| Great West Life – London Life | 012533 | Daniel A Speights | Speights & Runyan | 2001 University Street Montrea,l QC H3a2a6 | QC (Canada) |
|---|---|---|---|---|---|
| Great West Life | 012534 | Daniel A Speights | Speights & Runyan | 199 Bay Street, Commerce Court West Toronto, ON M5l1e2 | ON (Canada) |
| Canadian Imperial Bank Of Commerce | 012536 | Daniel A Speights | Speights & Runyan | 215 Water Street St John's, NL A1c6c9 | NL (Canada) |
| Edmonton Public Schools | 012537 | Daniel A Speights | Speights & Runyan | 14313 92 Street Edmonton, AB T5r3b3 | AB (Canada) |
| Edmonton Public Schools | 012541 | Daniel A Speights | Speights & Runyan | 5523 122 Avenue Edmonton, AB T5w1s3 | AB (Canada) |
| Edmonton Public Schools | 012542 | Daniel A Speights | Speights & Runyan | 6920 128 Avenue Edmonton, AB T5c1s7 | AB (Canada) |
| Edmonton Public Schools | 012546 | Daniel A Speights | Speights & Runyan | 10450 72 Avenue Edmonton, AB T6e0z6 | AB (Canada) |
| Edmonton Public Schools | 012548 | Daniel A Speights | Speights & Runyan | 10210 108 Avenue Edmonton, AB T5h1a8 | AB (Canada) |
| Edmonton Public Schools | 012549 | Daniel A Speights | Speights & Runyan | 13160 127 Street Edmonton, AB T5l1b2 | AB (Canada) |
| Edmonton Public Schools | 012554 | Daniel A Speights | Speights & Runyan | 13750 Woodcroft Avenue Edmonton, AB  T5t5x9 | AB (Canada) |
| Edmonton Public Schools | 012557 | Daniel A Speights | Speights & Runyan | 11430 68 Street Edmonton, AB T5b1p1 | AB (Canada) |
| Calgary Board Of Education | 012570 | Daniel A Speights | Speights & Runyan | 220 16th Avenue Calgary, AB  T2m0h4 | AB (Canada) |
| Edmonton Public Schools | 012576 | Daniel A Speights | Speights & Runyan | 15004 76 Street Edmonton, AB T6c1c2 | AB (Canada) |
| Calgary Board Of Education | 012590 | Daniel A Speights | Speights & Runyan | 728 32nd Street NW Calgary, AB  T2n2v9 | AB (Canada) |
| Calgary Board Of Education | 012591 | Daniel A Speights | Speights & Runyan | 512 18th Street NW Calgary, AB  T2n2g5 | AB (Canada) |
| Calgary Board Of Education | 014885 | Daniel A Speights | Speights & Runyan | 4506 16th Street SW Calgary, AB T2t4h9 | AB (Canada) |

**EXHIBIT B TO AMENDED ORDER SETTING VARIOUS DEADLINES REGARDING
OBJECTIONS TO ASBESTOS PROPERTY DAMAGE CLAIMS**

| I.  Schedule for Limitations Period Hearing | Dates |
|---|---|
| A.  Non-expert discovery may commence upon the entry of this Order. | |
| B.  Last day for depositions of witnesses. | |
| C.  Final witness lists due. | |
| D.  Pre-trial conference | |
| E.  Trial briefs and trial exhibits due. | |
| F.  Limitations period Hearing | |
| **II.  Schedule for Lack of Hazard Hearing** | **Dates** |
| A.  Non-expert discovery may commence upon the entry of this Order. | |
| B.  Designation of fact and expert witnesses and submission of expert reports addressing the lack of hazard issues by parties who did not previously submit expert reports on lack of hazard any any party who has obtained leave of court to file any such report. | |
| C.  Debtors' additional rebuttal expert reports on the lack of hazard issue and identification of rebuttal fact witness testimony with respect to any new matters raised by the additional experts and reports filed as outlined in II.B above. | |
| D.  Depositions of any expert witnesses who submits an expert report per II.B above. | |
| E.  Last day to file Motions for Summary Judgment on lack of hazard issue. | |
| F.  Conclusion of all discovery on lack of hazard issue. | |
| G.  Responses to Summary Judgment Motions due. | |
| H.  Final fact witness/expert witness list due, including identification of expert witnesses by issues on which experts shall opine, exhibit lists, and deposition designations | |
| I.  Preliminary pre-trial conference | |
| J.  Replies to Motions for Summary Judgment due. | |

| | |
|---|---|
| K.  Pre-trial motions, including motions in limine | |
| 1.    Opening papers due | |
| 2.    Response papers due | |
| 3.    Replies due | |
| 4.    Hearing on Pre-trial motions (if any) | |
| L.  Hearing on Motions for Summary Judgment | |
| M.  Trial briefs and trial exhibits due. | |
| N.  Final pre-trial conference. | |
| O.  Trial on lack of hazard issue. | |
| **III.  Schedule for Damages Hearing** | **Dates** |
| A.  Non-expert discovery may commence upon the entry of this Order. | |
| B.  Preliminary designation of fact witnesses and subject matter on which such witnesses are expected to testify or types of experts who are expected to testify and the nature of their expertise. | |
| C.  Supplemental identification of additional witnesses based on the disclosures outlined in III.B above | |
| D.  All parties to submit any expert reports on damages | |
| E.  Parties to submit rebuttal expert reports on damages | |
| F.  Depositions of expert and non-expert witnesses related to damages may begin. | |
| G.  Preliminary pre-trial conference on damages. | |
| H.  Conclusion of all discovery on damages | |
| I.  Final fact witness/expert witness lists due, including identification of expert witnesses by issues on which expert shall opine, exhibit lists, and deposition designations. | |
| J.  Pretrial motions, including motions in limine | |
| 1.    Opening papers due | |
| 2.    Response papers due | |

| | |
|---|---|
| 3.   Replies due | |
| 4.   Hearing on Pre-trial motions (if any) | |
| K.  Trial briefs and trial exhibits due. | |
| L.  Final pre-trial conference | |
| M.  Trial on Damages | |

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re:** | ) | Chapter 11 |
| | ) | |
| **W. R. GRACE & CO.,** *et al.*[1] | ) | Case No. 01-01139 (JKF) |
| | ) | Jointly Administered |
| **Debtors.** | ) | |
| | ) | |
| | ) | |
| | ) | |

## EXHIBIT 26 TO EXHIBIT BOOK
## ASBESTOS PI/PD INTER-CREDITOR AGREEMENT

**EXHIBIT 26**

Attached.

---

[1]   The Debtors consist of the following 62 entities:  W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co. Conn., A-1 Bit & Tool Co., Inc., Alewife  Boston Ltd., Alewife Land Corporation, Amicon, Inc.,  CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., GC Limited Partners I, Inc., (f/k/a Grace Cocoa Limited Partners I, Inc.), GC Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc. GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation., W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (F/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

## INTERCREDITOR AGREEMENT

THIS INTERCREDITOR AGREEMENT (this "Intercreditor Agreement") is made and entered into as of [__], 2009 by and among the WRG Asbestos PI Trust (the "Trust (PI)"), a Delaware statutory trust established pursuant to §524(g) of the Bankruptcy Code in accordance with the Plan of Reorganization (as hereinafter defined), the WRG Asbestos PD Trust (the "Trust (PD)" and, together with the Trust (PI), each a "Trust" and, collectively, the "Trusts"), a Delaware statutory trust established pursuant to §524(g) of the Bankruptcy Code in accordance with the Plan of Reorganization, on behalf of the Holders of Asbestos PD Claims and the Holders of US ZAI PD Claims, and the Trust (PI), in its capacity as representative of the Trusts upon the terms and conditions set forth in this Intercreditor Agreement (in such capacity, together with any successor appointed pursuant to Section 2(f) of this Intercreditor Agreement, the "Trusts' Representative"). Unless otherwise defined herein or the context otherwise requires, all capitalized terms used herein and defined in the Plan of Reorganization shall be used herein as therein defined.

NOW, THEREFORE, in consideration of the premises contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## 1.    **Definitions; Rules of Interpretation**.

(a) The following terms are defined as follows:

"Acceptable Representative" shall mean (a) either Trust or (b) a bank, trust company or other financial institution organized and doing business under the laws of the United States or any state thereof that has a combined capital and surplus of at least $100,000,000 (or a combined capital and surplus in excess of $20,000,000 and the obligations of which, whether now in existence or hereafter incurred, are fully and unconditionally guaranteed by a corporation organized under the laws of the United States or any state or territory thereof or the District of Columbia and having a combined capital and surplus of at least $100,000,000). If a bank, trust company or other financial institution corporation publishes reports of conditions at least annually, pursuant to law or to the requirements of a federal, state, territorial or District of Columbia supervising or examining authority, then for the purposes of this definition, the combined capital and surplus of such bank, trust company or other financial institution or such corporation shall be deemed to be its combined capital and surplus as set forth in its most recent report of conditions so published.

"Available Balance" means, with respect to any Collection Account as of any date of determination, an amount equal to the sum of (a) the total amount of deposits made by the Trusts' Representative to such Collection Account as of such date, minus (b) the total amount of distributions made by the Trusts' Representative from such Collection Account as of such date (but excluding any distributions to be made on such date), plus (c) the total Investment Earnings attributable to the funds on deposit in such Collection Account as of such date.

"Business Day" means any day other than a Saturday, Sunday, or any other day on which banks are authorized or required to close in New York, New York or Columbia, Maryland.

"Cause" means any of the following circumstances as a result of which the Trusts' Representative may be removed by a Trust pursuant to Section 2(f)(i):  (a) the gross negligence or willful misconduct of the Trusts' Representative in performing (or failing to perform) its duties under this Intercreditor Agreement, (b) the ordinary negligence by the Trusts' Representative in the receipt, handling and disbursement of funds actually received by the Trusts' Representative, (c) the Trusts' Representative shall become subject to a Proceeding, (d) the Trusts' Representative shall cease to be an Acceptable Representative or (e) the Trusts' Representative shall breach any material provision of this Intercreditor Agreement and shall have failed to cure such breach within thirty (30) days following written notice from either Trust of such breach.

"Collection Accounts" means the Contingent Obligations Account, the Liquidated Obligations Account and, if applicable, the Holding Account.

"Contingent Deferred Payment (ZAI)" has the meaning set forth in the Deferred Payment Agreement (ZAI) as in effect on the date hereof.

"Contingent Deferred Payment Date (ZAI)" means each "Contingent Deferred Payment Date", as defined in the Deferred Payment Agreement (ZAI) as in effect on the date hereof.

"Contingent Obligations" means, collectively, the Contingent Obligations (PD) and the Contingent Obligations (ZAI).

"Contingent Obligations (PD)" means (a) as of any date of determination during the period from the Initial Contingent Amount Date to the Rebalancing Date, the sum of (i) the Initial Contingent Amount (PD) minus (ii) the aggregate amount of all the Deferred Payments (PD) that have become Liquidated from the Initial Contingent Amount Date to such date of determination and (b) as of any date of determination after the Rebalancing Date, the Rebalanced Contingent Amount (PD).

"Contingent Obligations (ZAI)" means (a) as of any date of determination on or prior to the Rebalancing Trigger Date, the sum of (i) $80,000,000 minus (ii) the aggregate amount of all the Contingent Deferred Payments (ZAI) that have become Liquidated from the Effective Date to and including such date of determination and (b) after the Rebalancing Trigger Date, zero.

"Contingent Obligations Account" has the meaning set forth in Section 5(a)(ii).

"Contingent Obligations Distribution Amount" means, with respect to any Deferred Payment (PD) or Contingent Deferred Payment (ZAI) that has become Liquidated after the Initial Contingent Amount Date, an amount equal to the sum of (a) the lesser of (i) the Liquidated Amount of such Deferred Payment and (ii) the Available Balance of the Contingent Obligations Account as of the Contingent Obligations Distribution Date for such Deferred

2

Payment <u>minus</u> (b) the Trust (PD)'s Proportionate Share of the fees, expenses and indemnities payable to the Trusts' Representative under <u>Sections 8(a)</u> and <u>8(b)</u>.

"<u>Contingent Obligations Distribution Date</u>" means a Contingent Obligations Distribution Date (PD) or a Contingent Obligations Distribution Date (ZAI).

"<u>Contingent Obligations Distribution Date (PD)</u>" means, if the Trusts' Representative has received from the Trust (PD) a Liquidation Notice after the Initial Contingent Amount Date with respect to any Deferred Payment (PD), the fifth (5th) Business Day after the receipt by the Trusts' Representative of such Liquidation Notice.

"<u>Contingent Obligations Distribution Date (ZAI)</u>" means, if the Trusts' Representative has received from the Trust (PD) a Liquidation Notice after the Initial Contingent Amount Date with respect to any Contingent Deferred Payment (ZAI), the fifth (5th) Business Day after the receipt by the Trusts' Representative of such Liquidation Notice.

"<u>Contingent Obligations Percentage</u>" means, as of any date of determination, the percentage of the Total Obligations that are Contingent Obligations as of such date.

"<u>Controlling Party</u>" means, (a) as of any date of determination prior to the Initial Contingent Amount Date, the Trust party to the Deferred Payment Agreement with the highest amount of Deferred Payments outstanding (and, for purposes of this definition only, the Deferred Payment Agreement (PD) and the Deferred Payment Agreement (ZAI) shall be treated as a single Deferred Payment Agreement) and (b) as of any date from and after the Initial Contingent Amount Date, the Trust with the highest Proportionate Share as of such date; <u>provided</u>, <u>however</u>, that (i) the "Controlling Party" for purposes of delivering to the Trusts' Representative a Demand Direction Notice shall mean either Trust and (ii) during the Disposition Period (or, if the Disposition Period has been extended pursuant to <u>Section 4A</u>, during the Extended Disposition Period), the "Controlling Party" for purposes of delivering to the Trusts' Representative a Disposition Direction Notice shall mean the Trust (PI).

"<u>Courts</u>" has the meaning set forth in <u>Section 18(b)</u>.

"<u>Cumulative Liquidated Obligations</u>" means, collectively, the Cumulative Liquidated Obligations (PI) and the Cumulative Liquidated Obligations (PD/ZAI).

"<u>Cumulative Liquidated Obligations (PD)</u>" means, as of any date of determination, the sum of (a) the aggregate unpaid amount of Deferred Payments (PD) that are Liquidated as of the Issuance Date <u>plus</u> (b) the aggregate amount of Deferred Payments (PD) that become Liquidated after the Issuance Date to and including such date of determination. For purposes of determining the amount of Cumulative Liquidated Obligations (PD) under this Intercreditor Agreement, (i) any payment made by or on behalf of Grace in respect of the Deferred Payments (PD) on or after the Issuance Date, (ii) any reduction of the aggregate amount of Deferred Payments (PD) owing by Grace pursuant to <u>Section 4</u> of this Intercreditor Agreement and Section 2(b) of the Deferred Payment Agreement (PD) and (iii) any distribution received by the Trust (PD) in respect of its Liquidated Obligations Proportionate Share under this Intercreditor Agreement, in each case, shall be disregarded.

3

"Cumulative Liquidated Obligations (PD/ZAI)" means, collectively, the Cumulative Liquidated Obligations (PD) and the Cumulative Liquidated Obligations (ZAI).

"Cumulative Liquidated Obligations (PI)" means, as of any date of determination, the aggregate unpaid amount of Deferred Payments (PI) that are Liquidated as of the Issuance Date. For purposes of determining the amount of Cumulative Liquidated Obligations (PI) under this Intercreditor Agreement, (i) any payment made by or on behalf of Grace in respect of the Deferred Payments (PI) on or after the Issuance Date, (ii) any reduction of the aggregate amount of Deferred Payments (PI) owing by Grace pursuant to Section 4 of this Intercreditor Agreement and Section 2(b) of the Deferred Payment Agreement (PI) and (iii) any distribution received by the Trust (PI) in respect of its Liquidated Obligations Proportionate Share under this Intercreditor Agreement, in each case, shall be disregarded.

"Cumulative Liquidated Obligations (ZAI)" means, as of any date of determination, the sum of (a) the aggregate unpaid amount of Deferred Payments (ZAI) that are Liquidated as of the Issuance Date plus (b) the aggregate amount of Deferred Payments (ZAI) that become Liquidated after the Issuance Date to and including such date of determination. For purposes of determining the amount of Cumulative Liquidated Obligations (ZAI) under this Intercreditor Agreement, (i) any payment made by or on behalf of Grace in respect of the Deferred Payments (ZAI) on or after the Issuance Date, (ii) any reduction of the aggregate amount of Deferred Payments (ZAI) owing by Grace pursuant to Section 4 of this Intercreditor Agreement and Section 2(c) of the Deferred Payment Agreement (ZAI) and (iii) any distribution received by the Trust (PD) in respect of its Liquidated Obligations Proportionate Share under this Intercreditor Agreement, in each case, shall be disregarded.

"Deferred Payment Agreement (PD)" means the Deferred Payment Agreement (Class 7(a) PD), dated as of the date hereof, between Grace and the Trust (PD), on behalf of the Holders of the Asbestos PD Claims.

"Deferred Payment Agreement (PI)" means the Deferred Payment Agreement (PI), dated as of the date hereof, between Grace and the Trust (PI).

"Deferred Payment Agreement (ZAI)" means the Deferred Payment Agreement (Class 7(b) ZAI), dated as of the date hereof, between Grace and the Trust (PD), on behalf of the Holders of the US ZAI PD Claims.

"Deferred Payment Agreements" means, collectively, (a) the Deferred Payment Agreement (PI), (b) the Deferred Payment Agreement (PD) and (c) the Deferred Payment Agreement (ZAI).

"Deferred Payment Date (PD)" has the meaning set forth in the Deferred Payment Agreement (PD) as in effect on the date hereof.

"Deferred Payment Date (PI)" has the meaning set forth in the Deferred Payment Agreement (PI) as in effect on the date hereof.

"Deferred Payment Date (ZAI)" has the meaning set forth in the Deferred Payment Agreement (ZAI) as in effect on the date hereof.

4

"Deferred Payment Documents" means, collectively, the Deferred Payment Documents (PD), the Deferred Payment Documents (PI) and the Deferred Payment Documents (ZAI), as defined in the respective Deferred Payment Agreements.

"Deferred Payments (PD)" has the meaning set forth in the Deferred Payment Agreement (PD) as in effect on the date hereof.

"Deferred Payments (PI)" has the meaning set forth in the Deferred Payment Agreement (PI) as in effect on the date hereof.

"Deferred Payments (ZAI)" has the meaning set forth in the Deferred Payment Agreement (ZAI) as in effect on the date hereof.

"Deferred Payments" means each of (a) the Deferred Payments (PI), (b) the Deferred Payments (PD) and (c) the Deferred Payments (ZAI).

"Demand Direction Notice" means a Direction Notice (a) certifying that (i) an Event of Default has occurred under the Deferred Payment Agreement to which the Entity delivering such Direction Notice is a party and (ii) the Trusts' Representative is permitted by the Share Issuance Agreement to deliver to the Parent the Demand for Issuance of the Section 524(g) Shares and (b) directing the Trusts' Representative to deliver to the Parent the Demand for Issuance of the Section 524(g) Shares.

"Demand for Issuance of the Section 524(g) Shares" has the meaning set forth in the Share Issuance Agreement.

"Designated Signatories" means the Trusts' Representative Signatories and the Trust Signatories identified under Section 9(b).

"Direction Notice" means a Written Notice executed and delivered to the Trusts' Representative by the Controlling Party.

"Disposition Date" means any date on which the Trusts' Representative disposes of any of the Section 524(g) Shares.

"Disposition Direction Notice" means a Direction Notice directing the Trusts' Representative to dispose of any of the Section 524(g) Shares.

"Disposition Period" has the meaning set forth in Section 4A(a).

"Disposition Termination Notice" has the meaning set forth in Section 4A(c).

"Dollars" and "$" means the legal currency of the United States of America.

"Eligible Deposit Account" means either (a) a segregated account with an Eligible Institution or (b) a segregated trust account with the corporate trust department of a depository institution organized under the laws of the United States or any one of the states thereof or the District of Columbia (or any United States branch of a foreign bank), having corporate trust

5

powers and acting as trustee for funds deposited in such account, so long as any of the securities of such depository institution has a long-term unsecured debt rating or issuer credit rating, as the case may be, of at least A3 or its equivalent by Moody's or at least A- or its equivalent by S&P.

"Eligible Institution" means a depository institution organized under the laws of the United States of America or any state thereof or the District of Columbia (or any U.S. branch of a foreign bank) which has a combined capital and surplus in excess of $500,000,000.

"Eligible Investments" means Eligible Overnight Investments and Eligible Short-Term Investments.

"Eligible Overnight Investments" means investment funds containing only Eligible Short-Term Investments maturing on an overnight basis.

"Eligible Short-Term Investments" means investments in (a) obligations of the United States government or agencies thereof, or obligations guaranteed by the United States government, (b) open market commercial paper of any corporation incorporated under the laws of the United States or any state thereof rated at least P-1 or its equivalent by Moody's or at least A-1 or its equivalent by S&P, (c) certificates of deposit issued by commercial banks organized under the laws of the United States or of any political subdivision thereof (or any United States branch of a foreign bank) having a combined capital and surplus in excess of $500,000,000 which banks or their holding companies have a rating of A or its equivalent by Moody's or A or its equivalent by S&P; provided, however, that the aggregate amount at any one time invested in certificates of deposit issued by any one bank shall not be in excess of 5% of such bank's capital and surplus, (d) Dollar denominated offshore certificates of deposit issued by, or offshore time deposits with, any commercial bank described in (c) or any subsidiary thereof, and (e) repurchase agreements with any financial institution having combined capital and surplus of at least $500,000,000 with any of the obligations described in clauses (a) through (d) as collateral so long as such collateral is held by a third party custodian also qualifying as an Eligible Institution. If all of the above investments are unavailable, the entire amounts to be invested may be used to purchase Federal funds from an entity described in clause (c) above. All Eligible Investments must be held in an Eligible Deposit Account.

"Exclusivity Extension Notice" has the meaning set forth in Section 4A(b).

"Extended Disposition Period" has the meaning set forth in Section 4A(b).

"Fair Market Value" has the meaning set forth in the Deferred Payment Agreements as of the date hereof.

"Final Distribution Date" means (a) the Rebalancing Distribution Date if the Rebalancing Trigger Date occurs after the Initial Contingent Amount Date and (b) otherwise, the tenth (10th) Business Day following the last day of the Disposition Period (or, if the Disposition Period has been extended pursuant to Section 4A, the tenth (10th) Business Day following the last day of the Extended Disposition Period).

"Final PI Distribution Amount" means, an amount, if positive, equal to the sum of (a) the product of (i) the Trust (PI)'s Proportionate Share as of the Final Distribution Date

6

multiplied by (ii) the aggregate amount of Section 524(g) Share Proceeds received by the Trusts' Representative from all dispositions of Section 524(g) Shares on or prior to the Final Distribution Date minus (b) the aggregate amount of Section 524(g) Share Proceeds distributed to the Trust (PI) under Section 7(c)(i) on or prior to the Final Distribution Date.

"Fixed Deferred Payment (ZAI)" has the meaning set forth in the Deferred Payment Agreement (ZAI) as of the date hereof.

"Grace" means W. R. Grace & Co.-Conn, a Connecticut corporation, together with its successors and permitted assigns under the Deferred Payment Agreements.

"Holding Account" has the meaning set forth in Section 5(a)(iii).

"Initial Contingent Amount (PD)" has the meaning set forth in Section 3(a).

"Initial Contingent Amount Date" means the date on which the Initial Contingent Amount (PD) shall be established pursuant to Section 3(a) and the Resolution Procedures.

"Initial Reduction Amount" means, with respect to any Deferred Payment Agreement, an amount equal to the product of (a) a fraction, (x) the numerator of which is the aggregate amount of Cumulative Liquidated Obligations and Contingent Obligations with respect to such Deferred Payment Agreement as of the Initial Contingent Amount Date and (y) the denominator of which is the Total Obligation as of the Initial Contingent Amount Date multiplied by (b) the Fair Market Value of the Section 524(g) Shares as of the Issuance Date.

"Investment Earnings" means, with respect to either Collection Account, the sum of (a) investment earnings on funds on deposit in such Collection Account minus (b) investments losses on such fund minus (c) the Trusts' Representative's reasonable expenses in making such investments.

"Issuance Date" means the date on which the Section 524(g) Shares are issued to the Trusts' Representative pursuant to Section 2 of the Share Issuance Agreement.

"Liquidated" means (a) with respect to any Deferred Payment (PI), that the amount of such Deferred Payment (PI) has become fixed under the Deferred Payment Agreement (PI), (b) with respect to any Deferred Payment (PD), that the amount of such Deferred Payment (PD) has become fixed under the Deferred Payment Agreement (PD), and (c) with respect to any Deferred Payment (ZAI), that the amount of such Deferred Payment (ZAI) has become fixed under the Deferred Payment Agreement (ZAI); provided however, that any reduction of the aggregate outstanding amount of Deferred Payments owing by Grace pursuant to (i) Section 4 of this Intercreditor Agreement and (ii)(A) Section 2(b) of the Deferred Payment Agreement (PD), (B) Section 2(b) of the Deferred Payment Agreement (PI), or (C) Section 2(c) of the Deferred Payment Agreement (ZAI), in each case, shall be disregarded for purposes of determining whether any Deferred Payment has become Liquidated.  For the avoidance of doubt, each Deferred Payment (PI) and the Fixed Deferred Payment (ZAI) are Liquidated as of the date of this Intercreditor Agreement.

7

"Liquidated Amount" means, with respect to any Deferred Payment (PD) or Contingent Deferred Payment (ZAI), the amount of such Deferred Payment upon it becoming Liquidated.

"Liquidated Obligations Account" has the meaning set forth in Section 5(a)(i).

"Liquidated Obligations Distribution Date" means the fifth (5th) Business Day after the later to occur of (a) the Initial Contingent Amount Date and (b) each date that any Section 524(g) Share Proceeds are deposited in the Liquidated Obligations Account pursuant to Section 7(a).

"Liquidated Obligations Distribution Amount" means, with respect to either Trust on any Liquidated Obligations Distribution Date, an amount equal to the sum of (a) the product of (i) such Trust's Liquidated Obligations Proportionate Share multiplied by (ii) the Available Balance of the Liquidated Obligations Account as of such Liquidated Obligations Distribution Date minus (b) such Trust's Proportionate Share of the fees, expenses and indemnities payable to the Trusts' Representative under Sections 8(a) and 8(b).

"Liquidated Obligations Percentage" means, as of any date of determination, the percentage of the Total Obligations that are Cumulative Liquidated Obligations as of such date.

"Liquidated Obligations Proportionate Share" means, with respect to either Trust as of any date of determination, the percentage of the Cumulative Liquidated Obligations that are held by such Trust as of such date.

"Liquidation Notice" means, with respect to any Deferred Payment (PD) or Contingent Deferred Payment (ZAI) that becomes Liquidated after the Initial Contingent Amount Date, a Written Notice given by the Trust (PD) setting forth the Deferred Payment Date for and Liquidated Amount of such Deferred Payment.

"Moody's" means Moody's Investors Service, Inc.

"Parent" means W. R. Grace & Co., a Delaware corporation, together with any successor and permitted assigns under the Share Issuance Agreement.

"Plan of Reorganization" means that certain First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code of W. R. Grace & Co., et al., the Official Committee of Asbestos Personal Injury Claimants, the Future Claimants' Representative, and the Official Committee of Equity Security Holders Dated as of [__], 2009, as filed by Grace and certain of its affiliates in their reorganization cases under chapter 11 of the Bankruptcy Code, in the United States Bankruptcy Court for the District of Delaware, and as confirmed by order of that court dated as of [__], 2009, together with the exhibits and schedules thereto, each as amended, supplemented or otherwise modified from time to time in accordance with its terms.

"Proceeding" means, with respect to any Entity, any voluntary or involuntary insolvency, bankruptcy, receivership, custodianship, liquidation, reorganization, assignment for the benefit of creditors, appointment of a custodian, receiver, trustee or other officer with similar

8

powers or any other proceeding for the liquidation, or other winding up of such Entity or all or substantially all of the properties of such Entity.

"Proportionate Share" means, with respect to either Trust as of any date of determination, the percentage of the Total Obligations that are held by such Trust as of such date.

"Rebalanced Contingent Amount (PD)" has the meaning set forth in Section 3(b).

"Rebalancing Date" means the date, if any, on which the Rebalanced Contingent Amount (PD) shall be established pursuant to Section 3(b) and the Resolution Procedures.

"Rebalancing Distribution Date" means the tenth (10th) Business Day after the receipt by the Trusts' Representative of a Written Notice from the Trusts of the occurrence of the Rebalancing Date (if at all).

"Rebalancing Trigger Date" means the earlier to occur of (a) the twenty-fifth (25th) anniversary of the Effective Date and (b) the tenth (10th) Contingent Deferred Payment Date (ZAI).

"Resolution Procedures" means the procedures set forth on Appendix A to this Intercreditor Agreement by which the Trusts shall stipulate the estimated amount of Deferred Payments (PD) to become Liquidated from and after the Initial Contingent Amount Date or Rebalancing Date, as the case may be.

"Responsible Party" means (i) with respect to either Trust (including either Trust acting as the Trusts' Representative), any duly appointed trustee of or attorney in fact for such Trust, and (ii) with respect any other Entity, any authorized officer of such Entity.

"S&P" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc.

"Section 524(g) Share Proceeds" means any proceeds received or receivable by the Trusts' Representative, on behalf of the Trusts, from any disposition of Section 524(g) Shares.

"Section 524(g) Shares" has the meaning set forth in the Share Issuance Agreement.

"Total Obligations" means, collectively, the Contingent Obligations and the Cumulative Liquidated Obligations.

"Trust (PD)" has the meaning set forth in the introductory paragraph hereof.

"Trust (PI)" has the meaning set forth in the introductory paragraph hereof.

"Trust Incumbency Certificate" has the meaning set forth in Section 9(b).

"Trust Signatories" has the meaning set forth in Section 9(b).

9

"Trusts" has the meaning set forth in the introductory paragraph hereof.

"Trusts' Representative" has the meaning set forth in the introductory paragraph hereof.

"Trusts' Representative Incumbency Certificate" has the meaning set forth in Section 9(a).

"Trusts' Representative Signatories" has the meaning set forth in Section 9(a).

"Written Notice" means, from the Trusts' Representative or either Trust, a written instrument executed by the Designated Signatory of such Entity.

(b) Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  All references herein to Sections shall be deemed references to Sections of this Intercreditor Agreement unless the context shall otherwise require.

(c) Unless otherwise indicated, (i) the term "including" means "including without limitation," except when used in the computation of time periods, and (ii) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein).

(d) For purposes of the computation of time periods, whenever this Intercreditor Agreement provides for an event to occur "within" a specified number of days of a preceding event, it shall mean that the latter event shall occur before the close of business on the last of the specified days, and the day on which the preceding event occurs shall not be included in the computation of days elapsed.  The word "from" means "from and including", "after" means "after and excluding", and "to" and "until" mean "to and including".

(e) All terms defined in this Intercreditor Agreement in the singular form shall have comparable meanings when used in the plural form and vice versa.

## 2.    The Trusts' Representative.

(a) Each of the Trusts hereby irrevocably appoints the Trusts' Representative as its agent and representative and authorizes the Trusts' Representative, acting pursuant to a Direction Notice, to take such actions on its behalf and to exercise such powers as are delegated to such Trusts' Representative by the terms of this Intercreditor Agreement and the Share Issuance Agreement, together with such actions and powers as are reasonably incidental thereto.  The Trusts' Representative hereby accepts such appointment and agrees to take such actions and perform such duties as are required of it hereunder.  Without limiting the generality of the foregoing, the Trusts' Representative is hereby expressly authorized, pursuant to any Direction Notice, to do any of the following: (i) to execute any and all documents with respect to the Section 524(g) Shares, the Share Issuance Agreement, and the rights of the Trusts with respect thereto, as contemplated by and in accordance with the provisions of the Share Issuance Agreement (including any Demand for Issuance of the Section 524(g) Shares under the Share

10

Issuance Agreement), (ii) to dispose of any Section 524(g) Shares and (iii) to exercise any voting rights with respect to the Section 524(g) Shares (including any voting rights arising in the case of any Proceeding); provided, however, that the Trusts' Representative shall deliver to the Parent a Demand for Issuance of the Section 524(g) Shares under the Share Issuance Agreement if it has received a Demand Direction Notice duly executed by either Trust.

(b) The Entity serving as the Trusts' Representative, if a Trust, shall have the same rights and powers in its capacity as a Trust as any other Trust and may exercise the same as though it were not a Trusts' Representative. The Trusts' Representative shall not have any duties or obligations except those expressly set forth in this Intercreditor Agreement and the Share Issuance Agreement.

(c) Without limiting the generality of the foregoing, (i) the Trusts' Representative shall not be subject to any fiduciary or other implied duties, regardless of whether or not a default or breach of the Deferred Payment Documents has occurred and is continuing, except that the Trusts' Representative shall exercise reasonable care in the handling of funds under this Intercreditor Agreement, (ii) the Trusts' Representative shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby that the Trusts' Representative is instructed or directed to exercise pursuant to a Direction Notice, and (iii) except as expressly set forth in this Intercreditor Agreement and the Share Issuance Agreement, the Trusts' Representative shall not have any duty to disclose, nor shall it be liable for the failure to disclose, any information relating to the Parent, Grace and/or any Affiliate thereof that is communicated to or obtained by the Entity serving as Trusts' Representative or any of its Affiliates in any capacity. The Trusts' Representative shall not be liable for any action taken or not taken by it pursuant to any Direction Notice, or in the absence of its own gross negligence or willful misconduct (or ordinary negligence in the receipt, handling and disbursement of funds actually received by the Trusts' Representative). The Trusts' Representative shall not be deemed to have knowledge of any default or breach of any Deferred Payment Document, unless and until written notice thereof is given to the Trusts' Representative by the Parent, Grace or a Trust, and the Trusts' Representative shall not be responsible for or have any duty to ascertain or inquire into (A) any statement, warranty or representation made in or in connection with any Deferred Payment Document, (B) the contents of any certificate, report or other document delivered thereunder or in connection therewith, (C) the performance or observance of any of the covenants, agreements or other terms or conditions set forth in any Deferred Payment Document, (D) the validity, enforceability, effectiveness or genuineness of any Deferred Payment Document or any other agreement, instrument or document or (E) the existence or possible existence of any Event of Default.

(d) The Trusts' Representative shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing believed by it to be genuine and to have been signed or sent by the proper Entity. The Trusts' Representative may also rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Entity, and shall not incur any liability for relying thereon. The Trusts' Representative may consult with legal counsel (which may be counsel for the Trust (PI) and/or its Affiliates), independent accountants and other

11

experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

(e) Each Trust represents to the Trusts' Representative and to each other Trust that it has, independently and without reliance on the Trusts' Representative or any other Trust, and based on such documents and information as it has deemed appropriate, made its own appraisal of the financial condition and affairs of the Parent and Grace and its own decision to enter into this Intercreditor Agreement and the other Deferred Payment Documents to which it is party and agrees that it will, independently and without reliance upon the Trusts' Representative or any other Trust, and based on such documents and information as it shall deem appropriate at the time, continue to make its own appraisals and decisions in taking or not taking action under this Intercreditor Agreement and the other Deferred Payment Documents to which it is party. The Trusts' Representative shall not be required to keep informed as to the performance or observance by the Parent or Grace of the obligations under any Deferred Payment Document or any other document referred to or provided for herein or therein or to make inquiry of or inspect the properties or books of the Parent, Grace or any of their Subsidiaries or Affiliates. Except for notices, reports and other documents and information expressly required to be furnished to the Trusts by the Trusts' Representative hereunder, the Trusts' Representative shall not have any duty or responsibility to provide either Trust with any credit or other information concerning the Parent, Grace or any of their Subsidiaries or Affiliates or the Section 524(g) Shares that may come into the possession of the Trusts' Representative.

(f) Subject to the appointment and acceptance of a successor Trusts' Representative as provided below, the Trusts' Representative may resign at any time by notifying the Trusts, the Parent and Grace, or may be removed (i) for Cause, by either Trust and (ii) with or without Cause, by the Controlling Party. Upon any such resignation, or removal by a Trust or the Controlling Party, as the case may be, a successor Trusts' Representative that is an Acceptable Representative may be appointed by the Trusts, acting unanimously. If no successor shall have been so appointed and shall have accepted such appointment within 30 days after the retiring Trusts' Representative gives notice of its resignation or the Trusts' Representative receives such notice of such removal, then either Trust may petition any court of competent jurisdiction for the appointment of a successor Trusts' Representative. Upon the acceptance of its appointment as Trusts' Representative hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring (or removed) Trusts' Representative, and the retiring (or removed) Trusts' Representative shall have no further duties or obligations to act as the Trusts' Representative from and after the acceptance by such successor of its appointment as Trusts' Representative hereunder. Notwithstanding the foregoing, any appointment of a successor Trusts' Representative on or before the Issuance Date shall be subject to Section 12 of the Share Issuance Agreement.

**3.    Determination of Initial Contingent Amount (PD) and Rebalanced Contingent Amount (PD)**.

(a) Upon the occurrence of the Issuance Date, the Trusts shall establish, pursuant to the Resolution Procedures, the estimated amount of Deferred Payments (PD) that will become Liquidated from and after the Initial Contingent Amount Date (such amount, the "Initial Contingent Amount (PD)").

12

(b) If, but only if, the Rebalancing Trigger Date occurs after the Initial Contingent Amount Date, then upon the occurrence of the Rebalancing Trigger Date, the Trusts shall establish, pursuant to the Resolution Procedures, the estimated amount of Deferred Payments (PD) that will become Liquidated from and after the Rebalancing Date (such amount, the "Rebalanced Contingent Amount (PD)").

4.     **Reduction of Deferred Payments Owing By Grace**.  Each Trust agrees that, for purposes of Section 2(b) of the Deferred Payment Agreement (PD), Section 2(b) of the Deferred Payment Agreement (PI), and Section 2(c) of the Deferred Payment Agreement (ZAI), in each case:

(a) on the Initial Contingent Amount Date, the outstanding amount of the Deferred Payments that are Liquidated under such Deferred Payment Agreement shall be automatically reduced, in the order directed by Grace, by an amount not to exceed the Initial Reduction Amount applicable to such Deferred Payment Agreement; and

(b) to the extent the Initial Reduction Amount applicable to such Deferred Payment Agreement exceeds the outstanding amount of Deferred Payments that are Liquidated under such Deferred Payment Agreement as of the Initial Contingent Amount Date, such excess shall be applied to automatically reduce the amount of Deferred Payments owing by Grace under such Deferred Payment Agreement as and when such Deferred Payments become Liquidated until such excess shall be depleted.

4A.     **Disposition Period**.

(a) During the period beginning on the Issuance Date and ending on the date, no earlier than the one-year anniversary of the Issuance Date, that either Trust gives a Disposition Termination Notice pursuant to Section 4A(c)(i) (such period, the "Disposition Period"), the Trust (PI) shall have the exclusive right to deliver to the Trusts' Representative a Disposition Direction Notice with respect to all or any portion of the Section 524(g) Shares.

(b) Subject to the terms and conditions of this subsection (b) and subsection (c), the Trust (PI) may elect to extend the period during which the Trust (PI) shall have the exclusive right to deliver to the Trusts' Representative a Disposition Direction Notice with respect to all or any portion of the Section 524(g) Shares for a period of up to 24 months following the Issuance Date (such extended period, the "Extended Disposition Period").  In order to make such election, the Trust (PI) must deliver to the Trusts' Representative and the Trust (PD) a written notice of such election (an "Exclusivity Extension Notice") prior to the one-year anniversary of the Issuance Date.  Upon the delivery by the Trust (PI) of an Exclusivity Extension Notice, the Trust (PI) and the Trust (PD) shall negotiate in good faith an agreement setting forth the terms and conditions upon which the Trust (PI) would lend to the Trust (PD) during the Extended Disposition Period an amount equal to the Contingent Obligations (PD) estimated to become Liquidated during the Extended Disposition Period, but in no event shall such amount exceed the Trust (PD)'s Proportionate Share of the Section 524(g) Share Proceeds anticipated to be realized from the disposition of the Section 524(g) Shares during the Extended Disposition Period.

13

(c) If the Trust (PI) and Trust (PD) fail to enter into a definitive agreement before the one-year anniversary of the Issuance Date setting forth the terms and conditions (including the amount) of a loan from the Trust (PI) to the Trust (PD) pursuant to subsection (b), then (i) either Trust may give the Trusts' Representative a written notice of such failure (such notice, a "Disposition Termination Notice"), thereby terminating the Disposition Period and (ii) the Trusts' Representative shall, as soon as practicable after the end of the Disposition Period, distribute to each Trust a portion of the Section 524(g) Shares then held by the Trusts' Representative equal to such Trust's Proportionate Share of such Section 524(g) Shares.

(d) If less than all of the Section 524(g) Shares have been disposed of by the Trusts' Representative before the end of the Disposition Period (or, if the Disposition Period has been extended pursuant to this Section 4A, before the end of the Extended Disposition Period), the Trusts' Representative shall, as soon as practicable after the end of the Disposition Period or the Extended Disposition Period, as the case may be, distribute to each Trust a portion of the Section 524(g) Shares then held by the Trusts' Representative equal to such Trust's Proportionate Share of such Section 524(g) Shares.

(e) Nothing contained in this Section 4A shall constitute a commitment by the Trust (PI) to lend any amount to the Trust (PD).

## 5.   Establishment of Collection Accounts; Investment of Funds.

(a) The Collection Accounts.  As soon as practicable after the Issuance Date (but in any event prior to the receipt by the Trusts' Representative of any Section 524(g) Share Proceeds), the Trusts' Representative shall establish and maintain in its name the following accounts, each of which shall be an Eligible Deposit Account bearing a designation clearly indicating that the funds deposited therein are held in trust for the benefit of the Trusts: (i) an account designated the "W.R. Grace Liquidated Obligations Account" (such account, the "Liquidated Obligations Account"), (ii) an account designated the "W.R. Grace Contingent Obligations Account" (such account, the "Contingent Obligations Account") and (iii) if the Trusts' Representative shall have received a Disposition Direction Notice prior to the Initial Contingent Amount Date, an account designated the "W.R. Grace Holding Account" (such account, the "Holding Account").

(b) Investment of Funds.

(i)     Funds on deposit in the Contingent Obligations Account shall be invested and reinvested by the Trusts' Representative in Eligible Investments selected by the Controlling Party if such investments are reasonably available and, in the case of Eligible Short-Term Investments that are not Eligible Overnight Investments, have maturities no later than the earlier of (A) 90 days following the date of such investment and (B) the Business Day immediately preceding the Deferred Payment Date (PD) or Deferred Payment Date (ZAI) next following the date of such investment.

(ii)     Funds on deposit in the Liquidated Obligations Account shall be invested and reinvested by the Trusts' Representative in Eligible Overnight Investments selected by the Controlling Party if such investments are reasonably available.

14

(iii)    Funds on deposit in the Holding Account shall be invested and reinvested by the Trusts' Representative in Eligible Investments selected by the Controlling Party if such investments are reasonably available and, in the case of Eligible Short-Term Investments that are not Eligible Overnight Investments, have maturities no later than 90 days following the date of such investment.

(iv)    Unless otherwise expressly provided in this Agreement, any Investment Earnings shall be deposited in the applicable Collection Account when received by the Trusts' Representative and shall be applied by the Trusts' Representative in the same manner as the other amounts on deposit in such Collection Account are to be applied.    The Trusts' Representative's fees and expenses in making such investments and any losses incurred in such investments shall be charged against the principal amount invested.    Neither the Trusts' Representative nor the Controlling Party shall be liable for any loss resulting from any investment, reinvestment or liquidation required to be made under this Agreement other than by reason of its willful misconduct or gross negligence.    Eligible Investments and any other investment required to be made hereunder shall be held to their maturities except that any such investment may be sold (without regard to its maturity) by the Trusts' Representative without instructions whenever such sale is necessary to make a distribution required under this Agreement.    Uninvested funds held in the Collection Accounts shall not earn or accrue interest.

6.    **Certain Notices**.

(a) If the Trusts' Representative receives from Grace or the Parent any written request for consent to Grace's selection of a reputable investment bank or valuation firm, as contemplated by clause (iii) of the definition of "Fair Market Value" in the Deferred Payments Agreements, the Trusts' Representative shall deliver copies thereof to the Trusts as promptly as practicable (and in any event no later than five (5) Business Days after receipt thereof).

(b) If the Trusts' Representative receives from the Parent any written notice, written request for a consent, waiver, amendment or other action under the Share Issuance Agreement, or other written information from the Parent under the Share Issuance Agreement, the Trusts' Representative shall deliver copies thereof to the Trusts as promptly as practicable (and in any event no later than five (5) Business Days after receipt thereof).

(c) If the Trusts' Representative receives from the Controlling Party any Demand Direction Notice or Disposition Direction Notice, the Trusts' Representative shall deliver copies thereof to the Trusts (other than the Trust that delivered such Direction Notice to the Trusts' Representative) as promptly as practicable (and in any event no later than five (5) Business Days after receipt thereof).

(d) The Trusts' Representative shall, as promptly as practicable (and in any event no later five (5) Business Day after the Issuance Date) deliver to the Trusts a Written Notice of the occurrence of the Issuance Date.

(e) If the Trusts receive from the Trusts' Representative (i) a copy of a Disposition Direction Notice delivered by the Trusts' Representative under Section 6(c) or (ii) any other Written Notice from the Trusts' Representative requesting a current statement of Cumulative

15

Liquidated Obligations and Contingent Obligations, each Trust shall deliver to the Trusts' Representative as promptly as practicable (but, in each case, no later than five (5) Business Days after receipt thereof) a Written Notice setting forth the Cumulative Liquidated Obligations and Contingent Obligations held by such Trust as of the Disposition Date shown in such Disposition Direction Notice or the date requested by the Trusts' Representative, as the case may be. If either Trust fails to deliver to the Trusts' Representative the Written Notice required by this Section 6(e), the Trusts' Representative shall be entitled to presume that the amount of Cumulative Liquidated Obligations and Contingent Obligations owing to such Trust have remain unchanged since the last Written Notice delivered to the Trusts' Representative by such Trust under this Section 6(e).

(f) After the occurrence of the Issuance Date, the Trust (PD) shall deliver to the Trusts' Representative a Liquidation Notice as soon as practicable after each Deferred Payment (PD) and each Contingent Deferred Payment (ZAI) becomes Liquidated (but in any event no later than five (5) Business Days after the Deferred Payment Date for such Deferred Payment).

(g) The Trusts, acting jointly pursuant to the Resolution Procedures, shall (i) as soon as practicable but no later than five (5) Business Days after the Initial Contingent Amount Date) deliver to the Trusts' Representative a Written Notice of the occurrence of the Initial Contingent Amount Date and the Initial Contingent Amount (PD) and (ii) as soon as practicable but no later than five (5) Business Days after the Rebalancing Date) deliver to the Trusts' Representative a Written Notice of the occurrence of the Rebalancing Date) and the Rebalanced Contingent Amount (PD).

(h) If either Trust obtains knowledge of an Event of Default (as defined in the Deferred Payment Agreements), such Trust shall deliver to the other Trust and the Trusts' Representative as promptly as practicable (and in any event no later than ten (10) Business Days after obtaining knowledge of such Event of Default) a Written Notice describing the nature of such Event of Default.

## 7.  **Deposits to and Distributions From Collection Accounts**.

(a) Deposit of Section 524(g) Share Proceeds.  Subject to Section 7(b), upon any disposition of Section 524(g) Shares by the Trusts' Representative, the Trusts' Representative shall deposit, or shall cause to be deposited, the Section 524(g) Share Proceeds from such disposition in the Collection Accounts as follows:

(i)  a portion of such Section 524(g) Share Proceeds equal to the product of (A) the Liquidated Obligations Percentage as of the applicable Disposition Date multiplied by (B) the amount of such Section 524(g) Share Proceeds, shall be deposited in the Liquidated Obligations Account; and

(ii)  a portion of such Section 524(g) Share Proceeds equal to the product of (A) the Contingent Obligations Percentage as of the applicable Disposition Date multiplied by (B) the amount of such Section 524(g) Share Proceeds, shall be deposited in the Contingent Obligations Account.

16

(b) <u>Temporary Deposit in Holding Account</u>.  Notwithstanding anything to the contrary in <u>Section 7(a)</u>, if the Trusts' Representative disposes of any Section 524(g) Shares prior to the Initial Contingent Amount Date (PD), the Trusts' Representative shall deposit, or shall cause to be deposited, the Section 524(g) Share Proceeds from such disposition into the Holding Account. If the Trusts' Representative shall have deposited, or caused to be deposited, any Section 524(g) Share Proceeds in the Holding Account pursuant to this <u>subsection (b)</u>, then on the Initial Contingent Amount Date (or as soon as practicable thereafter), the Trusts' Representative shall withdraw the entire Available Balance of the Holding Account and deposit such amount in the Collection Accounts as follows:

(i)     a portion of such Available Balance equal to the product of (A) the Liquidated Obligations Percentage as of the Initial Contingent Amount Date <u>multiplied by</u> (B) the amount of such Available Balance, shall be deposited in the Liquidated Obligations Account; and

(ii)     a portion of such Available Balance equal to the product of (A) the Contingent Obligations Percentage as of the Initial Contingent Amount Date <u>multiplied by</u> (B) the amount of such Available Balance, shall be deposited in the Contingent Obligations Account.

(c) <u>Distributions from the Collection Accounts</u>.  Subject to <u>subsection (d)</u>:

(i)     On each Liquidated Obligations Distribution Date, the Trusts' Representative shall distribute to each Trust a portion of the Available Balance of the Liquidated Obligations Account equal to such Trust's Liquidated Obligations Distribution Amount as of such Liquidated Obligations Distribution Date.  For the avoidance of doubt, no distribution shall be made by the Trusts' Representative under this <u>clause (i)</u> to either Trust if such Trust's Liquidated Obligations Distribution Amount as of the applicable Liquidated Obligations Distribution Date is equal to or less than zero.

(ii)     On each Contingent Obligations Distribution Date, the Trusts' Representative shall distribute to the Trust (PD) a portion of the Available Balance of the Contingent Obligations Account equal to the Contingent Obligation Distribution Amount applicable to such Contingent Obligations Distribution Date.  For the avoidance of doubt, no distribution shall be made by the Trusts' Representative under this <u>clause (ii)</u> if the Contingent Obligation Distribution Amount as of the applicable Contingent Obligations Distribution Date is equal to or less than zero.

(iii)     On the Final Distribution Date, the Trusts' Representative shall distribute the entire Available Balance of the Contingent Obligations Account in the following order of priority:

<u>first</u>, the Trusts' Representative shall retain, for its own account, an amount equal to the outstanding fees, expenses and indemnities payable to the Trusts' Representative under <u>Sections 8(a)</u> and <u>8(b)</u>;

<u>second</u>, the Trusts' Representative shall distribute to the Trust (PI) an amount equal to the Final PI Distribution Amount (but in no event greater than the Available Balance of the Contingent Obligations Account (after giving effect to <u>clause first</u>)); and

17

third, the Trusts' Representative shall distribute to the Trust (PD) the remaining Available Balance of the Contingent Obligations Account (after giving effect to clauses first and second).

(d) Distribution of Available Balances Upon Termination of Either Trust. Notwithstanding anything to the contrary in subsection (c), if either Trust shall have terminated prior to the Final Distribution Date, the entire Available Balances of the Collection Accounts, less an amount equal to the outstanding fees, expenses and indemnities payable to the Trusts' Representative under Sections 8(a) and 8(b), shall be distributed to the surviving Trust as soon as practicable after the Trusts' Representative receives written notice of such termination.

(e) Manner of Distributions. Any amounts distributed hereunder by the Trusts' Representative to either Trust shall be paid to such Trust by wire transfer of funds to the address such Trust shall provide to the Trusts' Representative in a Written Notice.

(f) Distributions Limited to Available Balances. All distributions to be made by the Trusts' Representative hereunder shall be made only from Section 524(g) Share Proceeds deposited in the Collection Accounts and only to the extent that the applicable Collection Account shall have a sufficient Available Balance to enable the Trusts' Representative to make such distributions in accordance with the terms hereof. Each Trust has agreed (i) to look solely to such amounts to the extent available for distribution to it as provided in this Intercreditor Agreement, and (ii) that none of the Trusts or the Trusts' Representative is personally liable to any of them for any amounts payable or any liability under this Intercreditor Agreement.

## 8.  Indemnification of the Trusts' Representative by the Trusts; Expenses of Trusts' Representative.

(a) Each Trust hereby severally agrees to indemnify, defend and hold harmless the Trusts' Representative and its past and present officers, directors, shareholders, employees, agents, attorneys, advisors and Affiliates, together with their respective heirs, beneficiaries, executors, administrators, trustees, predecessors, successors and assigns (collectively, the "Indemnitees"), on a pro rata basis according to such Trust's Proportionate Share, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, demands, costs, expenses or disbursements of any kind or nature whatsoever which may at any time be imposed on, incurred by or asserted against the Indemnitees arising on account of or in connection with any matter or thing or action or failure to act by the Indemnitees, or any of them, in any way relating to or arising out of this Intercreditor Agreement, any Deferred Payment Document or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or the enforcement of any of the terms hereof or thereof or of any such other documents within thirty (30) days after demand therefor; provided, however, that no Trust shall be liable for any of the foregoing to the extent they arise from the gross negligence or willful misconduct of any Indemnitee (or ordinary negligence in the receipt, handling and disbursement of funds actually received by such Indemnitee). The Trusts' Representative shall be fully justified in refusing to take or to continue to take any action under this Intercreditor Agreement or any Deferred Payment Document unless it shall first be indemnified to its satisfaction by the Trusts against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any action under this Intercreditor

18

Agreement or any Deferred Payment Document.  Upon receiving knowledge of any suit, claim or demand asserted by a third party that the Trusts' Representative believes is covered by this indemnity, the Trusts' Representative shall give the Trusts notice of the matter and an opportunity to defend it, at the Trusts' sole cost and expense, with legal counsel approved by the Trusts' Representative (such approval not to be unreasonably withheld, conditioned or delayed). The Trusts' Representative may also require the Trusts to defend the matter.  Any failure or delay of the Trusts' Representative to notify the Trusts of any such suit, claim or demand shall not relieve the Trusts of their obligations under this Section 8(a) but shall reduce such obligations to the extent of any increase in those obligations caused solely by an unreasonable failure to provide, or delay in providing, such notice.  Each Trust hereby irrevocably authorizes the Trusts' Representative to deduct from amounts distributable to such Trust from the Collection Accounts under Section 7(c), and to retain, for the Trusts' Representative own account, such Trust's Proportionate Share of the amounts payable to the Trusts' Representative under this Section 8(a).  The provisions of this Section 8(a) shall survive the payment in full of all the Deferred Payments and shall continue to apply to either Trust which ceases to be a party hereunder in respect of matters occurring (or alleged to have occurred) during the period in which such entity was a party hereunder.

(b) The Trusts' Representative shall not be obliged to expend its own funds in performing its obligations under this Intercreditor Agreement or the Share Issuance Agreement. Provided that the Trusts' Representative is not in breach of its obligations under Section 8(a), each Trust hereby severally agrees to pay any such unpaid expenses (including reasonable legal fees and expenses) of the Trusts' Representative, on a pro rata basis according to such Trust's Proportionate Share, within five (5) Business Days after receipt of a written demand for payment thereof from the Trusts' Representative.  Each Trust hereby irrevocably authorizes the Trusts' Representative to deduct from amounts distributable to such Trust from the Collection Accounts under Section 7(c), and to retain, for the Trusts' Representative own account, such Trust's Proportionate Share of the amounts payable to the Trusts' Representative under this Section 8(b). The provisions of this Section 8(b) shall survive the payment in full of all the Deferred Payments and shall continue to apply to either Trust which ceases to be a party hereunder in respect of matters occurring (or alleged to have occurred) during the period in which such entity was a party hereunder.

## 9.    Designated Signatories.

(a) Trusts' Representative Signatories.  With the delivery of this Intercreditor Agreement, the Trusts' Representative shall furnish to each Trust, and from time to time thereafter may furnish to each Trust, at the Trusts' Representative discretion, or upon either Trust's request (which request shall not be made more than one time in any 12-month period) shall furnish to each Trust, a certificate (a "Trusts' Representative Incumbency Certificate") of a Responsible Party of the Trusts' Representative certifying as to the incumbency and specimen signatures of the officers of the Trusts' Representative and the attorney in fact and agents of the Trusts' Representative (the "Trusts' Representative Signatories") authorized to give Written Notices on behalf of the Trusts' Representative hereunder.  Until each Trust receives a subsequent Trusts' Representative Incumbency Certificate, it shall be entitled to rely on the last Trusts' Representative Incumbency Certificate delivered to it hereunder.

19

(b) <u>Trust Signatories</u>.  With the delivery of this Intercreditor Agreement, each Trust shall furnish to the Trusts' Representative, and from time to time thereafter may furnish to the Trusts' Representative, at such Trust's discretion, or upon the Trusts' Representative's request (which request shall not be made more than one time in any 12-month period) shall furnish to the Trusts' Representative, a certificate (a "<u>Trust Incumbency Certificate</u>") of a Responsible Party of such Trust certifying as to the incumbency and specimen signatures of the officers of such Trust and the attorney in fact and agents of such (with respect to each such Trust, the "<u>Trust Signatories</u>" and, together with the Trusts' Representatives Signatories, the "<u>Designated Signatories</u>") authorized to give Written Notices on behalf of such Trust hereunder.  Until the Trusts' Representative receives a subsequent Trust Incumbency Certificate, it shall be entitled to rely on the last Trust Incumbency Certificate delivered to it hereunder.

10.   **Determination of Obligations Held by Trusts**.  Solely for purposes of this Intercreditor Agreement, (a) the Trust (PI) shall be deemed to be the holder of any Cumulative Liquidated Obligations (PI) and (b) the Trust (PD) shall be deemed to be the holder of any Cumulative Liquidated Obligations (PD/ZAI) and Contingent Obligations, in each case, notwithstanding (i) any assignment by the Trust (PI), the Trust (PD) or the Trust (ZAI), as the case may be, of its respective rights under the applicable Deferred Payment Agreement or (ii) any granting of a security interest by the Trust (PI), the Trust (PD) or the Trust (ZAI), as the case may be, in its respective rights under the applicable Deferred Payment Agreement.

11.   **Free Exercise of Rights**.

(a) Subject to any obligations under this Agreement if acting as the Trusts' Representative, (i) each Trust may exercise its rights and remedies under this Agreement, the Share Issuance Agreement and each other Deferred Payment Document for its sole benefit and (ii) no Trust shall have any obligation or duty to exercise any such rights or duties for the benefit of any other Trust.

(b) Without limitation of the foregoing, nothing contained herein shall limit or restrict the independent right of either Trust to initiate an action or actions in any Proceeding and to appear or be heard on any matter before the bankruptcy or other applicable court in any such Proceeding.  This Agreement shall survive the commencement of any such Proceeding.

12.   **No Contest, Etc**.  Neither the Trusts' Representative nor either Trust shall contest the validity or enforceability of or seek to avoid, have declared fraudulent or have set aside any of the obligations of the Parent or Grace under the Deferred Payment Documents.

13.   **Severability**.  Whenever possible, each provision of this Intercreditor Agreement will be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Intercreditor Agreement by any party hereto is held to be invalid, void, voidable, illegal or unenforceable in any respect under any applicable Law in any jurisdiction, such event will not affect any other provision or the effectiveness or validity of any provision in any other jurisdiction, or the obligations of any other party to this Intercreditor Agreement, and this Intercreditor Agreement will be reformed, construed and enforced in such jurisdiction as if such invalid, void, voidable, illegal, unenforceable or rejected provision had never been contained herein.  The parties hereto further agree to use commercially reasonable efforts to

20

replace such invalid, void, voidable, illegal, unenforceable or rejected provision of this Intercreditor Agreement with a an effective, valid and enforceable provision which will achieve, to the fullest extent possible, the economic, business and other purposes of the invalid, void, voidable, illegal, unenforceable or rejected provision.

**14.**    **Complete Agreement**.    This Intercreditor Agreement, together with the Share Issuance Agreement, the Plan of Reorganization and the Confirmation Order, embodies the complete agreement and understanding between the parties hereto in respect of the subject matter hereof and supersedes, preempts and terminates all other prior understandings, agreements or representations by or among the parties hereto, written or oral, to the extent relating thereto.

**15.**    **Counterparts**.    This Intercreditor Agreement may be executed (including by facsimile or portable document format (pdf)) in separate counterparts, each of which will be deemed to be an original and all of which taken together will constitute one and the same agreement.

**16.**    **No Third Party Beneficiaries**.    There are no third party beneficiaries of this Intercreditor Agreement and nothing in this Intercreditor Agreement, express or implied, is intended to confer on any Entity other than the parties hereto and their respective successors, and assigns, any rights, remedies, obligations or liabilities.

**17.**    **Successors and Assigns**.    This Intercreditor Agreement shall be binding upon each Trust and its successors and permitted assigns and shall inure to the benefit of each Trust and its successors and permitted assigns.

**18.**    **Governing Law; Submission to Jurisdiction; Injunction Default, etc**.

(a)  This Intercreditor Agreement and the rights and obligations of the parties hereto shall be construed in accordance with the laws of the State of New York, without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York.

(b) Except as set forth in Section 3 of this Intercreditor Agreement and the Resolution Procedures, with respect to claims, suits, actions, proceedings, and other disputes arising out of, in respect of or relating to this Intercreditor Agreement (such claims, suits, actions, proceedings, and other disputes, the "Claims") each of the parties to this Intercreditor Agreement hereby irrevocably submits to the jurisdiction of the Bankruptcy Court for the District of Delaware or the United States District Court for the District of Delaware (the "Courts"), or, if both such Courts are not permitted under applicable Law to exercise jurisdiction with respect to the matter in question then to the jurisdiction of any other federal or state court in the state, county and city of New York, New York and each of the parties to this Intercreditor Agreement agrees that any and all Claims may be brought, heard and determined in such courts.

(c) Except as set forth in Section 3 of this Intercreditor Agreement and the Resolution Procedures, each of the parties to this Intercreditor Agreement agrees that (i) venue shall be proper in the courts referenced in Section 18(b) and hereby waives any objection or defense which it may now or hereafter have to the laying of venue in such courts, including any of the

21

foregoing based upon 28 U.S.C. §1404(a) or the doctrine of *forum non conveniens*; and (ii) all process which may be or be required to be served in respect of any such Claim (including any pleading, summons or other paper initiating any such Claim) may be served upon it, which service shall be sufficient for all purposes, in the manner then for the provision of notice under this Intercreditor Agreement and shall be deemed in every respect effective service of process upon such party when so given.

(d) EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS INTERCREDITOR AGREEMENT OR ANY OF THE DEFERRED PAYMENT DOCUMENTS.  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS INTERCREDITOR AGREEMENT AND THE OTHER DEFERRED PAYMENT DOCUMENTS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS PROVISION.

19.   **Notices**.   All notices required or permitted under this Intercreditor Agreement must be in writing and will be deemed to be delivered and received (i) if personally delivered or if delivered by the United States Postal Service, facsimile or courier service, when actually received by the party to whom notice is sent or (ii) with respect to parties located other than within the United States, if deposited with the United States Postal Service (whether actually received or not), at the close of business on the seventh Business Day after the day when placed in the mail, postage prepaid, certified or registered with return receipt requested, addressed to the appropriate party or parties, at the address of such party or parties set forth below (or at such other address as such party may designate by written notice to all other parties in accordance with this Section 19):

| **If to the Trust (PI):** | *With copies, which shall not constitute notice, to:* | [Notice Street Address for Trust (PI)'s Counsel] |
|---|---|---|
| WRG Asbestos PI Trust [Notice Street Address] [City], [State] [Zip] Attn: [ ] Facsimile: [ ] *(if sending overnight packages use zip code [ ])* | | [City], [State] [Zip] Attn: [ ] Facsimile: [ ] |
| | | [Notice Street Address for PI FCR)] [City], [State] [Zip] Attn: [ ] Facsimile: [ ] |
| | | [Notice Street Address for PI TAC Chairman)] [City], [State] [Zip] |

22

Attn: [ ]
Facsimile: [ ]

**If to the Trust (PD):**

WRG Asbestos PD Trust
[Notice Street Address]
[City], [State] [Zip]
Attn: [ ]
Facsimile: [ ]
*(if sending overnight
packages use zip code [ ])*

*With copies,
which shall
not constitute
notice, to:*

[Notice Street Address for Trust
(PD)'s Counsel)]
[City], [State] [Zip]
Attn: [ ]
Facsimile: [ ]

[Notice Street Address for
Edward J. Westbrook]
[City], [State] [Zip]
Attn: [ ]
Facsimile: [ ]

[Notice Street Address for
Darrell W. Scott]
[City], [State] [Zip]
Attn: [ ]
Facsimile: [ ]

Hon. Alexander M. Sanders, Jr.
19 Water Street
Charleston, SC  29401
Facsimile:  (843) 953-7570

**If to the Trusts'
Representative:**

WRG Asbestos PI Trust
[Notice Street Address]
[City], [State] [Zip]
Attn: [ ]
Facsimile: [ ]
*(if sending overnight
packages use zip code [ ])*

*With copies,
which shall
not constitute
notice, to:*

[Notice Street Address]
[City], [State] [Zip]
Attn: [ ]
Facsimile: [ ]

    **20.**　　**Amendments and Waivers**.  No provision of this Intercreditor Agreement may be waived, amended, supplemented or modified except by a written instrument executed by the Trusts' Representative and each Trust.

    **21.**　　**Termination**.  This Intercreditor Agreement (excepting such provisions that by their terms expressly survive the termination of this Intercreditor Agreement) shall terminate upon both (a) the earlier to occur of (i) the Final Distribution Date or (ii) the termination of either Trust and (b) the distribution of all Available Balances from the Collection Accounts pursuant to the terms of this Intercreditor Agreement, unless otherwise terminated prior to such date by the

23

written agreement of each Trust; provided, however, that if no Section 524(g) Shares have been disposed of by the Trusts' Representative before the end of the Disposition Period (or, if the Disposition Period has been extended pursuant to Section 4A, before the end of the Extended Disposition Period), this Intercreditor Agreement (excepting such provisions that by their terms expressly survive the termination of this Intercreditor Agreement) shall terminate upon the distribution by the Trusts' Representative to the Trusts of the Section 524(g) Shares pursuant to Section 4A.

24

IN WITNESS WHEREOF, the parties hereto have executed this Intercreditor Agreement as of the date first written above.

TRUST (PI):                     WRG ASBESTOS PI TRUST

By: _____

        Name:
        Title:  Trustee

TRUST (PD):                          WRG ASBESTOS PD TRUST,
                                     on behalf of the Holders of Asbestos PD Claims
                                     and the Holders of the US ZAI PD Claims


                                     By: _____
                                         Name:
                                         Title:  Trustee

APPENDIX A

RESOLUTION PROCEDURES

Upon the occurrence of the Issuance Date or the Rebalancing Trigger Date, (each, a "<u>Trigger Date</u>"), if the Trusts are unable to agree as to the Initial Contingent Amount (PD) or the Rebalanced Contingent Amount (PD) (each, a "<u>Contingent Amount (PD)</u>"), as the case may be, then the Trusts shall proceed as follows:

1.    **Mediation**.

(a)    No later than ten (10) Business Days following the Trigger Date, the Trusts shall meet and confer to select jointly a mediator to preside at a non-binding mediation (the "<u>Mediation</u>") between the Trusts to establish the Contingent Amount (PD). The Mediation shall take place in New York, NY, or at such other location as the Trusts may jointly agree. If the Trusts are unable to agree on a mediator to preside at the Mediation, the Trusts shall proceed with binding arbitration to establish the Contingent Amount (PD), as described further in <u>Paragraph 2</u>.

(b)    The Mediation shall be concluded, and the mediator shall issue his/her recommendation as to the Contingent Amount (PD) (the "<u>Mediation Recommendation</u>"), as promptly as practicable after the Trigger Date, and in any event no later than forty-five (45) days after the mediator is selected (the "<u>Mediation Recommendation Deadline</u>"). If the mediator shall not issue his/her Mediation Recommendation by the Mediation Recommendation Deadline, or if the mediator shall advise the Trusts that he/she will be unable to issue the Mediation Recommendation by the Mediation Recommendation Deadline, either Trust may terminate the Mediation and shall proceed with binding arbitration to establish the Contingent Amount (PD), as described further in <u>Paragraph 2</u>.

(c)    Promptly, and in any event within ten (10) days after receipt of the Mediation Recommendation (the "<u>Mediation Acceptance Deadline</u>"), each Trust shall notify the other Trust in writing whether it accepts the Mediation Recommendation. If a Trust does not deliver written notice to the other Trust on or before the Mediation Acceptance Deadline that it accepts the Mediation Recommendation, that Trust will be deemed to have rejected the Mediation Recommendation. If one or both Trusts rejects (or is deemed to have rejected) the Mediation Recommendation, the Trusts shall terminate the Mediation and shall proceed with binding arbitration to establish the Contingent Amount (PD), as described further in <u>Paragraph 2</u>.

(d)    All costs and expenses of the mediator and the Mediation (other than each Trust's costs and expenses for its own legal counsel, accountants, experts and other consultants and advisors) shall be borne equally by the Trusts.

2.    **Arbitration**. If (x) the Trusts are unable to agree on a mediator to preside at the Mediation pursuant to <u>Paragraph 1(a)</u>, (y) either Trust terminates the Mediation pursuant to <u>Paragraph 1(b)</u>, or (z) either Trust rejects (or is deemed to have rejected) the Mediation Recommendation pursuant to <u>Paragraph 1(c)</u>, then each Trust agrees to submit to binding arbitration ("<u>Arbitration</u>") to establish the Contingent Amount (PD) pursuant to this <u>Paragraph 2</u>.

(a)     Any Arbitration will (i) proceed in a location in New York, NY, under the auspices of the American Arbitration Association ("AAA"); (ii) be governed by the Federal Arbitration Act (Title 9 of the United States Code), notwithstanding any conflicting choice of law provision in any document to which a Trust is a party; (iii) proceed before three arbitrators, and (iv) be conducted by the AAA, or such other administrator as the Trusts shall mutually agree upon, in accordance with the AAA's optional procedures for large, complex commercial disputes (the optional procedures for large, complex commercial disputes to be referred to herein, as applicable, as the "Arbitration Rules").  If there is any inconsistency between the terms of this Paragraph 2 and the Arbitration Rules, the terms and procedures set forth herein shall control.  If either Trust fails or refuses to submit to Arbitration as required by these Resolution Procedures, such Trust shall bear all costs and expenses incurred by the other Trust in compelling Arbitration.

(b)     Any Arbitration shall be decided by majority vote of a panel of three arbitrators; provided however, that all three arbitrators must actively participate in all hearings and deliberations.  Each arbitrator will be a neutral licensed attorney or a neutral retired state or federal judge.  The arbitrators shall resolve all disputes in accordance with the substantive law of the State of New York and may grant any remedy or relief that a court of such State could order or grant within the scope hereof and such ancillary relief as is necessary to make effective any determination.

(c)     In any Arbitration, discovery will be permitted in accordance with the Arbitration Rules.  All discovery shall be expressly limited to matters directly relevant to the determination of the Contingent Amount (PD) and must be completed no later than 20 days before the hearing date.  Any requests for an extension of the discovery periods, or any discovery disputes, will be subject to final determination by the arbitrators upon a showing that the request for discovery is essential for the party's presentation and that no alternative means for obtaining information is available.

(d)     Neither Trust shall be entitled to join or consolidate disputes by or against others in any Arbitration.

(e)     All costs and expenses of the Arbitration (other than (i) each Trust's costs and expenses for its own legal counsel, accountants, experts and other consultants and advisors and (ii) as expressly set forth in the last sentence of subparagraph (a)) shall be borne equally by the Trusts.

(f)     To the maximum extent practicable, the AAA, the arbitrators and the parties shall take all action required to conclude any Arbitration within 180 days of the filing of the dispute with the AAA.  No arbitrator or other party to an arbitration proceeding may disclose the existence, content or results thereof, except for disclosures required by applicable law or regulation and the confirmation by the Trusts to the Trusts' Representative as contemplated by Paragraph 3.

3.     **Confirmation of Contingent Amount (PD)**.  Promptly after (x) the acceptance by both Trusts of the Mediation Recommendation as to the Contingent Amount (PD) pursuant to Paragraph 1, (y) the entry by the arbitrators in an Arbitration of a determination with respect to

the Contingent Amount (PD) pursuant to Paragraph 2, or (z) the agreement of the Trusts to the Contingent Amount (PD) as of the relevant date, the Trusts shall jointly execute and deliver to the Trusts' Representative a Confirmation of Contingent Amount (PD) in substantially the form of Exhibit 1 to this Appendix A, appropriately completed to reflect the Contingent Amount (PD) as determined pursuant to these Resolution Procedures.

## EXHIBIT 1 TO APPENDIX A

### CONFIRMATION OF CONTINGENT AMOUNT (PD)

Reference is made to that certain Intercreditor Agreement, dated as of [_____], 2009 (as amended, supplemented or otherwise modified from time to time, the "Intercreditor Agreement"), by and among the WRG Asbestos PI Trust (the "Trust (PI)"), a Delaware statutory trust established pursuant to §524(g) of the Bankruptcy Code in accordance with the Plan of Reorganization (as hereinafter defined), the WRG Asbestos PD Trust (the "Trust (PD)" and, together with the Trust (PI), each a "Trust" and, collectively, the "Trusts"), a Delaware statutory trust established pursuant to §524(g) of the Bankruptcy Code in accordance with the Plan of Reorganization, on behalf of the Holders of Asbestos PD Claims and the Holders of US ZAI PD Claims, and the Trust (PI), in its capacity as representative of the Trusts upon the terms and conditions set forth in this Intercreditor Agreement (in such capacity, together with any successor appointed pursuant to Section 2(f) of the Intercreditor Agreement, the "Trusts' Representative"). Unless otherwise defined herein or the context otherwise requires, all capitalized terms used herein and defined in the Intercreditor Agreement (including by reference therein to another document) or in the Resolution Procedures (as defined in the Intercreditor Agreement) shall be used herein as therein defined.    This confirmation is being delivered to the Trusts' Representative by the Trusts pursuant to Section 6(g) of the Intercreditor Agreement and Section 3 of the Resolution Procedures.

1.    The [Issuance Date] [Rebalancing Trigger Date] occurred on [_____], 20[\_\_] [as a result of the occurrence of the following [SPECIFY REBALANCING TRIGGER DATE][1]].    Accordingly, the Trusts followed the Resolution Procedures for determining [the Initial Contingent Amount (PD)] [the Rebalanced Contingent Amount (PD)].

[2.    The Trusts have accepted the Mediation Recommendation that [the Initial Contingent Amount (PD)] [the Rebalanced Contingent Amount (PD)] is $[_____]. Attached hereto is a copy of the Mediation Recommendation.][2]

[2.    The arbitrators have determined pursuant to the Arbitration that the [the Initial Contingent Amount (PD)] [the Rebalanced Contingent Amount (PD)] is $[_____]. Attached hereto is a copy of the arbitrators determination].[3]

[2.    The Trusts have agreed that, as of the [Initial Contingent Amount Date] [Rebalancing Date], the Contingent Amount (PD) is $[_____].][4]

---

[1] Include this bracketed language only if this Confirmation is being delivered following a Rebalancing Trigger Date (PD).

[2] Use this alternative for Paragraph 2 if the Initial Contingent Amount (PD) or the Rebalance Contingent Amount (PD) is settled by Mediation.

[3] Use this alternative for Paragraph 2 if the Initial Contingent Amount (PD) or the Rebalance Contingent Amount (PD) is settled by Arbitration.

[4] Use this alternative for Paragraph 2 if the Trusts agree.

3.      [The Initial Contingent Amount Date] [The Rebalancing Date] is [_____],
20[__].


WRG ASBESTOS PI TRUST                    WRG ASBESTOS PD TRUST,
                                         on behalf of the Holders of Asbestos PD
                                         Claims and the Holders of the US ZAI PD
                                         Claims



                                         By: _____
                                            Name:
By: _____        Title:  Trustee
   Name:
   Title:  Trustee

Date:_____       Date:_____

[THIS PAGE INTENTIONALLY LEFT BLANK]

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re:** | ) | Chapter 11 |
| | ) | |
| **W. R. GRACE & CO.,** *et al.*[1] | ) | Case No. 01-01139 (JKF) |
| | ) | Jointly Administered |
| **Debtors.** | ) | |
| | ) | |
| | ) | |
| | ) | |

## EXHIBIT 27 TO EXHIBIT BOOK
## DEFERRED PAYMENT AGREEMENT (CLASS 7A PD)

**EXHIBIT 27**

Attached.

---

[1]    The Debtors consist of the following 62 entities:  W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co. Conn., A-1 Bit & Tool Co., Inc., Alewife  Boston Ltd., Alewife Land Corporation, Amicon, Inc.,  CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., GC Limited Partners I, Inc., (f/k/a Grace Cocoa Limited Partners I, Inc.), GC Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc. GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation., W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (F/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

**FORM OF DEFERRED PAYMENT AGREEMENT**
**(CLASS 7A PD)**

THIS DEFERRED PAYMENT AGREEMENT (CLASS 7A PD) (this "<u>Deferred Payment Agreement (PD)</u>") is made and entered into as of [___], 2009 by and between W. R. Grace & Co.-Conn., a Connecticut corporation (together with any successor thereto pursuant to the terms and conditions of <u>Section 16</u>, "<u>Grace</u>"), and the WRG Asbestos PD Trust, on behalf of the Holders of Asbestos PD Claims (in such capacity, the "<u>Trust (PD)</u>"), a Delaware statutory trust established pursuant to §524(g) of the Bankruptcy Code in accordance with the Plan of Reorganization (as hereinafter defined).  Unless otherwise defined herein or the context otherwise requires, all capitalized terms used herein and defined in the Plan of Reorganization shall be used herein as therein defined.

NOW, THEREFORE, in consideration of the premises contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. **Definitions; Rules of Interpretation**.

(a) The following terms are defined as follows:[1]

"<u>Administrative Agent</u>" has the meaning set forth in <u>Section 16(d)(iii)</u>.

"<u>Authorized Officer</u>" means, with respect to any Entity, the chief executive officer, president, chief financial officer, controller, executive vice president or senior vice president of such Entity.

"<u>Bona Fide Compensation Transaction</u>" means any payment, grant or award, whether in cash, securities, options or other consideration, including without limitation salary or bonus, to or for the benefit of any director, officer or employee of any Transferor or any of its Affiliates made for legitimate, bona fide compensation and/or incentivization purposes; provided, that compensation paid, granted or awarded to any one such individual in any Fiscal Year of Transferor whose aggregate value at the time or times of payment, grant or award is in excess of $15,000,000 shall be a Bona Fide Compensation Transaction only (i) if the relevant Transferor is then obligated to file or furnish, or is otherwise filing or furnishing, reports with the United States Securities and Exchange Commission pursuant to Section 13 or 15 of the Securities Exchange Act of 1934, it is approved by an independent committee of the Board of Directors of the Transferor (or other similar management body of the Transferor) or (ii) if the relevant Transferor is not then obligated to file or furnish, or is not otherwise filing or furnishing, reports with the United States Securities and Exchange Commission pursuant to Section 13 or 15 of the Securities Exchange Act of 1934, a reputable independent compensation expert or consultant selected by the Transferor with the consent of the "Permitted Holder" (as defined in the Deferred Payment Agreement (PI)) (which consent shall not be unreasonably withheld,

---

[1]    To the extent that any of these definitions are contained in the Plan of Reorganization, they will be deleted here.

conditioned or delayed) shall have determined, in its reasonable, good faith judgment, that such payment, grant or award is reasonable and appropriate. For purposes of the proviso in the previous sentence, (A) no payment or other value received in a given year pursuant to the terms of a grant or award in a previous year shall be taken into account for calculating the compensation in such given year; and (B) in the event of multiple payments, grants or awards in a given Fiscal Year, the independent committee approval, or independent compensation expert or consultant determination, as appropriate, shall be made with respect to each payment, grant or award beginning with the payment, grant or award that causes the compensation to be in excess of $15,000,000.

"Business Day" means any day other than a Saturday, Sunday, or any other day on which banks are authorized or required to close in New York, New York or Columbia, Maryland.

"Capital Stock" means, with respect to any Entity, any share of stock, or any depositary receipt or other certificate representing any share of stock, or any similar equity ownership interest, and any warrant, option, or any other security providing for the right to acquire any such share of stock or similar equity ownership interest.

"Claims" has the meaning set forth in Section 17(b).

"Collateral Agent" has the meaning set forth in Section 16(d)(iii).

"Common Stock" has the meaning set forth in the Share Issuance Agreement.

"Compliance Certificate" means a certificate in the form of Exhibit C.

"Control" means, as to any Entity, the power to direct the management and policies of such Entity directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "Controlling" and "Controlled" have meanings correlative to the foregoing.

"Controlled Affiliate" means, as to any Entity (the "Controlling Entity"), any Affiliate that is Controlled by such Controlling Entity.

"Courts" has the meaning set forth in Section 17(b).

"Default Rate" means a floating rate equal to the Prime Rate plus 2.00% per annum.

"Deferred Payments" means, collectively, the Deferred Payments (PI), the Deferred Payments (PD) and the Deferred Payments (ZAI).

"Deferred Payment Agreement (PD)" has the meaning set forth in the introductory paragraph hereof.

"Deferred Payment Agreement (PI)" means the Deferred Payment Agreement (PI) dated as of even date herewith between Grace and the Trust (PI).

2

"Deferred Payment Agreement (ZAI)" means the Deferred Payment Agreement (Class 7(b) ZAI) dated as of even date herewith between Grace and the Trust (ZAI) (as defined in the Deferred Payment Agreement (ZAI)).

"Deferred Payment Date (PD)" means, in respect of a Deferred Payment (PD), each corresponding date set forth in Section 2(a).

"Deferred Payment Documents" means this Deferred Payment Documents (PD), the Deferred Payment Documents (PI) (as defined in the Deferred Payment Agreement (PI)) and the Deferred Payment Documents (ZAI) (as defined in the Deferred Payment Agreement (ZAI)).

"Deferred Payment Documents (PD)" means this Deferred Payment Agreement (PD), the Parent Guarantee (PD) and the Share Issuance Agreement.

"Deferred Payment (PD)" means each payment to be made on a Deferred Payment Date (PD) as set forth in Section 2(a).

"Deferred Payment (PI)" has the meaning set forth in the Deferred Payment Agreement (PI).

"Deferred Payment (ZAI)" has the meaning set forth in the Deferred Payment Agreement (PD).

"Demand for Issuance of the Section 524(g) Shares" has the meaning set forth in the Share Issuance Agreement.

"Designated Senior Indebtedness" means Senior Indebtedness issued, pursuant to a facility with an aggregate principal amount, commitments and/or other financial accommodations then outstanding and/or available (disregarding for purposes of this definition whether any conditions for draws thereunder have been satisfied), as of the relevant date of determination, of at least $25,000,000.

"Disposition Transaction" has the meaning set forth in Section 6(b).

"Disqualified Equity Interest" means that portion of any Equity Interest which, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable), or upon the happening of any event, matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or is redeemable at the sole option of the holder thereof on or prior to the final Deferred Payment Date (PD).

"Dollars" and "$" means the legal currency of the United States of America.

"EBITDA" means, for any Entity for any period, such Entity's and its Subsidiaries' consolidated net income (determined in accordance with GAAP) for such period plus, without duplication, in respect of any such item of such Entity and/or any of its Subsidiaries (i) to the extent deducted in determining such consolidated net income, the sum, without duplication, of (a) interest expense, (b) provisions for any income or similar taxes paid or accrued, (c) all amounts treated as expenses for depreciation and amortization of any kind, (d)

3

cash and non-cash restructuring and reorganization, and other similar fees, costs, charges and expenses, including without limitation, as a result of, or in connection with, the Chapter 11 Cases and the Deferred Payment Documents, (e) items classified as extraordinary under Accounting Principles Board Opinion No. 30 (as amended, restated, supplemented, replaced or otherwise modified from time to time) incurred during such period, and (f) any non-cash charges minus (ii) to the extent included in determining such consolidated net income, the sum, without duplication, of (a) gross interest income received during such period and (b) items classified as extraordinary under Accounting Principles Board Opinion No. 30 (as amended, restated, supplemented, replaced or otherwise modified from time to time) realized during such period, all, in the cases of clauses (i) and (ii) above, as determined on a consolidated basis in accordance with GAAP.

"Equity Interest" means shares of capital stock or equity, equity securities or ownership interests in any Entity or any rights (including any (x) options, warrants or other rights to purchase or acquire any such stock, equity or interests (whether or not at the time exercisable), or (y) securities by their terms convertible into or exchangeable for any such stock, equity or interests (whether or not at the time so convertible or exchangeable) or options, warrants or rights to purchase such convertible or exchangeable securities.

"Event of Default" has the meaning set forth in Section 8.

"Fair Market Value" means, with respect to each share of the Common Stock:

(i)     If traded on the NYSE, NASDAQ or another stock exchange, the last reported sale price of the Common Stock on the NYSE, NASDAQ or such other exchange on the trading day immediately prior to the date on which the Section 524(g) Shares are issued;

(ii)     If traded over-the-counter other than on NASDAQ, the average of the closing bid and ask prices of the Common Stock on the trading day immediately prior to the date on which the Section 524(g) Shares are issued; and

(iii)     If there is no public market for the Common Stock, the fair market value of the Common Stock as of the day immediately prior to the date on which the Section 524(g) Shares are issued, as determined by a reputable investment bank or valuation firm selected jointly by Grace and the Trusts' Representative (the "Independent Appraiser"). Grace and the Trusts' Representative shall instruct the Independent Appraiser to render its decision within thirty days of its acceptance of its selection. The fees and expenses of the Independent Appraiser shall be borne by Grace. Unless otherwise agreed to by Grace and the Trusts' Representative, no investment bank or valuation firm, nor any of its Affiliates or Subsidiaries, shall perform a valuation pursuant to this clause (iii) if such bank or firm has rendered services to Grace, the Parent Guarantor or any of their Affiliates or Subsidiaries within the last three years prior to performing such valuation or has or is reasonably likely to have an agreement with Grace, the Parent Guarantor or any of its Affiliates to render such services within the following year.

"Fiscal Quarter" means, in respect of any Entity, a fiscal quarter of such Entity as determined by it.

"Fiscal Year" means, in respect of any Entity, a fiscal year of such Entity as determined by it.

4

"GAAP" means generally accepted accounting principles in effect from time to time in the United States, applied on a consistent basis; provided, however, that as of such time, if any, when any Entity begins to provide financial information generally on the basis of IFRS, then any reference to GAAP with respect to such Entity shall be given effect as a reference to IFRS.

"Governing Documents" means, as to any Entity, its articles or certificate of incorporation and by-laws, its partnership agreement, its certificate of formation and operating agreement and/or the organizational or governing documents of such Entity.

"Governmental Authority" means the government of the United States of America or any other country, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of, or pertaining to, government (including any supra-national bodies such as the European Union or the European Central Bank).

"Grace" has the meaning set forth in the introductory paragraph hereof.

"IFRS" means the International Financial Reporting Standards as adopted by the International Accounting Standards Board and in effect from time to time, consistently applied.

"Insolvent" means the financial condition of the Parent Guarantor, its Subsidiaries and Grace taken as a whole such that as of the date specified, the sum of their liabilities is greater than a fair valuation of all of their property and other assets.

"Intercreditor Agreement" means the Intercreditor Agreement, dated as of the date hereof, among the Trusts' Representative, the Trust (PI) and the Trust (PD).

"Laws" means, collectively, all applicable international, foreign, Federal, state and local statutes, treaties, rules, regulations, ordinances and codes, including the binding interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof.

"NASDAQ" shall mean The NASDAQ Stock Market (including any of its subdivisions such as the NASDAQ Global Select Market) or any successor market thereto.

"NYSE" shall mean The New York Stock Exchange or any successor stock exchange thereto.

"NY UCC" means the Uniform Commercial Code, as enacted and in effect in the State of New York from time to time.

"Ordinary Dividends" means, in respect of any Entity, ordinary cash dividends declared and paid out of surplus and/or net profits (as determined in accordance with applicable law) in accordance with the dividend policy of such Entity as in effect from time to time; provided, however, that notwithstanding the foregoing, the excess, if any, of (a) the aggregate amount of dividends declared and paid by such Entity in any Fiscal Year over (b) 50% of such

5

Entity's and its Subsidiaries' consolidated net income (determined in accordance with GAAP) for the immediately preceding Fiscal Year shall not constitute "Ordinary Dividends" to the extent of such excess.

"Parent Guarantee (PD)" means the W. R. Grace & Co. Guarantee Agreement (Class 7(a) PD) dated as of even date herewith by the Parent Guarantor in favor of the Trust (PD).

"Parent Guarantor" means W. R. Grace & Co., a Delaware corporation, and any successor guarantor of the obligations of Grace (or a successor Entity) arising under this Deferred Payment Agreement (PD) pursuant to the terms and conditions of the Parent Guarantee (PD).

"Payment Blockage Notice" has the meaning set forth in Section 7(a)(ii).

"Payment Blockage Period" has the meaning set forth in Section 7(a)(ii).

"Permitted Holder" means, as of any date of determination, collectively, (a)(i) if the Trust (PD) has not, as of such date, assigned any of its rights or privileges under this Deferred Payment Agreement (PD) (other than granting a security interest in its rights and privileges under this Deferred Payment Agreement (PD)), the Trust (PD) and (ii) otherwise, the Administrative Agent and (b) the Collateral Agent.

"Permitted Payee" means, as of any date of determination, the Permitted Holder or any permitted assignee of all or any portion of the Deferred Payments (PD) and the rights and interests therein and thereto pursuant to the terms and conditions of Section 16.

"Permitted Payor" means any Entity (other than Grace but including the Parent Guarantor) acting on behalf of, or designated by Grace.

"Plan of Reorganization" means that certain First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code of W. R. Grace & Co., et al., the Official Committee of Asbestos Personal Injury Claimants, the Future Claimants' Representative, and the Official Committee of Equity Security Holders Dated as of February 27, 2009, as filed by Grace and certain of its affiliates in their reorganization cases under chapter 11 of the Bankruptcy Code, in the United States Bankruptcy Court for the District of Delaware, and as confirmed by order of that court dated as of [__], 2009, together with the exhibits and schedules thereto, each as amended, supplemented or otherwise modified from time to time in accordance with its terms.

"Post-Transaction Certificate" means a certificate in the form of Exhibit D.

"Post-Transaction Pro Forma Cash Balance" means with respect to any Entity as of any date of determination, the aggregate amount of such Entity's and its consolidated Subsidiaries' cash and cash equivalents as of such date (after giving effect to and assuming the consummation of any Significant Transaction with a Transaction Date occurring on or prior to such date, notwithstanding that such Significant Transaction may not have actually been consummated as of such date), other than cash and cash equivalents the disposition of which is

6

subject to a material restriction for the benefit of Entities other than such Entity and its consolidated Subsidiaries.

"Post-Transaction Pro Forma EBITDA" means, with respect to any Entity for any four-Fiscal Quarter period and any specified Disposition Transaction, such Entity's Pro Forma EBITDA for such four-Fiscal Quarter period, computed assuming that such Disposition Transaction, and any other Significant Transaction the Transaction Date of which occurs on or prior to the Transaction Date of such Disposition Transaction and during the same Fiscal Quarter as the Transaction Date of such Disposition Transaction, were consummated on the same terms in effect on the respective Transaction Dates at the beginning of the four-Fiscal Quarter period most recently ended prior to the Transaction Date of such Disposition Transaction, and shall include adjustments which give effect to events that are (i) directly attributable to such Disposition Transaction and any such Significant Transactions, (ii) expected to have a continuing impact on the Entity, and (iii) factually supportable.

"Post-Transaction Pro Forma Senior Indebtedness" means with respect to any Entity as of any date of determination, the aggregate outstanding principal amount of such Entity's and its consolidated Subsidiaries' Senior Indebtedness as of such date (after giving effect to and assuming the consummation of any Significant Transaction (and any related incurrence, reduction or repayment of Senior Indebtedness) with a Transaction Date occurring on or prior to such date, notwithstanding that such Significant Transaction (and any related incurrence, reduction or repayment of Senior Indebtedness) may not have actually been consummated as of such date).

"Post-Transaction Pro Forma Valuation" means, with respect to any Entity as of any date of determination, the amount resulting from (a) the product of (i) such Entity's Post-Transaction Pro Forma EBITDA for the four-Fiscal Quarter period most recently ended, multiplied by (ii) seven (7), minus (b) such Entity's Post-Transaction Pro Forma Senior Indebtedness as of such date, plus (c) such Entity's Post-Transaction Pro Forma Cash Balance as of such date.

"Prime Rate" means as of any date of determination, the *per annum* rate publicly announced on such date as the daily "U.S. prime rate" by The Wall Street Journal (National Edition) for transactions in Dollars. Any change in the Default Rate resulting from a change in the Prime Rate shall become effective on the Business Day on which each change in the Prime Rate is publicly announced by The Wall Street Journal (National Edition).

"Proceeding" means, with respect to any Entity, any voluntary or involuntary insolvency, bankruptcy, receivership, custodianship, liquidation, reorganization, assignment for the benefit of creditors, appointment of a custodian, receiver, trustee or other officer with similar powers or any other proceeding for the liquidation, or other winding up of such Entity or all or substantially all of the properties of such Entity.

"Pro Forma Cash Balance" means with respect to any Entity as of the last day of any four-Fiscal Quarter period, the aggregate amount of such Entity's and its consolidated Subsidiaries' cash and cash equivalents as of such date (after giving effect to and assuming the consummation of any Significant Transaction with a Transaction Date occurring during such

7

four-Fiscal Quarter period, notwithstanding that such Significant Transaction may not have actually been consummated during such four-Fiscal Quarter period), other than cash and cash equivalents the disposition of which is subject to a material restriction for the benefit of Entities other than Entity and its consolidated Subsidiaries.

"Pro Forma EBITDA" means, with respect to any Entity for any four Fiscal-Quarter period, such Entity's EBITDA for such four Fiscal-Quarter period, computed assuming that any Significant Transaction the Transaction Date of which occurred during the relevant four-Fiscal Quarter period was consummated, on the terms in effect on such Transaction Date, at the beginning of such four-Fiscal Quarter period most recently ended prior to the Transaction Date of such Significant Transaction, and shall include adjustments which give effect to events that are (i) directly attributable to any Significant Transactions the Transaction Date of which occurs during such four-Fiscal Quarter period, (ii) expected to have a continuing impact on the Entity, and (iii) factually supportable.

"Pro Forma Senior Indebtedness" means with respect to any Entity as of the last day of any four-Fiscal Quarter period, the aggregate outstanding principal amount of such Entity's and its consolidated Subsidiaries' Senior Indebtedness as of such date (after giving effect to and assuming the consummation of any Significant Transaction (and any related incurrence, reduction or repayment of Senior Indebtedness) with a Transaction Date occurring during such four-Fiscal Quarter period, notwithstanding that such Significant Transaction (and any related incurrence, reduction or repayment of Senior Indebtedness) may not have actually been consummated during such four-Fiscal Quarter period).

"Pro Forma Valuation" means, with respect to any Entity as of the last day of any four-Fiscal Quarter period, the amount resulting from (a) the product of (i) such Entity's Pro Forma EBITDA for such four-Fiscal Quarter period, multiplied by (ii) seven (7), minus (b) such Entity's Pro Forma Senior Indebtedness as of such date, plus (c) such Entity's Pro Forma Cash Balance as of such date.

"Quarterly EBITDA and Valuation Certificate" means a certificate in the form of Exhibit B.

"Regulation S-X" means Regulation S-X promulgated by the United States Securities and Exchange Commission as in effect on the date hereof.

"Related Party" means in respect of an Entity (the "Affected Entity"): (a) any senior key employee, officer or director of the Affected Entity or, in respect of an officer or director, any person holding a similar position in an Affected Entity that is not a corporation (any such person, an "Insider"); (b) any spouse, child, parent or sibling of an Insider; (c) another Entity which alone or together with other Entities under its Control directly or indirectly Controls or holds ten percent (10%) or more of the Equity Interests that (i) generally entitle the holders thereof to vote for the election of the board of directors or other governing body of the Affected Entity, or (ii) confer upon the holders thereof an interest in the capital or profits of the Affected Entity; (d) any Entity Controlled by the Affected Entity or by any Insider or in which the Affected Entity or any Insider Controls or holds ten percent (10%) or more of the stock or other equity interests which (i) generally entitle the holders thereof to vote for the election of the board

8

of directors or other governing body of the Affected Entity or (ii) confer upon the holders thereof an interest in the capital or profits of such Affected Entity; or (e) any Controlled Affiliate of any Entity that is a Related Person by virtue of clause (d) of this definition; provided, however, that any direct or indirect 100% owned Subsidiary of Grace shall not constitute a "Related Party" for purposes of this Deferred Payment Agreement (PD).

"Section 524(g) Shares" has the meaning set forth in the Share Issuance Agreement.

"Senior Indebtedness" means any and all present and/or future, direct and/or indirect, indebtedness, liabilities and other obligations of Grace and/or the Parent Guarantor owed to any Entity (whether as senior or subordinated indebtedness, as a first lien, second lien, any other position or priority, and any mezzanine, subordinated or other indebtedness), including any principal, interest and premiums, fees, investment points, reimbursement obligations, issuance discounts and/or other costs, indemnities, liabilities and/or expenses thereon or in connection therewith (including any interest accruing subsequent to the filing of a petition of bankruptcy at the rate provided for in the documentation with respect thereto, whether or not such interest is an allowed claim under applicable Law), in each case, under or with respect to (i) any credit or loan facilities (whether provided by one or more banks, insurance companies, financial institutions, private equity or hedge funds, lenders, and/or other Entities) and/or (ii) any debt, bonds, debentures, notes, repurchase, discount, securitization, factoring and/or other similar facilities providing for indebtedness, including any and all obligations of any nature in respect of loans, credit agreements, indentures, and bonds, together with obligations in respect of hedging arrangements (whether in respect of interest rates, currencies, commodities, equities, indebtedness and/or otherwise), in each case, entered into with banks, insurance companies, financial institutions, private equity or hedge funds, lenders and/or other Entities who are engaged in the business of providing financing (but not customers of or suppliers to Grace and/or the Parent Guarantor to the extent constituting trade payables), notes, letters of credit, and synthetic letters of credit in connection therewith, and/or (iii) any reimbursement, payment, indemnities, fees, guarantees or other obligations in connection with any credit or loan facilities or indebtedness, liabilities and other obligations referenced in clauses (i) or (ii);

except in each case, for indebtedness of Grace and/or the Parent Guarantor (A) that by its express terms is not Senior Indebtedness for purposes of this Deferred Payment Agreement (PD) and the Parent Guarantee (PD) and is to be treated as pari passu or junior and subordinated with respect thereto in accordance with its terms, (B) for the avoidance of doubt, consisting of obligations to trade creditors and other trade payables in connection with the purchase of goods, materials or services, (C) owed to, or guaranteed by Grace or the Parent Guarantor on behalf of, any director, officer or senior key employee of (1) Grace, (2) the Parent Guarantor or (3) any Subsidiary or Affiliate of Grace or the Parent Guarantor, (D) represented by Disqualified Equity Interests, (E) owed to (1) Grace, (2) the Parent Guarantor or (3) any Subsidiary or Affiliate of Grace or the Parent Guarantor and (F) resulting from the Deferred Payment Documents (PI) or the Deferred Payment Documents (ZAI).

"Senior Non-Payment Default" has the meaning set forth in Section 7(a)(ii).

"Senior Payment Default" has the meaning set forth in Section 7(a)(i).

9

"Senior Remedies" means, if an event of default has occurred and is continuing under the terms of any agreement or document relating to Senior Indebtedness, any of the following by the holder (or any agent or trustee of the holder) of any Senior Indebtedness:  (1) exercising or seeking to exercise any rights or remedies against Grace or the Parent Guarantor with respect to such event of default or (2) instituting any action or proceeding with respect to such rights or remedies (including any action of foreclosure, contest or protest) under any agreement or document relating to Senior Indebtedness, or under such event of default or otherwise or (3) attempting to do any of the foregoing.

"Significant Transaction" means (a) any Disposition Transaction or (b) any transaction of the type described in Section 210.11-01(a)(1) or Section 210.11-01(a)(2) of Regulation S-X (disregarding, for purposes of clause (b) of this definition, whether the Entity entering into such transaction is at the time obligated to file or furnish, or is otherwise filing or furnishing, reports with the United States Securities and Exchange Commission pursuant to Section 13 or 15 of the Securities Exchange Act of 1934, as amended).

"Subsidiary" means, with respect to any Entity at any date, any corporation, limited or general partnership, limited liability company, trust, estate, association, joint venture or other business entity (i) the accounts of which would be consolidated with those of such Entity in such Entity's consolidated financial statements if such financial statements were prepared in accordance with GAAP or (ii) of which more than 50% of (A) the outstanding Capital Stock having (in the absence of contingencies) ordinary voting power to elect a majority of the board of directors or other managing body of such Entity, (B) in the case of a partnership or limited liability company, the interest in the capital or profits of such partnership or limited liability company or (C) in the case of a trust, estate, association, joint venture or other entity, the beneficial interest in such trust, estate, association or other entity business is, at the time of determination, owned or Controlled directly or indirectly through one or more intermediaries, by such Entity.

"Taxes" means any and all present or future taxes, levies, imposts, fees, assessments, levies, duties, deductions, charges, liabilities or withholdings (including interest, fines, penalties or additions to tax) imposed by any Governmental Authority.

"Threshold Amount" means, as of any date of determination, the sum of (a) $2,000,000,000 minus (b) the aggregate amount of Deferred Payments (PD) made by Grace and any Permitted Payor under this Deferred Payment Agreement (PD) on or prior to such date plus (c) the aggregate amount of Deferred Payments (PD) received by the Permitted Holder or any Permitted Payee under this Deferred Payment Agreement (PD) from Grace or any relevant Permitted Payor that have subsequently been invalidated, declared to be fraudulent or preferential, set aside and/or required or agreed to be repaid or returned by the Permitted Holder or such Permitted Payee under this Deferred Payment Agreement (PD) as of such date under any Law or in respect of any Proceeding or other litigation to which Grace, the relevant Permitted Payor, the Permitted Holder or any Permitted Payee is subject plus, without duplication, (d) the aggregate amount of Deferred Payments (PD) received by the Permitted Holder or any Permitted Payee that the relevant Permitted Holder or such Permitted Payee has delivered to the holders of any Senior Indebtedness pursuant to Section 7(c) of this Deferred Payment Agreement (PD) as of such date.

10

"Transaction Date" means, with respect to any Significant Transaction, (a) the date, if any, on which final, definitive documentation providing for such Significant Transaction is executed; provided, however, that the "Transaction Date" shall no longer be deemed to have occurred with respect to any Significant Transaction if the final, definitive documentation providing for such Significant Transaction is terminated for any reason, or (b) if no such final, definitive documentation for such Significant Transaction is executed, the date on which such Significant Transaction is consummated.

"Transfer" has the meaning set forth in Section 6(b).

"Transferor" has the meaning set forth in Section 6(b).

"Trust (PD)" has the meaning set forth in the introductory paragraph hereof.

"Trust (PI)" means the WRG Asbestos Trust, a Delaware statutory trust established pursuant to §524(g) of the Bankruptcy Code in accordance with the Plan of Reorganization.

"Trusts" has the meaning set forth in the Share Issuance Agreement.

"Trusts' Representative" has the meaning set forth in the Share Issuance Agreement.

"Valuation" means, with respect to any Entity as of the last day of any four-Fiscal Quarter period, the amount resulting from (a) the product of (i) such Entity's EBITDA for such four-Fiscal Quarter period, multiplied by (ii) seven (7), minus (b) the aggregate outstanding principal amount of such Entity's and its consolidated Subsidiaries' Senior Indebtedness as of such date, plus (c) the amount of cash and cash equivalents of such Entity and its consolidated Subsidiaries as of such date other than cash and cash equivalents the disposition of which is subject to a material restriction for the benefit of Entities other than such Entity and its consolidated Subsidiaries.

(b)      Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  All references herein to Sections shall be deemed references to Sections of this Deferred Payment Agreement (PD) unless the context shall otherwise require.

(c)      Unless otherwise indicated, (i) the term "including" means "including without limitation," except when used in the computation of time periods, and (ii) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein).

(d)      For purposes of the computation of time periods, whenever this Deferred Payment Agreement (PD) provides for an event to occur "within" a specified number of days of a preceding event, it shall mean that the latter event shall occur before the close of business on the last of the specified days, and the day on which the preceding event occurs shall not be included

11

in the computation of days elapsed.  The word "from" means "from and including", "after" means "after and excluding", and "to" and "until" mean "to and including".

(e)      All terms defined in this Agreement or any other Deferred Payment Documents (PD) in the singular form shall have comparable meanings when used in the plural form and vice versa.

2.      **Payment of Deferred Payments (PD)**.

(a)      Subject to <u>Sections 2(b)</u>, <u>3(c)</u>, <u>(f)</u> and <u>(g)</u> and <u>Section 7</u>, Grace agrees to pay to the Permitted Holder on the first Business Day of January and the first Business Day of July of each year (each such date, a "<u>Deferred Payment Date (PD)</u>"), an amount (each such payment, a "<u>Deferred Payment (PD)</u>") equal to the sum of:

(i)      the amount of all the Asbestos PD Claims that were Allowed against the Asbestos PD Trust during the semiannual period immediately preceding the relevant Deferred Payment Date (PD) (the "<u>Semiannual Accrual Period</u>") (without duplication, for the avoidance of doubt, of any amounts of Asbestos PD Claims Allowed during other Semiannual Accrual Periods);

(ii)      interest accrued on each of the Asbestos PD Claims described in <u>Section 2(a)(i)</u> above from the date such Asbestos PD Claim was Allowed until the relevant Deferred Payment Date (PD), at the federal judgment rate *per annum* in effect on the date on which such Asbestos PD Claim was Allowed (as reasonably determined by Grace); and

(iii)      (without duplication of Asbestos PD Trust Expenses already paid) an amount equal to the Asbestos PD Trust Expenses accrued and paid by the Trust (PD) during the immediately preceding Semiannual Accrued Period; <u>provided</u>, <u>however</u>, that the aggregate amount of Asbestos PD Trust Expenses accrued in any fiscal year of Grace and payable hereunder shall not exceed $200,000 in any such fiscal year.

(b)      To the extent that the Trusts' Representative exercises its rights on behalf of the Trust (PD) under the Share Issuance Agreement and the Section 524(g) Shares are issued and delivered to the Trust (PD) (or its permitted successors or assigns), the amount of the remaining Deferred Payments (PD) shall automatically be reduced, in the order directed by Grace, by the Fair Market Value of the portion of the Section 524(g) Shares allocated to the Trust (PD) pursuant to Section 4 of the Intercreditor Agreement (as such Section 4 of the Intercreditor Agreement, together with any defined terms used (directly or indirectly) in such Section 4 of the Intercreditor Agreement are in effect as of the date hereof, or as amended or modified from time to time with the consent (not to be unreasonably withheld) of Grace and the Parent Guarantor after the date hereof.

3.      **Payments**.

(a)      All payments to be made hereunder or in respect hereof shall be made in Dollars by wire transfer of immediately available funds to the Permitted Holder in accordance with wire transfer instructions provided by the Permitted Holder in writing from time to time.  Upon request by the Permitted Holder, Grace shall provide, or cause to be provided, the Federal

12

Reserve Bank wire reference numbers and other wire information related to any payments hereunder.

(b)      Subject to <u>Sections 2(b)</u>, <u>3(e)</u>, <u>(f)</u> and <u>(g)</u>, all payments hereunder or in respect hereof shall be made in full, without any reduction, set-off or counterclaim.

(c)      Whenever any payment to be made under this Deferred Payment Agreement (PD) (including a Deferred Payment (PD) on a Deferred Payment Date (PD)) shall be stated to be due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day.

(d)      All payments made hereunder or in respect hereof (i) during the existence of an Event of Default shall be applied, <u>first</u> to pay any fees, costs and expenses payable by Grace pursuant to <u>Section 16(h)</u> and <u>Section 19</u>, <u>second</u>, to any unpaid interest accrued on the Deferred Payments (PD) and, <u>third</u>, to the Deferred Payments (PD) in direct order of maturity, and (ii) at any other time, as directed by the Permitted Payor.

(e)      If, after giving effect to (y) any Disposition Transaction or any assignment, delegation or transfer by Grace of its rights or obligations under this Deferred Payment Agreement (PD) or (z) any election to have a Permitted Payor make any payment on behalf of Grace pursuant to <u>Section 4(a)</u>, Grace, any successor Entity to Grace or such Permitted Payor shall be required by applicable Law to withhold any Taxes from any payments of Deferred Payments (PD) or interest at the Default Rate hereunder, and if such requirement would not have been imposed by such applicable Law but for such Disposition Transaction, assignment or transfer, then (i) the sum payable on account of Deferred Payments (PD) or interest at the Default Rate shall be increased as necessary so that after making all withholdings required by applicable Law (including withholdings applicable to additional sums payable under this <u>Section 3(e)</u>) the Permitted Payee receives an amount equal to the sum it would have received on account of Deferred Payments (PD) or interest at the Default Rate had no such withholdings been made, (ii) Grace or such successor Entity, shall, or shall cause such Permitted Payor to, make such withholdings; and (iii) Grace or such successor Entity shall, or shall cause such Permitted Payor to, timely pay the full amount deducted to the relevant Governmental Authority in accordance with applicable Law.  This <u>Section 3(e)</u> shall survive the termination of this Deferred Payment Agreement (PD) pursuant to <u>Section 11</u>.

(f)      If, after giving effect to any permitted assignment or Transfer by the Permitted Holder of its rights or obligations under this Deferred Payment Agreement (PD), Grace or a Permitted Payor shall be required by applicable Law to withhold any Taxes from any payments of Deferred Payments (PD) or interest at the Default Rate hereunder, and if such requirement would not have been imposed by such applicable Law but for such assignment or Transfer, then the obligation of Grace or the Permitted Payor to make the relevant payment of a Deferred Payment (PD) or interest at the Default Rate hereunder shall be discharged by making such payment net of such Taxes.  This <u>Section 3(f)</u> shall survive the termination of this Deferred Payment Agreement (PD) pursuant to <u>Section 11</u>.

(g)      If, due to either (i) the introduction of or any change in any law or regulation (or any change in the interpretation thereof) or (ii) the compliance with any guideline or request

13

from any central bank or other Governmental Authority (whether or not having the force of law), in each case adopted after the date hereof, Grace or a Permitted Payor shall be required to withhold any Taxes from any payments of Deferred Payments (PD) or interest at the Default Rate hereunder, then the obligation of Grace or the Permitted Payor to make the relevant payment of a Deferred Payment (PD) or interest at the Default Rate hereunder shall be discharged by making such payment net of such Taxes.  This <u>Section 3(g)</u> shall survive the termination of this Deferred Payment Agreement (PD) pursuant to <u>Section 11</u>.

4.    <u>**Permitted Payor; Prepayments**</u>.

(a)    The obligation of Grace to make all or any portion of any Deferred Payment (PD) may be satisfied by direct payment of such amounts by a Permitted Payor.

(b)    To the extent any Deferred Payment (PD) is timely paid by a Permitted Payor, and except as set forth in <u>Section 4(d)</u>, the obligation of Grace in respect of the amounts paid shall be deemed satisfied in full, Grace shall have no further obligation in connection therewith and Grace shall not be considered in default in respect of such amounts so paid.

(c)    Any Permitted Payor and Grace may at any time and from time to time prepay any Deferred Payment (PD) in whole or in part without penalty, premium or discount.  Any such prepayment(s) shall be applied to the Deferred Payments (PD) as directed by Grace.

(d)    To the extent that any Entity makes a payment to the Permitted Holder or any Permitted Payee on account of this Deferred Payment Agreement (PD) that (in whole or in part) is subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required or agreed to be repaid or returned by the Permitted Holder or such Permitted Payee under any Law or in respect of any Proceeding or other litigation to which Grace, the relevant Permitted Payor, the Permitted Holder or any Permitted Payee is subject, then, to the extent of the amount of such payment, the portion of the obligations under this Deferred Payment Agreement (PD) which has been paid, reduced or satisfied by such amount shall be reinstated and continue to be in full force and effect as of the time immediately preceding such initial payment, reduction or satisfaction.

5.    <u>**Representations and Warranties**</u>.  Grace hereby represents and warrants to the Trust (PD) that as of the Effective Date:

(a)    Grace is duly organized and validly existing under the laws of the State of Connecticut.

(b)    Grace has the corporate power and authority to execute and deliver each Deferred Payment Document (PD) to which it is a party.  Each Deferred Payment Document (PD) to which Grace is a party has been duly authorized by all necessary corporate action of Grace and has been duly executed and delivered by Grace.

(c)    Each Deferred Payment Document (PD) to which Grace is a party is a legal, valid and binding obligation of Grace, enforceable against Grace in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally, by the

14

discretion of the court in which enforcement is sought, and/or by general equitable principles (whether enforcement is sought by proceedings at law or in equity).

(d)     The execution, delivery and performance by Grace of each Deferred Payment Document (PD) to which it is party does not conflict with, result in a breach of any of the provisions of, or violate the Governing Documents of Grace.

6.     **Covenants**.  Grace covenants and agrees that, from the Effective Date until the earlier of (A) this Deferred Payment Agreement (PD) terminates in accordance with Section 11 or (B) payment in full of the Deferred Payments (PI):

(a)     Affirmative Covenants.  Grace shall:

(i)     Maintenance of Existence and Qualifications.  Maintain and preserve in full force and effect its existence and all other rights, powers, franchises, licenses and qualifications necessary or desirable for its ownership or use of properties or the conduct of its business, except (A) as permitted by Section 16, and (B) where the failure to do so would not be reasonably likely to adversely affect Grace's ability to make the Deferred Payments (PD) under this Deferred Payment Agreement (PD) or to perform its obligations under the Deferred Payment Documents (PD) to which it is a party.

(ii)     Notices of Event of Default, Senior Payment Default and Senior Non-Payment Default.  Furnish to the Permitted Holder (x) within five (5) Business Days after an Authorized Officer of Grace shall first learn of an Event of Default, and (y) on or before the earlier of (A) the fifteenth (15th) day after an Authorized Officer of Grace shall first learn of a Senior Payment Default or Senior Non-Payment Default and (B) the first Business Day following the date on which a Payment Blockage Notice is delivered pursuant to Section 7(a)(ii), the written statement of an Authorized Officer of Grace setting forth the material details of such Event of Default, Senior Payment Default or Senior Non-Payment Default, as the case may be, and the actions that Grace proposes to take with respect thereto.

(iii)     Financial Statements.  If (x) the financial statements of Grace are no longer consolidated with the financial statements of the Parent Guarantor and (y) Grace is not obligated to file or furnish, or is not otherwise filing or furnishing, reports with the United States Securities and Exchange Commission pursuant to Section 13 or 15 of the Securities Exchange Act of 1934, Grace shall furnish to the Permitted Holder:

(A)     Annual Financial Statements.  As soon as available but in no event later than ninety (90) days after the last day of each of Grace's Fiscal Years, its annual consolidated financial statements audited by a nationally recognized registered independent public accounting firm allowed to practice before the Securities and Exchange Commission or any successor Governmental Authority, consisting of a consolidated balance sheet of Grace and its consolidated Subsidiaries as of the end of such year and consolidated statements of income, cash flows and stockholders equity for such year (all in reasonable detail and with all notes and supporting schedules); and

(B)     Quarterly Financial Statements.  As soon as available and in any event within forty-five (45) days after the end of each of the first three Fiscal Quarters in each

15

Fiscal Year of Grace, its consolidated balance sheet as of the end of such Fiscal Quarter, and consolidated statements of income and cash flows of Grace and its consolidated Subsidiaries for such Fiscal Quarter, all in reasonable detail and certified by an Authorized Officer of Grace to present fairly in all material respects the financial condition, results of operations and other information reflected therein and to have been prepared in accordance with GAAP (subject to year-end audit adjustments and the absence of footnotes).

      (iv)    <u>Officer's Certificates</u>. Grace shall furnish to the Permitted Holder:

      (A)    If the financial results of Grace are no longer consolidated with the financial results of the Parent Guarantor, no later than ninety (90) days after the last day of each of Grace's Fiscal Years and no later than forty-five (45) days after the end of each of the first three Fiscal Quarters in each Fiscal Year of Grace, a Quarterly EBITDA and Valuation Certificate executed by an Authorized Officer of Grace setting forth (I) if the Transaction Date of a Significant Transaction has occurred during the four-Fiscal Quarter period ending on the last day of such Fiscal Quarter or Fiscal Year, as the case may be, the Pro Forma EBITDA of Grace for such four-Fiscal Quarter period and the Pro Forma Valuation of Grace as of the last day of such four-Fiscal Quarter period or (II) if the Transaction Date of a Significant Transaction did not occur during the four-Fiscal Quarter period ending on the last day of such Fiscal Quarter or Fiscal Year, as the case may be, the EBITDA of Grace for such four-Fiscal Quarter period and the Valuation of Grace as of the last day of such four-Fiscal Quarter period; provided, however, that Grace shall not be required to furnish to the Permitted Holder a Quarterly EBITDA and Valuation Certificate under this subclause (A) if (x) Grace is filing or furnishing reports with the United States Securities and Exchange Commission pursuant to Section 13 or 15 of the Securities Exchange Act of 1934, and (y)(1) if the Transaction Date of a Significant Transaction has occurred during the four-Fiscal Quarter period ending on the last day of the applicable Fiscal Quarter or Fiscal Year, the Pro Forma EBITDA of Grace for such four-Fiscal Quarter period and the Pro Forma Valuation of Grace as of the last day of such four-Fiscal Quarter period is readily ascertainable from such reports or (2) if the Transaction Date of a Significant Transaction did not occur during the four-Fiscal Quarter period ending on the last day of the applicable Fiscal Quarter or Fiscal Year, the EBITDA of Grace for such four-Fiscal Quarter period and Valuation of Grace as of the last day of such four-Fiscal Quarter period is readily ascertainable from such reports;

      (B)    no later than ninety (90) days after the last day of each of Grace's Fiscal Years, a Compliance Certificate executed by an Authorized Officer of Grace for such Fiscal Year; and

      (C)    no later than thirty (30) days after the consummation by a Transferor of a Disposition Transaction of the type described in <u>clause (ii)</u> or <u>clause (iii)</u> of <u>Section 6(b)</u>, a Post-Transaction Certificate setting forth the Post-Transaction Pro Forma EBITDA of Grace with respect to such Disposition Transaction executed and delivered by an Authorized Officer of Grace.

      (b)    <u>Negative Covenant</u>. Grace shall not, and shall cause each of its Subsidiaries and Controlled Affiliates (each, a "<u>Transferor</u>") to not, sell, assign, transfer, license, lease or otherwise dispose of (each, a "<u>Transfer</u>") any property and/or other assets and/or enter into any

16

transaction or obligation, whether constituting or by way of merger, consolidation, sale of assets or other disposition, reorganization, recapitalization, dividend, other distribution, or otherwise, or any related series of the foregoing (any such Transfer other than Ordinary Dividends, Bona Fide Compensation Transactions and other Transfers in the ordinary course of business, a "Disposition Transaction"), if the Transferor (taken together with all of its direct and indirect wholly owned Subsidiaries) would (1) receive (directly or indirectly) less than a reasonably equivalent value in such Disposition Transaction, (2) become or be rendered Insolvent as a result of such Transfer and/or such Disposition Transaction, or (3) be engaged in business and/or transactions, and/or would be about to engage in business and/or transactions, for which the Transferor's (taken together with all of its direct and indirect wholly owned Subsidiaries) remaining property and other assets would be unreasonably small capital; provided, however, that notwithstanding the foregoing, a Transferor:

(i)    that is a direct or indirect wholly-owned Subsidiary of Grace may make a Transfer to or engage in a Disposition Transaction exclusively with Grace or any other direct or indirect wholly-owned Subsidiary of Grace;

(ii)    may engage in a Disposition Transaction whereby such Transferor (A) pays or makes (directly or indirectly) dividends or distributions (whether in cash, securities or other property) with respect to any of its Capital Stock (including by way of a spin-off or spin-out of any of its assets), or (B) repurchases its Capital Stock, provided, that in the case of any Disposition Transaction under subclause (A) or (B) above, all of the following conditions are satisfied:

(1)    no Event of Default has occurred and is continuing at the time of, or would result from, such Disposition Transaction;

(2)    as of the Transaction Date of such Disposition Transaction, the Post-Transaction Pro Forma Valuation of (x) the Parent Guarantor or (y) Grace shall equal or exceed the Threshold Amount; and

(3)    if such Disposition Transaction exceeds $15,000,000 and is not publicly disclosed at least 10 days prior to the consummation of such Disposition Transaction, then Grace shall provide the Permitted Holder with at least 10 days prior to the consummation of such Disposition Transaction, a written notice describing in reasonable detail the material terms of such Disposition Transaction and setting forth the Post-Transaction Pro Forma Valuation of Grace as of the Transaction Date of such Disposition Transaction; and

(iii)    other than as set forth in Section 6(b)(ii) above, shall not enter into any Disposition Transaction with a Related Party to the Transferor in which the aggregate value of the assets or other property Transferred in such Disposition Transaction to such Related Party exceeds $15,000,000 if the Transferor (taken together with all of its direct and indirect wholly owned Subsidiaries) would (1) receive (directly or indirectly) less than a reasonably equivalent value in such Disposition Transaction, as determined by a reputable investment bank or valuation firm jointly selected by Grace and the "Permitted Holder" (as defined in the Deferred Payment Agreement (PI)), (2) become or be rendered Insolvent as a result of such Transfer and/or such Disposition Transaction or (3) be engaged in business and/or transactions, and/or would be about

17

to engage in business and/or transactions, for which the Transferor's (taken together with all of its direct and indirect wholly owned Subsidiaries) remaining property and other assets would be unreasonably small capital; provided, that if the aggregate value of the assets or other property Transferred to such Related Party in such Disposition Transaction exceeds $15,000,000 and the existence of such Disposition Transaction is not publicly disclosed at least 10 days prior to the consummation of such Disposition Transaction, then Grace shall provide the Permitted Holder with at least 10 days' prior to the consummation of such Disposition Transaction, a written notice describing in reasonable detail the material terms of such Disposition Transaction and setting forth the Post-Transaction Pro Forma Valuation of Grace as of the Transaction Date of such Disposition Transaction;

provided further that if Grace is not the surviving or succeeding Entity as a result of any Disposition Transaction (but in the case of a sale of assets, only if such sale involves a sale of all or substantially all of the assets of Grace) otherwise permitted by the exceptions to this Section 6(b), such Disposition Transaction shall be permitted under this Section 6(b) only if Grace and the Parent Guarantor shall comply with the requirements of Section 16(g).

7. **Subordination Terms**. Any and all obligations of Grace in respect of Deferred Payments (PD) and this Deferred Payment Agreement (PD) shall be subordinated and otherwise junior at all times in right of payment and in all other respects, in the manner and to the extent set forth herein, to any and all present and future obligations of Grace in respect of any Senior Indebtedness.

(a) Blockage of Deferred Payments (PD).

(i) If any payment default occurs and is continuing beyond any applicable grace period pursuant to the terms and conditions of any Senior Indebtedness (a "Senior Payment Default"), then subject to Section 7(g), no payment or distribution of cash, securities or any other assets shall be made by Grace with respect to any Deferred Payments (PD) or pursuant to the Deferred Payment Documents (PD) for as long as such Senior Payment Default is continuing.

(ii) If any default other than a Senior Payment Default occurs pursuant to the terms and conditions of any Designated Senior Indebtedness that would allow the holders thereof to accelerate the maturity thereof (a "Senior Non-Payment Default"), then subject to Section 7(g), no payment or distribution of cash, securities or any other assets shall be made by Grace with respect to any Deferred Payments (PD) or pursuant to the Deferred Payment Documents (PD) during the period (the "Payment Blockage Period") (x) beginning on the date that the Permitted Holder receives from the Entity entitled to give notice under any document evidencing such Designated Senior Indebtedness (or from Grace acting at the direction or request of such Entity) a written notice (a "Payment Blockage Notice") that such a Senior Non-Payment Default has occurred and is continuing and (y) ending on the earliest to occur of (1) 180 days from the date the Permitted Holder shall have received the Payment Blockage Notice, (2) the date such Senior Non-Payment Default shall have been cured or waived or shall have ceased to exist and (3) the date such Payment Blockage Period shall have been terminated by written notice to the Permitted Holder from the Entity initiating such Payment Blockage Period.

18

(iii)    Notwithstanding the foregoing, (A) in no event will a Payment Blockage Period extend beyond 180 days from the date the Payment Blockage Notice in respect thereof was received by the Permitted Holder, (B) there shall be a period of at least 180 consecutive days in each period of 360 consecutive days when no Payment Blockage Period is in effect, and (C) no Senior Non-Payment Default that existed or was continuing on the date of delivery of any Payment Blockage Notice (whether or not such Senior Non-Payment Default is with respect to the same issue of Designated Senior Indebtedness) may be, or be made, the basis for a subsequent Payment Blockage Notice, unless such Senior Non-Payment Default has been cured or waived for a period of not less than 90 consecutive calendar days.

(iv)    The making of Deferred Payments (PD) or other payments pursuant to this Deferred Payment Agreement (PD) shall resume, and any Deferred Payments (PD) or other payments pursuant to this Deferred Payment Agreement (PD) not paid due to a suspension thereof pursuant to clause (i) or clause (ii) of this Section 7(a) shall be paid, together with accrued interest thereon at the Default Rate, when such suspension is no longer in effect (either due to cure or waiver of the relevant Senior Payment Default or the expiration or termination of the Payment Blockage Period pursuant to clause (i) or clause (ii) of this Section 7(a)) unless a subsequent Payment Blockage Notice has been delivered in accordance with clause (iii) of this Section 7(a) and is not prohibited from being delivered by clause (iii) of this Section 7(a).

(v)    The failure of Grace to make any Deferred Payments (PD) or to pay any other amounts under this Deferred Payment Agreement (PD) by reason of the operation of this Section 7(a) shall not be construed as preventing the occurrence of an Event of Default or from characterizing any Deferred Payments (PD) as "past due" for purposes of Section 9(c).

(b)    Proceedings.    Upon any payment made by Grace, or any distribution of cash, securities or other assets of any kind of Grace (other than securities issued in substitution for the obligation to make Deferred Payments (PD) that are subordinated to at least the extent described herein for Deferred Payments (PD), which Securities the Permitted Holder (or any Permitted Payee, if applicable) is specifically authorized to receive notwithstanding any other provision of this Section 7), to creditors in any Proceeding with respect to Grace or its properties, all obligations due on all Senior Indebtedness shall first be paid in full in cash before any payment or distribution is made on account of any Deferred Payments (PD) or otherwise pursuant to the Deferred Payment Documents (PD).

(c)    Improper Payments Held in Trust.    Any payments or property received by the Permitted Holder or any Permitted Payee in breach of this Section 7 shall be held by the Permitted Holder or such Permitted Payee in trust and promptly delivered in the form received to the holder of Senior Indebtedness entitled to receive the same (any such payment or property delivered by the Permitted Holder or such Permitted Payee to any holder of Senior Indebtedness, a "Turnover Payment"). To the maximum extent permitted under applicable Law, Grace agrees that any Turnover Payment shall be treated as a payment by Grace on account of such Senior Indebtedness and shall not satisfy Grace's obligation with respect to any amount due to the Permitted Holder or such Permitted Payee under this Deferred Payment Agreement (PD). If, notwithstanding the preceding sentence, it is determined (by a court of competent jurisdiction or otherwise) that a Turnover Payment is a payment by Grace on account of, and satisfies any obligation of Grace with respect to, any amount due to the Permitted Holder or any Permitted

19

Payee under this Deferred Payment Agreement (PD), then, to the extent of the amount of such Turnover Payment, the portion of the obligation which has been determined to be paid and satisfied by such Turnover Payment shall be reinstated and shall continue to be in full force and effect as of the time immediately preceding the initial payment thereof by Grace to the Permitted Holder or such Permitted Payee.  If, notwithstanding the preceding sentence, any portion of an obligation of Grace in respect of such Turnover Payment is not reinstated and continued to the extent of the amount of the relevant Turnover Payment, then the Permitted Holder or the applicable Permitted Payee shall, upon the payment in full in cash of all Senior Indebtedness owed to the holder thereof to whom the Permitted Holder or such Permitted Payee delivered such Turnover Payment, be subrogated to the rights of such holder to receive payments or distributions applicable to such Senior Indebtedness, and for the purpose of such subrogation such Turnover Payment shall not, as between Grace and the Permitted Holder or such Permitted Payee, be deemed to be payment by Grace to or on account of such Senior Indebtedness.

(d)    <u>Remedies Blockage</u>.  Subject in any event to the other terms and conditions of this <u>Section 7</u> (including <u>Section 7(a)</u> and <u>Section 7(g)</u>), and not in abrogation thereof, if an Event of Default has occurred and is continuing and any Senior Indebtedness is then outstanding, the Permitted Holder hereby agrees for itself and its assigns that it will not (1) exercise or seek to exercise any rights or remedies against Grace or the Parent Guarantor with respect to such Event of Default or (2) institute any action or proceeding with respect to such rights or remedies (including any action of foreclosure, contest or protest) under any Deferred Payment Document (PD) or any agreement or document relating thereto, or under such Event of Default or otherwise or (3) attempt to do any of the foregoing (collectively, the "<u>Remedies</u>"), for a period commencing on the date that such Event of Default occurs and ending on the earliest to occur of (i) 180 days after the first date on which such Event of Default shall have occurred, (ii) the commencement of a Proceeding with respect to Grace, the Parent Guarantor or their respective properties, (iii) the date that the holder (or any agent or trustee of the holder) of any Senior Indebtedness commences exercising any Senior Remedies with respect to such Senior Indebtedness (including, without limitation, the acceleration of all or any portion of such Senior Indebtedness) and (iv) the payment in full in cash of all Senior Indebtedness.

(e)    Notwithstanding the foregoing, as applied to the Permitted Holder, the term "Remedies" shall not include, and the Permitted Holder shall not be impaired by this <u>Section 7(d)</u> from doing, any of the following:  (A) exercising rights and remedies for specific performance or injunctive relief to compel Grace or the Parent Guarantor to comply with any non-payment obligations under the Deferred Payment Documents (PD) (including commencing any action contemplated by <u>Section 16(h)</u>), (B) instituting or maintaining any suit or action solely to prevent the running of any applicable statute of limitations, (C) accruing interest on the Deferred Payments (PD) at the Default Rate pursuant to <u>Section 9(c)</u> and (D) giving any notice (including notice of an Event of Default) to Grace under the Deferred Payment Documents (PD).

(f)    <u>No Secured Obligation</u>.  Except for the Parent Guarantee and the share issuance obligation with respect to the Section 524(g) Shares as and to the extent contemplated in the Share Issuance Agreement, no credit support or security interest shall be granted by Grace, the Parent Guarantor or any of its Subsidiaries in connection with, or otherwise support or secure any obligation set forth in, the Deferred Payment Documents (PD).  Notwithstanding the foregoing, the Permitted Holder may obtain to the extent permitted under applicable Law a

20

judgment lien on the properties of Grace and/or the Parent Guarantor to secure the payment and performance of a judgment obtained by the Permitted Holder against Grace and/or the Parent Guarantor.

(g)    No Impairment of Right to Receive Section 524(g) Shares.  Nothing in this Section 7 shall impair the rights of the Trust (PD) (or its permitted successor or assigns) acting through the Trusts' Representative pursuant to the Intercreditor Agreement, to deliver to the Parent Guarantor a Demand for Issuance of the Section 524(g) Shares and to receive the Trust (PD)'s percentage of the Section 524(g) Shares pursuant to the Share Issuance Agreement.

(h)    Further Assurances.  At the reasonable request of Grace or the Parent Guarantor, the Permitted Holder will, at the sole expense of Grace and the Parent Guarantor, execute such agreement, documents, certificates and/or other instruments confirming the existence and extent of the subordination terms detailed in this Section.

8.    **Events of Default**.  The occurrence of any of the following events shall constitute an "Event of Default" under this Deferred Payment Agreement (PD):

(a)    Neither Grace nor any Permitted Payor shall make (i) any Deferred Payment (PD) on any Deferred Payment Date (PD) and such failure shall continue for five (5) Business Days after the relevant Deferred Payment Date (PD) or (ii) any payment of interest at the Default Rate owing under this Deferred Payment Agreement (PD) within seven (7) Business Days after demand therefor by the Permitted Holder (or the Permitted Payee, if applicable) entitled thereto;

(b)    Grace or the Parent Guarantor (A) shall institute any proceeding or voluntary case seeking to adjudicate it a bankrupt or insolvent, or seeking dissolution, liquidation, winding up, reorganization, arrangement, adjustment, protection, relief or composition of it or its debts pursuant to any law relating to bankruptcy, insolvency, reorganization or relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee, custodian or other similar official for any such Entity or for any substantial part of its property, (B) shall be generally not paying its debts as such debts become due or shall admit in writing its inability to pay its debts generally, or (C) shall make a general assignment for the benefit of creditors;

(c)    Any proceeding shall be instituted against Grace or the Parent Guarantor seeking to adjudicate it a bankrupt or insolvent, or seeking dissolution, liquidation, winding up, reorganization, arrangement, adjustment, protection, relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee, custodian or other similar official for any such Entity or for any substantial part of its property, and either such proceeding shall remain undismissed or unstayed for a period of sixty (60) consecutive days;

(d)    Grace shall breach any covenant set forth in Section 6(a)(i), or the Parent Guarantor shall breach any covenant set forth in Section 7(a)(i) of the Parent Guarantee (PD), and in any such case such breach shall continue for thirty (30) days after the earlier of (A) any Authorized Officer of Grace obtains knowledge of such failure and (B) the Permitted Holder's written notice to Grace and the Parent Guarantor of such failure;

(e) Grace shall breach any covenant set forth in Section 6(a)(iv)(A), or the Parent Guarantor shall breach any covenant set forth in Section 7(a)(iv)(A) of the Parent Guarantee

21

(PD), and in any such case such breach shall continue for ten (10) days after the Permitted Holder's written notice to Grace and the Parent Guarantor of such breach;

(f) Grace shall breach any covenant set forth in <u>Section 6(b)</u> (other than any notice requirement set forth therein), or the Parent Guarantor shall breach any covenant set forth in Section 7(b) of the Parent Guarantee (PD) (other than any notice requirement set forth therein), and in any such case, as of the Transaction Date of the Disposition Transaction that resulted in such breach, the Post-Transaction Pro Forma Valuation of the Parent Guarantor shall not exceed the Threshold Amount and the Post-Transaction Pro Forma Valuation of Grace shall not exceed the Threshold Amount;

(g) Grace or the Parent Guarantor shall assert in writing that any Deferred Payment Document (PD) or any material term thereof is not a legal, valid and binding obligation of Grace or the Parent Guarantor, as the case may be, enforceable in accordance with its terms in any material respect; or

(h) A default occurs under the Deferred Payment Agreement (PI) or the Deferred Payment Agreement (ZAI) that causes any of the Deferred Payments due under either or both the Deferred Payment Agreement (PI) or the Deferred Payment Agreement (ZAI), respectively, to be accelerated and become due prior to its or their stated maturity.

9. **<u>Remedies</u>**.

(a) Subject to <u>Section 7</u>, the Permitted Holder shall have the right, power and authority to do all things deemed necessary or advisable to enforce the provisions of, and protect its rights under, this Deferred Payment Agreement (PD) and upon the occurrence and during the continuance of an Event of Default the Permitted Holder may institute or appear in such appropriate proceedings permitted and not prohibited under this Deferred Payment Agreement (PD) as the Permitted Holder shall deem most effectual to protect and enforce any of its rights hereunder, whether for the specific enforcement of any covenant or agreement in this Deferred Payment Agreement (PD) or to enforce any other proper remedy.

(b) Subject to <u>Section 7</u>, without limiting the foregoing, upon the occurrence and during the continuance of an Event of Default, the Permitted Holder may declare the unpaid Deferred Payments (PD), together with all other amounts payable hereunder, to be immediately due and payable, whereupon such Deferred Payments (PD) and other amounts shall become forthwith due and payable, without presentment, demand, protest or any other notice of any kind (except that in the case of an Event of Default of the type described in subsection <u>(b)</u> or <u>(c)</u> under <u>Section 8</u>, such acceleration shall occur without any action of the Permitted Holder or any other Entity).

(c) In addition, upon the occurrence and during the continuance of an Event of Default, all Deferred Payments (PD) that are past due shall accrue interest at the Default Rate, which, subject to the terms of <u>Section 7</u>, shall be payable to the Permitted Holder on demand until such Event of Default shall have been cured or waived, or all remaining Deferred Payments (PD) shall have been paid in full.

22

10. **Waiver**. There shall be no implied waiver based upon any delay on the part of any party hereto in exercising any right or remedy such party may have pursuant to this Deferred Payment Agreement (PD).

11. **Termination**. Upon the earlier of (A) all of the Deferred Payments (PD) and other amounts payable hereunder having been paid in full or (B) the termination of the WRG Asbestos PD Trust in accordance with the terms of its trust agreement, any and all obligations under this Deferred Payment Agreement (PD) shall be discharged and this Deferred Payment Agreement (PD) shall terminate without any further action by the parties thereto or any other Entity (except to the extent all or any portion of any Deferred Payment (PD) or such other amount is reinstated pursuant to Section 4(d) or to the extent any provision hereof expressly survives the termination of this Deferred Payment Agreement (PD)). Promptly upon such termination, the Permitted Holder shall execute and deliver to Grace, at Grace's sole cost and expense, such documents as are reasonably requested by Grace to fully document the payment, termination and discharge of all obligations hereunder.

12. **Severability**. Whenever possible, each provision of this Deferred Payment Agreement (PD) will be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Deferred Payment Agreement (PD) by any party hereto is held to be invalid, void, voidable, illegal or unenforceable in any respect under any applicable Law in any jurisdiction, such event will not affect any other provision or the effectiveness or validity of any provision in any other jurisdiction, or the obligations of any other party to this Deferred Payment Agreement (PD), and this Deferred Payment Agreement (PD) will be reformed, construed and enforced in such jurisdiction as if such invalid, void, voidable, illegal, unenforceable or rejected provision had never been contained herein. The parties hereto further agree to use commercially reasonable efforts to replace such invalid, void, voidable, illegal, unenforceable or rejected provision of this Deferred Payment Agreement (PD) with a an effective, valid and enforceable provision which will achieve, to the fullest extent possible, the economic, business and other purposes of the invalid, void, voidable, illegal, unenforceable or rejected provision.

13. **Complete Agreement**. This Deferred Payment Agreement (PD), together with the Parent Guarantee (PD), the Share Issuance Agreement, the Plan of Reorganization and the Confirmation Order, embodies the complete agreement and understanding between the parties hereto in respect of the subject matter hereof and supersedes, preempts and terminates all other prior understandings, agreements or representations by or among the parties hereto, written or oral, to the extent relating thereto.

14. **Counterparts**. This Deferred Payment Agreement (PD) may be executed (including by facsimile or portable document format (pdf)) in separate counterparts, each of which will be deemed to be an original and all of which taken together will constitute one and the same agreement.

15. **No Third Party Beneficiaries**. Other than the Parent Guarantor, there are no third party beneficiaries of this Deferred Payment Agreement (PD) and nothing in this Deferred Payment Agreement (PD), express or implied, is intended to confer on any Entity other than the

23

parties hereto and their respective successors, and assigns, any rights, remedies, obligations or liabilities.

16.   **Assignment**.

(a)    This Deferred Payment Agreement (PD) shall be binding upon Grace and its successors and permitted assigns and shall inure to the benefit of the Permitted Holder and its successors and permitted assigns.

(b)    Except as expressly permitted by <u>Section 16(c)</u> and <u>Section 16(d)</u> with respect to this Deferred Payment Agreement (PD), as expressly set forth in Section 16(b) of the Parent Guarantee (PD) with respect to the Parent Guarantor or as expressly set forth in Section 12(b) of the Share Issuance Agreement, in no event shall (i) any Deferred Payment Document (PD) or any rights, interests, duties, obligations or liabilities of the Permitted Holder under the Deferred Payment Documents (PD) (including this Deferred Payment Agreement (PD)), the Plan of Reorganization or the Confirmation Order be Transferred to, or assumed by, any Entity or (ii) the Permitted Holder grant a security interest in any right or interest it has or may have under any Deferred Payment Document (PD) (including this Deferred Payment Agreement (PD)), in each case, without the prior written consent of Grace and the Parent Guarantor.

(c)    Subject to compliance with <u>sub-clauses (d)(i)</u> and <u>(d)(ii)</u> below, upon the occurrence and during the continuance of an Event of Default, the Permitted Holder shall have the right to Transfer, in whole or in part, or grant a security interest in, this Deferred Payment Agreement (PD) or all or any of its rights, interests, duties, liabilities or obligations under this Deferred Payment Agreement (PD) without the prior written consent of Grace or the Parent Guarantor.  Any such Transfer or grant, if made in compliance with this <u>Section 16(c)</u>, shall be effective notwithstanding any subsequent cure or waiver of any Event of Default.

(d)    Subject to compliance with <u>sub-clauses (d)(i)</u> through <u>(d)(v)</u> below, the Permitted Holder shall have the right, at any time and from time to time, to Transfer, in whole or in part, or grant a security interest in, this Deferred Payment Agreement (PD) or all or any of its rights, interests, duties, liabilities or obligations under this Deferred Payment Agreement (PD):

(i)    The Trust (PD) shall provide notice of such Transfer to Grace and the Parent Guarantor in accordance with NY UCC § 9-406 or any successor provision.

(ii)    Unless expressly consented to in advance in writing by Grace and the Parent Guarantor, such Transfer or such grant of a security interest shall not adversely change the duty of, increase the burden, costs or risk imposed upon, or impair the chance of obtaining return performance of, either Grace or the Parent Guarantor under any of the Deferred Payment Documents (PD), as such terms are used, with respect to an assignment or other Transfer, in NY UCC § 2-210(2) or any successor provision, and any such Transfer or grant of a security interest shall not result in increased liabilities or costs for Grace and/or the Parent Guarantor (including on account of any Taxes).

(iii)    Unless expressly consented to in advance in writing by Grace and the Parent Guarantor, upon and following such Transfer or such grant of a security interest, no more than one Entity on behalf of the Trust (PD) and all Entities to whom Transfers have been made

24

(the "Administrative Agent") and one Entity on behalf of all recipients of grants of security interests (the "Collateral Agent") shall have, or shall have the ability to bring, or be able to enforce, any claim, right or cause of action against Grace, the Parent Guarantor or any of their respective Affiliates (other than the Trust (PD)) under this Deferred Payment Agreement (PD) or any document or instrument effecting or evidencing such Transfer or grant of a security interest, regardless of whether any such claim, right, cause of action, or enforcement right arises out of a contract, statute, law, in equity, common law or otherwise.

(iv)     Any such Transfer or such grant of a security interest shall comply with all applicable Laws, including all applicable federal, state and foreign securities laws.

(v)     No such Transfer and no such grant of a security interest shall relieve the Trust (PD) of any of its duties or obligations under this Deferred Payment Agreement (PD), the other Deferred Payment Documents (PD), the Plan of Reorganization, the Confirmation Order or any agreements entered into by the Trust (PD) pursuant to the Plan of Reorganization or the Confirmation Order.

(e)     Subject to Section 16(f), Grace may not Transfer its rights, interests, duties, liabilities or obligations under this Deferred Payment Agreement (PD) without the prior written consent of the "Permitted Holder" (as defined in the Deferred Payment Agreement (PI)), such consent not to be unreasonably withheld, conditioned or delayed.

(f)     Subject to Section 16(g), neither Section 16(e) nor anything else in this Deferred Payment Agreement (PD) or any other Deferred Payment Document (PD) shall prohibit or restrict the ability of Grace to undertake any Disposition Transaction; provided that, unless the "Permitted Holder" (as defined in the Deferred Payment Agreement (PI)) otherwise consents in writing, (i) such Disposition Transaction shall not violate Section 6(b), (ii) no Event of Default and, no event which, with the giving of notice or the passage of time, or both, would constitute an Event of Default, exists at the time of, or would exist immediately following, the consummation of such Disposition Transaction; (iii) such Disposition Transaction does not conflict with, or result in a breach of, any of the provisions of, or constitute a default under, the Governing Documents of Grace or the surviving or succeeding Entity that results from such Disposition Transaction; and (iv) at least ten (10) days prior to consummation of such Disposition Transaction, Grace shall, subject to reasonable confidentiality arrangements between the Permitted Holder and Grace, deliver to the Permitted Holder written notice of its intention to consummate such Disposition Transaction.

(g)     If the surviving or succeeding Entity as a result of any such Disposition Transaction (but in the case of a sale of assets, only if such sale involves a sale of all or substantially all of the assets of Grace) as applicable, is not Grace, then prior to, or concurrently with, the consummation of any such Disposition Transaction, (i) the surviving or succeeding Entity shall by written instrument substantially in the form of Exhibit A signed by such Entity, Grace and, at its option, the Permitted Holder expressly assume the rights and obligations of Grace hereunder, whereupon such Entity shall be the successor of all rights and obligations of Grace hereunder, with the same effect as if it had been originally named herein (it being expressly acknowledged and agreed by Grace and the Permitted Holder that such written instrument shall, and shall expressly provide that it shall, be binding upon, and inure to the

25

benefit of, the Permitted Holder, Grace and such surviving or succeeding Entity whether or not the Permitted Holder shall have executed such written instrument) and (ii) the Parent Guarantor shall confirm in writing to such Entity, Grace and the Permitted Holder that the Parent Guarantee (PD) shall remain in full force and effect after giving effect to such Disposition Transaction and the assumption by the surviving or succeeding Entity of all of the rights and obligations hereunder; provided, however, that Grace shall not be discharged from, and shall remain liable for, any and all of its duties, liabilities and obligations under this Deferred Payment Agreement (PD).

(h)     Grace shall be responsible for, and shall pay promptly upon demand all, documented and direct out-of-pocket costs and expenses incurred by the Permitted Holder (including legal fees and expenses of legal counsel) in connection with any Disposition Transactions proposed by Grace pursuant to Section 16(f) if the Permitted Holder challenges such Disposition Transaction in a judicial or other proceeding or otherwise as being in breach of the provisions of the Deferred Payment Documents (PD) and the Permitted Holder is successful in such challenge.

(i)     Any Transfer in breach of this Section 16 shall be null and void, and shall not Transfer any right, interest, duty, liability or obligation in or under this Deferred Payment Agreement (PD) to any other Entity.

17.     **Governing Law; Submission to Jurisdiction; Waiver of Jury Trial**.

(a)     This Deferred Payment Agreement (PD) and the rights and obligations of the parties hereto shall be construed in accordance with the laws of the State of New York, without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York.

(b)     With respect to claims, suits, actions, proceedings, and other disputes arising out of, in respect of or relating to this Deferred Payment Agreement (PD) (such claims, suits, actions, proceedings, and other disputes, the "Claims") each of the parties to this Deferred Payment Agreement (PD) hereby irrevocably submits to the jurisdiction of the Bankruptcy Court for the District of Delaware or the United States District Court for the District of Delaware (the "Courts"), or, if both such Courts are not permitted under applicable Law to exercise jurisdiction with respect to the matter in question then to the jurisdiction of any other federal or state court in the state, county and city of New York, New York and each of the parties to this Deferred Payment Agreement (PD) agrees that any and all Claims may be brought, heard and determined in such courts.

(c)     Each of the parties to this Deferred Payment Agreement (PD) agrees that (i) venue shall be proper in the courts referenced in Section 17(b) and hereby waives any objection or defense which it may now or hereafter have to the laying of venue in such courts, including any of the foregoing based upon the doctrine of *forum non conveniens*; and (ii) all process which may be or be required to be served in respect of any such Claim (including any pleading, summons or other paper initiating any such Claim) may be served upon it, which service shall be sufficient for all purposes, in the manner for the provision of notice under this Deferred Payment

26

Agreement (PD) and shall be deemed in every respect effective service of process upon such party when so given.

(d)    EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE DEFERRED PAYMENT DOCUMENTS (PD).   EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER DEFERRED PAYMENT DOCUMENTS (PD), AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS PROVISION.

18.    **Notices**.    All notices required or permitted under this Deferred Payment Agreement (PD) must be in writing and will be deemed to be delivered and received (i) if personally delivered or if delivered by the United States Postal Service, facsimile or courier service, when actually received by the party to whom notice is sent or (ii) with respect to parties located other than within the United States, if deposited with the United States Postal Service (whether actually received or not), at the close of business on the seventh Business Day after the day when placed in the mail, postage prepaid, certified or registered with return receipt requested, addressed to the appropriate party or parties, at the address of such party or parties set forth below (or at such other address as such party may designate by written notice to all other parties in accordance with this Section 18):

| **If to Grace:** | *With copies, which shall not constitute notice, to:* | Kirkland & Ellis LLP Citigroup Center 153 E. 53rd Street New York, NY 10022-4675 Attn:  Theodore L. Freedman & Thomas W. Christopher Facsimile:  (212) 446-4900 |
|---|---|---|
| W. R. Grace & Co.-Conn. 7500 Grace Drive Columbia, MD 21044 Attn:  Corporate Secretary Facsimile:  (410) 531-4545 | | |
| **If to the Parent Guarantor:** | *With copies, which shall not constitute notice, to:* | Kirkland & Ellis LLP Citigroup Center 153 E. 53rd Street New York, NY 10022-4675 Attn:  Theodore L. Freedman & Thomas W. Christopher Facsimile:  (212) 446-4900 |
| W. R. Grace & Co. 7500 Grace Drive Columbia, MD 21044 Attn:  Corporate Secretary Facsimile:  (410) 531-4545 | | |

| **If to the Permitted Holder:** | *With copies, which shall not constitute notice, to:* | [Notice Street Address] [City], [State] [Zip] Attn:  [ ] Facsimile: [ ] |
|---|---|---|
| WRG Asbestos PD Trust [Notice Street Address] [City], [State] [Zip] Attn:  [ ] Facsimile:  [ ] *(if sending overnight packages use zip code [ ])* | | |

19.     **Costs and Expenses**.  Grace agrees to reimburse the Permitted Holder promptly upon demand for all, documented and direct out-of-pocket costs and expenses, including all attorney's fees and expenses of legal counsel, which may be incurred by the Permitted Holder in enforcing this Deferred Payment Agreement (PD) or the Parent Guarantee (PD) or protecting the rights of the Permitted Holder hereunder or thereunder, but only to the extent that the Permitted Holder succeeds in enforcing this Deferred Payment Agreement (PD) or the Parent Guarantee (PD) or protecting the rights of the Permitted Holder hereunder or thereunder.

20.     **Amendments and Waivers**.  No provision of this Deferred Payment Agreement (PD) may be waived, amended, supplemented or modified except by a written instrument executed by the Parent Guarantor, Grace and the Permitted Holder.

21.     **Further Assurances**.  At the reasonable request of the Permitted Holder, Grace will, at the sole expense of the Permitted Holder, execute such agreements, documents, certificates and/or other instruments confirming the existence of this Agreement, the obligations of Grace hereunder and the rights of the Permitted Holder hereunder.

22.     **Specific Performance**.  Each of the parties hereto acknowledges and agrees that, in the event of any breach of, or any failure to perform, any specific provision of this Deferred Payment Agreement (PD), the non-breaching party would be irreparably and immediately harmed and could not be made whole by monetary damages.  It is accordingly agreed that, subject to Section 7, the parties hereto (a) shall be entitled, in addition to any other remedy to which they may be entitled at law or in equity, to compel specific performance of any specific provision of this Deferred Payment Agreement (PD) or to obtain injunctive relief to prevent breaches of any specific provision of this Deferred Payment Agreement (PD) exclusively in the Courts, (b) shall waive, in any action for specific performance or injunctive relief, the defense of the adequacy of a remedy at law, and (c) shall waive any requirement for the securing or posting of any bond in connection with the obtaining of any such specific performance or injunctive relief.  For the avoidance of doubt, the parties agree that the Permitted Holder shall be entitled to enforce specifically the terms and provisions of this Deferred Payment Agreement (PD) to prevent breaches of or enforce compliance with those covenants of Grace set forth in Section 6. Any party's pursuit of specific performance or injunctive relief at any time will not be deemed an election of remedies or waiver of the right to pursue any other right or remedy to which such

28

party may be entitled, including the right to pursue remedies for liabilities or damages incurred or suffered by such party.

23.     **Other Remedies**.   Except as otherwise provided herein, any and all remedies herein expressly conferred upon a party shall be deemed cumulative with and not exclusive of any other remedy conferred hereby or by law on such party, and the exercise of any one remedy shall not preclude the exercise of any other.

24.     **Trust (PD) Covenant**.   The Trust (PD) covenants and agrees that any funds or other assets remaining in the Trust (PD) at the expiration of its existence shall be paid over in full to the Trust (PI) upon such expiration.   This Section 24 shall survive the termination of this Deferred Payment Agreement (PD).

29

IN WITNESS WHEREOF, the parties hereto have executed this Deferred Payment Agreement (PD) as of the date first written above.

GRACE:                              W. R. GRACE & CO.-CONN.


                                    By: _____
                                         Name:
                                         Title:

TRUST (PD):                           WRG ASBESTOS PD TRUST

By: _____

    Name:
    Title:  Trustee

Solely for purposes of <u>Section 20</u>:

PARENT GUARANTOR:               W. R. GRACE & CO.

By: _____
        Name:
        Title:

EXHIBIT A

FORM OF

ASSUMPTION AGREEMENT

[To come]

EXHIBIT B

FORM OF

QUARTERLY EBITDA AND VALUATION CERTIFICATE

[To come]

EXHIBIT C

FORM OF

COMPLIANCE CERTIFICATE

[To come]

EXHIBIT D

FORM OF

POST-TRANSACTION CERTIFICATE

[To come]

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| **In re:** | ) | Chapter 11 |
|  | ) |  |
| **W. R. GRACE & CO.,** *et al.*[1] | ) | Case No. 01-01139 (JKF) |
|  | ) | Jointly Administered |
| **Debtors.** | ) |  |
|  | ) |  |
|  | ) |  |
|  | ) |  |

## EXHIBIT 28 TO EXHIBIT BOOK
## DEFERRED PAYMENT AGREEMENT (CLASS 7B ZAI)

**EXHIBIT 28**

Attached.

---

[1]    The Debtors consist of the following 62 entities:  W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co. Conn., A-1 Bit & Tool Co., Inc., Alewife  Boston Ltd., Alewife Land Corporation, Amicon, Inc.,  CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., GC Limited Partners I, Inc., (f/k/a Grace Cocoa Limited Partners I, Inc.), GC Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc. GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation., W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (F/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

## FORM OF DEFERRED PAYMENT AGREEMENT
## (CLASS 7B ZAI)

THIS DEFERRED PAYMENT AGREEMENT (CLASS 7B ZAI) (this "Deferred Payment Agreement (ZAI)") is made and entered into as of [__], 2009 by and between W. R. Grace & Co.-Conn., a Connecticut corporation (together with any successor thereto pursuant to the terms and conditions of Section 16, "Grace"), and the WRG Asbestos PD Trust, on behalf of the Holders of US ZAI PD Claims (in such capacity, the "Trust (ZAI)"), a Delaware statutory trust established pursuant to §524(g) of the Bankruptcy Code in accordance with the Plan of Reorganization (as hereinafter defined).   Unless otherwise defined herein or the context otherwise requires, all capitalized terms used herein and defined in the Plan of Reorganization shall be used herein as therein defined.

NOW, THEREFORE, in consideration of the premises contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    **Definitions; Rules of Interpretation**.

(a)    The following terms are defined as follows:[1]

"Administrative Agent" has the meaning set forth in Section 16(d)(3).

"Aggregate Excess Expense Credit" means, for purposes of calculating any Contingent Deferred Payment (ZAI), the total aggregate amount (if any) by which the sum of Trust's Expenses (ZAI) for each Contingent Payment Reference Period since the last Contingent Deferred Payment (ZAI) exceeds the corresponding amount set forth below for each such Contingent Payment Reference Period:

(A)    for the Contingent Payment Reference Period between the first Effective Day Anniversary and the second Effective Day Anniversary, $1,500,000; plus

(B)    for the Contingent Payment Reference Period between the second Effective Day Anniversary and the third Effective Day Anniversary, $1,250,000; plus

(C)    for the Contingent Payment Reference Period between the third Effective Day Anniversary and the fourth Effective Day Anniversary, and for each Contingent Payment Reference Period thereafter, $1,000,000; provided, however, that on and after any Contingent Payment Reference Period occurring on or after the fifth Effective Date Anniversary, such $1,000,000 amount shall be annually adjusted to reflect the inflation rate in respect of the relevant Contingent Payment Reference Period  (as determined by the U.S. Department of Bureau of Labor Statistics in the Consumer Price Index provided by it in respect of the relevant Contingent Payment Reference Period); and

---

[1]    To the extent that any of these definitions are contained in the Plan of Reorganization, they will be deleted here.

provided, further, that if Grace is required to make a Contingent Deferred Payment (ZAI) and as to such Contingent Deferred Payment (ZAI) is permitted to apply an Aggregate Excess Expense Credit, then the calculation of Grace's Aggregate Excess Expense Credit from and after the last day of the Contingent Payment Reference Period in respect of such Contingent Deferred Payment (ZAI) has accrued shall be calculated only with respect to the applicable caps and Trust's Expenses for such succeeding Contingent Payment Reference Periods.

"Authorized Officer" means, with respect to any Entity, the chief executive officer, president, chief financial officer, controller, executive vice president or senior vice president of such Entity.

"Bona Fide Compensation Transaction" means any payment, grant or award, whether in cash, securities, options or other consideration, including without limitation salary or bonus, to or for the benefit of any director, officer or employee of any Transferor or any of its Affiliates made for legitimate, bona fide compensation and/or incentivization purposes; provided that compensation paid, granted or awarded to any one such individual in any Fiscal Year of Transferor whose aggregate value at the time or times of payment, grant or award is in excess of $15,000,000 shall be a Bona Fide Compensation Transaction only (i) if the relevant Transferor is then obligated to file or furnish, or is otherwise filing or furnishing, reports with the United States Securities and Exchange Commission pursuant to Section 13 or 15 of the Securities Exchange Act of 1934, it is approved by an independent committee of the Board of Directors of the Transferor (or other similar management body of the Transferor) or (ii) if the relevant Transferor is not then obligated to file or furnish, or is not otherwise filing or furnishing, reports with the United States Securities and Exchange Commission pursuant to Section 13 or 15 of the Securities Exchange Act of 1934, a reputable independent compensation expert or consultant selected by the Transferor with the consent of the "Permitted Holder" (as defined in the Deferred Payment Agreement (PI)) (which consent shall not be unreasonably withheld, conditioned or delayed) shall have determined, in its reasonable, good faith judgment, that such payment, grant or award is reasonable and appropriate.  For purposes of the proviso in the previous sentence, (A) no payment or other value received in a given year pursuant to the terms of a grant or award in a previous year shall be taken into account for calculating the compensation in such given year; and (B) in the event of multiple payments, grants or awards in a given Fiscal Year, the independent committee approval, or independent compensation expert or consultant determination, as appropriate, shall be made with respect to each payment, grant or award beginning with the payment, grant or award that causes the compensation to be in excess of $15,000,000.

"Business Day" means any day other than a Saturday, Sunday, or any other day on which banks are authorized or required to close in New York, New York or Columbia, Maryland.

"Capital Stock" means, with respect to any Entity, any share of stock, or any depositary receipt or other certificate representing any share of stock, or any similar equity ownership interest, and any warrant, option, or any other security providing for the right to acquire any such share of stock or similar equity ownership interest.

2

"Claims" has the meaning set forth in Section 17(b).

"Collateral Agent" has the meaning set forth in Section 16(d)(3).

"Common Stock" has the meaning set forth in the Share Issuance Agreement.

"Compliance Certificate" means a certificate in the form of Exhibit C.

"Contingent Deferred Payment Date"  means the later of:

(i)     the anniversary date of the Effective Date (the "Effective Date Anniversary") immediately following the receipt of the relevant Trust's Certificate, or

(ii)    the sixtieth (60th) day after receipt of the relevant Trust's Certificate; provided, however, that if an Effective Date Anniversary occurs between the date the Trust's Certificate is received by Grace and Parent Guarantor and the 60th day thereafter, then such Contingent Deferred Payment (ZAI) shall be due and payable, and the Contingent Deferred Payment Date shall be deemed to occur, on such 60th day.

"Contingent Deferred Payment (ZAI)"  means an amount equal to $8,000,000 minus the amount, if any, of the Aggregate Excess Expense Credit as determined in accordance with Section 2(b).

"Contingent Payment Reference Period" has the meaning set forth in Section 2(a)(ii).

"Control" means, as to any Entity, the power to direct the management and policies of such Entity directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "Controlling" and "Controlled" have meanings correlative to the foregoing.

"Controlled Affiliate" means, as to any Entity (the "Controlling Entity"), any Affiliate that is Controlled by such Controlling Entity.

"Courts" has the meaning set forth in Section 17(b).

"Default Rate" means a floating rate equal to the Prime Rate plus 2.00% per annum.

"Deferred Payments" means, collectively, the Deferred Payments (PI), the Deferred Payments (PD) and the Deferred Payments (ZAI).

"Deferred Payment Agreement (PD)" means the Deferred Payment Agreement (Class 7(a) PD) dated as of even date herewith between Grace and the Trust (PD) (as defined in the Deferred Payment Agreement (PD)).

"Deferred Payment Agreement (PI)" means the Deferred Payment Agreement (PI) dated as of even date herewith between Grace and the Trust (PI).

3

"Deferred Payment Agreement (ZAI)" has the meaning set forth in the introductory paragraph hereof.

"Deferred Payment Date (ZAI)" means, in respect of a Deferred Payment (ZAI), each corresponding date set forth in Section 2.

"Deferred Payment Documents" means this Deferred Payment Documents (ZAI), the Deferred Payment Documents (PD) (as defined in the Deferred Payment Agreement (PD)) and the Deferred Payment Documents (PI) (as defined in the Deferred Payment Agreement (PI)).

"Deferred Payment Documents (ZAI)" means this Deferred Payment Agreement (ZAI), the Parent Guarantee (ZAI) and the Share Issuance Agreement.

"Deferred Payment (PD)" has the meaning set forth in the Deferred Payment Agreement (PD).

"Deferred Payment (PI)" has the meaning set forth in the Deferred Payment Agreement (PI).

"Deferred Payment (ZAI)" means (i) a Contingent Deferred Payment (ZAI) or a Fixed Deferred Payment (ZAI) and (ii) all Contingent Deferred Payments (ZAI) and all Fixed Deferred Payments (ZAI), collectively.

"Demand for Issuance of the Section 524(g) Shares" has the meaning set forth in the Share Issuance Agreement.

"Designated Senior Indebtedness" means Senior Indebtedness issued, pursuant to a facility with an aggregate principal amount, commitments and/or other financial accommodations then outstanding and/or available (disregarding for purposes of this definition whether any conditions for draws thereunder have been satisfied), as of the relevant date of determination, of at least $25,000,000.

"Disposition Transaction" has the meaning set forth in Section 6(b).

"Disqualified Equity Interest" means that portion of any Equity Interest which, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable), or upon the happening of any event, matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or is redeemable at the sole option of the holder thereof on or prior to the final Deferred Payment Date (ZAI).

"Dollars" and "$" means the legal currency of the United States of America.

"EBITDA" means, for any Entity for any period, such Entity's and its Subsidiaries' consolidated net income (determined in accordance with GAAP) for such period plus, without duplication, in respect of any such item of such Entity and/or any of its Subsidiaries (i) to the extent deducted in determining such consolidated net income, the sum, without duplication, of (a) interest expense, (b) provisions for any income or similar taxes paid or accrued, (c) all amounts treated as expenses for depreciation and amortization of any kind, (d)

4

cash and non-cash restructuring and reorganization, and other similar fees, costs, charges and expenses, including without limitation, as a result of, or in connection with, the Chapter 11 Cases and the Deferred Payment Documents, (e) items classified as extraordinary under Accounting Principles Board Opinion No. 30 (as amended, restated, supplemented, replaced or otherwise modified from time to time) incurred during such period, and (f) any non-cash charges minus (ii) to the extent included in determining such consolidated net income, the sum, without duplication, of (a) gross interest income received during such period and (b) items classified as extraordinary under Accounting Principles Board Opinion No. 30 (as amended, restated, supplemented, replaced or otherwise modified from time to time) realized during such period, all, in the cases of clauses (i) and (ii) above, as determined on a consolidated basis in accordance with GAAP.

"Effective Date Anniversary" has the meaning set forth in the definition of "Contingent Deferred Payment Date."

"Equity Interest" means shares of capital stock or equity, equity securities or ownership interests in any Entity or any rights (including any (x) options, warrants or other rights to purchase or acquire any such stock, equity or interests (whether or not at the time exercisable), or (y) securities by their terms convertible into or exchangeable for any such stock, equity or interests (whether or not at the time so convertible or exchangeable) or options, warrants or rights to purchase such convertible or exchangeable securities.

"Event of Default" has the meaning set forth in Section 8.

"Fair Market Value" means, with respect to each share of the Common Stock:

(i)    If traded on the NYSE, NASDAQ or another stock exchange, the last reported sale price of the Common Stock on the NYSE, NASDAQ or such other exchange on the trading day immediately prior to the date on which the Section 524(g) Shares are issued;

(ii)    If traded over-the-counter other than on NASDAQ, the average of the closing bid and ask prices of the Common Stock on the trading day immediately prior to the date on which the Section 524(g) Shares are issued; and

(iii)    If there is no public market for the Common Stock, the fair market value of the Common Stock as of the day immediately prior to the date on which the Section 524(g) Shares are issued, as determined by a reputable investment bank or valuation firm selected jointly by Grace and the Trusts' Representative (the "Independent Appraiser"). Grace and the Trusts' Representative shall instruct the Independent Appraiser to render its decision within thirty days of its acceptance of its selection. The fees and expenses of the Independent Appraiser shall be borne by Grace. Unless otherwise agreed to by Grace and the Trusts' Representative, no investment bank or valuation firm, nor any of its Affiliates or Subsidiaries, shall perform a valuation pursuant to this clause (iii) if such bank or firm has rendered services to Grace, the Parent Guarantor or any of their Affiliates or Subsidiaries within the last three years prior to performing such valuation or has or is reasonably likely to have an agreement with Grace, the Parent Guarantor or any of its Affiliates to render such services within the following year.

5

"Fiscal Quarter" means, in respect of any Entity, a fiscal quarter of such Entity as determined by it.

"Fiscal Year" means, in respect of any Entity, a fiscal year of such Entity as determined by it.

"Fixed Deferred Payment Date (ZAI)" has the meaning set forth in Section 2(a).

"Fixed Deferred Payment (ZAI)" has the meaning set forth in Section 2(a).

"GAAP" means generally accepted accounting principles in effect from time to time in the United States, applied on a consistent basis; provided, however, that as of such time, if any, when any Entity begins to provide financial information generally on the basis of IFRS, then any reference to GAAP with respect to such Entity shall be given effect as a reference to IFRS.

"Governing Documents" means, as to any Entity, its articles or certificate of incorporation and by-laws, its partnership agreement, its certificate of formation and operating agreement and/or the organizational or governing documents of such Entity.

"Governmental Authority" means the government of the United States of America or any other country, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of, or pertaining to, government (including any supra-national bodies such as the European Union or the European Central Bank).

"Grace" has the meaning set forth in the introductory paragraph hereof.

"IFRS" means the International Financial Reporting Standards as adopted by the International Accounting Standards Board and in effect from time to time, consistently applied.

"Insolvent" means the financial condition of the Parent Guarantor, its Subsidiaries and Grace taken as a whole such that as of the date specified, the sum of their liabilities is greater than a fair valuation of all of their property and other assets.

"Intercreditor Agreement" means the Intercreditor Agreement, dated as of the date hereof, among the Trusts' Representative, the Trust (PI) and the Trust (PD).

"Laws" means, collectively, all applicable international, foreign, Federal, state and local statutes, treaties, rules, regulations, ordinances and codes, including the binding interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof.

"NASDAQ" shall mean The NASDAQ Stock Market (including any of its subdivisions such as the NASDAQ Global Select Market) or any successor market thereto.

6

"NYSE" shall mean The New York Stock Exchange or any successor stock exchange thereto.

"NY UCC" means the Uniform Commercial Code, as enacted and in effect in the State of New York from time to time.

"Ordinary Dividends" means, in respect of any Entity, ordinary cash dividends declared and paid out of surplus and/or net profits (as determined in accordance with applicable law) in accordance with the dividend policy of such Entity as in effect from time to time; provided, however, that notwithstanding the foregoing, the excess, if any of (a) the aggregate amount of dividends declared and paid by such Entity in any Fiscal Year over (b) 50% of such Entity's and its Subsidiaries' consolidated net income (determined in accordance with GAAP) for the immediately preceding Fiscal Year shall not constitute "Ordinary Dividends" to the extent of such excess.

"Parent Guarantee (ZAI)" means the W. R. Grace & Co. Guarantee Agreement (Class 7(b) ZAI) dated as of even date herewith by the Parent Guarantor in favor of the Trust (ZAI).

"Parent Guarantor" means W. R. Grace & Co., a Delaware corporation, and any successor guarantor of the obligations of Grace (or a successor Entity) arising under this Deferred Payment Agreement (ZAI) pursuant to the terms and conditions of the Parent Guarantee (ZAI).

"Payment Blockage Notice" has the meaning set forth in Section 7(a)(ii).

"Payment Blockage Period" has the meaning set forth in Section 7(a)(ii).

"Permitted Holder" means, as of any date of determination, collectively, (a)(i) if the Trust (ZAI) has not, as of such date, assigned any of its rights or privileges under this Deferred Payment Agreement (ZAI) (other than granting a security interest in its rights and privileges under this Deferred Payment Agreement (ZAI)), the Trust (PI) and (ii) otherwise, the Administrative Agent and (b) the Collateral Agent.

"Permitted Payee" means, as of any date of determination, the Permitted Holder or any permitted assignee of all or any portion of the Deferred Payments (ZAI) and the rights and interests therein and thereto pursuant to the terms and conditions of Section 16.

"Permitted Payor" means any Entity (other than Grace but including the Parent Guarantor) acting on behalf of, or designated by Grace.

"Plan of Reorganization" means that certain First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code of W. R. Grace & Co., et al., the Official Committee of Asbestos Personal Injury Claimants, the Future Claimants' Representative, and the Official Committee of Equity Security Holders Dated as of February 27, 2009, as filed by Grace and certain of its affiliates in their reorganization cases under chapter 11 of the Bankruptcy Code, in the United States Bankruptcy Court for the District of Delaware, and as confirmed by order of that court dated as of [__], 2009, together with the exhibits and

7

schedules thereto, each as amended, supplemented or otherwise modified from time to time in accordance with its terms.

"Post-Transaction Certificate" means a certificate in the form of Exhibit D.

"Post-Transaction Pro Forma Cash Balance" means with respect to any Entity as of any date of determination, the aggregate amount of such Entity's and its consolidated Subsidiaries' cash and cash equivalents as of such date (after giving effect to and assuming the consummation of any Significant Transaction with a Transaction Date occurring on or prior to such date, notwithstanding that such Significant Transaction may not have actually been consummated as of such date), other than cash and cash equivalents the disposition of which is subject to a material restriction for the benefit of Entities other than such Entity and its consolidated Subsidiaries.

"Post-Transaction Pro Forma EBITDA" means, with respect to any Entity for any four-Fiscal Quarter period and any specified Disposition Transaction, such Entity's Pro Forma EBITDA for such four-Fiscal Quarter period, computed assuming that such Disposition Transaction, and any other Significant Transaction the Transaction Date of which occurs on or prior to the Transaction Date of such Disposition Transaction and during the same Fiscal Quarter as the Transaction Date of such Disposition Transaction, were consummated on the same terms in effect on the respective Transaction Dates at the beginning of the four-Fiscal Quarter period most recently ended prior to the Transaction Date of such Disposition Transaction, and shall include adjustments which give effect to events that are (i) directly attributable to such Disposition Transaction and any such Significant Transactions, (ii) expected to have a continuing impact on the Entity, and (iii) factually supportable.

"Post-Transaction Pro Forma Senior Indebtedness" means with respect to any Entity as of any date of determination, the aggregate outstanding principal amount of such Entity's and its consolidated Subsidiaries' Senior Indebtedness as of such date (after giving effect to and assuming the consummation of any Significant Transaction (and any related incurrence, reduction or repayment of Senior Indebtedness) with a Transaction Date occurring on or prior to such date, notwithstanding that such Significant Transaction (and any related incurrence, reduction or repayment of Senior Indebtedness) may not have actually been consummated as of such date).

"Post-Transaction Pro Forma Valuation" means, with respect to any Entity as of any date of determination, the amount resulting from (a) the product of (i) such Entity's Post-Transaction Pro Forma EBITDA for the four-Fiscal Quarter period most recently ended, multiplied by (ii) seven (7), minus (b) such Entity's Post-Transaction Pro Forma Senior Indebtedness as of such date, plus (c) such Entity's Post-Transaction Pro Forma Cash Balance as of such date.

"Prime Rate" means as of any date of determination, the *per annum* rate publicly announced on such date as the daily "U.S. prime rate" by The Wall Street Journal (National Edition) for transactions in Dollars.  Any change in the Default Rate resulting from a change in the Prime Rate shall become effective on the Business Day on which each change in the Prime Rate is publicly announced by The Wall Street Journal (National Edition).

8

"Proceeding" means, with respect to any Entity, any voluntary or involuntary insolvency, bankruptcy, receivership, custodianship, liquidation, reorganization, assignment for the benefit of creditors, appointment of a custodian, receiver, trustee or other officer with similar powers or any other proceeding for the liquidation, or other winding up of such Entity or all or substantially all of the properties of such Entity.

"Pro Forma Cash Balance" means with respect to any Entity as of the last day of any four-Fiscal Quarter period, the aggregate amount of such Entity's and its consolidated Subsidiaries' cash and cash equivalents as of such date (after giving effect to and assuming the consummation of any Significant Transaction with a Transaction Date occurring during such four-Fiscal Quarter period, notwithstanding that such Significant Transaction may not have actually been consummated during such four-Fiscal Quarter period), other than cash and cash equivalents the disposition of which is subject to a material restriction for the benefit of Entities other than such Entity and its consolidated Subsidiaries.

"Pro Forma EBITDA" means, with respect to any Entity for any four Fiscal-Quarter period, such Entity's EBITDA for such four Fiscal-Quarter period, computed assuming that any Significant Transaction the Transaction Date of which occurred during the relevant four-Fiscal Quarter period was consummated, on the terms in effect on such Transaction Date, at the beginning of such four-Fiscal Quarter period most recently ended prior to the Transaction Date of such Significant Transaction, and shall include adjustments which give effect to events that are (i) directly attributable to any Significant Transactions the Transaction Date of which occurs during such four-Fiscal Quarter period, (ii) expected to have a continuing impact on the Entity, and (iii) factually supportable.

"Pro Forma Senior Indebtedness" means with respect to any Entity as of the last day of any four-Fiscal Quarter period, the aggregate outstanding principal amount of such Entity's and its consolidated Subsidiaries' Senior Indebtedness as of such date (after giving effect to and assuming the consummation of any Significant Transaction (and any related incurrence, reduction or repayment of Senior Indebtedness) with a Transaction Date occurring during such four-Fiscal Quarter period, notwithstanding that such Significant Transaction (and any related incurrence, reduction or repayment of Senior Indebtedness) may not have actually been consummated during such four-Fiscal Quarter period).

"Pro Forma Valuation" means, with respect to any Entity as of the last day of any four-Fiscal Quarter period, the amount resulting from (a) the product of (i) such Entity's Pro Forma EBITDA for such four-Fiscal Quarter period, multiplied by (ii) seven (7), minus (b) such Entity's Pro Forma Senior Indebtedness as of such date, plus (c) such Entity's Pro Forma Cash Balance as of such date.

"Quarterly EBITDA and Valuation Certificate" means a certificate in the form of Exhibit B.

"Regulation S-X" means Regulation S-X promulgated by the United States Securities and Exchange Commission as in effect on the date hereof.

9

"Related Party" means in respect of an Entity (the "Affected Entity"): (a) any senior key employee, officer or director of the Affected Entity or, in respect of an officer or director, any person holding a similar position in an Affected Entity that is not a corporation (any such person, an "Insider"); (b) any spouse, child, parent or sibling of an Insider; (c) another Entity which alone or together with other Entities under its Control directly or indirectly Controls or holds ten percent (10%) or more of the Equity Interests that (i) generally entitle the holders thereof to vote for the election of the board of directors or other governing body of the Affected Entity, or (ii) confer upon the holders thereof an interest in the capital or profits of the Affected Entity; (d) any Entity Controlled by the Affected Entity or by any Insider or in which the Affected Entity or any Insider Controls or holds ten percent (10%) or more of the stock or other equity interests which (i) generally entitle the holders thereof to vote for the election of the board of directors or other governing body of the Affected Entity or (ii) confer upon the holders thereof an interest in the capital or profits of such Affected Entity; or (e) any Controlled Affiliate of any Entity that is a Related Person by virtue of clause (d) of this definition; provided, however, that any direct or indirect 100% owned Subsidiary of Grace shall not constitute a "Related Party" for purposes of this Deferred Payment Agreement (ZAI).

"Section 524(g) Shares" has the meaning set forth in the Share Issuance Agreement.

"Senior Indebtedness" means any and all present and/or future, direct and/or indirect, indebtedness, liabilities and other obligations of Grace and/or the Parent Guarantor owed to any Entity (whether as senior or subordinated indebtedness, as a first lien, second lien, any other position or priority, and any mezzanine, subordinated or other indebtedness), including any principal, interest and premiums, fees, investment points, reimbursement obligations, issuance discounts and/or other costs, indemnities, liabilities and/or expenses thereon or in connection therewith (including any interest accruing subsequent to the filing of a petition of bankruptcy at the rate provided for in the documentation with respect thereto, whether or not such interest is an allowed claim under applicable Law), in each case, under or with respect to (i) any credit or loan facilities (whether provided by one or more banks, insurance companies, financial institutions, private equity or hedge funds, lenders, and/or other Entities) and/or (ii) any debt, bonds, debentures, notes, repurchase, discount, securitization, factoring and/or other similar facilities providing for indebtedness, including any and all obligations of any nature in respect of loans, credit agreements, indentures, and bonds, together with obligations in respect of hedging arrangements (whether in respect of interest rates, currencies, commodities, equities, indebtedness and/or otherwise), in each case, entered into with banks, insurance companies, financial institutions, private equity or hedge funds, lenders and/or other Entities who are engaged in the business of providing financing (but not customers of or suppliers to Grace and/or the Parent Guarantor to the extent constituting trade payables), notes, letters of credit, and synthetic letters of credit in connection therewith, and/or (iii) any reimbursement, payment, indemnities, fees, guarantees or other obligations in connection with any credit or loan facilities or indebtedness, liabilities and other obligations referenced in clauses (i) or (ii);

except in each case, for indebtedness of Grace and/or the Parent Guarantor (A) that by its express terms is not Senior Indebtedness for purposes of this Deferred Payment Agreement (ZAI) and the Parent Guarantee (ZAI) and is to be treated as *pari passu* or junior and subordinated with respect thereto in accordance with its terms, (B) for the avoidance of doubt,

10

consisting of obligations to trade creditors and other trade payables in connection with the purchase of goods, materials or services, (C) owed to, or guaranteed by Grace or the Parent Guarantor on behalf of, any director, officer or senior key employee of (1) Grace, (2) the Parent Guarantor or (3) any Subsidiary or Affiliate of Grace or the Parent Guarantor, (D) represented by Disqualified Equity Interests, (E) owed to (1) Grace, (2) the Parent Guarantor or (3) any Subsidiary or Affiliate of Grace or the Parent Guarantor and (F) resulting from the Deferred Payment Documents (PD) or the Deferred Payment Documents (PI).

"Senior Non-Payment Default" has the meaning set forth in Section 7(a)(ii).

"Senior Payment Default" has the meaning set forth in Section 7(a)(i).

"Senior Remedies" means, if an event of default has occurred and is continuing under the terms of any agreement or document relating to Senior Indebtedness, any of the following by the holder (or any agent or trustee of the holder) of any Senior Indebtedness:  (1) exercising or seeking to exercise any rights or remedies against Grace or the Parent Guarantor with respect to such event of default or (2) instituting any action or proceeding with respect to such rights or remedies (including any action of foreclosure, contest or protest) under any agreement or document relating to Senior Indebtedness, or under such event of default or otherwise or (3) attempting to do any of the foregoing.

"Significant Transaction" means (a) any Disposition Transaction or (b) any transaction of the type described in Section 210.11-01(a)(1) or Section 210.11-01(a)(2) of Regulation S-X (disregarding, for purposes of clause (b) of this definition, whether the Entity entering into such transaction is at the time obligated to file or furnish, or is otherwise filing or furnishing, reports with the United States Securities and Exchange Commission pursuant to Section 13 or 15 of the Securities Exchange Act of 1934, as amended).

"Subsidiary" means, with respect to any Entity at any date, any corporation, limited or general partnership, limited liability company, trust, estate, association, joint venture or other business entity (i) the accounts of which would be consolidated with those of such Entity in such Entity's consolidated financial statements if such financial statements were prepared in accordance with GAAP or (ii) of which more than 50% of (A) the outstanding Capital Stock having (in the absence of contingencies) ordinary voting power to elect a majority of the board of directors or other managing body of such Entity, (B) in the case of a partnership or limited liability company, the interest in the capital or profits of such partnership or limited liability company or (C) in the case of a trust, estate, association, joint venture or other entity, the beneficial interest in such trust, estate, association or other entity business is, at the time of determination, owned or Controlled directly or indirectly through one or more intermediaries, by such Entity.

"Taxes" means any and all present or future taxes, levies, imposts, fees, assessments, levies, duties, deductions, charges, liabilities or withholdings (including interest, fines, penalties or additions to tax) imposed by any Governmental Authority.

"Threshold Amount" means, as of any date of determination, the sum of (a) $2,000,000,000 minus (b) the aggregate amount of Deferred Payments (ZAI) made by Grace and

11

any Permitted Payor under this Deferred Payment Agreement (ZAI) on or prior to such date <u>plus</u> (c) the aggregate amount of Deferred Payments (ZAI) received by the Permitted Holder or any Permitted Payee under this Deferred Payment Agreement (ZAI) from Grace or any relevant Permitted Payor that have subsequently been invalidated, declared to be fraudulent or preferential, set aside and/or required or agreed to be repaid or returned by the Permitted Holder or such Permitted Payee under this Deferred Payment Agreement (ZAI) as of such date under any Law or in respect of any Proceeding or other litigation to which Grace, the relevant Permitted Payor, the Permitted Holder or any Permitted Payee is subject <u>plus</u>, without duplication, (d) the aggregate amount of Deferred Payments (ZAI) received by the Permitted Holder or any Permitted Payee that the relevant Permitted Holder or such Permitted Payee has delivered to the holders of any Senior Indebtedness pursuant to <u>Section 7(c)</u> of this Deferred Payment Agreement (ZAI) as of such date.

"<u>Total Assets</u>" means, as of any date of determination, the value of the Trust (ZAI)'s total assets as reflected on the "Asset" column of its balance sheet and as determined in accordance with GAAP; <u>provided</u>, <u>however</u>, that such amount of total assets shall be increased (without duplication) on a dollar-for-dollar basis by an amount equal to the aggregate amount of any payments made in breach of the Plan of Reorganization and/or the [ZAI Trust Distribution Procedures] (as determined either by the Trust (ZAI) and Grace or through an independent alternative dispute resolution procedure in accordance with the Plan of Reorganization and/or the [ZAI Trust Distribution Procedures], as applicable) prior to the date of determination.

"<u>Transaction Date</u>" means, with respect to any Significant Transaction, (a) the date, if any, on which final, definitive documentation providing for such Significant Transaction is executed; <u>provided</u>, <u>however</u>, that the "Transaction Date" shall no longer be deemed to have occurred with respect to any Significant Transaction if the final, definitive documentation providing for such Significant Transaction is terminated for any reason, or (b) if no such final, definitive documentation for such Significant Transaction is executed, the date on which such Significant Transaction is consummated.

"<u>Transfer</u>" has the meaning set forth in <u>Section 6(b)</u>.

"<u>Transferor</u>" has the meaning set forth in <u>Section 6(b)</u>.

"<u>Trust (PD)</u>" has the meaning set forth in the Deferred Payment Agreement (PD).

"<u>Trust (PI)</u>" means the WRG Asbestos Trust, a Delaware statutory trust established pursuant to §524(g) of the Bankruptcy Code in accordance with the Plan of Reorganization.

"<u>Trusts</u>" has the meaning set forth in the Share Issuance Agreement.

"<u>Trust's Certificate</u>" means a certificate duly executed and delivered by an officer of the Trust (ZAI) to Grace and Parent Guarantor setting forth:

(i) the balance sheet of the Trust (ZAI) as of the relevant date and a certification that such balance sheet is true and correct in all material respects and fairly represents the assets

12

and liabilities of the Trust (ZAI) as of such date as determined in accordance with GAAP consistently applied,

(ii) an itemized list, and the aggregate amount of, the Trust's Expenses incurred during the most recently completed Contingent Payment Reference Period (or, in respect of the first Trust's Certificate, the Trust's Expenses incurred since (and including) the Effective Date),

(iii) the aggregate amount, if any, of any Aggregate Excess Expense Credit as of the end of such Contingent Payment Reference Period, and

(iv) a certification by the Trust (ZAI) that all the information set forth in the certificate is true and correct in all material respects.

"Trust's Expenses (ZAI)" means any and all costs, fees, disbursements and expenses of any nature, whether administrative, accounting, operational, legal, financial, agency, advisory, on account of compensation, or otherwise, of the Trust (ZAI) incurred by or for the account of the Trust (ZAI) in connection with bona fide purposes of the Trust (ZAI) as such purposes existed as of the Effective Date; provided, however, that the following shall not constitute Trust's Expenses (ZAI):

(A) costs, fees, disbursement and expenses on account of Allowed Class 7(b) Claims,

(B) costs, fees, disbursements and expenses that may be ordered by the U.S. Bankruptcy Court or U.S. District Court in connection with any US ZAI Class Action Common Fund fee petitions,

(C) costs, fees, disbursements and expenses in respect of the "ZAI educational program" described in Section 5.3 of the ZAI Trust Distribution Procedures),

(D) costs, fees, disbursements and expenses in respect of any vermiculite testing procedure set forth in Section 5.4.2 of the ZAI Trust Distribution Procedures, and

(E) costs, fees, disbursements and expenses of the PD FCR (other than legal fees and related disbursements).

(F) costs, fees, disbursements and expenses in respect of any extraordinary and unforeseen costs, fees, disbursements and expenses that (x) Grace shall agree from time to time shall not constitute Trust's Expenses or (y) are determined to be extraordinary and unforeseen pursuant to a final decision obtained pursuant to the alternative dispute resolution procedures set forth in the ZAI Trust Distribution Procedures.

"Trusts' Representative" has the meaning set forth in the Share Issuance Agreement.

"Trust (ZAI)" has the meaning set forth in the introductory paragraph hereof.

13

"Valuation" means, with respect to any Entity as of the last day of any four-Fiscal Quarter period, the amount resulting from (a) the product of (i) such Entity's EBITDA for such four-Fiscal Quarter period, multiplied by (ii) seven (7), minus (b) the aggregate outstanding principal amount of such Entity's and its consolidated Subsidiaries' Senior Indebtedness as of such date, plus (c) the amount of cash and cash equivalents of such Entity and its consolidated Subsidiaries as of such date other than cash and cash equivalents the disposition of which is subject to a material restriction for the benefit of Entities other than such Entity and its consolidated Subsidiaries.

(a)    Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  All references herein to Sections shall be deemed references to Sections of this Deferred Payment Agreement (ZAI) unless the context shall otherwise require.

(b)    Unless otherwise indicated, (i) the term "including" means "including without limitation," except when used in the computation of time periods, and (ii) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein).

(c)    For purposes of the computation of time periods, whenever this Deferred Payment Agreement (ZAI) provides for an event to occur "within" a specified number of days of a preceding event, it shall mean that the latter event shall occur before the close of business on the last of the specified days, and the day on which the preceding event occurs shall not be included in the computation of days elapsed.  The word "from" means "from and including", "after" means "after and excluding", and "to" and "until" mean "to and including".

(b)    All terms defined in this Agreement or any other Deferred Payment Documents (ZAI) in the singular form shall have comparable meanings when used in the plural form and vice versa.

2.    **Payment of Deferred Payments (ZAI)**.

(a)    Subject to Sections 2(c), 3(c), (f) and (g) and Section 7, Grace shall make the following payments:

(i)    $30,000,000 (the "Fixed Deferred Payment (ZAI)") on the third anniversary of the Effective Date (the "Fixed Deferred Payment Date (ZAI)").

(ii)    Subject to Sections 2(c), 3(c), (f) and (g) and Section 7, if and only if, on any date after the fourth anniversary of the Effective Date (x) the Total Assets of the Trust (ZAI) are less than $10,000,000 and (y) the Trust (ZAI) shall deliver to Grace and Parent Guarantor a Trust's Certificate, then Grace shall, no later than the Contingent Deferred Payment Date, pay the Contingent Deferred Payment (ZAI) to the Trust (ZAI); provided, however, that

the payment obligation set forth in this Section 2(b) shall be subject to the following conditions: (A) no more than one Trust's Certificate may be delivered by the Trust

14

(ZAI) in any twelve-month period after the Effective Date (each such period, a "Contingent Payment Reference Period"), (B) no more than one Contingent Deferred Payment (ZAI) shall accrue and be payable during any Contingent Payment Reference Period, (C) no Contingent Deferred Payment (ZAI) shall be payable prior to the fifth Effective Date Anniversary, (D) no more than ten (10) Contingent Deferred Payments (ZAI) shall be payable in the aggregate and the total aggregate amount of all Contingent Deferred Payments (ZAI) shall in no event exceed $80 million and (E) no Contingent Deferred Payment (ZAI) shall be due and payable after the twenty-fifth (25th) Effective Date Anniversary.

(b)     In determining the amount of the Aggregate Excess Expense Credit and offsetting it against a Contingent Deferred Payment (ZAI), the terms and conditions set forth in Annex A hereto ("Credit to Grace for Administrative Expenses Exceeding a Presumptively Reasonable Expense Amount") shall be given effect for purposes of interpreting, to the extent necessary or appropriate, the provisions of this Deferred Payment Agreement (ZAI) relevant to such determination and offset.

(c)     To the extent that the Trusts' Representative exercises its rights on behalf of the Trust (ZAI) under the Share Issuance Agreement and the Section 524(g) Shares are issued and delivered to the Trust (ZAI) (or its permitted successors or assigns), the amount of the remaining Deferred Payments (ZAI) shall automatically be reduced, in the order directed by Grace, by the Fair Market Value of the portion of the Section 524(g) Shares allocated to the Trust (ZAI) pursuant to Section 4 of the Intercreditor Agreement (as such Section 4 of the Intercreditor Agreement, together with any defined terms used (directly or indirectly) in such Section 4 of the Intercreditor Agreement are in effect as of the date hereof, or as amended or modified from time to time with the consent (not to be unreasonably withheld) of Grace and the Parent Guarantor after the date hereof.

3.    **Payments**.

(a)     All payments to be made hereunder or in respect hereof shall be made in Dollars by wire transfer of immediately available funds to the Permitted Holder in accordance with wire transfer instructions provided by the Permitted Holder in writing from time to time. Upon request by the Permitted Holder, Grace shall provide, or cause to be provided, the Federal Reserve Bank wire reference numbers and other wire information related to any payments hereunder.

(b)     Subject to Sections 2(c), 3(e), 3(f) and 3(g), all payments hereunder or in respect hereof shall be made in full, without any reduction, set-off or counterclaim.

(c)     Whenever any payment to be made under this Deferred Payment Agreement (ZAI) (including a Deferred Payment (ZAI) on a Deferred Payment Date (ZAI)) shall be stated to be due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day.

(d)     All payments made hereunder or in respect hereof (i) during the existence of an Event of Default shall be applied, first to pay any fees, costs and expenses payable by Grace pursuant to Section 16(h) and Section 19, second, to any unpaid interest accrued on the

15

Deferred Payments (ZAI) and, third, to the Deferred Payments (ZAI) in direct order of maturity, and (ii) at any other time, as directed by the Permitted Payor.

(e)     If, after giving effect to (y) any Disposition Transaction or any assignment, delegation or transfer by Grace of its rights or obligations under this Deferred Payment Agreement (ZAI) or (z) any election to have a Permitted Payor make any payment on behalf of Grace pursuant to Section 4(a), Grace, any successor Entity to Grace or such Permitted Payor shall be required by applicable Law to withhold any Taxes from any payments of Deferred Payments (ZAI) or interest at the Default Rate hereunder, and if such requirement would not have been imposed by such applicable Law but for such Disposition Transaction, assignment or transfer, then (i) the sum payable on account of Deferred Payments (ZAI) or interest at the Default Rate shall be increased as necessary so that after making all withholdings required by applicable Law (including withholdings applicable to additional sums payable under this Section 3(e)) the Permitted Payee receives an amount equal to the sum it would have received on account of Deferred Payments (ZAI) or interest at the Default Rate had no such withholdings been made, (ii) Grace or such successor Entity, shall, or shall cause such Permitted Payor to, make such withholdings; and (iii) Grace or such successor Entity shall, or shall cause such Permitted Payor to, timely pay the full amount deducted to the relevant Governmental Authority in accordance with applicable Law.  This Section 3(e) shall survive the termination of this Deferred Payment Agreement (ZAI) pursuant to Section 11.

(f)     If, after giving effect to any permitted assignment or Transfer by the Permitted Holder of its rights or obligations under this Deferred Payment Agreement (ZAI), Grace or a Permitted Payor shall be required by applicable Law to withhold any Taxes from any payments of Deferred Payments (ZAI) or interest at the Default Rate hereunder, and if such requirement would not have been imposed by such applicable Law but for such assignment or Transfer, then the obligation of Grace or the Permitted Payor to make the relevant payment of a Deferred Payment (ZAI) or interest at the Default Rate hereunder shall be discharged by making such payment net of such Taxes.  This Section 3(f) shall survive the termination of this Deferred Payment Agreement (ZAI) pursuant to Section 11.

(g)     If, due to either (i) the introduction of or any change in any law or regulation (or any change in the interpretation thereof) or (ii) the compliance with any guideline or request from any central bank or other Governmental Authority (whether or not having the force of law), in each case adopted after the date hereof, Grace or a Permitted Payor shall be required to withhold any Taxes from any payments of Deferred Payments (ZAI) or interest at the Default Rate hereunder, then the obligation of Grace or the Permitted Payor to make the relevant payment of a Deferred Payment (ZAI) or interest at the Default Rate hereunder shall be discharged by making such payment net of such Taxes.  This Section 3(g) shall survive the termination of this Deferred Payment Agreement (ZAI) pursuant to Section 11.

4.     **Permitted Payor; Prepayments**.

(a)     The obligation of Grace to make all or any portion of any Deferred Payment (ZAI) may be satisfied by direct payment of such amounts by a Permitted Payor.

16

(b)     To the extent any Deferred Payment (ZAI) is timely paid by a Permitted Payor, and except as set forth in <u>Section 4(d)</u>, the obligation of Grace in respect of the amounts paid shall be deemed satisfied in full, Grace shall have no further obligation in connection therewith and Grace shall not be considered in default in respect of such amounts so paid.

(c)     Any Permitted Payor and Grace may at any time and from time to time prepay any Deferred Payment (ZAI) in whole or in part without penalty, premium or discount. Any such prepayment(s) shall be applied to the Deferred Payments (ZAI) as directed by Grace.

(d)     To the extent that any Entity makes a payment to the Permitted Holder or any Permitted Payee on account of this Deferred Payment Agreement (ZAI) that (in whole or in part) is subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required or agreed to be repaid or returned by the Permitted Holder or such Permitted Payee under any Law or in respect of any Proceeding or other litigation to which Grace, the relevant Permitted Payor, the Permitted Holder or any Permitted Payee is subject, then, to the extent of the amount of such payment, the portion of the obligations under this Deferred Payment Agreement (ZAI) which has been paid, reduced or satisfied by such amount shall be reinstated and continue to be in full force and effect as of the time immediately preceding such initial payment, reduction or satisfaction.

5.     **Representations and Warranties**.  Grace hereby represents and warrants to the Trust (ZAI) that as of the Effective Date:

(a)     Grace is duly organized and validly existing under the laws of the State of Connecticut.

(b)     Grace has the corporate power and authority to execute and deliver each Deferred Payment Document (ZAI) to which it is a party.  Each Deferred Payment Document (ZAI) to which Grace is a party has been duly authorized by all necessary corporate action of Grace and has been duly executed and delivered by Grace.

(c)     Each Deferred Payment Document (ZAI) to which Grace is a party is a legal, valid and binding obligation of Grace, enforceable against Grace in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally, by the discretion of the court in which enforcement is sought, and/or by general equitable principles (whether enforcement is sought by proceedings at law or in equity).

(d)     The execution, delivery and performance by Grace of each Deferred Payment Document (ZAI) to which it is party does not conflict with, result in a breach of any of the provisions of, or violate the Governing Documents of Grace.

6.     **Covenants**.  Grace covenants and agrees that, from the Effective Date until the earlier of (A) this Deferred Payment Agreement (ZAI) terminates in accordance with <u>Section 11</u> or (B) payment in full of the Deferred Payments (PI):

17

(a)    <u>Affirmative Covenants</u>.  Grace shall:

(i)    <u>Maintenance of Existence and Qualifications</u>.  Maintain and preserve in full force and effect its existence and all other rights, powers, franchises, licenses and qualifications necessary or desirable for its ownership or use of properties or the conduct of its business, except (A) as permitted by <u>Section 16</u>, and (B) where the failure to do so would not be reasonably likely to adversely affect Grace's ability to make the Deferred Payments (ZAI) under this Deferred Payment Agreement (ZAI) or to perform its obligations under the Deferred Payment Documents (ZAI) to which it is a party.

(ii)    <u>Notices of Event of Default, Senior Payment Default and Senior Non-Payment Default</u>.  Furnish to the Permitted Holder (x) within five (5) Business Days after an Authorized Officer of Grace shall first learn of an Event of Default, and (y) on or before the earlier of (A) the fifteenth (15th) day after an Authorized Officer of Grace shall first learn of a Senior Payment Default or Senior Non-Payment Default and (B) the first Business Day following the date on which a Payment Blockage Notice is delivered pursuant to <u>Section 7(a)(ii)</u>, the written statement of an Authorized Officer of Grace setting forth the material details of such Event of Default, Senior Payment Default or Senior Non-Payment Default, as the case may be, and the actions that Grace proposes to take with respect thereto.

(iii)    <u>Financial Statements</u>.  If (x) the financial statements of Grace are no longer consolidated with the financial statements of the Parent Guarantor and (y) Grace is not obligated to file or furnish, or is not otherwise filing or furnishing, reports with the United States Securities and Exchange Commission pursuant to Section 13 or 15 of the Securities Exchange Act of 1934, Grace shall furnish to the Permitted Holder:

(A)    <u>Annual Financial Statements</u>.  As soon as available but in no event later than ninety (90) days after the last day of each of Grace's Fiscal Years, its annual consolidated financial statements audited by a nationally recognized registered independent public accounting firm allowed to practice before the Securities and Exchange Commission or any successor Governmental Authority, consisting of a consolidated balance sheet of Grace and its consolidated Subsidiaries as of the end of such year and consolidated statements of income, cash flows and stockholders equity for such year (all in reasonable detail and with all notes and supporting schedules); and

(B)    <u>Quarterly Financial Statements</u>.  As soon as available and in any event within forty-five (45) days after the end of each of the first three Fiscal Quarters in each Fiscal Year of Grace, its consolidated balance sheet as of the end of such Fiscal Quarter, and consolidated statements of income and cash flows of Grace and its consolidated Subsidiaries for such Fiscal Quarter, all in reasonable detail and certified by an Authorized Officer of Grace to present fairly in all material respects the financial condition, results of operations and other information reflected therein and to have been prepared in accordance with GAAP (subject to year-end audit adjustments and the absence of footnotes).

(iv)    <u>Officer's Certificates</u>.  Grace shall furnish to the Permitted Holder:

18

(A)     If the financial results of Grace are no longer consolidated with the financial results of the Parent Guarantor, no later than ninety (90) days after the last day of each of Grace's Fiscal Years and no later than forty-five (45) days after the end of each of the first three Fiscal Quarters in each Fiscal Year of Grace, a Quarterly EBITDA and Valuation Certificate executed by an Authorized Officer of Grace setting forth (I) if the Transaction Date of a Significant Transaction has occurred during the four-Fiscal Quarter period ending on the last day of such Fiscal Quarter or Fiscal Year, as the case may be, the Pro Forma EBITDA of Grace for such four-Fiscal Quarter period and the Pro Forma Valuation of Grace as of the last day of such four-Fiscal Quarter period or (II) if the Transaction Date of a Significant Transaction did not occur during the four-Fiscal Quarter period ending on the last day of such Fiscal Quarter or Fiscal Year, as the case may be, the EBITDA of Grace for such four-Fiscal Quarter period and the Valuation of Grace as of the last day of such four-Fiscal Quarter period; provided, however, that Grace shall not be required to furnish to the Permitted Holder a Quarterly EBITDA and Valuation Certificate under this subclause (A) if (x) Grace is filing or furnishing reports with the United States Securities and Exchange Commission pursuant to Section 13 or 15 of the Securities Exchange Act of 1934, and (y)(1) if the Transaction Date of a Significant Transaction has occurred during the four-Fiscal Quarter period ending on the last day of the applicable Fiscal Quarter or Fiscal Year, the Pro Forma EBITDA of Grace for such four-Fiscal Quarter period and the Pro Forma Valuation of Grace as of the last day of such four-Fiscal Quarter period are readily ascertainable from such reports or (2) if the Transaction Date of a Significant Transaction did not occur during the four-Fiscal Quarter period ending on the last day of the applicable Fiscal Quarter or Fiscal Year, the EBITDA of Grace for such four-Fiscal Quarter period and Valuation of Grace as of the last day of such four-Fiscal Quarter period is readily ascertainable from such reports;

(B)     no later than ninety (90) days after the last day of each of Grace's Fiscal Years, a Compliance Certificate executed by an Authorized Officer of Grace for such Fiscal Year; and

(C)     no later than thirty (30) days after the consummation by a Transferor of a Disposition Transaction of the type described in clause (ii) or clause (iii) of Section 6(b), a Post-Transaction Certificate setting forth the Post-Transaction Pro Forma EBITDA of Grace with respect to such Disposition Transaction executed and delivered by an Authorized Officer of Grace.

(b)     Negative Covenant.   Grace shall not, and shall cause each of its Subsidiaries and Controlled Affiliates (each, a "Transferor") to not, sell, assign, transfer, license, lease or otherwise dispose of (each, a "Transfer") any property and/or other assets and/or enter into any transaction or obligation, whether constituting or by way of merger, consolidation, sale of assets or other disposition, reorganization, recapitalization, dividend, other distribution, or otherwise, or any related series of the foregoing (any such Transfer other than Ordinary Dividends, Bona Fide Compensation Transactions and other Transfers in the ordinary course of business, a "Disposition Transaction"), if the Transferor (taken together with all of its direct and indirect wholly owned Subsidiaries) would (1) receive (directly or indirectly) less than a reasonably equivalent value in such Disposition Transaction, (2) become or be rendered Insolvent as a result of such Transfer and/or such Disposition Transaction, or (3) be engaged in

19

business and/or transactions, and/or would be about to engage in business and/or transactions, for which the Transferor's (taken together with all of its direct and indirect wholly owned Subsidiaries) remaining property and other assets would be unreasonably small capital; provided, however, that notwithstanding the foregoing, a Transferor:

        (i)      That is a direct or indirect wholly-owned Subsidiary of Grace may make a Transfer to or engage in a Disposition Transaction exclusively with Grace or any other direct or indirect wholly-owned Subsidiary of Grace;

        (ii)     may engage in a Disposition Transaction whereby such Transferor (A) pays or makes (directly or indirectly) dividends or distributions (whether in cash, securities or other property) with respect to any of its Capital Stock (including by way of a spin-off or spin-out of any of its assets), or (B) repurchases its Capital Stock, provided that, in the case of any Disposition Transaction under subclause (A) or (B) above, all of the following conditions are satisfied:

        (1) no Event of Default has occurred and is continuing at the time of, or would result from, such Disposition Transaction;

        (2) as of the Transaction Date of such Disposition Transaction, the Post-Transaction Pro Forma Valuation of (x) the Parent Guarantor or (y) Grace shall equal or exceed the Threshold Amount; and

        (3) if such Disposition Transaction exceeds $15,000,000 and is not publicly disclosed at least 10 days prior to the consummation of such Disposition Transaction, then Grace shall provide the Permitted Holder with at least 10 days' prior to the consummation of such Disposition Transaction, a written notice describing in reasonable detail the material terms of such Disposition Transaction and setting forth the Post-Transaction Pro Forma Valuation of Grace as of the Transaction Date of such Disposition Transaction; and

        (iii)     other than as set forth in Section 6(b)(ii) above, shall not enter into any Disposition Transaction with a Related Party to the Transferor in which the aggregate value of the assets or other property Transferred in such Disposition Transaction to such Related Party exceeds $15,000,000 if the Transferor (taken together with all of its direct and indirect wholly owned Subsidiaries) would (1) receive (directly or indirectly) less than a reasonably equivalent value in such Disposition Transaction, as determined by a reputable investment bank or valuation firm jointly selected by Grace and the "Permitted Holder" (as defined in the Deferred Payment Agreement (PI)), (2) become or be rendered Insolvent as a result of such Transfer and/or such Disposition Transaction or (3) be engaged in business and/or transactions, and/or would be about to engage in business and/or transactions, for which the Transferor's (taken together with all of its direct and indirect wholly owned Subsidiaries) remaining property and other assets would be unreasonably small capital; provided, that if the aggregate value of the assets or other property Transferred to such Related Party in such Disposition Transaction exceeds $15,000,000 and the existence of such Disposition Transaction is not publicly disclosed at least 10 days prior to the consummation of such Disposition Transaction, then Grace shall provide the Permitted Holder with at least 10 days' prior to the consummation of such Disposition Transaction, a written

20

notice describing in reasonable detail the material terms of such Disposition Transaction and setting forth the Post-Transaction Pro Forma Valuation of Grace as of the Transaction Date of such Disposition Transaction;

provided further that if Grace is not the surviving or succeeding Entity as a result of any Disposition Transaction (but in the case of a sale of assets, only if such sale involves a sale of all or substantially all of the assets of Grace) otherwise permitted by the exceptions to this Section 6(b), such Disposition Transaction shall be permitted under this Section 6(b) only if Grace and the Parent Guarantor shall comply with the requirements of Section 16(g).

7. **Subordination Terms**.  Any and all obligations of Grace in respect of Deferred Payments (ZAI) and this Deferred Payment Agreement (ZAI) shall be subordinated and otherwise junior at all times in right of payment and in all other respects, in the manner and to the extent set forth herein, to any and all present and future obligations of Grace in respect of any Senior Indebtedness.

(a) Blockage of Deferred Payments (ZAI).

(i) If any payment default occurs and is continuing beyond any applicable grace period pursuant to the terms and conditions of any Senior Indebtedness (a "Senior Payment Default"), then subject to Section 7(g), no payment or distribution of cash, securities or any other assets shall be made by Grace with respect to any Deferred Payments (ZAI) or pursuant to the Deferred Payment Documents (ZAI) for as long as such Senior Payment Default is continuing.

(ii) If any default other than a Senior Payment Default occurs pursuant to the terms and conditions of any Designated Senior Indebtedness that would allow the holders thereof to accelerate the maturity thereof (a "Senior Non-Payment Default"), then subject to Section 7(g), no payment or distribution of cash, securities or any other assets shall be made by Grace with respect to any Deferred Payments (ZAI) or pursuant to the Deferred Payment Documents (ZAI) during the period (the "Payment Blockage Period") (x) beginning on the date that the Permitted Holder receives from the Entity entitled to give notice under any document evidencing such Designated Senior Indebtedness (or from Grace acting at the direction or request of such Entity) a written notice (a "Payment Blockage Notice") that such a Senior Non-Payment Default has occurred and is continuing and (y) ending on the earliest to occur of (1) 180 days from the date the Permitted Holder shall have received the Payment Blockage Notice, (2) the date such Senior Non-Payment Default shall have been cured or waived or shall have ceased to exist and (3) the date such Payment Blockage Period shall have been terminated by written notice to the Permitted Holder from the Entity initiating such Payment Blockage Period.

(iii) Notwithstanding the foregoing, (A) in no event will a Payment Blockage Period extend beyond 180 days from the date the Payment Blockage Notice in respect thereof was received by the Permitted Holder, (B) there shall

21

be a period of at least 180 consecutive days in each period of 360 consecutive days when no Payment Blockage Period is in effect, and (C) no Senior Non-Payment Default that existed or was continuing on the date of delivery of any Payment Blockage Notice (whether or not such Senior Non-Payment Default is with respect to the same issue of Designated Senior Indebtedness) may be, or be made, the basis for a subsequent Payment Blockage Notice, unless such Senior Non-Payment Default has been cured or waived for a period of not less than 90 consecutive calendar days.

(iv)    The making of Deferred Payments (ZAI) or other payments pursuant to this Deferred Payment Agreement (ZAI) shall resume, and any Deferred Payments (ZAI) or other payments pursuant to this Deferred Payment Agreement (ZAI) not paid due to a suspension thereof pursuant to clause (i) or clause (ii) above shall be paid, together with accrued interest thereon at the Default Rate, when such suspension is no longer in effect (either due to cure or waiver of the relevant Senior Payment Default or the expiration or termination of the Payment Blockage Period pursuant to clause (i) or clause (ii) of this Section 7(a)) unless a subsequent Payment Blockage Notice has been delivered in accordance with clause (iii) of this Section 7(a) and is not prohibited from being delivered by clause (iii) of this Section 7(a).

(v)    The failure of Grace to make any Deferred Payments (ZAI) or to pay any other amounts under this Deferred Payment Agreement (ZAI) by reason of the operation of this Section 7(a) shall not be construed as preventing the occurrence of an Event of Default or from characterizing any Deferred Payments (ZAI) as "past due" for purposes of Section 9(c).

(b)    Proceedings.  Upon any payment made by Grace, or any distribution of cash, securities or other assets of any kind of Grace (other than securities issued in substitution for the obligation to make Deferred Payments (ZAI) that are subordinated to at least the extent described herein for Deferred Payments (ZAI), which Securities the Permitted Holder (or any Permitted Payee, if applicable) is specifically authorized to receive notwithstanding any other provision of this Section 7), to creditors in any Proceeding with respect to Grace or its properties, all obligations due on all Senior Indebtedness shall first be paid in full in cash before any payment or distribution is made on account of any Deferred Payments (ZAI) or otherwise pursuant to the Deferred Payment Documents (ZAI).

(c)    Improper Payments Held in Trust.  Any payments or property received by the Permitted Holder or any Permitted Payee in breach of this Section 7 shall be held by the Permitted Holder or such Permitted Payee in trust and promptly delivered in the form received to the holder of Senior Indebtedness entitled to receive the same (any such payment or property delivered by the Permitted Holder or such Permitted Payee to any holder of Senior Indebtedness, a "Turnover Payment").  To the maximum extent permitted under applicable Law, Grace agrees that any Turnover Payment shall be treated as a payment by Grace on account of such Senior Indebtedness and shall not satisfy Grace's obligation with respect to any amount due to the Permitted Holder or such Permitted Payee under this Deferred Payment Agreement (ZAI).  If, notwithstanding the preceding sentence, it is determined (by a court of competent jurisdiction or

22

otherwise) that a Turnover Payment is a payment by Grace on account of, and satisfies any obligation of Grace with respect to, any amount due to the Permitted Holder or any Permitted Payee under this Deferred Payment Agreement (ZAI), then, to the extent of the amount of such Turnover Payment, the portion of the obligation which has been determined to be paid and satisfied by such Turnover Payment shall be reinstated and shall continue to be in full force and effect as of the time immediately preceding the initial payment thereof by Grace to the Permitted Holder or such Permitted Payee. If, notwithstanding the preceding sentence, any portion of an obligation of Grace in respect of such Turnover Payment is not reinstated and continued to the extent of the amount of the relevant Turnover Payment, then the Permitted Holder or the applicable Permitted Payee shall, upon the payment in full in cash of all Senior Indebtedness owed to the holder thereof to whom the Permitted Holder or such Permitted Payee delivered such Turnover Payment, be subrogated to the rights of such holder to receive payments or distributions applicable to such Senior Indebtedness, and for the purpose of such subrogation such Turnover Payment shall not, as between Grace and the Permitted Holder or such Permitted Payee, be deemed to be payment by Grace to or on account of such Senior Indebtedness.

(d) <u>Remedies Blockage</u>. Subject in any event to the other terms and conditions of this <u>Section 7</u> (including <u>Section 7(a)</u> and <u>Section 7(g)</u>), and not in abrogation thereof, if an Event of Default has occurred and is continuing and any Senior Indebtedness is then outstanding, the Permitted Holder hereby agrees for itself and its assigns that it will not (1) exercise or seek to exercise any rights or remedies against Grace or the Parent Guarantor with respect to such Event of Default or (2) institute any action or proceeding with respect to such rights or remedies (including any action of foreclosure, contest or protest) under any Deferred Payment Document (ZAI) or any agreement or document relating thereto, or under such Event of Default or otherwise or (3) attempt to do any of the foregoing (collectively, the "<u>Remedies</u>"), for a period commencing on the date that such Event of Default occurs and ending on the earliest to occur of (i) 180 days after the first date on which such Event of Default shall have occurred, (ii) the commencement of a Proceeding with respect to Grace, the Parent Guarantor or their respective properties, (iii) the date that the holder (or any agent or trustee of the holder) of any Senior Indebtedness commences exercising any Senior Remedies with respect to such Senior Indebtedness (including, without limitation, the acceleration of all or any portion of such Senior Indebtedness) and (iv) the payment in full in cash of all Senior Indebtedness.

(e) Notwithstanding the foregoing, as applied to the Permitted Holder, the term "Remedies" shall not include, and the Permitted Holder shall not be impaired by this <u>Section 7(d)</u> from doing, any of the following: (A) exercising rights and remedies for specific performance or injunctive relief to compel Grace or the Parent Guarantor to comply with any non-payment obligations under the Deferred Payment Documents (ZAI) (including commencing any action contemplated by <u>Section 16(h)</u>), (B) instituting or maintaining any suit or action solely to prevent the running of any applicable statute of limitations, (C) accruing interest on the Deferred Payments (ZAI) at the Default Rate pursuant to <u>Section 9(c)</u> and (D) giving any notice (including notice of an Event of Default) to Grace under the Deferred Payment Documents (ZAI).

(f) <u>No Secured Obligation</u>. Except for the Parent Guarantee and the share issuance obligation with respect to the Section 524(g) Shares as and to the extent contemplated in the Share Issuance Agreement, no credit support or security interest shall be granted by Grace,

23

the Parent Guarantor or any of its Subsidiaries in connection with, or otherwise support or secure any obligation set forth in, the Deferred Payment Documents (ZAI). Notwithstanding the foregoing, the Permitted Holder may obtain to the extent permitted under applicable Law a judgment lien on the properties of Grace and/or the Parent Guarantor to secure the payment and performance of a judgment obtained by the Permitted Holder against Grace and/or the Parent Guarantor.

(g)    No Impairment of Right to Receive Section 524(g) Shares. Nothing in this Section 7 shall impair the rights of the Trust (ZAI) (or its permitted successor or assigns) acting through the Trusts' Representative pursuant to the Intercreditor Agreement, to deliver to the Parent Guarantor a Demand for Issuance of the Section 524(g) Shares and to receive the Trust (ZAI)'s percentage of the Section 524(g) Shares pursuant to the Share Issuance Agreement.

(h)    Further Assurances. At the reasonable request of Grace or the Parent Guarantor, the Permitted Holder will, at the sole expense of Grace and the Parent Guarantor, execute such agreements, documents, certificates and/or other instruments confirming the existence and extent of the subordination terms detailed in this Section.

8.    **Events of Default**. The occurrence of any of the following events shall constitute an "Event of Default" under this Deferred Payment Agreement (ZAI):

(a)    Neither Grace nor any Permitted Payor shall make (i) any Deferred Payment (ZAI) on any Deferred Payment Date (ZAI) and such failure shall continue for five (5) Business Days after the relevant Deferred Payment Date (ZAI) or (ii) any payment of interest at the Default Rate owing under this Deferred Payment Agreement (ZAI) within seven (7) Business Days after demand therefor by the Permitted Holder (or the Permitted Payee, if applicable) entitled thereto;

(b)    Grace or the Parent Guarantor (A) shall institute any proceeding or voluntary case seeking to adjudicate it a bankrupt or insolvent, or seeking dissolution, liquidation, winding up, reorganization, arrangement, adjustment, protection, relief or composition of it or its debts pursuant to any law relating to bankruptcy, insolvency, reorganization or relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee, custodian or other similar official for any such Entity or for any substantial part of its property, (B) shall be generally not paying its debts as such debts become due or shall admit in writing its inability to pay its debts generally, or (C) shall make a general assignment for the benefit of creditors;

(c)    Any proceeding shall be instituted against Grace or the Parent Guarantor seeking to adjudicate it a bankrupt or insolvent, or seeking dissolution, liquidation, winding up, reorganization, arrangement, adjustment, protection, relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee, custodian or other similar official for any such Entity or for any substantial part of its property, and either such proceeding shall remain undismissed or unstayed for a period of sixty (60) consecutive days;

(d)    Grace shall breach any covenant set forth in Section 6(a)(i), or the Parent Guarantor shall breach any covenant set forth in Section 7(a)(i) of the Parent Guarantee (ZAI),

24

and in any such case such breach shall continue for thirty (30) days after the earlier of (A) any Authorized Officer of Grace obtains knowledge of such failure and (B) the Permitted Holder's written notice to Grace and the Parent Guarantor of such failure;

(e)     Grace shall breach any covenant set forth in <u>Section 6(a)(iv)(A)</u>, or the Parent Guarantor shall breach any covenant set forth in Section 7(a)(iv)(A) of the Parent Guarantee (ZAI), and in any such case such breach shall continue for ten (10) days after the Permitted Holder's written notice to Grace and the Parent Guarantor of such breach;

(f)     Grace shall breach any covenant set forth in <u>Section 6(b)</u> (other than any notice requirement set forth therein), or the Parent Guarantor shall breach any covenant set forth in Section 7(b) of the Parent Guarantee (ZAI) (other than any notice requirement set forth therein), and in any such case, as of the Transaction Date of the Disposition Transaction that resulted in such breach, the Post-Transaction Pro Forma Valuation of the Parent Guarantor shall not exceed the Threshold Amount and the Post-Transaction Pro Forma Valuation of Grace shall not exceed the Threshold Amount;

(g)     Grace or the Parent Guarantor shall assert in writing that any Deferred Payment Document (ZAI) or any material term thereof is not a legal, valid and binding obligation of Grace or the Parent Guarantor, as the case may be, enforceable in accordance with its terms in any material respect; or

(h)     A default occurs under the Deferred Payment Agreement (PI) or the Deferred Payment Agreement (PD) that causes any of the Deferred Payments due under either or both the Deferred Payment Agreement (PI) or the Deferred Payment Agreement (PD), respectively, to be accelerated and become due prior to its or their stated maturity.

9.     **Remedies**.

(a)     Subject to <u>Section 7</u>, the Permitted Holder shall have the right, power and authority to do all things deemed necessary or advisable to enforce the provisions of, and protect its rights under, this Deferred Payment Agreement (ZAI) and upon the occurrence and during the continuance of an Event of Default the Permitted Holder may institute or appear in such appropriate proceedings permitted and not prohibited under this Deferred Payment Agreement (ZAI) as the Permitted Holder shall deem most effectual to protect and enforce any of its rights hereunder, whether for the specific enforcement of any covenant or agreement in this Deferred Payment Agreement (ZAI) or to enforce any other proper remedy.

(b)     Subject to <u>Section 7</u>, without limiting the foregoing, upon the occurrence and during the continuance of an Event of Default, the Permitted Holder may declare the unpaid Deferred Payments (ZAI), together with all other amounts payable hereunder, to be immediately due and payable, whereupon such Deferred Payments (ZAI) and other amounts shall become forthwith due and payable, without presentment, demand, protest or any other notice of any kind (except that in the case of an Event of Default of the type described in subsection <u>(b)</u> or <u>(c)</u> under <u>Section 8</u>, such acceleration shall occur without any action of the Permitted Holder or any other Entity).

25

(c)    In addition, upon the occurrence and during the continuance of an Event of Default, all Deferred Payments (ZAI) that are past due shall accrue interest at the Default Rate, which, subject to the terms of <u>Section 7</u>, shall be payable to the Permitted Holder on demand until such Event of Default shall have been cured or waived, or all remaining Deferred Payments (ZAI) shall have been paid in full.

10.    **Waiver**.    There shall be no implied waiver based upon any delay on the part of any party hereto in exercising any right or remedy such party may have pursuant to this Deferred Payment Agreement (ZAI).

11.    **Termination**.    Upon the earlier of (A) all of the Deferred Payments (ZAI) and other amounts payable hereunder having been paid in full or (B) the termination of the WRG Asbestos PD Trust in accordance with the terms of its trust agreement, any and all obligations under this Deferred Payment Agreement (ZAI) shall be discharged and this Deferred Payment Agreement (ZAI) shall terminate without any further action by the parties thereto or any other Entity (except to the extent all or any portion of any Deferred Payment (ZAI) or such other amount is reinstated pursuant to <u>Section 4(d)</u> or to the extent any provision hereof expressly survives the termination of this Deferred Payment Agreement (ZAI)).  Promptly upon such termination, the Permitted Holder shall execute and deliver to Grace, at Grace's sole cost and expense, such documents as are reasonably requested by Grace to fully document the payment, termination and discharge of all obligations hereunder.

12.    **Severability**.    Whenever possible, each provision of this Deferred Payment Agreement (ZAI) will be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Deferred Payment Agreement (ZAI) by any party hereto is held to be invalid, void, voidable, illegal or unenforceable in any respect under any applicable Law in any jurisdiction, such event will not affect any other provision or the effectiveness or validity of any provision in any other jurisdiction, or the obligations of any other party to this Deferred Payment Agreement (ZAI), and this Deferred Payment Agreement (ZAI) will be reformed, construed and enforced in such jurisdiction as if such invalid, void, voidable, illegal, unenforceable or rejected provision had never been contained herein.  The parties hereto further agree to use commercially reasonable efforts to replace such invalid, void, voidable, illegal, unenforceable or rejected provision of this Deferred Payment Agreement (ZAI) with a an effective, valid and enforceable provision which will achieve, to the fullest extent possible, the economic, business and other purposes of the invalid, void, voidable, illegal, unenforceable or rejected provision.

13.    **Complete Agreement**.    This Deferred Payment Agreement (ZAI), together with the Parent Guarantee (ZAI), the Share Issuance Agreement, the Plan of Reorganization and the Confirmation Order, embodies the complete agreement and understanding between the parties hereto in respect of the subject matter hereof and supersedes, preempts and terminates all other prior understandings, agreements or representations by or among the parties hereto, written or oral, to the extent relating thereto.

14.    **Counterparts**.    This Deferred Payment Agreement (ZAI) may be executed (including by facsimile or portable document format (pdf)) in separate counterparts,

26

each of which will be deemed to be an original and all of which taken together will constitute one and the same agreement.

15.    **No Third Party Beneficiaries**.  Other than the Parent Guarantor, there are no third party beneficiaries of this Deferred Payment Agreement (ZAI) and nothing in this Deferred Payment Agreement (ZAI), express or implied, is intended to confer on any Entity other than the parties hereto and their respective successors, and assigns, any rights, remedies, obligations or liabilities.

16.    **Assignment**.

(a)    This Deferred Payment Agreement (ZAI) shall be binding upon Grace and its successors and permitted assigns and shall inure to the benefit of the Permitted Holder and its successors and permitted assigns.

(b)    Except as expressly permitted by Section 16(c) and Section 16(d) with respect to this Deferred Payment Agreement (ZAI), as expressly set forth in Section 16(b) of the Parent Guarantee (ZAI) with respect to the Parent Guarantor or as expressly set forth in Section 12(b) of the Share Issuance Agreement, in no event shall (i) any Deferred Payment Document (ZAI) or any rights, interests, duties, obligations or liabilities of the Permitted Holder under the Deferred Payment Documents (ZAI) (including this Deferred Payment Agreement (ZAI)), the Plan of Reorganization or the Confirmation Order be Transferred to, or assumed by, any Entity or (ii) the Permitted Holder grant a security interest in any right or interest it has or may have under any Deferred Payment Document (ZAI) (including this Deferred Payment Agreement (ZAI)), in each case, without the prior written consent of Grace and the Parent Guarantor.

(c)    Subject to compliance with sub-clauses (d)(1) and (d)(2) below, upon the occurrence and during the continuance of an Event of Default, the Permitted Holder shall have the right to Transfer, in whole or in part, or grant a security interest in, this Deferred Payment Agreement (ZAI) or all or any of its rights, interests, duties, liabilities or obligations under this Deferred Payment Agreement (ZAI) without the prior written consent of Grace or the Parent Guarantor.  Any such Transfer or grant, if made in compliance with this Section 16(c), shall be effective notwithstanding any subsequent cure or waiver of any Event of Default.

(d)    Subject to compliance with sub-clauses (d)(1) through (d)(5) below, the Permitted Holder shall have the right, at any time and from time to time, to Transfer, in whole or in part, or grant a security interest in, this Deferred Payment Agreement (ZAI) or all or any of its rights, interests, duties, liabilities or obligations under this Deferred Payment Agreement (ZAI):

(1)    The Trust (ZAI) shall provide notice of such Transfer to Grace and the Parent Guarantor in accordance with NY UCC § 9-406 or any successor provision.

(2)    Unless expressly consented to in advance in writing by Grace and the Parent Guarantor, such Transfer or such grant of a security interest shall not adversely change the duty of, increase the burden, costs or risk imposed upon, or impair the chance of obtaining return performance of, either Grace or the Parent Guarantor under any of the Deferred Payment Documents (ZAI), as

27

such terms are used, with respect to an assignment or other Transfer, in NY UCC § 2-210(2) or any successor provision, and any such Transfer or grant of a security interest shall not result in increased liabilities or costs for Grace and/or the Parent Guarantor (including on account of any Taxes).

(3)     Unless expressly consented to in advance in writing by Grace and the Parent Guarantor, upon and following such Transfer or such grant of a security interest, no more than one Entity on behalf of the Trust (ZAI) and all Entities to whom Transfers have been made (the "Administrative Agent") and one Entity on behalf of all recipients of grants of security interests (the "Collateral Agent") shall have, or shall have the ability to bring, or be able to enforce, any claim, right or cause of action against Grace, the Parent Guarantor or any of their respective Affiliates (other than the Trust (ZAI)) under this Deferred Payment Agreement (ZAI) or any document or instrument effecting or evidencing such Transfer or grant of a security interest, regardless of whether any such claim, right, cause of action, or enforcement right arises out of a contract, statute, law, in equity, common law or otherwise.

(4)     Any such Transfer or such grant of a security interest shall comply with all applicable Laws, including all applicable federal, state and foreign securities laws.

(5)     No such Transfer and no such grant of a security interest shall relieve the Trust (ZAI) of any of its duties or obligations under this Deferred Payment Agreement (ZAI), the other Deferred Payment Documents (ZAI), the Plan of Reorganization, the Confirmation Order or any agreements entered into by the Trust (ZAI) pursuant to the Plan of Reorganization or the Confirmation Order.

(e)     Subject to Section 16(f), Grace may not Transfer its rights, interests, duties, liabilities or obligations under this Deferred Payment Agreement (ZAI) without the prior written consent of the "Permitted Holder" (as defined in the Deferred Payment Agreement (PI)), such consent not to be unreasonably withheld, conditioned or delayed.

(f)     Subject to Section 16(g), neither Section 16(e) nor anything else in this Deferred Payment Agreement (ZAI) or any other Deferred Payment Document (ZAI) shall prohibit or restrict the ability of Grace to undertake any Disposition Transaction; provided that, unless the "Permitted Holder" (as defined in the Deferred Payment Agreement (PI)) otherwise consents in writing, (i) such Disposition Transaction shall not violate Section 6(b), (ii) no Event of Default and, no event which, with the giving of notice or the passage of time, or both, would constitute an Event of Default, exists at the time of, or would exist immediately following, the consummation of such Disposition Transaction; (iii) such Disposition Transaction does not conflict with, or result in a breach of, any of the provisions of, or constitute a default under, the Governing Documents of Grace or the surviving or succeeding Entity that results from such Disposition Transaction; and (iv) at least ten (10) days prior to consummation of such Disposition Transaction, Grace shall, subject to reasonable confidentiality arrangements between

28

the Permitted Holder and Grace, deliver to the Permitted Holder written notice of its intention to consummate such Disposition Transaction.

(g)     If the surviving or succeeding Entity as a result of any such Disposition Transaction (but in the case of a sale of assets, only if such sale involves a sale of all or substantially all of the assets of Grace) as applicable, is not Grace, then prior to, or concurrently with, the consummation of any such Disposition Transaction, (i) the surviving or succeeding Entity shall by written instrument substantially in the form of <u>Exhibit A</u> signed by such Entity, Grace and, at its option, the Permitted Holder expressly assume the rights and obligations of Grace hereunder, whereupon such Entity shall be the successor of all rights and obligations of Grace hereunder, with the same effect as if it had been originally named herein (it being expressly acknowledged and agreed by Grace and the Permitted Holder that such written instrument shall, and shall expressly provide that it shall, be binding upon, and inure to the benefit of, the Permitted Holder, Grace and such surviving or succeeding Entity whether or not the Permitted Holder shall have executed such written instrument) and (ii) the Parent Guarantor shall confirm in writing to such Entity, Grace and the Permitted Holder that the Parent Guarantee (ZAI) shall remain in full force and effect after giving effect to such Disposition Transaction and the assumption by the surviving or succeeding Entity of all of the rights and obligations hereunder; <u>provided</u>, <u>however</u>, that Grace shall not be discharged from, and shall remain liable for, any and all of its duties, liabilities and obligations under this Deferred Payment Agreement (ZAI).

(h)     Grace shall be responsible for, and shall pay promptly upon demand all, documented and direct out-of-pocket costs and expenses incurred by the Permitted Holder (including legal fees and expenses of legal counsel) in connection with any Disposition Transactions proposed by Grace pursuant to <u>Section 16(f)</u> if the Permitted Holder challenges such Disposition Transaction in a judicial or other proceeding or otherwise as being in breach of the provisions of the Deferred Payment Documents (ZAI) and the Permitted Holder is successful in such challenge.

(i)     Any Transfer in breach of this <u>Section 16</u> shall be null and void, and shall not Transfer any right, interest, duty, liability or obligation in or under this Deferred Payment Agreement (ZAI) to any other Entity.

17.     **Governing Law; Submission to Jurisdiction; Waiver of Jury Trial**.

(a)     This Deferred Payment Agreement (ZAI) and the rights and obligations of the parties hereto shall be construed in accordance with the laws of the State of New York, without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York.

(b)     With respect to claims, suits, actions, proceedings, and other disputes arising out of, in respect of or relating to this Deferred Payment Agreement (ZAI) (such claims, suits, actions, proceedings, and other disputes, the "<u>Claims</u>") each of the parties to this Deferred Payment Agreement (ZAI) hereby irrevocably submits to the jurisdiction of the Bankruptcy Court for the District of Delaware or the United States District Court for the District of Delaware

29

(the "Courts"), or, if both such Courts are not permitted under applicable Law to exercise jurisdiction with respect to the matter in question then to the jurisdiction of any other federal or state court in the state, county and city of New York, New York and each of the parties to this Deferred Payment Agreement (ZAI) agrees that any and all Claims may be brought, heard and determined in such courts.

        (c)    Each of the parties to this Deferred Payment Agreement (ZAI) agrees that (i) venue shall be proper in the courts referenced in Section 17(b) and hereby waives any objection or defense which it may now or hereafter have to the laying of venue in such courts, including any of the foregoing based upon the doctrine of *forum non conveniens*; and (ii) all process which may be or be required to be served in respect of any such Claim (including any pleading, summons or other paper initiating any such Claim) may be served upon it, which service shall be sufficient for all purposes, in the manner for the provision of notice under this Deferred Payment Agreement (ZAI) and shall be deemed in every respect effective service of process upon such party when so given.

        (d)    EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE DEFERRED PAYMENT DOCUMENTS (ZAI).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER DEFERRED PAYMENT DOCUMENTS (ZAI), AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS PROVISION.

        18.    **Notices**.  All notices required or permitted under this Deferred Payment Agreement (ZAI) must be in writing and will be deemed to be delivered and received (i) if personally delivered or if delivered by the United States Postal Service, facsimile or courier service, when actually received by the party to whom notice is sent or (ii) with respect to parties located other than within the United States, if deposited with the United States Postal Service (whether actually received or not), at the close of business on the seventh Business Day after the day when placed in the mail, postage prepaid, certified or registered with return receipt requested, addressed to the appropriate party or parties, at the address of such party or parties set forth below (or at such other address as such party may designate by written notice to all other parties in accordance with this Section 18):

30

| **If to Grace:** | *With copies, which shall not constitute notice, to:* | Kirkland & Ellis LLP Citigroup Center 153 E. 53rd Street New York, NY 10022-4675 Attn:  Theodore L. Freedman & Thomas W. Christopher Facsimile:  (212) 446-4900 |
|---|---|---|
| W. R. Grace & Co.-Conn. 7500 Grace Drive Columbia, MD 21044 Attn:  Corporate Secretary Facsimile:  (410) 531-4545 | | |
| **If to the Parent Guarantor:** | *With copies, which shall not constitute notice, to:* | Kirkland & Ellis LLP Citigroup Center 153 E. 53rd Street New York, NY 10022-4675 Attn:  Theodore L. Freedman & Thomas W. Christopher Facsimile:  (212) 446-4900 |
| W. R. Grace & Co. 7500 Grace Drive Columbia, MD 21044 Attn:  Corporate Secretary Facsimile:  (410) 531-4545 | | |
| **If to the Permitted Holder:** | *With copies, which shall not constitute notice, to:* | [Notice Street Address] [City], [State] [Zip] Attn:  [ ] Facsimile: [ ] |
| WRG Asbestos PD Trust [Notice Street Address] [City], [State] [Zip] Attn:  [ ] Facsimile:  [ ] *(if sending overnight packages use zip code [ ])* | | |

19.    **Costs and Expenses**.  Grace agrees to reimburse the Permitted Holder promptly upon demand for all, documented and direct out-of-pocket costs and expenses, including all attorney's fees and expenses of legal counsel, which may be incurred by the Permitted Holder in enforcing this Deferred Payment Agreement (ZAI) or the Parent Guarantee (ZAI) or protecting the rights of the Permitted Holder hereunder or thereunder, but only to the extent that the Permitted Holder succeeds in enforcing this Deferred Payment Agreement (ZAI) or the Parent Guarantee (ZAI) or protecting the rights of the Permitted Holder hereunder or thereunder.

20.    **Amendments and Waivers**.  No provision of this Deferred Payment Agreement (ZAI) may be waived, amended, supplemented or modified except by a written instrument executed by the Parent Guarantor, Grace and the Permitted Holder.

21.    **Further Assurances**.  At the reasonable request of the Permitted Holder, Grace will, at the sole expense of the Permitted Holder, execute such agreements, documents, certificates and/or other instruments confirming the existence of this Agreement, the obligations of Grace hereunder and the rights of the Permitted Holder hereunder.

31

22.  **Specific Performance**.  Each of the parties hereto acknowledges and agrees that, in the event of any breach of, or any failure to perform, any specific provision of this Deferred Payment Agreement (ZAI), the non-breaching party would be irreparably and immediately harmed and could not be made whole by monetary damages.  It is accordingly agreed that, subject to Section 7, the parties hereto (a) shall be entitled, in addition to any other remedy to which they may be entitled at law or in equity, to compel specific performance of any specific provision of this Deferred Payment Agreement (ZAI) or to obtain injunctive relief to prevent breaches of any specific provision of this Deferred Payment Agreement (ZAI) exclusively in the Courts, (b) shall waive, in any action for specific performance or injunctive relief, the defense of the adequacy of a remedy at law, and (c) shall waive any requirement for the securing or posting of any bond in connection with the obtaining of any such specific performance or injunctive relief.  For the avoidance of doubt, the parties agree that the Permitted Holder shall be entitled to enforce specifically the terms and provisions of this Deferred Payment Agreement (ZAI) to prevent breaches of or enforce compliance with those covenants of Grace set forth in Section 6.  Any party's pursuit of specific performance or injunctive relief at any time will not be deemed an election of remedies or waiver of the right to pursue any other right or remedy to which such party may be entitled, including the right to pursue remedies for liabilities or damages incurred or suffered by such party.

23.  **Other Remedies**.  Except as otherwise provided herein, any and all remedies herein expressly conferred upon a party shall be deemed cumulative with and not exclusive of any other remedy conferred hereby or by law on such party, and the exercise of any one remedy shall not preclude the exercise of any other.

32

IN WITNESS WHEREOF, the parties hereto have executed this Deferred Payment Agreement (ZAI) as of the date first written above.

GRACE:                          W. R. GRACE & CO.-CONN.


By: _____
        Name:
        Title:

TRUST (ZAI):                           WRG ASBESTOS PD TRUST


By: _____

     Name:
     Title:  Trustee

Solely for purposes of <u>Section 20</u>:

PARENT GUARANTOR:               W. R. GRACE & CO.

By: _____

        Name:
        Title:

EXHIBIT A

FORM OF

ASSUMPTION AGREEMENT

[To come]

36

EXHIBIT B

FORM OF

QUARTERLY EBITDA AND VALUATION CERTIFICATE

[To come]

37

EXHIBIT C

FORM OF

COMPLIANCE CERTIFICATE

[To come]

38

EXHIBIT D

FORM OF

POST-TRANSACTION CERTIFICATE

[To come]

ANNEX A

**CREDIT TO GRACE FOR ADMINISTRATIVE EXPENSES EXCEEDING A
PRESUMPTIVELY REASONABLE EXPENSE AMOUNT**

Beginning after the first year anniversary of the effective date (i.e. the second year of Trust operation), there shall be established a Presumptively Reasonable Expense Amount ("PREA") for each year's operations thereafter with respect to ZAI. The PREA for each of these years is as follows: Year 2 - $1.5 million, Year 3 - $1.25 million, Year 4 and each succeeding year thereafter - $1 million. Beginning with the fifth anniversary of the effective date, the $1 million PREA shall be adjusted annually for inflation. There is no PREA for the first year of Trust operations and first year expenses will not be included in any calculations concerning the PREA or any credit to Grace. The PREA shall be used for the purpose of determining whether Grace will receive a credit on its Contingent Deferred Payments (ZAI), and for no other purpose. The potential credit to Grace shall be calculated as follows: On the anniversary of an effective date when a Contingent Deferred Payment (ZAI) of $8 million would otherwise be due, the parties shall add up the administrative expenses for the years since the last Contingent Deferred Payment (ZAI), if any, and preceding the current anniversary date, and subtract from those total expenses the cumulative PREAs for the same years. If the result of that subtraction is a positive number, i.e. if the total expenses for the period preceding the anniversary date on which a Contingent Deferred Payment (ZAI) is due exceed the cumulative PREAs for the same period, then and only then Grace will receive a dollar for dollar credit on its $8 million payment for the amounts by which the total expenses exceed the total PREAs. Once Grace has received such a credit, the amount by which the cumulative expenses exceeded the cumulative PREAs shall be disregarded in any future credit calculations and be of no effect. However, if the cumulative

40

expenses for the years preceding an anniversary date on which a Contingent Deferred Payment (ZAI) is due are below the cumulative PREAs for the same corresponding years, the ZAI Trust Assets will receive an expense credit in the amount that the cumulative PREAs for the years preceding the anniversary date exceed the cumulative ZAI expenses.  That credit will be carried forward for the ZAI Trust Assets' benefit for the purposes of determining any subsequent credit that Grace may receive on any subsequent Contingent Deferred Payment (ZAI).

The administrative expenses that will be included in calculating whether the ZAI Trustee has exceeded the PREA limit for any year do not include: (1) any payments to ZAI Claimants; (2) any common fund counsel fees that may be awarded by the Court for the creation of the common fund per the ZAI Term Sheet and Class Settlement Agreement; (3) the costs of the ZAI educational program (ZAI TDP Section 5.3); (4) the costs of any vermiculite testing procedure set up under Section 5.4.2 of the ZAI TDP; and (5) the costs of the PD FCR (other than expenses incurred in connection with legal fees).

Should the ZAI Trustee, in consultation with the ZTAC, determine that an extraordinary circumstance exists that justifies having an expense or expense amount not be included in calculation of the PREA, the Trustee shall consult with Grace in an attempt to receive Grace's agreement.  If the parties are unable to agree on whether the expense should or should not be considered as part of the PREA, the parties will utilize the alternate dispute resolution procedures set forth in the ZAI TDP.

41

[THIS PAGE INTENTIONALLY LEFT BLANK]

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re:** | ) | Chapter 11 |
| | ) | |
| **W. R. GRACE & CO., *et al.*[1]** | ) | Case No. 01-01139 (JKF) |
| | ) | Jointly Administered |
| **Debtors.** | ) | |
| | ) | |
| | ) | |
| | ) | |

## EXHIBIT 29 TO EXHIBIT BOOK
## W. R. GRACE & CO. GUARANTEE AGREEMENT (CLASS 7A PD)

**EXHIBIT 29**

Attached.

---

[1]     The Debtors consist of the following 62 entities:  W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co. Conn., A-1 Bit & Tool Co., Inc., Alewife  Boston Ltd., Alewife Land Corporation, Amicon, Inc.,  CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., GC Limited Partners I, Inc., (f/k/a Grace Cocoa Limited Partners I, Inc.), GC Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc. GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation., W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (F/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

**FORM OF W. R. GRACE & CO. GUARANTEE AGREEMENT (CLASS 7A PD)**

**Deferred Payment Agreement (Class 7A PD)**

This W. R. GRACE & CO. GUARANTEE AGREEMENT (CLASS 7(a) PD) (this "Guarantee (PD)") is made and entered into as of [ ], 2009, by and between W. R. Grace & Co., a Delaware corporation (together with any successor thereto pursuant to the terms and conditions of Section 16, the "Guarantor"), and the WRG Asbestos PD Trust, on behalf of the Holders of Asbestos PD Claims (in such capacity, the "Trust (PD)"), a Delaware statutory trust established pursuant to §524(g) of the Bankruptcy Code in accordance with the Plan of Reorganization (as hereinafter defined). Unless otherwise defined herein or the context otherwise requires, capitalized terms used herein and defined in the Plan of Reorganization shall be used herein as therein defined.

This Guarantee (PD) is the "Parent Guarantee" described and defined in the Deferred Payment Agreement (PD) (as defined below) and is effective as of the Effective Date.

W I T N E S S E T H

In consideration of the terms and conditions contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.      Definitions; Rules of Interpretation.

(a)      As used in this Guarantee (PD), the following terms shall have the following meanings:

"Authorized Officer" means, with respect to any Entity, the chief executive officer, president, chief financial officer, controller, executive vice president or senior vice president of such Entity.

"Bona Fide Compensation Transaction" means any payment, grant or award, whether in cash, securities, options or other consideration, including without limitation salary or bonus, to or for the benefit of any director, officer or employee of any Transferor or any of its Affiliates made for legitimate, bona fide compensation and/or incentivization purposes; provided that compensation paid, granted or awarded to any one such individual in any Fiscal Year of Transferor whose aggregate value at the time or times of payment, grant or award is in excess of $15,000,000 shall be a Bona Fide Compensation Transaction only (i) if the relevant Transferor is then obligated to file or furnish, or is otherwise filing or furnishing, reports with the United States Securities and Exchange Commission pursuant to Section 13 or 15 of the Securities Exchange Act of 1934, it is approved by an independent committee of the Board of Directors of the Transferor (or other similar management body of the Transferor) or (ii) if the relevant Transferor is not then obligated to file or furnish, or is not otherwise filing or furnishing, reports

with the United States Securities and Exchange Commission pursuant to Section 13 or 15 of the Securities Exchange Act of 1934, a reputable independent compensation expert or consultant selected by the Transferor with the consent of the "Permitted Holder" (as defined in the Deferred Payment Agreement (PI)) (which consent shall not be unreasonably withheld, conditioned or delayed) shall have determined, in its reasonable, good faith judgment, that such payment, grant or award is reasonable and appropriate.  For purposes of the proviso in the previous sentence, (A) no payment or other value received in a given year pursuant to the terms of a grant or award in a previous year shall be taken into account for calculating the compensation in such given year; and (B) in the event of multiple payments, grants or awards in a given Fiscal Year, the independent committee approval, or independent compensation expert or consultant determination, as appropriate, shall be made with respect to each payment, grant or award beginning with the payment, grant or award that causes the compensation to be in excess of $15,000,000.

"Business Day" has the meaning set forth in the Deferred Payment Agreement (PD).

"Capital Stock" means, with respect to any Entity, any share of stock, or any depositary receipt or other certificate representing any share of stock, or any similar equity ownership interest, and any warrant, option, or any other security providing for the right to acquire any such share of stock or similar equity ownership interest.

"Claims" has the meaning set forth in Section 17(b).

"Collateral Agent" has the meaning set forth in the Deferred Payment Agreement (PD).

"Compliance Certificate" means a certificate in the form of Exhibit C.

"Control" means, as to any Entity, the power to direct the management and policies of such Entity directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "Controlling" and "Controlled" have meanings correlative to the foregoing.

"Controlled Affiliate" means, as to any Entity (the "Controlling Entity"), any Affiliate that is Controlled by such Controlling Entity.

"Default Rate" has the meaning set forth in the Deferred Payment Agreement (PD).

"Deferred Payment Agreement (PD)" means that certain Deferred Payment Agreement (Class 7(a) PD), dated as of the date hereof, between Grace and the Trust (PD).

"Deferred Payment Agreement (PI)" means that certain Deferred Payment Agreement (PI) , dated as of the date hereof, between Grace and the Trust (PI).

"Deferred Payment Date (PD)" has the meaning set forth in the Deferred Payment Agreement (PD).

2

"Deferred Payment Documents" has the meaning set forth in the Deferred Payment Agreement (PD).

"Deferred Payment Documents (PI)" has the meaning set forth in the Deferred Payment Agreement (PD)

"Deferred Payment Documents (PD)" means this Guarantee (PD), the Deferred Payment Agreement (PD) and the Share Issuance Agreement.

"Deferred Payment Documents (ZAI)" has the meaning set forth in the Deferred Payment Agreement (PD).

"Deferred Payment (PD)" has the meaning set forth in the Deferred Payment Agreement (PD).

"Deferred Payment (PI)" has the meaning set forth in the Deferred Payment Agreement (PI).

"Demand for Issuance of the Section 524(g) Shares" has the meaning set forth in the Share Issuance Agreement.

"Designated Guarantor Senior Indebtedness" means Guarantor Senior Indebtedness issued, pursuant to a facility with an aggregate principal amount, commitments and/or other financial accommodations then outstanding and/or available (disregarding for purposes of this definition whether any conditions for draws thereunder have been satisfied), as of the relevant date of determination, of at least $25,000,000.

"Disposition Transaction" has the meaning set forth in Section 7(b).

"Disqualified Equity Interest" means that portion of any Equity Interest which, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable), or upon the happening of any event, matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or is redeemable at the sole option of the holder thereof on or prior to the final Deferred Payment Date (PD).

"EBITDA" means, for any Entity for any period, such Entity's and its Subsidiaries' consolidated net income (determined in accordance with GAAP) for such period plus, without duplication, in respect of any such item of such Entity and/or any of its Subsidiaries (i) to the extent deducted in determining such consolidated net income, the sum, without duplication, of (a) interest expense, (b) provisions for any income or similar taxes paid or accrued, (c) all amounts treated as expenses for depreciation and amortization of any kind, (d) cash and non-cash restructuring and reorganization, and other similar fees, costs, charges and expenses, including without limitation, as a result of, or in connection with, the Chapter 11 Cases and the Deferred Payment Documents, (e) items classified as extraordinary under Accounting Principles Board Opinion No. 30 (as amended, restated, supplemented, replaced or otherwise modified from time to time) incurred during such period, and (f) any non-cash charges minus (ii) to the extent included in determining such consolidated net income, the sum, without duplication, of (a) gross interest income received during such period and (b) items classified as extraordinary

3

under Accounting Principles Board Opinion No. 30 (as amended, restated, supplemented, replaced or otherwise modified from time to time) realized during such period, all, in the cases of clauses (i) and (ii) above, as determined on a consolidated basis in accordance with GAAP.

"Equity Interest" means shares of capital stock or equity, equity securities or ownership interests in any Entity or any rights (including any (x) options, warrants or other rights to purchase or acquire any such stock, equity or interests (whether or not at the time exercisable), or (y) securities by their terms convertible into or exchangeable for any such stock, equity or interests (whether or not at the time so convertible or exchangeable) or options, warrants or rights to purchase such convertible or exchangeable securities.

"Event of Default" has the meaning set forth in the Deferred Payment Agreement (PD).

"Fiscal Quarter" means, in respect of any Entity, a fiscal quarter of such Entity as determined by it.

"Fiscal Year" means, in respect of any Entity, a fiscal year of such Entity as determined by it.

"GAAP" means generally accepted accounting principles in effect from time to time in the United States, applied on a consistent basis; provided, however, that as of such time, if any, when any Entity begins to provide financial information generally on the basis of IFRS, then any reference to GAAP with respect to such Entity shall be given effect as a reference to IFRS.

"Governing Documents" means, as to any Entity, its articles or certificate of incorporation and by-laws, its partnership agreement, its certificate of formation and operating agreement and/or the organizational or governing documents of such Entity.

"Governmental Authority" means the government of the United States of America or any other country, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of, or pertaining to, government (including any supra-national bodies such as the European Union or the European Central Bank).

"Grace" means W. R. Grace & Co.-Conn., a Connecticut corporation, and any successor to its obligations under the Deferred Payment Agreement (PD) pursuant to the terms and conditions of Section 16 thereof.

"Guaranteed Obligations (PD)" has the meaning set forth in Section 2(a).

"Guarantee Payment Blockage Notice" has the meaning set forth in Section 8(a)(ii).

"Guarantee Payment Blockage Period" has the meaning set forth in Section 8(a)(ii).

4

"<u>Guarantor</u>" has the meaning set forth in the introductory paragraph hereof.

"<u>Guarantor Senior Indebtedness</u>" means any and all present and/or future, direct and/or indirect, indebtedness, liabilities and other obligations of the Guarantor owed to any Entity (whether as senior or subordinated indebtedness, as a first lien, second lien, any other position or priority, and any mezzanine, subordinated or other indebtedness) including any principal, interest and premiums, fees, investment points, reimbursement obligations, issuance discounts and/or other costs, indemnities, liabilities and/or expenses thereon or in connection therewith (including any interest accruing subsequent to the filing of a petition of bankruptcy at the rate provided for in the documentation with respect thereto, whether or not such interest is an allowed claim under applicable Law), in each case, under or with respect to (i) any credit or loan facilities (whether provided by one or more banks, insurance companies, financial institutions, private equity or hedge funds, lenders, and/or other Entities) and/or (ii) any debt, bonds, debentures, notes, repurchase, discount, securitization, factoring and/or other similar facilities providing for indebtedness, including any and all obligations of any nature in respect of loans, credit agreements, indentures, and bonds, together with obligations in respect of hedging arrangements (whether in respect of interest rates, currencies, commodities, equities, indebtedness and/or otherwise), in each case, entered into with banks, insurance companies, financial institutions, private equity or hedge funds, lenders and/or other Entities who are engaged in the business of providing financing (but not customers of or suppliers to the Guarantor to the extent constituting trade payables), notes, letters of credit, and synthetic letters of credit in connection therewith, and/or (iii) any reimbursement, payment, indemnities, fees, guarantees or other obligations in connection with any credit or loan facilities or indebtedness, liabilities and other obligations referenced in <u>clauses (i)</u> or <u>(ii)</u>;

except in each case, for any indebtedness owed by the Guarantor (A) that by its express terms is not Guarantor Senior Indebtedness for purposes of the Deferred Payment Agreement (PD) and this Guarantee (PD) and is to be treated as *pari passu* or junior and subordinated with respect thereto in accordance with its terms, (B) for the avoidance of doubt, consisting of obligations to trade creditors and other trade payables in connection with the purchase of goods, materials or services, (C) owed to, or guaranteed by Grace or the Guarantor on behalf of, any director, officer or senior key employee of (1) Grace, (2) the Guarantor or (3) any Subsidiary or Affiliate of Grace or the Guarantor (D) represented by Disqualified Equity Interest, (E) owed to (1) Grace or (2) any Subsidiary or Affiliate of Grace or the Guarantor and (F) resulting from the Deferred Payment Documents (PI) or the Deferred Payment Documents (ZAI).

"<u>Guarantor Senior Non-Payment Default</u>" has the meaning set forth in <u>Section 8(a)(ii)</u>.

"<u>Guarantor Senior Payment Default</u>" has the meaning set forth in <u>Section 8(a)(i)</u>.

"<u>Guarantor Senior Remedies</u>" means, if an event of default has occurred and is continuing under the terms of any agreement or document relating to Guarantor Senior Indebtedness, any of the following by the holder (or any agent or trustee of the holder) of any Guarantor Senior Indebtedness:  (1) exercising or seeking to exercise any rights or remedies against Grace or the Guarantor with respect to such event of default or (2) instituting any action

5

or proceeding with respect to such rights or remedies (including any action of foreclosure, contest or protest) under any agreement or document relating to Guarantor Senior Indebtedness, or under such event of default or otherwise or (3) attempting to do any of the foregoing.

"IFRS" means the International Financial Reporting Standards as adopted by the International Accounting Standards Board and in effect from time to time, consistently applied.

"Insolvent" means the financial condition of the Guarantor and its Subsidiaries taken as a whole such that, as of the date specified, the sum of their liabilities is greater than a fair valuation of all of their property and assets.

"Intercreditor Agreement" means the Intercreditor Agreement, dated as of the date hereof, among the Trusts' Representative, the Trust (PI) and the Trust (PD).

"Laws" means, collectively, all applicable international, foreign, Federal, state and local statutes, treaties, rules, regulations, ordinances and codes, including the binding interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof.

"NASDAQ" shall mean The NASDAQ Stock Market (including any of its subdivisions such as the NASDAQ Global Select Market) or any successor market thereto.

"NYSE" shall mean The New York Stock Exchange or any successor stock exchange thereto.

"Ordinary Dividends" means, in respect of any Entity, ordinary cash dividends declared and paid out of surplus and/or net profits (as determined in accordance with applicable law) in accordance with the dividend policy of such Entity as in effect from time to time; provided, however, that notwithstanding the foregoing, the excess, if any, of (a) the aggregate amount of dividends declared and paid by such Entity in any Fiscal Year over (b) 50% of such Entity's and its Subsidiaries' consolidated net income (determined in accordance with GAAP) for the immediately preceding Fiscal Year shall not constitute "Ordinary Dividends" to the extent of such excess.

"Permitted Holder" has the meaning set forth in the Deferred Payment Agreement (PD).

"Permitted Payee" has the meaning set forth in the Deferred Payment Agreement (PD).

"Permitted Payor" has the meaning set forth in the Deferred Payment Agreement (PD).

"Plan of Reorganization" means that certain First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code of W. R. Grace & Co., et al., the Official Committee of Asbestos Personal Injury Claimants, the Future Claimants' Representative, and the Official Committee of Equity Security Holders Dated as of February 27, 2009, as filed by Grace and certain of its affiliates in their reorganization cases under chapter 11

6

of the Bankruptcy Code, in the United States Bankruptcy Court for the District of Delaware, and as confirmed by order of that court dated as of [__], 2009, together with the exhibits and schedules thereto, each as amended, supplemented or otherwise modified from time to time in accordance with its terms.

"Post-Transaction Certificate" means a certificate in the form of Exhibit D.

"Post-Transaction Pro Forma Cash Balance" means with respect to any Entity as of any date of determination, the aggregate amount of such Entity's and its consolidated Subsidiaries' cash and cash equivalents as of such date (after giving effect to and assuming the consummation of any Significant Transaction with a Transaction Date occurring on or prior to such date, notwithstanding that such Significant Transaction may not have actually been consummated as of such date), other than cash and cash equivalents the disposition of which is subject to a material restriction for the benefit of Entities other than such Entity and its consolidated Subsidiaries.

"Post-Transaction Pro Forma EBITDA" means, with respect to any Entity for any four-Fiscal Quarter period and any specified Disposition Transaction, such Entity's Pro Forma EBITDA for such four-Fiscal Quarter period, computed assuming that such Disposition Transaction, and any other Significant Transaction the Transaction Date of which occurs on or prior to the Transaction Date of such Disposition Transaction and during the same Fiscal Quarter as the Transaction Date of such Disposition Transaction, were consummated on the same terms in effect on the respective Transaction Dates at the beginning of the four-Fiscal Quarter period most recently ended prior to the Transaction Date of such Disposition Transaction, and shall include adjustments which give effect to events that are (i) directly attributable to such Disposition Transaction and any such Significant Transactions, (ii) expected to have a continuing impact on the Entity, and (iii) factually supportable.

"Post-Transaction Pro Forma Guarantor Senior Indebtedness" means with respect to any Entity as of any date of determination, the aggregate outstanding principal amount of such Entity's and its consolidated Subsidiaries' Guarantor Senior Indebtedness as of such date (after giving effect to and assuming the consummation of any Significant Transaction (and any related incurrence, reduction or repayment of Guarantor Senior Indebtedness) with a Transaction Date occurring on or prior to such date, notwithstanding that such Significant Transaction (and any related incurrence, reduction or repayment of Guarantor Senior Indebtedness) may not have actually been consummated as of such date).

"Post-Transaction Pro Forma Valuation" means, with respect to any Entity as of any date of determination, the amount resulting from (a) the product of (i) such Entity's Post-Transaction Pro Forma EBITDA for the four-Fiscal Quarter period most recently ended, multiplied by (ii) seven (7), minus (b) such Entity's Post-Transaction Pro Forma Guarantor Senior Indebtedness as of such date, plus (c) such Entity's Post-Transaction Pro Forma Cash Balance as of such date.

"Proceeding" means, with respect to any Entity, any voluntary or involuntary insolvency, bankruptcy, receivership, custodianship, liquidation, reorganization, assignment for the benefit of creditors, appointment of a custodian, receiver, trustee or other officer with similar

7

powers or any other proceeding for the liquidation, or other winding up of such Entity or all or substantially all of the properties of such Entity.

"Pro Forma Cash Balance" means with respect to any Entity as of the last day of any four-Fiscal Quarter period, the aggregate amount of such Entity's and its consolidated Subsidiaries' cash and cash equivalents as of such date (after giving effect to and assuming the consummation of any Significant Transaction with a Transaction Date occurring during such four-Fiscal Quarter period, notwithstanding that such Significant Transaction may not have actually been consummated during such four-Fiscal Quarter period), other than cash and cash equivalents the disposition of which is subject to a material restriction for the benefit of Entities other than such Entity and its consolidated Subsidiaries.

"Pro Forma EBITDA" means, with respect to any Entity for any four Fiscal-Quarter period, such Entity's EBITDA for such four Fiscal-Quarter period, computed assuming that any Significant Transaction the Transaction Date of which occurred during the relevant four-Fiscal Quarter period was consummated, on the terms in effect on such Transaction Date, at the beginning of such four-Fiscal Quarter period most recently ended prior to the Transaction Date of such Significant Transaction, and shall include adjustments which give effect to events that are (i) directly attributable to any Significant Transactions the Transaction Date of which occurs during such four-Fiscal Quarter period, (ii) expected to have a continuing impact on the Entity, and (iii) factually supportable.

"Pro Forma Guarantor Senior Indebtedness" means with respect to any Entity as of the last day of any four-Fiscal Quarter period, the aggregate outstanding principal amount of such Entity's and its consolidated Subsidiaries' Guarantor Senior Indebtedness as of such date (after giving effect to and assuming the consummation of any Significant Transaction (and any related incurrence, reduction or repayment of Guarantor Senior Indebtedness) with a Transaction Date occurring during such four-Fiscal Quarter period, notwithstanding that such Significant Transaction (and any related incurrence, reduction or repayment of Guarantor Senior Indebtedness) may not have actually been consummated during such four-Fiscal Quarter period).

"Pro Forma Valuation" means, with respect to any Entity as of the last day of any four-Fiscal Quarter period, the amount resulting from (a) the product of (i) such Entity's Pro Forma EBITDA for such four-Fiscal Quarter period, multiplied by (ii) seven (7), minus (b) such Entity's Pro Forma Guarantor Senior Indebtedness as of such date, plus (c) such Entity's Pro Forma Cash Balance as of such date.

"Quarterly EBITDA and Valuation Certificate" means a certificate in the form of Exhibit B.

"Regulation S-X" means Regulation S-X promulgated by the United States Securities and Exchange Commission as in effect on the date hereof.

"Related Party" means in respect of an Entity (the "Affected Entity"): (a) any senior key employee, officer or director of the Affected Entity or, in respect of an officer or director, any person holding a similar position in an Affected Entity that is not a corporation (any such person, an "Insider"); (b) any spouse, child, parent or sibling of an Insider; (c) another

8

Entity which alone or together with other Entities under its Control directly or indirectly Controls or holds ten percent (10%) or more of the Equity Interests that (i) generally entitle the holders thereof to vote for the election of the board of directors or other governing body of the Affected Entity, or (ii) confer upon the holders thereof an interest in the capital or profits of the Affected Entity; (d) any Entity Controlled by the Affected Entity or by any Insider or in which the Affected Entity or any Insider Controls or holds ten percent (10%) or more of the stock or other equity interests which (i) generally entitle the holders thereof to vote for the election of the board of directors or other governing body of the Affected Entity or (ii) confer upon the holders thereof an interest in the capital or profits of such Affected Entity; or (e) any Controlled Affiliate of any Entity that is a Related Person by virtue of clause (d) of this definition; provided, however, that any direct or indirect 100% owned Subsidiary of the Guarantor shall not constitute a "Related Party" for purposes of this Guarantee (PD).

"Section 524(g) Shares" has the meaning set forth in the Share Issuance Agreement.

"Significant Transaction" means (a) any Disposition Transaction or (b) any transaction of the type described in Section 210.11-01(a)(1) or Section 210.11-01(a)(2) of Regulation S-X (disregarding, for purposes of clause (b) of this definition, whether the Entity entering into such transaction is at the time obligated to file or furnish, or is otherwise filing or furnishing, reports with the United States Securities and Exchange Commission pursuant to Section 13 or 15 of the Securities Exchange Act of 1934, as amended).

"Subsidiary" means, with respect to any Entity at any date, any corporation, limited or general partnership, limited liability company, trust, estate, association, joint venture or other business entity (i) the accounts of which would be consolidated with those of such Entity in such Entity's consolidated financial statements if such financial statements were prepared in accordance with GAAP or (ii) of which more than 50% of (A) the outstanding Capital Stock having (in the absence of contingencies) ordinary voting power to elect a majority of the board of directors or other managing body of such Entity, (B) in the case of a partnership or limited liability company, the interest in the capital or profits of such partnership or limited liability company or (C) in the case of a trust, estate, association, joint venture or other entity, the beneficial interest in such trust, estate, association or other entity business is, at the time of determination, owned or Controlled directly or indirectly through one or more intermediaries, by such Entity.

"Taxes" means any and all present or future taxes, levies, imposts, fees, assessments, levies, duties, deductions, charges, liabilities or withholdings (including interest, fines, penalties or additions to tax) imposed by any Governmental Authority.

"Threshold Amount" has the meaning set forth in the Deferred Payment Agreement (PD).

"Transaction Date" means, with respect to any Significant Transaction, (a) the date, if any, on which final, definitive documentation providing for such Significant Transaction is executed; provided, however, that the "Transaction Date" shall no longer be deemed to have occurred with respect to any Significant Transaction if the final, definitive documentation

9

providing for such Significant Transaction is terminated for any reason, or (b) if no such final, definitive documentation for such Significant Transaction is executed, the date on which such Significant Transaction is consummated.

"Transfer" has the meaning set forth in Section 7(b).

"Transferor" has the meaning set forth in Section 7(b).

"Trust (PD)" has the meaning set forth in the introductory paragraph hereof.

"Trust (PI)" has the meaning set forth in the Deferred Payment Agreement (PD).

"Trusts" has the meaning set forth in the Share Issuance Agreement.

"Trusts' Representative" has the meaning set forth in the Share Issuance Agreement.

"Trust (ZAI)" has the meaning set forth in the Deferred Payment Agreement (PD).

"Valuation" means, with respect to any Entity as of the last day of any four-Fiscal Quarter period, the amount resulting from (a) the product of (i) such Entity's EBITDA for such four-Fiscal Quarter period, multiplied by (ii) seven (7), minus (b) the aggregate outstanding principal amount of such Entity's and its consolidated Subsidiaries' Guarantor Senior Indebtedness as of such date, plus (c) the amount of cash and cash equivalents of such Entity and its consolidated Subsidiaries as of such date other than cash and cash equivalents the disposition of which is subject to a material restriction for the benefit of Entities other than such Entity and its consolidated Subsidiaries.

(b)    Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  All references herein to Sections shall be deemed references to Sections of this Guarantee (PD) unless the context shall otherwise require.

(c)    Unless otherwise indicated, (i) the term "including" means "including without limitation", except when used in the computation of time periods, and (ii) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein).

(d)    For purposes of the computation of time periods, whenever this Guarantee (PD) provides for an event to occur "within" a specified number of days of a preceding event, it shall mean that the latter event shall occur before the close of business on the last of the specified days, and the day on which the preceding event occurs shall not be included in the computation of days elapsed. The word "from" means "from and including", "after" means "after and excluding", and "to" and "until" means "to and including".

10

(e)     All terms defined in this Guarantee (PD) in the singular form shall have comparable meanings when used in the plural form and vice versa.

2.     Guarantee (PD).

(a)     For value received and in consideration of the transactions set forth in the Deferred Payment Agreement (PD) and in the Plan of Reorganization, the Guarantor hereby absolutely, irrevocably and unconditionally guarantees for the benefit of the Permitted Holder and each Permitted Payee, as a primary obligor and not merely as a surety, and pursuant to the terms and conditions of this Guarantee (PD), (i) the full and prompt payment when due (whether by acceleration or otherwise) of (A) all Deferred Payments (PD) and (B) all other amounts payable under the Deferred Payment Agreement (PD) (including interest at the Default Rate) accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding) and at all times thereafter, and (ii) the due performance by Grace of all of its other obligations under the Deferred Payment Agreement (PD) (the obligations described in items (i) and (ii), the "Guaranteed Obligations (PD)").

(b)     The Guarantor hereby agrees that this Guarantee (PD) is an absolute, unconditional guarantee of payment and performance and is not merely a surety or guarantee of collection, and that the Guarantor and Grace are jointly and severally liable for the Guaranteed Obligations (PD), which liability is a continuing, absolute and unconditional obligation of payment or performance, as the case may be, regardless of the solvency or insolvency of Grace or the Guarantor at any time.

(c)     The obligations of the Guarantor hereunder are secured by the Guarantor's obligation to issue and deliver to the Trusts' Representative, for the benefit of the Trusts, the Section 524(g) Shares under the circumstances, and upon the terms and subject to the conditions, set forth in the Share Issuance Agreement.

(d)     If the acceleration of the Guaranteed Obligations (PD) is stayed in connection with any Proceeding commenced by or against Grace, all such Guaranteed Obligations (PD) shall nonetheless be payable by the Guarantor immediately upon demand by the Permitted Holder.

3.     Enforceability of Obligations.

(a)     Subject to Section 3(b), the Guarantor hereby agrees that its obligations in respect of this Guarantee (PD) shall be enforceable against the Guarantor irrespective of:

(i)     the legality, validity, enforceability, avoidance or subordination of any of the Guaranteed Obligations (PD) or the Deferred Payment Agreement (PD);

(ii)     any law, regulation, or order of any jurisdiction, or any other event, affecting any term of the Guaranteed Obligations (PD) or the Deferred Payment Agreement (PD);

11

(iii)    the absence of any attempt by, or on behalf of, the Permitted Holder to collect, or to take any other action to enforce, all or any part of the Guaranteed Obligations (PD) whether from or against Grace or any other Entity;

(iv)    the election of any remedy available under the Deferred Payment Agreement (PD) or applicable Law or in equity by, or on behalf of, the Permitted Holder with respect to all or any part of the Guaranteed Obligations (PD);

(v)    any change in the corporate existence, structure or ownership of Grace or the Guarantor;

(vi)    any impairment of the capital of Grace or the Guarantor, or any insolvency, bankruptcy, reorganization or other similar proceeding affecting Grace, the Guarantor or their assets, or any resulting release or discharge of the Guaranteed Obligations (PD);

(vii)    any amendment, waiver, consent, extension, forbearance or granting of any indulgence by, or on behalf of, the Permitted Holder with respect to any provision of the Deferred Payment Agreement (PD), or any other act or thing or omission or delay to do any other act or thing which may or might in any manner or to any extent vary the risk of Grace or the Guarantor, including any renewal or extension of the time or change of the manner or place of payment or performance, as the case may be, of the Guaranteed Obligations (PD);

(viii)    the disallowance, under Section 502 of the Bankruptcy Code, of all or any portion of the claims against Grace held by the Permitted Holder for payment or performance, as the case may be, of all or any part of the Guaranteed Obligations (PD);

(ix)    the existence of any right, claim, counterclaim, or right of set-off, whether arising from or relating to the Guaranteed Obligations (PD) or Grace or otherwise, that the Guarantor may have at any time against Grace, the Permitted Holder or any other Entity, whether in connection herewith or any unrelated transactions, provided, however, that nothing herein shall prevent the assertion of a separate suit or compulsory counterclaim;

(x)    the cessation for any reason of the liability of Grace under the Deferred Payment Agreement (PD) or any other circumstance which might otherwise constitute a legal or equitable discharge of Grace or the Guarantor; or

(xi)    any other act or circumstance which might or could be deemed a discharge or modification hereunder other than payment in full of the Guaranteed Obligations (PD).

(b)    Notwithstanding Section 3(a) and Section 4, or any other provision to the contrary in this Guarantee (PD), from and after such time, if any, that the Guarantor has notified the Permitted Holder in writing that Grace is no longer a Subsidiary or a Controlled Affiliate of the Guarantor, any amendment, waiver, modification, supplement, restatement or change in respect of the terms and conditions of the Deferred Payment Agreement (PD) or any other Deferred Payment Document (PD) shall require the prior written consent of the Guarantor.

12

4.     <u>Waivers</u>.  With respect to the Guaranteed Obligations (PD), the Guarantor hereby waives (subject to <u>Section 3(b)</u>) (a) acceptance, promptness, diligence, presentment, demand of payment, filing of claims with a court in the event of receivership or bankruptcy of Grace, protest or notice, all setoffs and counterclaims and all presentments, demands for performance, notices of nonperformance, protests, notices of protest, notices of dishonor and notices of acceptance of this Guarantee (PD) or the Deferred Payment Agreement (PD) (and shall not require that the same be made on or given to Grace as a condition to the Guarantor's obligations hereunder), (b) any defense arising by reason of any disability or other defense of Grace or any other guarantor, or the cessation from any cause whatsoever (including any act or omission of the Permitted Holder or any other Entity) of the liability of Grace; (c) any right to, or to require the Permitted Holder to, proceed against Grace, proceed against or exhaust any security (including the Section 524(g) Shares) for the Guaranteed Obligations (PD), or pursue any other remedy in the power of the Permitted Holder whatsoever, (d) any benefit of and any right to participate in any security now or hereafter securing the Guaranteed Obligations (PD), (e) the benefits of all statutes of limitation, and (f) all other demands and defenses whatsoever (other than payment in full of all Guaranteed Obligations (PD)).

5.     <u>Payments</u>.

(a)     All payments to be made by the Guarantor pursuant to this Guarantee (PD) shall be made in lawful currency of the United States of America by wire transfer of immediately available funds to the Permitted Holder in accordance with such wire transfer instructions as are provided by the Permitted Holder in writing from time to time.  Subject to <u>Sections 5(b)</u>, <u>(c)</u> and <u>(d)</u>, all payments under this Guarantee (PD) shall be made in full, without any set-off, counterclaim or any deduction whatsoever.

(b)     If, after giving effect to any Disposition Transaction or any assignment, delegation or transfer by the Guarantor of its rights or obligations under this Guarantee (PD), the Guarantor shall be required by applicable Law to withhold any Taxes from any payments hereunder, and if such requirement would not have been imposed by such applicable Law but for such Disposition Transaction, assignment or transfer, then (i) the sum payable shall be increased as necessary so that after making all withholdings required by applicable Law (including withholdings applicable to additional sums payable under this <u>Section 5(b)</u>) the payee receives an amount equal to the sum it would have received had no such withholdings been made, (ii) the Guarantor shall make such withholdings and (iii) the Guarantor shall timely pay the full amount deducted to the relevant Governmental Authority in accordance with applicable Law.  This <u>Section 5(b)</u> shall survive the termination of this Guarantee (PD) pursuant to <u>Section 15</u>.

(c)     If, after giving effect to any permitted assignment or Transfer by the Permitted Holder of its rights or obligations under this Guarantee (PD), the Guarantor shall be required by applicable Law to withhold any Taxes from any payments hereunder, and if such requirement would not have been imposed by such applicable Law but for such assignment or Transfer, then the obligation of the Guarantor or the Permitted Payor to make the relevant payment hereunder shall be discharged by making such payment net of such Taxes.  This <u>Section 5(c)</u> shall survive the termination of this Guarantee (PD) pursuant to <u>Section 15</u>.

13

(d)     If, due to either (i) the introduction of or any change in any law or regulation (or any change in the interpretation thereof) or (ii) the compliance with any guideline or request from any central bank or other Governmental Authority (whether or not having the force of law), in each case adopted after the date hereof, the Guarantor or a Permitted Payor shall be required to withhold any Taxes from any payments hereunder, then the obligation of the Guarantor or the Permitted Payor to make the relevant payment hereunder shall be discharged by making such payment net of such Taxes.  This <u>Section 5(d)</u> shall survive the termination of this Guarantee (PD) pursuant to <u>Section 15</u>.

6.     <u>Representations and Warranties</u>.  The Guarantor represents and warrants, as of the Effective Date, that:

(a)     The Guarantor is duly organized, validly existing and in good standing under the laws of the jurisdiction of the Guarantor's incorporation; <u>provided</u>, <u>however</u>, with respect to good standing, only to the extent the concept of good standing exists in such jurisdiction of incorporation.

(b)     The Guarantor has the corporate power and authority to execute and deliver this Guarantee (PD) and each other Deferred Payment Document (PD) to which it is a party.  This Guarantee (PD) and each other Deferred Payment Document (PD) to which the Guarantor is a party has been duly authorized by all necessary corporate action of the Guarantor and has been duly executed and delivered by the Guarantor.

(c)     This Guarantee (PD) and each other Deferred Payment Document (PD) to which the Guarantor is a party is a legal, valid and binding obligation of the Guarantor, enforceable against the Guarantor in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally, by the discretion of the court in which enforcement is sought, and/or by general equitable principles (whether enforcement is sought by proceedings at law or in equity).

(d)     The execution, delivery and performance by the Guarantor of this Guarantee (PD) and each other Deferred Payment Document (PD) to which the Guarantor is a party does not conflict with, result in a breach of any of the provisions of, or constitute a default under, the Governing Documents of the Guarantor.

7.     <u>Guarantor Covenants</u>.  The Guarantor covenants and agrees that, from the Effective Date until all Guaranteed Obligations (PD) are paid and performed in full:

(a)     <u>Affirmative Covenants</u>.  The Guarantor shall:

(i)     <u>Maintenance of Existence and Qualifications</u>.  Maintain and preserve in full force and effect its existence and good standing (to the extent the concept of good standing exists in the Guarantor's jurisdiction of incorporation) and all other rights, powers, franchises, licenses and qualifications necessary or desirable for its ownership or use of properties or the conduct of its business, except (A) as permitted by <u>Section 16</u>, and (B) where the failure to do so would not reasonably be likely to adversely affect the Guarantor's ability to make payments in

14

respect of the Guaranteed Obligations (PD) or to perform its obligations under the Deferred Payment Documents (PD) to which it is a party.

(ii)    <u>Notice of Event of Default, Guarantor Senior Payment Default and Guarantor Senior Non-Payment Default</u>.  Furnish to the Permitted Holder (x) within five (5) days after an Authorized Officer of the Guarantor shall first learn of an Event of Default, and (y) on or before the earlier of (A) the fifteenth (15th) day after an Authorized Officer of the Guarantor shall first learn of a Guarantor Senior Payment Default or Guarantor Senior Non-Payment Default and (B) the first Business Day following the date upon which a Guarantee Payment Blockage Notice is delivered pursuant to <u>Section 8(a)(ii)</u>, a written statement of an Authorized Officer of the Guarantor stating that an Event of Default, Guarantor Senior Payment Default or Guarantor Senior Non-Payment Default, as the case may be, has occurred, which written statement shall, to the extent known by the Guarantor, set forth in reasonable detail the facts giving rise to and status of such Event of Default, Guarantor Senior Payment Default or Guarantor Senior-Non Payment Default, as the case may be, and the actions, if any, the Guarantor is taking or proposes to take with respect thereto.

(iii)    <u>Information Covenants</u>.  If the Guarantor is not obligated to file or furnish, or is not otherwise filing or furnishing, reports with the United States Securities and Exchange Commission pursuant to Section 13 or 15 of the Securities Exchange Act of 1934, the Guarantor shall furnish to the Permitted Holder:

(A)    <u>Annual Financial Statements</u>.  As soon as available but in no event later than ninety (90) days after the last day of each of the Guarantor's Fiscal Years, its annual consolidated financial statements audited by a nationally recognized registered independent public accounting firm allowed to practice before the Securities and Exchange Commission or any successor Governmental Authority, consisting of a consolidated balance sheet of the Guarantor and its consolidated Subsidiaries as of the end of such year and consolidated statements of income, cash flows and stockholders equity for such year (all in reasonable detail and with all notes and supporting schedules); and

(B)    <u>Quarterly Financial Statements</u>.  As soon as available and in any event within forty-five (45) days after the end of each of the first three Fiscal Quarters in each Fiscal Year of the Guarantor, its consolidated balance sheet as of the end of such Fiscal Quarter, and consolidated statements of income and cash flows of the Guarantor and its consolidated Subsidiaries for such Fiscal Quarter, all in reasonable detail and certified by an Authorized Officer of the Guarantor to present fairly in all material respects the financial condition, results of operations and other information reflected therein and to have been prepared in accordance with GAAP (subject to year-end audit adjustments and the absence of footnotes).

(iv)    <u>Officer's Certificates</u>.    The Guarantor shall furnish to the Permitted Holder:

(A)    No later than ninety (90) days after the last day of each of the Guarantor's Fiscal Years and no later than forty-five (45) days after the end of each of the first three Fiscal Quarters in each Fiscal Year of the Guarantor, a Quarterly EBITDA and Valuation Certificate executed by an Authorized Officer of the Guarantor setting forth (I) if the Transaction

15

Date of a Significant Transaction has occurred during the four-Fiscal Quarter period ending on the last day of such Fiscal Quarter or Fiscal Year, as the case may be, the Pro Forma EBITDA of the Guarantor for such four-Fiscal Quarter period and the Pro Forma Valuation of the Guarantor as of the last day of such four-Fiscal Quarter period or (II) if the Transaction Date of a Significant Transaction did not occur during the four-Fiscal Quarter period ending on the last day of such Fiscal Quarter or Fiscal Year, as the case may be, the EBITDA of the Guarantor for such four-Fiscal Quarter period and the Valuation of the Guarantor as of the last day of such four-Fiscal Quarter period; provided, however, that the Guarantor shall not be required to furnish to the Permitted Holder a Quarterly EBITDA and Valuation Certificate under this subclause (A) if (x) the Guarantor is filing or furnishing reports with the United States Securities and Exchange Commission pursuant to Section 13 or 15 of the Securities Exchange Act of 1934, and (y)(1) if the Transaction Date of a Significant Transaction has occurred during the four-Fiscal Quarter period ending on the last day of the applicable Fiscal Quarter or Fiscal Year, the Pro Forma EBITDA of the Guarantor for such four-Fiscal Quarter period and the Pro Forma Valuation of the Guarantor as of the last day of such four-Fiscal Quarter period is readily ascertainable from such reports or (1) if the Transaction Date of a Significant  Transaction did not occur during the four-Fiscal Quarter period ending on the last day of the applicable Fiscal Quarter or Fiscal Year, the EBITDA of the Guarantor for such four-Fiscal Quarter period and Valuation of the Guarantor as of the last day of such four-Fiscal Quarter period is readily ascertainable from such reports;

(B)     no later than ninety (90) days after the last day of each of the Guarantor's Fiscal Years, a Compliance Certificate executed by an Authorized Officer of the Guarantor for such Fiscal Year; and

(C)     no later than thirty (30) days after the consummation by a Transferor of a Disposition Transaction of the type described in clause (ii) or clause (iii) of Section 7(b), a Post-Transaction Certificate setting forth the Post-Transaction Pro Forma EBITDA of the Guarantor with respect to such Disposition Transaction executed and delivered by an Authorized Officer of the Guarantor.

(b)     Negative Covenant.  The Guarantor shall not, and shall cause each of its Subsidiaries and Controlled Affiliates (each, a "Transferor") to not, sell, assign, transfer, license, lease or otherwise dispose of (each, a "Transfer") any property and/or other assets and/or enter into any transaction or obligation, whether constituting or by way of merger, consolidation, sale of assets or other disposition, reorganization, recapitalization, dividend, other distribution, or otherwise, or any related series of the foregoing (any such Transfer other than Ordinary Dividends, Bona Fide Compensation Transactions and other Transfers in the ordinary course of business, a "Disposition Transaction"), if the Transferor (taken together with all of its direct and indirect wholly owned Subsidiaries) would (1) receive (directly or indirectly) less than a reasonably equivalent value in such Disposition Transaction, (2) become or be rendered Insolvent as a result of such Transfer and/or such Disposition Transaction, or (3) be engaged in business and/or transactions, and/or would be about to engage in business and/or transactions, for which the Transferor's (taken together with all of its direct and indirect wholly owned Subsidiaries) remaining property and other assets would be unreasonably small capital; provided, however, that notwithstanding the foregoing, a Transferor:

16

(i)      That is a direct or indirect wholly-owned Subsidiary of the Guarantor may make a Transfer to or engage in a Disposition Transaction exclusively with the Guarantor or any other direct or indirect wholly-owned Subsidiary of the Guarantor; provided further, that if such Transferor is Grace or any of Grace's Subsidiaries or Controlled Affiliates, such Disposition Transaction shall be permitted under this clause (i) only if it is also permitted under Section 6(b) of the Deferred Payment Agreement (PD);

(ii)      may engage in a Disposition Transaction whereby such Transferor (A) pays or makes (directly or indirectly) dividends or distributions (whether in cash, securities or other property) with respect to any of its Capital Stock (including by way of a spin-off or spin-out of any of its assets), or (B) repurchases its Capital Stock, provided that, in the case of any Disposition Transaction under subclause (A) or (B) above, all of the following conditions are satisfied:

(1)      no Event of Default has occurred and is continuing at the time of, or would result from, such Disposition Transaction;

(2)      as of the Transaction Date of such Disposition Transaction, (x) the Post-Transaction Pro Forma Valuation of the Guarantor shall equal or exceed the Threshold Amount or (y) the "Post-Transaction Pro Forma Valuation" (as defined in the Deferred Payment Agreement (PD)) of Grace shall equal or exceed the Threshold Amount; and

(3)      if such Disposition Transaction exceeds $15,000,000 and is not publicly disclosed at least 10 days prior to the consummation of such Disposition Transaction, then the Guarantor shall provide the Permitted Holder with, at least 10 days' prior to the consummation of such Disposition Transaction, a written notice describing in reasonable detail the material terms of such Disposition Transaction and setting forth the Post-Transaction Pro Forma Valuation of the Guarantor as of the Transaction Date of such Disposition Transaction; and

(iii)      other than as set forth in Section 7(b)(ii) above, shall not enter into any Disposition Transaction with a Related Party to the Transferor in which the aggregate value of the assets or other property Transferred in such Disposition Transaction to such Related Party exceeds $15,000,000 if the Transferor (taken together with all of its direct and indirect wholly owned Subsidiaries) would (1) receive (directly or indirectly) less than a reasonably equivalent value in such Disposition Transaction, as determined by a reputable investment bank or valuation firm jointly selected by the Guarantor and the "Permitted Holder" (as defined in the Deferred Payment Agreement (PI)), (2) become or be rendered Insolvent as a result of such Transfer and/or such Disposition Transaction or (3) be engaged in business and/or transactions, and/or would be about to engage in business and/or transactions, for which the Transferor's (taken together with all of its direct and indirect wholly owned Subsidiaries) remaining property and other assets would be unreasonably small capital; provided, that if the aggregate value of the assets or other property Transferred to such Related Party in such Disposition Transaction exceeds $15,000,000 and the existence of such Disposition Transaction is not publicly disclosed at least 10 days prior to the consummation of such Disposition Transaction, then the Guarantor shall provide the Permitted Holder with, at least 10 days' prior to the consummation of such Disposition Transaction, a written notice describing in reasonable detail the material terms of

17

such Disposition Transaction and setting forth the Post-Transaction Pro Forma Valuation of the Guarantor as of the Transaction Date of such Disposition Transaction;

provided further that if the Guarantor is not the surviving or succeeding Entity as a result of any Disposition Transaction (but in the case of a sale of assets, only if such sale involves a sale of all or substantially all of the assets of the Guarantor) otherwise permitted by the exceptions to this Section 7(b), such Disposition Transaction shall be permitted under this Section 7(b) only if the Guarantor shall comply with the requirements of Section 16(e).

8.    Subordination Terms.  Any and all obligations of the Guarantor in respect of the Guaranteed Obligations (PD) shall be subordinated and otherwise junior at all times in right of payment and in all other respects, in the manner and to the extent set forth herein, to any and all present and future obligations of the Guarantor in respect of any Guarantor Senior Indebtedness.

(a)    Blockage of Payments for Guaranteed Obligations (PD).

(i)    If any payment default occurs and is continuing beyond any applicable grace period pursuant to the terms and conditions of any Guarantor Senior Indebtedness (a "Guarantor Senior Payment Default"), then subject to Section 8(g), no payment or distribution of cash, securities or any other assets shall be made by the Guarantor with respect to the Guaranteed Obligations (PD) or this Guarantee (PD) for as long as such Guarantor Senior Payment Default is continuing.

(ii)    If any default other than a Guarantor Senior Payment Default occurs pursuant to the terms and conditions of any Designated Guarantor Senior Indebtedness that would allow the holders thereof to accelerate the maturity thereof (a "Guarantor Senior Non-Payment Default"), then subject to Section 8(g), no payment or distribution of cash, securities or any other assets shall be made by the Guarantor with respect to any Guaranteed Obligations (PD) or pursuant to this Guarantee (PD) during the period (the "Guarantee Payment Blockage Period") (x) beginning on the date that the Permitted Holder receives from the Entity entitled to give notice under any document evidencing such Designated Guarantor Senior Indebtedness (or from the Guarantor acting at the direction or request of such Entity) a written notice (a "Guarantee Payment Blockage Notice") that such a Guarantor Senior Non-Payment Default has occurred and is continuing and (y) ending on the earliest to occur of (1) 180 days from the date the Permitted Holder shall have received the Guarantee Payment Blockage Notice, (2) the date such Guarantor Senior Non-Payment Default shall have been cured or waived or shall have ceased to exist and (3) the date such Guarantee Payment Blockage Period shall have been terminated by written notice to the Permitted Holder from the Entity initiating such Guarantee Payment Blockage Period.

(iii)    Notwithstanding the foregoing, (A) in no event will a Guarantee Payment Blockage Period extend beyond 180 days from the date the Guarantee Payment Blockage Notice in respect thereof was received by the Permitted Holder, (B) there shall be a period of at least 180 consecutive days in each period of 360 consecutive days when no Guarantee Payment Blockage Period is in effect, and (C) no Guarantor Senior Non-Payment Default that existed or was continuing on the date of delivery of any Guarantor Payment

18

Blockage Notice (whether or not such Guarantor Senior Non-Payment Default is with respect to the same issue of Designated Guarantor Senior Indebtedness) may be, or be made, the basis for a subsequent Guarantor Payment Blockage Notice, unless such Guarantor Senior Non-Payment Default has been cured or waived for a period of not less than 90 consecutive calendar days.

(iv)     The payment of Guaranteed Obligations (PD) shall resume, and the payment of any Guaranteed Obligations (PD) not paid due to a suspension thereof pursuant to clause (i) or clause (ii) above shall be paid, together with accrued interest thereon at the Default Rate, when such suspension is no longer in effect (either due to cure or waiver of the relevant Guarantor Senior Payment Default or the expiration or termination of the Guarantee Payment Blockage Period pursuant to clause (i) or clause (ii) of this Section 8(a)) unless a subsequent Guarantor Payment Blockage Notice has been delivered in accordance with clause (iii) of this Section 8(a) and is not prohibited from being delivered by clause (iii) of this Section 8(a).

(b)     Proceedings.     Upon any payment made by the Guarantor, or any distribution of cash, securities or other assets of any kind of the Guarantor (other than securities issued in substitution for the obligation to make payments in respect of the Guaranteed Obligations (PD) that are subordinated to at least the extent described herein for the obligation to make payments in respect of the Guaranteed Obligations (PD), which Securities the Permitted Holder (or any Permitted Payee, if applicable) is specifically authorized to receive notwithstanding any other provision of this Section 8), to creditors in any Proceeding with respect to the Guarantor or its properties, all obligations due on all Guarantor Senior Indebtedness shall first be paid in full in cash before any payment or distribution is made on account of any Guaranteed Obligations (PD) or otherwise pursuant to this Guarantee (PD).

(c)     Improper Payments Held in Trust.     Any payments or property received by the Permitted Holder or any Permitted Payee in breach of this Section 8 shall be held by the Permitted Holder or such Permitted Payee in trust and promptly delivered in the form received to the holder of Guarantor Senior Indebtedness entitled to receive the same (any such payment or property delivered by the Permitted Holder or such Permitted Payee to any holder of Guarantor Senior Indebtedness, a "Guarantor Turnover Payment"). To the maximum extent permitted under applicable Law, the Guarantor agrees that any Guarantor Turnover Payment shall be treated as a payment by the Guarantor on account of such Guarantor Senior Indebtedness and shall not satisfy the Guarantor's obligation with respect to any amount due to the Permitted Holder or such Permitted Payee under this Guarantee (PD). If, notwithstanding the preceding sentence, it is determined (by a court of competent jurisdiction or otherwise) that a Guarantor Turnover Payment is a payment by the Guarantor on account of, and satisfies any obligation of the Guarantor with respect to, any amount due to the Permitted Holder or any Permitted Payee under this Guarantee (PD), then, to the extent of the amount of such Guarantor Turnover Payment, the portion of the obligation which has been determined to be paid and satisfied by such Guarantor Turnover Payment shall be reinstated and shall continue to be in full force and effect as of the time immediately preceding the initial payment thereof by the Guarantor to the Permitted Holder or such Permitted Payee. If, notwithstanding the preceding sentence, any portion of an obligation of the Guarantor in respect of such Guarantor Turnover Payment is not reinstated and continued to the extent of the amount of the relevant Guarantor Turnover Payment, then the Permitted Holder or the applicable Permitted Payee shall, upon the payment in full in cash of all Guarantor Senior Indebtedness owed to the holder thereof to whom the

19

Permitted Holder or such Permitted Payee delivered such Guarantor Turnover Payment, be subrogated to the rights of such holder to receive payments or distributions applicable to such Guarantor Senior Indebtedness, and for the purpose of such subrogation such Guarantor Turnover Payment shall not, as between the Guarantor and the Permitted Holder or such Permitted Payee, be deemed to be payment by the Guarantor to or on account of such Guarantor Senior Indebtedness.

(d)    Remedies Blockage.    Subject in any event to the other terms and conditions of this Section 8 (including Section 8(a) and Section 8(g)), if an Event of Default has occurred and is continuing and any Guarantor Senior Indebtedness is then outstanding, the Permitted Holder hereby agrees for itself and any assignee that it will not (1) exercise or seek to exercise any rights or remedies against Grace or the Guarantor with respect to such Event of Default or (2) institute any action or proceeding with respect to such rights or remedies (including any action of foreclosure, contest or protest) under any Deferred Payment Document (PD) or any agreement or document relating thereto, or under such Event of Default or otherwise or (3) attempt to do any of the foregoing (collectively, the "Remedies"), for a period commencing on the date that such Event of Default occurs and ending on the earliest to occur of (i) 180 days after the first date on which such Event of Default shall have occurred, (ii) the commencement of a Proceeding with respect to Grace, the Guarantor or their respective properties, (iii) the date that the holder (or any agent or trustee of the holder) of any Guarantor Senior Indebtedness commences exercising any Guarantor Senior Remedies with respect to such Guarantor Senior Indebtedness (including, without limitation, the acceleration of all or any portion of such Guarantor Senior Indebtedness) and (iv) the payment in full in cash of all Guarantor Senior Indebtedness.

(e)    Notwithstanding the foregoing, as applied to the Permitted Holder, the term "Remedies" shall not include, and the Permitted Holder shall not be impaired by this Section 8(e) from doing, any of the following:  (A) exercising rights and remedies for specific performance or injunctive relief to compel Grace or the Guarantor to comply with any non-payment obligations under the Deferred Payment Documents (PD) (including commencing any action contemplated by Section 16(f)), (B) instituting or maintaining any suit or action solely to prevent the running of any applicable statute of limitations, (C) accruing interest on the Deferred Payments (PD) at the Default Rate pursuant to the Deferred Payment Agreement (PD) and (D) giving any notice (including notice of an Event of Default) to the Guarantor under the Deferred Payment Documents (PD).

(f)    No Secured Obligation.    Except for this Guarantee (PD) and the share issuance obligation with respect to the Section 524(g) Shares as and to the extent contemplated in the Share Issuance Agreement, no credit support or security interest shall be granted by Grace, the Guarantor or any of its Subsidiaries in connection with, or otherwise support or secure any obligation set forth in, the Deferred Payment Documents (PD).  Notwithstanding the foregoing, the Permitted Holder may obtain to the extent permitted under applicable Law a judgment lien on the properties of Grace and/or the Guarantor to secure the payment and performance of a judgment obtained by the Permitted Holder against Grace and/or the Guarantor.

(g)    No Impairment of Right to Receive Section 524(g) Shares or Warrant Shares.  Nothing in this Section 8 shall impair the rights of the Trust (PD) (or its permitted

20

successor or assigns) (i) acting through the Trusts' Representative pursuant to the Intercreditor Agreement, to deliver to the Guarantor a Demand for Issuance of the Section 524(g) Shares and to receive the Trust (PD)'s percentage of the Section 524(g) Shares pursuant to the Share Issuance Agreement or (ii) to exercise all or any portion of the Warrant and to receive the shares of Common Stock in connection therewith.

(h)    Further Assurances.    At the reasonable request of the Guarantor, the Permitted Holder will, at the sole expense of the Guarantor, execute such agreement, documents, certificates and/or other instruments confirming the existence and extent of the subordination terms detailed in this Section.

9.    Defaults and Remedies.

(a)    Subject in each case to Section 8 of this Guarantee (PD), the Permitted Holder shall have the right, power and authority to do all things deemed necessary or advisable to enforce the provisions of this Guarantee (PD) and protect its rights under the Deferred Payment Agreement (PD) and, upon the occurrence and during the continuance of an Event of Default, the Permitted Holder may institute or appear in such appropriate proceedings permitted or not prohibited under this Guarantee (PD) as the Permitted Holder shall deem most effectual to protect and enforce any of its rights hereunder, whether for the specific enforcement of any covenant or agreement in this Guarantee (PD) or in aid of the exercise of any power granted herein or in the Permitted Holder, or to enforce any other proper remedy.

(b)    Each and every Event of Default or breach by the Guarantor of this Guarantee (PD) shall give rise to a separate cause of action hereunder, and separate actions may be brought hereunder as each cause of action arises.  For so long as such an Event of Default or such a breach is continuing, the Permitted Holder shall have the right to proceed first and directly against the Guarantor under this Guarantee (PD) without proceeding against any other Entity (including Grace), without exhausting any other remedies which it may have and without resorting to any other security (if any) (including the Section 524(g) Shares) held by the Permitted Holder to secure the Guaranteed Obligations (PD).

10.    Setoff.  Subject to Section 8 of this Guarantee (PD), at any time after all or any part of the Guaranteed Obligations (PD) have become due and payable or performable, as the case may be (by acceleration or otherwise), the Permitted Holder or any Permitted Payee may, without notice to the Guarantor and regardless of the acceptance of any security or collateral (if any) for the payment thereof, and up to the unpaid amount of the Guaranteed Obligations (PD) then due, appropriate and apply toward the payment or performance, as the case may be, of all or any part of the Guaranteed Obligations (PD) then owing to the Permitted Holder or such Permitted Payee (i) any indebtedness due or to become due from the Permitted Holder or such Permitted Payee to the Guarantor, and (ii) any moneys, credits or other property belonging to the Guarantor, at any time validly held by or coming into the possession of the Permitted Holder or such Permitted Payee.

11.    Financial Information.  The Guarantor hereby acknowledges that it has adequate means of, and assumes sole responsibility for, keeping itself informed of the financial condition of Grace including any circumstances bearing upon the risk of nonpayment or

21

nonperformance of the Guaranteed Obligations (PD), or any part thereof, and the Guarantor hereby agrees that no Permitted Holder shall have any duty to advise the Guarantor of information known to it regarding any such circumstances. In the event the Permitted Holder in its reasonable discretion, undertakes at any time or from time to time to provide any such information to the Guarantor, the Permitted Holder shall be under no obligation (i) to undertake any investigation not a part of its regular business routine or (ii) to disclose any information which the Permitted Holder, pursuant to accepted or reasonable practices, wishes to maintain confidential.

           12.    Reinstatement. Notwithstanding any provision herein to the contrary, the Guarantor agrees that, to the extent that any Entity makes a payment or payments to the Permitted Holder on account of the Guaranteed Obligations (PD) which payments or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required or agreed to be repaid or returned by the Permitted Holder under any Law or in respect of any Proceeding or other litigation to which the Guarantor, the Permitted Holder or any Permitted Payee is subject, then, to the extent of the amount of such payments, the portion of the Guaranteed Obligations (PD) which has been paid, reduced or satisfied by such amount shall be reinstated and continued in full force and effect as of the time immediately preceding such initial payment, reduction or satisfaction.

           13.    Distribution of Grace Assets in Proceeding; Subrogation.

        (a)    Upon any distribution of assets of Grace to creditors in connection with any Proceeding relating to Grace or its property (but subject to Section 8), (i) the Permitted Holder and each Permitted Payee shall be entitled to receive payment in full of all Guaranteed Obligations (PD) before the Guarantor shall be entitled to receive any payment of principal of or interest on or any other amounts in respect of indebtedness of Grace in favor of the Guarantor; and (ii) until payment and performance in full of all Guaranteed Obligations (PD), any distribution of assets of any kind or character to which the Guarantor would otherwise be entitled shall be paid by Grace or by any receiver, trustee in bankruptcy, liquidating trustee, agents or other Entity making such payment or distribution to, or if received by the Guarantor, shall be held for the benefit of and shall be forthwith paid or delivered to, the Permitted Holder and each Permitted Payee on a pro rata basis according to the amount of all Guaranteed Obligations (PD) owing to the Permitted Holder and each such Permitted Payee.

        (b)    The Guarantor hereby agrees that it will not assert, enforce, or otherwise exercise any rights which it may acquire against Grace or any guarantor pursuant to any other guaranties by way of subrogation pursuant to this Guarantee (PD), by any payment made hereunder or otherwise, until the Guaranteed Obligations (PD) shall have been paid in full.

           14.    Amendments; Waivers.

        (a)    No provision of this Guarantee (PD) may be waived, amended, supplemented or modified except by a written instrument executed by the Permitted Holder and the Guarantor.

22

(b)        No delay on the part of the Permitted Holder in the exercise of any right or remedy arising under this Guarantee (PD) or the Deferred Payment Agreement (PD) or otherwise with respect to all or any part of the Guaranteed Obligations (PD), any collateral (if any) or any other guarantee of or security (if any) for all or any part of the Guaranteed Obligations (PD) shall operate as a waiver thereof, and no single or partial exercise by the Permitted Holder of any such right or remedy shall preclude any further exercise thereof.  Failure by the Permitted Holder at any time or times hereafter to require strict performance by Grace, the Guarantor or any other guarantor of all or any part of the Guaranteed Obligations (PD) or of any of the provisions, warranties, terms and conditions contained in the Deferred Payment Agreement (PD) shall not waive, affect or diminish any right of the Permitted Holder at any time or times hereafter to demand strict performance thereof.  No waiver of any Event of Default by the Permitted Holder shall operate as a waiver of any other Event of Default or breach of this Guarantee (PD) or the same Event of Default or breach of this Guarantee (PD) on a future occasion, and no action by the Permitted Holder permitted hereunder shall in any way affect or impair the Permitted Holder's rights and remedies or the obligations of the Guarantor under this Guarantee (PD).  The remedies herein provided are cumulative and not exclusive of any remedies provided by law or in equity or any other Deferred Payment Document (PD).

15.        Effectiveness; Termination.  This Guarantee (PD) shall become effective against the Guarantor upon its execution by the Guarantor and the occurrence of the Effective Date and shall continue in full force and effect and may not be terminated or otherwise revoked until the Guaranteed Obligations (PD) shall have been paid in full.

16.        Consolidation, Successors and Assigns.

(a)        This Guarantee (PD) shall be binding upon the Guarantor and upon the successors and permitted assigns of the Guarantor and shall inure to the benefit of the Permitted Holder.  The successors and assigns of the Guarantor and Grace shall include, without limitation, their respective receivers, trustees or debtors-in-possession.

(b)        If the Permitted Holder Transfers or grants a security interest in its rights in the Deferred Payment Agreement (PD) or any Deferred Payments (PD) upon the terms and subject to the conditions set forth in the Deferred Payment Agreement (PD), the Permitted Holder shall have the right to Transfer or grant a security interest in this Guarantee (PD) to such transferee or secured party without the consent of the Guarantor; provided, however, that in no event shall any person or Entity other than the Collateral Agent have, or have the ability to bring, or be able to enforce, any claim, right or cause of action against the Guarantor or any of is affiliates under, in connection with or as a result of such security interest.

(c)        Subject to Section 16(d), the Guarantor may not Transfer its rights, interests, duties, liabilities or obligations under this Guarantee (PD) without the prior written consent of the Permitted Holder, which consent shall not be unreasonably withheld, conditioned or delayed.

(d)        Subject to Section 16(e), neither Section 16(c) nor anything else in this Guarantee (PD) shall prohibit or restrict the ability of the Guarantor to undertake any Disposition Transaction; provided that, unless the Permitted Holder otherwise consents in writing, (i) such

23

Disposition Transaction shall not violate <u>Section 7(b)</u>, (ii) no Event of Default and, no event which, with the giving of notice or the passage of time, or both, would constitute an Event of Default, exists at the time of, or would exist immediately following the consummation of such Disposition Transaction, (iii) such Disposition Transaction does not conflict with, or result in a breach of, any of the provisions of, or constitute a default under, the Governing Documents of the Guarantor or such surviving or succeeding Entity and (iv) at least ten (10) days prior to consummation of such Disposition Transaction, the Guarantor shall, subject to reasonable confidentiality arrangements between the Permitted Holder and the Guarantor, deliver to the Permitted Holder written notice of its intention to consummate such Disposition Transaction.

(e)     If the surviving or succeeding Entity as a result of any such Disposition Transaction (but in the case of a sale of assets, only if such sale involves a sale of all or substantially all of the assets of the Guarantor) is not the Guarantor, then prior to, or concurrently with, the consummation of any such Disposition Transaction, the surviving or succeeding Entity shall by written instrument substantially in the form of <u>Exhibit A</u> signed by such Entity, the Guarantor and, at its option, the Permitted Holder expressly assume the rights and obligations of the Guarantor hereunder, whereupon such Entity shall be the successor of all rights and obligations of the Guarantor hereunder, with the same effect as if it had been originally named herein (it being expressly acknowledged and agreed by the Guarantor and the Permitted Holder that such written instrument shall, and shall expressly provide that it shall, be binding upon, and inure to the benefit of, the Permitted Holder, the Guarantor and such surviving or succeeding Entity whether or not the Permitted Holder shall have executed such written instrument); <u>provided</u>, <u>however</u>, that the Guarantor shall not be discharged from, and shall remain liable for, any and all of its duties, liabilities and obligations under this Guarantee (PD).

(f)     The Guarantor shall be responsible for, and shall pay promptly upon demand all documented and direct out-of-pocket costs and expenses incurred by the Permitted Holder (including legal fees and expenses of legal counsel) in connection with (i) enforcing its rights and/or interests under this Guarantee (PD) and (ii) challenging any Disposition Transactions proposed by the Guarantor pursuant to <u>Section 16(d)</u>; <u>provided</u>, <u>however</u>, that in the case of clause (i) above, the Guarantor shall not be responsible for any such costs and expenses (including legal fees and expenses of legal counsel) unless the Permitted Holder is successful in enforcing its rights and/or interests under this Guarantee (PD) in a judicial or other proceeding, and in the case of clause (ii) above, the Guarantor shall not be responsible for any such costs and expenses (including legal fees and expenses of legal counsel) unless the Permitted Holder challenges such Disposition Transaction in a judicial or other proceeding or otherwise as being in breach of the provisions of this Guarantee (PD) or any of the Deferred Payment Documents (PD) and the Permitted Holder is successful in such challenge.

(g)     Any assignment or transfer in breach of this <u>Section 16</u> shall be null and void and not Transfer any interest in this Guarantee (PD) to any other Entity.

17.     <u>Governing Law; Submission to Jurisdiction; Waiver of Jury Trial</u>.

(a)     This Guarantee (PD) and the rights and obligations of the parties hereto shall be construed in accordance with the laws of the State of New York, without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other

24

jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York.

(b)    With respect to claims, suits, actions, proceedings, and other disputes arising out of, in respect of or relating to this Guarantee (PD) (such claims, suits, actions, proceedings, and other disputes, the "Claims") each of the parties to this Guarantee (PD) hereby irrevocably submits to the jurisdiction of the Bankruptcy Court for the District of Delaware or the United States District Court for the District of Delaware (the "Courts"), or, if both such Courts are not permitted under applicable Law to exercise jurisdiction with respect to the matter in question then to the jurisdiction of any other federal or state court in the state, county and city of New York, New York and each of the parties to this Guarantee (PD) agrees that any and all Claims may be brought, heard and determined in such courts.

(c)    Each of the parties to this Guarantee (PD) agrees that (i) venue shall be proper in the courts referenced in Section 17(b) and hereby waives any objection or defense which it may now or hereafter have to the laying of venue in such Courts, including any of the foregoing based upon the doctrine of *forum non conveniens*; and (ii) all process which may be or be required to be served in respect of any such Claim (including any pleading, summons or other paper initiating any such Claim or dispute) may be served upon it, which service shall be sufficient for all purposes, in the manner for the provision of notice under Section 19 hereof and shall be deemed in every respect effective service of process upon such party when so given.

(d)    EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE DEFERRED PAYMENT DOCUMENTS (PD).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER DEFERRED PAYMENT DOCUMENTS (PD), AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS PROVISION.

18.    Advice of Counsel. Each of the Guarantor and the Permitted Holder represent and warrant to the other that it has analyzed this Guarantee (PD) with, and has been advised as to its legal effects by, its legal counsel.

19.    Notices.  All notices required or permitted under this Guarantee (PD) must be in writing and will be deemed to be delivered and received (i) if personally delivered or if delivered by the United States Postal Service, facsimile or courier service, when actually received by the party to whom notice is sent or (ii) with respect to parties located other than within the United States, if deposited with the United States Postal Service (whether actually received or not), at the close of business on the seventh Business Day after the day when placed in the mail, postage prepaid, certified or registered with return receipt requested, addressed to the appropriate party or parties, at the address of such party or parties set forth below (or at such

25

other address as such party may designate by written notice to all other parties in accordance with this Section 19):

| | | |
|---|---|---|
| **If to the Guarantor:**<br><br>W. R. Grace & Co.<br>7500 Grace Drive<br>Columbia, MD 21044<br>Attn:  Corporate Secretary<br>Facsimile:  (410) 531-4545 | *With copies,*<br>*which shall*<br>*not constitute*<br>*notice, to:* | Kirkland & Ellis LLP<br>Citigroup Center<br>153 E. 53rd Street<br>New York, NY 10022-4675<br>Attn:  Theodore L. Freedman &<br>Thomas W. Christopher<br>Facsimile:  (212) 446-4900 |
| **If to the Permitted**<br>**Holder:**<br><br>WRG Asbestos PD Trust<br>[Notice Street Address]<br>[City], [State] [Zip]<br>Attn: [ ]<br>Facsimile: [ ]<br>*(if sending overnight*<br>*packages use zip code [ ])* | *With copies,*<br>*which shall*<br>*not constitute*<br>*notice, to:* | [Notice Street Address]<br>[City], [State] [Zip]<br>Attn:  [ ]<br>Facsimile: [ ] |

20.    Severability.  Wherever possible, each provision of this Guarantee (PD) will be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Guarantee (PD) by any party hereto is held to be invalid, void, voidable, illegal or unenforceable in any respect under any applicable Law in any jurisdiction, such event will not affect any other provision or the effectiveness or validity of any provision in any other jurisdiction, or the obligations of any other party to this Guarantee (PD), and this Guarantee (PD) will be reformed, construed and enforced in such jurisdiction as if such invalid, void, voidable, illegal, unenforceable or rejected provision had never been contained herein. The parties hereto further agree to use commercially reasonable efforts to replace such invalid, void, voidable, illegal, unenforceable or rejected provision of this Guarantee (PD) with a an effective, valid and enforceable provision which will achieve, to the fullest extent possible, the economic, business and other purposes of the invalid, void, voidable, illegal, unenforceable or rejected provision.

21.    Entire Agreement.  This Guarantee (PD), together with the Deferred Payment Agreement (PD), the Share Issuance Agreement, the Plan of Reorganization and the Confirmation Order, embodies the complete agreement and understanding between the parties hereto in respect of the subject matter hereof and supersedes, preempts and terminates all other prior understandings, agreements or representations by or among the parties hereto, written or oral, to the extent relating thereto.

22.    Execution in Counterparts.  This Guarantee (PD) may be executed (including by facsimile or portable document format (pdf)) in separate counterparts, each of which will be deemed to be an original and all of which taken together will constitute one and the same agreement.

26

23.     Further Assurances.   At the reasonable request of the Permitted Holder, the Guarantor will, at the sole expense of the Permitted Holder, execute such agreements, documents, certificates and/or other instruments confirming the existence of this Guarantee (PD), the obligations of the Guarantor hereunder and the rights of the Permitted Holder hereunder.

24.     Specific Performance.   Each of the parties hereto acknowledges and agrees that, in the event of any breach of, or any failure to perform, any specific provision of this Guarantee (PD), the non-breaching party would be irreparably and immediately harmed and could not be made whole by monetary damages.  It is accordingly agreed that, subject to Section 8 hereof, the parties hereto (a) shall be entitled, in addition to any other remedy to which they may be entitled at law or in equity, to compel specific performance of any specific provision of this Guarantee (PD) or to obtain injunctive relief to prevent breaches of any specific provision of this Guarantee (PD) exclusively in the Courts, (b) shall waive, in any action for specific performance or injunctive relief, the defense of the adequacy of a remedy at law, and (c) shall waive any requirement for the securing or posting of any bond in connection with the obtaining of any such specific performance or injunctive relief.  For the avoidance of doubt, the parties agree that the Permitted Holder shall be entitled to enforce specifically the terms and provisions of this Guarantee (PD) to prevent breaches of or enforce compliance with those covenants of the Guarantor set forth in Section 7.  Any party's pursuit of specific performance or injunctive relief at any time will not be deemed an election of remedies or waiver of the right to pursue any other right or remedy to which such party may be entitled, including the right to pursue remedies for liabilities or damages incurred or suffered by such party.

25.     Other Remedies.   Except as otherwise provided herein, any and all remedies herein expressly conferred upon a party shall be deemed cumulative with and not exclusive of any other remedy conferred hereby or by law on such party, and the exercise of any one remedy shall not preclude the exercise of any other.

[Signature page follows]

27

IN WITNESS WHEREOF, this Guarantee (PD) has been duly executed by the Guarantor as of the day and year first set forth above.

W. R. Grace & Co.

By_____
    Name:
    Title:

Acknowledged and agreed to
as of the _____ day of [ ], 2009.

WRG ASBESTOS PD TRUST

By:_____
    Name:
    Title:

EXHIBIT A

FORM OF

ASSUMPTION AGREEMENT

[To come]

EXHIBIT B

FORM OF

QUARTERLY EBITDA AND VALUATION CERTIFICATE

[To come]

EXHIBIT C

FORM OF

COMPLIANCE CERTIFICATE

[To come]

<u>EXHIBIT D</u>

FORM OF

POST-TRANSACTION CERTIFICATE

[To come]

[THIS PAGE INTENTIONALLY LEFT BLANK]

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re:** | ) | Chapter 11 |
| | ) | |
| **W. R. GRACE & CO.,** *et al.*[1] | ) | Case No. 01-01139 (JKF) |
| | ) | Jointly Administered |
| **Debtors.** | ) | |
| | ) | |
| | ) | |
| | ) | |

## EXHIBIT 30 TO EXHIBIT BOOK
## W. R. GRACE & CO. GUARANTEE AGREEMENT (CLASS 7B ZAI)

**EXHIBIT 30**

Attached.

---

[1]    The Debtors consist of the following 62 entities:  W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co. Conn., A-1 Bit & Tool Co., Inc., Alewife  Boston Ltd., Alewife Land Corporation, Amicon, Inc.,  CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., GC Limited Partners I, Inc., (f/k/a Grace Cocoa Limited Partners I, Inc.), GC Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc. GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation., W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (F/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

**FORM OF W. R. GRACE & CO. GUARANTEE AGREEMENT (CLASS 7B ZAI)**

**Deferred Payment Agreement (CLASS 7B ZAI)**

This W. R. GRACE & CO. GUARANTEE AGREEMENT (CLASS 7(b) ZAI) (this "Guarantee (ZAI)") is made and entered into as of [ ], 2009, by and between W. R. Grace & Co., a Delaware corporation (together with any successor thereto pursuant to the terms and conditions of Section 16, the "Guarantor"), and the WRG Asbestos PD Trust, on behalf of the Holders of US ZAI PD Claims (in such capacity, the "Trust (ZAI)"), a Delaware statutory trust established pursuant to §524(g) of the Bankruptcy Code in accordance with the Plan of Reorganization (as hereinafter defined).  Unless otherwise defined herein or the context otherwise requires, capitalized terms used herein and defined in the Plan of Reorganization shall be used herein as therein defined.

This Guarantee (ZAI) is the "Parent Guarantee" described and defined in the Deferred Payment Agreement (ZAI) (as defined below) and is effective as of the Effective Date.

W̲ I̲ T̲ N̲ E̲ S̲ S̲ E̲ T̲ H̲

In consideration of the terms and conditions contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.    Definitions; Rules of Interpretation.

(a)    As used in this Guarantee (ZAI), the following terms shall have the following meanings:

"Authorized Officer" means, with respect to any Entity, the chief executive officer, president, chief financial officer, controller, executive vice president or senior vice president of such Entity.

"Bona Fide Compensation Transaction" means any payment, grant or award, whether in cash, securities, options or other consideration, including without limitation salary or bonus, to or for the benefit of any director, officer or employee of any Transferor or any of its Affiliates made for legitimate, bona fide compensation and/or incentivization purposes; provided that compensation paid, granted or awarded to any one such individual in any Fiscal Year of Transferor whose aggregate value at the time or times of payment, grant or award is in excess of $15,000,000 shall be a Bona Fide Compensation Transaction only (i) if the relevant Transferor is then obligated to file or furnish, or is otherwise filing or furnishing, reports with the United States Securities and Exchange Commission pursuant to Section 13 or 15 of the Securities Exchange Act of 1934, it is approved by an independent committee of the Board of Directors of the Transferor (or other similar management body of the Transferor) or (ii) if the relevant Transferor is not then obligated to file or furnish, or is not otherwise filing or furnishing, reports

with the United States Securities and Exchange Commission pursuant to Section 13 or 15 of the Securities Exchange Act of 1934, a reputable independent compensation expert or consultant selected by the Transferor with the consent of the "Permitted Holder" (as defined in the Deferred Payment Agreement (PI)) (which consent shall not be unreasonably withheld, conditioned or delayed) shall have determined, in its reasonable, good faith judgment, that such payment, grant or award is reasonable and appropriate.  For purposes of the proviso in the previous sentence, (A) no payment or other value received in a given year pursuant to the terms of a grant or award in a previous year shall be taken into account for calculating the compensation in such given year; and (B) in the event of multiple payments, grants or awards in a given Fiscal Year, the independent committee approval, or independent compensation expert or consultant determination, as appropriate, shall be made with respect to each payment, grant or award beginning with the payment, grant or award that causes the compensation to be in excess of $15,000,000.

"Business Day" has the meaning set forth in the Deferred Payment Agreement (ZAI).

"Capital Stock" means, with respect to any Entity, any share of stock, or any depositary receipt or other certificate representing any share of stock, or any similar equity ownership interest, and any warrant, option, or any other security providing for the right to acquire any such share of stock or similar equity ownership interest.

"Claims" has the meaning set forth in Section 17(b).

"Collateral Agent" has the meaning set forth in the Deferred Payment Agreement (ZAI).

"Compliance Certificate" means a certificate in the form of Exhibit C.

"Control" means, as to any Entity, the power to direct the management and policies of such Entity directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "Controlling" and "Controlled" have meanings correlative to the foregoing.

"Controlled Affiliate" means, as to any Entity (the "Controlling Entity"), any Affiliate that is Controlled by such Controlling Entity.

"Default Rate" has the meaning set forth in the Deferred Payment Agreement (ZAI).

"Deferred Payment Agreement (PI)" means that certain Deferred Payment Agreement (PI) , dated as of the date hereof, between Grace and the Trust (PI).

"Deferred Payment Agreement (ZAI)" means that certain Deferred Payment Agreement (Class 7(b) ZAI), dated as of the date hereof, between Grace and the Trust (ZAI).

"Deferred Payment Date (ZAI)" has the meaning set forth in the Deferred Payment Agreement (ZAI).

2

"Deferred Payment Documents" has the meaning set forth in the Deferred Payment Agreement (ZAI).

"Deferred Payment Documents (PI)" has the meaning set forth in the Deferred Payment Agreement (ZAI).

"Deferred Payment Documents (PD)" has the meaning set forth in the Deferred Payment Agreement (ZAI).

"Deferred Payment Documents (ZAI)" means this Guarantee (ZAI), the Deferred Payment Agreement (ZAI) and the Share Issuance Agreement.

"Deferred Payment (PI)" has the meaning set forth in the Deferred Payment Agreement (PI).

"Deferred Payment (ZAI)" has the meaning set forth in the Deferred Payment Agreement (ZAI).

"Demand for Issuance of the Section 524(g) Shares" has the meaning set forth in the Share Issuance Agreement.

"Designated Guarantor Senior Indebtedness" means Guarantor Senior Indebtedness issued, pursuant to a facility with an aggregate principal amount, commitments and/or other financial accommodations then outstanding and/or available (disregarding for purposes of this definition whether any conditions for draws thereunder have been satisfied), as of the relevant date of determination, of at least $25,000,000.

"Disposition Transaction" has the meaning set forth in Section 7(b).

"Disqualified Equity Interest" means that portion of any Equity Interest which, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable), or upon the happening of any event, matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or is redeemable at the sole option of the holder thereof on or prior to the final Deferred Payment Date (ZAI).

"EBITDA" means, for any Entity for any period, such Entity's and its Subsidiaries' consolidated net income (determined in accordance with GAAP) for such period plus, without duplication, in respect of any such item of such Entity and/or any of its Subsidiaries (i) to the extent deducted in determining such consolidated net income, the sum, without duplication, of (a) interest expense, (b) provisions for any income or similar taxes paid or accrued, (c) all amounts treated as expenses for depreciation and amortization of any kind, (d) cash and non-cash restructuring and reorganization, and other similar fees, costs, charges and expenses, including without limitation, as a result of, or in connection with, the Chapter 11 Cases and the Deferred Payment Documents, (e) items classified as extraordinary under Accounting Principles Board Opinion No. 30 (as amended, restated, supplemented, replaced or otherwise modified from time to time) incurred during such period, and (f) any non-cash charges minus (ii) to the extent included in determining such consolidated net income, the sum, without duplication, of (a) gross interest income received during such period and (b) items classified as extraordinary

3

under Accounting Principles Board Opinion No. 30 (as amended, restated, supplemented, replaced or otherwise modified from time to time) realized during such period, all, in the cases of clauses (i) and (ii) above, as determined on a consolidated basis in accordance with GAAP.

"Equity Interest" means shares of capital stock or equity, equity securities or ownership interests in any Entity or any rights (including any (x) options, warrants or other rights to purchase or acquire any such stock, equity or interests (whether or not at the time exercisable), or (y) securities by their terms convertible into or exchangeable for any such stock, equity or interests (whether or not at the time so convertible or exchangeable) or options, warrants or rights to purchase such convertible or exchangeable securities.

"Event of Default" has the meaning set forth in the Deferred Payment Agreement (ZAI).

"Fiscal Quarter" means, in respect of any Entity, a fiscal quarter of such Entity as determined by it.

"Fiscal Year" means, in respect of any Entity, a fiscal year of such Entity as determined by it.

"GAAP" means generally accepted accounting principles in effect from time to time in the United States, applied on a consistent basis; provided, however, that as of such time, if any, when any Entity begins to provide financial information generally on the basis of IFRS, then any reference to GAAP with respect to such Entity shall be given effect as a reference to IFRS.

"Governing Documents" means, as to any Entity, its articles or certificate of incorporation and by-laws, its partnership agreement, its certificate of formation and operating agreement and/or the organizational or governing documents of such Entity.

"Governmental Authority" means the government of the United States of America or any other country, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of, or pertaining to, government (including any supra-national bodies such as the European Union or the European Central Bank).

"Grace" means W. R. Grace & Co.-Conn., a Connecticut corporation, and any successor to its obligations under the Deferred Payment Agreement (ZAI) pursuant to the terms and conditions of Section 16 thereof.

"Guaranteed Obligations (ZAI)" has the meaning set forth in Section 2(a).

"Guarantee Payment Blockage Notice" has the meaning set forth in Section 8(a)(ii).

"Guarantee Payment Blockage Period" has the meaning set forth in Section 8(a)(ii).

4

"<u>Guarantor</u>" has the meaning set forth in the introductory paragraph hereof.

"<u>Guarantor Senior Indebtedness</u>" means any and all present and/or future, direct and/or indirect, indebtedness, liabilities and other obligations of the Guarantor owed to any Entity (whether as senior or subordinated indebtedness, as a first lien, second lien, any other position or priority, and any mezzanine, subordinated or other indebtedness) including any principal, interest and premiums, fees, investment points, reimbursement obligations, issuance discounts and/or other costs, indemnities, liabilities and/or expenses thereon or in connection therewith (including any interest accruing subsequent to the filing of a petition of bankruptcy at the rate provided for in the documentation with respect thereto, whether or not such interest is an allowed claim under applicable Law), in each case, under or with respect to (i) any credit or loan facilities (whether provided by one or more banks, insurance companies, financial institutions, private equity or hedge funds, lenders, and/or other Entities) and/or (ii) any debt, bonds, debentures, notes, repurchase, discount, securitization, factoring and/or other similar facilities providing for indebtedness, including any and all obligations of any nature in respect of loans, credit agreements, indentures, and bonds, together with obligations in respect of hedging arrangements (whether in respect of interest rates, currencies, commodities, equities, indebtedness and/or otherwise), in each case, entered into with banks, insurance companies, financial institutions, private equity or hedge funds, lenders and/or other Entities who are engaged in the business of providing financing (but not customers of or suppliers to the Guarantor to the extent constituting trade payables), notes, letters of credit, and synthetic letters of credit in connection therewith, and/or (iii) any reimbursement, payment, indemnities, fees, guarantees or other obligations in connection with any credit or loan facilities or indebtedness, liabilities and other obligations referenced in clauses (i) or (ii);

except in each case, for any indebtedness owed by the Guarantor (A) that by its express terms is not Guarantor Senior Indebtedness for purposes of the Deferred Payment Agreement (ZAI) and this Guarantee (ZAI) and is to be treated as *pari passu* or junior and subordinated with respect thereto in accordance with its terms, (B) for the avoidance of doubt, consisting of obligations to trade creditors and other trade payables in connection with the purchase of goods, materials or services, (C) owed to, or guaranteed by Grace or the Guarantor on behalf of, any director, officer or senior key employee of (1) Grace, (2) the Guarantor or (3) any Subsidiary or Affiliate of Grace or the Guarantor (D) represented by Disqualified Equity Interest, (E) owed to (1) Grace or (2) any Subsidiary or Affiliate of Grace or the Guarantor and (F) resulting from the Deferred Payment Documents (PD) or the Deferred Payment Documents (PI).

"<u>Guarantor Senior Non-Payment Default</u>" has the meaning set forth in <u>Section 8(a)(ii)</u>.

"<u>Guarantor Senior Payment Default</u>" has the meaning set forth in <u>Section 8(a)(i)</u>.

"<u>Guarantor Senior Remedies</u>" means, if an event of default has occurred and is continuing under the terms of any agreement or document relating to Guarantor Senior Indebtedness, any of the following by the holder (or any agent or trustee of the holder) of any Guarantor Senior Indebtedness:  (1) exercising or seeking to exercise any rights or remedies against Grace or the Guarantor with respect to such event of default or (2) instituting any action

5

or proceeding with respect to such rights or remedies (including any action of foreclosure, contest or protest) under any agreement or document relating to Guarantor Senior Indebtedness, or under such event of default or otherwise or (3) attempting to do any of the foregoing.

"IFRS" means the International Financial Reporting Standards as adopted by the International Accounting Standards Board and in effect from time to time, consistently applied.

"Insolvent" means the financial condition of the Guarantor and its Subsidiaries taken as a whole such that, as of the date specified, the sum of their liabilities is greater than a fair valuation of all of their property and assets.

"Intercreditor Agreement" means the Intercreditor Agreement, dated as of the date hereof, among the Trusts' Representative, the Trust (PI) and the Trust (PD).

"Laws" means, collectively, all applicable international, foreign, Federal, state and local statutes, treaties, rules, regulations, ordinances and codes, including the binding interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof.

"NASDAQ" shall mean The NASDAQ Stock Market (including any of its subdivisions such as the NASDAQ Global Select Market) or any successor market thereto.

"NYSE" shall mean The New York Stock Exchange or any successor stock exchange thereto.

"Ordinary Dividends" means, in respect of any Entity, ordinary cash dividends declared and paid out of surplus and/or net profits (as determined in accordance with applicable law) in accordance with the dividend policy of such Entity as in effect from time to time; provided, however, that notwithstanding the foregoing, the excess, if any, of (a) the aggregate amount of dividends declared and paid by such Entity in any Fiscal Year over (b) 50% of such Entity's and its Subsidiaries' consolidated net income (determined in accordance with GAAP) for the immediately preceding Fiscal Year shall not constitute "Ordinary Dividends" to the extent of such excess.

"Permitted Holder" has the meaning set forth in the Deferred Payment Agreement (ZAI).

"Permitted Payee" has the meaning set forth in the Deferred Payment Agreement (ZAI).

"Permitted Payor" has the meaning set forth in the Deferred Payment Agreement (ZAI).

"Plan of Reorganization" means that certain First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code of W. R. Grace & Co., et al., the Official Committee of Asbestos Personal Injury Claimants, the Future Claimants' Representative, and the Official Committee of Equity Security Holders Dated as of February 27, 2009, as filed by Grace and certain of its affiliates in their reorganization cases under chapter 11

6

of the Bankruptcy Code, in the United States Bankruptcy Court for the District of Delaware, and as confirmed by order of that court dated as of [ __ ], 2009, together with the exhibits and schedules thereto, each as amended, supplemented or otherwise modified from time to time in accordance with its terms.

"Post-Transaction Certificate" means a certificate in the form of Exhibit D.

"Post-Transaction Pro Forma Cash Balance" means with respect to any Entity as of any date of determination, the aggregate amount of such Entity's and its consolidated Subsidiaries' cash and cash equivalents as of such date (after giving effect to and assuming the consummation of any Significant Transaction with a Transaction Date occurring on or prior to such date, notwithstanding that such Significant Transaction may not have actually been consummated as of such date), other than cash and cash equivalents the disposition of which is subject to a material restriction for the benefit of Entities other than such Entity and its consolidated Subsidiaries.

"Post-Transaction Pro Forma EBITDA" means, with respect to any Entity for any four-Fiscal Quarter period and any specified Disposition Transaction, such Entity's Pro Forma EBITDA for such four-Fiscal Quarter period, computed assuming that such Disposition Transaction, and any other Significant Transaction the Transaction Date of which occurs on or prior to the Transaction Date of such Disposition Transaction and during the same Fiscal Quarter as the Transaction Date of such Disposition Transaction, were consummated on the same terms in effect on the respective Transaction Dates at the beginning of the four-Fiscal Quarter period most recently ended prior to the Transaction Date of such Disposition Transaction, and shall include adjustments which give effect to events that are (i) directly attributable to such Disposition Transaction and any such Significant Transactions, (ii) expected to have a continuing impact on the Entity, and (iii) factually supportable.

"Post-Transaction Pro Forma Guarantor Senior Indebtedness" means with respect to any Entity as of any date of determination, the aggregate outstanding principal amount of such Entity's and its consolidated Subsidiaries' Guarantor Senior Indebtedness as of such date (after giving effect to and assuming the consummation of any Significant Transaction (and any related incurrence, reduction or repayment of Guarantor Senior Indebtedness) with a Transaction Date occurring on or prior to such date, notwithstanding that such Significant Transaction (and any related incurrence, reduction or repayment of Guarantor Senior Indebtedness) may not have actually been consummated as of such date).

"Post-Transaction Pro Forma Valuation" means, with respect to any Entity as of any date of determination, the amount resulting from (a) the product of (i) such Entity's Post-Transaction Pro Forma EBITDA for the four-Fiscal Quarter period most recently ended, multiplied by (ii) seven (7), minus (b) such Entity's Post-Transaction Pro Forma Guarantor Senior Indebtedness as of such date, plus (c) such Entity's Post-Transaction Pro Forma Cash Balance as of such date.

"Proceeding" means, with respect to any Entity, any voluntary or involuntary insolvency, bankruptcy, receivership, custodianship, liquidation, reorganization, assignment for the benefit of creditors, appointment of a custodian, receiver, trustee or other officer with similar

7

powers or any other proceeding for the liquidation, or other winding up of such Entity or all or substantially all of the properties of such Entity.

"Pro Forma Cash Balance" means with respect to any Entity as of the last day of any four-Fiscal Quarter period, the aggregate amount of such Entity's and its consolidated Subsidiaries' cash and cash equivalents as of such date (after giving effect to and assuming the consummation of any Significant Transaction with a Transaction Date occurring during such four-Fiscal Quarter period, notwithstanding that such Significant Transaction may not have actually been consummated during such four-Fiscal Quarter period), other than cash and cash equivalents the disposition of which is subject to a material restriction for the benefit of Entities other than such Entity and its consolidated Subsidiaries.

"Pro Forma EBITDA" means, with respect to any Entity for any four Fiscal-Quarter period, such Entity's EBITDA for such four Fiscal-Quarter period, computed assuming that any Significant Transaction the Transaction Date of which occurred during the relevant four-Fiscal Quarter period was consummated, on the terms in effect on such Transaction Date, at the beginning of such four-Fiscal Quarter period most recently ended prior to the Transaction Date of such Significant Transaction, and shall include adjustments which give effect to events that are (i) directly attributable to any Significant Transactions the Transaction Date of which occurs during such four-Fiscal Quarter period, (ii) expected to have a continuing impact on the Entity, and (iii) factually supportable.

"Pro Forma Guarantor Senior Indebtedness" means with respect to any Entity as of the last day of any four-Fiscal Quarter period, the aggregate outstanding principal amount of such Entity's and its consolidated Subsidiaries' Guarantor Senior Indebtedness as of such date (after giving effect to and assuming the consummation of any Significant Transaction (and any related incurrence, reduction or repayment of Guarantor Senior Indebtedness) with a Transaction Date occurring during such four-Fiscal Quarter period, notwithstanding that such Significant Transaction (and any related incurrence, reduction or repayment of Guarantor Senior Indebtedness) may not have actually been consummated during such four-Fiscal Quarter period).

"Pro Forma Valuation" means, with respect to any Entity as of the last day of any four-Fiscal Quarter period, the amount resulting from (a) the product of (i) such Entity's Pro Forma EBITDA for such four-Fiscal Quarter period, multiplied by (ii) seven (7), minus (b) such Entity's Pro Forma Guarantor Senior Indebtedness as of such date, plus (c) such Entity's Pro Forma Cash Balance as of such date.

"Quarterly EBITDA and Valuation Certificate" means a certificate in the form of Exhibit B.

"Regulation S-X" means Regulation S-X promulgated by the United States Securities and Exchange Commission as in effect on the date hereof.

"Related Party" means in respect of an Entity (the "Affected Entity"): (a) any senior key employee, officer or director of the Affected Entity or, in respect of an officer or director, any person holding a similar position in an Affected Entity that is not a corporation (any such person, an "Insider"); (b) any spouse, child, parent or sibling of an Insider; (c) another

8

Entity which alone or together with other Entities under its Control directly or indirectly Controls or holds ten percent (10%) or more of the Equity Interests that (i) generally entitle the holders thereof to vote for the election of the board of directors or other governing body of the Affected Entity, or (ii) confer upon the holders thereof an interest in the capital or profits of the Affected Entity; (d) any Entity Controlled by the Affected Entity or by any Insider or in which the Affected Entity or any Insider Controls or holds ten percent (10%) or more of the stock or other equity interests which (i) generally entitle the holders thereof to vote for the election of the board of directors or other governing body of the Affected Entity or (ii) confer upon the holders thereof an interest in the capital or profits of such Affected Entity; or (e) any Controlled Affiliate of any Entity that is a Related Person by virtue of clause (d) of this definition; provided, however, that any direct or indirect 100% owned Subsidiary of the Guarantor shall not constitute a "Related Party" for purposes of this Guarantee (ZAI).

"Section 524(g) Shares" has the meaning set forth in the Share Issuance Agreement.

"Significant Transaction" means (a) any Disposition Transaction or (b) any transaction of the type described in Section 210.11-01(a)(1) or Section 210.11-01(a)(2) of Regulation S-X (disregarding, for purposes of clause (b) of this definition, whether the Entity entering into such transaction is at the time obligated to file or furnish, or is otherwise filing or furnishing, reports with the United States Securities and Exchange Commission pursuant to Section 13 or 15 of the Securities Exchange Act of 1934, as amended).

"Subsidiary" means, with respect to any Entity at any date, any corporation, limited or general partnership, limited liability company, trust, estate, association, joint venture or other business entity (i) the accounts of which would be consolidated with those of such Entity in such Entity's consolidated financial statements if such financial statements were prepared in accordance with GAAP or (ii) of which more than 50% of (A) the outstanding Capital Stock having (in the absence of contingencies) ordinary voting power to elect a majority of the board of directors or other managing body of such Entity, (B) in the case of a partnership or limited liability company, the interest in the capital or profits of such partnership or limited liability company or (C) in the case of a trust, estate, association, joint venture or other entity, the beneficial interest in such trust, estate, association or other entity business is, at the time of determination, owned or Controlled directly or indirectly through one or more intermediaries, by such Entity.

"Taxes" means any and all present or future taxes, levies, imposts, fees, assessments, levies, duties, deductions, charges, liabilities or withholdings (including interest, fines, penalties or additions to tax) imposed by any Governmental Authority.

"Threshold Amount" has the meaning set forth in the Deferred Payment Agreement (ZAI).

"Transaction Date" means, with respect to any Significant Transaction, (a) the date, if any, on which final, definitive documentation providing for such Significant Transaction is executed; provided, however, that the "Transaction Date" shall no longer be deemed to have occurred with respect to any Significant Transaction if the final, definitive documentation

9

providing for such Significant Transaction is terminated for any reason, or (b) if no such final, definitive documentation for such Significant Transaction is executed, the date on which such Significant Transaction is consummated.

"Transfer" has the meaning set forth in Section 7(b).

"Transferor" has the meaning set forth in Section 7(b).

"Trust (PD)" has the meaning set forth in the Deferred Payment Agreement (ZAI).

"Trust (PI)" has the meaning set forth in the Deferred Payment Agreement (ZAI).

"Trusts" has the meaning set forth in the Share Issuance Agreement.

"Trusts' Representative" has the meaning set forth in the Share Issuance Agreement.

"Trust (ZAI)" has the meaning set forth in the introductory paragraph hereof.

"Valuation" means, with respect to any Entity as of the last day of any four-Fiscal Quarter period, the amount resulting from (a) the product of (i) such Entity's EBITDA for such four-Fiscal Quarter period, multiplied by (ii) seven (7), minus (b) the aggregate outstanding principal amount of such Entity's and its consolidated Subsidiaries' Guarantor Senior Indebtedness as of such date, plus (c) the amount of cash and cash equivalents of such Entity and its consolidated Subsidiaries as of such date other than cash and cash equivalents the disposition of which is subject to a material restriction for the benefit of Entities other than such Entity and its consolidated Subsidiaries.

(b)     Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  All references herein to Sections shall be deemed references to Sections of this Guarantee (ZAI) unless the context shall otherwise require.

(c)     Unless otherwise indicated, (i) the term "including" means "including without limitation", except when used in the computation of time periods, and (ii) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein).

(d)     For purposes of the computation of time periods, whenever this Guarantee (ZAI) provides for an event to occur "within" a specified number of days of a preceding event, it shall mean that the latter event shall occur before the close of business on the last of the specified days, and the day on which the preceding event occurs shall not be included in the computation of days elapsed. The word "from" means "from and including", "after" means "after and excluding", and "to" and "until" means "to and including".

10

(e)    All terms defined in this Guarantee (ZAI) in the singular form shall have comparable meanings when used in the plural form and vice versa.

2.    Guarantee (ZAI).

(a)    For value received and in consideration of the transactions set forth in the Deferred Payment Agreement (ZAI) and in the Plan of Reorganization, the Guarantor hereby absolutely, irrevocably and unconditionally guarantees for the benefit of the Permitted Holder and each Permitted Payee, as a primary obligor and not merely as a surety, and pursuant to the terms and conditions of this Guarantee (ZAI), (i) the full and prompt payment when due (whether by acceleration or otherwise) of (A) all Deferred Payments (ZAI) and (B) all other amounts payable under the Deferred Payment Agreement (ZAI) (including interest at the Default Rate) accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding) and at all times thereafter, and (ii) the due performance by Grace of all of its other obligations under the Deferred Payment Agreement (ZAI) (the obligations described in items (i) and (ii), the "Guaranteed Obligations (ZAI)").

(b)    The Guarantor hereby agrees that this Guarantee (ZAI) is an absolute, unconditional guarantee of payment and performance and is not merely a surety or guarantee of collection, and that the Guarantor and Grace are jointly and severally liable for the Guaranteed Obligations (ZAI), which liability is a continuing, absolute and unconditional obligation of payment or performance, as the case may be, regardless of the solvency or insolvency of Grace or the Guarantor at any time.

(c)    The obligations of the Guarantor hereunder are secured by the Guarantor's obligation to issue and deliver to the Trusts' Representative, for the benefit of the Trusts, the Section 524(g) Shares under the circumstances, and upon the terms and subject to the conditions, set forth in the Share Issuance Agreement.

(d)    If the acceleration of the Guaranteed Obligations (ZAI) is stayed in connection with any Proceeding commenced by or against Grace, all such Guaranteed Obligations (ZAI) shall nonetheless be payable by the Guarantor immediately upon demand by the Permitted Holder.

3.    Enforceability of Obligations.

(a)    Subject to Section 3(b), the Guarantor hereby agrees that its obligations in respect of this Guarantee (ZAI) shall be enforceable against the Guarantor irrespective of:

(i)    the legality, validity, enforceability, avoidance or subordination of any of the Guaranteed Obligations (ZAI) or the Deferred Payment Agreement (ZAI);

(ii)    any law, regulation, or order of any jurisdiction, or any other event, affecting any term of the Guaranteed Obligations (ZAI) or the Deferred Payment Agreement (ZAI);

11

(iii)    the absence of any attempt by, or on behalf of, the Permitted Holder to collect, or to take any other action to enforce, all or any part of the Guaranteed Obligations (ZAI) whether from or against Grace or any other Entity;

(iv)    the election of any remedy available under the Deferred Payment Agreement (ZAI) or applicable Law or in equity by, or on behalf of, the Permitted Holder with respect to all or any part of the Guaranteed Obligations (ZAI);

(v)    any change in the corporate existence, structure or ownership of Grace or the Guarantor;

(vi)    any impairment of the capital of Grace or the Guarantor, or any insolvency, bankruptcy, reorganization or other similar proceeding affecting Grace, the Guarantor or their assets, or any resulting release or discharge of the Guaranteed Obligations (ZAI);

(vii)    any amendment, waiver, consent, extension, forbearance or granting of any indulgence by, or on behalf of, the Permitted Holder with respect to any provision of the Deferred Payment Agreement (ZAI), or any other act or thing or omission or delay to do any other act or thing which may or might in any manner or to any extent vary the risk of Grace or the Guarantor, including any renewal or extension of the time or change of the manner or place of payment or performance, as the case may be, of the Guaranteed Obligations (ZAI);

(viii)    the disallowance, under Section 502 of the Bankruptcy Code, of all or any portion of the claims against Grace held by the Permitted Holder for payment or performance, as the case may be, of all or any part of the Guaranteed Obligations (ZAI);

(ix)    the existence of any right, claim, counterclaim, or right of set-off, whether arising from or relating to the Guaranteed Obligations (ZAI) or Grace or otherwise, that the Guarantor may have at any time against Grace, the Permitted Holder or any other Entity, whether in connection herewith or any unrelated transactions, provided, however, that nothing herein shall prevent the assertion of a separate suit or compulsory counterclaim;

(x)    the cessation for any reason of the liability of Grace under the Deferred Payment Agreement (ZAI) or any other circumstance which might otherwise constitute a legal or equitable discharge of Grace or the Guarantor; or

(xi)    any other act or circumstance which might or could be deemed a discharge or modification hereunder other than payment in full of the Guaranteed Obligations (ZAI).

(b)    Notwithstanding Section 3(a) and Section 4 or any other provision to the contrary in this Guarantee (ZAI), from and after such time, if any, that the Guarantor has notified the Permitted Holder in writing that Grace is no longer a Subsidiary or a Controlled Affiliate of the Guarantor, any amendment, waiver, modification, supplement, restatement or change in

12

respect of the terms and conditions of the Deferred Payment Agreement (ZAI) or any other Deferred Payment Document (ZAI) shall require the prior written consent of the Guarantor.

4.    Waivers.    With respect to the Guaranteed Obligations (ZAI), the Guarantor hereby waives (subject to Section 3(b)) (a) acceptance, promptness, diligence, presentment, demand of payment, filing of claims with a court in the event of receivership or bankruptcy of Grace, protest or notice, all setoffs and counterclaims and all presentments, demands for performance, notices of nonperformance, protests, notices of protest, notices of dishonor and notices of acceptance of this Guarantee (ZAI) or the Deferred Payment Agreement (ZAI) (and shall not require that the same be made on or given to Grace as a condition to the Guarantor's obligations hereunder), (b) any defense arising by reason of any disability or other defense of Grace or any other guarantor, or the cessation from any cause whatsoever (including any act or omission of the Permitted Holder or any other Entity) of the liability of Grace; (c) any right to, or to require the Permitted Holder to, proceed against Grace, proceed against or exhaust any security (including the Section 524(g) Shares) for the Guaranteed Obligations (ZAI), or pursue any other remedy in the power of the Permitted Holder whatsoever, (d) any benefit of and any right to participate in any security now or hereafter securing the Guaranteed Obligations (ZAI), (e) the benefits of all statutes of limitation, and (f) all other demands and defenses whatsoever (other than payment in full of all Guaranteed Obligations (ZAI)).

5.    Payments.

(a)    All payments to be made by the Guarantor pursuant to this Guarantee (ZAI) shall be made in lawful currency of the United States of America by wire transfer of immediately available funds to the Permitted Holder in accordance with such wire transfer instructions as are provided by the Permitted Holder in writing from time to time.  Subject to Sections 5(b), (c) and (d), all payments under this Guarantee (ZAI) shall be made in full, without any set-off, counterclaim or any deduction whatsoever.

(b)    If, after giving effect to any Disposition Transaction or any assignment, delegation or transfer by the Guarantor of its rights or obligations under this Guarantee (ZAI), the Guarantor shall be required by applicable Law to withhold any Taxes from any payments hereunder, and if such requirement would not have been imposed by such applicable Law but for such Disposition Transaction, assignment or transfer, then (i) the sum payable shall be increased as necessary so that after making all withholdings required by applicable Law (including withholdings applicable to additional sums payable under this Section 5(b)) the payee receives an amount equal to the sum it would have received had no such withholdings been made, (ii) the Guarantor shall make such withholdings and (iii) the Guarantor shall timely pay the full amount deducted to the relevant Governmental Authority in accordance with applicable Law.  This Section 5(b) shall survive the termination of this Guarantee (ZAI) pursuant to Section 15.

(c)    If, after giving effect to any permitted assignment or Transfer by the Permitted Holder of its rights or obligations under this Guarantee (ZAI), the Guarantor shall be required by applicable Law to withhold any Taxes from any payments hereunder, and if such requirement would not have been imposed by such applicable Law but for such assignment or Transfer, then the obligation of the Guarantor or the Permitted Payor to make the relevant

13

payment hereunder shall be discharged by making such payment net of such Taxes. This <u>Section 5(c)</u> shall survive the termination of this Guarantee (ZAI) pursuant to <u>Section 15</u>.

(d)     If, due to either (i) the introduction of or any change in any law or regulation (or any change in the interpretation thereof) or (ii) the compliance with any guideline or request from any central bank or other Governmental Authority (whether or not having the force of law), in each case adopted after the date hereof, the Guarantor or a Permitted Payor shall be required to withhold any Taxes from any payments hereunder, then the obligation of the Guarantor or the Permitted Payor to make the relevant payment hereunder shall be discharged by making such payment net of such Taxes. This <u>Section 5(d)</u> shall survive the termination of this Guarantee (ZAI) pursuant to <u>Section 15</u>.

6.     <u>Representations and Warranties</u>. The Guarantor represents and warrants, as of the Effective Date, that:

(a)     The Guarantor is duly organized, validly existing and in good standing under the laws of the jurisdiction of the Guarantor's incorporation; <u>provided, however</u>, with respect to good standing, only to the extent the concept of good standing exists in such jurisdiction of incorporation.

(b)     The Guarantor has the corporate power and authority to execute and deliver this Guarantee (ZAI) and each other Deferred Payment Document (ZAI) to which it is a party. This Guarantee (ZAI) and each other Deferred Payment Document (ZAI) to which the Guarantor is a party has been duly authorized by all necessary corporate action of the Guarantor and has been duly executed and delivered by the Guarantor.

(c)     This Guarantee (ZAI) and each other Deferred Payment Document (ZAI) to which the Guarantor is a party is a legal, valid and binding obligation of the Guarantor, enforceable against the Guarantor in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally, by the discretion of the court in which enforcement is sought, and/or by general equitable principles (whether enforcement is sought by proceedings at law or in equity).

(d)     The execution, delivery and performance by the Guarantor of this Guarantee (ZAI) and each other Deferred Payment Document (ZAI) to which the Guarantor is a party does not conflict with, result in a breach of any of the provisions of, or constitute a default under, the Governing Documents of the Guarantor.

7.     <u>Guarantor Covenants</u>. The Guarantor covenants and agrees that, from the Effective Date until all Guaranteed Obligations (ZAI) are paid and performed in full:

(a)     <u>Affirmative Covenants</u>. The Guarantor shall:

(i)     <u>Maintenance of Existence and Qualifications</u>. Maintain and preserve in full force and effect its existence and good standing (to the extent the concept of good standing exists in the Guarantor's jurisdiction of incorporation) and all other rights, powers, franchises, licenses and qualifications necessary or desirable for its ownership or use of properties or the

14

conduct of its business, except (A) as permitted by Section 16, and (B) where the failure to do so would not reasonably be likely to adversely affect the Guarantor's ability to make payments in respect of the Guaranteed Obligations (ZAI) or to perform its obligations under the Deferred Payment Documents (ZAI) to which it is a party.

(ii)    Notice of Event of Default, Guarantor Senior Payment Default and Guarantor Senior Non-Payment Default. Furnish to the Permitted Holder (x) within five (5) days after an Authorized Officer of the Guarantor shall first learn of an Event of Default, and (y) on or before the earlier of (A) the fifteenth (15th) day after an Authorized Officer of the Guarantor shall first learn of a Guarantor Senior Payment Default or Guarantor Senior Non-Payment Default and (B) the first Business Day following the date upon which a Guarantee Payment Blockage Notice is delivered pursuant to Section 8(a)(ii), a written statement of an Authorized Officer of the Guarantor stating that an Event of Default, Guarantor Senior Payment Default or Guarantor Senior Non-Payment Default, as the case may be, has occurred, which written statement shall, to the extent known by the Guarantor, set forth in reasonable detail the facts giving rise to and status of such Event of Default, Guarantor Senior Payment Default or Guarantor Senior-Non Payment Default, as the case may be, and the actions, if any, the Guarantor is taking or proposes to take with respect thereto.

(iii)    Information Covenants. If the Guarantor is not obligated to file or furnish, or is not otherwise filing or furnishing, reports with the United States Securities and Exchange Commission pursuant to Section 13 or 15 of the Securities Exchange Act of 1934, the Guarantor shall furnish to the Permitted Holder:

(A)    Annual Financial Statements. As soon as available but in no event later than ninety (90) days after the last day of each of the Guarantor's Fiscal Years, its annual consolidated financial statements audited by a nationally recognized registered independent public accounting firm allowed to practice before the Securities and Exchange Commission or any successor Governmental Authority, consisting of a consolidated balance sheet of the Guarantor and its consolidated Subsidiaries as of the end of such year and consolidated statements of income, cash flows and stockholders equity for such year (all in reasonable detail and with all notes and supporting schedules); and

(B)    Quarterly Financial Statements. As soon as available and in any event within forty-five (45) days after the end of each of the first three Fiscal Quarters in each Fiscal Year of the Guarantor, its consolidated balance sheet as of the end of such Fiscal Quarter, and consolidated statements of income and cash flows of the Guarantor and its consolidated Subsidiaries for such Fiscal Quarter, all in reasonable detail and certified by an Authorized Officer of the Guarantor to present fairly in all material respects the financial condition, results of operations and other information reflected therein and to have been prepared in accordance with GAAP (subject to year-end audit adjustments and the absence of footnotes).

(iv)    Officer's Certificates. The Guarantor shall furnish to the Permitted Holder:

(A)    No later than ninety (90) days after the last day of each of the Guarantor's Fiscal Years and no later than forty-five (45) days after the end of each of the first

15

three Fiscal Quarters in each Fiscal Year of the Guarantor, a Quarterly EBITDA and Valuation Certificate executed by an Authorized Officer of the Guarantor setting forth (I) if the Transaction Date of a Significant Transaction has occurred during the four-Fiscal Quarter period ending on the last day of such Fiscal Quarter or Fiscal Year, as the case may be, the Pro Forma EBITDA of the Guarantor for such four-Fiscal Quarter period and the Pro Forma Valuation of the Guarantor as of the last day of such four-Fiscal Quarter period or (II) if the Transaction Date of a Significant Transaction did not occur during the four-Fiscal Quarter period ending on the last day of such Fiscal Quarter or Fiscal Year, as the case may be, the EBITDA of the Guarantor for such four-Fiscal Quarter period and the Valuation of the Guarantor as of the last day of such four-Fiscal Quarter period; provided, however, that the Guarantor shall not be required to furnish to the Permitted Holder a Quarterly EBITDA and Valuation Certificate under this subclause (A) if (x) the Guarantor is filing or furnishing reports with the United States Securities and Exchange Commission pursuant to Section 13 or 15 of the Securities Exchange Act of 1934, and (y)(1) if the Transaction Date of a Significant Transaction has occurred during the four-Fiscal Quarter period ending on the last day of the applicable Fiscal Quarter or Fiscal Year, the Pro Forma EBITDA of the Guarantor for such four-Fiscal Quarter period and the Pro Forma Valuation of the Guarantor as of the last day of such four-Fiscal Quarter period is readily ascertainable from such reports or (1) if the Transaction Date of a Significant  Transaction did not occur during the four-Fiscal Quarter period ending on the last day of the applicable Fiscal Quarter or Fiscal Year, the EBITDA of the Guarantor for such four-Fiscal Quarter period and Valuation of the Guarantor as of the last day of such four-Fiscal Quarter period is readily ascertainable from such reports;

(B)    no later than ninety (90) days after the last day of each of the Guarantor's Fiscal Years, a Compliance Certificate executed by an Authorized Officer of the Guarantor for such Fiscal Year; and

(C)    no later than thirty (30) days after the consummation by a Transferor of a Disposition Transaction of the type described in clause (ii) or clause (iii) of Section 7(b), a Post-Transaction Certificate setting forth the Post-Transaction Pro Forma EBITDA of the Guarantor with respect to such Disposition Transaction executed and delivered by an Authorized Officer of the Guarantor.

(b)    Negative Covenant.  The Guarantor shall not, and shall cause each of its Subsidiaries and Controlled Affiliates (each, a "Transferor") to not, sell, assign, transfer, license, lease or otherwise dispose of (each, a "Transfer") any property and/or other assets and/or enter into any transaction or obligation, whether constituting or by way of merger, consolidation, sale of assets or other disposition, reorganization, recapitalization, dividend, other distribution, or otherwise, or any related series of the foregoing (any such Transfer other than Ordinary Dividends, Bona Fide Compensation Transactions and other Transfers in the ordinary course of business, a "Disposition Transaction"), if the Transferor (taken together with all of its direct and indirect wholly owned Subsidiaries) would (1) receive (directly or indirectly) less than a reasonably equivalent value in such Disposition Transaction, (2) become or be rendered Insolvent as a result of such Transfer and/or such Disposition Transaction, or (3) be engaged in business and/or transactions, and/or would be about to engage in business and/or transactions, for which the Transferor's (taken together with all of its direct and indirect wholly owned Subsidiaries) remaining property and other assets would be unreasonably small capital; provided, however, that notwithstanding the foregoing, a Transferor:

16

(i)    That is a direct or indirect wholly-owned Subsidiary of the Guarantor may make a Transfer to or engage in a Disposition Transaction exclusively with the Guarantor or any other direct or indirect wholly-owned Subsidiary of the Guarantor; provided further, that if such Transferor is Grace or any of Grace's Subsidiaries or Controlled Affiliates, such Disposition Transaction shall be permitted under this clause (i) only if it is also permitted under Section 6(b) of the Deferred Payment Agreement (ZAI);

(ii)    may engage in a Disposition Transaction whereby such Transferor (A) pays or makes (directly or indirectly) dividends or distributions (whether in cash, securities or other property) with respect to any of its Capital Stock (including by way of a spin-off or spin-out of any of its assets), or (B) repurchases its Capital Stock, provided that, in the case of any Disposition Transaction under subclause (A) or (B) above, all of the following conditions are satisfied:

(1)    no Event of Default has occurred and is continuing at the time of, or would result from, such Disposition Transaction;

(2)    as of the Transaction Date of such Disposition Transaction, (x) the Post-Transaction Pro Forma Valuation of the Guarantor shall equal or exceed the Threshold Amount or (y) the "Post-Transaction Pro Forma Valuation" (as defined in the Deferred Payment Agreement (ZAI)) of Grace shall equal or exceed the Threshold Amount; and

(3)    if such Disposition Transaction exceeds $15,000,000 and is not publicly disclosed at least 10 days prior to the consummation of such Disposition Transaction, then the Guarantor shall provide the Permitted Holder with, at least 10 days' prior to the consummation of such Disposition Transaction, a written notice describing in reasonable detail the material terms of such Disposition Transaction and setting forth the Post-Transaction Pro Forma Valuation of the Guarantor as of the Transaction Date of such Disposition Transaction; and

(iii)    other than as set forth in Section 7(b)(ii) above, shall not enter into any Disposition Transaction with a Related Party to the Transferor in which the aggregate value of the assets or other property Transferred in such Disposition Transaction to such Related Party exceeds $15,000,000 if the Transferor (taken together with all of its direct and indirect wholly owned Subsidiaries) would (1) receive (directly or indirectly) less than a reasonably equivalent value in such Disposition Transaction, as determined by a reputable investment bank or valuation firm jointly selected by the Guarantor and the "Permitted Holder" (as defined in the Deferred Payment Agreement (PI)), (2) become or be rendered Insolvent as a result of such Transfer and/or such Disposition Transaction or (3) be engaged in business and/or transactions, and/or would be about to engage in business and/or transactions, for which the Transferor's (taken together with all of its direct and indirect wholly owned Subsidiaries) remaining property and other assets would be unreasonably small capital; provided, that if the aggregate value of the assets or other property Transferred to such Related Party in such Disposition Transaction exceeds $15,000,000 and the existence of such Disposition Transaction is not publicly disclosed at least 10 days prior to the consummation of such Disposition Transaction, then the Guarantor shall provide the Permitted Holder with, at least 10 days' prior to the consummation of such Disposition Transaction, a written notice describing in reasonable detail the material terms of

17

such Disposition Transaction and setting forth the Post-Transaction Pro Forma Valuation of the Guarantor as of the Transaction Date of such Disposition Transaction;

provided further that if the Guarantor is not the surviving or succeeding Entity as a result of any Disposition Transaction (but in the case of a sale of assets, only if such sale involves a sale of all or substantially all of the assets of the Guarantor) otherwise permitted by the exceptions to this Section 7(b), such Disposition Transaction shall be permitted under this Section 7(b) only if the Guarantor shall comply with the requirements of Section 16(e).

8.    Subordination Terms.  Any and all obligations of the Guarantor in respect of the Guaranteed Obligations (ZAI) shall be subordinated and otherwise junior at all times in right of payment and in all other respects, in the manner and to the extent set forth herein, to any and all present and future obligations of the Guarantor in respect of any Guarantor Senior Indebtedness.

(a)    Blockage of Payments for Guaranteed Obligations (ZAI).

(i)    If any payment default occurs and is continuing beyond any applicable grace period pursuant to the terms and conditions of any Guarantor Senior Indebtedness (a "Guarantor Senior Payment Default"), then subject to Section 8(g), no payment or distribution of cash, securities or any other assets shall be made by the Guarantor with respect to the Guaranteed Obligations (ZAI) or this Guarantee (ZAI) for as long as such Guarantor Senior Payment Default is continuing.

(ii)    If any default other than a Guarantor Senior Payment Default occurs pursuant to the terms and conditions of any Designated Guarantor Senior Indebtedness that would allow the holders thereof to accelerate the maturity thereof (a "Guarantor Senior Non-Payment Default"), then subject to Section 8(g), no payment or distribution of cash, securities or any other assets shall be made by the Guarantor with respect to any Guaranteed Obligations (ZAI) or pursuant to this Guarantee (ZAI) during the period (the "Guarantee Payment Blockage Period") (x) beginning on the date that the Permitted Holder receives from the Entity entitled to give notice under any document evidencing such Designated Guarantor Senior Indebtedness (or from the Guarantor acting at the direction or request of such Entity) a written notice (a "Guarantee Payment Blockage Notice") that such a Guarantor Senior Non-Payment Default has occurred and is continuing and (y) ending on the earliest to occur of (1) 180 days from the date the Permitted Holder shall have received the Guarantee Payment Blockage Notice, (2) the date such Guarantor Senior Non-Payment Default shall have been cured or waived or shall have ceased to exist and (3) the date such Guarantee Payment Blockage Period shall have been terminated by written notice to the Permitted Holder from the Entity initiating such Guarantee Payment Blockage Period.

(iii)    Notwithstanding the foregoing, (A) in no event will a Guarantee Payment Blockage Period extend beyond 180 days from the date the Guarantee Payment Blockage Notice in respect thereof was received by the Permitted Holder, (B) there shall be a period of at least 180 consecutive days in each period of 360 consecutive days when no Guarantee Payment Blockage Period is in effect, and (C) no Guarantor Senior Non-Payment Default that existed or was continuing on the date of delivery of any Guarantor Payment

18

Blockage Notice (whether or not such Guarantor Senior Non-Payment Default is with respect to the same issue of Designated Guarantor Senior Indebtedness) may be, or be made, the basis for a subsequent Guarantor Payment Blockage Notice, unless such Guarantor Senior Non-Payment Default has been cured or waived for a period of not less than 90 consecutive calendar days.

(iv)     The payment of Guaranteed Obligations (ZAI) shall resume, and the payment of any Guaranteed Obligations (ZAI) not paid due to a suspension thereof pursuant to clause (i) or clause (ii) above shall be paid, together with accrued interest thereon at the Default Rate, when such suspension is no longer in effect (either due to cure or waiver of the relevant Guarantor Senior Payment Default or the expiration or termination of the Guarantee Payment Blockage Period pursuant to clause (i) or clause (ii) of this Section 8(a)) unless a subsequent Guarantor Payment Blockage Notice has been delivered in accordance with clause (iii) of this Section 8(a) and is not prohibited from being delivered by clause (iii) of this Section 8(a).

(b)     Proceedings.     Upon any payment made by the Guarantor, or any distribution of cash, securities or other assets of any kind of the Guarantor (other than securities issued in substitution for the obligation to make payments in respect of the Guaranteed Obligations (ZAI) that are subordinated to at least the extent described herein for the obligation to make payments in respect of the Guaranteed Obligations (ZAI), which Securities the Permitted Holder (or any Permitted Payee, if applicable) is specifically authorized to receive notwithstanding any other provision of this Section 8), to creditors in any Proceeding with respect to the Guarantor or its properties, all obligations due on all Guarantor Senior Indebtedness shall first be paid in full in cash before any payment or distribution is made on account of any Guaranteed Obligations (ZAI) or otherwise pursuant to this Guarantee (ZAI).

(c)     Improper Payments Held in Trust.     Any payments or property received by the Permitted Holder or any Permitted Payee in breach of this Section 8 shall be held by the Permitted Holder or such Permitted Payee in trust and promptly delivered in the form received to the holder of Guarantor Senior Indebtedness entitled to receive the same (any such payment or property delivered by the Permitted Holder or such Permitted Payee to any holder of Guarantor Senior Indebtedness, a "Guarantor Turnover Payment").  To the maximum extent permitted under applicable Law, the Guarantor agrees that any Guarantor Turnover Payment shall be treated as a payment by the Guarantor on account of such Guarantor Senior Indebtedness and shall not satisfy the Guarantor's obligation with respect to any amount due to the Permitted Holder or such Permitted Payee under this Guarantee (ZAI).  If, notwithstanding the preceding sentence, it is determined (by a court of competent jurisdiction or otherwise) that a Guarantor Turnover Payment is a payment by the Guarantor on account of, and satisfies any obligation of the Guarantor with respect to, any amount due to the Permitted Holder or any Permitted Payee under this Guarantee (ZAI), then, to the extent of the amount of such Guarantor Turnover Payment, the portion of the obligation which has been determined to be paid and satisfied by such Guarantor Turnover Payment shall be reinstated and shall continue to be in full force and effect as of the time immediately preceding the initial payment thereof by the Guarantor to the Permitted Holder or such Permitted Payee.  If, notwithstanding the preceding sentence, any portion of an obligation of the Guarantor in respect of such Guarantor Turnover Payment is not reinstated and continued to the extent of the amount of the relevant Guarantor Turnover Payment, then the Permitted Holder or the applicable Permitted Payee shall, upon the payment in

19

full in cash of all Guarantor Senior Indebtedness owed to the holder thereof to whom the Permitted Holder or such Permitted Payee delivered such Guarantor Turnover Payment, be subrogated to the rights of such holder to receive payments or distributions applicable to such Guarantor Senior Indebtedness, and for the purpose of such subrogation such Guarantor Turnover Payment shall not, as between the Guarantor and the Permitted Holder or such Permitted Payee, be deemed to be payment by the Guarantor to or on account of such Guarantor Senior Indebtedness.

(d)  Remedies Blockage.  Subject in any event to the other terms and conditions of this Section 8 (including Section 8(a) and Section 8(g)), if an Event of Default has occurred and is continuing and any Guarantor Senior Indebtedness is then outstanding, the Permitted Holder hereby agrees for itself and any assignee that it will not (1) exercise or seek to exercise any rights or remedies against Grace or the Guarantor with respect to such Event of Default or (2) institute any action or proceeding with respect to such rights or remedies (including any action of foreclosure, contest or protest) under any Deferred Payment Document (ZAI) or any agreement or document relating thereto, or under such Event of Default or otherwise or (3) attempt to do any of the foregoing (collectively, the "Remedies"), for a period commencing on the date that such Event of Default occurs and ending on the earliest to occur of (i) 180 days after the first date on which such Event of Default shall have occurred, (ii) the commencement of a Proceeding with respect to Grace, the Guarantor or their respective properties, (iii) the date that the holder (or any agent or trustee of the holder) of any Guarantor Senior Indebtedness commences exercising any Guarantor Senior Remedies with respect to such Guarantor Senior Indebtedness (including, without limitation, the acceleration of all or any portion of such Guarantor Senior Indebtedness) and (iv) the payment in full in cash of all Guarantor Senior Indebtedness.

(e)  Notwithstanding the foregoing, as applied to the Permitted Holder, the term "Remedies" shall not include, and the Permitted Holder shall not be impaired by this Section 8(d) from doing, any of the following:  (A) exercising rights and remedies for specific performance or injunctive relief to compel Grace or the Guarantor to comply with any non-payment obligations under the Deferred Payment Documents (ZAI) (including commencing any action contemplated by Section 16(f)), (B) instituting or maintaining any suit or action solely to prevent the running of any applicable statute of limitations, (C) accruing interest on the Deferred Payments (ZAI) at the Default Rate pursuant to the Deferred Payment Agreement (ZAI) and (D) giving any notice (including notice of an Event of Default) to the Guarantor under the Deferred Payment Documents (ZAI).

(f)  No Secured Obligation.  Except for this Guarantee (ZAI) and the share issuance obligation with respect to the Section 524(g) Shares as and to the extent contemplated in the Share Issuance Agreement, no credit support or security interest shall be granted by Grace, the Guarantor or any of its Subsidiaries in connection with, or otherwise support or secure any obligation set forth in, the Deferred Payment Documents (ZAI).  Notwithstanding the foregoing, the Permitted Holder may obtain to the extent permitted under applicable Law a judgment lien on the properties of Grace and/or the Guarantor to secure the payment and performance of a judgment obtained by the Permitted Holder against Grace and/or the Guarantor.

20

(g)     No Impairment of Right to Receive Section 524(g) Shares or Warrant Shares.  Nothing in this Section 8 shall impair the rights of the Trust (ZAI) (or its permitted successor or assigns) (i) acting through the Trusts' Representative pursuant to the Intercreditor Agreement, to deliver to the Guarantor a Demand for Issuance of the Section 524(g) Shares and to receive the Trust (ZAI)'s percentage of the Section 524(g) Shares pursuant to the Share Issuance Agreement or (ii) to exercise all or any portion of the Warrant and to receive the shares of Common Stock in connection therewith.

(h)     Further Assurances.  At the reasonable request of the Guarantor, the Permitted Holder will, at the sole expense of the Guarantor, execute such agreements, documents, certificates and/or other instruments confirming the existence and extent of the subordination terms detailed in this Section.

9.     Defaults and Remedies.

(a)     Subject in each case to Section 8 of this Guarantee (ZAI), the Permitted Holder shall have the right, power and authority to do all things deemed necessary or advisable to enforce the provisions of this Guarantee (ZAI) and protect its rights under the Deferred Payment Agreement (ZAI) and, upon the occurrence and during the continuance of an Event of Default, the Permitted Holder may institute or appear in such appropriate proceedings permitted or not prohibited under this Guarantee (ZAI) as the Permitted Holder shall deem most effectual to protect and enforce any of its rights hereunder, whether for the specific enforcement of any covenant or agreement in this Guarantee (ZAI) or in aid of the exercise of any power granted herein or in the Permitted Holder, or to enforce any other proper remedy.

(b)     Each and every Event of Default or breach by the Guarantor of this Guarantee (ZAI) shall give rise to a separate cause of action hereunder, and separate actions may be brought hereunder as each cause of action arises.  For so long as such an Event of Default or such a breach is continuing, the Permitted Holder shall have the right to proceed first and directly against the Guarantor under this Guarantee (ZAI) without proceeding against any other Entity (including Grace), without exhausting any other remedies which it may have and without resorting to any other security (if any) (including the Section 524(g) Shares) held by the Permitted Holder to secure the Guaranteed Obligations (ZAI).

10.     Setoff. Subject to Section 8 of this Guarantee (ZAI), at any time after all or any part of the Guaranteed Obligations (ZAI) have become due and payable or performable, as the case may be (by acceleration or otherwise), the Permitted Holder or any Permitted Payee may, without notice to the Guarantor and regardless of the acceptance of any security or collateral (if any) for the payment thereof, and up to the unpaid amount of the Guaranteed Obligations (ZAI) then due, appropriate and apply toward the payment or performance, as the case may be, of all or any part of the Guaranteed Obligations (ZAI) then owing to the Permitted Holder or such Permitted Payee (i) any indebtedness due or to become due from the Permitted Holder or such Permitted Payee to the Guarantor, and (ii) any moneys, credits or other property belonging to the Guarantor, at any time validly held by or coming into the possession of the Permitted Holder or such Permitted Payee.

21

11.     <u>Financial Information</u>.  The Guarantor hereby acknowledges that it has adequate means of, and assumes sole responsibility for, keeping itself informed of the financial condition of Grace including any circumstances bearing upon the risk of nonpayment or nonperformance of the Guaranteed Obligations (ZAI), or any part thereof, and the Guarantor hereby agrees that no Permitted Holder shall have any duty to advise the Guarantor of information known to it regarding any such circumstances.  In the event the Permitted Holder in its reasonable discretion, undertakes at any time or from time to time to provide any such information to the Guarantor, the Permitted Holder shall be under no obligation (i) to undertake any investigation not a part of its regular business routine or (ii) to disclose any information which the Permitted Holder, pursuant to accepted or reasonable practices, wishes to maintain confidential.

12.     <u>Reinstatement</u>.  Notwithstanding any provision herein to the contrary, the Guarantor agrees that, to the extent that any Entity makes a payment or payments to the Permitted Holder on account of the Guaranteed Obligations (ZAI) which payments or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required or agreed to be repaid or returned by the Permitted Holder under any Law or in respect of any Proceeding or other litigation to which the Guarantor, the Permitted Holder or any Permitted Payee is subject, then, to the extent of the amount of such payments, the portion of the Guaranteed Obligations (ZAI) which has been paid, reduced or satisfied by such amount shall be reinstated and continued in full force and effect as of the time immediately preceding such initial payment, reduction or satisfaction.

13.     <u>Distribution of Grace Assets in Proceeding; Subrogation</u>.

(a)     Upon any distribution of assets of Grace to creditors in connection with any Proceeding relating to Grace or its property (but subject to <u>Section 8</u>), (i) the Permitted Holder and each Permitted Payee shall be entitled to receive payment in full of all Guaranteed Obligations (ZAI) before the Guarantor shall be entitled to receive any payment of principal of or interest on or any other amounts in respect of indebtedness of Grace in favor of the Guarantor; and (ii) until payment and performance in full of all Guaranteed Obligations (ZAI), any distribution of assets of any kind or character to which the Guarantor would otherwise be entitled shall be paid by Grace or by any receiver, trustee in bankruptcy, liquidating trustee, agents or other Entity making such payment or distribution to, or if received by the Guarantor, shall be held for the benefit of and shall be forthwith paid or delivered to, the Permitted Holder and each Permitted Payee on a pro rata basis according to the amount of all Guaranteed Obligations (ZAI) owing to the Permitted Holder and each such Permitted Payee.

(b)     The Guarantor hereby agrees that it will not assert, enforce, or otherwise exercise any rights which it may acquire against Grace or any guarantor pursuant to any other guaranties by way of subrogation pursuant to this Guarantee (ZAI), by any payment made hereunder or otherwise, until the Guaranteed Obligations (ZAI) shall have been paid in full.

22

14.     Amendments; Waivers.

(a)     No provision of this Guarantee (ZAI) may be waived, amended, supplemented or modified except by a written instrument executed by the Permitted Holder and the Guarantor.

(b)     No delay on the part of the Permitted Holder in the exercise of any right or remedy arising under this Guarantee (ZAI) or the Deferred Payment Agreement (ZAI) or otherwise with respect to all or any part of the Guaranteed Obligations (ZAI), any collateral (if any) or any other guarantee of or security (if any) for all or any part of the Guaranteed Obligations (ZAI) shall operate as a waiver thereof, and no single or partial exercise by the Permitted Holder of any such right or remedy shall preclude any further exercise thereof. Failure by the Permitted Holder at any time or times hereafter to require strict performance by Grace, the Guarantor or any other guarantor of all or any part of the Guaranteed Obligations (ZAI) or of any of the provisions, warranties, terms and conditions contained in the Deferred Payment Agreement (ZAI) shall not waive, affect or diminish any right of the Permitted Holder at any time or times hereafter to demand strict performance thereof. No waiver of any Event of Default by the Permitted Holder shall operate as a waiver of any other Event of Default or breach of this Guarantee (ZAI) or the same Event of Default or breach of this Guarantee (ZAI) on a future occasion, and no action by the Permitted Holder permitted hereunder shall in any way affect or impair the Permitted Holder's rights and remedies or the obligations of the Guarantor under this Guarantee (ZAI). The remedies herein provided are cumulative and not exclusive of any remedies provided by law or in equity or any other Deferred Payment Document (ZAI).

15.     Effectiveness; Termination. This Guarantee (ZAI) shall become effective against the Guarantor upon its execution by the Guarantor and the occurrence of the Effective Date and shall continue in full force and effect and may not be terminated or otherwise revoked until the Guaranteed Obligations (ZAI) shall have been paid in full.

16.     Consolidation, Successors and Assigns.

(a)     This Guarantee (ZAI) shall be binding upon the Guarantor and upon the successors and permitted assigns of the Guarantor and shall inure to the benefit of the Permitted Holder. The successors and assigns of the Guarantor and Grace shall include, without limitation, their respective receivers, trustees or debtors-in-possession.

(b)     If the Permitted Holder Transfers or grants a security interest in its rights in the Deferred Payment Agreement (ZAI) or any Deferred Payments (ZAI) upon the terms and subject to the conditions set forth in the Deferred Payment Agreement (ZAI), the Permitted Holder shall have the right to Transfer or grant a security interest in this Guarantee (ZAI) to such transferee or secured party without the consent of the Guarantor; provided, however, that in no event shall any person or Entity other than the Collateral Agent have, or have the ability to bring, or be able to enforce, any claim, right or cause of action against the Guarantor or any of is affiliates under, in connection with or as a result of such security interest.

(c)     Subject to Section 16(d), the Guarantor may not Transfer its rights, interests, duties, liabilities or obligations under this Guarantee (ZAI) without the prior written

23

consent of the Permitted Holder, which consent shall not be unreasonably withheld, conditioned or delayed.

(d)     Subject to Section 16(e), neither Section 16(c) nor anything else in this Guarantee (ZAI) shall prohibit or restrict the ability of the Guarantor to undertake any Disposition Transaction; provided that, unless the Permitted Holder otherwise consents in writing, (i) such Disposition Transaction shall not violate Section 7(b), (ii) no Event of Default and, no event which, with the giving of notice or the passage of time, or both, would constitute an Event of Default, exists at the time of, or would exist immediately following the consummation of such Disposition Transaction, (iii) such Disposition Transaction does not conflict with, or result in a breach of, any of the provisions of, or constitute a default under, the Governing Documents of the Guarantor or such surviving or succeeding Entity and (iv) at least ten (10) days prior to consummation of such Disposition Transaction, the Guarantor shall, subject to reasonable confidentiality arrangements between the Permitted Holder and the Guarantor, deliver to the Permitted Holder written notice of its intention to consummate such Disposition Transaction.

(e)     If the surviving or succeeding Entity as a result of any such Disposition Transaction (but in the case of a sale of assets, only if such sale involves a sale of all or substantially all of the assets of the Guarantor) is not the Guarantor, then prior to, or concurrently with, the consummation of any such Disposition Transaction, the surviving or succeeding Entity shall by written instrument substantially in the form of Exhibit A signed by such Entity, the Guarantor and, at its option, the Permitted Holder expressly assume the rights and obligations of the Guarantor hereunder, whereupon such Entity shall be the successor of all rights and obligations of the Guarantor hereunder, with the same effect as if it had been originally named herein (it being expressly acknowledged and agreed by the Guarantor and the Permitted Holder that such written instrument shall, and shall expressly provide that it shall, be binding upon, and inure to the benefit of, the Permitted Holder, the Guarantor and such surviving or succeeding Entity whether or not the Permitted Holder shall have executed such written instrument); provided, however, that the Guarantor shall not be discharged from, and shall remain liable for, any and all of its duties, liabilities and obligations under this Guarantee (ZAI).

(f)     The Guarantor shall be responsible for, and shall pay promptly upon demand all documented and direct out-of-pocket costs and expenses incurred by the Permitted Holder (including legal fees and expenses of legal counsel) in connection with (i) enforcing its rights and/or interests under this Guarantee (ZAI) and (ii) challenging any Disposition Transactions proposed by the Guarantor pursuant to Section 16(d); provided, however, that in the case of clause (i) above, the Guarantor shall not be responsible for any such costs and expenses (including legal fees and expenses of legal counsel) unless the Permitted Holder is successful in enforcing its rights and/or interests under this Guarantee (ZAI) in a judicial or other proceeding, and in the case of clause (ii) above, the Guarantor shall not be responsible for any such costs and expenses (including legal fees and expenses of legal counsel) unless the Permitted Holder challenges such Disposition Transaction in a judicial or other proceeding or otherwise as being in breach of the provisions of this Guarantee (ZAI) or any of the Deferred Payment Documents (ZAI) and the Permitted Holder is successful in such challenge.

24

(g)     Any assignment or transfer in breach of this <u>Section 16</u> shall be null and void and not Transfer any interest in this Guarantee (ZAI) to any other Entity.

17.     <u>Governing Law; Submission to Jurisdiction; Waiver of Jury Trial</u>.

(a)     This Guarantee (ZAI) and the rights and obligations of the parties hereto shall be construed in accordance with the laws of the State of New York, without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York.

(b)     With respect to claims, suits, actions, proceedings, and other disputes arising out of, in respect of or relating to this Guarantee (ZAI) (such claims, suits, actions, proceedings, and other disputes, the "<u>Claims</u>") each of the parties to this Guarantee (ZAI) hereby irrevocably submits to the jurisdiction of the Bankruptcy Court for the District of Delaware or the United States District Court for the District of Delaware (the "<u>Courts</u>"), or, if both such Courts are not permitted under applicable Law to exercise jurisdiction with respect to the matter in question then to the jurisdiction of any other federal or state court in the state, county and city of New York, New York and each of the parties to this Guarantee (ZAI) agrees that any and all Claims may be brought, heard and determined in such courts.

(c)     Each of the parties to this Guarantee (ZAI) agrees that (i) venue shall be proper in the courts referenced in <u>Section 17(b)</u> and hereby waives any objection or defense which it may now or hereafter have to the laying of venue in such Courts, including any of the foregoing based upon the doctrine of *forum non conveniens*; and (ii) all process which may be or be required to be served in respect of any such Claim (including any pleading, summons or other paper initiating any such Claim or dispute) may be served upon it, which service shall be sufficient for all purposes, in the manner for the provision of notice under <u>Section 19</u> hereof and shall be deemed in every respect effective service of process upon such party when so given.

(d)     EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE DEFERRED PAYMENT DOCUMENTS (ZAI).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER DEFERRED PAYMENT DOCUMENTS (ZAI), AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS PROVISION.

18.     <u>Advice of Counsel</u>. Each of the Guarantor and the Permitted Holder represent and warrant to the other that it has analyzed this Guarantee (ZAI) with, and has been advised as to its legal effects by, its legal counsel.

25

19.    Notices.  All notices required or permitted under this Guarantee (ZAI) must be in writing and will be deemed to be delivered and received (i) if personally delivered or if delivered by the United States Postal Service, facsimile or courier service, when actually received by the party to whom notice is sent or (ii) with respect to parties located other than within the United States, if deposited with the United States Postal Service (whether actually received or not), at the close of business on the seventh Business Day after the day when placed in the mail, postage prepaid, certified or registered with return receipt requested, addressed to the appropriate party or parties, at the address of such party or parties set forth below (or at such other address as such party may designate by written notice to all other parties in accordance with this Section 19):

| **If to the Guarantor:** | *With copies, which shall not constitute notice, to:* | Kirkland & Ellis LLP |
|---|---|---|
| | | Citigroup Center |
| W. R. Grace & Co. | | 153 E. 53rd Street |
| 7500 Grace Drive | | New York, NY 10022-4675 |
| Columbia, MD 21044 | | Attn:  Theodore L. Freedman & |
| Attn:  Corporate Secretary | | Thomas W. Christopher |
| Facsimile:  (410) 531-4545 | | Facsimile:  (212) 446-4900 |
| | | |
| **If to the Permitted Holder:** | *With copies, which shall not constitute notice, to:* | [Notice Street Address] |
| | | [City], [State] [Zip] |
| WRG Asbestos PD Trust | | Attn:  [ ] |
| [Notice Street Address] | | Facsimile: [ ] |
| [City], [State] [Zip] | | |
| Attn:  [ ] | | |
| Facsimile:  [ ] | | |
| *(if sending overnight packages use zip code [ ])* | | |

20.    Severability.  Wherever possible, each provision of this Guarantee (ZAI) will be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Guarantee (ZAI) by any party hereto is held to be invalid, void, voidable, illegal or unenforceable in any respect under any applicable Law in any jurisdiction, such event will not affect any other provision or the effectiveness or validity of any provision in any other jurisdiction, or the obligations of any other party to this Guarantee (ZAI), and this Guarantee (ZAI) will be reformed, construed and enforced in such jurisdiction as if such invalid, void, voidable, illegal, unenforceable or rejected provision had never been contained herein. The parties hereto further agree to use commercially reasonable efforts to replace such invalid, void, voidable, illegal, unenforceable or rejected provision of this Guarantee (ZAI) with a an effective, valid and enforceable provision which will achieve, to the fullest extent possible, the economic, business and other purposes of the invalid, void, voidable, illegal, unenforceable or rejected provision.

21.    Entire Agreement.  This Guarantee (ZAI), together with the Deferred Payment Agreement (ZAI), the Share Issuance Agreement, the Plan of Reorganization and the

26

Confirmation Order, embodies the complete agreement and understanding between the parties hereto in respect of the subject matter hereof and supersedes, preempts and terminates all other prior understandings, agreements or representations by or among the parties hereto, written or oral, to the extent relating thereto.

        22.    <u>Execution in Counterparts</u>.  This Guarantee (ZAI) may be executed (including by facsimile or portable document format (pdf)) in separate counterparts, each of which will be deemed to be an original and all of which taken together will constitute one and the same agreement.

        23.    <u>Further Assurances</u>.  At the reasonable request of the Permitted Holder, the Guarantor will, at the sole expense of the Permitted Holder, execute such agreements, documents, certificates and/or other instruments confirming the existence of this Guarantee (ZAI), the obligations of the Guarantor hereunder and the rights of the Permitted Holder hereunder.

        24.    <u>Specific Performance</u>.  Each of the parties hereto acknowledges and agrees that, in the event of any breach of, or any failure to perform, any specific provision of this Guarantee (ZAI), the non-breaching party would be irreparably and immediately harmed and could not be made whole by monetary damages.  It is accordingly agreed that, subject to <u>Section 8</u>, the parties hereto (a) shall be entitled, in addition to any other remedy to which they may be entitled at law or in equity, to compel specific performance of any specific provision of this Guarantee (ZAI) or to obtain injunctive relief to prevent breaches of any specific provision of this Guarantee (ZAI) exclusively in the Courts, (b) shall waive, in any action for specific performance or injunctive relief, the defense of the adequacy of a remedy at law, and (c) shall waive any requirement for the securing or posting of any bond in connection with the obtaining of any such specific performance or injunctive relief.  For the avoidance of doubt, the parties agree that the Permitted Holder shall be entitled to enforce specifically the terms and provisions of this Guarantee (ZAI) to prevent breaches of or enforce compliance with those covenants of the Guarantor set forth in <u>Section 7</u>.  Any party's pursuit of specific performance or injunctive relief at any time will not be deemed an election of remedies or waiver of the right to pursue any other right or remedy to which such party may be entitled, including the right to pursue remedies for liabilities or damages incurred or suffered by such party.

        25.    <u>Other Remedies</u>.  Except as otherwise provided herein, any and all remedies herein expressly conferred upon a party shall be deemed cumulative with and not exclusive of any other remedy conferred hereby or by law on such party, and the exercise of any one remedy shall not preclude the exercise of any other.

[Signature page follows]

27

IN WITNESS WHEREOF, this Guarantee (ZAI) has been duly executed by the Guarantor as of the day and year first set forth above.

W. R. Grace & Co.

By_____
    Name:
    Title:

Acknowledged and agreed to
as of the ____ day of [ ], 2009.

WRG ASBESTOS PD TRUST


By:_____

    Name:
    Title:

EXHIBIT A

FORM OF

ASSUMPTION AGREEMENT

[To come]

EXHIBIT B

FORM OF

QUARTERLY EBITDA AND VALUATION CERTIFICATE

[To come]

EXHIBIT C

FORM OF

COMPLIANCE CERTIFICATE

[To come]

EXHIBIT D

FORM OF

POST-TRANSACTION CERTIFICATE

[To come]

[THIS PAGE INTENTIONALLY LEFT BLANK]

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re:** | ) | Chapter 11 |
| | ) | |
| **W. R. GRACE & CO.,** *et al.*[1] | ) | Case No. 01-01139 (JKF) |
| | ) | Jointly Administered |
| **Debtors.** | ) | |
| | ) | |
| | ) | |
| | ) | |

## EXHIBIT 31 TO EXHIBIT BOOK
## STOCK INCENTIVE PLAN

**EXHIBIT 31**

Attached.

---

[1]    The Debtors consist of the following 62 entities:  W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co. Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., GC Limited Partners I, Inc., (f/k/a Grace Cocoa Limited Partners I, Inc.), GC Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc. GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation., W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (F/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

# W. R. GRACE & CO.

## 2009 STOCK INCENTIVE PLAN

1. *Purposes.* The purposes of this Plan are (a) to enable Key Persons to have incentives related to Common Stock, (b) to encourage Key Persons to increase their interest in the growth and prosperity of the Company and to stimulate and sustain constructive and imaginative thinking by Key Persons, (c) to further the identification of interests of Key Persons with the interests of the Company's stockholders, and (d) to induce the service or continued service of Key Persons and to enable the Company to compete with other organizations offering similar or other incentives in obtaining and retaining the services of the most highly qualified individuals.

2. *Definitions.* When used in this Plan, the following terms shall have the meanings set forth in this section 2.

*Board of Directors:* The Board of Directors of the Company.

*cessation of service (or words of similar import):* When a person ceases to be an employee of the Company or a Subsidiary, or ceases to serve as a Director, as appropriate. For purposes of this definition, if an entity that was a Subsidiary ceases to be a Subsidiary, persons who immediately thereafter remain employees of that entity (and are not employees of the Company or an entity that is a Subsidiary) shall be deemed to have ceased service.

*Change in Control:* Shall be deemed to have occurred if (a) the Company determines that any "person" (as such term is used in Sections 13(d) and 14(d) of the Exchange Act), other than a trustee or other fiduciary holding securities under an employee benefit plan of the Company or a corporation owned, directly or indirectly, by the stockholders of the Company in substantially the same proportions as their ownership of stock of the Company, has become the "beneficial owner" (as defined in Rule 13d-3 under the Exchange Act), directly or indirectly, of twenty (20%) percent or more of the outstanding Common Stock of the Company *(provided, however,* that a Change in Control shall not be deemed to have occurred if such person has become the beneficial owner of twenty (20%) percent or more of the outstanding Common Stock as the result of a sale of Common Stock by the Company that has been approved by the Board of Directors); (b) individuals who are "Continuing Directors" (as defined below) cease to constitute a majority of any class of the Board of Directors; (c) there occurs a reorganization, merger, consolidation or other corporate transaction involving the Company (a "Corporate Transaction"), in each case, with respect to which the stockholders of the Company immediately prior to such Corporate Transaction do not, immediately after the Corporate Transaction, own fifty (50%) percent or more of the combined voting power of the corporation resulting from such Corporate Transaction; or (d) the stockholders of the Company approve a complete liquidation or dissolution of the Company. "Continuing Director" means any member of the Board of Directors who was

such a member on the date on which this Plan was approved by the Committee and any successor to such a Continuing Director who is approved as a nominee or elected to succeed a Continuing Director by a majority of Continuing Directors who are then members of the Board of Directors.

*Code*:   The Internal Revenue Code of 1986, as amended, and the rules and regulations issued thereunder.

*Committee:* The Compensation Committee of the Board of Directors of the Company or any other committee or entity designated by the Board of Directors to administer stock incentive and stock option plans of the Company and the Subsidiaries generally or this Plan specifically.  However, the grant of Stock Incentives to individuals who are subject to Section 16 of the Exchange Act or Section 162(m) of the Code may only be made by a Committee which consists of not less than two (2) members of the Board of Directors of the Company, each of whom is a "non-employee director" within the meaning of Rule 16b-3 under the Exchange Act and an "outside director" within the meaning of Section 162(m) of the Code and the regulations thereunder.

*Common Stock:* The common stock of the Company, par value $.01 per share, or such other class of shares or other securities or property as may be applicable pursuant to the provisions of section 9.

*Company:* W. R. Grace & Co., a Delaware corporation.

*Continuing Director:* The meaning set forth in the definition of "Change in Control" above.

*Corporate Transaction:* The meaning set forth in the definition of "Change in Control" above.

*Covered Employee:*   A Key Person of the Company or a Subsidiary who is subject to Code Section 162(m).

*Director:*   A member of the Board of Directors of the Company who is not an employee of the Company.

*Effective Date:*   The date that the Plan becomes effective in accordance with section 10.

*Exchange Act:* The Securities Exchange Act of 1934, as amended.

*Exercise Period:* The meaning set forth in section 15(a)(iii) of this Plan.

*Fair Market Value:* (a) The mean between the high and low sales prices of a share of Common Stock in New York Stock Exchange composite transactions on the applicable date, as reported in *The Wall Street Journal* or another newspaper of gen-

2

eral circulation, or, if no sales of shares of Common Stock were reported for such date, on the next preceding date for which such sales were so reported, or, if the shares are not traded on the New York Stock Exchange, (b) the fair market value of a share of Common Stock determined in accordance with any other reasonable method approved by the Committee in such a manner as to comply with Code Section 409A.

*Incentive Stock Option:* An Option that states that it is an incentive stock option and that is intended to meet the requirements of Section 422 of the Code and the regulations thereunder applicable to incentive stock options, as in effect from time to time.

*issuance (or words of similar import):* The issuance of authorized but unissued Common Stock or the transfer of issued Common Stock held by the Company or a Subsidiary.

*Key Person:* Either (i) an employee of the Company or a Subsidiary who, in the opinion of the Committee, has contributed or can contribute significantly to the growth and successful operations of the Company or one or more Subsidiaries, as determined by the Committee, or (ii) a Director. The grant of a Stock Incentive to an employee shall be deemed a determination by the Committee that such person is a Key Person.

*Net Exercise Option:* An Option described in section 7 hereof.

*Nonstatutory Stock Option:* An Option that is not an Incentive Stock Option.

*Option:* An option granted under this Plan to purchase shares of Common Stock.

*Option Agreement:* An agreement setting forth the terms of an Option.

*Performance Award:* A Stock Incentive that is awarded in accordance with the provisions of section 16 of this Plan.

*Performance Measure:* One or more of the following criteria, or such other operating objectives, with respect to a Performance Award, selected by the Committee to measure performance of the Company or any Subsidiary or other business division of same for a Performance Period, whether in absolute or relative terms: basic or diluted earnings per share of Common Stock; revenue; operating income; net income (either before or after taxes); earnings and/or net income before interest and taxes; earnings and/or net income before interest, taxes, depreciation and amortization; return on capital; return on equity; return on assets; net cash provided by operations; free cash flow; Common Stock price; economic profit; economic value added; total stockholder return; gross margins and costs. Each such measure shall be determined in accordance with generally accepted accounting principles as consistently applied and, as

3

determined by the independent accountants of the Company in the case of a Performance Award to a Covered Employee, to the extent intended to meet the performance-based compensation exception under Code Section 162(m), or as determined by the Committee for other Performance Awards, adjusted to omit the effects of extraordinary items, gain or loss on the disposal of a business segment, unusual or infrequently occurring events and transactions and cumulative effects of changes in accounting principles

*Performance Period:*   A period of not less than one year over which the achievement of targets for Performance Measures is determined.

*Plan:* The 2009 Stock Incentive Plan of the Company herein set forth, as the same may from time to time be amended.

*service:* Service to the Company or a Subsidiary as an employee or as a Director (as appropriate). "To serve" has a correlative meaning.

*Stock Award*:  An issuance of shares of Common Stock or an undertaking (other than an Option) to issue such shares in the future.

*Spread:* The meaning set forth in section 15(a)(iii) of this Plan.

*Stock Incentive:* A stock incentive granted under this Plan in one of the forms provided for in section 3.

*Subsidiary:* A corporation (or other form of business association) of which shares (or other ownership interests) having fifty (50%) percent or more of the voting power regularly entitled to vote for directors (or equivalent management rights) are owned, directly or indirectly, by the Company, or any other entity designated as such by the Board of Directors with respect to whose employees Common Stock would constitute "service recipient stock" as defined under Treasury Regulations Section 1.409A-1(b)(5)(iii) or any successor provision; *provided, however,* that in the case of an Incentive Stock Option, the term "Subsidiary" shall mean a Subsidiary (as defined by the preceding clause) that is also a "subsidiary corporation" as defined in Section 424(f) of the Code and the regulations thereunder, as in effect from time to time.

    3.   *Grants* of *Stock Incentives. (a)* Subject to the provisions of this Plan, the Committee may at any time and from time to time, grant Stock Incentives under this Plan to, and only to, Key Persons.

    (b)    The Committee may grant a Stock Incentive to be effective at a specified future date or upon the future occurrence of a specified event. For the purposes of this Plan, any such Stock Incentive shall be deemed granted on the date it becomes effective. An agreement or other commitment to grant a Stock Incentive that is to be effective in the future shall not be deemed the grant of a Stock

4

Incentive until the date on which such Stock Incentive becomes effective.

      (c)    A Stock Incentive may be granted in the form of:

          (i)    a Stock Award, or

          (ii)    an Option, or

          (iii)    a Net Exercise Option, or

          (iv)    a combination of a Stock Award, an Option and/or Net Exercise Option.

    4.    *Stock Subject to this Plan.* (a) Subject to the provisions of paragraphs (c) and (d) of this section 4 and the provisions of section 9, the maximum number of shares of Common Stock that may be issued pursuant to Stock Incentives granted under this Plan shall not exceed Six Million (6,000,000). Authorized but unissued shares of Common Stock and issued shares of Common Stock held by the Company or a Subsidiary, whether acquired specifically for use under this Plan or otherwise, may be used for purposes of this Plan.

    (b)  If any shares of Common Stock subject to a Stock Incentive shall not be issued and shall cease to be issuable because of the termination, in whole or in part, of such Stock Incentive or for any other reason, or if any such shares shall, after issuance, be reacquired by the Company or a Subsidiary from the recipient of such Stock Incentive, or from the estate of such recipient, for any reason, such shares shall no longer be charged against the limitation provided for in paragraph (a) of this section 4 and may again be made subject to Stock Incentives; provided that, no more than Six Million (6,000,000) shares of Common Stock (adjusted as provided in section 9) may be issued under Incentive Stock Options issued under this Plan.

    (c)    The maximum number of shares of Common Stock that may be subject to Stock Incentives granted to any one Covered Employee during any one calendar year shall be limited to 1,000,000 shares of Common Stock (subject to adjustment as provided in section 9). To the extent required by Section 162(m) of the Code and so long as Section 162(m) of the Code is applicable to persons eligible to participate in the Plan, shares of Common Stock subject to the maximum in the preceding sentence with respect to which the related Stock Incentive is terminated, surrendered or canceled shall nonetheless continue to be taken into account with respect to such maximum for the calendar year in which granted.

    (d)    Notwithstanding any other provision of this Plan, for each share of Common Stock issued under the Plan as a Stock Award, three (3) shares of the limit specified in paragraph (a) of this section 4 shall be regarded as utilized; and for each share of Common Stock that is covered by a grant of an Option under the Plan, one (1) share of that limit will be regarded as utilized (subject to the provisions of section 7 with

5

respect to Net Exercise Options).

5.    *Stock Awards.* Except as otherwise provided in section 12, Stock Incentives in the form of Stock Awards shall be subject to the following provisions:

(a)    For purposes of this Plan, all shares of Common Stock subject to a Stock Award shall be valued at not less than one hundred (100%) percent of the Fair Market Value of such shares on the date such Stock Award is granted, regardless of whether or when such shares are issued pursuant to such Stock Award and whether or not such shares are subject to restrictions affecting their value.

(b)    Shares of Common Stock subject to a Stock Award may be issued to a Key Person at the time the Stock Award is granted, or at any time subsequent thereto, or in installments from time to time. In the event that any such issuance shall not be made at the time the Stock Award is granted, the Stock Award may provide for the payment to such Key Person, either in cash or shares of Common Stock, of amounts not exceeding the dividends that would have been payable to such Key Person in respect of the number of shares of Common Stock subject to such Stock Award (as adjusted under section 9) if such shares had been issued to such Key Person at the time such Stock Award was granted. Any Stock Award may provide that the value of any shares of Common Stock subject to such Stock Award may be paid in cash, on each date on which shares would otherwise have been issued, in an amount equal to the Fair Market Value on such date of the shares that would otherwise have been issued.

(c)    The material terms of each Stock Award shall be determined by the Committee. Each Stock Award shall be evidenced by a written instrument consistent with this Plan. It is intended that a Stock Award would be (i) made contingent upon the attainment of one or more specified objectives and (ii) subject to restrictions on the sale or other disposition of the Stock Award or the shares subject thereto for a period of two or more years; *provided, however,* that (x) a Stock Award may include restrictions and limitations in addition to those provided for herein and (y) of the total number of shares specified in paragraph (a) of section 4 (subject to adjustment as specified therein), up to five (5%) percent may be subject to Stock Awards not subject to clause (i) or clause (ii) of this sentence.

(d)    A Stock Award shall be granted for such lawful consideration as may be provided therein.

6.    *Options.* Except as otherwise provided in section 12, Stock incentives in the form of Options shall be subject to the following provisions:

(a)    The purchase price per share of Common Stock shall not be less than one

6

hundred (100%) percent of the Fair Market Value of a share of Common Stock on the date the Option is granted; and such purchase price per share of Common Stock shall not be reduced, by action of the Board of Directors or otherwise, at any time after the date the Option is granted (subject to section 9 hereof). The purchase price and any withholding tax that may be due on the exercise of an Option may be paid in cash, or, if so provided in the Option Agreement, (i) in shares of Common Stock (including shares issued pursuant to the Option being exercised and shares issued pursuant to a Stock Award granted subject to restrictions as provided for in paragraph (c) of section 5), or (ii) in a combination of cash and such shares; *provided, however,* that no shares of Common Stock delivered in payment of the purchase price may be "immature shares," as determined in accordance with generally accepted accounting principles in effect at the time. Any shares of Common Stock delivered to the Company in payment of the purchase price or withholding tax shall be valued at their Fair Market Value on the date of exercise. No indication of ownership of shares of Common Stock shall be issued upon the exercise of an Option until the purchase price for such shares has been paid in full and arrangements have been made for any tax withholding due.

(b)    If so provided in the Option Agreement (but subject to paragraph (i) of this section 6), the Company shall, upon the request of the holder of the Option and at any time and from time to time, cancel all or a portion of the Option then subject to exercise and either (i) pay the holder an amount of money equal to the excess, if any, of the Fair Market Value, at such time or times, of the shares subject to the portion of the Option so canceled over the purchase price for such shares; or (ii) issue shares of Common Stock to the holder with a Fair Market Value, at such time or times, equal to such excess; or (iii) pay such excess by a combination of money and shares.

(c)    Each Option may be exercisable in full at the time of grant, or may become exercisable in one or more installments and at such time or times or upon the occurrence of such events, as may be specified in the Option Agreement, as determined by the Committee. Unless otherwise provided in the Option Agreement, an Option, to the extent it is or becomes exercisable, may be exercised at any time in whole or in part until the expiration or termination of such Option.

(d)    Each Option shall be exercisable during the life of the holder only by him and, after his death, only by his estate or by a person who acquires the right to exercise the Option by will or the laws of descent and distribution. An Option, to the extent that it shall not have been exercised or canceled, shall terminate as follows after the holder ceases to serve: (i) if the holder shall voluntarily cease to serve without the consent of the Committee or shall have his service terminated for cause, the Option shall terminate immediately upon cessation of service; (ii) if the holder shall cease to serve by reason of death, incapacity or retirement under a retirement plan of the Company or a Subsidiary, the Option shall terminate three years after the date on which he ceased to serve; and (iii) except as provided in the next sentence, in all other cases the Option shall terminate three months after the date on which the holder ceased to serve unless the Committee shall approve a longer period (which approval may be given before

7

or after cessation of service) not to exceed three years. If the holder shall die or become incapacitated during the three (3) month period (or such longer period as the Committee may approve) referred to in the preceding clause (iii), the Option shall terminate three (3) years after the date on which he ceased to serve. A leave of absence for military or governmental service or other purposes shall not, if approved by the Committee (which approval may be given before or after the leave of absence commences), be deemed a cessation of service within the meaning of this paragraph (d). Notwithstanding the foregoing provisions of this paragraph (d) or any other provision of this Plan, no Option shall be exercisable after expiration of a period of five (5) years and one (1) month from the date the Option is granted and no Incentive Stock Option shall be exercisable after expiration of a period of five (5) years from the date the Option is granted. Except as otherwise provided in Code Section 409A, where a Nonstatutory Option is granted for a term of less than five (5) years and one (1) month, the Committee may, at any time prior to the expiration of the Option, extend its term for a period ending not later than five (5) years and one (1) month from the date the Option was granted. Such an extension shall not be deemed the grant of a new Option under this Plan.

(e)     No Option nor any right thereunder may be assigned or transferred except by will or the laws of descent and distribution and except, in the case of a Nonstatutory Option, pursuant to a qualified domestic relations order (as defined in the Code), unless otherwise provided in the Option Agreement.

(f)     An Option may, but need not, be an Incentive Stock Option; *provided, however,* that (i) no Incentive Stock Option may be granted more than ten years after the earlier of adoption of the Plan by the Committee or approval by the Company's stockholders; (ii)  the exercise price of any Incentive Stock Option granted to a Key Person who owns (within the meaning of Section 422(b)(6) of the Code, after the application of the attribution rules in Section 424(d) of the Code) more than ten (10%) percent of the total combined voting power of all classes of shares of stock of the Company or any parent or Subsidiary of the Company shall be not less than one hundred ten (110%) percent of the Fair Market Value of the Common Stock on the grant date and the term of such stock option shall not exceed five (5) years; (iii) the aggregate Fair Market Value (determined as of the time an Incentive Stock Option is granted) of the shares subject to each installment becoming exercisable for the first time in any calendar year under Incentive Stock Options granted (under all plans, including this Plan, of his employer corporation and its parent and subsidiary corporations) to the Key Person to whom such Incentive Stock Option is granted shall not exceed $100,000; (iv) Incentive Stock Options shall only be issued to Key Persons who are employees of the Company or of a Subsidiary; and (v) no stock option issued under the Plan shall be an Incentive Stock Option unless the Plan is approved by the stockholders of the Company within twelve (12) months of its adoption by the Committee.

(g)     The material terms of each Option shall be determined by the Committee. Each Option shall be evidenced by a written instrument consistent with this Plan and

8

shall specify whether the Option is an Incentive Stock Option or a Nonstatutory Option. An Option may include restrictions and limitations in addition to those provided for in this Plan.

(h)    Options shall be granted for such lawful consideration as may be provided for in the Option Agreement.

(i)    Subject to section 9 hereof, no transaction or series of transactions shall have the effect of exchanging all or any portion of any Option granted under this Plan (a "Previously Granted Option") for, or replacing all or any portion of any Previously Granted Option with, a new Option, where the purchase price per share of Common Stock under the new Option is less than such purchase price applicable under the Previously Granted Option.

*7.    Net Exercise Options.* A "Net Exercise Option" is an Option that is a Nonstatutory Stock Option, where the applicable Option Agreement specifies that the Company will reduce the number of shares issued under the Option upon exercise by the minimum whole number of shares with a Fair Market Value sufficient to pay the aggregate exercise price of the exercised shares. (If the Fair Market Value of the whole number of shares withheld exceeds the aggregate exercise price of the exercised shares, the excess fractional share shall be forfeited by the Option holder.)  Shares of Common Stock that are withheld to pay the exercise price on a Net Exercise Option shall not be charged against the limitation provided for in paragraph (a) of section 4 and may again be made subject to Stock Incentives.

*8.    Combination of Stock Awards and Options.* Stock Incentives authorized by paragraph (c)(iv) of section 3 in the form of combinations of Stock Awards and Options shall be subject to the following provisions:

(a) A Stock Incentive may be a combination of any form of Stock Award and any form of Option; *provided, however,* that the terms and conditions of such a Stock Incentive pertaining to a Stock Award are consistent with section 5 and the terms and conditions of such a Stock Incentive pertaining to an Option are consistent with section 6 and in the case of an Incentive Stock Option, the combination is not in violation of Treasury Regulations Section 1.422-5(d).

(b)    Such a combination Stock Incentive shall be subject to such other terms and conditions as may be specified therein, including without limitation a provision terminating in whole or in part a portion thereof upon the exercise in whole or in part of another portion thereof.

(c)    The material terms of each combination Stock Incentive shall be determined by the Committee. Each combination Stock Incentive shall be evidenced by a written instrument consistent with this Plan.

9

9.    *Adjustment Provisions. (a)* In the event that any reclassification, split-up (whether by a dividend payable in Common Stock or otherwise), or consolidation of the Common Stock shall be effected, or the outstanding shares of Common Stock are, in connection with a merger or consolidation of the Company or a sale by the Company of all or a part of its assets, exchanged for a different number or class of shares of stock or other securities or property of the Company or for shares of the stock or other securities or property of any other corporation or person; (i) the number, kind, and class of shares or other securities or property that may be issued pursuant to Stock Incentives thereafter granted, (ii) the number, kind and class of shares or other securities or property that have not been issued under outstanding Stock Incentives; (iii) the purchase price to be paid per share or other unit under outstanding Stock Incentives; and (iv) the price to be paid per share or other unit by the Company or a Subsidiary for shares or other securities or property issued pursuant to Stock Incentives that are subject to a right of the Company or a Subsidiary to re-acquire such shares or other securities or property, shall in each case be equitably adjusted as determined by the Committee.

(b)    In the event that there shall occur any spin-off or other distribution of assets of the Company to its shareholders (including without limitation an extraordinary dividend), (i) the number, kind and class of shares or other securities or property that may be issued pursuant to Stock Incentives thereafter granted, (ii) the number, kind and class of shares or other securities or property that have not been issued under outstanding Stock Incentives, (iii) the purchase price to be paid per share or other unit under outstanding Stock Incentives, and (iv) the price to be paid per share or other unit by the Company or a Subsidiary for shares or other securities or property issued pursuant to Stock Incentives that are subject to a right of the Company or a Subsidiary to re-acquire such shares or other securities or property, shall in each case be equitably adjusted as determined by the Committee.

10.    *Term.* This Plan shall be deemed adopted, if it is approved by the Committee, and by the U.S. Bankruptcy Court as part of the Company's "plan or reorganization" under Chapter 11 of the U.S. Bankruptcy Code.  If adopted, this Plan shall become effective on the date that the Company's plan of reorganization is confirmed by the Bankruptcy Court.

11.    *Administration.* (a) This Plan shall be administered by the Committee, which shall have full authority to act in the matter of selection of Key Persons and in granting Stock Incentives to them and such other authority as is granted to the Committee by this Plan. Notwithstanding any other provision of this Plan, the Board of Directors may exercise any and all powers of the Committee with respect to this Plan, except to the extent that the possession or exercise of any power by the Board of Directors would cause any Stock Incentive to become subject to, or to lose an exemption from, Section 162(m) of the Code or Section 16(b) of the Exchange Act.

(b)    The Committee may establish such rules and regulations, not

10

inconsistent with the provisions of this Plan, as it deems necessary to determine eligibility to be granted Stock Incentives under this Plan and for the proper administration of this Plan, and the Committee may amend or revoke any rule or regulation so established. The Committee may make such determinations and interpretations under or in connection with this Plan as it deems necessary or advisable. All such rules, regulations, determinations and interpretations shall be binding and conclusive upon the Company, its Subsidiaries, its shareholders and its directors, officers and employees, and upon their respective legal representatives, beneficiaries, successors and assigns, and upon all other persons claiming under or through any of them.

(c)     Members of the Board of Directors and members of the Committee acting under this Plan shall be fully protected in relying in good faith upon the advice of counsel and shall incur no liability in the performance of their duties, except as otherwise provided by applicable law.

12.    *General Provisions.* (a) Nothing in this Plan or in any instrument executed pursuant hereto shall confer upon any person any right to continue in the service of the Company or a Subsidiary, or shall affect the right of the Company or of a Subsidiary to terminate the service of any person with or without cause.

(b)     No shares of Common Stock shall be issued pursuant to a Stock Incentive unless and until all legal requirements applicable to the issuance of such shares have, in the opinion of counsel to the Company, been complied with. In connection with any such issuance, the person acquiring the shares shall, if requested by the Company, give assurances, satisfactory to counsel to the Company, in respect of such matters as the Company or a Subsidiary may deem desirable to assure compliance with all applicable legal requirements.

(c)     No person (individually or as a member of a group), and no beneficiary or other person claiming under or through him, shall have any right, title or interest in or to any shares of Common Stock allocated or reserved for the purposes of this Plan or subject to any Stock Incentive, except as to such shares of Common Stock, if any, as shall have been issued to him.

(d)     In the case of a grant of a Stock Incentive to a Key Person who is employed by a Subsidiary, such grant may provide for the issuance of the shares covered by the Stock Incentive to the Subsidiary, for such consideration as may be provided or as a contribution to the Subsidiary's capital, upon the condition or understanding that the Subsidiary will transfer the shares to the Key Person in accordance with the terms of the Stock Incentive.

(e)     In the event the laws of a country in which the Company or a Subsidiary has employees prescribe certain requirements for Stock Incentives to

11

qualify for advantageous tax treatment under the laws of that country (including, without limitation, laws establishing options analogous to Incentive Stock Options), the Committee, may, for the benefit of such employees, amend, in whole or in part, this Plan and may include in such amendment additional provisions for the purposes of qualifying the amended plan and Stock Incentives granted thereunder under such laws; provided, however, that (i) the terms and conditions of a Stock Incentive granted under such amended plan may not be more favorable to the recipient than would be permitted if such Stock Incentive had been granted under this Plan as herein set forth, (ii) all shares allocated to or utilized for the purposes of such amended plan shall be subject to the limitations of section 4, and (iii) the provisions of the amended plan may restrict but may not extend or amplify the provisions of sections 9 and 13.

(f)     The Company or a Subsidiary may make such provisions as either may deem appropriate for the withholding of any taxes that the Company or a Subsidiary determines is required to be withheld in connection with any Stock Incentive.

(g)     Nothing in this Plan is intended to be a substitute for, or shall preclude or limit the establishment or continuation of, any other plan, practice, or arrangement for the payment of compensation or benefits to directors, officers, or employees generally, or to any class or group of such persons, that the Company or any Subsidiary now has or may hereafter put into effect, including, without limitation, any incentive compensation, retirement, pension, group insurance, stock purchase, stock bonus, or stock option plan.

(h)     Stock Incentives under the Plan are intended to be either exempt from Code Section 409A or in compliance with Code Section 409A and the Plan shall be so administered and interpreted.  Any Stock Award which does not meet the requirements for a "short-term deferral" under Treasury Regulations Section 1.409A-1(b)(4) or is otherwise not exempt from Section 409A will be issued pursuant to an agreement that complies with Section 409A.  The Committee shall take no action under the Plan that would cause a Stock Incentive under the Plan to fail to either be exempt from Code Section 409A or in compliance with Code Section 409A.  Notwithstanding the foregoing, Stock Incentive recipients are solely responsible for the tax consequences to them of Stock Incentives under the Plan including any tax consequences under Code Section 409A.

13.   *Acquisitions.* If the Company or any Subsidiary should merge or consolidate with, or purchase stock or assets or otherwise acquire the whole or part of the business of, another entity, the Company, upon the approval of the Committee, (a) may assume, in whole or in part and with or without modifications or conditions, any stock incentives granted by the acquired entity to its directors, officers, employees or consultants in their capacities as such, or (b) may grant new Stock Incentives in substitution therefor. Any such assumed or substitute Stock

12

Incentives may contain terms and conditions inconsistent with the provisions of this Plan (including the limitations set forth in paragraph (d) of section 4), including additional benefits for the recipient; provided, however, that if such assumed or substitute Stock Incentives are Incentive Stock Options, such terms and conditions are permitted under the plan of the acquired entity. For the purposes of any applicable plan provision involving time or a date, a substitute Stock Incentive shall be deemed granted as of the date of grant of the original stock incentive.

14. *Amendments and Termination. (a)* Anytime subsequent to the Effective Date, this Plan may be amended or terminated by the Committee; *provided, however,* that, without the approval of the stockholders of the Company, no amendment shall be made that (i) causes this Plan to cease to comply with applicable law; (ii) permits any person who is not a Key Person to be granted a Stock Incentive (except as otherwise provided in section 13); (iii) increases the maximum number of shares of Common Stock that may be issued pursuant to Stock Incentives granted under this Plan (subject to the provisions of section 4(c) and the provisions of section 9); (iv) amends the provisions of paragraph (d) of section 4, paragraph (a) of section 5 or paragraph (a) or paragraph (f) of section 6 to permit shares to be valued at, or to have a purchase price of, respectively, less than the percentage of Fair Market Value specified therein; (v) amends section 10 to extend the date set forth therein; or (vi) amends this section 14.

(b) No amendment or termination of this Plan shall adversely affect any Stock Incentive theretofore granted, and no amendment of any Stock Incentive granted pursuant to this Plan shall adversely affect such Stock Incentive, without the consent of the holder thereof.

15. *Change in Control Provisions. (a)* Notwithstanding any other provision of this Plan to the contrary, in the event of a Change in Control:

(i) Any Options outstanding as of the date on which such Change in Control occurs, and which are not then exercisable and vested, shall become fully exercisable and vested to the full extent of the original grant;

(ii) All restrictions and deferral limitations applicable to Stock Incentives shall lapse, and Stock Incentives shall become free of all restrictions and become fully vested and transferable to the full extent of the original grant;

(iii) During the sixty (60) day period from and after a Change in Control (the "Exercise Period"), unless the Committee shall determine otherwise at the time of grant, the holder of an Option shall have the right, in lieu of the payment of the purchase price for the shares of Common Stock being purchased under the Option, by giving notice to the Company, to elect (within the Exercise Period) to surrender all or part of the Option to the Company and to receive cash, within thirty (30) days after such notice, in an amount equal to the amount by which the Fair Market Value per share of

13

Common Stock on the date of such election shall exceed the purchase price per share of Common Stock under the Option (the "Spread") multiplied by the number of shares of Common Stock subject to the Option as to which the right subject to this section 15(a)(iii) shall have been exercised; and

          (iv)  The Committee shall take such action as it deems appropriate and equitable to effectuate the purposes of this Plan and to protect the grantees of Options, which action may include, without limitation, any one or more of the following, provided such action is in compliance with Code Section 409A if applicable:  (i) acceleration or change of the exercise and/or expiration dates of any Option to require that exercise be made, if at all, prior to the Change in Control; (ii) cancellation of any Option upon payment to the holder in cash of the Fair Market Value of the shares subject to such Option as of the date of (and, to the extent applicable, as established for purposes of) the Change in Control, less the aggregate exercise price, if any, of the Option; and (iii) in any case where equity securities of another entity are proposed to be delivered in exchange for or with respect to shares of Common Stock of the Company, arrangements to have such other entity replace the Options granted hereunder with awards with respect to such other securities, with appropriate adjustments in the number of shares subject to, and the exercise prices under, the Option.

     16.  *Performance Awards*

     (a)  The Committee, in its discretion, may authorize the granting, vesting, payment and/or delivery of any form of Stock Incentive as Performance Awards to such Key Persons upon achievement of such targets for Performance Measures during a Performance Period as are selected by the Committee. The Committee, in its discretion, shall determine the Key Persons eligible for Performance Awards, the targets for Performance Measures to be achieved during each Performance Period, and the type, amount, and terms and conditions of any Performance Awards.  Performance Awards may be granted either alone or in addition to other Stock Incentives made under the Plan.

     (b)  If the Company is subject to Code Section 162(m), in connection with any Performance Awards granted to a Covered Employee which are intended to meet the performance-based compensation exception under Code Section 162(m), the Committee shall (i) establish in the Performance Award Agreement the specific targets relative to the Performance Measures which must be attained before the respective Performance Award is granted, vests, or is otherwise paid or delivered, (ii) provide in the applicable Performance Award Agreement the method for computing the portion of the Performance Award which shall be granted, vested, paid and/or delivered if the target or targets are attained in full or part, and (iii) at the end of the relevant Performance Period and prior to any such grant, vesting, payment or delivery certify the extent to which the applicable target or targets were achieved and whether any other material terms were in fact satisfied.  The specific targets and the method for computing the portion of such Performance Award which shall be granted, vested, paid or delivered to any Covered Employee shall be established by the Committee prior to the

14

earlier to occur of (A) ninety (90) days after the commencement of the Performance Period to which the Performance Measure applies and (B) the elapse of twenty-five (25%) percent of the Performance Period and in any event while the outcome is substantially uncertain.   In interpreting Plan provisions applicable to Performance Measures and Performance Awards which are intended to meet the performance-based compensation exception under Code Section 162(m), it is the intent of the Plan to conform with the standards of Section 162(m) of the Code and Treasury Regulations Section 1.162-27(e)(2), and the Committee in interpreting the Plan shall be guided by such provisions.

February, 2009

15

[THIS PAGE INTENTIONALLY LEFT BLANK]

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re:** | ) | Chapter 11 |
| | ) | |
| **W. R. GRACE & CO.,** *et al.*[1] | ) | Case No. 01-01139 (JKF) |
| | ) | Jointly Administered |
| **Debtors.** | ) | |
| | ) | |
| | ) | |
| | ) | |

## EXHIBIT 32 TO EXHIBIT BOOK
## STOCK TRADING RESTRICTIONS TERM SHEET

### EXHIBIT 32

Attached.

---

[1] The Debtors consist of the following 62 entities:  W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co. Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc.,  CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., GC Limited Partners I, Inc., (f/k/a Grace Cocoa Limited Partners I, Inc.), GC Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc. GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation., W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (F/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

**Term Sheet for Proposed Trading Restrictions
on Reorganized WR Grace Common Stock**

Reorganized WR Grace's ("Grace") Restated Certificate of Incorporation will provide:

1.    No tax restrictions on trading (either buying or selling) after emergence from bankruptcy other than as provided herein.

2.    In the event that the following event occurs, Grace's Board of Directors shall meet on an expedited basis to determine whether to impose trading restrictions on transfers of Grace equity:

a.    At least 25 percentage points of "owner shift" have occurred with respect to Grace equity during the immediately preceding three-year period for purposes of Section 382 of the Internal Revenue Code and the Treasury regulations thereunder (collectively, "Section 382") since Grace's most recent "ownership change" (the "Testing Period") as reasonably determined by Grace (in consultation with outside counsel).

In determining whether 25 percentage points of "owner shift" have occurred during the Testing Period, it shall be presumed that at least 12.5 percentage points of "owner shift" have occurred as a result of the issuance of warrants (the "Warrants") to the WRG Asbestos PI Trust (the "Trust") pursuant to the Warrant Agreement dated as of the Effective Date. The actual exercise of such warrants shall then be disregarded for purposes of determining whether 25 percentage points of "owner shift" has occurred. To the extent that the Trust has exercised a portion of its Warrants, appropriate adjustments shall be made in the presumption that at least 12.5 percentage points of "owner shift" have occurred. To the extent that the Trust has exercised all of its Warrants, the presumption of this paragraph shall be eliminated.

3.    The decision by Grace's Board of Directors to impose trading restrictions will require a vote by 2/3 of such Directors based upon the advice of tax counsel experienced in matters regarding Section 382. Grace shall promptly announce the imposition of such restrictions by means of a press release and the filing of an 8-K. The decision by Grace's Board of Directors to remove trading restrictions shall require only a majority vote of such Directors.

4.    If Grace's Board of Directors votes to impose restrictions, the principal terms of such restrictions will be:

a.    Any acquisition of stock by a person or entity who is not a 5% shareholder of Grace will be null and void ab initio as to the purchaser to the extent such acquisition causes such person or entity to become a 5% shareholder, unless the acquisition of such stock (i) has been approved by a majority vote of Grace's Board of

Directors, (ii) will not result in an increase in an "owner shift" for purposes of Section 382 in excess of any "owner shift" that would have occurred if the seller had sold the same amount of stock in the market (e.g., because the stock is purchased from another 5% shareholder whose stock acquisition had caused an owner shift), (iii) is the result of the exercise by the Trust of the Warrants (the "Warrant Stock") or (iv) is the result of any stock acquisition by the Trust, the Asbestos PD Trust, or both.  Clause (iii) and (iv) constitute a "Trust Permitted Acquisition", and together with clauses (i) and (ii) above, each a "Permitted Acquisition".

        b.      Any person or entity that is a 5% shareholder of Grace shall not be permitted to acquire any additional stock of Grace without the consent of a majority of Grace's Board of Directors, unless the acquisition is a Permitted Acquisition.

Any shareholder seeking to use the "Permitted Acquisition" exception in the case of 4(a) or (b) above (other than in respect of a Trust Permitted Acquisition) shall, at the request of Grace, provide at its own expense either (i) a legal opinion reasonably acceptable to Grace to the effect that such acquisition will qualify as a Permitted Acquisition or (ii) a representation reasonably acceptable to Grace, establishing that the acquisition will qualify as a Permitted Acquisition.

        c.      Any person or entity that holds more than 5% of Grace's stock, other than as a result of a Trust Permitted Acquisition, shall not be permitted to sell such stock, subject to the following two exceptions:

        (i) There shall be no restriction on the ability of any person or entity to dispose of any Grace stock to the extent that the amount of stock sold by such person or entity is equal to or less than the amount of stock held by such shareholder on the Effective Date of Grace's bankruptcy.

        (ii) Any person or entity holding 9.99% or less of the outstanding Grace stock by value shall be permitted to sell up to 5 percentage points of such stock. Beginning two business days after such person or entity owns less than 5% of Grace's stock by value, such person or entity shall be permitted to sell the rest of such stock.

        d.      Grace will announce by press release and 8-K if its Board of Directors shall determine that trading restrictions are no longer required. However, any such trading restrictions shall expire automatically if the total amount of "owner shift" during the current Testing Period shall be less than 20 percentage points for purposes of Code Section 382.

        e.      Not withstanding anything to the contrary contained herein, no restrictions shall be imposed on the acquisition or sale of Grace stock by the Trust or the Asbestos PD Trust or the ability of any person to acquire any or all of the Warrant Stock or any other Grace stock from the Trust and/or the Asbestos PD Trust to the

extent the aforementioned Warrant Stock or Grace stock is acquired by the Trust or the Asbestos PD Trust from Grace..

5.      All shareholders that have filed or would be required to file a Form 13D or 13G with the Securities and Exchange Commission shall be required to provide reasonable information to Grace regarding such shareholder's ownership of Grace stock, including the dates of the acquisition and disposition of such stock and the amounts of such acquisitions and dispositions, to the extent such information is reasonably requested by Grace and such information is not readily available through the Form 13D or 13G.  Such information shall be provided within five business days of Grace's request, and shall be subject to standard confidentiality provisions.   In determining whether any information requested by Grace is reasonable, any such information shall be reasonably necessary only to the extent such information is relevant to Grace in determining the level of owner shift that has or will occur for purposes of Section 382.

6.      The restrictions described herein, once in effect, shall be subject to the standard rules for corporations emerging from bankruptcy, including that any acquisitions of stock in violation of such restrictions shall be null and void ab initio without any action being taken by Grace

(a)      Any trading restrictions imposed by the Board shall automatically expire on (i) the second anniversary of the imposition of such restrictions, subject to the ability of the Board to impose new restrictions by an affirmative vote of the Board pursuant to Paragraph 3 above or (ii) the date on which the amount of "owner shift" for purposes of Section 382 during the Testing Period is less than 20 percentage points.

(b)      The provisions of this Term Sheet, as reflected in Grace's Restated Certificate of Incorporation, shall automatically expire on the date that is three years after the Effective Date of Grace's bankruptcy; provided, however, that Grace's Board shall be permitted to extend such provisions for additional three-year periods upon the affirmative 2/3 vote of such Board.

7.      Terms used herein are intended to have the meanings ascribed to them under Section 382 and the Plan and shall be construed accordingly.

[THIS PAGE INTENTIONALLY LEFT BLANK]

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

In re:                                        )        Chapter 11
                                              )
**W. R. GRACE & CO., *et al.*[1]**            )        Case No. 01-01139 (JKF)
                                              )        Jointly Administered
            **Debtors.**                      )
                                              )
                                              )
                                              )

## EXHIBIT 33 TO EXHIBIT BOOK
## ZAI PD TRUST DISTRIBUTION PROCEDURES (ZAI TDP)

**EXHIBIT 33**

Attached.

---

[1]     The Debtors consist of the following 62 entities:  W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co. Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc.,  CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., GC Limited Partners I, Inc., (f/k/a Grace Cocoa Limited Partners I, Inc.), GC Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc. GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation., W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (F/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

**WRG**
**UNITED STATES ZONOLITE ATTIC INSULATION ("US ZAI") PROPERTY**
**DAMAGE SETTLEMENT TRUST DISTRIBUTION PROCEDURES**

The WRG US ZAI Settlement Trust Distribution Procedures (the "ZAI TDP") contained herein provide for resolving all US ZAI PD Claims as defined in the Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code of W. R. Grace & Co., et al. dated February 27, 2009 (as it may be amended or modified, the "Plan"), including, without limitation, all "Zonolite Attic Insulation Claims" as defined in the General Instructions For Completing the W. R. Grace & Co. ZAI Proof of Claim, attached to the Certification of Counsel regarding order: (a) establishing October 31, 2008 as the proof of claim Bar Date for Zonolite Attic Insulation claims; and (b) approving the related proof of claim form, Bar Date notices and notice program. (Dkt. No. 18920, June 13, 2008). The Plan and the Asbestos Property Damage Settlement Trust Agreement ("PD Trust Agreement") establish the WRG Asbestos PD Trust (the "PD Trust"). The PD Trust will have a separate ZAI Trustee who will administer the ZAI Trust Assets, the ZAI claims process, the ZAI educational program and all related ZAI matters. The ZAI Trustee shall implement and administer this ZAI TDP in accordance with the ZAI Class Settlement Agreement and the PD Trust Agreement.

## SECTION I

## Introduction

1.1    **Purpose.** This ZAI TDP has been adopted pursuant to the PD Trust Agreement and the Plan. It is designed to provide fair, equitable and substantially similar

1

treatment for all US ZAI PD Claims that may presently exist or may arise in the future in compliance with Section 524(g) of the Bankruptcy Code.

1.2   **Interpretation.**  Except as may otherwise be provided below, nothing in this ZAI TDP shall be deemed to create a substantive right for any Claimant.  The rights and benefits provided herein to holders of US ZAI PD Claims shall vest in such holders as of the Effective Date of the Plan.

**SECTION II**

**Overview**

2.1   **US ZAI Trust Distribution Goals.**  The purpose of the US ZAI TDP is to treat Claimants equitably and to provide a low transaction cost method for resolving US ZAI PD Claims.  The ZAI Trustee shall operate the ZAI aspects of the PD Trust in accordance with this purpose, and limit PD Trust administrative expenditures for ZAI matters to reasonable amounts required to carry out this purpose.  At no time may the ZAI Trustee waste ZAI Trust Assets.  The ZAI Trustee will only pay legitimate US ZAI PD Claims as verified by compliance with the evidentiary requirements of this ZAI TDP.  This ZAI TDP may be interpreted by the ZAI Trustee only when an ambiguity exists.  The interpretation shall be consistent with the purposes set forth herein, including providing payment in a cost-effective manner.  Claimants may, but need not, be represented by counsel when making a Claim under this ZAI TDP.  If a Claimant hires counsel, any fee agreement is a matter of private contract between the Claimant and counsel.

2

**2.2** **Claims Liquidation Procedures.** US ZAI PD Claims shall be processed based on their place in the FIFO Processing Queue to be established pursuant to Section 5.1.1 below. The ZAI Trustee shall take all reasonable steps to resolve US ZAI PD Claims as efficiently and expeditiously as possible at each stage of claims processing and dispute resolution, including, in the ZAI Trustee's sole discretion, conducting settlement discussions with Claimants or their representatives. The ZAI Trustee shall make every effort to resolve each year all US ZAI PD Claims filed by October 1st of that year and as many of the US ZAI PD Claims filed thereafter as feasible.

**2.3** **Application of the Payment Percentage.** After the Allowed Value of a US ZAI PD Claim is determined by the ZAI Trustee using the information provided by the Claimant in accordance with Sections 5.4 (Evidentiary Requirements), 6.1 (Claims Materials), and 7.1 (Showing Required), and a percentage of 55% is applied to the Allowed Value to produce an Allowed Amount, the Claimant shall receive 100% of the Allowed Amount (the "Initial Payment Percentage") unless there are insufficient funds available, based on the ZAI Trustee's determination, to pay all Claimants 100% of their Allowed Amount in a given year. In such case, unless the ZAI Trustee chooses, in conjunction with the ZTAC and the PD FCR, to invoke the provision of Section 4.4 of this ZAI TDP, the Initial Payment Percentage may be adjusted by the ZAI Trustee with the consent of the ZTAC and the PD FCR, to reflect then-current estimates of the ZAI Trust Assets and its liabilities, as well as the then-estimated value of pending and future claims. Any adjustment to the Initial Payment Percentage shall be made only pursuant to

3

Section 4.2 below, and it is the intention of this ZAI TDP that all claims be paid at 100% of their Allowed Amount as quickly as feasible. If the Initial Payment Percentage is decreased at any time below 100% and then increased, or if the provisions of Section 4.4 below have been invoked, Claimants whose claims were liquidated and paid at less than 100% of their Allowed Amount in prior periods under the ZAI TDP shall receive additional payments as provided in Sections 4.3 and 4.4 below. Because there is uncertainty with respect to both the number and size of future US ZAI PD Claims, and the amount of the ZAI Trust Assets, no guarantee can be made of any particular Payment Percentage of a US ZAI PD Claim's Allowed Amount.

2.4    **ZAI Trustee's Determination of the Maximum Annual Payment.** The ZAI Trustee shall estimate or model the amount of cash flow anticipated to be necessary over its entire life to ensure that funds shall be available to treat all present and future holders of US ZAI PD Claims as similarly as possible. In each year, the ZAI Trustee shall be empowered to pay out all of the income earned during the year (net of taxes payable with respect thereto), together with as much of its principal (including 100% where applicable), calculated so that the application of ZAI Trust Assets funds over the PD Trust's life shall correspond with the initial and estimated anticipated future flow of claims (the **"Maximum Annual Payment"**), taking into account the Payment Percentage provisions set forth in Sections 2.3, 4.2 and 4.3. The ZAI Trustee's distributions to all Claimants for a given year shall not exceed the Maximum Annual Payment determined for that year.

4

## SECTION III

### TDP Administration

3.1     **ZAI Trust Advisory Committee (ZTAC).**  This ZAI TDP shall be administered by the ZAI Trustee in consultation with the ZTAC.  The ZAI Trustee shall obtain the consent of the ZTAC and the PD FCR on any amendments to this ZAI TDP pursuant to Section 8.1 below, and on such other matters as are otherwise required by the PD Trust Agreement, the Plan or this ZAI TDP.  The initial members of the ZTAC are Edward J. Westbrook, Esq., Darrell W. Scott, Esq. and, serving *ex officio*, The Honorable Alexander M. Sanders.  **Individual ZTAC members** shall choose their successor, unless a ZTAC member should die or become incapacitated, in which case the remaining ZTAC member and the PD FCR shall choose the successor to the deceased or incapacitated member; provided, that if for any reason the remaining ZTAC member and the PD FCR are unable to choose a successor for a deceased or incapacitated ZTAC member, application shall be made to the Bankruptcy Court by any remaining ZTAC member, the PD FCR, or the ZAI Trustee seeking appointment of a successor ZTAC member or members.  While solely an *ex officio* member of the ZTAC, the PD FCR shall be entitled to all rights and privileges of regular members of the ZTAC; *provided, however,* that the PD FCR shall vote on issues put to the ZTAC only in the event that there is a tie vote by the ZTAC members.  The PD FCR shall nominate his successor, unless he is unable to do so, in which case the successor shall be nominated by the ZTAC.  A nominated successor to the PD FCR must be confirmed by the Bankruptcy Court.

5

**3.2**    **Consent and Consultation Procedures.**  In those circumstances in which consultation or consent is required, the ZAI Trustee shall provide written notice to the ZTAC, the PD FCR, and W. R. Grace of the specific amendment or other action that is proposed.  The ZAI Trustee shall not implement such amendment, nor take such action, unless and until the parties consult.

**SECTION IV**

**Payment Percentage; Periodic Estimates**

**4.1**    **Uncertainty of Grace's US ZAI PD Asbestos Liabilities.**  To ensure substantially equivalent treatment of all present and future US ZAI PD Claims, the ZAI Trustee shall determine from time to time the percentage of the full liquidated value of the Allowed Amount that holders of present and future US ZAI PD Claims shall be likely to receive, *i.e.*, the "Payment Percentage" described in Sections 2.3 and 4.2.

**4.2**    **Computation of Payment Percentage.**  As provided in Section 2.3, the Initial Payment Percentage shall be 100% unless decreased by the ZAI Trustee as provided herein after consultation with the ZTAC and the PD FCR.  In making any such adjustment, the ZAI Trustee, the PD FCR, and the ZTAC shall take into account the fact that the holders of US ZAI Voting Claims voted on the Plan relying on the fact that the Initial Payment Percentage for all Allowed US ZAI PD Claims would be 100%.  This percentage is based on the number of US ZAI Claimants who had filed claims by the US ZAI Bar Date and had undertaken some remedial action that would qualify for reimbursement from the ZAI Trust Assets under the ZAI Term Sheet and Class Settlement Agreement.

6

The Payment Percentage shall be subject to change pursuant to the terms of this ZAI TDP and the PD Trust Agreement if the ZAI Trustee, with the consent of the ZTAC and the PD FCR, determines that an adjustment is required; provided, however, that the Payment Percentage shall not exceed 100%.  No less frequently than once every three (3) years, commencing with the first day of January occurring after the Effective Date, the ZAI Trustee shall evaluate the then-applicable Payment Percentage to assure that it is based on accurate, current information and may, after such reconsideration, change the Payment Percentage if necessary with the consent of the ZTAC and the PD FCR.  The ZAI Trustee shall also evaluate whether the then-applicable Payment Percentage should be reconsidered at shorter intervals if appropriate or if requested to do so by the ZTAC or the PD FCR.

The ZAI Trustee must base its determination of the Payment Percentage on current estimates of the number and size of present and future compensable US ZAI PD Claims, the value of the ZAI Trust Assets available for their payment, all anticipated administrative and legal expenses, and any other material matters that are reasonably likely to affect the sufficiency of funds to pay a comparable percentage of full value to all holders of US ZAI PD Claims.  When making these determinations, the ZAI Trustee shall exercise common sense and flexibly evaluate all relevant factors.

**4.3**  **Applicability of the Payment Percentage.**  If a redetermination of the Payment Percentage has been proposed in writing by the ZAI Trustee to the ZTAC and the PD FCR, but has not yet been adopted, all claims in process shall receive the

7

lower of the current Payment Percentage or the proposed Payment Percentage. However, if the proposed Payment Percentage was the lower amount but was not subsequently adopted, the Claimant shall thereafter receive the difference between the lower proposed amount and the higher current amount.  Conversely, if the proposed Payment Percentage was the higher amount and was subsequently adopted, the Claimant shall thereafter receive the difference between the lower current amount and the higher adopted amount.

If the ZAI Trustee, with the consent of the ZTAC and the PD FCR, makes a determination to increase a Payment Percentage that has been below 100% due to a material change in the estimates of the ZAI Trust Assets and/or liabilities or for any other reason, the ZAI Trustee shall also make supplemental payments to all Claimants who previously liquidated their claims and received payments based on a lower Payment Percentage.  The amount of any such supplemental payment shall be the liquidated amount of the claim in question times the newly adjusted Payment Percentage, less all amounts previously paid to the Claimant with respect to the claim, plus interest on that amount at the rate prevailing for federal court judgments from the time of the initial payment until the supplemental payment.

4.4    **Temporary Cash-Flow Adjustments to Payments.**  Since W. R. Grace has obligations to fund the ZAI Trust Assets in the PD Trust on an ongoing, periodic basis as set forth in the ZAI Term Sheet, ZAI Class Action Settlement Agreement and applicable reorganization documents, the ZAI Trustee may determine, with the consent of the ZTAC and the PD FCR, that it is not feasible at the then present time to pay ZAI Claimants 100% of the Allowed Amount due to cash flow issues

8

arising from the timing of payments to the PD Trust by W. R. Grace, and that an adjustment to the Payment Percentage is necessary.  In such an event, and notwithstanding any other provision of this ZAI TDP, the ZAI Trustee may pay a US ZAI Claimant less than 100% of the Allowed Amount of an approved claim, and instead may pay that claim and all other claims during the period of insufficient cash flow at a lower rate determined by the ZAI Trustee so as to allow all approved claims to be paid ratably during the entire period of predicted decreased cash flow.  The lower percentage payment provided for by this Section shall apply only until the receipt of the next scheduled payment from W. R. Grace.  Thereafter, any Claimant who received a payment made at a lower rate pursuant to this provision shall be entitled to a supplemental payment, prior to any other claimants in any FIFO queue, equal to the difference, if any, between the payment already received and the payment that would have been made at the current Payment Percentage, plus interest at the then prevailing federal judgment rate, from the date of the initial payment until the supplemental payment is made.

**SECTION V**

**Resolution of US ZAI PD Claims**

**5.1**    **Ordering, Processing and Payment of Claims.**

**5.1.1 Establishment of the FIFO Processing Queue.**  The ZAI Trustee shall order claims that are sufficiently complete to be reviewed for processing purposes on a FIFO basis except as otherwise provided herein (the **"FIFO Processing Queue"**).  The Claimant's position in the FIFO Processing Queue shall be determined by the date the claim is filed with the PD Trust.  Claims filed on the

9

same date shall receive the same FIFO number and an identifying subscript (*e.g.* Claim 331(a), Claim 331(b).

**5.1.2 Inapplicability of Tort System Defenses.** It is the intention of this ZAI TDP that valid US ZAI PD Claims will be paid without regard to any defenses that could have been asserted in the tort system except for those requirements set forth in this ZAI TDP:  product identification (Section 5.4.1(a) or 5.4.2), verified expenditures (Section 5.4.1.(b)), and ownership interest (Section 5.4.1(c)).  No other defenses, affirmative or otherwise, shall be considered in processing a claim, except for fraud or misrepresentation which will result in a claim being denied and the claim referred for future proceedings pursuant to Section 5.6.

**5.1.3  Processing and Payment of Claims.** US ZAI PD Claims that have been allowed shall be paid in FIFO order based on the date their allowance became final (the "**FIFO Payment Queue")**, all such payments being subject to the applicable Payment Percentage, and the Maximum Annual Payment.

**5.2**    **ZAI Resolution Procedures.**  As soon as feasible following establishment of the PD Trust, the ZAI Trustee, with the consent of the ZTAC and the PD FCR, shall adopt procedures for reviewing and liquidating all US ZAI PD Claims.  Such procedures shall require that Claimants seeking resolution of US ZAI PD Claims shall first file a proof of claim form, together with the required supporting documentation, in accordance with the provisions of Sections 5.4, 6.1 and 6.2 below.  Upon filing of a valid proof of claim form with the required supporting documentation, the Claimant shall be placed in the FIFO Processing Queue in accordance with the ordering criteria described in Section 5.1.1 above.

10

5.3    **ZAI Educational Program.**

    1.    The ZAI Trustee may, in his or her discretion, expend up to $2 million over the first three years after the Effective Date, and up to $500,000 for each three-year period thereafter, to fund an educational program about ZAI, to be developed with the advice and consent of the ZTAC and the PD FCR, and subject to the provisions of Section 5.3.2.

    2.    Initially, the content of any such educational program shall be consistent with published EPA guidance concerning ZAI and with the Debtors' US ZAI bar date notice program; provided, however, that the educational program's content shall reflect any material scientific or regulatory changes or developments that pertain to ZAI, in terms and in a manner of publication acceptable to the Reorganized Grace.  In the event the ZAI Trustee and the Reorganized Grace disagree on any matter set forth in this paragraph, the parties shall submit such disagreement to the alternative dispute resolution procedure of Section 5.7.

5.4    **Evidentiary Requirements.**  The US ZAI PD Claim Form will inform prospective Claimants that they must meet the following evidentiary requirements for their claim to be allowed:

    1.    For ZAI remedial action taken before the date on which this ZAI TDP is approved and published on the Trust website, a Claimant must submit the information set forth below:

11

(a)    the following documentary or other evidence sufficient to demonstrate that ZAI is or was installed in the structure which is the subject of the claim:

    (1)    a receipt or invoice reflecting the purchase of ZAI for the structure; or

    (2)    an affidavit from a Claimant who timely filed a US ZAI Proof of Claim and who has direct personal knowledge of events surrounding the installation of ZAI in the structure: (i) attesting that ZAI was installed in the structure; and (ii) attesting to facts establishing his or her direct personal knowledge; or

    (3)    a ZAI bag, portion of a ZAI bag, or photograph of a ZAI bag in the structure, with an affidavit from the homeowner or abatement contractor verifying that the bag was found in the structure's attic or other area in question; or

    (4)    a certification that vermiculite attic insulation was present in the structure, attested to by a licensed or certified asbestos abatement contractor who removed vermiculite from the structure; or

    (5)    a sample of the vermiculite attic insulation (minimum 2 tbsps. of material) with an affidavit by the homeowner or contractor that the insulation came from the structure in question; or

12

(6)     before and after photographs of the attic or other area in
        question depicting the presence of and removal of
        vermiculite attic insulation accompanied by an affidavit by
        the homeowner or contractor verifying that the material
        depicted in the photographs was vermiculite that was
        present in that structure; or

(7)     a laboratory report showing the presence of vermiculite in
        an attic insulation sample taken from the structure.

(b)     the following documentary evidence to establish the funds
        expended by the Claimant to remove, abate or contain ZAI:

(1)     (i) a copy of the contract or invoice specifying the cost of
        removing, abating or containing ZAI, and (ii) cancelled
        checks or credit card statements reflecting payment of the
        specific cost of removing, abating or containing ZAI; or

(2)     where any payment by the PD Trust will be
        made directly to the contractor which removed, abated or
        contained ZAI: (i) cancelled checks or credit card
        statements reflecting payment of the applicable non-
        reimbursable portion of the specific cost for removal,
        abatement or containment of ZAI, consistent with section
        5.4(b)(1); (ii) a copy of the contract or invoice for such
        work; and (iii) a certification from the contractor that the

13

work reflected in such contract or invoice was performed to completion.

(c)     an affidavit establishing that the Claimant is or was an owner or tenant of the structure.

2.     For ZAI remedial action taken after the date on which this ZAI TDP is approved and published on the PD Trust website, and providing that the testing procedure described below is implemented, a Claimant, in addition to establishing its costs under Section 5.4.1(b), and its property interest under Section 5.4.1(c) must  comply with Section 5.4.1(a)(1) or 5.4.1(a)(3), or the following:

(a)     If the ZAI Trustee and Reorganized Grace agree that there exists a feasible, reliable and economical test to distinguish ZAI from non-ZAI vermiculite attic insulation, a Claimant must submit a sample of the vermiculite attic insulation (of a size to be determined) either to a laboratory approved by the PD Trust to conduct such a test or as otherwise directed by the PD Trust.  The PD Trust will pay for the Claimant's remedial action pursuant to the ZAI TDP unless the material is determined not to be ZAI.  The cost of the test will be paid by the PD Trust and will not reduce a Claimant's recovery.

(b)     If the procedure in Section 5.4.2(a) is implemented, and the ZAI Trustee and Reorganized Grace agree after two years of experience with the test that the benefits of such a testing program are

14

insufficient to justify its continued use, the ZAI Trustee may discontinue the testing requirement of Section 5.4.2(a) and the procedure set forth in Section 5.4.1 will be reinstated for all Claimants.

(c)     In the event the ZAI Trustee and Reorganized Grace disagree on the determinations in Section 5.4.2(a) or Section 5.4.2(b), the parties shall submit such disagreement to the alternative dispute resolution procedure of Section 5.7.

3.     If the testing procedure outlined in Section 5.4.2(a) is not implemented, then a Claimant must comply with the criteria in Section 5.4.1 for ZAI remedial action taken after the date this ZAI TDP is approved and published on the PD Trust website.

4.     Subject to Section 5.4.5., claims that qualify for payment from the PD Trust in accordance with the ZAI TDP shall be paid 55% of the Allowed Value (provided the 100% payment percentage of Section 2.3 is in effect), but in no event shall the PD Trust pay more than 55% of $7,500 (the latter figure is hereafter referred to as the "Maximum Claim Amount") on any claim; *provided, however,* that (a) commencing on the fifth anniversary of the Effective Date, the Maximum Allowed Value shall be increased by the increase in the Consumer Price Index for the preceding 12 months, and (b) the Maximum Allowed Value shall be increased every year thereafter on the anniversary of the Effective Date by the increase in the Consumer

15

Price Index for the 12 months immediately preceding each such anniversary date.

5.   The ZAI Trustee shall only pay claims that are in compliance with the requirements of the Plan, the ZAI TDP and the ZAI claim form. Notwithstanding the foregoing, the ZAI Trustee may liquidate and pay up to 5 claims per year that, in the ZAI Trustee's discretion, qualify as Extraordinary Claims, but in no event shall the ZAI Trustee pay more than $100,000 cumulatively in any year with respect to such Extraordinary Claims. In addition, the ZAI Trustee may pay up to $25,000 each to the two class representatives in the <u>Barbanti</u> class action (Barbanti and Busch) in recognition of the time, effort and commitment those individuals expended in the ZAI litigation and thereby contributed to the resolution embodied in the ZAI Term Sheet and Class Settlement Agreement.

**5.5   Claims Audit Program.**  W. R. Grace, with the input of the ZTAC and the PD FCR, may develop methods for auditing the reliability of the claims and evidence submitted to the ZAI Trustee and the ZAI Trustee's processing of claims to ensure compliance with the ZAI TDP and the PD Trust Agreement. W. R. Grace shall have the right to conduct annual audits of the books, records and claim processing procedures of the PD Trust to:

1.   examine the sufficiency of the documentary and other evidence submitted by any Claimant relating to the installation of ZAI in the house or other building which is the subject of a claim, and the ZAI-related costs incurred by said Claimant; and

16

2.      confirm that PD Trust expenditures have complied with the terms of the ZAI Term Sheet, the ZAI Class Settlement Agreement, the Plan, the PD Trust Agreement and the ZAI TDP;

provided, however, that in the event of unusual claiming and/or payment activity, the Reorganized Grace may, upon reasonable notice to the ZAI Trustee, conduct audits in addition to its annual audit.

**5.6     Improper or Fraudulent Claims Activity.**  To the extent the ZAI Trustee and the Reorganized Grace determine that one or more payments made by the ZAI Trustee to US ZAI Claimants were made in violation of the terms of the ZAI Term Sheet, the ZAI Class Settlement Agreement, the Plan, the PD Trust Agreement or the ZAI TDP:

1.      the amounts of such PD Trust payments shall be added to the ZAI Trust Assets for purposes of calculating the $10 million trigger relating to deferred contingent payment obligations as set forth in the ZAI Term Sheet and PD Trust Agreement; and

2.      the PD Trust shall review its claim review and payment procedures. In the event the ZAI Trustee and the Reorganized Grace disagree over whether one or more payments were made in violation of the ZAI Term Sheet, ZAI Class Settlement Agreement, the Plan, the PD Trust Agreement or the ZAI TDP, the parties shall submit such disagreement to the alternative dispute resolution procedure of Section 5.7.

3.      To the extent any noncompliant payments were made as the result of fraudulent conduct on the part of a contractor, Claimant or other person,

17

the ZAI Trustee shall notify the Bankruptcy Court and the United States

Attorney for the District of Delaware of such fraud and shall provide all

information those entities may request in connection with any

investigation, civil proceedings or criminal proceedings.  The PD Trust

may also initiate litigation against the responsible party or parties to

recover such noncompliant payments.

**5.7**    **Arbitration.**

**5.7.1  Establishment of ADR Procedures.**  The ZAI Trustee, with the consent of

the ZTAC and the PD FCR, shall institute non-binding mediation and binding

arbitration procedures for resolving disputes: (1) between the ZAI Trustee and W.

R. Grace or the ZTAC or the PD FCR concerning the operation of the ZAI TDP;

(2) between the ZAI Trustee and a Claimant who contests any matter involving

the ZAI Trustee's decision on a US ZAI PD Claim.

Mediation shall precede arbitration and be conducted informally before a

single mediator chosen by the parties or, failing agreement, by the American

Arbitration Association.

Arbitration shall be conducted by a single arbitrator chosen either by

agreement of the parties or, absent agreement, by an arbitrator selected by the

American Arbitration Association.  The arbitration shall be conducted in a cost

effective and efficient manner.  The costs (excluding attorneys' fees) of

arbitration shall be borne by the losing party, provided that if the losing party is a

Claimant, and there is a finding by the arbitrator that the Claimant's position was

18

unreasonable, the costs of the arbitration will be deducted, to the extent possible, from the Claimant's award.

**5.7.2  US ZAI PD Claims Eligible for ADR.**  In order to be eligible for ADR of a US ZAI PD Claim, the Claimant must first request reconsideration within thirty (30) days of notification of the ZAI Trustee's decision.  The ZAI Trustee will reconsider its decision and any additional information the Claimant submits and render a decision within thirty (30) days.  If the Claimant is still dissatisfied, the Claimant must participate in a mediation before a single mediator chosen by agreement or, failing agreement, by the American Arbitration Association.  The ZAI Trustee and Claimant may submit written statements to the mediator not to exceed ten (10) pages, and any party may attend mediation by conference call.

**5.7.3  Limitations on and Payment of Arbitration Awards.**  The arbitrator shall not return an award in excess of the then-applicable Payment Percentage multiplied by the Allowed Amount of a claim, which must be computed in accordance with the ZAI TDP.  A Claimant who submits to arbitration and who accepts the arbitral award shall receive payments in the same manner as one who accepts the ZAI Trustee's original valuation of the claim.  No interest will be paid on any award on reconsideration, mediation, or arbitration due to the passage of time required by the process.

**SECTION VI**

**Claims Materials**

**6.1**     **Claims Materials.**  The ZAI Trustee shall prepare suitable and efficient claims materials ("**Claims Materials**") for all US ZAI Claimants, and shall provide such

19

Claims Materials on a website for US ZAI PD Claims, as well as in hard copy upon request.  The proof of claim form shall also include a certification by the Claimant or his or her attorney sufficient to meet the requirements of Rule 11of the Federal Rules of Civil Procedure.  In developing its claim filing procedures, the ZAI Trustee shall make every effort to provide Claimants with the opportunity to utilize currently available technology at their discretion, including filing claims and supporting documentation over the Internet or in electronic form.  The proof of claim form and instructions to be used by the ZAI Trustee shall be developed by the ZAI Trustee with the consent of the ZTAC and the PD FCR after consulting with W. R. Grace and may be changed by the ZAI Trustee with the consent of the ZTAC and the PD FCR after consulting with W. R. Grace.

6.2     **Content of Claims Materials.**  The Claims Materials shall include a copy of this ZAI TDP, such instructions as the ZAI Trustee shall approve, and a readily understandable proof of claim form written in simple English.  If requested by the Claimant, the ZAI Trustee shall accept information provided electronically.

6.3     **Withdrawal of Claims.**  A Claimant can withdraw a US ZAI PD Claim at any time upon written notice to the ZAI Trustee and file a subsequent claim, but any such claim filed after withdrawal shall be given a place in the FIFO Processing Queue based on the date of such subsequent filing.

6.4     **Confidentiality of Claimant's Submissions.**  All submissions to the ZAI Trustee by a holder of a US ZAI PD Claim, including a proof of claim form and materials related thereto, shall be treated as made in the course of settlement discussions between the Claimant and the ZAI Trustee, and intended by the parties to be

20

confidential and to be protected by all applicable state and federal privileges, including, but not limited to, those directly applicable to settlement discussions. The ZAI Trustee will preserve the confidentiality of such Claimant submissions, and shall disclose the contents thereof only to (a) W. R. Grace as part of the Claims Audit Program described in Section 5.5 above or (b) only with the permission of the Claimant, to such other persons as authorized by the Claimant, in response to a valid subpoena of such materials issued by a Court of competent jurisdiction, or pursuant to the ZAI Trustee's duty to notify the Bankruptcy Court or US Attorney of suspected fraudulent activity.  Furthermore, the ZAI Trustee shall provide the Claimant or counsel for the Claimant notice of any submission concerning suspected fraudulent activity, and a copy of any subpoena immediately upon being served.  Nothing in this ZAI TDP, the Plan or the PD Trust Agreement expands, limits or impairs the obligation under applicable law of a Claimant to respond fully to lawful discovery in an underlying civil action regarding his or her submission of factual information to the ZAI Trustee for the purpose of obtaining compensation for US ZAI PD Claims.

## SECTION VII

### General Guidelines for Liquidating and Paying Claims

7.1     **Showing Required.**  To establish a valid US ZAI PD Claim, a Claimant must meet the requirements set forth in this ZAI TDP.

7.2     **Transaction Costs to be Minimal.**  Notwithstanding any provisions of this ZAI TDP to the contrary, the ZAI Trustee shall always give appropriate consideration to the overall goal of the ZAI TDP to effectuate the processing and payment of

21

US ZAI PD Claims in a cost-effective manner so that the maximum amount of ZAI Trust Assets is preserved for payment of claims.  The ZAI Trustee shall have discretion regarding the amount of transaction costs to be expended to ensure that all valid US ZAI PD Claims are compensated while invalid claims are not. Nothing herein shall prevent the ZAI Trustee, in appropriate circumstances, from contesting the validity of any claim against the ZAI Trust Assets in order to ensure that invalid claims do not deplete the funds reserved for valid claims.

7.3    **Discretion to Vary or Suspend Payments in Event of Limited Liquidity.**

Consistent with the provisions hereof and subject to the FIFO Processing and Payment Queues, the Maximum Annual Payment, and the Percentage Payment requirements set forth herein, the ZAI Trustee shall proceed as quickly as possible to liquidate valid US ZAI PD Claims, and shall make payments to holders of such claims in accordance with this ZAI TDP promptly as funds become available and as claims are liquidated, while maintaining sufficient resources in light of the contingent payments to be made by W. R. Grace as set forth in the ZAI Term Sheet and PD Trust Agreement, to pay future valid claims in substantially the same manner.

Because the ZAI Trust Assets and income over time remain uncertain, and decisions about payments must be based on estimates that cannot be done precisely, decisions about the Payment Percentage may have to be revised in light of experiences over time, and there can be no guarantee of any specific level of payment to Claimants.  However, the ZAI Trustee shall use its best efforts to treat similar claims in substantially the same manner, consistent with its duties as

22

Trustee, and the practical limitations imposed by the inability to predict the future with precision.

In the event that the ZAI Trust Assets face temporary periods of limited liquidity, the ZAI Trustee may, with the consent of the ZTAC and the PD FCR, temporarily limit or suspend payments altogether.  In extreme situations, the ZAI Trustee may also, with the consent of the ZTAC and the PD FCR, continue to receive, but suspend processing of claims to conserve resources.

7.4    **Releases.**  The ZAI Trustee shall have the discretion to determine the form and substance of the releases to be provided to the PD Trust.  As a condition to making any payment to a Claimant, the ZAI Trustee shall obtain a general, partial, or limited release as appropriate in accordance with the applicable state or other law.  If allowed by state law, the endorsing of a check or draft for payment by or on behalf of a Claimant may, in the discretion of the ZAI Trustee, constitute such a release.

7.5    **ZAI Trustee Disclosure of Information.**  Periodically, but not less often than once a year, the ZAI Trustee shall make available to W. R. Grace, Claimants and other interested parties a summary of the number of claims that have been resolved, indicating the total amounts of the awards, the range of the awards and the average award.  The ZAI Trustee shall also make available annually to W. R. Grace, the PD FCR, and the ZTAC an audited financial statement.  The PD Trust shall file with the Bankruptcy Court an annual report containing its financial statements audited by independent registered public accounts.

23

## SECTION VIII

### Miscellaneous

8.1 **Amendments.** Except as otherwise provided herein, the ZAI Trustee may amend, modify, delete, or add to any provisions of this ZAI TDP (including without limitation, amendments to conform this ZAI TDP to advances in scientific or medical knowledge or other changes in circumstances), provided it first obtains the consent of the ZTAC and the PD FCR, except that consent must also be obtained from Grace as to any changes to Section 5.3 (ZAI Educational Program); Section 5.4 (Evidentiary Requirements); Section 5.5 (Claims Audit Program); or Section 5.6 (Improper or Fraudulent Claims Activity). The ZAI Trustee's right to amend shall not apply to the W. R. Grace funding obligations or the payment percentage of 55% as they are set forth in the ZAI Term Sheet and Class Settlement Agreement. Nothing herein is intended to preclude the ZTAC or the PD FCR from proposing to the ZAI Trustee, in writing, amendments to this ZAI TDP.

8.2 **Severability.** Should any provision of this ZAI TDP be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of this ZAI TDP. Should any provision contained in this ZAI TDP be determined to be inconsistent with or contrary to W. R. Grace's obligations under the ZAI Term Sheet, Class Settlement Agreement, the Plan or the PD Trust Agreement, the ZAI Trustee with the consent of the ZTAC and the PD FCR may amend this ZAI TDP

24

to make the provisions of the ZAI TDP consistent with the duties and obligations of W. R. Grace as set forth in those documents.

**8.3**   **Governing Law.**  Administration of this ZAI TDP shall be governed by, and construed in accordance with, the laws of the State of Delaware.

25

[THIS PAGE INTENTIONALLY LEFT BLANK]