IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| | ) | |
| In re | ) | Chapter 11 |
| | ) | |
| W.R. Grace & Co., *et. al.*, | ) | Case No. 01-01139 (JKF) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

## PHASE I TRIAL BRIEF OF FIREMAN'S FUND INSURANCE COMPANY, ALLIANZ S.P.A., F/K/A RIUNIONE ADRIATICA DI SICURTA, AND ALLIANZ SE, F/K/A ALLIANZ AKTIENGESELLSCHAFT PURSUANT TO THIRD AMENDED CASE MANAGEMENT ORDER

Dated:  June 1, 2009

STEVENS & LEE, P.C.
John D. Demmy (DE Bar No. 2802)
1105 North Market Street, 7th Floor
Wilmington, DE 19801
Telephone: (302) 425-3308
Telecopier: (610) 371-8515
Email: jdd@stevenslee.com

-and-

Leonard P. Goldberger
Marnie E. Simon
(Members PA Bar)
1818 Market Street, 29th Floor
Philadelphia, PA 19103-1702
Telephone:  (215) 751-2864/2885
Telecopier:  (610) 371-7376/8505
Email: lpg@stevenslee.com
Email: mes@stevenslee.com

ATTORNEYS FOR FIREMAN'S FUND INSURANCE COMPANY, ALLIANZ S.p.A., f/k/a  RIUNIONE ADRIATICA DI SICURTA, AND ALLIANZ SE, f/k/a ALLIANZ AKTIENGESELLSCHAFT

## <u>TABLE OF CONTENTS</u>

I.    PRELIMINARY STATEMENT ........................................................................................1

II.    BACKGROUND ...........................................................................................................7

    A.    Insurers' Policies ...............................................................................................7

    B.    Treatment of Insurers' Policies Under The First Amended Plan ..................................7

    C.    The Trust and the TDPs .........................................................................................9

III.    ARGUMENT ...............................................................................................................10

    A.    Insurers Satisfy The Constitutional Standing Requirements of Article III ................10

    B.    Insurers Satisfy The Statutory Standing Requirements Under
        Sections 1109(b) and 1128 of the Bankruptcy Code. ................................................14

    C.    The Third Circuit Has Consistently Recognized The Right Of Insurers To
        Participate In Confirmation Proceedings ...................................................................16

    D.    The First Amended Plan's Purported "Insurance Neutrality" Provision Fails to
        Eliminate the Injury Threatened By Confirmation of the First Amended Plan. ..........16

        1.    Section 7.15 of the First Amended Plan Entitled "Insurance Neutrality" Is
            Unintelligible and Illusory ....................................................................................17

        2.    The Plan Improperly Abrogates the Anti-Assignment Provisions of the
            Policies ................................................................................................................20

        3.    The Plan Improperly Impacts Insurers' Rights Under Other Coverage
            Defenses Available to Insurers Under Its Policies and Applicable Law ..............21

        4.    The Plan Impairs Insurers' Rights Under Their Policies Because Asbestos
            PI Claims Will Be Resolved By A Trust With Fiduciaries That Have
            Potential and Actual Conflicts of Interest ............................................................25

        5.    The Plan Improperly Impairs Insurers' Ability to Obtain § 524 Injunctive
            Relief ...................................................................................................................30

    E.    Insurers Have Standing To Object To The First Amended Plan, Even If The
        Court Finds That It Is Insurance Neutral. ...................................................................31

IV.    CONCLUSION ............................................................................................................33

(i)

# TABLE OF AUTHORITIES

**CASES**

*In re A.P.I., Inc.*,
  331 B.R. 828 (Bankr. D. Minn. 2005) ...................................................................................33

*Alliance for Clean Coal v. Miller*,
  44 F.3d 591 (7th Cir. 1995) ...........................................................................................12

*Alumax Mill Products, Inc. v. Congress Financial Corp.*,
  912 F.2d 996 (8th Cir. 1990) ..........................................................................................4

*In re Amatex Corp.*,
  755 F.2d 1034 (3d Cir. 1985).........................................................................................15

*Association of Data Processing Serv. Orgs. v. Camp*,
  397 U.S. 150 (1970).......................................................................................................12

*AXA Marine & Aviation Ins. (UK) Ltd. v. Seajet Indus. Inc.*,
  84 F.3d 622 (2d Cir. 1996).............................................................................................29

*Baker v. Carr*,
  369 U.S. 186 (1962).......................................................................................................10

*Baron & Budd, P.C. v. Unsecured Asbestos Claimants*,
  321 B.R. 147 (D.N.J. 2005) ...........................................................................................16

*Baur v. Veneman*,
  352 F.3d 625 (2d Cir. 2003)...........................................................................................12

*In re Berkshire Foods, Inc.*,
  302 B.R. 587 (Bankr. N.D. Ill. 2003) ............................................................................16

*Bowman v. Wilson*,
  672 F.2d 1145 (3d Cir. 1982).........................................................................................11

*Bryant v. Yellen*,
  447 U.S. 352 (1980).......................................................................................................12

*Canadian Lumber Trade Alliance v. United States*,
  425 F. Supp. 2d 1321 (CIT 2006) ..................................................................................12

*Cargill, Inc. v. JWH Special Circumstance LLC*,
  959 A.2d 1096 (Del. Ch. 2008).....................................................................................28

*Clinton v. New York*,
  524 U.S. 417 (1998).................................................................................................12, 13

*In re Combustion Eng'g, Inc.*,
    391 F.3d 190 (3d Cir. 2004)..............................................................14, 16, 17, 31, 32, 33

*In re Combustion Eng'g, Inc.*,
    295 B.R. 459 (Bankr. D. Del. 2003) ....................................................................32

*In re Congoleum*,
    426 F.3d 675 (3d Cir. 2005)..............................................................................15

*In re Congoleum Corp.*,
    362 B.R. 167 (Bankr. D. N.J. 2007) ....................................................................4

*Consolidated Edison Co. of N.Y. v. Allstate Ins. Co.*, 98 N.Y.2d 208 (2002) ............................25

*Danvers Motor Co. v. Ford Motor Co.*,
    432 F.3d 286 (3d Cir. 2005) (Alito, J.) ................................................................11

*DuPont v. Delaware Trust Co.*,
    320 A.2d 694 (Del. 1974) ................................................................................28

*In re Dykes*,
    10 F.3d 184 (3d Cir. 1993)................................................................................33

*Elliot v. Metropolitan Cas. Ins. Co. of N.Y.*,
    250 F.2d 680 (10th Cir. 1957) ..........................................................................29

*Franchise Tax Bd. of Cal. v. Alcan Aluminum Ltd.*,
    493 U.S. 331 (1990)........................................................................................12

*J.P. Realty Trust v. Pub. Serv. Mut. Ins. Co.*, 476 N.Y.S.2d 325 (App. Div. 1984) ....................25

*In re Kaiser Group Int'l, Inc.*,
    272 B.R. 846 (Bankr. D. Del. 2002) ..................................................................28

*In re L & J Anaheim Assocs.*,
    995 F.2d 940 (9th Cir. 1993) ............................................................................33

*Lac Du Flambeau Band v. Norton*,
    422 F.3d 490 (7th Cir. 2005) ......................................................................12, 13

*Law v. Law*,
    1997 Del. Ch. LEXIS 134 (Del. Ch. 1997)..........................................................28

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)..................................................................................11, 14

*In re Marin Motor Oil, Inc.*,
    689 F.2d 445 (3d Cir. 1982)..............................................................................14

SL1 924173v2/021630.00003

*In re Morton*,
  298 B.R. 301 (B.A.P. 6th Cir. 2003).......................................................................16

*Motor & Equip. Mfrs. Ass'n v. Nichols*,
  142 F.3d 449 (D.C. Cir. 1998).............................................................................12

*Ocean Advocates v. United States Army Corps of Eng'rs*,
  361 F.3d 1108 (9th Cir. 2004)...........................................................................12

*Pacific Legal Found. v. Goyan*,
  664 F.2d 1221 (2d Cir. 1981)............................................................................13

*Penn. Gen. Ins. Co. v. Aetna Cas. & Surety Co.*, 761 N.Y.S.2d 571 (App. Div. 2003) ...............25

*In re PPI Enterprises (U.S.), Inc.*,
  324 F.3d 197 (3d Cir. 2003)..............................................................................33

*Sabre v. Dep't of Transp.*,
  429 F.3d 1113 (D.C. Cir. 2005).........................................................................12

*Smith v. Arthur Andersen LLP*,
  421 F.3d 989 (9th Cir. 2005) ...............................................................................4

*In re Standard Insulations, Inc.*,
  138 B.R. 947 (Bankr. W.D. Mo. 1992)................................................................16

*In re Virginia Mansions Apartments, Inc.*,
  102 B.R. 444 (Bankr. W.D. Pa.), *aff'd*, 108 B.R. 557 (W.D. Pa. 1989)................................16

*Westport Taxi Serv., Inc. v. Adams*,
  571 F.2d 697 (2d Cir.1978)................................................................................12

*Whitmore v. Arkansas*,
  495 U.S. 149 (1990)..........................................................................................14

*In re Zale Corp.*,
  62 F.3d 746 (5th Cir. 1995) .................................................................................4

## STATUTES & RULES

11 U.S.C. § 502(a) ...............................................................................................3

11 U.S.C. § 524(g).......................................................................................5, 20, 29, 31

11 U.S.C. § 524(g)(4)(A)(ii)...............................................................................30

11 U.S.C. § 524(g)(4)(B)(i) .................................................................................29

11 U.S.C. § 1109(b) ...........................................................................................15

11 U.S.C. § 1123(a)(5)........................................................................................................20

