# EXHIBIT B

# EXHIBIT A

Westlaw.    NewsRoom
9/6/04 FORTUNE 186    Page 1

9/6/04 Fortune 186
2004 WLNR 17888598

FORTUNE
Copyright 2004 Time Inc. All rights reserved. Reproduction in whole or in part without permission is prohibited.

September 6, 2004

Volume 150

Section: FeaturesNo. 5

Welcome to the New Asbestos Scandal.

For a quarter-century, companies have struggled with asbestos liability. Now, thanks to the very lawyers who are suing them, they've found a new tool--one that sticks it to their insurance companies and the genuinely sick.

Roger Parloff Reporter Associate Christopher Tkaczyk

Joe Rice is smokestack industry's new best friend. That's an unaccustomed role for Rice, since he is the co-leader of Motley Rice (formerly Ness Motley), the most feared asbestos/tobacco/mass-torts plaintiffs law firm in the country. Over the years his firm has represented more than 96,000 asbestos plaintiffs against hundreds of corporations. Rice and his more famous partner, trial lawyer Ron Motley--actor Bruce McGill played Motley in the 1999 film The Insider--are also the ones who helped engineer the great tobacco industry takedown of 1998, which will ultimately divert about $246 billion in tobacco revenues into state treasuries and another $2 billion to $3 billion (yes, billion) to Motley Rice.

That resume notwithstanding, Rice is now the guy corporate executives want to see when their company needs to get out from under asbestos liabilities. He can get them something they need very badly, something Congress still hasn't seen fit to give them, and something even the courts can't secure for them--at least not without Rice's consent: total and final asbestos absolution. Rice can exorcise from a corporation, once and for all, the ghosts of asbestos liability past, present, and future. He can save its employees from layoffs and turn its stock back into the investment-grade security it once was. And if a company is good and follows his instructions to the letter, he might even let its shareholders keep their stock. That way they'll get rich when it skyrockets in value after Rice lifts the asbestos "overhang."

Rice's panacea is called a prepackaged asbestos bankruptcy--or "prepack." The executive summary goes like this: Your company (or a subsidiary) will have to dip

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

into Chapter 11 bankruptcy, but just briefly. Rice will make the experience as painless as possible. Instead of languishing in Chapter 11 for years, you might be able to blaze through it in months--theoretically in as little as 30 to 45 days. You'll go in, wash off all your asbestos liability for surprisingly little money, and then re-emerge clean and healthy. Your company does fine, the plaintiffs lawyers do great, and most of the asbestos claimants do well enough. The only ones who may get hurt are the usual big losers in asbestos litigation: the insurance companies--some of which may go belly-up paying for the liabilities you and Rice are going to agree that they owe--and the tiny minority of asbestos claimants who are severely sick and may get paid less than they need and deserve. Nobody said life would be fair.

Rice's fee for putting together a prepack varies. The giant Swiss power conglomerate ABB--which used to be known as the General Electric of Europe but was teetering on the brink of insolvency because of the asbestos liabilities of its Combustion Engineering unit in the U.S.--agreed to pay Rice $20 million in October 2002. (That, of course, is over and above the millions of dollars in contingency fees Rice will receive from his thousands of asbestos clients when they get paid under the terms of the prepack itself.) For the small Alabama contractor Shook & Fletcher, on the other hand, Rice charged just $3 million. Perry Weitz of New York's Weitz & Luxenberg initially asked for $30 million for himself and Rice to put together another prepack, that of flooring manufacturer Congoleum, according to the deposition testimony of a Congoleum attorney. Though Congoleum refused, it did agree to pay Rice and Weitz $2 million cash as an advance toward reimbursing their professional fees on the deal. (They don't have to submit documentation or return unspent portions.) That $2 million expense allowance is eight times greater than the total sum of cash--just $250,000--that Congoleum will pay its hundreds of thousands of present and future asbestos claimants under the deal Rice and Weitz negotiated. Beyond that modest cash outlay, Congoleum will toss in a $2.7 million note, due in ten years, to round out its obligations. Congoleum's shareholders will keep all their stock. Congoleum's insurers, on the other hand, will owe their entire policy limit--close to $1 billion. And instead of paying it in dribs and drabs over the next 50 years, the way their actuaries had anticipated, they will owe it all in cash on the day the prepack is confirmed by the bankruptcy court--possibly before year-end.

THE SCANDAL INSIDE THE SCANDAL

When this magazine last addressed the asbestos litigation crisis, in March 2002 (see "The $200 Billion Miscarriage of Justice" on fortune.com), we described the 25-year evolution of a national scandal. That article chronicled the transformation of asbestos litigation from a means of enabling injured and dying asbestos workers to gain compensation from corporations that had grievously wronged them into a means of transferring the shareholder wealth of thousands of companies--whose blame is so marginal as to be a legal construct--to a handful of plaintiffs law firms and hundreds of thousands of people who aren't sick. The situation had

9/6/04 FORTUNE 186                                                           Page 3

become so disgraceful that plaintiffs firms specializing in representing the truly sick had broken ranks with the rest of the plaintiffs bar and aligned themselves with the defendant corporations and insurance companies in seeking reform.

At that time we hailed a Senate bill that would have imposed stiff, nationwide medical criteria for asbestos suits. But that bill, like every other effort to address the asbestos crisis through congressional legislation over the past quarter-century, failed.

With the bill's failure, asbestos defendants turned to a new solution offered not by Congress but by the plaintiffs lawyers themselves: the prepack. Shook & Fletcher's was announced in February 2002, insulation contractor AC&S followed suit two months later, and Houston contractor J.T. Thorpe came next, in June. Combustion Engineering unveiled its own version in November 2002, as did Congoleum in January 2003.

