# EXHIBIT C

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

— — —

| | | |
|---|---|---|
| In Re: | : | Chapter 11 |
| | : | |
| | : | Case No. |
| W.R. GRACE & CO., et al, | : | 01–01139 JKF |
| | : | |
| | : | (Jointly |
| Debtors | : | Administered) |

— — —

Friday, May 15, 2009

— — —

Oral deposition of DAVID T.
AUSTERN, ESQUIRE, taken pursuant to
notice, was held at the offices of ORRICK
HERRINGTON & SUTCLIFFE, LLP, Columbia
Center, 1152 15th Street, N.W.,
Washington, DC  20005–1706, commencing at
10:07 a.m., on the above date, before
Lori A. Żabielski, a Registered
Professional Reporter and Notary Public
in and for the Commonwealth of
Pennsylvania.

— — —

MAGNA LEGAL SERVICES
Seven Penn Center
1635 Market Street
8th Floor
Philadelphia, Pennsylvania 19103

## Page 2

```
 1   APPEARANCES:
 2
 3   DRINKER BIDDLE & REATH, LLP
     BY: MICHAEL F. BROWN, ESQUIRE
 4   One Logan Square
     18th & Cherry Streets
 5   Philadelphia, Pennsylvania 19103-6996
     215.988.2988
 6   (brownmf@dbr.com)
     (jeffrey.boerger@dbr.com)
 7   Representing OneBeacon America Insurance
     Company, Seaton Insurance Company,
 8   Government Employees Insurance Company,
     Columbia Insurance Company f/k/a Republic
 9   Insurance Company
10
11   ORRICK HERRINGTON & SUTCLIFFE, LLP
     BY: JONATHAN P. GUY, ESQUIRE
12      ROGER FRANKEL, ESQUIRE
        JOSHUA M. CUTLER, ESQUIRE
13   Columbia Center
     1152 15th Street, N.W.
14   Washington, DC 20005-1706
     202.339.8427
15   (jguy@orrick.com)
     Representing Future Claimants
16   Representative
17
18   CAPLIN & DRYSDALE, CHARTERED
     BY: JEFFREY A. LIESEMER, ESQUIRE
19   One Thomas Circle, NW
     Suite 1100
20   Washington, DC 20005
     202.862.5000
21   (jal@capdale.com)
     Representing Grace, Official Committee of
22   Asbestos Personal Injury Claimants
     ("ACC")
23
 4
```

## Page 3

```
 1   APPEARANCES (continued)
 2
 3   KIRKLAND & ELLIS, LLP
     BY: THEODORE L. FREEDMAN, ESQUIRE*
 4      (*VIA TELECONFERENCE)
     Citigroup Center
 5   153 East 53rd Street
     New York, New York 10022-4611
 6   212.446.4800
     (theodore.freedman@kirkland.com)
 7   Representing the Debtors
 8
 9   THE LAW OFFICES OF JANET S. BAER, P.C.
     BY: JANET S. BAER, ESQUIRE
10   70 West Madison Street
     Suite 2100
11   Chicago, Illinois 606002
     312.641.2162
12   Representing the Debtors
13
14   SIMPSON THACHER & BARTLETT, LLP
     BY: ELISA ALCABES, ESQUIRE
15      KAREN E. ABRAVANEL, ESQUIRE*
        (*VIA TELECONFERENCE)
16   425 Lexington Avenue
     New York, New York 10017-3954
17   212.455.3133
     (ealcabes@stblaw.com)
18   (kabravanel@stblaw.com)
     Representing Travelers Casualty and
19   Surety Company
     )
21
22
23
24
```

## Page 4

```
 1   APPEARANCES (continued)
 2
 3   VORYS, SATER, SEYMOUR AND PEASE, LLP
     BY: WILLIAM J. POHLMAN, ESQUIRE*
 4      TIFFANY STRELOW COBB, ESQUIRE*
        (*VIA TELECONFERENCE)
 5   52 East Gay Street
     Columbus, Ohio 43215
 6   614.464.8322
     (wjpohlman@vorys.com)
 7   (tscobb@vorys.com)
     Representing The Scotts Company, LLC
 8
 9   COHN WHITESELL & GOLDBERG, LLP
10   BY: CHRISTOPHER M. CANDON, ESQUIRE
     101 Arch Street
11   Boston, Massachusetts 02110
     617.951.2505
12   (candon@cwg11.com)
     Representing the Libby Claimants
13
14
15   SPEIGHTS & RUNYAN
     BY: DANIEL H. SPEIGHTS, ESQUIRE*
16      (* VIA TELECONFERENCE)
     200 Jackson Avenue East
17   P.O. Box 685
     Hampton, South Carolina 29924
18   803.943.4444
     (dspeights@speightsrunyan.com)
19   Representing Anderson Memorial Hospital
20
21   TUCKER ARENSBERG, P.C.
     BY: MICHAEL A. SHINER, ESQUIRE*
22      (*VIA TELECONFERENCE)
     1500 One PPG Place
23   Pittsburgh, Pennsylvania 15222
     412.594.5586
24   (mshiner@tuckerlaw.com)
     Representing Certain London Market
```

## Page 5

```
 1   APPEARANCES (continued)
 2
 3   BILZIN SUMBERG BAENA PRICE & AXELROD, LLP
     BY: MATTHEW I. KRAMER, ESQUIRE*
 4      (*VIA TELECONFERENCE)
     200 South Biscayne Boulevard
 5   Suite 2500
     Miami, Florida 33131-5340
 6   305.450.7246
     (mkramer@bilzin.com)
 7   Representing Property Damage Committee
 8
 9   STROOCK & STROOCK & LAVAN, LLP
     BY: DANIEL J. HARRIS, ESQUIRE*
10      (*VIA TELECONFERENCE)
     180 Maiden Lane
11   New York, New York 10038-4982
     212.806.5400
12   (djharris@stroock.com)
     Representing Official Committee of
13   Unsecured Creditors
14
15   CROWELL & MORING, LLP
     BY: MARK PLEVIN, ESQUIRE
16      NOAH S. BLOOMBERG, ESQUIRE
     1001 Pennsylvania Avenue NW
17   Washington, DC 20004-2595
     202.624.2913
18   (mplevin@crowell.com)
     (nbloomberg@crowell.com)
19   Representing Fireman's Fund Insurance
     (Surety Bond)
20
21
     STEVENS & LEE, P.C.
22   BY: JOHN D. DEMMY, ESQUIRE
     1818 Market Street, 29th Floor
23   Philadelphia, Pennsylvania 19103-1702
     215.751.2885
24   (jdd@stevenslee.com)
```

## Page 6

```
 1   APPEARANCES (continued)
 2
 3   ALAN B. RICH LAW OFFICES
     BY:  ALAN B. RICH, ESQUIRE
 4   Elm Place, Suite 4620
     1401 Elm Street
 5   Dallas, Texas 75202
     214.744.5100
 6   (arich@alanrichlaw.com)
     Representing Property Damage FCR
 7
 8
 9   CONNOLLY BOVE LODGE & HUTZ, LLP
     BY:  JEFFREY C. WISLER, ESQUIRE
10   The Nemours Building
     1007 North Orange Street
11   P.O. Box 2207
     Wilmington, Delaware 19899
12   302.88.6528
     (jwisler@cblh.com)
13   Representing Maryland Casualty
14
15   ECKERT SEAMANS CHERIN & MELLOTT, LLC
     BY:  EDWARD J. LONGOSZ, II, ESQUIRE
16   1747 Pennsylvania Avenue, NW
     12th Floor
17   Washington, DC 20006
     202.659.6619
18   (elongosz@eckertseamans.com)
     Representing Maryland Casualty and Zurich
19
20   COZEN O'CONNOR
     BY:  JACOB C. COHN, ESQUIRE
21   1900 Market Street
     Philadelphia, Pennsylvania 19103-3508
22   215.665.2147
     (jcohn@cozen.com)
23   Representing Federal Insurance Company
 4
```

## Page 7

```
 1   APPEARANCES (continued)
 2
 3   CUYLER BURK, P.C.
     BY:  STEFANO V. CALOGERO, ESQUIRE
 4   Parsippany Corporate Center
     Four Century Drive
 5   Parsippany, New Jersey 07054
     973.734.3200
 6   (scalogero@cuyler.com)
     Representing Allstate Insurance Company
 7
 8
 9   GOODWIN PROCTER, LLP
     BY:  BRIAN H. MUKHERJEE, ESQUIRE*
10   (*VIA TELECONFERENCE)
     901 New York Avenue, N.W.
11   Washington, DC 20001
     202.346.4124
12   (bmukherjee@goodwinprocter.com)
     Representing CNA Insurance
13
14   WOMBLE CARLYLE SANDRIDGE & RICE, PLLC
     BY:  KEVIN J. MANGAN, ESQUIRE*
15   (*VIA TELECONFERENCE)
     222 Delaware Avenue
16   Suite 1501
     Wilmington, Delaware 19801
17   302.252.4361
     (kmangan@wcsr.com)
18   Representing State of Montana
19
20   PEPPER HAMILTON, LLP
     BY:  LINDA J. CASEY, ESQUIRE*
21   (*VIA TELECONFERENCE)
     3000 Two Logan Square
22   Philadelphia, Pennsylvania 19103
     215.981.4000
23   (caseyl@pepperlaw.com)
     Representing BNSF Railway Company
24
```

