# EXHIBIT G

1

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

IN RE:                          : Case No. 03-51524(KCF)
                                : June 7, 2004
        CONGOLEUM CORPORATION,  : Trenton, New Jersey
                                : 2:37 P.M.
                Debtor.         :

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE KATHRYN C. FERGUSON
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtor:         Saul Ewing, LLP
                        BY:  DOMENIC PACITTI, ESQ.,
                        JEFFREY HAMPTON, ESQ.,
                        214 Carnegie Center
                        Princeton, New Jersey 08540

                        Gilbert, Heintz & Randolph, LLP
                        BY:  JEROME RANDOLPH, ESQ.
                        and  BETTE M. ORR, ESQ.
                        1100 New York Avenue, N.W.
                        Suite 700
                        Washington, D.C. 20005

Audio Operator:         Christine Kelly

Transcribers:           Isabel E. Cole and Kathleen Connolly
                        **COLE TRANSCRIPTION AND RECORDING SERVICE**
                        **Certified Court Transcribers**
                        **P.O. BOX 1216**
                        **OCEAN GATE, NEW JERSEY 08740-1216**
                        **1-877-245-4876**
Proceedings were electronically recorded, transcript produced
by transcription.

APPEARANCES:

| | |
|---|---|
| Travelers: | Simpson, Thacher & Bartlett |
| | BY:  MYER O. SIGAL, ESQ. |
| | 425 Lexington Avenue |
| | New York, New York |
| | |
| First State Insurance: | Hogan & Hartson, LLP |
| Co. and Twin City | BY:  JAMES P. RUGGERI, ESQ. |
| Fire Insurance Co. | 555 13th Street, N.W. |
| | Washington, D.C. 20004 |
| | |
| First State Insurance: | Wilmer, Cutler, Pickering, |
| Co. and Twin City | Hale & Dorr, LLP |
| Fire Insurance Co. | BY:  PHILIP ANKER, ESQ. |
| | 399 Park Avenue |
| | New York, New York 10022 |
| | |
| Certain London: | Linklaters |
| Market Insurers | BY:  MARY K. WARREN, ESQ. |
| | 1345 Avenue of the Americas |
| | New York, New York 10105 |
| | |
| One Beacon Insurance: | Crowell & Moring, LLP |
| Co. Seaton Insurance | BY:  CLIFF ELGARTEN, ESQ. |
| and Stonewall | 1001 Pennsylvania Avenue, N.W. |
| Insurance Co. | Washington, D.C. 20004 |
| | |
| AIG Member Companies: | Bivona & Cohen, PTL. CITTA: |
| | BY:  MICHAEL MODANSKI, ESQ. |
| | 88 Pine Street |
| | New York, New York 10605 |
| | |
| AIG Member Companies: | Zeichner, Ellman & Krause, LLP |
| | BY:  JANTRA VAN ROY, ESQ. |
| | 575 Lexington Avenue |
| | New York, New York 10022 |
| | |
| Pre-Petition Asbestos: | Goldstein, Lem & Isaacson |
| Claimants' Committee | BY:  NANCY ISAACSON, ESQ. |
| | 100 Morris Avenue |
| | Springfield, New Jersey 07081 |

APPEARANCES:

3

```
Pre-Petition Asbestos:      Caplin & Drysdale
Claimants' Committee        BY:  RONALD REINSEL, ESQ.
                            399 Park Avenue
                            New York, New York

Proposed Futures Rep.:      Swidler, Berlin, Shereff,
                            Friedman, LLP
                            BY:  JONATHAN GEISS, ESQ.
                            3000 K Street, N.W.
                            Washington, D.C.

Wachovia Bank, N.A.:        Greenberg Traurig, LLP
Indentured Trustee          BY:  RICK FRIMMER, ESQ.
                            Suite 2700 - Two Commons Square
                            Philadelphia, MR. YORK: 19103

Continental Casualty:       McDermott, Will & Emery
and Continental             BY: STEVEN HANDLER, ESQ.
Insurance Co.               227 West Monroe Street
                            Chicago, Illinois 60606

Mt. McKinley Insurance:     McClain, Leppert & Mansey, P.C.
and Everest Reinsruance     BY:  DAVID P. McCLAIN, ESQ.
Company                     711 Louisiana - Suite 3100
                            Houston, TX 77002
```

**Colloquy**                                                        **4**

1          THE COURT:  Good afternoon, Counsel.  May I have

2     your appearances please.

3          MR. PACITTI:  Good afternoon, Your Honor.  Domenic

4     Pacitti and Jeffrey Hampton of Saul Ewing, and Jerome Randolph

5     and Bette Orr of Gilbert, Heintz & Randolph, all on behalf of

6     the Debtors.

7          THE COURT:  Okay.

8          MR. REINSEL:  Good afternoon, Your Honor.  Ron

9     Reinsel from Caplin & Drysdale.  Also present is Nancy

10    Isaacson on behalf of the Official Committee of Unsecured

11    Asbestos Creditors.

12         MR. GUY:  Good afternoon, Your Honor.  Jonathan Guy,

13    Swidler, Berlin, Shereff & Friedman, on behalf of the Future

14    Claims Representative.

15         MR. ANKER:  Good afternoon, Your Honor.  Philip

16    Anker, Wilmer, Cutler, Pickering, Hale & Dorr.  I'm joined by

17    my partner Duane Morris, and also James Ruggeri of Hogan &

18    Hartson, also on behalf of certain of the Hartford Insurers.

19         MS. WARREN:  Hello, Your Honor.  Mary Warren of

20    Linklaters for the London Market Insurers.

21         MR. SIGAL:  Your Honor, Mike Sigal, Simpson Thacher

22    for Travelers.

23         MR. HANDLER:  Good afternoon, Your Honor.  Steve

24    Handler on behalf of the CNA Companies, Continental Insurance

25    and Continental Casualty.

**Colloquy**                                                      5

1          MR. ELGARTEN:  My name is Cliff Elgarten, Crowell &

2    Moring, Washington, D.C., on behalf of One Beacon America,

3    Seaton, and Stonewall Insurance.

4          MR. McCLAIN:  Good afternoon, Your Honor.  David

5    McClain, M-c C-L-A-I-N for Mount McKinley Insurance Company

6    and Everest Reinsurance Company.

7          MR. FRIMMER:  Good afternoon, Your Honor.  Rick

8    Frimmer from Greenberg Traurig on behalf of Wachovia Bank

9    National Association, the Indentured Trustee.

10         MS. VanROY:  Good afternoon.  Jantra VanRoy of

11   Zeichman, Ellman & Krause.  With me is Michael Modanski of

12   Bivona and Cohen for the AIG member companies.

13         THE COURT:  Anybody else?  Okay.

14         We have a couple matters on this afternoon.  We have

15   a Motion by the Debtors for determination that the

16   modifications to their plan are nonmaterial and don't require

17   further solicitation.  We have that as uncontested.  We have a

18   Motion by the Debtor for a determination that the insurers

19   don't have standing to raise objections to the modified plan;

20   and, we have a Motion to compel discovery.  Let's do the

21   standing Motion first.

22         MR. PACITTI:  Thank you, Your Honor.  You surprised

23   me.  I was going to do it in a different order.  That's why

24   I'm flipping pages.  Sorry, Your Honor.

25         THE COURT:  If there's a particular reason you want

**Colloquy**                                                                                **6**

1  to do it in a different order. . .

2          MR. PACITTI:  Your Honor, the only one was that I

3  would take first would be the Motion to compel, although we

4  did file a response and reserved on the standing issue.  When

5  we were in court last time we indicated to the Court that we

6  would comply with each of those document requests and provide

7  non-privileged, and by that we mean also non-work product and

8  non-internal documents.  And in fact, we did produce on Friday

9  the initial production of those documents which were

10 approximately three boxes burned onto CD-ROMs or a CD-ROM, I

11 believe, and they were delivered on Friday.  Another

12 production will happen today, and we'll follow that up with a

13 privilege log as well.  So we believe that we've, we've

14 partially complied, have indicated that we will comply.  We

15 would withdraw our objection as it relates to those three

16 interrogatory requests; and, we believe as a consequence

17 renders the Motion moot save Your Honor's ruling on standing

18 should, should that go a different way than it did previously.

19         THE COURT:  Do the insurers have anything to say

20 about that?

21         MR. RUGGERI:  Yes, Your Honor.  Good afternoon.

22 James Ruggeri for First State Insurance Company and Twin City

23 Fire Insurance Company.

24         Your Honor, we're pleased that we received some

25 documents last week and that we're going to get some more

1    documents, although we're not quite sure when, and a privilege

2    log.  We disagree, however, that our Motion is moot.  The

3    Court probably can appreciate from the papers that the

4    insurers, at least my clients, are growing increasingly

5    frustrated at, at what's transpiring here in terms of the

6    Debtors moving this court, urging this court to go fast-

7    forward to a confirmation and to a very short fact discovery

8    schedule, and at the same time being very, very slow in

9    producing the documents to us.  I was thinking on the way up

10   here, you know, what is the metaphor that one would use, and

11   it seems to me that this is a grand squeeze play on us that

12   fast, fast, fast, but slow, slow, slow.

13          Specifically with regard to the three categories, we

14   didn't understand why there was such a dispute anyway.  The

15   Court made it clear in its ruling on the Motions to quash that

16   the insurers would be allowed discovery into the full range of

17   negotiations surrounding the pre-packaged plan and disclosure

18   statement.  That's really what these three categories of

19   documents go to; but, specifically to what we would want said

20   and to walk out of the courtroom here today with is a firm

21   deadline from the Court by which the Debtor must produce the

22   responsive documents.  We believe 48 hours from now, close of

23   business Wednesday, is appropriate, in light of the fast

24   approaching cutoff date, and in light of the fact that this

25   discovery was served three months ago.  Three months ago in

**Motion/Ruggeri**                                                    **8**

1   February is when we started the process of trying to get these

2   documents and going through a couple of confer sessions, and

3   finally we are at the point where we're gonna get some

4   documents, but we didn't know when we're gonna get all the

5   responsive documents.

6           We're also concerned about leaving this courtroom

7   without a more clear definition of what's within and without

8   the Common Interest Doctrine.  The Court made it very clear on

9   the Motions to quash it's interpretation of what the Common

10  Interest Doctrine is.  We're concerned that we're gonna be

11  back before Your Honor trying to get more documents that

12  aren't going to be produced initially, and we think the Court,

13  and ask the Court to make clear that the Debtor has to produce

14  all responsive documents reflecting communications between the

15  Debtors and anyone else.  Those fall outside the common

16  interest document in accordance with the Court's prior ruling.

17          In addition, Your Honor, it's a little unclear to me

18  what privilege is the internal documents privilege.  We, we

19  see plainly in the papers that Debtors' been told to withhold

20  internal documents.  There's no definition provided of what is

21  an internal document, and even if there were, clearly not all

22  internal documents are privileged.  We actually think that a

23  good argument here, Your Honor, is that none of those

24  documents is privileged because those are at issue.  Those go

25  to the heart of the good faith case before this court, and

**Motion/Ruggeri** 9

1  which would be presented at confirmation.

2          In any event though, to the extent Debtor is going

3  to withhold documents, we make the same request that they be

4  required in order to produce a privilege log due at the same

5  time they produce the documents or the deadline for producing

6  the documents, which is, we believe, should be 48 hours from

7  today, or, or this Wednesday, June 9th.  We simply don't have

8  time to waste on baseless privilege claims or a rolling

9  production that's going to take us well into the month when

10  depositions have to take place, and we only have a few more

11  days relatively speaking left for fact discovery, and we need

12  to go forward now.  So with those three points, Your Honor, we

13  would accept what the Debtor says, but ask the Courts to make

14  clear when the documents they have to produce that are

15  responsive, when the privilege log has to be produced that,

16  that reflects any withheld documents, and that it reinforce

17  its, its prior ruling on the common interest doctrine so we're

18  not here fighting the same fight that we had to fight over a

19  month ago.  Thank you, Your Honor.

