## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:                                    *

W.R. GRACE & CO., et al.,                 *      Chapter 11

    Debtors.                          *      Case No. 01-01139 (JKF)
                                                 (Jointly Administered)

                                          *      Related Docket Nos. 20666, 21544, 21794

-----------------------------------------------------------x

## PHASE I TRIAL BRIEF FOR CNA COMPANIES

FORD MARRIN ESPOSITO WITMEYER
& GLESER, L.L.P.
Elizabeth DeCristofaro (*pro hac vice*)
Wall Street Plaza, 23rd Floor
New York, New York 10005-1875
Telephone: (212) 269-4900
FACSIMILE: (212) 344-4294

ROSENTHAL, MONHAIT & GODDESS, P.A.
Edward B. Rosenthal (Bar No. 3131)
P.O. Box 1070
Wilmington, Delaware 19899
Telephone: (302) 656-4433x6
Facsimile: (302) 658-7567

WILDMAN, HARROLD, ALLEN &
DIXON LLP
Jonathan W. Young
Jeff Chang
225 West Wacker Drive
Chicago, Illinois 60606-1229
Telephone: (312) 201-2662
Facsimile: (312) 416-4524

GOODWIN PROCTER LLP
Daniel M. Glosband (*pro hac vice*)
Michael S. Giannotto (*pro hac vice*)
Brian H. Mukherjee (*pro hac vice*)
Goodwin Procter LLP
Exchange Place
Boston, Massachusetts 02109
Telephone: (617) 570-1000
Facsimile: (617) 523-1231

*Counsel for Continental Casualty Company, Transportation Insurance Company and their
American insurance affiliates*

June 1, 2009

LIBW/1709534.5

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION ..........................................................................................................................1

STATEMENT OF FACTS ............................................................................................................2

ARGUMENT.................................................................................................................................3

I.     CNA HAS STANDING TO RAISE ITS PHASE I OBJECTIONS....................................4

       A.     The Applicable Tests ...............................................................................................4

       B.     CNA Has Standing to the Extent That the Plan Is Not Insurance Neutral to
              Object to Confirmation. .........................................................................................5

       C.     CNA Has Standing to Object To Having Its Rights Enjoined.................................8

       D.     CNA Has Standing to Object to Provisions That Implicate the Integrity of
              the Plan....................................................................................................................8

II.    THE PLAN IMPAIRS CNA'S RIGHTS AS AN INSURER TO THE EXTENT
       THAT IT IS NOT INSURANCE NEUTRAL.....................................................................9

       A.     The Plan Cannot Be Confirmed If It Results in a Modification of CNA's
              Rights Under Its Asbestos Insurance Policies. ......................................................9

       B.     The Requirements for Insurance Neutrality...........................................................11

       C.     The Plan May Not Be Insurance Neutral...............................................................12

              1.     The Plan Potentially Could Eliminate Coverage Defenses That
                     Would Be Available to CNA Under Its Policies and the Law and
                     Otherwise Impairs CNA's Policy Rights..................................................... 12

       D.     The Plan May Impair CNA's Right to Obtain Contribution from Settled
              Insurance Entities with Respect to Payments That CNA May Be Required
              to Make to Third Parties. ......................................................................................17

       E.     The Plan Should Make Clear That It Does Not Modify the Parties' Rights
              Under Certain Independent Insurance Programs with the Fresenius
              Indemnified Parties and Sealed Air Indemnified Parties.......................................19

       F.     The Plan May Impair CNA's Rights Regarding Post-Confirmation
              Handling of Workers' Compensation Claims..........................................................19

i

| III. | THE PLAN IMPAIRS CNA'S INTERESTS AS AN INSURER BECAUSE TRUST FIDUCIARIES HAVE CONFLICTS OF INTEREST IN VIOLATION OF THE RULES OF PROFESSIONAL CONDUCT. | 20 |
| | | | |

| | A. | The ACC Picked the Trustees and TAC, and Drafted the Trust Agreement and the TDP, and the TAC Can Exercise Extensive Control Over the Operation of the Trust. | 22 |

| | | 1. | The ACC Selected the Members of the TAC. | 22 |

| | | 2. | The ACC and FCR Selected the Trustees. | 23 |

| | | 3. | The ACC Drafted the TDP Without Any Input From CNA or Other Insurers. | 24 |

| | | 4. | The TAC Can Exercise Enormous Influence Over the Operation of the Trust. | 25 |

| | B. | The Plan Does Not Comply with Applicable Law as Required by Section 1129(a)(3). | 26 |

| | | 1. | The TAC Will Owe the Fiduciary Duty of Fair Dealing to All Trust Beneficiaries, Including the Indirect PI Trust Claimants. | 28 |

| | | 2. | The TAC Members Owe Conflicting Duties to Their Clients. | 30 |

| | | 3. | The Selection Process for the Trustees Creates an Appearance of Partiality. | 33 |

| | C. | The Trust Agreement Includes Improper Exculpation and Release Provisions. | 34 |

| IV. | THE PLAN IMPROPERLY IMPAIRS CNA'S ABILITY AS AN INSURER TO OBTAIN SECTION 524(G) INJUNCTIVE PROTECTION. | 36 |

| V. | INCORPORATION BY REFERENCE OF CERTAIN OBJECTIONS ASSERTED BY OTHER OBJECTING ASBESTOS INSURANCE ENTITIES | 39 |

| | CONCLUSION | 39 |

| | APPENDIX A: REVISED INSURANCE NEUTRALITY PROVISION | A1 |

## TABLE OF AUTHORITIES

**CASES:** **Page**

*Am. Transit Ins. Co. v. Sartor*, 814 N.E.2d 1189 (N.Y. 2004) ......................................................13

*Baron & Budd, P.C. v. Unsecured Asbestos Claimants Comm.*, 321 B.R. 147 (D.N.J.
2005) ....................................................................................................................................4, 5, 7

*Butner v. United States*, 440 U.S. 48 (1979).................................................................................10

*Cargill, Inc. v. JWH Special Circumstance LLC*, 959 A.2d 1096 (Del. Ch. 2008) .................28, 29

*Consolidated Edison Co. of N.Y. v. Allstate Ins. Co.*, 98 N.Y.2d 208 (2002) ...............................18

*Continental Cas. Co. v. W.R. Grace & Co.*, No. 06-4524 (S.D.N.Y.)...........................................13

*Danvers Motor Co. v. Ford Motor Co.*, 432 F.3d 286 (3d Cir. 2005)..............................................5

*DuPont v. Delaware Trust Co.*, 320 A.2d 694 (Del. 1974) ...........................................................29

*Fine Gold Jewelry, Inc. v. Guar. Nat'l Ins. Co.*, 1986 U.S. Dist. LEXIS 29340 (S.D.N.Y.
Feb. 13, 1986) ...........................................................................................................................13

*Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 885 F.2d 1149 (3d Cir. 1989) ........10

*In re ACandS, Inc.*, 297 B.R. 395 (Bankr. D. Del. 2003) ..............................................................27

*In re ACandS, Inc.*, 311 B.R. 36 (Bankr. D. Del. 2004) ................................................................27

*In re Amatex Corp.*, 97 B.R. 220 (Bankr. E.D. Pa. 1989), *aff'd sub nom. Amatex Corp. v.
Stonewall Ins. Co.*, 102 B.R. 411 (E.D. Pa. 1989)....................................................................10

*In Re American Capital Equipment Inc.*, Bankruptcy Nos. 01-23987-MBM & 01-23988-
MBM, (Bankr. W.D. Pa. May 26, 2009) ...................................................................................13

*In re Armstrong World Indus., Inc.*, 348 B.R. 136 (Bankr. D. Del. 2006) ....................................38

*In re Combustion Eng'g, Inc.*, 295 B.R. 459 (Bankr. D. Del. 2003), *modified,* 391 F.3d
190 (3d Cir. 2004)................................................................................................................20, 27

*In re Combustion Eng'g, Inc.*, 391 F.3d 190 (3d Cir. 2004)...........................................4, 6, 11, 20

*In re Congoleum Corp.,* 2005 Bankr. LEXIS 556 (Bankr. D.N.J. Mar. 24, 2005)..................... 6-7

*In re Congoleum Corp.*, 426 F.3d 675 (3d Cir. 2005) ..........................................................9, 21, 32

*In re Congoleum Corp.*, 362 B.R. 167 (Bankr. D.N.J. 2007) ..................................................11, 34

*In re Congoleum Corp.*, 2009 Bankr. LEXIS 900 (Bankr. D.N.J. Feb. 26, 2009) ...............6, 7, 11

*In re Continental Airlines*, 203 F.3d 203 (3d Cir. 2000) ................................................................34

*In re Fuller-Austin Insulation*, 1998 U.S. Dist. LEXIS 18340 (D. Del. Nov. 10, 1998).................4

*In re Johns-Manville Corp.*, 340 B.R. 49 (S.D.N.Y. 2006), *rev'd on other grounds*, 517
F.3d 52 (2d Cir. 2008), *cert. granted sub nom. Travelers Indem. Co. v. Bailey*, 129 S.
Ct. 761 (2008) (No. 08-295, argued March 30, 2009)................................................................8

*In re Joint E. & S. Dist. Asbestos Litig.*, 982 F.2d 721 (2d Cir. 1992), *modified*, 993 F.2d
7 (2d Cir. 1993)..........................................................................................................................31

*In re Kaiser Group Int'l, Inc.*, 272 B.R. 846 (Bankr. D. Del. 2002) .............................................30

*In re Lernout & Hauspie Speech Prods., N.V.*, 301 B.R. 651 (Bankr. D. Del. 2003), *aff'd*,
308 B.R. 672 (D. Del. 2004)........................................................................................................7

*In re Lisanti Foods, Inc.*, 329 B.R. 491 (D.N.J. 2005) ..................................................................38

*In re Pittsburgh Corning Corp.*, 2006 Bankr. LEXIS 4636 (Bankr. W.D. Pa. Dec. 21,
2006) ......................................................................................................................................7, 11

*In re Pittsburgh Corning Corp.*, 308 B.R. 716 (Bankr. W.D. Pa. 2004)....................................9, 27

*In re PWS Holding Corp.*, 228 F.3d 224 (3d Cir. 2000).................................................................4

*In re Quigley Corp.*, 391 B.R. 695 (Bankr. S.D.N.Y. 2008) ...........................................................7

*In re Western Asbestos Co.*, 313 B.R. 832 (Bankr. N.D. Cal. 2003)............................................37

*In re Zale Corp.*, 62 F.3d 746 (5th Cir. 1995) ...............................................................................8

*In re Zenith Elec. Corp.*, 241 B.R. 92 (Bankr. D. Del. 1999)........................................................34

*Integrated Solutions. Inc. v. Service Support Specialties, Inc.,* 124 F.3d 487 (3d Cir.
1997) ..........................................................................................................................................10

*J.P. Realty Trust v. Pub. Serv. Mut. Ins. Co.*, 476 N.Y.S.2d 325 (App. Div. 1984), *aff'd
mem*, 488 N.Y.S. 2d 650 (N.Y. 1985).......................................................................................18

*Law v. Law*, 1997 Del. Ch. LEXIS 134 (Del. Ch. 1997)................................................................29

*Lewis v. Hanson*, 128 A.2d 819 (Del. 1957), *aff'd sub nom. Hanson v. Denekla*, 357 U.S.
235 (1958)...................................................................................................................................28

*Penn. Gen. Ins. Co. v. Aetna Cas. & Surety Co.*, 761 N.Y.S.2d 571 (App. Div. 2003) ...............18

iv

*Scotts Co. v. American Employers Ins. Co.*, No. 04-ap-55083-JFK (Bankr. D. Del. filed
Sept. 2, 2004) ............................................................................................................................... 18

*Smith v. Arthur Andersen LLP*, 421 F.3d 989 (9th Cir. 2005) ........................................................ 8

*Stradford v. Zurich*, 2002 U.S. Dist. LEXIS 24050 (S.D.N.Y. Dec. 10, 2002) ............................ 13

*TLC Beatrice Int'l Holdings, Inc., v. Cigna Ins. Co.*, 2000 U.S. Dist. LEXIS 2917
(S.D.N.Y. Mar. 14, 2000) ............................................................................................................ 13

*UNR Industries, Inc. v. Continental Casualty Co.*, 942 F.2d 1101 (7th Cir. 1991) ...................... 16

*Value Property Trust v. Zim Co. (In re Mortgage & Realty Trust)*, 195 B.R. 740 (Bankr.
C.D. Cal. 1996) ............................................................................................................................. 32

*Zartman v. First Nat'l Bank of Waterloo,* 216 U.S. 134 (1910) ................................................. 9-10

## STATUTES:

11 U.S.C. 524(g) .................................................................................................................... *passim*

11 U.S.C. 524(g)(4)(A)(ii)(III) ...................................................................................................... 36

11 U.S.C. 1109(b) ...................................................................................................................... 4, 7

11 U.S.C. 1123(a)(5) ...................................................................................................................... 38

11 U.S.C. 1128(b) ............................................................................................................................ 4

11 U.S.C. 1129(a)(1) ........................................................................................................... 9, 19, 20

11 U.S.C. 1129(a)(3) ........................................................................................................... 9, 15, 20

12 Del. Code § 3313(a) .................................................................................................................. 28

12 Del. Code § 3801 *et seq.* ........................................................................................................... 28

12 Del. Code § 3806(e) .................................................................................................................. 35

12 Del. Code § 3809 ....................................................................................................................... 28

## RULES & REGULATIONS:

Model Rules of Prof'l Conduct R. 1.3, cmt. 1 ............................................................................... 31

Model Rules of Prof'l Conduct R. 1.7, cmt. 1 ..............................................................................30

Model Rules of Prof'l Conduct R. 1.7(a)......................................................................................30

Model Rules of Prof'l Conduct R. 1.7(a), cmt. 9..........................................................................30

