# Exhibit 5

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - -

| | |
|---|---|
| In Re: | : Chapter 11 |
| | : |
| | : Case No. |
| W.R. GRACE & CO., et al, | : 01-01139 JKF |
| | : |
| | : (Jointly |
| Debtors | : Administered) |

- - -

Friday, May 1, 2009

- - -

Oral deposition of PETER VAN N. LOCKWOOD, ESQUIRE, taken pursuant to notice, was held at the offices of CAPLIN & DRYSDALE, One Thomas Circle N.W., Suite 1100, Washington, DC 20005, commencing at 9:43 a.m., on the above date, before Lori A. Zabielski, a Registered Professional Reporter and Notary Public in and for the Commonwealth of Pennsylvania.

- - -

MAGNA LEGAL SERVICES
Seven Penn Center
1635 Market Street
8th Floor
Philadelphia, Pennsylvania 19103

1   **Asbestos PI Trust?**

2          A.      PI Trust.

3          **Q.      Fair enough.**

4          A.      When the Trust is assigned

5   rights under the policies and the Debtors

6   are given the right to assert any and all

7   coverage defenses --

8                  MR. FINCH:  You mean

9          insurers?

10                 THE WITNESS:  I am sorry.

11         Let me start over again.

12                 When the Trust is assigned

13         rights under the policies and the

14         insurers are retaining all of

15         their coverage defenses with the

16         two exceptions we discussed

17         earlier, if the Trust proposes to

18         demand in some way or another

19         coverage from one or more insurers

20         under those policies, then

21         whatever the insurer asserts as a

22         pre-condition to coverage, what

23         you would call an obligation or a

24         right, would have to be fulfilled

1          to the extent that a coverage

2          court determines that there is a

3          pre-condition to coverage.

4              And since the Trust is the

5          one seeking the coverage, by

6          hypothesis, it's the only one that

7          has any incentive to make sure

8          that the rights or -- excuse me --

9          that the obligations, the

10          pre-conditions are satisfied as

11          required by a coverage court.

12              And so to that extent, yes,

13          the Trust, one way or another, to

14          the extent determined by a

15          coverage court or by negotiations

16          with insurers, will have to

17          perform what you have described as

18          the obligations and rights under

19          the assigned insurance coverage.

20          That's my understanding.

21    BY MR. BROWN:

22          Q.    Do the Debtors, the

23    Reorganized Debtors, retain any duties or

24    obligations under the asbestos insurance

1          MR. FINCH:  Objection,

2      foundation.

3          THE WITNESS:  Only in the

4      sort of vaguest and most general

5      terms.  Well, I am sure it's more

6      than 10,000.  Again, it could be

7      20,000; it could be 30,000.  I

8      just don't know.

9          Those firms -- with the

10     exception of Mr. Cooney's firm,

11     those firms represent a lot of

12     people.  And in the case of

13     Mr. Rice, he has co-counsel

14     relationships, his firm does, with

15     a lot of other firms.  So it gets

16     into the question of, quote, what

17     do you mean by representation,

18     sole representation, joint

19     representation.  But, suffice it

20     to say, they represent a lot of

21     claimants.

22  BY MR. BROWN:

23          Q.    Okay.  And in their capacity

24  as counsel for those claimants, they have

1          discovery and litigation of

2          confirmation objections.  But

3          those are not -- I would not

4          regard those as any types of

5          agreements you are questioning

6          about.

7    BY MR. DANIEL COHN:

8          Q.    All right.  Directing your

9    attention now to ACC Exhibit-11, which is

10   the TDP.

11         A.    I have it.

12         Q.    All right.  Who drafted the

13   TDP?

14         MR. FINCH:  Objection.  This

15         gets into Plan negotiations and

16         drafting.  I will let you answer

17         that question, but we will see how

18         it goes from there.

19         THE WITNESS:  To some

20         extent, Mr. Inselbuch may know

21         more about this than I do.  But I

22         have a pretty good knowledge of

23         it.

