**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| W.R. Grace & Co., *et al.* | : | Case No. 01-01139 JKF |
| | : | |
| Debtors. | : | **Docket Reference No. 20872** |

**PHASE I TRIAL BRIEF OF GOVERNMENT EMPLOYEES INSURANCE CO.,
REPUBLIC INSURANCE COMPANY N/K/A STARR INDEMNITY & LIABILITY
COMPANY, AND SEATON INSURANCE COMPANY IN OPPOSITION TO
CONFIRMATION OF AMENDED JOINT PLAN OF REORGANIZATION**

Dated:  June 1, 2009

Warren T. Pratt (4334)
David P. Primack (4449)
DRINKER BIDDLE & REATH LLP
1100 N. Market Street, Suite 1000
Wilmington, DE  19801-1254
Telephone:  302-467-4200

-- and --

Michael F. Brown (*Admitted Pro Hac*)
Jeffrey M. Boerger (*Admitted Pro Hac*)
DRINKER BIDDLE & REATH LLP
One Logan Square
Philadelphia, PA  19103-6996
Telephone:  215-988-2700

Counsel for Parties-in Interest
Government Employees Insurance
Company, Republic Insurance Company,
and Seaton Insurance Company

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

I.    Introduction ........................................................................................................... 1

II.   Background ............................................................................................................ 1

      A.    The GEICO and Republic Policies ............................................................ 1

      B.    Seaton's Policy No. 1-2517 ....................................................................... 2

      C.    The Debtors' Insurers Were Excluded From the Plan Proponents'
            Negotiations and the Drafting of the Plan and Plan Documents ............... 3

      D.    The Plan's Treatment of the GEICO, Republic, and Seaton Policies ........ 4

III.  Argument ............................................................................................................... 6

      A.    The Plan Proponents Bear the Burden of Establishing That Their
            Plan Satisfies the Requirements of the Bankruptcy Code ......................... 6

      B.    The Plan is Decidedly Not "Insurance Neutral" With Respect to the
            Debtors' Insurers in their Capacity as the Debtors' Insurers .................... 7

            1.    Section 7.15 of the Plan is Unintelligible ....................................... 7

                  (a)    Even the Plan Proponents Do Not Understand or Do Not
                         Agree on How § 7.15 Is Intended to Operate ..................... 7

                  (b)    Section 7.15(b) Contradicts § 7.15(a) for Insurers That Are
                         "Beneficiaries of the Asbestos PI Trust." ......................... 10

                  (c)    Section 7.15(i) Fails to Protect the Contribution, Indemnity,
                         and Subrogation Rights of Unsettled Insurers Against Other
                         Insurance Companies ....................................................... 12

                  (d)    GEICO, Republic, and Seaton Do Not Agree to the
                         Non-Consensual Releases Referenced in § 7.15(h) ............ 13

                  (e)    Section 7.1(f) Is an Improper Backdoor Limitation on
                         § 7.15(a) and § 7.15(e) Is Simply Improper ...................... 14

2.      The Plan Improperly Impacts the Insurers' Rights Under Their Respective Policies By Excluding Them from the Process of Evaluating, Defending Against, and Settling Asbestos PI Claims ............15

3.      The Plan Improperly Purports to Assign the Debtor's Interests Under the GEICO, Republic, and Seaton Policies to the Trust in Violation of the Anti-Assignment Provisions in Those Policies ..............18

    (a)      The Bankruptcy Code Does Not Preempt the Anti-Assignment Provision in the Policies ....................................18

    (b)      The Proposed Assignment of the Policies and Policy Rights Violates Bankruptcy Code § 1129(a)(3)............................20

    (c)      The Proposed Assignment Is Not Valid Under New York Law .........................................................................................21

    (d)      The Proposed Assignment Is Invalid Because It Purports to Assign the Rights of Non-Debtors, in Violation of the Anti-Assignment Provisions ........................................................23

C.      The Proposed TAC Members Are Burdened By Irreconcilable Conflicts of Interest and Should Not Be Approved By The Court ......................24

D.      The Plan Does Not Comply With § 524(g)'s Requirements .................................29

E.      The Plan Has Impermissibly Overbroad Release and Exculpation Provision ........................................................................................................35

F.      GEICO, Republic, and Seaton Are Parties-In-Interest With Standing to Object to Confirmation of the Plan ....................................................................37

1.      Bankruptcy Code §§ 1109(b) and 1128(b) Confer Broad Standing to Object to Confirmation of a Plan ..........................................................37

2.      Article III Standing and the Prudential Principles That Bear on Standing .............................................................................................37

3.      GEICO, Republic, and Seaton Easily Satisfy All Standing Requirements to Object to Confirmation of the Plan................................38

IV.     Conclusion ......................................................................................................................39

# TABLE OF AUTHORITIES

## CASES

*In re ACandS, Inc.,*
 311 B.R. 36 (Bankr. D. Del. 2004) ...................................................................................28

*Alumax Mill Prods., Inc. v. Congress Fin. Corp.,*
 912 F.2d 996 (8th Cir. 1990) ....................................................................................13, 35

*In re Amatex Corp.,*
 755 F.2d 1034 (3d Cir. 1985)............................................................................................37

*BFP v. Resolution Trust Corp.,*
 511 U.S. 531 (1994).........................................................................................................19

*Baron & Budd, P.C. v. Unsecured Asbestos Claimants Comm.,*
 321 B.R. 147 (D.N.J. 2005) .............................................................................................35

*Bennett v. Spear,*
 520 U.S. 154 (1997).........................................................................................................38

*Bldg. & Constr. Trades Council v. Associated Builders & Contractors of
  Mass./R.I., Inc.,*
 507 U.S. 218 (1993).........................................................................................................19

*In re Combustion Engineering, Inc.,*
 391 F.3d 190 (3d Cir. 2004).............................................................................14, 24, 30, 37

*In re Congoleum Corp.,*
 362 B.R. 167 (Bankr. D.N.J. 2007) ......................................................................30, 35, 36

*In re Congoleum Corp.,*
 426 F.3d 675 (3d Cir. 2005).............................................................................29, 30, 34, 35

*In re Congoleum Corp.,*
 Bankr. Case No. 03-51524, 2009 Bankr. LEXIS 900 (Bankr. D.N.J. Feb. 26,
 2009) ...................................................................................................................................7

*In re Congoleum Corp.,*
 Bankr. Case No. 03-51524, 2009 WL 499262 (Bankr. D.N.J. Feb. 26, 2009).......................28

*In re Federal-Mogul Global Inc.,*
 385 B.R. 560 (Bankr. D. Del. 2008), *aff'd*, 402 B.R. 625 (D. Del. 2009),
 *appeal filed*, No. 03-2230 (3d Cir.).................................................................................18

*In re Frascella Enters., Inc.*,
   360 B.R. 435 (Bankr. E.D. Pa. 2007) ...................................................................7

*In re Genesis Health Ventures, Inc.*,
   266 B.R. 591 (Bankr. D. Del. 2001) ...................................................7, 29, 35, 36

*In re Global Indus. Techs., Inc.*,
   No. 08-3650 (3d Cir.) ......................................................................................18

*Globecon Group, LLC v. Hartford Fire Ins. Co.*,
   434 F.3d 165 (2d Cir. 2006) ........................................................................21, 22

*Henkel Corp. v. Hartford Accident & Indem. Co.*,
   62 P.3d 69 (Cal. 2003) .....................................................................................22

*Integrated Solutions, Inc. v. Serv. Support Specialties, Inc.*,
   124 F.3d 487 (3d Cir. 1997)..........................................................................19, 20

*In re Johns-Manville Corp.*,
   843 F.2d 636 (2d Cir. 1988)..............................................................................31

*Joint Stock Soc'y v. UDV N. Am., Inc.*,
   266 F.3d 164 (3d Cir. 2001)..............................................................................38

*In re Lernout & Hauspie Speech Prods., N.V.*,
   301 B.R. 651 (Bankr. D. Del. 2003) ..................................................................6, 7

*Lorillard Tobacco Co. v. Reilly*,
   533 U.S. 525 (2001)......................................................................................19, 20

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992)..........................................................................................38

*Marcus Hook Dev. Park, Inc. v. Lampl, Sable & Makoroff*,
   153 B.R. 693 (Bankr. W.D. Pa. 1993) ...............................................................35

*In re PWS Holding Corp.*,
   228 F.3d 224 (3d Cir. 2000)...........................................................................7, 37

*Pac. Gas & Elec. Co. v. Cal.*,
   350 F.3d 932 (9th Cir. 2003) .............................................................................20

*Paxton & Vierling Steel Co. v. Great Am. Ins. Co.*,
   497 F. Supp. 573 (D. Neb. 1980)......................................................................22

*In re Pittsburgh Corning Corp.*,
   308 B.R. 716 (Bankr. W.D. Pa. 2004), *aff'd*, Case No. 04-1199 (W.D. Pa.
   2005) ............................................................................................................................29

*Smith v. Arthur Andersen LLP*,
   421 F.3d 989 (9th Cir. 2005) ....................................................................................13

*Sprietsma v. Mercury Marine*,
   537 U.S. 51 (2002).......................................................................................................20

*In re Union Meeting Partners*,
   165 B.R. 553 (Bankr. E.D. Pa. 1994) *aff'd*, 52 F.3d 317 (3d Cir. 1995) ..................6

*United States v. SCRAP*,
   412 U.S. 669 (1973)......................................................................................................38

*Valley Forge Christian College v. Americans United for Separation of Church &*
   *State, Inc.*,
   454 U.S. 464 (1982)......................................................................................................38

*In re Zale Corp.*,
   62 F.3d 746 (5th Cir. 1995) .......................................................................................13

*In re Zenith Elecs. Corp.*,
   241 B.R. 92 (Bankr. D. Del. 1999) ....................................................................13, 21, 36

## STATUTES AND RULES

11 U.S.C. § 101..................................................................................................................30

11 U.S.C. § 524............................................................................................................7, 25, 30

11 U.S.C. § 1012................................................................................................................20

11 U.S.C. § 1109................................................................................................................37

11 U.S.C. § 1123................................................................................................................19

11 U.S.C. § 1128................................................................................................................37

11 U.S.C. § 1129............................................................................................................7, 21

15 U.S.C. § 1012................................................................................................................19

N.J. Stat. Ann. §§ 17:33A-7...............................................................................................6

Tenn. Code Ann. § 56-7-106 ..........................................................................................6

Model Rules of Professional Conduct. Rule 1.7 ........................................................26

## OTHER AUTHORITIES

140 Cong. Rec. H10765 (daily ed. Oct. 4, 1994) ........................................................31

140 Cong. Rec. S4522 (daily ed. Apr. 20, 1994) ........................................................32

140 Cong. Rec. S4523 (daily ed. Apr. 20, 1994) ........................................................32

140 Cong. Rec. S14464 (daily ed. Oct. 6, 1994). .......................................................32

Stephen Hudak & John F. Hagan, *Asbestos Litigation Overwhelms Courts*,
    Cleveland Plain Dealer, Nov. 5, 2002, *available at* 2002 WLNR 269888 ..............................27

## I.    Introduction

The Third Amended Case Management Order provides that Phase I of the Confirmation Hearing shall address, *inter alia*, (i) whether the First Amended Joint Plan of Reorganization proposed by the Debtors, the Official Committee of Asbestos Personal Injury Claimants, the Asbestos PI Future Claimants' Representative, and the Official Committee of Equity Security Holders (the "Plan") improperly affects the rights of the Debtors' insurers (in their capacity as insurers, but not creditors) and (ii) the standing of the Debtors' insurers (again, as insurers, not creditors) to litigate various confirmation objections.  To that end, Government Employees Insurance Co. ("GEICO"), Republic Insurance Company n/k/a Starr Indemnity & Liability Company ("Republic"), and Seaton Insurance Company ("Seaton") submit this Phase I Trial Brief to preview for the Court how their rights are adversely affected by the Plan and, therefore, why they have standing to litigate plan objections well beyond those conceded by the Plan Proponents.

