# EXHIBIT 4

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - -

In Re:                      : Chapter 11
                            :
                            : Case No.
W.R. GRACE & CO., et al,    : 01-01139 JKF
                            :
                            : (Jointly
            Debtors         : Administered)


- - -

Friday, May 1, 2009

- - -


Oral deposition of PETER VAN
N. LOCKWOOD, ESQUIRE, taken pursuant to
notice, was held at the offices of CAPLIN
& DRYSDALE, One Thomas Circle N.W., Suite
1100, Washington, DC  20005, commencing
at 9:43 a.m., on the above date, before
Lori A. Zabielski, a Registered
Professional Reporter and Notary Public
in and for the Commonwealth of
Pennsylvania.


- - -

MAGNA LEGAL SERVICES
Seven Penn Center
1635 Market Street
8th Floor
Philadelphia, Pennsylvania 19103

## Page 2

```
 1   APPEARANCES:
 2
 3   DRINKER BIDDLE & REATH, LLP
       BY: MICHAEL F. BROWN, ESQUIRE
 4         JEFFREY M. BOERGER, ESQUIRE
       One Logan Square
 5     18th & Cherry Streets
       Philadelphia, Pennsylvania 19103-6996
 6     215.988.2988
       (brownmf@dbr.com)
 7     (jeffrey.boerger@dbr.com)
       Representing OneBeacon America Insurance
 8     Company, Seaton Insurance Company,
       Government Employees Insurance Company,
 9     Columbia Insurance Company f/k/a Republic
       Insurance Company
10
11   CAPLIN & DRYSDALE, CHARTERED
12     BY: NATHAN D. FINCH, ESQUIRE
           JEFFREY A. LIESEMER, ESQUIRE*
13         (*VIA TELECONFERENCE)
       One Thomas Circle N.W.
14     Suite 1100
       Washington, DC 20005
15     202.862.7801
       (ndf@capdale.com)
16     (jal@capdale.com)
       Representing Grace, Official Committee of
17     Asbestos Personal Injury Claimants
       ("ACC"), and Witness
18
19
     W.R. GRACE & CO.
20     BY: RICHARD C. FINKE, ESQUIRE*
           ASSISTANT GENERAL COUNSEL
21         (*VIA TELECONFERENCE)
       5400 Broken Sound Boulevard, NW
22     Suite 300
       Boca Raton, Florida 33487
23     561.362.1533
       Representing W.R. Grace & Co.
```

## Page 3

```
 1   APPEARANCES (continued)
 2
 3   KIRKLAND & ELLIS, LLP
       BY: BARBARA M. HARDING, ESQUIRE
 4         THEODORE L. FREEDMAN, ESQUIRE
       655 Fifteenth Street, N.W.
 5     Washington, DC 20005-5793
       202.879.5081
 6     (barbara.harding@kirkland.com)
       (tfreedman@kirkland.com)
 7     Representing the Debtors
 8
 9   SIMPSON THACHER & BARTLETT, LLP
       BY: ELISA ALCABES, ESQUIRE
10     425 Lexington Avenue
       New York, New York 10017-3954
11     212.455.3133
       (ealcabes@stblaw.com)
12     Representing Travelers Casualty and
       Surety Company
13
14
     VORYS, SATER, SEYMOUR AND PEASE, LLP
15     BY: TIFFANY STRELOW COBB, ESQUIRE*
           ROBERT J. SIDMAN, ESQUIRE*
16         (*VIA TELECONFERENCE)
       52 East Gay Street
17     Columbus, Ohio 43215
       614.464.8322
18     (tscobb@vorys.com)
       Representing The Scotts Company, LLC
19
20
     COHN WHITESELL & GOLDBERG, LLP
21     BY: DANIEL C. COHN, ESQUIRE
       101 Arch Street
22     Boston, Massachusetts 02110
       617.951.2505
23     (cohn@cwg11.com)
       Representing the Libby Claimants
24
```

## Page 4

```
 1   APPEARANCES (continued)
 2
 3   SPEIGHTS & RUNYAN
       BY: DANIEL H. SPEIGHTS, ESQUIRE*
 4         (* VIA TELECONFERENCE)
       200 Jackson Avenue East
 5     P.O. Box 685
       Hampton, South Carolina 29924
 6     803.943.4444
       (dspeights@speightsrunyan.com)
 7     Representing Anderson Memorial Hospital
 8
 9   TUCKER ARENSBERG
       BY: MICHAEL A. SHINER, ESQUIRE
10     1500 One PPG Place
       Pittsburgh, Pennsylvania 15222
11     412.594.5586
       (mshiner@tuckerlaw.com)
12     Representing Certain London Market
       Insurers and AXA Belgium
13
14
     MENDES & MOUNT, LLP
15     BY: CAROLINA ACEVEDO, ESQUIRE*
           (*VIA TELECONFERENCE)
16     750 Seventh Avenue
       New York, New York 10019
17     212.261.8262
       (carolina.acevedo@mendes.com)
18     Representing AXA Belgium as Successor to
       Royale Belge SSA
19
20
     MENDES & MOUNT, LLP
21     BY: ALEXANDER MUELLER, ESQUIRE*
           (*VIA TELECONFERENCE)
22     750 Seventh Avenue
       New York, New York 10019-6829
23     212.261.8296
       (alexander.mueller@mendes.com)
24     Representing London Market Companies
```

## Page 5

```
 1   APPEARANCE (continued)
 2
 3   FORD MARRIN ESPOSITO & WITMEYER & GLESER
       BY: ELIZABETH M. DeCRISTOFARO, ESQUIRE
 4     Wall Street Plaza
       New York, New York 10005-1875
 5     212.269.4900
       Representing Continental Casualty Company
 6     and Continental Insurance Company
 7
 8   BILZIN SUMBERG BAENA PRICE & AXELROD, LLP
       BY: MATTHEW I. KRAMER, ESQUIRE
 9     200 South Biscayne Boulevard
       Suite 2500
10     Miami, Florida 33131-5340
       305.450.7246
11     (mkramer@bilzin.com)
       Representing Property Damage Committee
12
13
     STROOCK & STROOCK & LAVAN, LLP
14     BY: ARLENE G. KRIEGER, ESQUIRE
       180 Maiden Lane
15     New York, New York 10038-4982
       212.806.5400
16     (akrieger@stroock.com)
       Representing Official Committee of
17     Unsecured Creditors
18
19   CROWELL & MORING, LLP
       BY: MARK PLEVIN, ESQUIRE
20         NOAH S. BLOOMBERG, ESQUIRE
       1001 Pennsylvania Avenue NW
21     Washington, DC 20004-2595
       202.624.2913
22     (mplevin@crowell.com)
       (nbloomberg@crowell.com)
23     Representing Fireman's Fund Insurance
       (Surety Bond)
24
```

Page 6

1   APPEARANCES (continued)
2
3   STEVENS & LEE, P.C.
    BY: JOHN D. DEMMY, ESQUIRE
    1105 North Market Street, 7th Floor
4   Wilmington, Delaware 19801
    302.654.5180
5   (jdd@stevenslee.com)
    Representing Fireman's Fund Insurance
6
7
    ALAN B. RICH LAW OFFICES
8   BY: ALAN B. RICH, ESQUIRE
    Elm Place, Suite 4620
9   1401 Elm Street
    Dallas, Texas 75202
10  214.744.5100
    (arich@alanrichlaw.com)
11  Representing Property Damage FCR
12
13  CONNOLLY BOVE LODGE & HUTZ, LLP
    BY: JEFFREY C. WISLER, ESQUIRE
14  The Nemours Building
    1007 North Orange Street
15  P.O. Box 2207
    Wilmington, Delaware 19899
16  302.88.6528
    (jwisler@cblh.com)
17  Representing Maryland Casualty
18
19  ECKERT SEAMANS CHERIN & MELLOTT, LLC
    BY: EDWARD J. LONGOSZ, II, ESQUIRE
20  1747 Pennsylvania Avenue, NW
    12th Floor
21  Washington, DC 20006
    202.659.6619
22  (elongosz@eckertseamans.com)
    Representing Maryland Casualty and Zurich
23

Page 7

1   APPEARANCES (continued)
2
    WILEY REIN, LLP
3   BY: KARALEE C. MORELL, ESQUIRE
    1776 K Street NW
4   Washington, DC 20006
    202.719.7520
5   (kmorell@wileyrein.com)
    Representing Maryland Casualty and Zurich
6
7
    COZEN O'CONNOR
8   BY: JACOB C. COHN, ESQUIRE
    1900 Market Street
9   Philadelphia, Pennsylvania 19103-3508
    215.665.2147
10  (jcohn@cozen.com)
    Representing Federal Insurance Company
11
12
    ORRICK HERRINGTON & SUTCLIFFE, LLP
13  BY: JONATHAN P. GUY, ESQUIRE
        JOSHUA M. CUTLER, ESQUIRE
14  Columbia Center
    1152 15th Street, N.W.
15  Washington, DC 20005-1706
    202.339.8516
16  (jguy@orrick.com)
    Representing Future Claimants
17  Representative
18
19  CUYLER BURK, P.C.
    BY: ANDREW CRAIG, ESQUIRE
20  4 Century Drive
    Parsippany, New Jersey 07054
    973.734.3200
    (acraig@cuyler.com)
22  Representing Allstate Insurance Company
23
24

Page 8

1   APPEARANCES (continued)
2
3   WILSON ELSER MOSKOWITZ EDELMAN & DICKER,
    LLP
4   BY: CARL PERNICONE, ESQUIRE*
        (*VIA TELECONFERENCE)
5   150 East 42nd Street
    New York, New York 10017-5639
6   212.915.5656
    (carl.pernicone@wilsonelser.com)
7   Representing Arrowood Indemnity Company
8
9   WOMBLE CARLYLE SANDRIDGE & RICE, PLLC
    BY: KEVIN J. MANGAN, ESQUIRE*
10      (*VIA TELECONFERENCE)
    222 Delaware Avenue
11  Suite 1501
    Wilmington, Delaware 19801
12  302.252.4361
    (kmangan@wcsr.com)
13  Representing State of Montana
14
15  PEPPER HAMILTON, LLP
    BY: LINDA J. CASEY, ESQUIRE*
16      (*VIA TELECONFERENCE)
    3000 Two Logan Square
17  Philadelphia, Pennsylvania 19103
    215.981.4000
18  (caseyl@pepperlaw.com)
    Representing BNSF Railway Company
19
20          - - -
21
22
23
24

Page 9

1           - - -
2         I N D E X
3           - - -
4
5   Testimony of:
6   PETER VAN N. LOCKWOOD, ESQUIRE
7
8   By Mr. Brown          Page  12
9   By Ms. Alcabes        Page 267
10  By Ms. Cobb           Page 339
11  By Mr. Cohn           Page 368
12
13
14          - - -
15        E X H I B I T S
16          - - -
17  NO.   DESCRIPTION              PAGE
18   1    Amended Notice of Deposition
        of Asbestos PI Committee...   12
19
20   2    Objections to the Official
        Committee...               12
21   3    Form 8-K and Term Sheet     15
22   4    Exhibit-6 to Exhibit Book   26
23   5    First Amended Joint Plan of
        Reorganization...          27
24

Page 10

1   EXHIBITS (continued)
2
3   NO.   DESCRIPTION          PAGE
4   6     Exhibit-19 to Exhibit Book      83
5   7     Settlement Agreement
          * CONFIDENTIAL *              144
6
    8     Complaint for Declaration of
7         the Relief...            175
8   9     Diagram                  175
9   10    Exhibit-2 to Exhibit Book    196
10  11    Exhibit-4 to Exhibit Book    224
11  12    Exhibit-10 to Exhibit Book   260
12  13    Travelers Casualty and Surety
          Company's Notice of Deposition
13        to the Official Committee of
          Asbestos Personal Injury
14        Claimants...            267
15  14    Debtors' Disclosure...    280
16  15    Documents bearing Bates stamps
          TRAVAS0000019 through 141
17        * CONFIDENTIAL *           289
18  16    Notice of Service of Discovery 324
19
              - - -
20
21
22
23
 1

Page 11

1               - - -
2        DEPOSITION SUPPORT INDEX
3               - - -
4
5   Direction to Witness Not to Answer:
6   Page  Line       Page    Line
7   NONE
8
9
10  Request for Production of Documents:
11  Page  Line       Page    Line
12  NONE
13
14
15  Stipulations:
16  Page  Line       Page    Line
17   12    02
18
19
20  Area(s) Marked Confidential:
21  Page  Line     Page   Line
    152   01   through  168    03
    292   01   through  311    14
23
24

Page 12

1               - - -
2            (It is hereby stipulated and
3        agreed by and among counsel for
4        the respective parties that the
5        filing, sealing and certification
6        of the deposition are waived; and
7        that all objections, except as to
8        the form of the question, will be
9        reserved until the time of trial.)
10              - - -
11           PETER VAN N. LOCKWOOD,
12       ESQUIRE, after having been first
13       duly sworn, was examined and
14       testified as follows:
15              - - -
16           EXAMINATION
17              - - -
18           (ACC 30(b)(6)-1 and 2
19       premarked for identification.)
20              - - -
21  BY MR. BROWN:
22       Q.   Good morning, Mr. Lockwood.
23       A.   Good morning, Mr. Brown.
24       Q.   You are appearing here today

Page 13

1   as the Rule 30(b)(6) designee for the
2   ACC, correct?
3        A.   Correct.
4        Q.   And that is with respect to
5   a number of 30(b)(6) notices, correct?
6        A.   A very large number, yes.
7        Q.   Can you look at the one
8   that's been put before you and marked ACC
9   Rule 30(b)(6)-1, which I will call ACC-1
10  here after.
11       A.   I have it.
12       Q.   Can you identify it?
13       A.   It is an Amended Notice of
14  Deposition of Asbestos PI Committee
15  Pursuant to Rule 30(b)(6) served by four
16  insurance companies, One Beacon, Seaton,
17  Geico, and Columbia.  And it contains an
18  attachment with definitions and topics
19  which are the subject matter of
20  testimony.
21       Q.   Okay.  And can you look at
22  the document that I put before you that's
23  marked ACC-2.
24       A.   I have it.

Page 14

1      Q.   And identify that document,
2  please.
3      A.   That document is the
4  Objections of the Official Committee of
5  Asbestos Personal Injury Claimants to
6  Rule 30(b)(6) Notices of Deposition
7  served by Certain Plan Objectors.
8      Q.   Okay. And is it correct
9  that you are here today prepared to
10  testify about the topics that are listed
11  in ACC-1 subject to the objections that
12  appear in ACC-2?
13      A.   The answer to that question
14  is yes, subject to the following caveats:
15  To the extent that the topics in this
16  notice or any of the other notices are
17  subjects that the ACC has a person with
18  knowledge on, I am here to testify about
19  it. To the extent that the ACC doesn't
20  have a person with knowledge on certain
21  topics, then I am here to testify that
22  the ACC doesn't have knowledge on those
23  topics.
24      Q.   Okay. And --

Page 15

1      A.   And to the extent that
2  occurs, we will see how it occurs in the
3  course of the questions.
4      Q.   Okay. And then you
5  mentioned ACC and a person with the ACC.
6  How are you using the term
7  "ACC"?
8      A.   I am using it as the entity
9  that was appointed in the bankruptcy case
10  by the U.S. Trustee.
11      MR. BROWN: ACC-3.
12      (ACC 30(b)(6)-3 marked for
13      identification at this time.)
14  BY MR. BROWN:
15      Q.   Okay. Mr. Lockwood, you now
16  have before you a document that should
17  have two exhibit labels on it. One is an
18  Exhibit-12 from the deposition of
19  Mr. Finke, and the other is ACC-3.
20      Could you identify the
21  document that has been marked as ACC-3?
22      A.   It appears to be a Form 8-K
23  file by W.R. Grace & Company dated April
24  6, 2008.

Page 16

1      Q.   Have you ever seen this
2  document before?
3      A.   Frankly, I am not sure.
4      Q.   Okay.
5      A.   I may have. I may not have.
6      Q.   All right. Why don't you go
7  to the back of the document, starting
8  with page 9.
9      A.   Page 9 or page 8?
10      Q.   I am sorry. Page 8.
11      A.   I am there.
12      Q.   Can you identify that
13  document?
14      A.   It appears to be a copy of a
15  Term Sheet for the Resolution of Asbestos
16  Personal Injury Claims entered into by a
17  variety of parties, including the ACC.
18      Q.   Okay. Have you seen the
19  Term Sheet, either this Term Sheet or
20  some iteration of it previously?
21      A.   I have seen the original of
22  it.
23      Q.   Okay. Can you take a look
24  at what you have before you and tell me

Page 17

1  whether it differs in any way from the
2  original?
3      MR. FINCH: Objection.
4      THE WITNESS: On the face of
5  it, it does not appear to
6  different. I mean, obviously, a
7  comparison of the original and
8  this copy would be the definitive
9  way of determining whether there
10  is a difference, but this looks to
11  be the same, as best I can recall.
12  BY MR. BROWN:
13      Q.   Okay. And this document was
14  negotiated by the parties that executed
15  it, is that correct, or their counsel?
16      A.   Broadly speaking, yes. I
17  mean, negotiated implies human beings in
18  a room or in some communication, and
19  these are all entities. So various
20  representatives of the entities that are
21  listed here in negotiated this document
22  on behalf of their respective principals.
23      Q.   Is there anything in the
24  Term Sheet that you can see that's

Page 18

1  inaccurate?
2      MR. FINCH: Object to form.
3      THE WITNESS: To answer that
4  question, I would have to read
5  every word in the Term Sheet and
6  determine whether or not there are
7  statements in here which are
8  contained facts which might be
9  erroneously stated. I am not sure
10  that there are any such things.
11  BY MR. BROWN:
12      Q.  Take a moment to review it,
13  if you would. It's not that long.
14      A.  Well, I have read it. As
15  far as I can tell, it is accurate in the
16  sense that it states the terms of an
17  agreement, and those are the terms of the
18  agreement. It doesn't purport to recite
19  facts.
20      Q.  Okay. Look at the first
21  sentence. There is a reference there to
22  certain of the principal terms and
23  conditions.
        Do you see that?

