# EXHIBIT 5

Page 1

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: | ) Chapter 11 |
| | ) |
| W. R. GRACE & CO., et al | ) Case No. 01-01139 JKF |
| | ) |
| | ) |
| Debtors | ) |

      Deposition of RICHARD CHARLES FINKE taken pursuant to notice at the law offices of Drinker, Biddle & Reath, LLP, 1100 North Market Street, Suite 1000, Wilmington, Delaware, beginning at 9:35 a.m., on Monday, March 30, 2009, before Allen S. Blank, Registered Merit Reporter and Notary Public.

APPEARANCES:

    LISA G. ESAYIAN, ESQUIRE
    KIRKLAND & ELLIS, LLP
    200 East Randolph Drive
    Chicago, IL 60601

      For - Debtors

    DANIEL A. SPEIGHTS, ESQUIRE
    SPEIGHTS & RUNYAN
    200 Jackson Avenue, East
    Hampton, SC 29924

      For - Anderson Memorial Hospital

---

WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477
www.wilfet.com

### Page 2

```
 1   APPEARANCES: CONTINUED
 2      JOHN W. KOZYAK, ESQUIRE
        KOZYAK TROPIN THROCKMORTON
 3      2525 Ponce de Leon, 9th Floor
        Miami, FL 33134
 4
           For - Anderson Memorial Hospital
 5
        MATTHEW I. KRAMER, ESQUIRE
 6      BILZIN, SUMBERG, BAENA, PRICE
        & AXELROD, LLP
 7      200 S. Biscayne Boulevard, Suite 2500
        Miami, FL 33131-5340
 8
           For - PD Committee
 9
        ARLENE G. KRIEGER, ESQUIRE
10      STROOCK & STROOCK & LAVAN, LLP
        180 Maiden Lane
11      New York, NY 10038-4982
12         For - Official Committee of
              Unsecured Creditors
13
        ALAN B. RICH, ESQUIRE
14      Elm Place
        1401 Elm Street, Suite 4620
15      Dallas, TX 75202
16         For - PD FCR
17      ELISA ALCABES, ESQUIRE
        SIMPSON, THACHER & BARTLETT, LLP
18      425 Lexington Avenue
        New York, NY 10017-3954
19
           For - Travelers Casualty & Surety
20            Company
21      KATHLEEN A. ORR, ESQUIRE
        ORRICK, HERRINGTON & SUTLIFFE, LLP
22      1152 15th Street, N.W.
        Washington, D.C. 20005
23
           For - David Anstem, Asbestos PI
24
```

### Page 3

```
 1   APPEARANCES: CONTINUED
 2      MICHAEL F. BROWN, ESQUIRE
        DRINKER, BIDDLE & REATH, LLP
 3      One Logan Square
        18th and Cherry Streets
 4      Philadelphia, PA 19103-6996
 5         For - Government Employees Insurance
              Company, Columbia Insurance,
 6            One Beacon America Insurance
              Company and Seaton Insurance
 7            Company
 8      SHANNON L. GRIFFIN, ESQUIRE
        O'MELVENY & MYERS, LLP
 9      Times Square Tower
        7 Times Square
10      New York, NY 10036
11         For - Arrowood Indemnity Company,
              f/k/a Royal Indemnity Co.
12
        MARNIE E. SIMON, ESQUIRE
13      STEVENS & LEE
        1818 Market Street, 29th Floor
14      Philadelphia, PA 19103-1702
             - and -
15      JOHN D. DEMMY, ESQUIRE (VIA TELEPHONE)
        STEVENS & LEE
16      1105 North Market Street, 7th Floor
        Wilmington, DE 19801
17
           For - Fireman's Fund Insurance
18            Company
19      SHAYNE W. SPENCER, ESQUIRE
        ELIZABETH DeCRISTOFARO, ESQUIRE (VIA
20      TELEPHONE)
        FORD, MARRIN, ESPOSITO, WITMEYER
21      & GLESER, LLP
        Wall Street Plaza
22      New York, NY 10005-1875
23         For - CNA Insurance Company
24
```

