# EXHIBIT 6

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - -

| | |
|---|---|
| In Re: | : Chapter 11 |
| | : |
| | : Case No. |
| W.R. GRACE & CO., et al, | : 01-01139 JKF |
| | : |
| | : (Jointly |
| Debtors | : Administered) |

- - -

Friday, May 15, 2009

- - -

Oral deposition of DAVID T. AUSTERN, ESQUIRE, taken pursuant to notice, was held at the offices of ORRICK HERRINGTON & SUTCLIFFE, LLP, Columbia Center, 1152 15th Street, N.W., Washington, DC  20005-1706, commencing at 10:07 a.m., on the above date, before Lori A. Zabielski, a Registered Professional Reporter and Notary Public in and for the Commonwealth of Pennsylvania.

- - -

MAGNA LEGAL SERVICES
Seven Penn Center
1635 Market Street
8th Floor
Philadelphia, Pennsylvania 19103

## Page 2

```
 1   APPEARANCES:
 2
 3   DRINKER BIDDLE & REATH, LLP
       BY: MICHAEL F. BROWN, ESQUIRE
 4   One Logan Square
       18th & Cherry Streets
 5   Philadelphia, Pennsylvania 19103-6996
       215.988.2988
 6   (brownmf@dbr.com)
       (jeffrey.boerger@dbr.com)
 7   Representing OneBeacon America Insurance
       Company, Seaton Insurance Company,
 8   Government Employees Insurance Company,
       Columbia Insurance Company f/k/a Republic
 9   Insurance Company
10
11   ORRICK HERRINGTON & SUTCLIFFE, LLP
       BY: JONATHAN P. GUY, ESQUIRE
12        ROGER FRANKEL, ESQUIRE
            JOSHUA M. CUTLER, ESQUIRE
13   Columbia Center
       1152 15th Street, N.W.
14   Washington, DC 20005-1706
       202.339.8427
15   (jguy@orrick.com)
       Representing Future Claimants
16   Representative
17
18   CAPLIN & DRYSDALE, CHARTERED
       BY: JEFFREY A. LIESEMER, ESQUIRE
19   One Thomas Circle, NW
       Suite 1100
20   Washington, DC 20005
       202.862.5000
21   (jal@capdale.com)
       Representing Grace, Official Committee of
22   Asbestos Personal Injury Claimants
       ("ACC")
23
 4
```

## Page 3

```
 1   APPEARANCES (continued)
 2
 3   KIRKLAND & ELLIS, LLP
       BY: THEODORE L. FREEDMAN, ESQUIRE*
 4        (*VIA TELECONFERENCE)
       Citigroup Center
 5   153 East 53rd Street
       New York, New York 10022-4611
 6   212.446.4800
       (theodore.freedman@kirkland.com)
 7   Representing the Debtors
 8
 9   THE LAW OFFICES OF JANET S. BAER, P.C.
       BY: JANET S. BAER, ESQUIRE
10   70 West Madison Street
       Suite 2100
11   Chicago, Illinois 606002
       312.641.2162
12   Representing the Debtors
13
14   SIMPSON THACHER & BARTLETT, LLP
       BY: ELISA ALCABES, ESQUIRE
15        KAREN E. ABRAVANEL, ESQUIRE*
            (*VIA TELECONFERENCE)
16   425 Lexington Avenue
       New York, New York 10017-3954
17   212.455.3133
       (ealcabes@stblaw.com)
18   (kabravanel@stblaw.com)
       Representing Travelers Casualty and
19   Surety Company
20
21
22
23
24
```

## Page 4

```
 1   APPEARANCES (continued)
 2
 3   VORYS, SATER, SEYMOUR AND PEASE, LLP
       BY: WILLIAM J. POHLMAN, ESQUIRE*
 4        TIFFANY STRELOW COBB, ESQUIRE*
            (*VIA TELECONFERENCE)
 5   52 East Gay Street
       Columbus, Ohio 43215
 6   614.464.8322
       (wjpohlman@vorys.com)
 7   (tscobb@vorys.com)
       Representing The Scotts Company, LLC
 8
 9
10   COHN WHITESELL & GOLDBERG, LLP
       BY: CHRISTOPHER M. CANDON, ESQUIRE
11   101 Arch Street
       Boston, Massachusetts 02110
12   617.951.2505
       (candon@cwg11.com)
13   Representing the Libby Claimants
14
15   SPEIGHTS & RUNYAN
       BY: DANIEL H. SPEIGHTS, ESQUIRE*
16        (* VIA TELECONFERENCE)
       200 Jackson Avenue East
17   P.O. Box 685
       Hampton, South Carolina 29924
18   803.943.4444
       (dspeights@speightsrunyan.com)
19   Representing Anderson Memorial Hospital
20
21   TUCKER ARENSBERG, P.C.
       BY: MICHAEL A. SHINER, ESQUIRE*
22        (*VIA TELECONFERENCE)
       1500 One PPG Place
23   Pittsburgh, Pennsylvania 15222
       412.594.5586
24   (mshiner@tuckerlaw.com)
       Representing Certain London Market
```

## Page 5

```
 1   APPEARANCES (continued)
 2
 3   BILZIN SUMBERG BAENA PRICE & AXELROD, LLP
       BY: MATTHEW I. KRAMER, ESQUIRE*
 4        (*VIA TELECONFERENCE)
       200 South Biscayne Boulevard
 5   Suite 2500
       Miami, Florida 33131-5340
 6   305.450.7246
       (mkramer@bilzin.com)
 7   Representing Property Damage Committee
 8
 9   STROOCK & STROOCK & LAVAN, LLP
       BY: DANIEL J. HARRIS, ESQUIRE*
10        (*VIA TELECONFERENCE)
       180 Maiden Lane
11   New York, New York 10038-4982
       212.806.5400
12   (djharris@stroock.com)
       Representing Official Committee of
13   Unsecured Creditors
14
15   CROWELL & MORING, LLP
       BY: MARK PLEVIN, ESQUIRE
16        NOAH S. BLOOMBERG, ESQUIRE
       1001 Pennsylvania Avenue NW
17   Washington, DC 20004-2595
       202.624.2913
18   (mplevin@crowell.com)
       (nbloomberg@crowell.com)
19   Representing Fireman's Fund Insurance
       (Surety Bond)
20
21
22   STEVENS & LEE, P.C.
       BY: JOHN D. DEMMY, ESQUIRE
23   1818 Market Street, 29th Floor
       Philadelphia, Pennsylvania 19103-1702
24   215.751.2885
       (jdd@stevenslee.com)
```

Page 6

```
 1   APPEARANCES (continued)
 2
 3   ALAN B. RICH LAW OFFICES
     BY:  ALAN B. RICH, ESQUIRE
 4   Elm Place, Suite 4620
     1401 Elm Street
 5   Dallas, Texas  75202
     214.744.5100
 6   (arich@alanrichlaw.com)
     Representing Property Damage FCR
 7
 8
     CONNOLLY BOVE LODGE & HUTZ, LLP
 9   BY:  JEFFREY C. WISLER, ESQUIRE
     The Nemours Building
10   1007 North Orange Street
     P.O. Box 2207
11   Wilmington, Delaware  19899
     302.88.6528
12   (jwisler@cblh.com)
     Representing Maryland Casualty
13
14
     ECKERT SEAMANS CHERIN & MELLOTT, LLC
15   BY:  EDWARD J. LONGOSZ, II, ESQUIRE
     1747 Pennsylvania Avenue, NW
16   12th Floor
     Washington, DC  20006
17   202.659.6619
     (elongosz@eckertseamans.com)
18   Representing Maryland Casualty and Zurich
19
20   COZEN O'CONNOR
     BY:  JACOB C. COHN, ESQUIRE
21   1900 Market Street
     Philadelphia, Pennsylvania 19103-3508
22   215.665.2147
     (jcohn@cozen.com)
23   Representing Federal Insurance Company
 4
```

Page 7

```
 1   APPEARANCES (continued)
 2
 3   CUYLER BURK, P.C.
     BY:  STEFANO V. CALOGERO, ESQUIRE
 4   Parsippany Corporate Center
     Four Century Drive
 5   Parsippany, New Jersey  07054
     973.734.3200
 6   (scalogero@cuyler.com)
     Representing Allstate Insurance Company
 7
 8
     GOODWIN PROCTER, LLP
 9   BY:  BRIAN H. MUKHERJEE, ESQUIRE*
     (*VIA TELECONFERENCE)
10   901 New York Avenue, N.W.
     Washington, DC  20001
11   202.346.4124
     (bmukherjee@goodwinprocter.com)
12   Representing CNA Insurance
13
14   WOMBLE CARLYLE SANDRIDGE & RICE, PLLC
     BY:  KEVIN J. MANGAN, ESQUIRE*
15   (*VIA TELECONFERENCE)
     222 Delaware Avenue
16   Suite 1501
     Wilmington, Delaware  19801
17   302.252.4361
     (kmangan@wcsr.com)
18   Representing State of Montana
19
20   PEPPER HAMILTON, LLP
     BY:  LINDA J. CASEY, ESQUIRE*
21   (*VIA TELECONFERENCE)
     3000 Two Logan Square
22   Philadelphia, Pennsylvania  19103
     215.981.4000
23   (caseyl@pepperlaw.com)
     Representing BNSF Railway Company
24
```

Page 8

```
 1            - - -
 2          I N D E X
 3            - - -
 4
 5   Testimony of:
 6       DAVID T. AUSTERN, ESQUIRE
 7
 8   By Mr. Brown        Page  12, 242
 9   By Ms. Alcabes      Page  95
10   By Mr. Candon       Page  123, 251
11   By Mr. Demmy        Page  164
12   By Mr. Cohn         Page  173
13   By Mr. Plevin       Page  192
14   By Ms. Cobb         Page  207
15   By Ms. Casey        Page  219
16   By Mr. Mangan       Page  221
17   By Mr. Speights     Page  222
18
19
20
21
22
23
24
```

Page 9

```
 1            - - -
 2          E X H I B I T S
 3            - - -
 4   NO.     DESCRIPTION          PAGE
 5   Austern-1
         Amended Notice of Deposition
 6       Of David T. Austern      31
 7   Austern-2
         Exhibit 2 to Exhibit Book
 8       Asbestos PI Trust Agreement  32
 9   Austern-3
         First Amended Joint Plan of
10       Reorganization...        43
11   Austern-4
         Exhibit 6 to Exhibit Book
12       Asbestos Insurance Transfer
         Agreement                80
13
     Austern-5
14       Exhibit 4 to Exhibit Book
         Trust Distribution Procedures 90
15
     Austern-6
16       Exhibit 10 to Exhibit Book
         Cooperation Agreement     92
17
     Austern-7
18       Notice of Deposition of
         David Austern            95
19
     Austern-8
20       Debtors' Disclosure Statement
         for the First Amended Joint
21       Plan of Reorganization...  118
22   Austern-9
         Notice of Deposition of
23       David T. Austern         124
24
```

Page 10

1  EXHIBITS (continued)
2
   NO.     DESCRIPTION          PAGE
3
   Austern-10
4     Form 8-K          124
5  Austern-11
      Exhibit 8 to Exhibit Book
6     Best Interests Analysis   156
7
            - - -
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
1

Page 11

1           - - -
2   DEPOSITION SUPPORT INDEX
3           - - -
4
5  Direction to Witness Not to Answer:
6  Page  Line     Page  Line
7  181   13       225   16
   229   04       239   03
8
9
10 Request for Production of Documents:
11 Page  Line     Page  Line
12 NONE
13
14
15 Stipulations:
16 Page  Line     Page  Line
17 NONE
18
19
20 Area(s) Marked Confidential:
   Page  Line     Page  Line
22 NONE
23
24

Page 12

1           - - -
2           PROCEEDINGS
3           - - -
4      MR. GUY:  We will follow the
5  federal rules.
6           - - -
7      DAVID T. AUSTERN, ESQUIRE,
8  after having been first duly
9  sworn, was examined and testified
10 as follows:
11          - - -
12         EXAMINATION
13          - - -
14 BY MR. BROWN:
15     Q.  Good morning, Mr. Austern.
16 My name is Michael Brown.  I represent
17 OneBeacon American Insurance Company,
18 Seaton Insurance Company, GEICO, and
19 Republic Insurance Company.
20         Could you state your full
21 name for the record, please?
22     A.  David Thomas Austern.
23     Q.  Have you ever been deposed
24 before?

Page 13

1      A.  Yes.
2      Q.  How many times?
3      A.  Somewhere between 25 and 30
4  times.
5      Q.  So it's fair to say that you
6  are familiar with the protocol for a
7  deposition then?
8      A.  I am.
9      Q.  Okay.  Can you give me a
10 summary of your professional background?
11     A.  I was an assistant district
12 attorney in the New York County District
13 Attorney's Office for four years; I was
14 an assistant United States attorney in
15 the United States Attorney's Office in
16 Washington, D.C. for four years; I was a
17 law professor for two years; I was in the
18 private practice of law for something
19 like 12 years; and I've been general
20 counsel of the Manville Personal Injury
21 Settlement Trust, and I have had some
22 other asbestos matters for the last 21
23 and a half years.  That doesn't add up to
24 45, and it should, but...

Page 14

1    Q.   Those are estimates, I take
2  it?
3    A.   Those are estimates, yes.
4    Q.   What did you do in
5  preparation for today's deposition?
6    A.   I reviewed some documents,
7  and I spoke to counsel.
8    Q.   What documents did you
9  review?
10    A.   I also reviewed some
11  transcripts.
12       I reviewed the Personal
13  Injury Trust Agreement; the Trust
14  Distribution Process -- the Personal
15  Injury Trust Distribution Process; the
16  Transfer Agreement; the Cooperation
17  Agreement; I reviewed Ms. Biggs' latest
18  estimation report; Dr. Peterson's latest
19  report; Dr. Florence's latest report;
20  Dr. Whitehouse's -- one of
21  Dr. Whitehouse's reports -- I am sorry --
22  two of Dr. Whitehouse's reports; the
23  rebuttal to those reports from Dr. Welsh
24  and Dr. Freedman; the objections filed by

Page 15

1  the Libby claimants and by one or more
2  insurance companies, and I am not sure I
3  know which ones; my prior deposition in
4  this case; my prior deposition in the
5  Combustion Engineering case; my testimony
6  in the Combustion Engineering case.  I
7  may have left something out, but I think
8  those are most of the documents I
9  reviewed.
10    Q.   Okay.  And you also
11  mentioned that you had reviewed some
12  transcripts?
13    A.   Those were the depositions
14  and trial testimony -- oh, excuse me.
15  Yes.  I reviewed Mr. Lockwood's
16  deposition.
17    Q.   Did you actually review the
18  Amended Plan of Reorganization?
19    A.   Yes -- and excuse me -- and
20  the Disclosure Statement.
21    Q.   And over what period of time
22  did you review all these materials in
23  preparation for your deposition?
24    A.   Two weeks.  I did one other

Page 16

1  thing in preparation of the deposition.
2  I listened to parts of, albeit not all,
3  of the Lockwood deposition.
4    Q.   Did you meet with counsel in
5  preparation for the deposition?
6    A.   Yes.
7    Q.   When?
8    A.   Last Friday and yesterday.
9    Q.   And for how long last
10  Friday?  What period of time did you meet
11  with counsel?
12    A.   I confess I don't remember,
13  but it was several hours.
14    Q.   And the more recent meeting?
15    A.   I would say three hours.
16    Q.   Was it just counsel for the
17  Future Claimants' Representative or were
18  other Plan proponent counsel present?
19    A.   No.  There were no other
20  Plan proponent counsel.
21    Q.   In reviewing Mr. Lockwood's
22  deposition testimony, was there anything
23  in his transcript with which you
24  disagreed?

