# EXHIBIT 7

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

------------------------------ X

In Re:                          Chapter 11

                                Case No.

                                01-01139 JKF

W.R. Grace & Co., et al.,

                                (Jointly
        Debtors.               Administered)

------------------------------ X


* * * CONFIDENTIAL * * *


—    —    —

May 13, 2009

—    —    —


DEPOSITION of RICHARD FINKE, held

at the offices of Kirkland & Ellis, 655

Fifteenth Street, N.W., Washington, DC,

commencing at 9:32 A.M., on the above

date, before Lisa Lynch, a Registered

Merit Reporter, New Jersey Certified Court

Reporter, License No. XI00825, and

Certified Realtime Reporter


—    —    —

MAGNA LEGAL SERVICES, LLP

7 Penn Center, 8th Floor
1635 Market Street
Philadelphia, PA  19103

Page 2

```
 1  APPEARANCES:
 2
    DRINKER BIDDLE & REATH, LLP
 3  BY: MICHAEL F. BROWN, ESQUIRE
    One Logan Square
 4  18th and Cherry Streets
    Philadelphia, Pennsylvania 19103-6996
 5  (brownmf@dbr.com)
    Representing OneBeacon America Insurance
 6  Company, Seaton Insurance Company,
    Government Employees Insurance Company,
 7  Columbia Insurance Company f/k/a Republic
    Insurance Company
 8
 9  CAPLIN & DRYSDALE, CHARTERED
    BY: JEFFREY A. LIESEMER, ESQUIRE
10  One Thomas Circle NW
    Suite 1100
11  Washington, DD 20005
    202.862.7801
12  (jal@capdale.com)
    Representing Grace, Official Committee of
13  Asbestos Personal Injury Claimants ("ACC")
14
    KIRKLAND & ELLIS, LP
15  BY: BARBARA M. HARDING, ESQUIRE
        THEODORE L. FREEDMAN, ESQUIRE
16  655 Fifteenth Street, N.W.
    Washington, DC  20005-5793
17  202.879.5081
    (barbara.harding@kirkland.com)
18  (tfreedman@kirkland.com)
    Representing the Debtors
19
20  THE LAW OFFICES OF JANET S. BAER, P.C.
    BY: JANET S. BAER, ESQUIRE
21  70 West Madison Street
    Suite 2100
22  Chicago, Illinois 60602
    jbaer@jsbpc.com
23  Representing W.R. Grace
24
```

Page 3

```
 1  APPEARANCES: (continued)
 2  SIMPSON THACHER & BARTLETT, LLP
    BY: ELISA ALCABES, ESQUIRE
 3  425 Lexington Avenue
    New York, New York 10017-3954
 4  212.455.2846
    (ealcabes@stblaw.com)
 5  Representing Travelers Casualty and Surety
    Company
 6
 7  VORYS, SATER, SEYMOUR AND PEASE, LLP
    BY: WILLIAM J. POHLMAN, ESQUIRE*
 8      PHILIP DOWNEY, ESQUIRE*
    (*VIA TELECONFERENCE)
 9  52 East Gay Street
    Columbus, Ohio 43215
10  614.464.8349
    (wjpohlman@vorys.com)
11  Representing The Scotts Company, LLC
12
    LEWIS, SLOVAK & KOVACICH, PC
13  BY: TOM L. LEWIS, ESQUIRE
    P.O. Box 2325
14  723 Third Avenue
    Great Falls, Montana 59403
15  406.761.5595
    tom@lsklaw.net
16  Representing the Libby Claimants
17
    SPEIGHTS & RUNYAN
18  BY: DANIEL H. SPEIGHTS, ESQUIRE*
    (*VIA TELECONFERENCE)
19  200 Jackson Avenue East
    P.O. Box 685
20  Hampton, South Carolina 29924
    803.943.4444
21  (dspeights@speightsrunyan.com)
    Representing Anderson Memorial Hospital
22
23
24
```

Page 4

```
 1  APPEARANCES:(continued)
 2  MENDES & MOUNT, LLP
    BY: ALEXANDER MUELLER, ESQUIRE
 3  750 Seventh Avenue
    New York, New York 10019
 4  212.261.8296
    (alexander.mueller@mendes.com)
 5  Representing London Market Companies
 6
    FORD MARRIN ESPOSITO & WITNEYER & GLESER
 7  BY: ELIZABETH M. DeCRISTOFARO, ESQUIRE*
    (*VIA TELECONFERENCE)
 8  Wall Street Plaza
    New York, New York 10005-1875
 9  212.269.4900
    Representing Continental Casualty Company
10  and Continental Insurance Company
11
    BILZIN SUMBERG BAENA PRICE & AXELROD, LLP
12  BY: MATTHEW I. KRAMER, ESQUIRE*
    (*VIA TELECONFERENCE)
13  200 South Biscayne Boulevard
    Suite 2500
14  Miami, Florida 33131-5340
    305.450.7246
15  (mkramer@bilzin.com)
    Representing Property Damage Committee
16
17  STROOCK & STROOCK & LAVAN, LLP
    BY: ARLENE G. KRIEGER, ESQUIRE*
18      LEWIS KRUGER, ESQUIRE*
    (*VIA TELECONFERENCE)
19  180 Maiden Lane
    New York, New York 10038-4982
20  212.806.5400
    (akrieger@stroock.com)
21  Representing Official Committee of
    Unsecured Creditors
22
23
24
```

Page 5

```
 1  APPEARANCES: (continued)
 2
    CROWELL & MORING, LLP
 3  BY: MARK D. PLEVIN, ESQUIRE
        NOAH S. BLOOMBERG, ESQUIRE
 4  1001 Pennsylvania Avenue, N.W.
    Washington, DC 20004-2595
 5  202.624.2913
    (mplevin@crowell.com)
 6  (nbloomberg@crowell.com)
    Representing Fireman's Fund Insurance
 7  (Surety Bond)
 8
    STEVENS & LEE, P.C.
 9  BY: MARNIE E. SIMON, ESQUIRE
    1818 Market Street, 29th Floor
10  Philadelphia, Pennsylvania 19103-1702
    215.751.2885
11  (mes@stevenslee.com)
    Representing Fireman's Fund Insurance
12
    LAW OFFICES OF ALAN B. RICH
13  BY: ALAN B. RICH, ESQUIRE
    Elm Place, Suite 4620
14  1401 Elm Street
    Dallas, Texas 75202
15  214.744.5100
    (arich@alanrichlaw.com)
16  Representing Property Damage PCR
17
    CONNOLLY BOVE LODGE & HUTZ, LLP
18  BY: JEFFREY C. WISLER, ESQUIRE
    The Nemours Building
19  1007 North Orange Street
    P.O. Box 2207
20  Wilmington, Delaware 19899
    302.888.6528
21  (jwisler@cblh.com)
    Representing Maryland Casualty
22
23
24
```

## Page 6

1  A P P E A R A N C E S: (continued)
2  ECKERT SEAMANS CHERIN & MELLOTT, LLC
   BY:  EDWARD J. LONGOSZ, II, ESQUIRE
3  1747 Pennsylvania Avenue, N.W.
   12th Floor
4  Washington, DC 20006
   202.659.6619
5  (elongosz@eckertseamans.com)
   Representing Maryland Casualty and Zurich
6
7  WILEY REIN, LLP
   BY:  RICHARD A. IFFT, ESQUIRE
8  1776 K Street NW
   Washington, DC 20006
9  202.719.7170
   (rifft@wileyrein.com)
10 Representing Maryland Casualty and Zurich
11
   COZEN O'CONNOR
12 BY:  JACOB C. COHN, ESQUIRE
   1900 Market Street
13 Philadelphia, Pennsylvania 19103-3508
   215.665.2147
14 (jcohn@cozen.com)
   Representing Federal Insurance Company
15
16 ORRICK HERRINGTON & SUTCLIFFE, LLP
   BY:  PERI N. MAHALEY, ESQUIRE
17 Columbia Center
   1152 15th Street, N.W.
18 Washington, DC 20005-1706
   202.339.8516
19 (pmahaley@orrick.com)
   Representing PI Future Claimants'
20 Representative
21
   CUYLER BURK, P.C.
22 BY:  ANDREW CRAIG, ESQUIRE
   4 Century Drive
23 Parsippany, New Jersey 07054
   973.734.3200
4  (acraig@cuyler.com)

## Page 7

1  A P P E A R A N C E S: (continued)
2  O'MELVENY & MEYERS LLP
   BY:  TANCRED SCHIAVONI, ESQUIRE*
3  (*VIA TELEPHONE)
   7 Times Square
4  New York, New York 10036
   212.326.2267
5  (tschiavoni@omm.com)
   Representing Arrowood Indemnity Company
6
7  WOMBLE CARLYLE SANDRIDGE & RICE, PLLC
   BY:  KEVIN J. MANGAN, ESQUIRE*
8  (*VIA TELECONFERENCE)
   222 Delaware Avenue
9  Suite 1501
   Wilmington, Delaware 19801
10 302.252.4361
   (kmangan@wcsr.com)
11 Representing State of Montana
12
   PEPPER HAMILTON, LLP
13 BY:  LINDA J. CASEY, ESQUIRE*
   (*VIA TELECONFERENCE)
14 3000 Two Logan Square
   Philadelphia, Pennsylvania 19103
15 215.981.4000
   (caseyl@pepperlaw.com)
16 Representing BNSF Railway Company
17 KRAMER LEVIN NAFTALIS & FRANKEL, LLP
   BY:  SARAH SCHINDLER-WILLIAMS, ESQUIRE*
18 (*VIA TELECONFERENCE)
   1177 Avenue of the Americas
19 New York, New York 10036
   212.715.9515
0  (SSchindlerWilliams@kramerlevin.com)
   Representing the Equity Committee
21
22
23
24

## Page 8

1              INDEX
             EXAMINATION
2
   Witness Name              Page
3  RICHARD FINKE
4    BY MR. BROWN           12,333
5    BY MS. ALCABES         129
6    BY MR. LEWIS           187
7    BY MR. PLEVIN          265
8    BY MR. WISLER          285
9    BY MR. COHN            289
10   BY MR. MANGAN          296
11   BY MR. DOWNEY          305, 371
12   BY MR. SCHIAVONI       343
13   BY MR. SPEIGHTS        347
14
15            EXHIBITS
   EXHIBIT   DESCRIPTION         ID
16
17 Exhibit 1  Notice of Deposition of   16
           Debtors Pursuant to Rule
           30(b)(6)
18
19 Exhibit 2  Document entitled W.R.    16
           Grace/Confirmation Hearing
           30(b)(6) Deposition Notice
20
21 Exhibit 3  SEC Form 8-K            25
22 Exhibit 4  Exhibit 6 to Exhibit Book, 41
           Asbestos Insurance
23         Transfer Agreement
24 Exhibit 5  Exhibit 19 to Exhibit    53
           Book, Retained Causes of

## Page 9

1            EXHIBITS
   EXHIBIT   DESCRIPTION         ID
2
3  Exhibit 6  Exhibit 2 to Exhibit Book, 55
           Asbestos PI Trust Agreement
4
5  Exhibit 7  Exhibit 4 to Exhibit Book, 55
           Trust Distribution
           Procedures
6
7  Exhibit 8  First Amended Joint Plan 70
           of Reorganization
8  Exhibit 9  Exhibit 5 to Exhibit Book, 92
           Schedule of Settled
9          Asbestos Insurers Entitled
           to 524(g) Protection
10
11 Exhibit  Settlement Agreement    98
10   Bates stamped OB 1 through
     33
12
13 Exhibit  Travelers/Allstate     135
11   30(b)(6) deposition notice
14 Exhibit  Travelers 30(b)(6)     136
12   supplemental deposition
     notice
15
16 Exhibit  Grace/Aetna Asbestos   149
13   Settlement Agreement dated
17   May 22, 1996
18 Exhibit  Exhibit 25 to Exhibit  178
14   Book, CMO for Class 7A
19   Asbestos PD Claims
20
21
22
23
24

Page 10

1    DEPOSITION SUPPORT INDEX
2
3

Direction to Witness Not To Answer
4    Page Line    Page Line
     30   2     37   12
5    37   17    39    8
     39   15    369   1
6

Request For Production of Documents
7    Page Line    Page Line
     (None)
8

Stipulations
9    Page Line    Page Line
     (None)
10

Questions Marked
11   Page Line    Page Line
     (None)
12
13           - - -
14
15
16
17
18
19
20
21
22
23
24

Page 11

1    R I C H A R D   F I N K E,
2        having been sworn by the Notary
3        Public of the States of New York
4        and New Jersey, was examined and
5        testified as follows:
6
7    EXAMINATION BY
8    MR. BROWN:
9        Q.   Good morning, Mr. Finke.
10   My name is Michael Brown.  I represent One
11   Beacon, Seaton, Geico and Republic for the
12   objecting insurance companies in the Grace
13   bankruptcy.  You've been deposed several
14   times before, correct?
15       A.   Yes, I have.
16       Q.   Okay.  So we can dispense
17   with the formalities of what a
18   deposition's all about?
19       A.   Yes, we can.
20       Q.   Okay.
21       MS. HARDING:  Michael,
22   would you mind if I made a quick
23   statement on the record?
24       MR. BROWN:  Sure.

Page 12

1        MS. HARDING:  I just wanted
2    to make a statement on the record
3    that the debtors have designated
4    Mr. Finke to answer certain
5    appropriate questions related to
6    certain 30(b)(6) topics.
7        As we've indicated, Mr.
8    Finke will be available for seven
9    hours today.  We've also designated
10   Mr. Hughes and Mr. LaForce to
11   answer other 30(b)(6) topic
12   questions.  We are hoping and
13   expecting that the parties seeking
14   to ask questions have coordinated
15   so that we can end in seven hours
16   and we think it's a reasonable
17   expectation.
18       The debtors have reviewed
19   the deposition of Mr. Lockwood and
20   agree, in essence, with Mr.
21   Lockwood's answers with respect to
22   how the Plan operates and so we
23   think and are very hopeful that
24   there will not be a need to go

Page 13

1    further than seven hours to get to
2    the appropriate inquiry as to how
3    the Plan operates.  So I just
4    wanted to get that on the record.
5        MR. BROWN:  Okay.
6    Actually, that's helpful.  Maybe I
7    could follow up with a question for
8    Mr. Finke.
9        Q.   Mr. Finke, have you
10   reviewed Mr. Lockwood's Rule 30(b)(6)
11   deposition transcript?
12       A.   Yes, I have.
13       Q.   Okay.  Is there anything
14   that you read in that transcript that you
15   disagreed with?
16       A.   No, nothing of substance.
17       Q.   Okay.  How about anything
18   not of substance?
19       A.   There are a few occasions,
20   I think, where I either would have worded
21   something differently or where I think Mr.
22   Lockwood may have been either in error --
23   might have been in error depending on
24   whether he was -- depending on the

Page 14

1    context. Let me give you one example of
2    that.
3        Q.   Sure.
4        A.   He, I think, made a
5    statement at one point where he equated
6    asbestos in place coverage or insurance
7    coverage with the asbestos insurance
8    reimbursement agreements. I believe he
9    said he thought they were the same thing,
10   and perhaps in substance or in concept
11   they are. I'm not an insurance lawyer,
12   but I know that under the Plan
13   definitionally the definition of asbestos
14   (sic) in place insurance coverage
15   specifically excludes asbestos
16   reimbursement agreements from the
17   definition.
18       Q.   Okay.
19       A.   Which would suggest they
20   are not the same.
21       Q.   All right. I'm going to
22   suggest that Miss Alcabes, or one of the
23   people whose issue that is, may want to
1    follow up with you on that point.

