## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| W.R. Grace & Co., et al., | : | Case No. 01-1139 (JKF) |
| | : | Jointly Administered |
| Debtors. | : | |
| | : | |

## AXA BELGIUM'S PHASE I TRIAL BRIEF

 

Eileen T. McCabe, *pro hac vice*
750 Seventh Avenue
New York, NY  10019
Telephone:  (212)261-8254
Facsimile:  (302)235-2536
eileen.mccabe@mendes.com

Michael A. Shiner, *pro hac vice*
TUCKER ARENSBERG
1500 One PPG Place
Pittsburgh, PA 15222-5401
Telephone: (412) 566-1212
Facsimile: (412) 594-5619
mshiner@tuckerlaw.com

John S. Spadaro (No. 3155)
724 Yorklyn Road, Suite 375
Hockessin, DE 19707
Telephone:  (302) 235-7745
Facsimile:  (302) 235-2536
jspadaro@johnsheehanspadaro.com

# TABLE OF CONTENTS

I.   BACKGROUND ...................................................................................................................1

   A.   The Case Management Order ...................................................................................1

   B.   Plan Provisions..........................................................................................................2

II.  AXA BELGIUM HAS STANDING TO OBJECT TO THE PLAN ....................................3

III. THE PLAN LACKS INSURANCE NEUTRALITY ............................................................6

IV.  THE PLAN IMPROPERLY TRANSFERS INSURANCE RIGHTS IN
     CONTRAVENTION OF THE INSURANCE CONTRACTS .............................................9

V.   THE PLAN IMPAIRS AXA BELGIUM'S COVERAGE RIGHTS AND
     DEFENSES ..........................................................................................................................10

VI.  WITNESSES AND EXHIBITS ..........................................................................................12

VII. JOINDER & RESERVATION OF RIGHTS ......................................................................13

VIII. CONCLUSION ..................................................................................................................13

# **TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Alumax Mill Products, Inc. v. Congress Financial Corp.*, 912 F.2d 996, 1002 (8th Cir. 1990) .... 5

*Baker v. Carr*, 369 U.S. 186, 204 (1962) .................................................................................. 10

*Eichenholtz v. Brennan*, 52 F.3d 478, 482 (3d Cir. 1995) ............................................................ 5

*Fuller-Austin Insulation Company v. Highlands Ins. Company*, 135 Cal.App. 4th 958, 1000 (Cal. Ct. App. 2006) .................................................................................................................. 12

*In re Amatex Corp.*, 755 F.2d 1034, 1041-42 (3d Cir. 1985) ........................................................ 4

*In re Congoleum*, 362 B.R. 167, 173-75 (Bankr. D. N.J. 2007) ............................................... 4, 6

*In re Integra Realty Resources, Inc.*, 262 F.3d 1089, 1102 (10th Cir. 2001) ................................ 5

*In re Marin Motor Oil, Inc.*, 689 F.2d 445, 451 (3d Cir. 1982) .................................................... 4

*In re Morton*, 298 B.R. 301, 306 (B.A.P. 6th Cir. 2003) ................................................................ 4

*In re Zale Corp.*, 62 F.3d 746, 751 n.13 (5th Cir. 1995) ............................................................... 5

*Smith v. Arthur Andersen LLP*, 421 F.3d 989, 1001 (9th Cir. 2005) ............................................ 5

*Waller v. Financial Corp. of America*, 828 F.2d 579, 583 (9th Cir. 1987) .................................. 5

**FEDERAL STATUTES**

11 U.S.C. § 1109(b) ..................................................................................................................... 3

11 U.S.C. § 1128(b) ..................................................................................................................... 3

11 U.S.C. § 1123(a)(5) ............................................................................................................... 10

§ 524(g) of the Bankruptcy Code .......................................................................................2, 6, 12

**OTHER AUTHORITIES**

Plan §1.1.12 ................................................................................................................................. 2

Plan § 7.1 ................................................................................................................................... 11

Plan § 7.13 ................................................................................................................ 11

