## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| W.R. GRACE & CO., *et al.*, | Case No. 01-01139 (JKF) |
| Debtors. | Jointly Administered<br>Related Docket Nos. 19581, 19620 |

**ARROWOOD'S PHASE I TRIAL BRIEF OBJECTING TO THE AMENDED JOINT PLAN'S NON-DEBTOR RELEASE AND EXCULPATION PROVISIONS AND THE INJUNCTION THAT IMPAIR ARROWOOD'S RIGHTS OF CONTRIBUTION, SUBROGATION AND REIMBURSEMENT**

QUESTION: "Does the Plan purport to release claims that may exist between insurers and Non-Debtors?" . . .

ANSWER: "Mr. Lockwood: Phrased as broadly as you have, I think the answer is yes."

Lockwood Deposition at page 635.

Garvan F. McDaniel, Esq. (#4167)
BIFFERATO GENTILOTTI LLC
800 N. King Street, Plaza Level
Wilmington, DE 19801
(302) 429-1900 Phone
(302) 429-8600 Fax

Carl J. Pernicone, Esq.
WILSON, ELSER, MOSKOWITZ
EDELMAN & DICKER, LLP
150 East 42nd Street
New York, NY 10017-5639
Telephone: (212) 490-3000

Tancred V. Schiavoni, Esq.
O'MELVENY & MYERS LLP
7 Times Square
New York, New York
(212) 326-2267

*Counsel to Arrowood Indemnity
Company, f/k/a Royal Indemnity Company*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................... 1

THE LANGUAGE OF THE NON-DEBTOR RELEASES ......................................... 8

    A.    The Exculpation And Release Provisions Are Exceptionally Broad And Materially Impair The Rights Of Arrowood And Other Insurers.............................................................................................. 8

    B.    The Plan Purports To Exculpate And Release An Astounding Number Of Non-Debtor Third Parties. ...................................... 11

    C.    The Plan Purports To Bar Arrowood And Others Insurers From Asserting Claims Against The Exculpated And Released Third-Party Non-Debtors. .................................................................. 18

THE LANGUAGE OF THE INJUNCTION ............................................................ 19

POINTS ARROWOOD WILL SHOW AT CONFIRMATION ................................. 20

    POINT I    The Bankruptcy Court Does Not Have The Jurisdictional Basis To Approve These Releases And Exculpations ........................................... 20

    POINT II    The Non-Debtor Releases And Exculpations Improperly Exceed The Permissible Scope Of § 524(g), Which Is The Outer Boundary For Third-Party Releases And Exculpations In Asbestos Cases .................................................................................................. 21

    A.    The Third Party Releases And Exculpations Clearly Fall Outside The Scope Of § 524(g)............................................................................. 21

    B.    Section 524(g) Is the Only Basis for Third-Party Releases and Exculpations in Asbestos Cases.............................................................. 23

    POINT III    The Non-Debtor Releases and Exculpations Improperly Impair Arrowood's Rights and Interests and Exceed the Scope Permitted by the Third Circuit Even in Those Cases Where § 524(g) Did Not Apply.................................................................................................. 24

    A.    The Non-Debtor Releases and Exculpations In The Plan Fail To Meet The Stringent Requirements For Such Extraordinary Protection .......................................................................................... 24

        1.    Grace Does Not Have Pre-Confirmation Indemnification Obligations With Most Of The Third Parties It Seeks To Release And Exculpate And The Estate Is Not Impacted By These Released And Exculpated Claims. ................................... 27

        2.    The Estate Was Not Given Substantial Assets In Exchange For All Of The Non-Debtor Releases And Exculpations. .......... 29

-i-

# TABLE OF CONTENTS
(continued)

3.     The Plan Does Not Channel The Released And Exculpated Claims To The Estate, Grace Has Not Created Any Other Mechanism To Provide Full Payment For The Non-Debtor Claims Grace Seeks To Have Released And Exculpated, Nor Has Arrowood Consented To The Loss Of Its Rights. ......... 30

4.     Grace Offers No Justification For The Non-Debtor Releases and Exculpations, Nor Can It. ...................................... 31

5.     The Releases And Exculpations Are Unnecessary For The Reorganization ........................................................... 32

B.     The Non-Debtor Releases and Exculpations In The Plan Also Present A High Potential For Abuse. ....................................................... 34

C.     By Releasing And Exculpating Lawyers Even From Their Own Clients The Releases And Exculpations In The Plan Are Against Public Policy And Ethical Norms. ........................................................... 35

D.     The Releases And Exculpations Are Not Limited to Liability Derivative Of The Debtors. ...................................................... 37

POINT IV     The Channeling Injunction Impairs Arrowood's Rights And Interests By Channeling  Its Claims To An Impaired Class ................... 38

POINT V     The Breadth Of The Releases, Exculpations and Injunction, Viewed In the Context of the Reorganization and Coverage Action Together, Violate the Bankruptcy Code's Good Faith Requirement ....... 39

CONCLUSION ............................................................................................................. 42

# TABLE OF AUTHORITIES

**Page**

**Cases**

*A&M Bldg. & Condo Maint., Inc. v. Atlas Elec. of Staten Island, Inc.,*
    294 A.D.2d 520 (2d Dep't 2002) ........................................................................... 18

*In re A.H. Robins,*
    880 F.2d 694 (4th Cir. 1989) .................................................................. 30, 32, 37

*In re Adelphia Comm. Corp.,*
    368 B.R. 140 (Bankr. S.D.N.Y. 2007) ................................................ 27, 29, 33, 35

*In re Chateaugay Corp.,*
    167 B.R. 776 (S.D.N.Y. 1994) ........................................................................... 32

*In re Combustion Engineering, Inc.,*
    391 F.3d 190 (3d Cir. 2004) ...................................................................... passim

*In re Congoleum Corp.,*
    362 B.R. 167 (Bankr. D. N.J. 2007) ........................................................... passim

*In Re Continental Airlines,*
    203 F.3d. 203 (3d. Cir. 2000) .................................................................... passim

*In re Coram Healthcare Inc.,*
    271 B.R. 228 (Bankr. D. Del. 2001) ................................................................... 40

*In re Dow Corning,*
    280 F.3d 648 (6th Cir. 2002) ............................................................................ 31

*In re Drexel Burnham Lambert Group,*
    960 F.2d 285 (2d Cir. 1992) ...................................................................... 30, 32, 37

*In re Elsinore Shore Assocs.,*
    91 B.R. 238 (Bankr. D.N.J. 1988) ..................................................................... 41

*In re Federal Mogul Global, Inc.,*
    300 F.3d 368 (3d. Cir. 2002) ....................................................................... 3, 21

*In re Genesis Health Ventures, Inc.,*
    266 B.R. 591 (Bankr. D. Del. 2001) ............................................................. 25, 29

*In re Heron, Burchette, Ruckert & Rothwell,*
    148 B.R. 660  (Bankr. D.C. 1992) ..................................................................... 32

*In re Ionosphere Clubs, Inc.,*
    124 B.R. 635  (S.D.N.Y. 1991) ......................................................................... 32

*In re Johns-Mansville,*
    517 F.3d 52 (2nd Cir. 2008) ................................................................ 2, 22, 30, 37

*In re Koelbl,*
    751 F.2d 137 (2d Cir. 1984) ............................................................................ 40

# TABLE OF AUTHORITIES
## (continued)

**Page**

*In re Lowenschuss*,
    67 F.3d 1394 (9th Cir. 1995) ................................................. 25

*In re Metromedia Fiber Network*,
    16 F.3d 136 (2d Cir. 2005) .................................................... 34

*In re Metropolitan Realty Corp.*,
    433 F.2d 676 (5th Cir. 1970) .................................................. 41

*In re Monroe Well Serv.*,
    80 B.R. 324 (Bankr. E.D. Pa. 1987) ......................................... 33

*In re Specialty Equip. Cos.*,
    3 F.3d 1043 (7th Cir. 1993) ................................................... 30

*In re Stolrow's Inc.*,
    84 B.R. 167 (B.A.P. 9th Cir. 1988) .......................................... 41

*In re Thorpe Insulation Co.*,
    No. CV 08-3711 (DSF) (C.D. Cal. Oct. 8, 2008) ................... 7, 38, 39

*In re Transit Group*,
    286 B.R. 811 (Bankr. D. Fla. 2002) .......................................... 32

*In re Zenith Elecs. Corp.*,
    241 B.R. 92 (Bankr. D. Del. 1999) ..................................... passim

*MacArthur Co. v. Johns-Manville Corp.*,
    837 F.2d 89 (2d Cir. 1988) ................................................ 32, 37

*Master Mortgage Investment Fund, Inc.*,
    168 B.R. 930 (Bankr. W. D. Mo. 1994) ...................................... 28

*Mercury Capital Corp. v. Milford Conn. Assocs., L.P.*,
    354 B.R. 1 (D. Conn. 2006) ................................................... 41

*Pacor v. Higgins*,
    743 F.2d 984 (3d Cir. 1984) .................................................. 20

*People v. Birkett*,
    980 P.2d 912 (Cal. 1999) ..................................................... 19

*Shepherd v. Truex*,
    823 N.E.2d 320 (Ind. Ct. App. 2005) ........................................ 18

*State Farm Fire & Casualty Co. v. Sevier*,
    537 P.2d 88 (Or. 1975) ....................................................... 18

**Statutes**

11 U.S.C. § 105 .................................................... 4, 5, 24, 32, 34

11 U.S.C. § 1129 ............................................................ 8, 40

## TABLE OF AUTHORITIES
### (continued)

**Page**

11 U.S.C. § 524 .................................................................................................................... passim

28 U.S.C. § 1334 ....................................................................................................................... 20

Cal. Civ. Proc. Code § 1572 ..................................................................................................... 18

**Other Authorities**

ABA Model Code of Professional Responsibility DR 6-102(A) ................................................ 36

ABA Model Rules of Professional ............................................................................................ 36

Fielkow & Eisenberg, *Civil RICO: The Insurers Fight Back*, 21 Tort & Ins. L.J. 1-29
(1985) .................................................................................................................................. 19

Kress, *Insurers as RICO Plaintiffs: A Civil Remedy for Fraud*, 16 The Brief – A.B.A.
SEC Tort & Ins. Prac. 33 (1986) ........................................................................................ 19

Robert W. Emerson, *Insurance Claims Fraud Problems and Remedies*, 46 U. Mia. L.
Rev. 907 (1992) .................................................................................................................. 19

## PRELIMINARY STATEMENT

The only issue before the Court at the Phase I confirmation hearing is whether the Plan impairs, modifies or in any way changes the rights of insurers.[1]  The Plan[2] provides for an astonishing number of third party non-debtor releases and exculpations that are egregious in their scope, and which conflict with the law in this Circuit as well as every single other Circuit. These non-debtor releases and exculpations indisputably impair, modify and change Arrowood's rights and impact its interests.  Arrowood has standing to address this issue and should be allowed to be heard in the Phase II confirmation hearing.

