**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | Chapter 11 |
| W.R. GRACE & CO., *et al.*, | Case No. 01-01139 (JKF) |
| Debtors. | Jointly Administered |
|  | Related Docket Nos. 19581, 19620 |

**ARROWOOD'S PHASE I TRIAL BRIEF OBJECTING TO THE**
**PLAN PROPONENTS' FIRST AMENDED JOINT PLAN OF REORGANIZATION**

BIFFERATO GENTILOTTI LLC
Garvan F. McDaniel (#4167)
800 King Street, Plaza Level
Wilmington, DE 19801
(302) 429-1900

WILSON ELSER MOSKOWITZ
EDELMAN & DICKER LLP
Carl J. Pernicone (*pro hac vice*)
150 East 42nd Street
New York, NY 10017-5639

O'MELVENY & MYERS LLP
Tancred V. Schiavoni (*pro hac vice*)
Gary Svirsky (*pro hac vice*)
Times Square Tower
7 Times Square
New York, New York 10036

*Attorneys for Arrowood Indemnity Company*
*f/k/a Royal Indemnity Company*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................................ 1

POINTS TO BE SHOWN AT CONFIRMATION HEARING ................................................ 12

1.    The Plan Impairs Arrowood Rights and Interests and Is Not
      "Insurance Neutral" as to Arrowood.................................................... 19

2.    The Plan is unconfirmable to the extent it treats Arrowood's claims
      differently than other similarly situated claims .................................... 27

3.    The Plan is unconfirmable to the extent that it purports to upgrade Grace's
      bargained-for exchange in the 1995 Settlement Agreement................................ 29

4.    The Plan is unconfirmable to the extent that it purports to assign rights
      that Grace does not have...................................................................... 32

5.    The Plan is unconfirmable to the extent that it seeks to fund the trust
      by breaching the Settlement Agreement ............................................... 33

6.    The Plan is unconfirmable to the extent that the broad exculpation sought
      in the Plan violates applicable law ....................................................... 35

7.    The Plan Does Not Satisfy The Requirements Of § 524(g)................................ 35

8     The Plan Does Not Meet The Confirmation Requirements Of § 1129(a) ........... 34

9.    The Plan is unconfirmable to the extent that it was not proposed
      in good faith ...................................................................................... 35

10.   The Plan is unconfirmable to the extent that it is not fundamentally fair ............ 36

11.   The Plan is unconfirmable to the extent that it is financially infeasible .................

12.   The Plan is unconfirmable to the extent that Class 9 (General Unsecured)
      claims are incorrectly designated as not impaired ............................... 37

13.   The Plan is unconfirmable to the extent that it violates the absolute
      priority rule and the "fair and equitable" requirement of Section 1129(b). ......... 37

RESERVATION OF RIGHTS .......................................................................................... 38

CONCLUSION.............................................................................................................. 39

# CASES

*ACandS, Inc. v. Aetna Cas. & Sur. Co.,*
  764 F.2d 968 (3d Cir. 1985) ............................................................................... 25

*Alaska v. U.S. Dep't of Transp.,*
  868 F.2d 441 (D.C. Cir. 1989) .............................................................................. 7

*In re Amatex Corp.,*
  107 B.R. 856 (E.D. Pa. 1989) .................................................................. 2, 6, 8, 25

*American United Mutual Life Ins. Co. v. City of Avon Park,*
  311 U.S. 138 (1940) ........................................................................................... 30

*Baron & Budd, P. C. v. Unsecured Asbestos Claimants Comm.,*
  321 B.R. 147 (D.N.J. 2005) ...................................................................... 4, 6, 13

*Beard v. Braunstein,*
  914 F.2d 434 (3rd Cir. 1990) ............................................................................. 17

*Begier v. IRS,*
  496 U.S. 53 (1990) ............................................................................................. 21

*Bowman v. Wilson,*
  672 F.2d 1145 (3d Cir. 1982) .............................................................................. 2

*Brown v. General Motors Corp.,*
  152 B.R. 935 (W.D. Wis. 1993) ......................................................................... 29

*Butner v. United States,*
  440 U.S. 48 (1979) .............................................................................. 14, 24, 26

*City of Covington v. Covington Landing Ltd. Partnership,*
  71 F.3d 1221 (6th Cir. 1995) ............................................................................. 24

*Clinton v. New York,*
  524 U.S. 417 (1998) ...................................................................................... 5, 14

*Columbia Cas. Co. v. Fed. Press Co. (In re Fed. Press Co.),*
  104 B.R. 56
  (Bankr. N.D. Ind. 1989) ..................................................................................... 25

*Danvers Motor Co. v. Ford Motor Co.,*
  432 F.3d 286 (3d Cir. 2005) ............................................................................. 2, 7

*Federal Mogul Global, Inc., et al.,*
  Case No. 01-10578,
  (Bankr. D. Del.) (confirmed November 8, 2007) ............................................... 19

*First Fidelity Bank v. McAteer*,
    985 F.2d 114 (3d Cir. 1993) ...................................................................... 26

*Friends of the Earth*,
    528 U.S. at 185 ....................................................................................... 6

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
    528 U.S. 167 (2000) ................................................................................. 2

*General Instrument Corp. of Del. v. Nu-Tek Elecs. & Mfg.*,
    197 F.3d 83 (3d Cir. 1999) ....................................................................... 6

*IBA, Inc. v. Hoyt (In re Hoyt)*,
    326 B.R. 13 (Bankr. W.D.N.Y. 2005) ....................................................... 26

*In re Armstrong World Indus.*,
    432 F.3d 507 (3d Cir. Del. 2005) .............................................................. 32

*In re Bolin Oil Co.*,
    51 B.R. 936 (Bankr. N.D. Ohio 1985) ....................................................... 25

*In re Bush Indus., Inc.*,
    315 B.R. 292 (Bankr. W.D.N.Y. 2004) ................................................. 23, 24

*In re Combustion Engineering*,
    *391 F.3d at 214 & n.20* ................................................... 4, 12, 13, 21

*In re Congoleum Corp.*,
    426 F.3d 675 (3d. Cir. 2005) ............................................................. 4, 12

*In re Coram Healthcare Corp.*,
    271 B.R. 228 (Bankr. D. Del. 2001) ......................................................... 29

*In re Crippin*,
    877 F.2d 594 (7th Cir. 1989) ................................................................... 24

*In re Dapontes*,
    364 B.R. 866 (Bankr. D. Conn. 2007) ...................................................... 27

*In re EES Lambert Assocs.*,
    62 B.R. 328 (Bankr. N.D. Ill. 1986) ......................................................... 24

*In re Fantastic Homes Enters., Inc.*,
    44 B.R. 999 (M.D. Fla. 1984) .................................................................. 20

*In re Heaven Sent, Ltd.*,
    50 B.R. 636 (Bankr. E.D. Pa. 1985) ......................................................... 25

C:\Local Data\omm16098\Temp\#1781059 v3 - Grace Trial
Brief v3.doc
                                            -iii-

*In re Hoffinger Indus.*,
   321 B.R. 498 (Bankr. E.D. Ark. 2005) ................................................................... 20

*In re Ingleside Associates*,
   136 B.R. 955 (Bankr. E.D. Pa. 1992) ............................................................. 27, 28

*In re Italian Cook Oil Corp.*,
   190 F.2d 994 (3d Cir. 1951) .................................................................................. 24

*In re Jersey City Med. Ctr.*,
   817 F.2d 1055 (3d Cir. 1987) .......................................................................... 20, 30

*In re Jones*,
   179 B.R. 450 (Bankr. E.D. Pa. 1995) ............................................................. 25, 26

*In re Joshua Slocum Ltd.*,
   922 F.2d 1081 (9th Cir. 1990) .............................................................................. 24

*In re Kelley*,
   58 B.R. 927 (Bankr. D. Del. 1986) ....................................................................... 26

*In re Koelbl*,
   751 F.2d 137 (2d Cir. 1984) ................................................................................. 23

*In re Manor Place Dev. Assocs., L.P.*,
   144 B.R. at 686 ..................................................................................................... 24

*In re Marin Motor Oil, Inc.*,
   689 F.2d 445 (3d Cir. 1982) ................................................................................... 6

*In re McKay*,
   732 F.2d 44 (3d. Cir. 1984) ................................................................................... 17

*In re Pegasus Agency, Inc.*,
   101 F.3d 882 (2d Cir. 1996) ................................................................................. 31

*In re PPI Enters.*,
   228 B.R. 339 (Bankr. D. Del. 1998) ..................................................................... 31

*In re Safety-Kleen Corp.*,
   380 B.R. 716 (Bankr. D. Del. 2008) ..................................................................... 20

*In re Silberkraus*,
   253 B.R. 890 (Bankr. C.D. Cal. 2000) .................................................................. 29

*In re Szostek*,
   886 F.2d *1405* (3d Cir. 1989) ............................................................................... 1

*Integrated Solutions, Inc. v. Service Support Specialties, Inc.,*
    124 F.3d 487 (3d Cir. 1997) ........................................................................ 15, 19, 26

*Mack Trucks,*
    372 F.2d at 22-23 ............................................................................................. 28

*Maryland Casualty Co. v. W. R. Grace & Co., et al.,*
    83 Civ.7451 (SWK) ...................................................................................... 9, 12, 27

*Mayer* v. *Hellman,*
    91 U.S. 496 (1875) ............................................................................................ 21

*Medtronic Ave., Inc. v. Advanced Cardiovascular Sys., Inc.,*
    247 F.3d 44 (3d Cir. 2001) ................................................................................ 24

*Nathanson* v. *N. L. R. B.,*
    344 U.S. 25 (1952) ............................................................................................ 21

*NLRB v. Bildisco and Bildisco,*
    465 U.S. 513 (1984) .......................................................................................... 24

*Sampsell* v. *Imperial Paper* & *Color Corp.,*
    3 13 U.S. 21 5 (1941) ........................................................................................ 21

*Whitmore v. Arkansas,*
    495 U.S. 149 (1990) ........................................................................................... 7

*Zartman v. First Nat'l Bank of Waterloo*, N.Y.,
    216 U.S. 1324 (1910) .................................................................................... 14, 24

