**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| W.R. GRACE & CO., *et al.*, | Case No. 01-01139 (JKF) |
| Debtors. | Jointly Administered |
| | **Hearing Date: July 27, 2009 at 10:30 a.m. (ET)** ·<br>**Objection Deadline: July 10, 2009 at 4:00 p.m. (ET)** |
| | **Ref. No. 21874** |

**LIBBY CLAIMANTS' MOTION TO RECONSIDER
MODIFIED ORDER GRANTING IN PART MOTION OF ARROWOOD
INDEMNITY COMPANY, F/K/A/ ROYAL INDEMNITY COMPANY TO STRIKE
WHITEHOUSE EXPERT REPORT OR, ALTERNATIVELY, COMPEL THE
PRODUCTION OF DOCUMENTS AND DATABASES ON WHICH HE RELIES
AND FOR ENTRY OF A CONFIDENTIALITY ORDER**

The claimants injured by exposure to asbestos from the Debtors' operations in Lincoln

County, Montana (the "Libby Claimants"),[1] by and through their counsel, Cohn Whitesell &

Goldberg LLP and Landis Rath & Cobb LLP, hereby move this Court to reconsider Modified

Order Granting in Part Motion of Arrowood Indemnity Company, f/k/a Royal Indemnity

Company to Strike Whitehouse Expert Report or, Alternatively, Compel the Production of

Documents and Databases on Which He Relies and for Entry of a Confidentiality Order entered

on May 27, 2009.  In support of this Motion, the Libby Claimants state:

**BACKGROUND**

1.      On April 9, 2009, Arrowood Indemnity Company, f/k/a/ Royal Indemnity

Company, filed a Motion to Strike the Whitehouse Expert Report or, Alternatively, Compel the

Production of Documents and Databases on Which He Relies and for Entry of a Confidentiality

Order (Docket No. 21245) (the "<u>Motion</u>").  The matter was set for a May 14, 2009, hearing (the

---

[1] As identified in the Amended and Restated Verified Statement of Cohn Whitesell & Goldberg LLP and Landis
Rath & Cobb LLP Pursuant to Fed. R. Bankr. P. 2019 [D.I. 21365], as it may be amended and restated from time to
time.

"Hearing").

2.      Debtors W.R. Grace ("Grace") supported the Motion with a brief and argument (May 8, 2009, Docket No. 21591).[2] Libby Claimants filed a brief opposing the Motion. (May 8, 2009, Docket No. 21595).   At the Hearing, fellow Plan Proponents Official Committee of Asbestos Personal Injury Claimants ("ACC") and the Asbestos PI Future Claimants' Representative ("FCR") orally joined the Motion.[3]

3.      After the Hearing, the parties could not reach agreement for a proposed order. Therefore, Grace submitted a proposed order on behalf of Movants, and separately Libby Claimants submitted their own proposed order.   This Court essentially accepted Grace's proposed order.  It entered the "Modified Order Granting in Part Motion of Arrowood Indemnity Company, f/k/a/ Royal Indemnity Company to Strike Whitehouse Expert Report or, Alternatively, Compel the Production of Documents and Databases on Which He Relies and for Entry of a Confidentiality Order," a copy of which is attached hereto as Exhibit 1. (Docket No. 21874) ("Modified Order").  It states in relevant part:[4]

> It is FURTHER ORDERED, that medical records (the "records") for any
> individual in the population of 1800 patients whose medical records have not yet
> been produced to the Plan Proponents or other requesting parties must be
> produced by May 21, 2009, regardless of whether or not such individual is a
> claimant in these bankruptcy proceedings.  The medical records of persons who
> are not claimants shall have personal identifying information redacted.  Failure to
> produce a complete set of these medical records will bar Dr. Whitehouse from
> offering any expert opinion that was formed based upon reliance, in whole or in
> part, on the records. . . .
> It is FURTHER ORDERED that the cost of this production of the records
> will be borne by the Libby Claimants.

---

[2]  Insurers Maryland Casualty Company ("MCC") (April 30, 2009, Docket No. 21492) and Continental Casualty Company ("CCC") (May 4, 2009, Docket No. 21523) also joined the Motion.
[3]  Collectively, Arrowood, Grace, MCC, CCC, ACC, and FCR, are hereinafter referred to as "Movants."
[4]  Other aspects of the Modified Order compelling Libby Claimants are dealt with separately. *See, e.g.,* Docket No. 22012, representing the June 8, 2009, filing of Dr. Whitehouse's affidavit on the status of the 550 database.

## BASIS FOR RELIEF

4.     This Motion to Reconsider filed by Libby Claimants asks the Court to reconsider, based upon the argument and newly-presented evidence set forth herein, the following aspects of the Modified Order:

(1)     The requirement that medical records for all 1,800 Libby asbestos patients be produced under threat of Dr. Whitehouse being barred "from offering any expert opinion that was formed based upon reliance, in whole or in part, on the records;" and

(2)     The terms and scope of any production of additional medical records that is ultimately required regarding Libby asbestos patients, specifically including the timing and costs associated therewith.

