# Exhibit 2

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W.R. Grace & Co., et al., | ) | Case No. 01-1139 (JKF) |
| | ). | Jointly Administered |
| Debtors. | ) | |
| | ) | |

## AFFIDAVIT OF MARK KROLL

STATE OF MONTANA    )
                     ):ss
County   of   Lincoln   )

MARK KROLL, being first duly sworn upon oath, deposes and states as follows:

1.     I am Mark Kroll, CPHIT, CPEHR.[1]

2.     I am the Health Information Manager, Privacy Officer at St. John's Lutheran Hospital (St. John's) in Libby, Montana. I am trained and certified in, and familiar with both federal and Montana state laws that apply to medical records. In my duties at St. John's, I am responsible for overseeing and administering, among other things, all medical records created, possessed, and maintained at St. John's.

3.     I understand that together with the Center for Asbestos Related Disease (CARD) in Libby, Montana, St. John's possesses and controls most of the medical records, including almost all original x-rays, CT's, and other imaging studies, associated with asbestos treatment for patients who were exposed to asbestos in Libby, Montana.

---

[1] CPHIT–Certified Professional in Health Information Technology; CPEHR–Certified Professional in Electronic Health Records

4.      I am aware that Alan C. Whitehouse, MD, is one of the primary physicians at CARD, and that both currently and over a period of decades, he has been involved in the medical care and treatment of hundreds of patients who were exposed to asbestos in Libby, Montana. Despite his role in treating patients at St. John's and/or CARD, Dr. Whitehouse does not control medical records that are created, possessed, and maintained at St. John's.

5.      I am also aware that Dr. Whitehouse has been named as a witness in past and ongoing litigation involving asbestos exposure caused by W.R. Grace in Libby, Montana.

6.      I was personally involved with facilitating and overseeing a production of medical records by St. John's for W.R. Grace lawyers and their experts as part of the Missoula-based, federal criminal case of *United States v. W.R Grace & Co., et al* (Criminal Case). I am aware that a similar production of medical records (and perhaps more than one) was made by CARD for W.R. Grace lawyers and their experts as part of the Criminal Case. It is my understanding that these productions of medical records by St. John's and CARD to W.R. Grace in the Criminal Case were related and generally limited to Dr. Whitehouse's patients.

7.      The production of medical records by St. John's to W.R. Grace in the Criminal Case was governed by, and allowed by St. John's only under court order from U.S. District Court Judge Donald Molloy. Consistent with applicable laws and the privacy protections that govern patient health care information, absent either a specific court order, express authorization from a patient, or a legally-recognized special circumstance (e.g., public health emergency), it is the policy of St. John's not to produce or allow access to a patient's medical records. Consistent with applicable laws, St. John's does produce or allow access to patient medical records that another health care provider requests for purposes of assisting in that patient's medical care and treatment.

8.    The production of and access to medical records that St. John's allowed W.R. Grace in the Criminal Case was a massive endeavor for St. John's, and it represented a massive intrusion on our operations.

9.    I recall that the production of and access to medical records that St. John's allowed W.R. Grace in the Criminal Case involved approximately 550 patients. First, St. John's had to identify whether it had medical records for those 550 patients. Second, under the court's order and consistent with our own policies of protecting the privacy of patient health care information, St. John's was required to redact personal information from all the medical records that we produced to and allowed W.R. Grace to access in the criminal case. Third, medical records had to be reproduced to disks. Based on the process required by our own physical systems at St. John's, only one patient can be burned to each disk. Since most patients had multiple images, multiple disks were required for some of the 550 patients. St. John's had to hire one additional person to complete the project. This whole process in the Criminal Case took us two and one-half (2 ½) months to complete. The total cost of the charges that St. John's billed to the W.R. Grace lawyers in the Criminal Case was approximately $56,000.

10.    I have reviewed the May 27, 2009, Modified Order (Modified Order) issued by the U.S. Bankruptcy Court for the District of Delaware, Case No. 01-01139 (JKF) (Bankruptcy Case). I have also reviewed the May 26, 2009, Protective Order issued in the Bankruptcy Case. I understand that this Bankruptcy Case involves the W.R. Grace bankruptcy, and that it is different from the Criminal Case.

