# Exhibit 3

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: ) | Chapter 11 |
| ) | |
| W.R. Grace & Co., et al., ) | Case No. 01-1139 (JKF) |
| ) | Jointly Administered |
| Debtors. ) | |

### AFFIDAVIT OF KIMBERLY ROWSE

STATE OF MONTANA    )
                    ):ss
County of Lincoln   )

KIMBERLY ROWSE, being first duly sworn upon oath, deposes and states as follows:

1. I am Kimberly Rowse, RN.

2. I am the Clinical Coordinator of the Center for Asbestos Related Disease (CARD) in Libby, Montana. I have been educated about and am familiar with both federal and Montana state laws that apply to medical records. In my duties at CARD, I am ultimately responsible for the oversight and supervision of policy, staff, process and protection of all medical records created, possessed, and maintained at CARD.

3. I understand that together with St. John's Lutheran Hospital (St. John's) in Libby, Montana, CARD possesses and controls most of the medical records and protected health information for patients that are screened and/or are being treated as a result of exposure to asbestos in Libby, Montana.

4. I am aware that Alan C. Whitehouse, MD, is a consulting pulmonologist who is contracted by CARD, and that both currently and over a period of decades, he has been involved with screening, diagnosing, and treating hundreds of patients who were exposed to asbestos in

Libby, Montana. Despite his role in treating patients at St. John's and CARD, Dr. Whitehouse does not control medical records that are created, possessed, and maintained at CARD.

5. I am also aware that Dr. Whitehouse has been named as a witness in past and ongoing litigation involving asbestos exposure caused by W.R. Grace in Libby, Montana.

6. I coordinated, supervised, and was personally involved in production of medical records by CARD for W.R. Grace lawyers and their experts as part of the Missoula-based, federal criminal case of *United States v. W.R. Grace & Co., et al* (Criminal Case), most recently in February and March of 2009. I am aware that a production of medical records was also made by St. John's for W.R. Grace lawyers and their experts as part of the Criminal Case. It is my understanding that these productions of medical records by CARD and St. John's to W.R. Grace in the Criminal Case were related and generally limited to Dr. Whitehouse's patients, including patients that were identified in his published papers and studies.

7. The production of medical records by CARD to W.R. Grace in the Criminal Case was governed by, and allowed by CARD only under court order from U.S. District Court Judge Donald Molloy. Consistent with applicable laws and the privacy protections that govern patient health care information, absent either a specific court order, express authorization from a patient, or a legally-recognized special circumstance (e.g., public health emergency), it is the policy of CARD not to produce or allow access to a patient's medical records. Consistent with applicable laws, CARD does produce or allow access to patient medical records that another health care provider requests for purposes of assisting in that patient's medical care and treatment.

8. The production of and access to medical records that CARD allowed W.R. Grace in the Criminal Case was an enormous undertaking that proved intrusive for CARD staff, operations, and patients.

9. I recall that the production of and access to medical records that CARD allowed W.R. Grace in the Criminal Case involved approximately 550 patients. First, CARD was required to determine whether it had medical records for those individuals identified by W.R. Grace for production. Second, under the court's order and consistent with our own policies of protecting the privacy of patient health care information, CARD was required to redact personal information from many of the medical records that we produced to and allowed W.R. Grace to access in the Criminal Case. CARD staff worked overtime during the production process while continuing to provide our regular care services to patients with asbestos disease in Libby. CARD also hired one additional person to help with the production. Third, CARD was required to accommodate the physical presence of W.R. Grace lawyers and staff during this process. CARD is a very small facility, and the intrusion of W.R. Grace personnel, equipment, and supplies displaced several CARD staff members from their work spaces. In addition, excessive W.R. Grace demands for information and assistance from CARD staff during the production in the Criminal Case was time-consuming and intrusive. This whole process in the Criminal Case took us two and one-half (2 ½) months to complete. The total cost of the charges that CARD billed to the W.R. Grace lawyers in the Criminal Case was invoiced at $34,264.40, which W.R. Grace has consistently ignored and which remains outstanding as of this date.

10. I have reviewed the May 27, 2009, Modified Order (Modified Order) issued by the U.S. Bankruptcy Court for the District of Delaware, Case No. 01-01139 (JKF) (Bankruptcy Case). I have also reviewed the May 26, 2009, Protective Order issued in the Bankruptcy Case. I understand that this Bankruptcy Case involves the W.R. Grace bankruptcy, and that it is different from the Criminal Case.

