# Exhibit 4

# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W.R. Grace & Co., et al., | ) | Case No. 01-1139 (JKF) |
| | ) | Jointly Administered |
| Debtors. | ) | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) | |

## AFFIDAVIT OF DR. ALAN C. WHITEHOUSE

STATE OF WASHINGTON)

:ss

County    of    Spokane )

DR. ALAN C. WHITEHOUSE, being first duly sworn upon oath, deposes and states as follows:

1.    I am Dr. Alan C. Whitehouse, of 28810 North Milan Road, Chattaroy, WA 99003.

2.    I am licensed in Washington and Montana. I am Board Certified in pulmonology and internal medicine. I currently practice chest medicine at the Center for Asbestos Related Disease (CARD) in Libby, Montana, where we have over 1,800 active cases of asbestos disease from exposure to Libby asbestos. I have practiced pulmonary medicine in Spokane, Washington, from 1969 - 2004, and in Libby, Montana, from 2004 to date.

3.    In the early 1980s, when seeing Libby asbestos exposure patients I was quite skeptical about the progression and severity of

asbestos pleural disease.  In later years, as I saw more and more patients, my opinions evolved.  In the clinical practice of medicine, opinions are formed based on training and then experience with each patient, and review of objective data such as films and pulmonary function tests.  A doctor does not classify experience by which patients are in litigation and which are not in litigation.

4.    In the 1980s and 1990s, I treated over 500 patients with asbestos disease from predominately chrysotile exposures.  My observations and opinions on these patients were formed in the same way in part, through experience with each patient.

5.    I have looked at the list of approximately 950 Libby Claimants represented by the law firms of McGarvey, Heberling, Sullivan & McGarvey, and by Lewis, Slovak and Kovacich.  I can assure the court that all the medical phenomena, observations and opinions I have discussed in my expert report are amply represented in the 950 Libby Claimants.  The 950 are sufficiently representative of the 850 patients who are not represented by lawyers, in the approximate 1,800 total patients diagnosed. The 850 also amply represent all medical phenomena, observations and opinions I have discussed in my report.   Both the 950 and the 850 represent all levels of severity of ARD.

6.    It is also true that all the medical phenomena, observations

and opinions I have discussed in my expert reports are sufficiently represented and demonstrated in the 110 patients in the CARD mortality study who died of asbestos disease, and in the 123 patients in Whitehouse (2004). In the Whitehouse (2004) publication "Asbestos Related Pleural Disease Due to Tremolite Associated With Progressive Loss of Lung Function: Serial Observations in 123 Miners, Family Members, and Residents of Libby, Montana," Am J Ind Med 46:219-225, and in the 11 patients and individuals who were subjects in the publication Whitehouse et al (2008) "Environmental Exposure to Libby Asbestos and Mesotheliomas," Am J Ind Med., 51(11):877-880. All three of these epidemiology studies were done on CARD patients as a whole.

7.    I understand there is a request for all patient records on the 1,800 or more patients at CARD diagnosed with asbestos-related disease, including the deceased. I understand patient charts, but not films, have been delivered on some 950 who have attorney representation. As a physician on staff at the CARD Clinic, I am familiar with the CARD Clinic operations. I have access to patient records. I have access to patient films through the St. John's Hospital digital system. There are also some older hard copies of chest x-rays and CT scans at the CARD Clinic. I do not have control over the CARD Clinic records. Dr. Brad Black is medical

director at CARD.  He would make the decision on any records redacting project.

8.     I have contacted Dr. Brad Black and he informs that it would be physically impossible to copy, number, redact, and scan 850 sets of patient records in a week, or even in a month.  Other similar projects have taken longer than that.  The CARD Clinic operates on a very limited budget, and does not have staff or resources to devote to such a project even if costs were prepaid.  Separate arrangements would have to be made.  There is extremely limited space in the building.  Disruption of patient care must be avoided.

9.     I have no control over patient films which are in the possession of St. John's Hospital.  I believe that it is impossible to redact patient names from digital or hard copy films.

Copying films for 1,800 patients would be expensive.  Digital film copies are generally $35 each.  Based on familiarity, I can conservatively estimate that each patient chart contains an average of two films.  1,800 x 2 = 3,600 films x $35 = $126,000.  Relatively few patients have hard copy films at this point.  Costs of reproduction would be about the same at $35 per copy.

Some kind of special order from the court would be necessary

before St. John's would release films.

10.     In 2006 I believe there was a major records copying and redaction project at the CARD Clinic.   This was done for W.R. Grace through the criminal case.  It took months to copy, number, redact, and scan the records.   I understand hundreds of patients' records were delivered to W.R. Grace.  In 2006, there was also a copying project for W.R. Grace related to the bankruptcy, and coordinated by the CARD Clinic.   Again, I believe hundreds of patients' records were delivered to W.R. Grace.

11.     Beginning in about February of 2009, there was another major records copying and redaction project at the CARD Clinic.  This too was done for W.R. Grace for the criminal case.  I understand the records were delivered to W.R. Grace.

12.     The copying and redaction projects disrupted patient care at the CARD Clinic.  The Clinic is in a small building with no extra space for additional  work stations.  The CARD Clinic staff reported to me that the W.R. Grace representatives were discourteous, rude, and unappreciative of the help extended to them.

13.     In the summer of 2007, I believe, Dr. Stephen Haber, a hired expert for W.R. Grace spent weeks in the basement of the CARD Clinic

examining x-rays.  Although he was monitored, x-rays were left in disarray.

Since that time the staff at the CARD Clinic has spent many hours hunting

for x-rays placed in wrong jackets.  It was reported to me that Dr. Haber

was also rude and discourteous to the staff at the CARD Clinic.

DATED this _2_ day of June, 2009.

_____
Alan C. Whitehouse, M.D.

SUBSCRIBED AND SWORN to before me this _2_ day of June, 2009.



_____
Notary Public for the State of Washington

Residing at: _Spokane_

My Commission Expires: _12-1-2010_