IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re:** | ) | Chapter 11 |
| | ) | |
| **W. R. GRACE & CO.,** *et al.*,[1] | ) | Case No. 01-01139 (JKF) |
| | ) | Jointly Administered |
| | ) | |
| **Debtors.** | ) | |
| | ) | |

DECLARATION OF KEVIN A. MARTIN
CERTIFYING TABULATION OF BALLOTS REGARDING
VOTE ON FIRST AMENDED JOINT PLAN OF REORGANIZATION

I, KEVIN A. MARTIN declare:

1. I am over the age of eighteen years and am competent to testify about the matters contained herein. I am a Senior Manager of the BMC Group, Inc. (f/k/a Bankruptcy Management Corporation) ("BMC"), at its Southern California office located at 444 North Nash

---

[1] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

Street, El Segundo, California 90245. Unless otherwise stated, I have personal knowledge of the matters set forth herein.

## BMC's Retention

2.  BMC was retained by W.R. Grace & Co. and certain of its affiliates (the "Debtors") to act as the Debtors' voting agent in the above-referenced chapter 11 cases by order entered on May 8, 2002 (Docket No. 2021). The Debtors retained BMC to, among other things: (i) distribute solicitation materials to those holders of claims or interests who are entitled to vote to accept or reject the Plan (as defined herein); (ii) receive all ballots and master ballots in connection with the solicitation of votes on the Plan; (iii) tabulate the results of the balloting process and submit such results to the Court for purposes of determining acceptance or rejection by creditors and interest holders of the Plan; and (iv) act as the initial contact point to which the holders of claims against and interests in the Debtors can address questions regarding the Plan and the balloting process.

3.  To the best of my knowledge, information and belief, BMC is not a creditor or equity security holder of the Debtors, except to the extent that there are outstanding amounts due BMC in connection with the services provided to the Debtors in accordance with its retention in this case.

## Plan Solicitation

4.  On February 27, 2009, the Debtors filed the *First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code of W.R. Grace & Co., et al., the Official Committee of Asbestos Personal Injury Claimants, the Asbestos PI Future Claimants' Representative, and the Official Committee of Equity Security Holders Dated February 27, 2009* (the "Plan") (Docket No. 20872) and accompanying *Debtors' Disclosure Statement for the First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code of W.R. Grace*

*& Co., et al., the Official Committee of Asbestos Personal Injury Claimants, the Asbestos PI Future Claimants' Representative, and the Official Committee of Equity Security Holders Dated February 27, 2009* (the "Disclosure Statement") (Docket No. 20873).

5. Pursuant to the *Order Approving Disclosure Statement, Solicitation and Confirmation Procedures, Confirmation Schedule and Related Relief* entered on March 9, 2009 (the "Disclosure Statement Order") (Docket No. 20944), the Court approved the Debtors' proposed voting procedures (the "Voting Procedures")[2], which provided, among other things, that Solicitation Packages[3] be mailed to: (a) the Entity that holds a Claim or Equity Interest entitled to vote as of the Voting Record Date; (b) Holders of Class 6 Asbestos PI Claims; (c) Holders of Class 7 Asbestos PD Claims; (d) Holders of Class 8 Canadian ZAI PD Claims; (e) Holders of Class 9 General Unsecured Claims; (f) Holders of Class 10 Parent Common Stock; (g) the Securities and Exchange Commission; (h) the Office of the United States Trustee for the District of Delaware; (i) the Internal Revenue Service; (j) the attorneys for each official committee appointed in the Debtors' chapter 11 cases; (k) the attorneys for the Asbestos PI Future Claimants' Representative; (l) the attorneys for the Asbestos PD Future Claimants' Representative; (m) the attorneys for the agent for the Debtors' pre-petition bank lenders; (n) the attorneys for the agent for the Debtors' postpetition bank lenders, and (o) each party that filed a notice of appearance with the Bankruptcy Court pursuant to the Federal Rule of Bankruptcy Procedure 2002.

