IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al.[1] | ) | Case No. 01-01139 (JKF) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | **Hearing Date:  June 22, 2009 at 9:00 a.m.** |

**PLAN PROPONENTS' CONSOLIDATED PHASE I BRIEF IN SUPPORT OF
CONFIRMATION OF JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF
THE BANKRUPTCY CODE**

---

[1]  The Debtors consist of the following 62 entities:  W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co. Conn., A-1 Bit & Tool Co., Inc., Alewife  Boston Ltd., Alewife Land Corporation, Amicon, Inc.,  CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., GC Limited Partners I, Inc., (f/k/a Grace Cocoa Limited Partners I, Inc.), GC Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc. GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation., W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (F/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...........................................................................................1

ARGUMENT.....................................................................................................................4

I.    THE INSURERS DO NOT HAVE STANDING TO OBJECT TO THE
      JOINT PLAN ...........................................................................................................4

      A.    The Insurance Neutrality Provisions In Section 7.15 Of The Joint Plan Are
            Clear.................................................................................................................8

      B.    The Joint Plan Is Insurance Neutral. .......................................................................9

      C.    The Insurers' Complaints About The Insurance Neutrality Provisions Are
            Groundless. ....................................................................................................16

      D.    Standing Is Determined Issue By Issue, And The Insurers Cannot Assert
            Third Party Rights...........................................................................................19

            1.    Standing Is Determined Issue By Issue. ...................................................19

            2.    The Insurers May Not Raise The Rights Of Third Parties Who Do
                  Not Object To Confirmation In Order To Defeat The Plan.......................23

      E.    The Independent Duty Of The Court To Ultimately Determine The
            Fundamental Fairness And Good Faith Of The Joint Plan Does Not
            Provide A Basis For The Insurers' Standing. .......................................................27

      F.    None Of The Insurers' Other Arguments Demonstrate That The Insurers
            Have Standing As Insurers To Object To Any Confirmation Issue Other
            Than The Bankruptcy Preemption Issues, And Many Of Their Arguments
            Are Premature Phase II Arguments. ...................................................................27

II.   THE LENDERS ARE NOT IMPAIRED BY THE JOINT PLAN'S
      FAILURE TO PAY DEFAULT INTEREST ON THEIR CLAIMS. .........................31

      A.    This Court Has Jurisdiction To Decide Whether The Lenders Under The
            Prepetition Credit Facilities Are Impaired.............................................................32

            1.    The Bankruptcy Court Maintains Jurisdiction Over Matters That
                  Are Not The Subject Of The Appeal, And Impairment And Claims
                  Allowance Are Distinctly Different Matters In These Cases. ...................32

            2.    In The Absence Of A Stay Pending Appeal, This Court Can
                  Enforce The Claims Objection Opinion And Apply Such Findings
                  To Matters Before It In The Confirmation Proceedings In Any
                  Event. .....................................................................................................35

i

B.  This Court Has Determined That No Prepetition Or Postpetition Defaults Have Occurred And That, As A Result, The Lenders Are Not Entitled To Postpetition Default Interest. ...............................................................37

C.  The Joint Plan Does Not Impair The Claims Of The Lenders...............................38

    1.  Only Impairment By The Joint Plan Is Relevant For Purposes Of Section 1124 Of The Bankruptcy Code......................................................39

    2.  There Is No Plan Impairment By The Failure To Pay The Lenders Postpetition Default Interest To Which They Are Not Entitled. ..............40

    3.  The Third Circuit's Decision In PPI Enterprises Does Not Require Payment Of Postpetition Default Interest. .................................................42

D.  The Provisions Of Section 1129 Of The Bankruptcy Code Are Not Relevant To Determine Impairment. ....................................................47

E.  Conclusion:  The Joint Plan Does Not Impair The Lenders' Claims. ...................48

III.  CLASS 9 NON-LENDER CLAIMANTS ARE ALSO NOT IMPAIRED BY THE JOINT PLAN..........................................................................................48

IV.  ISSUES TO BE RESOLVED AT THE JUNE 18, 2009 PRE-TRIAL HEARING AND PROPOSED AGENDA.......................................................52

    1.  Plan Proponents' Pending Motions To Strike The Expert Reports Of Messrs. Shein And Priest.....................................................................52

    2.  Committee's And Lenders' Pending Motions To Modify The CMO With Respect To The Issue Of The Lenders' Impairment By The Joint Plan..................................................................................................53

    3.  Order Setting Agenda For Argument For June 22 - 25 Phase I Hearing...........................................................................................53

K&E 14762746.10

## TABLE OF AUTHORITIES

**Cases**

Allen v. Wright,
    468 U.S. 737 (1984)..................................................................................................... 20

Applied Safety, Inc.,
    200 B.R. 576 (Bankr. E.D. Pa. 1996) ......................................................................... 11, 22

Camacho v. Brandon,
    317 F.3d 153 (2d Cir. 2003).............................................................................................. 26

Campbell v. Louisiana,
    523 U.S. 392 (1998)............................................................................................................ 26

Carrieri v. Jobs.com, Inc.,
    393 F.3d 508 (5th Cir. 2004) ............................................................................................ 41

Clinton v. City of New York,
    524 U.S. 417 (1998)............................................................................................................. 6

DaimlerChrysler Corp. v. Cuno,
    547 U.S. 332 (2006)............................................................................................................ 20

General Instrument Corp. of Del. v. Nu-Tek Elecs. & Mfg., Inc.,
    197 F.3d 83 (3d Cir. 1999)................................................................................................. 25

Griggs v. Provident Consumer Discount Co.,
    459 U.S. 56 (1982).............................................................................................................. 33

Hartford Underwriters Ins. Co v. Union Planters Bank, N.A.,
    530 U.S. 1 (2000)................................................................................................................ 25

Hilton v. Braunskill,
    481 U.S. 770 (1987)............................................................................................................ 36

In re A.P.I., Inc.,
    331 B.R. 828 (Bankr. D. Minn. 2005) ....................................................................... passim

In re Alpex Computer Corp.,
    71 F.3d 353 (10th Cir. 1995) ............................................................................................ 22

In re Amatex Corp.,
    755 F.2d 1034 (3d Cir. 1985).............................................................................................. 25

In re ANC Rental Corp.,
    No. 01-11220(MFW), 2002 WL 1058196 (D. Del. May 22, 2002) .................................. 36

In re AWC Liquidation Corp.,
    292 B.R. 239 (D. Del. 2003) ........................................................................................... 35

In re B. Cohen & Sons Caterers, Inc.,
    124 B.R. 642 (E.D. Pa. 1991) ........................................................................................ 27

In re Board of Directors of Hopewell Intern. Ins. Ltd.,
    258 B.R. 580 (Bankr. S.D.N.Y. 2001) ...................................................................... 33, 35

In re Central Medical Center, Inc.,
    122 B.R. 568 (Bankr. E.D. Mo. 1990) ........................................................................... 50

In re Combustion Eng'g, Inc.,
    391 F.3d 190 (3d Cir. 2004) ................................................................................... passim

In re Congoleum Corp.,
    426 F.3d 675 (3d Cir. 2005) ..................................................................................... 6, 20

In re Coram Healthcare Corp.,
    315 B.R. 321 (Bankr. D. Del. 2004 ................................................................................ 43

In re Cypresswood Land Partners,
    Case No. 07-32437-H4-11, 2009 WL 136021 (Bankr. S.D. Tex., Jan. 20, 2009) ........... 24

In re Dow Corning Corp,
    255 B.R. 445 (E.D. Mich. 2000) .................................................................................... 51

In re Federal-Mogul Global Inc.,
    2007 WL 4180545 (Bankr. D. Del. Nov. 16, 2007) .................................................. passim

In re Finova Group, Inc.,
    304 B.R. 630 (D. Del. 2004) .......................................................................................... 50

In re Genesis Health Ventures, Inc.,
    367 B.R. 516 (Bankr. D. Del. 2007) .............................................................................. 36

In re Hutchinson,
    5 F.3d 750 (4th Cir. 1993) ............................................................................................. 22

In re J.M. Fields, Inc.,
    8 B.R. 638 (Bankr. S.D.N.Y. 1981) ............................................................................... 34

In re Madison Hotel Assocs.,
    749 F.2d 410 (7th Cir. 1984) ......................................................................................... 47

In re Mazzocone,
    1995 WL 113110 (E.D. Pa. Mar. 16, 1995) ............................................................. 33, 35

iv

In re Mid-Valley, Inc.,
    305 B.R. 425 (Bankr. W.D. Pa. 2004) ............................................................ 10, 14, 15, 26

In re Mirant Corp.,
    334 B.R. 800 (Bankr. N.D. Tex. 2005) .......................................................... 35, 43

In re New Valley Corp.,
    168 B.R. 73 (Bankr. D. N.J. 1994) ................................................................ 45

In re Nextwave Personal Communs., Inc.,
    244 B.R. 253 (Bankr. S.D.N.Y. 2000) ........................................................... 38

In re Pittsburgh Corning Corp.,
    No. 00-22876, Mem. Op. at 49-50 (Bankr. W.D. Pa. Dec. 21, 2006) ........................ 10, 23

In re Prudential Lines, Inc.,
    170 B.R. 222 (S.D.N.Y. 1994) ..................................................................... 35

In re PWS Holding Corp.,
    228 F.3d 224 (3d Cir. 2000) ........................................................................ 25

In re Quigley Co.,
    391 B.R. 695 (Bankr. S.D.N.Y. 2008) ........................................................ 7, 20, 22, 23

In re Refco Inc.,
    505 F.3d 109 (2d Cir. 2007) ....................................................................... 22

In re Richard Buick, Inc.,
    126 B.R. 840 (Bankr. E.D. Pa. 1991) ............................................................ 27

In re Rocha,
    179 B.R. 305 (Bankr. M.D. Fla. 1995) ........................................................... 45

In re Seatco, Inc.,
    257 B.R. 469 (Bankr. N.D. Tex. 2001) ........................................................... 47

In re Sharon Steel Corp.,
    159 B.R. 730 (Bankr. W.D. Pa.1993) ............................................................ 36

In re Strawberry Square Associates,
    152 B.R. 699 (Bankr. E.D.N.Y. 1993) ........................................................... 33

In re Tex. Health Enters., Inc.,
    255 B.R. 181 (Bankr. E.D. Tex. 2000) ........................................................... 36

In re Texaco, Inc.,
    84 B.R. 893 (Bankr. S.D.N.Y. 1988) ............................................................. 47

v

In re Thirteen Chapter 7 Cases of Former Trustee Germain,
    182 B.R. 375 (Bankr. D. Conn. 1995) ............................................................................... 22

In re Thorpe Insulation Co.,
    No. 07-19271, Tentative Ruling at 15-16 (Bankr. C.D. Cal. Apr. 2, 2009) ..................... 10

In re Transtexas Gas Corp.,

    303 F.3d 571 (5th Cir. 2002) ............................................................................................ 35

In re Urban Development Ltd., Inc.,
    42 B.R. 741 (Bankr. Fla. 1984).......................................................................................... 34

In re USG Corp.,
    Case No. 01-2094 (JFK) (Bankr. D. Del. Mar 27, 2006) ................................................. 49

In re Wonder Corp. of Am.,
    70 B.R. 1018 (Bankr. D. Conn. 1987) ............................................................................. 11

Kane v. Johns-Manville (In re Johns-Manville Corp.),
    843 F.2d 636 (2d Cir. 1988)............................................................................................. 25

Kowalski v. Tesmer,
    543 U.S. 125 (2004)........................................................................................................... 24

Lac du Flambeau Band of Lake Superior Chippewa Indians v. Norton,
    422 F.3d 490 (7th Cir. 2005) .............................................................................................. 6

Lewis v. Casey,
    518 U.S. 343 (1996)..................................................................................................... 20, 21

Lujan v. Defenders of Wildlife,
    504 U.S. 555 (1992)................................................................................................ 9, 10, 20

Mary Ann Pensiero, Inc. v. Lingle,
    847 F.2d 90 (3d Cir. 1988)................................................................................................ 33

Matter of Deist Forest Prods., Inc.,
    850 F.2d 340 (7th Cir. 1988) ............................................................................................ 26

Matter of James Wilson Assocs.,
    965 F.2d 160 (7th Cir. 1992) ..................................................................................... 21, 25

Matter of Johns-Manville Corp.,
    68 B.R. 618 (Bankr. S.D.N.Y. 1986)............................................................................... 11

Matter of Marin Motor Oil, Inc.,
    689 F.2d 445 (3d Cir. 1982)............................................................................................. 25

Matter of Ofty Corp.,
    44 B.R. 479 (Bankr. D. Del. 1984) ................................................................................ 21

Republic of Philippines v. Westinghouse Elec. Corp.,
    949 F.2d 653 (3d Cir. 1991)......................................................................................... 36

Solow v. PPI Enters. (U.S.) Inc. (In re PPI Enter. (U.S.) Inc.),
    324 F.3d 197 (3d Cir. 2003)................................................................................... passim

The Pitt News v. Fisher,
    215 F.3d 354 (3d Cir. 2000).................................................................................... 24, 43

Travelers Ins. Co. v. H.K. Porter Co.,
    45 F.3d 737 (3d Cir. 1995)............................................................................................ 7

United States Nat'l Bank v. Independent Ins. Agents of Am.,
    508 U.S. 439 (1993)................................................................................................... 44

Venen v. Sweet,
    758 F.2d 117 (3d Cir. 1985)........................................................................................ 35

W. R. Grace & Co. v. Libby Claimants (In re W. R. Grace & Co.),
    2008 WL 5978951 (D. Del. Oct. 28, 2008) ................................................................. 35

W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP,
    549 F.3d 100 (2d Cir. 2008)........................................................................................ 24

Warth v. Seldin,
    422 U.S. 490 (1975)......................................................................................... 7, 20, 24

Yenkin-Majestic Paint Corp. v. Wheeling-Pittsburgh Steel Corp. (In re Pittsburgh-Canfield Corp.),
    309 B.R. 277 (B.A.P. 6th Cir. 2004)............................................................................ 41

**Statutes**

11 U.S.C. § 1109(b) ........................................................................................... 21, 22, 23, 25

11 U.S.C. § 1123(a)(4)............................................................................................ 34, 38, 50

11 U.S.C. § 1124.......................................................................................................... passim

11 U.S.C. § 1124(1) .............................................................................................. 39, 40, 42, 43

11 U.S.C. § 1124(3) ......................................................................................................... 45

11 U.S.C. § 1126(f)........................................................................................................ 47

11 U.S.C. § 1129........................................................................................... 12, 34, 47, 54

K&E 14762746.10

11 U.S.C. § 1129(a)(1) ........................................................................................ 23

11 U.S.C. § 1129(a)(3) ........................................................................................ 18

11 U.S.C. § 1129(a)(3) ........................................................................................ 23

11 U.S.C. § 1129(a)(7) ........................................................................................ 47

11 U.S.C. § 1129(b) ........................................................................................ 47

11 U.S.C. § 1129(b)(1) ........................................................................................ 47

11 U.S.C. § 362 ........................................................................................ 33

11 U.S.C. § 362(a)(2) ........................................................................................ 34

11 U.S.C. § 502(b) ........................................................................................ 34, 43, 47

11 U.S.C. § 502(b)(2) ........................................................................................ 44

11 U.S.C. §524(g) ........................................................................................ 54

**Other Authorities**

Alan N. Resnick et al.,
    7 COLLIER ON BANKRUPTCY ¶¶ 1109.01 & .02 (15th ed. rev. 2006) ................................ 22

Cable Communications Policy Act § 553(c)(1) ........................................................... 25

The above-captioned debtors (the "Debtors"), together with the Official Committee of Asbestos Personal Injury Claimants, the Official Committee of Equity Security Holders, and the Asbestos PI Future Claimants' Representative (collectively the "Plan Proponents"), hereby submit this Phase I Brief in support of confirmation of their First Amended Joint Plan of Reorganization (as amended, the "Joint Plan").[2]

## PRELIMINARY STATEMENT

The Phase I Confirmation process respecting the Joint Plan, which will commence on June 22, 2009, marks the beginning of the end to Grace's now over 8 years in Chapter 11. Significantly, as evidenced by the Balloting Report and Declaration of the Balloting Agent,[3] the Joint Plan has been overwhelmingly accepted by all impaired Classes; namely, Asbestos Personal Injury Claimants in Class 6; U.S. ZAI Claimants in Class 7B; Canadian ZAI Claimants in Class 8; and Equity Interests in Class 10. Moreover, "traditional" Asbestos PD Claims in Class 7A, who are not impaired because they will receive 100% of their allowed Claims from the Asbestos PD Trust, have overwhelmingly accepted the Joint Plan for purposes of channeling claims in that class to the Asbestos PD Trust pursuant to § 524(g).

