**EXHIBIT C**

## IN THE UNITED STATES BANKRUPTCY COURT FOR
## THE WESTERN DISTRICT OF PENNSYLVANIA

In Re:

Pittsburgh Corning
Corporation,
     Debtor

Bankruptcy No. 00-22876 (JKF)
Chapter 11

Related to Dkt. No. 2700, Second Amended Disclosure
Statement to Accompany the Second Amended Plan of
Reorganization Dated November 20, 2003, Jointly
Proposed by Pittsburgh Corning Corporation, the
Official Committee of Asbestos Creditors and the Future
Claimants' Representative,[1]

Dkt. No. 3186, Second Amended Plan of Reorganization
Dated November 20, 2003, and

Dkt. No. 4108, Order regarding briefs addressing the
impact, if any, of *In re Combustion Engineering*, 391
F.3d 190 (3d Cir. 2004), on the proposed plan of
reorganization

Dkt. No. 3033, Motion in Limine (No. Two) Re Plan
Finding on Purported "Validity and Enforceability" of
Corning's Proposed Assignment of Corning Plan
Insurance Policy Rights filed on behalf of Lumbermens
Mutual Casualty Company

### MEMORANDUM OPINION[2]

#### Introduction

The matter before the court is the confirmation of the Second Amended Plan of Debtor

Pittsburgh Corning Corporation (hereafter "PCC" or "the Debtor"). We find that the plan is

---

[1]A redlined version was filed at Dkt. No. 2702 on April 21, 2004. The Second
Amended Disclosure Statement with Plan was also filed as an exhibit.

[2]This Memorandum Opinion constitutes the court's findings of fact and conclusions of
law. The court's jurisdiction will be discussed in the text.

1

unconfirmable as over-inclusive under the Court of Appeals' decision in *In re Combustion Engineering*, 391 F.3d 190 (3d Cir. 2004). The plan would channel the independent claims against PPG and Corning, which it may not do. We repeat much of the same evidence throughout this Memorandum Opinion for the sake of pinpointing relevant evidence to the issue under discussion.

The plan was accepted by the overwhelming majority of all voting classes of creditors and interest holders and satisfies both §1126 and §524g(2)(B)(ii)(IV)(bb). There are two objections to confirmation: the scope of the §524(g) injunction regarding alleged asbestos-related personal injury claims and future demands (hereafter collectively "claims") as to nondebtors PPG and Corning (Debtor's shareholders) and the assignment to the trust of certain insurance rights. Property damage (i.e., "premises") claims are not in issue. As to those objections that deal with the scope of the §524(g) injunction with respect to nondebtors, we find that claims against PPG and Corning alleging liability for personal injury sustained as a result of exposure to PCC's asbestos- containing product, Unibestos, can be channeled to a trust. These claims are referred to in the Stipulated Findings of Fact ("SFF") as "PC-Relationship" claims. *See* SFF ¶¶ 58, 72,[3] Dkt. No. 3603.

In addition to the "PC-Relationship" claims involving PCC's Unibestos product, there are claims against PPG for a product called "Pyrocal" and claims against Corning for a

---

[3]Some objectors argue that because PPG or Corning have not been found liable for PCC's products those liabilities cannot be channeled. However, §524(g) speaks to allegations of liability, not findings.

product known as "Corhart."[4]  These are identified, respectively, as "Non-PC-Relationship"

claims and "Corning Fund" (or "Corhart") claims. *See* note 4, *infra*.

As to PPG, Non-PC-Relationship claims do not involve Unibestos. SFF ¶ 70. As to

Corning, there exist PC-Relationship claims (those involving Unibestos), SFF ¶ 72, but only

one "conspiracy theory" claim, *see* discussion of Exhibit P-18, *infra*, because PC-

Relationship claims against Corning typically did not include a "conspiracy theory," which

we explain below.  Similarly, claims against Corning for Corhart[5] did not typically include

allegations against PCC, as evidenced by the fact that when Corning settled Corhart claims it

did not seek to include PCC in the release it obtained. SFF ¶ 90.  PCC had no involvement

with Corhart. *See* SFF ¶ 84.  The oddity, for this case, is that suits against PCC with respect

to the Corhart product do not name Corning as a defendant. *See* SFF ¶ 247; Exhibits P-53, P-

54.

In addition to claims related to Pyrocal, Non-PC-Relationship claims against PPG also

include what we denominate "conspiracy theory" claims. SFF ¶ 70.  PC-Relationship and

Non-PC-Relationship claims[6] against PPG allege joint and several liability with PCC based

---

[4]Unibestos and Pyrocal are asbestos-containing products manufactured by PCC and
PPG, respectively.  Corhart refers to a product of Corhart Refractories Company for which
Corning is alleged to have liability.  SFF ¶ 81.

[5]Corning and Hartford Empire Company formed Corhart Refractories Company in
1927.  SFF ¶ 82.  In the 1950s, Corning acquired all outstanding Corhart stock.  SFF ¶ 83.
Corning sold Corhart assets in 1985 but retained liability arising out of any Corhart product
sold while Corning owned Corhart.  SFF ¶ 83.

[6]*See, e.g.*, SFF ¶ 70 which, as to PPG, states in part:

> The non PC-Relationship claims PPG settled historically arose
> out of alleged exposure to . . . "Pyrocal" . . . .  In such cases,

(continued...)

on conspiracy, alter ego, piercing the corporate veil, domination and control, concert of action, common enterprise, aiding and abetting, *respondeat superior*, negligent provision of services, principal and agent, successor in interest, and other joint and/or several liability theories (hereafter sometimes referred to as "conspiracy theories"). *See, e.g.,* SFF ¶¶ 51-52, 56-61.

As will be explained, we find that PC-Relationship and Non-PC-Relationship claims as to PPG that included "conspiracy theory" claims are properly within the scope of §524(g) and can be channeled. PC-Relationship claims and "conspiracy theory" claims against Corning are properly within the scope of §524(g) and can be channeled. Corning Fund claims, which by definition exclude claims based on exposure to Unibestos or any other asbestos containing product manufactured, marketed or sold by PCC, cannot be channeled unless they also include a "conspiracy theory."

The assignment issues concern assignment of insurance policies or proceeds to the asbestos personal injury trust and what has been called "insurance neutrality" language. For the reasons explained *infra* we find that the assignments of certain rights to proceeds under policies and/or proceeds themselves are permissible and valid with respect to claims for losses that have already occurred. Regarding "insurance neutrality," the plan provides that

---

[6](...continued)
> the claimants also alleged that, with respect to asbestos, PPG was ... engaged in a civil conspiracy or joint enterprise with, or otherwise aided and abetted [PCC]. . . Claimants who filed such claims against PPG also included a PC-Relationship claim . . . .

With respect to Corning, there is at least one instance in which Corning is alleged to be liable with PCC, PPG, and others on "conspiracy" theories. *See* Exhibit P-18 and note 40, *infra*.

4

the court's findings, other than those regarding assignment, are not binding and will not have collateral estoppel effect on non-participating insurers in any coverage litigation regarding their coverage obligations. *See* Second Amended Plan of Reorganization, §8.1.15. *See also* SFF ¶ 21. We find that the plan does not impermissibly assign the contested insurance proceeds or rights and that the plan is "insurance neutral." That is, defenses to coverage are preserved and insurer rights and risks are unaffected.

### Case History and Plan Confirmation Process

After PCC filed its Second Amended Plan of Reorganization, and after the hearing on confirmation of PCC's plan in this court, the United States Court of Appeals for the Third Circuit issued its decision in *In re Combustion Engineering*, 391 F.3d 190 (3d Cir. 2004). That decision provided both binding precedent and extensive guidance regarding the interpretation of §524(g) of the Bankruptcy Code. Of direct relevance to PCC's Second Amended Plan of Reorganization is the Court of Appeals' determination that an asbestos channeling injunction is available only to nondebtor affiliates that meet the express conditions of §524(g) and that "the general powers of §105(a) cannot be used to achieve a result not contemplated by the more specific provisions of §524(g)." *Combustion Engineering*, 391 F.3d at 236-37. On February 2, 2005, this court entered an order permitting the parties to submit briefs addressing the impact, if any, of the *Combustion Engineering* decision of the Court of Appeals for the Third Circuit on the debtor's proposed plan of reorganization. A hearing on the impact issue was held on March 16, 2005, *see* Transcript of 3/16/05, Dkt. No. 4215, (hereafter cited as "Tr. of ____") and at that time counsel for PCC asked for an additional 60 days to consider issues raised at that hearing. At a hearing on April 15, 2005,

the Plan Proponents reported that they wished to go forward with the plan as written. *See* Tr.

of 4/15/05, Dkt. No. 4256. At a hearing on February 28, 2006, *see* Tr. of 2/28/06, Dkt. No.

4734, this court gave the parties an opportunity to negotiate amendments to the plan inasmuch

as the plan included §105 as an "enhancement" to the §524(g) injunction. The court advised

the parties that because the plan provided for an injunction under §105 in contravention of

*Combustion Engineering*, it was unconfirmable. Plan amendments were filed on March 17,

2006, Dkt. No. 4741, to delete those references, and certain insurers filed additional

objections.

Briefs were filed by (i) Certain Insurers designated as "Interested Parties,[7] Dkt. No.

4149; (ii) ACE USA Insurers and Lumbermens Mutual Casualty Company, Dkt. No. 4173;

(iii) PPG Industries, Inc. ("PPG"), one of two shareholders of PCC, Dkt. No. 4153; (iv)

Employers Mutual Casualty Company, Dkt. No. 4154; (v) the Plan Proponents (PCC, ACC,

FCR), Dkt. No. 4155; (vi) Certain Insurers,[8] Dkt. No. 4156; (vii) Corning Incorporated, the

second shareholder of PCC, Dkt. No. 4157; and (viii) Estates of John W. Howiler and George

Garren, Dkt. No. 4162.[9] Argument was held and several status conferences were scheduled to

permit the parties to determine whether a consensual resolution to the *Combustion*

[7]These interested parties are identified in the brief as Century Indemnity Company, Lumbermens Mutual Casualty Company, and Westchester Fire Insurance Company.

[8]These Certain Insurers are identified as Certain Underwriters at Lloyd's, London, Government Employees Insurance Company, London Market Insurers, Mt. McKinley Insurance Co., Northwestern National Insurance Company, Stonewall Insurance Company, Interested Parties Everest Reinsurance Company and North Star Reinsurance Corp.

[9]Argonaut Insurance Company filed a joinder to Certain Insurers' Brief. Dkt. No. 4161. ACE USA and Lumbermens filed a reply brief at Dkt. No. 4173. PPG filed a reply to Certain Insurers' Memoranda, Dkt. No. 4176. Certain Insurers filed a Consolidated Reply to Three Briefs Filed by Plan Proponents, PPG and Corning, Dkt. No. 4177.

*Engineering* issue could be reached. The parties have not been able to agree. Therefore this court will address plan confirmation but first must address the impact of *Combustion Engineering* on PCCs' Second Amended Plan.

In light of *Combustion Engineering*, the Plan Proponents deleted references to §105 in the plan but not in their proposed findings of fact and conclusions of law.[10] We stated at a hearing on April 25, 2006, that the proposed findings related to §105 in lieu of §524(g) would not be adopted. Tr. 4/25/06 at 15, 27, 31-32, Dkt. No. 4846. At that hearing, certain insurers requested additional briefing with respect to whether, under facts dissimilar from those in *Combustion Engineering*, a §524(g) injunction could issue that governs nonderivative, independent claims. *Id.* at 29, 31-32. The request was granted. Argument on whether §524(g) permits nonderivative claims to be channeled on the facts of this case was held on July 21, 2006. *See* Tr. at Dkt. No. 4987.

The court has examined the Unibestos, Pyrocal and Corhart claims and finds that the ruling of the Court of Appeals in *Combustion Engineering* does not bar the inclusion of those claims in the proposed channeling injunction to the extent that (1) PCC is alleged to be liable for Unibestos, Pyrocal or Corhart claims, (2) PPG or Corning is alleged to be liable for Unibestos claims as a result of ownership or involvement with PCC, (3) PPG or Corning is

---

[10]The Notice of Amendments to Second Amended Plan, Dkt. No. 4741, includes references to ¶¶ 3,4, and 74-81 of proponents' proposed conclusions of law. The docket entry states that it is related to Dkt. No. 2700. We note that an additional reference to Dkt. No. 3603, the Stipulated Findings of Fact, should have been included in light of the references to that document. *See also* Dkt. No. 3634, Disputed Findings of Fact and Conclusions of Law Regarding Confirmation of the Second Amended Plan of Reorganization of Pittsburgh Corning Corporation, and Dkt. No. 3711, the Amended Disputed Findings of Fact and Conclusions of Law Regarding same.

alleged to be liable with PCC based on allegations of conspiracy, alter ego, piercing the corporate veil, domination and control, concert of action, common enterprise, aiding and abetting, *respondeat superior*, negligent provision of services, principal and agent, successor in interest, and other joint and/or several liability theories. *See, e.g.,* SFF ¶¶ 51-52, 56-61, 72-76.

