# EXHIBIT B

Page 1

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

---------------------------------------

CHAPTER 11

IN RE:

W.R. GRACE & CO., et al.,

        Debtors.

Case No. 01-1139 (JFK)

Jointly Administered

---------------------------------------

DEPOSITION OF

Professor James B. Shein

May 14, 2009

Chicago, Illinois

Lead:  Peter Van N. Lockwood, Esquire

Firm:  Caplin & Drysdale, Chartered

FINAL COPY

JANE ROSE REPORTING 1-800-825-3341

Page 14

1  Q. You've been teaching at Kellogg since
2  2002, correct?
3  A. That's right.
4  Q. And then before that you taught at Loyola
5  from 1994 to 2001?
6  A. That's correct.
7  Q. It indicates under the Loyola entry that
8  you taught both in the graduate school of business
9  and in the school of law; is that correct?
10 A. That's correct.
11 Q. And in the school of law the courses you
12 indicate that you taught were, quote, Business
13 Concepts For Lawyers, closed quote, and, quote,
14 New Venture Creation, closed quote.
15     Could you describe for us just sort of
16 generally what those two courses were?
17 A. Yes, those courses were the business
18 concepts where lawyers took them through the main
19 aspects of business.
20     In other words, the goal was to teach
21 business concepts to people who were about to go
22 and advise businessmen, and so we took them
23 through marketing concepts, finance, things like
24 that.
25 Q. Was corporation law encompassed within

Page 15

1  that course or?
2  A. No.
3  Q. And what about new venture creation?
4  A. That's where I actually had the students
5  put together business plans for a new business
6  idea, and it was solely devoted to the business
7  aspect, not the legal aspect.
8  Q. Now, during the time that you have been
9  teaching at first Loyola and then Kellogg, your
10 resume indicates that you also from 1997 to the
11 present have been counsel to McDermott, Will &
12 Emery here in Chicago; is that correct?
13 A. That's correct.
14 Q. And in your capacity as counsel at that
15 firm, would you regard yourself as practicing law
16 or advising lawyers on business matters such as
17 the ones you described yourself teaching?
18 A. More the latter.
19 Q. And while you've been at McDermott, Will &
20 Emery, and I don't want to get into anything
21 confidential here, but just as sort of a broad
22 question, have you participated in the firm's
23 representation of Honeywell?
24 A. No.
25 Q. Turning back to the first page of your

Page 16

1  resume, the summary in the fourth bullet point, it
2  states, quote:
3      Deemed and, subquote, expert on corporate
4  governance, subquote, by a federal court, closed
5  quote.
6      Could you tell us, sir, what that refers
7  to?
8  A. That refers to something that a judge said
9  in a case in California where a number of expert
10 reports were presented to the Court, and the judge
11 went through and said:
12     This one's not an expert, this one isn't
13 an expert, this one is, and then when she got to
14 Shein, she said:
15     This one is an expert on governance.
16 Q. And what was that case?
17 A. Thorpe.
18 Q. Thorpe Insulation?
19 A. Yes.
20 Q. And did you in fact testify in that case?
21 A. No.
22 Q. Why not?
23 A. Because I was stopped from testifying by
24 an objection that the insurance carriers who had
25 submitted these expert reports didn't have

Page 17

1  standing in the case.
2  Q. And the Court agreed with that objection?
3  A. Yes.
4  Q. Or sustained it I guess.
5  A. Or sustained.
6  Q. Okay. And is that the only time that you
7  could have testified or sought to testify in a
8  court?
9  A. No.
10 Q. Within the last four years have you
11 testified in other court proceedings?
12 A. No.
13 Q. How extensively I guess prior to the last
14 four years have you testified in court?
15 A. I think three times in my career.
16 Q. And are you able to give a general
17 description of in what capacity you testified
18 those three times or do you need to do it one by
19 one?
20 A. Two times was in my capacity as CEO of a
21 company, one of which was the fact that a customer
22 didn't pay us, and the other one was a few weeks
23 after I arrived at a company it went into
24 bankruptcy, and, of course, I was deposed as well
25 as testifying in court as to the company and its

