## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>W.R. GRACE & CO., *et al.*,<br><br>                    Debtors. | Chapter 11<br><br>Case No. 01-01139 (JKF)<br>Jointly Administered<br>**Related Docket Nos. 19581, 19620** |

## ARROWOOD'S BRIEF IN OPPOSITION TO PLAN PROPONENTS' MOTION TO STRIKE THE EXPERT REPORT AND TESTIMONY OF GEORGE L. PRIEST

QUESTION: "Does the Plan purport to release claims that may exist between insurers and Non-Debtors?" . . .

ANSWER: "Mr. Lockwood: Phrased as broadly as you have, I think the answer is yes."

Lockwood Deposition at page 635.

Garvan F. McDaniel, Esq. (#4167)
BIFFERATO GENTILOTTI LLC
800 N. King Street, Plaza Level
Wilmington, DE 19801
(302) 429-1900 Phone
(302) 429-8600 Fax

Carl J. Pernicone, Esq.
WILSON, ELSER, MOSKOWITZ
EDELMAN & DICKER, LLP
150 East 42nd Street
New York, NY 10017-5639
Telephone: (212) 490-3000

Tancred Schiavoni, Esq.
O'MELVENY & MYERS LLP
7 Times Square
New York, New York
(212) 326-2267

*Counsel to Arrowood Indemnity*
*Company, f/k/a Royal Indemnity Company*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................. 1

LEGAL STANDARD.............................................................................................. 4

ARGUMENT ....................................................................................................... 5

I.      THE PLAN PROPONENTS' ARGUMENT THAT PROFESSOR PRIEST'S
        TESTIMONY LACKS FOUNDATION IS UTTERLY BASELESS AND
        CONFUSES PHASE II ISSUES WITH THE ISSUES TO BE DECIDED IN
        PHASE I.................................................................................................. 5

II.     PROFESSOR PRIEST OFFERS ECONOMIC ANALYSIS, NOT LEGAL
        CONCLUSIONS........................................................................................ 7

III.    PROFESSOR PRIEST'S TESTIMONY IS RELEVANT TO PHASE I
        CONFIRMATION ISSUES ......................................................................... 9

        A.      Professor Priest's Economic Testimony Is Relevant To The Impairment
                Of Insurers Rights ....................................................................... 9

        B.      Professor Priest's Opinions Will Assist the Court in Evaluating the Nature
                and Extent to Which the Plan Impairs Insurers' Rights...................... 12

        C.      Professor Priest's Opinion is Relevant to the Good Faith of the Plan ................ 13

IV.     IRONICALLY, THE PLAN PROPONENTS ARE OFFERING SEVERAL
        LAWYERS TO TESTIFY ABOUT THEIR LEGAL INTERPRETATION OF
        THE PLAN DOCUMENTS ......................................................................... 15

CONCLUSION.................................................................................................... 16

# TABLE OF AUTHORITIES

**Page**

## CASES

*American Tech. Res. v. U.S.*,
    893 F.2d 651 (3d Cir. 1990)......................................................................... 4

*Globecon Group, LLC v. Hartford Fire Ins. Co.*,
    No. 03 Civ. 0023, 2004 U.S. Dist. Lexis 13130
    (S.D.N.Y. July 13, 2004) ........................................................................... 12

*Hartford Accident and Indem. Co. v.  Fitzpatrick*,
    (*In re North American Refractory Co.*), Dkt. Appeal No. 08-3651
    (3d Cir. August 25, 2008) .......................................................................... 12

*Henkel Corp. v. Hartford Acc. & Indem. Co.*,
     62 P.3d 69, 75 (Cal. 2003) ...................................................................12-13

*In re ACandS Inc.*,
    311 B.R. 36 (Bankr.D.Del.2004) ............................................................... 14

*In re Babcock & Wilcox*,
     No. 00-10992, (Bankr. E.D. La. December 16, 2003).............................. 4, 9

*In re Combustion Eng'g*,
    391 F.3d 190  (3d Cir. 2004).................................................................. 13, 14

*In re Congoleum Corp.*,
    Case No. 03-51524, (Bankr. D.N.J. March 26, 2008) ............................... 3-4

*In re Coram Healthcare Corp.*,
    271 B.R. 228 (Bankr. D. Del. 2001) ........................................................... 14

*In re Japanese Elec. Prods.*,
    723 F.2d 238 (3d Cir. 1983)......................................................................... 4

In *re Johns-Manville*, 2004 WL 1876046,
    (Bankr. S.D.N.Y. Aug. 17, 2004) ................................................................. 4

*In re Paoli R.R. Yard PCB Litig.*,
    916 F.2d 829 (3d Cir. 1990)......................................................................... 4

*In re PWS Holding Corp.*,
    228 F.3d 224 (3d Cir. 2000)....................................................................... 14

*In re Skinner Engine Co., Inc.*,
    No. 01-23987 (Bankr. W.D. Penn. May 26, 2009) ................................. 3, 11

*N.L.R.B. v. Bildisco & Bildisco*,
    465 U.S. 513 (1984).................................................................................. 4-5

*Parkway Ins. Co. v. New Jersey Neck & Back*,
    330 N.J. Super. 172 (N.J. 1988).................................................................. 13

## STATUTES

11 U.S.C. § 1129(a)(3)............................................................................. 12, 14

Fed. R. Evid. 401 ........................................................................................... 9

Arrowood[1] respectfully submits this memorandum of law in opposition to the motion by the Plan Proponents to preclude this Court from hearing or considering the expert testimony of Professor George L. Priest.

## PRELIMINARY STATEMENT

The Plan Proponents are now attempting, at the last moment, to prevent this court from learning the full extent to which the First Amended Joint Plan of Reorganization ("Plan") impairs insurers' basic rights. Just weeks away from the Phase I confirmation hearing and while fact depositions continue to be taken, the Plan Proponents filed a motion in limine to exclude the testimony of Professors Priest and Shein, months after they received their expert reports. This last-second ambush was compounded by the Plan Proponents' misrepresentation of Professor Priest's testimony and his expertise. Professor Priest is a nationally recognized expert in the economics of insurance, whose qualifications the Plan Proponents cannot in good-faith dispute. Professor Priest is to testify during the Phase I confirmation hearing on the Plan's economic implications on the objecting insurers' rights and interests under their contracts with Grace.

In their efforts to push through a flawed Plan, the Plan Proponents now seek to deter insurers from showing, and the Court from hearing, the extent to which the Plan impairs the insurers' rights and the ways in which the so-called insurance neutrality clause is ineffective. Part of this showing requires expert economic testimony *that like all expert testimony* will ultimately aid the fact-finder in reaching a legal conclusion. Professor Priest's report, amongst other things, explains the economic purpose of the insurance provisions the Debtors are violating, and the economic consequences of their violation. Professor Priest's report also identifies and provides an economic analysis of many of the key structural problems with this

---

[1] Arrowood Indemnity Company f/k/a Royal Indemnity Company. Arrowood joins the other insurers in their brief in opposition to the Plan Proponents motion to strike Professor Shein.

very complex Plan and how they impair, modify or change the rights of the insurers and their economic interests.

The Plan Proponents' motion turns on two arguments: (1) that Professor Priest's opinions are not reliable because he "offers no support for his conclusions regarding the generalities of the insurer/insured relationship," that is "because he offers absolutely no foundational basis for his opinions"[2]; and (2) that Professor's Priest's economic analysis is somehow actually "legal" in nature.[3]

The argument that Professor Priest's opinion is somehow unreliable is entirely frivolous. The Plan Proponents are essentially saying he has not studied the Plan enough to quantify how much the insurers' rights are being changed; but that is not what Phase I is about.  Phase I is intended to address only the simple issue of *whether* insurers' rights are impaired, modified or changed by the Plan.  Professor Priest is a nationally known expert in the economics of insurance.  He holds a professorship at Yale and has almost forty years of experience in the economics of insurance.  Professor Priest has studied the policies and the Plan.  He is eminently qualified to offer testimony about the issue before the Court in Phase I.

The Plan Proponents are also unsuccessful in recharacterizing Professor Priest's economic analysis as legal in nature.  Professor Priest never stated that he was applying legal precedents to the facts of this case, nor that he was drawing conclusions about how a coverage court should rule.  Professor Priest explores the economic function of insurance to transfer risks in ways that control and constrain the economic impact of losses, the economic allocation of the responsibility that the contracts create to reduce and control risks, and the ways in which the Plan changes the economic burdens and responsibilities established contractually in Grace's insurance

[2] *See* Plan Proponents Joint Mot. 6, 8.

