# EXHIBIT A

IN THE UNITED STATES BANKRUPTCY COURT
     FOR THE DISTRICT OF DELAWARE
_____X
In Re:                    Chapter 11
                           Case No.

                     01-01139 JKF

W.R. Grace & Co., et al.,

                          (Jointly
          Debtors.   Administered)
_____X


          —   —   —

          June 9, 2009

          —   —   —

     DEPOSITION of MARK PETERSON,

held at the Four Seasons Hotel

Westlake Village, Two Dole Drive,

Westlake, California, commencing at

approximately 7:15 A.M., on the above

date, before Lisa Lynch, a Registered

Merit Reporter, New Jersey Certified

Court Reporter, License No. XI00825,

and Certified Realtime Reporter


          —   —   —

     MAGNA LEGAL SERVICES, LLP

     7 Penn Center, 8th Floor
      1635 Market Street
      Philadelphia, PA  19103
           1.866.MAGNA.21

## Page 2

1  A P P E A R A N C E S :
2
3  DRINKER BIDDLE & REATH, LLP
   BY:  MICHAEL F. BROWN, ESQUIRE*
   (*VIA TELECONFERENCE)
4  One Logan Square
   18th and Cherry Streets
5  Philadelphia, Pennsylvania 19103-6996
   (brownmf@dbr.com)
6  Representing OneBeacon America
   Insurance Company, Seaton Insurance
7  Company, Government Employees
   Insurance Company, Republic Insurance
8  Company n/k/a Starr Indemnity &
   Liability Company
9
10 CAPLIN & DRYSDALE, CHARTERED
   BY:  NATHAN D. FINCH, ESQUIRE
11 One Thomas Circle NW
   Suite 1100
12 Washington, DD 20005
   202.862.7801
13 (ndf@capdale.com)
   Representing Grace, Official
14 Committee of
   Asbestos Personal Injury Claimants
15 ("ACC")
16
17 KIRKLAND & ELLIS, LP
   BY:  SAMUEL L. BLATNICK, ESQUIRE
18 300 North LaSalle Street
   Chicago, Illinois
19 312.862.2359
   (samuel.blatnick@kirkland.com)
20 Representing the Debtors
21
22
23
24

## Page 3

1  A P P E A R A N C E S : (Continued)
2  SIMPSON THACHER & BARTLETT, LLP
   BY:  ELISA ALCABES, ESQUIRE*
3       SAMUEL RUBIN, ESQUIRE*
   (*VIA TELECONFERENCE)
4  425 Lexington Avenue
   New York, New York 10017-3954
5  212.455.2846
   (ealcabes@stblaw.com)
6  Representing Travelers Casualty and
   Surety
7  Company
8
9  COHN WHITESELL & GOLDBERG, LLP
   BY:  DANIEL C. COHN, ESQUIRE
10 101 Arch Street
   Boston, Massachusetts 02110
11 617.951.2505
   (cohn@cwgll.com)
12 Representing the Libby Claimants
13 SPEIGHTS & RUNYAN
   BY:  DANIEL H. SPEIGHTS, ESQUIRE
14 200 Jackson Avenue East
   P.O. Box 685
15 Hampton, South Carolina 29924
   803.943.4444
16 (dspeights@speightsrunyan.com)
   Representing Anderson Memorial
17 Hospital
18
19 STEVENS & LEE, P.C.
   BY: JOHN D. DEMMY, ESQUIRE*
20    (*VIA TELECONFERENCE)
   1105 North Market Street, 7th Floor
   Wilmington, Delaware 19801
21 302.654.5180
   (jdd@stevenslee.com)
22 Representing Fireman's Fund Insurance
23
24

## Page 4

1  A P P E A R A N C E S : (Continued)
2
3  LAW OFFICES OF ALAN B. RICH
   BY:  ALAN B. RICH, ESQUIRE
   Elm Place, Suite 4620
4  1401 Elm Street
   Dallas, Texas 75202
5  214.744.5100
   (arich@alanrichlaw.com)
6  Representing Property Damage PCR
7
   ECKERT SEAMANS CHERIN & MELLOTT, LLC
8  BY:  EDWARD J. LONGOSZ, II, ESQUIRE
   1747 Pennsylvania Avenue, N.W.
9  12th Floor
   Washington, DC 20006
10 202.659.6619
   (elongosz@eckertseamans.com)
11 Representing Maryland Casualty and
   Zurich
12
13 COZEN O'CONNOR
   BY:  JACOB C. COHN, ESQUIRE*
14 (*VIA TELECONFERENCE)
   1900 Market Street
15 Philadelphia, Pennsylvania 19103-3508
   215.665.2147
16 (jcohn@cozen.com)
   Representing Federal Insurance
17 Company
18
   CUYLER BURK, P.C.
19 BY:  ANDREW CRAIG, ESQUIRE*
   (*VIA TELECONFERENCE)
20 4 Century Drive
   Parsippany, New Jersey 07054
21 973.734.3200
   (acraig@cuyler.com)
22 Representing Allstate Insurance
   Company
23
24

## Page 5

1       INDEX
       EXAMINATION
2
   Witness Name          Page
3  MARK PETERSON
4  BY MR. COHN          12
   BY MR. SPEIGHTS     157
5  BY MR. BROWN        218
6
7       EXHIBITS
   EXHIBIT  DESCRIPTION       ID
8
9  Exhibit 1          11
10 Notice of Deposition
11 Exhibit 2          13
12 Preliminary Expert
   Report on W.R. Grace
   Trust
13
14 Exhibit 2A         11
   Errata sheet for trust
15 report
16 Exhibit 2B         11
   Revised trust report
17 Exhibit 2C         11
18 Errata sheet for the
   estimation report
19 Exhibit 2D         12
   Full revised estimation
20 report
   Exhibit 3          21
21 Exhibit 4 to the Exhibit
   Book Trust Distribution
22 Procedures
   Exhibit 4          60
23 E-mail string, four pages
24 Exhibit 5          100

Page 6

1    with attached settlement
     data sheet, two pages
2              EXHIBITS
     EXHIBIT   DESCRIPTION          ID
3
4    Exhibit 6              235
              E-mail Bates stamped ACC
5             2352 through 2353
     Exhibit 7              237
6             E-mail chain Bates stamped
              ACC 2483 through 2485
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 7

1         DEPOSITION SUPPORT INDEX
2
3    Direction to Witness Not To Answer
     Page  Line    Page  Line
4    (None)
5    Request For Production of Documents
     Page  Line    Page  Line
6    (None)
7    Stipulations
     Page  Line    Page  Line
8    (None)
9    Questions Marked
     Page  Line    Page  Line
10   (None)
11
                  –  –  –
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 8

1    M A R K   A.   P E T E R S O N,
2    having been sworn by the Notary
3    Public of the States of New
4    York and New Jersey, was
5    examined and testified as
6    follows:
7                    _ _ _
8         MR. FINCH:  Before we
9    went on the record this morning
10   I handed Mr. Cohn four
11   documents.  The four documents
12   were an errata sheet, or a
13   correction sheet, for Dr. Mark
14   Peterson's March 2006 -- excuse
15   me -- March 2009 report
16   entitled Preliminary Expert
17   Report on W.R. Grace trust; a
18   corrected copy of the March
19   2009 preliminary expert report
20   on the W.R. Grace trust; a
21   document called -- or,
22   actually, a copy that is the
23   errata sheet for, or correction
24   sheet for the Mark Peterson

