# EXHIBIT A



**WILCOX & FETZER LTD.**

In The Matter Of:

# W.R. Grace & Co., et al.

## Case No. 01-01139 JKF

Richard Charles Finke

March 30, 2009

Wilcox and Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

Page 1

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

IN RE:                  ) Chapter 11
                        )
W. R. GRACE & CO.,      ) Case No. 01-01139 JKF
et al                   )
                        )
      Debtors           )

          Deposition of RICHARD CHARLES FINKE
taken pursuant to notice at the law offices of
Drinker, Biddle & Reath, LLP, 1100 North Market
Street, Suite 1000, Wilmington, Delaware,
beginning at 9:35 a.m., on Monday, March 30,
2009, before Allen S. Blank, Registered Merit
Reporter and Notary Public.

APPEARANCES:

        LISA G. ESAYIAN, ESQUIRE
        KIRKLAND & ELLIS, LLP
        200 East Randolph Drive
        Chicago, IL 60601

            For - Debtors

        DANIEL A. SPEIGHTS, ESQUIRE
        SPEIGHTS & RUNYAN
        200 Jackson Avenue, East
        Hampton, SC 29924

            For - Anderson Memorial Hospital

    ------------------------------------------
                WILCOX & FETZER
    1330 King Street -  Wilmington, Delaware 19801
                  (302) 655-0477
                  www.wilfet.com

W.R. Grace & Co., et al.

## Page 2

APPEARANCES:  CONTINUED

JOHN W. KOZYAK, ESQUIRE
KOZYAK TROPIN THROCKMORTON
2525 Ponce de Leon, 9th Floor
Miami, FL 33134

    For - Anderson Memorial Hospital

MATTHEW I. KRAMER, ESQUIRE
BILZIN, SUMBERG, BAENA, PRICE
& AXELROD, LLP
200 S. Biscayne Boulevard, Suite 2500
Miami, FL 33131-5340

    For - PD Committee

ARLENE G. KRIEGER, ESQUIRE
STROOCK & STROOCK & LAVAN, LLP
180 Maiden Lane
New York, NY 10038-4982
    For - Official Committee of
    Unsecured Creditors

ALAN B. RICH, ESQUIRE
Elm Place
1401 Elm Street, Suite 4620
Dallas, TX 75202
    For - PD FCR

ELISA ALCABES, ESQUIRE
SIMPSON, THACHER & BARTLETT, LLP
425 Lexington Avenue
New York, NY 10017-3954

    For - Travelers Casualty & Surety
    Company

KATHLEEN A. ORR, ESQUIRE
ORRICK, HERRINGTON & SUTLIFFE, LLP
1152 15th Street, N.W.
Washington, D.C. 20005

    For - David Anstern, Asbestos PI

## Page 3

APPEARANCES:  CONTINUED
MICHAEL F. BROWN, ESQUIRE
DRINKER, BIDDLE & REATH, LLP
One Logan Square
18th and Cherry Streets
Philadelphia, PA 19103-6996
    For - Government Employees Insurance
    Company, Columbia Insurance,
    One Beacon America Insurance
    Company and Seaton Insurance
    Company
SHANNON L. GRIFFIN, ESQUIRE
O'MELVENY & MYERS, LLP
Times Square Tower
7 Times Square
New York, NY 10036
    For - Arrowood Indemnity Company,
    f/k/a Royal Indemnity Co.

MARNIE E. SIMON, ESQUIRE
STEVENS & LEE
1818 Market Street, 29th Floor
Philadelphia, PA 19103-1702
    - and -
JOHN D. DEMMY, ESQUIRE (VIA TELEPHONE)
STEVENS & LEE
1105 North Market Street, 7th Floor
Wilmington, DE 19801

    For - Fireman's Fund Insurance
    Company
SHAYNE W. SPENCER, ESQUIRE
ELIZABETH DeCRISTOFARO, ESQUIRE (VIA
TELEPHONE)
FORD, MARRIN, ESPOSITO, WITMEYER
& GLESER, LLP
Wall Street Plaza
New York, NY 10005-1875
    For - CNA Insurance Company

## Page 4

APPEARANCES:  CONTINUED
    ANDREW F. CRAIG, ESQUIRE (VIA TELEPHONE)
    CUYLER BURK, LLP
    Parsippany Corporate Center
    Four Century Drive
    Parsippany, NJ 07054
        For - Allstate Insurance Company
    LAURA M. STOVER, ESQUIRE (VIA TELEPHONE)
    NEARHOOD LAW OFFICES
    7537 E. McDonald Drive
    Scottsdale, AZ 85250
        - and -
    GABRIELLA V. CELLAROSI, ESQUIRE
    (VIA TELEPHONE)
    ECKERT SEAMANS
    1747 Pennsylvania Avenue, N.W.
    Suite 200
    Washington, D.C. 20006-4604
        For - Maryland Casualty Insurance
            Company and Zurick
            Insurance Company
                * * * * * *
        RICHARD CHARLES FINKE,
    the deponent herein, having first been
    duly sworn on oath, was examined and
    testified as follows:
            EXAMINATION
BY MR. SPEIGHTS:
    Q.  Would you state your full name, please,
sir?
    A.  Yes.  Richard Charles Finke, F-i-n-k-e.
    Q.  Mr. Finke, who are you employed by?

## Page 5

    A.  W. R. Grace & Co.
    Q.  How long have you been employed by Grace?
    A.  Twenty years.
    Q.  Can you tell me the approximate date you
started?
    A.  No.  I can tell you the exact date I
started.  February 27, 1989.
    Q.  Who do you presently report to?
    A.  Mark Shelnitz, general counsel of W. R.
Grace.
    Q.  How long have you reported to
Mr. Shelnitz?
    A.  Since he became general counsel, which
was three or four years ago.  I forget how long.
    Q.  Does April 2005 seem about right?
    A.  It seems about right, yes.
    Q.  Would you give me the positions you have
held at Grace and the approximate dates you held
each position?
    A.  When I was hired, I held the position of
senior litigation counsel and I became assistant
general counsel for litigation in -- it was
around March of 2006.
    Q.  Is that your present position?

W. R. Grace & Co., et al.
RICHARD CHARLES FINKE

---

Page 6

1    **A. Yes.**
2    **Q. When you initially went to work at Grace,**
3    **who did you report to?**
4    **A. I reported to Robert Beber, B-e-b-e-r.**
5    **Q. And how long did you report to Mr. Beber?**
6    **A. Until he retired. He was general counsel**
7    **of W. R. Grace. When he retired, I frankly don't**
8    **recall the year or the date.**
9    **Q. Who did you report to between the**
10   **retirement of Mr. Beber and Mr. Shelnitz taking**
11   **over as general counsel?**
12   **A. I reported to David Siegel, S-i-e-g-e-l,**
13   **who became general counsel after Mr. Beber.**
14   **Q. Were you reporting to Mr. Siegel when**
15   **Grace filed its petition for reorganization?**
16   **A. Yes.**
17          MS. GRIFFIN: May I interrupt? I
18   apologize. I'm Shannon Griffin with O'Melveny &
19   Myers. I represent Arrowood Indemnity. And I
20   thought we were going to do introductions. So I
21   apologize for the interruption.
22          But I would like to enter an exhibit
23   before we take off on Arrowood's objections,
24   which were filed last night. Everyone should

---

Page 7

1    have received a copy. And I have copies for
2    everybody here. But I would like to mark this as
3    Exhibit 1 so I don't have to keep objecting
4    throughout.
5          MR. SPEIGHTS: I have not seen it so
6    I would like to see it before you mark it.
7          MS. GRIFFIN: Sure.
8          (Finke Deposition Exhibit No. 1 was
9    marked for identification.)
10         MR. SPEIGHTS: Although it's normal
11   for a party to mark its exhibits during its own
12   examination, I certainly don't object to counsel
13   marking it now to avoid having to state these
14   same objections orally or restate them
15   innumerable times.
16         MS. GRIFFIN: Thank you.
17         MR. BROWN: While we are doing that,
18   so that we can avoid it. My clients, Government
19   Employees Insurance Company, Columbia Insurance
20   Company and Seaton Insurance Company and One
21   Beacon America Insurance Company, join in those
22   objections.
23         MS. ALCABES: My clients as well,
24   Travelers Casualty & Surety Company, also joins

---

Page 8

1    in the objection.
2          And to the extent that the debtor
3    implied on Friday that this was the one and only
4    time that this witness would be provided, we
5    object to any implication of that sort and
6    reserve our rights to take another deposition as
7    required.
8          MS. SIMON: And my clients, Firemen's
9    Fund Insurance Company, also joins in the
10   objections and reserves its rights to depose the
11   deponent at that time, if necessary.
12         MR. SPENCER: Continental Casualty
13   also joins in the objection and reserves its
14   rights as stated by all other counsel previously.
15         MS. ESAYIAN: From the debtor's
16   perspective, everyone's reservations of rights
17   are noted and I believe our position was clearly
18   stated on Friday. And I won't take more time
19   here.
20   BY MR. SPEIGHTS:
21   Q. Mr. Finke, were your general duties and
22   responsibilities the same from 1989 until the
23   bankruptcy?
24   **A. Yes.**

---

Page 9

1    Q. Can you generally describe what your
2    duties and responsibilities were during that
3    period?
4    **A. Primarily, I was responsible for**
5    **oversight and management of asbestos property**
6    **damage cases, including reporting to Grace**
7    **management on the status or developments in those**
8    **cases.**
9          **I also was responsible for oversight**
10   **of expert witnesses that Grace retained or**
11   **Grace's counsel retained to testify in the**
12   **asbestos property damage litigation.**
13   Q. Were you part of a, for lack of a better
14   term, a team of lawyers working under Mr. Beber?
15   **A. Yes.**
16   Q. And what did you call the team?
17   **A. Just the asbestos litigation group**
18   **informally.**
19   Q. When a case was filed against Grace, how
20   was it decided which member of the group would be
21   responsible for that case?
22   **A. Early in the process or shortly after the**
23   **team was formed, the caseload was divided**
24   **geographically so that each person of the team**

---

3  (Pages 6 to 9)

W.R. Grace & Co., et al.
RICHARD CHARLES FINKE

Page 30

1    did.
2    Q.  Was it searchable?
3    A.  To a limited extent, yes.
4    Q.  Who in your office was the person that
5    you would go to if you needed something searched?
6    A.  I would have gone to my paralegal.
7    Initially, it was Gail, whose last name I can't
8    recall.  And after Gail, to my paralegal that's
9    still with us, Adie Hammond.  A-d-i-e.
10   Q.  H-a-m-m-o-n-d?
11   A.  Yes.
12   Q.  Have you seen pages of the index?
13   A.  Yes.
14   Q.  Have you seen the entire index printed
15   out?
16   A.  No.
17   Q.  Do you know how long the index would be,
18   how many pages if you printed it out or how many
19   gigabytes or whatever these computer people call
20   the amount of it in the computer?
21   A.  No, I don't know.  I think it would be
22   extremely voluminous if it were printed out in
23   hard copy.  But I don't know by how much.
24   Q.  Does the index actually show the document

Page 31

1    like in a PDF format or is it just a list of the
2    documents with certain information?
3    A.  It's a list of the documents with certain
4    fields.
5    Q.  What fields?
6    A.  Product type, job sites, product names,
7    dates, names of addressees, names of the sender
8    or author.  And number, a number had been
9    assigned to each document.  So the document
10   number would appear.  I don't recall what else.
11   Q.  Would that be a Bates stamp number?
12   A.  Yes.
13   Q.  And, as I understand it, someone with
14   computer skills could search it by any of these
15   fields?
16   A.  That's correct.
17   Q.  Did you have any involvement with the
18   personal injury litigation before the bankruptcy?
19   A.  Very little.
20   Q.  What little did you have?
21   A.  On occasion, there may be an issue in a
22   personal injury case that came to my attention or
23   an expert involved in the property damage
24   litigation would be appearing in a personal

Page 32

1    injury case.  And then I would talk to Jay Hughes
2    about that issue or the expert to determine
3    either if he needed assistance relating to that
4    issue or expert or if -- or just for my own
5    edification to see if anything going on in this
6    personal injury case might impact the property
7    damage.
8    Q.  Who is Jay Hughes?
9    A.  Jay Hughes is an attorney with W. R.
10   Grace.  He has been with Grace longer than I
11   have.  He is still with Grace.  And Jay's primary
12   responsibility at Grace was to oversee the
13   personal injury litigation.
14   Q.  Did he report to Mr. Beber before
15   Mr. Beber's retirement?
16   A.  Yes.
17   Q.  And did he then report to Mr. Siegel
18   while he was general counsel?
19   A.  Yes.
20   Q.  And does he presently report to
21   Mr. Shelnitz?
22   A.  He presently reports to me.
23   Q.  I'd like to talk about Anderson before
24   the bankruptcy a few minutes.  First of all, see

Page 33

1    if we can try to pin down when you had
2    responsibility for Anderson.  Did you have
3    responsibility for Anderson when the venue motion
4    was decided and the judge said it could be
5    maintained in Hampton County?
6    A.  No.
7    Q.  Did you have responsibility for Anderson
8    at the time of the evidentiary hearing on
9    certification?
10   A.  Yes.
11   Q.  Did you have responsibility for Anderson
12   when the motion to certify was filed and briefed?
13   A.  I believe so.  I do recall reading the
14   briefs.  I don't recall specifically if that --
15   if I did that because they had already been filed
16   when I took over the case or if I had already
17   assumed responsibility for the case and then they
18   were filed.  I just don't recall.
19   Q.  Do you recall whether you were involved
20   in the decision to challenge the adequacy of
21   Speights & Runyan?
22   A.  Yes.
23   Q.  And, yes, you recall you were involved?
24   A.  Yes.

W.R. Grace & Co., et al.
RICHARD CHARLES FINKE

Page 162

1    A.  My understanding is that the homeowner
2  would have a claim against the personal injury
3  trust.
4    Q.  Where is that set forth?
5    A.  I believe that's in the plan under the
6  definition of indirect PI trust claim.  I may not
7  have the exact terminology there.
8    Q.  Does the indemnification cover defense as
9  well as payment of the claim?
10    A.  That would be set forth in the PI TDP.
11  And I would refer to that document before trying
12  to answer your question.  Because I'm not sure of
13  the answer.
14    Q.  If somebody had sued Grace in 1979 for
15  exposure to Monokote in the Jordan Hospital in
16  Plymouth, Massachusetts, would someone at Grace
17  have gone to see whether it had any records of
18  Monokote being in the Jordan Hospital?
19    A.  This is a hypothetical lawsuit before
20  1979?
21    Q.  No.  In 1999.  I said before the
22  bankruptcy.  I meant to say that.  I may have
23  misspoken.
24    A.  Maybe I misheard it.  Okay.  I'm sorry.

Page 163

1    Q.  1999.  Somebody serves a complaint
2  alleging mesothelioma exposure in the Jordan
3  Hospital in Plymouth, Mass, would the Grace
4  person handling the PI claims check to see if
5  there were any records showing Monokote had been
6  installed in the Jordan Hospital?
7    A.  I don't know.
8    Q.  Who would be the best person to ask that
9  question to?
10    A.  Jay Hughes.
11    Q.  Is Mr. Hughes in Columbia or Boca?
12    A.  He is based in Cambridge, Massachusetts.
13    MR. SPEIGHTS:  That's all I have at
14  this time, Mr. Finke.  I reserve my position to
15  be able to pursue those questions which counsel
16  has instructed you not to answer and other
17  questions that flow from that, if I am permitted
18  to proceed along those lines.
19    Would somebody who wants to question
20  the witness like to have this chair or can we do
21  it from wherever you are?
22    MR. BROWN:  Does anyone else on the
23  PD side have any questions?
24    Okay.  Why don't we take a five

Page 164

1  minute break.
2    (The deposition was recessed from
3  3:46 p.m. to 3:53 p.m.)
4    EXAMINATION
5  BY MR. BROWN:
6    Q.  Mr. Finke, my name is Michael Brown and I
7  represent the cast of foreign insurance companies
8  that I identified earlier.
9    I want to go back and fill in some of
10  the blanks in terms of your employment history
11  with Grace.  And I want to start by asking the
12  role that you had pre-petition and then go to
13  post-petition.
14    As I understand it, you were senior
15  litigation counsel at the time the petition was
16  filed?
17    A.  Yes.
18    Q.  And prior to that, your primary
19  responsibility was with PD claims, is that
20  correct?
21    A.  Yes.
22    Q.  And I think you identified some minimal
23  involvement on the PI side?
24    A.  Right.  Very sporadic.

Page 165

1    Q.  And that was primarily when there was a
2  PD expert, as I understood it, that may have some
3  application to PI claims?
4    A.  More or less, yes.  Or was involved in
5  some way in a property -- I'm sorry, personal
6  injury case, which might have ramifications for
7  property damage litigation.
8    Q.  Okay.  And then other than what you
9  described earlier, you had no involvement on the
10  PI side?
11    A.  That's right.
12    Q.  Okay.  Who did have the involvement on
13  the PI side?
14    A.  Jay Hughes.
15    Q.  And what was Mr. Hughes' title
16  pre-petition?
17    A.  I believe it was also senior litigation
18  counsel.
19    Q.  Okay.  So you were senior litigation
20  counsel on PD, he was senior litigation counsel
21  on PI?
22    A.  Correct.
23    Q.  And who did you report to at that time?
24    A.  When I first started, it was in 1989, it

42  (Pages 162 to 165)

W.R. Grace & Co., et al.
RICHARD CHARLES FINKE

| Page 166 | Page 168 |
|---|---|
| 1 was Robert Beber. | 1 personal injury cases. |
| 2 Q. How do you say that? | 2 Q. Okay. Mr. Hughes was the individual who |
| 3 A. Beber. B-e-b-e-r. | 3 dealt primarily with the outside counsel handling |
| 4 Q. Okay. Beber? | 4 PI claims? |
| 5 A. Right. | 5 A. Yes. |
| 6    I don't recall his title at the time. | 6 Q. Who else at Grace was involved in the |
| 7 He was not general counsel. He became general | 7 handling of PI claims? |
| 8 counsel a year to two after that. | 8 A. Really, no one else. He had a staff of |
| 9 Q. Okay. And at the time of the petition, | 9 legal assistants that helped to maintain the |
| 10 that's who you were reporting to? | 10 files. But Jay was really the only in-house |
| 11 A. At the time of the Chapter 11 petition, I | 11 attorney involved with the personal injury cases. |
| 12 was reporting to David Siegel, general counsel. | 12 Q. What about Mr. Beber? |
| 13 Q. Okay. Mr. Siegel had replaced Mr. Beber | 13 A. He would have been involved as well to |
| 14 by that point? | 14 the extent of being Jay's superior. |
| 15 A. Yes. | 15 Q. And then Mr. Siegel after Mr. Beber? |
| 16 Q. Okay. And how about Mr. Hughes at the | 16 A. After Mr. Beber, right. |
| 17 time of the petition? Who did he report to | 17 Q. All right. You I believe testified |
| 18 directly? | 18 earlier this morning that you became assistant GC |
| 19 A. Also to Mr. Siegel. | 19 for litigation in March of 2006, is that correct? |
| 20 Q. And Mr. Siegel was the GC at that time? | 20 A. I think so. |
| 21 A. Yes. | 21 Q. Was that a new position? |
| 22 Q. Did Grace have national coordinating | 22 A. Yes. |
| 23 counsel for PI claims pre-petition? | 23 Q. Okay. And if I understood your testimony |
| 24 A. I don't know if they were actually deemed | 24 earlier today, that from that point forward, |

| Page 167 | Page 169 |
|---|---|
| 1 or considered national coordinating counsel. But | 1 Mr. Hughes reported to you rather than reporting |
| 2 the Casner & Edwards law firm in Boston -- | 2 to the general counsel? |
| 3 Q. I'm sorry. What was the name of that? | 3 A. Yes. |
| 4 A. Casner & Edwards, C-a-s-n-e-r, & Edwards | 4 Q. Okay. So from March of 2006 on, is it |
| 5 law firm in Boston performed some of the | 5 fair to say you have played some role on the PI |
| 6 functions of national coordinating counsel. | 6 side? |
| 7 Q. Okay. Were they also local counsel for | 7 A. Yes. But I would describe it still as a |
| 8 the Boston area? | 8 minor role. |
| 9 A. I believe they were, yes. Yes, in fact, | 9 Q. Can you describe for me what the role has |
| 10 I think they were. | 10 been? |
| 11 Q. Okay. And what were the national | 11 A. More coordination with the other parts of |
| 12 coordinating counsel functions that they | 12 our reorganization effort to make sure that |
| 13 undertook? | 13 others working on the reorganization such as |
| 14 A. Supported local counsel throughout the | 14 finance, such as those who prepare our SEC |
| 15 country in terms of providing documents and | 15 disclosure documents, were kept informed of |
| 16 transcripts, coordinating the use of experts. I | 16 developments, facts, relating to the personal |
| 17 think they were also involved in responding to | 17 injury claims in the Chapter 11. |
| 18 standard discovery requests. | 18 Q. I think you used the term you were |
| 19 Q. And how many sets of counsel around the | 19 coordinating the parts. Can you tell me what you |
| 20 country did Grace have with respect to the | 20 mean by the parts? |
| 21 defense of PI claims? | 21 A. Well, yes. When I -- part of the role of |
| 22 A. Probably -- I'm going to say 25. That's | 22 assistant general counsel in the Chapter 11 was |
| 23 just a little bit more than a guess. As I said, | 23 to coordinate and oversee all of the individuals |
| 24 I wasn't involved with the litigation of the | 24 involved, both at Grace as well as outside |

