# APPENDIX B

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., *et al.* | ) | Case No. 01-01139 (JKF) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | Docket No. |
| | ) | |

---

## REBUTTAL EXPERT REPORT OF
## JOSEPH V. RODRICKS, PH.D., D.A.B.T.

_____

Joseph V. Rodricks, Ph.D., D.A.B.T                    June 8, 2007

## REBUTTAL EXPERT REPORT OF JOSEPH V. RODRICKS, PH.D., D.A.B.T.
### June 8, 2007

I am a consultant in toxicology and human health risk assessment and I have been certified as a Diplomate of the American Board of Toxicology (DABT) since 1982.  I am employed as a Principal at ENVIRON International Corporation, Arlington, Virginia.  In addition, I am a Visiting Professor at the Johns Hopkins Bloomberg School of Public Health (Baltimore, Maryland), where I teach courses in toxicology and risk assessment.  I have a B.S. degree in Chemistry from M.I.T. (1960), a Ph.D. in Biochemistry from the University of Maryland (1968), and was a Post-doctoral Scholar in the Department of Biochemistry, University of California at Berkeley (1969-1970).

I previously submitted an expert report on September 21, 2006 in which I provided my full qualifications and provided an opinion in the above-captioned matter on governmental regulatory activities relating to asbestos and asbestos exposure.  In that report, I summarized the historical development of standards for asbestos exposure in occupational and non-occupational settings by such agencies as the Occupational Safety and Health Administration (OSHA) and the U.S. Environmental Protection Agency (EPA), and I discussed the use of risk assessment in standard setting for asbestos and other carcinogens.  I also discussed risks associated with current asbestos standards and offered opinions on the relevance of risk-based standards to the evaluation of disease causation in individuals.

In this supplemental expert report, I have been asked to expand on certain points I made in my earlier report to address specific points made by Plaintiffs' Experts Drs. Barry Castleman, Richard Lemen, and Arthur Frank in their expert reports submitted for this case.  These issues include:

1. A brief discussion of the process of developing standards for the protection of workers from the effects of asbestos, with specific focus on the history of the availability of scientific information useful to develop such standards;
2. A discussion of the inappropriateness of using regulatory standards and risk assessment methods to assess health risks to specific individuals; and
3. A discussion of the evolution of W.R. Grace's understanding of asbestos-related health risks, and of the company's efforts to manage those risks.

## I.    REGULATORY STANDARDS

### A. Regulatory Standards and Protection Against Lung Cancer Risks from Occupational Asbestos Exposure

The risk assessment process uses scientific information to develop policies to protect the public (in an occupational or community setting) from the adverse health effects that may result

from exposure to chemicals.  Risk assessment is used to turn scientific knowledge into policy in a variety of settings; for example, by the government for regulatory policy, by industry organizations to guide member companies, or by an individual corporation to guide its own corporate policies.  A formalized risk assessment process was not established until 1983 (NAS 1983); however, the concepts contained in this formalized process have long been the foundation for development of public health standards.  For use in the occupational setting, an organization known as the American Conference of Governmental Industrial Hygienists (ACGIH) developed and published so-called TLVs® (Threshold Limit Values) beginning in the 1940s.  TLVs were (and still are) developed by expert committees of the ACGIH, and were (and still are) widely used as guides to worker health protection.  The committees have relied upon scientific information relating exposures to chemical substances to adverse health effects, and judgments about the levels of exposure likely to be health protective.  TLVs are periodically reviewed and, if supported by scientific information, are revised.

The evolution of ACGIH's TLVs for asbestos is summarized in Table 1.  Until 1971, all of these TLVs were based upon quantitative data relating asbestos exposures to asbestosis.  Dr. Castleman (September 26, 2006), has stated that some medical professionals in the 1950s  (e.g., Mayers 1952; McLaughlin 1953; Cook 1956) were concerned that TLVs were not protective for all individuals, and may not have been protective against asbestos-related cancers.  However, these TLVs, though not explicitly based upon data relating to asbestos-related cancers, at the time were generally considered adequate to protect against these risks.  I will discuss this in more detail below.

The first cases of lung cancer associated with occupational exposure to asbestos were described in the 1930s (Wood and Gloyne 1934; Lynch and Smith 1935).  A commonly held belief in the scientific community (NIOSH 1972; NIOSH 1976) has been that the first study to firmly establish the association between occupational asbestos exposure and lung cancer was of asbestos textile workers in the United Kingdom (UK), and was reported by Doll (1955).

ACGIH Documentation of TLVs for asbestos fails to mention, until 1971, the scientific evidence reporting an increased risk of lung cancer associated with occupational asbestos exposure (ACGIH 1962; ACGIH 1966; ACGIH 1971).  I cannot explain this omission on the part of ACGIH. However, that this omission occurred does not mean the TLVs published until 1971 were inadequate, based on the information available until 1971.

| TABLE 1<br>History of ACGIH Asbestos TLVs | |
|---|---|
| **Date** | **Exposure recommendation  (TLV, 8-hour TWA)** |
| 1946-1973 | 5 mppcf[1] |
| 1968-1969 | Proposed 12 f/ml >5 μm in length or 2 mppcf |
| 1970-1972 | Proposed 5 f/ml >5 μm in length |
| 1974-1979 | 5 f/cc >5 μm in length |
| 1978 | For chrysotile and other forms: Proposed 2 f/cc >5 μm in length<br>For amosite and tremolite: Proposed 0.5 f/cc >5 μm in length |
| 1980-1986 | For chrysotile and other forms: 2.0 f/cc >5 μm in length<br>For amosite[2]: 0.5 f/cc >5 μm in length |
| 1987-1997 | For chrysotile and other forms: 2.0 f/cc >5 μm in length<br>For amosite[2]: 0.5 f/cc >5 μm in length |
| 1991 | For all asbestos forms: Proposed 0.2 f/cc >5 μm in length |
| 1997 | For all asbestos forms: Proposed 0.1 f/cc >5 μm in length |
| 1998-present | For all asbestos forms: 0.1 f/cc >5 μm in length |

*Notes and abbreviations*:
Sources: (ACGIH 1962; ACGIH 1966; ACGIH 1971; ACGIH 1984; ACGIH 2001)
[1]From 1946 to 1947, occupational exposure recommendations by the ACGIH were called maximum allowable concentrations (MAC).
[2]Tremolite listing deleted.
mppcf, million particles per cubic foot; f/ml, fibers per milliliter; f/cc, fibers per cubic centimeter; f/ml=f/cc.

It is important to understand the following: 1) through the early 1970s, it was commonly believed that the development of lung cancer following asbestos exposure would not occur in the absence of the development of asbestosis; therefore, an exposure standard protective against asbestosis would be protective against lung cancer; and 2) exposure standards can not be created in the absence of definitive and quantitative exposure data correlated with health effects, and for lung cancer, these definitive and quantitative data did not exist until the 1970s.

Through the 1970s, the TLV for asbestos exposure was developed with the goal of preventing asbestosis, and was based on an early recommendation of the U.S. Public Health Service (Dreessen et al. 1938).  That TLV was consistent with the state of scientific knowledge at the time. Dreessen's (1938) report presented measured asbestos exposure data correlated with asbestosis and recommended that no excess asbestos disease would occur if exposures did not exceed 5 million particles per cubic foot (mppcf).  After Dreessen (1938), the next effort to develop a quantitative standard for the purposes of preventing occupational asbestosis came in 1968.

More specifically, in 1968, the British Occupational Hygiene Society (BOHS 1968) published occupational exposure standards for chrysotile dust based on a study of a group of

**E N V I R O N**                                        - 3 -

asbestos textile workers in the UK.[1]  The BOHS (1968)[2] review was used by NIOSH for its recommended standard in 1972 (NIOSH 1972), and accordingly by OSHA in its June 1972 rulemaking, to become effective in July 1976 (OSHA 1972); the review was referenced by ACGIH for its proposed new standard in 1971 (ACGIH 1971) and used to develop the standard in 1984 (ACGIH 1984).  As stated by the BOHS (1968), this recommended standard (i.e., 2 f/cc for 50 years) was aimed at reducing "the risk of contracting asbestosis to 1 per cent of those who have a lifetime's exposure to the dust."  Regarding lung cancer the BOHS (1968) stated, "The primary danger of inhaling asbestos dust is asbestosis.  It is generally recognized that there is also a significant risk of lung cancer associated with asbestosis…the quantitative relationship between asbestos and cancer risk is not known, nor is it known exactly why these two are related, nor even whether all kinds of asbestos present a risk.  Consequently, it is not possible at this time to specify an air concentration which is known to be free of risk in this respect."

In 1972, asbestos was listed definitively as a carcinogen by ACGIH, although the exposure standard remained at 5 f/cc until 1979 (ACGIH 2001).

In August 1983, OSHA completed its first comprehensive quantitative risk assessment for asbestos-related cancer (OSHA 1983b), which was based on numerous human studies and which estimated the number of excess deaths from lung cancer, mesothelioma, and gastrointestinal cancer at various exposure concentrations and durations.  The earliest study relied upon was one study from 1977 (Liddell et al. 1977).  Other studies were from 1979 (Henderson and Enterline 1979; Nicholson et al. 1979; Rubino et al. 1979; Weill et al. 1979), from 1980 (Peto 1980) and from 1983 (Dement et al. 1983a; Dement et al. 1983b; Finkelstein 1983).  In the 1986 OSHA risk assessment, the earliest studies relied upon are from 1979 (OSHA 1986).

In 1984, the ACGIH Documentation of TLVs stated, "The only reliable exposure data from the asbestos industry on which a recommendation for a threshold limit of asbestos can be based, stem from England" (ACGIH 1984), which specifically refers to studies of a single cohort of asbestos textile workers (BOHS 1968; Peto et al. 1977).  ACGIH further states, "These workers represent the only cohort of asbestos workers in the world in which health effects have been correlated with definitive exposure data defined as fibers per cc" (ACGIH 1984).  In addition, regarding the request of some researchers to lower the chrysotile asbestos exposure standard (e.g., Gillam et al. 1976), ACGIH states "It would be premature and ill advised to change the present

---

[1] This is the same cohort studied by Doll (1955), Knox et al. (1965; 1968), and Peto et al. (1977).  The only useful exposure data correlated with health effects were presented by BOHS (1968) and Peto et al. (1977).
[2] Recognizing the limitations of their review, BOHS (1968) stated "As long as there is any airborne chrysotile dust in the work environment, there may be some small risk to health" and "These hygiene standards are subject to review in light of new evidence and improved methods of measurement.  The standards are, in our opinion, the best that can be drawn from the existing data.  These data are scanty and based on factory experience of continuous exposure during working hours."

