IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., *et al.* | ) | Case No. 01-01139 (JKF) |
| | ) | |
| Debtors. | ) | Jointly Administered |

**Response Deadline: July 10, 2009 at 4:00 p.m.**
**Hearing Date: July 27, 2009 at 10 ;30 a.m.**

### DEBTORS' OBJECTIONS TO CERTAIN CLAIMS FILED BY NEUTOCRETE PRODUCTS, INC., NEUTOCRETE SYSTEMS, INC. AND FTF CRAWLSPACE SPECIALISTS, INC.

The above-captioned debtors (the "Debtors" or "Grace") object to Claim Nos. 8378, 8379 and 8380 (collectively, the "Proofs of Claim," which are respectively attached as Exhibits 1, 2 and 3) filed by Neutocrete Products, Inc. ("Neutocrete"), Neutocrete Systems, Inc. ("NSI") and FTF Crawlspace Specialists, Inc. ("FTF," and collectively with Neutocrete and NSI, the "Claimants"). In support of this Objection, the Debtors state the following:

#### Introduction

The Claimants are affiliated companies that collectively perform residential concrete-crawlspace installations. The Proofs of Claim assert contingent and unliquidated claims for alleged damages relating to a contract for the sale of goods, which was entered between Grace and Neutocrete in December 2000. Through that agreement, Neutocrete contracted to purchase its required dry, lightweight concrete from Grace, which Neutocrete would mix with water and then use in their crawlspace installations. The Proofs of Claim allege that Grace under-filled certain bags of concrete, and that because of these alleged shortages, Claimants experienced an unexpectedly high incidence of cracking in its crawlspace applications. The Proofs of Claim seek a myriad of damages, including damages for the alleged shortages of product, fraud under

the Connecticut Unfair Trade Practices Act, estimated legal fees, and indemnification for alleged lost sales and "goodwill."

The Debtors object to the Proofs of Claim, because Claimants' factual allegations are without merit. Grace delivered conforming materials and otherwise fulfilled its obligations under the Agreement (defined below). To the extent that Claimants experienced problems with their installations, any such problems were due solely to Claimants' improper mixture and application of the materials. Specifically, in order to reduce installation times and "spread out" their use of the materials, Claimants added too much water to the materials and mixed the resulting cementitious mixture for far too long. Grace notified Neutocrete of these and other misuses during the pendency of the Agreement, but the Claimants apparently failed to adjust their conduct.

Even if the Claimants' factual allegations were true, they could not recover for the Proofs of Claim, because the explicit terms of the Agreement and controlling law each required Neutocrete to reject any nonconforming materials upon delivery or within a reasonable period thereafter. Neutocrete did not do so. Instead, Neutocrete accepted and used the allegedly nonconforming materials in its crawlspace installations, and did not object until years later, when Grace sought payment from Neutocrete on account of unpaid, delinquent balances. Further, the Agreement provided that "Grace's invoice weights, volumes, and sizes shall be treated as prima facie correct." Given the passage of time and Neutocrete's intervening use of the materials, it would be impossible for Neutocrete to present facts sufficient to overcome this presumption. Thus, Neutocrete's failure to reject any delivery of materials, and its subsequent use and installation of the delivered materials, precludes it from recovering at this time.

2

Finally, even if the Claimants were entitled to recovery for any portion of their Proofs of Claim, they would not be entitled to recover for most of the amounts and types of damages asserted therein. First, the Agreement specifically disclaims any warranty for fitness of any intended use; expressly limits any recovery to replacement of materials or the refund or partial refund of the purchase price of the nonconforming materials at issue; and precludes any recovery for "incidental or consequential damages." (Agreement ¶ 7, and attached in Ex. 1-3.) Therefore, even if Neutocrete could establish that it received any specific deliveries of materials that were insufficient or otherwise nonconforming, Neutocrete would only be entitled to the lesser of the replacement of the materials at issue or the purchase price of those specific deliveries. Second, by continuing to accept delivery of materials and entering into an amendment to the Agreement after the alleged breaches had occurred, Neutocrete has waived any claims that they may otherwise have had. Third, the Claimants assert damages under the Connecticut Unfair Trade Practices Act, but they fail to establish why sales made pursuant to the Agreement, which by its terms is governed by Massachusetts law, should be governed by that statute. Claimants also fail to allege that Grace intentionally under-filled any bags, or that Grace engaged in any other fraudulent activity, as is required under that statute. To the contrary, Grace "bent over backwards" to try to satisfy Neutocrete's commercial needs, even in the face of Neutocrete's misuse of the materials and delinquent payments. Finally, NSI and FTF are not parties to the Agreement, and are not referenced as beneficiaries in the Agreement. Therefore, they lack standing to prosecute their respective Proofs of Claim.

Therefore, Grace requests that the Court disallow and expunge the Proofs of Claim. (a proposed order is attached as Exhibit 5.) To the extent the Court does not disallow and expunge the Proofs of Claim, Grace requests that the Court enter an order finding that as a matter of law,

3

the Claimants cannot recover for any alleged lost sales, "goodwill," or any other incidental and/or consequential damages, and limiting any recoveries to replacement of any specific shipment(s) that Neutocrete establishes as nonconforming. Grace further requests that the Court enter an order granting Grace recovery for all unpaid amounts under the Agreement, with interest, as well as any other damages that the Court deems appropriate under the present circumstances.

## Jurisdiction

1.      This Court has jurisdiction over this matter under 28 U.S.C. § 1334. This matter is a core proceeding within the meaning of 28 U.S.C. §§ 157(b)(2)(A) and (O).

