# EXHIBIT A

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE
- - -

In Re:                    : Chapter 11
                          :
                          : Case No.
W.R. GRACE & CO., et al,  : 01-01139 JKF
                          :
                          : (Jointly
        Debtors           : Administered)


- - -

Friday, May 1, 2009

- - -

Oral deposition of PETER VAN
N. LOCKWOOD, ESQUIRE, taken pursuant to
notice, was held at the offices of CAPLIN
& DRYSDALE, One Thomas Circle N.W., Suite
1100, Washington, DC  20005, commencing
at 9:43 a.m., on the above date, before
Lori A. Zabielski, a Registered
Professional Reporter and Notary Public
in and for the Commonwealth of
Pennsylvania.


- - -
MAGNA LEGAL SERVICES
Seven Penn Center
1635 Market Street
8th Floor
Philadelphia, Pennsylvania 19103

Page 2

```
1   APPEARANCES:
2
3   DRINKER BIDDLE & REATH, LLP
    BY:  MICHAEL F. BROWN, ESQUIRE
4        JEFFREY M. BOERGER, ESQUIRE
    One Logan Square
5   18th & Cherry Streets
    Philadelphia, Pennsylvania 19103-6996
6   215.988.2988
    (brownmf@dbr.com)
7   (jeffrey.boerger@dbr.com)
    Representing OneBeacon America Insurance
8   Company, Seaton Insurance Company,
    Government Employees Insurance Company,
9   Columbia Insurance Company f/k/a Republic
    Insurance Company
10
11
    CAPLIN & DRYSDALE, CHARTERED
12  BY:  NATHAN D. FINCH, ESQUIRE
         JEFFREY A. LIESEMER, ESQUIRE*
13       (*VIA TELECONFERENCE)
    One Thomas Circle N.W.
14  Suite 1100
    Washington, DC  20005
15  202.862.7801
    (ndf@capdale.com)
16  (jal@capdale.com)
    Representing Grace, Official Committee of
17  Asbestos Personal Injury Claimants
    ("ACC"), and Witness
18
19
    W.R. GRACE & CO.
20  BY:  RICHARD C. FINKE, ESQUIRE*
         ASSISTANT GENERAL COUNSEL
21       (*VIA TELECONFERENCE)
    5400 Broken Sound Boulevard, NW
22  Suite 300
    Boca Raton, Florida  33487
23  561.362.1533
    Representing W.R. Grace & Co.
24
```

Page 3

```
1   APPEARANCES (continued)
2
3   KIRKLAND & ELLIS, LLP
    BY:  BARBARA M. HARDING, ESQUIRE
4        THEODORE L. FREEDMAN, ESQUIRE
    655 Fifteenth Street, N.W.
5   Washington, DC  20005-5793
    202.879.5081
6   (barbara.harding@kirkland.com)
    (tfreeedman@kirkland.com)
7   Representing the Debtors
8
9   SIMPSON THACHER & BARTLETT, LLP
    BY:  ELISA ALCABES, ESQUIRE
10  425 Lexington Avenue
    New York, New York  10017-3954
11  212.455.3133
    (ealcabes@stblaw.com)
12  Representing Travelers Casualty and
    Surety Company
13
14
    VORYS, SATER, SEYMOUR AND PEASE, LLP
15  BY:  TIFFANY STRELOW COBB, ESQUIRE*
         ROBERT J. SIDMAN, ESQUIRE*
16       (*VIA TELECONFERENCE)
    52 East Gay Street
17  Columbus, Ohio  43215
    614.464.8322
18  (tscobb@vorys.com)
    Representing The Scotts Company, LLC
19
20
    COHN WHITESELL & GOLDBERG, LLP
21  BY:  DANIEL C. COHN, ESQUIRE
    101 Arch Street
22  Boston, Massachusetts 02110
    617.951.2505
23  (cohn@cwg11.com)
    Representing the Libby Claimants
24
```

Page 4

```
1   APPEARANCES (continued)
2
3   SPEIGHTS & RUNYAN
    BY:  DANIEL H. SPEIGHTS, ESQUIRE*
4        (* VIA TELECONFERENCE)
    200 Jackson Avenue East
5   P.O. Box 685
    Hampton, South Carolina  29924
6   803.943.4444
    (dspeights@speightsrunyan.com)
7   Representing Anderson Memorial Hospital
8
9   TUCKER ARENSBERG
    BY:  MICHAEL A. SHINER, ESQUIRE
10  1500 One PPG Place
    Pittsburgh, Pennsylvania  15222
11  412.594.5586
    (mshiner@tuckerlaw.com)
12  Representing Certain London Market
    Insurers and AXA Belgium
13
14
15  MENDES & MOUNT, LLP
    BY:  CAROLINA ACEVEDO, ESQUIRE*
16       (**VIA TELECONFERENCE)
    750 Seventh Avenue
17  New York, New York  10019
    212.261.8262
18  (carolina.acevedo@mendes.com)
    Representing AXA Belgium as Successor to
19  Royale Belge SSA
20
    MENDES & MOUNT, LLP
21  BY:  ALEXANDER MUELLER, ESQUIRE*
         (*VIA TELECONFERENCE)
22  750 Seventh Avenue
    New York, New York  10019-6829
23  212.261.8296
    (alexander.mueller@mendes.com)
24  Representing London Market Companies
```

Page 5

```
1   APPEARANCE (continued)
2
3   FORD MARRIN ESPOSITO & WITMEYER & GLESER
    BY:  ELIZABETH M. DeCRISTOFARO, ESQUIRE
4   Wall Street Plaza
    New York, New York  10005-1875
5   212.269.4900
    Representing Continental Casualty Company
6   and Continental Insurance Company
7
8   BILZIN SUMBERG BAENA PRICE & AXELROD, LLP
    BY:  MATTHEW I, KRAMER, ESQUIRE
9   200 South Biscayne Boulevard
    Suite 2500
10  Miami, Florida  33131-5340
    305.450.7246
11  (mkramer@bilzin.com)
    Representing Property Damage Committee
12
13
    STROOCK & STROOCK & LAVAN, LLP
14  BY:  ARLENE G. KRIEGER, ESQUIRE
    180 Maiden Lane
15  New York, New York  10038-4982
    212.806.5400
16  (akrieger@stroock.com)
    Representing Official Committee of
17  Unsecured Creditors
18
19  CROWELL & MORING, LLP
    BY:  MARK PLEVIN, ESQUIRE
20       NOAH S. BLOOMBERG, ESQUIRE
    1001 Pennsylvania Avenue NW
21  Washington, DC  20004-2595
    202.624.2913
22  (mplevin@crowell.com)
    (nbloomberg@crowell.com)
23  Representing Fireman's Fund Insurance
    (Surety Bond)
24
```

Page 6

1   APPEARANCES (continued)
2
    STEVENS & LEE, P.C.
3   BY:  JOHN D. DEMMY, ESQUIRE
    1105 North Market Street, 7th Floor
4   Wilmington, Delaware  19801
    302.654.5180
5   (jdd@stevenslee.com)
    Representing Fireman's Fund Insurance
6
7
    ALAN B. RICH LAW OFFICES
8   BY:  ALAN B. RICH, ESQUIRE
    Elm Place, Suite 4620
9   1401 Elm Street
    Dallas, Texas  75202
10  214.744.5100
    (arich@alanrichlaw.com)
11  Representing Property Damage FCR
12
13  CONNOLLY BOVE LODGE & HUTZ, LLP
    BY:  JEFFREY C. WISLER, ESQUIRE
14  The Nemours Building
    1007 North Orange Street
15  P.O. Box 2207
    Wilmington, Delaware  19899
16  302.88.6528
    (jwisler@cblh.com)
17  Representing Maryland Casualty
18
19  ECKERT SEAMANS CHERIN & MELLOTT, LLC
    BY:  EDWARD J. LONGOSZ, II, ESQUIRE
20  1747 Pennsylvania Avenue, NW
    12th Floor
21  Washington, DC  20006
    202.659.6619
22  (elongosz@eckertseamans.com)
    Representing Maryland Casualty and Zurich
23
24

Page 7

1   APPEARANCES (continued)
2
    WILEY REIN, LLP
3   BY:  KARALEE C. MORELL, ESQUIRE
    1776 K Street NW
4   Washington, DC  20006
    202.719.7520
5   (kmorell@wileyrein.com)
    Representing Maryland Casualty and Zurich
6
7
    COZEN O'CONNOR
8   BY:  JACOB C. COHN, ESQUIRE
    1900 Market Street
9   Philadelphia, Pennsylvania  19103-3508
    215.665.2147
10  (jcohn@cozen.com)
    Representing Federal Insurance Company
11
12
    ORRICK HERRINGTON & SUTCLIFFE, LLP
13  BY:  JONATHAN P. GUY, ESQUIRE
         JOSHUA M. CUTLER, ESQUIRE
14  Columbia Center
    1152 15th Street, N.W.
15  Washington, DC  20005-1706
    202.339.8516
16  (jguy@orrick.com)
    Representing Future Claimants
17  Representative
18
19  CUYLER BURK, P.C.
    BY:  ANDREW CRAIG, ESQUIRE
20  4 Century Drive
    Parsippany, New Jersey  07054
21  973.734.3200
    (acraig@cuyler.com)
22  Representing Allstate Insurance Company
23
24

Page 8

1   APPEARANCES (continued)
2
    WILSON ELSER MOSKOWITZ EDELMAN & DICKER,
3   LLP
    BY:  CARL PERNICONE, ESQUIRE*
4     (*VIA TELECONFERENCE)
    150 East 42nd Street
5   New York, New York  10017-5639
    212.915.5656
6   (carl.pernicone@wilsonelser.com)
    Representing Arrowood Indemnity Company
7
8
    WOMBLE CARLYLE SANDRIDGE & RICE, PLLC
9   BY:  KEVIN J. MANGAN, ESQUIRE*
      (*VIA TELECONFERENCE)
10  222 Delaware Avenue
    Suite 1501
11  Wilmington, Delaware  19801
    302.252.4361
12  (kmangan@wcsr.com)
    Representing State of Montana
13
14
    PEPPER HAMILTON, LLP
15  BY:  LINDA J. CASEY, ESQUIRE*
      (*VIA TELECONFERENCE)
16  3000 Two Logan Square
    Philadelphia, Pennsylvania  19103
17  215.981.4000
    (caseyl@pepperlaw.com)
18  Representing BNSF Railway Company
19
20       - - -
21
22
23
24

Page 9

1        - - -
2      I N D E X
3        - - -
4
5   Testimony of:
6      PETER VAN N. LOCKWOOD, ESQUIRE
7
8   By Mr. Brown        Page  12
9   By Ms. Alcabes      Page  267
10  By Ms. Cobb         Page  339
11  By Mr. Cohn         Page  368
12
13
14       - - -
15     E X H I B I T S
16       - - -
17  NO.   DESCRIPTION              PAGE
18  1    Amended Notice of Deposition
         of Asbestos PI Committee...   12
19
    2    Objections to the Official
20       Committee...                  12
21  3    Form 8-K and Term Sheet       15
22  4    Exhibit-6 to Exhibit Book     26
23  5    First Amended Joint Plan of
         Reorganization...            27
24

Page 10

```
1   EXHIBITS (continued)
2
3   NO.   DESCRIPTION                    PAGE
4   6    Exhibit-19 to Exhibit Book    83
5   7    Settlement Agreement
         * CONFIDENTIAL *              144
6
    8    Complaint for Declaration of
7        the Relief...                 175
8   9    Diagram                       175
9   10   Exhibit-2 to Exhibit Book     196
10  11   Exhibit-4 to Exhibit Book     224
11  12   Exhibit-10 to Exhibit Book    260
12  13   Travelers Casualty and Surety
         Company's Notice of Deposition
13       to the Official Committee of
         Asbestos Personal Injury
14       Claimants...                  267
15  14   Debtors' Disclosure...        280
16  15   Documents bearing Bates stamps
         TRAVAS0000019 through 141
17       * CONFIDENTIAL *              289
18  16   Notice of Service of Discovery 324
19
          - - -
20
21
22
23
24
```

Page 11

```
1           - - -
2    DEPOSITION SUPPORT INDEX
3           - - -
4
5    Direction to Witness Not to Answer:
6    Page   Line      Page    Line
7    NONE
8
9
10   Request for Production of Documents:
11   Page   Line      Page    Line
12   NONE
13
14
15   Stipulations:
16   Page   Line      Page    Line
17   12     02
18
19
20   Area(s) Marked Confidential:
21   Page   Line      Page    Line
22   152    01   through  168    03
     292    01   through  311    14
23
24
```

Page 12

```
1           - - -
2         (It is hereby stipulated and
3    agreed by and among counsel for
4    the respective parties that the
5    filing, sealing and certification
6    of the deposition are waived; and
7    that all objections, except as to
8    the form of the question, will be
9    reserved until the time of trial.)
10          - - -
11        PETER VAN N. LOCKWOOD,
12   ESQUIRE, after having been first
13   duly sworn, was examined and
14   testified as follows:
15          - - -
16        EXAMINATION
17          - - -
18        (ACC 30(b)(6)-1 and 2
19   premarked for identification.)
20          - - -
21   BY MR. BROWN:
22     Q.   Good morning, Mr. Lockwood.
23     A.   Good morning, Mr. Brown.
24     Q.   You are appearing here today
```

Page 13

```
1    as the Rule 30(b)(6) designee for the
2    ACC, correct?
3      A.   Correct.
4      Q.   And that is with respect to
5    a number of 30(b)(6) notices, correct?
6      A.   A very large number, yes.
7      Q.   Can you look at the one
8    that's been put before you and marked ACC
9    Rule 30(b)(6)-1, which I will call ACC-1
10   here after.
11     A.   I have it.
12     Q.   Can you identify it?
13     A.   It is an Amended Notice of
14   Deposition of Asbestos PI Committee
15   Pursuant to Rule 30(b)(6) served by four
16   insurance companies, One Beacon, Seaton,
17   Geico, and Columbia.  And it contains an
18   attachment with definitions and topics
19   which are the subject matter of
20   testimony.
21     Q.   Okay.  And can you look at
22   the document that I put before you that's
23   marked ACC-2.
24     A.   I have it.
```

Page 14

1    Q.    And identify that document,
2    please.
3         A.    That document is the
4    Objections of the Official Committee of
5    Asbestos Personal Injury Claimants to
6    Rule 30(b)(6) Notices of Deposition
7    served by Certain Plan Objectors.
8         Q.    Okay.  And is it correct
9    that you are here today prepared to
10   testify about the topics that are listed
11   in ACC-1 subject to the objections that
12   appear in ACC-2?
13        A.    The answer to that question
14   is yes, subject to the following caveats:
15   To the extent that the topics in this
16   notice or any of the other notices are
17   subjects that the ACC has a person with
18   knowledge on, I am here to testify about
19   it.  To the extent that the ACC doesn't
20   have a person with knowledge on certain
21   topics, then I am here to testify that
22   the ACC doesn't have knowledge on those
23   topics.
24        Q.    Okay.  And --

Page 15

1         A.    And to the extent that
2    occurs, we will see how it occurs in the
3    course of the questions.
4         Q.    Okay.  And then you
5    mentioned ACC and a person with the ACC.
6         How are you using the term
7    "ACC"?
8         A.    I am using it as the entity
9    that was appointed in the bankruptcy case
10   by the U.S. Trustee.
11        MR. BROWN:  ACC-3.
12        (ACC 30(b)(6)-3 marked for
13   identification at this time.)
14   BY MR. BROWN:
15        Q.    Okay.  Mr. Lockwood, you now
16   have before you a document that should
17   have two exhibit labels on it.  One is an
18   Exhibit-12 from the deposition of
19   Mr. Finke, and the other is ACC-3.
20        Could you identify the
21   document that has been marked as ACC-3?
22        A.    It appears to be a Form 8-K
23   file by W.R. Grace & Company dated April
24   6, 2008.

Page 16

1         Q.    Have you ever seen this
2    document before?
3         A.    Frankly, I am not sure.
4         Q.    Okay.
5         A.    I may have.  I may not have.
6         Q.    All right.  Why don't you go
7    to the back of the document, starting
8    with page 9.
9         A.    Page 9 or page 8?
10        Q.    I am sorry.  Page 8.
11        A.    I am there.
12        Q.    Can you identify that
13   document?
14        A.    It appears to be a copy of a
15   Term Sheet for the Resolution of Asbestos
16   Personal Injury Claims entered into by a
17   variety of parties, including the ACC.
18        Q.    Okay.  Have you seen the
19   Term Sheet, either this Term Sheet or
20   some iteration of it previously?
21        A.    I have seen the original of
22   it.
23        Q.    Okay.  Can you take a look
24   at what you have before you and tell me

Page 17

1    whether it differs in any way from the
2    original?
3         MR. FINCH:  Objection.
4         THE WITNESS:  On the face of
5    it, it does not appear to
6    different.  I mean, obviously, a
7    comparison of the original and
8    this copy would be the definitive
9    way of determining whether there
10   is a difference, but this looks to
11   be the same, as best I can recall.
12   BY MR. BROWN:
13        Q.    Okay.  And this document was
14   negotiated by the parties that executed
15   it, is that correct, or their counsel?
16        A.    Broadly speaking, yes.  I
17   mean, negotiated implies human beings in
18   a room or in some communication, and
19   these are all entities.  So various
20   representatives of the entities that are
21   listed here in negotiated this document
22   on behalf of their respective principals.
23        Q.    Is there anything in the
24   Term Sheet that you can see that's

Page 18

1  inaccurate?
2        MR. FINCH:  Object to form.
3        THE WITNESS:  To answer that
4  question, I would have to read
5  every word in the Term Sheet and
6  determine whether or not there are
7  statements in here which are
8  contained facts which might be
9  erroneously stated.  I am not sure
10  that there are any such things.
11  BY MR. BROWN:
12     Q.   Take a moment to review it,
13  if you would.  It's not that long.
14     A.   Well, I have read it.  As
15  far as I can tell, it is accurate in the
16  sense that it states the terms of an
17  agreement, and those are the terms of the
18  agreement.  It doesn't purport to recite
19  facts.
20     Q.   Okay.  Look at the first
21  sentence.  There is a reference there to
22  certain of the principal terms and
23  conditions.
24        Do you see that?

Page 19

1     A.   I do.
2     Q.   Were there other principal
3  terms and conditions that were left off
4  the Term Sheet?
5     A.   I don't believe there were
6  that had been negotiated, agreed on.
7        It is common that a Term
8  Sheet is subject to a definitive
9  agreement.  And in a complicated
10  bankruptcy case, involving a complicated
11  settlement, it would be my understanding
12  and I believe the understanding of
13  everybody else that was involved in this
14  that this Term Sheet would only purport
15  to set out certain of the most -- what
16  the parties consider to be the most
17  important terms, and other terms would
18  remain to be negotiated as part of the
19  drafting of either the definitive Plan or
20  a more definitive settlement agreement or
21  whatever document would be required to
22  flesh out the details.
23     Q.   Okay.  Can you turn to page
24  9, and you will see under the Romanette

Page 20

1  5, there is a sentence that begins,
2  "Provided however..."?
3     A.   Yes.
4     Q.   Do you know to what that
5  refers?
6        MR. FINCH:  Objection.  I
7  caution the witness not to reveal
8  any privileged communications.  If
9  you can answer the question
10  without divulging privileged
11  information, you can do so.
12        MS. HARDING:  And I am going
13  to object also as to privilege as
14  to the relevancy of negotiations,
15  and I believe that -- well --
16  okay.
17        THE WITNESS:  I am trying to
18  remember what this phrase referred
19  to at the time this Term Sheet was
20  entered into.  As best I can
21  recall, at the time of the Term
22  Sheet, the concept that was
23  reflected by this language was
24  that what was going to be

Page 21

1  transferred to the Trust was
2  coverage for asbestos personal
3  injury claims, and to the extent
4  that there was coverage that
5  didn't -- that somehow or another
6  didn't cover asbestos personal
7  injury claims, like, for example,
8  workers' compensation insurance,
9  that wouldn't be transferred to
10  the Trust.
11        But since this Term Sheet
12  was superseded by the Plan
13  ultimately, I am not sure exactly
14  what the significance of this
15  particular term at this time is.
16  BY MR. BROWN:
17     Q.   Okay.  Well, putting aside
18  workers' compensation coverage, is there
19  any other coverage that you are aware of
20  that Grace has under the policies that
21  are being transferred to the Asbestos PI
22  Trust?
23        MR. FINCH:  Objection to the
24  form.

Page 22

1    THE WITNESS:  The answer to
2 that is certainly, yes.
3    I mean, for example, Grace
4 has insurance beginning in -- I
5 don't know -- 1986 or so that
6 contains asbestos exclusions,
7 running up through today, and none
8 of that insurance is being
9 transferred to the Trust because
10 it doesn't provide any coverage
11 for asbestos personal injury
12 claims.
13 BY MR. BROWN:
14    Q.   What if we limited it to
15 asbestos insurance rights?  In other
16 words, the policies -- the asbestos
17 insurance rights are being transferred to
18 the Trust by Grace, correct?
19    A.   Well, you are using a term
20 that is a term that is defined in the
21 Plan, and as defined in the Plan, the
22 asbestos insurance rights under the terms
23 of the Plan and the Insurance Transfer
24 Agreement are being transferred to the

Page 23

1 Trust.
2    Q.   Okay.  And does that include
3 all the coverages under the policies that
4 are covered by that term?
5    A.   I have no idea, because
6 asbestos insurance rights are not
7 asbestos insurance policies, and I have
8 not undertaken to examine each and every
9 policy that does or might provide
10 coverage for asbestos personal injury
11 claims to determine whether or not there
12 is some coverage under that policy that
13 doesn't and that might not be
14 transferred.
15    As a general proposition, my
16 recollection is that the Plan is pretty
17 specific about what's being transferred
18 and what's not.
19    There is an Exhibit-5, for
20 example, that lists various categories of
21 policies and settlement agreements and
22 things of that nature.  There is the
23 Insurance Transfer Agreement; there are
24 schedules of insurance rights.

Page 24

1    Trying to answer a question
2 from memory that's as broad and all
3 encompassing as that, I think frankly is
4 virtually impossible, and I don't think I
5 can do it any better than I just did.
6    MR. BROWN:  Okay.  And just
7 so everyone knows how we are going
8 to be handling the question
9 regarding Plan documents, we are
10 going to mark certain Plan
11 exhibits as separate exhibits in
12 the deposition.
13    Mr. Lockwood has a
14 separately tabbed collection of
15 all the Plan documents.  He wants
16 to work off of that.  I have no
17 problem with that.  But, for
18 purposes of the record, it will be
19 the individual Plan documents that
20 we are referring to.
21    THE WITNESS:  For purposes
22 of the record, what I have in
23 front of me is the printed book
24 called Exhibit Book to First

Page 25

1    Amended Joint Plan of
2 Reorganization and Disclosure
3 Statement as of February 27, 2009,
4 which is the document that was
5 distributed to people to vote on
6 the Plan.  And the only -- there
7 are no markings or anything in it.
8    What I have had done is, so
9 that I could have ready access to
10 the multiple -- well, there are 33
11 exhibits in this book, and I have
12 simply had numerical tabs placed
13 on the first page of each separate
14 exhibit, so that if somebody wants
15 me to find an exhibit, I can look
16 to the tab rather than pawing
17 through hundreds of pages of
18 documents to see where the
19 exhibit, in fact, can be found.
20 BY MR. BROWN:
21    Q.   All right.  Mr. Lockwood,
22 can you take a look at Exhibit 6?
23    MR. BROWN:  And we will have
24 that marked as ACC-4.

Page 26

1        (ACC 30(b)(6)-4 marked for
2    identification at this time.)
3        THE WITNESS:  I have it.
4    BY MR. BROWN:
5        Q.    Okay.  And why don't you
6    identify that document?
7        A.    That is Exhibit 6 to Exhibit
8    Book captioned Asbestos Insurance
9    Transfer Agreement.
10        Q.    Okay.  And it has certain
11    attachments to it, correct?
12        A.    It does.
13        Q.    Okay.  Can you look at
14    Schedule 1?
15        A.    I am looking at it.
16        Q.    Okay.  Am I correct that all
17    of the policies that are listed on
18    Schedule 1 fit within the definition of
19    asbestos insurance policies under the
20    Plan?
21        A.    I will need to look at this
22    a little bit here.
23        As I understand it, and I am
24    going to read from this document, "All

Page 28

1        Q.    My question is, well, you
2    will see the asbestos insurance rights
3    starts off, "shall mean any and all
4    rights, titles, privileges," and so
5    forth.
6        Do you see that language?
7        A.    I do.
8        Q.    And that's with respect to
9    asbestos insurance policies?
10        A.    Well, among other things,
11    yes.
12        Q.    And those are all being
13    transferred to the Asbestos PI Trust,
14    correct?
15        MR. FINCH:  Object to form.
16        THE WITNESS:  The reason I
17    am hesitating is I am not sure I
18    can recall whether or not the
19    general -- to answer the question,
20    I have to look to see what the
21    Plan says about the transfer and
22    whether or not the Plan statement
23    about what's being transferred.
24    This is simply the definition.

Page 27

1    insurance policies that the Insurance
2    Contributors have reason to believe
3    potentially or actually provide insurance
4    coverage for Asbestos Pi Claims are
5    listed and described accurately on the
6    attached Schedule 1."  That, to my
7    knowledge, is what Schedule 1 is.
8        Q.    All right.  Now, what I
9    would like you to do is to look at
10    Exhibit 1, which is the Joint Plan
11    itself, and specifically page 5,
12    definition 13.
13        MR. BROWN:  And we will mark
14    that as ACC-5.
15        (ACC 30(b)(6)-5 marked for
16    identification at this time.)
17        MR. FINCH:  What page do you
18    want him to go to?
19        MR. BROWN:  Page 5,
20    definition 13.
21        THE WITNESS:  Looking at it.
22    BY MR. BROWN:
23        Q.    Asbestos Insurance Rights?
24        A.    That is correct.

Page 29

1        There are other provisions
2    that describe what is transferred
3    to the Trust.  I would have to
4    look to the Plan to see what the
5    definition of the assets being
6    transferred is and then look at
7    the Insurance Transfer Agreement,
8    which was Exhibit-4, ACC
9    Exhibit-4, and see whether those
10    two are coextensive.  I think they
11    are, but that's what I would have
12    to do to make sure.
13    BY MR. BROWN:
14        Q.    Well, if you look at page 2
15    of the Transfer Agreement, the very first
16    sentence is, "Effective upon the
17    Effective Date, the Insurance
18    Contributors hereby irrevocably transfer,
19    convey, and grant to the Asbestos PI
20    Trust all of their Asbestos Insurance
21    Rights."
22        A.    Okay.
23        Q.    Now, bearing in mind that
24    language and turning back to the

Page 30

1  definition of asbestos insurance rights,
2  which does have some restrictions at the
3  end of it, after the provided that
4  language on page 6 --
5      A.   Yes, I see it.
6      Q.   Other than what's excluded
7  from asbestos insurance rights in that
8  language in the definition, are all of
9  the Debtors' interests in the policies
10 that are on Schedule 1 of the asbestos
11 Insurance Transfer Agreement being
12 transferred to the Asbestos PI Trust, or
13 are some others being retained by the
14 Debtors?
15     A.   All I can say is that what
16 is being transferred is all of the
17 asbestos insurance rights as defined in
18 the Plan.  And if there are, in fact,
19 some other rights that are not asbestos
20 insurance rights, then the Plan does not
21 appear to transfer those.
22     Q.   Okay.  And the workers'
23 compensation coverage is one of those
24 items?

Page 31

1      A.   That's my recollection, that
2  is workers' comp rights are not
3  transferred.
4      Q.   Okay.  Are you aware of
5  anything else that is not transferred?
6      A.   Not as I sit here right now.
7  I do not recall having any knowledge of
8  anything that specifically carved out of
9  the policies, but, again, I mean, the
10 definitions say what they say.
11     Q.   Okay.  Can you go back to
12 the --
13     A.   I mean, if you have some
14 specific item in mind that you want to
15 ask me about whether it is or it isn't
16 transferred, I will try and answer that.
17 But asked globally the way you are doing
18 it, I don't have any recollection of
19 anything.
20     Q.   Okay.  Can you turn back to
21 ACC-3, please.
22     MR. FINCH:  What's that, the
23 Term Sheet?
24     MR. BROWN:  Yes.

Page 32

1      THE WITNESS:  That's the 8-K
2  with the Term Sheet in it, I
3  believe.
4      MR. BROWN:  Yes.
5      THE WITNESS:  I have it.
6  BY MR. BROWN:
7      Q.   On page 10, Roman 4, if you
8  will just take a look at that for a
9  moment?
10     A.   The provision captioned
11 Binding Effect?
12     Q.   Correct.
13     A.   I have read it.
14     Q.   Okay.  Does the ACC
15 understand the Term Sheet to be binding
16 on the parties to it?
17     MS. HARDING:  Object under
18 408 and instruct the witness not
19 to answer if it reveals settlement
20 negotiations.
21     THE WITNESS:  The ACC --
22     MR. BROWN:  Wait.
23     MR. JACOB COHN:  Does that
24 create an evidentiary privilege in

Page 33

1  discovery as opposed to
2  admissibility in trial?
3      MS. HARDING:  I have made my
4  objection for the record.
5      MR. JACOB COHN:  Jacob Cohn,
6  Federal Insurance Company.
7  BY MR. BROWN:
8      Q.   I don't know that the Debtor
9  should be instructing a Rule 30 --
10     A.   The Debtor hasn't instructed
11 the witness not to do anything as far as
12 I am aware.
13     MR. JACOB COHN:  I heard her
14 try.
15     MS. HARDING:  Suggest.
16     THE WITNESS:  Would you read
17 back the question, please?
18     (The reporter read from the
19 record as requested.)
20     THE WITNESS:  The ACC
21 understands that the Plan, when
22 the Plan is confirmed, will be
23 binding on it and everybody else
24 that is bound by a confirmed Plan.

Page 34

1    The ACC does not consider the Term
2    Sheet to have any binding effect
3    at this particular time in the
4    bankruptcy process.
5    BY MR. BROWN:
6        Q.    Did the Term Sheet have a
7    binding effect prior to the filing of a
8    Plan?
9        MR. FINCH:  Objection to the
10   extent that it calls for either a
11   legal conclusion or privileged
12   information.
13       You can answer, if you can.
14       THE WITNESS:  Well, it calls
15   for the former, and I am not going
16   to refuse to answer.
17       If you want my opinion, it's
18   a question of contract law.  I
19   personally doubt very much that as
20   a matter of contract law or
21   bankruptcy law, the Term Sheet was
22   binding, because, number one, as
23   under contract law, it wouldn't,
24   as I said earlier, have contained

Page 35

1    all the material terms and
2    conditions.  And so it would be
3    very difficult under doctrines
4    having to do with completeness of
5    contracts to be enforceable for it
6    to have been binding.
7        And, secondly, it wasn't a
8    Plan, and it wasn't a settlement
9    agreement that was separate from
10   the Plan.  It recites by its terms
11   that "The parties shall use their
12   best efforts to incorporate the
13   terms in this Term Sheet into a
14   mutually agreeable Plan of
15   Reorganization to be filed with
16   the Bankruptcy Court as soon as
17   possible."
18       And, therefore, almost by
19   definition, it recognizes that as
20   a stand-alone document in a
21   bankruptcy context, it's not
22   binding on anybody, in my opinion.
23   But that's just my opinion.
24   BY MR. BROWN:

Page 36

1        Q.    Okay.  Put that aside.
2        Just note the date.  It's
3    April 6, 2008.  So the next series of
4    questions I have pertains to the period
5    prior to that.
6        A.    Okay.
7        Q.    Were any asbestos insurance
8    entities involved in the negotiation of
9    the Term Sheet?
10       MS. HARDING:  Object --
11       THE WITNESS:  Not that I
12   recall.
13       MS. HARDING:  Object under
14   408.
15   BY MR. BROWN:
16       Q.    Were any asbestos insurance
17   entities invited to participate in the
18   negotiations of the Term Sheet?
19       MS. HARDING:  Same
20   objection.
21       THE WITNESS:  Well, to the
22   extent that the Term Sheet
23   negotiations involve people
24   sitting down together and/or being

Page 37

1    on telephone calls together to
2    discuss it and agree on it, to my
3    knowledge, I don't recall any.
4        Whether or not the Debtors,
5    for example, had communications
6    unknown to the ACC with their
7    insurers on the subject matter
8    that ultimately was reflected in
9    the Term Sheet, I don't know.
10   BY MR. BROWN:
11       Q.    Okay.  Well, for purposes of
12   this question, I am asking for the ACC's
13   knowledge.
14       A.    I understand.  But I want to
15   make it clear what the limitations of the
16   ACC's knowledge is.
17       Q.    I understand.
18       To the ACC's knowledge, were
19   any asbestos insurance entities consulted
20   regarding any provision in the Term
21   Sheet?
22       MS. HARDING:  Same
23   objection.
24       THE WITNESS:  To the ACC's

Page 38

1  knowledge, they are unaware of any
2  such consultations.
3  BY MR. BROWN:
4      Q.   Did any asbestos insurance
5  entity consent to the assignment of the
6  policy or proceeds thereof prior to the
7  execution of the Term Sheet?
8      A.   Not to the knowledge of the
9  ACC as an entity or me, in particular.
10  My make statements about the ACC's
11  knowledge, I am speaking obviously of
12  both its and my knowledge at the same
13  time.
14      Q.   Did any asbestos insurance
15  entity agree to any term in this Term
16  Sheet before the parties in the Term
17  Sheet executed it?
18      A.   I have no idea.
19      Q.   Do you have any knowledge of
20  any such --
21      A.   I have no knowledge that
22  they did and I have no knowledge that
23  they didn't.
24      Q.   Okay.  The initial Joint

Page 39

1  Plan was filed on September 19th, 2008,
2  correct?
3      A.   I don't, as I sit here,
4  right now, unrefreshed by looking at the
5  document, recall that that's the specific
6  date, but A, it sounds about right, and
7  B, I will take your word for it, if you
8  are representing that that's the date.
9      Q.   Okay.  And along with the
10  filing of the initial Plan, there was
11  also a filing of the Asbestos PI Trust
12  Agreement and the Asbestos PI TDP,
13  correct?
14      A.   I don't recall actually
15  whether those documents were filed at
16  exactly the same time the Plan was filed
17  or whether they were filed on some later
18  day.
19          They were certainly filed at
20  some approximation of the same time, but
21  it could have been a month later or
22  something like that.  Again, what was
23  filed with the court is a matter of
24  record, so...