11 U.S.C. § 1124(1) ...........................................................................................................32

11 U.S.C. § 1126(f)............................................................................................................32

11 U.S.C. § 1128(b)...........................................................................................................15

Fed. R. Bankr. P. 7001.........................................................................................................2

Fed. R. Bankr. P. 9013.........................................................................................................2

Fed. R. Bankr. P. 9014.........................................................................................................2

**OTHER AUTHORITIES**

43 Am. Jur.2d Insurance § 1384 ........................................................................................22

American Bar Association Model Rule 1.7 .........................................................................28

U.S. D. Del Local Rule 83.6(d) .........................................................................................28

7C J. Appleman, Insurance Law & Prqactice § 4681 (Rev. ed. 1979) ..............................22

SL1 924173v2/021630.00003

Pursuant to the Third Amended Case Management Order entered by this Court on May 5, 2009 [Docket No. 21544] (the "CMO"), Fireman's Fund Insurance Company ("FFIC"), Allianz S.p.A., f/k/a Riunione Adriatica di Sicurta ("Allianz S.p.A."), Allianz SE, f/k/a Allianz Aktiengesellschaft ("Allianz SE"), and possibly other related insurance companies (collectively, "Insurers"), by their attorneys, submit this brief (this "Phase I Trial Brief") in connection with Phase I proceedings, as defined by the CMO, in respect of the *First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code of W.R. Grace & Co., et al., the Official Committee of Asbestos Personal Injury Claimants, the Asbestos PI Future Claimants' Representative, and the Official Committee of Equity Security Holders Dated as of February 27, 2009* (the "First Amended Plan").[1]

## I.    PRELIMINARY STATEMENT[2]

Pursuant to the CMO, the Confirmation Hearing is bifurcated into two phases: (x) Phase I, scheduled to be heard on June 22-25, 2009, on certain specifically defined issues, including "(i) whether the Plan improperly affects the rights of the Debtors' insurers (in their capacity as insurers, but not creditors); [and] (ii) the standing of the Debtors' insurers (in their capacity as insurers, but not creditors) to litigate confirmation objections that involve issues other than those described in Section (i) ..."  CMO at ¶ 1; and

---

[1]    All capitalized terms not otherwise defined in this Trial Brief refer to those terms as currently defined in the First Amended Plan and/or in the Disclosure Statement relating to the First Amended Plan (the "Disclosure Statement") in the forms in which such documents appear on the docket as of this date.

[2]    On May 20, 2009, Insurers filed their *Final Phase I And Non-Surety Claim Related Phase II Objections Of Fireman's Fund Insurance Company, Allianz S.P.A., F/K/A Riunione Adriatica Di Sicurta, And Allianz Se, F/K/A Allianz Aktiengesellschaft To Confirmation Of The First Amended Joint Plan Of Reorganization* [Docket No. 21781].

1

(y) Phase II, scheduled to be heard on September 8-11, 2009, which is for everything that is not a Phase I issue.

      As to Phase I, however, the Plan Proponents have done nothing to date – including, without limitation, filing a motion to strike or dismiss either Insurers' preliminary confirmation objections (filed on January 5, 2009) or the final confirmation objections (filed on May 20, 2009) – to properly frame, both on a procedural and a contextual basis, or to directly bring, the Phase I issues to the Court.   Thus, the Phase I proceeding is premature and out of context, as a decision with respect to insurer standing (or the asserted "insurance neutrality" of the First Amended Plan) can be made only within the context of the First Amended Plan, the Confirmation Hearing, Debtors' grounds for asserting that Insurers lack standing, and the specific confirmation objections that have been asserted by Insurers.[3]  What the Plan Proponents should have done, to comply with applicable procedural rules and to obtain a ruling from the Court within the bounds of procedural and substantive due process, is file a motion seeking to dismiss or strike insurer confirmation objections.  At such time, in accordance with applicable rules and orders relating to motion practice in this case, Insurers could respond to the Plan Proponents specific contentions why insurers lack standing.   In the absence of such a procedure, however, Phase I is procedurally and substantively unfair and prejudicial to Insurers and

---

[3]    Under the Federal Rules of Bankruptcy Procedure, a Bankruptcy Court can hear and determine contested matters in one of two ways – by motion (*see* Fed. R. Bankr. P. 9013) or by adversary proceeding (*see* Fed. R. Bankr. P. 7001, *et seq.*).  Bankruptcy Rule 9013 provides, in relevant part, that "a request for an order, ... shall be by written motion  ... [which] ... shall state with particularity the grounds therefor, and shall set forth the relief or order sought."  *See* Fed. R. Bankr. P. 9013.  Of course, a motion that is opposed becomes a contested matter under Fed. R. Bankr. P. 9014.  The Plan Proponents have filed neither a motion, nor an adversary proceeding, seeking any determination that Insurers in their capacities as insurers have standing to object to confirmation of the First Amended Plan and also have not set forth the grounds upon which they assert such to be the case.

should be folded into Phase II, at which time Insurers' actual objections to confirmation of

the First Amended Plan (and standing to raise them) can be considered in the appropriate

procedural and substantive context.

             Nevertheless, Insurers clearly have standing to object to confirmation of the

First Amended Plan on a number of bases.  First, having filed a proof of claim, FFIC is a

creditor of Grace in an amount in excess of $43 million relating to a surety bond claim (the

"Surety Claim").  FFIC's Surety Claim relates to a pre-petition "Indemnity Agreement"

under which Grace agreed to indemnify FFIC for any loss suffered under a supersedeas

bond (the "Bond") issued by FFIC.  FFIC issued the Bond on Grace's behalf so that Grace

could appeal an underlying judgment (the "Edwards Judgment") that five asbestos personal

injury claimants obtained against Grace pre-petition.  The Edwards Judgment awarded five

claimants compensatory damages against Grace totaling $21 million, punitive damages in

the amount of $21.5 million, and post-judgment interest at the rate of 12 percent per annum

(interest accrued to date on the compensatory damages portion of the judgment amounts to

approximately $22 million).  On March 27, 2003, FFIC timely filed its proof of claim in

this bankruptcy case asserting an unsecured claim for the full amount of the Bond,

$43,038,931.91, which is the maximum amount that Grace is obligated to pay to FFIC

pursuant to the Indemnity Agreement, should FFIC incur any loss as a result of furnishing

the Bond.  The proof of claim also asserts a secured claim based on a $13 million letter of

credit provided by Wachovia Bank to secure Grace's obligations to FFIC under the

Indemnity Agreement, including the payment of premiums.  FFIC has drawn

approximately $1.8 million on the letter of credit due to Grace's failure to pay premiums

owed on the Bond, leaving collateral of $11,204,000 available.  To date, there has been no

3

objection to FFIC's proof of claim, hence the claim is undisputed.  *See* 11 U.S.C. § 502(a).

On May 20, 2009, FFIC filed its *Phase II "Surety Claim" Related Objections Of Fireman's Fund Insurance Company, As A Creditor, To Confirmation Of The First Amended Plan Of Reorganization* [Docket No. 21791].  Thus, as an actual creditor of Grace, FFIC clearly has standing to object to confirmation of the First Amended Plan.

Moreover, and apart from the Surety Claim, Insurers have standing to object to confirmation of the First Amended Plan because confirmation will directly impair their rights and/or increase their burdens under their insurance policies and under both bankruptcy and applicable non-bankruptcy law.  Insurers issued excess general liability insurance policies (collectively, the "Policies")[4] to one or more of the Debtors.  The contractual and other rights of the Insurers are directly, adversely and improperly effected by the First Amended Plan; and the so-called "Insurance Neutrality" language in the Plan does not ameliorate such impairments.  As a result, the Insurers are parties-in-interest with standing to object to confirmation.  S*ee, e.g.*, *In re Congoleum Corp.*, 362 B.R. 167, 173-75 (Bankr.  D.  N.J. 2007).[5]

Standing doctrines, whether constitutional, statutory or prudential, are designed to ensure that courts only adjudicate concrete grievances of parties threatened

---

[4]    *See* Insurers' Compendium of Exhibits ("COE") relating to this Phase I Trial brief, at Exhibit A.  The COE will be filed separately on the Court's docket substantially contemporaneously with the filing of this Phase I Trial Brief.

[5]    An illustrative example is Insurers' clear standing to object to confirmation of the First Amended Plan to the extent that it purports to release, enjoin, or otherwise alter their respective rights against the Debtors and non-debtor third parties. S*ee, e.g.*, *Smith v.  Arthur Andersen LLP*, 421 F.3d 989, 1001 (9th Cir. 2005) ("That the Non-Settling Defendants have not articulated the precise nature of the 'indemnity or other[ ]' claims they are barred from asserting does not demonstrate a lack of formal legal prejudice"); *In re Zale Corp.*, 62 F.3d 746, 751 n.13 (5th Cir. 1995) (rejecting argument that injunction did not harm insurer and holding that "the fact that the injunction bars [the insurers] in any way gives them standing to appeal it"); *Alumax Mill Products, Inc. v.  Congress Financial Corp.*, 912 F.2d 996, 1002 (8th Cir. 1990) (party stripped of indemnity and contribution rights has standing to object).