Prepacks were not invented by the plaintiffs bar. Outside the asbestos context, they are a common, respected means whereby debtors and creditors settle most of their differences prior to a bankruptcy filing--thus minimizing the costs of bankruptcy. But asbestos prepacks are nearly always characterized by a unique feature: They call for the debtor company, a few months before the filing, to turn over a huge chunk of its assets to a subgroup of privileged asbestos claimants, to be divvied up outside the scrutiny of a bankruptcy judge. One veteran bankruptcy lawyer refers to this distinctive feature of prepacks as their "great train robbery" aspect.

The perils posed by these unusual agreements are further complicated by the lawyers involved, who often play multiple roles--roles that critics claim constitute conflicts of interest. In the ABB/Combustion Engineering matter, for instance, Rice simultaneously represented asbestos claimants and the parent of the company that they were suing. ("I had ethical consultants all along," says Rice. "I get paid a fee for a business transaction, and the claimants get paid because I was able to put together that transaction. My interests are 100% aligned with my clients'.")

This article, then, is about the new asbestos scandal--the scandal within the scandal. Because asbestos prepacks are such a recent phenomenon, few of them have wended their way through the courts, and some, like Congoleum's, have not yet even cleared the first hurdle--approval by a bankruptcy judge. Accordingly, no one knows precisely what is and isn't legal in this context. We will begin getting guidance when the federal appeals court in Philadelphia rules on the legality of the ABB/Combustion Engineering prepack--a ruling expected any day.

As we write, Congress is once again debating asbestos reform legislation. This time it's the Fairness in Asbestos Injury Resolution Act (FAIR), which would set up a $140 billion industry-funded national trust fund to pay off all asbestos

claims. Once again the bill's fate seems doubtful, since it is opposed by the plaintiffs bar and labor. If FAIR fails to pass this congressional session, many companies will have no choice but to begin (or resume) talking to Rice or other prominent asbestos plaintiffs lawyers about prepacks. It'll be a seller's market, because more than 8,400 companies have been named as asbestos defendants at this point, including some names that might surprise the reader. Ford Motor, for instance, had 41,500 asbestos cases outstanding as of February--a 66% increase over the previous February--while Pfizer faced 169,900 cases as of March (see box).

The underlying asbestos scandal has not abated since we last visited it. The Manville Trust, which pays the claims that are still being filed against the old Johns-Manville company, once the biggest manufacturer of asbestos products, received a record 101,172 new claims last year. (The Manville Trust's data are thought to provide the best barometer for what is happening nationally in asbestos litigation. In its 15-year existence it has had 670,000 claims brought against it.) Last year only 9.5% of the claimants against the Manville Trust suffered from cancers. The rest were "nonmalignants." According to estimates accepted by the most experienced federal judges in this area, two-thirds to 90% of the nonmalignants are "unimpaireds"--that is, they have slight or no physical symptoms. Indeed, many nonmalignants actually have ailments that have nothing to do with asbestos--or have nothing wrong with them at all. Several painstaking audits over the years have reached that conclusion, the latest being a peer-reviewed study of the X-rays of 492 asbestos claimants published in the August issue of Academic Radiology. Though doctors working with the plaintiffs lawyers had interpreted 96% of those films as being consistent with asbestosis, a debilitating disease involving scarring of the lungs, the study's panel of dispassionate experts found that only 4.5% merited such a reading. (That does not mean, by the way, that 4.5% really had asbestosis. It means that 4.5% really had lung scarring. The next question that a doctor would grapple with, were he treating a patient rather than recruiting clients for a plaintiffs lawyer, would be: Was the scarring brought on by asbestos or by one of more than 100 other possible causes?)

Without legislation, asbestos defendants will resume their inexorable march toward the bankruptcy cliff, over which 73 have now toppled, according to the Tillinghast unit of Towers Perrin--36 since 2000. No company, once targeted in earnest, has yet been able to fend off the thousands of court cases that, like crows in the Hitchcock movie, suddenly appear out of nowhere to darken its future. Indeed, once a company has been placed in the cross hairs of the asbestos lawyers, it is inevitable that either it or a subsidiary is going to have to go into Chapter 11. And after a targeted company comes to that realization--and sooner or later, they all do--then the idea of a prepack, scandalous though it may be, becomes not just palatable but downright appealing.

THE CHANNEL TO THE HOLY GRAIL

The Holy Grail for an asbestos defendant is something called a channeling injunc-

tion. It's a court order that channels all of a company's current and future asbestos liabilities away from the company and into a trust, which is a fund that's set up for the sole purpose of paying off the company's asbestos liabilities from that point forward. (Future liabilities are an enormous concern for asbestos defendants because of the long latency periods of asbestos-related diseases.) A company can get a channeling injunction only by going into bankruptcy.

The first channeling injunction was imposed in the Johns-Manville bankruptcy in the late 1980s. Johns-Manville put about $2 billion in cash and other assets into a trust, including 80% of the stock of what was to be the reorganized company, called Manville. The idea was that the reorganized company, when freed of asbestos liability, would thrive again. Once it thrived, its stock would rise in value and throw off dividends that would benefit the trust. The trust, in turn, would then be able to pay Johns-Manville's asbestos claimants as they came down with diseases in the future. By contrast, if Johns-Manville had kept its liabilities and had been forced to liquidate, its future asbestos claimants would have had no Manville-related entity to recover from.

The channeling injunction was a great idea, but no one was sure if it was legal, since the judge had improvised it. In the early 1990s, when the trust wanted to sell its Manville stock and diversify its investments, it found no buyers; investors feared they might be buying Johns-Manville's asbestos liabilities if the channeling injunction was later found to have been beyond the judge's power to impose.