## Page 8

```
 1              - - -
 2            I N D E X
 3              - - -
 4
 5   Testimony of:
 6       DAVID T. AUSTERN, ESQUIRE
 7
 8   By Mr. Brown        Page 12, 242
 9   By Ms. Alcabes      Page 95
10   By Mr. Candon       Page 123, 251
11   By Mr. Demmy        Page 164
12   By Mr. Cohn         Page 173
13   By Mr. Plevin       Page 192
14   By Ms. Cobb         Page 207
15   By Ms. Casey        Page 219
16   By Mr. Mangan       Page 221
17   By Mr. Speights     Page 222
18
19
20
21
22
23
24
```

## Page 9

```
 1             - - -
 2           E X H I B I T S
 3             - - -
 4   NO.   DESCRIPTION          PAGE
 5   Austern-1
       Amended Notice of Deposition
 6     Of David T. Austern       31
 7   Austern-2
       Exhibit 2 to Exhibit Book
 8     Asbestos PI Trust Agreement   32
 9   Austern-3
       First Amended Joint Plan of
10     Reorganization...           43
11   Austern-4
       Exhibit 6 to Exhibit Book
12     Asbestos Insurance Transfer
       Agreement                   80
13
14   Austern-5
       Exhibit 4 to Exhibit Book
       Trust Distribution Procedures 90
15
     Austern-6
16     Exhibit 10 to Exhibit Book
       Cooperation Agreement       92
17
     Austern-7
18     Notice of Deposition of
       David Austern             95
19
     Austern-8
20     Debtors' Disclosure Statement
       for the First Amended Joint
21     Plan of Reorganization...  118
22   Austern-9
       Notice of Deposition of
23     David T. Austern          124
24
```

Page 10

1  EXHIBITS (continued)
2
   NO.    DESCRIPTION         PAGE
3
   Austern-10
4     Form 8-K            124
5  Austern-11
      Exhibit 8 to Exhibit Book
6     Best Interests Analysis   156
7
         - - -
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 11

1          - - -
2    DEPOSITION SUPPORT INDEX
3          - - -
4
5  Direction to Witness Not to Answer:
6  Page  Line      Page   Line
7  181   13        225    16
   229   04        239    03
8
9
10  Request for Production of Documents:
11  Page  Line      Page   Line
12  NONE
13
14
15  Stipulations:
16  Page  Line      Page   Line
17  NONE
18
19
20  Area(s) Marked Confidential:
21  Page  Line      Page   Line
22  NONE
23
24

Page 12

1          - - -
2          PROCEEDINGS
3          - - -
4      MR. GUY:  We will follow the
5  federal rules.
6          - - -
7      DAVID T. AUSTERN, ESQUIRE,
8  after having been first duly
9  sworn, was examined and testified
10 as follows:
11
12      EXAMINATION
13          - - -
14 BY MR. BROWN:
15     Q.   Good morning, Mr. Austern.
16 My name is Michael Brown.  I represent
17 OneBeacon American Insurance Company,
18 Seaton Insurance Company, GEICO, and
19 Republic Insurance Company.
20         Could you state your full
21 name for the record, please?
22     A.   David Thomas Austern.
23     Q.   Have you ever been deposed
24 before?

Page 13

1     A.   Yes.
2     Q.   How many times?
3     A.   Somewhere between 25 and 30
4  times.
5     Q.   So it's fair to say that you
6  are familiar with the protocol for a
7  deposition then?
8     A.   I am.
9     Q.   Okay.  Can you give me a
10 summary of your professional background?
11     A.   I was an assistant district
12 attorney in the New York County District
13 Attorney's Office for four years; I was
14 an assistant United States attorney in
15 the United States Attorney's Office in
16 Washington, D.C. for four years; I was a
17 law professor for two years; I was in the
18 private practice of law for something
19 like 12 years; and I've been general
20 counsel of the Manville Personal Injury
21 Settlement Trust, and I have had some
22 other asbestos matters for the last 21
23 and a half years.  That doesn't add up to
24 45, and it should, but...

Page 14

1    Q.    Those are estimates, I take
2  it?
3    A.    Those are estimates, yes.
4    Q.    What did you do in
5  preparation for today's deposition?
6    A.    I reviewed some documents,
7  and I spoke to counsel.
8    Q.    What documents did you
9  review?
10    A.    I also reviewed some
11  transcripts.
12        I reviewed the Personal
13  Injury Trust Agreement; the Trust
14  Distribution Process -- the Personal
15  Injury Trust Distribution Process; the
16  Transfer Agreement; the Cooperation
17  Agreement; I reviewed Ms. Biggs' latest
18  estimation report; Dr. Peterson's latest
19  report; Dr. Florence's latest report;
20  Dr. Whitehouse's -- one of
21  Dr. Whitehouse's reports -- I am sorry --
22  two of Dr. Whitehouse's reports; the
23  rebuttal to those reports from Dr. Welsh
24  and Dr. Freedman; the objections filed by

Page 15

1  the Libby claimants and by one or more
2  insurance companies, and I am not sure I
3  know which ones; my prior deposition in
4  this case; my prior deposition in the
5  Combustion Engineering case; my testimony
6  in the Combustion Engineering case. I
7  may have left something out, but I think
8  those are most of the documents I
9  reviewed.
10    Q.    Okay. And you also
11  mentioned that you had reviewed some
12  transcripts?
13    A.    Those were the depositions
14  and trial testimony -- oh, excuse me.
15  Yes. I reviewed Mr. Lockwood's
16  deposition.
17    Q.    Did you actually review the
18  Amended Plan of Reorganization?
19    A.    Yes -- and excuse me -- and
20  the Disclosure Statement.
21    Q.    And over what period of time
22  did you review all these materials in
23  preparation for your deposition?
24    A.    Two weeks. I did one other

Page 16

1  thing in preparation of the deposition.
2  I listened to parts of, albeit not all,
3  of the Lockwood deposition.
4    Q.    Did you meet with counsel in
5  preparation for the deposition?
6    A.    Yes.
7    Q.    When?
8    A.    Last Friday and yesterday.
9    Q.    And for how long last
10  Friday? What period of time did you meet
11  with counsel?
12    A.    I confess I don't remember,
13  but it was several hours.
14    Q.    And the more recent meeting?
15    A.    I would say three hours.
16    Q.    Was it just counsel for the
17  Future Claimants' Representative or were
18  other Plan proponent counsel present?
19    A.    No. There were no other
20  Plan proponent counsel.
21    Q.    In reviewing Mr. Lockwood's
22  deposition testimony, was there anything
23  in his transcript with which you
24  disagreed?

Page 17

1    A.    I don't remember -- nothing
2  occurs to me, although if you showed me a
3  question and answer, I might say I
4  disagreed. But I don't recall anything.
5    Q.    Okay. When you listened in
6  on a portion of the deposition, was there
7  anything that you heard by way of an
8  answer by Mr. Lockwood that struck you as
9  inaccurate?
10    A.    Not that I recall.
11    Q.    Okay. Now, you mentioned
12  that you had reviewed the Disclosure
13  Statement, the Plan, the PI Trust
14  Agreement I assume you were referring to,
15  the PI Trust Distribution Procedures, the
16  Transfer Agreement, and the Cooperation
17  Agreement?
18    A.    Yes.
19    Q.    Do you understand all of
20  those documents?
21    A.    No.
22    Q.    Are there particular
23  documents that you understand better than
24  others?

Page 18

1    A.    Yes.
2    Q.    Which ones?
3    A.    The Trust Distrubution
4    Process.
5    Q.    By that, you mean the
6    Asbestos PI Trust Distribution
7    Procedures?
8    A.    Yes, yes.
9    Q.    Okay.
10    A.    I will refer to it as the
11    TDP, most likely.
12    Q.    We will finish the
13    deposition a lot sooner if you do that.
14    A.    And there were some sections
15    in some of the other documents I thought
16    I understood and some sections I thought
17    I did not.
18    Q.    Okay.  How about the Trust
19    Agreement?
20    A.    I believe I understood most
21    of that.
22    Q.    Okay.  You were appointed by
23    the bankruptcy court as the, quote, legal
24    representative, close quote, under

Page 19

1    Section 524(g) of the bankruptcy code,
2    correct?
3    A.    Correct.
4    Q.    When did that occur?
5    A.    Just about this time of year
6    five years ago.
7    Q.    Okay.  So in 2004?
8    A.    Yes.
9    Q.    And, as I understand it,
10    under the Plan your title is the asbestos
11    PI FCR, correct?
12    A.    Yes.
13    Q.    And the FCR is for Future
14    Claimants' Representative?
15    A.    Yes.
16    Q.    You will understand if I
17    refer to you as the FCR in the
18    deposition?
19    A.    I will understand what the
20    reference is.
21    Q.    Okay.  You are a
22    co-proponent of the Plan, correct?
23    A.    Yes.
24    Q.    How did you come to be the

Page 20

1    FCR?  I understand that you were approved
2    by the bankruptcy court, but how were you
3    presented, if you will, for that role?
4    A.    Understanding I was not in
5    the case at the time, I can only tell you
6    what documents I have looked at appear to
7    say.
8    Q.    Okay.
9    A.    The Debtor presented to the
10    court a motion of seeking an appointment
11    of an FCR, provided the court with three
12    names and an untitled fourth name -- I
13    will explain that in a moment.  The three
14    names proposed were me and two other
15    people, and then a statement that the
16    Property Damage Representatives didn't
17    want any of the three mentioned by
18    the Debtor and wanted some unnamed fourth
19    person.  So there were four, if you will,
20    potential choices presented to the
21    bankruptcy court.
22    Q.    Who were the other two named
23    individuals?
24    A.    Professor Eric Green and

Page 21

1    Dean Trafelet.
2    Q.    I gather from your answer
3    that at the time this occurred, it was
4    contemplated that there would be a single
5    asbestos trust that would handle both
6    personal injury claims and property
7    damage claims?
8    A.    I don't know.
9    Q.    Do you have any idea how the
10    Debtors came up with the three names that
11    they did?
12    A.    I know what they said in
13    their pleading.  They said they had
14    discussed this matter with, well,
15    obviously, the Property Damage Trust
16    Representatives that I mentioned, and
17    they had discussed it with one or more
18    Creditors Committees and the Asbestos
19    Claimants Committee.
20    Q.    And then did the bankruptcy
21    court select you from the list of
22    contenders for the position?
23    A.    Well, I have left out a
24    pleading.