20          THE COURT:  Thank you.  Mr. Pacitti?

21          MR. PACITTI:  Yes, Your Honor.  It is true that the

22  document production was served some time ago.  It's also true

23  that our objections were filed shortly after receiving the

24  document production request.  It's also true that the Motion

25  to compel was not filed until about two weeks ago, and this is

**Response/Pacitti**                                                    10

1   being heard on short notice.  So number one, Your Honor, the

2   timing, I think, quite frankly is not the Debtors' fault.

3          As it relates to the production, Your Honor, and the

4   definition of internal documents, and I apologize if we used

5   that term.  By that we mean privileged documents, and by

6   privilege we also include in there attorney work product

7   documents as well.  So Your Honor, if it helps in any regard,

8   the internal documents that we discussed really means that.

9          As it relates to the Common Interest Doctrine and a

10  discussion about the <u>bona fides</u> of the underlying Motion and

11  our response, our response does set forth what we believed,

12  Your Honor, was the law as it relates to drafts and

13  negotiations of plan drafts and plan documents.  We think that

14  the law is clear.  Your Honor's ruling was in a much different

15  context.  Your Honor's ruling was in the context of a Motion

16  to compel individual committee members to turn over documents

17  that they had that might relate to discussions that they had

18  among themselves with respect to plan negotiations, plan

19  discussions, plan drafts and what have you.  And I think Your

20  Honor found that the Common Interest Doctrine does not apply

21  as between the committee members.  Your Honor did not rule on

22  the Common Interest Doctrine generally in this case as it

23  related to drafts or any types of discovery.  So Your Honor, I

24  think that's one clarification.

25         As I said on the record last week, and I think what

1   the concern is is that we would not produce documents that we

2   sent or negotiations we had with members of the Asbestos

3   Creditors' Committee, pre-petition committee, their counsel,

4   the Future's Rep, their counsel or professionals.  We agreed

5   last week and we agree today that, in fact, many of those

6   documents were turned over on Monday -- on Friday rather, and

7   additional documents will be turned over today.  We're not

8   seeking to extend a, a privilege to those types of

9   communications.  I thought we were clear last week that we did

10  not intend that.

11          So Your Honor, to clarify the record, we're turning

12  over all that stuff, and we turned over a lot on Friday.  We

13  believe, and I'd have to check, we think in large measure the

14  balance of those non-privileged, non-work product documents

15  should be turned over today.  I can't swear to that because I

16  haven't checked with the office and the folks that are back

17  there to see how, how they're coming along in terms of the

18  scanning of those documents, because in large part we're

19  producing them on CD format because that seems to be the

20  preferred method.  It's easier to disseminate among the crowd

21  of insurers.

22          So Your Honor, I think we've complied.  I think the

23  privilege issues that we will raise in our privilege log can

24  be dealt with on a privilege-by-privilege assertion basis.

25  We're not seeking to extend that privilege to the Asbestos

1   Committee or the future's rep and their respective

2   professionals.  So I think we've complied with what's been

3   asked for, and we believe that we've timely complied in

4   accordance with our meet and confer that we had in late May,

5   Your Honor.

6        THE COURT:  So the Debtor doesn't have any objection

7   to the proposed 48-hour deadline for the balance of discovery

8   and a privilege log?

9        MR. PACITTI:  Your Honor, the privilege log I'm not

10  quite sure about because we're talking about, a guesstimate

11  about eight to 10,000 documents that have to be logged on a

12  privilege basis.  Their request was so broad, rather than

13  limiting it and trying to negotiate a much narrower scope

14  because we couldn't get there, we said, "You know, we're just

15  gonna comply."  So we're gonna give them all of the non-

16  privileged -- we're going to give them all the documents that

17  they really want, the negotiations and discussions with the

18  Future's Representative and the Claimants' Committee, and the

19  privilege log really goes to communications, the internal

20  stuff that I think we're talking about privileged documents as

21  between clients, attorney, and all of the attorney work

22  product documents.  There's no prejudice in having a privilege

23  log delayed in this instance, Your Honor, particularly since

24  we're giving them everything they really wanted.

25        THE COURT:  But if the parties seeking discovery

1    want to challenge the assertion of those privileges and get

2    all this wrapped up by the June 30th factual deadline there is

3    some prejudice to not getting a privilege log quickly.

4        MR. PACITTI:  Well, Your Honor, I guess quickly is,

5    I guess, the operative word.  You suggested the 48 hours.  I

6    think I can, I can certainly live by the 48 hours to get them

7    the responsive documents.  I don't know as I stand here

8    whether in the 48 hours I can generate that huge privilege log

9    to them.  Maybe we can hold this.  I can call the folks back

10   in the office to see if we can get it to them sooner than what

11   I thought, which would probably be by the end of the week, but

12   I don't want to --

13       THE COURT:  Okay.  I'll certainly allow you to do

14   that, and but I guess I want you to understand where I am.

15   I'm not sure that I buy the squeeze analogy, but if we go with

16   that this could quickly become a suicide squeeze on the

17   Debtors' part because you can't have it both ways.  You can't

18   have it delaying discovery when I've already set this fairly

19   aggressive discovery schedule to get to confirmation as

20   quickly as we can consistent with principles of due process,

21   and then also get to the confirmation hearing as quickly as

22   the Debtor wants.

23       MR. PACITTI:  Sure.  And that's why we effectively

24   said never mind to our objections, we'll give you the stuff.

25       THE COURT:  Okay.  All right.  We'll hold this till

 1   after the other matters so that you can have an opportunity to

 2   contact your office.

 3              MR. PACITTI:  Thank you, Your Honor.

 4              THE COURT:  Okay.  So now we go back to standing.

 5              MR. PACITTI:  Your Honor, as you know, we have filed

 6   our second modified plan and the modifications were filed in

 7   large measure to attempt to address the, the issues that Your

 8   Honor raised in your last standing ruling, as well as to

 9   implement what were technical modifications and also to

10   implement the first modification that contained the changes

11   with respect to the treatment of Congress Financial.  So the

12   second modification is a conglomeration of those three

13   categories of changes.  And Your Honor, we believe that the

14   modifications that we've made hit squarely the issues that

15   were both raised at the last standing hearing, as well as Your

16   Honor's decision, and we did go through each of the, the

17   comments raised by the insurers, and rather than regurgitate

18   the pleadings from last time which we incorporated in this

19   Motion and the law, I think Your Honor obviously knows the

20   law, and since you've ruled on it once already.  I think it

21   might make sense to just walk through each of what now seems

22   to be provisions of the plan that the insurers believe still

23   affect them somehow and why we think that they're wrong.

24   Would that be a --

25              THE COURT:  Well rather than walk through everything

**Motion/Pacitti**                                          **15**

1   that's in your papers, what I prefer is if you just reply or

2   highlight --

3          MR. PACITTI:  That's what I'm --

4          THE COURT:  Okay.

5          MR. PACITTI:  -- Your Honor, replying effectively to

6   what --

7          THE COURT:  That's fine.

8          MR. PACITTI:  -- they've raised on a point-by-point

9   basis.  And I think we have about 14 or 15 specific provisions

10  that appear from the insurers' perspective to them to be

11  problematic.

12         The first, Your Honor, is actually a grouping of

13  two, and they are the changes in Sections 5.1(s) and 10.1

14  Roman XVI.  And that deals with the insurance assignment and

15  provisions relating to the assignment of the rights of the

16  Debtor in the insurance policies to the plan trust.  As a

17  preliminary matter, Your Honor, the insurers continue to refer

18  to this assignment as an assignment of the policies.  The

19  definition of insurance assignment is very clear, the plan is

20  very clear, the disclosure statement is very clear.  We're not

21  seeking to assign policies.  We're seeking to assign our

22  rights under the policies.  It's much different as the Third

23  Circuit has, has ruled on on several cases.  So as a point of

24  clarification, we're talking about an assignment of the

25  Debtors' insurance rights, number one.

1    Number two, Your Honor, as we indicated at the last

2  standing hearing, and as we do again today, we are seeking a

3  determination from this court that the assignment of the

4  insurance rights under the plan is binding on the insurers.

5  We've agreed that they should have standing to argue on a

6  legal basis whether we're able to do that.  So Your Honor, I

7  don't know how else to respond other than to say yes, we agree

8  they should have standing to argue whether we're allowed to

9  assign our insurance rights to the trust.  So Your Honor, I

10  think that ticks off at least two of the provisions that

11  appear to be troublesome.

12    Your Honor, by that I guess what the insurers also

13  find problematic is that they want to also argue in the State

14  Court that as a consequence of that assignment it somehow

15  negates coverage.  Your Honor, we're not seeking to bind them

16  to a finding of this court on that issue as it might relate to

17  an issue that they want to raise in the State Court in that

18  coverage action.  That's clear in our Section 11.10, which is

19  sort of a global reservation of rights that we'll get to

20  later.  So Your Honor, I think when you read in conjunction

21  the fact that, number one, we're only seeking to assign

22  insurance rights; number two, we're giving them standing to

23  argue with respect to the issue of whether we can, in fact, do

24  that as a legal matter; and, number three, that there is a

25  reservation of rights under 11.10, we believe that there

Motion/Pacitti                                                    17

1  should be no issue and there's no rights affected by those

2  plan provisions.

3        Next, Your Honor, I think we also should take two

4  other provisions in context, and they are Sections 5.1, Roman

5  I, or it might be letter "I", and 7.2.  Actually, it's letter

6  "I".  In Roman, 5.1 Roman I talks about the, the formulation

7  of the trust distribution procedures, the TDP, under our plan,

8  and granting the plan trustee authority to administer claims

9  and to administer the trust in accordance with that TDP.

10        Additionally, Your Honor, Section 7.2, Your Honor, that

11  was a provision that was never modified.  It wasn't complained

12  of at the last hearing either.  So that's a new objection.

13  7.2 talks about the prosecution of objections to claims, and

14  that wasn't raised at the last hearing, and we attempted to

15  address that, and we think we did effectively by adding on

16  Page 34, and the page reference is to the black line pleading

17  that was filed with the Court.  The caveat that, that this is

18  without prejudice to the right of the asbestos, any asbestos

19  insurance company to contest coverage under any asbestos

20  insurance policy.  That was a specific issue that Your Honor

21  had.  You didn't believe that there was an adequate enough

22  reservation of rights there so we added it.

23        So Your Honor, again, this deals with what we

24  believe is a State Court issue.  There's a coverage action

25  ongoing if, if the insurers seek to complain that their rights

Motion/Pacitti                                    18

1    under their insurance policies are somehow affected by the

2    Trustee, the administration of the claims under the trust

3    distribution procedures, that really goes to whether, in fact,

4    under their insurance policies, under the contractual rights,

5    that we're able to affect those rights, and that effect, the

6    determination of whether those rights are affected or not is

7    gonna be heard in the coverage action.  And again, under 11.10

8    we're not seeking to bind them by a finding that either

9    Section 5.1(i) or 7.2 is part of this plan, that it in any way

10   affects their rights in the coverage action.