Model Rules of Prof'l Conduct R. 1.7(b)(1)..................................................................................32

Model Rules of Prof'l Conduct R. 1.8(h) .....................................................................................35

D. Del. Civ. R. 83.6(d)..................................................................................................................30

Del. Law. R. Prof'l Conduct R. 1.7 ..............................................................................................30

Del. Law. R. Prof'l Conduct R. 1.7, cmt. 9 .................................................................................31

Del. Law. R. Prof'l Conduct R. 1.8(h)..........................................................................................35

## OTHER AUTHORITIES:

3 Scott and Ascher on Trusts § 16.7 (5th ed. 2006)......................................................................28

Restatement (Third) of Law Governing Lawyers § 16 (2000) ......................................................31

Restatement (Third) of Law Governing Lawyers § 110 (2000) ....................................................31

Restatement (Third) of Law Governing Lawyers § 135, cmt. c (2000) ........................................31

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | * | |
| W.R. GRACE & CO., et al., | * | Chapter 11 |
| Debtors. | * | Case No. 01-01139 (JKF)<br>(Jointly Administered) |
| | * | Related Docket Nos. 20666, 21544, 21794 |

-------------------------------------------------------x

## PHASE I TRIAL BRIEF FOR CNA COMPANIES

### INTRODUCTION

Pursuant to the Third Amended Case Management Order ("CMO") [Docket No. 21544], Continental Casualty Company and Continental Insurance Company, on their behalf and on behalf of their predecessor companies, affiliates and subsidiaries which issued insurance policies to the Debtors (individually or collectively "CNA"), submit this Trial Brief in support of their Phase I Objections to the Proposed First Amended Joint Plan of Reorganization (the "Plan") [Docket No. 20666].[1]

Pursuant to the CMO, Phase I addresses, *inter alia*: "(i) whether the Plan improperly affects the rights of the Debtors' insurers (in their capacity as insurers, but not creditors)," and "(ii) the standing of the Debtors' insurers (in their capacity as insurers, but not creditors) to litigate confirmation objections that involve issues other than those described in section (i) …." As noted in CNA's Objections [Docket No. 21794], the demarcation between Phase I and Phase II is not entirely clear, and should the Court determine that an issue CNA has listed as Phase II should be heard in Phase I, CNA is prepared to litigate the issue in Phase I. In that regard, CNA

---

[1] Capitalized terms not defined herein shall have the meaning ascribed to them in the Plan.

believes that two objections it listed as Phase I in its Objections — *i.e.*, that the Plan deprives CNA of indemnity rights against Sealed Air Corporation (CNA's Objections § I.E.3, at 15) and fails to properly list settled policies in Exhibit 5 (*id.* § I.H., at 16-17) — should, upon further consideration, be deemed Phase II because they arise under settlement agreements and therefore can be more properly considered as arising in CNA's capacity as a creditor.

## STATEMENT OF FACTS

The evidence at the Phase I hearing will show that CNA is an Asbestos Insurance Entity that issued insurance policies to the Debtors (the "CNA Policies"). Certain of the CNA Policies are Asbestos Insurance Policies under the Plan. *See* Plan § 1.1(11); Plan Exhibit 6 at Schedule 1. Under the Plan, the rights of the Debtors, Reorganized Debtors and Non-Debtor Affiliates (hereafter "Insurance Contributors") under the CNA Asbestos Insurance Policies are assigned to the Asbestos PI Trust (the "Trust") pursuant to the Asbestos Insurance Transfer Agreement. *See* Plan §§ 1.1(15), 7.2.

CNA is a "non-settled" Asbestos Insurance Entity with respect to 16 high-level excess Asbestos Insurance Policies issued to the Debtors. In addition, however, CNA has entered into several settlement agreements with the Debtors and Non-Debtor Affiliates with respect to other of its Asbestos Insurance Policies, and is thus also a Settled Asbestos Insurance Company under the Plan. *See* Plan Exhibit 5; Plan Exhibit 6 at Schedule 2. The rights of the Insurance Contributors under the Asbestos Insurance Settlement Agreements with CNA are also to be transferred to the Asbestos PI Trust. *See* Plan § 7.2.

CNA has also entered into a Settlement Agreement that constitutes an "Asbestos Insurance Reimbursement Agreement" under the Plan, pursuant to which CNA has settled coverage disputes arising under three excess insurance policies and has agreed to pay the Debtors for certain costs arising from or related to Asbestos PI Claims. In addition, CNA is a creditor

2

and Claimant of the Debtors in several respects. Because CNA understands that its objections as

to the Plan's treatment of its rights under its Asbestos Insurance Reimbursement Agreement and

as a creditor (including as a creditor with indemnity rights under settlement agreements) are to be

considered in Phase II, it does not deal with those objections in this brief.

## ARGUMENT

The Plan will or may improperly impair the following rights that CNA has as an insurer

under its policies and agreements and under the law:

- The right to have claims asserted against the Debtors investigated and resolved in accordance with the procedures, conditions, and rights set forth in the CNA Asbestos Insurance Policies and applicable non-bankruptcy law;

- The right to interpose defenses to claims for insurance coverage by the Debtors based on the terms of applicable policies, settlement agreements and non-bankruptcy law;

- The right to pursue claims for contribution against Settled Asbestos Insurance Companies where CNA is required under its policies issued to Debtors to provide a defense or coverage for claims asserted against third parties who are determined to be co-insureds under these policies;

- The right to have the Asbestos PI Trust managed by fiduciaries who will act in a disinterested fashion and not undermine the defenses of the Debtors and CNA; and

- The right to seek from this Court appropriate injunctive relief, as specified in section 524(g) of the Bankruptcy Code, where the requirements allowing this Court the discretion to issue such an injunction have been satisfied.

In Part I below, CNA shows that it has standing to raise its contentions on these issues; in

Part II, it shows that the Plan needs to be clarified to make absolutely clear that it is insurance

neutral; in Part III, it shows that the Plan's Asbestos PI Trust Agreement and Asbestos PI Trust

Distribution Procedures must be modified to ensure that the Trust is neither managed nor under

the sway of lawyers with conflicts of interest; and in Part IV, it shows that the Plan must be

3

clarified to allow the Court discretion to issue a Channeling Injunction to the full extent authorized by section 524(g) of the Code.

## I.     CNA HAS STANDING TO RAISE ITS PHASE I OBJECTIONS.

### A.     The Applicable Tests

The CMO provides that the Phase I hearing will address, among other things, "the standing of the Debtors' insurers (in their capacity as insurers, but not creditors) to litigate confirmation objections" that involve issues other than their rights as insurers.  The insurers can so litigate if they (a) are "a party in interest" under the Bankruptcy Code and (b) have standing under Article III of the Constitution.

The applicable Code provisions are sections 1109(b) and 1128(b).[2]  Section 1109(b) provides: "A party in interest ... may raise and may appear and be heard on **any issue** in a case under this chapter." (Emphasis added.)  Section 1128(b) further provides that "[a] party in interest may object to confirmation of a plan."   The Third Circuit has made clear that section 1109(b) "create[s] a broad right of participation in Chapter 11 cases."  *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 214 n.21 (3d Cir. 2004); *accord In re PWS Holding Corp.*, 228 F.3d 224, 249 (3d Cir. 2000) (section 1109(b) "confers broad standing at the trial level").  "The test to determine whether an entity is a party in interest is whether the prospective party in interest has a sufficient stake in the outcome of the proceeding so as to require representation." *Baron & Budd, P.C. v. Unsecured Asbestos Claimants Comm.*, 321 B.R. 147, 158 (D.N.J. 2005).  A "sufficient stake" generally means that the party has an interest that is directly or adversely affected by the bankruptcy proceeding.  *In re Fuller-Austin Insulation*, 1998 U.S. Dist. LEXIS 18340, at *11 (D. Del. Nov. 10, 1998).  That interest may be a "pecuniary interest that is directly or adversely affected." *Baron & Budd,* 321 B.R. at 158.

---

[2] All citations to the Bankruptcy Code are to title 11 of the United States Code.

4

An objector to confirmation must also satisfy Article III standing requirements. There is, however, "substantial overlap between the two inquiries." *Baron & Budd*, 321 B.R. at 158. "Constitutional standing requires (1) injury-in-fact, which is an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical; (2) a causal connection between the injury and the conduct complained of; and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Danvers Motor Co. v. Ford Motor Co.*, 432 F.3d 286, 290-91 (3d Cir. 2005). "While it is difficult to reduce injury-in-fact to a simple formula, economic injury is one of its paradigmatic forms." *Id.* at 291.

In this matter, there are at least four ways in which CNA is injured sufficiently to be a party in interest with Article III standing to object to the confirmation of the Plan: (i) to the extent that the Plan is or may not be insurance neutral such that CNA would be deprived of its rights under its policies and other agreements and the applicable law; (ii) to the extent that CNA would be enjoined from exercising what would otherwise be its rights to seek judicial relief; (iii) to the extent that conflicts of interest of the Trust's fiduciaries impact payments CNA may have to make as an insurer or offend the integrity of the process; and (iv) to the extent that CNA is a creditor of the Debtors. Because CNA's standing as a creditor is to be determined in Phase II, it does not discuss that aspect of its standing here, but rather deals with demonstrating its standing as to the first three aspects.

**B.     CNA Has Standing to the Extent That the Plan Is Not Insurance Neutral to Object to Confirmation.**

As shown in Part II below, the Plan is not, or may not be, "insurance neutral." The Third Circuit's decision in *Combustion Engineering* makes clear that insurers have standing to the extent that the Plan is or may not be insurance neutral. There, the Court found that insurers had

5

standing to challenge an amendment to that plan's insurance neutrality provision, stating that

"for purposes of standing, the question is not whether the Plan impaired the claims of insurers,

but whether it 'diminishes their property, increases their burdens, or impairs their rights.'" 391

F.3d at 218. Significantly, this determination was made in the context of appellate standing,

where the courts apply the "person aggrieved" standard, which is more restrictive than the

"broad right of participation" allowed to parties in interest before the bankruptcy courts. *Id.* at

214-15 & n.21. An insurer, therefore, plainly has standing to object, for instance, that a plan is

not insurance neutral because it is "strong on protecting the Insurers' contract defenses but less

stalwart on protecting the Insurers from the Debtors' use of any express or implied findings in

the bankruptcy case." *In re Congoleum Corp.* ("*Congoleum IV*"), 2009 Bankr. LEXIS 900, at *6

(Bankr. D.N.J. Feb. 26, 2009). "[T]o bar the door to the courtroom to the Insurers" a plan must

"provide unqualified assurance to the Insurers that their rights are utterly unaffected." *Id.* Thus,

the test is not whether insurers' rights are in fact impaired, but "whether the insurers' rights and

obligations [are] potentially affected." *In re Congoleum Corp.* ("*Congoleum I*"), 2005 Bankr.

LEXIS 556, at *5 (Bankr. D.N.J. Mar. 24, 2005).

Accordingly, at the very least, CNA has standing to object to the Plan to the extent that it

is, or potentially may, affect its contractual rights and obligations in any fashion. This much

appears to be conceded by the Plan Proponents. But beyond that, as the court ruled in

*Congoleum I,* once it is determined that the Plan is not insurance neutral, CNA's standing is not

limited to merely challenging the Plan's impact on its contractual rights. That decision rejected

the argument that *Combustion Engineering* required that insurer standing be determined on an

issue-by-issue basis in the bankruptcy court on the ground that "*Combustion* was decided in the

appellate context and the case itself acknowledged that bankruptcy standing is broader." 2005

Bankr. LEXIS 556, at *9. The court reasoned that the standing of insurers in the bankruptcy court cannot be "determined on an issue by issue basis" because "an issue by issue analysis would be ineffectual when it has been found that the plan itself is not 'insurance neutral' ...." *Id.* at *9-10. At that point, the "'insurers' stake in plan confirmation includes a stake in the fundamental fairness of the Plan ....' [and a] determination of fundamental fairness cannot be tied to discrete sections of 1129." *Id.* at *10 (quoting *Baron & Budd*, 321 B.R. at 160). The court further reasoned that the argument limiting bankruptcy court standing to specific issues was contrary to the explicit language of § 1109(b) allowing a party in interest to be heard on "any issue." *Id.* at *11.[3]

Thus, if the Plan is not insurance neutral, CNA has standing to remedy that situation by objecting to Confirmation on any and all grounds. And far from burdening the Court, allowing such objections will assist the Court in fulfilling its "independent obligation" to assure itself that the Plan meets the requirements of the Bankruptcy Code. *See Congoleum IV*, 2009 Bankr. LEXIS 900, at *7; *In re Lernout & Hauspie Speech Prods., N.V.*, 301 B.R. 651, 656 (Bankr. D. Del. 2003) ("The Code imposes an independent duty upon the court to determine whether a plan satisfies each element of § 1129, regardless of the absence of valid objections to confirmation."), *aff'd*, 308 B.R. 672 (D. Del. 2004).[4]

---

[3] The court distinguished cases that limit bankruptcy court standing on the ground that they involved parties who were tangential to the proceeding or who were not affected at all by the particular issue. The interests of the insurers in *Congoleum* (as in this case) were "neither tangential nor unaffected" by the Plan. *Id.* at *11-12.

[4] Concededly, there is caselaw that insurer standing should be determined on an issue-by-issue basis. *See In re Quigley Corp.*, 391 B.R. 695 (Bankr. S.D.N.Y. 2008). But, for the reasons stated in the text, that case should not be followed. Also, contrary to what Plan Proponents imply in their motion to strike the testimony of Professors Priest and Shein [Docket No. 21902, at 9], this issue was not decided in *In re Pittsburgh Corning Corp.*, 2006 Bankr. LEXIS 4636, at *80 (Bankr. W.D. Pa. Dec. 21, 2006). In that case, the plan was found to be insurance neutral; thus, there was no need to decide what issues the insurers could raise if it had not been insurance neutral.