24               As I have previously

```
1              mentioned in this deposition, this

2              TDP in its inception was a sort of

3              mark-up job on one of the previous

4              TDPs from one of the previous

5              bankruptcies that that had been

6              confirmed.  I don't recall, as I

7              sit here today, which one it was,

8              but it would have been one of the

9              more recent ones.

10                  It then, of course, had to

11             be modified to reflect the

12             particularities of Grace and the

13             claims against Grace and what have

14             you.  And you have heard some

15             testimony about things like

16             Sections 5.12 and 5.13.  The

17             participants that did it were

18             basically counsel for the ACC,

19             counsel for the FCR, and members

20             of the ACC itself in terms of

21             reviewing and commenting on

22             things, and the FCR himself.

23                  The actual, physical

24             drafting as opposed to the
```

 1          commenting and what have you was,

 2          I believe, done by Caplin &

 3          Drysdale.

 4   BY MR. DANIEL COHN:

 5          Q.    What input, if any, did

 6   Grace have concerning the TDP?

 7                MS. HARDING:  Objection with

 8          respect to negotiations.

 9                THE WITNESS:  Well, it was a

10          general proposition.  Grace was

11          furnished copies of drafts and

12          afforded the opportunity to

13          comment on them.

14   BY MR. DANIEL COHN:

15          Q.    And were any changes made to

16   what sounds like an ACC FCR draft at the

17   behest of Grace?

18                MS. HARDING:  Same

19          objection.

20                THE WITNESS:  I don't really

21          recall.

22   BY MR. DANIEL COHN:

23          Q.    Directing your attention to

24   Section 2.1 of the TDP.

1    having to do with how the Asbestos

2    Permanent Channelling Injunction

3    works.

4         The provisions in the

5    Asbestos Permanent Channelling

6    Injunction are very complex.  As a

7    general proposition, however, I

8    would say that the claims that are

9    being channelled to the Asbestos

10   Personal Injury Trust are claims

11   that are against the Debtors or

12   against various other entities

13   defined as asbestos-protected

14   parties that arise in the manner

15   that satisfies the requirements of

16   Section 524(g), which has very

17   specific language about what can

18   and cannot be channelled to an

19   Asbestos Personal Injury Trust

20   under that section.

21        What you are, in effect,

22   trying to ask is does the phrase

23   you have used fit within or

24   without the terminology of Section

1           fine, if it's two minutes.

2                   MR. FINCH:  It's two

3           minutes.  Off the record.

4                   (There was a break from 3:17

5           p.m. to 3:20.)

6      BY MR. SPEIGHTS:

7           Q.    Mr. Lockwood, has trustees

8      been selected for the PI Trust?

9           A.    Yes.

10          Q.    Have they been revealed?

11          A.    Their names are set forth at

12     the end of the PI Trust Agreement.  The

13     second-to-last page is a signature page

14     which names three individuals, Harry

15     Huge, Lewis Sifford, and Dean Trafelet,

16     as the three prospective trustees.

17          Q.    Did the ACC choose these

18     three people?

19          A.    The ACC and the FCR

20     consulted each other on these three

21     prospective individuals and then proposed

22     them to the co-proponents and the

23     co-proponents accepted them.

24          Q.    Had the ACC or the FCR

1   would be.

2          And is it correct that the

3   ACC does not have a position on what type

4   of claim it would be if it's not a Class

5   6 claim?

6      A.   Well, the ACC doesn't, as

7   such, have positions on hypothetical

8   questions.  So, yes, the ACC doesn't have

9   a position on that issue.  The ACC --

10   well, I will leave it at that.

11      Q.   On Friday, Mr. Cohn asked

12   you a question, who drafted the TDP.

13   That was the question, and you gave an

14   answer which I am happy to show you the

15   full answer.  But I WANT to repeat a

16   portion of your answer.  You said:  "The

17   participants that did it were basically

18   counsel for the ACC, counsel for the FCR,

19   and members of the ACC itself in terms of

20   reviewing and commenting on things, and

21   the FCR himself."

22          When you said the ACC

23   itself, what did you mean?

24      A.   I meant --

1          Q.    I am sorry.  When you said

2     members of the ACC itself, what members

3     are you talking about?