## II.    Background

### A.    The GEICO and Republic Policies

GEICO and Republic are unsettled excess general liability insurers of one or more of the Debtors.  GEICO issued three policies providing liability coverage, each covering successive one-year policy periods.  (*See* Ex. "1" ¶¶ 4-6 and Exs. "A," "B," and "C" thereto).[1]  Republic issued two policies providing liability coverage, both for the same one-year policy period.  (*See id.* at ¶¶ 7-8 and Exs. "D" and "E").  The GEICO and Republic policies each contain an anti-assignment provision.  (*See id.*, Exs. "A," "B," and "C" thereto, at Condition I; *id.*, Exs. "D" and "E" thereto, at Condition No. 6; *id.*, Exs.

---

[1] The exhibits reference herein are exhibits to the Declaration of Jeffrey M. Boerger, dated June 1, 2009, submitted in support hereof, unless otherwise indicated.

"F" and "G" thereto, at Condition O).[2]  They also contain a provision requiring the

insured to cooperate in the defense and settlement of claims.  (*See id.*, Exs. "A," "B," and

"C" thereto, at Condition C(3); Exs. "F" and "G" thereto, at Condition H).  And, each

also contains a provision prohibiting settlement by the insured without insurer consent,

except at the insured's own expense.  (*See id.*, Exs. "A," "B," and "C" thereto, at

Condition C(5); Exs. "F" and "G" thereto, at Condition J).

###### B.    Seaton's Policy No. 1-2517

In August 1992, Seaton's predecessor, Unigard Security Insurance Company

("Unigard"), entered into a settlement agreement with W. R. Grace & Co. – Conn.

("Grace-Conn"), pursuant to which Unigard agreed to, and did, pay Grace-Conn the

aggregate amount of $10,000,000.  (*See* Ex. "2" at 279-80, and Ex. "18" thereto).  In

exchange, Grace-Conn. agreed to a release with respect to "Products Claims," as defined

therein, under Unigard Policy No. 1-2517.  (*Id.*).  It also agreed to indemnify Unigard

with respect to any subsequent "Products Claims," again as defined therein, asserted by

any third parties relating to policy.  (*Id.*).  This settlement agreement, along with one

other, qualifies Seaton as a Settled Asbestos Insurance Company.  (*See* D.I. 20874, Ex.

"5" thereto at 9-10).

The Plan Proponents, however, contend that Seaton has residual asbestos-related

policy obligations to the Debtors under Unigard Policy No. 1-2517.  (*See* D.I. 20874, Ex.

"5" thereto, at 9).  Seaton disputes this contention, but to the extent that such coverage

still exists, Seaton would be an insurer of the Debtors, as well as a creditor.  Seaton's

---

[2] Each of the GEICO and Republic policies includes following-form language,
incorporating by reference certain terms and conditions of underlying umbrella policies
issued by Certain London Market Insurers.

predecessor issued Policy No. 1-2517, which provided first-layer excess liability coverage for a one-year period.  (*See* Ex. "3" ¶ 4 and Ex. "A" thereto).  Like the GEICO and Republic policies, this policy also contains an anti-assignment provision.  (*See id.*, at Condition 13).  Likewise, it contains provisions requiring the insured to cooperate in the defense and settlement of claims, and prohibiting settlements by the insured without Seaton's consent, except at the insured's own expense.  (*See id.*, at Conditions 7, 9).

## C.    The Debtors' Insurers Were Excluded From the Plan Proponents' Negotiations and the Drafting of the Plan and Plan Documents.

On April 6, 2008, the Debtors, the Official Committee of Asbestos Personal Injury Claimants (the "ACC"), the Future Claimants Representative ("FCR"), and the Official Committee of Equity Holders executed a "Term Sheet for Resolution of Asbestos Personal Injury Claims" (the "Term Sheet").  (*See* Ex. "4" at 15-25, Ex. "3" thereto; Ex. "5" at 179-84; Ex. "6" at 124-25, 242-22; Ex. "7" at 24-37, Ex. "3" thereto).  Pursuant to the Term Sheet, the Debtors agreed, *inter alia*, to an assignment of all of their "insurance policies and all insurance proceeds available for payment of Asbestos PI Claims."  In addition, the Term Sheet states: "The Asbestos PI Trust will pay claims from trust assets *in accordance with a trust agreement and trust distribution procedures established by the ACC and FCR* in connection with the Plan." (*Id.*) (emphasis added).  It is undisputed that the Plan Proponents excluded Grace's insurers – including GEICO, Republic, and Seaton – from any of the negotiations that lead up to the execution of the Term Sheet. (Ex. "4" at 35-38; Ex. "5" at 179-84; Ex. "6" at 242-44; Ex. "7" at 24-37).  It is also undisputed that none of Grace's insurers were consulted about, or consent to, any of the terms set forth in the Term Sheet.  (*Id.*).

Similarly, it is undisputed that the Plan Proponents did not consult with, or seek

-3-

the consent of, the Debtors' insurers with respect to the terms of the initial Plan and Plan Documents between April 6, 2008, when the Term Sheet was executed, and September 2008, when the initial Plan and Plan Documents were filed with this Court.  (*See* Ex. "4" at 38-50; Ex. "6" at 244-45; Ex. "7" at 37-39).  Notably, the crafting of the Trust Agreement and the TDP – as per the Term Sheet – was left in the hands of the ACC and FCR, with the Debtors playing virtually no role.  (Ex. "4" at 381-87, 636-42; Ex. "6" at 180-83, 190-91; Ex. "7" at 94-95).  After the initial Plan was filed, it is also undisputed that neither GEICO, Republic, nor Seaton ("Insurers") consented to any provision in the Plan or Plan Documents.  (Ex. "4" at 49-50).

    **D.**     **The Plan's Treatment of the GEICO, Republic, and Seaton Policies.**

        Not surprisingly, the Plan and Plan Documents adversely impact the Insurers – in their capacity as insurers – in several ways.[3]  To begin with, under the Plan, the Debtors seek to transfer all of their rights under the Insurers' policies to the Asbestos PI Trust ("Trust").  (*See* D.I. 20874, Ex. "6").  The Trust is to be established pursuant to the Asbestos PI Trust Agreement ("Trust Agreement"), and operated in accordance with the Asbestos PI Trust Distribution Procedures ("TDP").  (*See* D.I. 20874, Exs. "2" and "4").  But, neither the Trust Agreement nor the TDP, nor any other Plan Document, provides for any role for the Insurers in the handling, defense, or settlement of Asbestos PI Claims submitted to the Trust.  (*See* D.I. 20874, Exs. "2" and "4"; Ex. "6" at 91-92).  Indeed, the Trust Agreement and TDP place all responsibility for the handling, defense, and settlement of Asbestos PI Claims squarely in the hands of the Trust itself.

_____

[3] Seaton raises only its Phase I objections (*i.e.*, its objections in its capacity as an insurer) in this Trial Brief.  Seaton is also a creditor and, therefore, will be submitting a Trial Brief in Phase II addressing its objections in its capacity as a creditor.

Although the Plan specifically provides that the Trust will be the assignee of the Asbestos Insurance Rights, and that the assignment of such rights will be valid and enforceable against the Insurers, the Plan and Plan Documents are absolutely silent with respect to whether the Trust will assume or comply with the Debtors' duties and obligations under the Asbestos Insurance Policies, including the GEICO, Republic, and Seaton policies. That issue, the Plan Proponents maintain, will be decided later by a coverage court. (Ex. "4" at 104-06; Ex. "6" at 93-94; Ex. "7" at 47-48).

The Plan, however, does more than just trammel the policy rights of the Insurers. It also contains injunctions, releases, and an exculpation provision all of which purport to be binding upon the Insurers. (*See, e.g.,* D.I. 20872, §§ 8.2, 8.3, 8.4, 8.5, 8.8.7, and 11.9). These Plan features have the effect of stripping the Insurers of other important legal rights. By way of example, The Scotts Company ("Scotts") is seeking to pursue the Debtors' insurers – both settled and unsettled – for insurance coverage as a purported "vendor" of Grace's products. (*See* D.I. 21775 and Ex. "8"). If Scotts were successful in pursuing such a claim against GEICO, Republic, or Seaton, each may then have claims for indemnity, equitable contribution, or subrogation (collectively "Contribution Claims") as against other settled and unsettled insurers of the Debtors. The injunctions in the Plan, however, would enjoin the Insurers from asserting such Contribution Claims. The Asbestos PI Channeling Injunction (a § 524(g) injunction) would enjoin such claims against any Settled Asbestos Insurance Company, while the Asbestos Insurance Entity Injunction (a § 105 injunction) would enjoin such claims against any unsettled insurer. (*See* D.I. 20872, §§ 8.2 and 8.4).

The Insurers are also adversely impacted by § 11.9 of the Plan, which purports to

exculpate an impermissibly overbroad group of entities and individuals.  Among those exculpated by § 11.9 are the Reorganized Debtors, the Debtors, the Asbestos PI Trustees, the Trust, the Asbestos PI Trust Advisory Committee ("TAC"), the FCR, and each of their Representatives.  The proposed exculpation is both retrospective and prospective.  (D.I. 20872, § 11.9).  If the Plan is confirmed, the Insurers' putative insured would be presumably be the Trust or the Reorganized Debtors, or perhaps both.  Surprisingly, the Plan Proponents do not appear to agree on which entity, if any, would actually be the insured under the policies.  (Ex. "4" at 84-88; Ex. "6" at 85-88; Ex. "7" at 42-54).  Either way, however, § 11.9 may well preclude the Insurers from pursuing, for example, any private right of action they possess now or may possess in the future, whether statutory or common law, as against the exculpated parties for certain acts or omissions.  *See, e.g.*, N.J. Stat. Ann.  §§ 17:33A-7 and 17:33A-4 (prohibiting, *inter alia*, false or misleading statements with respect to claims tendered to the insurer); Tenn. Code Ann. § 56-7-106.