Page 19

1      A.  I do.
2      Q.  Were there other principal
3  terms and conditions that were left off
4  the Term Sheet?
5      A.  I don't believe there were
6  that had been negotiated, agreed on.
7      It is common that a Term
8  Sheet is subject to a definitive
9  agreement. And in a complicated
10  bankruptcy case, involving a complicated
11  settlement, it would be my understanding
12  and I believe the understanding of
13  everybody else that was involved in this
14  that this Term Sheet would only purport
15  to set out certain of the most -- what
16  the parties consider to be the most
17  important terms, and other terms would
18  remain to be negotiated as part of the
19  drafting of either the definitive Plan or
20  a more definitive settlement agreement or
21  whatever document would be required to
22  flesh out the details.
23      Q.  Okay. Can you turn to page
24  9, and you will see under the Romanette

Page 20

1  5, there is a sentence that begins,
2  "Provided however..."?
3      A.  Yes.
4      Q.  Do you know to what that
5  refers?
6      MR. FINCH: Objection. I
7  caution the witness not to reveal
8  any privileged communications. If
9  you can answer the question
10  without divulging privileged
11  information, you can do so.
12      MS. HARDING: And I am going
13  to object also as to privilege as
14  to the relevancy of negotiations,
15  and I believe that -- well --
16  okay.
17      THE WITNESS: I am trying to
18  remember what this phrase referred
19  to at the time this Term Sheet was
20  entered into. As best I can
21  recall, at the time of the Term
22  Sheet, the concept that was
23  reflected by this language was
24  that what was going to be

Page 21

1  transferred to the Trust was
2  coverage for asbestos personal
3  injury claims, and to the extent
4  that there was coverage that
5  didn't -- that somehow or another
6  didn't cover asbestos personal
7  injury claims, like, for example,
8  workers' compensation insurance,
9  that wouldn't be transferred to
10  the Trust.
11      But since this Term Sheet
12  was superseded by the Plan
13  ultimately, I am not sure exactly
14  what the significance of this
15  particular term at this time is.
16  BY MR. BROWN:
17      Q.  Okay. Well, putting aside
18  workers' compensation coverage, is there
19  any other coverage that you are aware of
20  that Grace has under the policies that
21  are being transferred to the Asbestos PI
22  Trust?
23      MR. FINCH: Objection to the
24  form.

Page 22

1    THE WITNESS: The answer to
2  that is certainly, yes.
3    I mean, for example, Grace
4  has insurance beginning in -- I
5  don't know -- 1986 or so that
6  contains asbestos exclusions,
7  running up through today, and none
8  of that insurance is being
9  transferred to the Trust because
10  it doesn't provide any coverage
11  for asbestos personal injury
12  claims.
13  BY MR. BROWN:
14    Q.   What if we limited it to
15  asbestos insurance rights?  In other
16  words, the policies -- the asbestos
17  insurance rights are being transferred to
18  the Trust by Grace, correct?
19    A.   Well, you are using a term
20  that is a term that is defined in the
21  Plan, and as defined in the Plan, the
22  asbestos insurance rights under the terms
23  of the Plan and the Insurance Transfer
24  Agreement are being transferred to the

Page 23

1  Trust.
2    Q.   Okay.  And does that include
3  all the coverages under the policies that
4  are covered by that term?
5    A.   I have no idea, because
6  asbestos insurance rights are not
7  asbestos insurance policies, and I have
8  not undertaken to examine each and every
9  policy that does or might provide
10  coverage for asbestos personal injury
11  claims to determine whether or not there
12  is some coverage under that policy that
13  doesn't and that might not be
14  transferred.
15    As a general proposition, my
16  recollection is that the Plan is pretty
17  specific about what's being transferred
18  and what's not.
19    There is an Exhibit-5, for
20  example, that lists various categories of
21  policies and settlement agreements and
22  things of that nature.  There is the
23  Insurance Transfer Agreement; there are
24  schedules of insurance rights.

Page 24

1    Trying to answer a question
2  from memory that's as broad and all
3  encompassing as that, I think frankly is
4  virtually impossible, and I don't think I
5  can do it any better than I just did.
6    MR. BROWN:  Okay.  And just
7  so everyone knows how we are going
8  to be handling the question
9  regarding Plan documents, we are
10  going to mark certain Plan
11  exhibits as separate exhibits in
12  the deposition.
13    Mr. Lockwood has a
14  separately tabbed collection of
15  all the Plan documents.  He wants
16  to work off of that.  I have no
17  problem with that.  But, for
18  purposes of the record, it will be
19  the individual Plan documents that
20  we are referring to.
21    THE WITNESS:  For purposes
22  of the record, what I have in
23  front of me is the printed book
24  called Exhibit Book to First

Page 25

1  Amended Joint Plan of
2  Reorganization and Disclosure
3  Statement as of February 27, 2009,
4  which is the document that was
5  distributed to people to vote on
6  the Plan.  And the only -- there
7  are no markings or anything in it.
8    What I have had done is, so
9  that I could have ready access to
10  the multiple -- well, there are 33
11  exhibits in this book, and I have
12  simply had numerical tabs placed
13  on the first page of each separate
14  exhibit, so that if somebody wants
15  me to find an exhibit, I can look
16  to the tab rather than pawing
17  through hundreds of pages of
18  documents to see where the
19  exhibit, in fact, can be found.
20  BY MR. BROWN:
21    Q.   All right.  Mr. Lockwood,
22  can you take a look at Exhibit 6?
23    MR. BROWN:  And we will have
24  that marked as ACC-4.

Page 26

1       (ACC 30(b)(6)-4 marked for
2    identification at this time.)
3       THE WITNESS: I have it.
4  BY MR. BROWN:
5       Q.   Okay. And why don't you
6    identify that document?
7       A.   That is Exhibit 6 to Exhibit
8    Book captioned Asbestos Insurance
9    Transfer Agreement.
10       Q.   Okay. And it has certain
11    attachments to it, correct?
12       A.   It does.
13       Q.   Okay. Can you look at
14    Schedule 1?
15       A.   I am looking at it.
16       Q.   Okay. Am I correct that all
17    of the policies that are listed on
18    Schedule 1 fit within the definition of
19    asbestos insurance policies under the
20    Plan?
21       A.   I will need to look at this
22    a little bit here.
23       As I understand it, and I am
1    going to read from this document, "All

Page 27

1    insurance policies that the Insurance
2    Contributors have reason to believe
3    potentially or actually provide insurance
4    coverage for Asbestos Pi Claims are
5    listed and described accurately on the
6    attached Schedule 1." That, to my
7    knowledge, is what Schedule 1 is.
8       Q.   All right. Now, what I
9    would like you to do is to look at
10    Exhibit 1, which is the Joint Plan
11    itself, and specifically page 5,
12    definition 13.
13       MR. BROWN: And we will mark
14    that as ACC-5.
15       (ACC 30(b)(6)-5 marked for
16    identification at this time.)
17       MR. FINCH: What page do you
18    want him to go to?
19       MR. BROWN: Page 5,
20    definition 13.
21       THE WITNESS: Looking at it.
22  BY MR. BROWN:
23       Q.   Asbestos Insurance Rights?
24       A.   That is correct.

Page 28

1       Q.   My question is, well, you
2    will see the asbestos insurance rights
3    starts off, "shall mean any and all
4    rights, titles, privileges," and so
5    forth.
6       Do you see that language?
7       A.   I do.
8       Q.   And that's with respect to
9    asbestos insurance policies?
10       A.   Well, among other things,
11    yes.
12       Q.   And those are all being
13    transferred to the Asbestos PI Trust,
14    correct?
15       MR. FINCH: Object to form.
16       THE WITNESS: The reason I
17    am hesitating is I am not sure I
18    can recall whether or not the
19    general -- to answer the question,
20    I have to look to see what the
21    Plan says about the transfer and
22    whether or not the Plan statement
23    about what's being transferred.
24    This is simply the definition.

Page 29

1       There are other provisions
2    that describe what is transferred
3    to the Trust. I would have to
4    look to the Plan to see what the
5    definition of the assets being
6    transferred is and then look at
7    the Insurance Transfer Agreement,
8    which was Exhibit-4, ACC
9    Exhibit-4, and see whether those
10    two are coextensive. I think they
11    are, but that's what I would have
12    to do to make sure.
13  BY MR. BROWN:
14       Q.   Well, if you look at page 2
15    of the Transfer Agreement, the very first
16    sentence is, "Effective upon the
17    Effective Date, the Insurance
18    Contributors hereby irrevocably transfer,
19    convey, and grant to the Asbestos PI
20    Trust all of their Asbestos Insurance
21    Rights."
22       A.   Okay.
23       Q.   Now, bearing in mind that
24    language and turning back to the

Page 30

1   definition of asbestos insurance rights,
2   which does have some restrictions at the
3   end of it, after the provided that
4   language on page 6 --
5       A.   Yes, I see it.
6       Q.   Other than what's excluded
7   from asbestos insurance rights in that
8   language in the definition, are all of
9   the Debtors' interests in the policies
10  that are on Schedule 1 of the asbestos
11  Insurance Transfer Agreement being
12  transferred to the Asbestos PI Trust, or
13  are some others being retained by the
14  Debtors?
15      A.   All I can say is that what
16  is being transferred is all of the
17  asbestos insurance rights as defined in
18  the Plan. And if there are, in fact,
19  some other rights that are not asbestos
20  insurance rights, then the Plan does not
21  appear to transfer those.
22      Q.   Okay. And the workers'
23  compensation coverage is one of those
24  items?

Page 31

1       A.   That's my recollection, that
2   is workers' comp rights are not
3   transferred.
4       Q.   Okay. Are you aware of
5   anything else that is not transferred?
6       A.   Not as I sit here right now.
7   I do not recall having any knowledge of
8   anything that specifically carved out of
9   the policies, but, again, I mean, the
10  definitions say what they say.
11      Q.   Okay. Can you go back to
12  the --
13      A.   I mean, if you have some
14  specific item in mind that you want to
15  ask me about whether it is or it isn't
16  transferred, I will try and answer that.
17  But asked globally the way you are doing
18  it, I don't have any recollection of
19  anything.
20      Q.   Okay. Can you turn back to
21  ACC-3, please.
22      MR. FINCH: What's that, the
23  Term Sheet?
24      MR. BROWN: Yes.

Page 32

1       THE WITNESS: That's the 8-K
2   with the Term Sheet in it, I
3   believe.
4       MR. BROWN: Yes.
5       THE WITNESS: I have it.
6   BY MR. BROWN:
7       Q.   On page 10, Roman 4, if you
8   will just take a look at that for a
9   moment?
10      A.   The provision captioned
11  Binding Effect?
12      Q.   Correct.
13      A.   I have read it.
14      Q.   Okay. Does the ACC
15  understand the Term Sheet to be binding
16  on the parties to it?
17      MS. HARDING: Object under
18  408 and instruct the witness not
19  to answer if it reveals settlement
20  negotiations.
21      THE WITNESS: The ACC --
22      MR. BROWN: Wait.
23      MR. JACOB COHN: Does that
24  create an evidentiary privilege in

Page 33

1   discovery as opposed to
2   admissibility in trial?
3       MS. HARDING: I have made my
4   objection for the record.
5       MR. JACOB COHN: Jacob Cohn,
6   Federal Insurance Company.
7   BY MR. BROWN:
8       Q.   I don't know that the Debtor
9   should be instructing a Rule 30 --
10      A.   The Debtor hasn't instructed
11  the witness not to do anything as far as
12  I am aware.
13      MR. JACOB COHN: I heard her
14  try.
15      MS. HARDING: Suggest.
16      THE WITNESS: Would you read
17  back the question, please?
18      (The reporter read from the
19  record as requested.)
20      THE WITNESS: The ACC
21  understands that the Plan, when
22  the Plan is confirmed, will be
23  binding on it and everybody else
24  that is bound by a confirmed Plan.

Page 34

1    The ACC does not consider the Term
2  Sheet to have any binding effect
3  at this particular time in the
4  bankruptcy process.
5  BY MR. BROWN:
6    Q.   Did the Term Sheet have a
7  binding effect prior to the filing of a
8  Plan?
9        MR. FINCH: Objection to the
10  extent that it calls for either a
11  legal conclusion or privileged
12  information.
13    You can answer, if you can.
14    THE WITNESS:  Well, it calls
15  for the former, and I am not going
16  to refuse to answer.
17    If you want my opinion, it's
18  a question of contract law.  I
19  personally doubt very much that as
20  a matter of contract law or
21  bankruptcy law, the Term Sheet was
22  binding, because, number one, as
23  under contract law, it wouldn't,
24  as I said earlier, have contained

Page 35

1    all the material terms and
2  conditions.  And so it would be
3  very difficult under doctrines
4  having to do with completeness of
5  contracts to be enforceable for it
6  to have been binding.
7    And, secondly, it wasn't a
8  Plan, and it wasn't a settlement
9  agreement that was separate from
10  the Plan.  It recites by its terms
11  that "The parties shall use their
12  best efforts to incorporate the
13  terms in this Term Sheet into a
14  mutually agreeable Plan of
15  Reorganization to be filed with
16  the Bankruptcy Court as soon as
17  possible."
18    And, therefore, almost by
19  definition, it recognizes that as
20  a stand-alone document in a
21  bankruptcy context, it's not
22  binding on anybody, in my opinion.
23  But that's just my opinion.
24  BY MR. BROWN:

Page 36

1    Q.   Okay.  Put that aside.
2    Just note the date.  It's
3  April 6, 2008.  So the next series of
4  questions I have pertains to the period
5  prior to that.
6    A.   Okay.
7    Q.   Were any asbestos insurance
8  entities involved in the negotiation of
9  the Term Sheet?
10    MS. HARDING:  Object --
11    THE WITNESS:  Not that I
12  recall.
13    MS. HARDING:  Object under
14  408.
15  BY MR. BROWN:
16    Q.   Were any asbestos insurance
17  entities invited to participate in the
18  negotiations of the Term Sheet?
19    MS. HARDING:  Same
20  objection.
21    THE WITNESS:  Well, to the
22  extent that the Term Sheet
23  negotiations involve people
24  sitting down together and/or being

Page 37

1    on telephone calls together to
2  discuss it and agree on it, to my
3  knowledge, I don't recall any.
4    Whether or not the Debtors,
5  for example, had communications
6  unknown to the ACC with their
7  insurers on the subject matter
8  that ultimately was reflected in
9  the Term Sheet, I don't know.
10  BY MR. BROWN:
11    Q.   Okay.  Well, for purposes of
12  this question, I am asking for the ACC's
13  knowledge.
14    A.   I understand.  But I want to
15  make it clear what the limitations of the
16  ACC's knowledge is.
17    Q.   I understand.
18    To the ACC's knowledge, were
19  any asbestos insurance entities consulted
20  regarding any provision in the Term
21  Sheet?
22    MS. HARDING:  Same
23  objection.
24    THE WITNESS:  To the ACC's

Page 38

1    knowledge, they are unaware of any
2    such consultations.
3  BY MR. BROWN:
4    **Q.  Did any asbestos insurance**
5  **entity consent to the assignment of the**
6  **policy or proceeds thereof prior to the**
7  **execution of the Term Sheet?**
8    A.  Not to the knowledge of the
9  ACC as an entity or me, in particular.
10  My make statements about the ACC's
11  knowledge, I am speaking obviously of
12  both its and my knowledge at the same
13  time.
14    **Q.  Did any asbestos insurance**
15  **entity agree to any term in this Term**
16  **Sheet before the parties in the Term**
17  **Sheet executed it?**
18    A.  I have no idea.
19    **Q.  Do you have any knowledge of**
20  **any such --**
21    A.  I have no knowledge that
22  they did and I have no knowledge that
23  they didn't.
    **Q.  Okay.  The initial Joint**

Page 39

1  **Plan was filed on September 19th, 2008,**
2  **correct?**
3    A.  I don't, as I sit here,
4  right now, unrefreshed by looking at the
5  document, recall that that's the specific
6  date, but A, it sounds about right, and
7  B, I will take your word for it, if you
8  are representing that that's the date.
9    **Q.  Okay.  And along with the**
10  **filing of the initial Plan, there was**
11  **also a filing of the Asbestos PI Trust**
12  **Agreement and the Asbestos PI TDP,**
13  **correct?**
14    A.  I don't recall actually
15  whether those documents were filed at
16  exactly the same time the Plan was filed
17  or whether they were filed on some later
18  day.
19    They were certainly filed at
20  some approximation of the same time, but
21  it could have been a month later or
22  something like that.  Again, what was
23  filed with the court is a matter of
24  record, so...

Page 40

1    **Q.  Okay.  Between April 6, 2008**
2  **and September of 2008, is it fair to say**
3  **that the Plan documents were being**
4  **drafted?**
5    MS. HARDING:  Object under
6  408.
7    THE WITNESS:  Of course.
8  BY MR. BROWN:
9    **Q.  And who were the parties**
10  **that were involved in the negotiation of**
11  **Plan documents?**
12    MS. HARDING:  Object under
13  408.
14    MR. FINCH:  Are you talking
15  about entities or people?
16    THE WITNESS:  A lot.
17    MR. BROWN:  Let's start with
18  entities.
19    MR. FINCH:  That, you can
20  answer.
21    THE WITNESS:  Entities,
22  representatives of the Debtors,
23  the Equity Committee, the Future
24  Claimants' Representative and the

Page 41

1  ACC, and I can't remember whether
2  there was any involvement by
3  representatives of the Unsecured
4  Creditors' Committee or not.  I
5  just don't remember at this point.
6  BY MR. BROWN:
7    **Q.  How about any of the Sealed**
8  **Air indemnified parties?**
9    MS. HARDING:  Object under
10  408.
11    THE WITNESS:  At some point,
12  representative of the Sealed Air
13  indemnified parties were involved
14  in reviewing drafts and commenting
15  on drafts, et cetera.  I think
16  they were involved before we filed
17  the first Plan, but I am not -- I
18  mean, I know they were -- right
19  now, we are looking at the Amended
20  Plan filed in February 27, 2009.
21  I am quite confident that they
22  were involved in discussing --
23  reviewing and discussing this
24  Plan.

Page 42

1    I just don't remember for
2    sure whether they were involved in
3    the first Plan or whether they got
4    involved between the first Plan
5    and this Plan. I think they were
6    involved in the first Plan.
7    BY MR. BROWN:
8        Q. Okay. Would your answer be
9    the same for the Fresenius indemnified
10   parties?
11       MS. HARDING: Object under
12       408. I think we should take a
13       break. I would like to consult
14       with counsel.
15       MR. BROWN: Okay.
16       THE WITNESS: Does that
17       include me or do you want to just
18       talk to him?
19       MS. HARDING: I will talk to
20   Nate.
21       (There was a break from
22   10:15 a.m. to 10:17 a.m.)
23       MR. FINCH: Can we read back
     the pending question?