### Page 4

```
 1   APPEARANCES: CONTINUED
 2      ANDREW F. CRAIG, ESQUIRE (VIA TELEPHONE)
        CUYLER BURK, LLP
 3      Parsippany Corporate Center
        Four Century Drive
 4      Parsippany, NJ 07054
 5         For - Allstate Insurance Company
 6      LAURA M. STOVER, ESQUIRE (VIA TELEPHONE)
        NEARHOOD LAW OFFICES
 7      7537 E. McDonald Drive
        Scottsdale, AZ 85250
 8         - and -
        GABRIELLA V. CELLAROSI, ESQUIRE
 9      (VIA TELEPHONE)
        ECKERT SEAMANS
10      1747 Pennsylvania Avenue, N.W.
        Suite 200
11      Washington, D.C. 20006-4604
12         For - Maryland Casualty Insurance
              Company and Zurick
13            Insurance Company
14                  * * * * * *
15         RICHARD CHARLES FINKE,
16   the deponent herein, having first been
17   duly sworn on oath, was examined and
18   testified as follows:
19             EXAMINATION
20   BY MR. SPEIGHTS:
21      Q. Would you state your full name, please,
22   sir?
23      A. Yes. Richard Charles Finke, F-i-n-k-e.
24      Q. Mr. Finke, who are you employed by?
```

### Page 5

```
 1      A. W. R. Grace & Co.
 2      Q. How long have you been employed by Grace?
 3      A. Twenty years.
 4      Q. Can you tell me the approximate date you
 5   started?
 6      A. No. I can tell you the exact date I
 7   started. February 27, 1989.
 8      Q. Who do you presently report to?
 9      A. Mark Shelnitz, general counsel of W. R.
10   Grace.
11      Q. How long have you reported to
12   Mr. Shelnitz?
13      A. Since he became general counsel, which
14   was three or four years ago. I forget how long.
15      Q. Does April 2005 seem about right?
16      A. It seems about right, yes.
17      Q. Would you give me the positions you have
18   held at Grace and the approximate dates you held
19   each position?
20      A. When I was hired, I held the position of
21   senior litigation counsel and I became assistant
22   general counsel for litigation in -- it was
23   around March of 2006.
24      Q. Is that your present position?
```

Case 01-01139-AMC   Doc 21943-7   Filed 06/01/09   Page 4 of 10

W.R. Grace & Co., et al.
RICHARD CHARLES FINKE

Page 6

1  A. Yes.
2  Q. When you initially went to work at Grace,
3  who did you report to?
4  A. I reported to Robert Beber, B-e-b-e-r.
5  Q. And how long did you report to Mr. Beber?
6  A. Until he retired. He was general counsel
7  of W. R. Grace. When he retired, I frankly don't
8  recall the year or the date.
9  Q. Who did you report to between the
10 retirement of Mr. Beber and Mr. Shelnitz taking
11 over as general counsel?
12 A. I reported to David Siegel, S-i-e-g-e-l,
13 who became general counsel after Mr. Beber.
14 Q. Were you reporting to Mr. Siegel when
15 Grace filed its petition for reorganization?
16 A. Yes.
17     MS. GRIFFIN: May I interrupt? I
18 apologize. I'm Shannon Griffin with O'Melveny &
19 Myers. I represent Arrowood Indemnity. And I
20 thought we were going to do introductions. So I
21 apologize for the interruption.
22     But I would like to enter an exhibit
23 before we take off on Arrowood's objections,
24 which were filed last night. Everyone should

Page 7

1  have received a copy. And I have copies for
2  everybody here. But I would like to mark this as
3  Exhibit 1 so I don't have to keep objecting
4  throughout.
5      MR. SPEIGHTS: I have not seen it so
6  I would like to see it before you mark it.
7      MS. GRIFFIN: Sure.
8      (Finke Deposition Exhibit No. 1 was
9  marked for identification.)
10     MR. SPEIGHTS: Although it's normal
11 for a party to mark its exhibits during its own
12 examination, I certainly don't object to counsel
13 marking it now to avoid having to state these
14 same objections orally or restate them
15 innumerable times.
16     MS. GRIFFIN: Thank you.
17     MR. BROWN: While we are doing that,
18 so that we can avoid it. My clients, Government
19 Employees Insurance Company, Columbia Insurance
20 Company and Seaton Insurance Company and One
21 Beacon America Insurance Company, join in those
22 objections.
23     MS. ALCABES: My clients as well,
24 Travelers Casualty & Surety Company, also joins