Page 17

1    A.   I don't remember -- nothing
2  occurs to me, although if you showed me a
3  question and answer, I might say I
4  disagreed.  But I don't recall anything.
5    Q.   Okay.  When you listened in
6  on a portion of the deposition, was there
7  anything that you heard by way of an
8  answer by Mr. Lockwood that struck you as
9  inaccurate?
10    A.   Not that I recall.
11    Q.   Okay.  Now, you mentioned
12  that you had reviewed the Disclosure
13  Statement, the Plan, the PI Trust
14  Agreement I assume you were referring to,
15  the PI Trust Distribution Procedures, the
16  Transfer Agreement, and the Cooperation
17  Agreement?
18    A.   Yes.
19    Q.   Do you understand all of
20  those documents?
21    A.   No.
22    Q.   Are there particular
23  documents that you understand better than
24  others?

Page 18

1    A.   Yes.
2    Q.   **Which ones?**
3    A.   The Trust Distribution
4 Process.
5    Q.   **By that, you mean the**
6 **Asbestos PI Trust Distribution**
7 **Procedures?**
8    A.   Yes, yes.
9    Q.   **Okay.**
10    A.   I will refer to it as the
11 TDP, most likely.
12    Q.   **We will finish the**
13 **deposition a lot sooner if you do that.**
14    A.   And there were some sections
15 in some of the other documents I thought
16 I understood and some sections I thought
17 I did not.
18    Q.   **Okay.  How about the Trust**
19 **Agreement?**
20    A.   I believe I understood most
21 of that.
22    Q.   **Okay.  You were appointed by**
23 **the bankruptcy court as the, quote, legal**
24 **representative, close quote, under**

Page 19

1 **Section 524(g) of the bankruptcy code,**
2 **correct?**
3    A.   Correct.
4    Q.   **When did that occur?**
5    A.   Just about this time of year
6 five years ago.
7    Q.   **Okay.  So in 2004?**
8    A.   Yes.
9    Q.   **And, as I understand it,**
10 **under the Plan your title is the asbestos**
11 **PI FCR, correct?**
12    A.   Yes.
13    Q.   **And the FCR is for Future**
14 **Claimants' Representative?**
15    A.   Yes.
16    Q.   **You will understand if I**
17 **refer to you as the FCR in the**
18 **deposition?**
19    A.   I will understand what the
20 reference is.
21    Q.   **Okay.  You are a**
22 **co-proponent of the Plan, correct?**
23    A.   Yes.
24    Q.   **How did you come to be the**

Page 20

1 **FCR?  I understand that you were approved**
2 **by the bankruptcy court, but how were you**
3 **presented, if you will, for that role?**
4    A.   Understanding I was not in
5 the case at the time, I can only tell you
6 what documents I have looked at appear to
7 say.
8    Q.   **Okay.**
9    A.   The Debtor presented to the
10 court a motion of seeking an appointment
11 of an FCR, provided the court with three
12 names and an untitled fourth name -- I
13 will explain that in a moment.  The three
14 names proposed were me and two other
15 people, and then a statement that the
16 Property Damage Representatives didn't
17 want any of the three names mentioned by
18 the Debtor and wanted some unnamed fourth
19 person.  So there were four, if you will,
20 potential choices presented to the
21 bankruptcy court.
22    Q.   **Who were the other two named**
23 **individuals?**
24    A.   Professor Eric Green and

Page 21

1 Dean Trafelet.
2    Q.   **I gather from your answer**
3 **that at the time this occurred, it was**
4 **contemplated that there would be a single**
5 **asbestos trust that would handle both**
6 **personal injury claims and property**
7 **damage claims?**
8    A.   I don't know.
9    Q.   **Do you have any idea how the**
10 **Debtors came up with the three names that**
11 **they did?**
12    A.   I know what they said in
13 their pleading.  They said they had
14 discussed this matter with, well,
15 obviously, the Property Damage Trust
16 Representatives that I mentioned, and
17 they had discussed it with one or more
18 Creditors Committees and the Asbestos
19 Claimants Committee.
20    Q.   **And then did the bankruptcy**
21 **court select you from the list of**
22 **contenders for the position?**
23    A.   Well, I have left out a
24 pleading.

Page 22

1    Q.   Okay.
2    A.   The Asbestos Claimants
3  Committee filed a motion, I guess, in
4  response to the Debtors motion in which
5  they -- I should back up a step.
6         The Debtors motion had a
7  chart on it, as I recall, which showed
8  who opposed various of the names
9  mentioned and who was in favor of various
10  of the names mentioned, looking at the
11  committees.  And one of the things that
12  was said was that the ACC opposed me and
13  wanted Dean Trafelet.  The ACC responded
14  to that, I believe, saying they did not
15  oppose me, but they wanted Dean Trafelet
16  rather than me.
17    Q.   Okay.  And did judge
18  Fitzgerald then make a decision based
19  upon the pleadings you just described?
20    A.   I don't know what drove her
21  decision, but she made a decision and she
22  selected me.
23    Q.   Okay.  Now, did you have the
24  title FCR with respect to other asbestos

Page 23

1  trusts?
2    A.   Yes.
3    Q.   Which ones?  Actually, just
4  for purposes of that question, I want to
5  focus on trusts that are obviously up and
6  running as opposed to ones that may be in
7  the works.
8    A.   One other trust, the
9  Combustion Engineering Trust.
10    Q.   And then you mentioned
11  earlier that you are the general counsel
12  for the Manville Trust?
13    A.   Yes.
14    Q.   Is your role as the general
15  counsel for the Manville Trust akin to
16  your role as the FCR for the Combustion
17  Engineering Trust?
18    A.   No.
19    Q.   Okay.  Can you describe the
20  differences in your roles?
21    A.   Well, first of all, the
22  Manville Trust has a Futures Claims
23  Representative.
24    Q.   Okay.

Page 24

1    A.   So I certainly don't have
2  that role.  I advise the trustees -- I am
3  the legal advisor to the trustees and
4  sometimes trust staff.
5    Q.   And what is your role as the
6  FCR for the Combustion Engineering Trust?
7    A.   I represent future
8  claimants.
9    Q.   Are you familiar with a term
10  "Trust Advisory Committee"?
11    A.   Yes.
12    Q.   Is there a Trust Advisory
13  Committee for the Combustion Engineering
14  Trust?
15    A.   Yes.
16    Q.   And who are its current
17  members?
18    A.   Mr. Cooney, Mr. Weitz,
19  Mr. Kazan, and there is somebody else.
20  And I am not sure who it is.
21    Q.   With respect to the
22  Combustion Engineering Trust, did you
23  have the role of future claimants -- let
24  me back up.  Strike that.

Page 25

1         Did you have the role of
2  legal representative, as that term is
3  used in Section 524(g) of the bankruptcy
4  code?
5    A.   I believe that was what I
6  was, yes.
7    Q.   Okay.  And were you a
8  co-proponent of the CE Trust --
9    A.   Yes.
10    Q.   The CE Plan?
11    A.   Yes.
12    Q.   Putting aside confirmed
13  plans and trusts that are up and running,
14  are you the designated Future Claimants'
15  Representative in connection with any
16  pending asbestos bankruptcy cases other
17  than the Grace case?
18    A.   No.
19    Q.   Are you familiar with the
20  statutory requirements for a Section
21  524(g) trust?
22    A.   I am generally familiar.  I
23  am not sure I can recall each and every
24  one right at the moment.

Page 26

1    Q.   You have read Section
2  524(g)?
3    A.   I have.
4    Q.   How many times?
5    A.   Countless times.
6    Q.   Okay.  That's what I thought
7  you would say.
8         Did you play any role in the
9  drafting or enactment of Section 524(g)?
10    A.   I met with some legislators
11  and the staff of some legislators at the
12  time it was being proposed.
13    Q.   And who were they?
14    A.   Senator Heflin, one of
15  Senator Heflin's legislative assistants,
16  counsel to Senator Kennedy.  There were
17  some other staff members of some other
18  senators that I met with.  I am not sure
19  I can recall them.
20    Q.   Besides meeting with them,
21  did you have any input in the provisions
22  that appear in Section 524(g)?
23    A.   I am not sure I know what
1  you mean by input.  I attended --

Page 27

1    Q.   Let me back up.
2         Did you comment on any
3  drafts?  Did you provide suggestions as
4  to what the legislation should involve in
5  terms of requirements for 524(g) trust?
6    A.   No.
7    Q.   Okay.  What was the nature
8  of your input then?
9    A.   I was asked to come answer
10  questions that they had about the
11  necessity for 524(g).
12    Q.   Okay.  And what, if you
13  recall, did they specifically ask you?
14    A.   Well, the Manville Trust, of
15  course, did not have the benefits of a
16  524(g) injunction, and it frustrated
17  somewhat dramatically our ability to sell
18  our Manville stock, which was a very
19  large percentage of the assets of the
20  Trust.  And they wanted to know why --
21  because there was another injunction
22  under Section 105.  They wanted to know
23  why I thought it would be easier to sell
24  the Manville stock if we had 524(g)

Page 28

1  protection in addition to whatever
2  Section 105 gave us.
3    Q.   And what was your rationale
4  or your response?
5    A.   First of all, we couldn't
6  sell the stock because people,
7  prospective purchasers were worried about
8  Section 105 protection, and that came out
9  again and again in attempts to sell the
10  stock.  I can't think of any other way of
11  putting it.
12    Q.   Okay.  Other than what you
13  have just described, did you have any
14  other input with respect to Section
15  524(g)'s enactment?
16    A.   No.
17    Q.   All right.  In this case,
18  there are actually two Future Claimants'
19  Representatives, correct?
20    A.   Yes.
21    Q.   There is the PI FCR and
22  there is the PD FCR?
23    A.   Yes.
24    Q.   I want to focus on your role

Page 29

1  as the PI FCR, obviously, and what I
2  would like you to do first is to identify
3  for me the members of the Asbestos PI
4  Trust Advisory Committee in this case.
5    A.   Well, the members --
6    Q.   The proposed members, I
7  should say.
8    A.   The members are actually, as
9  I understand it, individual claimants,
10  but they are represented by certain
11  lawyers, who I guess you would say appear
12  on their behalf.  And they are Mr. Budd,
13  Mr. Cooney, Mr. Weitz, and Mr. Rice.
14         MR. BROWN:  Okay.  Could you
15  read my last question?
16         (The reporter read from the
17  record as requested.)
18         MR. BROWN:  Let me back up.
19  You might have misunderstood my
20  question, Mr. Austern.
21  BY MR. BROWN:
22    Q.   I was asking about the Trust
23  Advisory Committee as opposed to the
24  asbestos PI Committee.  But let's start

Page 38

1          MR. BROWN: I couched it as
2    does he have an understanding.
3          THE WITNESS: I don't know.
4    BY MR. BROWN:
5       Q.   Do you have an understanding
6    as to whether Section 524(g) of the
7    bankruptcy code requires someone with the
8    title Future Claimants' Representative
9    after a Plan of Reorganization has been
10   confirmed and gone effective?
11         MR. GUY: Same objection.
12         THE WITNESS: I believe it
13   does.
14   BY MR. BROWN:
15      Q.   And what is the basis for
16   your belief?
17      A.   Well, my belief is based on
18   Fibreboard and the decision in Fibreboard
19   by the Supreme Court. And I don't
20   remember if I am confusing that with
21   actually what got into the language of
22   524(g). But the Supreme Court found
23   something of a conflict between present
24   claimants and future claimants, or at

Page 39

1    least potential conflicts, and there was
2    a Future Claims Representative or
3    essentially a requirement in that case.
4    And I think it was transferred into
5    524(g).
6       Q.   If I showed you the language
7    of 524(g), would you be able to tell me
8    where that is set forth?
9       A.   If it's not there, I
10   wouldn't.
11      Q.   You are not sure whether
12   it's there?
13      A.   That's right.
14      Q.   Okay. The Joint Plan in
15   this case has two trusts, correct?
16      A.   Yes.
17      Q.   It has an Asbestos PI Trust,
18   and it has an Asbestos PD Trust. Why?
19      A.   Well, that's the way the
20   Plan proponents have done it. My view of
21   this is that property damage claimants
22   are different than personal injury
23   claimants.
24      Q.   Are you aware of any other

Page 40

1    asbestos trust that is up and running
2    that has a two-trust structure, one trust
3    involving PI claims and the other
4    involving PD claims?
5       A.   The answer to the first part
6    of your question would be yes, but not
7    because of that division.
8       Q.   Okay. What's the division?
9       A.   Well, I believe that -- I
10   believe what I refer to as the
11   Halliburton Trust has a number of
12   sub-trusts for dispute claims but not the
13   differentiation as between property
14   damage and otherwise.
15      Q.   When you say sub-trust, do
16   you mean by that sub-funds within a
17   single trust?
18      A.   Yes.
19      Q.   Okay. As opposed to two
20   distinct trusts?
21      A.   Yes.
22         MR. COHN: Michael, I think
23   he's referring to silica trust.
24   BY MR. BROWN:

Page 41

1       Q.   You mentioned the PD claims
2    and PI claims are different. They are
3    actually treated differently under this
4    Joint Plan; are they not?
5       A.   Yes.
6       Q.   Can you describe the
7    difference between asbestos PI claims and
8    asbestos PD claims under the Joint Plan?
9       A.   I can describe the treatment
10   of personal injury claims; I cannot
11   describe the treatment of property damage
12   claims.
13      Q.   Can you describe the
14   differences?
15      A.   No, because I can't...
16      Q.   Do you know whether Section
17   524(g) addresses the propriety of a
18   two-trust structure of bankruptcy?
19      A.   I do not.
20      Q.   Are you familiar with the
21   distinction between the term "demand" as
22   it's used in 524(g) and "claim" as it's
23   used in the bankruptcy code?
24      A.   No.