Page 15

1        A.   Sure.
2        Q.   But let's pass on that.
3    Other than what you've just
4    described, is there anything else in Mr.
5    Lockwood's deposition transcript that the
6    debtors disagreed with?
7        A.   Nothing that comes to
8    mind.
9            MR. BROWN: Okay. Let me
10   have the first exhibit marked, and
11   can we go off the record for a
12   second.
13           (Off the record.)
14           (Notice of Deposition of
15   Debtors Pursuant to Rule
16   30(b)(6) marked for identification
17   as Exhibit Finke-1.)
18           (Document entitled W.R.
19   Grace/Confirmation Hearing 30(b)(6)
20   Deposition Notice marked for
21   identification as Exhibit
22   Finke-2.)
23   BY MR. BROWN:
24       Q.   Mr. Finke, I'm going to put

Page 16

1    before you two exhibits marked -- we're
2    using the term Finke 30(b)(6) 1 and Finke
3    30(b)(6) 2. For shorthand during the
4    deposition I'll just refer to them as
5    Finke-1 and Finke-2. Could you identify
6    Finke-1 for me, please?
7        A.   It is a Notice of
8    Deposition of Debtors Pursuant to Rule
9    30(b)(6) served by One Beacon, Seaton,
10   Geico and Columbia.
11       Q.   Going forward, it would be
12   more accurate to refer to Columbia as
13   Republic. I know it says Columbia there.
14   The date on here is April 28th, 2009 and
15   the site is Drinker Biddle & Reath's
16   offices but we obviously changed those by
17   agreement after this was scheduled.
18       Is it your understanding that
19   you're appearing here today in response to
20   this Rule 30(b)(6) notice?
21       A.   Yes.
22       Q.   And there were several
23   others served on you as well?
24       A.   Correct.

Page 17

1        Q.   Correct, all right.
2        If you look at what's been marked
3    as Finke-2, can you identify that for
4    me?
5        A.   It is a chart 18 pages long
6    entitled W.R. Grace/Confirmation Hearing
7    30(b)(6) Deposition Notice Witness
8    Designations.
9        Q.   Okay. And is it your
10   understanding that this document was
11   prepared by your counsel?
12       A.   Yes, that's my
13   understanding.
14       Q.   And have you seen it before
15   today?
16       A.   Yes.
17       Q.   Okay. And am I correct
18   that it basically lists all the various
19   topics from all the 30(b)(6) notices that
20   were served on Grace and then designates
21   one of, I believe, three individuals to
22   testify about the various topics?
23       A.   I would agree that it
24   includes all 30(b)(6) notices that have

Page 18

1    been served as of the time that the chart
2    was created.
3         MS. HARDING: And I just
4    want to just object to the extent
5    that Exhibit 2 does not include the
6    cover letter that accompanied
7    Attachment A which also set out our
8    objections with respect to the
9    30(b)(6) notices.
10        I have no objection to him
11   answering questions about it; I
12   just wanted to make clear on the
13   record that there was a cover
14   letter that accompanied that.
15        MR. COHN: Which I actually
16   have but I didn't --
17        MR. BROWN: Can we just go
18   off the record a second?
19        (Off the record.)
20   BY MR. BROWN:
21        Q.   Mr. Finke, when we were
22   just off the record, we were discussing
23   another document, a copy of which I do not
1    have and apparently no one else does,

Page 19

1    which was described as being objections to
2    the various 30(b)(6) notices that were
3    served on the debtors. Are you familiar
4    with the document that I'm describing?
5        A.   No, I don't think I am.
6        Q.   Okay. In any event, you're
7    appearing here today pursuant to the Rule
8    30(b)(6) notices for the topics for which
9    you've been designated on Finke-2 and
10   subject to whatever objections were
11   asserted by the debtors, correct?
12       A.   Correct.
13        MR. BROWN: Okay. We don't
14   have a document, but my
15   recollection of the objections was
16   that there was an objection to this
17   witness testifying about any Plan
18   negotiations or draft Plan
19   documents. Is that right, Barbara?
20        MS. HARDING: That's
21   correct.
22        MR. BROWN: Okay. At Mr.
23   Lockwood's deposition we reached an
24   agreement that we wouldn't go down

Page 20

1    the road of having all the people
2    in this room ask questions about
3    negotiations and draft documents
4    only to draw objections and
5    instructions not to answer.
6        Can we have that same
7    arrangement for this deposition
8    with the understanding that if
9    there subsequently is a ruling by a
10   court that entitles us to discovery
11   on those subjects that the witness
12   would be recalled for that purpose?
13        MS. HARDING: Subject to
14   Judge Fitzgerald ordering the
15   debtors to submit and answer
16   questions to those, then we can
17   have that agreement, yes.
18        MR. COHN: Just for my
19   clarity, in all of these
20   depositions we're talking about the
21   relevance objection instruction
22   that was asserted at Lockwood's
23   deposition that I clarified on the
24   record?

Page 21

1        MR. BROWN: That is
2    correct, and I believe the document
3    that we don't have, the objections
4    to the 30(b)(6)'s, if I recall
5    correctly, had a paragraph setting
6    forth that objection and a number
7    of different decisions by Judge
8    Fitzgerald in other cases.
9        MS. HARDING: That's
10   correct, and it relates -- our
11   objection relates to the -- to the
12   relevance to the extent that the
13   questions seek information relating
14   to settlement negotiations,
15   drafting --
16        MR. COHN: The
17   clarification that I thought that I
18   made earlier that I'll make clear
19   is still the clarification that
20   this is a relevance objection, or
21   are you asserting a privilege?
22        MS. HARDING: Well, I
23   disagree with that
24   characterization. The objection is

Page 22

1    set out in our official objection
2    to the 30(b)(6) notices which is
3    filed on record.  It includes
4    attorney-client privilege, it
5    includes work product, it includes
6    joint interest privilege.  I don't
7    have it in front of me so I can't
8    recite them, but it includes much
9    more than relevance so --
10       MR. COHN:  Just to be
11   clear, because --
12       MS. HARDING:  With respect
13   to negotiations, you can -- there
14   will be other objections other than
15   just relevance, so --
16       MR. COHN:  Well, but my
17   understanding was there was a
18   blanket instruction not to answer
19   without any attempt to parse
20   through potential privilege
21   objections on the basis of a
22   blanket relevance objection.  Am I
23   missing something?
1        MS. HARDING:  I don't

Page 23

1    disagree with that, but I think
2    that in light of the blanket
3    relevance objection with respect to
4    negotiations that there was that
5    agreement reached.  That doesn't
6    mean that with respect to
7    everything that might fall under
8    negotiations that there wouldn't be
9    other objections as well.
10       MR. COHN:  I'm not
11   suggesting that --
12       MS. HARDING:  Okay.
13       MR. COHN:  -- if there's a
14   valid privilege objection here that
15   you've somehow waived your right to
16   assert that by asserting a blanket
17   objection, but my understanding is
18   we didn't start down that path
19   because there was a relevance
20   objection.
21       I'm sorry, Michael.
22       MR. BROWN:  That's all
23   right.  Suffice it to say that if
24   we ask questions concerning the

Page 24

1    negotiations of the Plan or the
2    draft Plan documents that that will
3    draw an instruction not to
4    answer.
5        MS. HARDING:  That's
6    correct.
7        MR. BROWN:  Okay, thank
8    you.
9        (SEC Form 8-K marked for
10   identification as Exhibit
11   Finke-3.)
12   BY MR. BROWN:
13       Q.   Mr. Finke, you have before
14   you now another document that has been
15   marked for this deposition as Finke-3.
16   You'll note that there is a prior
17   deposition exhibit number on there, Number
18   12, and that was from your deposition as a
19   fact witness.  Do you see that?
20       A.   Yes, I do.
21       Q.   We obviously had some
22   questioning about this at your prior
23   deposition but that was not in your
24   capacity as a designee for Grace and I

Page 25

1    have some additional questions.  So the
2    first one is:  Can you identify the
3    document?
4        A.   Yes.  This is a Form 8-K
5    report that was filed by W.R. Grace with
6    the Securities and Exchange Commission on
7    April 6, 2008.
8        Q.   And the document has a
9    couple of attachments, correct?
10       A.   Yes.
11       Q.   What are they?
12       A.   Let's see.  The first
13   attachment is, in essence, a press release
14   in which Grace announced the -- its
15   settlement of asbestos personal injury
16   claims in the context of the Chapter 11
17   cases and the second attachment is a term
18   sheet for resolution of asbestos personal
19   injury claims.
20       Q.   And was the press release
21   actually issued?
22       A.   I do not know.
23       Q.   Okay.  If it was issued,
24   was it issued on or about the time that

Page 26

1  this document was filed, to your
2  knowledge?
3      A.  Yes.
4      Q.  Let's focus on the term
5  sheet.  Who are the parties to the term
6  sheet?
7      A.  The debtors, the Official
8  Equity Security Committee, the Official
9  Committee of Personal Injury Claimants and
10  the Future Claimants' Representative.
11      Q.  And what is the date of the
12  term sheet?
13      A.  April 6, 2008.
14      Q.  I want you to focus now on
15  the period -- for purposes of my next
16  series of questions -- the period prior to
17  April 6, 2008.  And am I correct that
18  prior to April 6, 2008 that Grace did not
19  consult with any of its insurers
20  concerning the terms that appear in this
21  term sheet?
22      MS. HARDING:  I'm going to
23  object to the extent that it seems
1  to me that this is going right into

Page 27

1  the issue of negotiations and
2  settlement negotiations with
3  respect to the Plan.  I thought we
4  weren't going to go there.
5      MR. COHN:  I think there
6  was no -- if there was no contact,
7  how are we going into that?
8      MR. BROWN:  Yeah, we ought
9  to see what his answer is.  I'm not
10  asking him about negotiations with
11  the parties that signed the term
12  sheet.  I'm asking about whether
13  Grace consulted with any of its
14  insurers concerning the terms of
15  the term sheet prior to executing
16  it.
17      MS. HARDING:  First of all,
18  I'm going to object.  I think that
19  the -- this is not a topic of the
20  30(b)(6) notice and we're prepared
21  to answer questions about how the
22  Plan operates.  I think that that's
23  what Judge Fitzgerald would
24  instruct the debtors to do and

Page 28

1  we're here to do that.
2      We're not here to talk
3  about and have the witness testify
4  about how it was negotiated, how it
5  came about, the prior drafts, who
6  was consulted, who wasn't
7  consulted, and all that.  I don't
8  think that's the proper scope of
9  this deposition.
10      MR. BROWN:  I'm not asking
11  who was consulted.  I'm asking him
12  whether the insurers -- I'm asking
13  him to affirm that the insurers
14  were not consulted.
15      MS. HARDING:  Right.  But
16  the problem with that is if we
17  answer that question, then we have
18  opened the door to answering that
19  question with respect to any party
20  and I think that that's not the
21  proper subject of this
22  deposition.
23      MR. BROWN:  I can assure
24  you the only one I'm going to ask

Page 29

1  about is the insurers.
2      MS. HARDING:  Well, I
3  understand that you are, but I
4  don't want to spend any of the time
5  of the seven hours talking about
6  any of the negotiations or what led
7  up to the drafting of the document.
8  We didn't agree to that.  It wasn't
9  asked for in the 30(b)(6) topics
10  with respect to how the term sheet
11  came about and so I think that
12  we've got an agreement.
13      If you all want to seek an
14  order compelling us to answer those
15  kinds of questions, then I think
16  you should do that.  Otherwise,
17  we're here to talk about how the
18  Plan operates.  So --
19      MR. BROWN:  I thought you
20  just --
21      MS. HARDING:  That's what
22  he's here to answer questions
23  about.
24      MR. BROWN:  Are you

Page 30

1  instructing him not to answer?
2      MS. HARDING: I'm
3  instructing him not to answer
4  because I think it leads into a
5  series of questions that we all
6  have already agreed is not proper
7  under the current law.
8      MR. COHN: Oh, wait, wait,
9  wait, wait, wait.
10      MR. BROWN: I'm not
11  sure --
12      MS. HARDING: Actually, I
13  understand that you don't agree
14  with the law, but we've agreed for
15  purposes of this deposition that we
16  weren't going to do that.
17      MR. BROWN: I don't know
18  that we agreed to any such thing.
19  I asked the same series of
20  questions of Mr. Lockwood. I don't
21  know if you were at his deposition
22  or not --
23      MS. HARDING: I was.
1      MR. BROWN: -- but he

Page 31

1  answered those questions and he
2  left open in his answers about
3  whether Grace had discussed with
4  its insurers these topics and
5  that's why I'm asking these
6  questions. It was perfectly fine
7  when I asked them of Mr. Lockwood;
8  he answered them and so should this
9  witness.
10      MS. HARDING: Well, I
11  believe that I objected and I
12  wasn't the person defending Mr.
13  Lockwood. And Mr. Lockwood --
14  that's between him and his counsel.
15  I'm Mr. Finke's counsel. I'm
16  instructing Mr. Finke not to answer
17  questions relating to how the
18  settlement -- how the term sheet,
19  the Plan or any of the documents
20  related to it were drafted or put
21  together and who was consulted and
22  who wasn't consulted and how that
23  came about.
24      MR. COHN: On the basis of

Page 32

1  relevance?
2      MS. HARDING: I think
3  that's an appropriate scope of the
4  objection.
5      MR. COHN: On the basis of
6  relevance?
7      MS. HARDING: On the basis
8  of all of the objections that were
9  stated in our objection to the
10  30(b)(6) notice --
11      MR. COHN: No, I want you
12  to state on the record --
13      MS. HARDING: Let me
14  finish.
15      MR. COHN: -- here and now
16  what the basis for a yes or no
17  question of whether or not people
18  were consulted. If there was no
19  communication, there's no arguable
20  privilege and I want the basis now
21  because I think we are going to
22  litigate this.
23      MS. HARDING: Well, I
24  think --

Page 33

1      MR. BROWN: I think I have
2  the floor on this, but thank you,
3  Jack.
4      I think we have a
5  disconnect between what constitutes
6  negotiations. I'm not asking him
7  about how this was negotiated
8  between these parties. I
9  understand your position on that.
10  I'm simply asking whether Grace
11  consulted with its insurers with
12  regard to any term that appears in
13  the term sheet prior to executing
14  it on April 6, 2008. I don't think
15  that gets into negotiations at all.
16  In point of fact, I suspect he's
17  going to say no, in which case it
18  doesn't involve negotiations at
19  all.
20      MS. HARDING: Well, I
21  suggest this: I think that the
22  question "did you negotiate with
23  anyone" gets into that question.
24      MR. BROWN: That wasn't the

Page 34

1    question.
2        MS. HARDING: Well, by
3    asking him -- I think it does. I
4    think we disagree about that. I
5    think why don't we move forward.
6    At a break I'm happy to talk about
7    it further but right now I'm
8    instructing him not to answer the
9    questions.
10        MR. BROWN: Well, I'll ask
11    a series --
12        MR. LEWIS: Hold on just a
13    second. My name is Tom Lewis. I
14    represent the Libby claimants, and
15    I've never seen a deposition like
16    this. I'm in practice 30 some
17    years.
18        I thought the examiner
19    makes a question and if there's an
20    objection, the objection is stated
21    clearly as to that particular
22    question and we don't sit here and
23    debate for 15 or 20 minutes whether
24    the question should be answered.