Plan § 7.15 ....................................................................................................... 6, 7, 8, 11

Plan §7.15(g) ............................................................................................................. 3

Plan § 7.15(h)……………………………………………………………………….....8

Plan §7.15(i)……………………………………………………………….…….…....8

Plan §7.7.2(d)(ii) ....................................................................................................... 2

Plan §8.1.1……………………………………………………………….………..............11

## NON-TOA REFERENCES

Deposition Transcript of David Austern........................................................................7

Deposition Transcript of Richard Finke ........................................................................8

Deposition Transcript of Peter Lockwood..................................................................7, 8

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| W.R. Grace & Co., et al., | : | Case No. 01-1139 (JKF) |
| | : | Jointly Administered |
| Debtors. | : | |
| | : | |

## AXA BELGIUM'S PHASE I TRIAL BRIEF

AXA Belgium, as successor to Royale Belge SA ("AXA Belgium"), a party in interest in the captioned proceeding, submits its trial brief on Phase I issues, pursuant to the Third Amended Case Management Order Related to the First Amended Joint Plan of Reorganization ("CMO").

### I.     BACKGROUND

#### A.     The Case Management Order

The CMO provides that the plan confirmation hearing is to take place in two phases. Paragraph 1 of the CMO provides that the first phase shall address

(i)     whether the Plan improperly affects the rights of Debtors' insurers (in their capacity as insurers, but not creditors);

(ii)    the standing of the Debtors' insurers (in their capacity as insurers, but not creditors) to litigate confirmation objections that involve issues other than those described in section (i) herein provided however, that the Plan Proponents shall not challenge the standing of the insurers, to the extent they are parties to Asbestos Insurance Reimbursement Agreements, to object to, in Phase II, the Plan's proposed treatment of the Asbestos Insurance Reimbursement Agreements, under the Plan; and

(iii)   confirmation objections raised on behalf of and specific to lenders under the Pre-Petition Credit.

AXA Belgium notes that the Plan Proponents have not filed any motions to strike or dismiss the objections of AXA Belgium or any other insurer in this matter with regard to their

claim that they have standing to object to plan confirmation. This forces AXA Belgium to address the Plan Proponents anticipated objections in a vacuum. Accordingly, AXA Belgium reserves its right to reply once the Debtors actually assert legal positions with respect to AXA Belgium's standing.

### B. Plan Provisions

The First Amended Plan establishes an Asbestos Personal Injury Trust pursuant to §524(g) of Title 11 of the United States Code to which Asbestos Personal Injury Claims ("Asbestos PI Claims") will be channeled. The Trust will have the sole authority, with no participation by any insurers, to process and pay Asbestos PI Claims. Under the Asbestos PI Trust Agreement, the Trust will demand payment from insurers for the claims presented to the Trust, at values established by the Trust Distribution Procedures. *See* Asbestos PI Trust Agreement (the "Trust Agreement").

As part of the Plan, the Asbestos Insurance Transfer Agreement "irrevocably transfers, conveys, and grants to the Asbestos PI Trust all of their Asbestos Insurance Rights, including, without limitation, any and all rights to Proceeds." Asbestos Insurance Transfer Agreement, §1(a). See also Plan §7.7.2(d)(ii). The Agreement does not transfer from the insured to the Asbestos PI Trust any of the insured's obligations under any insurance policies; nor does the Plan definition of "Asbestos Insurance Rights" include any obligations on the part of the insured. See Plan §1.1.12. The Agreement also alleges that "[t]he Transfer is not an assignment of any insurance policy." Asbestos Insurance Transfer Agreement, §1(a).

The Agreement then provides a list of "[a]ll insurance policies that the Insurance Contributors have reason to believe potentially or actually provide insurance coverage for Asbestos PI Claims are listed and described accurately on the attached Schedule 1." §3(a)(i).

The Plan further provides that "Asbestos Insurance Entities shall be bound by the Court's findings and conclusions that, under the Bankruptcy Code, the transfer of all rights under the Asbestos Insurance Transfer Agreement is valid and enforceable against each Asbestos Insurance Entity notwithstanding any anti-assignment provision in or incorporated into any Asbestos Insurance Policy."  Plan §7.15(g).