With regard to Arrowood's standing, the Court need look no further then the testimony of the ACC's senior bankruptcy lawyer who readily acknowledged the obvious fact that the non-debtor exculpations and releases impair, modify and change Arrowood's rights:

QUESTION: "Does the Plan purport to release claims that may exist between insurers and Non-Debtors?" . . .

ANSWER: "Mr. Lockwood: Phrased as broadly as you have, I think the answer is yes." *See* Ex. A (Lockwood Deposition) at 635.

Grace's corporate designate witness Richard Finke agreed stating that "any provisions in the Plan that would constitute a release or an injunction, and I would include 11.9 in that language, are binding on the asbestos insurance entities."  *See* Ex. B (Finke Deposition) at 80.

---

[1] Arrowood Indemnity Company f/k/a Royal Indemnity Company ("Arrowood") respectfully submits this trial brief for Phase I.  The only issue before the Court at the Phase I confirmation hearing is whether the Plan impairs, modifies or in any way changes the rights of the objectors.  The non-debtor releases by definition indisputably impair, modify and change Arrowood's rights and interests and Arrowood should have standing to address this issue in the Phase II confirmation hearing.  Arrowood's objections to other provisions of the Plan are addressed in a separate submission.

[2] Plan Proponents' First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code of W.R. Grace & Co., et. al., the Official Committee of Asbestos Personal Injury Claimants, the Asbestos PI Future Claimants Representative, and the Official Committee of Equity Security Holders Dated February 27, 2009 (the "Plan").

Mr. Finke also acknowledged that that the insurers received no monetary consideration for the exculpations and releases.  *Id.* at 81-82.   And a leading national expert in insurance has also agreed with the ACC's and Debtors' designated witnesses and is prepared to explain why at the Phase I hearing.  Professor George Priest, in discussing how the Plan is not insurance neutral, has indeed confirmed that the Plan "certainly doesn't except the insurers from the operation of the [exculpation] provision."  *See* Ex. C (Priest Deposition) at 245.  Furthermore, he testified that the Plan nowhere purports to compensate insurers for their lost rights.[3]

        Arrowood has a right to be heard, and to present evidence at the Phase II confirmation hearing on these provisions.  Moreover, when the Court hears evidence on these provisions it will find that they are deeply flawed.[4]  The Third Circuit has established limitations for the approval of third-party releases in asbestos bankruptcies under § 524(g):  "As both the plain language of the statute and its legislative history make clear, § 524(g) provides no specific authority to extend a channeling injunction to include third party actions against non-debtors where the liability alleged is not derivative of the debtor."  *In re Combustion Engineering, Inc.*, 391 F.3d 190, 228 (3d Cir. 2004).  The non-debtor releases and exculpations in the Plan do not fall within the narrow definition of § 524(g).  Under § 524(g), the non-debtors must be "alleged to be directly or indirectly liable for the conduct of, claims against, or demands on the debtor."  *See* 11 U.S.C. § 524(g)(4)(A)(ii).  The Second Circuit has also recently held in *In re Johns-Mansville*, 517 F.3d 52, 68 (2nd Cir. 2008), *cert. granted sub nom. Travelers Indem. Co. v. Bailey*, 129 S. Ct. 761, 2008 U.S. Lexis 9124 (Dec. 12, 2008) that "the application of a

---

[3] *Id.* at 236-237. (Mr. Pernicone: "In the course of that careful review of the Plan, did you come across any provision that would purport to compensate insurers for the release under Section 11.9 of any claims that they might have against Non-Debtors? . . ." Mr. Priest responded: "No, I did not.")

[4] The United States Trustee's Office has also reached this conclusion, and has submitted its own objections to the Plan focused entirely around the unlawful breadth and scope of the Plan's release and exculpation provisions.  *See* Acting United States Trustee's Objection to the First Amended Joint Plan of Reorganization, at Dkt. No. 21797, May 20, 2009.

channeling injunction to enjoin actions against third parties is limited to situations where a third party has derivative liability for the claims against the debtor." Yet the non-debtor third party exculpations and releases here clearly go way beyond anything that is authorized by § 524(g), releasing claims against third parties for pre-petition and post-petition conduct having nothing to do with the Debtors' liability.

The Third Circuit has already warned in *In Re Continental Airlines*, 203 F.3d. 203, 215 n. 12 (3d. Cir. 2000), that because bankruptcy jurisdiction is limited, "a court cannot simply presume it has jurisdiction in a bankruptcy case to permanently enjoin third-party class actions against non-debtors." And in *In re Congoleum Corp.*, 362 B.R. 167, 190 (Bankr. D. N.J. 2007), the court there expressed its own concerns about its jurisdictional power to approve third party non-debtor exculpations and releases while reluctantly not ruling on that basis because the record was insufficient. Here, because the vast majority of the Plan's non-debtor exculpations and releases are not of claims that would directly result in liability for the debtor, they fail to meet the jurisdictional test in the Third Circuit. *See In re Federal Mogul Global, Inc.*, 300 F.3d 368, 382 (3d. Cir. 2002) ("Whether a lawsuit could conceivably have an effect on the bankruptcy proceeding inquires whether the allegedly related lawsuit would affect the bankruptcy without the intervention of yet another lawsuit.")

As § 524(g) is the only code provision that explicitly provides for third-party non-debtor releases, it is the only appropriate vehicle for third party non-debtor relief in asbestos bankruptcy cases. *See In re Combustion Engineering, Inc.*, 391 F.3d 190, 236-37 (3d Cir. 2004). In *Combustion Engineering* the Third Circuit made clear that in asbestos cases, a bankruptcy court may not approve a third-party release that falls outside § 524(g)'s parameters. *Id.* ("Because § 524(g) expressly contemplates the inclusion of third parties' liability within the scope of the

channeling injunction—and sets out the specific requirements that must be met in order to permit inclusion—the general powers of § 105(a) cannot be used to achieve a result not contemplated by the more specific provisions of § 524(g).")

Recently, in *In re Congoleum Corp.*, 362 B.R. 167, 191 (Bankr. D. N.J. 2007), the bankruptcy court similarly noted that the relationship between § 524(e) and § 524(g) indicates a Congressional intent to limit the list of third party releases to those specifically enumerated in the Code. The Court noted that because Congress carefully created and enacted a provision that allows for third-party discharges in a limited number of circumstances in enacting § 524(g), courts may not unilaterally expand third-party discharges to categories outside the bounds of what is provided in § 524(g). *See id.* The *Congoleum* Court stated that:

> [t]he Code now provides specific instances when Congress thought it appropriate to extend protection to particular non-debtors parties in asbestos cases and delineated them in § 524(g)(4). Congress presumably did not intend to include others. Where Congress has so carefully crafted a category of entities entitled to exception to § 524(e), expansion of those categories would be an abuse of judicial authority under § 105. . . . The Court may not unilaterally expand the exception to § 524(e) in asbestos cases to include every conceivable entity involved in an asbestos case.

*Id*. (internal citations omitted).

The non-debtor release and exculpation provisions here go far beyond the limitations imposed by § 524(g), and purport to release and exculpate numerous claims between third parties for conduct not derivative of the Debtors' liability. The third party exculpations and releases provided under the Plan clearly do not fit within any of § 524(g)'s enumerated exceptions to the general principle that third parties cannot receive discharges riding on a Debtor's coattails. And because Congress has explicitly expressed its intent by limiting the categories of such third-party discharges in asbestos cases to four specific instances, other provisions of the bankruptcy code,

such as 11 U.S.C. § 105, should not be used to provide these discharges in asbestos-bankruptcy cases.

Yet, even if § 524(g) did not establish the outer boundary for third-party discharges in asbestos cases, the proposed releases and exculpations would still exceed the scope permitted in this Circuit. In non-asbestos cases, the Third Circuit Court of Appeals has limited the scope and permissibility of third-party non-debtor releases and exculpations to—at the very least—rare situations, and held out the possibility that they may never be acceptable. *See In Re Continental Airlines*, 203 F.3d. 203, 217 (3d. Cir. 2000).

While Section 11.9 of the Plan uses very vague language to describe the non-debtors exculpated, it is nonetheless clear that a vast array of persons and entities are exculpated for nearly all liability relating to almost all possible conduct regarding, *inter alia*, almost anything that can be cast as constituting prepetition negotiations—when there was no court supervision— the creation and management of a asbestos trust, and anything "relating to the Chapter 11 case." Moreover, the reach of these exculpations is not limited to matters relating to the Bankruptcy case, but would reach conduct completely unrelated to the bankruptcy, and to conduct that occurred outside the supervision of the bankruptcy court going back years.

Additionally, Section 8.8.7 of the Plan provides for releases of numerous claims by those voting in favor of the Plan as against certain third parties. While this provision purports to provide a consensual release, courts have found such provisions to be non-consensual when based on a mere vote in favor of the Plan. *See Congoleum*, 362 B.R. at 194 (holding that "a consensual release cannot be based solely on a vote in favor of a Plan. For a release to be consensual, the creditor must have unambiguously manifested assent to the release of the non-debtor from liability on its debt . . . Such unambiguous assent is absent here. This is an

immensely complicated plan and it would be difficult for the layperson to comprehend its

details") (internal citations omitted).  These releases therefore cannot be considered consensual

and are no different in this regard than the third-party releases provided in Section 8.8.8.  Thus,

the releases are subject to the same test for non-debtor releases in this Circuit.  *See id.*

Nearly all of the non-debtor releases and exculpations in the Plan were not given in

exchange for substantial consideration to the estate, none of the claims are channeled to a

settlement fund, nor is there any other mechanism created for full payment of these claims.  They

cannot in any way be said to be fair to the releaser as required by *Continental*.  *See id.* at 214.

These exculpations and releases were given without the consent of the Insurers whose potential

claims are eradicated.  Furthermore, the scope and breadth of the Plan's exculpation and release

provisions are of mammoth proportions.  The duration for which the Plan provides exculpations

and releases reaches back years before this Court ever had any relationship to this case, and

seeks to extend such releases and exculpations for years after.  And the scope of the exculpations

and releases in terms of the types of claims for which exculpation and release is sought is

unbelievably broad.  Finally, as courts must analyze each exculpation and release individually,

they must be individually acceptable under the standards articulated in the Third Circuit, not

merely some or most.