**STATUTES**

11 U.S.C. § 524 .................................................................................................... 29

11 U.S.C. § 524(a)(1) .......................................................................................... 29

11 U.S.C. § 524(a)(2) .......................................................................................... 29

11 U.S.C. § 524(e) .......................................................................................... 23, 28

11 U.S.C. § 524(g) .............................................................................. 16, 20, 21, 26, 33

11 U.S.C. § 101(5) ............................................................................................... 29

11 U.S.C. § 101(12) ............................................................................................. 29

11 U.S.C. § 1109(b) ...................................................................................... 2, 4, 6, 13

11 U.S.C. § 1122 ............................................................................................. 20, 22

11 U.S.C. §1122(a) ................................................................................................ 20

11 U.S.C. § 1123(a)(4) ...................................................................................... 20, 22

11 U.S.C. § 1124(1) ............................................................................................. 31

11 U.S.C. § 1128 ............................................................................................... 4, 13

11 U.S.C. § 1128(b) .............................................................................................. 2

11 U.S.C. § 1129(a) .......................................................................................... 12, 22

11 U.S.C. § 1129(a)(1) ............................................................................. 9, 20, 22, 26

11 U.S.C. § 1129(a)(3) ................................................................................... passim

11 U.S.C. § 1129(a)(11) ........................................................................................ 31

11 U.S.C. § 1129(b) .............................................................................................. 32

11 *U.S.C. § 1141* ........................................................................................ 1, 23, 29

11 U.S.C. § 1141(d) .............................................................................................. 29

## OTHER AUTHORITIES

7 COLLIER ON BANKRUPTCY §1129.03 (15th ed. rev.) .............................................. 27

In accordance with the Case Management Order, Arrowood[1] respectfully submits this Phase I Trial Brief related to the Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (the "Plan") of W.R. Grace & Co., *et al.* (the "Debtors"), the Official Committee of Asbestos Personal Injury Claimants, the Asbestos PI Future Claimants' Representative, and the Official Committee of Equity Security Holders dated as of February 27, 2009 (collectively the "Plan Proponents")

## PRELIMINARY STATEMENT

The Plan Proponents seek to avoid this Court's consideration of the merits by challenging the insurers' standing to object to Plan confirmation.  The Plan Proponents are wrong—the insurers have standing—but the Plan Proponents' whole argument is a red herring.  Unlike civil litigation, where the court need not review the legality of challenged conduct if the plaintiff lacks standing, a Chapter 11 debtor petitioning the bankruptcy court seeks to reorganize its assets and liabilities with binding effect against the world.  *See* 11 *U.S.C. § 1141*.  Congress therefore required that the court independently determine the plan complies with the Bankruptcy Code before confirming it, even if no party objects. 11 U.S.C. § 1129(a) ("The court shall confirm a plan *only* if all of the following requirements are met" (emphasis added)); *In re Szostek,* 886 F.2d *1405, 1414* (3d Cir. 1989) (court must "examine a plan for compliance with the code even though no objections by creditors were made").  Thus, even if this Court were to hold the insurers lacked standing, it could still not ignore the arguments advanced by the insurers that the Plan is unconfirmable. Accordingly, the Court need not address standing in order to decide whether the Plan is confirmable.

The court, however, should allow the insurers to be heard in the Phase II confirmation

---

[1] Arrowood Indemnity Company, f/k/a Royal Indemnity Company ("Arrowood")

-1-

hearing.  The Plan Proponents' persistent efforts to shut the courthouse door on the insurers that are expected to fund the Debtors' Plan have been properly rejected by the other bankruptcy court in rulings by Judge Chesler, Judge McCoullough in the Skinner bankruptcy where he denied confirmation and converted the case to a Chapter 7 liquidation and the Third Circuit generally.

Standing under Article III simply requires that a party be threatened with an injury-in-fact to a judicially cognizable interest, fairly traceable to the challenged action, that can be redressed by a favorable decision. *See, e.g., Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 180–81 (2000).

The Bankruptcy Code itself grants standing to any "party in interest," who may appear and be heard on any issue," 11 U.S.C. § 1109(b), and "may object to confirmation of a plan," *id.* § 1128(b) ) ). The Third Circuit has interpreted the term "party in interest" liberally, to apply to anyone "hav[ing] a practical stake in the outcome of the proceedings," including anyone with a financial or legal interest affected by the proceedings. *In re Amatex Corp., 755* F.2d 1034, 1041–42 (3d Cir. 1985).

Neither standard is difficult to satisfy.  "Injury-in-fact is not Mount Everest." *Danvers Motor Co. v. Ford Motor Co.,* 432 F.3d 286, 294 (3d Cir. 2005). "The contours of the injury-in-fact requirement, while not precisely defined, are very generous," requiring only "some specific, `identifiable trifle' of injury." *Id.* (quoting *Bowman v. Wilson,* 672 F.2d 1145, 1151 (3d Cir. 1982)). Similarly, the Bankruptcy Code's term "party in interest" is a "broad, flexible" and "elastic concept" designed to permit anyone affected by a bankruptcy "the absolute right to be heard." *Amatex, 755* F.2d at 1042.

Bankruptcy courts have correctly applied these standards to hold that insurers have standing to object to confirmation of a Plan, if it in any way threatens harm to the insurers' financial and contractual interests.

As an initial matter, the Plan Proponents start from the wrong premise: contrary to their contentions, Arrowood and various other insurers are creditors. Arrowood has a proof of claim on file that has not been opposed, as do other insurers. Moreover, Arrowood has an ongoing contractual relationship with the Debtor.[2]

Even if Arrowood were not a creditor, it would have standing to be heard in opposition to confirmation. The Plan will dramatically affect Arrowood because it is a source of the Plan's funding.  Arrowood will be asked to pay asbestos claims that it will not be allowed to defend in the tort system, where Grace previously cooperated with its insurers under the insurance policies in order to limit its asbestos liability.  The Plan will instead establish a new process for resolving claims, in which the exclusive right to contest and settle claims will pass to the trust, Plan § 7.2, which will be run by a trustee selected and overseen by plaintiff lawyer.  Moreover, the trust will then determine claims according to lax "trust distribution procedures" ("TDP"), which were negotiated without insurer participation by the ACC, and which contain weak medical and exposure standards.

Not surprisingly under these circumstances, bankruptcy courts, the district courts and the Third Circuit repeatedly held that insurers have standing to object to the Plan Proponents' scheme.  Judge Chesler, for example, readily agreed in Congoleum that the "Insurers' stake in plan confirmation . . . cannot be seriously challenged." *Baron & Budd, P. C. v. Unsecured Asbestos Claimants Comm.,* 321 B.R. 147, 160 (D.N.J. 2005),  Observing that "parties with potential responsibility to pay claims against debtors regularly have standing to participate in

---

[2] The Debtors vigorously argued that the many of the claims for which the Claimants would obtain recovery under their Trust Distribution Procedures were not compensable in the tort system. After making detailed and extensive judicial and other representations in this regard, the Debtors abandoned its position and adopted the claimants TPDs after a deal was struck that allowed the Debtors to retain various assets. To the extent Grace has knowingly adopted criteria that authorizes payment of invalid claims to the insurers for payment, the insurers have claims against Grace for their attorneys' fees and other damages.

bankruptcy cases," Judge Chesler held that the "Insurers' standing is appropriate with respect to plan confirmation, at minimum, because the plan is not insurance neutral: The principal source of funding for the Plan Trust (and distributions to asbestos claimants) is insurance proceeds." *Id.* at 158–5.

The Plan Proponents now trumpet their addition of words to the Plan declaring it "insurance neutral" (Plan § 7.15), but saying it does not make it so. In this regard, the Plan Proponents' reliance on *Combustion Engineering—which* the Third Circuit held to be no bar to the insurers' standing in *In re Congoleum Corp.,* 426 F.3d 675, 685 (3d. Cir. 2005)—is misplaced. There, the Third Circuit merely held that language in the *Combustion* plan preserving the insurers' pre-petition rights was sufficient, on the facts of that case, to limit the insurers' standing *to appeal.* 391 F.3d at 217. But standing to appeal bankruptcy orders is restricted to "persons aggrieved," which is a "prudential standing limitation" on "bankruptcy *appellate* standing" that is "more restrictive than Article III standing" and the "`party in interest' standard" under §§ 1109(b) and 1128) )—principles which, by "contrast[]," have been "construed to create a broad right of participation in Chapter 11 cases" affording "broad standing at the trial level." *Id.* at 214, 215, 217 (emphasis added). Nothing in *Combustion Engineering* holds that the "neutrality" language in that case provides any basis to deny insurers standing in the *bankruptcy court.*[3]

In addition, while the "neutrality" provision in Grace's Plan includes some of the language employed in the plan in *Combustion Engineering,* that decision relied on specific findings that the plan in that case did not change the way in which asbestos claims were resolved

---

[3] Nor does *Combustion Engineering* limit the insurers' standing to be heard in this Court, since the "persons aggrieved" standard only restricts appellate "[s]tanding to appeal . . . an order," 391 F.3d at 214 & n.20 (emphasis added), and the parties appealing here are the Plan Proponents, not the insurers. See *Baron & Budd,* 321 B.R. at 160 n.4 ("The `persons aggrieved' standard does not apply to parties such as Appellee Insurers, who seek to defend a favorable ruling on appeal—these parties need not meet standing requirements.").

prior to bankruptcy. *See id.* at 209, 217.  Not so here.  The Plan strips the insurers of their contractual rights to defend claims they are now asked to pay. As Judge Chesler and other bankruptcy judges have recognized, a Plan's "neutrality" language merely preserving the ability to raise defenses to coverage, *after a* potential billion-dollar bill is presented to the insurers as *a fait accompli,* does not put the insurers in the same position they would enjoy if they were able to defend against the claims in the first instance, with resort to discovery and the protections of the tort system to investigate the underlying merits of those claims. *See Baron & Budd,* 321 B.R. at 159. That harm gives the insurers a practical stake in the Plan sufficient for standing, even if the threat of financial loss for the liability Grace would have committed to under the Plan was contingent on the outcome of subsequent coverage litigation. *See, e.g., Clinton v. New York,* 524 U.S. 417, 430—31 (1998) (plaintiff had standing to challenge President's use of line-item veto to revive a contingent liability, even though plaintiff's pecuniary loss would not occur unless it lost a separate proceeding disputing that liability).

Moreover, the Plan Proponents carefully drafted the Plan's "neutrality" provision in this case to permit Grace and the trust to use the bankruptcy court's findings against the insurers in the Coverage Action.  For all their protestations about the Plan's supposed "insurance neutrality," the Plan Proponents assiduously refused, despite repeated requests, to include language barring Grace and the trust from using in coverage litigation the bankruptcy court's findings, were it to confirm the Plan.  In this light, the insurers' stake in confirmation was palpable.  Nothing now stops claimants' lawyers from asking the bankruptcy court to find that the Plan and TDP are "fair," "reasonable" and in "good faith," all with a view to using that judicial stamp of approval as evidence in a Coverage Action that the insurers owed coverage for the resulting liability. The insurers have a practical stake in seeing that the Plan-confirmation proceedings are not so misused to tilt the playing field in the Coverage Action against the insurers.