## ARGUMENT

### I.     Reconsideration of the Modified Order Is Appropriate.

5.     A judgment or ruling can be reconsidered under Federal Rule of Bankruptcy Procedure ("FRBP") 9023, which incorporates Federal Rule of Civil Procedure ("FRCP") 59. "The purpose of a motion for reconsideration [under FRBP 9023] . . . is to correct manifest errors of law or fact or to present newly discovered evidence." *Max's Seafood Cafe v. Quinteros by Lou-Ann, Inc.*, 176 F.3d 669, 677 (3d Cir.1999) (quoting *Harsco Corp. v. Zlotnicki*, 779 F.2d 906, 909 (3d Cir.1985), *cert. denied*, 476 U.S. 1171 (1986)).   Accordingly, the Third Circuit Court of Appeals has held that a judgment may be altered or amended if the party seeking reconsideration shows at least one of the following grounds: (1) an intervening change in the controlling law; (2) the availability of new evidence that was not previously available; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice. *North River Ins. Co. v. CIGNA Reinsurance Co.*, 52 F.3d 1194, 1218 (3d Cir.1995).

6.     Here, there is a clear need to prevent the potential manifest injustice of barring Dr. Whitehouse as an expert in this case.  Dr. Whitehouse is the one doctor most qualified to address

3

the intricacies of disease caused by exposure to Libby asbestos. Just as importantly, he is also the treating pulmonologist for almost all the approximately 950 Libby Claimants who suffer from asbestos disease caused by Grace and who are parties in this case pursuing formal objections to the Plan and the proposed TDP based upon its discriminating effect. The Libby Claimants object to the Modified Order because it implies that medical records of approximately 850 Libby asbestos patients who are not a party to these proceedings are critical to the Dr. Whitehouse report. The Modified Order suggest that even partial "reliance" by Dr. Whitehouse on his clinical experience treating hundreds of Libby asbestos patients who are not claimants in these proceedings may preclude his testimony on behalf of those whom he also treats but who have filed claims in these proceedings. Dr. Whitehouse's ability to offer opinions as a treating physician must be recognized, and the Court's Modified Order needs to be reconsidered and corrected to state the failure to produce such records should not bar Dr. Whitehouse's testimony.

7.      In addition, new evidence exists for this Court to consider regarding custody and control of the medical records at issue. The Libby Claimants have submitted the affidavits from staff at St. John's Lutheran Hospital (St. John's)[5] and the Center for Asbestos Related Disease (CARD),[6] both in Libby, Montana (collectively, the "Affidavits"), in support of the Motion to Reconsider. St. John's and CARD own and control almost all of the medical records at issue in the Court's Modified Order.[7] Libby Claimants have represented–accurately and lawfully throughout[8]–that neither they nor Dr. Whitehouse have control of or a right to produce medical

---

[5] See June 4, 2009, Affidavit of Mark Kroll ("St. John's Affidavit"), attached hereto as Exhibit 2.
[6] See June 8, 2009, Affidavit of Kimberly Rowse ("CARD Affidavit"), attached hereto as Exhibit 3.
[7] *See* St. John's Affidavit, ¶ 3; CARD Affidavit, ¶ 3.
[8] *See, e.g.,* Libby Claimants' Response to Debtors' Requests for the Production of Documents (March 24, 2009), wherein the following general objections were stated:
    1.      Libby Claimants object to any request for production of documents relating to or referencing "patients" or persons who are not represented by counsel and who are therefore not among the "Libby Claimants." Libby Claimants have no right or access to the private health care information or other documents for such non-clients, and the requested documents regarding such non-clients are not within the possession, custody, or control of Libby Claimants.

4

records for individuals who are not claimants in these bankruptcy proceedings.[9]  The Movants

and the Modified Order ignore the distinction between the Libby Claimants who have voluntarily

---

    2.      Libby Claimants object to any request for production of documents relating to or referencing "patients" or persons who are not represented by counsel and who are therefore not among the "Libby Claimants" as unduly burdensome.

    3.      In addition, subject to the above General Objections and any specific objections stated below, Libby Claimants state that their Responses to Debtors' Requests for the Production of Documents are provided pursuant to Federal Rule of Civil Procedure 34, made applicable hereto by Federal Rules of Bankruptcy Procedure 7034 and 9014, and are not intended to fulfill or satisfy any independent obligations regarding expert witnesses that Libby Claimants might have pursuant to Federal Rule of Civil Procedure 26(a)(2).  Libby Claimants reserve their right to produce additional or separate documents in response to any potential obligations or disclosure requirements pursuant to Federal Rule of Civil Procedure 26(a)(2).

In response to Grace's Request for Production regarding medical records, Libby Claimants answered:

    1.      All Medical Records for any and all patients of Dr. Whitehouse whose medical conditions form the basis for the opinions expressed in his December 29, 2008 expert report, including by way of example but not limited to the 700 patients referenced in paragraph 5 of Dr. Whitehouse's report, the 1,800 active cases referenced in paragraph 2 of Dr. Whitehouse's report, and all patients whose past medical records were produced to Grace or made available for use in this bankruptcy case pursuant to this Court's June 5, 2006 production order.