11.    I understand that the Modified Order compels St. John's to cooperate with and allow for the production of documents: "IT IS FURTHER ORDERED, that medical records . . . must be produced by May 21, 2009 . . ." It is my further understanding that the Modified Order

requires St. John's to redact personal identifying information from the medical records to be produced of those persons who are not claimants in the Bankruptcy Case. Consistent with applicable laws and St. John's health information policy, St. John's is willing and intends to comply with the Modified Order by facilitating and overseeing a production of medical records by St. John's for the "Plan Proponents or other requesting parties" designated in the Modified Order.

12.    St. John's willingness and ability to produce medical records to the "Plan Proponents or other requesting parties" is governed by and stems only from the Modified Order, together with the Protective Order to protect the privacy of health care information for St. John's patients.  Prior to entry of the Modified Order compelling St. John's to produce the medical records, and consistent with applicable laws and the privacy protections that govern patient health care information, St. John's would not have been at liberty to produce or allow access to a patient's medical records except in the case of express authorization from a patient, a legally-recognized special circumstance (e.g., public health emergency), or to another health care provider's request for purposes of assisting in that patient's medical care and treatment.

13.    I understand that perhaps St. John's will not need to produce redacted medical records for all the 1,800 patients referenced in the Modified Order, and that the project of redaction may be necessary for only approximately 850 patients who are not claimants in the Bankruptcy Case.

14.    Based upon my experience with the production of redacted medical records for W.R. Grace in the Criminal Case, I expect that the production now in the Bankruptcy Case of redacted medical records for 850 patients would require at least four (4) months to complete.  I expect that given the additional approximately 300 patients now involved, this production in the

Bankruptcy Case will be an even more massive endeavor for St. John's than what occurred in the Criminal Case, and it will certainly represent an even more massive intrusion on our operations. I expect that over a thousand actual CD's will be necessary.

15. I expect that St. John's will have to hire additional staff to begin and complete the production of 850 redacted records, requiring advanced payment of $20,000 from someone involved in the Bankruptcy Case. For purposes of protecting both the privacy of patient health care information during redaction and the integrity of medical records and the systems owned and maintained by St. John's, it is my expectation that St. John's must control and oversee the day-to-day work and personnel involved in this production. St. John's policy will not allow third-parties, such as lawyers or their representatives, access to the private health care information of unrepresented patients for purposes of performing the threshold redaction required by the Modified Order.

16. Before the above-referenced four-months of work can begin, we will first need to receive a list of the patients from someone defining which patients' records, and the dates of each examination which need to be located, redacted, and then produced.

17. Physical limitations associated with our small facility present a major problem. I already struggle with space constraints on a daily basis during our regular hospital operations. For example, at the moment I do not have easy access to a temporary space for the required outside audit of medical records that St. John's must undergo. These physical limitations with our facility, together with St. John's limited computer capacity to reproduce digital copies of medical records/images, mean that we cannot simply hire more people as a way of shortening how long it would take for this production of records to be completed. That said, we are willing and do intend to comply with the Modified Order as best we can. Obviously, St. John's cannot

produce the contemplated records much less redacted records, by May 21, 2009 (a date that has already passed) as called for in the Modified Order.

18.     Based upon my experience with the production of redacted medical records for W.R. Grace in the Criminal Case, I expect that the cost of producing now in the Bankruptcy Case redacted medical records for 850 patients, together with any other production of non-redacted medical records, could easily exceed $100,000.

19.     Consistent with applicable laws and St. John's health information policy, St. John's is willing to discuss other options that will fulfill our obligations under the Modified Order, either for purposes of expediting the required production and certainly with an aim of reducing the intrusion that this production will be upon St. John's.

DATED this 4TH day of June, 2009.

_____
Mark Kroll

SUBSCRIBED AND SWORN to before me this 4 day of June, 2009.

(SEAL)

_____
Notary Public for the State of Montana
Debra J. Fech
Residing at: Libby, Lincoln
My Commission Expires: 02-02-2012