11. I understand that the Modified Order compels CARD to cooperate with and allow

for the production of documents: "IT IS FURTHER ORDERED, that medical records . . . must be produced by May 21, 2009 . . . ." It is my further understanding that the Modified Order requires CARD to redact personal identifying information from the medical records to be produced of those persons who are not claimants in the Bankruptcy Case. Consistent with applicable laws and CARD health information policy, CARD is willing and intends to comply with the Modified Order by facilitating and overseeing a production of medical records by CARD for the "Plan Proponents or other requesting parties" designated in the Modified Order.

12. CARD's willingness and ability to produce medical records to the "Plan Proponents or other requesting parties" is governed by and stems only from the Modified Order, together with the Protective Order to protect the privacy of health care information for CARD patients. Prior to entry of the Modified Order compelling CARD to produce the medical records, and consistent with applicable laws and the privacy protections that govern patient health care information, CARD would not have been at liberty to produce or allow access to a patient's medical records except in the case of express authorization from a patient, a legally-recognized special circumstance (e.g., public health emergency), or to another health care provider's request for purposes of assisting in that patient's medical care and treatment.

13. I understand that the project of redacting "personal identifying information" may not be necessary for all the 1,800 patients referenced in the Modified Order, and that the project of redacting "personal identifying information" may be necessary for only approximately 850 patients who are not claimants in the Bankruptcy Case. However, it is my expectation that above and beyond the redaction of "personal identifying information" for approximately 850 patients, CARD will also need to redact certain information regarding all 1,800 patients that is contained in most CARD patients' medical records files. Specifically, CARD is prohibited by applicable

laws and the privacy protections that govern patient health care information from disclosing, in the absence of express patient consent, even in the context of the Modified Order, the private patient information that is included on the standard forms used at CARD which are attached hereto as Exhibit A. CARD expects that these forms, referenced as the attached Exhibit A, would need to be redacted from every medical records file which is produced.

14. Based upon my experience with the production of redacted medical records for W.R. Grace in the Criminal Case, I expect that the production now in the Bankruptcy Case of redacted medical records for 850 patients would require at least four (4) months to complete. I expect that given the additional approximately 300 patients now involved, this production in the Bankruptcy Case will be an even more massive endeavor for and hardship upon CARD than what occurred in the Criminal Case. Also, CARD's screenings and patient visits are at their peak during the non-snowy months of summer and fall. Considerable strain would be caused for both CARD staff and patients by this production in the Bankruptcy Case, due to its size and timing.

15. I expect that CARD will have to hire additional staff to begin and complete the production of 850 redacted records, requiring advanced payment of $25,000 from someone involved in the Bankruptcy Case. Moreover, CARD will require payment of the $34,264.40 invoice from the production in the Criminal Case before beginning a production in the Bankruptcy Case. For purposes of protecting both the privacy of patient health care information during redaction and the integrity of medical records and the systems owned and maintained by CARD, it is my expectation that CARD must coordinate, control, and oversee the day-to-day work and personnel involved in this production. CARD policy will not allow third-parties, such as lawyers or their representatives, access to the private health care information of unrepresented patients for purposes of performing the threshold redaction required by the Modified Order.

16. Before the above-referenced four-months of work can begin, we will first need to receive a list of the patients from someone defining which patients' records and the defining dates of treatment for inclusion which need to be located, redacted, and then produced.

17. Physical limitations associated with our small facility mean that we cannot simply hire more people as a way of shortening how long it would take for this production of records to be completed. That said, we are willing and do intend to comply with the Modified Order as best we can. Obviously, CARD cannot produce the contemplated records much less redacted records, by May 21, 2009 (a date that has already passed) as called for in the Modified Order.

18. Based upon my experience with the production of redacted medical records for W.R. Grace in the Criminal Case, I expect that the cost of producing now in the Bankruptcy Case redacted medical records for 850 patients, together with any other production of non-redacted medical records, could easily exceed $75,000.

19. Consistent with applicable laws and CARD health information policy, CARD is willing to discuss other options that will fulfill our obligations under the Modified Order, either for purposes of expediting the required production and certainly with an aim of reducing the intrusion that this production will be upon CARD.