---

[2] The Voting Procedures were attached as Exhibit C to the Debtors' *Amended Proposed Confirmation and Solicitation Procedures for First Amended Joint Plan of Reorganization*, filed on February 3, 2009 (Docket No. 20662).

[3] Capitalized terms not defined herein shall have the same meaning as in the Plan, the Disclosure Statement Order or the Voting Procedures, as applicable.

6.   As is more fully set forth in BMC's declaration of service filed with the Court on June 1, 2009, (Docket No. 21923), at the direction of Kirkland & Ellis LLP, co-counsel to the debtors and debtors in possession in the above-captioned cases, BMC caused the Solicitation Packages to be served, commencing on March 27, 2009 and concluding on March 30, 2009, on the parties listed above via first-class U.S. mail with postage fully prepaid.

### Description of Classes and Classes Entitled to Vote

7.   The following table identifies each class of Claims and Interests in this case and indicates whether or not such class is impaired or unimpaired as described under the Plan:

|  | CLASSIFICATION | IMPAIRED OR UNIMPAIRED |
|---|---|---|
| Class 1 | Priority Claims | Unimpaired |
| Class 2 | Secured Claims | Unimpaired |
| Class 3 | Employee Benefit Claims | Unimpaired |
| Class 4 | Workers' Compensation Claims | Unimpaired |
| Class 5 | Intercompany Claims | Unimpaired |
| Class 6 | Asbestos PI Claims | Impaired |
| Class 7 | Class 7A. Asbestos PD Claims (excluding US ZAI PD Claims) | Unimpaired |
|  | Class 7B. US ZAI PD Claims | Impaired |
| Class 8 | CDN ZAI PD Claims | Impaired |
| Class 9 | General Unsecured Claims | Unimpaired |
| Class 10 | Equity Interests in the Parent | Impaired |
| Class 11 | Equity Interests in Debtors Other than the Parent | Unimpaired |

8.   Pursuant to the Plan, and as set forth in the Disclosure Statement: (a) Classes 1, 2, 3, 4, 5, and 11 are unimpaired and deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and were not entitled to vote; accordingly, votes were not solicited from such Classes; (b) Class 7A is unimpaired but their vote was solicited for purposes of section 524(g) of the Bankruptcy Code; (c) Class 9 is unimpaired but their provisional vote

was solicited; and (d) Classes 6, 7B, 8 and 10 are impaired and entitled to vote on the Plan, and thus were solicited as described above.

9.  Pursuant to the Disclosure Statement Order, all Ballots or Master Ballots accepting or rejecting the Plan must have been actually received by BMC by 4:00 p.m. prevailing Eastern Time, no later than May 20, 2009, at the following address either: (a) by U.S. Mail at BMC Group, Inc., Attn: W.R. Grace Voting Agent, P.O. Box 2007, Chanhassen, Minnesota 55317-2007; or (b) by courier at BMC Group, Inc., Attn: W.R. Grace Voting Agent, 18750 Lake Drive East, Chanhassen, Minnesota 55317.

## Tabulation Procedures

10.  BMC was instructed by the Debtors to tabulate ballots cast by creditors in compliance with the Disclosure Statement Order and Voting Procedures. BMC agreed to undertake such responsibility.

11.  BMC's internal procedures for ballot tabulation require personnel employed by BMC to daily open all envelopes and remove all ballots received that day. Upon removal, ballots are stamped with the date received, whether received timely or not timely, and a control number, and then scanned into the BMC vote tabulation system, which reads the pre-printed information bar-code, the date, and the control number barcode applied to the ballot. BMC employees then manually enter into the system, utilizing a triple entry method, the vote, indicating acceptance or rejection of the Plan. A manager is required to review each ballot entry if and to the extent there are any discrepancies at all in the ballot entry. To the best of my knowledge, information and belief, each of the foregoing procedures was adhered to in all respects for all ballots received by BMC.