Sadly, notwithstanding this overwhelming acceptance of the Joint Plan from the constituencies who have a legitimate and equitable right to be heard, confirmation of the Joint Plan is being obstructed by certain constituencies who ultimately either (1) have no economic interest in the allocation of the Debtors' assets, or (2) are seeking to arrogate to themselves more

---

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Joint Plan.

[3]   See Declaration of Kevin A. Martin Certifying Tabulation of Ballots Regarding Vote on First Amended Joint Plan of Reorganization, and Balloting Report attached thereto at Exhibit A, filed with the Court on June 8, 2009 concurrently herewith.

than their legal share.   The objections asserted by these constituencies do not upset the

fundamental integrity of the Joint Plan.   Rather, they ultimately seek to force the Plan Proponents

to amend the Joint Plan in favor of the objectors' self-interests over the interest of all of the

Debtors' other constituencies, based on various erroneous technical and extremely tenuous

arguments.   Such objections include, without limitation:

- Numerous insurers (the "Insurers") have decided to interpose objections to confirmation not only with respect to the issue of insurance neutrality, but also with respect to fundamental and ubiquitous provisions of the Joint Plan relating to (i) the way in which the Asbestos PI Trust will function post-confirmation (irrespective of the plain language of the Joint Plan that fully preserves their rights in that respect); (ii) the injunctions contemplated by the Joint Plan; and (iii) the Joint Plan's release and exculpation provisions.   In mounting this attack, particularly as to the Joint Plan's release and exculpation provisions, the objecting Insurers fail to demonstrate how they have any legal or economic interest that would be affected by these provisions so as to afford them standing.[4]

- The Lenders have utterly failed to address their purported rights in connection with the Debtors' motion to disallow the Lenders' claim for default interest, by either (i) demonstrating a legally cognizable default by the Debtors; or (ii) that the Debtors are solvent.   Indeed, the Lenders have also entirely failed to pursue their opportunity for discovery during the confirmation process established by this Court's Third Amended Case Management Order Related to the First Amended Joint Plan of Reorganization (the "CMO") [Dkt. 21544].   Nevertheless, they are now attempting to derail the entire confirmation agenda on the premise that because, as a matter of law which they concede, this Court must conclude from its order and opinion disallowing the default interest claim that the Lenders are not impaired for the purposes of confirmation, their appeal from the default interest order divests the Court's jurisdiction to rule on the impairment issue in these confirmation proceedings.

- The General Unsecured Creditors' Committee (the "Committee") rather than applauding the Joint Plan because it contemplates that all of the allowed claims of their constituency will be paid in full in cash, have decided to bow to the wishes of an economically powerful group of creditors -- the Lenders -- and support the untenable argument that

---

[4]   Final Objection to Confirmation of Amended Joint Plan of Reorganization filed By Government Employees Insurance Company, Republic Insurance Company n/k/a Starr Indemnity & Liability Company ("GEICO Ob.") at 35-37 [Dkt. 21943]; Arrowood Ob. to Release & Exculpation Provisions ("Arrowood Exculpation Ob.") [Dkt. No. 21945].

confirmation cannot proceed because of the Lenders' appeal from the disallowance of the Lenders' claims for default interest.

- The Libby Claimants, in an attempt to extract more money for themselves from the Asbestos PI Trust's pool of assets at the expense of other asbestos claimants and demand holders, continue to oppose confirmation on the ground that their claims are somehow discriminated against based on unsupported scientific theories and on incorrect and untenable theories of law. (To be addressed in Phase II)

- Anderson Memorial Hospital continues to complain that it is being discriminated against, not because the Joint Plan will fail to pay its ultimately allowed claim in full, but rather because the forum which will preside over the allowance of that claim will be this Court. (To be addressed in Phase II)

The Plan Proponents will show that all objections to Joint Plan are at best unfounded, and that the Court should proceed to confirmation of the Joint Plan on the agenda that it established in the CMO. The CMO provides in Paragraph 1:

> The hearing with respect to confirmation of the Plan shall take place in two phases. The first phase shall address (i) whether the Plan improperly affects the rights of Debtors' insurers (in their capacity as insurers, but not creditors); (ii) the standing of the Debtors' insurers (in their capacity as insurers, but not creditors) to litigate confirmation objections that involve issues other than those described in section (i) herein provided however, that the Plan Proponents shall not challenge the standing of the insurers, to the extent they are parties to Asbestos Insurance Reimbursement Agreements, to object to, in Phase II, the Plan's proposed treatment of the Asbestos Insurance Reimbursement Agreements; and (iii) the confirmation objections raised on behalf of and specific to lenders under the Pre-Petition Credit Facilities and other Class 9 creditors with respect to impairment. The second phase shall address the objections of: (i) parties classified under the Plan as Holders of Indirect PI or PD Trust Claims (including insurers as Holders of Indirect PI or PD Trust Claims with respect to such Claims); (ii) the objections of the Libby Claimants and (iii) any other confirmation objections not addressed and resolved in Phase I.

In addition, the Plan Proponents are required to file their Phase I Trial Brief by June 8, 2009.

CMO at 3.

In accordance with the CMO, this pleading constitutes the Plan Proponents' Phase I Trial Brief. In addition, the Plan Proponents set forth at the end of this pleading their proposed agenda for addressing the issues raised by the various objections to confirmation in the Phase I hearing.

3

## ARGUMENT

### I.    THE INSURERS DO NOT HAVE STANDING TO OBJECT TO THE JOINT PLAN

This Court has ruled that "Phase I" of the confirmation hearing shall address, in relevant part, "(i) whether the Plan improperly affects the rights of Debtors' insurers (in their capacity as insurers but not creditors)" and "(ii) the standing of the Debtors' insurers (in their capacity as insurers, but not creditors) to litigate confirmation objections that involve issues other than those described in section (i)." CMO at 1. This brief addresses these issues and responds to the Phase I Objections and Trial Briefs of the various Insurers.

In their capacity as insurers, the Insurers are merely counter-parties to the Debtors with respect to insurance policies purchased long ago to protect the Debtors' other assets and to compensate those harmed by their operations, including asbestos claimants. Section 7.15 of the Joint Plan is specifically designed to preserve the contractual rights of the Insurers with respect to their obligations to make payments under open insurance policies, subject to very limited exceptions specifically identified in the Joint Plan.

The limited exceptions to the reservation of issues for a later coverage court are (1) the transfer of Asbestos Insurance Rights under the Joint Plan, as to which the Plan Proponents acknowledge that the Insurers have standing, (2) the acknowledgment that the decision by this Court that the Joint Plan and its documents comply with the Bankruptcy Code is not subject to collateral attack in another forum, (3) the recognition that, if the Insurers choose to litigate certain issues in this Court, they will be bound by the result under generally applicable principles of *res judicata*, and (4) the recognition that the releases and injunctions in the Joint Plan bind the Insurers to the extent, if any, that they are creditors with claims affected thereby. The Insurers also argue that the Joint Plan eliminates the Debtors' and/or the Asbestos PI Trust's obligations

4

under the policies, but this is simply false, as § 7.15(a) of the Joint Plan clearly protects the Insurers from any such alteration of their rights under the policies.

As a consequence of the structure of § 7.15 of the Joint Plan, the sole issues as to which the Insurers have standing as insurers in this bankruptcy are (1) that anti-assignment provisions of insurance contracts are preempted under the Bankruptcy Code as a matter of law, and (2) the Joint Plan's proposed treatment of Asbestos Insurance Reimbursement Agreements (collectively, the "Bankruptcy Preemption Issues"). Other than with respect to those limited issues, the Joint Plan is entirely "insurance neutral" under controlling Third Circuit precedent. See In re Combustion Eng'g, Inc., 391 F.3d 190 (3d Cir. 2004). Whether a particular claim paid by the Asbestos PI Trust in the future is covered by the Insurers' policies is not determined by the Joint Plan, and will not be decided in this bankruptcy case. Rather, coverage decisions will be made either by the relevant insurers themselves, in agreement with the Asbestos PI Trust, or by a non-bankruptcy court in coverage litigation. Pursuant to the Joint Plan's insurance neutrality provisions, neither approval of the Joint Plan nor any other ruling by this Court will have any effect on the Insurers' rights to raise defenses to coverage for any Claims resolved by the

5

Asbestos PI Trust. *See* Joint Plan § 7.15.[5] Accordingly, the Insurers' view that they have "standing to object to all Plan confirmation issues"[6] is simply false.

Moreover, standing is determined on an issue by issue basis; constitutional and prudential limitations on standing require that the Insurers demonstrate that the particular plan provisions to which they now object cause them injury or affect their rights. In re A.P.I., Inc., 331 B.R. 828, 857 (Bankr. D. Minn. 2005) ("The insurers' standing to object must be determined *on a particularized basis as to each theory* they have raised in opposition to confirmation.") (emphasis added), aff'd sub nom., OneBeacon America Insurance Co. v. A.P.I. Inc., No. Civ. 06-167 (JNE), 2006 WL 1473004 (D. Minn. May 25, 2006). They cannot make such a showing.[7]

---

[5]   This case does not involve a "preliminary issue" like the retention of professionals at issue when the Third Circuit considered insurer standing in In re Congoleum Corp., 426 F.3d 675 (3d Cir. 2005).   Rather, as in Combustion Engineering, this proceeding deals with confirmation of an amended plan, the Joint Plan that here is the culmination of a laborious 8-year effort.  This distinction is critical, and demonstrates the lack of insurer standing here. The Insurers here have been provided broad protection from harm to contractual and state law rights under insurance policies by insurance neutrality provisions and are not entitled to assert the rights of others in an effort to delay confirmation.

[6]   May 20, 2009 Objection of General Insurance Company of America ("GIC Ob.") at 5 (Dkt. No. 21776).

[7]   The Insurers misconstrue the Clinton and Lac du Flambeau decisions. See, e.g., Final Phase I Objection by FFIC ("FFIC Ob.") at 12-13 [Dkt. No. 21781] (citing Clinton v. City of New York, 524 U.S. 417 (1998)); Lac du Flambeau Band of Lake Superior Chippewa Indians v. Norton, 422 F.3d 490 (7th Cir. 2005).  Both of those cases stand only for the proposition that a *present injury* is sufficient to support standing, even when that present injury is the negative impact on credit rating caused by a "future though uncertain harm," such as the reinstatement of a contingent liability (in Clinton), or the risk that governmental approval of a casino would be withheld (in Lac du Flambeau.).  They do not support the principle that *contingent injuries* are sufficient for standing.  For example, in Clinton, the Supreme Court found that New York State had suffered present injury when President Clinton vetoed a statutory provision that would have eliminated a multi-billion dollar contingent liability of the State.  Clinton, 524 U.S. at 430-31.  Here, by contrast, the Insurers suffer no such present injury to their financial interests; the Joint Plan does not reinstate liabilities previously eliminated.  The Insurers will have the same contingent liabilities -- and the same defenses to coverage -- as they had pre-
(Continued...)

Nor can the Insurers raise the putative rights of third parties who have not themselves objected in order to defeat confirmation. See In re Quigley Co., 391 B.R. 695, 705 (Bankr. S.D.N.Y. 2008) ( "a 'party in interest' cannot assert third party rights defensively to defeat confirmation even if confirmation would directly and adversely affect its own rights. Instead, the objecting party can only challenge the parts of the plan that directly implicate its own rights and interests."); see also A.P.I, 331 B.R. at 859 ("[t]he party in question 'generally must assert his own legal rights and interests,' and cannot generally rest his claim for relief on the legal rights or interest of third parties.") (quoting Warth v. Seldin, 422 U.S. 490, 499 (1975)).  Simply put, the Insurers do not have standing to object to issues that will only directly affect others.

At bottom, "rather than seeking to remedy the impairment of [their] rights or lift a pecuniary burden, [the Insurers are] seeking a windfall at the expense of the Claimants." Travelers Ins. Co. v. H.K. Porter Co., 45 F.3d 737, 743 (3d Cir. 1995).  The Insurers have long benefited and wish to continue to benefit by protracting the Debtors' bankruptcy, thereby postponing the Debtors' right to apply their insurance for the very purposes it is meant to serve -- protecting the Debtors' other assets while compensating the Debtors' tort claimants.  For these and other reasons set forth in detail below, the Plan Proponents respectfully request that this Court rule that the Insurers' standing is limited to the Bankruptcy Preemption Issues.

This Court has already recognized that under circumstances such as those presented here, the Insurers have no right to object generally to confirmation.  In its conclusions of law in the Federal-Mogul bankruptcy, this Court held that where a plan preserves the rights of issuers of

---

petition.  Cf. Travelers Ins. Co. v. H.K. Porter, 45 F.3d 737, 743 (3d Cir. 1995) (rejecting insurer's argument that the contingency of its exposure was irrelevant to the determination of standing, and holding insurer did not have appellate standing because insurer's only "demonstrable interest" was "as a potential defendant" in another proceeding).

7

asbestos insurance policies, they have no standing to object to confirmation.   In that case, the
plan preserved all "Asbestos Insurance Coverage Defenses" except for "defenses concerning the
assignment of Asbestos Insurance Action Recoveries, Asbestos Insurance Actions and Asbestos
In-Place Insurance Coverage."   In re Federal-Mogul Global Inc., 2007 WL 4180545, at *41-42
(Bankr. D. Del. Nov. 16, 2007)   This Court recognized, therefore, that the plan "broadly
preserve[d]" those pre-petition rights, permitted insurers to "dispute coverage" and to "raise any
of the same challenges or defenses to the payment of claims available pre-petition."   Id.
Therefore, the Third Circuit's decision in Combustion Engineering controlled and deprived the
insurers of standing except to contest the assignments.   Id. (citing Combustion Eng'g).   The same
conclusion applies equally here.