In other words, to the extent that PCC, PPG and Corning are alleged to be jointly and severally liable for PCC's products (generally Unibestos) or conduct, or allegations against them are based on conspiracy or other joint or several liability theories, we find that the claims against the nondebtor entities are derivative and can be channeled under §524(g). The parties stipulated that in asbestos cases in which all three entities (PCC, PPG, and Corning) were named as defendants, cross claims were "asserted or deemed asserted" among and between all defendants. SFF ¶ 94. Furthermore, PPG and Corning each filed proofs of claim against PCC for contribution or indemnity regarding asbestos personal injury claims. SFF ¶ 95. *See also* Exhibit P-51, Standing Order No. One in *In re Master Asbestos File*, District Courts of Jefferson County, Texas.

We deal first with one over-arching objection as to Corning. There was argument that PCC had nothing to do with Corhart and, therefore, no Corhart claims could be channeled. We disagree that there is no basis upon which Corhart claims can be channeled. PCC was named as a co-defendant in 93 to 97 percent of the Corhart cases.[11] SFF ¶ 247. Insofar as

---

[11]At a hearing on July 21, 2006, counsel for Corning stated that "in over 97 percent of the Corhart claims against Corning the debtor is also named in the lawsuit." Dkt. No. 4987, Tr. 7/21/06, at 79. However, the Stipulated Finding of Fact at ¶ 247 does not support this contention, nor do the cited exhibits, P-53 and P-54, because Corning was not the named
(continued...)

there are suits alleging liability of Corning with PCC for Corhart based on some "conspiracy theory" of liability, the claims can be channeled. The Corhart suits against PCC, however, named, *inter alia*, Corhart, PCC, and PPG as defendants, not Corning. *See, e.g.*, Exhibits P-53, P-54 cited in SFF ¶ 247.[12]  William D. Eggers, Corning's general counsel and senior vice president, testified that Corning usually was not named as a defendant in Corhart cases. Tr. 5/4/04, Dkt. No. 3288, at 63.[13]  Thus, even though Corhart claims against PCC can be channeled, insofar as the Corhart claims against PCC do not include Corning, Corning is not subject to the §524(g) channeling injunction. Further, to the extent that Corhart claims brought against Corning do not also assert conduct of PCC or allege liability derivative of PCC, those claims against Corning cannot be channeled.

    As a threshold matter, we find that the standards for imposition of a channeling injunction are met in that under the plan a trust is to be created to assume PCC's liabilities based on asbestos, §524(g)(1)(B)(i)(I), the trust is to be funded by PCC's securities in whole or part, §524(g)(1)(B)(i)(II), (III), and the trust assets will be used to pay claims and demands, §524(g)(1)(B)(i)(IV). We also find that PCC "is likely to be subject to substantial future demands for payment arising out of the same or similar conduct or events that gave rise to the claims" to be enjoined, §524(g)(1)(B)(ii)(I), that the actual amounts, numbers, and timing of such future demands cannot be determined, §524(g)(1)(B)(i)(II), pursuit of the claims in the

---

[11](...continued)
defendant.

    [12]This was disputed as to relevance. We find it relevant. *See infra.*

    [13]Mr. Eggers testified that he was sure Corning was named as a defendant in some Corhart cases, *id.*, but none were cited.

tort system will threaten the plan's purpose to deal equitably with claims and future demands, §524(g)(1)(B)(i)(III), and the plan complies with §524(g)(1)(B)(i)(IV) insofar as it sets forth terms with respect to the injunction to be issued.

We do not recite the evidence regarding the plan's compliance with §1129 because those factors are not in dispute except as to the insurance assignment and the scope of the §524(g) channeling injunction. The evidence supports confirmation under §1129 except as noted regarding the channeling injunction. Further, the plan, disclosure statement, balloting process and classification satisfy all of the requisite provisions of §§524g, 1123, 1124, 1125, 1126 1127, and 1128 of the Bankruptcy Code except as to the scope of the channeling injunction.

<u>Background</u>

Pittsburgh Corning Corporation, the Debtor ("PCC"), was formed in 1937 by PPG and Corning to develop, manufacture and sell glass building products. SFF ¶¶ 3, 29.[14] PPG and Corning have always been the sole shareholders of PCC, each owning fifty percent. PCC's board of directors has consisted of representatives of PPG and Corning. SFF ¶ 30. PCC's two principal products were glass blocks and FOAMGLAS®, a cellular glass insulation product. SFF ¶ 31. Neither contained asbestos. *Id.*

In addition to its other products, from 1962 to 1972, PCC manufactured and sold asbestos-containing molded pipe insulation called Unibestos. Unibestos was installed at work sites requiring high temperature insulation such as shipyards, naval facilities, oil refineries,

---

[14]Disputed Findings of Fact and Conclusions of Law were filed at Dkt. No. 3634 and amended at Dkt. No. 3711. Additional Stipulated Findings of Fact with respect to Northwestern National Insurance Company were filed at Dkt. No. 3733.

petrochemical plants and heavy industrial sites. In 1972, PCC ceased all production of Unibestos. SFF ¶¶ 35, 37, 39.

PPG is a global manufacturer and distributor of coatings, glass, chemicals and fiberglass. SFF ¶ 33. Most asbestos claims against PPG were PC-Relationship claims, SFF ¶ 68, even though, except for two de minimis sales of Unibestos by PPG's fiberglass division in August and October 1969 for sales prices of $384.00 and $292.80, respectively, PPG did not manufacture, distribute or sell Unibestos. *Id.* at ¶ 40. Non-PC-Relationship claims against PPG arose out of alleged exposure to asbestos containing products that PPG sold under the "Pyrocal" brand name. SFF ¶ 70. Non-PC-Relationship claims against PPG typically included allegations that it "was engaged, *inter alia*, in a civil conspiracy or joint enterprise with, or otherwise aided and abetted" PCC. *Id.*

Corning manufactures and supplies specialty glass and glass ceramic products. SFF ¶ 34. Corning did not manufacture, distribute or sell Unibestos. SFF ¶ 40. It has, however, been subject to PC-Relationship claims on the same basis as PPG with respect to its ownership of PCC and the fact that its employees serve on PCC's board of directors. SFF ¶ 76. A more detailed description of the Corning claims will be addressed, *infra*.

PCC experienced an increase in asbestos claims in the late 1990s. On April 16, 2000, it filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. As of the petition date, there were approximately 235,000 asbestos claims pending against PCC. SFF ¶¶ 1, 2.

The Unibestos (PC-Relationship) Suits Against PCC, PPG, and Corning

11

In 1974, former employees of PCC's plant in Tyler, Texas, filed a series of lawsuits (the "Yandle/Kay" cases) in the United States District Court for the Eastern District of Texas against PCC, Corning, PPG, Dr. Lee Grant (at the time, Medical Director of PPG and Medical Consultant to PCC), and others. The Yandle/Kay cases alleged, *inter alia*, injuries to the employees resulting from exposure to asbestos at the Tyler plant. With respect to PPG and Corning, complaints were based in part on their awareness of conditions at PCC's plant and PPG's and Corning's failure to exercise their right to control PCC to "correct deficiencies." SFF ¶ 43. Over 2,000 claims ultimately were filed in the Yandle/Kay litigation which was settled for approximately $20 million. Settlement payments were made by or on behalf of PCC, PPG and Corning.  SFF ¶¶ 41, 42, 43, 44, 45.

After the Yandle/Kay settlement, an ever increasing number of cases alleging liability of PCC, PPG, Corning and others for asbestos exposure were filed. For example, thousands of temporary employees and business invitees of PCC's Tyler plant and residents living nearby filed another series of cases against PCC, PPG and Corning alleging liability of PPG and Corning for asbestos exposure. SFF ¶¶ 46, 47. These cases were also settled by PCC, PPG, and Corning for approximately $1.2 million, of which approximately five to ten percent was attributed to Corning. SFF ¶ 47.

In a third series of suits, referred to as the *Barber* case, employees of PCC's Port Allegany plant sued the Debtor (PCC), PPG and Corning. SFF ¶ 49. Summary judgment in favor of PCC and Corning was issued by a Pennsylvania state trial court and PPG eventually settled the case. SFF ¶ 49. More cases alleging joint liability of PCC, PPG and Corning with respect to Unibestos exposure, in addition to those involving the Tyler and Port Allegany

12

manufacturing operations, were also filed.  SFF ¶ 50.  Some of these suits included claims

against PPG and Corning arising from their ownership of a financial interest in PCC and their

"alleged right to control and manage" PCC.  SFF ¶ 51.

In 1981, PCC had approximately 15,000 to 20,000 claims pending or open against it.

By 1985, the number of claims had increased to between approximately 60,000 to 75,000,

SFF ¶ 53.  Before the Petition Date, PCC defended and resolved more than 200,000 Unibestos

claims at a cost of approximately $1.2 billion.  SFF ¶ 54.  As of the Petition Date, PCC had

approximately 235,000 Unibestos claims pending against it.  SFF ¶ 55.  Approximately

116,000 claimants named PPG as a defendant and 11,400 claimants named Corning as a

defendant, all regarding Unibestos.  SFF ¶ 56.

As will be explained, with respect to PC-Relationship claims, all of which are based

on liability for PCC's Unibestos product, a channeling injunction with respect to PPG and

Corning is appropriate.

Claims Against PPG

PPG historically manufactured a limited number of asbestos-containing products and

sold a limited number of asbestos-containing products manufactured by others.  SFF at ¶ 67.

Most asbestos claims against PPG were PC-Relationship claims.  SFF ¶ 68.  PC-Relationship

claims against PPG alleged liability based on, *inter alia*, the fact that (1) PPG is a fifty percent

shareholder of PCC, (2) its employees were on PCC's board, (3) PPG provided services to

PCC at various times, (4) PPG and PCC have joint insurance coverage, (5) PPG permitted

PCC to participate in its insurance coverage program, and (6) provided certain services to

13

PCC, SFF ¶ 60.[15] PPG has suffered only one adverse verdict on a "PC-Relationship" claim

and that was in the year 2000 in Texas where it was found to be ten percent liable with respect

to certain plaintiffs ("the *Sonnier* case").[16]  SFF ¶ 64.  Before 2000, it had never been found

liable for any Unibestos exposure claims.  SFF ¶ 63.  Other theories asserted against PPG

with respect to Unibestos liability included alter ego, piercing of the corporate veil, concert of

action, common enterprise, conspiracy and others, SFF ¶ 52, its ownership of a financial

interest in PCC and of its right to control and manage PCC, SFF ¶ 51.

"Non-PC-Relationship"[17] claims against PPG by definition exclude Unibestos.  Non-

PC-Relationship claims are those related to Pyrocal and generally included "conspiracy

theory" claims.  Pyrocal[18] is an asbestos-containing product sold by PPG but manufactured by

---

[15]These services included environmental and legal services and health and safety advice through the activities of Dr. Lee B. Grant, PPG's medical director.  SFF ¶¶60, 43, respectively.

[16]A week before the *Sonnier* verdict PPG had been found not liable on similar claims in the same court.  Second Amended Disclosure Statement, Dkt. No. 2700, at 42.

[17]The Non-PC-Relationship claims against PPG are discussed in section VI.C of the Second Amended Disclosure Statement, Dkt. No. 2700, at 41-46.  PCC argues that, because complaints in asbestos-related lawsuits typically refer very generally to the basis for claims against defendants, as is borne out by the examples filed in this case, it is not possible to state the number of pending asbestos-related lawsuits against PPG that do not relate to Unibestos. Second Amended Disclosure Statement, Dkt. No. 2700, at 46.  In addition, the theories presented with respect to PPG liability include, *inter alia*, aiding and abetting PCC in commission of a tort and civil conspiracy.  *Id.* at 41.  As discussed below, PCC argues that these claims implicate the insurance that PPG shares with PCC.

[18]Pyrocal is the only asbestos-containing product that has ever given rise to a payment by PPG and the total settlements in that regard have approximated $2 million over the years. SFF ¶ 70.  PPG sold Pyrocal from approximately 1968 to 1971.  Second Amended Disclosure Statement, Dkt. No. 2700, at 43.  PPG has never been found liable for any asbestos claims allegedly arising out of products it manufactured.  Second Amended Disclosure Statement, Dkt. No. 2700, at 43.  It has settled cases, as stated above, with respect to Pyrocal.  PPG's
(continued...)

PABCO Industrial Products Division of the Fibreboard Corporation,[19] a company not

affiliated with PPG. SFF ¶¶ 70, 71; Second Amended Disclosure Statement, Dkt. No. 2700,

at 43. The parties stipulated that claimants who filed Non-PC-Relationship claims against

PPG before PCC filed its bankruptcy petition also asserted "conspiracy theory" claims in an

attempt to establish PCC's liability for asbestos-related injuries based on PPG's relationship

with PCC. Additional claims were based on theories of civil conspiracy, joint enterprise,

and/or aiding and abetting PCC, among other joint and several liability theories. SFF ¶ 70.

Although the testimony established that in over thirty years, no separate Pyrocal claim has

been brought against PPG that did not also involve PCC, Tr. of May 5, 2004, Dkt. No. 3308,

at 134-35, Testimony of James Clarence Diggs, the parties stipulated that there were

approximately 800 "Asbestos PI Trust" claims against PPG that did not also include claims

against PCC. SFF ¶ 61.