Page 86

1 probably 2 1/2 versus a 3. Could it be a 2, could
2 it be a 3 therefore? Which way do we round?
3   Q. And the decision of this by the trustees
4 is going to be implemented by saying that this
5 intermediate category for the clients of TAC
6 member X will be paid, but the same intermediate
7 category for everybody else won't be paid.
8   A. I'm just saying that the incentive is to
9 pay certain ones and not others.
10   Q. I hate to sound like a broken record, but
11 I thought we had agreed earlier that incentive had
12 to be coupled with opportunity before bad things
13 could happen, isn't that true?
14   A. Yes.
15   Q. And I'm asking you do you know of anything
16 in this Trust document that presents the
17 opportunity for the TAC members to do this middle
18 category gets bumped up for my claims but left
19 down at the lower category for everybody else's
20 claims that you just posited in a previous answer?
21   A. Well, it's everything from that, you know,
22 they can influence what medical evidence is
23 needed, they can influence anything for the
24 proof-of-claim forms, the kind of things that I've
25 got throughout my report.

Page 87

1   Q. But the medical evidence and the
2 proof-of-claim forms apply to all present
3 claimants, don't they?
4   A. True, but they have their forms that they
5 use, and they're saying:
6       Well, you didn't use the right form.
7   Q. Do you have any experience about claims
8 resolution at all in terms of the forms and
9 proof-of-claims and processing?
10   A. For bankruptcy, yes.
11   Q. No, no, no. For asbestos trusts.
12   A. I'm sorry. No.
13   Q. For any kind of trust?
14   A. Yes, but not for asbestos.
15   Q. Okay. What kind of trusts do you have
16 personal experience with observing the processing
17 of tort claims?
18   A. Probably the closest that I've had is when
19 I was on the board, pension board for a steel
20 company where we had all these disability claims
21 that came in.
22   Q. And your experience with that was that --
23   A. It was incredibly gray areas. We debated
24 forever as to whether or not the person really was
25 disabled or not.

Page 88

1   Q. So in that facility, you, as a trustee,
2 were personally and directly involved with the
3 resolution of the claim that was being considered;
4 is that correct?
5   A. Well, there were intermediaries. We were
6 the final decider.
7   Q. Are you aware of anything in this trust
8 agreement that creates a structure under which the
9 trustees would be the final decider of individual
10 claim resolution similar to what you just
11 described?
12   A. Their decisions could certainly affect
13 that, yes.
14   Q. Decisions about individual claims or
15 decisions about broad categories of claims?
16   A. But by the decisions of the individual
17 claims can affect the -- the broad category rather
18 can influence the individual.
19   Q. So what you're saying is that if a TAC
20 member had some individual claims that might not
21 qualify, that would motivate him to get the
22 trustees to amend the document in some way or
23 another so that all claims of that sort would get
24 better treatment as opposed to just his own
25 specific clients' claims.

Page 89

1   A. If I understand the hypothetical, yes.
2   Q. And the trustees would not -- well, and
3 the trustees would not pass on that proposal using
4 their own fiduciary judgment, but, rather, they
5 would be influenced to come up with a different
6 result because of the control and influence that
7 you say the TAC members have over the trustees in
8 the various ways you identify in your report?
9   A. It could happen.
10       MR. GIANNOTTO: Do you want lunch?
11       MR. LOCKWOOD: Yeah. How about if we take
12 a lunch break.
13       MR. GIANNOTTO: How long of a break for
14 the people on the phone so they know?
15       We're off the record by the way.
16           (Whereupon a discussion was had
17            off the record.)
18           (Whereupon a recess was had from
19            1:06 p.m. to 1:55 p.m.)
20       MR. LOCKWOOD: Folks on the phone?
21       MS. ORR: I'm ready.
22       MR. LOCKWOOD: Okay. We're about to get
23 restarted here.
24       A MALE TELEPHONE VOICE: Sure.
25 BY MR. LOCKWOOD:

Page 94

1  between the individual interests of a member of a
2  group and the collective interest of the member of
3  the group can't be eliminated as a practical
4  matter?
5     A.  Well, it's probably never eliminated. The
6  question is is are there mechanisms or ways you
7  could deal with it.
8     Q.  Well, here I take it the way you would
9  propose to deal with the conflicts you've
10 identified here is by preventing personal injury
11 lawyers who help asbestos claimants from being
12 members of a TAC?
13    A.  That's probably the cleanest way.
14    Q.  What is your understanding of the function
15 of a TAC in a case like this?
16    A.  The things that are set out in the
17 documents.
18    Q.  But why not just have a trust with
19 trustees and no TAC and no futures representative?
20    A.  I think you could have a TAC, and you can
21 have a futures representative. The point is to
22 eliminate the conflicts, not to eliminate the
23 positions.
24    Q.  Well, what I'm asking you is what your
25 understanding of the rationale, if you will, is

Page 95

1  for having a TAC and a futures rep to look over
2  the shoulder of trustees in the first place is.
3     A.  Because there's two different groups who
4  can take from that trust, and you're effectively I
5  assume putting on representative of the two most
6  important groups.
7     Q.  So if you accepted the notion that you
8  just expressed, then are you saying that when you
9  select people to represent the interests of
10 present claimants, it would be the conflicts that
11 you have identified are so severe that you would
12 be better off picking people that have no
13 involvement in or experience of asbestos tort
14 litigation on the TAC in preference to people that
15 do.
16    A.  If they don't have the -- if that's the
17 only way to get rid of a conflict, but I'm sure
18 there's other qualified smart people who can get
19 up to speed fast.
20    Q.  Do you think you would be a good TAC
21 member?
22    A.  I'd probably randomly choose quite a few
23 of my fellow professors to be good TAC members.
24    Q.  And that's because you know all sorts of
25 professors that are familiar with the prosecution

Page 96

1  and evaluation of asbestos personal injury cases
2  in the state tort systems?
3     A.  Because I think they can come up to speed
4  very fast.
5     Q.  Let's break it down a little bit.
6        Putting aside for a moment the learning
7  curve on law professors who have never practiced
8  as a litigator in a tort case in a tort system.
9     A.  I'm not talking about law professors. I'm
10 talking about business professors.
11    Q.  Oh, business professors. Better yet. Who
12 aren't even lawyers.
13    A.  That aren't even lawyers.
14    Q.  And putting aside the learning curve for
15 those folks?
16    A.  Um-hmm.
17    Q.  If we ignore what you identified as the
18 conflict problems and just sort of focus solely on
19 who would be the most capable, informed, qualified
20 person to represent the interests of personal
21 injury claimants against a trust that's supposed
22 to be liquidating and valuing their claims, would
23 you actually say that your hypothetical, a smart
24 business professor, would be preferable to a
25 hypothetical equally smart personal injury lawyer?

Page 97

1     A.  If it was a personal injury lawyer who had
2  nothing to do with any claimants in this case,
3  then I could go with that.
4     Q.  So it's a trade-off.
5        The experience or expertise of the
6  asbestos personal injury claimants in dealing with
7  claims resolution which includes settlements and
8  litigation and what have you on the one hand, and
9  the conflict if you will between their interests
10 in the collective and their interests in
11 individual claimants. Is that fair?
12       THE WITNESS: Want to read that one back
13 to me?
14       (Whereupon the record was read as
15        requested.)
16       THE WITNESS: Could you rephrase that?
17 BY MR. LOCKWOOD:
18    Q.  Well, what I'm positing is there's a
19 reason to have asbestos plaintiffs' lawyers on the
20 committee because of knowledge and experience, and
21 there's a reason that you posit not to have them
22 on there, and if you don't put them on there
23 because of the conflicts, then you lose the
24 knowledge and the experience, and that's what I
25 characterize as is that a trade-off. You can't