[3] *Id*. at 8-10.

policies, increasing risk to the insurers as a whole.[4]  His testimony is about economic principles –

risk-shifting transactions, assumption of responsibilities, appropriate incentive structures,

intended and unintended consequences, costs to the objecting insurers, and so on.  Professor

Priest is not here to say that any party's conduct comported with or violated the broad array of

coverage cases.  He is here to help this Court understand the economic implications of the Plan

for the parties involved.  It is completely fitting and appropriate that Professor Priest will be

heard to help guide this Court's analysis.  Indeed, Bankruptcy Courts have consistently admitted

Professor Priest's expert testimony.  This Court should do the same.

Professor Priest's proposed testimony is directly relevant to this Court's assessment in

Phase I as to whether the insurers' rights are impaired, modified or changed by the Plan.  This

Court has repeatedly stated that the insurers have a right to be heard on these issues.  Professor

Priest's testimony about the Plan's economic effects on such things as the insurers' right to

participate in the defense and settlement of claims, the prohibition of voluntary payments by

policyholders, the insurers right to consent to any assignment of its policies, and the insurers

potential claims against third-party non-debtors,[5] are central pieces of Arrowood's Phase I

presentation on this issue.  Arrowood has a right to submit a full presentation of its views on

what are undeniably critical issues to plan confirmation.

Moreover, the recent decision by Judge McCullough of the United States Bankruptcy

Court of the Western District of Pennsylvania in *In re Skinner Engine Co., Inc.*, No. 01-23987

(Bankr. W.D. Penn. May 26, 2009), demonstrates the merits of the analysis and conclusions set

out in Professor Priest's expert report.  Arrowood urges the Court to review Judge McCullough's

decision, which is attached as Appendix A to this brief.  *See also In re Congoleum Corp.*, Case

---

[4] *See* Plan Proponents Joint Mot. Ex. A (Priest Report ¶¶ 31, 40-46).

[5] *See* Plan Proponents Joint Mot. Ex. A (Priest Rep Report 40-51, Priest Dep. 245).

No. 03-51524, Tr. at 14-15 (Bankr. D.N.J. March 26, 2008). The facts and analysis here are

totally different from the record that supported the insurance neutrality decision in *Combustion*.

Professor Priest will aid the Court in assessing these issues.

      In *In re Babcock & Wilcox,* No. 00-10992, Tr. at 56 (Bankr. E.D. La. December 16,

2003), an asbestos-related bankruptcy proceeding, Judge Brown found Professor Priest's

testimony to be relevant and admissible.  Similarly, Judge Lifland in *In re Johns-Manville*, 2004

WL 1876046, ¶¶ 14, 15, 17, 49, 65 (Bankr. S.D.N.Y. Aug. 17, 2004) admitted and relied upon

Professor Priest's testimony in a landmark ruling in that case.  Other courts have similarly

admitted and relied on the expert testimony of Professor Priest.  The ruling that the Plan

Proponents ask this Court to make—one barring the testimony of a nationally recognized expert

whose testimony has been admitted and relied upon by other well regarded courts—would be

error.  It would be folly to taint the confirmation proceeding in this way.  The Plan Proponents'

motion should be denied

## LEGAL STANDARD

      As the Third Circuit has held, expert testimony should be freely admitted where helpful

to the trier of fact.  *See In re Paoli R.R. Yard PCB Litig.*, 916 F.2d 829, 857-58 (3d Cir. 1990)

(the Federal Rules of Evidence "embody a strong and undeniable preference for admitting any

evidence having some potential for assisting the trier of fact") (citation omitted); *American Tech.*

*Res. v. U.S.*, 893 F.2d 651, 655-56 (3d Cir. 1990) ("We interpret the helpfulness standard

broadly."); *see also In re Japanese Elec. Prods.*, 723 F.2d 238, 279 (3d Cir. 1983) (any doubts as

to whether an expert's testimony will be useful "should generally be resolved in favor of

admissibility") (quotations omitted).  This principle is particularly relevant to bankruptcy courts,

which, as courts of equity, have broad latitude in considering evidence relevant to the equities of

a plan of reorganization.  *See N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 527 (1984)

(Bankruptcy Code requires examination of "how the equities relate to the success of the reorganization. The Bankruptcy Court's inquiry is of necessity speculative and *it must have great latitude to consider any type of evidence relevant to this issue*.") (emphasis added). Because Professor Priest will offer permissible economic opinions that can assist the Court in rendering determinations as to important plan confirmation issues, Plan Proponents' Motion to Exclude the Opinion and Testimony of George L. Priest should be denied

## ARGUMENT

I.    **THE PLAN PROPONENTS' ARGUMENT THAT PROFESSOR PRIEST'S TESTIMONY LACKS FOUNDATION IS UTTERLY BASELESS AND CONFUSES PHASE II ISSUES WITH THE ISSUES TO BE DECIDED IN PHASE I**

The Plan Proponents create a straw man argument and then devote much of their motion to arguing that Professor Priest lacks a "reliable" means or methodology to testify.[6] The Plan Proponents are essentially saying he has not studied the Plan enough to quantify how much insurers' rights are being changed; but that is not what Phase I is about. Phase I is only about *whether* insurers' rights are impaired, modified or changed by the Plan.[7] Professor Priest's testimony is fully relevant to the issue that Phase I is about, which is focused exclusively on establishing that the insurers' rights are impaired.

Professor Priest's testimony is also reliable and will be of assistance to the Court. Professor Priest is a nationally known expert in the economics of insurance.[8] He holds a professorship at Yale and has almost forty years experience in the economics of insurance.[9] Other bankruptcy judges have admitted and expressly relied upon Professor Priest's testimony on

---

[6] Plan Proponents Joint Mot. 6.

[7] Third Amended Case Management Order 1 (Dkt. No. 21544)

[8] *See* Plan Proponents Joint Mot. Ex. A (Priest Rep. ¶ 6.)

[9] *Id.* ¶ 1.

the economics of insurance.  Professor Priest has studied the policies and the Plan.[10]   He is

eminently qualified to offer testimony about the issue before the Court in Phase I.[11]

Professor Priest's conclusion that the Plan impairs the rights of insurers also has ample

support. While Professor Priest will explain in his testimony the multiple ways in which the

insurers' economic interests are impaired, the Court need look no further then the testimony of

Peter Lockwood to find that Professor Priest's conclusions are well founded. Mr. Lockwood

readily acknowledged the obvious fact that the non-debtor releases and exculpations in the Plan,

impair, modify and change the objecting insurers' rights. Specifically, he admitted that:

QUESTION:   "Does the Plan purport to release claims that may exist between
            insurers and Non-Debtors?" . . .

ANSWER:     "Mr. Lockwood: Phrased as broadly as you have, I think the
            answer is yes."[12]

Grace's corporate designee witness, Richard Finke, agreed stating that "any provisions in

the Plan that would constitute a release or an injunction, and I would include 11.9 in that

language, are binding on the asbestos insurance entities."[13]  Mr. Finke also acknowledged that

that the insurers received no monetary consideration for such things as the non-debtor releases

and exculpations that are being imposed on them.[14]

Professor Priest has, among other things, confirmed that the Plan "certainly doesn't

except the insurers from the operation of the [exculpation] provision"[15]  Furthermore, he will

---

[10] *Id.* (Priest Rep. Appendix A.)

[11] *Id.*, ¶¶ 1-17.

[12] *See* Lockwood Dep. 635.

[13] *See* Finke Dep. 80.

[14] *Id.* at 81-82.

[15] *See* Priest Dep. 245.

testify that the Plan nowhere purports to compensate insurers for their lost rights.[16]  While these are examples, other issues are address in his report.[17]

Arrowood has a right to be heard, and to present evidence through Professor Priest at the Phase I confirmation hearing on the provisions of the Plan that impair, modify or change their economic interests.  When the Court hears evidence on these provisions it will find that they are deeply flawed.

## II.    PROFESSOR PRIEST OFFERS ECONOMIC ANALYSIS, NOT LEGAL CONCLUSIONS

Professor Priest was engaged to address the *economic* effects and implications of various features proposed in the Plan, in particular, and the economic impact of various insurance provisions, and the effect of the Plan on insurers' and other parties.   Among the Plan provisions were provisions providing the insurers the right to control or associate in the defense and settlement of claims, provisions prohibiting assignment of Grace's and, quite possibly, insurers' rights under the insurance policies to the Plan Trust, the proposed Trust Distribution Procedures that are the product of a settlement which, in violation of the policies, insurers were shut out of completely, and the Asbestos Trust Agreement as it related to the proposed Trust Distribution Procedures.

Professor Priest is *not* addressing questions of whether Grace has breached its policies or whether the insurers have an obligation to pay for claims tendered by Grace or any other entity. The Plan Proponents nonetheless seek to divert this Court's attention away from the important

---

[16] *Id.* at 236-237. (Mr. Pernicone: "In the course of that careful review of the Plan, did you come across any provision that would purport to compensate insurers for the release under Section 11.9 of any claims that they might have against Non-Debtors? . . ." Mr. Priest responded: "No, I did not.")