Page 9

1    report, Projected Liabilities
2    for Asbestos Personal Injury
3    Claims as of April 2001 Revised
4    January 2009; and then a
5    corrected copy of the January
6    2009 Projected Liabilities for
7    Asbestos Personal Injury Claims
8    as of April 2001.
9         Subsequent to submitting
10   his reports in the bankruptcy
11   confirmation proceedings in
12   March, Dr. Peterson rereviewed
13   the trust report and the
14   estimation report and noted
15   several minor corrections he
16   wished to make and those two
17   corrections are in the
18   documents that I handed to Mr.
19   Cohn.
20        If Mr. Cohn wants to
21   inquire into them, I think it's
22   probably better that Dr.
23   Peterson describe exactly what
24   he did and we could mark the

Page 10

1    documents as exhibits to the
2    deposition.
3        I have additional copies
4    of the documents that I handed
5    out here for people in the
6    room, although I don't know if
7    I have a copy for everyone.
8        MR. COHN:  All right,
9    let's get started.  Let's mark
10   this Exhibit 1.
11       (Notice of Deposition of
12   Mark A. Peterson marked for
13   identification as Peterson
14   Exhibit 1.)
15       (Errata sheet for trust
16   report marked for
17   identification as Peterson
18   Exhibit 2A.)
19       (Revised trust
20   report marked for
21   identification as Peterson
22   Exhibit 2B.)
23       (Errata sheet for the
24   estimation report marked for

Page 11

1    identification as Peterson
2    Exhibit 2C.)
3        (Full revised estimation
4    report marked for
5    identification as Peterson
6    Exhibit 2D.)
7    EXAMINATION BY
8    MR. COHN:
9        Q.   Good morning, Dr.
10   Peterson.
11       A.   Good morning.
12       Q.   Do you recognize the
13   document that I've placed in front of
14   you marked Exhibit 1?
15       A.   Yes.
16       Q.   What is it?
17       MR. SPEIGHTS:  Hold it a
18   minute.
19       (Off the record.)
20       A.   It's the Notice of
21   Deposition for this deposition
22   directed to me.
23       Q.   And do you understand
24   that you're here testifying this

Page 12

1    morning in connection with
2    confirmation of the plan that's been
3    proposed by W.R. Grace and other
4    proponents --
5        A.   Yes.
6        Q.   -- in this Chapter 11
7    case?
8        A.   Excuse me.  Yes.
9        MR. COHN:  Let me -- I
10   need to go off the record
11   again.
12       (Off the record.)
13       MR. COHN:  Let's mark
14   this Exhibit 2, please.
15       (Preliminary Expert
16   Report on W.R. Grace trust,
17   Mark A. Peterson, March 2009
18   marked for identification as
19   Peterson Exhibit 2.)
20       Q.   Dr. Peterson, I hand you
21   a document that has been marked as
22   Exhibit 2 and ask whether you can
23   identify it.
24       A.   Yes, I can.  But

Page 13

1    actually -- pause a minute.  Yes.
2        Q.   What is it?
3        A.   It's a copy of my
4    preliminary expert report on the W.R.
5    Grace trust that I prepared in March
6    2009.  Attached to it is a copy of my
7    June 2007 expert report for
8    projecting liabilities for tort
9    liabilities of W.R. Grace as of April
10   2001.  That was revised and dated
11   January 2009.  It has some but not
12   all of the corrections that were
13   passed to you earlier today and both
14   of these have been marginally changed
15   by the errata that we distributed.
16       Q.   Let's get to the errata
17   in a moment.
18       Can we agree -- do you need
19   another moment with the exhibit?
20       A.   It has my resume
21   attached too.  There may be other
22   exhibits but that's -- I think that's
23   what it is in its entirety.
24       Q.   Okay.  Now, for ease of

Page 194

1 report, that the criteria for the
2 trust is tighter than what Grace
3 historically paid.  Is that a fair
4 statement?
5      A.   I believe that's true,
6 yes.
7      Q.   And that's what I'm
8 trying to get at.  There's a term in
9 here -- I happen to have it because I
10 was studying Mr. Inselbuch's
11 deposition -- but there's a term in
12 here about credible exposure.  Do you
13 recall that term?
14      A.   I believe --
15      MR. FINCH:  Term in the
16 TDP?
17      MR. SPEIGHTS:  In the
18 TDP.
19      MR. FINCH:  Okay.
20      A.   I don't recall that
21 specific language but it sounds
22 reasonable that that's in there.
23      Q.   But I'm looking for that
24 particular term, but it's something

Page 195

1 to that particular effect and, yet, I
2 don't understand what that means.  Is
3 this something that the trustees will
4 later have to decide what the
5 credible -- what a credible exposure
6 is?
7      A.   Yes.
8      Q.   And when they decide
9 that, if they operate typically as
10 other trusts operate with TDPs, will
11 they set that forth in some document
12 or some guidelines?
13      A.   Likely so, yes.
14      Q.   So that in Manville in
15 which you're a trustee, somewhere
16 there Mr. Austern has some guidelines
17 he can go to and say is this a
18 credible exposure justifying
19 payment?
20      A.   There are instructions
21 that are given to the claims
22 personnel who process claims.
23 There's rules that are incorporated
24 in computer programs and those

Page 196

1 provide specifications of those kinds
2 of things and other matters.
3      Q.   And that will be
4 something created by the trustees
5 after the trust comes into existence;
6 is that correct?
7      A.   Yes.
8      MR. SPEIGHTS:  I'm
9 hungry.
10      MR. FINCH:  Let's take a
11 break.  We're going to take a
12 lunch break now for 45
13 minutes.
14      MR. SPEIGHTS:  That's
15 good.
16      MR. FINCH:  It's 2:19
17 Eastern time.  I don't know
18 what time it is in California,
19 but we'll come back a little
20 after 3:00 Eastern time.
21      THE WITNESS:  Almost
22 11:20.
23      (Luncheon recess taken.)
24 BY MR. SPEIGHTS:

Page 197

1      Q.   Dr. Peterson, during
2 your examination by Mr. Cohn you
3 mentioned that you had some
4 involvement with the TDP and Grace.
5 Who did you work with on the TDP?
6      A.   Various lawyers at
7 Caplin & Drysdale.
8      Q.   Were you involved in the
9 TDP for Mogul?
10      A.   Yes.
11      Q.   Suppose a person was
12 exposed to asbestos as an applicator
13 of Monokote manufactured by W.R.
14 Grace and Limpet manufactured by
15 Turner & Newall, later bought by
16 Mogul, and those were the only known
17 exposures.
18      Would there be any distinction
19 in the payments received from either
20 one of those bankruptcies because --
21 or bankruptcy trust because Limpet is
22 a crysolite product and Monokote is a
23 chrysotile product?
24      MR. FINCH:  Object to

Page 214

1  have in your mind?
2      A.   Just three or four.
3      Q.   Who were the
4  participants?
5      A.   There was general
6  counsel of Grace.
7      Q.   Mr. Shelnitz?
8      A.   Yes.  Mr. Bernick.  I
9  think there was someone there from
10  Grace.  At one point I think the CEO
11  or one of the principals attended a
12  meeting.  There were other attorneys
13  from Kirkland & Ellis.  There was
14  several attorneys representing the
15  SCB -- I mean the ACC.  There were
16  the attorneys for the FCR.  There
17  were -- Tom Florence and Amy Brockman
18  from ARPC were there as experts for
19  the debtor.  Jenni Biggs, B-i-g-g-s,
20  from Tillinghast and some of her
21  partners were there for future
22  representative and I was there for
23  claimants.
24      Q.   What attorneys