Case 01-01139-AMC    Doc 22168-1    Filed 06/18/09    Page 9 of 91

W.R. Grace & Co., et al.
RICHARD CHARLES FINKE

Page 174

1    A. Pre-petition or post-petition?
2    Q. Post-petition we are talking about. As
3  you were describing his role in the negotiations.
4    A. I don't know.
5    Q. And was your role in dealing with PI
6  issues and the resolution of PI issues indirect
7  in the sense that Mr. Hughes reported to you or
8  did you have any direct involvement?
9    A. It was really indirect.
10    Q. And besides Mr. Hughes, who else was
11  involved in that effort on the Grace side?
12    A. Mark Shelnitz, the general counsel.
13  Robert Tarola.
14    Q. I'm sorry?
15    A. Robert Tarola, T-a-r-o-l-a, the former
16  CFO. The CEO, Fred Festa, had some involvement.
17  And outside counsel, David Bernick. And I
18  believe -- I don't know if Ted Freedman was
19  involved with the negotiations or came in after a
20  deal had been reached.
21    Q. Other than the individuals you have just
22  run through on the Grace side, was there anyone
23  else that you can recall that was on the Grace
24  negotiating team for the resolution of the PI

Page 175

1  claims?
2    A. Pam Zilly was involved in some of the
3  discussions as well. She is with Blackstone.
4  She is our financial advisor.
5    Q. What was her role?
6    A. Beyond being financial adviser, I don't
7  know. I wasn't directly involved.
8    Q. What was Mr. Festa's role?
9    A. I think primarily to ensure that the
10  other parties understood that the Grace
11  representatives there spoke with the full
12  authority of the company, but, again, I was not
13  present at the meetings and discussions that he
14  attended with the personal injury
15  representatives.
16    Q. Were you at any of the meetings with the
17  personal injury representatives?
18    A. No.
19    Q. I gather Mr. Hughes was?
20    A. I believe he was, yes.
21    Q. And Mr. Shelnitz?
22    A. Yes.
23    Q. Okay. I want to shift gears for a second
24  and turn to insurance. And, again, looking at

Page 176

1  the issue pre-petition. Have you had any role or
2  did you have any role in connection with Grace's
3  liability insurance program before the petition
4  date?
5    A. No.
6    Q. Who was responsible for this at Grace?
7    A. Bob Beber handled it from the litigation
8  standpoint. And Jeff Posner was in charge of our
9  risk management function, including insurance.
10    Q. When did Mr. Posner leave Grace?
11    A. I honestly don't know. I don't recall.
12    Q. Was it after the petition date?
13    A. I believe it was before.
14    Q. And his title immediately before he left
15  was risk manager?
16    A. I don't know.
17    Q. But that's the function that he had, was
18  risk manager for Grace?
19    A. Yes.
20    Q. Post-petition, have you had any role in
21  connection with Grace's liability insurance
22  program?
23    A. A limited one. Limited to the extent of
24  motions that have been made or objections

Page 177

1  asserted by insurance. To the extent an issue is
2  being litigated, I have been involved in
3  reviewing motion papers and related documents,
4  participating in conference calls on strategy.
5    Q. For dealing with the insurance?
6    A. For dealing with the insurance. Some of
7  the insurance issues. Certainly not all of them.
8    Q. Can you tell me which issues you're
9  talking about?
10    A. Issues related to the claims by Keneb
11  pipeline that they believe they are entitled to
12  insurance coverage. In connection with
13  remediation costs or potential responsibility for
14  remediation costs in connection with the Otis
15  pipeline.
16      There were a few others. I'm just
17  drawing a blank right now.
18    Q. Have you had any role in the Scotts
19  adversary proceeding?
20    A. Yes. Thank you. Yes, I have reviewed
21  the papers, not that there have been much --
22  there has been much recently. But I did review
23  the adversary proceeding papers when Scotts first
24  commenced its adversary proceeding. And, again,

W.R. Grace & Co., et al.
RICHARD CHARLES FINKE

| Page 178 | Page 180 |
|---|---|
| 1  participated in conference calls relating to | 1  But I don't think that I did. |
| 2  their claim that they are entitled to coverage. | 2  Q.  Do you know, if it wasn't you, do you |
| 3  Q.  And with whom were these conference calls | 3  know who was involved at Grace in the preparation |
| 4  that you participated? | 4  of this document? |
| 5  A.  Outside counsel from Kirkland & Ellis. | 5  And just for clarification, it's an |
| 6  And Mr. Posner is often on those calls.  I think | 6  8-K.  It has attachments to it.  You probably |
| 7  that's -- and it's usually the same group. | 7  noted. |
| 8  Q.  Did you play any role in the manner in | 8  A.  Right. |
| 9  which insurance is handled under the plan? | 9  Q.  One is a pre release and the other is a |
| 10  A.  No. | 10  terms sheet.  So we can probably take -- why |
| 11  Q.  Who did? | 11  don't we take them one by one. |
| 12  A.  Other than Kirkland & Ellis, I don't know | 12  A.  Typically, the 8-K's are prepared by an |
| 13  who else was involved. | 13  in-house attorney, Michael Conron, who obtains |
| 14  Q.  Other than what you have just described, | 14  input and facts from persons who are involved |
| 15  have you had any role in the manner in which | 15  firsthand with the events being reported.  In |
| 16  insurance, unsettled insurance, is handled under | 16  this case, I believe he would have obtained the |
| 17  the plan? | 17  details from Mark Shelnitz since Mr. Shelnitz was |
| 18  A.  No. | 18  personally involved in the negotiations. |
| 19  Q.  How about any role in connection with the | 19  Q.  Did he receive any information from you? |
| 20  manner in which settled insurance is handled | 20  A.  No. |
| 21  under the plan? | 21  Q.  Okay.  How about the press release that's |
| 22  A.  No. | 22  attached to it?  There is a couple of names at |
| 23  Q.  Did anyone replace Mr. Posner as the risk | 23  the top from media relations and investor |
| 24  manager? | 24  relations.  But do you know who prepared the |

| Page 179 | Page 181 |
|---|---|
| 1  A.  No.  He basically still serves the same | 1  press release? |
| 2  function but as an outside consultant. | 2  A.  Where are you at?  I'm not finding it. |
| 3  Q.  Okay.  Thank you. | 3  Q.  I think it's probably page five it starts |
| 4  (Finke Deposition Exhibit No. 12 | 4  at. |
| 5  was marked for identification.) | 5  A.  Okay.  Okay.  There we go.  William |
| 6  BY MR. BROWN: | 6  Corcoran is -- I forget if he is executive |
| 7  Q.  Mr. Finke, you have what's been marked | 7  vice-president or senior vice-president.  And he |
| 8  Exhibit 12.  If you would take a few moments to | 8  is in charge of media relations, among other |
| 9  look at it.  My first question is going to be | 9  things.  Typically, Mr. Corcoran prepares press |
| 10  whether you have ever seen it before? | 10  releases.  In the same manner as I described, I |
| 11  A.  Yes, I have seen it before. | 11  described Mr. Conron preparing 8-K's.  He would |
| 12  Q.  Can you identify it for me? | 12  have obtained the information from whoever was |
| 13  A.  It's Form 8K that Grace filed with the | 13  personally involved. |
| 14  SEC announcing its agreement in principle with | 14  Q.  And would that have been Mr. Shelnitz or |
| 15  the personal injury committee and others to | 15  someone else? |
| 16  resolve present and future asbestos related PI | 16  A.  I'm pretty confident it would have been |
| 17  claims. | 17  Mr. Shelnitz. |
| 18  Q.  When did you first see it? | 18  Q.  But it was not you? |
| 19  A.  I believe it was shortly after it was | 19  A.  Correct. |
| 20  filed.  A day or two after it was filed. | 20  Q.  Let's go to the terms sheet, which |
| 21  Q.  Had you seen drafts of it before it was | 21  appears to begin on page eight. |
| 22  filed? | 22  A.  Um-hmm. |
| 23  A.  I don't believe I did.  But I -- I cannot | 23  Q.  Had you seen this terms sheet prior to |
| 24  be a hundred percent sure I didn't see a draft. | 24  the filing of the 8-K? |

46  (Pages 178 to 181)

W.R. Grace & Co., et al.
RICHARD CHARLES FINKE

| Page 182 | Page 184 |
|---|---|

Page 182

1  A. I believe I did.
2  Q. When?
3  A. I think I saw it in a prior draft.
4  Within a few days of the final, the final
5  version.
6  Q. Were you involved in preparing any of the
7  drafts?
8  A. No, I was not.
9  Q. Do you know who was?
10  A. No, I don't. I believe Mr. Shelnitz was
11  involved along with outside counsel.
12  Q. How about Mr. Hughes?
13  A. I don't know.
14  Q. Do you know who was involved for the
15  other constituencies that are a party to the
16  terms sheet?
17  A. No, I do not.
18  Q. In the first line of the text, it says,
19  this term sheet sets forth certain of the
20  principal terms and conditions.
21        Are there other principal terms and
22  conditions that are not reflected or were not
23  reflected in the terms sheet?
24  A. I don't know. I wasn't involved in the

Page 184

1  consent of any of its insurers prior to agreeing
2  to that term with the other constituencies to the
3  terms sheet?
4  A. I don't know.
5  Q. Who would know?
6  A. Mr. Shelnitz.
7  Q. If you turn to the next page on page nine
8  under v. I want to direct your attention to the
9  second paragraph that begins with the word,
10  provided.
11  A. Okay.
12  Q. Do you understand what's being referred
13  to in that section?
14  A. No, I'm not sure what's being referred to
15  by the foregoing.
16        (Finke Deposition Exhibit Nos. 13 and
17  14 were marked for identification.)
18  BY MR. BROWN:
19  Q. Mr. Finke, you have two documents that
20  have been marked Exhibit 13 and one is Exhibit 14
21  in front of you. Can you just identify them both
22  for me?
23  A. Exhibit 13 is debtor's preliminary list
24  of witnesses that they intend to call during the

| Page 183 | Page 185 |
|---|---|

Page 183

1  discussions. I don't know if there were other
2  principal terms and conditions that have been
3  agreed upon at that time and not included.
4  Q. Were any of Grace's insurers involved in
5  the discussions that led up to the execution of
6  the terms sheet?
7  A. Not to my knowledge. But, again, I
8  wasn't personally involved in the discussions.
9  Q. Do you know whether Grace's insurers were
10  purposely left out of any discussions leading up
11  to the terms sheet?
12  A. Not that I know of.
13  Q. Who would be the individual at Grace, to
14  your knowledge, that would know the answer to
15  those questions?
16  A. Mr. Shelnitz.
17  Q. If you look on the first page down at
18  I.A.1.b, titled, Insurance?
19  A. Yes.
20  Q. There is a reference there to the
21  assignment of insurance policies and all
22  insurance proceeds. Do you see that?
23  A. Yes.
24  Q. Did Grace, to your knowledge, seek the

Page 185

1  confirmation hearing and is dated March 13, 2009.
2  Exhibit 14 is the second amended case
3  management order related to the first amended
4  joint plan of reorganization and was ordered on
5  January 29, 2009.
6  Q. Would I be correct if I said that you
7  have seen both of these documents before?
8  A. Yes, you would.
9  Q. If you look at the witness list, you'll
10  note that your name appears first?
11  A. Yes.
12  Q. As someone who, at least on a preliminary
13  basis, is going to testify in Phases I and II of
14  the confirmation hearing?
15  A. Um-hmm.
16  Q. About company information.
17        What is the company information that
18  you possess relevant to plan confirmation?
19        MS. ESAYIAN: Objection to the form
20  of the question. You can answer, if you can.
21        THE WITNESS: I was asked by outside
22  counsel to be available to testify at one or both
23  of the confirmation hearings to the extent they
24  needed someone to present their basic company

47 (Pages 182 to 185)

W.R. Grace & Co., et al.
RICHARD CHARLES FINKE

Page 186

1  information, such as anything from the nature of
2  our businesses to number of employees and more
3  specifically with respect to our asbestos
4  litigation and claims, both historical, meaning
5  pre-petition litigation history relating to
6  asbestos claims, as well as the asbestos related
7  claims filed in the Chapter 11.
8          The only thing I wanted to add was,
9  in a subsequent discussion, it was decided that
10  Jay Hughes would most likely handle any issues
11  relating or testimony relating to personal
12  injury -- asbestos personal injury claims and
13  issues.
14  BY MR. BROWN:
15      Q. That was going to be my question. You
16  used the generic term asbestos litigation. Did
17  you mean PD asbestos litigation?
18      **A. Well, initially the discussion was**
19  **generic. But, as I say, subsequently it was**
20  **narrowed to property damage and attic insulation**
21  **within my purview.**
22      Q. To your knowledge, you're not going to be
23  proffering any testimony on PI issues?
24      **A. That is my understanding, yes.**

Page 187

1      Q. Would your answer be the same with
2  respect to insurance related issues?
3      **A. Yes.**
4      Q. How about with the manner in which
5  indirect asbestos PI trust claims are handled
6  under the plan?
7      **A. I would expect that Jay Hughes would**
8  **handle that.**
9      Q. Okay. If you can look at what's been
10  marked as Exhibit 14, the second amended case
11  management order. I want to direct your
12  attention specifically to paragraph two.
13          The second sentence in paragraph two
14  talks about the first phase of the confirmation
15  hearing. Do you see that?
16      **A. Yes.**
17      Q. And there are three Romanettes in that
18  sentence.
19          Do I understand you correctly that
20  you are not, to your knowledge, being proffered
21  to offer any testimony relevant to i or ii?
22      **A. That's correct.**
23      Q. And if you go to the next sentence, which
24  talks about the topics to be addressed in the

Page 188

1  second phase of the confirmation hearing, are
2  you, to your knowledge, being proffered to offer
3  any testimony with respect to i or iii?
4      **A. I think that's unknown at this point.**
5      Q. Is that true for both i and iii?
6      **A. Yes.**
7      Q. Okay. I want to go back to the
8  preliminary witness list. And I think most of
9  these individuals on here we have already
10  identified in terms of what their acknowledge is.
11  Pam Zilly, she is with the Blackstone Group, she
12  is the financial person?
13      **A. Correct.**
14      Q. I believe you said Denise Martin is a PD
15  expert?
16      **A. Yes, she is an expert. She'll offer**
17  **expert testimony concerning the likelihood that**
18  **future property damage and ZAI claims will be**
19  **brought.**
20      Q. Okay. I believe I heard earlier the name
21  Hudson LaForce. Who is that?
22      **A. He is our current chief financial**
23  **officer.**
24      Q. And Derrick Tay?

Page 189

1      **A. He is a Canadian restructuring attorney**
2  **who represents Grace in Canada concerning the**
3  **Canadian ZAI claimants.**
4      Q. And Mr. Dunbar, he is an outside
5  modelling consultant?
6      **A. Yes, I believe that's right.**
7      Q. Mr. Hughes we have talked about.
8          What about all the doctors?
9      **A. Can you be more specific what you're**
10  **asking?**
11      Q. What's the area? Have each of the other
12  witnesses listed here starting with I guess
13  Dr. Florence, are they all experts?
14      **A. Other than Jay Hughes, yes.**
15      Q. And they have all submitted reports at
16  this point?
17      **A. I presume so.**
18      **(Finke Deposition Exhibit No. 15 was**
19  **marked for identification.)**
20  BY MR. BROWN:
21      Q. All right. Mr. Finke, you have before
22  you a document marked Exhibit 15. The first
23  question is, can you identify it?
24      **A. Exhibit 15 is debtors' response to**

48  (Pages 186 to 189)

W.R. Grace & Co., et al.
RICHARD CHARLES FINKE

## Page 190

1 Government Employees Insurance Company and
2 Columbia Insurance Company's requests for
3 admission, interrogatories and requests for
4 production of documents.
5    Q. And I gather you have seen this document
6 before?
7    A. Yes, I have.
8    Q. Okay. If you would turn to the last
9 page.
10    A. Um-hmm.
11    Q. Is that your signature on the
12 verification?
13    A. Yes, it is.
14    Q. The verification is worded a little
15 oddly. At least in my experience.
16       The first question I have for you is
17 that, do you actually have any personal knowledge
18 of the information that's contained in the
19 responses to the interrogatories that you
20 verified?
21    A. Well, I'm just going to note for the
22 record that it's a rather long document. So if
23 you want him to read the whole thing, that's
24 going to take a while.

## Page 191

1    Q. I don't want him to read the whole thing.
2 If you turn to page 50.
3    A. I was just going to read the -- review
4 the answers to interrogatories.
5       In general, no, I would not have
6 firsthand knowledge of most of the facts or the
7 facts asserted in the responses to the
8 interrogatories.
9    Q. In your verification, you note, sort of
10 the middle or halfway down, that the responses
11 are true and correct to the best of my personal
12 knowledge or based on information supplied to me
13 by others.
14    A. Right.
15    Q. Who are the others?
16    A. Primarily counsel at Kirkland & Ellis.
17    Q. Anyone else?
18    A. No, I don't believe so.
19    Q. Okay. Can I direct your attention to the
20 first interrogatory?
21    A. Um-hmm.
22    Q. Just let me know when you're finished
23 reading it.
24    A. Okay. I'm ready.

## Page 192

1    Q. It says that, prior to September 19,
2 2008, which is when the initial joint plan was
3 filed, correct?
4    A. Yes.
5    Q. Okay. It says, prior to that time,
6 debtors did not communicate or consult with GEICO
7 or Columbia regarding the proposed terms of the
8 plan, asbestos PI trust agreement, asbestos
9 insurance transfer agreement with TDP.
10       Why not?
11    A. I was not involved in whatever decision
12 was made concerning communicating or consulting
13 with the insurers.
14    Q. And would that have been Mr. Shelnitz
15 again that was involved in that?
16    A. I don't know that. But that is who I
17 would -- who I would ask.
18    Q. I want to direct your attention to the
19 fourth interrogatory.
20    A. Okay.
21    Q. In Grace's response to interrogatory
22 four, the latter portion of it, it says, but also
23 does not prohibit participation. Do you see
24 that?

## Page 193

1    A. Yes.
2    Q. Could you describe for me your
3 understanding of the manner in which Grace's
4 insurance companies could participate in the
5 investigation and evaluation defense in allowance
6 or settlement of the asbestos PI claims in the
7 event the plan is confirmed?
8    A. My understanding of that provision is the
9 insurers could negotiate with the PI trust for
10 whatever role the insurers would seek to have
11 with respect to the claim submitted to the PI
12 trust.
13    Q. And with whom would they be negotiating
14 specifically, the individuals?
15    A. Well, the trustees. Whoever that is.
16    Q. Would the TAC be involved in that
17 process?
18    A. I would not know that. I do not know
19 that.
20    Q. So it's your understanding that the only
21 way in which the insurers would be involved was
22 through some sort of negotiation with the trust?
23       MS. ESAYIAN: Objection to
24 foundation. But you can answer, if you can.

49 (Pages 190 to 193)

W. R. Grace & Co., et al.
RICHARD CHARLES FINKE

Page 194

1      THE WITNESS:  I wouldn't say it's the
2   only way because I haven't -- I'm not
3   knowledgeable enough about the manner in which
4   the trust would operate to know whether that's
5   the only avenue.
6   BY MR. BROWN:
7      Q.  It's the only one you're aware of?
8      A.  It is the only one I am aware of, yes.
9      Q.  Is there someone that has some knowledge
10   about other mechanisms by which Grace's insurers
11   could be involved in the topics that are
12   identified in interrogatory number four?
13      A.  I doubt very much that anyone at Grace
14   would have such knowledge since I don't believe
15   anybody at Grace has been involved in
16   bankruptcies before or asbestos 524 G trusts.
17      Q.  If not at Grace, where or who?
18      A.  You would have to consult with
19   experienced bankruptcy counsel.
20      Q.  Kirkland & Ellis?
21      A.  They are taken.
22      Q.  Okay.
23      MR. BROWN:  Why don't we take a five
24   minute break.