OSHA standard of 2 fibers longer than 5 μm per cc for chrysotile without indications from this study population of the advisability for such change" (ACGIH 1984).

In summary, Dr. Castleman's claim that the TLV historically did not specifically address the risks of asbestos-related cancers does not take into account the fact that TLVs (and regulatory standards in general), can only be developed if quantitative data are available relating exposures to adverse health outcomes.

Additionally, although the carcinogenic effects of asbestos were known by the 1950s, through the 1970s, regulatory standards for asbestos-related health effects were based on data regarding the risks of asbestosis, because sufficient exposure information for lung cancer risks was not available. In addition, it was widely and reasonably believed that if workers were protected against asbestosis, these standards would protect against the development of lung cancer as well.

It would have been reasonable and good occupational health practice for W.R. Grace to have relied upon TLVs until the OSHA Permissible Exposure Levels (PELs) became available, and to have assumed that compliance with TLVs would ensure worker protection against asbestosis, and therefore excess rates of asbestos-related cancers. Dr. Castleman's correct statement that ACGIH's documentation omits reference to lung cancer should not lead to the conclusion that the TLVs were not consistent with the scientific knowledge available at the time, and that W.R. Grace's reliance upon these was somehow inappropriate.

### B. Relevance of Regulatory Standards and Risk Assessments to Evaluation of Disease Causation in Individuals

Dr. Lemen, in his September 2006 expert report, presents a history of the development of scientific evidence on asbestos-related diseases and a discussion of asbestos exposure guidelines. Dr. Lemen discusses excess risks to workers based on the risk assessment conducted by OSHA in its 1986 standard-setting process. The OSHA risk assessment discussed by Dr. Lemen, like other risk assessments conducted by regulatory agencies, is designed to ensure the absence of significant health risks in populations of individuals. These risk assessments include a number of general assumptions that have only incomplete scientific documentation, and are designed to protect workers who are assumed to be exposed to an asbestos level equal to the standard every working day for a full working lifetime.

In the case of asbestos, cancer risks are modeled by evaluating various sets of data from observational studies in workers, and then extrapolating from the data in these studies to estimate cancer risks at lower exposures. That extrapolation model assumes a linear relationship between asbestos exposure and lung cancer risk, and the additional assumption that cancer risk reaches zero only at zero exposure. The assumed linear, no-threshold model, which Dr. Lemen accurately

**ENVIRON**                          - 5 -

describes, is used by regulators as a cautious (public health protective) assumption that has not been fully documented scientifically.  Whether it is correct or not, it is largely irrelevant to the questions to be evaluated in this current matter: whether specific individuals with asbestos disease incurred asbestos exposures sufficient to cause those diseases, under a "more likely true than not true" standard.  Dr. Lemen's conclusions that asbestos-related lung cancer risk follows a linear, no-threshold model is not useful in addressing this question of individual causation.

Evaluation of disease causation in individuals who claim to have been harmed by exposures to asbestos (or any other substance) typically requires a different approach than that applied by regulators when the latter are using risk assessments to establish health protective standards for populations (FJC 2000; Rodricks 2006).  The assumptions and models used in regulatory risk assessments are not known to apply to any actual individuals, but rather are generic in nature, and apply only to certain hypothetical individuals who share common characteristics regarding their exposures and their potential sensitivities to asbestos.  Regulatory risk assessments also, as I have said, involve adoption of common assumptions (e.g., the "no threshold" assumption) that have incomplete scientific support.  For the same reason, risk-based standards are not useful to evaluate disease causation in individuals.

Evaluation of disease causation in actual individuals does not require such untested assumptions, but can be accomplished using observed dose-response relationships from epidemiological studies to calculate the exposures necessary to increase an individual's risk significantly above his or her normal risk of developing disease in the absence of exposure (Rodricks 2006).  The process begins with an analysis of what is called general causation; this analysis involves determining, from the available scientific literature, the specific diseases that can be caused by exposure to asbestos.  Once this is completed it is possible to determine whether the exposures incurred by specific individuals were sufficient to put those individuals at significant risk of the diseases that can be caused by asbestos (this is called specific causation analysis).  All individuals carry some risk of the diseases that can be caused by asbestos, even in the absence of asbestos exposure.  These normal ("background") risks are a function of age, gender, smoking habits, race, and some other characteristics; data are available on such background risks.  Using the exposure-risk data on asbestos-related diseases that are available from the scientific literature, it is possible to estimate, for individuals, the increased risks (relative to background) an individual has incurred because of his or her exposures to asbestos.  Assessments regarding the significance of the increase can be made, to determine the probability of disease causation.  Assumptions such as those used in the regulatory process are not necessary to evaluate general and specific causation.  Consideration of alternative causes of disease should also be a component of the specific causation evaluation.

It is extremely unlikely that if any individual incurred exposures at levels below a risk-based standard, that the individual would have incurred a significantly increased risk of disease relative to his or her ordinary background risk.  If an individual incurred exposures in excess of a risk-based standard, it is possible that he or she incurred a disease related to that exposure, but additional analysis is required before a firm conclusion on the matter can be reached.  Regulatory standards based on risk assessments are designed to protect populations, and are based on risk assessments that are not wholly scientific in nature.  More rigorous scientific methods, such as the one I have outlined above, are available to evaluate disease causation in individuals.

## II.      RESPONSE TO PLAINTIFFS' EXPERTS OPINIONS REGARDING W.R. GRACE'S RISK MANAGEMENT PRACTICES

I am not sure if the issues discussed in this section are relevant to the Estimation case. However, Plaintiffs' Experts, Drs. Castleman and Frank, have raised issues regarding the risk management practices of W.R. Grace and this section is my response to these Experts' opinions regarding W.R. Grace's program.

*Introduction: Corporate Risk Management Practices*

Companies involved in the production, distribution, and ultimate uses of substances that may, at sufficiently high exposures, increase the risks of disease in individuals who become exposed to them, have responsibilities for managing exposures to these substances to ensure that disease risk is minimized or eliminated.  Development of an appropriate risk management program requires understanding of the product and potential releases and exposures that may occur during production, use, and disposal, as well as an understanding of the scientific information relating to these health risks.  Such understanding may come from systematic tracking of the underlying scientific literature, from expert reviews of the scientific literature, and from the statements of public health and regulatory authorities.  Because scientific knowledge is in a continuous state of evolution, it should be recognized that experts, including those engaged or employed by corporations, can be responsible only for the understanding that existed at different points in time. Moreover, scientific understanding does not change in large steps, but only gradually, so there are always periods of time during which there is uncertainty, and disagreements among experts, regarding scientific evaluations.  Thus, because any risk management efforts necessarily rely upon scientific understanding of risks and methods for their mitigation, a corporation's conduct regarding risk management[3] should be evaluated in light of the evolving science and its attendant uncertainties.

---

[3] In recent years the term "product stewardship" has come to be used to describe a corporation's efforts to ensure that its products do not cause harm.

*Response to Plaintiffs' Experts: Conduct by W.R. Grace*

Dr. Frank, in his report of September 26, 2006, claimed that W.R. Grace did not conduct its risk management programs in a manner that was consistent with general standards of practice from the 1960s through the 1980s. Dr. Frank isolates only activities that appear to reflect deficiencies in W.R. Grace's programs; he often cites these activities in the absence of their context, and omits any mention of the many efforts of the company to engage in risk management practices. Additionally, many of Dr. Castleman's examples of corporate conduct are presented without their proper context. In doing so, the plaintiffs' experts suggest that W.R. Grace was completely deficient in its efforts to protect workers, customers, and consumers.

In my evaluation of W.R. Grace's risk management and product stewardship programs, it is necessary to take account of the activities undertaken to protect workers at the Libby mine and mill, to protect workers and consumers exposed to Grace's vermiculite products, and to ensure that residents in communities surrounding Grace's facilities were not adversely affected by company operations. Evidence of compliance with applicable regulatory requirements is also a necessary component. It is important to note that before 1970, the federal and state governments had very few regulations to address environmental and occupational risks. Major federal agencies were created, and policies developed, during the 1970s, and corporations were attempting to understand these regulations and adopt compliance practices in response to these regulatory developments.

In order to evaluate W.R. Grace's activities surrounding the protection of workers, customers, and consumers, I have organized this section of my report into six topics. These topics represent areas that are generally recognized as components of a corporate risk management program:

A. Knowledge of Asbestos Disease
B. Medical Surveillance of Workers
C. Exposures and Controls for Workers at Libby
D. Exposures and Controls for Downstream Users
E. Pollution Controls and Community Exposures
F. Transparency to Government

I focus on W.R. Grace's activities following the company's purchase of the Zonolite Corporation in 1963. While I cannot hope, because of the extent of documentation in this case, to include every example of actions taken by W.R. Grace that provide evidence of efforts to manage asbestos-related risks, I highlight some key examples in the areas considered.

**ENVIRON**                                         - 8 -

In summary, from the time W.R. Grace acquired the Libby mine and mill in 1963 and began operating expanding plants, the company engaged in a series of efforts to understand the nature and magnitude of the health risk that might be posed by its asbestos, and to reduce worker, consumer, and community exposures to asbestos.  The evolution of the company's efforts to understand the problem involved review and evaluation of the developing scientific literature on the adverse health effects of asbestos, and the potency of the asbestos found as a contaminant of vermiculite relative to other forms.  It also involved the sponsorship of human health and animal carcinogenicity studies. The company collected industrial hygiene data on levels of fibers in various operational settings to evaluate compliance with any existing regulatory requirements.  These various efforts of the company were undertaken in the context of the scientific and regulatory understanding and actions that evolved during the same period of time.

## A.  Knowledge of Asbestos Disease

In a reasonable risk management program, a company would make efforts to obtain knowledge regarding potential health risks associated with the company's product(s).  Dr. Frank claims that W.R. Grace did not comply with the occupational medicine standard of studying the hazard and consulting appropriate physicians and scientists.  Based on my review of the documents, from the time that W.R. Grace acquired the Zonolite Company in 1963, it is clear that management was aware of the presence of asbestos contamination in Libby vermiculite.  Documents show that W.R. Grace attempted in particular to understand the health risks of tremolite.  Although the company knew asbestos contamination was a problem, from 1963 until the mid-1970s, W.R. Grace, like many others in the scientific community, believed that tremolite, with its particular structure, did not share the same pathologic properties as commercial forms of asbestos such as chrysotile and crocidolite (CE 149/March 10, 1971; CE 162.8/June 28, 1972; CE 183.12/GE 108/May 24, 1977). While I cannot review and opine on the merit of all the opinions and advice provided by experts consulted by W.R. Grace, W.R. Grace's pace in monitoring the literature, reaching out to other scientists, and sponsoring studies was reasonable.  When it became clear in the scientific literature that tremolite asbestos posed risks similar to other forms of asbestos, W.R. Grace adopted that view.