2.      The statutory bases for relief requested herein are 11 U.S.C. §§ 105(a) and 502, Rules 3001 and 3007 of the Federal Rules of Bankruptcy Procedure, and Rule 3007-1 of the Local Rules of the United States Bankruptcy Court for the District of Delaware.

## Facts and Background

3.      The Claimants are Connecticut Corporations that are involved in the installation of concrete crawlspaces under residential dwellings. (Proofs of Claim, at Summary ¶ 1.) According to Claimants, they are related entities that share common shareholders and directors. (*Id.*)

4.      Before the summer of 1999, Neutocrete used concrete supplied by "ThermoRock™" for its crawl space installations. (5/19/99 letter, Ex. C to Proofs of Claim.) However, Neutocrete reportedly wanted to switch its supplier, because it was experiencing, "cracking and settling of finished concrete, some inconsistency (soft spots) in finished concrete, debris causing pump jams and increased labor costs." (*Id.*)

5.      During the summer of 1999, Neutocrete switched to Grace, and Grace began supplying Neutocrete with a lightweight concrete product, which the Claimants allegedly

sprayed on the walls of residential crawlspaces. (Proofs of Claim Summary ¶ 1.) At that time, there was no written agreement in place between Grace and any of the Claimants.

6.      On December 14, 2000, Grace and Neutocrete entered into a long-term supply agreement, (the "Agreement," Ex. A to Proofs of Claim), whereby Grace agreed to supply materials to Neutocrete pursuant to the terms and conditions described therein (the "Goods"). No similar agreement was made between Grace and either NSI or FTF, and the Agreement does not state that it was being made for the benefit of NSI and/or FTF.

7.      The Agreement, which states that it was to be governed by the laws of Massachusetts (Agreement ¶ 15), provided for a three-year term commencing on January 1, 2001. (Agreement ¶ 3.) The Agreement required Neutocrete to purchase all of its Goods from Grace and to purchase a minimum quantity of 50,000 bags/month. (Agreement, at Ex. A.) The Agreement further provided that each bag of Goods would contain 2 cubic feet of Zonolite #4 Vermiculite, 30 pounds of Type I or II Portland Cement, and <2 oz. of Grace proprietary additive. (*Id.*) The Agreement provided that the original price would be $5.27/bag, and provided for price adjustments at 6 month intervals, beginning 12 months after the commencement of the Agreement. (*Id.*)

8.      The Agreement stated that the Goods would be provided, "F.O.B. [from] Grace's plant in Enoree, South Carolina," and that "*Grace's invoice weights, volumes and sizes shall be treated as prima facie correct.*" (Agreement ¶ 6) (emphasis added).

9.      The Agreement limited Grace's liability on account of the delivery of any nonconforming Goods as follows: "Grace's liability and Neutocrete's remedy under this warranty are limited in Grace's discretion to replacement of Goods returned to Grace which are shown to Grace's reasonable satisfaction to have been non-conforming or to refund or credit of

5

the purchase price." (Agreement ¶ 7(a).)  The Agreement further provided that this language

constituted Grace's exclusive warranty with respect to conformity of the Goods, that Neutocrete

agreed to waive any and all other express and implied warranties, including any implied

warranty of fitness for a particular purpose and warranty of merchantability, and that Neutocrete

could not recover for incidental or consequential damages:

> THE FOREGOING WARRANTIES ARE EXCLUSIVE AND ARE GIVEN
> AND ACCEPTED IN LIEU OF ANY AND ALL OTHER WARRANTIES,
> EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION, THE
> IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE. THE
> REMEDIES OF NEUTOCRETE FOR ANY BREACH OF WARRANTY
> SHALL BE LIMITED TO THOSE PROVIDED HEREIN AND FOR DELAY
> OR NONDELIVERY WHICH IS NOT EXCUSABLE TO THE PURCHASE
> PRICE OF THE NEUTOCRETE PRODUCT IN RESPECT OF WHICH THE
> DELAY OR NONDELIVERY IS CLAIMED TO THE EXCLUSION OF ANY
> AND ALL OTHER REMEDIES, INCLUDING, WITHOUT LIMITATION,
> INCIDENTAL OR CONSEQUENTIAL DAMAGES.  NO AGREEMENT
> VARYING OR EXTENDING THE FOREGOING WARRANTIES, REMEDIES
> OR THIS LIMITATION WILL BE BINDING UPON GRACE UNLESS IN
> WRITING, SIGNED BY A DULY AUTHORIZED OFFICER OF GRACE.
> (Agreement ¶ 7.)

10.    The Agreement stated that "[e]ach delivery shall stand and may be recovered for

as a separate and independent contract." (Agreement ¶ 10.)

11.    The Agreement also contained a "Termination" provision, which allowed either

party to terminate the Agreement for any of the specified reasons, including either party's

"fail[ure] to observe any of the material terms and conditions of this Agreement and fails to

remedy such breach within thirty (30) days of written notice from the terminating party," or if

either party, "becomes a party in a bankruptcy or similar proceeding…" (Agreement ¶ 13.)

12.    Finally, the Agreement contained an integration clause, pursuant to which the

"Agreement constitute[d] the full exclusive understanding between the parties [t]hereto with

reference to the subject matter hereof and no statements or agreements, oral or written, made

prior to or at the signing hereof shall claim any amendment, modification or release from any

6

provisions hereto of mutual agreement, acknowledgement or acceptance of purchase order forms, or otherwise, unless such agreement is in writing signed by the other party and specifically stating it is an amendment to this Agreement." (Agreement ¶ 15.)