Page 40

1      Q.   Okay.  Between April 6, 2008
2  and September of 2008, is it fair to say
3  that the Plan documents were being
4  drafted?
5          MS. HARDING:  Object under
6  408.
7          THE WITNESS:  Of course.
8  BY MR. BROWN:
9      Q.   And who were the parties
10  that were involved in the negotiation of
11  Plan documents?
12          MS. HARDING:  Object under
13  408.
14          MR. FINCH:  Are you talking
15  about entities or people?
16          THE WITNESS:  A lot.
17          MR. BROWN:  Let's start with
18  entities.
19          MR. FINCH:  That, you can
20  answer.
21          THE WITNESS:  Entities,
22  representatives of the Debtors,
23  the Equity Committee, the Future
24  Claimants' Representative and the

Page 41

1  ACC, and I can't remember whether
2  there was any involvement by
3  representatives of the Unsecured
4  Creditors' Committee or not.  I
5  just don't remember at this point.
6  BY MR. BROWN:
7      Q.   How about any of the Sealed
8  Air indemnified parties?
9          MS. HARDING:  Object under
10  408.
11          THE WITNESS:  At some point,
12  representative of the Sealed Air
13  indemnified parties were involved
14  in reviewing drafts and commenting
15  on drafts, et cetera.  I think
16  they were involved before we filed
17  the first Plan, but I am not -- I
18  mean, I know they were -- right
19  now, we are looking at the Amended
20  Plan filed in February 27, 2009.
21  I am quite confident that they
22  were involved in discussing --
23  reviewing and discussing this
24  Plan.

Page 42

1    I just don't remember for
2  sure whether they were involved in
3  the first Plan or whether they got
4  involved between the first Plan
5  and this Plan.  I think they were
6  involved in the first Plan.
7  BY MR. BROWN:
8    Q.   Okay.  Would your answer be
9  the same for the Fresenius indemnified
10 parties?
11    MS. HARDING:  Object under
12  408.  I think we should take a
13  break.  I would like to consult
14  with counsel.
15    MR. BROWN:  Okay.
16    THE WITNESS:  Does that
17  include me or do you want to just
18  talk to him?
19    MS. HARDING:  I will talk to
20  Nate.
21    (There was a break from
22  10:15 a.m. to 10:17 a.m.)
23    MR. FINCH:  Can we read back
24  the pending question?

Page 43

1    (The reporter read from the
2  record as requested.)
3    MR. FINCH:  You can answer
4  that question.
5    THE WITNESS:  In general,
6  yes, although their involvement
7  was less.
8  BY MR. BROWN:
9    Q.   Okay.  What was the
10 involvement of Sealed Air and Fresenius
11 in the drafting of the Plan documents?
12    MR. FINCH:  Objection,
13  instruct the witness not to
14  answer.
15    MS. HARDING:  Objection.
16    MR. JACOB COHN:  Basis,
17  please.
18    MR. FINCH:  Basis is Judge
19  Fitzgerald's ruling that Plan
20  negotiations and the draft Plan
21  Agreement are not relevant to the
22  confirmability of the Plan.
23    MS. HARDING:  Same
24  objection.

Page 44

1  BY MR. BROWN:
2    Q.   Let me, Mr. Lockwood, refer
3  you back to ACC-2, which was the
4  objection, and direct your attention
5  specifically to paragraph 3.
6    A.   I see it.
7    MR. BROWN:  Okay.  This is
8  more directed to Nate than anyone
9  else.  There are, as you might
10  guess, a whole host of questions
11  that lots of people in this room,
12  including myself, would want to
13  ask concerning the negotiations of
14  the Plan and the Plan documents as
15  well as questions about prior
16  drafts that weren't filed.
17    Is it safe to say that you
18  will object to those questions and
19  instruct the witness not to
20  answer?
21    MR. FINCH:  That is correct.
22    MR. BROWN:  Okay.  Then with
23  the caveat that we won't ask them
24  simply because we are not here to

Page 45

1  waste everyone's time, I am going
2  to move forward and not ask
3  questions about the negotiations.
4    Can we have an agreement on
5  that ground?
6    MR. FINCH:  Sure.  We can
7  have an agreement on that point.
8    MR. BROWN:  And in the event
9  that that is ever reversed or your
10  position is not upheld by the
11  court, we would have an
12  opportunity to come back and ask
13  questions about the drafting as
14  well as the negotiations.
15    MR. FINCH:  If Judge
16  Fitzgerald reverses herself on
17  what she has ruled in various
18  other cases, you would have that
19  opportunity.
20    MR. BROWN:  Or some higher
21  court.
22    MR. FINCH:  Or some higher
23  court.
24    MR. BROWN:  Fair enough.

Page 46

```
 1        MR. JACOB COHN:  I want to
 2  be perfectly clear here that you
 3  are not relying upon not a ruling
 4  that you don't need to answer
 5  questions at these depositions on
 6  this subject, but your position is
 7  that this is a relevance objection
 8  and you are instructing not to
 9  answer on the basis of relevance.
10        MR. FINCH:  That's right.
11        MR. JACOB COHN:  And you are
12  aware of the local Delaware rules
13  on this subject?
14        MR. FINCH:  Yes, I am.
15        MR. JACOB COHN:  I am.
16        MR. BROWN:  Thanks, Jacob.
17        MR. SPEIGHTS:  Excuse me.
18  This is Dan Speights, representing
19  Anderson Memorial Hospital.
20        Mr. Finch, would you advise
21  us of what rulings you are
22  referring to?
23        MR. FINCH:  Sure.  If you
24  look at the ACC's objections to
```

Page 47

```
 1  the 30(b)(6) notice, Dan --
 2        MR. SPEIGHTS:  If it's
 3  contained in there, just refer to.
 4  I want to make sure if we want to
 5  file a motion, we have the basis
 6  of your objection.
 7        MR. FINCH:  Yes.  The basis
 8  of the objection is set forth on
 9  page 2, paragraph number 3, and
10  ACC deposition Exhibit-2 to this
11  deposition.
12        MR. SPEIGHTS:  Thank you,
13  Mr. Finch.
14  BY MR. BROWN:
15     Q.   Okay.  Mr. Lockwood, in the
16  period between the Term Sheet and the
17  filing of the initial Plan in September,
18  was any asbestos insurance entity invited
19  to participate in the negotiation of the
20  Plan documents or the drafting of the
21  Plan documents?
22        MS. HARDING:  Same
23  objection.
24        THE WITNESS:  I have no
```

Page 48

```
 1  knowledge whether they were or
 2  were not.
 3  BY MR. BROWN:
 4     Q.   To your knowledge, did any
 5  asbestos insurance entity actually
 6  participate?
 7        MS. HARDING:  Same
 8  objection.
 9        THE WITNESS:  I have no
10  knowledge that they did.
11  BY MR. BROWN:
12     Q.   Was any asbestos insurance
13  entity consulted concerning any term or
14  provision in the Joint Plan or any Plan
15  documents?
16        MS. HARDING:  Same
17  objection.
18        THE WITNESS:  In the same
19  period?
20        MR. BROWN:  Correct.
21  BY MR. BROWN:
22     Q.   From April 2008 to
23  September, when the initial Plan was
24  filed in September of 2008.
```

Page 49

```
 1     A.   I have no knowledge that
 2  anyone was.
 3     Q.   Were any asbestos insurance
 4  entities consulted regarding the
 5  assignment or transfer of their policies
 6  or proceeds under their policies to the
 7  Asbestos PI Trust in that time period?
 8        MS. HARDING:  Same
 9  objection.
10        THE WITNESS:  I have no
11  knowledge that they were or were
12  not.
13  BY MR. BROWN:
14     Q.   Did any consent?
15     A.   I have no knowledge --
16        MS. HARDING:  Same
17  objection.
18        THE WITNESS:  -- that anyone
19  did, in fact, consent.
20  BY MR. BROWN:
21     Q.   Okay.  Now, I want to focus
22  your attention now on the period after
23  the initial Plan was filed.
24        In that period, after the
```

Page 50

```
 1  initial Plan and Plan documents were
 2  filed, did GEICO consent to the Joint
 3  Plan or any Plan document or any
 4  provision in the Plan or Plan documents?
 5       A.   Not to my knowledge.
 6       Q.   Okay.  Would your answer be
 7  the same for Republic Insurance Company?
 8       A.   Yes.
 9       Q.   And OneBeacon American
10  Insurance Company?
11       A.   Yes.
12       Q.   And Seaton Insurance
13  Company?
14       A.   Yes.
15       Q.   How about any other asbestos
16  insurance entity?  Would your answer be
17  the same?
18       A.   No, I don't think it would,
19  actually.  I believe -- and I would have
20  to sort of try and reconstruct and
21  recollect the timing, but I believe there
22  was a settlement agreement entered into
23  with Equitas during some time period.  It
24  actually might have predated.  It might
```

Page 51

```
 1  have predated the Plan.
 2            But, in any event, the
 3  settlement agreement with Equitas to my
 4  recollection involved its agreeing to
 5  either this Plan or a 524(g) Plan that
 6  this Plan would qualify as.
 7            And I believe that there was
 8  also a settlement agreement with the
 9  KWELM Companies that either by its terms
10  or implicitly represented the KWELM
11  Companies' consent to this Plan, to the
12  first Plan.  Those are the only two that
13  come to mind.
14       Q.   Why don't we turn to the
15  first Amended Joint Plan, which is
16  Exhibit-1 in your book.
17       A.   Okay.  I have it.
18            MR. FINCH:  Exhibit-5 to the
19  deposition.
20            THE WITNESS:  It's ACC
21  Exhibit-5.
22  BY MR. BROWN:
23       Q.   All right.  Could you turn
24  to the first page?
```

Page 52

```
 1       A.   The cover page?
 2       Q.   No, no.  The first --
 3       A.   Numbered page.
 4       Q.   -- well, it's actually not
 5  numbered, but it's 1.  It should be 1.
 6       A.   Okay.  I have it.
 7       Q.   All right.  Midway down the
 8  page, it says, "This Plan constitutes a
 9  settlement of all Claims in the Demands
10  against the Debtors on, and subject to,
11  the terms described herein and the other
12  Plan Documents."
13            Are the Debtors settling the
14  asbestos PI claims against them through
15  this Plan?
16       A.   I think --
17            MS. HARDING:  Object to
18  form.
19            THE WITNESS:  I think it
20  would be a fair characterization
21  that the Plan embodies a
22  compromise between the class of
23  claimants consisting of the
24  asbestos PI claimants and others.
```

Page 53

```
 1  And if the Plan were confirmed
 2  that that compromise could be
 3  called a settlement between the
 4  Debtors and those entities, under
 5  which there would be a Trust
 6  created and the claims would be
 7  brought to the Trust, not against
 8  the Debtors, I think that would be
 9  a fair characterization, yes.
10  BY MR. BROWN:
11       Q.   Is it a settlement of the
12  demands that have not yet even been
13  asserted against the Debtors?
14            MS. HARDING:  Object to
15  form.
16            MR. FINCH:  Object to form.
17            THE WITNESS:  That calls for
18  a legal conclusion at an almost
19  metaphysical level, frankly.
20            I guess you could conceive
21  of it as that or you could just
22  say that the Plan itself is what
23  it is.  I mean, it has the effect
24  under 524(g) of the bankruptcy
```

Page 54

1    code on the holders of future
2    demands that the bankruptcy code
3    prescribes.
4          It's hard to come to an
5    answer because settlement sort of
6    implies -- I mean, to the extent
7    that the Future Claimants
8    Representative is regarded as the
9    equivalent of a guardian ad litem
10   for the Future Claimants, which is
11   one way of looking at it, you
12   could characterize it as a
13   settlement.
14         But, again, the Future
15   Claimants Representative exists,
16   only in a legal capacity of
17   somebody appointed by the
18   bankruptcy court for that purpose,
19   has no independent ability to
20   settle things. So, as I said
21   before, I mean, I am not sure the
22   question, A, could be answered
23   and, B, is meaningful.
24   BY MR. BROWN:

Page 55

1    Q.    To the extent it is a
2    settlement, is it binding on the asbestos
3    insurance entities in the view of the
4    ACC?
5          MS. HARDING:  Object to the
6    form.  Calls for a legal
7    conclusion.
8          THE WITNESS:  That question
9    is unanswerable as phrased
10   because, I mean, binding for what
11   purpose?
12   BY MR. BROWN:
13   Q.    For purposes of insurance
14   coverage.
15         MS. HARDING:  Same
16   objection.
17         THE WITNESS:  The extent of
18   which, A, it's a settlement within
19   the meaning of, for example,
20   insurance comprehensive general
21   liability insurance policies that
22   talk about settlements, B, it
23   could be made without the consent
24   of insurance companies, under the

Page 56

1    Plan that's an issue that will
2    only get resolved by some other
3    court in the event there is a
4    dispute between the Trust and any
5    asbestos insurance company over
6    whether it is a, quote, settlement
7    that's binding on them.
8          That is not something that
9    the Plan or the Confirmation Order
10   under the insurance neutrality
11   provisions of this Plan purports
12   to resolve.
13   BY MR. BROWN:
14   Q.    Is it intended to be
15   binding?
16         MS. HARDING:  Object to
17   form.
18         THE WITNESS:  Intended by
19   whom?
20   BY MR. BROWN:
21   Q.    By the ACC?
22         MR. FINCH:  Object to the
23   question to the extent it calls
24   for privileged or work product

Page 57

1    analysis.  To the extent the ACC
2    has a position on that, that it's
3    not privileged and work product,
4    you can answer.
5          THE WITNESS:  I guess the
6    best answer I could give you on
7    that from the ACC's perspective is
8    that -- well, let me back up a
9    little bit.  When you say "is it
10   intended," you are describing the
11   settlement.  The settlement is a
12   125-page Plan with multiple
13   exhibits.
14         In light of the insurance
15   neutrality provisions, there are
16   clearly aspects that are not
17   binding on the insurers, but the
18   question of whether -- I guess the
19   best way I could put it is the ACC
20   would hope that in the event that
21   post-consummation, the Trust
22   sought coverage from any
23   particular set of insurers, whose
24   asbestos insurance rights were

Page 58

1    assigned to the Trust, that the
2    Trust would be able to obtain such
3    coverage, either by agreement with
4    the asbestos insurance companies
5    or through coverage litigation in
6    some coverage court, which
7    coverage litigation might entail a
8    decision by a judge that in some
9    manner or another what the Trust
10   was doing pursuant to the Plan in
11   terms of resolving individual
12   asbestos claims was, in fact,
13   binding on the insurers. That's
14   about the best I can do.
15   BY MR. BROWN:
16       Q.   Okay. To the extent it
17   constitutes a settlement of asbestos PI
18   claims, is it superseded by Section 7.15
19   entitled Insurance Neutrality?
20       A.   That question is almost
21   incomprehensible to me, because Section
22   7.15 is sort of a form selection
23   provision. Essentially, in my view of
24   it, what it does is it says to the extent

Page 59

1    that there are disagreements about the
2    Trust's rights under transferred
3    insurance assets, those disputes are
4    going to get resolved by the parties, the
5    insurers, and the Trust at a later date
6    in front of a later court.
7            And so some later court
8    would determine whether it was a
9    settlement or not. The 7.15 itself
10   doesn't purport to say whether it is or
11   isn't a settlement. It says essentially
12   that some other court, if necessary, will
13   have to decide that issue because the
14   insurers don't want to have coverage
15   litigation in this bankruptcy case.
16       Q.   All right. But the sentence
17   that we are referring to on page 1 says,
18   "The Plan constitutes a settlement of all
19   Claims and Demands against the Debtors
20   on, and subject to, the terms described
21   herein and the other the Plan Documents."
22       A.   That is --
23       Q.   My question is, is that
24   language superseded by the insurance

Page 60

1    neutrality language that appears in 7.15?
2            MS. HARDING: Objection.
3            MR. FINCH: Objection, asked
4    and answered.
5            THE WITNESS: I cannot give
6    you any better answer to that than
7    the one I gave you already.
8            You are asking me whether a
9    descriptive sentence in a Plan
10   supersedes a form selection clause
11   in some other part of the Plan,
12   and, to me, that's just -- I don't
13   even understand how one could
14   supersede the other in the first
15   place. I mean, if you can explain
16   to me why you think it supersedes
17   it, maybe I could have a more
18   specific answer.
19   BY MR. BROWN:
20       Q.   Well, why don't you look at
21   7.15 A on page 87 of the Plan.
22       A.   Okay.
23       Q.   As I read that sentence,
24   other than what appears in the other

Page 61

1    portions of 7.15, nothing in the Plan,
2    the Plan documents, the Confirmation
3    Order, is to operate or shall operate --
4    "shall in any way operate to, or have the
5    effect of, impairing any Asbestos
6    Insurance Entity's legal, equitable or
7    contractual rights, if any, in any
8    respect."
9        A.   Yeah?
10           MS. HARDING: Object to
11   form. Is there a question?
12           MR. BROWN: I am reading the
13   language first. Can I finish?
14           MS. HARDING: I am sorry. I
15   thought you were asking a
16   question. I didn't hear it.
17   BY MR. BROWN:
18       Q.   To the extent that the Plan
19   or the Confirmation Order constitutes a
20   settlement of asbestos PI claims against
21   the Debtors, is that going to then be
22   binding upon the insurers in coverage
23   litigation?
24           MS. HARDING: Object to

Page 62

1    form.  It calls for a legal
2    conclusion.
3         THE WITNESS:  If a coverage
4    court decides that it's a
5    settlement and that it's a
6    settlement that's reasonable and
7    that it doesn't have to be
8    consented to by insurers, then the
9    coverage court will have decided
10   that the settlement isn't
11   impairing the insurers' rights
12   under their policies.
13        That's what I mean by it's
14   up to the coverage court.  Your
15   question assumes that for it to be
16   a settlement, it would have to
17   impair the insurers' rights.  My
18   limited understanding of insurance
19   law is that that may be true or it
20   may not be true.  But what this
21   says is that the Plan and the
22   Confirmation Order aren't
23   purporting to resolve that issue.
24        Your rights are what they

Page 63

1    are; you will be able to present
2    them to a coverage court.  And the
3    coverage court, if it agrees with
4    you, will say, first, the Plan
5    doesn't control the outcome of
6    this decision because that's what
7    7.15(a) says, and, secondly, you
8    are correct in asserting that this
9    is an unconsented-to settlement or
10   it's not a settlement or whatever
11   defense you have applies.  And it
12   will say you win, you don't have
13   any coverage obligations for this
14   claim or these claims or whatever.
15   That's my understanding of how
16   this is supposed to work.
17   BY MR. BROWN:
18        Q.   Okay.  I am going to go
19   through the Plan and various items.  We
20   are going to jump around a little bit.
21   So why don't we first turn to page 5.
22        A.   I have it.
23        Q.   And the definition -- we
24   looked at this earlier -- 13,

Page 64

1    specifically (a) under 13.
2        A.   I see it.
3        Q.   Is that language intended to
4    include any property damage-related
5    causes of action?
6        A.   It depends on what you mean
7    by included.  What it basically means is
8    that, as I understand it, that the Trust
9    gets the rights; nobody else gets the
10   rights.  The Trust can then seek coverage
11   from the insurers.
12        Since the Trust has no
13   asbestos property damage claims to assert
14   against the insurers, it will not be
15   asserting asbestos property claims
16   against the insurers.  But the effect of
17   the transfer would mean that, for
18   example, Grace or a property damage
19   claimant could not assert property damage
20   claims under that insurance coverage
21   because those rights have been assigned
22   to the Trust and they are, therefore, no
23   longer available to be invoked or
24   utilized by anybody else.

Page 65

1        Q.   Okay.  Let's turn to page 6,
2    Asbestos Insurance Coverage Defenses, 6
3    and 7.
4        A.   Definition 16.
5        Q.   Correct.
6        A.   I see it.
7        Q.   Did you have a chance to
8    read it?
9        A.   Yes.
10       Q.   And there are two exceptions
11   that are listed there to asbestos
12   insurance coverage defenses?
13       A.   Correct.
14       Q.   And the first one says,
15   "...the Plan or any of the Plan documents
16   do not comply with the Bankruptcy
17   Code..."
18        So, as I understand that, if
19   in a subsequent coverage action, an
20   insurer sought to argue that the Plan or
21   Plan documents don't comply with the
22   bankruptcy code, they would be precluded
23   from doing so by virtue of the
24   confirmation of the Plan; is that

Page 66

1  correct?
2      A.   Correct.
3      Q.   And the second one has to
4  deal with the assignment of policy
5  rights, correct?
6      A.   Correct.
7      Q.   And asbestos insurance
8  entities would be prohibited from
9  litigating that issue?
10     A.   If the bankruptcy court
11 decided that those consent rights were
12 effectively preempted by the bankruptcy
13 code.  If it decided the other way, then
14 they wouldn't be precluded from doing so.
15     Q.   Okay.  If you go before the
16 two exceptions, it describes "Asbestos
17 Insurer Coverage Defenses include any
18 defense based on the terms of the Plan or
19 the Plan documents or the manner in which
20 the Plan or Plan documents were
21 negotiated..."
22          What if an asbestos
23 insurance entity wanted to argue in
24 subsequent coverage litigation that the

Page 67

1  resolution of asbestos PI claims was the
2  product of some sort of collusion between
3  the Plan proponents?  Could that be
4  argued by the asbestos insurance
5  companies in the subsequent coverage
6  litigation?
7          MS. HARDING:  Object to
8  form.
9          MR. FINCH:  Objection to
10 form.
11         THE WITNESS:  First, it's
12 hypothetical.  Second, it's a
13 question sort of to some extent of
14 insurance law.
15         But subject to that, and the
16 fact that I don't profess to be an
17 expert on this subject, it is my
18 understanding that an asbestos
19 insurer could argue any state law
20 coverage defense that it had,
21 including collusion.
22         It is also my understanding
23 that the Trust in this
24 hypothetical scenario in which

Page 68

1  this dispute is arising could
2  argue that it's not collusion
3  because of the insolvency clauses
4  in the CGL policies and that,
5  therefore, almost by definition, a
6  bankruptcy case doesn't involve
7  collusion.
8          They couldn't argue that the
9  bankruptcy court had decided that
10 it wasn't collusion, because the
11 insurance neutrality provision
12 would preclude that argument.  But
13 it could certainly argue to the
14 coverage court that the type of
15 agreement that is entered into
16 here, as a result, as I said, of
17 state law -- of the facts and the
18 state law didn't amount to
19 collusion.  But as such, the
20 collusion defense is not, in my
21 opinion, precluded by this
22 language.
23 BY MR. BROWN:
24     Q.   Okay.

Page 69

1      A.   Again, that's my legal
2  opinion.  You got it, for whatever it's
3  worth.
4      Q.   Let's back up then.  Is it
5  intended to prevent such an argument --
6  let's back up.
7      A.   Intended by who?
8      Q.   For purposes of these
9  questions -- and I will try to fix my
10 questions -- the ACC, because that's you
11 are here to speak for.
12         MR. FINCH:  Object to form.
13 It assumes there is an intent.
14 Object to form.
15         MS. HARDING:  Object to
16 form, too.
17         THE WITNESS:  The intent of
18 the ACC in this language, frankly,
19 is to satisfy what we perceive to
20 be the requirements of the Third
21 Circuit decision in combustion
22 engineering for rendering a Plan
23 sufficiently, quote, neutral,
24 close quote, as to its impact on

Page 82

1   up some kind of derivative successor
2   liability, veil piercing, alterego,
3   whatever kind of claims, and the notion
4   was that Grace's economic enterprise,
5   which included the Non-Debtor affiliates,
6   were going to be freed of asbestos
7   liability.
8          So if there aren't any
9   claims asserted against them, then
10  nothing ever gets enjoined.  The
11  injunction only kicks in in the event
12  that a claim actually attempts to assert
13  derivative liability of Grace against one
14  of these entities.
15        Q.   Do you know if any of them
16  have asbestos liabilities for their own
17  products or actions?
18        A.   I am not aware of any such
19  allegations or claims by anybody.  I have
20  never seen them or heard of them.
21        Q.   Okay.  Can you turn to page
22  33 of the Joint Plan, definition 178.
23        A.   I see it.
24        Q.   Definition 178 makes

Page 83

1   reference to Exhibit-19 to the Plan.
2          Do you see that?
3        A.   Yes.
4        Q.   And that's entitled Retained
5   Causes of Action Schedule.  And actually
6   I think we will get that marked.
7          MR. FINCH:  Are you going to
8   mark Exhibit-19 to the Plan?
9          MR. BROWN:  Yes.
10         THE WITNESS:  This was
11  supposed to be Exhibit-19.  This
12  is Exhibit-5 to the Plan.
13         MR. BOERGER:  Sorry.  Here
14  you go.
15          (ACC 30(b)(6)-6 marked for
16  identification at this time.)
17  BY MR. BROWN:
18        Q.   If you thumb through there,
19  Mr. Lockwood, you would get to page 10
20  where it says Retained Causes of Action
21  (Insurance Claims)?
22        A.   Uh-huh.
23        Q.   And then it goes on for
24  several pages, listing multiple insurance

Page 84

1   companies?
2        A.   Yes.
3        Q.   Among the insurance
4   companies that are listed on this
5   document is American Employers, which for
6   now is OneBeacon; Employers Commercial
7   Union, which is also OneBeacon; GEICO;
8   Republic; and Unigard Security, which is
9   now Seaton.
10         Do you have any
11  understanding of what causes of action
12  the Debtor is retaining with respect to
13  those four insurance companies?
14        A.   No.  My only understanding
15  is that they don't include causes of
16  action relating to asbestos insurance
17  rights, which are referred to in the
18  exclusion at the end of 178.
19        Q.   Do you have an understanding
20  as to whether the Debtors will continue
21  to be insurers under any of the policies
22  issued by those companies or whether the
23  Asbestos PI Trust will become the
24  punitive insurer?

Page 85

1          MS. HARDING:  Object to
2   form.
3          MR. FINCH:  Object to form.
4          THE WITNESS:  When you say
5   those insurance policies, which
6   insurance policies are you talking
7   about?
8   BY MR. BROWN:
9        Q.   Whatever ones are included
10  within the Retained Causes of Action.
11         MR. FINCH:  Object to form.
12         THE WITNESS:  I believe that
13  if it's a retained cause of
14  action, by definition, the Trust
15  is not going to be the punitive
16  insured under whatever cause of
17  action.  Indeed, I am not sure
18  that the Trust -- there is sort of
19  a sematic issue when you talk
20  about the Trust becoming an
21  insured.
22          The Trust has whatever
23  rights under the insurance
24  transfer it gets.  Whether that

Page 86

1  would make it a, quote, insured,
2  close quote, for purposes of
3  insurance law, I have absolutely
4  no idea.  That's a terminological
5  issue.
6       But my understanding of this
7  is that whatever rights Grace is
8  retaining against the four
9  companies that you identified are
10  mutually exclusive of any rights
11  that the Asbestos PI Trust is
12  getting.
13       And so since I don't know
14  what policies Grace is retaining
15  rights to or what coverages, all I
16  can say is that whatever they are,
17  they are not rights that were
18  transferred to the Trust.  Grace
19  and the Trust aren't going to be
20  trying to make claims on the same
21  set of rights.
22  BY MR. BROWN:
23     Q.   But they may make claims on
24  the same set of policies?

Page 87

1     A.   I don't think so, because I
2  believe that the assignment of the
3  asbestos insurance rights relates to
4  policies that, as a general proposition,
5  Grace is not retaining any rights in.
6       So I would speculate that
7  you must be talking about other policies,
8  but since I have no idea what retained
9  rights Exhibit-19 or Retained Causes of
10  Action refer to, I really can't answer
11  the question.
12     Q.   Do you know whether anyone
13  has any idea what retained rights are --
14     A.   I would assume that the
15  Debtor knows what it thought it was
16  retaining, because that particular
17  exhibit was something that was prepared
18  by the Debtor.
19     Q.   Okay.  Is there any plan to
20  your knowledge to update this exhibit so
21  that it's a little more clear in terms of
22  what is being retained other than simply
23  putting the name of the entity and an
24  address?

Page 88

1       MS. HARDING:  Objection to
2  form.
3       MR. FINCH:  Objection.
4       THE WITNESS:  Prior to this
5  deposition, I am not aware of any
6  undertaking by anybody to do an
7  update of this.  Whether or not
8  the result of this deposition or
9  some other deposition, somebody
10  might possibly make such a
11  decision in the future, would be
12  rank speculation at this point.
13  BY MR. BROWN:
14     Q.   Would it be fair to say that
15  absent that, we are not really going to
16  know what's retained?
17       MR. FINCH:  Object the form.
18       MS. HARDING:  Object to
19  form.
20       THE WITNESS:  I told you
21  earlier, I would assume that
22  somebody at Grace knows what is
23  sought to be retained by this.  I
24  don't know who that person is, but

Page 89

1  somebody probably does.
2  BY MR. BROWN:
3     Q.   Okay.  If you turn to page
4  37 of the Joint Plan, definition 200.
5     A.   Ah, yes.  I see it.
6     Q.   Okay.  I have a few
7  questions on this one.
8       It says, "'Settled Asbestos
9  Insurance Company' shall mean any
10  Asbestos Insurance Entity that has
11  entered into an Asbestos Insurance
12  Settlement Agreement prior to the
13  conclusion of the Confirmation
14  Hearing..."
15       What's the basis for
16  limiting it to prior to the confirmation
17  hearing?
18       MR. FINCH:  Object.  To the
19  extent that calls for privileged
20  information or work product, you
21  are not allowed to answer.  To the
22  extent you can answer that without
23  divulging privileged
24  communications, you can do so.

Page 102

1  BY MR. BROWN:
2      Q.   So that if prior to the
3  issuance of the warrant, there is
4  additional stock issued, you are going to
5  adjust the strike price as well as the
6  number of warrants; is that right?
7      A.   You are going to make the
8  adjustments described in this section.  I
9  am not sure I want to summarize them the
10 way you just did, but this section spells
11 out in somewhat gory detail exactly the
12 type of antidilution provision that's
13 being offered for these warrants.
14     Q.   What if there is dilution
15 after the issuance of the warrant?  Is
16 there any mechanism to deal with that
17 situation?
18         MS. HARDING:  Object to
19 form.
20         THE WITNESS:  There is a
21 warrant agreement around here
22 somewhere -- I believe it's
23 probably an exhibit to this
24 Plan -- that specifies all of the

Page 103

1  rights of the warrant holder.
2         I cannot, sitting here, tell
3  you at the moment that I can
4  recall whether there is a -- it's
5  a one-year warrant, and I just
6  don't remember whether during the
7  one-year exercise period that
8  there is or there is not
9  anti-dilution provisions.
10 BY MR. BROWN:
11     Q.   Okay.
12     A.   But if there are, they will
13 be in the warrant agreement as well as
14 they might be referenced in this section
15 of the Plan.
16     Q.   Let's go to the heading 7.2
17 The Asbestos PI Trust.
18     A.   I see it.
19     Q.   Do you see the second full
20 paragraph beings "The purpose of the
21 Asbestos PI Trust"?
22     A.   I see it.
23     Q.   And it lists a few items
24 there.

Page 104

1      A.   Yes.
2      Q.   Does the asbestos PI Trust
3  assume the duties and obligations of the
4  Debtors under asbestos insurance
5  policies?
6          MR. FINCH:  Object to form,
7  overly broad.
8          MS. HARDING:  Object to
9  form.
10         THE WITNESS:  As I
11 understand it, the duties and the
12 obligations of the Debtors under
13 insurance policies are triggered
14 only by the submission of claims
15 by the Debtor or some other
16 insured under the policies.
17         Absent an effort by the
18 insured or successor to get
19 coverage for claims, there are no
20 independent remaining duties and
21 obligations.
22 BY MR. BROWN:
23     Q.   If I can stop you, by
24 successor in that sentence, you mean

Page 105

1  Asbestos PI Trust?
2      A.   PI Trust.
3      Q.   Fair enough.
4      A.   When the Trust is assigned
5  rights under the policies and the Debtors
6  are given the right to assert any and all
7  coverage defenses --
8          MR. FINCH:  You mean
9  insurers?
10         THE WITNESS:  I am sorry.
11 Let me start over again.
12         When the Trust is assigned
13 rights under the policies and the
14 insurers are retaining all of
15 their coverage defenses with the
16 two exceptions we discussed
17 earlier, if the Trust proposes to
18 demand in some way or another
19 coverage from one or more insurers
20 under those policies, then
21 whatever the insurer asserts as a
22 pre-condition to coverage, what
23 you would call an obligation or a
24 right, would have to be fulfilled

Page 106

1    to the extent that a coverage
2    court determines that there is a
3    pre-condition to coverage.
4         And since the Trust is the
5    one seeking the coverage, by
6    hypothesis, it's the only one that
7    has any incentive to make sure
8    that the rights or -- excuse me --
9    that the obligations, the
10   pre-conditions are satisfied as
11   required by a coverage court.
12        And so to that extent, yes,
13   the Trust, one way or another, to
14   the extent determined by a
15   coverage court or by negotiations
16   with insurers, will have to
17   perform what you have described as
18   the obligations and rights under
19   the assigned insurance coverage.
20   That's my understanding.
21   BY MR. BROWN:
22        Q.   Do the Debtors, the
23   Reorganized Debtors, retain any duties or
24   obligations under the asbestos insurance

Page 107

1    policies if this Plan is confirmed?
2         A.   There are provisions
3    involving cooperation in the Plan
4    documents which would allow the Trust to
5    require, to the extent those cooperation
6    provisions say so, the Debtors to help
7    satisfy or wholly satisfy whatever the
8    particular requirement might be that only
9    the Debtor could do.
10        So there is, I guess, the
11   answer is there is an indirect obligation
12   on the Debtor's part.  But the Debtor,
13   qua-Debtor, vis-a-vie, the insurer, since
14   the Debtor under the asbestos insurance
15   rights will not on its own be seeking
16   coverage, the Debtor sort of independent
17   of the Trust would not have any rights,
18   any obligations to the insureds except to
19   the extent, as I say, that the
20   cooperation with the Trust efforts to
21   access that insurance trigger such
22   cooperation obligations.
23        Q.   And the cooperation
24   obligations that you described in the

Page 108

1    beginning of your answer are set forth in
2    the cooperation agreement; is that what
3    you were referring to?
4         A.   They are set forth there.
5    There may be -- I don't remember whether
6    they are also set forth in other
7    documents, such as the Insurance Transfer
8    Agreement and/or the Plan itself.  But
9    they are set forth -- I think there may
10   be some set forth in the Insurance
11   Transfer Agreement.  I am not sure.  I
12   would have to look at them.
13        Q.   Okay.
14        A.   But I do remember that there
15   are cooperation arrangements.
16        Q.   If I understand your answer,
17   the cooperation obligation of the
18   Reorganized Debtors post-confirmation is
19   not the asbestos insurance companies but
20   rather to the Trust under the cooperation
21   agreement?
22        A.   That's correct.
23        MS. HARDING:  Object to
24   form.