4

with genuine injury rather than abstract disputes.  Insurers easily meet this requirement. They face concrete and genuine injury by confirmation of the First Amended Plan because their contractual rights under their insurance policies will be impaired by, *inter alia*: (i) Debtors handing over to the Asbestos PI Trust, administered by and for asbestos claimants and their lawyers, the exclusive right to process and pay asbestos claims without affording Insurers the opportunity to defend or consent to the settlement and payment of such claims,[6] (ii) Debtors (and others) being released and/or discharged from their obligations to Insurers under their insurance policies and otherwise under non-bankruptcy law, (iii) Debtors improperly assigning their Asbestos Insurance Rights to the Asbestos PI Trust, contrary to anti-assignment provisions of the Insurers' policies and applicable state law, (iv) cutting off certain of Insurers' coverage defenses, in the absence of any pending coverage litigation, and (v) impairing Insurers' right to assert and fully litigate claims for contribution against Settled Asbestos Insurance Companies and non-Debtor entities.  In addition, although § 524(g) expressly contemplates that Insurers in their capacities as insurers are eligible for § 524(g) protection, the First Amended Plan imposes an artificial deadline for Insurers to enter into settlement agreements pursuant to which

---

[6]    Insurers were not invited to participate in the process of devising the Asbestos PI Trust (the "Trust") or the TDP, which were negotiated solely by representatives of claimants (the ACC, on behalf of present claimants, and the FCR, on behalf of future claimants) and there is no provision in the TDP that would permit insurers to participate in the investigation, evaluation, defense, processing or payment of claims by the Trust.  Rather, the Insurers will be handed, as a *fait accompli*, a bill reflecting what purports to be the predetermined liability of its insured.  In short, this case is another example of a phenomenon that one commentator has noted in mass-tort bankruptcies: "Defendants are increasingly making common cause with the plaintiffs lawyers in their quest to empty out that great Platonic ATM machine, the insurance industry."  Parloff, *Welcome to the New Asbestos Scandal*, Fortune, Sept. 6, 2004, at 186, 202.  *See* COE, at Exhibit B.  This is even more starkly reflected here in light of Debtors' abandonment of their positions in the estimation proceedings that the size of their asbestos problem was vastly overestimated by the ACC and FCR and based on scads of unmeritorious claims that would not be compensated in the tort system.  In these, and other respects, confirmation of the First Amended Plan threatens Insurers with concrete and genuine injury in fact.

5

§ 524(g) protection can be obtained.  Thus, confirmation of the First Amended Plan would impair Insurers' bankruptcy rights by establishment, without any legitimate reason for such, of an artificial "drop-dead" date for § 524(g) relief.

Moreover, inclusion of so-called "insurance neutrality" language in the First Amended Plan does not deprive the Insurers of standing to object to confirmation of the First Amended Plan.  In the first instance, the insurance neutrality language included in § 7.15 is unintelligible and illusory.  In addition, the insurance neutrality language does not allow Insurers' contractual rights to pass through the bankruptcy case unaffected. Numerous Insurer' rights are impaired under the First Amended Plan, despite the insurance neutrality language set forth in § 7.15.  Finally, the limited remedies provided to the Insurers in § 7.15 (being able to contest coverage or offset a liability to the Trust with a Contribution Claim) do not redress the injuries that will be caused to Insurers by the artificial impairment of their contractual and state law rights that will occur upon confirmation of the First Amended Plan.

Plan Proponents are attempting to preemptively derail, on standing grounds, confirmation objections raised by Insurers prior to the Confirmation Hearing.  Without the benefit of the Plan Proponents' arguments relating to standing and insurance neutrality, Insurers are unfairly forced to speculate and argue in a vacuum.  As the case law in the Third Circuit will attest, however, Insurers are afforded a broad right of standing to participate in plan confirmation proceedings.  Accordingly, this Court should find that the First Amended Plan is not insurance neutral and reject the Plan Proponents' challenge to the Insurers' standing to object to confirmation of the First Amended Plan, on both procedural and substantive grounds.

## II.    BACKGROUND

### A.  Insurers' Policies

Exhibit 6 to the First Amended Plan includes a list of Asbestos Insurance Policies that the Plan Proponents assert provide coverage to Debtors.  [Docket No. 20874 Ex. 6, Sch. 1].  Some of the Asbestos Insurance Policies included in Exhibit 6 were issued by the Insurers (collectively, the "Policies").   The Policies generally "follow form" to certain underlying insurance policies, expressly incorporating certain terms and conditions of such underlying insurance policies by reference.   Each of the Policies contains anti-assignment provisions, cooperation provisions and provisions prohibiting settlement by the insured without insurer consent.  *See* COE, at Exhibit A.

### B.  Treatment of Insurers' Policies Under The First Amended Plan

The First Amended Plan, provides, *inter alia*, (i) for creation of the Trust pursuant to § 524(g) of Title 11 of the United States Code (the "Bankruptcy Code"), to which all present and future Asbestos Personal Injury Claims ("Asbestos PI Claims") against Debtors will be channeled, (ii) lawyers for asbestos personal injury claimants having effective control of the Trust, and (iii) the Trust having the sole authority, with no court oversight and no participation by insurers, to process and pay Asbestos PI Claims.

The First Amended Plan contemplates that the Trust will demand that Insurers pay the claims, at the values arbitrarily established by the TDPs (or as such values may hereafter be adjusted by the Trust in its absolute and unfettered discretion, *see* Docket No. 20874, Exs. 2 Asbestos PI Trust Agreement (the "Trust Agreement") and 4 (TDP).

Significantly, and contrary to Insurers' rights under the Policies, the Trust will seek coverage from Insurers without Insurers' corresponding ability to participate in

7

the defense of, or in the processing and payment of the claims as contemplated by the TDPs, and without even being made aware of the basis on which the claim was asserted against the Trust.  Insurers submit that the discretion afforded to the Trust (as controlled by the TAC) along with the secretiveness of the process will ensure that Asbestos PI Claims that otherwise would not receive compensation in the tort system will be paid (and likely at inflated claim values).

Those people administering the Trust, i.e., the Trustees and TAC (and processing and paying claims under the TDPs), are the very lawyers for many of the asbestos claimants seeking payment from the Trust.  Of course, those lawyers have every economic incentive to maximize recoveries to their (and their colleagues') Asbestos PI Claimant-clients, at the expense of Insurers.  Certainly, the contractual rights enjoyed by Insurers under their Policies – the insured's duty to cooperate, the identity of interest between Debtors and their insurers, the Insurers' right to associate in the defense of claims, and so on – will be substantially impaired by confirmation of the First Amended Plan. These contract rights will be replaced by a system that has as its primary function processing and payment – not the strict investigation, evaluation, review and defense – of Asbestos PI Claims. Thus, because of this actual injury, Insurers have standing to object to confirmation.

Of course, in the non-TDP based tort system, Debtors and their insurers were on the same side of the tort system adversarial process, and asbestos claimants and their lawyers were on the other.  The First Amended Plan will overturn this in a manner not contemplated by, and contrary to, the terms of the Policies.  Upon confirmation, asbestos claimants and their lawyers will effectively control the processing and payment of

8

their own asbestos-related claims, without any provision in the TDP expressly authorizing

participation by Insurers, and in the face of the "exclusive" right of the Trust to process

and pay claims contained in many places in the First Amended Plan, the Trust Agreement

and the TDP.  *See* First Amended Plan §§ 3.1.6, 5.2; Trust Agreement  §§ 1.2, 2.1; and

TDP §§ 2.2, 5.1, 5.10, 5.11.  Afterward, the Trust will present a bill to Insurers.  The way

the First Amended Plan, the Trust Agreement and the TDP are written make it clear that

neither the Reorganized Debtors, the Trust nor anyone else has any duty to cooperate with

Insurers or otherwise comply with the Policies in respect of any Asbestos PI Claims that

may be tendered to Insurers.[7]

To be sure, no party that will be involved with the Trust has an interest in

ensuring that asbestos-related claims are thoroughly vetted and paid only in a manner

consistent with the evidentiary standards and burdens of proof employed in the tort system

– interests that, pre-petition, were shared by the Debtors and Insurers and upon which the

Policies were written and executed.  Indeed, the only entities that will have an incentive to

ensure that these standards are met post-confirmation – Insurers– are expressly excluded

from the process.

### C.  The Trust and the TDPs

Any discussion of the terms of the TDPs must be underscored by the fact

that the Trustee and the fiduciaries for Asbestos PI Claimants – the TAC made up of

claimants' lawyers and the FCR – have unfettered discretion to change anything about the

---

[7]    Also, the Trust, dominated by asbestos claimant's lawyers, will, in effect, have authority over any
settlement of coverage issues with insurers, *see* Trust Agreement § 2.2 (f)(viii); a situation that simply
does not exist outside of bankruptcy.  In effect, the Trust and the TDPs, as would be implemented by
confirmation of the First Amended Plan, is truly a situation in which the "fox is guarding the hen
house," and represents a world turned upside down, at the expense of Insurers.

9

Trust or the TDPs that they wish at any time after confirmation without any approval from anyone else, including either the Bankruptcy Court or the District Court. *See* Trust Agreement, § 2.2(f); TDPs § 5.3(a)(3). With respect to (i) lax medical and evidentiary requirements, *see* TDPs pages 23-40, (ii) compromised connectivity standards, *see* pages 40-43, (iii) elimination of meritorious defenses, *see* pages 20-23, and (iv) the TDPs providing no assurances that asbestos claimants will be limited to one satisfaction, the Trust and the TDPs as proposed amply demonstrate that the Trust structure in respect of the determination of liability of Insurers' policyholder – Grace – for asbestos claims, will result in harm to Insurers.