So the Manville Trust went to Congress and, in 1994, got an amendment to the bankruptcy code that retroactively ratified what the judge had done. (Warren Buffett then bought Manville's stock from the trust.) But the amendment also set up a procedure for issuing channeling injunctions in future asbestos bankruptcies.

The forward-looking provision, known as Section 524(g), did some highly unusual things, we now realize. Most important, it specified that the bankruptcy judge could not issue the precious channeling injunction to a company unless 75% of the current asbestos claimants voted to approve the company's bankruptcy reorganization plan.

Providing asbestos claimants with a voice on the company's reorganization plan was not in itself unusual, since creditor classes always get to vote on whether to approve a Chapter 11 debtor's plan. But the bankruptcy judge always retains the ultimate power to override a creditor class's veto if he feels that the plan is "fair and equitable." The bankruptcy judge can, in the evocative legal phrase, "cram down" the plan on dissenting creditors. The judge's cram-down power acts as a check on creditor greed, encourages compromise, and promotes consensual plans.

But the 75% approval required for a 524(g) channeling injunction is not subject to a cram-down. The omission has astounding consequences for the dynamics of an as-

bestos bankruptcy. Since bankruptcy is worthless to an asbestos defendant if the company can't get a channeling injunction, the asbestos claimants--or to be more precise, the plaintiffs lawyers who control 75% of them--effectively have more power than the bankruptcy judge!

"[Section] 524(g) creates an unlevel playing field and gives the asbestos claimants virtually an absolute veto over a consensual plan," says former U.S. district judge Alfred Wolin. Wolin presided over five large Delaware asbestos bankruptcies from late 2001 until this spring. "You could have 99 other issues to deal with," Wolin continues, "but ultimately it's going to boil down to, Can the debtor get a 524(g)? And if the debtor can't get a 524(g), everything else is for naught." (Wolin can speak freely now, because in May a federal appeals court disqualified him from three of his asbestos cases for the appearance of pro-plaintiff bias. Wolin, 71, then stepped down after 17 years on the federal bench. But that's another story.)

The 75% requirement has another consequence: It favors one type of plaintiffs law firm over another. Though there are hybrids, asbestos law firms gravitate toward one of two economic models. At one extreme are the firms that pursue a low-margin, high-volume strategy. They sign up thousands of claimants of whom the overwhelming majority are unimpaireds. They then seek "inventory settlements"--settlements of all their cases at once--which are typically accomplished at discount prices in which the ratio between what a fatal cancer victim gets and what a totally unimpaired claimant gets can fall as unconscionably low as four to one--or less.

At the other extreme are the high-margin, low-volume boutiques that specialize in representing only severely sick people--mostly people with mesothelioma (a 100% fatal cancer of the pleura) or lung cancer. They represent far fewer clients but seek multimillion-dollar recoveries for each.

Obviously the 75% requirement favors the mass filers who cater to the unimpaireds. Such lawyers are "very interested in the 90% [who are] asymptomatics receiving compensation," Judge Wolin explains, "or else they're not going to be compensated. And without compensating the 90%, you're never going to get a consensual plan, because you're not going to get the votes."

So there's no two ways about it. If a company wants a channeling injunction, it needs a 75% vote, and to get the 75% vote, it needs to get the mass filers on board. Which is where Joe Rice comes in.

AVOIDING FREE FALLS AND NANNIES

Tanned and fit, with a full head of tousled hair, Joe Rice, 50, has star power. In a courtroom full of workaday bankruptcy and insurance lawyers, Rice looks like George Clooney at a Rotary luncheon. Though Rice's law firm is based in Mount Pleasant, S.C., rather than in Chicago or New York City, nobody in the room mistakes him for a country rube. Rice doesn't handle slip-and-falls. His forte is

big-picture wheeling and dealing, and his practice has come to resemble a species of investment banking.

Rice is in a unique position to corral the 75% vote that companies need, because his firm has long maintained a network of consulting and co-counsel arrangements with scores of other asbestos plaintiffs firms around the country. Historically a local firm would work up the particulars of a case while engaging Ness Motley to handle recurring liability issues common to every asbestos suit. Rice's stature in the field now enables him to craft global settlement deals that both he and the defendants know will very likely gain acceptance from most of the asbestos plaintiffs bar.

Rice understands that a conventional bankruptcy--or "free fall" bankruptcy, as he pejoratively calls it--would be devastating to a company with asbestos liability. Free-fall bankruptcies take too long--they average around six years in asbestos cases--and they are money barbecues, costing as much as $15 million a month. It's hard for a company to stay competitive under the drag of Chapter 11, and some companies don't make it.

Fortunately for asbestos defendants, most bigtime asbestos plaintiffs lawyers don't like free-fall bankruptcies either. For one thing, they don't like the way bankruptcy judges split up the money available for asbestos claimants. Bankruptcy judges do it equitably and rationally, based solely on disease category, with sick people getting much more than the unimpaireds. By contrast, in the tort system lots of other factors can trump disease category in importance--like which county the case is filed in, which law firm represents the plaintiff, and how close the case has gotten to a judgment.

There's a still graver problem with free-fall bankruptcy from a plaintiffs lawyer's perspective. Bankruptcy judges have to treat current claimants the same way they treat "futures"--i.e., claimants who don't yet exist but who can be anticipated due to the long latency of asbestos diseases. Since there could easily be five or ten times as many future as current claimants, a bankruptcy judge will have to set aside a lot of assets for them. Every dollar set aside is a dollar diverted from the current claimants and, more important, about 40 cents diverted from their contingency-fee lawyer. As a consequence, most plaintiffs lawyers would much prefer that a company hand over a big chunk of its most liquid assets to them before going into bankruptcy. That way they can get a bigger kitty than a bankruptcy judge would give them, they can get it sooner, and they can divvy it up without being scrutinized by a nannyish judge. Hence the prepack.