Page 22

1    Q.   Okay.
2    A.   The Asbestos Claimants
3  Committee filed a motion, I guess, in
4  response to the Debtors motion in which
5  they -- I should back up a step.
6         The Debtors motion had a
7  chart on it, as I recall, which showed
8  who opposed various of the names
9  mentioned and who was in favor of various
10  of the names mentioned, looking at the
11  committees. And one of the things that
12  was said was that the ACC opposed me and
13  wanted Dean Trafelet. The ACC responded
14  to that, I believe, saying they did not
15  oppose me, but they wanted Dean Trafelet
16  rather than me.
17    Q.   Okay. And did judge
18  Fitzgerald then make a decision based
19  upon the pleadings you just described?
20    A.   I don't know what drove her
21  decision, but she made a decision and she
22  selected me.
23    Q.   Okay. Now, did you have the
24  title FCR with respect to other asbestos

Page 23

1  trusts?
2    A.   Yes.
3    Q.   Which ones? Actually, just
4  for purposes of that question, I want to
5  focus on trusts that are obviously up and
6  running as opposed to ones that may be in
7  the works.
8    A.   One other trust, the
9  Combustion Engineering Trust.
10    Q.   And then you mentioned
11  earlier that you are the general counsel
12  for the Manville Trust?
13    A.   Yes.
14    Q.   Is your role as the general
15  counsel for the Manville Trust akin to
16  your role as the FCR for the Combustion
17  Engineering Trust?
18    A.   No.
19    Q.   Okay. Can you describe the
20  differences in your roles?
21    A.   Well, first of all, the
22  Manville Trust has a Futures Claims
23  Representative.
24    Q.   Okay.

Page 24

1    A.   So I certainly don't have
2  that role. I advise the trustees -- I am
3  the legal advisor to the trustees and
4  sometimes trust staff.
5    Q.   And what is your role as the
6  FCR for the Combustion Engineering Trust?
7    A.   I represent future
8  claimants.
9    Q.   Are you familiar with a term
10  "Trust Advisory Committee"?
11    A.   Yes.
12    Q.   Is there a Trust Advisory
13  Committee for the Combustion Engineering
14  Trust?
15    A.   Yes.
16    Q.   And who are its current
17  members?
18    A.   Mr. Cooney, Mr. Weitz,
19  Mr. Kazan, and there is somebody else.
20  And I am not sure who it is.
21    Q.   With respect to the
22  Combustion Engineering Trust, did you
23  have the role of future claimants -- let
24  me back up. Strike that.

Page 25

1         Did you have the role of
2  legal representative, as that term is
3  used in Section 524(g) of the bankruptcy
4  code?
5    A.   I believe that was what I
6  was, yes.
7    Q.   Okay. And were you a
8  co-proponent of the CE Trust --
9    A.   Yes.
10    Q.   The CE Plan?
11    A.   Yes.
12    Q.   Putting aside confirmed
13  plans and trusts that are up and running,
14  are you the designated Future Claimants'
15  Representative in connection with any
16  pending asbestos bankruptcy cases other
17  than the Grace case?
18    A.   No.
19    Q.   Are you familiar with the
20  statutory requirements for a Section
21  524(g) trust?
22    A.   I am generally familiar. I
23  am not sure I can recall each and every
24  one right at the moment.

Page 42

1    Q.   Do you have any
2  understanding at all of what a demand is?
3    A.   In bankruptcy law, no.
4    Q.   Who do you understand to be
5  your constituency?
6    A.   Future claimants.
7    Q.   Do you have an understanding
8  that future claimants are the holders of
9  future demands?
10   A.   I don't know.
11   Q.   Do you have an understanding
12 as to whether the Debtors face the
13 prospect of any future asbestos PD
14 demands or asbestos PD claims?
15   A.   I believe there are
16 scenarios in which they do.
17   Q.   Could you describe them?
18   A.   No, but I believe that there
19 are property damage claims that -- that
20 the Debtor is responsible
21 post-confirmation for certain property
22 damage claims.
23   Q.   And that those property
24 damage claims would fit within what you

Page 43

1  understand to be a future property damage
2  claim as opposed to a current property
3  damage claim?
4    A.   I am not sure.
5    Q.   All right.
6      MR. BROWN:  We will mark
7  this Austern-3.
8      (Austern-3 marked for
9  identification at this time.)
10 BY MR. BROWN:
11   Q.   Mr. Austern, you have before
12 you a document that we have marked
13 Austern-3.
14      My first question is, can
15 you identify it?
16   A.   It's the first Amended Joint
17 Plan of Reorganization.
18   Q.   And this is one of the
19 documents you indicated previously that
20 you reviewed in preparation for this
21 deposition, correct?
22   A.   Yes.
23   Q.   Are there particular
24 provisions in the Plan, as you sit here

Page 44

1  today, for which you -- strike that.
2      Are there particular
3  provisions in the Plan that you don't
4  understand?
5    A.   Yes.
6    Q.   Are there any that stick out
7  in your mind in that regard?
8    A.   Can I look at the Plan for a
9  moment?
10   Q.   Sure.
11   A.   By way of example, 7.15 of
12 the document.
13   Q.   That's one that you do not
14 understand?
15   A.   Well, it's one I have
16 trouble trying to understand.
17   Q.   You are in good company.
18   A.   There are other sections of
19 the Plan and other documents I reviewed
20 that address insurance issues, which I
21 have trouble understanding and rely on
22 counsel to explain to me.
23   Q.   Well, as would have it, 7.15
24 is an area that I wanted to question you

Page 45

1  about.  So why don't we turn to that
2  section.
3    A.   (Witness complies with
4  request.)
5    Q.   And why don't you take a
6  moment to review it.  It's not terribly
7  long.
8      MR. GUY:  Is there any
9  particular section, Michael?
10     MR. BROWN:  Well, I have
11 questions about a few sections, so
12 it might be easiest if he reads
13 the whole thing.
14     THE WITNESS:  Okay.  I have
15 reviewed it.
16 BY MR. BROWN:
17   Q.   Okay.  Recognizing that you
18 don't understand it fully, do you have an
19 idea of what its intended purpose is?
20   A.   Its intended purpose, as I
21 understand it, is to create insurance
22 neutrality.
23   Q.   And what do you understand
24 insurance neutrality to be?

Page 46

1      A.   That the Plan does not
2   interfere with the rights of the
3   insurance companies.
4      Q.   Okay.  Are there any
5   exceptions to that broad statement, as
6   you understand Section 7.15?
7         MR. COHN:  You might want to
8   rephrase that because you just
9   changed from his understanding of
10   insurance neutrality in the broad
11   concept to a provision that very
12   clearly is not what it was
13   announced to be.
14         MR. BROWN:  Can you read the
15   last question?
16         (The reporter read from the
17   record as requested.)
18   BY MR. BROWN:
19      Q.   You understand Section 7.15
20   to be intended to preserve the insurers'
21   rights; is that a fair statement?
22      A.   Yes.
23      Q.   Okay.  Is it your belief
1   that that's what it accomplishes?

Page 47

1      A.   I don't know.
2         (There was a discussion held
3   off the record at this time.)
4   BY MR. BROWN:
5      Q.   Mr. Austern, are you
6   familiar with the UNR decision in the
7   Seventh Circuit, the citation to which is
8   942 F.2d 1101?
9      A.   I am familiar with the UNR
10   Trust.  I am not familiar with the
11   decision.
12      Q.   Are you familiar with what
13   happened in the trial court in the
14   Fuller-Austin coverage case?
15         MR. GUY:  Objection, vague.
16         THE WITNESS:  No.
17   BY MR. BROWN:
18      Q.   You said you just read
19   Section 7.15.  Let's focus on (a).
20         Is your understanding that
21   (a) is a preemptory provision with
22   respect to the Plan, Plan documents, and
23   Confirmation Order except as specifically
24   set forth in Section 7.15?