11        So again, Your Honor, these are implementation

12   provisions of the plan.  They're contemplated by Section

13   5.24(g).  The whole purpose that we're here is to allow for a

14   trust to be formed, for that trust to administer claims in

15   accordance with procedures which could include matrices and

16   other things, and by virtue of just complying with 5.24(g)

17   allowing for reservation of rights as it relates to the

18   implications of those determinations in the coverage action,

19   we believe that the insurers' rights are not going to be

20   affected by this court's adjudication of those issues.

21        Next, Your Honor, move on to Section 5.1(q), and

22   5.1(q) was an issue that had been raised at the last standing

23   Motion as well, and it talks about the preservation of

24   insurance claims, and that the discharge of the Debtors and

25   the released non-Debtor parties from all claims provided

1  herein shall neither, diminish nor impair the enforceability

2  of any insurance policies.  It stops short there at the last

3  go round.  The modification was it included "by any entity"

4  which would include the insurers.  So Your Honor, our

5  modification sought to give the insurers the same benefit that

6  they thought they lacked in that provision at the last

7  hearing, and that Your Honor pointed out that they potentially

8  could be right.  So I think again we've met the insurers

9  complaint, and I think we've also, we believe, addressed Your

10 Honor's concern with respect to that perspective provision

11 that this, in fact, becomes a neutral reservation and we, in

12 fact, made the change to accommodate both the insurers and to

13 meet Your Honor's concerns.

14         The next provision, Your Honor, I believe is 7.3,

15 and 7.3 was not a provision that was complained of last time,

16 and is a new objection here.  And the objection effectively is

17 is that there should be court allowance of personal injury

18 claims in, in this court, in the Bankruptcy Court rather

19 through the trust distribution procedures, and that somehow

20 we're affecting their rights by the provisions in 7.3.  That

21 notwithstanding any provisions hereof, if a claim or any

22 portion of a claim is disputed no distribution shall be made

23 on account of disputed claims unless it becomes an allowed

24 claim.

25         Your Honor, why I think this really is irrelevant is

**Motion/Pacitti**                                                    20

1    because the concept of allowance.  We are not seeking this

2    Bankruptcy Court to allow, as the term "allowed" means both in

3    the Bankuptcy Court and as in many plans, with respect to

4    personal injury claims for asbestos related injuries.  In

5    fact, personal injury claims are specifically carved out of

6    the definition of "allowed".  So Your Honor, we're not seeking

7    to bind them by this court, in an adjudication through this

8    plan that these claims are allowed.  All we're seeking to do

9    is for this court to approve a trust, a channeling of claims

10   to that trust, an assignment of insurance proceeds and other

11   assets to the trust, to allow that trust to deal with both the

12   allowance of and payment of asbestos personal injury claims

13   through matrices and trust distribution procedures as set

14   forth before the Court.  So Your Honor, we're not seeking a

15   specific allowance of claims.  Rather, approval of a 524

16   mechanism that is approved in a host of cases to allow a trust

17   to ultimately review, deal with and allow and/or pay claims.

18         So Your Honor, again, I don't believe that this

19   provision effects the insurers as they believe that it would

20   because their view was that they should have the right to come

21   in here and talk to you about allowance of claims in the

22   context of the bankruptcy and in the context of this plan

23   when, in fact, we are not seeking for this court to make an

24   adjudication of the allowance of personal injury asbestos

25   related claims.  So again, Your Honor, we do not believe that

1   that provision specifically effects the insurers.

2        The next provision, Your Honor, is 8.4, and 8.4

3   again was a provision that was complained of by the insurers

4   for the last standing hearing and was a provision that Your

5   Honor spoke to as well.  And we made specific modifications to

6   8.4, and those specific modifications were to make the

7   reservation of rights and the preservation of, of claims as it

8   relates to insurance agreements mutual.  Again, Your Honor, I

9   don't see how the mutuality in any way can affect the insurers

10  if there's a reservation of both the Debtors' rights under

11  insurance agreements and of the insurers' rights under those

12  same insurance agreements to be adjudicated in the State Court

13  when it, when the State Court gets to it.  I don't know how

14  that impacts the insurers.  We think that we plainly and

15  specifically met with the insurers' objections, and Your

16  Honor's voiced concerns with respect to this provision as

17  potentially affecting the insurers' rights.

18        Again, Your Honor, that provision coupled with the,

19  the generic reservation of rights under 11.10 I think is

20  adequate to allay the fears of the insurers that somehow a

21  determination by this court that this plan is confirmed and

22  the entry of an Order confirming this plan can somehow be used

23  against them in the coverage action.  We just believe that

24  that's not the case and that's not our intention.

25        The next provision, Your Honor, is 11.3, and that is

Case 04-01139-AMC   Doc 21036-51   Filed 06/01/09   Page 23 of 74

**Motion/Pacitti**                                                    **22**

1   the I guess the complaint by a couple of the insurers that the

2   exculpation provisions here are somehow over broad, that it

3   might be appropriate in some circumstances but not appropriate

4   here, in light of well documented allegations of "fraud,

5   collusion and conflict of interest".

6        Your Honor, I guess number one, I find it

7   problematic that, that there's some view that this exculpation

8   provision somehow affects the insurers' rights as it relates

9   to any obligations they might have for the Debtor under the

10  insurance policies.  Again, with 11.10 in this plan, we

11  believe that there, there is effectively a savings clause that

12  will allow them to raise those types of objections at the

13  coverage, in the coverage action.  However, Your Honor, to the

14  extent that this becomes problematic and it somehow deters

15  Your Honor from ruling on standing, we would certainly like to

16  revisit it with you.  And if it becomes a stumbling block to

17  your ruling on standing, we will certainly I think address it

18  in a more appropriate way that perhaps makes it very clear

19  that their rights are preserved, but we don't think that's

20  necessary.

21       The next provision, Your Honor, is 11.6, and 11.6 is

22  the asbestos channeling injunction provision.  Your Honor,

23  this was I guess, I guess the real complaint here is the last

24  paragraph of, of that provision, and, and it was in addition

25  that effectively states that if insurers have standing,

Case 03-51624-KCF Doc 2103-6751 Filed 06/01/09 Page 24 of 74 Desc Main

**Motion/Pacitti**                                                23

1   they're deemed to have standing, and they raise issues and

2   seek to litigate issues before this court, and this court is a

3   competent, court of competent jurisdiction, and this court

4   makes a determination, a full record of those issues, insurers

5   should be bound by those.  But to the extent that they do not

6   have standing, to the extent that they, that a adjudication by

7   this court of issues is, is made and they did not participate

8   in that adjudication, then we're not seeking to bind them. by

9   those findings.

10        But Your Honor, it's one of those you can't have

11  your cake and eat it too.  If you're gonna come in here and

12  litigate issues, you're going to have discovery on issues,

13  you're going to have this court of competent jurisdiction make

14  decisions on those issues, then they should be bound by the

15  determination that this court makes.  That's all that

16  provision was meant to be is that if we don't win on the

17  standing Motion we're saying that if you come in here and you

18  litigate issues you should know you're going to be bound by

19  those, those issues that are determined by the Court.

20        Your Honor, what we want to clarify, and perhaps --

21  we think it's clear, but to the extent that it's not clear in

22  either Your Honor's mind or others, for instance, if this

23  court makes a determination of feasibility, this court makes a

24  determination of good faith in the plan process and in the

25  plan confirmation, we are not seeking to use that

1   determination in any way in the coverage action.  Number one,

2   I think it's irrelevant.  Number two, it's probably going to

3   cause a State Court judge to be quite upset by it; but, more

4   importantly, we're not seeking to bind them to this court's

5   adjudication of good faith or feasibility of this plan in the

6   context of whether they have rights or don't have rights under

7   insurance policies that are going to be adjudicated in the

8   coverage action by Judge Epstein.  So Your Honor, I guess it's

9   a long-winded way of saying that if they have standing and

10  they come in here and want to try something, guess what,

11  they're going to be bound by it because they tried it in a

12  court of competent jurisdiction.

13        If they don't have standing and they don't try

14  something, they're not going to be bound by it, obviously.

15  We're being very specific that either way we're not seeking to

16  use this court's determinations of good faith, this court's

17  determinations of feasibility of this plan in any way in the

18  State Court action.  So we think, again, Your Honor, with

19  those modifications, there's no possible way coupled with the

20  savings provisions of 11.10 that the rights of the insurers as

21  either a party-in-interest or any pecuniary interest that they

22  may have in this case are affected in any way.

23        I guess the next couple, Your Honor, are not section

24  specific, and they deal with the same findings that we just

25  spoke about.  That is feasibility and good faith.  Again, Your

Motion/Pacitti                                                    25

1   Honor, if there is no standing we don't believe that their

2   rights will be affected since they will not have participated

3   in the adjudication of those, those issues.  We're

4   specifically saying that we will not use those, those findings

5   in the State Court.  So again, we don't believe that any

6   adjudication by this court of feasibility or good faith in the

7   context of confirmation in any way impacts the insurers'

8   rights.

9            I think the last issue to address, Your Honor, is a

10  request that should this court make a determination that the

11  insurers, in fact, do not have standing, that there would be a

12  request by the insurers to allow them to file pleadings with

13  the Court to assist this Court in its determination of the

14  issues on confirmation.  Your Honor, we have no problem with

15  whatever assistance this court requires.  If the insurers

16  would like to file legal briefs to assist the court in

17  analyzing specific confirmation issues, the more the merrier.

18  We suspect they would be filed regardless.  So my view is

19  that's fine.

20           But what we don't want to have happen, and what,

21  what was left out of the papers, and this all comes from the

22  Mid-Valley case and Judge Fitzgerald's determination in that

23  case where she asks specifically for the assistance of the

24  insurers to filing briefs, was that she didn't allow them to

25  seek discovery or participate in the cross-examination of

1   witnesses and the like at a confirmation hearing.  So to the

2   extent that there is an admission on our part that should this

3   court find that there is a lack of standing and Your Honor

4   would like the assistance of other pleadings to be filed in

5   the case, we have no problem with that and we would just like

6   to abide by Judge Fitzgerald's I guess motto in that it would

7   be a requirement that obviously there shouldn't be discovery

8   on the issues that this court finds that they don't have

9   standing on, nor participation in the confirmation hearing in,

10  in those contexts either.

11       Your Honor, I guess I would preserve rebuttal and I

12  would reserve also for, for my co-counsel, Mr. Randolph, to

13  the extent that there is any issues raised by the insurers

14  relating to insurance agreements or law that I can't speak to.

15  Thank you, Your Honor.

16       THE COURT:  Thank you.  Does anyone else wish to be

17  heard in support of the Debtors' Motion?

18       MR. REINSEL:  Your Honor, Ron Reinsel on behalf of

19  the Asbestos Committee and only briefly, and I don't want to

20  rehash any of the ground already covered by Mr. Pacitti, but I

21  think in a good faith effort, Your Honor, the Debtor took your

22  prior ruling as a road map, and as effectively an invitation

23  to modify the plan to seek a more neutral position.  I think

24  the, while the Court phrased it as insurance neutral, I think

25  probably the more correct way of looking at it is insurance

1   coverage neutral.  And the plan I think gets there as modified

2   because it does not bind the insurers to payment, to coverage

3   on any issue.  All of their rights are preserved, all of their

4   defenses are preserved.  All of those issues will be

5   determined in the coverage litigation, which is, after all,

6   before them.  The insurers chose to determine those issues.

7           I think we have to look at what the plan really is

8   for the, in one of the pleadings filed by one of the insurers

9   they talk about the elephant in the room.  Well the elephant

10  in the room isn't necessarily the insurance issue.  The

11  elephant in the room with the 100,000 individual asbestos

12  clients that are my constituency.  The plan as it is framed is

13  to provide that the trust to be established is going to get

14  some funding from the Debtor and it's going to receive

15  whatever rights to insurance proceeds may exist, as determined

16  in the coverage litigation.  That does not anywhere in the

17  plan bind the insurers to present payment.  It does not bind

18  the insurers to present liability.  It doesn't bind the

19  insurers to determine the legitimacy of individual claims.