## C.    CNA Has Standing to Object To Having Its Rights Enjoined.

As discussed below in Part II.D, the Plan's Asbestos PI Channeling Injunction would enjoin CNA from exercising its contractual and common law rights to seek contribution from such non-Debtors as Settled Asbestos Insurance Companies. An objector plainly has standing, even at the appellate level, to challenge a plan that enjoins it from exercising its otherwise applicable rights.[5]

## D.    CNA Has Standing to Object to Provisions That Implicate the Integrity of the Plan.

As shown in Part III below, certain fiduciaries of the Trust that would be established by the Plan have conflicts of interest. In particular, the Asbestos PI Trust Advisory Committee ("TAC") has a significant role in overseeing the management and operation of the Trust, and accordingly owes fiduciary obligations to all Trust beneficiaries under applicable trust law, including to insurance companies that are parties to contracts to be transferred to the Trust and Indirect PI Trust Claimants; yet, at the same time, the TAC members owe conflicting fiduciary obligations under the relevant Rules of Professional Conduct to their own individual clients with claims against the Trust. Those obligations are irreconcilable.

Such ethical considerations should make the Plan unconfirmable by the Court.    In addition, those conflicts implicate CNA's contractual rights under both its unsettled and settled coverage. The Plan would transfer the Debtors' rights to coverage under 16 unsettled high-layer CNA insurance policies, involving tens of millions of dollars of coverage, to a Trust that will be overseen and controlled by attorneys who cannot be deemed independent fiduciaries. Moreover, while the question of CNA's standing as a creditor is not before the Court in Phase I, CNA

---

[5] *See, e.g.*, *Smith v. Arthur Andersen LLP*, 421 F.3d 989, 1001 (9th Cir. 2005); *In re Zale Corp.*, 62 F.3d 746, 751 n.13 (5th Cir. 1995); *In re Johns-Manville Corp.*, 340 B.R. 49, 56-58 (S.D.N.Y. 2006), *rev'd on other grounds*, 517 F.3d 52 (2d Cir. 2008), *cert. granted sub nom. Travelers Indem. Co. v. Bailey*, 129 S. Ct. 761 (2008) (No. 08-295, argued March 30, 2009).

certainly has standing as a potential Indirect PI Claimant — just as any other claimant to the Trust would — to object to a proposed Trust and TDP that is controlled or influenced in significant ways by its adversaries.[6]

CNA also has standing as an insurer to object to Plan provisions that "implicate the integrity" of the Trust and TDP. *In re Congoleum Corp.* ("*Congoleum II*"), 426 F.3d 675, 685 (3d Cir. 2005). In *Congoleum II*, the Third Circuit held that insurers had standing to challenge the retention of debtor's special insurance counsel based on conflicts-of-interest concerns. *Id.* at 685-87. The court noted that "counsel for the insurers [have] a responsibility, if not a duty, to alert the Court to ethical conflicts," and that "insurers' counsel [have] the right to raise the issue under the Rules of Professional Conduct and require adjudication by the court." *Id.* at 686-87. Since CNA has standing to raise conflicts of interest on appeal, *a fortiori* it has standing to raise conflicts-of-interest issues in this Court where less restrictive rules of standing apply. *See In re Pittsburgh Corning Corp.*, 308 B.R. 716, 721 (Bankr. W.D. Pa. 2004).

## II. THE PLAN IMPAIRS CNA'S RIGHTS AS AN INSURER TO THE EXTENT THAT IT IS NOT INSURANCE NEUTRAL.

### A. The Plan Cannot Be Confirmed If It Results in a Modification of CNA's Rights Under Its Asbestos Insurance Policies.

Pursuant to sections 1129(a)(1) and (a)(3) of the Code, this Court can confirm the Plan only if it "complies with the applicable provisions of [the Bankruptcy Code]" and "has been proposed in good faith and not by any means forbidden by law." The Bankruptcy Code does not permit a debtor's rights in property, such as the Debtors' rights under CNA's Asbestos Insurance Policies, to be expanded beyond what they were at the commencement of the case: "[T]he [bankruptcy] trustee takes the property of the bankrupt, not as an innocent purchaser, *but as the*

---

[6] CNA intends to object to the Plan on this basis in Phase II in its capacity as a creditor, as well as here in Phase I, in its capacity as an insurer.

9

***debtor had it at the time of the petition***, subject to all valid claims, liens and equities." *Zartman v. First Nat'l Bank of Waterloo,* 216 U.S. 134, 138 (1910) (emphasis added). Put differently, a debtor does not receive "a windfall merely by reason of the happenstance of bankruptcy." *Butner v. United States*, 440 U.S. 48, 55 (1979).

Thus, it is well established that bankruptcy courts lack the power to unilaterally alter contractual rights and obligations, or permit debtors to rewrite their prepetition contracts or selectively perform their prepetition contractual obligations.[7] That principle applies to contracts for insurance. See, *e.g.*, *In re Amatex Corp.*, 97 B.R. 220, 221 (Bankr. E.D. Pa. 1989) (the bankruptcy court's powers cannot "stretch so far as to alter contractual rights established under state law" and there is no bankruptcy code provision permitting the modification of contract rights), *aff'd sub nom. Amatex Corp. v. Stonewall Ins. Co.*, 102 B.R. 411 (E.D. Pa. 1989) (refusing to compel insurers to make lump-sum payments to the debtor contrary to the terms of their policies).

The Plan Proponents purport to provide for insurance neutrality in Plan § 7.15.   But as shown in CNA's Objections and discussed further below, in several respects § 7.15 of the Plan does not, or may not, in fact provide for insurance neutrality, for by its very structure it purports to operate without regard to CNA's rights under its policies and without any clear provision for retaining the duties of the insured under them. Among other things, under the Plan, the Debtors surrender all defense of Asbestos PI Claims to a Trust administered by the Debtors' adversaries and permit the Trust to settle claims without the participation or consent of CNA.

---

[7] *See, e.g., Integrated Solutions. Inc. v. Service Support Specialties, Inc.,* 124 F.3d 487, 492-95 (3d Cir. 1997) ("[T]he trustee does not have greater rights in the property of the estate than the debtor had before filing for bankruptcy" and "the estate succeeds only to the nature and the rights of the property interest that the debtor possessed pre-petition"); *Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 885 F.2d 1149, 1153 (3d Cir. 1989) ("We start our analysis with the principle that a trustee [in bankruptcy] is generally bound by the debtor's non-executory contracts.").

10

### B.   The Requirements for Insurance Neutrality

In order to be insurance neutral, the Plan must leave CNA's rights and obligations under its policies "utterly unaffected." *Congoleum IV*, 2009 Bankr. LEXIS 900, at *6. Among other things, the Plan must "'broadly preserve[] insurers' pre-petition rights under the subject insurance policies' and ... permit the Objecting Insurers to 'dispute coverage under specific policies, and ... raise any of the same challenges or defenses to the payment of claims available pre-petition.'" *In re Pittsburgh Corning Corp.*, 2006 Bankr. LEXIS 4636, at *86 (Bankr. W.D. Pa. Dec. 21, 2006) (quoting *Combustion Engineering*, 391 F.3d at 217).

In *Combustion Engineering,* the Third Circuit upheld the insurance neutrality provision (which it called the "super-preemptory provision") as initially adopted by the Bankruptcy Court, which provided:

> "Notwithstanding anything to the contrary in this Order, the Plan or any of the Plan Documents, nothing in this Order, the Plan or any of the Plan documents (including any other provision that purports to be preemptory or supervening), shall in anyway [sic] operate to, or have the effect of, impairing the insurers' legal, equitable or contractual rights, if any, in any respect. The rights of insurers shall be determined under the Subject Insurance Policies or Subject Insurance Settlement Agreements as applicable." 391 F.3d at 209.

Case law makes clear that attempts to hedge on broad grants of insurance neutrality should be rejected. *See, e.g.*, *In re Congoleum Corp.* ("*Congoleum III*"), 362 B.R. 167, 174 (Bankr. D.N.J. 2007) (finding that a plan was not insurance neutral where the plan's neutrality language preserved only the rights "to assert any Asbestos Insurer Coverage Defense"). Section 7.15 of the Plan attempts to mimic the language of *Combustion Engineering*, but the Plan Proponents have included in § 7.15 and elsewhere in the Plan certain exceptions and provisions that could be construed to remove such neutrality or override it. [8]

---

[8] The Plan Proponents acknowledge that in two respects the Plan is not insurance neutral: (1) it permits the Debtors' rights under the policies to be assigned to the Trust notwithstanding anti-assignment provisions in the

## C.   The Plan May Not Be Insurance Neutral.

### 1.   The Plan Potentially Could Eliminate Coverage Defenses That Would Be Available to CNA Under Its Policies and the Law and Otherwise Impairs CNA's Policy Rights.

#### a.   Unclarity About Preserving CNA's Coverage Defenses

CNA's non-settled Asbestos Insurance Policies contain provisions that provide CNA with

certain rights and impose certain obligations on the Debtors. The policies require the Debtors to

provide timely notice to CNA of any "occurrence" or "claim" made against them,[9] and

furthermore, give CNA the right and opportunity to participate or associate in the investigation,

defense, and settlement of those claims.[10] Those policies also condition the obligation to pay

settlements upon the insurer's consent.[11]

Plan Proponents have admitted in discovery that, under the Plan, CNA would not be

entitled as a matter of right, as it would be under the non-settled policies, to participate in the

---

policies; and (2) certain rights and obligations under Asbestos Insurance Reimbursement Agreements may be modified. Under the CMO as understood by the parties, these issues are to be determined in Phase II.

[9] The policies all impose notice requirements. For example. Policy No. CCC RDX 1784981 in clause 5 of the "Conditions" section provides: "Notice of an occurrence which appears likely to involve this policy shall be given by or on behalf of the insured … as soon as practicable."

[10] For example, Policy No. CCC RDX 1784981, an excess policy issued by Continental Casualty Co. to W.R. Grace for the period June 30, 1980 to June 30, 1982, provides in clause 5 of the "Conditions" section: "The company *at its own option may, but is not required to, participate in the investigation, settlement or defense of any claim* or suit against the insured." (Emphasis added.) In addition, to the extent that CNA's excess policies follow form to the terms of Grace's first-layer excess London policies, those London policies provide: "The … Underwriters *shall have the right and shall be given the opportunity to associate* with the Assured or the Assured's underlying insurers or both *in the defense and control of any claim, suit or proceeding relative to an occurrence where the claim or suit involves, or appears reasonably likely to involve Underwriters,* in which event the Assured and Underwriters shall cooperate in all things in the defense of such claim, suit or proceeding." (Emphasis added). *E.g.*, London Policy KYO 17582, at Condition H. Finally, to the extent that Plan Proponents do not accord fully resolved treatment to CNA's primary policies, and claim that unsettled coverage is available under them, CNA has both the duty and *the right* under those policies to defend claims as to which coverage is asserted. *E.g.*, CNA Primary Policy No. CCP 2483440, clause 4(a)-(c) at pp. 11-12 (emphasis added).

[11] *See,.e.g.*, CCC Policy No. CCC RDX 1784981 ("the insured shall not, **except at his own expense**, voluntarily make any payment, assume any obligation, or incur any expense.") (Emphasis added.) *See also* London Policy No. KYO17582, which provides at Condition J: "The Assured shall make a definite claim for any loss for which the Underwriters may be liable under this policy within twelve (12) months after … the Assured's liability shall been fixed and rendered certain … *by written agreement of the Assured, the claimant, and Underwriters.*" (Emphasis added.)

12

investigation, defense or settlement of Asbestos PI Claims.[12]  Under applicable non-bankruptcy law, a failure to give CNA notice and to allow it to participate in investigating, defending, and settling claims would give rise to defenses to coverage.[13]  A truly insurance neutral plan would make clear that a failure of the Debtors to satisfy all of the insureds' obligations and policy conditions can be asserted as a defense to coverage.[14]

The Plan as proposed does not, however, make this clear.  Rather, § 7.15 of the Plan (the insurance neutrality provision), when read in conjunction with Plan §§ 7.13 and 8.1.1, creates confusion as to whether, by virtue of the transfer of Asbestos Insurance Rights to the Asbestos PI Trust, the Debtors and the Trust will be relieved of the duties and obligations of the Debtors under the CNA Policies.  Sections 7.7(tt) and 7.7(uu) of the Plan would require the Court to find that "the duties and obligations of the Asbestos Insurance Entities" are not diminished by the transfer of Asbestos Insurance Rights to the Asbestos PI Trust.  Nowhere, however, does the Plan expressly state that the *Debtors'* obligations under the Asbestos Insurance Policies remain

---

[12] Debtors' Response to CNA's Request for Admission No. 9 ("Admitted that the Plan, if confirmed, does not provide for participation by the Discovering Parties in the investigation, defense or settlement of Asbestos PI Claims for purposes of making payment with respect to such claims out of the Asbestos PI Trust but also does not prohibit such participation by the Discovering Parties") (Ex. 1); ACC's Response to CNA's Request for Admission No. 9 (same) (Ex. 2); FCR's Response to CNA's Request for Admission No. 9 (same) (Ex. 3).

[13] *See, e.g., Am. Transit Ins. Co. v. Sartor*, 814 N.E.2d 1189, 1192 (N.Y. 2004) (providing notice is a condition precedent to coverage); *Stradford v. Zurich*, 2002 U.S. Dist. LEXIS 24050, at *15 (S.D.N.Y. Dec. 10, 2002) (insured's cooperation with insurer is a condition precedent to coverage); *Fine Gold Jewelry, Inc. v. Guar. Nat'l Ins. Co.*, 1986 U.S. Dist. LEXIS 29340, at *7 (S.D.N.Y. Feb. 13, 1986) (same); *TLC Beatrice Int'l Holdings, Inc., v. Cigna Ins. Co.*, 2000 U.S. Dist. LEXIS 2917 (S.D.N.Y. Mar. 14, 2000) (insured's settlement of lawsuit without insurer's consent failed to satisfy a condition precedent, therefore insured cannot recover the costs of settling).  The Court in *Continental Cas. Co. v. W.R. Grace & Co.*, No. 06-4524 (S.D.N.Y.), has determined that New York law governs CNA's Policies.