4          A.    Well, I was referring to the

5     personal injury counsel who were the

6     delegated representatives of the

7     individual ACC members, if that's what

8     you are driving at.

9          Q.    That's what I am driving at.

10         And who specifically were

11    they?

12         A.    As far as I know -- well,

13    the way in which the process works, in

14    general, is sometimes the ACC has

15    in-person meetings, sometimes it has

16    telephonic meetings, sometimes documents

17    get sent to it by email as PDF

18    attachments or whatever, and the ACC has

19    asked do you want to have a meeting or is

20    this good enough for you.  So there is a

21    variety of ways in which the ACC views an

22    input as obtained.

23         And my answer was simply

24    that at the conclusion of a process, the

1    members of the ACC had weighed in in one

2    or more of the ways in which I had

3    described some of them had; they all had

4    the opportunity to express their views;

5    and, therefore, the final product was the

6    product of their input.  And there was a

7    final vote to go forward with the

8    document.

9            Q.    Okay.  And when you say the

10   members, you are talking about their

11   actual personal injury counsel?

12           A.    As far as I know.  But,

13   again, I couldn't tell you whether an

14   individual personal injury lawyer might

15   have consulted with his client, the

16   member, on one or more aspects of the TDP

17   or, for that matter, even sent the client

18   a copy of the entire TDP and had a

19   discussion with him about it.  I

20   certainly couldn't exclude that.

21           Q.    Can you tell me the list of

22   counsel that you are talking about, the

23   actual names?

24           A.    They would be -- as a

1    general proposition, I believe they are

2    in the Disclosure Statement.  If they

3    are, it's a hell of a lot better

4    description of them than my memory.  I

5    just --

6                MR. FINCH:  There is also an

7            order entered by the U.S. Trustee

8            that identifies the 11 individual

9            members of the ACC and their

10           counsel, care of their firms.

11   BY MR. BROWN:

12           Q.    That's what I am driving at.

13   I would like to know who the individuals

14   were at their firms that were involved.

15           A.    Well, let me just see.  I am

16   somewhat surprised.  The Disclosure

17   Statement does not appear to contain the

18   members of the ACC.  It just lists the

19   counsel representing the committee as a

20   whole.  I had misremembered.  I had

21   thought that it did.

22                I can't really remember.  I

23   mean, I know the four -- I identified

24   four earlier as being involved in the

```
 1      discussions with Grace.  They are

 2      included.  I think there is at least nine

 3      members of the ACC.  I do not recall, as

 4      I sit here, who the other five members of

 5      the ACC are.  I mean, they are of

 6      record -- strike that.  I do not recall

 7      who the other five lawyers for the

 8      members of the ACC are.  They are of

 9      record.

10          Q.    But the four to which you

11      are referring is Mr. Budd, Mr. Rice,

12      Mr. Cooney, and Mr. Weitz?

13          A.    Correct.

14          Q.    You were talking about the

15      Trust Distribution Procedures and who

16      drafted them.

17              Would your answer be the

18      same with respect to the Trust Agreement?

19          A.    On the Trust Agreement, I

20      think there was more input from Grace,

21      and, indeed, I think there may have been

22      some from counsel from Sealed Air, as I

23      think about it.  And, indeed, now that I

24      think about it, I think there may have
```

1      even been a little input from the Sealed

2      Air counsel on the TDP.  But, again, the

3      primary draftspersons were counsel for

4      the ACC and the FCR.

5              Q.    Okay.  Can I direct your

6      attention to the Plan, which I guess is

7      ACC-5, and specifically it's page 70 on

8      my copy.  It's under Section 7.7

9      Conditions to Occurrence of the

10     Confirmation Date, specifically condition

11     (j).

12             A.    I see it.

13             Q.    Can you just take a moment

14     to read that?  I have one question on

15     that.

16             A.    I have read it.

17             Q.    In the portion of that

18     condition dealing with asbestos PD

19     claims, second-to-the last line, you will

20     see the words "if any" appear there, but

21     the same language doesn't appear for

22     asbestos PI claims.

23                   Why?

24                   MR. FINCH:  Objection,