The Plan Proponents' proposed "cure-all" for all of these adverse impacts on the Insurers is § 7.15 of the Plan, entitled "Insurance Neutrality."  That provision, however, is woefully inadequate to protect the rights of the Insurers.

### III.   <u>Argument</u>

### A.   **The Plan Proponents Bear the Burden of Establishing That <u>Their Plan Satisfies the Requirements of the Bankruptcy Code.</u>**

"[A] plan proponent has the affirmative burden of proving that its plan satisfies the provisions of § 1129(a) by the preponderance of the evidence, even in the absence of an objection."  *In re Union Meeting Partners*, 165 B.R. 553, 574 (Bankr. E.D. Pa. 1994) *aff'd*, 52 F.3d 317 (3d Cir. 1995) (footnote omitted); *see also In re Lernout & Hauspie Speech Prods., N.V.*, 301 B.R. 651, 656 (Bankr. D. Del. 2003).  Moreover, courts have a

mandatory, independent duty to determine whether plans meet all the requirements

necessary for confirmation, even absent valid objections to confirmation. *See Lernout &*

*Hauspie*, 301 B.R. at 656; *see also*, *In re Genesis Health Ventures, Inc.*, 266 B.R. 591,

599 (Bankr. D. Del. 2001); *In re Congoleum Corp.*, Bankr. Case No. 03-51524, 2009

Bankr. LEXIS 900, at *7 (Bankr. D.N.J. Feb. 26, 2009).

Section 1129(a)(1) of the Bankruptcy Code provides that a court may confirm a

plan only if it "complies with the applicable provisions" of Title 11. *In re PWS Holding*

*Corp.*, 228 F.3d 224, 243 (3d Cir. 2000).  A plan is not confirmable if it fails to comply

with *any* provision in Title 11. *See In re Frascella Enters., Inc.*, 360 B.R. 435, 441

(Bankr. E.D. Pa. 2007).  The Plan, as discussed below, fails to comply with, *inter alia*,

Bankruptcy Code §§ 1129(a)(1), 1129(a)(3), 1129(a)(5)(A)(ii), and 524(g).

> **B.      The Plan Is Decidedly Not "Insurance Neutral" With Respect to
>           the Debtors' Insurers in their Capacity as the Debtors' Insurers.**
>
> > 1.      Section 7.15 of the Plan is Unintelligible.[4]
>
> > > (a)      *Even the Plan Proponents Do Not Understand or Do
> > >          Not Agree on How § 7.15 Is Intended to Operate.*

David T. Austern, the FCR, is an attorney who has practiced law for 45 years.

(Ex. "6" at 205-06).  During his career, he has been (a) an assistant district attorney, (b)

an assistant United States attorney, (c) a law professor, (d) an attorney in private practice,

and (e) general counsel of the Manville Personal Injury Settlement Trust.  (*Id.* at 13-14).

He also serves as FCR for the Combustion Engineering Asbestos Trust.  (*Id.* at 22-24).

---

[4] Section 7.15 by it terms also purports preserve the rights of Settled Asbestos Insurance
Companies under their Asbestos Insurance Settlement Agreements.  In that capacity,
however, those insurers, which includes Seaton, are the holders of so-called Indirect PI
Trust Claims.  Their objections to the Plan, including objections pertaining to § 7.15, are
to be addressed in Phase II of the Confirmation Hearing in accordance with the Third
Amended Case Management Order.  (*See* D.I. 21544).

He has more legal experience than most, with a particular emphasis on asbestos bankruptcies.

Before his deposition, Mr. Austern reviewed several Plan Documents, including the Plan itself; he reviewed Mr. Lockwood's deposition transcript; he listened-in on a portion of Mr. Lockwood's deposition; and he met with his own counsel twice. (*Id.* at 14-18). Despite his extensive experience and preparation, Mr. Austern candidly admits that he does not understand § 7.15 of the Plan – the so-called "Insurance Neutrality" provision that the Plan Proponents trumpet as purportedly protecting the rights of the Debtors' insurers:

> Q.    . . . Are there particular provisions in the Plan that you don't understand?
> A.    Yes.
> Q.    Are there any that stick out in your mind in that regard?
> A.    Can I look at the Plan for a moment?
> Q.    Sure.
> A.    By way of example, 7.15 of the document.
> Q.    That's one that you don't understand?
> A.    Well, it's one I have trouble trying to understand.
> . . .
> Q.    Do you believe Section 7.15 to be unclear?
> A.    To me.

(Ex. "6" at 44-48). When questioned further as to how § 7.15 was intended to operate, and how it interacts with other Plan provisions, Mr. Austern repeatedly stated that he did not know. (*Id.* at 48-61).

By contrast, Richard Finke, the Debtor's Rule 30(b)(6) designee with respect to the "Scope and operation of Section 7.15 of the Plan" testified that he does understand § 7.15. (Ex. "7" at 15-19, 75-77; Ex. "2" thereto). Indeed, when questioned about the interplay between § 7.15 and § 11.9, Mr. Finke stated that the latter preempted the former, notwithstanding the super-preemptory language in the former! (*Id.* at 75-86). He

opined that § 11.9 is encompassed within the language of § 7.15(h), even though there is no specific reference to § 11.9 in § 7.15(h).  (*Id.* at 80).  He also testified that if an insurer fit within the undefined phrase "the beneficiaries of the Asbestos PI Trust" that appears in § 7.15(b), such as the holder of an "Indemnified Insurer TDP Claim" as used in § 5.13 of the TDP, then the insurer would be bound by the Plan, Plan Documents, and Confirmation Order.  (*Id.* at 86-90).  If Mr. Finke is right, then the Plan is plainly not "insurance neutral" as to any insurer that holds an "Indemnified Insurer TDP Claim." (Compare § 7.15(a) with § 7.15(b)).

Peter Lockwood, the ACC's Rule 30(b)(6) designee, testified that he viewed § 7.15 as being "sort of a for[u]m selection provision."  (Ex. "4" at 58-63).  That, of course, begs the question why § 7.15 is entitled "Insurance Neutrality."  When asked whether § 11.9 was preempted by § 7.15, and whether various releases in the Plan were preempted by § 7.15, Mr. Lockwood gave equivocal responses.  (*Id.* at 170-76).  With respect to the interaction between § 7.15 and § 11.9, for example, at one point he said he did not think § 7.15 would override § 11.9 "because the exculpation provision comes under the heading bankruptcy issues," and therefore is presumably within a "carve-out" in the definition of the term Asbestos Insurance Defenses, only later to testify that the question "is almost impossible to answer" without more information.  (*Id.* at 171-73).

In short, even as "interpreted" by the Plan Proponents, § 7.15 – with its various exceptions, undefined terms, and conflicting subsections – fails to achieve simple clarity, much less "insurance neutrality."  It is like an "abstract painting."  Most people who study it, see something different, while others – like Mr. Austern – candidly admit that they just don't understand it.  That is little comfort to the Insurers who are being asked to

-9-

rely upon it to protect their rights.

> (b)     *Section 7.15(b) Contradicts § 7.15(a) for Insurers That Are "Beneficiaries of the Asbestos PI Trust."*

Putting aside the Plan Proponents' various "interpretations" of § 7.15, it is obvious that the provision fails to live up to its title simply by comparing subsection (a) with subsection (b).  The latter is one of several exceptions to the purported "insurance neutrality" conferred by the former.  The first sentence of subsection (b) says: "The Plan, the Plan Documents, and the Confirmation Order *shall be binding* on the Debtors, the Reorganized Debtors, the Asbestos PI Trust, and *the beneficiaries of the Asbestos PI Trust*." (*See* D.I. 20872, § 7.15(b)) (emphasis added).  The Plan Documents include, *inter alia*, the Trust Agreement and the TDP.  (*See* D.I. 20872, § 1.1(164) and D.I. 20874, Exs. "2" and "4" thereto).  The phrase "the beneficiaries of the Asbestos PI Trust" is not actually defined, but as noted by Mr. Finke – the Debtors' Rule 30(b)(6) designee on the subject – it includes holders of Indirect PI Trust Claims and "Indemnified Insurer TDP Claims," as the latter term is described in § 5.13 of the TDP.  (Ex. "6" at 47-54; Ex. "7" at 15-19, 86-96, Ex. "2" thereto).

Many of the Debtors' insurers are holders of Indirect PI Trust Claims, or the so-called "Indemnified Insurer TDP Claims.  (Ex. "4" at 233-39).  They are, therefore, "beneficiaries of the Asbestos PI Trust" according to the testimony of Mr. Finke.  As purported "beneficiaries," § 7.15(b) states that they are bound by the Plan, Plan Documents (including the Trust Agreement and TDP), and Confirmation Order.  As result, any insurer that holds an Indirect PI Trust Claim or an Indemnified Insurer TDP Claim loses all the benefit, if there were any, of the "insurance neutrality" language in § 7.15(a) because that subsection begins with the clause "[e]xcept to the extent provided

-10-

in this Section 7.15." (*See* D.I. 20872, § 7.15).  This result is the polar opposite of "insurance neutrality" because it specifically provides that holders of Indirect PI Trust Claims and Indemnified Insurer TDP Claims are bound without exception by the Plan, Plan Documents, and Confirmation Order.

Seaton is one of the Debtor's insurers impacted by this absurd outcome.  With respect to Unigard Policy No. 1-2517, Seaton is listed as a Settled Asbestos Insurance Company on Exhibit 5 to the Exhibit Book, but only with respect to "the 'Products' coverage portion of" Policy No. 1-2517.  (*See* D.I. 20874, Ex. 5 thereto at 9).  The Plan Proponents maintain that the Debtors have residual coverage available under Policy No. 1-2517 – presumably non-products asbestos-related coverage – the alleged rights to which the Debtors are proposing to assign to the Trust.  (*See* D.I. 20874, Ex. "6" thereto, Schedule 1 at 18).  Seaton, however, is also a Settled Asbestos Insurance Company with respect to Policy No. 1-2517 – or at least a portion of it.  The settlement agreement that gives rise to Seaton's Settled Asbestos Insurance Company status (which relates to Policy No. 1-2517) contains an indemnity provision pursuant to which Grace-Conn. agreed to indemnify Unigard (now Seaton) against certain claims (including asbestos-related claims) made by third parties against Policy No. 1-2517.  (*See* Ex. "2" at 279-80, and Ex. "18" thereto); D.I. 20874, Ex. 6 thereto, Schedule 2).  Seaton filed a Proof of Claim with respect to its contractual indemnity rights and it received a ballot indicating that it holds an Indirect PI Trust Claim.  (*See* D.I. 15503; Ex. "9").  Thus, Seaton is a creditor and, according to the Plan Proponents, also remains a purported insurer of the Debtors with respect to certain asbestos-related coverage under Policy No. 1-2517.  This is coverage that the Trust – as the Debtors' assignee – may seek to tap in the future.  If it does,

Seaton's policy rights as an insurer, including its coverage defenses, must be preserved. The interplay between § 7.15(a) and (b) of the Plan, however, assures just the opposite result. Seaton loses the benefit – if there were any – of the so-called "insurance neutrality" established by subsection (a) because it happens also to be a creditor and, therefore, is a "beneficiary" of the Trust. This outcome is decidedly not "insurance neutral" for Seaton.