Page 43

1        (The reporter read from the
2    record as requested.)
3        MR. FINCH: You can answer
4    that question.
5        THE WITNESS: In general,
6    yes, although their involvement
7    was less.
8    BY MR. BROWN:
9        Q. Okay. What was the
10   involvement of Sealed Air and Fresenius
11   in the drafting of the Plan documents?
12       MR. FINCH: Objection,
13   instruct the witness not to
14   answer.
15       MS. HARDING: Objection.
16       MR. JACOB COHN: Basis,
17   please.
18       MR. FINCH: Basis is Judge
19   Fitzgerald's ruling that Plan
20   negotiations and the draft Plan
21   Agreement are not relevant to the
22   confirmability of the Plan.
23       MS. HARDING: Same
24   objection.

Page 44

1    BY MR. BROWN:
2        Q. Let me, Mr. Lockwood, refer
3    you back to ACC-2, which was the
4    objection, and direct your attention
5    specifically to paragraph 3.
6        A. I see it.
7        MR. BROWN: Okay. This is
8    more directed to Nate than anyone
9    else. There are, as you might
10   guess, a whole host of questions
11   that lots of people in this room,
12   including myself, would want to
13   ask concerning the negotiations of
14   the Plan and the Plan documents as
15   well as questions about prior
16   drafts that weren't filed.
17       Is it safe to say that you
18   will object to those questions and
19   instruct the witness not to
20   answer?
21       MR. FINCH: That is correct.
22       MR. BROWN: Okay. Then with
23   the caveat that we won't ask them
24   simply because we are not here to

Page 45

1    waste everyone's time, I am going
2    to move forward and not ask
3    questions about the negotiations.
4        Can we have an agreement on
5    that ground?
6        MR. FINCH: Sure. We can
7    have an agreement on that point.
8        MR. BROWN: And in the event
9    that that is ever reversed or your
10   position is not upheld by the
11   court, we would have an
12   opportunity to come back and ask
13   questions about the drafting as
14   well as the negotiations.
15       MR. FINCH: If Judge
16   Fitzgerald reverses herself on
17   what she has ruled in various
18   other cases, you would have that
19   opportunity.
20       MR. BROWN: Or some higher
21   court.
22       MR. FINCH: Or some higher
23   court.
24       MR. BROWN: Fair enough.

Page 46

1    MR. JACOB COHN: I want to
2  be perfectly clear here that you
3  are not relying upon not a ruling
4  that you don't need to answer
5  questions at these depositions on
6  this subject, but your position is
7  that this is a relevance objection
8  and you are instructing not to
9  answer on the basis of relevance.
10    MR. FINCH: That's right.
11    MR. JACOB COHN: And you are
12  aware of the local Delaware rules
13  on this subject?
14    MR. FINCH: Yes, I am.
15    MR. JACOB COHN: I am.
16    MR. BROWN: Thanks, Jacob.
17    MR. SPEIGHTS: Excuse me.
18  This is Dan Speights, representing
19  Anderson Memorial Hospital.
20    Mr. Finch, would you advise
21  us of what rulings you are
22  referring to?
23    MR. FINCH: Sure. If you
24  look at the ACC's objections to

Page 47

1    the 30(b)(6) notice, Dan --
2    MR. SPEIGHTS: If it's
3  contained in there, just refer to.
4  I want to make sure if we want to
5  file a motion, we have the basis
6  of your objection.
7    MR. FINCH: Yes. The basis
8  of the objection is set forth on
9  page 2, paragraph number 3, and
10  ACC deposition Exhibit-2 to this
11  deposition.
12    MR. SPEIGHTS: Thank you,
13  Mr. Finch.
14  BY MR. BROWN:
15    Q.   Okay. Mr. Lockwood, in the
16  period between the Term Sheet and the
17  filing of the initial Plan in September,
18  was any asbestos insurance entity invited
19  to participate in the negotiation of the
20  Plan documents or the drafting of the
21  Plan documents?
22    MS. HARDING: Same
23  objection.
24    THE WITNESS: I have no

Page 48

1    knowledge whether they were or
2  were not.
3  BY MR. BROWN:
4    Q.   To your knowledge, did any
5  asbestos insurance entity actually
6  participate?
7    MS. HARDING: Same
8  objection.
9    THE WITNESS: I have no
10  knowledge that they did.
11  BY MR. BROWN:
12    Q.   Was any asbestos insurance
13  entity consulted concerning any term or
14  provision in the Joint Plan or any Plan
15  documents?
16    MS. HARDING: Same
17  objection.
18    THE WITNESS: In the same
19  period?
20    MR. BROWN: Correct.
21  BY MR. BROWN:
22    Q.   From April 2008 to
23  September, when the initial Plan was
24  filed in September of 2008.

Page 49

1    A.   I have no knowledge that
2  anyone was.
3    Q.   Were any asbestos insurance
4  entities consulted regarding the
5  assignment or transfer of their policies
6  or proceeds under their policies to the
7  Asbestos PI Trust in that time period?
8    MS. HARDING: Same
9  objection.
10    THE WITNESS: I have no
11  knowledge that they were or were
12  not.
13  BY MR. BROWN:
14    Q.   Did any consent?
15    A.   I have no knowledge --
16    MS. HARDING: Same
17  objection.
18    THE WITNESS: -- that anyone
19  did, in fact, consent.
20  BY MR. BROWN:
21    Q.   Okay. Now, I want to focus
22  your attention now on the period after
23  the initial Plan was filed.
24    In that period, after the

Page 50

1   initial Plan and Plan documents were
2   filed, did GEICO consent to the Joint
3   Plan or any Plan document or any
4   provision in the Plan or Plan documents?
5       A.   Not to my knowledge.
6       Q.   Okay. Would your answer be
7   the same for Republic Insurance Company?
8       A.   Yes.
9       Q.   And OneBeacon American
10  Insurance Company?
11      A.   Yes.
12      Q.   And Seaton Insurance
13  Company?
14      A.   Yes.
15      Q.   How about any other asbestos
16  insurance entity? Would your answer be
17  the same?
18      A.   No, I don't think it would,
19  actually. I believe -- and I would have
20  to sort of try and reconstruct and
21  recollect the timing, but I believe there
22  was a settlement agreement entered into
23  with Equitas during some time period. It
24  actually might have predated. It might

Page 51

1   have predated the Plan.
2           But, in any event, the
3   settlement agreement with Equitas to my
4   recollection involved its agreeing to
5   either this Plan or a 524(g) Plan that
6   this Plan would qualify as.
7           And I believe that there was
8   also a settlement agreement with the
9   KWELM Companies that either by its terms
10  or implicitly represented the KWELM
11  Companies' consent to this Plan, to the
12  first Plan. Those are the only two that
13  come to mind.
14      Q.   Why don't we turn to the
15  first Amended Joint Plan, which is
16  Exhibit-1 in your book.
17      A.   Okay. I have it.
18          MR. FINCH: Exhibit-5 to the
19      deposition.
20          THE WITNESS: It's ACC
21      Exhibit-5.
22  BY MR. BROWN:
23      Q.   All right. Could you turn
24  to the first page?

Page 52

1       A.   The cover page?
2       Q.   No, no. The first --
3       A.   Numbered page.
4       Q.   -- well, it's actually not
5   numbered, but it's 1. It should be 1.
6       A.   Okay. I have it.
7       Q.   All right. Midway down the
8   page, it says, "This Plan constitutes a
9   settlement of all Claims in the Demands
10  against the Debtors on, and subject to,
11  the terms described herein and the other
12  Plan Documents."
13          Are the Debtors settling the
14  asbestos PI claims against them through
15  this Plan?
16      A.   I think --
17          MS. HARDING: Object to
18      form.
19          THE WITNESS: I think it
20      would be a fair characterization
21      that the Plan embodies a
22      compromise between the class of
23      claimants consisting of the
24      asbestos PI claimants and others.

Page 53

1   And if the Plan were confirmed
2   that that compromise could be
3   called a settlement between the
4   Debtors and those entities, under
5   which there would be a Trust
6   created and the claims would be
7   brought to the Trust, not against
8   the Debtors, I think that would be
9   a fair characterization, yes.
10  BY MR. BROWN:
11      Q.   Is it a settlement of the
12  demands that have not yet even been
13  asserted against the Debtors?
14          MS. HARDING: Object to
15      form.
16          MR. FINCH: Object to form.
17          THE WITNESS: That calls for
18      a legal conclusion at an almost
19      metaphysical level, frankly.
20          I guess you could conceive
21      of it as that or you could just
22      say that the Plan itself is what
23      it is. I mean, it has the effect
24      under 524(g) of the bankruptcy

Page 54

1  code on the holders of future
2  demands that the bankruptcy code
3  prescribes.
4      It's hard to come to an
5  answer because settlement sort of
6  implies -- I mean, to the extent
7  that the Future Claimants
8  Representative is regarded as the
9  equivalent of a guardian ad litem
10  for the Future Claimants, which is
11  one way of looking at it, you
12  could characterize it as a
13  settlement.
14      But, again, the Future
15  Claimants Representative exists,
16  only in a legal capacity of
17  somebody appointed by the
18  bankruptcy court for that purpose,
19  has no independent ability to
20  settle things. So, as I said
21  before, I mean, I am not sure the
22  question, A, could be answered
23  and, B, is meaningful.
    BY MR. BROWN:

Page 55

1      Q.   To the extent it is a
2  settlement, is it binding on the asbestos
3  insurance entities in the view of the
4  ACC?
5      MS. HARDING: Object to the
6  form. Calls for a legal
7  conclusion.
8      THE WITNESS: That question
9  is unanswerable as phrased
10  because, I mean, binding for what
11  purpose?
12  BY MR. BROWN:
13      Q.   For purposes of insurance
14  coverage.
15      MS. HARDING: Same
16  objection.
17      THE WITNESS: The extent of
18  which, A, it's a settlement within
19  the meaning of, for example,
20  insurance comprehensive general
21  liability insurance policies that
22  talk about settlements, B, it
23  could be made without the consent
24  of insurance companies, under the

Page 56

1  Plan that's an issue that will
2  only get resolved by some other
3  court in the event there is a
4  dispute between the Trust and any
5  asbestos insurance company over
6  whether it is a, quote, settlement
7  that's binding on them.
8      That is not something that
9  the Plan or the Confirmation Order
10  under the insurance neutrality
11  provisions of this Plan purports
12  to resolve.
13  BY MR. BROWN:
14      Q.   Is it intended to be
15  binding?
16      MS. HARDING: Object to
17  form.
18      THE WITNESS: Intended by
19  whom?
20  BY MR. BROWN:
21      Q.   By the ACC?
22      MR. FINCH: Object to the
23  question to the extent it calls
24  for privileged or work product

Page 57

1  analysis. To the extent the ACC
2  has a position on that, that it's
3  not privileged and work product,
4  you can answer.
5      THE WITNESS: I guess the
6  best answer I could give you on
7  that from the ACC's perspective is
8  that -- well, let me back up a
9  little bit. When you say "is it
10  intended," you are describing the
11  settlement. The settlement is a
12  125-page Plan with multiple
13  exhibits.
14      In light of the insurance
15  neutrality provisions, there are
16  clearly aspects that are not
17  binding on the insurers, but the
18  question of whether -- I guess the
19  best way I could put it is the ACC
20  would hope that in the event that
21  post-consummation, the Trust
22  sought coverage from any
23  particular set of insurers, whose
24  asbestos insurance rights were

Page 58

1    assigned to the Trust, that the
2    Trust would be able to obtain such
3    coverage, either by agreement with
4    the asbestos insurance companies
5    or through coverage litigation in
6    some coverage court, which
7    coverage litigation might entail a
8    decision by a judge that in some
9    manner or another what the Trust
10   was doing pursuant to the Plan in
11   terms of resolving individual
12   asbestos claims was, in fact,
13   binding on the insurers. That's
14   about the best I can do.
15   BY MR. BROWN:
16       Q.   Okay.  To the extent it
17   constitutes a settlement of asbestos PI
18   claims, is it superseded by Section 7.15
19   entitled Insurance Neutrality?
20       A.   That question is almost
21   incomprehensible to me, because Section
22   7.15 is sort of a form selection
23   provision.  Essentially, in my view of
24   it, what it does is it says to the extent

Page 59

1    that there are disagreements about the
2    Trust's rights under transferred
3    insurance assets, those disputes are
4    going to get resolved by the parties, the
5    insurers, and the Trust at a later date
6    in front of a later court.
7            And so some later court
8    would determine whether it was a
9    settlement or not.  The 7.15 itself
10   doesn't purport to say whether it is or
11   isn't a settlement.  It says essentially
12   that some other court, if necessary, will
13   have to decide that issue because the
14   insurers don't want to have coverage
15   litigation in this bankruptcy case.
16       Q.   All right.  But the sentence
17   that we are referring to on page 1 says,
18   "The Plan constitutes a settlement of all
19   Claims and Demands against the Debtors
20   on, and subject to, the terms described
21   herein and the other the Plan Documents."
22       A.   That is --
23       Q.   My question is, is that
24   language superseded by the insurance

Page 60

1    neutrality language that appears in 7.15?
2        MS. HARDING:  Objection.
3        MR. FINCH:  Objection, asked
4    and answered.
5        THE WITNESS:  I cannot give
6    you any better answer to that than
7    the one I gave you already.
8            You are asking me whether a
9    descriptive sentence in a Plan
10   supersedes a form selection clause
11   in some other part of the Plan,
12   and, to me, that's just -- I don't
13   even understand how one could
14   supersede the other in the first
15   place.  I mean, if you can explain
16   to me why you think it supersedes
17   it, maybe I could have a more
18   specific answer.
19   BY MR. BROWN:
20       Q.   Well, why don't you look at
21   7.15 A on page 87 of the Plan.
22       A.   Okay.
23       Q.   As I read that sentence,
24   other than what appears in the other

Page 61

1    portions of 7.15, nothing in the Plan,
2    the Plan documents, the Confirmation
3    Order, is to operate or shall operate --
4    "shall in any way operate to, or have the
5    effect of, impairing any Asbestos
6    Insurance Entity's legal, equitable or
7    contractual rights, if any, in any
8    respect."
9        A.   Yeah?
10       MS. HARDING:  Object to
11   form.  Is there a question?
12       MR. BROWN:  I am reading the
13   language first.  Can I finish?
14       MS. HARDING:  I am sorry.  I
15   thought you were asking a
16   question.  I didn't hear it.
17   BY MR. BROWN:
18       Q.   To the extent that the Plan
19   or the Confirmation Order constitutes a
20   settlement of asbestos PI claims against
21   the Debtors, is that going to then be
22   binding upon the insurers in coverage
23   litigation?
24       MS. HARDING:  Object to

Page 62

1    form. It calls for a legal
2    conclusion.
3         THE WITNESS: If a coverage
4    court decides that it's a
5    settlement and that it's a
6    settlement that's reasonable and
7    that it doesn't have to be
8    consented to by insurers, then the
9    coverage court will have decided
10   that the settlement isn't
11   impairing the insurers' rights
12   under their policies.
13        That's what I mean by it's
14   up to the coverage court. Your
15   question assumes that for it to be
16   a settlement, it would have to
17   impair the insurers' rights. My
18   limited understanding of insurance
19   law is that that may be true or it
20   may not be true. But what this
21   says is that the Plan and the
22   Confirmation Order aren't
23   purporting to resolve that issue.
         Your rights are what they

Page 63

1    are; you will be able to present
2    them to a coverage court. And the
3    coverage court, if it agrees with
4    you, will say, first, the Plan
5    doesn't control the outcome of
6    this decision because that's what
7    7.15(a) says, and, secondly, you
8    are correct in asserting that this
9    is an unconsented-to settlement or
10   it's not a settlement or whatever
11   defense you have applies. And it
12   will say you win, you don't have
13   any coverage obligations for this
14   claim or these claims or whatever.
15   That's my understanding of how
16   this is supposed to work.
17   BY MR. BROWN:
18        Q.    Okay. I am going to go
19   through the Plan and various items. We
20   are going to jump around a little bit.
21   So why don't we first turn to page 5.
22        A.    I have it.
23        Q.    And the definition -- we
24   looked at this earlier -- 13,

Page 64

1    specifically (a) under 13.
2        A.    I see it.
3        Q.    Is that language intended to
4    include any property damage-related
5    causes of action?
6        A.    It depends on what you mean
7    by included. What it basically means is
8    that, as I understand it, that the Trust
9    gets the rights; nobody else gets the
10   rights. The Trust can then seek coverage
11   from the insurers.
12        Since the Trust has no
13   asbestos property damage claims to assert
14   against the insurers, it will not be
15   asserting asbestos property claims
16   against the insurers. But the effect of
17   the transfer would mean that, for
18   example, Grace or a property damage
19   claimant could not assert property damage
20   claims under that insurance coverage
21   because those rights have been assigned
22   to the Trust and they are, therefore, no
23   longer available to be invoked or
24   utilized by anybody else.