Page 8

1  in the objection.
2      And to the extent that the debtor
3  implied on Friday that this was the one and only
4  time that this witness would be provided, we
5  object to any implication of that sort and
6  reserve our rights to take another deposition as
7  required.
8      MS. SIMON: And my clients, Firemen's
9  Fund Insurance Company, also joins in the
10 objections and reserves its rights to depose the
11 deponent at that time, if necessary.
12     MR. SPENCER: Continental Casualty
13 also joins in the objection and reserves its
14 rights as stated by all other counsel previously.
15     MS. ESAYIAN: From the debtor's
16 perspective, everyone's reservations of rights
17 are noted and I believe our position was clearly
18 stated on Friday. And I won't take more time
19 here.
20 BY MR. SPEIGHTS:
21 Q. Mr. Finke, were your general duties and
22 responsibilities the same from 1989 until the
23 bankruptcy?
24 A. Yes.

Page 9

1  Q. Can you generally describe what your
2  duties and responsibilities were during that
3  period?
4  A. Primarily, I was responsible for
5  oversight and management of asbestos property
6  damage cases, including reporting to Grace
7  management on the status or developments in those
8  cases.
9      I also was responsible for oversight
10 of expert witnesses that Grace retained or
11 Grace's counsel retained to testify in the
12 asbestos property damage litigation.
13 Q. Were you part of a, for lack of a better
14 term, a team of lawyers working under Mr. Beber?
15 A. Yes.
16 Q. And what did you call the team?
17 A. Just the asbestos litigation group
18 informally.
19 Q. When a case was filed against Grace, how
20 was it decided which member of the group would be
21 responsible for that case?
22 A. Early in the process or shortly after the
23 team was formed, the caseload was divided
24 geographically so that each person of the team

Case 01-01139-AMC   Doc 21943-7   Filed 06/01/09   Page 5 of 10

W.R. Grace & Co., et al.
RICHARD CHARLES FINKE

Page 10

1 was responsible for cases filed within certain
2 states.
3 Q. For example, you got North Dakota?
4 A. Yes, I did.
5 Q. Who had South Carolina?
6 A. Amy Klein.
7 Q. And after her untimely death, who had
8 South Carolina?
9 A. Correct.
10 Q. Who did?
11 A. I did. I'm sorry.
12 Q. Do you remember about when that was?
13 A. No, offhand, I don't.
14    I'm sorry. I take it back. Another
15 attorney, Jerry Sheinman, took over for Amy after
16 she passed away. And I then took over for Jerry.
17 Q. Do you know whether you took over on or
18 after Anderson Memorial filed its case in
19 December of 1992?
20 A. It would have been after.
21 Q. Would Jerry Sheinman have been the
22 attorney responsible for Anderson when it was
23 originally filed?
24 A. No, I believe Amy Klein was responsible

Page 11

1 at that time.
2 Q. Let me take a case as an example and kind
3 of walk through it as a means of understanding
4 what you did.
5    I believe you were responsible for
6 the Montana/Dakota Utilities lawsuit filed in
7 North Dakota, which we referred to as MDU, is
8 that correct?
9 A. Yes.
10 Q. When that case was filed, of course, it
11 was assigned to you because it was a North Dakota
12 case, did you open a file?
13 A. Yes.
14 Q. Where was the file maintained?
15 A. In Boca Raton, where the litigation group
16 was based.
17 Q. Did you receive copies of the various
18 pleadings that were filed in that case?
19 A. Yes.
20 Q. And would you file those in your file at
21 Boca Raton?
22 A. Yes.
23 Q. Was somebody responsible for doing the
24 filing?