Page 42

1    Q.   Do you have any
2  understanding at all of what a demand is?
3    A.   In bankruptcy law, no.
4    Q.   Who do you understand to be
5  your constituency?
6    A.   Future claimants.
7    Q.   Do you have an understanding
8  that future claimants are the holders of
9  future demands?
10    A.   I don't know.
11    Q.   Do you have an understanding
12  as to whether the Debtors face the
13  prospect of any future asbestos PD
14  demands or asbestos PD claims?
15    A.   I believe there are
16  scenarios in which they do.
17    Q.   Could you describe them?
18    A.   No, but I believe that there
19  are property damage claims that -- that
20  the Debtor is responsible
21  post-confirmation for certain property
22  damage claims.
23    Q.   And that those property
1  damage claims would fit within what you

Page 43

1  understand to be a future property damage
2  claim as opposed to a current property
3  damage claim?
4    A.   I am not sure.
5    Q.   All right.
6        MR. BROWN:  We will mark
7  this Austern-3.
8        (Austern-3 marked for
9        identification at this time.)
10  BY MR. BROWN:
11    Q.   Mr. Austern, you have before
12  you a document that we have marked
13  Austern-3.
14        My first question is, can
15  you identify it?
16    A.   It's the first Amended Joint
17  Plan of Reorganization.
18    Q.   And this is one of the
19  documents you indicated previously that
20  you reviewed in preparation for this
21  deposition, correct?
22    A.   Yes.
23    Q.   Are there particular
24  provisions in the Plan, as you sit here

Page 44

1  today, for which you -- strike that.
2        Are there particular
3  provisions in the Plan that you don't
4  understand?
5    A.   Yes.
6    Q.   Are there any that stick out
7  in your mind in that regard?
8    A.   Can I look at the Plan for a
9  moment?
10    Q.   Sure.
11    A.   By way of example, 7.15 of
12  the document.
13    Q.   That's one that you do not
14  understand?
15    A.   Well, it's one I have
16  trouble trying to understand.
17    Q.   You are in good company.
18    A.   There are other sections of
19  the Plan and other documents I reviewed
20  that address insurance issues, which I
21  have trouble understanding and rely on
22  counsel to explain to me.
23    Q.   Well, as would have it, 7.15
24  is an area that I wanted to question you

Page 45

1  about.  So why don't we turn to that
2  section.
3    A.   (Witness complies with
4  request.)
5    Q.   And why don't you take a
6  moment to review it.  It's not terribly
7  long.
8        MR. GUY:  Is there any
9  particular section, Michael?
10        MR. BROWN:  Well, I have
11  questions about a few sections, so
12  it might be easiest if he reads
13  the whole thing.
14        THE WITNESS:  Okay.  I have
15  reviewed it.
16  BY MR. BROWN:
17    Q.   Okay.  Recognizing that you
18  don't understand it fully, do you have an
19  idea of what its intended purpose is?
20    A.   Its intended purpose, as I
21  understand it, is to create insurance
22  neutrality.
23    Q.   And what do you understand
24  insurance neutrality to be?

Page 46

1    A.    That the Plan does not
2  interfere with the rights of the
3  insurance companies.
4    Q.    Okay.  Are there any
5  exceptions to that broad statement, as
6  you understand Section 7.15?
7        MR. COHN:  You might want to
8    rephrase that because you just
9    changed his understanding of
10    insurance neutrality in the broad
11    concept to a provision that very
12    clearly is not what it was
13    announced to be.
14        MR. BROWN:  Can you read the
15    last question?
16        (The reporter read from the
17    record as requested.)
18  BY MR. BROWN:
19    Q.    You understand Section 7.15
20  to be intended to preserve the insurers'
21  rights; is that a fair statement?
22    A.    Yes.
23    Q.    Okay.  Is it your belief
1  that that's what it accomplishes?

Page 47

1    A.    I don't know.
2        (There was a discussion held
3    off the record at this time.)
4  BY MR. BROWN:
5    Q.    Mr. Austern, are you
6  familiar with the UNR decision in the
7  Seventh Circuit, the citation to which is
8  942 F.2d 1101?
9    A.    I am familiar with the UNR
10  Trust. I am not familiar with the
11  decision.
12    Q.    Are you familiar with what
13  happened in the trial court in the
14  Fuller-Austin coverage case?
15        MR. GUY:  Objection, vague.
16        THE WITNESS:  No.
17  BY MR. BROWN:
18    Q.    You said you just read
19  Section 7.15. Let's focus on (a).
20        Is your understanding that
21  (a) is a preemptory provision with
22  respect to the Plan, Plan documents, and
23  Confirmation Order except as specifically
24  set forth in Section 7.15?

Page 48

1        MR. GUY:  Objection.
2        MR. LIESEMER:  Object to the
3    form of the question.
4        MR. GUY:  It calls for a
5    legal conclusion.  The witness is
6    a fact witness.
7        MS. BAER:  Same objection.
8        THE WITNESS:  I am not
9    positive I know what you mean by
10    preemptory.  You sort of focused
11    on my problem with 7.15.  I don't
12    know how you read the successive
13    paragraphs as impacting on each
14    other.
15  BY MR. BROWN:
16    Q.    Do you believe Section 7.15
17  to be unclear?
18    A.    To me.
19        MR. GUY:  Objection.
20  BY MR. BROWN:
21    Q.    Okay.  Well, let's explore
22  that a little bit.
23        Let's look at Section
24  7.15(b), and you will see that there is a

Page 49

1  reference in subsection (b) to, quote,
2  the beneficiaries of the Asbestos PI
3  Trust?
4        Do you see that?
5    A.    Yes.
6    Q.    Do you have any
7  understanding as to what that means?
8    A.    It means what it states, the
9  beneficiaries of the Personal Injury
10  Trust.
11    Q.    And who are they?
12    A.    Well, there are personal
13  injury claimants obviously, and there
14  are, under certain circumstances,
15  indirect personal injury claimants.
16    Q.    Okay.  And who do you
17  understand to be within the definition of
18  indirect PI Trust claimants?
19    A.    Entities that can bring
20  claims as indirect claimants on the
21  grounds that they have paid dollars that
22  the Personal Injury Trust should
23  reimburse them for.
24    Q.    Okay.  Are you familiar at

Page 50

1  all with any of the Debtors' pre-petition
2  settlements with insurance companies?
3     A.  I have seen a list, and
4  that's the extent of my knowledge.
5     Q.  Are you aware that at least
6  certain of those insurers have
7  contractual indemnity provisions against
8  the Debtors in those settlement
9  agreements?
10    A.  Can you explain to me what
11 you mean by contractual?
12    Q.  Sure.  I will represent to
13 you that there are settlement agreements
14 that are pre-petition settlement
15 agreements in which the insurer paid a
16 sum of money to the Debtors, and in
17 exchange for paying that money, the
18 Debtors agreed to indemnify the insurer
19 in the event that claims were asserted
20 against the policy after the settlement
21 by other parties.
22    A.  Third party claimants?
23    Q.  Third parties.
1     Do you understand the term

Page 51

1  "indirect PI Trust claims" to include the
2  insurers insofar as they have the type of
3  contractual indemnity claim that I just
4  described?
5     MR. LIESEMER:  Object to the
6  form of the question.
7     MR. GUY:  Same objection.
8     THE WITNESS:  Mr. Brown, I
9  understand that all asbestos
10 personal injury insurance has been
11 channelled to the Asbestos
12 Personal Injury Trust.  And there
13 are settled insurance companies
14 that -- how would I describe it --
15 their obligations have been
16 settled with the Debtor; there are
17 unsettled ones; and then there are
18 those that have coverage in place
19 agreements or reimbursement
20 agreements.
21    I don't know where your
22 question fits into my
23 understanding of those buckets of
24 insurance entities.

Page 52

1  BY MR. BROWN:
2     Q.  Okay.  Let me parse that
3  out.  Do you understand certain of the
4  Debtors' insurance companies to have
5  indirect asbestos PI claims?
6     A.  They could.  They could have
7  the right to file them, yes.
8     Q.  Okay.  And do you understand
9  those insurers to fit within the phrase
10 in (b), the beneficiaries of the Asbestos
11 PI Trust?  In other words, are the
12 insurers that have the contractual
13 indemnity claims against the Debtors,
14 quote, beneficiaries of the Asbestos PI
15 Trust, as that term is used in 7.15(b)?
16    MR. LIESEMER:  Object to the
17 form of the question.
18    MR. GUY:  Objection, asked
19 and answered, compound.
20    MS. BAER:  Same objection.
21    MR. GUY:  You may answer.
22    THE WITNESS:  As far as I
23 know, they could be under certain
24 circumstances.

Page 53

1  BY MR. BROWN:
2     Q.  All right.  Then I would now
3  like you to compare the language in (a)
4  and the language in (b) based on the
5  assumption that they are.
6     MR. GUY:  Now I am confused.
7     MR. BROWN:  Anyone who reads
8  this provision is confused.
9     MR. GUY:  I am confused.
10 It's talking --
11    THE WITNESS:  You are asking
12 me to compare (a) to (b) or (b) to
13 (a)?
14    MR. GUY:  For what purpose?
15 BY MR. BROWN:
16    Q.  If the insurer that I just
17 described is a beneficiary of the
18 Asbestos PI Trust, then, according to
19 (b), it is bound by the Plan, the Plan
20 documents, and the Confirmation Order,
21 correct?
22    A.  That's what (b) says, yes.
23    Q.  So does (b) then supersede
24 subsection (a)?

Page 54

```
 1        A.   I don't know.
 2        Q.   Let's go to a defined term
 3   in the Plan which appears on page 6,
 4   number 16, quote, asbestos insurer
 5   coverage defenses.  Take a moment to
 6   review that provision.
 7        MR. GUY:  So that I don't
 8        have to repeat it throughout, I am
 9        going to enter a standing
10        objection.  The witness is here
11        not as a 30(b)(6) witness on
12        insurer issues, and the Plan says
13        what it says.
14        MR. BROWN:  I understand.
15        MR. COHN:  Can you keep your
16        voice up, Tom?
17        MR. GUY:  We will go off the
18        record.
19        (There was a discussion held
20        off the record at this time.)
21   BY MR. BROWN:
22        Q.   Have you had a chance to
23   review the definition of asbestos insurer
24   coverage defenses?
```

Page 55

```
 1        A.   Yes.
 2        Q.   Do you understand it?
 3        A.   No.
 4        Q.   Fair enough.  You are not
 5   alone.
 6        Let's get back to 7.15.
 7        A.   Can you give me the page
 8   again?
 9        Q.   I am sorry.  It's page 87.
10   Actually, what I would like to do is I
11   want to do a comparison.  Can you also
12   look at Section 11.9?  You might want to
13   take a moment to read 11.9.
14        A.   Can you give me a page
15   number?
16        Q.   Yes.  Page 115, Section 11.9
17   entitled Exculpation.
18        A.   Okay.
19        Q.   If you keep that page handy
20   and go back and look at Section 7.15, I
21   will represent to you, feel free to look
22   yourself, that there is no specific
23   reference in 7.15 to Section 11.9.
24        A.   I believe that's correct.
```

Page 56

```
 1        Q.   Okay.  My question is, do
 2   you have an understanding as to whether
 3   the language in 7.15(a) supersedes the
 4   language in 11.9?
 5        A.   I don't know.
 6        Q.   Do you know whether it's
 7   intended to?
 8        A.   No.
 9        Q.   Reading both of those
10   provisions, do you understand whether it
11   does?
12        MR. GUY:  Objection, calls
13        for a legal conclusion.
14        MR. BROWN:  It just calls
15        for his understanding.
16        THE WITNESS:  Mr. Brown, I
17        must confess to you when I read
18        11.9 both the first time and the
19        second time, what I concentrated
20        on was on the fact that I had
21        exculpation, and I didn't
22        concentrate very much more.
23   BY MR. BROWN:
24        Q.   So you have been exculpated
```

Page 57

```
 1   if the Plan is confirmed?
 2        A.   Yes.
 3        Q.   Let's just use that as an
 4   example, not to pick on you, but since
 5   you understand at least that much in
 6   11.9.
 7        Insofar as an insurer had a
 8   claim against you, would you still be
 9   exculpated in light of Section 7.15 as
10   you understand it?
11        MR. LIESEMER:  Object to the
12        form of the question.
13        MR. GUY:  Objection, calls
14        for a legal conclusion.
15        THE WITNESS:  The first part
16        of the answer is that in the Trust
17        Agreement, I also have what is not
18        labeled as exculpation but
19        indemnification rights, not
20        including gross negligence.
21        The answer is I don't know
22        the answer to that question.
23   BY MR. BROWN:
24        Q.   Does that concern you?
```

Page 58

1    A.    Does a possible conflict of
2    7.15 to 11.9 concern me?
3    **Q.    Well, yes.**
4    A.    No.
5    **Q.    Okay.  Would you go back to**
6    **Section 7.7 of the Plan?**
7    A.    Did you say 7.7?
8    **Q.    Yes.  7.7 entitled**
9    **Conditions to Occurrence of the**
10   **Confirmation Date.**
11       MR. GUY:  What page is that?
12       MR. BROWN:  I am sorry.  It
13   starts on page 69, and there are a
14   lot of conditions.  So it runs to
15       page 81.
16       THE WITNESS:  Okay.
17   BY MR. BROWN:
18       **Q.    You are free to look at**
19   **that, if you want, but I understand you**
20   **have already reviewed the Plan.**
21   A.    Yes.
22       **Q.    My question is, do you have**
23   **an understanding as to whether Section**
24   **7.15 entitled Insurance Neutrality**

Page 59

1    **preempts Section 7.7 insofar as the**
2    **Debtors's insurers are concerned?**
3        MR. GUY:  Objection, calls
4    for a legal conclusion.
5        THE WITNESS:  I don't know.
6    BY MR. BROWN:
7        **Q.    Okay.  If you look at**
8    **Section 7.8, which begins on page 81,**
9    **that one is entitled Conditions to**
10   **Occurrence of the Effective Date.**
11       **If I asked you the same**
12   **question, would your answer be the same**
13   **with respect to Section 7.8?**
14   A.    Can I look at 7.8 for a
15   moment?
16       **Q.    Sure.**
17   A.    I am sorry.  Could you
18   repeat the question?
19       **Q.    Let me see if I can rephrase**
20   **it.  My question is whether the**
21   **preemptory language that appears in**
22   **Section 7.15(a) preempts the conditions**
23   **set forth in Section 7.8, as understand**
24   **it?**