Page 35

1        I think we should proceed
2    in a proper question and answer
3    proceeding here or we're never
4    going to get done and we're going
5    to have an impossible record.
6        So I object to the form of
7    the examination and the failure of
8    counsel for this witness to make a
9    proper objection on the record of
10    this deposition and I join in the
11    objection that this gentleman to my
12    right --
13        MR. COHN: Mr. Cohn.
14        MR. LEWIS: Thank you.
15        MS. HARDING: I think I've
16    stated the objection very clearly
17    and I instruct the witness not to
18    answer.
19        MR. LEWIS: I disagree with
20    that. I have not heard an
21    objection on the record of this
22    deposition.
23        MS. HARDING: The objection
24    is relevance. It's not relevant

Page 36

1    under 408. The objection
2    relates -- the rules of the
3    bankruptcy law do not require the
4    debtors to answer questions
5    relating to Plan negotiations and
6    settlement with respect to their
7    Plan and attorney-client privilege,
8    work product and joint interest
9    privilege.
10        MR. BROWN: Okay.
11        MR. COHN: Wait, I'm sorry.
12    I don't mean to -- I would like to
13    know with whom you assert a common
14    interest exists.
15        MS. HARDING: You know
16    what? My objection's on the record
17    and I'm not stating any more. I've
18    instructed the witness not to
19    answer and I think we should move
20    forward.
21        MR. BROWN: I think we
22    should, too, and I'm going to say
23    for purposes of stating your
24    objections to this series of

Page 37

1    questions let's just use the
2    shorthand, you know, same as before
3    so that we don't have to repeat
4    it.
5    BY MR. BROWN:
6        Q.    Mr. Finke, I'm correct, am
7    I not, that prior to signing this term
8    sheet that we've been discussing that
9    Grace did not obtain the consent of any of
10    its insurers with respect to any of the
11    terms in the term sheet?
12        MS. HARDING: Same
13    objection. Instruct the witness
14    not to answer.
15        Q.    Why did Grace exclude its
16    insurers?
17        MS. HARDING: Same
18    objection. Instruct the witness
19    not to answer.
20        Q.    The initial Joint Plan, Mr.
21    Finke, was filed on September 19th, 2008,
22    correct?
23        A.    I believe that's correct.
24        Q.    Okay. And it included, did

Page 38

1    it not, the initial version of the
2    Asbestos PI Trust agreement and the
3    Asbestos PI TDP?
4         MS. HARDING: I'm sorry,
5    Mike, can you repeat the question?
6    I'm sorry.
7         (The reporter reads the
8    pending question.)
9         MS. HARDING: And "it" was
10   the --
11        MR. BROWN: The Plan.
12        MS. HARDING: Thank you,
13   okay.
14   A.    I don't recall which
15   documents were -- or exhibits were filed
16   with the Plan.
17   Q.    Okay. Do you know whether
18   a press release was issued by Grace in
19   conjunction with the filing of the initial
20   Plan in September of 2008?
21   A.    I don't recall.
22   Q.    Am I correct that in the
23   period between April 6, 2008 and September
24   19th, 2008 that the Plan proponents were

Page 39

1    engaged in negotiating the terms of the
2    plan and drafting Plan documents?
3    A.    Yes.
4    Q.    Okay. In that time frame,
5    did Grace consult with any of its insurers
6    concerning the terms of the Joint Plan or
7    any of the Plan documents?
8         MS. HARDING: Same
9    objection. Instruct the witness
10   not to answer.
11   Q.    In that time frame, did
12   Grace obtain the consent of any of its
13   insurers with respect to any of the terms
14   in the Plan or the Plan documents?
15        MS. HARDING: Same
16   objection. Instruct the witness
17   not to answer.
18        MR. BROWN: Okay. Let's
19   mark another exhibit. The next
20   document we're going to mark is
21   Exhibit 6 to the Exhibit Book which
22   is the asbestos insurance transfer
23   agreement, and by convention I
24   brought one copy to be marked and

Page 40

1    one for counsel.
2         MS. HARDING: Thank you.
3         (Exhibit 6 to Exhibit Book,
4         Asbestos Insurance Transfer
5         Agreement, marked for
6         identification as Exhibit
7         Finke-4.)
8    BY MR. BROWN:
9    Q.    Mr. Finke, you have before
10   you the document marked as Finke-4. Can
11   you identify the document for me,
12   please?
13   A.    This is the proposed
14   asbestos transfer agreement also referred
15   to as Exhibit 6 to the Exhibit Book.
16   Q.    And what is your
17   understanding as to what this document
18   accomplishes?
19   A.    It is --
20        MS. HARDING: Object to
21   form but --
22   A.    It is intended once it is
23   signed to transfer the asbestos insurance
24   rights to the Asbestos PI Trust.

Page 41

1    Q.    Okay. It has a -- it has a
2    few schedules. Look at Schedule 1, if you
3    will, and can you just identify what
4    Schedule 1 is?
5    A.    Schedule 1 is a, I think,
6    20-page list of primary and excess
7    insurance policies that were or are
8    applicable to asbestos-related claims.
9    Q.    And who is the insured
10   under those policies?
11   A.    My understanding is that
12   the insured under the policies would be
13   one or more of the debtors in these
14   Chapter 11 cases. I don't recall if a
15   non-debtor affiliate would have been an
16   insured under any of these. I'd have to
17   check on that.
18   Q.    By non-debtor affiliate,
19   who were you -- what entities or
20   individual are you thinking of?
21   A.    Any Grace-affiliated entity
22   that is not a debtor.
23   Q.    Okay. Who owns the
24   policies at this point?

Page 42

1     A.   The debtors, or the -- I
2   should say the insurance contributors.
3     Q.   And that includes the
4   debtors?
5     A.   Debtors, and I believe the
6   non- -- I believe that the non-debtor
7   affiliates as well.
8     Q.   And I think they are
9   described somewhere.  I think Mr. Lockwood
10   told us they were.
11     A.   Who are you referring to
12   when you say "they"?
13     Q.   The non-debtor affiliates.
14     A.   They are listed on an
15   exhibit.
16     Q.   You're right, there was
17   another exhibit that had that.
18     A.   The number of which I don't
19   recall offhand.
20     MS. ALCABES:  Exhibit 16.
21     MR. BROWN:  Oh, yes,
22   Exhibit 16.
23     Q.   Exhibit 16 to the Exhibit
  Book?

Page 43

1     A.   Correct.
2     MR. BROWN:  Okay.  I'm not
3   going to bother marking that.
4     Q.   If the Joint Plan is
5   confirmed and if the asbestos insurance
6   transfer agreement is executed as
7   contemplated by the Joint Plan, who are or
8   will be the insureds under the policies on
9   Schedule 1?
10     MS. HARDING:  Object to
11   form.
12     MR. LIESEMER:  Join.
13     MS. HARDING:  And also
14   object to the extent it calls for
15   speculation and a legal conclusion
16   as well.
17     A.   My understanding is that
18   the named insureds would remain the same
19   as they currently are but that the rights
20   and interests in the policies themselves
21   are transferred to the PI Trust.
22     Q.   Who will be the owner of
23   the policies?
24     MS. HARDING:  Same

Page 44

1   objections.
2     MR. LIESEMER:  Object to
3   the form.
4     A.   Again, I'm not an insurance
5   attorney but I believe -- since the
6   policies themselves are not being
7   assigned, I believe the ownership of the
8   policies does not change.
9     Q.   Are you familiar with the
10   basic responsibilities of an insured under
11   a general liability insurance policy?
12     MR. LIESEMER:  Object to
13   the form.
14     MS. HARDING:  Object to the
15   form in terms of basic.
16     MR. BROWN:  Well, let me
17   rephrase it.
18     Q.   Are you familiar with any
19   of the responsibilities of an insured
20   under a standard general liability
21   policy?
22     MS. HARDING:  Object to
23   form as to foundation but...
24     A.   Yes.

Page 45

1     Q.   Why don't you tell me which
2   ones you're familiar with?
3     A.   There's an obligation to
4   provide notice to the insurer of a claim
5   or an event that gives rise to a claim, an
6   obligation to provide relevant
7   documentation in support of a claim under
8   a policy.  Offhand, I can't think of any
9   other specific obligations.
10     Q.   Have you heard of the duty
11   to cooperate under the policy?
12     MS. HARDING:  Object to
13   form.  It assumes facts not in
14   evidence.  With respect to what
15   policy?  There are hundreds of
16   different insurance policies.
17     MR. BROWN:  Yes, there are,
18   and I'm asking him just about
19   general provisions in a general
20   liability policy.
21     Q.   Are you familiar with the
22   concept of the duty to cooperate on the
23   part of an insured under a general
24   liability insurance policy?

Page 46

1           MS. HARDING: Again object
2    to form.
3           MR. LIESEMER: Join in that
4    objection.
5           MS. HARDING: And
6    foundation.
7        A.   Yes.
8        Q.   **Okay. Are you familiar**
9    **with the right to defend or to associate**
10   **in the defense of claims under a general**
11   **liability policy?**
12          MS. HARDING: Same
13   objection.
14          MR. LIESEMER: Object to
15   the form.
16       A.   No, I'm not.
17       Q.   **Let me ask you a**
18   **different -- to your knowledge, does Grace**
19   **have any duties to the insurers listed on**
20   **Schedule 1 of the transfer agreement?**
21          MS. HARDING: Object to the
22   form.
23          MR. LIESEMER: Object to
24   the form.

Page 47

1        A.   Does Grace currently have
2    any duties? Is that the question?
3        Q.   **Well, let's break it up.**
4    **Let's say: Did Grace pre-petition have**
5    **any duties to the insurers listed on**
6    **Schedule 1?**
7           MS. HARDING: Same
8    objection.
9        A.   Whatever -- whatever duties
10   and obligations are spelled out in the
11   policy, yes.
12       Q.   **Okay. If the Plan is**
13   **confirmed, what happens to those duties**
14   **and obligations?**
15          MR. LIESEMER: Object to
16   the form.
17          MS. HARDING: Same
18   objection. And I am going to
19   object, I think, to -- are you --
20   what particular -- are you talking
21   about any particular policy or with
22   respect to all of the policies
23   listed in the exhibit or -- object
24   to the form.

Page 48

1           MR. BROWN: Okay.
2           MS. HARDING: I don't see
3    how he could answer that question
4    with respect to all policies.
5        A.   The duties and obligations
6    are still owed to the insurance companies
7    since the Plan is intended to be
8    insurance-neutral. I don't have an answer
9    as to specific duties in terms of whether
10   the PI Trust has a given duty and
11   obligation or whether that given duty or
12   obligation remains with a Grace entity. I
13   think it would depend on the nature of the
14   duty or obligation.
15       Q.   **Okay. How about the duty**
16   **to cooperate in the defense of a claim?**
17          MS. HARDING: Same
18   objection as before.
19          MR. LIESEMER: Join.
20       Q.   **Is that a duty that would**
21   **remain with the reorganized debtors or is**
22   **that a duty that would be assumed by the**
23   **Trust or both or something different?**
24       A.   I don't -- I don't know the

Page 49

1    answer to that because I'm not aware of
2    any attempt or effort by either Grace or
3    the ACC or the FCR to try to parse out
4    specific duties, obligations, et cetera
5    under the policies since it is the intent
6    of the joint co-proponents that the Plan
7    and the transfer of insurance rights be
8    insurance-neutral aside from, you know,
9    the fact of the assignment that it has
10   not -- that no one -- none of the
11   co-proponents have felt it necessary to
12   engage in that effort.
13       Q.   **Under the Joint Plan, is**
14   **the Asbestos PI Trust the successor to the**
15   **debtors with respect to asbestos-related**
16   **liabilities?**
17          MR. LIESEMER: Object to
18   form.
19          MS. HARDING: Object to
20   form.
21          MR. BROWN: Let me rephrase
22   that.
23       Q.   **With respect to -- well,**
24   **back up.**

Page 50

1    If a Plan is confirmed, will the
2    Asbestos PI Trust become the successor to
3    Grace's asbestos personal injury
4    liabilities?
5        MS. HARDING: Object to
6    form.
7        MR. LIESEMER: Same
8    objection.
9        A.    The Asbestos PI Trust
10   assumes Grace's asbestos PI liabilities.
11       Q.    Okay. Is it the successor?
12   That is, is the Asbestos PI Trust the
13   successor to Grace's liability insurance
14   policies?
15       MS. HARDING: Object.
16       Q.    Excuse me. The ones listed
17   on Schedule 1 to the transfer agreement.
18       MS. HARDING: Object to
19   form.
20       MR. LIESEMER: Object to
21   the form.
22       A.    I'm not clear on the
23   ramifications of referring to or
1    identifying the PI Trust as a successor to

Page 51

1    Grace's insurance rights. There's -- they
2    are the transferee. The Trust is the
3    transferee of those insurance rights.
4        Q.    Okay. Is there any
5    residual insurance rights that will be
6    retained by the debtors with respect to
7    the policies listed on Schedule 1 on the
8    transfer agreement?
9        MS. HARDING: Object to
10   form.
11       MR. LIESEMER: Object to
12   the form.
13       A.    Not with respect to any
14   actual or potential coverage for asbestos
15   claims.
16       Q.    How about any type of
17   coverage?
18       A.    I don't know. I think that
19   may depend on the nature and terms of the
20   policy.
21       MR. BROWN: Let's mark this
22   document. The next document we're
23   having marked as Finke-5 is Exhibit
24   19 to the Exhibit Book.