Schedule 1 to the Asbestos Insurance Transfer Agreement alleges that "Royale Belge S.A." issued three excess layer policies to W.R. Grace:

| Policy Number | Policy Period |
|---|---|
| AVB102 | June 30, 1977- June 30, 1978 |
| AVB124 | June 30, 1978- June 30, 1979 |
| 1251427 | June 30, 1984- June 30, 1985 |

Based on the limited information available, it appears that these policies would incorporate certain terms and conditions of underlying policies, which state that "[a]ssignment of interest under this policy shall not bind Underwriters unless and until their consent is endorsed hereon."

## II.     AXA BELGIUM HAS STANDING TO OBJECT TO THE PLAN

Congress determined that standing to participate in bankruptcy proceedings should be granted broadly to all "parties in interest," as bankruptcy proceedings affect the monetary and legal interests of a wide variety of persons and entities. Section 1109(b) of the Bankruptcy Code provides that "a party in interest may raise and may appear to be heard on any issue in a case under this chapter," including be able to raise objection to confirmation of a plan.  *See* 11 U.S.C. § 1109(b) and 11 U.S.C. § 1128(b). The Third Circuit has interpreted the term "party in interest" to include any party with "a practical stake in the outcome of the proceedings" and has

3

emphasized that standing is to be "construed broadly." *In re Amatex Corp.*, 755 F.2d 1034, 1041-42 (3d Cir. 1985). The Third Circuit has further stated that standing in bankruptcy proceedings is broad, reflecting Congress' liberal extension of standing to any "party in interest" to "raise . . . and be heard" on "any issue" in a bankruptcy case. S*ee, e.g.*, *Combustion Engineering*, 391 F.3d at 214 n.21 (recognizing "the broad right of participation in the early stages of a bankruptcy proceeding"); *In re Marin Motor Oil, Inc.*, 689 F.2d 445, 451 (3d Cir. 1982) (party in interest may be heard "on any issue in a case").

It is also well-established that an insurer or other party who may be asked to pay a claim against a debtor has standing to participate in the debtor's bankruptcy case, and in the particular resolution of that underlying claim, even if that party may dispute the obligation to pay. *See, e.g.*, *In re Morton*, 298 B.R. 301, 306 (B.A.P. 6th Cir. 2003) (a party that "*may be* liable…to the creditors for the debtor's debts is a party in interest with standing to participating the resolution of claims against the debtor). As the proposed Plan intends to use proceeds from insurance policies allegedly issued to the Debtors to fund the Asbestos PI Trust, AXA Belgium clearly has an interest in how the Plan treats its policies and contractual rights and, consequently, it is a party-in-interest in this matter and has standing in the Bankruptcy Court to protect those interests and object to the proposed Plan. S*ee, e.g*., *In re Congoleum Corp*., 362 B.R. 167, 173-75 (Bankr. D. N.J. 2007).

Further, the creation of the Trust and the processing and payment of claims through that Trust and the TDPs will alter the way in which the Debtors' liability is determined, and, consequently, the determination of how that liability is covered under insurance policies. If it is confirmed, the Plan will also likely affect an insurer's bargaining leverage in any coverage litigation or negotiated effort to resolve coverage disputes. Negotiations with the Asbestos PI Trust, which will actually receive the insurance proceeds, as opposed to the Debtors, who pay the

proceeds over to claimants as part of settlements, represents a completely different dynamic. The First Amended Plan also purports to preclude insurers from raising coverage defenses based on the anti-assignment provisions in the Policies. The Plan will prejudice the manner in which AXA Belgium will be able to evaluate claims for coverage and litigate its coverage defenses, and therefore, has standing to object to its confirmation.