In addition, the Plan provides exculpations and releases to every lawyer working for the

dozens of categories discussed below including a host of plaintiff lawyers.  This is contrary to

public policy and professional ethical norms because in releasing all lawyers involved in years of

unsupervised negotiations, indeed all lawyers involved in any aspect of the Chapter 11 case, the

exculpation and release provisions operate as a waiver agreement, and even worse, in this case,

the clients may not even be aware of the rights they are waiving away.  Section 11.9, for

example, would operate to prevent clients from suing their lawyers under a variety of legal theories. Putting aside all the other reasons for why the exculpations and releases in the Plan are contrary to the law in this Circuit, exculpation and release provisions written by lawyers in an obscure provision of the Plan that severely limits clients' rights of redress against their own lawyers, presents truly grave ethical problems. Indeed, if non-debtor exculpations and releases are to be rarely allowed because they are subject to abuse, exculpation and release provisions in a reorganization plan written by lawyers that limits their clients' right to sue them, and for which many, if not most of the clients, have no awareness of the rights they are losing, should never be allowed.

Separate and apart from the non-consensual release and exculpation of non-debtors, the Plan Proponents also seek an injunction that purports to cut-off the contractual and common law rights of contribution, subrogation and indemnity that Arrowood and the other insurers hold against other non-debtor insurers. The terms of the injunction has a direct monetary impact on Arrowood's rights and interest, and provides a further basis for rejecting the Plan. In *In re Thorpe Insulation Co.*, another asbestos bankruptcy case, the district court recently held that "the actual issuance of a Section 524(g) injunction covering [third parties] could impact [insurers]" and that insurers could "challenge a Section 524(g) injunction that barred their claims against a party covered under the injunction as the injunction would detrimentally affect [insurers'] rights against the [third parties]."[5]

The Plan does not provide the means to satisfy any portion of the non-debtor claims it seeks to release, exculpate and/or enjoin, much less satisfy them in full, nor does it call for consideration of any kind from the released, exculpated and/or enjoined non-debtors. Moreover,

---

[5] *See In re Thorpe Insulation Co.*, No. CV 08-3711 (DSF), Doc. No. 39 (C.D. Cal. Oct. 8, 2008). A copy of this decision is attached hereto as Ex. D.

the tactical advantage that the Plan Proponents hope to achieve in separate litigation as a result of these and other Plan provisions, is clearly improper.  Were this Court to endorse the exculpations, releases, and injunctions sought by confirming the Plan, it would be rewarding the most brazen and cynical abuses of the protections afforded by the Bankruptcy Code.

These provisions violate the law in this Circuit, and eliminate some of Arrowood's most basic legal rights.  Because the undisputed facts demonstrate as a matter of law that the Plan fails to meet the requirements of 11 U.S.C. § 1129, Arrowood respectfully asks the court to deny confirmation of the Plan.

## THE LANGUAGE OF THE NON-DEBTOR RELEASES

**A.    The Exculpation And Release Provisions Are Exceptionally Broad And Materially Impair The Rights Of Arrowood And Other Insurers.**

The Plan contains a series of provisions that purport to exculpate and release a host of non-debtor parties.[6]  Section 11.9 of the Plan purports to exculpate not only the Debtors but also a host of non-debtors from liability to third parties such as Arrowood and the other insurers:

> None of the Reorganized Debtors, the Debtors, the Non-Debtor Affiliates, the Sealed Air Indemnified Parties, the Asbestos PI Trustees of the Asbestos PI Trust, the Trust Advisory Committee, the Asbestos PD Trustees of the Asbestos PD Trust, the Asbestos PI Committee, the Asbestos PD Committee, the Unsecured Creditors Committee, the Equity Committee, the Asbestos PI FCR, the Asbestos PD FCR, or any of their respective Representatives are to have or incur any liability to any Entity for any act or omission in connection with or arising out of the Chapter 11 Cases, including the negotiation of this Plan or the settlements provided in the Sealed Air Settlement Agreement and the Fresenius Settlement Agreement, the pursuit of confirmation of this Plan, the consummation of this Plan or the settlements provided in the Sealed Air Settlement Agreement or Fresenius Settlement Agreement, or the administration of this Plan or the property to be distributed under this Plan so long as, in each case, such action, or failure to act, did not constitute gross negligence or willful misconduct.

---

[6] *See, e.g.,* Plan at §§ 11.9, 8.8.7, 8.8.8.

Section 8.8.7. the Creditor Release provision states the following:

> Without limiting any other provisions in this Plan, each Holder of a
> Claim or Equity Interest who votes in favor of this Plan or receives
> or retains any property under this Plan shall be deemed to
> unconditionally have released the Asbestos Protected Parties, the
> Asbestos Insurance Entities, the Unsecured Creditors Committee,
> the Asbestos PI Committee, the Asbestos PD Committee, the
> Equity Committee, Asbestos PI FCR, and the Asbestos PD FCR
> and each party's Representatives, as of the Effective Date from any
> and all Claims, SA Claims, SA Damages, obligations, rights, suits,
> judgments, damages, causes of action, remedies, and liabilities of
> any nature whatsoever, whether known or unknown, foreseen or
> unforeseen, matured, or unmatured, existing or hereafter arising, in
> law, equity, or otherwise, that such Entity would have been legally
> entitled to assert in its own right (whether individually or
> collectively), based in whole or in part upon any act or omission,
> transaction agreement, event, or other occurrence taking place on
> or before the Effective Date in any way relating to or pertaining to,
> the Reorganized Debtors, their operations on or before the
> Effective Date, their respective property, the Chapter 11 Cases, or
> the negotiation, formulation, preparation of this Plan or any related
> agreements, instruments, or other documents.

This provision purports to release numerous third parties, and their agents and Representatives,

from all liability relating to anything having to do with the Debtor, thus releasing these third

parties from their conduct going back decades.

Section 8.8.8 is yet another provision releasing numerous claims against non-debtor

third-parties.  It states that:

> Effective as of the Confirmation Date, but subject to the
> occurrence of the Effective Date, for good and valuable
> consideration, to the fullest extent permissible under applicable
> law, each Debtor, in its individual capacity and as a debtor-in-
> possession for, and on behalf of, its estate and its Affiliates, and
> the Reorganized Debtors on their own behalf and as
> representatives of their respective estates and their Affiliates, and
> their respective successors, assigns, and any and all Entities who
> may purport to claim by, through, for or because of them, *and any
> third parties*, are hereby deemed to release and waive conclusively,
> absolutely, unconditionally, irrevocably, and forever each and all
> of the Debtors and their Non-Debtor Affiliates' Representatives
> and their respective properties ("the Released Parties"), from any
> and all Claim, obligations, rights, suits, damages, remedies,
> liabilities, or causes of action in any manner arising from, based
> on, or relating to, in whole or in part, the Debtors, the Debtors'
> property, the Chapter 11 Cases, the purchase sale, or rescission of
> the purchase or sale of any security of the Debtors, the subject

9

> matter of, or the transactions or events giving rise to, any Claim or
> Interest that is treated in this Plan, the restructuring of Claims and
> Interests prior to or in the Chapter 11 Cases, the negotiations,
> formulation, or preparation of the Plan and the Disclosure
> Statement, or related agreements, instruments, or other documents,
> involving any act, omission, transaction, agreement, occurrence, or
> event taking place on or before the Effective Date, other than any
> act or omission of a Released Party that constitutes willful
> misconduct.

(emphasis added). This provision purports to release numerous non-debtor third parties from

claims relating to decades of conduct and a whole array of claims.

The Plan's definition of the term "Representative" is extremely broad, ambiguous, and

difficult to understand. The term Representative is defined in Section 1.160:

> Representatives shall mean with respect to any Entity, the past and
> present directors, officers, employees, accountants (including
> independent registered public accountants), advisors, attorneys,
> consultants, or other agents of that Entity, or any other
> representatives or professionals of that Entity or of any of those
> directors, officers, employees, accountants (including independent
> registered public accountants), advisors, attorneys, consultants, or
> other agents, but only in their capacity as such.

The terms "agents," "consultants," and "advisors," are used numerous times in Section 1.160 but

are left undefined. Indeed, the scope of all the terms and persons in Section 1.160 are left nearly

completely undefined, thus leaving the exact number of persons exculpated under Section 11.9

unclear and unknown because it is not clear who may fit within these undefined categories.

Section 1.160 also seems to indicate when it repeats and says "or any other representatives or

professionals of that Entity or of any of those directors, officers, employees, accountants . . .

advisors, attorneys, consultants, or other agents . . ." that the Representatives of Representatives

are also included within the orbit of Section 1.160 and thus under the release and exculpation

provision. This is another critical ambiguity that renders the Plan's exculpation and release

provisions incomprehensibly vague in scope.

The term "Entity" is defined in Section 1.91 as referring to "any person, individual, corporation, firm, partnership, association, joint stock company, joint venture, estate, trust, business trust, unincorporated organization, any other entity, the United States Trustee or any Governmental Unity or any political subdivision thereof."

Sections 11.9, 8.8.8 and 8.8.7 thus purport to release and exculpate all of these persons, both identified and in the case of "Representatives," unidentified, for a very broad array of possible Claims arising from, among other things, any claims relating to the Debtor, any activity relating to the Bankruptcy, and the many years of negotiations preceding the actual Bankruptcy filing and the many years following the conclusion of the bankruptcy. The release and exculpation provisions, in other words, cover third-party claims, such as those held by Arrowood and other insurers and a host of other parties, and would prevent Arrowood and other insurers from asserting their direct claims against these non-debtor third parties.

**B.      The Plan Purports To Exculpate And Release An Astounding Number Of Non-Debtor Third Parties.**

The full array of the non-debtors covered by the exculpation and release provisions are difficult to discern from the language and organization of the Plan. This provision often refers to other provisions, which in turn cross-reference yet additional provisions. In other instances, the exculpation provisions rely on defined terms that themselves incorporate other defined terms. At a minimum, the list includes the following:

1.      Asbestos Protected Parties and their Representatives. *See* §§ 8.8.7, 1.160.

2.      Asbestos Insurance Entities and their Representatives. *See* §§ 8.8.7, 1.160.

3.      The Reorganized Debtors. *See* §§ 11.9, 1.157.

4.      The past and present directors, officers, employees, accountants (including independent registered public accountants), advisors, attorneys, consultants, or other agents of

11

the Reorganized Debtors, or any other representatives or professionals of the Reorganized

Debtors or of any of those directors, officers, employees, accountants (including independent

registered public accountants), advisors, attorneys, consultants, or other agents. *See* §§ 11.9,

1.157, 1.160

5.      The past and present directors, officers, employees, accountants (including

independent registered public accountants), advisors, attorneys, consultants, or other agents of

the Debtors, or any other representatives or professionals of the Debtors or of any of those

directors, officers, employees, accountants (including independent registered public

accountants), advisors, attorneys, consultants, or other agents. *See* §§ 11.9, 1.160, 1.80

6.      The various Non-Debtor Affiliates.  *See* §§ 11.9, 1.160, 1.136

7.      The past and present directors, officers, employees, accountants (including

independent registered public accountants), advisors, attorneys, consultants, or other agents of

the various Non-Debtor Affiliates, or any other representatives or professionals of the various

Non-Debtor affiliates or of any of those directors, officers, employees, accountants (including

independent registered public accountants), advisors, attorneys, consultants, or other agents.  *See*

§§ 11.9, 1.160, 1.136, 1.160.