The bankruptcy court likewise properly should properly reject the Plan Proponents' argument that the insurers' standing to be heard could be confined to a single issue concerning the Plan's purported preemption of their rights.  Article III focuses on whether the litigant is threatened with an *injury* that could be redressed by denial of the challenged *relief* (confirmation of the Plan), not on the particular *arguments* the litigant makes to oppose that relief. *See Friends of the Earth,* 528 U.S. at 185 (standing must be shown "separately for each form of relief sought" and not for each ground on which that relief is sought).  And Congress has abrogated any prudential limitations on standing in Chapter 11 cases, specifically providing that a party in interest may be heard on "any issue." 11 U.S .C. § 1109(b); *General Instrument Corp. of Del. v. Nu-Tek Elecs. & Mfg.,* 197 F.3d 83, 87 (3d Cir. 1999) ("Where Congress has expressly conferred standing by statute, prudential standing concerns are superseded.") The Third Circuit has therefore interpreted section 1109(b)'s "sweeping language" to provide an "unqualified," "broad" and "absolute right to appear and be heard" on "all matters" in a Chapter 11 case. *See In re Marin Motor Oil, Inc.,* 689 F.2d 445, 451–53 (3d Cir. 1982); *id.* at 453–55 (endorsing decisions holding that "Congress intended section 1109(b) to carry forward an absolute right to be heard on any issue arising in a chapter 11 reorganization," "without limitation on the types of issues"); *Amatex,* 755 F.2d at 1042 (§ 1109(b) affords "absolute right to be heard").

Accordingly, as Judge Chesler has held, because the "Insurers' stake in plan confirmation includes a stake in the fundamental fairness of the Plan," they are "parties-in-interest under § 1109(b) with respect to plan confirmation," entitled to be heard on "all issues" affecting the "outcome of the proceeding." *Baron & Budd,* 321 B.R. at 158—62.

Finally, the Plan Proponents' argument that insurers lack standing because the Bankruptcy Code purportedly preempts their contractual rights to control the defense and settlement of claims proves just the opposite.  If the insurers can be deprived of their rights by

preemption, they are, by definition, being harmed, giving them standing to be heard. *Danvers,* 432 F.3d at 293.  Whether those rights may be *lawfully* deprived under preemption principles is a question on the *merits.* But standing is a "threshold inquiry" of harm that "in no way depends on the merits." *Whitmore v. Arkansas,* 495 U.S. 149, 155 (1990) (citation omitted).  And the Plan indisputably seeks to impair the insurers' rights: it provides that the assignment of Grace's insurance rights to the trust  notwithstanding any anti-assignment provision under the policies requiring the insurers' consent to assignment, and it grants the trust the exclusive right to defend and settle asbestos claims, notwithstanding cooperation provisions in the insurers' policies giving the insurers the right to control or associate in the defense and settlement of those claims. While the bankruptcy court may have opined on the merits in connection with a prior plan that such provisions could be preempted, it is certainly correct that "preemption of those rights is an injury-in-fact" giving the insurers standing to be heard.  *See Alaska v. U.S. Dep't of Transp., 868 F.2d 441,* 444 (D.C. Cir. 1989) ("Inasmuch as this preemptive effect [of federal orders on state laws] is the injury of which petitioners complain, we are satisfied that the States meet the standing requirements of Article III.").  In short, the Court need not address standing to decide confirmation, but if it elects to do so, it should find that the insurers have standing to be heard on Plan confirmation.

The Court should also note that Arrowood is differently situated from the bulk of the other insurers.  Arrowood and Grace entered into a complex $100 million Agreement pre-petition, pursuant to which, Grace gave Arrowood full releases as to all asbestos-related claims and assumed a host of continuing obligations, including indemnification obligations.  Arrowood is a creditor and has paid Grace over 100 millions dollars.  Arrowood has filed a proof of claim. Arrowood's contractual and other rights against the Grace are real and their impairment subjects Arrowood to direct pecuniary loss.

It is "well settled" that a debtor's rights under a contract are "subject to all valid claims, liens and equities. While bankruptcy courts have the power to allow debtors to *escape* burdensome contracts by rejecting them, bankruptcy courts do not have the power to rewrite contracts to allow debtors to continue to perform on more favorable terms. It is also well-established that a debtor must assume a contract's burdens as well as its benefits, even in the case of assigned contracts.

Therefore, a debtor may not use the bankruptcy process to upgrade a contract that is the basis for its claim against a non-debtor. Courts have consistently applied these principles in asbestos bankruptcies. Indeed, in a bankruptcy case similar to this one, a district court in the Third Circuit held that the filing of bankruptcy did not alter the rights of parties to contracts. *See In re Amatex Corp.*, 107 B.R. 856, 865-66 (E.D. Pa. 1989) ("It is therefore clear, under Pennsylvania law, that the rights and obligations of the Debtor and [insurer] under the [insurance] policy are not altered because of the Debtor's Chapter 11 filing"). The *Amatex* court acknowledged that it had no power to alter the terms of a contract.

Grace is obligated to assist and cooperate with Arrowood and to ensure that the Arrowood Agreement is fully implemented and that no further asbestos-related or products claims are tendered to Arrowood.[4] As explained below and as will be demonstrated at the confirmation hearing, because Plan purports to release Grace from its contractual obligations-- and mistreats and misclassifies Arrowood's indemnity claims pursuant to the 1995 Settlement-- the Plan violates, amongst other provisions, Sections 1129(a)(1) and (a)(3).[5]

## ARROWOOD'S CONTACTS WITH THE DEBTORS

---

[4] Arrowood incorporates by reference the text of its objection to Grace's disclosure statement and the explanation of plan related objections set out therein, as well as the supporting exhibits.
[5] Unless otherwise indicated, all statutory citations in these Objections are to the United States Bankruptcy Code, 11 U.S.C.

**The Grace-Arrowood 1995 Settlement**

Arrowood issued Grace's predecessor multiple primary and excess policies over half century ago.[6]  While Grace and Arrowood ultimately resolved the primary policies, the Settlement Agreement did not cover two high level late-year excess policies issued as part of a separate program.  The settlement agreement was the result of a convoluted litigation history that began in an action entitled *Maryland Casualty Co. v. W. R. Grace & Co.*, *et al.*, where Arrowood (together with other insurers) asserted claims and/or cross-claims against Grace, and sought declaration of the parties' rights and obligations concerning coverage for Grace's asbestos-related suits under the Arrowood Policies ("New York Coverage Action").[7]  Grace countersued in 1985, seeking broad coverage not just for products claims, but for all suits "in which claimants have alleged bodily injury . . . *arising out of alleged exposure to asbestos or asbestos containing products* allegedly sold by Grace . . . (the 'asbestos-related bodily injury cases')."[8]  Grace further claimed that the Arrowood Policies "provide insurance coverage against loss and liability arising from bodily injury cases, *including asbestos-related bodily injury cases against Grace*."[9]

In 1995, Grace and Arrowood reached an agreement-in-principle to settle coverage for any and all past, present and future Asbestos-Related Claims and Products Claims under the Arrowood Policies (the "Settlement Agreement").  The basic terms were that Arrowood would pay $100 million, and that Grace would in turn agree there was no more coverage for products claims (since the $6.0 million aggregate limits for such claims had been exhausted) and that it

---

[6] The following policies were at issue in the suit and the ones that the Settlement Agreement resolved: RLG027635 (03/31/53-03/31/54); RLG031840 (03/31/54-04/01/55); RLG035805; (04/01/55-04/01/56); RLG045762 (04/01/56-04/01/57); RLG045836 (04/01/57-04/01/58); RLG053959 (04/01/58-04/01/59); RLG021629 (04/01/59-04/01/60); RLG021620 (04/01/60-04/01/61); RLG021621 (04/01/61-04/01/62); RLG021622 (04/01/62-04/01/63).

[8] Grace's Answer, Cross-Claim and Counterclaim at p.12  ¶ 24 (emphasis added) (See Elias Decl., Ex. C at Docket No. 19991).

[9] *Id*. at p.21 ¶56 (emphasis added).

would give a broad, unconditional and all-encompassing release as to any and all past, present

and future asbestos-related claims. That agreement settled all allegations and claims raised in

that coverage case, and, specifically, Grace's claims to coverage for asbestos-related bodily

injuries allegedly arising from exposure to asbestos or asbestos-containing materials.

To effectuate the settlement, Grace agreed that the products coverage for the Arrowood

Policies was cancelled, since the total of all aggregate limits for the Products Hazard had been

exhausted:

> Grace hereby agrees to the cancellation of all insurance coverage for Product
> Claims under the Primary Policies, effective as of the Effective Date, in exchange
> for a payment of $100,000,000 as provided in Section 2.0. The cancellation of
> insurance coverage for Product Claims under the Primary Policies shall not affect
> the rights and obligations of Grace and Royal under the Primary Policies with
> respect to insurance coverage for claims that are not Product Claims.[10]

Grace likewise gave Arrowood the following release not just as to products claims but as to all

asbestos-related claims:

> Except for the obligations set forth in this Agreement, Grace hereby releases and
> forever discharges Royal of and from any and all actions, causes of action in law
> or in equity, suits, debts, liens, contracts, indemnity and defense obligations,
> agreements, promises, liabilities, claims, demands, losses, costs or expenses of
> any kind or nature, known or unknown, fixed or contingent, direct or indirect,
> which Grace now has or may have against Royal in any way relating to the
> New York Primary Action and/or payment or handling of Asbestos-Related
> Claims and other Product Claims under the Primary Policies, including, but not
> limited to, any alleged potential claim for breach of the covenant of good faith
> and fair dealing, unfair claims practices or punitive damages.[11]

---

[10] *Id*. at §3.0.

[11] *Id*. at §4.0.

C:\Local Data\omm16098\Temp\#1781059 v3 - Grace Trial
Brief v3.doc

On January 18, 1995,[12] the Court signed a Stipulated Order of Dismissal that stated "[a]ll claims brought by Grace and Royal against each other in this action are dismissed with prejudice pursuant to Rule 41 of the Federal Rules of Civil Procedure."[13]

**The Undisputed Testimony of Grace's Witnesses Confirms that the Arrowood Settlement Released All Asbestos Related Claims**

The Grace officer who was in-charge of insurance and negotiated and signed the Grace-Arrowood Settlement confirmed in testimony in response to questions by the Libby Claimants that the Grace-Arrowood Settlement was full and final and released all claims for any asbestos-related claims including those by the Libby Claimants.

Jeffery Posner stated at his deposition "My recollection of the agreement is that we gave them two releases. We gave them a complete products release and we gave them what I'm going to call an asbestos-related release, and the asbestos-related release encompassed not only asbestos products claims but asbestos premises claims." *See* Ex. A. (Posner Dep.) pg. 148-149. This testimony constitutes a party admission and is admissible at the confirmation hearing in support of Arrowood's objections.  He also said that "I knew that Grace had released all asbestos-related claims which would encompass the Libby Claims . . ." *Id.* at 145.

---

[12] Importantly, the final, executed Settlement Agreement was substantially different than the original draft Grace sent to Arrowood, which purported to limit the settlement's scope to products claims without releasing other kinds of asbestos-related claims.  When Arrowood explained that the agreement should be far broader and include all asbestos-related claims, even those not falling within the definition of "Products Hazard," Grace revised the final version accordingly.  As a result, the final signed Settlement Agreement included a broad, unconditional and all-encompassing release of any and all asbestos-related claims, even those not within the definition of "Products Hazard."  The documents created contemporaneously with the Settlement Agreement's drafting and negotiation also confirm that the parties intended and agreed to a broader settlement than just products claims.