    <u>Response</u>:  Objection to Debtors' Request for documents that Grace already has independent access to or already possesses by virtue of the Grace Libby Medical Program as unnecessary and unduly burdensome on Libby Claimants.  Objection also to Debtors' Request for "past medical records [already] produced to Grace or made available for use in this bankruptcy case pursuant to this Court's June 5, 2006 production order" as unnecessary and unduly burdensome on Libby Claimants.

    Without waiving these objections or the above-stated General Objections, Libby Claimants direct the Debtors to: (1) Exhibit 2, produced in Response to RFP No. 2 of Libby Claimants' Response to Official Committee of Asbestos Personal Injury Claimants First Set of Requests for the Production of Documents, which consists of all medical records and death certificates within the possession, custody, or control of Libby Claimants to support Exhs. 7, 10, & 14 of the Expert Report of Dr. Alan C. Whitehouse 12/29/08; (2) Exhibit 3, produced in Response to RFP No. 4 of Libby Claimants' Response to Official Committee of Asbestos Personal Injury Claimants First Set of Requests for the Production of Documents, which consists of all medical records within the possession, custody, or control of Libby Claimants for 121 of the 123 patients relied upon in *Whitehouse* (2004); and (3) Exhibit 7, produced in Response to RFP No. 15 of Libby Claimants' Response to Official Committee of Asbestos Personal Injury Claimants First Set of Requests for the Production of Documents, which consists in part of all pulmonary function test result documents reflecting PFT's administered by CARD or Dr. Alan C. Whitehouse for the Libby Claimants and within the possession, custody, or control of Libby Claimants.

    Libby Claimants further respond by directing the Debtors to the attached Exhibit 1, which represents ALL medical records presently within the possession, custody, or control of Libby Claimants. (Footnote omitted).

    Libby Claimants further respond by stating that Libby Claimants will produce to Debtors, when available, documents referenced in the attached Exhibit 2, consisting of a signed medical authorization for each Libby Claimant, together with a list of each Libby Claimants' medical providers, enabling the Debtors to obtain any or all medical records otherwise responsive to this Request and not already referenced herein or provided hereto.  Generally, Libby Claimants respond that chest x-rays or CT scans for most Libby Claimants are available only through St. John's Hospital in Libby, and to a much lesser degree through the Libby CARD Clinic.  Regarding such x-rays and CT scans, Libby Claimants respond that Debtors (through Dr. Haber) had access to such medical records in 2007.

[9]  *See* St. John's Affidavit, ¶ 4 ("Despite his role in treating patients at St. John's and/or CARD, Dr. Whitehouse does not control medical records that are created, possessed, and maintained at St. John's.") & ¶ 7 ("Consistent with applicable laws and the privacy protections that govern patient health care information, absent either a specific court order, express authorization from a patient, or a legally-recognized special circumstance (e.g., public health

put their medical records at issue in this case, and the hundreds of other Libby asbestos patients who have never been involved in this case or been the subject of any particular research by Dr. Whitehouse, but rather whose only role is to have been in need of medical care in Libby for asbestos disease.[10]

8.      This Court's Modified Order–together with the Court's May 26, 2009, Protective Order (Docket No. 21854)–addresses only the redaction of and subsequent confidentiality of records.   It overlooks the threshold issue of how license to reproduce otherwise protected medical records is even secured, by Libby Claimants, Dr. Whitehouse, or any other party to these proceedings.   In short, the Affidavits affirm what Libby Claimants have asserted all along: without patient authorization or some other strict exception or court order, records cannot be made available by CARD or St. John's (and presumably any other law-abiding medical provider) to litigants or their experts in these bankruptcy proceedings based merely upon a discovery-related request from Dr. Whitehouse or Libby Claimants or a claimed need by an opposing party.[11]

9.      Finally, the St. John's and CARD Affidavits set forth the unreasonable nature of and burdens associated with the Court's Modified Order.   Both CARD and St. John's attest that any production of the records as contemplated by the Court would require at least four  months

---

emergency), it is the policy of St. John's not to produce or allow access to a patient's medical records."); CARD Affidavit, ¶¶ 4, 7.

[10]   References to 1,800 originate from one statement in the Report of Dr. Alan C. Whitehouse, 12/29/08, ¶ 2, "I currently practice chest medicine at the [CARD] in Libby, Montana, where we have over 1,800 active cases of asbestos disease from exposure to Libby asbestos."

[11]   *See, e.g.,* 45 C.F.R. § 164.512(e) (permitting disclosure of health information under HIPAA only in response to a court order or subpoena).  The Affidavits confirm that production of specifically medical records regarding Libby asbestos disease require direct court orders, not mere requests from parties or assurances about how they might be handled once produced. *See* St. John's Affidavit, ¶ 7 ("The production of medical records by St. John's to W.R. Grace in the Criminal Case was governed by, and allowed by St. John's only under court order from U.S. District Court Judge Donald Molloy.") (emphasis added), and ¶ 12 ("St. John's willingness and ability to produce medical records . . . is governed by and stems only from the Modified Order . . . Prior to entry of the Modified Order compelling St. John's to produce the medical records, and consistent with applicable laws and the privacy protections that govern patient health care information, St. John's would not have been at liberty to produce or allow access to a patient's medical records . . ."); CARD Affidavit, ¶¶ 7, 12.