DATED this 8 day of June, 2009.

_____
Kimberly Rowse

SUBSCRIBED AND SWORN to before me this 8 day of June, 2009.

_____
(SEAL)         Notary Public for the State of Montana
               Debra J. Kerch.
               Residing at: Libby, Lincoln
               My Commission Expires: 02-02-2012



**CARD**
Center for Asbestos Related Disease

## Adult State Anxiety

Date _____

Name _____    Filled in by CARD    Patient ID _____

DIRECTIONS: A number of statements which people have used to describe themselves are given below. Read each statement and then choose the appropriate box to indicate how you feel RIGHT now, that is, AT THIS MOMENT. There are no right or wrong answers. Do not spend too much time on any one statement but give the answer which seems to describe your present feelings best.

| | Not At All | Somewhat | Moderately So | Very Much So |
|---|---|---|---|---|
| 1. I feel calm | ❏ | ❏ | ❏ | ❏ |
| 2. I feel secure | ❏ | ❏ | ❏ | ❏ |
| 3. I am tense | ❏ | ❏ | ❏ | ❏ |
| 4. I feel strained | ❏ | ❏ | ❏ | ❏ |
| 5. I feel at ease | ❏ | ❏ | ❏ | ❏ |
| 6. I feel upset | ❏ | ❏ | ❏ | ❏ |
| 7. I am presently worrying over possible misfortunes | ❏ | ❏ | ❏ | ❏ |
| 8. I feel satisfied | ❏ | ❏ | ❏ | ❏ |
| 9. I feel frightened | ❏ | ❏ | ❏ | ❏ |
| 10. I feel comfortable | ❏ | ❏ | ❏ | ❏ |
| 11. I feel self-confident | ❏ | ❏ | ❏ | ❏ |
| 12. I feel nervous | ❏ | ❏ | ❏ | ❏ |
| 13. I am jittery | ❏ | ❏ | ❏ | ❏ |
| 14. I feel indecisive | ❏ | ❏ | ❏ | ❏ |
| 15. I am relaxed | ❏ | ❏ | ❏ | ❏ |
| 16. I feel content | ❏ | ❏ | ❏ | ❏ |
| 17. I am worried | ❏ | ❏ | ❏ | ❏ |
| 18. I feel confused | ❏ | ❏ | ❏ | ❏ |
| 19. I feel steady | ❏ | ❏ | ❏ | ❏ |
| 20. I feel pleasant | ❏ | ❏ | ❏ | ❏ |

Compute Score?   ◯ Yes   ◯ No      For Clinic Use Only    Adult State Anxiety Score _____

Select "Yes" and hit Tab key to view score

STAIB-AD, copyright 1968, 1977 Charles D. Spielberger. All Rights Reserved

For Clinic Use Only    Entered By: _____

AnxietyV3.sav 6/11/2008 ab

 

## Perceived Stress Scale

Patient Name _____

Date Administered _____    Patient ID _____

The questions in this scale ask you about your feelings and thoughts during the last month. In each case, you will be asked to indicate by selecting how often you felt or thought a certain way.

| | Never | Almost Never | Sometimes | Fairly Often | Very Often |
|---|---|---|---|---|---|
| 1. In the last month, how often have you been upset because of something you could not control? | ❏ | ❏ | ❏ | ❏ | ❏ |
| 2. In the last month, how often have felt that you were unable to control the important things in your life? | ❏ | ❏ | ❏ | ❏ | ❏ |
| 3. In the last month, how often have you felt nervous and "stressed"? | ❏ | ❏ | ❏ | ❏ | ❏ |
| 4. In the last month, how often have you felt confident about your ability to handle your personal problems? | ❏ | ❏ | ❏ | ❏ | ❏ |
| 5. In the last month, how often have you felt that things were going your way? | ❏ | ❏ | ❏ | ❏ | ❏ |
| 6. In the last month, how often have you found that you could not cope with all the things you had to do? | ❏ | ❏ | ❏ | ❏ | ❏ |
| 7. In the last month, how often have you been able to control irritations in your life? | ❏ | ❏ | ❏ | ❏ | ❏ |
| 8. In the last month, how often have you felt that you were on top of things? | ❏ | ❏ | ❏ | ❏ | ❏ |
| 9. In the last month, how often have you been angered because of things that were outside of your control? | ❏ | ❏ | ❏ | ❏ | ❏ |
| 10. In the last month, how often have you felt difficulties were piling up so high that you could not overcome them? | ❏ | ❏ | ❏ | ❏ | ❏ |