**Asbestos PI Claims**

12. Each Holder of an Asbestos PI Claim (other than an Indirect PI Trust Claim, discussed below) had a single vote on the Plan in an amount based upon the type of disease that formed the basis for such Holder's asserted Asbestos PI Claim. The amount of an Asbestos PI Claim, to be used solely for purposes of voting to accept or reject the Plan, was as follows:

    a. If the basis for the Asbestos PI Claim was alleged to be "MESOTHELIOMA" (Disease Level VIII) (according to the criteria set forth in the TDP, which criteria was described in the instructions on the Ballot), then each Holder of an Asbestos PI Claim of this type voted his or her Asbestos PI Claim in an amount equal to the scheduled value for "Mesothelioma" in the TDP (which scheduled value was set forth in the instructions to the Ballot). Claim amount for voting purposes only was: $180,000.

    b. If the basis for the Asbestos PI Claim was alleged to be "LUNG CANCER 1" (Disease Level VII) (according to the criteria set forth in the TDP, which criteria was described in the instructions on the Ballot), then each Holder of an Asbestos PI Claim of this type voted his or her Asbestos PI Claim in an amount equal to the scheduled value for "Lung Cancer 1" in the TDP (which scheduled value was set forth in the instructions to the Ballot). Claim amount for voting purposes only was: $42,000.

    c. If the basis for the Asbestos PI Claim was alleged to be "LUNG CANCER 2" (Disease Level VI) (according to the criteria set forth in the TDP, which criteria was described in the instructions on the Ballot), then each Holder of an Asbestos PI Claim of this type voted his or her Asbestos PI Claim in an amount equal to the average value for "Lung Cancer 2" in the TDP (which average value was set forth in the instructions to the Ballot). Claim amount for voting purposes only was: $14,000.

    d. If the basis for the Asbestos PI Claim was alleged to be "OTHER CANCER" (Disease Level V) (according to the criteria set forth in the TDP, which criteria was described in the instructions on the Ballot), then each Holder of an Asbestos PI Claim of this type voted his or her Asbestos PI Claim in an amount equal to the scheduled value for "Other Cancer" in the TDP (which scheduled value was set forth in the instructions to the Ballot). Claim amount for voting purposes only was: $20,000.

    e. If the basis for the Asbestos PI Claim was alleged to be "SEVERE ASBESTOSIS" (Disease Level IV-A) (according to the criteria set forth in the TDP, which criteria was described in the instructions on the Ballot), then each Holder of an Asbestos PI Claim of this type voted his or her

      Asbestos PI Claim in an amount equal to the scheduled value for "Severe Asbestosis" in the TDP (which scheduled value was set forth in the instructions to the Ballot). Claim amount for voting purposes only was: $50,000.

f.    If the basis for the Asbestos PI Claim was alleged to be "SEVERE DISABLING PLEURAL DISEASE" (Disease Level IV-B) (according to the criteria set forth in the TDP, which criteria was described in the instructions on the Ballot), then each Holder of an Asbestos PI Claim of this type voted his or her Asbestos PI Claim in an amount equal to the scheduled value for "Severe Disabling Pleural Disease" in the TDP (which scheduled value was set forth in the instructions to the Ballot). Claim amount for voting purposes only was: $50,000.

g.    If the basis for the Asbestos PI Claim was alleged to be "ASBESTOSIS/PLEURAL DISEASE" (Disease Level III) (according to the criteria set forth in the TDP, which criteria was described in the instructions on the Ballot), then each Holder of an Asbestos PI Claim of this type voted his or her Asbestos PI Claim in an amount equal to the scheduled value for "Asbestosis/Pleural Disease" in the TDP (which scheduled value was set forth in the instructions to the Ballot). Claim amount for voting purposes only was: $7,500.

h.    If the basis for the Asbestos PI Claim was alleged to be "ASBESTOSIS/PLEURAL DISEASE" (Disease Level II) (according to the criteria set forth in the TDP, which criteria was described in the instructions on the Ballot), then each Holder of an Asbestos PI Claim of this type voted his or her Asbestos PI Claim in an amount equal to the scheduled value for "Asbestosis/Pleural Disease" in the TDP (which scheduled value was set forth in the instructions to the Ballot). Claim amount for voting purposes only was: $2,500.

i.    If the basis for the Asbestos PI Claim was alleged to be "OTHER ASBESTOS DISEASE" (Disease Level I) (according to the criteria set forth in the TDP, which criteria was described in the instructions on the Ballot), then each Holder of an Asbestos PI Claim of this type voted his or her Asbestos PI Claim in an amount equal to the scheduled value for "Other Asbestos Disease" in the TDP (which scheduled value was set forth in the instructions to the Ballot). Claim amount for voting purposes only was: $300.