### A.     The Insurance Neutrality Provisions In Section 7.15 Of The Joint Plan Are Clear.

As explained in further detail below, § 7.15(a) of the Joint Plan incorporates the "super-
preemptory" provision of the Combustion Engineering plan that broadly protects insurer rights.
Section 7.15(b) provides that the Joint Plan, Plan Documents, and the Confirmation Order shall
be binding on the Debtors, the Asbestos PI Trust, and beneficiaries of the Asbestos PI Trust.
Section 7.15(c) provides that the Insurers' rights under their policies and settlement agreements
are preserved unless expressly affected elsewhere in §  7.15, and §  7.15(d) makes clear that the
Asbestos PI Channeling Injunction protects Settled Asbestos Insurance Companies, as has been
true in numerous other § 524(g) plans as well.

Likewise, § 7.15(e) sets forth the basic and inarguable principles of *res judicata* set forth
in more detail below, and does not detract in any way from insurance neutrality.  Section 7.15(f)
protects the rights of the Insurers to raise Asbestos Insurer Coverage Defenses, and the
exclusions of §§ 7.15(g), (j), and 7.2.2(d)(iv) merely make explicit what is already well

8

understood by the Insurers: the Plan Proponents argue, and will demonstrate in Phase II, the propriety of the transfer of insurance rights pursuant to those provisions. Indeed, the Combustion Engineering case itself demonstrates that a plan can be insurance neutral while transferring insurance rights to a trust. Accordingly, contrary complaints by the Insurers do not implicate insurance neutrality or their standing as to other issues. The Insurers' standing to complain about the transfer of Asbestos Insurance Rights is preserved by the CMO, and the merits of that transfer will be addressed as part of Phase II. CMO at 1-2.

Section 7.15(h) of the Joint Plan makes clear what is already implicit in other sections of the Joint Plan: that § 7.15 is not intended to, and does not, waive the protections of the injunctions and releases in the Joint Plan, including those appropriately granted to the Sealed Air and Fresenius Indemnified Parties elsewhere in the Joint Plan. The propriety of the releases and injunctions, and their effect, if any, on any insurer or any other alleged creditor, is a Phase II issue.

Finally, § 7.15(i) of the Joint Plan provides a mechanism by which contribution claims against Settled Asbestos Insurance Companies may be asserted as a defense or offset against the Asbestos PI Trust or the Reorganized Debtors.

## B.    The Joint Plan Is Insurance Neutral.

The Insurers bear the burden of proving their standing, by demonstrating, with respect to each of their objections to the Joint Plan, that: (1) they have suffered an "injury in fact" to a legally protected interest; (2) there is a "causal connection" between the injury and the challenged action; and (3) the injury is likely to be redressed by a favorable decision. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992); In re Mid-Valley, Inc., 305 B.R. 425, 431

9

(Bankr. W.D. Pa. 2004) (same).[8]  As confirmation is the "final stage" of a bankruptcy case, mere allegations of standing will not suffice.  Lujan, 504 U.S. at 561.

The Court need look no further than the language of the Joint Plan to determine that, other than with respect to the Bankruptcy Preemption Issues, the Joint Plan is "insurance neutral" -- it has no other effect on the Insurers' legally protected rights and interests.  Thus, the Insurers cannot demonstrate an injury in fact, and they have no standing, with respect to any other issue.[9]

Here, the Joint Plan contains explicit insurance neutrality language, set out in § 7.15 and attached as Exhibit A hereto, which is similar to the language endorsed by the Third Circuit in Combustion Engineering and numerous courts since that time.  See also Pittsburgh Corning Op. at 5.  In fact, § 7.15 of the Joint Plan incorporates language that the Third Circuit has already recognized "broadly preserves insurers' pre-petition rights under the subject insurance policies,"[10] Combustion Eng'g, 391 F.3d at 217, and deprives them of standing to challenge

---

[8]   A putative party in a federal court always bears the burden of proving the facts on which it relies to establish its standing.  See Lujan, 504 U.S. at 561.  A party seeking to object to confirmation "must establish its standing to be heard under the bedrock principles that apply to *all* federal courts, as well as its statutory right to participate in the case under § 1109(b) ." A.P.I., 331 B.R. at 856 (emphasis in original).

[9]   See, e.g, Hr'g Tr. at 72, Nov. 24, 2008 [D.I. 20170] ("[Court:] if, in fact, the plan is insurance neutral * * * you don't have standing and there's nothing to litigate"); In re Pittsburgh Corning Corp., No. 00-22876, Mem. Op. at 49-50 (Bankr. W.D. Pa. Dec. 21, 2006) (JKF) (D.I. 5192) ("Pittsburgh Corning Op.") (attached hereto as Exhibit B) ("The insurers clearly have standing to raise issues as to the plan to the extent it affects their rights and obligations. Beyond that, however, they lack standing.  We have referred to this concept as 'insurance neutrality.'") (citations omitted); In re Thorpe Insulation Co., No. 07-19271, Tentative Ruling at 15-16 (Bankr. C.D. Cal. Apr. 2, 2009) (attached hereto as Exhibit C) ("so long as the plan is properly-framed to create actual insurance neutrality,` no other provisions of the plan have any legally cognizable effect on the insurers").

[10]  Combustion Eng'g considered appellate standing under the "persons aggrieved" standard, which is, in some respects, more exacting than the standard applied in bankruptcy court under 11 U.S.C. § 1109(b) .  See Combustion Eng'g, 391 F.3d at 214 & n.21.  Yet the two
(Continued...)

10

confirmation. See id. at 211-12, 217-18.[11] The Joint Plan thus ensures that if an Insurer receives a demand from the Asbestos PI Trust for payment of an Asbestos PI Claim, but wishes to contest coverage under its policy, the dispute will be resolved in the way that such matters are usually handled outside of Chapter 11 if not settled by the parties -- by the decision of a non-bankruptcy court in coverage litigation.

In such litigation, the Confirmation Order will have no preclusive effect with respect to matters that have not actually been decided in the bankruptcy case. Indeed, incorporating the "super-preemptory" provision of the Combustion Engineering plan (see id. at 216), the Joint Plan expressly provides that "nothing in the Confirmation Order, the Plan, or any of the Plan

---

standards are alike in recognizing standing only for litigants *directly* affected by the issue to be litigated. Compare id. at 214, with In re Applied Safety, Inc., 200 B.R. 576, 587 (Bankr. E.D. Pa. 1996). Thus, although not coextensive with § 1109, the appellate standard is "instructive with respect to the question of standing in a contested confirmation hearing." In re Wonder Corp. of Am., 70 B.R. 1018, 1022 (Bankr. D. Conn. 1987); see also Matter of Johns-Manville Corp., 68 B.R. 618, 623-24 (Bankr. S.D.N.Y. 1986). Furthermore, the "same general principles of prudential standing apply in all federal courts, including the bankruptcy court." See Quigley, 391 B.R. at 704 n.5.

[11] The insurance neutrality language approved by the Third Circuit in Combustion Eng'g provided:

Nothing in the Plan or in the Confirmation Order shall preclude any Entity from asserting in any proceeding any and all claims, defenses, rights or causes of action that it has or may have under or in connection with any Subject Insurance Policy or any Subject Insurance Settlement Agreement. Nothing in the Plan or the Confirmation Order shall be deemed to waive any claims, defenses, rights or causes of action that any Entity has or may have under the provisions, terms, conditions, defenses, and/or exclusions contained in the Subject Insurance Policies and the Subject Insurance Settlement Agreements, including, but not limited to any and all such claims, defenses, rights or causes of action based upon or arising out of Asbestos PI Trust Claims that are liquidated, resolved, discharged, channeled, or paid in connection with the Plan.

[N]otwithstanding anything to the contrary in this Order, the Plan or any of the Plan Documents, nothing in this Order, the Plan or any of the Plan documents (including any other provision that purports to be preemptory or supervening), shall in any way [sic] operate to, or have the effect of, impairing the insurers' legal, equitable or contractual rights, if any, in any respect. The rights of insurers shall be determined under the Subject Insurance Policies or Subject Insurance Settlement Agreements as applicable.

Combustion Eng'g, 391 F.3d at 209, 212, 217.

Documents (including any other provision that purports to be preemptory or supervening), shall in any way operate to, or have the effect of, impairing any Asbestos Insurance Entity's legal, equitable or contractual rights, if any, in any respect." Joint Plan § 7.15(a). To make insurance neutrality even more explicit, the Joint Plan also expressly provides that "[e]xcept as provided in Section 7.15(g), Section 7.15(j), and Section 7.2.2(d)(iv), nothing in the Plan, the Plan Documents, the Confirmation Order, or any finding of fact and/or conclusion of law with respect to the confirmation or consummation of the Plan shall limit the right, if any, of any Asbestos Insurance Entity, in any Asbestos Insurance Action, to assert any Asbestos Insurer Coverage Defense." Joint Plan § 7.15(f).

In response, General Insurance Company of America alleges plenary standing to be heard on *any* issue in the bankruptcy case unless and until the Joint Plan gives it assurance that nothing that transpires in this Court will ever be presented to the state court.[12] But no court addressing insurance neutrality has ever imposed such a requirement, including the Third Circuit in Combustion Engineering. Indeed, such a provision would be an impermissible attempt to strip the findings of this Court of binding force, even with respect to matters within its exclusive province, and would be contrary to basic principles of *res judicata*.

If the Joint Plan is confirmed, the Confirmation Order will actually and necessarily determine that the Joint Plan comports with the Bankruptcy Code, including, for example, a ruling that the Joint Plan was proposed in good faith, as required by Bankruptcy Code § 1129, and other tribunals must accord that determination binding force. The Insurers will not be permitted to attack collaterally the decisions of this Court on matters of bankruptcy law.

---

[12] GIC Ob. at 7 ("any use of the Order or other rulings and findings as evidence in coverage litigation * * * would be highly prejudicial to General Insurance").

12

Accordingly, the Joint Plan specifically provides that the Insurers cannot re-litigate the Bankruptcy Preemption Issues in a subsequent proceeding: the defined term "Asbestos Insurer Coverage Defenses" excludes any defense that "the transfer of Asbestos Insurance Rights pursuant to the Asbestos Insurance Transfer Agreement is prohibited by any Asbestos Insurance Policy, any Asbestos Insurance Settlement Agreement, any Asbestos in-Place Insurance Coverage or applicable non-bankruptcy law." Joint Plan § 1.1(16).[13]

Naturally, if the Insurers are permitted to raise any other particular issue -- and they should not be -- the Joint Plan also provides that the Insurers will be bound by the decision on that issue. Joint Plan § 7.15(e). That the Insurers cannot by the Joint Plan's terms re-litigate issues they have previously raised, simply recognizes and reflects ordinary principles of *res judicata* and collateral estoppel. This principle has already been applies by the Court in this case when it "ORDERED, based upon said lack of standing, that the objecting Insurers, as Insurers, may not and shall not participate in the Personal Injury Claims Estimation Proceedings, including initiating discovery and/or pretrial proceedings; *provided*, however, that any Insurer who, despite this Order, chooses to participate in said Proceedings, including by initiating discovery and/or pretrial proceedings, shall be bound by any and all findings of fact, conclusions of law, and orders issued in said Proceedings."[14] The same principle applies now.

The Joint Plan provisions do not diminish in any other respect the protections afforded the Insurers by the insurance neutrality language of § 7.15, or in any way impinge on the

---

[13] See also Joint Plan §§ 7.15(g), (j) & 7.2.2(d)(iv).

[14] Order Denying Insurers' Motion for Access to Exhibits to 2019 Statements and Clarifying Scope of the Personal Injury Claims Estimation Proceeding, dated Nov. 10, 2005, at 3 [Dkt. No. 11031].

13

Insurers' rights to assert any and all defenses to coverage that they would be able to raise if there were no bankruptcy, and to have those defenses adjudicated in coverage litigation (other than a defense based on assignment of Asbestos Insurance Rights). The insurance neutrality language of the Joint Plan expressly preserves all defenses and issues appropriate for coverage litigation.

For example, a ruling in this case that the Joint Plan was proposed in good faith within the meaning of the Bankruptcy Code will not preclude an Insurer from raising, as a coverage defense in a subsequent proceeding, the good faith of a particular settlement entered into by the Asbestos PI Trust.[15] Thus, the Insurers remain free to raise defenses involving the good faith or reasonableness of a particular settlement, or any other defense to coverage they wish to assert, if any, when the Asbestos PI Trust presents Claims for payment.

Fundamentally, the Insurers reject the notion that any plan that creates a § 524(g) trust funded by insurance proceeds can be insurance neutral. CNA acknowledges this when it states that "even if this Court should rule that the Plan does fully protect CNA's coverage defenses under the CNA Policies, the transfer itself would nonetheless impair CNA's rights as an insurer."[16] But as this Court previously held in Federal-Mogul, "[a]s in Combustion Engineering, because the Plan has been rendered 'insurance neutral' and broadly preserves the Asbestos Insurance Companies' rights and defenses to coverage, the Plan does not affect the

---

[15] This refutes FFIC's allegation, FFIC Ob. at 19, that the Joint Plan is not insurance neutral because the TDP allegedly will ensure compensation of meritless claims. "The fact that Debtors agreed to pay more to asbestos claimants to settle their liabilities than the certain insurers think Debtors should have agreed to does not create an injury to the certain insurers. The insurers retain rights to dispute whatever they may be asked to pay in future proceedings." Mid-Valley, 305 B.R. at 432.

[16] Final Plan Objections of CNA Companies to the First Amended Plan of Reorganization ("CNA Ob."). at 10 [Dkt. No. 21794]; *see also* GEICO Ob. at 12 ("[o]nce sued, the insurers are left merely to assert coverage defenses").

14

direct interests of the Asbestos Insurance Companies (with the exception of the assignment issue discussed in Section II.K, *infra*), and hence the Asbestos Insurance Companies lack standing to contest Confirmation of the Plan." 2007 WL 4180545, at *42. The same analysis applies here.

Moreover, the specific complaints made by CNA and other insurers along these lines relate to alleged defects in the Asbestos PI TDP and/or to the alleged incentives or ability of the Asbestos PI Trust to "cooperate" or meet other future alleged policy obligations to the Insurers.[17] These disputes are neither ripe for decision, nor would they be appropriate for this Court to decide unless it decided to address and resolve coverage issues (which, whether they intend that result or not, is what the various objections by the Insurers are implicitly inviting this Court to do). As the Court recognized in Mid-Valley, whether certain conduct "constitutes a breach of the policy is not before this court and is certainly not ripe for decision as the insurers are not yet called upon to pay." 305 B.R. at 432. The Insurers' attempt to block confirmation of the Joint Plan based on allegations that the Asbestos PI Trust might, in the future, breach the cooperation or other provisions of insurance policies is therefore both premature and improper: those are state-law issues, which will be determined, if necessary, when and if they are presented to a non-bankruptcy court in subsequent coverage litigation.[18]

Accordingly, the Joint Plan is "insurance neutral" -- it has no other effect on the Insurers' legally protected rights and interests. As such, the Insurers cannot demonstrate an injury in fact and they have no standing other than with respect to the Bankruptcy Preemption Issues.