Regarding the "conspiracy theory" claims, the parties cite, in the Stipulated Findings

of Fact, *Connorty, et al. v. Owens Corning Fiberglas, et al.*, filed in the District Court of

Galveston County, Texas. Exhibit P-15. The complaint in *Connorty* identifies PCC and PPG

---

[18](...continued)
total sales of Pyrocal were less than $700,000. SFF ¶ 70. There were other products
containing asbestos that were allegedly manufactured, distributed and/or sold by PPG but in
much smaller quantities, and PPG received few if any claims with respect to those. Second
Amended Disclosure Statement, Dkt. No. 2700, at 43.

[19]Fibreboard was a debtor in the Bankruptcy Court for the District of Delaware. *See*
Casc No. 00-3842-JKF. An order was entered the day after the chapter 11 was filed directing
procedural consolidation and joint administration with Owens Corning, 00-3837-JKF, D. Del.
Its plan of reorganization was confirmed and the plan took effect on October 31, 2006. *See In
re Owens Corning, et al.*, 00-3837, Bankruptcy Court for the District of Delaware, Dkt. No.
19659.

15

as products defendants, ¶¶ 5, 39, asserting joint and several products liability claims and conspiracy claims, ¶¶ 72, 88. In *Black v. A&M Insulations, et al.*, filed in Lake County, Indiana, Exhibit P-53, PPG and PCC are defendants and it is alleged that, in addition to manufacturing[20] or distributing Pyrocal, PPG, through PCC, "manufactured, produced and sold" asbestos products, "including, but not limited to" Unibestos. Exhibit P-53 at ¶ 8(bc). The plaintiffs in *Black* alleged conspiracy, joint and several action, "and/or . . . tacit agreement" as to all defendants. Exhibit P-53 at ¶¶ 14, 16, 18-19. *See also* Exhibit P-54 naming PCC and PPG and others as defendants, alleging joint and several liability, ¶ 12, and conspiracy, ¶¶ 75-79, 83.

Claims Against Corning

Asbestos claims against Corning for PC-Relationship (Unibestos) claims rely on theories which include Corning's status as a fifty percent shareholder of PCC, Corning's right to control and manage PCC, SFF ¶ 51, and the fact that Corning employees were on PCC's board of directors. SFF ¶¶ 72, 76. At the time of the bankruptcy filing, Corning had been named as a defendant, along with PPG, in Unibestos/PC-Relationship cases involving about 11,400 claimants. SFF ¶¶ 56, 75.[21]

---

[20]The parties stipulated that PPG sold Pyrocal and that Pyrocal was manufactured by a third party. SFF ¶ 70.

[21]Although Corning has never been held liable with respect to Unibestos, SFF ¶¶ 77-78, §524(g) applies to <u>allegations</u> of liability, not findings, verdicts, judgments, etc. *See* SFF ¶ 72 ("Corning has been named as a defendant in lawsuits by Claimants that allege that Corning is liable for bodily injuries they allegedly sustained as a result of exposure to Pittsburgh Corning's Unibestos product"). We also note that when PCC settled an asbestos case, it typically obtained a release that included Corning with respect to Unibestos claims. SFF ¶ 79.

In addition to PC-Relationship claims, Corning has also been alleged to have potential asbestos liability arising from a refractory brick product called "Corhart" distributed by Corhart Refractories Company, which Corning and Hartford Empire Company formed in 1927. SFF ¶¶ 81-82. As noted in note 5, *supra*, Corning acquired all outstanding Corhart stock in the 1950s and when it sold its Corhart assets in 1985 it retained liability with respect to Corhart products sold during the time that Corning owned Corhart. SFF ¶ 83. The type of refractory brick sold by Corhart was used in the steel industry in the construction of open hearth steel furnaces. None of the products manufactured by Corhart contained asbestos, *id.* ¶ 88, but occasionally, for about 10 years starting in 1962, Corhart provided, without charge, spacer material for use between the bricks, upon customer request. *Id.* ¶ 85. The spacers, paper material alleged to contain asbestos, were supplied by third parties and were not manufactured by Corhart. *Id.* Corhart did not manufacture, sell or distribute any other asbestos-containing product. *Id.* ¶ 88.

There are approximately 10,000 pending Corhart cases involving about 40,000 claimants.[22] *Id.* ¶ 89. It is not alleged that these cases name Corning as well. The exhibits cited in Stipulated Finding of Fact 247, Exhibits P-53 and P-54, and the disclosure statement, Dkt. No. 2700 at 51, refer to PCC and Corhart regarding these cases, not Corning. Approximately 21,000 Corhart claims were dismissed or discontinued without payment to any plaintiff; ten or eleven thousand Corhart claims settled for $3.1 million, an average of about

---

[22]The disclosure statement states that when it was filed there were 9,000 cases involving 36,500 claimants. *See* Disclosure Statement, Dkt. No. 2700, at 51. We rely on the Stipulated Findings of Fact with respect to the number of cases and claimants. *See* note 25, *infra*.

17

three hundred dollars per claim. SFF ¶ 89. Corhart suffered an adverse verdict in one state

court trial in Maryland for a total amount of $60,000 with respect to four claimants.[23] *Id.* ¶

91. William Eggers, Corning's general counsel and senior vice president, testified that

Corhart and Unibestos claims will be paid from the same insurance program, Tr. 5/4/04, Dkt.

No. 3288, at 44-46, and that Corhart claims could "potentially lead to contribution claims,

cross claims" against PCC. *Id.* at 46. The record establishes only one "conspiracy theory"

---

[23]The disclosure statement filed in this case states

> Since Corning was first named as a defendant in cases involving
> PCC and Unibestos, it has defended the cases on the grounds
> that under the governing law, it could not be held liable for
> injuries allegedly caused by a product made, sold, and
> distributed by a separate corporation, that it did not owe a duty
> to any person who claimed exposure to Unibestos, and that it
> was completely uninvolved in PCC's manufacture, sale, and
> distribution of Unibestos.

Dkt. No. 2700 at 48. Corning obtained summary judgment rulings in its favor in 1991 with a
Texas federal court finding as a matter of law that there was no agency relationship between
Corning and PCC. *Id.* A Pennsylvania state court granted summary judgment to Corning in
an action by former plant workers claiming injury resulting from exposure to asbestos while
working for PCC. *Id.* However, §524(g) refers to <u>allegations</u> of liability which exist here.
The alleged liability is derivative of PCC insofar as allegations concern various theories of
joint and several liability.
    With respect to Corhart, although most cases have been voluntarily dismissed without
payment, a small percentage have been settled for relatively nominal amounts (in the range of
$500 to $1,500). Dkt. No. 2700 at 51. In 1991-92, in a trial with numerous defendants
including PCC, Corhart was dismissed without prejudice from the plaintiffs' case but
remained a defendant with respect to co-defendants' cross-claims. At a subsequent trial on
the cross-claims Corhart's product was found to be defective. *Id.* As a result, Corhart
remains a defendant in what the disclosure statement refers to as "mini trials" in which
claimants must prove exposure and injury in order to be awarded compensation. *Id.* These
mini trials are apparently on-going. *Id.* Corhart also suffered an adverse verdict and was held
liable in the amount of $60,000 to four claimants in a consolidated trial in Maryland state
court in 1990. *Id.* When the disclosure statement was filed there were 9,000 Corhart cases
pending (10,000 according to the Stipulated Findings), involving about 36,500 claimants
(40,000 according to the Stipulated findings). *Id.*

18

suit against Corning that includes PCC, Exhibit P-18, but that suit does not identify the

product as Corhart.

That Corning and PPG expect this plan (and the relevant funds within) to pay claims

against them that are not derivative of PCC is evident from the arguments of counsel. *See* Tr.

of July 21, 2006, at 69, where Attorney Heller, on behalf of Corning, stated:

> As eligible nondebtor third parties entitled to injunctive
> relief we can - the shareholders can channel all of our asbestos
> related liabilities to the asbestos PI trust so long as the treatment
> is fair and equitable.

Later, in that proceeding, Ms. Ramsey, counsel for the Certain Cancer Claimants,

reiterated, at 94:

> In the future the – the court can enjoin those types of
> claims, claims for derivative liability. We have no quarrel with
> that. What the argument that the shareholders [PPG and
> Corning] are urging on the court is because anybody's even
> made an allegation against them for – or just because they
> qualify for derivative liability for Unibestos, that all actions of
> all kinds for asbestos liability can be – can be enjoined by the
> court.

PCC never had any financial involvement or owned any interest in Corhart nor did it

manufacture, sell, distribute, market or supply any Corhart product. SFF ¶ 84. Nonetheless,

it is a named defendant in most of the Corhart asbestos liability suits, 93 to 97 percent. SFF ¶

247; Tr. 11/17/04, Dkt. No. 3770, at 196. The parties dispute the relevance of this in light of

the fact that Corhart, not Corning, is named as a defendant with PCC and PPG (and others).

*See* SFF ¶ 247 and Exhibits P-53, P-54.[24] Plan Proponents argued that the fact of "possible

---

[24]Corning seems to rely, at least in part, on allegations of PCC's liability for injuries
allegedly caused by exposure to Corhart. Corning Incorporated's Memorandum of Law in
(continued...)

19

reduction of insurance coverage" made inclusion of Corhart claims necessary to the plan.

Thus, the Corning Fund claims provisions were included in the plan. Tr. 11/17/04, Dkt. No.

3770, at 196. We will address this in more detail *infra*. We merely note here that to the

extent the argument is that the channeling injunction is proper with respect to these suits as to

Corning because there will be an impact on insurance coverage as a result of the Corhart

claims, Tr. 10/20/04, Dkt. No. 3770, at 196, it is evident that such an impact will not occur

unless a separate contribution or indemnity action is brought. The stipulation is relevant

because, even though at least some of the suits against Corhart name PCC and PPG, *see*

Exhibits P-53, P-54, Corning is not named and a separate suit against Corning could be

required to establish Corning's liability or to affect the insurance shared between PCC and

Corning. The Court of Appeals in *Combustion Engineering* was very clear that related-to

jurisdiction does not exist when a separate lawsuit would be required to affect the bankruptcy

estate. 391 F.3d at 232.

<u>The Combustion Engineering Decision and Related-to Jurisdiction</u>

In this court's *Combustion Engineering* decision, 293 B.R. 459 (Bankr.D.Del. 2003),

*vacated* 391 F.3d 190 (3d Cir. 2005), it was recommended that the district court approve

Combustion Engineering's (hereafter "CE" or "Combustion Engineering") plan of

reorganization. Among the provisions of that plan was the creation of a trust pursuant to

---

[24](...continued)
Support of Plan Confirmation, Dkt. No. 4157, at 5, citing SFF ¶ 247. However, the exhibits
cited in the Stipulated Finding of Fact, P-53 and P-54, are examples of suits against PCC,
PPG and Corhart, not Corning. That Corning may, at some point, be found liable based on its
prior ownership of Corhart does not provide the requisite basis for a finding that its liability is
derivative of PCC's, inasmuch as a separate suit for contribution or indemnity would be
required.

§524(g) of the Bankruptcy Code which channeled asbestos claims against CE as well as

claims derivative of CE against its parent companies, Asea Brown Boveri, Inc. ("U.S. ABB")

and ABB Limited, U.S. ABB's parent (together, "ABB" or the "parent companies"), and CE's

affiliates ABB Lummus Global, Inc. ("Lummus")  and Basic, Inc. ("Basic").  In addition, the

plan provided for channeling nonderivative independent liabilities of Lummus and Basic

under §105.  CE had argued for the inclusion of the nonderivative independent liabilities of

Basic and Lummus in the trust because CE's restructuring, and ABB's funding of the plan,

were contingent upon the sale of Lummus free and clear of asbestos liabilities.

The bankruptcy court stated that Lummus and Basic did not meet the requirements of

§524(g) except with respect to shared insurance.  The bankruptcy court found that "§524(g)

permits shared liabilities to be covered but does not permit the inclusion of nonderivative

independent claims against Lummus and Basic that are not also claims against CE."  295 B.R.

at 481.  However, for several reasons, the bankruptcy court found it appropriate for Lummus

and Basic to be included in the injunction and determined that it had authority under 11

U.S.C. §105(a) to enjoin third party claims against Lummus and Basic for their nonderivative

independent liabilities.  *Id.* at 483.  The bankruptcy court recommended confirmation of the

plan (after additional information was provided regarding notice to Lummus and Basic

creditors) and the district court approved the plan in a modified confirmation order.  *See*

Revised Proposed Confirmation Order entered August 8, 2003, Wolin, J., Bankr. No. 03-

10495, D. Del., Docket No. 1211.  *See also* Oral Opinion, *id.*, Dkt. No. 1201.  Some of the

21

Objecting Insurers and the Certain Cancer Claimants[25] appealed to the Court of Appeals.

On appeal, the Court of Appeals addressed whether the bankruptcy court had "related-to" jurisdiction over nonderivative independent claims against Lummus and Basic and thus could enjoin such claims pursuant to §105(a).  The court held:

> [b]ecause §524(g) expressly contemplates the inclusion of third parties' liability within the scope of a channeling injunction – and sets out the specific requirements that must be met in order to permit inclusion – the general powers of §105(a) cannot be used to achieve a result not contemplated by the more specific provisions of §524(g).