Page 146

1    MR. GIANNOTTO: Is that not on the report?
2    THE WITNESS: No.
3  BY MR. SMITH:
4    Q.  What was the date of your law degree?
5    A.  Law degree was 1997.
6    Q.  Okay. And after you graduated from law
7  school, you immediately started working at
8  McDermott, Will & Emery; is that right?
9    A.  Yes, as counsel.
10   Q.  And would the opinions you're giving in
11 this case be similar to the type of work you did
12 at McDermott?
13   A.  Not really.
14   Q.  Okay. And your business school degree
15 before that, do you have any recollection of about
16 when that was?
17   A.  Sounds like it was more -- longer than it
18 was.
19   Q.  I didn't mean this to be a difficult
20 exam-type question.
21   A.  I got the, let's see, my undergrad was
22 '64, my MBA was '66 and my doctorate was '68.
23 That's 19, not 18.
24   Q.  Okay. And before you were teaching as a
25 professor at Northwestern, you were listed as an

Page 147

1  adjunct professor; is that correct?
2    A.  That's right.
3    Q.  What's the distinction in the type of
4  position you have now?
5    A.  One's part time, one's full time.
6    Q.  Okay. And how did it come about that you
7  were teaching full time?
8    A.  I was asked to.
9    Q.  Okay. Are you a tenured track professor?
10   A.  No.
11   Q.  Okay. There's no possibility you could be
12 eligible for tenure?
13   A.  There is if I'm willing to undertake a
14 tremendous part of my life in researching.
15   Q.  Okay. But you don't have tenure and
16 you're not willing to undertake the research to
17 get tenure; is that right?
18   A.  That's correct.
19   Q.  And the Loyola law degree, were you
20 working full time while you were getting that?
21   A.  No.
22   Q.  Okay. Were you in law school full time at
23 that time?
24   A.  Yes, but I was working part time.
25   Q.  Have you ever worked for any of the

Page 148

1  lawyers in this case before?
2    A.  No.
3    Q.  Okay. How did you get retained in the
4  case?
5    A.  Mr. Giannotto called me.
6    Q.  Okay. How did he find out about you?
7    MR. GIANNOTTO: Objection, lack of
8  foundation.
9    THE WITNESS: I have no idea.
10 BY MR. SMITH:
11   Q.  Okay. You list some documents that you've
12 considered, such as the Trust agreement and things
13 like that in your report. Who provided you with
14 those documents?
15   A.  I think I got some on-line or -- and then
16 I asked Mr. Giannotto to send me copies.
17   Q.  Okay. Were the majority of the documents
18 you've relied on provided by the lawyers in this
19 case?
20   A.  I think so, yes.
21   Q.  Okay. And in order to render your
22 opinions in this case, is it fair to say that you
23 had to interpret various legal documents that are
24 at issue in the case?
25   A.  I guess "interpret" is the right word.

Page 149

1    Q.  Okay. And, in addition, in order to
2  render your opinions in this case, you had to
3  interpret various rules and statutory provisions
4  you cite in your report; is that right?
5    A.  Right. Well, wait. Wait. You know, when
6  you say I had to -- use your words again.
7    Q.  Well, why don't I ask another question.
8    Is it fair to say that ultimately these
9  Plan documents, the Trust documents will be
10 interpreted by the Court. Is that fair to say?
11   A.  Everything's going to get interpreted by
12 the Court.
13   Q.  Okay. And the Court may disagree with the
14 interpretations that you've given to the
15 documents, right?
16   A.  Well, I hope the Court sees them in a new
17 light from a business and behavioral standpoint
18 instead of just a legal standpoint because all
19 these documents may be perfectly legal --
20   Q.  That's not what I'm asking. I was sitting
21 here today, and I heard, would it be fair to say,
22 there were a lot of disagreements about
23 interpretation of the documents between yourself
24 and Mr. Lockwood. Would that be fair to say?
25   A.  I think the disagreement wasn't an