[17] The United States Trustee's Office has also reached this conclusion, and has submitted its own objections to the Plan focused entirely around the unlawful breadth and scope of the Plan's release and exculpation provisions.  *See* Acting United States Trustee's Objection to the First Amended Joint Plan of Reorganization, at Dkt. No. 21797, May 20, 2009.

economic analysis that Professor Priest is uniquely qualified to provide by mislabeling it as "impermissible legal opinions."[18]  They cite to this court's opinion in *In re Pittsburgh Corning* as support, but neglect to mention that Professor Priest testified as an expert in that case.  *Id.* at 9. In fact, Professor Priest has offered his expertise regarding the economic function of insurance policies and the economic relationships established thereunder in numerous other cases, including *Babcock & Wilcox*, *ACandS*, *Johns-Manville*, *Federal Mogul*, and *In re Johns-Manville Corp.*

As other courts have found, and contrary to the Plan Proponents' assertions, Professor Priest's testimony is entirely about *economic* principles.  And, despite several hours of deposing Professor Priest as to these opinions, the Plan Proponents cite just one page of his deposition testimony in support of this argument, attempting to mis-frame Professor Priest's testimony through two quotes to his report and one quote of his deposition testimony in support of this argument.[19]

This proceeding is not an insurance coverage action, nor is Professor Priest testifying about the legal meaning of terms in the policy or providing factual arguments about whether the policyholder complied with its *legal* obligations under the policy.  To the contrary, Professor Priest is providing an *economic* analysis of the relationships underlying the insurance contract, including the (1) insurers' right to participate in the defense and settlement of claims; (2) the prohibition against voluntary payments by the policyholder contained in the policies; (3) the insurers' right to consent to any assignment of its policies; (4) the insurers' potential claims against third-party non-debtors, and (5) how Grace's actions impair insurers' rights and give

---

[18] *See* Plan Proponents Joint Mot. 8.

[19] *See* Plan Proponents Joint Mot. 8-9.

them standing to be heard.[20]  Professor Priest's testimony about the economic effects of the

Plan on the parties involved is a central piece of Arrowood's presentation on this issue.

    In *In re Babcock & Wilcox*, an asbestos-related bankruptcy proceeding, Professor Priest

was proffered to testify on the economic structure and function of insurance policies and the

economic implications of a proposed plan on those policies.  In that case, the federal bankruptcy

judge found Professor Priest's testimony to be relevant and admissible. *Babcock & Wilcox,* No.

00-10992, Tr. at 56.  This Court should make the same finding here.

## III.    PROFESSOR PRIEST'S TESTIMONY IS RELEVANT TO PHASE I CONFIRMATION ISSUES

    Professor Priest's opinions are directly relevant to the issue of *whether* insurers' rights

are impaired, modified or changed by the Plan.  Because Professor Priest's economic analysis

can assist the Court in evaluating this threshold confirmation issue, his expert testimony should

not be excluded.  *See* Fed. R. Evid. 401 ("'Relevant evidence' means evidence having any

tendency to make the existence of any fact that is of consequence to the determination of the

action more probable or less probable than it would be without the evidence.").

### A.    Professor Priest's Economic Testimony Is Relevant To The Impairment Of Insurers Rights

    Professor Priest has stated the basic fact that under the Grace insurance policies, insurers

have numerous rights, including, "the right[s] of the insurers to participate in the defense and

settlement of covered claims; the obligation of the policyholder to cooperate in the defense of

claims; the prohibition of voluntary payments by the policyholder; and the insurer's right to

consent to any assignment of its policies."[21]  Professor Priest explains that "provisions such as

these [providing for insurers' right to control defense and settlements], like all other insurance

---

[20] *See* Plan Proponents Joint Mot., Ex. A (Priest Rep. ¶¶ 40-51); *See* Priest Dep. 245.

[21] *See* Plan Proponents Joint Mot. Ex. A (Priest Report ¶ 19).

policy terms, place the risk or the burden of controlling risks on the party in the best position to exercise that control.  The primary insurer has the duty to defend claims against the policyholder and is also granted the <u>right</u> to control that defense . . . and to decide when and on what terms to enter a settlement with a claimant." [22]  The reason for this is that "if the policyholder were to control the defense, especially to control when and on what terms to settle adverse claims, it may well decide to minimize its own costs by entering rapid generous settlements on the expectation of obtaining subsequent indemnity from the insurer." [23]

The "economic structure gives to the insurers ultimate control over the litigation and settlement of claims brought against the policyholder and requires the policyholder to fully cooperate with the insurers in the defense or settlement of those claims."[24]  Furthermore, "the economic purposes of the assignment of control is straightforward:  it is the insurers who must ultimately pay the indemnity from their own funds.  Thus, the insurers bring discipline to the evaluation and resolution of claims."[25]  This serves the general social interest, because "[t]o the extent that compensation of such [fraudulent or exaggerated] claims must be included in the cost of insurance coverage, insurance becomes more expensive and insurance availability is reduced, to the harm of society."[26]  The Debtor has less incentive to fight fraudulent claims once in this type of bankruptcy, and the claimant-creditors' overwhelming leverage over the bankrupt-estate creates perverse incentives, which is why the economic policy that insurers have the right to control settlement of claims becomes even more important.[27]

---

[22] *Id.* ¶ 27. (emphasis in original).

[23] *Id.*

[24] *Id.* ¶ 24

[25] *Id.*

[26] *Id.* ¶ 23.

[27] *Id.* ¶ 35-38.

These economic concerns were borne out recently in another asbestos bankruptcy.  On

May 26, 2009, Judge McCullough of the United States Bankruptcy Court of the Western District

of Pennsylvania issued an opinion and order in the *Skinner Engine Company* ("*Skinner*"), that

found that *Skinner*'s Fifth Plan—which, like the current Grace Plan, attempted to create weak

alternative claimant recovery procedures and attempted a settlement without insurers' consent—

violated insurers' rights in numerous ways. *See* Appendix 1, *In re Skinner Engine Co., Inc.*, No.

01-23987 (Bankr. W.D. Penn. May 26, 2009).[28]

The court in *Skinner* held that the Debtors' entering into a settlement with asbestos

claimants without its insurers' consent, indeed shutting its insurers out of the settlement

negotiation process—where the provisions in the policies provided the insurers' with the right to

control the defense, where the insurers had undertaken to defend against the claims, and where

the insurers did not act in bad faith or unreasonably in not consenting to the settlement—violated

state law and therefore made the Fifth Plan unconformable.  *Id*. at * 3-4.  The court in *Skinner*

also noted the "extreme extent to which due process protections/procedural safeguards afforded

to the Insurers via the Federal Bankruptcy Rules and the Federal Rules of Civil Procedure have

been relaxed by relevant terms of the Fifth Plan."  *Id.* at * 10.   The alternative recovery

procedures appeared designed to allow easy recovery of claims that could not survive the tort

system.  *See id.*

The Plan Proponents now seek to deter insurers' from showing the court the extent of the

Plan's impairment of the insurers' rights.  Part of this showing requires expert economic

testimony, that like all expert testimony, will ultimately aid the fact-finder in reaching factual

and legal conclusions.  Professor Priest's report, amongst other things, explains the economic

---

[28] The court not only rejected the Fifth Plan but also converted the case into a Chapter 7 liquidation.  *Id.* at * 2.

purpose of the insurance provisions the Debtor is impairing, and the economic consequences of

that impairment.  Professor Priest's report also identifies and provides an economic analysis of

many of the key structural problems with this very complex Plan.

**B.**      **Professor Priest's Opinions Will Assist the Court in Evaluating the Nature and Extent to Which the Plan Impairs Insurers' Rights**

Professor Priest is uniquely qualified to offer insight as to how the Trust Distribution

Procedures ("TDPs") overturn the economic rights and relationships established by the insurance

policies so as to increase risk to the insurers and violate the economic "essence" of the insurance

contract.[29]  This analysis would undoubtedly be helpful to the Court.  Furthermore, Professor

Priest's testimony will be helpful in evaluating whether the assignment violates the "essence of

the contract" so as to be impermissible under *Caldwell Trucking*.  The Debtors' purported

assignment of the insurance policies to the Trust, in violation of applicable law, directly

implicates Section 1129(a)(3) of the Bankruptcy Code which requires that a Chapter 11 plan be

proposed "in good faith and *not by any means forbidden by state or federal law*").  11 U.S.C. §

1129(a)(3) (emphasis added).  Courts have repeatedly invalidated assignments where a transfer

of rights would increase risk to the insurer by effectively altering the terms of an insurance

contract and deprive the insurer of the performance to which it is contractually entitled.[30]  *See*

*Caldwell Trucking Trucking PRP Group v. Spaulding Composites Co.*, 890 F. Supp. 1247, 1259-

61 (D.N.J. 1995); *Globecon Group, LLC v. Hartford Fire Ins. Co.*, No. 03 Civ. 0023, 2004 U.S.