Page 215

1  representing the ACC were there?
2      A.   Inselbuch was there.  I
3  don't remember whether or not Finch
4  was there.  I don't remember who else
5  was there.
6      Q.   Were any of the asbestos
7  PI lawyers there?
8      A.   I think at some of the
9  meetings some were.  I don't recall
10  who.  Probably Rice but I can't say
11  for sure.
12      Q.   Was anybody representing
13  equity at any of those meetings?
14      A.   Yes, I believe there was
15  a representative of equity but I'm
16  not certain of whom.  Mr. Inselbuch
17  would have much better knowledge of
18  the participants, and there were
19  certain meetings that I wasn't at.
20      Q.   Were you at the meeting
21  when the participants had a meeting
22  of the mind?
23      A.   I think I was at a
24  meeting when they figured out the

Page 216

1  road they were going down wasn't
2  going right.  I don't necessarily
3  believe there was a meeting of the
4  mind.  I don't think there was an
5  actual settlement at that meeting.
6  It's when Mr. Inselbuch started
7  explaining the quantitative analyses
8  that everyone threw up their hands.
9      MR. SPEIGHTS:  Thank
10  you, Dr. Peterson.
11      THE WITNESS:  Thank you.
12      MR. FINCH:  Does anybody
13  else in the room have any
14  questions for Dr. Peterson?
15  Okay.
16      Does anyone on the
17  telephone have questions for
18  Dr. Peterson?  If you could
19  announce who you are and who
20  you represent before you start
21  questioning and that will help
22  the court reporter.
23      MR. BROWN:  Nathan, this
24  is Mike Brown.  I represent

Page 217

1  Geico, Republic, Seaton and
2  OneBeacon.  I have a few
3  questions for Dr. Peterson.
4      MR. FINCH:  Okay, fire
5  away.
6      MR. BROWN:  Actually,
7  could you do me a favor?  Could
8  you move, I guess, the
9  microphone a little closer to
10  Dr. Peterson?  He was a little
11  bit harder to hear than the
12  questioners.
13      THE WITNESS:  I'm just
14  soft spoken.
15      MR. FINCH:  Okay.  We've
16  switched chairs and Dr.
17  Peterson is as close to the mic
18  as we can get him so go ahead.
19
20  EXAMINATION BY
21  MR. BROWN:
22      Q.   Good afternoon, Dr.
23  Peterson.  I guess it's afternoon in
24  California by now.

Page 226

1 opinion in this bankruptcy case with
2 respect to Grace's overall liability
3 for asbestos personal injury claims
4 for purposes of insurance coverage
5 litigation?
6        MR. FINCH:  Object.
7 Form, lack of foundation.
8        MR. DEMMY:  Same
9 objection.
10     A.   Not so far.
11     Q.   Fair enough.
12     And am I correct that so far
13 you have not provided such an
14 opinion?
15        MR. FINCH:  Objection,
16 form.
17     A.   Not to my
18 understanding -- but I don't know,
19 again, uses.  I've not explicitly
20 done such -- made such an opinion.
21        MR. BROWN:  I'm sorry.
22 Can the court reporter read
23 back that last comment by Dr.
24 Peterson?

Page 227

1        (The reporter reads the
2 requested portion.)
3        MR. BROWN:  Okay, all
4 right.
5     Q.   Dr. Peterson, am I
6 correct that the ACC has not retained
7 you to provide an opinion regarding
8 the asbestos PI trust's liability for
9 indemnified insurer TDP claims?
10     A.   That's a safe
11 assumption, yes.  Not -- again, not
12 until -- not so far.
13     Q.   Okay.  And would your
14 answer be the same with respect to
15 insurance-related TDP claims?
16        MR. FINCH:  Object to
17 form.
18     A.   I don't even know what
19 that is so I've not been asked to
20 do -- to provide any opinions about
21 that so far.
22     Q.   Okay.  Have you been
23 asked to provide any opinions
24 regarding the asbestos PI trust's

Page 228

1 liability for indirect PI trust
2 claims?
3        A.   Not as a separate
4 matter, no.
5     Q.   I think you said
6 earlier, but correct me if I'm wrong,
7 that the Grace trust will be
8 insolvent.  Do I have that correct?
9        MR. FINCH:  Object to
10 form.
11     A.   I don't think I said
12 that explicitly.  I think I said it
13 would be impaired.
14     Q.   Okay.  Well, let me ask
15 it then.  Do you have an opinion on
16 whether the Grace trust, asbestos PI
17 trust, is insolvent?
18        MR. FINCH:  Object to
19 form, lack of foundation.
20     A.   Its liabilities will be
21 far in excess of its assets.
22     Q.   Okay.  I know someone
23 asked you a question very similar to
24 this; I'm not sure I heard the

Page 229

1 answer.
2     What role did you play in
3 developing the TDP disease values in
4 this case?
5        MR. FINCH:  Objection,
6 asked and answered.  You can
7 answer it again.
8     A.   I did analyses of what
9 the historic settlements were and
10 what I believe the current values of
11 the various kinds of disease claims
12 were against the trust.  I made
13 alternative recommendations of
14 possible TDP values derived from
15 those analyses and probably discussed
16 that with members of the committee as
17 well as committee professionals.
18     Q.   Is that pretty typical
19 of the role that you played in
20 connection with your retention in
21 other asbestos bankruptcy cases?
22     A.   It's typical of one role
23 I play, yes.
24     Q.   Okay.  I'm not sure what

1  the exhibit number is because I was a
2  little bit confused even after Mr.
3  Speights went through it.  You have
4  an Exhibit 2 in front of you; is that
5  correct?
6      A.   Just a moment.  Yes.
7      Q.   Is that -- I just
8  want -- is that the big, thick
9  packet?  I mean, it's about
10 three-quarters of an inch or so
11 thick?
12     A.   Yes.  It's the thickest
13 of the exhibits.
14     Q.   Okay.  Is there a CV in
15 there?
16     A.   Yes.
17     Q.   Can you turn to the
18 CV?
19     A.   Yes, it's Exhibit 1
20 which follows the -- what we've
21 called the trust report and precedes
22 the estimation report and I have
23 that.
24     Q.   Okay.  Can you turn

1      What's the relevance of this to
2  the Grace bankruptcy
3  confirmation hearings, Mr.
4  Brown?
5      MR. BROWN:  Well, it's
6  part of the CV.  That would be
7  maybe part of it.
8      A.   I am providing
9  consultation and expert judgments and
10 liabilities estimates and helping
11 calculating payment percentages for
12 Mr. Brownson, the trustee, as well as
13 consulting with the FCR and the
14 one-person TAC so I talk with all
15 three parties.  Formally my retention
16 is by the trust.
17     Q.   Who is the TAC -- who is
18 the one-person TAC?
19     A.   Well, it's Mike Polk of
20 Sieben Polk.
21     Q.   Okay.
22     A.   It may be Sieben Polk as
23 a whole, but Mike Polk tends to be
24 the one that's involved with it.

1  to -- well, let's see.  Starting at
2  the bottom of page three but carrying
3  over to page four, the last bullet
4  point on page three is "Expert to 20
5  Asbestos trusts Regarding Claims,
6  Procedures and Liability Estimation".
7      A.   I see that.
8      Q.   And on page four the
9  last one looked to there is the API
10 trust?
11     A.   Yes.
12     Q.   And you were an expert
13 for the representative of future
14 claimants, otherwise known as the FCR
15 is what we typically call them?
16     A.   Yes.
17     Q.   And that gentleman's
18 name was Thomas Carey; is that
19 correct?
20     A.   Still is.
21     Q.   Still is, okay.  What
22 role are you playing for the API
23 trust for the moment?
24     MR. FINCH:  Objection.