Page 195

1      THE WITNESS:  Okay.
2      (Deposition recessed from 4:52 p.m.
3   to 5:03 p.m.)
4   BY MR. BROWN:
5      Q.  Mr. Finke, I understand you had a
6   clarification on one of your responses?
7      A.  Yes.  With respect to Exhibit 15, I had
8   identified counsel as Kirkland & Ellis as having
9   supplied information upon which I relied in
10   connection with the debtor's interrogatory
11   responses.  An additional person that I forgot
12   about was, but who did review the interrogatory
13   responses, was Jeff Posner.  I also relied on his
14   review and comments concerning the answers.
15      Q.  Did Mr. Posner review all of the answers
16   or were there certain ones that he passed on?
17      A.  My understanding is he reviewed all of
18   them.
19      Q.  The question will probably come up.  But
20   there is a lot of other insurers here that served
21   interrogatories on you, on Grace.  Is the answer
22   the same for all of them as well?
23      A.  Yes.  As far as I know, he reviewed all
24   of the interrogatory answers or answers to

Page 196

1   interrogatories that have been propounded by
2   insurers.
3      Q.  Is it fair to say that you didn't have
4   any independent knowledge of any of the responses
5   that were given to the insurance companies?
6      A.  The answer is if I had -- if I had any,
7   it would be very little.  I hate to make the
8   sweeping statement that there is not a single
9   answer.
10      Q.  I'm just trying to save you the question
11   from seven other lawyers.
12      A.  I understand.  I just don't want to be
13   caught with a generalization where somebody finds
14   an exception.
15      Q.  Okay.  Fair enough.
16      Have you either pre-petition or
17   post-petition had occasion to review the terms of
18   any of Grace's insurance policies?
19      A.  Certain specific provisions I have
20   reviewed.  I have not read any of the policies in
21   their entirety.  But, for example, in connection
22   with the Scotts adversary proceeding, I did
23   review the I guess relevant provisions of the
24   policy that Scotts is relying on.

Page 197

1      Q.  By that, do you mean the vendor
2   endorsement?
3      A.  Yes.
4      Q.  Anything else?
5      A.  There might have been a few, very few
6   other portions of policies that I reviewed.  But
7   nothing specific comes to mind.
8      Q.  How about in connection with Keneb's
9   claims?  Have you reviewed any policies in
10   connection with that?
11      A.  I have not.
12      Q.  You're aware, are you not, that Grace had
13   a number of pre-petition settlement agreements
14   with various insurers?
15      A.  Yes.
16      Q.  Have you reviewed any of those
17   agreements?
18      A.  I have not.
19      Q.  You mentioned I guess that you had
20   reviewed the complaint, I think, in the Scotts
21   adversary?
22      A.  Yes.
23      Q.  When is the last time you reviewed that
24   complaint?

50  (Pages 194 to 197)

W.R. Grace & Co., et al.
RICHARD CHARLES FINKE

Page 198

1    A.  I don't think I have reviewed it since
2 shortly after they filed it.
3    Q.  Back in the fall of 2004?
4    A.  That sounds right, yeah.
5    Q.  Is that when you reviewed the vendor
6 endorsement that you just referred to?
7    A.  Yes.  All at the same time.
8    Q.  Do you have an understanding as to how
9 the claims that Scotts has against the various
10 insurers that are named in the adversary
11 proceeding, how those claims are treated under
12 the plan?
13    A.  I believe they are treated as indirect PI
14 trust claims under the plan.
15    Q.  And what does that mean in real terms?
16    A.  That the insurers' claims would be
17 presented to the or submitted to the PI trust.
18    MS. ESAYIAN:  Are you asking about
19 the insurers claims or Scotts' claims?
20    MR. BROWN:  I was asking about the
21 Scotts claims against the insurers.
22    THE WITNESS:  I apologize.  I thought
23 you were referring to any insurers' claims
24 resulting from coverage of Scotts' claims.

Page 199

1    Scotts' claims, I believe those are
2 also indirect PI trust claims.
3 BY MR. BROWN:
4    Q.  And is it your understanding that they
5 are enjoined in their entirety as against the
6 insurers?
7    MS. ESAYIAN:  Objection to form.  But
8 you can answer, if you can.
9    THE WITNESS:  I don't know.
10 BY MR. BROWN:
11    Q.  Do you have an understanding as to
12 whether the claims that Keneb is asserting give
13 rise to any claims by certain insurers against
14 Grace?
15    A.  I think, in theory, my understanding is
16 that, in theory, it could, they could, Keneb's
17 claims could give rise.  But that the likelihood
18 that there is any coverage available is very
19 small.
20    Q.  Coverage available to --
21    A.  Keneb.
22    Q.  Do you understand what the reason for
23 that is or the basis is for that statement?
24    A.  Only that what coverage might otherwise

Page 200

1 have been available has been exhausted.
2    Q.  To the extent that the claims by Keneb do
3 give rise to claims by the insurers, how are they
4 treated under the plan, to your knowledge?
5    A.  That I do not know.
6    (Finke Deposition Exhibit No. 16 was
7 marked for identification.)
8 BY MR. BROWN:
9    Q.  All right, Mr. Finke, you have before you
10 Exhibit 16.  Can you identify this document?
11    A.  Yes.  This is the debtors' response to
12 One Beacon America Insurance Company and Seaton
13 Insurance Company's requests for admission,
14 interrogatories and requests for production of
15 documents.
16    Q.  Okay.  And you'll note that on page 21,
17 the interrogatory responses begin?
18    A.  Yes.
19    Q.  And your verification, I believe, is
20 essentially identically worded to the one we just
21 looked at for GEICO and Columbia, is that
22 correct?
23    A.  Correct.
24    Q.  And am I correct that the direct source

Page 201

1 of any knowledge with respect to the responses
2 comes either from Kirkland & Ellis or from
3 Mr. Posner?
4    A.  That's correct.
5    Q.  You don't have any personal knowledge of
6 the responses?
7    A.  No, I do not.
8    Q.  Let me direct your attention to
9 interrogatory number three and the response to
10 it.
11    A.  Okay.
12    Q.  Were you involved in the events leading
13 up to the January 13, 2005 amended joint plan
14 that Grace filed?
15    A.  I was involved in certain aspects or
16 certain sections of the plan.
17    Q.  Did you play a role with that plan
18 similar to the one you played with the joint
19 plan?
20    A.  In general, yes.
21    Q.  Are you familiar with the term resolved
22 that was used to describe the insurance policies
23 under that prior plan?
24    A.  I remember the prior plan included that

51  (Pages 198 to 201)

UNITED STATES

SECURITIES AND EXCHANGE COMMISSION

WASHINGTON, DC 20549

FORM 8-K

CURRENT REPORT PURSUANT

TO SECTION 13 OR 15(D) OF THE

SECURITIES EXCHANGE ACT OF 1934

Date of report (Date of earliest event reported) April 6, 2008

W. R. GRACE & CO.

(Exact Name of Registrant as Specified in Its Charter)

Delaware

(State or Other Jurisdiction of Incorporation)

1-13953                          65-0773649
(Commission File Number)        (IRS Employer Identification No.)
7500 Grace Drive                                        21044

Columbia, Maryland
(Address of Principal Executive Offices) (Zip Code)

(410) 531-4000



(Registrant's Telephone Number, Including Area Code)

(Former Name or Former Address, if Changed Since Last Report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

o    Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

o    Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

o    Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

o    Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

-------------------------------------------------------------------------

W. R. GRACE & CO.

FORM 8-K

CURRENT REPORT

Item 7.01.                     Regulation FD Disclosure.

On April 6, 2008, W. R. Grace & Co., on behalf of itself and its subsidiaries
and affiliates that are debtors in the Chapter 11 cases, (the "Company")
entered into an agreement in principle (the "Agreement") with the Official
Committee of Asbestos Personal Injury Claimants, the Future Claimants
Representative and the Official Committee of Equity Security Holders, all
parties-in-interest in the Company's Chapter 11 case, that would settle all
present and future asbestos-related personal injury claims against the Company
on the terms and conditions set forth therein.  Certain terms and conditions of
the Agreement are described in the press release attached hereto as Exhibit
99.1.  The description of the terms and conditions of the Agreement is
qualified in its entirety by reference to the provisions of the Agreement
attached hereto as Exhibit 99.2.

The information furnished pursuant to this Item 7.01, including Exhibit 99.1
and Exhibit 99.2, shall not be deemed to be "filed" for purposes of Section 18
of the Securities Exchange Act of 1934, as amended, (the "Exchange Act"), or
otherwise subject to the liabilities of such section, nor shall such
information be deemed incorporated by reference in any filing under the
Securities Act of 1933, as amended, or the Exchange Act, except as shall be
expressly set forth by specific reference in such a filing.

Item 9.01.                     Financial Statements and Exhibits.

(d)  Exhibits

99.1                           Press Release

99.2                 .         Term Sheet for Resolution of Asbestos Personal
Injury Claims dated as of April 6, 2008

2

---

*3*

SIGNATURES


Pursuant to the requirements of the Securities Exchange Act of 1934, the
Registrant has duly caused this report to be signed by the undersigned,
thereunto duly authorized.


W. R. GRACE & CO.
(Registrant)
By /s/ Mark A. Shelnitz
Mark A. Shelnitz
Secretary


Dated:   April 7, 2008


3

Exhibit 99.1

Grace News #2919

Media Relations:            Investor Relations:
William Corcoran            Bridget Sarikas
T +1 410.531.4203           T +1 410.531.4194
Ewilliam.corcoran@grace.com Ebridget.sarikas@grace.com

### GRACE ANNOUNCES SETTLEMENT OF ASBESTOS PERSONAL INJURY CLAIMS

COLUMBIA, Maryland, April 7, 2008 -- W. R. Grace & Co. (NYSE: GRA) today
announced an agreement in principle that would settle all present and future
asbestos-related personal injury claims. The agreement, reached with the
Official Committee of Asbestos Personal Injury Claimants, the Future Claimants
Representative and the Official Committee of Equity Security Holders, requires
the following assets to be paid into a trust to be established under Section
524(g) of the United States Bankruptcy Code:

Cash in the amount of $250 million;

Warrants to acquire 10 million shares of Grace common stock at an
exercise price of $17.00 per share, expiring one year from the effective date
of a plan of reorganization;

Rights to proceeds under Grace's asbestos-related insurance
coverage;

The value of cash and stock under the litigation settlement
agreements with Sealed Air Corporation and Fresenius Medical Care Holdings,
Inc.; and

Deferred payments at $110 million per year for five years beginning in 2019, and $100 million per year for ten years beginning in 2024; the deferred payments would be obligations of Grace backed by 50.1% of Grace's common stock to meet the requirements of Section 524(g).

The agreement in principle contemplates the filing of a plan of reorganization and related documents with the Bankruptcy Court. The plan will be subject to approval of its co-proponents, exit financing, and Bankruptcy Court and District Court approvals.

"This agreement in principle is a very important step in emerging from Chapter 11," said Fred Festa, Grace's Chairman, President and Chief Executive Officer. "In this challenging global marketplace, we need to be able to focus all of our efforts on increasing shareowner value and continued improvement in our core businesses. The agreement and the Plan of Reorganization that will be based on it will be good for our shareholders, customers, creditors, and our employees. A lot of work remains to be done before we can confirm a Plan of Reorganization, but I am optimistic we will be successful in reaching that goal by the end of this year or early in 2009."

1

---

"Also, I want to point out that the Plan of Reorganization will preserve all employee benefits. During the seven years we have been in Chapter 11, our people have nearly doubled Grace's sales and dramatically improved the core businesses. We look forward to final approval of our Plan of Reorganization when we can once again operate without the constraints of Chapter 11," said Festa.

*    *    *    *    *

Grace is a leading global supplier of catalysts and other products to petroleum refiners; catalysts for the manufacture of plastics; silica-based engineered and specialty materials for a wide-range of industrial applications; sealants and coatings for food and beverage packaging, and specialty chemicals, additives and building materials for commercial and residential construction. With annual sales of more than $3.1 billion, Grace has about 6,500 employees and operations in over 40 countries. For more information, visit Grace's web site at www.grace.com.

\*   \*   \*   \*   \*

This announcement contains forward-looking statements, that is, information related to future, not past, events.  Such information generally includes the words "believes," "plans," "intends," "targets," "will," "expects," "anticipates," "continues" or similar expressions.  For these statements, Grace claims the protection of the safe harbor for forward-looking statements contained in the Private Securities Litigation Reform Act of 1995.  Grace is subject to risks and uncertainties that could cause actual results to differ materially from those projected in the forward-looking statements or that could cause other forward-looking information to prove incorrect.  Factors that could cause actual results to materially differ from those contained in the forward-looking statements include: Grace's bankruptcy, plans of reorganization proposed by Grace and others, Grace's legal proceedings (especially the Montana criminal proceeding and environmental proceedings), the cost and availability of raw materials and energy, Grace's unfunded pension liabilities, costs of environmental compliance, risks related to foreign operations, especially, security, regulation and currency risks and those factors set forth in Grace's most recent Annual Report on Form 10-K, quarterly report on Form 10-Q and current reports on Form 8-K, which have been filed with the Securities and Exchange Commission and are readily available on the Internet at www.sec.gov. Reported results should not be considered as an indication of future performance.  Readers are cautioned not to place undue reliance on forward-looking statements, which speak only as of the date thereof. Grace undertakes no obligation to publicly release any revisions to the forward-looking statements contained in this announcement, or to update them to reflect events or circumstances occurring after the date of this announcement.

### 

Corporate Communications

W. R. Grace & Co.-Conn.

7500 Grace Drive

Columbia, MD 21044

2

------------------------------------------------------------------------

Exhibit 99.2

W. R. GRACE & CO., et al.
CASE NO. 01-1139 (JFK)

TERM SHEET FOR RESOLUTION OF
ASBESTOS PERSONAL INJURY CLAIMS

This Term Sheet sets forth certain of the principal terms and conditions under which the Debtors, the Official Equity Security Committee, the Official Committee of Personal Injury Claimants ("ACC") and the Future Claimants Representative ("FCR") in the above-captioned Chapter 11 cases are prepared to file a plan of reorganization ("Plan") as co-proponents providing for the resolution of all asbestos personal injury claims and liabilities, including without limitation all asbestos personal injury claims pending at the filing date of the Chapter 11 cases and those arising subsequent thereto (collectively, "Asbestos PI Claims"). This Term Sheet also sets forth the proposed treatment of other key classes of claims asserted in the Chapter 11 cases. This Term Sheet has been produced for settlement purposes only and is subject to the provisions of Rule 408 of the Federal Rules of Evidence.

I.              Treatment of Claims

A.              Asbestos PI Trust

All Asbestos PI Claims will be channeled to a trust (the "Asbestos PI Trust") that is established in accordance with Section 524(g) of the United States Bankruptcy Code. The Asbestos PI Trust will pay claims from trust assets in accordance with a trust agreement and trust distribution procedures established by the ACC and FCR in connection with the Plan.

1.              Funding of Asbestos PI Trust at Emergence. On the Effective Date of the Plan, the Asbestos PI Trust shall receive the following, each of which shall be a condition to the Plan becoming effective:

a.              Cash Payment:  $250 million, plus, if the Effective Date occurs after December 31, 2008, interest from January 1, 2009 to the Effective Date accrued at the same rate applicable to Grace's senior debt.

b.              Insurance:  the assignment by W. R. Grace & Co.-Conn. ("Grace") and all of its affiliates to the Asbestos PI Trust, of all insurance policies and all insurance proceeds available for payment of Asbestos PI Claims, effective as of the Effective Date, including without limitation:

i.              Any such proceeds from the date hereof of all settlements with insurance companies, and all interest accrued thereon;

--------------------------------------------------------------------------------
ii.              Any proceeds of the settlement with Equitas held in escrow with all interest accrued thereon;

ii.              Any proceeds of all settlements with all insurance companies

under coverage in place agreements or installment payment arrangements where payment has not yet occurred;

iv.          Assignment of and the right to recover on all outstanding insurance policies potentially applicable to personal injury claimants; and

v.           The right to recover from all insolvent insurance estates as to which Grace or its affiliates has made a claim and the proceeds of all payments received by Grace or its affiliates from those insolvent estates after the date hereof, and all interest accrued thereon.

Provided however that Grace is in the process of examining its policies and the foregoing will not affect Grace's separate coverages, if any, for losses not arising from asbestos personal injury claims.

The ACC and FCR (or, after the Effective Date, the Asbestos PI Trust) shall control (and Grace shall cooperate in connection with) any negotiations or legal proceedings related to the underlying policies or settlement agreements applicable to Asbestos PI Claims.

c.           Warrant: a warrant for 10 million shares of W. R. Grace & Co. ("Parent") common stock, exercisable at $17 per share, and expiring one year after the Effective Date.

d.           Cryovac, Inc. Payment: The consideration contemplated by the Sealed Air Settlement Agreement.

e.           Fresenius Medical Care Payment:  The proceeds of the payment contemplated by the Fresenius Settlement Agreement.

2.           Deferred Payment Obligations:  Grace shall make additional payments to the Asbestos PI Trust over a 15 year period as follows:  five annual payments of $110 million commencing on January 2, 2019; and 10 annual payments of $100 million commencing on January 2, 2024.  Such payment obligations shall be subordinate to any bank debt or bonds outstanding and shall be guaranteed by Parent or any successor ultimate parent entity of Grace. Such guaranty shall be secured by an obligation of Parent to issue to the Asbestos PI Trust, in the event an additional payment is not made, the number of shares of Parent common stock which, when

2

--------------------------------------------------------------------------------
added to the number of shares of common stock issued and outstanding as of the Effective Date, shall constitute 50.1% of the voting shares of Parent as of the Effective Date (such number of shares shall be equitably adjusted for stock splits, stock dividends, recapitalizations, corporate reorganizations or changes in control of Parent after the Effective Date).

B.           Other Classes

1.           Administrative Claims: 100% of allowed amount in cash.

2.           Priority Tax Claims: 100% of allowed amount in cash.

3.           Priority Non-Tax Claims: 100% of allowed amount in cash.

4.           Secured Claims: 100% of allowed amount either in cash or by reinstatement.

5.           Unsecured Employee Claims (post-retirement health and special pension): 100% of allowed amount by reinstatement.

6.           Workers Compensation Claims: 100% by reinstatement.

7.           Allowed General Unsecured Claims: 100% of allowed amount plus

post-petition interest as follows: (i) for holders of pre-petition bank credit facilities, post-petition interest at the rate of 6.09% from the filing date through December 31, 2005 and thereafter at floating prime, in each case compounded quarterly; and (ii) for all other unsecured claims, interest at 4.19%, compounded annually, or if pursuant to an existing contract, interest at the non-default contract rate.

8.          Allowed Environmental Claims: 100% of allowed amount in cash.

9.          Traditional Asbestos Property Damage Claims:  100% of allowed amount in cash for settled claims.  The Plan shall set forth procedures for the allowance of all Asbestos PD Claims that are disputed as of the Effective Date.

10.         ZAI Claims: Unless the Plan Proponents agree otherwise as to the treatment of ZAI Claims, the court shall estimate, for purposes of allowance and distribution, any liability on account of ZAI Claims prior to or in connection with the confirmation of the Plan.  ZAI Claims shall be paid 100% of their allowed amount up to the amount of the court's estimate.

II.                               Channeling Injunctions.  The Plan shall contain injunctions under Sections 524(g) and Section 105(a) of the Bankruptcy Code to protect the Debtors, Cryovac, Sealed Air, Fresenius, their affiliates, officers, directors and employees, and other parties in interest and certain insurers.  The Plan shall also contain such provisions, injunctions and releases

3

-------------------------------------------------------------------------

(i) as are necessary to comply with the terms of the Sealed Air Settlement Agreement and the Fresenius Settlement Agreement; and (ii) to the full extent permitted by law, to indemnify, and release all of Grace's officers, directors, employees and professionals, and the members of all official committees, the FCR and their professionals, from any liability on account of claims against Grace, or arising in or in connection with these Chapter 11 cases.  The foregoing injunctions, indemnifications and releases shall be at least as extensive as, and consistent with, the injunctions, indemnifications and releases provided for under Grace's Amended Plan currently filed in the Chapter 11 Cases to the extent such latter injunctions, indemnifications and releases are not inconsistent with this Term Sheet.

III.         Resolution of Outstanding Issues.   The parties agree to cooperate in seeking a resolution of outstanding issues material to or not otherwise resolved in connection with the confirmation of a plan of reorganization.