To evaluate the scientific evidence and appropriate future courses of action, W.R. Grace monitored the scientific literature.  There are numerous instances of W.R. Grace circulating internally articles of potential interest to alert other staff to new opinions or new issues that were published (CE 149/March 10, 1971; CE 163/July 1972; CE 178.5/August 14, 1974; GE 249/March 11, 1981).  In addition, W.R. Grace reached out to other scientists and industry representatives for their understanding of the scientific evidence, and maintained a presence over several decades at conferences and meetings relating to the potential hazards of tremolite and other asbestiform materials (CE 182.134/January 19, 1976; CE 183.2/March 31, 1977; CE 183.7/April 21, 1977; GE

**E N V I R O N**                                     - 9 -

11/May 31, 1973; GE 312/April 15, 1982; Bates stamp: 15027557/November 29, 1977).  W.R.
Grace also sponsored studies to address gaps in the literature to answer questions it had on the
potential health effects from the asbestos fiber specific to its vermiculite.  This included studies in
animals (CE 183.2/March 31, 1977; CE 184b.1/May 25, 1978) and humans, including its own
employees (CE 182.30/November 10, 1977; CE 193.56/July 28, 1982; CE 194.05/November 2,
1983; CE 184.10/August 25, 1978; CE 193.12/May 7, 1981; GE 103/April 23, 1977; McDonald et
al. 1986a; McDonald et al. 1986b).

In addition to efforts to monitor the literature and stay abreast of current scientific
knowledge, W.R. Grace worked closely with industry members to understand the developing
regulatory and scientific information on asbestos (CE 102/November 13, 1968; CE 112/September
16, 1968; CE 183.12/GE 108/May 24, 1977).  For example, W.R. Grace considered Johns Manville
(JM) to be "a leader in the field of asbestos safety and health precautions," (CE 183.12/GE 108/May
24, 1977), as did other companies at the time, and sought JM's assistance in conducting an
industrial hygiene survey at Libby and in recommending appropriate measures to protect workers
(CE 99.3/January 5, 1968; CE 102/November 13, 1968; CE 112/September 16, 1968; CE
113/October 7, 1968).  In the late 1960s, when the first exposure monitoring technique able to
distinguish between total dust and asbestos fibers was introduced, W.R. Grace quickly adopted the
improved approach and sought training on the technique from JM (GE 207A/October 22, 1979).
Physicians and industrial hygienists from JM shared with W.R. Grace its opinion that asbestosis
would not progress if the workers were removed from the continuing asbestos exposure.  JM also
reported that the likelihood of developing asbestosis at exposures below 5 mppcf (the TLV at the
time) was minimal, based on experience with its own workers.  Based on this information, W.R.
Grace believed it could "arrest lung contamination" in workers whose company-sponsored chest x-
rays were abnormal by keeping their exposures below the TLV (CE 99.3/January 5, 1968).
Through conversation with JM, W.R. Grace decided that knowledge about the exposure to tremolite
could be gained by allowing the U.S. Public Health Service to study the vermiculite from the Libby
mine and mill as well as worker health information (CE 110/August 20, 1968; CE 134/October 31,
1969).

The above examples demonstrate that W.R. Grace stayed current with the state of the
knowledge regarding asbestos disease by reviewing the scientific literature, sponsoring research to
further that knowledge, and allowing research scientists to study conditions at its mine and mill.[4]

---

[4] Dr. Frank also claims that Grace knew that asbestos was toxic, but kept employees working in the mill.  This statement
seems to contradict his claims that Grace did not recognize or study the hazard.  It also fails to recognize that workers in
almost all industries can be exposed to toxic substances, and that the health of these workers can be protected if
exposures to these substances are adequately controlled (see Section C).  If the only adequate response to identifying
workplace hazards related to toxic substances is to cease operations, then almost no industrial facility could survive.

*B. Medical Surveillance of Workers*

Another component of a reasonable corporate risk management program in the case of W.R. Grace is the establishment of a medical monitoring program for employees. Dr. Frank claims that W.R. Grace ignored health effects of its employees and that the established medical monitoring program in the company was inadequate. In addition, Dr. Frank claims that W.R. Grace declined participation in worker health studies and was negligent in doing so. Based on my review of the documents, as described below, W.R. Grace instituted a medical surveillance program for its workers at the Libby facility before there was any regulatory requirement to do so (OSHA 1986). The program, which focused on the early detection of asbestos-related disease, is evidence of the company's attention to risk management. In fact, W.R. Grace performed regular screening of its employees via x-ray and pulmonary function tests for asbestos-related diseases (CE 67/January 2, 1965; CE 192/November 18, 1980). The medical monitoring results were not always favorable; W.R. Grace realized early that there were worker health effects possibly due to asbestos exposure in the Libby mill (CE 54/1964; CE 56/August 25, 1964; CE 73/January 27, 1965; CE 184x/GE 204/May 8, 1979; CE 193.14/June 1981; GE 386/September 29, 1983; GE 447/May 15, 1985). When W.R. Grace declined participation in worker health studies, it appears to be due to the fact that the company was already aware of existing health effects. In fact, W.R. Grace, commenting on a 1977 discussion with Dr. MacMahon of Harvard University, noted that the company was advised by Dr. MacMahon against performing an epidemiology study, and that "the best and most effective means of establishing excess cancer risk is to conduct a mortality study among present and past employees through a search of the Social security files…such a study at this date would not be of value" (CE 183.7/April 21, 1977).

W.R. Grace conducted regular medical surveillance of all its expanding plant employees beginning in the 1970s (GE 71/February 16, 1977; GE 80/March 7, 1977). Reports from W.R. Grace's Health, Safety and Toxicology Department in the 1980s documented the medical surveillance activities at expanding plants. Examples of such efforts include health and safety surveys (GE 274/August 12, 1981), audits (GE 461/August 6, 1985), and employee health consultations (GE 424/May 11, 1984).

W.R. Grace used the information gathered in the medical surveillance program "as a rough barometer to gauge…progress in controlling fibrosis at Libby" (CE 182i /October 1, 1975) and as a tool to address worker health problems. The company shared x-rays and other clinical results with the workers' personal physicians so that workers could seek appropriate treatment, if necessary (CE 67/January 2, 1965; CE 130.4/December, 1969). In response to respiratory function testing of workers that revealed a "serious hazard from Pneumo-coniosis", W.R. Grace instituted annual x-rays in 1964 to monitor the problem and ensure that disease rates were declining as hazardous exposures were brought under control (CE 85/March 29, 1966; CE 192/November 18, 1980; see

**ENVIRON**                                    - 11 -

following sections). W.R. Grace continually improved the quality of its medical surveillance program, hiring a government-trained "B reader" to its x-ray program, and computerizing health surveillance data in order to better facilitate sharing of information with employees (CE 193.14/June 1981).

Evidence of W.R. Grace's medical monitoring efforts contradicts the claims of Dr. Frank that the company failed to investigate the health of its workers. Clearly, W.R. Grace was concerned with worker health, and took steps to monitor and protect it (CE 130.4/December 1969; CE 182i/October 1, 1975; CE 193.14/June 1981; CE 193h /March 24, 1983; CE 196.7/October 7, 1985).


C. *Exposures and Controls for Workers at Libby*

Monitoring and minimizing worker exposures through engineering controls, personal protective equipment (PPE), worker education, and safety training are additional aspects of a reasonable corporate risk management program. W.R. Grace engaged in a sustained effort to measure and control worker exposures, and this resulted in continually decreasing worker exposures at the Libby mine and mill.

Dr. Frank makes several claims regarding inadequate housekeeping, maintenance, and exposure controls at the Libby facility. He specifically claims that after the opening of the wet mill in 1974 (which resulted in substantial reductions in exposures), W.R. Grace lacked a proper respiratory protection program. I address Dr. Frank's claims of inadequate actions to protect workers from excessive exposures in the discussion below.

From the time it acquired the Zonolite Company's mine and mill at Libby in 1963, W.R. Grace was aware of the potential for high dust levels. Beginning in the 1940s, the Montana Board of Health (MBH) measured dust exposures at the Libby site, and continued regular visits through 1968 (GE 309/March 24, 1982). W.R. Grace began its own program of regular dust monitoring at least as early as 1969 (CE 119/GE 3/March 3, 1969).

To address any findings of excess exposures as compared to levels considered protective by regulatory agencies, W.R. Grace instituted a series of engineering controls designed to reduce worker exposures at Libby in the 1960s and 1970s (CE 189.6/October 5, 1979; CE 195.2. See Table 2). When it became clear that asbestos exposures could not be sufficiently controlled at the dry mill, plans to implement a wet mill were initiated. W.R. Grace company officials, like the regulatory authorities, believed that the reduction in workplace exposures accompanying the installation of the wet mill would be adequate to reduce disease; as expressed by the U.S. Bureau of Mines (BOM) in a 1971 report, "[t]he new mill and its wet process hopefully will bring fiber levels down to acceptable figures" (CE 151/May 1971). The basis for this belief was the well-established

view that exposure reduction will ensure risk reduction, and that the types of adverse health effects associated with asbestos exposure could be eliminated or greatly reduced by exposure reduction. Because asbestos-related diseases have long latency periods, and dust levels were decreasing over time as illustrated by the government reports (MBH: CE 53/May 11, 1964; CE 58/October 2, 1964. BOM: CE 145/September 1970; CE 151/May 1971; CE 160/May 1972; CE 164/July 1972; CE 171b/April 12, 1973.  MESA/MSHA: CE 174/October 3, 1973; CE 177/May 1974; CE 182a/October 23, 1975; CE 182b/October 24, 1975; see also Figure 1). W.R. Grace officials held the view that worker health effects observed and reported in the 1970s and 1980s were the result of the relatively high levels of asbestos exposures incurred in periods before the wet mill installation. By 1976, W.R. Grace believed that adherence to the OSHA PEL of 2 f/cc would eliminate or greatly reduce employee health problems associated with earlier and much higher workplace exposures (CE 183.12/GE 108/May 24, 1977; CE 193h/March 24, 1983).