13.     During the course of the Agreement, Neutocrete expressed concerns with variations amongst the amount of Goods contained in different bags. (*Id.*) Nevertheless, Neutocrete never refused acceptance of any shipment or otherwise identified any specific bags as deficient. However, in an effort to address Neutocrete's expressed concerns, Grace examined its bagging mechanisms and reworked its machinery to reduce variations. (*Id.*) In April of 2002, Grace gave Neutocrete a $15,000 credit for variations in bag weights up to that time, which Neutocrete accepted. (Grace Credit Memo, attached as Exhibit 4.)

14.     Neutocrete also indicated to Grace that, much like it had experienced with Neutocrete's previous supplier (ThermoRock), it was experiencing cracking in the finished installations at some of its jobsites. (*Id.*) Grace sent a representative to a Neutocrete jobsite to provide technical assistance and to determine why Neutocrete may have been experiencing cracking in its finished installations. (*Id.*) Based upon that visit, Grace learned that Neutocrete and/or its installers were misusing the Goods. (5/7/02 letter, Ex. D to Proofs of Claim.) Specifically, in an attempt to speed up application and save labor time, Neutocrete's installers were adding too much water to the Goods. (*Id.*) Rather than adding 5.6 gallons of water per bag of Goods, Neutocrete's installers were adding 7-8 gallons of water per bag of Goods. Also, rather than mixing the Goods for 1-2 minutes, as was recommended, Neutocrete's installers were mixing the Goods for upwards of 5 minutes. (*Id.*) Further, Neutocrete was also installing plastic sheeting under installations, which was causing air bubbles that led to potential cracks. (*Id.*) Grace informed Neutocrete of these misuses of the Goods and provided guidance for their

correct usage. (*Id.*) Grace also told Neutocrete that is might consider using Daraweld C as an additive, which would further reduce the possibility of cracking. (*Id.* at pg. 3.) Grace continued to work with Neutocrete on implementing the above-described changes. When Neutocrete implemented some of these changes, there appeared to be substantial improvement in performance.

15.    On April 2, 2001, Grace filed its bankruptcy petitions under Chapter 11 of Title 11 of the United States Code.

16.    In early 2001, Neuotocrete fell behind in its financial obligations under the Agreement, and by May 7, 2002, Neutocrete's unpaid balance to Grace exceeded $130,000. (*Id.* at pg. 4.) Neutocrete indicated to Grace that it was experiencing cash flow problems due to internal partnership issues. (*Id.*)

17.    Effective October 15, 2001, Neutocrete and Grace renewed their commitment to the Agreement in the face of Grace's pending bankruptcy cases, by entering into an amendment to the Agreement, which adjusted Section 4 (Pricing) to contain different pricing terms for Goods that were delivered inside or outside of the New England region, provided Grace with the right to subcontract all or part of the Agreement, and acknowledged that Grace had filed for bankruptcy. The remainder of the Agreement was not affected by the amendment. (Amendment A to Purchase Agreement, attached as Exhibit A to Proofs of Claim.)

18.    In April 2002, Neutocrete stopped payment on checks that it had tendered to Grace in exchange for Goods that had already been supplied by Grace and used by Neutocrete. In response to Neutocrete's failure to make timely payments, Grace threatened to stop supplying Neutocrete with additional Goods until Grace had been fully compensated. At that time,

8

Neutocrete assured Grace that they would be paid in-full for the delivered Goods and Neutocrete gave Grace a check for approximately $60,000. (*Id.* at pg. 4.)

19.     Neutocrete subsequently stopped payment on that check as well.  On May 7, 2002, Grace notified Neutocrete that "Grace [would] not supply any more material to Neuotcrete until Neutocrete's account [was] up to date."  (Exhibit D to Proofs of Claim, at pg. 5.) Neutocrete failed to pay Grace for its outstanding obligations, and thereafter, Grace ceased conducting business with Neutocrete.

20.     Thereafter, Grace referred Neutocrete's delinquent account to NCO Financial Services, Inc. (the "Collection Agent"), Grace's collection agency, to pursue recovery of the delinquent payments.

21.     In October 2002, the Collection Agent pursued recovery from Neutocrete by filing a complaint on behalf of Grace in the Superior Court of the State of Connecticut, Judicial District of Litchfield (the "Collection Action").  The Collection Action was an action for collection of unpaid post-petition invoices totaling $112,637.  The Collection Agent was simply trying to collect unpaid invoices and had no reason to believe that Neutocrete would assert counter-claims.  Indeed, prior to the Collection Action, Neutocrete had never expressed any intent to file suit against Grace on account of the Agreement.

22.     Neutocrete responded to the Collection Action by raising multiple counter-claims. In particular, Neutocrete alleged that batches of the Goods purchased by Neutocrete between September 1999 and May 2002 were deficient in the amount of Goods contained in each bag and in the mixture used to manufacture the Goods.

23.     On March 28, 2003, the Claimants each filed a Proof of Claim (Claims No. 8378, 8379 and 8380) against Grace.  The Proofs of Claim allege that Grace "did not fulfill the

contractual requirements of its long-term supply agreement" with the Neutocrete. (Proofs of Claim Summary, at pg. 1.) Specifically, the Claimants allege that Grace (i) underfilled the concrete bags, (ii) did not provide a superior Good and technical support, and (iii) use of the Goods containing "Daraweld C" led to an unpleasant odor. (Proofs of Claim Summary, at pgs. 2-3.)