Page 109

1         THE WITNESS:  But the
2    asbestos insurance companies,
3    through the retention of asbestos
4    coverage defenses, are the
5    indirect beneficiaries of that
6    provision.
7    BY MR. BROWN:
8         Q.   How so?
9         A.   Because if they don't -- if
10   the Trust can't get Grace to perform the
11   cooperation that the policies require,
12   the insurance companies won't have to
13   provide the coverage if the coverage
14   court says such cooperation is mandatory.
15        There is nothing in the Plan
16   that says that an insurance company -- if
17   policy obligations are not performed as
18   required by the policy by somebody,
19   nevertheless they have to pay on the
20   insurance.  The only entity or person
21   that could make such a determination
22   would be a coverage court judge and only
23   in the context of deciding that for
24   whatever reason the particular obligation

Page 110

1  sought to be enforced by the insurer was
2  not applicable or required.
3       Q.   Okay.  I want to ask you the
4  same series of questions with respect to
5  two other types of documents, and we can
6  try to short-circuit this or you can give
7  me the long answer.  I don't care.
8       Would your answers to the
9  questions concerning the assumption of
10 duties under the asbestos insurance
11 policies or the retention of those
12 duties, as you have just articulated, be
13 the same if my questions dealt with the
14 Asbestos Insurance Settlement Agreements?
15      A.   Well, sort of, except that
16 the Asbestos Insurance Settlement
17 Agreements, as far as I am aware, don't
18 have any obligations.  They fully
19 performed.  Well, strike that.  There are
20 two categories of asbestos insurance.
21      Q.   I want to get to the third
22 one as well.
23      A.   There is a pre-petition
24 where it's been fully performed, and

Page 111

1  there is post-petition one where we make
2  a settlement as the case is going on,
3  such as the Equitas agreement that I
4  mentioned before, and any others that
5  might get entered into.
6       With respect to the former,
7  the pre-petition settlement agreements,
8  it's my understanding, rightly or
9  wrongly, that both parties have
10 essentially fully performed those
11 agreements, both the Debtors and the
12 insurers, at least to the extent
13 described in Exhibit-5, which is where
14 those are identified and described.
15      The only remaining
16 obligation, quote/unquote, that I am
17 aware of under those agreements is a
18 potential indemnity obligation on the
19 part of Grace in the event that somebody
20 successfully or attempts to sue a settled
21 insurer.
22      The Plan channels to the
23 Trust any claims against those settled
24 insurers, and, therefore, there should

Page 112

1  never be any indemnity claim because the
2  claim gets cutoff from the insurer before
3  it reaches the point where the insurer
4  has paid money, which would trigger an
5  indemnity right.  That's quite a bit
6  different from the non-settled coverage
7  that I was discussing earlier.
8       Q.   But that obligation, to the
9  extent it exists, is being assumed by the
10 Asbestos PI Trust?
11      A.   That obligation -- if one
12 could hypothesize, on the one hand, a
13 524(g) order that created the Trust in
14 the first place and protected the insurer
15 at the same time, which is what this Plan
16 does, and simultaneously somebody being
17 able to violate the 524(g) injunction by
18 successfully suing a protected party
19 without blowing up the entire Plan and
20 blowing up the Trust in the process, then
21 in that almost unimaginable hypothetical
22 situation, the protected insurer would
23 have an indemnity claim against Grace,
24 which would be channelled to the Trust

Page 113

1  and either -- I forget whether it's
2  Section 5.12 or 5.13 of the TDP says that
3  the Trust has to honor that claim to the
4  extent that it's valid.
5       Q.   Okay.  I know some others in
6  the room have probably a question about
7  another type of agreement.
8       Asbestos Insurance
9  Reimbursement Agreements, are the
10 obligations of the Debtors under those
11 documents being assumed by the Trust?
12      A.   That cannot be answered yes
13 or no, because the Trust and its handling
14 of claims is obviously going to be in
15 some sense different from Grace in its
16 handling of the claims because Grace
17 didn't have a TDP.
18      The Plan proponents are
19 seeking in the Plan and in the
20 confirmation process a ruling from the
21 court under applicable bankruptcy
22 principles that the Debtors can transfer
23 those agreements to the Trust and the
24 Trust's performance under those

Page 118

1    provision, essentially that we are
2    going to transfer the assets to
3    the Trust and if you got a claim
4    or an interest in the assets, then
5    you can litigate that claim
6    against the Trust.
7         But we are going, I guess,
8    have potential confirmation
9    objections about whether there are
10   any such claims. I mean, the mere
11   assertion of a claim doesn't mean
12   that it's valid.
13   BY MR. BROWN:
14        Q.   Okay. If I can direct your
15   attention down to 7.2.4, which is
16   entitled Assignment and Enforcement of
17   Asbestos PI Trust Causes of Action.
18        A.   Yes.
19        Q.   I must confess, I am a bit
20   baffled by this one, so I need some help
21   with it.
22        How do Asbestos PI Trust
23   causes of action differ from asbestos
24   insurance rights?

Page 119

1         A.   Well, I have to go back and
2    look at the definitions to answer that
3    question.
4         Well, I think asbestos PI
5    Trust causes of action does include
6    asbestos insurance rights.
7         Q.   What else does it include?
8         A.   Well, if you look at the
9    definition, it includes defenses such
10   that, for example, if a claimant says, I
11   have a valid claim against Grace that's
12   channelled to the Trust and the Trust
13   disagrees with it, the Trust retains all
14   the defenses to that claim that Grace
15   would have had. That's clause A under
16   definition 47.
17        Q.   Okay.
18        A.   Clause B is, for example,
19   contribution rights, et cetera. So, for
20   example, if the Trust has -- if Grace has
21   contribution rights that it has not
22   asserted and that which are still valid
23   against a codefendant in a tort system
24   and the codefendant brings in indirect

Page 120

1    Asbestos PI Trust claim against the
2    Trust, the Trust could assert Grace's
3    contribution rights as a counterclaim to
4    that. That's two categories of things
5    that this is intended to include.
6         Q.   Okay. Let's go to page 64,
7    7.2.6, Creation and Termination of the
8    Asbestos PI TAC.
9         A.   Correct.
10        Q.   It says, "On or before the
11   Confirmation Date, the initial members of
12   the Asbestos PI TAC shall be selected by
13   the Asbestos PI Committee."
14        That has already occurred,
15   correct?
16        A.   Correct. They are
17   identified in the Asbestos PI Trust
18   Agreement.
19        Q.   Okay. How many actual
20   committee members are there on the
21   Asbestos PI Committee?
22        A.   I don't remember. But we
23   have the Disclosure Statement here. I
24   could pretty quickly find out by just

Page 121

1    looking at it where they are identified.
2         Q.   Okay.
3         A.   It's certainly more than the
4    four that are going to be on the TAC.
5         Q.   Okay. Is it fair to say
6    that the actual committee members who are
7    asbestos claimants act through their tort
8    counsel in connection with their
9    obligations as committee members?
10        A.   As a general proposition,
11   that's true. In any given committee on
12   any given issue, an individual member
13   might choose to show up and act on their
14   own behalf, and there have been some
15   examples in the past where that has
16   occurred.
17        But, as a general
18   proposition, the committee members are
19   blue-collar folks of limited legal
20   knowledge, and they delegate to their
21   personal injury lawyers their sort of
22   activities acting for them as an agent on
23   these committees.
24        Q.   Okay. You are counsel to

Page 122

1  the Asbestos PI Committee.  You don't
2  have occasion, do you, to deal directly
3  with the actual claimants?
4      MR. FINCH:  Object to the
5  form.
6      THE WITNESS:  That's not
7  entirely true.  I get calls
8  periodically that I just got this
9  incomprehensible Disclosure
10  Statement from Grace and could you
11  please tell me what it means or
12  something.  But as a general
13  proposition --
14      MR. FINCH:  Transfer to it
15  to Finch.
16      THE WITNESS:  Or where do I
17  file my proof of claim.
18      But, as a general
19  proposition, I don't nor do other
20  folks at Caplin & Drysdale deal
21  directly with original committee
22  members.
23  BY MR. BROWN:
24      Q.    You deal with personal

Page 123

1  injury attorneys, correct?
2      A.    As a general proposition, we
3  deal with the PI lawyers who have been
4  appointed by their client committee
5  member to act on their behest in the
6  committee.
7      Q.    Now, the TAC members are
8  John Cooney, Perry Weitz, Joe Rice,
9  and -- who was the fourth one?
10      A.    Well, I can tell you by
11  looking at the PI Trust Agreement, which
12  is Exhibit-2 to the Plan and looking at
13  the signature page, we should have, which
14  is --
15      Q.    Russell Budd.
16      A.    Russell Budd, John Cooney,
17  Joseph Rice, and Perry Weitz.
18      Q.    And each of them works for a
19  law firm, correct?
20      A.    Each of them is a partner a
21  law firm, yes.
22      Q.    Sorry.  I didn't mean to...
23      Now, does each of those law
24  firms have a client that sits on the

Page 124

1  committee?
2      A.    Yes.
3      Q.    And do those committee
4  members for those firms act through those
5  four gentlemen?
6      A.    On the committee?
7      Q.    Yes.
8      A.    Generally, yes.
9      Q.    Okay.  So is it fair to say
10  that Mr. Rice, Mr. Weitz, Mr. Cooney, and
11  Mr. Budd selected themselves to be
12  members of the TAC?
13      A.    No, because there are many
14  other members of the committee, and the
15  committee as a whole, which, in this
16  particular case, I believe has a majority
17  of members that are not these four
18  gentlemen, decided which of their members
19  they thought would be appropriate persons
20  to put on the TAC.
21      Q.    And how was that decided?
22      A.    As far as I know, they had
23  informal discussions, and they had a
24  committee meeting.  I don't remember

Page 125

1  whether there were votes or anything like
2  that.  But at the end of the day, through
3  some sort of nomination or informal
4  self-nomination or self-nomination,
5  speeches, lobbying, discussions, what
6  have you, there came a time at which the
7  committee voted to select these four
8  people.
9      Q.    Okay.
10      A.    And I might add that the
11  Future Claimants Representative had a
12  sort of a generalized oversight in the
13  sense that while the Plan contemplates
14  that the committee would nominate the
15  TAC.  If the FCR thought, for some reason
16  or another, that somebody had been put on
17  the TAC that was a real bad idea, the
18  committee would probably have had to
19  listen to the Future Representative's
20  views on that even though the Futures Rep
21  did not have sort of a formal veto or
22  role in that process.
23      Q.    Okay.  I want to now turn to
24  page -- well, it's 69 on my version,

Page 126

1   **Section 7.7, Conditions to Occurrence of**
2   **the Confirmation Date, and I want to**
3   **focus your attention first on (g).**
4       A.   I see it.
5       **Q.   What are the securities that**
6   **are funding the Asbestos PI Trust?**
7       A.   The warrant and the Deferred
8   Payment Agreement, which is a debt
9   obligation, which also includes, I
10  believe, a promissory note or promissory
11  notes.
12      **Q.   Can you describe for me the**
13  **circumstances under which the asbestos PI**
14  **claim -- excuse me -- the Asbestos PI**
15  **Trust will be funded with dividends?**
16      A.   In the event that it
17  exercises the warrant and acquires stock
18  pursuant to that exercise and the stock
19  pays dividends, it will get dividends.
20      **Q.   And if the warrant is not**
21  **exercised?**
22      A.   Then it won't get dividends.
23      Q.   What about if there is a
24  default under the deferred payment note?

Page 127

1       A.   My recollection is that the
2   Trust has the right to get 50.1 percent
3   of the stock of the Debtor under those
4   circumstances.
5       But, again, the terms of --
6   that's a very complicated set of
7   documents, and the precise terms of that
8   are whatever the document states.  I can
9   only give you a sort of a very
10  generalized description.
11      Q.   Okay.  Let me draw your
12  attention now down to (l), condition (l).
13      A.   Yes, I see it.
14      Q.   What does that mean?
15      MS. HARDING:  Object to
16  form.
17      THE WITNESS:  Well, what it
18  means is that if you didn't have a
19  TDP, which includes things like a
20  payment percentage and mechanisms
21  for trying to trying to limit the
22  ways in which the Trust expends
23  monies on claims, and you just had
24  sort of a come in, sue the Trust

Page 128

1   and the tort system, et cetera,
2   you would have a
3   first-come-first-serve operation
4   where there was the distinct
5   possibility that, as it happened
6   in the Manville Trust at the very
7   beginning, all the money would run
8   out the door at the front end, and
9   there wouldn't be anything left
10  for future claimants, which would
11  violate 524(g).
12  BY MR. BROWN:
13      **Q.   Okay.  Well, the way that**
14  **this provision is written suggests that**
15  **any procedures other than those that are**
16  **set forth in this Plan would defeat the**
17  **purposes of Section 524(g).**
18          **Is that what is intended**
19  **here?**
20      MR. FINCH:  Object to form.
21      MS. HARDING:  Object to
22  form.
23  BY MR. BROWN:
24      Q.   Are there other options, is

Page 129

1   the question?
2       A.   If the question is could one
3   hypothesize a somewhat different set of
4   TDPs that had somewhat different
5   procedures, the answer is depending on
6   what that different TDP set of procedures
7   was, you might be able to say the same
8   thing about it.
9       The purpose of this thing is
10  to say that this structure, according to
11  the court, satisfies the requirements of
12  524(g) that say that you have to
13  establish this requirement.
14      I mean, this is a finding of
15  fact that is intended to have the court
16  rule that the Plan does, in fact, meet
17  the requirements of a subsection of
18  524(g).
19      **Q.   You could, in fact, have a**
20  **Plan that met the qualifications for**
21  **524(g) that actually had a role for**
22  **asbestos insurance entities, correct?**
23      MR. FINCH:  Object to form.
24      MS. HARDING:  Object to

Page 130

1   form.
2       THE WITNESS:
3   Hypothetically, probably yes.  It
4   would be more difficult, but,
5   hypothetically, yes.  You could
6   have -- we have had some plans
7   that had coverage in place
8   agreements with insurers, for
9   example, that we felt satisfied
10  524(g).  But you have to get the
11  insurers' agreement to have a
12  coverage in place agreement.
13  BY MR. BROWN:
14      Q.   Okay.  Let's go now to
15  condition (r) -- I am sorry.  Condition
16  (s).
17      A.   Yes.
18      Q.   Now, for purposes of my
19  question, I want you to assume that when
20  I use the term "settled asbestos
21  insurance companies," I want you to
22  assume that those that are pre-petition.
23      A.   Okay.
24      Q.   And my question is a very

Page 131

1   general one, because I have heard
2   different views, and that is, what
3   benefits are being provided by or on
4   behalf of settled asbestos insurance
5   companies listed on Exhibit-5?
6       A.   It is the position of the
7   ACC that Grace is paying close to
8   $3 billion of value to the Trust on
9   behalf of not only itself but a variety
10  of other protected parties, including
11  Non-Debtor affiliates and, in this
12  particular case, settled asbestos
13  insurers.
14      And it is doing so on behalf
15  of settled asbestos insurers because
16  those insurers have indemnity claims
17  against Grace, which are being, if they
18  hypothetically could ever occur, are
19  being channelled to the Trust as a means
20  of protecting Grace against such -- well,
21  let me back up.
22      The purpose of putting
23  settled asbestos insurers in here is not
24  to provide a gratuitous asbestos insurers

Page 132

1   because we think they are nice folks.
2       Q.   I didn't think so.
3       A.   Settled asbestos insurers,
4   by definition, are insurers that have
5   indemnity rights against Grace.
6       Q.   They have also paid a lot of
7   money?
8       A.   And they paid a lot of money
9   in the past.  But the past money -- money
10  is fungible.  The past money went into
11  Grace's coffers, went out or didn't go
12  out, et cetera.  But they are not being
13  asked for any new money.
14      But Grace has an economic
15  interest in not having asbestos PI claims
16  brought against those insurers that could
17  then trigger an indemnity obligation of
18  Grace to the insurer against which that
19  asbestos PI claim is asserted.  They
20  have an economic interest in preventing
21  that.
22      So the deal is channel any
23  such claim that might give rise to the
24  asbestos indemnity claim to the Trust,

Page 133

1   and in exchange for that, part of what
2   Grace is paying you is to get rid of
3   asbestos PI claims which include indirect
4   asbestos PI claims for indemnity or
5   direct asbestos PI claims for indemnity.
6       Q.   Okay.
7       A.   And that's the basis.
8       Q.   I think you said at the very
9   beginning of either the last question or
10  the one before that Grace was
11  contributing 3 million?
12      A.   Billion.
13      Q.   That's what I thought.
14  Okay.  I just wanted to make sure I had
15  the number correct.
16      A.   I mean, that's our view of
17  the approximate amount of what they were
18  contributing at the time we made the
19  deal, I guess would be a better way to
20  put it.  There are other people that
21  might value it differently.
22      Some of things that were
23  worth more at the time the deal was made
24  are worth less today but hopefully will

Page 170

1  at that injunction.
2         I can't recall ever having
3  spent a lot of time thinking about that
4  issue before, but it seems possible that
5  that hypothetical claim could be enjoined
6  by the successor claims injunction in
7  Section 8.5 of the Plan as against
8  Fresenius and Sealed Air.
9         Q.   I want to turn your
10 attention now to Section 7.15.  We have
11 talked about it a little bit already,
12 Insurance Neutrality.
13        A.   I have it.
14        Q.   Okay.  Other than the
15 conditions set forth in (g) under 7.15,
16 are asbestos insurance entities bound by
17 any other findings or conclusions
18 contained in the Plan?
19        A.   Yes, potentially under
20 Section 7.15(j).
21        Q.   Okay.  Anything else?
22        A.   Well, yes, two other
23 categories of things.  One would be
24 rulings on compliance with the bankruptcy

Page 171

1  code provisions, which are not under the
2  definition of asbestos coverage defenses
3  preserved, as we had discussed earlier.
4         Q.   Okay.
5         A.   And, secondly, there is a
6  race judicata provision in Section
7  7.15(e) that, in effect, says that if an
8  asbestos insurer actually litigates some
9  claim in the bankruptcy case, it could
10 be -- assuming that otherwise
11 non-bankruptcy principles of race
12 judicata or collateral estoppel would
13 apply, it could be bound by the outcome
14 of any such litigation that it initiated.
15        Q.   Okay.
16        A.   Other than that, I believe
17 the answer to your question, those are
18 the only conditions that I am aware of.
19        Q.   Okay.  Would it be correct
20 to say that this provision overrides the
21 exculpation provision in the Plan which
22 appears at Section 11.9?
23        MR. FINCH:  Object to form.
24        MS. HARDING:  Object to

Page 172

1  form.
2         THE WITNESS:  Let me turn to
3  Section 11.9.  I don't think so,
4  because I think the exculpation
5  provision comes under the heading
6  bankruptcy issues.
7         The exculpation provision is
8  pretty limited.  What it applies
9  to are acts or omissions in
10 connection with or arising out of
11 the Chapter 11 cases.  And my
12 understanding of what is intended
13 to be covered by that is some
14 claim that one of the parties
15 covered by it engaged in some sort
16 of misconduct during the course of
17 the bankruptcy case -- I don't
18 know -- a claim, to put it
19 personally, the Asbestos Claimants
20 Committee somehow or another
21 breached a fiduciary duty to its
22 constituency by proposing a Plan
23 that this exculpation provision
24 would apply to that sort of a

Page 173

1  claim or a similar claim against
2  the Debtors.
3         But those types of claims
4  are not insurance coverage claims
5  or defenses.  They would just be
6  some sort of -- and, indeed, it's
7  almost inconceivable to me how an
8  insurance company could ever have
9  the sort of claim that would be
10 exculpated by Section 11.9,
11 frankly.
12 BY MR. BROWN:
13        Q.   Well, if they did --
14        MR. FINCH:  Object to the
15 form.
16 BY MR. BROWN:
17        Q.   -- would the exculpation
18 provision take precedence over Section
19 7.15?
20        MR. FINCH:  Object to form.
21        MS. HARDING:  Object to
22 form.
23        THE WITNESS:  That question
24 is almost impossible to answer,

Page 174

1  because without knowing what the
2  claim is -- I mean, 7.15 addresses
3  specific types of situations
4  having to do with insurance.
5       11.9 addresses claims that,
6  on their face, have no apparent
7  relationship to insurance, and,
8  therefore, to know whether there
9  is any overlap between the two to
10  determine which one would prevail
11  in the event that there was an
12  overlap, you would have to have
13  some idea what kind of claim you
14  are talking about.  And, frankly,
15  I have no idea what kind of claim
16  you want me to hypothesize for
17  purposes of that question.
18  BY MR. BROWN:
19       Q.   All right.  There are some
20  releases that are mentioned in Section
21  7.15, and I want you to put those aside
22  for a moment.
23            Other than the releases that
24  are cited in 7.15, are any other releases

Page 175

1  that appear in the Plan or Plan documents
2  binding on asbestos insurance entities?
3       MS. HARDING:  Object to
4  form.
5       THE WITNESS:  I would have
6  to give you a very similar answer
7  to the one I just gave you on
8  exculpation because I would have
9  to know what kind of claims you
10  are talking about.
11       7.15 is intended to deal
12  with insurance policy/settlement,
13  insurance settlement, insurance
14  reimbursement situations, and
15  preservation of insurer rights
16  with respect to those types of
17  agreements.  Releases in the Plan
18  may or may not cover those
19  situations.
20       As a general proposition, I
21  don't think the Plan purports to
22  release claims by asbestos
23  insurers sort of generically
24  against a whole lot of different

Page 176

1  people.  There are some specific
2  releases that we have talked about
3  already.
4       Without knowing what sort of
5  a claim you believe the Plan
6  releases and being able to figure
7  out whether that claim ties into
8  the sort of relationships that
9  7.15 -- policy type relationships
10  that 7.15 is intended to address,
11  I really can't answer.  I am not
12  trying to evade the question.  I
13  just can't answer it for the
14  reasons I stated.
15       MR. BROWN:  Okay.
16       (ACC 30(b)(6)-8 and 9 marked
17  for identification at this time.)
18  BY MR. BROWN:
19       Q.   All right.  Mr. Lockwood,
20  you have before you two documents, ACC-8
21  and ACC-9.  Let's start with 8.
22       A.   I have it.
23       Q.   Have you ever seen that
24  document before?

Page 177

1       A.   Yes.
2       Q.   What is it?
3       A.   It is a complaint by The
4  Scotts Company attempting to initiate an
5  adversary proceeding in the Grace
6  bankruptcy case against various insurers
7  and Grace.
8       Q.   Okay.  And is the relief
9  that is sought by Scotts in this
10  adversary complaint as against the
11  insurers that are defendants, who are
12  also settled asbestos insurance
13  companies, enjoined in its totality?
14       A.   As of right now or under the
15  Plan?
16       Q.   Under the Plan.
17       A.   I want to say yes to that,
18  but I would have to say this:  I believe
19  that Scotts is asserting claims in this
20  action as asserted additional insured
21  under vendor coverage in W.R. Grace
22  insurance policies, point one.
23       I believe the basis is suits
24  against Scotts for Scotts' liability for

Page 194

1    BNSF, for example, purports to
2    have, at least in one instance, I
3    think it's Royal, claims issued
4    directly to it by Royal that were
5    somehow procured by Grace but
6    which don't cover Grace.  I don't
7    believe that this injunction would
8    preclude suits by BNSF on that
9    sort of insurance claim.
10   BY MR. BROWN:
11       Q.    Would the prior injunction
12   enjoin that type of claim?
13       A.    The asbestos personal
14   injury?
15       Q.    Yes.
16       A.    No, because those policies
17   are not within the definition -- they are
18   not covered in Exhibit-5, and so Royal
19   wouldn't be an asbestos-protected party
20   with respect to those policies.
21       We are now talking about
22   non-settled coverage here, aren't we?
23   Wasn't that what your question was?
24       Q.    I don't know.  This was your

Page 195

1    hypothetical.
2        A.    You asked me were the claims
3    as additional insureds of BNSF and Scotts
4    covered by this injunction, and I am
5    trying to tell you it depends on what
6    kind of claims against whom.
7        I mean, it's got -- first,
8    unlike the 524(g) injunction, which
9    applies only to protected parties, this
10   applies to people with settled coverage,
11   unsettled coverage, reimbursement
12   coverage, as long as it's coverage that's
13   being transferred to the Trust.  If it's
14   coverage that's not being transferred to
15   the Trust, then there is no effort to
16   protect it.
17       Q.    Okay.
18       A.    The complexity of your
19   question arises out of the fact that you
20   could have coverage that's being
21   transferred to the Trust, which somebody
22   nevertheless claims to be an additional
23   insured on, such as Scotts under a vendor
24   endorsement.  And there, I think this

Page 196

1    injunction probably does preclude Scotts
2    from seeking that coverage, although I
3    really have to think about that.
4        I don't know.  I have to
5    confess that I haven't really -- I would
6    really have to parse this to make sure
7    whether -- if you are talking about
8    unsettled coverage, not settled coverage,
9    but unsettled coverage.  And I am not
10   sure Scotts -- so if it's unsettled,
11   then, by definition, it hasn't been
12   indemnified by Grace.  So the claims
13   don't go to the Trust on that basis.
14       I guess I have to just say I
15   think it may very well be enjoined by
16   this, but, really, to be more confident
17   about that, I would really have to spend
18   more time parsing this and thinking about
19   it.
20       Q.    Okay.
21       A.    I think it would be
22   channelled -- not channelled but
23   enjoined.
24       Q.    I am going to move at this

Page 197

1    point from the Plan to another document,
2    so why don't we take a quick break.
3        A.    Okay.
4        (There was a break from 2:10
5    p.m. to 2:22 p.m.)
6    BY MR. BROWN:
7        Q.    Mr. Lockwood, can you take a
8    look at Exhibit-2.  That's Exhibit-2 to
9    the Plan, which we are going to mark as
10   ACC1-10.
11       (ACC 30(b)(6)-10 marked for
12   identification at this time.)
13   BY MR. BROWN:
14       Q.    Can you identify it?
15       A.    ACC Exhibit-10 is the
16   Asbestos PI Trust Agreement, which is
17   attached as Exhibit-2, to the February
18   27, 2009 Plan reorganization of W.R.
19   Grace.
20       Q.    Can I direct your attention
21   to Section 2.2 entitled General
22   Administration and specifically
23   subsection (e).
24       A.    Yes.

Page 198

1    Q.    There is a reference in
2  subsection (e) to the TAC, T-A-C, which
3  is the Trust Advisory Committee, correct?
4    A.    Correct.
5    Q.    And the Futures
6  Representative, which is the Asbestos PI
7  Futures Representative, correct?
8    A.    Correct.
9    Q.    And earlier today, we went
10 through a list of the individuals who are
11 on the TAC, and you mentioned Russell
12 Budd, John Cooney, Joe Rice, and Perry
13 Weitz.
14    A.    Correct.
15    Q.    Am I correct that each of
16 those gentlemen or their respective firms
17 represent asbestos claimants with claims
18 against Grace?
19    A.    Correct.
20    Q.    Can you give me some idea of
21 how many claims Mr. Budd's firm has
22 against Grace?
23       MR. FINCH:  Objection, lack
24 of foundation.

Page 199

1       THE WITNESS:  No, except
2  that it's -- I think we
3  established when we were doing
4  request for admission or something
5  to somebody that all four of
6  those, each one of those firms
7  represents at least 1,000
8  claimants against Grace.
9  BY MR. BROWN:
10    Q.    We did.
11    A.    What I don't know is how
12 many more than a thousand any of them may
13 represent.
14    Q.    Okay.
15    A.    The proofs of claim are on
16 file.  Somebody could go and ascertain
17 that, if it mattered.
18    Q.    Okay.  Do you know how many
19 -- the firms that those four TAC members
20 are members of collectively how many they
21 have?  In other words, if you took the
22 four firms, do you have an idea or
23 estimate as to the number of claims that
24 they have against Grace?

Page 200

1       MR. FINCH:  Objection,
2  foundation.
3       THE WITNESS:  Only in the
4  sort of vaguest and most general
5  terms.  Well, I am sure it's more
6  than 10,000.  Again, it could be
7  20,000; it could be 30,000.  I
8  just don't know.
9       Those firms -- with the
10 exception of Mr. Cooney's firm,
11 those firms represent a lot of
12 people.  And in the case of
13 Mr. Rice, he has co-counsel
14 relationships, his firm does, with
15 a lot of other firms.  So it gets
16 into the question of, quote, what
17 do you mean by representation,
18 sole representation, joint
19 representation.  But, suffice it
20 to say, they represent a lot of
21 claimants.
22 BY MR. BROWN:
23    Q.    Okay.  And in their capacity
24 as counsel for those claimants, they have

Page 201

1  fiduciary duties to their clients,
2  correct?
3    A.    However those are
4  established by the local bars, et cetera,
5  before which they practice, yes,
6  generally.
7    Q.    And they get paid to
8  represent those clients, correct?
9    A.    Generally speaking, I assume
10 that's correct.
11    Q.    And is it your understanding
12 that, generally speaking, that's through
13 a contingency arrangement?
14    A.    Again, generally speaking,
15 correct.
16    Q.    And is it your understanding
17 that the contingent fee that is typically
18 charged by those firms is somewhere
19 between 33 and a third and 40 percent of
20 the recovery?
21       MR. FINCH:  Objection, lack
22 of foundation, calls for
23 speculation.
24       THE WITNESS:  I really don't

Page 202

1    have firsthand knowledge of that.
2  BY MR. BROWN:
3       Q.   Okay.  Well, if it's a
4  contingent fee arrangement and there is
5  no recovery, there is no payment to the
6  firm, generally speaking, correct?
7       A.   Except for reimbursed
8  expenses in those states that permit you
9  to advance expenses and require that you
10 seek recovery from your client under
11 their ethical rules, but yes.
12      Q.   So is it fair to say that
13 Mr. Budd, Mr. Cooney, Mr. Weitz, and
14 Mr. Rice are motivated by their fiduciary
15 obligations and their own personal gain
16 to obtain a recovery on behalf of their
17 clients against the Asbestos PI Trust?
18      A.   When they are acting as
19 counsel for their individual clients,
20 yes.
21      Q.   Okay.  How about when they
22 are acting as TAC members?
23      A.   When they are acting as TAC
24 members, they have a fiduciary

Page 203

1  obligation, as they do as ACC members, to
2  look out for the interests of the
3  constituency they represent as a whole.
4       Q.   Okay.  And the fiduciary
5  duties that they owe to their clients, on
6  the one hand, and to all beneficiaries of
7  the Asbestos PI Trust, on the other hand,
8  are they the same?
9       A.   I don't know how to answer
10 that question.
11      Q.   Let me --
12      A.   Because they are acting in
13 different capacities.  So when you say
14 are they the same, do you mean do they
15 come from the same source?  I can't
16 answer that.
17      Q.   Are the fiduciary duties
18 that they have to their clients, on the
19 one hand, and to all claimants against
20 the Asbestos PI Trust in conflict with
21 one another at any level?
22      A.   As a general proposition, I
23 don't think so, because when they process
24 individual claims against the Trust, they

Page 204

1  are not acting as TAC members.  And when
2  they are acting as TAC members, they are
3  not involved in processing individual
4  claims or evaluating individual claims or
5  having anything to do with individual
6  claims any more than they are as ACC
7  members with respect to individual claims
8  and their clients in the bankruptcy case.
9       Q.   Well, if you look at (e),
10 the section that I referred you to at the
11 outset, it says that the TAC members
12 should consult with the trustees on
13 matters of general implementation and
14 administration of the PI Trust.
15           MR. FINCH:  Object to form.
16      The document doesn't say that.
17 BY MR. BROWN:
18      Q.   All right.  Mr. Lockwood,
19 just take a look at Section 8, if you
20 would.
21      A.   It says, "The Trustees shall
22 consult with the TAC and the Futures
23 Representative on the general
24 implementation and administration of the

Page 205

1  PI Trust."
2       Q.   Okay.  What's covered by
3  Romanette (i), would that involve how the
4  Trust should deal with meritless claims?
5       A.   That question is hard to
6  answer in the sense that I am not sure
7  what you mean by meritless claims.  I
8  mean, the TDPs identify what claims are
9  eligible for compensation and what
10 aren't.
11           If you are of the personal
12 opinion that certain categories of claims
13 under the TDP, under the criteria are,
14 quote, meritless, close quote, well, the
15 TAC and the Futures Rep take the TDP as
16 it finds it.
17           So they don't have a
18 fiduciary obligation to render personal
19 opinions about the TDP criteria as it
20 applies to individual clients or
21 individual claims.
22           That said, at some level, I
23 suppose they have a generalized -- if the
24 trustees raise with them the question, on

Page 206

1  some generalized basis, whether there is
2  some large category of claims that are,
3  quote, meritless that are not otherwise
4  prescribed by the Trust, I could
5  hypothesize the situation where they
6  might be consulted on that subject.
7      Q.    Okay.  And that would be
8  true even if their firm was the firm that
9  submitted those claims, correct?
10     A.    Well, if their firm was the
11 firm that submitted their claims, I would
12 assume that they would recuse themselves,
13 just like any organization, if there was
14 a specific conflict of interest on a
15 subject like that, the party involved
16 would recuse themselves.
17     Q.    Is there anything in the
18 Trust Agreement or the TDP that requires
19 them to recuse themselves?
20     A.    No, but there is nothing in
21 the TDP that requires them to act in any
22 way different from any set of fiduciaries
23 that are they are confronted in a
24 particular factual context, some conflict

Page 207

1  of interest between their personal
2  interests and their interest of the
3  entity that they are involved with.
4      Q.    Well, to the extent that
5  their fiduciary duties to their clients
6  in any particular case are in conflict
7  with their fiduciary duties to all
8  beneficiaries of the Asbestos PI Trust,
9  are they required to step aside from the
10 decision-making?
11         MR. FINCH:  Objection, form.
12         THE WITNESS:  Yeah, I
13         mean -- if you take the position
14         that prosecuting an individual
15         claim is a conflict with the
16         interest of the Trust as a whole
17         because if the claim is
18         successful, it will reduce the
19         amount in the Trust that would be
20         available to other people; if the
21         claim were unsuccessful, then no,
22         they don't have an obligation not
23         to prosecute individual claims.
24         It's well understood that

Page 208

1  the whole function of the TAC is
2  to represent the interest of
3  people with individual claims,
4  albeit on a collective basis.
5      If you are saying the
6  hypothetical you gave earlier that
7  if there was some -- the trustees
8  were proposing a change that
9  somehow or another focused on the
10 individual claims of a particular
11 firm as opposed to categories of
12 claims that virtually all lawyers,
13 asbestos lawyers represented, then
14 you might have a recusal issue.
15     And/or the trustees might be
16 motivated to discount the advice
17 they were getting.  Because this
18 is a consultation provision.  It
19 doesn't say the trustees having
20 consulted with the TAC; all of a
21 sudden have to agree with whatever
22 the TAC tells them.  It just says
23 they have to consult with them.
24 BY MR. BROWN:

Page 209

1      Q.    What about the next
2  subsection, which is (f), which sets
3  forth a whole series of items on which
4  the trustees must obtain the consent of
5  the TAC and the Futures Representative?
6      A.    Subject to certain other
7  provisions that apply if the TAC and the
8  FCR don't give their consent, yes.  What
9  do you mean what about it?  There are --
10 it exists in the TDP, in the Trust
11 Agreement.  And there are specified
12 things that they have to obtain consent
13 from the TAC on and the FCR, and if they
14 don't get the consent, they can get them
15 overruled by the judge.
16     Q.    Let me ask you a more
17 general question.  What is the need to
18 have the TAC?
19     A.    The TAC goes back -- the
20 concept goes back at least to the
21 Manville TDP.  And the notion was that
22 this was -- this Trust was created --
23 well, let me start out by saying that my
24 partner, Mr. Inselbuch, who you are going

Page 210

1  to take the deposition of on June 12th --
2      Q.   Somebody is.
3      A.   -- is a lot better to
4  equipped to give you the historical
5  overview of these kind of TDP provisions
6  than I am, and anything I say on this
7  subject frankly is subject probably to be
8  corrected by him.
9           But, in general, as I
10 understand the history of the concept,
11 the idea was that this is a settlement
12 between a whole lot of people who are
13 agreeing to have their claims taken away
14 from the Debtor and put in a Trust, and
15 the Trust is going to deal with the
16 claims.
17          And the notion was that --
18 first, it was always a criteria you would
19 not put a asbestos personal injury lawyer
20 or anybody would submit claims in as a
21 trustee.  So the trustee, by definition,
22 therefore, in order to avoid that sort of
23 conflict, were not going to have any real
24 knowledge about asbestos personal injury

Page 211

1  litigation and asbestos personal injury
2  claims.
3           And, as I understand, the
4  notion was that it would be a good idea
5  to do two things:  First, have
6  experienced personal injury lawyers
7  around who could, to the extent needed,
8  educate trustees who come to the job with
9  no real knowledge of how the system works
10 to give them input.  That's the
11 consultation notion.
12          And the same for the FCR,
13 who would be a counterbalance, to some
14 extent, because to the extent that the
15 TAC represents present claimants, it
16 would have, even as a collective group
17 representing present claimants, some kind
18 of incentive to try and get more money
19 out sooner than might be in the
20 beneficial interests of the future
21 claimant.  So you have the Future
22 Claimants' Representative who has got
23 coequal status in the TAC in advising the
24 trustees.