Once claims have been processed and paid as contemplated by the Trust, with all the deviations from applicable non-bankruptcy law as outlined above, the Trust will present a bill to Insurers. However, as of such time, Insurers' rights under the Policies and applicable non-bankruptcy law will have been impaired. Insurers will have lost important coverage defenses, solely by virtue of confirmation of the First Amended Plan, that they had prior to confirmation. They will have been injured in fact. Thus, Insurers have standing to object to confirmation of the First Amended Plan.

## III.  ARGUMENT[8]

### A.  Insurers Satisfy The Constitutional Standing Requirements of Article III

A litigant has standing under Article III of the United States Constitution if it has "a personal stake in the outcome of the controversy as to assure . . . concrete

---

[8]  Because there can be no question that FFIC has standing as a creditor to object to confirmation of the First Amended Plan, the argument contained herein will focus on the Insurers standing in their capacities as insurers to object to confirmation.

10

adverseness." *Baker v. Carr*, 369 U.S. 186, 204 (1962).  A "personal stake" is established

when the litigant alleges (1) it has suffered, or is threatened with, an "injury in fact" to a

judicially cognizable interest; (2) the injury is fairly traceable to the challenged action; and

(3) a favorable decision will redress that injury.  *See, e.g.*, *Lujan v. Defenders of Wildlife*,

504 U.S. 555, 560-61 (1992).

As the Third Circuit has recently noted, "[i]njury-in-fact is not Mount

Everest."  *Danvers Motor Co. v. Ford Motor Co.*, 432 F.3d 286, 294 (3d Cir. 2005) (Alito,

J.); *Bowman v. Wilson*, 672 F.2d 1145, 1151 (3d Cir. 1982) (party need only "allege[]

some specific, 'identifiable trifle' of injury"(internal citations omitted)).  Among the most

straightforward of injuries cognizable under Article III is an injury to a party's economic

interests.  *See Danvers*, 432 F.3d at 291 ("economic injury is one of [the] paradigmatic

forms" of "injury-in-fact").

Confirmation of the First Amended Plan and establishment of the Trust

threaten Insurers with precisely the type of economic injury that satisfies Article III.  The

First Amended Plan would do so in at least three ways.

*First*, creation of the Trust and the processing and payment of claims

through that Trust and the TDPs will fundamentally change the way in which the Debtors'

liability is determined, upon which, among other things, Insurers' coverage obligations

rest.  The TDPs will determine the criteria and values for allowance of claims—criteria

that are deliberately set at a level sufficiently lax, with values sufficiently high, to garner

the support of the plaintiffs' bar.  Funding of the Trust with approximately $1.250 billion[9]

---

[9]     Based on the present value of the Asbestos PI Deferred Payment Agreement [Docket No. 20873 §
2.11.2.4].

11

and the assignment of future Insurance Rights will surely draw a multitude of claims, whether meritorious or not, thereby inflating the number and value of claims asserted against the Debtors.

Of course, the economic injury with which the First Amended Plan threatens Insurers may not occur immediately upon confirmation; the Trust still would have to establish its right to coverage under the Insurers' Policies.  But by resolving the amount of the insured's liability, the first step necessary to inflict that injury will have taken place, giving rise to a present, albeit contingent, liability for Insurers.  As the Supreme Court has repeatedly held, however, an economic injury contingent on subsequent events is sufficient for Article III standing.  *See Clinton v.  New York*, 524 U.S. 417, 430-31 (1998) (President's use of the line-item veto to revive a contingent liability caused the plaintiff to "suffer[] an immediate, concrete injury" giving rise to Article III standing); *see also Lac Du Flambeau Band v. Norton*, 422 F.3d 490, 498 (7th Cir. 2005)

12

("[T]he present impact of a future though uncertain harm may establish injury in fact for standing purposes.").[10]

Even if Insurers prevail in a coverage dispute, they still would incur the burden and expense of defending against claims, some of which may have merit and some of which may not, on a much more expedited aggregated basis than they would have in the non-bankruptcy tort system. *See, e.g.*, *Pacific Legal Found. v. Goyan*, 664 F.2d 1221, 1224 (2d Cir. 1981) (participant in administrative proceedings had standing to challenge regulation that would likely lead more parties to participate in such proceedings by reimbursing their costs, making it "quite possible" that the non-profit would have to expend more effort to monitor such proceedings).

*Second*, confirmation of the First Amended Plan likely will affect bargaining leverage in any coverage litigation or negotiated effort to resolve coverage

---

[10]   Indeed, the Supreme Court has routinely found standing when the injury was considerably more remote than that posed here. For example, the Court has found injury-in-fact when a change in the market environment "might entail some future loss of profits" for a market competitor, *Association of Data Processing Serv. Orgs. v. Camp*, 397 U.S. 150, 152 (1970); when a tax on a corporation "threaten[ed]" indirect financial injury to a corporation's shareholder, *Franchise Tax Bd. of Cal. v. Alcan Aluminum Ltd.*, 493 U.S. 331, 336 (1990); or when regulatory action decreased the availability of land that buyers might (but might not) have been able to purchase absent the regulation, *Bryant v. Yellen*, 447 U.S. 352, 367 (1980). *See also Sabre v. Dep't of Transp.*, 429 F.3d 1113, 1119 (D.C. Cir. 2005) (government action that "shapes the competitive environment in the . . . industry" creates sufficient injury to confer standing); *Ocean Advocates v. United States Army Corps of Eng'rs*, 361 F.3d 1108, 1120 (9th Cir. 2004) (finding when "an increased risk of harm can itself be injury in fact for standing," and noting that "nothing necessitates a showing of existing environmental harm"); *Baur v. Veneman*, 352 F.3d 625, 633-34 (2d Cir. 2003) (noting that potential exposure to an increased risk is an injury in fact sufficient to confer standing); *Motor & Equip. Mfrs. Ass'n v. Nichols*, 142 F.3d 449, 457 (D.C. Cir. 1998) (given new regulations, party's product "may be" more difficult to use, which will "presumably reduce the demand" for that product; party is thus "likely to be financially injured"); *Alliance for Clean Coal v. Miller*, 44 F.3d 591, 594 (7th Cir. 1995) ("But the showing of specific 'lost opportunities' is neither required to establish standing nor reasonably expected under the circumstances of this case."); *Westport Taxi Serv., Inc. v. Adams*, 571 F.2d 697, 700-01 (2d Cir.1978) (finding injury in fact when Plaintiffs are "likely to be financially injured"); *Canadian Lumber Trade Alliance v. United States*, 425 F. Supp. 2d 1321, 1349 n.26 (CIT 2006) (noting that "requiring the demonstration of actual losses would be contrary to the principle that plaintiffs need not wait until they are actually injured to have standing" and determining standing even though "the effect of subsidies may not be immediately clear; rather, the full effect of a subsidy may not be felt for years").

disputes.  By fundamentally changing the procedure through and timing by which the

insured's liability is determined, with no opportunity for Insurers to contest the validity of

the claims – the relative positions of the parties to a subsequent coverage dispute or

litigation is undeniably altered.  Accordingly, confirmation of the First Amended Plan

would alter Insurers' bargaining leverage – a significant economic injury that the Supreme

Court has recognized as sufficient for Article III standing, *Clinton*, 524 U.S. at 432-33 –

and force Insurers to resolve its coverage disputes with the Debtors (or the Trust) "under

the cloud" created by confirmation, *Lac Du Flambeau*, 422 F.3d at 498.

   *Third*, the First Amended Plan purports to preclude Insurers from raising

coverage defenses based on the anti-assignment provisions in the Policies.  Plainly, a

proceeding that threatens to impair a party's contractual rights poses an "injury-in-fact" to

a judicially cognizable interest, giving such party a "personal stake" in the outcome of

those proceedings.[11]

   Insurers easily satisfy the other requirements for Article III standing – that

the injury be fairly traceable to the challenged action (*i.e.* confirmation of the First

Amended Plan)  and that a favorable decision (*i.e.* denial of confirmation) would redress

that injury.  *See, e.g.*, *Lujan*, 504 U.S. at 560-61.  Establishment of the Trust,

implementation of the TDPs, and assignment of the Policies, all as proposed by the First

---

[11] Even if the Court were to conclude that the assignment proposed by the First Amended Plan is valid, such would be irrelevant for standing purposes.  A merits-before-standing approach is directly contrary to Supreme Court precedent:  standing is a "threshold inquiry" that "in no way depends on the merits" of the case.  *See Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990) (internal quotations omitted).  Standing merely requires that there be a case or controversy to which the judicial power may extend under Article III, and hence that a party have a concrete grievance sufficient to assure adversity.  A party threatened with injury to its contractual rights has exactly such a grievance.  And that is true regardless whether a court may ultimately determine, after adjudicating the merits of that controversy, that such rights can lawfully be impaired.

Amended Plan would be the direct cause of Insurers' economic injury: but for these bankruptcy cases, Insurers would not be confronted with the prospect of an inflated and accelerated indemnification obligation with respect to excess general liability insurance policies against which few asbestos bodily injury claims ever have been asserted.