There are many aspects of these prebankruptcy settlements that no bankruptcy judge could stomach. In the prebankruptcy settlement in the Combustion Engineering case, for instance, the value of some claimants' cases fetched as much as 20 times what others' fetched--even though they had exactly the same diseases--simply because of the identity of the law firm bringing the claimants' case. (The sums were set ac-

9/6/04 FORTUNE 186                                                                Page 8

cording to each firm's average historical settlement values with Combustion Engineering.)

Then there was the odd situation involving a company called the Clearing House. When a corporation settles thousands of claims in a prebankruptcy agreement, it needs to have an administrator sift through all the paperwork to make sure that each individual claimant has supplied all the proof required for payment. The claims-processing function for the prebankruptcy settlements in each of Rice's first three prepacks--involving contractors Shook & Fletcher, J.T. Thorpe, and AC&S--was assigned to a consulting firm. (Rice was one of eight plaintiffs lawyers who put together J.T. Thorpe.) That's a good idea, since it looks better to have an independent, disinterested party handle that function. But then the consulting firm subcontracted the work to another company, called the Clearing House. The Clearing House was incorporated by a Ness Motley lawyer in December 2001 on behalf of its sole proprietor, Benee Wallace. Wallace is Rice's longtime paralegal, personal assistant, and friend. In early 2002, Wallace went on "sabbatical" from Ness Motley to run the Clearing House. That year Wallace cleared "just under a million dollars" from running that company, she testified in a subsequent deposition. (Wallace did not respond to interview requests.) Wallace then sold the Clearing House for $100,000 to the consulting firm that had subcontracted the work to it, and returned to Rice's law firm by February 2003. Rice maintains that the arrangement barely involved him. A principal at the consulting firm offered to help Wallace set up her own business, Rice says. "She was interested but wasn't sure if she wanted to do it permanently," he continues. She took a leave of absence, ran the business for a while, and then "decided it was not what she wanted to do," so she returned to his firm. "That was it."

THE 90-DAY LOOPHOLE

While the prebankruptcy settlement will take care of most of the current claimants, there will always be a few left over. Some of them may not qualify for the settlement for various technical reasons, and others won't like the settlement's terms. The latter group will typically be composed of severely injured claimants, who often find global settlements too cheap. In either case, under the grand design of the prepack those leftover "currents" will be tossed in with the futures, who are then relegated to seeking their recoveries from a separate pool of assets--the bankruptcy trust that will be set up after the Chapter 11 petition is filed.

As a rule of thumb, the bankruptcy trust will pay less, and pay later, than the prebankruptcy settlement. Because many of the assets set aside for the bankruptcy trust will be illiquid and risky--like notes or stock--they may not be there at all by the time a future mesothelioma victim finally arrives to make a claim upon it several years from now. The bankruptcy trusts in the Combustion Engineering and Congoleum cases are funded heavily with disputed insurance proceeds that may or may not exist, depending on whether the debtor ultimately wins contested coverage

Case 00-4110-RG-13 Doc 2532 Filed 11/1/08 Entered 11/1/08 13:52:36 Desc
Case 01-01139-AMC Doc 21936-4 Filed 06/01/09 Page 11 of 20 Page 10 of 19
Exhibit A    Page 10 of 19

9/6/04 FORTUNE 186                                                                Page 9

litigation against its insurers.

Some attorneys reading this story may want to interrupt here with a technical question: If a company forks over a huge treasure chest of its most liquid assets to a privileged subgroup of creditors right before filing for bankruptcy, isn't that a classic "preferential transfer" that can be reversed by the bankruptcy judge? The answer is yes. That's why Rice will have the company count off at least 90 days between the time it funds the prebankruptcy settlement and the time it files for Chapter 11 protection. Legally, that 90-day buffer makes it tough for a judge to void the prebankruptcy settlement. (And as a practical matter no judge is going to try to force thousands of asbestos claimants to return settlement money after they've received it.)

The company will also use that 90-day waiting period to unveil the upcoming bankruptcy reorganization plan and seek the all-important 75% approval needed for the channeling injunction. This prebankruptcy vote is the defining feature of a prepack. It is precisely because all necessary creditor classes will have approved the plan before filing for bankruptcy that the company can then sail through Chapter 11.

Now obviously, if the only claimants voting on the plan are the ones who either missed out on the better prebankruptcy settlement or refused to join it, a company might have real trouble scraping together 75% approval. Rice foresaw that problem. As he noted in an early memo mapping out the proposed Combustion Engineering prepack, the company has to "create a 'creditor' status" for those who participate in the prebankruptcy settlement so that they will retain the right to vote on the bankruptcy plan. So instead of paying off those prebankruptcy settlement participants completely, the company will pay them only 95% or 85% of their claims, say. That will leave them with an unpaid "stub claim" against the bankruptcy trust, and that stub will entitle them to vote on the bankruptcy plan. That way the company can be assured that the votes of those who settled prebankruptcy (mainly unimpaireds) will swamp the votes of the dissenting stragglers (mainly severely sick people), and the company will get its 75%.

BOTTOMLESS INSURANCE POLICIES

Despite the harrowing picture just painted of them, asbestos prepacks evolved in a natural and logical way, at least when viewed against the bizarre backstory that spawned them. That backstory is about insurance, and the best person to tell it is Scott Gilbert. Gilbert has spent the past 25 years becoming, hands down, the nation's premier attorney for asbestos defendants seeking reimbursement from reluctant insurance carriers. On a Tuesday morning in Washington, D.C., Gilbert greets a reporter dressed in comfy slacks and what looked like a bowling shirt, bearing the Harley-Davidson logo in brown piping. The shirt is no surprise, since a rare silver water-cooled Harley and a fire-engine-red limited-edition Ducati are on display in his firm's seventh-floor lobby. (Though the two bikes belong to the firm,

9/6/04 FORTUNE 186                                                          Page 10

Gilbert has six motorcycles at home.)