Page 48

1         MR. GUY:  Objection.
2         MR. LIESEMER:  Object to the
3   form of the question.
4         MR. GUY:  It calls for a
5   legal conclusion.  The witness is
6   a fact witness.
7         MS. BAER:  Same objection.
8         THE WITNESS:  I am not
9   positive I know what you mean by
10   preemptory.  You sort of focused
11   on my problem with 7.15.  I don't
12   know how you read the successive
13   paragraphs as impacting on each
14   other.
15   BY MR. BROWN:
16      Q.   Do you believe Section 7.15
17   to be unclear?
18      A.   To me.
19         MR. GUY:  Objection.
20   BY MR. BROWN:
21      Q.   Okay.  Well, let's explore
22   that a little bit.
23         Let's look at Section
24   7.15(b), and you will see that there is a

Page 49

1   reference in subsection (b) to, quote,
2   the beneficiaries of the Asbestos PI
3   Trust?
4         Do you see that?
5      A.   Yes.
6      Q.   Do you have any
7   understanding as to what that means?
8      A.   It means what it states, the
9   beneficiaries of the Personal Injury
10   Trust.
11      Q.   And who are they?
12      A.   Well, there are personal
13   injury claimants obviously, and there
14   are, under certain circumstances,
15   indirect personal injury claimants.
16      Q.   Okay.  And who do you
17   understand to be within the definition of
18   indirect PI Trust claimants?
19      A.   Entities that can bring
20   claims as indirect claimants on the
21   grounds that they have paid dollars that
22   the Personal Injury Trust should
23   reimburse them for.
24      Q.   Okay.  Are you familiar at

Page 50

1    all with any of the Debtors' pre-petition
2    settlements with insurance companies?
3        A.   I have seen a list, and
4    that's the extent of my knowledge.
5        Q.   Are you aware that at least
6    certain of those insurers have
7    contractual indemnity provisions against
8    the Debtors in those settlement
9    agreements?
10       A.   Can you explain to me what
11   you mean by contractual?
12       Q.   Sure.  I will represent to
13   you that there are settlement agreements
14   that are pre-petition settlement
15   agreements in which the insurer paid a
16   sum of money to the Debtors, and in
17   exchange for paying that money, the
18   Debtors agreed to indemnify the insurer
19   in the event that claims were asserted
20   against the policy after the settlement
21   by other parties.
22       A.   Third party claimants?
23       Q.   Third parties.
24           Do you understand the term

Page 51

1    "indirect PI Trust claims" to include the
2    insurers insofar as they have the type of
3    contractual indemnity claim that I just
4    described?
5           MR. LIESEMER:  Object to the
6    form of the question.
7           MR. GUY:  Same objection.
8           THE WITNESS:  Mr. Brown, I
9    understand that all asbestos
10   personal injury insurance has been
11   channelled to the Asbestos
12   Personal Injury Trust.  And there
13   are settled insurance companies
14   that -- how would I describe it --
15   their obligations have been
16   settled with the Debtor; there are
17   unsettled ones; and then there are
18   those that have coverage in place
19   agreements or reimbursement
20   agreements.
21           I don't know where your
22   question fits into my
23   understanding of those buckets of
24   insurance entities.

Page 52

1    BY MR. BROWN:
2        Q.   Okay.  Let me parse that
3    out.  Do you understand certain of the
4    Debtors' insurance companies to have
5    indirect asbestos PI claims?
6        A.   They could.  They could have
7    the right to file them, yes.
8        Q.   Okay.  And do you understand
9    those insurers to fit within the phrase
10   in (b), the beneficiaries of the Asbestos
11   PI Trust?  In other words, are the
12   insurers that have the contractual
13   indemnity claims against the Debtors,
14   quote, beneficiaries of the Asbestos PI
15   Trust, as that term is used in 7.15(b)?
16          MR. LIESEMER:  Object to the
17   form of the question.
18          MR. GUY:  Objection, asked
19   and answered, compound.
20          MS. BAER:  Same objection.
21          MR. GUY:  You may answer.
22          THE WITNESS:  As far as I
23   know, they could be under certain
24   circumstances.

Page 53

1    BY MR. BROWN:
2        Q.   All right.  Then I would now
3    like you to compare the language in (a)
4    and the language in (b) based on the
5    assumption that they are.
6           MR. GUY:  Now I am confused.
7           MR. BROWN:  Anyone who reads
8    this provision is confused.
9           MR. GUY:  I am confused.
10   It's talking --
11          THE WITNESS:  You are asking
12   me to compare (a) to (b) or (b) to
13   (a)?
14          MR. GUY:  For what purpose?
15   BY MR. BROWN:
16       Q.   If the insurer that I just
17   described is a beneficiary of the
18   Asbestos PI Trust, then, according to
19   (b), it is bound by the Plan, the Plan
20   documents, and the Confirmation Order,
21   correct?
22       A.   That's what (b) says, yes.
23       Q.   So does (b) then supersede
24   subsection (a)?

Page 54

1    A.   I don't know.
2    Q.   Let's go to a defined term
3  in the Plan which appears on page 6,
4  number 16, quote, asbestos insurer
5  coverage defenses. Take a moment to
6  review that provision.
7        MR. GUY:  So that I don't
8    have to repeat it throughout, I am
9    going to enter a standing
10   objection. The witness is here
11   not as a 30(b)(6) witness on
12   insurer issues, and the Plan says
13   what it says.
14       MR. BROWN:  I understand.
15       MR. COHN:  Can you keep your
16   voice up, Tom?
17       MR. GUY:  We will go off the
18   record.
19       (There was a discussion held
20   off the record at this time.)
21  BY MR. BROWN:
22   Q.   Have you had a chance to
23  review the definition of asbestos insurer
24  coverage defenses?

Page 55

1    A.   Yes.
2    Q.   Do you understand it?
3    A.   No.
4    Q.   Fair enough. You are not
5  alone.
6        Let's get back to 7.15.
7    A.   Can you give me the page
8  again?
9    Q.   I am sorry. It's page 87.
10  Actually, what I would like to do is I
11  want to do a comparison. Can you also
12  look at Section 11.9? You might want to
13  take a moment to read 11.9.
14   A.   Can you give me a page
15  number?
16   Q.   Yes. Page 115, Section 11.9
17  entitled Exculpation.
18   A.   Okay.
19   Q.   If you keep that page handy
20  and go back and look at Section 7.15, I
21  will represent to you, feel free to look
22  yourself, that there is no specific
23  reference in 7.15 to Section 11.9.
24   A.   I believe that's correct.

Page 56

1    Q.   Okay. My question is, do
2  you have an understanding as to whether
3  the language in 7.15(a) supersedes the
4  language in 11.9?
5    A.   I don't know.
6    Q.   Do you know whether it's
7  intended to?
8    A.   No.
9    Q.   Reading both of those
10  provisions, do you understand whether it
11  does?
12       MR. GUY:  Objection, calls
13   for a legal conclusion.
14       MR. BROWN:  It just calls
15   for his understanding.
16       THE WITNESS:  Mr. Brown, I
17   must confess to you when I read
18   11.9 both the first time and the
19   second time, what I concentrated
20   on was on the fact that I had
21   exculpation, and I didn't
22   concentrate very much more.
23  BY MR. BROWN:
24   Q.   So you have been exculpated

Page 57

1  if the Plan is confirmed?
2    A.   Yes.
3    Q.   Let's just use that as an
4  example, not to pick on you, but since
5  you understand at least that much in
6  11.9.
7        Insofar as an insurer had a
8  claim against you, would you still be
9  exculpated in light of Section 7.15 as
10  you understand it?
11       MR. LIESEMER:  Object to the
12   form of the question.
13       MR. GUY:  Objection, calls
14   for a legal conclusion.
15       THE WITNESS:  The first part
16   of the answer is that in the Trust
17   Agreement, I also have what is not
18   labeled as exculpation but
19   indemnification rights, not
20   including gross negligence.
21       The answer is I don't know
22   the answer to that question.
23  BY MR. BROWN:
24   Q.   Does that concern you?

Page 58

1      A.   Does a possible conflict of
2   7.15 to 11.9 concern me?
3      Q.   Well, yes.
4      A.   No.
5      Q.   Okay.  Would you go back to
6   Section 7.7 of the Plan?
7      A.   Did you say 7.7?
8      Q.   Yes.  7.7 entitled
9   Conditions to Occurrence of the
10   Confirmation Date.
11      MR. GUY:  What page is that?
12      MR. BROWN:  I am sorry.  It
13   starts on page 69, and there are a
14   lot of conditions.  So it runs to
15   page 81.
16      THE WITNESS:  Okay.
17   BY MR. BROWN:
18      Q.   You are free to look at
19   that, if you want, but I understand you
20   have already reviewed the Plan.
21      A.   Yes.
22      Q.   My question is, do you have
23   an understanding as to whether Section
24   7.15 entitled Insurance Neutrality

Page 59

1   preempts Section 7.7 insofar as the
2   Debtors's insurers are concerned?
3      MR. GUY:  Objection, calls
4   for a legal conclusion.
5      THE WITNESS:  I don't know.
6   BY MR. BROWN:
7      Q.   Okay.  If you look at
8   Section 7.8, which begins on page 81,
9   that one is entitled Conditions to
10   Occurrence of the Effective Date.
11      If I asked you the same
12   question, would your answer be the same
13   with respect to Section 7.8?
14      A.   Can I look at 7.8 for a
15   moment?
16      Q.   Sure.
17      A.   I am sorry.  Could you
18   repeat the question?
19      Q.   Let me see if I can rephrase
20   it.  My question is whether the
21   preemptory language that appears in
22   Section 7.15(a) preempts the conditions
23   set forth in Section 7.8, as understand
24   it?