20  All of the insurers' rights, as presently modified under the

21  plan, are preserved.

22          They have no issues in this case with one exception,

23  and that is the issue of assignment of the Debtors' rights in

24  the policies to the trust.  And we would posit, Your Honor,

25  that that is a legal issue.  That's not an issue that requires

**Response Reinsel**                                                      28

1   factual discovery.  That's not an issue that requires

2   evidentiary development.  That's a straight up or down legal

3   issue that can be determined in this court on the briefs.

4         In that respect, Your Honor, with that one limited

5   and discreet issue, I would believe that the Debtors have

6   formulated a plan which, under which the insurers do not have

7   general broad standing on every conceivable confirmation

8   issue.  Their intent there, Your Honor, is so they drag out

9   these proceedings to double-dip the issues that are going to

10  be determined in the coverage litigation, yet not want to be

11  bound by any determination the Court makes here.  And that,

12  Your Honor, is fundamental unfairness toward the Debtor and

13  the other constituencies.  Thank you.

14        THE COURT:  Thank you.  Anyone else want to be heard

15  in support of the Motion?

16        Mr. Anker, are you bringing the ball down the court

17  for the Objectors?

18        MR. ANKER:  I think other Counsel as well will

19  speak, but I think would start.  Your Honor, I'll try to be

20  brief and I often make promises I don't keep, but I'll try to

21  be briefer than I was last time, and I'm not going to try to

22  repeat everything that's in the briefs.  Your Honor obviously

23  reads them.

24        Let me start with two observations because I think

25  sometimes when legal arguments hit a judge it's important to

1   step back and use what I would call common sense.

2            First, before you today is a Motion filed by the

3   Debtors that you'll hear in a few minutes for a determination

4   that none of the changes they have made to the plan are

5   material.  None of them are worthy of being told to any of the

6   constituents in this case.  None could conceivably affect the

7   vote of a single Creditor in this case.  All of whom will

8   never see one penny, one penny unless their insurance recovery

9   is here.  I would submit to Your Honor that that proposition

10  is utterly inconsistent with the proposition that these

11  changes to the plan fundamentally address the concerns Your

12  Honor raised in making it insurer neutral.  Those are

13  irreconcilable, I would suggest to you, positions.

14           Second proposition is a matter of common sense.

15  This is a case completely different from Mid-Valley where, as

16  I say, if there is not insurance at the end of the day there

17  will be no recovery.  These Debtors, and ABI, the parent, are

18  walking away from this with 100 percent of their equity in

19  tact, giving a note with a face value of less than $3 million

20  and with no interest payments over ten years.  The present

21  value I would guess most investment bankers would suggest of

22  less than $1 million.  If the claimants who've agreed to this,

23  pretty sophisticated plaintiffs' lawyers, didn't believe that

24  fundamentally this plan changed the dynamic when it came to

25  the insurance, gave them a leg up, indeed an enormous leg up,

1  they'd never have agreed to it because they're letting a

2  company who's enterprise value going forward is considerable.

3  This company's stock is up.  This company's bonds are trading

4  higher.  This company makes money.  They're letting it walk

5  away without contributing essentially a dime; and again,

6  sophisticated parties don't do that if truly this is insurance

7  neutral and doesn't affect and doesn't give them a leg up on

8  insurance.

9        I submit to you that Your Honor had it right last

10  time on standing, and Your Honor should stick to your guns.  I

11  submit that's true for two essential reasons.  First deals

12  with structure.  No matter how much language changes we can

13  make in the plan or the Debtors can seek to make, this plan,

14  and I'll use an euphemism, Your Honor, and in this sense I am

15  repeating a sentence in our brief, is an insurance plan.

16  Contrast this case with Mid-Valley.  In Mid-Valley the Debtor

17  agreed, and it's parent Halliburton, to put up in cash 2.775

18  billion, that's with a "B", dollars.  It agreed to put up 13

19  percent of the equity of Halliburton, which the Future's Rep,

20  if I recall correctly at confirmation, testified had a value

21  of around $1.8 billion.  I may be off by what the number is to

22  the right of the decimal, but it was in that range.  He didn't

23  assign any insurance rights to the trust.  Indeed, the only

24  right was if the total insurance recovery exceeded $2.3

25  billion then the amount between 2.3 and 3 billion would go

1 into the trust.

2 At the confirmation hearing the Future's Rep, Prof.

3 Greene, testified that frankly, no one ever thought the number

4 would get anywhere near there; and, in fact, there were

5 settlements of all the insurance issues and they didn't get

6 there. And so in sort, what that Debtor was able to say to

7 Judge Fitzgerald with force was, "There's nothing collusive

8 about this. There's nothing affecting the insurers. We're

9 putting up out of our own pocket in excess of $4.5 billion.

10 With no one thinking we're even going to get $2.3 of it, and

11 with a realistic shot we're gonna get none of it. And so when

12 we're putting our own money on the line then the plan process

13 and the TDP, as we establish, and the allowance process we

14 establish is absolutely not susceptible of collusion because

15 it's our money and we want to make sure that we bring that

16 number, the total allowed claim down to the lowest amount

17 possible."

18 Now we argued we had standing in that case in any

19 event, and Judge Fitzgerald ultimately concluded that with the

20 plan neutrality language there and with that structure we did

21 not have standing to object to confirmation. But as we set

22 forth in our papers the grounding, the fundamental core of

23 that ruling was the structure of the plan. It was the

24 antithesis, at least on its face, of what this plan is. This

25 plan is a plan where nothing is being contributed by the

**Response/Anker**                                                    **32**

1   Debtor other than its insurance; and, therefore, it is the

2   insurers whose money is at risk, and that raises the

3   fundamental question that we, who we have standing for, is

4   this a good faith plan within the meaning off 11.29; are the

5   Debtors and ABI, their parent, making a contribution that is

6   substantial within the meaning of 5.24(g) such that they are

7   entitled to a channeling injunction, not only a discharge but

8   a channeling injunction with respect to future claims.

9           The incentives here are completely the opposite.

10  The incentives here are to sell out the insurers and to say to

11  the Plaintiffs, "Whatever you want by way of allowed claims,

12  whatever you want by TDP is fine."  And where do you see that

13  in the plan?  You see it in the plan in a provision, and I'm

14  not gonna go through all of the provisions of the plan, but I

15  will go through a few.

16          First, let's focus on the provision that says,

17              "The insurers shall have no rights to object to or

18              participate in the defense of a claim."

19          Now again, I think even in the Mid-Valley context

20  that provision gives the insurers incentives, but at least in

21  that context the Debtor can say, "Your Honor, we have every

22  incentive to keep the aggregate liability as low as possible

23  because everyone knows that we may recover something from the

24  insurers, but every incremental dollar is going to come out of

25  our pocket not the insurers' pocket."  In this case it is just

1   the opposite.  And so when you stick a provision in a plan

2   that says the insurers don't have the right to participate in

3   the defense, don't have the right to object to a claim, you

4   are taking, you are effecting their interest.

5           Again, let me suggest, Your Honor, let's go back to

6   common sense proposition.  Your Honor hasn't heard evidence on

7   this yet, but I will represent to Your Honor, and I don't

8   think Mr. Pacitti will disagree, liability insurance policies

9   routinely include a provision that allows the insurer if not

10  to take over the defense to participate in the defense and to

11  demand the cooperation of the insured.  Why is that?  If the

12  answer is that the insurers' rights are not affected at all,

13  as long as its defenses to cover it, which can litigate in

14  fully in coverage court are fully preserved, then why don't

15  the policies just say that the insured can go around and

16  defend the cases on its own and not contact the insurer?  Why

17  do they let the insurer control or participate in the defense?

18  Because the parties realize that in some situations the name

19  of the game is not is there coverage because their often is,

20  the name of the game is defeating liability in the first

21  instance, preventing the insured from being held liable, or,

22  if it is held liable, have it held liable at the most modest

23  amount possible.

24          So I submit to Your Honor that in a plan that is

25  structured like this that is an insurance play the denial to

1    the insurer of its contractual right to control or participate

2    in the defense or to demand the cooperation of its insured

3    causes it direct palpable injury and it is no answer to say,

4    "But we can litigate in coverage court coverage issues."

5          Let me go to a second provision.  The Debtors did

6    take out of the plan the provision that said, "The insurers

7    will be bound by everything in the plan," but they have

8    retained in the plan numerous provisions that as a practical

9    matter can have just that effect.  By way of example, Section

10   8.4 states that,

11          "Nothing in the plan or the plan negotiations shall

12          constitute a waiver of any plans or rights that the

13          Debtors have."

14          Indeed, as Mr. Pacitti says, there are provisions

15   throughout the plan that provide that all of the Debtors'

16   rights with respect to its insurance policies are preserved.

17   I appreciate that, Your Honor, I had a colloquy of I think two

18   or three hearings ago in which you said to me, "Isn't that

19   simply stating that the Debtor is not voluntarily

20   relinquishing its rights?"  I will represent to you, Your

21   Honor, we have pled as an affirmative defense in the coverage

22   action waiver, we've pled as an affirmative defense that 20

23   other defenses, all of which at its core come down to, there

24   may be different legal doctrines they come down to, but the

25   factual predicate is that the Debtor did give up rights to

1   insurance by doing this plan and writing it this way and

2   engaging in these negotiations because at its bottom, and

3   again I'll use the colloquialism, we submit this is a

4   collusive deal and a sham.  And for this -- that is something

5   we intend to litigate in coverage court, and when the Debtor

6   sticks in language in its plan that says, "No, no, no," that

7   directly affects us.

8          So how does the plan affect us?  It affects us based

9   on the structure of the plan, that it is an insurance play,

10  and it affects us because the plan language continues to

11  affect us.  In that regard, <u>Mid-Valley</u>, which was not, which

12  was not, at least not as obviously an insurance play, was

13  quite different in its language.  I spent many, many hours

14  negotiating that insurance neutrality stipulation.  What it

15  says when you read it is not that the Debtors' rights are

16  preserved, it says nothing of the kind.  It says, "All of the

17  insurers' rights are fully preserved," and it says,

18          "The Debtors' reserve the right to argue that their

19          rights are preserved, and the insurers reserve the

20          right to argue that the Debtors by engaging in this

21          plan have lost their right to coverage, and I --

22          Judge Fitzgerald -- am making no determination one

23          way or the other."

24          In short, what it says is the insured assumes the

25  risk that the effect of the plan and the plan negotiations is

**Response/Anker**                                                                  36

1   to eliminate insurance coverage that might otherwise exist.

2          This plan is replete with provisions that are

3   directly to the contrary.  So I submit to Your Honor as the

4   first proposition no language could deal with the fundamental

5   structure of this plan, and that the fundamental structure in

6   this plan gives us standing certainly as long as there are

7   provisions denying us a right to participate in the defense of

8   claims and to object to claims.  But even if that were not

9   right, this language is dramatically different from <u>Mid-</u>

10  <u>Valley</u>, a case that was litigated against a backdrop of an

11  insured who was putting its own money where its mouth was, so

12  to speak.