[14] In his recent decision in *In Re American Capital Equipments, Inc.*, Bankruptcy Judge McCullough concluded that a proposed Plan that allowed a Trust to settle asbestos claims against the Debtors in contravention of policy provisions providing for the participation of insurers in the defense and settlement was unconfirmable. *See In Re American Capital Equipment Inc.*, Bankruptcy Nos. 01-23987-MBM & 01-23988-MBM, Memorandum Opinion (Bankr. W.D. Pa. May 26, 2009).

13

undiminished and/or are transferred to the Asbestos PI Trust.[15]  To the contrary, Plan §§ 7.13 and

8.1.1 state that, except as otherwise provided in the Plan, any obligations of the Debtors that are

not specifically retained are eliminated.  CNA presumes that Plan § 7.15 (dealing with insurance

neutrality) trumps §§ 7.13 and 8.1.1 with respect to elimination of the Debtors' obligations under

the policies, given that § 7.15 states that it applies "notwithstanding anything to the contrary" in

the Plan.  Nonetheless, to the extent that Plan § 7.15 does not trump Plan §§ 7.13 and 8.1.1, the

Plan would impair CNA's rights under its policies, including its rights to defend against

coverage claims asserted by the Trust based on the failure by the Debtors or the Trust to comply

with the insured's obligations under the policies.

The Plan Documents do not provide any additional comfort to CNA on this issue.[16]

Moreover, attempts through written discovery to resolve the possible inconsistency and

determine the hierarchy among Plan § 7.15, on the one hand, and Plan §§ 7.13 and 8.1.1 on the

other, were unsuccessful, as the Plan Proponents' responses simply directed CNA to § 7.15,

which is not clear as to the question.[17]

### b.    Unclarity About Effect of Good Faith Finding

Section 7.15(f) provides additional potential exceptions to insurance neutrality by its use

of the defined term "Asbestos Insurer Coverage Defense."  Section 7.15(f) provides that nothing

---

[15] To add to the confusion, Richard Finke, Grace's counsel, stated in deposition that he was not sure whether the obligations owed by Grace under the policies would be transferred to the Trust or retained by the Reorganized Debtors.  Deposition of Richard Finke, Tr. at 47 (Ex. 4).  Counsel for the ACC, Mr. Lockwood, did testify at his 30(b)(6) deposition that someone, presumably the Trust, would have to satisfy the insureds' obligations, but the Plan does not say so.  Deposition of Peter Van N. Lockwood ("Lockwood Dep."), Tr. 5/1/09 at 105-06 (Ex. 5).

[16] The Asbestos Insurance Transfer Agreement between the Debtors and the Trust (Plan Exhibit 6) is silent on the assumption or performance by the Trust of the insureds' duties and obligations.  On the issue of the preservation and availability of books and records of the Debtors that may be necessary to insurers in presenting their coverage defenses, the Asbestos Insurance Transfer Agreement refers to the Cooperation Agreement (Plan Exhibit 10), but the Cooperation Agreement does not contain any obligation of the Reorganized Debtors to cooperate with the insurers on matters pertaining to coverage defenses.

[17] Debtors' Responses to CNA's Interrogatories Nos. 9-10; ACC's Responses to CNA's Interrogatories Nos. 9-10; FCR's Responses to CNA's Interrogatories Nos. 9-10.

14

in the Plan, the Plan Documents, the Confirmation Order, or any finding of fact and/or conclusion of law with respect to confirmation or consummation of the Plan shall limit the right of any Asbestos Insurance Entity, in any Asbestos Insurance Action, to assert any "Asbestos Insurer Coverage Defense." The definition of Asbestos Insurer Coverage Defense, however, contains a clause that could potentially swallow insurance neutrality. Specifically, pursuant to § 1.1(16) of the Plan, Asbestos Insurer Coverage Defenses "do not include any defense that (i) the Plan or any of the Plan Documents do not comply with the Bankruptcy Code ...." CNA does not understand the meaning or scope of this exception to Asbestos Insurer Coverage Defenses.

Clause (i) could create a potential weapon for use by creative counsel for the Asbestos PI Trust to eviscerate or diminish otherwise applicable coverage defenses available to CNA in at least two respects. First, as noted, section 1129(a)(3) of the Code provides that the Court cannot enter the Confirmation Order unless it finds that the Plan was proposed in good faith. Counsel for the Trust might argue in subsequent Asbestos Insurance Actions that elimination of any defense that the Plan does not comply with the Bankruptcy Code means that both the terms of the Plan and the TDP represent a reasonable valuation of the Asbestos PI Claims, either individually or as a group, or that resolution of such claims without the insurer's involvement is itself reasonable and/or appropriate.

In written discovery, CNA asked the Plan Proponents the meaning of clause (i). CNA also asked the Plan Proponents if the Plan would allow the Trust, in any subsequent coverage litigation, to make the types of arguments discussed above. In their responses, the Plan Proponents refused to explain the meaning of clause (i) on the ground that it was "clear" and

15

"speaks for itself," and moreover refused to specifically address whether the Plan, if confirmed, would have the effects stated in the two preceding paragraphs.[18]

In addition, clause (i) could potentially be used by Trust counsel to argue that this Court has valued, as part of the estimation process or the Plan Confirmation process, the loss that has been experienced by the Debtors in connection with Asbestos PI Claims, thereby triggering or accelerating the indemnity obligations of Asbestos Insurance Entities under their non-settled policies. While the Plan Proponents in their written discovery responses have denied that the Plan would have this effect or potential,[19] the Plan should not contain any ambiguities on that score. The Plan should make clear that an insurer under an excess policy is not responsible for paying on coverage until, as provided in the policies, the coverage provided by underlying policies has been exhausted based on actual payments by the Debtors or the Trust.[20] In a like vein, the Plan should make clear that, if an insurer is liable at all to make payments under a policy, it is only liable to pay the amount actually paid by the Trust to the claimant — not some Scheduled Value which may not be what was actually paid.

The way to remedy these deficiencies in the Plan is for the Court to adopt the changes to the Plan's insurance neutrality provision set out in Appendix A. As described in the annotations to the Appendix, these proposed changes have in many respects been taken or adapted from

---

[18] *See* Debtors' Responses to CNA's Interrogatories Nos. 1, 12; ACC's Responses to CNA's Interrogatories Nos. 1, 12; FCR's Responses to CNA's Interrogatories Nos. 1, 12.

[19] In their responses to written discovery, the Plan Proponents denied that confirmation of the Plan will trigger or accelerate any obligations of the Asbestos Insurance Entities under the Asbestos Insurance Policies, or that the doctrine stated in *UNR Industries, Inc. v. Continental Casualty Co.*, 942 F.2d 1101 (7th Cir. 1991), regarding valuation of claims and acceleration of insurer obligations would be applicable. *See* Debtors' Responses to CNA's Interrogatory No. 5; ACC's Answer to Interrogatory No. 5; FCR's Answer to Interrogatory No. 5.

[20] The excess policies generally contain, or incorporate, contractual provisions that provide that there is no obligation to pay under the policies until there has been complete exhaustion of underlying limits based upon the actual payment of claims. For example, the London first-layer policies provide: "Liability under this policy with respect to any occurrence shall not attach *unless and until the Assured, or the Assured's underlying insurer, shall have paid the amount of the underlying limits on such occurrence." See, e.g.*, London KYO 17582, Condition J (emphasis added).

16

insurance neutrality provisions negotiated by the parties in interest (including asbestos claimants) and approved by the courts in other bankruptcies.

### c.   Even if Coverage Defenses are Otherwise Preserved, CNA's Rights as an Insurer are Still Impaired

Even if this Court should rule that Plan § 7.15 preserves CNA's rights as a matter of law to assert applicable coverage defenses under its policies, the transfer of the CNA policies from the Debtors to the Asbestos PI Trust would still impair CNA's rights as an insurer. This is so because the assertion of a coverage defense does not place an insurer in the position, for which it bargained, of working in a cooperative manner with its insureds so that meritorious claims can be resolved reasonably and unmeritorious claims are not paid. *See* Report of George L. Priest, Professor of Law and Economics at the Yale Law School ("Priest Report"), ¶¶ 20-32 (Ex. 6). CNA has never surrendered its rights to such cooperation with respect to its non-settled policies.[21] A possible right for CNA to assert a coverage defense is a poor substitute for the cooperation with its insureds that CNA contracted for, because as Professor Priest says, a defense "compels the insurer to be claiming that there should be no coverage whatsoever. It becomes all or nothing [coverage] litigation," rather than, as envisioned by the policies, a relationship where the insured and the insurer mutually cooperate to achieve a reasonable resolution of claims. Priest Report ¶ 55.

### D.   The Plan May Impair CNA's Right to Obtain Contribution from Settled Insurance Entities with Respect to Payments That CNA May Be Required to Make to Third Parties.

Pursuant to the Asbestos PI Channeling Injunction, the Holder of an Asbestos PI Claim may only claim against the Asbestos PI Trust and may *not* assert a claim against any Settled Asbestos Insurance Company. Plan §§ 8.2.1, 101(50). The Plan recognizes that non-settled

---

[21] Nor did CNA completely surrender such rights in connection with the Asbestos Insurance Reimbursement Agreement it reached with Debtors. That, however, is a Phase II issue under the Plan.

17

Asbestos Insurance Entities (such as CNA) may have claims for contribution, indemnity, reimbursement, subrogation or the like arising out of Asbestos PI Claims (collectively, for purposes of this brief, "Contribution Claims") against a Settled Asbestos Insurance Company. The Plan provides that such Contribution Claims may be asserted as a defense or setoff against any claim for coverage brought by the Asbestos PI Trust against that non-settled insurer. Plan § 7.15(i). It is unclear, however, whether the Plan allows for payment or setoff when a Contribution Claim by a non-settled insurer does not arise out of an Asbestos PI Claim that has been paid by the Trust.

As the Court is aware, The Scotts Company ("Scotts") has instituted an adversary proceeding claiming that, in light of vendor endorsements, it is an additional insured under policies issued to the Debtors by CNA and other insurers.[22] According to Scotts, "[t]he policies obligate [CNA and other Asbestos Insurance Entities] to provide coverage to [Scotts] for asbestos-related liabilities that have arisen or may arise in connection with W.R. Grace vermiculite sold by Scotts."[23] CNA disputes that Scotts is an additional insured under any of its Asbestos Insurance Policies issued to the Debtors. However, to the extent that Scotts is successful in obtaining defense costs or coverage under such policies and CNA is obligated to pay more than its share, then, absent the bankruptcy, CNA would have the right to seek contribution from other insurers that issued policies covering Scotts, including policies issued by other insurers to the Debtors where Scotts is an additional insured.[24] But to the extent that the policies issued by other insurers are Settled Asbestos Insurance Policies, CNA's ability to seek

---

[22] *Scotts Co. v. American Employers Ins. Co.*, No. 04-ap-55083-JFK (Bankr. D. Del. filed Sept. 2, 2004).

[23] Complaint, ¶ 2, *Scotts Co. v. American Employers Ins. Co.*

[24] *See, e.g.*, *Consolidated Edison Co. of N.Y. v. Allstate Ins. Co.*, 98 N.Y.2d 208 (2002); *Penn. Gen. Ins. Co. v. Aetna Cas. & Surety Co.*, 761 N.Y.S.2d 571 (App. Div. 2003); *J.P. Realty Trust v. Pub. Serv. Mut. Ins. Co.*, 476 N.Y.S.2d 325 (App. Div. 1984), aff'd mem, 488 N.Y.S. 2d 650 (N.Y. 1985).

contribution would be cut off by the Asbestos PI Channeling Injunction. Plan § 8.2. Moreover, even if the policies were issued by Asbestos Insurance Entities that are not Settled Asbestos Insurance Companies, CNA's ability to seek contribution would be cut off by the Asbestos Insurance Entity Injunction. Plan § 8.4.

It is not clear whether, under Plan § 7.15(i), CNA would have the ability to be made whole pursuant to a defense or setoff in a coverage action by the Trust, where, as in the Scotts situation, CNA's claim does not arise out of an Asbestos PI Claim paid by the Trust. If not, the Plan, if confirmed, could impair CNA's rights under its policies and the law to obtain contribution. To remedy this problem, the Plan should make clear that Plan § 7.15(i) allows an insurer to offset its Contribution Claims in any coverage action brought by the Trust.

E.   **The Plan Should Make Clear That It Does Not Modify the Parties' Rights Under Certain Independent Insurance Programs with the Fresenius Indemnified Parties and Sealed Air Indemnified Parties**

The Plan releases certain claims against the Fresenius Indemnified Parties and the Sealed Air Indemnified Parties. Plan §§ 8.5, 8.6. CNA maintains separate, on-going insurance programs for certain of the Fresenius Indemnified Parties and the Sealed Air Indemnified Parties, and wishes assurance that none of the Plan's releases or exculpations modifies the parties' rights under those programs. CNA doubts that any such modification is intended. If the Plan does purport to so modify CNA rights, the Plan would be inconsistent with applicable law, and not confirmable under section 1129(a)(1). Appropriate clarifying language to Plan § 7.15(h) is suggested in Appendix A.