> (c)    *Section 7.15(i) Fails to Protect the Contribution, Indemnity, and Subrogation Rights of Unsettled Insurers Against Other Insurance Companies.*

Section 7.15(i) of the Plan purports to protect the contribution, indemnity, reimbursement, subrogation, and other similar rights ("Contribution Rights") of unsettled insurers against Settled Asbestos Insurance Companies. (D.I. 20872, § 7.15(i)). It does not do the job. To begin with, § 7.15(i) only purports to protect such rights if the Trust or Reorganized Debtors seek coverage from the unsettled insurer. It does nothing to protect such rights if a third party, such as Scotts, pursues coverage against an unsettled insurer. It is, of course, obvious that Scotts intends to pursue such coverage. (*See* D.I. 21775 and Ex. "8"). Under that scenario, the § 524(g) Asbestos PI Channeling Injunction would enjoin the Insurers from pursuing their Contribution Rights as against Settled Asbestos Insurance Companies. (*See* D.I. 20872, § 8.2). Similarly, the § 105(a) Asbestos Insurance Entity Injunction would enjoin the Insurers from pursuing their Contribution Rights as against other unsettled insurers. (*See* D.I. 20872, § 8.4).

Beyond that, to invoke § 7.15(i) the insurer in question must "not be a Settled Asbestos Insurance Company." Seaton is a Settled Asbestos Insurance Company. Nevertheless, because the Plan Proponents argue that there is residual coverage available

under Policy No. 1-2517, Seaton may also have Contribution Rights as against other

Settled Asbestos Insurance Companies in the event that the Trust or Reorganized Debtors

pursue such alleged residual coverage.  If they do, § 7.15(i) may not preserve Seaton's

Contribution Rights because Seaton is a Settled Asbestos Insurance Company.  In short,

§ 7.15(i) does not accomplish what the Plan Proponents say it accomplishes.  And, if the

Insurers are to be bound by the Plan's injunctions, they have standing to object to those

injunctions.  *See, e.g., Smith v. Arthur Andersen LLP*, 421 F.3d 989, 1001 (9th Cir. 2005);

*In re Zale Corp.*, 62 F.3d 746, 751 n.13 (5th Cir. 1995); *Alumax Mill Prods., Inc. v.*

*Congress Fin. Corp.*, 912 F.2d 996, 1002 (8th Cir. 1990).

> (d)     GEICO, Republic, and Seaton Do Not Agree to the
> Non-Consensual Releases Referenced in § 7.15(h).

Although not Plan Proponents, the overreaching of the Sealed Air Indemnified

Parties and the Fresenius Indemnified Parties can be seen throughout the Plan.  No more

so is that true than in § 7.15(h), which is yet another exception to the Plan's purported

"insurance neutrality."  (D.I. 20872, § 7.15(h)).  The purpose of § 7.15(h) is clear; it is to

bind all Asbestos Insurance Entities – including the Insurers – to the non-consensual

releases and injunctions (including the § 524(g) and § 105(a) injunctions) that the Plan

Proponents have elected to grant the Sealed Air Indemnified Parties and the Fresenius

Indemnified Parties.  The Insurers have not consented to these releases and injunctions;

nor have they (or will they) be compensated for them under the Plan.  These Plan features

are not "insurance neutral."  Moreover, the releases render the Plan unconfirmable.  *See,*

*e.g., In re Zenith Elecs. Corp.,* 241 B.R. 92, 111 (Bankr. D. Del. 1999).

> (e)  *Section 7.15(f) Is an Improper Backdoor Limitation
> on § 7.15(a) and § 7.15(e) Is Simply Improper.*

Section 7.15 has other serious problems, including the obvious conflict between § 7.15(a) and § 7.15(f).  Putting aside – momentarily – the introductory clause that says "[e]xcept to the extent provided in this Section 7.15," the "insurance neutrality" language of the former comes from *In re Combustion Engineering, Inc.*, 391 F.3d 190, 209-13, 215-18 (3d Cir. 2004).  The language in the latter, however, is plainly designed to narrow the scope of "insurance neutrality" conferred by the former.  It does that by limiting the Debtors' insurers to the assertion of so-called "Asbestos Insurer Coverage Defenses." (*See* D.I. 20872, § 7.15(f)).  The defined term has two broad exceptions – that is, defenses that the Plan, if confirmed, would prohibit an insurer from asserting as a defense to coverage.  Those two are: (1) any defense that the Plan or any Plan Documents do not comply with the Bankruptcy Code and (2) any defense based upon the assignment of the Debtors' policies (or rights or interests under them) to the Trust in contravention of the anti-assignment provisions in said policies.  (*See* D.I. 20872, § 1.1(16)).[5]

The first exception is both broad and ill-described, but could be read to swallow all or nearly all of the purported "insurance neutrality" conferred by § 7.15(a).  Which gets us back to the introductory clause in § 7.15(a).  Again, it says: "[e]xcept to the extent provided in this Section 7.15."  This clause has the effect of making § 7.15(f) (as well as all the other subsections of § 7.15) trump § 7.15(a), which was the language that the Third Circuit cited with approval in *Combustion Eng'g*.  To make matters worse, not to mention more confusing, § 7.15(f) has three exceptions of its own, each of which is designed to further narrow the Plan's purported "insurance neutrality."

---

[5] The second exception, dealing with assignment, is addressed below.

The last sentence of § 7.15(e) is also improper.  It says: "Plan objections that are withdrawn prior to the beginning of the Confirmation Hearing shall be deemed not to have been actually litigated."  (*See* D.I. 20872, § 7.15(e)).  It is not clear whether the converse is true.  That is, will plan objections not withdrawn prior to the beginning of the Confirmation Hearing be deemed to have been actually litigated?  If so, that provision of the Plan is improper for two reasons.  First, whether *res judicata* or collateral estoppel would apply to issues raised by the Debtors' insurers is a question for a later court, not this Court.  Second, the Plan Proponents will undoubtedly argue that the Debtors' insurers lack standing on several issues.  This Court will need to address that argument.  If this Court denies the Debtors' insurers standing on an issue, the Plan should not provide (as it arguably does now by implication) that the issue was actually litigated because the insurer did not withdraw the objection prior to the Confirmation Hearing, and prior to this Court finding that the insurer lacked standing to litigate the issue.  The last sentence of § 7.15(e), therefore, should be removed.

2.    The Plan Improperly Impacts the Insurers' Rights Under Their Respective Policies By Excluding Them from the Process of <u>Evaluating, Defending Against, and Settling Asbestos PI Claims</u>.

Even if § 7.15 were stripped of its broad and confusing exceptions, its needlessly circular language, and otherwise rendered intelligible, true "insurance neutrality" would not be achieved.  The principal problem is structural.  The Plan eliminates any role for the Insurers in evaluating, defending against, or settling Asbestos PI Claims, which is fundamentally at odds with their rights, and the insureds' duties, under the policies.  (*See* D.I. "20874," Exs. "2" and "4" thereto; Ex. "6" at 91-92).  Instead, it is the Trust, under the watchful eye of the TAC, that does everything.  The Insurers play no role, except to

have demands for coverage made against them by the Trust after the fact – with respect to claims resolved pursuant to a Trust Agreement and TDP drafted by the ACC and FCR – and, to the extent the Insurers dispute such coverage, to be sued by the Trust.  Once sued, the Insurers are left merely to assert coverage defenses, subject to exceptions crafted by the Plan Proponents, again without Insurer input.

By way of example only, the TDP call for most Asbestos PI Claims to be resolved pursuant to the "Expedited Review Process."  (D.I. 20874, Ex. "4" thereto, at 21-27). That effectively constitutes the Trust's "standing offer" to settle any claim at a "Scheduled Value" that meets the Trust's "Medical/Exposure Criteria" for a particular "Disease Level."  (*Id.*).  If an Asbestos PI Claimant accepts the "standing offer," the Trust will pay the Scheduled Value multiplied by the Payment Percentage.  It is that simple.  The Insurers play no role, nor is there any opportunity for them to play any role as the Expedited Review Process is structured.  Nor is there any way that the Trust or the Debtors could comply with the duty to cooperate under the Insurers' policies because the TDP, by its terms, precludes the Insurers from playing any role in the Expedited Review Process.  The same also holds true with respect to the other claims resolution processes set forth in the TDP.  (*See* 20874, Ex. "4" thereto)

When the Insurers issued their policies to the Debtors, the bargain they struck was not that Debtors – with this Court's approval – would (i) ignore the policy terms (especially the Debtors' duties and obligations), (ii) assign all their interests under the policies to a third-party, (iii) agree that the third-party could settle claims on terms dictated by representatives of asbestos claimants, and (iv) authorize the third-party to sue the Insurers, and thereby leave the Insurers merely with a right to assert certain coverage

-16-

defenses.  Rather, the deal was that each party would abide by its respective duties and

obligations under the Debtors' policies.  To date, the Insurers have done just that; they

are not in breach of their policy obligations.  (*See, e.g.,* Ex. "10" at 51-52).  By contrast,

however, the Debtors have co-proposed a Plan that by virtue of its structure and terms

precludes compliance with the Debtors' duties and obligations under the policies.  In fact,

as structured, it completely denies the Insurers any ability to exercise their policy rights –

as opposed to simply asserting defenses to coverage.  Despite this scheme, and the many

built-in exceptions to "Insurance Neutrality," the Plan Proponents improperly contend

that the Plan is "insurance neutral" because the Insurers will have the right to assert their

Asbestos Insurance Coverage Defenses, which is just an ill-defined term in the Plan that

fails to preserve the terms of the policies intact.  This self-serving arrangement – in which

the Plan violates the Insurers' contract rights – violates Bankruptcy Code §§ 1129(a)(1)

and (a)(3).