Page 65

1        Q.    Okay. Let's turn to page 6,
2    Asbestos Insurance Coverage Defenses, 6
3    and 7.
4        A.    Definition 16.
5        Q.    Correct.
6        A.    I see it.
7        Q.    Did you have a chance to
8    read it?
9        A.    Yes.
10        Q.    And there are two exceptions
11   that are listed there to asbestos
12   insurance coverage defenses?
13        A.    Correct.
14        Q.    And the first one says,
15   "...the Plan or any of the Plan documents
16   do not comply with the Bankruptcy
17   Code..."
18        So, as I understand that, if
19   in a subsequent coverage action, an
20   insurer sought to argue that the Plan or
21   Plan documents don't comply with the
22   bankruptcy code, they would be precluded
23   from doing so by virtue of the
24   confirmation of the Plan; is that

Page 66

1    correct?
2        A.    Correct.
3        Q.    And the second one has to
4    deal with the assignment of policy
5    rights, correct?
6        A.    Correct.
7        Q.    And asbestos insurance
8    entities would be prohibited from
9    litigating that issue?
10       A.    If the bankruptcy court
11    decided that those consent rights were
12    effectively preempted by the bankruptcy
13    code. If it decided the other way, then
14    they wouldn't be precluded from doing so.
15       Q.    Okay. If you go before the
16    two exceptions, it describes "Asbestos
17    Insurer Coverage Defenses include any
18    defense based on the terms of the Plan or
19    the Plan documents or the manner in which
20    the Plan or Plan documents were
21    negotiated..."
22            What if an asbestos
23    insurance entity wanted to argue in
24    subsequent coverage litigation that the

Page 67

1    resolution of asbestos PI claims was the
2    product of some sort of collusion between
3    the Plan proponents? Could that be
4    argued by the asbestos insurance
5    companies in the subsequent coverage
6    litigation?
7        MS. HARDING: Object to
8    form.
9        MR. FINCH: Objection to
10    form.
11        THE WITNESS: First, it's
12    hypothetical. Second, it's a
13    question sort of to some extent of
14    insurance law.
15        But subject to that, and the
16    fact that I don't profess to be an
17    expert on this subject, it is my
18    understanding that an asbestos
19    insurer could argue any state law
20    coverage defense that it had,
21    including collusion.
22        It is also my understanding
23    that the Trust in this
24    hypothetical scenario in which

Page 68

1    this dispute is arising could
2    argue that it's not collusion
3    because of the insolvency clauses
4    in the CGL policies and that,
5    therefore, almost by definition, a
6    bankruptcy case doesn't involve
7    collusion.
8        They couldn't argue that the
9    bankruptcy court had decided that
10    it wasn't collusion, because the
11    insurance neutrality provision
12    would preclude that argument. But
13    it could certainly argue to the
14    coverage court that the type of
15    agreement that is entered into
16    here, as a result, as I said, of
17    state law -- of the facts and the
18    state law didn't amount to
19    collusion. But as such, the
20    collusion defense is not, in my
21    opinion, precluded by this
22    language.
23    BY MR. BROWN:
24        Q.    Okay.

Page 69

1        A.    Again, that's my legal
2    opinion. You got it, for whatever it's
3    worth.
4        Q.    Let's back up then. Is it
5    intended to prevent such an argument --
6    let's back up.
7        A.    Intended by who?
8        Q.    For purposes of these
9    questions -- and I will try to fix my
10    questions -- the ACC, because that's you
11    are here to speak for.
12        MR. FINCH: Object to form.
13    It assumes there is an intent.
14    Object to form.
15        MS. HARDING: Object to
16    form, too.
17        THE WITNESS: The intent of
18    the ACC in this language, frankly,
19    is to satisfy what we perceive to
20    be the requirements of the Third
21    Circuit decision in combustion
22    engineering for rendering a Plan
23    sufficiently, quote, neutral,
24    close quote, as to its impact on

Page 78

1    is Insurance Contributor.
2        A.    I see it.
3        Q.    '"Insurance Contributor'
4    shall mean any of the Debtors, the
5    Reorganized Debtors, and the Non-Debtor
6    Affiliates identified in the Asbestos
7    Insurance Transfer Agreement."
8            Can you turn to that
9    agreement, which is Exhibit-6 to the
10    Plan, ACC-4, in this deposition.
11            And I couldn't find where
12    the Non-Debtor affiliates are identified
13    in this agreement.
14        A.    If you look at the first
15    page, third line, it refers to including
16    "without limitation, the Non-Debtor
17    Affiliates identified in Exhibit 16 to
18    the Plan."
19            If you turn to Exhibit-16 to
20    the Plan, you will see a three-page list
21    of Non-Debtor affiliates.
22        Q.    Can I -- I don't have that
23    in front of me.  Can I just take a look
24    at that?

Page 79

1        A.    Certainly.  It's Exhibit-16.
2    It's an incorporation by reference.
3        Q.    Mr. Lockwood, I just took a
4    look at Exhibit-16 in the Plan, and I
5    didn't see Fresenius or Sealed Air on
6    that.
7            Is that correct?
8        A.    Yes, I think that's correct.
9    This is a list, as I understand it, of
10    affiliates of the Debtor, and I don't
11    believe the Debtor regards Fresenius and
12    Sealed Air as its affiliate.
13        Q.    Okay.  What is the basis for
14    the assignment of policy rights of
15    Non-Debtor affiliates?
16            MS. HARDING:  Object to
17    form.
18            MR. FINCH:  Object.
19            You can answer.
20            THE WITNESS:  Well, in my
21    personal view of this, there are
22    two answers to that question.  One
23    is that in order to have the Trust
24    have the ability to deal with

Page 80

1    assigned insurance rights from the
2    Debtor, you can't have a lot of
3    other Debtor-owned entities
4    retaining possible rights to that
5    insurance, because you could never
6    resolve it with the insurers.
7            And so from my perspective,
8    it's important to make sure that
9    there aren't going to be competing
10    claims.  These Non-Debtor
11    affiliates, for the most part, if
12    not entirely, are not companies
13    that were pre-petitioned
14    defendants in asbestos litigation.
15    And the purpose of this is really
16    more to prevent them -- it's
17    almost more like a forbearance or
18    a give-up-your-rights provision
19    than it is the actual assignment.
20            The Trust is not likely to
21    be asserting claims on behalf of
22    AA consultancy and cleaning
23    Company, Limited, to use the first
24    name on the Non-Debtor affiliate

Page 81

1    list.  But if there were some sort
2    of derivative liability that
3    would -- remember, these are all
4    entities that are
5    asbestos-protected parties as
6    well.
7    BY MR. BROWN:
8        Q.    Right.
9        A.    So the claims against them
10    are going to the Trust.  So the insurance
11    covering those claims, if any existed,
12    ought to go to the Trust as well.
13        Q.    I think you mentioned that
14    most of them were not involved to your
15    knowledge in any kind of asbestos
16    litigation.
17            Do you know of any of them
18    that were?
19        A.    I really don't know.  I have
20    never made and I am not sure anybody for
21    the committee has ever made any effort to
22    determine whether there were.
23            The concern obviously was
24    that somebody could start trying to dream

Page 82

1   up some kind of derivative successor
2   liability, veil piercing, alterego,
3   whatever kind of claims, and the notion
4   was that Grace's economic enterprise,
5   which included the Non-Debtor affiliates,
6   were going to be freed of asbestos
7   liability.
8         So if there aren't any
9   claims asserted against them, then
10  nothing ever gets enjoined. The
11  injunction only kicks in in the event
12  that a claim actually attempts to assert
13  derivative liability of Grace against one
14  of these entities.
15        Q.   Do you know if any of them
16  have asbestos liabilities for their own
17  products or actions?
18        A.   I am not aware of any such
19  allegations or claims by anybody. I have
20  never seen them or heard of them.
21        Q.   Okay. Can you turn to page
22  33 of the Joint Plan, definition 178.
23        A.   I see it.
        Q.   Definition 178 makes

Page 83

1   reference to Exhibit-19 to the Plan.
2         Do you see that?
3         A.   Yes.
4         Q.   And that's entitled Retained
5   Causes of Action Schedule. And actually
6   I think we will get that marked.
7         MR. FINCH: Are you going to
8   mark Exhibit-19 to the Plan?
9         MR. BROWN: Yes.
10        THE WITNESS: This was
11  supposed to be Exhibit-19. This
12  is Exhibit-5 to the Plan.
13        MR. BOERGER: Sorry. Here
14  you go.
15        (ACC 30(b)(6)-6 marked for
16  identification at this time.)
17  BY MR. BROWN:
18        Q.   If you thumb through there,
19  Mr. Lockwood, you would get to page 10
20  where it says Retained Causes of Action
21  (Insurance Claims)?
22        A.   Uh-huh.
23        Q.   And then it goes on for
24  several pages, listing multiple insurance

Page 84

1   companies?
2         A.   Yes.
3         Q.   Among the insurance
4   companies that are listed on this
5   document is American Employers, which for
6   now is OneBeacon; Employers Commercial
7   Union, which is also OneBeacon; GEICO;
8   Republic; and Unigard Security, which is
9   now Seaton.
10        Do you have any
11  understanding of what causes of action
12  the Debtor is retaining with respect to
13  those four insurance companies?
14        A.   No. My only understanding
15  is that they don't include causes of
16  action relating to asbestos insurance
17  rights, which are referred to in the
18  exclusion at the end of 178.
19        Q.   Do you have an understanding
20  as to whether the Debtors will continue
21  to be insurers under any of the policies
22  issued by those companies or whether the
23  Asbestos PI Trust will become the
24  punitive insurer?

Page 85

1         MS. HARDING: Object to
2   form.
3         MR. FINCH: Object to form.
4         THE WITNESS: When you say
5   those insurance policies, which
6   insurance policies are you talking
7   about?
8   BY MR. BROWN:
9         Q.   Whatever ones are included
10  within the Retained Causes of Action.
11        MR. FINCH: Object to form.
12        THE WITNESS: I believe that
13  if it's a retained cause of
14  action, by definition, the Trust
15  is not going to be the punitive
16  insured under whatever cause of
17  action. Indeed, I am not sure
18  that the Trust -- there is sort of
19  a sematic issue when you talk
20  about the Trust becoming an
21  insured.
22        The Trust has whatever
23  rights under the insurance
24  transfer it gets. Whether that

Page 86

1    would make it a, quote, insured,
2    close quote, for purposes of
3    insurance law, I have absolutely
4    no idea. That's a terminological
5    issue.
6        But my understanding of this
7    is that whatever rights Grace is
8    retaining against the four
9    companies that you identified are
10   mutually exclusive of any rights
11   that the Asbestos PI Trust is
12   getting.
13       And so since I don't know
14   what policies Grace is retaining
15   rights to or what coverages, all I
16   can say is that whatever they are,
17   they are not rights that were
18   transferred to the Trust. Grace
19   and the Trust aren't going to be
20   trying to make claims on the same
21   set of rights.
22   BY MR. BROWN:
23       Q.   But they may make claims on
     the same set of policies?

Page 87

1        A.   I don't think so, because I
2    believe that the assignment of the
3    asbestos insurance rights relates to
4    policies that, as a general proposition,
5    Grace is not retaining any rights in.
6        So I would speculate that
7    you must be talking about other policies,
8    but since I have no idea what retained
9    rights Exhibit-19 or Retained Causes of
10   Action refer to, I really can't answer
11   the question.
12       Q.   Do you know whether anyone
13   has any idea what retained rights are --
14       A.   I would assume that the
15   Debtor knows what it thought it was
16   retaining, because that particular
17   exhibit was something that was prepared
18   by the Debtor.
19       Q.   Okay. Is there any plan to
20   your knowledge to update this exhibit so
21   that it's a little more clear in terms of
22   what is being retained other than simply
23   putting the name of the entity and an
24   address?

Page 88

1        MS. HARDING:  Objection to
2    form.
3        MR. FINCH:  Objection.
4        THE WITNESS:  Prior to this
5    deposition, I am not aware of any
6    undertaking by anybody to do an
7    update of this.  Whether or not
8    the result of this deposition or
9    some other deposition, somebody
10   might possibly make such a
11   decision in the future, would be
12   rank speculation at this point.
13   BY MR. BROWN:
14       Q.   Would it be fair to say that
15   absent that, we are not really going to
16   know what's retained?
17       MR. FINCH:  Object the form.
18       MS. HARDING:  Object to
19   form.
20       THE WITNESS:  I told you
21   earlier, I would assume that
22   somebody at Grace knows what is
23   sought to be retained by this.  I
24   don't know who that person is, but

Page 89

1    somebody probably does.
2    BY MR. BROWN:
3        Q.   Okay.  If you turn to page
4    37 of the Joint Plan, definition 200.
5        A.   Ah, yes.  I see it.
6        Q.   Okay.  I have a few
7    questions on this one.
8        It says, "'Settled Asbestos
9    Insurance Company' shall mean any
10   Asbestos Insurance Entity that has
11   entered into an Asbestos Insurance
12   Settlement Agreement prior to the
13   conclusion of the Confirmation
14   Hearing..."
15       What's the basis for
16   limiting it to prior to the confirmation
17   hearing?
18       MR. FINCH:  Object.  To the
19   extent that calls for privileged
20   information or work product, you
21   are not allowed to answer.  To the
22   extent you can answer that without
23   divulging privileged
24   communications, you can do so.

Page 90

1    MS. HARDING: Same
2  objection.
3       THE WITNESS: 524(g) of the
4  bankruptcy code permits you to
5  protect an asbestos insurance
6  company that is identifiable by
7  name or as part of the
8  identifiable group at the time the
9  Plan is confirmed.
10      In any case, you have to
11  have a cut-off date of some sort.
12  It's a decision of any Plan
13  proponents as to where you are
14  going to have that cut-off point
15  occur or when.
16      Here, the Plan proponents
17  drafted and agreed on a Plan that
18  says it has to be prior to the
19  conclusion of the confirmation
20  area.  That's the basis for it.
21  BY MR. BROWN:
22    Q.   Okay.  They could, if they
23  wanted, agree to some later date,
    correct?

Page 92

1    A.   Again, you are asking me for
2  a legal opinion.  I have had occasion to
3  consider this issue in other cases and
4  have arrived at the personal conclusion
5  that there is a risk that if you do not
6  have the ability to identify an insurance
7  company by name prior to the effective
8  date, that you might find yourself unable
9  to obtain 524(g) protection for such an
10  insurer if you tried to make a settlement
11  later.
12      On the other hand, there are
13  arguments that you could draft a
14  provision in such a way that could
15  describe the things generically, anybody
16  who settles by thus and such a date.
17      I mean, there is
18  uncertainty.  As far as I am aware, there
19  is no case law that tells you whether you
20  can or cannot have a Plan provision that
21  would be open-ended enough to allow you
22  to add a settlement insurer as a
23  protected party after the effective date
24  of a Plan.

Page 91

1    MR. FINCH: Object to the
2  form.
3      THE WITNESS:  Subject to the
4  strictures of the statute itself.
5  You can always have a different
6  Plan from the Plan -- from any
7  given Plan.  I mean, 524(g) plans
8  don't come out of a form book.
9  BY MR. BROWN:
10    Q.   By statute, you mean 524(g)?
11    A.   Yes.
12    Q.   Is it the ACC's position
13  that extending protected status to
14  settled asbestos insurance companies has
15  to be done or the settlement has to occur
16  pre-confirmation?
17    A.   Pre-confirmation?  You are
18  asking me, again, for a legal conclusion.
19  I don't know that the Grace Committee has
20  arrived at a legal conclusion on that
21  subject.
22    Q.   Would your answer be the
23  same if the question was pre-effective
24  date?

Page 93

1    Q.   524(g) doesn't require that
2  the party actually be identified by name,
3  does it?
4      MS. HARDING: Object to the
5  form, also a legal conclusion.
6      THE WITNESS:  My best
7  recollection of the statute is
8  that it says that it has to be
9  identified by name or as member of
10  an identifiable group, whatever
11  that means.
12  BY MR. BROWN:
13    Q.   Okay.  Are you aware of any
14  confirmed 524(g) plans where 524(g)
15  protection has been extended to an
16  insurer after the Plan has been
17  consummated?
18    A.   I believe so.  I don't
19  believe that there was a contest over
20  whether such an extension after the fact
21  was legally permissible or not, however.
22      There have been plans where
23  either -- either the Plan itself had a
24  provision in it that permitted such later

Page 98

1    A.   There is a whole lot.
2    Q.   Okay.  Do any of the rest of
3  the asbestos-protected parties, is there
4  language in the Plan with respect to any
5  of them that so limits the scope of the
6  524(g) protection afforded them?
7        MS. HARDING:  Object to
8    form.
9        THE WITNESS:  Probably as
10   best I can recall, not.  This
11   particular provision was, as it
12   says, for the avoidance of doubt.
13   There were some allegations that
14   were being made by parties in this
15   case on this subject by competing
16   objectors, and it was felt
17   important to make clear exactly
18   what the Plan proponents thought
19   the scope of and insurance
20   protection did or didn't cover.
21 BY MR. BROWN:
22   Q.   Okay.  Among the
23  asbestos-protected parties are Fresenius
24  indemnified parties and the Sealed Air

Page 99

1  indemnified parties, correct?
2    A.   Correct.
3    Q.   And as I read the Plan, they
4  have 524(g) protection, and they have 105
5  protection?
6    A.   On different injunctions,
7  yes.
8    Q.   Okay.  And there is no
9  limiting language with respect to the
10 scope of the protection afforded either
11 of those two entities with respect to
12 524(g), is there?
13   A.   That's correct.  I might add
14 that the scope of the protection to be
15 afforded those two entities was spelled
16 out in a settlement agreement or two
17 settlement agreements that were approved
18 by the court in -- I don't know -- 2003
19 or thereabouts as part of a settlement of
20 the fraudulent conveyance litigation.
21      And there wasn't a whole lot
22 of options by the time we got to 2008 as
23 to what would or wouldn't be put in the
24 Plan by way of language on those

Page 100

1  particular topics.
2    Q.   Can I direct your attention
3  now to page 60 of the Joint Plan.
4    A.   Which Section?
5    Q.   7.1.4 entitled Warrants.
6    A.   That's on page 61 of my
7  Plan.  We must have different
8  paginations.  But I see it.
9    Q.   What is the footer?  Do you
10 have a footer?
11   A.   As I say, mine is from the
12 printed version.  You are right.  The
13 version you gave me that has the K&E
14 footer is it starts at the bottom.
15   Q.   I am working off the file
16 version.
17   A.   Okay.  So you are working
18 off -- so this is Section 7.2, right?
19      MR. FINCH:  No.  Warrants,
20   7.1.4.
21      THE WITNESS:  Which, in your
22   Plan -- I say.  I see.  Your
23   Plan -- so we are clear, on what's
24   been marked as ACC Exhibit-5, the

Page 101

1  Section 7.1.4 appears beginning in
2  the middle of page 60.  In the
3  Plan that I have been using that I
4  described at the beginning is the
5  one that was printed and sent out
6  to everybody is at the top of page
7  61.  So there is slight variation.
8  But I see the Section which is
9  7.1.4.
10 BY MR. BROWN:
11   Q.   Okay.  The second paragraph
12 that starts "If, prior to the issuance."
13      Do you see that?
14   A.   Yes.
15   Q.   And it carries over on mine
16 over to page 61.
17      Can you tell me what the
18 purpose of this provision is?
19      MS. HARDING:  Object to
20   form.
21      THE WITNESS:  Let me read
22   it.  Well, I would characterize
23   this as an antidilution
24   protection.