Page 12

1 A. Yes. A paralegal.
2 Q. Who was that?
3 A. Her first name was Gail. And her last
4 name will come to me. But she has been -- she
5 has not been with the company for quite a while.
6 I don't recall her last name.
7 Q. And if you recall it during the
8 deposition, just stop me and say I'm now
9 recalling.
10    Would you review the pleadings as
11 they were filed in the case?
12 A. Yes.
13 Q. Would you have regular contact with the
14 lawyer assigned to the case; that is, litigation
15 counsel?
16 A. You're referring to outside counsel?
17 Q. Outside counsel. In this case,
18 Mr. Plunkett?
19 A. Yes. Yes, I would have regular contact
20 with him or his members of his staff.
21 Q. In addition to telephone calls with
22 outside counsel, did you have correspondence or
23 e-mails with outside counsel?
24 A. Yes.

Page 13

1 Q. Would a copy of the correspondence have
2 been maintained in the file?
3 A. Yes.
4 Q. How about e-mails? Would you have kept
5 those in the file?
6 A. To the extent we had e-mails then, and I
7 frankly don't recall at what point we started
8 using e-mail; and, if I had printed out hard
9 copies, they would have been maintained in the
10 file, yes.
11 Q. Where would the MDU file be today?
12 A. Probably in storage, in a facility in
13 Miami. Although the trial transcript is
14 maintained in the Boca Raton office.
15 Q. Do you maintain all trial transcripts in
16 the Boca Raton office of PD cases?
17 A. Yes.
18 Q. How about depositions taken in the MDU
19 case, expert or lay, do you maintain copies at
20 Boca?
21 A. Expert deposition transcripts would be
22 maintained and are maintained in the Boca Raton
23 office. Case specific transcripts would most
24 likely be with the case file, which I believe

Case 01-01139-AMC   Doc 21943-7   Filed 06/01/09   Page 6 of 10

W.R. Grace & Co., et al.
RICHARD CHARLES FINKE

Page 14

1  would be in storage.
2    Q. Who is responsible for that storage? Is
3  that an outside vendor?
4    A. Yes. Iron Mountain.
5    Q. Were you aware that Anderson was filed in
6  1992 even though it was not assigned to you at
7  that time?
8    A. Yes.
9    Q. Was it a case that generated some
10 discussion among the group?
11   A. Yes.
12   Q. Was it a case that was discussed, not
13 only among the group, but with Mr. Beber as well?
14   A. Yes.
15   Q. Would it be fair to say it was not just
16 another case?
17   A. Yes, I think that's fair.
18   Q. Were you assigned to particular experts
19 during this period of time before the bankruptcy?
20   A. Yes.
21   Q. Which experts were you assigned to or
22 which experts were assigned to you I suppose is
23 correct as well?
24   A. In general, I was responsible for what we

Page 15

1  referred to as the scientific and technical
2  experts. Those included Dr. Richard Lee,
3  Dr. Morton Corn, Charles Blake, Roger Morse.
4  From time to time, we did use other industrial
5  hygiene experts, although I don't recall names
6  right now.
7    Q. Would you attend depositions of these
8  experts on occasion when they were being deposed
9  in cases which were not assigned to you?
10   A. Yes.
11   Q. Would you attend all of their
12 depositions?
13   A. Nearly all of them.
14   Q. Which plaintiffs' experts were assigned
15 to you?
16   A. The plaintiffs' experts in the same field
17 and they included Dr. William Longo, Dr. James
18 Millette, Richard Hatfield, William Ewing, Dale
19 Keyes, K-e-y-e-s, Dr. Arthur Rohl, R-o-h-l. And,
20 again, there were others. I remember a gentleman
21 named I believe last name Mayer, M-a-y-e-r.
22   Q. Dave Mayer?
23   A. Yes. There were probably a few others in
24 those fields. But, again, the names don't come

Page 16

1  to me right now.
2    Q. How about Steve Hayes?
3    A. Yes, Steve Hayes would be another.
4    Q. And did you generally attend the
5  depositions of these plaintiffs' experts even
6  when they testified in cases that had not been
7  assigned to you?
8    A. In general, yes.
9    Q. Now, when you attended a deposition such
10 as a deposition of Dr. Longo, I think you
11 attended a few of them, did you prepare any sort
12 of report of the deposition?
13   A. Generally, no.
14   Q. Did you take notes during the deposition?
15   A. Yes.
16   Q. What would you do with your notes?
17   A. I would put -- either put the notes in a
18 file or do a memo to the file of any salient
19 points or novel points that were raised during
20 the deposition that might be of use in future
21 depositions.
22   Q. And those memos would go in the file as
23 well?
24   A. Yes.