Page 60

1        MR. GUY:  Objection.
2        MR. LIESEMER:  I join in
3    that objection.
4        MR. GUY:  It calls for a
5    legal conclusion.
6        THE WITNESS:  I don't know.
7    BY MR. BROWN:
8        **Q.    Okay.  Can you now look at**
9    **7.15(h)?**
10   A.    Did you say (e)?
11       **Q.    (H).  It appears on page 88.**
12   A.    Yes.
13       **Q.    Do you understand 7.15(h) to**
14   **bind all of the Debtors' insurers to all**
15   **of the releases and injunctions set forth**
16   **in the Plan?**
17       MR. GUY:  Objection, calls
18   for a legal conclusion.
19       THE WITNESS:  I don't know.
20   BY MR. BROWN:
21       **Q.    Let's go to page 97 of the**
22   **Plan, Section 8.5 entitled Successor**
23   **Claims Injunction.**
24       MR. GUY:  When you get to a

Page 61

1    point for a break, can we take
2    one?
3        MR. BROWN:  Why don't we do
4    that right now.
5        (There was a break from
6    11:03 a.m. to 11:13 a.m.)
7        (The reporter read from the
8    record as requested.)
9    BY MR. BROWN:
10       **Q.    Mr. Austern, I don't know if**
11   **you have had a chance to review that**
12   **section during the break, but if not, can**
13   **you take a look at it?**
14   A.    Yes, I have reviewed this.
15       **Q.    Do you have an understanding**
16   **as to the purpose of the successor claims**
17   **injunction?**
18       MR. LIESEMER:  Object to the
19   form of the question.
20       THE WITNESS:  Well, as its
21   name implies, it is intended to
22   enjoin certain conduct.  Beyond
23   that, I, of course, was not part
24   of this case when either the

Page 62

1    Sealed Air or the Fresenius
2    actions were commenced and
3    concluded and settled.
4  BY MR. BROWN:
5    Q.   Do you understand the
6  Fresenius indemnified parties and the
7  Sealed Air indemnified parties to be the
8  beneficiaries of the successor claims
9  injunction?
10   A.   I believe they are.
11   Q.   Okay.  The successor claims
12 injunction is a 105 injunction, correct?
13   A.   Correct.  It's not a 524(g)
14 injunction.
15   Q.   I gather from your answer
16 that you understand the difference
17 between a Section 105 injunction and a
18 Section 524(g) injunction?
19   A.   To the extent that Manville
20 had only a Section 105 injunction, yes.
21   Q.   Okay.  Do you have an
22 understanding as to whether the successor
23 claims injunction enjoins any claims that
24 are asbestos-related claims?

Page 63

1    MR. GUY:  Objection, calls
2  for a legal conclusion.
3    THE WITNESS:  Do you mean
4  asbestos personal injury, or no?
5  BY MR. BROWN:
6    Q.   Could be, or any other type
7  of asbestos-related claim.
8    A.   I am not sure.
9    Q.   Do you understand there to
10 be a problem with using a Section 105
11 injunction to enjoin asbestos-related
12 claims?
13   MR. GUY:  Objection, vague
14 as to problem.
15   MR. LIESEMER:  I join in the
16 objection.
17   THE WITNESS:  There are
18 certain 105 injunctions that can
19 be lifted.  I assume you cannot do
20 that with a 524(g) injunction as
21 it is inexorably intertwined with
22 the Plan itself.  I don't know of
23 any other distinctions.
24 BY MR. BROWN:

Page 64

1    Q.   The successor claims
2  injunction by its terms cannot be lifted?
3    A.   It cannot, as I understand
4  it.
5    Q.   If a claim fits within the
6  definition of the successor claim, as
7  that term is defined in the Plan, do you
8  understand the successor claims
9  injunction to enjoin that claim?
10   MR. LIESEMER:  Object to the
11 form of the question.
12   MR. GUY:  Same objection.
13   MS. BAER:  Same objection.
14   THE WITNESS:  I don't know.
15 BY MR. BROWN:
16   Q.   Let's turn back for a moment
17 to asbestos PI channeling injunction,
18 page 90, Section 8.2.
19   A.   Okay.
20   Q.   Do you understand the
21 asbestos PI channelling injunction to be
22 purely a 524(g) injunction?
23   MR. GUY:  Objection.
24   THE WITNESS:  I don't know.

Page 65

1  I don't know if it is or not.
2  BY MR. BROWN:
3    Q.   All right.  Mr. Austern, I
4  want to shift gears here and turn back to
5  the Asbestos PI Trust Agreement, which we
6  marked as Austern-2.  And I would like to
7  direct your attention to Section 6.1.
8  And you are going to want a page.
9    A.   It's 34.
10   Q.   In 6.1, the second sentence
11 says, "He shall serve in a fiduciary
12 capacity, representing the interests of
13 the holders of future PI Trust Claims for
14 the purpose of protecting the rights of
15 such persons."
16   Do you see that?
17   A.   Yes.
18   Q.   And the "he" there is you,
19 correct?
20   A.   Yes.
21   Q.   What do you understand your
22 obligations to be to the holders of
23 future PI Trust claims?
24   A.   I represent them, and, as to

Page 70

1    form of the question.
2        THE WITNESS: Well, I don't
3    think 6.1 says "all," but I will
4    accept the way you phrased it.
5    BY MR. BROWN:
6        Q.    Okay.
7        A.    I can't think of any
8    difference, as I sit here now, in terms
9    of -- it's a different population, but
10   other than that, I can't I can't think of
11   any difference.
12       Q.    You rightly noted that the
13   word "all" does not appear in 6.1.
14           Is there any particular
15   reason for that?
16       A.    Not that I know of.
17       Q.    Let me ask you a more
18   general question. What is the purpose of
19   the TAC?
20           MR. LIESEMER: Object to the
21   form of the question.
22           THE WITNESS: To advise the
23   trustees with respect to present
24   claimants and the operation of the

Page 71

1    Trust.
2    BY MR. BROWN:
3        Q.    And what do you mean by
4    advise?
5        A.    Well, present their views to
6    the trustees and under some
7    circumstances, in the Trust Agreement,
8    either give or do not give their consent
9    to certain trustee action.
10       Q.    Is there a reason why the
11   TAC members are personal injury asbestos
12   lawyers?
13       A.    I can give you my personal
14   view.
15       Q.    Okay.
16       A.    They represent the
17   beneficiaries of the Trust, and I don't
18   know who else you would appoint.
19       Q.    You are familiar, are you
20   not, with the consultation provisions
21   that appear in Section 2.2(e) of the
22   Trust Agreement, correct?
23           MR. GUY: What page?
24           MR. BROWN: Page 10.

Page 72

1        MS. ALCABES: Page 10.
2        THE WITNESS: Yes.
3    BY MR. BROWN:
4        Q.    Why don't you tell me what
5    the general purpose of the consultation
6    provisions is for? Well, it's actually
7    for the TAC and for the Futures'
8    Representative.
9        A.    There are a lot of decisions
10   trustees have to make. This is
11   consultation, not carving out consent for
12   a moment, in terms of investments, in
13   terms of selecting vendors, in terms of
14   things that are not in the Trust
15   Distribution Process, and that
16   consultation is described in (e).
17       Q.    Okay. You mentioned in your
18   answer the consent provisions.
19       A.    There are consent
20   provisions.
21       Q.    And those appear in (f),
22   correct, on page 11?
23       A.    Yes.
24       Q.    What is the rationale for

Page 73

1    the consent provisions that appear in the
2    Trust Agreement?
3        A.    As distinguished from
4    consultation?
5        Q.    Or as distinguished from not
6    having them at all?
7        A.    As I understand it, there
8    are certain decisions that trustees make
9    that are so important, they can only be
10   made with the consent of both the TAC and
11   the Future Claims Representative.
12       Q.    And that was a negotiated
13   term of the overall Plan, correct?
14       A.    Well, it's been negotiated a
15   lot before, and I am not sure if any
16   specific provision was negotiated in this
17   Plan.
18       Q.    Why can't the trustees make
19   these decisions on their own?
20           MR. GUY: Objection as to
21   "these decisions."
22           MR. BROWN: Well, let's back
23   up.
24   BY MR. BROWN:

Page 74

1    Q.   You will agree with me that
2    Section 2.2(f) sets forth a number of
3    different items for which the trustees
4    need the consent of the TAC and the
5    Future Claimants' Representative,
6    correct?
7    A.   Yes.
8    Q.   It goes on from Romanette 1
9    to Romanette 15, correct?
10   A.   Yes.
11   Q.   Why is there a need to have
12   the consent of the Future Claimants'
13   Representative and the TAC on these
14   particular items rather than simply
15   consultation?
16   A.   My answer is the same, and I
17   will speak forgetting the TAC, as the
18   Future Claimants' Representative, I want
19   the right to under certain circumstances
20   not agree to a decision by the trustees
21   and have that be the end of the decision.
22   Q.   Well, it's not actually the
23   end of the decision, is it?
24   A.   No.  There are ways of

Page 75

1    resolving that difference.
2    Q.   And what are those?
3    A.   Well, I may confuse this
4    with the Manville Trust, but you can
5    seek, shall we say, guidance from the
6    bankruptcy court.
7    Q.   By that, you mean a ruling?
8    A.   Yes, yes.
9    Q.   If your consent has been
10   unreasonably withheld in the views of the
11   trustees?
12   A.   That's correct.
13   Q.   Is there anything in Section
14   524(g) to your knowledge that requires a
15   Trust, an asbestos Trust, to have a
16   consultation and consent provisions that
17   are set forth in this Trust Agreement?
18   A.   I do not know of anything in
19   524(g) like that.
20   Q.   Do you know who the
21   designated trustees are for the Asbestos
22   PI Trust?
23   A.   Yes.
24   Q.   Okay.  Who are they?  Or

Page 76

1    list of them.
2    A.   Dean Trafelet, Lewis
3    Sifford, and Harry Huge.
4    Q.   And do you know each of
5    those gentlemen?
6    A.   Well, in the case of
7    Mr. Huge and Mr. Trafelet, I do know
8    them.  In the case of Mr. Sifford, I have
9    met him on a number of occasions.
10   Q.   Okay.  What is the
11   professional background of Mr. Huge?
12   A.   Let's see.  I first met him
13   about 40 years ago at the Justice
14   Department.  I am sorry.  He is a lawyer.
15   He has been with the government.  He has
16   been in private practice.  Do you want
17   more?
18   Q.   Does he have experience with
19   asbestos trusts?
20   A.   Yes, he does.
21   Q.   What is that experience?
22   A.   He is a trustee of Armstrong
23   and I believe a trustee of OCF.
24   Q.   How long has he had the role

Page 77

1    of trustee in Armstrong?
2    A.   I met with him shortly after
3    he was appointed, and I should be able to
4    remember that.  I think four or five
5    years.
6    Q.   And how about as a trustee
7    in OCF?
8    A.   I don't know.
9    Q.   Okay.  Why don't you tell me
10   what the professional background of
11   Mr. Sifford is?
12   A.   I know him less well.
13   Mr. Sifford is a practicing lawyer in a
14   law firm, and he is an Armstrong trustee,
15   I believe.  And that's, I believe, the
16   first time I met him, and thus I looked
17   him up.  And according to
18   Martindale-Hubbell, he does both personal
19   injury plaintiff's work and personal
20   injury defense work.  I am getting close
21   to exhausting my knowledge of him.
22   Q.   Okay.  Is the personal
23   injury work that he does, both defense
24   and plaintiff's work, asbestos-related?

Page 78

1    A.    It is not as far as I know.
2    Q.    Do you know what it does
3  relate to?
4    A.    No.
5    Q.    Okay.  Do you know how long
6  he has been a trustee of the Armstrong
7  Trust?
8    A.    The same period of time
9  Mr. Huge has been, but I don't remember
10  when that started.
11    Q.    I thought you said that one
12  was four to five years ago?
13    A.    Four to five years ago.  I
14  don't remember exactly.
15    Q.    All right.  And what is the
16  professional background of Mr. Trafelet?
17    A.    Before I get to that, let me
18  explain.  Armstrong was confirmed, and
19  for a long time, there was no activity
20  for reasons that allude me.  So I can't
21  remember exactly when I got involved in
22  talking to those people.
23    Q.    Okay.
24    A.    Mr. Trafelet is a lawyer who

Page 79

1  was a judge of, I believe, the Circuit
2  Court in Cook County, Illinois for a
3  period of time, and he is an asbestos
4  trustee of -- it seems to me, he is the
5  sole trustee of the Loomis Trust and also
6  a Futures Rep, I believe, at Armstrong.
7    Q.    Okay.  And he was one of the
8  gentlemen that you mentioned that, if I
9  remember correctly, the Asbestos PI
10  Committee, otherwise known as the ACC,
11  wanted to have the role that you have?
12    A.    Yes.
13    Q.    Do you know how long he has
14  been a trustee of the Loomis Trust?
15    A.    Since it was confirmed.  And
16  this I really should know, but I think it
17  was confirmed about three years ago.
18    Q.    Okay.  And do you know
19  whether he was the FCR in Armstrong
20  before a plan was confirmed?
21    A.    I do not know.
22    Q.    Okay.  But he is the FCR for
23  the Trust?
24    A.    Yes, I believe he is.

Page 80

1    Q.    And would I be correct that
2  he's been that for four or five years?
3    A.    Yes.
4    Q.    Let's go to Section 4.9 of
5  the Trust Agreement.  Take a moment to
6  read that, if you would.
7    A.    Okay.
8    Q.    The second-to-the-last
9  sentence in Section 4.9 says, "No Trustee
10  shall act as an attorney for any person
11  who holds an asbestos claim."
12      Do you see that?
13    A.    Yes.
14    Q.    What's the reason for that?
15    A.    To avoid conflicts.
16    Q.    What type of conflicts?
17    A.    Well, you are a trustee of a
18  Plan paying somebody; you shouldn't be
19  paying your client.
20    Q.    Is there any other reason?
21    A.    Not that I know of.
22      MR. BROWN:  Mark this as
23  Austern-4.
24      (Austern-4 marked for

Page 81

1      identification at this time.)
2  BY MR. BROWN:
3    Q.    Exhibit-4, Mr. Austern, is
4  Exhibit 6 to the Exhibit Book.  My first
5  question for you is, can you identify it?
6    A.    It's the Asbestos Insurance
7  Transfer Agreement, which is part of the
8  Plan, as you point out.
9    Q.    And I believe you said this
10  is one of the documents that you had
11  reviewed; am I correct?
12    A.    Yes.
13    Q.    Do you understand this
14  agreement?
15    A.    Not in its entirety.
16    Q.    Okay.  Are there particular
17  provisions of this agreement that you do
18  not understand that you could direct my
19  attention to?
20    A.    Well, I would have to look
21  at it for a moment.  I am not sure I
22  understand all of the representations and
23  warranties and some of the terms in them.
24  There are two schedules, if I remember

Page 82

1    correctly, here.
2        Q.   I think there is three.
3        A.   All right.  I was never
4    quite sure I understood the constant or
5    individual differences between the
6    Schedules 2 and 3.
7        Q.   Okay.  Other than what you
8    what you just described, do you generally
9    have a good handle on the Asbestos
10   Insurance Transfer Agreement?
11       A.   I wouldn't describe it as a
12   good handle, but I recognize some of the
13   paragraphs.
14       Q.   All right.  Let me direct
15   your attention -- let's look at Section 1
16   on page 2, and you should probably look
17   at subsection (a).  And then (d) is the
18   one I have the question on.
19       A.   Yes.
20       Q.   In (d), it says, "The
21   Transfer is not an assignment of any
22   insurance policy."
23            Do you see that?
1        A.   Yes.