Page 52

1        (Exhibit 19 to Exhibit
2    Book, Retained Causes of Action
3    Schedule marked for identification
4    as Exhibit Finke-5.)
5        Q.    Mr. Finke, if you can take
6    a look at what's been marked as Finke
7    Exhibit 5, my initial question to you is:
8    Can you identify it?
9        A.    This is Exhibit 19 of the
10   Exhibit Book. It's entitled Retained
11   Causes of Action Schedule.
12       Q.    And what do you understand
13   to be the purpose of this document?
14       MS. HARDING: Object to
15   form.
16       MR. LIESEMER: Join.
17       A.    The purpose was to try to
18   identify and thereby preserve any causes
19   of action that -- either actual or
20   potential causes of action that the
21   reorganized debtors might have against any
22   party.
23       Q.    Okay. If you turn to page
24   10, you'll see it says at the top

Page 53

1    "Retained Causes of Action (Insurance
2    Claims)."
3        A.    Uh-huh.
4        Q.    And then there appear to be
5    a number of different insurance companies
6    that are listed with the addresses, and
7    that goes on from page 10 to page 13.
8        A.    Uh-huh.
9        Q.    What retained causes of
10   action will Grace have against the
11   insurers listed here if the Joint Plan is
12   confirmed?
13       A.    I don't know that they will
14   have any.
15       Q.    You're not aware of any
16   claims, sitting here today, against any of
17   these insurers?
18       MS. HARDING: To the extent
19   that you know.
20       THE WITNESS: Yeah.
21       A.    No, I'm not aware of any
22   specific claims.
23       Q.    How about any general
24   claims?

Page 54

1     A.   No, no, I'm not aware of
2  any general claims. I'm not aware of any
3  claims that I could identify with respect
4  to any given insurer.
5         MR. BROWN:  Let's mark the
6     next exhibit, which will be the
7     Asbestos PI Trust agreement.
8         (Exhibit 2 to Exhibit Book,
9     Asbestos PI Trust Agreement  marked
10    for identification as Exhibit
11    Finke-6.)
12        (Exhibit 4 to Exhibit Book,
13    Trust Distribution Procedures,
14    marked for identification as
15    Exhibit Finke-7.)
16 BY MR. BROWN:
17    Q.   Okay. Mr. Finke, you have
18 before you Exhibits 6 and 7. Exhibit 6 --
19 well, why don't you tell me if you can
20 identify both of those documents?
21    A.   Exhibit 6 is the Asbestos
22 PI Trust agreement. I should say the
23 proposed Asbestos PI Trust agreement that
1  is also known as Exhibit 2 to the Exhibit

Page 55

1  Book. Finke Exhibit 7 is the Trust
2  Distribution Procedures relevant to the
3  Asbestos PI Trust and also known as
4  Exhibit 4 to the Exhibit Book.
5     Q.   Okay. What role, if any,
6  do either of those two documents
7  contemplate for Grace's insurers in the
8  handling, resolution, settlement, defense
9  of asbestos claims asserted against or
10 submitted to the Trust?
11        MS. HARDING:  Object to the
12    form.
13        MR. LIESEMER:  Object to
14    the form.
15        MS. HARDING:  Could you
16    read back the question, please?
17        (The reporter reads the
18    pending question.)
19        MS. HARDING:  Okay, and I
20    object to it asbeing overly broad
21    with respect to Grace's insurers
22    without reference to any particular
23    insurer or policy. And, Michael,
24    do you have -- are you asking him

Page 56

1  to look at a specific provision of
2  the policy or...
3         MR. BROWN:  I'm just asking
4     the question I asked.
5     A.   I don't know the answer to
6  your question. I'm not that familiar with
7  the two agreements to know whether these
8  two documents set forth the role of the
9  asbestos insurers with respect to the
10 handling, settlement, resolution, payment,
11 et cetera of asbestos PI claims.
12        In general, the Plan includes the
13 asbestos insurance coverage that is
14 transferred to the Trust to be available
15 to either pay asbestos PI claims or
16 reimburse the PI Trust for its payment of
17 claims. Sitting here today, I just -- I
18 do not recall to what extent, if any,
19 these two documents contain provisions
20 that relate to that role.
21    Q.   Let me broaden the scope of
22 the question to not just these two
23 documents but the Plan or any of the Plan
24 documents. Would that change your

Page 57

1  answer?
2         MS. HARDING:  Object to
3     form.
4         MR. LIESEMER:  Join.
5     A.   I thought I just answered
6  that question so maybe I don't understand
7  the question.
8     Q.   Well, my initial question
9  to you focused on the two documents, the
10 Trust agreement and the asbestos PI TDP.
11 I'm asking the question more broadly now.
12        If you look at the Plan -- at all
13 the Plan documents, do any of them
14 contemplate any role for Grace's insurers
15 in the handling, defense, resolution, of
16 any asbestos PI claim submitted to the
17 asbestos PI Trust for resolution?
18        MS. HARDING:  Object to
19    form. I think it's overly broad.
20    And by Plan, do you mean all of the
21    exhibits, including all of the
22    documents and policies listed in
23    exhibits?
24        MR. BROWN:  I'm using the

Page 70

1 you now what has been marked as Exhibit 8
2 to this deposition and what is Exhibit 1
3 to the Exhibit Book. First question is:
4 Would you identify the document, please?
5 A. Yes. I think Exhibit 8 is
6 the First Amended Joint Plan of
7 Reorganization that was filed by Grace and
8 its co-proponents.
9 Q. Okay.
10 A. And the date is February --
11 date on the document is February 27,
12 2009.
13 Q. Okay. Have you reviewed
14 this document in its entirety?
15 A. Yes.
16 Q. How many times?
17 MS. HARDING: You mean in
18 its entirety how many times?
19 MR. BROWN: Well, let's
20 start-up with that question.
21 A. Interpreting review as
22 meaning a detailed word-for-word reading
23 of the entire document, I would say
1 once.

Page 71

1 Q. Okay. And how many times
2 have you partially reviewed the
3 document?
4 A. Many times.
5 Q. Okay. Do you understand
6 it?
7 A. I have an understanding of
8 it. I would not profess to have a
9 complete understanding of it.
10 Q. Okay. Are there particular
11 provisions in the Plan that you're quite
12 certain you don't understand?
13 MS. HARDING: Object to
14 form and relevance and concern that
15 we're not going to the seven
16 hours -- I mean, if you have a
17 specific question about a specific
18 provision that you don't understand
19 as an insured, then I think you
20 should ask him questions about
21 that. I think...
22 MR. BROWN: Is that an
23 instruction not to answer the
24 question?

Page 72

1 MS. HARDING: No, it's
2 not.
3 MR. BROWN: Okay. It's
4 just --
5 MS. HARDING: It's just an
6 objection that...
7 A. I'm sure that I do not
8 understand the annex or annexes that I
9 believe relate to tax issues.
10 MS. HARDING: I guess --
11 are you asking him in his personal
12 capacity?
13 MR. BROWN: I don't think
14 he's here in his personal capacity.
15 I think he's here in his capacity
16 as a designee for W.R. Grace or for
17 the debtors.
18 MS. HARDING: Okay. Are
19 you asking him if there's anybody
20 at W.R. Grace that has an
21 understanding of different
22 provisions of the Plan as lawyers
23 and --
24 MR. BROWN: I think he's

Page 73

1 here to testify about the operation
2 of the Plan. I think that was --
3 isn't he? So my question is
4 what --
5 MS. HARDING: He's here to
6 answer questions to help you
7 understand the Plan.
8 MR. BROWN: Barbara, can
9 we --
10 MS. HARDING: So I think if
11 there are questions that you don't
12 understand, I think you should ask
13 him those.
14 MR. BROWN: I would like to
15 know whether there are particular
16 provisions in the Plan that the
17 witness can identify that he is not
18 familiar with or that he doesn't
19 understand.
20 MS. HARDING: Well, I think
21 he's asked and answered, so...
22 A. Yes, for myself there are
23 provisions that I do not understand, such
24 as the tax annexes. This --

Page 74

1     MS. HARDING: Which also
2  were not designated 30(b)(6) topics
3  by any person who --
4     MR. BROWN: Can I ask that
5  we just let the witness answer the
6  question?
7     MS. HARDING: Well, I think
8  if you want to ask him questions
9  about topics that were designated
10  that you asked him to become
11  familiar with, then --
12     MR. BROWN: I didn't ask
13  him a question about the tax annex.
14  It was in his answer.
15     MS. HARDING: Well, that's
16  because you asked him about any
17  provision of the Plan. You
18  asked -- we tried to prepare the
19  witness to answer questions about
20  topics that everybody asked about.
21     MR. BROWN: All right.
22  I'll ask my question again. If you
23  have an objection and you want to
24  instruct him not to answer, then do

Page 75

1  it and we'll move on.
2  BY MR. BROWN:
3     Q.   Mr. Finke, as you sit here
4  today looking at the Joint Plan, can you
5  identify particular provisions that you do
6  not understand?
7     MS. HARDING: Object, asked
8  and answered, but answer one more
9  time if you'd like.
10     A.   In addition to what I've
11  already identified, the provision on the
12  warrants is not entirely clear to me. And
13  if I spent the time to go through the
14  document page by page, there may be a few
15  other sections that I don't feel very
16  comfortable with in terms of the level of
17  my understanding.
18     Speaking on behalf of W.R. Grace as
19  a whole, there are individuals who
20  understand those sections and, taken as a
21  whole, I think W.R. Grace does have a good
22  understanding of the Plan.
23     Q.   Okay. Well, let me take
24  your counsel up on her offer and direct

Page 76

1  your attention to page 87 of the Plan,
2  Section 7.15, and what I would like you to
3  do, because I have a series of questions
4  about it, is why don't you take a few
5  moments to review Section 7.15. In fact,
6  if you want to take a break at this
7  point --
8     MR. BROWN: Does that make
9  sense? Okay.
10     MS. HARDING: Well, I mean,
11  how long is it, again?
12     THE WITNESS: Seven
13  pages.
14     MS. HARDING: Five-minute
15  break?
16     MR. BROWN: That's fine,
17  yes.
18     (Recess taken.)
19  BY MR. BROWN:
20     Q.   Mr. Finke, we had a short
21  break and before that I directed your
22  attention to Section 7.15 of the Plan
23  entitled Insurance Neutrality. Did you
24  have an opportunity to review that section

Page 77

1  during the break?
2     A.   Yes.
3     Q.   This was not one of the
4  sections that you mentioned in your prior
5  testimony that you were -- that you did
6  not understand. Is it safe to say that
7  this is a provision that you do
8  understand? And I'm asking that question,
9  really, in your capacity as an individual
10  and as the designee on this subject for
11  the debtors.
12     MS. HARDING: Object to
13  form.
14     A.   Yes, I believe I understand
15  it.
16     Q.   Okay. Can you turn to
17  Section 11.9 of the Plan, and that's
18  entitled Exculpation, and if you'd take a
19  moment to review that section.
20     (The witness reviews the document.)
21     A.   Okay.
22     Q.   Given the language in
23  Section 7.15, am I correct that asbestos
24  insurance entities are not bound by the

Page 78

1  exculpation provision in Section 11.9 of
2  the Plan?
3          MR. LIESEMER: Object to
4      the form.
5          MS. HARDING: Object to the
6      form.
7      A.   I believe they -- the
8  asbestos insurance companies are bound by
9  Section 11.9.
10     Q.   They are bound?
11     A.   Yes.
12     Q.   If you go back to 7.15,
13 where is that set forth?
14         MS. HARDING: Object to
15     form.
16         MR. LIESEMER: Same
17     objection.
18     A.   Well, of course, there's no
19 provision in Section 7.15 that
20 specifically states that the insurers are
21 bound by Section 11.9. I assume that's
22 not what you're asking, but -- well,
23 literally, I think that is what you asked,
1  so --

Page 79

1      Q.   Yes, that is what I asked.
2      A.   -- that's my answer then.
3      Q.   So there's nothing in 7.15
4  that says that they're bound by 11.9 but
5  your testimony is that they are in fact
6  bound by 11.9?
7      A.   Yes.
8      Q.   Are there any other
9  provisions in the Plan that are not
10 specifically spelled out in Section 7.15
11 for which the insurers are bound
12 notwithstanding Section 7.15?
13         MS. HARDING: Objection to
14     form, and I think it misstates his
15     testimony.
16         THE WITNESS: I'm sorry.
17     Could you read back the question?
18         (The reporter reads the
19     pending question.)
20         MS. HARDING: Object to
21     form. I think it's confusing,
22     speculative. I don't see how you
23     can possibly answer that question.
24     But if you can answer it, go ahead.

Page 80

1          It also calls for a legal
2      conclusion.
3          (The witness reviews the document.)
4      A.   Okay. I would direct you
5  to Section 7.15(h) which states that "the
6  asbestos insurance entities shall be
7  subject to the releases and injunctions to
8  the extent described in this Plan" so my
9  answer to your question is that I believe
10 any provisions in the Plan that would
11 constitute a release or an injunction, and
12 I would include 11.9 in that language, are
13 binding on the asbestos insurance
14 entities.
15     Q.   So your testimony is that
16 7.15(h) includes through its language
17 Section 11.9?
18     A.   Yes, that is how I read
19 it.
20     Q.   What consideration, if any,
21 are Grace's insureds getting under the
22 Plan in exchange for the exculpation
23 provision in 11.9?
24         MR. LIESEMER: Objection to

Page 81

1      form.
2          MS. HARDING: Objection to
3      form.
4      A.   All right. First, your
5  question assumes that the insurance
6  entities would be entitled to some
7  consideration in exchange for being bound
8  by Section 11.9. I don't know that to be
9  the case. I don't know that they're not
10 entitled to it either.
11         But as far as consideration, if one
12 had to justify being bound by Section 11.9
13 on the basis of consideration, I think the
14 answer with respect to asbestos insurance
15 entities would also apply to all parties
16 involved in the Chapter 11, which is that
17 the entities and individuals covered by
18 the exculpation have been active in the
19 business of these Chapter 11 cases, they
20 have had to take positions, make
21 arguments, make decisions, et cetera, that
22 affect one or more parties involved in the
23 Chapter 11 cases and have thereby exposed
24 themselves to potential liability, I

Page 82

1    suppose, for their acts or omissions. And
2    the Chapter 11 itself could not proceed to
3    the point of resolution without the
4    efforts of these entities and these
5    individuals. So to the extent -- so there
6    is a -- in order to encourage and
7    facilitate the activities of the parties
8    listed in Section 11.9, it is my
9    understanding that it is common in these
10   types of bankruptcies to provide
11   exculpation of those entities and
12   individuals for their activities, and I'm
13   quoting here from 11.9, "In connection
14   with or arising out of the Chapter 11
15   cases." It is their participation and the
16   fruits of their participation that would
17   constitute consideration.
18        Q.   I want to circle back to a
19   question that I asked a few questions ago
20   concerning 7.15 and I asked you a question
21   to the effect of other than what's
22   specifically set forth in Section 7.15 are
23   there any other provisions in the Plan or
24   Plan documents that are binding upon