AXA Belgium also has standing to object to the Plan insofar as the Plan purports to release, enjoin, or otherwise alter its rights against the Debtors and non-debtor third parties. *See, e.g.*, *Smith v. Arthur Andersen LLP*, 421 F.3d 989, 1001 (9th Cir. 2005) ("That the Non-Settling Defendants have not articulated the precise nature of the 'indemnity or other[ ]' claims they are barred from asserting does not demonstrate a lack of formal legal prejudice"); *In re Zale Corp.*, 62 F.3d 746, 751 n.13 (5th Cir. 1995) (rejecting argument that injunction did not harm insurer and holding that "the fact that the injunction bars [the insurers] in any way gives them standing to appeal it"); *Alumax Mill Products, Inc. v. Congress Financial Corp.*, 912 F.2d 996, 1002 (8th Cir. 1990) (party stripped of indemnity and contribution rights has standing to object). "There is consensus that a non-settling defendant has standing to object to a partial settlement which purports to strip it of a legal claim or cause of action, an action for indemnity or contribution for example." *Waller v. Financial Corp. of America*, 828 F.2d 579, 583 (9th Cir. 1987). *See also In Re Integra Realty Resources, Inc.*, 262 F.3d 1089, 1102 (10th Cir. 2001); *Eichenholtz v. Brennan*, 52 F.3d 478, 482 (3d Cir. 1995).

Furthermore, the exculpation provisions set forth in Section 11.9 of the Plan are overly broad. The exculpation impermissibly includes non-debtors such as the Sealed Air Indemnified Parties and the Fresenius Indemnified Parties. It also appears to provide protection for claims arising from "administration of this Plan or the Property distributed under this Plan". This could

5

provide prospective immunity from liability to the Asbestos PI Trust, which is clearly improper. *In re Congoleum*, 362 B.R. 167, 190-91 (Bankr. N.J. 2007) (holding that the bankruptcy court "may not unilaterally expand the exception to § 524(g) in asbestos cases to include every conceivable entity involved in an asbestos case."). These exculpation and injunctive provisions appear to supersede any insurance neutrality provisions contained in the plan. As a party affected by these improper injunctions and exculpations, AXA Belgium clearly has standing to object to the Plan.

### III. THE PLAN LACKS INSURANCE NEUTRALITY

The presence of an insurance neutrality provision does not do away with insurers' standing to object to plan confirmation. *See, e.g.*, *In re Congoleum*, June 7, 2004 Tr. at 62-63 ("The ability of the insurers to contest coverage is not co-extensive with the right to participate in the litigation or the settlement of claims," and therefore, "the possible infringement" of such rights "gives the insurers sufficient stake in the plan to have . . . standing."). This is especially true where the proposed insurance neutrality provisions in the current Plan do not preserve insurers' rights adequately. Section 7.15 of the Plan purportedly seeks to preserve the Asbestos Insurance Entities' rights under their insurance policies, settlement agreements, and non-bankruptcy law, subject to certain exceptions. This is a case where half a loaf is not better than none. Section 7.15 provides, in part:

> "(a) *Except to the extent provided in this Section 7.15*, notwithstanding anything to the contrary in the Confirmation Order, the Plan or any of the Plan Documents, nothing in the Confirmation Order, the Plan or any of the Plan Documents (including any other provision that purports to be preemptory or supervening), shall in any way operate to, or have the effect of, impairing any Asbestos Insurance Entity's legal, equitable or contractual rights, if any, in any respect."

>   ...
>
>   (c) *Except as provided in this Section 7.15*, the rights of Asbestos Insurance Entities shall be determined under the Asbestos Insurance Policies, Asbestos In-Place Insurance Coverage, Asbestos Insurance Reimbursement Agreements, or Asbestos Insurance Settlement Agreements, as applicable.
>
>   ...
>
>   (f) *Except as otherwise provided in this Section 7.15*, nothing in the Plan, the Plan Documents, the Confirmation Order, or any finding of fact and/or conclusion of law with respect to the confirmation or consummation of the Plan shall limit the right, if any, of any Asbestos Insurance Entity, in any Asbestos Insurance Action, to assert any Asbestos Insurer Coverage Defense."
>   (Emphasis added).