8.      Sealed Air Corporation and all of its parent corporations, subsidiary corporations,

joint ventures, Affiliates, and sister corporations, and any and all of their past, present, and future

agents, servants, officers, employees, successors, assigns, heirs, executors, administrators, legal

representatives, beneficiaries and insurers whose coverage was procured by Sealed Air after

March 31, 1998.  See §§ 11.9, 1.177.

9.      The past and present directors, officers, employees, accountants (including

independent registered public accountants), advisors, attorneys, consultants, or other agents of

the Sealed Air Corporation (and all of its parent corporations, subsidiary corporations, joint ventures, Affiliates, and sister corporations, and any and all of their past, present, and future agents, servants, officers, employees, successors, assigns, heirs, executors, administrators, legal representatives, beneficiaries and insurers whose coverage was procured by Sealed Air after March 31, 1998), or any other representatives or professionals of the Sealed Air Corporation (and all of its parent corporations, subsidiary corporations, joint ventures, Affiliates, and sister corporations, and any and all of their past, present, and future agents, servants, officers, employees, successors, assigns, heirs, executors, administrators, legal representatives, beneficiaries and insurers whose coverage was procured by Sealed Air after March 31, 1998, or of any of those directors, officers, employees, accountants (including independent registered public accountants), advisors, attorneys, consultants, or other agents. *See* §§ 11.9, 1.177, 1.160.

10.     Cryovac, Inc. and all of its parent corporations, subsidiary corporations, joint ventures, Affiliates, and sister corporations, and any and all of their past, present, and future agents, servants, officers, employees, successors, assigns, heirs, executors, administrators, legal representatives, beneficiaries and insurers whose coverage was procured by Cryovac, Inc. after March 31, 1998. *See* §§ 11.9, 1.177

11.     The past and present directors, officers, employees, accountants (including independent registered public accountants), advisors, attorneys, consultants, or other agents of Cryovac, Inc. (and all of its parent corporations, subsidiary corporations, joint ventures, Affiliates, and sister corporations, and any and all of their past, present, and future agents, servants, officers, employees, successors, assigns, heirs, executors, administrators, legal representatives, beneficiaries and insurers whose coverage was procured by Cryovac, Inc. after March 31, 1998, or any other representatives or professionals of Cryovac, Inc. (and all of its

parent corporations, subsidiary corporations, joint ventures, Affiliates, and sister corporations, and any and all of their past, present, and future agents, servants, officers, employees, successors, assigns, heirs, executors, administrators, legal representatives, beneficiaries and insurers whose coverage was procured by Cryovac, Inc. after March 31, 1998, or of any of those directors, officers, employees, accountants (including independent registered public accountants), advisors, attorneys, consultants, or other agents.  *See* §§ 11.9, 1.177, 1.160.

12.     Fresenius (which under Sections 1.102, 1.103, and 1.104 means Fresenius Medical Care Holdings, Inc. and Fresenius National Medical Care and the Fresenius Medical Care Holdings Group) and each of their respective present and former subsidiaries, parents, affiliates, officers, directors, employees, partners, trustees, shareholders, beneficiaries, agents, attorneys, predecessors, successors, and assigns, including Fresenius Medical Care AG and Fresenius AG.  *See* §§ 11.9, 1.106.

13.     The past and present directors, officers, employees, accountants (including independent registered public accountants), advisors, attorneys, consultants, or other agents of Fresenius and each of their respective present and former subsidiaries, parents, affiliates, officers, directors, employees, partners, trustees, shareholders, beneficiaries, agents, attorneys, predecessors, successors, and assigns, including Fresenius Medical Care AG and Fresenius AG., or any other representatives or professionals of Fresenius and each of their respective present and former subsidiaries, parents, affiliates, officers, directors, employees, partners, trustees, shareholders, beneficiaries, agents, attorneys, predecessors, successors, and assigns, including Fresenius Medical Care AG and Fresenius AG., or of any of those directors, officers, employees, accountants (including independent registered public accountants), advisors, attorneys, consultants, or other agents. *See* §§ 11.9, 1.160, 1.106.

14.     Asbestos PI Trustees of the Asbestos PI Trust. *See* §§ 11.9, 1.137, 1.138, 8.8.7.

15.     The past and present employees, accountants (including independent registered public accountants), advisors, attorneys, consultants, or other agents of the Asbestos PI Trustees of the Asbestos PI Trust, or any other representatives or professionals of the Asbestos PI Trustees of the Asbestos PI Trust or of any of those directors, officers, employees, accountants (including independent registered public accountants), advisors, attorneys, consultants, or other agents. *See* §§ 11.9, 1.160, 1.137, 1.138, 8.8.7.

16.     The Trust Advisory Committee. *See* §§ 11.9, 1.193.

17.     The past and present employees, accountants (including independent registered public accountants), advisors, attorneys, consultants, or other agents of the Trust Advisory Committee, or any other representatives or professionals of the Trust Advisory Committee or of any of those directors, officers, employees, accountants (including independent registered public accountants), advisors, attorneys, consultants, or other agents. *See* §§ 11.9, 1.160, 1.193.

18.     The Asbestos PD Trustees of the Asbestos PD Trust. *See* §§ 11.9, 1.25, 1.26, 8.8.7.

19.     The past and present employees, accountants (including independent registered public accountants), advisors, attorneys, consultants, or other agents of the Asbestos PD Trustees of the Asbestos PD Trust, or any other representatives or professionals of the Asbestos PD Trustees of the Asbestos PD Trust or of any of those directors, officers, employees, accountants (including independent registered public accountants), advisors, attorneys, consultants, or other agents. *See* §§ 11.9, 1.60, 1.25, 1.26, 8.8.7.

20.     Asbestos PI Committee. *See* §§ 11.9, 1.34, 8.8.7.

21.    The past and present employees, accountants (including independent registered public accountants), advisors, attorneys, consultants, or other agents of the Asbestos PI Committee, or any other representatives or professionals of the Asbestos PI Committee or of any of those directors, officers, employees, accountants (including independent registered public accountants), advisors, attorneys, consultants, or other agents. *See* §§ 11.9, 1.160 1.34, 8.8.7.

22.    The Asbestos PD Committee.  *See* §§ 11.9, 1.19, 8.8.7.

23.    The past and present employees, accountants (including independent registered public accountants), advisors, attorneys, consultants, or other agents of the Asbestos PD Committee, or any other representatives or professionals of the Asbestos PD Committee or of any of those directors, officers, employees, accountants (including independent registered public accountants), advisors, attorneys, consultants, or other agents. *See* §§ *See* §§ 11.9, 1.16, 1.19, 8.8.7.

24.    The Unsecured Creditors Committee.  *See* §§ 11.9, 1.200, 8.8.7.

25.    The past and present employees, accountants (including independent registered public accountants), advisors, attorneys, consultants, or other agents of the Unsecured Creditors Committee, or any other representatives or professionals of the Unsecured Creditors Committee or of any of those directors, officers, employees, accountants (including independent registered public accountants), advisors, attorneys, consultants, or other agents.  *See* §§ 11.9, 1.160, 1.200, 8.8.7.

26.    The Equity Committee.  *See* §§ 11.9, 1.94, 8.8.7.

27.    The past and present employees, accountants (including independent registered public accountants), advisors, attorneys, consultants, or other agents of the Equity Committee, or any other representatives or professionals of the Equity Committee or of any of those directors,

officers, employees, accountants (including independent registered public accountants), advisors, attorneys, consultants, or other agents.  *See* §§ 11.9, 1.160, 1.94, 8.8.7.

28.     The Asbestos PI FCR (David Austern or any court-appointed successor).  *See* §§ 11.9, 1.35, 1.36, 8.8.7.

29.     The past and present employees, accountants (including independent registered public accountants), advisors, attorneys, consultants, or other agents of the Asbestos PI FCR (David Austern or any court-appointed successor), or any other representatives or professionals of the Asbestos PI FCR (David Austern or any court-appointed successor) or of any of those directors, officers, employees, accountants (including independent registered public accountants), advisors, attorneys, consultants, or other agents.  *See* §§ 11.9, 1.160, 1.35, 1.36, 8.8.7.

30.     The Asbestos PD FCR.  *See* §§ 11.9, 1.21, 1.22, 8.8.7.

31.     The past and present directors, officers, employees, accountants (including independent registered public accountants), advisors, attorneys, consultants, or other agents of the Asbestos PD FCR, or any other representatives or professionals of the Asbestos PD FCR or of any of those directors, officers, employees, accountants (including independent registered public accountants), advisors, attorneys, consultants, or other agents.  *See* §§ 11.9, 1.160, 1.21, 1.22.

The difficulty in identifying all the non-debtors shielded by the release and exculpation provisions is further compounded by the fact that they cover very vaguely defined conduct and claims.

**C.      The Plan Purports To Bar Arrowood And Others Insurers From Asserting Claims Against The Exculpated And Released Third-Party Non-Debtors.**

Should a coverage action result in a finding that the agreements, arrangements or other actions taken pre or post-petition were the product of bad faith or collusion, Arrowood and the other insurers will have claims against a variety of third parties who purport to be covered by the broad release and exculpation provisions in the Plan. *See*, *e.g.*, *A&M Bldg. & Condo Maint., Inc. v. Atlas Elec. of Staten Island, Inc.,* 294 A.D.2d 520, 521-522 (2d Dep't 2002) (attorney could be liable for collusion where he breached duty not to assist his client in conduct that he knew was illegal or fraudulent, and where such acts were committed to harass and/or maliciously injure the plaintiff); *State Farm Fire & Casualty Co. v. Sevier*, 537 P.2d 88, 97 (Or. 1975) ("[I]f collusion is proven the insurer, after satisfying the injured person's claim, may prosecute a cause of action against the insured"); *Shepherd v. Truex*, 823 N.E.2d 320 (Ind. Ct. App. 2005) (attorney who is guilty of deceit or collusion, or consents thereto, with intent to deceive a court or judge or a party to an action or judicial proceeding . . . shall also forfeit to the party injured treble damages, recoverable in a civil action).

Likewise, to the extent that any non-debtor parties submitted (or caused to be submitted) invalid claims—because they were time-barred, lacked facts showing exposure, or were otherwise defective—for payment, Arrowood and the other insurers will have claims against those parties.[7]  The same is true about the presentation of false or misleading claims in the future. In cases where an insurer discovers that there has been collusion, misrepresentations, or other misconduct in the presentation of claims, it is well recognized that the law provides for a number of statutory and common law remedies against all involved.