[13] *Maryland Casualty Co. v. W.R. Grace & Co.*, 83 Civ.7451 (SWK), Stipulated Order of Dismissal (S.D.N.Y. Jan. 18, 1995) (Elias Decl., Ex. E at Docket No. 19991) (All Eliad Decl. Exhibits hereinafter cited can be found at Docket No. 19991).

**The Testimony of the ACC's Witness Confirms that the
Arrowood Settlement Released All Asbestos Related Claims**

The corporate designee witness produced by the ACC also confirmed that the Committee

agrees with and has ratified Grace's position that the Grace-Arrowood Settlement is full and final

and released all claims for any asbestos-related claims including those by the Libby Claimants.

Question: " Is it fair to say, Mr. Lockwood, that it is also the commitee's position that the

Disclosure Statement accurately reflects the status of the coverage that Grace alleges that Royal

issued to Zonolite?"  Mr. Lockwood: "Yes."  See Ex. B. (Lockwood Deposition) at 626-627. His

testimony constitutes a party admission and is admissible at the confirmation hearing in support

of Arrowood's objections.

**The Undisputed Testimony Also Confirms that the Arrowood Settlement
was Fair, Reasonable and Negotiated in Good Faith**

The Grace officer who was in-charge of insurance and negotiated and signed the Grace-

Arrowood Settlement also confirmed in testimony in response to questions by the Libby

Claimants that the Grace-Arrowood Settlement was fair, reasonable and negotiated in good faith.

> Q:  Was the 1995 Grace-Royal settlement agreement negotiated by
> Grace in good faith? A. Yes. Q. Do you have any reason to believe
> that the 1995 Grace-Royal settlement agreement was not
> negotiated in  good faith by the Royal folks?  A. No.,  Q. Did you,
> Mr. Posner, do  your best as part of the negotiation of  the 1995
> Grace-Royal settlement agreement to obtain as large a settlement
> payment as possible from Royal?  A. Yes.  Q. Did you, Mr.
> Posner, do  your best as part of the 1995 Grace-Royal  settlement
> negotiations to try to obtain  the best possible terms for Grace from
> Royal?  A. Yes.  Q. Did Grace do due diligence  on the coverage
> that was allegedly issued by Royal as part of the negotiations of the
> 1995 Grace-Royal settlement agreement?  A. Yes.  Q. And were
> you personally involved in those due diligence efforts, Mr. Posner?
> A. Yes. And did the due diligence efforts that were done by Grace
> include a review of the policies and the terms of the policies
> allegedly issued by Royal?  A. Yes.  Q. Counsel for the Libby
> claimants asked you some questions about what he referred to as
> premises/operations coverage. Do you remember generally that
> line of questioning?  A. Yes, I do.  Q. Were you aware at the time

that you negotiated the 1995 Grace-Royal settlement agreement
that there was possible coverage for certain types of asbestos
bodily injury claims under the premises/operations provisions of
the Royal policies? A. Yes.  Q. The counsel for the Libby
claimants also asked you some questions where I guess he
suggested that there  might be no aggregate limits for the
premises/operations portions of the coverage under the Royal
policies. Do you remember generally those questions? A. Yes, I
do.  Q. Were you aware at the time that you negotiated the 1995
Grace-Royal settlement agreement that there was a possibility that
there might be no aggregate limits for certain asbestos bodily
injury claims under the  premises/operations provisions of the
Royal policies?  A. I was aware of that, yes.  Q. Was the
settlement  payment -- the 1995 Royal -- Grace-Royal  settlement
agreement, it required that a settlement payment be made to Grace.
Is that right? A. Yes. Q. Was the settlement payment that was
required under the 1995  Grace-Royal settlement agreement
actually  paid to Grace? A. Yes. Q. And was the settlement amount
that was due under the 1995Grace-Royal settlement agreement
paid in  full to Grace? A. Yes.

Ex. A. (Posner Deposition) at 312-14.  This testimony constitutes a party admission and is

admissible at the confirmation hearing in support of Arrowood's objections.

**Grace repeatedly admitted that the 1995 Settlement Agreement
precludes coverage for any asbestos-related claims.**

### *Grace co-signed a letter with Royal in 2006 stating that there is no coverage under the Royal Policies.*

Grace is the target of lawsuits in Montana state court alleging bodily injury from Grace's

mining operation in Libby, Montana.  One of Grace's co-defendants in those cases is Burlington

Northern and Santa Fe Railroad ("BNSF").  After receiving BNSF's April 12, 2006, request for

coverage under the Royal Policies in connection with the Libby Claims, Grace together with

Royal agreed that there was no coverage for BNSF because the 1995 Settlement Agreement had

a release that barred any further claims for coverage for any and all asbestos-related claims.  It

was further agreed that Grace and Royal would send a "joint" letter so advising BNSF.

Accordingly, Royal's outside counsel and Grace's Senior Litigation Counsel Jay Hughes *cosigned* a May 5, 2006 letter sent to BNSF stating that based on "the 1995 Settlement Agreement between Grace and Royal[,] . . . *Royal has fully discharged and satisfied any obligations it may have owed Grace for asbestos related claims under the Zonolite policies*."[14] In this joint letter, both Royal and Grace stated unequivocally that the "[a]greement reflects that, in consideration of paying Grace the sum of *$100 Million, Grace fully and finally released Royal from any further liability for asbestos related claims under the Zonolite policies*."[15]

Grace stated on the record in Montana state court that<br>there is no coverage under the Royal Policies.

In March 2002, asbestos personal injury claimants in Libby, Montana—the so-called Libby Claimants—made a motion in Montana state court to have Royal appointed "trustee" for Montana Vermiculite Corporation.  During argument on that motion, Grace's outside counsel Janet Baer stated in open court that the claim for coverage under the Royal Policies "was all settled in 1994 and 1995.  *Royal received a release and an indemnity from Grace.  To the extent that the Plaintiffs have causes of action, unfortunately, those causes of action are against Grace*."[16]  Ms. Baer then submitted to the court a proposed order jointly with Royal's counsel that provided in part that "any coverage obligation for asbestos claims that Royal may have owed under that coverage *was fully satisfied and released pursuant to the 1995 Settlement Agreement between Royal and W. R. Grace & Co.*"[17]

Grace made statements in this Court confirming that<br>there is no coverage under the Royal Policies.

---

[14] May 5, 2006 letter from Wilson Elser to Hedger Moyers, at 2 (emphasis supplied) (Elias Decl., Ex. F).  The Royal Policies and the "Zonolite policies" are synonymous because the Royal Policies were issued to Grace's predecessor-in-interest, the Zonolite Company.

[15] *Id.* (emphasis supplied).

[16] March 22, 2002 Hr'g Tr. at 7-8 (emphasis added) (Elias Decl., Ex. G).

[17] Grace's proposed order to the Montana state court (emphasis added) (Elias Decl., Ex. H).

Grace has spent the last seven years in this Court attempting to set up a Section 524(g) trust to resolve its asbestos-related liabilities.  Not once during that time has Grace contended that it has any remaining asbestos-related coverage under the Royal Policies.  In fact, Grace has stated just the opposite.  In 2003, in a brief supporting its motion to expand the preliminary injunction to include Montana Vermiculite Corporation, Grace stated that "*in full and final settlement of Royal's obligations* under the Pre-Sale Policies.  In the Royal Settlement, the Debtors agreed to indemnify and hold harmless Royal against any asbestos-related claims made against the Pre-Sale Policies."[18]  Grace further stated that under the Settlement Agreement the "Royal Policies *were cancelled*.  Royal *settled its obligations under the Royal Policies* with Grace.  Grace indemnified Royal for future claims that may arise under such policies."[19]

Grace added that in "In the Royal Settlement, the Debtors agreed to indemnify and hold harmless Royal against any asbestos-related claims made against the Royal Policies issued by Royal to Zonolite."[20]  So "[a]ny attempt by Plaintiffs to pursue Royal and collect from Royal under the Royal Policies will immediately and directly affect Grace."[21]  And "[t]o the extent that a judgment for damages is entered against Montana Vermiculite, which could trigger coverage under the Pre-Sale Policies, Grace may have indemnity obligations to Royal."[22]  Grace did not make these assertions in a vacuum but rather in response to the Libby Claimants' assertions to the contrary.[23]

---

[18] Grace's Motion to Expand Preliminary Injunction to Include Montana Vermiculite Corporation at ¶3 (emphasis added) (Elias Decl., Ex. I).

[19] Grace's Reply Brief in Support of Motion to Expand Preliminary Injunction to Include Montana Vermiculite Corporation at ¶8 (emphasis added) (Elias Decl., Ex. J).

[20] *Id*. at 10.

[21] *Id*. at 8.

[22] Grace's Motion to Expand Preliminary Injunction to Include Montana Vermiculite Corporation at ¶15 (Elias Decl., Ex. I).

[23] Libby Claimants' Opposition to Debtors' Motion to Expand The Preliminary Injunction to Include Actions Against Montana Vermiculite Corporation Elias Decl., Ex. K).

Grace ultimately persuaded the Bankruptcy Court, at least as to the Settlement Agreement's implication. Accordingly, on October 7, 2004, this Court granted Grace's motion to expand the bankruptcy injunction to include Montana Vermiculite, stating that "[t]he settlement [between Grace and Royal] resolved Royal's obligation under the Pre-Sale [Zonolite] Policies and provided that Debtors would indemnify and hold Royal harmless against any asbestos-related claims made against those policies."[24]

In November 2004, Grace filed its first Disclosure Statement, where it stated in §2.7.2.2 that "[w]ith one exception, *coverage disputes regarding the Grace and Zonolite primary policies that have been settled, and the settlement amounts paid in full. The only unsettled primary coverage is that of CNA . . . .* Grace asserts that this [CNA] coverage is available to pay asbestos-related Claims that are not based on product liability, such as Claims made by certain Libby residents."[25] Grace filed an Amended Disclosure Statement in January 2005. The amended statement's description of the Royal Policies mirrored the text in the 2004 Disclosure Statement.[26] In addition, Exhibit 10 to the Amended 2005 Disclosure Statement, entitled "Primary & Excess Insurance Policies That Were or Are Applicable to Asbestos-Related Claims," categorized the Royal Policies as "Resolved."[27]

Absolutely nothing has happened between November 2004 and October 2008 that in any way affects the settlement between Grace and Royal or anything that Grace has said and done confirming that the Settlement Agreement extinguished any possible claim for coverage for any and all asbestos-related claims.

---

[24] Oct. 7, 2004 Memorandum Opinion (Elias Decl., Ex. L).
[25] 2004 Disclosure Statement at §2.7.2.2 (emphasis added) (Elias Decl., Ex. M).
[26] 2005 Amended Disclosure Statement at §2.7.2.2 (Elias Decl., Ex. N).
[27] Exhibit 10 to 2005 Amended Disclosure Statement, at 16 (exhibit entitled "Primary & Excess Insurance Policies That Were or Are Applicable to Asbestos-Related Claims" categorized the Royal Policies as "Resolved") (Elias Decl., Ex. O).

Grace repeatedly stated in its SEC disclosures that
there is no coverage under the Royal Policies.