W0000272.DOC

and cost well over a $100,000 to perform.[12]  They further reflect the great impact that such a production would have upon these small providers of essential medical care in Libby, Montana.

10.      Accordingly, the Libby Claimants submit that additional production of medical records for the 850 or more Libby asbestos disease claimants who have not filed a proof of claim in these proceedings is not warranted under the facts or law of this case.  However, even if after reconsideration, this Court determines that such production is required, then the St. John's and CARD Affidavits make clear the need to reconsider the scope and terms for production (and any sanctions related thereto) to prevent unjust harm.

II.    **Dr. Whitehouse Should Be Allowed to Offer Opinions Based on the Reliance Materials That Have Been Produced.**

11.      FRCP 26(a)(2)(B), states in relevant part:

> Unless otherwise stipulated or ordered by the court, this disclosure [of any witness who may be used at trial under Fed. R. Evid. 702, 703, or 705] must be accompanied by a written report–prepared and signed by the witness–if the witness is one retained or specially employed to provide expert testimony in the case . . . . The report must contain:
> (i)      a complete statement of all opinions the witness will express and the basis and reasons for them;
> (ii)     the data or other information considered by the witness in forming them;

The rule relied on by Movants states plainly that only those expert witnesses who are "retained or specially employed to provide expert testimony in the case" are subject to the requirements of producing an expert report.  Treating physicians are generally not subject to the written report requirements of FRCP 26(a)(2)(B).  *See Salas v. U.S.*, 165 F.R.D. 31, 33 (W.D.N.Y. 1995) (quoting FRCP 26(a)(2), Advisory Committee's Notes, 1993 Amendment, specifically excluding treating physicians).  Here, there can be no doubt that Dr. Whitehouse was <u>not</u> "retained or specially employed" for purposes of this litigation.  Rather, his experience as a treating physician of Libby asbestos disease defines his primary obligation to produce expert reliance materials.

---

[12]  St. John's Affidavit, ¶¶ 14, 18; CARD Affidavit, ¶¶ 14, 18.

W0000272.DOC

12.      An expert report is not required for Dr. Whitehouse to offer opinions as a treating physician. Without an obligation to produce even an expert report, there can be no legal duty to produce reliance materials for an otherwise unnecessary expert report.

13.      Nonetheless, while no expert report or reliance materials must be produced for Dr. Whitehouse to offer opinions as a treating physician of the Libby Claimants, Libby Claimants have identified extensively the facts and opinions on which Dr. Whitehouse will testify, and the materials that he has relied upon as a basis for his reports.[13] Dr. Whitehouse states in his Report:

> ¶ 84.   The data and other information considered in forming the above opinions and observations include:
>
>         a.       Unless otherwise indicated, observations made in litigation are based upon the approximately 950 persons with ARD who are clients of MHSM and LSK [Libby Claimants], and specific non-client patients who are listed in the documents in ¶ 82 [all records having been produced], for whom redacted medical records have been delivered. This is a very large number, and provides sufficient data to describe all phenomena discussed in this report.

May 14, 2009, report. Attached hereto as Exhibit 4 is a separate affidavit from Dr. Whitehouse regarding the bases of his opinions in this case, wherein he states:

> [A]ll the medical phenomena, observations and opinions I have discussed in my expert report are amply represented in the 950 Libby Claimants. The 950 are sufficiently representative of the 850 patients who are not represented by lawyers, in the approximate 1,800 total patients diagnosed.

Thus, all his opinions in this case can be said to derive from his general experience as a clinician treating Libby asbestos disease, and specifically made in reliance upon the medical records of the 950 Libby Claimants and the particular studies (and supporting data) discussed in his reports.

14.      Consistent with the Fed. R. Civ. P. 26(a)(2)(B) obligations for hired-gun experts, thousands of pages of materials on which Dr. Whitehouse does rely for his opinions in this case

---

[13]   See Expert Report by Dr. Alan C. Whitehouse of 12/29/08, of 3/14/09, and of 5/14/09.

W0000272.DOC

have been produced by the 950 Libby Claimants, including all medical records for the 950 Libby Claimants.

15.    Dr. Whitehouse is also offering expert opinions based upon literature and other medical studies involving Libby asbestos.  All those reliance materials have been produced. Specifically, all medical records for the following Libby studies with which Dr. Whitehouse was involved and on which he relies for his opinions in these plan confirmation proceedings have been provided to Movants and likewise been made available to all parties: (a) Whitehouse (2004) "Asbestos Related Pleural Disease Due to Tremolite Associated With Progressive Loss of Lung Function:  Serial Observations in 123 Miners, Family Members, and Residents of Libby, Montana," Am J Ind Med 46:219-225 [123 Libby patients]; (b) Whitehouse et al (2008) "Environmental Exposure to Libby Asbestos and Mesotheliomas," Am J Ind Med., 51(11):877-880 [11 Libby patients]; and (c) CARD mortality study [110 Libby patients].