Compute Score?   ○ Yes   ○ No      Score _____

Choose "Yes" and hit Tab key to view score


**Center for Asbestos Related Disease**

# Ego Resiliency Scale (ER89)

Patient Name _____    Date Administered _____

Patient ID _____

| | Does not apply at all | Applies slightly | Applies somewhat | Applies very strongly |
|---|---|---|---|---|
| 1. I am generous with my friends | ❏ | ❏ | ❏ | ❏ |
| 2. I quickly get over and recover from being startled | ❏ | ❏ | ❏ | ❏ |
| 3. I enjoy dealing with new and unusual situations | ❏ | ❏ | ❏ | ❏ |
| 4. I usually succeed in making a favorable impression on people. | ❏ | ❏ | ❏ | ❏ |
| 5. I enjoy trying new foods I have never tasted before. | ❏ | ❏ | ❏ | ❏ |
| 6. I am regarded as a very energetic person. | ❏ | ❏ | ❏ | ❏ |
| 7. I like to take different paths to familiar places. | ❏ | ❏ | ❏ | ❏ |
| 8. I am more curious than most people. | ❏ | ❏ | ❏ | ❏ |
| 9. Most of the people I meet are likeable. | ❏ | ❏ | ❏ | ❏ |
| 10. I usually think carefully about something before acting. | ❏ | ❏ | ❏ | ❏ |
| 11. I like to do new and different things | ❏ | ❏ | ❏ | ❏ |
| 12. My daily life is full of things that keep me interested. | ❏ | ❏ | ❏ | ❏ |
| 13. I would be willing to describe myself as a pretty "strong" personality. | ❏ | ❏ | ❏ | ❏ |
| 14. I get over my anger at someone reasonably quickly. | ❏ | ❏ | ❏ | ❏ |

Compute Score?   ○ Yes   ○ No              **Score** _____



# Center for Epidemiological Studies Depression Scale



Patient Name _____    Date _____

Patient ID _____

Think back to the past week and read each statement below; then choose the statement that best describes how often you felt this way during the past week

| | Rarely or None of the Time (less than 1 day) | Some or a little of the time (1 to 2 days) | Occasionally or a moderate amount of the time (3 to 4 days) | Most or all of the time (5 to 7 days) |
|---|---|---|---|---|
| 1. I was bothered by things that usually don't bother me | ❏ | ❏ | ❏ | ❏ |
| 2. I did not feel like eating; my appetite was poor | ❏ | ❏ | ❏ | ❏ |
| 3. I felt that I could not shake off the blues even with help from my family or friends | ❏ | ❏ | ❏ | ❏ |
| 4. I felt that I was just as good as other people | ❏ | ❏ | ❏ | ❏ |
| 5. I had trouble keeping my mind on what I was doing | ❏ | ❏ | ❏ | ❏ |
| 6. I felt depressed | ❏ | ❏ | ❏ | ❏ |
| 7. I felt everything I did was an effort | ❏ | ❏ | ❏ | ❏ |
| 8. I felt hopeful about the future | ❏ | ❏ | ❏ | ❏ |
| 9. I thought my life had been a failure | ❏ | ❏ | ❏ | ❏ |
| 10. I felt fearful | ❏ | ❏ | ❏ | ❏ |
| 11. My sleep was restless | ❏ | ❏ | ❏ | ❏ |
| 12. I was happy | ❏ | ❏ | ❏ | ❏ |
| 13. I talked less than usual | ❏ | ❏ | ❏ | ❏ |
| 14. I felt lonely | ❏ | ❏ | ❏ | ❏ |
| 15. People were unfriendly | ❏ | ❏ | ❏ | ❏ |
| 16. I enjoyed life | ❏ | ❏ | ❏ | ❏ |
| 17. I had crying spells | ❏ | ❏ | ❏ | ❏ |
| 18. I felt sad | ❏ | ❏ | ❏ | ❏ |
| 19. I felt people disliked me | ❏ | ❏ | ❏ | ❏ |
| 20. I could not get "going" | ❏ | ❏ | ❏ | ❏ |

Compute Score?    ○ Yes    ○ No            Score _____