Only one disease level was allowed to be selected for each Holder of an Asbestos PI Claim. In the event more than one disease level was selected by or on behalf of a Holder of an Asbestos PI Claim, BMC counted only the selected disease level with the highest value for voting purposes.

In the event a Ballot or Master Ballot failed to indicate the disease level of a Holder of an Asbestos PI Claim, the vote of the Holder of such Asbestos PI Claim was counted for voting purposes only in the amount of $1.00.

13. Each Holder of an Indirect PI Trust Claim that was unliquidated and/or contingent had a single vote in the amount, for voting purposes only, of $1.00, which did not constitute an allowance of such Claim for purposes of distribution. However, if the Holder's Claim was allowed in a liquidated amount, the Holder was entitled to vote the allowed liquidated amount of such Claim. This provision was without prejudice to the rights of the Holders of such Claims or the Asbestos PI Trust in any other context.

14. No vote for or against the Plan by or on behalf of a Holder of an Asbestos PI Claim (other than an Indirect PI Trust Claim) was counted by the BMC unless the Ballot or Master Ballot reflecting such vote was submitted to the BMC with written certifications, in the form contained on the Ballot and/or Master Ballot, which certifications were made under penalty of perjury. Individual Ballots were required to contain a certification that (A) the Holder of such Asbestos PI Claim had experienced exposure to an asbestos-containing material or product with respect to which the Debtors have legal liability, and (B) the Holder of such Asbestos PI Claim had the disease level asserted on such Holder's Ballot, based on medical records or similar documentation in the possession of the party/parties specified on the Ballot.

15. Attorneys who represented individual Holders of Asbestos PI Claims were permitted to cast Ballots for such Holders, but only to the extent such attorneys had the authority under applicable bankruptcy or non-bankruptcy law to do so, and so certify in the manner set forth herein and on the Master Ballots respecting Asbestos PI Claims. Each attorney who voted on behalf of the individuals he or she represented who held or asserted Asbestos PI Claims

completed a Master Ballot, which set forth the votes cast by such attorney on behalf of any such clients. The following procedures governed the completion and return of a Master Ballot:

    a.     The Master Ballot contained the following options for voting, one of which was marked by the attorney[4]:

        (i)     "ALL of the individuals listed on the Exhibit accompanying this Master Ballot, all of whom are Holders of Class 6 Asbestos PI Claims, ACCEPT the Plan."

        (ii)     "ALL of the individuals listed on the Exhibit accompanying this Master Ballot, all of whom are Holders of Class 6 Asbestos PI Claims, REJECT the Plan."

        (iii)     "SOME of the individuals listed on the Exhibit accompanying this Master Ballot, all of whom are Holders of Class 6 Asbestos PI Claims, ACCEPT the Plan, while other individuals on the Exhibit accompanying this Master Ballot REJECT the Plan."

    b.     The attorney who completed a Master Ballot was also required to complete a summary of votes on the Plan for the Holders of Class 6 Asbestos PI Claims for which the attorney voted on the Plan.

    c.     The Master Ballot contained certifications, which were made under penalty of perjury pursuant to 28 U.S.C. § 1746, to be completed by the attorney preparing and signing the Master Ballot pursuant to which such attorney certified that he or she had the authority under applicable bankruptcy or non-bankruptcy law to cast a Ballot on the Plan on behalf of the Holders of each of the Class 6 Asbestos PI Claims listed on the exhibit to the Master Ballot.

    d.     If the attorney was unable to make such certification on behalf of any Holder of a Class 6 Asbestos PI Claim whom he or she represented, the attorney could not cast a vote on behalf of such claimant and was required to timely send the information relating to the names and addresses of its clients for whom he or she may not vote to BMC in accordance with the Voting Procedures.

    e.     Each attorney was required to prepare an electronic list on a CD-ROM, which was in Excel™ or a comparable application, as an Exhibit to the

---

[4] BMC received 23 Class 6 Asbestos PI Master Ballots representing $1,272,472,900.00 in favor of the Plan, which did not indicate one of the options for voting. However, it was clear from the information provided in the Summary and on the CD Rom as to which option should have been marked, and at the direction of Kirkland & Ellis LLP, the Master Ballots were counted.