---

[17] See, e.g., CNA Ob. at 10-11; GEICO Ob. at 12-13; FFIC Ob. at 5-7.

[18] And the Insurers cannot have it both ways: if the Insurers were successful in asserting such coverage defenses now and receiving general standing, § 7.15 then should be deleted in its entirety, as the Insurers cannot assert such coverage issues and then deny that the Court has the power to rule on them.

15

**C.**    **The Insurers' Complaints About The Insurance Neutrality Provisions Are Groundless.**

The Insurers allege that § 7.15 of the Joint Plan, when read in conjunction with §§ 7.13 and 8.1.1, creates confusion as to whether the Debtors' "obligations" under their non-settled policies pass to the Asbestos PI Trust.[19]  But the super-preemptory language of § 7.15 is clear,[20] §§ 7.13 and 8.1.1 could not be read to remove such obligations in any event, and it is also clear from §§ 7.15(a) and (f) that if Grace and the Asbestos PI Trust breach the insurance policies by failing to perform material conditions, such breach can give rise to a coverage defense that under § 7.15 would be resolved by a non-bankruptcy court in coverage litigation.[21]

They also allege that § 7.15(b) "contradicts" § 7.15(a) because certain Insurers allegedly hold Indirect PI Trust Claims or otherwise are beneficiaries of the Asbestos PI Trust, and thus

---

[19]  Federal Objection to the First Amended Joint Plan of Reorganization ("Federal Ob.") at 16-17 [Dkt. No. 21770]; CNA Ob. at 12-14; FFIC Ob. at 23; AXA Belgium as Successor to Royale Belge SA Objection ("AXA Ob.") at 10-12 [Dkt. No. 21803].

[20]  Indeed, CNA even acknowledges that it "presumes" that § 7.15 governs in any such situation given its language. CNA Ob. at 12-14.

[21]  The Insurers attempt to focus on deposition testimony to establish that § 7.15 of the Joint Plan is unclear. GEICO Ob. at 7-8; FFIC Ob. at 17-21; AXA Ob. at 8-9. The Insurers, for example, point to Mr. David Austern's on-the-spot review of § 7.15. But they omit to mention that Mr. Austern was not identified or produced as a Rule 30(b)(6) witness on insurance neutrality issues or any other issue for that matter.  And GEICO simply misrepresents other testimony of actual Rule 30(b)(6) witnesses. Mr Finke's alleged lack of understanding of the primacy of § 7.15 is specious, because Mr. Finke pointed out that § 7.15(h) excludes the subject-matter of releases and injunctions from neutrality and that includes but is not limited to § 11.9, as did Mr. Lockwood. And the "more" information Mr. Lockwood was discussing was the Insurers' failure to identify any claims of theirs that would allegedly be subject to § 11.9 in the first place. Regardless, snippets of deposition testimony as to a given lawyer's understanding of any provision of a plan at a particular point in time, much like supposed "expert" testimony on legal issues regarding confirmation, are irrelevant.

16

are bound by the Joint Plan.[22] But this argument ignores that such an insurer would be bound by the Joint Plan and its channeling injunction only in its capacity as a holder of such a claim, and not in its capacity as an issuer of insurance coverage to the Debtors. Accordingly, such an allegation (1) is irrelevant to the insurance neutrality of the Joint Plan, (2) is also expressly denoted as a Phase II issue in the CMO and (3) is an argument relating to the alleged rights of the Insurers as alleged "creditors" rather than as "insurers" (and thus only appropriate for Phase II) in any event.[23] See CMO at 1-2 ("The second phase shall address the objections of: (i) parties classified under the Plan as Holders of Indirect PI or PD Trust Claims (including insurers as Holders of Indirect PI or PD Trust Claims with respect to such Claims)," and noting that Phase I issues were limited to issues relating to the rights and standing of Debtors' insurers "in their capacity as insurers, but not creditors.").

Nor are the Insurers harmed by the safe harbor provision set forth in the last sentence of § 7.15(e), which allows the Insurers to protect themselves from substantive rulings relating to confirmation by withdrawing such objections prior to the Confirmation Hearing. That provision is also identical to § 10.4.1.4 of the Federal-Mogul plan. But if the Insurers would prefer to do without the safe harbor provision and delete the last sentence of § 7.15(e) of the Joint Plan as GEICO proposes,[24] the Plan Proponents have no objection to that deletion.

---

[22]  See, e.g., GEICO Ob. at 10-12.

[23]  And in Phase II, Plan Proponents will dispute that alleged creditors such as Seaton, discussed at GEICO Ob. at 11-12, have any real indemnity claims, because the claims that allegedly could give rise to such an indemnity are being channeled away from Seaton (in its capacity as an Asbestos Protected Party with respect to the settled coverage) and into the Asbestos PI Trust, thereby insuring the indemnity claim will never arise.

[24]  GEICO Ob. at 15.

17

In addition, the Insurers allege that § 7.15(f) of the Joint Plan violates insurance neutrality by protecting Asbestos Insurer Coverage Defense[s] while, pursuant to § 1.1(16) of the Joint Plan, such defenses do not include any defense that the Joint Plan or Plan Documents do not comply with the Bankruptcy Code.[25] This Court's confirmation of the Joint Plan will necessarily determine that the Joint Plan and the Plan Documents do not violate the Bankruptcy Code, and no court will or should be permitted to attack that determination of bankruptcy law collaterally in a non-bankruptcy forum.  Moreover, the hypotheticals posed by the Insurers in this regard are nothing short of ridiculous.  For example, the Insurers posit that this Court's conclusion that the Joint Plan was proposed in good faith under § 1129(a)(3) could allow the Asbestos PI Trust to argue subsequently that the Joint Plan or the Asbestos PI TDP represent a "reasonable valuation of the Asbestos PI Claims" or that "resolution of such claims without the insurer's involvement is itself reasonable and/or appropriate."[26]   Section 1129(a)(3) has nothing to do with the reasonableness of the settlement amounts reached by the Asbestos PI Trust with claimants or with the specific details of the process by which such settlements will be reached, nor can the Insurers cite a single precedent or any other source to support their alleged concern, even obliquely.  It should also be noted that §§ 7.15(f) and 1.1(16) contain the same carve-out from Asbestos Insurer Coverage Defenses as the insurance neutrality provisions contained in §§ 10.4.1.1 and 1.1.23 of the Federal-Mogul plan recently confirmed by this Court.

The Insurers likewise allege that § 7.15(i) of the Joint Plan fails to protect their ability under certain circumstances to pursue contribution rights against Settled Asbestos Insurance

---

[25]  Federal Ob. at 19-20; CNA Ob. at 14-16; GEICO Ob. at 14; FFIC Ob. at 24; AXA Ob. at 7.

[26]  Id.

18

Companies because of the effect of the Asbestos PI Channeling Injunction.[27]  But this has nothing to do with either the intelligibility of § 7.15 or insurance neutrality generally, but relates solely to certain insurers' alleged status as creditors, and thus is a Phase II issue (where, among other things, the reality of such hypothetical claims can be tested, as, for example, Scotts may be shown to have no such claims, or if it does, they may not give rise to claims against the settled insurers).

Similarly, with respect to § 7.15(h) of the Joint Plan, the question of whether "non-consensual releases and injunctions"[28] are (1) being inflicted on non-settling insurers, and if so, (2) whether they are proper and (3) what effect, if any, does their existence have on non-settling insurers' standing to object to other provisions of the Joint Plan that do not affect them, will be addressed in Phase II, as with all issues relating to the asserted standing of alleged insurer-creditors.

As a consequence of the protections of § 7.15 of the Joint Plan, the non-creditor Insurers have no standing as to issues other than the Bankruptcy Preemption Issues, and any allegation that a particular insurer is a creditor will be addressed in Phase II, in accordance with the CMO.

> **D.    Standing Is Determined Issue By Issue, And The Insurers Cannot Assert Third Party Rights.**
>
> 1.    Standing Is Determined Issue By Issue.

While the Insurers do have standing to be heard on the limited Bankruptcy Preemption Issues, it does not follow that they have standing with respect to all other issues.  "[T]he court should decide questions of standing, particularly, in multi-party, multi-issue confirmation

---

27  GEICO Ob. at 12-13; Federal Ob. at 20-21; FFIC Ob. at 24-26; CNA Ob. at 17-19.

28  GEICO Ob. at 13.

19

proceedings, on an issue-by-issue basis." In re Quigley, 391 B.R. 695, 705 (Bankr. S.D.N.Y. 2008). This is because the Insurers must demonstrate the "irreducible constitutional minimum"[29] of injury, causation and redressability with respect to *each* of the issues they seek to raise. Standing as to one issue does not provide standing as to all others. The Insurers' argument to the contrary relies on non-precedential and unpublished decisions by the bankruptcy court in New Jersey in the Congoleum case[30] that are contrary to governing precedent and the decisions of this and many other courts.

For example, the Supreme Court has repeatedly emphasized that "standing is not dispensed in gross." Lewis v. Casey, 518 U.S. 343, 358 n.6 (1996); DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 353 (2006) (same). Rather, each party must establish standing with respect to each of the specific claims it asserts or each of the specific issues it raises. See DaimlerChrysler, 547 U.S. at 352 ("a plaintiff must demonstrate standing for each claim he seeks to press"); Allen v. Wright, 468 U.S. 737, 752 (1984) (court must "ascertain whether the *particular plaintiff* is entitled to an adjudication of the *particular claims* asserted") (emphasis added); Warth v. Seldin, 422 U.S. 490, 498 (1975) ("the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of *particular issues*") (emphasis added).

In Combustion Engineering, the Third Circuit made it equally clear that "standing is not dispensed in gross" in bankruptcy proceedings any more than in any other proceedings and that standing to object to confirmation must be determined on a particularized basis as to each

---

[29]  Lujan, 504 U.S. at 560-61.

[30]  CNA Ob. at 6-7.

objection raised.  Combustion Eng'g, 391 F.2d at 215 (quoting Lewis, 518 U.S. at 358 n.6).  The

Third Circuit in that case found that asbestos insurers had standing to appeal a confirmation

order *only* with respect to an amendment the district court had made to the insurance neutrality

language of the plan, which appeared to narrow its scope.  The Court emphasized that standing

on that issue "does *not* provide the Objecting Insurers . . . standing to challenge all aspects of

Plan confirmation."  Combustion Eng'g, 391 F.3d at 220 n.28 (emphasis added).[31]  As shown

above, the Joint Plan here is also insurance neutral, and the standing of the Insurers must be

addressed on an issue-by-issue basis.  See id.

       This controlling authority is consistent with numerous other decisions applying the

Bankruptcy Code.  Section 1109(b) of the Bankruptcy Code provides that "[a] party in interest . .

. may raise and may appear and be heard on any issue in a case under this chapter."  11 U.S.C.

§ 1109(b).  Courts have uniformly recognized that Congress, in enacting § 1109, "did not intend

to grant all parties in interest standing to be heard in confirmation proceedings on every single

aspect of the reorganization proposal and the effects of its consummation."  A.P.I., 331 B.R. at

860.  Rather, § 1109(b)  has been interpreted to mean that a person "who has a legally protected

interest that could be affected by a bankruptcy proceeding is entitled to assert that interest *with

respect to any issue to which it pertains*."  Matter of James Wilson Assocs., 965 F.2d 160, 169

(7th Cir. 1992) (emphasis added).  Thus, "[a]n entity may be [a] real party in interest and have

standing in one respect while he may lack standing for another purpose."  Matter of Ofty Corp.,

44 B.R. 479, 481 (Bankr. D. Del. 1984).

---

[31] Combustion Engineering was a decision on appeal, applying the "person aggrieved" standard
for appellate standing.  There is, however, no basis to contend that the requirement that
standing be determined on an issue by issue basis is not equally applicable to proceedings in
the bankruptcy court.

21

To recognize standing for all of the many persons who may be *indirectly* affected by the acts and entitlements of others could significantly delay final resolution of cases and would be contrary to the central purpose of Chapter 11. See generally Alan N. Resnick et al., 7 COLLIER ON BANKRUPTCY ¶¶ 1109.01 & .02 (15th ed. rev. 2006). Indeed, "[p]roceedings would quickly grind to a halt if the court had to hear every party on every issue." Quigley, 391 B.R. at 703. As the Second Circuit has stated: "allowing numerous parties to interject themselves into the case on every issue [would] thwart[] the [Bankruptcy Code's] goal[s] of a speedy and efficient reorganization * * * [and the] reasonably expeditious rehabilitation of financially distressed debtors with a consequent distribution to creditors who have acted diligently." In re Refco Inc., 505 F.3d 109, 118-19 (2d Cir. 2007).

As a result, the standing of a party in interest to object to confirmation is generally limited to "those provisions of the plan which directly, adversely and pecuniarily affect the party raising the objection." Wonder Corp. of Am., 70 B.R. at 1023.[32] That is, only those parties "whose own interests are impacted by particular plan provisions, may object to those provisions at confirmation." Applied Safety, 200 B.R. at 587. See also In re Hutchinson, 5 F.3d 750, 756 (4th Cir. 1993) (a party in interest must demonstrate that its "pecuniary interests are, *directly* affected by the bankruptcy proceedings.") (emphasis added); In re Alpex Computer Corp., 71 F.3d 353, 356 (10th Cir. 1995) (same); In re Thirteen Chapter 7 Cases of Former Trustee Germain, 182 B.R. 375, 377-78 (Bankr. D. Conn. 1995) (same). The only such direct injury even alleged by the Insurers is that the assignment of insurance rights itself injures them, and

---

[32] In this respect, the § 1109(b) requirement, like the test for appellate standing in bankruptcy, is "more restrictive than Article III standing, which need not be financial and need only be 'fairly traceable' to the alleged illegal action." Combustion Eng'g, 391 F.3d at 215.

22

while Combustion Engineering permits such an assignment and thus rejects that theory, the Insurers' standing to challenge the assignments is unchallenged here. Other alleged harms include purely contingent, unproven and absurd alleged harms allegedly stemming, for example, from the fact that other courts cannot collaterally attack a finding by this Court that the Joint Plan was proposed in good faith and otherwise complies with the Bankruptcy Code, or alleged contingent harms from the injunctions and releases that could only accrue to creditors, a Phase II issue under the CMO.

Against this overwhelming weight of authority, which establishes that standing is determined issue by issue, the Insurers rely on the Congoleum case. But as the court in Quigley recognized: "The Congoleum court's conclusion that § 1109(b) displaces the ordinary principles of prudential standing runs counter to the case law in this Circuit and the majority of the other courts that have considered this question." Quigley, 391 B.R at 705 n.6. See also Pittsburgh Corning Op. at 49-50 ("The insurers clearly have standing to raise issues as to the plan to the extent it affects their rights and obligations. Beyond that, however, they lack standing."). Similarly, the court in A.P.I. determined that the insurers' contention that they have the right to be heard on *any* issue under § 1109(b) displaces the doctrines of constitutional and prudential standing and "does not work." A.P.I., 331 B.R. at 859.