391 F.3d at 236-37 (footnotes omitted).  In light of our prior rulings, §105 is not implicated in this case.  Nonetheless, the Court of Appeals' *Combustion Engineering* decision governs the analysis of the propriety of an injunction in favor of nondebtors under §524(g).

The Court of Appeals cited *Pacor, Inc. v. Higgins*, 743 F.2d 984 (3d Cir. 1984), as providing the seminal test for determining "related-to" jurisdiction over third party claims and noted that Congress intended to grant bankruptcy courts broad authority to deal with these matters.

> The usual articulation of the test for determining whether a civil proceeding is related to bankruptcy is whether *the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy. . . .* An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling

---

[25]"Certain Cancer Claimants" were defined as "those individuals suffering from cancers caused by exposure to asbestos and the estates of individuals whose wrongful death was caused by asbestos exposure and who hold tort claims against Combustion Engineering . .. and identified in the Bankruptcy Rule 2019 Statement . . . ."  *In re Combustion Engineering, Inc., Motion for Reconsideration of Final Order Appointing Future Claimants' Representative*, Bankr. No. 03-10495, Dkt. No. 251, at 1.

and administration of the bankrupt estate.

*Combustion Engineering*, 391 F.3d at 226, quoting *Pacor v. Higgins*, 743 F.2d at 994

(emphasis in original; citations omitted).  Applying the *Pacor* test to the facts in *Combustion*

*Engineering*, the Court of Appeals examined the third party claims in terms of (i) corporate

affiliation; (ii) financial contributions; (iii) related liability; and (iv) shared insurance.  The

court found that a review of these factors in *Combustion Engineering* led to the conclusion

that there was no related-to jurisdiction in that case.  Our application of these factors to the

instant case leads to the opposite conclusion, except with respect to Corhart claims as to

Corning and Pyrocal claims against PPG that do not also allege liability with PCC.

Citing *In re Resorts Int'l, Inc.*, 372 F.3d 154, 161 (3d Cir. 2004), the Court of Appeals

found that "[a]lthough ABB Limited's contributions to the Asbestos PI Trust may depend on

freeing Lummus and Basic of asbestos liability, and these contributions may inure to the

benefit of certain CE asbestos claimants, these factors alone do not provide a sufficient basis

for exercising subject matter jurisdiction."  *Combustion Engineering*, 391 F.3d at 228.  The

Court of Appeals also found that corporate affiliation between "lateral, peer companies in a

holding company structure" cannot alone provide sufficient grounds for subject matter

jurisdiction.  *Id.*  The court also stated that "§524(g) provides no specific authority to extend a

channeling injunction to include third-party actions against non-debtors where the liability

alleged is not derivative of the debtor."  *Id.* at 236.  The court therefore vacated the

confirmation order, making it clear that the asbestos channeling injunction protection is

available only to nondebtor affiliates that meet the §524(g) requirements.  To the extent that

there is an identifiable third party that is "alleged to be directly or indirectly liable for the

23

conduct of, claims against, or demands on the debtor to the extent such alleged liability of

such third party arises by reason of," *inter alia*, its ownership of a financial interest in the

debtor, a past or present affiliate or predecessor in interest of the debtor, its involvement in

the management of the debtor or service as, *e.g.*, a director of the debtor, or its provision of

insurance to the debtor, a §524(g) injunction may issue.  11 U.S.C. §524(g)(4)(A).  In this

case more than one of these elements are met with respect to PPG and Corning.

Shared Insurance

We address first the major contention in this case – shared insurance.  The appellate

court continued its discussion in *Combustion Engineering* by looking at the insurance shared

among Combustion Engineering, Lummus and Basic and determined that there was "minimal

corporate affiliation" and only indirect effects on the plan on this basis.  The court stated that

it was "doubtful whether shared insurance would be sufficient grounds to find related-to

jurisdiction over independent claims" against the nondebtors.  391 F.3d at 232-33.  The court

in *Combustion Engineering* distinguished *CoreStates Bank, N.A. v. Huls Am. Inc.*, 176 F.3d

187 (3d Cir. 1999), because *CoreStates* "involved an intercreditor dispute that directly

concerned assets of the debtor's estate" and that was not the case in *Combustion Engineering*.

*Combustion Engineering*, 391 F.3d at 229-30.  We find in this case that, insofar as there is

shared insurance and joint liability is alleged, the insurance is property of the estate and can

be depleted as a result of suits against PPG and Corning for PC-Relationship or "conspiracy

theory" claims.  In *Combustion Engineering*, the Court of Appeals noted that claimants

holding independent claims against Lummus and Basic were not creditors of the debtor and

could not directly affect administration of the plan.  The court further noted that the dispute in

24

*CoreStates* involved estate assets and there were no findings in the lower courts' decisions in *Combustion Engineering* that independent nonderivative claims against Lummus and Basic would involve assets of the debtor. *Id.* at 230.

In the instant case, there was extensive testimony concerning insurance policies that cover all three entities. PCC, PPG and Corning introduced substantial evidence on the record concerning the interrelated insurance coverage. At least some of the policies are of record and there is no dispute with respect to the <u>language</u> of the policies but rather with the meaning or interpretation thereof. *See* Exhibit P-57 (list of policies); Exhibit P-20 (insurance naming PPG and PCC); Exhibit P-21 (insurance naming Corning and "affiliates" or "subsidiaries"). With respect to PPG, the parties stipulated that it and PCC have joint insurance coverage. SFF ¶ 60.

While it is disputed whether PCC is an "insured" under certain policies, certain facts are established by the evidence of record: (1) PPG and PCC are named insureds on some policies.[26] (2) Corning excess policies apply to it and its affiliates. PCC is an affiliate of

---

[26]There are certain policies issued to Corning with respect to which PCC makes no claim and under which PCC is not an insured. Those include INA policies, SFF ¶¶ 136,140, and Lumbermens, SFF ¶ 145.

With respect to PPG, the London Market Insurers dispute whether PCC is covered "for the entire block [of time] for its asbestos liabilities." Tr. 5/3/04 at 37, Dkt. No. 3289. David Ellis, former Vice President, General Counsel and Secretary to PCC, testified that, until July 1, 1981, the excess policies did not contain an asbestos exclusion relating to Unibestos. Tr. 5/3/04, Dkt. No. 3290, at 58-59, 74-75. After that time excess insurers who shared coverage could take an asbestos exclusion but PCC's position is that the exclusion was "null and void" because insurers did not obtain required regulatory approval. *Id.* at 75. *See also* Tr. 5/5/04, Dkt. No. 3308, at 41-42 (Seymour). Again, this is a matter for coverage litigation. PPG claims no interest in the Lumbermens policies issued to Corning for which there is a dispute as to whether PCC is insured. SFF ¶ 146. PPG has not claimed an interest in any of the INA policies issued to Corning. SFF ¶ 136.

25

Corning.[27]  (3) Suits allege "conspiracy theory" and theories based on the corporate structure

and involvement.  With respect to PPG, the parties stipulated that there is joint insurance

coverage with PPG, SFF ¶ 60, but there may be disputes as to the time periods for which PCC

is covered.  Tr. 5/3/04, Dkt. No. 3289, at 37.

There is evidence of specific policies insuring both PPG and PCC and an award

against PPG for a Unibestos or Pyrocal claim paid through the applicable insurance policy

would reduce funds available to the bankruptcy estate, dollar for dollar.  *See* Tr. 5/5/04, Dkt.

No. 3308, at 36 (PCC covered as an insured under certain primary policies issued to PPG and

under excess policies issued to PPG),[28] *id.* at 43 (shared policies potentially provided

coverage for PC-Relationship claims and claims arising from alleged exposure to PPG's

products), *id.* at 65 (non-participating insurers' policies subject to assignment insure PPG and

PCC), *id.* at 104 (PPG has not been found liable for Pyrocal claims but has settled them and

the funds to pay the settlement amounts cover PPG and PCC) (testimony of Donald E.

Seymour); *id.* at 112 (PPG and its participating insurers will contribute $2.7 billion in

exchange for a §524(g) injunction) (testimony of James Clarence Diggs, PPG General

---

[27]"Affiliate" is defined by the Bankruptcy Code as, *inter alia*, an "entity that directly
or indirectly owns, controls, or holds with power to vote, 20 percent or more of the
outstanding voting securities of the debtor."  11 U.S.C. §101(2).  Although this indicates that
Corning is an affiliate of PCC, the converse is also true.  Black's Law Dictionary defines
"affiliate company" as one that is "effectively controlled by another company.  A branch,
division, or subsidiary."  Black's Law Dictionary, 6th ed., at 58.  It is undisputed that Corning
owns fifty percent of PCC.

[28]From a time before1962, (PCC began to manufacture Unibestos in 1962) until 1966
PCC shared primary insurance with PPG.  SFF ¶ 96.  PCC was also included as an insured
under PPG's excess insurance program from a time period before PCC began to manufacture
Unibestos in 1962 until 1986.  *Id.*

Counsel); Exhibits P-40 (Insurance Coverage Chart for PPG/PCC Policies 1970-86), P-57 (Policy Register); SFF ¶ 96. Claims against PPG typically included PC-Relationship claims, whether the alleged liability was based on PCC's Unibestos product or PPG's Pyrocal product. SFF ¶ 70. All claims against PPG alleging liability as a result of asbestos-containing products PPG manufactured or distributed implicate insurance shared with PCC. Disclosure Statement, Dkt. No. 2700, at 43. Donald E. Seymour, an attorney who represented PPG in negotiations in insurance coverage disputes, testified that the policies listed on Exhibit P-57 identify PCC and PPG as insureds. Tr. 5/5/04, Dkt. No. 3308, at 44-46.

Counsel for PPG summarized the evidence, and was not contradicted at the hearing, that there were policies before 1966 which were primary policies and not shared but that those were all settled and every policy subject to an assignment of rights and proceeds is shared. Tr. 5/6/04, Dkt. No. 3316, at 104. Moreover, the parties stipulated that shared insurance exists between PPG and PCC. SFF ¶ 107 (PPG obtained excess policies for PCC's benefit; these policies potentially provide products liability coverage to PPG to the extent PCC has not exhausted the limits; the policies also provide non-products coverage to PPG for claims that are covered).

For purposes of plan confirmation, we find that the evidence overwhelmingly establishes that, between PPG and PCC, shared insurance exists, although there may be a dispute as to time periods covered. Whether a particular policy applies or insures any given claim is left to coverage litigation.[29] Nonetheless, although the insurance is an asset of this

---

[29]In a reply brief concerning the impact of the *Combustion Engineering* decision on the plan now under consideration, Certain Insurers argue that because PCC had nothing to do

(continued...)

27

estate and will be affected by independent, nonderivative claims against PPG, we do not read

*Combustion Engineering* as permitting channeling of those claims. *See* 391 F.3d at 224, n.33.

The record in this case establishes that there are approximately 800 prepetition claims against

PPG alleging liability for asbestos personal injuries that do not involve PCC.

The parties stipulated that Corning has some insurance that does not apply to PCC.[30]

They further stipulated that PCC has not claimed coverage under any primary or excess

policies issued to Corning. *See* SFF ¶ 131. The Corning-London Market primary policies are

not exhausted so Corning has not yet asserted PC-Relationship, Corhart, or other asbestos-

related claims under these policies. SFF ¶ 133. Accordingly, the excess policies have not yet

come into play. The excess insurance policies procured by Corning for the period of 1962 to

1974 apply by their terms to any "subsidiary, associated, affiliated companies or owned and

controlled companies." SFF ¶ 128.[31] The London Market Insurers dispute that PCC qualifies

---

[29](...continued)
with Pyrocal, and because the "conspiracy" theories applied not only to these three entities but to "dozens of other defendants" and if the conspiracy theory entitled PPG to a §524(g) injunction, PPG would be entitled to a §524(g) injunction in all the other asbestos-related bankruptcies. Dkt. No. 4177 at 5-6. Certain Insurers' argument ignores the fact that PPG is not a shareholder of, and does not share insurance with, those "dozens of other defendants."

[30]With respect to Corning, the London Market Insurers do not agree that PCC is a named insured under Corning policies. Tr. 5/3/04 at 37, Dkt. No. 3289. We note that the parties stipulated that Corning had primary, excess and umbrella insurance coverage protection through Insurance Company of North America, a predecessor to Century Indemnity Company (one of the ACE Insurers) from 1962 to 1969, SFF ¶¶ 134, 135, and that PCC is not an insured under these policies. SFF ¶¶ 136, 140. Another insurer, Lumbermens Mutual Casualty Company, issued primary insurance coverage to Corning from 1972 to 1985. SFF ¶ 141. PCC claims no interests under these policies and is not an insured. SFF ¶¶ 145.

[31]    The term "named insured" is often defined broadly in policies because many commercial policyholders are made up of different entities, each of which must be insured. Douglas R. Richmond, *The Additional Problems of Additional Insureds*, 33 Tort & Insurance. (continued...)