Page 154

1  it.
2      THE WITNESS: As best as I understand the
3  question, the Court is probably going to rule on
4  the legality.
5  BY MR. SMITH:
6    Q. Okay.
7    A. I am asking the Court to look at:
8      Wait a minute. You got to look past the
9  legality sometimes and see what the impact of any
10 perverse incentives are that may be legal, but,
11 really, under good governance practices shouldn't
12 be allowed to go on.
13   Q. Okay. So you agree with me that the
14 Court's going to make determinations regarding
15 interpretation of the documents you've relied on,
16 right?
17   A. The Court will interpret the legality of
18 those documents.
19   Q. Okay. And also the Court's going to
20 interpret what those documents mean, is that fair?
21   A. From a legal standpoint, yes.
22   Q. Okay. Now, you're not holding yourself
23 out as an expert on a medical expert on asbestos
24 disease, right?
25   A. That's correct.

Page 155

1    Q. And you're not an expert on what claims
2  have merit or don't have merit?
3    A. That's correct.
4    Q. And you're not an expert on medical
5  criteria that might be used in paying claims.
6    A. No.
7    Q. And you're not I suppose holding yourself
8  out as an expert on the interpretation of legal
9  documents.
10     MR. GIANNOTTO: I'm going to object. I
11 don't even know what that means.
12     Each of these documents are legal
13 document, and he's read them and said what he
14 thinks they said. If the point you're making --
15     MR. SMITH: You're making a speaking
16 objection.
17     MR. GIANNOTTO: I understand because we
18 can't understand what you're talking about.
19     MR. SMITH: He didn't say that. You said
20 that.
21 BY MR. SMITH:
22   Q. Are you holding yourself out as an expert
23 on this case on interpretation of legal documents?
24     MR. GIANNOTTO: And I'm going to object
25 because that question makes no sense.

Page 156

1      If you can understand it, answer it.
2      THE WITNESS: I'm not interpreting
3  anything.
4      What I'm saying is I read these documents
5  and I say:
6      This is the mischief it could cause.
7  BY MR. SMITH:
8    Q. Okay. So you're not holding yourself out
9  as an expert on the interpretation of legal
10 documents, correct?
11   A. That's correct.
12   Q. Okay.
13   A. If I understand your question.
14   Q. Now, you're not a psychologist, correct?
15   A. I have a Ph.D. in organizational behavior,
16 which we had to get into a lot of psychology and
17 sociology under a business setting.
18   Q. Okay. Are you holding yourself out as an
19 expert in psychology?
20   A. Only as that part of the motivational part
21 in a business setting.
22   Q. Have you ever done any empirical research
23 where you've collected data from subjects
24 regarding human behavior?
25   A. Yes.

Page 157

1    Q. What was that?
2    A. For my dissertation.
3    Q. And since your dissertation have you ever
4  done any empirical research on human behavior?
5    A. No, having read substantial amounts.
6    Q. Have you ever published any research on
7  human behavior in a peer review publication?
8    A. No.
9    Q. You've never held yourself out as an
10 expert in litigation on Trust procedures, correct?
11   A. That's correct.
12   Q. And you've never held yourself out as an
13 expert in litigation on trust governance, correct?
14     MR. GIANNOTTO: I'm going to object. I
15 don't know what "litigation on trust governance"
16 as opposed to "trust governance" means.
17 BY MR. SMITH:
18   Q. In a lawsuit have you ever held yourself
19 out as an expert on trust governance before?
20   A. No.
21     MR. GIANNOTTO: Wait, wait, wait, wait.
22 I'm going to object to that. He already testified
23 that he --
24     MR. SMITH: You're telling us what his
25 testimony is, not objecting.