Dist. Lexis 13130 (S.D.N.Y. July 13, 2004); *Henkel Corp. v. Hartford Acc. & Indem. Co.*, 62

---

[29] *See* Plan Proponents Joint Mot. Ex. A (Priest Report ¶¶ 43-49.)

[30] The Section 1123(a)(5) preemption issue is currently under appeal before the Third Circuit Court of Appeals in *Hartford Accident and Indem. Co. v. Fitzpatrick (In re North American Refractory Co.),* Dkt. Appeal No. 08-3651 (3d Cir. August 25, 2008), but regardless of how the court decides--it is only relevant to Phase II.  The issue here is standing and whether the Plan impairs insurers' rights, which it clearly does regardless.  In Phase II, the Third Circuit's decision will be directly relevant because it will decide whether the Code preempts state and contractual law in this regard.

P.3d 69, 75 (Cal. 2003); *Parkway Ins. Co. v. New Jersey Neck & Back*, 330 N.J. Super. 172, 184

(N.J. 1988) (upholding anti-assignment provisions where "to find otherwise would force insurers

to deal with parties with whom they had not contracted, violating the basic tenet and public

policy of freedom of contract." ).

Indeed, courts have made clear that they will not permit assignments of policies or policy

proceeds where the assignment violates the "essence of the contract" – *i.e.*, where the

contemplated assignment threatens to vitiate other rights of the insurer that form part of the

contractual bargain. *See*, *e.g.*, *Caldwell Trucking*, 890 F. Supp. at 1259-61.  In *Caldwell

Trucking*, the insured gave an assignment to a claimant, retained a percentage interest in the

recovery of insurance proceeds, and subverted its duties of cooperation and allegiance to the

insurer.  *Id*. at 1251.  The court found that the insured's conduct and retained interest was

fundamentally inconsistent with the insured's obligation to cooperate in its defense and declared

the assignment invalid.  *Id*. at 1260-61.

Professor Priest's economic analysis of the effect of various aspects of the agreements

that Grace has entered into in connection with its proposed reorganization upon the economic

relationship between the insurers and Grace has direct bearing on the assignment issue.

**C.     Professor Priest's Opinion is Relevant to the Good Faith of the Plan**

The Third Circuit has ruled that the Bankruptcy Court must evaluate whether the

Debtors' plan is proposed in good faith, which takes into account public policy concerns and

whether the plan is "consistent with the objectives and purposes of the Bankruptcy Code." *See In

re Combustion Eng'g*, 391 F.3d 190, 246-47 (3d Cir. 2004) (quotation omitted). Professor

Priest's proposed testimony regarding the economic implications of debtors' actions, such as

those taken by Grace, on the overall process for evaluating, transferring and dealing with risks of

loss between Grace and the objecting insurers will be extremely helpful to this Court in

13

evaluating the Plan's impairment of insurers' rights.

Professor Priest's opinion is relevant to the good faith of the Plan. The Bankruptcy Code explicitly requires that every reorganization plan confirmed under Chapter 11 be proposed in good faith. 11 U.S.C. § 1129(a)(3). "[F]or purposes of determining good faith under section 1129(a)(3) . . . the important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code." *Combustion Eng'g*, 391 F.3d at 246-47 (quotation omitted); *see also In re PWS Holding Corp.*, 228 F.3d 224, 242 (3d Cir. 2000) (same). Likewise, fundamental fairness requires that the plan be "proposed with honesty, good intentions and a basis for expecting that a reorganization can be effected with results consistent with the objectives and purposes of the Bankruptcy Code." *In re ACandS Inc*., 311 B.R. 36, 43 (Bankr.D.Del.2004) (citing *In re Coram Healthcare Corp*., 271 B.R. 228, 234 (Bankr. D. Del. 2001)). Among the objections insurers have asserted here is an objection that the Plan lacks good faith and fundamental fairness because, *inter alia*, Debtors are using the Plan to fundamentally alter Grace's insurance contracts to the benefit of the Debtors and the claimants at the expense of the insurers.

Professor Priest's testimony can clearly assist the Court in evaluating this issue. Professor Priest is uniquely qualified to explain the economic function of insurance and the broader societal gain achieved through the structure of the insurance contract, namely, by controlling and constraining the economic impact of losses suffered in the society.[31] In his report, he details how the various provisions in the insurance policies create a structure of economic rights and responsibilities to reduce or constrain the effects of losses suffered in the

---

[31] *See* Plan Proponents Joint Mot. Ex. A (Priest Report ¶¶ 20-33.)

society and thereby serve the societal goal of expanding insurance availability.[32]  Professor Priest

is likewise able to explain how the provisions of the Plan overturn this economic structure so as

to increase the risk to insurers and society as a whole.[33]  His testimony is directly relevant to the

good faith inquiry, which asks "whether [the] plan will fairly achieve a result consistent with the

objectives and purposes of the Bankruptcy."

## IV.    IRONICALLY, THE PLAN PROPONENTS ARE OFFERING SEVERAL LAWYERS TO TESTIFY ABOUT THEIR LEGAL INTERPRETATION OF THE PLAN DOCUMENTS

The Plan Proponents offered Peter Lockwood, Elihu Insubuch and David Austern and

others lawyers to testify about the meaning of various provisions of the Plan.  Through them,

they offered unabashed legal opinions.

These witnesses have opined, amongst other things, on (1) whether asbestos PI claims are

subject to Section 502(e); (2) legal issues relating to 524(g) and (3) whether the Trust will be

bound by indemnification agreements.[34]  This testimony is blatantly legal in nature.   The irony

here is that the Plan Proponents have used not one but at least multiple witnesses to discuss their

legal interpretations of the Plan, yet they complain about an expert who is to offer expert

economic testimony about the Plan's impairment of insurers' rights.

Equally troubling, the Plan Proponents brought this motion before all fact discovery was

complete.

[remainder of page intentionally left blank]

---

[32] *Id*.

[33] *See* Plan Proponents Joint Mot. Ex. A. (Priest Report ¶¶ 31, 43-51).

[34] *See* Lockwood Dep. at 73, 309 344.

## CONCLUSION

For the foregoing reasons, the Court should deny Plan Proponents' Motion In Limine to Exclude the Opinion and Testimony of George L. Priest.

Dated:     June 11, 2009
           Wilmington, Delaware

By:     /s/ Garcvan F. McDaniel
        Garvan F. McDaniel, Esq. (#4167)
        BIFFERATO GENTILOTTI LLC
        800 N. King Street, Plaza Level
        Wilmington, DE  19801
        (302) 429-1900 Phone
        (302) 429-8600 Fax

        -and-

        Carl J. Pernicone, Esq.
        WILSON, ELSER, MOSKOWITZ
        EDELMAN & DICKER, LLP
        150 East 42nd Street
        New York, NY 10017-5639
        Telephone: (212) 490-3000

        -and-

        Tancred Schiavoni, Esq.
        Gary Svirsky, Esq.
        O'MELVENY & MYERS LLP
        7 Times Square
        New York, New York
        (212) 326-2267

        *Counsel to Arrowood Indemnity
        Company, f/k/a Royal Indemnity Company*

# APPENDIX 1

*In re Skinner Engine Co., Inc.*, No. 01-23987

(Bankr. W.D. Penn. May 26, 2009).