1      Q.   Okay.  I think Ed
2  Longosz has a document that I'd like
3  you to take a look at if, you would,
4  and it's the -- it's the one marked
5  13.
6      MR. BROWN:  Could you
7  hand him a copy of that?  Ed,
8  did you have a chance to make
9  copies for everyone?
10     MR. LONGOSZ:  I did.
11 This is a new role for me.  I'm
12 discharging my duties and
13 obligations.
14     THE WITNESS:  Very
15 well.
16     MR. LONGOSZ:  Thank you.
17     Q.   Dr. Peterson, you can
18 take a moment to review -- well, let
19 me actually make a couple of comments
20 about it first.
21     The document that you have
22 should be a two-page document.  It
23 has a deposition exhibit number on it
24 which says 13 Polk in the lower

Page 234

1  right-hand corner.  It has two
2  numbers below that as well, ACC 2352,
3  and then below that A204.
4      I will represent to you that
5  the exhibit label is an exhibit label
6  from the deposition of Mr. Polk in
7  the API case, the ACC number is the
8  Bates number from the ACC in that
9  case and the A204 is the number from
10  the appendix that accompanied the a
11  cert appeal in that case.
12      But other than those markings,
13  which there's some similar markings
14  on the second page, could you
15  identify for me the document I guess
16  we're going to mark as Exhibit 6?
17          MR. BROWN:  Is that what
18      we're up to?
19          MR. LONGOSZ:  You want
20      this marked 6?
21          MR. BROWN:  I want it
22      marked as Peterson-6.
23          (E-mail Bates stamped
24      ACC 2352 through 2353 marked

Page 235

1      for identification as Peterson
2      Exhibit 6.)
3      A.   Is there a particular
4  part of this document you want me to
5  look at?
6      Q.   You can read the whole
7  thing.  The only question I have for
8  you is:  Would you identify it for
9  me?
10      A.   Let me look at it.
11      (The witness reviews the
12  document.)
13      A.   All right, I've read
14  this.  Your question is?
15          MR. FINCH:  What was the
16      question?
17      Q.   Can you identify it for
18  me?
19      A.   I don't recall this
20  document, but it purports to come
21  from me in a time frame when I was
22  working with these individuals and I
23  have no reason to think it isn't
24  something I authored.

Page 236

1      Q.   Okay.  And when you say
2  "these individuals", if you can see
3  on the top of the first page, it was
4  indicated as having been sent from
5  you to a Steven Meyer with copies to
6  a Michael Meyer, Mike Polk, Mike
7  Sieben, Thomas Carey and another copy
8  to you, correct?
9      A.   Yes.
10      Q.   All right.  And you have
11  no reason to doubt that you sent this
12  e-mail?
13      A.   Well, I just -- I
14  don't -- I don't recall this document
15  at all.  The subject matter is
16  familiar to me.  I don't recall the
17  particular language of this but it
18  very well might have come from me.
19      Q.   Mr. Longosz is going to
20  hand you another document.
21          MR. LONGOSZ:  7?
22          MR. BROWN:  We'll mark
23      this one Peterson-7.
24          (E-mail chain Bates

Page 237

1      stamped ACC 2483 through 2485
2      marked for identification as
3      Exhibit 7.)
4      Q.   Just so we're looking at
5  the same thing, Dr. Peterson, the
6  document you have should be a
7  three-page document with an exhibit
8  tab on the front that says 14 Polk.
9  Do you see that?
10      A.   Yes, I see that.
11      Q.   Okay.  I actually don't
12  need you to read this entire document
13  if it will save some time.  I can
14  direct your attention to page two at
15  the bottom which purports to be an
16  e-mail sent from you to Thomas Carey
17  and Steven Meyer, if you could read
18  that e-mail for me, and then I've got
19  a question or two.
20      (The witness reviews the
21  document.)
22          MR. DEMMY:  Michael,
23      this is Jonathan.  Could I have
24      someone from your team PDF to

Page 238

```
1    me those e-mails because we
2    Obviously don't have them here?
3    I mean, I don't need them this
4    second.
5           MR. BROWN:  Yes, we'll
6    PDF them to you.
7           MR. DEMMY:  Thanks.
8           A.    All right, I've read
9    this.
10          Q.    Okay.  Can you identify
11   that e-mail that begins at the bottom
12   of page two of what we've marked as
13   Peterson-7?
14          A.    Well, again, it purports
15   to come from me and it has my e-mail
16   address and it's a subject matter
17   that I would have -- would have been
18   likely to discuss with these persons
19   but I don't recall it.
20          Q.    You don't recall it?
21          A.    No.
22          Q.    Do you have any reason
23   to doubt that you sent this e-mail?
24          A.    Not particularly.
```

Page 239

```
1           Q.    If you look above there,
2    you'll -- right above what I directed
3    you to on page two there's a -- well,
4    let me back up.
5           You would agree with me,
6    wouldn't you, that what we've marked
7    as Exhibit 7 is an e-mail chain?
8           A.    Yes.
9           Q.    Okay.  And it begins
10   with your e-mail that I just referred
11   you to, correct?
12          A.    Yes.
13          Q.    And that's the one dated
14   Friday, August 27, 2004 at 4:43 PM?
15          A.    Actually, the --
16   apparently the Mike Polk e-mail
17   doesn't have a date but it appears to
18   follow those.  I'm sorry.  What was
19   your observation -- you asked --
20   you're talking about the time and
21   date of the --
22          Q.    Yes.  The first e-mail,
23   the one which I directed you to, is
24   dated Friday, August 27th, 2004 at
```

Page 240

```
1    4:43 PM, correct?
2           A.    It's the last in the --
3    on the document, but yes.
4           Q.    Okay.  And you
5    understand the one right above that
6    from Mr. Meyer -- that's Mr. Steven
7    Meyer -- to be a response to your
8    e-mail dated August 31st, 2004 at
9    9:26 AM?
10          A.    It appears to be.
11   That's what it says it is.
12          Q.    Okay.  And the e-mail
13   that begins on the first page you
14   noted earlier doesn't seem to have a
15   date on it but that appears to be a
16   comment from Mr. Polk, correct?
17          A.    Apparently.
18          Q.    And it was directed to
19   you, among others?
20          A.    Yes.
21          Q.    And do you recognize
22   that to be your e-mail address, at
23   least your e-mail address back in
24   2004?
```

Page 241

```
1           A.    It was and is.
2           Q.    Okay.  all right, you
3    can put that aside, Dr. Peterson.
4           I just -- I noted earlier from
5    your earlier testimony, and I want to
6    make sure I have this correct, that
7    you have had various involvement, as
8    I understand it, or engagements in
9    connection with the asbestos
10   liabilities of W.R. Grace.  And let
11   me try to summarize them and then you
12   just tell me whether I have it right.
13          I understood you to testify
14   earlier that you played some role
15   back in 1998 and that thereafter you
16   were involved in the fraudulent
17   transfer litigation involving Sealed
18   Air and Fresenius in or around 2002,
19   that thereafter you were also
20   involved in the estimation trial and
21   that you are obviously involved now
22   in connection with the plan
23   confirmation proceeding.  Is that
24   correct.
```



Δ π EXHIBIT 2
Peterson
Depo:
Date 6·9·09  U
Rptr.
WWW.DEPOBOOK.COM

# Preliminary Expert Report on W. R. Grace Trust

## Mark A. Peterson

## Legal Analysis Systems

## March 2009

# EXHIBIT 1

{D0090037.1 }

# MARK A. PETERSON

970 Calle Arroyo
Thousand Oaks, California 91360
(805) 499-3572

## EDUCATION

B.A. (summa cum laude), 1966, University of Minnesota
J.D. (cum laude), 1969, Harvard Law School
M.A. Social Psychology, 1973, UCLA
Ph.D. Social Psychology, 1976, UCLA

## ACADEMIC EXPERIENCE

**1976-2002—Senior Research Scientist, RAND, Santa Monica, California. Policy analysis and research on U.S. civil and criminal justice systems.**

- Founding Member of RAND's Institute for Civil Justice (ICJ), 1980

  - ICJ studies U.S. civil justice system using "an interdisciplinary empirical approach to public policy issues and rigorous standards of quality, objectivity and independence" (www.rand.org/icj).