IV.          Binding Effect.  This Term Sheet has been approved by all necessary corporate or organizational action of the Board of Directors of

Parent and Grace, the ACC, the FCR and the Equity Committee, and shall be binding upon the parties and each of their respective successors and assigns to the fullest extent permitted by applicable law. The parties shall use their best efforts to incorporate the terms of this Term Sheet into a mutually agreeable plan of reorganization to be filed with the Bankruptcy Court as soon as possible.


V.              Confidentiality.



The parties shall treat all negotiations regarding this Term Sheet as confidential. Neither the contents nor the existence of this Term Sheet shall be disclosed by any party, either orally or in writing, except to its directors, officers, employees, legal counsel, financial advisors, accountants and clients on a confidential basis until the Debtors have issued a press release announcing the terms and conditions contained herein. Notwithstanding the foregoing, the parties agree that this Term Sheet or the terms of this Term Sheet may be disclosed to the Official Committee of Unsecured Creditors and the Official Committee of Asbestos Property Damage Claimants. Grace will provide counsel to the ACC and counsel to the FCR an opportunity to review and comment on any press release relating to this Term Sheet prior to its issuance.

4

----------------------------------------------------------------------


AGREED TO AND ACCEPTED BY:
Dated: April 6, 2008
THE DEBTORS:
W. R. GRACE & CO., on behalf of itself and its subsidiaries and affiliates that are Debtors in the Chapter 11 cases
By:                                  /s/ Fred Festa
Name:                                Fred Festa
Title:                               Chairman, President and Chief Executive
                                     Officer
THE OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS
By:                                  /s/ R. Ted Weschler
Name:                                R. Ted Weschler
Title:                               Chair of the Committee
THE OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS:
CAPLIN & DRYSDALE, CHARTERED, on behalf of and in its capacity as counsel to the ACC
By:                                  /s/ Elihu Inselbuch
Name:                                                    Elihu Inselbuch
THE FUTURE CLAIMANTS REPRESENTATIVE:
ORRICK, HERRINGTON & SUTCLIFFE LLP, on behalf of and in its capacity as counsel to the FCR
By:                                  /s/ Roger Frankel
Name:                                                    Roger Frankel



5

----------------------------------------------------------------------

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W.R. GRACE & CO., *et. al.*, | ) | Case No. 01-01139 (JJF) |
| | ) | Jointly Administered |
| Debtors. | ) | |

## DEBTORS' PRELIMINARY LIST OF WITNESSES THAT
## THEY INTEND TO CALL DURING THE CONFIRMATION HEARING

Pursuant to the Court's Second Amended Case Management Order Related to the First

Amended Joint Plan of Reorganization, dated January 29, 2009 (Docket No. 20622), the

Debtors' hereby identify, prior to the close of discovery, the following individuals likely to be

called by the Debtors' during the Confirmation Hearings established pursuant to such Order.

The Debtors also indicate in which Phase of the Confirmation Hearing, as set forth in the Order,

they anticipate calling each witness and the broad general issues for which each witness is

presently expected to testify.

As discovery has not yet been completed, the Debtors reserve their rights to

supplement/alter this list as necessary and to designate additional/alternative individuals to

testify in their case-in-chief at the Confirmation Hearings.  Moreover, the identification of any

individual on this list does not necessarily mean that the Debtors intend to depose or offer

testimony from a particular witness.  However, this list is intended to be a good faith effort to

identify those persons who the Debtors will likely call as a witness at trial, either live or by

deposition.



DEPOSITION
EXHIBIT
#13
3/30/09 ASB

| Witness | Phase | Issues |
|---|---|---|
| Richard Finke | I and II | Company Information |
| Jeff Posner | I and II | Insurance Issues |
| Pam Zilly | I and II | Financial Issues |
| David Austern | II | PI Trust Issues |
| Honorable Alexander M. Sanders, Jr. | II | PD Trust Issues |
| Denise Martin | II | PD/ZAI Issues |
| Hudson LaForce | II | Financial Issues |
| Derrick Tay | II | Canadian Issues |
| Fred Dunbar | II | PI Issues |
| Dr. Thomas Florence | II | PI Issues |
| Dr. Steven Haber | II | PI Issues |
| Dr. Daniel Henry | II | PI Issues |
| Jay Hughes | II | PI Issues |
| Dr. Suresh Moolgavkar | II | PI Issues |
| Dr. Howard Ory | II | PI Issues |
| Dr. John Parker | II | PI Issues |
| Dr. David Weill | II | PI Issues |

This list may include some, but not necessarily all, fact or expert witnesses called solely for rebuttal or impeachment purposes. The Debtors may identify and produce expert witness reports from one or more experts who would be called solely for purposes of rebuttal. The Debtors also reserve the right to call as a witness any person identified on any other party's Preliminary Witness List or any subsequently filed witness list.

Dated: March 13, 2009                    Respectfully submitted,

KIRKLAND & ELLIS LLP
David M. Bernick, P.C.
Lisa G. Esayian
Andrew Running
200 East Randolph Drive
Chicago, Illinois 60601
Telephone: (312) 861-2000
Facsimile: (312) 861-2200

Theodore L. Freedman
Deanna Boll
Citigroup Center
153 East 53rd Street
New York, New York  10022-4611
Telephone:  (212) 446 - 4800
Facsimile:  (212) 446 – 4900

and

PACHULSKI STANG ZIEHL & JONES LLP

/s/James E. O'Neill
Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
Kathleen P. Makowski (Bar No. 3648)
Timothy Cairns (Bar No. 4228)
919 North Market Street, 17th Floor
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile:  (302) 652-4400

Co-Counsel for the Debtors and Debtors in Possession

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>W.R. GRACE & CO., et al.,<br><br>                        Debtors. | )<br>)  **Chapter 11**<br>)  **Case No. 01-1139 (JKF)**<br>)  **(Jointly Administered)**<br>)<br>)<br>) |

### DEBTORS' RESPONSE TO GOVERNMENT EMPLOYEES INSURANCE COMPANY AND COLUMBIA INSURANCE COMPANY'S REQUESTS FOR ADMISSION, INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS

Pursuant to Federal Rule of Civil Procedure 26, 33, 34 and 36, applicable to this proceeding by Federal Rules of Bankruptcy Procedure 7026, 7033, 7034, 7036 and 9014, the Debtors hereby respond to the Requests for Admission, Interrogatories and Requests for Production of Documents (the "Requests") propounded by Government Employees Insurance Company and Columbia Insurance Company f/k/a/ Republic Insurance Company (collectively, the "Discovering Parties").

### GENERAL OBJECTIONS AND RESERVATIONS OF RIGHTS

1.      The Debtors note that the Requests are based on the First Amended Joint Plan of Reorganization, dated December 19, 2008, as it may be amended hereafter. To be clear, these responses are based on the most recent versions of the Plan and the Plan Documents (as defined in the Plan) on file with the Court as of the date of these responses.

2.      By responding to these Requests, the Debtors should not be construed as accepting the definitions that the Discovering Parties have provided. In their responses below, the Debtors have used what it believes is an appropriate and reasonable understanding of the words that the Requests purport to define. In addition, to the extent



DEPOSITION
EXHIBIT
#15
3/30/09ABB

not otherwise defined herein or in the Requests, any capitalized terms in these responses shall have the meaning attributed to them in the Plan and the other Plan Documents.

3.　　The Debtors further note, in lieu of repeating throughout these responses, that, as set forth in Sections 7.15(a) and (f) of the Plan and except as otherwise provided in Section 7.15 of the Plan, the Plan provides that (i) nothing in the Confirmation Order, the Plan or any of the Plan Documents shall in any way operate to, or have the effect of, impairing any Asbestos Insurance Entity's legal, equitable or contractual rights, if any, in any respect; and (ii) nothing in the Plan, the Plan Documents, the Confirmation Order, or any finding of fact and/or conclusion of law with respect to the confirmation or consummation of the Plan shall limit the right, if any, of any Asbestos Insurance Entity, in any Asbestos Insurance Action, to assert any Asbestos Insurer Coverage Defense.

4.　　The Debtors will produce any and all non-privileged and non-confidential documents produced in response to the Requests to the virtual data room established by the Debtors.  If the responses indicate that documents are being produced, such statements do not mean, and should not be construed to suggest, that the Debtors possess documents responsive to all of the Requests.

5.　　The Debtors object to the Requests on the ground that the Discovering Parties lack standing to object to the confirmation of the Plan because the Plan is insurance neutral, as set forth in Section 7.15 of the Plan.  In responding to the Discovering Parties' Requests, and in producing any documents requested by the Discovering Parties, the Debtors do not waive, and expressly reserve, their objection that the Discovering Parties lack standing to pursue any objection to confirmation of the Plan and all matters related thereto.

DOCS_DE:145731.1

6.     The Debtors object generally to the instructions and definitions set forth in the Requests to the extent they seek to impose any obligation beyond that which is required by the Federal Rules of Civil Procedure, as applicable by the Federal Rules of Bankruptcy Procedure, the Local Rules for the United States Bankruptcy Court for the District of Delaware, or any case management or other applicable order entered by the Bankruptcy Court.

7.     The Debtors object to the Requests to the extent they seek to require the Debtors to speculate about the actions of others outside their direct knowledge.

8.     The Debtors object to any Request seeking information protected by the attorney-client privilege, work product doctrine, common-interest privilege, or any other applicable privilege, doctrine or protection.  The production of any information and/or documentation by the Debtors is without waiver of any claim of privilege or confidentiality.  If privileged or confidential information or documentation is inadvertently produced by the Debtors, its production does not constitute a waiver of any applicable privilege, doctrine or protection.

9.     The Debtors object to the Requests to the extent that they seek information and/or documents that are not relevant to the confirmation of the Plan, and/or are overly broad, unduly burdensome, harassing or not reasonably calculated to lead to the discovery of admissible evidence.

10.     The Debtors object to the Requests to the extent that they seek disclosure of communications in connection with negotiations of a plan of reorganization and/or draft plan documents.  Numerous bankruptcy courts have prohibited discovery into and the disclosure of such information.  See In re Federal-Mogul Global, Inc., Case No. 01-

3

10578 (JKF) (Bankr. D. Del. Feb. 26, 2007) (Hr'g Tr. at 31) (finding that draft plan

documents are not properly discoverable); In re Pittsburgh Corning Corp., Case No. 00-

22876 (JKF) (Bankr. W.D. Pa. Feb. 19, 2004) (Hr'g Tr. at 64-66) (finding that drafts of

plan documents are not discoverable); In re Combustion Eng'g, Case No. 03-10495 (JKF)

(Bankr. D. Del. May 2, 2003) (Hr'g Tr. at 301) (observing that "drafts generally are not

relevant to anything"); In re Babcock & Wilcox Co., No. 00-10992 (JAB) (Bankr. E.D.

La. Aug. 20, 2003) (Hr'g Tr. 84) (denying insurers' motion to compel discovery on draft

plan of reorganization documents and confidential plan of reorganization negotiations);

In re ACandS, Inc., No. 02-12687 (RJN) (Bankr. D. Del. Sept. 30, 2003) (Hr'g Tr. at 42-

45) (denying discovery into plan negotiations on the grounds that such discovery is

irrelevant to the issue of good faith in proposing the plan); In re Eagle-Picher Indus., 169

B.R. 130, 134 (Bankr. S.D. Ohio 1994) (finding that creditors were not entitled to drafts

of proposed plans of reorganization).

      11.    The Debtors object to the Requests to the extent that they seek information

that is protected from disclosure by FED. R. EVID. 408.

      12.    The Debtors object to the Requests to the extent they seek proprietary

information. To the extent there are responsive proprietary documents in their

possession, the Debtors will seek the entry of a protective order and such documents will

be produced subject to that order.

      13.    The Debtors object to the Requests to the extent that they are vague or

ambiguous or fail to describe the information sought with sufficient particularity to allow

for a meaningful response by them.

14.     The Debtors object to the Requests to the extent that they call for the Debtors to produce documents or information on behalf of any other party and/or seek discovery of information or documents no longer in existence or not within the Debtors' possession, custody or control.

15.     The Debtors object to the Requests to the extent that they request information or documents that are not responsive, but may be attached to a responsive document.

16.     The Debtors object to the Requests to the extent that the Requests are being improperly used to obtain discovery for use in connection with other disputes, including, but not limited to, future coverage litigation, and not for purposes of the confirmation of the Plan.

17.     The Debtors object to the Requests insofar as they require, or purport to require, the Debtors to turn over or otherwise surrender to the Discovering Parties, or their counsel, the original or only copy of a document or other tangible item in the Debtors' possession. Unless otherwise noted, the Debtors shall produce copies of documents to the virtual data room.

18.     The Debtors object to the Requests to the extent that they seek discovery of confidential business information, confidential settlement information, and/or information subject to confidentiality agreements with third parties.

19.     The Debtors object to the Requests to the extent that any portion of any of the Requests seeks discovery of information that is equally accessible and available to the Discovering Parties or that is already in their possession, custody or control, or is available as a matter of public record.

20.     The Debtors object to the Requests to the extent they seek material only discoverable upon a showing that the Discovering Parties have substantial need for the materials pursuant to Rule 26(b)(3) and Rule 26(b)(4) of the Federal Rules of Civil Procedure, applicable to this proceeding by Federal Rule of Bankruptcy Procedure 7026.

21.     The Debtors object to the Interrogatories and Requests for Production to the extent they state assumptions of law or fact, which the Debtors neither admit nor deny. The provision of any response or answer to any Interrogatory or Request for Production may not be construed as, and is not an admission to, any of the facts or legal assumptions stated in any such request. Nothing in the Debtors' responses to any Interrogatory or Request for Production should be construed as an admission respecting the admissibility or relevance of any fact or document or of the truth or accuracy of any characterization of any kind contained in the Interrogatories or Requests for Production.

22.     The information provided in the responses set forth below is that currently available to the Debtors, unless privileged or otherwise protected. The responses herein are made without waiver of and with specific preservation of: (a) questions and objections as to competence, relevance, materiality, privilege and admissibility; (b) the right to object to the use of any objections, response or answer, or any documents produced, in whole or in part, on any ground; (c) the right to object on any ground at any time to a demand for further productions, responses or answers involving or relating to the subject matter of the Requests; (d) the right at any time to revise, correct, add to or clarify any of the objections, responses and answers propounded herein; and (e) the right to move for an appropriate protective order.

6

23.    The Debtors' decision to provide responses notwithstanding the objectionable nature of any of the Requests should not be construed as a waiver of any of the general or specific objections.

24.    These General Objections and Reservations of Rights are incorporated by reference into the following specific objections and responses, and an objection or response by the Debtors to any Request is made without waiver of, and subject to, these General Objections and Reservation of Rights.

25.    The Debtors reserve the right to amend or supplement these responses.

**REQUESTS FOR ADMISSION**

**REQUEST FOR ADMISSION NO. 1:**

GEICO is not in breach of any provision of any of the GEICO Policies.

**RESPONSE TO REQUEST FOR ADMISSION NO. 1:**

Based on information currently known to the Debtors, admitted. The Debtors reserve the right to amend or supplement this response if additional information is discovered.

**REQUEST FOR ADMISSION NO. 2:**

The Debtors did not seek GEICO's consent to the transfer or assignment of any interests or rights under the GEICO Policies to the Asbestos PI Trust as provided under the Plan and Asbestos Insurance Transfer Agreement.

**RESPONSE TO REQUEST FOR ADMISSION NO. 2:**

Denied. Counsel for GEICO received various versions of the Plan Documents that were filed in the above-captioned case (see Joint Plan Documents, filed September 19, 2008 (Dkt. Nos. 19579, 19580); Amendments to Joint Plan Documents, filed

November 11, 2008 (Dkt. Nos. 19988, 19989); Further Amendments to Joint Plan

Documents, filed November 21, 2008 (Dkt. No. 20121); Further Amendments to Joint

Plan Documents, filed December 19, 2008 (Dkt. No. 20304); First Amended Joint Plan,

filed February 3, 2009 (Dkt. Nos. 20666, 20667, 20668); First Amended Joint Plan,

Disclosure Statement and Exhibit Book, filed February 27, 2009 (Dkt. Nos. 20872,

20873, 20874, 20877, 20905) and draft Plan Documents via electronic mail from the

Debtors and, therefore, GEICO was given the opportunity to comment on and consent to

the transfer or assignment of any interests or rights under the GEICO Policies to the

Asbestos PI Trust as provided under the Plan and Asbestos Insurance Transfer

Agreement.

**REQUEST FOR ADMISSION NO. 3:**

The Debtors did not consult with GEICO regarding the transfer or assignment of

any interests or rights under the GEICO Policies to the Asbestos PI Trust as provided

under the Plan and Asbestos Insurance Transfer Agreement.

**RESPONSE TO REQUEST FOR ADMISSION NO. 3:**

Admitted that the Debtors did not initially consult with GEICO regarding the

transfer or assignment of any interests or rights under the GEICO Policies to the Asbestos

PI Trust but further noted that counsel for GEICO received various versions of the Plan

Documents that were filed in the above-captioned case (see Joint Plan Documents, filed

September 19, 2008 (Dkt. Nos. 19579, 19580); Amendments to Joint Plan Documents,

filed November 11, 2008 (Dkt. Nos. 19988, 19989); Further Amendments to Joint Plan

Documents, filed November 21, 2008 (Dkt. No. 20121); Further Amendments to Joint

Plan Documents, filed December 19, 2008 (Dkt. No. 20304); First Amended Joint Plan,

8

filed February 3, 2009 (Dkt. Nos. 20666, 20667, 20668); First Amended Joint Plan,

Disclosure Statement and Exhibit Book, filed February 27, 2009 (Dkt. Nos. 20872,

20873, 20874, 20877, 20905)) and draft Plan Documents via electronic mail from the

Debtors and, therefore, GEICO was given the opportunity to comment on the transfer or

assignment of any interests or rights under the Republic Policies to the Asbestos PI Trust

as provided under the Plan and Asbestos Insurance Transfer Agreement.

**REQUEST FOR ADMISSION NO. 4:**

 The Debtors did not obtain GEICO's consent regarding the transfer or assignment

of any interests or rights under the GEICO Policies to the Asbestos PI Trust as provided

under the Plan and Asbestos Insurance Transfer Agreement.

**RESPONSE TO REQUEST FOR ADMISSION NO. 4:**

 Admitted but further clarified that counsel for GEICO received various versions

of the Plan Documents that were filed in the above-captioned case (see Joint Plan

Documents, filed September 19, 2008 (Dkt. Nos. 19579, 19580); Amendments to Joint

Plan Documents, filed November 11, 2008 (Dkt. Nos. 19988, 19989); Further

Amendments to Joint Plan Documents, filed November 21, 2008 (Dkt. No. 20121);

Further Amendments to Joint Plan Documents, filed December 19, 2008 (Dkt. No.

20304); First Amended Joint Plan, filed February 3, 2009 (Dkt. Nos. 20666, 20667,

20668); First Amended Joint Plan, Disclosure Statement and Exhibit Book, filed

February 27, 2009 (Dkt. Nos. 20872, 20873, 20874, 20877, 20905) and draft Plan

Documents via electronic mail from the Debtors and, therefore, GEICO was given the

opportunity to comment on and consent to the transfer or assignment of any interests or

9

rights under the GEICO Policies to the Asbestos PI Trust as provided under the Plan and

Asbestos Insurance Transfer Agreement.

**REQUEST FOR ADMISSION NO. 5:**

The GEICO Policies provide that GEICO must consent to any assignment of

interest under the GEICO Policies for said assignment to be binding on GEICO.

**RESPONSE TO REQUEST FOR ADMISSION NO. 5:**

Objection. This Request purports to summarize or characterize the GEICO

Policies or requires the Debtors to summarize or characterize information about the

GEICO Policies, which GEICO Policies, being in writing, speak for themselves. Further,

even assuming the GEICO Policies contain language similar to that described above, the

Debtors object to this Request insofar as an accurate response would require the

application of substantive law from each state and federal jurisdiction to numerous and

varied hypothetical fact patterns, which would be both burdensome and oppressive.

Subject to those objections and the General Objections and Reservation of Rights set

forth above, the Debtors note that the transfer of the Asbestos Insurance Rights with

respect to the Asbestos Insurance Policies provided for in the Plan and the Asbestos

Insurance Transfer Agreement is valid and enforceable under federal law against the

Discovering Parties without regard to consent, and that contrary state law, if any, is

preempted. See In re Combustion Engineering, Inc., 391 F.3d 190 (3d Cir. 2005); In re

Federal-Mogul Global Inc., 385 B.R. 560 (Bankr. D. Del. 2008). Otherwise, denied.

**REQUEST FOR ADMISSION NO. 6:**

The transfer or assignment of interests or rights under the GEICO Policies to the

Asbestos PI Trust as provided under the Plan and Asbestos Insurance Transfer

Agreement is not binding on GEICO.