The cumulative effect of these control efforts was that worker exposures were continually reduced over time (CE 193.8/December 10, 1996).  By 1977, the company was in substantial compliance with the OSHA PEL of 2 f/cc that had become effective in 1976 (CE 193.14/June 1981).

> "Overall results show about 98% of the Libby personnel samples to be less than 2.0 fibers per c.c. and about 70% are less than 0.5 fibers/cc.  The overall average on air samples is approximately 0.45 fibers/cc.  Over the past two years of MSHA air sampling (1979 and 1980), one potential violation of the 2 f/cc. standard was noted in 1980 and four in 1979.  When an air sample identifies an area as higher than permissible tremolite exposure level, respirators are used until the exposure level is reduced….Zonolite management believes that they have conformed to federal asbestos standards at the plant, and in fact, have done better than required" (CE 193.14/June 1981).

Figure 1 presents air concentrations of asbestos from pre-1950 to 1982, as estimated by NIOSH (Amandus et al. 1987b).  In its study, NIOSH estimated exposures for workers using average airborne fiber concentrations at various locations of the W.R. Grace Libby facility combined with the length of time a particular worker spent at that location during a work day.  The air concentration estimates were based on thousands of air samples obtained from 1956 to 1982 by the MBH, NIOSH, MESA/MSHA, and W.R. Grace.  From the time that W.R. Grace began ownership of the mine and mill in 1963, worker exposures to asbestos fibers declined, with a further decrease in estimated exposures when the dry mill ceased operation in 1974 and use of the wet mill began  (see Figure 1, detail: 1975-1982).

**Figure 1.  Estimates of Fiber Exposures by Operation-Location and Year, pre-1950 to 1982
(based on data from Amandus et al. 1987b)**



With respect to respiratory protection, evidence exists to show that respirators, approved by BOM and MSHA, were available to workers at Libby "[f]rom the time the vermiculite business began operations in Libby…" (CE 67/January 2, 1965), and by 1968 were mandatory for workers in high exposure areas (CE 98/January 1, 1968; CE 99/January 1, 1968; CE 115/October 31, 1968; CE 154.6/October 15, 1971; CE 171b/April 12, 1973).

Contrary to what Dr. Frank says about W.R. Grace housekeeping and maintenance at the Libby mine and mill, government reports show significant improvement in dust control as a result of housekeeping at the Libby facilities over time (MBH: CE 53/May 11, 1964; CE 58/October 2, 1964.  BOM: CE 145/September 1970; CE 151/May 1971; CE 160/March 1972; CE 164/June 1972; CE 171b/April 12, 1973.  MESA/MSHA: CE 174/October 3, 1973; CE 175/October 1973; CE 177/May 1974).  There are many instances of government agencies reporting, for example, that "…housekeeping has substantially improved…" (CE 58/October 2, 1964), "…housekeeping was generally good throughout the unit…" (CE 145/September 1970), and that "No violations were

observed" (CE 174/October 3, 1973; see also CE 182.10/October 1975).  MSHA, which made inspections of the Libby facility approximately four times per year as early as the 1970s (CE 174/October 3, 1973; CE 193.14/June 1981), reported in 1974 that "…the new process and equipment is achieving good control of airborne asbestos in most areas…" (CE 178/June 10, 1974).  The Office of the Inspector General's report on MSHA (OIG 2001b) concluded: "With few exceptions, laboratory analysis of the asbestos samples taken by MSHA Inspectors from 1978 through 1990 showed the samples to be under MSHA's regulated Permissible Exposure Limit (PEL)."

While not all attempts at engineering controls were immediately successful, systems were routinely re-evaluated and control efforts renewed, which is consistent with appropriate corporate risk management, and contrary to Dr. Frank's claims that housekeeping, maintenance, and exposure controls at the Libby facility were not adequate.  Thus it appears that W.R. Grace was aware of the dust and exposure problem (as a result of a program of regular dust and exposure monitoring) and reduced exposures (via implementation of numerous industrial hygiene measures) beginning in 1963 when it assumed ownership of the Libby facility and continuing throughout operation of the mine and mill.

| | TABLE 2 | |
|---|---|---|
| | **Dust Control Measures Implemented by W.R. Grace at Libby** | |
| **Year** | **Dust Control Measure** | **Reference** |
| 1964 | De-dusting equipment (mill and river loading)<br><br>Installed ventilation equipment (mill and loading dock)<br><br>Rehabilitated fan to increase air capacity in the dry mill | CE 65/December 30, 1964; CE 195.2; Amandus et al. 1987b |
| 1968 | Relocated ventilation discharge to improved airborne dust (laboratory, shop, mill) | CE 195.2; Amandus et al. 1987b |
| 1969 | Made exhaust system more effective in the dry mill  (installed larger cyclone fan, improved air flow, put hoses on top of screens, ventilated screens from the top rather than the back, re-ventilated, changed the design of ventilation, added ventilation in some areas)<br><br>Installation of a vertical stack on main mill fan<br><br>Oil used on haul road in the mine<br><br>Replaced cyclone and main ducts in the dry mill | CE 129/July 26, 1969; CE 195.2 |
| 1970 | New drill with dust control bagging system<br><br>Heavy oil used to keep dust down on roads<br><br>Respirators required in dry mill<br><br>Installation of vacuum belt extractor | CE 151/May 1971; Amandus et al. 1987b; CE 145/September 1970 |
| 1971 | Bagging plant and river load out dust control | CE 195.2; CE 189.6/October 5, 1979/ |
| 1972 | Installed ventilation in garage<br><br>The skipper control room was pressurized<br><br>Central vacuum sweeping system installed<br><br>Respirator cleaning station set up | CE 164/July 1972; CE 189.6/October 5, 1979; CE 195.2; Amandus et al. 1987b |
| 1973 | Dust abatement for river loading facilities<br><br>Pressurized rooms for car loader, loading foreman, millwrights room, shipper<br><br>Improvement in dust collecting cyclone to prevent leaks<br><br>Improvement in skirt around drill hole<br><br>Oil used to control dust in the mine<br><br>New wet mill construction began | CE 173/July 20, 1973; CE 175/October 1973; CE 189.6/October 5, 1979; CE 195.2; Amandus et al. 1987b |
| 1974 | New screen plant and new wet mill constructed<br><br>Side dust collection system<br><br>Ventilation in office, lunch room, change room, and laboratory<br><br>Dryer house unders discharge<br><br>Skip area dust clean-up<br><br>Mill stairwell cleaning system | CE 178/June 10, 1974; CE 189.6/October 5, 1979; Amandus et al. 1987b |

**E N V I R O N**                                              - 16 -

| TABLE 2 Dust Control Measures Implemented by W.R. Grace at Libby | | |
|---|---|---|
| Year | Dust Control Measure | Reference |
|  | Old dry mill closed |  |
| 1975 | Screen plant vacuum cleaners<br><br>Grade and pave screen plant area<br><br>Catalytic exhaust scrubber<br><br>Ventilated cab for D-3 dozer<br><br>Pave screen plant and new mill areas | CE 189.6/October 5, 1979 |
| 1976 | Mine vehicle dust control<br><br>Pollution control sampling and laboratory equipment<br><br>Safety training room and lab<br><br>Wall dryer area dust control | CE 189.6/October 5, 1979 |
| 1977 | Various screen plant, truck dump, and other baghouse dust disposals<br><br>Wet mill ventilation hood<br><br>Pave warehouse and screen plant product loading areas<br><br>Skip area dust clean-up | CE 189.6/October 5, 1979; CE 195.2 |
| 1978 | Multiple area of dust collection and disposal<br><br>Mine truck cleaning station<br><br>Pave mill access road, screen plant area<br><br>Enclose outside belt conveyor | CE 189.6/October 5, 1979; CE 195.2 |
| 1979 | Wet mill ventilation and others | CE 195.2 |
| 1980 | Screen plant ventilation and other | CE 195.2 |
| 1981 | Mine vehicle dust control | CE 195.2 |
| 1982 | Baghouse ventilation | CE 195.2 |

## D. Exposures and Controls for Downstream Users

Being aware of and addressing potential risks to customers (i.e., industrial users of vermiculite) and consumers (i.e., home users) is another important aspect of a reasonable corporate risk management program. Dr. Castleman implies that efforts by W.R. Grace in these areas were less than adequate, which my review suggests is erroneous. W.R. Grace was aware of, investigated, and responded to customer and consumer potential risks through expanding plant exposure control, product reformulation, warnings such as signage and placards, Material Safety Data Sheets (MSDSs), and product labels.

Downstream industrial users of vermiculite included both W.R. Grace and commercial manufacturing plants which "expanded" (heated) the vermiculite for use in commercial products.

**E N V I R O N**                      - 17 -

W.R. Grace was aware of dust and exposure potential at expanding plants in the 1960s (CE 119/GE 3/March 3, 1969) and as early as 1969 began the process of conducting semi-annual sampling (Bates stamp: 20085239/August 26, 1969; CE 119/GE 3/March 3, 1969; CE 165/August 30, 1972; GE 33/April 15, 1976).   The company also had a policy requiring purchasers of unexpanded vermiculite to demonstrate that they had "proper expanding equipment and protective devices in place and [knew] how to operate it" (CE 193.14/June 1981).

In response to high fiber counts at the West Chicago plant in late 1975, W.R. Grace management instituted a tremolite fiber count reduction program aimed at investigating exposures at all expanding plants (Bates stamp: 03633795/January 7, 1976).  As a result of this program, Grace personnel continued to perform and refine air sampling to monitor worker exposures and point sources, and made improvements to reduce dust generation (Bates stamp: 03633791/December 3, 1975; Bates stamp: 03633795/January 7, 1976; Bates stamp: 49609/February 4, 1976; April 20, 1976; Bates stamp: 03633603/June 16, 1976; November 1, 1976; GE 29/March 16, 1976).  Engineering design changes to facilities and equipment were piloted at West Chicago before being implemented across all expanding plants (Bates stamp: 03633795/January 7, 1976).  By April 1976, West Chicago employees' TWA exposures to tremolite were less than 0.5 f/cc (with the exception of one sample, which was 0.7 f/cc), well below the applicable 5 f/cc OSHA PEL and the pending 2 f/cc PEL to be enacted in July 1976 (Bates stamp: 49609/April 20, 1976).  Exposures at other expanding plants decreased over time as well, from an average 8-hour TWA of 2.84 f/cc in 1975 to 0.20 f/cc in 1980 (CE 193.8/April 9, 1981.  See Table 3).  More recent investigations of some W.R. Grace expanding plants by the Agency for Toxic Substances and Disease Registry (ATSDR) also documents declines in fiber levels during this period (see Appendix, Figures A-1 through A-8).