24.    The Proofs of Claim collectively assert unliquidated, continent claims and request aggregate damages of $2,857,803, consisting of the following: (a) $211,875 for alleged shortages of Goods, (b) $300,000 for fraud and violation of the Connecticut Unfair Trade Practices Act, (c) $250,000 for estimated legal fees, (d) $140,928 for indemnification for repair damages from unidentified material defects, (e) $1,700,000 for alleged lost sales, and (f) $255,000 for alleged loss of reputation and goodwill. (Proofs of Claim Summary, at pg. 3.)

**Relief Requested**

25.    For the reasons discussed below, Grace requests that this Court disallow and expunge the Proofs of Claim and award Grace judgment on account of outstanding amounts that are owed to Grace for deliveries that were accepted and used by Neutocrete. Further, to the extent that the Court does not expunge and disallow the Proofs of Claim in their entireties, Grace requests that the Court enter an order limiting any damages that Claimants could recover for their Proofs of Claim to the replacement of any shipments that Neutocrete establishes as having been nonconforming. [1]

---

[1] As explained below in the "Intent to Address Through Mediation" section, to the extent the Court does not immediately disallow and expunge the Claims, Grace and the Claimants have agreed to pursue resolution of the Claims through the Court-approved alternative dispute resolution program. (Dkt. No. 6853) (the "ADR Order").

## Argument

**I.    Grace Fulfilled Its Obligations under the Agreement and Neutocrete's Allegations Are Unfounded.**

26.    The Claimants allege that Grace "did not fulfill the contractual requirements of its long-term supply agreement." (*See* Proofs of Claim Summary, at pg. 1.)  Specifically, the Claimants allege that: (i) Grace underfilled the concrete bags; (ii) Grace did not provide a superior Good and technical support; and (iii) the use of the Goods let an unpleasant odor. (*Id.* at pg. 3.)  These allegations are factually incorrect.

27.    The Claimants allege that Grace underfilled the bags because the quantity in each bag was allegedly only 1.5 cubic feet, and when installed only yielded 8 square feet per bag. (Proofs of Claim Summary, at pg. 2)  However, Grace supplied Neutocrete with the amount of Goods that were specified in the contract: 2 cubic feet of Zonolite #4 Vermiculite, 30 lbs. of Type I or II Portland Cement, and <2 oz. of the Grace proprietary additive.  (Ex. A to Attachment A of Proofs of Claim.)  Claimants apparently believed that the bags were underfilled because they were not properly mixing the Goods.  As Grace explained to Neutocrete in May 2002, Neutocrete's installers were adding too much water to "produce a wet, soupy mix that would pump quickly so the installers could finish more quickly." (Ex. D to Proofs of Claim, at pg. 1.)

28.    While slight variations in the volume of Goods in the bags and/or weight may have been present, such variation were to be expected.  The Agreement recognized this fact by expressly stating that the amounts of Goods in each bag were to be prima facie correct, unless Neutocrete objected upon its receipt of delivery of the Goods.  (Agreement ¶ 6, 7)  Neutocrete failed to ever reject delivery or ever contest the sufficiency of any specific bag or delivery of Goods.  Given the passage of time and Neutocrete's intervening use of the Goods, Claimants

11

could not possibly overcome this burden with respect to establishing that any specific bags of Goods did not contain the correct amount.

29.     The Claimants also allege that Grace did not provide a superior Good and technical support.  This lack of a superior Good and technical support, they allege, caused excessive cracking in the installations.  This allegation is also not correct.  Any problems that Neutocrete may have encountered with the Goods were the result of Neutocrete's misuse of the Goods.  The cracking and yield issues that the Claimants were experiencing were a direct result of the Claimants' overmixing the Goods and poor water-control by the Claimants' employees and/or installers.    In addition, Claimants apparently installed plastic sheeting beneath its installations, which was not recommended by Grace and apparently resulted in "floating floors" that contributed to the incidence of cracking in Claimants' installations. (*See id.* at pg. 3.)

30.     Lastly, the Claimants allege that Grace's recommended use of Daraweld C with the Goods left an unpleasant odor and resulted in customer complaints and a lack of referrals.  This allegation is similarly without merit.  While the Goods with the Daraweld C additive may have had odor similar to Elmers glue, it was up to Neutocrete to determine the fitness of the use of the Goods and any additive (such as Daraweld C) for the particular purpose.  (Agreement ¶ 7(d).)  Further, this additive was only necessary because Neutocrete's installers were not properly using the Goods and, in any event, the Agreement does not cover or otherwise warrant the smell or odor of the Goods in its native form or otherwise.

## II.    The U.C.C. Precludes Neutocrete from Rejecting or Revoking Acceptance of Goods that It Accepted and Installed Several Years Ago.

31.     Neutocrete failed to revoke its acceptance of Grace's Goods after a reasonable period of time and, therefore, under the Massachusetts U.C.C. and the explicit terms of the

12

Agreement, it has waived any rights to do so.[2]  Further, Neutocrete has converted the Goods to a new form by installing them in its customers' buildings, an act that is inconsistent with rejection, and thus Neutocrete is now precluded from revoking acceptance of those Goods that it has both accepted and used.

32.    According to applicable provisions of the U.C.C., Neutocrete was required to reject any nonconforming goods within a reasonable period of time after their delivery or tender, and any subsequent rejection is ineffective unless Neutocrete seasonably notified Grace. MASS. GEN. LAWS CH. 106, § 2-608.  Further, Neutocrete was deemed to have accepted the Goods after it had a reasonable opportunity to inspect them.  MASS. GEN. LAWS CH. 106, § 2-606. Neutocrete has not alleged that it was ever deprived of an opportunity to inspect any deliveries, and Neutocrete never once rejected any delivery of allegedly nonconforming Goods.  Therefore, under the U.C.C., Neutocrete accepted the deliveries of Goods made by Grace pursuant to the Agreement, and given the passage of over 6 years since the last delivery, has waived its opportunity to reject or otherwise contest the conformity of such goods.