Page 212

1           With respect to the consent
2  process, the notion was we made a deal in
3  the bankruptcy case.  That deal was
4  embodied in the Trust Agreement and the
5  TDP.  If people are going to start
6  changing that deal after the fact, then
7  representatives who knew and were
8  involved with making the original deal
9  ought to at least presumptively have some
10 voice in whether or not it's okay to
11 change it.
12          However, there is the safety
13 valve on that, which is if the TAC, for
14 example, decides that they want to
15 resist -- let's assume you needed to
16 change the payment -- lower the payment
17 percentage because you thought there was
18 going to be more future claims coming in
19 than had been predicted.
20          Well, the TAC might have an
21 institutional interest in keeping the
22 payment percentage high, and the Futures
23 Rep might want to see it lowered and the
24 trustees might want to see it lowered.

Page 213

1  So how do you deal with that?
2           Well, the TAC is supposed to
3  be representing the present claimants.
4  That's where their fiduciary is.  So if
5  they don't consent, you go to the judge,
6  and you say, judge, "The TAC is being
7  unreasonable here."  And that's how you
8  resolve it.  So, in an overview sense,
9  that's the concept behind it.
10      Q.   Okay.  The statute 524(g)
11 does not require a TAC in connection with
12 an asbestos Trust, does it?
13      A.   It doesn't require a TAC,
14 and it doesn't require a Futures Rep.
15 But the legislative history says it was a
16 modeled on Manville and Manville has had
17 an SEB on the Futures Representative,
18 vis-a-vie the Trust, at least since the
19 Trust was reorganized in the mid-1990s or
20 early 1990s.  Again, Inselbuch can tell
21 you more about that because he was there.
22      Q.   The TAC, if I understand the
23 Trust Agreement, has fiduciary duties to
24 indirect PI Trust claimants as well,

Page 214

1  correct?
2      A.    As a general proposition,
3  that's true.
4      Q.    Now --
5      A.    But I will say -- it's a
6  little tricky because it's clear that the
7  vast bulk of the claimants whose claims
8  were being channelled to the Trust are
9  direct claimants.  And, moreover, the
10  individual -- the indirect claimants
11  generally tend to be entities that have
12  the financial and legal wherewithal to
13  look at their own interests.
14      So my own personal
15  perspective on it, while you can make a
16  general statement on the fiduciary
17  obligation, the major focus of the TAC
18  and the FCR is direct claimants, not
19  indirect claimants.
20      Q.    To the extent that the TAC
21  acts in a manner that the indirect
22  asbestos PI claimants feel is in their
23  interest, is the TAC insulated from any
24  liability to indirect asbestos PI

Page 215

1  claimants?
2      A.    Could you reread that
3  question, please?
4      (The reporter read from the
5  record as requested.)
6      THE WITNESS:  Aren't you
7  missing a "not" in that question?
8  BY MR. BROWN:
9      Q.    Against their interest is
10  what I meant.
11      A.    There is, I think, in here
12  some kind of a -- I don't know what you
13  call it -- exculpation provision or
14  something.  But it doesn't cover bad
15  faith.
16      So the answer is we would
17  have to look at the document to determine
18  exactly what potential liability the TAC
19  has.
20      And, moreover, given the
21  TAC's role, which is it doesn't have the
22  unilateral power to make any decisions.
23  The trustees make the decision, and the
24  TAC consults or consents.  It's a little

Page 216

1  hard to hypothesize the claim that you
2  talk about.
3      But, in any event, I am
4  looking for the -- I am pretty sure there
5  is a Trust Agreement provision here
6  somewhere that addresses -- Section 4.6.
7  Essentially, it provides for indemnity
8  and exculpation to the extent that that's
9  permitted by a statutory trust law, Trust
10  organized under the laws of Delaware.  So
11  whatever the laws of Delaware permit you
12  to indemnify fiduciaries for is what's
13  provided.
14      And that's obviously both
15  fact-specific and depends.  And I don't
16  know what Delaware law does or doesn't
17  provide on hypothetical fact
18  circumstances.
19      Q.    Let's go to page 13 on my
20  draft.
21      A.    Of the Trust Agreement?
22      Q.    Yes.
23      A.    I am there.  What Section is
24  this, just to make sure we have the same

Page 217

1  pagination?
2      Q.    It's under the Consent
3  provision.  It's (f), Romanette (xiv).
4      A.    I see it.
5      Q.    I am not sure I understand
6  this, the latter part of this, and I want
7  to ask you what it means.
8      Do you see where it says,
9  "...or to comply with an applicable
10  obligation under an insurance policy or
11  settlement agreement pursuant to Section
12  [6.5] of the TDP"?
13      A.    Yes.
14      Q.    Does this mean that the
15  trustees need the consent of the TAC in
16  order to comply with obligations under
17  insurance agreements, insurance policies?
18      A.    Well, first, since it
19  incorporates Section 6.5 of the TDP, you
20  have to look to see what that is, because
21  it certainly -- if there is any
22  limitations on their ability to comply
23  with obligations under transfer insurance
24  rights, it's got to be spelled out in

Page 218

1    6.5.  There is no other limitation
2    expressed in that paragraph.
3           6.5 deals with the
4    confidentiality of claimants'
5    submissions.  In general, it takes the
6    position that claimants' submissions to
7    the Trust are made in the course of
8    settlement negotiations and, therefore,
9    would be treated as confidential.  To the
10   extent state law provides a privilege,
11   the privilege is not going to be
12   eliminated.
13          There is then a provision --
14   there is a provision about subpoenas
15   getting information.  And then there is
16   the sentence, "Notwithstanding anything
17   in the foregoing to the contrary, with
18   the consent of the TAC and the Futures
19   Representative, the PI Trust may, in
20   specified limited circumstances, disclose
21   information, documents or other materials
22   reasonably necessary in the PI Trust's
23   judgment to preserve, litigate, resolve
24   or settle coverage, or to comply with any

Page 219

1    applicable obligation under an insurance
2    policy or settlement agreement within the
3    Asbestos Insurance Policies or the
4    Asbestos Insurance Settlement Agreements;
5    provided...," and then it takes steps
6    reasonably feasible in its judgment to
7    preserve the further confidentiality of
8    such documents, et cetera.
9           That's the scope of this.
10   It basically has to do with the
11   confidentiality of medical information
12   and personal information that's submitted
13   in claims files.
14       Q.   So if an insurance company
15   wants to see that information because the
16   Trust is seeking recovery under an
17   insurance policy for that claim, the
18   trustees need the consent of the TAC to
19   provide that information to the insurer;
20   is that correct?
21       A.   Voluntarily.  And, again, if
22   the TAC were to refuse to consent to it,
23   there is dispute resolution provisions.
24   The Trust could go to the bankruptcy

Page 220

1    court, and indeed there have been some
2    instances in which there has been
3    litigation, existing trusts by the Trust,
4    trying to get the court to determine that
5    certain claims information has to be
6    turned over to certain insurers in
7    connection with settlement agreements,
8    for example.
9           And in some instances, the
10   Trust has issued orders saying that
11   effect.  So this is not an absolute veto
12   power on the part of the TAC.
13          But, as I say, the
14   plaintiffs bar and their clients have a
15   general feeling that their personal
16   medical information shouldn't be
17   indiscriminately disseminated to anybody
18   who says they have a desire to do so --
19   excuse me -- to use it for whatever
20   purposes they may wish to use it.
21       Q.   I want to turn your
22   attention now to Section 5.5.
23       A.   Of the Trust Agreement?
24       Q.   Yes.

Page 221

1        A.   Okay.
2        Q.   Now, there is a provision,
3    as I understand it, under the TDP
4    pursuant to which an asbestos PI claim
5    can resort to the tort system after going
6    through a bunch of hoops; is that
7    correct?
8        A.   Correct.
9        Q.   If the asbestos PI claimant
10   elects to do that, then I presume that
11   the Trust will have defense counsel to
12   defend that claim; is that correct?
13       A.   One would assume that would
14   be the case.  It's happened to
15   infrequently in practice that it's hard
16   to know, but I can't imagine that they
17   would defend themselves in court without
18   a lawyer.
19       Q.   Okay.  And would that lawyer
20   be a Trust professional as that term is
21   used in Section 5.5(a)?
22          MR. FINCH:  5.5(a) talks
23   about TAC employment of
24   professionals.

Page 222

1    THE WITNESS:  But it also
2  talks about Trust professionals.
3        You would have to go back
4  and look at the definition of
5  Trust professional.
6        That's an interesting
7  question.  I don't know whether
8  they would be considered to be a
9  Trust professional or not,
10  actually.
11  BY MR. BROWN:
12    Q.   I don't think I can find a
13  definition of Trust professional.
14    A.   It's in Section 4.8(a), the
15  fourth line.  As a general proposition,
16  the Trust professionals are clearly
17  people who represent the Trust in a sort
18  of generalized sense, but it does include
19  counsel.  Whether or not it would include
20  counsel in a particular case -- suffice
21  it to say that if the question is would
22  the TAC and members of the TAC have
23  access to the files of a counsel for the
24  Trust that was the defending case --

Page 223

1    Q.   That's the question.
2    A.   -- brought by the TAC's law
3  firm, the answer is no.
4    Q.   Where does it say that?
5    A.   It doesn't have to say that
6  because the TAC's role is a generic role.
7  It talks about the general administration
8  of the Trust, et cetera.
9        Asking for information about
10  an individual claim that that guy is
11  pursuing in a tort system against the
12  Trust has nothing to do with the general
13  administration of the Trust and would be
14  a blatant exercise in abuse of kind of
15  fiduciary power, and no trustee would
16  accept it.  And I don't believe it would
17  ever cross the mind of any TAC member
18  that they could even try it, much less
19  skied succeed it at it.
20    Q.   But this provision does give
21  them complete access, correct, as
22  written?  It says, "...complete access to
23  all information generated by them or
24  otherwise available to the PI Trust..."

Page 224

1    A.   It says provided -- it says
2  "...complete access to all information
3  generated by them...," and it talks about
4  the TAC as a group.
5        An individual tort claim
6  would not be litigated by the TAC as a
7  group.  At best, it would be litigated by
8  one of the TAC members.  And the TAC
9  members -- I can't imagine the TAC
10  members saying, that as a group, we want
11  to find out how you are defending a
12  particular claim against did Trust so we
13  can give that information to the
14  plaintiff's lawyer that's part of our
15  group so we can help win the case.
16        I mean, it's just a
17  preposterous suggestion, quite frankly.
18  I mean, yeah, you are right, the document
19  doesn't prohibit that particular abuse of
20  fiduciary authority.  But, you know,
21  documents generally don't hypothesize
22  every possible breach of fiduciary duty.
23  You could create a laundry list, 50 pages
24  long, of all of those possible abuses and

Page 225

1  say thou shall not commit each one of
2  them.
3    Q.   Mr. Lockwood, I am correct,
4  am I not, that there was no asbestos
5  insurance entity that was involved in the
6  drafting of the Asbestos PI Agreement?
7    A.   To the best of my knowledge,
8  that's correct.
9    Q.   Let's turn to Plan
10  Exhibit-4.
11    A.   I have it.
12        (Exhibit-11 marked for
13  identification at this time.)
14        THE WITNESS:  Do you want me
15  to identify it?
16        MR. BROWN:  Yes.
17        THE WITNESS:  It's the Grace
18  Trust Distribution Procedures.
19  BY MR. BROWN:
20    Q.   Okay.  Now, no asbestos
21  insurance entity was invited to
22  participate in the drafting of the TDP,
23  correct?
24    A.   To the best of my knowledge,

Page 226

1    that's correct.
2        Q.   And no asbestos insurance
3    entity was consulted about the terms of
4    it, correct?
5        MS. HARDING:  Object to
6    form.
7        MR. FINCH:  Object to form.
8        THE WITNESS:  At one level,
9    that's certainly true.  I mean, I
10   will say that, in fact, I believe
11   that there were -- because of the
12   process that we went through of
13   filing successive draft versions
14   of this, in effect, the insurer
15   saw earlier versions of the TDP,
16   indeed, I think have objected to
17   various provisions in them.  And
18   those objections could be reviewed
19   as commenting on them.  And then
20   there were filed amended versions
21   of them.
22       So to that extent, I guess,
23   they did have an opportunity to,
24   quote, comment on them, close

Page 227

1    quote.  But other than through the
2    process that I have just
3    described, no.
4    BY MR. BROWN:
5        Q.   Okay.  The question was
6    whether they were consulted concerning
7    them.
8        A.   Well, I understand that, and
9    sending you a -- serving a copy on you
10   and having you make an objection or file
11   some comment or argument in court could
12   be viewed at some level as consulting.
13       But, as I said, we didn't do
14   it other than in the manner that I just
15   described.  If you don't think that's
16   consulting, that's fine.
17       Q.   And no asbestos insurance
18   entity consented in writing or orally to
19   the terms of the TDP, correct?
20       MS. HARDING:  Object to
21   form.
22       MR. FINCH:  Object to form.
23       THE WITNESS:  Except for
24   Equitas and KWELM in the manner

Page 228

1    that I described earlier in my
2    deposition.  That's as far as I
3    know, correct.
4    BY MR. BROWN:
5        Q.   Okay.  Did any asbestos
6    insurance entity play any role in the
7    establishment of a medical criteria in
8    the TDP?
9        MS. HARDING:  Object to the
10   form.
11       THE WITNESS:  Not to my
12   knowledge.
13   BY MR. BROWN:
14       Q.   How about the exposure
15   criteria?
16       A.   Same answer.
17       Q.   How about the claims
18   resolution process?
19       A.   Same answer.
20       Q.   How about any other term in
21   the TDP?
22       MR. FINCH:  Object to form,
23   overly broad.
24       THE WITNESS:  Again, the

Page 229

1    only role that was played was --
2    well, let me back up a second.
3    This TDP is in most particulars
4    similar, if not identical, to TDPs
5    that have been adopted in prior
6    asbestos bankruptcy cases.
7        In many of those cases, the
8    same insurers have objected to the
9    same provisions of the TDPs that
10   they object to now.  And in some
11   cases, over time the TDPs have
12   actually been modified and,
13   indeed, in some cases, some of the
14   provisions that we talked about,
15   like the one relating to providing
16   access for insurance coverage, I
17   believe was put into a TDP along
18   the way, not this one for the
19   first time, but some earlier TDP,
20   because it became apparent that
21   that was going to be needed to
22   deal with insurance problems.
23       And to that extent, the
24   insurers, as a result of this

Page 230

1    cumulative iteration process, have
2    had that sort of a role.
3    Obviously, that's not the kind of
4    role you have in mind.  The kind
5    of role you have in mind is coming
6    to you and saying we want to
7    negotiate about it, we want to get
8    your agreement to it, we want to
9    get your approval of it.  And that
10   sort of a role, to my knowledge,
11   you didn't have on this TDP.
12   BY MR. BROWN:
13   Q.    All right.  Under this TDP,
14   is there any role for any asbestos
15   insurance entity --
16   A.    In --
17   Q.    Well, I hadn't finished.
18   A.    Sorry.
19   Q.    -- in connection with any of
20   the claims resolution processes?
21   A.    Well, you yourself
22   identified one a few questions back,
23   which is if the claimant doesn't settle
24   its claim with the Trust, brings the

Page 231

1    claim against the Trust in the tort
2    system, and the Trust has to defend it.
3    It is certainly within the contemplation
4    of these documents that the Trust could
5    tender that defense in that claim to an
6    insurer.
7    Q.    Okay.
8    A.    And that would be where the
9    Trust -- while it doesn't spell that out
10   in here, that would certainly be a place
11   where an insurer might have an
12   involvement.
13   Beyond that, there is
14   nothing in the Trust that expressly
15   addresses any participation by insurers
16   in the claims resolution process.
17   That said, if some coverage
18   court decides that the insurers have the
19   right to participate in the claims
20   resolution process, the TDP has amendment
21   procedures in it, and the trustees might
22   very well conclude that if the only way
23   they could get access in the future to a
24   lot of valuable assigned insurance rights

Page 232

1    was to allow insurers to handle the
2    claims, they would have to right under
3    this document and the Trust Agreement
4    with the consent of the TAC and the FCR
5    to amend it to give the insurers a right.
6    But, in its present form, there is no
7    express provision involving the insurers
8    in the claims resolution process.
9    Q.    And that's true for the
10   expedited review, individual review, and
11   arbitration, correct?
12   A.    It's certainly true of the
13   expedited review and individual review.
14   It's an interesting question whether or
15   not the Trust could tender a claim for
16   arbitration to an insurer.  I don't know
17   whether there is anything that would
18   prohibit them from doing that.
19   Arbitration is, to some
20   extent, like litigation, and they could
21   certainly tender a claim for an insurer,
22   a litigation claim to an insurer.  They
23   might be able to.  I don't know of
24   anything that would preclude them, I

Page 233

1    guess, from tendering it to an insurer
2    for arbitration.  I don't know.
3    Q.    But the TDP doesn't spell
4    out any role?
5    A.    The TDP doesn't spell it
6    out, no.
7    Q.    Let's go to Section 2.6.
8    A.    Of which document?
9    Q.    Trust Distribution
10   Procedures, ACC-11.
11   A.    Okay.
12   Q.    Now, the first question I
13   have, that refers to indirect PI Trust
14   claims?
15   A.    Correct.
16   Q.    There is in Section 5.12 and
17   5.13 a couple of other terms that are
18   used.  In 5.12, the term "insurer-related
19   TDP claims" is used.
20   A.    Correct.
21   Q.    In 5.13, the term
22   "indemnified insurer TDP claims" is used.
23   And my first question is
24   whether those two terms are included

Page 234

1    within the term "indirect PI Trust
2    claim"?
3        A.    Well, that's, again, almost
4    a metaphysical debate, because --
5    actually, if you really parse the
6    definitions in the Plan, I remember
7    concluding that there was probably a
8    better argument that the claims that are
9    identified in 5.12 and 5.13 were direct
10   PI Trust claims and not indirect PI Trust
11   claims.
12           But we decided, rather than
13   to have to get into parsing things --
14   this is a classic example, these two
15   provisions of how you change TDP
16   provisions when insurers raise objections
17   that you think are meritorious in some
18   way or another.  We decided to just have
19   these specific provisions deal with
20   claims that are being channelled to the
21   Trust, whether they are direct claims or
22   indirect claims, being sort of not a
23   matter of great moment.  They are one or
24   the other or both.  And so they are dealt

Page 235

1    with in these two specific provisions --
2           MR. FINCH:  Which two are
3        you referring to?
4           THE WITNESS:  5.12 and 5.13.
5        -- to make sure that
6        everybody knew exactly how they
7        were going to be dealt with.
8    BY MR. BROWN:
9        Q.    So is your answer that the
10   terms "insurer-related TDP claims" and
11   "indemnified insurer TDP claims" might be
12   direct Trust claims or, on the other
13   hand, might be indirect Trust claims?
14       A.    My own personal opinion is
15   that they are direct PI Trust claims, if
16   you go back to the Plan and look at the
17   definitions.
18       Q.    Is that the ACC's position
19   or your personal position or both?
20       A.    Well, I mean, I am the ACC
21   representative, and I was the one who was
22   most involved in drafting the Plan, so I
23   guess it's the ACC's perspective.
24           I personally don't see

Page 236

1    frankly at the end of the day that it
2    matters whether they are direct or
3    indirect claims, and that's why we didn't
4    attempt to change the definition.
5    Remember, these two provisions are new.
6        Q.    I know.
7        A.    They were drafted long after
8    the definitions of direct and indirect PI
9    Trust claims were put in both the Plan
10   and in this TDP.
11           And so the question is, was
12   there any utility having agreed to put
13   these provisions in to deal with these
14   particular kinds of claims to going back
15   and trying to sort of re-write the
16   definitions of direct claims and indirect
17   claims to put them in one basket or the
18   other, and we couldn't see that it
19   mattered.
20           But if you, through your
21   probing cross-examination, convince me
22   that it does matter, then maybe we will
23   have to go and fix it.
24       Q.    Well, we are using the term

Page 237

1    "direct PI Trust claim," and I am not
2    sure there is such a term.
3        A.    Well, there may not be.  I
4    don't think there is an indirect PI Trust
5    claim, and I don't remember what -- there
6    is some term that we used for the claims
7    that are going in here somewhere, I would
8    assume.
9        Q.    Well, you have asbestos PI
10   claims.
11       A.    Well, maybe that's the term.
12   Yeah, it's asbestos PI claims.
13       Q.    So the ACC --
14       A.    It's on page 1 -- unnumbered
15   page 1, second line.  It says,
16   "...provide for resolving all 'Asbestos
17   PI Claims' as defined in the First
18   Amended Joint Plan of Reorganization," et
19   cetera.
20       Q.    I am sorry.  What document
21   are you in?
22       A.    TDP, page 1, second line on
23   the page.  There is the reference to
24   asbestos PI claims in quotes as defined

Page 238

1  in the First Amended Plan.  That's the
2  generic term.  And indirect PI Trust
3  claim is simply a subset of that.  And I
4  don't think it's an indirect PI Trust
5  claim.  I think it's an asbestos PI claim
6  which, of course, happens to include in
7  its definition indirect PI Trust claims.
8        (There was an interruption
9        at this time.)
10  BY MR. BROWN:
11      Q.   Just to circle out this line
12  of questioning, there is a Section in
13  5.6.
14      A.   Of the TDP?
15      Q.   Of the TDP.
16      A.   That's the section that
17  deals with PI claims.
18      Q.   So based on your answers
19  that you just gave, I presume that the
20  ACC's position is that 5.6 has no
21  application to insurer-related TDP claims
22  or indemnify insurer TDP claims?
23      A.   Correct.
24      MS. HARDING:  I think I

Page 239

1  wanted to object to form before
2  you answered, but that's all
3  right.
4  BY MR. BROWN:
5      Q.   Okay.  Let's go to page --
6      MS. HARDING:  Could you
7  repeat the question, please?
8        (The reporter read from the
9        record as requested.)
10      MS. HARDING:  Object to
11  form.  I think it's very
12  confusing.
13      THE WITNESS:  To make it
14  clear, the way in which the term
15  of the so-called insurance related
16  TDP claims are treated under the
17  TDP is set forth in Section 5.12
18  of the TDP and not in Section 5.6
19  of the TDP.
20        Similarly, the way in which
21  indemnified insurer TDP claims is
22  defined in the TDP, are treated
23  under the TDP is contained in
24  Section 5.13 of the TDP and not in

Page 240

1      Section 5.6 of the TDP.
2  BY MR. BROWN:
3      Q.   If I can direct your
4  attention now to Section 4.3 of the TDP.
5      A.   I have it.
6      Q.   Let's see.  The third full
7  paragraph begins "There is uncertainty."
8  I direct your attention to the second
9  sentence there.
10      A.   Yes.
11      Q.   If federal or state law were
12  to impose greater restrictions or limits
13  on the asbestos PI claimants to recover
14  in the tort system, is there a mechanism
15  under the Trust Agreement or the Trust
16  Distribution Procedures to incorporate
17  such restrictions or limits into the TDP?
18      A.   Yes, you could amend them.
19      Q.   Okay.  And does that
20  amendment require the consent of the
21  Trust Advisory Committee?
22      A.   Subject to the ability to go
23  to court if the trustees disagree with
24  the TAC's refusal to give such consent,

Page 241

1  yes.
2      Q.   Okay.
3      A.   I would also observe,
4  however, that to some extent, changes in
5  federal or state law could show up
6  without amendments to the TDP.  Because
7  in individual review, arbitration and
8  claims that go through to the tort
9  system, the trustees can apply applicable
10  state or federal law principles that
11  govern those claims.
12        The only claims for which
13  there are specified criteria, which might
14  or might not -- strike -- which might
15  become superseded at some level by some
16  hypothetical state or federal law would
17  be the expedited review provisions.  They
18  are the ones that are written down.
19        Everything else is you have
20  a claim, to the extent that you have a
21  valid claim under state law for
22  individual review, arbitration, and the
23  tort system.
24        So to the extent that you

Page 242

1  had such changes, they began to show up
2  in the results of individual review,
3  arbitration, or litigation in the tort
4  system, that could affect the totality of
5  the PI Trust claims to be paid over time,
6  which is what this sentence is talking
7  about.
8      Q.   All right.  If you look at
9  Section 5.3(a)(3), specifically the
10 sentence that begins "thereafter."
11      MR. FINCH:  What page are
12 you on, Mike?
13      MR. BROWN:  Mine is page 23.
14      THE WITNESS:  23.  I see it.
15 BY MR. BROWN:
16      Q.   Okay.  Now, there are some
17 limitations imposed by Section 524(g) and
18 by the Trust Agreement on the types of
19 changes that can be made under the TDP.
20      Is that a fair statement?
21      MR. FINCH:  Object to form.
22      THE WITNESS:  I am not sure,
23 actually.  What sort of
24 limitations do you have in mind?

Page 243

1  BY MR. BROWN:
2      Q.   Looking at the sentence that
3  I just directed you to, are there any
4  restrictions placed on the trustee in
5  terms of how they can change any of these
6  items, the disease levels, the scheduled
7  values, the medical or exposure criteria,
8  et cetera?
9      A.   Well, first, they have
10 fiduciary obligations to the
11 beneficiaries of the Trust which would
12 preclude them from making arbitrary
13 decisions that work to the detriment of
14 claimants.  So they have that sort of
15 restriction, but that's sort of general.
16      They have a restriction of
17 sorts in the need to go through the
18 consent process.  But at the end of the
19 day, they could do it, as I said earlier,
20 if a judge thought that either the FCR or
21 the TAC or both were being unreasonable.
22      I suppose, to go back to
23 your earlier question, that one could
24 hypothesize -- at some level, the

Page 244

1  trustees are obligated to make sure that
2  the Trust continues to comply with
3  524(g).  There is no question about that.
4  It's just hard to know what sort of
5  changes you could imagine that would be
6  consistent with their fiduciary duties to
7  the claimants that would jeopardize that.
8  So, yeah, it's a restriction, I guess,
9  but how it would actually ever come into
10 play, I don't know.
11      Q.   There is a reference on page
12 28 to foreign claims.
13      A.   Yes.
14      Q.   Which does not include
15 claims in U.S. jurisdictions or Canada.
16      A.   Correct.
17      Q.   Are there other claims
18 pending out there in other jurisdictions
19 right now?
20      A.   Against Grace?
21      Q.   Yes.
22      A.   I am not personally aware of
23 any such claims, but there have been
24 claims brought against other trusts by

Page 245

1  non-residents of the United States and
2  Canada.  So, therefore, since it's
3  possible, you put in a provision that
4  deals with the possibility that it might
5  occur in this case.
6      I mean, this is sort of a
7  standard provision nowadays in these
8  trusts.  I don't think it's responsive to
9  anything particular in the Grace case.
10 But, as I say, I just don't remember any
11 such claims.
12      Q.   All right.  Can you turn to
13 page 31?
14      A.   I am there.
15      Q.   The paragraph that begins,
16 "with respect"?
17      A.   Yes.
18      Q.   About halfway down the
19 sentence that begins "The choice of law
20 provision..."?
21      A.   Yes.
22      Q.   What is the purpose of this
23 provision?
24      A.   Let me refresh my memory on

Page 246

1   this.  Well, the first sentence has to be
2   taken into context with the second.
3       Q.   Okay.
4       A.   The first sentence was put
5   in because there is a prohibition on the
6   payment of punitive damages.  At some
7   point along the way, through an objection
8   to one of the prior plans, it was brought
9   to the attention of the ACCs that in
10  Alabama, the only way you could assert a
11  wrongful death claim is to call it a
12  punitive damage claim, even though you
13  were getting compensatory damages under
14  the wrongful death statute.  And that was
15  felt to be basically unfair to Alabama
16  wrongful death claimants.
17      But, on the other hand, you
18  didn't simply want to eliminate the
19  prohibition on real punitive damages in
20  Alabama.  So what you did was you said we
21  will apply a different jurisdiction; we
22  will apply Pennsylvania, which is where
23  the court was sitting in that Plan in
24  which this Plan was copied, which makes a

Page 247

1   distinction between wrongful death claims
2   and punitive damage claims.
3       So if an Alabama claim comes
4   in, you look to Pennsylvania law to see
5   whether it would be treated as a punitive
6   damages claim or a wrongful death
7   compensatory damages claim.
8       The second sentence has to
9   do with let's assume an Alabama claimant
10  brings a claim in Texas and the Texas
11  court was going to apply Alabama law, you
12  would want to have the same provision
13  apply to that choice of law claim as
14  applied if the claim had been brought in
15  Alabama in the first place.  And I think
16  that kicks you back up to -- and there
17  was also the notion that with respect
18  to -- this was put in with respect to
19  insurers who were taking the position
20  that it was arbitrary to sort to
21  reclassify Alabama punitive damages
22  claims as something else.
23      So it basically says this
24  reclassification only applies to the

Page 248

1   Trust, and if the Trust presents some
2   Alabama claim, decided under Pennsylvania
3   law to be not a punitive damages claim to
4   an insurer for reimbursement and the
5   insurer says this is a punitive damage
6   claim, I am not going to pay it because
7   my policy doesn't cover punitive damage
8   claims, then what this does is preserve
9   that argument in a form of insurance
10  neutrality, if you will, to that
11  insurance company because it says that
12  this provision is binding only on the
13  Trust and the claimants.  It's not
14  binding on the insurance company.
15      Q.   Okay.  That was a fair
16  explanation.
17      I am going to skip over 5.6
18  because we have been there.
19      Okay.  Let me direct your
20  attention to Section 5.7(b)(3),
21  specifically the last full paragraph and
22  the last sentence of that paragraph.
23      A.   Yes.
24      Q.   What's the purpose of that

Page 249

1   provision?
2       A.   As I understand it, that
3   provision is intended to deal with the
4   following situation:  A plaintiff in the
5   court system isn't suing the Trust
6   because the Trust has a channelling
7   injunction to go through a proof of claim
8   process.  Similarly, a claimant making a
9   proof of claim against another bankruptcy
10  trust under the TDPs for those trusts is
11  only generally required to produce
12  evidence of exposure to the product of
13  the Debtor, whose liability is that
14  bankruptcy trust has assumed.
15      As a result, plaintiffs
16  would not normally identify Grace
17  products as among the asbestos-containing
18  products to which they were exposed and a
19  suit against other defendants or in a
20  claim against another bankruptcy trust.
21      And what this says is the
22  Trust can't say, well, gee, you sued
23  Owens Illinois and you said you were
24  exposed to Owens Illinois products, but

Page 250

1  nothing in your complaint says you were
2  exposed to Grace products, so I am going
3  to treat the absence of an allegation of
4  exposure to Grace products in the Owens
5  Illinois suit as an omission that you
6  weren't exposed to Grace products.
7  Having said that, you still have to prove
8  that you were exposed to Grace products
9  to get money out of this Trust.
10      Q.   And how do you do that?
11  Let's assume for the moment that the
12  theoretical plaintiff we are talking
13  about in the tort case was asked in a
14  deposition, tell me all the products that
15  you were exposed to that contained
16  asbestos and he went through a list of
17  all the products of all the defendants in
18  that case but didn't mention any products
19  from Grace.
20      He still gets to come in and
21  make a claim against the Grace Trust,
22  correct?
23      A.   Let me put it to you this
24  way:  Anybody can commit fraud.  If a

Page 251

1  plaintiff files under oath statements
2  that this is 100 percent guaranteed the
3  only products, asbestos-containing
4  products, that I was ever exposed to and
5  then turns around without any new or
6  additional discovered evidence or
7  anything else and basically lies in the
8  declaration of -- the various evidentiary
9  materials that he produces in support of
10  his proof of claim, then that plaintiff
11  could probably get away with defrauding
12  this Trust, just like plaintiffs can get
13  away with lying whether they got exposed
14  to Owens Illinois products in the suit
15  against Owens Illinois.
16      So, yes, there is nothing
17  much you can do to write in a document
18  that says thou shall not commit fraud and
19  get away with it.
20      Q.   All right.  Let's go to
21  Section 5.8, Claims Audit Program.
22      A.   Yes.
23      Q.   I want to direct your
24  attention to the first paragraph, last

Page 252

1  sentence, "In the event that PI Trust
2  reasonably determines that any individual
3  or entity has engaged in a pattern or
4  practice providing unreliable medical
5  evidence to the PI Trust, it may decline
6  to accept additional evidence from such
7  provider in the future."
8      It's not required to; it
9  may, correct?
10      A.   Yes.
11      Q.   Okay.  What role, if any,
12  does the TAC play in deciding whether the
13  PI Trust will accept additional evidence
14  from that provider in the future?
15      A.   I don't know that there is
16  anything specific in the TDP that tells
17  you the answer to that.
18      I believe in practice, the
19  trustees would probably consult the TAC
20  to get the TAC's views on the subject,
21  which they might or might not accept,
22  depending on what the views were.
23  Certainly, a number of trusts have
24  refused to take B reads from some or all

Page 253

1  of the so-called Judge Jack doctors.
2      Q.   I was going to call this the
3  Judge Jack provision.
4      Does an individual TAC
5  member have a role in that decision even
6  if the medical provider was for one of
7  that TAC member's clients?
8      MR. FINCH:  Object to form.
9      THE WITNESS:  Well, again,
10  the TAC doesn't have any role in
11  the decision other than
12  consultation.  I suppose
13  theoretically a TAC member could
14  express his views on whether or
15  not a particular medical provider
16  that had done work for him or his
17  clients was a sufficiently bad
18  actor to be disqualified.  The
19  trustees, however, are the ones
20  that are going to make that
21  decision, not the TAC member.
22      MR. BROWN:  I am going to
23  suggest a short break because I
24  think I am getting close to the

Page 258

1    the indemnity covers that claim,
2    which, if it does and you can't
3    get it back from the plaintiff,
4    then it would be channelled to the
5    Trust, I guess.
6 BY MR. BROWN:
7        Q.   And subject to the payment
8 percentage?
9        A.   And subject to the payment
10 percentage.
11       Q.   Okay.  Let me direct your
12 attention again to 6.4, which is entitled
13 Filing Requirements and Fees.
14       A.   Yes.
15       Q.   It says, "The trustees shall
16 have the discretion to determine, with
17 the consent of the TAC and Futures
18 Representative, (a) whether a claimant
19 must have previously filed an
20 asbestos-related personal injury claim in
21 the tort system to be eligible to file
22 the claim with the PI Trust..."
23            What exactly does that mean?
24       A.   That is a provision that it

Page 259

1    was put in as a precautionary mechanism
2    to deal with the possibility that the
3    trustees could conclude that a large
4    number of plaintiffs lawyers were only
5    filing claims against bankruptcy trusts,
6    that were not filing the claims against
7    solvent defendants in the tort system.
8            And the concept would be
9    that if that practice arose and became
10   widespread, it would create a possible
11   indicia of claims that were really not
12   legitimate, that people were violating --
13   it would mostly come up -- the concern
14   was where it would come up with is in the
15   Category 1 claims, which you would get a
16   minimal amount of money on minimal amount
17   of proof.  It was sort of what in
18   bankruptcy cases would be regarded as a
19   convenience class.
20           And the idea would be if you
21   were filing a bunch of claims with a
22   bunch of trusts and not in the tort
23   system and were getting a hundred bucks
24   from this Trust and 200 bucks from that

Page 260

1    Trust and whatever, that if a Trust put
2    in either a requirement that you had to
3    file the claim against somebody in the
4    tort system or alternatively you imposed
5    a filing fee in the Trust of 50 or a
6    hundred bucks, it would render the
7    practice unprofitable enough that it
8    would go away.
9            To my knowledge, I don't
10   think any -- this is a fairly standard
11   provision in these Trust TDPs.  I don't
12   think it's ever been invoked by any trust
13   so far, because I don't think that the
14   perception has arisen that the problem of
15   the sort I described has become
16   widespread, but that's my understanding
17   of the rationale behind it.
18       Q.   Okay.  Now, I would like to
19 direct you to --
20       A.   Again, Mr. Inselbuch would
21   have more definitive knowledge on that
22   subject than I would.  So if he says
23   something different, I would stand to be
24   corrected by him.