### B. Insurers Satisfy The Statutory Standing Requirements Under Sections 1109(b) and 1128 of the Bankruptcy Code.

As the Third Circuit has made clear, standing in bankruptcy proceedings is broad, reflecting Congress' liberal extension of standing to any "party in interest" to "raise . . . and be heard" on "any issue" in a bankruptcy case. 11 U.S.C. § 1109(b); s*ee, e.g.*, *Combustion Engineering*, 391 F.3d 190, 214 n.21 (3d Cir. 2004) (recognizing "the broad right of participation in the early stages of a bankruptcy proceeding"); *In re Marin Motor Oil, Inc.*, 689 F.2d 445, 451 (3d Cir. 1982) (party in interest may be heard "on any issue in a case").

Moreover, Congress has specifically granted statutory standing to any "party in interest" to "object to confirmation of a plan." 11 U.S.C. § 1128(b). The Third Circuit has interpreted the term "party in interest" to include any party with "a practical stake in the outcome of the proceedings" and has emphasized that it is to be "construed broadly." *In re Amatex Corp.*, 755 F.2d 1034, 1041-42 (3d Cir. 1985). The interference with and impairment of Insurers' contractual rights more than suffices to meet the liberal standards for participation in bankruptcy court, under which a party need only show a "practical stake" in the outcome of the proceedings. *See Id.* at 1041.

Insurers have a "practical stake in the outcome of the proceedings" that plainly satisfies the "party in interest" standard. Creation of the Trust will result in a loss of rights Insurers enjoy under the Policies (including the right to defend or associate in the

15

defense of claims, as well as the requirement that its consent be obtained to the settlement of claims), possible inflated liability for manufactured claims, which Insurers will be asked to indemnify, and the stripping away of certain coverage defenses that Insurers would have outside of bankruptcy (including the defense to coverage based on an improper assignment of the Policies).

### C.  The Third Circuit Has Consistently Recognized The Right Of Insurers To Participate In Confirmation Proceedings

Under the expansive interpretation of standing under § 1109, the Third Circuit has consistently recognized the right of insurers to participate in bankruptcy proceedings.  For example, in *In re Congoleum*, 426 F.3d 675, 685 (3d Cir. 2005), the Third Circuit held that insurance companies whose policies were impacted by a bankruptcy case have sufficient Article III standing to object to unlawful conduct or conduct that questions the integrity of the bankruptcy process.  In that case, the Court of Appeals allowed insurers standing to object to retention of special counsel because "[i]t is an issue based on procedural due process concerns that implicate the integrity of the bankruptcy court proceeding as a whole."  *Id.*

At a minimum, insurance companies clearly have standing to object to a plan provision if it "diminishes their property, increases their burdens, or impairs their rights."  *In re Combustion Eng'g, Inc.*, 391 F.3d at 217 ("person aggrieved" standard, which is more restrictive than bankruptcy court standing, confers standing "to challenge a provision of the Plan only if that provision 'diminishes their property, increases their burdens, or impairs their rights'").  The incontrovertible fact that Insurers will be requested to pay Asbestos Personal Injury Claims confers absolute standing upon Insurers because "parties with *potential* responsibility to pay claims against debtors regularly have standing

16

to participate in bankruptcy cases." *Baron & Budd, P.C. v. Unsecured Asbestos Claimants*, 321 B.R. 147, 158-59 (D.N.J. 2005) (holding that insurers easily met Article III standing requirements and affirming bankruptcy court's decision that insurers had standing to object to plan confirmation and to bring a motion under Fed. R. Bankr. P. 2019).[12]

### D. The First Amended Plan's Purported "Insurance Neutrality" Provision Fails to Eliminate the Injury Threatened By Confirmation of the First Amended Plan.

The First Amended Plan's proposed "insurance neutrality" provision is, as the Asbestos PI Future Claimants' Representative (hereafter, the "FCR") candidly admits, unintelligible. It is riddled with exceptions. It also does not eliminate the various injuries the First Amended Plan will impose on Insurers, which affords them standing to object to confirmation. If insurance neutrality is the Plan Proponents' true objective, neutrality could easily be accomplished by allowing the Policies to "pass through" the bankruptcy unaffected by confirmation of the First Amended Plan, with the Debtors' and Insurers' rights and obligations remaining entirely unaffected post-confirmation. Moreover, even assuming, *arguendo*, that the First Amended Plan could be made truly insurance neutral in

---

[12]     *See also In re Morton*, 298 B.R. 301, 306 (B.A.P. 6th Cir. 2003) (a party that "*may be* liable . . . to the creditors" for the debtors' debts "is a party in interest"); *In re Berkshire Foods, Inc.*, 302 B.R. 587, 588-90 (Bankr. N.D. Ill. 2003) (where debtor had "possible insurance coverage" for a claim against it, insurer was party in interest); *In re Standard Insulations, Inc.*, 138 B.R. 947, 950 (Bankr. W.D. Mo. 1992) (in asbestos-related bankruptcy, where "[d]ebtor's insurance was the only asset of consequence," debtor's insurers were parties in interest); *In re Virginia Mansions Apartments, Inc.*, 102 B.R. 444, 445 (Bankr. W.D. Pa.) (indemnitor had standing to contest claim against debtor), *aff'd*, 108 B.R. 557 (W.D. Pa. 1989).

the absence of a pass through arrangement, § 7.15 of the First Amended Plan is inadequate.[13]

1. Section 7.15 of the First Amended Plan Entitled "Insurance Neutrality" Is Unintelligible and Illusory

David Austern, the FCR, is an attorney who has practiced law for 45 years and has substantial experience in large asbestos bankruptcy cases.[14]  In preparing for his deposition over a two-week period, Mr. Austern reviewed several Plan Documents, including the Plan itself; he reviewed Mr. Lockwood's deposition transcript; he listened-in on a portion of Mr. Lockwood's deposition; and he met with his own counsel twice.  (*See* Deposition Transcript of David Austern, COE, at Exhibit C, pp. 14-18).  Despite his experience in other cases and his involvement and preparation in this case, the FCR (one of the Plan Proponents) readily admitted he does not understand § 7.15 of the Plan.[15]

---

[13]    In that § 7.15 seems to have many different meanings to many different people, and is not necessarily capable of one uniform interpretation, it is clear that § 7.15 does not provide as much protection as was provided by the neutrality language considered by the Third Circuit in *In re Combustion Engineering*, 391 F.3d 130 (3d Cir. 2005).  In *Combustion Engineering*, the Third Circuit examined what was described as a "super-preemptory" insurance neutrality provision which provided insurers with certain protections that governed the post-confirmation rights of the debtors and their insurers notwithstanding any provisions to the contrary in the confirmation order, the plan and the plan documents.  In other words, the protections afforded to the insurers trumped any contrary provisions in the plan, confirmation order or related documents.  That is clearly not the case here, as explained in more detail below.

[14]    He is general counsel of the Manville Personal Injury Settlement Trust (for over 21 years) (Austern Dep. at pp. 13-14) and he also serves as Future Claimants' Representative for the Combustion Engineering Asbestos Trust.  (Id. at pp. 22-24).

[15]    Q.    … Are there particular provisions in the Plan that you don't understand?

A.    Yes.

Q.    Are there any that stick out in your mind in that regard?

A.    Can I look at the Plan for a moment?

Q.    Sure

A.    By way of example, 7.15 of the document.

Q.    That's one that you don't understand?

A.    Well, it's one I have trouble trying to understand.

18

Richard Finke, one of the Debtors' Rule 30(b)(6) designees, and the one specifically designated with respect to the "Scope and Operation of Section 7.15 of the Plan entitled 'Insurance Neutrality,' and any other purported insurance neutrality provisions in the Plan and Plan Documents," testified that he understands § 7.15. (*See*

---

Q.    You are in good company.

…

Q.    Do you believe Section 7.15 to be unclear?

A.    To me.

(Austern Dep. at pp. 44-48).  When questioned further as to how § 7.15 was intended to operate, and how i tinteracts with other Plan provisions, Mr. Austern frequently and candidly admitted, he did now know:

Q.    So does (b) [*i.e.,* § 7.15(b)] then supersede subsection (a) [*i.e.,* § 7.159a)]?

Q.    I don't know.

…

Q.    Okay.  My question is, do you have an understanding as to whether the language in 7.15(a) supersedes the language in 11.9?

A.    I don't know.

Q.    Do you know whether it's intended to?

A.    No.

…

Q.    My question is, do you have an understanding as to whether Section 7.15 entitled insurance Neutrality preempts Section 7.7 insofar as the Debtors's [sic] insurers are concerned?

[Objection]

THE WITNESS:  I don't know.

Q.    … My question is whether the preemptory language that appears in Section 7.15(a) preempts the conditions set forth in Section 7.8, as [you] understand it?

[Objections]

THE WITNESS:  I don't know

…

Q.    Do you understand 7.15(h) to bind all of the Debtors' insurers to all of the releases and injunctions set forth in the Plan?

[Objections]

THE WITNESS:  I don't know.

(Austern Dep. at pp. 48-61).

19

Deposition Transcript of Richard Finke, COE, at Exhibit D, pp. 75-77).  When questioned

about the interplay between § 7.15 (Insurance Neutrality) and § 11.9 (Exculpation),

Mr. Finke stated that latter trumped the former, notwithstanding the super-preemptory

language in the former.  (*Id.* at pp. 75-86).  He opined that § 11.9 is encompassed within

the language of § 7.15(h), even though there is no specific reference to § 11.9 in

§ 7.115(h).  (*Id.* at p. 80).  He also testified that if an insurer fit within the undefined

phrase "the beneficiaries of the Asbestos PI Trust" that appears in § 7.15(b), such as the

holder of an "Indemnified Insurer TDP Claim" as used in § 5.13 of the TDP, then the

insurer was, in fact, bound by the Plan, Plan Documents, and Confirmation Order.  (*Id.* at

pp. 86-90).  If Mr. Finke is correct then the Plan is not "insurance neutral" as to any insurer

that holds an "Indemnified Insurer TDP Claim."  (Compare § 7.15(a) with § 7.15(b)).