A likable, thoughtful, and seemingly guileless man, Gilbert recounts the course of asbestos-coverage litigation of the past quarter-century with clarity, distance, and civility. Few appreciate, as Gilbert does, the degree to which that history has been shaped by a few subtle clauses in the standard corporate insurance contract. After the bankruptcy of manufacturer Johns-Manville in 1982, for instance, asbestos litigation entered a long period in which the predominant strategy of the next tier of defendants--mainly producers and distributors of asbestos-containing products--became quick surrender and settlement. With the enthusiastic support of their insurers, many companies banded together to form two successive "settlement facilities"--Gilbert helped organize and run each--that would pay valid claims as they arose, holding wasteful litigation costs to a minimum. That strategy was driven largely by the fact that most primary insurance carriers were required not only to indemnify the policyholders' legal judgments--which are capped by an aggregate limit--but also to pay the costs of defending those suits. Crucially, the defense costs do not count toward the aggregate limit. Since aggressive litigation is much more expensive than settlement, primary insurers often preferred that its policyholder settle. Otherwise, Gilbert explains, "an insurer could have a $1 million policy and spend $10 million on it. It's not a good economic proposition."

Unfortunately, the settlement strategy made claims so easy for plaintiffs lawyers to collect that it spurred the filing of ever more claims. X-ray screening firms sprouted up to supply the plaintiffs lawyers with an inexhaustible supply of unimpaireds, whose numbers were thickly padded--unwittingly, let us assume--by healthy people with misinterpreted X-rays.

Over time, as the settling defendants exhausted their aggregate policy limits, many dropped away into bankruptcy. Others, however--the ones who had retained lawyers as sharp as Gilbert--learned that maybe they were actually entitled to still more insurance coverage. It turns out that under the standard policy, the "aggregate limit" applied only to a company's products-liability exposure. While insurers tended to treat all asbestos cases as products-liability cases, there were actually strong legal arguments to be made that many of those suits properly fell into different categories of coverage, known collectively as "nonproducts." The beauty of nonproducts coverage is that there is no aggregate cap on it! Incredible as it may sound, if a company had a contracting subsidiary--a unit that installed asbestos products, say, as opposed to just selling them--then that company might have a potentially infinite amount of insurance coverage. Once plaintiffs lawyers found out about nonproducts coverage, they had an incentive to go after lots of small, free-standing contracting companies because of their potentially inexhaustible insurance policies. "There's a lot of mom-and-pop companies out there that did almost nothing but asbestos installation," Gilbert explains.

Now it should be dawning on readers why bigtime plaintiffs lawyers are bothering to sue all these little contracting companies you've never heard of--Shook &

Fletcher, J.T. Thorpe, AC&S. Though these companies have virtually no assets except their insurance policies, those policies may be bottomless.

Those tiny companies created the paradigm for the first asbestos prepacks, Gilbert continues. "Say you're the management of a company worth $5 million," Gilbert explains, "and you're told by your lawyers that you have insurance coverage that's potentially unlimited. The insurers are giving you the finger because you don't have the wherewithal to fight them. What do you do? You could go into bankruptcy, liquidate, and lose everything you have. Or you can go out to the people suing you--the plaintiffs lawyers--and say, 'Look, I don't have the money. My insurers are breaching their obligations. I believe my insurance should pay all my liability. Tell you what. I'll settle all your claims for a reasonable sum, and when I recover insurance money, you'll be the first people to get it.'" (Under the terms of the prepack, the defendant will sign over all its insurance rights to the bankruptcy trust that is supposed to pay future claimants. The trust will then sue the insurers seeking the nonproducts coverage.)

It sounds innocuous and sensible when Gilbert describes it, and at first it might have been. Rice's first prepack, Shook & Fletcher, sailed through the courts with little opposition, while the small deal for regional contractor J.T. Thorpe attracted only slightly more. But when AC&S, a more prominent asbestos defendant, announced its intentions in April 2002, the phenomenon finally registered on Elizabeth Magner's radar screen.

A bankruptcy specialist from New Orleans, Magner represents a committee of 17 boutiques that specialize in representing the severely ill. The committee was formed by plaintiffs lawyer Steven Kazan in early 2000 when he decided that the official asbestos claimants committees in bankruptcy proceedings around the country were not adequately representing cancer claimants' interests because they were dominated by the mass filers who served the unimpaireds.

Magner wanted her committee to oppose the AC&S prepack on principle. The prebankruptcy agreement in that deal had given away all of AC&S's cash to certain claimants, gave others first crack at the company's insurance proceeds, and left future claimants with only a glimmer of hope of ever recovering a dime. Nevertheless, her committee's members did not have a large enough stake in the AC&S case to want to challenge it.

Then, in November 2002, ABB/Combustion Engineering announced its planned prepack. In many ways Combustion Engineering was a different animal from the deals that had preceded it. Though insurers were outraged by it, it was not fundamentally an insurance play in the way its predecessors had been. In addition, the problem in ABB's case was not so much that Combustion Engineering was facing bankruptcy--the former boilermaker, ravaged by asbestos litigation, had actually been an empty shell for several years--but rather that the parent, the vast ABB conglomerate itself, was on the ropes. ABB's lenders were refusing to provide critical refinan-

cing unless ABB came up with a resolution of Combustion Engineering's asbestos liabilities. ABB's lawyer was David Bernick of Kirkland & Ellis. He was given a deadline of Dec. 15, 2002, to come up with a solution; otherwise ABB would default on its bank loans.