Page 60

1      MR. GUY:  Objection.
2      MR. LIESEMER:  I join in
3   that objection.
4      MR. GUY:  It calls for a
5   legal conclusion.
6      THE WITNESS:  I don't know.
7   BY MR. BROWN:
8      Q.   Okay.  Can you now look at
9   7.15(h)?
10      A.   Did you say (e)?
11      Q.   (H).  It appears on page 88.
12      A.   Yes.
13      Q.   Do you understand 7.15(h) to
14   bind all of the Debtors' insurers to all
15   of the releases and injunctions set forth
16   in the Plan?
17      MR. GUY:  Objection, calls
18   for a legal conclusion.
19      THE WITNESS:  I don't know.
20   BY MR. BROWN:
21      Q.   Let's go to page 97 of the
22   Plan, Section 8.5 entitled Successor
23   Claims Injunction.
24      MR. GUY:  When you get to a

Page 61

1   point for a break, can we take
2   one?
3      MR. BROWN:  Why don't we do
4   that right now.
5      (There was a break from
6   11:03 a.m. to 11:13 a.m.)
7      (The reporter read from the
8   record as requested.)
9   BY MR. BROWN:
10      Q.   Mr. Austern, I don't know if
11   you have had a chance to review that
12   section during the break, but if not, can
13   you take a look at it?
14      A.   Yes, I have reviewed this.
15      Q.   Do you have an understanding
16   as to the purpose of the successor claims
17   injunction?
18      MR. LIESEMER:  Object to the
19   form of the question.
20      THE WITNESS:  Well, as its
21   name implies, it is intended to
22   enjoin certain conduct.  Beyond
23   that, I, of course, was not part
24   of this case when either the

Page 62

1    Sealed Air or the Fresenius
2    actions were commenced and
3    concluded and settled.
4    BY MR. BROWN:
5        Q.    Do you understand the
6    Fresenius indemnified parties and the
7    Sealed Air indemnified parties to be the
8    beneficiaries of the successor claims
9    injunction?
10       A.    I believe they are.
11       Q.    Okay. The successor claims
12   injunction is a 105 injunction, correct?
13       A.    Correct. It's not a 524(g)
14   injunction.
15       Q.    I gather from your answer
16   that you understand the difference
17   between a Section 105 injunction and a
18   Section 524(g) injunction?
19       A.    To the extent that Manville
20   had only a Section 105 injunction, yes.
21       Q.    Okay. Do you have an
22   understanding as to whether the successor
23   claims injunction enjoins any claims that
24   are asbestos-related claims?

Page 63

1        MR. GUY: Objection, calls
2    for a legal conclusion.
3        THE WITNESS: Do you mean
4    asbestos personal injury, or no?
5    BY MR. BROWN:
6        Q.    Could be, or any other type
7    of asbestos-related claim.
8        A.    I am not sure.
9        Q.    Do you understand there to
10   be a problem with using a Section 105
11   injunction to enjoin asbestos-related
12   claims?
13       MR. GUY: Objection, vague
14   as to problem.
15       MR. LIESEMER: I join in the
16   objection.
17       THE WITNESS: There are
18   certain 105 injunctions that can
19   be lifted. I assume you cannot do
20   that with a 524(g) injunction as
21   it is inexorably intertwined with
22   the Plan itself. I don't know of
23   any other distinctions.
24   BY MR. BROWN:

Page 64

1        Q.    The successor claims
2    injunction by its terms cannot be lifted?
3        A.    It cannot, as I understand
4    it.
5        Q.    If a claim fits within the
6    definition of the successor claim, as
7    that term is defined in the Plan, do you
8    understand the successor claims
9    injunction to enjoin that claim?
10       MR. LIESEMER: Object to the
11   form of the question.
12       MR. GUY: Same objection.
13       MS. BAER: Same objection.
14       THE WITNESS: I don't know.
15   BY MR. BROWN:
16       Q.    Let's turn back for a moment
17   to asbestos PI channeling injunction,
18   page 90, Section 8.2.
19       A.    Okay.
20       Q.    Do you understand the
21   asbestos PI channeling injunction to be
22   purely a 524(g) injunction?
23       MR. GUY: Objection.
24       THE WITNESS: I don't know.

Page 65

1    I don't know if it is or not.
2    BY MR. BROWN:
3        Q.    All right. Mr. Austern, I
4    want to shift gears here and turn back to
5    the Asbestos PI Trust Agreement, which we
6    marked as Austern-2. And I would like to
7    direct your attention to Section 6.1.
8    And you are going to want a page.
9        A.    It's 34.
10       Q.    In 6.1, the second sentence
11   says, "He shall serve in a fiduciary
12   capacity, representing the interests of
13   the holders of future PI Trust Claims for
14   the purpose of protecting the rights of
15   such persons."
16       Do you see that?
17       A.    Yes.
18       Q.    And the "he" there is you,
19   correct?
20       A.    Yes.
21       Q.    What do you understand your
22   obligations to be to the holders of
23   future PI Trust claims?
24       A.    I represent them, and, as to

Page 74

1    Q.    You will agree with me that
2  Section 2.2(f) sets forth a number of
3  different items for which the trustees
4  need the consent of the TAC and the
5  Future Claimants' Representative,
6  correct?
7    A.    Yes.
8    Q.    It goes on from Romanette 1
9  to Romanette 15, correct?
10   A.    Yes.
11   Q.    Why is there a need to have
12 the consent of the Future Claimants'
13 Representative and the TAC on these
14 particular items rather than simply
15 consultation?
16   A.    My answer is the same, and I
17 will speak forgetting the TAC, as the
18 Future Claimants' Representative, I want
19 the right to under certain circumstances
20 not agree to a decision by the trustees
21 and have that be the end of the decision.
22   Q.    Well, it's not actually the
23 end of the decision, is it?
24   A.    No.  There are ways of

Page 75

1  resolving that difference.
2    Q.    And what are those?
3    A.    Well, I may confuse this
4  with the Manville Trust, but you can
5  seek, shall we say, guidance from the
6  bankruptcy court.
7    Q.    By that, you mean a ruling?
8    A.    Yes, yes.
9    Q.    If your consent has been
10 unreasonably withheld in the views of the
11 trustees?
12   A.    That's correct.
13   Q.    Is there anything in Section
14 524(g) to your knowledge that requires a
15 Trust, an asbestos Trust, to have a
16 consultation and consent provisions that
17 are set forth in this Trust Agreement?
18   A.    I do not know of anything in
19 524(g) like that.
20   Q.    Do you know who the
21 designated trustees are for the Asbestos
22 PI Trust?
23   A.    Yes.
24   Q.    Okay.  Who are they?  Or

Page 76

1  list of them.
2    A.    Dean Trafelet, Lewis
3  Sifford, and Harry Huge.
4    Q.    And do you know each of
5  those gentlemen?
6    A.    Well, in the case of
7  Mr. Huge and Mr. Trafelet, I do know
8  them.  In the case of Mr. Sifford, I have
9  met him on a number of occasions.
10   Q.    Okay.  What is the
11 professional background of Mr. Huge?
12   A.    Let's see.  I first met him
13 about 40 years ago at the Justice
14 Department.  I am sorry.  He is a lawyer.
15 He has been with the government.  He has
16 been in private practice.  Do you want
17 more?
18   Q.    Does he have experience with
19 asbestos trusts?
20   A.    Yes, he does.
21   Q.    What is that experience?
22   A.    He is a trustee of Armstrong
23 and I believe a trustee of OCF.
24   Q.    How long has he had the role

Page 77

1  of trustee in Armstrong?
2    A.    I met with him shortly after
3  he was appointed, and I should be able to
4  remember that.  I think four or five
5  years.
6    Q.    And how about as a trustee
7  in OCF?
8    A.    I don't know.
9    Q.    Okay.  Why don't you tell me
10 what the professional background of
11 Mr. Sifford is?
12   A.    I know him less well.
13 Mr. Sifford is a practicing lawyer in a
14 law firm, and he is an Armstrong trustee,
15 I believe.  And that's, I believe, the
16 first time I met him, and thus I looked
17 him up.  And according to
18 Martindale-Hubbell, he does both personal
19 injury plaintiff's work and personal
20 injury defense work.  I am getting close
21 to exhausting my knowledge of him.
22   Q.    Okay.  Is the personal
23 injury work that he does, both defense
24 and plaintiff's work, asbestos-related?

Page 78

1    A.    It is not as far as I know.
2    Q.    Do you know what it does
3    relate to?
4    A.    No.
5    Q.    Okay.  Do you know how long
6    he has been a trustee of the Armstrong
7    Trust?
8    A.    The same period of time
9    Mr. Huge has been, but I don't remember
10   when that started.
11   Q.    I thought you said that one
12   was four to five years ago?
13   A.    Four to five years ago.  I
14   don't remember when that started.
15   Q.    All right.  And what is the
16   professional background of Mr. Trafelet?
17   A.    Before I get to that, let me
18   explain.  Armstrong was confirmed, and
19   for a long time, there was no activity
20   for reasons that allude me.  So I can't
21   remember exactly when I got involved in
22   talking to those people.
23   Q.    Okay.
24   A.    Mr. Trafelet is a lawyer who

Page 79

1    was a judge of, I believe, the Circuit
2    Court in Cook County, Illinois for a
3    period of time, and he is an asbestos
4    trustee of -- it seems to me, he is the
5    sole trustee of the Loomis Trust and also
6    a Futures Rep, I believe, at Armstrong.
7    Q.    Okay.  And he was one of the
8    gentlemen that you mentioned that, if I
9    remember correctly, the Asbestos PI
10   Committee, otherwise known as the ACC,
11   wanted to have the role that you have?
12   A.    Yes.
13   Q.    Do you know how long he has
14   been a trustee of the Loomis Trust?
15   A.    Since it was confirmed.  And
16   this I really should know, but I think it
17   was confirmed about three years ago.
18   Q.    Okay.  And do you know
19   whether he was the FCR in Armstrong
20   before a plan was confirmed?
21   A.    I do not know.
22   Q.    Okay.  But he is the FCR for
23   the Trust?
24   A.    Yes, I believe he is.