13         I will let other Counsel speak to other provisions.

14  We've gone through them in our brief.  I don't want to repeat

15  what others will say, nor do I want repeat everything that's

16  in our plan on all the different plan provisions.  But I do

17  want to come back to one point that Mr. Reinsel made at the

18  end, and that is we want two bites at the apple.  That's right

19  to a degree, but it's wrong to a degree.  We can avoid the

20  harm to us if Your Honor denies confirmation.  In <u>AC&S</u> where

21  confirmation was denied I don't believe the insurers have paid

22  anything yet.  So yes, we would like to be able to litigate

23  here and litigate in coverage court because if we win in

24  either forum the harm to us is eliminated.  But we're not

25  going to argue the same thing, and that underscores the harm

Case 04-01139-AMC  Doc 21036-51  Filed 06/01/09  Page 38 of 74

**Response/Anker**                                                                37

1   to us of a finding of no standing here.

2          I don't know how I am able to go to Judge Epstein

3   and say, "Judge Epstein, please rule for us in the coverage

4   action notwithstanding the fact that Judge Ferguson has

5   confirmed the plan, because the plan didn't satisfy

6   11.29(a)(3)," I think it's (a)(3), "was not proposed in good

7   faith.  Judge Epstein, please deny coverage because the

8   requirements of 5.24(g) were not met."

9          I don't think I can argue those issues in front of

10  Judge Epstein.  I can argue coverage issues in front of him,

11  but I can't argue bankruptcy issues in front of him, and what

12  I want to do in front of Your Honor is argue bankruptcy issues

13  not coverage issues.

14         One last point, Your Honor, the suggestion that we

15  should be able to file briefs is all well and good, and there

16  may be some legal issues here.  For example, there's a legal

17  issue as to whether a plan in which a Debtor is only providing

18  a promissory note and not putting any of the equity of the

19  Debtor into the trust satisfies the requirement of 5.24(g).  I

20  don't remember the subpart, but there's a provision that talks

21  about having to put securities into the trust and have

22  obligation to pay dividends.  That legal issue I will candidly

23  say I suspect can be litigated on the papers.

24         What can't be litigated on the papers is good faith.

25  Good faith, which is what Judge Newsome in AC&S found the plan

 1    lacked, a plan that there is testimony in the coverage action

 2    was the model for this plan.  Good faith, the issue that Judge

 3    Tchaikovsky in the <u>MacArthur</u> case said the insurers

 4    unequivocally had standing to litigate.  Good faith is at its

 5    core a fact-intensive inquiry.  The Third Circuit said that in

 6    the <u>SGL Carbon</u> case when it was good faith in filing for

 7    bankruptcy in the first place, the 11.12 issue, but in the

 8    11.29(a)(3) context it's also a fact inquiry.  It's, to look

 9    at what Judge Newsome held in <u>AC&S</u>, did the Debtors basically

10    turn over the keys to the plan process to the Plaintiff

11    lawyers.  Why was the security interest granted to certain

12    Plaintiffs and lawyers and their clients so that they get the

13    first $225 million in insurance?  What were the negotiations?

14           I can write briefs that raise all the legal issues,

15    Your Honor.  If I don't have the facts it becomes a hollow

16    exercise.  And so it is all well and good to say that we

17    should be able to file briefs, but that's not what we're

18    looking to do here.  We're looking to put the facts before

19    Your Honor so Your Honor can make an informed judgment of

20    whether this plan satisfies the requirements of 11.29 and

21    5.24, and for that we need standing and we need to be able to

22    have the facts.  Thank you, Your Honor.

23           THE COURT:  Thank you, Mr. Anker.

24           Anyone else?

25           MS. WARREN:  Hello, Your Honor.  Mary Warren of

1   Linklaters for London Market Insurers.

2        Your Honor, I'd just like to address a couple of

3   recurring themes in this plan which show the plan for what it

4   is.  It is a wholesale, non-consensual redraft of Congoleum's

5   insurance policies without insurer consent in the guise of a

6   Petition for Reorganization.  And no matter how much we pick

7   around the edges of different provisions that's what this plan

8   is all about. Mr. Anker has gone through the assignment

9   provision a little bit, and as Your Honor knows, that is

10  really the fulcrum upon which this plan of so-called

11  reorganization turns.

12       The compelled transfer of insurance proceeds from

13  the control of insurers to the control of the plan proponents

14  is what this plan is all about.  And what I found most

15  interesting in the standing briefs was that, although the

16  Debtors concede insurer standing on the assignment point, the

17  Debtors' claim, and you've heard this again today in oral

18  argument, that assignment is purely a legal matter.  I think I

19  heard, "An up or down legal matter."

20       The Debtors have never told Your Honor what that

21  standard could be, what is it.  One can comb through this

22  Debtors' standing briefs, the provisions of the plan, the plan

23  documentation, all the briefs in this case and not find a

24  single clue as to how the Debtors' attempts are going to

25  persuade you that the compelled non-consensual assignment of

1   insurance proceeds is compatible with bankruptcy law or

2   applicable state law.  Why don't they tell you this?  And if

3   they can't tell you this, Your Honor, then what basis do they

4   possibly have for saying that we're not entitled to fact

5   discovery?

6          Well, Your Honor, it's clear that the assignment

7   theory is the diciest legal proposition of this very dicey

8   plan.  Just using my clients' policies as an example, the

9   London Market policies have the standard anti-assignment

10  provisions in them.  The London Market policies are not

11  executory.  That being the case, as Your Honor knows,

12  bankruptcy precedent dictates that those policies continue

13  through the bankruptcy and beyond unchanged and in tact in all

14  their provisions.  Yet what the Debtors propose to have you do

15  is take a red pen and scratch out the anti-assignment

16  provisions giving the trust all the benefits of the contracts,

17  and they haven't told you the legal basis for that.  And Your

18  Honor, there isn't a satisfactory legal basis for that.  It's

19  not supposed to happen.

20         Now the Debtors will say and have said that other

21  Bankruptcy Courts have allowed an assignment, and that's true.

22  In the larger universe of asbestos bankruptcy cases Debtors

23  have come up with a hodgepodge of various theories, including

24  state law, bankruptcy law, non-bankruptcy law, you name it, to

25  try to justify this assignment theory, and in recent months

**Response/Warren**                                                    **41**

1   two courts have adopted one or the other, and they're making

2   their way up on appeal.  But we respectfully submit that Your

3   Honor would probably like to know more than the fact that a

4   couple other courts have embraced one or the other theory, and

5   we would like to know more, and Your Honor, we don't want to

6   be back here in two months still asking what's the Debtors'

7   theory of assignment, because it is very important and we are

8   entitled to discovery on it.

9          Your Honor, there -- oh, I'm sorry.  There's one,

10  and perhaps I just heard this incorrectly, but I think Mr.

11  Pacitti said that the Third Circuit has approved assignment of

12  insurance rights.  It hasn't, and perhaps I just heard that

13  wrong.  He might have been referring to another Bankruptcy

14  Court.  And Mr. Pacitti also made the remark that there's a

15  confusion between insurance policies and insurance rights in

16  terms of the assignment.  Either way there has to be a legal

17  basis for overcoming the anti-assignment provisions in the

18  policies.  The anti-assignment provisions don't apply just to

19  policies.  They apply to rights, proceeds, et cetera.  So no

20  matter how the Debtors slice it, they have to come up with a

21  legal basis for it, and we respectfully submit we think Your

22  Honor will be unpersuaded when they finally do.

23         There are just a couple other themes here that I

24  want to identify that show this plan for what it is.  One is

25  the repeated efforts by the Debtors to fix the amount, timing

**Response/Warren**                                                                    42

1  and manner of payment of insurance proceeds without insurer

2  participation or consent.  And as the papers amply set out,

3  that's not just a Section 7.2 issue.  That's a trust

4  distribution procedures issue, that's an assignment issue.  It

5  permeates the plan.

6          Another theme is the Debtors attempt to use the plan

7  and the powers of this court to preempt adjudication in the

8  coverage litigation of breach of contract issues presented by

9  the plan proponents pre-petition conduct and the plan.  Now

10  Mr. Pacitti has said several times that the Debtors don't

11  intend to use any findings here in the insurance coverage

12  action, but that's not what the last paragraph of their new

13  Section 11.10 says.  It says,

14          "Notwithstanding anything else in this provision,

15          the preclusive effect of whatever findings Your

16          Honor might make, if raised by any insurance company

17          shall not be limited as to all insurance companies."

18          Now that goes beyond what I even understand to be

19  normal issue preclusion, and that is not a provision that in

20  the words of Judge Fitzgerald pretends that the bankruptcy

21  didn't happen, which is, as you know, is Judge Fitzgerald's

22  definition of insurance neutrality.

23          And finally, Your Honor, another theme that

24  permeates this plan is the Debtors' attempt to use the plan

25  and the powers of this Bankruptcy Court to selectively

1  override insurers' pre-existing contractual and legal rights,

2  and I think that that's amply set forth in the papers.  I

3  would ask Your Honor not to forget again about the trust

4  distribution procedures and the claimant agreement.  In

5  particular, there's a provision that we identify in our brief

6  that turns the insured/insurer relationship on its head, and

7  essentially imposes a duty of cooperation between the Debtors

8  and asbestos Plaintiff's Counsel as against the insurers,

9  which is the diametric opposite of what the insurance

10  relationship has been throughout the ages.  And Your Honor, we

11  submit again that's something that the Debtors are trying to

12  use the plan and the Bankruptcy Court to accomplish, which it

13  could not accomplish otherwise, and certainly not in the

14  coverage action.  Thank you.

15          THE COURT:  Thank you, Ms. Warren.

16          MR. ELGARTEN:  Mr. Anker, to everybody's benefit,

17  has the habit of saying, "One more point," and taking away

18  points for us to argue that we had left over, and that's all

19  to the good and I'll try to keep to that.

20          There are three reasons we have standing here under

21  the case law, and they all arise from the fact that insurers

22  remain parties-in-interest to these proceedings, which is, of

23  course, what the code provides.  They have a practical stake

24  in the outcome of the confirmation, which is the test for

25  party-in-interest, because the plan effects and abrogates

1 certain contract rights. We hear that admitted both as to the

2 assignment and as to the right to approve settlements. It

3 changes or affects and abrogates insurer defenses in coverage

4 actions. That's a second ground for standing. And of course,

5 the third ground is the more general and broader ground, which

6 is that a party that may be liable to creditors for the

7 debtor's debts is a party-in-interest, and there's a long line

8 of cases, including <u>Berkshire Farms</u>, that, which is the most

9 recent one, that recognizes that that fact that the events in

10 this action will increase the burdens and the amounts that the

11 insurers may have to pay from a subsequent indemnity action is

12 in itself a basis for party-in-interest standing.

13    Of the three grounds I just discussed, the first,

14 the abrogation of contractual rights is conceded. The third

15 is conceded as well because it is obvious they are

16 incorporating settlements that will potentially impose

17 additional burdens. The effecting the insurers' rights in

18 the, in the State Court contract action, we heard an assertion

19 that by changing 8.4 of the plan they attempted to address it.

20 I would simply remind the Court that our problem with that

21 section was not the fix that they just told you about, that

22 they were gonna make it reciprocal.

23    All the insurers the first go round stated that the

24 problem is that in common parlance when parties say, "The

25 policyholder went forward and entered into a settlement

1   without consulting the insurer," we say that policyholder

2   waived its right to seek coverage for that settlement.   That's

3   the words one uses, and we said that the last time we were

4   here.   And notwithstanding what you just heard, they didn't

5   try to fix that.   They left that in there with the language

6   that says nothing in connection out of the plan with their

7   negotiations of the plan waive coverage.   So whether that

8   ultimately turns out to be meritorious, they certainly did not

9   try to fix that provision which affects our defenses in

10  coverage.   They knew what it was.   They did not try to do

11  anything about it.   So those are the three grounds.