F.   **The Plan May Impair CNA's Rights Regarding Post-Confirmation Handling of Workers' Compensation Claims.**

Under workers' compensation policies issued by CNA to Debtors, CNA has the responsibility to handle, adjust, litigate, settle, and pay Workers' Compensation Claims against

the Debtors.[25]  The Plan proposes to treat Workers' Compensation Claims as unimpaired.  Plan § 3.1.4.  By so doing, the Plan Proponents have obligated themselves to permit the handling of these claims to go forward on a business-as-usual basis.  At the same time, however, the Plan also contains broad injunctions regarding post-confirmation claims handling.  *See* Plan Art. 8. Assuming that the Plan Proponents intend for CNA to continue handling and resolving Workers' Compensation Claims in the ordinary course, the Plan should be clarified to allow for that purpose.  Absent such clarification, there is a potential inconsistency between the non-impairment provision and the injunction provisions.  Clarifying language is suggested in Appendix A.

## III.  THE PLAN IMPAIRS CNA'S INTERESTS AS AN INSURER BECAUSE TRUST FIDUCIARIES HAVE CONFLICTS OF INTEREST IN VIOLATION OF THE RULES OF PROFESSIONAL CONDUCT.

Sections 1129(a)(1) and (a)(3) of the Code require that the Plan comply with "the applicable provisions of this title" and be "proposed in good faith and not by any means forbidden by law."  Consequently, as this Court has recognized, it cannot, as a matter of law, put its imprimatur on components of a Plan that present ethical conflicts.  *See In re Combustion Eng'g, Inc.*, 295 B.R. 459 (Bankr. D. Del. 2003), *modified on other grounds*, 391 F.3d 190 (3d Cir. 2004).  In this proceeding, as shown below, the Court is being asked to approve a Trust that will be overseen by lawyers who themselves will be submitting tens of thousands of claims on behalf of their individual clients to the very Trust that they will be charged with administering as fiduciaries on behalf of all beneficiaries.

At the heart of this Plan lies the Asbestos PI Trust to which all present and future Asbestos PI Claims against the Debtors are to be channeled.  Plan §§ 1.1(33), 7.2.3.  The claims

---

[25] *See, e.g.,* Deductible Reimbursement Contract (Workers' Compensation and Employers' Liability) (dated June 30, 1993); Claim Service Agreement (Insurance Plans) (dated June 30, 1993) (Ex. 7).

so channeled include typical asbestos personal injury claims, but also Indirect PI Trust Claims. *Id.* §§ 1.1(33), 1.1(138). Indirect PI Trust Claims are defined to include contribution and/or indemnity claims that other creditors might have against the Debtors. *Id.* § 1.1(138). These include, without limitation, claims that CNA might assert for contribution or indemnity arising out of the claims brought against CNA by the Libby Claimants or arising out of prior insurance settlements that obligate Debtors to indemnify CNA against any claims made by Scotts or the BNSF Railway Company.

The operation of the Asbestos PI Trust directly impacts CNA. First, CNA's obligations to provide insurance under 16 excess policies would be transferred to the Trust as a significant asset of the Trust. The administration of the Trust — and possible depletion of other assets or underlying coverage — may implicate CNA's contractual obligations, especially where, as explained above, the Plan Proponents have failed to make the clarifications necessary to ensure insurance neutrality. CNA would also be impacted by the administration and operation of the Trust by virtue of its Indirect PI Claims, and its rights to have such claims processed both reasonably and fairly. Finally, as the Third Circuit held in *Congoleum II,* CNA's rights are impaired where conflicts of interest, and ethical violations, call into question the integrity of the bankruptcy process.

The proposed Asbestos PI Trust Agreement and the proposed Trust Distribution Procedures (Plan Exhibits 2 and 4) state that their goal is to provide "fair, equitable and substantially similar treatment for all PI Trust Claims." *See* Trust Agreement § 1.2l; TDP § 1.1. As the Trust is presently configured, however, this Court cannot conclude that this goal will be achieved, for the Trust Advisory Committee, which has fiduciary duties to all Trust beneficiaries, would have irreconcilable conflicts of interest. In addition, given the manner in which the Trust

was drafted and the Trustees selected, there is an appearance of partiality on the part of the Trustees.

### A. The ACC Picked the Trustees and TAC, and Drafted the Trust Agreement and the TDP, and the TAC Can Exercise Extensive Control Over the Operation of the Trust.

#### 1. The ACC Selected the Members of the TAC.

The proposed TAC members (Messrs. Budd, Cooney, Rice, and Weitz) are all counsel to individual members of the ACC. This is no accident, for the Plan provides that the initial members of the TAC are to be selected by the ACC (Plan § 7.2.6); and the record confirms that the ACC in fact selected the TAC members.[26] Collectively, the law firms with membership on the TAC represent tens of thousands of claimants who will claim against the Trust,[27] and each member of the TAC will be representing claimants submitting claims to the Trust pursuant to contingent fee arrangements with their clients.[28] As Professor James B. Shein, Professor of Management and Strategy at the Kellogg School of Management at Northwestern University explains in his expert report at 2 ("Shein Report") (Ex. 8), and as we discuss below, this situation "creates a potential for abuse and for the Trustees and TAC to act contrary to the governing principle in the Trust Agreement that all claimants be treated fairly and equitably in connection with claims made against the Trust and that the Trust not deplete its assets by paying undeserving claims."

---

[26] The Debtor and Future Claims Representative ("FCR") have stated that they did not select the members of the TAC. Debtors' Response to CNA's Interrogatory No. 8(a) at 26; FCR's Response to CNA's Interrogatory No. 8(a) at 27. Only the ACC states that it played any role in the selection of the TAC members, saying that the TAC "members were counsel to members of the ACC ..." and that their "qualifications, experience, and involvement with other 524(g) trusts informed the ACC's decision to agree to their selection as Asbestos PI TAC members." ACC's Response to CNA's Interrogatory No. 8(a), at 25.

[27] Lockwood Dep., Tr. 5/1/09 at 200:3-8 ("I am sure it's more than 10,000. Again, it could be 20,000; it could be 30,000. I just don't know"); Amended Statement of Baron & Budd under Bankruptcy Rule 2019, ¶ 4 (Feb. 25, 2009) ("As of the date of this Amended Statement, the Firm represents thousands of personal injury claimants ....").

[28] ACC's Response to CNA's Request for Admission No. 11.

## 2.    The ACC and FCR Selected the Trustees.

The ACC did not select just the TAC; acting in conjunction with the FCR, the ACC has also chosen the proposed Trustees (Messrs. Huge, Sifford, and Trafelet).[29]  These Trustees are persons with whom the ACC is familiar from their role as trustees for other asbestos personal injury trusts and presumably whose conduct as trustees for those other trusts the ACC did not find objectionable.[30]  Indeed, the amount of overlap of the proposed TAC members and the proposed Trustees in this proceeding compared with other asbestos bankruptcies is remarkable:

| Grace PI Trust Trustees and TAC Members In Other Asbestos Bankruptcy Trusts[31] | |
| --- | --- |
| **Name (Grace Role)** | **Other Asbestos Cases** |
| Harry Huge (trustee) | Trustee: <br> • Owens Corning/Fibreboard <br> • Armstrong World Industries, Inc. |
| Dean M. Trafelet (trustee) | Trustee: <br> • ABB Lummus and Owens Corning/Fibreboard <br> FCR: <br> • Armstrong World Industries, Inc. |
| Lewis Sifford (trustee) | Trustee: <br> • Armstrong World Industries, Inc. <br> • USG Corp. |
| Russell W. Budd (TAC) | TAC: <br> • ABB Lummus <br> • Combustion Engineering <br> • Federal Mogul <br> • Owens Corning/Fibreboard <br> • Armstrong World Industries, Inc. <br> • Pittsburg Corning Corp. (proposed) <br> • USG Corp. |

[29] *See* Lockwood Dep., Tr. 5/4/09 at 603:19-23: "The ACC and the FCR consulted each other on [the] three prospective individuals and then proposed them to the co-proponents and the co-proponents accepted them."

[30] The ACC states that "it is knowledgeable of the qualifications and experience of the proposed Asbestos PI Trustees, and such knowledge informed the ACC's decision to agree to their appointment as Asbestos PI Trustees." ACC's Response to CNA's Interrogatory No. 7, at 23-24. In a like vein, the FCR states that it "considered and accounted for, among other things, the experience of the Asbestos PI Trustees in other asbestos bankruptcies and notes that he has known all three Asbestos PI Trustees for many years in their roles as trustees for various asbestos bankruptcy trusts." FCR's Response to CNA's Interrogatory No. 7, at 25.

[31] *See* Exhibit 9 for documentation.

23

| John D. Cooney (TAC) | TAC: <br>• AC&S <br>• Combustion Engineering <br>• Owens Corning/Fibreboard <br>• Armstrong World Industries, Inc. <br>• Kaiser Aluminum & Chemical Corp. <br>• Mid-Valley <br>• USG Corp. |
|---|---|
| Joseph Rice (TAC) | TAC: <br>• AC&S <br>• Armstrong World Industries, Inc. <br>• Owens Corning/Fibreboard <br>• Federal Mogul <br>• North American Refractories Co./Global Industrial <br>• Babcock & Wilcox Co. <br>• Pittsburg Corning Corp. (proposed) <br>• USG Corp. |
| Perry Weitz (TAC) | TAC: <br>• ABB Lummus <br>• AC&S <br>• Armstrong World Industries, Inc. <br>• Federal Mogul <br>• Flintkote Co. (proposed) <br>• Mid-Valley <br>• Owens Corning/Fibreboard <br>• North American Refractories Co./Global Industrial <br>• Babcock & Wilcox Co. <br>• Kaiser Aluminum & Chemical Corp. <br>• Pittsburg Corning Corp. (proposed) <br>• USG Corp. |

Even a brief glance at this chart shows that there is an appearance that only potential trustees who in the past have served the overall interests of the major players in the plaintiffs' bar will be selected to serve as trustees in personal injury trusts established in future bankruptcies.

### 3. The ACC Drafted the TDP Without Any Input From CNA or Other Insurers.

Not only did the ACC, acting in conjunction with the FCR, choose the Trustees, it also drafted the proposed Trust Agreement and TDP. Mr. Lockwood in his deposition confirmed that counsel for the ACC and counsel for the individual members of the ACC, along with the FCR, were the drafters of the TDP and the Trust.[32] Mr. Lockwood could not recall any changes to the

---

[32] Lockwood Dep. Tr. 5/1/09 at 381:12 to 383:3; Lockwood Dep. Tr. 5/4/09 at 637:11 to 642:4.

TDP being made at the behest of Grace.[33]   CNA, along with other objecting insurers, was entirely excluded from the drafting process, only seeing the proposed Trust Agreement and TDP when filed with the Court.[34]

### 4. The TAC Can Exercise Enormous Influence Over the Operation of the Trust.

Section 2.2 of the Trust Agreement requires that the TAC consent to virtually any change of significance in the TDP. The Expert Report of Professor Shein describes these requirements in detail, but to give a few examples, the Trustees are required to obtain the consent of the TAC and FCR to:

- Adopt or amend PI Trust Bylaws, amend the Trust Agreement, or amend the TDP (Trust Agreement §§ 2.2(f)(xi), (xii));

- Change the Claim Payment Ratio between amounts paid (i) for claims for severe asbestosis, severe disabling pleural disease, and cancer and (ii) claims for asbestosis or pleural disease (Trust Agreement § 2.2(f)(ii); TDP § 2.5);

- Amend the Medical/Exposure Criteria for payable claims (Trust Agreement § 2.2(f)(iii); TDP § 5.3(a)(3));

- Require claimants to provide additional kinds of medical evidence (Trust Agreement § 2.2f(v); TDP § 7.1);

- Revise the Scheduled, Maximum or Average Values applicable to various categories of claims (Trust Agreement § 2.2(f)(iii), TDP § 5.3(b)(1), (3));

- Determine whether to allow a second claim for malignancy by a claimant who previously recovered on a claim for asbestosis or pleural disease (TDP § 6.4).

The Trustees must also consult with the TAC on a periodic basis regarding the general administration and implementation of the Trust (Trust Agreement § 2.2(e)).

Moreover, the TAC has a significant role in determining how the Trustees will be compensated and whether they will keep their jobs. The Trustees must obtain the consent of the

---

[33] Lockwood Dep. Tr. 5/1/09 at 383:15-21.

[34] *See* Debtors' Response to CNA's Request for Admission No. 7,; ACC's Response to CNA's Request for Admission No. 7; FCR's Response to CNA's Request for Admission No. 7.

25

TAC and FCR to change their compensation other than to reflect cost-of-living adjustments or, alternatively, seek Court approval (Trust Agreement § 2.2(f)(ix)). Also, if a trustee position falls vacant, the TAC and FCR can veto (subject to Court review) the recommendation of the remaining Trustees for a replacement (Trust Agreement § 4.3(a)). Finally, a Trustee can be removed at the recommendation of the TAC and FCR with Court approval for "good cause," which is specifically defined as including "any substantial failure to comply with the general administration provisions of Section 2.2," including its consent provisions. Trust Agreement § 4.2(c).

In marked contrast, the Trustees have no power to remove the members of the TAC or to exercise power over them. A TAC member can apparently only be removed by the other TAC members with approval of the Court. Trust Agreement § 5.3(c). Moreover, if a TAC position falls vacant, that position belongs to the designee of the terminated member or to the designee of his or her law firm. Trust Agreement § 5.4(a).

In short, the TAC can exercise enormous control over the operation of the Trust and TDP on matters that can impact CNA. It is no answer to these concerns to say that the Trustees can always override a TAC veto of a proposed action by obtaining approval of the action in arbitration followed by review by this Court. Trust Agreement § 7.13. That is surely an option that the Trustees would not take without the greatest of reluctance — particularly since their employment as trustees in this proceeding and other proceedings depends on the continuing good will of the leading members of the plaintiffs' bar.