Putting aside the obvious legal infirmities with this self-serving scheme, from a

purely economic standpoint, the procedures for the resolution of asbestos claims set forth

in the TDP violate the central allocation of rights and responsibilities in the policies

issued to the Debtors by the Insurers.  As a result, the Plan overturns the economic

relationships established in the policies by substituting the procedures set forth in the

TDP for the contractual obligations of the Debtors to cooperate with the Insurers in the

defense of claims.  The Plan establishes a payment matrix to which the Insurers have not

consented and excludes the Insurers from the process of claims settlement.  Thus, the

Plan and TDP fundamentally upset the economic structure of the Debtors' insurance

policies and overturn central contractual rights established in those policies in ways that

severely impact the economic ability of the Insurers to manage the financial risks that they assumed in issuing the policies.  (*See* Ex. "11").

        3.        The Plan Improperly Purports to Assign the Debtor's Interests Under the GEICO, Republic, and Seaton Policies to the Trust in <u>Violation of the Anti-Assignment Provisions in Those Policies</u>.

        *(a)        The Bankruptcy Code Does Not Preempt the Anti-Assignment Provisions in the Policies.*

Under the Plan, the Debtors purport to transfer all, or nearly all, of their rights under the Insurers' policies to the Trust.  (*See* D.I. 20874, Ex. "6" thereto; *see also* D.I. 20872, at § 7.2.2(d)(ii) (providing for transfer of all "Asbestos Insurance Rights" to the Trust); *id.* at § 1.1(13) (defining "Asbestos Insurance Rights") & § 1.1(140) (defining "Insurance Contributors")).[6]  The Trust is to be established pursuant to the Trust Agreement, and operated in accordance with the TDP.  (*See* D.I. 20874, Exs. "2" and "4" thereto).  This assignment of insurance rights to the Trust violates the anti-assignment provisions contained in the Insurers' policies, which prohibit any assignment of insurance rights without the insurers' consent.  (*See, e.g.*, Ex. "1" and Ex. "A" thereto, at Condition I and Ex. "G" thereto, at Condition O).  None of the Insurers has consented to such a transfer of insurance rights under their policies.

Section 1123(a)(5)(B) of the Bankruptcy Code, upon which the Plan Proponents presumably rely, does not preempt these anti-assignment provisions.  The text of the statute provides as follows:

---

[6] The Insurers acknowledge that this Court has recently approved a similar assignment. *See In re Federal-Mogul Global Inc.*, 385 B.R. 560, 567 (Bankr. D. Del. 2008), *aff'd*, 402 B.R. 625 (D. Del. 2009), *appeal filed*, No. 03-2230 (3d Cir.).  This issue is also pending in another case before the Third Circuit.  *See In re Global Indus. Techs., Inc.*, No. 08-3650 (3d Cir.).  The Insurers respectfully submit that this Court's prior assignment rulings were erroneous and should be reversed on appeal.

> Notwithstanding any otherwise applicable nonbankruptcy law, a
> plan shall . . . provide adequate means for the plan's implementation,
> such as . . . transfer of all or any part of the property of the estate to
> one or more entities, whether organized before or after the confirmation
> of such plan . . . .

11 U.S.C. § 1123(a)(5)(B).

A state law may be preempted in one of three ways: "[1] by express language in a congressional enactment, [2] by implication from the depth and breadth of a congressional scheme that occupies the legislative field, or [3] by implication because of a conflict with a congressional enactment." *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 541 (2001) (internal citations omitted).  There is a strong presumption against inferring preemption in the bankruptcy context.  *See Integrated Solutions, Inc. v. Serv. Support Specialties, Inc.*, 124 F.3d 487, 493 (3d Cir. 1997).  Indeed, absent a "clear and manifest" purpose to the contrary, "the Bankruptcy Code will be construed to adopt, rather than to displace, pre-existing state law." *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 544-45 (1994).  Moreover, this presumption is heightened in the insurance context by the McCarran-Ferguson Act, which expressly provides that Congress' other enactments should not be construed implicitly to preempt state regulation of insurance. *See* 15 U.S.C. § 1012(b).

Section 1123(a)(5)(B) does not expressly preempt the Insurers' policy rights. Congress expressly limited the preemptive scope, if any, of § 1123(a)(5)(B) to "otherwise applicable non-bankruptcy law."  11 U.S.C. § 1123(a)(5)(B).  By its terms, the statute does not preempt private contracts, which are separate and distinct from *law*.  *See, e.g.*, *Bldg. & Constr. Trades Council v. Associated Builders & Contractors of Mass./R.I., Inc.*, 507 U.S. 218, 227 (1993).  Moreover, the legislative history and overall structure of the

Bankruptcy Code demonstrate that Congress intended the preemptive scope, if any, of § 1123(a)(5)(B) to be limited to nonbankruptcy law "relating to [the] financial condition [of a debtor]." *See Pac. Gas & Elec. Co. v. Cal.*, 350 F.3d 932, 949 (9th Cir. 2003). The insurance policies issued to the Debtors by the Insurers are not contracts relating to the financial condition of the Debtors. Rather, they insure the Debtors against specified liability risks, unrelated to the Debtors' solvency, subject to the terms and conditions set forth in the policies. Accordingly, the terms and conditions of the Debtors' insurance policies are not preempted by § 1123(a)(5)(B).

Nor do "field" nor "conflict" preemption apply. Far from "occupy[ing] the legislative field," Congress has expressly left the field of insurance regulation to the states under the McCarran-Ferguson Act. *See* 11 U.S.C. § 1012; *Lorillard Tobacco*, 533 U.S. at 541. Moreover, the anti-assignment provisions in the Insurers' policies neither conflict with the requirements of the Bankruptcy Code, nor stand as an obstacle to the accomplishment of its objectives. *See Sprietsma v. Mercury Marine*, 537 U.S. 51, 64-65 (2002); *Integrated Solutions*, 124 F.3d at 492 n.3. Indeed, the fundamental goal of § 524(g) can be achieved while still honoring the Insurers' contract rights – specifically, their right not to have the Debtors' interests in the policies assigned without the Insurers' consent. The Plan Proponents acknowledge this indisputable fact by including § 7.2.2(d)(iii) in the Plan, which is their "Plan B" if the assignment is deemed invalid.

> (b)    *The Proposed Assignment of the Policies and Policy Rights Violates Bankruptcy Code § 1129(a)(3).*

In arguing that § 1123(a)(5)(B) preempts the anti-assignment provisions in the Insurers' policies, the Plan Proponents rely – as they must – on the statutory argument that the phrase "applicable non-bankruptcy law" as used in § 1123(a)(5)(B) includes

contracts.  If so, then the word "law" as used in Bankruptcy Code § 1129(a)(3) should also include contracts and be read as follows: "The court shall confirm a plan only if all of the following requirements are met: . . . (3) The plan has been proposed in good faith and not by any means forbidden by law [*e.g.*, contract]."  11 U.S.C. § 1129(a)(3). Indeed, this Court has itself previously held that the term "law" as used in § 1129(a)(3) includes "applicable non-bankruptcy law" within its scope, and thus it should be read to extend at least as far in § 1129(a)(3) as it does in § 1123(a)(5)(B).  *See Zenith*, 241 B.R. at 108.  Here, of course, the Plan has been proposed by a means forbidden by contract. Ever since the Plan Proponents executed their Term Sheet back on April 6, 2008, the Debtors have proposed to assign all their interests in their liability policies to the Trust, which assignment is expressly forbidden by the policies.  The proposed assignment, therefore, violates § 1129(a)(3).  Section 1129(a)(3) is, of course, bankruptcy law.  Thus, if the Plan Proponents are right that "law" equals "contract" under § 1123(a), then the same should hold true under § 1129(a)(3), in which case the anti-assignment provisions in the policies are not preempted because § 1129(a)(3) is bankruptcy law, *i.e.*, not the "non-bankruptcy law" purportedly preempted by § 1123(a).

(c) <em>The Proposed Assignment Is Not Valid Under New York Law.</em>

Moreover, New York law does not justify the proposed assignment of the Debtors' rights and interests under the Insurers' policies under the unusual circumstances of an asbestos bankruptcy case.  "[U]nder New York law, a no-transfer clause may, in certain unusual circumstances, remain valid as to some pre-transfer claims even though the loss occurred before the transfer."  *Globecon Group, LLC v. Hartford Fire Ins. Co.*, 434 F.3d 165, 171 (2d Cir. 2006).  A key factor in determining whether such "unusual

circumstances" are present is whether the insurer faces "materially increased" risk as a result of the insured's unilateral assignment.  *See id.* at 172.  Under New York law, and insurance law generally, "the relevant consideration is whether the insurer 'is prejudiced in the way of risk exposure by the Court's refusal to enforce [a] policy's anti-assignment language.'"  *Id.* at 173 (quoting *Paxton & Vierling Steel Co. v. Great Am. Ins. Co.*, 497 F. Supp. 573, 582 (D. Neb. 1980)) (alteration in original).[7]

Here, the Insurers face materially increased risk under the Plan.  The Plan purports to assign all of the Debtors' insurance rights under the Insurers' policies to the Trust, in violation of the anti-assignment provisions contained in those policies.  (*See* D.I. 20874, Ex. "6" thereto).  As a result, the Trust will become the putative insured of GEICO, Republic, and Seaton.  This assignment will materially increase the Insurers' risk, specifically its financial exposure, because unlike a typical insured which has an incentive to resist and defend against claims, especially those without any merit, the Trust's actual purpose here is to resolve and pay claims.  (*See* D.I. 20872, § 4.7.2.1; D.I. 20874, Ex. "2 thereto at § 1.2; *id.*, Ex. "4" thereto at § 2.1).

Moreover, the Trust will resolve claims based upon procedures, medical criteria, and exposure criteria that were established by the ACC and FCR (*i.e.*, asbestos claimant representatives), with no Grace input, much less input by Grace's insurers.  (*See* Ex. "4"

---

[7] A California decision concerning similarly unusual circumstances illustrates this principle.  In *Henkel Corp. v. Hartford Accident & Indem. Co.*, 62 P.3d 69, 74-76 (Cal. 2003), Henkel argued that an anti-assignment provision in liability policies issued to its predecessor, which had purported to assign the policies to Henkel without insurer consent, should not be enforced, arguing that "there is no additional risk because the injury occurred before the assignment and the assignment does not affect either liability or policy limits."  *Id.* at 75 (emphasis omitted).  The California Supreme Court rejected that argument, holding that, "[i]n view of the potential for such increased burdens, it is reasonable to uphold the insurer's contractual right to accept or reject an assignment."  *Id.*

at 381-86).  The Trust Agreement and TDP also provide for absolutely no role whatsoever for the Insurers in the investigation, handling, defense, or settlement of Asbestos PI Claims submitted to the Trust for resolution and payment, nor do they provide for the Debtors to retain, or the Trust to assume, the Debtors' duties and obligations under the policies.  (*See* Ex. "10" at 16-17, 27-28; Ex. "12" at 16-17, 26-27; Ex. "13" at 17, 27-27).