Page 102

1  BY MR. BROWN:
2      Q.   So that if prior to the
3  issuance of the warrant, there is
4  additional stock issued, you are going to
5  adjust the strike price as well as the
6  number of warrants; is that right?
7      A.   You are going to make the
8  adjustments described in this section. I
9  am not sure I want to summarize them the
10  way you just did, but this section spells
11  out in somewhat gory detail exactly the
12  type of antidilution provision that's
13  being offered for these warrants.
14      Q.   What if there is dilution
15  after the issuance of the warrant? Is
16  there any mechanism to deal with that
17  situation?
18      MS. HARDING:  Object to
19  form.
20      THE WITNESS:  There is a
21  warrant agreement around here
22  somewhere -- I believe it's
23  probably an exhibit to this
24  Plan -- that specifies all of the

Page 103

1  rights of the warrant holder.
2      I cannot, sitting here, tell
3  you at the moment that I can
4  recall whether there is a -- it's
5  a one-year warrant, and I just
6  don't remember whether during the
7  one-year exercise period that
8  there is or there is not
9  anti-dilution provisions.
10  BY MR. BROWN:
11      Q.   Okay.
12      A.   But if there are, they will
13  be in the warrant agreement as well as
14  they might be referenced in this section
15  of the Plan.
16      Q.   Let's go to the heading 7.2
17  The Asbestos PI Trust.
18      A.   I see it.
19      Q.   Do you see the second full
20  paragraph beings "The purpose of the
21  Asbestos PI Trust"?
22      A.   I see it.
23      Q.   And it lists a few items
24  there.

Page 104

1      A.   Yes.
2      Q.   Does the asbestos PI Trust
3  assume the duties and obligations of the
4  Debtors under asbestos insurance
5  policies?
6      MR. FINCH:  Object to form,
7  overly broad.
8      MS. HARDING:  Object to
9  form.
10      THE WITNESS:  As I
11  understand it, the duties and the
12  obligations of the Debtors under
13  insurance policies are triggered
14  only by the submission of claims
15  by the Debtor or some other
16  insured under the policies.
17      Absent an effort by the
18  insured or successor to get
19  coverage for claims, there are no
20  independent remaining duties and
21  obligations.
22  BY MR. BROWN:
23      Q.   If I can stop you, by
24  successor in that sentence, you mean

Page 105

1  Asbestos PI Trust?
2      A.   PI Trust.
3      Q.   Fair enough.
4      A.   When the Trust is assigned
5  rights under the policies and the Debtors
6  are given the right to assert any and all
7  coverage defenses --
8      MR. FINCH:  You mean
9  insurers?
10      THE WITNESS:  I am sorry.
11  Let me start over again.
12      When the Trust is assigned
13  rights under the policies and the
14  insurers are retaining all of
15  their coverage defenses with the
16  two exceptions we discussed
17  earlier, if the Trust proposes to
18  demand in some way or another
19  coverage from one or more insurers
20  under those policies, then
21  whatever the insurer asserts as a
22  pre-condition to coverage, what
23  you would call an obligation or a
24  right, would have to be fulfilled

Page 106

1    to the extent that a coverage
2    court determines that there is a
3    pre-condition to coverage.
4          And since the Trust is the
5    one seeking the coverage, by
6    hypothesis, it's the only one that
7    has any incentive to make sure
8    that the rights or -- excuse me --
9    that the obligations, the
10   pre-conditions are satisfied as
11   required by a coverage court.
12         And so to that extent, yes,
13   the Trust, one way or another, to
14   the extent determined by a
15   coverage court or by negotiations
16   with insurers, will have to
17   perform what you have described as
18   the obligations and rights under
19   the assigned insurance coverage.
20         That's my understanding.
21   BY MR. BROWN:
22       Q.   Do the Debtors, the
23   **Reorganized Debtors, retain any duties or**
24   **obligations under the asbestos insurance**

Page 107

1    **policies if this Plan is confirmed?**
2          A.   There are provisions
3    involving cooperation in the Plan
4    documents which would allow the Trust to
5    require, to the extent those cooperation
6    provisions say so, the Debtors to help
7    satisfy or wholly satisfy whatever the
8    particular requirement might be that only
9    the Debtor could do.
10         So there is, I guess, the
11   answer is there is an indirect obligation
12   on the Debtor's part. But the Debtor,
13   qua-Debtor, vis-a-vie, the insurer, since
14   the Debtor under the asbestos insurance
15   rights will not on its own be seeking
16   coverage, the Debtor sort of independent
17   of the Trust would not have any rights,
18   any obligations to the insureds except to
19   the extent, as I say, that the
20   cooperation with the Trust efforts to
21   access that insurance trigger such
22   cooperation obligations.
23       Q.   And the cooperation
24   **obligations that you described in the**

Page 108

1    **beginning of your answer are set forth in**
2    **the cooperation agreement; is that what**
3    **you were referring to?**
4          A.   They are set forth there.
5    There may be -- I don't remember whether
6    they are also set forth in other
7    documents, such as the Insurance Transfer
8    Agreement and/or the Plan itself. But
9    they are set forth -- I think there may
10   be some set forth in the Insurance
11   Transfer Agreement. I am not sure. I
12   would have to look at them.
13       Q.   Okay.
14         A.   But I do remember that there
15   are cooperation arrangements.
16       Q.   **If I understand your answer,**
17   **the cooperation obligation of the**
18   **Reorganized Debtors post-confirmation is**
19   **not the asbestos insurance companies but**
20   **rather to the Trust under the cooperation**
21   **agreement?**
22         A.   That's correct.
23         MS. HARDING:   Object to
24   form.

Page 109

1          THE WITNESS:   But the
2    asbestos insurance companies,
3    through the retention of asbestos
4    coverage defenses, are the
5    indirect beneficiaries of that
6    provision.
7    BY MR. BROWN:
8        Q.   **How so?**
9          A.   Because if they don't -- if
10   the Trust can't get Grace to perform the
11   cooperation that the policies require,
12   the insurance companies won't have to
13   provide the coverage if the coverage
14   court says such cooperation is mandatory.
15         There is nothing in the Plan
16   that says that an insurance company -- if
17   policy obligations are not performed as
18   required by the policy by somebody,
19   nevertheless they have to pay on the
20   insurance. The only entity or person
21   that could make such a determination
22   would be a coverage court judge and only
23   in the context of deciding that for
24   whatever reason the particular obligation

Page 118

1    provision, essentially that we are
2    going to transfer the assets to
3    the Trust and if you got a claim
4    or an interest in the assets, then
5    you can litigate that claim
6    against the Trust.
7        But we are going, I guess,
8    have potential confirmation
9    objections about whether there are
10   any such claims. I mean, the mere
11   assertion of a claim doesn't mean
12   that it's valid.
13   BY MR. BROWN:
14       Q.   Okay. If I can direct your
15   attention down to 7.2.4, which is
16   entitled Assignment and Enforcement of
17   Asbestos PI Trust Causes of Action.
18       A.   Yes.
19       Q.   I must confess, I am a bit
20   baffled by this one, so I need some help
21   with it.
22       How do Asbestos PI Trust
23   causes of action differ from asbestos
1    insurance rights?

Page 119

1        A.   Well, I have to go back and
2    look at the definitions to answer that
3    question.
4            Well, I think asbestos PI
5    Trust causes of action does include
6    asbestos insurance rights.
7        Q.   What else does it include?
8        A.   Well, if you look at the
9    definition, it includes defenses such
10   that, for example, if a claimant says, I
11   have a valid claim against Grace that's
12   channeled to the Trust and the Trust
13   disagrees with it, the Trust retains all
14   the defenses to that claim that Grace
15   would have had. That's clause A under
16   definition 47.
17       Q.   Okay.
18       A.   Clause B is, for example,
19   contribution rights, et cetera. So, for
20   example, if the Trust has -- if Grace has
21   contribution rights that it has not
22   asserted and that which are still valid
23   against a codefendant in a tort system
24   and the codefendant brings in indirect

Page 120

1    Asbestos PI Trust claim against the
2    Trust, the Trust could assert Grace's
3    contribution rights as a counterclaim to
4    that. That's two categories of things
5    that this is intended to include.
6        Q.   Okay. Let's go to page 64,
7    7.2.6, Creation and Termination of the
8    Asbestos PI TAC.
9        A.   Correct.
10       Q.   It says, "On or before the
11   Confirmation Date, the initial members of
12   the Asbestos PI TAC shall be selected by
13   the Asbestos PI Committee."
14           That has already occurred,
15   correct?
16       A.   Correct. They are
17   identified in the Asbestos PI Trust
18   Agreement.
19       Q.   Okay. How many actual
20   committee members are there on the
21   Asbestos PI Committee?
22       A.   I don't remember. But we
23   have the Disclosure Statement here. I
24   could pretty quickly find out by just

Page 121

1    looking at it where they are identified.
2        Q.   Okay.
3        A.   It's certainly more than the
4    four that are going to be on the TAC.
5        Q.   Okay. Is it fair to say
6    that the actual committee members who are
7    asbestos claimants act through their tort
8    counsel in connection with their
9    obligations as committee members?
10       A.   As a general proposition,
11   that's true. In any given committee on
12   any given issue, an individual member
13   might choose to show up and act on their
14   own behalf, and there have been some
15   examples in the past where that has
16   occurred.
17           But, as a general
18   proposition, the committee members are
19   blue-collar folks of limited legal
20   knowledge, and they delegate to their
21   personal injury lawyers their sort of
22   activities acting for them as an agent on
23   these committees.
24       Q.   Okay. You are counsel to

Page 122

1    the Asbestos PI Committee. You don't
2    have occasion, do you, to deal directly
3    with the actual claimants?
4         MR. FINCH: Object to the
5    form.
6         THE WITNESS: That's not
7    entirely true. I get calls
8    periodically that I just got this
9    incomprehensible Disclosure
10   Statement from Grace and could you
11   please tell me what it means or
12   something. But as a general
13   proposition --
14        MR. FINCH: Transfer to it
15   to Finch.
16        THE WITNESS: Or where do I
17   file my proof of claim.
18        But, as a general
19   proposition, I don't nor do other
20   folks at Caplin & Drysdale deal
21   directly with original committee
22   members.
23   BY MR. BROWN:
24        Q.   You deal with personal

Page 123

1    injury attorneys, correct?
2         A.   As a general proposition, we
3    deal with the PI lawyers who have been
4    appointed by their client committee
5    member to act on their behest in the
6    committee.
7         Q.   Now, the TAC members are
8    John Cooney, Perry Weitz, Joe Rice,
9    and -- who was the fourth one? .
10        A.   Well, I can tell you by
11   looking at the PI Trust Agreement, which
12   is Exhibit-2 to the Plan and looking at
13   the signature page, we should have, which
14   is --
15        Q.   Russell Budd.
16        A.   Russell Budd, John Cooney,
17   Joseph Rice, and Perry Weitz.
18        Q.   And each of them works for a
19   law firm, correct?
20        A.   Each of them is a partner in a
21   law firm, yes.
22        Q.   Sorry. I didn't mean to...
23        Now, does each of those law
24   firms have a client that sits on the

Page 124

1    committee?
2         A.   Yes.
3         Q.   And do those committee
4    members for those firms act through those
5    four gentlemen?
6         A.   On the committee?
7         Q.   Yes.
8         A.   Generally, yes.
9         Q.   Okay. So is it fair to say
10   that Mr. Rice, Mr. Weitz, Mr. Cooney, and
11   Mr. Budd selected themselves to be
12   members of the TAC?
13        A.   No, because there are many
14   other members of the committee, and the
15   committee as a whole, which, in this
16   particular case, I believe has a majority
17   of members that are not these four
18   gentlemen, decided which of their members
19   they thought would be appropriate persons
20   to put on the TAC.
21        Q.   And how was that decided?
22        A.   As far as I know, they had
23   informal discussions, and they had a
24   committee meeting. I don't remember

Page 125

1    whether there were votes or anything like
2    that. But at the end of the day, through
3    some sort of nomination or informal
4    self-nomination or self-nomination,
5    speeches, lobbying, discussions, what
6    have you, there came a time at which the
7    committee voted to select these four
8    people.
9         Q.   Okay.
10        A.   And I might add that the
11   Future Claimants Representative had a
12   sort of a generalized oversight in the
13   sense that while the Plan contemplates
14   that the committee would nominate the
15   TAC. If the FCR thought, for some reason
16   or another, that somebody had been put on
17   the TAC that was a real bad idea, the
18   committee would probably have had to
19   listen to the Future Representative's
20   views on that even though the Futures Rep
21   did not have sort of a formal veto or
22   role in that process.
23        Q.   Okay. I want to now turn to
24   page -- well, it's 69 on my version,

Page 126

1   Section 7.7, Conditions to Occurrence of
2   the Confirmation Date, and I want to
3   focus your attention first on (g).
4       A.   I see it.
5       Q.   What are the securities that
6   are funding the Asbestos PI Trust?
7       A.   The warrant and the Deferred
8   Payment Agreement, which is a debt
9   obligation, which also includes, I
10  believe, a promissory note or promissory
11  notes.
12      Q.   Can you describe for me the
13  circumstances under which the asbestos PI
14  claim -- excuse me -- the Asbestos PI
15  Trust will be funded with dividends?
16      A.   In the event that it
17  exercises the warrant and acquires stock
18  pursuant to that exercise and the stock
19  pays dividends, it will get dividends.
20      Q.   And if the warrant is not
21  exercised?
22      A.   Then it won't get dividends.
23      Q.   What about if there is a
24  default under the deferred payment note?

Page 127

1       A.   My recollection is that the
2   Trust has the right to get 50.1 percent
3   of the stock of the Debtor under those
4   circumstances.
5            But, again, the terms of --
6   that's a very complicated set of
7   documents, and the precise terms of that
8   are whatever the document states. I can
9   only give you a sort of a very
10  generalized description.
11      Q.   Okay. Let me draw your
12  attention now down to (l), condition (l).
13      A.   Yes, I see it.
14      Q.   What does that mean?
15           MS. HARDING: Object to
16  form.
17           THE WITNESS: Well, what it
18  means is that if you didn't have a
19  TDP, which includes things like a
20  payment percentage and mechanisms
21  for trying to trying to limit the
22  ways in which the Trust expends
23  monies on claims, and you just had
24  sort of a come in, sue the Trust

Page 128

1   and the tort system, et cetera,
2   you would have a
3   first-come-first-serve operation
4   where there was the distinct
5   possibility that, as it happened
6   in the Manville Trust at the very
7   beginning, all the money would run
8   out the door at the front end, and
9   there wouldn't be anything left
10  for future claimants, which would
11  violate 524(g).
12  BY MR. BROWN:
13      Q.   Okay. Well, the way that
14  this provision is written suggests that
15  any procedures other than those that are
16  set forth in this Plan would defeat the
17  purposes of Section 524(g).
18           Is that what is intended
19  here?
20           MR. FINCH: Object to form.
21           MS. HARDING: Object to
22  form.
23  BY MR. BROWN:
24      Q.   Are there other options, is

Page 129

1   the question?
2       A.   If the question is could one
3   hypothesize a somewhat different set of
4   TDPs that had somewhat different
5   procedures, the answer is depending on
6   what that different TDP set of procedures
7   was, you might be able to say the same
8   thing about it.
9            The purpose of this thing is
10  to say that this structure, according to
11  the court, satisfies the requirements of
12  524(g) that say that you have to
13  establish this requirement.
14           I mean, this is a finding of
15  fact that is intended to have the court
16  rule that the Plan does, in fact, meet
17  the requirements of a subsection of
18  524(g).
19      Q.   You could, in fact, have a
20  Plan that met the qualifications for
21  524(g) that actually had a role for
22  asbestos insurance entities, correct?
23           MR. FINCH: Object to form.
24           MS. HARDING: Object to

Page 130

1    form.
2        THE WITNESS:
3    Hypothetically, probably yes. It
4    would be more difficult, but,
5    hypothetically, yes. You could
6    have -- we have had some plans
7    that had coverage in place
8    agreements with insurers, for
9    example, that we felt satisfied
10   524(g). But you have to get the
11   insurers' agreement to have a
12   coverage in place agreement.
13   BY MR. BROWN:
14       Q.  Okay. Let's go now to
15   condition (r) -- I am sorry. Condition
16   (s).
17       A.  Yes.
18       Q.  Now, for purposes of my
19   question, I want you to assume that when
20   I use the term "settled asbestos
21   insurance companies," I want you to
22   assume that those that are pre-petition.
23       A.  Okay.
24       Q.  And my question is a very

Page 131

1    general one, because I have heard
2    different views, and that is, what
3    benefits are being provided by or on
4    behalf of settled asbestos insurance
5    companies listed on Exhibit-5?
6        A.  It is the position of the
7    ACC that Grace is paying close to
8    $3 billion of value to the Trust on
9    behalf of not only itself but a variety
10   of other protected parties, including
11   Non-Debtor affiliates and, in this
12   particular case, settled asbestos
13   insurers.
14       And it is doing so on behalf
15   of settled asbestos insurers because
16   those insurers have indemnity claims
17   against Grace, which are being, if they
18   hypothetically could ever occur, are
19   being channelled to the Trust as a means
20   of protecting Grace against such -- well,
21   let me back up.
22       The purpose of putting
23   settled asbestos insurers in here is not
24   to provide a gratuitous asbestos insurers

Page 132

1    because we think they are nice folks.
2        Q.  I didn't think so.
3        A.  Settled asbestos insurers,
4    by definition, are insurers that have
5    indemnity rights against Grace.
6        Q.  They have also paid a lot of
7    money?
8        A.  And they paid a lot of money
9    in the past. But the past money -- money
10   is fungible. The past money went into
11   Grace's coffers, went out or didn't go
12   out, et cetera. But they are not being
13   asked for any new money.
14       But Grace has an economic
15   interest in not having asbestos PI claims
16   brought against those insurers that could
17   then trigger an indemnity obligation of
18   Grace to the insurer against which that
19   asbestos PI claim was asserted. They
20   have an economic interest in preventing
21   that.
22       So the deal is channel any
23   such claim that might give rise to the
24   asbestos indemnity claim to the Trust,

Page 133

1    and in exchange for that, part of what
2    Grace is paying you is to get rid of
3    asbestos PI claims which include indirect
4    asbestos PI claims for indemnity or
5    direct asbestos PI claims for indemnity.
6        Q.  Okay.
7        A.  And that's the basis.
8        Q.  I think you said at the very
9    beginning of either the last question or
10   the one before that Grace was
11   contributing 3 million?
12       A.  Billion.
13       Q.  That's what I thought.
14   Okay. I just wanted to make sure I had
15   the number correct.
16       A.  I mean, that's our view of
17   the approximate amount of what they were
18   contributing at the time we made the
19   deal, I guess would be a better way to
20   put it. There are other people that
21   might value it differently.
22       Some of things that were
23   worth more at the time the deal was made
24   are worth less today but hopefully will

Page 166

1   agreement itself as being the
2   definitive answer to your
3   question.
4   BY MR. BROWN:
5   **Q.   And to the extent that it's**
6   **contained in the Fresenius agreement --**
7   A.   Correct.
8   **Q.   -- that indemnity obligation**
9   **only arises in the event that the Plan is**
10  **confirmed, correct?**
11  A.   I believe that's correct,
12  because I believe that the Fresenius
13  agreement itself is contingent on
14  confirmation to the Plan.  And,
15  therefore, if the Plan isn't confirmed,
16  then I think the Fresenius agreement
17  becomes ineffective or invalidated or
18  terminates, or whatever word you want to
19  use.
20  **Q.   Okay.  Now, what about to**
21  **the extent that OneBeacon or Seaton or,**
22  **for that matter, any other settled**
23  **insurer had a claim that was not arising**
24  **out of an asbestos personal injury**

Page 167

1   **claim --**
2       MR. KRAMER:  I am going to
3   object for the record because
4   these questions really don't
5   relate to this document, so we
6   either should unseal the record
7   and call Mr. Speights now or if
8   you can simply ask your questions
9   related to this document and then
10  you can unseal the record.
11     Matt Kramer for the Property
12  Damage Committee.
13     MR. BROWN:  I am happy to do
14  that.  That's fine.
15     THE WITNESS:  It seems to me
16  that there is nothing confidential
17  that we are talking about.  I
18  mean, if we are not talking about
19  the terms of the settlement --
20     MR. BROWN:  That's fine.
21  That's fair enough.
22     MR. KRAMER:  Since I made
23  the objection, I will be happy to
24  call Mr. Speights.