Page 17

1    Q. And are we now talking about files
2  organized by expert?
3    A. Yes.
4    Q. And I believe we said this. But those
5  files would still be at Boca?
6    A. That's correct.
7    Q. And when you did these memos on those
8  occasions that you did memos, would you copy the
9  other members of the team?
10   A. No, not typically.
11   Q. Did you have any involvement with Grace
12 insurance issues before the bankruptcy?
13   A. No.
14   Q. Who did?
15   A. Mr. Beber and an employee named Jeff
16 Posner was involved or I should say in charge of
17 risk management at the time.
18   Q. Is he still with Grace?
19   A. He is not. But he is a consultant to
20 Grace.
21   Q. Where is he located?
22   A. In Florida. South Florida.
23   Q. Did you have any involvement with the
24 Safe Buildings Alliance or the SBA before the

Page 174

1    A. Pre-petition or post-petition?
2    Q. Post-petition we are talking about. As
3 you were describing his role in the negotiations.
4    A. I don't know.
5    Q. And was your role in dealing with PI
6 issues and the resolution of PI issues indirect
7 in the sense that Mr. Hughes reported to you or
8 did you have any direct involvement?
9    A. It was really indirect.
10    Q. And besides Mr. Hughes, who else was
11 involved in that effort on the Grace side?
12    A. Mark Shelnitz, the general counsel.
13 Robert Tarola.
14    Q. I'm sorry?
15    A. Robert Tarola, T-a-r-o-l-a, the former
16 CFO. The CEO, Fred Festa, had some involvement.
17 And outside counsel, David Bernick. And I
18 believe -- I don't know if Ted Freedman was
19 involved with the negotiations or came in after a
20 deal had been reached.
21    Q. Other than the individuals you have just
22 run through on the Grace side, was there anyone
23 else that you can recall that was on the Grace
24 negotiating team for the resolution of the PI

Page 175

1 claims?
2    A. Pam Zilly was involved in some of the
3 discussions as well. She is with Blackstone.
4 She is our financial advisor.
5    Q. What was her role?
6    A. Beyond being financial adviser, I don't
7 know. I wasn't directly involved.
8    Q. What was Mr. Festa's role?
9    A. I think primarily to ensure that the
10 other parties understood that the Grace
11 representatives there spoke with the full
12 authority of the company, but, again, I was not
13 present at the meetings and discussions that he
14 attended with the personal injury
15 representatives.
16    Q. Were you at any of the meetings with the
17 personal injury representatives?
18    A. No.
19    Q. I gather Mr. Hughes was?
20    A. I believe he was, yes.
21    Q. And Mr. Shelnitz?
22    A. Yes.
23    Q. Okay. I want to shift gears for a second
24 and turn to insurance. And, again, looking at

Page 176

1 the issue pre-petition. Have you had any role or
2 did you have any role in connection with Grace's
3 liability insurance program before the petition
4 date?
5    A. No.
6    Q. Who was responsible for this at Grace?
7    A. Bob Beber handled it from the litigation
8 standpoint. And Jeff Posner was in charge of our
9 risk management function, including insurance.
10    Q. When did Mr. Posner leave Grace?
11    A. I honestly don't know. I don't recall.
12    Q. Was it after the petition date?
13    A. I believe it was before.
14    Q. And his title immediately before he left
15 was risk manager?
16    A. I don't know.
17    Q. But that's the function that he had, was
18 risk manager for Grace?
19    A. Yes.
20    Q. Post-petition, have you had any role in
21 connection with Grace's liability insurance
22 program?
23    A. A limited one. Limited to the extent of
24 motions that have been made or objections