Page 83

1        Q.   What is it?
2        A.   It's an assignment of a --
3    do you mean what is the Transfer
4    Agreement?
5        Q.   Yes.  What is the transfer,
6    which is a defined term?
7        A.   Being transferred?
8        Q.   Yes.
9        A.   The proceeds.
10       Q.   Anything else?
11       A.   Well, I confess as the
12   Futures Claims Rep, I never got past the
13   proceeds because the money was what
14   interested me.
15       Q.   Okay.  Have you reviewed any
16   of the Debtors' insurance policies?
17       A.   No.
18       Q.   Have you ever reviewed a
19   general liability insurance policy?
20       A.   Yes.
21       Q.   Do you have a general
22   understanding as to the duties and
23   obligations of an insured under general
24   liability insurance policy?

Page 84

1        A.   In general.
2        Q.   Could you describe for me
3    what some of those duties are?
4        A.   Well, you have to report
5    claims.
6        Q.   Okay.
7        A.   And you have to, under
8    certain policies, confer with the
9    insurance company about what you are
10   settling and why and for how much.  And,
11   forgetting individual policies for a
12   minute, under corporate policies, there
13   are certain audit rights that sometimes
14   exist as a condition of payment to the
15   insured.
16       Q.   Are you familiar with the
17   requirement in some policies that the
18   insurer have a right to defend the
19   insured?
20            MR. LIESEMER:  Object to
21   form.
22            THE WITNESS:  As well as an
23   obligation.
24   BY MR. BROWN:

Page 85

1        Q.   Okay.  And are you aware
2    that in some policies there is a right on
3    the part of the insurer to associate in
4    the defense of the insured?
5            MR. LIESEMER:  Object to
6    form.
7            THE WITNESS:  I am not sure
8    I am familiar with that.
9    BY MR. BROWN:
10       Q.   Okay.  Well, you indicated
11   that the one thing you knew that was
12   being transferred was proceeds.
13            Are you aware of anything
14   else that's being transferred pursuant to
15   the Asbestos Insurance Transfer
16   Agreement?
17       A.   I am not sure what you mean
18   by anything else, other than the money.
19       Q.   That's it?
20       A.   Well, other things may be
21   being transferred, but I can't think of
22   anything right now.
23       Q.   Okay.  Do you have an
24   understanding as to whether the Asbestos

Page 86

1   PI Trust will become the insured under
2   the policies that are listed on Schedule
3   1 to this agreement?
4           MR. GUY:  Objection, calls
5   for a legal conclusion.
6           THE WITNESS:  Mr. Brown, I
7   don't know.  I certainly hope so.
8   BY MR. BROWN:
9       Q.   Do you have an understanding
10  as to what, if anything, happens to the
11  obligations of the insured under the
12  policies on Schedule 1 if the Plan is
13  confirmed?
14          MR. GUY:  Objection to form.
15          MR. LIESEMER:  I join in
16  that objection.
17          THE WITNESS:  Let me make
18  sure I understand the question.
19  What happens to the obligations of
20  -- if the policy was still in the
21  hands of the Debtor, what would
22  happen to the obligations of the
23  Debtor and the rights of the
1   insurance company?

Page 87

1   BY MR. BROWN:
2       Q.   I am not sure I understood
3   the qualification.  Let me try it a
4   little differently.
5           To the extent that the
6   Debtor has duties and obligations under
7   one or more of its insurance policies, if
8   this Plan is confirmed, what happens to
9   those duties and obligations, as you
10  understand it?
11          MR. LIESEMER:  Object to the
12  form.
13          MS. BAER:  I join in the
14  objection.
15          THE WITNESS:  The Plan is
16  going to be administered pursuant
17  to the Trust Distrubution Process
18  as it affects personal injury
19  asbestos claims.
20          To that extent, the personal
21  injury Trust, as far as I know, is
22  not going to call up each and
23  every insurance company and say
24  "Can I settle this claim?"  I hope

Page 88

1   that's responsive to your
2   question.
3   BY MR. BROWN:
4       Q.   What is it going to do?
5   What is the Trust going to do?
6           MS. BAER:  Objection to
7   form.
8           MR. LIESEMER:  I join.
9           THE WITNESS:  It's going to
10  settle claims pursuant to the
11  Trust Distrubution Process.
12  BY MR. BROWN:
13      Q.   Okay.  Will the Debtors'
14  insurers have any role in the handling
15  defense or settlement of any claim
16  submitted to the Asbestos PI Trust?
17          MR. GUY:  Objection.
18          MR. LIESEMER:  Objection to
19  form.
20          MR. GUY:  Objection, calls
21  for speculation.
22          MS. BAER:  Objection, same.
23          THE WITNESS:  Let me address
24  audit rights.  In my copious free

Page 89

1   time, Mr. Brown, I am the claims
2   administrator of the Dow Corning
3   Trust -- that is not an asbestos
4   Trust -- and this issue has arisen
5   in that context.  And I dare say
6   it may arise in the context of the
7   W.R. Grace Trust.
8           If insurance companies
9   object to paying because they do
10  not have audit rights or because
11  of any other input into the Trust,
12  I dare say they are going to bring
13  that to the attention of the
14  trustees.  And either that will be
15  worked out between the trustees
16  and the insurance company or
17  some -- I don't like this phrase
18  because I am not sure I know what
19  it means -- but some coverage
20  court will have to determine the
21  rights of the insurance company as
22  a function of the trustees'
23  duties.
24          MR. BROWN:  Could you read

Page 90

1    back the question?
2        (The reporter read from the
3    record as requested.)
4    BY MR. BROWN:
5        Q.   Other than what you just
6    described, will the Debtors' insurers
7    have any role in the handling defense or
8    settlement of asbestos PI claims into the
9    Trust?
10        MR. GUY:  Same objection as
11    to speculation.
12        MR. LIESEMER:  Same
13    objection.
14        MS. BAER:  Same.
15        THE WITNESS:  I don't know
16    what the trustees are going to do
17    about that, so I don't know.
18        MR. BROWN:  Why don't we
19    take five minutes.
20        (There was a break from
21    11:46 a.m. to 11:57 a.m.)
22        MR. BROWN:  Let's go ahead
23    and mark this document.
24        (Austern-5 marked for

Page 91

1    identification at this time.)
2    BY MR. BROWN:
3        Q.   Mr. Austern, you have been
4    handed what's been marked Austern-5.
5    It's Exhibit 4 to the Exhibit Book.
6        Can you identify it?
7        A.   This is the TDP for the
8    Plan.
9        Q.   I am correct, am I not, that
10    this is one of the documents that you
11    reviewed in preparation for today's
12    deposition?
13        A.   Yes.
14        Q.   Are you aware of any
15    provision in the TDP or the Trust
16    Agreement that we spoke about earlier
17    that provides for any role for the
18    Debtors' insurers in the handling,
19    defense, or settlement of any asbestos
20    claims submitted to the Trust?
21        A.   No.
22        Q.   Are you aware of any other
23    Plan document that provides for such a
24    role?

Page 92

1        A.   No.
2        Q.   Is there a reason for that?
3        A.   I don't know.
4        MR. BROWN:  All right.
5    Let's mark this.
6        (Austern-6 marked for
7    identification at this time.)
8    BY MR. BROWN:
9        Q.   Mr. Austern, you have
10    another document in front of you now
11    marked Austern-6.  It's Exhibit 10 to the
12    Exhibit Book.
13        Can you identify this
14    development?
15        A.   It is the Cooperation
16    Agreement between the Debtor and others.
17        Q.   And, again, this is one of
18    the documents that you reviewed in
19    preparation for today's deposition,
20    correct?
21        A.   I don't remember if I
22    specifically did it for that purpose, but
23    I have certainly reviewed it in the past.
24        Q.   Okay.  What is the purpose

Page 93

1    of this document?
2        A.   I am not sure I know the
3    legal purpose.  It creates certain rights
4    and obligations between and among some of
5    the parties.
6        Q.   Okay.  And who are those
7    parties?
8        A.   Well, the Debtor, the
9    Reorganized Debtor, and the Trust.  I
10    mean the personal injury Trust.
11        Q.   The Debtors' insurers are
12    not a party to this agreement, correct?
13        A.   No.
14        Q.   We talked a little bit
15    earlier about general liability insurance
16    policies.
17        Are you generally familiar
18    with what's called duty to cooperate in a
19    general liability policy on the part of
20    the insured?
21        A.   Generally.
22        MR. LIESEMER:  Objection to
23    form.
24    BY MR. BROWN:

Page 94

Q. If the Joint Plan is confirmed and if there is a duty to cooperate under a given policy, what happens to that duty?

MR. GUY: Objection, calls for speculation.

THE WITNESS: Well, the proceeds of the policy have been transferred to the Personal Injury Trust. I don't know what happens to the duty of the Trust standing in the shoes of the Debtor.

BY MR. BROWN:

Q. So you don't know whether the Trust steps into the shoes of the Debtor with respect to the Debtors' obligations under the policy; is that what your telling me?

A. I don't know.

MR. BROWN: I think I am going to pass you to the next questioner, Mr. Austern. Thank you. Subject to maybe a few follow-ups, I am finished.

Page 95

- - -

EXAMINATION

- - -

BY MS. ALCABES:

Q. Hello, Mr. Austern. My name is Elisa Alcabes from Simpson Thacher & Bartlett. I am counsel for Travelers Casualty and Surety Company.

Travelers served a Notice of Deposition on you. I am just going to have that marked.

(Austern-7 marked for identification at this time.)

BY MS. ALCABES:

Q. Do you recall seeing this notice?

A. I saw many notices. I don't know if I saw this one.

Q. Okay. And are you familiar at all with any of the agreements between Travelers and W.R. Grace that were entered into pre-petition?

A. No.

Q. Can you turn to Austern

Page 96

Exhibit-4, which is the Transfer Agreement, and look at Schedules 2 and 3?

A. (Witness complies with request.)

Q. Correct me if I'm wrong, I believe you said you weren't sure what the difference was between Schedules 2 and 3?

A. In the sense that I don't know why there are two schedules. I mean, clearly different people are listed under certain schedules.

Q. Do you have an understanding that the types of settlement agreements are different on Schedule 2 and Schedule 3?

A. I assume that's why there are two schedules.

Q. You previously also mentioned that you understood that there were three types of insurance agreements; there were settlements -- there were settled insurers, there were unsettled insurers, and there were insurers are

Page 97

coverage in place agreements or reimbursement agreements? I am not sure I said that exactly right.

I believe you said you understood there were three types of settled insurers -- three types of insurers. I have got it right now. Three types of insurers.

There are unsettled insurers, fully settled insurers, and insurers with coverage in place or reimbursement agreements; is that right?

A. That is my understanding.

Q. And that's how you understand this Plan to operate; is that correct?

A. Yes.

Q. Okay. So do you understand that Schedule 2 lists the fully settled insurers, the insurers that have fully settled agreements?

A. What do you mean by fully?

Q. Fully paid settlement agreements.

Page 118

1    MS. ALCABES: Can you give
2    me two minutes? I may be
3    finished.
4    (There was a break from
5    12:24 p.m. to 12:25 p.m.)
6    BY MS. ALCABES:
7    Q.    I just have one more
8    question, and it relates to the
9    Disclosure Statement, which I don't know
10   if I have a copy to mark as an exhibit.
11   But I just want to read you one passage
12   from Section 7.2.2(d)(iv).
13   MR. GUY: I have one if you
14   want to mark it.
15   MS. ALCABES: Thank you.
16   Let's mark this as Austern-8.
17   (Austern-8 marked for
18   identification at this time.)
19   BY MS. ALCABES:
20   Q.    In my copy, it appears on
21   page 105. Actually, I quoted it wrong.
22   It's 4.7.2.2, Funding of the Asbestos PI
23   Trust.
1    A.    4.7.2?

Page 119

1    Q.    4.7.2.2, and I am going to
2    direct you to the paragraph just before
3    4.7.2.3, the paragraph that starts,
4    "Section 7.2.2(d)(iv) of the Plan..."
5    Do you see that? Have you
6    found it?
7    A.    No.
8    MR. GUY: It's on the bottom
9    of --
10   THE WITNESS: Okay. I am
11   sorry.
12   BY MS. ALCABES:
13   Q.    If you go towards the latter
14   part of the paragraph, there is a
15   sentence that starts, "As a result, the
16   Plan Proponents believe that, without
17   Section 7.2.2(d)(iv), the Asbestos PI
18   Trust may not be able to fulfill the
19   literal terms of certain reimbursement
20   conditions in the Asbestos Insurance
21   Reimbursement Agreements..."
22   And I would just ask you to
23   refer to the literal terms of certain
24   reimbursement conditions and ask you if

Page 120

1    you know what that is referring to.
2    A.    I hesitate because I spent
3    some time studying 7.2.2(d)(iv) or
4    whatever this is, which is not here. It
5    might help me if I could look at that.
6    Q.    7.25.2(d)(iv)?
7    A.    Yes.
8    Q.    It's in the Plan, which is
9    the section we were just looking at
10   before on page --
11   A.    Wait a minute. I have not
12   found the Plan. Yes. I am sorry.
13   Q.    It's on page 63 of the Plan.
14   A.    Okay. I am sorry. What was
15   the question?
16   Q.    What does the reference to
17   the literal terms of certain
18   reimbursement conditions in the
19   Disclosure Statement passage that I read
20   to you mean?
21   A.    Well, to the extent I
22   understand this -- and I am not positive
23   this is responsive to your question --
24   pursuant to some of the reimbursement

Page 121

1    agreements, an insurance company would be
2    required to pay Grace money if Grace had
3    paid a claim following judgment of the
4    tort system or by way of settlement.
5    And what this is, I believe,
6    saying is that that the insurer now has
7    to pay Personal Injury Trust when the
8    Personal Injury Trust pays a claim.
9    Q.    But, again, it doesn't speak
10   to any other obligations that may exist
11   under the reimbursement agreement on the
12   part of Grace before it can demand
13   payment from an insurer?
14   MR. LIESEMER: Objection to
15   form.
16   MS. BAER: Objection.
17   THE WITNESS: The document
18   does not, that's correct.
19   BY MS. ALCABES:
20   Q.    So, for example, it does not
21   address whether or not the Trust will
22   have to allocate payments or provide
23   reporting to the insurers or allow audits
24   to be taking place, correct?