Page 83

1    Grace's insurers, and in answer to that
2    question you referred me to subsection (h)
3    and how 11.9 in the debtor's view was
4    encompassed within the language of (h).
5        So I want to go back to that
6    question and ask: Other than 11.9, is
7    there anything else?
8        A.   I'm --
9             MS. HARDING: Object to
10            form. I think it's confusing
11            and I'll leave it at that. If you
12            can answer, go ahead.
13       A.   I believe there is a more
14   general provision relating to the binding
15   nature of court orders, findings, et
16   cetera. That is what I was looking for
17   initially in response to your answer and
18   then I remembered the provision in 7.15(h)
19   and so I've directed you to that
20   provision. If you want me to spend the
21   time -- I do not know where in that Plan
22   that more general provision is that I have
23   in mind.
24       Q.   Well --

Page 84

1        A.   I could spend the time to
2    look for it if you'd like.
3        Q.   No, let's try this a little
4    differently. Look at 7.15(a).
5        A.   Okay.
6        Q.   It says "Except to the
7    extent provided in this Section 7.15,
8    notwithstanding anything to the contrary
9    in the Confirmation Order, the Plan or any
10   of the Plan documents -- nothing in the
11   Confirmation Order, the Plan or the Plan
12   documents, including any other provision
13   that purports to be preemptory or
14   supervening, shall in any way operate to
15   or have the effect of impairing any
16   asbestos insurance entity's legal,
17   equitable or contractual rights, if any,
18   in any respect." Have I read that
19   correctly?
20       A.   I believe so.
21       Q.   Okay. And what I'm asking
22   is: Given that broad statement, are there
23   any other provisions in the plan that are
24   not set forth in 7.15 that override the

Page 85

1    language in 7.15(a)?
2             MS. HARDING: Object to
3             form.
4        A.   Based on the language of
5    7.15(a), and if I'm understanding it as it
6    was intended, it states by its terms that
7    nothing else in the Plan or any of the
8    Plan documents would operate, you know, to
9    impair the -- an asbestos insurance
10   entity's rights.
11       Q.   So is your answer no?
12            MS. HARDING: Object, asked
13            and answered, but...
14       A.   Based on the language in
15   7.15(a), my answer would be no, subject
16   to -- subject to wanting to review the
17   remainder of the Plan because, as I
18   mentioned, I do have in mind that there is
19   one or more general provisions concerning
20   the applicability or binding nature of
21   court orders, court findings and the like.
22       And while I understand 7.15(a)
23   appears to act in such a way that would
24   make my proviso in my answer irrelevant, I

Page 86

1  would still feel more comfortable having
2  found and reviewed those other provisions
3  before giving an unequivocal "no".
4      Q.  Let's do this because we
5  don't want to waste time.  Why don't we --
6  I'm going to continue on.  We'll obviously
7  have breaks.  And during one of those
8  breaks, why don't you look for whatever
9  provision it is that you -- or provisions
10  that you think you're talking about and
11  then when we return from our break, even
12  if I'm not the questioner, would you bring
13  those one or two sections up to me?  That
14  will save us some time.
15      A.  That's fine.
16      Q.  All right.  I want to focus
17  your attention now on 7.15(b).
18      (The witness reviews the document.)
19      A.  Okay.
20      Q.  You see on the second line
21  there rolling over to the third line the
22  phrase "The beneficiaries of the Asbestos
23  PI Trust"?  Do you see that?
1       A.  Yes.

Page 87

1      Q.  What do you understand that
2  term to mean?
3           MR. LIESEMER:  Object to
4  the form.
5      Q.  What does that term mean?
6      A.  I understand it to mean
7  holders of asbestos PI claims.
8      Q.  Okay.  And does that
9  include holders of indirect Asbestos PI
10  Trust claims?
11           MR. LIESEMER:  Object to
12  form.
13      A.  Yes.
14      Q.  And does it include
15  indemnified insurer -- does it -- excuse
16  me.
17      Does that term include the holders
18  of indemnified insurer TDP claims?
19           MR. LIESEMER:  Object to
20  the form.
21      A.  Is that a defined term?
22      Q.  Good question.  It is a
23  term that appears in Section 5.13 of the
24  Trust Distribution Procedures.  I don't

Page 88

1  know that it is, per se, defined.
2           MS. HARDING:  Where is it
3  in the TDP?
4           MR. BROWN:  It's in Section
5  5.13.
6           MR. COHN:  Is that on page
7  49 of the TDP?
8           MR. BROWN:  I don't know
9  the page number.
10           THE WITNESS:  Page 49,
11  yes.
12      A.  Based on Section 5.13 of
13  the TDP and on the basis that a holder of
14  an indemnified insured TDP claim
15  potentially may have that claim paid by
16  the PI Trust in accordance with Section
17  5.13, I would interpret such a holder to
18  be a beneficiary of the PI Trust.
19      Q.  Okay.  So let's just take
20  one of my clients, for example.  Let's
21  take Seaton Insurance Company.  If Seaton
22  Insurance Company has an indemnified
23  insured TDP claim, then Seaton Insurance
24  Company, as I understand 7.15(b), is bound

Page 89

1  by the Plan, the Plan documents and the
2  confirmation order?
3           MR. LIESEMER:  Object to
4  the form.
5           MS. HARDING:  Object to the
6  form.
7      Q.  Do I have that correct?
8      A.  I believe so, yes.
9      Q.  Okay.  And is it bound by
10  the Plan, Plan documents and confirmation
11  order insofar as it may also be listed as
12  being a partially settled insurer?
13           MS. HARDING:  Object to the
14  form.  And are you referring to
15  7.15(b)?
16           MR. BROWN:  Yes.
17           MS. HARDING:  Back to
18  7.15(b) when you asked that
19  question?
20           MR. BROWN:  Yes.
21      A.  I'm not sure I see the
22  connection between Section 5.13 of the TDP
23  and your question, if there is any.
24  The -- I believe the answer is they are

Page 90

1   bound to the same extent any asbestos
2   insurance entity is bound under the
3   Plan.
4       Q.   Mr. Finke, you understand,
5   don't you, that -- well, let's not do it
6   that way.  Let's go to -- I think it's the
7   asbestos insurance transfer agreement.
8       MS. HARDING:  Is that one
9   of our exhibits?
10      MR. BROWN:  No, I'm sorry,
11  it's not that.  It's Exhibit 5.
12      Q.   Do you have Exhibit 5?
13      A.   Retained causes of action?
14      Q.   No.  This is Exhibit 5 to
15  the Exhibit Book.
16      A.   To the Exhibit Book.
17      MS. HARDING:  I have a
18  copy.  It's not his but you can
19  look at it if you'd like.
20      MR. COHN:  What is the
21  document?
22      MS. BAER:  It's Exhibit 5
23  to the Exhibit Book, Schedule of
1   Settled Asbestos Insurers.

Page 91

1       (Exhibit 5 to Exhibit Book,
2   Schedule of Settled Asbestos
3   Insurers Entitled to 524(g)
4   Protection marked for
5   identification as Exhibit
6   Finke-9.)
7       Q.   What I'd like you, Mr.
8   Finke -- first of all, why don't you
9   identify what we've just marked as Exhibit
10  9?
11      A.   Okay.  Finke Exhibit 9 is
12  Exhibit 5 to the Exhibit Book.  It is
13  entitled Schedule of Settled Asbestos
14  Insurers Entitled to 524(g) Protection.
15      Q.   Now, you understand, don't
16  you, that at least some of the insurance
17  companies that are listed on this schedule
18  have indemnity claims against the
19  debtors?
20      MR. LIESEMER:  Object to
21  the form of the question.
22      A.   Yes, I believe that's
23  correct.
24      Q.   And to the extent that

Page 92

1   there are indemnity claims against the
2   debtor and to the extent that those are
3   asbestos-related, those fit within the
4   defined term "indemnified insured TDP
5   claims", correct?
6       MS. HARDING:  Object to
7   form.
8       MR. LIESEMER:  Join.
9       MS. HARDING:  Are you
10  looking for 7.15?
11      MS. ALCABES:  5.13.
12      MS. HARDING:  There you go.
13      A.   No, I don't agree.
14      MR. BROWN:  Could you read
15  back the last question?
16      (The reporter reads the
17  requested portion.)
18      A.   No, I don't agree.  My
19  understanding of Section 5.13 is this
20  provision would take effect only upon
21  confirmation of the Plan since the
22  definition indicates, or requires, that
23  the indemnified insuror TDP claim is
24  channeled to the PI Trust, which it can't

Page 93

1   be at this point.
2       Q.   All these questions are in
3   the context of the Plan being confirmed.
4       A.   Well, then I don't --
5       Q.   Let me back up.  I think
6   the record's kind of muddled at this
7   point.
8       A.   Okay.
9       Q.   Why don't you -- if you
10  look at the schedule of settled asbestos
11  insurance companies, I believe you'd
12  testified -- that's Exhibit 9 -- I believe
13  you'd testified that some of the companies
14  that are listed on there have contractual
15  indemnity claims against the debtors.
16      A.   That was under the
17  assumption we were talking about current
18  claims.  I didn't realize you had -- that
19  your questions were all in the context of
20  the assumption of a confirmed plan.
21      Q.   All right.  If you look at
22  the schedule, you understand that the
23  insureds that are listed on here have
24  settlement agreements with the debtors,

Page 94

1    correct?
2        A.  Yes.
3        Q.    And you also understand
4    that certain of those settlement
5    agreements have contractual indemnity
6    provisions in them, correct?
7        A.  Yes.
8        Q.    And I believe you testified
9    that those contractual indemnity
10   provisions are under the Plan to be
11   treated as indemnified insured TDP claims
12   under Section 5.13 of the TDP.  Is that
13   correct?
14       A.  No, no, that certainly
15   wasn't my intent.
16       Q.    Okay.  How are they being
17   treated under the Plan?
18       A.  As indirect PI Trust
19   claims.
20       Q.    Okay.  Do you understand
21   indemnified insured TDP claims to be a
22   class of indirect PI Trust claims?
23       A.  It appears to me to be
24   that, that they are the same.  Or at least

Page 95

1    I don't see a distinction.  Whether they
2    are intended to be or not, I don't know.
3    Since we really were not involved in the
4    drafting of the TDP, my --
5        Q.    The "we" you're referring
6    to is Grace?
7        A.  Grace, yes.  My bigger
8    problem is that once the plan is confirmed
9    I don't understand -- have not understood
10   and don't today how there can be such a
11   claim under 5.13 since my understanding of
12   the mechanics of the asbestos PI
13   channeling injunction is that any claim
14   against a settled insurer which is an
15   asbestos protected party would be barred
16   and that claim would be channeled to the
17   PI Trust and that that holder of that PI
18   claim, the sole resolution -- not
19   resolution -- the sole source for any
20   recovery for the holder of that claim is
21   the PI Trust.
22       So I have not understood, and still
23   don't, how any indemnified insurer TDP
24   claim could arise.

Page 96

1        Q.    Let's get back to the
2    insurance neutrality provision then, which
3    is 7.15.
4        A.  Okay.
5        Q.    Getting back to 7.15(b),
6    this line of questioning talked with or
7    started with the reference to the term,
8    the phrase, "the beneficiaries of the
9    Asbestos PI Trust".
10       A.  Uh-huh.
11       Q.    I'm a little confused by
12   your testimony at this point.  If you are
13   the holder of an indemnified insurer TDP
14   claim post-confirmation, are you a
15   beneficiary of the Asbestos PI Trust?
16       MR. LIESEMER:  Object to
17   the form of the question.
18       MS. HARDING:  Object to
19   form.
20       A.  Assuming for the sake of
21   argument such a claim could arise, my
22   understanding would be yes.
23       MR. BROWN:  All right.  I'm
24   going to shift gears.  We'll mark

Page 97

1    another document.  The document I'm
2    about to mark is one of our
3    settlement agreements so we can
4    mark this portion of the deposition
5    subject to the protective order but
6    what I would like to do with this
7    one, like we did with Mr. Posner,
8    to the extent that no one objects
9    to the extent that we, my clients,
10   would like to use this portion of
11   the testimony without having it
12   under seal, we would be able to do
13   so without asking all parties to
14   agree.  Is that fair?
15       MS. HARDING:  That's up to
16   you.
17       MR. BROWN:  All right.
18       MR. LEWIS:  Did you say
19   Mr. Posner?
20       MR. BROWN:  Yes.
21       MR. LEWIS:  Okay.
22       (Settlement Agreement
23   Bates stamped OB 1 through 33
24   marked for identification as

Page 98

1    Exhibit Finke-10.)
2        MS. HARDING: And as I
3    understand it, all parties are -- I
4    think all parties in this room have
5    agreed to the protective order.
6        MR. BROWN: I don't know.
7    Is Mr. Speights on the line?
8        Mr. Speights?
9        MS. BAER: We can put on
10   the record that Mr. Speights never
11   objected to the provisions of the
12   protective order.
13       MR. BROWN: Okay.
14       Q.  Mr. Finke, you have before
15   you a document which has been marked
16   Finke-10 and I'd like you to take a few
17   moments to review it and then tell me
18   whether you have ever seen the document
19   before.
20       A.  No, I have not.
21       Q.  Okay.  Can you turn to
22   pages 30 and 31?
23       MR. LIESEMER: Are you
1    referring to the Bates numbering?

Page 99

1        MR. BROWN: Actually, it's
2    the same on these, on this
3    particular document, but OB 30 and
4    31.
5        Q.  Do you recognize any of the
6    signatures that appear on either of those
7    pages?
8        MS. HARDING: You mean the
9    names of the people that have
10   signed or the actual signatures?
11       MR. BROWN: The latter.
12       A.  The signature of Robert H.
13   Beber appears to be his signature, not --
14   I can't say that conclusively, but --
15       Q.  Do you recognize --
16       A.  -- it looks familiar.
17       Q.  Do you recognize the
18   signature of Mr. Posner?
19       A.  I don't.
20       Q.  Who are the parties to the
21   agreement?
22       MS. HARDING: Object to
23   form and object to the extent that
24   he's testified that he's never seen

Page 100

1    the document before.
2        A.  Based on the --
3        MS. HARDING: To the extent
4    that you know.
5        THE WITNESS: Sorry.
6        A.  Based on the signature
7    page, the parties are W.R. Grace & Co.,
8    W.R. Grace & Co.-Conn., Commercial Union
9    Insurance Company as successor in interest
10   to Employers Commercial Union Insurance
11   Company of America and Employers
12   Commercial Union Insurance Company and
13   American Employers Insurance Company.
14       Q.  Okay.  And would you agree
15   with me that the parties that executed
16   this document appear, at least from what
17   is on the document, to have signed it in
18   or around May of 1993?
19       A.  Yes.
20       Q.  Okay.  If you look at the
21   signature block for Mr. Beber, he's
22   indicated as having signed this document
23   on behalf of W.R. Grace & Co.  Do you see
24   that?