In spite of the presence of these provisions, the insurers are nonetheless stripped of rights and defenses under the Plan. The limited remedies provided to the Insurers in § 7.15 (being able to contest coverage or offset a liability to the Trust with a Contribution Claim) do not redress the injuries that will be caused to insurers by the actual impairment of their contractual and state law rights if the Plan is confirmed.

For instance, Section 7.15(f) provides additional exceptions to insurer neutrality by its use of the limited defined term "Asbestos Insurer Coverage Defense." Section 7.15(f) provides that nothing in the Plan, the Plan Documents, the Confirmation Order, or any finding of fact and or conclusion of law with respect to confirmation or consummation of the Plan shall limit the right of any Asbestos Insurance Entity, in any Asbestos Insurance Action, to assert any "Asbestos Insurer Coverage Defense." However, insurers are precluded from being able to assert any defense "that (i) the Plan or any of the Plan Documents do not comply with the Bankruptcy Code…." In response to insurers' attempts to clarify the scope and meaning of Section 1.1(16) of the Plan, the Plan Proponents simply responded that "the Plan is a publicly available document and, being in writing, speaks for itself."

7

The insurance neutrality provision also attempts to enjoin insurers' rights to pursue Contribution Claims against non-Debtor entities. Section 7.15(i) provides that such Contribution Claims may be asserted only as a defense or setoff against any claim for coverage brought by the Trust against the non-settled insurer arising out of the Trust's payment on the same underlying Asbestos PI Claim.

Indeed, several 30(b)(6) designees of the Futures Representatives, the Debtors and the Asbestos PI Committee all confirmed that they actually are unsure as to the effect of the insurance neutrality provisions. Specifically, David Austern, the FCR, confirmed that he did not understand § 7.15 of the Plan and was unaware whether this section supersedes other sections of the Plan. *See* Deposition of David T. Austern on May 15 ,2009, excerpts attached hereto as Exhibit A at pp. 44-48; 48-61. Similarly, when Richard Finke, the Debtors' Rule 30(b)(6) designee on "Scope and Operation of Section 7.15 of the Plan entitled 'Insurance Neutrality,' and any other purported insurance neutrality provisions in the Plan and Plan Documents," was questioned about the interplay between § 7.15 (Insurance Neutrality) and § 11.9 (Exculpation), Mr. Finke stated that the latter trumped the former, notwithstanding the super-preemptory language in the former. See Deposition of Richard Finke on May 13, 2009, excerpts attached hereto as Exhibit B at pp. 75-86. He opined that § 11.9 is encompassed within the language of § 7.15(h), even though there is no specific reference to § 11.9 in § 7.115(h). *Id.* at 80.

Peter Lockwood also testified that he viewed § 7.15 as being "sort of a for[u]m selection provision." See Deposition of Peter Lockwood on May 1, 2009, attached hereto as Exhibit C, at pp. 58-63). That, of course, begs the question why § 7.15 is entitled "Insurance Neutrality." When asked whether §11.9 (Exculpation) was preempted by § 7.15, and whether various releases in the Plan were preempted by § 7.15, Mr. Lockwood provided equivocal responses. (*Id.* at 170-76). With respect to the interaction between § 7.15 and § 11.9, for example, at one point he

8

said he did not think § 7.15 would override § 11.9 "because the exculpation provision comes under the heading bankruptcy issues," and therefore is presumably within the carve-out in the definition of the term Asbestos Insurance Defenses, only later to testify that the question "is almost impossible to answer" without more information. (*Id.* at 171-173). One wonders what additional information (which is not available to insurers or the Court) Mr. Lockwood requires.