---

[7] *See, e.g.,* Cal. Civ. Code § 1572.

The types of claims that can potentially be raised by Arrowood include (1) misrepresenta-tion, (2) negligent misrepresentation, (3) tortious interference with contract, (4) constructive fraud, (5) civil conspiracy, (6) unjust enrichment, (7) conversion, (8) indemnification and (9) reverse bad faith.  *See, e.g.,* Robert W. Emerson, *Insurance Claims Fraud Problems and Remedies*, 46 U. Mia. L. Rev. 907 (1992); *see also* Fielkow & Eisenberg, *Civil RICO: The Insurers Fight Back*, 21 Tort & Ins. L.J. 1-29 (1985); Kress, *Insurers as RICO Plaintiffs: A Civil Remedy for Fraud*, 16 The Brief – A.B.A. SEC Tort & Ins. Prac. 33 (1986).  In addition to these claims, insurers that have funded, or may fund, the payment of claims have subrogation rights that may give rise to claims against various released non-debtors.  *See People v. Birkett*, 980 P.2d 912, 917 (Cal. 1999).

## THE LANGUAGE OF THE INJUNCTION

The Plan defines claims for contribution, subrogation and reimbursement as "Indirect Asbestos PI Claims," which are included within the broader definition of Asbestos PI Claims and classified in Class 6 under the Plan.[8]  Contribution Claims against Grace, and other Protected Parties (which include, by definition, all Settling Asbestos Insurance Entities and Post-Confirmation Settling Asbestos Insurance Entities) are channeled to the Trust via the Asbestos PI Channeling Injunction.  *See* Plan at §§ 1.31 1.32, 1.123, 3.1, 7.2.

Under the Plan, Class 6 is an impaired class.  Indeed, the Plan provides no process for an insurer to recover on a claim for contribution, subrogation or reimbursement, as the Plan only contemplates payment to "Indirect Claimants" (i.e., the holder of an Indirect Asbestos PI Claim) who have paid in full the liability and obligation of the Asbestos PI Trust to the individual

---

[8] *See* Plan at §§ 1.31 1.32, 1.123, 3.1, 7.2.

claimant to whom the Asbestos PI Trust would otherwise have had a liability or obligation under the TDP.[9]

## POINTS ARROWOOD WILL SHOW AT CONFIRMATION

### POINT I

#### THE BANKRUPTCY COURT DOES NOT HAVE THE JURISDICTIONAL BASIS TO APPROVE THESE RELEASES AND EXCULPATIONS

In *Continental*, the court noted "with some concern that the Bankruptcy Court apparently never examined its jurisdiction to release and permanently enjoin Plaintiff's claims against non-debtors . . ." and warned that because bankruptcy jurisdiction is limited, "a court cannot simply presume it has jurisdiction in a bankruptcy case to permanently enjoin third-party class actions against non-debtors." *Continental*, at 215 n. 12. In *Congoleum*, the court expressed concerns about its jurisdictional power to approve third party non-debtor exculpations and releases but reluctantly did not rule on that basis because the record was insufficient. *Id.* at 190.

28 U.S.C. § 1334(b) confers on district courts "original and exclusive jurisdiction of all cases arising under title 11" and "original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." Proceedings are "related to" a chapter 11 case under the relevant Third Circuit precedent if the outcome of the proceeding could conceivably have any effect on the estate being administered in bankruptcy." *Pacor v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984). In *In re Combustion Engineering,* 391 F.3d 190, 232 (3d. Cir. 2004), the Court held that there was no related to jurisdiction where there was no unity of interest between the debtor and non-debtors, that is, "when the third party claim would not directly result in liability for the debtor."

---

[9]  *See* Plan at §§ 1.31 1.32, 1.123, 3.1, 7.2.

Because most of the Plan's non-debtor exculpations and releases are not of claims that would directly result in liability for the debtor, they fail to meet the jurisdictional test in the Third Circuit. *See In re Federal Mogul Global, Inc.*, 300 F.3d 368, 382 (3d. Cir. 2002) ("*Whether a lawsuit could conceivably have an effect on the bankruptcy proceeding inquires whether the allegedly related lawsuit would affect the bankruptcy without the intervention of yet another lawsuit.*")  (emphasis added).  These non-debtor releases and exculpations are thus outside the orbit of even the most expansive view of the court's "related to" jurisdiction.

## POINT II

### THE NON-DEBTOR RELEASES AND EXCULPATIONS IMPROPERLY EXCEED THE PERMISSIBLE SCOPE OF § 524(g), WHICH IS THE OUTER BOUNDARY FOR THIRD-PARTY RELEASES AND EXCULPATIONS IN ASBESTOS CASES

**A.    The Third Party Releases And Exculpations Clearly Fall Outside the Scope of § 524(g)**

Section 524(e) provides the general principle that "discharge of debt of the debtor does not affect the liability of any other entity on, or the property of, any other entity for, such debt." The only explicit bankruptcy provision brooking the general principle that a bankruptcy court's authority to discharge debt is limited to the bankrupt entity itself is § 524(g).  Section 524(g) provides for third party non-debtor releases in asbestos cases in a limited number of instances, and for a limited category of entities.  It provides for third-party non-debtor relief for asbestos liability where the liability is based on:

> (I) the third party's ownership of a financial interest in the debtor or a past or present affiliate of the debtor, or a predecessor-in-interest of the debtor;

> (II) the third party's involvement in the management of the debtor or predecessor-in-interest of the debtor, or service as an officer, director or employee of the debtor or a related party;

> (III) the third party's provision of insurance to the debtor or a related party; [or]

> (IV) the third party's involvement in a transaction changing the
> corporate structure, or in a loan or other financial transaction
> affecting the financial condition of the debtor or a related party.

*See* 11 U.S.C. § 524(g)(4)(A)(ii).  The third party non-debtors who are exculpated and released,

clearly do not fall into the above categories.

Furthermore, for the third-party releases to be acceptable under § 524(g), the non-debtors

must be "alleged to be directly or indirectly liable for the conduct of, claims against, or demands

on the debtor."  *See id.*  Section 524(g) does not allow for discharges beyond third-party actions

against non-debtors in which their alleged asbestos liability is derivative of the debtor's liability.

*See In re Combustion Engineering, Inc.*, 391 F.3d 190, 236 (3d Cir. 2004) ("As both the plain

language of the statute and its legislative history make clear, § 524(g) provides no specific

authority to extend a channeling injunction to include third-party actions against non-debtors

where the liability alleged is not derivative of the debtor.")  The Second Circuit has also recently

held in *Johns-Mansville*, 517 F.3d at 68, that "the application of a channeling injunction to enjoin

actions against third parties is limited to situations where a third party has derivative liability for

the claims against the debtor."  Yet the non-debtor third party releases and exculpations clearly

go way beyond anything that is authorized by the only code section that provides for third-party

non-debtor relief, § 524(g).

These releases and exculpations provided by the Plan clearly do not fit within the narrow

confines of § 524(g)'s enumerated categories of allowable asbestos-related third-party

discharges.  The exculpated and released liability is hardly asbestos-related.  Furthermore, the

liability released and exculpated under the Plan is not derivative of the debtors' liability; rather, it

is for the conduct of the third-parties themselves.  For these reasons, the exculpations and

releases cannot be based on § 524(g).  These third parties are not the Debtor's' shareholders,

officers, directors, insurers, or lenders.  Arrowood's claims—and those of others—against the

exculpated and released parties are not derivatively related to asbestos-injuries allegedly caused

by the Debtors.  Rather, the claims arise directly from the released parties' conduct, long after

the Debtors ceased using asbestos.  The releases and exculpations directly impair Arrowood's

rights and interests, do not satisfy the requirements of § 524(g), and the Plan does not even

attempt to suggest otherwise.  Thus, the only congressionally mandated provision for such third-

party discharges cannot be used to justify this attempt to provide for the wholesale eradication of

claims against these non-debtor released and exculpated parties.

B.     **Section 524(g) Is the Only Basis for Third-Party Releases and Exculpations in Asbestos Cases**

Section 524(g) provides the only congressionally mandated vehicle for third-party relief

in asbestos cases.  And in *In re Combustion Engineering, Inc.*, 391 F.3d 190, 236-37 (3d Cir.

2004), the Third Circuit made clear that in asbestos cases, a bankruptcy court may not approve a

third-party release that falls outside § 524(g)'s parameters.  *See id.* (stating that "[b]ecause

§ 524(g) expressly contemplates the inclusion of third parties' liability within the scope of the

channeling injunction—and sets out the specific requirements that must be met in order to permit

inclusion—the general powers of § 105((a) cannot be used to achieve a result not contemplated

by the more specific provisions of § 524(g).")  Thus the court specifically held that § 524(g)

establishes the outer-limit for releases granted to non-debtors in asbestos bankruptcy cases, such

as this.

Additionally, in *In re Congoleum Corp.*, 362 B.R. 167, 191(Bankr. D. N.J. 2007), the

bankruptcy court similarly noted that the relationship between § 524(e) and § 524(g)'s exception

to the general principle of non-third party discharges, indicates a Congressional intent to limit the

list of third party releases to those it has specifically enumerated in the Code.   The Court noted

that because Congress carefully created and enacted a provision that allows for third-party

discharges in a limited number of circumstances, courts may not unilaterally expand third-party

discharges to categories outside the bounds of what is provided in § 524(g):

> [t]he Code now provides specific instances when Congress thought
> it appropriate to extend protection to particular non-debtors parties
> in asbestos cases and delineated them in § 524(g)(4).  Congress
> presumably did not intend to include others.  Where Congress has
> so carefully crafted a category of entities entitled to exception to
> § 524(e), expansion of those categories would be an abuse of
> judicial authority under § 105. . . . The Court may not unilaterally
> expand the exception to § 524(e) in asbestos cases to include every
> conceivable entity involved in an asbestos case.

*Id.* (internal citations omitted).

The third-party exculpations and releases provided in the Plan clearly do not fit within

any of § 524(g)'s enumerated exceptions to the general principle that third-parties cannot receive

discharges riding a Debtors' coattails.   And because Congress has explicitly expressed its intent

by limiting the categories of such third-party discharges in asbestos cases to four specific

instances, other provisions of the bankruptcy code, such as 11 U.S.C. § 105, should not be used

to provide these discharges in asbestos-bankruptcy cases.