As recently as August 8, 2008, Grace filed a Form 10Q statement with the United States

Securities and Exchange Commission that tracks Grace's representation to the bankruptcy court

about primary coverage in connection with the claims by the Libby Claimants.  That 10Q

states—under the heading "Insurance Rights"—that with "one exception, coverage disputes

regarding Grace's primary insurance policies have been settled, and the settlement amounts have

been paid in full."  That representation to the SEC and shareholders is essentially the same as

Grace's statement in its 2004 Disclosure Statement.  And based on Grace's 2004 Disclosure

Statement, the "exception" is clearly a reference to CNA's policies.  Indeed, Grace has repeated

essentially that description of the Settlement Agreement—or has indicated that "Grace has

settled with and been paid by its primary insurance carriers with respect to both property damage

and  personal injury cases and claims"—in *every* SEC Form 10K that it has filed since entering

into that agreement in 1995.[28]

## POINTS TO BE SHOWN AT CONFIRMATION HEARING

The many ways in which the Plan violates the Code have been set forth in Arrowood's

Plan and Disclosure Statement objections. and the objections filed by General, CNA,[29] Maryland

Casualty, Seaton, Travelers and the other insurers' objections with which Arrowood has joined.

Arrowood further joined in sponsoring the expert reports of Professor Priest, Professor Shien and

Mr. Maithas all of which are incorporated by reference herein.   An explanation of these

---

[28] *See* Grace, Annual Reports (Form 10-Ks) for February 29, 2008 at F-25; March 2, 2007 at F-23; March 13, 2006 at 24; March 7, 2005 at F-19-20; March 5, 2004 at 11; March 13, 2003 at 10-11; March 28, 2002 at 10; April 16, 2001 at 11; December 4, 2000 Amendment to Previous 10-K at F-10; March 28, 2000 at 10; March 29, 1999 at 10; March 30, 1998 at 10; March 28, 1997 at 15; March 29, 1996 Amendment to Previous 10-K at 25 (Elias Decl., Ex. P).

[29] Among other things, Arrowood specifically joins in CNA's objections to the manner in which the warrants are treated in the Plan.

objections (or, at least, as such an explanation as can be given absent completed discovery) is set forth below. [30]  In summary, Arrowood intends to show the following at confirmation[31]:

1.     The Plan Impairs Arrowood Rights and Interests and Is Not "Insurance Neutral" as to Arrowood.  The Plan Proponents trumpet their addition of words to the Plan declaring it "insurance neutral" (Plan § 7.15), but saying it does not make it so.  In this regard, the Plan Proponents' reliance on *Combustion Engineering—which* the Third Circuit held to be no bar to the insurers' standing in *Congoleum Corp.,* 426 F.3d at 685—is misplaced. There, the Third Circuit merely held that language in the *Combustion* plan preserving the insurers' pre-petition rights was sufficient, on the facts of that case, to limit the insurers' standing *to appeal.* 391 F.3d at 217. But standing to appeal bankruptcy orders is restricted to "persons aggrieved," which is a "prudential standing limitation" on "bankruptcy *appellate* standing" that is "more restrictive than Article III standing" and the "`party in interest' standard" under §§ 1109(b) and 1128—principles which, by "contrast[]," have been "construed to create a broad right of participation in Chapter 11 cases" affording "broad standing at the trial level." *Id.* at 214 & nn.20–21, 215, 217 (emphasis added). Nothing in *Combustion Engineering* holds that the "neutrality" language in that case provides any basis to deny insurers standing in the *bankruptcy court.*[32]

In addition, while the "neutrality" provision in Grace's Plan includes some of the

---

[30] Arrowood notes, preliminarily, that the ways in which the Plan fails to meet the confirmation requirements of § 1129(a) , and thereby make the Plan unconfirmable for additional reasons, may not be entirely clear until the conclusion of discovery and the Phase II confirmation hearing.  In addition, discovery may reveal that the Plan also fails to meet the requirements of § 524(g), precluding the issuance of the sort of "channeling injunction" that would be authorized if the requirements of that provision are satisfied

[31] Arrowood designates and hereby offers as exhibits for the Phase I confirmation hearing the Stipulation between Arrowood and Grace dated March 16, 2009, an the exhibits attached thereto. Arrowood fuither designates Royal Policy ED102071 and Arrowood's proof of claim and the proof of claim filed by BNSF

[32] Nor does *Combustion Engineering* limit the insurers' standing to be heard in this Court, since the "persons aggrieved" standard only restricts appellate "[s]tanding to appeal . . . an order," 391 F.3d at 214 & n.20 (emphasis added), and the parties appealing here are the Plan Proponents, not the insurers. See *Baron & Budd,* 321 B.R. at 160 n.4 ("The `persons aggrieved' standard does not apply to parties such as Appellee Insurers, who seek to defend a favorable ruling on appeal—these parties need not meet standing requirements.").

language employed in the plan in *Combustion Engineering,* that decision relied on specific findings that the plan in that case did not change the way in which asbestos claims were resolved prior to bankruptcy. *See id.* at 209, 217. Not so here. As described above, the Plan strips the insurers of their contractual rights to defend claims they would have been asked to pay. As Judge Chesler and other bankruptcy judges have recognized, Plan's "neutrality" language merely preserving the ability to raise defenses to coverage, *after a* potential billion-dollar bill is presented to the insurers as *a fait accompli,* does not put the insurers in the same position they would enjoy if they were able to defend against the claims in the first instance, with resort to discovery and the protections of the tort system to investigate the underlying merits of those claims. *See Baron & Budd,* 321 B.R. at 159. That harm gives the insurers a practical stake in the Plan sufficient for standing, even if the threat of financial loss for the liability Grace would have committed to under the Plan was contingent on the outcome of subsequent coverage litigation. *See, e.g., Clinton v. New York,* 524 U.S. 417, 430—31 (1998) (plaintiff had standing to challenge President's use of line-item veto to revive a contingent liability, even though plaintiff's pecuniary loss would not occur unless it lost a separate proceeding disputing that liability).

Moreover, the Plan Proponents carefully drafted the Plan's "neutrality" provision in this case to permit Grace and the trust to use the bankruptcy court's findings against the insurers in the Coverage Action. For all their protestations about the Plan's supposed "insurance neutrality," the Plan Proponents assiduously refuse, despite repeated requests, to include language barring Grace and the trust from using in coverage litigation the bankruptcy court's findings, were it to confirm the Plan.   In this light, the insurers' stake in confirmation is palpable. Nothing will stop Grace, and the claimants' lawyers, from asking the bankruptcy court to find that the Plan and TDP are "fair," "reasonable" and in "good faith," all with a view to using that judicial stamp of approval as evidence in a Coverage Action that the insurers owed coverage for the resulting

liability. The insurers have a practical stake in seeing that the Plan-confirmation proceedings are not so misused to tilt the playing field in the Coverage Action against the insurers.

Furthermore, as the Plan Proponents know,  it is well settled that a debtor's rights under a contract are "subject to all valid claims, liens and equities." *Zartman v. First Nat'l Bank of Waterloo*, N.Y., 216 U.S. 1324, 135 (1910); *see also Butner v. United States*, 440 U.S. 48, 54 (1979) ("Property interests [in bankruptcy] are created and defined by state law"). Consequently, the property interests of a bankruptcy estate are "subject to the same limitations imposed upon the debtor by applicable nonbankruptcy law," with nonbankruptcy law defining "the nature, scope and extent of the property rights that come into the hands of the bankruptcy estate." *Integrated Solutions, Inc. v. Service Support Specialties, Inc.*, 124 F.3d 487, 492-93 (3d Cir. 1997).  Accordingly, the Debtors "[do] not have greater rights in the property of the estate than [they] had before filing for bankruptcy." *Id.*

Here, the Plan violates this clear and well-established rule of law, as it purports to take Debtors' rights under its insurance policies, which are part of the bankruptcy estate under Section 541(a)(1), and change them into more favorable agreements, and re-write those contracts for the benefit of the Plan Trust and the Asbestos Claimants favored under the Plan.

Essentially, the Debtors, pursuant to the Plan, seek to avoid certain terms, conditions and defenses arising under Debtors' insurance policies by seeking approval of certain insurance-related provisions that are contrary to both the facts and applicable law, including, *inter alia*:

(a) Purporting to "transfer and assign" significant interests in the Arrowood policies to the Plan Trust despite consent to assignment provisions and applicable state law prohibiting such assignment;

(b) Purporting to "transfer and assign" significant interests in the Arrowood policies to the Plan Trust despite the fact that Grace has no asbestos-related rights as a result of the Settlement Agreement;

(c) Providing that only the Plan Trustee shall have the authority to contest asbestos personal injury claims, despite Arrowood's rights regarding the defense, investigation and settlement of Asbestos Claims under the insurance policies and Section 502(a) of the Bankruptcy Code;

(d) Providing for payments to Asbestos Claimants which might not be required under the terms and conditions of the insurance policies and applicable insurance law; and

(e) Allowing insurance-related decisions of the Bankruptcy Court made while addressing objections to the Plan can be used against insurers in future adversary proceedings.

(f)  Impairing Arrowood's coverage defenses;

(g) Carving out from a list of defenses that are supposedly preserved to the Coverage Litigation a variety of issues that are among those the state court would be most likely to find bar coverage;

(h)  Enacting TDPs that interfere with Arrowood's rights under state law to control the defense and settlement of claims;

(i) Enjoining Arrowood from asserting contribution and other claims against the Settling Insurers, without providing any alternative treatment of such claims and no means for such claims to be paid.[33]

These provisions violate bankruptcy and applicable non-bankruptcy law, denude Arrowood of important rights under its insurance policies with Grace, and convert the Arrowood insurance policies from bilateral contracts, with rights and duties on each contracting party, into unilateral receivable streams.[34]  Nothing in Sections 365, 524(g), 1123, or elsewhere in the

---

[33] Arrowood incorporates by reference the arguments and text asserted in Professor Priest's expert report.

[34] Arrowood has rights of subrogation and other rights against Grace to the extent that any claims are tendered to it by BNSF related to the contractual indemnity between Grace and BNSF. Discovery is ongoing with regard to the treatment of these claims and Arrowroot accordingly reserves all its rights. To the extent that these rights are in any way modified for impaired, Arrowroot objects and will present such objections at the confirmation hearing.

Bankruptcy Code allows the Debtors to seek these insurance-related provisions as part of their Plan and to thereby eliminate pertinent terms, conditions and defenses of Arrowood's insurance policies.