16.    Accordingly, for purposes of FRCP 26(a)(2), Dr. Whitehouse's reliance materials should be defined as (1) the records regarding the 950 Libby Claimants, not all 1,800 Libby asbestos patients, almost half of whom are beyond these proceedings, and (2) the particular studies (and supporting data) discussed in his reports.

17.    The Libby Claimants will support Dr. Whitehouse's opinions regarding the 950 Libby Claimants and his particular studies with additional, independent opinion testimony from other experts in the fields of pulmonology and epidemiology.

18.    The scope of how to define Dr. Whitehouse's reliance materials is also aided by the Libby Claimants' objections in these plan confirmation proceedings.  As a matter of both standing and the specific arguments raised by Libby Claimants, their objections only address whether these parties–the 950 Libby Claimants–are being discriminated against and denied rights

9

under the plan. Dr. Whitehouse's experience treating Libby asbestos victims goes beyond these 950 Libby Claimants, but the opinions he offers in this case only address the discrimination and rights of these 950 Libby Claimants. All his opinions in this case relate to and can be sufficiently derived from these 950 Libby Claimants and their medical records, and further sufficiently and independently derived from the following Dr. Whitehouse studies: CARD mortality study, Whitehouse (2004) and Whitehouse et al (2008), all of which have been produced. Any argument that Dr. Whitehouse has put all 1,800 Libby patients at issue, or an interpretation by this Court of FRCP 26(a)(2) that requires a treating physician to produce records of all his related cases as his reliance materials on which opinions in a particular case are based, is not supported.

19.     Dr. Whitehouse's opinions in this case are defined by his expert report, and the materials on which he relied in developing them are expressly stated therein.[14] Nonetheless, Dr. Whitehouse is first and foremost a treating physician responsible for taking care of people suffering in Libby from asbestos disease. As such, and like any treating physician, he relies upon his cumulative personal observations, professional experience, education, and training every time he treats a patient at CARD. Accordingly, just like all treating clinicians, he is constantly compiling and enhancing what he relies upon when he treats new and more patients. That is what Dr. Whitehouse has done here, as a treating physician at CARD of 1,800 Libby asbestos patients, and that is what makes him, like any experienced treating physician, an expert. This does not mean, however, that for purposes of defining a litigation duty to produce reliance

---

[14] *See* ¶¶ 82-84, Dr. Whitehouse report of May 14, 2009.

materials, Dr. Whitehouse or any treating physician must or even could produce records of every patient he has ever seen.[15]

20.    Ironically, Dr. Whitehouse's uniquely qualified expertise and capacity to rely upon personal expert knowledge, as well as general litigation reliance materials, in forming his opinions has turned this Court's view of an expert's role in litigation on its head.  Rather than seeing Dr. Whitehouse as the expert most uniquely and obviously qualified on Libby asbestos disease to "assist the trier of fact to understand the evidence or to determine a fact in issue," Rule 702 Fed. R. Evid., the Court has construed the breadth of his expertise to preclude him from testifying altogether.  Dr. Whitehouse has the legitimate and undeniable ability to rely upon decades of general clinical experience with Libby asbestos disease to offer opinions in this case. It does not fit in a box like the materials that all the other experts in this case can point to as their only reliance materials, but the expertise and right to rely on such expertise does exist.  What cannot be denied in this case, however, is that as stated above, all the records and studies defining the FRCP 26(a)(2)(B)(ii) reliance materials to support the specific opinions made by Dr. Whitehouse in his expert report have been produced.  Expanding that duty to require all 1,800 Libby patients' records is without basis, and comes only from an extreme interpretation of a treating physician's duties under FRCP 26(a)(2).

21.    In sum, the Court's view of whether 950 or 1,800 Libby asbestos patients' claims are at issue in this case needs to be reconsidered.  At the Hearing, the Court stated:

> So if I'm incorrect about the theory then stop me, because this is what I understand this issue to be about.  If [Dr. Whitehouse] is going to opine that there

---

[15]  The Modified Order is essentially premised on the theory that a medical expert in a case must produce all the medical records related to any prior similar patients whom he may have treated.  Even assuming that records of past patients of that doctor could be made available by expert physician under health care information law, the logical absurdity of parties becoming entitled to challenge consistency of a doctor's present opinion by comparison to all his past and potentially related patients' records should be obvious.  Indeed, there is no logical or legal grounds to the notion, mush less any guide about the limits to be relied upon once the door into the treating physician's "other" patients is opened.

11

is something special about Libby asbestos disease that separates it from the rest of
the asbestos claims that are likely to come through this trust distribution process,
and the reason he's gotten to that opinion is because he's looked at this population
of the 1800–whatever the number is–1800 claims and in that population he's
identified whatever these factors are, then that population database has to be
disclosed so that other people can take a look at it.

(Hearing Tr. 105:2-13).  The Court's Modified Order does reflect a misunderstanding of Dr.

Whitehouse's opinions in this case.[16]  As stated above, the basis for his opinion in this case that

Libby asbestos disease is different should be defined by the 950 Libby Claimants and the

specific publications and studies that have been identified.  All reliance materials related to these

bases of Dr. Whitehouse's opinions have been produced, and Libby Claimants have therefore

fulfilled their duty pursuant to FRCP 26(a)(2).  The Modified Order should be reconsidered, and

Dr. Whitehouse's ability to testify as an expert restored.