            Master Ballot. The Exhibit included each of the following fields (in the order listed): (I) the last four digits of the Social Security number of each Claimant; (II) the last name of the Claimant; (III) the first name of the Claimant; (IV) the street address of the Claimant; (V) the town of residence of the Claimant; (VI) the state of residence of the Claimant; (VII) the zip code of the Claimant's residence; (VIII) the disease level of the Claimant; and (IX) whether the Claimant votes to accept or reject the Plan.

    f.    In the event of any discrepancy between the information contained in a Master Ballot and the summary of votes and the information contained in the Exhibit to the Master Ballot described above, the Exhibit to the Master Ballot controlled.

    g.    The CD-ROM Exhibit described above was required to be enclosed with the Master Ballot, and the completed Master Ballot and Exhibit were returned to BMC in accordance with these Voting Procedures.

**Asbestos PD Claims**

    16.    The Debtors solicited the votes of Holders of Class 7A Asbestos PD Claims solely to the extent required by section 524(g) of the Bankruptcy Code. Each Class 7A Asbestos PD Claim that (A) had been filed with the Bankruptcy Court on or before the March 2003 Bar Date and (B) had not been withdrawn by the Holder or disallowed or expunged by order of the Bankruptcy Court entered on or before the Voting Record Date, was entitled to one vote for purposes of acceptance or rejection of the Plan under section 524(g) of the Bankruptcy Code.

    17.    The Debtors solicited the votes of Holders of Class 7B Asbestos PD Claims for purposes of both section 524(g) and 1126 of the Bankruptcy Code. Each Class 7B Asbestos PD Claim that (A) had been filed with the Bankruptcy Court on or before the US ZAI Bar Date and (B) had not been withdrawn by the Holder or disallowed or expunged by order of the Bankruptcy Court entered on or before the Voting Record Date, was entitled to one vote for purposes of acceptance or rejection of the Plan under section 524(g) of the Bankruptcy Code. In addition, each Holder of a Class 7B Asbestos PD Claim was entitled to one vote in the amount of $1.00 on account of its Claim for purposes of section 1126 of the Bankruptcy Code, which did not

constitute an allowance of such Claim for purposes of distribution and was without prejudice to the rights of the Holder of such Claim, the Asbestos PD Trust, the Debtors, or the Reorganized Debtors in any other context.

18. For purpose of both sections 524(g) and 1126 of the Bankruptcy Code, the US ZAI Class Representatives was entitled to vote the US ZAI PD Claims of all of the members of the US ZAI Rule 23 Class who did not individually vote to accept or reject the Plan.

19. The Debtors added the votes from Holders of Asbestos PD Claims in Class 7A and Class 7B together for purposes of determining acceptance or rejection of the Plan by Class 7 pursuant to section 524(g) of the Bankruptcy Code. The Debtors tabulated the votes of the Holders of Class 7B Asbestos PD Claims separately for purposes of determining acceptance or rejection of the Plan by Class 7B pursuant to section 1126(c) of the Bankruptcy Code.

20. No vote for or against the Plan by or on behalf of a Holder of an Asbestos PD Claim was counted by the BMC unless the Ballot or Master Ballot reflecting such vote was submitted to the BMC with written certifications, in the form contained on the Ballot and/or Master Ballot, which certifications were made under penalty of perjury. Individual Ballots were required to contain a certification that (A) the Holder of such Asbestos PD Claim had been provided with a copy of the Plan, the Disclosure Statement, the Exhibit Book, the Voting Procedures and the exhibits thereto, and (B) the individual was the Holder of an Asbestos PD Claim as of the Voting Record Date, or had the authority, under applicable law, to vote to accept or reject the Plan on behalf of a Holder of an Asbestos PD claim.