> 2.    The Insurers May Not Raise The Rights Of Third Parties Who Do Not Object To Confirmation In Order To Defeat The Plan.

Many of the objections raised by the Insurers are to the Joint Plan's alleged violations of § 524(g) and various sections of § 1129,[33] which do not concern the legal rights or pecuniary

---

[33]  GIC Ob. at 4 ("General Insurance hereby joins the objection filed by other insurance companies, which show *inter alia* that the Plan * * * does not satisfy the requirements of Section 524(g); that it violates Sections 1129(a)(1) and Section 1129(a)(3)").

interests of the Insurers.  But the Insurers cannot assert the rights of third parties whose interests may be affected by the challenged provisions of the Joint Plan:  "[A] 'party in interest' cannot assert third party rights defensively to defeat confirmation even if confirmation would directly and adversely affect its own rights."  Id. (citing cases); see also In re Cypresswood Land Partners, Case No. 07-32437-H4-11, 2009 WL 136021 (Bankr. S.D. Tex., Jan. 20, 2009) (citing cases, and also holding that standing is a threshold inquiry that must be resolved in connection with confirmation).

This is because, in addition to the constitutional requirement of establishing a "case or controversy," the Supreme Court has crafted prudential limitations on "the class of persons who may invoke the courts' decisional and remedial powers."  Warth, 422 U.S. at 499.  These prudential considerations may defeat standing even when an injury sufficient to establish constitutional standing has been shown. See The Pitt News v. Fisher, 215 F.3d 354, 359 (3d Cir. 2000).  One prudential limitation is that a litigant "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." Warth, 422 U.S. at 499.  To prove standing to assert a third party's rights, the party must demonstrate that it has a close relationship with the third party, and there is a barrier to the third party asserting its own rights. See W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP, 549 F.3d 100, 109 (2d Cir. 2008) ("[T]hird-party standing [is permitted] where the plaintiff can demonstrate (1) a close relationship to the injured party and (2) a barrier to the injured party's ability to assert its own interests."); Kowalski v. Tesmer, 543 U.S. 125, 130 (2004) (generally a party seeking third-party standing must demonstrate a "close relationship with the person who possesses the right" and that the possessor would face a "hindrance" to protecting his own interest).

24

It is well established that, in enacting § 1109(b) , Congress did not intend to override these prudential limitations on standing.[34]  To the contrary, "[t]hird-party standing is of special concern in the bankruptcy context." In re PWS Holding Corp., 228 F.3d 224, 248 (3d Cir. 2000); see also Combustion Eng'g, 391 F.3d at 220 n.28 ("We have generally taken a restrictive view of third-party prudential standing in the bankruptcy context."); Kane v. Johns-Manville (In re Johns-Manville Corp.), 843 F.2d 636, 643-44 (2d Cir. 1988) (parties in bankruptcy cases ordinarily are required to seek to enforce their own rights, not the rights of others); James Wilson Assocs., 965 F.2d at 169 (holding that § 1109 does not obviate other limitations on standing and that an alleged party in interest could not object to the plan on the basis of a Bankruptcy Code provision that protected a class of persons to which that litigant did not belong).[35]

Prudential limits are particularly important in the context of confirmation of a plan of reorganization, when "one constituency . . . seeks to disturb a plan of reorganization based on the rights of third parties[.]" PWS Holding Corp., 228 F.3d at 248. See also A.P.I., 331 B.R. at 854 (need for prudential limits on a party's standing under § 1109(b) "is especially pronounced in

---

[34]  General Instrument Corp. of Del. v. Nu-Tek Elecs. & Mfg., Inc., 197 F.3d 83, 87 (3d Cir. 1999), cited in Arrowood Ob. at 6, is totally inapposite -- it does not even concern § 1109. The court in that case held that § 553(c)(1) of the Cable Communications Policy Act, which grants a private cause of action to "any person aggrieved" by theft of cable services or devices, "confers standing as broadly as the Constitution allows." Id. at 89.  Courts -- including the Supreme Court in Hartford Underwriters Ins. Co v. Union Planters Bank, N.A., 530 U.S. 1, 8 (2000) -- consistently have declined to interpret the language of § 1109 that broadly.

[35]  The Insurers have no "practical stake in the outcome of the proceedings." In re Amatex Corp., 755 F.2d 1034, 1041 (3d Cir. 1985). Arrowood's citation of Matter of Marin Motor Oil, Inc., 689 F.2d 445, 453 (3d Cir. 1982), Arrowood Ob. at 6, likewise fails to provide a basis for its standing argument, as that case concerned only whether the right of a "party in interest" to appear in a "case" under Chapter 11 includes a right to intervene in an adversary proceeding.

25

the area of objections to plan confirmation"); Matter of Deist Forest Prods., Inc., 850 F.2d 340, 341 (7th Cir. 1988) ("The limits on standing are vital in bankruptcy, where clouds of persons indirectly affected by the acts and entitlements of others may buzz about, delaying final resolution of cases.").

The only parties whose rights are affected by the provisions to which the Insurers object are others, such as Asbestos PI Claimants. For example, the Insurers complain that the TAC members' fiduciary duties to all Asbestos PI Claimants conflict with those members' duties to those Asbestos PI Claimants whom they represent.[36] But the Insurers do not and cannot establish their entitlement to base their standing on the rights of Asbestos PI Claimants. Indeed, the Insurers' "interests are entirely adverse to those of the asbestos claimants," and they "cannot . . . act on [asbestos claimants'] behalf, any more than any other adverse entity could." Mid-Valley, 305 B.R. at 434. Furthermore, "there is no hindrance to the ability of future asbestos claimants to protect their own interests." Id. They are more than adequately represented by the Futures Representative, who has actively participated in the bankruptcy proceedings.

Accordingly, the Insurers cannot raise the rights of the Asbestos PI Claimants or others to object to the Joint Plan.[37]

---

[36] See, e.g., GEICO Ob. at 20-21; CNA Ob. at 20-21.

[37] Furthermore, the Insurers do not have standing to raise the rights of third parties because they have not suffered their own injury-in-fact. See Camacho v. Brandon, 317 F.3d 153, 159 (2d Cir. 2003) (in order to be allowed third-party standing, the plaintiff must demonstrate: "(1) injury to the plaintiff, (2) a close relationship between the plaintiff and the third party that would cause plaintiff to be an effective advocate for the third party's rights, and (3) 'some hindrance to the third party's ability to protect his or her own interests.'") (quoting Campbell v. Louisiana, 523 U.S. 392, 397 (1998)).

E.    **The Independent Duty Of The Court To Ultimately Determine The Fundamental Fairness And Good Faith Of The Joint Plan Does Not Provide A Basis For The Insurers' Standing.**

Finally, the Insurers cannot base their standing, as they try to do, on the Court's independent duty to determine the fundamental fairness and good faith of the Joint Plan. If it were otherwise, there would be no limits on standing in bankruptcy at all, and that is clearly not the law. See, e.g., Thorpe Insulation Co. Tentative Ruling, Exhibit C hereto at 15 (where insurers claimed the plan was filed in bad faith as the result of collusion between the debtor and asbestos claimants, the court held that "the insurers do not have standing to make the argument that the requisite good faith is lacking * * * assuming the plan is in fact insurance neutral * * * even the grand conspiracy that the insurers allege would not adversely affect any of the insurers' rights"). Rather, the Court properly "may base its decision upon a review of the proposed plan, together with any information submitted in conjunction with it." In re Richard Buick, Inc., 126 B.R. 840, 846 (Bankr. E.D. Pa. 1991). It need not -- and should not -- consider the views of parties who lack standing to object to the Joint Plan. In re B. Cohen & Sons Caterers, Inc., 124 B.R. 642, 645-47 (E.D. Pa. 1991); In re A.P.I., Inc., 331 B.R. at 861-62 (objections by insurers who lacked standing to challenge confirmation were not considered).

The law is clear that the Insurers have no standing to participate in the bankruptcy other than with respect to the Bankruptcy Preemption Issues. This Court should so rule.

F.    **None Of The Insurers' Other Arguments Demonstrate That The Insurers Have Standing As Insurers To Object To Any Confirmation Issue Other Than The Bankruptcy Preemption Issues, And Many Of Their Arguments Are Premature Phase II Arguments.**

The Insurers argue that the Joint Plan improperly affects their rights by "excluding" them from settling the Asbestos PI Claims and other claim handling functions, and thereby precludes

27

insurance neutrality.[38] But this complaint, to the extent it has any validity, is preserved as a coverage defense, a treatment that the Third Circuit made clear was appropriate and did not violate insurance neutrality in Combustion Engineering. Moreover, CNA's argument that, even if all of its coverage defenses are preserved, it is still inherently harmed by the transfer of insurance rights,[39] and its apparent argument that it then should be able to have standing as to all issues, is inconsistent with Combustion Engineering's refusal to grant insurers as to whom insurance rights were transferred standing as to all confirmation objections.

The remaining arguments of the Insurers are premature. Some of the Insurers argue that the assignment of the Asbestos Insurance Rights is inappropriate and that the Bankruptcy Code does not preempt the anti-assignment provisions of insurance policies they issued to the Debtors.[40] This issue (the Insurers' position on which is contrary to decisions of the Third Circuit, this Court, and every other court to consider the question) is not a Phase I issue under the CMO, but has been reserved for Phase II, as FFIC acknowledges.[41]

Similarly, the Insurers' argument that the TAC has impermissible conflicts of interest among its asbestos constituency is a Phase II issue.[42] (As noted earlier, the Insurers do not have standing to make this argument in any event). Likewise, the Insurers argue that the Joint Plan

---

[38] GEICO Ob at 15-17; Federal Ob. at 16; FFIC Ob. at 22-23.

[39] CNA Ob. at 17.

[40] GEICO Ob. at 18-24; Federal Ob. at 13-15, 18-19; AXA Ob. at 9-10.

[41] FFIC Ob. at 21.

[42] GEICO Ob. at 24-29; Federal Ob. at 21-26; FFIC Ob. at 26-30; CNA Ob. at 20-35.

28

does not comply with § 524(g)'s requirements[43] -- requirements that are for the benefit of asbestos creditors. Again, the Insurers have no standing to make such arguments, and their assertion that such an alleged failure to comply with § 524(g) gives them standing because it "impacts the fairness" of the Joint Plan and because they are bound by § 524(g) injunctions is directly contrary to the Third Circuit's holding in Combustion Engineering regarding the lack of insurer standing as to the ongoing business requirement of § 524(g). See Combustion Eng'g, 391 F.3d at 248 ("While the Objecting Insurers argue that § 524(g)(2)(B)(i)(II) is not satisfied, they do not have standing to raise this matter.").

Certain Insurers complain about allegedly overbroad release and exculpation provisions of the Joint Plan,[44] but that is a creditor issue, and to the extent the Insurers allege they are creditors, the resolution of their alleged standing as creditors, and, if so, the validity of those provisions, will be addressed in Phase II. It should be noted, however, that none of the Insurers have demonstrated that, even if they are creditors with respect to certain claims, they will suffer any actual injury as a result of the releases and exculpation.[45] In addition, Arrowood has attacked versions of the release and exculpation provisions that are no longer operative; the Plan

---

[43] GEICO Ob. at 29-35.

[44] GEICO Ob. at 35-37; Arrowood Exculpation Ob. passim.

[45] GEICO and Arrowood criticize the release and exculpation of Representatives (as defined in the Joint Plan) and Non-debtors Sealed Air and Fresenius. But the Insurers' arguments as to how they could maintain causes of action against such Representatives are based on pure speculation. And the Insurers have not demonstrated how exculpation of Sealed Air and Fresenius (who are making substantial contributions to the Debtors' reorganization) for liability for acts or omissions in connection with or arising out of the Chapter 11 cases is improper or, more significantly, impairs any Insurers' rights in any way. Nor have the Insurers demonstrated any other economic injury due to the release and exculpation provisions.

29

Proponents revised these provisions in December 2008, and in particular, revised several of the terms about which Arrowood erroneously continues to complain.[46]

Other Insurers complain that the Joint Plan does not provide that an insurer can become a settled insurer after confirmation,[47] but that issue has nothing to do with insurer standing, and is a Phase II issue at best. Of course, even during Phase II, the Plan Proponents will have no obligation to defend against proposed plan provisions that non-Plan Proponents might prefer, and Insurers cite no applicable law mandating that such a provision be included in the Joint Plan.

Federal alleges that the Joint Plan could be read to eliminate contractual indemnity rights.[48] While Federal is incorrect, this too is a Phase II issue, as are all of Arrowood's confirmation objections.[49] Similarly, General Insurance Company of America asserts that its alleged contract claims (based on a settlement agreement) against Grace should not be channeled to the Asbestos PI Trust, but should be classified as Class 9 claims.[50] This is not an argument about whether the Joint Plan improperly affects General Insurance's rights as an insurer, but as an alleged creditor, and is therefore a Phase II issue not properly presented in this Phase I briefing. Indeed, CNA acknowledges as much in its own trial brief. "CNA believes that two objections it listed as Phase I in its Objections * * * should, upon further consideration, be

---

[46] In their November 10, 2008 amended chart regarding Disclosure Statement objections, the Plan Proponents indicated that the release and exculpation provisions would be revised in several ways. Those revisions were implemented in the version of the First Amended Plan filed on December 19, 2008.

[47] Federal Ob. at 26-27; FFIC Ob. at 30-31; CNA Ob. at 36-38.

[48] Federal Ob. at 27-28.

[49] Arrowood Indemnity Company Objection ("Arrowood Ob.") (Dkt. No. 21814) passim.

[50] GIC Ob. at n. 6.

30

deemed Phase II because they arise under settlement agreements and therefore can be more properly considered as arising in CNA's [alleged] capacity as a creditor."[51]

The Plan Proponents respectfully request that this Court rule in Phase I that the Insurers have standing only as to the Bankruptcy Preemption Issues, as they have not met their burden of proving facts demonstrating standing as to any other issues. Conversely, if they do participate at confirmation with respect to any other particular issues, they will be bound by the determinations associated with those issues, in coverage litigation and otherwise.

## II.    THE LENDERS ARE NOT IMPAIRED BY THE JOINT PLAN'S FAILURE TO PAY DEFAULT INTEREST ON THEIR CLAIMS.

As noted above, the CMO specifies that confirmation objections raised on behalf of and specific to the Lenders and other Class 9 creditors with respect to impairment also are to be addressed in Phase I of the Confirmation Hearing.  CMO at ¶ 3.  The only basis for the Lenders'[52] assertions of impairment under the Joint Plan, and the Committee's assertions that the Lenders are impaired, is that the Joint Plan does not provide for the payment of postpetition interest on the claims of the Lenders at the contract default rate.  But that is because there has been no default.  Because the Lenders are not entitled to interest at the contract default rate, there can be no impairment of the Lenders' claims under the Joint Plan for failing to pay default interest.