28

as a "subsidiary" or "affiliate" under these policies.  It is undisputed that Corning and PPG

each own part of PCC.  The three entities, PCC, PPG, and Corning, are, without doubt,

"affiliates."[32]  As an affiliate of Corning, PCC is a "named insured" as that term is used in the

Corning Affiliate Policies.  Exhibit P-21.[33]  By definition, in those policies, there is shared

---

[31](...continued)
L.J. 945, 947 (1998).  *See generally John Deere Insurance. Co. v. Shamrock Indus., Inc.*, 929
F.2d 413, 417-18 (8th Cir. 1991)(definition of insured included "any entity coming under the
named insured's control over which it assumes active management").

[32]"Affiliate" under the Bankruptcy Code is defined in pertinent part as

> (A) entity that directly or indirectly owns, controls, or holds
> with power to vote, 20 percent or more of the outstanding
> voting securities of the debtor, other than an entity that holds
> such securities --
>> (i) in a fiduciary or agency capacity without sole discretionary power to
>> vote such securities; or
>> (ii) or solely to secure a debt, if such entity has
>> not in fact exercised such power to vote;
> (B) corporation 20 percent or more of whose outstanding voting
> securities are owned, controlled, or held with power to vote, by
> the debtor, or by an entity that directly or indirectly owns,
> controls, or holds with power to vote, 20 percent or more of the
> outstanding voting securities of the debtor, other than an entity
> that holds such securities – (see ¶¶  (i) and (ii) above).

11 U.S.C. §101(2).  PCC is an affiliate of and owned partially by Corning.

[33]Paragraph 128 of the Stipulated Findings of Fact says

> For the period 1962 to 1974, Corning procured excess insurance
> policies, some of which listed as named insureds Corning and
> any Corning "subsidiary, associated, affiliated companies or
> owned and controlled companies . . ."

Under particular policies that cover affiliates, PCC is entitled to claim coverage.  London
Market Insurers "Affiliate Policies" and Non-Affiliate Policies" are defined in SFF ¶ 129 as
follows:

(continued...)

29

insurance between Corning and PCC. Thus, any payments by the insurers for asbestos-related

claims to or for the benefit of Corning would reduce the amount of potential coverage

available to PCC dollar for dollar, thereby reducing an asset of the estate. Because of the

existence of excess coverage that would include PCC as an insured by virtue of the policies'

applicability to subsidiary or affiliated companies or those that are owned and controlled by

Corning, we find that the shared excess insurance will be affected if Corning exhausts the

primary policies.[34] *See* Amended Disputed Findings of Fact . . ., Dkt. No. 3711, ¶ 310, at 203

("Corning Plan Insurers are required to indemnify Corning only in accordance with the terms

of the insurance contracts they issued to Corning"); SFF 128 (Corning's excess insurance

policies name Corning and any "subsidiary, associated, affiliated companies or owned and

controlled companies . . . ."). *See also* Exhibit P-21, SFF ¶ 128. The court recognizes that

there is considerable dispute among the parties regarding insurance <u>coverage</u>. *See, e.g.,*

---

[33](...continued)
> London Market Insurers subscribed to certain excess insurance
> policies in favor of Corning during the periods February 1,
> 1962[,] to February 1, 1965 (the "Affiliate Policies")[,] and
> April 1, 1980[,] to April 1, 1983 (the "Non-Affiliate Policies")
> [,] (collectively, the "Corning-London Policies"). *See* Ex. P-39
> (Corning coverage chart). The definition of "named assured" in
> the Corning-London Policies expressly lists Corning, but not
> PCC. *See, e.g.* Ex. P-21 (unnumbered).

All decisions regarding the scope of coverage are left to coverage litigation. This court is
determining, for purposes of plan confirmation only, whether an asset of PCC's estate
includes rights to claim coverage as an affiliate under these policies . We find that the estate
includes those rights as an asset.

[34]That Corning has never been <u>found</u> liable for a PC-Relationship claim is not the
controlling factor for purposes of a §524(g) injunction inasmuch as that section applies to
<u>alleged</u> liability.

Disputed Findings of Fact, Dkt. No. 3634. However, the plan preserves all coverage claims

and defenses. We find for purposes of confirmation of PCC's plan that Corning's "affiliates"

are covered by the policies that so provide and that PCC is an affiliate of Corning as that term

is defined. Thus, the shared insurance is an asset of this estate that will be affected by

independent, nonderivative claims against Corning. However, in those instances where the

action is against Corhart and not against Corning and, in light of *Combustion Engineering*,

because the effect on this estate will not occur without a separate action brought against

Corning, the independent, nonderivative claims cannot be channeled.

These facts, coupled with PPG's and Corning's ownership of PCC, all have the

potential to affect estate assets without the need for additional litigation, with the exception of

those instances in which PCC, but not Corning, has been sued with respect to Corhart and

those instances in which PPG has been sued with respect to Pyrocal alone.

As a result, PC-Relationship claims against Corning are properly channeled for the

reasons stated above. The analysis as to Corhart claims, however, does not so readily satisfy

*Combustion Engineering*. The evidence established that PCC was named in most Corhart

cases but those suits do not name Corning. *See* testimony of William D. Eggers, Tr. 5/4/04,

Dkt. No. 3288, at 63.[35] There is only one instance cited where there exists a claim alleging

"conspiracy theories" with respect to Corning and PCC. *See* Exhibit P-18. Nonetheless, there

is shared insurance between Corning and PCC. The question is whether, under *Combustion*

*Engineering*, that is enough to channel non-Unibestos, non-"conspiracy theory" Corhart

---

[35]Mr. Eggers testified that he was sure Corning was named as a defendant in some
Corhart cases, *id.*, but none were cited.

claims solely against Corning or Corhart claims against PCC that do not also name Corning.

The evidence established that there have been no events that have affected Corning's insurance that also involve PCC. No Unibestos case involving Corning ever proceeded to trial. SFF ¶ 78. When PCC settled a Unibestos case, it got a release as to Corning. SFF ¶ 79. The Corhart claims against PCC do not involve Corning and there is no evidence that Corhart claims only against Corning are derivative of PCC. Corning's Corhart claims, therefore, cannot be channeled. For shared insurance to be affected on the basis of Corhart claims, Corhart would first have to suffer an adverse verdict, then seek contribution or indemnity from Corning by establishing that the liability arose from a time period in which Corning owned Corhart. Only if Corning's liability for indemnity or contribution is established would the insurance shared between it and PCC be affected. Under this scenario, the Corhart claims are Corning's independent, nonderivative liability and cannot be channeled, even though Corning shares insurance with PCC. *Combustion Engineering* held that related-to jurisdiction as to nondebtors does not exist when a separate suit would be required to have an effect on the bankruptcy estate. 391 F.3d at 226. *See Pacor, Inc. v. Higgins*, 743 F.2d 984 (3d Cir. 1984).

In *Pacor*, the civil proceeding was between two nondebtors and was a precursor to a potential third party claim for indemnity. The Corhart claims Corning seeks to channel likewise involve a suit by and between two third parties, i.e., a tort plaintiff against Corhart. Corning is not involved and its liability is not alleged or determined in that suit. Thus, those independent, nonderivative claims cannot be channeled.

<u>Additional Discussion Regarding Combustion Engineering and §524g</u>

Section 524(g)(4)(A)(ii) provides that the injunction to issue under that section may

bar action against a third party that is identifiable from the injunction, *e.g.*, by name, and is

alleged to be directly or indirectly liable for the conduct of, claims against, or demands on the

debtor, to the extent the alleged liability arises due to (I) the third party's ownership of a

financial interest in the debtor or a past/present affiliate thereof or predecessor (Corning and

PPG both meet this factor); (II) the third party's involvement in the management of the debtor

or a predecessor thereto or service as officer, director, employee of the debtor or a related

party (Corning and PPG both meet this factor); (III) the third party's provision of insurance to

the debtor or a related party (Corning and PPG both meet this factor); or (IV) the third party's

involvement in a transaction changing the corporate structure or a loan or financial

transaction affecting the condition of the debtor or a related party.[36] We note that

§524(g)(4)(A)(ii) is written in the disjunctive. Therefore, the plain language indicates that a

third party meeting any of the factors would qualify for the injunction.[37] Here, PPG and

---

[36]Although we need not determine whether Corning and/or PPG meet this factor, we note that PPG has been alleged to be liable with respect to non-Unibestos claims due to involvement in "a financial transaction" with PCC. *See* PPG Brief regarding the *Combustion Engineering* decision, Dkt. No. 4153, at 12.

[37]Certain Insurers, in their brief at Dkt. No. 4156, assert that subject matter jurisdiction is not an issue inasmuch as an injunction is not authorized by §524 or §105; *i.e.*, that there is no statutory basis for enjoining claims against PPG and Corning. We disagree. There clearly is jurisdiction to confirm plans pursuant to 28 U.S.C. §1334 and the reference to Title 11 cases to the bankruptcy courts, which the District Court has provided pursuant to 28 U.S.C. §157(a). There is jurisdiction to apply §524(g) to bankruptcy cases as a result. The insurers' argument is best viewed as one challenging the power of the court to enter an injunction based on the facts of this case. This court has the power to determine the scope of the injunction and to impose one when the facts establish that the elements of §524(g) are met.

ACE Insurers, at Dkt. No. 4149, interpret the *Combustion Engineering* decision as holding that there is no jurisdiction to issue a §524(g) injunction for nonderivative claims.

(continued...)

33

Corning each meet at least three of the four separate criteria. That, however, is not the end of the inquiry.

As to PC-Relationship claims of PPG and Corning, we find that we have subject matter jurisdiction to adjudicate the issue of whether §524(g) applies to those claims. We also find that PC-Relationship claims are the quintessential §524(g) claims as they are based on PCC's product and the nondebtors' involvement with PCC. The PC-Relationship claims are not like those the Court of Appeals found troubling in *Combustion Engineering*.[38] The court noted that the claims "reveal[ed] little evidence of derivative liability," 391 F.3d at 231, and pointed out that, although most asbestos claims against nondebtor Lummus also asserted claims against the debtor, only one Lummus claimant asserted derivative liability. The Court of Appeals found that there was not a unity of interest between CE and Lummus. Similarly, with respect to Corning and PCC, there has been cited only one instance of non-Unibestos derivative liability and that is the *Abernathy* suit, Exhibit P-18. That single instance, as in

---

[37](...continued)
However, the claims in this case are, to a great extent, derivative claims. The issue is whether all the claims Plan Proponents seek to channel are derivative.

> [38]In a footnote the *Combustion Engineering* court stated:
>> We note this provision is consistent with the purposes underlying §524(g). The channeling injunction issued in the Johns-Manville bankruptcy, after which §524(g) was modeled . . . was limited to third-party actions against non-debtors in which the liability alleged was derivative of the debtor. *See MacArthur Co. v. Johns-Manville*, 837 F.2d at 92-93 (2d Cir. 1988)(explaining that the channeling injunction applied only to "third parties [who] seek to collect out of the proceeds of Manville's insurance policies on the basis of Manville's conduct").

*Combustion Engineering*, 391 F.3d at 235, n. 47.

*Combustion Engineering*, is not enough to channel all Corning's non-Unibestos, non-

"conspiracy theory" claims.

The Court of Appeals distinguished *In re Dow Corning*, 86 F.3d 482 (6th Cir. 1996), in

which "related-to" jurisdiction was found based on the fact that there was a single product for

which Dow Corning was either the manufacturer or the supplier. Because of that, the *Dow*

*Corning* court found the requisite identity of interests and, therefore, "related-to" jurisdiction.

In *Combustion Engineering* the claims asserted against the debtor, Lummus and Basic arose

from different products which involved different asbestos-containing materials, and were sold

to different markets. 391 F.3d at 231. Further, there was a lateral, peer corporate affiliation

in *Combustion Engineering*, in a holding company structure. 391 F.3d at 228. The Court of

Appeals found, however, that "[s]uch an affiliation could be relevant to the jurisdictional

inquiry if supported by factual findings demonstrating that a suit against Basic or Lummus

would deplete the estate or affect its administration." 391 F.3d at 228. There was also no

inter-corporate involvement in *Combustion Engineering*, 391 F.3d at 235, as there is here,

especially as between PPG and PCC which shared resources[39] and personnel on some

occasions. *See* note 15, *supra.*

In the instant matter, we have more than a mere corporate affiliation between

companies. PPG and Corning are the owners of PCC and actively participate in its

management by membership on its board of directors. SFF ¶ 30. Section 524(g) requires,

*inter alia*, that there be allegations of liability based on the conduct of, claims against, or

---

[39]It is also undisputed that most of the $1.2 billion expended by PCC in the defense
and indemnification of asbestos personal injury claims was paid through the excess insurance
program that PCC and PPG shared. SFF ¶ 97.

demands on PCC (the Debtor) and the PC-Relationship claims, and those alleging joint

liability on various theories, comport with the statutory mandate.    There are facts stipulated

by the parties that PPG and Corning have been named as defendants in lawsuits asserting

PPG's and Corning's responsibility for the actions of PCC. *See, e.g.,* SFF ¶¶ 57, 61, 74, 75,

76.[40]    We have related-to jurisdiction to address these claims.