Page 166

1  Q. Correct. So you would be okay with that?
2  A. Probably.
3  Q. Why wouldn't you be okay with that?
4  A. Well, it's factual. I mean legally all
5  the stuff's okay --
6  Q. I'm asking you --
7  A. -- it's factual that drives me nuts.
8  Q. I'm asking you to assume for the purpose
9  of the question the fact that the lawyers serving
10 on the TAC do not have clients with claims against
11 W.R. Grace.
12     Under those circumstances would you be
13 okay with those people as TAC members?
14 A. I think I would be.
15 Q. Okay. So if then --
16 A. Let me clarify.
17 Q. Okay.
18 A. That they aren't beholden in some other
19 way to any of the players.
20 Q. Okay.
21 A. In other words, they're objective.
22 Q. All right. Would it be fair to state then
23 that the crux of your problem with this
24 arrangement is that you believe that there is a
25 potential conflict of interest when a TAC member

Page 167

1  has a client who has a claim against W.R. Grace?
2  A. Yes, that's the starting point, you're
3  right.
4  Q. Okay. If you again assume for me that a
5  TAC member who has clients with claims against
6  W.R. Grace is faithful to his fiduciary
7  obligations to the Trust, under those
8  circumstances would you have problems with the TAC
9  members?
10 A. I'd sure hate to figure out what
11 "faithful" meant in your descriptor.
12 Q. They complied with their fiduciary
13 obligations.
14 A. We talked about before with Mr. Lockwood,
15 the gentleman to your left, that, you know, it
16 doesn't change. The incentives are there to do
17 mischief sooner or later. Why have them in there
18 in the first place? I don't understand what
19 you're getting at.
20 Q. Your answer does not assume the assumption
21 I asked you to assume, so I'm going to ask you
22 again.
23 A. Okay.
24 Q. If you assume that the TAC member with a
25 client who has a claim against W.R. Grace complies

Page 168

1  with his or her fiduciary obligations to the
2  Trust, do you have any problem with that person
3  being a TAC member?
4     MR. PRATT: Objection to form.
5     It's Warren Pratt. I think the question's
6  incomplete.
7  BY MR. RICH:
8  Q. You can answer.
9  A. I honestly don't understand.
10 Q. You honestly don't understand that I'm
11 asking you to assume that a TAC member is
12 completely faithful to his fiduciary obligations
13 to the Trust. Do you have a problem making that
14 assumption?
15 A. Yeah, I guess maybe that's where it is. I
16 have a problem making that assumption.
17 Q. Okay. And that's because lawyers can't
18 possibly comply with their fiduciary obligations
19 with clients or others or what's the basis? Is it
20 prejudice against lawyers? What is it?
21 A. I'd have to be prejudiced I guess against
22 myself then.
23 Q. Well, it wouldn't be the first time.
24 A. All I'm saying here is I guess that's an
25 "if," and I guess I can't believe that that

Page 169

1  temptation wouldn't stay there.
2     Back up for just a second. I'm not saying
3  that they're going to do anything. Okay. I'm
4  just saying the temptation is there to do it.
5  Q. Well, I'm asking you to assume that they
6  can control these base urges.
7     If you assume that they can control their
8  urges, assume that that is a fact, that they will
9  indeed control their urges, do you still have a
10 problem with them being TAC members?
11 A. So there's a wizard behind the curtain who
12 can do that.
13 Q. I don't believe that that's necessary. I
14 think that we all can control our urges, but if
15 you think otherwise, that's your prerogative.
16 A. Given that huge leap of faith, I suppose
17 it could be done. I'd have to think more about
18 it.
19     MR. RICH: Okay. That's all I have.
20     MR. GIANNOTTO: Is there anyone on the
21 phone other than an insurance company
22 representative that has any questions?
23     Does the FCR have any questions?
24     MS. ORR: No, I do not.
25     MR. GIANNOTTO: Okay. There's no one else