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN RE:                                       :
                                             :
AMERICAN CAPITAL EQUIPMENT,   :   **Bankruptcy No's. 01-23987-MBM &**
INC., and SKINNER ENGINE       :                **01-23988-MBM**
COMPANY, INC.,                 :
                                             :   **Jointly Administered at**
                                             :   **Bankruptcy No. 01-23987-MBM**
               Debtors.         :
                                             :   **Chapter 11**

## <u>MEMORANDUM</u>

**AND NOW,** this **26th day** of **May, 2009**, upon consideration of (a) the

most recently proposed Chapter 11 plan – i.e., what has been characterized as

the modified Fifth Plan (hereafter "the Fifth Plan") – of Skinner Engine Company,

Inc., one of the above-captioned debtors acting as a Chapter 11 debtor-in-

possession (hereafter "the Debtor"), as well as the disclosure statement that

accompanies the Fifth Plan (hereafter "the Disclosure Statement"), (b) the

various briefs that have been submitted by the Debtor and its co-proponents of

the Fifth Plan (hereafter "the Co-Proponents"), both in support of the Disclosure

Statement and in response to four discrete questions relative to the approval of

the Disclosure Statement that were posed by the Court at a February 4, 2009

hearing, and (c) the various briefs that have been submitted by the various

insurance companies that insured the Debtor pre-petition against asbestos

liability, which insurance companies (hereafter "the Insurers") oppose the

approval of the Disclosure Statement;

and in light of the motion that the Court itself raised in its April 9, 2009

Order of Court to the effect that, if the Court should reject the Disclosure Statement (on the ground that it describes a facially unconfirmable plan), then the instant Chapter 11 bankruptcy case(s) shall be converted to Chapter 7;

and subsequent to a hearing held on May 7, 2009, to consider all of the above matters,

it is **hereby determined that the Court shall issue an order to the effect** that (a) the Fifth Plan is unconfirmable for at least several reasons, (b) the Disclosure Statement, in describing the Fifth Plan, describes not only an unconfirmable plan but one that is also facially unconfirmable, (c) the Disclosure Statement consequently cannot be approved, that is it shall be rejected, (d) the Debtor and the Co-Proponents have been, and are, unable to effectuate a confirmable plan within a reasonable period of time, and (e) the instant Chapter 11 bankruptcy case(s) consequently shall be converted to Chapter 7.

The rationale for the Court's decision is set forth below.

## I.

At the outset, the Court notes that the Fifth Plan embodies a settlement – at least what is purported to be a settlement – of disputed, unliquidated, pre-petition asbestos liability claims that exist against the Debtor and the Insurers (both are named as defendants with regard to such claims, which claims are hereafter referred to as "the Asbestos Claims"), which settlement (hereafter "the Asbestos Claims Settlement") has been entered into between the asbestos claimants (hereafter "the Asbestos Claimants"), on the one hand, and the Debtor and the Co-Proponents, on the other hand, without the consent, and over the

2

objection, of the Insurers.  The Insurers – at least Travelers Casualty and Surety

Company (hereafter "Travelers"), one of the Insurers and a primary insurer of the

Debtor – contend, and the Debtor and the Co-Proponents have not disputed, that

the Insurers, by virtue of terms contained in the insurance policies to which they

and the Debtor are parties (hereafter "the Insurance Policies"), possess a

contractual right to defend the Debtor (as the insured) with respect to, and to

settle as they deem expedient, any of the Asbestos Claims; the policy clauses

setting forth such rights are hereafter referred to as "the Right to Defend and

Settle Clauses."  *See* May 1, 2006 Travelers' Objection to Modified Disclosure

Statement, App. A, ¶ 11, at pp. 4-5 (Doc. No. 1042).  Also not disputed is that the

Insurance Policies contain clauses the substance of which is that the Debtor (as

the insured) shall (a) not, except at its own cost, voluntarily make any payment,

assume any obligation, or incur any expense (hereafter "the Voluntary Payment

Clauses"), and (b) cooperate with the Insurers (hereafter "the Cooperation

Clauses").  *See* Id.  As the Court understands it, the Debtor and the Co-

Proponents contend that, pursuant to Pennsylvania law, they may enter into the

Asbestos Claims Settlement and thereby settle the Asbestos Claims without the

consent of the Insurers notwithstanding the Insurers' rights that emanate from the

foregoing insurance policy clauses (hereafter referred to as "the Insurers' Right to

Control the Asbestos Litigation"), simply provided that the Asbestos Claims

Settlement is reasonable and entered into in good faith.  The Insurers dispute

that Pennsylvania law allows the Debtor and the Co-Proponents to so settle.  If

Pennsylvania law does not allow for such a settlement, then, as a threshold

3

matter, the Court could not approve the Asbestos Claims Settlement, in which case (a) the Fifth Plan is unconfirmable, (b) the Disclosure Statement describes a facially unconfirmable plan, and (c) the Disclosure Statement must be rejected.

Does Pennsylvania law allow for such a settlement, that is a settlement of the Asbestos Claims without the consent of the Insurers notwithstanding the Insurers' Right to Control the Asbestos Litigation, simply provided that the Asbestos Claims Settlement is reasonable and entered into in good faith?  The Court holds that such a settlement is not permissible under Pennsylvania law. The Court so holds for the following reasons.  First, the law in Pennsylvania, stated broadly, is that an insured is not free to enter into a settlement of a claim absent an insurer's consent – no matter how reasonable such settlement is, even if such settlement has been entered into in good faith, and even if such insurer has not been prejudiced by such settlement – if such insurer (a) is possessed of insurance contract rights similar to the Insurers' Right to Control the Asbestos Litigation, (b) has undertaken to defend, and is defending, such insured with respect to such claim, and (c) does not act in bad faith or unreasonably in refusing to settle such claim.  *See* Fisher v. USAA Casualty Insurance Co., 973 F.2d 1103, 1106-1107 (3rd Cir. 1992); *see also* Epstein v. Erie Indemnity Co., 39 Pa.D.&C. 117, 126 (Pa.Com.Pl. 1940) ("After the insurer has assumed control of the defense, the insured has no right to settle the claim"); 14A Summ.Pa.Jur.2d *Insurance* § 18:26 (West 2008) (citing Epstein decision); 14 Couch on Insurance § 203:38 (West 2008) ("Liability policies typically contain conditions which require the consent of the insurer with regard to any settlement, often referred to as the

4

'consent-to-settle' clause or *'voluntary payment' provision*.  Pursuant to such

provisions, an insured that enters into a settlement without the insurer's consent

breaches the terms of the policy, thereby voiding any coverage for the

settlement."; citing <u>Fisher</u> to the effect that a showing of prejudice is not required

in relation to an application of the voluntary payment provision").[1]  Second, the

Court must find that the Insurers have undertaken to defend, and are defending,

the Debtor with respect to the Asbestos Claims.  With respect to the issue of

---

[1]The Debtor and the Co-Proponents cite to several cases as supportive of their position regarding, and as being in disagreement with this Court's statement of, the status of relevant Pennsylvania law.  *See* Feb. 25, 2009 Debtor's Brief, at pp.10-11 (Docket No. 1302); Aug. 5, 2005 Debtor's Brief, at pp.1-2 (Docket No. 872).  Those cases so cited, however, rather than being in disagreement with this Court's statement of the law, are entirely consistent and reconcilable with such statement of the law.  In particular, the insured was free to reasonably settle the claim without the consent of the insurer in (a) <u>Resource America, Inc. v. Certain Underwriting Members of Lloyd's</u>, 2004 WL 2580554 (Pa.Com.Pl. 2004), because such insurer was held to have acted unreasonably in refusing to settle such claim, *see* <u>Id.</u> at 4 ("RAI seeks summary judgment on the ground that Lloyd's unreasonably refused to consent to the settlement"), (b) <u>Greater New York Mutual Insurance Co. v. The North River Insurance Co.</u>, 85 F.3d 1088 (3rd Cir. 1996), because such insurer was held to have acted in bad faith in refusing to settle such claim, *see* <u>Id.</u> at 1092-1093 ("central issue at trial was whether Greater New York acted in bad faith in refusing to settle" and "evidence was more than sufficient for the jury to conclude Greater New York had acted in bad faith in refusing to settle"), (c) <u>Trustees of the University of Pennsylvania v. Lexington Insurance Co.</u>, 815 F.2d 890 (3rd Cir. 1987), because such insurer (i) lacked the right to control the litigation regarding such claim, and (ii) did not defend such insured with respect to such claim, *see* <u>Id.</u> at 893 ("The policy also provided, however, that Lexington had no right to assume the defense of suits against HUP") & <u>Id.</u> at 898-899 (Lexington was an excess carrier and "excess carriers generally have no right to control a lawsuit," coupled with "Lexington neither provided HUP's defense nor had a right to do so under the policy"), and (d) <u>Alfiero v. Berks Mutual Leasing Co.</u>, 500 A.2d 169 (Pa.Super.Ct. 1985), because such insurer "repeatedly denied any and all obligation to defend or to indemnify" such insured and "thereby breached its duty to act in good faith," *see* <u>Id.</u> at 172.

defense of the Debtor, the Debtor and the Co-Proponents argue that such

defense has been lacking only because the Insurers have apparently (a)

attempted to impose some percentage of previous defense costs upon the

Debtor, and (b) conducted their defense under a reservation of rights as to the

issue of whether the Asbestos Claims are covered under the Insurance Policies.