  - Principal Investigator for ICJ studies in following areas

    - **Litigation Process.** Originated a new research area of systematic, empirical analysis of jury verdicts. Collected massive data on all civil jury verdicts reported in California and Cook County, Illinois, between 1959-1985 and then extending data collection to other states. Analyzed how juries' verdicts differed and changed over time by type of claims, severity and type of injury, economic losses, characteristics of plaintiffs and defendants, venue.

    - **Settlement Process.** Combined social science and computer science (artificial intelligence) to study how parties settle product liability claims. Developed a computer expert system to simulate lawyers' settlement decisions in product liability cases as revealed through extensive Socratic interviews of experienced trial lawyers and insurance claims persons.

    - **Settlement Process in Asbestos Claims.** Used social science and computer science methods to develop an expert system to simulate lawyers' settlement decisions in asbestos cases as revealed through extensive Socratic interviews of experienced plaintiffs and defense lawyers and insurance claims persons. Research was for and used by the U.S. District Court for the Northern District of Ohio and the Manville Personal Injury Settlement Trust.

    - **Mass Torts.** Case studies of asbestos and other mass torts based on interviews with participants, quantitative analyses of available data and research of existing records and articles. Looked across various mass torts to derived general empirical and theoretical observations about origins, characteristics, and methods for resolving mass torts.

- **Punitive Damages.** Analyzed years of jury verdict data to described frequency, size, and types of cases in which punitive damages are awarded; trends over time; effects of post-trial actions; possible effects of legal changes. In collaboration with Special Committee on Punitive Damages of the Litigation Section of the American Bar Association.

- **Workers Compensation.** Large scale quantitative and descriptive evaluation of California's workers compensation system with suggestions for change of that system. Work was for the California Commission on Health and Safety and Workers Compensation.

- **Economic Effects of Product Liability Law.** Case studies and statistical analyses of selected industries.

- Criminal Justice Program

  - Principal Investigator for studies in following areas

    - **RAND Criminal Offender Survey.** Survey of inmates in five California prisons. Estimated crime parameters; examined incapacitation effects; examined relationships between crime and inmate characteristics.

    - **RAND Criminal Offender Survey II.** Examined pre-incarceration crimes for sample of 2500 jail and prison inmates in three states.

    - **Effects of California Determinate Sentencing.**

- Author of 46 RAND publications

- Teaching

  - **Law School, University of California, Los Angeles.** Visiting Professor. Advanced Torts: Mass Torts; Law and Social Sciences Seminar, Fall 1989.

  - **RAND Graduate School.** Policy Analysis of Legal Issues, Fall 1984.

  - **Department of Psychology, University of California, Los Angeles.** Psychological Analyses of Legal Issues, Spring 1973, Spring 1975.

  - **Law School, University of California, Los Angeles.** Trial Tactics Spring 1974, Fall 1974, Spring 1975.

## PROFESSIONAL EXPERIENCE

**1984-Present—Legal Analysis Systems, Inc.  Special master, expert consultant in complex litigation.**

- Special Master and Expert for Courts in Asbestos Litigation

  - Special Advisor to **Judge Jack B. Weinstein**, U.S. District Courts for Eastern and Southern Districts of New York and **Judge Burton Lifland**, U.S. Bankruptcy Court for Southern District of New York, to restructure the insolvent Manville Personal Injury Settlement Trust. Worked as Courts' special master and technical consultant in the Findley v. Falise, mandatory, limited fund class action. 1990-1995.

    - Special Advisor to the Manville Trust: appointed by the Courts as part of the settlement of the Findley class action to direct dispute resolution and provide technical consultation to the Courts, the Trust and each of the Trust's bodily injury claimants,

co-defendants, distributors and future claimants beneficiary groups. 1995-2007.

- • Became a trustee of the Manville Personal Injury Settlement Trust in July 2007.

- − Neutral expert for **Judge Robert Parker**, U.S. District Court, Eastern District of Texas. Worked as the Court's expert in Jenkins v Raymark class action to collecting and evaluate empirical data about asbestos injury claims. 1984-1985.

- − Neutral expert for **Judge Thomas Lambros**, U.S. District Court, Northern District of Ohio. Worked as expert in Ohio Asbestos Litigation Plan (1) to develop an expert system for valuing asbestos claims based on interviews with plaintiffs and defense lawyers and insurance claims persons, (2) collected and evaluated data about pending and resolved asbestos injury claims to identify resolved claims that could be used as precedents for settling pending claims. 1983-1988. Expert system was done as research within RAND's ICJ.

- • Expert for Courts in Other Mass Tort Litigation

  - − Neutral expert for **Judge Robert Merhige**, U.S. District Court for Eastern District of Virginia. Worked as expert in Bankruptcy of A. H. Robins Company, Inc. to develop "expert system" of medical and claims issues for evaluating Dalkon Shield claims, to oversee development of claims data bases and to conduct statistical analyses to evaluate Dalkon Shield claims.

- • U. S. Senate Committee on Judiciary

  - − Testified on asbestos liabilities and proposed legislation on three occasions. June 2003, November 2005, February 2006.

- • Trustee of Asbestos Trusts and Director of Asbestos Claims Facilities

  - − **Trustee of Manville Personal Injury Settlement Trust.** 2007-present.

  - − **Trustee of Fuller-Austin Settlement Trust.** 1998-present.

  - − **Director of Claims Resolution Management Corporation,** which administers claims for Manville, H. K. Porter and other trusts. 2007-present.

  - − **Director of Trust Services Inc.** , which administers claims for National Gypsum, Fuller-Austin and 6 other trusts. 1998-present.

- • Expert to 20 Asbestos Trusts Regarding Claims, Procedures and Liability Estimation

  - − Manville Trust, 1987-1988.

  - − UNR Asbestos Disease Claimants Trust, 1992-2002.

  - − National Gypsum Trust, 1994-present.

  - − Fibreboard Interim Trust, 1994-1997

  - − Eagle-Picher Asbestos Trust, 1995-present.

  - − Celotex and Carey Canada Trust (expert for Representative of Future Claimants), 1996-2002.

  - − H. K. Porter Trust, 1996-present.

  - − Fuller-Austin Settlement Trust, 1998-present.

- Keene Asbestos Claimants Trust, 2000-2002.
- Raytech Trust, 2000-2004
- E. J. Bartels Trust, 2000-2005
- Wallace and Gale Trust, 2002-present.
- Shook and Fletcher Trust, 2004-present
- Western Asbestos Trust (MacArthur), 2005-present
- Porter Hayden Trust, 2006-present
- Combustion Engineering Trust, 2006-present
- C. E. Thurston Trust, 2007-present
- J. T. Thorpe Trust, 2007-present
- ARTRA Trust, 2007-present
- API Trust (expert for Representative of Future Claimants), 2008-present

• Expert on Asbestos Claims and Liability Forecasts in 35 Bankruptcy Cases

    - Testified about asbestos forecasts 22 times in 17 bankruptcy cases

        • **National Gypsum Corporation.** Testified in estimation hearing for Legal Representative for Future Claimants and Claimants Committee; testified twice after confirmation for National Gypsum Trust.