**RESPONSE TO REQUEST FOR ADMISSION NO. 6:**

Denied. The transfer of Asbestos Insurance Rights in the Asbestos Insurance

Transfer Agreement and Section 7.2 of the Plan is valid and enforceable against GEICO.

See In re Combustion Engineering, Inc., 391 F.3d 190 (3d Cir. 2005); In re Federal-

Mogul Global Inc., 385 B.R. 560 (Bankr. D. Del. 2008).

**REQUEST FOR ADMISSION NO. 7:**

The Debtors did not seek GEICO's consent to the proposed Asbestos PI Trust

Agreement.

**RESPONSE TO REQUEST FOR ADMISSION NO. 7:**

Denied. Counsel for GEICO received various versions of the Plan Documents

that were filed in the above-captioned case (see Joint Plan Documents, filed September

19, 2008 (Dkt. Nos. 19579, 19580); Amendments to Joint Plan Documents, filed

November 11, 2008 (Dkt. Nos. 19988, 19989); Further Amendments to Joint Plan

Documents, filed November 21, 2008 (Dkt. No. 20121); Further Amendments to Joint

Plan Documents, filed December 19, 2008 (Dkt. No. 20304); First Amended Joint Plan,

filed February 3, 2009 (Dkt. Nos. 20666, 20667, 20668); First Amended Joint Plan,

Disclosure Statement and Exhibit Book, filed February 27, 2009 (Dkt. Nos. 20872,

20873, 20874, 20877, 20905) and draft Plan Documents via electronic mail from the

Debtors and, therefore, GEICO was given the opportunity to comment on and consent to
the Asbestos PI Trust Agreement.

**REQUEST FOR ADMISSION NO. 8:**

The Debtors did not confer with GEICO regarding the proposed Asbestos PI Trust
Agreement.

**RESPONSE TO REQUEST FOR ADMISSION NO. 8:**

Admitted that the Debtors did not initially confer with GEICO regarding the
proposed Asbestos PI Trust Agreement but further noted that counsel for GEICO
received various versions of the Plan Documents that were filed in the above-captioned
case (see Joint Plan Documents, filed September 19, 2008 (Dkt. Nos. 19579, 19580);
Amendments to Joint Plan Documents, filed November 11, 2008 (Dkt. Nos. 19988,
19989); Further Amendments to Joint Plan Documents, filed November 21, 2008 (Dkt.
No. 20121); Further Amendments to Joint Plan Documents, filed December 19, 2008
(Dkt. No. 20304); First Amended Joint Plan, filed February 3, 2009 (Dkt. Nos. 20666,
20667, 20668); First Amended Joint Plan, Disclosure Statement and Exhibit Book, filed
February 27, 2009 (Dkt. Nos. 20872, 20873, 20874, 20877, 20905)) and draft Plan
Documents via electronic mail from the Debtors and, therefore, GEICO was given the
opportunity to comment on the Asbestos PI Trust Agreement.

**REQUEST FOR ADMISSION NO. 9:**

The Debtors did not ask GEICO to participate in the negotiation or drafting of the
Asbestos PI Trust Agreement.

12

**RESPONSE TO REQUEST FOR ADMISSION NO. 9:**

Admitted that the Debtors did not ask GEICO to participate in the negotiation or drafting of the Asbestos PI Trust Agreement but further clarified that counsel for GEICO received various versions of the Plan Documents that were filed in the above-captioned case (see Joint Plan Documents, filed September 19, 2008 (Dkt. Nos. 19579, 19580); Amendments to Joint Plan Documents, filed November 11, 2008 (Dkt. Nos. 19988, 19989); Further Amendments to Joint Plan Documents, filed November 21, 2008 (Dkt. No. 20121); Further Amendments to Joint Plan Documents, filed December 19, 2008 (Dkt. No. 20304); First Amended Joint Plan, filed February 3, 2009 (Dkt. Nos. 20666, 20667, 20668); First Amended Joint Plan, Disclosure Statement and Exhibit Book, filed February 27, 2009 (Dkt. Nos. 20872, 20873, 20874, 20877, 20905)) and draft Plan Documents via electronic mail from the Debtors and, therefore, GEICO had the opportunity to comment on drafts of the Asbestos PI Trust Agreement.

**REQUEST FOR ADMISSION NO. 10:**

The Debtors did not obtain GEICO's consent to the proposed Asbestos PI Trust Agreement.

**RESPONSE TO REQUEST FOR ADMISSION NO. 10:**

Admitted but further clarified that counsel for GEICO received various versions of the Plan Documents that were filed in the above-captioned case (see Joint Plan Documents, filed September 19, 2008 (Dkt. Nos. 19579, 19580); Amendments to Joint Plan Documents, filed November 11, 2008 (Dkt. Nos. 19988, 19989); Further Amendments to Joint Plan Documents, filed November 21, 2008 (Dkt. No. 20121); Further Amendments to Joint Plan Documents, filed December 19, 2008 (Dkt. No.

20304); First Amended Joint Plan, filed February 3, 2009 (Dkt. Nos. 20666, 20667, 20668); First Amended Joint Plan, Disclosure Statement and Exhibit Book, filed February 27, 2009 (Dkt. Nos. 20872, 20873, 20874, 20877, 20905)) and draft Plan Documents via electronic mail from the Debtors and, therefore, GEICO was given the opportunity to comment on and consent to the Asbestos PI Trust Agreement.

## REQUEST FOR ADMISSION NO. 11:

The Debtors did not seek GEICO's consent to the proposed TDP.

## RESPONSE TO REQUEST FOR ADMISSION NO. 11:

Denied. Counsel for GEICO received various versions of the Plan Documents that were filed in the above-captioned case (see Joint Plan Documents, filed September 19, 2008 (Dkt. Nos. 19579, 19580); Amendments to Joint Plan Documents, filed November 11, 2008 (Dkt. Nos. 19988, 19989); Further Amendments to Joint Plan Documents, filed November 21, 2008 (Dkt. No. 20121); Further Amendments to Joint Plan Documents, filed December 19, 2008 (Dkt. No. 20304); First Amended Joint Plan, filed February 3, 2009 (Dkt. Nos. 20666, 20667, 20668); First Amended Joint Plan, Disclosure Statement and Exhibit Book, filed February 27, 2009 (Dkt. Nos. 20872, 20873, 20874, 20877, 20905)) and draft Plan Documents via electronic mail from the Debtors and, therefore, GEICO had the opportunity to comment on and consent to the TDP.

## REQUEST FOR ADMISSION NO. 12:

The Debtors did not confer with GEICO regarding the proposed TDP.

14

## RESPONSE TO REQUEST FOR ADMISSION NO. 12:

Admitted that the Debtors did not initially confer with GEICO regarding the

proposed TDP but further noted that counsel for GEICO received various versions of the

Plan Documents that were filed in the above-captioned case (see Joint Plan Documents,

filed September 19, 2008 (Dkt. Nos. 19579, 19580); Amendments to Joint Plan

Documents, filed November 11, 2008 (Dkt. Nos. 19988, 19989); Further Amendments to

Joint Plan Documents, filed November 21, 2008 (Dkt. No. 20121); Further Amendments

to Joint Plan Documents, filed December 19, 2008 (Dkt. No. 20304); First Amended

Joint Plan, filed February 3, 2009 (Dkt. Nos. 20666, 20667, 20668); First Amended Joint

Plan, Disclosure Statement and Exhibit Book, filed February 27, 2009 (Dkt. Nos. 20872,

20873, 20874, 20877, 20905)) and draft Plan Documents via electronic mail from the

Debtors and, therefore, GEICO had the opportunity to comment on the TDP.

## REQUEST FOR ADMISSION NO. 13:

The Debtors did not ask GEICO to participate in the negotiation or drafting of the

TDP.

## RESPONSE TO REQUEST FOR ADMISSION NO. 13:

Admitted that the Debtors did not ask GEICO to participate in the negotiation or

drafting of the TDP but further clarified that counsel for GEICO received various

versions of the Plan Documents that were filed in the above-captioned case (see Joint

Plan Documents, filed September 19, 2008 (Dkt. Nos. 19579, 19580); Amendments to

Joint Plan Documents, filed November 11, 2008 (Dkt. Nos. 19988, 19989); Further

Amendments to Joint Plan Documents, filed November 21, 2008 (Dkt. No. 20121);

Further Amendments to Joint Plan Documents, filed December 19, 2008 (Dkt. No.

DOCS_DE:145731.1

20304); First Amended Joint Plan, filed February 3, 2009 (Dkt. Nos. 20666, 20667,

20668); First Amended Joint Plan, Disclosure Statement and Exhibit Book, filed

February 27, 2009 (Dkt. Nos. 20872, 20873, 20874, 20877, 20905)) and draft Plan

Documents via electronic mail from the Debtors and, therefore, GEICO was given the

opportunity to comment on drafts of the TDP.

**REQUEST FOR ADMISSION NO. 14:**

The Debtors did not obtain GEICO's consent to the proposed TDP.

**RESPONSE TO REQUEST FOR ADMISSION NO. 14:**

Admitted but further clarified that counsel for GEICO received various versions

of the Plan Documents that were filed in the above-captioned case (see Joint Plan

Documents, filed September 19, 2008 (Dkt. Nos. 19579, 19580); Amendments to Joint

Plan Documents, filed November 11, 2008 (Dkt. Nos. 19988, 19989); Further

Amendments to Joint Plan Documents, filed November 21, 2008 (Dkt. No. 20121);

Further Amendments to Joint Plan Documents, filed December 19, 2008 (Dkt. No.

20304); First Amended Joint Plan, filed February 3, 2009 (Dkt. Nos. 20666, 20667,

20668); First Amended Joint Plan, Disclosure Statement and Exhibit Book, filed

February 27, 2009 (Dkt. Nos. 20872, 20873, 20874, 20877, 20905)) and draft Plan

Documents via electronic mail from the Debtors and, therefore, GEICO was given the

opportunity to comment on and consent to the TDP.

**REQUEST FOR ADMISSION NO. 15:**

Under the Plan, GEICO is excluded from any role in the investigation, defense,

and settlement of Asbestos PI Claims by the Asbestos PI Trust.

**RESPONSE TO REQUEST FOR ADMISSION NO. 15:**

Admitted that the Plan, if confirmed, does not provide for participation by GEICO in the investigation, defense or settlement of Asbestos PI Claims for purposes of making payment with respect to such claims out of the Asbestos PI Trust but also does not prohibit participation by GEICO in the investigation, defense or settlement of Asbestos PI Claims for purposes of making payment with respect to such claims out of the Asbestos PI Trust. Further, as set forth in Sections 7.15(a) and (f) of the Plan and except as otherwise provided in Section 7.15 of the Plan, the Plan provides that (i) nothing in the Confirmation Order, the Plan, or any of the Plan Documents shall in any way operate to, or have the effect of, impairing GEICO's legal, equitable or contractual rights, if any, in any respect; and (ii) nothing in the Plan, the Plan Documents, the Confirmation Order, or any finding of fact and/or conclusion of law with respect to the confirmation or consummation of the Plan shall limit the right, if any, of GEICO, in any Asbestos Insurance Action, to assert any Asbestos Insurer Coverage Defense. Otherwise, denied.

**REQUEST FOR ADMISSION NO. 16:**

The GEICO Policies require GEICO's consent to the settlement of any asbestos-related bodily injury claim as a condition to obtaining coverage for such claim under the GEICO Policies.

**RESPONSE TO REQUEST FOR ADMISSION NO. 16:**

Objection. This Request purports to summarize or characterize the GEICO Policies or require the Debtors to summarize or characterize information about the GEICO Policies, which GEICO Policies, being in writing, speak for themselves. Further, even assuming the GEICO Policies contain language similar to that described above, the

DOCS_DE:145731.1

Debtors object to this Request insofar as an accurate response would require the application of substantive law from each state and federal jurisdiction to numerous and varied hypothetical fact patterns, which would be both burdensome and oppressive. To the extent a further response is required, this Request is denied.

## REQUEST FOR ADMISSION NO. 17:

Columbia is not in breach of any provision of any of the Republic Policies.

## RESPONSE TO REQUEST FOR ADMISSION NO. 17:

Based on information currently known to the Debtors, admitted. The Debtors reserve the right to amend or supplement this response if additional information is discovered.

## REQUEST FOR ADMISSION NO. 18:

The Debtors did not seek Columbia's consent to the transfer or assignment of any interests or rights under the Republic Policies to the Asbestos PI Trust as provided under the Plan and Asbestos Insurance Transfer Agreement.

## RESPONSE TO REQUEST FOR ADMISSION NO. 18:

Denied. Counsel for Columbia received various versions of the Plan Documents that were filed in the above-captioned case (see Joint Plan Documents, filed September 19, 2008 (Dkt. Nos. 19579, 19580); Amendments to Joint Plan Documents, filed November 11, 2008 (Dkt. Nos. 19988, 19989); Further Amendments to Joint Plan Documents, filed November 21, 2008 (Dkt. No. 20121); Further Amendments to Joint Plan Documents, filed December 19, 2008 (Dkt. No. 20304); First Amended Joint Plan, filed February 3, 2009 (Dkt. Nos. 20666, 20667, 20668); First Amended Joint Plan, Disclosure Statement and Exhibit Book, filed February 27, 2009 (Dkt. Nos. 20872,

20873, 20874, 20877, 20905)) and draft Plan Documents via electronic mail from the

Debtors and, therefore, Columbia was given the opportunity to comment on and consent

to the transfer or assignment of any interests or rights under the Republic Policies to the

Asbestos PI Trust as provided under the Plan and Asbestos Insurance Transfer

Agreement.

**REQUEST FOR ADMISSION NO. 19:**

The Debtors did not consult with Columbia regarding the transfer or assignment

of any interests or rights under the Republic Policies to the Asbestos PI Trust as provided

under the Plan and Asbestos Insurance Transfer Agreement.

**RESPONSE TO REQUEST FOR ADMISSION NO. 19:**

Admitted that the Debtors did not initially consult with Columbia regarding the

transfer or assignment of any interests or rights under the Republic Policies to the

Asbestos PI Trust but further noted that counsel for Columbia received various versions

of the Plan Documents that were filed in the above-captioned case (see Joint Plan

Documents, filed September 19, 2008 (Dkt. Nos. 19579, 19580); Amendments to Joint

Plan Documents, filed November 11, 2008 (Dkt. Nos. 19988, 19989); Further

Amendments to Joint Plan Documents, filed November 21, 2008 (Dkt. No. 20121);

Further Amendments to Joint Plan Documents, filed December 19, 2008 (Dkt. No.

20304); First Amended Joint Plan, filed February 3, 2009 (Dkt. Nos. 20666, 20667,

20668); First Amended Joint Plan, Disclosure Statement and Exhibit Book, filed

February 27, 2009 (Dkt. Nos. 20872, 20873, 20874, 20877, 20905)) and draft Plan

Documents via electronic mail from the Debtors and, therefore, Columbia was given the

opportunity to comment on the transfer or assignment of any interests or rights under the

19

Republic Policies to the Asbestos PI Trust as provided under the Plan and Asbestos

Insurance Transfer Agreement.

**REQUEST FOR ADMISSION NO. 20:**

The Debtors did not obtain Columbia's consent regarding the transfer or

assignment of any interests or rights under the Republic Policies to the Asbestos PI Trust

as provided under the Plan and Asbestos Insurance Transfer Agreement.

**RESPONSE TO REQUEST FOR ADMISSION NO. 20:**

Admitted but further clarified that counsel for Columbia received various versions

of the Plan Documents that were filed in the above-captioned case (see Joint Plan

Documents, filed September 19, 2008 (Dkt. Nos. 19579, 19580); Amendments to Joint

Plan Documents, filed November 11, 2008 (Dkt. Nos. 19988, 19989); Further

Amendments to Joint Plan Documents, filed November 21, 2008 (Dkt. No. 20121);

Further Amendments to Joint Plan Documents, filed December 19, 2008 (Dkt. No.

20304); First Amended Joint Plan, filed February 3, 2009 (Dkt. Nos. 20666, 20667,

20668); First Amended Joint Plan, Disclosure Statement and Exhibit Book, filed

February 27, 2009 (Dkt. Nos. 20872, 20873, 20874, 20877, 20905)) and draft Plan

Documents via electronic mail from the Debtors and, therefore, Columbia was given the

opportunity to comment on and consent to the transfer or assignment of any interests or

rights under the Republic Policies to the Asbestos PI Trust as provided under the Plan

and Asbestos Insurance Transfer Agreement.

**REQUEST FOR ADMISSION NO. 21:**

The Republic Policies provide that Columbia must consent to any assignment of

interest under the Republic Policies for said assignment to be binding on Columbia.

20

**RESPONSE TO REQUEST FOR ADMISSION NO. 21:**

Objection.  This Request purports to summarize or characterize the Republic

Policies or require the Debtors to summarize or characterize information about the

Republic Policies, which Republic Policies, being in writing, speak for themselves.

Further, even assuming the Republic Policies contain language similar to that described

above, the Debtors object to this Request insofar as an accurate response would require

the application of substantive law from each state and federal jurisdiction to numerous

and varied hypothetical fact patterns, which would be both burdensome and oppressive.

Subject to those objections and the General Objections and Reservation of Rights set

forth above, the Debtors note, by way of further response, that the assignment of the

proceeds of the Republic Policies provided for in the Plan and the Asbestos Insurance

Transfer Agreement is valid and enforceable under federal law against Columbia, without

regard to consent, and that contrary state law, if any, is preempted.  See In re Combustion

Engineering, Inc., 391 F.3d 190 (3d Cir. 2005); In re Federal-Mogul Global Inc., 385

B.R. 560 (Bankr. D. Del. 2008).  Otherwise, denied.

**REQUEST FOR ADMISSION NO. 22:**

The transfer or assignment of interests or rights under the Republic Policies to the

Asbestos PI Trust as provided under the Plan and Asbestos Insurance Transfer

Agreement is not binding on Columbia.

**RESPONSE TO REQUEST FOR ADMISSION NO. 22:**

Denied.  The transfer of Asbestos Insurance Rights in the Asbestos Insurance

Transfer Agreement and Section 7.2 of the Plan is valid and enforceable against

21

Columbia. See In re Combustion Engineering, Inc., 391 F.3d 190 (3d Cir. 2005); In re Federal-Mogul Global Inc., 385 B.R. 560 (Bankr. D. Del. 2008).

**REQUEST FOR ADMISSION NO. 23:**

The Debtors did not seek Columbia's consent to the proposed Asbestos PI Trust Agreement.

**RESPONSE TO REQUEST FOR ADMISSION NO. 23:**

Denied. Counsel for Columbia received various versions of the Plan Documents that were filed in the above-captioned case (see Joint Plan Documents, filed September 19, 2008 (Dkt. Nos. 19579, 19580); Amendments to Joint Plan Documents, filed November 11, 2008 (Dkt. Nos. 19988, 19989); Further Amendments to Joint Plan Documents, filed November 21, 2008 (Dkt. No. 20121); Further Amendments to Joint Plan Documents, filed December 19, 2008 (Dkt. No. 20304); First Amended Joint Plan, filed February 3, 2009 (Dkt. Nos. 20666, 20667, 20668); First Amended Joint Plan, Disclosure Statement and Exhibit Book, filed February 27, 2009 (Dkt. Nos. 20872, 20873, 20874, 20877, 20905)) and draft Plan Documents via electronic mail from the Debtors and, therefore, Columbia was given the opportunity to comment on and consent to the Asbestos PI Trust Agreement.

**REQUEST FOR ADMISSION NO. 24:**

The Debtors did not confer with Columbia regarding the proposed Asbestos PI Trust Agreement.

**RESPONSE TO REQUEST FOR ADMISSION NO. 24:**

Admitted that the Debtors did not initially confer with Columbia regarding the proposed Asbestos PI Trust Agreement but further noted that counsel for Columbia

22

received various versions of the Plan Documents that were filed in the above-captioned

case (see Joint Plan Documents, filed September 19, 2008 (Dkt. Nos. 19579, 19580);

Amendments to Joint Plan Documents, filed November 11, 2008 (Dkt. Nos. 19988,

19989); Further Amendments to Joint Plan Documents, filed November 21, 2008 (Dkt.

No. 20121); Further Amendments to Joint Plan Documents, filed December 19, 2008

(Dkt. No. 20304); First Amended Joint Plan, filed February 3, 2009 (Dkt. Nos. 20666,

20667, 20668); First Amended Joint Plan, Disclosure Statement and Exhibit Book, filed

February 27, 2009 (Dkt. Nos. 20872, 20873, 20874, 20877, 20905)) and draft Plan

Documents via electronic mail from the Debtors and, therefore, Columbia was given the

opportunity to comment on the Asbestos PI Trust Agreement.

**REQUEST FOR ADMISSION NO. 25:**

 The Debtors did not ask Columbia to participate in the negotiation or drafting of

the Asbestos PI Trust Agreement.