- "Fiber levels appear to have decreased after 1976," Newark, CA (ATSDR 2005e);

- "W.R. Grace enclosed the conveyor system, and in 1976 installed a wet dust collector system. These changes resulted in a 99% reduction in dust levels," Phoenix, AZ (ATSDR 2006);

- "Fiber levels appear to have substantially and continuously decreased after 1976," Santa Ana, CA (ATSDR 2003);

- "The data also show that airborne asbestos concentrations decreased over time as a result of improvements in the implementation of pollution control and dust suppression methods," Trenton, NJ (ATSDR 2005f).

As an additional precaution to workers and in compliance with OSHA regulations, W.R. Grace purchased caution signs to use at expanding plants in locations where airborne fibers concentrations might have exceeded the PEL (Bates stamp: 15162809/December 13, 1972; CE

164.7/August 25, 1972; CE 164.9/August 30, 1972; CE 168.9/February 2, 1973).  W.R. Grace also informed employees in writing in cases where air sampling revealed above-PEL worker exposures (Bates stamp: 49609/April 20, 1976; CE 168.9/February 2, 1973; GE 37/July 12, 1976).

Table 3 presents the average concentration of airborne asbestos fibers at the Libby and South Carolina (Enoree) facilities, and the average concentration for all U.S. expanding plants using Libby are, as listed in CE 193.8 (April 9, 1981).  A decline in fiber counts is seen following the program beginning in 1975 to reduce worker exposures at all expanding plants.

| TABLE 3 W.R. Grace Average 8-Hour Time Weighted Averages [1] at Libby (MT), Enoree (SC), and all U.S. Expanding Plants Using Libby Vermiculite | | | |
|---|---|---|---|
| Year | Expanding Plants | Libby | Enoree [2] |
| 1971 | 2 to 30 [2] | 33.8 [2] | n/a |
| 1972 | 2 to 30 [2] | 28.9 [2] | 0.7 |
| 1973 | 2 to 30 [2] | 16.3 [2] | n/a |
| 1974 | 2 to 30 [2] | 11.5 [2] | 1.4 |
| 1975 | 2.84 | 3.70 [2,3] | 0.75 |
| 1976 | 1.72 | 1.87 [2] | <0.10 |
| 1977 | 1.27 | 0.62 | 0.25 |
| 1978 | 0.62 | 0.45 | 0.45 |
| 1979 | 0.46 | 0.50 | <0.03 |
| 1980 | 0.20 | 0.45 | <0.05 |
| *Notes and abbreviations:* Source: CE 193.8/April 9, 1981 [1] 8-hour TWA obtained from sampling techniques and calculated on the basis of fiber count (f/cc) [2] Based on limited testing [3]The wet mill ran continuously since start-up in April 1975 | | | |

Another W.R. Grace effort to reduce exposures to downstream vermiculite customers was aimed at reducing the amount of fibrous tremolite present in its vermiculite concentrate at the mill (supplied to the expanding plants) by utilizing new processes (CE 182c/May 26, 1976; GE 215/February 14, 1980).  By 1980, the company had found means to remove greater than 99% of the tremolite fibers in the vermiculite concentrate, and the company continued to develop more sophisticated means of fiber reduction (GE 215/February 14, 1980).  W.R. Grace also researched potential ways to "develop a binding material for vermiculite concentrate which will effectively prevent tremolite fibers from becoming airborne" (Bates stamp: 05201933/June 20, 1983).  These efforts were initiated in the late 1970s and appear to have continued until 1988 (Bates stamp: 05201933/June 20, 1983; GE 48/December 23, 1976; GE 57/January 17, 1977; GE 65/February 1, 1977; GE 131/August 4, 1977; GE 138/September 6, 1977; GE 231/September 30, 1980; GE 310/March 29, 1982; GE 539/May 27, 1987; GE 544/March 17, 1988; GE 547/June 23, 1988).  For the period 1970 to 1980, W.R. Grace invested millions of dollars in tremolite reduction and binder

development efforts (GE 215/February 14, 1980). These efforts were aimed at reducing potential exposures not only to workers at W.R. Grace and other expanding plants, but also to consumers further downstream who interacted with products made from Grace vermiculite. Several studies indicated that W.R. Grace had reduced the tremolite content of its vermiculite products to trace amounts (Bates stamp: 03627243/September 22, 1983; GE 422/March 23, 1984; May 26, 1977).

Potential consumer exposures were also addressed in the reformulation of Mono-Kote in the 1960s and 1970s. Early formulations of Mono-Kote, a spray insulation used in industrial and consumer applications, contained approximately 11% chrysotile (commercial) asbestos (Bates stamp: 1025886/November 22, 1968). W.R. Grace began to explore alternative formulations free of added chrysotile in 1965 (Bates stamp: 40051297/July 15, 1965; Bates stamp: 40052327/November 10, 1965; Bates stamp: 03633344/February 7, 1969; Bates stamp: 20105604/February 13, 1969; Bates stamp: 20077526/May 9, 1969; Bates stamp: 20078634/October 1, 1969; Bates stamp: 15134706/April 28, 1970; Bates stamp: 20114760/May 19, 1970; Bates stamp: 20085496/October 26, 1970; Bates stamp: 15208260/February 16, 1971; Bates stamp: 15208095/February 4, 1972; CE 135.3/November 28, 1969). In 1970, Mono-Kote IV, with no commercially-added asbestos, was introduced (Bates stamp: 15134706/April 28, 1970; Bates stamp: 20114760/May 19, 1970; Bates stamp: 20085542/October 6, 1970). During this development period, W.R. Grace continued to sell Mono-Kote III, containing commercial asbestos, to customers upon request. W.R. Grace held the belief that the product presented minimal risk to customers because Mono-Kote was mixed and applied wet, and contained cement, which locked in the asbestos fibers (Bates stamp: 20021820/March 13, 1970; Bates stamp: 20015787/May 20, 1970; August 5, 1970). This view was consistent with the state of knowledge at the time as conveyed by experts such as Dr. W.J. Nicholson (Bates stamp: 20115198/July 24, 1970; EPA 1975). Furthermore, job site studies of Mono-Kote workers showed asbestos exposures to be below TLVs (Bates stamp: 15134673/September 28, 1970; Bates stamp: 20092185/November 2, 1970; August 5, 1970). W.R. Grace stopped production of Mono-Kote III in 1973 in accordance with new EPA regulations (Bates stamp: 15084445/October 1, 1974).

Just as with Mono-Kote, W.R. Grace tested its other vermiculite-containing products to ensure that they met regulatory exposure limits (CE 182.40/GE 90/March 28, 1977; GE 26/March 11, 1976; GE 61/January 27, 1977; GE 69/February 11, 1977; GE 104/April 25, 1977; GE 126/July 21, 1977; GE 369/July 13, 1983). Reduced fiber exposures from consumer products were accomplished through tremolite reduction and binding, as described above. In addition, although the focus was on reducing worker exposures, the use of ore from South Carolina instead of Libby at the expanding plants served to reduce exposures to end users (Bates stamp: 49609/April 20, 1976; CE 182.144/March 11, 1976; GE 191/February 2, 1979; February 4, 1976).

With respect to warnings for workers, OSHA, in 1972, stated that caution signs shall be provided and displayed at each location where airborne concentrations of asbestos fibers may be in excess of the PEL (5 f/cc), and that caution labels shall be affixed to all materials and products containing asbestos except when "any reasonably foreseeable" use of the product would not result in exposures in excess of the PEL (5 f/cc) (OSHA 1972).

W.R. Grace used warning labels as a means to protect downstream customers. First, the company labeled vermiculite-containing consumer products with a general dust warning label (CE 183.12/GE 108/May 24, 1977). Additionally, when necessary, Grace also required the use of asbestos-specific labels on bags of vermiculite when there was evidence of exposures above the PEL. For example, at a fertilizer plant that processed Grace's bagged and bulk vermiculite, exceedances of the PEL occurred, and W.R. Grace made clear to that customer that asbestos-specific warning labels would need to be added (Bates stamp: 023BPNB01368/July 11, 1979). This labeling policy was modeled after the practices of Johns Manville (CE 183.12/GE 108/May 24, 1977). As W.R. Grace also sold unbagged, bulk vermiculite concentrate to downstream customers, the company placed additional warning placards on rail cars loaded with concentrate (GE 113/June 21, 1977). Downstream users were permitted to remove the placards if they could demonstrate that fiber exposures to their workers during unloading were below the PEL (GE 173/July 25, 1978).

In addition, W.R. Grace was aware of the need for Material Safety Data Sheets (MSDSs) and began development of MSDSs for their products in 1977 (GE 117/June 24, 1977; GE 329/February 24, 1983; GE 412/December 15, 1983; GE 423/May 4, 1984; GE 546/April 20, 1988), several years before these were required by OSHA in 1983 (OSHA 1983a). In tandem with distributing the MSDS, W.R. Grace also contacted customers to inform about potential exposures from products, and to gather data from customers about exposures generated during actual use in order to ensure compliance with OSHA standards (Bates stamp: 023BPNB01368/July 11, 1979; GE 123/July 15, 1977). If customers requested documentation of reduced exposures, W.R. Grace would assist by providing job site monitoring free of charge (GE 61/January 27, 1977).

These examples show that W.R. Grace was aware of, investigated, and responded to downstream user risks through warnings, labels, MSDSs, and most importantly, product reformulations, which, as W.R. Grace documented, were successful in reducing the amount of asbestos in customer and consumer products.

**ENVIRON**                                          - 21 -

E. *Pollution Controls and Community Exposures*

An additional component of corporate risk management includes awareness of the potential for off-site movement of chemicals that may potentially affect the community.

Dr. Frank claims that W.R. Grace released large amounts of asbestos into the surrounding community, allowed workers to take asbestos home with them on their clothing, and allowed the community to be exposed to asbestos-contaminated vermiculite in common areas in the community.