33.    Neutocrete cannot revoke or otherwise "undo" its acceptance of the Goods.  The U.C.C. provides that a party may revoke its acceptance of nonconforming goods, but only if such revocation is undertaken within a reasonable period of time following the party's discovery of the grounds for revocation, and *"before any substantial change of condition of the goods which is not caused by their own defect."*  MASS. GEN. LAWS CH. 106, § 2-609 (emphasis added). Neutocrete substantially changed the condition of the Goods by mixing them with water and

---

[2] The Agreement contained a Massachusetts choice of law provision; therefore, the Agreement is governed by Massachusetts law.  Mass. Gen. Laws. Ch. 106, § 1-105; *Steranko v. Inforex, Inc.*, 362 N.E.2d 222, 228 (Mass App. Ct. 1977).  The Agreement also involved a contract for the sale of goods, and thus is governed by Massachusetts's adopted version of Article 2 of the Uniform Commercial Code ("U.C.C.").  *See* MASS. GEN. LAWS CH. 106, § 2-105; *Brewster Wallcovering Co. v. Blue Mountain Wallcoverings, Inc.*, 864 N.E.2d 518, 532 (Mass. App. Ct. 2007).

installing the Goods into its customers' buildings. Thus, Neutocrete's installation of the Goods precludes it from revoking its acceptance under the U.C.C. MASS. GEN. LAWS CH. 106, § 2-606(1)(a) and (c); *Carlo Bianchi & Co. v. Builders' Equipment & Supplies Co.*, 199 N.E.2d 519 (Mass. 1964); *Atwood v. Best Buick, Inc.*, 484 N.E.2d 647 (Mass. App. Ct. 1985); *U.S. v. Crawford*, 443 F.2d 611, 613 (5th Cir. 1971) (stating "once Crawford had accepted and installed the units supplied in place on the Albany site, any subsequent attempt at revocation was ineffective."); *Bevel-Fold, Inc. v. Bose Corp.*, 402 N.E.2d 1104, 1107 (Mass. App. Ct. 1980) (stating "acceptance occurs the buyer does any act inconsistent with the seller's ownership of the goods. ([MASS. GEN. LAWS CH.] 106, § 2-606(1)(c)) an event which certainly occurs when the buyer has taken the seller's unfinished goods and manufactured them into a new product.").

34.    The U.C.C. also required Neutocrete to notify Grace within a reasonable time after it discovered or should have discovered the alleged breach. Neutocrete failed to do so, and it therefore waived its rights to recover for breach of the Agreement. U.C.C. MASS. GEN. LAWS CH. 106, § 2-607.

35.    In addition to the provisions of the U.C.C., the explicit terms of the Agreement also preclude Neutocrete from recovering after its acceptance and use the allegedly nonconforming Goods. The Agreement provides that title to the Goods transferred upon Neutocrete's acceptance of the Goods, and that the invoice weights, volumes and sizes were deemed to be prima facie correct. (Agreement ¶ 6.) Thus, according to the Agreement, if Neutocrete desired to reject any Goods, or further revoke acceptance of any Goods, it was required to return any such non-conforming Goods to Grace for refund or credit of the purchase price, subject to Grace's agreement. (Agreement ¶ 7.) Neutocrete failed to do so, and given the intervening passage of time and use of the Goods at issue, could not possibly do so at this time.

14

**III.    Neutocrete Has Waived Its Rights to Recover for Any Alleged Damages.**

36.    Neutocrete never rejected any shipment of Goods; continued to accept deliveries of Goods from Grace for years after the alleged breaches began; never terminated the Agreement, as it was entitled to do upon 30 days' notice pursuant to the terms of the Agreement (Agreement, at pg. 4); entered into an amendment to the Agreement after the alleged problems occurred; and failed to pursue any judicial action until after Grace initiated the Collection Action.    By continuing to accept performance under the Agreement and amending the Agreement after the alleged breaches began, Neutocrete has waived any claims that they may have stemming from Grace's alleged breaches of the Agreement.

37.    Massachusetts law defines waiver as the "intentional relinquishment of a known right." *Dynamic Mach. Works, Inc. v. Machine & Elec. Consultants, Inc.*, 831 N.E.2d 875, 879 (Mass. 2005), *quoting Doujotos v. Leventhal,* 271 Mass. 280, 282, 171 N.E. 445 (1930). Whether a waiver has occurred is determined by an objective assessment of the conduct of the party alleged to have surrendered its contractual rights.    *Dunkin' Donuts Inc. v. Panagakos*, 5 F.Supp.2d 57, 60 (D. Mass. 1998).

38.    Waiver exists where (as here), "one party to a contract who, with knowledge of a breach by the other party, continues to accept benefits under the contract, and suffers the other party to continue in performance thereof. . . ." *Jet Asphalt & Rock Co. v. Angelo Iafrate Constr., LLC*, 431 F.3d 613, 617-18 (8th Cir. 2005), *quoting S. Pipe Coating Inc. v. Spear & Wood Mfg. Co.*, 363 S.W.2d 912 (Ark. 1963); *see also Chicago Coll. of Osteopathic Med.*, 776 F.2d 198, 202 (7th Cir. 1985) (a party waives a breach of contract by continuing to accept performance of the contract and the benefits thereof after learning of the breach); *Nat'l Westminster Bank, U.S.A. v. Ross*, 130 B.R. 656, 675 (S.D.N.Y. 1991) ("It is well-established that where a party to an agreement has actual knowledge of another party's breach and continues to perform under and

15

accepts the benefits of the contract, such continuing performance constitutes a waiver of the breach."), *aff'd sub nom. Yaeger v. Nat'l Westminster*, 962 F.2d 1 (2d Cir. 1992).