Page 261

1        Q.   Okay.  His answers will
2 supersede yours then?
3        A.   Almost assuredly.
4            MR. SHINER:  Are you
5        volunteering him for deposition?
6            THE WITNESS:  He's already
7        been identified.  His deposition
8        is set for June 12th.
9 BY MR. BROWN:
10       Q.   Let's put the TDPs aside,
11 Mr. Lockwood.  Did we mark earlier the
12 Cooperation Agreement?
13       A.   Not that I recall.
14       Q.   I know we talked about it.
15           (ACC 30(b)(6)-12 marked for
16       identification at this time.)
17           THE WITNESS:  Okay.
18 BY MR. BROWN:
19       Q.   Mr. Lockwood, we talked
20 about this document, titled the
21 Cooperation Agreement, marked ACC-12, a
22 bit earlier in your deposition.
23           And as I understand this,
24 this document is designed, in part, to

Page 262

1  enable the Asbestos PI Trust to comply
2  with whatever obligations it might have
3  under asbestos insurance policies in the
4  event that it elects to seek insurance
5  coverage for claims.  And it requires the
6  Reorganized Debtors to maintain a whole
7  host of documents in various databases
8  and so forth that are described.
9         Is that a fair
10  generalization of the document?
11     A.   Yeah, I think so.
12     Q.   Okay.  Now, is there any
13  requirement vis-a-vie the Reorganized
14  Debtors and the asbestos insurance
15  entities that this information be
16  preserved for purposes of coverage
17  litigation or frankly underlying
18  litigation?
19     A.   Do you mean is there
20  somewhere in the Plan documents a direct
21  undertaking writing for the Reorganized
22  Debtors to the insurers as opposed to the
23  Reorganized Debtors to the Trust?
24     Q.   Right.

Page 263

1     A.   I don't believe so.
2     Q.   Does the Trust contemplate
3  maintaining these documents imperpituity
4  or requiring the Reorganized Debtors to
5  do so?
6     A.   The Trust doesn't exist, so
7  the Trust doesn't contemplate anything.
8     Q.   All right.  Does the ACC
9  contemplate that the Trust will, for the
10  life of the Trust, have these documents
11  preserved?
12     A.   The ACC contemplates that
13  the trustees will, based on the facts and
14  circumstances in the future as to what
15  their relationships are with respect to
16  insurers, do what their fiduciary
17  obligations to maximize insurance
18  coverage for the benefit of their
19  beneficiaries will require.
20     Q.   All right.  You can put that
21  aside.
22        The TDPs have a payment
23  percentage that we talked about?
24     A.   Correct.

Page 264

1     Q.   And to the extent that a
2  claim gets paid, it's subject to the
3  payment percentage; is that your
4  understanding?
5     A.   Correct.
6     Q.   Now, if the Asbestos PI
7  Trust pays as PI claim and it only pays
8  the schedule value times the payment
9  percentage to the claimant, is the
10  Asbestos PI Trust able to recoup the
11  entire schedule value from the insurers?
12     A.   That depends on, A, whatever
13  agreements might exist that relate to
14  that subject that bind the Trust and, B,
15  what some coverage court might decide are
16  the insurers' coverage obligations if
17  there is some dispute over that issue.
18     Q.   Is there a difference
19  between insurers that have Insurance Pi
20  Reimbursement Agreements, I believe they
21  are called, as opposed to insurers that
22  are unsettled?
23     A.   I would say potentially,
24  yes.

Page 265

1     Q.   What's the nature of the
2  difference?
3     A.   As a general proposition,
4  the reimbursement agreements --
5        (There was an interruption
6  at this time.)
7        THE WITNESS:  My
8  recollection is that as a general
9  proposition, the reimbursement
10  agreements provide for a specific
11  amount of reimbursement expressed
12  as a percentage or for some other
13  basis of amounts that Grace paid
14  in claims prior to the bankruptcy.
15        There is obviously a much
16  stronger argument that if the
17  Trust succeeds to those
18  agreements, as we advocate that it
19  should, that the Trust rights
20  would be the same as Grace's were.
21        There might be arguments to
22  a different effect, but certainly,
23  there is a pretty strong argument
24  that based on the pre-petition

Page 318

1    I hear you; I understand
2  that you are hypothesizing something.
3  But I can't see how it can ever come to
4  pass.  And so I have no idea.  If a PD
5  claim -- I mean, I have never
6  considered -- I don't know the answer to
7  that hypothetical question.  I just know
8  I don't think it can happen.
9    Q.   Okay.  Under Travelers'
10 other agreement, which was a fully
11 settled agreement -- and I am not going
12 to put it in front of you right now; I
13 don't think it's necessary -- but to the
14 extent there is indemnification for
15 non-asbestos claims, how does that
16 indemnification claim get addressed in
17 the Plan?
18    A.   I think --
19      MS. HARDING:  Objection to
20 form.
21      MR. FINCH:  Objection, asked
22 and answered, I think.
23      MS. ALCABES:  I don't think
24 it's been answered.

Page 319

1      THE WITNESS:  I think the
2  answer was I am not aware of any
3  non-asbestos claims that could be
4  brought against that coverage.
5  But if it's not an asbestos PI
6  claim, then it isn't channelled to
7  the Trust and it's a claim against
8  Grace.  And it would be handled
9  however claims against Grace get
10 handled under the Plan.
11 BY MS. ALCABES:
12    Q.   Potentially as a Class 9
13 claim?
14    A.   To the extent, however the
15 Class 9 claims get treated, presents,
16 futures, contingent, whatever.
17    Q.   So, for example, if an
18 environmental claim came up that had
19 nothing to do with asbestos and there is
20 a claim against Travelers that would
21 trigger the indemnity in its fully
22 settled agreement, that's a claim that
23 would be addressed separate and apart
24 from how claims were addressed in Class 6

Page 320

1  and Class 7, right?
2      MR. FINCH:  Objection.
3      MS. HARDING:  Objection to
4  form.
5      THE WITNESS:  That's my
6  understanding of the way the Plan
7  works.
8  BY MS. ALCABES:
9    Q.   Just getting back to one
10 follow-up question along the lines that
11 Michael was asking you about the
12 retention of any rights under policies
13 that are being transferred under the
14 Transfer Agreement.
15    Can you just turn to the
16 TDPs -- I am sorry.  Let me strike that.
17 I will get back to that.
18    You agree that the
19 reimbursement agreements are not subject
20 to the insurance neutrality provisions,
21 correct?
22    A.   Correct.
23      MS. ALCABES:  Can you give
24 me five minutes, and I will take a

Page 321

1  break for five minutes and
2  re-group and see if we can wrap it
3  up.
4      (There was a break from 5:02
5  p.m. to 5:19 p.m.)
6  BY MS. ALCABES:
7    Q.   Can you turn to Lockwood
8  Exhibit-4, which is Exhibit-6 to the
9  Plan.  It is the Transfer Agreement.
10    A.   Yes.
11    Q.   And turn to page 3.  It's
12 Section 2(c).  And this is going back to
13 some other questions that Michael asked
14 you about, the rights that Grace may be
15 retaining under the policies that are
16 being transferred.
17    The last sentence of that
18 paragraph starts, "Upon the Effective
19 Date, the Insurance Contributors shall
20 cede to the Asbestos PI Trust all control
21 of the pursuit of any and all claims with
22 respect to any Asbestos Insurance
23 Policy..."
24    Do you see that?

Page 322

1    A.   Yes.
2    Q.   Actually let me finish it.
3         "...under any Asbestos
4    Insurance Policy, Asbestos Insurance
5    Settlement Agreement, Asbestos In-Place
6    Insurance Coverage, or Asbestos Insurance
7    Reimbursement Agreement, and the Asbestos
8    PI Trust shall have the right to control
9    and direct the choice of counsel and
10   conduct of all such proceedings."
11        So that seems to suggest
12   that, in fact, Grace is retaining no
13   control over the policies that are the
14   subject of the Transfer Agreement; would
15   you agree?
16        MS. HARDING:  Object to the
17   form.
18        THE WITNESS:  Well, I don't
19   know whether there is a
20   distinction between control of the
21   policies.  I mean, what this talks
22   about is control, the pursuit of
23   any and all claims with respect to
24   the policies.

Page 323

1         And it is my understanding
2    that as to the asbestos insurers
3    policies that are illuminated in
4    the various schedules and
5    definition and the other
6    agreements, that Grace is
7    transferring the rights under
8    those policies and the Trust has
9    control over them.
10        For example, if it wants to
11   settle with an insurer, it can
12   settle the entire policy buyback,
13   if you will, and that there is no
14   retained insurance rights that
15   Grace has under those policies,
16   yes.
17   BY MS. ALCABES:
18   Q.   So if Grace wanted to tender
19   a claim a non-asbestos claim under the
20   policies, it would have to go to the
21   Trust?
22   A.   I don't think --
23        MS. HARDING:  Object to the
24   form.

Page 324

1         THE WITNESS:  I don't think
2    it has any right to tender any
3    claims, period.  The Trust hasn't
4    agreed to act as some sort of
5    front person for Grace to tender
6    non-asbestos claims.  This is an
7    economic deal.
8         These policies that don't
9    have asbestos exclusions, et
10   cetera, et cetera, that are
11   defined in this thing are the
12   rights under those policies for
13   coverage are being assigned to
14   this Trust as part of the deal.
15   And Grace isn't retaining some
16   economic interest in those
17   policies, according to my
18   understanding of this Plan.
19        MS. ALCABES:  Okay.  Let's
20   mark one last exhibit.
21        (ACC 30(b)(6)-16 marked for
22   identification at this time.)
23        THE WITNESS:  I have it.
24   BY MS. ALCABES:

Page 325

1    Q.   Okay.  These are
2    Travelers -- sorry -- the Debtors'
3    Responses to RFA served by Travelers.
4         Do you see that?
5    A.   Yes.
6    Q.   Did you see these RFA
7    responses before they were served on
8    Travelers?
9    A.   Yes.
10   Q.   And do you concur with all
11   the responses were provided by the
12   Debtors?
13   A.   Best I can recall, we did.
14   Q.   So can you turn to Request
15   to Admit Nos. 15 and 16.  They sort of go
16   hand in hand.  It's on the last page,
17   page 13 of the RFA responses.
18   A.   Yes, I see them.
19   Q.   And the request is to admit
20   that the 1996 agreement is an executory
21   contract, and that request is denied.
22   A.   I thought it was 1992
23   agreement.
24   Q.   I am reading from page 13.

Page 366

1      A.    Well, the answer to that is,
2   first, normally the punitive or potential
3   indirect claimant, as a defendant in the
4   state court action, would have the right
5   to get discovery from the plaintiff.  And
6   that discovery in many jurisdictions, if
7   not most, would include discovery of the
8   plaintiff as to whether that plaintiff
9   had filed claims with any Trust,
10   including the prospective Grace Trust.
11      If the state court, for some
12   reason or another, said that that
13   discovery against the plaintiff would not
14   be permitted, it seems unlikely that
15   discovery of the same information from a
16   Trust would be permitted because the
17   hypothesis -- by hypothesis, the state
18   law doesn't regard it as relevant.  So
19   under normal circumstances, it's hard to
20   imagine why an indirect claimant would
21   ever need discovery from a Trust.
22      That stated, there are
23   provisions in Section 6.5 that allow
24   indirect claimants or anybody else to try

Page 367

1   and get a subpoena from a court, either
2   the Bankruptcy Court or the Delaware
3   Court or the United States Court for the
4   District of Delaware, for such records.
5   And whichever court that subpoena is
6   sought to be issued from will decide
7   whether or not the prospective indirect
8   claimant, because you won't be an
9   indirect claimant until you lose the suit
10   with the plaintiff -- whether that
11   prospective indirect claimant will or
12   will not be given access to that
13   information by the Trust.  But the first
14   line of attack is getting it from the
15   plaintiff.
16      And I might add, other than
17   the recitation that the submission and
18   the proof of claim is part of settlement
19   discussions, which is simply a view like
20   any defendant and a plaintiff might say
21   we agree that our settlement discussions
22   and our settlement agreement is
23   confidential, whether or not that makes
24   it non discoverable to a third party that

Page 368

1   isn't bound by the settlement agreement
2   is a matter, again, of federal or state
3   applicable non-bankruptcy law.
4      Q.    But as you interpret the TDP
5   then, there is not an outright
6   prohibition from a Payne in discovery
7   against the Trust?
8      A.    No.
9      Q.    Okay.
10      MS. COBB:  Well, those are
11   my questions, and I reserve the
12   right to ask follow-up questions,
13   depending upon the progression of
14   the questioning by the insurers.
15   But I will pass the witness to
16   Mr. Cohn.
17      MR. DANIEL COHN:  Thank you.
18      MS. COBB:  And thank you for
19   your courtesy, Dan.
20      MR. DANIEL COHN:  You are
21   very welcome.
22         -  -  -
23      EXAMINATION
24         -  -  -

Page 369

1   BY MR. DANIEL COHN:
2      Q.    All right.  Mr. Lockwood,
3   you are the representative of the
4   Asbestos PI Committee who is most
5   knowledgeable on the topics as to which
6   the Libby claimants have designated a
7   Rule 30(b)(6) deposition?
8      A.    Most knowledgeable about the
9   full range of the topics.  There might be
10   individual topics that I might defer, as
11   I have in a few questions earlier, for
12   example, to my partner, Mr. Inselbuch,
13   whose deposition is scheduled, but yes.
14      Q.    And if I may, I want to
15   start off with a couple of matters of
16   terminology.  When I use the term "Libby
17   claimants," I am referring to the clients
18   of my firm who are people who allege that
19   they have suffered personal injury from
20   exposure to asbestos of Grace in Lincoln
21   County, Montana.
22      A.    Okay.
23      Q.    And the other terminological
24   matter I want to get straight is that,

Page 370

1  whenever possible, I will try to use
2  terms that are defined in the Plan for
3  the sake of clarity.  And when I use a
4  term that is defined in the Plan, I am
5  using it with the meaning so defined.
6       A.   Okay.
7       Q.   And may I ask that when you
8  give answers, that you use terms that are
9  defined in the Plan, and that unless you
10 otherwise explain it to me, I will assume
11 that you are using that term with the
12 definition defined in the Plan?
13      A.   If I use the term in an
14 answer, I will try and make sure that I
15 am using it as defined in the Plan.
16      Q.   All right.  Referring to
17 Exhibit-3, which is -- and I am sorry.
18 Not Plan Exhibit-3.
19      A.   Okay.
20      Q.   ACC Exhibit-3.
21           MS. HARDING:  Can you remind
22 me what that is, please?
23           MR. DANIEL COHN:  That's the
24 Form 8-K with the Term Sheet

Page 371

1  attached.
2           THE WITNESS:  I have it.
3  BY MR. DANIEL COHN:
4       Q.   Who negotiated the deal
5  that's embodied in that Term Sheet on
6  behalf of the Asbestos PI Committee?
7           MR. FINCH:  Objection.
8           MS. HARDING:  Objection.
9           MR. FINCH:  To the extent it
10 enters into Plan negotiations, I
11 am not sure how it relevant to the
12 confirmation here.
13          MS. HARDING:  Same
14 objection.
15          THE WITNESS:  Are you
16 instructing me to answer it?
17          MR. FINCH:  I will let you
18 answer that question, and you will
19 see how far it goes.
20          THE WITNESS:  I am not
21 entirely sure I remember
22 accurately who the parties were,
23 and it also depends on what you
24 mean by involved in negotiating.

Page 372

1  There were direct negotiations
2  between sort of principals, if you
3  will, and then there were other
4  people, like, myself, that were
5  involved in commenting on drafts
6  of the Term Sheet to other people
7  on their side.
8       But taking the term and
9  meaning of who was face-to-face,
10 my recollection is that on behalf
11 of the ACC, it was a combination
12 of what was designated or called a
13 negotiating subcommittee of the
14 ACC, and my partner,
15 Mr. Inselbuch.
16      The people on the
17 negotiating subcommittee, I
18 believe, included Joe Rice,
19 Russell Budd, and I think Perry
20 Weitz and John Cooney, but I am
21 not positive about that.  But I
22 believe it was those four.  It
23 could have been three, but I think
24 it was those four.

Page 373

1  BY MR. DANIEL COHEN:
2       Q.   And was the Libby claimant
3  representative on the committee a member
4  of the negotiating subcommittee?
5       A.   Not to the best of my
6  recollection.
7       Q.   Was the Term Sheet submitted
8  to a vote by the committee?
9           MS. HARDING:  Objection.
10          THE WITNESS:  Well, I don't
11 know whether the Term Sheet in
12 precisely the form that it exists
13 in Exhibit-3 was submitted for a
14 vote, but certainly a document
15 embodying the terms of the Term
16 Sheet was submitted to a vote of
17 the committee.
18 BY MR. DANIEL COHEN:
19      Q.   And did that vote result in
20 approval of the deal?
21      A.   Yes.
22      Q.   How did the Libby claimants
23 vote?
24      A.   I don't recall, but I am

Page 378

1  terms from the previous plans that I am
2  aware of.
3      Q.   As the ACC's designee to
4  take this 30(b)(6) deposition, would you
5  be aware if there were such an agreement?
6      A.   I believe I would be, yeah.
7      Q.   What agreements, if any,
8  were struck at the time of ACC Exhibit-3
9  concerning how Libby claimants' claims
10 would be treated?
11     A.   Other than that they would
12 be part of the asbestos claimants whose
13 claims would be channelled to the Trust
14 and whose consideration would be paid out
15 of the assets that were to be contributed
16 to the asbestos Trust under the Term
17 Sheet, there were no agreements that I am
18 aware of.
19     Q.   Were there any agreements
20 concerning who would bear responsibility
21 for restitution claims, if any, in
22 connection with the criminal trial now
23 going on in Montana?
24         MS. HARDING:  Object to

Page 379

1      form.
2         THE WITNESS:  I don't
3      believe there were at that time,
4      no.
5  BY MR. DANIEL COHN:
6      Q.   Have there been any
7  agreement on that subject since then?
8      A.   Well, there is provisions in
9  the Plan that speak to that, so yes.
10     Q.   Apart from provisions of the
11 Plan, are there any agreements between
12 the Asbestos PI Committee and any of the
13 other Plan proponents on the subject
14 matter of the Plan?
15     A.   The Plan embodies the
16 agreements.  There are no side
17 agreements, oral or written, that vary
18 from the Plan that I am aware of.  And,
19 indeed, I would be very surprised if I
20 was not aware -- if there were any that I
21 was not aware of.
22     Q.   All right.  And one last
23 question on this subject.  It has been
24 known from time to time for the

Page 380

1  co-proponents of a Plan to enter into a
2  co-proponent agreement governing that
3  relationship.  Is there any such
4  agreement, written or orally?
5      A.   No.  Well, you say written
6  or oral.  There is certainly no written
7  agreement of that.  I mean, the Plan
8  itself -- other than the Plan itself.  I
9  mean, when you sign on to a Plan, is the
10 Plan proponent with somebody else is a
11 Plan proponent.  That's in a written
12 document, and we have sort of agreed.
13         But if you are talking about
14 some oral agreement that says this binds
15 us outside the Plan or -- I am not sure
16 really what kind of agreement you have in
17 mind.  But, as far as I am aware, there
18 isn't any such other than what's
19 reflected in the Plan itself.
20         MR. FINCH:  The parties to
21      the Plan also, to the extent there
22      are issues in common, there may
23      well be a common interest
24      privilege for purposes of

Page 381

1      discovery and litigation of
2      confirmation objections.  But
3      those are not -- I would not
4      regard those as any types of
5      agreements you are questioning
6      about.
7  BY MR. DANIEL COHN:
8      Q.   All right.  Directing your
9  attention now to ACC Exhibit-11, which is
10 the TDP.
11     A.   I have it.
12     Q.   All right.  Who drafted the
13 TDP?
14         MR. FINCH:  Objection.  This
15      gets into Plan negotiations and
16      drafting.  I will let you answer
17      that question, but we will see how
18      it goes from there.
19         THE WITNESS:  To some
20      extent, Mr. Inselbuch may know
21      more about this than I do.  But I
22      have a pretty good knowledge of
23      it.
24         As I have previously

Page 382

1    mentioned in this deposition, this
2    TDP in its inception was a sort of
3    mark-up job on one of the previous
4    TDPs from one of the previous
5    bankruptcies that that had been
6    confirmed.  I don't recall, as I
7    sit here today, which one it was,
8    but it would have been one of the
9    more recent ones.
10        It then, of course, had to
11    be modified to reflect the
12    particularities of Grace and the
13    claims against Grace and what have
14    you.  And you have heard some
15    testimony about things like
16    Sections 5.12 and 5.13.  The
17    participants that did it were
18    basically counsel for the ACC,
19    counsel for the FCR, and members
20    of the ACC itself in terms of
21    reviewing and commenting on
22    things, and the FCR himself.
23        The actual, physical
24    drafting as opposed to the

Page 383

1    commenting and what have you was,
2    I believe, done by Caplin &
3    Drysdale.
4    BY MR. DANIEL COHN:
5        Q.   What input, if any, did
6    Grace have concerning the TDP?
7            MS. HARDING:  Objection with
8    respect to negotiations.
9            THE WITNESS:  Well, it was a
10    general proposition.  Grace was
11    furnished copies of drafts and
12    afforded the opportunity to
13    comment on them.
14    BY MR. DANIEL COHN:
15        Q.   And were any changes made to
16    what sounds like an ACC FCR draft at the
17    behest of Grace?
18            MS. HARDING:  Same
19    objection.
20            THE WITNESS:  I don't really
21    recall.
22    BY MR. DANIEL COHN:
23        Q.   Directing your attention to
24    Section 2.1 of the TDP.

Page 384

1        A.   I have it.
2        Q.   In the second sentence,
3    there is reference to, and I quote,
4    "...the intention of paying all claimants
5    over time as equivalent a share as
6    possible of the value of their claims
7    based on historical values for
8    substantially similar claims in the tort
9    system."
10        A.   Yes.
11        Q.   Now, is that, in fact, the
12    intention of the Asbestos PI Committee in
13    respect to how the TDP should operate?
14        A.   The intention of the ACC on
15    how the TDP should operate is expressed
16    in all of the terms of the TDP.  That
17    particular aspirational sentence that you
18    have plucked from the beginning of the
19    TDP is not is not somehow or another a
20    super-preemptory provision that controls
21    all the other provisions in the Trust
22    that somebody might think either were or
23    were not in agreement with it.
24        Q.   In that phrase that I just

Page 385

1    read, what does the term "historical
2    values" mean?
3        A.   Again, Mr. Inselbuch
4    probably would have a more definitive
5    knowledge of this, but my understanding
6    is that it refers to the historical
7    claims data primarily in this particular
8    case from Grace with respect to
9    settlements and judgments in the tort
10    system as the starting point.
11        Q.   If that's the starting
12    point, what else is meant by historical
13    value?
14        A.   Well, again, this is boiler
15    plate language from TDPs.  In some cases,
16    depending upon the facts of the case, the
17    claims history of comparable defendants
18    in the tort system is looked at.
19        The TDPs are generally
20    drafted in consultation with the
21    committees asbestos claims advisor which
22    is usually, if not invariably, Mark
23    Peterson, and depending on the amount of
24    claims data available to Mr. Peterson

Page 402

1  to to best approximate the value of the
2  claim in the tort system today?
3       MS. HARDING:  Object to
4  form.
5       MR. FINCH:  Objection to
6  form.
7       THE WITNESS:  The purpose of
8  the criteria -- again,
9  Mr. Inselbuch may be better to
10 this than I am.
11      But the purpose of the
12 criteria is to negotiate about the
13 claimant and his lawyer a deal
14 that is acceptable to both of
15 them.  Because if you don't
16 negotiate an acceptable deal in
17 individual review, then you go to
18 mediation, binding or nonbinding
19 arbitration, and the tort system.
20      So at the end of the day,
21 this is referred to as an
22 alternative dispute resolution
23 system for a reason, because
24 that's what it is.  You start out

Page 403

1  with standing settlement offers in
2  an effort to get rid of most of
3  the claims without a lot of
4  processing costs on the basis of
5  values that are perceived to be
6  likely to be acceptable because
7  they are plus or minus some
8  reasonable amount from various
9  plaintiffs law firms' historical
10 values.  You move to individual
11 review for people that want more
12 than that and who think they can
13 show they are entitled to it.  And
14 if you don't persuade them in the
15 negotiation of individual review,
16 you can wind up in the tort system
17 with a judge and a jury deciding
18 what the claim is worth, applying
19 applicable non-bankruptcy law,
20 which will not include, to my
21 knowledge, anything about the
22 historical settlements or the
23 historical judgments experienced
24 by the Debtor for whose

Page 404

1       liabilities the Trust has assumed.
2  BY MR. DANIEL COHN:
3       Q.   Right.  So the ultimate end
4  point, if the alternative dispute
5  resolution process does not succeed, is
6  to go to the tort system and have a jury
7  or judge, if that that gets elected,
8  actually demonstrate the value of the
9  claim in the tort system?
10      A.   That's correct.  And these
11 plans are drafted in the hope that you
12 will eliminate that from happening in
13 very many cases because, A, it produces
14 widely disparate results and, B, it
15 increases claims processing expenses by a
16 very large margin.
17      And the experience of most
18 of these trusts in other cases is that
19 there are vanishingly few cases that ever
20 wind up going into the tort system.
21      Q.   Well, let's talk for a
22 minute about experience in other cases.
23      In other cases, if you can
24 generalize, approximately what percentage

Page 405

1  of claims are settled upon expedited
2  review?
3       MR. FINCH:  Objection, lack
4  of foundation.
5       MS. HARDING:  Objection to
6  form.
7       THE WITNESS:  I have no
8  knowledge of that.  You can ask
9  Mr. Inselbuch that.  My bet is
10 that he doesn't have any knowledge
11 of that, either, but he might.
12 BY MR. DANIEL COHN:
13      Q.   You did say a moment ago,
14 though, that vanishingly few claims in
15 other cases end up in the tort system?
16      A.   That much, I have been told
17 by people that work with the other
18 trusts, but that's a narrative
19 description.
20      I couldn't actually tell you
21 whether it's one case a year or five
22 cases or none.  It's just not very many.
23      But when you start moving
24 backward from that, how many cases go to

Page 406

1    arbitration, how many cases go to
2    individual review, what percentage goes
3    to expedited review, each Trust does have
4    records from which they can derive that
5    information.  And it may be that
6    Mr. Inselbuch might have knowledge of
7    some of that.  I don't.
8              MR. FINCH:  Grace ACC
9    certainly doesn't.
10   BY MR. DANIEL COHN:
11        Q.    You have earlier testified
12   that the starting point for the TDP was
13   the TDP in some recent case; is that
14   correct?
15        A.    That's my recollection.
16        Q.    And revisions were then made
17   to address the specific needs of the
18   Grace case; is that correct?
19        A.    Revisions over time were
20   made.  There had been multiple drafts of
21   the TDP over the last -- I don't know --
22   eight months.  And some of the earlier
23   drafts got filed as in the September
24   filing, and --

Page 407

1              (There was an interruption
2    at this time.)
3    BY MR. DANIEL COHN:
4         Q.    All right.  Were any of
5    those revisions made with the specific
6    intention of addressing issues that had
7    been raised by the Libby claimants?
8         A.    Yes.
9         Q.    Which ones?  Or why don't
10   you start off with one, and then we will
11   go through it.
12        A.    I don't know that I will get
13   a hundred percent of them, but for
14   example, in expedited review categories
15   in Section 5.3(a)(3), the category of
16   severe disabling pleural disease, Level
17   IV-B with its value and all of its
18   criteria, to my knowledge, has never
19   existed in any other TDP, in any other
20   case before and was entirely a function
21   of attempting to address concerns and
22   demands raised by the Libby claimants.
23   That's one that I know.
24              In addition to that, under

Page 408

1    the Section 5.4(a) of the TDP, the
2    creation of a eight times multiple for
3    claimants whose exposure was 95 percent a
4    result of exposure to an
5    asbestos-containing product of Grace was
6    new, and the standard one is the five
7    times provision, which is also in here
8    for 75 percent exposure.
9              There was another one that I
10   was thinking about.  Those are the two
11   that jump out.  I know there is at least
12   another one that I was just thinking
13   about and I have forgotten about.
14             MR. DANIEL COHN:  Why don't
15   we take a five-minute break, and
16   perhaps you will remember in that
17   period.
18             THE WITNESS:  Well, I would
19   just assume not take a five-minute
20   break because I would like to get
21   as much of this done as I can, and
22   if every time I can't remember
23   something we take a five-minute
24   break, we will be here for a very

Page 409

1    long time.
2              MR. DANIEL COHN:  No, no.  I
3    was not meaning to set a
4    precedent.  But if you would like
5    --
6              THE WITNESS:  If it comes to
7    me, I will volunteer it.
8    BY MR. DANIEL COHN:
9         Q.    All right.  Then let's turn
10   our attention to disease Level IV-B.
11             Is that the level that's
12   labeled severe disabling pleural disease?
13        A.    Correct.
14        Q.    Would you please explain to
15   me how that provision was designed to
16   address Libby claims?
17             MS. HARDING:  Object to form
18   to the extent that it's designed
19   to address just Libby claims.
20             MR. FINCH:  I join in that.
21             THE WITNESS:  It was --
22             MS. HARDING:  I think that's
23   what you said, right?
24             MR. DANIEL COHN:  Well --

```
        IN THE UNITED STATES BANKRUPTCY COURT
           FOR THE DISTRICT OF DELAWARE
                     -  -  -


In Re:                   : Chapter 11
                         :
                         : Case No.
W.R. GRACE & CO., et al, : 01-01139 JKF
                         :
                         : (Jointly
          Debtors        : Administered)


                     -  -  -


           Monday, May 4, 2009

                     -  -  -


           Continuation of oral

deposition of PETER VAN N. LOCKWOOD,

ESQUIRE, taken pursuant to notice, was

held at the offices of CAPLIN & DRYSDALE,

One Thomas Circle N.W., Suite 1100,

Washington, DC  20005, commencing at

12:05 p.m., on the above date, before

Lori A. Zabielski, a Registered

Professional Reporter and Notary Public

in and for the Commonwealth of

Pennsylvania.
                     -  -  -
            MAGNA LEGAL SERVICES
             Seven Penn Center
             1635 Market Street
                  8th Floor
       Philadelphia, Pennsylvania 19103
```