      Peter van N. Lockwood, the Rule 30(b)(6) designee for the Asbestos PI

Trust ("ACC"), testified that § 7.15 is "sort of a for[u]m selection provision."  (*See*

Deposition Transcript of Peter van N. Lockwood, COE, at Exhibit E, pp. 58-63).  That, of

course, begs the question why § 7.15 is entitled "Insurance Neutrality."  When asked

whether §11.9 (Exculpation) was preempted by § 7.15, and whether various releases in the

Plan were preempted by § 7.15, Mr. Lockwood provided equivocal responses.  (*Id.* at pp.

170-76).  With respect to the interaction between § 7.15 and § 11.9, for example, at one

point he said he did not think § 7.15 would override § 11.9 "because the exculpation

provision comes under the heading bankruptcy issues," and therefore is presumably within

the carve-out in the definition of the term Asbestos Insurance Defenses, only later to testify

that the question "is almost impossible to answer" without more information.  (*Id.* at pp.

171-173).

On its face, and even as interpreted by the Plan Proponents, § 7.15 – with its various subparts, circularity, undefined terms, carve-outs, and otherwise conflicting provisions – fails to achieve anything approaching clarity or "insurance neutrality."

2.  <u>The Plan Improperly Abrogates the Anti-Assignment Provisions of the Policies</u>

Pursuant to the Plan and the Asbestos Insurance Transfer Agreement [Docket No. 20874, Ex. 6], the Debtors and certain non-Debtor affiliates under Asbestos Insurance Policies issued by Insurers will be transferred to the Trust.  *See* Plan § 7.2.2  A condition of confirmation is that this Court find that the transfer of the Asbestos Insurance Rights is valid and enforceable against Insurers.  *See* Plan §§ 7.7 (uu) and 7.15(g).  The First Amended Plan's denial of the Insurers' rights to assert defense to coverage under the Policies' anti-assignment provisions affords them standing with regard to confirmation and demonstrates in and of itself how the First Amended Plan is not insurance neutral.

Insurers are well aware of this Court's rulings in other cases that insurance policy anti-assignment clauses are preempted in § 524(g) cases by § 1123(a)(5).  Insurers respectfully disagrees with the Court's analysis of this issue, which it believes is incorrect; and note that appeals are pending in the Third Circuit Court of Appeals in two cases in which this Court has ruled on this issue.  Because the parties have agreed that the resolution of this issue belongs in Phase II, Insurers will not belabor the point here; however, in order to fully preserve its arguments for appeal, Insurers will include in their trial brief on Phase II issues an accompanying Appendix containing the arguments it will raise on this issue.

3. <u>The Plan Improperly Impacts Insurers' Rights Under Other Coverage
Defenses Available to Insurers Under Its Policies and Applicable Law</u>

Insurers' unsettled Asbestos Insurance Policies impose specific obligations

on the Debtors.  For instance, the Debtors are required to provide timely notice of any

occurrence or  claim that may be covered by the pertinent policy.  Moreover, Insurers have

a right to associate in the investigation and defense of claims asserted against the Debtors

as well participating in the settlement of Asbestos PI Claims.  Notwithstanding the

"insurance neutrality" language of § 7.15, the Plan, Trust Agreement, and TDPs strip the

Insurers of their contractual and legal rights under their respective Policies to participate in

evaluating, defending against, or settling Asbestos PI Claims.  *See* TDPs, §5.3; First

Amended Plan, § 3.1.6.  Instead, it is the Trust, under the conflicted and watchful eyes of

the TAC, that does everything.  The Debtors' insurers play no role, except to have

demands for coverage made against them by the Trust after the fact – with respect to

claims resolved by the Trust pursuant to a Trust Agreement and TDP drafted by the ACC

and FCR (without insurer input or consent) – and, to the extent the insurers dispute such

coverage, to be sued by the Trust.  Once sued, the insurers are left merely to assert

coverage defenses, subject to exceptions negotiated by the Plan Proponents, again without

insurer input.

Under applicable non-bankruptcy law, these conditions to coverage are

enforceable against the insured, and failure of the insured to satisfy these conditions would

give rise to defenses to coverage.  Indeed, an insurer's right to associate in the defense of

covered claims is fundamental to the structural and economic relationships that form the

basis of an insurance policy.  *See* 43 Am. Jur.2d Insurance § 1384; 7C J. Appleman*,*

*Insurance Law and Practice* § 4681 (Rev. ed. 1979).  This right is so fundamental that its

SL1 924173v2/021630.00003

deprivation will vitiate an insurer's obligation to provide coverage under a policy.  S*ee* 43 Am. Jur.2d Insurance § 1384.  Debtors admit that, under the Plan, Insurers will not be allowed to participate in the investigation, defense or settlement of Asbestos PI Claim.  *See* Debtors' Response to Insurers' Request For Admission No. 16, COE, at Exhibit F. Moreover, under the Plan, claimant information is kept secret and undisclosed to Insurers notwithstanding the insureds' obligations under the Policies.  S*ee* TDP § 6.5.

Sections 7.7(tt) and 7.7(uu) of the Plan would require the Court to find that "the duties and obligations of the Asbestos Insurance Entities" are not diminished or reduced by the discharge of the Debtors under the Plan and the transfer of Asbestos Insurance Rights to the Trust.  The Plan, however, does not purport to transfer the *Debtors'* obligations under the Asbestos Insurance Policies to the Trust, nor does it provide for those obligations to survive undiminished upon confirmation.  On the contrary, Plan §§ 7.13 and 8.1.1 state that, except as otherwise provided in the Plan, any obligations of the Debtors that are not specifically retained are eliminated.  Although Plan § 7.15 might be meant to preempt §§ 7.1 and 8.1.1 with respect to elimination of the Debtors' obligations under the policies, such conclusion cannot be drawn from the Plan, as drafted.

Putting aside the legal infirmities with this self-serving scheme of claims resolution, from a purely economic standpoint, the procedures for the resolution of Asbestos PI  Claims set forth in the TDP violate the central allocation of rights and responsibilities in the Policies issued to the Debtors by Insurers.  The Plan overturns the economic relationships established in the Policies by substituting the procedures set forth in the TDP for the contractual obligations of the Debtors to cooperate with the Insurers in the defense of claims.  The Plan establishes a payment matrix to which the Insurers have

23

not consented and excludes the Insurers from the process of claims settlement.  Thus, the

Plan and TDP fundamentally upset the economic structure of the Debtors' insurance

policies and overturn central contractual rights established in those insurance policies in

ways that severely impact the economic ability of the Insurers to manage the financial risks

that they assumed in issuing the policies. [*See* Docket No. 21167, Ex. A – Declaration of

George L. Priest (the "Priest Report")].

Section 7.15(f) provides additional exceptions to insurer neutrality by its

use of the defined term "Asbestos Insurer Coverage Defense."  Section 7.15(f) provides

that nothing in the Plan, the Plan Documents, the Confirmation Order, or any finding of

fact and or conclusion of law with respect to confirmation or consummation of the Plan

shall limit the right of any Asbestos Insurance Entity, in any Asbestos Insurance Action, to

assert any "Asbestos Insurer Coverage Defense."  The definition of Asbestos Insurer

Coverage Defense, however, contains a clause that could potentially swallow insurance

neutrality.  Specifically, pursuant to Section 1.1(16) of the Plan, Asbestos Insurer

Coverage Defenses "do not include any defense that (i) the Plan or any of the Plan

Documents do not comply with the Bankruptcy Code…."  Insurers' attempts to clarify the

scope and meaning of Section 1.1(16) of the Plan yielded nothing more from the Plan

Proponents than "the Plan is a publicly available document and, being in writing, speaks

for itself."

Finally, the so-called insurance neutrality provision attempts to enjoin

Insurers' rights to pursue Contribution Claims against non-Debtor entities, including

Settled Asbestos Insurance Companies.  Section 7.15(i) provides that such Contribution

Claims may be asserted as a defense or setoff against any claim for coverage brought by

24

the Trust against the non-settled insurer arising out of the Trust's payment on the same

underlying Asbestos PI Claim.  The notion underlying this provision appears to be that the

non-settled insurer would be made whole inasmuch as any payment due the Trust from the

non-settled insurer on account of the underlying Asbestos PI Claim would be reduced by

the share that would otherwise have been owing by the Settled Asbestos Insurance

Company on the Contribution Claim.  Section 7.15(i), however, does not deal with the

situation where a Contribution Claim by a non-settled insurer arises independently of any

suit by the Trust seeking coverage.