This magazine has repeatedly celebrated Bernick for his aggressive, creative efforts to use the bankruptcy courts to rationalize mass-tort litigation, both in asbestos and breast implants. He continues those efforts today in the W.R. Grace bankruptcy. Nevertheless, Bernick recognized that protracted litigation was out of the question for ABB. "In ABB, I had a client that had a very different perspective," he explains. "It couldn't wait that long." Accordingly it was Bernick who, over dinner in Zurich on Oct. 22, 2002, offered Rice $20 million to put together ABB's prepack.

From both Bernick's and Rice's perspective, the ABB/Combustion Engineering deal seemed best for asbestos claimants too, since Combustion Engineering relied entirely on infusions from ABB to pay its asbestos debts. If ABB failed, Combustion Engineering's asbestos claimants would have gotten nothing.

Magner, however, didn't see it that way. What she saw was Combustion Engineering sending $417 million in cash and notes to privileged, mostly unimpaired claimants, on the eve of bankruptcy, in a deal that was being blessed after the fact by means of a vote-buying scheme. "This case was so patently unfair," she says, that she decided that "this was the place to take it through the court system and determine once and for all what could and could not be done with 524(g)."

In July 2003, Judge Wolin approved the prepack--but not without reservations. "The court was between a rock and a hard place," he says. "If I did not affirm, then the sick people would've gotten zero and ABB more than likely would've gone bankrupt.... Whatever occurred in Combustion Engineering should not be the formula for future prepacks.... Sometimes judges have to bite a bullet that they don't particularly like."

Meanwhile, new prepacks keep coming down the pike, adapting and evolving, precluding easy generalization. The prepack for Halliburton's KBR and former Dresser units, for instance--just confirmed by a bankruptcy judge in late July--currently has no opposition from either insurers or Magner's committee. That's largely because Halliburton is committing $4.6 billion of its own money to pull the deal off and establishing a bankruptcy trust that is currently projected to pay future claimants 100 cents on the dollar.

But with many of the deals we see new evidence of the quiet change sweeping across the asbestos landscape. Defendants are increasingly making common cause with the plaintiffs lawyers in their quest to empty out that great Platonic ATM machine, the insurance industry. Scott Gilbert's unusual law practice epitomizes the transformation. Though Gilbert once represented only defendant companies, he now also

Case 00-4H610-RG-13 Doc 2532 Filed 11/11/08 Entered 11/11/08 15:52:36 Desc
Case 01-01139-AMC Doc 21936-4 Filed 06/01/09 Page 15 of 20
Exhibit A    Page 14 of 19

9/6/04 FORTUNE 186                                                      Page 13

represents asbestos plaintiffs lawyers when they need independent advice on their target companies' insurance prospects. He even acts as co-counsel with some of them in their efforts to recover insurance for their clients on policies held by defunct companies. Gilbert is also a major player in the world of prepacks. He has represented Shook & Fletcher, AC&S, J.T. Thorpe, and Congoleum, and he says he has others in the works that he can't yet talk about.

The multiple roles Gilbert plays can get perplexingly dense. In the Congoleum case, for instance, it was plaintiffs lawyer Weitz--who has thousands of cases pending against Congoleum--who first recommended to Congoleum that it hire Gilbert to help with its insurance coverage disputes. Congoleum then retained Gilbert (for a $2 million flat fee) to represent it on its prepack--negotiating across the table from, of course, Weitz. At the same time the two lawyers were negotiating against each other in that case, Weitz and Gilbert were also co-counsels on behalf of about 15,000 asbestos plaintiffs who were suing three defunct companies whose only sizable assets were their insurance proceeds. In these matters Gilbert's and Weitz's firms are to share a 10% contingency fee on any moneys Gilbert can ultimately recover for Weitz's plaintiffs from the insurers--a fee worth potentially tens of millions of dollars. Gilbert also acknowledges that it is quite possible--he says he's never checked--that some of the asbestos plaintiffs Gilbert represents against those three defunct companies are, in fact, the same individuals that Weitz is now representing against Gilbert's client Congoleum. But Gilbert maintains that none of these potential conflicts matter as long as he discloses them all to Congoleum, as he has. Both the bankruptcy judge and district judge have ruled for Gilbert on the issue.

To have the full picture, the reader should be apprised that Gilbert's law firm also owned a 70% interest in the consulting firm that was selected to do the claims-processing work in Rice's AC&S prepack--the same one that subcontracted that work to the Clearing House, the outfit run by Rice's paralegal. Gilbert still claims not to see anything amiss there. It was "ministerial" work that could be audited by the insurers, Gilbert says. That Rice's paralegal made close to $1 million doesn't bother him either. "She wasn't a paralegal--she was running a business," he says. "In this country there's nothing illegal or inappropriate about somebody improving their quality of life." (Nevertheless, Gilbert's firm severed all ties to its former consulting firm as of June 1.)

"Insurers are getting set up in these deals," claims the general counsel of one insurance company, who requests anonymity. "Insurers have an obligation to pay claims," she acknowledges, "but we also get to decide how to defend and whether to settle, which is only fair, since it is our money that's at risk. The prepack situation turns this ordinary relationship on its head. Instead of working together to resist and defend claims, in a prepack the insured and the plaintiffs attorney work together to force the insurer to pay as much as possible."