Page 80

1    Q.    And would I be correct that
2    he's been that for four or five years?
3    A.    Yes.
4    Q.    Let's go to Section 4.9 of
5    the Trust Agreement.  Take a moment to
6    read that, if you would.
7    A.    Okay.
8    Q.    The second-to-the-last
9    sentence in Section 4.9 says, "No Trustee
10   shall act as an attorney for any person
11   who holds an asbestos claim."
12   Do you see that?
13   A.    Yes.
14   Q.    What's the reason for that?
15   A.    To avoid conflicts.
16   Q.    What type of conflicts?
17   A.    Well, you are a trustee of a
18   Plan paying somebody; you shouldn't be
19   paying your client.
20   Q.    Is there any other reason?
21   A.    Not that I know of.
22   MR. BROWN:  Mark this as
23   Austern-4.
24   (Austern-4 marked for

Page 81

1    identification at this time.)
2    BY MR. BROWN:
3    Q.    Exhibit-4, Mr. Austern, is
4    Exhibit 6 to the Exhibit Book.  My first
5    question for you is, can you identify it?
6    A.    It's the Asbestos Insurance
7    Transfer Agreement, which is part of the
8    Plan, as you point out.
9    Q.    And I believe you said this
10   is one of the documents that you had
11   reviewed; am I correct?
12   A.    Yes.
13   Q.    Do you understand this
14   agreement?
15   A.    Not in its entirety.
16   Q.    Okay.  Are there particular
17   provisions of this agreement that you do
18   not understand that you could direct my
19   attention to?
20   A.    Well, I would have to look
21   at it for a moment.  I am not sure I
22   understand all of the representations and
23   warranties and some of the terms in them.
24   There are two schedules, if I remember

Page 82

1   correctly, here.
2       Q.  I think there is three.
3       A.  All right.  I was never
4   quite sure I understood the constant or
5   individual differences between the
6   Schedules 2 and 3.
7       Q.  Okay.  Other than what you
8   what you just described, do you generally
9   have a good handle on the Asbestos
10  Insurance Transfer Agreement?
11      A.  I wouldn't describe it as a
12  good handle, but I recognize some of the
13  paragraphs.
14      Q.  All right.  Let me direct
15  your attention -- let's look at Section 1
16  on page 2, and you should probably look
17  at subsection (a).  And then (d) is the
18  one I have the question on.
19      A.  Yes.
20      Q.  In (d), it says, "The
21  Transfer is not an assignment of any
22  insurance policy."
23          Do you see that?
1       A.  Yes.

Page 83

1       Q.  What is it?
2       A.  It's an assignment of a --
3   do you mean what is the Transfer
4   Agreement?
5       Q.  Yes.  What is the transfer,
6   which is a defined term?
7       A.  Being transferred?
8       Q.  Yes.
9       A.  The proceeds.
10      Q.  Anything else?
11      A.  Well, I confess as the
12  Futures Claims Rep, I never got past the
13  proceeds because the money was what
14  interested me.
15      Q.  Okay.  Have you reviewed any
16  of the Debtors' insurance policies?
17      A.  No.
18      Q.  Have you ever reviewed a
19  general liability insurance policy?
20      A.  Yes.
21      Q.  Do you have a general
22  understanding as to the duties and
23  obligations of an insured under general
24  liability insurance policy?

Page 84

1       A.  In general.
2       Q.  Could you describe for me
3   what some of those duties are?
4       A.  Well, you have to report
5   claims.
6       Q.  Okay.
7       A.  And you have to, under
8   certain policies, confer with the
9   insurance company about what you are
10  settling and why and for how much.  And,
11  forgetting individual policies for a
12  minute, under corporate policies, there
13  are certain audit rights that sometimes
14  exist as a condition of payment to the
15  insured.
16      Q.  Are you familiar with the
17  requirement in some policies that the
18  insurer have a right to defend the
19  insured?
20          MR. LIESEMER:  Object to
21  form.
22          THE WITNESS:  As well as an
23  obligation.
24  BY MR. BROWN:

Page 85

1       Q.  Okay.  And are you aware
2   that in some policies there is a right on
3   the part of the insurer to associate in
4   the defense of the insured?
5           MR. LIESEMER:  Object to
6   form.
7           THE WITNESS:  I am not sure
8   I am familiar with that.
9   BY MR. BROWN:
10      Q.  Okay.  Well, you indicated
11  that the one thing you knew that was
12  being transferred was proceeds.
13          Are you aware of anything
14  else that's being transferred pursuant to
15  the Asbestos Insurance Transfer
16  Agreement?
17      A.  I am not sure what you mean
18  by anything else, other than the money.
19      Q.  That's it?
20      A.  Well, other things may be
21  being transferred, but I can't think of
22  anything right now.
23      Q.  Okay.  Do you have an
24  understanding as to whether the Asbestos

Page 86

1  PI Trust will become the insured under
2  the policies that are listed on Schedule
3  1 to this agreement?
4         MR. GUY:  Objection, calls
5  for a legal conclusion.
6         THE WITNESS:  Mr. Brown, I
7  don't know.  I certainly hope so.
8  BY MR. BROWN:
9      Q.   Do you have an understanding
10 as to what, if anything, happens to the
11 obligations of the insured under the
12 policies on Schedule 1 if the Plan is
13 confirmed?
14        MR. GUY:  Objection to form.
15        MR. LIESEMER:  I join in
16 that objection.
17        THE WITNESS:  Let me make
18 sure I understand the question.
19 What happens to the obligations of
20 -- if the policy was still in the
21 hands of the Debtor, what would
22 happen to the obligations of the
23 Debtor and the rights of the
1  insurance company?

Page 87

1  BY MR. BROWN:
2      Q.   I am not sure I understood
3  the qualification.  Let me try it a
4  little differently.
5         To the extent that the
6  Debtor has duties and obligations under
7  one or more of its insurance policies, if
8  this Plan is confirmed, what happens to
9  those duties and obligations, as you
10 understand it?
11        MR. LIESEMER:  Object to the
12 form.
13        MS. BAER:  I join in the
14 objection.
15        THE WITNESS:  The Plan is
16 going to be administered pursuant
17 to the Trust Distribution Process
18 as it affects personal injury
19 asbestos claims.
20        To that extent, the personal
21 injury Trust, as far as I know, is
22 not going to call up each and
23 every insurance company and say
24 "Can I settle this claim?"  I hope

Page 88

1  that's responsive to your
2  question.
3  BY MR. BROWN:
4      Q.   What is it going to do?
5  What is the Trust going to do?
6         MS. BAER:  Objection to
7  form.
8         MR. LIESEMER:  I join.
9         THE WITNESS:  It's going to
10 settle claims pursuant to the
11 Trust Distrubution Process.
12 BY MR. BROWN:
13     Q.   Okay.  Will the Debtors'
14 insurers have any role in the handling
15 defense or settlement of any claim
16 submitted to the Asbestos PI Trust?
17        MR. GUY:  Objection.
18        MR. LIESEMER:  Objection to
19 form.
20        MR. GUY:  Objection, calls
21 for speculation.
22        MS. BAER:  Objection, same.
23        THE WITNESS:  Let me address
24 audit rights.  In my copious free

Page 89

1  time, Mr. Brown, I am the claims
2  administrator of the Dow Corning
3  Trust -- that is not an asbestos
4  Trust -- and this issue has arisen
5  in that context.  And I dare say
6  it may arise in the context of the
7  W.R. Grace Trust.
8         If insurance companies
9  object to paying because they do
10 not have audit rights or because
11 of any other input into the Trust,
12 I dare say they are going to bring
13 that to the attention of the
14 trustees.  And either that will be
15 worked out between the trustees
16 and the insurance company or
17 some -- I don't like this phrase
18 because I am not sure I know what
19 it means -- but some coverage
20 court will have to determine the
21 rights of the insurance company as
22 a function of the trustees'
23 duties.
24        MR. BROWN:  Could you read

Page 90

1    back the question?
2        (The reporter read from the
3    record as requested.)
4  BY MR. BROWN:
5        Q.    Other than what you just
6    described, will the Debtors' insurers
7    have any role in the handling defense or
8    settlement of asbestos PI claims into the
9    Trust?
10        MR. GUY:  Same objection as
11    to speculation.
12        MR. LIESEMER:  Same
13    objection.
14        MS. BAER:  Same.
15        THE WITNESS:  I don't know
16    what the trustees are going to do
17    about that, so I don't know.
18        MR. BROWN:  Why don't we
19    take five minutes.
20        (There was a break from
21    11:46 a.m. to 11:57 a.m.)
22        MR. BROWN:  Let's go ahead
23    and mark this document.
1        (Austern-5 marked for

Page 91

1    identification at this time.)
2  BY MR. BROWN:
3        Q.    Mr. Austern, you have been
4    handed what's been marked Austern-5.
5    It's Exhibit 4 to the Exhibit Book.
6        Can you identify it?
7        A.    This is the TDP for the
8    Plan.
9        Q.    I am correct, am I not, that
10    this is one of the documents that you
11    reviewed in preparation for today's
12    deposition?
13        A.    Yes.
14        Q.    Are you aware of any
15    provision in the TDP or the Trust
16    Agreement that we spoke about earlier
17    that provides for any role for the
18    Debtors' insurers in the handling,
19    defense, or settlement of any asbestos
20    claims submitted to the Trust?
21        A.    No.
22        Q.    Are you aware of any other
23    Plan document that provides for such a
24    role?