12         They make a further assertion.   Their further

13  assertion in connection with this is that, okay, there are

14  various parts of the plan that affect the insurers, but

15  insurers should only be heard with respect to those specific

16  issues that came up.   That's not the law, and in practice

17  that's not this case.   It's not the law because when one reads

18  the Third Circuit cases including Amatex, including Marin

19  Motor and including Travelers where they said appellate

20  standing might be somewhat narrower, but that's because

21  standing in the Bankruptcy Court is so broad a party-in-

22  interest can speak to any issue, and that's because of the

23  purposes of the bankruptcy code, which is the Court has

24  independent duties so we welcome parties who are in a

25  financial position because they are affected, we welcome their

**Response/Elgarten**                                            **46**

1   input because they have Article 3 standing in order to present

2   the issues that go to confirmation that affect their interest.

3   It's a philosophical issue.

4           Second, as a practical matter in this case, insurers

5   are not going to be speaking to issues that they have no

6   business speaking to.  They are speaking to issues concerning

7   good faith, concerning the abrogation of their rights,

8   concerning claims allowance and how those procedures work in

9   which they do have a very specific and immediate interest.

10          So if there was, and I don't concede there is, a

11  concept of a claim, an objection to confirmation that is so

12  far fetched and so distant from insurers' interest that we

13  simply wouldn't tolerate it, we'll deal with that when it

14  comes up and we have an objection that is so distant.  But it

15  has not come up as yet and right now we are parties-in-

16  interest with standing to appear and object to confirmation.

17  Thank you, Your Honor.

18          THE COURT:  Thank you.  Okay.  Thank you.

19          I need to remind everyone to identify themselves

20  before they speak for the record.

21          MR. ELGARTEN:  Did I forget to do that, Your Honor?

22          THE COURT:  You did.

23          MR. ELGARTEN:  Can I make it up late?

24          THE COURT:  Please.

25          MR. ELGARTEN:  My name is Cliff Elgarten.  I

26  represent One Beacon America.

Response/Handler/Sigal                                                47

1          THE COURT:  That's right.

2          Thank you, Mr. Elgarten.

3          MR. HANDLER:  Your Honor, Steve Handler on behalf of

4    the CNA companies.

5          We submitted a brief in which we outlined the

6    provisions of the plan that we thought adversely affected the

7    insurers.  A couple of those, Debtors' counsel did not respond

8    to.  But this is all set out in our brief.

9          Unless Your Honor has any questions, I'd be happy to

10   just rely on what we've submitted in the written document.

11         THE COURT:  I'd appreciate that.  Thank you.

12         MR. SIGAL:  Your Honor, Mike Sigal, Simpson,

13   Thacher.  We represent Travelers.

14         Your Honor, I'm going to try to address four issues

15   which I don't think have been addressed before today.  One is

16   the irrelevancy of the modified plan with regard to the issues

17   before your court and how that plays out to classification,

18   allowance.  And I'd like to respond to some comments that Mr.

19   Pacitti said about allowance and the issue of reverse

20   preemption.

21         The Debtor now acknowledges that a bankruptcy plan

22   cannot upgrade a potential Debtor receivable.  The Supreme

23   Court told us that in Zartman in 1910, and the Third Circuit

24   strongly reiterated that about a half a dozen years ago in

25   Integrated Solutions.  The merits of whether the Debtor's plan

Response/Sigal                                        48

1   has achieved this undisputed standard of not upgrading what it

2   came into bankruptcy with is not at issue at this time at the

3   ruling on party-in-interest status.

4         But even if, hypothetically, the Debtor could

5   achieve the status of not affecting coverage or not affecting

6   coverage litigation, that does not mean some of those same

7   facts will come up as a matter of federal bankruptcy law in

8   addition to things that Mr. Anker mentioned, such as in good

9   faith.

10        And other ways that it will come up is

11  classification, allowance, and reverse preemption.  For

12  example, with regard to classification, the pre-petition

13  settlements are relevant, of course, in the coverage action.

14  But the pre-petition settlements also dictate the essential

15  classification of claims in Article II of the plan.

16        Whether that classification which sets up a priority

17  system which the Debtors would like Travelers and,

18  specifically, St. Paul to pay in excess of $100 million for,

19  whether that classification scheme is set up in Article II

20  that has been dictated by the pre-petition Settlement

21  Agreements, Claimants Agreements, and which automatically

22  assumed on an Article 80 plan, whether they satisfy the

23  reasonableness standards of <u>Jersey City Medical Center</u> is a

24  federal bankruptcy issue, not in the state law insurance

25  issue.

1       With regard to allowance, Mr. Pacitti said -- this

2   is my handwriting, I think this is relatively accurate -- but

3   something like they were not seeking allowance, they were

4   seeking an allowance procedure to allow the trust to deal with

5   allowance and payment of claims.

6       But can you imagine someone coming in to bankruptcy,

7   Judge, in another bankruptcy, Your Honor, and saying Judge,

8   don't worry about hassling yourself with claims allowance,

9   we're going to let our friends do it?  That's what he just

10  told you is happening in this plan.

11      502 of the Bankruptcy Code makes claims allowance a

12  judicial process.  In 524(g), it says in 1(b) that a trust may

13  pay claims, asbestos related claims.  But there's not one word

14  in the totality of 524(g) that offers the otherwise applicable

15  provisions of the statutory established claims allowance

16  process of 502.

17      Where 524(g) wants to override another section of

18  the Bankruptcy Code, it says so.  For example, in

19  524(g)(4)(a), to rely, it says that the injunction permitted

20  by 524(g) is "notwithstanding the provisions of 524(e)."  But

21  there's not one word in 524(g) saying it's notwithstanding the

22  claims allowance process of 502.

23      This is not an issue of federal preemption, as

24  federal preemption is only contemplated where there's both an

25  issue of compliance with both federal and state regulation.

**Response/Sigal**                                          **50**

1   Here, the issue is a straightforward application of statutory

2   construction of several sections of federal law.  Section 502

3   and Section 524 of the Bankruptcy Code and Section 157(b)(5)

4   of the Judicial Code, where it says that personal injury,

5   tort, and wrongful death claims shall be tried in the District

6   Court.  157(b)(5) was part of the so-called marathon fix, and

7   that was in 1984.  524(g) came in in 1994, ten years later.

8   There's nothing in 524(g) that changes 157(b)(5).

9        Without the Court deciding the ultimate allowance

10  issues at these times, which are very complicated, and how

11  those sections of federal law should be construed with respect

12  to the allowance of claims, the Travelers has, and Travelers

13  and St. Paul are being asked to pay, potentially, in excess of

14  $100 million.  This is something, we submit, Travelers should

15  be able to address the Court about.

16       And finally, Your Honor, I'd like to address the

17  issue of reverse preemption.  This was raised by the McCarran-

18  Ferguson Act at 15 USC 10.11 to 15.  In the McCarran-Ferguson

19  Act, the Court determined that no act of Congress shall

20  regulate insurance with two exceptions.  One exception are

21  statutes that are specified in the McCarran-Ferguson Act.  For

22  example, the National Labor Relations Act is a specified

23  statutory exemption.  The Bankruptcy Code is not.

24       Secondly, Congress said the other way that Congress

25  can get into the insurance world is if Congress, in a new act

1    of Congress, says so.  But in the mid-90's, the Supreme Court,

2    in a case called <u>Barnette Bike</u> said that the bankruptcy

3    statute was a general statute and does not relate to

4    insurance.  Last year, a sister court in the Third Circuit

5    said that the preference and fraudulent conveyance provisions

6    of the Bankruptcy Code, because of the McCarran-Ferguson Act,

7    were reverse preempted.

8        Again, this is not something that we are asking the

9    Court to make any decision on today.  But Travelers does have

10   an interest, Your Honor, in directing the Court as to the

11   proper integration of these two federal statutes as they apply

12   to confirmation of a plan that would affect the claims

13   handling which is regulated by state insurance law.

14       In conclusion, Your Honor, a plan schedule is in

15   place.  Confirmation is in less than three months.  The fact

16   that the Debtor may or may not have partially cleaned up its

17   act doesn't mean that Travelers is not a party-in-interest.

18   At the time of standing, Your Honor, Travelers had $100

19   million potential exposure.  It still does.  And nothing

20   really changed has happened since and has really changed

21   Travelers practical state.

22       Thank you, Your Honor.

23       THE COURT:  Thank you, Mr. Sigal.

24       MR. McCLAIN:  Good afternoon, Your Honor.  David

25   McClain for Mt. McKinley and Everest Reinsurance.  And I

1  believe that I'm going to be the last speaker in opposition to

2  the Motion.  And I'm going to be brief.

3       The reason I rise to stand at all, Your Honor, I

4  think we certainly agree with the arguments that have been

5  made today.  And I think that the briefing on this issue has

6  been relatively complete.  The main reason I stand today is to

7  point out to you that the issue, as it has been framed by the

8  Debtor, at least, today, is whether or not this plan is

9  neutral.  What the briefing and the argument have shown you is

10  that it's not.  And, frankly, with this Debtor, neutrality is

11  not a possibility in an insurance sense.

12       This plan establishes -- and I'm going to address

13  only a few points here, Your Honor.  This plan establishes

14  procedures to fix claims.  That's exactly what the plan

15  purports to do.  It contemplates payment by insurance proceeds

16  of those claims.  It provides no other mechanism, really, for

17  the payment of those claims, even though the Debtor has other

18  intrinsic value.  The plan has, because of that, a _prima facie_

19  -- or it does have _prima facie_ violations of the insurers'

20  contractual rights, which you've heard today orally, and

21  you've also seen in writing.

22       The response to all of that, Your Honor, is, from

23  the Debtor's prospective, to say that Section 7.3 says we're

24  only going to pay allowed claims and we're not seeking to

25  allow claims in this case.  I would respectfully submit that

Response/McClain                                          53

1   that is simply disingenuous.  The Debtor says that they're not

2   going to bind insurers; that they're not going to set claims;

3   and this is virtually a quote, and that they just want a trust

4   created channeling injunction issue, claims channeled to it,

5   and the trust to deal with the allowance of claims under the

6   Trust Distribution Procedures.

7           If all of that happens, Your Honor, which is what's

8   contemplated by the plan, then those claims are going to be

9   fixed.  The methodology for fixing those claims would be

10  established by this plan.  If all of that happens, Your Honor,

11  an allowed claim is going to be presented, and the idea is

12  going to be that we're going to have to pay it.

13          As our papers say, we have really two arguments:

14  One, an argument about coverage; but secondly, an argument

15  that the Debtor and the other plan proponents simply want to

16  pretend doesn't exist and, that is, a question of if we were

17  to have to pay, how much should we pay.  Certainly, that's a

18  definition of a pecuniary interest.  We have a pecuniary

19  interest in that, Your Honor, and that is not something that

20  we can handle in another forum.  It has to be addressed here.

21          Finally, Your Honor, the arguments that have been

22  addressed to you address the issue of standing.  It doesn't

23  mean that you have to rule that all of our objections are

24  correct, just that we have a right to make them.  In our

25  opinion, Your Honor, failure to recognize standing based on

**Response/Randolph** 54

1  the idea of the insurance neutrality of this plan is

2  sufficient ignores the terms of the plan.  It ignores the

3  economics of the Debtor.  And it ignores the economics of the

4  insurance policies themselves.