### B. The Plan Does Not Comply with Applicable Law as Required by Section 1129(a)(3).

The Plan does not comply with section 1129(a)(3) in that it places members of the TAC in an irreconcilable legal conflict—either they breach their duties as fiduciaries to the Trust or

their duties as attorneys to their clients. These are not abstract concerns, for some of the proposed TAC members have overreached in the past. In *In re Pittsburgh Corning Corp.*, 308 B.R. 716, 719-20 (W.D. Pa. 2004), the Court rejected a proposal by an ACC whose members were represented by many of the same lawyers as here to retain as special insurance counsel a law firm that had provided asbestos insurance coverage advice to one the debtor's shareholders even though that retention would have been clear conflict of interest. This Court in *Combustion Engineering* ruled that two of the proposed TAC members here (Mr. Rice and Mr. Budd (as Mr. Rice's counsel)) could not serve on the TAC on the ground that "Mr. Rice wears too many hats with respect to this Debtor and its creditors ...." 295 B.R. at 477 n.28. And in *In re: ACandS, Inc.*, 311 B.R. 36 (Bankr. D. Del. 2004), the Court ruled that a plan was not proposed in good faith where "the plan was largely drafted by and for the benefit of the prepetition committee" composed of leading plaintiffs' counsel, including Messrs. Budd, Cooney, Rice, and Weitz. *Id.* at 42-43, 39. Earlier in that proceeding (*In re ACandS, Inc.*, 297 B.R. 395 (Bankr. D. Del. 2003)), the Court had refused to authorize the retention of a firm for "independent" screening of asbestos claims when that firm, among other things, had paid \$2 million for work by another firm whose sole principal was "a paralegal allegedly on leave from the law firm of what was then know[n] as Ness Motley [now Motley Rice]." 311 B.R. at 40. In short, given their prior track record, CNA has good reason to be concerned about placing control of the Asbestos PI Trust in the hands of the proposed TAC members.

27

## 1. The TAC Will Owe the Fiduciary Duty of Fair Dealing to All Trust Beneficiaries, Including the Indirect PI Trust Claimants.

The Trust is proposed to be organized as a statutory trust under Delaware Law, 12 Del. Code § 3801 *et seq*. Trust Agreement § 1.1.[35] As the Delaware Chancery Court recently held, with the exception of express carve-outs, the Delaware Statutory Trust Act "explicitly subjects Delaware statutory trusts to existing trust law concepts." *Cargill, Inc. v. JWH Special Circumstance LLC*, 959 A.2d 1096, 1111 (Del. Ch. 2008) (citing 12 Del. Code § 3809).[36] That is, "unless the Trust Agreement or the Act 'otherwise provides,' existing trust law applies, including default fiduciary duties provided by statute or common law." *Id.*

Delaware trust law makes clear that "[w]here 1 or more persons are given authority by the terms of a governing instrument to direct, **consent to** or disapprove a fiduciary's actual or proposed investment decisions, **distribution decisions** or other decisions of the fiduciary, such persons shall be considered to be **advisers and fiduciaries** when exercising such authority unless the governing instrument otherwise provides." 12 Del. Code § 3313(a) (emphasis added). And as the Delaware Supreme Court stated in *Lewis v. Hanson*, 128 A.2d 819 (Del. 1957), *aff'd sub nom. Hanson v. Denekla*, 357 U.S. 235 (1958): "[A] trust advisor is a fiduciary, somewhat in the nature of a co-trustee, and is sometimes described as a co-trustee.... The resulting situation fundamentally is not unlike the appointment of co-trustees whose joint action is required in trust matters." 128 A.2d at 828. *See generally* 3 Scott and Ascher on Trusts § 16.7 (5th ed. 2006).

In short, under general Delaware trust law, the members of the TAC serve as fiduciaries to the Trust when exercising authority over the Trust. Given the substantial power of the TAC

---

[35] Both the Trust Agreement and the TDP provide that they are to be governed by Delaware law. Trust Agreement § 7.11; TDP § 8.3.

[36] Section 3809 states in relevant part: "Except to the extent otherwise provided in the governing instrument of a statutory trust or in this subchapter, the laws of this State pertaining to trusts are hereby made applicable to statutory trusts ...."

28

over the Trust and TDP, the TAC members should be considered fiduciaries for all Trust beneficiaries. At the least, the TAC members are, as the Trust Agreement states, fiduciaries for "all holders of present PI Trust Claims." Trust Agreement § 5.2. This means, at a minimum, that, with respect to any decision by the TAC where its consent is required, the members of the TAC act as fiduciaries with respect to all present holders of PI Claims at that particular time — whether those claimants be their own clients, the clients of other firms, or insurance companies.

Delaware law "clearly requires trustees to consider impartially the interests of all beneficiaries." *Law v. Law*, 1997 Del. Ch. LEXIS 134, at *7 (Del. Ch. 1997). That is, a "'trustee is under a duty so to administer the trust as to preserve a fair balance between [beneficiaries that are to some extent antagonistic].'" *DuPont v. Delaware Trust Co.*, 320 A.2d 694, 699 (Del. 1974). Delaware law also imposes a duty of loyalty on fiduciaries. *Cargill, Inc. v. JWH*, 959 A.2d at 1113 & n.68 (listing duties of trustee, including the duty of loyalty). This means that the TAC members have a duty to ensure that any changes, amendments and/or modifications to the TDP (or any decision not to amend the TDP) are for benefit of all beneficiaries as a whole, rather than just for the subset with whom they have a contingent fee arrangement. As a result, for instance, the duty to ensure a "fair balance" among competing claims means that TAC members must, *inter alia*, ensure that the Trust has in place procedures that deny payments to unmeritorious claims in order to preserve the corpus of the Trust for meritorious claims, even if that means that the unmeritorious claims of their own clients are rejected. It similarly means that other, competing claimants to Trust funds, including clients of other law firms and insurance companies, must be treated fairly even if that means that the TAC members' individual clients receive less. But, under the applicable rules of professional

responsibility, the members of the TAC cannot act in such an impartial fashion without violating their duties to their clients.

## 2.    The TAC Members Owe Conflicting Duties to Their Clients.

While the TAC members owe a duty of loyalty and impartiality to the beneficiaries of the Trust, they also owe a duty of loyalty to their individual clients.[37]  Applying the District Court's Local Civil Rule 83.6(d), another judge of this Court has ruled that the professional conduct of bar members should be governed by the Model Rules of Professional Conduct of the American Bar Association ("ABA Model Rules").  *In re Kaiser Group Int'l, Inc.*, 272 B.R. 846, 849 (Bankr. D. Del. 2002).  Given the nationwide scope of this proceeding, it is appropriate for this Court to apply the ABA Model Rules, although the apposite Delaware Rules are identical.

Both Rule 1.7(a) of the ABA Model Rules and Rule 1.7 of the Delaware Lawyers' Rules of Professional Conduct provide:

"Except as provided in paragraph (b), a lawyer **shall not represent a client** if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:

(1) the representation of one client will be directly adverse to another client; or

(2) **there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities** to another client, a former client **or a third person** or by a personal interest of the lawyer." (Emphasis added.)

Comment 9 to this provision makes clear that this bar on conflicting duties applies when a lawyer takes on duties as a fiduciary to a trust that conflict with the representation of the lawyer's clients. It states that "a lawyer's duties of loyalty and independence may be materially limited ... by the lawyer's responsibilities to other persons, such as **fiduciary duties arising**

---

[37] *See, e.g.*, ABA Model Rule 1.7, cmt. 1 ("Loyalty and independent judgment are essential elements in the lawyer's relationship to a client.").

**from a lawyer's service as a trustee**, executor or corporate director." (Emphasis added.) *Accord* Del. Law. R. Prof'l Conduct 1.7, cmt. 9 (identical statement); Restatement (Third) of Law Governing Lawyers § 135, cmt. c (2000) ("Restatement") ("A lawyer's service as ... trustee of a trust can create conflict between the duties of the lawyer as such a fiduciary and the interests of clients whom the lawyer represents").

Here, the fiduciary duties of TAC members conflict with their duty to represent their clients. For example, a TAC member is obliged to act with "zeal in advocacy" on behalf of a client's claim so long as the claim is non-frivolous even though the claim may well be without merit. *See* ABA Model Rule 1.3, cmt. 1; Restatement §§ 16, 110. As a fiduciary of the Trust, however, the TAC member should insist that the Trust have procedures that ensure that unmeritorious claims are rejected so that the Trust is not depleted by them and that more funds are available to pay meritorious claims. Likewise, as an impartial Trust fiduciary, a TAC member might conclude that certain claims of insurers are valid and should be paid by the Trust, but as an advocate for his clients, the TAC member should advocate for denial of those same claims as diminishing the funds available to pay his clients.

This is an irreconcilable conflict. A TAC member cannot comply with both sets of fiduciary obligations — either the TAC member's obligations to the Trust beneficiaries as a whole or the obligations to the TAC member's clients will go by the board. In analogous circumstances, the Second Circuit held, in connection with efforts to revise the Manville Personal Injury Settlement Trust, that subclasses had to be formed so that individual lawyers for the class were not purporting to represent class members whose interests were in fact adverse. *In re Joint E. & S. Dist. Asbestos Litig.*, 982 F.2d 721, 739-45 (2d Cir. 1992), *modified*, 993 F.2d 7

(2d Cir. 1993). The same principle applies here: lawyers who represent certain categories of claimants cannot be expected to act as impartial fiduciaries for all claimants to the Trust.

This conflict cannot be circumvented by the TAC members obtaining the consent of their clients to their proposed membership on the TAC. First, it is doubtful that any such waivers could be valid in a case as complex as this one.[38] This is particularly true since the waivers would have to be prospective. Moreover, the TAC members would likely need the informed consent of both their clients and all the Trust claimants (including insurers with Indirect PI Trust Claims) in order to continue to serve in both capacities.[39] Second, a conflict cannot be waived unless a lawyer reasonably believes that "the lawyer will be able to provide competent and diligent representation to each affected client." ABA Model Rule 1.7(b)(1). In this case, as shown above, a lawyer cannot satisfy the obligations owed both as a Trust fiduciary and as a lawyer representing individual clients. Finally, even if the conflict could be waived, there is no reason why this Court should approve a TDP that requires the obtaining of thousands of written conflict waivers. Rather, the Court should approve a TDP that does not contain such conflicts in the first place.

It is no answer to say that an individual TAC member will recuse himself on any question where that member has a conflict of interest. The answer to irreconcilable conflicts is withdrawal from one of the representations — not recusal. In any event, recusal cannot eliminate the conflict because the conflict in a TAC member's obligation as Trust fiduciary and as an individual's counsel does not merely exist at the level of one particular individual's claim

---

[38] *See Congoleum II*, 426 F.3d at 691 (conflict waivers were not enforceable where "the complexities of the bankruptcy proceedings and the 'many hats' worn by [counsel]" precluded true informed consent).

[39] *See Value Property Trust v. Zim Co. (In re Mortgage & Realty Trust)*, 195 B.R. 740, 754 (Bankr. C.D. Cal. 1996) ("Where the conflict is between two clients or a present and a former client, it is the affected clients who can give the waiver. Where the conflict arises from a fiduciary duty arising from a relationship other than an attorney-client relationship, the other party must give a written waiver, under the California rule.").

32

against the Trust. It exists at a systemic level. To take one example, suppose that the Trustees determined that it would be in the interests of beneficiaries to adopt more demanding criteria for claims as a means of weeding out unmeritorious claims. Such a change could benefit Trust beneficiaries as a whole, but it might be against the interest of clients of TAC members who would fail to satisfy the more stringent criteria. In that event, the TAC members would be conflicted between breaching their obligations as Trust fiduciaries by not consenting to the revisions or breaching their obligations to their clients by allowing the change to go into effect. Recusal cannot eliminate this conflict because it would still mean that the TAC members have failed to do everything in their power to prevent a revision to the TDP that is contrary to their clients' interests.

The way to remedy this conflict of interest problem is for the Court either to eliminate the TAC or to have disinterested persons with no ties to asbestos claimants to the Trust serve in that role.

### 3.   The Selection Process for the Trustees Creates an Appearance of Partiality.

The Court should also pick new Trustees. As shown above, the proposed Trustees were selected by ACC and FCR in a process where parties representing other PI Trust beneficiaries were excluded from the selection process. There is an appearance that they were selected because the ACC was satisfied with their work in other asbestos personal injury trusts. Because those gentlemen owe their job to the ACC, there would be an appearance of partiality if they are allowed to remain Trustees. To remove this appearance, the Court should select the trustees itself following an open selection process where all interested parties are allowed to recommend candidates.

33

C.     **The Trust Agreement Includes Improper Exculpation and Release
       Provisions.**

If it were not enough that the drafting of the Trust Agreement and TDP has been

dominated by the ACC and that the TAC has conflicts of interest, the Plan and Trust Agreement

propose both to exculpate and then to indemnify the Trustees and TAC members for breaches of

their fiduciary duties to the Trust. Plan § 11.9 would exculpate the Trustees and the TAC for

acts concerning "administration of [the] Plan or the Property to be distributed under this Plan,"

except in cases of "gross negligence or willful misconduct." Section 4.4 of the Trust Agreement

provides that Trustees, TAC Members, and the FCR "shall not be liable to the PI Trust, to any

individual holding an asbestos claim, or to any other person, except for such individual's own

breach of trust committed in bad faith or willful misappropriation." Section 4.6 further provides

that, unless an individual is ultimately found liable under the foregoing Section 4.4, the Trust is

obligated to indemnify and defend the Trustees, TAC members, and the FCR "to the fullest

extent [allowed by] a statutory trust organized under the laws of the State of Delaware ...."

As a general matter, the authority of this Court to exculpate non-debtors through

confirmation of a plan is limited, and there are prerequisites that must be satisfied. *See*, *e.g.*, *In

re Continental Airlines*, 203 F.3d 203, 216-18 (3d Cir. 2000); *Congoleum III*, 362 B.R. at 189-

96; *In re Zenith Elec. Corp.*, 241 B.R. 92, 110-11 (Bankr. D. Del. 1999). There is no showing

that the Plan Proponents have satisfied the necessary prerequisites to obtain the sought-after

exculpations.