And finally, to make matters worse, under the Trust Agreement and TDP, the Trust (and its Trustees) will be under the control of the TAC, which consists of four asbestos plaintiffs' attorneys, and the FCR, both of whom owe their fiduciary duties to the holders of Asbestos PI Claims – *i.e.*, the litigation adversaries of the Debtors (and the Debtors' insurers).  (*See* D.I. 20874, Ex. "2" thereto, at 43-50; Ex. "4" at 121-25).  The TAC members also have fiduciary duties to their respective clients, which includes a duty to maximize their clients' recoveries from the Trust, even if their claims are meritless. The only role that the Debtors' insurers will play is to pay the claims tendered to them by the Trust pursuant to the claimant-established TDP, or if they refuse to pay such claims, to be sued by the Trust for coverage.  (*See, e.g.*, Ex. "6" at 87-89).  This is not the role they bargained for in issuing policies to the Debtors, and it is a substantially more limited role that will invariably increase the risks they face.

   (d) *The Proposed Assignment Is Invalid Because It Purports to Assign the Rights of Non-Debtors, in Violation of the Anti-Assignment Provisions.*

The Plan also purports to transfer the insurance rights of Non-Debtor Affiliates to the Trust.  (*See* D.I. 20874, Ex. "6" thereto; *see also* D.I. 20872, at § 7.2.2(d)(ii) (providing for transfer of all "Asbestos Insurance Rights" to the Trust); *id.* at § 1.1(13)

(defining "Asbestos Insurance Rights") & § 1.1(140) (defining "Insurance Contributors")).  To the extent that any non-debtor party purports to assign its rights under the Insurers' policies to the Trust, such assignment clearly violates the anti-assignment provisions contained in those policies, which are not preempted by any provision in the Bankruptcy Code, thus rendering the Plan unconfirmable.  *See Combustion Eng'g*, 391 F.3d at 218-19.

      **C.**      **The Proposed TAC Members Are Burdened By Irreconcilable Conflicts of Interest and Should Not Be Approved By The Court.**

      Pursuant to the Trust Agreement, the proposed Trust – a successor to the Debtors and assignee of the Debtors' Asbestos Insurance Rights under the Plan – is to have three Asbestos PI Trustees (the "Trustees").  The three Trustees are Harry Huge, Lewis Sifford, and Dean Trafelet, each of whom has several years of experience with one or more asbestos bankruptcy trusts.  (*See* Ex. "6" at 76-80).  In addition to the Trustees, the Trust will also have a "Futures Representative" and a "Trust Advisory Committee."  (*See* D.I. 20874, Ex. "2" thereto).  The designated Futures Representative for the Trust is Mr. Austern, the same individual appointed by this Court as the statutory "legal representative" under 11 U.S.C. § 524(g)(4)(B)(i).  The designated members of the TAC are Russell W. Budd, Esq. of the law firm Baron & Budd, PC; John D. Cooney, Esq. of the law firm Cooney & Conway; Joseph F. Rice, Esq. of the law firm Motley Rice LLC; and Perry Weitz, Esq. of the law firm Weitz & Luxenberg.  (*See* D.I. 20874, Ex. "2" thereto, at 43-50).  Messrs. Budd, Cooney, Rice, and Weitz were selected to be the TAC members by the ACC.  (*See* D.I. 20872, § 7.2.6).  The ACC – which consists of asbestos personal injury claimants – was appointed on April 13, 2001 by the U.S. Trustee.  (*See* D.I. 20873 No.  at 53).  Each TAC member's law firm has a client on the ACC, and those

clients delegate to the law firm that represents them their duties as a member of ACC. (Ex. "4" at 121-25).  So, as a practical matter, Messrs. Budd, Cooney, Rice, and Weitz were directly involved in their own selection as TAC members.  (*Id.* at 124-25).

Section 524(g) does not require the Trust to have a TAC.  Nor does it require it to have a "Futures Representative."  The statute only requires that the Court appoint a legal representative to protect the rights of the holders of future demands in connection with the proceedings leading to the issuance of the channeling injunction, not thereafter.  *See* 11 U.S.C. § 524(g)(4)(B)(i).  Thus, here, the Trust has a TAC and Futures Representative not because it is mandated, but simply because the ACC and FCR decided it should.

Under the Trust Agreement, the TAC wields considerable control and influence over the Trustees and the Trust.  The Trustees must <u>consult</u> with the TAC on a variety of issues including, among others, the general implementation and administration of the Trust and TDP.  (*See* D.I. "20874", Ex. "2" thereto, at § 2.2(e), Ex. "4" thereto).  In addition, the Trustees must obtain the <u>consent</u> of the TAC before they may take any of a multitude of different actions including, but not limited to, changing the Payment Percentage, changing Disease Levels, Scheduled Values, and/or Medical/Exposure Criteria, establishing or changing Claims Materials, settling with any insurer, amending the Trust Agreement or TDP, complying with the Trust's obligations under insurance policies, *etc.*  (*See* D.I. "20874", Ex. "2" thereto at § 2.2(f), Ex. "4" thereto).

The TAC members also play a significant role with respect to the continued service of the Trustees, and the Trustees' compensation, which gives the TAC even more control and influence over Trustee decision making. (*See* D.I. "20874," Ex. "2" thereto, at §§ 2.2(f)(ix), 4.2(c), and 4.3(a)).  By contrast, nothing in the Trust Agreement gives the

Trustees the power to remove TAC members.  The net effect of these features, and others, is that the TAC, not the Trustees, have a dominant role in the affairs of the Trust.

The Trust Agreement states: "The members of the TAC shall serve in a *fiduciary capacity representing all holders* of present PI Trust Claims." (D.I. "20874," Ex. "2" thereto, at § 5.2) (emphasis added).  The term "PI Trust Claim" in the Trust Agreement means "Asbestos PI Claim," as defined in the Plan.  (*See* D.I. 20874, Ex. "2" thereto at 1 n.1).  Each TAC member, however, is also lawyer with a law firm that represents at least 1,000 individual holders of an Asbestos PI Claim (*i.e.*, "PI Trust Claims").  (*See* Ex. "12" at 32).  In his capacity as a lawyer for holders of Asbestos PI Claims, each TAC member is also bound by the applicable Rules of Professional Conduct.  Every state, except Texas, has adopted Rule 1.7 of the Model Rules of Professional Conduct.  Rule 1.7 (entitled "Conflict of Interest: Current Clients") provides, in part, as follows:

> (a)      Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest.  A concurrent conflict of interest exists if:  … (2)  there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client *or a third person* or by a personal interest of the lawyer.

Rule 1.7, Model Rules of Professional Conduct (emphasis added).  The Explanatory Comment to this Rule 1.7 says: "In addition to conflicts with other current clients, a lawyer's duties of loyalty and independence may be materially limited … *by the lawyer's responsibilities to other persons, such as fiduciary duties arising from a lawyer's service as a trustee*, executor or corporate director" (emphasis added).

Here, the fiduciary duties that Messrs. Budd, Cooney, Rice, and Weitz have under the Trust Agreement as TAC members to the holders of <u>all</u> Asbestos PI Claims are in

direct conflict with their ethical obligations to their respective clients under Rule 1.7.  As

lawyers for their clients, of course, they get paid, usually pursuant to a contingent fee

arrangement.  The customary contingency fee charged by asbestos personal injury

lawyers ranges up to 40% of their clients' recoveries.  *See* Stephen Hudak & John F.

Hagan, *Asbestos Litigation Overwhelms Courts*, Cleveland Plain Dealer, Nov. 5, 2002, at

A1 (40 percent contingency fee typical among asbestos plaintiffs' lawyers), *available at*

2002 WLNR 269888.  As lawyers, therefore, they are both ethically bound and

financially motivated to maximize their own clients' recoveries from the Trust.  By

contrast, as TAC members, they have a fiduciary duty to treat <u>all</u> holders of Asbestos PI

Claims fairly, not just those for whom they, or their respective law firm, act as counsel.

These conflicting roles cannot be reconciled.  (*See, e.g.,* Ex. "14").

     If the TAC member fully complies with his fiduciary duties to <u>all</u> holders of

Asbestos PI Claims under the Trust Agreement, he will necessarily be compromising his

ethical obligations to his own clients.  Similarly, if the TAC member complies with his

ethical obligations to his own clients, he necessarily will be violating his fiduciary duties

as a TAC member to the remaining holders of Asbestos PI Claims for whom he is not

counsel.  Thus, it is not a question of whether he will, or will not, act properly.  There is

simply a structural infirmity because the Trust Agreement permits TAC members to

represent asbestos claimants.  This is not permitted of the Trustees: "No Trustee shall act

as an attorney for any person who holds an asbestos claim."  (*See* D.I. "20874," Ex. "2"

thereto at § 4.9).  There is a good reason for this prohibition, as noted by the Mr. Austern:

"Well, you are a trustee of a Plan paying somebody; you shouldn't be paying your

client."  (*See* Ex. "6" at 80).  If the Trust is going to have a TAC, the same prohibition

must apply to the TAC, especially given the undue influence its members wield over the Trustees and Trust affairs.

This is not just a theoretical concern; it is real regardless of the specific individual asbestos personal injury lawyers chosen to be TAC members.  The concern, however, is even more heightened with respect to the four TAC members that self-selected themselves to serve in this case, *i.e.*, Messrs. Budd, Cooney, Rice, and Weitz.  Each has already been involved in one or more asbestos bankruptcy cases in which a court found that they acted in a manner that advanced their own clients' interests to the detriment of asbestos claimants that they did not represent.  *See, e.g.*, *In re ACandS, Inc.*, 311 B.R. 36, 39 (Bankr. D. Del. 2004) (finding that a "pre-petition asbestos plaintiffs committee" that included Messrs. Budd, Cooney, Rice, and Weitz engaged in "obvious self-dealing" to the detriment of claimants that were not their clients); *In re Congoleum Corp.*, Bankr. Case No. 03-51524, 2009 WL 499262, at *7 (Bankr. D.N.J. Feb. 26, 2009) (ruling that a § 524(g) plan, negotiated by Messrs. Weitz and Rice, was unconfirmable because it failed to achieve equality of distribution among creditors).

These structural defects and built-in conflicts of interest are further exacerbated by the indemnification and exculpation provisions contained in the Plan and Trust Agreement.  Those provisions significantly immunize members of the TAC from any liability resulting from negligent breach of their fiduciary duties to the Trust, its beneficiaries, and to their individual clients.  (*See* Ex. "14" at ¶¶ 29-37).