Page 168

1           * * * * *
2   CONFIDENTIAL PORTION OF TRANSCRIPT ENDS
3           * * * * *
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 169

1       (Mr. Speights re-joined.)
2   BY MR. BROWN:
3       **Q.   All right.  There was a**
4   **question pending, but let me see if I can**
5   **rephrase it.**
6          **To the extent that a settled**
7   **asbestos insurance company has a**
8   **contractual indemnity claim under a**
9   **settlement agreement against Fresenius or**
10  **Sealed Air that is not related to an**
11  **underlying asbestos personal injury**
12  **claim, is that type of claim enjoined**
13  **under the Plan?**
14      A.   Well, it's not enjoined by
15  the asbestos permanent channelling
16  injunction.
17      **Q.   Asbestos PI channelling**
18  **injunction?**
19      A.   PI channelling injunction.
20  Whether it's enjoined by some other
21  injunction, I can't think of offhand.
22      **Q.   What about the successor**
23  **claims injunction?**
24      A.   I am going to have to look

Page 170

1    at that injunction.
2            I can't recall ever having
3    spent a lot of time thinking about that
4    issue before, but it seems possible that
5    that hypothetical claim could be enjoined
6    by the successor claims injunction in
7    Section 8.5 of the Plan as against
8    Fresenius and Sealed Air.
9        Q.   I want to turn your
10   attention now to Section 7.15.  We have
11   talked about it a little bit already,
12   Insurance Neutrality.
13       A.   I have it.
14       Q.   Okay.  Other than the
15   conditions set forth in (g) under 7.15,
16   are asbestos insurance entities bound by
17   any other findings or conclusions
18   contained in the Plan?
19       A.   Yes, potentially under
20   Section 7.15(j).
21       Q.   Okay.  Anything else?
22       A.   Well, yes, two other
23   categories of things.  One would be
24   rulings on compliance with the bankruptcy

Page 171

1    code provisions, which are not under the
2    definition of asbestos coverage defenses
3    preserved, as we had discussed earlier.
4        Q.   Okay.
5        A.   And, secondly, there is a
6    race judicata provision in Section
7    7.15(e) that, in effect, says that if an
8    asbestos insurer actually litigates some
9    claim in the bankruptcy case, it could
10   be -- assuming that otherwise
11   non-bankruptcy principles of race
12   judicata or collateral estoppel would
13   apply, it could be bound by the outcome
14   of any such litigation that it initiated.
15       Q.   Okay.
16       A.   Other than that, I believe
17   the answer to your question, those are
18   the only conditions that I am aware of.
19       Q.   Okay.  Would it be correct
20   to say that this provision overrides the
21   exculpation provision in the Plan which
22   appears at Section 11.9?
23       MR. FINCH:  Object to form.
24       MS. HARDING:  Object to

Page 172

1    form.
2        THE WITNESS:  Let me turn to
3    Section 11.9.  I don't think so,
4    because I think the exculpation
5    provision comes under the heading
6    bankruptcy issues.
7        The exculpation provision is
8    pretty limited.  What it applies
9    to are acts or omissions in
10   connection with or arising out of
11   the Chapter 11 cases.  And my
12   understanding of what is intended
13   to be covered by that is some
14   claim that one of the parties
15   covered by it engaged in some sort
16   of misconduct during the course of
17   the bankruptcy case -- I don't
18   know -- a claim, to put it
19   personally, the Asbestos Claimants
20   Committee somehow or another
21   breached a fiduciary duty to its
22   constituency by proposing a Plan
23   that this exculpation provision
24   would apply to that sort of a

Page 173

1    claim or a similar claim against
2    the Debtors.
3        But those types of claims
4    are not insurance coverage claims
5    or defenses.  They would just be
6    some sort of -- and, indeed, it's
7    almost inconceivable to me how an
8    insurance company could ever have
9    the sort of claim that would be
10   exculpated by Section 11.9,
11   frankly.
12   BY MR. BROWN:
13       Q.   Well, if they did --
14       MR. FINCH:  Object to the
15   form.
16   BY MR. BROWN:
17       Q.   -- would the exculpation
18   provision take precedence over Section
19   7.15?
20       MR. FINCH:  Object to form.
21       MS. HARDING:  Object to
22   form.
23       THE WITNESS:  That question
24   is almost impossible to answer,

Page 174

1  because without knowing what the
2  claim is -- I mean, 7.15 addresses
3  specific types of situations
4  having to do with insurance.
5      11.9 addresses claims that,
6  on their face, have no apparent
7  relationship to insurance, and,
8  therefore, to know whether there
9  is any overlap between the two to
10  determine which one would prevail
11  in the event that there was an
12  overlap, you would have to have
13  some idea what kind of claim you
14  are talking about. And, frankly,
15  I have no idea what kind of claim
16  you want me to hypothesize for
17  purposes of that question.
18  BY MR. BROWN:
19      Q.  All right. There are some
20  releases that are mentioned in Section
21  7.15, and I want you to put those aside
22  for a moment.
23      Other than the releases that
24  are cited in 7.15, are any other releases

Page 175

1  that appear in the Plan or Plan documents
2  binding on asbestos insurance entities?
3      MS. HARDING: Object to
4  form.
5      THE WITNESS: I would have
6  to give you a very similar answer
7  to the one I just gave you on
8  exculpation because I would have
9  to know what kind of claims you
10  are talking about.
11      7.15 is intended to deal
12  with insurance policy/settlement,
13  insurance settlement, insurance
14  reimbursement situations, and
15  preservation of insurer rights
16  with respect to those types of
17  agreements. Releases in the Plan
18  may or may not cover those
19  situations.
20      As a general proposition, I
21  don't think the Plan purports to
22  release claims by asbestos
23  insurers sort of generically
24  against a whole lot of different

Page 176

1  people. There are some specific
2  releases that we have talked about
3  already.
4      Without knowing what sort of
5  a claim you believe the Plan
6  releases and being able to figure
7  out whether that claim ties into
8  the sort of relationships that
9  7.15 -- policy type relationships
10  that 7.15 is intended to address,
11  I really can't answer. I am not
12  trying to evade the question. I
13  just can't answer it for the
14  reasons I stated.
15      MR. BROWN: Okay.
16      (ACC 30(b)(6)-8 and 9 marked
17  for identification at this time.)
18  BY MR. BROWN:
19      Q.  All right. Mr. Lockwood,
20  you have before you two documents, ACC-8
21  and ACC-9. Let's start with 8.
22      A.  I have it.
23      Q.  Have you ever seen that
24  document before?

Page 177

1      A.  Yes.
2      Q.  What is it?
3      A.  It is a complaint by The
4  Scotts Company attempting to initiate an
5  adversary proceeding in the Grace
6  bankruptcy case against various insurers
7  and Grace.
8      Q.  Okay. And is the relief
9  that is sought by Scotts in this
10  adversary complaint as against the
11  insurers that are defendants, who are
12  also settled asbestos insurance
13  companies, enjoined in its totality?
14      A.  As of right now or under the
15  Plan?
16      Q.  Under the Plan.
17      A.  I want to say yes to that,
18  but I would have to say this: I believe
19  that Scotts is asserting claims in this
20  action as asserted additional insured
21  under vendor coverage in W.R. Grace
22  insurance policies, point one.
23      I believe the basis is suits
24  against Scotts for Scotts' liability for

Page 178

1  products that contain vermiculite that it
2  obtained from Grace.
3         To the extent, therefore,
4  that the claims sought to be asserted
5  against the insurers for coverage for
6  those claims that I just described are
7  the ones that are the subject matter,
8  they are enjoined under the Plan because
9  they are asbestos personal injury claims
10 -- and you can walk through them --
11 Asbestos PI Trust claims, channel
12 asbestos Trust. You can walk through the
13 definitions, and they are ultimately
14 claims that are channelled to the Trust.
15        If there is some other kind
16 of claim for which they are seeking
17 insurance coverage -- and I can't quite
18 imagine what it is, because I am not
19 aware that they are alleged vendor of any
20 products of Grace don't contain
21 vermiculite and create an
22 asbestos-related injury alleged from
23 vermiculite, then they wouldn't be
24 enjoined. But I don't think there are

Page 179

1  any such claims. I never heard of them.
2  So that's the caveat.
3     Q.  If the underlying claim or
4  an underlying claim against Scotts
5  alleges that Scotts itself was negligent
6  and Scotts is held liable in that case
7  for its own negligence and perhaps for
8  the negligence of Grace and then seeks
9  coverage against the settled asbestos
10 insurers under the vendor endorsements,
11 are all of those claims enjoined by the
12 asbestos PI channelling injunction?
13        MS. HARDING: Object to the
14 form.
15        THE WITNESS: The only
16 claims that are enjoined by the
17 asbestos PI channelling injunction
18 are claims against settled
19 insurers that meet two
20 qualifications: One, they are
21 indemnified by Grace, the claim
22 against the insurer; and, two,
23 they are based on exposure to an
24 asbestos-containing product

Page 180

1  manufactured, distributed, et
2  cetera, by Grace. Those are the
3  two requirements, and as far as I
4  can recall, the only two
5  requirements.
6  BY MR. BROWN:
7     Q.  Can you look at what's been
8  marked as ACC-9?
9     A.  I am looking at it.
10    Q.  You have seen this document
11 before?
12    A.  Yes, I saw it in a courtroom
13 in the not-too-distant past.
14    Q.  And you would recall when
15 you saw it in the courtroom, that
16 Mr. Bernick drew a line on this diagram.
17        Do you recall where he drew
18 a line?
19    A.  No.
20    Q.  I will refresh your
21 recollection. It was from the block that
22 says "Scotts" directly into the block
23 that says "Asbestos PI Trust."
24    A.  Okay. I can imagine why he

Page 181

1  would have drawn that line.
2     Q.  And he was indicating by
3  that line, as I understood it, that claim
4  4 on this diagram, claim 5, and claim 6
5  are nonexistent.
6         Is that your understanding?
7     A.  Of what he was doing or what
8  the facts are?
9     Q.  Yes. Of what he was doing?
10        MR. FINCH: Object to form.
11        MS. HARDING: Objection to
12 form.
13        THE WITNESS: If you drew a
14 line from the box called "Scotts"
15 to the Trust, that would be what
16 one was doing.
17 BY MR. BROWN:
18    Q.  Okay. And do you agree with
19 that?
20    A.  To the extent stated in the
21 answers to the previous questions, i.e.
22 that if -- the box at the top that gives
23 rise to the claims against Scotts says
24 "asbestos claimants." If those asbestos

Page 230

1    cumulative iteration process, have
2    had that sort of a role.
3        Obviously, that's not the kind of
4    role you have in mind. The kind
5    of role you have in mind is coming
6    to you and saying we want to
7    negotiate about it, we want to get
8    your agreement to it, we want to
9    get your approval of it. And that
10   sort of a role, to my knowledge,
11   you didn't have on this TDP.
12   BY MR. BROWN:
13       Q. All right. Under this TDP,
14   is there any role for any asbestos
15   insurance entity --
16       A. In --
17       Q. Well, I hadn't finished.
18       A. Sorry.
19       Q. -- in connection with any of
20   the claims resolution processes?
21       A. Well, you yourself
22   identified one a few questions back,
23   which is if the claimant doesn't settle
24   its claim with the Trust, brings the

Page 231

1    claim against the Trust in the tort
2    system, and the Trust has to defend it.
3    It is certainly within the contemplation
4    of these documents that the Trust could
5    tender that defense in that claim to an
6    insurer.
7        Q. Okay.
8        A. And that would be where the
9    Trust -- while it doesn't spell that out
10   in here, that would certainly be a place
11   where an insurer might have an
12   involvement.
13       Beyond that, there is
14   nothing in the Trust that expressly
15   addresses any participation by insurers
16   in the claims resolution process.
17       That said, if some coverage
18   court decides that the insurers have the
19   right to participate in the claims
20   resolution process, the TDP has amendment
21   procedures in it, and the trustees might
22   very well conclude that if the only way
23   they could get access in the future to a
24   lot of valuable assigned insurance rights

Page 232

1    was to allow insurers to handle the
2    claims, they would have to right under
3    this document and the Trust Agreement
4    with the consent of the TAC and the FCR
5    to amend it to give the insurers a right.
6    But, in its present form, there is no
7    express provision involving the insurers
8    in the claims resolution process.
9        Q. And that's true for the
10   expedited review, individual review, and
11   arbitration, correct?
12       A. It's certainly true of the
13   expedited review and individual review.
14   It's an interesting question whether or
15   not the Trust could tender a claim for
16   arbitration to an insurer. I don't know
17   whether there is anything that would
18   prohibit them from doing that.
19       Arbitration is, to some
20   extent, like litigation, and they could
21   certainly tender a claim for an insurer,
22   a litigation claim to an insurer. They
23   might be able to. I don't know of
24   anything that would preclude them, I

Page 233

1    guess, from tendering it to an insurer
2    for arbitration. I don't know.
3        Q. But the TDP doesn't spell
4    out any role?
5        A. The TDP doesn't spell it
6    out, no.
7        Q. Let's go to Section 2.6.
8        A. Of which document?
9        Q. Trust Distribution
10   Procedures, ACC-11.
11       A. Okay.
12       Q. Now, the first question I
13   have, that refers to indirect PI Trust
14   claims?
15       A. Correct.
16       Q. There is in Section 5.12 and
17   5.13 a couple of other terms that are
18   used. In 5.12, the term "insurer-related
19   TDP claims" is used.
20       A. Correct.
21       Q. In 5.13, the term
22   "indemnified insurer TDP claims" is used.
23       And my first question is
24   whether those two terms are included

Page 234

1  within the term "indirect PI Trust
2  claim"?
3      A.   Well, that's, again, almost
4  a metaphysical debate, because --
5  actually, if you really parse the
6  definitions in the Plan, I remember
7  concluding that there was probably a
8  better argument that the claims that are
9  identified in 5.12 and 5.13 were direct
10  PI Trust claims and not indirect PI Trust
11  claims.
12      But we decided, rather than
13  to have to get into parsing things --
14  this is a classic example, these two
15  provisions of how you change TDP
16  provisions when insurers raise objections
17  that you think are meritorious in some
18  way or another. We decided to just have
19  these specific provisions deal with
20  claims that are being channelled to the
21  Trust, whether they are direct claims or
22  indirect claims, being sort of not a
23  matter of great moment. They are one or
the other or both. And so they are dealt

Page 235

1  with in these two specific provisions --
2      MR. FINCH: Which two are
3  you referring to?
4      THE WITNESS: 5.12 and 5.13.
5      -- to make sure that
6  everybody knew exactly how they
7  were going to be dealt with.
8  BY MR. BROWN:
9      Q.   So is your answer that the
10  terms "insurer-related TDP claims" and
11  "indemnified insurer TDP claims" might be
12  direct Trust claims or, on the other
13  hand, might be indirect Trust claims?
14      A.   My own personal opinion is
15  that they are direct PI Trust claims, if
16  you go back to the Plan and look at the
17  definitions.
18      Q.   Is that the ACC's position
19  or your personal position or both?
20      A.   Well, I mean, I am the ACC
21  representative, and I was the one who was
22  most involved in drafting the Plan, so I
23  guess it's the ACC's perspective.
24      I personally don't see

Page 236

1  frankly at the end of the day that it
2  matters whether they are direct or
3  indirect claims, and that's why we didn't
4  attempt to change the definition.
5  Remember, these two provisions are new.
6      Q.   I know.
7      A.   They were drafted long after
8  the definitions of direct and indirect PI
9  Trust claims were put in both the Plan
10  and in this TDP.
11      And so the question is, was
12  there any utility having agreed to put
13  these provisions in to deal with these
14  particular kinds of claims to going back
15  and trying to sort of re-write the
16  definitions of direct claims and indirect
17  claims to put them in one basket or the
18  other, and we couldn't see that it
19  mattered.
20      But if you, through your
21  probing cross-examination, convince me
22  that it does matter, then maybe we will
23  have to go and fix it.
24      Q.   Well, we are using the term

Page 237

1  "direct PI Trust claim," and I am not
2  sure there is such a term.
3      A.   Well, there may not be. I
4  don't think there is an indirect PI Trust
5  claim, and I don't remember what -- there
6  is some term that we used for the claims
7  that are going in here somewhere, I would
8  assume.
9      Q.   Well, you have asbestos PI
10  claims.
11      A.   Well, maybe that's the term.
12  Yeah, it's asbestos PI claims.
13      Q.   So the ACC --
14      A.   It's on page 1, unnumbered
15  page 1, second line. It says,
16  "...provide for resolving all 'Asbestos
17  PI Claims' as defined in the First
18  Amended Joint Plan of Reorganization," et
19  cetera.
20      Q.   I am sorry. What document
21  are you in?
22      A.   TDP, page 1, second line on
23  the page. There is the reference to
24  asbestos PI claims in quotes as defined