Page 177

1 asserted by insurance. To the extent an issue is
2 being litigated, I have been involved in
3 reviewing motion papers and related documents,
4 participating in conference calls on strategy.
5    Q. For dealing with the insurance?
6    A. For dealing with the insurance. Some of
7 the insurance issues. Certainly not all of them.
8    Q. Can you tell me which issues you're
9 talking about?
10    A. Issues related to the claims by Keneb
11 pipeline that they believe they are entitled to
12 insurance coverage. In connection with
13 remediation costs or potential responsibility for
14 remediation costs in connection with the Otis
15 pipeline.
16       There were a few others. I'm just
17 drawing a blank right now.
18    Q. Have you had any role in the Scotts
19 adversary proceeding?
20    A. Yes. Thank you. Yes, I have reviewed
21 the papers, not that there have been much --
22 there has been much recently. But I did review
23 the adversary proceeding papers when Scotts first
24 commenced its adversary proceeding. And, again,

Case 01-01139-AMC   Doc 21943-7   Filed 06/01/09   Page 8 of 10

W.R. Grace & Co., et al.
RICHARD CHARLES FINKE

Page 178

1  participated in conference calls relating to
2  their claim that they are entitled to coverage.
3      Q. And with whom were these conference calls
4  that you participated?
5      A. Outside counsel from Kirkland & Ellis.
6  And Mr. Posner is often on those calls. I think
7  that's -- and it's usually the same group.
8      Q. Did you play any role in the manner in
9  which insurance is handled under the plan?
10     A. No.
11     Q. Who did?
12     A. Other than Kirkland & Ellis, I don't know
13 who else was involved.
14     Q. Other than what you have just described,
15 have you had any role in the manner in which
16 insurance, unsettled insurance, is handled under
17 the plan?
18     A. No.
19     Q. How about any role in connection with the
20 manner in which settled insurance is handled
21 under the plan?
22     A. No.
23     Q. Did anyone replace Mr. Posner as the risk
24 manager?

Page 179

1      A. No. He basically still serves the same
2  function but as an outside consultant.
3      Q. Okay. Thank you.
4          (Finke Deposition Exhibit No. 12
5  was marked for identification.)
6  BY MR. BROWN:
7      Q. Mr. Finke, you have what's been marked
8  Exhibit 12. If you would take a few moments to
9  look at it. My first question is going to be
10 whether you have ever seen it before?
11     A. Yes, I have seen it before.
12     Q. Can you identify it for me?
13     A. It's Form 8K that Grace filed with the
14 SEC announcing its agreement in principle with
15 the personal injury committee and others to
16 resolve present and future asbestos related PI
17 claims.
18     Q. When did you first see it?
19     A. I believe it was shortly after it was
20 filed. A day or two after it was filed.
21     Q. Had you seen drafts of it before it was
22 filed?
23     A. I don't believe I did. But I -- I cannot
24 be a hundred percent sure I didn't see a draft.

Page 180

1  But I don't think that I did.
2      Q. Do you know, if it wasn't you, do you
3  know who was involved at Grace in the preparation
4  of this document?
5          And just for clarification, it's an
6  8-K. It has attachments to it. You probably
7  noted.
8      A. Right.
9      Q. One is a pre release and the other is a
10 terms sheet. So we can probably take -- why
11 don't we take them one by one.
12     A. Typically, the 8-K's are prepared by an
13 in-house attorney, Michael Conron, who obtains
14 input and facts from persons who are involved
15 firsthand with the events being reported. In
16 this case, I believe he would have obtained the
17 details from Mark Shelnitz since Mr. Shelnitz was
18 personally involved in the negotiations.
19     Q. Did he receive any information from you?
20     A. No.
21     Q. Okay. How about the press release that's
22 attached to it? There is a couple of names at
23 the top from media relations and investor
24 relations. But do you know who prepared the