Page 122

1     MR. LIESEMER:  Objection to
2  form.
3     MS. BAER:  Same.
4     THE WITNESS:  The document
5  does not say that.
6  BY MS. ALCABES:
7     Q.   And the Plan does not say
8  that?
9     A.   And the Plan does not say
10  that.
11     Q.   And does the fact that the
12  Plan doesn't address the obligations --
13  strike that.
14     Does the fact that the Plan
15  doesn't address how the Trust will
16  perform obligations under a reimbursement
17  agreement impact your view as to whether
18  the Plan is fair as to the future
19  claimants?
20     MR. GUY:  Objection, lacks
21  foundation.
22     THE WITNESS:  It does not
23  impact it.
24  BY MS. ALCABES:

Page 123

1     Q.   Why not?
2     A.   Because I believe the
3  insurance money is going to come to the
4  Trust, and I am only interested in the
5  money.
6     MS. ALCABES:  I will pass
7  the witness.  Thank you.
8        - - -
9     (There was a luncheon recess
10  from 12:31 p.m. to 1:05 p.m.)
11        - - -
12     AFTERNOON SESSION
13        - - -
14     EXAMINATION
15        - - -
16  BY MR. CANDON:
17     Q.   Good afternoon, Mr. Austern.
18  My name is Chris Candon.  I am from the
19  law firm Cohn Whitesell & Goldberg,
20  representing the Libby claimants.  By
21  Libby claimants, it is terminology that
22  clients of our firm that are based in
23  Libby and expressed to asbestos exposure
24  in Lincoln County, Montana.  I probably

Page 124

1  need to speak up a little bit so everyone
2  can hear me.
3     MR. CANDON:  I would like to
4  mark this as Exhibit-9.
5     (Austern-9 marked for
6  identification at this time.)
7  BY MR. CANDON:
8     Q.   It's the Notice of
9  Deposition.  Do you recall having
10  received or have seen that?
11     A.   Yes.
12     Q.   I will start with another
13  exhibit here.
14     MR. CANDON:  Austern-10.
15     (Austern-10 marked for
16  identification at this time.)
17  BY MR. CANDON:
18     Q.   Can you tell me what that
19  is?
20     MR. GUY:  Do you have
21  another copy?
22     MR. CANDON:  No, I don't.
23  This was an exhibit in
24  Mr. Lockwood's deposition.

Page 125

1  BY MR. CANDON:
2     Q.   If you focus on pages 8, 9,
3  10.
4     MS. BAER:  What is it?
5     MR. CANDON:  It's the 8-K
6  and the Term Sheet.
7     MS. BAER:  And that's
8  Exhibit-10?
9     MR. CANDON:  Yes.
10  BY MR. CANDON:
11     Q.   Do you recall having
12  participated in negotiations of this Term
13  Sheet?
14     A.   I participated in
15  negotiations of the Term Sheet.  It was
16  in a somewhat different form than an 8-K,
17  but yes.
18     Q.   Other than the terms that
19  are embodied on the Term Sheet, were you
20  aware of any other agreements made with
21  respect to Plan proponents and going
22  forward?
23     MR. GUY:  Objection, vague.
24     MS. BAER:  Objection to

Page 126

1    form.
2        MR. GUY: Do you mean at the
3    time of the Term Sheet?
4    BY MR. CANDON:
5        Q.   At the time of the Term
6    Sheet, any separate agreements that the
7    terms are not embodied in that Term
8    Sheet?
9        A.   Do you mean between the
10   personal injury Trust and the Debtor?
11       Q.   Just any of the participants
12   or members of the agreement.
13       A.   I don't recall any.
14       Q.   Okay.  Are you aware of any
15   oral agreements?
16       A.   No.
17       Q.   Okay.  What agreements, if
18   any, were struck with respect to how
19   Libby claimants would be treated?
20       MS. BAER:  Objection to
21   form.
22       THE WITNESS:  In the Term
23   Sheet?
1    BY MR. CANDON:

Page 127

1        Q.   Yes.  You have already
2    testified that there were no other
3    agreements and no oral agreements, so I
4    am assuming there were no other
5    agreements.  But I am asking you, are you
6    aware of any other agreements during the
7    negotiations of this Term Sheet?
8        A.   Of the Term Sheet, no.
9        Q.   Now I would like to turn to
10   Exhibit-5, which is the TDP.
11       Do you have that?
12       A.   Yes.
13       Q.   Who drafted the TDP?
14       A.   Well, that's a hard question
15   to answer because many, many, many of the
16   provisions, but not all, of this Trust
17   Distrubution Process are incorporated
18   from other Trust Distribution Processes.
19       Q.   And so it was based on a
20   model from another case or from several
21   other cases?
22       MS. BAER:  Objection, form.
23       THE WITNESS:  I am not sure
24   I would call it a model, but many

Page 128

1    of the provisions are contained in
2    other Trust Distributions.
3    BY MR. CANDON:
4        Q.   Okay.  The TDP refers to
5    values within the tort system in multiple
6    places.  Section 2.1, the second sentence
7    is rather long, but we can read it here.
8    It says, "This TDP furthers that goal by
9    setting forth procedures for processing
10   and paying Grace's several share of the
11   unpaid portion of the value of the
12   asbestos personal injury claims generally
13   on an impartial, first-in-first-out
14   basis, with the intention of paying all
15   claimants over time as equivalent a share
16   as possible of the value of their claims
17   based on historical values for
18   substantially similar claims in the tort
19   system."
20       And in Section 5.3(b)(2), it
21   says in the second sentence that "The PI
22   Trust shall thus take into consideration
23   all of the factors that affect the
24   severity of damages and values within the

Page 129

1    tort system including...," and then it
2    goes on to list a number of factors.
3        Is the TDP designed to pick
4    claimants values substantially similar to
5    the claim values that the claimants would
6    receive in the tort system?
7        A.   It is designed to create
8    scheduled values, but not necessarily
9    pay, that are similar to values in the
10   tort system.
11       Q.   Do you know why that's done?
12       A.   Why what's done?
13       Q.   Why they are scheduled
14   values similar to what's done in the tort
15   system?
16       MS. BAER:  Objection, form;
17   objection, speculation.
18       THE WITNESS:  Well, the why
19   is simply the way it's done.  I am
20   not sure I can tell you as an
21   underlying philosophical reason.
22   BY MR. CANDON:
23       Q.   Okay.  Are you familiar with
24   Supreme Court case Butner versus the

Page 174

1    Q.    Why did you do that?
2    A.    Because it had been a long
3  time since I had looked at them.
4    Q.    Does the FCR have an opinion
5  on what the total value of the claims
6  that will be processed through the
7  anticipated Trust will be?
8    A.    I have relied on Ms. Biggs.
9    Q.    And what he is her current
10  view?
11    A.    Discounted back to the
12  petition date, the viability is between
13  $3.2 and $5 billion with her best
14  estimate, I think that's what it's
15  called, at 3.6.
16    Q.    And do you remember how much
17  nominal dollars that would involve
18  running through the Trust over time?
19    A.    Well, no, I don't.
20    Q.    It would be in her report.
21      Why do you think her number
22  is the most reliable?
23    MR. GUY:  Objection.  He
24  didn't state that.

Page 175

1    THE WITNESS:  Well, first of
2  all, she is my expert.  Second,
3  Dr. Florence has represented
4  Grace.  I believe he said since
5  1995 or something -- I am sorry.
6  He doesn't represent them.  He has
7  been Grace's future claims
8  forecaster since 1995.  And
9  Dr. Peterson has done future
10  claims forecasting for the
11  plaintiffs bar for a long time.
12  They accidentally, or because of
13  that, represent the high and the
14  low figure, and Ms. Biggs
15  represents the in-between figure.
16  BY MR. COHN:
17    Q.    Now, you said that you are
18  the representative of future claimants
19  and your constituency is future
20  claimants, right?
21    A.    Yes.
22    Q.    How do you distinguish what
23  sort of people are entitled to be future
24  claimants?

Page 176

1    A.    People who have an asbestos
2  personal injury claim against W.R. Grace.
3    Q.    Irrespective of whether or
4  not that claim would be compensable under
5  nonbankruptcy law?
6    MR. GUY:  Objection.
7    MS. BAER:  Objection to
8  form.
9    MR. GUY:  It
10  mischaracterizes his testimony.
11    THE WITNESS:  Well, if it
12  can't settle or it goes into the
13  tort system, those are the two
14  ways in nonbankruptcy law that I
15  assume it could be compensated.
16  BY MR. COHN:
17    Q.    Well, you were appointed,
18  what, in 2004 --
19    A.    2004.
20    Q.    -- as the FCR.
21      And in 2004, there were no
22  TDPs, right?
23    MR. GUY:  Objection.
24    THE WITNESS:  You mean in

Page 177

1  this case?
2  BY MR. COHN:
3    Q.    Right.  There was no Plan;
4  there were no TDPs, correct?
5    A.    That's right.
6    Q.    Are you aware that there
7  are -- do you believe that there at the
8  time of petition were claimants against
9  W.R. Grace who had no symptoms of any
10  asbestos-related disease?
11    A.    I don't know.
12    Q.    Do you consider people that
13  in the future have no symptoms of
14  asbestos-related disease but bring a
15  claim against W.R. Grace to be part of
16  your constituency?
17    MR. LIESEMER:  Objection to
18  form, speculation.
19    MR. GUY:  Same objection.
20    MS. BAER:  Same.
21    THE WITNESS:  Well, at the
22  risk of this being too
23  existential, of course, as soon as
24  they bring the claim, they are not

Page 178

1    my client.
2        I have never thought about
3    whether if you have been exposed
4    to W.R. Grace asbestos -- well,
5    let me back up a step.
6        You can be exposed to W.R.
7    Grace asbestos and never assert a
8    claim because you have no
9    manifestation of an
10   asbestos-related disease. I don't
11   know if those people are my
12   punitive clients or not.
13   BY MR. COHN:
14       Q.   Well, your job, as the FCR,
15   one of your jobs is to maximize the pool
16   of assets available for future claimants
17   to recover from eventually, correct?
18       A.   In many different ways, yes.
19       Q.   Is it also your job to
20   protect those future claimants from
21   having that pool of assets minimized by
22   claimants who are not really sick?
23       A.   That would include present
24   claimants, too, yes.

Page 179

1        Q.   When the Trust is formed,
2    claimants will be beneficiaries of that
3    Trust, right?
4        A.   Yes.
5        Q.   Do you view it as part of
6    your job to advocate standards that
7    ensure only true beneficiaries are
8    compensated?
9        MR. LIESEMER: Objection to
10   form.
11       MR. GUY: Objection.
12       THE WITNESS: If we could
13   agree on what a true beneficiary
14   was, yes.
15   BY MR. COHN:
16       Q.   What, to you, is a true
17   beneficiary?
18       A.   I think somebody who has not
19   been exposed to Grace asbestos is not a
20   beneficiary. I think somebody who has
21   been exposed to a Grace asbestos and has
22   no manifestation of an asbestos-related
23   disease or defect is not a beneficiary
24   subject to the prefatory language in the

Page 180

1    TDP that says everyone who can should be
2    fit under the umbrella of this Trust
3    Distribution Process.
4        Q.   What did you do -- strike
5    that.
6        Did you have any involvement
7    in the negotiation of the TDPs?
8        MR. GUY: You may answer yes
9    or no.
10       THE WITNESS: Yes.
11   BY MR. COHN:
12       Q.   What was your involvement?
13       A.   I attended meetings; I
14   consulted with counsel; I consulted with
15   other parties.
16       Q.   What issues were you
17   particularly interested in?
18       MS. BAER: Objection.
19       THE WITNESS: The Trust
20   Distribution Process.
21   BY MR. COHN:
22       Q.   Were there any areas where
23   you had disagreement with the ACC?
24       MS. BAER: Objection. Now

Page 181

1    you are going way beyond what we
2    agreed to --
3        MR. LIESEMER: I join the
4    objection.
5        MS. BAER: -- with Plan
6    proponents. I don't believe it's
7    appropriate inquiry for this
8    deposition.
9        MR. GUY: Can you repeat the
10   question?
11       (The reporter read from the
12   record as requested.)
13       MR. GUY: I am going to
14   instruct the witness not to answer
15   that because I don't see how he
16   can answer it without revealing
17   discussions with the parties that
18   are objecting to the revealing of
19   those discussions.
20       MR. COHN: So are we back to
21   where we have been in the Finke
22   deposition?
23       MR. GUY: I don't know. I
24   didn't go to the Finke deposition.

Page 182

1    MR. COHN: And the Lockwood
2    deposition, that as soon as I
3    start getting into substantive
4    issues about what happened in the
5    negotiation of the Plan of the
6    TDPs, I am going to face an
7    instruction not to answer on the
8    bases that Ms. Harding has set
9    forth previously?
10    MR. GUY: I didn't attend
11    Finke. I did attend Peter's. I
12    know that objection was raised,
13    but I also know that he got into a
14    lot of those issues. So we will
15    take it question by question.
16    MS. BAER: The Debtor will
17    object to any of those questions
18    being asked and answered.
19    MR. LIESEMER: So will the
20    ACC.
21    BY MR. COHN:
22    Q.   Who besides the FCR and the
23    ACC was involved in the negotiation of
24    the TDPs, if anyone?

Page 183

1    A.   I don't remember anybody
2    else.
3    Q.   So, as far as you know, the
4    TDPs were drafted in consultation between
5    the FCR and the ACC alone; is that
6    correct?
7    MR. GUY: Objection.
8    THE WITNESS: Well,
9    recognizing that the ACC included
10    a Libby claimant, the answer is
11    yes.
12    BY MR. COHN:
13    Q.   Okay. Is it fair to say
14    that -- strike that.
15    In constructing TDPs, what
16    are the major concerns of you, as the
17    FCR?
18    A.   The payment percentage; the
19    maximum available payment; the maximum
20    payment meaning the year; whether there
21    is sequencing, which in plain English is
22    if you are not paid -- if you are awarded
23    a payment but not paid because of maximum
24    available payment percentages, you get

Page 184

1    interest called sequencing; inflation
2    issues; and the scheduled values.
3    Q.   You want to maximize the
4    recovery for your constituency, correct?
5    A.   Yes.
6    Q.   You want to maximize the
7    likelihood that money is going to be
8    available to pay your constituency,
9    correct?
10    A.   That's correct.
11    Q.   You want to at the same time
12    maximize the payment to all beneficiaries
13    within the confines of making sure there
14    is enough money around; is that right?
15    MR. GUY: Objection as to
16    beneficiaries.
17    THE WITNESS: Well --
18    MR. COHN: Let me take that
19    back.
20    BY MR. COHN:
21    Q.   Do you understand
22    beneficiaries to be those people who are
23    entitled to receive money from the Trust?
24    A.   Yes.