Page 101

1        MS. HARDING: Which?
2        A.  Yes.
3        MS. HARDING: Wait a
4    minute.  What page? 30 or 31?
5        MR. BROWN: OB 30.
6        MS. HARDING: Right, I just
7    wanted to make it clear that he
8    appears to be in two different
9    places.
10       MR. BROWN: I'm focused on
11   the first signature on OB 30.
12       MS. HARDING: Page 30, all
13   right.
14       Q.  The company that was called
15   W.R. Grace & Company in May of 1993 has a
16   different name today, doesn't it?
17       A.  I believe that's correct.
18       Q.  Okay.  And the name is
19   Fresenius Medical Care Holdings, Inc., is
20   it not?
21       A.  I don't know the answer off
22   the top of my head.
23       Q.  Okay.  Let me direct you to
24   a few things in the Plan.  I'd like you to



Δ π EXHIBIT   2
FINKE 30(b)6
Deponent
5.13.09   LL
Date _____ Rptr. ____
WWW.DEPOBOOK.COM

**WR Grace / Confirmation Hearing 30(b)(6) Deposition Notice**

**Witness Designations**

| Dep Notice Filed by | Topic of Deposition | Designated Witness |
|---|---|---|
| Anderson Memorial Hospital | The interpretation of the sales information attached to Anderson Memorial Hospital's ZAI Proof of Claim Form, including billing registers, and all information contained therein | Richard Finke |
| Travelers and Allstate | 1. The treatment of the Travelers 1992 Agreement under the Revised Joint Plan | Richard Finke |
| | 2. The treatment of the Travelers 1996 Agreement under the Revised Joint Plan | Richard Finke |
| | 3. The treatment of the Allstate 1994 Agreement under the Revised Joint Plan | Richard Finke |
| | 4. The treatment of the Allstate 1996 Agreement under the Revised Joint Plan | Richard Finke |
| | 5. The provisions of the Revised Joint Plan that relate to Asbestos Insurance Settlement Agreements, including, without limitation, Sections 1.1(14), 1.1(16), 1.1(200), 7.7, 7.13, 7.15, 8.4.1, 9.1 and Exhibit 6 (Asbestos Insurance Transfer Agreement) | Richard Finke |
| | 6. The provisions of the Revised Joint Plan that relate to Asbestos Insurance Reimbursement Agreements, including, without limitation, Sections 1.1(9), 1.1(16), 7.2.2(d)(iv), 7.7, 7.13, 7.15, 9.1 and Exhibit 6 (Asbestos Insurance Transfer Agreement) | Richard Finke |
| | 7. The provision of the Revised Joint Plan that relate to Indirect PI Trust Claims, including, without limitation, Section 1.1(138) and Exhibit 4 (Trust Distribution Procedures) | Richard Finke |
| | **SUPPLEMENTAL NOTICE** | |
| | 1. The provisions of the Revised Joint Plan that relate to Asbestos PD Claims and Indirect PD Trust Claims, including, without limitation, Sections 1.1(18), 1.1(137), 3.1.7, Exhibit 3 (Asbestos PD Trust Agreement), and Exhibit 25 (Class 7A CMO) Trust Distribution Procedures | Richard Finke |
| | 2. The classification of Travelers as a Class 7A creditor and solicitation of Class 7A claims | Richard Finke |

14509752_1

| Dep Notice Filed by | Topic of Deposition | Designated Witness |
|---|---|---|
| | 3. The treatment and/or payment, pursuant to the Revised Joint Plan, of claims for indemnification arising under the Travelers 1992 Agreement arising from Asbestos PD Claims | Richard Finke |
| | 4. The treatment and/or payment, pursuant to the Revised Joint Plan, of claims for indemnification arising under the Travelers 1996 Agreement arising from Asbestos PD Claims | Richard Finke |
| OneBeacon, Seaton, GEICO, Columbia | A. Classification and treatment of Indirect PI Trust Claims, including "Indemnified Insurer TDP Claims" and "Insurance-Related TDP Claims" as those terms are used in Sections 5.13 and 5.12 respectively of the Asbestos PI Trust Distribution Procedures | Richard Finke |
| | B. Bases for the classification of certain contractual indemnity claims held by Settled Asbestos Insurance Companies as Class 6 Asbestos PI Claims | Richard Finke |
| | C. Bases for the classification and treatment of non-asbestos-related contractual indemnity claims held by Settled Asbestos Insurance Companies as Class 9 General Unsecured Claims | Richard Finke |
| | D. Scope and operation of the Asbestos PI Channeling Injunction | Richard Finke |
| | E. Scope and Operation of the Asbestos Insurance Entity Injunction and Successor Claim Injunction | Richard Finke |
| | F. Scope and operation of Section 7.15 of the Plan entitled, "Insurance Neutrality", and any other purported insurance neutrality provisions in the Plan or Plan Documents | Richard Finke |
| | G. Operation of the Asbestos PI Trust Agreement and Asbestos PI Trust Distribution Procedures | Jay Hughes |
| | H. Bases for Settled Asbestos Insurance Company designations appearing in Exhibit 5 to the Exhibit Book | Richard Finke |
| | I. Scope and bases for releases and exculpation provisions in the Plan | Richard Finke |
| | J. The scope, operation, and necessity of the findings of fact, conclusions of law, orders, and decrees | |

| Dep Notice Filed by | Topic of Deposition | Designated Witness |
|---|---|---|
| | set forth in Section 7.7 of the Plan | Richard Finke |
| | K. The impact of the Plan and Plan Documents on the claims asserted, threatened, or that may later be asserted by Scotts, BNSF, the Libby Claimants, and/or Kaneb against the Debtors and/or any Asbestos Insurance Entity | Richard Finke |
| | L. The criteria used to select the Asbestos PI Trustees and the Asbestos PI TAC | Richard Finke |
| | M. The business background, experience, and qualifications of the individuals selected to be the Asbestos PI Trustees and the members of the Asbestos PI TAC | Richard Finke |
| | N. The respective powers and authority conferred upon the Asbestos PI Trustees, Asbestos PI TAC, and the Asbestos PI FCR under the Plan and Plan Documents including, but not limited to , the Asbestos PI Trust Agreement, Asbestos PI Trust Distribution Procedures, and the Asbestos Insurance Transfer Agreement | Richard Finke |
| | O. The respective roles of the Asbestos PI Trustees, Asbestos PI TAC, and the Asbestos PI FCR in the evaluation, handling, defense and settlement/resolution of Asbestos PI Claims under the Plan and Plan Documents | Richard Finke |
| | P. the role, if any, of the Asbestos Insurance Entities in the evaluation, handling, defense and settlement/resolution of Asbestos PI Claims under the Plan and Plan Documents | Richard Finke |
| | Q. The scope of the Asbestos Insurance Rights that are to be transferred or assigned to the Asbestos PI Trust pursuant to the Asbestos Insurance Transfer Agreement, and any other Plan Documents | Richard Finke |
| | R. The impact of the Plan and Plan Documents on the respective rights and duties of the Debtors and Asbestos Insurance Entities under the Asbestos Insurance Policies | Richard Finke |
| | S. The impact of the Plan and Plan Documents on subsequent coverage litigation between the Asbestos PI Trust (or the Debtors) and Asbestos Insurance Entities including, but not limited to, Non- | Richard Finke |

3

| Dep Notice Filed by | Topic of Deposition | Designated Witness |
|---|---|---|
| | Settled Asbestos Insurance Companies | |
| | T. The nature and value of the Asbestos PI Trust Assets to be used to fund the Asbestos PI Trust | Hudson La Force |
| | U. The Plan's compliance with Section 524(g) of the Bankruptcy Code, as well as other applicable provisions of the Bankruptcy Code | Richard Finke |
| Fireman's Fund Insurance Co. (re Surety Bond Issues) | 1. The classification and treatment of the Proofs of Claim under the Plan (including, to the extent applicable, the TDPs) | Richard Finke |
| | 2. The classification and treatment of the Supersedeas Bond Claim under the Plan (including, to the extent applicable, the TDPs) | Richard Finke |
| | 3. The extent to which the claims asserted in the Proofs of Claim are "Pre-Petition Liquidated Claims" subject to treatment under § 5.2 of the TDPs | Richard Finke |
| | 4. The extent to which the Supersedeas Bond Claim is "Pre-Petition Liquidated Claim" | Richard Finke |
| | 5. The actual, expected, and/or intended effect of excluding Indirect PI Trust Claims that are Pre-Petition Liquidated Claims from § 5.6 of the TDPs | Richard Finke |
| | 6. The meaning and operation of § 5.2 of the TDPs in respect of Pre-Petition Liquidated Claims | Richard Finke |
| | 7. The meaning of the phrase "provided there is no supersedeas bond associated with such verdict or judgment…" in § 5.2(a)(ii) of the TDPs, as well as how this phrase works in relation to § 5.2(b) of the TDPs | Richard Finke |
| | 8. The extent to which the Supersedeas Bond Claim is an Indirect PI Trust Claim, a Class 6 Claim, or a Class 9 Claim | Richard Finke |
| | 9. Debtors' contentions, if any, regarding whether FFIC may setoff any obligations it may owe to Grace under liability insurance policies issued or allegedly issued by FFIC to W.R. Grace & Co., et | Richard Finke |

4

| Dep Notice Filed by | Topic of Deposition | Designated Witness |
|---|---|---|
| | al., against Grace's obligations to FFIC under the Special Surety Indemnification Agreement, and the bases for any such contentions | |
| | 10. Debtors' pre-petition payment or funding for the payment of Asbestos Claims, such as judgments, settlements, and litigation costs, from sources other than liability insurance | Jay Hughes |
| | 11. The actual, expected, and/or intended impact, if any, of Plan Confirmation on the Special Surety Indemnification Agreement, the Supersedeas Bond, and the Supersedeas Bond Indemnity, including whether or not Reorganized Debtors will retain the Debtors' obligations under the Special Surety Indemnification Agreement and who, if not Reorganized Debtors, will succeed to or assume such obligations | Richard Finke |
| | 12. The actual, expected, and/or intended impact, if any, of Plan Confirmation on <u>W.R. Grace & Co. v. Aaron Clifton Edwards, et al.</u>, No. 06-00-00112-CV (Tex. App., 6th Appellate Dist.), and the claims asserted in the Proofs of Claim | Jay Hughes |
| Fireman's Fund Insurance Co. and Allianz | 1. The drafting, negotiation, scope and operation of the Plan, the Asbestos PI Trust Agreement and the Asbestos PI Trust Distribution Procedures, including efforts to (i) involve Asbestos Insurance Entities in the negotiation and/or drafting of the Plan, the Asbestos PI Trust Distribution Procedures, or the Asbestos PI Trust Agreement, or (ii) obtain the consent of the Asbestos Insurance Entities to the Plan, the Asbestos PI Trust Distribution Procedures, and the Asbestos PI Trust Agreement | Richard Finke |
| | 2. The scope and operation of the Asbestos Insurance Entity Injunction and Successor Claims Injunction | Richard Finke |
| | 3. The scope and operation of the Asbestos PI Channeling Injunction, including but not limited to, the effect of the Asbestos PI Channeling Injunction on claims against Settled Asbestos Insurance Companies | Richard Finke |
| | 4. The bases for designating an Asbestos Insurance Entity as a Settled Asbestos Insurance Company | Richard Finke |
| | 5. The selection, qualification, and experience of the proposed Asbestos PI Trustees and the proposed | Richard Finke |

| Dep Notice Filed by | Topic of Deposition | Designated Witness |
|---|---|---|
| | Asbestos PI Trust Advisory Committee members | |
| | 6. Compensation or other financial arrangements between or among any of the proposed Asbestos PI Trustees, Asbestos PI Trust Advisory Committee members or members of the Asbestos PI Committee in respect of the negotiation, drafting or contemplated operation of the Asbestos PI Trust | Richard Finke |
| | 7. The value of the Warrants | Hudson La Force |
| | 8. The meaning and operation of Section 7.15 of the Plan, including the interaction of Section 7.15 with Sections 8.1.1, 7.13, 7.7(uu), and 7.7(tt) and the Asbestos Insurance Transfer Agreement | Richard Finke |
| | 9. The meaning of the phrase "any defense that the Plan or any of the Plan Documents do not comply with the Bankruptcy Code" in Section 1.1(16) (definition of "Asbestos Insurer Coverage Defenses") | Richard Finke |
| | 10. The impact, if any, of Plan Confirmation on Non-Settled Asbestos Insurance Companies, including:<br>a) Whether and to what extent the Reorganized Debtors retain the Debtors' obligations under Asbestos Insurance Policies;<br>b) Whether the Asbestos PI Trust assumes the obligations of the Debtors under the Asbestos Insurance Policies;<br>c) The application of the exculpation provision of Section 11.9 of the Plan;<br>d) Whether the Plan will act as a settlement or judgment that will immediately trigger a payment obligation under the Asbestos Insurance Policies issued by the Non-Settled Asbestos Insurance Companies;<br>e) Whether the Non-Settled Asbestos Insurance Companies' indemnity obligations will be triggered due to the establishment of tile Asbestos PI Trust and transfer of assets to the Trust;<br>f) Whether the Non-Settled Asbestos Insurance Companies' indemnity obligations for any Asbestos PI Claim will accrue or be triggered prior to the payment of an Asbestos PI Claim by Asbestos PI Trust;<br>g) Whether and how the Plan and Plan Documents can be used in subsequent Asbestos Insurance Actions or other proceedings by the Asbestos PI Trust or the Debtors against Non-Settled Asbestos | Richard Finke |

| Dep Notice Filed by | Topic of Deposition | Designated Witness |
|---|---|---|
| | Insurance Companies;<br><br>h) The role, if any, the Non-Settled Asbestos Insurance Companies will have in the evaluation, defense, allowance, or settlement of Asbestos PI Claims channeled to or submitted to the Asbestos PI Trust;<br><br>i) Whether, and to what extent, the Non-Settled Asbestos Insurance Companies will be responsible for paying all or part of any Asbestos PI Claim resolved by the Asbestos PI Trust pursuant to the Asbestos PI Trust Distribution Procedures or for indemnifying the Asbestos PI Trust for any payment it makes on account of Asbestos PI Claims | |
| | 11. The Debtors' duties and obligations with respect to any Asbestos Insurance Policies upon the transfer of the Asbestos Insurance Rights to the Asbestos PI Trust | Richard Finke |
| | 12. The meaning and scope of the definition of Indirect PI Trust Claims, including whether, and to what extent, claims by Asbestos Insurance Entities for indemnification and/or contribution from Debtors for claims asserted against them, such as, by illustration, the Libby Claimants, or The Scotts Company, LLC, or BNSF Railway Company (or its predecessors) | Richard Finke |
| | 13. The treatment of Indirect PI Trust Claims by the Plan and the Plan Documents | Richard Finke |
| | 14. The basis for classification and treatment of an Asbestos Insurance Entity's Asbestos Claims against the Debtors for indemnification arising from contract or otherwise as Class 6 Asbestos PI Claims | Richard Finke |
| Maryland Casualty Co, Zurich Insurance Co., and Zurich International | 1. The scope of protection provided to Settled Asbestos Insurance Companies by the Asbestos PI Channeling Injunction and the scope of Debtors' indemnity obligations under the respective Asbestos Insurance Settlement Agreements | Richard Finke |
| | 2. The viability of the Plan if the Court upholds any objections to the application of the Asbestos PI Channeling Injunction to one or more of the Settled Asbestos Insurance Companies | Richard Finke |
| | 3. The Plan's treatment of any Settled Asbestos Insurance Companies who are found by the Court to have discrete, unsettled coverage under an otherwise settled policy | Richard Finke |