### IV. THE PLAN IMPROPERLY TRANSFERS INSURANCE RIGHTS IN CONTRAVENTION OF THE INSURANCE CONTRACTS

As outlined above, the Plan and the Asbestos Insurance Transfer Agreement provide that certain "rights" under the Asbestos Insurance Policies issued by Insurers will be transferred to the Trust. *See* Plan § 7.2.2. A condition of confirmation is that this Court find that the transfer of the Asbestos Insurance Rights is valid and enforceable against Insurers. *See* Plan §§ 7.7 (uu) and 7.15(g). This assignment, which is proposed without the insurers' consent, is another basis for insurers' standing to object to the Plan and another reason why the Plan lacks insurance neutrality.[1]

Typically, liability insurance policies specify that that rights under the policies cannot be assigned to a third party without the insurer's consent. These anti-assignment provisions provide important protections for the insurer because an assignment to a third party could result in a drastically different risk than the one the insurer assumed when the policy was issued. Accordingly, under certain circumstances, an insured's nonconsensual assignment of rights under its policies to a third party may provide a defense to coverage under state law.

For instance, this Plan seeks to assign certain of the Debtors' rights under insurance policies issued by AXA Belgium and others to a Trust, established pursuant to the Plan. Such an

---

[1] AXA Belgium respectfully disagrees with the Court's rulings on this issue in other matters. As the issue is currently being considered by the Third Circuit Court of Appeals in *In re Global Industrial Technologies, Inc.*, No. 08-3650 (3d Cir.), and in the case of *In re Federal Mogul Global, et al.* Nos. 09-2230 & 09-2231 (3d Cir.), AXA

assignment of rights violates anti-assignment provisions in the policies, and the Plan Proponents have declared their intention to have the Court rule that any state laws prohibiting assignment are preempted by 11 U.SC. § 1123(a)(5). The Plan Proponents' objective to use the Plan to preempt insurers' state law rights under the policies renders it undeniable that any Article III standing requirements that may be applicable in this bankruptcy have been satisfied as to AXA Belgium and other insurers. The Plan Proponents' attempt to supersede AXA Belgium's state law rights to enforce the anti-assignment provisions of their policies gives rise to the irrefutable fact that the insurers have "such a personal stake in the controversy as to assure…concrete adverseness." *Baker v. Carr*, 369 U.S. 186, 204 (1962).

The fact that the Plan purportedly is assigning rights under the policies and not the policies themselves does not cure the Plan's deficiencies. Unlike the entities to whom these policies were originally issued, the Trust, which was created solely for the benefit of asbestos personal injury claimants, does not have an incentive to fight claims presented to it. Thus, the Plan lacks the good faith required by 1129(a)(3) because it rests upon breaches of contract in the form of the evisceration of AXA Belgium's rights under the policies.

## V.  THE PLAN IMPAIRS AXA BELGIUM'S COVERAGE RIGHTS AND DEFENSES

In claiming that the policies allegedly issued by AXA Belgium "potentially or actually provide insurance coverage for Asbestos PI Claims," the Asbestos Insurance Transfer Agreement has presumed that these policies do in fact provide insurance coverage for Asbestos PI Claims, doing away with a fundamental defense that AXA Belgium would be entitled to assert in any coverage dispute over asbestos-related claims. The Agreement irrevocably transfers <u>all</u> of the

---

Belgium raises it in this submission to preserve its right to address it further pending the outcome of the Third Circuit proceedings.

insured's Asbestos Insurance Rights, and <u>none</u> of its obligations under the policies. Specifically, Sections 7.7(tt) and 7.7(uu) of the Plan would require the Court to find that "the duties and obligations of the Asbestos Insurance Entities" are not diminished or reduced by the discharge of the Debtors under the Plan and the transfer of Asbestos Insurance Rights to the Trust. In contrast, Plan §§ 7.13 and 8.1.1 state that, except as otherwise provided in the Plan, any obligations of the Debtors that are not specifically retained are eliminated. Although Plan § 7.15 might be meant to preempt §§ 7.1 and 8.1.1 with respect to elimination of the Debtors' obligations under the policies, such conclusion cannot be drawn from the Plan, as drafted and this ambiguity, which could be construed against AXA Belgium in the future, is yet another way that AXA Belgium clearly has standing due to its "personal stake in the controversy as to assure…concrete adverseness." *Baker v. Carr*, 369 U.S. 186, 204 (1962).