## POINT III

### THE NON-DEBTOR RELEASES AND EXCULPATIONS IMPROPERLY IMPAIR ARROWOOD'S RIGHTS AND INTERESTS AND EXCEED THE SCOPE PERMITTED BY THE THIRD CIRCUIT  EVEN IN THOSE CASES WHERE § 524(g) DID NOT APPLY

**A.     The Non-Debtor Releases and Exculpations In The Plan Fail To Meet The Stringent Requirements For Such Extraordinary Protection**

Even if § 524(g) did not establish the outer boundary for third-party injunctions in

asbestos cases, which it clearly does, the proposed exculpations and releases would still exceed

the scope permitted in this Circuit.[10]  Courts in this and other Circuits have consistently rejected

---

[10] The Debtors represented that view issues concerning the priority of the non-debtor releases as entirely legal in nature and stipulated that they would offer no evidence at the Phase II trial in opposition.

the expansive nonconsensual third-party releases such as the ones proposed in the Plan,

regardless of their position on whether such releases are ever permissible.  *See In Re Continental*

*Airlines*, 203 F.3d. 203, 214 (3d. Cir. 2000) (noting that a third-party discharge is an

extraordinary protection but declining to say whether a non-consensual third-party release is ever

permissible).[11]  In *Continental*, the Court of Appeals held that while third party releases may be

appropriate in some circumstances, they are certainly not permissible unless they are fair to the

releasor, were given for fair consideration, and are necessary to the reorganization; there must

also be specific factual findings to support the conclusion that they are indeed fair and necessary.

*See id.* ("The hallmarks of permissible non-consensual releases" are "fairness, necessity to the

reorganization, and specific factual findings to support these conclusions[]." )  The exculpations

and releases provided in the Plan fail to meet the *Continental* court's basic threshold for the

possible permissibility of third party discharges.

Lower courts in this Circuit analyzing third-party discharges have also used a factor test

articulated in *In re Zenith Elecs. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999).  The factors are:

(1) An identity of interest between the debtor and non-debtor such that a suit against the non-

debtor will deplete the estate's resources; (2) a substantial contribution of assets to the plan by

the non-debtor; (3) the necessity of the injunction to the reorganization to the extent that without

the injunction there is little likelihood of success; (4) an agreement by a substantial majority of

affected classes to support the injunction; and (5) the payment of all, or substantially all, of the

claims of the creditors and interest holders affected by the injunction.  *See Congoleum*, 362 B.R.

at 192 (noting that "courts in this Circuit frequently look to the tests articulated in Zenith"); *In re*

*Genesis Health Ventures, Inc.*, 266 B.R. 591, 607 n. 15 (Bankr. D. Del. 2001) (applying the

---

[11] *See e.g. In re Lowenschuss*, 67 F.3d 1394, 1401(9th Cir. 1995) (holding that third party releases are not permissible); *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 143(2d Cir. 2005) (holding that a third party release should not be approved absent a finding of truly unusual circumstances).

Zenith factor test).  However even the *Zenith* Court held that the third-party exculpations and releases must be approved by the affected creditor(s).  *See Zenith*, 241 B.R. at 111.  ("*This . . . release of third party claims . . . cannot be accomplished without the affirmative agreement of the creditor affected.*") (emphasis added).  Thus, the *Zenith* factors presuppose that the third parties losing their claims have consented.

The factors articulated in *Continental* are the absolute minimum requirement for third-party releases and exculpations, but are not by themselves necessarily sufficient.  In fact, the *Continental* court reserved for another the day, the question of whether, and when, third party releases might ever be approved, implying that even if the requirements expressed in *Continental* are met, it is still not necessarily sufficient for approval; rather, the court held, anything less was definitely not approvable.  *See Continental*, 203 F.3d at 214 (stating that "we need not establish our own rule regarding the conditions under which non-debtor releases and permanent injunctions are appropriate or permissible.  Establishing a rule would provide guidance prospectively, but would be ill advised when we can rule on Plaintiffs' appeal without doing so . . . . we conclude that the provision in the Continental Debtors' plan releasing and permanently enjoining Plaintiffs' lawsuits against the non-Debtor . . . defendants does not pass muster under the most flexible tests for the validity of non-debtor releases.")

The Release Provision in Section 8.8.7 of the Plan is subject to the same requirements even if it purports to be consensual.  *See Congoleum*, 362 B.R. at 194 (holding that "a consensual release cannot be based solely on a vote in favor of a Plan.  For a release to be consensual, the creditor must have unambiguously manifested assent to the release of the non-debtor from liability on its debt. . . . Such unambiguous assent is absent here.  This is an immensely complicated plan and it would be difficult for the layperson to comprehend its details.")  These

releases are not consensual.  Furthermore, these releases are subject to the same test for non-debtor releases in this Circuit.  *See Id.* (applying the *Zenith* factors to the *Congoleum* Creditor Release Provision.)  Finally, the reach of these releases is not limited to matters relating to the Bankruptcy case, but would reach conduct completely unrelated to the bankruptcy, and to conduct that occurred outside the supervision of the bankruptcy court.

Finally, in analyzing the third-party exculpations and releases, each exculpation and release, including as to each party and category, must be analyzed individually and separately. *See In re Adelphia Comm. Corp.,* 368 B.R. 140, 363 (Bankr. S.D.N.Y. 2007) ("its plain that [releases] have to be analyzed individually, as the relevant factors apply to different situations in different ways.")  It is clear that the exculpations and releases provided in the Plan cannot meet fully meet the requirements articulated by the Third Circuit in *Continental*—fairness, consideration, necessity to the reorganization and specific factual findings—nor the non-rigid factor test used by some Delaware bankruptcy courts that includes the *Continental* factors.

       **1.**    ***Grace Does Not Have Pre-Confirmation Indemnification Obligations With Most Of The Third Parties It Seeks To Release And Exculpate And The Estate Is Not Impacted By These Released And Exculpated Claims.***

There is no identity of interest between Grace and all the exculpated parties such that a suit against the third parties will deplete the resources of the estate.  *See In re Congoleum*, 362 B.R. 167, 192 (Bankr. D. N.J. 2007) (whether a suit would "implicat[e] the Debtors is not the focus of the first Zenith test; rather it is whether a suit against the third party would 'deplete assets' of the estate.")  Furthermore, because the non-debtor releases and exculpations are not approved as a matter of right but are rather rarely and infrequently granted and subject to a strict analysis, it is the Plan Proponents' obligation to show which released parties are subject to pre-Plan indemnification agreements, something it failed to do in its Disclosure Statement.

Because the Plan exculpates and releases so many non-debtor parties, including all "agents," of the exculpated and released parties for example, most of these exculpated and released individuals and entities do not have pre-Plan indemnification agreements with Grace. Furthermore, even as to parties that may have pre-Plan indemnification agreements with Grace, the releases and exculpations must be congruent with the indemnified conduct, and the burden is on the Plan Proponents to show this.  And since Grace must justify these exculpations individually as to party and conduct, it must show that every single exculpated and released person, including, amongst others, all agents, lawyers, advisors, financial representatives, various law firms, and asbestos groups, has a pre-existing indemnification agreement with it, and that the exculpations and releases reach only claims subject to Grace's indemnification obligation.

Even more importantly, the Third Circuit in rejecting the third-party discharge in *Continental* stated that:

> we do not dispute that, some day in the future, the reorganized Continental Debtors may face litigation or experience some financial ramification based on liabilities of the [non-debtor released parties] as a result of the indemnity obligation . . . *[h]owever, we cannot accept the District Court's conclusion that a purported identity of interest between the Continental Debtors and the non-debtor [released] defendants . . .  established the necessity of releasing and permanently enjoining Plaintiffs' claims, nor does this identify of interest speak to the fairness of the release and permanent injunction that we construe cases such as Manville, Drexel, or Robbins to require.*

*Id.* at 217 (emphasis added).  Thus, even as to the parties to whom Grace can show an indemnification agreement, that alone does not mean that a release or exculpation is appropriate. For one thing, courts have made clear that this is not a matter of factors or prongs.  *See Master Mortgage Investment Fund, Inc.*, 168 B.R. 930, 935 (Bankr. W. D. Mo. 1994) (holding that no rigid factor test should be applied in every circumstance, but rather a fact specific review, weighing the equities in each case.)  Even more importantly though, the key factors articulated

by the Circuit Court—fairness, consideration, necessity to the reorganization, and specific factual

findings—must be found in order for the releases and exculpations to even be considered, let

alone approved.  *See Continental*, 213 F.3d at 214.  Thus, even as to those released and

exculpated parties that the Debtors purportedly agreed to indemnify, the fact that there is an

indemnification agreement that may or may not require the Reorganized Debtor to pay some

indeterminate amount at some indeterminate point in the future is insufficient to make a

particular exculpation and release, and all the concerns and possibilities of abuse that come along

with it, not to mention the loss of rights by third parties, approvable.

> ### 2.    *The Estate Was Not Given Substantial Assets In Exchange For All Of The Non-Debtor Releases And Exculpations.*

The estate did not receive substantial consideration from most of the persons and entities

exculpated and released.  And insofar as the exculpated and released parties might argue they

gave up rights in exchange for the releases and exculpations, "the give-ups that the parties made

were rights to recover that were subject to fair debate," and they were "merely striking the kinds

of deals that with respect to their shares of the pie that Chapter 11 contemplates."  *Adelphia*, 368

B.R. at 268.  Furthermore, the argument that some of the third-parties "made meaningful

contribution[s] to the reorganization by designing and implementing the operation restructuring

of the companies, and negotiating the financial restructuring with parties in interest" has already

been rejected.  *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 606-7 (Bankr. D. Del. 2001)

(rejecting an expansive definition of "substantial assets" because the third parties "[had] already

been compensated for their contributions, and the management functions they performed do not

constitute contributions of "assets" to the reorganization"); *See Congoleum*, 362 B.R. 167 at 195

(holding that "the Court does not consider the work done by the parties towards confirmation to

be a contribution of assets to the estate.")  This is not a case where even most of the non-debtors

that are exculpated and released gave substantial consideration to the estate. Furthermore, even as to parties that may have given consideration, this does not mean that their exculpation and release is lawful. As the *Continental* court made clear, there are basic requirements which must be met regardless. *See Continental*, 203 F.3d at 214.

3.    ***The Plan Does Not Channel The Released And Exculpated Claims To The Estate, Grace Has Not Created Any Other Mechanism To Provide Full Payment For The Non-Debtor Claims Grace Seeks To Have Released And Exculpated, Nor Has Arrowood Consented To The Loss Of Its Rights.***

The involuntary, third-party releases and exculpations of the non-debtor claims are unfair to Arrowood and the other releasors, especially since no consideration is provided. *Continental Airlines*, 203 F.3d at 215 (rejecting the third-party releases, in part, because "the Continental Airlines Debtors have not disputed Plaintiffs' contention that Plaintiffs received no consideration in exchange for having their lawsuits permanently enjoined. On this basis alone, *Manville*, *Drexel*, and *A.H. Robins* are inapplicable.") *In re Genesis Health Ventures Inc.*, 266 B.R. 591, 607 (Bankr. D. Del. 2001) ("As to the fairness of the releases[,] . . . the issue is whether non-consenting creditors were given reasonable consideration in exchange for the release."); *In re Specialty Equip. Cos.*, 3 F.3d 1043, 1044-45 (7th Cir. 1993) (approving release of non-debtor in a plan that provided for payment-in-full of priority and general unsecured claims); *In re A.H. Robins*, 880 F.2d 694, 697 (4th Cir. 1989) (allowing release of non debtor in a plan that created a fund estimated to pay in full all third parties affected by injunction).