Furthermore, having this Court make any finding or issue any order that would purport (or that might be construed) to bind the Arrowood to the TDPs, would improperly infringe Arrowood's contractual rights and, therefore, would be improper, unlawful, or unconstitutional. The Plan and the TDPs, by abrogating Arrowood's rights to associate in the defense of claims, abrogating insurers' rights to investigate and settle claims, and vitiating the Debtor's duty to cooperate with Arrowood in the defense of claims, is unlawful and definitely not "insurance neutral." The TDPs also have weak procedural safeguards, do not adequately prevent fraudulent claims, and are subject to numerous conflicts of interest because the claimants' lawyers will be effectively overseeing the trust as fiduciaries while also representing claimants

Furthermore, the numerous provisions modifying insurers' contract rights violate bankruptcy and applicable non-bankruptcy law, denude insurers of important rights under their insurance policies, and convert the policies from bilateral contracts with rights and duties on each contracting party into unilateral receivable streams. Moreover, the insurance-related provisions the Debtor seeks to have confirmed are unnecessary for Plan confirmation and violate requirements that asbestos-related plans be insurance neutral. In fact, most if not all of the many insurance related-provisions need to be addressed in separate proceedings, because such findings and conclusions are (a) beyond a bankruptcy court's jurisdiction, *see Beard v. Braunstein*, 914 F.2d 434, 445 (3rd Cir. 1990), and (b) must be addressed in a proper plenary proceeding with its attendant procedural and substantive protections. *See*, *e.g.*, *In re McKay*, 732 F.2d 44, 47-48 (3d. Cir. 1984).

And because all of the findings proposed in the Plan must be also be limited to purposes

necessary for confirmation and not be construed as a determination of the insurers' rights or obligations, this Court should preclusively enjoin the Debtor, the asbestos plaintiffs' law firms, the ACC, the FCR, and the Trust from using any findings of this Court in litigation following plan confirmation and there must be a mechanism to bind such parties to honor the injunction. The confirmation order must expressly state that it will not constitute an adjudication of rights of the insurers or the existence of a claim against, or liability on the part of Arrowood so that it will not trigger coverage or otherwise limit or affect the rights of insurers in ensuing coverage litigation.  Payments by the trust must be found not to constitute the existence of a valid claim or be reasonable with respect to the policies.  The purported "insurance neutrality" language in Section 7.15 does nothing to prevent any of this.  And it does not adequately prevent Plan Proponents from using confirmation against Arrowood.

Nor, for that matter, does it prevent any of the Plan Proponents from contending that they may accelerate claims against Arrowood before the Trust actually pays out individual claims. Arrowood's coverage obligations, if any, should not and cannot be accelerated as a result of Plan confirmation because while under Section 524(g) the Debtor may settle claims against itself, it may not obtain a ruling that Arrowood is bound to those settlements if they have not consented.

Here, the Plan's confirmation could be misinterpreted as an adjudication of Arrowood's purported liability for asbestos-related claims.  If anyone thus contends that Plan confirmation constitutes an immediate adjudication of liability on the part of Arrowood, it would also violate Arrowood's rights to pay claims only when they become due.  Problematically, the so-called "insurance neutrality" language does nothing to prevent this.

In fact, the Plan's neutrality language is decidedly less clear than that included in other recent confirmed plans in asbestos-related bankruptcy cases.  For example, in the recent *T H Agriculture and Nutrition, LLC* bankruptcy, the court approved an Insurance Neutrality

Stipulation that contained the following provisions:

- "[n]othing in the Plan, the Asbestos PI Trust Distribution Procedures, the other Plan Documents, any Confirmation Order, or any other judgment, order, finding of fact, conclusion of law, determination or statement . . . made by the Bankruptcy Court or affirmed by the District Court or entered by any other court exercising jurisdiction over a Bankruptcy Case . . . shall in any Asbestos Insurance Action . . . (a) constitute any adjudication, judgment, trial, hearing on the merits, finding, other determination, or evidence or suggestion of any such determination: (i) establishing the liability (aggregate or otherwise) or coverage obligations of any Asbestos Insurance Entity for any coverage claims . . . (v) establishing that the Plan, any other Plan Document, or any other agreement (including any procedures, matrices or criteria used or considered in valuing, estimating or allowing Asbestos PI Claims and Demands thereunder) are reasonable, appropriate or entered into in good faith, or consistent with any procedures that were used to evaluate, settle, or pay Asbestos PI Claims and Demands against [the Debtor] and [the Parent related parties] before the Commencement Date" (§2);

- any Demand for payment made to any Asbestos Insurance Entity . . . including for any Coverage Claims, indemnity claims, or any other Claims raised against any Asbestos Insurance Entity in an Asbestos Insurance Action, shall only be based on, and can only be brought for, the amount of the actual payments (aggregate or otherwise) made by the Asbestos PI Trust to any holders of Asbestos PI Claims and Demands (§6(a));

- any Demand for payment made to any Asbestos Insurance Entity . . . including for any Coverage Claims, indemnity claims, or any other Claims raised against any Asbestos Insurance Entity in an Asbestos Insurance Action shall not be raised or brought against any Asbestos Insurance Entity until the Asbestos PI Trust has actually paid the holder or holders of the Asbestos PI Claims and Demands for which such demand for payment toward an Asbestos Insurance Entity is based, and shall seek such demand for payment only to the extent of the actual payments to holders of Asbestos PI Claims and Demands, and not for any amount that may be paid by the Asbestos PI Trust in the future (§6(b)); and

- if [an] Asbestos Insurance [coverage] Action . . . is submitted to a trier of fact, none of the Parties may alert any trier of fact to the fact of or otherwise mention the Confirmation Order, or any other judgment, order, finding of fact, conclusion of law, determination or statement made by any court exercising jurisdiction over the Bankruptcy Case with regard to confirmation of the Plan (§6(c)).

Such language should be contained in the Plan to prevent wholesale violations of the Arrowood's rights.

In *Federal Mogul*, the bankruptcy court approved language making it clear that the confirmation of the plan and other orders and findings in that case would not "accelerate the obligations, if any, of any Asbestos Insurance Company" and could not "be used as evidence in any forum to prove," among other things, the reasonableness of the TDPs or that any of the Debtors had "suffered an insured loss with respect to any Asbestos Personal Injury Claims or Demands."[35]

The Plan contains none of these protections and violates the well settled rule that a Debtors "[do] not have greater rights in the property of the estate than [they] had before filing for bankruptcy." *Integrated Solutions, Inc. v. Service Support Specialties, Inc.*, 124 F.3d 487, 492-93 (3d Cir. 1997). The Plan, as currently formulated, and with its weak insurance neutrality language, violates this clear and well-established rule of law.

Arrowood will offer, among others, Professor Priest to offer testimony on these issues and incorporates the text of his report by reference.

2.    The Plan is unconfirmable to the extent it treats Arrowood's claims differently than other similarly situated claims.  Under Section 1129(a)(1), courts have reviewed and considered, among other provisions, a plan's compliance with Section 1122 (classification of

---

[35]  *In re Federal Mogul Global, Inc., et al.*, Case No. 01-10578, Plan of Reorganization, § 10.4 (Bankr. D. Del.) (confirmed November 8, 2007).

claims and interests).  *See, e.g., In re Fantastic Homes Enters., Inc.*, 44 B.R. 999, 1001 (M.D. Fla. 1984) (reversing order confirming plan which violated Section 1129(a)(1) because of non-compliance with Section 1122(b)).  Section 1122(a) permits claims to be placed in the same class only if they are "substantially similar."  11 U.S.C. §1122(a).  In determining the propriety of a plan's classification, the Bankruptcy Code requires that "classification of the claims or interests must be reasonable."  *In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1061 (3d Cir. 1987) ("[t]he authorities recognize that the classification of claims or interests must be reasonable").

Arrowood has both insurance-related claims and contract-related claims against Grace. The contractual claims must be treated like other contract claims.  *See In re Hoffinger Indus.*, 321 B.R. 498, 505 (Bankr. E.D. Ark. 2005) ("A plan discriminates unfairly only if similar claims are treated differently without a reasonable basis for the disparate treatment.") (internal quotation marks omitted).  And Arrowood must receive treatment at least equal to that of unsecured creditors.  *In re Safety-Kleen Corp.*, 380 B.R. 716, 733 (Bankr. D. Del. 2008) ("if it's a contract claim, you'll be treated like any other unsecured creditor).  But under the current Plan, Grace does not treat Arrowood's indemnity and insurance claims similarly to those of other similarly situated claims.

The Plan improperly classifies Arrowood's indemnity and contribution claims and treats them in a discriminatory fashion, in violation of Sections 1122 and 1123(a)(4)  of the Bankruptcy Code.  The Plan appears to provide that Arrowood, holder of contingent unsecured claims, is a Class 6 and Class 9 creditor with respect to its contractual indemnification claims under the Arrowood Settlement Agreement.  Indeed, a single contractual right may potentially give rise to unsecured claims that are treated in different ways: (i) as a Class 6 claim in respect of indemnification arising out of Asbestos PI Claims; and (ii) as a Class 9 claim in respect of non-asbestos-related indemnification. As a Class 6 creditor, Arrowood will be paid a mere fraction of

the amount of its contractual indemnification claims arising from asbestos personal injury claims under the Arrowood Settlement Agreement. By contrast, the Plan provides that similarly situated unsecured creditors in Class 9 will receive 100% of the allowed amount of their claims. The improper classification and disparate treatment afforded Arrowood violates one of the most fundamental principles of bankruptcy law: equality of distribution among similarly situated creditors. *See Mayer* v. *Hellman,* 91 U.S. 496,501 (1875) ("The great object of the Bankruptcy Act, so far as creditors are concerned, is to secure equality of distribution among them of the property of the bankrupt."); *Sampsell* v. *Imperial Paper* & *Color Corp.,* 3 13 U.S. 21 5,219 (1941) ("the theme of the Bankruptcy Act is equality of distribution" among creditors); *Nathanson* v. *N. L. R. B.,* 344 U.S. 25,29 (1952) (same).

Just recently, the Third Circuit's decision in *In re Combustion Engineering, Inc.,* 391 F.3d 190, 241 (3d Cir. 2004), reaffirmed that a reorganization plan is confirmable only if it upholds "the fundamental bankruptcy policy of 'equality of distribution among creditors. "' In *Combustion Engineering,* the Third Circuit recognized that "'[e]quality of distribution among creditors is a central policy of the Bankruptcy Code."' *Id.* at 239 (quoting *Begier* v. *IRS,* 496 U.S. 53, 56 (1990)).

The Plan's discriminatory treatment of Arrowood as compared with Class 9 creditors violates the letter and the spirit of the Bankruptcy Code and the result is fundamentally unfair to Arrowood, rendering the Plan unconfirmable. Arrowood and the Class 9 claimants are all unsecured creditors with substantially similar claims. Rather than providing for "equality of distribution among creditors" as mandated by the Supreme Court, the Plan provides for vastly inferior treatment to Arrowood without legal basis. The Plan distorts the treatment of indemnification claims under the Arrowood Agreement in a manner that violates Bankruptcy Code Sections 1122 and 1123(a)(4).

3.      The Plan is unconfirmable to the extent that it purports to upgrade

Grace's bargained-for exchange in the 1995 Settlement Agreement.  The Bankruptcy Code

requires that a reorganization plan be "proposed in good faith and not by any means forbidden by

law."  11 U.S.C. §1129(a)(3).  "[M]eans forbidden by law" refers to state as well as federal law.