**III.    Striking Dr. Whitehouse When Libby Claimants Are Legally Restricted from
Producing the Records at Issue Is Excessive.**

22.    Even if the Court determines that additional records should be available for other

parties to review, the Court's Modified Order ignores the fundamental issue that Libby

Claimants lack legal access to the medical records of all 1,800 Libby asbestos victims.[17]  *See,*

*e.g.,* § 50-16-535(1), MCA (prohibiting disclosure of medical records even to "compulsory legal

process or discovery in any judicial, legislative, or administrative proceeding"); § 50-16-530,

MCA (stating circumstances, none of which apply here, where disclosure without patient's

---

[16]  The Court also may have been unaware that Dr. Whitehouse is not the Libby Claimants only witness on
epidemiology.  "The Libby claimants have chosen to proceed in this fashion.  They don't need the medical–their
treating physician to be their epidemiological expert."  (Hearing Tr. 104:16-19).  Libby Claimants have an
epidemiological expert other than Dr. Whitehouse.  It is true that unlike every other medical expert in this case, Dr.
Whitehouse has treating physician experience in Libby.  This undoubtedly gives him personal medical expertise
with a large population of asbestos patients and has facilitated multiple specific, peer-reviewed research studies.
Nonetheless, the materials on which he relies for his medical opinions in this case, all of which Libby Claimants
have produced, should be interpreted based upon his expert reports, not by the Court's mistaken view of the scope of
his testimony.
[17]  *See* St. John's Affidavit, ¶ 7 ("Consistent with applicable laws and the privacy protections that govern patient
health care information, absent either a specific court order, express authorization from a patient, or a legally-

W0000272.DOC

authorization is permitted); *see generally* 45 C.F.R. §§ 164.102 et seq. (HIPAA).  Likewise, Dr. Whitehouse has limited rights regarding these 1,800 sets of medical records in his role as a treating physician, and he cannot produce to Movants all the records demanded in the Modified Order.[18]  Indeed, Dr. Whitehouse is and must be viewed independently from Libby Claimants and their counsel, who represent just some of the many Libby patients with asbestos disease whom he treats.  Accordingly, Dr Whitehouse cannot produce all the records demanded in the Modified Order.   Nonetheless, the Modified Order sanctions Libby Claimants for these established aspects of health care information law.

23.    Movants consistently argued that Libby Claimants have been guilty of "refusing to produce" these records, and on that basis argued for this Court to impose the ultimate harsh sanction on Libby Claimants of striking Dr. Whitehouse as an expert.  Contrary to Movants' misrepresentations, the 950 Libby Claimants have never refused to produce records in their possession, custody, or control, but have provided copies of and full access to their own medical records.[19]  Nor for that matter have Libby Claimants ever, including here, opposed disclosure regarding other Libby asbestos patients.[20]  Legal barriers to the production demanded by Movants have always existed that prevent Libby Claimants from producing these medical records.

recognized special circumstance (e.g., public health emergency), it is the policy of St. John's not to produce or allow access to a patient's medical records."); CARD Affidavit, ¶ 7.

[18]  *Compare* St. John's Affidavit, ¶ 7 ("St. John's does produce or allow access to patient medical records that [a] health care provider requests for purposes of assisting in that patient's medical care and treatment.") *with* ¶ 4 ("Despite his role in treating patients at St. John's and/or CARD, Dr. Whitehouse does not control medical records that are created, possessed, and maintained at St. John's."); CARD Affidavit, ¶¶ 4, 7.

[19]  *See* Libby Claimants' Response to Debtors' Requests for the Production of Documents (March 24, 2009), and Letter from Chris Candon, Esq., Counsel for Libby Claimants, Re: Document Production (May 4, 2009).  In doing so, Libby Claimants resolved most of Arrowood's Motion.

[20]  The Libby Claimants and Dr. Whitehouse have nothing to conceal from this Court or Movants, about their own condition or Libby asbestos disease in other patients.  That said, lack of opposition to disclosure cannot be equated with authority to produce the records of other, non-claimant patients, each and any of whom may wish to maintain privacy of their medical records.

13

24.    This Court has never found, and indeed Movants never provided any legal authority to support a claim, that the Libby Claimants or Dr. Whitehouse have legal access to or a right to produce private medical records regarding the hundreds of Libby CARD patients who are not involved with this case.  Arguments relying on the waiver made by a claimant who puts his or her medical condition at issue do not address the 850 non-claimants, nor are they even relevant since the 950 Libby Claimants have produced all of their own medical records.[21]  Now specifically implicated by the Court's Modified Order are the 850 patients for whom no waiver has occurred or even been alleged.  The Modified Order as written would punish the 950 Libby Claimants by precluding Dr. Whitehouse–their own treating physician–from offering any opinion regarding their disease, because like all treating physicians, his opinions regarding their condition falls within the scope of having been "formed based upon reliance, in whole or in part, on the records [of all 1,800 Libby asbestos patients]." (Emphasis added).