21. Attorneys who represented individual Holders of Asbestos PD Claims were permitted to cast Ballots for such Holders, but only to the extent such attorneys had the authority under applicable bankruptcy or non-bankruptcy law to do so, and so certify in the manner set

forth herein and on the Master Ballots respecting Asbestos PD Claims. Each attorney who voted on behalf of the individuals he or she represented who held or asserted Asbestos PD Claims completed a Master Ballot, which set forth the votes cast by such attorney on behalf of any such clients. The following procedures governed the completion and return of a Master Ballot:

a. The Master Ballot contained the following options for voting, one of which was marked by the attorney:

(i) "ALL of the individuals listed on the Exhibit accompanying this Master Ballot, all of whom are Holders of Class 7A Asbestos PD Claims [or 7B Asbestos PD Claims], ACCEPT the Plan."

(ii) "ALL of the individuals listed on the Exhibit accompanying this Master Ballot, all of whom are Holders of Class 7A Asbestos PD Claims [or 7B Asbestos PD Claims], REJECT the Plan."

(iii) "SOME of the individuals listed on the Exhibit accompanying this Master Ballot, all of whom are Holders of Class 7A Asbestos PD Claims [or 7B Asbestos PD Claims], ACCEPT the Plan, while other individuals on the Exhibit accompanying this Master Ballot REJECT the Plan."

b. The attorney who completed a Master Ballot was also required to complete a summary of votes on the Plan for the Holders of Class 7A or 7B Asbestos PD Claims for which the attorney voted on the Plan.

c. The Master Ballot contained certifications, which were made under penalty of perjury pursuant to 28 U.S.C. § 1746, to be completed by the attorney preparing and signing the Master Ballot pursuant to which such attorney certified that he or she had the authority under applicable bankruptcy or non-bankruptcy law to cast a Ballot on the Plan on behalf of the Holders of each of the Class 7A or 7B Asbestos PD Claims listed on the exhibit to the Master Ballot.

d. If the attorney was unable to make such certification on behalf of any Holder of a Class 7A or 7B Asbestos PD Claims whom he or she represented, the attorney could not cast a vote on behalf of such claimant and was required to timely send the information relating to the names and addresses of its clients for whom he or she may not vote to BMC in accordance with the Voting Procedures.

e. Each attorney was required to prepare an electronic list on a CD-ROM, which was in Excel™ or a comparable application, as an Exhibit to the Master Ballot. The Exhibit included each of the following fields (in the

       order listed): (I) the Proof of Claim number of each Claimant; (II) the last name of the Claimant; (III) the first name of the Claimant; (IV) the street address of the Claimant; (V) the town of residence of the Claimant; (VI) the state of residence of the Claimant; (VII) the zip code of the Claimant's residence; and (VIII) whether the Claimant votes to accept or reject the Plan.

    f.    In the event of any discrepancy between the information contained in a Master Ballot and the summary of votes and the information contained in the Exhibit to the Master Ballot described above, the Exhibit to the Master Ballot controlled.

    g.    The CD-ROM Exhibit described above was required to be enclosed with the Master Ballot, and the completed Master Ballot and Exhibit were returned to BMC in accordance with these Voting Procedures.

22.   BMC added the votes from Holders of Asbestos PD Claims in Class 7A and Class 7B together for purposes of determining acceptance or rejection of the Plan by Class 7 pursuant to section 524(g) of the Bankruptcy Code. BMC tabulated the votes of the Holders of Class 7B Asbestos PD Claims separately for purposes of determining acceptance or rejection of the Plan by Class 7B pursuant to section 1126(c) of the Bankruptcy Code.