---

[51]  CNA Ob. at 1-2.

[52]  The Lenders are the holders of rights under the Debtors' Pre-Petition Credit Facilities.

31

A.    **This Court Has Jurisdiction To Decide Whether The Lenders Under The Prepetition Credit Facilities Are Impaired.**

On May 19, 2009, this Court entered its Memorandum Opinion respecting the Debtors'

objection to claims for post-petition interest at the default rate filed on behalf of the Lenders (the

"Claims Objection Opinion"). The Claims Objection Opinion is very clear as to what it decided

and what it did not decide. The Court expressly stated:

- The Bank Lenders are not entitled to post-petition interest at the default rate and we will sustain Debtor's objection on the limited § 502(b) and § 726 grounds asserted in the objection. Claims Op. at 1.

- The only issue ripe for adjudication is whether, as unsecured creditors, Bank Lenders are entitled at the default rate of interest as a matter of claim allowance and we conclude that they are not. *Id.* at 8.

The Court also made clear that:

- *Whether as a matter of plan confirmation default interest should be awarded on the Bank Lenders' claims is not before us as: (a) we are not at the plan confirmation stage;* (b) we have no evidence of solvency or insolvency; (c) Bank Lenders are unsecured creditors who will be paid in full with interest at a rate higher than their contract rate; (d) there is no prepetition default; and (e) there is no evidence of postpetition defaults that would trigger any default interest provisions in the loan documents. *Id.* at 8-9 (emphasis added).

- *Whether default interest is appropriate to be paid on the Bank Lenders' allowed claims in the context of plan confirmation must await the plan confirmation hearing and the evidence adduced at that time. Id.* at 12. (emphasis added).

- [I]t is **ORDERED** that Debtors' objection to the claims of Bank Lenders is **SUSTAINED** insofar as there is no entitlement to postpetition interest at the contract default rate on the principal balance of claims 9159 and 9168, which are unsecured. Plan confirmation issues are preserved. Order Sustaining Debtors' Objection to Unsecured Claims Insofar as Claims Include Postpetition Interest at the Contract Default Rate, dated May 19, 2009.

    1.    The Bankruptcy Court Maintains Jurisdiction Over Matters That Are Not The Subject Of The Appeal, And Impairment And Claims Allowance Are <u>Distinctly Different Matters In These Cases</u>.

Both the Committee and the Lenders have alleged that this Court has been divested of

jurisdiction to decide issues related to the Lenders' impairment for purposes of this confirmation

32

proceeding because the Claims Objection Opinion is the subject of appeal.[53]   It is well-established that the filing of a notice of appeal divests the lower court "of its control over those aspects of the case involved in the appeal."   <u>Griggs v. Provident Consumer Discount Co.</u>, 459 U.S. 56, 58 (1982).   The purpose of this judge-made rule is "to prevent the confusion and inefficiency that would result if both the district court and court of appeals were adjudicating the <u>same issues</u> simultaneously."   <u>Mary Ann Pensiero, Inc. v. Lingle</u>, 847 F.2d 90, 97 (3d Cir. 1988) (emphasis added).   This rule is equally applicable to appeals from a bankruptcy court decision as to an appeal from a district court decision.   <u>In re Mazzocone</u>, 1995 WL 113110, at *4 (E.D. Pa. Mar. 16, 1995).

However, it is equally clear that although an appeal divests a court's control over those aspects involved in the specific appeal, a bankruptcy court does not lose jurisdiction over every other aspect of the case.   See <u>In re Board of Directors of Hopewell Intern. Ins. Ltd.</u>, 258 B.R. 580, 583 (Bankr. S.D.N.Y. 2001) (notice of appeal does not divest the bankruptcy court to decide issues and proceedings different from, and collateral to, those involved in an appeal); <u>In re Strawberry Square Associates</u>, 152 B.R. 699, 702 (Bankr. E.D.N.Y. 1993) (finding that the bankruptcy court retained jurisdiction to address the prerequisites to plan confirmation because these issues were distinct from those the appellate court needed to consider to resolve the appropriateness of a stay under § 362 of the Bankruptcy Code, and noting that an appeal does not deprive a bankruptcy court of jurisdiction over other aspects of the case because doing so "would

---

[53]   Motion of the Official Committee of Unsecured Creditors to Modify Third Amended Case Management Order Related to the First Amended Joint Plan of Reorganization, dated June 2, 2009 ("Committee Motion") [Dkt. No. 21959]; Motion to Modify the Third Amended Case Management Order Related to the First Amended Joint Plan of Reorganization, dated June 3, 2009 ("Lenders' Motion") [Dkt. No. 21972].

33

freeze the case at the procedural posture reached when the appeal was filed, and would inure

unjustly to the benefit of any party whose interests were furthered by delay."); In re J.M. Fields,

Inc., 8 B.R. 638, 641 (Bankr. S.D.N.Y. 1981) (appeal from order of bankruptcy court authorizing

debtor to sell, transfer, and assign its interest in a lease to a specified party divested court of its

jurisdiction only with respect to the questions raised and decided in that order, and jurisdiction

which the court had over all other matters, including whether the debtor had a right to terminate

the contract of sale, was in no way impaired); In re Urban Development Ltd., Inc., 42 B.R. 741,

745 (Bankr. Fla. 1984) (finding that the bankruptcy court had jurisdiction to consider a request

by the debtor to sell property of the estate free and clear of a lien because the issues involved in

this determination were sufficiently distinct from the issues of lack of adequate protection, lack

of equity, and lack of need to preserve the property for any effective reorganization that the

appellate court needed to address to determine whether an automatic stay under § 362(a)(2) of

the Bankruptcy Code was appropriate).

Here, confirmation issues related to default interest specifically were not addressed in the

Claims Objection Opinion; and there is simply no divestiture of jurisdiction from this Court to

address default interest in terms of Class 9 impairment and confirmation under §§ 1123(a)(4)

and 1129 while an appeal goes forward on issues related to allowance of the Lenders' claims

under § 502(b) of the Bankruptcy Code. This appeal is an appeal related to claims allowance and

default interest *only in that context*. These are two distinct events in these Chapter 11 Cases.

Indeed, the Lenders and the Committee cite *no* cases that would support a contrary result. All of

their cases involve appeals where the lower court is divested of jurisdiction to rule on the *exact*

*same issue* present in the appeal *or* where the court must decide whether it has jurisdiction to rule

34

on a *motion for stay* pending appeal once the appeal is filed.[54]  Because impairment for purposes of confirmation is not the same issue as claims allowance, there is no threat to this Court's jurisdiction to proceed in addressing Class 9 impairment issues in terms of the Lenders in Phase I of the confirmation hearing as set forth in the CMO that been entered by this Court.

> 2.    In The Absence Of A Stay Pending Appeal, This Court Can Enforce The Claims Objection Opinion And Apply Such Findings To Matters Before It In The Confirmation Proceedings In Any Event.

The law is also clear that a bankruptcy court retains jurisdiction, while an appeal is pending, and in the absence of a stay, to apply and enforce its order or judgment appealed from. See Mazzocone, 1995 WL 113110, at *4 ("most courts have also held that bankruptcy courts retain jurisdiction to enforce, implement, and otherwise treat as valid judgments and orders that are the subject of pending appeals, as long as that enforcement and implementation does not require redeciding [sic] issues that are on appeal"); Hopewell Intern., 258 B.R. at 583 (citing In re Prudential Lines, Inc., 170 B.R. 222, 243 (S.D.N.Y. 1994), appeal dismissed, 59 F.3d 327 (2nd Cir. 1995) ("This is true because in implementing an appealed order, the court does not disrupt the appellate process so long as its decision remains intact for the appellate court to review")); In re Mirant Corp., 334 B.R. 800, 826 (Bankr. N.D. Tex. 2005) ("Until the appeal is decided, this Court's findings of fact and conclusions of law on these issues remains [sic] the law

---

[54]    Venen v. Sweet, 758 F.2d 117 (3d Cir. 1985) (involving lack of jurisdiction by lower court to hear the same matter that was subject of appeal);  In re AWC Liquidation Corp., 292 B.R. 239 (D. Del. 2003) (district court lacked jurisdiction to hear motion for stay pending appeal on same matter after notice of appeal filed); In re Transtexas Gas Corp., 303 F.3d 571 (5th Cir. 2002) (bankruptcy court lacked jurisdiction to modify confirmation order when confirmation order was on appeal); W. R. Grace & Co. v. Libby Claimants (In re W. R. Grace & Co.), 2008 WL 5978951 (D. Del. Oct. 28, 2008) (jurisdictional issues addressed regarding motion for stay pending appeal of same issue that was subject to appeal).

35

of the case and is [sic] binding upon all parties.") (quoting In re Tex. Health Enters., Inc., 255

B.R. 181, 183 (Bankr. E.D. Tex. 2000)).

A stay in this context would only have been proper if brought under Bankruptcy Rule

8005. Bankruptcy Rule 8005 provides:

> A motion for a stay of the judgment, order or decree of a
> bankruptcy judge, for approval of a supersedeas bond, or for other
> relief pending appeal must ordinarily be presented to the
> bankruptcy judge in the first instance.... A motion for such relief,
> or for modification or termination of relief granted by a bankruptcy
> judge, may be made to the district court or the bankruptcy
> appellate panel, but the motion shall show why the relief,
> modification, or termination was not obtained from the bankruptcy
> judge.

Fed. R. Bankr. P. 8005. In order to obtain a stay pending appeal under Bankruptcy Rule 8005, a

movant must establish the elements necessary to obtain a preliminary injunction: In determining

whether to grant a stay pending appeal, courts should consider: (1) whether the stay applicant has

made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will

be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the

other parties interested in the proceeding; and (4) where the public interest lies. See Republic of

Philippines v. Westinghouse Elec. Corp., 949 F.2d 653, 658 (3d Cir. 1991) (citing Hilton v.

Braunskill, 481 U.S. 770, 776 (1987)); In re Genesis Health Ventures, Inc., 367 B.R. 516, 519

(Bankr. D. Del. 2007) (same); In re ANC Rental Corp., No. 01-11220(MFW), 2002 WL

1058196, at *2 (D. Del. May 22, 2002) (same); In re Sharon Steel Corp., 159 B.R. 730, 733

(Bankr.W.D. Pa.1993) (same).

The Lenders have not moved for such relief and have made no showing that they meet

the standards for such relief under Bankruptcy Rule 8005. Indeed, given their complete silence

on the solvency issue during the discovery phase of this confirmation hearing, and the substantial

harm that all of Grace's other constituencies will suffer if there is a disruption of the

36

confirmation agenda, the Lenders clearly cannot make the requisite showing. Rather, the Lenders have taken a different tactic. They have decided to advance the disingenuous argument that their appeal from the Claims Objection Opinion divests this Court of jurisdiction to decide matters which the Court expressly found not to be properly before it.

This is simply not enough to stay the enforcement of the Claims Objection Opinion. Furthermore, implementing the Claims Objection Opinion for purposes of resolving the impairment issue in these confirmation proceedings does not require this Court to re-decide issues on appeal. Neither during the claims objection proceeding, nor during the discovery process associated with confirmation of the Joint Plan, have the Lenders attempted to offer or adduce any evidence which goes to the issue of the Debtors' actual solvency or insolvency.

Simply put, the plan confirmation proceedings should not be held hostage pending an appeal of the Claims Objection Opinion. This Court maintains jurisdiction to decide confirmation issues, including those related to the Lenders' impairment, and it is law of the case that the Claims Objection Opinion and findings related thereto can be enforced by this Court in the context of whether the Lenders are impaired under the Joint Plan.

B.    **This Court Has Determined That No Prepetition Or Postpetition Defaults Have Occurred And That, As A Result, The Lenders Are Not Entitled To Postpetition Default Interest.**

This Court, by its Claims Objection Opinion, correctly held that "the Bank Lenders are not entitled to the postpetition default rate of interest as part of their allowed claims pursuant to §502." Claims Op. at 12. In so holding, the Court found that "[i]t is undisputed that there were no prepetition defaults with respect to the obligations to the Bank Lenders and so no prepetition interest is owed." *Id.* at 4-5. The Court also disposed of all of the Lenders' current arguments in

37

support of their claims for default interest based upon the Debtors' alleged failure to satisfy their "post-petition contractual payment obligations."[55] In particular, the Court found that the Lenders provided no evidence of alleged reporting failures to warrant the payment of default interest, Claims Op. at 4, and that "nonpayment of postpetition interest is not a default" inasmuch as the Bankruptcy Code precluded the Debtors from paying postpetition interest. *Id.* at 5; see also In re Nextwave Personal Communs., Inc., 244 B.R. 253, 276 (Bankr. S.D.N.Y. 2000) ("It is senseless to speak of a 'default' when, as a matter of bankruptcy law, the debtors had neither the authority nor the ability to make such payments absent notice and court approval.").

In their plan objections, the Lenders and the Committee attempt to reargue the merits of whether the Lenders are entitled to postpetition default interest using the *very same* arguments that the Court rejected in its Claims Objection Opinion. As a result, the Lenders, by their own admission,[56] and as fully supported in the discussion on the merits below, cannot dispute that because they are not entitled to default interest on their claims under the Pre-Petition Credit Facilities, the Plan does not impair them. Collateral attack of the Court's ruling in such manner, however, is inappropriate for the reasons articulated above. The only issue before the Court at this time is whether the Lenders are impaired by the Joint Plan. As explained below, the answer is clearly "no."

## C.    The Joint Plan Does Not Impair The Claims Of The Lenders.

The question of whether a claim is "impaired" is governed by § 1124 of the Bankruptcy Code, which states in pertinent part: "Except as provided in § 1123(a)(4) of this title, a class of

---

[55] Objection of Bank Lender Group to Confirmation of First Amended Joint Plan of Reorganization ("Lenders' Ob.") at ¶¶ 31-39 [Dkt. No. 21789].

[56] Lenders' Motion at 3-4.

38

claims or interests is impaired under a plan unless, with respect to each claim or interest of such class, <u>the plan</u> – (1) leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest[.]" 11 U.S.C. § 1124 (emphasis added). Here, the Joint Plan proposes to pay the Lenders 100 percent of the allowed amount of their claims *plus* postpetition interest in excess of the contract nondefault rate. Joint Plan at § 3.19. Under Third Circuit law, by proposing to pay the Lenders the full amount of their allowed claims, the Joint Plan leaves the Lenders unimpaired pursuant to § 1124(1) of the Bankruptcy Code. Moreover, as discussed above, this Court has already determined that the Lenders have no entitlement to contractual default interest, and thus the Lenders cannot claim that they are impaired *by the Joint Plan* as a consequence of the fact that the Joint Plan does not provide for such interest.