---

[40]Paragraph 57 of the Stipulated Findings of Fact provides:
> In some of Pittsburgh Corning's Unibestos cases, claims for
> conspiracy, concert of action, and common enterprise were
> asserted against all the defendants in the cases, including
> Pittsburgh Corning, PPG, Corning, and/or Corhart, with respect
> to asbestos-containing products generally.

Paragraph 61 provides:
> As of the Petition Date, PPG was a defendant in asbestos-
> related lawsuits involving approximately 116,000 claimants. . . .
> The majority of these cases were PC-Relationship cases. As of
> the Petition Date there were fewer than 30 Asbestos PI Trust
> Claims against PPG that did not also assert claims against the
> Debtor.

Citations omitted.

Paragraph 74 provides:
> Corning was named as a defendant along with Pittsburgh
> Corning and PPG in the five Texas Unibestos cases listed on
> Exhibit P-15.

Citations omitted.    (Note that, as stated above, the listing of five Texas cases is on Exhibit
P–19 and the complaint at Exhibit P-15 does not use the word "Unibestos".)

Paragraph 75 provides:
> As of the Petition Date Corning was a defendant in
> Unibestos/PC-Relationship cases involving approximately
> 11,400 claimants. Pittsburgh Corning is one of the co-
> defendants in all of these cases. . . . Those cases, as against
> Corning, have been enjoined on account of the injunction issued
> in connection with the bankruptcy case.

(continued...)

36

In this case, PCC manufactured Unibestos which was a molded pipe insulation. PPG sold but did not manufacture Pyrocal. Corhart provided asbestos-containing spacers during the time it was a subsidiary of Corning but did not manufacture an asbestos-containing product. Despite this "different product" similarity with *Combustion Engineering,* the situation here is dramatically at odds in several significant respects: (1) there are allegations of joint and several liability, regardless of the product; (2) PPG and Corning owned PCC and had members on PCC's board of directors; (3) PPG provided services and personnel to PCC; (4) there are PC-Relationship claims against PPG and Corning; (5) theories of liability with respect to PPG (and one instance applicable to Corning) include those based on "conspiracy" and other grounds that would impose joint liability and establish PPG's (and Corning's to the extent "conspiracy theories" are alleged against it) own knowledge and duty as to its own products; (6) theories of liability with respect to both PPG and Corning are based on, *inter alia*, their financial interest in PCC and their right, and alleged failure, to control PCC through their ownership interest.

In this case, PC-Relationship claims filed against all three entities, if proven, would give rise to joint and several liability with PCC and are the types of claims contemplated by §524(g). That is, they are "derivative" of PCC. Whether, after a trial, it would be established

---

[40](...continued)
Citations omitted.

> Paragraph 76 provides:
>> Asbestos claimants seeking to impose liability on Corning for Unibestos/PC-Relationship claims have relied upon, *inter alia,* the fact that Corning was a fifty percent shareholder of Pittsburgh Corning and the fact that employees of Corning were on Pittsburgh Corning's board of directors.

37

that the liability is in fact derivative, *i.e.*, that there is joint and several liability, is not the test.

The allegation is sufficient. Section §524(g)(4)(A)(ii) provides that the channeling injunction

> shall be valid and enforceable [and] may bar any action directed
> against a third party who is identifiable from the terms of such
> injunction . . . *and is alleged to be directly or indirectly liable
> for the conduct of, claims against, or demands on the debtor"* to
> the extent such *alleged liability* of such third party arises by
> reason of –
>> (I) the third party's ownership of a financial interest in the debtor . . .;
>> (II) the third party's involvement in the management of the debtor . . .
> or service as an officer, director . . .;
>> (III) the third party's provision of insurance to the debtor or a related
> party; or
>> (IV) the third party's involvement in a transaction
> changing the corporate structure, or in a loan or other financial
> transaction affecting the financial condition, of the debtor . . . .

11 U.S.C. §524(g)(4)(A)(ii)(emphasis added).

   Section 524(g) does not contain the word "derivative." The term is defined in Black's

Law Dictionary as "[l]iability for a wrong that a person other than the one wronged has a right

to redress." BLACK'S LAW DICTIONARY (8th ed. 2004). The Oxford English Dictionary

defines "derivative" as "[c]haracterized by transmission, or passing from one to another" and

"[a] thing of derived character; a thing flowing, proceeding, or originating from another."

"Liability" is defined, *inter alia*, as "[a]n attribute or trait which sets one at a disadvantage;

hence, a burdensome or disadvantageous person or thing, a handicap." *See*

http://dictionary.oed.com. The American Heritage Dictionary of the English Language, 4th

ed., found at www.dictionary.reference.com, states the definition of "derivative" as "not

original; secondary" and "resulting from." The claims against PPG and Corning that are

based on their shareholder status or joint liability theories fall within the definition of

derivative liability. Some of the derivative claims are alleged to be as a result of "conduct of,

38

claims against, or demands on" PCC or based on nondebtors' participation in and control of

PCC. Section 524(g) requires only that such claims be <u>alleged</u>. 11 U.S.C. §524(g)(4)(A)(ii).

As to non-Unibestos cases based on "conspiracy theories," there was ample evidence

of allegations that PCC is jointly liable for injuries caused by products distributed or sold by

PPG. *See, e.g.*, Plan Proponents' Exhibit P-15, *Connorty v. Owens Corning, et al.*, ¶ 107

(alleging aiding and abetting); ¶¶ 109-09 (alleging that PPG is PCC's alter ego or its

principal); ¶¶ 39, 111 (PPG is successor in interest to PCC); Exhibit P-18, *Abernathy v.*

*ACandS, Inc. et al.*, ¶¶ 23-25, 67, 71, 76 (alleging that acts of PCC, PPG, Corning, and others

were done in concert); Exhibit P-53, Black v. A&M Insulations, *et al.*, ¶ 16 (alleging

conspiracy). Thus, the evidence supports entry of a §524(g) injunction for all claims that

allege joint and several liability between PCC and PPG. As to Corning, there was evidence of

one non-Unibestos "conspiracy theory" claim. Exhibit P-18. Such claims, to the extent they

exist, can be channeled. The Corhart claims against PCC that do not name Corning, the

claims against Corhart, and the claims against Corning for Corhart which do not include PCC

cannot be channeled.

<u>PPG Fund, Corning Fund, and Plan Provisions</u>

The plan proposes to pay asbestos personal injury claims through a trust to be funded

by PCC, PPG, and Corning.[41]  There is no allegation that the contributions are insufficient to

---

[41]PCC is contributing the following to the Asbestos PI Trust:

> (1) proceeds of insurance policies totaling over $293 million, comprised of amounts already collected and paid into the Interim Qualified Settlement Fund, and amounts which insurers have agreed or are obligated to pay post-confirmation pursuant to any pre-1981 PCC Settlement agreement;

(continued...)

---

[41](...continued)

        (2) assignment of PCC's claimed insurance rights against PPG Non-Participating Insurers, the Corning London and Home Policies, state insurance guaranty associations, and insolvent insurers;

        (3) Dividend Payments (a term defined in the plan as "[s]uch dividends from Reorganized PCC to the shareholder of Reorganized PCC as the Board of Directors may approve from time to time");

        (4) Assigned Claims (a term defined in the plan as "[a]ll Claims that [PCC] or Reorganized PCC may have for contribution or other causes of action against any Entity in connection with any Asbestos PI Trust Claim, including, without limitation, any Claims which [PCC] may have against any Entity that manufactures, distributes, or sells tobacco products. Specifically excluded from the Assigned Claims are all Debtor-Released Claims.")

*See* SFF 155; Second Amended Plan, Dkt. No. 3186, at 6, 10-12. "Debtor-Released Claims" are defined in the plan as, in essence, all claims and causes of action PCC has or may have with respect to which it has the power to grant a release with respect to any "Debtor-Released Party." "Debtor-Released Party" includes PPG and Corning entities, affiliates, and others. *See* Second Amended Plan, Dkt. No. 3186, at 10-11.

      PPG's contribution to the plan includes:

        (1) $998 million in a series of annual cash payments beginning on a certain date;

        (2) assignment to the Asbestos PI Trust of the PPG Non-Participating Policy Rights with combined per occurrence limits of liability of about $500-$700 million; the PPG Insolvent Insurers Rights and PPG Insurance Guaranty Fund Rights with per occurrence limits of liability of approximately $315-$390 million;

        (3) payment of up to $30 million in legal fees and expenses incurred by the Asbestos PI Trust in pursuit of insurance proceeds assigned by PPG to the Asbestos PI Trust;

        (4) relinquishment of PPG's claims to more than $300 million in pre-1981 shared insurance proceeds;

        (5) 1,388,889 restricted shares of PPG common stock, the value of which on
                                   (continued...)

satisfy §524(g). However, within the Asbestos PI Trust, separate funds will be maintained, one for the benefit of PPG's creditors and another for the benefit of Corning's creditors. The Trust Distribution Procedures provide that PCC, PPG and Corning will contribute to the PCC Asbestos PI Trust and that there will be a PCC Fund, a PPG Fund and a Corning Fund within the trust. The PPG Fund and the Corning Fund are to consist of a portion of the cash

---

[41](...continued)
May 4, 2004, was $82.1 million

(6)  PPG's 50 percent equity interest in PCC; and

(7)  PPG's 50 percent equity interest in Pittsburgh Corning Europe, N.V., with a value in excess of $80 million.

SFF ¶ 157.  Some of PPG's insurers will also contribute. *See* SFF ¶¶ 162-67.

Corning's contribution includes:

(1)  a series of payments, subject to a prepayment discount of 5.5 percent, totaling not less than $165.85 million payable annually beginning at a certain time;

(2)  25 million restricted shares of Corning common stock, the value of which on April 26, 2004, was $281,250,000;

(3)  Corning's 50 percent equity interest in Pittsburgh Corning Europe, N.V., having a value in excess of $80 million;

(4)  Corning's 50 percent equity interest in PCC:

(5)  assignment of the Corning Plan Insurance Policy Rights which encompass claims for coverage against Corning Plan Insurance Policies with combined per occurrence limits of approximately $340 million and subject to all coverage defenses;

(6)  release of Corning's claims against PCC's and PPG's insurance for Asbestos PI Trust Claims under the Insurance Claims Agreement.

SFF ¶ 168.

payments that each is to make to the PCC Asbestos PI Trust. *See* PCC Asbestos Personal

Injury Settlement Trust Distribution Procedures, Dkt. No. 2702, Exhibit B, at 2-5, ¶¶ 2.1,

2.1(a), 2.1(b), 2.1(c).

As to PPG, the Trust Funding Agreement requires, as a condition precedent to

payment obligations and releases and indemnification, this court to make a finding that

> Suits against PPG for Claims or Demands relating to asbestos or
> asbestos-containing products manufactured, distributed, or sold
> by Pittsburgh Corning or its affiliates are inextricably
> intertwined with suits against Pittsburgh Corning.[42]

Dkt. No. 2702, Exhibit F, ¶ 4 at 20. While we accept this as a fact that is supported by the

evidence so that the finding is appropriate, the plan is broadly termed and could be interpreted

to include independent claims against PPG and Corning.

"PPG Fund Claims," i.e., those that are to be paid from the PPG Fund, are defined in

the plan as

> Any Asbestos PI Trust Claims based on exposure to an asbestos
> containing product manufactured, marketed, sold or distributed
> by any PPG Entity for which any PPG Entity has direct or
> indirect liability. The PPG Fund Claims do not include any
> claims for damages based on exposure to Unibestos or any other
> asbestos-containing product manufactured, marketed or sold by
> [PCC].

Dkt. No. 2700, Exhibit 1, Second Amended Plan at 28. "PPG Entities" are defined to exclude

PCC and Corning. *Id.*

"Corning Fund Claims," i.e., those that are to be paid from the Corning Fund, are

defined as

---

[42]A substantially similar requirement exists as to Corning. Dkt. No. 2702, Exhibit I, ¶
18, at 6. We accept this proposed finding as supported by the evidence.

> Any Asbestos PI Trust Claims based on exposure to an asbestos
> containing product manufactured, marketed, sold or distributed
> by Corhart or any other Corning Entity for which any Corning
> Entity has direct or indirect liability. Corning Fund Claims do
> not include any claims for damages based on exposure to
> Unibestos or any other asbestos-containing product
> manufactured, marketed or sold by [PCC].

Dkt. No. 2700, Exhibit 1, Second Amended Plan at 16. "Corning Entities" are defined to

include various entities but specifically exclude PCC and PPG. *Id.* at 15.


"Asbestos Protected Parties" are defined to include "any PPG-Affiliated Party" and

"any Corning-Affiliated Party." *Id.* at 10-11. PPG and Corning Affiliated Parties are defined

to include, *inter alia*, past, present, future officers, directors, employees, consultants,

attorneys, accountants and other persons of each of the PPG and Corning Entities. *Id.* at 15,

27. The plan provides, as to PPG, that the PPG Trust Contribution is reasonable in

consideration of the channeling injunction "in view of the potential liability of the PPG

Entities for Asbestos PI Trust Claims not relating to asbestos or asbestos-containing products

manufactured, distributed, or sold by [PCC] or its predecessors or Affiliates for which [PCC]

would not otherwise share liability with the PPG Entities, including the potential defenses

available to each and the difficulties that holders of such Asbestos PI Trust Claims would

have in establishing such liability." *Id.* at ¶ 8.1.23 at 54. The identical provision is included

with respect to the Corning Entities. *Id.* at ¶ 8.1.33 at 55-56.