Such arguments are unavailing, however, because (a) what would arguably be

relevant to the Court's analysis is not whether an attempt was made to impose

certain of the aforesaid defense costs upon the Debtor but rather whether the

Debtor has actually ever paid any portion of such defense costs, (b) the Debtor

and the Co-Proponents represent to the Court that the Debtor, in fact, has been

unable to pay any of such defense costs,[2] *see* Feb. 25, 2009 Debtor's Brief, at

p.12 (Docket No. 1302); Aug. 5, 2005 Debtor's Brief, at p.5 (Docket No. 872),

and (c) the law in Pennsylvania allows for the Insurers to defend under a

reservation of rights, *see* 14A Summ.Pa.Jur.2d *Insurance* § 18:29 (West 2008)

(citing Pennsylvania cases to that effect, as well as stating, in particular, that "[a]n

insurer's participation in defending the insured does not affect its ability to later

assert that the insured is not entitled to compensation from the insurer simply

because it is not covered under the policy").[3]   Third, the Court holds that the

---

[2]It also matters not that the Insurers have apparently filed proofs of claim
in the instant bankruptcy case seeking recovery of such defense costs allegedly
imposed upon the Debtor given that, as a practical matter, the Debtor's
bankruptcy estate is now a no-asset estate, meaning that such proofs of claim
will never be paid.

[3]The Debtor and the Co-Proponents cite to the decisions in J.H. France
Refractories Co. v. Allstate Ins. Co., 626 A.2d 502 (Pa. 1993), and Goodyear Tire

6

Insurers have not acted in bad faith or unreasonably in refusing to settle the

Asbestos Claims via the Asbestos Claims Settlement or on terms remotely

similar to such settlement.  The basis for such holding by the Court is that which

supports the Court's holding, set forth below, that the Asbestos Claims

Settlement is neither reasonable nor one that was entered into in good faith.

Because of the foregoing, and given the Insurers' Right to Control the Asbestos

Litigation, the Debtor may not enter into the Asbestos Claims Settlement without

the consent of the Insurers, no matter (a) how reasonable such settlement is, (b)

if such settlement has been entered into in good faith, and (c) if the Insurers are

not prejudiced by such settlement.  Because the Insurers have withheld their

consent to the Asbestos Claims Settlement, such settlement is impermissible

---

& Rubber Co. v. Aetna Casualty & Surety Co., 769 N.E.2d 835 (Ohio 2002), as
supportive of the proposition that the Insurers, by law, have an obligation to
defend on the Asbestos Claims without any reservation of rights.  *See* Feb. 25,
2009 Debtor's Brief, at p.12 (Docket No. 1302); Aug. 5, 2005 Debtor's Brief, at
p.5 (Docket No. 872).  The Court has examined those two cases, however, and
is bewildered as to their citation by the Debtor and the Co-Proponents given that
neither decision even speaks to such issue, let alone can be appropriately cited
for such proposition.  Moreover, such position by the Debtor and the Co-
Proponents is entirely at odds with the authority cited by the Court in the text
immediately prior to the instant footnote.  As for the reliance by the Debtor and
the Co-Proponents upon the decision in Presrite Corp. v. Commercial Union Ins.
Co., 680 N.E.2d 216, 220 (Ohio Ct. App. 1996), for the proposition that, if an
insurer defends under a reservation of rights, then an insured no longer has a
duty to cooperate, *see* Feb. 25, 2009 Debtor's Brief, at p.11 (Docket No. 1302),
the Ohio Court of Appeals subsequently clarified such decision to make clear
that, in Ohio (for what it is worth to the instant matter), "where the insurer defends
its insured, either in whole *or by a reservation of rights*, Sanderson (a case relied
upon by the Presrite court) does not apply and the insured is not 'at liberty to
make a reasonable settlement without prejudice to their rights under the
contract.'"  Westfield Insurance Co. v. D.C. Builders, Inc., 2004 WL 309272 at 7
(Ohio Ct. App. 2004).

under Pennsylvania law.

However, even accepting *arguendo* that Pennsylvania law is as the Debtor and the Co-Proponents contend, they still may only settle the Asbestos Claims without the Insurers' consent, according to their statement of the law, if the Asbestos Claims Settlement is reasonable and entered into in good faith.  Absent such reasonableness and good faith, the Court, once again, cannot approve the Asbestos Claims Settlement and the Fifth Plan will, consequently, be unconfirmable.  Moreover, if such reasonableness and good faith are patently lacking, then (a) the Disclosure Statement describes a facially unconfirmable plan, and (b) the Disclosure Statement must be rejected.

Is the Asbestos Claims Settlement that is embodied in the Fifth Plan reasonable, as well as one that was entered into in good faith?  The Court holds that the Asbestos Claims Settlement is neither reasonable nor one that was entered into in good faith.

The Asbestos Claims Settlement is not reasonable for several reasons. First, it is indisputable that no payment has ever been made by any of the Insurers on behalf of the Debtor to any of the Asbestos Claimants vis-a-vis the Asbestos Claims, notwithstanding that such claims have existed for roughly twenty (20) years.  Such fact is strong evidence as to the futility of such claims, and it makes little, indeed no, sense to settle claims that have thus far been so overwhelmingly unsuccessful.  Second, most, if not practically all, of the Asbestos Claims were administratively dismissed pre-petition by the U.S. District Court for the Eastern District of Pennsylvania, which court presides over such

claims given that they were filed on such court's Asbestos Products Liability Multi-District Litigation (MDL) docket. Such fact also serves to substantiate that such claims are not very strong, so that, once again, it makes little, if not any, sense for such claims to be settled. Finally, there is really no valid reason for the Debtor to even care if the Asbestos Claims get settled given that (a) the Debtor is defunct (i.e., out of business), (b) the Debtor will never again engage in business, (c) the Debtor is in bankruptcy, (d) no funds practically exist in the Debtor's bankruptcy estate in any event to pay on any judgment that the Asbestos Claimants might obtain in excess of the Debtor's insurance (hereafter referred to as an "excess judgment"), and (e) any excess judgment obtained would, therefore, be practically worthless. In light of the foregoing undisputed facts, it makes absolutely no sense for the Debtor to settle any of the Asbestos Claims absent the consent of the Insurers, and settlement without such consent (as is the case with respect to the Asbestos Claims Settlement), the Court holds, is thus *per se* unreasonable.

The Court holds that the Asbestos Claims Settlement has also not been entered into in good faith. The ground for such holding is that the Asbestos Claims Settlement is the result of patent collusion between the Debtor and the Co-Proponents, on the one hand, and the Asbestos Claimants, on the other hand. Such collusion is readily apparent when one considers the terms of the Fifth Plan. As part of the Asbestos Claims Settlement embodied in the Fifth Plan, the Asbestos Claimants may take advantage of (i.e., opt into) an alternative dispute resolution process to resolve their claims, which process (referred to as

9

the "Court Approved Distribution Procedures" or "CADP" by the Debtor and the

Co-Proponents), when compared to that which the Asbestos Claimants must

otherwise adhere to – i.e., court litigation, in the U.S. District Court for either the

Eastern District of Pennsylvania (outside of bankruptcy) or the Western District of

Pennsylvania (in bankruptcy), with the terms of such litigation imposed by the

Federal Bankruptcy Rules, the Federal Rules of Civil Procedure, and any other

requirement of constitutional due process – is indisputably procedurally much

more favorable and, thus, advantageous to the Asbestos Claimants' cause

(hereafter "the Alternative Dispute Resolution Process").  In return for the

opportunity to take advantage of the Alternative Dispute Resolution Process, the

Asbestos Claimants must – and as this Court surmises, they are eminently more

than happy to – agree to give to the Debtor 20% of any insurance proceeds that

the Asbestos Claimants would obtain from the Insurers if, and to the extent that,

they prevail on their claims.  Important to note is that, absent the Asbestos

Claims Settlement, the (a) Debtor is left with no means of obtaining any of the

insurance proceeds that might be paid out on behalf of the Asbestos Claims, and

(b) Asbestos Claimants, as set forth above, will be left to pursue the Asbestos

Claims via court litigation, which litigation, as also set forth above, has thus far

been very unsuccessful.  That the Debtor and the Co-Proponents, on the one

hand, and the Asbestos Claimants, on the other hand, are colluding becomes

even more apparent when one recognizes that, with respect to any of the

Asbestos Claims, the Debtor can obtain the aforesaid 20% cut of insurance

proceeds (the 20% Surcharge, as the Debtor and, hereafter, this Court refers to

10

it) only if the Debtor's defense – or, more accurately, the Insurers' defense of the