        • **Asbestos Claims Management Company (ACMC).** Testified for National Gypsum Trust.

        • **Hillsborough Holdings Corporation.** Testified during veil-piercing hearing for defendant asbestos claimants.

        • **Eagle-Picher Industries, Inc.** Testified about estimation methods during hearing on bar date, for Claimants Committee; testified in estimation hearing for Claimants Committee.

        • **Celotex and Carey Canada.** Testified in confirmation hearing for Claimants Committee.

        • **Raytech Corporation.** Testified about estimation methods during hearing on bar date, for Claimants Committee.

        • **Raymark Corporation.** Testified for Claimants Committee in hearing on dismissal of bankruptcy.

        • **Wallace and Gale Corporation.** Testified in confirmation hearing for Claimants Committee.

        • **The Babcock and Wilcox Company et. al.** Testified during veil-piercing hearing for defendant asbestos claimants; testified in estimation hearing for Claimants Committee.

        • **Owens Corning and Fibreboard.** Testified in estimation hearing for Claimants Committee.

        • **Armstrong World Industries.** Testified twice in separate estimation hearings for

Claimants Committee.

- **Federal Mogul.** Testified in hearing to estimate liabilities of Turner & Newall for Claimants Committee.

- **API Inc.** Testified in confirmation hearing for Legal Representative for Future Claimants.

- **C. E. Thurston, Inc.** Testified in confirmation hearing for Debtor.

- **Plibrico.** Testified in estimation hearing for Unofficial Committee of Claimants.

- **Western Asbestos.** Testified in confirmation hearing for Debtor and Claimants Committee.

- **J. T. Thorpe.** Testified in confirmation hearing for Debtor and Claimants Committee.

− Expert in 18 other bankruptcy Cases

- **U. S. Gypsum (USG)**

- **H. K. Porter Company, Inc.**

- **Keene Corporation**

- **E. J. Bartels, Inc.**

- **Fuller-Austin Insulation Company**

- **Pittsburgh Corning Corporation**

- **G-I (GAF)**

- **Burns and Roe**

- **W. R. Grace**

- **Porter Hayden**

- **Shook and Fletcher**

- **Plant**

- **Thorpe Insulation**

- **ARTRA**

- **ASARCO**

- **ACandS**

- **Congoleum**

- **Flintkote**

- Expert on Asbestos Claims and Liability Forecasts in Insurance Matters

  − Testified About Asbestos Forecasts in Insurance Litigation

    - **Ahearn v. Fibreboard (class action).** Testified about asbestos liabilities of Fibreboard for CNA (Continental) and Chubb Insurance Companies. 1994.

    - **Fuller-Austin Insulation Company v. CNA.** Testified in court trial and in jury trial about Fuller-Austin's asbestos liabilities for Fuller-Austin Insulation Company and

Fuller-Austin Trust. 2000 and 2001.

- **Western Mac Arthur v. USF&G.** Testified about asbestos liabilities for Western Mac Arthur. 2004

  &mdash; Expert for Insurance Companies

- **CNA (Continental).** Expert for CNA Insurance on liabilities of an asbestos defendant insured by Continental. 1999-2002.

- **Zurich (Bermuda).** Expert for Zurich Insurance on liabilities of an asbestos defendant insured by Zurich. 1999-2002.

- **KWELM.** Expert for London Insurance Company on methods for estimating asbestos liabilities.

- Expert for 9 asbestos defendants and other businesses regarding asbestos liabilities.

- Expert in Other Mass Torts

  &mdash; **MGM Grand Hotel Fire Insurance Litigation.** Expert for insurance companies and insurance broker Frank B. Hall, Inc. to evaluate wrongful death and personal injury claims arising from MGM Grand Hotel fire. 1982.

  &mdash; **In re Bankruptcy of Dow Corning Corporation.** Expert for Tort Claimants' Committee regarding estimation and treatment of breast implant and other medical implant claimants. 1998-99.

- Private Law practice in Los Angeles, California. 1969-1974.

## OTHER PROFESSIONAL ACTIVITIES

- California Legislature, Joint Rules Committee, Sacramento--Consultant. Supervised three research projects on prisons, sentencing, and prison alternatives.

- California Board of Prison Terms, Sacramento--Consultant. Developed computer system for reviewing disparity in felony sentencing.

## PROFESSIONAL ORGANIZATIONS

California Bar Association

## PUBLICATIONS

- "Compensating Permanent Workplace Injuries: A Study of the California System," RAND. 1998. Coauthored.

- "Findings and Recommendations of California's Permanent Partial Disability System," RAND, 1998. Coauthored.

- "Understanding Mass Personal Injury Litigation: A Socio-Legal Analysis," Brooklyn Law Review, Vol. 59, Fall 1993 (coauthored).

- "Mass Justice: The Limited and Unlimited Power of Courts," Law and Contemporary Problems, Vol. 54, Summer 1991 (coauthored).

- "Giving Away Money: Comparative Comments on Claims Facilities," Law and Contemporary Problems, Vol. 53, Autumn 1990.

- Resolution of Mass Torts: Toward a Framework for Evaluation of Aggregative Procedures, RAND, N-2805-ICJ, 1988 (coauthored).

- "Expert Systems for Legal Decisionmaking," in Knowledge-Based Systems for Management Decisions, Robert J. Mockler, Englewood Cliffs, NJ:  Prentice Hall, 1988 (coauthored).

- Trends in Tort Litigation: The Story Behind the Statistics, RAND, R-3583-ICJ, 1987 (coauthored).

- Punitive Damages; Empirical Findings, RAND, R-3311-ICJ, 1987 (coauthored).

- Civil Juries in the 1980s: Trends in Jury Trials and Verdicts in California and Cook County Illinois, RAND, R-3466-ICJ, 1987.

- Summary of Research Results: Trends and Patterns in Civil Jury Verdicts, RAND, P-7222-ICJ, 1986.

- "SA-L: An Expert System for Evaluating Asbestos Claims," in Proceedings of the Australian Artificial Intelligence Congress, November 1986 (coauthored).

- "Remarks on the Role of Juries in Cases Involving Medical Causation," in Causation and Financial Compensation for Claims of Personal injury from Toxic Chemical Exposure, The Institute for Health Policy Analysis of the Georgetown University Medical Center and the Georgetown University Law Center, 1986.

- Deep Pockets, Empty Pockets: Who Wins in Cook County Courts, RAND, R-3249-ICJ, 1985 (coauthored).

- "An Expert System Approach to Evaluating Product Liability Cases," in Computing Power and Legal Reasoning, Charles Walter (ed.), St.  Paul:  West Publishing Co., 1985 (coauthored).

- Evaluating Civil Claims: An Expert Systems Approach, RAND, P-7073-ICJ, 1985; also in Expert Systems:  The International Journal of Knowledge Engineering, Vol. 1, No. 1, 1984 (coauthored).

- Compensation of Injuries: Civil Jury Verdicts in Cook County, RAND, R-3011-ICJ, 1984.

- New Tools for Reducing Civil Litigation Expenses, RAND, R-3013-ICJ, 1983.

- Comparative Justice: Civil Jury Verdicts in San Francisco and Cook Counties, 1959-1980, RAND, R-3006-ICJ, 1983 (coauthored).