**RESPONSE TO REQUEST FOR ADMISSION NO. 25:**

 Admitted that the Debtors did not ask Columbia to participate in the negotiation

or drafting of the Asbestos PI Trust Agreement but further clarified that counsel for

Columbia received various versions of the Plan Documents that were filed in the above-

captioned case (see Joint Plan Documents, filed September 19, 2008 (Dkt. Nos. 19579,

19580); Amendments to Joint Plan Documents, filed November 11, 2008 (Dkt. Nos.

19988, 19989); Further Amendments to Joint Plan Documents, filed November 21, 2008

(Dkt. No. 20121); Further Amendments to Joint Plan Documents, filed December 19,

2008 (Dkt. No. 20304); First Amended Joint Plan, filed February 3, 2009 (Dkt. Nos.

20666, 20667, 20668); First Amended Joint Plan, Disclosure Statement and Exhibit

Book, filed February 27, 2009 (Dkt. Nos. 20872, 20873, 20874, 20877, 20905)) and draft

Plan Documents via electronic mail from the Debtors and, therefore, Columbia was given

the opportunity to comment on drafts of the Asbestos PI Trust Agreement.

**REQUEST FOR ADMISSION NO. 26:**

The Debtors did not obtain Columbia's consent to the proposed Asbestos PI Trust

Agreement.

**RESPONSE TO REQUEST FOR ADMISSION NO. 26:**

Admitted but further clarified that counsel for Columbia received various versions

of the Plan Documents that were filed in the above-captioned case (see Joint Plan

Documents, filed September 19, 2008 (Dkt. Nos. 19579, 19580); Amendments to Joint

Plan Documents, filed November 11, 2008 (Dkt. Nos. 19988, 19989); Further

Amendments to Joint Plan Documents, filed November 21, 2008 (Dkt. No. 20121);

Further Amendments to Joint Plan Documents, filed December 19, 2008 (Dkt. No.

20304); First Amended Joint Plan, filed February 3, 2009 (Dkt. Nos. 20666, 20667,

20668); First Amended Joint Plan, Disclosure Statement and Exhibit Book, filed

February 27, 2009 (Dkt. Nos. 20872, 20873, 20874, 20877, 20905)) and draft Plan

Documents via electronic mail from the Debtors and, therefore, Columbia was given the

opportunity to comment on and consent to the Asbestos PI Trust Agreement.

**REQUEST FOR ADMISSION NO. 27:**

The Debtors did not seek Columbia's consent to the proposed TDP.

**RESPONSE TO REQUEST FOR ADMISSION NO. 27:**

Denied. Counsel for Columbia received various versions of the Plan Documents

that were filed in the above-captioned case (see Joint Plan Documents, filed September

24

19, 2008 (Dkt. Nos. 19579, 19580); Amendments to Joint Plan Documents, filed

November 11, 2008 (Dkt. Nos. 19988, 19989); Further Amendments to Joint Plan

Documents, filed November 21, 2008 (Dkt. No. 20121); Further Amendments to Joint

Plan Documents, filed December 19, 2008 (Dkt. No. 20304); First Amended Joint Plan,

filed February 3, 2009 (Dkt. Nos. 20666, 20667, 20668); First Amended Joint Plan,

Disclosure Statement and Exhibit Book, filed February 27, 2009 (Dkt. Nos. 20872,

20873, 20874, 20877, 20905)) and draft Plan Documents via electronic mail from the

Debtors and, therefore, Columbia was given the opportunity to comment on and consent

to the TDP.

**REQUEST FOR ADMISSION NO. 28:**

The Debtors did not confer with Columbia regarding the proposed TDP.

**RESPONSE TO REQUEST FOR ADMISSION NO. 28:**

Admitted that the Debtors did not initially confer with Columbia regarding the

proposed TDP but further noted that counsel for Columbia received various versions of

the Plan Documents that were filed in the above-captioned case (see Joint Plan

Documents, filed September 19, 2008 (Dkt. Nos. 19579, 19580); Amendments to Joint

Plan Documents, filed November 11, 2008 (Dkt. Nos. 19988, 19989); Further

Amendments to Joint Plan Documents, filed November 21, 2008 (Dkt. No. 20121);

Further Amendments to Joint Plan Documents, filed December 19, 2008 (Dkt. No.

20304); First Amended Joint Plan, filed February 3, 2009 (Dkt. Nos. 20666, 20667,

20668); First Amended Joint Plan, Disclosure Statement and Exhibit Book, filed

February 27, 2009 (Dkt. Nos. 20872, 20873, 20874, 20877, 20905)) and draft Plan

25

Documents via electronic mail from the Debtors and, therefore, Columbia was given the opportunity to comment on the TDP.

**REQUEST FOR ADMISSION NO. 29:**

The Debtors did not ask Columbia to participate in the negotiation or drafting of the TDP.

**RESPONSE TO REQUEST FOR ADMISSION NO. 29:**

Admitted that the Debtors did not ask Columbia to participate in the negotiation or drafting of the TDP but further clarified that counsel for Columbia received various versions of the Plan Documents that were filed in the above-captioned case (see Joint Plan Documents, filed September 19, 2008 (Dkt. Nos. 19579, 19580); Amendments to Joint Plan Documents, filed November 11, 2008 (Dkt. Nos. 19988, 19989); Further Amendments to Joint Plan Documents, filed November 21, 2008 (Dkt. No. 20121); Further Amendments to Joint Plan Documents, filed December 19, 2008 (Dkt. No. 20304); First Amended Joint Plan, filed February 3, 2009 (Dkt. Nos. 20666, 20667, 20668); First Amended Joint Plan, Disclosure Statement and Exhibit Book, filed February 27, 2009 (Dkt. Nos. 20872, 20873, 20874, 20877, 20905ft Plan Documents via electronic mail from the Debtors and, therefore, Columbia was given the opportunity to comment on drafts of the TDP.

**REQUEST FOR ADMISSION NO. 30:**

The Debtors did not obtain Columbia's consent to the proposed TDP.

**RESPONSE TO REQUEST FOR ADMISSION NO. 30:**

Admitted but further clarified that counsel for Columbia received various versions of the Plan Documents that were filed in the above-captioned case (see Joint Plan

26

Documents, filed September 19, 2008 (Dkt. Nos. 19579, 19580); Amendments to Joint

Plan Documents, filed November 11, 2008 (Dkt. Nos. 19988, 19989); Further

Amendments to Joint Plan Documents, filed November 21, 2008 (Dkt. No. 20121);

Further Amendments to Joint Plan Documents, filed December 19, 2008 (Dkt. No.

20304); First Amended Joint Plan, filed February 3, 2009 (Dkt. Nos. 20666, 20667,

20668); First Amended Joint Plan, Disclosure Statement and Exhibit Book, filed

February 27, 2009 (Dkt. Nos. 20872, 20873, 20874, 20877, 20905)) and draft Plan

Documents via electronic mail from the Debtors and, therefore, Columbia was given the

opportunity to comment on and consent to the TDP.

**REQUEST FOR ADMISSION NO. 31:**

Under the Plan, Columbia is excluded from any role in the investigation, defense,

and settlement of Asbestos PI Claims by the Asbestos PI Trust.

**RESPONSE TO REQUEST FOR ADMISSION NO. 31:**

Admitted that the Plan, if confirmed, does not provide for participation by

Columbia in the investigation, defense or settlement of Asbestos PI Claims for purposes

of making payment with respect to such claims out of the Asbestos PI Trust but also does

not prohibit participation by Columbia in the investigation, defense or settlement of

Asbestos PI Claims for purposes of making payment with respect to such claims out of

the Asbestos PI Trust. Further, as set forth in Sections 7.15(a) and (f) of the Plan and

except as otherwise provided in Section 7.15 of the Plan, the Plan provides that (i)

nothing in the Confirmation Order, the Plan or any of the Plan Documents shall in any

way operate to, or have the effect of, impairing any Asbestos Insurance Entity's legal,

equitable or contractual rights, if any, in any respect; and (ii) nothing in the Plan, the Plan

27

Documents, the Confirmation Order, or any finding of fact and/or conclusion of law with respect to the confirmation or consummation of the Plan shall limit the right, if any, of any Asbestos Insurance Entity, in any Asbestos Insurance Action, to assert any Asbestos Insurer Coverage Defense. Otherwise, denied.

**REQUEST FOR ADMISSION NO. 32:**

The Republic Policies require Columbia's consent to the settlement of any asbestos-related bodily injury claim as a condition to obtaining coverage for such claim under the Republic Policies.

**RESPONSE TO REQUEST FOR ADMISSION NO. 32:**

Objection. This Request purports to summarize or characterize the Republic Policies or require the Debtors to summarize or characterize information about the Republic Policies, which Republic Policies, being in writing, speak for themselves. Further, even assuming the Republic Policies contain language similar to that described above, the Debtors object to this Request insofar as an accurate response would require the application of substantive law from each state and federal jurisdiction to numerous and varied hypothetical fact patterns, which would be both burdensome and oppressive. To the extent a further response is required, this Request is denied.

**REQUEST FOR ADMISSION NO. 33:**

The Asbestos PI Trust Agreement is the agreement pursuant to which the Asbestos PI Trust will be formed and governed.

**RESPONSE TO REQUEST FOR ADMISSION NO. 33:**

Admitted. By way of further response, the Debtors refer the Discovering Parties to the Plan Documents, which are publicly available.

28

## REQUEST FOR ADMISSION NO. 34:

The TDP establishes how the Asbestos PI Trust will resolve and pay Asbestos PI Claims.

## RESPONSE TO REQUEST FOR ADMISSION NO. 34:

Admitted that the TDP provides that the Asbestos PI Trust will have the authority to review, process and, if entitled to payment, pay Asbestos PI Claims. As further set forth in Sections 5.10, 5.11, and 7.6 of the TDP, however, Asbestos PI Claimants may also arbitrate and/or litigate their claims in the tort system in certain specified circumstances.

## REQUEST FOR ADMISSION NO. 35:

The TDP are not binding on GEICO.

## RESPONSE TO REQUEST FOR ADMISSION NO. 35:

The Debtors object to this Request as vague and ambiguous insofar as the meaning of "binding" is unclear. Subject to that objection and the General Objections and Reservations of Rights set forth above, a court in coverage litigation may determine that the TDP is valid and enforceable against GEICO but, as set forth in Sections 7.15(a) and (f) of the Plan and except as otherwise provided in Section 7.15 of the Plan, the Plan provides that (i) nothing in the Confirmation Order, the Plan, or any of the Plan Documents shall in any way operate to, or have the effect of, impairing any GEICO's legal, equitable or contractual rights, if any, in any respect; and (ii) nothing in the Plan, the Plan Documents, the Confirmation Order, or any finding of fact and/or conclusion of law with respect to the confirmation or consummation of the Plan shall limit the right, if

any, of GEICO, in any Asbestos Insurance Action, to assert any Asbestos Insurer

Coverage Defense.

**REQUEST FOR ADMISSION NO. 36:**

The TDP are not binding on Columbia.

**RESPONSE TO REQUEST FOR ADMISSION NO. 36:**

The Debtors object to this Request as vague and ambiguous insofar as the

meaning of "binding" is unclear. Subject to that objection and the General Objections

and Reservations of Rights set forth above, the Debtors state that a court in coverage

litigation may determine that the TDP is valid and enforceable against Columbia but, as

set forth in Sections 7.15(a) and (f) of the Plan and except as otherwise provided in

Section 7.15 of the Plan, the Plan provides that (i) nothing in the Confirmation Order, the

Plan, or any of the Plan Documents shall in any way operate to, or have the effect of,

impairing any Columbia's legal, equitable or contractual rights, if any, in any respect; and

(ii) nothing in the Plan, the Plan Documents, the Confirmation Order, or any finding of

fact and/or conclusion of law with respect to the confirmation or consummation of the

Plan shall limit the right, if any, of Columbia, in any Asbestos Insurance Action, to assert

any Asbestos Insurer Coverage Defense.

**REQUEST FOR ADMISSION NO. 37:**

Confirmation of the Plan will not render the TDP binding on GEICO.

**RESPONSE TO REQUEST FOR ADMISSION NO. 37:**

The Debtors object to this Request as vague and ambiguous insofar as the

meaning of "binding" is unclear. Subject to that objection and the General Objections

and Reservations of Rights set forth above, the Debtors state that a court in coverage

30

litigation may determine that the TDP is valid and enforceable against Columbia but, as set forth in Sections 7.15(a) and (f) of the Plan and except as otherwise provided in Section 7.15 of the Plan, the Plan provides that (i) nothing in the Confirmation Order, the Plan or any of the Plan Documents shall in any way operate to, or have the effect of, impairing any Columbia's legal, equitable or contractual rights, if any, in any respect; and (ii) nothing in the Plan, the Plan Documents, the Confirmation Order, or any finding of fact and/or conclusion of law with respect to the confirmation or consummation of the Plan shall limit the right, if any, of Columbia, in any Asbestos Insurance Action, to assert any Asbestos Insurer Coverage Defense.

**REQUEST FOR ADMISSION NO. 38:**

Confirmation of the Plan will not render the TDP binding on Columbia.

**RESPONSE TO REQUEST FOR ADMISSION NO. 38:**

The Debtors object to this Request as vague and ambiguous insofar as the meaning of "binding" is unclear. Subject to that objection and the General Objections and Reservations of Rights set forth above, the Debtors state that a court in coverage litigation may determine that the TDP is valid and enforceable against Columbia but, as set forth in Sections 7.15(a) and (f) of the Plan and except as otherwise provided in Section 7.15 of the Plan, the Plan provides that (i) nothing in the Confirmation Order, the Plan or any of the Plan Documents shall in any way operate to, or have the effect of, impairing any Columbia's legal, equitable or contractual rights, if any, in any respect; and (ii) nothing in the Plan, the Plan Documents, the Confirmation Order, or any finding of fact and/or conclusion of law with respect to the confirmation or consummation of the Plan shall limit the right, if any, of Columbia, in any Asbestos Insurance Action, to assert

31

any Asbestos Insurer Coverage Defense.

**REQUEST FOR ADMISSION NO. 39:**

Neither GEICO nor Columbia were consulted with respect to the selection of the proposed members of the Trust Advisory Committee.

**RESPONSE TO REQUEST FOR ADMISSION NO. 39:**

Admitted that the Debtors did not initially consult with GEICO or Columbia regarding the selection of the proposed members of the Trust Advisory Committee, as set forth in the Asbestos PI Trust Agreement, but further noted that GEICO and Columbia received various versions of the Plan Documents that were filed in the above-captioned case (see Joint Plan Documents, filed September 19, 2008 (Dkt. Nos. 19579, 19580); Amendments to Joint Plan Documents, filed November 11, 2008 (Dkt. Nos. 19988, 19989); Further Amendments to Joint Plan Documents, filed November 21, 2008 (Dkt. No. 20121); Further Amendments to Joint Plan Documents, filed December 19, 2008 (Dkt. No. 20304); First Amended Joint Plan, filed February 3, 2009 (Dkt. Nos. 20666, 20667, 20668); First Amended Joint Plan, Disclosure Statement and Exhibit Book, filed February 27, 2009 (Dkt. Nos. 20872, 20873, 20874, 20877, 20905)) and draft Plan Documents via electronic mail from the Debtors and, therefore, were given the opportunity to comment on the proposed members of the Trust Advisory Committee, as set forth in the Asbestos PI Trust Agreement.

**REQUEST FOR ADMISSION NO. 40:**

Neither GEICO nor Columbia consented to the selection of the proposed members of the Trust Advisory Committee.

32

**RESPONSE TO REQUEST FOR ADMISSION NO. 40:**

Admitted but further clarified that counsel for GEICO and Columbia received various versions of the Plan Documents that were filed in the above-captioned case (see Joint Plan Documents, filed September 19, 2008 (Dkt. Nos. 19579, 19580); Amendments to Joint Plan Documents, filed November 11, 2008 (Dkt. Nos. 19988, 19989); Further Amendments to Joint Plan Documents, filed November 21, 2008 (Dkt. No. 20121); Further Amendments to Joint Plan Documents, filed December 19, 2008 (Dkt. No. 20304); First Amended Joint Plan, filed February 3, 2009 (Dkt. Nos. 20666, 20667, 20668); First Amended Joint Plan, Disclosure Statement and Exhibit Book, filed February 27, 2009 (Dkt. Nos. 20872, 20873, 20874, 20877, 20905) and draft Plan Documents via electronic mail from the Debtors and, therefore, GEICO and Columbia were given the opportunity to comment on and consent to the selection of the proposed members of the Trust Advisory Committee.

**REQUEST FOR ADMISSION NO. 41:**

Each proposed member of the Trust Advisory Committee, or his respective law firm, represents at least 1,000 Asbestos PI Claimants.

**RESPONSE TO REQUEST FOR ADMISSION NO. 41:**

Upon information and belief, admitted.

**REQUEST FOR ADMISSION NO. 42:**

Neither GEICO nor Columbia were consulted with respect to the selection of the proposed Asbestos PI Trustees of the Asbestos PI Trust.

DOCS_DE:145731.1

**RESPONSE TO REQUEST FOR ADMISSION NO. 42:**

Admitted that the Debtors did not initially consult with GEICO or Columbia regarding the selection of the proposed Asbestos PI Trustees of the Asbestos PI Trust, as set forth in the Asbestos PI Trust Agreement, but further noted that counsel for GEICO and Columbia received various versions of the Plan Documents that were filed in the above-captioned case (see Joint Plan Documents, filed September 19, 2008 (Dkt. Nos. 19579, 19580); Amendments to Joint Plan Documents, filed November 11, 2008 (Dkt. Nos. 19988, 19989); Further Amendments to Joint Plan Documents, filed November 21, 2008 (Dkt. No. 20121); Further Amendments to Joint Plan Documents, filed December 19, 2008 (Dkt. No. 20304); First Amended Joint Plan, filed February 3, 2009 (Dkt. Nos. 20666, 20667, 20668); First Amended Joint Plan, Disclosure Statement and Exhibit Book, filed February 27, 2009 (Dkt. Nos. 20872, 20873, 20874, 20877, 20905) and draft Plan Documents via electronic mail from the Debtors and, therefore, GEICO and Columbia were given the opportunity to comment on the proposed Asbestos PI Trustees of the Asbestos PI Trust, as set forth in the Asbestos PI Trust Agreement.

**REQUEST FOR ADMISSION NO. 43:**

Under the Plan, after the Effective Date, the Reorganized Debtors will retain all of their contractual duties and obligations under the GEICO Policies including, but not limited to, the duty to cooperate.

**RESPONSE TO REQUEST FOR ADMISSION NO. 43:**

Objection. The Request purports to summarize or characterize the GEICO Policies or require the Debtors to summarize or characterize information about the GEICO Policies, which GEICO Policies, being in writing, speak for themselves. Further,

even assuming the GEICO Policies contain language similar to that described above, the

Debtors object to this Request insofar as an accurate response would require the

application of substantive law from each state and federal jurisdiction to numerous and

varied hypothetical fact patterns, which would be both burdensome and oppressive.

Subject to those objections and the General Objections and Reservations of Rights set

forth above, denied but, as set forth in Sections 7.15(a) and (f) of the Plan and except as

otherwise provided in Section 7.15 of the Plan, the Plan provides that (i) nothing in the

Confirmation Order, the Plan or any of the Plan Documents shall in any way operate to,

or have the effect of, impairing GEICO's legal, equitable or contractual rights, if any, in

any respect; and (ii) nothing in the Plan, the Plan Documents, the Confirmation Order, or

any finding of fact and/or conclusion of law with respect to the confirmation or

consummation of the Plan shall limit the right, if any, of GEICO in any Asbestos

Insurance Action, to assert any Asbestos Insurer Coverage Defense.

**REQUEST FOR ADMISSION NO. 44:**

Under the Plan, after the Effective Date, the Reorganized Debtors will retain all of

their contractual duties and obligations under the Republic Policies including, but not

limited to, the duty to cooperate.

**RESPONSE TO REQUEST FOR ADMISSION NO. 44:**

Denied.

**REQUEST FOR ADMISSION NO. 45:**

Under the Plan, after the Effective Date, the Asbestos PI Trust will assume the

Debtors' contractual duties and obligations under the GEICO Policies including, but not

limited to, the duty to cooperate.

DOCS_DE:145731.1

**RESPONSE TO REQUEST FOR ADMISSION NO. 45:**

Objection. The Request purports to summarize or characterize the GEICO

Policies or require the Debtors to summarize or characterize information about the

GEICO Policies, which GEICO Policies, being in writing, speak for themselves. Further,

even assuming the GEICO Policies contain language similar to that described above, the

Debtors object to this Request insofar as an accurate response would require the

application of substantive law from each state and federal jurisdiction to numerous and

varied hypothetical fact patterns, which would be both burdensome and oppressive.