Some waste materials from the mine, the mill, and from expanding plants were placed in certain areas of the town of Libby and in other communities, and created the opportunity for some degree of community exposure to asbestos. Dusts deposited on the clothing of mine and mill workers were another source of potential community exposures. W.R. Grace was aware of these practices and, beginning in the 1960s, took steps to understand whether it was putting individuals in nearby communities at risk of disease.

Beginning in the 1960s, it became clear from reports in the literature that exposures around some asbestos mines, mills, and manufacturing facilities may have resulted in asbestos-related disease (e.g., asbestosis and mesothelioma) among community members. Also around this time period, studies among family members of asbestos workers reported asbestosis and mesothelioma (As cited in NIOSH 1976: Kiviluoto 1960; Wagner et al. 1960; Newhouse and Thompson 1965; Gilson 1970; Bohlig and Hain 1973; Greenberg and Lloyd Davies 1974; Anderson et al. 1976). Family members presumably were exposed to asbestos dust carried home on workers' clothes and during the laundering of these clothes. W.R. Grace was aware of these community and take home exposures issues, but it appeared to believe, not unreasonably, that actual disease was limited to communities where asbestos itself was mined or asbestos products manufactured (CE 53/May 11, 1964; CE 119/GE 3/March 3, 1969; CE 183.2/March 31, 1977; CE 183.12/GE 108/May 24, 1977), and would not be relevant to vermiculite mining Libby.[5]

Nevertheless, beginning in the mid- to late 1970s, W.R. Grace sampled for asbestos outside of the mine and mill operation and in the town of Libby (CE 182.126). At the time of these air measurements there was no established methodology for quantitatively assessing health risks, nor had any regulatory or public health agency established an air standard (i.e., an asbestos air concentration) intended to protect the health of the general (non-occupational) population. In the absence of relevant guidance, W.R. Grace compared the measured community values with the asbestos TLV or PEL established for occupational health exposures (CE 182.24/ GE 41/August 23, 1976; August 5, 1970). W.R. Grace found no asbestos measurements that exceeded, on an 8-hour time-weighted average (TWA) basis, the TLV/PEL in effect at the time the measurements were

---

[5] To my knowledge, the first report of community health effects associated with asbestos exposure that was not associated with an asbestos mining, milling, or manufacturing setting appeared in 1978 (Yazicioglu et al. 1978).

**ENVIRON**                                    - 22 -

taken.  In fact, the highest 8-hour TWA measurement found during the 1970s and 1980s was 0.03 f/cc, several times lower than the PEL in effect at the time.[6]  In the absence of any other guidance, and with an understanding that actual community measurements did not exceed a small fraction of the PEL, and that the PEL had been established at a level below those that had been associated with excess disease, the company appears to have concluded that no action was needed on the basis of these measurements – a position that was not unreasonable given the circumstances of the time.

When particular concerns for community exposure came to the attention of W.R. Grace management, they took action to address those concerns.  One situation included a local school running track, which had been surfaced with tailings that contained tremolite.  W.R. Grace conducted air sampling, which "indicated levels of about 0.2 f/cc exposure to users.  A greater exposure, estimated at peaks to 1.0 f/cc, could occur during periods of heavy use," and then ordered the track to be re-surfaced with alternate materials (CE 193.165/GE 269/July 27, 1981; GE 271/July 31, 1981).  Additionally, in 1981, as part of the findings of a corporate audit, W.R. Grace officials recommended fencing the downtown facility that was adjacent to the ball field (CE 193.14/June 1981).

It is important to note that the state and federal governments were aware from the peer-reviewed literature of the health risks of non-occupational exposures in asbestos-mining and asbestos-manufacturing communities during this time, but took no action to evaluate community exposures in Libby (CE 53/May 11, 1964; EPA 1980; GE 220/June 5, 1980).  In fact, in a 1985 exposure assessment document, EPA stated that a maximum of 0.5 f/cc had been recorded in the area surrounding the Libby mine (less than the PEL in effect at the time) and persons near expanding plants would be exposed to concentrations ranging from $5 \times 10^{-5}$ and $2.5 \times 10^{-2}$ ug/m$^3$ (EPA 1985)[7], also less than the PEL in effect at the time.

In addition to community exposures, plaintiffs' experts criticize W.R. Grace for failing to do more to reduce take home exposures.  Relevant to the expanding plants, OSHA promulgated the following regulations effective in 1972 and thereafter:

---

[6] 8-hour TWA samples in community or non-mining/milling locations are cited at: Bates stamp: WRG00235506/September 7, 1978; Bates stamp:WRG00235528/August 9, 1978; Bates stamp: WRG05529504/February 3, 1982; Bates stamp:WRG05529297/October 5, 1982; Bates stamp: WRG05529476/March 4, 1982; Bates stamp: WRG05548955/May 29, 1987; Bates stamp: WRG05548968/June 12, 1984; Bates stamp: WRG05527861/October 27. 1986; Bates stamp: WRG05599031/March 2, 1987; Bates stamp: WRG05548941/October 3, 1986; Bates stamp: WRG05259320/; Bates stamp: WRG 05259393/March 9, 1988; Bates stamp: WRG05259467/May 9, 1988).
[7] EPA adopted a conversion factor of 30 (μg/m$^3$) / (f/mL), the geometric mean conversion factor based on six studies (EPA 1986).  Based on this conversion factor, the measurements $5 \times 10^{-5}$ and $2.5 \times 10^{-2}$ μg/m$^3$ are equivalent to a range from 0.015 f/mL to 0.75 f/mL.

**ENVIRON**                                    - 23 -

- In 1972, special clothing was required for exposures above the ceiling limit (i.e., 10 f/cc), and change rooms, lockers, and laundry facilities were required for exposures above the PEL (i.e., 5 f/cc) (OSHA 1972);

- In 1986, protective clothing, laundry facilities, change rooms, and showers were required for employees working in areas with airborne exposures greater than the PEL, which was reduced to 0.2 f/cc (OSHA 1986).

As discussed earlier (see Section D), W.R. Grace monitored exposures at its expanding plants to ensure exposures were below the PEL. In at least one example where the exposure levels did exceed the PEL, W.R. Grace called for providing a change of clothing for all employees at that facility, though it was required for only that one employee whose exposure exceeded the PEL (GE 29/March 16, 1976; Bates stamp: 03633800/February 25, 1976).

At the Libby mine and mill, OSHA regulations did not apply; MSHA regulations governed mines and mills. However, MSHA has never promulgated rules related to workers and take-home contamination issues (see MSHA 2005). Nevertheless, W.R. Grace was mindful of the potential for take-home exposures.

In 1973, BOM recommended to W.R. Grace that it improve its locker room, wash room, and shower facilities so as to reduce carry home exposures (CE 171b/April 12, 1973). By 1974, however, the wet mill was up and running, and overall occupational exposures at the Libby facilities were reduced (see Figure 1 and Amandus et al. 1987b). Presumably, overall reduced exposures at the dry mill resulted in lower take-home exposures as well. For example, Amandus and colleagues, in estimating exposures on the 60-minute round-trip bus ride to and from the mill, used a value of 0.0 f/cc (in the absence of any measurements) after 1974 compared to an average of 1.2 f/cc on the bus ride before 1974 (an average based on 4 measurements obtained in 1971 and 1973 by the BOM (CE 151/May 18, 1971; CE 171b/April 12, 1973)).

Additionally, unlike the case studies that identified asbestos-related diseases in family members of *asbestos* miners, millers, and manufacturers, there were no reports of asbestos-related disease in family-members of W.R. Grace employees. In fact, unlike these other settings, there were no reports of mesothelioma in W.R. Grace workers until 1979.

Significantly, in 1983, W.R. Grace took steps to speak with local physicians to gauge whether there were incidents of asbestos-related disease in those without occupational exposures. Unlike the reports appearing in the literature in the prior two decades identifying incidents of non-occupational asbestos-related diseases (including mesothelioma), W.R. Grace did not uncover a single instance of asbestos-related disease in family members of W.R. Grace workers (CE 193.77/GE 370/July 15, 1983). Specifically, the memo summarized conversations with two radiologists who had previously taken x-rays among Libby employees, and who were specifically

**ENVIRON**                                    - 24 -

queried about any asbestos-related lung problems in members of the Libby community.  According to the memo, "Dr. Dalgren has stated that he has no recollection of any asbestos related lung problems in any member of the Libby community, other than our employees.  Dr. Little has stated that he recalled seeing one or two cases from the Libby area which he had suspected might have resulted from exposure carried home by employees.  He stated that at that time they investigated very carefully because of concern over the possibility that such a pattern might exist.  He recalls that no relationship could be established between these cases and our employees."  The memo also noted that W.R. Grace queried the personnel who processed medical insurance claims for Libby employees over the prior eight years.  According to the memo, these staff could not recall any claims for medical treatment of asbestos related lung problems for any spouse or dependent of a Libby employee during that time (CE 193.77/GE 370/July 15, 1983).

From my vantage point, given the institution of the wet mill and the lack of any evidence of asbestos-related disease amongst those non-occupationally exposed in Libby, it was not unreasonable for W.R. Grace to have concluded that further steps to reduce take-home exposures were not necessary.  In 1984, W.R. Grace did implement a new policy providing workers with an allowance for coveralls, providing enhanced laundry equipment, and requiring workers to wash their work clothes before returning home (Bates stamp: DSP3900834/October 5, 1984).  I am not sure what prompted this change, but even had W.R. Grace not changed its policies, its actions would not have been unreasonable in light of the scientific evidence available to it at the time.

In summary, Dr. Frank's characterization of W.R. Grace's lack of concerns for the community is not at all substantiated by the available data.


*F.  Transparency to Government*

One final and important aspect of a corporate risk management program is transparency to government.  Dr. Frank claims that W.R. Grace attempted to hide data and to obstruct investigations of its facilities and employees.  Based on my review of the documents, W.R. Grace continually had government agencies investigating its facilities and continually had medical experts evaluating the workers health.  It is clear that what was occurring at the Libby facilities and expanding plants was not hidden or secret.

By the time W.R. Grace acquired the Zonolite Company in 1963, state and federal government agencies had already been involved in worker health and environmental issues at the Libby site (OIG 2001a; OIG 2001b).  (These activities were mentioned previously in the section describing corporate activities related to exposures and industrial hygiene investigations by several government agencies.)  Briefly, according to a review by the Federal Office of the Inspector General, regular inspections of the mine by the State of Montana began in 1941, and the Federal

**ENVIRON**                                    - 25 -

Bureau of Mines, later superseded by the Mining Enforcement and Safety Administration, in 1961, continued inspections through the cessation of operations in 1990 (OIG 2001a; OIG 2001b).