39.     Neutocrete did not only continue to accept Goods after the alleged breaches had begun; it also renewed its commitment to the Agreement in October 2002 by entering into an amendment to the Agreement, which acknowledged and waived any rights relating to Grace's intervening bankruptcy filing.  Therefore, even if it were true that Grace had breached the Agreement as early as December 2000, Neutocrete cannot take the benefits of two years of deliveries of Goods; enter into an amendment to the Agreement; and then turn around and sue Grace for over $2 million based on Grace's supposed longstanding breach of contract. Massachusetts law does not allow this type of abuse.

## IV.    Neutocrete Released Any Claim for Allegedly Underfilled Bags of Goods by Accepting a $15,000 Credit on April 12, 2001.

40.     In April of 2002 Grace gave Neutocrete a $15,000 credit for variations in bag weights up to that time, which Neutocrete agreed to and accepted.  (*See* Grace Credit Memo, attached as Exhibit 4).  The $15,000 credit was offered by Grace as a compromise for Neutocrete's claim that it was experiencing variations in the weight of the Goods.  By accepting the credit, Neutocrete released and waived any claim they had relating to alleged shortages in the Goods prior to April 12, 2001.

## V.     Neutocrete Seeks Amounts and Categories of Damages that Are Expressly Prohibited Under the Agreement and Applicable Law.

41.     The Agreement expressly precludes the amounts and certain categories of damages sought in the Proofs of Claim.  Specifically, the Agreement limits any damages to (in Grace's discretion) either the replacement of, or purchase price for, any nonconforming Goods. The Agreement also precludes recovery for any incidental and/or consequential damages. (Agreement ¶ 7(d).)  Such provisions are allowed under the U.C.C. and applicable Massachusetts

16

law. MASS. GEN. LAWS CH. 106, § 2-316; *Canal Elec. Co. v. Westinghouse Elec. Corp.*, 548 N.E.2d 182, 186 (Mass. 1990).

42.     Despite these limitations, the Proofs of Claim seek $2,857,803 in damages, which is far in excess of the alleged $256,275 purchase price of any nonconforming Goods. The Proofs of Claim also seek the following categories of prohibited incidental and/or consequential damages: indemnification for repair of allegedly cracked crawlspaces, lost sales, and lost reputation and good will. *See, e.g., Delano Growers' Co-op. Winery v. Supreme Wine Co., Inc.*, 473 N.E.2d 1066, 1075 (Mass. 1985), *citing* Mass. Gen. Laws Ch. 106, § 2-715.) (loss of good will is a consequential damage); *Agri-Mark, Inc. v. Niro, Inc.*, 233 F.Supp.2d 200 (D. Mass. 2002) (lost profits constitute consequential and incidental damages).

43. Further, besides being barred under the Agreement, Neutocrete has already admitted that its "lost opportunity" claims were groundless. (5/7/02 letter, Ex. D to Proofs of Claim.) Therefore, any such claims are both barred under the Agreement and also meritless.

## VI.     Neutocrete Cannot Recover for Any Damages from Alleged Cracking.

44.     The Agreement specifically disclaimed any warranty of Merchantability and Fitness for a Particular Purpose, and such disclaimers are allowed and enforced under MASS. GEN. LAWS CH. 106, § 2-316 and Massachusetts law. *Theos & Sons, Inc. v. Mack Trucks, Inc.*, 729 N.E.2d 1113, 1117 (Mass. 2000)  Therefore, to the extent that Neutocrete experienced cracking or other problems after its use and installation of the Goods (just as it had previously experienced with its prior supplier "ThermoRock"), Grace cannot be held liable for any such issues.   This result is entirely appropriate under the circumstances.   Neutocrete had sole dominion over the process through which the Goods were mixed and installed at its project sites, as well as the specific purposes for which the Goods were used.   Therefore, it would be

17

unreasonable if Grace were held accountable for problems that may have occurred on account of actions for which Grace had no control.

## VII.    Neutocrete Cannot Recover for Goods and Services that Allegedly Were Not "Superior."

45.    Neutocrete could not possibly recover for its allegation that Grace failed to provide "superior" Goods or services. That is because the issue of whether or not the Goods were "superior" to other goods necessarily involves consumer tastes and preferences, which vary from one consumer to the next. Claims based upon this sort of "puffery" or marketing terms are not recoverable under Massachusetts law, because "[t]he law recognizes the fact that men will naturally overstate the value and qualities of the articles which they have to sell. All men know this, and a buyer has no right to rely upon such statements." *Kabatchnick v. Hanover-Elm Bldg. Corp.*, 328 Mass. 341, 344 (1952).

## VIII.    NSI and FTF Lack Standing to Sue Under the Agreement.

46.    NSI and FTF, the remaining Claimants, lack standing to assert claims against Grace, because neither entity was a party to the Agreement, and neither entity was "clearly identified" as either an intended beneficiary or assignee of the Agreement.