Page 450

```
1   APPEARANCES:
2
3   DRINKER BIDDLE & REATH, LLP
    BY:  MICHAEL F. BROWN, ESQUIRE
4   One Logan Square
    18th & Cherry Streets
5   Philadelphia, Pennsylvania  19103-6996
    215.988.2988
6   (brownmf@dbr.com)
    (jeffrey.boerger@dbr.com)
7   Representing OneBeacon America Insurance
    Company, Seaton Insurance Company,
8   Government Employees Insurance Company,
    Columbia Insurance Company f/k/a Republic
9   Insurance Company
10
11  CAPLIN & DRYSDALE, CHARTERED
    BY:  NATHAN D. FINCH, ESQUIRE
12     JEFFREY A. LIESEMER, ESQUIRE*
         (*VIA TELECONFERENCE)
13  One Thomas Circle N.W.
    Suite 1100
14  Washington, DC  20005
    202.862.7801
15  (ndf@capdale.com)
    (jal@capdale.com)
16  Representing Grace, Official Committee of
    Asbestos Personal Injury Claimants
17  ("ACC"), and Witness
18
19  ANDERSON KILL & OLICK, P.C.
    BY:  ROBERT M. HORKOVICH, ESQUIRE
    1251 Avenue of the Americas
20  New York, New York 10020
    212.278.1322
21  (rhorkovitz@andersonkill.com)
    Representing the ACC
22
23
24
```

Page 451

```
1   APPEARANCES (continued)
2
3   KIRKLAND & ELLIS, LLP
    BY:  THEODORE L. FREEDMAN, ESQUIRE
4   655 Fifteenth Street, N.W.
    Washington, DC  20005-5793
5   202.879.5081
    (tfreedman@kirkland.com)
6   Representing the Debtors
7
8   THE LAW OFFICES OF JANET S. BAER, P.C.
    BY:  JANET S. BAER, ESQUIRE
9   70 West Madison Street
    Suite 2100
10  Chicago, Illinois  606002
    312.641.2162
11  Representing the Debtors
12
13  SIMPSON THACHER & BARTLETT, LLP
    BY:  SAMUEL J. RUBIN, ESQUIRE*
14     (*VIA TELECONFERENCE)
    425 Lexington Avenue
15  New York, New York  10017-3954
    212.455.3122
16  (srubin@stblaw.com)
    Representing Travelers Casualty and
17  Surety Company
18
19  VORYS, SATER, SEYMOUR AND PEASE, LLP
    BY:  TIFFANY STRELOW COBB, ESQUIRE*
20     (*VIA TELECONFERENCE)
    52 East Gay Street
21  Columbus, Ohio 43215
    614.464.8322
22  (tscobb@vorys.com)
    Representing The Scotts Company, LLC
23
24
```

Page 452

```
1   APPEARANCES (continued)
2
3   COHN WHITESELL & GOLDBERG, LLP
    BY:  DANIEL C. COHN, ESQUIRE
4   101 Arch Street
    Boston, Massachusetts 02110
5   617.951.2505
    (cohn@cwg11.com)
6   Representing the Libby Claimants
7
8   SPEIGHTS & RUNYAN
    BY:  DANIEL H. SPEIGHTS, ESQUIRE*
9      (*VIA TELECONFERENCE)
    200 Jackson Avenue East
10  P.O. Box 685
    Hampton, South Carolina  29924
11  803.943.4444
    (dspeights@speightsrunyan.com)
12  Representing Anderson Memorial Hospital
13
14  TUCKER ARENSBERG
    BY:  MICHAEL A. SHINER, ESQUIRE*
15     (*VIA TELECONFERENCE)
    1500 One PPG Place
16  Pittsburgh, Pennsylvania  15222
    412.594.5586
17  (mshiner@tuckerlaw.com)
    Representing Certain London Market
18  Insurers and AXA Belgium
19
20  FORD MARRIN ESPOSITO & WITMEYER & GLESER
    BY:  ELIZABETH M. DeCRISTOFARO, ESQUIRE
21  Wall Street Plaza
    New York, New York  10005-1875
22  212.269.4900
    Representing Continental Casualty Company
23  and Continental Insurance Company
24
```

Page 453

```
1   APPEARANCES (continued)
2
3   BILZIN SUMBERG BAENA PRICE & AXELROD, LLP
    BY:  MATTHEW I. KRAMER, ESQUIRE*
4      (*VIA TELECONFERENCE)
    200 South Biscayne Boulevard
5   Suite 2500
    Miami, Florida  33131-5340
6   305.450.7246
    (mkramer@bilzin.com)
7   Representing Property Damage Committee
8
9   STROOCK & STROOCK & LAVAN, LLP
    BY:  ARLENE G. KRIEGER, ESQUIRE*
10     (*VIA TELECONFERENCE)
    180 Maiden Lane
11  New York, New York  10038-4982
    212.806.5400
12  (akrieger@stroock.com)
    Representing Official Committee of
13  Unsecured Creditors
14
15  CROWELL & MORING, LLP
    BY:  MARK PLEVIN, ESQUIRE
16     NOAH S. BLOOMBERG, ESQUIRE
    1001 Pennsylvania Avenue NW
17  Washington, DC  20004-2595
    202.624.2913
18  (mplevin@crowell.com)
    (nbloomberg@crowell.com)
19  Representing Fireman's Fund Insurance
    (Surety Bond)
20
21
22
23
24
```

Page 454

```
1    APPEARANCES (continued)
2
3    STEVENS & LEE, P.C.
     BY:  JOHN D. DEMMY, ESQUIRE*
4      (* VIA TELECONFERENCE)
     1105 North Market Street, 7th Floor
5    Wilmington, Delaware  19801
     302.654.5180
6    (jdd@stevenslee.com)
     Representing Fireman's Fund Insurance
7
8
     ALAN B. RICH LAW OFFICES
9    BY:  ALAN B. RICH, ESQUIRE*
       (*VIA TELECONFERENCE)
10   Elm Place, Suite 4620
     1401 Elm Street
11   Dallas, Texas  75202
     214.744.5100
12   (arich@alanrichlaw.com)
     Representing Property Damage FCR
13
14
     CONNOLLY BOVE LODGE & HUTZ, LLP
15   BY:  JEFFREY C. WISLER, ESQUIRE
     The Nemours Building
16   1007 North Orange Street
     P.O. Box 2207
17   Wilmington, Delaware  19899
     302.88.6528
18   (jwisler@cblh.com)
     Representing Maryland Casualty
19
20
     ECKERT SEAMANS CHERIN & MELLOTT, LLC
21   BY:  EDWARD J. LONGOSZ, II, ESQUIRE
     1747 Pennsylvania Avenue, NW
22   12th Floor
     Washington, DC  20006
23   202.659.6619
     (elongosz@eckertseamans.com)
24   Representing Maryland Casualty and Zurich
```

Page 456

```
1    APPEARANCES (continued)
2
3    WILSON ELSER MOSKOWITZ EDELMAN & DICKER,
     LLP
4    BY:  CARL PERNICONE, ESQUIRE
     150 East 42nd Street
5    New York, New York  10017-5639
     212.915.5656
6    (carl.pernicone@wilsonelser.com)
     Representing Arrowood Indemnity Company
7
8    O'MELVENY & MYERS, LLP
     BY:  TANCRED SCHIAVONI, ESQUIRE*
9      (*VIA TELECONFERENCE)
     Times Square Tower
10   7 Times Square
     New York, New York 10036
11   212.326.2267
     (tschiavoni@omm.com)
12   Representing Arrowood Indemnity Company
13
14   WOMBLE CARLYLE SANDRIDGE & RICE, PLLC
     BY:  KEVIN J. MANGAN, ESQUIRE*
15     (*VIA TELECONFERENCE)
     222 Delaware Avenue
16   Suite 1501
     Wilmington, Delaware  19801
17   302.252.4361
     (kmangan@wcsr.com)
18   Representing State of Montana
19
20   PEPPER HAMILTON, LLP
     BY:  LINDA J. CASEY, ESQUIRE*
21     (*VIA TELECONFERENCE)
     3000 Two Logan Square
22   Philadelphia, Pennsylvania 19103
     215.981.4000
23   (caseyl@pepperlaw.com)
     Representing BNSF Railway Company
24
```

Page 455

```
1    APPEARANCES (continued)
2
3    WILEY REIN, LLP
     BY:  KARALEE C. MORELL, ESQUIRE
4    1776 K Street NW
     Washington, DC  20006
5    202.719.7520
     (kmorell@wileyrein.com)
6    Representing Maryland Casualty and Zurich
7
8    COZEN O'CONNOR
     BY:  ILAN ROSENBERG, ESQUIRE*
9      (*VIA TELECONFERENCE)
     1900 Market Street
10   Philadelphia, Pennsylvania  19103-3508
     215.665.4621
11   (irosenberg@cozen.com)
     Representing Federal Insurance Company
12
13
     ORRICK HERRINGTON & SUTCLIFFE, LLP
14   BY:  JONATHAN P. GUY, ESQUIRE
       JOSHUA M. CUTLER, ESQUIRE
15   Columbia Center
     1152 15th Street, N.W.
16   Washington, DC  20005-1706
     202.339.8516
17   (jguy@orrick.com)
     Representing Future Claimants
18   Representative
19
20   CUYLER BURK, P.C.
     BY:  TANYA M. MASCARICH, ESQUIRE*
21     (*VIA TELECONFERENCE)
     4 Century Drive
22   Parsippany, New Jersey  07054
     973.734.3200
23   (tmascarich@cuyler.com)
     Representing Allstate Insurance Company
24
```

Page 457

```
1
2    APPEARANCES (continued)
3
4    GOODWIN PROCTER, LLP
     BY:  DANIEL M. GLOSBAND, ESQUIRE*
       (*VIA TELECONFERENCE)
5    Exchange Place
     53 State Street
6    Boston, Massachusetts  02109
     617.570.1930
7    (dglosband@goodwinprocter.com)
     Representing CNA Insurance
8
9
     KRAMER LEVIN NAFTALIS & FRANKEL, LLP
10   BY:  GREGORY A. HOROWITZ, ESQUIRE
     1177 Avenue of the Americas
11   New York, New York 10036
     212.715.9571
12   (ghorowitz@kramerlevin.com)
     Representing Official Committee of Equity
13   Holders
14
              - - -
15
16
17
18
19
20
21
22
23
24
```

Page 458

```
 1              - - -
 2           I N D E X
 3              - - -
 4
 5   Testimony of:
 6        PETER VAN N. LOCKWOOD, ESQUIRE
 7
 8   By Mr. Cohn          Page 462
 9   By Mr. Wisler        Page 531
10   By Mr. Mangan        Page 544
11   By Ms. Casey         Page 549
12   By Mr. Speights      Page 563
13   By Mr. Plevin        Page 606
14   By Mr. Schiavoni     Page 624
15   By Mr. Brown         Page 636
16
17           - - -
18        E X H I B I T S
19           - - -
20   NO.   DESCRIPTION          PAGE
21   17   Notice of Deposition of
         Asbestos PI Committee Pursuant
22       to Rule 30(b)(6)       460
23   18    Exhibit 8 to Exhibit Book   460
24           - - -
```

Page 459

```
 1              - - -
 2      DEPOSITION SUPPORT INDEX
 3              - - -
 4
 5   Direction to Witness Not to Answer:
 6   Page  Line      Page   Line
 7   620   11        632    14
 8
 9
10   Request for Production of Documents:
11   Page  Line      Page   Line
12   NONE
13
14
15   Stipulations:
16   Page  Line      Page   Line
17   12    02
     (Previously)
18
19
20   Area(s) Marked Confidential:
21   Page  Line      Page   Line
22   NONE
23
24
```

Page 460

```
 1              - - -
 2        PETER VAN N. LOCKWOOD,
 3   ESQUIRE, after having been first
 4   duly sworn, was examined and
 5   testified as follows:
 6              - - -
 7        PROCEEDINGS
 8              - - -
 9        (ACC 30(b)(6)-17 and 18
10   premarked for identification at
11   this time.)
12              - - -
13        MR. COHN:  Go ahead,
14   Mr. Schiavoni.
15        MR. SCHIAVONI:  I just
16   wanted to object.  We have written
17   the Libby claimants separately
18   about this, but we object to them
19   doing any questioning of
20   Mr. Lockwood on the grounds that
21   the Libby claimants are members of
22   the committee; they have not
23   objected to Mr. Lockwood's
24   designation to testify on behalf
```

Page 461

```
 1   of the committee; nor have they
 2   offered in response to requests
 3   any alternative witness to testify
 4   on any topics on which they
 5   disagree with Mr. Lockwood.
 6        We see Mr. Lockwood's
 7   testimony and the failure of the
 8   Libby claimants to object to the
 9   designation of Mr. Lockwood as an
10   adoptive omission by the Libby
11   claimants, and we object to any
12   questioning by them as essentially
13   questioning seeking to impeach
14   their own witness.  Thank you.
15        MR. COHN:  You are welcome.
16   We will respond to your
17   correspondence, but, for the
18   moment, let's simply say that we
19   reject the basis for your
20   objection.
21        MR. SCHIAVONI:  If there are
22   any topics that the Libby
23   claimants object to Mr. Lockwood's
24   designation on, we need to know
```

Page 562

1  extent that the proceeds of those
2  settlements wind up in the Grace Trust as
3  opposed to the Grace Estate for
4  distribution to other people, they are a
5  settlement part of Grace's contribution
6  to the Trust.
7      Q.  Has the ACC attempted to
8  apportion or value those portions of the
9  contributions made by Grace that are upon
10  Grace's behalf versus upon the insurer's
11  behalf?
12      MR. FINCH:  You can answer
13  that yes or no.
14      THE WITNESS:  Well, I will
15  answer it no and add I am not sure
16  how anybody could go about doing
17  that.  It's what is known as a
18  lump sum deal.
19      MS. CASEY:  I have no
20  further questions.
21      MR. SCHIAVONI:  Actually,
22  could we let Mr. Speights from
23  South Carolina go first.
24      MR. FINCH:  You are up, Dan.

Page 563

1          - - -
2      EXAMINATION
3          - - -
4  BY MR. SPEIGHTS:
5      Q.  Mr. Lockwood, were you
6  involved in the negotiation of the 524 --
7  strike that.
8      Were you involved in the --
9      MS. BAIER:  Dan, can you
10  speak up or come closer to the
11  phone or something?
12      THE WITNESS:  Nobody can
13  hear you.
14      MR. SPEIGHTS:  I picked up
15  the phone.  I am not on speaker.
16      MR. FINCH:  Now we can hear
17  you.
18      THE WITNESS:  That's better.
19      MR. FINCH:  That's better.
20  BY MR. SPEIGHTS:
21      Q.  Let me start over again.
22  Mr. Lockwood, were you involved in the
23  negotiation of the 524(g) statute?
24      A.  Me personally?

Page 564

1      MR. FINCH:  Objection,
2  foundation.
3  BY MR. SPEIGHTS:
4      Q.  Yes, you personally.
5      A.  No.
6      Q.  Was your law firm?
7      MR. FINCH:  Objection, form,
8  foundation, relevance.
9      THE WITNESS:  It depends on
10  how you define negotiations when
11  it comes to dealing with a
12  congressional enactment.  My
13  partner, Mr. Inselbuch, to my
14  knowledge, had at least one
15  meeting with Senator Heflin on the
16  subject of the statute.
17      What other discussions,
18  either in committee or outside
19  committee or whatever,
20  Mr. Inselbuch might have been
21  involved with, I really don't
22  know.  But he's being deposed on
23  June 12th, and I guess you could
24  ask him.

Page 565

1  BY MR. SPEIGHTS:
2      Q.  Would you agree with me that
3  the 524(g) statute always refers to the
4  word "Trust" in singular rather than
5  plural?
6      A.  I would have to go back and
7  look at the statute to be sure of that.
8  If you tell me it does, I am not going to
9  argue with you about it.
10      Q.  Well, I am actually not
11  going to tell you anything.  But if you
12  don't recall without looking at the
13  statute, I certainly would accept that
14  answer.
15      A.  I do not specifically recall
16  without looking at the statute.
17      Q.  Do you recall any bankruptcy
18  that was contested and provides for two
19  asbestos trusts, two or more asbestos
20  trusts?
21      A.  Do you mean a bankruptcy
22  where the Plan proposed to create two
23  trusts, and somebody said there could
24  only be one and that was the contest and

Page 566

1  the court ruled on that?
2      **Q.   I will accept that.**
3      A.   I don't think I do recall
4  any such bankruptcy.
5      **Q.   How many bankruptcies do you**
6  **recall where there had been separate**
7  **trusts of property damage and personal**
8  **injury?**
9      A.   As I sit here right now, I
10 can't think of one.  I believe there have
11 been some, but I am hard-pressed to
12 identify one from memory.  This was not a
13 topic I was prepared to deal with:
14     My recollection, however, is
15 there were a number of bankruptcies in
16 which there was no property damage trust
17 at all, whether separate or as part of a
18 single trust to which PI trusts were also
19 channelled.
20     **Q.   Mr. Lockwood, what was the**
21 **status of the PI estimation proceedings**
22 **when the ACC agreed, at least in**
23 **principle, with the Debtors to resolve**
24 **this bankruptcy?**

Page 567

1      A.   There are others that are
2  probably better equipped to be precise
3  about that than I, but my general
4  recollection was that I believe that
5  Grace had basically completed putting on
6  its case.  And it was before the PI and
7  FCR were putting on their case.
8      But I really was not --
9  unlike Mr. Finch, who is sitting here
10 next to me, who actually was involved in
11 trying that case, I wasn't.  So I could
12 be wrong about that.
13     **Q.   Well, maybe you could**
14 **represent Mr. Finch, and I could question**
15 **him.**
16     **Regardless -- and by the**
17 **way --**
18     A.   Suffice it to say, there had
19 been a lot of witnesses put on by Grace
20 at the time the case was over -- excuse
21 me -- was postponed.
22     **Q.   What was your understanding**
23 **of Grace's position of the total amount**
24 **that should be paid to asbestos PI**

Page 568

1  **claimants, both present and future,**
2  **whenever it ended its presentation of the**
3  **estimation?**
4      MS. BAIER:  Objection as to
5  form.
6      MR. FINCH:  Object to form.
7      THE WITNESS:  My
8  recollection is that Grace had
9  various numbers on the table from
10 various witnesses, but they were
11 all way too low.
12 BY MR. SPEIGHTS:
13     **Q.   Well, what is your**
14 **recollection of the last number they were**
15 **using before you settled?**
16     MS. BAIER:  Objection as to
17 form.
18     MR. FINCH:  Object form and
19 lack of -- well, maybe not lack of
20 foundation but lack of recall.
21     THE WITNESS:  When you say
22 "they were using," using in what
23 context?
24 BY MR. SPEIGHTS:

Page 569

1      **Q.   Well, what is your**
2  **understanding of Grace's last position of**
3  **the total amount that should be paid to**
4  **asbestos present and future PI claimants**
5  **before the deal was negotiated with the**
6  **ACC?**
7      MS. BAIER:  Objection to
8  form.
9      MR. FINCH:  Mr. Speights,
10 are you asking for his
11 recollection of what is the
12 estimate of the total present and
13 future liability for asbestos PI
14 claims put forward through the
15 testimony of Tom Florence in his
16 expert report and testimony that
17 occurred on March 31st, 2008, two
18 days before the company rested its
19 case?
20     MR. SPEIGHTS:  Well, that
21 wasn't my question, but I will ask
22 that.  If Mr. Lockwood knows the
23 answer to that, maybe that will
24 suffice.

Page 602

1  nature of the general objection?
2       MR. FREEDMAN:  The nature of
3  the general objection is that they
4  are presenting hypotheticals,
5  which the witness can't answer
6  and, as a result, require him to
7  set forth opinions about things
8  that are beyond what he should be
9  testifying to in the 30(b)(6)
10  deposition.
11      MR. SCHIAVONI:  That's been
12  90 percent of the testimony,
13  hypotheticals.
14      MR. FREEDMAN:  Well, I am
15  stating this objection to this
16  line of questions.  You have done
17  well on everything else.
18  BY MR. SPEIGHTS:
19      Q.   Mr. Lockwood, I am going to
20  try to wind up in less than ten minutes.
21      MR. FINCH:  Mr. Speights,
22  before you wind up, can we take a
23  two-minute break?
24      MR. SPEIGHTS:  That will be

Page 603

1  fine, if it's two minutes.
2       MR. FINCH:  It's two
3  minutes.  Off the record.
4       (There was a break from 3:17
5  p.m. to 3:20.)
6  BY MR. SPEIGHTS:
7       Q.   Mr. Lockwood, has trustees
8  been selected for the PI Trust?
9       A.   Yes.
10      Q.   Have they been revealed?
11      A.   Their names are set forth at
12  the end of the PI Trust Agreement.  The
13  second-to-last page is a signature page
14  which names three individuals, Harry
15  Huge, Lewis Sifford, and Dean Trafelet,
16  as the three prospective trustees.
17      Q.   Did the ACC choose these
18  three people?
19      A.   The ACC and the FCR
20  consulted each other on these three
21  prospective individuals and then proposed
22  them to the co-proponents and the
23  co-proponents accepted them.
24      Q.   Had the ACC or the FCR

Page 604

1  proposed any other person to the
2  co-proponent which they did not accept?
3       A.   Not that I recall.
4       Q.   Has the ACC chosen an entity
5  to administer the Trust?
6       A.   Not to my knowledge.
7  Indeed, I don't believe the ACC is
8  capable of making that choice.  I believe
9  under the Trust Agreement, the trustees
10  are the only parties with the authority
11  to make that decision.
12      Q.   Is statute of limitations a
13  legal defense in the Trust Distribution
14  Procedures?
15      A.   To the extent --
16      Q.   To any claim?
17      A.   Yes, to the extent so
18  provided in the TDPs.  What I mean by
19  that is there are one or more provisions
20  that address that subject in which the
21  statute of limitations is made
22  applicable.
23      Q.   And if I sit down tonight
24  and very carefully review again this

Page 605

1  Trust Distribution Procedure for the
2  Grace PI Trust, I will find statute of
3  limitations somewhere?
4       A.   Somewhere in there, it is my
5  best recollection that there is a
6  provision, one or more provisions, that
7  address statute of limitations.
8       I might be able to find it,
9  if you really wanted me to root around in
10  it for a while here.  I can't from memory
11  remember exactly where it shows up, but I
12  am --
13      Q.   Well, I actually don't want
14  you to do that.
15      A.   Okay.
16      Q.   But I would request you or
17  your attorney --
18      A.   Okay.  It's Section
19  5.1(a)(2) of the TDP is at least one
20  place.  It's captioned Effect of Statutes
21  of Limitation and Repose.  It starts at
22  page 16 of the TDP and extends over to
23  page 17.  There may be possibly other
24  places where statute of limitations

Page 634

1    the same position and give the
2    same instruction.
3        If you ask about questions
4    that Libby claimants have taken in
5    papers filed in the court, for
6    example, in a Disclosure Statement
7    objections and the bullet point
8    Plan objections and the
9    committee's responses made to that
10   in open court, I will permit
11   Mr. Lockwood certainly to answer
12   those questions.
13       But anything that gets into
14   communications with between the
15   Libby claimants with the rest of
16   the ACC or counsel for the ACC
17   about their respective views of
18   insurance coverage, I am going to
19   take the position as privileged.
20       And so I think you have to
21   do it on a question-by-question
22   basis, but that's my general
23   position.
24   BY MR. SCHIAVONI:

Page 635

1        Q.   Okay.  Mr. Lockwood, I just
2    have one other brief topic.  And here is
3    the first question on that:  Does the
4    Plan purport to release claims that may
5    exist between insurers and Non-Debtors?
6        MR. FINCH:  Objection, form,
7    broad, vague.
8        THE WITNESS:  Phrased as
9    broadly as you have, I think the
10   answer is yes.
11       MR. SCHIAVONI:  Okay.  Thank
12   you.  I have no further questions.
13       MR. FINCH:  Is there anyone
14   else in the room who has
15   questions?
16       MR. BROWN:  I have some
17   follow-ups.
18       MR. FINCH:  Is there anyone
19   else on the telephone who has not
20   asked questions yet who has
21   questions?
22       (No response.)
23       MR. FINCH:  Hearing no
24   affirmative response, I will let

Page 636

1    you have follow-up until we run
2    out of time.
3        (There was a discussion held
4    off the record at this time.)
5        (There was a break from 3:55
6    p.m. to 4:03 p.m.)
7              - - -
8             EXAMINATION
9              - - -
10   BY MR. BROWN:
11       Q.   Mr. Lockwood, just a couple
12   of follow-ups.  The court reporter is
13   actually going to read back a question
14   and answer.  I think it's probably easier
15   to do that, and then I will ask my
16   follow-up question.  It was end of
17   Mr. Wisler's questioning of you.
18       A.   Okay.
19       (The reporter read from the
20   record as requested.)
21   BY MR. BROWN:
22       Q.   And after that,
23   Mr. Lockwood, Mr. Wisler asked you a
24   follow-up as to what type of claim it

Page 637

1    would be.
2        And is it correct that the
3    ACC does not have a position on what type
4    of claim it would be if it's not a Class
5    6 claim?
6        A.   Well, the ACC doesn't, as
7    such, have positions on hypothetical
8    questions.  So, yes, the ACC doesn't have
9    a position on that issue.  The ACC --
10   well, I will leave it at that.
11       Q.   On Friday, Mr. Cohn asked
12   you a question, who drafted the TDP.
13   That was the question, and you gave an
14   answer which I am happy to show you the
15   full answer.  But I WANT to repeat a
16   portion of your answer.  You said: "The
17   participants that did it were basically
18   counsel for the ACC, counsel for the FCR,
19   and members of the ACC itself in terms of
20   reviewing and commenting on things, and
21   the FCR himself."
22       When you said the ACC
23   itself, what did you mean?
24       A.   I meant --

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

EXHIBIT
Acc 36(b)(6)-1
5-1-09          LY

In re:                                    :        Chapter 11
                                          :        Case No. 01-01139 JKF
W.R. GRACE & CO., *et al.*,               :        (Jointly Administered)
                                          :
          Debtors.                        :        Related Docket No. 21241

## AMENDED NOTICE OF DEPOSITION OF ASBESTOS PI COMMITTEE PURSUANT TO RULE 30(B)(6)

PLEASE TAKE NOTICE that, pursuant to Rule 30 of the Federal Rules of Civil

Procedure and Rules 7030 and 9014 of the Federal Rules of Bankruptcy Procedure, OneBeacon

America Insurance Company ("OneBeacon"), Seaton Insurance Company ("Seaton"),

Government Employees Insurance Company ("GEICO"), and Columbia Insurance Company

f/k/a Republic Insurance Company ("Columbia"), through their undersigned counsel, will take

the deposition of the **Official Committee of Asbestos Personal Injury Claimants** (the

"Committee"), c/o Peter Van N. Lockwood, Esq., Caplin & Drysdale, Chartered, One Thomas

Circle N.W., Suite 1100, Washington, DC 20005. By agreement, the deposition will commence

on **May 1, 2009**, beginning at **9:30 a.m.**, at Caplin & Drysdale, Chartered, One Thomas Circle

N.W., Suite 1100, Washington, DC 20005, and will continue from day to day thereafter until

complete. The deposition will proceed before an officer authorized by law to administer oaths

and will be recorded by stenographic means. You are hereby invited to attend and examine the

witness.

Pursuant to Rule 30(b)(6), the Committee shall designate one or more officers, directors,

managing agents, or other persons who consent to testify on their behalf as to all facts and other

information known or reasonably available to the Committee relating to the matters set forth in

Attachment A. For each person designated to testify as to any matter set forth in Attachment A,

the Committee is requested to produce at the deposition all documents which the person has

reviewed in preparing to testify with respect to the matters as to which the person is designated

to testify, and, unless already made available in discovery, all other documents relating to the

matters set forth in Attachment A.

Dated: April 23, 2009

/s/ David P. Primack
Warren T. Pratt (DE Bar I.D. #4334)
David P. Primack (DE Bar I.D. #4449)
DRINKER BIDDLE & REATH LLP
1100 N. Market Street, Suite 1000
Wilmington, DE 19801-1243
Telephone: (302) 467-4200
Facsimile: (302) 467-4201

- and -

Michael F. Brown (*pro hac vice*)
Jeffrey M. Boerger (*pro hac vice*)
DRINKER BIDDLE & REATH LLP
One Logan Square
18th & Cherry Streets
Philadelphia, PA 19103-6996
Telephone: (215) 988-2700
Facsimile: (215) 988-2757

Counsel for OneBeacon America Insurance
Company, Seaton Insurance Company,
Government Employees Insurance
Company, and Columbia Insurance
Company f/k/a Republic Insurance
Company

## ATTACHMENT A

### DEFINITIONS

1.      "Plan" means the Debtors' First Amended Joint Plan of Reorganization Under

Chapter 11 of the Bankruptcy Code of W. R. Grace & Co., et al., the Official Committee of

Asbestos Personal Injury Claimants, the Asbestos PI Future Claimants Representative, and the

Official Committee of Equity Security Holders Dated February 27, 2009.

2.      The following terms have the meanings ascribed to them in the Plan:

    a.  "Asbestos Insurance Entity"

    b.  "Asbestos Insurance Entity Injunction"

    c.  "Asbestos Insurance Rights"

    d.  "Asbestos Insurance Transfer Agreement"

    e.  "Asbestos PI Channeling Injunction"

    f.  "Asbestos PI Claim"

    g.  "Asbestos PI FCR"

    h.  "Asbestos PI TAC"

    i.  "Asbestos PI Trust"

    j.  "Asbestos PI Trustee"

    k.  "Asbestos PI Trust Agreement"

    l.  "Asbestos PI Trust Distribution Procedures"

    m.  "Bankruptcy Code"

    n.  "Class"

    o.  "Debtors"

    p.  "Exhibit Book"

- 1 -

q.  "General Unsecured Claim"

r.  "Indirect PI Trust Claim"

s.  "Plan Documents

t.  "Settled Asbestos Insurance Company"

3.      "BNSF" means BNSF Railway Company, or any predecessor of BNSF Railway

Company, including without limitation, the Great Northern Railway Company, the Burlington

Northern Railroad Company, and The Burlington Northern & Santa Fe Railway Company.

4.      "Document" or "documents" shall have the meaning set forth in Rule 34 of the

Federal Rules of Civil Procedure, and shall include, without limitation, the original and non-

identical copy of any written, electronic, recorded, or graphic matter, however produced or

reproduced, including, without limitation, any correspondence, memoranda, notes, meeting

minutes, telegrams, reports, transcripts, e-mails, or telephone conversations or any other writings

or documentary material of any nature whatsoever, together with any attachments thereto and

enclosures therewith, and any other retrievable matter (whether encarded, taped or encoded,

electrostatically or otherwise), in the possession, custody, or control, of you, your agents,

employees, counsel, or other representatives.  Non-identical copies, drafts, and identical copies

with handwriting are separate "documents" within the meaning of that term.

5.      "Kaneb" means Kaneb Pipe Line Operation Partnership, L.P. and/or Support

Terminal Services, Inc.

6.      "Libby Claimants" means the claimants who allege personal injuries due to

exposure to asbestos from the Debtors' operations in Lincoln County, Montana.

7.      "Non-Settled Asbestos Insurance Company" means any Asbestos Insurance

Entity other than a Settled Asbestos Insurance Company.

8.    "Scotts" means The Scotts Company, LLC.

## SUBJECT MATTER OF TESTIMONY

A.     Classification and treatment of Indirect PI Trust Claims, including "Indemnified Insurer TDP Claims" and "Insurance-Related TDP Claims" as those terms are used in Sections 5.13 and 5.12 respectively of the Asbestos PI Trust Distribution Procedures.

B.     Bases for the classification of certain contractual indemnity claims held by Settled Asbestos Insurance Companies as Class 6 Asbestos PI Claims.

C.     Bases for the classification and treatment of non-asbestos-related contractual indemnity claims held by Settled Asbestos Insurance Companies as Class 9 General Unsecured Claims.

D.     Scope and operation of the Asbestos PI Channeling Injunction.

E.     Scope and operation of the Asbestos Insurance Entity Injunction and Successor Claim Injunction.

F.     Scope and operation of Section 7.15 of the Plan entitled, "Insurance Neutrality," and any other purported insurance neutrality provisions in the Plan or Plan Documents.

G.     Operation of the Asbestos PI Trust Agreement and Asbestos PI Trust Distribution Procedures.

H.     Bases for Settled Asbestos Insurance Company designations appearing in Exhibit 5 to the Exhibit Book.

I.     Scope and bases for releases and exculpation provisions in the Plan.

- 4 -

J.      The scope, operation, and necessity of the findings of fact, conclusions of law, orders, and decrees set forth in Section 7.7 of the Plan.

K.      The impact of the Plan and Plan Documents on the claims asserted, threatened, or that may later be asserted by Scotts, BNSF, the Libby Claimants, and/or Kaneb against the Debtors and/or any Asbestos Insurance Entity.

L.      The criteria used to select the Asbestos PI Trustees and the Asbestos PI TAC.

M.      The business background, experience, and qualifications of the individuals selected to be the Asbestos PI Trustees and the members of the Asbestos PI TAC.

N.      The respective powers and authority conferred upon the Asbestos PI Trustees, Asbestos PI TAC, and the Asbestos PI FCR under the Plan and Plan Documents including, but not limited to, the Asbestos PI Trust Agreement, Asbestos PI Trust Distribution Procedures, and the Asbestos Insurance Transfer Agreement.

O.      The respective roles of the Asbestos PI Trustees, Asbestos PI TAC, and the Asbestos PI FCR in the evaluation, handling, defense and settlement/resolution of Asbestos PI Claims under the Plan and Plan Documents.

P.      The role, if any, of the Asbestos Insurance Entities in the evaluation, handling, defense and settlement/resolution of Asbestos PI Claims under the Plan and Plan Documents.

Q.      The scope of the Asbestos Insurance Rights that are to be transferred or assigned to the Asbestos PI Trust pursuant to the Asbestos Insurance Transfer Agreement, and any other Plan Documents.

R.    The impact of the Plan and Plan Documents on the respective rights and duties of the Debtors and Asbestos Insurance Entities under the Asbestos Insurance Policies.

S.    The impact of the Plan and Plan Documents on subsequent coverage litigation between the Asbestos PI Trust (or the Debtors) and Asbestos Insurance Entities including, but not limited to, Non-Settled Asbestos Insurance Companies.

T.    The nature and value of the Asbestos PI Trust Assets to be used to fund the Asbestos PI Trust.

U.    The Plan's compliance with Section 524(g) of the Bankruptcy Code, as well as other applicable provisions of the Bankruptcy Code.

V.    Any other topic identified in a Rule 30(b)(6) Deposition Notice served by any Asbestos Insurance Entity on the Official Committee of Asbestos Personal Injury Claimants.