    For example, a non-debtor third party might make a claim as an additional

insured under the Policies.  To the extent that the non-debtor third parties are successful in

obtaining defense costs or coverage under the Policies, then, absent the bankruptcy,

Insurers would have the right, under the "other insurance" clauses of the Policies or

pursuant to state law, to seek contribution from other insurers that issued policies covering

the non-debtor third party, including policies issued by other insurers to Grace where the

non-debtor third party is an additional insured.[16]  However, to the extent that the policies

issued by other insurers are Settled Asbestos Insurance Policies, then Insurers' ability to

seek contribution would be cut off by the Asbestos PI Channeling Injunction.  Moreover, if

the policies were issued by Asbestos Insurance Entities that are not Settled Asbestos

Insurance Companies, Insurers' ability to seek contribution would be cut off by the

Asbestos Insurance Entity Injunction.  Insurers would not have the ability to recover on

their Contribution Claims, and, thus, their rights are impaired, in this scenario as the Plan's

---

[16] *See, e.g., Consolidated Edison Co. of N.Y. v. Allstate Ins. Co.*, 98 N.Y.2d 208 (2002); *Penn. Gen. Ins. Co. v. Aetna Cas. & Surety Co.*, 761 N.Y.S.2d 571 (App. Div. 2003); *J.P. Realty Trust v. Pub. Serv. Mut. Ins. Co.*, 476 N.Y.S.2d 325 (App. Div. 1984).

only redress to insurers in this scenario is a set off in the context of a coverage action by the Trust.  In this respect, therefore, the First Amended Plan, if confirmed, will impair Insurers' contract and state law rights, with respect to which the First Amended Plan cannot be considered insurance neutral, and, Insurers' have standing to object.

Moreover, Insurers have standing to object to a plan that purports to deny them rights with respect to the resolution of claims for which coverage will be sought, even if an "insurance neutrality" provision otherwise purports to permit insurers to assert defenses to coverage.  *See, e.g.*, *In re Congoleum*, June 7, 2004 Hearing Tr. at 62-63 ("The ability of the insurers to contest coverage is not co-extensive with the right to participate in the litigation or the settlement of claims," and therefore, "the possible infringement" of such rights "gives the insurers sufficient stake in the plan to have . . . standing.").  *See* COE, at Exhibit G.

    4.    <u>The Plan Impairs Insurers' Rights Under Their Policies Because Asbestos PI Claims Will Be Resolved By A Trust With Fiduciaries That Have Potential and Actual Conflicts of Interest</u>

Under the Plan, Asbestos PI Claims will be channeled to the Trust and resolved pursuant to the proposed TDP.  The Trust Agreement states that the Trust's goal is to provide "fair, equitable and substantially similar treatment for all PI Trust claims," given the finite resources of the proposed Trust.  *See* Trust Agreement § 1.2.  As presently structured, however, there is a significant risk that the Trust will not achieve this goal – and may, instead, end up paying unmeritorious claims or paying meritorious claims in amounts greater than appropriate.  This is so, *inter alia*, because one set of Trust fiduciaries – the TAC – have a significant conflict of interest between the fiduciary duties

26

they owe to the Trust and the individual fiduciary duties they owe, pursuant to the relevant Rules of Professional Responsibility, to their individual claimant-clients.

The designated members of the TAC are Russell W. Budd, Esq. of the law firm Baron & Budd, PC; John D. Cooney, Esq. of the law firm Cooney & Conway; Joseph F. Rice, Esq. of the law firm Motley Rice LLC; and Perry Weitz, Esq. of the law firm Weitz & Luxenberg. [*See* Docket No. 20874, Ex. 2 at 43-50]. Messrs. Budd, Cooney, Rice, and Weitz were selected to be the TAC members by the Asbestos PI Committee. [*See* Docket No. 20872 at § 7.2.6]. The Asbestos PI Committee – which consists of asbestos personal injury claimants – was appointed on April 13, 2001 by the U.S. Trustee. [*See* Docket No. 20873 at 53]. Each TAC member's law firm has a client on the Asbestos PI Committee, and those clients delegate to the law firm that represents them their duties as a member of Asbestos PI Committee. *See* Lockwood Deposition at COE, Exhibit E, pp. 121-25. So, as a practical matter, Messrs. Budd, Cooney, Rice, and Weitz were directly involved in their own selection as TAC members. *See Id.* at pp. 124-25 ("But, at the end of the day, through some sort of nomination or informal self-nomination, speeches, lobbying, discussions, what have you, there came a time at which the committee voted to select these four members.").

The ACC, acting in conjunction with the FCR, drafted the proposed Trust Agreement and TDP, with apparently no changes being made at the behest of Debtors. *See Id.* at pp. 381-383, 637-642. The insurers were entirely excluded from the drafting process, only seeing the proposed Trust Agreement and TDP when filed with the Court.

The Trust Agreement reposes significant powers in the TAC. By way of example only, the TAC has the power to adopt the Trust By-Laws and amend them, as

27

well as authority to amend the Trust Agreement and the TDP.  Trust Agreement

§§ 2.2(f)(xi)-(xii); 7.3.  The TAC has authority to change the Disease Levels, Scheduled,

Maximum or Average Values or Medical/Exposure Criteria applicable to claims.  Trust

Agreement § 2.2(f)(iii); TDP § 5.3(b)(1), (3).  The TAC can redetermine the Payment

Percentages.  Trust Agreement § 2.2(f)(i); TDP § 2.3.  Furthermore, the TAC can develop

methods for auditing the reliability of medical evidence, and may establish binding and

non-binding arbitration procedures.  TDP §§ 5.8, 5.10(a).  The TAC is also given influence

over Trustee compensation, removal of trustees, and selection of successor trustees.  Trust

Agreement §§ 2.2(f)(ix), 4.2(c), 4.3(a).

   In light of these powers, members of the TAC must be deemed fiduciaries

to all trust beneficiaries – not merely to present Asbestos PI Claimants.  But whether

deemed fiduciaries to all Trust beneficiaries, or only the holders of present Asbestos PI

Claims, the members of the TAC have actual, significant, and irreconcilable conflicts of

interest.  As attorneys representing thousands of individual claimants who will be making

claims against the Asbestos PI Trust, the members of the TAC have a fiduciary duty,

rooted in Rules of Professional Responsibility, to represent those claimants zealously and

to take all necessary and appropriate actions to ensure that their claims are paid, and are

paid at the highest possible amounts, from the finite funds that will be available from the

Trust – even where this might involve proposing amendments to the Trust.

   However, as fiduciaries to all beneficiaries of the Trust (or even only to

present Asbestos PI Claimants), the members of the TAC have fiduciary duties, pursuant to

the law of fiduciaries and trusts, to act in the best interests of all beneficiaries to the Trust

(including all or at least all present Trust beneficiaries) in allocating the finite Trust funds,

28

even where this would prove detrimental to their individual claimant clients.[17]  As

fiduciaries to the Trust, the members of the TAC also owe a duty to ensure that the Trust

does not pay unmeritorious claims, and that the Trust defends against such unmeritorious

claims; whereas, as attorneys representing individual claimant clients, they have a duty to

seek compensation for their clients from the Trust even if they believe that their client-

claimants may not in fact be deserving of payment.

This actual conflict of interest of the TAC members is set out, and discussed

in detail, in the expert Report of James B.  Shein of the Kellogg School of Management at

Northwestern University.  [Docket No. 21020 Ex. A - Expert Report of James B. Shein

(the "Shein Report")].  As Professor Shein states in his expert report: "[T]he structure of

the Trust creates a potential for abuse and for the Trustees and TAC to act contrary to the

governing principle in the Trust that all claimants be treated fairly and equitably with

claims made against the Trust and that the Trust not deplete its assets by paying

undeserving claims."  Shein Report at 2.

The TAC's conflict of interest is stark and irreconcilable.  The TAC

members will have to breach their duties as Trust fiduciaries or their duties as counsel to

their individual clients.  Either way, a Plan should not be approved that contains such built-

---

[17]    See, *e.g.*, *Law v. Law*, 1997 Del. Ch. LEXIS 134, *7 (Del. Ch. 1997) (a "'trustee is under a duty so to
administer the trust as to preserve a fair balance between [beneficiaries that are to some extent
antagonistic]."); *DuPont v. Delaware Trust Co.*, 320 A.2d 694, 699 (Del. 1974) (quoting Scott on
Trusts § 232 (3d ed.)); *Cargill, Inc. v. JWH Special Circumstance LLC,* 959 A.2d 1096, 1113 & n.68
(Del. Ch. 2008) (listing duties of trustee, including the duty of loyalty); Model Rules of Professional
Conduct of the American Bar Association ("ABA Model Rules") 1.7, cmt. 1 ("Loyalty and independent
judgment are essential elements in the lawyer's relationship to a client."). Applying the U.S. District
Court for the District of Delaware's Local Civil Rule 83.6(d), another judge of this Court has held the
professional conduct of bar members should be governed by the ABA Model Rules. *In re Kaiser Group
Int'l, Inc.*, 272 B.R. 846, 849 (Bankr. D. Del. 2002). Given the nationwide scope of this proceeding, it is
appropriate for this Court to apply the ABA Model Rules, although the apposite Delaware Local Rules
are identical.

29

in unnecessary conflicts.  The Court should remedy this conflict in obligations by eliminating the role of the TAC[18] or by insisting that the TAC be composed of individuals with no conflicting interests.

These structural defects and inherent conflicts of interest are further exacerbated by the indemnification and exculpation provisions contained in the Plan and Trust Agreement.  *See* Plan § 11.9  Those provisions significantly immunize members of the TAC from any liability resulting from negligent breach of their fiduciary duties to the Trust, its beneficiaries, and to their individual clients.  *See* Shein Report at ¶¶ 29-37.