It's not hard to see why she feels that way. Once a defendant reaches an agreement

9/6/04 FORTUNE 186

with the plaintiffs lawyers about what its own lump-sum contributions will be, it has no further incentive to fight spurious claims. In the two decades prior to September 2002, for instance, Congoleum incurred just $13.5 million in asbestos judgments in the course of resolving 33,000 cases. Because so many of the cases filed against it were meritless, Congoleum disposed of 99% of them at an average price of just $102 each. Yet in 2003, during the asset transfer preceding its prepack, Congoleum settled 79,630 claims for $466 million--all of which it hopes to pass along to its insurers. Similarly, over the 20 years that preceded AC&S's decision to do a prepack, it had paid a total of $600 million in asbestos settlements. Yet in the four-month run-up to its September 2002 bankruptcy filing, AC&S liquidated $2 billion worth of claims--all but $24 million of which it hopes to force its insurers to pay for.

Then there's the tragicomic kicker. When an insurer goes to bankruptcy court to challenge the legality of a prepack, the judge often rules that it has no legal standing to object! While it might seem odd that the party footing the bill for the whole thing should have no say in the matter, those rulings may be technically sound. In theory, at least, by approving a bankruptcy plan judges are not making any binding decision about insurance coverage. Insurers can still bring separate litigation in state court later and argue that their policies don't require them to fund the plan that's been approved. But it's a little like asking Congress not to appropriate funds for troops after the President has already sent them into combat.

"I'm asking you, How practical is that?" says the insurance carrier's livid general counsel. "The cow's out of the barn at that point! And if I do prevail, what happens to Elizabeth's clients then?" she asks, referring to the cancer victims Magner indirectly represents. "You now have a plan where the insured is released from asbestos liability. They got their 524(g) injunction! That's all they care about. They could care less whether there's money to pay future people who get mesothelioma. If we win, they get nothing."

And if the insurers lose, they'll begin failing. At least one already has. An early asbestos prepack involving the small Houston insulation contractor Fuller-Austin put Highlands Insurance into receivership last year, before the company could complete its appeals. In an October 2003 report, A.M. Best estimated that insurers' reserves for asbestos were underfunded by at least $20 billion, and it opined that the ability of some of them to weather their predicament "seems questionable." Kemper Insurance, for instance, which has significant asbestos liabilities, went into "runoff" mode in March, meaning that it will no longer write new policies. In June, Equitas--the giant reinsurer of Lloyd's of London's pre-1993 liabilities--increased its asbestos reserves for the fourth time in five years. Its chairman, Hugh Stevenson, commented that asbestos is "the greatest single threat to Equitas."

"Insurers cannot just say, 'Okay, fine. Enter these two-and three-and four-bil-

lion-dollar settlements, and we'll just come pay it,' " continues the insurer's general counsel. "We don't have enough money to do that. Insurance is all about spreading risk. You can't do that for 8,000 commercial insureds who are currently being sued in asbestos litigation. It will take down the insurance industry."

Gilbert acknowledges that some insurers are probably struggling for their lives. But that's not the fault of the prepacks, he says. It's the fault of those insurers' having written unwise policies. "That liability's there with or without prepacks," he says. "The policies say what they say."

THE WORST OF ALL WORLDS

At some level of consciousness, nearly everyone in the asbestos game knows that we, as a society, should have stopped paying the unimpaireds decades ago. In 1993, Joe Rice acknowledged that was the right thing to do, as did most of the other big asbestos plaintiffs lawyers of that era. That year Rice and a group of 20 asbestos defendants entered into a creative, convoluted legal agreement they termed a "settlement class action" in a case called Georgine. Under Georgine, most of the plaintiffs bar agreed in essence that in exchange for one last massive payday for all their existing clients, they would agree to set up a trust to handle all claims from that day forward. Under the terms of Georgine, unimpaireds would have received nothing from that trust--except the peace of mind of knowing that if they ever did come down with a serious illness, there would be money readily available for them.

In 1997, though, the Supreme Court struck down Georgine, finding that it strained class-action concepts past the breaking point. Since then the mass filers have never again offered to relinquish their lucrative franchise representing the unimpaireds and their practically indistinguishable cousins--healthy claimants with misinterpreted X-rays. This magazine mistakenly thought they might be cajoled into doing so in 2002, when Senator Don Nickles (R-Oklahoma) introduced his "medical criteria" bill. The bill had been backed by a remarkable coalition of asbestos defendants, insurers, and the plaintiffs firms that Magner represents. The mass filers refuse to join, however, and in any event the coalition disintegrated. Too many asbestos defendants began to fear that the cancer cases alone could put them into bankruptcy. (The value of mesothelioma claims in the tort system has doubled in the past four years for some defendants, according to Tillinghast.)

The FAIR Act then rose in the Nickles bill's place. Sadly, since it does not incorporate the Nickles medical criteria, it actually represents the "worst of all worlds" from Magner's perspective. "It caps the total dollars that are available to pay claimants," she says, "and then it lets in all the junk at the bottom.... So now we're back to where we are every day, fighting in the tort system for limited dollars with people who aren't hurt."

Still, the FAIR Act is the closest Congress has ever gotten to bringing rational-

ity and finality to the asbestos mess, and we may never get this close again. Though the mass filers evidently have too much political power to let us root out the scandal, they might permit us at least to contain it through the FAIR Act.

Maybe Congress could appropriate a little something for Joe Rice to get his people onboard.

FEEDBACK rparloff@fortunemail.com

The losers in this game are the insurance carriers--and the tiny minority of asbestos claimants who are severely sick. Why are all these little contracting companies being sued? Though their only asset is their insurance, those policies may be bottomless. Once a targeted company sees that bankruptcy is inevitable, then the idea of a prepack, scandalous or not, becomes appealing. "The court was between a rock and a hard place," says Judge Wolin. "If I did not affirm, then the sick people would've gotten zero."