Page 92

1        A.    No.
2        Q.    Is there a reason for that?
3        A.    I don't know.
4        MR. BROWN:  All right.
5    Let's mark this.
6        (Austern-6 marked for
7    identification at this time.)
8  BY MR. BROWN:
9        Q.    Mr. Austern, you have
10    another document in front of you now
11    marked Austern-6.  It's Exhibit 10 to the
12    Exhibit Book.
13        Can you identify this
14    development?
15        A.    It is the Cooperation
16    Agreement between the Debtor and others.
17        Q.    And, again, this is one of
18    the documents that you reviewed in
19    preparation for today's deposition,
20    correct?
21        A.    I don't remember if I
22    specifically did it for that purpose, but
23    I have certainly reviewed it in the past.
24        Q.    Okay.  What is the purpose

Page 93

1    of this document?
2        A.    I am not sure I know the
3    legal purpose.  It creates certain rights
4    and obligations between and among some of
5    the parties.
6        Q.    Okay.  And who are those
7    parties?
8        A.    Well, the Debtor, the
9    Reorganized Debtor, and the Trust.  I
10    mean the personal injury Trust.
11        Q.    The Debtors' insurers are
12    not a party to this agreement, correct?
13        A.    No.
14        Q.    We talked a little bit
15    earlier about general liability insurance
16    policies.
17        Are you generally familiar
18    with what's called duty to cooperate in a
19    general liability policy on the part of
20    the insured?
21        A.    Generally.
22        MR. LIESEMER:  Objection to
23    form.
24  BY MR. BROWN:

Page 94

1       Q.   If the Joint Plan is
2   confirmed and if there is a duty to
3   cooperate under a given policy, what
4   happens to that duty?
5           MR. GUY:  Objection, calls
6   for speculation.
7           THE WITNESS:  Well, the
8   proceeds of the policy have been
9   transferred to the Personal Injury
10  Trust.  I don't know what happens
11  to the duty of the Trust standing
12  in the shoes of the Debtor.
13  BY MR. BROWN:
14      Q.   So you don't know whether
15  the Trust steps into the shoes of the
16  Debtor with respect to the Debtors'
17  obligations under the policy; is that
18  what you're telling me?
19      A.   I don't know.
20          MR. BROWN:  I think I am
21  going to pass you to the next
22  questioner, Mr. Austern.  Thank
23  you.  Subject to maybe a few
1   follow-ups, I am finished.

Page 95

1           - - -
2       EXAMINATION
3           - - -
4   BY MS. ALCABES:
5       Q.   Hello, Mr. Austern.  My name
6   is Elisa Alcabes from Simpson Thacher &
7   Bartlett.  I am counsel for Travelers
8   Casualty and Surety Company.
9           Travelers served a Notice of
10  Deposition on you.  I am just going to
11  have that marked.
12          (Austern-7 marked for
13          identification at this time.)
14  BY MS. ALCABES:
15      Q.   Do you recall seeing this
16  notice?
17      A.   I saw many notices.  I don't
18  know if I saw this one.
19      Q.   Okay.  And are you familiar
20  at all with any of the agreements between
21  Travelers and W.R. Grace that were
22  entered into pre-petition?
23      A.   No.
24      Q.   Can you turn to Austern

Page 96

1   Exhibit-4, which is the Transfer
2   Agreement, and look at Schedules 2 and 3?
3       A.   (Witness complies with
4   request.)
5       Q.   Correct me if I'm wrong, I
6   believe you said you weren't sure what
7   the difference was between Schedules 2
8   and 3?
9       A.   In the sense that I don't
10  know why there are two schedules.  I
11  mean, clearly different people are listed
12  under certain schedules.
13      Q.   Do you have an understanding
14  that the types of settlement agreements
15  are different on Schedule 2 and Schedule
16  3?
17      A.   I assume that's why there
18  are two schedules.
19      Q.   You previously also
20  mentioned that you understood that there
21  were three types of insurance agreements;
22  there were settlements -- there were
23  settled insurers, there were unsettled
24  insurers, and there were insurers are

Page 97

1   coverage in place agreements or
2   reimbursement agreements?  I am not sure
3   I said that exactly right.
4           I believe you said you
5   understood there were three types of
6   settled insurers -- three types of
7   insurers.  I have got it right now.
8   Three types of insurers.
9           There are unsettled
10  insurers, fully settled insurers, and
11  insurers with coverage in place or
12  reimbursement agreements; is that right?
13      A.   That is my understanding.
14      Q.   And that's how you
15  understand this Plan to operate; is that
16  correct?
17      A.   Yes.
18      Q.   Okay.  So do you understand
19  that Schedule 2 lists the fully settled
20  insurers, the insurers that have fully
21  settled agreements?
22      A.   What do you mean by fully?
23      Q.   Fully paid settlement
24  agreements.

Page 198

```
 1              MR. PLEVIN: Let me
 2     reiterate my view that Mr. Austern
 3     is a party to the case, and -- all
 4     right. Let me see if I can get to
 5     the point of demonstrating the
 6     relevance in this fashion.
 7              MR. GUY: I will tell you
 8     what. If I could talk to my
 9     client for two seconds, I think we
10     can cut through this.
11              MR. PLEVIN: Sure.
12          (There was a discussion held
13     off the record at this time.)
14              MR. GUY: You may answer the
15     question as long as there is an
16     express understanding that you are
17     not going to argue that there is
18     any kind of waiver of privilege in
19     the answer.
20              MR. PLEVIN: That's
21     acceptable.
22              THE WITNESS: I believe
23     there is a question on the floor.
24     BY MR. PLEVIN:
```

Page 199

```
 1          Q.   Yes. And I believe the
 2     question on the floor is whether you have
 3     an opinion as to the likelihood of
 4     success on appeal or the strength of
 5     Grace's position on appeal in the Edwards
 6     matter?
 7          A.   No.
 8              MS. BAER: Objection to the
 9     extent you are requesting
10     communications among the
11     co-proponents and therefore the
12     codefendants.
13              MR. LIESEMER: And I join
14     the objection.
15              MR. PLEVIN: And I will
16     reiterate that I was not asking
17     him about any communications. I
18     was asking him about his own view.
19     BY MR. PLEVIN:
20          Q.   And your answer,
21     Mr. Austern?
22          A.   I have no view.
23          Q.   Do you have a view as to the
24     proper classification under the Plan of
```

Page 200

```
 1     the proof of claim filed by Fireman's
 2     Fund that I described a moment ago?
 3              MS. BAER: Objection as to
 4     form.
 5              MR. GUY: Objection.
 6     You may answer.
 7              THE WITNESS: No.
 8     BY MR. PLEVIN:
 9          Q.   Do you have an
10     understanding, Mr. Austern, as to what
11     the rights of the Edwards plaintiffs
12     would be under the Plan in the TDPs in
13     the event that the judgment that they
14     currently hold were to be reversed by
15     either the Texas Court of Appeals or the
16     Texas Supreme Court?
17              MS. BAER: Objection, form.
18              MR. LIESEMER: Same
19     objection.
20              MR. PLEVIN: What was the
21     objection?
22              MS. BAER: Form.
23              THE WITNESS: You are asking
24     me, do I have a view of what they
```

Page 201

```
 1     would do?
 2     BY MR. PLEVIN:
 3          Q.   What their rights would be
 4     under the Plan.
 5          A.   I assume their rights would
 6     be to file a personal injury claim with
 7     the Trust.
 8          Q.   As opposed to taking their
 9     case back to a trial court, if it were
10     remanded for a new trial and retrying the
11     case in the trial court?
12              MS. BAER: Objection. Now
13     you are asking for a legal
14     conclusion.
15              MR. LIESEMER: Objection,
16     speculation, hypothetical.
17              THE WITNESS: I don't know.
18     My understanding of the Plan is
19     they got to file a Personal Injury
20     Trust claim.
21     BY MR. PLEVIN:
22          Q.   If there is a reversal?
23          A.   Yes.
24          Q.   Do you understand,
```

Page 202

1   Mr. Austern, the concept of set-off in
2   bankruptcy?
3       A.   I understand set-off
4   generally as a proposition.  I am not
5   sure I would apply it -- I don't know
6   that I know enough bankruptcy law to
7   apply it to bankruptcy.
8       Q.   Okay.  What is your
9   understanding of the concept of set-off?
10      A.   Well, if I owe you $10,000
11  and I have to pay Mr. Guy because you owe
12  him some money, I can set-off from what I
13  paid Mr. Guy what I owe you.
14          MR. PLEVIN:  Can you read
15      that answer back?
16          (The reporter read from the
17      record as requested.)
18  BY MR. PLEVIN:
19      Q.   Are you aware, Mr. Austern,
20  that Grace has made claims for insurance
21  coverage against Fireman's Fund under
22  liability insurance policies issued by
23  Fireman's Fund?
24      A.   Yes.