5         Thank you, Your Honor.

6         THE COURT:  Thank you.

7         Anyone else wish to be heard in objection to the

8  Motion?

9         Mr. Pacitti, you reserved some time.

10        MR. PACITTI:  Yes, Your Honor.  If I could defer to

11  Mr. Randolph.

12        THE COURT:  Of course.

13        MR. RANDOLPH:  Good afternoon, Your Honor.  My name

14  is Jerome Randolph.  I'm also here on behalf of the Debtor.

15        Your Honor, I am primarily involved in the coverage

16  case.  And I just wanted to address a few of the issues that

17  came up in the arguments by the insurers here regarding what

18  is going on in the coverage case and how it plays out here.

19        In effect, the coverage case is being hotly

20  litigated right now.  It's going to resolve the consequences

21  of this pre-pack on virtually all aspects of coverage

22  available to Congoleum and, ultimately, to the claimants in

23  this case.  It will decide virtually all of the issues you've

24  heard about here raised by the insurers during this argument.

25        We are in the process in the coverage case, right

Response/Randolph                                        55

1   now, as we speak, of extensive discovery on virtually all of

2   these aspects.  The discovery goes into collusion.  The

3   discovery goes into consent to the settlements by the insurers

4   and their alleged inability to be involved in or to consent to

5   the settlements.  It involves the rights of the insurers to

6   cooperate -- excuse me -- the insurers to cooperate with the

7   policyholders here in connection with the settlements.

8        All of those issues are being currently litigated in

9   the coverage case.  And, for example, just to sort of show the

10  Court how there's parallel discovery going on in this case,

11  the insurers have attempted to take a discovery regarding a

12  sample of approximately 2,000 claims, apparently in an attempt

13  to show that those 2,000 claims do not meet appropriate

14  criteria for either exposure or for disease type.  It's

15  exactly that evidence which the insurers are trying to

16  present, as well -- and we'll present, as well, in the

17  coverage case -- extensive evidence regarding a sample of the

18  100,000 claims to determine whether those claims do, in fact,

19  meet the appropriate legal standards for both exposure and

20  disease type.

21       Our position is, Your Honor, there is no need to

22  duplicate those efforts in this court with what's going on

23  already in the insurance coverage case.  And I think Mr. Anker

24  said it best.  They are trying to litigate these issues twice,

25  once here and once there.

**Response/Pacitti**                                        **56**

1      We are facing a six-to-eight-week trial probably at

2  the end of this year or beginning of next year in the coverage

3  case to do what the insurers are suggesting here would be, in

4  effect, to have a six-to-eight-week hearing before this Court

5  on confirmation.

6      Our position is very clear, Your Honor.  Those

7  issues are being litigated in the coverage case.  The

8  creditors here, the claimants here are willing to take the

9  risk of the outcome of that coverage case to determine whether

10  there are going to be assets to pay those claims.  That will

11  be decided in the coverage case.  It does not affect the

12  feasibility of this plan.  And we believe, Your Honor, that

13  those issues should be resolved where they are currently being

14  litigated between the parties, that is, in the coverage case

15  rather than in the bankruptcy case.

16      Thank you, Your Honor.

17      THE COURT:  Thank you.

18      MR. PACITTI:  Your Honor, I'll be brief.

19      As Mr. Randolph said, I guess if you let the

20  insurers continue on, they get to tell you exactly what

21  they're doing and why they're doing it.

22      Your Honor, they're not here seeking standing

23  because they really think that if this plan is confirmed that,

24  somehow, one of their rights under their policies is affected.

25  That's not what this is about.  What this is about is exactly

Response/Pacitti                                                   57

1    what Mr. Anker said.  If they are able to defeat confirmation,

2    they've been successful in avoiding, somehow, coverage under

3    the settlements.  So what they're seeking to do is, yes,

4    they're coming into this court, and a court where their rights

5    are not being adjudicated, or their interests are not at

6    stake, number one, because first of all, they're not, and

7    number two, because we preserved all their rights for a

8    coverage action that's going forward.

9            They're not seeking to protect that right.  What

10   they're seeking to do is get to the end.  And the end and

11   their goal is to defeat confirmation because that, to them, is

12   a win.  Whether the plan is confirmed or not has no bearing on

13   their rights.  It just means they didn't get a chance to

14   perhaps do something that they could otherwise do, but is yet

15   to be determined in the coverage action.

16           So, yes, Your Honor, Mr. Anker is right.  He's

17   finally come and told you exactly what they want to do.  They

18   want to defeat confirmation here, even though they truly don't

19   have a pecuniary interest in the outcome of this litigation

20   since it's all preserved for the coverage action.

21           So, Your Honor, all this paper and all this

22   discussion about Supreme Court cases and how it affects their

23   rights, when you boil it down, you step back, and you really

24   take a practical look at what's going on here, we're not

25   talking about affecting their rights.  We're talking about

**Response/Pacitti** 58

1  them being upset if they don't have an opportunity to derail

2  coverage.  They see that opportunity in the form of a

3  confirmation hearing on a plan that seeks to implement a

4  settlement that has already happened.  We already settled

5  those claims.

6        So to think now well, because we've settled claims,

7  they don't, no longer have a right to come in and defend those

8  claims or participate in a resolution of those claims, guess

9  what, Your Honor, that's already happened, and they're already

10  raising that issue, as Mr. Randolph told Your Honor, in the

11  coverage action.  And we're preserving their right to continue

12  to raise that same issue in the coverage action.  So nothing

13  here is going to affect them.

14        All they're concerned about is the end, whether they

15  can defeat this plan as a way of potentially avoiding

16  coverage.  That's all that this is about.  They don't care

17  about whether they even file objections, quite frankly, or

18  they provide Your Honor with briefs.  It provides a great

19  billing opportunity for lawyers, don't get me wrong.  But,

20  Your Honor, quite frankly, they don't care.  They just are

21  concerned about getting an opportunity to defeat coverage in

22  the context of confirmation.  So I think we have to stop

23  kidding ourselves about what this is really about.

24        Additionally, Your Honor, just to clarify these

25  continued misstatements, you know, the Debtor is making all

1   this money.  Your Honor, we're not making money.  We reported

2   a loss.  We're only contributing $2 million to the trust.

3   Well, Your Honor, everyone overlooks it, there's a reset

4   provision under this plan note.  It originally was set at

5   2.4-something million dollars and it's subject to reset within

6   a two-year period.  If it was reset today, it would be a 10-

7   plus million-dollar note, Your Honor.

8            So I just want to clarify that for the record so

9   that people don't continue to be under the misperception that

10  the Debtors are not contributing anything.  They're

11  contributing substantial assets.  This s not Halliburton.

12  This is not Mid-Valley.  We don't have $3 billion to put in a

13  trust.  I wish we did.  We don't.  We hope that we have the

14  $10 million to put into the trust over time.  We have to

15  demonstrate that to Your Honor in the context of feasibility

16  at plan confirmation.  We think we can show you that, as well

17  as all the other obligations that we have to meet under our

18  plan.

19           So, Your Honor, I think if you step back and review,

20  truly, point-by-point, the issues that have been raised as

21  potentially affecting rights, truly not affecting rights,

22  particularly with the savings provisions under 11.10, we're

23  truly talking about a missed opportunity for the insurers to

24  derail the confirmation proceedings and somehow avoid coverage

25  that they ultimately have chosen to avoid.

**Response/Pacitti**                                                    60

1     And, Your Honor, there was another statement about

2   well, you know, we want the opportunity to participate in

3   discussions and to somehow participate in settlements and

4   defend these claims.  Your Honor, they had that opportunity.

5   They chose not to take that opportunity.  They chose not to

6   defend.  They chose not to pay settlements.  They chose not to

7   pay judgments.  To come in now and say well, we want that

8   opportunity now after we've settled our claims, Your Honor,

9   that's being adjudicated in the coverage action.  They had

10   their opportunity.  They chose to ignore it.

11     So, Your Honor, we believe that we have met,

12   specifically, each of the provisions that Your Honor laid out.

13   And, quite frankly, each of the provisions that have been

14   raised now by the insurers, we think, number one, with the

15   inclusion of 11.10 and the specific language that we've

16   referenced in each of the sections that we've modified and,

17   specifically, 8.4, which everyone seems to overlook as, you

18   know, yes, there's a reservation of rights for the Debtor as

19   it relates to insurance claims.  But there's a whole other

20   balance of the paragraph that talks about the reservation of

21   rights of the insurers.  So it's a mutual reservation.  It's

22   not just our reservation.  That's what we specifically were

23   told the last time by Your Honor was a defect in that

24   provision.  That's what we fixed.

25     So, Your Honor, we believe that the plan does not

**Decision**                                                    61

1   affect the insurers' rights; that all of this is truly a

2   mechanism to derail confirmation in an effort to avoid

3   coverage and, literally, as Mr. Anker said, get two bites at

4   the apple.

5           Thank you, Your Honor.

6           THE COURT:  Thank you.

7           Anyone else?

8           The Debtor has moved for a determination of the

9   insurers' standing with regard to its modified plan.  The

10  Motion is supported by the Official Unsecured Asbestos

11  Claimants Committee, as well as Wachovia Bank in its capacity

12  as Indentured Trustee.  The Motion is opposed by numerous

13  insurers.  And those oppositions have been joined, in whole or

14  in part, by numerous other insurers.

15          As of Thursday, that is, June 3rd, the Court had

16  received papers from Federal Insurance Company, Mt. McKinley

17  Insurance Company, Continental Casualty, New Jersey Property

18  Liability Insurance Guarantee Association, certain insurers,

19  that is, Stonewall Insurance, One Beacon Insurance, American

20  Insurance Company, and Seaton Insurance Company, Certain

21  London Market Insurance Companies, Travelers Casualty &

22  Surety, Century Insurers, First State Insurance Company, and

23  AIU Insurance Company.

24          The Debtor contends that the plan, as modified, is

25  insurance neutral and, as a result, the insurers lack the

**1** standing to appear and be heard with respect to the modified

**2** plan, other than with respect to the insurance assignment

**3** provision.  The Committee and Wachovia add that the Motion

**4** should be granted because the amendment to the plan fully

**5** addresses the Court's concerns as expressed at the hearing on

**6** April 19th.

**7**          Based on the responses, the Court believes it

**8** necessary to clarify the ruling on April 19th.  In that

**9** opinion, the Court pointed to what it regarded as the most

**10** obvious provisions in the plan that implicated the rights of

**11** insurers and, thus, gave them standing.  The Court did not

**12** rule that if those specific provisions were changed that it

**13** would then automatically deny standing.  The Court merely left

**14** open the possibility that changes to the plan could be made

**15** that might render it truly insurance neutral.

**16**          With that clarification in mind, the Court turns to

**17** the specific objections raised by the insurers.  The section

**18** that garners the most attention from the insurers and is of

**19** the biggest concern to the Court is Section 7.2 of the plan.

**20** That section, as modified, now provides that although the plan

**21** Trustee has sole authority to contest asbestos personal injury

**22** claims, that authority is without prejudice to the right of

**23** any asbestos insurance company to contest coverage under any

**24** asbestos insurance policy.

**25**          While on its face that appears to alleviate the

**Decision** 63

1 insurers' concern, on closer examination, it is an inadequate

2 concession.  The ability of the insurers to contest coverage

3 is not co-extensive with the right to participate in the

4 litigation or the settlement of claims.

5          As the Court noted in its prior opinion, the

6 possible infringement on the insurers' contractual right to

7 elicit the insured's assistance in the contested claims is an

8 important matter and gives the insurers sufficient stake in

9 the plan to have a standing.

10          Even if the modified plan did not limit the

11 insurers' right to litigate the personal injury claim as

12 Section 7.2 appears to do, it, at the very least, changes the

13 party with whom the insurers would be required to litigate.