Moreover, the exculpation provisions applicable to the Trustees and TAC are in any

event unjustified in a case like this where these fiduciaries were selected by lawyers for one

group of claimants and will be applying a TDP drafted largely by those lawyers without the

participation of other interested parties. In a case such as this, the threat of lawsuits for breach of

34

fiduciary obligations is the only meaningful weapon that other claimants have to attempt to ensure that their claims are treated equally and fairly. If the Trustees and TAC are to remain as proposed, the exculpation and indemnification provisions should be dropped so as to give beneficiaries at least one means of promoting fairness of treatment.

At the least, the exculpation and indemnification provisions should be clarified. First, they should be clarified to make clear that they only apply to claims against TAC members brought in their capacity as TAC members. As Professor Shein states (Report at 10), these provisions could be construed to protect TAC members from legal malpractice claims brought by their individual clients. While it is not certain that this is the intent, such a result would run afoul of state professional responsibility rules that severely restrict attempts by lawyers to exclude their own liability for negligence.[40]

Beyond that, the exculpation clause should be clarified to provide that individuals remain liable for "bad faith, including bad faith breach of the covenant of good faith and fair dealing, and willful misappropriation." This change incorporates the provision of 12 Del. Code § 3806(e) that a trust agreement cannot immunize a fiduciary for "any act or omission that constitutes a bad faith violation of the implied contractual covenant of good faith and fair dealing." Such a change would make explicit what should be implicit — namely, that the Trustees and TAC owe an obligation of fair dealing to all Asbestos PI Claimants, even those who are adversaries to the TAC.

---

[40] *See*, *e.g.*, ABA Model Rule 1.8(h) ("A lawyer shall not (1) make an agreement prospectively limiting the lawyer's liability to a client for malpractice unless the client is independently represented in making the agreement"); Del. Code Prof'l. Resp. R. 1.8(h) (same).

35

## IV.     THE PLAN IMPROPERLY IMPAIRS CNA'S ABILITY AS AN INSURER TO OBTAIN SECTION 524(G) INJUNCTIVE PROTECTION.

Section 524(g)(4)(A)(ii)(III) of the Code expressly provides this Court with the power to enjoin actions by Asbestos PI Claimants against settled insurance companies, and channel such claims to the Trust, where the insurer is "alleged to be directly or indirectly liable for the conduct of, claims against, or demands on the debtor to the extent such alleged liability of such [insurer] arises by reason of ... [the] provision of insurance to the debtor or a related party ...." Pursuant to this provision, the Plan seeks from the Court an Asbestos PI Channeling Injunction that would protect "Settled Asbestos Insurance Companies." However, the term "Settled Asbestos Insurance Companies" is defined to mean only an Asbestos Insurance Entity that enters an Asbestos Insurance Settlement Agreement "*prior* to the conclusion of the Confirmation Hearing." Plan § 1.1(200) (emphasis added). Moreover, the protection is granted "*only* with respect to, and only to the extent of, any Asbestos Insurance Policy (or any portion thereof) identified … in Exhibit 5 in the Exhibit Book ...." *Id.* (emphasis is in original)

These limitations on who can qualify as a Settled Asbestos Insurance Company for purposes of obtaining injunctive relief improperly affect the rights of CNA as an insurer to obtain the full protection of an Asbestos PI Channeling Injunction even if it reaches a settlement subsequent to Confirmation. The Bankruptcy Code contains no "timing" restriction on granting a section 524(g) channeling injunction to insurers. A settlement reached after Confirmation will benefit the Asbestos PI Trust as much as a pre-Confirmation settlement, and reaching a comprehensive settlement of coverage disputes will be more likely if the insurer knows that it is buying its peace from asbestos-related claims arising out of its having provided insurance to the

Debtors. The courts in other bankruptcies have recognized this by allowing the channeling injunction to be revised to protect insurers who settle post-confirmation.[41]

In addition, the Plan potentially impairs the rights of insurance companies by limiting the protection of the Asbestos PI Channeling Injunction only to claims "with respect to, and only to the extent of, any Asbestos Insurance Policy" identified in Plan Exhibit 5. Plan § 1.1(200). The scope of this provision is not clear. No provision is made for providing injunctive relief to insurers with respect claims allegedly arising out of liability polices that are the subject of an Asbestos Insurance Reimbursement Agreement listed in Plan Exhibit 6, Schedule 3 (*see* Plan § 1.1(12)). Moreover, the Channeling Injunction does not specifically track the language in section 524(g) that it applies to all claims that seek to hold the insurer "directly or indirectly liable for the conduct of, claims against, or demands on the Debtors" due to "provision of insurance to the debtor." It therefore does not make clear — as the Plan Proponents apparently intended — that it provides injunctive protection to the fullest extent allowable under section 524(g).[42]

There is authority for the proposition that, once the prerequisites for a channeling injunction under section 524(g) have been satisfied, a court has no discretion but to issue the full injunctive relief authorized by that subsection. *See In re Western Asbestos Co.*, 313 B.R. 832, 855 (Bankr. N.D. Cal. 2003) ("While an injunction is an equitable remedy, in this instance, the equities are built into [section 524(g)]. If those equities are satisfied, the Court does not believe

---

[41] *See, e.g., In re Federal Mogul Global, Inc.*, No. 01-10578 (JKF), Dkt. No. 12620 at 26 (Bankr. D. Del.) (plan provides that the district court after confirmation can include an insurer as a party afforded the protection of the section 524(g) injunction) (Ex. 10); *accord In re Porter-Hayden Co.*, No. 02-54152, Dkt. No. 967 at 13 (Bankr. D. Md.) (Ex. 11); *In re Mid-Valley, Inc.*, No. 03-35592 (JKF), Dkt. No. 2086 at Ex. A, 17 (Bankr. W.D. Pa) (Ex. 12); *In re Owens Corning/ Fibreboard Corp.*, Dkt. No. 17942 , Ex. A, 133-34, No. 00-0383 (JKF) (Bankr. D. Del) (Ex. 13).

[42] *See* Lockwood Dep. Tr. 5/4/09 at 506:4-20 (stating that claims being channeled to the Trust are those that § 524(g) authorizes to be channeled to the Trust).

37

that it has the discretion to limit the effect of the supplemental injunction to something less than that permitted by statute"). At the least, however, whatever discretion is provided in section 524(g) ought to be exercised by the Court and not by the Plan Proponents — when and if a particular settlement is brought to the Court's attention (whether pre- or post- confirmation).

Narrowing the scope of the Plan's proposed Channeling Injunction would also constitute a violation of section 1123(a)(5) of the Bankruptcy Code. That section requires that a Plan contain adequate means for its implementation. While the Bankruptcy Code provides a list of examples of "adequate means," that list is not exhaustive. *In re Lisanti Foods, Inc.*, 329 B.R. 491, 506 (D.N.J. 2005). Indeed, where a debtor has significant asbestos-related liabilities, the injunction allowed under section 524(g) of the Bankruptcy Code is a primary means for adequately implementing a plan of reorganization. *See In re Armstrong World Indus., Inc.*, 348 B.R. 136, 156 (Bankr. D. Del. 2006). By constraining the Bankruptcy Court's authority to extend the Channeling Injunction to insurers that settle post-confirmation, or not making clear that the scope of the Channeling Injunction is to be as broad as section 524(g) permits, non-settled insurers will be less likely to reach settlements with the Trust, or more likely to reach settlements on terms that result in lesser payments to the Trust, than would be the case if they knew that, in return for settlement payments, they could buy their peace by being the beneficiaries of a full section 524(g) injunction.[43]

Suggested changes to the Plan that would eliminate these concerns are set forth in Appendix A.

---

[43] Additional guidance on the proper scope of a channeling injunction under § 524(g) may be forthcoming from the Supreme Court in *Travelers Indem. Co. v. Bailey*, No. 08-295 (argued March 30, 2009).

38

## V.   INCORPORATION BY REFERENCE OF CERTAIN OBJECTIONS ASSERTED BY OTHER OBJECTING ASBESTOS INSURANCE ENTITIES

In § II.D, of Plan Objections [Docket No. 21794], CNA designated as a Phase II Objection that the Plan, in several respects, fails to comply with the funding requirements contained in section 524(g) of the Code. To the extent that the Court deems this objection to be properly part of Phase I, CNA adopts the legal arguments contained in the Phase I Trial Brief being today filed by Government Employees Insurance Co., Republic Insurance Company n/k/a Starr Indemnity & Liability Company, and Seaton Insurance Company.

CNA also reserves the right to join the Phase I Trial Briefs filed by other Objectors.

### CONCLUSION

For the reasons set forth above, CNA respectfully requests that the Court not confirm the Plan unless the Plan is modified to satisfy these objections, and that it provide such further relief as is just and proper.

Dated:  June 1, 2009

ROSENTHAL, MONHAIT & GODDESS,
P.A.

By:
Edward B. Rosenthal (*Bar No. 3131*)
P.O. Box 1070
Wilmington, Delaware 19899
Telephone: (302) 656-4433x6
FACSIMILE: (302) 658-7567

GOODWIN PROCTER LLP
Daniel M. Glosband (*pro hac vice*)
Michael S. Giannotto (*pro hac vice*)
Brian H. Mukherjee (*pro hac vice*)
Goodwin Procter LLP
Exchange Place
Boston, Massachusetts 02109
Telephone: (617) 570-1000
facsimile: (617) 523-1231

FORD MARRIN ESPOSITO WITMEYER &
GLESER, L.L.P.
Elizabeth DeCristofaro (*pro hac vice*)
Wall Street Plaza, 23rd Floor
New York, New York 10005-1875
Telephone: (212) 269-4900
FACSIMILE: (212) 344-4294

WILDMAN, HARROLD, ALLEN & DIXON
LLP
Jonathan W. Young
Jeff Chang
225 West Wacker Drive
Chicago, Illinois 60606-1229
Telephone:  (312) 201-2662
FACSIMILE:  (312) 416-4524

*Counsel for Continental Casualty Company, Transportation Insurance Company
and their American insurance affiliate*

## APPENDIX A

## REVISED INSURANCE NEUTRALITY PROVISION[1]

For the reasons stated in CNA's Trial Brief, CNA proposes the modifications to the Plan set forth below. Proposed deletions appear as struck-through text, and additions as bolded and underlined.

1.1 DEFINED TERMS

16. "**Asbestos Insurer Coverage Defenses**" shall mean all rights and defenses at law or in equity that any Asbestos Insurance Entity may have under any Asbestos Insurance Policy, Asbestos Insurance Settlement Agreement, Asbestos In-Place Insurance Coverage, or applicable law to a claim seeking insurance coverage. Asbestos Insurer Coverage Defenses include any defense based on the terms of the Plan or the Plan Documents or the manner in which the Plan or Plan Documents were negotiated; but Asbestos Insurer Coverage Defenses do not include any defense that (i) the Plan or any of the Plan Documents do not comply with the Bankruptcy Code, or (ii) the transfer of Asbestos Insurance Rights pursuant to the Asbestos Insurance Transfer Agreement is prohibited by any Asbestos Insurance Policy, any Asbestos Insurance Settlement Agreement, any Asbestos In-Place Insurance Coverage or applicable non-bankruptcy law.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

7.2.2(d)(iv)   On the Effective Date, the Asbestos PI Trust shall be the successor to all rights of the Debtors and Non-Debtor Affiliates under each Asbestos Insurance Reimbursement Agreement. The Asbestos PI Trust's payment of an Asbestos PI Claim

---

[11] The language in this proposed neutrality section is based in large part on provisions from prior confirmed plans of reorganization as set out in the following footnotes. Copies of the relevant documents are attached as Exhibits to this Trial Brief.

~~under the PI TDP shall be deemed to constitute settlement and payment of such claim by~~
~~or on behalf of the Debtors or Non-Debtor Affiliates within the meaning of, and in full~~
~~compliance with, each Asbestos Insurance Reimbursement Agreement.~~


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*


7.15  INSURANCE NEUTRALITY

(a)    Except to the extent provided in this Section 7.15, notwithstanding anything to the contrary in the Confirmation Order, the Plan or any of the Plan Documents, nothing in the Confirmation Order, the Plan or any of the Plan Documents (including any other provision that purports to be preemptory or supervening), shall in any way operate to, or have the effect of, impairing any Asbestos Insurance Entity's legal, equitable or contractual rights, if any, in any respect.  The rights of Asbestos Insurance Entities shall be determined under the Asbestos Insurance Policies, Asbestos In-Place Insurance Coverage, Asbestos Insurance Reimbursement Agreements, or Asbestos Insurance Settlement Agreements, **as applicable.**

(b)    The Plan, the Plan Documents, and the Confirmation Order shall be binding on the Debtors, the Reorganized Debtors, the Asbestos PI Trust and the beneficiaries of the Asbestos PI Trust. The obligations, if any, of the Asbestos PI Trust to pay holders of Asbestos PI Claims shall be determined pursuant to the Plan, the Plan Documents, and the Confirmation Order.  **None of (I) the Bankruptcy Court's or District Court's approval of the Plan or the Plan Documents, (II) the Confirmation Order or any findings and conclusions entered with respect to Confirmation, (III)**

any judgment, order, finding of fact, conclusion of law, determination or statement
(written or verbal, made on or off the record) made by the Bankruptcy Court or
issued or affirmed by the District Court pursuant to 11 U.S.C. § 524(g)(3), nor (IV)
any estimation or valuation of Asbestos PI Claims, either individually or in the
aggregate (including, without limitation, any agreement as to the valuation of
Asbestos PI Claims or any value attributed to the Asbestos PI Trust Assets) in the
Chapter 11 Cases or otherwise, shall, with respect to any Asbestos Insurance Entity
(including on the basis of the decision in UNR Industries, Inc. v. Continental
Casualty Co., 942 F. 2d. 1101 (7th Cir. 1991)), constitute a trial or hearing on the
merits or an adjudication or judgment; or trigger or accelerate the obligations, if
any, of any Asbestos Insurance Entity under its Asbestos Insurance Policies,
Asbestos In-Place Insurance Coverage, Asbestos Insurance Settlement Agreements
or Asbestos Insurance Reimbursement Agreements, as applicable; or be used as
evidence in any forum to prove: [2]

> (i)    that any of the Debtors, the Reorganized Debtors, the Asbestos
> PI Trust, or any Asbestos Insurance Entity is liable for, or otherwise
> obligated to indemnify or pay with respect to, any individual Asbestos PI
> Claim or Demand;
>
> (ii)    that the procedures established by the Plan, including without
> limitation the Trust Distribution Procedures, for evaluating and paying

---

[2] The revised language in paragraphs (b)(i)-(vii) is based on the Fourth Amended Joint Plan of
Reorganization for Debtors and Debtors-in-Possession § 10.4.1.2, *In re Federal-Mogul Global, Inc.*, No.
01-10578 (Bankr. D. Del. Feb. 7, 2007) (Ex. 10); *see also* Stipulation and Agreed Order, Exhibit A ¶ 16, *In
re Kaiser Alum. Corp.*, No. 02-10429 (Bankr. D. Del. Nov. 15, 2005) (Ex. 14).