In short, because the Plan permits TAC members, and their firms, to represent asbestos claimants, there is a "built-in" conflict of interest in the Trust's governance structure.  This will invariably result in the TAC members either violating their ethical

obligations to their clients or, much more likely, breaching their fiduciary duties to holders of Asbestos PI Claims that are not their clients.  This arrangement clearly violates Bankruptcy Code §§ 1129(a)(3) and 1129(a)(5)(A)(ii), not to mention § 524(g), which requires the Trust to treat all claimants fairly.

The Insurers have standing to object to this structural defect in the Trust, not only because they are a targeted source of funding for the Trust, but also because the defect gives rise to an obvious conflict of interest.  *See In re Congoleum Corp.*, 426 F.3d 675, 685-87 (3d Cir. 2005) ("[w]e are persuaded that, in the circumstances here, the insurers and their attorneys have standing to present this appeal"); *In re Pittsburgh Corning Corp.*, 308 B.R. 716, 721 (Bankr. W.D. Pa. 2004) ("Lumbermens' counsel has standing to object to the application to employ GHR"), *aff'd, In re Pittsburgh Corning Corp.*, Case No. 04-1199 (W.D. Pa. 2005) (objecting insurers "had standing to object to the application to employ GHR and have standing to defend the order denying that application") (Ex. "15").  But, even if the Insurers lacked standing, this Court has a mandatory independent duty not to confirm a plan that violates the Bankruptcy Code. *See, e.g., Genesis*, 266 B.R. at 599.

## D.    The Plan Does Not Comply With § 524(g)'s Requirements.

Bankruptcy Code § 524(g) has strict trust funding requirements:

> The requirements of this subparagraph are that –
>
> (i) the injunction is to be implemented in connection with a trust that, pursuant to the plan of reorganization –
>
> …
>
> > (II) is to be funded in whole or in part by the *securities of 1 or more debtors involved in such plan and by the obligation of such debtor or debtors to make future payments, including dividends*;

> > (III) *is to own, or by the exercise of rights granted under such plan would be entitled to own if specified contingencies occur, a majority of the voting shares of –*
> >
> > > (aa) each such debtor;
> > >
> > > (bb) the parent corporation of each such debtor; or
> > >
> > > (cc) a subsidiary of each such debtor that is also a debtor …

11 U.S.C. § 524(g)(2)(B)(i)(II) and (III) (emphasis added).  The Plan fails to comply with these funding requirements.  The Trust will not be funded in whole or in part by the *securities of 1 or more debtors involved in such plan and by the obligation of such debtor or debtors to make future payments, including dividends*.  The Plan Proponents will argue that both the Warrants and the Asbestos PI Deferred Payment Agreement purportedly qualify as "securities" as that term is used in § 524(g)(2)(B)(i)(II).  (*See* Ex. "4" at 126-27).  They are, no doubt, relying upon the definition of "security" set forth in § 101(49), which includes both a "warrant" and a "note."  11 U.S.C. § 101(49).  However, neither the Warrant nor the Asbestos PI Deferred Payment Agreement qualifies as "securities" as that term is used in § 524(g).

In the Third Circuit, the term "securities" as used in § 524(g) has been construed to mean equity in the debtor.  *See Congoleum*, 426 F.3d at 680 ("***Notably, neither Congoleum nor related entities were required to contribute equity to the trust***") (emphasis added); *In re Congoleum Corp.*, 362 B.R. 167, 175 (Bankr. D.N.J. 2007) ("Despite the express requirements of § 524(g), and explicit concern expressed by the Third Circuit, it was not until the Seventh Modified Joint Plan was filed on February 3, 2006, that the Debtors or ABI proposed contributing any equity toward the Plan Trust"); *see also Combustion Eng'g*, 391 F.3d at 248 ("[t]he implication of this requirement is that

the reorganized debtor must be a going concern, such that it is able to make future

payments into the trust to provide an *'evergreen' funding source* for future asbestos

claimants") (emphasis added).  The Third Circuit's reading of the "securities"

requirement contained in § 524(g)(2)(B)(i)(II) is not only correct, it is the only rational

reading in light of the statute's legislative history.

Congress modeled § 524(g) on the plan of reorganization in *In re Johns-Manville*

*Corp.,* 843 F.2d 636 (2d Cir. 1988).  *See* 140 Cong. Rec. H10765 (daily ed. Oct. 4, 1994).

Its purpose was to remove uncertainty concerning the validity of the Johns-Manville plan

of reorganization, as well as to provide a statutory basis for other asbestos companies to

structure their own plans.  *See Id.*  In *Johns-Manville*, the Second Circuit observed:

> The cornerstone of the Plan is the Asbestos Health Trust (the "Trust"), a
> mechanism designed to satisfy the claims of all asbestos health victims,
> both present and future.  The Trust is funded with the proceeds from
> Manville's settlements with its insurers; certain cash, receivables, and
> *stock of the reorganized Manville Corporation*; long term notes; and the
> right to receive up to 20% of Manville's yearly profits for as long as it
> takes to satisfy all health claims.

843 F.2d at 640 (emphasis added).  The legislative history of § 524(g) underscores

precisely what Congress had in mind in enacting the statute – namely, a trust-funding

mechanism that includes stock.  Indeed, the Congressional Committee that recommended

adoption of § 524(g) said:

> Asbestos claimants would have a stake in Johns-Manville's successful
> reorganization, because the company's success would *increase both the*
> *value of the stock held by the trust* and the company profits set aside for it
> . . . the Committee also recognizes that the interests of future claimants are
> ill-served if Johns-Manville *and other asbestos companies* are forced into
> liquidation and lose their ability to *generate stock value* and profits that
> can be used to satisfy claims.

(Ex. "16" (140 Cong. Rec. H10765 (daily ed. Oct. 4, 1994) (emphasis added)).  This

legislative intent was also evident in the Senate:

> [T]he proposed amendment would codify a court's existing authority to issue a permanent injunction to channel claims to an independent trust *funded by the securities and future earnings of the debtor*. In plain English, this means that when an asbestos-producing company goes into bankruptcy and is faced with present and future asbestos-related claims, the bankruptcy court can set up a trust to pay the victims. *The underlying company funds the trust with securities* and the company remains viable. Thus, the company continues to generate assets to pay claims today and into the future. In essence, *the reorganized company becomes the goose that lays the golden egg by remaining a viable operation and maximizing the trust's assets to pay claims*.
>
> Without a clear statement in the code of a court's authority to issue such injunctions, *the financial markets tend to discount the securities of the reorganized debtor. This in turn diminishes the trust's assets and its resources to pay victims. The amendment is intended to eliminate that speculation so that the marketplace values the trust's assets fairly.*
>
> *This amendment is about growing the pie available to victims. The result could be significant. In the case of one such trust, for instance, every dollar increase in the value of the reorganized company's stock translates to $96 million more for compensating asbestos victims.*

(Ex. "17" (140 Cong. Rec. S4522, S4523 (daily ed. Apr. 20, 1994)) (emphasis added);

Ex. "18" (140 Cong. Rec. S14464 (daily ed. Oct. 6, 1994)). Nowhere does the legislative

history mention a warrant or deferred payment agreement, in lieu of stock, as a funding

source for an asbestos trust. Rather, the references are to stock or securities. And, where

the latter term is used, the context makes clear that stock was intended.

With the backdrop of *Johns-Manville*, the legislative intent of Congress is

obvious. It wanted a statutory scheme to legitimize the concept of the channeling

injunction to deal with future demands. That would eliminate the lingering doubts in the

financial markets as to whether Manville would remain free of asbestos liability. That, in

turn, would enable the Manville Trust to realize the full value of the Manville stock it

owned in order to satisfy future claims. The statutory scheme represents a delicate

balance pursuant to which future claimants have their rights against the debtor cut off in exchange for, *inter alia*, an equity stake in and, therefore, potential upside in the company that injured them, which by virtue of the injunction is free of its asbestos liability.

The Warrants are, of course, not stock.  Rather, they are a right to purchase stock at a given price (*i.e.*, the strike price) within a given period of time.  Here, the Warrant Agreement provides for Warrants to purchase in the aggregate, 10,000,000 shares of common stock of W.R. Grace & Co. at a strike price of $17.00 per share.  (D.I. "20874," Ex. "24" thereto, at 3).  The Warrants have a term of one year from the Issue Date.  (*Id.* at 2).  The share price of W.R. Grace & Co. stock is currently well below the $17.00 strike price.  On April 7, 2008, the day after the Plan Proponents executed their Term Sheet, which included the Warrants with a $17.00 strike price, Grace stock closed at $26.83 per share.  (*See* Ex. "7" at 24-26, Ex. "3" thereto).  By contrast, on Friday, the stock closed at $12.98 per share.  Thus, the Warrants are currently well "out of the money" and, as a practical matter, are of little economic value to the Trust.  (*See* Ex. "19").   Moreover, even if the Warrants have value, it is still unlikely that the $17.00 strike price will be reached within the one year term.  As a consequence, the Warrants will likely expire without ever being exercised by the Trust.  (*Id.*).  If they are not exercised, the Trust will not be funded with "securities" (*i.e.*, stock) of Grace.  Nor will the Trust be funded with "dividends" because dividends would only be paid to the Trust if it owned Grace stock. As a result, the Warrants do not satisfy the funding requirements of § 524(g)(2)(B)(i)(II).[8]

Likewise, the Asbestos PI Deferred Payment Agreement does not qualify as

---

[8] Irrespective of where Grace stock is trading relative to the $17.00 strike price, the Warrants simply do not qualify as "securities" as that term is used in § 524(g).  Thus, even if it were likely that Grace's stock would trade above the strike price before the Warrants expired, the use of the Warrants would still not comply with the statute.

"securities" of the Debtors.  It has a set value – *i.e.*, the present value of $1.55 billion in

future payments.  (D.I. 20874, Ex. "11" thereto, at 12-13).  No matter how well Grace

does in the future – once freed of its asbestos liabilities – the payments Grace is obliged

to make under the agreement will not change.  Nor will the agreement generate any

interest income during its term.  In short, the Asbestos PI Deferred Payment Agreement

does not qualify as "equity" and, therefore, does not satisfy the funding requirements of

§ 524(g)(2)(B)(i)(II).  *See Congoleum*, 426 F.3d at 680.

The Plan also fails to comply with 11 U.S.C. § 524(g)(2)(B)(i)(III).  The Plan

calls for two separate and distinct § 524(g) trusts – namely, the Asbestos PI Trust and the

Asbestos PD Trust.  (*See* D.I. 20874, Exs. "2" and "3").  Each is to be governed pursuant

to a different trust agreement, and each trust will have its own trustees, TAC, Futures

Representative, and TDP (or its equivalent).  Each of these trusts must, of course, comply

with the funding requirements of § 524(g)(2)(B)(i)(III), but because there are to be two

separate and distinct trusts, neither can comply.  There can be, for example, no "specified

contingency" that would entitle each of the Asbestos PI Trust and the Asbestos PD Trust

to own a majority of voting shares of Grace because, for each to have a majority, the total

would have to exceed 100%.  In the event of a default under the Asbestos PI Deferred

Payment Agreement, it appears that – at best – the Asbestos PI Trust and the Asbestos

PD Trust might share ownership of a majority of the voting shares of Grace.  (*See* D.I.