Page 238

1   in the First Amended Plan. That's the
2   generic term. And indirect PI Trust
3   claim is simply a subset of that. And I
4   don't think it's an indirect PI Trust
5   claim. I think it's an asbestos PI claim
6   which, of course, happens to include in
7   its definition indirect PI Trust claims.
8         (There was an interruption
9         at this time.)
10  BY MR. BROWN:
11       Q.   Just to circle out this line
12  of questioning, there is a Section in
13  5.6.
14       A.   Of the TDP?
15       Q.   Of the TDP.
16       A.   That's the section that
17  deals with PI claims.
18       Q.   So based on your answers
19  that you just gave, I presume that the
20  ACC's position is that 5.6 has no
21  application to insurer-related TDP claims
22  or indemnify insurer TDP claims?
23       A.   Correct.
24            MS. HARDING: I think I

Page 239

1   wanted to object to form before
2   you answered, but that's all
3   right.
4   BY MR. BROWN:
5       Q.   Okay. Let's go to page --
6            MS. HARDING: Could you
7   repeat the question, please?
8            (The reporter read from the
9   record as requested.)
10           MS. HARDING: Object to
11  form. I think it's very
12  confusing.
13           THE WITNESS: To make it
14  clear, the way in which the term
15  of the so-called insurance related
16  TDP claims are treated under the
17  TDP is set forth in Section 5.12
18  of the TDP and not in Section 5.6
19  of the TDP.
20           Similarly, the way in which
21  indemnified insurer TDP claims is
22  defined in the TDP, are treated
23  under the TDP is contained in
24  Section 5.13 of the TDP and not in

Page 240

1         Section 5.6 of the TDP.
2   BY MR. BROWN:
3       Q.   If I can direct your
4   attention now to Section 4.3 of the TDP.
5       A.   I have it.
6       Q.   Let's see. The third full
7   paragraph begins "There is uncertainty."
8   I direct your attention to the second
9   sentence there.
10      A.   Yes.
11      Q.   If federal or state law were
12  to impose greater restrictions or limits
13  on the asbestos PI claimants to recover
14  in the tort system, is there a mechanism
15  under the Trust Agreement or the Trust
16  Distribution Procedures to incorporate
17  such restrictions or limits into the TDP?
18      A.   Yes, you could amend them.
19      Q.   Okay. And does that
20  amendment require the consent of the
21  Trust Advisory Committee?
22      A.   Subject to the ability to go
23  to court if the trustees disagree with
24  the TAC's refusal to give such consent,

Page 241

1   yes.
2       Q.   Okay.
3       A.   I would also observe,
4   however, that to some extent, changes in
5   federal or state law could show up
6   without amendments to the TDP. Because
7   in individual review, arbitration and
8   claims that go through to the tort
9   system, the trustees can apply applicable
10  state or federal law principles that
11  govern those claims.
12           The only claims for which
13  there are specified criteria, which might
14  or might not -- strike -- which might
15  become superseded at some level by some
16  hypothetical state or federal law would
17  be the expedited review provisions. They
18  are the ones that are written down.
19           Everything else is you have
20  a claim, to the extent that you have a
21  valid claim under state law for
22  individual review, arbitration, and the
23  tort system.
24           So to the extent that you

Page 242

1  had such changes, they began to show up
2  in the results of individual review,
3  arbitration, or litigation in the tort
4  system, that could affect the totality of
5  the PI Trust claims to be paid over time,
6  which is what this sentence is talking
7  about.
8      Q.   All right.  If you look at
9  Section 5.3(a)(3), specifically the
10  sentence that begins "thereafter."
11      MR. FINCH:  What page are
12  you on, Mike?
13      MR. BROWN:  Mine is page 23.
14      THE WITNESS:  23.  I see it.
15  BY MR. BROWN:
16      Q.   Okay.  Now, there are some
17  limitations imposed by Section 524(g) and
18  by the Trust Agreement on the types of
19  changes that can be made under the TDP.
20      Is that a fair statement?
21      MR. FINCH:  Object to form.
22      THE WITNESS:  I am not sure,
23  actually.  What sort of
24  limitations do you have in mind?

Page 243

1  BY MR. BROWN:
2      Q.   Looking at the sentence that
3  I just directed you to, are there any
4  restrictions placed on the trustee in
5  terms of how they can change any of these
6  items, the disease levels, the scheduled
7  values, the medical or exposure criteria,
8  et cetera?
9      A.   Well, first, they have
10  fiduciary obligations to the
11  beneficiaries of the Trust which would
12  preclude them from making arbitrary
13  decisions that work to the detriment of
14  claimants.  So they have that sort of
15  restriction, but that's sort of general.
16      They have a restriction of
17  sorts in the need to go through the
18  consent process.  But at the end of the
19  day, they could do it, as I said earlier,
20  if a judge thought that either the FCR or
21  the TAC or both were being unreasonable.
22      I suppose, to go back to
23  your earlier question, that one could
24  hypothesize -- at some level, the

Page 244

1  trustees are obligated to make sure that
2  the Trust continues to comply with
3  524(g).  There is no question about that.
4  It's just hard to know what sort of
5  changes you could imagine that would be
6  consistent with their fiduciary duties to
7  the claimants that would jeopardize that.
8  So, yeah, it's a restriction, I guess,
9  but how it would actually ever come into
10  play, I don't know.
11      Q.   There is a reference on page
12  28 to foreign claims.
13      A.   Yes.
14      Q.   Which does not include
15  claims in U.S. jurisdictions or Canada.
16      A.   Correct.
17      Q.   Are there other claims
18  pending out there in other jurisdictions
19  right now?
20      A.   Against Grace?
21      Q.   Yes.
22      A.   I am not personally aware of
23  any such claims, but there have been
24  claims brought against other trusts by

Page 245

1  non-residents of the United States and
2  Canada.  So, therefore, since it's
3  possible, you put in a provision that
4  deals with the possibility that it might
5  occur in this case.
6      I mean, this is sort of a
7  standard provision nowadays in these
8  trusts.  I don't think it's responsive to
9  anything particular in the Grace case.
10  But, as I say, I just don't remember any
11  such claims.
12      Q.   All right.  Can you turn to
13  page 31?
14      A.   I am there.
15      Q.   The paragraph that begins,
16  "with respect"?
17      A.   Yes.
18      Q.   About halfway down the
19  sentence that begins "The choice of law
20  provision..."?
21      A.   Yes.
22      Q.   What is the purpose of this
23  provision?
24      A.   Let me refresh my memory on

Page 378

1  terms from the previous plans that I am
2  aware of.
3     Q.  As the ACC's designee to
4  take this 30(b)(6) deposition, would you
5  be aware if there were such an agreement?
6     A.  I believe I would be, yeah.
7     Q.  What agreements, if any,
8  were struck at the time of ACC Exhibit-3
9  concerning how Libby claimants' claims
10  would be treated?
11     A.  Other than that they would
12  be part of the asbestos claimants whose
13  claims would be channelled to the Trust
14  and whose consideration would be paid out
15  of the assets that were to be contributed
16  to the asbestos Trust under the Term
17  Sheet, there were no agreements that I am
18  aware of.
19     Q.  Were there any agreements
20  concerning who would bear responsibility
21  for restitution claims, if any, in
22  connection with the criminal trial now
23  going on in Montana?
         MS. HARDING:  Object to

Page 379

1  form.
2         THE WITNESS:  I don't
3  believe there were at that time,
4  no.
5  BY MR. DANIEL COHN:
6     Q.  Have there been any
7  agreement on that subject since then?
8     A.  Well, there is provisions in
9  the Plan that speak to that, so yes.
10     Q.  Apart from provisions of the
11  Plan, are there any agreements between
12  the Asbestos PI Committee and any of the
13  other Plan proponents on the subject
14  matter of the Plan?
15     A.  The Plan embodies the
16  agreements.  There are no side
17  agreements, oral or written, that vary
18  from the Plan that I am aware of.  And,
19  indeed, I would be very surprised if I
20  was not aware -- if there were any that I
21  was not aware of.
22     Q.  All right.  And one last
23  question on this subject.  It has been
24  known from time to time for the

Page 380

1  co-proponents of a Plan to enter into a
2  co-proponent agreement governing that
3  relationship.  Is there any such
4  agreement, written or orally?
5     A.  No.  Well, you say written
6  or oral.  There is certainly no written
7  agreement of that.  I mean, the Plan
8  itself -- other than the Plan itself.  I
9  mean, when you sign on to a Plan, is the
10  Plan proponent with somebody else is a
11  Plan proponent.  That's in a written
12  document, and we have sort of agreed.
13         But if you are talking about
14  some oral agreement that says this binds
15  us outside the Plan or -- I am not sure
16  really what kind of agreement you have in
17  mind.  But, as far as I am aware, there
18  isn't any such other than what's
19  reflected in the Plan itself.
20         MR. FINCH:  The parties to
21  the Plan also, to the extent there
22  are issues in common, there may
23  well be a common interest
24  privilege for purposes of

Page 381

1  discovery and litigation of
2  confirmation objections.  But
3  those are not -- I would not
4  regard those as any types of
5  agreements you are questioning
6  about.
7  BY MR. DANIEL COHN:
8     Q.  All right.  Directing your
9  attention now to ACC Exhibit-11, which is
10  the TDP.
11     A.  I have it.
12     Q.  All right.  Who drafted the
13  TDP?
14         MR. FINCH:  Objection.  This
15  gets into Plan negotiations and
16  drafting.  I will let you answer
17  that question, but we will see how
18  it goes from there.
19         THE WITNESS:  To some
20  extent, Mr. Inselbuch may know
21  more about this than I do.  But I
22  have a pretty good knowledge of
23  it.
24         As I have previously

Page 382

1   mentioned in this deposition, this
2   TDP in its inception was a sort of
3   mark-up job on one of the previous
4   TDPs from one of the previous
5   bankruptcies that that had been
6   confirmed. I don't recall, as I
7   sit here today, which one it was,
8   but it would have been one of the
9   more recent ones.
10      It then, of course, had to
11  be modified to reflect the
12  particularities of Grace and the
13  claims against Grace and what have
14  you. And you have heard some
15  testimony about things like
16  Sections 5.12 and 5.13. The
17  participants that did it were
18  basically counsel for the ACC,
19  counsel for the FCR, and members
20  of the ACC itself in terms of
21  reviewing and commenting on
22  things, and the FCR himself.
23      The actual, physical
24  drafting as opposed to the

Page 383

1   commenting and what have you was,
2   I believe, done by Caplin &
3   Drysdale.
4   BY MR. DANIEL COHN:
5       Q.   What input, if any, did
6   Grace have concerning the TDP?
7       MS. HARDING: Objection with
8   respect to negotiations.
9       THE WITNESS: Well, it was a
10  general proposition. Grace was
11  furnished copies of drafts and
12  afforded the opportunity to
13  comment on them.
14  BY MR. DANIEL COHN:
15      Q.   And were any changes made to
16  what sounds like an ACC FCR draft at the
17  behest of Grace?
18      MS. HARDING: Same
19  objection.
20      THE WITNESS: I don't really
recall.
22  BY MR. DANIEL COHN:
23      Q.   Directing your attention to
24  Section 2.1 of the TDP.

Page 384

1       A.   I have it.
2       Q.   In the second sentence,
3   there is reference to, and I quote,
4   "...the intention of paying all claimants
5   over time as equivalent a share as
6   possible of the value of their claims
7   based on historical values for
8   substantially similar claims in the tort
9   system."
10      A.   Yes.
11      Q.   Now, is that, in fact, the
12  intention of the Asbestos PI Committee in
13  respect to how the TDP should operate?
14      A.   The intention of the ACC on
15  how the TDP should operate is expressed
16  in all of the terms of the TDP. That
17  particular aspirational sentence that you
18  have plucked from the beginning of the
19  TDP is not is not somehow or another a
20  super-preemptory provision that controls
21  all the other provisions in the Trust
22  that somebody might think either were or
23  were not in agreement with it.
24      Q.   In that phrase that I just

Page 385

1   read, what does the term "historical
2   values" mean?
3       A.   Again, Mr. Inselbuch
4   probably would have a more definitive
5   knowledge of this, but my understanding
6   is that it refers to the historical
7   claims data primarily in this particular
8   case from Grace with respect to
9   settlements and judgments in the tort
10  system as the starting point.
11      Q.   If that's the starting
12  point, what else is meant by historical
13  value?
14      A.   Well, again, this is boiler
15  plate language from TDPs. In some cases,
16  depending upon the facts of the case, the
17  claims history of comparable defendants
18  in the tort system is looked at.
19      The TDPs are generally
20  drafted in consultation with the
21  committees asbestos claims advisor which
22  is usually, if not invariably, Mark
23  Peterson, and depending on the amount of
24  claims data available to Mr. Peterson

Page 386

1  from the Debtor, the length of time that
2  the Debtor has been in bankruptcy and,
3  therefore, the possible staleness of the
4  pre-petition data and the judgment of
5  Mr. Peterson and the members of the
6  committee and the FCR, sometimes claims
7  data from other defendants is taken into
8  account.
9      Q.   And the purpose of that is
10 to most accurately discern the amount
11 that claimants would obtain if they were
12 permitted to resort to the tort system?
13     MR. FINCH:  Object to the
14     form.
15     THE WITNESS:  The purpose
16     for that is to provide the values
17     that are used in the various
18     portions of the TDP where values
19     are assigned.  They are used in
20     determining the expedited review
21     criteria, which is basically an
22     average value open settlement
23     offer to claimants that don't want
24     to get into a whole lot of

Page 387

1  back-and-forth about their claims.
2      It doesn't apply individual
3  review as such, although you also
4  have the so-called average and
5  maximum values, which are also
6  tied to the analysis of the
7  historical claims values, which
8  are intended to provide sort of
9  targets, if you will, for what, on
10 average, the individual review
11 process is supposed to come up
12 with.
13     The maximum values are
14 supposed to provide limits on what
15 the individual review process is
16 supposed to come up with.  And all
17 of these are done in the context
18 of a Trust that is attempting to
19 pay similar claims in a similar
20 value, and they are all averages,
21 by definition.  They are not
22 balkanized numbers reflecting the
23 results of different -- you don't
24 have different sets of numbers for

Page 388

1  different jurisdictions where the
2  history settlement values might be
3  higher or lower, whatever.
4      The expedited review, which
5  is where the numbers are used for
6  the most part, is a result of an
7  averaging process.  And, as I say,
8  Mr. Inselbuch and Mark Peterson,
9  who are both going to be witnesses
10 in this case can tell you a lot
11 more about the detail about it
12 than I can.
13 BY MR. DANIEL COHN:
14     Q.   Is it the position of the
15 Asbestos PI Committee that a TDP would be
16 legally sufficient if it did not try to
17 treat claims as equivalently as possible
18 in accordance with their historical value
19 in the court system?
20     MS. HARDING:  Object to
21     form.
22     MR. FINCH:  Object to form.
23     THE WITNESS:  That's such a
24     hypothetical question.  I have no

Page 389

1  idea what the committee's position
2  would be on that.  And, moreover,
3  I have no idea what kind of a TDP
4  you are talking about.
5      It's the committee's
6  position that this TDP satisfies
7  the requirements of Section 524(g)
8  of the bankruptcy code and is a
9  reasonable means of doing so.
10 BY MR. DANIEL COHN:
11     Q.   Now, you have previously
12 testified earlier today that the Plan
13 envisions that asbestos PI claims will
14 not be allowed or disallowed pursuant to
15 Section 502 of the bankruptcy code; is
16 that correct?
17     A.   That is the general
18 contemplation of the Plan.
19     Q.   If an asbestos PI claim were
20 to be allowed or disallowed under Section
21 502, what would the standard for doing so
22 be?
23     MR. FINCH:  Objection,
24     hypothetical, calls for a legal

Page 390

1    conclusion, irrelevant to the Plan
2    at issue.
3        MS. HARDING:  Same
4    objection.
5        THE WITNESS:  Presumably, it
6    would be the result of the
7    bankruptcy court's determination
8    on the basis of a full contested
9    matter proceeding as to what the
10   state law validity and appropriate
11   amount would be.
12       I am not exactly sure how
13   the bankruptcy court would
14   determine the appropriate amount,
15   but I am pretty sure that they
16   wouldn't determine it by reference
17   to the historic values of claims
18   settled by Grace in the tort
19   system or the historic values of
20   Grace verdicts in the tort system.
21   They would determine it like any
22   court would determine it.
23       Moreover, it wouldn't be
24   done by the bankruptcy court.  It

Page 391

1    would have to be done by the
2    district court, because under the
3    Section 157 of 28 U.S.C., the
4    bankruptcy court doesn't have
5    jurisdiction to determine the
6    amount and validity of personal
7    injury claims.  And you would
8    probably have a right to a jury
9    trial under Section, I think it's,
10   1408.
11       And so you would wind up
12   with some jury being empanelled by
13   the District Court, I guess, of
14   Delaware, and that jury would tell
15   you whatever that jury thought
16   that claim was worth.
17   BY MR. DANIEL COHN:
18       Q.   And the standard under
19   Section 502 -- and this is a yes-or-no
20   question.  The standard under Section 502
21   would be the claimant is entitled to
22   whatever he is entitled to under
23   applicable non-bankruptcy law except to
24   the extent that it is overridden by a

Page 392

1    specific provision of the bankruptcy
2    code?
3        MR. FINCH:  Object to the
4    form.
5        MS. HARDING:  Objection to
6    the form.
7        THE WITNESS:  I am certainly
8    getting opportunities to do my
9    opinions about legal matters here
10   today.  This is really refreshing.
11       Generally speaking, I guess
12   the answer to that is yes.
13   BY MR. DANIEL COHN:
14       Q.   May I direct your attention
15   to Section 5.3 of the TDP.
16       A.   I have it.
17       Q.   And specifically to Section
18   5.3(a)(3).  Can you explain to me how the
19   schedule values listed there were
20   derived?
21       MR. FINCH:  Objection, asked
22   and answered; certainly answered.
23       MS. HARDING:  And calls for
24   negotiations to the extent it

Page 393

1    does, I am objecting.
2        MR. DANIEL COHN:  Can we
3    stop for a second and go off the
4    record.
5        (There was a discussion held
6    off the record at this time.)
7        THE WITNESS:  Let's go back
8    on the record.  Mr. Inselbuch and
9    Mr. Peterson are better equipped
10   to answer the question that you
11   just asked because, while I
12   reviewed these TDPs and commented
13   on them and am generally familiar
14   with how they were created, et
15   cetera, the way in which our firm
16   and our committee operated was
17   that Mr. Inselbuch had a greater
18   role in working with the committee
19   and other lawyers in my firm on
20   the nitty-gritty of a lot of these
21   provisions.
22       And this particular
23   provision, they would be more
24   equipped to answer than I am.  I

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - -

In Re:                          : Chapter 11
                                :
                                : Case No.
W.R. GRACE & CO., et al,        : 01-01139 JKF
                                :
                                : (Jointly
              Debtors           : Administered)


- - -

Monday, May 4, 2009

- - -

Continuation of oral

deposition of PETER VAN N. LOCKWOOD,

ESQUIRE, taken pursuant to notice, was

held at the offices of CAPLIN & DRYSDALE,

One Thomas Circle N.W., Suite 1100,

Washington, DC  20005, commencing at

12:05 p.m., on the above date, before

Lori A. Zabielski, a Registered

Professional Reporter and Notary Public

in and for the Commonwealth of

Pennsylvania.