Page 181

1  press release?
2      A. Where are you at? I'm not finding it.
3      Q. I think it's probably page five it starts
4  at.
5      A. Okay. Okay. There we go. William
6  Corcoran is -- I forget if he is executive
7  vice-president or senior vice-president. And he
8  is in charge of media relations, among other
9  things. Typically, Mr. Corcoran prepares press
10 releases. In the same manner as I described, I
11 described Mr. Conron preparing 8-K's. He would
12 have obtained the information from whoever was
13 personally involved.
14     Q. And would that have been Mr. Shelnitz or
15 someone else?
16     A. I'm pretty confident it would have been
17 Mr. Shelnitz.
18     Q. But it was not you?
19     A. Correct.
20     Q. Let's go to the terms sheet, which
21 appears to begin on page eight.
22     A. Um-hmm.
23     Q. Had you seen this terms sheet prior to
24 the filing of the 8-K?

Case 01-01139-AMC   Doc 21943-7   Filed 06/01/09   Page 9 of 10

W.R. Grace & Co., et al.
RICHARD CHARLES FINKE

Page 182

1  A. I believe I did.
2  Q. When?
3  A. I think I saw it in a prior draft.
4  Within a few days of the final, the final
5  version.
6  Q. Were you involved in preparing any of the
7  drafts?
8  A. No, I was not.
9  Q. Do you know who was?
10  A. No, I don't. I believe Mr. Shelnitz was
11  involved along with outside counsel.
12  Q. How about Mr. Hughes?
13  A. I don't know.
14  Q. Do you know who was involved for the
15  other constituencies that are a party to the
16  terms sheet?
17  A. No, I do not.
18  Q. In the first line of the text, it says,
19  this term sheet sets forth certain of the
20  principal terms and conditions.
21      Are there other principal terms and
22  conditions that are not reflected or were not
23  reflected in the terms sheet?
24  A. I don't know. I wasn't involved in the

Page 183

1  discussions. I don't know if there were other
2  principal terms and conditions that have been
3  agreed upon at that time and not included.
4  Q. Were any of Grace's insurers involved in
5  the discussions that led up to the execution of
6  the terms sheet?
7  A. Not to my knowledge. But, again, I
8  wasn't personally involved in the discussions.
9  Q. Do you know whether Grace's insurers were
10  purposely left out of any discussions leading up
11  to the terms sheet?
12  A. Not that I know of.
13  Q. Who would be the individual at Grace, to
14  your knowledge, that would know the answer to
15  those questions?
16  A. Mr. Shelnitz.
17  Q. If you look on the first page down at
18  I.A.1.b, titled, Insurance?
19  A. Yes.
20  Q. There is a reference there to the
21  assignment of insurance policies and all
22  insurance proceeds. Do you see that?
23  A. Yes.
24  Q. Did Grace, to your knowledge, seek the

Page 184

1  consent of any of its insurers prior to agreeing
2  to that term with the other constituencies to the
3  terms sheet?
4  A. I don't know.
5  Q. Who would know?
6  A. Mr. Shelnitz.
7  Q. If you turn to the next page on page nine
8  under v. I want to direct your attention to the
9  second paragraph that begins with the word,
10  provided.
11  A. Okay.
12  Q. Do you understand what's being referred
13  to in that section?
14  A. No, I'm not sure what's being referred to
15  by the foregoing.
16      (Finke Deposition Exhibit Nos. 13 and
17  14 were marked for identification.)
18  BY MR. BROWN:
19  Q. Mr. Finke, you have two documents that
20  have been marked Exhibit 13 and one is Exhibit 14
21  in front of you. Can you just identify them both
22  for me?
23  A. Exhibit 13 is debtor's preliminary list
24  of witnesses that they intend to call during the

Page 185

1  confirmation hearing and is dated March 13, 2009.
2      Exhibit 14 is the second amended case
3  management order related to the first amended
4  joint plan of reorganization and was ordered on
5  January 29, 2009.
6  Q. Would I be correct if I said that you
7  have seen both of these documents before?
8  A. Yes, you would.
9  Q. If you look at the witness list, you'll
10  note that your name appears first?
11  A. Yes.
12  Q. As someone who, at least on a preliminary
13  basis, is going to testify in Phases I and II of
14  the confirmation hearing?
15  A. Um-hmm.
16  Q. About company information.
17      What is the company information that
18  you possess relevant to plan confirmation?
19      MS. ESAYIAN: Objection to the form
20  of the question. You can answer, if you can.
21      THE WITNESS: I was asked by outside
22  counsel to be available to testify at one or both
23  of the confirmation hearings to the extent they
24  needed someone to present their basic company