Page 185

1    MR. GUY: Presents or
2    futures?
3    MR. COHN: Aren't the
4    futures and the presents all
5    beneficiaries of the contemplated
6    Trust?
7    MR. GUY: But your questions
8    have been asking about futures,
9    and the witness has been answering
10    as to futures. And now you are
11    bringing it back as to --
12    MR. COHN: I thought I was
13    talking holistically.
14    BY MR. COHN:
15    Q.   Does your answer change for
16    the last couple of questions?
17    A.   No. But I was going to say
18    the Plan -- the TDP and I believe the
19    Plan itself requires that all
20    beneficiaries be treated similarly. So
21    to the extent that I have to live with
22    that, the answer is yes.
23    Q.   What is the FCR's view with
24    respect to the propriety of inflation,

Page 186

1    increased payments to take account in
2    inflation?
3        A.   I am in favor of that.
4        Q.   What about interest on
5    sequencing?
6        A.   I am agnostic.
7        Q.   Now, you say the
8    contemplated PI TAC is going to be
9    Messrs. Budd, Cooney, Weitz, and Rice; is
10   that right?
11       A.   Yes.
12       Q.   Now, you understand that
13   each of them represents claimants who
14   will seek to recover from the Trust,
15   correct?
16           MR. GUY:  Objection.  This
17       actually will be the third
18       go-around on this issue, so I am
19       going to be indulgent but only in
20       a limited fashion.
21           THE WITNESS:  I don't know
22       who their future clients will be,
23       but you are probably right.
24   BY MR. COHN:

Page 187

1        Q.   And you do understand that
2    they expect to take a contingency fee
3    payment from every dollar that they are
4    as successful at obtaining from the Trust
5    for their claimants?
6           MR. LIESEMER:  Objection,
7       lack of foundation.
8           MS. BAER:  Objection.
9           MR. GUY:  Objection.
10          THE WITNESS:  It is
11      traditional.  I must tell you that
12      I know personal injury asbestos
13      lawyers who have waived fees.
14   BY MR. COHN:
15       Q.   But that's not your
16   expectation with respect to these
17   gentlemen, is it?
18       A.   I don't know.
19       Q.   Earlier Mr. Brown asked you
20   about the PD FCR.  Do you believe that it
21   is possible within this Plan to cut off
22   all property damage claims without the
23   need for a Trust?
24          MR. GUY:  Objection, lacks

Page 188

1    foundation.
2           THE WITNESS:  I don't know.
3           MR. GUY:  This is
4       speculation.
5    BY MR. COHN:
6        Q.   And the reason you exist in
7    this case is because, among other things,
8    you can't give notice to somebody that
9    doesn't know that he is going to get sick
10   some day?
11       A.   That's among the reasons,
12   yes.
13       Q.   And you are not aware of any
14   property owner in the United States that
15   isn't capable of being given notice of
16   the pendency of this bankruptcy case and
17   their ability to assert a claim, are you?
18       A.   I can tell you in the
19   Manville case, the corporation in 1987
20   spent something like $10 million giving
21   notice to people and there were people
22   who later claimed they hadn't gotten
23   notice.  So I don't know if that's so.
24       Q.   So you are happy that you

Page 189

1    have exculpation in the Plan; is that
2    right?
3           MR. GUY:  Objection.
4           THE WITNESS:  I am.
5    BY MR. COHN:
6        Q.   Do you view obtaining that
7    protection as in any way presenting a
8    conflict between your personal interest
9    and your duties as the FCR?
10       A.   What personal interest?  I
11   don't know what personal interest you
12   mean.
13       Q.   You have a personal interest
14   in not being sued by somebody after the
15   Plan is confirmed.
16       A.   Well, I think that's taken
17   care of in the Trust Agreement, but
18   putting aside where my exculpation comes
19   from, yes.  I don't think it creates any
20   conflict.
21           MR. COHN:  Two minutes.
22           (There was a break from 2:13
23       p.m. to 2:20 p.m.)
24   BY MR. COHN:

Page 190

1    Q.  How many meetings did you
2  personally attend in the course of
3  negotiating the TDPs?
4        MR. GUY:  Meetings with who?
5        MS. BAER:  Objection.
6  BY MR. COHN:
7    Q.  I guess with the ACC would
8  be the other involved party that wasn't
9  your counsel.
10   A.  I am sorry.  Are you
11 eliminating this to negotiating the TDP?
12   Q.  Yes.
13   A.  I would have to guess.
14 Somewhere between eight and 12.
15   Q.  Was there discussion of
16 whether or not to permit the insurers to
17 be involved in the processing of claims?
18       MR. LIESEMER:  Objection.
19       MR. GUY:  Objection.
20       You can answer -- well, you
21 know what?  I will defer to these
22 guys.
23       MS. BAER:  Can you read back
24 the question?

Page 191

1        (The reporter read from the
2  record as requested.)
3        MS. BAER:  Objection.
4        MR. LIESEMER:  Objection.
5        MR. GUY:  But do you want
6  the witness to answer?
7        MS. BAER:  To the extent the
8  witness would have to reveal
9  discussions about negotiations of
10 the various Plan documents, I
11 would object.
12       If you can answer without
13 revealing that kind of
14 information, then I won't object.
15       THE WITNESS:  I don't think
16 I can.
17       MR. COHN:  So you are
18 instructing?
19       MR. GUY:  Yes.
20       MR. DEMMY:  Can I ask a
21 clarifying question?  Who is
22 instructing the witness not to
23 answer?
24       MR. GUY:  I am instructing,

Page 192

1  as counsel for the FCR,
2  Mr. Austern not to answer the
3  question because the other Plan
4  proponents are raising
5  confidentiality issues with regard
6  to settlement discussions, and I
7  am adhering to that request.
8        And as the Court has stated
9  many times, negotiations are not
10 relevant and, therefore, would not
11 be admissible at the Plan
12 confirmation hearing.
13       MR. COHN:  We disagree.
14       MR. GUY:  Understood.
15       MR. COHN:  I think I tested
16 your tolerance to where I am going
17 to get instructions not to answer.
18 I think I will stand down now and
19 let Mr. Plevin question.
20       - - -
21       EXAMINATION
22       - - -
23 BY MR. PLEVIN:
24   Q.  Good afternoon, Mr. Austern.

Page 193

1    A.  Good afternoon.
2    Q.  Just so we are straight, I
3  represent Fireman's Fund Insurance
4  Company in this case only with respect to
5  issues concerning Fireman's Fund's proof
6  of claim and the indemnity agreement
7  between Fireman's Fund and Grace and the
8  supersedeas bond that Fireman's Fund
9  posted with respect to a case in Texas
10 that I want to ask you some questions
11 about.
12       Let me start, first of all,
13 by asking if you are generally familiar
14 with the Edwards case in Texas?
15   A.  Yes.
16   Q.  Can you tell me what you
17 know about that case in general?
18   A.  Mr. Reaud, R-E-A-U-D, I
19 think --
20   Q.  Correct spelling.  I don't
21 know if the pronunciation is right.
22   A.  -- has a judgment on appeal
23 in an asbestos personal injury claim
24 against Grace in a number of millions of

Page 194

1    dollars. I think that's what I know --
2    which was stayed, of course, because of
3    the bankruptcy.
4        Q.    And in which the appeal was
5    stayed?
6        A.    The appeal was stayed.
7        Q.    And I will represent to you
8    that there were five plaintiffs who are
9    part of that judgment.
10        But your understanding then
11    is that there was a judgment in the trial
12    court, correct?
13        A.    Correct.
14        Q.    Which was appealed?
15        A.    Correct.
16        Q.    And that the appellate
17    proceedings were stayed by the Grace
18    bankruptcy?
19        A.    Correct.
20        Q.    Do you know that as part of
21    the appellate proceedings, Fireman's Fund
22    posted a supersedeas bond to enable Grace
23    to go forward on the appeal without
24    Grace's assets being immediately at risk

Page 195

1    for execution by the plaintiffs?
2        A.    I have been told that.
3        Q.    Do you understand that in
4    connection with the issuance of the
5    supersedeas bond, Fireman's Fund and
6    Grace entered into an indemnity agreement
7    pursuant to which Grace agreed to
8    indemnify Fireman's Fund for any amounts
9    that Fireman's Fund paid pursuant to the
10    bond?
11        A.    I have been told that.
12        Q.    And do you know that
13    Fireman's Fund has filed a proof of claim
14    seeking to recover from Grace's estate
15    any and all amounts that Fireman's Fund
16    might be obligated to pay under the
17    supersedeas bond?
18        A.    I have been told that.
19        Q.    Do you have a view as to the
20    likelihood of success on Grace's appeal
21    or the strength of Grace's position on
22    appeal?
23        MR. GUY:  Objection, seeks a
24    legal conclusion.

Page 196

1        MS. BAER:  Objection. It
2    also seeks attorney-client
3    communication.
4        MR. LIESEMER:  Same
5    objection.
6        MR. GUY:  To the extent you
7    can answer without revealing
8    communications with your
9    counsel --
10        MR. PLEVIN:  Let me just be
11    certain that I did not ask him for
12    any communications. I didn't ask
13    him what anybody told him or what
14    he said to anybody. I asked him
15    if he has a view.
16        He is a party to the
17    bankruptcy as the Future
18    Claimants' Representative, and he
19    either has a view or he doesn't.
20    If he has a view, I intend to ask
21    him what his view is and what the
22    basis for it is.
23        And if the point then is
24    that he can only say it based on

Page 197

1    counsel, that would be the proper
2    time to make that objection.
3        MR. GUY:  I actually don't
4    think you can, because what you
5    are trying to elicit is expert
6    testimony from a lawyer about a
7    merits of a case that's pending in
8    court. And that testimony would
9    be barred on a 701 F.R.E. I don't
10    think you can ask that. It would
11    not be admissible in the
12    bankruptcy case.
13        If you can explain to me how
14    Mr. Austern's view about the
15    merits of a legal case would be
16    admissible before Judge
17    Fitzgerald, I would be happy to
18    hear it. Maybe you can try it
19    another way.
20        MR. PLEVIN:  I am trying to
21    think of what the other way would
22    be.
23        MR. GUY:  There is no good
24    way.

Page 202

1  Mr. Austern, the concept of set-off in
2  bankruptcy?
3       A.   I understand set-off
4  generally as a proposition. I am not
5  sure I would apply it -- I don't know
6  that I know enough bankruptcy law to
7  apply it to bankruptcy.
8       Q.   Okay. What is your
9  understanding of the concept of set-off?
10       A.   Well, if I owe you $10,000
11  and I have to pay Mr. Guy because you owe
12  him some money, I can set-off from what I
13  paid Mr. Guy what I owe you.
14          MR. PLEVIN: Can you read
15       that answer back?
16          (The reporter read from the
17       record as requested.)
18  BY MR. PLEVIN:
19       Q.   Are you aware, Mr. Austern,
20  that Grace has made claims for insurance
21  coverage against Fireman's Fund under
22  liability insurance policies issued by
23  Fireman's Fund?
24       A.   Yes.

Page 203

1       Q.   And that the insurance
2  coverage claims Grace has made at least
3  include, if not -- they are not limited
4  to claims for coverage of asbestos
5  personal injury claims?
6       A.   I am sorry. Can you say
7  that again?
8       Q.   I got a little tied up
9  there.
10          Grace is seeking coverage
11  from Fireman's Fund under the Fireman's
12  Fund insurance coverage policies for
13  asbestos personal injury claims asserted
14  against Grace, correct?
15       A.   Yes.
16       Q.   Do you have a view as to
17  whether in the event that Fireman's Fund
18  is obligated to pay insurance coverage to
19  Grace, Fireman's Fund would be able to
20  reduce that obligation by any amount that
21  Grace is obligated to pay under the
22  indemnity agreement?
23          MR. GUY: Objection. I
24  don't see how he can answer that

Page 204

1  question without getting into a
2  legal analysis. He is here as a
3  fact witness.
4          But, again, let me talk to
5  my client, and I think we can
6  resolve it with the answer.
7          MS. BAER: We join in the
8  objection.
9          (There was a discussion held
10  off the record at this time.)
11          THE WITNESS: I have no
12  view.
13  BY MR. PLEVIN:
14       Q.   Do you have a concern that
15  if the Edwards appeal were to be --
16  withdrawn.
17          Do you have a concern that
18  if the Edwards judgment were to be
19  affirmed on appeal and Fireman's Fund
20  paid money to Edwards and then made a
21  claim against Grace for the amount paid,
22  that that would in some way reduce the
23  amount of money coming into the Trust
24  from the Fireman's Fund insurance policy?

Page 205

1          MR. LIESEMER: Objection to
2  the form.
3          MS. BAER: Objection.
4          MR. GUY: Objection to form.
5          THE WITNESS: Mr. Plevin, I
6  have any concern that the activity
7  might reduce the amount of
8  insurance coming into the Grace
9  Trust. And I understand this is
10  approximately $6 million. And if
11  Fireman's Fund were to reduce its
12  payment or be entitled to reduce
13  its payment under the Fireman's
14  Fund policy for asbestos personal
15  injury to the Trust and it would
16  reduce it by $6 million, yes, I
17  have a concern.
18  BY MR. PLEVIN:
19       Q.   And I am sure this has been
20  established on the record long before I
21  came here, but let me just ask this
22  question for foundational purposes.
23          You are an attorney,
24  Mr. Austern?