| Dep Notice Filed by | Topic of Deposition | Designated Witness |
|---|---|---|
| | 4. The intended scope of Debtors' indemnity obligations under the MCC Settlement Agreements | Richard Finke |
| | 5. The Plan Proponents' position that Settled Asbestos Insurance Companies are not creditors | Richard Finke |
| | 6. The impact of the Plan and Plan Documents on the claims asserted, threatened, or that may later be asserted by Scotts, BNSF, and/or the Libby Claimants, against the Debtors and/or any Asbestos Insurance Entity | Richard Finke |
| | 7. The bases for the classification of certain indemnity claims arising from contract or otherwise, against the Debtors held by Settled Asbestos Insurance Companies as Class 6 Asbestos PI Claims | Richard Finke |
| | 8. The classification and treatment under the Plan of Asbestos Insurance Entities' claims against the Debtors for indemnification arising from contract or otherwise which are not Indirect PI Trust Claims | Richard Finke |
| | 9. The scope and operation of the Asbestos PI Channeling Injunction, including but not limited to, the effect of the Asbestos PI Channeling Injunction on claims against Settled Asbestos Insurance Companies | Richard Finke |
| | 10. The Plan's compliance with section 524(g) of the Bankruptcy Code | Richard Finke |
| | 11. The meaning and scope of the indirect PI Trust Claims, including whether, and to what extent, claims by Asbestos Insurance Entities for indemnification and contribution deriving from claims against them, such as those by the Libby Claimants, Scotts, BNSF are Indirect PI Trust Claims | Richard Finke |
| | 12. The treatment of Indirect PI Trust Claims under the Plan, the Asbestos PI Trust Distribution Procedures, and the other Plan Documents, including but not limited to, the treatment of an Asbestos Insurance Entity's claims against the Debtors for indemnification arising from a pre-bankruptcy petition settlement agreement | Richard Finke |
| | 13. The scope of Section 524(g) of the Bankruptcy Code on claims against Settled Asbestos Insurance | Richard Finke |

| Dep Notice Filed by | Topic of Deposition | Designated Witness |
|---|---|---|
| | Companies | |
| | 14. The scope and operation of the Asbestos Insurance Entity Injunction and Successor Claims Injunction | Richard Finke |
| | 15. The meaning of the phrase "any defense that the Plan or any of the Plan Documents do not comply with the Bankruptcy Code" in Section 1.1(16)(definition of "Asbestos Insurer Coverage Defenses") | Richard Finke |
| | 16. The meaning and operation of the insurer neutrality provision of Section 7.15 of the Plan, including the interaction of Section 7.15 of the Plan with Sections 8.1.1, 7.13, 7.7(uu), and 7.7(tt) of the Plan and the Asbestos Insurance Transfer Agreement | Richard Finke |
| | 17. The Plan's treatment of Asbestos Insurance Reimbursement Agreements | Richard Finke |
| Libby Claimants | Plan | |
| | 1. Development of Plan among plan proponents, including negotiations, other discussions between or within the plan proponents, and preparation of documents, including drafts. | Richard Finke |
| | 2. Funding of the Asbestos PI Trust, including value at time of negotiation of assets to be used to fund the Asbestos PI Trust. | Hudson La Force |
| | 3. Current value of assets to be used to fund the Asbestos PI Trust. | Hudson La Force |
| | 4. Projected value at scheduled Confirmation Hearing of assets to be used to fund the Asbestos PI Trust. | Hudson La Force |
| | Asbestos PI Trust | |
| | 1. Development of the TDP, including negotiations, other discussions between or within the plan proponents, and preparation of documents, including drafts. | Jay Hughes |

| Dep Notice Filed by | Topic of Deposition | Designated Witness |
|---|---|---|
| | 2. TDP's in other cases used as models, points of reference or in any other way utilized in the development of the TDP ("Other TDPs"). | Jay Hughes |
| | 3. Liquidation of claims under Other TDPs. | Jay Hughes |
| | 4. Process by which the Asbestos PI Trust will liquidate claims. | Jay Hughes |
| | 5. Disease categories under the TDP. | Jay Hughes |
| | 6. The "Severe Pleural" disease category under the TDP. | Jay Hughes |
| | 7. Provisions of the TDP concerning "Extraordinary Claims." | Jay Hughes |
| | Injunctions | |
| | 1. The Asbestos PI Channeling Injunction. | Richard Finke |
| | 2. Development of Asbestos PI channeling Injunction among plan proponents, including negotiations, other discussions between or within the plan proponents, and preparation of documents, including drafts. | Richard Finke |
| | 3. Injunctions in other cases similar to the Asbestos PI Channeling Injunction used as models, points of reference or in any other way utilized in the development of the Asbestos PI Channeling Injunction ("Other Channeling Injunctions"). | Richard Finke |
| | 4. Litigation concerning scope of Other Channeling Injunctions. | Richard Finke |
| | 5. Scope and operation of the Asbestos PI Channeling Injunction, including the effect, if any, on actions by Libby Claimants against parties other than the Debtors, including but not limited to BNSF, the State of Montana and Maryland Casualty Company, for their own allegedly tortious conduct ("Libby Claimants' Independent Actions"). | Richard Finke |
| | 6. Necessity of, or benefit to plan proponents or Asbestos PI Trust from, the Asbestos PI Channeling | Richard Finke |

| Dep Notice Filed by | Topic of Deposition | Designated Witness |
|---|---|---|
| | Injunction (including consideration supplied to any of the plan proponents by those protected by the Asbestos PI Channeling Injunction). | |
| | 7. The Asbestos Insurance Entity Injunction. | Richard Finke |
| | 8. Development of Asbestos Insurance Entity Injunction among plan proponents, including negotiations, other discussions between or within the plan proponents, and preparation of documents, including drafts. | Richard Finke |
| | 9. Injunctions in other cases similar to the Asbestos Insurance Entity Injunction used as models, points of reference or in any other way utilized in the development of the Asbestos Insurance Entity Injunction ("Other Insurance Entity Injunctions"). | Richard Finke |
| | 10. Litigation concerning scope of Other Insurance Entity Injunctions. | Richard Finke |
| | 11. Scope and operation of the Asbestos Insurance Entity Injunction, including the effect, if any, on Libby Claimants' Independent Actions. | Richard Finke |
| | 12. Necessity of, or benefit to plan proponents or Asbestos PI Trust from, the Asbestos Insurance Entity Injunction (including consideration supplied to any of the plan proponents by those protected by the Asbestos Insurance Entity Injunction). | Richard Finke |
| | 13. The Successor Claims Injunction. | Richard Finke |
| | 14. Development of Successor Claims Injunction among plan proponents, including negotiations, other discussions between or within the plan proponents, and preparation of documents, including drafts. | Richard Finke |
| | 15. Injunctions in other cases similar to the Successor Claims Injunction used as models, points of reference or in any other way utilized in the development of the Successor Claim Injunction ("Other Successor Claims Injunctions"). | Richard Finke |

11

| Dep Notice Filed by | Topic of Deposition | Designated Witness |
|---|---|---|
| | 16. Litigation concerning scope of Other Successor Claims Injunctions. | Richard Finke |
| | 17. Scope and operation of the Successor Claims Injunction, including the effect, if any, on Libby Claimants' Independent Actions. | Richard Finke |
| | 18. Necessity of, or benefit to plan proponents or Asbestos PI Trust from, the Successor Claims Injunction (including consideration supplied to any of the plan proponents by those protected by the Successor Claims Injunction). | Richard Finke |
| | 19. Release and exculpation provisions of the Plan (the "Releases and Exculpations"). | Richard Finke |
| | 20. Development of The Releases and Exculpations among plan proponents, including negotiations, other discussions between or within the plan proponents, and preparation of documents, including drafts. | Richard Finke |
| | 21. Injunctions in other cases similar to the Releases and Exculpations used as models, points of reference or in any other way utilized in the development of the Releases and Exculpations ("Other Releases and Exculpations"). | Richard Finke |
| | 22. Litigation concerning scope of Other Releases and Exculpations. | Richard Finke |
| | 23. Scope and operation of the Releases and Exculpations, including the effect, if any, on Libby Claimants' Independent Actions. | Richard Finke |
| | 24. Necessity of, or benefit to plan proponents or Asbestos PI Trust from, the Releases and Exculpations (including consideration supplied to any of the plan proponents by those protected by the Releases and Exculpations). | Richard Finke |
| | 25. The plan's compliance with Section 524(g) of the Bankruptcy Code.<br><br>Liquidation Analysis | Richard Finke |

| Dep Notice Filed by | Topic of Deposition | Designated Witness |
|---|---|---|
| | 1. Liquidation analysis contained in Exhibit Book as Exhibit 8 (the "Liquidation Analysis") | Hudson La Force |
| | 2. Development of Liquidation Analysis among plan proponents, including negotiations, other discussions between or within the plan proponents, and preparation of documents. | Hudson La Force |
| | 3. Projections, assumptions, calculations and sources of information utilized in preparing Liquidation Analysis. | Hudson La Force |
| | 4. Any changes in, or changes in the validity of, any such projections, assumptions, calculations and sources of information, through the present date. | Hudson La Force |
| | Claims History | |
| | 1. Grace claims history concerning Asbestos PI Claims. | Jay Hughes |
| | 2. Grace's settlement practices and verdict history for Asbestos PI Claims. | Jay Hughes |
| | 3. Grace's settlement practices and verdict history for punitive damage claims. | Jay Hughes |
| | 4. Grace's settlement practices and verdict history for wrongful death claims. | Jay Hughes |
| | 5. Grace's settlement practices and verdict history for claims resulting from exposure to Grace's asbestos in Lincoln County, Montana. | Jay Hughes |
| | 6. Grace's settlement practices and verdict history for claims resulting from exposure outside of Lincoln County, Montana, to Grace's asbestos originating in Lincoln County, Montana. | Jay Hughes |
| | Rights of BNSF | |
| | 1. Claims of Burlington Northern Santa Fe Railroad and affiliates ("BNSF") against the Debtors. | Jay Hughes |
| | 2. Proofs of claim filed by BNSF. | Jay Hughes |

13

| Dep Notice Filed by | Topic of Deposition | Designated Witness |
|---|---|---|
| | 3. Any rights of indemnification by BNSF against the Debtors, and any agreements pertaining thereto. | Jay Hughes |
| | 4. Any rights of contribution by BNSF against the Debtors. | Jay Hughes |
| | 5. Any insurance covering BNSF for Libby Claimants' Independent Actions against BNSF. | Jay Hughes |
| | Rights of the State of Montana | |
| | 1. Claims of the State of Montana against the Debtors. | Jay Hughes |
| | 2. Proofs of claim filed by the State of Montana. | Jay Hughes |
| | 3. Any rights of indemnification by the State of Montana against the Debtors, and any agreements pertaining thereto. | Jay Hughes |
| | 4. Any rights of contribution by the State of Montana against the Debtors. | Jay Hughes |
| | 5. Any insurance covering the State of Montana for Libby Claimants' Independent Actions against the State of Montana. | Jay Hughes |
| | Rights of Maryland Casualty Company | |
| | 1. Claims of the Maryland Casualty Company, including affiliates ("MCC") against the Debtors. | Jay Hughes |
| | 2. Proofs of claim filed by MCC. | Jay Hughes |
| | 3. Any rights of indemnification by MCC against the Debtors, and any agreements pertaining thereto. | Jay Hughes |
| | 4. Any rights of contribution by MCC against the Debtors. | Jay Hughes |
| | 5. Any insurance covering MCC for Libby Claimants' Independent Actions against MCC. | Jay Hughes |

14

| Dep Notice Filed by | Topic of Deposition | Designated Witness |
|---|---|---|
| | _Insurance_ | |
| | 1. Grace's insurance policies (whether owned by Grace or purchased for another entity), coverage issues and settlements with insurers. | Jay Hughes |
| | 2. Grace's insurance coverage for products/completed operations, including terms thereof, aggregate caps, and defenses to and limitations on such coverage. | Jay Hughes |
| | 3. Projected value of the Asbestos Insurance Rights constituting products/completed operations coverage. | Jay Hughes |
| | 4. Projected aggregate liquidated amount of the Asbestos PI Claims (including future claims) covered by products/completed operations insurance. | Jay Hughes |
| | 5. Grace's insurance coverage for premises/non-completed operations, including terms thereof, aggregate caps, and defenses to and limitations on such coverage. | Jay Hughes |
| | 6. Projected value of the Asbestos Insurance Rights constituting premises/non-completed operations coverage. | Jay Hughes |
| | 7. Projected aggregate liquidated amount of the Asbestos PI Claims (including future claims) covered by premises/non-completed operations insurance. | Jay Hughes |
| | 8. Settlements with Grace insurers. | Jay Hughes |
| | 9. Bases for designation under the Plan of certain Asbestos Insurance Entities as Settled Asbestos Insurance Companies. | Richard Finke |
| CNA | 1. The meaning and operation of the insurer neutrality provision of Section 7.15 of the Plan, including the interaction of Section 7.15 of the Plan with Sections 8.1.1, 7.13, 7.7(uu), and 7.7(tt) of the Plan and the Asbestos Insurance Transfer Agreement. | Richard Finke |
| | 2. The treatment of Indirect PI Trust Claims under the Plan, the Asbestos PI Trust Distribution Procedures, and the other Plan Documents, including but not limited to, the treatment of an Asbestos | Richard Finke |