The Plan and the Asbestos Transfer Agreement strip AXA Belgium of its contractual rights, including, but not limited to the right to notice from an insured, the right to assistance and cooperation from the insured, the right to participate in the defense of claims against the insured, the right to no assignment by the insured without the insurer's consent, the applicability of asbestos exclusions, and the right to pay only claims covered by the policies, that no action shall lie against the insurer unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of the Policy, or until the amount of the insured's obligation to pay shall have been finally determined. Put another way, the protections and privileges to which AXA Belgium would be entitled to in the context of litigation in the tort system are not preserved under the Plan.

Thus, the creation of the Trust and the transfer of insurance-related "rights" to it has two dire consequences for AXA Belgium. First, it replaces the policyholder with the Trust, an entity that has no contractual relationship with AXA Belgium and second, it ensures that the Trust will

11

have none of the policyholder's contractual duties under the insurance policies yet it vests in the Trust the exclusive authority to contest, litigate and settle claims using proceeds from these policies.

The Plan also fails to meet the statutory requirements for a confirmable Plan, including 11 U.S.C. 524(g) and 1129(a). For instance, 524(g)(2)(B)(ii)(V) requires that the Trust "will value, and . . . pay, present claims and future demands that involved similar claims in substantially the same manner." However, while the Plan provides that the Trustees will have the right to implement the TDPs without the benefit of judicial oversight, the insurers who are expected to fund the Trust have no input into these matters.

Finally, the Plan, as currently drafted, obligates AXA Belgium to pay to the Asbestos PI Trust any amount in excess of the amount actually paid by the Asbestos PI Trust to the holders of Asbestos PI Claims. <u>Fuller-Austin Insulation Company v. Highlands Ins. Company</u>, 135 Cal.App. 4th 958, 1000 (Cal. Ct. App. 2006). The resulting "acceleration" of insurers' payments to the Trust clearly impairs insurer rights.

## VI.    WITNESSES AND EXHIBITS

AXA Belgium intends to rely on the testimony of the witnesses identified in its Final Witness List filed with the Court on May 15, 2009. AXA Belgium will also rely on the Plan and the Plan Proponents' responses to discovery in this matter. Per the CMO, AXA Belgium will provide the complete and specific detail of documents on which it intends to rely when it exchanges and files its exhibits on or before June 8, 2009. Finally, AXA Belgium reserves the right to rely on the exhibits of other parties to the extent that they may be applicable to AXA Belgium.

## VII.  JOINDER & RESERVATION OF RIGHTS

AXA Belgium hereby incorporates by reference its previously filed objections to the Plan and joins in other insurers' trial briefs and objections. AXA Belgium also hereby reserves the right to incorporate by reference, and adopt as its own, any reservations of rights stated by any other insurer or any other party.

## VIII.  CONCLUSION

For the reasons stated above, and as will be shown at the Phase I Hearing, the Plan fails to comply with the provisions of the Bankruptcy Code and applicable law.

WHEREFORE, AXA Belgium requests that this Court sustain AXA Belgium's Objections to the First Amended Plan of Reorganization, and grant AXA Belgium such other and further relief to which it may be justly entitled.

Dated:  June 1, 2009

> Respectfully submitted,
> MENDES & MOUNT, LLP
>
> /s/ Eileen T. McCabe
> Eileen T. McCabe, *pro hac vice*
> 750 Seventh Avenue
> New York, NY  10019
> Telephone:  (212)261-8254
> Facsimile:  (302)235-2536
> eileen.mccabe@mendes.com

Michael A. Shiner, *pro hac vice*
TUCKER ARENSBERG
1500 One PPG Place
Pittsburgh, PA 15222-5401
Telephone: (412) 566-1212
Facsimile: (412) 594-5619
mshiner@tuckerlaw.com

John S. Spadaro (No. 3155)
724 Yorklyn Road, Suite 375
Hockessin, DE 19707
Telephone:  (302) 235-7745
Facsimile:  (302) 235-2536
jspadaro@johnsheehanspadaro.com

14