To satisfy the "compensation" requirement, the parties forced to give the releases must receive, in exchange, reasonable consideration. *Continental Airlines*, 203 F.3d at 215. In this case, Arrowood and the other Insurers have been offered no compensation at all from any source under the Plan. Arrowood will thus receive nothing in exchange for the release of claims, much less full compensation under the Plan or a third-party funded pool of assets. *Continental*

*Airlines*, 203 F.3d at 215.  This lack of compensation alone is sufficient to doom the releases, because the Insurers will lose their direct claims against the parties who orchestrated the transactions and their policy defenses will be truncated without receiving reasonable compensation.  This utter failure to compensate Arrowood and the other releasors makes these third-party releases and exculpations plainly unfair and unlawful.

Furthermore, this is not a situation where Arrowood or any of the other insurers have voluntarily agreed to accept a waiver of their claims and defenses in exchange for the benefits of the Plan.  *See Zenith*, 241 B.R. at 111 ("This . . . release of third party claims . . . cannot be accomplished without the affirmative agreement of the creditor affected").  Rather, Arrowood and the other insurers expressly oppose the exculpations and releases set forth in the Plan.  Again, the failure to compensate the insurers or anyone else for their claims and defenses (in the face of their opposition) compels rejecting the releases.  Indeed, this alone means that these releases and exculpations are unlawful under the *Continental* standard.

### 4.      *Grace Offers No Justification For The Non-Debtor Releases and Exculpations, Nor Can It.*

Grace fails to articulate any reason to grant the non-debtor releases.  The Plan and the Disclosure Statement are conspicuously silent.  Such an omission is fatal to the non-debtor releases.  *See Continental Airlines*, 203 F.3d at 214 ("the order confirming the Continental Debtors' plan of reorganization and releasing and permanently enjoining Plaintiffs' claims was not accompanied by any findings that the release was fair to the Plaintiffs and necessary to the Continental Debtors' reorganization.  Without such findings, a release and permanent injunction cannot stand on their merits under any of the standards set forth in the case law of other circuits."); *In re Dow Corning*, 280 F.3d 648, 658 (6th Cir. 2002) ("record produced by the bankruptcy court in this case does not support a finding of 'unusual circumstances' such that we

can endorse enjoining non-consenting creditors' claims against a non-debtor."); *In re Transit Group*, 286 B.R. 811, 821 (Bankr. D. Fla. 2002) (holding that the third-party non-debtor releases and related injunctions for the debtor's current officers and a number of the members of the unsecured creditors' committee were not supported by any factual findings).

5.    ***The Releases And Exculpations Are Unnecessary For The Reorganization***

Courts approving non-consensual releases of lawsuits against non-debtors outside of the scope of § 524(g) have required, in addition to compensation for the rights forsaken, that the plan proponents demonstrate that the releases were necessary to make the plan feasible. *Continental Airlines*, 203 F.3d at 214 (holding that "[t]he hallmarks of permissible non-consensual releases" are "fairness, necessity to the reorganization, and specific factual findings to support these conclusions"); *In re Drexel Burnham Lambert Group*, 960 F.2d 285, 293 (2d Cir. 1992) (requiring a non-debtor release to "play[] an important part in the debtor's reorganization plan" in order to be lawful); *In re Chateaugay Corp.*, 167 B.R. 776, 780-81 (S.D.N.Y. 1994) (bankruptcy court has authority to release claims against non-debtors pursuant to § 105(a), if the discharge is essential to success of the plan); *In re Ionosphere Clubs, Inc.*, 124 B.R. 635, 642 (S.D.N.Y. 1991) (injunction necessary for successful reorganization).

Here, the non-debtor releases and exculpations are granted to a host of claimant lawyers and others who are paying nothing for them.[12]  Many of these releases are purely gratuitous,

---

[12] The co-liable third parties released in *A.H. Robins*, *Drexel Burnham* and *Johns-Manville* contributed hundreds of millions of dollars to the Debtor's reorganization plans to compensate claimants and to make the Debtor's plans feasible.  *In re A.H. Robins Co.*, 880 F.2d 694, 702 (4th Cir. 1989) (third-party insurer contributed assets to claimant fund); *In re Drexel Burnham Lambert Group*, 960 F.2d 285, 289, n.2 (2d Cir. 1992) (allowing a creditor and debtor to pool their rights and collect judgments from the debtor's former officers and director into a $1.3 billion dollar fund); *MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, 90 (2d Cir. 1988) 837 F.2d 89 (2d Cir. 1988), Writ of certiorari denied *MacArthur Co. v. Johns-Manville  Corp.*, 488 U.S. 868, 109 S. Ct. 176, 102 L. Ed. 2d 145, 1988 U.S. LEXIS 3881 (1988) (calling the contributions of non-debtor insurance companies a "cornerstone" of reorganization, where third-party insurers contributed $770 million to a claimant fund).  *See also In re Heron, Burchette, Ruckert & Rothwell*, 148 B.R. 660, 665-66 (Bankr. D.C. 1992) (noting that the plan reorganization was

having been demanded by the claimant lawyers who orchestrated the plan process. Most of the released and exculpated parties did not fund the Plan or make any contribution in exchange for the releases. As a result, not only will certain of the exculpated and released Parties be paid generously for their involvement in the case, but these parties will receive substantial sums if the Plan is confirmed.

Additionally, a purported indemnification obligation simply does not make third-party exculpations and releases "necessary to the reorganization." The Third Circuit in *Continental* has already stated that "even if the . . . [released non-debtor] defendants' obligations . . . were identifiable, the fact that the reorganized Continental Airlines might face an indemnity claim sometime in the future, in some unspecified amount, does not make the release and permanent injunction of Plaintiffs' claims necessary to ensure the success of the Continental Debtors' reorganization." *Id.* at 216.

Furthermore, the argument that the exculpations and releases were necessary to reorganization because the parties might not have made the deal otherwise has already been rejected by courts in this circuit, and others. *See Congoleum*, 362 B.R. at 196 ("to allow this 'but for' justification to be the sole factor in favor of allowing the exculpation would be to set a dangerous precedent."); *Adelphia*, 368 B.R. at 269 ("it would set the law on its head if the parties could get around [the illegality of the releases] by making a third party release a *sine qua non* of their deal, to establish a foundation for an argument that the injunction is essential to the reorganization, or even "an important part" of the reorganization."). Nor can it be said that the possibility of intercreditor bickering is unique. *Id.* at 267. ("many of the large Chapter 11

---

funded almost exclusively by contributions of non-debtors); *In re Monroe Well Serv.*, 80 B.R. 324, 329 (Bankr. E.D. Pa. 1987) (the largest creditor contributed $6.45 million and other creditors paid more Grace $1 million to fund plan)

cases . . . have intercreditor bickering and threats, aimed at each other and at debtor board members and management, that gives the targets of those threats a legitimate fear that they will be sued.  But unfortunately, that can't be said to be unique either.")  And because third-party releases and exculpations cannot be approved unless they are necessary to the reorganization, the third-party exculpations and releases in the Plan cannot be approved as a matter of law.

**B.      The Non-Debtor Releases And Exculpations In The Plan Also Present
          A High Potential For Abuse.**

        Courts have noted that there are at least two reasons why non-debtor release and exculpation provisions are highly problematic, and why they are only allowed in the rarest of cases.  First, the only explicit authorization for non-debtor releases is provided by § 524(g), the application of which is subject to very specific criteria.  And even under the general authority to issue orders necessary to effectuate the code provisions provided by 11 U.S.C. § 105(a),  that section nonetheless does not "create substantive rights that are otherwise unavailable under applicable law."  *Continental*, 203 F.3d at 211 (internal citations omitted). Secondly, a non-debtor release "is a device that lends itself to abuse" and "in effect . . . may operate as a bankruptcy discharge arranged without filing and without the safeguards of the Code."  *In re Metromedia Fiber Network*, 16 F.3d 136, 143 (2d Cir. 2005).  Here, Grace has sought to exculpate and release conduct that was completely unsupervised by the court.  It spent years negotiating a multi-million dollar deal with numerous parties.  In the Plan it seeks to exculpate and release dozens of categories of persons for all their conduct having anything to do with itself, these negotiations, the Plan, the Chapter 11 case, or the creation and operation of the Asbestos PI Trust.  They are essentially seeking and providing a get-out-of-court-free card, immunizing non-debtor conduct from legal scrutiny, and taking away the rights of other persons to redress their

injuries.  The exculpations and releases in the Plan thus pose a great threat of possible abuse, and indeed, as one court worded it, these releases and exculpations "lend themselves to abuse."  *Id.*

Furthermore, "the potential for abuse is heightened when releases afford blanket immunity."  *Id.*  Here the releases and exculpations reach almost every type of legal wrongdoing imaginable.  Section 11.9, for example, limits all liability, except for two specific exceptions, for anything relating to, *inter alia*, the negotiations, the bankruptcy, and the creation and management of the trust.  The blanket use of the term "all liability" indicates the breadth of the exculpation provision, and only heightens the already existing potential for abuse that is inherent in third party exculpations and releases.  And releases and exculpations for pre-petition conduct such as the years of negotiation before Grace filed bankruptcy create much more potential for abuse.  *See Adelphia*, 368 B.R. at 267 ("plainly there is less potential for abuse if only postposition events are covered.")  The breadth and temporal duration of the Plan's non-debtor exculpations and releases create the highest potential for abuse and implicates all the concerns courts have had with these provisions.

**C.      By Releasing And Exculpating Lawyers Even From Their Own Clients, The Releases And Exculpations In The Plan Are Against Public Policy And Ethical Norms.**

The non-debtor release and exculpation provisions include all "representatives" of all the exculpated and released parties.  One of the categories of representatives are the "lawyers" for all the other exculpated and released parties and entities, including the lawyers for all the asbestos claimants committees, the future representatives committee, and all the other entities listed above.  Section 11.9, for example, exculpates these lawyers from nearly all liability (except gross negligence as opposed to regular negligence, as well as willful misconduct) arising out of the Chapter 11 case, including the years of unsupervised negotiations, for any Claims relating to the Chapter 11 case, and during the years during which the trust would be operating.  The

exculpation provision does not include a carve-out for clients; rather, it extends to prevent clients from suing their own lawyers under many of the causes of action that might be available to them, including a malpractice claim based on something less than "gross negligence".