*See In re Koebl*, 751 F.2d 137, 139 (2d Cir. 1984); *In re Bush Indus., Inc.*, 315 B.R. 292, 308

(Bankr. W.D.N.Y. 2004) (mandate under Section 1129(a)(3) includes laws of corporate

governance).  Courts will deny confirmation under Section 1129(a)(3) where, as here, the debtor

proposes a plan to effect improper objectives, including to avoid applicable law or to gain a

tactical advantage.  *See In re Bush Indus., Inc.*, 315 B.R. at 304-08; *In re Manor Place Dev.*

*Assocs., L.P.*, 144 B.R. 679, 686 (Bankr. D.N.J. 1992).[36]

It is "well settled" that a debtor's rights under a contract are "subject to all valid claims,

liens and equities."  *Zartman v. First Nat'l Bank of Waterloo, N.Y.*, 216 U.S. 134, 138 (1910).

"While bankruptcy courts have the power to allow debtors to *escape* burdensome contracts by

rejecting them, bankruptcy courts do not have the power to rewrite contracts to allow debtors to

continue to perform on more favorable terms."  *In re Crippin*, 877 F.2d 594, 598 (7th Cir. 1989)

(vacating confirmed plan on grounds that it allowed debtors to unilaterally modify contract); *see*

*also Butner v. United States*, 440 U.S. 48, 55 (1979) (rule that property rights should not receive

different treatment because an interested party enters bankruptcy is necessary "to reduce

uncertainty . . . and to prevent a party from receiving a windfall merely by reason of the

happenstance of bankruptcy") (internal quotation omitted).  It is also well-established that a

debtor must assume a contract's burdens as well as its benefits, *see NLRB v. Bildisco and*

*Bildisco*, 465 U.S. 513, 531-32 (1984), citing *In re Italian Cook Oil Corp.*, 190 F.2d 994, 996 (3d

---

[36] The Court should also deny confirmation based on Section 1129(a)(1), which prohibits confirmation of a plan that, by its terms or in its proposed implementation, conflicts with or contravenes applicable bankruptcy law.  *See In re Manor Place Dev. Assocs., L.P.*, 144 B.R. 679 (Bankr. D.N.J. 1992).

Cir. 1951), even in the case of assigned contracts, *Medtronic Ave., Inc. v. Advanced Cardiovascular Sys., Inc.*, 247 F.3d 44, 60 (3d Cir. 2001).**[37]**

Therefore, a debtor may not use the bankruptcy process to upgrade a contract that is the basis for its claim against a non-debtor. *See In re EES Lambert Assocs.*, 62 B.R. 328, 336 (Bankr. N.D. Ill. 1986) ("However expansive the bankruptcy court's power may be to protect the property interests of debtors-in-possession, it does not extend to enlarging the rights of a debtor under a contract or rewriting its terms."); *In re Heaven Sent, Ltd.*, 50 B.R. 636, 638 (Bankr. E.D. Pa. 1985) ("the Code does not augment the rights of a debtor under a contract"); *In re Bolin Oil Co.*, 51 B.R. 936, 938 (Bankr. N.D. Ohio 1985) (with respect to an insurance policy issued to the debtor, "[t]he Bankruptcy Code does not enlarge the rights of the debtor under a contract").

Courts have consistently applied these principles in asbestos bankruptcies. Indeed, in a bankruptcy case similar to this one, a district court in the Third Circuit held that the filing of bankruptcy did not alter the rights of parties to insurance contracts. *See In re Amatex Corp.*, 107 B.R. 856, 865-66 (E.D. Pa. 1989) ("It is therefore clear, under Pennsylvania law, that the rights and obligations of the Debtor and [insurer] under the [insurance] policy are not altered because of the Debtor's Chapter 11 filing"). The *Amatex* court acknowledged that it had no power to alter the terms of the policy. "[T]his court does not have the power to require that [the insurer] cash out the coverage under its policy contrary to the terms of that policy. [The insurer] must only indemnify the Debtor in accordance with the terms of its policy." *Id.* at 871; *see also ACandS, Inc. v. Aetna Cas. & Sur. Co.*, 764 F.2d 968, 975 (3d Cir. 1985) ("It is undisputed that .

---

[37] *See also In re Joshua Slocum Ltd.*, 922 F.2d 1081, 1091 (9th Cir. 1990) (bankruptcy court "must be sensitive to the rights of the non-debtor contracting party . . . and the policy requiring that the non-debtor receive the full benefit of his or her bargain"); *City of Covington v. Covington Landing Ltd. Partnership*, 71 F.3d 1221, 1226 (6th Cir. 1995) ("Neither the debtor nor the bankruptcy court may excise material obligations owing to the non-debtor contracting party").

. . the policy language explicitly gave the insurer the right to defend ACandS in any suit in which the insurer had the duty to defend.  The district court was without power to abrogate this contract right"); *In re Jones*, 179 B.R. 450, 455 (Bankr. E.D. Pa. 1995) (holding that the debtor did not have any right to immediate possession of the insurance proceeds); *see also Columbia Cas. Co. v. Fed. Press Co. (In re Fed. Press Co.)*, 104 B.R. 56, 64 (Bankr. N.D. Ind. 1989) (debtor "not automatically relieved of its obligations under the . . . policies simply because it has filed its Chapter 11 petition").

Grace is obligated to assist and cooperate with Arrowood and to ensure that the Arrowood Settlement Agreement is fully implemented and that no further asbestos-related or products claims are tendered to Arrowood.  Because the Plan purports to release Grace of its contractual obligations, the Plan violates Sections 1129(a)(1) and (a)(3).

3.    <u>The Plan is unconfirmable to the extent that it purports to assign rights that Grace does not have</u>.  The Third Circuit has recognized that "the estate's legal and equitable interests in property rise no higher than those of the debtor," *First Fidelity Bank v. McAteer*, 985 F.2d 114, 117 (3d Cir. 1993), and thus are "subject to the same limitations imposed upon the debtor by applicable non-bankruptcy law," *Integrated Solutions, Inc. v. Service Support Specialties, Inc.*, 124 F.3d 487, 492 (3d Cir. 1997); *see also In re Jones*, 179 B.R. 450, 455 (Bankr. E.D. Pa. 1995) ("Under the reasoning of *McAteer*, the owner of an insurance policy cannot obtain greater rights to the proceeds of that policy than he would have under state law by merely filing a bankruptcy petition").  Uniform treatment of the property rights of the debtor and its successors is necessary "to prevent a party from receiving a windfall merely by reason of the happenstance of bankruptcy."  *Butner v. United States*, 440 U.S. 48, 55 (1979).

To the extent that the Plan attempts to assign Arrowood's Policies it fails because pursuant to the Settlement Agreement, Grace no longer has *any* rights to asbestos-related coverage under the Arrowood Policies.  Grace may not transfer to the trust assets to which it has no right, such as asbestos-related coverage under the Arrowood Policies.  *See In re Kelley*, 58 B.R. 927, 930 (Bankr. D. Del. 1986) ("Misrepresentation of their assets and of the amount of income available after expenses for distribution to creditors makes any attempt to determine whether the proposed plan meets the requirements of § 1325(a)(4) and (b)(1) meaningless."); *IBA, Inc. v. Hoyt (In re Hoyt)*, 326 B.R. 13, 15 (Bankr. W.D.N.Y. 2005) ("the Debtors' various Plans were not proposed in good faith, because among other things, the Debtors' Schedules and Statements, as originally filed and amended, were materially inaccurate relative to their assets and income").

       4.      <u>The Plan is unconfirmable to the extent that it seeks to fund the trust by breaching the Settlement Agreement</u>.  Section 1129(a)(3) prohibits confirming any plan that was proposed by any means forbidden by law.  7 COLLIER ON BANKRUPTCY §1129.03 (15th ed. rev.).  The section 1129(a)(3) prohibition is expansive, and includes all applicable law, not merely bankruptcy law.  *Id.*; *In re Dapontes*, 364 B.R. 866, 867 (Bankr. D. Conn. 2007) ("The 1129(a)(3) prohibition is expansive, *i.e.*, it includes both federal and any other applicable law").  Courts in the Third Circuit have held that confirmation can be denied pursuant to Section 1129(a)(3) when a contract has been violated.  *See In re Ingleside Associates*, 136 B.R. 955, 962 (Bankr. E.D. Pa. 1992) ("[P]roposed amendments and modifications to [] partnership agreement[s], as those to any other contract, may be so substantial as to justify denial of confirmation under [Section 1129(a)(3)]").

Arrowood and Grace entered into a pre-petition Settlement Agreement, pursuant to which, Grace gave Arrowood full releases as to all asbestos-related claims.  Shortly after the

parties executed the Settlement Agreement, the court presiding over the New York Coverage

Action entered a Stipulated Order dismissing Grace's and Arrowood's claims against each other

with prejudice.[38]  The court confirmed its intention to accept the Settlement Agreement between

Arrowood and Grace in its 1998 Final Judgment when it stated "IT IS HEREBY FURTHER

ORDERED AND ADJUDGED that the claims of Grace and Arrowood against each other are

dismissed pursuant to the Court's order of January 18, 1995."[39]

        To the extent the Plan contemplates that Arrowood's Policies will be among the assets

transferred to the trust to pay asbestos-related personal injury claims,[40] that transfer would

violate the Settlement Agreement.  That is contrary to Section 1129(a)(3) not only because Grace

proposes to fund the trust by breaching its contract but also because that contract is a settlement

agreement, to which courts in this circuit attach special importance.  *See Mack Trucks*, 372 F.2d

at 22-23; *Ingleside Assocs*, 136 B.R. at 962.  Moreover, by seeking more money from Arrowood,

Grace would violated not only a binding settlement agreement, but also the court orders

approving that agreement.  The Third Circuit has made clear that those are grounds to deny

confirmation under Section 1129(a)(3).

        5.        The Plan is unconfirmable to the extent that the broad

exculpation sought in the Plan violates applicable law.  As explained in the separate brief filed

by Arrowood, pursuant to the exculpation provision in the Plan, the Debtors seek to release an

amazing array of non-debtors, including the Future Claimants' Representative, the Asbestos PI

Committee, the Trust Advisory Committee, the Plan Trustees, and all of their Representatives.

See Plan, §11.9.  In addition, the exculpation provision impermissibly reaches back to pre-

---

[38] *Maryland Casualty Co. v. W.R. Grace & Co.*, 83 Civ.7451, Stipulated Order of Dismissal (S.D.N.Y. Jan. 18, 1995) (Elias Decl., Ex. E at dkt. no. ).
[39] *Maryland Casualty Co. v. W.R. Grace & Co.*, 83 Civ. 7451 (JSM), Final Judgment (S.D.N.Y. Mar. 4, 1998) (Elias Decl., Ex. S).
[40] Plan at §7.2.2(d)(ii) (dkt. no. 19579); 2008 Disclosure Statement §1.2.8 (dkt. no. 19581).

petition actions, and exculpates an indeterminate number of actors and types of conduct. *See id.*
In addition to a wide array of non-debtor third parties, §11.8 of the Plan seeks to release all
current and former representatives of the Debtors from any claim against them for a broad array
of acts or omissions.