25.    Dr. Whitehouse did rely in his studies and publications on some Libby asbestos patients (and their medical records) who are not claimants in these proceedings but who met the criteria of the particular studies.  In his capacity as a researcher, Dr. Whitehouse relied on clear exceptions under the law[22] and/or an express, limited authorization which he secured from those patients.  His use as a researcher of those limited number[23] of other Libby patients' records for his research cannot possibly constitute a waiver by Libby Claimants or Dr. Whitehouse of all the other 850 Libby asbestos patients.

---

[21]  *See* § 50-16-535(1)(c), MCA (allowing compelled disclosure of medical records when a patient is a party to a proceeding and has put his medical condition at issue); Arrowood Motion (Docket No. 21245) at pp. 14-15; Grace Brief (Docket No. 21591) at pp. 10-12.

[22]  *See, e.g.*, § 50-16-529(6), MCA.

[23]  Whitehouse (2004) involved 123 Libby asbestos subjects, only 5 of whom were not among the Libby Claimants; Whitehouse (2008) involved 11 Libby mesothelioma cases, 3 of whom were not among the Libby Claimants; the CARD Mortality Study involved 110 deceased from Libby asbestos disease, 30 of whom were not Libby Claimants.

14

26.     Movants are free to challenge the conclusions made by Dr. Whitehouse in his studies and their application to the claims made here by the 950 Libby Claimants regarding their own disease and rights under the TDP any number of ways.  They should not have to rely on the Libby Claimants who have the same limited rights regarding the 850 other Libby asbestos patients or the Modified Order to do so.  Movants and their experts could employ the same explicit research-based exceptions in health care information law to gain access to any or all of the 1,800 Libby patients records that they seek.[24]  Their failure to employ such rights should not now be held against the Libby Claimants.  Movants can also attack the procedures used by Dr. Whitehouse in his studies and research like they would any author of a published study.  They have failed, however, to cite any legal authority for the proposition that a peer-reviewed author or expert must substantiate his published findings through actual production of the vast universe of cases that were not included in his study, which is the consequence of their argument and the conclusion reflected in the Court's Modified Order.

27.     The 850 victims of Libby asbestos disease implicated by the Modified Order are not parties to this case and have never authorized release of their medical records.[25]  The Court does not have jurisdiction over these parties.  It is one thing for this Court to order that the Libby

---

[24]  This Court should note that despite years in which to do so, none of the experts hired by Movants to offer their opinions on Libby asbestos disease throughout this case have ever conducted medical examinations of any of the 1,800 Libby asbestos victims.  Despite already having in their possession records from hundreds of Libby asbestos patients (*see* St. John's and CARD Affidavits regarding productions in the Criminal Case), they have never developed any studies of their own regarding Libby asbestos disease.  They have never even so much as re-worked the data in their possession for many years to contest specifically the conclusions reached in Dr. Whitehouse's studies, or to identify how they believe the data really should be read.  In short, instead of attempting to describe through science their version of "truth" about Libby asbestos disease, Movants are simply trying to kill the messenger–Dr. Whitehouse–who really has done the work and supported his conclusions thereby.

[25]  *See* § 50-16-535(1)(c), MCA (allowing compelled disclosure of medical records when a patient is a party to a proceeding and has put his medical condition at issue).  They have no formal role in this case.  Their only "act" in this case is to have developed asbestos disease as a result of exposure to asbestos in Libby, and then to have sought medical treatment from Dr. Whitehouse and/or CARD in the hope that such care and treatment would assist their own health and well-being.  The notion that doing so should have caused them to surrender all privacy in their medical records to Grace, which is responsible for their illness, has no support in the law and should not force the disclosure of all their medical records.

15

Claimants' records must be made available to Movants.  It is another to sanction the 950 Libby

Claimants for failure to produce records when they could not have achieved such a production

for themselves, much less for Movants.[26]  As stated in the St. John's and CARD Affidavits:

> St. John's willingness and ability to produce medical records to the "Plan Proponents or other requesting parties" is governed by and stems only from the Modified Order, together with the Protective Order to protect the privacy of health care information for St. John's patients.  Prior to entry of the Modified Order compelling St. John's to produce the medical records, and consistent with applicable laws and the privacy protections that govern patient health care information, St. John's would not have been at liberty to produce or allow access to a patient's medical records except in the case of express authorization from a patient, a legally-recognized special circumstance (e.g., public health emergency), or to another health care provider's request for purposes of assisting in that patient's medical care and treatment.

St. John's Affidavit, ¶ 12; *see also* CARD Affidavit, ¶ 12.

28.    The need for Libby Claimants to depend upon some independent and previously

non-existent right of access to the medical records of other Libby asbestos patients is highlighted

also by the St. John's and CARD Affidavits, which deny the Libby Claimants any right to be

involved in the redaction contemplated by the Modified Order.[27]  *See* St. John's Affidavit, ¶ 12;

CARD Affidavit, ¶ 12.