**Canadian ZAI PD Claims**

23.   The aggregate value of Class 8 CDN ZAI PD Claims for voting purposes was $6,500,000, which represented the payment to the CDN ZAI PD Claims Fund pursuant to the CDN ZAI Minutes of Settlement. The CCAA Representative Counsel was entitled to vote to accept or reject the Plan on behalf of all Holders of Canadian ZAI PD Claims in the manner and to the extent provided in the Minutes of Settlement of Canadian ZAI Claims and the Canadian Settlement Approval Order.

**General Unsecured Claims**

24.   Pursuant to the Court's instructions, although the Plan deems the Holders of General Unsecured Claims in Class 9 to have voted to accept the Plan pursuant to Section 1126(f) of the Bankruptcy Code, the Debtors provisionally solicited the votes of Holders of

General Unsecured Claims in Class 9. These votes will be given effect only if it is determined that Class 9 is an impaired Class under Section 1124 of the Bankruptcy Code. If it is determined that Class 9 is unimpaired, then Class 9 will be deemed to accept the Plan and any and all Ballots cast by the Holders of General Unsecured Claims will be disregarded for all purposes.

25. With respect to the Bank Claims, the Voting Procedures contemplated that the Administrative Agent would make the register of Lenders maintained pursuant to each of the Pre-Petition Credit Facilities available to BMC as an agent of the Debtors. BMC worked with Kirkland & Ellis LLP and counsel for the Administrative Agent to acquire the register of Lenders. To the extent that the register of Lenders provided to BMC was incomplete, BMC worked with Kirkland & Ellis LLP to mail Solicitation Packages to each of the Holders of the Bank Claims and, in instances where BMC was unable to obtain an address for a particular Bank Claim Holder, BMC mailed Solicitation Packages to the attention of counsel for the Administrative Agent. In many of those instances, BMC was subsequently contacted by counsel for the Administrative Agent with the correct mailing addresses for the Holders of Bank Claims and BMC, in consultation with Kirkland & Ellis LLP, followed up by mailing a Solicitation Package to the proper address.

26. The amount used to tabulate acceptance or rejection of the Plan for Class 9 was as follows:

    a.    If (A) prior to the Voting Deadline, a Claim had been allowed fully or partially, whether for all purposes or for voting purposes only, pursuant to a Bankruptcy Court order or Bankruptcy Court-approved procedures, (B) prior to the Voting Deadline, the Debtors and the Holder of a Claim Filed a stipulation agreeing to fully or partially allow such Claim for voting purposes only and no objection to such allowance was received by the Debtors within seven (7) calendar days after service by first-class mail of notice of such agreement to the parties upon whom notice is required, or (C) after the Voting Deadline, the Bankruptcy Court entered an order

        allowing a Claim for voting purposes only in response to a timely Filed Voting Motion, the amount allowed thereunder.

   b.     The liquidated amount specified in a proof of claim timely Filed in accordance with the March 2003 Bar Date Order, so long as such Claim had not been disallowed or expunged by the Bankruptcy Court and was not the subject of an objection pending as of the Voting Record Date; *provided, however*, that the Holders of Claims arising from the Pre-petition Credit Facilities were entitled to vote such Claims, subject to the limitation in paragraph (f) below, notwithstanding the pending objection to post-petition interest payable in relation to such Claims.

   c.     The amount of the Claim listed in the Schedules as liquidated, undisputed, and noncontingent.

   d.     If a Claim was recorded in the Schedules or on a proof of claim as unliquidated, contingent, and/or disputed only in part, the Holder of the Claim was entitled to vote that portion of the Claim that was liquidated, noncontingent, and undisputed in the liquidated, noncontingent, and undisputed amount, subject to any limitations set forth herein and unless otherwise ordered by the Bankruptcy Court.

   e.     If a proof of claim had been timely filed in accordance with the March 2003 Bar Date Order and such Claim was wholly unliquidated or contingent, the Claim amount, for voting purposes only, was $1.00, so long as such Claim had not been disallowed or expunged by the Bankruptcy Court and was not the subject of an objection pending as of the Voting Record Date.

   f.     With respect to (a) through (e) above, any amount of post-petition interest that may be payable with respect to a Claim under the Plan was not to be included for purposes of tabulating votes to accept or reject the Plan.