1.    Only Impairment By The Joint Plan Is Relevant For Purposes Of Section 1124 Of The Bankruptcy Code.

Consistent with the language of § 1124(1) of the Bankruptcy Code, the Third Circuit has made clear that a claim is only impaired under § 1124 of the Bankruptcy Code if a plan of reorganization itself, not some provision of the Bankruptcy Code, alters the alleged rights of a claimant.  <u>Solow v. PPI Enters. (U.S.) Inc. (In re PPI Enter. (U.S.) Inc.)</u>, 324 F.3d 197, 204-05 (3d Cir. 2003). Both the Lenders and the Committee agree that PPI Enterprises governs the issue of impairment.[57]

Under <u>PPI Enterprises</u>, plan impairment occurs with respect to a creditor's claims "when the debtor alters the 'legal, equitable, and contractual rights to which [the] claim entitles the

---

[57] Objection of the Official Committee of Unsecured Creditors to Confirmation of the First Amended Joint Plan of Reorganization ("Committee Ob.") at 7 [Dkt. No. 21790]; Lenders' Ob. at 8.

39

holder of such claim," whereas statutory impairment occurs when "the operation of a provision of the [Bankruptcy] Code alters the amount that the creditor is entitled to under nonbankruptcy law." In re PPI Enters., 228 B.R. 339, 353 (Bankr. D. Del. 1998), aff'd, 324 F.3d 197 (3d Cir. 2003).

The distinction between plan impairment and statutory impairment is critical in these cases. "A creditor's claim outside of bankruptcy is not the relevant barometer for impairment; [the court] must examine whether the plan itself is a source of limitation on a creditor's legal, equitable, or contractual rights." In re PPI Enters., 324 F.3d at 204. As long as a plan does not itself alter a creditor's rights, but leaves such creditor subject to the other provisions of the Bankruptcy Code, the creditor's claim is unimpaired. Id. ("[W]e hold that where § 502(b)(6) alters a creditor's nonbankruptcy claim, there is no alteration of the claimant's legal, equitable, and contractual rights for the purposes of impairment under § 1124(1).").

Here, as explained below, the Joint Plan does nothing to limit the amount of the Lenders' claims.

### 2. There Is No Plan Impairment By The Failure To Pay The Lenders Postpetition Default Interest To Which They Are Not Entitled.

The fundamental error in the Lenders' Objection (and the Committee Objection) is that the Lenders presume that their legal, equitable, and contractual rights "include the right to post-petition interest at the contract default rate" and that this right is being altered by the Joint Plan.[58] Given the Claims Objection Opinion, the Lenders are wrong as a matter of fact and law. Simply put, the Lenders are not entitled to default interest as part of their allowed claim, and it is accordingly of no consequence that the Joint Plan does not provide for the payment of default

---

[58] Lenders' Ob. at ¶ 16; Committee Ob. at 8.

40

interest on the Lenders' claims. Indeed, to characterize the failure to pay default interest in the absence of a default that would trigger the right to such payment as impairment would undermine the well-settled principle that a creditor's rights should not be enlarged by the mere happenstance of bankruptcy. See generally Yenkin-Majestic Paint Corp. v. Wheeling-Pittsburgh Steel Corp. (In re Pittsburgh-Canfield Corp.), 309 B.R. 277, 287 (B.A.P. 6th Cir. 2004) ("Reclaiming seller is not entitled to administrative expense priority or lien without showing that claim has value outside of bankruptcy[.]"), abrogated on other grounds by Phar-Mor, Inc. v. McKesson Corp., 534 F.3d 502 (6th Cir. 2008); see also Carrieri v. Jobs.com, Inc., 393 F.3d 508, 527 (5th Cir. 2004) ("[u]nder § 502(b), the rights of holders of claims and interests are fixed as of the Petition Date.").

Accordingly, the Lenders (as well as the Committee) are hard-pressed to argue that the Lenders are impaired by the Joint Plan's failure to pay them default interest -- and indeed they apparently concede that they are not so impaired. Quite the contrary, the Joint Plan will pay the full amount of the Lenders' allowed claims. In fact, the Joint Plan goes one step further and also provides for interest in excess of the nondefault rate provided in the Pre-Petition Credit Agreements. As such, this clearly is not a case of plan impairment. Rather, to the extent the Lenders' claims are affected because the Lenders will not receive postpetition interest at the contract default rate, this alleged impairment results, if at all, solely by operation of the Bankruptcy Code, for the reasons set forth in the Claims Objection Opinion, as opposed to the Joint Plan. Under Third Circuit law, this type of statutory effect is not impairment at all under § 1124 of the Bankruptcy Code.

41

3.    The Third Circuit's Decision In PPI Enterprises Does Not Require
Payment Of Postpetition Default Interest.

The Lenders' reliance upon PPI Enterprises for the proposition that the Joint Plan's

failure to pay postpetition default interest results in impairment is misplaced. In PPI Enters., the

bankruptcy court determined that a creditor-landlord's lease rejection claim was subject to the

statutory cap imposed by § 502(b)(6) of the Bankruptcy Code, which limits the damages

resulting from the rejection of a lease of real property. The debtor, *which indisputably was

solvent* (unlike the facts here), proposed a plan that paid the entire amount of the creditor-

landlord's allowed claim under § 502(b)(6), along with prepetition interest at New York's

statutory rate and postpetition interest at either the same statutory rate or the federal judgment

rate. See In re PPI Enters., 228 B.R. at 343 & n.7. The creditor-landlord asserted that its claim

was impaired because it was limited by § 502(b)(6), but the bankruptcy court held that the

creditor-landlord was unimpaired.

The Third Circuit affirmed, finding that "where § 502(b)(6)  alters a creditor's

nonbankruptcy claim, there is no alteration of the claimant's legal, equitable, and contractual

rights for the purposes of impairment under § 1124(1)." In re PPI Enters., 324 F.3d at 204. In

reaching this conclusion, the Third Circuit stated: "A creditor's claim outside of bankruptcy is

not the relevant barometer for impairment; [the court] must examine whether the plan itself is a

source of limitation on a creditor's legal, equitable, or contractual rights." Id. at 204. Thus, the

Third Circuit's holding in PPI Enterprises is simple and straightforward -- a claim is only

impaired under § 1124 of the Bankruptcy Code if a plan of reorganization itself, not some

provision of the Bankruptcy Code, alters the alleged rights of a claimant.

In an effort to manufacture support for their claim of impairment and ongoing demand for

postpetition interest at the contractual default rate, the Lenders point to *dicta* in PPI Enterprises

42

suggesting that, in a solvent debtor case, a claim will not be unimpaired under § 1124(1) unless the claim is also paid postpetition interest.[59]. There are two problems with the Lenders' reliance on this *dicta* in support of their argument. First, this *dicta* is inconsistent with the express holding of PPI Enterprises. Second, even if this *dicta* is considered part of the Court's holding, it is not in any way inconsistent with the Debtors' position in this case.

There is no question that, under the express holding of PPI Enterprises, the Lenders are not impaired under § 1124(1). The Lenders and the Committee claim that the Lenders will be impaired if they do not receive postpetition interest at the contract default rate. But just as in PPI Enterprises, this alleged alteration of the Lenders' rights derives solely from operation of § 502(b) of the Bankruptcy Code. The only difference between this case and PPI Enterprises is the applicable subsection of § 502(b). In PPI Enterprises, the impairment resulted from operation of § 502(b)(6), and in this case the alleged impairment results from operation of § 502(b)(2), which prohibits the payment of "unmatured interest." See 11 U.S.C. § 502(b)(2); Claims Op. at 6. The Lenders do not, and credibly cannot, argue that PPI Enterprises applies only to impairment by one subsection of § 502(b) but not to other subsections. Other courts certainly have not parsed so finely the Third Circuit's holding. See, e.g., In re Mirant Corp., No. 03-46590-DML-11, 2005 Bankr. LEXIS 909, at *15 (Bankr. N.D. Tex. May 24, 2005) ("If the 'impairment' asserted is a consequence of the proper operation of the statute, it is not an impairment entitling the affected class to a vote.").

In In re Coram Healthcare Corp., 315 B.R. 321 (Bankr. D. Del. 2004), this Court specifically relied upon PPI Enterprises in concluding that a proposed plan erroneously classified

---

[59]  Lenders' Ob. at ¶ 21 (citing In re PPI Enters., 324 F.3d at 206).

43

unsecured creditors' claims as impaired when the plan provided for payment in full to such creditors plus post-petition interest at the federal judgment rate or such other rate determined by the court. Id. at 351. The court, after citing PPI Enterprises, stated that "[i]t is not the Equity Committee's Plan which limits the rights of the class CHC 3 and C 3 creditors. Instead, if their rights are altered at all, it is because of the Code and decisional law under the Code." Id.

The *dicta* cited by the Lenders -- suggesting that the failure to pay post-petition interest would leave a claim impaired -- is at odds with the Third Circuit's distinction between plan impairment and statutory impairment. As noted above, the prohibition on postpetition interest derives from the express language of § 502(b)(2) of the Bankruptcy Code. This is a classic example of statutory impairment which, under a strict reading of PPI Enterprises, is no impairment at all. In re PPI Enters., 324 F.3d at 204 ("A plan which leaves a claimant subject to other applicable provisions of the Bankruptcy Code does no more to alter a claimant's legal rights than does a plan which leaves a claimant vulnerable to a given state's usury laws or to federal environmental laws."). The Lenders do not even address, let alone attempt to explain, the tension between the *dicta* they cite and the Third Circuit's express holding. Needless to say, if they cannot be reconciled, the express holding controls. See United States Nat'l Bank v. Independent Ins. Agents of Am., 508 U.S. 439, 463 n.11 (1993) (emphasizing "the need to distinguish an opinion's holding from its dicta").

But even assuming that the *dicta* cited by the Lenders somehow limits the holding of PPI Enterprises, the fact remains that the Third Circuit's decision still does not support the Lenders' and the Committee's contention that they are impaired by virtue of the fact that they will not receive postpetition interest at the contractual default rate. As the Lenders acknowledge in their Objection, the Third Circuit's discussion of postpetition interest in PPI Enterprises arose in

44

response to a creditor-landlord's contention that Congress's repeal of § 1124(3) of the Bankruptcy Code eliminated impairment for creditors receiving cash equal to the creditor's allowed claim plus postpetition interest.[60] The bankruptcy court rejected such a broad reading of the 1994 repeal, finding that the 1994 repeal related solely to the award of postpetition interest where the debtor was solvent. In re PPI Enters., 228 B.R. at 351.[61] The Third Circuit, in turn, agreed with the bankruptcy court's analysis. In re PPI Enters., 324 F.3d at 207.

At most, the Third Circuit's decision in PPI Enterprises stands for the proposition that in a solvent debtor case, a claim must receive postpetition interest to qualify as unimpaired. But this *is not a solvent debtor case*. Instead, *this is a case where the Debtors' solvency has never been established*. Neither PPI Enterprises, nor any other authority, supports the Lenders' contention that a claim must receive postpetition interest before it can qualify as unimpaired even where, as here, there has been absolutely no showing of solvency.

Moreover, even if this was a solvent debtor case -- which it is not -- PPI Enterprises is still of no help to the Lenders in their quest for postpetition interest at the contractual default rate. As noted above, the Third Circuit's decision at most would require the payment of postpetition

---

60 Lenders' Ob. at 9-10.

61 More specifically, the bankruptcy court concluded that the repeal of § 1124(3) was intended to address the "anomalous result" from In re New Valley Corp., 168 B.R. 73 (Bankr. D. N.J. 1994), where the court held that the language of § 1124(3) allowed a solvent debtor to pay the "allowed" claims of unsecured creditors in full, excluding postpetitition interest, without risking impairment. The bankruptcy court concluded that, in deleting § 1124(3), Congress intended to clarify that in the case of a solvent debtor, a claim must receive both prepetition and postpetition interest to be deemed unimpaired. In re PPI Enters., 228 B.R. at 351-52 (citing In re Rocha, 179 B.R. 305, 307 n.1 (Bankr. M.D. Fla. 1995)) ("[A] solvent debtor must now pay post-petition and pre-confirmation interest on a claim to have a class considered 'unimpaired.' Section 1124(3) has been deleted in its entirety, which had previously allowed a class of creditors to be considered 'unimpaired' without paying interest on the claim.").

interest before a claim can qualify for unimpairment under § 1124 of the Bankruptcy Code. Nothing in that opinion remotely suggests that the postpetition interest must be paid at the contractual default rate. Indeed, this Court, in its Claims Objection Opinion, has already noted that in PPI Enterprises, the Third Circuit "agreed with the bankruptcy court's holding that a solvent debtor must pay postpetition preconfirmation interest on a claim in order for that claim to be unimpaired," but that "the court said nothing about the interest being paid at the default rate and the case cannot be read to require the default rate to be paid." Claims Op. at 11-12.

To the contrary, PPI Enterprises undermines the Lenders' and the Committee's contention that the Lenders are somehow impaired by the Joint Plan's nonpayment of contractual default interest. It is undisputed that the only basis for demanding contractual default interest is if there were a hypothetical default outside of bankruptcy, such interest arguably would be owed under the Pre-Petition Credit Agreements. But as the Third Circuit made clear, "a creditor's claim outside of bankruptcy is not the relevant barometer for impairment." Id. at 204. Instead, "a creditor's rights must be ascertained with regard to applicable statutes . . ." Id. Here, there is nothing in the Bankruptcy Code or any other statute that entitles the Lenders to contractual default interest. Indeed, this Court has just made that determination. Thus, far from compelling the payment of postpetition interest at the contractual default rate, PPI Enterprises suggests that such interest is not required to render the Lenders' claims unimpaired.

The Joint Plan will, consistent with the *dicta* in PPI Enterprises, pay the Lenders postpetition interest. In fact, it will pay them postpetition interest at a rate higher than the federal judgment rate and higher than the contract rate. If the Lenders want to argue that they nevertheless will still be impaired for failing to be paid default interest, they will not find any support for their argument in PPI Enterprises.

46

D.    **The Provisions Of Section 1129 Of The Bankruptcy Code Are Not Relevant To Determine Impairment.**

The Lenders and the Committee devote a substantial portion of their objections to the contention that payment of contractual default interest supposedly is required under two exceptions to § 502(b)'s bar against postpetition interest -- the "best interests" test of § 1129(a)(7) and the "fair and equitable" requirement of § 1129(b). But this contention misses the issue before the Court for Phase I. By the exact language of the Bankruptcy Code, both the "best interests" test (§ 1127(a)(7)) and the "fair and equitable" requirement (§ 1129(b)) are limited to creditors whose claims are part of an impaired class. The best interests test of § 1129(a)(7) expressly applies only to "each impaired class of claims or interests." 11 U.S.C. § 1129(a)(7). And the same restriction applies to the fair and equitable requirement of § 1129(b). 11 U.S.C. § 1129(b)(1). Other than in a solvent debtor case "'[u]nimpaired' creditors have no such rights." In re PPI Enters., 324 F.3d at 205 n.14.