Although the plan language includes the "direct/indirect" liability language of

§524(g), the terms of the plan are broad enough to include nonderivative, independent claims

of PPG and Corning that have nothing to do with PCC. Thus, the plan cannot be confirmed.

43

As written, the plan runs afoul of the *Combustion Engineering* decision because it enjoins suits against the nondebtors PPG and Corning with respect to suits by tort claimants on actions that do not arise derivatively from PCC.

Based on the foregoing, we find that Corning and PPG are entitled to the channeling injunction for PC-Relationship claims, for Non-PC-Relationship claims arising from the "conspiracy theory" allegations such as concert of actions, conspiracy, alter ego, etc., but not for claims that allege absolutely no connection with, interest or involvement in PCC. Similarly, to the extent that Corning Fund claimants assert a "conspiracy theory" against PCC and Corning, those claims, too, may be channeled. However, the evidence does not establish that more than one such claim exists. As structured, the channeling injunction provided by this plan is not limited to those claims which satisfy §524(g) and may be channeled.

<u>Assignment</u>

In objections to the plan, certain insurers make much of the existence of anti-assignment clauses in their policies and the fact that rights to pursue coverage under policies are assigned without insurer consent through this plan. Some insurers also argue that there is no jurisdiction to permit an assignment to the trust of the policies that are at issue. We disagree. It is established in this circuit that assignment of policy <u>proceeds</u> is not prohibited by anti-assignment provisions in insurance policies. *In re Combustion Engineering, Inc.*, 391 F.3d at 218. Corning is assigning <u>only</u> proceeds. Dkt. No. 3186, Exhibit J, at ¶ II.B. Further, once an event occurs that gives rise to the insurer's liability under the policy, the policy itself can be assigned. PPG is assigning certain rights to proceeds. Dkt. No. 2702, Exhibit H. *See generally* 3 Couch on Insurance §35.7 (3d ed. 1999). *See also Viola v. Fireman's Fund*

44

*Insurance Co.*, 965 F.Supp. 654, 658 (E.D. Pa. 1997)("[u]nder Pennsylvania law, an insurer

may not limit an insured's ability to assign . . . rights under a policy after the occurrence of

the event which gives rise to the insurer's liability"). *See also National Memorial Services,*

*Inc. v. Metropolitan Life Insurance Co.*, 49 A.2d 382 (Pa. 1946)(anti-assignment clause does

not preclude beneficiaries of life insurance policy from assigning proceeds of policy after the

event giving rise to liability; it applies only to assignments before liability). *See also*

*OneBeacon America Insurance Co. v. A.P.I., Inc.* 2006 WL 1473004 at *2-*3 (D.Minn. May

25, 2006)(anti-assignment clauses are to protect insurer from increase in the risk it agreed to

insure but assignment of loss does not expand risk to insurer, simply allows change in identity

to "reconnect the policy's coverage to the insured loss;" most courts follow the risk/loss

distinction to allow insured to assign loss); *R.L. Vallee, Inc. v. American Intern. Specialty*

*Lines Insurance Co.*, 431 F.Supp.2d 428, 435 (D.Vt. 2006)(assignments after loss are

permitted as there is no additional risk to insurer; anti-assignment clauses operate after loss

occurs to limit the free assignability of claims which is not favored by the law). There is no

dispute that the policies cover past periods. Thus, there will be no additional risk to the

insurance companies by virtue of the assignments. Coverage issues, including, *inter alia,*

proof that an event giving rise to liability occurred within the covered period before a specific

policy can be accessed for coverage, are all preserved.

The rule enunciated in *National Memorial Services, supra,* that a non-assignment

clause is unenforceable after the loss has occurred, was reiterated in *Egger v. Gulf Insurance*

45

*Co.*, 903 A.2d 1219 (Pa. 2006).[43]  In *In re Western Asbestos Company*, 313 B.R

---

[43]The Pennsylvania Supreme Court in *Egger* noted that *National Memorial Services* involved a life insurance policy but applied the rule to the facts before it involving personal injury and an excess insurance policy.  The court in *Egger* said:

> The logic behind the general rule is that post-loss assignments do not invalidate the policy, thereby changing the risks the insurer undertook to insure; rather, they assign the right to a money claim. See G. Couch, CYCLOPEDIA OF INSURANCE LAW § 35.7 (3d ed. 1995) ("The purpose of a no assignment clause is to protect the insurer from increased liability, and after events giving rise [*16] to the insurer's liability have occurred, the insurer's risk cannot be increased by a change in the insured's identity.").

> While *Nat'l Mem'l* involved life insurance policies and the matter concerns an excess insurance policy, this distinction does not warrant a different outcome or analysis.  The triggering event for coverage in *Nat'l Mem'l* was the death of the insured. Accordingly, we found that there was no "sound reason for the insurance company to forbid or limit an assignment by a beneficiary of the amount due him or her after the death of the insured." *Id.* at 382-83.

> However, with the Gulf excess insurance policy, there was no death of an insured; rather, Foulke purchased coverage to protect itself against an award of damages exceeding the limits of its primary liability policy with respect to its activities at the PECO plant.  Foulke provided plant protection and security services pursuant to its contracts with PECO.  Gulf insured these activities of Foulke through its issuance of an excess insurance policy, "which provides coverage for any sum the insured is obligated to pay for bodily injury arising out of an 'occurrence.'"  Trial Court Opinion at 2.  It is an "Occurrence" that triggers the obligation of Foulke. . . .

> Consequently, in parsing the terms of the policy, the triggering event for coverage was bodily injury occasioned by Foulke, which arose out of an Occurrence during the period of the policy. . . .

(continued...)

832, 858 (Bankr.N.D.Cal. 2003), the bankruptcy court concluded that under 11 U.S.C.

§1123(a)(5), policies or rights thereunder may be transferred to an asbestos personal injury

trust, whether or not state law would permit assignment.

In a subsequent opinion in the same case, *In re Western Asbestos Co.*, 313 B.R. 456,

459 (Bankr.N.D.Cal. 2004), the court held that, with respect to causes of action that were

transferred to the trust pursuant to the plan of reorganization, court orders or a plan

confirmation order, the trust was designated as a successor to the debtors and a representative

of the chapter 11 estates. Further, the court held that the trust was authorized as a matter of

law to appear in and act for debtors in pending actions and to pursue causes of action for the

benefit of holders of asbestos related claims. The court found that under §1123(b)(3)(B), on

---

[43](...continued)

> In attempting to circumvent the principle that we articulated in *Nat'l Mem'l* that a restriction against a post-loss assignment is void, Gulf asserts that its loss did not arise until the jury reached its verdict and awarded damages in an amount exceeding the underlying $ 1,000,000.00 of primary insurance coverage . . .

> This argument lacks merit. First, as Appellee correctly notes, the term "by reason of liability imposed by law" could mean, for example: (1) only after a judgment has been entered; (2) only after all appeals are exhausted and the verdict stands; (3) only after efforts to execute judgment have begun; (4) the occurrence upon which the liability is based (i.e., the death of Egger); or (5) only after the tender of primary coverage. . . . This demonstrates the ambiguity of the clause that Gulf cites as support for its argument that this term means the jury verdict.

> We have stated that where ambiguity exists in the interpretation of policy language, the ambiguity must be construed in favor of coverage.

*Egger v. Gulf Insurance. Co.*, 903 A.2d at 1224-26 (citations omitted).

47

the effective date of the plan,

> the Trust shall be vested with and have the right to enforce
> against any Entity any and all such causes of action, with the
> proceeds of the recovery of any such actions related to
> insurance for Asbestos Related Claims (including, without
> limitation, the Coverage Litigation) to be paid to the respective
> Debtor . . . .

313 B.R. at 459. The court concluded that insurance rights could be vested in the trust under

§1123(a)(5)(B), notwithstanding state law or contractual provisions to the contrary. *Id.* at

462. The court further ruled that the vesting of insurance rights in the trust "shall neither

diminish nor impair the enforceability of any of the Asbestos Insurance Policies against a

party that is not a Released Party." *Id.* Likewise, it would not expand rights. We agree with

this analysis and adopt it here.

The PPG Insurance Proceeds Assignment Agreement, Exhibit H to Dkt. No. 2702,

provides that, with respect to any Asbestos PI Trust claims that have been channeled, PPG

assigns to the Asbestos PI Trust all of the Non-Participating Policy Rights under Non-

Participating Insurance Policies in any pending insurance coverage actions. It applies by its

terms only to claims made before the "Funding Effective Date" which is defined in the PPG

Trust Funding Agreement.[44] Under the preceding authorities, the assignment is permissible

and does not affect insurer rights or risks.

The Corning Insurance Proceeds Assignment Agreement clearly and

---

[44]If there is a stay of the plan confirmation order, the Funding Effective Date will be
the thirtieth business day after such a stay no longer exists. Exhibit F to Dkt. No. 2702, PPG
Trust Funding Agreement, at 8, ¶ X. Nonetheless, if all conditions precedent to
implementation of the plan have not been satisfied or waived when the Funding Effective
Date occurs, the Funding Effective Date will be the tenth day after conditions precedent are
satisfied or waived. *Id.*

specifically applies only to proceeds of Corning Plan Insurance Policies, Exhibit J, Dkt. No.

3186, at ¶ II.B. The Agreement explicitly states that "[n]othing herein shall be construed as a

transfer or assignment of the Corning Plan Insurance Policies themselves." *Id.* Because only

proceeds are assigned, the assignment by Corning does not infringe on insurers' rights,

notwithstanding anti-assignment clauses in the policies.

> Generally, non-assignment clauses are included in insurance
> policies for the protection of insurers. Such clauses are designed
> to guarantee that an increase of the risk of loss by a change of
> the policy's ownership cannot occur without the consent of the
> insurer. . . . Because non-assignment clauses limit the amount
> of risk that the insurer may be forced to accept, courts will
> generally strike down an insured's attempt to assign its policy to
> a new insured. . . . Consistent with the general purposes of non-
> assignment clauses, however, courts are reluctant to restrict the
> assignment of an insured's right to payment which has already
> accrued. . . . Therefore, because an insured's right to proceeds
> vests at the time of the loss giving rise to the insurer's liability,
> restrictions on an insured's right to assign its proceeds are
> generally rendered void.

*Continental Casualty Co. v. Diversified Indus.*, 884 F.Supp. 937, 946 (E.D. Pa.

1995)(citations omitted), relying in part on *National Memorial Services, Inc. v. Metropolitan*

*Life Insurance Company,* 49 A.2d 382 (Pa. 1946).

<u>Insurance Neutrality and Standing</u>

PCC contests the insurers' standing in this proceeding. The Objecting Insurers are not

creditors. Nonetheless, they contend that the plan does not contain language that is neutral as

to them and that the plan deprives them of defenses in coverage litigation. PCC contends that

the insurers have no standing to object to the plan because their rights are not affected by this

plan. The insurers clearly have standing to raise issues as to the plan to the extent it affects

49

their rights and obligations. Beyond that, however, they lack standing.[45] We have referred to

this concept as "insurance neutrality." The plan was amended in light of insurers' concerns

that findings concerning the fair and equitable nature of contributions made to the asbestos

personal injury trust by PPG and Participating Insurers and Corning could affect the

Objecting Insurers' rights in subsequent coverage litigation. Language was added to the

Second Amended Plan to indicate that, with respect to PPG, its contribution to the Asbestos

PI Trust "fully resolves and satisfies the PPG Entities' alleged and disputed liabilities for the

Asbestos PI Trust Claims . . . . This finding, however, shall not be binding and shall not have

collateral estoppel effect on the PPG Non-Participating Insurers in any coverage litigation

regarding the insurance coverage obligations of the PPG Non-Participating Insurers." Second

---

[45]In *In re Mid-Valley, Inc.*, 305 B.R. 425, 431 (Bankr.W.D.Pa. 2004), this court
discussed the three requirements that a party must establish to qualify as a "party in interest"
for Article III purposes:

> First, a plaintiff must demonstrate an "injury in fact," which is
> "concrete," "distinct and palpable," and "actual or imminent" .
> . . . Second, a plaintiff must establish "a causal connection
> between the injury and the conduct complained of – the injury
> has to be 'fairly trace[able] to the challenged action of the
> defendant, and not . . . th[e] result [of] some third party not
> before the court'" . . . . Third, a plaintiff must show the
> "'substantial likelihood'" that the requested relief will remedy
> the alleged injury in fact.

*See also McConnell v. Federal Election Comm'n*, 540 U.S. 93, 225-26 (2003)(minimum
constitutional requirements for standing are (1) injury in fact which is concrete, distinct and
palpable and actual or imminent, (2) a causal connection between the injury and the conduct
complained of; (3) substantial likelihood that the requested relief will remedy the alleged
injury). Only those directly and adversely affected may appeal. *Travelers Insurance Co. v.
H.K. Porter Co.*, 45 F.3d 737, 741 (3d Cir. 1995). They would have standing to challenge
any part of the plan that affects their direct interests. *In re Orlando Investors, LP*, 103 B.R.
593, 596 (Bankr.E.D.Pa. 1989), but the plan is insurance neutral as to them. Because the plan
is insurance neutral, the insurers' rights are not affected and they do not have standing to
object.