Debtor – with respect to such claim(s) is unsuccessful; because of the foregoing

fact, the Debtor is nothing but financially incentivized to sabotage its own defense

or, more aptly, the Insurers' defense of itself vis-a-vis the Asbestos Claims.  As a

consequence of the foregoing realizations, the Court is not surprised to see the

extreme extent to which due process protections/procedural safeguards afforded

to the Insurers via the Federal Bankruptcy Rules and the Federal Rules of Civil

Procedure have been relaxed by relevant terms of the Fifth Plan.  Indeed,

because, as set forth above, there is really no valid reason for the Debtor to even

care if the Asbestos Claims get settled – given that, as explained above, even if

such claims are not settled, any excess judgment obtained by the Asbestos

Claimants would be worthless in any event – the Court can only conclude that

the Debtor (a) wishes to settle for one reason, that is so as to obtain the 20%

Surcharge, (b) consequently hopes that its defense – or, more aptly, the Insurers'

defense of itself – will be unsuccessful, given that such defense must fail in order

for the Debtor to obtain such surcharge, and (c) has attempted to facilitate the

defeat of such defense by proposing the Fifth Plan (in particular, by attempting

thereby to severely relax such due process protections/procedural safeguards

otherwise afforded to the Insurers).  The Court attaches to all of the foregoing

collectively the label "collusion."[4]  However, whether it be collusion or not is not

---

[4]A consent judgment was similarly found to have been procured by
collusion in <u>Carlson v. Zellaha</u>, 482 N.W.2d 281 (Neb. 1992), wherein the party
who obtained such consent judgment then proceeded against the losing party's
insurer.  Such collusion was found to have existed, *inter alia*, because (a) "[t]he

really important; what is important is that all of the foregoing demonstrates bad

faith on the part of the Debtor, the Co-Proponents, and the Asbestos Claimants

in entering into the Asbestos Claims Settlement.

Therefore, the Asbestos Claims Settlement is neither reasonable nor one

that was entered into in good faith.  That such settlement is neither reasonable

nor one that was entered into in good faith constitutes an additional reason why

such settlement is impermissible under Pennsylvania law.

Since the Asbestos Claims Settlement is forbidden by Pennsylvania law,

the Fifth Plan, pursuant to 11 U.S.C. § 1129(a)(3), cannot be confirmed.

Furthermore, given that the Fifth Plan embodies the Asbestos Claims Settlement,

and since, as just set forth above, such settlement was entered into in bad faith,

the Court is compelled to conclude that the Fifth Plan itself has been proposed in

bad faith; such conclusion dictates a holding, as well, that the Fifth Plan,

pursuant to § 1129(a)(3), cannot be confirmed.  Moreover, because the Asbestos

Claims Settlement is forbidden by Pennsylvania law, and particularly given that

the unreasonableness of, and the bad faith that accompanies, such settlement is

transparent, the Disclosure Statement describes a facially unconfirmable plan.

Therefore, the Disclosure Statement must be rejected.

Because of the rulings contained in the immediately preceding paragraph

---

amount of the judgment was unreasonable given the improbability of the
plaintiff's [(party who obtained consent judgment)] success against Zellaha [(i.e.,
the insured)]," and (b) "Zellaha [(i.e., the insured)] was to be compensated $575
out of the first $4,000 collected in exchange for consenting to the judgment."  Id.
at 284.

herein, the Court need not determine whether (a) confirmation of the Fifth Plan
(and accompanying court approval of the Asbestos Claims Settlement) would
operate to breach the Right to Defend and Settle Clauses, the Voluntary
Payment Clauses, and the Cooperation Clauses, thereby voiding the coverage
afforded by the Insurance Policies, or (b) the very existence of the Asbestos
Claims Settlement, the fact that such settlement was entered into without the
consent of the Insurers, and the aforementioned collusion operate to breach the
aforesaid insurance policy clauses, thereby voiding the aforesaid insurance
coverage.  Since the Court need not make the foregoing determinations, it will
simply rule summarily that, if it were to confirm the Fifth Plan, such confirmation
would operate to breach the aforesaid insurance policy clauses, thereby voiding
the coverage afforded by the Insurance Policies.[5]  Such breach of the Insurance
Policies would serve to make the Fifth Plan unconfirmable pursuant to
§ 1129(a)(3).  As well, if the Insurance Policies were to be voided by virtue of
confirmation of the Fifth Plan, then no money could be obtained through such
contracts, which eventuality would serve to make the Fifth Plan not financially
viable; such lack of prospective viability means that confirmation of the Fifth Plan
would most certainly be followed by immediate liquidation, which prospect, by
itself, means that, pursuant to 11 U.S.C. § 1129(a)(11), the Fifth Plan is

---

[5]At least at the present time, the Court will abstain entirely from ruling as
to whether the coverage afforded by the Insurance Policies has already been
voided by virtue of the very existence of the Asbestos Claims Settlement, the fact
that such settlement was entered into without the consent of the Insurers, and
the aforementioned collusion.

13

unconfirmable.  Moreover, that confirmation of the Fifth Plan would operate to ultimately void the coverage afforded by the Insurance Policies is, the Court concludes, obvious from a simple reading of the Disclosure Statement, which means that (a) the Disclosure Statement describes a facially unconfirmable plan, and (b) the Disclosure Statement must accordingly be rejected.

## II.

Although the Court, as set forth above, has now concluded that the Fifth Plan is unconfirmable, that the Disclosure Statement describes a facially unconfirmable plan, and that the Disclosure Statement must accordingly be rejected, the Court identifies two additional discrete reasons that dictate the foregoing conclusions.  Because such reasons are not really necessary to support the Court's decision, the Court shall address them in relatively brief fashion.

First, the Court holds that the 20% Surcharge constitutes an assignment by the Asbestos Claimants – in particular, those Asbestos Claimants that opt into the Alternative Dispute Resolution Process – to the Debtor (i.e., the Debtor's bankruptcy estate) of 20% of any insurance proceeds that the Asbestos Claimants might obtain in the future from the Insurers vis-a-vis the subsequent liquidation of the presently unliquidated Asbestos Claims via the Alternative Dispute Resolution Process; such assignment will occur the moment that an Asbestos Claimant opts into the Alternative Dispute Resolution Process.  The Court holds that such assignment is impermissible because (a) unliquidated personal injury tort claims, such as are the Asbestos Claims, can't themselves be

14

assigned pre-judgment, *see* 3 P.L.E.2d *Assignments* § 9 at 71 (Bender 2006), (b) the Pennsylvania courts have yet to rule as to whether insurance proceeds emanating from such claims can be assigned pre-judgment, and (c) the Pennsylvania Supreme Court, this Court predicts, would rule, in large part for the reasons set forth by the Insurers at pages 6-8 of their February 25, 2009 Joint Brief (Docket No. 1301), that such insurance proceeds cannot be assigned pre-judgment.  The Debtor and the Co-Proponents argue that the 20% Surcharge does not constitute a present assignment at all of such insurance proceeds (i.e., an assignment as of the moment of opt-in).  The Court understands the Debtor and the Co-Proponents to really raise but two apparent grounds in support of such argument, namely that (a) the Fifth Plan, when dealing with the 20% Surcharge, does not utilize the word "assign" or any variation thereof, and (b) the 20% Surcharge is merely a voluntary contribution by the opt-in Asbestos Claimants to the Debtor to be made upon receipt of insurance proceeds, which contribution is thus only made at the whim of the Asbestos Claimants. Unfortunately for the Debtor and the Co-Proponents, such grounds are without merit.  Dealing first with the technical language issue, it matters not whether the term "assign" or any variation thereof appears in a written assignment.  *See* 3 P.L.E.2d *Assignments* § 21 at 75.  As for the latter of the grounds raised, the "voluntary contribution" characterization of the 20% Surcharge by the Debtor and the Co-Proponents is belied by the actual language of the Fifth Plan to the effect that "upon the Asbestos Claimant submitting his or her claim to the ... [Alternative Dispute Resolution Process], he or she shall thereby have agreed to pay the

15

[20%] Surcharge ... from any amounts paid on account of the Asbestos Claim under and through the ... [Alternative Dispute Resolution Process]," *see* Fifth Plan, § 1.53 (Docket No. 1030); by virtue of such language, any of the Asbestos Claimants that opt in are divested of control of that portion of the insurance proceeds that are first utilized to satisfy the 20% Surcharge.

Because the 20% Surcharge constitutes an impermissible assignment under Pennsylvania law, the Fifth Plan, which relies on such impermissible assignment, is forbidden by law.  Consequently, the Fifth Plan is unconfirmable pursuant to § 1129(a)(3).  As well, the Disclosure Statement, for that reason, describes a facially unconfirmable plan, which means that the Disclosure Statement must be rejected.