- The Civil Jury: Trends in Trials and Verdicts, Cook County, Ill., 1960-1979, RAND, R-2881-ICJ, 1982 (coauthored).  Also in Federation of Insurance Council Quarterly, Summer 1982.

- The Pace of Litigation, RAND, R-2922-ICJ, 1981 (coauthored).

- Models of Legal Decisionmaking, RAND, R-2717-ICJ, 1981 (coauthored).

- Punitive Damages: Preliminary Empirical Findings, RAND, N-2342-ICJ, 1985.

- Who Commits Crime: A Survey of Prison Inmates, Oelgeschlager, Gunn and Hain, Cambridge, 1981 (coauthored).

- Survey of Prison and Jail Inmates: Background and Method, RAND, N-1635-NIJ, 1982 (coauthored).

- California Justice Under Determinate Sentencing: A Review and Agenda for Research, RAND, R-2497-CRB, 1980 (coauthored).

- Doing Crime: A Survey of California Prison Inmates, RAND, R2200-DOJ, 1980 (coauthored).

- Recommendations and Report of the Citizens' Advisory Committee on Alternatives to Incarceration, California Legislature, Joint Rules Committee, 1980.

- Witnesses' Perception of Meaning, RAND, P5975, 1977.

- Results of YLS Survey on Specialization/Relicensing, RAND, P-5752, 1976.

- "Specialization and Relicensing," Barrister Magazine, 1976.

- "Right to Jury Trial in Public Employee Strikes," Harvard Civil Rights-Civil Liberties Law Review, 1969.

*January 2008*

## Mike Polk

| | |
|---|---|
| From: | Mark Peterson [mark.peterson56@verizon.net] |
| Sent: | Friday, November 12, 2004 6:34 PM |
| To: | Meyer, Steven W. |
| Cc: | Michael L. Meyer; Mike Polk; Mike Sleben; Thomas Carey; Mark Peterson |
| Subject: | Mike Meyer's Questions |

I am responding to two issues that Steve Meyers passed on to me by voice mail.  I assume you are all enjoying your weekend, but it is still working hours out here.

1.  **Cash flows:**  Steve said that Mike noted the continue "balance" column for each year and asked why that could not be distributed to pending claimants.

    The goal of the cash flow--indeed of the trust--is to retain just enough money in each year so that the trust can pay future claims as they arise using both the balance at the end of each year and earnings on that balance, all with the objective of having $0 dollars when the last claim is paid.  This is what bankruptcy code section 524g requires.

    The cash flow shows a balance in each year because this must be retained to pay future claimants.  Remember, this is cash flow is designed to see how pending and future claimants can be paid assuming that there will be no further money from insurers.  We all assume that the trust will receive some money from insurers, but right now we are uncertain about how much the trust might get and unsure if it will receive anything at all.  The trust cannot bank on getting this money; the cash flow analysis cannot now assume there will be insurance money; and the payment percentage calculated by the cash flow (13.36%) cannot be based on this unforeseeable insurance money.  If and when insurance money comes in the cash flow will be rerun; the payment percentage will increase; and claimants who have been paid 13.36% will receive a supplemental payment.  This is how all trusts work.

    We must keep a balance in each year because most of the trust's income is in early years and most claims are over time.  We must keep a non-zero balance to pay future claims from that balance and what the retained money earns as income.  The balance is a reserve for future claims.

    Here the cash flow shows a $30,000 balance at the end.  We could reduce this $30,000 to $0 by slightly increasing the payemnt percentage by some hundreds or thousands of a percentage, but this would not have any real impact on what might be paid to pending claimants (one thousandth of one percent of $56 million, the value of pending claims, equals $560).  We cannot add $30,000 to the distribution of pending claims because most of this $30,000 is from interest earned by keeping some small amount on reserve for 35 years.

    In short, the cash flows do not show any basis for increasing payments to pending claimants.  If additional money is paid to pending claimants it would have to come from money reserved for payment of future claims or money needed to fund the insurance litigation or money for trust operations.  The cash flow already assumes almost implausibly low payments for trust administration.  The bankruptcy plan cannot pay present claimants by reserving so little that future claimants could not be paid at the same percentage rate.  And use of money needed for insurance litigation will compromise that litigation.  The real money in this trust will come from insurance payments.  All claimants, including present claims, will suffer if that litigation is compromised because the trust runs out of money needed for the litigation.  Insurers will see this and bleed the trust through aggressive litigation.

1

EXHIBIT 
13  Polk
39.05

ACC 2352

Δ π EXHIBIT 6
Deponent Peterson
Date 6-9-09  Rptr. U
WWW.DEPOBOOK.COM

A204

2.  TDP Values:  To a substantial degree the TDP values are irrelevant.

This trust, like most asbestos trust, is insolvent.  It will not have
enough money to pay all claims.  This means that the amount that
claimants will receive from the trust is determined by the actual
amount of trust assets, not by the TDP values placed on claims.  We
could increase TDP values ten-fold, valuing every meso at $3.16
million, etc, but this would only reduce the payment percent to one
tenth of the 13.36 percent shown in the cash flow.  We can cut TDP
values in half and thereby double the TDP values.  In either case, with
TDP values 10 times their present level or 1/2 their present level,
claimants will receive precisely the same amount of money.

What is important is that TDP values are reasonable and defensible
and will be accepted by a jury in the insurance litigation.  I believe
personally that the current values are defensible and reasonable.  I
suggested them.  But we do not want a jury in the insurance litigation
to find that the values are unreasonable.  The Sieben Folk lawyers
must agree that the values are reasonable and feel that they can defend
them in insurance litigation.  API and its lawyers must agree that the
numbers are reasonable and defensible and support them in insurance
litigation.  I must be able to testify that they are reasonable and
show that those values were derived in ways that are consistent with
API's historic payments for asbestos claims as those historic values
are being affected by continuing asbestos litigation that will apply
over the future years when the trust will be paying claims.

In other words, we must get these numbers at least approximately
right, as reasonable estimates of what API would have had to pay in
future tort litigation if it had not filed for bankruptcy protection.
You might prefer reasonable estimates higher or lower than those I
have proposed and want to change the TDP values.  I can assure you
that even relatively substantial changes won't affect what pending
claimants now get paid, but changes might make the plan more or less
subject to attack by insurers.

2

ACC 2353

A205

Δ π EXHIBIT 7
Depo *Peterson*
6-9-09 Rptr. U
WWW.DEPOBOOK.COM

Linda Tatge

To:        SMeyer@oppenheimer.com; Michael L. Meyer (mlmeyer@ravichmeyer.com);
           Mark.peterson56@verizon.net; Tom Carey (tcarey@lcp2.net)
Cc:        Mike Polk (MPolk@SiebenPolkLaw.com); Mike Sieben (MSieben@SiebenPolkLaw.com)
Subject:   FW: API Trust administration

EXHIBIT 30
14 POLK
3.9.05

Dictated by Michael Polk:

Gentlemen:

I just read Mark's email and for the most part, I agree with what he says.

We have our files ready to be evaluated for payment as part of the bankruptcy (which will mean that the trust would not be responsible as is pointed out by the Mark). We also have our site list prepared. I completely agree with Mark that there is "no reason to wait and identify this person nor to wait to start review of pending claims". We want our pending claims paid by way of settlement and they need to be liquidated ASAP. I would envision submitting a short claim form (one or two pages), supporting medical for mesothelioma, lung cancer, other cancer or non-malignant asbestos disease, and I would propose that we begin submitting claim materials immediately. We need to, with API, determine who API's designee will be to review the claims material and either approve it or identify deficiencies.

We would need to have a simplified dispute resolution in the event there was a disagreement on qualification of a particular case.