Subject to those objections and the General Objections and Reservations of Rights set

forth above, as set forth in the Asbestos Insurance Transfer Agreement, under the Plan, if

confirmed, Asbestos Insurance Rights are being transferred to the Asbestos PI Trust and,

as set forth in Sections 7.15(a) and (f) of the Plan and except as otherwise provided in

Section 7.15 of the Plan, the Plan provides that (i) nothing in the Confirmation Order, the

Plan or any of the Plan Documents shall in any way operate to, or have the effect of,

impairing any GEICO's legal, equitable or contractual rights, if any, in any respect; and

(ii) nothing in the Plan, the Plan Documents, the Confirmation Order, or any finding of

fact and/or conclusion of law with respect to the confirmation or consummation of the

Plan shall limit the right, if any, of GEICO in any Asbestos Insurance Action, to assert

any Asbestos Insurer Coverage Defense.

**REQUEST FOR ADMISSION NO. 46:**

Under the Plan, after the Effective Date, the Asbestos PI Trust will assume the

Debtors' contractual duties and obligations under the Republic Policies including, but not

limited to, the duty to cooperate.

36

**RESPONSE TO REQUEST FOR ADMISSION NO. 46:**

Objection. The Request purports to summarize or characterize the Republic Policies or require the Debtors to summarize or characterize information about the Republic Policies, which Republic Policies, being in writing, speak for themselves. Further, even assuming the Republic Policies contain language similar to that described above, the Debtors object to this Request insofar as an accurate response would require the application of substantive law from each state and federal jurisdiction to numerous and varied hypothetical fact patterns, which would be both burdensome and oppressive. Subject to those objections and the General Objections and Reservations of Rights set forth above as set forth in the Asbestos Insurance Transfer Agreement, under the Plan, if confirmed, Asbestos Insurance Rights are being transferred to the Asbestos PI Trust and, as set forth in Sections 7.15(a) and (f) of the Plan and except as otherwise provided in Section 7.15 of the Plan, the Plan provides that (i) nothing in the Confirmation Order, the Plan or any of the Plan Documents shall in any way operate to, or have the effect of, impairing any Columbia's legal, equitable or contractual rights, if any, in any respect; and (ii) nothing in the Plan, the Plan Documents, the Confirmation Order, or any finding of fact and/or conclusion of law with respect to the confirmation or consummation of the Plan shall limit the right, if any, of Columbia, in any Asbestos Insurance Action, to assert any Asbestos Insurer Coverage Defense.

**REQUEST FOR ADMISSION NO. 47:**

The Debtors did not seek the consent of any Non-Settled Asbestos Insurance Entity to the proposed Asbestos PI Trust Agreement.

37

**RESPONSE TO REQUEST FOR ADMISSION NO. 47:**

Objection. The term "Non-Settled Asbestos Insurance Entities" is not defined in the Plan and the definition of "Non-Settled Asbestos Insurance Entities" provided by the Discovering Parties is unclear and imprecise. For example, as defined by the Discovery Parties, the term "Non-Settled Asbestos Insurance Entities" includes insurers that are parties to Asbestos Insurance Reimbursement Agreements. Subject to that objection and the General Objections and Reservations of Rights set forth above, denied. Counsel for GEICO and Columbia and various other counsel for Non-Settled Asbestos Insurance Entities received various versions of the Plan Documents that were filed in the above-captioned case (see Joint Plan Documents, filed September 19, 2008 (Dkt. Nos. 19579, 19580); Amendments to Joint Plan Documents, filed November 11, 2008 (Dkt. Nos. 19988, 19989); Further Amendments to Joint Plan Documents, filed November 21, 2008 (Dkt. No. 20121); Further Amendments to Joint Plan Documents, filed December 19, 2008 (Dkt. No. 20304); First Amended Joint Plan, filed February 3, 2009 (Dkt. Nos. 20666, 20667, 20668); First Amended Joint Plan, Disclosure Statement and Exhibit Book, filed February 27, 2009 (Dkt. Nos. 20872, 20873, 20874, 20877, 20905)) and draft Plan Documents via electronic mail from the Debtors and, therefore, Non-Settled Asbestos Insurance Entities were given the opportunity to comment on and consent to the proposed Asbestos PI Trust Agreement.

**REQUEST FOR ADMISSION NO. 48:**

The Debtors did not confer with any Non-Settled Asbestos Insurance Entity regarding the proposed Asbestos PI Trust Agreement.

**RESPONSE TO REQUEST FOR ADMISSION NO. 48:**

Objection. The term "Non-Settled Asbestos Insurance Entities" is not defined in

the Plan and the definition of "Non-Settled Asbestos Insurance Entities" provided by the

Discovering Parties is unclear and imprecise. For example, as defined by the

Discovering Parties, the term "Non-Settled Asbestos Insurance Entities" includes insurers

that are parties to Asbestos Insurance Reimbursement Agreements. Subject to that

objection and the General Objections and Reservations of Rights set forth above,

admitted that the Debtors did not initially consult with Non-Settled Asbestos Insurance

Entities regarding the proposed Asbestos PI Trust Agreement but further noted that

certain counsel for Non-Settled Asbestos Insurance Entities that entered appearances

prior to February 27, 2009, received various versions of the Plan Documents that were

filed in the above-captioned case (see Joint Plan Documents, filed September 19, 2008

(Dkt. Nos. 19579, 19580); Amendments to Joint Plan Documents, filed November 11,

2008 (Dkt. Nos. 19988, 19989); Further Amendments to Joint Plan Documents, filed

November 21, 2008 (Dkt. No. 20121); Further Amendments to Joint Plan Documents,

filed December 19, 2008 (Dkt. No. 20304); First Amended Joint Plan, filed February 3,

2009 (Dkt. Nos. 20666, 20667, 20668); First Amended Joint Plan, Disclosure Statement

and Exhibit Book, filed February 27, 2009 (Dkt. Nos. 20872, 20873, 20874, 20877,

20905 )) and draft Plan Documents via electronic mail from the Debtors and, therefore,

Non-Settled Asbestos Insurance Entities were given the opportunity to comment on the

proposed Asbestos PI Trust Agreement.

**REQUEST FOR ADMISSION NO. 49:**

The Debtors did not ask any Non-Settled Asbestos Insurance Entity to participate

in the negotiation or drafting of the Asbestos PI Trust Agreement.

**RESPONSE TO REQUEST FOR ADMISSION NO. 49:**

Objection. The term "Non-Settled Asbestos Insurance Entities" is not defined in

the Plan and the definition of "Non-Settled Asbestos Insurance Entities" provided by the

Discovering Parties is unclear and imprecise. For example, as defined by the

Discovering Parties, the term "Non-Settled Asbestos Insurance Entities" includes insurers

that are parties to Asbestos Insurance Reimbursement Agreements. Subject to that

objection and the General Objections and Reservations of Rights set forth above,

admitted that the Debtors did not ask Non-Settled Asbestos Insurance Entities to

participate in the negotiation or drafting of the Asbestos PI Trust Agreement but further

clarified that certain counsel for Non-Settled Asbestos Insurance Entities that entered

appearances prior to February 27, 2009, received various versions of the Plan Documents

that were filed in the above-captioned case (see Joint Plan Documents, filed September

19, 2008 (Dkt. Nos. 19579, 19580); Amendments to Joint Plan Documents, filed

November 11, 2008 (Dkt. Nos. 19988, 19989); Further Amendments to Joint Plan

Documents, filed November 21, 2008 (Dkt. No. 20121); Further Amendments to Joint

Plan Documents, filed December 19, 2008 (Dkt. No. 20304); First Amended Joint Plan,

filed February 3, 2009 (Dkt. Nos. 20666, 20667, 20668); First Amended Joint Plan,

Disclosure Statement and Exhibit Book, filed February 27, 2009 (Dkt. Nos. 20872,

20873, 20874, 20877, 20905)) and draft Plan Documents via electronic mail from the

40

Debtors and, therefore, Non-Settled Asbestos Insurance Entities were given the
opportunity to comment on drafts of the Asbestos PI Trust Agreement.

**REQUEST FOR ADMISSION NO. 50:**

The Debtors did not obtain the consent of any Non-Settled Asbestos Insurance
Entity to the proposed Asbestos PI Trust Agreement.

**RESPONSE TO REQUEST FOR ADMISSION NO. 50:**

Objection. The term "Non-Settled Asbestos Insurance Entities" is not defined in
the Plan and the definition of "Non-Settled Asbestos Insurance Entities" provided by the
Discovering Parties is unclear and imprecise. For example, as defined by the
Discovering Parties, the term "Non-Settled Asbestos Insurance Entities" includes insurers
that are parties to Asbestos Insurance Reimbursement Agreements. Subject to that
objection and the General Objections and Reservations of Rights set forth above,
admitted but further clarified that certain counsel for Non-Settled Asbestos Insurance
Entities that entered appearances prior to February 27, 2009, received various versions of
the Plan Documents that were filed in the above-captioned case (see Joint Plan
Documents, filed September 19, 2008 (Dkt. Nos. 19579, 19580); Amendments to Joint
Plan Documents, filed November 11, 2008 (Dkt. Nos. 19988, 19989); Further
Amendments to Joint Plan Documents, filed November 21, 2008 (Dkt. No. 20121);
Further Amendments to Joint Plan Documents, filed December 19, 2008 (Dkt. No.
20304); First Amended Joint Plan, filed February 3, 2009 (Dkt. Nos. 20666, 20667,
20668); First Amended Joint Plan, Disclosure Statement and Exhibit Book, filed
February 27, 2009 (Dkt. Nos. 20872, 20873, 20874, 20877, 20905)) and draft Plan
Documents via electronic mail from the Debtors and, therefore, Non-Settled Asbestos

41

Insurance Entities were given the opportunity to comment on and consent to the proposed

Asbestos PI Trust Agreement.

**REQUEST FOR ADMISSION NO. 51:**

The Debtors did not seek the consent of any Non-Settled Asbestos Insurance

Entity to the proposed TDP.

**RESPONSE TO REQUEST FOR ADMISSION NO. 51:**

Objection. The term "Non-Settled Asbestos Insurance Entities" is not defined in

the Plan and the definition of "Non-Settled Asbestos Insurance Entities" provided by the

Discovering Parties is unclear and imprecise. For example, as defined by the Discovery

Parties the term "Non-Settled Asbestos Insurance Entities" includes insurers that are

parties to Asbestos Insurance Reimbursement Agreements. Subject to that objection and

the General Objections and Reservations of Rights set forth above, denied. Certain

counsel for Non-Settled Asbestos Insurance Entities that entered appearances prior to

February 27, 2009, received various versions of the Plan Documents that were filed in the

above-captioned case (see Joint Plan Documents, filed September 19, 2008 (Dkt. Nos.

19579, 19580); Amendments to Joint Plan Documents, filed November 11, 2008 (Dkt.

Nos. 19988, 19989); Further Amendments to Joint Plan Documents, filed November 21,

2008 (Dkt. No. 20121); Further Amendments to Joint Plan Documents, filed December

19, 2008 (Dkt. No. 20304); First Amended Joint Plan, filed February 3, 2009 (Dkt. Nos.

20666, 20667, 20668); First Amended Joint Plan, Disclosure Statement and Exhibit

Book, filed February 27, 2009 (Dkt. Nos. 20872, 20873, 20874, 20877, 20905)) and draft

Plan Documents via electronic mail from the Debtors and, therefore, Non-Settled

42

Asbestos Insurance Entities were given the opportunity to comment on and consent to the proposed TDP.

**REQUEST FOR ADMISSION NO. 52:**

The Debtors did not confer with any Non-Settled Asbestos Insurance Entity regarding the proposed TDP.

**RESPONSE TO REQUEST FOR ADMISSION NO. 52:**

Objection. The term "Non-Settled Asbestos Insurance Entities" is not defined in the Plan and the definition of "Non-Settled Asbestos Insurance Entities" provided by the Discovering Parties is unclear and imprecise. For example, as defined by the Discovery Parties, the term "Non-Settled Asbestos Insurance Entities" includes insurers that are parties to Asbestos Insurance Reimbursement Agreements. Subject to that objection and the General Objections and Reservations of Rights set forth above, admitted that the Debtors did not initially consult with Non-Settled Asbestos Insurance Entities regarding the proposed TDP but further noted that certain counsel for Non-Settled Asbestos Insurance Entities that entered appearances prior to February 27, 2009, received various versions of the Plan Documents that were filed in the above-captioned case (see Joint Plan Documents, filed September 19, 2008 (Dkt. Nos. 19579, 19580); Amendments to Joint Plan Documents, filed November 11, 2008 (Dkt. Nos. 19988, 19989); Further Amendments to Joint Plan Documents, filed November 21, 2008 (Dkt. No. 20121); Further Amendments to Joint Plan Documents, filed December 19, 2008 (Dkt. No. 20304); First Amended Joint Plan, filed February 3, 2009 (Dkt. Nos. 20666, 20667, 20668); First Amended Joint Plan, Disclosure Statement and Exhibit Book, filed February 27, 2009 (Dkt. Nos. 20872, 20873, 20874, 20877, 20905)) and draft Plan

43

Documents via electronic mail from the Debtors and, therefore, Non-Settled Asbestos

Insurance Entities were given the opportunity to comment on the proposed TDP.

## REQUEST FOR ADMISSION NO. 53:

The Debtors did not ask any Non-Settled Asbestos Insurance Entity to participate

in the negotiation or drafting of the TDP.

## RESPONSE TO REQUEST FOR ADMISSION NO. 53:

Objection. The term "Non-Settled Asbestos Insurance Entities" is not defined in

the Plan and the definition of "Non-Settled Asbestos Insurance Entities" provided by the

Discovering Parties is unclear and imprecise. For example, as defined by the Discovery

Parties, the term "Non-Settled Asbestos Insurance Entities" includes insurers that are

parties to Asbestos Insurance Reimbursement Agreements. Subject to that objection and

the General Objections and Reservations of Rights set forth above, admitted that the

Debtors did not ask Non-Settled Asbestos Insurance Entities to participate in the

negotiation or drafting of the TDP but further clarified that certain counsel for Non-

Settled Asbestos Insurance Entities that entered appearances prior to February 27, 2009,

received various versions of the Plan Documents that were filed in the above-captioned

case (see Joint Plan Documents, filed September 19, 2008 (Dkt. Nos. 19579, 19580);

Amendments to Joint Plan Documents, filed November 11, 2008 (Dkt. Nos. 19988,

19989); Further Amendments to Joint Plan Documents, filed November 21, 2008 (Dkt.

No. 20121); Further Amendments to Joint Plan Documents, filed December 19, 2008

(Dkt. No. 20304); First Amended Joint Plan, filed February 3, 2009 (Dkt. Nos. 20666,

20667, 20668); First Amended Joint Plan, Disclosure Statement and Exhibit Book, filed

February 27, 2009 (Dkt. Nos. 20872, 20873, 20874, 20877, 20905)) and draft Plan

44

Documents via electronic mail from the Debtors and, therefore, Non-Settled Asbestos

Insurance Entities were given the opportunity to comment on drafts of the TDP.

**REQUEST FOR ADMISSION NO. 54:**

The Debtors did not obtain the consent of any Non-Settled Asbestos Insurance

Entity to the proposed TDP.

**RESPONSE TO REQUEST FOR ADMISSION NO. 54:**

Objection. The term "Non-Settled Asbestos Insurance Entities" is not defined in

the Plan and the definition of "Non-Settled Asbestos Insurance Entities" provided by the

Discovering Parties is unclear and imprecise. For example, as defined by the Discovery

Parties, the term "Non-Settled Asbestos Insurance Entities" includes insurers that are

parties to Asbestos Insurance Reimbursement Agreements. Subject to that objection and

the General Objections and Reservations of Rights set forth above, admitted but further

clarified that certain counsel for Non-Settled Asbestos Insurance Entities that entered

appearances prior to February 27, 2009, received various versions of the Plan Documents

that were filed in the above-captioned case (see Joint Plan Documents, filed September

19, 2008 (Dkt. Nos. 19579, 19580); Amendments to Joint Plan Documents, filed

November 11, 2008 (Dkt. Nos. 19988, 19989); Further Amendments to Joint Plan

Documents, filed November 21, 2008 (Dkt. No. 20121); Further Amendments to Joint

Plan Documents, filed December 19, 2008 (Dkt. No. 20304); First Amended Joint Plan,

filed February 3, 2009 (Dkt. Nos. 20666, 20667, 20668); First Amended Joint Plan,

Disclosure Statement and Exhibit Book, filed February 27, 2009 (Dkt. Nos. 20872,

20873, 20874, 20877, 20905)) and draft Plan Documents via electronic mail from the

45

Debtors and, therefore, Non-Settled Asbestos Insurance Entities were given the opportunity to comment on and consent to the proposed TDP.

**REQUEST FOR ADMISSION NO. 55:**

Under the Plan, all Non-Settled Asbestos Insurance Entities are excluded from any role in the investigation, defense, and settlement of Asbestos PI Claims by the Asbestos PI Trust.

**RESPONSE TO REQUEST FOR ADMISSION NO. 55:**

Objection. The term "Non-Settled Asbestos Insurance Entities" is not defined in the Plan and the definition of "Non-Settled Asbestos Insurance Entities" provided by the Discovering Parties is unclear and imprecise. For example, as defined by the Discovery Parties, the term "Non-Settled Asbestos Insurance Entities" includes insurers that are parties to Asbestos Insurance Reimbursement Agreements. Subject to that objection and the General Objections and Reservations of Rights set forth above, admitted that the Plan, if confirmed, does not provide for participation by Non-Settled Asbestos Insurance Entities in the investigation, defense or settlement of Asbestos PI Claims for purposes of making payment with respect to such claims out of the Asbestos PI Trust but also does not prohibit participation by Non-Settled Asbestos Insurance Entities in the investigation, defense or settlement of Asbestos PI Claims for purposes of making payment with respect to such claims out of the Asbestos PI Trust. Further, as set forth in Section 7.15(a) and (f) of the Plan and except as otherwise provided in Section 7.15 of the Plan, the Plan provides that (i) nothing in the Confirmation Order, the Plan, or any of the Plan Documents shall in any way operate to, or have the effect of, impairing any Asbestos Insurance Entity's legal, equitable or contractual rights, if any, in any respect; and (ii)

46

nothing in the Plan, the Plan Documents, the Confirmation Order, or any finding of fact and/or conclusion of law with respect to the confirmation or consummation of the Plan shall limit the right, if any, of any Asbestos Insurance Entity, in any Asbestos Insurance Action, to assert any Asbestos Insurer Coverage Defense. Otherwise, denied.

**REQUEST FOR ADMISSION NO. 56:**

If confirmed, the Plan will constitute a settlement of some, or all, Asbestos PI Claims.

**RESPONSE TO REQUEST FOR ADMISSION NO. 56:**

Objection. This Request calls for speculation about future conduct, in particular what may occur in future coverage litigation, which is not the proper subject of a Request for Admission under Federal Rule of Civil Procedure 36, applicable to this proceeding by Federal Rule of Bankruptcy Procedure 7036, or any other applicable rule. The Debtors further object to this Request insofar as it seeks a legal conclusion about a matter that is relevant only to coverage litigation and not confirmation of the Plan. Subject to those objections and the General Objections and Reservations of Rights set forth above, as set forth in Sections 7.15(a) and (f) of the Plan and except as otherwise provided in Section 7.15 of the Plan, the Plan provides that (i) nothing in the Confirmation Order, the Plan or any of the Plan Documents shall in any way operate to, or have the effect of, impairing any Asbestos Insurance Entity's legal, equitable or contractual rights, if any, in any respect and (ii) nothing in the Plan, the Plan Documents, the Confirmation Order, or any finding of fact and/or conclusion of law with respect to the confirmation or consummation of the Plan shall limit the right, if any, of any Asbestos Insurance Entity, in any Asbestos Insurance Action, to assert any Asbestos Insurer Coverage Defense.

47

**REQUEST FOR ADMISSION NO. 57:**

If confirmed, the Plan will not constitute a settlement of any Asbestos PI Claim.