NIOSH approached W.R. Grace in September 1980 with a request to conduct a study of the Libby workers (GE 230/September 25, 1980). After agreeing to participate in this study, a protocol was developed, and the study began in early 1982 (GE 308/March 23, 1982/). Reports of the studies were published in the scientific literature in the mid-1980s (Amandus and Wheeler 1987; Amandus et al. 1987a; Amandus et al. 1987b).

The EPA involvement began in 1975 when staff from the EPA visited the mine and mill site in Libby, Montana and took numerous samples as part of a nationwide EPA investigation of known asbestos point and non-point sources to identify potential discharges of asbestos fibers to surface water. EPA ultimately determined that the asbestos fibers were contained in the on-site discharge and settling ponds and did not pose an offsite threat to public water systems. EPA next generated a series of reports to investigate potential exposures and health effects following a letter to EPA and OSHA from the O.M. Scott and Sons regarding three instances of bloody pleural effusions among employees who used Libby vermiculite in its facility (EPA 1979; EPA 1980; EPA 1981; EPA 1982). EPA also enlisted contractors to collect samples to better characterize asbestos in vermiculite and air monitoring in various situations. One of the contractors, MRI, sampled bulk vermiculite and air samples at Libby and at two companies in Enoree, South Carolina. Most air samples were less than 0.1 f/cc; only 1 of 30 air samples exceeded the OSHA/MSHA standard of 2 f/cc (MRI 1982). Another EPA contractor prepared an exposure assessment to estimate asbestos exposures to transport workers and exfoliators, as well as during consumer uses (e.g., attic insulation and lawn care), using worst-case scenario exposures to estimate risks (EPA 1985). In its August 1982 report, the EPA concluded that there were significant adverse health effects from past occupational exposure to asbestos-contaminated vermiculite, however, there is no evidence that EPA pursued any further investigation or other recommendations (OIG 2001a).

Information about the presence of asbestos at the mine and mill was well described and much of it was publicly available. Dr. Frank claims that W.R. Grace violated the occupational medicine standard of publishing new findings in the literature. Although the various exposure studies conducted by W.R. Grace at the mine and elsewhere were not released publicly, the studies sponsored by W.R. Grace did not identify new findings previously unavailable in the scientific literature. For example, W.R. Grace sponsored a toxicological study of tremolite in hamsters conducted by Dr. Smith at Fairleigh Dickinson University (CE 184b.1/May 25, 1978). In 1977, at a scientific meeting organized by the Society for Occupational and Environmental Health (SOEH), Dr. Smith had reported that hamsters treated with different samples of tremolite asbestos developed mesotheliomas. This 1977 meeting was attended by representatives from academia, industry, the EPA, and OSHA (Bates stamp: 15027557/November 29, 1977) and the results of Smith's

presentation were later published in the Conference Proceedings (Smith et al. 1979).  The study sponsored by W.R. Grace was corroborative of the results of the study reported by Smith at the 1977 SOEH meeting.

Other than the W.R. Grace-sponsored animal study, all other company-sponsored studies were reported to EPA in 1983 under TSCA (CE 193h /March 24, 1983) or published (McDonald et al. 1986a; McDonald et al. 1986b).

These and other activities I have described demonstrate that the situation at Libby was ordinarily open to government inspections and review.


## III.    OVERALL REPORT CONCLUSIONS

Scientifically-based exposure standards to protect worker health from asbestos exposure have been available since the late 1930s.  These standards have been lowered over time as new data emerged on the health effects of asbestos.  Based on current scientific knowledge, pre-1980 exposure standards were inadequately protective of cancer; this conclusion is, I should caution, based on current knowledge and hindsight.  Whether the earlier asbestos exposures actually caused disease can not be evaluated solely on the basis of knowledge that workers were exposed to levels greater than concurrent standards, or at levels greater than today's standards.  It is also the case that the "no-threshold" assumption ("single fiber hypothesis") that is used in regulatory risk assessment can not be used to conclude that "any" asbestos exposure is sufficient to cause cancer in an individual.  Disease causation in individuals requires an evaluation, based on actual scientific data, of whether that individual incurred exposures sufficient to increase his or her disease risk significantly above that which the individual carries in the absence of asbestos exposure.  And finally, with respect to W.R. Grace's risk assessment and management practices, the characterization by plaintiffs' experts that W.R. Grace ignored worker and community health issues is inaccurate.  Based on my review of the documents, W.R. Grace was engaged in activities consistent with contemporaneous risk management and product stewardship programs.

**Appendix**

Historical Airborne Asbestos Concentrations at W.R. Grace Expanding Plants

**Figure A-1.** Airborne asbestos fiber concentrations over time: personal sample data at the former Texas Vermiculite/W.R. Grace facility, Dallas, Texas (ATSDR 2005b)



**Figure A-2.** Airborne asbestos fiber concentrations over time: area sample data at the former Texas Vermiculite/W.R. Grace facility, Dallas, Texas (ATSDR 2005b)



**Figure A-3.**  Airborne asbestos fiber concentrations over time: personal sample data at the former Western Minerals/W.R. Grace facility, Minneapolis, MN (ATSDR 2005a)



**Figure A-4.**  Airborne asbestos fiber concentrations over time: personal and area sample data at the former W.R. Grace facility, New Orleans, LA (ATSDR 2005c)



**Figure A-5.** Airborne asbestos fiber concentrations over time: personal sample data at the former W.R. Grace facility, Santa Ana, CA (ATSDR 2003)



**Figure A-6.**  Airborne asbestos fiber concentrations over time: area sample data at the former W.R.
Grace facility, Santa Ana, CA (ATSDR 2003)



**Figure A-7.**  Airborne asbestos fiber concentrations over time: personal sample data at the former
W.R. Grace facility, Wilder, KY (ATSDR 2005d)



**Figure A-8.** Airborne asbestos fiber concentrations over time: area sample data at the former W.R. Grace facility, Wilder, KY (ATSDR 2005d)



## References

American Conference of Governmental and Industrial Hygienists (ACGIH).  1962.  *Documentation of the threshold limit value: asbestos, all forms; 1962 TLV*.  1st Ed.  Cincinnati, OH.  From the CD "TLVs and Other Occupational Exposure Values - 2000".

American Conference of Governmental and Industrial Hygienists (ACGIH).  1966.  *Documentation of the threshold limit value: asbestos, all forms; 1966 TLV*.  2nd Ed.  Cincinnati, OH.  From the CD "TLVs and Other Occupational Exposure Values - 2000".

American Conference of Governmental and Industrial Hygienists (ACGIH).  1971.  *Documentation of the threshold limit value: asbestos, all forms; 1971 TLV*.  3rd Ed.  Cincinnati, OH.  From the CD "TLVs and Other Occupational Exposure Values - 2000".

American Conference of Governmental and Industrial Hygienists (ACGIH).  1984.  *Documentation of the threshold limit value: asbestos, all forms; 1984 TLV*.  4th Ed., Supplement.  Cincinnati, OH.  From the CD "TLVs and Other Occupational Exposure Values - 2000".

American Conference of Governmental and Industrial Hygienists (ACGIH).  2001.  *Documentation of the threshold limit value: asbestos, all forms; 2001 TLV*.  7th Ed.  Cincinnati, OH.  From the CD "Documentation of the TLVs and BEIs with Other Worldwide Occupational Exposure Values - 2004".

Amandus HE, Althouse R, Morgan WK, Sargent EN, and Jones R.  1987a.  The morbidity and mortality of vermiculite miners and millers exposed to tremolite-actinolite: Part III.  Radiographic findings.  *Am J Ind Med* 11(1):27-37.

Amandus HE and Wheeler R.  1987.  The morbidity and mortality of vermiculite miners and millers exposed to tremolite-actinolite: Part II. Mortality.  *Am J Ind Med* 11(1):15-26.

Amandus HE, Wheeler R, Jankovic J, and Tucker J.  1987b.  The morbidity and mortality of vermiculite miners and millers exposed to tremolite-actinolite: Part I. Exposure estimates.  *Am J Ind Med* 11(1):1-14.

Anderson HA, Lilis R, Daum SM, Fischbein AS, and Selikoff IJ.  1976.  Household-contact asbestos neoplastic risk.  *Ann N Y Acad Sci* 271311-323.  (Reported in NIOSH 1976.)

Agency for Toxic Substances and Disease Registry (ATSDR).  2003.  *Health consultation: W.R. Grace & Company Santa Ana plant, Santa Ana, CA*.  CAN000905631.  Accessed 05/29/2007.  http://www.atsdr.cdc.gov/asbestos/sites/health_consultations/pdf/HCFinalSantaAnaR6.pdf.

Agency for Toxic Substances and Disease Registry (ATSDR).  2005a.  *Final report of the Northeast Minneapolis community vermiculite investigation (NMCVI) and worker/household study: cohort identification and characterization, Minneapolis, MN*.  Accessed 05/29/2007.  http://www.health.state.mn.us/divs/eh/hazardous/sites/hennepin/western/nmcvicohort.pdf.

Agency for Toxic Substances and Disease Registry (ATSDR).  2005b.  *Health consultation: former W.R. Grace & Company/Texas Vermiculite site, Dallas, TX: figures.*  TX0000605352. Accessed 05/29/2007.  http://www.atsdr.cdc.gov/HAC/pha/FormerWRGrace-TexasVermiculiteSite/DallasHCFinal092205-Figures.pdf.

Agency for Toxic Substances and Disease Registry (ATSDR).  2005c.  *Health consultation: former Zonolite/W.R. Grace & Company site, New Orleans, LA.*  Accessed 05/29/2007. http://www.atsdr.cdc.gov/asbestos/sites/health_consultations/pdf/NewOrleansHCFinal092205.pdf.

Agency for Toxic Substances and Disease Registry (ATSDR).  2005d.  *Health consultation: W.R. Grace & Company (a/k/a Zonolite Co. Wilders), Wilder, KY.*  KYN000407413.  Accessed 05/29/2007. http://www.atsdr.cdc.gov/asbestos/sites/health_consultations/pdf/WilderHC082205.pdf.

Agency for Toxic Substances and Disease Registry (ATSDR).  2005e.  *Health consultation: W.R. Grace Newark plant, Newark, CA.*  CAD981389653.  Accessed 05/29/2007. http://www.atsdr.cdc.gov/asbestos/sites/health_consultations/pdf/NewarkHC092205.pdf.