47.    Under Massachusetts law, for a non-party to recover for the breach of contract, they have the burden of establishing "that the parties to the contract 'clear[ly] and definite[ly]' intended the beneficiaries to benefit from the promised performance." *Miller v. Mooney*, 725 N.E.3d 545, 550 (Mass. 2000) (quoting *Anderson v. Fox Hill Village Homeowners Corp.*, 676 N.E.2d 821, 822 (1997)). Because the Agreement contains an integration clause, NSI and FTF would have had to have been identified as intended beneficiaries in the Agreement. (Agreement ¶ 15.) ( "Agreement constitutes the full exclusive understanding between the parties hereto…"). The Agreement does not identify any parties (NSI, FTF, or otherwise) as intended beneficiaries

18

of the Agreement. Therefore neither NSI nor FTF were "clearly and definitely" identified as intended beneficiaries to the Agreement. *Id.*

48.    NSI and FTF likewise are not assignees of the Agreement. The Agreement contains a provision, by which Neutocrete could have assigned the benefits of the Agreement to third parties, such as NSI and FTF. Under the Agreement, if a party is identified in the Agreement as an "Affiliate" of Neutocrete, then Neutocrete was allowed to unilaterally assign the Agreement to that party; Neutocrete was required to obtain Grace's written authorization before assigning the Agreement to any other third parties. The Agreement states:

> This Agreement shall inure to the benefit of and be binding upon the successors and permitted assigns of the parties hereto. This Agreement is not assignable or transferable by either party whether voluntary or by operation of law, in whole or in part, *without the prior written consent of the other party*, which consent shall not be unreasonably withheld, provided that (i) *Neutocrete may assign this Agreement to its Affiliate* and (ii) either party may assign this Agreement to the buyer of all or substantially all of the business or assets of the assigning party to which this Agreement relates. (Agreement ¶ 9(a)) (emphasis added)

49.    FTF is not identified as an "Affiliate" or otherwise identified in any way in the Agreement. (*See* Agreement.) Therefore, in order for FTF to have been an assignee under the Agreement, Neutocrete was required to first obtain Grace's written consent. Neutocrete never sought Grace's consent to make FTF an Assignee of the Agreement, and Grace therefore, never authorized any such arrangement. Therefore, FTF is neither an intendend beneficiary nor an assignee of the Agreement and lacks standing to assert claims that relate to the Agreement.

50.    NSI is identified in the Agreement as an "Affiliate" of Neutocrete, and therefore Neutocrete had the ability to assign the agreement to NSI without Grace's prior written authorization. However, Neutocrete never told Grace that it had assigned the Agreement to NSI

19

and, upon information and belief, Neutocrete never assigned its benefits under the Agreement to NSI. Therefore, NSI likewise is neither an intended beneficiary nor assignee of the Agreement.[3]

## IX.    CUTPA Does Not Apply to these Massachusetts Transactions.

51.    Neutocrete has not presented any evidence to demonstrate that CUTPA applies to the Agreement. Neutocrete and Grace contracted under Massachusetts law; Neutocrete agreed to accept possession of the Goods from Grace's South Carolina facility; and Neutocrete has presented no evidence that any of the Goods made their way to Connecticut. Thus, the only apparent link to the State of Connecticut is the fact that the parties to the Agreement were incorporated in Connecticut. Yet, had Neutocrete and Grace desired for Connecticut law to govern the Agreement, they could have chosen Connecticut law to apply in the Agreement. To the contrary, the Agreement expressly provides that Massachusetts law governs the Agreement.

52.    Even if CUTPA were to apply, Neutocrete has presented no facts that Grace engaged in (a) unfair acts or practices, (b) deceptive acts or practices or (c) unfair methods of competition, as is required to recover under CUTPA. CONN. GEN. STAT. § 42-110(b)(a). Neutocrete similarly has not alleged any of the following factors, which have been recognized by the Supreme Court of Connecticut as bases for recovery under CUTPA: (1) whether the practice offends public policy; (2) whether it is immoral, unethical, oppressive or unscrupulous; and/or (3) whether it causes substantial injury to consumers, competitors, or other businessman. *Web Press Serv. Corp. v. New London Motors, Inc.*, 203 Conn. 342, 355 (1987); *see also Willow Springs Condominium Ass'n, Inc. v. Seventh BRT, Dev. Corp.*, 245 Conn. 1 (1998). Therefore, CUTPA does not apply to the Proofs of Claim, because the Agreement is governed by

---

[3] Even if the Court were to determine that either NSI or FTF had standing to sue under the Agreement, any resulting damages would likewise be limited in the same manner as Neutocrete's recovery under the Agreement (*i.e.*, partial or total refund for any non-conforming Goods properly rejected) and would therefore be redundant of any claims that Neutocrete may have.

Massachusetts (not Connecticut law), and Claimants have failed to alleged facts that would allow recovery under the CUTPA.

**X.    Neutocrete Is Not Entitled to Recover for Breach of Contract or Otherwise on Account of Deliveries Made Before January 1, 2001.**

53.    Neutocrete seeks damages relating to the period from September 1999 through Grace's termination of the Agreement; and all damages are sought on account of Neutocrete's assertion that Grace "did not fulfill the contractual requirements of its long-term supply agreement." (*See* Proofs of Claim Summary, at 1.)    However, the Agreement between Neutocrete and Grace was not executed until December 2000, and by its own terms was not effective until January 1, 2001. (Agreement ¶ 3) ("This Agreement shall commence on January 1, 2001 and continue for a period of three years.").    Therefore, Neutocrete is not entitled to recover for any alleged "breaches" or related damages stemming from the Agreement for the period between September 1999 and January 1, 2001, because the Agreement was not yet effective, and it is axiomatic that before a party can recover for the breach of a written Agreement, the respective Agreement must actually exist and be applicable to the period of time at issue in the dispute. *Carson v. Giant Food, Inc.*, 187 F.Supp.2d 462, 482 (D. Md. 2002).