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

EXHIBIT
PENGAD 800-631-6989
ACC 3016)6 -2
5-1705
(x

In re:                                          :        Chapter 11
                                                :
W.R. GRACE & CO., *et al.*,                     :        Case No. 01-1139 (JKF)
                                                :        Jointly Administered
            Debtors-in-possession.              :
                                                :
_____:

**OBJECTIONS OF THE OFFICIAL COMMITTEE
OF ASBESTOS PERSONAL INJURY CLAIMANTS TO RULE 30(B)(6)
NOTICES OF DEPOSITION SERVED BY CERTAIN PLAN OBJECTORS**

Pursuant to Federal Rules of Civil Procedure 26 and 30, and Federal Rules of Bankruptcy

Procedure 3020(b)(1), 7026, 7030, and 9014, the Official Committee of Asbestos Personal Injury

Claimants ("**ACC**"), by and through its undersigned counsel, hereby objects as follows to the

Rule 30(b)(6) notices of deposition (collectively, "**Notices**") served on the ACC by OneBeacon

America Insurance Company, Seaton Insurance Company, Government Employees Insurance

Company, Columbia Insurance Company f/k/a Republic Insurance Company, Fireman's Fund

Insurance Company, Allianz S.p.A., f/k/a Riunione Adriatica di Scurta, the Libby Claimants,

Maryland Casualty Company, Zurich Insurance Company, and Zurich International (Bermuda)

Ltd.:

1.      The ACC objects to the Notices to the extent they seek Rule 30(b)(6) testimony

regarding legal conclusions, information prepared in anticipation of litigation, information

obtained by or on behalf of counsel for the ACC in preparation for trial, information protected by

the attorney-client privilege, information protected by the common-interest privilege,

information protected by Federal Rule of Evidence 408, and/or information otherwise beyond the

permissible scope of discovery as set forth in the Federal Rules of Civil Procedure, the Federal

Rules of Evidence, the Federal Rules of Bankruptcy Procedure, or the rules of this Court.

{D0150983.1 }

2.      The ACC further objects to the Notices to the extent they seek testimony and

information protected by the work product doctrine. *See* Hickman v. Taylor, 329 U.S. 495, 511

(1947) (finding that the work product doctrine excludes from disclosure attorney statements,

memos, correspondence, briefs, and mental impressions obtained or prepared by an attorney in

anticipation of litigation); In re Grand Jury (Impounded), 138 F.3d 978, 981 (3d Cir. 1998);

Tobacco & Allied Stocks, Inc. v. Transamerica Corp., 16 F.R.D. 537, 541-43 (D. Del. 1954)

(stating that "pre-trial discovery does not call for the elicitation of contentions, opinions or legal

conclusions of an attorney").

3.      The ACC also objects to the Notices to the extent they seek testimony that would

disclose communications in connection with negotiations of a plan of reorganization or draft plan

documents.  Courts in numerous asbestos-related bankruptcies have prohibited discovery into,

and the disclosure of, such information.  *See* In re Federal-Mogul Global, Inc., Case No. 01-

10578 (JKF) (Bankr. D. Del. Feb. 26, 2007) (Hr'g Tr. at 31) (finding that draft plan documents

are not properly discoverable); In re Pittsburgh Corning Corp., Case No. 00-22876 (JKF) (Bankr.

W.D. Pa. Feb. 19, 2004) (Hr'g Tr. at 64-66) (finding that drafts of plan documents are not

discoverable); In re ACandS, Inc., No. 02-12687 (RJN) (Bankr. D. Del. Sept. 30, 2003) (Hr'g Tr.

at 42-45) (denying discovery into plan negotiations on the grounds that such discovery is

irrelevant to the issue of good faith in proposing the plan); In re Babcock & Wilcox Co., No. 00-

10992 (JAB) (Bankr. E.D. La. Aug. 20, 2003) (Hr'g Tr. 84) (denying insurers' motion to compel

discovery on draft plan of reorganization documents and confidential plan of reorganization

negotiations); In re Combustion Eng'g, Case No. 03-10495 (JKF) (Bankr. D. Del. May 2, 2003)

(Hr'g Tr. at 301) (observing that "drafts generally are not relevant to anything"); In re Eagle-

<u>Picher Indus.,</u> 169 B.R. 130, 134 (Bankr. S.D. Ohio 1994) (finding that creditors were not entitled to drafts of proposed plans of reorganization).

4.      The ACC expressly reserves all other claims of privilege.

5.      Subject to and without waiving any of its objections, the ACC designates the following witness pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure: Peter Lockwood.  The ACC will make Mr. Lockwood available for deposition on all topics designated by any plan objector for no longer than a total of eight (8) hours, on either May 1, 2009, or May 4, 2009.

**[Signature of counsel on following page]**

**CAMPBELL & LEVINE, LLC**

*/s/ Marla R. Eskin*
Marla R. Eskin (No. 2989)
Mark T. Hurford (No. 3299)
800 N. King Street, Suite 300
Wilmington, DE 19801
Telephone: (302) 426-1900
Telefax: (302) 426-9947
meskin@camlev.com
mhurford@camlev.com

**CAPLIN & DRYSDALE, CHARTERED**
Elihu Inselbuch
375 Park Avenue, 35th Floor
New York, NY 10152-3500
Telephone: (212) 319-7125
Telefax: (212) 644-6755

Peter Van N. Lockwood
Nathan D. Finch
Jeffrey A. Liesemer
One Thomas Circle, N.W.
Washington, D.C. 20005
Telephone: (202) 862-5000
Telefax: (202) 429-3301

*Counsel for the Official Committee
of Asbestos Personal Injury Claimants*

Date: April 17, 2009

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| W.R. GRACE & CO., *et al.*, | : | Case No. 01-01139 (JKF) |
| Debtors in Possession. | : | Jointly Administered |

### CERTIFICATE OF SERVICE

I, Marla Rosoff Eskin, of Campbell & Levine, LLC, hereby certify that on April 17, 2009 I caused a copy of the foregoing to be served upon the individuals on the attached service list via first-class mail.

Date: April 17, 2009

/s/ Marla Rosoff Eskin
Marla Rosoff Eskin (No. 2989)

{D0150977.1 }

**W.R. Grace 2002 Service List**

Laura Davis Jones, Esquire
James O'Neill, Esquire.
Pachulski, Stang, Ziehl, & Jones LLP
919 North Market Street, 17th Floor
Wilmington, DE 19899-8705

William H. Sudell, Jr., Esquire
Eric D. Schwartz, Esquire
Morris, Nichols Arsht & Tunnell
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899

Mark D. Collins, Esquire
Deborah E. Spivak, Esquire
Richards, Layton & Finger, P.A.
One Rodney Square
Wilmington, DE 19899

Jeffrey C. Wisler, Esquire
Michelle McMahon, Esquire
Connolly Bove Lodge & Hutz LLP
1220 Market Street, 10th Floor
Wilmington, DE 19899

Carmella Keener, Esquire
Rosenthal, Monhait, Gross & Goddess, P.A.
919 Market Street, Suite 1401
Wilmington, DE 19899

Kathryn Sallie, Esquire
Bayard, P.A.
222 Delaware Avenue, Suite 900
Wilmington, DE 19899

Joseph Grey, Esquire
Stevens & Lee
1105 N. Market St. – Ste 700
Wilmington, DE 19801-1270

Francis A. Monaco, Jr., Esquire
Womble Carlyle
222 Delaware Avenue, 15th Floor
Wilmington, DE 19801

Mark S. Chehi, Esquire
Kevin Brady, Esquire
Skadden, Arps, Slate, Meagher & Flom LLP
One Rodney Square
Wilmington, DE 19801

Robert Jacobs, Esquire
Jacobs & Crumplar, PA
Two East 7th Street
Wilmington, DE 19801

Kathleen M. Miller, Esquire
Smith, Katzenstein & Furlow LLP
The Corporate Plaza
800 Delaware Ave., 7th Floor
Wilmington, DE 19899

Theresa K.D. Currier, Esquire
Buchanan Ingersoll & Rooney, P.C.
The Brandywine Building
1000 West Street, Suite 1410
Wilmington, DE 19801

David Klauder, Esquire
Office of the United States Trustee
844 King St., 2nd Floor
Wilmington, DE 19801

William D. Sullivan, Esquire
Sullivan Hazeltine Allinson
4 East 8th Street, Suite 400
Wilmington, DE 19801

Michael R. Lastowski, Esquire
Duane Morris LLP
1100 N. Market Street, Suite 1200
Wilmington, DE 19801

Michael B. Joseph, Esquire
Ferry & Joseph, P.A.
824 N. Market Street, Suite 904
Wilmington, DE 19801

J. Douglas Bacon, Esquire
David S. Heller, Esquire
Latham & Watkins
Sears Tower, Suite 5800
Chicago, IL 60606

D. J. Baker, Esquire
Sheila Birnbaum, Esquire
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, NY 10036

Nancy Worth Davis, Esquire
Ness, Motley, Loadhold, Richardson & Poole
28 Bridgeside Boulevard
P.O. Box 1792
Mount Pleasant, SC 29465

Securities & Exchange Commission
15th & Pennsylvania Ave. N.W.
Washington, DC 20020

District Director
IRS
409 Silverside Road
Wilmington, DE 19809

Securities & Exchange Commission
Atlanta Regional Office Branch/Reorganization
3475 Lenox Road, NE, Suite 100
Atlanta, GA 30326-1232

Secretary of Treasurer
P.O. Box 7040
Dover, DE 19903

Secretary of State
Division of Corporations
Franchise Tax
P.O. Box 7040
Dover, DE 19903

James D. Freeman, Esquire
Jerel L. Ellington, Esquire
U.S. Department of Justice
Environmental Enforcement Section
1961 Stout Street – 8th Floor
Denver, CO 80294

Martin J. Bienenstock, Esquire
Judy G.Z. Liu, Esquire
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153

David S. Rosenbloom, Esquire
Jeffrey E. Stone, Esquire
Lewis S. Rosenbloom, Esquire
McDermott, Will & Emery
227 West Monroe Street
Chicago, IL 60606-5096

Brad Rogers, Esquire
Office of the General Counsel
Pension Benefit Guaranty Corp
1200 K. Street, N. W.
Washington, D.C. 20005-4026

Pamela Zilly
Richard Shinder
David Blechman
Michael Alexander
The Blackstone Group
345 Park Avenue
New York, NY 10154

Patrick L. Hughes, Esquire
Haynes & Boone LLP
1 Houston Center
1221 McKinney, Suite 2100
Houston, TX 77010

Elio Battista, Jr., Esquire
Blank Rome LLP
1201 Market Street, Suite 800
Wilmington, DE 19801-4226

David S. Heller, Esquire
Latham & Watkins
Sears Tower, Suite 5800
Chicago, IL 60606

Stephen H. Case, Esquire
Nancy L. Lazar, Esquire
David D. Tawil, Esquire
Davis Polk & Wardwell
450 Lexington Avenue
New York, NY 10017

Jan M. Hayden, Esquire
William H. Patrick, Esquire
Heller, Draper, Hayden, Patrick & Horn, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA 70130-6103

Joseph F. Rice, Esquire
Ness, Motley, Loadholt, Richardson & Poole
28 Bridgeside Blvd.
P.O. Box 1792
Mt. Pleasant, SC 29465

Attn.: Meridee Moore & Kirsten Lynch
Farallon Capital Management LLC
One Maritime Plaza
Suite 1325
San Francisco, CA 94111

John M. Klamann, Esquire
Klamann & Hubbard
7101 College Blvd., Suite 120
Overland Park, KS 66210

Hamid R. Rafatjoo, Esquire
Pachulski, Stang, Ziehl, & Jones LLP
10100 Santa Monica Boulevard
Los Angeles, CA 90067-4100

Charles E. Boulbol, Esquire
26 Broadway, 17th Floor
New York, NY 10004

Matthew Grimshaw, Esquire
Rutan & Tucker
611 Anton Boulevard
Suite 1400
Costa Mesa, California 92626-1931

Steven T. Baron, Esquire
Member
Silber Pearlman, LLP
2711 North Haskell Avenue, 5th Floor, LLP
Dallas, TX 75204

Bankruptcy Administration
IOS Capital, Inc.
1738 Bass Road
P.O. Box 13708
Macon, GA 31208-3708

W.J. Winterstein, Jr., Esquire
John J. Winter, Esquire
William M. Aukamp, Esquire
Eleven Penn Center, 29th Floor
1835 Market Street
Philadelphia, PA 19103

Richard S. Cobb, Esquire
Megan N. Harper, Esquire
Landis Rath & Cobb LLP
919 Market Street, Suite 600
Wilmington, DE 19801

Margery N. Reed, Esquire
Duane Morris LLP
4200 One Liberty Place
Philadelphia, PA 19103-7396

Elizabeth S. Kardos, Esquire
Gibbons, Del Deo, Dolan, Griffinger
 & Vecchione, PC
One Riverfront Plaza
Newark, NJ 07102-5497

Thomas J. Noonan, Jr.
c/o R & S Liquidation Company
Five Lyons Mall PMB #530
Basking Ridge, NJ 07920-1928

James A. Sylvester, Esquire
Intercat, Inc.
P.O. Box 412
Sea Girt, NJ 08750

Alan R. Brayton, Esquire
Brayton & Purcell
222 Rush Landing Road
Novato, CA 94945

Jonathan W. Young, Esquire
T. Kellan Grant, Esquire
Wildman, Harrold, Allen & Dixon
225 West Wacker Drive, Suite 3000
Chicago, IL 60606-1229

Steven J. Johnson, Esquire
Gibson, Dunn & Crutcher LLP
1530 Page Mill Road
Palo Alto, CA 94304-1125

Russell W. Budd, Esquire
Baron & Budd, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219

Shelby A. Jordan, Esquire
Nathaniel Peter Holzer, Esquire
Jordan, Hyden, Womble & Culbreth, P.C.
500 N. Shoreline Blvd., Suite 900
Corpus Christi, TX 78471

Charlotte Klenke, Esquire
Schneider National, Inc.
P.O. Box 2545
3101 S. Packerland
Green Bay, WI 54306

Courtney M. Labson, Esquire
The Mills Corporation
Legal Department
1300 Wilson Boulevard, Suite 400
Arlington, VA 22209

Ira S. Greene, Esquire
Squadron, Ellenoff, Plesent & Sheinfeld, LLP
551 Fifth Avenue
New York, NY 10176-0001

Joseph T. Kremer, Esquire
Lipsiptz, Green, Fahringer, Roll, Salisbury
 & Cambria, LLP
42 Delaware Avenue, Suite 300
Buffalo, NY 14202

Paul M. Matheny, Esquire
The Law Offices of Peter G. Angelos, P.C.
5905 Harford Road
Baltimore, MD 21214

Paul D. Henderson, Esquire
Paul D. Henderson, P.C.
712 Division Avenue
Orange, TX 77630

Michael J. Urbis, Esquire
Jordan, Hyden, Womble & Culbreth, P.C.
500 N. Shoreline Blvd., Suite 900
Corpus Christi, TX 78471

David B. Siegel
W.R. Grace and Co.
7500 Grace Drive
Columbia, MD 21044

Mary A. Coventry
Sealed Air Corporation
Park 80 East
Saddle Brook, NJ 07663

David Bernick, Esquire
Lisa G. Esayian, Esquire
Samuel L. Blatnick, Esquire
Kirkland & Ellis
300 North LaSalle
Chicago, IL 60654

Elizabeth J. Cabraser, Esquire
Richard M. Heimann, Esquire
Lieff Cabraser Heimann & Bernstein LLP
275 Battery Street, 30th Floor
San Francisco, CA 94111

Derrick Tay, Esquire
Meighen Demers
Suite 1100, Box 11, Merrill Lynch Can.Tower
Sun Life Center, 200 Kint Street West
**Toronto, Ontario M5H 3T4**
**CANADA**

Evelyn J. Meltzer
Pepper Hamilton LLP
Hercules Plaza, Suite 5100
1313 Market Street
P.O. Box 1709
Wilmington, DE 19899-1709

Scott L. Baena, Esquire
Bilzin Sumberg Dunn Baena Price
 & Axelrod LLP
First Union Financial Center
200 South Biscayne Blvd., Suite 2500
Miami, FL 33131

Edward W. Westbrook, Esquire
Robert M. Turkewitz, Esquire
Richardson, Patrick, Westbrook & Brickman
174 East Bay Street
Charleston, SC 29401

Elihu Inselbuch, Esquire
Rita Tobin, Esquire
Caplin & Drysdale, Chartered
375 Park Avenue, 35th Floor
New York, NY 10152-3500

Peter Van N. Lockwood, Esquire
Nathan D. Finch, Esquire
Caplin & Drysdale, Chartered
One Thomas Circle, N.W.
Washington, DC 20005

Todd Meyer, Esquire
Kilpatrick Stockton
1100 Peachtree Street
Atlanta, GA 30309

Bernice Conn, Esquire
Robins, Kaplan, Miller & Ciresi LLP
2049 Century Park East, Suite 3700
Los Angeles, CA 90067

Cindy Schultz
Ingersoll-Rand Fluid Products
One Aro Center
P. O. Box 151
Bryan, OH 43506

Peter A. Chapman, Esquire
572 Fernwood Lane
Fairless Hills, PA 19030

Michael B. Schaedle, Esquire
Blank Rome LLP
One Logan Square
130 North 18th Street
Philadelphia, PA 19103

Hal Pitkow, Esquire
The Falls at Lambertville
351 South Main Street
Lambertville, NJ 08530

Alan B. Rich, Esq.
Elm Place
1401 Elm Street, Suite 4620
Dallas, TX 75201

Mr. Thomas Moskie
Bankers Trust Company
Four Albany Street, 4th Floor
New York, NY 10006

Charles E. Gibson, III, Esquire
Gibson Law Firm
447 Northpark Drive
Ridgeland, MS 39157-5109

John P. Dillman, Esquire
Linebarger Heard Goggan Blair
Graham Peña & Sampson, LLP
P. O. Box 3064
Houston, TX 77253-3064

Steven J. Kherkher, Esquire
Laurence G. Tien, Esquire
Williams Kherkher Hart & Boundas, LLP
8441 Gulf Freeway, Suite #600
Houston, TX 77017

Steven T. Hoort, Esquire
Ropes & Gray
One International Place
Boston, MA 02110-2624

Patrick J. Reilly, Esquire
Cole, Schotz, Meisel, Forman & Leonard, P.A.
1000 N. West Street
Suite 1200
Wilmington, DE 19801

Paul M. Baisier, Esquire
SEYFARTH SHAW
1545 Peachtree Street, Suite 700
Atlanta, GA 30309

William S. Katchen, Esquire
Duane, Morris LLP
744 Broad Street, Suite 1200
Newark, NJ 07102-3889

Sander L. Esserman, Esquire
Stutzman, Bromberg, Esserman & Plifka
2323 Bryan Street
Suite 2200
Dallas, TX 75201-2689

Delta Chemical Corporation
2601 Cannery Avenue
Baltimore, MD 21226-1595

Paul D. Henderson, Esquire
Dies, Dies & Henderson
1009 W. Green Avenue
Orange, TX 77630

Tara L. Lattomus, Esquire
Eckert Seamans Cherin & Mellott, LLC
300 Delaware Avenue, Suite 1210
Wilmington, DE 19801

Todd C. Meyers, Esquire
Kilpatrick Stockton, LLP
1100 Peachtree Street, Suite 2800
Atlanta, GA 30309-4530

Peter S. Goodman, Esquire
Andrews & Kurth LLP
450 Lexington Avenue, 15th Floor
New York, New York 10017

Brad N. Friedman, Esquire
Rachel S. Fleishman, Esquire
Milberg Weiss Bershad Hynes & Learch
One Pennsylvania Plaza
New York, NY 10019

Lewis Kruger, Esquire
Robert Raskin, Esquire
Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, NY 10038-4982

C. Randall Bupp, Esquire
Plastiras & Terrizzi
24 Professional Center Parkway
Suite 150
San Rafael, CA 94903

Thomas J. Noonan, Jr.
Herman's Sporting Goods in Liquidation
C/o R&S Liquidation Company, Inc.
5 Lyons Mall PMB #530
Basking Ridge, NJ 07920-1928

William E. Frese, Esquire
Attn: Sheree L. Kelly, Esquire
80 Park Plaza, T5D
P.O. Box 570
Newark, NJ 07101

Scott W. Wert, Esquire
Foster & Sear, L.L.P.
817 Greenview Drive
Grand Prairie, TX 75050

Rosa Dominy
Bankruptcy Administration
IOS Capital, Inc.
1738 Bass Road
P.O. Box 13708
Macon, GA 31208-3708

State Library of Ohio
c/o Michelle T. Sutter
Revenue Recovery
101 E. Town Street, Second Floor
Columbus, OH 43215

Dorine Vork, Esquire
Stibbe, P.C.
350 Park Avenue
New York, New York 10022

Jonathan H. Alden, Esquire
Assistant General Counsel
3900 Commonwealth Boulevard, MS 35
Tallahassee, Florida 32399-3000

Credit Lyonnais
1301 Avenue of the Americas
New York, New York 10019-0602

Randall A. Rios, Esquire
Floyd Isgur Rios & Wahrlich, P.D.
700 Louisiana, Suite 4600
Houston, TX 77002

Anton Volovsek
Rt2 – Box 200 #42
Kamiah, Idah 83536-9229

Paul G. Sumers, Esquire
TN Attorney General's Office, Bankr. Unit
P.O. Box 20207
Nashville, TN 37202-0207

General Counsel
Enron Energy Services
1400 Smith Street
EB 0889
Houston, TX 77002

Harry Lee, Esquire
Steptoe & Johnson LLP
1330 Connecticut Avenue, N.W.
Washington, DC 20036

Thomas O. Bean, Esquire
Eric P. Magnuson, Esquire
Nutter, McClennen & Fish, LLP
World Trade Center West
155 Seaport Blvd.
Boston, MA 02210

Allan M. McGarvey, Esquire
Jon L. Heberling, Esquire
Roger M. Sullivan, Esquire
McGarvey Heberling Sullivan & McGarvey
745 South Main
Kalispell, MT 59901

Neil Berger, Esquire
Togut Segal & Segal LLP
One Penn Plaza, Suite 3335
New York, NY 10119

Deirdre Woulfe Pacheo, Esquire
Wilentz Goldman & Spitzer
P.O. Box 10
Woodbridge Center Drive
Woodbridge, NJ 07095

John G. Stoia, Jr., Esquire
Timothy G. Blood, Esquire
Lerach Coughlin Stoia Geller Rudman & Robbins
LLP
655 West Broadway, Suite 1900
San Diego, CA 92101

Philip Bentley, Esquire
Gary M. Becker, Esquire
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY 10036

Jacob C. Cohn, Esquire
Cozen O'Connor
1900 Market Street
Philadelphia, PA 19103

Ralph R. Mabey, Esquire
Penrod W. Keith, Esquire
LeBoeuf Lamb Greene & MacRae LLP
1000 Kearns Building
Salt Lake City, UT 84101

James Sottile, Esquire
Zuckerman Spaeder LLP
1800 M Street, NW, Suite 1000
Washington, DC 20036-5802

Richard S. Lewis, Esquire
Cohen Milstein Hausfeld & Toll, PLLC
1100 New York Avenue, N.W.
West Tower, Suite 500
Washington, DC 20005

Marsha A. Penn, Esquire
P.O. Box 3725
Houston, TX 77253

Darrell W. Scott, Esquire
The Scott Law Group, P.S.
926 W. Sprague Avenue, Suite 583
Spokane, WA 99201

Thomas M., Esquire
Hagens Berman Sobol Shapiro LLP
One Main Street
4th Floor
Cambridge, MA 02142

Robert J. Dehney, Esquire
Morris Nicholas Arsht & Tunnell
1201 N. Market Street
Wilmington, DE 19899

David Pastor, Esquire
Edward L. Manchur, Esquire
Gilman & Pastor LLP
225 Franklin Street
16th Floor
Boston, MA 02110

Thomas G. Macauley, Esquire
Zuckerman Spaeder LLP
919 Market Street, Suite 990
PO Box 1028
Wilmington, DE 19899

Mark Minuti, Esquire
Saul Ewing LLP
222 Delaware Avenue
P.O. Box 1266
Wilmington, DE 19899

Thomas G. Whalen, Esquire
Stevens & Lee
1105 North Market Street, 7th Floor
Wilmington, DE 19801

Mr. Mark Hankin
HanMar Associates, M.L.P.
P.O. Box 26767
Elkins Park, PA 19027

Attn: Ted Weschler
Peninsula Capital, L.P.
404B East Main Street, 2nd Floor
Charlottesville, VA 22902

Jordan N. Malz, Esquire
Simpson Thacher & Bartlett
425 Lexington Avenue
New York, NY 10017

Richard D. Trenk, Esquire
Henry M. Karkowski, Esquire
Trenk, DiPasquale, Webster, Della Fera & Sodono P.C.
347 Mt. Pleasant Avenue
Suite 300
West Orange, New Jersey 07052-3317

Vahe Melkonian, Pres.
Newco Management Company LLC
6320 Canoga Avenue, Suite 1430
Woodland Hills, CA 91367

Christopher R. Momjian, Esquire
Senior Deputy Attorney General
Office of the Attorney General
21 S. 12th Street, 3rd Floor
Philadelphia, PA 19107

Janet M. Weiss, Esquire
Gibson Dunn & Crutcher LLP
200 Park Avenue.
New York, NY 10166

Joseph L. Schwartz, Esquire
Curtis M. Plaza, Esquire
Craig T. Moran, Esquire
Riker Danzig Scherer Hyland & Perretti LLP
Headquarters Plaza, 1 Speedwell Avenue
Morristown, NJ 07962

Mr. Harvey Schultz
The Schultz Organization
900 Route 9 North
Woodbridge, NJ 07095

Charles L. Finke, Assistant Attorney General
Brad Rogers, Attorney
Pension Benefit Guarantee Corporation
Office of the General Counsel
1200 K Street, NW
Washington, DC 20005-4026

Richard A. O'Halloran, Esquire
BURNS, WHITE & HICKTON, LLC
531 Plymouth Road, Suite 500
Plymouth Meeting, PA 19462

W. Wallace Finlator, Jr.
Assistant Attorney General
N.C. Department of Justice
Post Office Box 629
Raleigh, NC 27602-0629

Daniel C. Cohn, Esquire
Christopher M. Candon
Cohn & Whitesell LLP
101 Arch Street, Suite 1605
Boston, MA 02110

Steven K. Kortanek, Esquire
Joanne B. Wills, Esquire
Klehr, Harrison, Harvey, Branzburg & Ellers
919 Market Street, Suite 1000
Wilmington, DE 19801

William P. Bowden, Esquire
Amanda M. Winfree, Esquire
Ashby & Geddes, P.A.
500 Delaware Avenue, 8th Floor
Wilmington, DE 19899

Jeffrey L. Roelofs, Esquire
Anderson & Kreiger, LLP
43 Thorndike Street
Cambridge, MA 02141

John V. Fiorella, Esquire
Archer & Greiner, P.C.
1300 North Market Street
Suite 700
Wilmington, DE 19801

Thomas Tew, Esquire
Tew Cardenas L.L.P.
Four Seasons Tower, 15th Floor
1441 Brickell Avenue
Miami, Florida 33131-3407

James E. Wimberley, Esquire
McPherson, Monk, Hughes, Bradley & Wimberley, L.L.P.
3120 Central Mall Drive
Port Arthur, TX 77642

Marc Abrams, Esquire
Willkie, Farr & Gallagher
787 Seventh Avenue
New York, NY 10019-6099

Citadel Investment Group, L.L.C.
Attn: S. Jay Novatney
131 South Dearborn Street, 36th Floor
Chicago, IL 60603

Kirk A. Patrick III, Esquire
Donohue Patrick
1500 Bank One Centre-North Tower
PO Box 1629
Baton Rouge, LA 70821-1629

Anne McGinness Kearse, Esquire
Motley Rice LLC
28 Bridgeside Blvd.
PO Box 1792
Mt. Pleasant, SC 29465

Roger W. Hammond
Kforce Inc.
1001 East Palm Avenue
Tampa, FL 33605

Mr. Eugene Paul Sullivan
29-B Plaza Delas Flores
Freehold, NJ 07728

Todd C. Schiltz, Esquire
Wolf, Block, Schorr and Solis-Cohen LLP
Wilmington Trust Center
1100 N. Market Street, Suite 1001
Wilmington, DE 19801

Bruce D. Levin, Esquire
Peter B. McGlynn, Esquire
Bernkopf Goodman LLP
125 Summer Street, Suite 1300
Boston, MA 02110

Frederick P. Furth, Esquire
Michael P. Lehmann, Esquire
Christopher L. Lebsock, Esquire
The Furth Firm LLP
225 Bush Street, 15th Floor
San Francisco, CA 94104

John C. Phillips, Jr., Esquire
Phillips, Goldman & Spence, P.A.
1200 N. Broom Street
Wilmington, DE 19806

Roger Frankel, Esquire
Richard H. Wyron, Esquire
Orrick, Herrington & Sutcliffe LLP
The Washington Harbour
3050 K Street, NW, Ste 200
Washington, DC 20007

Robert J. Sidman, Esquire
Tiffany Strelow Cobb, Esquire
Vorys, Sater, Seymour and Pease LLP
52 East Gay Street
P.O. Box 1008
Columbus, OH 43215

Justin Shrader, Esquire
Shrader & Associates, L.L.P.
1021 Main Street, Ste. 1450
Houston, TX 77002

Sean Allen
BMC Group
720 Third Avenue, 23rd Floor
Seattle, WA 98104

M. David Minnick, Esquire
Michael P. Ellis, Esquire
Pillsbury Winthrop Shaw Pittman LLP
50 Fremont Street
San Francisco, CA 94105-2228

Gerald F. George, Esquire
Pillsbury Winthrop Shaw Pittman LLP
50 Fremont Street
San Francisco, CA 94105-2228

Thomas A. Spratt, Jr., Esquire
Pepper Hamilton, LLP
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA 19103

Steven T. Davis
Obermayer Rebmann Maxwell & Hippel LLP
3 Mill Road, Suite 306A
Wilmington, DE 19806

D. Alexander Barnes, Esquire
Obermayer Rebmann Maxwell & Hippel LLP
One Penn Center, 19th Floor
1617 John F. Kennedy Blvd.
Philadelphia, Pa 19103-1895

Steven J. McCardell, Esquire
Jared Inouye, Esquire
Duham Jones & Pinegar
111 E. Broadway, Suite 900
Salt Lake City, UT 84111

John Waters, Esquire
Iowa Department of Revenue
Collections Section
P.O. Box 10457
Des Moines, Iowa 50306

Yves Lauzon
Michel Belanger
Lauzon Belanger, Inc.
286, rue St-Paul Quest, Bureau 100
Montreal Quebec

Daniel K. Hogan, Esquire
The Hogan Firm
1311 Delaware Avenue
Wilmington, DE 19806

David A. Hickerson, Esquire
M. Jarrad Wright, Esquire
Weil, Gotshal & Manges, LLP
1300 Eye Street N.W., Suite 900
Washington, D.C. 20005

Ralph I. Miller, Esquire
Weil, Gotshal & Manges, LLP
200 Cresent Court, Suite 300
Dallas, TX 75201

Neil B. Glassman, Esquire
Steven M. Yoder, Esquire
Kathryn D. Sallie, Esquire
The Bayard Firm
222 Delaware Avenue, Ste 900
Wilmington, DE 19801

Steven J. Mandelsberg, Esquire
Christina J. Kang, Esquire
Hahn & Hessen LLP
488 Madison Avenue
New York, NY 10022

Tobey M. Daluz, Esquire
Leslie C. Heilman, Esquire
Ballard Spahr Andrews & Ingersoll, LLP
919 N. Market Street, 12th Floor
Wilmington, DE 19801

Pryor Cashman LLP
Attn: Richard Levy, Jr., Esquire
410 Park Avenue
New York, NY 10022-4441

Jacqueline Dais-Visca, Esquire
Business Law Section
Ontario Regional Office
Suite 2400, Box 34
The Exchange Tower
130 King Street West
Toronto, Ontario M5X 1K6

Peter D. Keisler, Esquire
Assistant Attorney General
Department of Justice, Civil Division
Ben Franklin Station
P.O. Box 875
Washington, DC 20044-0875

Katherine White, Esquire
Sealed Air Corporation
20 Riverfront Boulevard
Elmwood Park, NJ 07407

Garvan F. McDaniel, Esquire
Bifferato Gentilotti & Balick, L.L.C.
800 King Street, 1st Floor
Box 2165
Wilmington, DE 19801

John Kevin Welch, Esquire
Office of Legal Services
Fifth Floor, Capital Plaza Tower
Frankfort, KY 40601

John F. Dickinson, Jr., Esquire
Deputy Attorney General
Department of Law & Public Safety
Division of Law
Richard J. Hughes Justice Complex
P.O. Box 093
Trenton, NY 08625-0093

Elihu E. Allinson, Esq.
Sullivan Hazeltine Allinson LLP
4 East 8th Street, Suite 400
Wilmington, DE 19801

Anthony Petru, Esquire
Quynh L. Nguyen, Esquire
Hildebrand McLeod & Nelson LLP
350 Frank H. Ogawa Plaza, 4th Floor
Oakland, CA 94612

Daniel A. Speights, Esquire
Speights & Runyan
200 Jackson Avenue, East
P.O. Box 685
Hampton, SC  29924

Christopher D. Loizides
Loizides, PA
1225 King Street, Suite 800
Wilmington, DE 19801

John W. Kozyak
David L. Rosendorf
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon, 9th Floor
Coral Gables, FL 33134

W R GRACE & CO NEW

Filing Date: 04/06/08

UNITED STATES

SECURITIES AND EXCHANGE COMMISSION

WASHINGTON, DC 20549

FORM 8-K

CURRENT REPORT PURSUANT

TO SECTION 13 OR 15(D) OF THE

SECURITIES EXCHANGE ACT OF 1934

Date of report (Date of earliest event reported) April 6, 2008

W. R. GRACE & CO.

(Exact Name of Registrant as Specified in Its Charter)

Delaware

(State or Other Jurisdiction of Incorporation)



EXHIBIT

Acc 30(6)(6)3
5-7-09

1-13953                                   65-0773649
(Commission File Number)            (IRS Employer Identification No.)
7500 Grace Drive                                    21044

Columbia, Maryland
(Address of Principal Executive Offices) (Zip Code)

DEPOSITION
EXHIBIT
#12
3/20/09 AS

(410) 531-4000

(Registrant's Telephone Number, Including Area Code)

(Former Name or Former Address, if Changed Since Last Report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

o     Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

o     Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

o     Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

o     Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

---

W. R. GRACE & CO.

FORM 8-K

CURRENT REPORT


Item 7.01.                    Regulation FD Disclosure.