These provisions of the Trust Agreement and TDP empowering the TAC to exercise control over the management of the Trust improperly purport to legitimize the same forms of economic conflict of interest condemned by legal doctrines prohibiting policyholder-claimant collusion.  *See* Priest Report at pp. 15-16, 18.  *See also Elliot v. Metropolitan Cas. Ins. Co. of N.Y.*, 250 F.2d 680, 683-84 (10th Cir. 1957) and *AXA Marine & Aviation Ins. (UK) Ltd. v.  Seajet Indus. Inc.*, 84 F.3d 622, 627-28 (2d Cir. 1996) (applying New York law).  These provisions, therefore, render the insurance neutrality provision illusory.

5.  The Plan Improperly Impairs Insurers' Ability to Obtain § 524 Injunctive Relief

Section 524(g)(4)(A)(ii) of the Bankruptcy Code expressly provides this Court with the power to enjoin actions by Asbestos PI Claimants against Settled Insurance

---

[18]    There is no requirement under Bankruptcy Code § 524(g) for the Trust to have a TAC. Nor is there any requirement for a "Futures Representative" once a § 524(g) trust is formed. The statute only requires that the Court appoint a legal representative for the purpose of protecting the rights of the holders of future demands in connection with the proceedings leading to the issuance of the channeling injunction, not thereafter. *See* 11 U.S.C. § 524(g)(4)(B)(i). Thus, the Trust has a TAC and Futures Representative not because it is statutorily-mandated, but rather merely because the ACC and FCR wanted it, and the other Plan Proponents agreed to it.

30

Companies where the settled insurer is "alleged to be directly or indirectly liable for the conduct of, claims against, or demands on the debtor to the extent such alleged liability of such [insurer] arises by reason of ... [the] provision of insurance to the debtor or a related party ...."  Pursuant to this provision, the Plan seeks from the Court an Asbestos PI Channeling Injunction that would protect "Settled Asbestos Insurance Companies." However, the term "Settled Asbestos Insurance Companies" is defined to mean only an Asbestos Insurance Entity that enters an Asbestos Insurance Settlement Agreement "**prior** the conclusion of the Confirmation Hearing." Plan § 1.1(200).  (Emphasis supplied).

These limitations on who can qualify as a Settled Asbestos Insurance Company improperly affect the rights of Insurers as insurers to obtain the full protection of an Asbestos PI Channeling Injunction in the event that it reaches a settlement subsequent to Confirmation.  The Bankruptcy Code contains no "timing" restriction on granting a § 524(g) channeling injunction to insurers.  A settlement reached after Confirmation will benefit the Trust as much as a pre-confirmation settlement, and reaching a comprehensive settlement of coverage disputes will be more likely if the insurer knows that it is buying its peace from asbestos-related claims arising out its having provided insurance to the Debtors.  Much like the case of other bankruptcies,[19] this Court should have the full discretion given it by the Bankruptcy Code to issue a Channeling Injunction authorized by § 524(g) to protect insurers that enter into coverage settlements following Confirmation. The timing restrictions on obtaining § 524(g) protection therefore render the insurance neutrality provision of the Plan illusory.

---

[19]   *See*, *e.g.*, Fourth Amended Joint Plan of Reorganization (As Modified), Dkt. No. 12620, In re Federal-Mogul Global, Inc., No. 01-10578 (JKF) ("Federal-Mogul") (Bankr. D. Del. Jun. 5, 2007) at §1.1.198 (emphasis added); Order Confirming Fourth Amended Joint Plan of Reorganization for Debtors and Debtors-in-Possession (As Modified), Dkt. No. 13674, Federal-Mogul (Bankr. D. Del. Nov. 8, 2007).

### E.  Insurers Have Standing To Object To The First Amended Plan, Even If The Court Finds That It Is Insurance Neutral.

As the Third Circuit recognized in *Combustion Engineering*, "for purposes of standing, the question is not whether the Plan impaired the claims of insurers, but whether it 'diminishes their property, increases their burdens, or impairs their rights.'" *Combustion Engineering*, 391 F.3d at 218.

Thus, when the matter relates to standing, the issue is not whether a claim that Insurers might assert against the estates in this bankruptcy case is unimpaired as a result of insurance neutrality language, but instead it is whether the First Amended Plan increases Insurers' burdens, diminishes its property or impairs its rights.  In *Combustion Engineering* insurers were not allowed to vote on the plan because the Court found they were "unimpaired" within the meaning of § 1124(1) of the Bankruptcy Code,[20] because the subject plan purportedly "preserved" all rights under the insurers' policies.  *In re Combustion Engineering, Inc.,* 295 B.R. 459 (Bankr.  D.  Del. 2003) ("The insurers insist that they are impaired but the Plan has been modified to make clear that *nothing* impairs their rights.  Because their rights are unimpaired, they are not entitled to vote and there is no occasion to address in the Plan or adjudicate in this confirmation process non-core

---

[20]    Section 1124(1) of the Bankruptcy Code provides:

> Except as provided in Section 1123(a)(4) of this title, a class of claims or interests is impaired under a plan unless, with respect to each claim or interest of such class, the plan –
> (1) leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest; ....

With respect to voting on a plan of reorganization, § 1126(f) of the Bankruptcy Code provides:

> Notwithstanding any other provision of this section, a class that is not impaired under a plan, and each holder of a claim or interest of such class, are conclusively presumed to have accepted the plan, ....

32

issues such as potential breach by Debtor that might lead to a claim by insurers."), vacated, 391 F.3d 190 (emphasis in original).

The court's determination that insurers were not impaired was based on language in the plan that preserved insurers' rights under their policies.  This ruling tracks the language of § 1124, which provides that a claimant is not impaired if the plan "leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest."  11 U.S.C. § 1124(1).

Thus, at most, satisfactory insurance neutrality language (which is not present here), merely allows the conclusion that insurance companies are not impaired for voting purposes.  It does not, however, translate into a finding that insurance companies lack standing to object to a plan.[21]

That insurance neutrality concepts are distinct from standing concepts also flows logically from the way courts have approached the "insurance neutrality" issue. Insurance neutrality is a legal issue – it depends upon the language of a plan.  *See, e.g., In re L & J Anaheim Assocs.,* 995 F.2d 940, 942 (9th Cir. 1993) ("Whether a claim is impaired under Section 1124 is a question of law, subject to de novo review.").  Conversely, it is well-accepted that standing is a fact-based determination and depends upon whether the relief that is being sought will adversely affect the party which asserts it has standing.  *In*

---

[21]    In *In re A.P.I., Inc.*, 331 B.R. 828, 862 (Bankr. D. Minn. 2005), the Minnesota bankruptcy court summarily concluded, without any analysis, that "[h]olders of unimpaired claims lack standing to vote and to object to confirmation."  In support of this sweeping statement, the court cited the Third Circuit's opinion in *In re PPI Enterprises (U.S.), Inc.*, 324 F.3d 197,  206 (3d Cir. 2003).  However, there is nothing in *PPI* that would support such a conclusion and, in fact, *PPI* supports the opposite conclusion – i.e., an entity who is unimpaired under Section 1124, still has standing to challenge confirmation.  In that case, the objecting party objected to confirmation and moved to dismiss the subject case, arguing that it had been filed in bad faith.  Judge Walsh and the Third Circuit, however, did not throw the entity out on standing grounds, but instead carefully evaluated the merits of the confirmation objections and, after rejecting them on the merits (not on standing grounds), confirmed the plan.

33

*re Dykes*, 10 F.3d 184, 188 (3d Cir. 1993) ("Whether an appellant is a "person aggrieved" is generally considered a question of fact for the district court."); *Combustion Engineering*, 391 F.3d at 214 (same).  The only way to reconcile the views that insurance neutrality is a legal issue and that standing is a factual issue, is to recognize, as this Court must in light of *Combustion Engineering*, that Insurers have standing to object to the First Amended Plan, even if the Court finds it to be insurance neutral.

## IV.    CONCLUSION

The First Amended Plan is not insurance neutral as the provisions of § 7.15 do not protect Insurers from provisions of the First Amended Plan that will expressly impair Insurers' existing rights under their Policies and applicable law.  Because their rights will be directly and substantially impaired by confirmation, they have standing to object.  Accordingly, in the event the Plan Proponents hereafter may formally request, by appropriate motion or adversary proceeding, that the Court determine issues with respect to standing and whether the First Amended Plan is truly insurance neutral, Insurers respectfully request that the Court enter an order determining that they (i) have standing to be heard generally with respect to confirmation of the First Amended Plan, and (ii) that the First Amended Plan is not insurance neutral.

Dated:  June 1, 2009     STEVENS & LEE, P.C.

        */s/ John D.  Demmy*
        John D. Demmy (DE Bar No. 2802)
        1105 North Market Street, 7th Floor
        Wilmington, DE 19801
        Telephone: (302) 425-3308
        Telecopier: (610) 371-8515
        Email: jdd@stevenslee.com

        -and-

        Leonard P. Goldberger
        Marnie E. Simon
        (Members PA Bar)
        1818 Market Street, 29th Floor
        Philadelphia, PA 19103-1702
        Telephone:  (215) 751-2864/2885
        Telecopier:  (610) 371-7376/8505
        Email: lpg@stevenslee.com
        Email: mes@stevenslee.com

        ATTORNEYS FOR FIREMAN'S FUND
        INSURANCE COMPANY, ALLIANZ
        S.p.A., f/k/a  RIUNIONE ADRIATICA DI
        SICURTA AND ALLIANZ SE, f/k/a
        ALLIANZ AKTIENGESELLSCHAFT