Not sick? No problem Of the 670,000 people who've made asbestos claims against the Manville Trust, the vast majority do not have any cancers--and most aren't functionally impaired. ASBESTOS CLAIMANT TOTALS in thousands Lung cancer 43 Mesothelioma 28 Other cancer 9 Nonmalignant 565 Other 25 FORTUNE CHART /SOURCE: TILLINGHAST TOWERS PERRIN

Viacom has asbestos trouble? Yep--as do 8,400 other companies. Here's a sampling of some big names. COMPANY WHERE ITS PROBLEM STEMS FROM Viacom As part of its purchase of CBS, Viacom inherited asbestos liability from the network's former owner, Westinghouse. 3M Suits claim that a 3M dust mask failed to protect workers from asbestos--something the mask was never intended to do. Sears Sears never made any asbestos products. It's being sued for selling products that contained asbestos. Pfizer Pfizer bought insulation maker Quigley in the 1960s. Today the subsidiary exists solely to settle asbestos claims. Ford Motor Asbestos was once used in automotive parts, including brakes, clutches, and gaskets. FORTUNE TABLE

FORTUNE.COM SUBSCRIBERS ONLY Read more about asbestos litigation online in "The $200 Billion Miscarriage of Justice," plus see "Is Fat the Next Tobacco?"

COLOR PHOTO: DOUGLAS LEVERE ASBESTOS LAWYER JOE RICE This 50-year-old plaintiffs lawyer has more power over companies with asbestos liabilities than any judge.

COLOR PHOTO: PHOTOGRAPHS BY MICHAEL LEWIS ALFRED WOLIN The retired judge says that plaintiffs lawyers can veto the bankruptcy process.

COLOR PHOTO: PHOTOGRAPHS BY MICHAEL LEWIS SCOTT GILBERT Gilbert represents both companies and plaintiffs against insurers.

9/6/04 FORTUNE 186                                                              Page 17


COLOR PHOTO: PHOTOGRAPHS BY MICHAEL LEWIS DAVID BERNICK He offered Rice a $20 million fee to put together ABB's prepack.

COLOR PHOTO: PHOTOGRAPHS BY MICHAEL LEWIS ELIZABETH MAGNER "This case is so patently unfair," she says of the Combustion Engineering prepack.

COLOR PHOTO: PHOTOGRAPHS BY MICHAEL LEWIS GUNSLINGERS Rice and partner Ron Motley (right) trot out the cowboy gear because they're "legal sharpshooters."

---- INDEX REFERENCES ----

COMPANY: VIACOM INC; ESPERION THERAPEUTICS INC; ABB AG ADR; GENERAL ELECTRIC CO; BROWN BOVERI SAUDI ARABIA; ABB AG; IREX CORP; TOWERS PERRIN FORSTER AND CROSBY INC; FAIR; GENERAL ELECTRIC; MANVILLE TRUST; PFIZER INC; KELLOGG BROWN AND ROOT INC; HARLEY DAVIDSON INC; CONGOLEUM CORP; FORD MOTOR CO; HALLIBURTON CO; PFIZER; TOWERS PERRIN

NEWS SUBJECT: (Corporate Financial Data (1XO59); Legal (1LE33); Business Lawsuits & Settlements (1BU19); Business Litigation (1BU04); Liability (1LI55); Financially Distressed Companies (1FI85); Company Profiles (1CO63); Economics & Trade (1EC26))

INDUSTRY: (Insurance Regulatory (1IN40); Commercial Property & Casualty Insurance (1CO35); Manufacturing (1MA74); Financial Services (1FI37); Utilities Regulatory (1UT69); Financial Services Regulatory (1FI03); Electric Utilities Generation (1EL37); Insurance Liability (1IN26); Electric Utilities (1EL82); Tobacco (1TO65); Property & Casualty Insurance (1PR21); Insurance Industry Legal Issues (1IN64); Electric Utilities Generators (1EL15); Utilities (1UT12); Corporate Insurance (1XO50); Consumer Products & Services (1CO62); Insurance (1IN97))

Language: EN

OTHER INDEXING: (ABB; AC; ASBESTOS INJURY RESOLUTION ACT; BOTTOMLESS; CBS; CHANNEL; CLEARING HOUSE; CONGOLEUM; CONGRESS; DRESSER; ELIZABETH; FAIR; FAIR ACT; FEEDBACK; FORD MOTOR; FORD MOTOR ASBESTOS; FORTUNE; FUTURE; GENERAL ELECTRIC; HALLIBURTON; HARLEY DAVIDSON; HITCHCOCK; HOLY GRAIL; KBR; LLOYD; MANVILLE; MANVILLE TRUST; PFIZER; PFIZER PFIZER; ROTARY; SCANDAL; SENATE; SUPREME COURT; TILLINGHAST; TOWERS PERRIN; VIACOM; WEITZ LUXENBERG) (Alfred Wolin; ASBESTOS CLAIMANT TOTALS; ASBESTOS LAWYER JOE RICE; AVOIDING FREE FALLS; Benee Wallace; Bernick; Bruce McGill; Combustion; Combustion Engineering; Crucially; David Bernick; Engineering; Georgine; Gilbert; Highlands Insurance; Hugh Stevenson; Incredible; J.T. Thorpe; Joe; Joe Rice; Kemper Insurance; MICHAEL LEWIS; Motley; Motley Rice; Ness Motley; Perry Weitz; Rice; Ron Motley; Sadly; Scott Gilbert; Shook Fletcher; Similarly; Tanned; W.R. Grace; Wallace; Warren Buffett; Weitz; Wolin; Yep)

KEYWORDS: (Lawsuit); (Corporations); (Insurance); (Law)

Word Count: 9619

9/6/04 FORTUNE 186
END OF DOCUMENT