Page 203

1       Q.   And that the insurance
2   coverage claims Grace has made at least
3   include, if not -- they are not limited
4   to claims for coverage of asbestos
5   personal injury claims?
6       A.   I am sorry.  Can you say
7   that again?
8       Q.   I got a little tied up
9   there.
10          Grace is seeking coverage
11  from Fireman's Fund under the Fireman's
12  Fund insurance coverage policies for
13  asbestos personal injury claims asserted
14  against Grace, correct?
15      A.   Yes.
16      Q.   Do you have a view as to
17  whether in the event that Fireman's Fund
18  is obligated to pay insurance coverage to
19  Grace, Fireman's Fund would be able to
20  reduce that obligation by any amount that
21  Grace is obligated to pay under the
22  indemnity agreement?
23          MR. GUY:  Objection.  I
24      don't see how he can answer that

Page 204

1   question without getting into a
2   legal analysis.  He is here as a
3   fact witness.
4           But, again, let me talk to
5   my client, and I think we can
6   resolve it with the answer.
7           MS. BAER:  We join in the
8   objection.
9           (There was a discussion held
10      off the record at this time.)
11          THE WITNESS:  I have no
12      view.
13  BY MR. PLEVIN:
14      Q.   Do you have a concern that
15  if the Edwards appeal were to be --
16  withdrawn.
17          Do you have a concern that
18  if the Edwards judgment were to be
19  affirmed on appeal and Fireman's Fund
20  paid money to Edwards and then made a
21  claim against Grace for the amount paid,
22  that that would in some way reduce the
23  amount of money coming into the Trust
24  from the Fireman's Fund insurance policy?

Page 205

1           MR. LIESEMER:  Objection to
2   the form.
3           MS. BAER:  Objection.
4           MR. GUY:  Objection to form.
5           THE WITNESS:  Mr. Plevin, I
6   have any concern that the activity
7   might reduce the amount of
8   insurance coming into the Grace
9   Trust.  And I understand this is
10  approximately $6 million.  And if
11  Fireman's Fund were to reduce its
12  payment or be entitled to reduce
13  its payment under the Fireman's
14  Fund policy for asbestos personal
15  injury to the Trust and it would
16  reduce it by $6 million, yes, I
17  have a concern.
18  BY MR. PLEVIN:
19      Q.   And I am sure this has been
20  established on the record long before I
21  came here, but let me just ask this
22  question for foundational purposes.
23          You are an attorney,
24  Mr. Austern?

Page 206

1    A.   Yes.
2    Q.   And you have practiced law
3  for how many years?
4    A.   45.
5        MR. PLEVIN:  Thank you.  I
6  have no further questions.
7        MR. CALOGERO:  I have no
8  questions.
9        MR. WISLER:  Maryland
10  Casualty has no questions.
11       MR. GUY:  Are there any
12  insurers on the phone who have
13  questions?
14       Scotts?  BNSF?  Do you have
15  any questions?
16       MS. COBB:  Yes.  This is
17  Tiffany Cobb on behalf of The
18  Scotts Company, LLC, with Vorys,
19  Sater, Seymour and Pease.  Can you
20  hear me?
21       MR. GUY:  Yes.  Hi, Tiffany.
22       - - -
23       EXAMINATION
1        - - -

Page 207

1  BY MS. COBB:
2    Q.   Mr. Austern, in your
3  capacity as the Asbestos PI Future
4  Claimants' Representative, what fiduciary
5  duties do you owe?
6        MR. GUY:  Tiffany, we
7  covered that earlier in the
8  deposition.  Were you listening
9  in?
10       MS. COBB:  I was.
11       MR. GUY:  I just don't want
12  to have a lot of duplicity in the
13  questioning.  I will allow this
14  one.
15       THE WITNESS:  I have a
16  fiduciary duty to future
17  claimants.
18  BY MS. COBB:
19    Q.   But what are the duties?
20    A.   Essentially to make sure
21  there is sufficient funds, that when they
22  file claims they will be treated the same
23  or similarly to present claimants.
24    Q.   In your capacity as the FCR,

Page 208

1  who specifically do you view as your
2  punitive clients?
3    A.   Future claimants.
4    Q.   Okay.  And in your capacity
5  as the FCR then, do you owe a fiduciary
6  duty to asbestos PI claimants as defined
7  in the Plan who hold future demands
8  against any entity that is addressed in
9  the definition of an asbestos PI
10  claimant?
11    A.   Can you repeat the last part
12  of that.  Against whom?
13    Q.   Sure.  Against any entity
14  that is addressed in the definition of
15  asbestos PI claimant?
16    A.   Yes.
17    Q.   In your capacity as the FCR,
18  do you owe a fiduciary duty to indirect
19  PI Trust claimants who hold future
20  demands against the Debtors?
21    A.   Yes.
22    Q.   In your capacity as the FCR,
23  do you owe a fiduciary duty to
24  insurance-related claimants who hold

Page 209

1  future demands against any settled
2  insurance company?
3    A.   I think I would have to go
4  back and look at the definition of those
5  people.
6    Q.   Okay.  Then let's do that.
7  If you would, please, look at Exhibit-5
8  which is the TDP, and if you would please
9  look at Section 5.12.
10    A.   I am looking at it, but give
11  me a moment.
12    Q.   Sure.
13    A.   Okay.  What was the
14  question?
15    Q.   In your capacity as the FCR,
16  do you owe a fiduciary duty to
17  insurance-related claimants who hold
18  future demands against any settled
19  insurance companies?
20    A.   I don't know.  I would have
21  to think about that.  I realize they
22  could be indirect claimants, at least I
23  think they could be indirect claimants.
24  So I would have to think about that.  I

Page 210

1  mean, I didn't mean this instant.
2      Q.   Mr. Austern, if an
3  insurance-related claimant is not an
4  indirect PI claimant, what other type of
5  claimant as defined in the Plan would you
6  think they would be?
7      A.   That's exactly what my
8  problem is. I am trying to see if they
9  would be an indirect claimant, and,
10  therefore, I don't know what other type
11  of claim they would have in the context
12  of this Plan. And that's my confusion.
13  But if they are, then it seems to me I
14  owe a fiduciary duty to them.
15      Q.   And if an insurance-related
16  claimant is an asbestos PI claimant, as
17  opposed to an indirect PI Trust claimant,
18  would your answer be the same?
19      MR. GUY:  Objection,
20      hypothetical and speculation.
21      THE WITNESS:  The insurance
22      company as a PI claimant?
23  BY MS. COBB:
24      Q.   As an asbestos PI claimant.

Page 211

1      A.   I must confess that I
2  haven't thought about that because I
3  don't know how it could happen.
4      Q.   Would you agree that in
5  Exhibit-3, the definition of an
6  asbestos -- pardon me -- strike that.
7      Would you agree that in
8  Exhibit-3 the definition of an indirect
9  PI Trust claimant is defined to be a
10  claim or demand against the Debtors?
11      MR. GUY:  Standing objection
12      that the Plan says what it says.
13      THE WITNESS:  I see a
14      definition of an indirect PI Trust
15      claim. I don't see a claimant.
16      Is that what you are were
17      referring to?
18  BY MS. COBB:
19      Q.   Pardon me. Yes. The
20  definition of indirect PI Trust claim is
21  defined as a claim or demand against
22  Debtors?
23      MR. LIESEMER:  If that's a
24      question, I object to the form of

Page 212

1  the question.
2      MS. BAER:  I join in the
3  objection.
4      THE WITNESS:  I don't know.
5      The Debtor is certainly -- it says
6      for which the Debtor has
7      liability. If that's the same,
8      then yes.
9  BY MS. COBB:
10      Q.   Would you agree that in
11  state court action, there are asbestos PI
12  claimants who have asserted bodily injury
13  asbestos-related claims relating to Grace
14  vermiculite against one or more indirect
15  PI claimants?
16      MS. BAER:  Objection,
17      foundation.
18      MR. LIESEMER:  Same
19      objection.
20      MR. GUY:  Objection.
21      THE WITNESS:  I am familiar
22      that the Libby claimants have
23      filed such claims.
24  BY MS. COBB:

Page 213

1      Q.   Are you aware of any other
2  asbestos PI claimants who have asserted
3  asbestos-related bodily injury claims
4  relating to Grace vermiculite against one
5  or more indirect PI claimants?
6      MS. BAER:  Objection,
7      foundation.
8      MR. GUY:  Objection, form.
9      Tiffany, I am not sure. I think
10      that's one is vague.
11      THE WITNESS:  I am not.
12  BY MS. COBB:
13      Q.   With respect to the Libby
14  claimants' actions of which you are aware
15  in the state court system, would you
16  agree that those asbestos PI claimants
17  and the indirect PI claimants against
18  whom they have asserted their claims are
19  adversaries in those actions?
20      MS. BAER:  Objection,
21      foundation.
22      MR. GUY:  Objection.
23      THE WITNESS:  If one is a
24      plaintiff and one is a defendant,