14 Section 4.1(j) of the modified plan states that each holder of

15 an unsecured asbestos personal injury claim shall be deemed to

16 have assigned to the plan trust, and the plan Trustee shall be

17 deemed such holders sole attorney in fact, as may be

18 appropriate, to prosecute, at the plan Trustee's discretion,

19 any direct action.

20          In Integrated Solutions vs. Service Report

21 Specialties at 124 Fed. 3rd 487, the Third Circuit held that

22 bankruptcy law did not preempt New Jersey law which prohibits

23 the assignability of prejudgment tort claims.  That case is

24 not precisely on point because it involved the transfer of

25 tort claims to the purchaser of the bankruptcy estate assets

**Decision**                                                    64

1   rather than to a trust created pursuant to a plan.

2           However, the Court finds that the insurers should

3   have standing to explore the interplay between that plan

4   provision, Section 524(g), and Section 1129, and New Jersey

5   law.

6           Another area of concern for the insurers is Section

7   8.4.  The Court disagrees with the insurers with the reading

8   of that section.  Many of the insurers expressed concern that

9   the section provides a sweeping defense of the state court

10  coverage litigation of any insertion on the part of the

11  insurers that circumstances surrounding the pre-petition plan

12  negotiations violated policy prohibitions against non-

13  consensual settlement of claims.

14          As this Court has noted with regard to a similar

15  provision in the previous plan, that section appears to be a

16  reservation of all parties' rights, rather than a waiver of

17  anything.  The Court is under the impression that the non-

18  consensual settlement issue would be a defense to coverage and

19  that the right to litigate any defense to coverage was

20  expressly preserved in Section 4, or 8.4.  As the Court reads

21  that section, the insurers would still be free to argue that

22  the negotiation of the plan and the settlement embodied in the

23  plan were collusive and breached the insurance policies.

24          The same is not true of Section 11.10, the section

25  the Debtor added to clarify the Debtor's intention that the

**Decision**                                                              65

1   plan remain insurance neutral.  The final paragraph of that

2   section could be interpreted as binding the insurers to

3   confirm the plan.

4          It is unclear to the Court what was intended by the

5   phrase with respect to any issue that is litigated by one or

6   more of the asbestos insurance companies as part of the

7   objection to confirmation of the plan when the amended plan

8   was filed for the express purpose of denying insurers standing

9   to object to the plan.

10         Even if that section were intended simply to address

11  the limited issue of the assignability of the insurance

12  proceeds that the Debtor concedes the insurers have standing

13  to argue, inclusion of that section presents the risk that the

14  Debtors will argue for a broader, preclusive effect in the

15  coverage litigation.

16         Another legitimate area of concern regarding Section

17  11.10 is that it might be interpreted as compromising the

18  insurers' allegation of fraud, collusion, and conflict of

19  interest.

20         Another legitimate concern on the part of the

21  insurers is that Section 5.1(d) and 10.1(a)(16) are a stamp of

22  approval for the proposed insurance assignment and would deny

23  the insurers the right to assert, in the coverage litigation,

24  that the insurance assignment negates coverage.

25         The Court assumes this is part of what the Debtor

**Decision**                                                        66

1   concedes standing about, but it also demonstrates how this

2   plan is not insurance neutral in any real sense of the word.

3   Section 10.1(16) talks about the duties and obligations of the

4   insurers as not being diminished by transfer.  But there is no

5   mention of the insurers' rights and defenses not being

6   eliminated or diminished.  There is a decided lack of

7   reciprocity in that position.

8            Section 5.1(q) is another example of a provision

9   that is spacially neutral but written with a pro-Debtor slant

10  that negates that neutrality.  That section states that the

11  Debtors' discharge does not diminish or impair in course of

12  the litigated policies, but it makes no mention of whether the

13  discharge diminishes or impairs the defenses.

14           Some insurers have also argued, quite reasonably,

15  that the section abrogates the insurers' rights by denying, by

16  seeking to deny them the right to assert, in the coverage

17  litigation, that the release and discharge proposed under the

18  plan negates coverage.

19           Additional areas of legitimate concern include

20  Section 11.6, to the extent that it limits any contribution

21  claim to an offset claim against the plan trust.  If a

22  particular insurer has no obligation to the plan trust, then

23  its contribution right is nullified.  Also, that section makes

24  the plan trust the party compensation is sought from, rather

25  than from another insurer who is perhaps more solvent.

1      Another point is that the plan documents, including

2   the Asbestos Insurance Rights Assignment and Agreement, Trust

3   Distribution Procedures, and Claimant Agreement, when viewed

4   in conjunction with one another, seem to seek indemnification

5   in contravention of the policies.

6      Another point is that the Trust Distribution

7   Procedure alters the policy's requirements regarding payment.

8   Another is that the plan alters the normal alliance of insurer

9   and insured in favor of an alliance between the insured and

10   the claimant.  That the plan requires an inappropriate finding

11   that the Debtors' contribution to the trust is adequate is

12   also an area of concern; as is, that the plan and its broad

13   release provisions may affect insurers.

14      Overall, the net effect of the sections mentioned

15   above compels the conclusion that even under the modified

16   plan, the insurers continue to have a practical stake in the

17   outcome of the plan confirmation proceedings.  And that

18   standard is in <u>Amatex</u>, as cited by almost everyone, at

19   755 Fed. 2nd 1034.

20      That finding is consistent with other Courts who

21   have found that when insurance proceeds are primarily an

22   issue, insurers are parties in interest.

23      And you can see, for example, <u>In Re: Berkshire Foods</u>

24   at 302 Bankruptcy Reporter 587; <u>Marcus Hook Development Park</u>

25   at 153 Bankruptcy Reporter 693; and <u>In Re: Peter DelBrandy</u>

1   Corporation at 138 Bankruptcy Reporter 458.

2          This Motion is somewhat premature as discovery is

3   not complete, so it's being brought on a less than complete

4   record.  Also, the parties still retain their right to fully

5   brief these issues in the context of confirmation.  Given

6   that, the Court's comments should not, in any way, be

7   construed as prejudging any confirmation issue.  The comments

8   are limited to this ruling regarding standing.

9          The Debtors' Motion will be denied with the standard

10  Order.

11         That leaves us, Mr. Pacitti, with the uncontested

12  Motion for, regarding solicitation.

13         MR. PACITTI:  Yes, Your Honor.

14         Well, Your Honor, we did seek to modify the plan in

15  hopes that, in large measure, we would change Your Honor's

16  opinion with respect to standing.  We obviously have heard

17  your ruling and, to the extent that there's any issues as to

18  whether it's altered, in any way, the insurers' rights, it's

19  clear it hasn't.

20         So, Your Honor, the rest of the modifications truly

21  were technical modifications that sought, number one, to

22  incorporate the modifications that we made for Congress

23  Financial and also cleaning up certain other provisions that

24  had ambiguities.

25         One, specifically, was dealing with environmental

**Decision/Colloquy** 69

1  liabilities other than asbestos environmental claims.  There

2  is discussions we had with the United States Department of

3  Justice on behalf of the Environmental Protection Agency that

4  dealt specifically with, I guess, Section 11.8 that we

5  modified and a concomitant change to definitions of property

6  damage and asbestos insurance rights as it relates to

7  available insurance coverage to pay those non-asbestos

8  environmental claims.

9        We just wanted to clarify that non-asbestos related

10  environmental liabilities were remaining with the Debtor and,

11  as well, non-asbestos related insurance coverage was remaining

12  with the Debtor, as well.  So we wanted to make sure that they

13  both jive, because that was the understanding and that's the

14  contemplation.

15        So, Your Honor, we believe that both the

16  modifications are not, do not create an adverse change in the

17  treatment of claimants and also are non-material and, as a

18  consequence, would not require any further solicitation.  And,

19  Your Honor, there were no objections filed, so I believe you

20  can add it to the Order.

21        THE COURT:  Sure.  Anybody want to be heard on that

22  one?

23        That Motion can be granted.  I agree with you that

24  solicitation is, re-solicitation is not necessary.

25        MR. PACITTI:  Thank you, Your Honor.

**Colloquy**                                                      70

1    THE COURT:  And, finally, that leaves us with the

2  Motion to compel discovery.  You were going to talk to your

3  client about --

4    MR. PACITTI:  We've been E-mailing on our

5  Blackberry's, Your Honor, but we haven't gotten a

6  clarification.  Can we take just five minutes for me to make a

7  telephone call?

8    THE COURT:  Sure.

9    MR. PACITTI:  Thank you, Your Honor.

10    THE COURT:  And those who are not interested in the

11  outcome of that Motion are certainly excused.

12                         (Recess)

13    THE COURT:  Well, the Blackberry failed, Mr.

14  Pacitti --

15    MR. PACITTI:  It did.

16    THE COURT:  -- how did the phone do?

17    MR. PACITTI:  I had to confer with the powers --

18    THE COURT:  I'm sorry.  Getting slower and slower

19  here.  Okay.  I'm sorry.

20    THE COURT:  Sorry, Your Honor.  I conferred with the

21  powers that be who are actually doing this.  Just so Your

22  Honor is aware, there's another five boxes of CD's that are on

23  the way in transit over today.

24    We would be willing to commit to provide the balance

25  of the production on the issues raised in the Motion by the

**Colloquy**                                                    71

1    end of business Wednesday --

2              THE COURT:  Okay.

3              MR. PACITTI:  -- and then have a privilege log on

4    those responses by the end of Friday.

5              THE COURT:  All right.  I think that will do.

6              And I'll need that in a form of Order.  Where did

7    Counsel go?

8              MALE VOICE:  Here, Your Honor --

9              THE COURT:  Okay?  All right.  We'll mark an Order

10   to be submitted.

11             MR. PACITTI:  Thank you, Your Honor.

12             THE COURT:  Thank you very much.

13             MR. RUGGERI:  Your Honor, if I may.  We have one

14   outstanding issue.  I don't know -- frankly, on the way here,

15   I don't know how the Court ruled on our Motion to shorten the

16   time to address, the Motion to enforce and for sanctions.

17             THE COURT:  14th.

18             MR. RUGGERI:  I'm sorry.  The 14th?

19             THE COURT:  14th.

20             MR. RUGGERI:  Okay.  Thank you, Your Honor.

21             A VOICE:  21st.

22             THE COURT:  No, sorry.  It's the 21st.  You're

23   right.  I'm sorry.  It's the 21st.

24             MR. RUGGERI:  The only problem with that, Your

25   Honor, is that only gives us nine days to complete fact

1    discovery.

2              THE COURT:  Yeah, I know.  I know.

3              MR. RUGGERI:  And they're under Order.  Okay.

4              Thank you, Your Honor.

5              THE COURT:  Thank you.

6                             *  *  *  *  *

## I N D E X

MOTION

By Mr. Ruggeri            6

RESPONSE

By Mr. Pacitti            9

MOTION

By Mr. Pacitti           14

RESPONSE

By Mr. Reinsel           26

By Mr. Anker             28

By Ms. Warren            38

By Mr. Elgarten          43

By Mr. Handler           47

Mr. Sigal                47

Mr. McClain              51

Mr. Randolph             54

THE COURT

Decision                 61

MOTION

By Mr. Pacitti           68
THE COURT

Decision                    69

CERTIFICATE:

        We certify that the foregoing is a correct transcript
from the electronic sound recording of the proceedings in the
above-entitled matter.


\s\Isabel E. Cole
Isabel E. Cole                      AOC #101


\s\Kathleen Connolly
Kathleen Connolly                   AOC #441
**COLE TRANSCRIPTION AND RECORDING SERVICE**

Dated:  June 11, 2004