Asbestos PI Claims and Demands (including the medical, causation or exposure criteria and disease values) are reasonable or appropriate;

(iii)     that the procedures established by the Plan, including without limitation the Trust Distribution Procedures, for evaluating and paying Asbestos PI Claims and Demands (including the medical, causation or exposure criteria and disease values) are consistent with any procedures that were used to evaluate or settle Asbestos PI Claims against the Debtors before the Petition Date;

(iv)     that the settlement of, or the value assigned to, any individual Asbestos PI Claim pursuant to the Trust Distribution Procedures was, is or will be reasonable and/or otherwise appropriate;

(v)     that any of the Asbestos Insurance Entities participated in the negotiation of and/or consented to the Plan or any of the Plan Documents including without limitation, the Trust Distribution Procedures;

(vi)     that any of the Debtors or the Asbestos PI Trust has suffered an insured loss with respect to any Asbestos PI Claim or Demand;

(vii)     (A) the liability of the Debtors, the Reorganized Debtors, or the Asbestos PI Trust for Asbestos PI Claims or Demands, whether such Asbestos PI Claims or Demands are considered individually or on an aggregate basis; or (B) the value of such Asbestos PI Claims or Demands, individually or in the aggregate;

(viii)     that the conduct of the Debtors, the Reorganized Debtors or the Asbestos PI Trust in connection with the negotiation, development,

A4

settlement, confirmation and/or implementation of the Plan, the other Plan
Documents, or any related agreements was, is or will be reasonable,
appropriate, in good faith, or consistent with the terms and conditions of any
Asbestos Insurance Policy, Asbestos In-Place Insurance Coverage, Asbestos
Insurance Settlement Agreement or Asbestos Insurance Reimbursement
Agreement, as applicable; or[3]

(ix)    that any Asbestos Insurance Entity did not have, does not
have or will not have a reasonable, good-faith basis to withhold consent to
the settlement, allowance or liquidation of, assignment of any value to and/or
payment of (including any presentation to any Asbestos Insurance Entity for
payment of) any Asbestos PI Claim, including under or in connection with
the Plan or any of the Plan Documents, or any related agreement.

(c)    Nothing in the Plan, the Plan Documents or the Confirmation Order
shall impose, or shall be deemed or construed to impose, any obligation on any
Asbestos Insurance Entity to provide a defense for, settle, or pay any judgment or
liability with respect to, any Asbestos PI Claim; rather, an Asbestos Insurance
Entity's obligations, if any, with respect to defending, settling, or paying any Claim,
including an Asbestos PI Claim, shall be determined solely by and in accordance
with the Asbestos Insurance Policies, Asbestos In-Place Insurance Coverage,
Asbestos Insurance Settlement Agreements or Asbestos Insurance Reimbursement
Agreements, as applicable.[4]

---

[3] The revised language in paragraphs (b)(viii)-(xi) is based on the Stipulation and Agreed Order Concerning Insurance Issues ¶ 5(d), *In re Quigley Co., Inc.*, No. 04-15739 (S.D.N.Y. May 2009) (Ex. 15).

[4] The revised language in paragraph (c) is based on the Stipulation and Agreed Order Concerning Insurance Issues ¶ 5(d), *In re Quigley Co., Inc.*, No. 04-15739 (S.D.N.Y. May 2009).

A5

(d)     Nothing in the Plan or the Plan Documents shall affect or limit, or be construed as affecting or limiting, the protection afforded to any Settled Asbestos Insurance Company by the Asbestos PI Channeling Injunction.

(e)     Nothing in this Section 7.15 is intended or shall be construed to preclude otherwise **application by a court adjudicating a claim seeking insurance coverage, including any claim asserted in an Asbestos Insurance Action, of any** applicable principles of res judicata or collateral estoppel from being applied against any Asbestos Insurance Entity with respect to any issue that is actually litigated by such Asbestos Insurance Entity as part of its objections, if any, to confirmation of the Plan or as part of any contested matter or adversary proceeding filed in conjunction with or related to confirmation of the Plan. Plan objections that are withdrawn prior to the beginning of the Confirmation Hearing shall be deemed not to have been actually litigated.

(f)     Except as provided in Section 7.15(g), Section 7.15(j), and Section 7.2.2(d)(iv), n**N**othing in the Plan, the Plan Documents, the Confirmation Order, or any finding of fact and/or conclusion of law with respect to the confirmation or consummation of the Plan shall limit the right, if any, of any Asbestos Insurance Entity, in any Asbestos Insurance Action, to assert any Asbestos Insurer Coverage Defense **defense based on the Plan or the Plan Documents or the manner in which the Plan or Plan Documents were negotiated**.[5]

(g)     Notwithstanding the provisions of this Section 7.15, **in the event that a Final Order is entered in the Chapter 11 Cases that the Bankruptcy Code authorizes the transfer of Asbestos Insurance Rights pursuant to the Asbestos**

---

[5] Taken from the current definition of Asbestos Insurer Coverage Defenses.

**Insurance Transfer Agreement by preempting any terms of Asbestos Insurance Policies, Asbestos Insurance Settlement Agreements, Asbestos In-Place Insurance Coverage, Asbestos Insurance Reimbursement Agreements or provisions of applicable non-bankruptcy law that otherwise might prohibit the transfer of Asbestos Insurance Rights pursuant to the Asbestos Insurance Transfer Agreement,** Asbestos Insurance Entities**, subject to their rights to appeal,** shall be bound by the **Bankruptcy** Court's findings and conclusions that, under the Bankruptcy Code, the transfer of rights under the Asbestos Insurance Transfer Agreement is valid and enforceable against each Asbestos Insurance Entity notwithstanding any anti-assignment provision in or incorporated into any Asbestos Insurance Policy, Asbestos In-Place Insurance Coverage, Asbestos Insurance Reimbursement Agreement, Asbestos Insurance Settlement Agreement or applicable non-bankruptcy law.

(h)    ~~The Asbestos Insurance Entities shall be subject to the releases and injunctions to the extent described in this Plan, and this~~ **Except as provided in Section 7.15(k) and Section 7.15(n),** Section 7.15 shall not be construed to limit the protections afforded to the Sealed Air Indemnified Parties or the Fresenius Indemnified Parties by the releases and injunctions in this Plan or to allow the Asbestos Insurance Entities to undertake any action against any ~~of the Sealed Air Indemnified Parties or the Fresenius~~ Indemnified Parties that is contrary to such releases and/or injunctions.

(i)    If an Asbestos Insurance Entity that is not a Settled Asbestos Insurance Company asserts that it has rights of contribution, indemnity, reimbursement, subrogation, or other similar claims (collectively, for purposes of this Section 7.15(i), "Contribution Claims") against a Settled Asbestos Insurance Company, (a) such

A7

Contribution Claims may be asserted as a defense or offset against the Asbestos PI Trust or the Reorganized Debtors (as applicable) in any Asbestos Insurance Action including such Asbestos Insurance Entity that is not a Settled Asbestos Insurance Company, and the Asbestos PI Trust or the Reorganized Debtors (as applicable) may assert the legal or equitable rights, if any, of the Settled Asbestos Insurance Entity, and (b) to the extent such Contribution Claim is determined to be valid, pursuant to a Final Order, the liability (if any) of such Asbestos Insurance Entity that is not a Settled Asbestos Insurance Company to the Asbestos PI Trust or the Reorganized Debtors (as applicable) shall be reduced by the amount of such Contribution Claim.

(j) Asbestos Insurance Entities that are parties to Asbestos Insurance Reimbursement Agreements shall be bound by the provisions of Section 7.2.2(d)(iv) with respect to such Asbestos Insurance Reimbursement Agreements.

(j) **The Asbestos Insurance Entities have not consented to the Plan or the Plan documents, including without limitation the Trust Distribution Procedures applicable to the WRG Asbestos PI Trust, and have not consented to the payment of any monies by the Trust with respect to any Asbestos PI Claims.**[6]

(k) **Notwithstanding anything to the contrary in the Plan or the Plan Documents, including the provisions of Section 7.15(h), (1) any entity (including the Trust, any Reorganized Debtor and any non-Debtor Affiliate) that tenders a Claim to an Asbestos Insurance Entity shall be responsible, for purposes of such Claim, for any retrospective insurance premium, self-insured retention, deductible, or similar obligation of the insured under the Asbestos Insurance Policies with respect to such**

---

[6] The revised language in paragraph (j) is based on the Stipulation and Agreed Order ¶ 7(f), *DII Indus. LLC v. Federal-Mogul Prods., Inc.* (*In re Federal-Mogul Global, Inc.*), No. 01-AP-09018 (Bankr. D. Del. June 30, 2006) (Ex. 16).

Claim; (2) with respect to any self-insured retention, deductible or similar obligation, any Asbestos Insurance Entity to which such Claim is tendered may seek to establish, as a coverage defense, that such tendering entity has not fulfilled the obligations of the insured under the Asbestos Insurance Policies in respect of which such Claim was tendered; and (3) with respect to any retrospective insurance premium or similar obligation, any Asbestos Insurance Entity to which such Claim is tendered may offset the amount of such retrospective insurance premium or similar obligation against any amount otherwise payable by such Asbestos Insurance Entity on account of such Claim under its Asbestos Insurance Policies.

(l)     Except as provided in Section 7.15(g), nothing in the Plan, the Plan Documents or the Confirmation Order shall relieve (by way of injunction or otherwise) any Reorganized Debtor, any non-Debtor Affiliate or any entity (including the Trust) that is or claims to be entitled to defense or indemnity under an Asbestos Insurance Policy from the duty to comply with the terms and conditions of such Asbestos Insurance Policy or under applicable law applicable to the insured, including any terms or conditions (1) requiring provision of timely notice to an Asbestos Insurance Entity of accidents, occurrences or claims, (2) requiring cooperation with the Asbestos Insurance Entity, or (3) precluding voluntary payments or settlement without the Asbestos Insurance Entity's consent.[7]

(m)     Any demand for payment by the Insurance Contributors or the Trust made to any Asbestos Insurance Entity shall only be based on, and can only be brought for, the amount of the actual payments (aggregate or otherwise) made by

---

[7] The revised language in paragraph (l) is based on the Fourth Amended Joint Plan of Reorganization for Debtors and Debtors-in-Possession § 11.23, *In re Federal-Mogul Global, Inc.*, No. 01-10578 (Bankr. D. Del. Feb. 7, 2007).

the Asbestos PI Trust to any holders of Asbestos PI Claims and Demands, and may not be based upon, inter alia, any payment not yet actually made to the holders of Asbestos PI Claims and Demands, or payments or amounts that will, or might, be paid at some point in the future to the holders of Asbestos PI Claims and Demands, but which have not yet actually been paid.[8]

(n)    None of the rights, remedies, duties and claims under any insurance policies and related agreements issued by CNA to the Fresenius Indemnified Parties or the Sealed Air Indemnified Parties shall be released, modified, impaired or affected in any way, whether by virtue of Confirmation of the Plan or otherwise, and CNA shall be permitted to adjust, handle, litigate, settle and pay any of the Workers' Compensation Claims, as and when permitted under the terms of the CNA Workers' Compensation policies and agreements, all without further order of the Court.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## 8.2 THE ASBESTOS PI CHANNELING INJUNCTION

\*\*\*\*\*\*\*\*\*\*\*

### 8.2.3  Motions to Extend the Asbestos PI Channeling Injunction

After the Confirmation Hearing and prior to the Effective Date, the Debtors, and from and after the Effective Date, the Asbestos PI Trust, may at any time in its or their sole and absolute discretion, move the District Court to extend the Asbestos PI Channeling Injunction to any Asbestos Insurance Entity to the full extent

---

[8] The revised language in paragraph (m) is based on the Order Pursuant to Fed. R. Bankr. P. 9019 Approving the Stipulation and Agreed Order, Exhibit A ¶ 6(a), *In re TH Agricultural & Nutrition, LLC*, No. 08-14692 (Bankr. S.D.N.Y. Feb. 10, 2009) (Ex. 17).

allowed by Section 524(g) of the Code, for good cause shown. Such motion shall disclose, to the extent necessary, the terms of any Asbestos Insurance Settlement Agreement with such Asbestos Insurance Entity.[9]

---

[9] The revised language in Section 8.2.3 is based on the Fourth Amended Joint Plan of Reorganization for Debtors and Debtors-in-Possession § 8.19, *In re Federal-Mogul Global, Inc.*, No. 01-10578 (Bankr. D. Del. Feb. 7, 2007).