20874, Ex. "26" thereto).  This funding scheme does not satisfy § 524(g)(2)(B)(i)(III).

The Plan may also fail to satisfy § 524(g)(2)(B)(II)(I), (II), and (III), as there

appears be to little or no evidence that the Debtors will face asbestos-related "future

demands" involving property damage.  (*See* D.I. 20872, § 7.7(j); Ex. "4" at 642-44).

The Plan Proponents' failure to comply with the requirements of § 524(g) impacts the fairness of the Plan, an issue on which the Insurers have standing. *See Congoleum*, 426 F.3d at 685. In addition, the Insurers – as targeted sources of funding to pay for Asbestos PI Claims submitted to the Trust and as parties enjoined by the § 524(g) injunctions – have standing to object to the Plan's non-compliance with the statute. *See, e.g., Baron & Budd, P.C. v. Unsecured Asbestos Claimants Comm.*, 321 B.R. 147, 158 (D.N.J. 2005); *Marcus Hook Dev. Park, Inc. v. Lampl, Sable & Makoroff*, 153 B.R. 693, 700 (Bankr. W.D. Pa. 1993); *Alumax*, 912 F.2d at 1002.

**E.      The Plan Has Impermissibly Overbroad
Release and Exculpation Provisions.**

The release and exculpation provisions in the Plan are overly broad and illegal. For example, the Plan's exculpation provision provides broad immunity from liability to the "Reorganized Debtors, the Debtors, the Non-Debtor Affiliates, the Sealed Air Indemnified Parties, the Fresenius Indemnified Parties," and various official committees and professionals, and to their respective "Representatives." (*See* D.I. 20872, § 11.9). The term "Representatives" is broadly defined to include, *inter alia*, past and present directors, officers, employees, accountants, advisors, attorneys, consultants, or other agents of the various referenced entities. (*See* D.I. 20872 at § 1.1(177)). This exculpation provision extends far beyond the official committees and professionals authorized by § 1103, to include the Debtors, Reorganized Debtors, and a host of non-debtors, without providing any factual support to justify it. *See Congoleum*, 362 B.R. at 190, 195-96; *Genesis*, 266 B.R. at 606-07. Indeed, it goes even further, seeking to confer immunity from liability not only for activities related to the prosecution of the bankruptcy case and related proceedings, but also for activities related to "administration of this Plan

-35-

or the property to be distributed under this Plan," which includes the post-Effective Date

administration of the Trust.  This prospective immunity from liability is plainly improper.

The Plan also contains improper non-debtor releases.  For example, § 8.8.7 of the

Plan provides that:

> In addition to the foregoing, each Holder of a Claim or Equity Interest
> who receives or retains any property under this Plan shall also be deemed
> to unconditionally release the Fresenius Indemnified Parties  . . . .

(*See* D.I. 20872, § 8.8.7).  This release is illegal on its face.  As another bankruptcy court

in this circuit has held:  "For a release to be consensual, the creditor must have

'unambiguously manifested assent to the release of the nondebtor from liability on its

debt."  *See Congoleum*, 362 B.R. at 194 (citation omitted).  Mere inclusion of a statement

in plan documents that voting to accept the plan constitutes consent to a release is not

sufficient.  *See id.*  The release set forth above is even further from being consensual,

because it is triggered by the Claim Holder's *mere receipt* of a distribution under the

Plan, which may occur even over the Claim Holder's vote against the Plan.

Moreover, this Court has held that releases of non-derivative third-party claims

against a non-debtor generally "cannot be accomplished without the affirmative

agreement of the creditor affected."  *See Zenith*, 241 B.R. at 111; *see also Genesis*, 266

B.R. at 607-08 (recognizing that only in "rare" and "exceptional circumstances may a

non-consensual release be validated, and only provided that the release is necessary to the

feasibility of the plan, and that the non-consenting creditors receive fair consideration in

exchange for the release).  Here, there has been no showing that the § 8.8.7 release is

necessary to the feasibility of the Plan.  And, for their part, the Insurers definitively state

that they have not, and do not, consent to the release of any claims they have, or may

-36-

have, now or in the future, against the released parties, nor have they received any, let

alone "fair," consideration in exchange for this, and other, non-consensual releases.[9]

    **F.    GEICO, Republic, and Seaton Are Parties-In-Interest
    With Standing to Object to Confirmation of the Plan.**

        1.    Bankruptcy Code §§ 1109(b) and 1128(b) Confer
            Broad Standing to Object to Confirmation of a Plan.

Section 1109(b) of the Bankruptcy Code provides that "[a] party in interest,

including the debtor, the trustee, a creditors' committee, and equity security holders'

committee, a creditor, an equity security holder, or an indenture trustee, may raise and

may appear and be heard on any issue in a case under this chapter." 11 U.S.C. § 1109(b).

The list of parties in interest in § 1109(b) is not exhaustive; it has been construed to

create a broad right of participation in Chapter 11 cases. *See Combustion Eng'g,* 391

F.3d at 214 (contrasting the restrictive approach to bankruptcy appellate standing with the

"broad right of participation in the early stages of a bankruptcy proceeding"); *In re

Amatex Corp.*, 755 F.2d 1034, 1042 (3d Cir. 1985) (indicating that § 1109 encourages

and promotes greater participation in reorganization cases); *PWS*, 228 F.3d at 249 (stating

that § 1109(b) "confers broad standing at the trial level"). Under § 1128(b), any "party in

interest may object to confirmation of a plan." 11 U.S.C. § 1128(b).

        2.    Article III Standing and the Prudential
            Principles That Bear on Standing.

To meet the requirement of Article III standing, a party must show that it has

suffered an 'injury in fact' that is:  concrete and particularized and actual or imminent;

fairly traceable to the challenged action of the opposing party; and likely to be redressed

---

[9] The Insurers hereby join in Arrowood's brief with respect to non-debtor release and exculpation provisions, to the extent pertinent and not inconsistent with the arguments herein.  (*See* D.I. 21815.)

by a favorable decision.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

An "identifiable trifle" of injury will qualify as an injury in fact.  *United States v. SCRAP*,

412 U.S. 669, 689 n.14 (1973).  The injury need not be current; even a "threatened"

injury will suffice.  *Joint Stock Soc'y v. UDV N. Am., Inc.*, 266 F.3d 164, 177 (3d Cir.

2001).  Beyond Article III, federal courts generally adhere to prudential principles that

bear on standing.  Thus, in general, a party (a) must assert his own legal rights or

interests, (b) cannot assert "abstract questions of wide public significance" that amount to

"general grievances," and (c) must assert a complaint within the "zone of interests" of the

applicable law.  *Valley Forge Christian College v. Americans United for Separation of

Church & State, Inc.*, 454 U.S. 464, 474-75 (1982).  These judicially imposed limits on

standing may, however, be "modified or abrogated by Congress."  *Bennett v. Spear*, 520

U.S. 154, 162 (1997).  Although it appears that Congress did just that by enacting

Bankruptcy Code §§ 1109(b) and 1128(b), it is clear that the Insurers satisfy, not only the

requirements of Article III standing, but also any applicable prudential limitations.

> 3.    GEICO, Republic, and Seaton Easily Satisfy All Standing
>        Requirements to Object to Confirmation of the Plan.

Here, the Insurers are plainly as parties-in-interest under § 1109(b).  They also

satisfy Article III standing and the prudential principles, if any, that bear on standing.  To

begin with, the policies they issued to the Debtors are being assigned to the Trust in

violation of the anti-assignment provisions.  Their claims handling rights under the

policies are being usurped by the Trust, which will be under the control of the TAC and

FCR, each of which owes its fiduciary duties to the litigation adversaries of the Debtors

and the Insurers.  As outlined earlier, the proposed "Insurance Neutrality" conferred by

§ 7.15 of the Plan is illusory at best.  The Plan has multiple injunctions, including the

§ 524(g) Asbestos PI Channeling Injunction, the § 105(a) Asbestos Insurance Entity

Injunction, and the § 105(a) Successor Claims Injunction, each of which would enjoin the

Insurers from asserting rights and claims against non-debtor third parties, including any

Contribution Claims they may have now, or in the future, against the Debtors' other

insurers, whether those insurers are settled or unsettled.  The Plan also contains non-

consensual releases that purport to bind the Insurers, without providing them with any

compensation.  The Insurers are also purportedly bound by the overly broad and illegal

exculpation provision set for § 11.9 of the Plan.  Given the Plan's adverse impact on the

Insurers' rights, and the fact that a denial of confirmation (or plan modifications) would

redress the Insurers' grievances, the Insurers satisfy all applicable standing requirements.

## IV.    <u>Conclusion</u>

In Phase I of the Confirmation Hearing the Court is to address whether the Plan

adversely impacts the Debtors' insurers, in their capacity as insurers.  Stated differently,

the issue is whether the Plan is "insurance neutral."  It is not.  Under the Plan, the policies

that the Insurers issued to the Debtors are assigned to the Trust.  Their policy rights are

usurped by the Trust, leaving the Insurers with just some, but not all of their coverage

defenses.  The Insurers are enjoined in perpetuity from asserting Contribution Claims, or

other claims, that they may have against non-debtor third parties by the Plan's § 524(g)

injunctions and § 105(a) injunctions.  They are bound by non-consensual releases and an

overly broad exculpation provision for which they have received no compensation.  The

Plan Proponents proposed "cure-all" for these ills is § 7.15 of the Plan, an unintelligible

morass that even they do not understand.  This Court should not permit them to close the

courthouse doors to the Insurers in Phase I.  In fact, the Court should deny confirmation now because it is obvious that the Plan fails to comply with the Bankruptcy Code.[10]

Dated:  June 1, 2009

Respectfully submitted,

*/s/ David P. Primack*

_____

Warren T. Pratt (4334)
David P. Primack (4449)
DRINKER BIDDLE & REATH LLP
1100 N. Market Street, Suite 1000
Wilmington, DE  19801-1254
Telephone:  302-467-4200


Michael F. Brown
Jeffrey M. Boerger
DRINKER BIDDLE & REATH LLP
One Logan Square
Philadelphia, PA  19103-6996
Telephone:  215-988-2700

Counsel for Parties-in Interest
GEICO, Republic, and Seaton

---

[10] The Insurers hereby join in the Phase I Briefs of other parties-in-interest, including the Debtors' insurers, to the extent pertinent and not inconsistent with the arguments set forth herein.