- - -

MAGNA LEGAL SERVICES
Seven Penn Center
1635 Market Street
8th Floor
Philadelphia, Pennsylvania 19103

Page 450

1    APPEARANCES:
2
3    DRINKER BIDDLE & REATH, LLP
        BY: MICHAEL F. BROWN, ESQUIRE
4    One Logan Square
        18th & Cherry Streets
5    Philadelphia, Pennsylvania 19103-6996
        215.988.2988
6    (brownmf@dbr.com)
        (jeffrey.boerger@dbr.com)
7    Representing OneBeacon America Insurance
        Company, Seaton Insurance Company,
8    Government Employees Insurance Company,
        Columbia Insurance Company f/k/a Republic
9    Insurance Company
10
11   CAPLIN & DRYSDALE, CHARTERED
        BY: NATHAN D. FINCH, ESQUIRE
12       JEFFREY A. LIESEMER, ESQUIRE*
        (*VIA TELECONFERENCE)
13   One Thomas Circle N.W.
        Suite 1100
14   Washington, DC 20005
        202.862.7801
15   (ndf@capdale.com)
        (jal@capdale.com)
16   Representing Grace, Official Committee of
        Asbestos Personal Injury Claimants
17   ("ACC"), and Witness
18
     ANDERSON KILL & OLICK, P.C.
19   BY: ROBERT M. HORKOVICH, ESQUIRE
        1251 Avenue of the Americas
20   New York, New York 10020
        212.278.1322
21   (rhorkorvitz@andersonkill.com)
        Representing the ACC
22
23
24

Page 451

1    APPEARANCES (continued)
2
3    KIRKLAND & ELLIS, LLP
        BY: THEODORE L. FREEDMAN, ESQUIRE
4    655 Fifteenth Street, N.W.
        Washington, DC 20005-5793
5    202.879.5081
        (tlfreedman@kirkland.com)
6    Representing the Debtors
7
8    THE LAW OFFICES OF JANET S. BAER, P.C.
        BY: JANET S. BAER, ESQUIRE
9    70 West Madison Street
        Suite 2100
10   Chicago, Illinois 606002
        312.641.2162
11   Representing the Debtors
12
13   SIMPSON THACHER & BARTLETT, LLP
        BY: SAMUEL J. RUBIN, ESQUIRE*
14       (*VIA TELECONFERENCE)
        425 Lexington Avenue
15   New York, New York 10017-3954
        212.455.3122
16   (srubin@stblaw.com)
        Representing Travelers Casualty and
17   Surety Company
18
19   VORYS, SATER, SEYMOUR AND PEASE, LLP
        BY: TIFFANY STRELOW COBB, ESQUIRE*
20       (*VIA TELECONFERENCE)
        52 East Gay Street
        Columbus, Ohio 43215
        614.464.8322
22   (tscobb@vorys.com)
        Representing The Scotts Company, LLC
23
24

Page 452

1    APPEARANCES (continued)
2
3    COHN WHITESELL & GOLDBERG, LLP
        BY: DANIEL C. COHN, ESQUIRE
4    101 Arch Street
        Boston, Massachusetts 02110
5    617.951.2505
        (cohn@cwg11.com)
6    Representing the Libby Claimants
7
8    SPEIGHTS & RUNYAN
        BY: DANIEL H. SPEIGHTS, ESQUIRE*
9        (*VIA TELECONFERENCE)
        200 Jackson Avenue East
10   P.O. Box 685
        Hampton, South Carolina 29924
11   803.943.4444
        (dspeights@speightsrunyan.com)
12   Representing Anderson Memorial Hospital
13
14   TUCKER ARENSBERG
        BY: MICHAEL A. SHINER, ESQUIRE*
15       (*VIA TELECONFERENCE)
        1500 One PPG Place
16   Pittsburgh, Pennsylvania 15222
        412.594.5586
17   (mshiner@tuckerlaw.com)
        Representing Certain London Market
18   Insurers and AXA Belgium
19
20   FORD MARRIN ESPOSITO & WITMEYER & GLESER
        BY: ELIZABETH M. DeCRISTOFARO, ESQUIRE
21   Wall Street Plaza
        New York, New York 10005-1875
22   212.269.4900
        Representing Continental Casualty Company
23   and Continental Insurance Company
24

Page 453

1    APPEARANCES (continued)
2
3    BILZIN SUMBERG BAENA PRICE & AXELROD, LLP
        BY: MATTHEW I. KRAMER, ESQUIRE*
4        (*VIA TELECONFERENCE)
        200 South Biscayne Boulevard
5    Suite 2500
        Miami, Florida 33131-5340
6    305.450.7246
        (mkramer@bilzin.com)
7    Representing Property Damage Committee
8
9    STROOCK & STROOCK & LAVAN, LLP
        BY: ARLENE G. KRIEGER, ESQUIRE*
10       (*VIA TELECONFERENCE)
        180 Maiden Lane
11   New York, New York 10038-4982
        212.806.5400
12   (akrieger@stroock.com)
        Representing Official Committee of
13   Unsecured Creditors
14
15   CROWELL & MORING, LLP
        BY: MARK PLEVIN, ESQUIRE
16       NOAH S. BLOOMBERG, ESQUIRE
        1001 Pennsylvania Avenue NW
17   Washington, DC 20004-2595
        202.624.2913
18   (mplevin@crowell.com)
        (nbloomberg@crowell.com)
19   Representing Fireman's Fund Insurance
        (Surety Bond)
20
21
22
23
24

Page 630

1  testimony on behalf of the committee with
2  respect to any of the topics on which the
3  committee's designated you as a 30(b)(6)
4  witness?
5      A.  Not that I recall.
6      Q.  Did either Mr. Heberling or
7  his client, which is a member of the
8  committee, convey any position to the
9  committee concerning the treatment of
10  asbestos PI claims that's in any way
11  inconsistent with the testimony that you
12  have offered today?
13      MR. FINCH:  Objection, form,
14  foundation.  To the extent that
15  calls for privileged
16  communications, I instruct the
17  witness not to answer.  To the
18  extent that calls for settlement
19  communications, I instruct the
20  witness not to answer.
21      If you can answer subject to
22  either of those instructions, you
23  can do so.
24      THE WITNESS:  Mr. Cohn and

Page 631

1  his clients have filed voluminous
2  papers in this case expressing
3  positions with which the majority
4  of the committee is in
5  disagreement, and the committee
6  has filed papers in opposition or
7  otherwise in response to those
8  papers.
9      You have asked me whether or
10  not anything I have said in the
11  course of a day and a half of
12  testimony is inconsistent with the
13  positions expressed by the Libby
14  claimants in those papers.  I
15  would have to say it strikes me as
16  probable that I have said things
17  that were inconsistent with those
18  positions.  But for me to go back
19  and recite from memory everything
20  that I might have said that might
21  be so inconsistent, I could not
22  begin to accomplish.
23  BY MR. SCHIAVONI:
24      Q.  Have Mr. Heberling and his

Page 632

1  client taken positions inconsistent with
2  the other committee members with regard
3  to the Plan that's now on file?
4      A.  Yes.
5      Q.  And has that been the case
6  for the last year?
7      A.  Probably, I would say so, at
8  least.
9      Q.  Would you tell us what
10  positions the Libby claimants took in
11  meetings with the other ACC members with
12  regard to the insurance coverage that's
13  alleged to be issued to Grace?
14      MR. FINCH:  Objection.  To
15  the extent he is calling for
16  discussions between committee
17  members in the presence of
18  committee counsel that would
19  reveal privileged communications
20  or work product communications, I
21  instruct you not to answer the
22  question.
23      I think on its face, the
24  question invades the privilege,

Page 633

1  but if you can answer the question
2  without so doing, you may do so,
3  although I tend to doubt it.
4      THE WITNESS:  Read the
5  question back.
6      (The reporter read from the
7  record as requested.)
8      THE WITNESS:  I have been
9  instructed not to answer that
10  question by my understanding my
11  instructions.
12      MR. SCHIAVONI:  And, Nate, I
13  don't want to belabor the point,
14  but this would be the case with
15  regard to other questions about
16  what positions the Libby claimants
17  had communicated to the other
18  committee members in which they
19  are in opposition to the other
20  committee members, right?
21      THE WITNESS:  Any
22  communication that happened that
23  wasn't as a result of them filing
24  something in court, I would take

Page 634

1    the same position and give the
2    same instruction.
3        If you ask about questions
4    that Libby claimants have taken in
5    papers filed in the court, for
6    example, in a Disclosure Statement
7    objections and the bullet point
8    Plan objections and the
9    committee's responses made to that
10   in open court, I will permit
11   Mr. Lockwood certainly to answer
12   those questions.
13       But anything that gets into
14   communications with between the
15   Libby claimants with the rest of
16   the ACC or counsel for the ACC
17   about their respective views of
18   insurance coverage, I am going to
19   take the position as privileged.
20       And so I think you have to
21   do it on a question-by-question
22   basis, but that's my general
23   position.
24   BY MR. SCHIAVONI:

Page 635

1        Q.   Okay. Mr. Lockwood, I just
2    have one other brief topic. And here is
3    the first question on that: Does the
4    Plan purport to release claims that may
5    exist between insurers and Non-Debtors?
6        MR. FINCH:  Objection, form,
7    broad, vague.
8        THE WITNESS:  Phrased as
9    broadly as you have, I think the
10   answer is yes.
11       MR. SCHIAVONI:  Okay. Thank
12   you. I have no further questions.
13       MR. FINCH:  Is there anyone
14   else in the room who has
15   questions?
16       MR. BROWN:  I have some
17   follow-ups.
18       MR. FINCH:  Is there anyone
19   else on the telephone who has not
20   asked questions yet who has
21   questions?
22       (No response.)
23       MR. FINCH:  Hearing no
24   affirmative response, I will let

Page 636

1    you have follow-up until we run
2    out of time.
3        (There was a discussion held
4    off the record at this time.)
5        (There was a break from 3:55
6    p.m. to 4:03 p.m.)
7                - - -
8            EXAMINATION
9                - - -
10   BY MR. BROWN:
11       Q.   Mr. Lockwood, just a couple
12   of follow-ups.  The court reporter is
13   actually going to read back a question
14   and answer.  I think it's probably easier
15   to do that, and then I will ask my
16   follow-up question.  It was end of
17   Mr. Wisler's questioning of you.
18       A.   Okay.
19       (The reporter read from the
20   record as requested.)
21   BY MR. BROWN:
22       Q.   And after that,
23   Mr. Lockwood, Mr. Wisler asked you a
24   follow-up as to what type of claim it

Page 637

1    would be.
2        And is it correct that the
3    ACC does not have a position on what type
4    of claim it would be if it's not a Class
5    6 claim?
6        A.   Well, the ACC doesn't, as
7    such, have positions on hypothetical
8    questions.  So, yes, the ACC doesn't have
9    a position on that issue.  The ACC --
10   well, I will leave it at that.
11       Q.   On Friday, Mr. Cohn asked
12   you a question, who drafted the TDP.
13   That was the question, and you gave an
14   answer which I am happy to show you the
15   full answer.  But I WANT to repeat a
16   portion of your answer.  You said: "The
17   participants that did it were basically
18   counsel for the ACC, counsel for the FCR,
19   and members of the ACC itself in terms of
20   reviewing and commenting on things, and
21   the FCR himself."
22       When you said the ACC
23   itself, what did you mean?
24       A.   I meant --

Page 638

1    Q.   I am sorry.  When you said
2    members of the ACC itself, what members
3    are you talking about?
4    A.   Well, I was referring to the
5    personal injury counsel who were the
6    delegated representatives of the
7    individual ACC members, if that's what
8    you are driving at.
9    Q.   That's what I am driving at.
10    And who specifically were
11    they?
12    A.   As far as I know -- well,
13    the way in which the process works, in
14    general, is sometimes the ACC has
15    in-person meetings, sometimes it has
16    telephonic meetings, sometimes documents
17    get sent to it by email as PDF
18    attachments or whatever, and the ACC has
19    asked do you want to have a meeting or is
20    this good enough for you.  So there is a
21    variety of ways in which the ACC views an
22    input as obtained.
23    And my answer was simply
24    that at the conclusion of a process, the

Page 639

1    members of the ACC had weighed in in one
2    or more of the ways in which I had
3    described some of them had; they all had
4    the opportunity to express their views;
5    and, therefore, the final product was the
6    product of their input.  And there was a
7    final vote to go forward with the
8    document.
9    Q.   Okay.  And when you say the
10    members, you are talking about their
11    actual personal injury counsel?
12    A.   As far as I know.  But,
13    again, I couldn't tell you whether an
14    individual personal injury lawyer might
15    have consulted with his client, the
16    member, on one or more aspects of the TDP
17    or, for that matter, even sent the client
18    a copy of the entire TDP and had a
19    discussion with him about it.  I
20    certainly couldn't exclude that.
21    Q.   Can you tell me the list of
22    counsel that you are talking about, the
23    actual names?
24    A.   They would be -- as a

Page 640

1    general proposition, I believe they are
2    in the Disclosure Statement.  If they
3    are, it's a hell of a lot better
4    description of them than my memory.  I
5    just --
6    MR. FINCH:  There is also an
7    order entered by the U.S. Trustee
8    that identifies the 11 individual
9    members of the ACC and their
10    counsel, care of their firms.
11    BY MR. BROWN:
12    Q.   That's what I am driving at.
13    I would like to know who the individuals
14    were at their firms that were involved.
15    A.   Well, let me just see.  I am
16    somewhat surprised.  The Disclosure
17    Statement does not appear to contain the
18    members of the ACC.  It just lists the
19    counsel representing the committee as a
20    whole.  I had misremembered.  I had
21    thought that it did.
22    I can't really remember.  I
23    mean, I know the four -- I identified
24    four earlier as being involved in the

Page 641

1    discussions with Grace.  They are
2    included.  I think there is at least nine
3    members of the ACC.  I do not recall, as
4    I sit here, who the other five members of
5    the ACC are.  I mean, they are of
6    record -- strike that.  I do not recall
7    who the other five lawyers for the
8    members of the ACC are.  They are of
9    record.
10    Q.   But the four to which you
11    are referring is Mr. Budd, Mr. Rice,
12    Mr. Cooney, and Mr. Weitz?
13    A.   Correct.
14    Q.   You were talking about the
15    Trust Distribution Procedures and who
16    drafted them.
17    Would your answer be the
18    same with respect to the Trust Agreement?
19    A.   On the Trust Agreement, I
20    think there was more input from Grace,
21    and, indeed, I think there may have been
22    some from counsel from Sealed Air, as I
23    think about it.  And, indeed, now that I
24    think about it, I think there may have

Page 642

1  even been a little input from the Sealed
2  Air counsel on the TDP. But, again, the
3  primary draftspersons were counsel for
4  the ACC and the FCR.
5      **Q.  Okay. Can I direct your**
6  **attention to the Plan, which I guess is**
7  **ACC-5, and specifically it's page 70 on**
8  **my copy. It's under Section 7.7**
9  **Conditions to Occurrence of the**
10 **Confirmation Date, specifically condition**
11 **(j).**
12     A.  I see it.
13     **Q.  Can you just take a moment**
14 **to read that? I have one question on**
15 **that.**
16     A.  I have read it.
17     **Q.  In the portion of that**
18 **condition dealing with asbestos PD**
19 **claims, second-to-the last line, you will**
20 **see the words "if any" appear there, but**
21 **the same language doesn't appear for**
22 **asbestos PI claims.**
23     **Why?**
24     MR. FINCH: Objection,

Page 643

1  foundation.
2      THE WITNESS: I need to talk
3  to my counsel about this one.
4      (There was a discussion held
5  off the record between the witness
6  and counsel at this time.)
7      MR. FINCH: The discussion
8  was with respect to whether I need
9  to instruct him not to answer the
10 question. He is allowed to answer
11 the question as long as doing so
12 doesn't reveal privileged
13 communication.
14     I think you can answer.
15     THE WITNESS: Barely.
16     The "if any" is in there, as
17 best I can recall, because the
18 Plan proponents -- in contrast of
19 PI, "if any" is under PD. Because
20 the Plan proponents are quite
21 confident that there is going to
22 be lots of future PI demands and
23 are less confident that there is
24 going to be lots of future PD

Page 644

1  demands, or if there are, they
2  will be valid.
3      MR. BROWN: Okay. That's
4  all I have.
5      MR. FINCH: Could you go
6  back to the question I asked you
7  to find and read that question and
8  read the answer, and I will see if
9  I have got any redirect.
10     Does anybody else have any
11 questions?
12     (No response.)
13     MR. FINCH: Hearing none,
14 let me just hear that back.
15     (The reporter read from the
16 record as requested.)
17     MR. FINCH: No questions.
18     I think that is the end of
19 the deposition.
20     (The deposition concluded at
21 4:19 p.m.)
22
23
24

Page 645

1              CERTIFICATE
2
3
4      I HEREBY CERTIFY that the witness
5  was duly sworn by me and that the
6  deposition is a true record of the
7  testimony given by the witness.
8
9
10
11
12
13     Lori A. Zabielski
14     Registered Professional Reporter
15     Dated: May 5, 2009
16
17
18
19
20     (The foregoing certification
21 of this transcript does not apply to any
22 reproduction of the same by any means,
23 unless under the direct control and/or
24 supervision of the certifying reporter.)