Case 01-01139-AMC   Doc 21943-7   Filed 06/01/09   Page 10 of 10

W.R. Grace & Co., et al.
RICHARD CHARLES FINKE

Page 186

1  information, such as anything from the nature of
2  our businesses to number of employees and more
3  specifically with respect to our asbestos
4  litigation and claims, both historical, meaning
5  pre-petition litigation history relating to
6  asbestos claims, as well as the asbestos related
7  claims filed in the Chapter 11.
8      The only thing I wanted to add was,
9  in a subsequent discussion, it was decided that
10 Jay Hughes would most likely handle any issues
11 relating or testimony relating to personal
12 injury -- asbestos personal injury claims and
13 issues.
14 BY MR. BROWN:
15   Q. That was going to be my question. You
16 used the generic term asbestos litigation. Did
17 you mean PD asbestos litigation?
18   A. Well, initially the discussion was
19 generic. But, as I say, subsequently it was
20 narrowed to property damage and attic insulation
21 within my purview.
22   Q. To your knowledge, you're not going to be
23 proffering any testimony on PI issues?
24   A. That is my understanding, yes.

Page 187

1    Q. Would your answer be the same with
2  respect to insurance related issues?
3    A. Yes.
4    Q. How about with the manner in which
5  indirect asbestos PI trust claims are handled
6  under the plan?
7    A. I would expect that Jay Hughes would
8  handle that.
9    Q. Okay. If you can look at what's been
10 marked as Exhibit 14, the second amended case
11 management order. I want to direct your
12 attention specifically to paragraph two.
13     The second sentence in paragraph two
14 talks about the first phase of the confirmation
15 hearing. Do you see that?
16   A. Yes.
17   Q. And there are three Romanettes in that
18 sentence.
19     Do I understand you correctly that
20 you are not, to your knowledge, being proffered
21 to offer any testimony relevant to i or ii?
22   A. That's correct.
23   Q. And if you go to the next sentence, which
24 talks about the topics to be addressed in the

Page 188

1  second phase of the confirmation hearing, are
2  you, to your knowledge, being proffered to offer
3  any testimony with respect to i or iii?
4    A. I think that's unknown at this point.
5    Q. Is that true for both i and iii?
6    A. Yes.
7    Q. Okay. I want to go back to the
8  preliminary witness list. And I think most of
9  these individuals on here we have already
10 identified in terms of what their acknowledge is.
11 Pam Zilly, she is with the Blackstone Group, she
12 is the financial person?
13   A. Correct.
14   Q. I believe you said Denise Martin is a PD
15 expert?
16   A. Yes, she is an expert. She'll offer
17 expert testimony concerning the likelihood that
18 future property damage and ZAI claims will be
19 brought.
20   Q. Okay. I believe I heard earlier the name
21 Hudson LaForce. Who is that?
22   A. He is our current chief financial
23 officer.
24   Q. And Derrick Tay?

Page 189

1    A. He is a Canadian restructuring attorney
2  who represents Grace in Canada concerning the
3  Canadian ZAI claimants.
4    Q. And Mr. Dunbar, he is an outside
5  modelling consultant?
6    A. Yes, I believe that's right.
7    Q. Mr. Hughes we have talked about.
8      What about all the doctors?
9    A. Can you be more specific what you're
10 asking?
11   Q. What's the area? Have each of the other
12 witnesses listed here starting with I guess
13 Dr. Florence, are they all experts?
14   A. Other than Jay Hughes, yes.
15   Q. And they have all submitted reports at
16 this point?
17   A. I presume so.
18     (Finke Deposition Exhibit No. 15 was
19 marked for identification.)
20 BY MR. BROWN:
21   Q. All right. Mr. Finke, you have before
22 you a document marked Exhibit 15. The first
23 question is, can you identify it?
24   A. Exhibit 15 is debtors' response to