1       A.   Yes.
2       Q.   And you have practiced law
3   for how many years?
4       A.   45.
5           MR. PLEVIN:  Thank you.  I
6   have no further questions.
7           MR. CALOGERO:  I have no
8   questions.
9           MR. WISLER:  Maryland
10  Casualty has no questions.
11          MR. GUY:  Are there any
12  insurers on the phone who have
13  questions?
14          Scotts?  BNSF?  Do you have
15  any questions?
16          MS. COBB:  Yes.  This is
17  Tiffany Cobb on behalf of The
18  Scotts Company, LLC, with Vorys,
19  Sater, Seymour and Pease.  Can you
20  hear me?
21          MR. GUY:  Yes.  Hi, Tiffany.
22              - - -
23          EXAMINATION
24              - - -

1   BY MS. COBB:
2       Q.   Mr. Austern, in your
3   capacity as the Asbestos PI Future
4   Claimants' Representative, what fiduciary
5   duties do you owe?
6           MR. GUY:  Tiffany, we
7   covered that earlier in the
8   deposition.  Were you listening
9   in?
10          MS. COBB:  I was.
11          MR. GUY:  I just don't want
12  to have a lot of duplicity in the
13  questioning.  I will allow this
14  one.
15          THE WITNESS:  I have a
16  fiduciary duty to future
17  claimants.
18  BY MS. COBB:
19      Q.   But what are the duties?
20      A.   Essentially to make sure
21  there is sufficient funds, that when they
22  file claims they will be treated the same
23  or similarly to present claimants.
24      Q.   In your capacity as the FCR,

1   who specifically do you view as your
2   punitive clients?
3       A.   Future claimants.
4       Q.   Okay.  And in your capacity
5   as the FCR then, do you owe a fiduciary
6   duty to asbestos PI claimants as defined
7   in the Plan who hold future demands
8   against any entity that is addressed in
9   the definition of an asbestos PI
10  claimant?
11      A.   Can you repeat the last part
12  of that.  Against whom?
13      Q.   Sure.  Against any entity
14  that is addressed in the definition of
15  asbestos PI claimant?
16      A.   Yes.
17      Q.   In your capacity as the FCR,
18  do you owe a fiduciary duty to indirect
19  PI Trust claimants who hold future
20  demands against the Debtors?
21      A.   Yes.
22      Q.   In your capacity as the FCR,
23  do you owe a fiduciary duty to
24  insurance-related claimants who hold

1   future demands against any settled
2   insurance company?
3       A.   I think I would have to go
4   back and look at the definition of those
5   people.
6       Q.   Okay.  Then let's do that.
7   If you would, please, look at Exhibit-5
8   which is the TDP, and if you would please
9   look at Section 5.12.
10      A.   I am looking at it, but give
11  me a moment.
12      Q.   Sure.
13      A.   Okay.  What was the
14  question?
15      Q.   In your capacity as the FCR,
16  do you owe a fiduciary duty to
17  insurance-related claimants who hold
18  future demands against any settled
19  insurance companies?
20      A.   I don't know.  I would have
21  to think about that.  I realize they
22  could be indirect claimants, at least I
23  think they could be indirect claimants.
24  So I would have to think about that.  I

Page 238

1    **During any Plan negotiations**
2  **in which you were involved which led to**
3  **the present Plan of Reorganization, going**
4  **back to 2004, was property damage**
5  **discussed, including ZAI?**
6        MS. BAER: Objection. This
7     goes into discussions with Plan
8     negotiations which Plan proponents
9     have already agreed is beyond the
10    inquiry of what this witness can
11    testify about.
12       MR. LIESEMER: The ACC joins
13    in the objection.
14       MR. GUY: Dan, I am sorry.
15    I have to agree with them. The
16    answer to this question will
17    necessarily reveal substance of
18    communications.
19       MR. SPEIGHTS: And I
20    understand that, and I am asking
21    simply for a yes or no answer as
22    to was property damage discussed
23    in his presence. You have not yet
1     instructed him not to answer. I

Page 239

1     am not sure what your position is
2     on that.
3        MR. GUY: I am going to
4     instruct the witness not to answer
5     because I don't see how he can
6     answer that without revealing the
7     substantive communications either
8     with a yes or a no answer, i.e.
9     they took place.
10   BY MR. SPEIGHTS:
11       **Q.   Mr. Austern, is there any**
12   **difference in the amount paid to a**
13   **mesothelioma victim from a sole exposure**
14   **to Libby vermiculite and from**
15   **mesothelioma victim who was exposed to**
16   **Grace and other products as a part of**
17   **general construction trade?**
18       A.   If the scheduled value is
19   the same. If somebody seeks individual
20   review, it could result in a different
21   number.
22       **Q.   And, among other reasons,**
23   **could it result in a different number**
24   **because in many instances, the Libby**

Page 240

1     claimant may have no other source of
2     exposure?
3        A.   If by source of exposure,
4     you mean nobody else to recover from, the
5     answer is yes, it could.
6        **Q.   I am not sure what you mean**
7     **by nobody else to recover from. There**
8     **may be another source of exposure. Or**
9     **are you saying if everybody else was**
10    **broke, then that would place them in the**
11    **same category?**
12       A.   Well, I haven't thought
13    about if somebody -- well, I will give
14    you an initial reaction. I think if
15    everyone else is broke, then, yes, they
16    would be entitled to a greater payment
17    because there was no one else to recover
18    from.
19       MR. SPEIGHTS: Mr. Austern,
20    that's all I have for you at this
21    time. For the record, I certainly
22    wish to reserve my right to
23    question Mr. Austern when I am
24    able to question him concerning

Page 241

1     the negotiations which led to the
2     proposed Plan insofar as property
3     damage is concerned and on the
4     other subjects that he was
5     instructed not to respond to.
6        Have a nice weekend,
7     Mr. Austern.
8        THE WITNESS: Thank you,
9     Mr. Speights.
10       MR. GUY: I think, for the
11    record, the only thing that
12    Mr. Austern is being instructed
13    not to answer your questions on
14    were with regard to the
15    negotiations. The transcript will
16    say what it says.
17       Is there any other party
18    that would like to ask questions
19    of Mr. Austern?
20       MR. BROWN: I have one.
21       MR. HARRIS: This is Daniel
22    Harris for the Unsecured
23    Creditors' Committee. I don't
24    have any questions for

Page 242

1    Mr. Austern, but I would like to
2    read a statement into the record,
3    if that's okay.
4        As counsel for the
5    Creditors' Committee that Plan
6    proponents have previously
7    discussed and agreed the
8    Creditors' Committee may seek a
9    subsequent deposition of
10   Mr. Austern or any other person or
11   persons solely in connection with
12   Plan feasibility issues. Thank
13   you.
14       MR. GUY: Mr. Brown.
15       - - -
16       EXAMINATION
17       - - -
18   BY MR. BROWN:
19       Q.   Mr. Austern, I have a few
20   follow-up questions mainly to what
21   Mr. Cohn questioned you about.
22       I think one of the documents
23   that the Libby claimants' counsel handed
24   you was an 8-K. I don't recall the name

Page 243

1    of it. Do you have it there?
2        A.   I have it here. I have it.
3        Q.   Okay. And attached to that
4    8-K there is a Term Sheet, correct?
5        A.   Yes.
6        Q.   And I believe your testimony
7    was earlier that you have seen this Term
8    Sheet but some other iteration of it; is
9    that correct?
10       A.   Yes.
11       Q.   Not in the form of an
12   attachment to an 8-K?
13       A.   Oh, no. I meant I have seen
14   a printed version of this.
15       Q.   Okay. But, in substance,
16   it's the same document as what is
17   attached to the 8-K?
18       A.   Yes.
19       Q.   Okay. You will agree with
20   me, will you not, that the Term Sheet is
21   dated April 6, 2008?
22       A.   If you will tell me -- yes,
23   it is.
24       Q.   Okay. To your knowledge,

Page 244

1    were any of the Debtors' insurers
2    consulted about any term of this Term
3    Sheet prior to April 6, 2008?
4        A.   Well, I didn't consult with
5    them, so I don't know. I did not consult
6    with them.
7        Q.   Are you aware of anyone else
8    consulting with them?
9        A.   No.
10       Q.   To your knowledge, did any
11   of the Debtors' insurers consent to any
12   term in the Term Sheet prior to April 6,
13   2008?
14       A.   Not that I know of.
15       Q.   Now, the initial Joint Plan
16   was filed in September of 2008, correct?
17       A.   Yes.
18       Q.   Would I be correct in
19   assuming that between April 6, 2008 and
20   September 2008 that the Plan proponents
21   were working on the terms of the Plan and
22   Plan documents?
23       A.   I was, and I know others
24   were.

Page 245

1        Q.   Okay. And would I also be
2    correct in that time period the Plan
3    proponents and their counsel were
4    drafting Plan documents?
5        A.   I know my counsel was.
6        Q.   In that time frame, April 6,
7    2008 to September 2008, to your
8    knowledge, were any of the Debtors
9    insurers' consulted about any of the
10   terms in the Plan or Plan documents?
11       A.   I do not know of any
12   consultations that took place.
13       Q.   Okay. To your knowledge,
14   were any of the Debtors insurers'
15   consented about any term in the Plan or
16   Plan documents in that time frame?
17       A.   Well, having not been
18   consulted, I would be surprised if they
19   consented, but I don't know if they
20   consented.
21       Q.   All right. Now, in your
22   prior testimony, in answer to one of
23   Mr. Cohn's questions, you indicated that
24   you were aware of circumstances in which

Page 246

1  plaintiff's personal injury attorneys had
2  waived their fees?
3       A.   Yes.
4       Q.   Putting those circumstances
5  aside, do you have an understanding as to
6  what the customary contingency fee
7  arrangement is for plaintiffs' asbestos
8  personal injury lawyers?
9            MR. LIESEMER:  Objection to
10       the form.  No foundation.
11           THE WITNESS:  I know what it
12       is in the Manville Trust because
13       the Manville Trust dictates what
14       it will be.
15  BY MR. BROWN:
16       Q.   Okay.
17       A.   Putting that aside, I think
18  it depends on the case.  I am familiar
19  with the fact, for instance, that medical
20  malpractice attorneys charge a somewhat
21  higher contingency fee than others do.  I
22  am not sure I know what the standard fee
23  is for asbestos personal injury.
24       Q.   Do you have any idea what

Page 247

1  Mr. Cooney's firm charges by way of
2  contingency fee?
3       A.   No.
4       Q.   Mr. Weitz?
5       A.   No.
6       Q.   Mr. Rice?
7       A.   No.
8       Q.   Mr. Budd?
9       A.   No.
10       Q.   Anyone?
11       A.   No.
12       Q.   You mentioned that there is
13  a cap -- I am not sure you used the term
14  "cap" -- there is a fee in the Manville
15  Trust Agreement?
16       A.   Yes.
17       Q.   Is it a cap?
18       A.   No -- it is a cap.  It says
19  the fee cannot exceed 5 percent.
20       Q.   Okay.  How did that term
21  come about in the Manville Trust?
22       A.   In words of one syllable,
23  Judge Weinstein insisted on it.
24       Q.   Is there a cap under this

Page 248

1  Plan?
2       A.   Not that I know of.
3       Q.   Why?
4       A.   I don't know.
5       Q.   Are you aware of other
6  asbestos trusts where there is a cap with
7  respect to contingency fees that can be
8  paid to plaintiffs lawyers?
9       A.   You did say asbestos trusts?
10       Q.   Yes.
11       A.   I do not know of any other
12  asbestos trust that has a cap.
13       Q.   Focusing for a moment on the
14  CE Trust, are the TAC members paid for
15  their services as TAC members?
16       A.   You know, I don't remember.
17  I know there is a provision to pay their
18  expenses.  I can't remember if they are
19  paid.  I just know I am paid.
20       Q.   Well, that's important.
21           How about with respect to
22  this Trust in the Grace bankruptcy?  Do
23  you know whether the TAC members will be
24  paid in any fashion for their services

Page 249

1  TAC members?
2       A.   Do you mean other than
3  expenses?
4       Q.   Yes.
5       A.   And I don't recall any
6  specific provision.
7       Q.   Okay.  I found it.
8       A.   Which page?
9       Q.   Page 32.
10       A.   Are we in the Plan?
11       Q.   No.  We are in the Trust
12  Agreement, page 32 of the Trust
13  Agreement.
14       A.   I am sorry.  Just a minute.
15  What page?
16       Q.   32, Section 5.6.
17       A.   I seem to have an agreement
18  that's out of pagination.  Just a moment.
19  Yes.  5.6, yes, they are
20  paid -- I stand corrected -- an hourly
21  rate.
22       Q.   All right.  Do you have any
23  understanding today as to what the hourly
24  rate will be for the members of the TAC

Page 250

1   if the Plan is confirmed?
2       A.   No, I don't.
3       Q.   Do you have any view as to
4   what the hourly rate would be if the Plan
5   is confirmed?
6       A.   I confess, Mr. Brown, having
7   forgotten that they are entitled to an
8   hourly rate, I would have to think about
9   that. But I, at this point, have no
10  view.
11      Q.   Okay.  Do you have a view as
12  to whether they should be paid that
13  hourly rate above and beyond whatever
14  fees they get from their individual
15  clients who recover from the Trust?
16      A.   If Section 5.6 gives them
17  the right to get the hourly rate, I think
18  they should get the hourly rate.
19          MR. BROWN: I think that's
20  all. Thank you, Mr. Austern.
21          MR. CANDON: I have one
22  follow-up question.
23          MR. GUY: Sure. Go ahead.
24              - - -

Page 251

1              EXAMINATION
2                  - - -
3   BY MR. CANDON:
4       Q.   Mr. Austern, you had
5   mentioned that you reviewed Mr. Biggs'
6   estimation report, and the figure was
7   somewhere exactly between, you said, 3
8   and 5 billion?
9       A.   Let me explain. There was a
10  follow-up letter to the report. The
11  report I believe said 3.8, and it was
12  reduced to 3.6 because of the
13  mathematical error.
14      Q.   Did she provide a separate
15  estimate for Libby claims?
16      A.   No, she did not.
17          MR. CANDON: Okay. That's
18  all I have. Thank you.
19          MR. GUY: Okay. We are
20  done.
21          (The deposition concluded at
22  3:27 p.m.)
23
24

Page 252

1              CERTIFICATE
2
3
4       I HEREBY CERTIFY that the witness
5   was duly sworn by me and that the
6   deposition is a true record of the
7   testimony given by the witness.
8
9
10
11
12      _____
13      Lori A. Zabielski
14      Registered Professional Reporter
15      Dated:  MAY 17, 2009
16
17
18
19
20      (The foregoing certification
21  of this transcript does not apply to any
22  reproduction of the same by any means,
23  unless under the direct control and/or
24  supervision of the certifying reporter.)

Page 253

1          INSTRUCTIONS TO WITNESS
2
3       Please read your deposition over
4   carefully and make any necessary
5   corrections. You should state the reason
6   in the appropriate space on the errata
7   sheet for any corrections that are made.
8       After doing so, please sign the
9   errata sheet and date it.
10  You are signing same subject to the
11  changes you have noted on the errata
12  sheet, which will be attached to your
13  deposition.
14      It is imperative that you return
15  the original errata sheet to the deposing
16  attorney within thirty (30) days of
17  receipt of the deposition transcript by
18  you. If you fail to do so, the
19  deposition transcript may be deemed to be
20  accurate and may be used in court.
21
22
23
24