| Dep Notice Filed by | Topic of Deposition | Designated Witness |
|---|---|---|
| | Insurance Entity's claims against the Debtors for indemnification arising from a pre-bankruptcy petition settlement agreement. | |
| | 3.  The meaning and scope of Indirect PI Trust Claims, including whether, and to what extent, claims by Asbestos Insurance Entities for indemnification and contribution deriving from claims against them, such as those by the Libby Claimants, Scotts, and BNSF, are Indirect PI Trust Claims. | Richard Finke |
| | 4.  The basis for classification and treatment of an Asbestos Insurance Entity's Asbestos Claims against the Debtors for indemnification arising from contract or otherwise as Class 6 Asbestos PI Claims. | Richard Finke |
| | 5.  The classification and treatment under the Plan of Asbestos Insurance Entities' claims against the Debtors for indemnification arising from contract or otherwise which are not Indirect PI Trust Claims. | Richard Finke |
| | 6.  The scope and operation of the Asbestos PI Channeling Injunction, including but not limited to, the effect of the Asbestos PI Channeling Injunction on claims against Settled Asbestos Insurance Companies. | Richard Finke |
| | 7.  The scope and operation of the Asbestos Insurance Entity Injunction and Successor Claims Injunction. | Richard Finke |
| | 8.  The meaning of the phrase "any defense that the Plan or any of the Plan Documents do not comply with the Bankruptcy Code" in Section 1.1(16) (definition of "Asbestos Insurer Coverage Defenses") | Richard Finke |
| | 9.  The drafting, negotiation, scope and operation of the Asbestos PI Trust Agreement and the Asbestos PI Trust Distribution Procedures, including efforts to obtain the consent of the Asbestos Insurance Entities to the Plan, the Asbestos PI Trust Distribution Procedures, and the Asbestos PI Trust Agreement, or to involve them in drafting the Asbestos PI Trust Agreement. | Richard Finke |
| | 10.  The selection, qualification, and experience of the Asbestos PI Trustees and Asbestos PI Trust Advisory Committee members. | Richard Finke |

| Dep Notice Filed by | Topic of Deposition | Designated Witness |
| --- | --- | --- |
| | 11. Any compensation or other financial arrangements between each Asbestos PI Trustee and any Asbestos PI Trust Advisory Committee member or member of the Asbestos Claimants Committee on the one hand, and the Asbestos PI Trust. | Richard Finke |
| | 12. The bases for designating an Asbestos Insurance Entity as a Settled Asbestos Insurance Company. | Richard Finke |
| | 13. The Plan's treatment of Asbestos Insurance Reimbursement Agreements. | Richard Finke |
| | 14. The valuation of the Warrants, including, but not limited to, the use of any valuation model or similar valuation tool. | Hudson La Force |
| | 15. The impact, if any, of Plan Confirmation on Non-Settled Asbestos Insurance Companies, including:<br>  a. Whether and to what extent the Reorganized Debtors retain the Debtors' obligations under Asbestos Insurance Policies;<br>  b. Whether the Asbestos PI Trust assumes the obligations of the Debtors under the Asbestos Insurance Policies;<br>  c. The application of the exculpation provision of Section 11.9 of the Plan;<br>  d. Whether the Plan will act as a settlement or judgment that will immediately trigger a payment obligation under the Asbestos Insurance Policies issued by the Non-Settled Asbestos Insurance Companies;<br>  e. Whether the Non-Settled Asbestos Insurance Companies' indemnity obligations will be triggered due to the establishment of the Asbestos PI Trust and transfer of assets to the Trust;<br>  f. Whether the Non-Settled Asbestos Insurance Companies' indemnity obligations for any Asbestos PI Claim will accrue or be triggered prior to the payment of an Asbestos PI Claim by Asbestos PI Trust;<br>  g. Whether and how the Plan and Plan Documents can be used in subsequent Asbestos Insurance Actions or other proceedings by the Asbestos PI Trust or the Debtors against Non-Settled Asbestos Insurance Companies;<br>  h. The role, if any, the Non-Settled Asbestos Insurance Companies will have in the evaluation, defense, allowance, or settlement of Asbestos PI Claims channeled to or submitted to the Asbestos PI | Richard Finke |

| Dep Notice Filed by | Topic of Deposition | Designated Witness |
|---|---|---|
| | Trust;<br>    i.  Whether, and to what extent, the Non-Settled Asbestos Insurance Companies will be responsible for paying all or part of any Asbestos PI Claim resolved by the Asbestos PI Trust pursuant to the Asbestos PI Trust Distribution Procedures or for indemnifying the Asbestos PI Trust for any payment it makes on account of Asbestos PI Claims. | |
| | 16.  The Debtors' duties and obligations with respect to any Asbestos Insurance Policies upon the transfer of the Asbestos Insurance Rights to the Asbestos PI Trust. | Richard Finke |
| | 17.  The treatment of workers compensation obligations as unimpaired, general unsecured claims that are to be liquidated and paid in full. | Richard Finke |
| London Market Companies | 1. The treatment of the London Market Companies 1995 Agreement under the Revised Joint Plan. | Richard Finke |
| | 2. The treatment of the London Market Companies 1996 Agreement under the Revised Joint Plan. | Richard Finke |
| | 3. The provisions of the Revised Joint Plan that relate to Asbestos Insurance Reimbursement Agreements, including, without limitation, Sections 1.1(9), 1.1(16), 7.2.2(d)(iv), 7.7, 7.13, 7.15, 9.1 and Exhibit 6 (Asbestos Insurance Transfer Agreement). | Richard Finke |
| | 4. The provisions of the Revised Joint Plan that relate to Indirect PI Trust Claims, including, without limitation, Sections 1.1(138) and Exhibit 4 (Trust Distribution Procedures). | Richard Finke |

*W R GRACE & CO NEW*                                      *Filing Date: 04/06/08*

UNITED STATES

SECURITIES AND EXCHANGE COMMISSION

WASHINGTON, DC 20549

FORM 8-K

CURRENT REPORT PURSUANT

TO SECTION 13 OR 15(D) OF THE

SECURITIES EXCHANGE ACT OF 1934

Date of report (Date of earliest event reported) April 6, 2008

W. R. GRACE & CO.

(Exact Name of Registrant as Specified in Its Charter)

Delaware

(State or Other Jurisdiction of Incorporation)



|                              | 1-13953 | 65-0773649 |
|------------------------------|---------|------------|
| (Commission File Number)     |         | (IRS Employer Identification No.) |

7500 Grace Drive                                      21044

Columbia, Maryland
(Address of Principal Executive Offices) (Zip Code)



(410) 531-4000

CURRENT REPORT


Item 7.01.                 Regulation FD Disclosure.



On April 6, 2008, W. R. Grace & Co., on behalf of itself and its subsidiaries
and affiliates that are debtors in the Chapter 11 cases, (the "Company")
entered into an agreement in principle (the "Agreement") with the Official
Committee of Asbestos Personal Injury Claimants, the Future Claimants
Representative and the Official Committee of Equity Security Holders, all
parties-in-interest in the Company's Chapter 11 case, that would settle all
present and future asbestos-related personal injury claims against the Company
on the terms and conditions set forth therein.   Certain terms and conditions of
the Agreement are described in the press release attached hereto as Exhibit
99.1.   The description of the terms and conditions of the Agreement is
qualified in its entirety by reference to the provisions of the Agreement
attached hereto as Exhibit 99.2.



The information furnished pursuant to this Item 7.01, including Exhibit 99.1
and Exhibit 99.2, shall not be deemed to be "filed" for purposes of Section 18
of the Securities Exchange Act of 1934, as amended, (the "Exchange Act"), or
otherwise subject to the liabilities of such section, nor shall such
information be deemed incorporated by reference in any filing under the
Securities Act of 1933, as amended, or the Exchange Act, except as shall be
expressly set forth by specific reference in such a filing.


Item 9.01.                 Financial Statements and Exhibits.



(d)  Exhibits



99.1                       Press Release



99.2                       Term Sheet for Resolution of Asbestos Personal
Injury Claims dated as of April 6, 2008



2
--------------------------------------------------------------------------------

*W R GRACE & CO NEW*                                                      *Filing Date: 04/06/08*

Exhibit 99.1

Grace News #2919

Media Relations:                    Investor Relations:
William Corcoran                    Bridget Sarikas
T +1 410.531.4203                   T +1 410.531.4194
Ewilliam.corcoran@grace.com Ebridget.sarikas@grace.com

### GRACE ANNOUNCES SETTLEMENT OF ASBESTOS PERSONAL INJURY CLAIMS

COLUMBIA, Maryland, April 7, 2008 -- W. R. Grace & Co. (NYSE: GRA) today
announced an agreement in principle that would settle all present and future
asbestos-related personal injury claims. The agreement, reached with the
Official Committee of Asbestos Personal Injury Claimants, the Future Claimants
Representative and the Official Committee of Equity Security Holders, requires
the following assets to be paid into a trust to be established under Section
524(g) of the United States Bankruptcy Code:

Cash in the amount of $250 million;

Warrants to acquire 10 million shares of Grace common stock at an
exercise price of $17.00 per share, expiring one year from the effective date
of a plan of reorganization;

Rights to proceeds under Grace's asbestos-related insurance
coverage;

The value of cash and stock under the litigation settlement
agreements with Sealed Air Corporation and Fresenius Medical Care Holdings,
Inc.; and

*    *    *    *    *

This announcement contains forward-looking statements, that is, information related to future, not past, events. Such information generally includes the words "believes," "plans," "intends," "targets," "will," "expects," "anticipates," "continues" or similar expressions. For these statements, Grace claims the protection of the safe harbor for forward-looking statements contained in the Private Securities Litigation Reform Act of 1995. Grace is subject to risks and uncertainties that could cause actual results to differ materially from those projected in the forward-looking statements or that could cause other forward-looking information to prove incorrect. Factors that could cause actual results to materially differ from those contained in the forward-looking statements include: Grace's bankruptcy, plans of reorganization proposed by Grace and others, Grace's legal proceedings (especially the Montana criminal proceeding and environmental proceedings), the cost and availability of raw materials and energy, Grace's unfunded pension liabilities, costs of environmental compliance, risks related to foreign operations, especially, security, regulation and currency risks and those factors set forth in Grace's most recent Annual Report on Form 10-K, quarterly report on Form 10-Q and current reports on Form 8-K, which have been filed with the Securities and Exchange Commission and are readily available on the Internet at www.sec.gov. Reported results should not be considered as an indication of future performance. Readers are cautioned not to place undue reliance on forward-looking statements, which speak only as of the date thereof. Grace undertakes no obligation to publicly release any revisions to the forward-looking statements contained in this announcement, or to update them to reflect events or circumstances occurring after the date of this announcement.

###

Corporate Communications

W. R. Grace & Co.-Conn.

7500 Grace Drive

Columbia, MD 21044

2

---

under coverage in place agreements or installment payment arrangements where payment has not yet occurred;

iv.          Assignment of and the right to recover on all outstanding insurance policies potentially applicable to personal injury claimants; and

v.          The right to recover from all insolvent insurance estates as to which Grace or its affiliates has made a claim and the proceeds of all payments received by Grace or its affiliates from those insolvent estates after the date hereof, and all interest accrued thereon.

Provided however that Grace is in the process of examining its policies and the foregoing will not affect Grace's separate coverages, if any, for losses not arising from asbestos personal injury claims.

The ACC and FCR (or, after the Effective Date, the Asbestos PI Trust) shall control (and Grace shall cooperate in connection with) any negotiations or legal proceedings related to the underlying policies or settlement agreements applicable to Asbestos PI Claims.

c.          Warrant: a warrant for 10 million shares of W. R. Grace & Co. ("Parent") common stock, exercisable at $17 per share, and expiring one year after the Effective Date.

d.          Cryovac, Inc. Payment: The consideration contemplated by the Sealed Air Settlement Agreement.

e.          Fresenius Medical Care Payment:  The proceeds of the payment contemplated by the Fresenius Settlement Agreement.

2.          Deferred Payment Obligations:  Grace shall make additional payments to the Asbestos PI Trust over a 15 year period as follows:  five annual payments of $110 million commencing on January 2, 2019; and 10 annual payments of $100 million commencing on January 2, 2024.  Such payment obligations shall be subordinate to any bank debt or bonds outstanding and shall be guaranteed by Parent or any successor ultimate parent entity of Grace.  Such guaranty shall be secured by an obligation of Parent to issue to the Asbestos PI Trust, in the event an additional payment is not made, the number of shares of Parent common stock which, when

2

---------------------------------------------------------------------------

added to the number of shares of common stock issued and outstanding as of the Effective Date, shall constitute 50.1% of the voting shares of Parent as of the Effective Date (such number of shares shall be equitably adjusted for stock splits, stock dividends, recapitalizations, corporate reorganizations or changes in control of Parent after the Effective Date).

B.          Other Classes

1.          Administrative Claims: 100% of allowed amount in cash.

2.          Priority Tax Claims: 100% of allowed amount in cash.

3.          Priority Non-Tax Claims: 100% of allowed amount in cash.

4.          Secured Claims: 100% of allowed amount either in cash or by reinstatement.

5.          Unsecured Employee Claims (post-retirement health and special pension): 100% of allowed amount by reinstatement.

6.          Workers Compensation Claims: 100% by reinstatement.

7.          Allowed General Unsecured Claims: 100% of allowed amount plus

Parent and Grace, the ACC, the FCR and the Equity Committee, and shall be
binding upon the parties and each of their respective successors and assigns to
the fullest extent permitted by applicable law.  The parties shall use their
best efforts to incorporate the terms of this Term Sheet into a mutually
agreeable plan of reorganization to be filed with the Bankruptcy Court as soon
as possible.


V.            Confidentiality.



The parties shall treat all negotiations regarding this Term Sheet as
confidential.  Neither the contents nor the existence of this Term Sheet shall
be disclosed by any party, either orally or in writing, except to its
directors, officers, employees, legal counsel, financial advisors, accountants
and clients on a confidential basis until the Debtors have issued a press
release announcing the terms and conditions contained herein.  Notwithstanding
the foregoing, the parties agree that this Term Sheet or the terms of this Term
Sheet may be disclosed to the Official Committee of Unsecured Creditors and the
Official Committee of Asbestos Property Damage Claimants.  Grace will provide
counsel to the ACC and counsel to the FCR an opportunity to review and comment
on any press release relating to this Term Sheet prior to its issuance.

4

----------------------------------------------------------------------------


AGREED TO AND ACCEPTED BY:
Dated: April 6, 2008
THE DEBTORS:
W. R. GRACE & CO., on behalf of itself and its subsidiaries and affiliates that are Debtors
in the Chapter 11 cases
By:                                          /s/ Fred Festa
Name:                                        Fred Festa
Title:                                       Chairman, President and Chief Executive
                                             Officer
THE OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS
By:                                          /s/ R. Ted Weschler
Name:                                        R. Ted Weschler
Title:                                       Chair of the Committee
THE OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS:
CAPLIN & DRYSDALE, CHARTERED, on behalf of and in its capacity as counsel to the ACC
By:                                          /s/ Elihu Inselbuch
Name:                                                      Elihu Inselbuch
THE FUTURE CLAIMANTS REPRESENTATIVE:
ORRICK, HERRINGTON & SUTCLIFFE LLP, on behalf of and in its capacity as counsel to the FCR
By:                                          /s/ Roger Frankel
Name:                                                      Roger Frankel


5

----------------------------------------------------------------------------