The Plan, in effect, contains a waiver of liability that prevents clients from suing their own lawyers, and does so, not through an explicit agreement with the client, but through a tiny provision hidden in a complex and verbose Plan.  Such provisions, if accepted, would be a violation of ethical norms in our profession. And even if no code discusses the exact scenario existing here, that is, a waiver of liability pushed through via a reorganization Plan, the general ethical principles found in Professional Responsibility codes clearly indicate that these kinds of actions are unethical.  *See* ABA Model Code of Professional Responsibility DR 6-102(A) (a lawyer "shall not attempt to exonerate himself from or limit his liability to his client for professional malpractice."); ABA Model Rules of Professional Conduct Rule 1.8(h) (prohibits lawyers from making an agreement prospectively limiting the lawyer's liability to a client for malpractice unless the client has independent, and separate, representation in making that agreement; and it prohibits lawyers from settling a claim or potential claim for malpractice unless the lawyer advises the client in writing that it is desirable to seek independent representation and gives the person a reasonable opportunity to do so).

Furthermore, Section 11.9 creates a grave risk of abuse, because the lawyers operating the trust, or having other involvement in the case now or later, will know that they cannot be sued for any basic negligence.  A reorganization plan that removes this deterrent, and operates to waive retrospective and prospective liability of lawyers to their clients, is a plan that cannot be confirmed.

**D.      The Releases And Exculpations Are Not Limited to Liability
          Derivative of the Debtors.**

As discussed above, in *Combustion Engineering*, the Third Circuit made clear that any

injunction against third-party claims in a § 524(g) case would have to comply with the

limitations of that section, including that the injunction bar only claims for liability that is

derivative of the debtors.  *See Combustion Engineering* 391 F.3d at 228 (holding that "as both

the plain language of the statute and its legislative history make clear, § 524(g) provides no

specific authority to extend a channeling injunction to include third party actions against non-

debtors where the liability alleged is not derivative of the debtor." ); The third-party injunctions

approved by the courts outside of the Third Circuit have typically likewise involved derivative

liability, and not direct liability as proposed by the Plan in this case.  *See, e.g. Johns Mansville*,

517 F.3d at 68 ("the application of channeling injunction to enjoin actions against third parties is

limited to situations where a third party has derivative liability for the claims against the

debtor.") (internal citations omitted.); *A.H. Robins Co.,* 880 F.2d at 702 (third party insurer

contributed assets to claimant fund); *Drexel Burnham*, 960 F.2d at 289, n.2 (allowing a creditor

and debtor to pool their rights and collect judgments from the debtor's former officers and

director into a $1.3 billion dollar fund); *MacArthur Co.*, 837 F.2d at 90 (third party insurer

contributed $770 million to a claimant fund to resolve its own claims).  In *A. H. Robins*, *Drexel

Burnham*, the insurance companies were allowed to make a cash contribution to a plan trust in

order to settle their derivative liability on claims against the debtor.  In essence, the litigation

against such third parties is an adjunct to the direct claims against the debtor.  When Congress

codified these cases through the passage of § 524(g), it kept this requirement.  Only claims in

which non-debtors are "alleged to be directly or indirectly liable for the conduct of, claims

against, or demands on the debtor" may be released.  11 U.S.C. § 524(g)(4)(A)(ii).

*         *         *

Courts in this Circuit and District have refused to impose nonconsensual third-party exculpation and releases, such as the ones proposed in the Plan.  Arrowood, other insurers and creditors, have not consented to the release and exculpation of their claims against non-debtor third parties.  Nor did Grace give even the claimants a chance to reject the releases, as the ballots distributed by the Debtor's did not contain this option, absent rejecting the entire Plan. These are truly involuntary exculpations and releases as to Arrowood, the other insurers and creditors generally.

## POINT IV

### THE CHANNELING INJUNCTION IMPAIRS ARROWOOD'S RIGHTS AND INTERESTS BY CHANNELING ITS CLAIMS TO AN IMPAIRED CLASS

In addition to the non-consensual releases of non-debtors to be imposed on Arrowood and the other insurers, the Plan Proponents also seek an injunction that purports to cut-off the contractual and common law rights of contribution, subrogation and reimbursement that Arrowood and the other insurers hold against other non-debtor insurers.  The terms of the injunction incorporated in the Plan have a direct monetary impact on Arrowood's rights and interest, and provide a further basis for Arrowood's standing to be heard with regard to confirmation of the Plan.  In another asbestos bankruptcy case, *In re Thorpe Insulation Co.*, the district court recently held that "the actual issuance of a Section 524(g) injunction covering [third parties] could impact [insurers]" and that insurers could "challenge a Section 524(g) injunction that barred their claims against a party covered under the injunction as the injunction would detrimentally affect [insurers'] rights against the [third parties]."[13]

---

[13]  *See* Ex. D, *In re Thorpe Insulation Co.*, No. CV 08-3711 (DSF), Doc. No. 39 (C.D. Cal. Oct. 8, 2008).

Even if a non-settling insurer is held to have valid defenses to coverage, and thus no (or reduced) liability to the Trust, it may still have a right to contribution from Grace, settling Asbestos Insurance Entities or Post-Confirmation Settling Asbestos Insurance Entities for costs incurred in defending against Grace and the Asbestos PI Trust's claims for coverage. Thus, Arrowood has rights to contribution, subrogation and reimbursement against the non-debtor parties that the Plan Proponents have made subject to the Asbestos PI Channeling Injunction. Moreover, Arrowood's rights to defense from other non-debtors cannot be left unimpaired by set-off or judgment reduction.

Thus, by channeling these claims to the Trust and then classifying them as Class 6 claims, the Plan impairs Arrowood's rights and interests.

## POINT V

### THE BREADTH OF THE RELEASES, EXCULPATIONS AND INJUNCTION, VIEWED IN THE CONTEXT OF THE REORGANIZATION AND COVERAGE ACTION TOGETHER, VIOLATE THE BANKRUPTCY CODE'S GOOD FAITH REQUIREMENT

When viewed in the context of the reorganization and coverage action, and how the various Plan provisions that implicate both work together, the good faith of the Plan is called into question. Because of this, "any attempt to segregate one confirmation issue" from other objections "is both doomed to failure and unlikely to meet constitutional muster." *In re Congoleum Corp.*, Case No. 03-51524, Tr. at 14 (Bankr. D.N.J. March 26, 2008). This court has held that "The good faith standard requires that the plan be 'proposed with honesty, good intentions and a basis for expecting that a reorganization can be effected with results consistent with the objectives and purposes of the Bankruptcy' Code." *See Zenith*, 241 B.R. at 107. Furthermore, "[i]n evaluating the totality of circumstances surrounding a plan, a court has considerable judicial discretion in finding good faith, with the most important feature being an

inquiry into the fundamental fairness of the plan." *See In re Coram Healthcare Inc.*, 271 B.R. 228, 234 (Bankr. D. Del. 2001) (internal citations omitted).

While the Debtors envision getting a full release from all asbestos liability, they also build into the Plan a number of provisions that purport to release all of the representatives, as well as the very attorneys for the asbestos claimants who hatched the Plan and will receive millions of dollars as a result of its confirmation.  By attempting to rush to confirmation *before* a State Court trial, the Plan Proponents also seek to secure full releases for themselves and everyone else involved before the claims and defenses of Arrowood, and the other insurers can be adjudicated.  As a result, Arrowood and the other insurers may be left with their claims eliminated, while the Debtors, their representatives, and the claimants' counsel, amongst many others, could walk away with full releases from any liability.  Gaining a tactical advantage in separate litigation is not a plan objective sanctioned by the Code.

The result that the exculpations, releases and channeling injunction seek to achieve—without even providing fair consideration to those whose claims are eradicated in the process—is plainly inconsistent with the objectives and purposes of the Bankruptcy Code.  It is therefore contrary to 11 U.S.C. § 1129(a)(3) and demonstrates a lack of fundamental fairness.  *In re Koelbl*, 751 F.2d 137,139 (2d Cir. 1984) (analyzing §1129(a)(3) and stating that "[t]his court has defined the good faith standard in the bankruptcy context as requiring a showing that the plan was proposed with honesty and good intentions. . . [and] good faith has been found to be lacking if the plan was proposed for ulterior motives.") (internal citations omitted); *In re Elsinore Shore Assocs.*, 91 B.R. 238, 260 (Bankr. D.N.J. 1988) (holding that in "the context of reorganization under Chapter 11, a plan is proposed in good faith if there is a reasonable likelihood that the plan will achieve a result consistent with the standards prescribed under the Code."); *Mercury Capital*

*Corp. v. Milford Conn. Assocs., L.P.*, 354 B.R. 1, 7 (D. Conn. 2006) (holding that "[a] plan must be proposed in good faith. . . . [and] good faith is generally interpreted to mean that there exists a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code.") (internal citations omitted); *In re Stolrow's Inc.,* 84 B.R. 167, 172 (B.A.P. 9th Cir. 1988) ("[g]ood faith requires a fundamental fairness in dealing with one's creditors"); *see also In re Metropolitan Realty Corp.*, 433 F.2d 676, 678 (5th Cir. 1970) ("[g]ood faith implies an honest intent and genuine desire on the part of the petitioner to use the statutory process to effect a plan of reorganization and not merely as a device to serve some sinister or unworthy purpose").

**CONCLUSION**

For all the reasons stated above, Arrowood respectfully requests that this court find that Arrowood has a right to be heard at Phase II.  The Plan impairs Arrowood's rights and is uncomfirmable as a matter of law.[14]

[remainder of page left blank]

---

[14]  Because the Plan Proponents were uncooperative in responding to Arrowood's Interrogatories and Document Requests relating these particular issues, Arrowood has had to limit itself to the Plan documents and other sources in undertaking its analysis of these provisions.  This memorandum of law, therefore, is based on the terms of the Plan itself and such information as Arrowood has been able to obtain through other sources.  Yet even without the benefit of adequate discovery and co-operation from the Plan Proponents on these issues, it is abundantly clear that they fail to pass muster under the standards set forth in this or any other circuit.

Dated: June 1, 2009
        Wilmington, Delaware

By:    /s/ Garvan F. McDaniel
       Garvan F. McDaniel, Esq. (#4167)
       BIFFERATO GENTILOTTI LLC
       800 N. King Street, Plaza Level
       Wilmington, DE  19801
       (302) 429-1900 Phone
       (302) 429-8600 Fax

       -and-

       Carl J. Pernicone, Esq.
       WILSON, ELSER, MOSKOWITZ
       EDELMAN & DICKER, LLP
       150 East 42nd Street
       New York, NY 10017-5639
       Telephone: (212) 490-3000

       -and-

       Tancred Schiavoni, Esq.
       Gary Svirsky, Esq.
       O'MELVENY & MYERS LLP
       7 Times Square
       New York, New York
       (212) 326-2267

       *Counsel to Arrowood Indemnity*
       *Company, f/k/a Royal Indemnity Company*