Such terms and conditions violate applicable bankruptcy law, *see* 11 U.S.C. § 524(e),
need to be expressly approved by the creditors and other parties-in-interest whom the Debtors
seek to bind, and are overly broad in that the exculpation seeks to protect persons and entities
from a broad array of acts or omissions.

Arrowood also objects to the discharges and releases provided in, 8.7, 8.8, and §8.1 of the
Plan and specifically objects to the language that the Reorganized Debtors "shall not be
responsible for any obligations of the Debtors or the Debtors in Possession except those
expressly assumed by the Reorganized Debtors in the Plan," and the language that "All entities
shall be precluded and forever barred from asserting against the Debtors and Reorganized
Debtors, or their assets, properties, or interest in property" as being broader than that allowed by
11 U.S.C. §§ 1141 and 524. The Debtor is entitled only to a discharge of "debt" as a "personal
liability." 11 U.S.C. §§ 1141(d) ; 524(a)(1); 524(a)(2) ; see also 11 U.S.C. §101(5) and (12)
("debt" means liability on claim, and "claim" is right to payment); *Brown v. General Motors
Corp.*, 152 B.R. 935, 939 (W.D. Wis. 1993) (only debts are discharged).

6. <u>The Plan Does Not Satisfy The Requirements Of § 524(g)</u>. Because the Plan
seeks the issuance of a channeling injunction under § 524(g), the Debtors must satisfy the
requirements of that section of the Bankruptcy Code. As yet, however, the Debtors appear to fail
to do so in various ways, including the following:

- The Debtors have not established that their contributions to the Trust are "fair and
  equitable" as required by § 524(g)(4)(B)(ii); and

- The Debtors have not established that the non-debtor persons and entities who would be protected by the Channeling Injunction have derivative liability for Debtors' asbestos problems, and thus qualify for protection under § 524(g)(4)(A)(ii); they also are not making contributions that are "fair and equitable;" some are making no contributions at all, while the contributions of others are *de minimis* at best.

4.    <u>The Plan Does Not Meet The Confirmation Requirements Of § 1129(a)</u>.  Every plan proponent must bear the burden of proving that its plan meets the enumerated confirmation requirements set forth in § 1129(a) of the Bankruptcy Code.  It is less then clear that the Plan Proponents here can carry that burden, and the Court can make the requisite findings under § 1129(a), because of the following:

- Since the Plan violates numerous provisions of the Bankruptcy Code, Plan Proponents cannot meet the requirements of § 1129(a)(1), which requires that a plan comply with the applicable provisions of the Bankruptcy Code.  Among the Code provisions that this Plan may violates are the following:

  ➤ The Plan appears to discharge the liabilities of non-debtors in violation of §§ 1141 and 524(e);

  ➤ The Plan cancels the requirement in § 501 that claimants have allowed claims before they can vote or be paid, and overrides Arrowood's rights under § 502 to object to claims; and

  ➤ The solicitation and voting under the Plan did not meet the Code's requirements;

- The Plan does not meet the requirement of § 1129(a)(3) that it be proposed in "good faith." The claimants' lawyers wrote the TDPs, which govern the liquidation and

payment of claims, and which contain lax medical criteria, lax exposure criteria, and

admittedly inflated claim values, so as to make it easier for the claims to be paid

rapidly;

7.     <u>The Plan is unconfirmable to the extent that it was not proposed in good faith</u>.  In

determining whether the good faith requirement of Section 1129(a)(3) has been met, the Court

must examine the totality of facts and circumstances, *see In re Coram Healthcare Corp.*, 271

B.R. 228, 234 (Bankr. D. Del. 2001), including the facts and circumstances leading up to the

filing of the case and the debtor's conduct during the case.  *See In re Silberkraus*, 253 B.R. 890,

902 (Bankr. C.D. Cal. 2000).  In making that inquiry, the Court considers whether "the plan

[was] proposed with honesty, good intentions and a basis for expecting that a reorganization can

be effected with results consistent with the objectives and purposes of the Bankruptcy Code."

*Coram Healthcare*, 271 B.R. at 234.  The Court "has considerable judicial discretion in finding

good faith, with the most important feature being an inquiry into the fundamental fairness of the

plan." *Coram Healthcare*, 271 B.R. at 234.

In *ACandS*, based on the "totality of circumstances" standard articulated in *Healthcare

Corp*, the Court determined that "[e]ven if all of the requirements of Sec 524(g) were met, I

would deny confirmation of the plan as not having been proposed in good faith under Sec

1129(a)(3) … [g]iven the unbridled dominance of the [pre-petition] committee in the debtor's

affairs and actions during the pre-petition period … and the obvious self-dealing that resulted

from control of the debtor…." *ACandS*, slip op. at 10 - 11.  Similarly, in this case, a self-selected

group of asbestos claimants counsel dominated the bankruptcy proceeding and engaged in self-

dealing with Grace.  This is evidenced by Grace's recent change of position on the scope of the

Settlement Agreement.  Consequently, the Plan was not proposed in good faith based on the

totality of the circumstances.

Moreover, the Plan does not meet the "good faith" confirmation requirement because it was designed, at least in part, to prejudice Arrowood and evade the Settlement Agreement. Although that agreement extinguished all of Arrowood's "indemnity and defense obligations . . . in any way relating to . . . asbestos-related claims," Settlement Agreement §4.0, the Plan attempts to assign to the Trust the right to seek payment from Arrowood for asbestos-related claims. And although the Settlement Agreement also precludes Grace from voluntarily assisting any person in the establishment of any claim against Arrowood, the Plan is actually designed to aid asbestos claimants, specifically the Libby Claimants, in establishing direct action claims against Arrowood. In exchange for Grace providing this assistance in breach of its contract, Grace receives claimants' support for the Plan.

8.  The Plan is unconfirmable to the extent that it is not fundamentally fair. Classifications under the Plan must be fair and reasonable in order for the Plan to be approved by this Court. *In re Jersey City Medical Center*, 817 F.2d 1055, 1061 (3d Cir. 1987). Consequently, the results of the Plan must be fair. This "is not dependent on express statutory provisions. It inheres in the jurisdiction of a court of bankruptcy." *American United Mutual Life Ins. Co. v. City of Avon Park*, 311 U.S. 138, 146 (1940). Accordingly, such a determination of fundamental fairness is "based on the responsibility of the court before entering an order of confirmation to be satisfied that the plan in its practical incidence embodies a fair and equitable bargain openly arrived at and devoid of overreaching, however subtle." *Id.*

9.  The Plan is unconfirmable to the extent that it is financially infeasible. The Plan discharges Grace from all liabilities and transfers those liabilities to the Plan Trust. See Plan, §7.2.3 ("all liabilities, obligations, and responsibilities . . . with respect to all Asbestos PI Claims shall be channeled to and assumed by the Asbestos PI Trust."), §7.2.1 ("The purpose of the Asbestos PI Trust shall be to . . . assume the liabilities of the Debtors with respect to all Asbestos

PI Claims."  The Plan proposes to fund the Plan Trust with unliquidated and contingent

insurance recoveries, despite the risks that such insurance proceeds may not be available.  See

Disclosure Statement, §2.10.  A plan's feasibility should not be based on "unsubstantiated

assumptions."  *In re Pegasus Agency, Inc.*, 101 F.3d 882, 886-87 (2d Cir. 1996).

The Plan is also unfeasible because Grace has failed to show that it can obtain sufficient

financing to effectuate the Plan's provisions.  If exit financing is unavailable, or available on

unreasonable terms, the Plan will violate Section 1129(a)(11) .

10.    The Plan is unconfirmable to the extent that Class 9 (General Unsecured)

claims are incorrectly designated as not impaired.  Under Section 1124(1) of the Bankruptcy

Code, a class of claims is impaired under a plan of reorganization unless the plan leaves

unaltered the legal, equitable and contractual rights of the holders of each claim.  Class 9 is

impaired because each claim is not being paid in full, in cash, including with post-petition

interest at the applicable default rate to which each such claim is contractually entitled.  *See In re*

*PPI Enters.*, 228 B.R. 339, 352 (Bankr. D. Del. 1998) ("to be unimpaired, the claim must receive

postpetition interest").  Accordingly, as a result of the impairment, the vote that is being

provisionally solicited of Class 9 should be counted for all purposes in connection with the Plan.

11.    The Plan is unconfirmable to the extent that it violates the

absolute priority rule and the "fair and equitable" requirement of Section 1129(b).  As a class

senior to the class of equity, Class 9 claims must be paid in full before equity can receive or

retain any property.  *See In re Armstrong World Indus.*, 432 F.3d 507, 513 (3d Cir. Del. 2005)

("The absolute priority rule was later codified as part of the "fair and equitable" requirement of

11 U.S.C. § 1129(b) .  Under the statute, a plan is fair and equitable with respect to an impaired,

dissenting class of unsecured claims if (1) it pays the class's claims in full, or if (2) it does not

allow holders of any junior claims or interests to receive or retain any property under the plan

"on account of" such claims or interests").  The Plan violates this requirement because it provides for Grace's equity holders to retain substantial value without first providing payment in full to more senior creditors, including Class 9 claimants.

## RESERVATION OF RIGHTS

Arrowood files this trial brief without benefit of completed discovery.  Arrowood timely served plan-related discovery on the Debtors, the Future Claimants Representative, the Asbestos Claimants Committee, and the Unsecured Creditors Committee,  but the Court has required these objections to be filed by May 20, before discovery is complete.  As explained below, the Court's scheduling order has made it virtually impossible for Arrowood to develop and set forth its objections to the Plan in the manner it deems appropriate.  While this problem affects all of Arrowood's objections, the impact of the Court's scheduling order is perhaps most acute with respect to the objection that the Plan does not satisfy the "good faith" requirement of § 1129(a)(3) of the Bankruptcy Code.

## [REMAINDER OF PAGE LEFT BLANK]

# CONCLUSION

Based on the forgoing, Arrowood asks that the Court rule in its favor at the Phase I

hearing and that the Court deny approval of the Plan.

Dated:  June 1, 2009
New York, New York

BIFFERATO GENTILOTTI LLC

By: /s/ Garvan F. McDaniel
Garvan F. McDaniel (#4167)
800 King Street, Plaza Level
Wilmington, DE 19801
(302) 429-1900

WILSON ELSER MOSKOWITZ
EDELMAN & DICKER LLP
Carl J. Pernicone  (*pro hac vice*)
150 East 42nd Street
New York, NY 10017-5639
Telephone:    (212) 490-3000
Facsimile:    (212) 490-3038

O'MELVENY & MYERS LLP
Tancred V. Schiavoni (*pro hac vice*)
Gary Svirsky (*pro hac vice*)
Times Square Tower
7 Times Square
New York, New York 10036
Telephone:    (212) 326-2000
Facsimile:    (212) 326-2061

*Attorneys for Arrowood Indemnity Company*
*f/k/a Royal Indemnity Company*