29.    Reliance by the Court in its Modified Order on a protective order ensuring

confidentiality in these proceedings or on records of non-claimants being redacted does not cure

the basic threshold issue of access.  The assumption that all medical records *could* be produced

by Libby Claimants is flawed.  Thus, this Court must reconsider whatever duty it implicitly

---

[26]  The 950 Libby Claimants must be considered equally entitled "beneficiaries" of any production that Movants would receive under the Court's Modified Order, since they do not already have and do not have access to the 850 other Libby asbestos patients' medical records.

[27]  *See* St. John's Affidavit, ¶ 15 ("For purposes of protecting both the privacy of patient health care information during redaction and the integrity of medical records and the systems owned and maintained by St. John's, it is my expectation that St. John's must control and oversee the day-to-day work and personnel involved in this production. St. John's policy will not allow third-parties, such as lawyers or their representatives, access to the private health care information of unrepresented patients for purposes of performing the threshold redaction required by the Modified Order.")  CARD Affidavit, ¶ 15.

16

relied on in concluding that the Libby Claimants or Dr. Whitehouse *should* now or previously
have produced the medical records of non-claimants.

**IV.    Any Production of Reliance Materials Needs to Be Reasonable and Cannot Impose
the Kind of Undue Burden Contemplated in the Court's Initial Modified Order on
Libby Claimants and the Medical Providers it Impacts.**

30.    The Modified Order gave Libby Claimants until May 21, 2009, to produce a
"complete set" of redacted medical records regarding all 1,800 Libby asbestos patients, or else
Dr. Whitehouse would be barred from testifying as an expert.  This represented just one week
from the date of the Hearing, at which time Libby Claimants' alleged duty to produce the records
was first identified by the Court.  The St. John's and CARD Affidavits demonstrate, based upon
specific experience in smaller, past productions of Libby medical records to Grace, that the
production of records contemplated in the Modified Order would require <u>at least four months</u>.[28]
Obviously, a one week period is not reasonable.  The time for any production, if still necessary,
should be reconsidered now that the Court is fully informed about the scope of the project.

31.    The Modified Order also requires the Libby Claimants to bear the cost of this
production.  The St. John's and CARD Affidavits demonstrate, again based upon specific
experience in smaller, past productions of Libby medical records to Grace, that the total cost of
producing the records contemplated in the Modified Order could exceed $175,000.[29]  St. John's
and CARD would require payment of $45,000 before they would begin any work.[30]  Moreover,
because Grace has refused to pay CARD's costs from previous productions, CARD would
require approximately $35,000 more before beginning this production.[31]  Whether gauged by the
immediate cost of $45,000–$80,000 or the total cost of approximately $175,000, the Libby

---

[28]  *See* St. John's Affidavit, ¶ 14; CARD Affidavit, ¶ 14.
[29]  *See* St. John's Affidavit, ¶ 18; CARD Affidavit, ¶ 18.
[30]  *See* St. John's Affidavit, ¶ 15; CARD Affidavit, ¶ 15.
[31]  *See* CARD Affidavit, ¶¶ 9, 15.

Claimants who have received no compensation for several years from Grace, simply cannot pay this kind of cost. The financial burden, especially given the time pressure for payment, demands that the Modified Order be reconsidered.

32.     Finally, the St. John's and CARD Affidavits demonstrate that the Modified Order and the production that it contemplates impose a substantial burden on innocent third parties and costs beyond dollars on staff and on asbestos patients in Libby who depend upon these facilities for their medical care.[32] The Movants' demand for these records[33] needs to be balanced against the intrusion that the production would be on St. John's and CARD. Indeed, this Motion to Reconsider should be granted if for no other reason than to evaluate at this time the legitimate requests by St. John's and CARD regarding "reduc[ing] the intrusion that this production will be on [them]."[34]

## CONCLUSION

Based upon the above argument and the newly-presented evidence attached hereto. Libby Claimants respectfully request that this Court grant the Motion to Reconsider the Modified Order.

---

[32] *See* St. John's Affidavit, ¶ 14-17; CARD Affidavit, ¶¶ 9, 14-17.
[33] Grace already has been given access to and copies of hundreds of these records in past productions. *See* St. John's Affidavit, ¶ 9; CARD Affidavit, ¶ 9. Libby Claimants have already provided a complete set of records for all 950 Libby Claimants, and separately, for all Libby asbestos patients involved in Dr. Whitehouse's above-mentioned studies and others .
[34] *See* St. John's Affidavit, ¶ 19; CARD Affidavit, ¶ 19.

W0000272.DOC

WHEREFORE, the Libby Claimants respectfully request that this Court (i) enter an order

granting this Motion; and (ii) grant such other and further relief as this Court may deem just and

proper.

Dated: June 8, 2009
       Wilmington, Delaware

**LANDIS RATH & COBB LLP**

Adam G. Landis (No. 3407)
Kerri K. Mumford (No. 4186)
919 Market Street, Suite 1800
Wilmington, DE 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450

- and -

Daniel C. Cohn
Christopher M. Candon
**COHN WHITESELL & GOLDBERG LLP**
101 Arch Street
Boston, MA 02110
Telephone: (617) 951-2505
Facsimile: (617) 951-0679

*Counsel for Libby Claimants*