**Equity Interests**

27.    Each registered holder or beneficial owner of Parent Common Stock was entitled to a vote equal to the number of the registered holder's or beneficial owner's shares of Parent Common Stock as of the Voting Record Date. With respect to the tabulation of Ballots and Master Ballots for Equity Interests in the Parent, for purposes of voting, the amount used to tabulate acceptance or rejection of the Plan was as follows (in order of priority):

   a.     Votes cast by beneficial owners holding Parent Common Stock through a Nominee were applied against the positions held by such entities as of the

K&E 14722721.5

        Voting Record Date, as evidenced by the record and depository listings. Votes submitted by a Nominee, whether pursuant to a Master Ballot or prevalidated Ballots, were not counted in excess of the Record Amount of Parent Common Stock held by such Nominee.

    b.    To the extent that conflicting votes or "overvotes" were submitted by a Nominee, whether pursuant to a Master Ballot or prevalidated Ballots, BMC resolved the conflict or overvote prior to the preparation of the vote certification.

    c.    To the extent that overvotes on a Master Ballot or on prevalidated Ballots were not reconcilable prior to the preparation of the vote certification, BMC applied the votes to accept and to reject the Plan in the same proportion as the votes to accept and reject the Plan submitted on the Master Ballot or prevalidated Ballots that contained the overvote, but only to the extent of the Nominee's position in Parent Common Stock.

    d.    Multiple Master Ballots were allowed to be completed by a single Nominee and delivered to BMC. Votes reflected by multiple Master Ballots were counted, except to the extent that they were duplicative of other Master Ballots. If two or more Master Ballots were inconsistent, the latest otherwise valid Master Ballot received prior to the Voting Deadline, to the extent of any such inconsistency, superseded and revoked any prior Master Ballot.

    e.    For purposes of tabulating votes, each registered holder or beneficial holder of Parent Common Stock was deemed to have voted the full amount of its holdings relating to Parent Common Stock.

    28.    To the best of my knowledge, information and belief, BMC has complied in all respects with the Disclosure Statement Order and Voting Procedures in determining the validity of, and tabulating, the ballots. As set forth in the Voting Procedures, ballots cast to accept the Plan were accumulated and totaled for each voting class. Ballots cast to reject the Plan were accumulated and totaled for each voting class. For the purposes of tabulating votes, BMC counted each properly filed and completed ballot in accordance with the Voting Procedures. To the best of my knowledge, information and belief, all valid ballots received on or prior to the Voting Deadline by BMC in accordance with the Voting Procedures were counted and included in the tabulation.

29. The results of the voting in all classes entitled to vote, as reflected on the valid ballots received by BMC prior to the Voting Deadline, are attached here to as <u>Exhibit A</u>. As reflected in <u>Exhibit A</u>, Holders of at least two-thirds in amount and more than one-half in number (or for classes voting for Section 524(g) purposes, at least 75% in number) of claims voting in each impaired class have voted to accept the Plan. The votes of creditors in Class 9, which is unimpaired, were provisionally solicited and provisionally tabulated. More than one-half in number of claims voting in Class 9 voted to accept the Plan, but the provisional vote did not obtain the requisite two-thirds dollar amount for acceptance.

30. I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 8, 2009

                                                           Kevin A. Martin
                                                         BMC Group, Inc.
                                                         444 North Nash Street
                                                         El Segundo, California 90245
                                                         Telephone: (310) 321-5555
                                                         Telecopier: (310) 640-8071

                                                         Claims Reconciliation and Solicitation
                                                         Consultant to the Debtors and Debtors in
                                                         Possession

State of California                       )
                                        )
County of Los Angeles               )

On June 8, 2009 before me, James H. Myers, a Notary Public, personally appeared Kevin A. Martin, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

17

K&E 14722721 5

JAMES H. MYERS
Commission # 1589628
Notary Public - California
Los Angeles County
My Comm. Expires Jul 19, 2009

# EXHIBIT A

**The Tabulation Report is voluminous and is not attached. A copy of the Tabulation Report can be requested by contacting BMC or Debtors' counsel.**