For all of the reasons discussed above, the Lenders are not impaired as a matter of law. Thus, the exceptions found in § 1129 do not apply. See In re Madison Hotel Assocs., 749 F.2d 410, 426 (7th Cir. 1984) ("Prudential's claim is not impaired and thus, pursuant to 11 U.S.C. Section 1126(f) Prudential is deemed to have accepted the plan, notwithstanding any provision to the contrary. In light of this fact, Prudential cannot now reject the plan under 11 U.S.C. Section 1129(a)(7).") (emphasis in original); In re Seatco, Inc., 257 B.R. 469, 480 (Bankr. N.D. Tex. 2001) ("Class 3 creditors are unimpaired under the Joint Plan and the best interest test is not applicable to them."); In re Texaco, Inc., 84 B.R. 893, 908 (Bankr. S.D.N.Y. 1988) ("Because the Joint Plan leaves all classes of claims and all classes of interests other than that of the Texaco Stockholders unimpaired, the best interests test is inapplicable with respect to those classes.").

To the extent that the Lenders and the Committee raise these arguments again in relation to Phase II, the Debtors reserve their right to respond accordingly.

### E.    Conclusion: The Joint Plan Does Not Impair The Lenders' Claims.

Try as they might, the Lenders cannot change several critical facts -- there is no evidence of a prepetition default by the Debtors, there has been no postpetition default by the Debtors as a result of the Bankruptcy Code, and there is no evidence of solvency. These facts resulted in this Court's determination that the Lenders are not entitled to postpetition default interest as part of their allowed claim. It would turn the Bankruptcy Code on its head to find that the failure to pay postpetition default interest - to which the Lenders are not entitled pursuant to the Court's Claims Objection Opinion - constituted impairment of the Lenders' claims under § 1124 of the Bankruptcy Code.

### III.    CLASS 9 NON-LENDER CLAIMANTS ARE ALSO NOT IMPAIRED BY THE JOINT PLAN

In addition to the arguments addressed above with respect to the Lenders' claims, the Committee, Morgan Stanley, and Longacre[62] argue that non-lender claimants in Class 9 ("Non-Lender Claimants") are impaired, claiming that the Debtors are not paying the appropriate rate

---

[62] One of Longacre's claims has been classified in Class 6, and the Plan Proponents believe such claim is properly classified in Class 6. Arguments regarding whether claims are properly classified in Class 6 versus Class 9 are the subject of Phase II of the Confirmation Hearing, and will not be addressed here. However, since Longacre has also raised arguments related to the interest paid to Non-Lender Claims in Class 9, these arguments will be addressed here, notwithstanding the fact that Longacre only has standing to raise such arguments if Longacre's claim is reclassified in Class 9.

on post-petition interest to various Non-Lender Claimants; therefore, such claims are not being paid in full.[63]  As with the Lenders' contentions, these arguments lack any merit.

*First*, the Committee alleges that the Joint Plan is ambiguous[64] as to whether it provides for the payment of the full amount of post-petition interest on these Non-Lender Claims. However, the Joint Plan unequivocally provides for post-petition interest.  *See* Joint Plan § 3.1.9(b).  In addition, the Joint Plan provides very simple instructions to Non-Lender Claimants who disagree with the rate of interest that they are receiving. Joint Plan at § 3.1.9(d).  Indeed, such instructions were adopted from the confirmed plan in the *USG* case[65] and were proposed *by the Committee itself* in its negotiations with the Plan Proponents here.

The Committee does not even dispute that such procedures are in place.[66]  Instead, the Committee argues that although Non-Lender Claimants can challenge the rate or calculation of post-petition interest, the dispute resolution procedures need to specify all of the various arguments that Non-Lender Claimants might want to raise to form the basis of why they dispute

[63] Committee Ob. at 10-11; Objection of Morgan Stanley Senior Funding, Inc. to the First Amended Joint Plan of Reorganization ("Morgan Stanley Ob.") at 4 [Dkt. No. 21752]; Objection of Longacre Master Fund, Ltd. and Longacre Capital Partners (QP), L.P. to Confirmation of the First Amended Joint Plan of Reorganization ("Longacre Ob.") at 10 [Dkt. No. 21778].

[64] Committee Ob. at 11.  In addition, the Committee raises another argument that the Joint Plan fails to affirmatively state that the treatment for the Non-Lender Claims is to leave unaltered the legal, equitable, and contractual rights to which each such creditor is entitled. Committee Ob. at 11.  The Plan Proponents are willing to accommodate the Committee's request and add that language to the Joint Plan for both Bank Lender and Non-Lender Claims alike subject to the clarification that all of such rights are subject to the preemptory effect of bankruptcy law.  The Plan Proponents will make the change as part of certain technical modifications to the Joint Plan.

[65] In re USG Corp., Case No. 01-2094 (JFK) (Bankr. D. Del. Mar 27, 2006).

[66] Committee Ob. at 5.

49

what has been provided for in the Joint Plan.[67] This simply is unnecessary and will do nothing but create confusion if some scenario is unintentionally omitted from the list. The Plan Proponents contend that the Joint Plan is clear in that Non-Lender Claimants can dispute the rate or calculation of interest, and there is no need for "clarifying language" in the Joint Plan. Non-Lender Claimants can raise their arguments to the Court as part of adjudication of their claims, and the Court can decide whether such arguments have merit. The Joint Plan simply does not, and should not, get into those nuances and list every possible scenario under which interest may be contested.

*Second*, Morgan Stanley alleges that different rates of interest are proposed for different Non-Lender Claimants in Class 9, thereby violating § 1123(a)(4) of the Bankruptcy Code for failure to provide equal treatment to all holders in the class.[68] However, the fact that different Non-Lender Claimants may be entitled to different rates of post-petition interest under applicable non-bankruptcy law or otherwise is not a basis to separately classify each of these claims. All of these Non-Lender Claimants are being paid in full the allowed amount of the claims. In addition, they are being paid post-petition interest, and they can dispute the amount of post-petition interest as discussed above. Therefore, they are all similarly situated pursuant to § 1123(a)(4) of the Bankruptcy Code. See also In re Finova Group, Inc., 304 B.R. 630, 637 (D. Del. 2004) (Section 1123(a)(4) provides for equal treatment, which does not require equal payment); In re Central Medical Center, Inc., 122 B.R. 568, 575 (Bankr. E.D. Mo. 1990) (if a plan subjects class members to the same process for claim satisfaction, there is no violation of § 1123(a)(4),

---

[67] Id. at 11.

[68] Morgan Stanley Ob. at 4.

50

notwithstanding that such process could yield a different pecuniary result for different claimants within the same class); In re Dow Corning Corp, 255 B.R. 445, 500 (E.D. Mich. 2000) ("[a]s to whether the claim is being treated fairly within the class, the inquiry is whether the claim is subject to the *same process* in satisfying the claim as the other claims within the class") (emphasis added).[69]

*Finally,* Longacre takes a somewhat different position, essentially saying that the *USG* procedures themselves create impairment for claimants who challenge the interest rate provided under the Joint Plan and who find themselves receiving less after their matter is adjudicated by the Court than what is provided for under the Joint Plan.[70] It is the classic "have my cake and eat it too" philosophy -- Longacre does not want the amount provided for under the Joint Plan because it thinks it deserves more, but if the Court rules that it actually is entitled to less under the terms of any underlying agreements, then Longacre wants what the Joint Plan provides. That simply is not required under the law, and the class is not impaired by failing to provide a windfall position for claimants in the position of Longacre who choose to reject the rate of post-petition interest offered as a settlement under the Joint Plan and want to instead submit the calculation of their interest claim to an adjudication on the merits.

In short, there simply is no impairment of Non-Lender Claims under the Joint Plan. The Plan Proponents have provided post-petition interest at a certain rate and have invited all Non-

---

[69] However, if the Court concludes that the rate of interest being offered the Lenders is somehow discriminatory against other creditors in Class 9 because the Lenders are receiving more than their contractual rate of interest under the Joint Plan (pursuant to the deal previously negotiated with the Committee), then the Plan Proponents will have no objection to lowering the rate of post-petition interest paid to the Lenders to the stated non-default rate.

[70] Longacre Ob. at 10.

51

Lender Claimants to step forward if they believe that they are entitled to something else. The procedures are clearly outlined in § 3.1.9 of the Joint Plan, and interest will either be paid in the amount determined by this Court or as proposed by the Debtors under the Joint Plan. Accordingly, the impairment arguments with respect to Non-Lender Claimants raised by the Committee, Morgan Stanley, and Longacre should be overruled.

## IV. ISSUES TO BE RESOLVED AT THE JUNE 18, 2009 PRE-TRIAL HEARING AND PROPOSED AGENDA

By the time the parties are before the Court on June 18th, all Phase I discovery will be complete. Phase I issues will be ripe for the Court's consideration at the Phase I hearings scheduled for June 22 - 25. In an effort to assist the Court in an orderly and efficient process for completing Phase I of the confirmation proceedings, the Plan Proponents offer the following proposed agenda for the June 18, 2009 Pre-Trial Hearing, as well as the Phase I hearing beginning June 22nd:

> 1. Plan Proponents' Pending Motions To Strike The Expert Reports Of Messrs. Shein And Priest.

The Plan Proponents have filed motions to strike the expert reports of Messrs. Shein and Priest. These reports purport to offer expert testimony relating to insurance neutrality. However, as indicated in the Plan Proponents' briefs, both experts offer legal conclusions and do not offer expert opinions that will assist the Court with any issues relevant to Phase I or Phase II (and additionally, the experts' purported conclusions are not reliable nor relevant pursuant to Daubert). Objecting parties have until June 11, 2009 to file responses to the Plan Proponents' motions to strike, and apparently wish to call these experts during Phase I. The Court will need to resolve the Plan Proponents' motion at the June 18, 2009 Pre-trial Hearing, so that the parties know whether or not those experts will be testifying at the Phase I hearing.

52

2.      Committee's And Lenders' Pending Motions To Modify The CMO With
        Respect To The Issue Of The Lenders' Impairment By The Joint Plan.

As indicated above, the Committee and the Lenders have filed motions to modify the
CMO on the ground that the Court has been divested of jurisdiction to decide whether or not the
lenders are impaired by the Joint Plan. The Plan Proponents will be filing a response to the
motions on June 11, 2009. The Plan Proponents further believe that the issue of whether this
Court has been divested of jurisdiction to address the impairment issue, and the substantive
merits of the impairment issue are intertwined and should be addressed at the same time. The
Plan Proponents therefore recommend that the hearing on these inter-related matters commence
on June 22. Nevertheless, if the Court determines to hear, on June 18, argument on the
jurisdictional issue and modification of the CMO with respect to the impairment issue, the Plan
Proponents will be prepared to address this issue with the Court at the June 18, 2009 Pre-trial
Hearing.

3.      Order Setting Agenda For Argument For June 22 - 25 Phase I Hearing.

The Plan Proponents propose that the Phase I hearing should proceed in the following
order, and that the Court should set the Agenda for Phase I as follows:

- Argument on the Court's jurisdiction to hear the Lender impairment issue, modification
  of the CMO with respect to the impairment issue, and substantive arguments respecting
  whether the Joint Plan impairs the Lenders by not providing for the payment to the
  Lenders of default interest. The Plan Proponents believe that this issue should be
  resolved as a matter of law on the arguments and that no evidence is required.

- Argument on any other objections to the Joint Plan by creditors in Class 9 that they are
  impaired by the Joint Plan. The Plan Proponents believe that any such issues should be
  resolved as a matter of law on the arguments and that no evidence is required.

- Argument on the treatment under the Joint Plan of the Insurers, in their capacity as
  insurers, with respect to:

        (i)     insurance neutrality; and

53

(ii)    the standing of the Insurers, in their capacity as insurers, to be heard on any issue other than the transfer of the Asbestos Insurance Rights, and the rights of insurers under Asbestos Insurance Reimbursement Agreements as contemplated by §§ 7.2.2(d)(iv) and 7.15(j) of the Joint Plan. In particular, the Plan Proponents will ask the Court to rule that the Insurers, in their capacity as insurers, have no standing to be heard on the confirmability of the Joint Plan under §1129, the entry of the channeling injunction under §524(g), or the propriety of the other injunction, release, and exculpation provisions under the Joint Plan. The Court should further direct, as already contemplated by the CMO, that all substantive objections as to which the Insurers, in their capacity as insurers, are found to have standing to assert (including the issues related to the transfer of Asbestos Insurance Rights and the assignment of rights under Asbestos Insurance Reimbursement Agreements) will be heard in Phase II. The Plan Proponents believe that such issues should be resolved as a matter of law on the arguments and that no evidence is required.

- Ruling on all Phase I issues so as to inform the proceedings in Phase II.

K&E 14762746.10

Dated: June 8, 2009
Wilmington, Delaware

Respectfully submitted,

KIRKLAND & ELLIS LLP
David M. Bernick, P.C.
Theodore L. Freedman
Eric F. Leon
Deanna D. Boll
Craig A. Bruens
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

Barbara Harding
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200

and

THE LAW OFFICES OF JANET S. BAER, P.C.
Janet S. Baer, P.C.
70 W. Madison Street
Suite 2100
Chicago, IL 60602
Telephone: (312) 641-2162

and


   /s/ James E. O'Neill
PACHULSKI, STANG, ZIEHL & JONES LLP
James E. O'Neill (Bar No. 4042)
Timothy Cairns (Bar No. 4228)
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705
(Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400

*Counsel for the Debtors and Debtors in Possession*

CAMPBELL & LEVINE, LLC


    /s/ Mark T. Hurford
Mark T. Hurford (No. 3299)
800 N. King Street, Suite 300
Wilmington, DE 19801
Telephone:  (302) 426-1900
Facsimile:  (302) 426-9947
Email: mhurford@camley.com

and

CAPLIN & DRYSDALE, CHARTERED
Elihu Inselbuch
375 Park Avenue, 35th Floor
New York, NY 10152-3500
Telephone: (212) 319-7125
Facsimile: (212) 644-6755

Peter Van N. Lockwood
Nathan D. Finch
Jeffrey A. Liesemer
Kevin Maclay
One Thomas Circle, N.W.
Washington, D.C. 20005
Telephone:  (202) 862-5000
Facsimile:  (202) 429-3301

*Counsel for the Official Committee of Asbestos
Personal Injury Claimants*

PHILIPS, GOLDMAN & SPENCE, P.A.

   /s/ John C. Phillips
John C. Philips (Bar No. 110)
1200 North Broom Street
Wilmington, DE 19806
Telephone:  (302) 655-4200
Facsimile:  (302) 655-4210

and

ORRICK, HERRINGTON & SUTCLIFFE LLP
Roger Frankel
Richard H. Wyron
Jonathan P. Guy
Debra L. Felder
1152 15th Street, NW
Washington, DC 20005
Telephone: (202) 339-8400
Facsimile: (202) 339-8500

*Counsel for David T. Austern, Asbestos PI Future
Claimants' Representative*

SAUL EWING LLP

_/s/ Teresa K.D. Currier_
Teresa K.D. Currier (Bar No. 3080)
222 Delaware Avenue, Suite 1200
P.O. Box 1266
Wilmington, DE 19899
Telephone:  (302) 421-6800
Facsimile:  (302) 421-6813

and

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Philip Bentley
Gregory Horowitz
Douglas Mannal
1177 Avenue of the Americas
New York, NY 10022
Telephone:  (212) 715-9100
Facsimile: (212) 715-8000

*Counsel for the Official Committee of Equity Security Holders*