Amended Plan of Reorganization, §8.1.15. *See also* SFF ¶ 21.[46] The identical language

appears with respect to Corning. *See* Second Amended Plan of Reorganization, §8.1.26; SFF

¶ 22.[47] The Case Management Order Related to the Second Amended Plan of

---

[46]Paragraph 21 of the Stipulated Findings provides as follows:

> 21. On December 17, 2003, the Court entered a Case
> Management Order related to the Second Amended Plan of
> Reorganization ("CMO"). Docket No. 2805. Paragraph 10 of
> the CMO provides that: "any estimation of asbestos liabilities
> of the Debtor and/or PPG and/or Corning and/or any entity
> affiliated with or related to the Debtor, PPG or Corning that
> occurs in the context of this bankruptcy proceeding shall not be
> binding and shall have no collateral estoppel effect on the PPG
> Non-Participating Insurers, the Corning Plan Insurers or the
> Corning Insurers (collectively, the Insurers) or on the Corning
> Entities or the PPG Entities regarding the insurance coverage
> obligations of the Insurers in any coverage dispute or coverage
> litigation. The Insurers will not conduct any discovery related
> to such estimation in this Bankruptcy Case, nor shall the
> Insurers present any evidence or otherwise participate in any
> hearings or briefing in the Bankruptcy Case relating to such
> estimation (or voluntarily provide any information, assistance
> or cooperation or briefing relating to such estimation to anyone
> that is disputing that issue). The Court finds that the Insurers
> did not participate in the estimation process or the discovery
> leading to same. With the parties' consent, the Court's findings
> with respect to estimation shall apply only to Plan confirmation
> issues and not to issues of insurance coverage." Id. Paragraph
> 11 of the CMO provides: "Any Plan and any order confirming
> any Plan shall include the language set forth in paragraph 10 of
> this Order.' Id.

[47]Paragraph 22 of the Stipulated Findings provides:
> On December 18, 2003, the Court entered an order ruling that
> the issue of whether the Corning Trust Contribution is
> reasonable from an insurance coverage standpoint would not be
> litigated or determined in connection with Plan confirmation,
> that all discovery related to that issue would be preserved and
> addressed in the coverage litigation and any finding made by
> the Court with respect to whether the Corning Trust

(continued...)

Reorganization, Dkt. No. 2805, provides at ¶ 10:

> The Debtor, Corning. PPG, the Asbestos Claimants' Committee
> and the Future Claimants' Representative have agreed, and the
> Asbestos PI Trust is ordered to agree, that any estimation of the
> asbestos liabilities of the Debtor and/or PPG and/or Corning
> and/or any entity affiliated with or related to the Debtor, PPG,
> or Corning that occurs in the context of this bankruptcy
> proceeding shall not be binding and shall not have collateral
> estoppel effect on the PPG Non-Participating Insurers, the
> Corning Plan Insurers, or the Corning Insurers (collectively, the
> "Insurers") or on the Corning Entities or the PPG Entities
> regarding the insurance coverage obligations of the Insurers in
> any coverage dispute or coverage litigation. . . With the parties'
> consent, the Court's findings with respect to estimation shall
> apply only to Plan confirmation issues and not to issues of
> insurance coverage.

This language clearly establishes that, to be confirmed, the Plan must be "insurance neutral."

Insurers' rights under the policies, including all defenses to coverage for particular

claims, are preserved.  Thus, the insurers' rights are protected and unimpaired in this plan.[48]

Still, the rights under the policies can be assigned.  Assignment of policy rights and proceeds

is permissible, particularly where the event giving rise to the insurers' obligation to pay has

---

[47](...continued)
> Contribution is "reasonable" or "fair and equitable" shall not be
> binding upon or have collateral estoppel effect upon the
> Corning Insurers in any insurance coverage litigation.  Docket
> No. 2806.

We note that PCC filed another set of technical amendments on a motion and an order was
entered permitting those amendments to be made (see Dkt. Nos.  3120, 3185) but Corning
Plan Insurers and PPG Non-Participating Insurers dispute that those amendments resolve their
objections. See SFF ¶ 23.

[48]We note that certain insurers argued that PPG and/or PCC may not have claims
under certain policies for non-products liability, despite the fact that policies are shared
between the two entities.  At a hearing on May 24, 2004, this court ruled that that was an
issue for coverage litigation and not for purposes of plan confirmation.

arisen. Counsel for the ACC pointed out as well that it would be the Asbestos PI Trust and not the Plan Proponents who would be making claims against insurance. *See* Tr. 5/6/04, Dkt. No. 3316, at 106.

The Court of Appeals in *Combustion Engineering* remarked favorably on that plan's insurance neutrality provisions and took issue with the standing of Objecting Insurers who were granted similar protections in that plan of reorganization. The Second Amended Plan of Reorganization in the instant case, like the plan at issue in *Combustion Engineering*, "broadly preserves insurers' pre-petition rights under the subject insurance policies" and will permit the Objecting Insurers to "dispute coverage under specific policies, and . . . raise any of the same challenges or defenses to the payment of claims available pre-petition." *Combustion Engineering*, 391 F.3d at 217.

Because the Second Amended Plan of Reorganization does not diminish the rights of the Objecting Insurers or increase their burdens under the subject insurance policies, the court finds that it is "insurance neutral." As a result, the insurers have no standing to object to confirmation.

### Motion *in Limine*

A motion *in Limine* was filed by Lumbermens Mutual Casualty Company regarding proposed findings in the plan relating to the validity and enforceability of Corning's proposed assignment of the Corning Plan Insurance Policy Rights. Dkt. No. 3033, Motion *in Limine* (No. Two); Dkt. No. 3034; Brief in Support of Motion *in Limine* (No. Two). In this motion Lumbermens seeks exclusion of evidence and rejection of argument "in support of the Plan Proponents' requested finding that Corning's proposed assignment of the 'Corning Plan

53

Insurance Policy Rights' is valid and enforceable." Dkt. No. 3034 at 2. The motion will be denied.

As noted, assignment of rights under an insurance policy or of the policy itself is permissible, notwithstanding an anti-assignment clause, after a loss has incurred. *See OneBeacon America Insurance Co. v. A.P.I., Inc.* 2006 WL 1473004 (D.Minn. May 25, 2006). In *OneBeacon, id.* at *2, the confirmation order provided that the debtor's insurance policies, rights thereunder, or proceeds from asbestos insurance coverage would vest in the Asbestos PI Trust on the plan effective date, notwithstanding state law or contractual provisions to the contrary. The confirmation order further provided that the enforceability of the policies would not be diminished or impaired and anti-assignment provisions would not be enforced. The court agreed with the debtor that because the loss had occurred, the bankruptcy court had not erred in rejecting the insurer's challenge to the trust operation. *Id.* at *3. In *In re A.P.I., Inc.*, 331 B.R. 828 (Bankr.D.Minn. 2005), the court held that insurers did not have standing to object to confirmation of a plan that assigned to the trust all the debtor's rights under liability insurance extant when the chapter 11 was filed inasmuch as the trust's administration of asbestos-related personal injury claims under the plan would not determine the rights or duties of any party or affect any duty or right. *Id.* at 830. *See also In re Western Asbestos Co.,* 313 B.R. 832 (Bankr.N.D.Cal. 2003). Here, Corning is assigning only proceeds. Because the assignment by Corning of proceeds of its policies is specifically permitted, *see Egger v. Gulf Insurance Co.*, 903 A.2d 1219 (Pa. 2006); *In re Western Asbestos Company,* 313 B.R 832, 858 (Bankr.N.D.Cal. 2003), the Motion *in Limine* will be denied.

54

## Conclusion

The allegations against PCC, PPG and Corning as to liability for PCC's Unibestos

product and as to joint and several liability ("conspiracy theories") unquestionably meet the

requirement of §524(g)(4)(A)(ii) that "an injunction may bar any action directed against a

third party who is . . . alleged to be directly or indirectly liable for the conduct of, claims

against, or demands on the debtor."   Section 524(g)(4)(A)(ii) also provides a threshold

requirement that third parties must meet before they may take advantage of this provision.

The first two provisions of the threshold requirement, any one of which qualifies the third

party under the section, are:

> (I) the third party's ownership of a financial interest in
> the debtor, a past or present affiliate of the debtor, or a
> predecessor in interest of the debtor;
> (II) the third party's involvement in the management of
> the debtor or a predecessor in interest of the debtor, or service
> as an officer, director or employee of the debtor or a related
> party.

There is no dispute that these two sections apply to PPG and to Corning.  The remaining two

threshold requirements, provision of insurance to the debtor or involvement in certain

financial transactions with the debtor, are contested by one or more parties.  We find that both

PPG and Corning have provided insurance to PCC and qualify under the third provision as

well.  We need not address the fourth factor because, as noted above, only one of the four

requirements is needed to qualify the third party under §524(g)(4)(A), and both PPG and

Corning qualify under at least the first two.  The assignment of policies and proceeds is

permitted under the law in this circuit.

On March 17, 2006, PCC filed Amendments to the Second Amended Plan of
Reorganization in Response to the Court's Directive at the February 28, 2006, Hearing, Dkt.
No. 4741, which identifies proposed amendments to the Second Amended Plan and related
exhibits as well as proposed conclusions of law previously submitted, which had references
to §105 in connection with issuance of the §524(g) channeling injunction.  Under the holding
in *Combustion Engineering*, §105 cannot be used to extend the channeling injunction of
§524(g) to asbestos-related personal injury claims that are independent nonderivative claims
of nondebtor affiliates of PCC.  391 F.3d at 236.  The amendments, to the extent they delete
the references to §105, are accepted.  The court finds that §105 is not a basis upon which to
issue the channeling injunction as to PPG and/or Corning's nonderivative liabilities.  The plan
meets the standards for confirmation and for issuance of the channeling injunction to the
extent addressed in this Memorandum Opinion.  However, the problem lies in the plan
provisions that are broad enough to cover independent claims of PPG and Corning.  Inasmuch
as it appears from the record that such independent claims exist as to Corning and PPG, the
plan, which otherwise meets the confirmation standards of 11 U.S.C. §1129, cannot be
confirmed.

Epilogue

Because the court cannot extend the time to file an appeal on its own, under
Fed.R.Bankr.P. 8002,[49] and because the issuance of this Memorandum Opinion and Order
coincides with the imminence of the December holidays, if parties in interest require

---

[49]*See In re Barbel*, 2006 U.S. App. Lexis 30788 (3d Cir., December 14, 2006)(Not
Precedential).

additional time to consider this Memorandum Opinion, the court will entertain a timely filed

motion to extend the time to file motions for reconsideration and/or appeal.

An appropriate order will be entered with respect to plan confirmation. A separate

order will be entered regarding Lumbermens Mutual Casualty Company's motion *in limine*.

DATE:  **December 21, 2006**

Judith K. Fitzgerald          rmab
United States Bankruptcy Judge

The Case Administrator will send copies of this Memorandum Opinion to all parties on the
current Service List.

57

**IN THE UNITED STATES BANKRUPTCY COURT FOR
THE WESTERN DISTRICT OF PENNSYLVANIA**

In Re:

Pittsburgh Corning
Corporation,
      Debtor

Bankruptcy No. 00-22876 (JKF)
Chapter 11

Related to Dkt. No. 2700, Second Amended Disclosure
Statement to Accompany the Second Amended Plan of
Reorganization Dated November 20, 2003, Jointly
Proposed by Pittsburgh Corning Corporation, the
Official Committee of Asbestos Creditors and the Future
Claimants' Representative,

Dkt. No. 3186, Second Amended Plan of Reorganization
Dated November 20, 2003, and

Dkt. No. 4108, Order regarding briefs addressing the
impact, if any, of *In re Combustion Engineering*, 391
F.3d 190 (3d Cir. 2004), on the proposed plan of
reorganization

Dkt. No. 3033, Motion in Limine (No. Two) Re Plan
Finding on Purported "Validity and Enforceability" of
Corning's Proposed Assignment of Corning Plan
Insurance Policy Rights filed on behalf of Lumbermens
Mutual Casualty Company

**ORDER DENYING PLAN CONFIRMATION**

     **AND NOW**, this **21st** day of **December, 2006**, for the reasons expressed in the

foregoing Memorandum Opinion, it is **ORDERED** that the Second Amended Plan of

Reorganization is not confirmed.

     It is **FURTHER ORDERED** that the court will entertain a timely filed motion to

extend the time to file motions for reconsideration and/or appeal if filed pursuant to

Fed.R.Bankr.P. 8002(c)(1).

1

It is **FURTHER ORDERED** that a status conference shall be held on **January 17,**

**2007,** at **1:00 p.m.** in Courtroom A, 54th Floor, US Steel Building, 600 Grant Street,

Pittsburgh, Pennsylvania.

*Judith K. Fitzgerald*
_____
Judith K. Fitzgerald    rmab
United States Bankruptcy Judge

The Case Administrator will send copies of this Memorandum Opinion to all parties on the current Service List.