Second, the Court notes that provisions of the Alternative Dispute Resolution Process repeatedly call for this Court, in its official capacity, to make final binding determinations as to the validity and valuation of contested opt-in Asbestos Claims, that is such process ultimately requires this Court, in its official capacity, to finally liquidate such claims, and without any chance for review by another court.  *See* Fifth Plan, § 1.24 (Docket No. 1030); CADP, ¶¶ B.2(a), C & F.2.  Unfortunately for the Debtor and the Co-Proponents, this Court lacks authority to finally liquidate such claims, and authority does not exist, as well, for liquidation of such claims by this Court without review by another court.  The Court so holds because (a) the liquidation of unliquidated personal injury tort claims, as are the opt-in Asbestos Claims, constitute(s) a noncore proceeding, *see* 28 U.S.C.A. § 157(b)(2)(B) (West 2008), (b) the Court may only issue

16

proposed findings of fact and conclusions of law to the district court with respect to noncore proceedings, that is this Court is powerless to make a final determination regarding the liquidation of any opt-in Asbestos Claims that are disputed, *see* 28 U.S.C.A. § 157(c)(1) (West 2008), and (c) the District Court for the Western District of Pennsylvania, since it must enter final orders or judgments with respect to noncore proceedings dealt with by this Court, necessarily must conduct a review of any decision that this Court might make regarding the liquidation of any disputed opt-in Asbestos Claims, *see* Id.  The Court understands the Debtor and the Co-Proponents to respond to the foregoing by contending, in turn, that (a) the Alternative Dispute Resolution Process constitutes part of a settlement of the Asbestos Claims, and (b) this Court's final liquidation of contested opt-in Asbestos Claims, because it is a part of such process, can be done regardless of this Court's lack of authority to so finally liquidate outside of such process.  By logical extension, this Court can only presume that, by arguing that this Court can so finally liquidate within the confines of the Alternative Dispute Resolution Process notwithstanding this Court's lack of authority to otherwise so finally liquidate, the Debtor and the Co-Proponents argue, as well, that this Court (a) is free to act (and will act when finally liquidating within the confines of the Alternative Dispute Resolution Process) other than as the presiding Court that it is vis-a-vis the instant bankruptcy case – for instance, as an arbitrator, mediator, or something else, and (b) may thereby transgress the legal confines of its official position. Unfortunately for the Debtor and the Co-Proponents, this Court is unaware of any

legal authority that would permit it to so act while, at the same time, it also acts as the presiding Court.  Furthermore, the relevant provisions of the Fifth Plan and CADP cited to above refer to this Court as "the Bankruptcy Court" when it makes its final determinations thereunder, which indicates to the Court that the Debtor and the Co-Proponents expect that this Court, when making final determinations within the confines of the Alternative Dispute Resolution Process, will only act within its official capacity as the presiding Court in the instant bankruptcy case. Acting in such official capacity, this Court, as set forth above, may not finally liquidate contested opt-in Asbestos Claims, and even to the extent that it can act with respect to such claims, such action will necessarily be reviewable by another court.[6]

The Alternative Dispute Resolution Process thus violates 28 U.S.C. § 157(b)(2)(B) and 28 U.S.C. § 157(c)(1) and is, therefore, forbidden by law. Because the Fifth Plan incorporates the Alternative Dispute Resolution Process, and since, as just set forth, such process is forbidden by law, so too is the Fifth Plan itself forbidden by law.  Consequently, the Fifth Plan is unconfirmable pursuant to § 1129(a)(3).  As well, the Disclosure Statement, for that reason, describes a facially unconfirmable plan, which means that the Disclosure

---

[6]The Court observes that the Debtor and the Co-Proponents could probably remove the Court from the Alternative Dispute Resolution Process altogether and thereby rectify the flaw that the Court has just identified regarding such process.  However, such removal of the Court would serve to make the Asbestos Claims Settlement, which incorporates the Alternative Dispute Resolution Process, even more unreasonable than it has already been determined to be by the Court.

18

Statement must be rejected.

**III.**

Having now ruled that the Fifth Plan is unconfirmable, and for several reasons, the Court now concludes, as well, that a present conversion of the instant bankruptcy case(s) to Chapter 7 is appropriate. Such conversion is called for because the Debtor and the Co-Proponents have been, and are, unable to effectuate a confirmable plan within a reasonable period of time. Such basis for conversion remains a viable basis for conversion given that "the list of examples of cause [for conversion] under [11 U.S.C.] section 1112(b)[(4)] is not exhaustive." 7 Collier on Bankruptcy, ¶ 1112.04[5][b] at 1112-38 (Bender 2008).

The Court concludes that the Debtor and the Co-Proponents have been unable to effectuate a confirmable plan within a reasonable period of time because (a) they have now unsuccessfully proposed at least five Chapter 11 plans within a span of some five to six years, (b) a span of five to six years is, if anything, longer than a reasonable period of time within which to get a Chapter 11 plan confirmed, and (c) five opportunities to propose a Chapter 11 plan is, if anything, more than a reasonable number of opportunities to produce a confirmable plan.

The Court also concludes that the Debtor and the Co-Proponents will not be able to effectuate a confirmable plan going forward, regardless of how much more time the Court might afford such parties to produce such a plan. The Court so concludes because (a) such parties have already expressed to the Court, at several hearings, their unwillingness to rectify certain of the flaws that the Court

19

has identified with respect to the Fifth Plan, such as, for instance, (i) removal of – not merely a reduction to – the 20% Surcharge, and (ii) substantial upgrades to the due process protections to be afforded the Insurers within the Alternative Dispute Resolution Process, (b) it does not even identify any incentive for such parties to rectify such flaws, given, as set forth above, that the Debtor wishes to settle the Asbestos Claims for but one reason, that is so as to obtain the 20% Surcharge, (c) even if such parties were to rectify such flaws, such rectification would almost certainly beget new flaws,[7] and (d) certain of such flaws identified by the Court likely cannot be rectified no matter what such parties do, such as, for instance, such parties' failure to obtain the consent of the Insurers to a settlement of the Asbestos Claims, which consent almost assuredly will never be forthcoming (at least not with respect to a Chapter 11 plan that would rival any of those that have been proposed thus far).

---

[7]For instance, if such parties were to remove the 20% Surcharge altogether from the Fifth Plan, such removal would operate such that the Fifth Plan would no longer be viable given that the 20% Surcharge is the only means by which (a) the Alternative Dispute Resolution Process can be funded, and (b) the Debtor can obtain any recovery for general creditors (as opposed to the Asbestos Claimants) of the Debtor.  Absent any recovery for general creditors, resolution of the Asbestos Claims would also no longer have any effect upon the administration of the Debtor's bankruptcy estate given that (a) the amount of assets that presently exist in such estate is such that none would ultimately reach the Asbestos Claimants, and (b) resolution of such claims, by itself, would thus not impact such estate; of course, without such impact, the Court would lack subject matter jurisdiction altogether to address resolution of the Asbestos Claims.  *See* Halper v. Halper, 164 F.3d 830, 837 (3rd Cir. 1999) (quoting Pacor v. Higgins, 743 F.2d 984, 994 (3rd Cir. 1984), to the effect that bankruptcy jurisdiction generally lies only if "'the outcome of th[e] proceeding [in question] could conceivably have any effect on the [Debtor's] estate being administered in bankruptcy'").

For all of the foregoing reasons, the Court shall convert the instant

bankruptcy case(s) to Chapter 7 forthwith.

**BY THE COURT**


  **/s/**
**M. BRUCE McCULLOUGH,**
**U.S. Bankruptcy Judge**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **IN RE:** | : | |
| | : | |
| **AMERICAN CAPITAL EQUIPMENT,** | : | **Bankruptcy No's. 01-23987-MBM &** |
| **INC., and SKINNER ENGINE** | : | **01-23988-MBM** |
| **COMPANY, INC.,** | : | |
| | : | **Jointly Administered at** |
| | : | **Bankruptcy No. 01-23987-MBM** |
| Debtors. | : | |
| | : | **Chapter 11** |

**ORDER OF COURT**

AND NOW, this **26th day** of **May, 2009**, for the reasons, and utilizing the

nomenclature, set forth in the accompanying Memorandum of the same date, it is

**hereby ORDERED, ADJUDGED, AND DECREED** that (a) the Fifth Plan is

unconfirmable for at least several reasons, (b) the Disclosure Statement, in

describing the Fifth Plan, describes not only an unconfirmable plan but one that

is also facially unconfirmable, (c) the Disclosure Statement consequently cannot

be approved, that is it must be rejected, (d) the Debtor and the Co-Proponents

have been, and are, unable to effectuate a confirmable plan within a reasonable

period of time, and (e) the instant Chapter 11 bankruptcy cases consequently

shall be, and thus are, converted to Chapter 7.

The Debtor's counsel shall serve this Memorandum and Order on all

members of the service list

**BY THE COURT**

 **/s/**
**M. BRUCE McCULLOUGH,
U.S. Bankruptcy Judge**

copies to:

Sally Edison
(to be served electronically by case administrator)