I think we have all agreed that the pending claims must be paid a portion of their settlement amount immediately upon confirmation. That amount would be equal to each claims pro rata share of the monies available which to date, equals API's initial payment contribution of $15 Million.

I believe that the $10 Million figure which we have discussed before is appropriate for payment to present claimants.

With respect to Mark's comment regarding Tom as the trustee, I don't think Tom could serve as trustee because of his role as the future's representative but I understand from Mark's email that he does not necessarily agree with that. I would propose that we talk to someone like Bob Brownson to see of his interest in serving as trustee and I know that he has paralegal support for administration of the claims. He has expressed interest in the past. I would also recommend that API agree to Brownson and his paralegal as a person to review and settle the pending claims.

I understand that there is some uncertainty involved but that is the nature of the beast.

With respect to insurance litigation and specifically Faricy and Roen's proposals, I would propose the following:

1.    Reducing the partner rates to $200 per hour, associate rates to $125 per hour, and paralegal rate to $50 per hour. I would suggest the monthly cap at $60,000 making a per annum cap of $720,000. Your proposal excludes costs from the cap but I would want to know what costs are running on a per month or per annum basis. With this limitation, it would be well within the annual obligation of 1.3 of API.

2.    Faricy and Roen propose a contingency fee of 10% of recovery from any payments made or agreed to be made by any insurer prior to the bankruptcy filing. They also propose an 18% contingency of recoveries from any payments made after the filing. I would suggest that the payment percentage not be timed in any way. I question whether or not a contingency on the excess policies is appropriate in light of the fact that most, if not all of the excess carriers have either made offers or are in the process of doing so. For example, ERC I believe has extended an offer of something in the range of $6 Million to $7 Million. Demands have gone out to Continental (9.5 Million) and also to U.S. Fire (6 Million) and I do know that Travelers has a definite interest in talking. In light of the status of the excess carriers at this point in time, and in light of the billings that

1

demanded 9.5 [9-16-04]

ACC 2483

A350

have been submitted to API on an hourly basis by Faricy and Roen to date, I feel quite strongly that a contingency fee would be inappropriate at least on the excess carriers at this point.

With respect to the contingency versus the primary carriers, I believe that that is appropriate cause to provide sufficient incentive to see the case through, etc. What that percentage should be is difficult to assess but in light of the fact that API/the Trust is covering F&R's overhead through the hourly rates, etc. I would propose a contingency fee more in the range of 10% to 12%.

3.     With respect to paragraph 3 of F&R's proposal, I am not sure I understand what it is that they are saying.

4.     With respect to F&R's paragraph 4 as set forth in their proposal, if that is being handled on a straight contingency (which it appears that it is), I would be agreeable to a contingency fee in the range of 15% to 20%.

5.     With respect to F&R's paragraph 5 as set forth in their proposal, I do not agree with paragraph 5 in which Faricy & Roen propose that, "API and the Trust shall be entitled to a reimbursement of hourly fees paid to F&R and for costs associated with the coverage litigation from any lump sum payments made by API's insurers regardless of whether there is an award of such fees and costs in the litigation."

It seems to me that a filing by October 1 with prefiling solicitation is unrealistic. We haven't even had the opportunity to attempt to get the insurers on board and I think that it is important that we be afforded a full opportunity to fully explore settlement with the insurers so that they become proponents of the plan. Otherwise, it seems to me that we are inviting litigation within the bankruptcy with its attendant costs.

Thank you.

Michael S. Polk

-----Original Message-----
From: Meyer, Steven W. [mailto:SMeyer@oppenheimer.com]
Sent: Tuesday, August 31, 2004 9:26 AM
To: Michael L. Meyer; Mike Polk; Mike Sieben
Cc: Mark Peterson
Subject: FW: API Trust administration

Gentleman:

Tom asked me to forward this e-mail from Mark Peterson to you. Tom will be following up with his own e-mail regarding the problems associated with the estimating the cost of administering the trust.

Steve

-----Original Message-----
From: Mark Peterson [mailto:mark.peterson56@verizon.net]
Sent: Friday, August 27, 2004 4:43 PM
To: Thomas Carey; Meyer, Steven W.
Cc: Mark Peterson
Subject: API Trust administration

The API Trust needs a simple, low cost administrative and claim process. Particularly because claims will most likely come from a couple states and law firms, there seems little need for an elaborate claim process. And the trust will have meager assets to pay much to run its affairs. We need to be imaginative and thrifty here.

We need to identify who will be the claims administrator. We need to assure quite specific, simple to administer claims qualification requirements so that the administrator can carry them out with minimum controversy. API, the trustee and plaintiffs' counsel should jointly develop a list of exposure sites and times that can be added to or amended as needed. Similarly, we should have medical criteria that are as specific as possible.

2

ACC 2484

A351

The administrator would then need only see if the claimant provides whatever documentation that the plan requires to satisfy exposures. There will still be give and take between the law firms and administrators but it would be useful to have an administrator who is familiar with the medicals, claims, sites and bases of proof. A paralegal who has worked in the past for API might be appropriate, but the trustee would have to reprogram and monitor the work to make sure that whoever is doing the work is user-friendly to the claimants and lawyers and does not take the defense tack. We had success with this in Fuller-Austin where the trust hired a knowledgeable paralegal who now understands where her obligations lie. I think costs would be minized by having one experienced person do this, on a part time basis. The flow of claims will be big only at first with the pending claims. But these should probably be evaluated for payment as part of the bankruptcy, which would mean that the trust would not be responsible. If not, then claim flow will be so low that this would be a very part time job.

I think that initially the trustee might have to intervene in this role, but perhaps these potential glitches might be worked out by having whoever will work for the trust work on reviewing present claims for payment in the course of the bankruptcy. There is no reason to wait to identify this person nor to wait to start review of pending claims.

Clearly you want a single trustee, but he/she must have office and other support for required tasks:

        overseeing investments.
        preparation of reports and filings that the
          plan and court will require;
        arranging and overseeing audits and other
          necessary professional services;
        overseeing insurance litigation;
        overseeing claims processing;
        overseeing claims payments and record keeping;
        responding to claimants and their lawyers.

If Tom is the trustee (I wouldn't be concerned about conflicts, particularly if the pending claims are reviewed and allowed for payment in the course of the bankruptcy), he would need some office support. I assume that he could find some part-time support in an appropriate law firm.

D&O insurance for the trustee, future rep and their professionals will not be cheap. Expect $100,000 or so per year. It would be great if you could pursuade API to add the trust to its insurance coverage. Would this raise any legal issues Steve?

In short, I think you guys and Seiben Polk need to identify the trustee, where he/she will be officed and staffed (presumably part time), who will administer claims at what costs and how we might minimize insurance costs, and accounting and legal fees.

You should also consider how the trust might be folded into another or some other means to cut off administrative costs within a relative short number of years. There simply seems no sense to incur hundreds of thousands of administrative costs to pay less than 100 claims per year.

Until some of these issues are addressed, I have no comfort about what will be the trust's expenses for purposes of running a cash flow analysis which in turn sets the payment percentage.

I'd be happy to brain storm on this. One thing, we should probably talk\ to some other small trusts. Here Fran Lawall might be helpful.

-------------------------------------------------------------------------------
  This message contains confidential information intended only for the use of the addressee(s) named above and may contain information that is legally privileged. If you are not the addressee, or the person responsible for delivering it to the addressee, you are hereby notified that reading, disseminating, distributing or copying this message is strictly prohibited. If you have received this message by mistake, please immediately notify us by replying to the message and delete the original message immediately

3

ACC 2485

A352