**RESPONSE TO REQUEST FOR ADMISSION NO. 57:**

Objection. This Request calls for speculation about future conduct, in particular

what may occur in future coverage litigation, which is not the proper subject of a Request

for Admission under Federal Rule of Civil Procedure 36, applicable to this proceeding by

Federal Rule of Bankruptcy Procedure 7036, or any other applicable rule. The Debtors

further object to this Request insofar as it seeks a legal conclusion about a matter that is

relevant only to coverage litigation and not confirmation of the Plan. Subject to those

objections and the General Objections and Reservations of Rights set forth above, as set

forth in Sections 7.15(a) and (f) of the Plan and except as otherwise provided in Section

7.15 of the Plan, the Plan provides that (i) nothing in the Confirmation Order, the Plan or

any of the Plan Documents shall in any way operate to, or have the effect of, impairing

any Asbestos Insurance Entity's legal, equitable or contractual rights, if any, in any

respect; and (ii) nothing in the Plan, the Plan Documents, the Confirmation Order, or any

finding of fact and/or conclusion of law with respect to the confirmation or

consummation of the Plan shall limit the right, if any, of any Asbestos Insurance Entity,

in any Asbestos Insurance Action, to assert any Asbestos Insurer Coverage Defense.

**REQUEST FOR ADMISSION NO. 58:**

If confirmed, the Plan will constitute a judgment with respect to some, or all,

Asbestos PI Claims.

DOCS_DE:145731.1

**RESPONSE TO REQUEST FOR ADMISSION NO. 58:**

Objection. This Request calls for speculation about future conduct, in particular what may occur in future coverage litigation, which is not the proper subject of a Request for Admission under Federal Rule of Civil Procedure 36, applicable to this proceeding by Federal Rule of Bankruptcy Procedure 7033, or any other applicable rule. The Debtors further object to this Request insofar as it seeks a legal conclusion about a matter that is relevant only to coverage litigation and not confirmation of the Plan. Subject to those objections and the General Objections and Reservations of Rights set forth above, as set forth in Sections 7.15(a) and (f) of the Plan and except as otherwise provided in Section 7.15 of the Plan, the Plan provides that (i) nothing in the Confirmation Order, the Plan or any of the Plan Documents shall in any way operate to, or have the effect of, impairing any Asbestos Insurance Entity's legal, equitable or contractual rights, if any, in any respect; and (ii) nothing in the Plan, the Plan Documents, the Confirmation Order, or any finding of fact and/or conclusion of law with respect to the confirmation or consummation of the Plan shall limit the right, if any, of any Asbestos Insurance Entity, in any Asbestos Insurance Action, to assert any Asbestos Insurer Coverage Defense.

**REQUEST FOR ADMISSION NO. 59:**

If confirmed, the Plan will not constitute a judgment with respect to any Asbestos PI Claim.

**RESPONSE TO REQUEST FOR ADMISSION NO. 59:**

Objection. This Request calls for speculation about future conduct, in particular what may occur in future coverage litigation, which is not the proper subject of a Request for Admission under Federal Rule of Civil Procedure 36, applicable to this proceeding by

49

Federal Rule of Bankruptcy Procedure 7036, or any other applicable rule. The Debtors further object to this Request insofar as it seeks a legal conclusion about a matter that is relevant only to coverage litigation and not confirmation of the Plan. Subject to those objections and the General Objections and Reservations of Rights set forth above, as set forth in Sections 7.15(a) and (f) of the Plan and except as otherwise provided in Section 7.15 of the Plan, the Plan provides that (i) nothing in the Confirmation Order, the Plan or any of the Plan Documents shall in any way operate to, or have the effect of, impairing any Asbestos Insurance Entity's legal, equitable or contractual rights, if any, in any respect; and (ii) nothing in the Plan, the Plan Documents, the Confirmation Order, or any finding of fact and/or conclusion of law with respect to the confirmation or consummation of the Plan shall limit the right, if any, of any Asbestos Insurance Entity, in any Asbestos Insurance Action, to assert any Asbestos Insurer Coverage Defense.

### INTERROGATORIES

#### INTERROGATORY NO. 1:

Prior to September 19, 2008, did the Debtors communicate or consult with GEICO or Columbia regarding the proposed terms of the Plan, Asbestos PI Trust Agreement, Asbestos Insurance Transfer Agreement, or TDP? If so, explain when and how the Debtors communicated or consulted with GEICO or Columbia.

#### RESPONSE TO INTERROGATORY NO. 1:

Prior to September 19, 2008, the Debtors did not communicate or consult with GEICO or Columbia regarding the proposed terms of the Plan, Asbestos PI Trust Agreement, Asbestos Insurance Transfer Agreement or TDP.

**INTERROGATORY NO. 2:**

Did the Debtors obtain the consent of GEICO or Columbia to the Plan, Asbestos PI Trust Agreement, Asbestos Insurance Transfer Agreement, or TDP? If so, explain when and how such consent was obtained.

**RESPONSE TO INTERROGATORY NO. 2:**

The Debtors did not obtain the consent of GEICO or Columbia to the Plan, Asbestos PI Trust Agreement, Asbestos Insurance Transfer Agreement or TDP but counsel for GEICO and Columbia received various versions of the Plan Documents that were filed in the above-captioned cases (see Joint Plan Documents, filed September 19, 2008 (Dkt. Nos. 19579, 19580); Amendments to Joint Plan Documents, filed November 11, 2008 (Dkt. Nos. 19988, 19989); Further Amendments to Joint Plan Documents, filed November 21, 2008 (Dkt. No. 20121); Further Amendments to Joint Plan Documents, filed December 19, 2008 (Dkt. No. 20304); First Amended Joint Plan, filed February 3, 2009 (Dkt. Nos. 20666, 20667, 20668); First Amended Joint Plan, Disclosure Statement and Exhibit Book, filed February 27, 2009 (Dkt. Nos. 20872, 20873, 20874, 20877, 20905)) and draft Plan Documents via electronic mail from the Debtors and, therefore, GEICO and Columbia were given the opportunity to comment on and consent to the Plan, Asbestos PI Trust Agreement, Asbestos Insurance Transfer Agreement and TDP.

**INTERROGATORY NO. 3:**

To the Debtors' knowledge, has GEICO or Columbia breached any term or provision of the GEICO Policies or Republic Policies respectively? If so, explain the nature of the breach(es) and when it/they occurred.

DOCS_DE:145731.1

**RESPONSE TO INTERROGATORY NO. 3:**

Based on information currently known to the Debtors, neither GEICO nor Columbia have breached any term or provision of their respective Policies. The Debtors reserve the right to amend or supplement this response if additional information is discovered.

**INTERROGATORY NO. 4:**

If GEICO and Columbia have not breached, and do no breach, any term or provision of the GEICO Policies or Republic Policies respectively, describe what role, if any, they would be permitted to have under the Plan and Plan Documents with respect to the investigation, evaluation, defense, allowance, or settlement of Asbestos PI Claims submitted to the Asbestos PI Trust. If GEICO and Columbia are permitted any such a role, identify the specific provisions in the Plan or Plan Documents that so provide.

**RESPONSE TO INTERROGATORY NO. 4:**

The Plan, if confirmed, does not provide for participation by GEICO or Columbia in the investigation, evaluation, defense, allowance or settlement of Asbestos PI Claims submitted to the Asbestos PI Trust for purposes of making payment with respect to such claims out of the Asbestos PI Trust but also does not prohibit participation by GEICO or Columbia in the investigation, evaluation, defense, allowance or settlement of Asbestos PI Claims submitted to the Asbestos PI Trust for purposes of making payment with respect to such claims out of the Asbestos PI Trust. Further, as set forth in Section 7.15(a) and (f) of the Plan and except as otherwise provided in Section 7.15 of the Plan, the Plan provides that (i) nothing in the Confirmation Order, the Plan or any of the Plan Documents shall in any way operate to, or have the effect of, impairing GEICO's or

52

Columbia's legal, equitable or contractual rights, if any, in any respect; and (ii) nothing in the Plan, the Plan Documents, the Confirmation Order, or any finding of fact and/or conclusion of law with respect to the confirmation or consummation of the Plan shall limit the right, if any, of GEICO or Columbia, in any Asbestos Insurance Action, to assert any Asbestos Insurer Coverage Defense.

**INTERROGATORY NO. 5:**

Upon the Effective Date, will the Reorganized Debtors retain any of the Debtors' duties and obligations under the GEICO Policies or Republic Policies including, but not limited to, the duty to cooperate?

(a)    If so, which of the Debtors' duties and obligations under the GEICO Policies or Republic Policies will the Reorganized Debtors retain?

(b)    If not, what happens to those duties and obligations of the Debtors that the Reorganized Debtors do not retain?

**RESPONSE TO INTERROGATORY NO. 5:**

The Debtors object to this Interrogatory to the extent that it purports to summarize or characterize the GEICO Policies and the Republic Policies or require the Debtors to summarize or characterize information about the GEICO Policies and the Republic Policies, which Policies, being in writing, speak for themselves. Further, even assuming the GEICO Policies and Republic Policies contain language similar to that described above, the Debtors object to this Interrogatory insofar as an accurate response would require the application of substantive law from each state and federal jurisdiction to numerous and varied hypothetical fact patterns, which would be both burdensome and oppressive. Subject to those objections and the General Objections and Reservations of

53

Rights set forth above, as set forth in the Asbestos Insurance Transfer Agreement, under

the Plan, if confirmed, Asbestos Insurance Rights are being transferred to the Asbestos PI

Trust and, as set forth in Sections 7.15(a) and (f) of the Plan and except as otherwise

provided in Section 7.15 of the Plan, the Plan provides that (i) nothing in the

Confirmation Order, the Plan or any of the Plan Documents shall in any way operate to,

or have the effect of, impairing GEICO's or Columbia's legal, equitable or contractual

rights, if any, in any respect; and (ii) nothing in the Plan, the Plan Documents, the

Confirmation Order, or any finding of fact and/or conclusion of law with respect to the

confirmation or consummation of the Plan shall limit the right, if any, of GEICO and

Columbia in any Asbestos Insurance Action, to assert any Asbestos Insurer Coverage

Defense.

**INTERROGATORY NO. 6:**

Upon the Effective Date, will the Asbestos PI Trust, as the transferee of the

Asbestos Insurance Rights under the Asbestos Insurance Transfer Agreement, assume all

of the Debtors' duties and obligations under the GEICO Policies and Republic Policies

including, but not limited to, the duty to cooperate?

(a)    If not, which of the Debtors' duties and obligations under the GEICO

Policies and Republic Policies will the Asbestos PI Trust not be assuming and why is it

not assuming them?

(b)    If so, to the extent that the TDP are inconsistent with the Debtors' duties

and obligations under the GEICO Policies and Republic Policies, which will govern.

**RESPONSE TO INTERROGATORY NO. 6:**

See response to Interrogatory No. 5 above.

DOCS_DE:145731.1

**INTERROGATORY NO. 7:**

With respect to each proposed member of the Trust Advisory Committee (*i.e.*, Russell W. Budd, John D. Cooney, Joseph F. Rice, and Perry Weitz), provide the total number of Asbestos PI Claimants that each such member's current law firm represents as reflected on the law firm's most recent verified statement filed pursuant to Fed. R. Bankr. P. 2019.

**RESPONSE TO INTERROGATORY NO. 7:**

The Debtors object to this Interrogatory to the extent that it is unduly burdensome, irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Moreover, the Debtors object to this Interrogatory to the extent that it seeks to require the Debtors to review and provide information from documents that are equally available to the Discovering Parties for review and identification.

**INTERROGATORY NO. 8:**

If the Court confirms the Plan, do the Debtors agree that the Plan, Plan Documents, and/or Confirmation Order will not constitute a settlement of some, or all, Asbestos PI Claims?

**RESPONSE TO INTERROGATORY NO. 8:**

The Debtors object to this Interrogatory insofar as it calls for speculation about future conduct, in particular what may occur in future coverage litigation, which is not the proper subject of a Request for Admission under Federal Rule of Civil Procedure 36, applicable to this proceeding by Federal Rule of Bankruptcy Procedure 7036, or any other applicable rule. The Debtors further object to this Interrogatory insofar as it seeks a legal conclusion about a matter that is relevant only to coverage litigation and not

DOCS_DE:145731.1

confirmation of the Plan. Subject to those objections and the General Objections and

Reservations of Rights set forth above, as set forth in Sections 7.15(a) and (f) of the Plan

and except as otherwise provided in Section 7.15 of the Plan, the Plan provides that (i)

nothing in the Confirmation Order, the Plan or any of the Plan Documents shall in any

way operate to, or have the effect of, impairing any Asbestos Insurance Entity's legal,

equitable or contractual rights, if any, in any respect; and (ii) nothing in the Plan, the Plan

Documents, the Confirmation Order, or any finding of fact and/or conclusion of law with

respect to the confirmation or consummation of the Plan shall limit the right, if any, of

any Asbestos Insurance Entity, in any Asbestos Insurance Action, to assert any Asbestos

Insurer Coverage Defense.

**INTERROGATORY NO. 9:**

      If the Court confirms the Plan, do the Debtors agree that the Plan, Plan

Documents, and/or Confirmation Order will not constitute a judgment with respect to

some, or all, Asbestos PI Claims?

**RESPONSE TO INTERROGATORY NO. 9:**

      The Debtors object to this Interrogatory insofar as it calls for speculation about

future conduct, in particular what may occur in future coverage litigation, which is not

the proper subject of a Request for Admission under Federal Rule of Civil Procedure 36,

applicable to this proceeding by Federal Rule of Bankruptcy Procedure 7036, or any

other applicable rule. The Debtors further object to this Interrogatory insofar as it seeks a

legal conclusion about a matter that is relevant only to coverage litigation and not

confirmation of the Plan. Subject to those objections and the General Objections and

Reservations of Rights set forth above, as set forth in Sections 7.15(a) and (f) of the Plan

DOCS_DE:145731.1

and except as otherwise provided in Section 7.15 of the Plan, the Plan provides that (i) nothing in the Confirmation Order, the Plan or any of the Plan Documents shall in any way operate to, or have the effect of, impairing any Asbestos Insurance Entity's legal, equitable or contractual rights, if any, in any respect; and (ii) nothing in the Plan, the Plan Documents, the Confirmation Order, or any finding of fact and/or conclusion of law with respect to the confirmation or consummation of the Plan shall limit the right, if any, of any Asbestos Insurance Entity, in any Asbestos Insurance Action, to assert any Asbestos Insurer Coverage Defense.

**INTERROGATORY NO. 10:**

Prior to December 19, 2008, did the Debtors consult with any Asbestos Insurance Entity with respect to any provision of the Plan, Asbestos PI Trust Agreement, Asbestos Insurance Transfer Agreement, or TDP?  If so, identify each such Asbestos Insurance Entity, state when and how the Debtors consulted with it, and identify which provisions were the subject of such consultation.

**RESPONSE TO INTERROGATORY NO. 10:**

The Debtors object to this Interrogatory to the extent that it is unduly burdensome, irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Subject to that objection and the General Objections and Reservations of Rights set forth above, although the Debtors did not initially consult with any Asbestos Insurance Entity with respect to any provision of the Plan, Asbestos PI Trust Agreement, Asbestos Insurance Transfer Agreement or TDP, counsel for certain Asbestos Insurance Entities that entered appearances prior to February 27, 2009, received various versions of the Plan Documents that were filed in the above-captioned cases (see Joint Plan Documents, filed

57

September 19, 2008 (Dkt. Nos. 19579, 19580); Amendments to Joint Plan Documents,

filed November 11, 2008 (Dkt. Nos. 19988, 19989); Further Amendments to Joint Plan

Documents, filed November 21, 2008 (Dkt. No. 20121); Further Amendments to Joint

Plan Documents, filed December 19, 2008 (Dkt. No. 20304); First Amended Joint Plan,

filed February 3, 2009 (Dkt. Nos. 20666, 20667, 20668); First Amended Joint Plan,

Disclosure Statement and Exhibit Book, filed February 27, 2009 (Dkt. Nos. 20872,

20873, 20874, 20877, 20905)) and draft Plan Documents via electronic mail from the

Debtors beginning as early as September 2008 and, therefore, Asbestos Insurance Entities

were given the opportunity to comment on and consent to the Plan, Asbestos PI Trust

Agreement, Asbestos Insurance Transfer Agreement and TDP.

**INTERROGATORY NO. 11:**

Identify each individual (by name, employer, and business address) that had any

role, other than merely clerical, in the preparation of the Debtors' responses to these

Interrogatories and the Debtors' responses to Government Employees Insurance

Company's and Columbia Insurance Company's Requests for Admission Directed to the

Debtors ("RFAs") and, as to each, describe what role he/she had and with respect to

which Interrogatories and RFAs.

**RESPONSE TO INTERROGATORY NO. 11:**

The Debtors object to this Interrogatory to the extent that it seeks information

protected from disclosure by the attorney-client privilege, work product doctrine and/or

the extension of those privileges by the joint defense and/or common interest doctrines.

Subject to that objection and the General Objections and Reservations of Rights set forth

58

above, the Debtors' responses to the Interrogatories and Requests for Admission were

prepared by the Debtors and their counsel.

## REQUESTS FOR PRODUCTION

### REQUEST FOR PRODUCTION NO. 1:

All Documents that You refer to, or rely upon, in responding to the Interrogatories

and Requests for Admission served by GEICO and Columbia on You.

### RESPONSE TO REQUEST FOR PRODUCTION NO. 1:

Subject to the General Objections and Reservation of Rights set forth above, the

Debtors refer the Discovering Parties to the Plan Documents, which are publicly

available.

### REQUEST FOR PRODUCTION NO. 2:

All Documents that You will rely upon in contesting GEICO's and Columbia's

preliminary objections to the Plan filed on or about January 5, 2009, or GEICO's and

Columbia's final plan objections.

### RESPONSE TO REQUEST FOR PRODUCTION NO. 2:

The Debtors object to this Request insofar as it requires them to identify

documents that will be referenced in, identified in, or relied upon in connection with the

Debtors' trial brief, which, pursuant to the Second Amended Case Management Order

Relating to the First Amended Joint Plan of Reorganization, entered on January 29, 2009,

is not yet due.

### REQUEST FOR PRODUCTION NO. 3

All Documents sent by You, or on Your behalf, to GEICO or Columbia, or

received by You from GEICO or Columbia, that refer or relate to this bankruptcy case.

[Note: For Purposes of this Request, You should exclude Documents place in the data room established by Grace in response to Certain Insurer's First Request for Production of Documents, directed to Debtors (as defined therein) and dated November 25, 2008.]

## RESPONSE TO REQUEST FOR PRODUCTION NO. 3:

The Debtors object to this Request to the extent that it seeks discovery of information that is equally accessible and available to the Discovering Parties or that is already in their possession, custody or control, such as Plan Documents and pleadings and motions filed in the Bankruptcy Court. Subject to that objection and the General Objections and Reservations of Rights set forth above, the Debtors note that a settlement demand was sent to the Discovering Parties. If the Discovering Parties cannot locate such document, the Debtors will provide an additional copy of it.

## INCORPORATION AND RESERVATIONS

In response to the joinder of GEICO and Columbia in the Requests for Production of Documents served by other Asbestos Insurance Entities on the Debtors, Asbestos PI Committee and Asbestos PI FCR, the Debtors incorporate by reference their response to any requests for production filed by other Asbestos Insurance Entities on the Debtors and reserve the right to amend or supplement those or these responses.

DOCS_DE:145731.1

**For purposes of objections under Federal Rule of Civil Procedure 33(b)(5) (made applicable by Rule 7033 of the Federal Rules of Bankruptcy Procedure):**

Dated: March 6, 2009

KIRKLAND & ELLIS LLP
David M. Bernick, P.C.
Lisa G. Esayian
200 East Randolph Drive
Chicago, Illinois 60601
Telephone: (312) 861-2000
Facsimile: (312) 861-2200

Theodore L. Freedman
Citigroup Center
153 East 53rd Street
New York, New York 10022-4611
Telephone: (212) 446 - 4800
Facsimile: (212) 446 - 4900

and

PACHULSKI STANG ZIEHL & JONES LLP

Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
Kathleen P. Makowski (Bar No. 3648)
Timothy Cairns (Bar No. 4228)
919 North Market Street, 17th Floor
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400

Co-Counsel for the Debtors and Debtors in Possession

DOCS_DE:145731.1

## VERIFICATION

I, Richard C. Finke, am Assistant General Counsel-Litigation for W. R. Grace &

Co. I declare under penalty of perjury that I am authorized to make this declaration on

behalf of W. R. Grace & Co., that I have read the above and foregoing Debtors' Response

to Government Employees Insurance Company and Columbia Insurance Company's

Interrogatories, the facts and statements set forth therein are true and correct to the best of

my personal knowledge or based on information supplied to me by others, including

counsel, and as such are true and correct to the best of my knowledge, information and

belief. In verifying the foregoing Debtors' Response to Government Employees

Insurance Company and Columbia Insurance Company's Interrogatories, I have relied

upon the assistance of counsel and the investigation they have undertaken to compile the

information upon which these Responses are based and the statements contained therein.

W.R. Grace & Co. hereby reserves the right to modify, clarify, or supplement these

discovery responses should new information warrant such modification, clarification or

supplementation.


Dated: March 6, 2009

Richard C. Finke

62