Agency for Toxic Substances and Disease Registry (ATSDR).  2005f.  *Health consultation:Zonolite/W.R. Grace site, Hamilton Township (Trenton), NJ.*  NJD067387472. Accessed 05/29/2007.  http://www.atsdr.cdc.gov/HAC/pha/ZonoliteWRGrace031405-NJ/ZonoliteWRGrace031405-NJ_pt1.pdf.

Agency for Toxic Substances and Disease Registry (ATSDR).  2006.  *Health consultation: W.R. Grace exfoliation facility, Phoenix, AZ.*  AZD051452563.  Accessed 05/29/2007. http://www.atsdr.cdc.gov/HAC/pha/arizona_hc/WR%20%20Grace%20--%20Solomon's%20Mines_HC_FINAL.pdf.

Bohlig H and Hain E.  1973.  Cancer in relation to environmental exposure.  In: *Proceedings of the international conference on biological effects of asbestos,* eds Bogovski P, Gilson JC, Tibrell V, and Wagner JC, 217-221.  Lyon: IARC Scientific Publishing.  (Reported in NIOSH 1976.)

British Occupational Hygiene Society (BOHS).  1968.  Hygiene standards for chrysotile asbestos dust.  *Ann Occup Hyg* 1147-69.

Cook WA.  1956.  Present trends in MAC's.  *Am Ind Hyg Assoc Q* 17(3):273-274.

Dement JM, Harris RL, Jr., Symons MJ, and Shy CM.  1983a.  Exposures and mortality among chrysotile asbestos workers. Part II: mortality.  *Am J Ind Med* 4(3):421-433.  (Reported in OSHA 1983b.)

Dement JM, Harris RL, Jr., Symons MJ, and Shy CM.  1983b.  Exposures and mortality among chrysotile asbestos workers. Part I: exposure estimates.  *Am J Ind Med* 4(3):399-419. (Reported in OSHA 1983b.)

Doll R.  1955.  Mortality from lung cancer in asbestos workers.  *Brit J Ind Med* 1281-86.

Dreessen WC, DallaValle JM, Edwards TI, Miller JW, and Sayers RR.  1938.  A study of asbestosis in the asbestos textile industry.  *Public Health Bulletin* 241ix-126.

Environmental Protection Agency (EPA).  1975.  *Asbestos contamination of the air in public buildings*.  EPA 450/3-76-004.  Washington, DC.

Environmental Protection Agency (EPA).  1979.  *Vermiculite chemical hazard information profile (CHIP)*.  Washington, DC.

Environmental Protection Agency (EPA).  1980.  *Priority review level 1 - asbestos-contaminated vermiculite*.  Washington, DC.

Environmental Protection Agency (EPA).  1981.  *Decision paper for asbestos-contaminated vermiculite*.  Washington, DC.

Environmental Protection Agency (EPA).  1982.  *Disposition paper for asbestos-contaminated vermiculite*.  Washington, DC.

Environmental Protection Agency (EPA).  1985.  *Exposure assessment for asbestos-contaminated vermiculite*.  Doc # EPA 560/5-85-013.

Environmental Protection Agency (EPA).  1986.  *Airborne asbestos health assessment update*.  EPA/600/8-84/003F.  Research Triangle Park, NC.

Finkelstein MM.  1983.  Mortality among long-term employees of an Ontario asbestos-cement factory.  *Br J Ind Med* 40(2):138-144.  (Reported in OSHA 1983b.)

Federal Judicial Center (FJC).  2000.  *Reference manual on scientific evidence, 2nd Ed*.  Accessed 05/29/2007.  http://www.fjc.gov/public/home.nsf/pages/16.

Gillam JD, Dement JM, Lemen R, Wagoner JK, Archer VE, and Blejer HP.  1976.  Mortality patterns among hard rock gold miners exposed to an asbestiform mineral.  *Ann N Y Acad Sci* 271336-344.  (Reported in ACGIH 1984.)

Gilson J.  1970.  Asbestos health hazards.  Recent observations in the United Kingdom.  In: *Pneumoconiosis.  Proceedings of the international conference,* ed Shapiro H, 173-176.  Cape Town: Oxford University Press.  (Reported in NIOSH 1976.)

Greenberg M and Lloyd Davies TA.  1974.  Mesothelioma Register 1967-1968.  *Br J Indust Med* 3191-104.  (Reported in NIOSH 1976.)

Henderson VL and Enterline PE.  1979.  Asbestos exposure: factors associated with excess cancer and respiratory disease mortality.  *Ann N Y Acad Sci* 330117-126.  (Reported in OSHA 1983b.)

Kiviluoto R.  1960.  Pleural calcification as a roentgenologic sign of non-occupational endemic anthophyllite-asbestosis.  *Acta Radiol Suppl* 1941-67.  (Reported in NIOSH 1976.)

Knox JF, Doll RS, and Hill ID.  1965.  Cohort analysis of changes in incidence of bronchial carcinoma in a textile asbestos factory.  *Ann N Y Acad Sci* 132(1):526-535.

Knox JF, Holmes S, Doll R, and Hill ID.  1968.  Mortality from lung cancer and other causes among workers in an asbestos textile factory.  *Br J Ind Med* 25(4):293-303.

Liddell FD, McDonald JC, and Thomas DC.  1977.  Methods of cohort analysis: appraisal by application to asbestos mining.  *J Roy Stat Soc* 140(Part A):469-491.  (Reported in OSHA 1983b.)

Lynch KM and Smith WA.  1935.  Asbestosis bodies in sputum and lung.  *J Am Med Assoc* 95(659):661.

Mayers MR.  1952.  The program of the New York State Occupational Cancer Committee.  *A M A Arch Ind Hyg Occup Med* 5(3):279-283.

McDonald JC, McDonald AD, Armstrong B, and Sebastien P.  1986a.  Cohort study of mortality of vermiculite miners exposed to tremolite.  *Br J Ind Med* 43(7):436-444.

McDonald JC, Sebastien P, and Armstrong B.  1986b.  Radiological survey of past and present vermiculite miners exposed to tremolite.  *Br J Ind Med* 43(7):445-449.

McLaughlin AI.  1953.  The prevention of the dust diseases.  *Lancet* 265(6776):49-52.

Midwest Research Institute (MRI).  1982.  *Collection, analysis, and characterization of vermiculite samples for fiber content and asbestos contamination: Report prepared for the US Environmental Protection Agency Office of Pesticides and Toxic Substances.*  Kansas City, MO.

Mine Safety and Health Administration (MSHA).  2005.  *Asbestos exposure limit. Proposed rule; Notice of public hearings.*  Federal Register 70(145):43950-43989.

National Academy of Sciences (NAS).  1983.  *Risk assessment in the federal government: managing the process.*  Washington, DC.

Newhouse ML and Thompson H.  1965.  Mesothelioma of pleura and peritoneum following exposure to asbestos in the London area.  *Br J Ind Med* 22(4):261-269.  (Reported in NIOSH 1976.)

Nicholson WJ, Selikoff IJ, Seidman H, Lilis R, and Formby P.  1979.  Long-term mortality experience of chrysotile miners and millers in Thetford Mines, Quebec.  *Ann N Y Acad Sci* 33011-21.  (Reported in OSHA 1983b.)

National Institute for Occupational Safety and Health (NIOSH).  1972.  *Criteria for a recommended standard: occupational exposure to asbestos.*  72-10267.  Washington DC.

National Institute for Occupational Safety and Health (NIOSH).  1976.  *Revised recommended asbestos standard.*  77-169.  Washington, DC.

Office of Inspector General (OIG).  2001a.  *EPA's actions concerning asbestos-contaminated vermiculite in Libby, Montana*.  2001-S-7.  Washington, DC.

Office of Inspector General (OIG).  2001b.  *Evaluation of MSHA's handling of inspections at the W.R. Grace & Company mine in Libby, Montana*.  2E-060620-002.  Washington, DC.

Occupational Safety and Health Administration (OSHA).  1972.  *Standard for exposure to asbestos dust*.  Federal Register 37(110):11318-11322.

Occupational Safety and Health Administration (OSHA).  1983a.  *Hazard communication: final rule*.  Federal Register 48(228):53280-53309.

Occupational Safety and Health Administration (OSHA).  1983b.  *Occupational exposure to asbestos: emergency temporary standard*.  Federal Register 48(215):51086-51140.

Occupational Safety and Health Administration (OSHA).  1986.  *Occupational exposure to asbestos, tremolite, anthophyllite, and actinolite: final rule*.  Federal Register 51(119):22612-22790.

Peto J.  1980.  Lung cancer mortality in relation to measured dust levels in an asbestos textile factory.  *IARC Sci Publ* 1(30):829-836.  (Reported in OSHA 1983b.)

Peto J, Doll R, Howard SV, Kinlen LJ, and Lewinsohn HC.  1977.  A mortality study among workers in an English asbestos factory.  *Br J Ind Med* 34(3):169-173.

Rodricks JV.  2006.  Evaluating disease causation in humans exposed to toxic substances.  *J of Law and Policy* XIV(1):39-63.

Rubino GF, Piolatto G, Newhouse ML, Scansetti G, Aresini GA, and Murray R.  1979.  Mortality of chrysotile asbestos workers at the Balangero Mine, Northern Italy.  *Br J Ind Med* 36187-194.  (Reported in OSHA 1983b.)

Smith WE, Hubert DD, Sobel HJ, and Marquet E.  1979.  Biologic tests of tremolite in hamsters.  In: *Dust and Disease,* eds Lemen R and Dement JM, 335-355.  Park Forest South, Illinois: Pathotox Publishers, Inc.

Wagner JC, Sleggs CA, and Marchand P.  1960.  Diffuse pleural mesothelioma and asbestos exposure in the North Western Cape Province.  *Br J Ind Med* 17260-271.  (Reported in NIOSH 1976.)

Weill H, Hughes J, and Waggenspack C.  1979.  Influence of dose and fiber type on respiratory malignancy risk in asbestos cement manufacturing.  *Am Rev Respir Dis* 120(2):345-354.  (Reported in OSHA 1983b.)

Wood WB and Gloyne SR.  1934.  Pulmonary asbestosis: a review of 100 cases.  *Lancet* 21383-1385.

Yazicioglu S, Oktem K, Ilcayto R, Balci K, and Sayli BS.  1978.  Association between malignant tumors of the lungs and pleurae and asbestosis. A retrospective study.  *Chest* 73(1):52-56.