**XI.    Grace Is Entitled to Receive Payment for Unpaid Deliveries of Goods, Some of which Were Made After Neutocrete's Express Assurances that Payment Would Be Made.**

54.    Pursuant to the U.C.C. and to the terms of the Agreement, to the extent that Neutocrete believed that the quality or amount of the Goods in any order did not fulfill the Agreement's requirements, then Neutocrete was obligated to notify Grace of its belief at the time of delivery.    Neutocrete failed to do so.    Instead, Neutocrete accepted and used Grace's deliveries, but it has not paid for approximately $112,636.70 worth of Goods.    Because Claimants used the Goods in its building installations, it can no longer be recovered by Grace in

21

lieu of payment. Therefore, Neutocrete has breached its obligations under the Agreement, and Grace is entitled to recovery for these amounts and the related interest that has accumulated over the course of the past 7 years. MASS. GEN. LAWS CH. 106, § 2-709 ("(1)When the buyer fails to pay the price as it becomes due the seller may recover, together with any incidental damages under the next section, the price (a) of good accepted..."); *see also Connecticut Inv. Casting Corp. v. Made-Rite Tool Co., Inc.*, 416 N.E.2d 966, 970 (Mass. 1981) (holding "We conclude that Made-Rite failed to make an effective rejection and thus accepted the goods, MASS. GEN. LAWS CH. 106, § 2-606(1)(b), and that Made-Rite did not revoke this acceptance. Having accepted the goods, Made-Rite must pay for them at the contract rate. MASS. GEN. LAWS CH. 106, §§ 2-607(1), 2-709(1)(a ).").

55.     Further, in addition to Grace's contractual rights to the unpaid amounts, Grace is also entitled to the unpaid amounts under a theory of quantum meruit. Neutocrete accepted delivery of the Goods, used them in its applications, and assumedly were paid on account of the installations for which the Goods were used. Therefore, Neutocrete has been unjustly enriched by its refusal to pay, and the Debtors' estate is entitled to payment for these amounts. *Park Drive Towing, Inc. v. City of Revere*, 800 N.E.2d 331, 335 (Mass. App. Ct. 2003) (stating "[t]he measure of damages in these circumstances is quantum meruit, the reasonable value of the benefit conferred on the unjustly enriched party.").

### Reservation

56.     Grace hereby reserves the right to object in the future to any of the Proofs of Claim listed in this Objection on any ground, and to amend, modify and/or supplement this Objection, including, without limitation, to object to amended claims and newly-filed claims and to file all other objections relating to these Proofs of Claim. Separate notice and hearing will be scheduled for any such objection.

22

## Intent to Address Through Mediation

57.    On November 8, 2004, the Court approved Grace's motion to establish an alternative dispute resolution program to liquidate certain prepetition claims (Dkt. No. 6853) (the "ADR Order"). Pursuant to the ADR Order, before a claim can be submitted for mediation under the terms of the ADR order, Grace must first file an objection to the disputed claim, and then, after the claimant has responded to Grace's objection, Grace is authorized to submit the disputed claim(s) to the ADR program established under the ADR Order.

58.    In the interests of pursing an efficient and mutually agreeable resolution to the Claims, Grace and the Claimants have agreed that, to the extent the Court does not disallow and expunge the Proofs of Claim, then it is in the best interests' of both Grace and the Claimants to attempt to resolve the Proofs of Claim under the terms of the ADR Order. Therefore, to the extent that the Court does not believe that it is appropriate to grant Grace's judgment at this time, then once the Claimants have responded, the Parties intend to submit the Proofs of Claim to mediation pursuant to the terms of the ADR Order.

## Notice

59.    Grace will serve copies of this Objection on (i) the Office of the United States Trustee and (ii) the Claimants, (iii) counsel to each of the official committees appointed by the United States Trustee; (iv) counsel for the personal injury future claimants' representatives; (v) counsel to the property damage future claimants' representative, (vi) counsel to the debtor in possession lender and (vii) all parties that have requested that they be served with all pleadings filed in these cases pursuant to Federal Rule of Bankruptcy Procedure 2002.

60.    Grace submits that notice of this Objection as outlined above is sufficient under Bankruptcy Rule 3007 and that no further notice is necessary.

### No Previous Request

61.    No previous request for the specific relief set forth herein has been made to this or any other court.

### Compliance With Rule 3007-1

62.    This Objection and related exhibits attached hereto, complies with Rule 3007-1 of the Local Rules of the United States Bankruptcy Court for the District of Delaware.

### Conclusion

WHEREFORE, Grace requests that this Court disallow and expunge the Proofs of Claim for all purposes and award Grace damages for unpaid amounts under the Agreement, with accumulated interest.  To the extent the Court does not feel that judgment is appropriate at this time, then Grace requests the Proofs of Claim be referred to mediation pursuant to the terms of the ADR Order, so that resolution of the Proofs of Claim may be addressed initially through consensual mediation.

DOCS_DE:149733.1

Dated:  June 22, 2009

Respectfully submitted,

KIRKLAND & ELLIS LLP
David M. Bernick, P.C.
Samuel L. Blatnick
Andrew B. Fromm
300 N. LaSalle St.
Chicago, IL  60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

and

The Law Offices of Janet S. Baer P.C.,
Janet S. Baer, P.C.
70 W. Madison St., Suite 2100,
Chicago, IL 60602.
Phone: 312-641-2162.
Fax:  312-641-2165.

and

PACHULSKI STANG ZIEHL & JONES LLP

Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
Kathleen P. Makowski (Bar No. 3648)
Timothy P. Cairns (Bar No. 4228)
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
(302) 652-4100

Co-Counsel for Debtors and Debtors in Possession

25