On April 6, 2008, W. R. Grace & Co., on behalf of itself and its subsidiaries and affiliates that are debtors in the Chapter 11 cases, (the "Company") entered into an agreement in principle (the "Agreement") with the Official Committee of Asbestos Personal Injury Claimants, the Future Claimants Representative and the Official Committee of Equity Security Holders, all parties-in-interest in the Company's Chapter 11 case, that would settle all present and future asbestos-related personal injury claims against the Company on the terms and conditions set forth therein.   Certain terms and conditions of the Agreement are described in the press release attached hereto as Exhibit 99.1.   The description of the terms and conditions of the Agreement is qualified in its entirety by reference to the provisions of the Agreement attached hereto as Exhibit 99.2.



The information furnished pursuant to this Item 7.01, including Exhibit 99.1 and Exhibit 99.2, shall not be deemed to be "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended, (the "Exchange Act"), or otherwise subject to the liabilities of such section, nor shall such information be deemed incorporated by reference in any filing under the Securities Act of 1933, as amended, or the Exchange Act, except as shall be expressly set forth by specific reference in such a filing.


Item 9.01.                    Financial Statements and Exhibits.



(d)  Exhibits



99.1                          Press Release



99.2                          Term Sheet for Resolution of Asbestos Personal Injury Claims dated as of April 6, 2008


2
--------------------------------------------------------------------

SIGNATURES


Pursuant to the requirements of the Securities Exchange Act of 1934, the
Registrant has duly caused this report to be signed by the undersigned,
thereunto duly authorized.



W. R. GRACE & CO.
(Registrant)
By /s/ Mark A. Shelnitz
Mark A. Shelnitz
Secretary


Dated:  April 7, 2008


3

--------------------------------------------------------------------------------

Exhibit 99.1


Grace News #2919



Media Relations:              Investor Relations:
William Corcoran              Bridget Sarikas
T +1 410.531.4203            T +1 410.531.4194
Ewilliam.corcoran@grace.com  Ebridget.sarikas@grace.com



### GRACE ANNOUNCES SETTLEMENT OF ASBESTOS PERSONAL INJURY CLAIMS



COLUMBIA, Maryland, April 7, 2008 -- W. R. Grace & Co. (NYSE: GRA) today announced an agreement in principle that would settle all present and future asbestos-related personal injury claims. The agreement, reached with the Official Committee of Asbestos Personal Injury Claimants, the Future Claimants Representative and the Official Committee of Equity Security Holders, requires the following assets to be paid into a trust to be established under Section 524(g) of the United States Bankruptcy Code:


.       Cash in the amount of $250 million;



.       Warrants to acquire 10 million shares of Grace common stock at an exercise price of $17.00 per share, expiring one year from the effective date of a plan of reorganization;



.       Rights to proceeds under Grace's asbestos-related insurance coverage;



.       The value of cash and stock under the litigation settlement agreements with Sealed Air Corporation and Fresenius Medical Care Holdings, Inc.; and

Deferred payments at $110 million per year for five years beginning in 2019, and $100 million per year for ten years beginning in 2024; the deferred payments would be obligations of Grace backed by 50.1% of Grace's common stock to meet the requirements of Section 524(g).

The agreement in principle contemplates the filing of a plan of reorganization and related documents with the Bankruptcy Court. The plan will be subject to approval of its co-proponents, exit financing, and Bankruptcy Court and District Court approvals.

"This agreement in principle is a very important step in emerging from Chapter 11," said Fred Festa, Grace's Chairman, President and Chief Executive Officer. "In this challenging global marketplace, we need to be able to focus all of our efforts on increasing shareowner value and continued improvement in our core businesses. The agreement and the Plan of Reorganization that will be based on it will be good for our shareholders, customers, creditors, and our employees. A lot of work remains to be done before we can confirm a Plan of Reorganization, but I am optimistic we will be successful in reaching that goal by the end of this year or early in 2009."

1
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

"Also, I want to point out that the Plan of Reorganization will preserve all employee benefits. During the seven years we have been in Chapter 11, our people have nearly doubled Grace's sales and dramatically improved the core businesses. We look forward to final approval of our Plan of Reorganization when we can once again operate without the constraints of Chapter 11," said Festa.

*    *    *    *    *

Grace is a leading global supplier of catalysts and other products to petroleum refiners; catalysts for the manufacture of plastics; silica-based engineered and specialty materials for a wide-range of industrial applications; sealants and coatings for food and beverage packaging, and specialty chemicals, additives and building materials for commercial and residential construction. With annual sales of more than $3.1 billion, Grace has about 6,500 employees and operations in over 40 countries. For more information, visit Grace's web site at www.grace.com.

\*     \*     \*     \*     \*

This announcement contains forward-looking statements, that is, information related to future, not past, events. Such information generally includes the words "believes," "plans," "intends," "targets," "will," "expects," "anticipates," "continues" or similar expressions. For these statements, Grace claims the protection of the safe harbor for forward-looking statements contained in the Private Securities Litigation Reform Act of 1995. Grace is subject to risks and uncertainties that could cause actual results to differ materially from those projected in the forward-looking statements or that could cause other forward-looking information to prove incorrect. Factors that could cause actual results to materially differ from those contained in the forward-looking statements include: Grace's bankruptcy, plans of reorganization proposed by Grace and others, Grace's legal proceedings (especially the Montana criminal proceeding and environmental proceedings), the cost and availability of raw materials and energy, Grace's unfunded pension liabilities, costs of environmental compliance, risks related to foreign operations, especially, security, regulation and currency risks and those factors set forth in Grace's most recent Annual Report on Form 10-K, quarterly report on Form 10-Q and current reports on Form 8-K, which have been filed with the Securities and Exchange Commission and are readily available on the Internet at www.sec.gov. Reported results should not be considered as an indication of future performance. Readers are cautioned not to place undue reliance on forward-looking statements, which speak only as of the date thereof. Grace undertakes no obligation to publicly release any revisions to the forward-looking statements contained in this announcement, or to update them to :eflect events or circumstances occurring after the date of this announcement.


###


Corporate Communications

W. R. Grace & Co.-Conn.

7500 Grace Drive

Columbia, MD 21044

2

--------------------------------------------------------------------------------

Exhibit 99.2

W. R. GRACE & CO., et al.
CASE NO. 01-1139 (JFK)


TERM SHEET FOR RESOLUTION OF
ASBESTOS PERSONAL INJURY CLAIMS


This Term Sheet sets forth certain of the principal terms and conditions under
which the Debtors, the Official Equity Security Committee, the Official
Committee of Personal Injury Claimants ("ACC") and the Future Claimants
Representative ("FCR") in the above-captioned Chapter 11 cases are prepared to
file a plan of reorganization ("Plan") as co-proponents providing for the
resolution of all asbestos personal injury claims and liabilities, including
without limitation all asbestos personal injury claims pending at the filing
date of the Chapter 11 cases and those arising subsequent thereto
(collectively, "Asbestos PI Claims").  This Term Sheet also sets forth the
proposed treatment of other key classes of claims asserted in the Chapter 11
cases.  This Term Sheet has been produced for settlement purposes only and is
subject to the provisions of Rule 408 of the Federal Rules of Evidence.


I.              Treatment of Claims

A.              Asbestos PI Trust

All Asbestos PI Claims will be channeled to a trust (the "Asbestos PI Trust")
that is established in accordance with Section 524(g) of the United States
Bankruptcy Code.  The Asbestos PI Trust will pay claims from trust assets in
accordance with a trust agreement and trust distribution procedures established
by the ACC and FCR in connection with the Plan.

1.              Funding of Asbestos PI Trust at Emergence.  On the Effective
Date of the Plan, the Asbestos PI Trust shall receive the following, each of
which shall be a condition to the Plan becoming effective:

a.              Cash Payment: $250 million, plus, if the Effective Date occurs
after December 31, 2008, interest from January 1, 2009 to the Effective Date
accrued at the same rate applicable to Grace's senior debt.

b.              Insurance: the assignment by W. R. Grace & Co.-Conn. ("Grace")
and all of its affiliates to the Asbestos PI Trust, of all insurance policies
and all insurance proceeds available for payment of Asbestos PI Claims,
effective as of the Effective Date, including without limitation:

i.              Any such proceeds from the date hereof of all settlements with
insurance companies, and all interest accrued thereon;

----------------------------------------------------------------------------
ii.             Any proceeds of the settlement with Equitas held in escrow with
all interest accrued thereon;

iii.            Any proceeds of all settlements with all insurance companies

under coverage in place agreements or installment payment arrangements where payment has not yet occurred;

iv.           Assignment of and the right to recover on all outstanding insurance policies potentially applicable to personal injury claimants; and

v.            The right to recover from all insolvent insurance estates as to which Grace or its affiliates has made a claim and the proceeds of all payments received by Grace or its affiliates from those insolvent estates after the date hereof, and all interest accrued thereon.

Provided however that Grace is in the process of examining its policies and the foregoing will not affect Grace's separate coverages, if any, for losses not arising from asbestos personal injury claims.

The ACC and FCR (or, after the Effective Date, the Asbestos PI Trust) shall control (and Grace shall cooperate in connection with) any negotiations or legal proceedings related to the underlying policies or settlement agreements applicable to Asbestos PI Claims.

c.            Warrant: a warrant for 10 million shares of W. R. Grace & Co. ("Parent") common stock, exercisable at $17 per share, and expiring one year after the Effective Date.

d.            Cryovac, Inc. Payment: The consideration contemplated by the Sealed Air Settlement Agreement.

e.            Fresenius Medical Care Payment: The proceeds of the payment contemplated by the Fresenius Settlement Agreement.

2.            Deferred Payment Obligations: Grace shall make additional payments to the Asbestos PI Trust over a 15 year period as follows:  five annual payments of $110 million commencing on January 2, 2019; and 10 annual payments of $100 million commencing on January 2, 2024.  Such payment obligations shall be subordinate to any bank debt or bonds outstanding and shall be guaranteed by Parent or any successor ultimate parent entity of Grace.  Such guaranty shall be secured by an obligation of Parent to issue to the Asbestos PI Trust, in the event an additional payment is not made, the number of shares of Parent common stock which, when

2

----------------------------------------------------------------------------------

added to the number of shares of common stock issued and outstanding as of the Effective Date, shall constitute 50.1% of the voting shares of Parent as of the Effective Date (such number of shares shall be equitably adjusted for stock splits, stock dividends, recapitalizations, corporate reorganizations or changes in control of Parent after the Effective Date).

B.            Other Classes

1.            Administrative Claims: 100% of allowed amount in cash.

2.            Priority Tax Claims: 100% of allowed amount in cash.

3.            Priority Non-Tax Claims: 100% of allowed amount in cash.

4.            Secured Claims: 100% of allowed amount either in cash or by reinstatement.

5.            Unsecured Employee Claims (post-retirement health and special pension): 100% of allowed amount by reinstatement.

6.            Workers Compensation Claims: 100% by reinstatement.

7.            Allowed General Unsecured Claims: 100% of allowed amount plus

post-petition interest as follows: (i) for holders of pre-petition bank credit facilities, post-petition interest at the rate of 6.09% from the filing date through December 31, 2005 and thereafter at floating prime, in each case compounded quarterly; and (ii) for all other unsecured claims, interest at 4.19%, compounded annually, or if pursuant to an existing contract, interest at the non-default contract rate.

8.          Allowed Environmental Claims: 100% of allowed amount in cash.

9.          Traditional Asbestos Property Damage Claims:  100% of allowed amount in cash for settled claims.  The Plan shall set forth procedures for the allowance of all Asbestos PD Claims that are disputed as of the Effective Date.

10.          ZAI Claims: Unless the Plan Proponents agree otherwise as to the treatment of ZAI Claims, the court shall estimate, for purposes of allowance and distribution, any liability on account of ZAI Claims prior to or in connection with the confirmation of the Plan.  ZAI Claims shall be paid 100% of their allowed amount up to the amount of the court's estimate.

II.                              Channeling Injunctions.  The Plan shall contain injunctions under Sections 524(g) and Section 105(a) of the Bankruptcy Code to protect the Debtors, Cryovac, Sealed Air, Fresenius, their affiliates, officers, directors and employees, and other parties in interest and certain insurers.  The Plan shall also contain such provisions, injunctions and releases

3

------------------------------------------------------------------------

(i) as are necessary to comply with the terms of the Sealed Air Settlement Agreement and the Fresenius Settlement Agreement; and (ii) to the full extent permitted by law, to indemnify, and release all of Grace's officers, directors, employees and professionals, and the members of all official committees, the FCR and their professionals, from any liability on account of claims against Grace, or arising in or in connection with these Chapter 11 cases.  The foregoing injunctions, indemnifications and releases shall be at least as extensive as, and consistent with, the injunctions, indemnifications and releases provided for under Grace's Amended Plan currently filed in the Chapter 11 Cases to the extent such latter injunctions, indemnifications and releases are not inconsistent with this Term Sheet.

III.          Resolution of Outstanding Issues.  The parties agree to cooperate in seeking a resolution of outstanding issues material to or not otherwise resolved in connection with the confirmation of a plan of reorganization.

IV.          Binding Effect.  This Term Sheet has been approved by all necessary corporate or organizational action of the Board of Directors of

Parent and Grace, the ACC, the FCR and the Equity Committee, and shall be binding upon the parties and each of their respective successors and assigns to the fullest extent permitted by applicable law. The parties shall use their best efforts to incorporate the terms of this Term Sheet into a mutually agreeable plan of reorganization to be filed with the Bankruptcy Court as soon as possible.

V.              Confidentiality.

The parties shall treat all negotiations regarding this Term Sheet as confidential. Neither the contents nor the existence of this Term Sheet shall be disclosed by any party, either orally or in writing, except to its directors, officers, employees, legal counsel, financial advisors, accountants and clients on a confidential basis until the Debtors have issued a press release announcing the terms and conditions contained herein. Notwithstanding the foregoing, the parties agree that this Term Sheet or the terms of this Term Sheet may be disclosed to the Official Committee of Unsecured Creditors and the Official Committee of Asbestos Property Damage Claimants. Grace will provide counsel to the ACC and counsel to the FCR an opportunity to review and comment on any press release relating to this Term Sheet prior to its issuance.

4

---------------------------------------------------------------------------

AGREED TO AND ACCEPTED BY:
Dated: April 6, 2008
THE DEBTORS:
W. R. GRACE & CO., on behalf of itself and its subsidiaries and affiliates that are Debtors in the Chapter 11 cases
By:                              /s/ Fred Festa
Name:                            Fred Festa
Title:                           Chairman, President and Chief Executive
                                 Officer
THE OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS
By:                              /s/ R. Ted Weschler
Name:                            R. Ted Weschler
Title:                           Chair of the Committee
THE OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS:
CAPLIN & DRYSDALE, CHARTERED, on behalf of and in its capacity as counsel to the ACC
By:                              /s/ Elihu Inselbuch
Name:
                                              Elihu Inselbuch
THE FUTURE CLAIMANTS REPRESENTATIVE:
ORRICK, HERRINGTON & SUTCLIFFE LLP, on behalf of and in its capacity as counsel to the FCR
By:                              /s/ Roger Frankel
Name:
                                              Roger Frankel

5

---------------------------------------------------------------------------

REMAINDER OF EXHIBIT OMITTED
SEE EXHIBIT 6 TO EXHIBIT BOOK
(D.I. 20874)



## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re:** | ) | Chapter 11 |
| | ) | |
| **W. R. GRACE & CO.,** *et al.* | ) | Case No. 01-1139 (JKF) |
| | ) | Jointly Administered |
| **Debtors.** | ) | |
| | ) | |

**FIRST AMENDED JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE OF W. R. GRACE & CO., ET AL., THE OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS, THE ASBESTOS PI FUTURE CLAIMANTS' REPRESENTATIVE, AND THE OFFICIAL COMMITTEE OF <u>EQUITY SECURITY HOLDERS DATED FEBRUARY 27, 2009</u>**

REMAINDER OF EXHIBIT OMITTED
SEE FIRST AMENDED JOINT PLAN
(D.I. 20872)

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

EXHIBIT
ACC3O6X6-6
5-1-09    IX

In re:

W. R. GRACE & CO., *et al.*[1]

Debtors.

)
)
)
)
)
)
)
)

Chapter 11

Case No. 01-01139 (JKF)
Jointly Administered

**EXHIBIT 19 TO EXHIBIT BOOK
RETAINED CAUSES OF ACTION SCHEDULE**

**EXHIBIT 19**

Attached.

---

[1]  The Debtors consist of the following 62 entities:  W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co. Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., GC Limited Partners I, Inc., (f/k/a Grace Cocoa Limited Partners I, Inc.), GC Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc. GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation., W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (F/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

REMAINDER OF EXHIBIT OMITTED
SEE EXHIBIT 19 TO EXHIBIT BOOK
(D.I. 20874)



IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - X

In re:                                              § Chapter 11
                                                    §
W. R. GRACE & CO., <u>et al.</u>,                   § Case No. 01-01139 (JKF)
                                                    §
                    Debtors.                        § Jointly Administered
- - - - - - - - - - - - - - - - - - - - - - - - - - X
THE SCOTTS COMPANY,                                 §
                                                    §
        Plaintiff,                                  §
                                                    §
        v.                                          §
                                                    § Adv. Pro. No. _____
AMERICAN EMPLOYERS                                  §
INSURANCE COMPANY; BOSTON OLD                       §
COLONY INSURANCE COMPANY; CONTINENTAL               §
CASUALTY COMPANY; EMPLOYERS COMMERCIAL              §
UNION N/K/A ONEBEACON AMERICA                       §
INSURANCE COMPANY; MARYLAND                         §
CASUALTY COMPANY; UNIGARD                           §
INSURANCE COMPANY,                                  §
                                                    §
    – and –                                         §
                                                    §
W. R. GRACE & CO., et al., Debtors.[1]              §
                                                    §
        Defendants.                                 §
                                                    §

## COMPLAINT FOR DECLARATORY AND OTHER RELIEF

---

[1]    The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food >N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc.), E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

Plaintiff The Scotts Company ("Plaintiff" or "Scotts"), by and through its counsel, alleges as follows:

## Introduction

1.    This is an insurance coverage action for declaratory relief, pursuant to United States Bankruptcy Rule 7001.

2.    Plaintiff seeks declaratory and other relief with respect to the liability insurance policies sold to W. R. Grace & Co. (the "Debtors" or "W. R. Grace") by the Insurance Defendants (all defendants except for the Debtors are collectively referred to as the "Insurance Defendants"). The policies obligate the Insurance Defendants to provide coverage to Plaintiff for asbestos-related liabilities that have arisen or may arise in connection with W. R. Grace vermiculite sold by Scotts.

3.    The Insurance Defendants' duties under the policies include the obligations to defend, investigate, and indemnify Plaintiff with respect to asbestos-related bodily injury claims asserted against Plaintiff in multiple jurisdictions (the "BI Actions").

## The Parties

4.    The Scotts Company is an Ohio corporation with its principal place of business in Marysville, Ohio. Scotts is referred to herein as "Plaintiff."

5.    Defendant American Employers Insurance Company ("American Employers") is a Massachusetts corporation with its principal place of business in Boston, Massachusetts.

6.    Defendant Boston Old Colony Insurance Company ("Boston Old") is a Massachusetts corporation with its principal place of business in Chicago, Illinois.

7.    Defendant Continental Casualty Company ("Continental Casualty") is an

Illinois corporation with its principal place of business in Chicago, Illinois.

8.      Defendant Employers Commercial Union n/k/a OneBeacon America Insurance Company ("Employers Commercial") is a Massachusetts corporation with its principal place of business in Boston, Massachusetts.

9.      Defendant Maryland Casualty Company ("Maryland Casualty") is a Swiss corporation with its principal place of business in Schaumburg, Illinois.

10.      Defendant Unigard Insurance Company ("Unigard") is a Washington corporation with its principal place of business in Bellevue, Washington.

11.      Each of the foregoing Insurance Defendants is and, at all time relevant hereto was, engaged in the business of selling liability insurance.

12.      Defendant W. R. Grace & Co., et al. ("W. R. Grace") purchased liability insurance policies from the foregoing Insurance Defendants and has claimed an interest in the proceeds of such policies.

13.      Upon information and belief, W. R. Grace purchased liability insurance policies from other insurers. To the extent those policies extend coverage to Plaintiff for the BI Actions, Plaintiff will seek leave to join those insurers, once their identity is known.

**Jurisdiction**

14.      Jurisdiction over this adversary proceeding is proper pursuant to 28 U.S.C. § 1134 and 28 U.S.C. § 157.

15.      Venue over this adversary proceeding is proper pursuant to 28 U.S.C. § 1409.

16.      This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O).

**Procedural History**

17.    On April 2, 2001 (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  Since the Petition Date, the Debtors have continued to operate their businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

18.    On January 22, 2002, this Court entered an order (the "Injunction Order") that stays and enjoins actions "for which there <u>may</u> be coverage under the Insurance Policies," which Insurance Policies are defined in the Injunction Order as "those insurance policies that may provide coverage for asbestos-related claims asserted against the Debtors."  <u>See</u> Exhibit A, Injunction Order, p. 3 at ¶¶ 9, 10.b. (emphasis added).  The Injunction Order further stays and enjoins actions "against Insurance Carriers alleging coverage for asbestos-related liabilities."  <u>Id.</u>, at ¶ 10.d.

19.    On July 22, 2004, this Court entered an Order Denying the Expedited Motion of the Scotts Company for an Order (I) Enforcing the Debtors' Preliminary Injunction and Automatic Stay to Enjoin Prosecution of Certain Asbestos-Related Actions against The Scotts Company and (II) Finding all such Actions Commenced Post-Petition Void *Ab Initio* (the "July 2004 Order").  <u>See</u> Exhibit B, July 2004 Order.

20.    In its July 2004 Order, this Court prohibited "[t]he Insurance Carriers as to which Scotts makes a claim on shared insurance . . . from paying those claims <u>until the issue of coverage is litigated in an appropriate forum</u>."  <u>Id.</u>, at ¶ 2 (emphasis added).

21.    In response to this Court's July 2004 Order, Plaintiff hereby seeks to litigate the issue of coverage in this forum.

4

## Nature of Causes of Action

22.     Many of the Insurance Policies addressed by the Injunction Order extend

coverage to vendors of W. R. Grace's products, including Plaintiff (the "Shared Insurance

Policies"). A list of the Shared Insurance Policies of which Plaintiff is presently aware is

attached to the Injunction Order as Exhibit B.[2]  (See Exhibit A hereto).

23.     The Shared Insurance Policies include, but are not limited to, the

following:

(a)     The Maryland Casualty Company Primary Policies (1967-73).  Maryland
Casualty Company issued two, three-year primary-layer policies of
comprehensive general liability insurance to W. R. Grace.  The first
policy, policy no. 31-278301, covers the period from June 30, 1967 to
June 30, 1970.  The second policy, policy no. 31R-911051, covers the
period from June 30, 1970 to June 30, 1973.  Both policies extend
coverage to "Any person or organization (herein referred to as 'vendor'), as
an Insured, but only with respect to the distribution or sale in the regular
course of the vendor's business of the named insured's products . . . ."

(b)     The Umbrella Policies above the Maryland Casualty Primary Policies
(1967-73).  During the period of the Maryland Casualty Company Primary
Policies referenced above, W. R. Grace purchased first-layer umbrella
policies from American Employers Insurance Company (policy nos. A16-
8220-001 and A16-8220-003) and Employers Commercial Union
Insurance Company (policy no. EY-8220-005).    All three umbrella
policies afford coverage to "any other person or organization who is an
additional Insured under any underlying policy of insurance . . . ."
Plaintiff qualifies as an insured under these umbrella policies, because it is
an additional insured under the Maryland Casualty Company Primary
Policies.

(c)     The Excess Policies above the Maryland Casualty Primary Policies (1967-
73).  Upon information and belief, the upper-layer excess liability policies
sold to W. R. Grace for this period contain provisions specifying that those
policies "follow form" to the terms of the underlying umbrella policy.
Thus, the upper-layer excess policies issued to W. R. Grace likely follow
form to the terms of the umbrella policy issued by American Employers or

---

[2]     Because of the voluminous nature of the Shared Insurance Policies, complete copies of those policies have not been
attached to this Complaint. Exhibit B to the Injunction Order contains a list of the Shared Insurance Policies, the policy numbers,
and the effective dates of said policies.

Employers Commercial Union. Because Plaintiff qualifies as an insured under the umbrella policies, it also qualifies as an insured under W. R. Grace's upper-layer excess policies.

(d)     The Continental Casualty Insurance Company Primary Policies (1973-79). In addition to the primary policies issued by Maryland Casualty, Continental Casualty Insurance Company sold two, three-year primary policies to W. R. Grace, covering the period from June 30, 1973 to June 30, 1976 (policy no. 902-36-70), and from June 30, 1976 to June 30, 1979 (policy no. 248-3440). Upon information and belief, both Continental Casualty policies contain the identical "additional insured" language found in the Maryland Casualty policies. As a result, Plaintiff is as an additional insured under the Continental Casualty policies as a vendor of W. R. Grace's vermiculite products.

(e)     The Umbrella Policies above the Continental Casualty Primary Policies (1973-79). The first-layer umbrella policies during this period were issued by Employers Commercial Union, Unigard Mutual, and various London-based insurers. The Employers Commercial Union policy is the same policy that was issued during the period of the Maryland Casualty primary policies, and affords coverage to "any other person or organization who is an additional Insured under any underlying policy of insurance . . . ." The Unigard policy, policy no. 1-2517, contains identical language. Upon information and belief, the umbrella policies issued by the London-based insurers contain similar language. To the extent that Plaintiff is as an insured under the primary-layer Continental Casualty policies, it is also an insured under the first-layer umbrella policies.

(f)     The Excess Policies above the Continental Casualty Primary Policies (1973-79). Plaintiff is also an insured under the excess policies purchased by W. R. Grace during this period. For example, Boston Old Colony issued an excess policy of insurance to W. R. Grace, policy no. LX 2 666 569, covering the period from June 30, 1974 to June 30, 1977. The policy is part of a quota share layer of $25 million which attaches at $75 million. An endorsement to the policy states that the "policy is hereby amended to follow all the terms, conditions, definitions and exclusions of the first umbrella policy (Insurer - Unigard Mutual Insurance Company, policy no. 1-2517) and all renewal and replacements thereof." Because Plaintiff qualifies as an insured under the Unigard policy, it likewise qualifies as an insured under the Boston Old Colony policy. Moreover, upon information and belief, all of the other policies sharing this excess layer contain comparable, if not identical, language, as do the other upper-layer excess policies purchased by W. R. Grace from June 30, 1973 to June 30, 1979.

6

24.     Beginning in approximately 1960 and continuing for some forty years, Plaintiff purchased vermiculite from W. R. Grace for resale to customers. Most of the vermiculite that W. R. Grace sold to Plaintiff from the early 1960s until 1980 came from the W.R. Grace mine at Libby, Montana ("Libby"). It was ultimately determined that some of the Libby vermiculite that W. R. Grace sold to Plaintiff may have contained asbestos.

25.     In the BI Actions, Plaintiff is currently defending asbestos-related bodily injury claims arising out of the W. R. Grace vermiculite Plaintiff sold in the marketplace. Seventy-six of these BI Actions involving approximately 4,192 plaintiffs were filed following the Petition Date.

26.     In connection with the BI Actions, Plaintiff has incurred expenses and will continue to expend substantial amounts of money (the "Defense Expenses") in defense of claims alleging bodily injury to third parties arising out of the W. R. Grace vermiculite sold by Scotts.

27.     Because the allegations against Plaintiff in the BI Actions are premised on the purported asbestos found in the W. R. Grace vermiculite sold by Plaintiff, Plaintiff has a right to coverage under these Shared Insurance Policies.

28.     Plaintiff hereby tenders the BI Actions to the Insurance Defendants for defense and indemnity in accordance with the terms of their respective insurance policies.

## COUNT ONE
### (Declaratory Judgment against all Insurance Defendants)

29.     The averments of paragraphs 1 through 28 hereof are incorporated by reference as if herein set forth at length.

30.     Pursuant to the terms of their respective policies, each Insurance Defendant is obligated, *inter alia*, to defend Plaintiff, to pay Plaintiff's defense costs, including the costs of investigation, and to indemnify Plaintiff in connection with claims by third parties

alleging liability of the Plaintiff for damages because of bodily injury incurred in connection with W. R. Grace products sold by Plaintiff.

31.     The claimants in the BI Actions allege that such bodily injuries as hereinabove described occurred during some part of the policy years during which the Shared Insurance Policies were in effect.

32.     All conditions precedent to recovery under the Shared Insurance Policies referenced in Exhibit B have been satisfied or waived.

33.     An actual controversy currently exists among Plaintiff and the Insurance Defendants with respect to their duties and obligations under the Shared Insurance Policies in that Plaintiff contends:

(a)     Each Insurance Defendant has a duty to provide Plaintiff with a full defense and to pay all defense costs incurred in connection with the BI Actions in which bodily injury potentially occurred during its respective policy period;

(b)     Each Insurance Defendant has a duty to indemnify Plaintiff for all sums that Plaintiff may be obligated to pay as damages in the BI Actions in which bodily injury occurred during its respective policy period; and

(c)     In the event that more than one of the Insurance Defendants owes Plaintiff defense and/or indemnity, Plaintiff is entitled to select the insurance policy and policy years which will be accessed to provide such defense and/or indemnity payments.

34.     Upon information and belief, each Insurance Defendant disputes one or more of Plaintiff's contentions set forth in the immediately preceding paragraph.

35.     Declaratory relief from this Court will resolve some or all of said disputes and controversies.

36.     Pursuant to 28 U.S.C. § 2201, Plaintiff is entitled to a declaration by this Court of its rights and the Insurance Defendants' duties.  A judicial declaration is necessary to

8

determine Plaintiff's rights and the Insurance Defendants' duties regarding the Shared Insurance Policies and their applicability to the BI Actions. Pursuant to 28 U.S.C. § 2202, this Court may also grant further necessary or proper relief as it deems appropriate.

WHEREFORE, Plaintiff demands judgment in its favor against the Insurance Defendants:

(1)     requiring each Insurance Defendant to defend and to indemnify Plaintiff against all liability, loss, or expense caused by reason of the claims hereinabove described;

(2)     granting Plaintiff specific performance of the contracts of insurance issued by the Insurance Defendants;

(3)     declaring and adjudging the rights and obligations of the parties under the respective insurance policies issued to W. R. Grace with respect to past and future liabilities of Plaintiff arising from claims allegedly based upon the events hereinabove described;

(4)     for costs of suit;

(5)     for counsel fees; and

(6)     for such other and further relief, including any appropriate equitable relief, as the Court may deem just and proper.

Dated: September 2, 2004

MORRIS, NICHOLS, ARSHT & TUNNELL

*William H. Sudell* (signature)

William H. Sudell, Jr. (#0463)
Donna L. Culver (#2983)
1201 North Market Street
P. O. Box 1347
Wilmington, DE 19899-1347
Phone: (302) 658-9200
Facsimile: (302) 658-3989

and

9

Robert J. Sidman (Ohio Bar #0017390)
William J. Pohlman (Ohio Bar #0040912)
Tiffany Strelow Cobb (Ohio Bar #0067516)
Vorys, Sater, Seymour and Pease LLP
52 East Gay Street
P.O. Box 1008
Columbus, OH 43215
Phone: (614) 464-6400
Facsimile: (614) 719-4663

Attorneys for Plaintiff
The Scotts Company

425728v3

10

G = Grace's proportionate share of liability for asbestos claims
S = Scotts' proportionate share of liability for asbestos claims
L = Litigation costs incurred by Settled Asbestos Insurance Companies
   in coverage litigation with Scotts





IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE



In re:                                    )    Chapter 11
                                          )
W. R. GRACE & CO., *et al.*[1]            )    Case No. 01-01139 (JKF)
                                          )    Jointly Administered
            Debtors.                      )
                                          )
                                          )
                                          )
                                          )

EXHIBIT 2 TO EXHIBIT BOOK
ASBESTOS PI TRUST AGREEMENT

EXHIBIT 2

Attached.

---

[1]    The Debtors consist of the following 62 entities:  W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.),
W. R. Grace & Co. Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon,
Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc.,
Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC
(f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., GC Limited Partners I, Inc., (f/k/a
Grace Cocoa Limited Partners I, Inc.), GC Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC
Management Corporation, GN Holdings, Inc. GPC Thomasville Corp., Gloucester New Communities
Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary
Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe,
Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc.
(f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace
Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W.
R. Grace Capital Corporation., W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe
Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai
Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH,
Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings
Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (F/k/a Nestor-BNA, Inc.), MRA
Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental
Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin &
Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country
Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

REMAINDER OF EXHIBIT OMITTED
SEE EXHIBIT 2 TO EXHIBIT BOOK
(D.I. 20874)

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al.[1] | ) | Case No. 01-01139 (JKF) |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | |
| | ) | |
| | ) | |

EXHIBIT 4 TO EXHIBIT BOOK
TRUST DISTRIBUTION PROCEDURES

EXHIBIT 4

Attached.

---

[1]    The Debtors consist of the following 62 entities:  W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.),
W. R. Grace & Co. Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon,
Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc.,
Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC
(f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., GC Limited Partners I, Inc., (f/k/a
Grace Cocoa Limited Partners I, Inc.), GC Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC
Management Corporation, GN Holdings, Inc. GPC Thomasville Corp., Gloucester New Communities
Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary
Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe,
Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc.
(f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace
Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W.
R. Grace Capital Corporation., W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe
Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai
Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH,
Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings
Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (F/k/a Nestor-BNA, Inc.), MRA
Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental
Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin &
Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country
Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

REMAINDER OF EXHIBIT OMITTED
SEE EXHIBIT 4 TO EXHIBIT BOOK
(D.I. 20874)

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE



In re:                                    )        Chapter 11
                                          )
W. R. GRACE & CO., *et al.*[1]            )        Case No. 01-01139 (JKF)
                                          )        Jointly Administered
            Debtors.                      )
                                          )
                                          )
                                          )
                                          )


EXHIBIT 10 TO EXHIBIT BOOK
COOPERATION AGREEMENT

EXHIBIT 10

Attached.

---

[1]  The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.),
W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon,
Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc.,
Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC
(f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., GC Limited Partners I, Inc., (f/k/a
Grace Cocoa Limited Partners I, Inc.), GC Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC
Management Corporation, GN Holdings, Inc. GPC Thomasville Corp., Gloucester New Communities
Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary
Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe,
Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc.
(f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace
Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W.
R. Grace Capital Corporation., W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe
Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai
Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH,
Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings
Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (F/k/a Nestor-BNA, Inc.), MRA
Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental
Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin &
Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country
Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

REMAINDER OF EXHIBIT OMITTED
SEE EXHIBIT 10 TO EXHIBIT BOOK
(D.I. 20874)