UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF PENNSYLVANIA


IN RE:                        .    Case No.  01-01139 (JKF)
                              .    Jointly Administered
W.R. GRACE & COMPANY,         .
et al.,                       .    5414 U.S. Steel Tower
                              .    600 Grant Street
                              .    Pittsburgh, PA 15219
          Debtors.            .
                              .    June 22, 2009
. . . . . . . . . . . . . ..       9:04 a.m.


TRANSCRIPT OF HEARING
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtors:          Kirkland & Ellis, LLP
                          By:  DAVID BERNICK, ESQ.
                               BARBARA HARDING, ESQ.
                               JANET BAER, ESQ.
                               LISA ESAYIAN, ESQ.
                          200 East Randolph Drive
                          Chicago, IL  60601


For the Debtors:          Kirkland & Ellis, LLP
                          By:  THEODORE FREEDMAN, ESQ.
                               JUSTIN BROOKS, ESQ.
                               DEANNA BOLL, ESQ.
                          Citigroup Center
                          601 Lexington Avenue
                          New York, NY  10022-4611


Audio Operator:           Cathy Younker

Proceedings recorded by electronic sound recording, transcript
               produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609)586-2311      Fax No. (609) 587-3599**

APPEARANCES (CONT'D):

| | |
|---|---|
| For W.R. Grace: | Pachulski Stang Ziehl & Jones, LLP<br>By:  JAMES E. O'NEILL, III, ESQ.<br>919 North Market Street, 17th Floor<br>Wilmington, DE  19899 |
| For W.R. Grace: | W.R. Grace<br>By:  RONALD R. FINKE, ESQ.<br>     MARK SHELNITZ, ESQ.<br>7500 Grace Drive<br>Columbia, MD  21044 |
| For the FCR: | Orrick, Herrington & Sutcliffe<br>  LLP<br>By:  ROGER FRANKEL, ESQ.<br>     RICHARD WYRON, ESQ.<br>     JONATHAN GUY, ESQ.<br>Washington Harbour<br>3050 K Street, N.W.<br>Washington, D.C.  20007 |
| For the PD Committee: | Bilzin Sumberg Baena Price &<br>  Axelrod LLP<br>By:  MATTHEW KRAMER, ESQ.<br>200 South Biscayne Boulevard<br>Suite 2500<br>Miami, FL  33131 |
| For the ACC: | Caplin & Drysdale, Chartered<br>By:  PETER LOCKWOOD, ESQ.<br>     NATHAN FINCH, ESQ.<br>One Thomas Circle, NW<br>Washington, D.C.  20005 |
| For the<br>Unsecured Creditors'<br>Committee: | Stroock & Stroock & Lavan<br>By:  LEWIS KRUGER, ESQ.<br>     KENNETH PASQUALE, ESQ.<br>     ARLENE KRIEGER, ESQ.<br>     180 Maiden Lane<br>     New York, NY  10038-4982 |
| For Committee of<br>Asbestos Personal<br>Injury Claimants: | Campbell & Levine<br>By:  MARK T. HURFORD, ESQ.<br>800 North King Street<br>Suite 300<br>Wilmington, DE  19701 |
| For Morgan Stanley<br>Senior Funding: | Edwards Angell Palmer & Dodge LLP<br>By:  R. CRAIG MARTIN, ESQ.<br>919 North Market Street, Suite 1500<br>Wilmington, DE  19801 |

APPEARANCES (CONT'D):

For Arrowood/Royal:            Wilson Elser Moskowitz Edelman &
                                Dicker, LLP
                               By:  CARL J. PERNICONE, ESQ.
                               150 East 42nd Street,
                               New York, NY  10017

For General Insurance          Sonnenschein Nath & Rosenthal LLP
Co. of America:                By:  ROBERT B. MILLNER, ESQ.
                               233 South Wacker Drive, Suite 7800
                               Chicago, IL  60606

For the ACC:                   Caplin & Drysdale, Chartered
                               By:  KEVIN C. MACLAY, ESQ.
                                    PETER LOCKWOOD, ESQ.
                               One Thomas Circle, NW
                               Suite 1100
                               Washington, DC  20005

For the Bank Lenders:          Paul Weiss Rifkind Wharton &
                                Garrison, LLP
                               By:  ANDREW N. ROSENBERG, ESQ.
                                    MARGARET PHILLIPS, ESQ.
                               1285 Avenue of the Americas
                               New York, NY  10019

For the Bank Lenders:          Landis, Rath & Cobb, LLP
                               By:  RICHARD COBB, ESQ.
                               919 Market Street, Suite 1800
                               Wilmington, DE  19899

For PD FCR:                    Law Office of Alan B. Rich
                               By:  ALAN RICH, ESQ.
                               1201 Main Street, Suite 1910, LB 201
                               Dallas, TX

For the Equity                 Kramer Levin Naftalis & Frankel LLP
Committee:                     By:  GREGORY HORKOVICH, ESQ.
                               1177 Avenue of the Americas
                               New York, NY  10036

For CNA:                       Goodwin Proctor
                               By:  DANIEL GLOSBAND, ESQ.
                                    MICHAEL S. GIANNOTTO, ESQ.
                               901 New York Avenue, N.W.
                               Washington, DC  20001

```
APPEARANCES (CONT'D):

For CNA:                    Ford Marrin Esposito Witmeyer &
                              Gleser, LLP
                            By:  ELIZABETH M. DeCRISTOFARO, ESQ.
                            Wall Street Plaza, 23rd Floor
                            New York, NY  10005-1875


For Sealed Air:             Skadden, Arps, Slate, Meagher &
                              Flom, LLP
                            By:  DAVID TURETSKY, ESQ.
                                 J. GREGORY ST. CLAIR, ESQ.
                            Four Times Square
                            New York, NY  10036


For GEICO, Seaton           Drinker Biddle & Reath LLP
Ins. Co., Republic          By:  MICHAEL F. BROWN, ESQ.
Ins. Co.:                        JEFFREY M. BOERGER, ESQ.
                            One Logan Square
                            18th and Cherry Streets
                            Philadelphia, PA  19103


                            Drinker Biddle & Reath LLP
                            By:  WARREN T. PRATT, ESQ.
                            1100 N. Market Street, Suite 1000
                            Wilmington, DE  19801


For Fresenius:              McDermott Will & Emery
                            By:  NATHAN F. COCO, ESQ.
                            227 West Monroe Street
                            Chicago, IL  60606


For Insurance Counsel       Anderson Kill & Olick, P.C.
to ACC:                     By:  ROBERT M. HORKOVICH, ESQ.
                            1251 Avenue of the Americas
                            New York, NY


For Mountain:               Womble Carlyle Sandridge & Rice
                            By:  FRANCIS A. MONACO, JR., ESQ.
                            222 Delaware Avenue, Suite 1501
                            Wilmington, DE


For MCC & Zurich:           Connolly Bove Lodge & Hutz LLP
                            By:  JEFFREY WISLER, ESQ.
                            The Nemours Building
                            1007 North Orange Street
                            Wilmington, DE  19899
```

APPEARANCES (CONT'D):

For MCC & Zurich:            Eckert Seamans
                            By:  EDWARD D. LONGOSZ, ESQ.
                            1747 Pennsylvania Avenue, NW
                            Suite 1200
                            Washington, DC

For MCC & Zurich:            Wiley Rein LLP
                            By:  ROBERT A. IFFT, ESQ.
                            1776 K Street NW
                            Washington, DC  20006

For AXA Belgium:             Tucker Arensberg, P.C.
                            By:  MICHAEL A. SHINER, ESQ.
                            1500 One PPG Place
                            Pittsburgh, PA  15222

For AXA Belgium:             Mendes & Mount
                            By:  EILEEN McCABE, ESQ.
                            750 Seventh Avenue
                            New York, NY  10019

For FFIC:                    Stevens & Lee
                            By:  JOHN D. DEMMY, ESQ.
                            1105 North Market Street
                            7th Floor
                            Wilmington, DE  19801

For Federal Insurance        Cozen O'Connor
Co.:                        By:  JACOB C. COHN, ESQ.
                            1900 Market Street
                            Philadelphia, PA  19103

TELEPHONIC APPEARANCES:

For the PD Committee:        Bilzin Sumberg Baena Price &
                              Axelrod LLP
                            By:  SCOTT BAENA, ESQ.
                                 JAY SAKALO, ESQ.
                            200 South Biscayne Boulevard
                            Suite 2500
                            Miami, FL  33131

For David T. Austern,        Phillips, Goldman & Spence, P.A.
the Future Claimants'        By:  JOHN C. PHILLIPS, ESQ.
Representative:              1200 North Broom Street
                            Wilmington, DE  19806

TELEPHONIC APPEARANCES (CONT'D):

For the ACC:                    Ferry Joseph & Pearce, P.A.
                                By:  THEODORE TACCONELLI, ESQ.
                                824 Market Street, Suite 19899
                                Wilmington, DE  19899

For the PD Committee:           Speights & Runyan
                                By:  DANIEL SPEIGHTS, ESQ.
                                     MARION FAIREY, ESQ.
                                     ALAN RUNYAN, ESQ.
                                200 Jackson Avenue, East
                                Hampton, SC  29924

For D.E. Shaw:                  By:  BRANDON BAER

For Bank Lenders:               Paul Weiss Rifkind Wharton &
                                  Garrison, LLP
                                By:  DANIEL BELLER, ESQ.
                                     STEPHEN SHIMSHAK, ESQ.
                                     REBECCA ZUBATY, ESQ.
                                1285 Avenue of the Americas
                                New York, NY  10019

For the Official                The Brandi Law Firm
Committee of Asbestos           By:  THOMAS J. BRANDI, ESQ.
Property Damage                      TERENCE D. EDWARDS, ESQ.
Claimants:                      354 Pine Street, Third Floor
                                San Francisco, CA  94104

For Dow Jones                   By:  PEG BRICKLEY
News Wires:

For Oliver Butt:                JP Morgan Chase & Co.
                                By:  OLIVER BUTT

For Official Committee          Lieff, Cabraser, Heimann & Bernstein
of Asbestos Property            By:  ELIZABETH J. CABRASER, ESQ.
Damage Claimants:               Embarcadero Center West
                                275 Battery Street, Suite 3000
                                San Francisco, CA  94111

For Normandy Hill               Normandy Hill Capital LP
Capital:                        By:  MATTHEW CANTOR

TELEPHONIC APPEARANCES (CONT'D):

For Burlington                Pepper Hamilton, LLP
Northern Santa Fe             LINDA J. CASEY, ESQ.
Railway:                      3000 Two Logan Square
                              Eighteenth and Arch Streets
                              Philadelphia, PA  19103


For Scotts Company:           Vorys, Sater, Seymour & Pease LLP
                              By:  TIFFANY COBB, ESQ.
                              52 East Gay Street
                              Columbus, OH  43215


For Everest                   Crowell & Moring LLP
Reinsurance Co.:              By:  LESLIE A. DAVIS, ESQ.
                                   MARK PLEVIN, ESQ.
                              1001 Pennsylvania Avenue, N.W.
                              Washington, DC  20004


For AIG:                      Zeichner Ellman & Krause, LLP
                              By:  MICHAEL S. DAVIS, ESQ.
                                   ROBERT GUTTMAN, ESQ.
                              575 Lexington Avenue
                              New York, NY  10022


For Official Committee        LECG
of Asbestos Property          By:  ELIZABETH DEVINE, ESQ.
Damage Claimants:


For Official Committee        Dies & Hile LLP
of Asbestos Property          By:  MARTIN DIES, ESQ.
Damage Claimants:             1009 Green Avenue
                              Orange, TX  77630


For Hartford Financial        Wilmer Cutler Pickering Hale & Dorr,
Service Group, Inc.:            LLP
                              By:  MELANIE DRITZ, ESQ.
                              399 Park Avenue
                              New York, NY  10022


For RBS:                      RBS Greenwich Capital
                              By:  JEFFREY FARKAS


For Travelers Casualty        Morris Nichols Arsht & Tunnell, LLP
& Surety Company of           By:  ERIN FAY, ESQ.
America:                      1201 North Market Street, 18th Fl.
                              Wilmington, DE  19801

TELEPHONIC APPEARANCES (CONT'D):

For Pentwater Capital          Pentwater Capital Management
Management:                    By:  JORDAN FISHER


For Morgan Stanley             Katten Muchin Rosenman LLP
Senior Funding:                By:  JEFF FRIEDMAN, ESQ.
                                    NOAH HELLER, ESQ.
                                    MERRITT PARDINI, ESQ.
                               575 Madison Avenue
                               New York, NY  10022


For Bank Lender Group:         Landis Rath & Cobb, LLP
                               By:  JAMES S. GREEN, JR.
                               919 Market Street, Suite 1800
                               Wilmington, DE  19899


For Canadian ZAI:              Hogan Firm, Attorneys at Law
                               By:  DANIEL K. HOGAN, ESQ.
                               1311 Delaware Avenue
                               Wilmington, DE  19806


For Everest Reinsurance        Marks, O'Neill, O'Brien & Courtney LLP
Company, et al.:               By:  BRIAN L. KASPRZAK, ESQ.
                                    JOHN D. MATTEY, ESQ.
                               913 North Market Street
                               Suite 800
                               Wilmington, DE  19801


For the U.S. Trustee:          Office of the U.S. Trustee
                               By:  DAVID KLAUDER, ESQ.
                               844 King Street, Suite 2313
                               Wilmington, DE  19801


For W.R. Grace:                Onex Credit Partners
                               By:  STUART KOVENSKY


For Official Committee         Duane Morris, LLP
of Unsecured Creditors:        By:  MICHAEL LASTOWSKI, ESQ.
                               Suite 1200
                               1100 North Market Street
                               Wilmington, DE  19801
For Asbestos Property          Pryor Cashman LLP
Damage Claimants:              By:  RICHARD LEVY, ESQ.
                               401 Park Avenue
                               New York, NY  10022

APPEARANCES (CONT'D):

| | |
|---|---|
| For Other Prof., David<br>T. Austern Future<br>Claims Rep.: | Orrick, Herrington & Sutcliffe<br>   LLP<br>By:  PERI MAHALEY, ESQ.<br>        KATE ORR, ESQ.<br>Washington Harbour<br>3050 K Street, N.W.<br>Washington, D.C.  20007 |
| For Arrowwood<br>Indemnity Co.: | Bifferato Gentilotti LLC<br>By:  GARVAN McDANIEL, ESQ.<br>800 North King Street<br>Wilmington, DE  19801 |
| For London Market<br>Company: | Mendes & Mount<br>By:  ALEX MUELLER, ESQ.<br>750 Seventh Avenue<br>New York, NY  10019 |
| For Babson Capital<br>Management: | Babson Capital Management, Inc.<br>By:  MARTI MURRAY |
| For Deborah Pace: | DebtWire<br>By:  DEBORAH PACE |
| For Various Claimant<br>Firms: | Stutzman, Bromberg, Esserman & Pflika,<br>   P.C.<br>By:  DAVID J. PARSONS, ESQ.<br>2323 Bryan Street, Suite 2200<br>Dallas, TX  75201 |
| For Other Prof., David<br>T. Austern, Future<br>Claimants Rep.: | Tre Angeli, LLC<br>By:  JOSEPH RADECKI, ESQ. |
| For Grace Certain<br>Cancer Claimants: | Montgomery, McCracken, Walker &<br>   Rhoads, LLP<br>By:  NATALIE D. RAMSEY, ESQ.<br>123 South Broad Street<br>Avenue of the Arts<br>Philadelphia, PA  19109 |
| For the Official<br>Committee of Asbestos<br>Property Damage<br>Claimants: | Scott Law Group, P.C.<br>By:  DARRELL SCOTT, ESQ.<br>926 W. Sprague Ave., Suite 680<br>Spokane, WA 99201 |

TELEPHONIC APPEARANCES (CONT'D):

For  FFIC:                    Stevens & Lee
                             By:  MARNIE SIMON, ESQ.
                             1105 North Market Street
                             7th Floor
                             Wilmington, DE  19801


For Other Prof., David       Piper Jaffray & Co.
T. Austern, Future           By:  JASON SOLGANICK, ESQ.
Claimants Rep.:


For Ford Marrin:             Ford Marrin Esposito Witmeyer &
                                Gleser, LLP
                             By:  SHAYNE SPENCER, ESQ.
                             Wall Street Plaza, 23rd Floor
                             New York, NY  10005-1875

For Goldman Sachs &          Goldman Sachs & Company
Company:                     By:  ALEXANDER THAIN


For Official Committee       Richardson Patrick Westbrook &
of Asbestos Property         Brickman
Damage Claimants:            By:  EDWARD J. WESTBROOK, ESQ.
                             1037 Chuck Dawley Boulevard
                             Building A
                             Mount Pleasant, South Carolina


For Jennifer Whitener:       Dewey & LeBoeuf LLP
                             By:  JENNIFER WHITENER, ESQ.
                             125 West 55th Street
                             New York, NY  10019

For Allstate:                Cuyler Burk, P.C.
                             By:  STEFANO V. CALOGERO, ESQ.
                             4 Century Drive
                             Parsippany, NJ  07054

1          THE CLERK:  All rise.

2                        (Pause)

3          THE COURT:  Please be seated.  Sorry.  I can't see

4   around the binders.  This is the matter of W.R. Grace, 01-1139,

5   pending in the District of Delaware, and today is the beginning

6   of the Phase I plan confirmation hearing.  The parties I have

7   participating by phone, Scott Baena, Brandon Baer, Daniel

8   Beller, Deanna Boll, Thomas Brandi, Peg Brickley, Oliver Butt,

9   Elizabeth Cabraser, Matthew Cantor, Linda Casey, Richard Cobb,

10  Tiffany Cobb, Leslie Davis, Michael Davis, Elizabeth

11  DeCristofaro, Elizabeth Devine, Martin Dies, Melanie Dritz,

12  Terence Edwards, Marion Fairey, Jeffrey Farkas, Erin Fay,

13  Jordan Fisher, Jeff Friedman, James Green, Robert Guttmann,

14  Noah Heller, Daniel Hogan, Robert Horkovich, Brian Kasprzak,

15  David Klauder, Stuart Kovensky, Matthew Kramer, Lewis Kruger,

16  Michael Lastowski, Richard Levy, Peri Mahaley, John Mattey,

17  Garvan McDaniel, Alex Mueller, Marti Murray, Kate Orr, Deborah

18  Pace, Merritt Pardini, David Parsons, Margaret Phillips, John

19  Phillips, Mark Plevin, Joseph Radecki, Natalie Ramsey, Andrew

20  Rosenberg, Alan Runyan, Jay Sakalo, Darrell Scott, Stephen

21  Shimshak, Marnie Simon, Jason Solganick, Daniel Speights,

22  Shayne Spencer, Theordore Tacconelli, Alexander Thain, Edward

23  Westbrook, Jennifer Whitener, Richard Wyron and Rebecca Zubaty.

24  I'll take entries in Court, please.  Good morning.

25          MR. BERNICK:  Good morning, Your Honor.  David

                   **J&J COURT TRANSCRIBERS, INC.**

1  Bernick for Grace.

2          MR. FREEDMAN:  Theodore Freedman for Grace.

3          MS. HARDING:  Barbara Harding for Grace, Your Honor.

4          MS. BAER:  Janet Baer for Grace.

5          MR. HURFORD:  Mark Hurford, Campbell & Levine, for

6  the ACC.  Also, Your Honor, Peter Lockwood will be here later

7  this morning, as will Kevin Maclay.  Mr. Maclay's pro hac

8  motion will be filed this morning, but since I have the mike,

9  if I could ask for him to be able to participate this week in

10 the Phase I hearings?

11         THE COURT:  When he gets here, if somebody can give

12 me some information about him I'll be happy, since I don't know

13 that the motion has been filed, I need to know where he's

14 admitted and if no one has an objection, that's fine.

15         MR. HURFORD:  Okay.  Okay.

16         THE COURT:  All right.  Thank you.

17         MR. FRANKEL:  Good morning, Your Honor.  Roger

18 Frankel for Orrick Herrington on behalf of the P.I. future

19 claims representative.  Also here is Richard Wyron and Jonathan

20 Guy, my partners.

21         MR. HOROWITZ:  Good morning, Your Honor.  Greg

22 Horowitz from Kramer Levin for the equity committee.

23         MR. KRUGER:  Good morning, Your Honor.  Lewis Kruger,

24 Stroock and Stroock and Lavan, together with my colleagues, Ken

25 Pasquale and Arlene Krieger, on behalf of the official

1  unsecured creditors' committee.

2          MR. PASQUALE:  Good morning, Your Honor.

3          MS. KRIEGER:  Good morning.

4          THE COURT:  Good morning.

5          MR. COBB:  Good morning, Your Honor.  Richard --

6          THE COURT:  Wait.  Excuse me one second.  I'm not

7  caught up yet, Mr. Cobb.  One minute.

8                      (Pause)

9          THE COURT:  Okay.  Thank you.

10         MR. COBB:  Good morning, Your Honor.  Richard Cobb of

11 Landis, Rath & Cobb, on behalf of the bank lenders.  With me is

12 Andrew Rosenberg of the Paul Weiss firm.

13         THE COURT:  Thank you.

14         MR. MARTIN:  Good morning, Your Honor.  Craig Martin

15 from the law firm of Edwards Angell Palmer & Dodge in

16 Wilmington, Delaware, on behalf of Morgan Stanley Senior

17 Funding Incorporated.

18         THE COURT:  Thank you.

19         MR. KRAMER:  Good morning, Your Honor.  Matt Kramer,

20 Bilzin Sumberg, on behalf of the property damage committee.

21         MR. RICH:  Good morning, Your Honor.  Alan Rich for

22 the PD FCR.

23         THE COURT:  Good morning.

24         MR. TURETSKY:  Good morning, Your Honor.  David

25 Turetsky of Skadden Arps on behalf of Sealed Air Corporation.

**J&J COURT TRANSCRIBERS, INC.**

1  Also with me is J. Gregory St. Clair, also a Skadden.  A pro

2  hac vice motion has been filed for him, but not yet entered,

3  and we would ask that he be allowed to appear today.

4          THE COURT:  All right.  When was it filed?  I'm

5  sorry.  I just haven't seen it yet.

6          MR. TURETSKY:  I believe June 10th, Your Honor.

7          THE COURT:  Okay.  I'll have it looked into.  Thank

8  you.

9          MR. TURETSKY:  Thank you.

10          THE COURT:  Anyone else?  All right.  Mr. Bernick?

11          MR. BERNICK:  Good morning, Your Honor.

12          THE COURT:  Good morning.

13          MR. BERNICK:  I'd note a request, now that we're

14  drawing towards the end of the case, I won't be a beneficiary,

15  but the case we just tried in Montana they had a podium for the

16  vertically challenged where if you press the button it would go

17  down.  And I note with some degree of reassurance here, I was

18  not the only one who used it.  There were other people who used

19  it, as well.

20          THE COURT:  Well, Mr. Bernick, actually -- I know

21  this is aside from today, but they're redesigning that whole

22  set up for me --

23          MR. BERNICK:  Is that right?

24          THE COURT:  And since you're the person who tends to

25  use it most, I was actually going to ask at some point in time

1  what your idea for the design would be, but --

2                        (Laughter)

3            THE COURT:  So, maybe after Court you could spend a

4  minute with my staff.

5            MR. BERNICK:  Okay.

6            THE COURT:  But if you want to -- if you need

7  something lower, pull the tray out in front of you.

8            MR. BERNICK:  No, no, no.  Actually what I'll do --

9            THE COURT:  Well, the tray does pull out.

10           MR. BERNICK:  Just let me get that little -- get that

11 little mike.

12           UNIDENTIFIED SPEAKER:  Do you want a portable?

13           MR. BERNICK:  Well, I know not to ask -- I'll start

14 out over here.  Your Honor, I think the first order of

15 business, and I know that I left a little early on Thursday,

16 but the first order of business I think today is to have -- to

17 take up the question of impairment with respect to the lenders,

18 and then after that to proceed to the insurance related

19 matters.  And I'm prepared to address an argument, where we

20 think we are.  We also have some evidence that we're prepared

21 to proffer, but I suppose that probably the best idea is for

22 both sides to address the fundamental issue that we're facing

23 on impairment before Your Honor then turns to the question of

24 what kind of evidence needs to be taken this morning with

25 respect to that.  So, that's how I plan to proceed.  And if I

1 can get the little microphone here, I'd like to draw a little

2 chart because this is at least a little bit -- I want to begin

3 --

4         MR. COBB:  Your Honor, it's Richard Cobb.  I just

5 want to be certain we're clear on what we're going to be doing

6 in the next 90 minutes, which is the amount of time the Court

7 had reserved to hear us this morning.

8         THE COURT:  Yes.

9         MR. COBB:  As Your Honor had directed on Thursday,

10 this was to be legal argument, and then evidentiary issues

11 would be dealt with either at a later time or whenever the

12 Court cared to deal with them.  That's my understanding of what

13 we were to be doing this morning.

14         MR. BERNICK:  Yes.  I didn't have the same

15 understanding, but we can take that up as we go forward here

16 this morning.

17         THE COURT:  I didn't understand I was addressing

18 factual issues at a later date.  What I thought I said was that

19 to the extent that the bank lenders' one witness was unable to

20 be here today, that we would take up that issue at a later

21 date, not all evidence.

22         MR. COBB:  I understand, Your Honor.  So, what Your

23 Honor is expecting is that there will be a presentation of

24 evidence, and that there will be argument this morning --

25         THE COURT:  If you --

1        MR. COBB:  -- except for the bank lenders' witness,

2   as we can work that out, or we'll just have to have a

3   discussion later about that.

4        THE COURT:  That's what I thought was happening.

5        MR. COBB:  Thank you, Your Honor.

6        MR. BERNICK:  We'll talk about the -- again, apart

7   from Mr. Cobb's efforts to lead the Court, what I -- I think we

8   should talk about Mr. Freedgood (phonetic) in a minute, and

9   we're prepared, certainly, to address that.  But I want, first

10  of all, to create a little bit of background here on where it

11  is that I think we've come.  And it is a little bit involved

12  and probably is going to get even more involved, so I want to

13  make sure I don't make a mistake here.

14        Your Honor has issued an opinion that deals with the

15  question of entitlement to default interest, and the first part

16  of the analysis, as Your Honor has indicated, was under 502,

17  whether default interest, or even post-petition interest was

18  allowable.  And Your Honor's answer to that question, using the

19  plain language of 502, was that there was not entitlement to

20  default interest, and that was simply based upon the plain

21  language of 502.  Your Honor then took up certain exceptions

22  that, at least arguably have been identified in the law, and

23  I'm going to talk about whether they're really exceptions or

24  not in a minute, but Your Honor's analysis assumed that there

25  were exceptions and took up those exceptions in your opinion.

1   And in dealing with the exceptions, analyzed in particular the

2   application of the language of 726, which ordinarily applies in

3   a Chapter 7, but some Courts have referred to it in the context

4   of Chapter 11.  And Your Honor determined that there was no

5   entitlement to default interest, even assuming that the

6   exception existed.  And I think that there were two bases for

7   that, one was that insolvency had not been shown -- or, I'm

8   sorry, solvency not shown, and that, two, the plan provided for

9   recovery of post-petition interest above the federal judgment

10  rate.  So, even if 726 were applicable, that is even if there

11  were solvency, the legal rate, which I think Your Honor looked

12  to the Ninth Circuit in that regard, a case out of the Ninth

13  Circuit as being persuasive, says the federal judgment rate

14  here the plan provides for interest in excess -- post-petition

15  interest in excess of the federal judgment rate, and therefore

16  even if 726 were to be applicable it would have been satisfied.

17          THE COURT:  Well actually, that analysis was based on

18  Dow, because in Dow the claims were paid at a rate less than

19  the federal rate and that's the reason I was exploring the

20  federal judgment rate.  I made no findings about the applicable

21  rate.  It didn't matter for purposes of this what the legal

22  rate is defined as except that it's not the default rate.

23          MR. BERNICK:  But -- all right.  I would add that

24  there's actually another basis for saying that 726 doesn't get

25  them there, which is -- I'd add on as a (c), because it wasn't

1  the predicate of the Court's decision.  The add on is that 726

2  really only does apply in a Chapter 11 case in connection with

3  the best interest test.  You don't get the best interest if you

4  don't have impairment, which is a fundamental architectural

5  feature that we have to deal with.  So, that's really another

6  basis, but it wasn't relied upon by Your Honor.  This is all

7  the subject of Your Honor's existing opinion.

8          We now get to the issue today about whether there is

9  impairment.  Could you pull this over for a second?  Thanks.

10  Is there impairment?  And the focal point here is 1124(1).  And

11  the simple answer to the question for today's proceedings

12  really is, I think, purely a matter of law, given the plan in

13  this case, which is if you look to the Third Circuit's decision

14  in PPIE, it says that limitations that are imposed on recovery

15  by operation of statute are not impairment.  It has to flow

16  from the plan.  That's a clear holding of the Third Circuit in

17  PPIE.  If we are to say, well, what does that mean here?  The

18  answer is that because 502 and 726 don't get you to default,

19  that that means that there is not impairment because the

20  limitation is a function of statutory limitations, not plan

21  limitations.  So, we look to see what the source of the

22  limitation is that says they can't get default interest.  You

23  come back to the same provisions that Your Honor looked to by

24  way of probing entitlement, and it's those same provisions that

25  then, by operation of law, say that there's a limitation.  In

1 that case there's no impairment.  And I think that, in a sense,

2 that's the simple answer to the question for today.

3       The bank lenders in particular in their papers really

4 treat this issue in more detail than, with due respect to the

5 folks at Stroock, the committee's papers do, although the

6 committee's papers deal with this.  The bank lenders parse it

7 pretty -- try to parse it pretty carefully.  And they basically

8 come up with the argument that says this is not a question of

9 whether default interest is owed under, or it's encompassed

10 within 502.  502 simply deals with what is an allowed -- what

11 is allowable as part of the claim.  They say that's just the

12 first step.  The second step is tacking on interest to the

13 claim, and that they're entitled to tack on interest to the

14 claim.

15       And so, I'll call this -- I won't call it -- well,

16 I'll call it tack on.  That's not meant to be pejorative.

17 We'll call it tack on, or second step, with a question mark.

18 And the question is, well, can you do that?  And if that's --

19 what they would say is, yes.  And if that tack on is then

20 limited, then there is impairment and they get back to the

21 point about impairment.  And I think that the answer to tack on

22 is no, there is no tack on, and for two principle reasons.

23 One is, in fact, 502 and 726.  That is to say you can't tack on

24 the interest if 502 and 726 say it's not recoverable.  There is

25 no way to get around 502 and 726 because they call this out.

1  There is no -- once it's gone there's no affirmative position,

2  there's no affirmative provision that says, oh, well, you can

3  still recover interest as a tack on under the Code.  It does

4  not exist.  Moreover, to the extent that the argument might be

5  made that in some fashion it's a residual, that because these

6  provisions only relate to entitlement, it remains something to

7  which they are contractually entitled, and thereby it gets

8  swept into 1121.  That's the same argument all over again.  The

9  Code is explicit in 502 about what you can get.  There's no

10  carve out for 502 that says, well, common law entitlements or

11  contractual entitlements under common law are still preserved.

12  Allowable means allowed.  It means what you get in the

13  Bankruptcy Code.  So, 502 and 726 are themselves bars to the

14  tack on.

15          They then say -- they then would say, well, wait a

16  minute.  The intention of Congress in repealing 1124(3) -- the

17  repeal of 1124(3) says, and the record says, well, gee, the

18  intent of that was to allow people to get post-petition

19  interest.  Now, it's interesting, go back into the record of

20  what actually Congress did, and I think that's laid out in the

21  most detail in the District Court's decision in PPIE, but

22  Congress was seeking to preserve really a principle that allows

23  recovery of post-petition interest only under the fair and

24  equitable standard, which doesn't come into place unless there

25  is impairment.  And so, the -- in a sense what Congress

1  probably did in repealing 1124(3) was based perhaps upon a

2  misunderstanding or an improper gloss on the law.  But in any

3  event it doesn't make a difference because while they repealed

4  1124(3), they did not repeal 1124(1).  And it's 1124(1) that is

5  the predicate of the Third Circuit's decision in PPIE.  So,

6  that then takes us to the last question, which is the dicta in

7  PPIE that says the post-petition interest is recoverable.

8  That's dicta that the Court reached in the course of disposing

9  of Solo's argument that statutory limitation was still

10  impairment.  That whole argument got into -- they got into the

11  whole argument of what it is that the repeal meant by way of

12  dealing with the question of whether Solo was correct in saying

13  that plan limitation is not the only basis for impairment,

14  statutory limitation too.  So, that was important to their

15  decision, but it was not really a holding that related to the

16  question of whether the repeal of 1124(3) actually extended in

17  some fashion to 1124(1), which on its face it did not.  And the

18  proof in the pudding to this dicta is the plan in PPIE because

19  the plan in PPIE provided for post-petition interest.  That was

20  never at issue in the case.  The plan was there.

21        And if you take a look in the bank lender's brief

22  they make the argument which is very difficult to figure out,

23  they suggest that the dicta is not dicta, it really is the

24  holding in the case.  They then go on to say that the analysis,

25  their feeling about what the analysis is by the Court was the

1  reason that the plan provided for post-petition interest.  Na-

2  ah.  The plan provided for post-petition interest before the

3  Third Circuit said anything.  So, what the Third Circuit said

4  with respect to post-petition interest was important because it

5  stood in service of a holding on a different proposition, which

6  is that statutory limitations on recovery do not comprise a

7  basis for arguing impairment.  It was not a holding that

8  related to 1124(1).  1124(1), indeed, was the predicate for the

9  Court's analysis saying that there is such as a thing as --

10 there is a difference between plan and statutory impairment.

11 So, I don't think that the dicta is germane, and I think that

12 the analysis remains completely consonant with where impairment

13 stands under the Third Circuit's decision in _PPIE_.

14       502, 726 set out limitations.  Because those are the

15 source of the limitations, there is no impairment.  There is no

16 basis for arguing an end run around that analysis by saying

17 that there's some other source, some other judicial or

18 juridical source of a right to post-petition interest.

19       Now, I think, therefore, _PPIE_ is dispositive.  Their

20 efforts for tack on are -- I find no support, indeed, they run

21 contrary to it.  But what if -- what if we considered them and

22 we said, okay, you have a tack on right?  And now the question

23 is is it impaired?  That is, if somehow they can find a basis,

24 a juridical basis for saying interest gets tacked on, is it

25 impaired?  And what's that going to bring us back to?  Say,

1  okay, what was the interest that they now can tack on?  Well,

2  they can argue that the contract provides for it.  They can't

3  argue that anything else provides for it without getting back

4  into what it is that 726 actually called for.  But again, 726

5  isn't going to help them because all it gets them to is the

6  judgment rate, federal judgment rate.  So, they get back to the

7  question of, well, what does the contract provide, and

8  therefore squarely back to the analysis that Your Honor has

9  already gone through on the question of whether they're

10 entitled to recover under 726 -- under 726 -- I'm sorry -- what

11 the amount would be if they had the ability to recover post-

12 petition interest.  In other words, Your Honor has already

13 looked at the question of what the contract provides in

14 connection with your decision with respect to entitlement.

15         I'd like to touch on that for a moment and then come

16 back to the question of what that means here.  In other words,

17 if we assume that their legal analysis is correct, that they

18 have some kind of potential entitlement under the contract

19 notwithstanding 502 and 726, and we ask whether it's now

20 impaired, we still have to go back to analyzing the contract.

21 Your Honor already has done that, and I'd like to review that a

22 little bit and then ask the question of whether there's

23 something more that should be done today, because Your Honor

24 has already addressed this.

25         Your Honor, last week we were going through the

1  question of these non-monetary defaults, and this was something

2  that the bank lenders raised prominently and said in -- and I

3  think it came in by way of saying that they wanted to tender

4  some further evidence, or they were arguing about what it is

5  Your Honor already decided.  And I think it became a little bit

6  confused as to whether Your Honor actually had addressed the

7  question of non-monetary defaults in your opinion and what the

8  basis for it was.  And it clearly is the case that Your Honor

9  specifically addressed that question.  You know what?  I think

10 it's just not being held flat.  This is at Page 4, post-

11 petition non-monetary defaults.  And Your Honor walks through

12 this issue specifically.  The only default mentioned in this

13 category is debtor's failure to meet certain reporting

14 requirements under the loan documents.  The bank lenders did

15 not specify the reporting requirements that were not met and do

16 not deny that during the course of this case debtors have

17 complied with the Court reporting requirements of the

18 Bankruptcy Code, nor would the bank lenders, which continued to

19 serve as lenders post-petition, have never in the eight year

20 life of this case expressed dissatisfaction with the debtor's

21 reporting or filed any requests in connection therewith until

22 they responded to debtor's objection to their claims.  For

23 purposes of this memorandum opinion we have insufficient

24 evidence that any alleged reporting failures under the loan

25 documents constitute a type of default that would trigger any

1  default interest provision in the loan documents.  So, it was

2  absolutely squarely addressed.

3         And we went back to kind of shake our heads a little

4  bit and say okay, Your Honor clearly did address it.  Was there

5  somehow some gap or insufficiency in the record?  And there was

6  none.  Your Honor had before you in connection with that

7  determination three -- no less than three different affidavits,

8  none of which -- all of which, Your Honor, they were cited in

9  the briefs and they were all brought to Your Honor's attention.

10 They included the affidavit of Mr. Freedgood.  And all that Mr.

11 Freedgood did was to list a bunch of agreements, and then say,

12 well, default is here -- there had been events of default,

13 Paragraph 13, have defaulted under the terms of the credit

14 agreements by, among other things, the first two are principal

15 and interest, which we're not talking about.  Your Honor has

16 addressed that squarely in the opinion in talking about whether

17 the failure to pay monetary sums post-petition is an event of

18 default and addressed that as a matter of law.  It's only the

19 third one that's non-monetary, and it's literally four lines.

20 Not furnishing to each bank all certificates and other

21 information required by Section 8.2A-C, not promptly giving

22 notice of the JPMorgan Chase Bank N.A. as required by 8.7, and

23 not remedying such breaches within 30 days.  That's it.  And

24 that was before Your Honor in connection with the opinion that

25 you rendered.  At the same time, there were two other documents

1 that were before Your Honor.  One was the declaration of Robert

2 Torola (phonetic), and the second was the declaration of Mark

3 Shelnitz.  In both -- Mr. Shelnitz, in connection with his

4 affidavit, he talks about, in Paragraph 7 he talks about the

5 fact that there were semi-monthly conference calls that took

6 place, participation in the calls, and then there were also

7 direct conversations with Mr. Kruger.  At no point during any

8 of the conversations with Mr. Kruger prior to April 2008 did

9 Mr. Kruger or anyone else at Stroock state that the creditors'

10 committee demanded that debtors pay interest under the joint

11 plan at default rate set forth in the credit agreements as a

12 condition to continuing the creditor committee's support.  And

13 this is germane because it supports Your Honor's determination

14 in the opinion that nobody ever expressed any dissatisfaction.

15          We also have Mr. Torola.  And Mr. Torola's affidavit

16 talks about -- extensively about the agreements -- the meetings

17 that took place during the process, during the plan process.

18 Paragraph 11.  In addition to these quoted conference calls,

19 Grace management team also attended annual conferences with

20 representatives of the creditors' committee, etcetera,

21 etcetera.  And basically this is all the -- these are -- this

22 is an attestation as to the flow of information that took place

23 in connection with the bankruptcy process squarely supporting

24 Your Honor's finding that there -- that the debtors had

25 complied with the reporting requirements of the Bankruptcy

1 Code.   Even Mr. Kruger, in his declaration, recited the fact

2 that there was a cooperative relationship between the debtor

3 and the creditors' committee in part as a consequence of all

4 these different meetings.   There's a cooperative relationship.

5 So, there's no question but that Your Honor's opinion was fully

6 supportive in the record that said that there had not actually

7 been a default, or there hadn't been a default and that

8 moreover the context of the bankruptcy assured that the

9 information that in a sense was the reason why these different

10 loan provisions existed was being provided in connection with

11 the bankruptcy process.   So, that is the state of the record,

12 and it is the reason why Your Honor decided in the opinion that

13 there had not been a non-monetary default, which then brings us

14 back to the impairment question.

15          If, in fact, they take the position that they can get

16 tack on, and tack on somehow survives the gauntlet of all the

17 different legal problems that exist, and the question now is is

18 it impaired?   That is, is their tack on right, whatever it

19 might be, impaired?   That takes you back to the contract and

20 therefore back to exactly the same analysis that Your Honor

21 performed in connection with the contract.   To the extent that

22 Your Honor's analysis was based in part on the Bankruptcy Code,

23 that is the Bankruptcy Code has a reporting relationship of its

24 own, they can't argue that the difference between that and the

25 contract is impairment because once again the Bankruptcy Code

reporting structure is something that's called out by the Code itself.  So, either way they come back to it.  But there is a technical issue, therefore, and Your Honor could therefore rule, bottom line, that you already have a record on the basis of which to find that any kind of tack on right that they argue is not impaired because the contract is not in default and hasn't been breached.

So, we are now at a very technical point.  They said last week -- the gentlemen is not here today -- Mr. Rosenberg, however, is here.  They said last week that Your Honor was divested of jurisdiction to deal with any of this, and on the basis of that argument they said Your Honor can't consider it. I believe Your Honor has rejected that position.  Your Honor, however, did say in the morning that you had resolved these issues and you were not going to revisit them.  And in that respect one could say that even though Your Honor had the latitude as part -- this doctrine of divestment of jurisdiction involves an issue not only of whether the issue is -- the issue framed is the same or not, but also questions of jurisprudential considerations, to want to slow up the case. If Your Honor were to say that, look, I've decided that there's no divestment because the issue is different and I have finally resolved that issue and I'm not going to touch it again, then that's basically law of the case.  That is, you've resolved the matter, you're not going to revisit it.  If Your Honor decided

1  no, there's no divestment as a prudential matter, that is for

2  prudential reasons, I'm not going to get hung up on the

3  question of whether this matter is on appeal and the fact that

4  it's on appeal, then perhaps we're not in a law of the case

5  situation and there's no reason why we can't consider further

6  evidence at this point.

7          What I would suggest, though, is the simple answer is

8  that either way Your Honor is now addressing an issue that you

9  didn't address before, which is impairment.  Impairment is a

10 new issue.  And therefore even if the prior determination is

11 law of the case, because you now have a new legal issue to

12 confront, law of the case may not be applicable and binding.

13 So, whether or not Your Honor relied upon the prudential

14 considerations to say, no, there's not been divestiture of

15 jurisdiction, or whether Your Honor relied upon the fact of

16 their being a different issue, either way, and whether there's

17 law of the case or not, either way because impairment is an

18 issue that Your Honor did not squarely address, I believe that

19 the record is now open to consider evidence on that subject.

20         The question now is what evidence?  They have

21 proposed resubmitting Mr. Freedgood's affidavit as evidence.

22 It's not evidence.  It's hearsay.  It was their decision not to

23 bring Mr. Freedgood here.  Indeed, the reports that I heard

24 after the end of the day when I ended up getting hung up at the

25 airport anyhow, was that Your Honor still could consider the

1  Freedgood affidavit.  So, the Freedgood affidavit is not a

2  proper -- is not a submission of evidence per the prior opinion

3  that controls here because in connection with the prior opinion

4  that addressed a different issue.  If we're talking about

5  impairment, and impairment is a new issue, we're not agreeable

6  that the Freedgood affidavit could be considered absent the

7  witness's appearance.  It's hearsay.

8              THE COURT:  But I think that's what I said, that he

9  would have to be made available for purposes of cross

10 examination, perhaps for direct, if the parties didn't agree

11 that we would start by way of his affidavit.  I thought that's

12 what I had ruled at the end of the hearing.

13             MR. BERNICK:  But we're not agreeable, and I don't

14 know how the affidavit comes in at all.  If they're not

15 producing the guy, it doesn't come in.  If he is produced, at

16 that time the affidavit can come in, or his testimony can come

17 in.

18             THE COURT:  Right.

19             MR. BERNICK:  So, I think that we're basically in a

20 position where the affidavit should not come in because the

21 witness is not here.  If he is made available and we have his

22 direct examination, then we can consider that testimony to the

23 extent that Your Honor wants to take that testimony out of

24 time.  I would, however, observe that Mr. Freedgood was not

25 present during most of the discussions that took place, most of

1  these meetings.  It was his predecessor, Mr. Meyer.  In Mr.

2  Freedgood's affidavit, if this is what he's going to testify

3  to, not furnishing to each bank all certificates and other

4  information required, not promptly giving notices, that fact,

5  which is different from the opinion which precedes that fact,

6  debtors have also defaulted, the fact of what he can testify to

7  is simply what has or has not taken place.  If what he is going

8  to say is that the certificates were not provided and other

9  information was not provided, I don't know that there's going

10 to be a particular issue about that.  Whether that is a

11 default, and what happened in connection with that default is a

12 totally different proposition that he hasn't addressed in his

13 affidavit.  So, the question I have of the affidavit is, number

14 one, it's hearsay, number two is it doesn't go to the ultimate

15 issue that we're really addressing, which is did that default

16 give rise to an entitlement to default interest?  That's the

17 question.  And I don't see anything in the affidavit that

18 addresses that.  So, the affidavit isn't really helpful.  By

19 contrast, we are prepared this morning to add to the record.  I

20 think that Mr. Torola's affidavit and Mr. Shelnitz's affidavit,

21 as provided in connection with Your Honor's prior opinion,

22 established that there is not a default that gives rise to an

23 entitlement to default interest for all the reasons that Your

24 Honor indicated, but we have Mr. Shelnitz here today, and he is

25 prepared to testify and will testify to the matters that are

1  set forth in his declaration, and to some other related

2  matters.  And I'll be a little bit more specific.

3          Our proffer today will show that if Your Honor takes

4  evidence on the question of whether there was impairment of the

5  contract, and therefore takes evidence on whether the contract

6  gives rise to an entitlement to default interest, it will be

7  our position that there are three answers to that that

8  demonstrate that it does not.  And the first answer is the

9  terms of the contract itself, and this is a demonstrative that

10 we'll provide to the Court.  And what it says -- what it really

11 recites are the different provisions or the different aspects

12 of what the alleged default was per Mr. Freedgood, and it lists

13 them, all these things that they say are default.  The problem

14 is that under the loan document that Mr. Freedgood is

15 referencing and that we will put in through evidence, there

16 being a default even under the terms of the contract doesn't

17 give rise to acceleration of interest or a default -- a payment

18 of a default rate of interest.  There has to be -- other steps

19 have to be taken under the strict terms of the loan documents

20 to be able to get to the point of asking for default interest,

21 and the very first one of them is you have to provide notice.

22 They never provided notice, ever, and that's in the record

23 already, and Mr. Shelnitz will confirm that in his examination.

24 End of story.  Without an event of default which requires the

25 notice you can't get acceleration and you can't get the default

1  rate of interest, and that's exactly what this demonstrative

2  indicates.  There has to be notice.  There has to be

3  acceleration.  And then there has -- based on the acceleration

4  then they get to the default rate of interest.  None of that

5  occurred here.  And because none of that occurred here, even

6  under the terms of the contract just construed

7  on their face there is no entitlement to default interest,

8  period, full stop.  That's point one.  Point two is that even

9  before you get to the question of bankruptcy, that is if we

10  were outside of bankruptcy, there is a well established

11  doctrine that says that default rates of interest where the

12  lender tries to accelerate without acting in good faith and

13  reasonably, that is to say under contract law, in order to, in

14  the case of a default with notice, to be able to accelerate,

15  there has to be a consideration of good faith and

16  reasonableness.  Put simply, you can't take a technical default

17  and say, gotcha, when the fundamental predicates of the default

18  don't warrant acceleration.  And therefore -- and we believe

19  that under these circumstances, witness their own conduct --

20  their own conduct is that they didn't press -- well, they

21  didn't give us a notice of default, and they didn't press for

22  acceleration.  Why?  Because they themselves recognize that

23  we're in bankruptcy, that we couldn't pay, that with respect to

24  the non-monetary payments they -- non-monetary obligations,

25  they recognize that we're in bankruptcy and we were loading

1  them with all kinds of information.  So that not only were the

2  literal terms of the contract not met, but under the case law,

3  under the common law of contracts you can't invoke an event of

4  default on the basis of a technical and strategic move when

5  there hasn't really been a default that warrants acceleration.

6  And here their own conduct demonstrates that they were being

7  reasonable, that is that they were not seeking to accelerate

8  because they recognize that, A, we couldn't make the payments,

9  and that, B, insofar as the non-monetary obligations were

10  concerned they were already being effectively discharged

11  because we were providing them with the information that they

12  actually needed.  And then, thirdly, we get to the bankruptcy

13  overlay.  And the bankruptcy overlay is really pretty obvious,

14  and this would say, again, you can't have impairment of the

15  contract if the bankruptcy case is making you do what you're

16  doing.  And in this case that is flat out what Your Honor

17  already has pointed to and indicated.  We couldn't comply with

18  the contract in paying principal and interest because it would

19  violate the Bankruptcy Code.  And for exactly the same reason

20  that you see articulated in PPIE, that is statutory limitations

21  don't give rise to impairment, the statutory limitation that

22  says we couldn't pay principal and interest doesn't give rise

23  to impairment.  By the same token the statutory process whereby

24  we communicate all kinds of information to the other side,

25  instead of filling out a bunch of forms and certificates is, in

1    fact, the process that the Bankruptcy Code dictates that we

2    follow.  And because we followed that process to the extent

3    that there wasn't a certificate, well, there wasn't a

4    certificate because it would be silliness.  That was something

5    that would be appropriate outside of bankruptcy, not

6    appropriate inside of bankruptcy.  So, the PPIE analysis that

7    says globally there's no such thing as a limitation imposed by

8    the bankruptcy process and law that provides a limitation that

9    means impairment.  It doesn't exist. Effectively that if you

10   comply with the bankruptcy process and the bankruptcy law, the

11   other side can't argue -- can't ask for more, can't vote the

12   plan down.  That is just bedrock.  That's PPIE.  And under --

13   in this case, again, their conduct demonstrates that we were

14   doing precisely that.  So, if we can't pay principal and we

15   can't pay interest, and we're providing them with all the

16   information, on what basis do they say that under the

17   Bankruptcy Code their right to non-monetary information is

18   being impaired?  It can't be.

19          So, on the basis of all these different things, Your

20   Honor, we believe that the evidence will show through Mr.

21   Shelnitz that there has not -- and through the other materials

22   that we're going to proffer here, that there is no entitlement

23   under the contract to default interest, now in the context of

24   impairment, and in further that the bankruptcy process and the

25   bankruptcy restrictions on what we can do mean that to the

**J&J COURT TRANSCRIBERS, INC.**

1 extent that there is any, quote, effect on the contract, it

2 doesn't constitute impairment by reason of the decision by the

3 Third Circuit that said that statutory limitations on rights

4 don't constitute impairment.  So, those will be -- that's where

5 we stand this morning.  We're prepared to call Mr. Shelnitz,

6 put in the evidence, and rest our case.

7          THE COURT:  All right.  Mr. Cobb?  Oh.  Mr. Goldberg?

8          MR. GOLDBERG:  I just make it.  Actually, you'll get

9 Mr. Cobb and Mr. Rosenberg.  We're going to follow Mr.

10 Bernick's script and try to deal with what -- I will deal with

11 the first point, the tack on, which is simply really whether,

12 as a code matter, there is or is not impairment.  Mr. Cobb is

13 then going to deal with the issues that really were the bulk of

14 Mr. Bernick's remarks as to whether there was or was not a

15 default under the contract.  I think that will be easiest.

16 That way we'll parallel Mr. Bernick's argument, and hopefully

17 easiest for the Court to consider in that way.

18          My part of the analysis, Your Honor, is very simple.

19 We're just -- let us assume that there are defaults under the

20 contract for just purposes of the analysis.  And I think we

21 actually agree with a lot of the tack -- the first part of Mr.

22 Bernick's chart.  We all agree that if the bankruptcy had never

23 occurred and the debtor had not paid the bank lenders for the

24 last ten years, we would have a state law claim for principal

25 and unpaid interest at the contract default rate.  I don't

1  think there's any dispute on that.  I think we also agree that

2  --

3         THE COURT:  Well, apparently if you had provided the

4  notices and so forth.  I mean, you're going to -- you --

5         MR. GOLDBERG:  Well, I think as a matter -- outside

6  of bankruptcy I don't think even the debtor would dispute that

7  if you didn't pay the -- any of the interest, 42 interest

8  payments, or $500 million of principal due in 2003, that would

9  have to be a default outside of bankruptcy.  I would hope so.

10        THE COURT:  It may be a default, but I think what Mr.

11 Bernick has just argued is that to get the default interest

12 rate you have to dot the i's and cross the t's, and the problem

13 here that the bank lenders would face is they didn't.  But

14 assuming that they did all of that --

15        MR. GOLDBERG:  We're going -- we're assuming that --

16        THE COURT:  -- pre-petition --

17        MR. GOLDBERG:  -- you complied --

18        THE COURT:  Okay.

19        MR. GOLDBERG:  Let's take this -- we're assuming that

20 you complied with the contract.  There is no bankruptcy.  Mr.

21 Cobb will address all of these --

22        THE COURT:  All right.

23        MR. GOLDBERG:  -- issues.  I'm trying to just follow

24 the chart, so to speak, that's been laid out to me by the

25 debtor.

1                    THE COURT:  Okay.

2                    MR. GOLDBERG:  So, I think we would also agree, under

3        Section 502(b) of the Bankruptcy Code that the bank lenders'

4        state law claim is limited to an allowed bankruptcy claim equal

5        only to the principal amounts of the claim and any pre-petition

6        interest that had accrued, but excluding any post-petition

7        interest under 502(b).  No disagreement.  We're up to (a) here,

8        and we're all in agreement.  That brings me to New Valley, and

9        in New Valley -- this is New Valley.  This is a re-argument of

10       New Valley by the debtor.  In New Valley the Court -- the New

11       Valley Court concluded that for impairment purposes only that

12       payment in full of this allowed 502(b) bankruptcy claim for

13       principal but excluding contractual post-petition interest on

14       this allowed bankruptcy claim rendered the claim unimpaired

15       using the exact same arguments just made by Mr. Bernick.

16       That's what the New Valley case said.  I read it this morning.

17       That's exactly what it said.  This led Congress to delete

18       Section 1124(a)(3) of the impairment section to prevent this

19       result for impairment purposes from happening again.  And the

20       legislative history states, if the plan nevertheless proposes

21       that equity will retain an interest, but unsecured creditors

22       will only be paid in full without post-petition interest, that

23       class of unsecured creditors may vote on the plan because it is

24       impaired by the deletion of Section 1124(3), and they may

25       reject the plan.  That's what Congress said in this

1  circumstance.  It is directly on point.  And I'm going to get

2  to that in connection with PPIE in a second.  In other words,

3  what Congress said was the Bankruptcy Code, 502, is modifying

4  the state law claim for principal plus contractual interest

5  thereon into an allowed bankruptcy claim under Section 502 for

6  just principal.  However, what the debtor's plan, and that's

7  the key issue for impairment, is further modifying the lender's

8  state law right to interest on such allowed claim by providing

9  for interest on such allowed claim at a different rate than is

10  provided for under the credit agreements.  This is impairment

11   -- this is not impairment by statute here.  It is impairment

12  of a state law contractual right by the plan, hence the bank

13  lenders are entitled to vote because they're impaired.  Let's

14  turn to PPIE.

15          THE COURT:  But wait a second.  Because this plan

16  does provide for post-petition interest --

17          MR. GOLDBERG:  But it doesn't --

18          THE COURT:  -- and in fact, it provides it for higher

19  than the contract rate.

20          MR. GOLDBERG:  No, not the contract default rate.

21          THE COURT:  Right.  But --

22          MR. GOLDBERG:  Remember --

23          THE COURT:  -- higher than the contract rate, and

24  there is nothing in any case anywhere that says that with a

25  plan confirmation process, not a sale, that has taken place

1  that would divest the lenders of their race, so that the

2  lenders are still going to be paid their claim.  There is no

3  case that I could find and none was cited to me that says that

4  there is an entitlement to post-petition default contract --

5          MR. GOLDBERG:  This is not an entitlement.  This is

6  just a --

7          THE COURT:  -- rate interest.

8          MR. GOLDBERG:  -- impairment.  If you change the

9  slightest thing in somebody's contract for impairment purposes,

10  that is impairment.  I may not --

11          THE COURT:  You aren't changing anything in the

12  contract if you're paying higher than the contract rate --

13          MR. GOLDBERG:  It --

14          THE COURT:  -- potentially.  The issue, I think,

15  under the best interest and fair and equitable standards is the

16  rate to be applied.  But whether, for purposes of impairment,

17  you can substantiate that you're entitled to the default rate

18  when there is no statutory entitlement because there is no

19  proof that the debtors were in default is a problem.  So, I

20  need the proof.

21          MR. GOLDBERG:  The proof, Your Honor -- again, for my

22  purposes we were simply assuming that you have the default

23  rate.  There is nothing in this -- the contract rate --

24          THE COURT:  I can't assume that I have the default

25  rate.  I can't assume it because you've agreed there was no

1  pre-petition default.

2          MR. GOLDBERG:  No.  I'm saying for purposes of my

3  analysis.  Mr. Cobb, as I said, we're trying to follow the

4  exact analysis that the debtor did.

5          THE COURT:  But there is no point in my assuming a

6  pre-petition default when everybody has stipulated that there

7  wasn't one.

8          MR. GOLDBERG:  There is no pre-petition default.

9          THE COURT:  Okay.

10          MR. GOLDBERG:  But what the statute said is a

11  contractual right.  There is nothing -- the contractual

12  interest rate, with all due respect, Your Honor, that is the

13  default rate.  There's no such thing as -- the contract rate is

14  the rate under the contract.  The rate under the contract under

15  this circumstances is the default rate.  When you say contract

16  rate, when Congress is talking about contract rights it's the

17  contract.  The contract has a default rate in it.  If there

18  were defaults then that rate is the -- the contract rate is the

19  contract default rate.  This is a distinction.  There is no --

20  it's a non-existent distinction.  It is a contract rate.  The

21  contract is the default rate if there are defaults.

22          THE COURT:  No.  There's a clear distinction.  The

23  default rate is a contingent rate.  It's contingent on the fact

24  that there has to be a default.  And pre-petition there is a

25  stipulation that indicates -- or an agreement -- I don't know

1  that it's a formal stipulation, that indicates that there was

2  no default, so pre-petition, as the lenders come into

3  bankruptcy, the rate that's applicable is not the default rate

4  because it's conditional on there having been a default, and

5  there was no default.  I don't know how you get past that, pre-

6  petition.

7          MR. GOLDBERG:  Well, I'll submit -- in <u>Dow Corning</u>,

8  Your Honor, I mean, I was attempting to have Mr. Cobb deal with

9  this, but in <u>Dow Corning</u> this was the exact same situation.

10          THE COURT:  No, it was not.

11          MR. GOLDBERG:  Yes --

12          THE COURT:  The exact situation in <u>Dow</u> was that the

13  interest rate that was applied was less than the contract rate.

14  It was the federal judgment rate, which was determined -- I'm

15  sorry.  I hope I'm not getting the cases confused.  I think it

16  was a determination there that the legal rate was the federal

17  judgment rate.

18          MR. GOLDBERG:  That was part one of <u>Dow</u>.

19          THE COURT:  And the rate that was being paid by the

20  plan was more than the federal judgment rate but less than the

21  contract rate, not less than the default rate.

22          MR. GOLDBERG:  But the --

23          THE COURT:  That's a significant difference.

24          MR. GOLDBERG:  The Sixth Circuit's final ruling,

25  though, was that you are entitled to the default rate.  There

1 were no pre-petition defaults in <u>Dow Corning</u>, either.

2      THE COURT:  That was a whole different circumstance

3 that the Circuit analyzed very clearly.  I don't see how the

4 facts apply.

5      MR. GOLDBERG:  I'm not --

6      THE COURT:  But in any event, the rate that was

7 applied under that contract and the issue that went up was not

8 whether or not the default -- as I understand it -- not whether

9 or not the default rate applied, what the holding ended up

10 being and the reasons why are somewhat different.  But the plan

11 provided for something that was less than the contract rate.

12 Now, I agree that would be a problem, but this plan doesn't

13 provide for less than the contract rate.  It provides for more

14 than the contract rate.  It provides for more than the current

15 federal judgment rate.  It provides for probably more than the

16 state rate.  I don't know that.

17      MR. GOLDBERG:  Actually, it's less, Your Honor, I

18 believe.

19      THE COURT:  Less than the state rate.

20      MR. GOLDBERG:  New York State rate is nine percent.

21      THE COURT:  Oh.  Okay.  Well, that's clearly less

22 than the state rate.  But it is -- so, it's less than the state

23 rate, less than the default rate, more than the contract rate,

24 and more than the federal judgment rate.

25      MR. GOLDBERG:  Where we disagree, Your Honor, is what

1 the word contract rate means.  The contract rate is the rate

2 under the contract, the entire contract.  There's no such thing

3 as the -- just a --

4          THE COURT:  I agree.

5          MR. GOLDBERG:  It's the contract is the default rate.

6          THE COURT:  No challenge here.

7          MR. GOLDBERG:  That is the rate under the contract.

8          THE COURT:  No, the default interest under the

9 contract only kicked in if there is a default.  It's a --

10          MR. GOLDBERG:  We agree.

11          THE COURT:  -- contingent rate.  Okay, and there was

12 no default.  You can't have a contingency that does -- that

13 comes to fruition and makes -- and satisfies that contingency,

14 unless you satisfy the facts -- the future events contemplated

15 by the parties at the time they entered into the agreement, and

16 that didn't happen here pre-petition.  So pre-petition the

17 contract rate in this case was not the default rate.  Everybody

18 has agreed that there was no pre-petition default.  It was not

19 the default rate.

20          MR. GOLDBERG:  I agree.

21          THE COURT:  That was a contingency in the contract in

22 the event that there was a default, and everybody dots the Is

23 and crosses the Ts to get to the contractual default, which is

24 what I said in my opinion and still stand by.  I didn't have

25 evidence of that -- sufficient evidence of that type of default

**J&J COURT TRANSCRIBERS, INC.**

1  to find that that was any portion of an allowed claim and

2  couldn't find that, because pre-petition the stipulation was

3  there was no default, therefore, there can't be a default rate

4  of interest which is contingent on a default.  The contract

5  rate is the non-default rate in this case on the facts pre-

6  petition.  Now you want to argue post-petition?  Fine.  I'll

7  listen post-petition.  But pre-petition there's no point

8  pursuing that.

9           MR. GOLDBERG:  Your Honor, we have absolutely no

10 disagreement on that.  I think where we disagree is that when

11 contract rate is used, we think it's the contract rate --

12 contract default rate.  That there's no -- that's the rate in

13 the contract when there's a default.  And then the question is

14 -- and we agree that there's no pre-petition default.

15          THE COURT:  Okay.

16          MR. GOLDBERG:  Where we disagree is whether there are

17 post-petition defaults.

18          THE COURT:  Okay.  Well, let me ask two questions.

19          MR. GOLDBERG:  And I'm going to turn that over to --

20 that portion over to Mr. Cobb, because, clearly, the attempt to

21 break this down neatly is not working quite as I hoped.

22          THE COURT:  Oh, no, it's working fine.  It's just

23 that I disagree.

24          MR. GOLDBERG:  Okay.

25          THE COURT:  And I disagree, because --

1          MR. GOLDBERG:  It works best, obviously, if you

2  agree, but --

3                    (Laughter)

4          THE COURT:  I disagree, because the -- unless you can

5  show me something in this contract that says the contract rate

6  is the default rate, but we're giving the debtor a break

7  provided that there's no default, rather than saying that it's

8  a -- here's the -- the rate of interest is -- I've forgotten --

9  4 point whatever percent tied to the prime.  But if the debtor

10 defaults, then the rate becomes -- that is a contingent rate.

11         Now, pre-petition there was no default.  There can't

12 be a satisfaction of the contingency.  There was no entitlement

13 to default rate -- to default interest.  So you come into the

14 bankruptcy as an unsecured creditor without the entitlement of

15 default interest, because there was no default.  How do you

16 bootstrap yourself into a default rate post-petition when it's

17 not part of your allowed claim pre-petition?  That's the issue

18 for impairment.

19         MR. GOLDBERG:  Would the Court agree if we showed

20 that there was a recognizable default post-petition, such as

21 that became the contract rate?  That if we were not paid -- I'm

22 just looking for guidance from the Court.

23         THE COURT:  Well, that's what I --

24         MR. GOLDBERG:  At that point would the Court agree

25 that we -- if we were not receiving that rate, we are impaired?

 1          THE COURT:  I don't know, but I'd certainly like to

 2 see some evidence, because right now I don't have any.  So

 3 right now, as I'm sitting here or right -- I should say that

 4 right now, based on the analysis that I went through for 502

 5 purposes, I don't see a default, because the affidavits --

 6 well, two things.

 7          First of all, although the affidavit talked about a

 8 principal default, at the argument I specifically asked what

 9 the lenders were relying on, and they told me interest, not

10 principal but interest.  So --

11          MR. GOLDBERG:  Wait.  Wait.  Wait.

12          THE COURT:  May -- interest.  That's -- it's on the

13 record.  I don't have the cite.  You can look.  I double

14 checked.  I had my staff double check.  So there was no alleged

15 argument about a principal default post-petition.  It was

16 interest that was argued to me.

17          MR. GOLDBERG:  Your Honor, I just want to finish one

18 last point.  I don't -- wasn't at the last hearing, so I

19 obviously --

20          THE COURT:  This was before.  This was the argument

21 on the -- before I issued this opinion.

22          MR. GOLDBERG:  I think it is in the affidavit.  I

23 think the Court can also --

24          THE COURT:  It is.

25          MR. GOLDBERG:  -- take judicial notice of the fact

1  that the principal obviously was not paid.

2          THE COURT:  Actually, I don't know that.  I don't

3  know that in the refinance the debtor didn't pay the principal.

4  But from that argument, frankly, that's what I assumed, that

5  the interest hadn't been paid, but the principal had.  That's

6  what I thought the lenders were telling me.

7          MR. GOLDBERG:  No.  I am just -- to correct the

8  record, Your Honor, there was $500 million of principal due in

9  2003.  That principal was not paid.

10          THE COURT:  Okay.

11          MR. GOLDBERG:  Which is one of the reasons why we --

12  it is a strange circumstances, as we've said, that we have a

13  debtor that -- forgetting interest payments, that did not pay

14  us $500 million of principal --

15          THE COURT:  You've got an unsecured --

16          MR. GOLDBERG:  -- seven years ago.

17          THE COURT:  -- claim.  The debtor can't pay it.  The

18  -- Mr. Bernick's argument in that respect is quite correct.

19  That the -- just as the Code would've prevented the payment of

20  interest, it also prevented the payment of principal.  You're

21  unsecured creditors.  You represent unsecured creditors.

22          MR. GOLDBERG:  Well, Your Honor, you said we could've

23  refinanced it, with all due respect.

24          THE COURT:  Well, you can't -- lots of times things

25  are rolled into the pre-petition or the post-petition credit

1  facilities.  I don't know whether that's rolled up in the post-

2  petition credit facility.  I don't know.  I didn't go back to

3  check.

4          MR. GOLDBERG:  I just think it begs the question,

5  Your Honor, what I think the Court is saying is not that they

6  could pay it.

7          THE COURT:  And I didn't say you could do it.  I said

8  that I thought, as a result of the argument on which you

9  relied, on the fact that there was an interest default, that it

10  had been satisfied.  That's all.

11          MR. GOLDBERG:  Okay.

12          THE COURT:  But --

13          MR. GOLDBERG:  Just to clear up the record, we have

14  received nothing, and the last ten years have been --

15          THE COURT:  Okay.

16          MR. GOLDBERG:  Forty-two -- I believe 42 or so missed

17  interest payments and, obviously, $500 million of principal

18  that was due six or seven years ago --

19          THE COURT:  All right.

20          MR. GOLDBERG:  -- just so the record is complete.

21          THE COURT:  Okay.  Thank you.  I appreciate that

22  correction to the record and my understanding, but it doesn't

23  change the reality that for purposes of the pre-petition claim,

24  which is what 502 looks at --

25          MR. GOLDBERG:  Yes.

1          THE COURT:  -- okay, the lenders are not entitled to
2    default interest, because as of the date of the filing of the
3    case, there was no pre-petition default, and everybody's agreed
4    with that.   Therefore, the contingent rate of interest didn't
5    kick into effect.   There was no interest that's allowable on a
6    pre-petition claim under 502 or 726 in this instance anyway.
7    So pre-petition it's sort of a no issue.   I guess there's just
8    no issue there.

9          Post-petition, if you give me some evidence of what
10   on earth some default is that's not entitled -- not tied up in
11   the Bankruptcy Code that prohibited the debtor from making
12   those payments, I'd like to see and hear that evidence.   That's
13   what I thought today was for.

14         MR. GOLDBERG:  Okay.  Your Honor, I'm going to turn
15   it over to Mr. Cobb to discuss the evidence, and I think we
16   also are going to raise the issue again, because, with all due
17   respect, we disagree as to the issue that the default cannot
18   occur by the failure to pay interest or principal or by the
19   fact of the bankruptcy itself, and I will sit down.

20         THE COURT:  Okay.  Well, I appreciate that legal
21   issue.   In that sense I think PPI addresses that point.   It
22   says essentially that there is no statutory -- no statutory
23   basis under the Bankruptcy Code constitutes the impairment that
24   is necessary -- that a default that is necessary for
25   impairment.   As part of the allowed claim, I'm looking at the

1  pre-petition default not post-petition default.

2             MR. GOLDBERG:  Right.

3             THE COURT:  So I'm back to what I said before.  I

4  need some evidence of a post-petition default.

5             MR. GOLDBERG:  I will sit down and hand over part two

6  to my colleague, then we'll deal with the post-petition

7  default.

8             THE COURT:  Okay.

9             MR. GOLDBERG:  Take it away.

10            MR. COBB:  Thank you.  Hello, David.  Good morning,

11 Your Honor.

12            THE COURT:  Good morning.

13            MR. COBB:  There's a lot of pressure on me now, Your

14 Honor.  I can tell.  The Court has given us a clear direction,

15 so let me see if I can --

16            MR. BERNICK:  We'll tell everybody you did a fabulous

17 job.

18            MR. COBB:  Thank you, Mr. Bernick.  Much appreciated.

19 I'm glad you found your wallet last Thursday, too.

20            Your Honor, the -- we're at an interesting spot

21 today.  I believe that the way that this litigation is supposed

22 to unfold is that the Court and the parties are to be put on

23 notice of the arguments and the issues that are to be presented

24 to the Court prior to the commencement of the hearing of Phase

25 I.  In the -- in Grace's brief that it submitted to the Court

1 two weeks ago where it raised the issue on default -- and I'm

2 only addressing default, Your Honor -- it relied on one piece

3 --one issue, one piece of evidence, and that is law of the

4 case.  Your Honor has already decided the issue.  It is the law

5 of the case and how dare the bank lenders try to collaterally

6 attack that finding.  I'm prepared to argue that today, Your

7 Honor.

8          Law of the -- I mean where we are at today, Your

9 Honor, now things have shifted, and so Your Honor has been

10 asked by Grace to consider factual determinations, factual

11 evidence that goes beyond law of the case.  So I want to start

12 with that predicate, Your Honor, because it is the case.

13          THE COURT:  Well --

14          MR. COBB:  They put Your Honor on notice that all

15 they're arguing on default is law of the case.  And I

16 understand, Your Honor, that Thursday came and went, and it was

17 illuminative for all the parties, but I respectfully suggest

18 that it is appropriate, because Your Honor is considering this

19 in a fresh light, that that should be briefed.  I --

20          THE COURT:  All right.  You wanted to see briefs.

21          MR. COBB:  But doesn't that -- Your Honor, doesn't

22 that put -- kind of stand this on its head and question why are

23 we here in June when we could be doing this in September in an

24 organized fashion?

25          THE COURT:  It -- well, I don't know.  I asked you

1  parties to talk about that fact over the weekend, and I don't

2  know what did or didn't transpire.  From my point of view, as I

3  tried to articulate on Thursday, I don't think I reached the

4  issues that are here.  I specifically reserved the issues that

5  are supposed to be tried today.  I don't know how it can be the

6  law of the case when I've reserved the issues, because I don't

7  have any facts at this point, in my view, that go to this

8  issue.

9          The affidavits that were submitted I thought were in

10  connection with the issues that I could address.  They may have

11  been submitted in connection with the issue of impairment if

12  somebody was really pushing that issue, but that issue wasn't

13  really pushed very hard by the parties at the time, and I think

14  for good reason.  You need to figure out what your claim is

15  before you even know whether the plan will impair that claim.

16  So now you know what your claim is.  Now I think we're at the

17  point where the focus has to be on what the plan does with that

18  claim, which is what I think impairment does.  If you disagree,

19  tell me why I'm wrong.

20          MR. COBB:  Your Honor, I don't disgree, but we now

21  have a curve ball come Monday morning when the papers that I

22  had been preparing to respond to, all they say is law of the

23  case, and so that puts us at a distinct and unusual

24  disadvantage.  And, Your Honor, I would submit that this is

25  better served if we deal with this in September after proper

1 briefing, but I'll move on.  I would like to make that argument
2 though and preserve it.
3          THE COURT:  On briefing on whether it's law of the
4 case or not?
5          MR. COBB:  No.  No, Your Honor, on what issues Grace
6 would like to argue --
7          THE COURT:  Oh.
8          MR. COBB:  -- in order to carry its burden of
9 proof --
10          THE COURT:  Okay.
11          MR. COBB:  -- at the impairment stage.
12          THE COURT:  All right.
13          MR. COBB:  And, Your Honor, that -- well, it's funny.
14          THE COURT:  Wait.  Grace's burden on the impairment?
15          MR. COBB:  Oh, yes, Your Honor, that's -- I went back
16 -- I was flying home on Thursday, and I thought, wow, the Court
17 has given us some direction here.  Why does the Court view this
18 as a different issue when it is simply a factual determination
19 on default, which really doesn't change between the claims
20 proceeding and the impairment proceeding?  And then -- and then
21 I re-read PPI, and in PPI the Third Circuit says, "It is the
22 debtor's burden to show that the creditor is unimpaired."
23          THE COURT:  But the issue, I think, is beyond whether
24 or not there is a default.  It's how the plan treats the
25 lender's claim.  So it's beyond the concept of default, but I

1 agree we have to at least get there.

2          MR. COBB:  Right, Your Honor, and --

3          THE COURT:  Okay.

4          MR. COBB:  -- it's their burden to show that there

5 was no default entitling us to default interest.

6          THE COURT:  And that's what Mr. Bernick just

7 volunteered to do by way of a witness, and you're saying you're

8 not prepared to address that.

9          MR. COBB:  Well, I'm not prepared to address the

10 witness, Your Honor, because that issue was not put before us

11 in the trial papers, which are supposed to fairly put us on

12 notice of what will be litigated two weeks later.

13          THE COURT:  All right.

14          MR. COBB:  But Mr. Bernick also cleverly completely

15 ignored the issues of failure to pay and the ipso facto

16 provision.  That is that the mere filing of the bankruptcy, as

17 clearly provided under Section 10 of the credit agreement,

18 accelerates -- causes a default without any notice required

19 whatsoever and accelerates all payment, and thereby kicks in

20 default interest.  He ignored all of that.  His demonstrative

21 exhibit has nothing to do with that.

22          But, Your Honor, it is their burden, and that I

23 appreciate is why we're here today.  They have to stand up and

24 prove to you they were not in default.  And I agree post-

25 petition, because we agree that pre-petition there was no

1  default.

2          Let's start first with, Your Honor, the ipso facto

3  default.  And ipso facto -- the so-called -- I'm going to call

4  it defense for purposes of our argument, the defense to having

5  -- to paying, to having the legal obligation to pay under this

6  loan agreement, because in their view the mere filing of the

7  bankruptcy is they are protected under the Bankruptcy Code from

8  having to repay as a result of an ipso de facto default

9  provision, and, therefore, it cannot serve as a default.  Your

10 Honor, the ipso facto defense appears only in Section 365, and

11 as Your Honor wells knows, 365 deals with executory contracts

12 and unexpired leases.

13         There are express carve outs for contracts or

14 agreements to loan money.  365(e)(2) expressly carves out from

15 the ipso facto defense or protections contracts or agreements

16 to loan money.  That's exactly what we have here, Your Honor.

17 That's precisely the contract we're dealing with.  And it makes

18 sense under the Code, Your Honor.

19         The debtor cannot force the -- cannot assume a

20 contract to loan money.  They cannot assume a loan.  They can

21 assume unexpired executory contracts and leases.  They can

22 preserve that value.  Your Honor deals with that all the time.

23 They see that as a -- you know, a -- that's one of the reasons

24 that bankruptcy's such a powerful tool, but they can't do it

25 with loans, Your Honor.  And the ipso facto defense doesn't

1 apply to loan agreements.  It says it right in the Code, and

2 I'm happy to review it with particularity.

3         THE COURT:  No, I understand, and you're concept of

4 the fact that even the filing of bankruptcy without the ipso

5 facto clause would accelerate the payments.  That's why you

6 have a claim that you can file is not something that I even

7 think I need to have you argue.

8         MR. COBB:  So, Your Honor, with -- just so I'm clear,

9 I want to -- because I want to walk carefully through this,

10 Your Honor agrees with me that the filing of the bankruptcy

11 case is a default.

12         THE COURT:  No, I agree that it accelerates the

13 payments under the loan, because that's what you have to do in

14 order to file your claim.

15         MR. COBB:  Okay.

16         THE COURT:  The Bankruptcy Code will accelerate all

17 the obligations up to the point of the filing of the

18 bankruptcy.  So any obligation that is due you can file your

19 claim for.  Not stated very well, but --

20         MR. COBB:  All right.  That's okay, Your Honor.  Let

21 me see if I understand.  So if I can show Your Honor in the

22 loan agreements where the filing of the bankruptcy proceeding

23 is a default, and that default kicks in default interest, I can

24 sit down.

25         THE COURT:  I don't know.  Show me -- wait till I

59

1   find my Bankruptcy Code.  I'm sorry.  It's buried here.  I

2   agree that 365 is going to apply only to an unexpired lease or

3   executory contract, and that there is a carve out for loan

4   documents that the debtor would not be able to assume a

5   monetary contrary or force the -- I should say the debtor can't

6   force the lender to make a new monetary contract.  Is that what

7   you're arguing?

8           MR. COBB:  Your Honor, let me guide you to -- in my

9   Code it's Page 88, Section 365(e)(2).

10          THE COURT:  Yes, I'm there.

11          MR. COBB:  Well, let's start with (e)(1).  That lays

12  out the ipso facto defense, and this is what they cite.  They

13  say, Your Honor -- and that's I believe what Judge Walrath

14  cited in the -- in a case which I was too involved with.  Your

15  Honor, it's clear that Section (1) says, "A mere filing of --

16  commencement of the bankruptcy case cannot serve as a default."

17          THE COURT:  Right.

18          MR. COBB:  We are in perfect agreement on that.  But

19  then Subsection (2) says it doesn't apply, "if such contract is

20  a contract to make a loan."  So no ipso facto defense, Your

21  Honor.  So now I think all I've got to show you is that this is

22  a default under the credit agreement, and as a result of that

23  default, which doesn't require notice -- and I'll show Your

24  Honor that -- all payments are accelerated and are immediately

25  due.  Grace has never contested it and certainly isn't prepared

1 today to prove. That's why their plan repays us principal upon

2 consummation. They can't prove it, because it isn't the case.

3 That the principal is outstanding. So, Your Honor, the default

4 interest rate kicks in just upon this very simple analysis.

5 So let's turn to the loan documents. And I don't

6 know if Your Honor has it in front of you, but I --

7 THE COURT: I don't -- I don't think I have them at

8 all.

9 MR. COBB: Why don't I hand up to you my copies right

10 from the infamous Mr. Freedgood's affidavit. Your Honor, I

11 have no belief that the debtors have any intention of

12 contesting that what was once admitted without objection

13 somehow does not reflect an accurate copy of the loan

14 agreements issue here.

15 THE COURT: If there's somewhere in the binders, you

16 can tell me where, and I'll have a copy --

17 MR. COBB: Your Honor, it's -- we have it. I can

18 either hand you this, Your Honor, or we had submitted our trial

19 exhibits, as we were required to do under the CMO.

20 THE COURT: Yes.

21 MR. COBB: And there are only two, one of which is

22 Mr. Freedgood's affidavit and his exhibits to his affidavit are

23 the two loan agreements.

24 MR. BERNICK: Why don't you just offer the loan

25 agreement? There won't be an objection to the loan agreement.

1           MR. COBB:  It's not an evidentiary hearing.

2           THE COURT:  Here we go.  I have --

3           MR. BERNICK:  Well, you can offer it --

4           THE COURT:  I think I do have the binder.

5           MR. BERNICK:  -- and then it will be in evidence.

6           MR. COBB:  I tell you what.  Why don't --

7                    (Pause)

8           THE COURT:  Okay.  I do have your binder, and I do

9  have the exhibits.

10          MR. COBB:  Very good.

11          THE COURT:  All right.

12          MR. COBB:  Your Honor, let's turn to Section 10.

13          THE COURT:  Of?

14          MR. COBB:  On Exhibit A, and I'll represent to the

15  Court that there is no meaningful -- but I can walk through it

16  if Your Honor would like -- difference between loan Agreement A

17  behind Exhibit Tab A or the loan agreement behind Exhibit Tab

18  B.  And if we turn to Section 10 --

19          THE COURT:  Can you give me the Bates stamp number?

20  It might be --

21          MR. COBB:  -- on these provisions -- Your Honor, I

22  don't have a Bates-stamped section.  I apologize for that.

23          THE COURT:  Well, Section 9.  Section 10, Events of

24  Default?

25          MR. COBB:  Section 10 --

1           THE COURT:  I'm there.

2           MR. COBB:  -- events of default.

3           THE COURT:  Okay.  It's --

4           MR. COBB:  And if Your Honor takes a look under

5  Subsection (f)?

6                          (Pause)

7           THE COURT:  Okay.

8           MR. COBB:  And I think in the first few sentences

9  there it outlines that as an event of default, and I can read

10 it into the record if Your Honor would like, but I -- I think

11 it's --

12          THE COURT:  It's defines -- it says that the -- if

13 the parent shall commence any case including a bankruptcy, in

14 essence, that that would be an event of default.

15          MR. COBB:  All right, so now we have an event of

16 default.

17          MR. BERNICK:  I'm sorry.  What page are we on?

18          THE COURT:  It's Bates BLG-0053.  It's --

19          MR. COBB:  Thank you, Your Honor.

20          THE COURT:  -- Section 10(f).

21          MR. COBB:  Now, Your Honor, let's take a look at the

22 section that provides on notices.  So you've got to drop to the

23 end of Section 10, and there's a set aside paragraph that

24 begins with the phrase -- I think it's the next page over.

25 Just turn the page.

1             THE COURT:  Yes.

2             MR. COBB:  "Then in any such event, if such event is

3  an event of default specified of Clause 1, 2, or 3 of Paragraph

4  (f) --" let's see.  Solvency, Paragraph (1) -- (f)(1).  With

5  respect to -- "automatically the commitments of such borrower

6  shall immediately terminate, and the loans made to such

7  borrower hereunder with accrued interest," et cetera, et

8  cetera, et cetera, "shall immediately become due and payable."

9             Then it talks about, in Subsection (b) of the same

10 paragraph, if it's another kind of event, then it goes on to

11 describe the notice that Mr. Bernick's -- Mr. Bernick pointed

12 out to Your Honor in his demonstrative exhibit.  There's no

13 notice requirement with regard to an ipso facto default.  And

14 that's not surprising, Your Honor, because the Code permits it,

15 and no lender in their right mind would've otherwise -- I think

16 that proves the point.

17            So, Your Honor, now it's accelerated.  Now we turn to

18 Section 5, and that talks about the application of default

19 interest, when it kicks in.  It kicks in if they don't pay the

20 principal and interest when due.  Section 10 says without

21 notice, upon the filing of the commencement of insolvency

22 proceedings, it's due.

23            THE COURT:  I'm sorry.

24            MR. COBB:  That's okay, Your Honor.

25            THE COURT:  It's a long section.

1          MR. COBB:  I know.

2          THE COURT:  Okay.

3          MR. COBB:  That's why I'm --

4          THE COURT:  Where in Section 5 do you want me to

5   look?

6          MR. COBB:  -- not a bank lawyer.  The Subsection 5

7   talks about -- I think it's 5 point -- all the way at the

8   beginning of 5.  Look at 5.1©.  "Except as otherwise provided -

9   -" which doesn't apply "-- any interest payable or principals

10  payables isn't paid when due," and now it's due, because it was

11  accelerated, then the default rate kicks in.

12         THE COURT:  Okay.

13         MR. COBB:  I think that's it, Your Honor.  I think

14  that's all we have.

15         THE COURT:  All right.

16         MR. COBB:  I'm happy to continue to argue, because I

17  do think that there are other points that Mr. -- like, for

18  example, the failure to pay the interest and the principal.

19  They cite one case, a lone soldier standing in the cold winter,

20  NextWave.  I re-read NextWave, because I appreciate that was

21  mentioned in Your Honor's May 19 opinion.

22         What I found was that, interestingly, NextWave was

23  vacated by the Second Circuit in 2000.  It's not good law, Your

24  Honor.  It was vacated.  I went back to their trial brief, and

25  I said, well, I'm sure they pointed this out to Your Honor.

65

1  They didn't.  But NextWave is not good law, Your Honor.

2          THE COURT:  Well, that's a problem --

3          MR. COBB:  On whatever grounds it was vacated, it was

4  vacated.

5          THE COURT:  If we didn't find it, that's a big

6  problem.

7          MR. COBB:  Your Honor, let's talk more about

8  NextWave.  Completely different case.  The FCC was trying to

9  seize and cause a forfeiture of licenses from a debtor.  The

10 Court focused on the 362 issues, violation of the automatic

11 stay.  That was NextWave.  And then in part two of its vacated

12 decision the Court says -- it lays out this purported defense

13 to non-payment and payment of -- payment of interest when due

14 post-petition.  Not a single authority is cited by that Court,

15 not a single one.  Not a single authority.

16         THE COURT:  Well, I --

17         MR. COBB:  It stands alone.  And, Your Honor, that is

18 the only case cited by Grace in defense of failure to repay

19 principal and interest.  I don't want to beat this with a dead

20 horse, Your Honor.  We've got a lot of things to do today.  I

21 think we're done with ipso facto.  That resolves it entirely.

22 But I think it's unfair to say that NextWave proves -- it is

23 their burden to prove now, Your Honor.  Not back at the claim

24 stage now.  We're at impairments.  It's their burden to prove

25 NextWave does not support that concept.

**J&J COURT TRANSCRIBERS, INC.**

1            So, Your Honor, that -- we do assert a number of non-

2   payment or non-monetary defaults.  I think Committee counsel's

3   going to address that briefly.  We -- you know, I can speak

4   briefly about the Freedgood affidavit.  Your Honor, it is on

5   Rule 807.  It absolutely should be admitted by this Court at

6   this point, as should the other affidavits.  There's no other

7   evidence on the defaults that we would submit.  Mr. Freedgood's

8   not going to polish his testimony.

9            They were on notice that that affidavit was out

10  there.  They were on notice that we had submitted it as an

11  exhibit.  They had absolutely every opportunity to subpoena Mr.

12  Freedgood and bring him in to prove their case, and they didn't

13  do that.  Your Honor accepted the affidavit, and they didn't

14  object on grounds that it wasn't truthful or that somehow it

15  was hearsay back when it was before your Court -- this Court

16  back in October the fact of whether there was a default, and

17  that's all that affidavit asserts.  And it puts in the credit

18  agreements, which they don't object, but on the fact of default

19  there was no hearsay objection, and your Court can -- and the

20  Court considered it.

21           So I -- frankly, it's a -- it's kind of a fool's

22  errand to bring him in and have this discussion.  It's a fool's

23  errand for me to get Mr. Shelnitz up here and talk to him about

24  his affidavit.  They're already in before the Court, and they

25  should be accepted.  A Rule 807 allows you to do that.  We

1 don't need to have anymore to and fro about this.

2          Your Honor, let me just check my notes briefly.  I do

3 have a demonstrative exhibit on the defaults that I think -- in

4 the spirit of what this morning's exercise seems to be, but I

5 would like to hand it up.  It lists our allegations of default

6 that we have raised in our papers and then it has traces in the

7 credit agreements, precisely how they are defaults under the

8 credit agreements and ultimately how we are entitled to default

9 interest as a result.

10          THE COURT:  All right.

11          MR. COBB:  May I hand it up?

12          THE COURT:  Yes.

13          MR. COBB:  I'm not going to walk Your Honor through

14 it.  I know I am dangerously close to running out of time.

15          THE COURT:  Okay.  Thank you.

16          MR. COBB:  All right.  Lastly, Your Honor, I think

17 the Anchor Resolution case, which we cite, Judge Walsh, this

18 District --

19          THE COURT:  I'm sorry.  Which case?

20          MR. COBB:  Anchor Resolution.

21          THE COURT:  Oh, okay.

22          MR. COBB:  That is a -- I think a helpful analysis of

23 the 365 ipso facto application.  Judge Walsh takes a look at

24 that in the context of an agreement to purchase notes, and he

25 says I find that this agreement is not executory, and,

**J&J COURT TRANSCRIBERS, INC.**

68

1  therefore, ipso facto protection or the defense doesn't apply.

2  Your Honor, there's nothing executory about this loan as of the

3  petition date.  They borrowed the money.  They had to pay it

4  back, and we had to accept.

5          I challenge Grace to show us where there is a

6  material obligation remaining as of the petition date owed by

7  the bank lenders.  That if the bank lenders breached that

8  obligation, it would relieve Grace of their obligation to repay

9  the notes, to perform on their side.  They can't do it, Your

10  Honor.  It's a simple loan agreement.  The loans -- the funds

11  were already loaned.

12          So, Your Honor, even under Judge Walsh's analysis

13  under Anchor Resolution, the ipso facto provision doesn't

14  apply.  I don't think you need to get there, because there's

15  the express carve out for loan agreements, which this -- which

16  these are, but I wanted to point that out to the Court, because

17  I do think it is a very helpful opinion.  It puts in context

18  the ipso facto concept in that defense.  That's all I have,

19  Your Honor.

20          THE COURT:  All right.

21          MR. BERNICK:  Is there somebody else that's going to

22  talk?

23          THE COURT:  Mr. Pasquale.

24          MR. PASQUALE:  Thank you, Your Honor.  Good morning.

25          THE COURT:  Good morning.

**J&J COURT TRANSCRIBERS, INC.**

1            MR. PASQUALE:  Ken Pasquale for the Committee.  In

2  light of Mr. Cobb's presentation, I'm not sure how important or

3  relevant this is at this point, but I do want to address some

4  of the comments Mr. Bernick made in proffering Mr. Shelnitz's

5  evidence.  And in some sense we're right back in September when

6  this was argued in respect of the claim objection in frankly

7  what I think is somewhat misleading in the way them and

8  pronouns are used.  I think I have Mr. Bernick's quote

9  correctly.  "They were loading them with all kinds of

10  information."

11            Well, the them is the Committee.  JPMorgan Chase is a

12  member of the Committee.  It's also the agent on the bank

13  loans.  The information that was given to, quote, them, close

14  quote, and the Committee was given to the Committee under

15  confidentiality requirements.  No member of that Committee was

16  free without Grace's permission to give that to anybody else.

17  That's no different for JPMorgan Chase as agent.  And we did

18  not hear Mr. Bernick proffer that any information was given to

19  JPMorgan Chase directly wearing its agent hat for distribution

20  or explanation to the lenders, and I think that's a very

21  important distinction to the extent we're arguing we're loading

22  them with information.  It's very different.  I think that's

23  all I need to say on that issue, Your Honor.

24            I did just want to add -- and I don't know that now

25  is the time.  We can come back to this.  We've been focused, as

1  well we should've been, on the bank lender claims.  There are

2  non-bank lender claims in Class 9.  Morgan Stanley itself is

3  here to argue impairment for a non-lender claim.  I think we

4  and the debtors need to address that as well, but I think we

5  should finish this issue, and then I'll stand up again and

6  discuss that.

7             THE COURT:  All right.

8             MR. PASQUALE:  Thank you, Your Honor.

9             MR. BERNICK:  I'm sorry.  What's being reserved?  I

10 missed that.

11            MR. PASQUALE:  The non-lender --

12            UNIDENTIFIED ATTORNEY:  Non-lender --

13            MR. PASQUALE:  -- portions of Class 9.

14            MR. BERNICK:  Oh, yes.  Yes.  That's right.

15            UNIDENTIFIED ATTORNEY:  We're talking impairments of

16 the class.

17                         (Pause)

18            MR. MARTIN:  Your Honor, if it may please the Court,

19 Craig Martin from Edwards, Angell, Palmer & Dodge appearing on

20 behalf of Morgan Stanley --

21            MR. BERNICK:  I thought this --

22            MR. MARTIN:  -- senior lending --

23            MR. BERNICK:  I'm sorry.  I thought this was what had

24 been reserved.

25            THE COURT:  I'm not sure what it is.  Go ahead.  I

1  just -- I'm not sure what we're --

2          MR. BERNICK:  Yes, I --

3          THE COURT:  -- what the issue is.

4          MR. MARTIN:  I think the Committee's reserving its

5  rights to make arguments in addition to what I'm making.

6          MR. BERNICK:  Oh, I haven't addressed Morgan Stanley,

7  but that's okay.

8          THE COURT:  Go ahead.

9          MR. MARTIN:  Thank you, Your Honor.  A lot has been

10  said about the bank lender issues, and I want to focus

11  specifically on my client's claim, and I want to focus on three

12  key principles that I divined from the case law on impairment

13  when I reviewed all of these cases over the weekend.  And those

14  key principles are that I believe an unsecured claim is

15  impaired, unless it's paid in full plus interest.  I also

16  believe that, as Mr. Cobb stated on Page 203 of the Third

17  Circuit's opinion in PPIE, that there is a presumption of

18  impairment for unsecured claims, and that the debtor has the

19  burden to rebut that presumption.

20          Your Honor, those concepts will permeate my arguments

21  on behalf of Morgan Stanley, who has an allowed claim by

22  stipulation, which is Docket Number 21835, for approximately

23  16.5 million, and by further stipulation that claim falls in

24  Class 9.

25          Your Honor, under the plan Section 3.1.9(b) says

1   that, "An allowed claim in Class 9 will be paid its allowed

2   amount plus interest," and then it has four different

3   categories of claims with different interest rates.  The banks,

4   which there's been a lot of discussion about, received 6.09

5   percent, and certain environmental claims received 4.19

6   percent.  General unsecured creditors with contracts received

7   their non-default rate of interest, and general unsecured

8   creditors with no contractual rights received 4.19 percent.

9       Section 3.1.9(d) of the plan then provides that, "Any

10  creditor that believes it is entitled to a different interest

11  rate can file a notice which can be disputed by the debtors

12  within 60 days."  And the debtor states in Section 3.1.9(d)

13  that, "It may argue that such creditor gets no interest or less

14  than the amount of interest set forth in Section 3.1.9(b)."

15      The plan further provides that, "Principal for these

16  general unsecured claims will be paid on the effective date,

17  and that any creditor that files a notice of a different pre-

18  petition rate will only receive interest when the claim is

19  resolved, and there will not be any payment of interest on

20  interest."

21      Your Honor, further, the plan provides that, "As a

22  condition to the effective date, the confirmation order will

23  have to contain a finding that the interest allowed in Section

24  3.1.9(b) is the appropriate amount of interest."

25      So, Your Honor, what we have is a situation where we

**J&J COURT TRANSCRIBERS, INC.**

1  have one class of creditors, and they're receiving different

2  interest rates.  So, Your Honor, in that context I turn to what

3  is impairment, and to answer that question I turn to Section

4  1124, which addresses the issue in two separate subparts.

5  There's Subpart 1, which states that, "Unless a creditor has

6  its contractual legal or equitable rights unaffected, it is

7  impaired," and Subpart 2, which allows a debtor to reinstate

8  and cure certain defaults.

9          Your Honor, the Morgan Stanley claim is based on a

10  letter of credit upon which the debtor drew amounts under the

11  letter of credit, and under our contract we are entitled to

12  receive payment of interest, and the amount drawn at the Bank

13  of America, prime rate plus three percent.

14          And, Your Honor, the -- so turning back to 1124(1)

15  with those facts in mind, 1124(1) focuses on a class of claims

16  under a plan that with respect to each claim the plan leaves

17  unaltered.  So, Your Honor, that means that under the PPI case,

18  again at Page 203, where the debtors have the burden to prove

19  every claim in the class is not impaired, then there's a

20  presumption of impairment.

21          And, Your Honor, there's some interesting cases that

22  I think demonstrate in the context of 1124(1) when there is

23  mature debt that has matured and interest that has matured,

24  and, therefore, impairment is under 1124(a)(1) rather than

25  1124(a)(2).  That, in fact, the -- there is a presumption that

1  default rate interest is the appropriate rate.  And, Your

2  Honor, I would cite to you, and we cited in our brief, a case

3  called In re:  Ace-Texas at 217 Bankruptcy Reporter 719, and in

4  this case Judge Walsh, ruling from the Bankruptcy Court in the

5  District of Delaware in 1998, was faced with a situation where

6  there were no claims that had matured and were accruing

7  interest, and under the debtor's plan there was an effort to

8  reinstate those note claims and to pay interest after

9  confirmation.  And an argument made that under Section 1124(2),

10 that meant that those claims were unimpaired.

11         And Judge Walsh ruled that, "With respect to mature

12 obligations under contracts, the courts employ a presumption in

13 favor of the contractual rate of interest subject to rebuttal

14 based upon the equitable considerations."  This is at Page 723.

15 And Judge Walsh added that, "The burden is on the debtor to

16 show the default rate is unreasonable."

17         Your Honor, the Court went on to conclude that, and

18 I'm quoting from Page 726, and Judge Walsh was citing a

19 treatise from James Keenan, a former Bankruptcy Judge, "The

20 impairment rule applicable to unaccelerated debt is that

21 impairment can be avoided only if the plan proposes cash

22 payments in the full amount of the claim in accordance with the

23 parties' agreement.  When the agreement requires a higher post-

24 default rate of interest, this means the higher rate must be

25 paid.  Any other treatment would alter the creditors' rights."

1          Your Honor, there's also a case from the District of

2     New Jersey that essentially applies the same reasoning.  That's

3     In re:  Route One West Windsor Limited Partnership 225 BR 76

4     with a pinpoint cite of Page 83.

5          And, Your Honor, there's also a recent 2008 Ninth

6     Circuit case called General Electric Capital Corporation vs.

7     Future Media Products, and this case, while admittedly a sale

8     in dealing with an over-secured creditor and its entitlement to

9     interest from the sale proceeds, the Ninth Circuit looked to

10    the recent Supreme Court decision of Travelers Casualty &

11    Surety Company of America vs. Pacific Gas & Electric, which,

12    Your Honor, is found at 549 U.S. 443, and cites the language in

13    that case with Judge Alito writing for the Supreme Court stated

14    that, "Creditors' entitlement in bankruptcy arises in the first

15    instance from the underlying substantive law creating the

16    debtor's obligation subject to any qualifying or contrary

17    provision of the Bankruptcy Code."  Bawed on that language, the

18    Court read the Szupreme Court to be instructing it and other

19    lower courts that the default rate should be enforced subject

20    only to the substantive law of the governing agreement, and

21    that to provide otherwise -- I would argue from that then to

22    provide otherwise would be impairment.

23         THE COURT:  Well, I think both of those cases though

24    that you're citing, Ace-Texas and Route One, had over-secured

25    creditors in them.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. MARTIN:  I don't dispute that, Your Honor.  I

2    think that's correct.

3          THE COURT:  Okay.  That's a whole different

4    circumstance.

5          MR. MARTIN:  But, Your Honor, I think the point of

6    those cases is that 506(b) does not use the word default rate

7    interest.  It uses interest.

8          THE COURT:  Right.

9          MR. MARTIN:  It uses interest, and what the courts

10   say is that when you're determining what interest rate to

11   charge, in that situation default rate is the presumption.  I'm

12   not suggesting that that's binding on Your Honor.  I'm simply

13   saying that it's analogous reasoning that the Court might wish

14   to consider.

15         THE COURT:  I think if you're looking at an over-

16   secured creditor, there's an entirely different issue out

17   there.  I mean this issue I did go through in this 502 opinion.

18   I looked for circumstances, and no one pointed any to me, where

19   unsecured creditors in the pre-petition claims allowance

20   context were entitled to any interest let alone default rates

21   of interest.

22         MR. MARTIN:  That's fair enough, Your Honor, and I'm

23   not trying to argue about what the banks are entitled to.  I'm

24   arguing about my contract in which there's an event where the

25   debtor draws money that we fund.  That money has not yet been

1  reimbursed, and our contract provides that our rate of interest

2  should be Bank of America prime plus 3 percent.

3          THE COURT:  Okay.

4          MR. MARTIN:  The plan suggests that if that's to be

5  considered a default rate, that we will not be paid that.  We

6  would only get the non-default rate.  And I don't know what

7  that means in the context where we only had one interest rate.

8  We don't have a contract where we have six percent and then a

9  default happens.  It clicks up to a higher rate.  I think Your

10  Honor called that a contingent rate.  We only have one rate,

11  but it's a rate that comes into place when we don't get paid.

12  If that's considered to be a default, and, therefore, the

13  interest rate is considered a default rate, then unless we

14  litigate with the debtors, we get 4.19 percent.  That's

15  different than the rate in our contract, and I would argue

16  impairment.

17          Let's turn to what happens if we litigate, Your

18  Honor, because I think there's a second reason why Class 9 is

19  impaired.  For those classes that receive -- for those

20  creditors that wish to challenge the interest rate -- let's say

21  in my instance we decide that we want the full contract rate,

22  and we, therefore, litigate, what that means, Your Honor, is

23  that as of the effective date, we're not going to be paid in

24  full.  The debtor is only proposing to pay us as of the

25  effective date of the confirmation plan the principal.  The

1  interest is deferred until some later date.

2        And, Your Honor, I think that if you look at some of

3  the cases closely, you will find that those cases -- the

4  impairment cases that deal with interest and find that the

5  creditors are not impaired, if you look closely at the facts,

6  you'll see that the plan itself is proposing payment in full of

7  whatever the interest rate is on the effective date, and

8  indeed, Your Honor, there is an entire line of cases that deals

9  with artificial impairment predominantly in single asset real

10 estate cases.  But where a debtor says I need one impaired

11 class to get my plan confirmed, and so what I'm going to do is

12 I'm going to pay some unsecured class in full, but I'm going to

13 defer payment to them for 60 days, 90 days, 120 days, sometimes

14 it's only 10 days.

15       And in that context banks have frequently risen and

16 said wait a second, this is artificial impairment, and you're

17 not really impaired.  You're getting paid in full.  Albeit it's

18 only 60 days later, you're not impaired.  And the courts almost

19 uniformly hold that in that situation it is, in fact,

20 impairment.  And for the purposes of today's argument, Your

21 Honor, there is a case PNC Bank National Association vs. Park

22 Forest Development Corporation.  That's 197 Bankruptcy Reporter

23 388.  And In re:  Valley View Shopping Center, LP 260

24 Bankruptcy Reporter 10 with a pinpoint cite of 32 and 33,

25 Bankruptcy District of Kansas.

**J&J COURT TRANSCRIBERS, INC.**

1          And I recognize that in his trial court opinion Judge

2    Walsh distinguished those cases on some other grounds.  I would

3    argue that on this ground of whether the creditor was getting

4    paid in full on the effective date, his distinguishment in the

5    PPI case does not apply.

6          So, Your Honor, I submit that the plan as proposed

7    impairs creditors, and again I want to reemphasize that if it

8    only impairs one creditor under 1124, then the entire class is

9    impaired.  But I would argue that it impairs creditors by

10   applying different interest rates or requiring a creditor to

11   forego an interest rate or litigate and delaying payment until

12   some time after the effective date.

13         And, Your Honor, I want to just turn -- I want to

14   make three final points.  The first is the issue of impairment

15   and solvency, and the argument that a creditor is only entitled

16   to interest if the debtor is solvent, and that, therefore, you

17   only get into the issue of whether a creditor is entitled to

18   interest on its claim to be impaired.  And I would submit, Your

19   Honor, that even where a debtor is insolvent, if a creditor is

20   receiving less than its full allowed claim plus its contractual

21   interest, it is impaired.  I don't think the law is that, well,

22   if the debtor is insolvent, and, therefore, can only pay

23   creditors 20 cents on the dollar, and we're proposing to pay

24   them that, that they're not impaired.  I don't think that's the

25   law.  And I think that to argue that interest is only

1  applicable in a solvent situation in the context of a plan, I'm

2  not talking about 502(b), but in the context of impairment,

3  1129(a)(7), and 1129(b) that the solvency issue is not

4  relevant.

5         But if it is relevant, you know, first, Your Honor,

6  I'd like to -- I know Your Honor has found that there's no

7  evidence in the record, and, certainly, we would reserve our

8  right to pursue those issues, either independently or perhaps

9  in conjunction with the Committee, to address the solvency of

10  the debtor.  But for the purposes of today's argument, Your

11  Honor, I would like to note that in the debtor's disclosure

12  statement at Section 211 on Pages 46 through 50 there is a

13  detailed discussion about the enterprise value of these

14  debtors.  And I won't bore you with the detail, but the punch

15  line is that there's an enterprise -- a midpoint enterprise

16  reorganization value of $2.3 billion, and that that results in

17  a reorganized share value of $5.96 per share to $11.38 per

18  share.

19         And Your Honor may be familiar with the recent Third

20  Circuit decision in <u>VFB, LLC vs. Campbell's Soup Company</u> 482 F

21  3d 624, where the Third Circuit said in the context of looking

22  at solvency for a fraudulent transfer reasonable equivalent

23  value analysis that, "Where there is a market value, there is

24  strong evidence of solvency."  So, Your Honor, I would submit

25  that under the debtor's disclosure statement they have

1 suggested that they are solvent.  That they will be solvent on

2 the effective date.  That entitles creditors to receive the

3 interest that they're entitled to under the contract.

4        So, Your Honor, in closing on the impairment issue,

5 there is a presumption of impairment.  The debtor must rebut

6 that presumption.  I've yet to see any evidence of insolvency

7 or that the default rate of interest is not reasonable.  I know

8 that the debtor has stated today that it would like to submit

9 evidence with respect to the bank claims.  If it does that,

10 that evidence does not address every single claim in Class 9,

11 then the claims in Class 9 are deemed to be impaired.  That

12 presumption will not be rebutted for any claims other than the

13 banks perhaps, but I make no comment on that, and, therefore,

14 Class 9 is impaired.

15        Two final points, Your Honor.  One is just simply a

16 policy point, which is what are we really here arguing about.

17 What we're really here arguing about is whether or not this

18 large class of general unsecured creditors who have waited

19 eight years to get paid get to essentially have a voice, be

20 enfranchised on the debtor's plan.  Giving them that vote does

21 not mean that the debtor cannot confirm a plan.  By not giving

22 them that vote, the debtor seeks to avoid having this Court

23 conduct an 1129(a)(7) analysis and an 1129(b) analysis.  And,

24 Your Honor, I would respectfully submit that in a case of this

25 importance the debtor has not proven that it -- that every

1  claim in Class 9 is not impaired.  That Your Honor should find

2  that the case is impaired.  That the class is impaired and

3  entitled to vote.

4        Your Honor, that concludes my argument on impairment,

5  and I would like to make one final point, which is we wanted to

6  alert the Court to a recent decision from Judge Robinson from

7  the District Court of Delaware that dealt with the Section 1124

8  argument that we made.  On Page 9 of our brief, Your Honor, we

9  talk about how this Class 9 has different categories of

10  interest payments, and that if a creditor litigates, then that

11  creditor might get a higher interest rate.  If a creditor

12  chooses not to litigate, then that creditor may get a lower

13  interest rate.

14        And, Your Honor, on June 16th Judge Robinson issued a

15  decision called In re:  New Century TRS Holdings, Inc.,

16  Schroeder vs. New Century Liquidating Trust, in which she

17  reversed the plan that Judge Carey had confirmed in which the

18  plan provided for a big class and then within it had subclasses

19  of different debtors and had a protocol where some of those

20  creditors would be paid 130 percent of their claims based on

21  inter-company claims, and other creditors would only get 100

22  percent of their claims or a lesser amount.  And Judge Robinson

23  found that when you mix and match claim allowance provisions

24  like that within a single class, that there is a problem under

25  the Bankruptcy Code, and she reversed confirmation.  I know

1  that may be a Phase II issue, Your Honor, but since we filed

2  our objection already, and that wasn't in it, I wanted to bring

3  that to your attention.  I'm certainly happy to pass it up or

4  submit it under letter or even maybe the July 13th Phase II

5  briefing.  However Your Honor would like to have that put

6  before, but I didn't want you to overlook it.

7          THE COURT:  I'm not sure whether this is going to

8  take supplemental briefing or not.  Why don't you give a copy

9  to my clerk, if you have one?  I'll read it later.

10          MR. MARTIN:  Okay.

11          THE COURT:  But if there is supplemental briefing,

12  then you can certainly include it in that.

13          MR. MARTIN:  Okay.  And, Your Honor, I only had one

14  copy, because it's 26 pages.

15          THE COURT:  Oh, that's fine.

16          MR. MARTIN:  But I want to make sure that if the

17  other parties don't have it, they give me their business card.

18  I'll be happy to email it to them.

19          THE COURT:  Is there a cite yet?  If there --

20          MR. MARTIN:  I don't have a cite yet, Your Honor.

21  Again, June 16th, 2009.  I only have the --

22          THE COURT:  Give me -- just give me the case number.

23  I'll pull it off the docket.

24          MR. MARTIN:  Okay.  It's -- the bankruptcy case

25  number is 07-10416.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  All right.

2          MR. MARTIN:  And there is a note on the Bankruptcy

3 docket, but if Your Honor rather pull it from Judge Robinson's

4 docket, that is in the District Court, 08-546.

5          THE COURT:  Okay.

6          MR. MARTIN:  Thank you, Your Honor.

7          MR. BERNICK:  Anyone else?  I just had a -- I know

8 that Your Honor probably wants to take a break at some point

9 fairly soon, but I just had a couple short --

10          THE COURT:  Go ahead.

11          MR. BERNICK:  -- points to make, and then a proposal

12 about how to proceed further.  And first let me take up the

13 last counsel's argument, because I think it would make -- we're

14 missing the boat a little bit here.

15          The plan with respect to the non-lender members of

16 Class 9 -- the plan provides -- and this is at -- let's see if

17 I can zoom it and get it a little bit better.  The plan

18 provides -- the plan provisions that are potentially relevant

19 appear at 3.1.9(b) Sub © and (d).  Sub © says, "For general

20 unsecured claims arising from an existing contract that

21 specifies a payment of interest at a non-default rate of

22 interest, post-petition interest shall be calculated the non-

23 default rate," dah, dah, dah, dah, dah.

24          That doesn't apply to Morgan Stanley, because their

25 contract does not specify a payment of interest as a non-

1  default rate of interest.  It's just not -- that's not the way

2  that their contract reads out.

3       So you then are in capital D, "For all other general

4  unsecured claims post-petition interest shall be calculated at

5  the rate of 4.19 percent from the petition date," et cetera, et

6  cetera.  And so that's how their claims would be treated,

7  except they have the ability effectively to opt out of that

8  treatment entirely.  And this is post -- procedures for

9  resolution of post-petition interest disputes.

10       "If any holder of a general unsecured claim other

11  than a holder of a general unsecured claim arising from pre-

12  petition credit facilities --" that's these guys over here "--

13  which claims are subject to pending objection and litigation

14  concerning the amount of post-petition interest to which the

15  holders are entitled."  So we're now reading into a procedure

16  that's not available to these guys.  They get -- they're

17  objecting, et cetera, but they also have a treatment under the

18  plan that Your Honor's very familiar with.  So it doesn't apply

19  to these guys.  It applies to the gentleman who represents

20  Morgan Stanley.

21       And it says that, "If such a holder believes that it

22  is entitled to post-petition interest at a rate or calculation

23  other than as set forth in Section 3.1.9(b) of the plan, such

24  holder may --" which we just read "-- such holder may file with

25  the Bankruptcy Court a post-petition interest determination

1  notice."  They've done that.  They've made the election.

2          And then we have a procedure that calls out for post-

3  effective date litigation, and the post-effective date

4  litigation is spelled out in the remaining paragraphs, and

5  basically, it converges on Romanette (iv).  "At any time if the

6  debtor or reorganized debtor -- this is applicable to determine

7  that the post-petition interest rate or calculation asserted is

8  appropriate, we can file a certificate of no objection.  No

9  hearing is required -- no hearing is required by the Bankruptcy

10 Court with respect to any post-petition interest rate

11 determination and notice for which a certificate of no

12 objection is filed or to which debtors or reorganized debtors

13 as applicable do not timely file an objection in the respective

14 amount, and post-petition interest shall be paid.  If, however,

15 there is an objection," that's then handled in Romanette (iv),

16 "then a hearing gets scheduled.  All litigation with respect to

17 a disputed post-petition interest determination notice shall be

18 conducted in the Bankruptcy Court as claims allowance

19 litigation subject to the same bankruptcy rules and procedures

20 that would've applied had the litigation been conducted before

21 the bank -- before the effective date."

22          So effectively, these folks are entitled to continue

23 to litigate this issue as they're doing here, and any

24 determination that is made we then have to pay.  And,

25 therefore, effectively, they have the ability in bankruptcy --

1  to do post-petition exactly what has happened with respect to

2  the lenders on their own.

3         And what does that effectively mean?  It means that

4  whatever determination gets made, they get paid, which also

5  means that their rights are not impaired.  Why are they not

6  impaired?  Because, like today, nobody's rights have been

7  impaired anywhere here.  We haven't impaired anything, because

8  the plan hasn't gone effective.  We're in bankruptcy.  There's

9  no operation of the plan.  There's only the operation of

10 bankruptcy law.  And so effectively, the litigation that is

11 preserved for these folks forecloses any argument of

12 impairment, because the plan as to them will not even have an

13 effective on their rights.

14        The only limitation that will exist with respect to

15 their rights, either as a function of non-bankruptcy law, which

16 isn't impairment, or as a function of bankruptcy law, which

17 isn't impairment under PPIE.  So for counsel to argue that

18 there's impairment ignores, just wears blinders with respect to

19 what the plan itself says, which is effectively, the plan is

20 never effective as to them.  It never comes into being.  It

21 never operates.

22        They simply maintain their status as if the company

23 were still in bankruptcy for the determination of this issue

24 precisely so that they never get impaired, and that was the

25 whole reason for running it with way.  There is no impairment,

1 because the plan will never become effective as to them in a
2 way it could operate independently of the law to effect their
3 rights.

4        Now, <u>PPIE</u> says the impact of bankruptcy law or
5 limitations is not impairment.  The only litigation -- the only
6 -- what the litigation will determine is their rights under
7 that bankruptcy law or non-bankruptcy law.  No more.

8        THE COURT:  But I think that may actually put the
9 context a little bit out of skew, and that's because the plan
10 proponents in drafting the plan obviously have the first shot
11 at determining whether there is or isn't going to be an
12 impaired class.  And in putting together all of the creditors
13 with different rates of interest, the debtors are not -- the
14 debtors are creating an impairment by -- I think under the
15 Bankruptcy Code which talks about the fact that creditors in
16 one class should be rated equally.  By changing interest rates,
17 by -- maybe if I say it affirmatively.

18        If the debtor were to say something like whatever the
19 contractual rate of interest is, that's what we're paying, and
20 if there is none, no contract that has a stated rate, this is
21 what it is, then I'm not sure how anybody could argue
22 impairment as to that, because the debtor then is complying
23 with the contractual terms to the extent there is one.  And if
24 there is no contractual term, is giving the creditor more than
25 their contract would provide.  So that might be difficult.

1  Maybe you have to break it into two classes.  I don't know.

2  That's really for a different day.  But I don't see how the

3  impairment argument as to the contractual creditors would work.

4       But here what the debtor is saying is I'm putting

5  some creditors in with a rate of interest that's different from

6  a contract rate.  And you can define for this purpose contract

7  rate however you want.  The bank lenders are not getting either

8  their non-default or their default contract rate.  So they're

9  not getting the contract rate.  Other creditors with contracts

10 are getting the contract rate.  Creditors without contracts are

11 getting a different rate from the bank lenders who aren't

12 getting the contract rate.  So --

13      MR. BERNICK:  So I -- the best way in which to look

14 at that is whether that still constitutes impairment.  That is

15 to say the argument about different treatment is not an

16 impairment argument.  The argument about different treatment

17 says -- works with a different provision of the Code, that may

18 become applicable in Phase II, but it's not an impairment

19 argument.  We have paid these people -- we could pay these

20 people every penny that they could argue their owed and still

21 pay somebody else more.  If we paid somebody else more, they're

22 treated differently, but these people aren't impaired.

23      MR. FREEDMAN:  Your Honor, if I could interject for a

24 second.  I think --

25      THE CLERK:  Use the mike, please.

1          MR. FREEDMAN:  Theodore Freedman also for the

2 debtors.  Just to step in --

3          MR. BERNICK:  And save me.

4          MR. FREEDMAN:  -- I'll -- and save my partner.

5          UNIDENTIFIED ATTORNEY:  This is an opportunity.

6                         (Laughter)

7          MR. FREEDMAN:  I think that it's useful, and then

8 I'll turn it back to Mr. Bernick, to just review the history of

9 this.  The way the plan evolved is that the debtors proposed

10 the interest rates, the non-default -- the federal judgment

11 rate structure actually based on previous visions of the plan

12 that had been negotiated with the General Unsecured Creditors'

13 Committee in this version of the plan.  We presented that

14 structure both as to the rate that was going to be paid to the

15 lenders and also the rate that was going to be paid to all the

16 other general unsecured creditors.

17          During the disclosure statement hearings, the general

18 unsecured creditors came in, and they said that's not fair to

19 our other constituencies.  We insist that everybody, everybody

20 get an option here.  The option being either to take the deal

21 that's offered in the plan or to get what they're entitled to

22 under their contract.  So -- and that was what was done during

23 the discussions before the Court at the time of the disclosure

24 statement hearing as the USG procedures.  So we worked with

25 the --

1          MR. MARTIN:  Your Honor, I might just like to

2 interpose an objection here.  I certainly haven't been given

3 any prior plans. I know that there's been a lot of history in

4 this case that I haven't been involved in, but to the extent

5 that Mr. Freedman is offering some form of testimonial history

6 of the negotiations of the plans, I would object to that.

7          THE COURT:  I think he's talking about what happened

8 at the disclosure statement hearing.

9          MR. MARTIN:  Yes, that's fine, Your Honor.  I just

10 want to make sure that we keep the record clear that this is

11 not some kind of evidentiary submission.

12          THE COURT:  Okay.

13          MR. FREEDMAN:  This is not an evidentiary submission,

14 this is an explanation of what happened before the Court.

15          So, we discussed extensively before the Court, how we

16 were going to resolve the general unsecured creditors'

17 objections and what we committed to do and the general

18 unsecured creditors' committed to do, is to work together to

19 come up with the USG procedures that were incorporated into the

20 plan.  And what they do is to say that everybody, with the

21 exception of the lenders who are a separate category because

22 there was already a pending objection to their entitlement to

23 interest, but everybody else, everybody gets the same treatment

24 and that treatment is, take the deal that we offer, or get what

25 you're entitled to under your contract.

**J&J COURT TRANSCRIBERS, INC.**

1          So, the argument that there is discriminatory

2    treatment here is a very disingenuous one, it's exactly the

3    same treatment.  They all get the opportunity to take Option A

4    or Option B, and that is just not discriminatory when everybody

5    has it.

6          THE COURT:  Well, I'm not sure it's an issue of

7    discrimination, I think it's an issue of impairment that we're

8    talking about and the question is, if you change the legal

9    equitable or contractual contract rights of the parties in the

10   plan --

11         MR. FREEDMAN:  But we aren't.  We're saying --

12         COURT CLERK:  Use the mike please.

13         MR. FREEDMAN:  -- the plan specifically as to those

14   people who don't want to take the deal that the plan offers, it

15   absolutely does not change their rights.  It specifically says

16   they will get what their rights are.  It was drafted with the

17   very close supervision of the general Unsecured Creditors

18   Committee to provide precisely that.  That they will get

19   exactly what their rights are, to be determined, post effective

20   date, in discussions between the debtors and those creditors,

21   or, if necessary, subsequent litigation if there's a dispute.

22   But the underlying principle is that they get exactly what the

23   contractual rights are.  How could that be impairment?

24         MR. BERNICK:  Yes.  I adopt everything that Mr.

25   Freedman said.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Because it shifts the burden to the

2     creditor to prove some entitlement beyond what the plan

3     provides.  That's the problem.  Impairment can provide a

4     benefit as opposed to a detriment.  It doesn't have to be a

5     detrimental impairment, it can be a beneficial impairment, it's

6     still impairment.

7          So to the extent, for example, that somebody's

8     contract rate of interest provides for 2 percent and the plan

9     is going to provide for 4, would that creditor want the plan

10    rate?  Yes, of course, but is that impairment?  Yes, it is.

11    It's changed the legal or equitable contract rights of the

12    parties and it is -- that is an impairment.

13          MR. BERNICK:  Well, Your Honor, I think really that

14    comes back to the question, the proposition that's on the table

15    is whether they're having to litigate is an impairment.  And

16    having to litigate is not an impairment.  Their route, it's

17    totally available to them, and if they've elected to take, is a

18    litigation route, in fact, having elected that route, I'm not

19    sure why they're even standing up and making an argument

20    because they've elected to take a litigation procedure.  The

21    litigation procedure allows them to bring the same issue, that

22    is, what their entitlement is, to this Court, post effective

23    date, which then means, that they stand in exactly the same

24    shoes as the people who have already exercised their right, at

25    our prompting, been offered the opportunity to exercise their

1 right to litigate, subject to the bankruptcy court's

2 jurisdiction and rules.

3        So, by taking this election, and whether they had

4 taken it or not, it would have been available to them, they'll

5 come into the court if they're not satisfied after the

6 effective date and they'll be able to make their arguments, all

7 the arguments that they could possibly make, to say that they

8 are entitled under their contracts, to the default rate of

9 interest which means that yes, they have to litigate, but the

10 fact of having to litigate is not an impairment.  They would

11 have to litigate even if there were no bankruptcy.  You don't

12 just automatically get paid.  Bankruptcy doesn't enhance your

13 rights in a way that constitutes impairment.  They would have

14 had to litigate pre-bankruptcy to collect, they would have to

15 litigate during bankruptcy to establish entitlement.  So,

16 litigation is not a right that -- the obligation to litigate is

17 not something that constitutes an impairment.  And all we're

18 saying is yes, you have that right to litigate, indeed, the

19 obligation to litigate.

20        Now, to the extent that we're calling for that

21 litigation to take place in the bankruptcy court, subject to

22 the bankruptcy rules, that also is not an impairment under

23 PPIE, the limitations that are imposed by the bankruptcy

24 process and the bankruptcy code, are not imposed by the plan.

25        THE COURT:  But see, I can't -- I don't agree that

1 the focus is on litigation, I think the focus is on what the

2 plan does to the claim.  1124(1) says, except as provided in

3 1123(a)(4) and for this purpose that's not relevant, a class of

4 claims or interest is impaired under a plan unless with respect

5 to each claim or interest of such class the plan; one, leaves

6 unaltered the legal, equitable and contractual rights to which

7 such claim or interest entitles the holder of such claim or

8 interest.  So, it's the plan that has to leave that claim

9 unaltered.  And if the plan attempts to alter it in any way,

10 it's impaired the class.

11          MR. BERNICK:  That's the plan that has to do it.

12          THE COURT:  Yes.

13          MR. BERNICK:  But under the terms that we're talking

14 about here, effectively, what this plan provides for is that

15 it's not doing anything.  All that it's doing is saying, you

16 get to litigate what your rights are.  It's the same thing as

17 if we had said, it's the same thing that we have said, what if

18 we were to say in our plan, we're passing your claim through?

19 Let's assume that that's what it said.  We're passing your

20 claim through.  Under those circumstances, while the plan says

21 that, which is, we're passing you through, they can't argue

22 that the plan impairs them if they're passed through.  This is

23 a pass through plan, with respect to them.

24          THE COURT:  But it's not.  It's setting a rate and

25 then it's saying, if you don't like this plan, we'll pass it

1 through.

2          MR. BERNICK: That's right and it's setting the rate

3 -- no, it's not setting the rate, it's providing them with an

4 option, just like the lenders had an option.  If they want to

5 exercise the option to get paid at 4.19 percent, they can take

6 it.  If they decide not to take that option, they are passed

7 through to post bankruptcy litigation.

8          THE COURT:  Then maybe the thing to do is to break

9 them out into separate classes and say, if you want 4.19

10 percent, vote in this class and if you don't, vote in that

11 class, and then I think you're not impaired because then if --

12 whoever elects the option, it's like a convenience class, but

13 for interest, as opposed to small claims, because then you know

14 where people are voting within that class.

15          MR. BERNICK:  But effectively, effectively, and I

16 don't think it's really a voting issue, effectively, these

17 folks have already done what Your Honor has indicated, because

18 what the plan does, it affords them the opportunity, indeed,

19 the obligation, to make that notification before the

20 confirmation hearing, and they've already made it.  So, they

21 have now elected to put themselves into the part of the plan

22 that's not the 4.19 percent part of the plan.  They've rejected

23 the offer and they, de facto, have put themselves into a part

24 of Class 9 where the treatment that's given to them, I'll avoid

25 the use of the word treatment, where what happens to them is

1 that they work greenfields, they basically say, they want more,

2 they get to litigate it and in litigating it, they don't get

3 more than everybody else because they still get the bankruptcy

4 court and the bankruptcy rules.

5          And, to the extent that they argue that that

6 litigation, because it's not passed through to -- towards --

7 it's not passed through to the non-bankruptcy courts is an

8 impairment, PPIE prevents them from making that argument,

9 because under PPIE the litigation that takes place in

10 bankruptcy, before the plan becomes effective and applies the

11 bankruptcy rules and strictures, is not impairment.

12          So, effectively, because of this procedure, they are

13 what I'll call PPIE pass throughs.  They are passed through

14 totally, and the only limitation on the pass through is the

15 limitation that's recognized by PPIE as not being impairment,

16 which is the limitations that are imposed as a matter of

17 statutory law and procedure.

18          So, I think we get to exactly the right place, which

19 is that, you know, Your Honor would say differently classified,

20 but effectively, we've created differentiation within the

21 class, that's true, but it's by election and they have elected

22 to put themselves into a part of the class that gets the pass

23 through treatment.  I don't know how -- I mean, if they got

24 anything more, they would actually get a treatment that is

25 different from everybody else.  They would be entitled to

1  litigate under non-bankruptcy law and get the result when

2  nobody else in the class gets that opportunity, which I don't

3  think would be right.

4          So, I didn't think that this was going to be so

5  involved, I understand Your Honor's point, but I think it

6  really comes down to what the plan treatment is, and

7  effectively, these people are passed through.

8          MR. FREEDMAN:  Your Honor, if I could just add one

9  note to Mr. Bernick's comments and it goes to the concern you

10 were expressing.

11         Your concern would be particularly well founded if

12 the plan forced anybody to take an altered treatment, even if

13 it was a better treatment than what they were entitled to, but

14 I think that the point in the response to your concern is that

15 nobody, because of the structure of the plan, is being forced

16 to take any treatment.  They are given the opportunity to elect

17 either a deal that's in the plan or their full contractual

18 rights.

19         So, I think that that's quite different from what's

20 going on with Section 1124(1), where somebody is, in effect,

21 being required by a plan to take a treatment that does alter

22 their legal, equitable or contractual rights.

23         Under this plan, their legal, equitable or

24 contractual rights are not altered.  They can elect a better

25 deal or they can get precisely with those rights.  And for that

1  reason, I don't think that we fall within the concerns that

2  you've expressed as to why there would be impairment.

3              THE COURT:  Okay.

4              MR. BERNICK:    A process suggestion, Your Honor.  I

5  have some brief responses to make to the effective advocacy of

6  my colleagues on the other side of the table with respect to

7  now the question of whether a post petition default arose by

8  virtue of not paying principal, and I have a response to that,

9  that I'd like to be able to make.

10             MR. FRIEDMAN:  Your Honor, this is Jeff Friedman.

11 Before Mr. Bernick turns to that, can I just reply to the

12 arguments on impairment because I think the Court, I think, had

13 it right and what Mr. Bernick and Mr. Freedman are trying to do

14 is to shift the burden that the Third Circuit has made clear,

15 is the debtors' burden, which is to show that Morgan Stanley is

16 unimpaired.

17             THE COURT:  Pardon me, I don't -- I apologize but I

18 don't know who is speaking and I don't know who you represent.

19             MR. MARTIN:  Your Honor, this is --

20             MR. FRIEDMAN:  I'm sorry, Your Honor, Jeff Friedman

21 from Katten, Muchin, Rosenman.  I also represent Morgan

22 Stanley.

23             THE COURT:  Well --

24             MR. BERNICK:  So, we have two different lawyers --

25             MR. MARTIN:   Your Honor, Mr. Friedman has been

1 admitted pro hac, he is my co-counsel.  If you only want to

2 keep it to one lawyer, I can certainly make that reply.

3          THE COURT:  No, I want to hear Mr. Bernick and then

4 I'll get to the bases for the rest of the argument, so that --

5          MR. BERNICK:  But what I was going to observe, Your

6 Honor, I had some things to say in response to the arguments on

7 the bank lenders, but from a process point of view, we're now

8 at the stage where we do want to submit our evidence and,

9 therefore, the part that I most immediately want to address of

10 the remarks that were made, is the part that relates to Mr.

11 Cobb's statement that somehow we should be foreclosed from

12 doing that.

13          THE COURT:  Well, today, I think he said.

14          MR. BERNICK:  Well, but -- but it's not just -- that

15 is the point.  He says that Your Honor determined last week

16 that all that there would be is legal argument, but then he

17 offers Mr. Freedgood's affidavit.  Mr. Freedgood's affidavit is

18 being offered, he makes the argument that we agreed to it once

19 in connection with the first issue, we can't not agree to it

20 now which, of course, is wrong.  It's being offered for a

21 different purpose in a different issue.

22          THE COURT:  I dealt with this last week, which was,

23 if Mr. Freedgood was unavailable today and I haven't heard that

24 he was, I've only heard that he's not here, I haven't heard

25 that he's unavailable, that we would defer the issue of his

1 examination because of the fact that this was coming up, I

2 think, Friday, maybe Thursday, whatever the day was, I'm sorry,

3 last week, and because they may not have been able to get in

4 touch with him at the hour that we left here, which was rather

5 late, that I would understand if they couldn't somehow or other

6 find him available today, but I haven't heard any of that.  So,

7 I don't know whether we need to proceed today or not.  But,

8 nonetheless, today was the day for the evidentiary hearing.

9            MR. BERNICK:  Right.  So, they --

10            THE COURT:  But for that one issue.

11            MR. BERNICK:  -- yes, exactly.  And then they say,

12 but oh, wait, it's our burden now, in impairment, whereas

13 before it wasn't our burden, the question is not burden, all

14 the matters that were presented before, with respect to the

15 Freedgood affidavit and with respect to the question of what

16 the contract provided, who bears the burden isn't really going

17 to dispose of this issue.

18            This issue is, what is the legal principle that's

19 involved and what are the facts that are related to the

20 contract.  We certainly have the entitlement, today, to proceed

21 with our evidence.  If Mr. Cobb is saying, he's not prepared to

22 cross-examine Mr. Shelnitz because of late notice, you know,

23 Mr. Shelnitz is basically talking about exactly the same

24 matters that were in the declaration that was offered in

25 connection with the entitlement briefing.  It's exactly the

1  same thing.

2        THE COURT:  Well, I'm not really sure I have any

3  facts that are in dispute. I think what I need to find out,

4  because there's no point for an evidentiary hearing if there

5  are no facts in dispute.  So, I think what I need to know is

6  what facts are in dispute.  If there are facts in dispute, then

7  yes, I need an evidentiary hearing.  If there are not, why

8  don't you folks just tell me what the stipulated facts are and

9  let's move on with this.

10        MR. BERNICK:  Well, let me take that up for just a

11  minute.  I mean, I'd like to take a short break because I also

12  want to get a couple cases that are relevant to my argument,

13  but just, I think by way of trying to narrow this, we have now

14  heard a lot that is not in dispute, including the fact, at

15  least I haven't heard any response, when this whole thing got

16  framed, most recently, the focus was on the non-payment

17  defaults.  And we've explained to the Court and evidence has

18  now been provided with respect to the contract that, indeed,

19  Mr. Cobb read it out, that when it comes to the non-monetary

20  defaults that they allege, post petition, that they have not

21  complied with the terms of the contract because there notice is

22  required.

23        Mr. Cobb went through Section 10 and then notice, and

24  then there obviously is a notice provision that it treats

25  differently, the default is associated with filing a petition

1  for bankruptcy and the notice provision that pertains to other

2  events of defaults, or other defaults.  And, under the language

3  of that contract, any breach of the non-payment obligations

4  requires notice, no notice was provided.  And I don't think

5  that they dispute that no notice was provided.

6          I don't see anywhere in their submissions where they

7  take issue with that.  Indeed, they didn't take issue with that

8  before.

9          THE COURT:  So, but if the note is already

10 accelerated, do they have to give notice of continuing

11 defaults?

12         MR. BERNICK:  No, that's the problem, is that the

13 acceleration, in order to get from -- you've got the principal

14 and interest, then you've got non-payment.  They recited a

15 change that says, if you have a filing for a petition for

16 bankruptcy, they say that, per se, that gives you, under the

17 terms of the contract, that gives you acceleration.  And they

18 further say that you don't need no notice.

19         For the non-payment obligations, the reporting

20 obligations, the acceleration provision that relates to the

21 petition for bankruptcy doesn't constitute a default of that.

22 I didn't read that provision to say that at all.  So, for

23 non-payment, the question is, was there, in fact, a default

24 within the terms of the contract because these provisions were

25 not, in fact, satisfied.

1          If you assume that there was a default under the

2    terms of the contract, because the certificate was not filed,

3    in order for that default to become an event of default and

4    then give you the acceleration, you have to have notice.

5          For the payment portions, principal and interest, the

6    petition for Chapter 11 triggers acceleration.  It is an event

7    of default.  For the non-payment, yes, there's default if it's

8    not done, for there to be an event of default, there has to be

9    notice.  Get that one right?  And then you get acceleration.

10          So, even if you're looking purely at the contract, I

11    haven't even gotten to the question of the bankruptcy overlay,

12    if all you're looking at is the contract, I don't believe that

13    there's any dispute but that notice was not provided and,

14    therefore, there is no event of default and without the event

15    of default, there's no acceleration under the terms of the

16    contract.

17          We also have the argument they haven't addressed,

18    which is whether, even if there had been an event of default

19    and notice, which hasn't taken place, whether the event of

20    default by virtue of the non-payment could lead to acceleration

21    as a matter of law and those are the cases that deal with good

22    faith and reasonableness, and we believe that they've got a

23    problem there as well, but, Your Honor doesn't need to reach

24    that because they haven't given us notice.

25          So, undisputed fact one is, was there, in fact, a

1  failure to provide the certificates.  We don't dispute that

2  there was a failure to provide the certificates.  Does that

3  constitute an event of default in the contract?  That's two,

4  answer no, because there was no notice.  So, I think that those

5  are the undisputed facts that take care of non-payment.

6          If we now start talking about the payment portion,

7  the payment portion, that's now essentially a new argument

8  that's been raised here and they're now saying, they're now

9  saying, this is a post petition default, event of default.  And

10 the answer is, they're wrong.  And they're wrong for many

11 reasons, but the simplest reason that they're wrong is that the

12 very -- under their own theory, before you get to ipso facto

13 and all the rest of that, and I do want to actually, I wanted

14 to look at a couple cases on ipso facto because I think they've

15 given Your Honor an imperfect view of the ipso facto law, which

16 is not limited to 365, not limited to 365, but before you even

17 get to ipso facto on whether this is enforceable, the event,

18 the event that triggers this argument is the petition.  502

19 specifically applies as of the date of the filing, as of the

20 date of the filing.  This is not a post petition default,

21 they're arguing that it constitutes a petition default, as of

22 the time that the petition is filed.

23         If that's true, it's totally trumped by 502, all over

24 again.  Because 502 says, as of the date you get it, unless,

25 unmatured interest.

1          So, this event is problematic under the ipso facto

2    law but it does not give them a way around 502.  So, if they're

3    now talking about, this was non-pay, let's talk about pay, the

4    contract does have a provision, but this contract provision

5    only comes in to operate, only come in to operate as of the

6    filing of the petition.  And even were it to be enforceable,

7    you have an express limitation, imposed by 502, that says

8    specifically, that you can't get unmatured interest, so it does

9    not help them out of their problem.  And if it did, it would

10   just gut all of 502.  You wouldn't even need to worry about

11   best interest or anything, they would say, oh, well, gee, you

12   know, we're okay.  And they never took the best evidence, they

13   never took this position, is that in fact they didn't do

14   anything about it.

15        THE COURT:  I think the question is whether or not,

16   what constitutes -- I thought this argument was coming up

17   because of my concern that prepetition the default rate of

18   interest can't be the default rate because there's no default,

19   and it has to be contingent on an event of default.

20        MR. BERNICK:  Yes.  Yes, yes, yes.

21        THE COURT:  They are now arguing, I thought, that the

22   petition filing is an event of default, so at least post

23   petition, the contract rate is now the default rate because

24   there is a default, the petition itself constitutes a default

25   under the contract.  So, the issue is, what's the contract

1 rate, post petition.  I thought that's what this was being

2 argued for.

3          MR. BERNICK:  Yes.

4          THE COURT:  Okay.  Not that there is --

5          MR. BERNICK:  No, it's not -- no.  Well, let's be

6 clear.  It is -- I thought that -- and maybe what we all

7 thought doesn't really make -- at the end of the day, this is

8 not a post petition -- it's not a post petition event.

9          THE COURT:  Well, it's contemporaneous with the

10 filing of this petition.

11          MR. BERNICK:  It's contemporaneous.  It is as of the

12 date of the filing.

13          THE COURT:  Well, it's as of the moment of the

14 filing.

15          MR. BERNICK:  It's as of the moment of the filing.

16          THE COURT:  Okay.

17          MR. BERNICK:  And, therefore, even if they were to be

18 correct that under the terms of the contract yes, there's no

19 question, under the terms of the contract if you file a

20 bankruptcy petition, that provision reads out.

21          THE COURT:  Right.

22          MR. BERNICK:  Yes.  The question is, well, so what.

23 In the same fashion that under the contract, yeah, we did not

24 issue the certificates.

25          With respect to the certificates, we say, under the

1 contract, before you get to anything to do with bankruptcy,

2 they didn't comply with the further provisions, therefore,

3 they're out on the face of the contract.

4         With respect to this, no question that if you filed a

5 petition, that's exactly what the provision calls for.  Then

6 that is acceleration.

7         THE COURT:  Well, the operation of law would

8 accelerate the debt.

9         MR. BERNICK:  Right.

10        THE COURT:  Whether the contract called for it or

11 not, the debt would be accelerated.

12        MR. BERNICK:  Right.  So, now the question is, A, is

13 it enforceable, right?

14        THE COURT:  Right.

15        MR. BERNICK:  And then B, is it -- does it fall

16 within the scope of 502?  Because if it falls within the scope

17 of 502, 502 says, you don't get the unmatured interest and

18 we're back to PPIE.

19        THE COURT:  Well, you don't get it as part of your

20 allowed claim and I think everybody is in agreement, that as

21 part of the allowed claim, because these are unsecured lenders

22 and there is no prepetition default, there's no entitlement to

23 interest.  So, it's not a default rate, it's not a contract

24 rate, under 502 there's no interest that's going to be part of

25 the allowed claim.

1              MR. BERNICK:  Right.

2              THE COURT:  The question is, what rate of interest

3    can you get added to that claim under certain circumstances and

4    here, the issue for 1124 is whether the plan leaves their

5    contract rights unaltered.  Their argument is that the petition

6    itself, for purposes of impairment, constitutes an event of

7    default that then bumps up the contract rate to be the default

8    rate because under the terms of the contract, the default rate

9    comes into play on the filing of the bankruptcy.  So,

10   regardless of what happens to the allowed claim prepetition,

11   post petition, the default rate of interest is the contract

12   rate because there is a bankruptcy and that's why the

13   presumption is there, that there's a default -- an entitlement

14   to a default rate, post petition when a contract provides for

15   it.

16              Your argument, I think, if I understand it is, that

17   regardless of the petition filing, that the debtor in

18   exercising its right to file a petition is taking advantage of

19   a statutory concept and as a result of PPIE that says, there is

20   no impairment based on statutory operations, that by filing the

21   petition, which is what led to the default rate of interest

22   being applied, there can't be impairment and, therefore, the

23   default rate can't be the contract rate. I think that's what --

24              MR. BERNICK:  That's exactly right.  Then, basically,

25   it goes back to where we were this morning, which is, we say

1 that the simple answer on impairment is 1124(1), under PPIE.

2 PPIE says, you give force to whatever bankruptcy limitations

3 apply and that includes 502, 726, therefore, no impairment

4 because the limitation that we're invoking is 502, perhaps,

5 726, either way we work.

6          We then get to Column 2, which is, they say, TAC, is

7 there such -- and the preliminary question on TAC on is, is

8 there such a thing as TAC on? Is there such a thing as a source

9 of a right to interest that goes beyond the claim.

10          THE COURT:  Okay, I got it.  We don't have to redo

11 that.

12          MR. BERNICK:  Yes.  And it's the same basic deal, but

13 the proof of the pudding, the proof of the pudding, this is why

14 what they're doing is so key here, is that 502 speaks directly

15 to unmatured interest as of the date of the filing.

16          THE COURT:  Right.

17          MR. BERNICK:  And their particular, their particular

18 breed of entitlement to unmatured interest is the provision of

19 their loan document that speaks the moment the petition is

20 filed.  This might be different if they had a condition in

21 their contract that they could argue gave rise to a default

22 post petition.  We could still argue about whether 502 still

23 was a bar, but 502 specifically addresses the particular kind

24 of provision that they've got here.  It basically trumps, you

25 could read -- you know, you read 502, 502 specifically, on the

1  moment, trumps the kind of provision that they're invoking,

2  which is, rights that are triggered by the very fact of filing.

3  Indeed, you could say that effectively, 502 accomplishes the

4  same effect as the ipso facto precedence.  It says, you can't

5  improve your position by virtue of the debtor having filed,

6  which then goes back to Your Honor's argument.

7          Your Honor's argument says that that's essentially

8  what we're saying, is that the debtor in taking advantage of

9  the fact that they're permitted to file the petition, thereby,

10  and gets into the protection of bankruptcy, including against

11  impairment arguments, by virtue of having filed.

12          And, therefore, and that's right, this really is

13  exactly the kind of -- if this provision is enforced,

14  notwithstanding 502, it basically always enables every single

15  time, the unsecured creditors to get what 502 would otherwise

16  deny them.

17          THE COURT:  Well, okay.  Your argument, if I

18  understand it correctly is, that 502 sets the allowed claim. In

19  this instance, I've defined the allowed claim as not including

20  any unmatured interest, which is what 502(b)(2) tells me I have

21  to do by operation of law.

22          MR. BERNICK:  Right.

23          THE COURT:  Okay.  So, their unmatured -- or I'm

24  sorry, their prepetition allowed claim, as I've defined it and

25  ruled, is the principal without interest.  The debtors' plan

1 proposes to set an interest rate that's not the default rate

2 and your argument is that under 502 that is more than the

3 lenders are entitled to under their contract document or claim

4 because 1124 says the plan has to leave unaltered the legal,

5 equitable and contractual rights, to which such claim entitles

6 the holder of the claim and I've already fixed the claim at the

7 amount of principal without interest.

8 So, your argument, I think is, maybe they're all

9 circular, maybe I'm just doing it in a circular fashion, I

10 don't know, but your argument essentially is, that the claim

11 has changed the contractual right because it fixed the allowed

12 claim at principal without any interest attached to it and,

13 therefore, the contract on which that claim is based is not

14 being altered by the plan because the claims allowance has

15 determined that issue.

16 MR. BERNICK: Yes. Or, maybe -- maybe in an effort

17 to make it a tad bit simpler, but maybe not quite as correct as

18 Your Honor has put it, that it addresses the whole question of

19 whether there is such a thing as a TAC on.

20 Your Honor has determined that they're not entitled,

21 in the broadest sense of the word under the code they're not

22 entitled. All right? That's where all this goes, is they're

23 not entitled and 502, again, specifically addresses whether

24 they get it when their right of action -- well, it addresses

25 specifically whether they get it. We're now an impairment

1 plan.  In an impairment plan, it gives complete force to 502,

2 to which they then say, oh, well, but there's something beyond

3 claims allowance that comes in as part of the impairment

4 process that is --

5         THE COURT:  Actually, I think they were trying to

6 convince me there wasn't the other day by saying that I've

7 already determined these issues.

8         MR. BERNICK:  Yes, but they're not saying that any

9 more, really, because this is an argument, this is an argument

10 that they can only make to the extent that they get beyond 502.

11         Under 502, if Your Honor --

12         THE COURT:  They don't want to go beyond that.

13         MR. BERNICK:  -- but for purposes of making the

14 impairment arguments, they've got to.  So, either they're

15 satisfied with the entitlement analysis under 502, they say

16 that's dispositive of impairment, we agree -- we disagree with

17 this, the entitlement point, but we recognize that if you're

18 right about entitlement, there's no impairment.  Or, in order

19 to get some other right that they can say has been compromised

20 or some other interest as defined by the language 1124(1), they

21 now argue that 1124(1) effectively sweeps up a broader ambit of

22 rights or interests than does entitlement under 502, under the

23 allowable provision of 502.

24         If that's true, they say, okay, we're going to test

25 out that proposition, we're going to say it's broader and we

1 get to do TAC on and the problem with the TAC on analysis, is

2 that the TAC on analysis basically says that we can go back and

3 avoid 502 because there's this event of default upon the filing

4 of the petition.  And that event of default now means there is

5 a post petition entitlement to interest that can still be

6 impaired and the answer to that is very simple, which is that

7 502 basically, and directly abrogates this contractual right

8 under the bankruptcy code.

9        THE COURT:  Well, I think what you're both telling

10 me, if I go back to Thursday, is that my prior opinion has

11 determined the issue.  There is nothing else left to be

12 determined.  I thought there were facts that I needed to make

13 this determination but the bank lenders are telling me my

14 ruling, essentially, forecloses this and now I think you're

15 arguing the same thing.

16        MR. BERNICK:  I think that --

17        THE COURT:  For different reasons.

18        MR. BERNICK:  -- no.  I think that it may be that

19 your prior analysis, now incorporated into the rubric of

20 impairment, is exactly the same and if it holds, is

21 dispositive.  That's what we would say.  But it's still a new

22 issue which is impairment.

23        THE COURT:  Yes.  It's clearly a different issue than

24 the one that I addressed before, but I think the issue they

25 were arguing is, that the ruling, essentially, forecloses their

1  entitlement to vote because however you want to get there, my

2  ruling under 502 --

3         MR. BERNICK:  Yes.

4         THE COURT:  -- means that they're not impaired.

5         MR. BERNICK:  Right.

6         THE COURT:  And I think the debtor is saying the same

7  thing.

8         MR. BERNICK:  Right.  And all that we're really

9  picking up here is, a lot of focus that, you know, was probably

10  there in the briefing, that led to your opinion on the

11  contract, but now it's become in a sense much more intensive.

12         Put simply, Your Honor's finding that there was not

13  an event of default was -- is a part of Your Honor's ruling

14  that they're really zeroing in on here and basically saying,

15  you didn't get it right, and as a result, there really is

16  impairment and, therefore, they raised the non-payment

17  provision, to which we answer, you had a record, and you got it

18  right, but if we're going to -- if that's going to be disputed

19  --

20         THE COURT:  You're saying non-payment, you mean the

21  non-monetary defaults.

22         MR. BERNICK:  Non-monetary.

23         THE COURT:  Okay.

24         MR. BERNICK:  We say there was a record, you got it

25  right, but if they're going to reopen that record, or take the

**J&J COURT TRANSCRIBERS, INC.**

1 position that it was wrong, well then we're going to walk right

2 through the door and we're going to put in some more evidence

3 on that, it's not just a declaration, there's more that's

4 there.  But, yes, we believe that Your Honor got it right on

5 non-payment the first time.

6       With respect to the payment portions, they're now

7 focused and they argue the acceleration provision and the lack

8 of need for notice, we say, okay, let's talk about that.  We

9 thought before that that was disposed of because it's,

10 effectively, an ipso facto provision and ipso facto provisions

11 are not favored, in fact, we've got more cases that are outside

12 the 365 context, but even if you were to acknowledge that

13 they've got this provision and even if this provision were to

14 read out in some fashion as being applicable to this case, it

15 can't trump 502, because 502 speaks specifically to this.  And

16 if 502 speaks specifically to it, then they can't get to

17 impairment under PPIE.

18       502 says -- where's 502?

19       THE COURT:  Well, the 365 argument, of course, is

20 still talking about contracts, even contracts to make loans

21 that are executory, and carves out an exception to those

22 contracts.  So, I'm not sure 365 applies in this context, I

23 don't think anybody has ever argued that this contract, the

24 loan that's at issue, is executory.  So, I don't think

25 365(e)(2) applies at all to the circumstances here.

1          MR. BERNICK:  But we also believe that the ipso facto

2   law is not confined to 365.

3          THE COURT:  Well, there are cases that would support

4   that view, there are also cases that would talk about financial

5   accommodations in a slightly different context.  I'm not sure I

6   need to get there, I don't think 365 applies.  At least if it

7   does, I've never heard a word, by anybody, suggesting that this

8   is an executory contract.  So, I don't think 365, in that

9   sense,  is operative in this case.

10          With respect to the 502 argument you're making, I

11  understand it.  So, why don't we take a break, if you want to

12  cite a couple of cases when we get back, we'll do that, and

13  I'll give you a chance, Mr. Cobb, after the break.  We're

14  taking a ten minute recess.

15          UNIDENTIFIED MALE SPEAKER:  Sorry, Your Honor.

16                         (Recess)

17          THE COURT:  Please be seated.  Mr. Bernick, before

18  you begin, I want to note for the record that I have had the

19  Sheppards checked on both on West Law and on LEXUS, again, for

20  the NextWave opinion that we cited in the opinion and I can't

21  see any place that it's been vacated, reversed, overruled.  In

22  fact, I can't even see that it was appealed.  So, if somebody

23  has an indication of where that is, I would like it.  There are

24  a series of NextWave cases that have, in fact, been vacated on

25  appeal, but not the one we cited.

1          MR. COBB:  Your Honor, I'll read to you the citation.

2          THE COURT:  Okay.

3          MR. COBB:  That citation is 217 F.2d. 125 (2nd. Cir.

4  2000).

5          THE COURT:  I'm sorry, 125?

6          MR. COBB:  Excuse -- yes, 217 F.2d. 125 (2nd, Cir.

7  2000).

8          MR. BERNICK:  Are you sure it's the right one?

9          THE COURT:  How did you come up with this?

10          MR. COBB:  I think so.  I think so, Your Honor.

11          UNIDENTIFIED MALE SPEAKER:  F.3rd?

12          THE COURT:  It should be F.3rd, I think.

13          MR. BERNICK:  F.3rd?

14          MR. COBB:  It should be F.3rd, I'm sorry.  Thanks,

15  David.

16          MR. BERNICK:  That may be the error.  Did you ask --

17  well, we'll take a look at it.  It doesn't sound to me like

18  there's a strong degree of confidence that it really is the

19  right decision, but we'll take a look at it.  I'm sure the

20  Court will as well.

21          Your Honor, I only had a couple other -- I'm sorry,

22  was there something else Your Honor wanted to take up?

23          THE COURT:  Not at the moment.

24          MR. BERNICK:  Okay.  I only have a couple other

25  points to take up that are, I think, very consistent with what

1 we've been talking about here.

2          We're saying that 502, by its very terms, is in a

3 sense, a specific ruling on de facto in the context of

4 unmatured interest because is speaks specifically to unmatured

5 interest as of the date of the filing and the ipso facto clause

6 that they're talking about, obviously, is as of the date of the

7 filing.  So, it's right on point and, obviously, would then

8 trigger the non-impairment argument under PPIE in exactly the

9 fashion that we've indicated.

10          But counsel is kind of at pains to suggest that

11 somehow ipso facto clauses are only disfavored in the context

12 of 365.  And the answer to that is no.  365 addresses ipso

13 facto, but so does 541 and Judge Walrath's decision in the

14 context of the EBCI case, specifically deals with Section 541,

15 which has to do with property of the estate, and says that ipso

16 facto clauses do not control what constitutes property of the

17 estate.  The estate can't be divested of property rights by

18 virtue of an ipso facto clause.

19          So -- and, then she goes on to comment, Judge Walrath

20 goes on to comment that they are, generally ipso facto clauses

21 are generally disfavored, if not outright unenforceable, under

22 the bankruptcy code. It's broad language, but that's a

23 particularly appropriate observation in this case because

24 there's not just one, but there's clearly more than one,

25 there's 541, and we would say, 502, all of them express exactly

1  the same policy.  Exactly the same policy.  And under 502 it's

2  not a policy, it is an actual provision that under <u>PPIE</u> means

3  that there can't be impairment to the extent that clause does

4  not result in acceleration.

5        In the course of the break, my bankruptcy mentor,

6  Theodore Freedman, also pointed out to me that there is an

7  additional provision of 1124 that we ought to focus on and that

8  is 1124(2).  We've only been talking about 1124(1), but if you

9  talk about 1124(2), this applies, this says a class is impaired

10 under a plan with respect to each claim or interest of such

11 class unless, with respect to each claim, the plan -- I don't

12 have the highlighter but -- notwithstanding any contractual

13 provision, or applicable law that entitles the holder of such

14 claim or interest, to demand or receive accelerated payment of

15 such claim or interest after the occurrence of a default, which

16 is what they're arguing, (a) cures any such default of a cure

17 before or after the commencement of the case under this title,

18 other than a default of a kind, specified kind, not the default

19 specified in 365(b)(2) of the kind of this title, or of a kind

20 that 365(b)(2) expressly does not require to be cured.

21       What this says is that if the plan cures a default

22 that otherwise gives rise to a demand for accelerated payment,

23 if it cures a default, then there's not impairment.  And,

24 effectively, our plan cures the default to the extent that

25 there was non-payment of principal and interest.  Effectively,

1 it does that and, therefore, really, unless you've got the --

2 unless the ipso facto clause is to be recognized.

3         So, our plan also is unimpaired with respect to the

4 lender group by virtue of 124(2) and then it says, but then

5 goes further.  It says, well, the question is, well, are we

6 curing default insofar as a default rate of interest is

7 concerned, and the answer is no.  We're not.  But you take a

8 look at the remainder of the language of 1124(2)(a), it

9 specifically excludes that kind of default that does --

10 essentially does not need to be cured.  What does that refer

11 to?

12         Well, if you take a look at 365(b)(2) --

13         THE COURT:  Well, 365 isn't going to apply anyway.

14         MR. BERNICK:  I understand that.  But that was the

15 first thing I pushed back on Mr. Freedman for, but I think he's

16 correct, which is that this refers to a default of a kind

17 specified, it is the kind of default.  In other words, this is

18 not a provision that is simply reading out to 365.  This is a

19 more general provision.  This provision says that if your plan

20 cures a default, that's the basis of a claim for acceleration,

21 it's not impairment.  However, it also further says, you don't

22 have to cure the kind of default that wouldn't have to be cured

23 under 362.  And what does that mean?  It's 362(b)(2) and that,

24 of course, is defaults that include the commencement of the

25 case.

1           THE COURT:  The commencement of the case.

2           MR. BERNICK:  So, if you take a look at 1124(2)(a),

3  (2)(a) recognizes now in the context of impairment,

4  specifically.  Here we were talking about 502 means, that ipso

5  facto causes giving rise to acceleration are not recognized as

6  being allowable, now in the context of impairment, if we take a

7  look at 1124(2), 1124(2) recognizes that (a), where you've

8  cured, it's not impaired, and we have cured -- we have more

9  than cured with respect to the non-default contract rate and,

10  therefore, we're okay here, then they said -- and then to

11  answer the point that we haven't cured with respect to the

12  default, contract default rate, the answer is, we don't have to

13  cure because this contemplates that those kinds of defaults are

14  not being recognized by the code.  And that is specifically --

15           THE COURT:  Okay.  Can I get back to what we were

16  supposed to be doing today, because the time is two hours past

17  it and we only have through Wednesday to get through

18  everything.

19           MR. BERNICK:  Right.

20           THE COURT:  We were supposed to be here for an

21  evidentiary hearing.  Are there any facts that are in dispute

22  because you folks can argue all of this in a supplemental

23  brief.  I think that PPI addresses somewhat this issue that

24  you're raising now, in any event.  The thing about PPI is it

25  doesn't say what the rate of interest is that has to be applied

1  it doesn't specify whether there's a default rate. In my view,

2  at least for allowance purposes, it's clear that it's not

3  making a presumption of a default rate.

4        One of the cases that was cited, and I apologize I

5  forgot which one, I was trying to look at them quickly, in

6  which there was -- Judge Walsh allegedly determined -- I think

7  it was Judge Walsh, allegedly determined that there was need to

8  consider the evidence of -- I'm sorry, the -- I've forgotten.

9  Let me get it straight.

10        I think it was whether or not you have to prove --

11  have evidence, of solvency.  In the case that was under

12  discussion there was, in fact, evidence of solvency on the

13  record, there was evidence that after the petition --

14        MR. BERNICK:  Yes.

15        THE COURT:  -- the debtor was solvent and the

16  adjudication was that that evidence was sufficient to determine

17  that the debtor was solvent on the date of the filing.

18        MR. BERNICK:  Right.

19        THE COURT:  So, it has nothing to do with what I have

20  determined so far.  If there are facts in dispute, I would like

21  to get to them because the insurers have now been here for two

22  hours and we're well past what's due.  If there are no facts in

23  dispute, then tell me that, you can do a stipulation of facts,

24  do a supplemental briefing and I can address all of these

25  issues in that context.

1      MR. BERNICK:  Okay.  That's fine, Your Honor.  I

2 think that maybe the way to cut to the chase on that, we

3 provided a declaration from Mr. Shelnitz that we are going to

4 offer into evidence through his appearance as a live witness.

5 Maybe if counsel can take a look at that declaration and

6 determine if there's any issue with respect to what's in the

7 declaration, we, of course, will then cast our eyes back over

8 the Freedgood affidavit and make the same determination.  And

9 maybe if we can all agree on that, we won't have a need for any

10 further evidence.

11      THE COURT:  Mr. Cobb?

12      MR. COBB:  Your Honor, Richard Cobb, again.  I think

13 that's the best way to resolve this.  And that way, we can put

14 something clean before the Court with regard to the evidence

15 and we can put -- there's a lot of things here, Your Honor,

16 that I haven't even heard before.  That's not fair, Your Honor.

17 We should be briefing this fully and I agree with post hearing

18 briefing.

19      THE COURT:  I agree that to the extent -- this has

20 gone beyond anything that I expected for today --

21      MR. COBB:  I agree, Your Honor.

22      THE COURT:  -- by way of the legal argument, but

23 particularly, I am looking for an evidentiary hearing.  If we

24 don't need one, then tell me that and let's move on.

25      MR. COBB:  I don't think we do, Your Honor.  I think

1  we can work this out fairly quickly.

2          MR. BERNICK:  If that's so, then maybe you could take

3  a look over the lunch hour. I'd like to be able to know today,

4  because otherwise I have Mr. Shelnitz.

5          THE COURT:  That's fine.

6          MR. COBB:  I can do that.

7          THE COURT:  All right.

8          MR. COBB:  Your Honor, can I just make one comment

9  with regard to Mr. Freedgood?

10          THE COURT:  Yes.

11          MR. COBB:  He is not available today.  Hopefully, we

12  can work this out, but I wanted to make sure the Court

13  understood, we did make that inquiry, he told us he's not

14  available today or tomorrow.

15          THE COURT:  All right.

16          MR. COBB:  And may I make one comment with regard,

17  before the Court leaves the bench?

18          THE COURT:  Yes.

19          MR. COBB:  With regard to his 1124 argument.  Very

20  creative over the break.  Your Honor, please read the entire

21  section.  He has to reinstate the maturity of the claim as such

22  maturity existed before the default.  That's the next section,

23  that's the next provision in that section.  These agreements

24  expired in 2001 and 2003.  They can't reinstate the maturity.

25          So, Your Honor, I'm not sure how where argument goes,

1  I'm sure we'll hear about it more in the papers, when we brief

2  this, but you have to read all of it.   Thank you, Your Honor.

3          THE COURT:  All right.  Yes, Morgan Stanley wanted to

4  make some further comment, too, and I deferred that.

5          MR. MARTIN:  Yes, Your Honor.  Again, Craig Martin

6  for the record. I think Mr. Friedman, if he's still on the

7  telephone, had a point or two he wanted to make.

8          THE COURT:  All right, Mr. Friedman.

9          MR. MARTIN:  He's no longer there.  Then I think the

10 points were in the nature of legal argument.  The point he

11 wanted to make is that requiring us to litigate is, in fact,

12 impairment and that waiting several months, perhaps years, for

13 litigation to pay us our interest that we're entitled to after

14 the effective date, is impairment.

15         Your Honor, with respect to evidence, I think you hit

16 the nail on the head.  It really doesn't matter what evidence

17 is put on with respect to the banks because 6.09 is different

18 than either the contract or the default rate.  It's impairment

19 as you said.

20         With respect to my client, I don't believe that

21 there's been any -- we don't anticipate putting on evidence and

22 I haven't heard anything from the debtor that they want to put

23 in evidence with respect to our claim.  So, I would be

24 satisfied without an evidentiary hearing and if Your Honor

25 wants supplemental briefing, I'd be happy to accommodate the

1 Court on whatever schedule you think is appropriate.

2          THE COURT:  All right. Mr. Pasquale?

3          MR. PASQUALE:  Thank you, Your Honor, Ken Pasquale

4 for the Committee.  Mr. Freedman will be surprised, but I stand

5 to help the debtors.

6          We talked about this a little bit on Thursday and now

7 I'm focused on the non-lender claims, of which Morgan Stanley

8 is one, but the non-lender claims in Class 9.

9          We did, for the committee, raise various objections

10 with respect to the treatment of that group of creditors, and

11 just so the record is clear, it is true the provisions in the

12 plan were suggested by the committee and negotiated with the

13 debtors.  That doesn't bind any individual creditor like Morgan

14 Stanley, that's the <u>Kensington</u> case that's been cited to the

15 Court many times from the Third Circuit.

16          With respect to the committee's objection, however,

17 with respect to that sub-group of creditors in Class 9, the

18 debtors have made a statement that they are going to modify the

19 language with respect to the litigation protocol, to make clear

20 that no creditors legal, contractual, equitable rights, the

21 language from 1124, will be impacted by the procedures.

22          We wanted to be sure to preserve the argument that

23 any of those creditors had, to argue anything, both a default

24 rate, a contractual rate different from that provided in the

25 plan, interest on interest, whatever arguments they may have.

1  And my understanding is, the debtors agree with that, so long

2  as the debtors for their part, get to argue whatever they want

3  to argue, including --

4          THE COURT:  But it's related to interest.

5          MR. PASQUALE: -- oh, of course, Your Honor.

6          THE COURT:  Okay.

7          MR. PASQUALE:  Of course, it is.  That's right.  But

8  we wanted to be sure, and I didn't hear anything to the

9  contrary in Mr. Bernick's argument or Mr. Freedman's argument

10 earlier.

11          But with those changes, should they be, when we see

12 the language and something that's acceptable to the committee,

13 I think that resolves our objection with respect to impairment

14 as to that group of creditors.

15          MR. BERNICK:  Would Morgan Stanley also be satisfied

16 with that language?

17          MR. MARTIN:  I'm not going not negotiate with you on

18 the record.  This is the first I've heard of it.  I have a

19 client and counsel that I have to confer with.

20          MR. BERNICK:  Well, if we could find --

21          MR. MARTIN:  I'd be happy to do that.  I'm not going

22 to negotiate on the record.

23          MR. BERNICK:  Okay.  Well, I'm posing the question on

24 the record, and if we could get that, again, coming back to us

25 today --

1          COURT CLERK:  Mr. Bernick, I don't think your mike is

2    on.

3          MR. BERNICK:  That's fine.  Thank you.  We'd like to

4    get that coming back to us today because to address what should

5    be in the record, we may need to put a couple things in the

6    record.  So if you can make the call, it may be that we're

7    done.

8          THE COURT:  All right.  I'll defer this issue until

9    after whatever the lunch recess is so that Morgan Stanley's

10   counsel can contact the client if it's at all possible and see.

11   And to the extent that anyone else has to talk to get together

12   a series of dates by which whatever you're going to file will

13   come in, you can tell me that when we get back on the record.

14         So it seems to me at this point, from what I've been

15   hearing, that the essential facts that I need to decide are

16   really not in dispute, and that all of this is a legal argument

17   based on those facts.  So I'm really not sure what an

18   evidentiary hearing is going to do.  But, you know, to the

19   extent that you've still got these hearsay issues or whatever,

20   then we may have to have live witnesses.  I'm not sure why if

21   the facts are not in dispute.  I'm not sure that you need the

22   affidavits if you can do a stipulation of facts.

23         MR. BERNICK:  I'm sorry.  There was one other thing,

24   while Mr. Pasquale is standing up there.  As a housekeeping

25   matter, Your Honor was going to, we were going to hear from the

1  --

2           MR. PASQUALE:  Just about to address it.

3           MR. BERNICK:  Okay, go ahead.

4           MR. PASQUALE:  You had asked, Your Honor, that this

5  side of the room address today what, if anything, we would need

6  on solvency grounds --

7           THE COURT:  Yes.

8           MR. PASQUALE:  -- going forward under 1129, which, of

9  course, presumes a finding in our favor on impairment.  Mr.

10  Kruger is prepared to address that.

11           MR. KRUGER:  About to say good morning, Your Honor,

12  but I guess we've had that.  So good afternoon, Your Honor.

13           THE COURT:  Good afternoon.

14           MR. KRUGER:  Your Honor, we're again going to try to

15  be mindful of the time constraints and no one is more eager to

16  have these cases come to a conclusion than the Unsecured

17  Creditors Committee.  We've been at this for eight years and

18  it's time that these cases were indeed resolved.  And Mr.

19  Bernick asked during the break whether we'd be seeking to put

20  on evidence with respect to solvency, and as Mr. Pasquale said,

21  we would first need a finding by yourself or some other Court

22  of impairment.  But assuming that we actually got around to

23  this solvency issue, we don't intend to call any additional

24  witnesses with respect to solvency unless they are needed in

25  the result of a response to information put on the record by

1  others.  But we do expect to rely for solvency on the case put

2  in by the debtor with respect to the personal injury claimants.

3  That's one part of what we would rely upon.

4         And we would also rely upon the plan of

5  reorganization disclosure document and especially the exhibits

6  to the disclosure document.  We may have some questions around

7  the edges, so-to-speak, of the disclosure document's financial

8  information, and we expect to be providing those questions and

9  have discussions with the debtor with respect to those in the

10 course of the very near term.  Other than that, that would be

11 what we intend to demonstrate and use for demonstrating that

12 this debtor is indeed solvent.

13        THE COURT:  Okay.  Well, with respect to the personal

14 injury litigation, that didn't finish.

15        MR. KRUGER:  Well, the debtors' case did finish, Your

16 Honor and except for cross examination --

17        MR. LOCKWOOD:  But our case didn't finish, Your

18 Honor.

19        MR. KRUGER:  I didn't say I was relying upon whatever

20 you might decide to do, Mr. Lockwood.  I was just saying that

21 for us, we are relying on the debtors' case.

22        THE COURT:  Okay.

23        MR. LOCKWOOD:  Your Honor, that puts the asbestos PI

24 interest in something of a quandary here.  Because in effect

25 what --

1          THE COURT:  Mr. Lockwood, would you check your
2  microphone too please?
3          MR. LOCKWOOD:  Sorry, Your Honor.
4          THE COURT:  Thank you.
5          MR. LOCKWOOD:  In effect, what Mr. Kruger is
6  suggesting is that they are going to re-up the estimation and
7  they'll just sort of say we incorporate everything that Mr.
8  Bernick and his crew of merry men did and we'll rest.  If in
9  fact there was some stipulation or something or another that --
10 the purpose for that exercise was somehow or another only
11 limited to I'm not sure what -- but I'm very concerned that
12 he's going to force us back in, we're going to have to put on
13 our whole case.  And that would make this case go on a whole
14 lot longer and it will destroy, effectively, the entire purpose
15 of having the deal that's embodied in the plan in the first
16 place.  Because it in effect puts you back to square one where
17 they're seeking termination from the Court that the debtors' PI
18 liabilities are some very low number which would then
19 presumably bind everybody among the plan proponents, including
20 the asbestos PI interest.  So I'm just -- this is a recipe for
21 very, very continued and extended litigation.
22          MR. BERNICK:  If I can make a suggestion that may not
23 allay Mr. Lockwood's concern, but will take us to the next step
24 so that we can get on with the insurance part, in part because
25 I'm looking forward to Mr. Lockwood being cross examined by the

1  carriers here this afternoon.

2        I think we've heard from Mr. Kruger about their

3  intentions with respect to solvency in Phase II.  And we

4  appreciate their coming here today to do that.  And I'm

5  assuming if we could get a deadline -- they said there's some

6  things around the edges, if we can just specify a deadline by

7  which time they'll formally confirm that there is nothing else,

8  and then we then have to consider, and I say, we, the plan

9  proponents have to consider, what to do and say about that and

10  by way of what we're going to do as part of our case.  And

11  we're going to need some time for that, not very much.  The

12  reason this, I think, is problematic from Mr. Lockwood's point

13  of view also, is that the deadline for doing all this has long

14  ago passed.  So effectively, the unsecured creditors are now

15  saying that they want to have more come into the confirmation

16  trial, which Your Honor has provided them with the latitude to

17  do.  We then have to have the opportunity to say what we're

18  going to do in response.  So I think if Mr. Kruger and his

19  clients can maybe --

20        MR. KRUGER:  We're happy to do that, Your Honor.  Two

21  weeks time.

22        MR. BERNICK:  -- if he does that in two weeks time,

23  then maybe we can get together what we will do by way of a

24  response, Mr. Lockwood, two weeks after that?

25        MR. LOCKWOOD:  Whatever you say, boss.

**J&J COURT TRANSCRIBERS, INC.**

1                          (Laughter)

2              MR. BERNICK:  That might be the appropriate way to

3    proceed.  I missed the last one, that's okay.

4              THE COURT:  All right.  Then the Creditors Committee

5    is to provide to the plan proponents a request for all

6    information sought in connection with the solvency

7    determination within two weeks, and then the debtor is going to

8    -- the plan proponents --

9              MR. BERNICK:  The plan proponents will respond.

10             THE COURT:  -- in an additional two weeks?

11             MR. BERNICK:  Yes.

12             THE COURT:  And is there any information you're going

13   to want coming back?

14             MR. BERNICK:  That's what we're going to have to

15   address.  I just don't know.  I want to have the opportunity to

16   speak with Mr. Lockwood and think about this, but whatever the

17   response is, then maybe -- I don't know, when's the next

18   omnibus?

19             THE COURT:  July 27th, which is shortly at the end of

20   that time.  So it might be appropriate just to put it back on

21   if you --

22             MR. BERNICK:  The Phase II pretrial's on July the

23   20th?

24             UNIDENTIFIED SPEAKER:  Yes.

25             MR. BERNICK:  I'll be in Jordan then, but --

1          MR. KRUGER:  Your Honor, as far as we're concerned,

2  that timetable is fine, either the 20th or the 27th.

3          THE COURT:  Yes.  There are those two dates set

4  aside, but --

5          MR. BERNICK:  Could I suggest that maybe we move the

6  pretrial to the 27th?

7          THE COURT:  Pretrial?

8          MR. BERNICK:  Yes, on Phase II.

9          THE COURT:  I thought it was supposed to be part of

10 the evidentiary hearing on Phase II.

11         MS. BAER:  Your Honor, those two days, July 20th and

12 21st were number one, for the Phase II pretrial, and number

13 two, they were reserved for any sort of flow over from this

14 hearing or additional issues we could take up before the

15 September hearing.

16         THE COURT:  All right, so you don't need it?  You

17 just want to move all of it to the 27th?

18         MR. BERNICK:  Let's talk about this on the lunch

19 break.

20         THE COURT:  All right.

21         MR. BERNICK:  My problem is that I'm going to be out

22 of town that day.

23         THE COURT:  Okay.

24         MR. KRUGER:  Anything further, Your Honor, for us in

25 solvency, thank you.

1          THE COURT:  No, sir.  Thank you.  Anybody have

2   anything else to add to this solvency determination issue?

3          MR. MARTIN:  Your Honor, I think we -- I think

4   earlier I stated that we reserve our rights.  We continue to do

5   so.  I think whatever time frame the parties have agreed to,

6   we'll live with.  And it's unlikely that we're going to do

7   anything, but to the extent that in working with the Committee,

8   we want to add some additional things.  We'll just stick with

9   the time schedule.

10         THE COURT:  All right.

11         MR. COBB:  Your Honor, the bank lenders adopt the

12  Committee's position --

13         THE COURT:  Okay.

14         MR. COBB:  -- on this point.  Thank you.

15         THE COURT:  Okay, you can let me know after the lunch

16  recess.  If you want to move this to the 27th, that's not a

17  problem from my point of view.  We'll just do that.  And if it

18  was only to be a pretrial on Phase II and you want to use the

19  27th for that purpose, that's fine.  So you can let me know

20  after lunch.  Okay.  Anything else before we start with the

21  main event for the day?  Okay, do you want your lunch recess

22  now?

23         MR. BERNICK:  Yes.  Although, I think that that would

24  probably be a good idea.

25         THE COURT:  All right, how long?

1           MR. BERNICK:  Half hour, 40 minutes.

2           THE COURT:  Can you folks live with half an hour or

3    40 minutes?

4           UNIDENTIFIED SPEAKER:  I think, Your Honor, some of

5    the bit players may leave before the main event so --

6           MR. BERNICK:  Well, we want your feedback, yes.

7           THE COURT:  Okay.  I'm continuing both of these

8    matters that I just heard until right after the lunch recess to

9    make sure that I have some agreement on the record.  And then

10   we'll start with the next.  So how about quarter after one?

11   All right.  We'll be in recess until -- I'm sorry, until 1:15.

12                          (Recess)

13          MR. MARTIN:  Your Honor, this is Craig Martin.  Some

14   of the folks that were arguing the impairment stuff are in the

15   hallway.  Do you mind if I get them?

16          THE COURT:  Okay, thank you.

17          MR. COBB:  Hello, Your Honor.  Richard Cobb on behalf

18   of the bank lenders.  I'm sorry, Your Honor, I've not gone home

19   yet.  We are right now negotiating over the forms of affidavit

20   in a good faith effort to try to resolve the evidentiary issues

21   that we had identified for the Court prior to the lunch break.

22          MR. FREEDMAN:  And we will get there.  It's just a

23   matter of just tweaking some words.

24          THE COURT:  All right.  Do you have a schedule

25   together yet about when things may be filed?

**J&J COURT TRANSCRIBERS, INC.**

1          MR. COBB:  We do, Your Honor.  And I --

2          MR. FREEDMAN:  Your Honor, we're discussing something

3 in the range of three weeks from today file simultaneous

4 briefs.  We have to look at schedules to determine whether or

5 not it's three weeks from today or perhaps three weeks from

6 Friday.  We'll report that back to the Court.

7          THE COURT:  Okay.

8          MR. COBB:  Your Honor, it would be simultaneous

9 briefing.  It would not be opening, answering, reply.

10          THE COURT:  All right, that's fine.

11          MR. COBB:  Thank you.  Your Honor --

12          THE COURT:  So can I proceed with the insurance

13 matters or do you folks all have -- I guess you have to be

14 involved?

15          MR. MARTIN:  I was going to suggest that at least

16 with respect to Morgan Stanley's issues, we're not involved in

17 the negotiation of the affidavit.  We're on board with the

18 proposed briefing schedule.  And I was going to ask to be

19 excused, because I think we're finished subject to this

20 affidavit issue.  But I don't want to leave if Your Honor

21 thinks that there's going to be more on this impairment issue.

22          MR. FREEDMAN:  Your Honor, just to clarify, the

23 briefing schedule that I was referring to is the briefing

24 schedule with respect to the lenders on the impairment issue.

25 Is counsel for Morgan Stanley going to be filing a brief during

1  that period on your issues too?

2           MR. MARTIN:  Yes.  Same schedule that we would -- if

3  we choose to file a brief, we will file it within the same

4  schedule as they agreed to with the lenders.

5           THE COURT:  All right.  So you don't care about the

6  schedule.  Just so they notify you, you'll comply with it.

7           MR. MARTIN:  Well, I think what's been tossed around

8  is three weeks and either three weeks from today or three weeks

9  Friday from now.

10           THE COURT:  Let's just make it three weeks from

11  Friday if it's an issue.  It's not going to make a difference

12  --

13           MR. MARTIN:  Okay.

14           THE COURT:  -- to me, one way or the other.

15           MR. COBB:  It's simultaneous, Your Honor, so they'll

16  be filed by four p.m. on that Friday.

17           THE COURT:  Yes, that's fine.

18           MR. FREEDMAN:  But I just want to clarify.  Debtors

19  -- the plan proponents' brief will speak to both Morgan Stanley

20  issues and to the lender issues.

21           THE COURT:  Okay.  All briefs are due then -- wait,

22  I'm sorry, Mr. Freedman, I didn't hear you properly, I'm sorry,

23  it will speak to what?

24           MR. FREEDMAN:  I understand that counsel for Morgan

25  Stanley believes he is going to be part of this briefing

1 process and we'll be filing a simultaneous brief on three weeks

2 from Friday.  And I wanted to clarify that, of course, the plan

3 proponents' brief will then be addressing both the issues for

4 the lenders and the issues for Morgan Stanley.

5      THE COURT:  Okay, that's fine.  All the briefs are

6 due then July 10 at four o'clock eastern.  Is there any --

7      MR. BERNICK:  Something else is specific to Morgan

8 Stanley.  There was also conversation, we've stated the

9 flexibility on the language that's used in the plan that would

10 affect the litigation track.  Mr. Pasquale made reference to

11 this before we broke.  I've asked to get prompt feedback from

12 Morgan Stanley if it wasn't that satisfactory to them, because

13 that will have the effect, we believe, of mooting the

14 impairment issue.  So that's what I've asked about, and I

15 believe that counsel's going to undertake that promptly.

16      And then with respect to discovery or the undisputed

17 facts, I don't know that there are any facts that are in

18 dispute there, but we would want to make a matter of record,

19 and I don't believe that counsel disagrees with this, the fact

20 that Morgan Stanley did in fact provide notice of their

21 election to proceed using the litigation procedures.  That

22 would be important to our argument with respect to what Your

23 Honor raised about classification, because if they've already

24 elected to make that determination.

25      MR. MARTIN:  I'll be happy to respond to both of

1  those points, Your Honor.  With respect to the first point, I

2  think that we're happy to look at exact language that the

3  debtors and plan proponents would propose. And if that solves

4  the issue then we may not have to file a brief.  If it doesn't,

5  then we're certainly willing to work with the debtors and I've

6  already communicated that request, and the response back is,

7  just send us the exact language in the plan, either in a black

8  line or where you would put exact language.

9        With respect to the second issue, we stated in our

10 briefing that we filed our objection that we did in fact file

11 those notices, one of which is filed on the docket.  I think

12 the plan requires a second one to be sent to the claims' agent.

13 So that one's not on the docket.  We did in fact file those

14 notices.

15       THE COURT:  All right, so there's no dispute about

16 that fact?  Okay.  Anything else about what I had been

17 referring to as the first item on the agenda, the bank lenders'

18 issue, impairment issue?  It's not just bank lenders, I

19 apologize, the impairment issue.

20       MR. BERNICK:  With respect to that item on the agenda

21 -- first of all, with respect to undisputed facts, we've now

22 exchanged the affidavits, and I believe we're trying to mark

23 them up so that there isn't a reference to legal opinions.  And

24 I think that probably if Your Honor would read those

25 affidavits, I don't think that you can find in those affidavits

1 a dispute of facts.  But rather than try to reach some separate

2 stipulation or articulate now whether there are any contested

3 facts that remain, I think what we would -- at least I think we

4 would be prepared to agree that the Court should simply rely

5 upon these declarations to determine if there are any disputes.

6 I don't believe that there are.  But Your Honor will be able to

7 look at that, unless you're able to say now that there's no

8 dispute.

9        MR. COBB:  Your Honor, for the bank lenders, that is

10 precisely our position.  We just need to reach agreement on the

11 language of the declarations.  I think we're fairly --

12        THE COURT:  That the Court should look at the

13 declarations?

14        MR. COBB:  Yes, Your Honor.

15        THE COURT:  Okay.

16        MR. PASQUALE:  Same for the committee, Your Honor.

17        MR. BERNICK:  And we'll do that before the end of the

18 day here.

19        THE COURT:  Okay.

20        MR. BERNICK:  And then there's one other matter which

21 was discovery, or further proceedings on solvency.  And I think

22 where that has been left is that we have dates for two weeks

23 and two weeks, and the only remaining question is when the

24 matter would come up for a further hearing.  I will be back in

25 time for the 27th, but it would be much preferable to me if the

1 matter could be taken up on the 27th.

2          MR. PASQUALE:  Your Honor, I'm a little confused what

3 we're addressing.

4          MR. BERNICK:  We're not addressing anything now, I

5 guess, because I haven't spoken with my client.  So give us a

6 little bit more time on that.

7          MR. PASQUALE:  Well, let me say of the record for the

8 committee, I mean, it's our position this is a Phase II issue,

9 we're talking about September.

10          UNIDENTIFIED SPEAKER:  That's not what --

11          MR. PASQUALE:  Oh, then I didn't understand.  I

12 apologize.

13          THE COURT:  No, they were dates to exchange

14 information and --

15          MR. PASQUALE:  That's two weeks and two weeks.

16          THE COURT:  --  yes, two weeks and two weeks.  And

17 the issue is whether you need something supplemental, whether

18 it should come up on July 20 or whether that should come up on

19 July 27th.

20          MR. PASQUALE:  I'm sorry, Your Honor.

21          THE COURT:  And I don't have a preference.  I think

22 everybody will be here the 27th.  If you're not going to use

23 the 20th for anything else, I'm not sure that you want to make

24 another trip just for that purpose.  So that's what I was

25 asking, whether it should be moved to the 27th?

1          MR. MARTIN:  Your Honor, may I be excused?

2          THE COURT:  Well, what's the answer?

3          MR. BERNICK:  On the 27th.  That's what I had to talk

4   to my client about.  It's a personal thing for me.  Shortly

5   I'll be able to express the Court's desire one way or the

6   other.

7          THE COURT:  All right.  There is one more issue.  I

8   am still troubled by this assertion that the case the Court

9   cited was in fact reversed on appeal by the citation that I was

10  given at 217 F.3d 125.  In fact, it was not.  The matter --

11  first of all, it's a mandamus action, not a direct appeal.  And

12  secondly, the case that was at issue was that reported at 200

13  -- I'm sorry, the issue was whether the Bankruptcy Court had

14  violated the mandate at 200 F.3d 43, and the Court does indeed

15  address various aspects of the case that this Court cited, and

16  says that the Court exceeded its jurisdiction because it

17  involved itself in an issue that should have been within the

18  exclusive jurisdiction of the Federal Communication Commission

19  Regulatory Authority.  It has nothing to do with the

20  proposition for which this Court assessed it and it is not an

21  appeal with that order.  It's a mandamus action brought by the

22  Federal Communications Commission.  I have the opinion here

23  now.  And I again have the Westlaw and Lexis search done, and

24  if you track the process by which the tree is, it's not a

25  direct appeal.  So you folks can look at it.  I point out, the

1 debtor and the bank lenders both cite to this case, one in the

2 text, one in a footnote, and neither of you cited as overruled,

3 reversed, vacated or anything else.

4       MR. COBB:  Your Honor, if we disagree in any way with

5 the Court's determination on that as you just recited it, Your

6 Honor, we'll put it in our supplemental papers.

7       THE COURT:  All right.

8       MR. COBB:  And if not, Your Honor, it is a very

9 confusing record on appeal, I do concede that.  Thank you.

10       THE COURT:  Okay.  All right.  So is there anything

11 else on Items one, on Item one, the bank lender -- I'm sorry, I

12 keep saying that -- the issue concerning impairment for class

13 nine?  All right.  Then anybody who's only interested in that

14 is free to leave.  What about the issue of discovery on

15 solvency?  Okay, is there anything more except for the date

16 that it's coming back up?  All right.  Anybody who doesn't care

17 may leave.  The debtor will let everyone know what date that

18 is.

19       MR. MARTIN:  Thank you, Your Honor.  We appreciate

20 your time this morning.

21       THE COURT:  Okay, thank you.  Okay, I think that

22 actually gets us to the insurer issues.

23       MR. BERNICK:  Your Honor, with respect to the

24 insurance portion of the agenda, I think that what Your Honor

25 had articulated as the best process was to have an initial

1 argument followed then by the submission of any evidence that

2 people want to offer up.  And unless people have a strong view

3 or a view to the contrary, Mr. Lockwood and I are prepared to

4 proceed with the argument portion of this, and then we can

5 determine what the carriers want to submit by way of evidence.

6          As Your Honor knows from things that we've said

7 previously last week, we don't believe that this is a matter

8 that requires any actual evidence.  This is an issue of law.

9 And as a consequence, we will not be submitting any additional

10 evidence into the record in connection with these matters.

11 We'll simply be asking the Court to treat it as a matter of law

12 and the only document that we really need is the plan.

13          So I'm going to go first, give some general remarks,

14 and then Mr. Lockwood is going to give some general remarks,

15 and I think we then can have the argument follow.  I see that

16 Mr. Brown has already taken to his feet, so he may have a

17 different view.

18          THE COURT:  Actually, I think what I probably need to

19 do is get the entries of appearances of the rest of the folks

20 who had not entered appearances this morning.  So maybe I

21 should start with that, and then, Mr. Brown, whatever it is you

22 want to state, I'll hear.

23          MR. BROWN:  Okay.

24          THE COURT:  Good morning -- afternoon, sorry.

25          MR. GIANNOTTO:  Good morning, Judge.  Good afternoon.

1   Michael Giannotto for Continental Casualty Company and

2   Continental Insurance Company.

3           MR. BROWN:  Good afternoon, Your Honor.  Michael

4   Brown for Seaton Insurance Company, Geico, and Republic

5   Insurance Company.

6           MR. PRATT:  Warren Pratt, same clients.

7           MR. GLOSBAND:  Daniel Glosband, also for Continental

8   Casualty, Continental Insurance.

9           MS. DeCRISTOFARO:  Elizabeth DeCristofaro,

10  Continental Casualty Company and Continental Insurance Company.

11          MR. MILLNER:  Robert Millner for General Insurance

12  Company of America.

13          MR. DEMMY:  Good afternoon, Your Honor.  John Demmy

14  for Fireman's Fund Insurance Company and the Allianz insurers.

15          MR. SHINER:  Good afternoon, Your Honor.  Michael

16  Shiner for Axa Belgium, as successor to Royal Belge.

17          MS. McCABE:  Good afternoon, Your Honor.  Eileen

18  McCabe for Axa Belgium as successor to Royal Belge as well.

19          MR. COHN:  Good afternoon, Your Honor.  Jacob Cohn

20  from Cozen O'Connor for Federal Insurance Company.

21          MR. PERNICONE:  Good afternoon, Your Honor.  Carl

22  Pernicone for Arrowood Indemnity.

23          MR. HURFORD:  Good afternoon, Your Honor.  Mark

24  Hurford again.  If I could take the opportunity to introduce

25  Mr. Kevin Maclay of Kaplan and Drysdale.  He's in the

1 courtroom right now.

2           THE COURT: I'm sorry, what's the last name please?

3           MR. HURFORD:  Maclay.

4           THE COURT:  Maclay.  Good afternoon.

5           MR. HURFORD:  The pro hac motion for Mr. Maclay was

6 filed this morning at Docket 222-03.  He is admitted to the

7 State Bar of Maryland and the District of Columbia.

8           THE COURT:  Okay.  I'll address the pro hac motion

9 when it comes to me and you're admitted for today.  Thank you.

10          MR. MACLAY:  Thank you, Your Honor.

11          MR. BOERGER:  Good afternoon, Your Honor.  I'm Jeff

12 Berger.  I'm also with Geico, Republic and Seaton.

13          MR. COCO:  Good morning, Your Honor.  Nathan F. Coco

14 on behalf of Fresenius Medical Care Holdings Inc., and it's

15 affiliates.

16          MR. LONGOSZ:  Good afternoon, Your Honor.  Edward

17 Longosz on behalf of Maryland Casualty and Zurich.

18          MR. WISLER:  Good afternoon, Your Honor.  Jeffrey

19 Wisler on behalf of Zurich International, Bermuda Limited and

20 Zurich Insurance Company, which I'll refer to as Zurich in any

21 argument I make, and also for Maryland Casualty.  And also,

22 Your Honor, with me is Richard Ifft, my co-counsel, whose pro

23 hac motion I filed this morning.  I don't know if Mr. Ifft will

24 be making any presentations, but I wanted to introduce him to

25 the Court.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  What is the last name please?

2          MR. WISLER:  I-f-f-t, Ifft.

3          THE COURT:  Okay, thank you.  Okay, good afternoon.

4   Thank you.  Again, I'll address your pro hac motion when I get

5   it.  But -- I'm sorry, Mr. Wisler, Mr. Ifft is admitted at some

6   court in good standing?

7          MR. WISLER:  Yes.

8                    (Laughter)

9          MR. IFFT:  If I may speak, Your Honor, before me,

10  admitted to the State of Maryland and the District of Columbia,

11  Your Honor.

12         THE COURT:  All right, thank you.

13         THE CLERK:  Your name please?

14         MR. IFFT:  Richard, last name Ifft, I-f-f-t.

15         THE COURT:  You're admitted for today, sir.  Thank

16  you.

17         MR. IFFT:  Thank you, Your Honor.

18         MR. HORKOVICH:  Good afternoon, Your Honor.  Robert

19  Horkovich, insurance counsel to the ACC.

20         MR. CALOGERO:  Good afternoon, Your Honor.  Stefano

21  Calogero, Cuyler Burk, P.C., for Allstate Insurance.

22         MR. LOCKWOOD:  And, Your Honor, Peter Lockwood for

23  the ACC.  I don't think actually I entered an appearance this

24  morning now that I think about it.

25         THE COURT:  Okay.  Is anyone else that I missed from

1 earlier?  Okay, Mr. Brown?

2         MR. BROWN:  Your Honor, I believe this is an

3 evidentiary hearing, and when we were all together last

4 Thursday for the pretrial, it was my understanding that the

5 plan proponents' position was that they had no witnesses and

6 they had no exhibits.  It seems to me that the appropriate

7 thing for them to do is rest and then for the insureds to have

8 an opportunity to put on their evidence.

9         UNIDENTIFIED SPEAKER:  Your Honor, I just want to

10 remind the Court that last Thursday at the end of the --

11         THE COURT:  You don't need to bend over, you just

12 need to press the button.

13         UNIDENTIFIED SPEAKER:  I believe Mr. Millner asked on

14 behalf of the insurers to have argument first and we discussed

15 that, and I thought the Court ordered that we have argument

16 first.

17         THE COURT:  That was the process that I thought that

18 everyone had asked for.

19         MR. LOCKWOOD:  Your Honor, in addition, as Mr.

20 Bernick pointed out, our evidence is the plan, and we would --

21 in a normal process, we would have an opening statement, even

22 apart from this argument, you'd be able to present your views

23 on what your one piece of evidence, the plan, does or doesn't

24 have to tell the Court, trier of fact, in the oncoming

25 proceedings.

1          THE COURT:  That's fine.

2          MR. LOCKWOOD:  So I think Mr. Brown's effort to try

3    and go first is misguided.

4          THE COURT:  This was a time, I think, set to hear

5    certain objections to the plan to determine whether or not the

6    insurers as insurers will have standing.  The debtor obviously

7    has, as one of the plan proponents, and the other plan

8    proponents, I think have a burden to substantiate that this is

9    the plan.  I don't think that's going to be disputed.  And at

10   least direct me, I think, to what sections they wish to refer

11   to.  Then I think we'll do the openings from the insurers and

12   then we'll proceed with the evidence.

13         MR. LOCKWOOD:  Thank you, Your Honor.

14         THE COURT:  All right, Mr. Bernick?

15         MR. BERNICK:  Thank you.  I think probably the best

16   place to begin in dealing with the issue that brings us here is

17   to go back a little bit in time before the Combustion

18   Engineering case.  As Your Honor is well familiar, this is a

19   very, in a sense a very rare instance in the jurisprudence

20   where not only is there precedent, but in point of fact, there

21   are a whole series of cases that are not only precedential, but

22   actually deal with the identical fact, which is the question of

23   insurance neutrality in the identical context which is asbestos

24   reorganizations.  So that effectively we can look to the cases

25   not only for guidance, but the cases actually have developed,

**J&J COURT TRANSCRIBERS, INC.**

1  not only the question, but also the answer and the fix.  And

2  what is the fix a fix of?  A fix is a fix of an original

3  concern that was expressed in cases, including seminally in the

4  Combustion Engineering case, that the events of a bankruptcy

5  proceeding, and in particular the judgment and determination

6  made at the end of a bankruptcy proceeding, that is an order

7  confirming a plan of reorganization, could be used to gain some

8  advantage or otherwise alter disputes about coverage for

9  insurance policies that were implicated by the plan of

10 reorganization.  Now I guess the most single example of that is

11 the UNR case, where effectively the plan was used to call upon

12 the insurance carriers to fund immediately the downstroke

13 funding for the post-confirmation trust without any intervening

14 proceeding to determine whether in fact the coverers were

15 obliged to provide coverage.  You kind of, you know, go past

16 go, collect $200, whatever.  You were already there by

17 operation of the bankruptcy case itself.

18         So the perceived problem was the use of the

19 bankruptcy proceeding as a sword or the strongest term, but as

20 a process and a determination that would actually affect

21 coverage rights that were otherwise preserved to the carriers

22 as part of their insurance policies.

23         CE was the seminal case that addressed this case, and

24 the fix that was approved in CE was beautiful for its

25 simplicity, which is that instead of analyzing a bunch of

                    **J&J COURT TRANSCRIBERS, INC.**

1  insurance policies or indeed focusing on and ruling on the

2  basis of some case specific fact, the answer that was developed

3  and approved in CE was a shield to the sword.  It effectively

4  said that whatever use might be made of the bankruptcy case and

5  its outcome, the carriers would be shielded from that, in

6  effect, when it came to the adjudication of their contract

7  rights in the context of a coverage action.  And in this way,

8  it wasn't necessary to have a tailored solution case by case

9  because the solution was driven by process.  That is to say, by

10  including language in the plan that the outcome of the

11  bankruptcy case, developments in the bankruptcy case, whatever,

12  could not be used in connection with or to foreclose coverage

13  rights.

14       That fix, and the language that was associated with

15  it, was not framed by any of the policies, it wasn't framed by

16  any case specific facts.  Rather, it was totally process

17  driven.  Simply a shield to stand in the way of the sword.

18       I want to touch on certain language in the Combustion

19  Engineering case because there's been a suggestion in court

20  last week that somehow the Combustion Engineering decision

21  turned upon evidence that was provided in the Combustion

22  Engineering case by a Mr. Dickhoff (phonetic).   Your Honor

23  will recall that Mr. Dickhoff testified perhaps in the CE cases

24  how many years ago, and he offered evidence for the proposition

25  that the procedures that had been used to resolve claims,

1  prepetition, were essentially very much the same as the TDP

2  type of process.  That testimony was really offered for a

3  different purpose, but the carrier suggested that that is a

4  fact that is not present in this case and therefore that

5  somehow CE should be read to be confined to its facts.  And

6  that's not so.  The language and the analysis in CE make clear

7  that the determination that was made with regard to the super

8  peremptory provision in that case was not limited by those

9  particular facts.  This is at Page 22, it's actually Page 391

10 F.3d at 190.

11         THE COURT:  Kathy, can you turn the screens on?

12         MR. BERNICK:  In reciting what took place before the

13 bankruptcy Court, the Court of Appeals noted that although the

14 trust distribution procedures do not provide for insurers to

15 have any say in what claims are paid, the insurers did not have

16 such input prepetition.  So that's the same kind of recitation

17 of fact they're quoting from, what the Court, what Your Honor

18 did in the context of the bankruptcy proceeding.

19         The key thing is that the Court of Appeals then goes

20 on to say, but, but separate point, recognizing the plan should

21 not modify the contractual rights of insurers, the Court added

22 a provision to make clear the plan did not alter the

23 contractual right of insurers under any insurance policy or

24 settlement agreement.  The super peremptory provision provided

25 -- and of course we then have the quote of the super peremptory

1  provision that was approved by the Court -- the Court of

2  Appeals comes back to essentially the same distinction in its

3  holding and this appears now at -- I guess I only have -- Page

4  217, I'm sorry.  It says, the super peremptory provision

5  drafted by the bankruptcy Court provides that nothing in the

6  plan, "Shall in any way operate to or have the effect of

7  impairing the insurers' legal equitable or contractual rights

8  if any in any respect."  And the Court then goes on to say, "As

9  both the bankruptcy Court and the District Court recognize,

10 this language broadly preserves an insurers' prepetition rights

11 under the subject insurance policies and settlements.  Insureds

12 are not obligated to pay amounts exceeding their preexisting

13 policy limits," and it then goes on to talk about some things

14 that we don't have to deal, in effect, with the facts and

15 again, recites this proposition.  "The trust distribution

16 procedures do not permit insurers to participate in the payment

17 of claims, the asbestos PI Trust trustee and claims reviewers

18 evaluate them.  But as the Bankruptcy Court found, the insurers

19 did not have this right prepetition."

20        So you have the recitation by the Court of Appeals of

21 the broad language of the super peremptory provision.  You have

22 the further recitation by the Court of Appeals of certain case

23 specific facts that were also recited by the Bankruptcy Court

24 from exactly the parallel fashion to what happened earlier in

25 the opinion when it comes to the holding.  The Court of Appeals

1  was very plain.  It says, "Moreover, even though insurers are

2  excluded from claims processing as they were prepetition, they

3  may still dispute coverage under specific policies and may

4  raise any of the same challenges or defenses to the payment of

5  claims available prepetition.  For these reasons..." plural,

6  "we conclude the plan as originally drafted does not diminish

7  the rights of insurers," et cetera, et cetera.

8          So the Court of Appeals was very, very clear that the

9  prophylactic measure that counted was the shield provided by

10  the super peremptory provision.  Very, very plain on the face

11  of the opinion, and, of course, Your Honor, in decisions since

12  has recognized the impact of CE on neutrality and has decided

13  neutrality as a matter of law predicated upon adoption of the

14  same language, did so in Federal Mogul, did so in Pittsburgh

15  Corning, finding the plan was insurance neutral, and also in

16  the G.I.T. case.

17          So Third Circuit has now spoken and the language is

18  now the magical language, thus the whole idea, the whole impact

19  of the Third Circuit's decision is to provide a claim test and

20  shield that addresses the concerns with the potential use of

21  bankruptcy proceedings as a sword that would affect the

22  adjudication of coverage rights in the policies.

23          What has happened in connection with the present

24  plan?  Well, the present plan follows the language religiously.

25  This is a demonstrative that we'll provide to the Court and

counsel that simply quotes the language of the plan, this is at
Page 209.  If you compare the language in the plan -- I'm sorry
in CE, this has the CE language -- if you compare the language
on the CE decision with the Grace plan, Your Honor will observe
that the language cited by the Third Circuit at Page 209 as
being the key peremptory provision, is adopted into the Grace
Plan at 7.15(a), at 7.15(c).  It's one paragraph in CE, it's
two paragraphs, 7.15(a) and 7.15(c) in the Grace plan.

Now, there is other language that makes its way into
the CE case.  But the language on the basis of which the Third
Circuit held that there was neutrality is this precise
language.  The holding in the law established by the CE court
is language specific, it is this language, and that language is
adopted into the plan.

Counsel made the remark last week that somehow it
got, you know, changed in some fashion.  It didn't get changed
in some fashion.  It is this language.

Now there are other provisions in the plan in this
case that bear upon neutrality.  And there's no question about
that, we've obviously pointed this out.  There's language that
creates carve outs or exceptions to the neutrality provision.
One is assignment, another is reimbursement, another is the
binding effect of 1129 and 524(g) findings.  They are all carve
outs, they're handled in Phase II.  Then we have, also in Phase
II, other aspects of the plan that are alleged to affect the

1  rights of the insurers as creditors, that is not as insurers,

2  but as creditors.  And obviously they get into the releases,

3  exculpation and the injunction.  That also is Phase II.

4       What is Phase I?  Phase I is neutrality setting aside

5  the carve outs.  If we were to go back and do -- well, I will

6  do it -- just so that Mr. Millner can tell me once again that

7  this is not right, I've got to give him the -- fair is fair,

8  you've got to have your chance here.  So as kind of an adjunct

9  to this, we have the ambit of the super peremptory provisions.

10 That's what we're here to talk about.  We're not here to talk

11 about other matters that may pertain to the insurers' rights,

12 rights or interest as creditors.

13      Within the super peremptory provision, there are

14 carve outs that are for Phase II.  What is here is, if we set

15 aside the matters that are carved out for Your Honor's

16 determination, there is the central question of whether this

17 plan affects the rights of insurance carriers to raise defenses

18 in the context of coverage.  It is the coverage defense's

19 rights.

20      Super peremptory provision is designed to preserve

21 these as against the outcome of this bankruptcy.  That is where

22 we're asking for the Court to determine that the super

23 peremptory provision is appropriate and it's lawful under

24 Combustion Engineering, that is in fact a live issue before us

25 here today.  And therefore the order that we're asking for and

that we've submitted to the Court recites very simply, "That the plan properly preserves all rights and coverage defenses and insureds that issued non-settled insurance policies." Because the people who have settled insurance policies have a different set of issues.  "Non-settled insurance policies to the debtors' rights to which are being transferred to the Asbestos Personal Injury Trust under the plan as therefore neutral as to them in their capacity as insurers of non-settled coverage." This very, very simple tailor-made to the <u>CE</u> language and <u>CE</u> holding.

And then it goes on to talk about standing.  That is what the implications are for standing.  Let me turn to standing briefly.  Standing, in terms of the legal structure, is a little bit -- I don't want to say obscure -- but complicated, because of the overlay of bankruptcy language, in part derived from 1109, but also from the person aggrieved language that used to be in the code, there's an overlay of bankruptcy standing considerations to constitutional or non-bankruptcy standing principles and how the two bodies of standing limitations or requirements interact.

And what's very clear, and the Courts have made very clear, is that the constitutional in Article III Standing Requirements that exist outside of the code, also apply in this Court.  So there must be an injury, in fact, giving rise to an actual controversy, that's the first prong.  And then there's

1   also Prudential standing that says that even if that exists,

2   the ambit of the kinds of matters or the scope of issues that

3   can be adjudicated for somebody who has that injury, also is

4   subject to limitation.  That's Prudential standing.  And it's

5   on that basis that the Courts have said even the party

6   withstanding in a constitutional sense because they have

7   injury, in fact, may not have the ability to speak to all

8   issues that arise in the case.  That's Prudential standing.

9   That says you can't, in a sense, strike out or latch onto other

10  issues in the case.

11          Those basic requirements are not watered down or in

12  any way abridged in the context of bankruptcy proceeding.

13  Bankruptcy Courts are still part of the federal courts, those

14  same principles apply.  Issues that come out of the bankruptcy

15  overlay, if anything, tend to be further restricted, because in

16  bankruptcy, you have so many parties, that you have a situation

17  in which, if you didn't have limitations on the ability that

18  people have to participate and how far they can participate,

19  the process could be very much slowed down and delayed.  So

20  person aggrieved is an especially stringent requirement imposed

21  in the bankruptcy case on Prudential standing.  But it is, it

22  by no means in any ways fashion suggest that the ordinary

23  principles of Prudential standing, which limit the issues that

24  can be spoken to, are not fully applicable.

25          So what do we have in our particular case?  Well, our

1  particular case, as Your Honor well appreciates, in Combustion

2  Engineering, the person aggrieved limitation was applied to say

3  to the insurance carriers, once your issue of how the language

4  for the super peremptory provision reads out was addressed,

5  once that issue of the super peremptory provision was resolved,

6  in a sense, you don't have any standing to participate in this

7  case at all.  And so they don't really have a further proper

8  role in the case.

9          We're not saying that in connection with this case.

10  What we're saying is, it's not person aggrieved, but it's still

11  Prudential standing and they do have standing to raise the

12  issues that they've raised with respect to the language of the

13  super peremptory provision, but even beyond the person

14  aggrieved standard that was addressed by the Combustion

15  Engineering Court of Appeals, Prudential standing would still

16  say what the order reads out.  That is separate and apart from

17  person aggrieved, Prudential standing applied outside of

18  bankruptcy would still have effectively the same result that

19  the CE Court reached using the person aggrieved standard.

20  These people, once this language issue is addressed, should not

21  have the ability to address other issues in the bankruptcy

22  case.  And that is essentially -- that is in fact what the

23  balance of order says about the participation of the

24  non-settled insurers in the context of Phase II.

25          What issues or what objections are specifically

1  picked up by this?  I think that Mr. Lockwood is going to

2  address that question and go through the different objections

3  that we believe these folks should not have standing to

4  address.  So with that as the backdrop, the legal principle

5  coming out of CE, our plan, we're doing our job, we're doing

6  just what we're supposed to do.  We're quoting the language,

7  adopting the language of CE, we should have exactly the same

8  effect which Your Honor has given to the same language in the

9  series of prior cases.  And with that I'll turn it over to Mr.

10 Lockwood.

11         MR. LOCKWOOD:  Good afternoon, Your Honor.  I want to

12 backup a little and provide a little bit different context than

13 Mr. Bernick did, although I agree with his recitation of the

14 historical origins of insurance neutrality, and focus on what's

15 really at stake in this case at this time with respect to what

16 our adversaries are asking and what we're asking for.

17         I think first it would be helpful to point out

18 clarity, because it comes up a lot in this sort of Phase I,

19 Phase II discussion, that there are -- and this is sort of

20 unusual for a plan of this sort -- there are three different

21 categories of insurers in this case, and we're only talking

22 about one of them today.  The three carriers -- excuse me --

23 the three categories are the following.

24         First, there are insurers that Grace settled with

25 prepetition and gave indemnities to with respect to certain

1  specified policies and coverages.   Those settled insurers are

2  proposed to be treated as asbestos protected parties under the

3  plan and the trust will not be pursuing any assigned insurance

4  claims against them because their policies have been settled.

5  And they're not involved in that capacity in the insurance

6  neutrality discussion.

7          And I might answer that the word, in that capacity, I

8  should elaborate on a little bit, because while I am describing

9  three categories of insurers, in fact, some of the insurers

10 fall into all three categories.   CNA, for example, has settled

11 coverage and two other kinds of coverage that I'll get to in a

12 moment.   And so it falls into three categories.   Some of the

13 other insurers fall into two categories, but they're two

14 different categories and others -- I think only one of them

15 falls into simply one category alone of the sort that we're

16 dealing with today.

17         Anyway, the second category is what we've called the

18 asbestos reimbursement insurance settlement agreements

19 carriers.   And those were carriers that had what, for want of a

20 better word, we refer to sometimes as coverage in place

21 agreements with the debtors' prepetition which -- and we'll get

22 to some of the insurance neutrality provisions and carve outs

23 that speak to them.   But in summary, the settlement agreements

24 that they have entered into are being assigned to the trust,

25 and certain rulings are being sought under the plan by the plan

1  proponents with respect to how those, what I'll call

2  reimbursement agreements, will be handled post consummation by

3  the trust and those insurers.

4         And again, we have stipulated with insurers that are

5  parties to such agreements, that the plan is not insurance

6  neutral as to the relief we're seeking with respect to those

7  agreements.  And so -- and we have stipulated that their

8  ability to dispute their treatment under those agreements will

9  be addressed in Phase II and will not be addressed in Phase I,

10 and so they're not before us today.

11        The third category is what Mr. Bernick referred to as

12 unsettled insurance carriers.  And those are sort of the

13 classic insurers that we normally see in these cases.  They are

14 insurers that -- in this case they tend to be excess carriers,

15 and -- indeed, I believe they're exclusively excess carriers --

16 and they are insurers that have entered into no kind of

17 prepetition settlement agreement with Grace, and the plan

18 proposes to assign rights under their unsettled policies to the

19 trust and it is those carriers that the insurance neutrality

20 provisions are intended to address.

21        And so when we talk about either unsettled insurance

22 or non-settled insurers or whatever, that's the third group

23 that we're talking about.  And I as I said earlier, some of the

24 carriers are both in that group and also in other groups.  And

25 one of the problems that has created as we will see when we get

1  to some of the objections that have been filed, is that some of

2  the carriers that are in more than one position are making

3  arguments about insurance neutrality inadequacy for Phase I

4  that only apply to the rights that they claim as creditors that

5  we'll be addressing in Phase II.  So it's pretty important for

6  us to keep straight in our minds the capacity of particular

7  insurers that we're talking about.

8         With that stated, what's to fight about?  Well, Grace

9  has literally hundreds of millions of dollars of unsettled

10  excess liability insurance rights that are being transferred to

11  the trust pursuant to the plan.  The unsettled insurers object

12  to that transfer and assert that it, and thus the plan,

13  violates a variety of provisions in their insurance policies.

14  The basic premise of those objections is that if the plan is

15  consummated, and if the trust is created, then in the future,

16  post consummation, the trust will seek to have the insurers pay

17  for the debtors' asbestos personal injury claim liabilities

18  that are being assumed by the trust pursuant to the plan.

19         More specifically, the non-settling insurers contend

20  that the trust's resolution of assumed asbestos PI claims,

21  pursuant to the trust distribution procedures, will not comply

22  with various provisions of their insurance policies governing

23  the manner in which the insured and the insurer are to deal

24  with one another with respect to claims against the insured

25  that the insured tenders to the insurer for defense and

1  indemnity.

2         Under normal circumstances, a party objecting to a

3  reorganization plan on the ground that its provisions breach a

4  contract between that party and the debtor, would have the

5  burden of proving such a breach as a predicate for its

6  objection.  Here, that would and should require that unsettled

7  insurers not merely assert the existence of such breaches of

8  their policies, but prove the breaches.

9         Since the insurers -- since the breaches alleged are

10 all prospective, that is, they involve actions by an as yet

11 unformed trust to obtain insurance proceeds for claims that

12 will be resolved by the trust in the future, such prospective

13 alleged breaches would have to be addressed by some form of

14 declaratory judgment proceeding involving hypothetical facts

15 about how the claims will ultimately be resolved by the trust,

16 which of the claims the trustees will then determine to seek

17 coverage from the insurers on, and what are the facts that will

18 exist with respect to the claims that the trustees in the

19 future decide to present to the insurers.

20        Such an action would also involve the application of

21 one or more state's insurance laws to the hypothetical facts

22 and the policies to determine whether those facts did or did

23 not breach the policies in the manner sufficient to justify the

24 insurers' refusal to pay the trust for the claims the trust

25 resolved.  Such litigation is generally referred by all of us

1   in these cases as coverage litigation.

2          An illustration of the type of action that would be
3   required to prove a breach of this sort here is the assertion
4   by many non-settling insurers that the plan violates their
5   so-called consent to settlement provisions in their policies.
6   Since many states have case law permitting an insured to make a
7   settlement without insurer consent, if on the particular facts
8   the settlement is reasonable based on those facts, litigation
9   of such an issue before the trust has made any settlements and
10  where the trustees have the power to amend the TDPs if a
11  coverage court decides that a particular method of claims
12  resolution under the TDPs is inconsistent with the insurers'
13  coverage rights under their policies would be a completely
14  hypothetical and speculative enterprise at this stage in the
15  bankruptcy case.

16         Given that, what have insurers, and insureds and
17  debtors and courts decided to do about the problems of
18  rightness and hypothetical nature of dispute, et cetera?  Well,
19  as the general matter, as this Court knows, insurers
20  strenuously resist having coverage issues litigated in asbestos
21  bankruptcy cases frequently arguing that bankruptcy courts lack
22  jurisdiction to even hear such disputes.  I'm sure Your Honor
23  can recall some instances of seeing just such arguments.

24         Also, asbestos debtors frequently wish to avoid the
25  expense and delay of litigating coverage issues with insurers

1  where coverage is being assigned to a trust as a prerequisite

2  to confirming a reorganization plan.  And, finally, many

3  bankruptcy courts, including Your Honor, have evinced a marked

4  lack of enthusiasm for presiding over coverage litigation as

5  part of plan -- the plan confirmation process.  So, what has

6  been done?  The effective solution to these issues has been the

7  creation and utilization in many asbestos bankruptcies of plan

8  provisions dubbed insurance neutrality provisions.

9         The purpose and effect of such provisions of which,

10  as Mr. Bernick pointed out, the premier example is the one

11  originated by this Court and ultimately approved by the Third

12  Circuit in the Combustion Engineering case is to insert

13  language in the plan pursuant to which the insurers' rights to

14  deny coverage to claims from the trust based on alleged failure

15  to comply with applicable policy terms are preserved for

16  subsequent coverage litigation, if necessary, between the trust

17  and any non-settling insurers in a non-bankruptcy forum.

18         Since the effect of such protection is to render the

19  insurers' rights under their policy unimpaired by the plan, the

20  correlative of such insurance neutrality is to deprive the

21  insurers of standing to object to the plan based on contentions

22  that it violates their contractual rights.

23         Okay.  What have we got here?  Mr. Bernick pointed

24  out and showed the Court the similarity between the provisions

25  contained in CE case and this one, and I'm not going to repeat

**J&J COURT TRANSCRIBERS, INC.**

1  that comparison.  But, I would like to walk the Court through

2  the specific language of not merely provisions that Mr. Bernick

3  showed you, but all the provisions of Section 7.15 which is the

4  totality of the insurance neutrality provisions.  And in the

5  process describe and discuss what we've referred to as the

6  carve outs which the existence of which some of the insurers

7  claim in and of themselves makes Combustion Engineering

8  inapplicable to the case.

9        As Mr. Bernick pointed out, two of the fundamental

10 insurance neutrality provisions in the plan are Sections

11 7.15(a) and 7.15(c), and as combined those provisions mirror

12 the image of Combustion Engineering.  In addition, we have

13 Section 7.15(f) of the plan which has additional coverage

14 protection language that Your Honor may recognize from the

15 Federal Mogul plan.  All three of these subsections, however,

16 contain language which I've highlighted at the beginning of

17 each clause saying, except to the extent provided in this

18 Section 7.15.  And we concede that the exception language is

19 not taken verbatim from Combustion Engineering.  It doesn't

20 exist in those plans.  And one of the primary disputes that we

21 have with the insurers in this case is whether the existence of

22 this exception language in some manner or another renders the

23 plan not insurance neutral.  And in order to discuss and

24 analyze that, we have to look at the exceptions themselves.

25        To do that we have to actually start with Section

1  7.15(f) because it actually contains the first two exceptions

2  to what you might call total neutrality.  And it does so by

3  saying that nothing will prevent the -- in the plan the

4  confirmation order, et cetera, will limit the right of any

5  asbestos insurance entity in any asbestos insurance action to

6  assert any asbestos insurer coverage.  To know what that means

7  one has to look at the definition of asbestos insureds --

8  insurer coverage offenses.  That definition is contained in

9  Section 1.1.16 of the plan and is -- I've got it on the screen

10  here.  And it contains in Subclause Romanette (i) and Subclause

11  Romanette (ii), two items that are excluded from or carved out

12  from the definition of asbestos insurer coverage defenses.

13          The first one of those -- excuse me, the second one

14  of those has to do with the transfer of asbestos insurance

15  rights pursuant to the plan.  And that also relates to one of

16  the specific carve outs in Section 7.15 itself which is Section

17  7.15(g) which specifically provides that the insurers will be

18  bound by any finding that the Court may enter that the transfer

19  of rights under these insurance policies is valid and

20  enforceable because of preemptive provisions of the bankruptcy

21  code.  And it is -- we take the position, and have so argued in

22  our trial brief, and Your Honor has implicitly if not

23  explicitly agreed with this position in some of the prior

24  insurance neutrality rulings that you've made that this

25  exception does not render the insurance neutrality provisions

1 of the plan insufficient, inadequate to protect insurers'

2 interests.

3        In part, this provision is a reflection of what

4 actually happened in the CE case itself which as Your Honor

5 will recall not only was there the insurance neutrality

6 language that's contained in 7.15(a) and 7.15(c) that we

7 discussed earlier, not only was that language in CE, but

8 notwithstanding that language the Court -- the Third Circuit

9 said that the transfer of the insurance rights to a trust was

10 pursuant to provisions of the bankruptcy code, and the Third

11 Circuit did not see any apparent conflict between that carve

12 out, if you will, or that exception to insurance neutrality,

13 and the general notion that the insurers' coverage defenses

14 were protected.

15        Essentially, what you got is, all the asbestos

16 insurers' coverage defenses are protected with the exception of

17 that provision in their contracts that gives them the right to

18 consent in their absolute discretion or as limited by state law

19 to the "assignment" of their interest in their policies to a

20 third party.  So, that's one exception.

21        The second exception which the -- that's an

22 exception.  And, moreover, we will litigate, and we have

23 stipulated we will litigate with the non-settling insurers

24 whether or not by the time we get to Phase II of the plan

25 there's some reason for the Court to change its mind about the

1  preemption issue.  But, we've accepted the notion that it's a

2  Phase II issue and they have standing to object to it at Phase

3  II.  The second carve out is in Romanette (i) that any argument

4  that the plan or any of the plan documents do not comply with

5  the bankruptcy code.  The rationale for this, which we submit

6  is implicit in the CE language itself, is that the plan

7  confirmation should not create new coverage defenses.

8         For example, an argument in coverage litigation that

9  somehow there's no coverage available because the plan didn't

10 comply with Section 1129 or 524(g) of the bankruptcy code

11 beyond what the insurers' state law writes under their

12 preexisting insurance policies were.  I mean, prior to

13 bankruptcy the insurer certainly didn't have any defenses to

14 coverage demands from an insured that somehow or another the

15 insured hadn't complied with some provision of the bankruptcy

16 code.  I mean, the insurance policies don't even purport to

17 speak to that.  And the concern here was that, and perhaps, you

18 know, it was a little bit on the belt and suspender side from

19 our perspective, but the concern is that we didn't want to have

20 to re-litigate in coverage litigation whether or not this plan

21 complied with the bankruptcy code.  It's a pretty simple and

22 straightforward concept.

23        A number of the insurers have taken the position in

24 their papers that somehow or another this exclusion for

25 compliance with the bankruptcy code sort of sweeps up and

1  vitiates the provisions of 7.15(a) and (c), and for that matter

2  (f), because they assert that instead of simply limiting them

3  to or precluding them from raising bankruptcy code objections

4  it would preclude them from raising objections under standard

5  coverage defenses that were somehow or another similar to a

6  bankruptcy code defense.

7          And, I think, the most frequently touted example that

8  they give of this potential conflict with you or override of

9  this clause is the notion that by precluding them from arguing

10 that the plan was not proposed in good faith under Section

11 1129(a)(3) of the code that somehow or another that would

12 prevent them, in coverage litigation, from arguing that the

13 drafting and negotiation between the debtor/insured and the ACC

14 and the FCR amounted to some kind of "collusion" as that term

15 is used in state law coverage cases.  And the answer to that is

16 simply that it doesn't bar any such defense.  That's a state

17 coverage defense.  It's not a bankruptcy case defense.  So, as

18 long as what they're arguing is something about state law

19 coverage rights, there's no reason that this Subsection of 7.15

20 -- well, 1.1.16 which is incorporated into 7.15(c) has any

21 impact on their coverage defenses and the preservation of those

22 coverage defenses.

23          Excuse me, Your Honor.

24                    (Pause)

25          MR. LOCKWOOD:  Another carve out in Section 7.15 is

**J&J COURT TRANSCRIBERS, INC.**

1  the one I mentioned earlier about the reimbursement insurers

2  when I said we were not dealing with them today.  If you look

3  at 7.15(j) of the insurance neutrality provision it

4  specifically says that, "Insurers shall be bound by the

5  provisions of Section 7.2.2(d)(4) of the plan," and those

6  provisions are shown immediately above the 7.15(j) language.

7        This is actually, in our view, rather similar to the

8  assignment provision carve out that we've discussed a few

9  minutes ago.  Essentially, what it says is -- what 7.2.2(d)(4)

10  says is that with respect to these reimbursement agreements

11  that are being assigned to the trust, the trust will be deemed

12  to be Grace, in effect, for purposes of performing under those

13  agreements.

14        And it is our view that that result, as we will show

15  in Phase II, which we have stipulated is the venue in which

16  this issue will be litigated with the reimbursement insurers,

17  are very similar to the language that Mr. Bernick was reading

18  you earlier from the CE case involving Mr. Dickhoff that we

19  will be showing the Court that, in fact, the insurer rights

20  under those agreements are not being impaired by the plan

21  because the trust performance under the TVPs will be,

22  essentially, as similar to what Grace was doing pre-petition.

23  But, whether or not we prevail on that issue the one thing

24  that's clear is that it's not a Phase I issue.  We're not here

25  today to attempt to litigate that issue which would obviously

1  require the presentation of evidence.  So, that is an express

2  carve out for a very limited set of settlement agreements.

3        The next provision could be viewed as a kind of carve

4  out, and that's 7.15(d).  And what that effectively says is

5  that the insurance neutrality provisions are not intended to

6  override Section 524(g) of the bankruptcy code with respect to

7  the injunctive protection to be provided to settling insurers

8  under the plan.  And while the <u>CE</u> decision and the Third

9  Circuit didn't specifically address this issue, at all, I think

10  it's fair to say that it was sort of an accepted proposition

11  that giving settling insurers 524(g) protection, including

12  against contribution claims from non-settling insurers, was

13  somehow or another not inconsistent with the notion that the

14  non-settling insurers' rights under their policies were not

15  being impaired.

16        And, indeed, when you think about what this claim is

17  -- what the insurers, the non-settling insurers, how they would

18  be affected by this provision, it really has to do with

19  hypothetical contribution, indemnification or subrogation

20  claims that might arise in the future if the trust pursued

21  insurance coverage from a non-settling insurer was successful

22  in that and the judgment awarding insurance proceeds to the

23  trust under applicable state law gave rise to a cross claim for

24  contribution against the settling insurer, a right which, I

25  might add, nowhere appears in any of the non-settling insurers'

1  policies, but is purely the sort of equitable, as I understand

2  it, provision of state law.

3          In any event -- well, let me -- and, moreover, as you

4  will see we have put in, in Section (i) of the plan a provision

5  that gives to the non-settling insurers the right to reduce any

6  judgment that the trust might obtain against such a

7  non-settling insurer by the amount of any contribution,

8  subrogation or indemnification claims that they could show they

9  had against settling insurers.  To the extent that the

10 non-settling insurers believe and seek to prove that the

11 protection provided by 7.15(i), in exchange for the cutoff of

12 their claims against settling insurers, is inadequate and in

13 some way or another is a basis for a valid objection to the

14 confirmation of the plan, that is a Phase II objection, because

15 that's basically an objection about the injunctions.

16         And you will recall the chart that Mr. Bernick showed

17 you, on the right-hand side there were three categories of

18 things that were Phase II objections and one of them was

19 whether rights were being cut off by injunctions.  And this is

20 one of those.

21         There is another provision, a carve out, if you will,

22 or an exclusion, which is 7.15(h).  And this provision

23 basically provides, as I just mentioned, that non-settling

24 insurers will be subject to the releases and injunctions to the

25 extent described in the plan and specifically identifies among

1   those the releases and indemnifications given to the Sealed Air

2   and Fresenius entities.

3          Again, releases and injunctions relate to, in this

4   case, contingent, indeed highly contingent, claims by insurers

5   not to deny coverage for matters that the trust is asking them

6   to reimburse it for, but rather for claims that somehow or

7   another they have against the debtors or various protected non-

8   debtors already or contingent claims that they think they might

9   have in the future, none of which are policy coverage issues.

10          And just as with the injunctions we have agreed, and

11   if you look at the chart of objections that was -- the revised

12   chart that was just filed recently you'll see that it makes

13   explicit that any insurer, non-settling insurer, that wishes to

14   show that they have a claim of some sort or a right of some

15   sort that is being cut off by the injunctive, or the release or

16   the exculpation provisions of the plan may seek to do that in

17   Phase II and may seek to argue that if, in fact, there is such

18   a cutoff that that is a reason why the plan cannot be

19   confirmed.

20          And, again, if you look at the objections of many of

21   the non-settling insurers, you will see assertions that as a

22   Phase I issue the existence of this carve out is a ground for

23   the Court to rule that the plan is not insurance neutral as to

24   non-settling insurers in their capacity as issuers of insurance

25   policies and rights thereunder to the debtors that are being

1  transferred to the trust.  And as the CMO made clear, issues

2  involving those types of claims of cutoff of actual claims or

3  rights is a separate issue which has always been proposed to be

4  dealt with in Phase II.

5         Another provision of Section 7.15, which some of the

6  non-settling insurers complain about, is not under, in our

7  view, a carve out of insurance neutrality, at all.  It is as

8  its wording indicates, simply a clarification establishing that

9  the insurance neutrality provisions do not apply to

10  non-insurers that are otherwise bound by the plan.

11         Again, this may be an excessive caution on the part

12  of the plan proponents, but we didn't want somebody who wasn't

13  an insurer somehow trying to come here and argue that for some

14  reason or other because of the insurance neutrality provisions

15  their claims or rights that were otherwise dealt with in the

16  trust are somehow or another being preserved.  And if you look

17  at the people that are covered by this provision, it's the

18  debtors, the reorganized debtors, the asbestos PI trust and the

19  beneficiaries of the asbestos PI trust.

20         Now, a couple of the insurers have argued that the

21  reference to the beneficiaries of the asbestos PI trust

22  includes insurers.  And they say it includes insurers because

23  they have a -- they have or may have claims for indemnity, or

24  contribution, or what have you, that would be channeled to the

25  trust.  Apart from the fact that the plan proponents do not

believe that any non-settling insurer who unlike settling
insurers doesn't have an indemnity agreement with Grace can
actually establish in Phase II that it has any such claim, the
binding effect of the plan on any insurer that has that sort of
a claim would only be in its capacity as a plan beneficiary and
not in its capacity as the issuer of non-settled coverage
assigned to the trust.  And that's an important distinction.

I mean, in the capacity of non-settled insurers whose
coverage rights have been assigned to the trust, that insurer
is an adversary of the trust.  The trust wants it to reimburse
it for claims and the insurer doesn't want to do that.

The idea that somehow or another in that capacity or
relationship the insurer would be a "plan beneficiary" that was
bound by the trust is absurd.  On the other hand, if an insurer
-- a non-settled insurer somehow under some hypothetical set of
facts winds up with a claim against a trust that's channeled to
the trust, then like all other people whose claims are being
channeled to the trust, the plan provides that they're bound by
that.  But, that has nothing to do with insurance neutrality of
the sort that we're talking about.

And if there are such insurers who think they have
claims that are going to go to the trust and they don't like
that and they want to object to the plan because of that, they
can in Phase II seek to prove what those claims are, at least
to the point of establishing that they're real even if

1  contingent, as opposed to just pulled out of thin air which

2  frankly if you read the insurers' descriptions of the types of

3  claims that they assert in their trial brief you will look long

4  and hard for anything resembling specificity about either the

5  factual or the legal basis, much less the likelihood of such

6  claims would actually occur to the extent that they're

7  contingent and hypothetical.  But, again, that's a Phase II

8  issue.

9          We're not here today to litigate with the insurers

10 whether they have these kind of claims, and if they have the

11 kind of claims whether or not those claims are somehow or

12 another being treated improperly under the bankruptcy law.  All

13 we're here -- all this provision does is to say that that's not

14 part -- that issue is not part of insurance neutrality.  But,

15 as I said earlier because of the capacity point that I made,

16 it's really not -- it really isn't an insurance neutrality

17 issue to begin with.

18          THE COURT:  Then why is it in this section?

19          MR. LOCKWOOD:  Excuse me?

20          THE COURT:  Then why is it in this section?

21          MR. LOCKWOOD:  It's in the section because, as I said

22 earlier, we didn't want non-insurers to be coming in and

23 arguing that somehow or another they could take advantage of

24 the insurance neutrality provisions.  I grant -- I mean, we

25 could move it somewhere else in the plan, but I have to tell

1  you, until I got the insurer objections it had never crossed my

2  mind that an insurer would become a plan beneficiary.  I mean,

3  maybe I'm a little bit simple, but to me non-settling insurers

4  objecting to the plan, they're my adversaries.  They're not the

5  guys that my trust is supposed to be looking after the interest

6  of.  But, I have to say, it's theoretically possible that they

7  could become a plan beneficiary if they went through a bunch of

8  hypothetical events and wound up with the claim it was

9  channeled to the trust.  And I think it's incumbent upon me to

10  explain why this provision doesn't impair or impact their

11  rights.

12      Finally, we have Section 7.15(e) of -- Subsection

13  7.15(e) of the insurance neutrality provisions which is

14  something Your Honor will recognize from Federal Mogul and

15  Kaiser and a number of other things which basically is a

16  provision that prevents insurers from kind of getting two bites

17  at the apple, or talking out of both sides of their mouth or

18  whatever figure of speech you want to use to describe it.  I

19  mean, it essentially says, look, we've created insurance

20  neutrality provisions here, so you don't have to argue coverage

21  issues.  You don't have to argue that your policy rights are

22  being violated because they're protected whatever they are.

23      But, if you persuade the Court that you have some

24  claim that your rights are being violated, and you litigate

25  that claim and you lose it, because the Court says, you don't

1  have any such right, then normal provisions of res judicata

2  apply.  You can't just sort of turn around and say, well, I

3  lost that one in the bankruptcy court, but I'll go and

4  re-litigate the very same issue in a coverage dispute.  And

5  while, again, this provision does not appear in haec verba in

6  Combustion Engineering, we do not believe that it is

7  inconsistent with the rationale of Combustion Engineering which

8  was, after all, to say to the insurers you shouldn't be here

9  complaining about your policy rights, et cetera, because you're

10  protected by this provision in the plan.

11          And if you want to reject that protection -- I mean,

12  the issue of what would happen if some insurer, in effect,

13  rejected the protection of insurance neutrality and went ahead

14  and litigated something simply wasn't before the Court in CE.

15  But, I would suggest that the Court would not have had a whole

16  lot of difficulty in concluding that under the hypothetical

17  circumstances that this provision is intended to deal with,

18  that the insurers, indeed, had forfeited their right to claim

19  the benefit of the insurance neutrality provision.

20          Your Honor, the plan -- or actually, I guess, it was

21  the debtors filed, originally, a chart summarizing the final

22  objections to the first plan, amended plan of reorganization.

23  And then on June 19th filed a revised version of that chart in

24  both clean and black line form.  Does Your Honor have that?

25          THE COURT:  I do.  I have both of them.

1          MR. LOCKWOOD:  I don't want to stand here right now

2     and go through the multiplicity of pages of trial briefs that

3     the insurers have filed in this case.  And I assume that Your

4     Honor has our trial brief, as well, where we responded to that.

5     But, I think, probably at least a summary of our -- well, an

6     identification of the rejections that the insurers have filed

7     with respect to Phase I, and at least a summary description to

8     the extent that I haven't already done so in the course of my

9     previous remarks, of our responses to that would be

10    appropriate.

11          As we see it, the insurers have raised essentially

12    seven objections to the insurance neutrality provisions

13    themselves.  And those are laid out in the chart under the

14    heading of Roman I, capital letter A, in the first two pages of

15    that chart.  And the first objection is sort of a naked

16    assertion that the plan is not insurance neutral because it

17    alters and impairs the insurers' contractual rights under their

18    policies to evaluate, defend, and settle PI claims and it

19    violates contractual rights under applicable law.

20          This is a naked -- I call this a naked assertion

21    because first, there's no discussion of applicable state law

22    rules regarding the treatment of these policy provisions.

23    There's no analysis, even on a hypothetical basis, of how the

24    claims will be submitted by the trust to these insurers which

25    could be the -- which is the only event that could possibly

1  breach any of their rights.  I mean, if the trust never submits

2  a claim to any of the non-settling insurers, for whatever

3  reason, then by definition their rights to notice of claims and

4  cooperation in defense of claims and the handling of claims and

5  the settlement of claims is just words on a piece of paper.  I

6  mean, it has no reality.  And so as I walked through Section

7  7.15(a) and (c) and (f) earlier, all of the rights that they

8  have to assert the violation or breach of their contractual

9  rights by the trust when it's up and running and tendering

10  claims to them are expressly preserved, except for the carve

11  outs.

12        To the extent that -- so, the only thing that they

13  should legitimately be able to argue here is that somehow or

14  another the carve outs are inappropriate in the sense that

15  whatever they've carved out is something which is a breach of

16  their policy.  And I won't reiterate what I just spent some

17  time walking you through, but it's our submission that every

18  one of those carve outs is consistent -- either consistent with

19  insurance neutrality, or the Third Circuit at least has

20  recognized that you can have a bankruptcy override.  And we've

21  admitted that as to bankruptcy overrides they have standing in

22  Phase II to complain about whatever specific right they have

23  that's subject to a carve out.  So, that's simply, in our view,

24  not a legitimate Phase I objection.

25        The second objection is that the plan is not

1  insurance neutral in that Section 7.15 of the plan is
2  unintelligible or otherwise confusing with respect to insurers'
3  rights.  I have done my best to walk the Court through the
4  provisions and explain what they mean, and I guess it'll be up
5  to the Court to determine whether or not with whatever aid that
6  explanation has provided the Court regards them as
7  unintelligible or confusing, and I'm sure that the Court will
8  tell us to the extent to which you agree with that and we'll
9  have to make them more intelligible and not confusing.  For
10 the time being, however, I would submit that that is a
11 groundless objection.

12         CNA has referred to the asbestos coverage defense
13 provision involving the -- doesn't include any defense that the
14 plan or any of the plan documents do not comply with the
15 bankruptcy code.  I think I've explained our answer to that
16 already, that it's perfectly consistent with insurance
17 neutrality.  And we've also addressed that in the brief at the
18 pages cited in the objection.

19         The third objection is a little bit confusing.  I'm
20 going to have to -- unfortunately, I don't have slides for the
21 two sections referred to in it, but I have a copy of the plan.
22 This objection refers to two sections of the plan which are not
23 specifically referenced in the insurance neutrality language.
24 They're not identified as being carved out, and they're not
25 otherwise identified.  The first one is the release of Sealed

1 Air indemnified parties and it talks about the discharge of

2 claims, and the contention is that the plan fails to preserve

3 insurance neutrality because of the discharge provision.

4          And then, similarly, Section 7.13 of the plan

5 addresses successor liability claims and provides, in

6 substance, that various entities associated with the plan

7 proponents do not -- will not have successor liability for the

8 pre-petition liabilities of the debtors.  And, supposedly, this

9 provision cast doubt on whether the debtors' obligations remain

10 undiminished and/or are transferred to the trust.  And when

11 they talk about debtors' obligations they're talking about the

12 obligations to comply with terms of non-settled insurance

13 policies.  Well, first, it's our position that neither these

14 provisions nor any other provisions in the plan purport to

15 discharge the debtors or anybody else from whatever

16 requirements may exist under insurance policies.

17          I mean, when you start talking about discharging

18 claims a provision of an insurance policy which only becomes

19 operative in the future when you submit a claim to an insurer

20 is not a claim against the debtor that existed now.  Indeed, it

21 is our view that the insurance neutrality provision allows the

22 insurers to assert as a defense any failure by whatever

23 combination of the trust and the debtors needs to comply with

24 some policy provision.  They can raise it as a coverage

25 defense, and there's nothing in Section 7.13 or 8.1 that could

1 possibly be read as preventing that.  And in any event there's

2 no carve out form in the insurance neutrality provision which

3 is super peremptory.  So if there's no carve out, i.e., no

4 exception, and the super peremptory language means what it

5 says, then we don't have to appear to preserve rights.  We've

6 stated that the rights are, in fact, preserved as asbestos

7 insurer coverage defenses.

8          To the extent that there are insurers that are

9 creditors or can show that they're creditors, who actually do

10 have claims that would be subject to a discharge or who do have

11 claims that could arguably be brought against successors, they

12 can be asserted in Phase II.  We'll see whether they exist and

13 are bona fide, and if they are, we'll see what the plan

14 proposes to do to them is acceptable or a violation of the

15 legal rights of the insurers under the bankruptcy laws, and

16 we'll sort it out.  But, it's not a Phase I objection.

17          The fourth objection.  To be insurance neutral the

18 plan should have a no use provision like <u>Federal Mogul</u> did

19 barring confirmation of the plan as evidence in any form to

20 prove any liability on the part of the asbestos insurance

21 company.  It's one thing to make sure that an order of a court

22 doesn't have any issue preclusion or claims preclusion effects.

23 That's what <u>CE</u> was all about, giving you your shot at coverage

24 litigation to litigate your issues.

25          There's nothing in <u>CE</u> that suggests that it is

1  required to have a bunch of subsidiary provisions that address

2  matters like what sort of documents can be used as evidence.  I

3  mean, I'm not sure how, frankly, a confirmation order, if it

4  wasn't sought to be used for issue or claims preclusion, would

5  be admissible as evidence.  I mean, it's just something some

6  other judge did in some other case.  But, there's certainly

7  nothing CE requires this.  And Federal Mogul as Your Honor will

8  undoubtably recall, was a stipulation.  And we put in -- I

9  mean, it goes on for a couple three pages, or something, which

10 is way longer than anything in CE.

11         And as I think I said at the pretrial conference last

12 week if all the insurers want to get together in a group and

13 negotiate a stipulation with us so we give them Federal Mogul

14 -- elaborate Federal Mogul language in return for which they'll

15 go away and stop biting our ankles, hey, my phone number is in

16 the book.  But, the idea that they have some right to demand

17 that Federal Mogul language go in as part of an adequate or

18 sufficient insurance neutrality provision is unsupported by

19 reason or law.

20         The next objection is to obtain insurance neutrality

21 language.  The language used in Combustion Engineering must be

22 mirrored.  Here the plan is not neutral because the asbestos

23 insureds' coverage defenses are too restrictive.  I mean, we've

24 been through that discussion already.  I won't repeat it.

25 Suffice it to say, we disagree.

**J&J COURT TRANSCRIBERS, INC.**

1      Six.  Parties should not have to pay to the trust any

2  amount in excess of the amount actually paid by the trust to

3  the holder of a claim.  The insurance neutrality gives the

4  insurers the right to make that argument to a coverage court.

5  There's nothing in the plan that even purports to say whether

6  an insurer should or should not have to pay more than the

7  actual payment by the trust.  And to the extent that that's a

8  -- I will volunteer this observation.  The question of whether

9  or not an insurer under a comprehensive general liability

10 policy is liable for the amount that the insured is able to pay

11 when it's insolvent, which is less than the full amount of the

12 claim or judgment as compared with whether the insurer is

13 liable to pay the liability of the insured, is a matter of

14 state coverage law.

15      There's case law and, indeed, they cite <u>Fuller-Austin</u>

16 in which in that particular case an intermediate court in the

17 state of -- an appellate court in the State of California

18 determined that in the context of the <u>Fuller-Austin</u> plan that

19 was, in fact, as a matter of coverage law, the answer.  So, you

20 know, they can cite <u>Fuller-Austin</u> to the coverage court.

21 There's absolutely no reason why they should be citing it to

22 this Court, because this is a coverage issue and their rights

23 are preserved under Section 7.15.

24      Seven.  Despite plan proponents' denials that this

25 could occur the plan needs to clarify that there is no

1  acceleration of any of the asbestos insurance entity obligation

2  citing the <u>UNR</u> case.  As Mr. Bernick pointed out, Section 7.15,

3  in fact, protects against a <u>UNR</u> result to the extent that the

4  <u>UNR</u> result is regarded as or interpreted as a holding about

5  what the bankruptcy law impact of a confirmation order is on

6  insurers, because these provisions specifically say that you're

7  reserving your rights to dispute coverage, and among your

8  rights to dispute coverage are whether or not you had a

9  settlement, for example, that was not consented to by the

10  insurers or whether there was a judgment, et cetera.

11         And what the 7.15 effectively does is it says that

12  we're not characterizing the confirmation order as a judgment

13  or a settlement under bankruptcy law for purposes of binding a

14  coverage court in that regard.  It's up to the coverage court

15  to determine whether it was unconsented to settlement which

16  vitiates coverage, which a coverage court could certainly

17  decide, or whether even without consent it was a reasonable

18  settlement or the settlement of individual claims by the trust

19  under the TDP is reasonable.  All of those issues are

20  preserved.  So, the idea that there ought to be some sort of

21  specific provision in the plan clarifying that there is no

22  acceleration of any of the asbestos insurance entity

23  obligations is, in effect, a request that we put something in

24  the plan that prejudges the outcome of coverage litigation in

25  their favor.  And whatever else you want to say there's not

1  much neutrality in that.

2          Now, in Section 1(b) beginning at the bottom of Page

3  2 there are a series of objections, there's 23 of them, bottom

4  of 2 to the middle of Page 8, that we would contend that if the

5  Court finds that this plan is insurance neutral, the insurers

6  would not have standing, as insurers, to litigate.  On the

7  other hand, we concede that in many of these sections if you

8  look, I mean, for example, at Numbers 2, 3, 4, 5, 8, 9, 10,

9  et cetera, if some of these insurers have creditor issues about

10 these, then they can prove up their creditor status at Phase II

11 and assert that they have standing to litigate these issues.

12         So, the reason that we submitted the form of order

13 that Mr. Bernick gave you earlier which did not contain a

14 laundry list of the various particular arguments made in the

15 insurers' briefs that they will be deprived of standing to

16 litigate was, in some sense, it's sort of premature, because

17 until we know whether they successfully established creditor

18 status in Phase II many, if not the majority of these issues,

19 may or may not -- they may or may not have standing to

20 litigate.

21         But, we thought it was useful certainly for the Court

22 and also for the non-settling insurers for them to know what

23 our view of the consequences of an order saying that the plan

24 is insurance neutral and that therefore they lack standing to

25 raise generalized objections to compliance with Section 1129 or

1  Section 524(g) was a useful exercise here.  But, I'm not going

2  to -- it would take more time than I think is useful for me to

3  go through these one-by-one, and I think the Court --

4           THE COURT:  I've read them.

5           MR. LOCKWOOD:  -- can certainly familiarize yourself

6  with them.  And unless you have any particular items you'd like

7  me to address --

8           THE COURT:  Not right now.

9           MR. LOCKWOOD:  -- I'll pass on it.  That's my

10 presentation, Your Honor.  Thank you very much.

11          THE COURT:  All right.  Let's take a ten minute

12 recess, and then we'll reconvene.

13                         (Recess)

14          THE COURT:  Please be seated.  Well, it doesn't seem

15 like it cooled it off any but maybe it will move some air.

16 There may be some folks coming in to try to see what's the

17 matter with the cooling system in the courtroom as we're

18 talking, so if it distracts you, let me know and we'll take a

19 break.  Otherwise, I've told them that, as long as it's not

20 distracting, they can do what they need to do.

21          Okay.  Who's next?  Good afternoon.

22          MR. GIANNOTTO:  Good afternoon, Your Honor.  I'm

23 Michael Giannotto representing Continental Casualty and

24 Continental Insurance.  We often refer to ourselves as the CNA

25 Company so I may be using that word here.

                    **J&J COURT TRANSCRIBERS, INC.**

1            I think that if -- I mentioned to Mr. Lockwood during

2    the break that if the insurance had gone first, I think a lot

3    of the issues that were discussed by Mr. Lockwood and Mr.

4    Bernick could have been avoided because I think that there's a

5    lot more agreement between the two sides than they think.  In

6    fact, there is a lot of agreement and it may well be, when we

7    get through with this, that one thing that might be appropriate

8    is for the sides to get together after this hearing and try to

9    draft appropriate neutrality language or neutrality language we

10   can both live with.  We've attached as Appendix A to our trial

11   brief the neutrality language we think does the trick and I'll

12   be discussing that as I go through here but I just want to make

13   you aware of that.

14           7.15 of the plan is obviously the linchpin of

15   insurance neutrality and, as both Mr. Bernick and Mr. Lockwood

16   said, it adopts the combustion engineering goal standard

17   language but then has certain exceptions, certain carve outs.

18   And they've discussed those carve outs today and one of the

19   things that concerns the CNA companies, and I think concerns

20   other insurance companies as well, is that the manner in which

21   these carve outs are worded and other provisions in the plan

22   could lead a coverage court down the road to construe this plan

23   in a way that the plan proponents don't intend for it to be

24   construed.  And we point these out in our trial brief and I'll

25   point them out now and a large reaction of the plan proponents

1  is that you're like Chicken Little, just worried, you know, the

2  sky is going to fall in.  But this is a matter of some

3  importance because we have 16 high level unsettled insurance

4  policies that have been issued to the debtors.  They involve a

5  lot of money and we want to make sure that if there is

6  neutrality language, it really does protect us down the road

7  and preserve all of our rights.

8          So, the first thing I want to point to, and Mr.

9  Lockwood alluded to this, or he talked about it is, does the

10 plan preserve the debtors' obligations under the insurance

11 policies, the debtors' obligations.  We intend to introduce as

12 part of our evidentiary case here the unsettled insurance

13 policies that have been issued by the CNA companies to the

14 debtors.  And we're not introducing them for the purpose of you

15 making a coverage determination.  We don't want that.  The plan

16 proponents evidently don't want that as well.  What we want to

17 do though, in order to be able to establish our standing on the

18 issue of insurance neutrality, is to show that at least on the

19 face those policies do contain certain obligations that the

20 debtors are supposed to comply with, including notice of claims

21 and occurrences, allowing us to assist in the investigation

22 defense and settlement of claims, not making any voluntary

23 payments.  And so we intend to introduce those policies for the

24 purpose that I said and therein the policies are basically

25 those that we sent to you in the binders as CNA Exhibits 17, 18

1 and 19, although, when we get to that point, there have been

2 some substitutions because of negotiations among the parties as

3 to authentication, and we'll speak to that at that time.  But,

4 with two or three exceptions, they're going to be the policies

5 that were marked or identified as CNA Exhibits 17 through 19.

6           Now, one of the things that we are concerned about in

7 this plan, and I want to put this on the screen, there are

8 various provisions in the plan that deal with rights under the

9 policies that are not in -- or could deal with rights under the

10 policies that are not in 7.15.  First of all, Section 7.7(tt),

11 which I have here, under that provision, if this Court confirms

12 the plan, it will have made a finding that the insurer's

13 obligations under the policies are not diminished or reduced,

14 the insurer's obligations.  In addition, and Mr. Lockwood

15 pointed to Section 7.13 and 8.1.1, those provisions basically

16 state that except as otherwise provided in the plan, the

17 liabilities and obligations of the debtors and the reorganized

18 debtors are discharged and are no longer there after the

19 confirmation.  And the plan also says it transfers the rights,

20 not everything, not the insurance policies, but the rights

21 under the policies to the trust.  Okay.

22           So, we have the insurer's obligations are not

23 diminished.  After discharge, the debtors or reorganized

24 debtors have no obligations unless the plan otherwise provides

25 and the rights of the debtors are transferred to the trust.

**J&J COURT TRANSCRIBERS, INC.**

1 But nowhere does the plan specifically state that the debtors

2 retain their duties and obligations under the policies.  And I

3 understand Mr. Lockwood's argument that, well, that's not in

4 7.15(a) and 7.15(a) says, except as provided in 7.15, nothing

5 changes.  But, in our view, we want to make that clear, that

6 the debtors's obligations survive and they don't disagree with

7 it.  In a lot of ways, it's sort of the lady does protest too

8 much.  I mean, we don't understand why they don't want to put

9 that simple thing in 7.15 just so we can be clear, which I

10 think you would agree with and I think they would agree with,

11 that the debtors' obligations have to survive or else this is

12 clearly not an insurance neutral plan.

13       So, that's sort of -- and, again, when we got their

14 trial brief and we read their responses to our objections, the

15 document that Mr. Lockwood was referring to, they agree with

16 us.  They agree that the debtors' obligations are preserved and

17 what we want to do is just make sure that's the case under the

18 plan.  And that language is in our sort of Appendix A where

19 we've modified it.  We've added a provision in our modified

20 language.  It's in what would be now 7.15(l) under -- you know,

21 the way that we wrote our appendix.

22       The second thing is whether the -- all right.  So,

23 the first thing is are the debtors' obligations preserved.  The

24 second thing, are there more carve outs in this plan than they

25 intend to have as carve outs.  And, again, we believe the plan

1  is ambiguous in certain respects.  We'd like to see it fixed so

2  those ambiguities are removed and we really don't think they

3  disagree with us on what the final results should be.

4          And the first thing I want to point to is 7.15(f).

5  7.15(f) basically provides that with certain exceptions nothing

6  in the plan, the plan documents, confirmation order, et cetera,

7  limits an insurer from asserting any asbestos insurer coverage

8  defense.  And Mr. Lockwood pointed out, as we did in our

9  objections and in our trial brief, that the definition of

10  asbestos insurer coverage defense excludes any defense that the

11  plan or any of the plan documents do not comply with the

12  Bankruptcy Code.  And we were concerned, what does that mean,

13  and we'd asked in our discovery early on, what does that mean,

14  and they sort of gave a non-answer type answer.

15          But now what I understand they're saying from their

16  trial brief and from Mr. Lockwood's comments today, is that

17  that clause (i), that carve out from asbestos insurer coverage

18  defenses merely means that insurers will not be able to

19  collaterally attack the decisions of this Court on matters of

20  bankruptcy law.  So, if this Court says, this plan satisfies

21  524(g), we can't go to a coverage court and say, we want you to

22  rule that the plan doesn't satisfy 524(g).  And I understand

23  that and that's fine.

24          But, what we're concerned about is that a court, a

25  coverage court, could construe this language as doing more,

**J&J COURT TRANSCRIBERS, INC.**

1 that a court or the trust's lawyers might argue to a court that

2 because to confirm this plan you have to find that it was --

3 that the plan was made in good faith, that they could come

4 along and say, look, this bankruptcy judge blessed this plan so

5 these TDP, they were negotiated in good faith.  They're

6 reasonable values for claims.  In fact, the whole settlement is

7 a reasonable settlement of claims between Grace and the ACC and

8 so coverage court, you should take that into account in

9 determining whether if the insurers make a claim that this was

10 an unreasonable settlement or paid too much or those types of

11 things, you should take that into account that we have a

12 bankruptcy judge who already ruled on that.

13        And I hear Mr. Lockwood saying, and I see in their

14 briefs, they don't want to happen and we want to make sure that

15 doesn't happen.  And so, again, we think they agree with us on

16 that and we -- in the Appendix A, CNA attached to its trial

17 brief, put provisions in there that would make clear what we

18 believe they believe this clause (i) means.  And we agree with

19 that, that we can't just collaterally attack judgements of the

20 bankruptcy court on matters of bankruptcy law.  And in Appendix

21 A of our brief, the parts of it that would deal with this would

22 be Revised 7.15(b)(i) through (iv) and (viii) through (ix).

23        Mr. Lockwood and Mr. Bernick also talked about the

24 <u>UNR</u> decision.  One of the things we're concerned about with

25 this carve out for clause (i), that the plan complies with the

1   Bankruptcy Code, is that someone could use that to argue that

2   the court, by confirming the plan, has in effect said this is a

3   settlement and then it accelerates our obligations to pay under

4   our policies as the 7th Circuit held in UNR.  And they say

5   that's not what they want to do.  And what we want to make

6   clear in the plan is that that's not what would happen from

7   this plan.

8          I understand a coverage court would decide, you know,

9   how much money we have to pay scheduled values or TDP values.

10  But we don't want anything in the plan negatively influencing

11  our ability to make those arguments.  We don't want them to be

12  able to use any findings of fact or conclusions of law you make

13  or the confirmed plan itself to be able to -- to give them a

14  leg up on that issue.  We want it to be purely neutral in that

15  respect.  And, again, I think they agree with us on the UNR

16  report.  They did in their answers to interrogatories early on.

17  They did in their trial brief and responses to objections.  I

18  don't think there's really a disagreement here other than we

19  want to make sure we're protected.  They think we're already

20  protected enough and our view is, so, you know, humor us.  I

21  mean, really, seriously, make it clear there's a lot of money

22  at stake here.

23         THE COURT:  So why are these things that can't be

24  taken care of in the confirmation order as they have been in

25  virtually every other case?

1          MR. GIANNOTTO:  I think they can be, Judge, as long

2    as they are taken care of in the order and you make clear that

3    this is the case and that the order -- I don't want to -- I

4    don't know what the right word is -- supersedes but sort of

5    explains the confirmed --

6          THE COURT:  That the findings are made for purposes

7    of confirmation and nothing else.

8          MR. GIANNOTTO:  Pardon?

9          THE COURT:  That the findings are made for purposes

10   of confirming the plan and nothing else.

11         MR. GIANNOTTO:  Well, I think we'd like to see

12   something more that -- I understand what you're saying but that

13   they can't be used against us in the coverage litigation.

14         THE COURT:  Well, see, here's the problem that the

15   Court has.  This -- I can't, as a judge issuing a ruling,

16   determine that some other court isn't going to use my order or

17   my judgment in a certain way, just like some other court that

18   issues a judgment can't determine how I'm going to use it.  So,

19   I don't think -- and we've gone through this in other cases. I

20   don't think there is a way to automatically foreclose some

21   court from making some use that the parties don't intend.  The

22   way to do that, I think, is to say that the Court's findings

23   are limited to the issue that's before me which is plan

24   confirmation and not coverage.  I'm not making coverage

25   determinations.  I haven't been presented with any evidence

1 concerning the rights and liabilities of the parties under the

2 policies.  The whole point of going through this exercise is to

3 make sure that I'm not presented with that evidence so that I

4 can't make those findings.

5      So, if that's made clear in the confirmation order,

6 and all sides agree that they're not going to present any

7 evidence of that fact, then you can certainly stipulate that

8 you're not going to present the evidence but, in terms of

9 automatically foreclosing some other court from using an order

10 in a certain way or an opinion in a certain way, I just don't

11 think it's humanly possible.

12      MR. GIANNOTTO:  Obviously, you can't make a court use

13 or not use an order in a certain way.  You could direct the

14 parties --

15      THE COURT:  Right.

16      MR. GIANNOTTO:  -- not to use -- not to use the

17 evidence in a certain way and I think, in a lot of ways, when

18 you were doing the estimation process and you entered an order

19 making it neutral as to the insurers so you didn't want us

20 participating, I think part of that order actually said that

21 the parties involved in the estimation would not be able to use

22 that in a subsequent proceeding --

23      THE COURT:  That's right.

24      MR. GIANNOTTO:  -- to bind us.  And that's fine.  As

25 long as this clause (i) is construed or set in the order to say

1  it has no affect on, you know, subsequent coverage litigation,

2  I think that would make us happy.  There have been stipulations

3  in other cases, and Mr. Lockwood referred to them and I know

4  you're familiar with them in <u>Federal Mogul</u> and <u>Kaiser</u> and

5  <u>Quigley</u> you may not be familiar with, where the parties did

6  spell out these things.  And, as Mr. Lockwood said, it was in

7  the process of settlement but really, even so, it was the

8  parties were spelling out what they considered insurance

9  neutrality to mean and what those stipulations said, and they

10 were then incorporated into your order in <u>Federal Mogul</u> and

11 they are in Appendix I, are things like you can't use this plan

12 or any finding of fact to show in a coverage defense, a

13 coverage action, that the insurers are liable for any claim or

14 are liable for claims in general or that the TDP and the plan

15 procedures are reasonable or appropriate or that the trust

16 settlement or valuation of any claim is appropriate or that any

17 asbestos company doesn't have a reasonable good faith belief

18 not to pay.

19      THE COURT:  But wait.  Those were all negotiated

20 issues.  For my purposes, I need one simple statement and

21 that's one sentence from <u>Combustion Engineering</u> that tracks

22 1124.  That's all I think the plan has to do to say that it's

23 insurance neutral.

24      Now, if you want to try to define that as a matter of

25 stipulation, you know, more power to all the parties involved.

**J&J COURT TRANSCRIBERS, INC.**

1  But as soon as you start making one definition change, then at

2  least the way <u>Federal Mogul</u> went on, it went on four months

3  with the parties bargaining back and forth and I, of course,

4  wasn't there but I saw the end result of it and the end result

5  and the status conferences that were going through was, one

6  party would ask for A so another party would ask for Z, and

7  eventually then it would end up somewhere around M.  And then

8  someone would start with B and whatever the other numbers are

9  at the other end -- or the other letters are at the end of the

10  alphabet and they would come up with some other stipulation.

11  So, if you want to do it, that's what the bankruptcy

12  negotiation process is all about.  Go do it.

13        MR. GIANNOTTO:  Yeah.  The problem is, in <u>Combustion</u>

14  <u>Engineering</u>, at least in the opinion that I read, it didn't

15  have this clause (i), this notion that the super-peremptory

16  provision is applicable in this plan, the Grace plan, except as

17  provided in 7.15.  And then 7.15 says that nothing you do here

18  shall limit our ability to raise asbestos insurer coverage

19  defenses but then asbestos insurer -- that wasn't in <u>Combustion</u>

20  <u>Engineering</u>.  At least it wasn't discussed in the <u>Combustion</u>

21  <u>Engineering</u> opinion.

22        THE COURT:  I'm sorry.  That you wouldn't be able to

23  raise what?  I'm sorry?  I just missed it for a minute.

24        MR. GIANNOTTO:  I'm sorry.  In 7.15(f), there is a

25  provision that says that nothing in the plan will limit the

1   insurer's ability to raise asbestos insurer coverage defenses.

2            THE COURT:  Well, it says nothing in the plan, the

3   plan documents, the confirmation order or any finding of fact

4   and/or conclusion of law --

5            MR. GIANNOTTO:  Correct.

6            THE COURT:  -- with respect to the confirmation or

7   consummation of the plan shall limit the right, if any, of the

8   asbestos insurance entity in any asbestos insurance action to

9   assert the coverage defenses.

10           MR. GIANNOTTO:  Correct.  And the problem -- we don't

11  have any problem with that language if you defined asbestos

12  insurer coverage defense to mean any defense we might assert.

13  But the term asbestos insurer coverage defense is then

14  defined --

15           THE COURT:  Yes.

16           MR. GIANNOTTO:  -- to exclude any defense that the

17  plan or any of the plan documents do not comply with the

18  Bankruptcy Code.  And if --

19           THE COURT:  I can't confirm the plan if I find that

20  they don't confirm -- comply with the Bankruptcy Code.

21           MR. GIANNOTTO:  I understand that, Your Honor.

22           THE COURT:  Well, then, of course you're going to --

23  if the plan is confirmed -- let's assume for a moment that

24  there is a confirmable plan and it's confirmed.  I have to make

25  that finding.  There isn't any way I'm going to make a finding

1 that I'm confirming a plan that doesn't comply with the

2 Bankruptcy Code.

3          MR. GIANNOTTO:  That's correct, Your Honor.  And what

4 we wouldn't want to happen is that that finding would prejudice

5 us in subsequent coverage litigation.

6          THE COURT:  But it will to the extent that it's a

7 bankruptcy issue.  It will prejudice everybody.

8          MR. GIANNOTTO:  I understand that as a bankruptcy

9 issue.

10          THE COURT:  Yes.

11          MR. GIANNOTTO:  If the provision said that we can't

12 collaterally attack your determinations as a matter of

13 bankruptcy law, then that would be okay.  We're just concerned

14 that somebody down the road is going to construe that

15 differently, is going to say that because I found the plan was

16 negotiated in good faith, somebody is going to say because the

17 court found that, these TDP are reasonable and good faith

18 resolutions to clients.

19          THE COURT:  I have to make a finding.  I'm not --

20 well, reasonable resolution.  Okay.  I thought you were going

21 to say settlement.  I'm not making any findings about whether

22 they're settlements.  Are they reasonable resolutions?  Of

23 course I have to make that finding, otherwise I can't issue a

24 524(g) injunction.  I have to make such findings if the plan is

25 confirmable.  But they're binding for purposes of plan

1 confirmation.  They don't have anything to do with coverage.

2 The claims still have to be processed.  They have to be

3 presented to the insurers.  The insurers still have the right

4 to look at the claims and determine whether or not to pay.  And

5 if you determine you're not going to pay, you'll be in coverage

6 litigation and you'll assume your defenses.

7        There isn't anything different about this TDP process

8 in that respect than there has been about the other TDPs.  I'm

9 missing something.

10        MR. GIANNOTTO:  Okay.  I guess, Your Honor, what

11 we're concerned about is that this could be misused.  We don't

12 think they disagree with us on that and we'd like to make it

13 clear in the plan as we've said in our brief and we've said in

14 the Appendix A.  I understand your point.  Obviously, you have

15 to find the plan confirmed -- complies with the Bankruptcy Code

16 and we're not going to attack that in coverage litigation.

17 What we don't want to happen, what we don't want to happen is

18 for, in coverage litigation, as Mr. Lockwood said -- let's say

19 the trust settles with the claimant and then comes against us

20 and says pass indemnity and we say forget it.  You know, you

21 didn't let us cooperate in the defense or settlement, we're not

22 going to pay.  And let's say state law says, as Mr. Lockwood

23 posited in a given state, that if they entered into a

24 settlement that was a good faith reasonable settlement, then

25 that's a -- then they're not in breach of the policy by paying

1  without our consent.  And so we could litigate that.  Is that a

2  reasonable settlement for that claim?  What we don't want them

3  to be able to do, is to say that because these TDP were part of

4  a confirmed bankruptcy plan, by they're very nature they're

5  reasonable or at least it evidenced that they're reasonable.

6          THE COURT:  Each individual payout under the TDP or

7  settlement of claim or whatever words you want to use to

8  explain the process by which an individual personal injury

9  claimant presents a claim to the trust, has it evaluated, and

10  gets paid, is not before me.  I couldn't make findings with

11  respect to that.  That's the whole purpose of 524(g), to avoid

12  that issue and put it into a trust or other process for

13  purposes of prosecuting those claims elsewhere and not in the

14  bankruptcy court.

15          So, nothing that I find in terms of the fact that the

16  TDP itself was negotiated in good faith, that the amounts that

17  are being put in by whoever is going to be governed by the

18  524(g) injunctions is reasonable affects any determinations,

19  any individual claim.  That's not before me.

20          MR. GIANNOTTO:  I understand that.

21          THE COURT:  Okay.

22          MR. GIANNOTTO:  I understand that and we just want to

23  make sure that's clear or clearer, at least, to some coverage

24  court down the line.

25          THE COURT:  You know, at this point, almost every

**J&J COURT TRANSCRIBERS, INC.**

1  major company in the country has been through one of these

2  cases, and I have my doubts that any coverage court in the

3  country doesn't get it at this point.  But, you know, if that's

4  the issue, it seems to me that the place to put that is in the

5  findings of fact and conclusions of law of the Court.  That's a

6  determination this Court has to make.  How do you bargain for

7  that in the plan?  You can't compel me to make a finding that

8  there's something either reasonable or unreasonable.  That's

9  what I have to do as a matter of my judicial determination.

10        MR. GIANNOTTO:  No, we don't want you to make a

11  finding that something is unreasonable or reasonable for

12  coverage purposes.  That's exactly what we don't want you to

13  do.  What we want to make clear to the coverage court is that

14  no findings you are making in connection with the plan have an

15  effect on our coverage arguments.

16        THE COURT:  No.  But they're -- that I am not making

17  any findings that will -- that have anything to do with the

18  coverage determination I think is the way to say it.  There may

19  be consequences that affect everybody as the result of the plan

20  confirmation.  A coverage court may determine that there are.

21  Just like I'm not going to say that there are in advance, I'm

22  also not going to say that there aren't in advance.  Those

23  issues are preserved.  That's the whole point of insurance

24  neutrality, that everything that can be preserved to a coverage

25  court gets preserved to a coverage court.  That's the purpose.

1          MR. GIANNOTTO:  I agree with you a hundred percent,

2   Your Honor.

3          THE COURT:  Okay.

4          MR. GIANNOTTO:  I just want to make sure that's done.

5   But I think that we're just -- I understand your position, Your

6   Honor, and --

7          THE COURT:  I want to make sure it's done too.

8          MR. GIANNOTTO:  Okay.

9          THE COURT:  Okay.  So, I'm not arguing about the fact

10  that it should be clear.  It's just I'm trying to figure out

11  what the objection is and why there is some assertion that the

12  plan has to be modified because it seems to me that your rights

13  are preserved in this section unless the definition of asbestos

14  insurance coverage defense is too narrow and that I don't know

15  about.

16         MR. GIANNOTTO:  Okay.

17         THE COURT:  If that's what you're arguing, then

18  that's a different focus.

19         MR. GIANNOTTO:  No, that is what we are -- that that

20  could be misused.  That's what we are arguing.

21         THE COURT:  Okay.  And why can it be misused?

22         MR. GIANNOTTO:  Because our concern is that, since

23  you found that the plan -- let's say you confirm the plan.  You

24  find that it was negotiated in good faith.  Somebody argues,

25  the trust lawyers argues down the road to a coverage court

1  that, because of that good faith finding, that means that the

2  asbestos TDP represent good faith and reasonable settlements,

3  and of individual claims, as applied to individual claims or as

4  applied to claims in general, and you don't intend to do that,

5  and I don't think they intend for that to happen, and maybe I

6  am just being, you know, Chicken Little and the sky is falling

7  in, but there's a lot of money involved here.  And we would

8  like some comfort or more comfort that that couldn't happen.

9          And I understand what you're saying, is that you

10 would never intend to do that, and you don't think this

11 language does that and that's what Mr. Lockwood and Mr.

12 Bernick, I assume too, say.  And, you know, maybe we should try

13 to fiddle with that language and give it to you in an order and

14 maybe that's the way to -- what we tried to do, CNA, I don't

15 mean all the insurers, what CNA tried to do was to revise the

16 insurer neutrality section to make it -- to incorporate the

17 concepts that were in <u>Kaiser</u> and <u>Federal Mogul</u> and some of the

18 other bankruptcies on the theory that that's the type of

19 language that's been used in order to avoid these possibly

20 unintended results.

21         And we understand they were negotiated and they go on

22 for two or three pages but I believe they do accomplish the

23 results that the parties intend to be encompassed by insurance

24 neutrality and that you would intend to be encompassed by

25 insurance neutrality.  And I understand there were stipulations

1 but, again, we think they make clear -- maybe they go on for

2 too long, you don't want to go on for that long, and maybe

3 there's a quicker way to do it and we'll put our thinking caps

4 on and do that.  But what we want to do is avoid these

5 unintended results that somehow your findings and conclusions,

6 even though they're intended only to be applicable to this

7 bankruptcy case, could somehow be used against us or somehow,

8 you know, to avoid -- I know you can't stop a court from

9 construing it any way they want but to somehow minimize the

10 chances that that would occur.  That's what our concern is.

11          THE COURT:  Okay.  You know, so far, it doesn't seem

12 to me as though you folks have any real disagreement about what

13 the construction of the neutrality section ought to be.  So, it

14 sounds like a tweaking issue.

15          MR. GIANNOTTO:  You know, Your Honor, there are other

16 insurers that have other concerns but I think that's right.

17 That's why when I mentioned to Mr. Lockwood after the break

18 that if you had let us go first, it would have gone a lot

19 shorter because I think -- I think what's happened since they

20 filed their trial brief and their responses to objections, and

21 since the insurers have rethought their position since last

22 Thursday when you made certain comments about what's really

23 Phase I versus Phase II, because I really do think it was

24 ambiguous but it was clarified by the Court to me, at least.

25 And so I think it is a matter of tweaking and perhaps we can

1  get together after this hearing and tweak it some or give you

2  language in an order.  And I think that would be very useful

3  and I think Mr. Lockwood said that his number was in the phone

4  book so, you know, we can -- I'll call you at home in the

5  middle of the night.

6        The other issue I wanted to deal with was standing,

7  and I don't know, maybe this isn't an issue.  Maybe I was a bit

8  confused between what Mr. Bernick said and Mr. Lockwood said.

9  One of the questions is, let's assume this plan -- you conclude

10  the plan is not insurance neutral.  Obviously, we can complain

11  about whether it is insurance neutral or not.  Everybody agrees

12  to that.  But the question is, let's assume you find that it's

13  not insurance neutral.  Can we then raise -- as insurers, not

14  as creditors, can we raise any issue of confirmation of the

15  plan in Phase II.  And what I heard Mr. Bernick saying was no,

16  because even if it's not insurance neutral, you can only raise

17  issues, you know, where it's -- you know, you only have

18  standing on an issue by issue basis so --

19        THE COURT:  Right.  That's correct.  I think that's

20  the law in this circuit.

21        MR. GIANNOTTO:  Right.  And I heard Mr. Lockwood

22  saying something different.  But I think that's what Mr.

23  Bernick said and I was going to say I think that that's what

24  you've ruled in other cases --

25        THE COURT:  Yes.


**J&J COURT TRANSCRIBERS, INC.**

1          MR. GIANNOTTO:  -- and other bankruptcy courts have

2     as well.  And we argue in our brief that it shouldn't be that

3     way in the bankruptcy court as opposed to the Court of Appeals.

4     I'm not going to belabor it because I know you've ruled against

5     it before.  In brief, our argument is that the 3rd Circuit, you

6     know, applied the person aggrieved standard as an appellate

7     standard and has said on several occasions, or at least two

8     occasions, in both in Combustion Engineering and in the PWS

9     case, that bankruptcy court standing is more liberal because it

10    doesn't apply, the person aggrieved standard.  And basically

11    the arguments that -- and the Congoleum case we cite in our

12    brief held that once a plan is not insurance neutral, since the

13    insurers are injured in fact, because it is not insurance

14    neutral, they can then object to anything dealing with

15    confirmation of the plan since the plan, if it's confirmed,

16    will hurt them because the plan is not insurance neutral.

17    That's what one case held, one bankruptcy court, Congoleum,

18    held.

19         THE COURT:  Well, to the extent that confirmation

20    would somehow jeopardize your interests, then, yes, you can

21    object to any issue in that plan that would affect your

22    interest.  I agree.  That's the whole concept of standing.  But

23    you've got to show me where your interests are affected.  You

24    can't, for example, pick up the objections of the general

25    unsecured creditor class.  You don't represent the general

1 unsecured creditors, the Committee does.  So, they've got their

2 own counsel.   You don't have standing to raise objections of

3 trade creditors in your capacity as an insurer.

4          MR. GIANNOTTO:  Right, but there are other issues --

5 I would agree with that but there are other issues that arise.

6 We have, for instance, if you approve the 524(g) plan and that

7 ultimately means that, you know, we're going to get sued for

8 coverage and pay.  Now, if the plan is insurance neutral, you

9 know, we can't complain.  But if a plan is not insurance

10 neutral, the issue arises, can we then complain about the

11 structure of the 524(g) trust because the plan is not insurance

12 neutral and will ultimately get hit with bills.

13          MR. LOCKWOOD:  Your Honor, with all due respect to

14 Mr. Giannotto --

15          THE COURT CLERK:  You need to speak into your mic.

16          MR. LOCKWOOD:  We're here to determine whether the

17 plan is insurance neutral.  He's asking you to rule on an issue

18 that's not before you, which is what happens if you determine

19 the plan is not insurance neutral, what's the scope of insurer

20 standing.  And we haven't tendered that for decision in Phase

21 I.  The only question you're being asked in Phase I is (a) is

22 it insurance neutral and (b) if it is, then does that impact

23 standing.  If it's not, then we're in Phase II and I believe

24 that was maybe why Mr. Giannotto thought that me and Mr.

25 Bernick were somehow or another not on the same wavelength.  If

1    it's not insurance neutral, then we're going to have individual

2    standing issues when the insurers seek to raise issues that we

3    think they're asserting jus certiorari standing or some other

4    set of creditors.  But this is just sort of asking you for an

5    advisory opinion on the spot of what you would do if you

6    decided something different from what you've been asked to do.

7          MR. GIANNOTTO:  Your Honor, if that's the

8    understanding -- that was not my understanding but, if that's

9    your understanding, that if you find that it's not insurance

10   neutral, then we can argue in Phase II whether, as insurers, we

11   have standing to raise other issues, then I'm happy to defer

12   that till then if that's what you would like to do.

13         THE COURT:  Well, I thought that's what Thursday

14   determined, that if there is -- if the plan is not insurance

15   neutral and that's the determination for Phase I, then you're

16   into Phase II and you raise whatever plan objections you raise

17   and then the standing issue, to the extent that somebody

18   objects to your standing, will be litigated in that context.

19   But you were asking whether it's issue by issue, you know,

20   claim by claim.  And I think in this circuit, the answer is

21   yes, it is.

22         MR. GIANNOTTO:  Well, with the understanding that

23   that issue is preserved for Phase II, whether if we raise a

24   particular issue -- let's say you find it not insurance neutral

25   and we raise an issue in Phase II, we can argue over whether we

1  have standing in Phase II.  That's fine.

2          THE COURT:    Yes.  That's preserved.

3          MR. GIANNOTTO:  Okay.  And I don't know whether this

4  is preserved as well because I don't want to take up your time

5  with stuff but, you know, the way the CMO was phrased was that

6  Phase I dealt with your standing as insurers to raise things

7  other than insurance neutrality.  That's why -- that's what the

8  order said and that was the confusion.

9          Now, one of the issues we've raised, as you know,

10 from Thursday, some of the insurers have raised, is that the

11 TAC has impermissible conflicts of interest under the trust

12 agreement.  And we put in our brief on standing, we believe

13 that insurers, indeed anybody, even the insurers' attorneys,

14 have standing under <u>Congoleum</u>, the 3rd Circuit's decision in

15 <u>Congoleum</u>, to raise ethical conflicts on -- that arise out of

16 the plan.  And we can save that for Phase II to argue if want

17 to argue it in Phase II.

18          THE COURT:  Well, I thought that was a Phase II

19 issue.  I just assumed it was, but if somebody has a different

20 view, I guess you should tell me.

21          MR. LOCKWOOD:  Your Honor, as we formulated it, it's

22 a Phase II issue if any of the insurers can show that they have

23 claims that are somehow or another being channeled to the

24 trust, so that it would affect, as trust beneficiaries, the

25 conflict of interest, it might affect their interest.  But

1  we've asked in Phase I, that since the insurance neutrality

2  means they have all their coverage defenses, if they think the

3  alleged conflicts of interest or TAC somehow or another pollute

4  or otherwise give them a basis for rejecting the way in which

5  the trust resolves claims, then they can raise that as a

6  coverage defense.  If they don't have -- if the alleged

7  conflicts of the TAC have no impact on their coverage

8  obligations, then under insurance neutrality, they should not

9  be here telling us about they don't like the TAC.  The plan is

10  insurance neutral as to them.  That's our position on that.

11  That's different from the other issue.

12       MR. BERNICK:  Tell me if I'm wrong, but I think what

13  we'd say is that this is yet another subcategory of an issue

14  that pertains to the operation or the application of the TDP.

15       MR. LOCKWOOD:  Correct.

16       MR. BERNICK:  And as such, it is covered by the

17  neutrality language.  It's a matter that would affect arguably

18  their defenses in the existence of coverage that's preserved

19  for the coverage courts.

20       MR. LOCKWOOD:  Right.  If they can convince a

21  coverage court that the role of the TAC and the trust is

22  inappropriate because they have conflicts of interests, then

23  that somehow or another affects the legitimacy of the

24  resolution of claims by the trust that are being tendered to

25  the insurers.  They can raise that issue in coverage litigation

1 and get the judge -- the coverage court, to say no, you don't

2 have to pay any claims because that TAC polluted the trust

3 document and the trust operation.

4          THE COURT:  Okay.

5          MR. LOCKWOOD:  But that's a Phase I issue unless they

6 are creditors whose claims are actually being channeled to the

7 trust in which event it's a Phase II issue.  That's the

8 distinction we tried to draw here, Your Honor.

9          THE COURT:  All right.  I thought -- maybe I

10 misunderstood this objection.  I thought the objection went a

11 little beyond both the coverages to a confirmation issue as to

12 whether or not the court can confirm the plan when it has a TAC

13 that is allegedly so conflicted.

14          MR. LOCKWOOD:  That's the substance of the objection.

15 The issue is, with insurance neutrality, did they have standing

16 to make that objection if they have no -- if the operation of

17 the trust and the TAC doesn't adversely affect them because, on

18 the one hand, they have coverage defenses to deny claims and,

19 on the other hand, they don't have any claims as a creditor

20 being channeled to the trust.  So, they don't get adversely

21 affected either way so the argument is that they don't have

22 standing to raise an issue because, as to them, it's

23 essentially an academic issue.

24          MR. BERNICK:  Well, but, again, to address the narrow

25 issue before Your Honor, which is neutrality and the

1  super-peremptory provision, if you accept that there is

2  evidence of their being a conflict of interest, and I don't

3  think we have seen that evidence yet but if you were to accept

4  that there was such evidence and there is a conflict of

5  interest, the question is whether that would say that the

6  super-peremptory provision that we have is in some sense

7  insufficient.  It's back to the question does that conflict, if

8  it is established, mean that there's not plan neutrality.  And

9  we would say it's swept up in the -- to the extent that it

10 affects the processing of claims and therefore their interest

11 as insurers in the processing of claims, it falls within the

12 umbrella or shield or whatever the figure of speech might be,

13 as a matter that they do have protection such that if they

14 later prove that up, it's a defense to coverage.  And that's

15 exactly what the super-peremptory language is designed to do.

16 So, it would be a subset of many issues that they might seek to

17 raise by way of saying that the operation of the TDP is such

18 that it constitutes a breach of the insurance contract.

19         All that we're establishing here today is that the

20 language preserves the right to make that defense.

21         MR. GIANNOTTO:  Your Honor, I was talking about

22 something differently.  I think both under the 3rd Circuit's

23 decision in Congoleum, 426 F.3d at 686, and you decided a

24 similar -- rendered a similar holding in Pittsburgh Corning in

25 2004, anybody, any attorney, I, personally, can but certainly

1  any insurer can as well, raise a conflict of interest issue.  I

2  think the words of the 3rd Circuit were that counsel for the

3  insurers has a responsibility, if not a duty to alert the court

4  to ethical conflicts and that if you raise --

5           THE COURT:  Well, I think that is the case.  I think

6  both of those courts were looking at something different from

7  people being representatives of a trust committee and

8  professionals employed to represent parties in the bankruptcy

9  context.  But, nonetheless,  I think, you know, depending on

10  how broad the language can be read, the cases are out there.  I

11  don't know whether it can be read that broadly in the context

12  in which you're raising it, but I think the issue, substantive

13  issue for today, is whether it's Phase I or Phase II.

14           MR. GIANNOTTO:  Okay.

15           THE COURT:  In reading the reports, it looked to me

16  -- or the deposition notices, transcripts, I apologize, I don't

17  recall where it was now -- that there was a pretty clear

18  statement that this was not being raised as an ethical

19  violation because I thought the professor indicated that that's

20  not his area of expertise; that what he was doing was raising a

21  process question which is whether or not, as a matter of

22  business operation law or economics or something -- he was

23  clear that he wasn't offering legal opinion but that he was

24  attempting to define a process that would work more

25  efficiently, effectively, and without the conflicts that the

1   insurers identified in his view, but not as a matter of ethical

2   violation.

3         So, I think I'm a little unclear as to how that

4   opinion or that expert report would factor into today.   It

5   seems to me that if it's a process issue, that's a Phase II

6   determination.

7         MR. GIANNOTTO:  Your Honor, there's two aspects of

8   that.   Professor Shein, that was the gentleman's name, was not

9   testifying as a legal expert but we've also raised as an

10  objection -- in addition to what you refer to as the process

11  objection, we've raised an objection based on the law.   This is

12  not Professor Shein.   This is us, based on the law, that there

13  is an impermissible conflict here.   And we understood, and I

14  think everybody understands from your rulings or statements on

15  Thursday, that that substantive issue, whether there is a

16  conflict of interest issue, would go to Phase II and I

17  understand that.

18        The question just is whether we have to persuade you

19  now -- and the fact is that my -- not all companies are in the

20  same boat, as Mr. Lockwood said.   You know, my company is a

21  settled insurance company, an unsettled insurance company, it's

22  a creditor, and so, you know, we can raise it in our creditor

23  status in Phase II.   I mean, we can argue whether we're a real

24  creditor or something.   We'll have those fights.   But we

25  believe we can raise it in Phase II.   But we believe also, just

1  as an insurer, an unsettled insurer, we can raise it because it

2  raises conflicts of interest.

3          Now, if you want to take up that issue in Phase II,

4  that's fine as well.  And I apologize because of my confusion

5  over some of these things.  I just want to make sure that we're

6  not precluded from arguing certain things in Phase II, you

7  know, because of my confusion over these issues.

8          MR. BERNICK:  Your Honor, if I can make a suggestion

9  because I think I understand where Mr. Giannotto is going?  If

10  Your Honor were to determine that this plan is neutral,

11  including if they are making the contention that any conflict

12  that would affect the processing of claims is preserved for a

13  coverage action, if Your Honor were to make the determination

14  that it's neutral, we would further ask, as the order calls

15  out, that that means that they do not have standing to raise

16  all kind of other issues, that's the second prong.  And we

17  would argue that that includes the question of whether there's

18  some ethical problem associated with the operation of the TAC.

19  That is to say, as a matter of law, if the plan is neutral to

20  them in their capacity as insurers, they don't have standing to

21  raise the TAC issue as an ethical issue pertaining to the

22  operation of the TDP.  And if it's neutral, and neutral

23  including in the context of preserving their right to argue TDP

24  conflicts in connection with insurance coverage, we don't

25  believe that there's an exception to the Prudential standing

1  law that has been created by <u>Congoleum</u> that applies to this

2  case.  We think that the same Prudential standing rules would

3  apply to this case as applied generally, and it's very well

4  articulated, in the <u>Quigley</u> case which was not a person

5  aggrieved case, it was a District Court decision and

6  beautifully articulated how Prudential standing applies

7  separate and apart from the bankruptcy overlay.

8        So, as a matter of law, we would ask the Court to

9  rule that there is no <u>Congoleum</u> exception that's been created

10 such that they can raise that TAC issue if, in fact, this plan

11 is insurance neutral.

12       The distinction between Phase I and Phase II is all

13 to do with the capacity in which the issue is being raised.

14 And here, if they are insurers and they want to raise that

15 issue, ethics, TDP, they can't do it if the plan is neutral

16 because they lack standing as a matter of law.

17       MR. GIANNOTTO:  And, Your Honor, I believe we can

18 under <u>Congoleum</u>.  We can raise it, whether or not the plan is

19 neutral, because there's an ethical violation or an alleged

20 ethical violation by members of the TAC and I think <u>Congoleum</u>

21 says -- I understand the context of <u>Congoleum</u> and <u>Pittsburgh</u>

22 <u>Corning,</u> we're hiring insurance counsel for the, I don't know,

23 the debtor or for the ACC or somebody.  And so it was earlier

24 on in the process and the 3rd Circuit talks about that in

25 <u>Congoleum</u>.  But the 3rd Circuit also makes clear that when

1  there is an ethical violation, that the insurers or at least

2  their insurers' lawyers have a duty not just -- they have a

3  duty to bring it to the attention of the court.

4        THE COURT:  Okay.  To the extent that you want to

5  raise that issue, I'm going to consider it in Phase II.  I need

6  a brief on this separate point as to how, under <u>Congoleum</u> or

7  <u>Pittsburgh Corning</u> or whatever cases you're going to cite, the

8  insurers have independent standing -- I'm calling it

9  independent -- whether or not the plan is neutral to raise this

10 ethical violation.  Clearly, if there is the determination that

11 the plan is not insurance neutral, you can raise it.

12       MR. GIANNOTTO:  Okay.

13       THE COURT:  But if there is a determination that the

14 plan is insurance neutral, then I need this separate brief to

15 tell me how you get around the fact that this is a coverage

16 issue.

17       MR. GIANNOTTO:  Another way that -- and Mr. Lockwood

18 said this would be Phase II so again, I want to -- but one of

19 the ways in which the plan is not insurer neutral, not in the

20 traditional <u>Combustion Engineering</u> sense, is that it enjoins --

21 the plan enjoins insurers from bringing certain contribution

22 and indemnity claims.  And Mr. Lockwood said, or I believe he

23 said, look, if you believe that you're being enjoined from

24 bringing certain claims against settled or unsettled insurers

25 and you're not getting proper recompense for it or something,

1 you know, bring it on in Phase II, or something, words to that

2 effect.

3        And so we do raise in our brief, issues where we

4 believe that we are being improperly -- or we are being

5 enjoined from bringing certain claims, not just against -- and

6 they don't arise necessarily in a creditor status because they

7 arise out of claims that Scotts may make against us and then we

8 may want to file for contribution against settled or unsettled

9 insurers.  But with Mr. Lockwood's statement that our standing

10 to do that as well as our ability to do that would be raised in

11 Phase II, that's fine.  I can save that for Phase II.  But

12 they're also impinged on insurance neutrality because -- not in

13 the traditional <u>Combustion Engineering</u> sense for coverage

14 defenses, but it would affect our ability to bring contribution

15 actions.

16        MR. LOCKWOOD:  Your Honor, both I and Mr. Bernick

17 clearly stated -- Mr. Bernick actually had a pretty colored

18 chart that said "Injunctions" on the right hand side under the

19 heading "Phase II Issue."  So I don't really think we need to

20 belabor this.

21        MR. BERNICK:  Although, again, to the extent that

22 there's a finding of insurance neutrality, insurance

23 neutrality, and it does not fall within the creditors' status

24 -- that is, if you had an insurer -- I'm not saying CNA, but if

25 there were an insurer, it's simply an unsettled insurer and the

1  plan is neutral as to that unsettled insurer, I don't believe

2  that that insurer would have Prudential standing, and this is

3  what we say in our order, to get into the injunction issue.

4        MR. LOCKWOOD:  I agree with that.  I mean, what we're

5  talking about is -- Mr. Giannotto is positing that CNA has

6  rights that have been cut off by the injunction.  And all we've

7  said is that he can show up, try and establish the existence of

8  some rights that are being cut off by the injunction in Phase

9  II.  And if he establishes that, then he could tell you why

10 they shouldn't be cut off.  But those rights don't include

11 being sort of a spectator with insurance neutrality as to his

12 coverage and saying, well, gee, I think it's a bad idea because

13 there's somebody else whose rights are being cut off by the

14 injunction.

15       MR. BROWN:  Your Honor, could I interject here?

16       MR. LOCKWOOD:  The injunction shouldn't be -- the

17 injunction shouldn't be issued because, I, as this interested

18 onlooker, think that it doesn't comply with Section 524(g).

19 And the whole purpose of this exercise is trying to distinguish

20 between insurers as issuers of coverage with coverage defenses,

21 and insurers as people who have, say -- maybe the term creditor

22 is a little bit imprecise.  We don't mean to say it's got to be

23 a claim against the debtor as a creditor, but it's got to be a

24 claim.  It's got to be some sort of a right, a legal right,

25 that the plan is demonstrably impairing in some way or another.

1  The insurance neutrality language is only addressing the rights

2  of insurers who are asked to pay claims by the trust on the

3  assigned insurance.  That's all it deals with.  Any other

4  capacity with various -- you know, your injunction is

5  preventing me from doing something that I have a legal right to

6  do, let's phrase it that way, that's a Phase II issue.

7        MR. GIANNOTTO:  I know Mr. Brown wants to speak up on

8  that issue.  With that understanding, that's fine.  I mean,

9  because they kept phrasing it, if you have a problem with the

10 injunction, your status as a creditor.  What I hear Mr.

11 Lockwood saying is, if you have a problem with an injunction

12 because you can't exercise certain rights you believe you have,

13 whether it's in your status as a creditor or an insurer or

14 anything else, you can -- you will be able to raise that issue

15 in Phase II as to, you know, the injunction, as to you.  And,

16 if that's the understanding of the Court, then that takes care

17 of CNA's problem.  But I think that Mr. Brown, you know, may

18 have some other issues with that.

19        THE COURT:  Mr. Brown.

20        MR. BROWN:  Your Honor, I've been listening to this

21 for quite some time and I must confess I'm getting more

22 confused all the time with what's considered to be a Phase I

23 and a Phase II issue and it's a little odd to be sitting here

24 in Phase I trying to decide what it is we're actually

25 litigating.

**J&J COURT TRANSCRIBERS, INC.**

1          I accept Mr. Lockwood's qualification.  I think it

2  was contradicted by Mr. Bernick.  And I think for clarification

3  purposes on this particular point, the slide that Mr. Lockwood

4  was referring to that had the little color chart with the

5  injunctions in one color, ought to be made part of the record

6  today.

7          THE COURT:  Well, do we have it?

8          MR. BERNICK:  We will make it a matter of record and

9  we're going to mark it up further because I think that -- I

10  applaud Mr. Giannotto, not that it's my station to applaud, but

11  the distinction that Mr. Lockwood drew is we can put it on the

12  chart and it advances the cause.  The only standing -- this all

13  comes about because of standing.  The only standing that we're

14  asking the Court to address is if there is neutrality vis-a-vis

15  the insurance companies, then, do they have standing to address

16  matters that pertain to issues other than -- do they have

17  standing as providers of coverage to raise other issues.  And

18  they may have standing to argue Phase II based upon their being

19  insurers in other respects, including making claims against

20  other people.  So we'll mark up the chart and we'll furnish it

21  to the Court and we're happy to advance the cause of focusing

22  this issue.

23          MR. BROWN:  Your Honor, could we see the marked up

24  chart before it gets made part of the record?

25          THE COURT:  Yes.  Yes.


**J&J COURT TRANSCRIBERS, INC.**

1          MR. BERNICK:  Only if you're nice.

2          MR. MILNER:  Good afternoon, Your Honor.  Robert

3  Milner for General Insurance Company of America.  I want to

4  just focus on two things about the neutrality.  I don't think

5  we're as close to Mr. Bernick and Mr. Lockwood as Mr. Giannotto

6  makes out, but on the other hand, I think it's useful to focus

7  where I think that we are pretty far apart.  I really want to

8  focus on two things, the use of findings that the Court makes

9  which I know you discussed with Mr. Giannotto, and also the

10  fact that the plan expressly transfers insurance rights to the

11  trust but it does not expressly transfer the obligations in

12  those very same insurance contracts to the trust.

13          THE COURT:  I'm sorry.  Like the debtors' obligation

14  to cooperate, for example?  I'm not sure what you mean.

15          MR. MILNER:  No.  That's a fair point.  It would be

16  the debtors' obligation to cooperate.  It would be the debtors'

17  obligation to permit an insurer to defend claims.  My client is

18  a primary insurer, not of W.R. Grace but of a small company in

19  western Washington, I think, Vermiculite Northwest that Grace

20  acquired at some point.  And so we actually have primary

21  policies that have that right.

22          But, actually, what brings this to the floor is that,

23  in my case, and this is why I think it's a little bit important

24  to look at some facts, and I submitted a pretrial statement to

25  Your Honor this morning.  I filed it because I thought you had

1 directed I do such.

2          THE COURT:  I did and I think -- I got one.

3          MR. MILNER:  Okay.  Well, I filed one for General

4 Insurance also, probably about ten this morning.

5          THE COURT:  I probably didn't get that one.  Okay.

6          MR. MILNER:  Okay.  Do I have to send it to your

7 office in hard copy or will you take --

8          THE COURT:  No.  We'll print it.

9          MR. MILNER:  Okay.  But what I made clear in that is

10 that we're not calling any witnesses live, although we joined

11 in others, and we have two documents we want in evidence.  One

12 is a single insurance policy.  We had more than that but that

13 works as a proxy, a sample.  It directs the Court to the exact

14 clauses in the policy which I'm sure you're generally familiar

15 with and the exact pages so you don't have to read a whole

16 policy or you can just take my word that it has no action,

17 cooperation, right to defend claims, anti-signing provision,

18 and also a -- and equally important a settlement agreement.

19 These two documents, we've agreed with the other side on every

20 objection except relevance.  These are authentic.  And one of

21 the documents is actually a replacement.  I call it Substitute

22 Exhibit 1A because, in order to agree with Mr. Horkovich, we

23 substituted a policy.  So do I need -- should I send a copy of

24 the substituted to your office?

25          THE COURT:  Yes.

1          MR. MILNER:  Okay, I will, and I filed that also on

2   the docket with an affidavit on top of it saying it's authentic

3   because Your Honor had said that we should do that.  So I

4   listen to everything you say.

5          THE COURT:  Can I have you -- can I introduce you to

6   my husband?

7                         (Laughter)

8          MR. MILNER:  Well, he might tell me I shouldn't do

9   that.

10         THE COURT:  He probably would.

11         MR. MILNER:  That might not be a good idea.  But the

12  point -- one of the points here for us is that we have a

13  settlement agreement that was entered into back in 1994.  We

14  believe strongly that it settled all asbestos liability

15  products and non-products claims.  Apparently, the debtor

16  thinks it settled only products claims because on the Exhibit

17  5, it makes a reference to it's a settlement agreement as to

18  products.  It seems to do that.

19         Nevertheless, one of the things that's very, very

20  clear and one of the reasons we submit the settlement

21  agreement, is that it has specific express language in it about

22  the obligations of W.R. Grace.  And one of those obligations is

23  that it will not tender an asbestos claim, products,

24  non-products, anything related on any legal theory whatsoever,

25  Section 15(d) of that policy.  It covenants and warrants that

1  it will not do that and it agrees to cooperate fully with

2  General Insurance in imposing any effort to invalidate that

3  policy.  And it's very important to us if Your Honor assigns

4  insurance rights to that trust, that this obligation not to

5  tender claims on any theory, must also be with that trust, so

6  that if the trust comes to us for money, we say, wait a minute,

7  you are breaching an obligation.  We don't have to pay.

8          There's nothing expressed in the plan that transfers

9  the obligation together with the rights to that trust.  I

10 listened very closely to Mr. Lockwood's argument and, on that

11 area of the argument, if you get the transcript, I think you'll

12 see it's very weak and mushy.  It basically said we really

13 don't have to do that, the language is sufficient.  I say they

14 really do have to do that.  So, that is a point, number one.

15         THE COURT:  And this isn't a matter for the coverage

16 court to look at, whether or not the debtors' failure to do

17 whatever the obligation of the debtor is in the policy?  For

18 example, if a claim is tendered, there isn't a breach --

19         MR. MILNER:  We would like --

20         THE COURT:  -- under the terms of the policy that

21 would be cognizable in the coverage court?

22         MR. MILNER:  What we would like to say to the

23 coverage court, that the person tendering the claim and asking

24 us to pay money, is breaching the contract by doing that.  We'd

25 like to be very sure that the person who tenders has the

1  obligation under that contract.

2          THE COURT:  Okay.

3          MR. MILNER:  Wouldn't you, if you were in my position

4  in the coverage court, want to say to the court, the person

5  tendering the claim is breaching a contract by doing that?

6          MR. LOCKWOOD:  There's nothing in the plan that

7  precludes you from saying that.

8          MR. MILNER:  There's nothing in the plan, however,

9  that says where those obligations go, and I think it's unfair

10 and wrong to transfer rights to a trust from a contract,

11 without transferring the obligations that go with it.

12         THE COURT:  Well, they're not -- as I understand it,

13 though, this trust vehicle doesn't transfer the policies.  It

14 transfers certain rights.  To the extent that rights or

15 obligations aren't transferred, don't they have to stay with

16 the debtor?

17         MR. MILNER:  That's a problem.  That will also, in

18 Phase II, render the plan unconfirmable.

19         MR. LOCKWOOD:  Actually --

20         MR. MILNER:  That will render the plan unconfirmable

21 for the following reason.  If that were to happen --

22         MR. BERNICK:  It's a Phase II issue.

23         MR. LOCKWOOD:  We're not here to discuss

24 confirmation.  Your Honor, there's a --

25         THE COURT:  Mr. Lockwood, please.  I would like to

1  hear from Mr. Milner.  You've had your chance.  I'll be glad to

2  hear you again.  Go ahead, Mr. Milner.

3          MR. MILNER:  Okay.  On the coverage front, I think

4  it's wrong, unfair, unneutral, to transfer coverage rights but

5  not coverage obligations.  If you follow that logic, Your

6  Honor, beyond my settlement agreement, you can transfer the

7  right to pay the money but not the right to defend a claim, not

8  the right to cooperate, not the right to give notice, not the

9  right of the insurance company to receive notice.  That would

10  totally rewrite things.  That would be totally unneutral.

11          If I were to re-read your language to you from

12  Combustion, all rights preserved, not impaired.  The import I

13  think of what is sought to be done is to make clear that the

14  obligations go with the rights.

15          I don't want to address Phase II except -- I don't

16  want to address these points but in Phase -- except

17  parenthetically to say in Phase II, deal with monetary claims.

18  The breach of that warranty and covenant I just read, Section

19  15(d), unambiguous, would also give right to a monetary claim

20  which is a set-off, and by trying to separate the rights from

21  the obligations, they're trying to use a sort of flim-flam,

22  maybe if they thought it through, to deprive a set-off right.

23  I'll raise that in Phase II and that will render the plan

24  unconfirmable because at Section 542 of the Bankruptcy Code,

25  says set-off rights need to be preserved, and we'll get into

1 that in the next brief.  Anyway, so I just wanted to say,

2 that's one point and it should be clarified.  It should be done

3 fairly.

4          Number two, if you look at -- if we looked at some

5 other plans, for example the Armstrong plan, you'll see

6 provisions in there that say that the obligations go also to

7 the trust.  It couldn't be considered otherwise.

8          Parenthetically, the language that they're using

9 here, we keep using the word <u>Combustion</u>.  It's not -- it has

10 some <u>Combustion</u> language except every -- almost every other

11 paragraph begins with the word except as otherwise provided.

12 And when you put them all together, somebody can begin to make

13 the argument saying, well, yes, Paragraph 1 has <u>Combustion</u>

14 language except as otherwise provided.  Oh, it looks like the

15 insurer's rights, they go under (f) which deals with preserving

16 defenses, and then we have this argument which we're going to

17 come to right immediately saying, well, the compliance with the

18 code, that's a carve out and Mr. Lockwood says don't worry

19 about it.  All it means is that the insurer cannot collaterally

20 attack the Court's findings and conclusions in the confirmation

21 order.  Something like that.

22          That would be better than if Mr. Lockwood and Mr.

23 Bernick would actually say what they mean.  But the problem on

24 the collateral use is that just take a very simple example.

25 And, by the way, parenthetically, also, the <u>Fuller-Austin</u> case

1  which became so infamous, that has neutrality language.  That

2  plan also said that the rights of the insurers under their

3  contracts, insurance contracts, would not be impaired, not be

4  affected.  It used the stronger word, in fact.  Everybody was

5  very surprised, at least everybody on the insurance side

6  somewhat later when all kinds of arguments were being made in

7  the state court very creatively by the plaintiff's lawyers.

8          And so, here, just focusing on this little -- which

9  to my client is not so little -- settlement agreement, we would

10 -- we -- and focusing on the words that Mr. Bernick actually

11 said in his opening remarks, Mr. Bernick said, I believe I

12 wrote down, that the concern was that the, you know, bankruptcy

13 process could be used to gain advantage in disputes about

14 insurance coverage, that the bankruptcy process would somehow

15 be used as a sword.  He said the answer was a shield.

16          MR. BERNICK:  That's a partial quote, but go ahead.

17          MR. MILLNER:  Partial quote.  Was that -- I got the

18 gist, didn't I?

19          MR. BERNICK:  I said process in findings.

20          MR. MILLNER:  Good, process in finding.  Better than

21 I did for myself.

22          MR. BERNICK:  Okay.

23          MR. MILLNER:  Thank you.

24          MR. BERNICK:  Good.

25          MR. MILLNER:  And I didn't attack your chart today,

1 so --

2        MR. BERNICK:  I'm waiting.

3        MR. MILLNER:  There you go.  The concern we have

4 on -- just on the settlement agreement's very simple.  The

5 concern we have is that somebody would go in a coverage case

6 about that settlement agreement which we disagree with and say,

7 well, look, here's how the plan proponents characterize this in

8 Exhibit 5 to the plan and the judge approved that plan.  And,

9 therefore, there's validity to it.  Okay.  Now, that may sound

10 like a very simple, stupid argument, but it --

11        THE COURT:  No, it sounds like a legitimate argument.

12 I am going to have to --

13        MR. MILLNER:  You are.

14        THE COURT:  -- confirm a plan --

15        MR. MILLNER:  Right.

16        THE COURT:  -- and it will be "legitimate" if it's

17 confirmed.

18        MR. MILLNER:  Well, that's where we have a problem

19 here because if you rule the plan to be neutral, we will not be

20 litigating in this case.  And I don't think under any

21 circumstance we shouldn't be litigating the issue, the coverage

22 issue, as to whether their characterization of my client's

23 settlement agreement is correct or not.  That should be

24 litigated.

25        THE COURT:  Exactly.

1           MR. MILLNER:  Your Honor --

2           THE COURT:  In the -- it should be litigated in the

3    coverage court.

4           MR. MILLNER:  Absolutely.

5           THE COURT:  Right.

6           MR. MILLNER:  And, Your Honor, we're not asking you

7    to read it, we're not asking you to have a piece of coverage

8    litigation which would be a big satellite case which probably

9    you don't need anyway.  And so Your Honor really will not be

10   determining that their characterization is true, correct,

11   proper, valid, anything of that sort.  So it would be very

12   unfair to us if somebody in another court, without a

13   technically adept judge, to go to a trier of fact which might

14   well be a jury, and say here is the confirmed plan and the

15   judge approved this plan and that plan had such and such

16   exhibit, therefore, the exhibit has validity.  I don't think

17   it's a legitimate argument.  And I think we need some

18   protection against collateral use.

19           And I will say this because I know I was in the Owens

20   Corning case and when Mr. Lockwood and some of his colleagues

21   agreed that we should be kept out of the estimation there, the

22   insurers, there were some others who didn't agree, even some

23   insurers, so we couldn't do this simply by agreement.  But what

24   was put before Your Honor was an order.  It was based actually

25   on Pittsburgh Corning, I think, which had some very strong

1 language.  And it said something like these findings that'll be

2 made on the estimation, you know, should not be used or cited

3 or whatever in the other court.  They may have said for

4 coverage purposes or something, but it was pretty strong

5 indication so that the judge the other -- in another court, if

6 he every saw that, would say this is not something we should

7 be --

8         THE COURT:  Well, those findings of fact, though, to

9 that extent were bargained for.  The Court adopted certain

10 findings that the parties agreed to.  Not every issue, despite

11 how contested the things were, not every issue was contested.

12 And that was one that wasn't.  And I don't have any problem

13 making as part of the findings a statement that indicates what

14 I'm doing.  I am staying within my jurisdictional limit.  My

15 jurisdictional limit, without anybody asking me to do some kind

16 of coverage limitation, is to confirm the plan or not confirm a

17 plan.  But, you know, for purposes of this discussion, if it's

18 not confirmed, it's irrelevant.  So to confirm the plan.

19         If I confirm the plan, I have to make certain

20 findings.  The code requires me to make those findings or I

21 can't confirm the plan.  So you can't ask me not to make

22 findings that I have to make in order to confirm the plan.

23         MR. MILLNER:  I'm -- we're not --

24         THE COURT:  The issue -- so the issue becomes what

25 happens to those findings.  They may have some collateral

**J&J COURT TRANSCRIBERS, INC.**

1 consequences to other parties in other proceedings because

2 they're findings of a federal court in the course of its -- the

3 exercise of its proper jurisdiction regarding the plan.  But

4 that doesn't mean that they bind a coverage court with respect

5 to a particular claim that's been processed through the trust,

6 tendered to the insurance company, and the insurance company

7 refuses to pay.

8           MR. MILLNER:  But if we don't have a chance because

9 the plan is found to be insurance neutral to contest whether

10 those findings should be made, then we stand at risk at

11 relatively unprotected collateral use of them to our

12 prejudice --

13           THE COURT:  But you do have standing.  To the extent

14 that some finding in the order goes to insurance neutrality,

15 everybody has agreed that you have standing to raise those

16 issues.

17           MR. MILLNER:  Correct, but --

18           THE COURT:  Okay.

19           MR. MILLNER:  -- and I'll read you -- there's not a

20 lot of learning on this subject, but -- on this call that use

21 as evidence of findings, but I would note in the Congoleum case

22 from Judge Ferguson, bankruptcy case from last February that I

23 cited in my small submission this morning, you know, she makes

24 clear that for a plan to be insurance neutral it must "protect

25 the insurers from debtor's use of any express or implied

1  findings in the bankruptcy case". And the protection she was

2  talking about was as to the coverage case.

3        Now, it is true that in <u>Federal Mogul</u> and some other

4  cases there were stipulations against offering these things as

5  evidence to prove coverage. It seems to me, though, even

6  without a stipulation, we need that protection. Let me say,

7  not everything was thought through in <u>Combustion Engineering</u>.

8  Not everything was aired in <u>Combustion Engineering</u>. People see

9  things, people think more. I think that Your Honor probably,

10 because I think I was there, actually, you know, finally put

11 that language out because the parties just couldn't do anything

12 and said here it is and got it affirmed.

13        The proof that the <u>Combustion</u> language probably needs

14 fleshing out is actually in the debtor's own plan because they

15 have all these other provisions for everything the need to

16 flesh out. And what I'm telling you, Your Honor, is we need

17 protection against the use of findings to prove coverage in the

18 coverage court. I'm not saying that the court -- that the fact

19 of confirmation can't be noted. I'm not saying that any of

20 these things, but that these things should not be offered or

21 argued to prove that the Court made findings that favored the

22 coverage. That's all I'm saying.

23        We need that just as much as they need all those

24 additional -- or they think they need anyway all those

25 additional provisions. So I'm just focusing on that transfer

1 of rights without obligations.  It's dangerous, unfair.

2 Translating also on the use of findings and, in fact, that we

3 need some additional protection.

4        Last point is just one more thing I -- you know, I

5 got into this case very late.  I've been working here about a

6 months or six weeks or something because curiously in the

7 versions of the plan before the version that came out in

8 October '08, the Exhibit 5 listing settlements listed my client

9 as fully resolved.  And then it flipped in '08.  We never got

10 notice and finally word of mouth reached my client.  But at

11 least I've had a chance now to talk with most of the other

12 insurers, maybe all of them.  I think if not all of them, I

13 think overwhelmingly almost all would very much like something

14 like the <u>Federal Mogul</u> language.  I don't think because Mr.

15 Lockwood keeps saying that the insurers are so disorganized or

16 disagreeing or whatever, I think the contrary here.  And that's

17 really my presentation, Your Honor.

18        THE COURT:  Okay.  Thank you.

19        MR. MILLNER:  Thank you.

20        THE COURT:  Anyone else for the insurers?  Mr. Demmy?

21        MR. DEMMY:  Your Honor, excuse me, John Demmy for

22 Fireman's Fund Insurance Company.  And I agree a lot with what

23 Mr. Giannotto and Mr. Millner had to say.  I'm going to try not

24 to repeat what they say, but just supplement in a couple of

25 respects and I'll just make a few points.

1          First, we, as Mr. Millner stated, we have -- we'll

2   have insurance policies.  We won't have admitted -- I'm

3   sorry -- not admitted, but we have come to an agreement with

4   counsel for the ACC with respect to a set of insurance policies

5   for the purposes of the Phase I proceedings and for no other

6   purpose.  They retain their right to make a relevance objection

7   because we were working over the past couple of weeks on the

8   stipulation and over the past several days on the actual form

9   of the policies because these are older documents and there's

10  always some disagreement about missing pages and legible pages

11  and so forth.  We're going to have to supplement the exhibits

12  that we -- that were previously submitted and we'll be able to

13  -- we'll be in a position to do that tomorrow.

14          THE COURT:  All right.

15          MR. DEMMY:  They're being sent to me.  I just wanted

16  to make that process housekeeping point.  With respect -- I

17  think I get the distinction that was being made by Mr. Lockwood

18  and Mr. Bernick with respect to what is a Phase I and Phase II

19  issue, so I don't need to deal with that.  I think that in the

20  one hand Fireman's Fund is an actual creditor here based on its

21  claim.  It has filed a proof claim in respect of surety bonds

22  that were issued and the indemnification obligation that

23  relates to those surety bonds.  So we can make, you know, all

24  the arguments in Phase II in its status as a creditor that as

25  an insurer could be made in Phase I.

**J&J COURT TRANSCRIBERS, INC.**

1          There's two points I want to make with respect to I

2    think what Mr. Giannotto touched on and what Mr. Millner was

3    dealing with and that's the collateral use issue.  And I try to

4    put this in some practical context.  We propounded discovery on

5    the plan proponents, specifically the debtor, the ACC and the

6    FCR on that issue.  And I'd just like to read into the record

7    the question and the response really quickly.  These are

8    also -- these were all part of our exhibit binder that we'd

9    like the Court to receive into evidence or at least take

10   judicial notice of.

11         Our Request for Admission 88, "Admit that the debtors

12   and/or reorganized debtors will not use the confirmation order,

13   findings and related court orders as a basis to seek payment

14   from non-settled insurers for demands and/or asbestos PI claims

15   that have not been made to holders of such asbestos PI claims

16   or demands or to the extent such asbestos PI claims or demands

17   have not been paid in full."

18         The response was an objection.  They say that the

19   request calls for speculation, improperly about a request for

20   admission.  I'm not here to argue that objection, but they go

21   on to say then to the extent a further response is required,

22   this request is denied.  And I would note, Your Honor, we

23   propounded the same question on all three, the ACC, the debtor

24   and the FCR and we received, essentially, the same response to

25   each.  So although I'm looking at the debtor's response, I

1  think the same applies to all.

2          Request for Admission 90, Your Honor, says "Admit the

3  confirmation order findings and any related court orders cannot

4  be used as evidence of or in support of any argument that the

5  claim allowance criteria (medical exposure, claim value, et

6  cetera) for asbestos PI claims that are included in the TDP are

7  reasonable, appropriate or judicially approved." Response is

8  denied. They go on to then cite 7.15, but the initial response

9  was denied.

10          Request for Admission 91, Your Honor, "Admit that the

11  confirmation order findings and any related court orders cannot

12  be used as evidence of or in support of any argument that any

13  payment to the asbestos PI trust is reasonable, appropriate or

14  judicially approved." And, again, the response, the initial

15  response, is denied. The debtor goes on to recite some of the

16  provisions of 7.15, but that was denied.

17          I think as a practical matter, Your Honor, it

18  highlights the issue that we're trying to grapple with in the

19  context of neutrality which is we understand the Court will

20  have to make findings in a bankruptcy context about the plan.

21  There's no way around that and we're not arguing, I don't

22  think, that the Court shouldn't or is not entitled to make

23  those findings. The question comes what happens with those

24  findings when you go to coverage court. And although I

25  recognize that the Court probably can't tell another court what

1  it ultimately will do, I think this Court could probably

2  request what another Court would do with its findings or make

3  statements in those findings about what they can be used for,

4  what they were intended for and try to limit them to the

5  bankruptcy and not to coverage.

6        I think these discovery responses highlight the

7  jeopardy that the insurers are potentially in in the coverage

8  court where, notwithstanding what may be said here today or

9  tomorrow, that the trust or other parties may seek to use the

10 Court's findings to make arguments that would be in the nature

11 of an unneutral attempt to use the bankruptcy process contrary

12 to what Mr. Millner recited to the Court about what Mr. Bernick

13 said at the outset and what Mr. Bernick then corrected which I

14 think made it, as I agree with Mr. Millner, made it a stronger

15 position for the insurers that the bankruptcy process should

16 not be used so that an advantage is gained in the coverage

17 action.

18        And what I would suggest to the Court in this regard

19 is that although the Court probably can't tell another Court

20 ultimately what it can do, this Court can tell the parties what

21 they can do.  And I think from a perspective of insurance

22 neutrality is something that's sorely needed here.  And

23 although the Federal Mogul stipulation which my client was a

24 signatory to and probably some others in other courts, not in

25 front of Your Honor, but other cases in which my client has

1 been a signatory to, those were negotiated situations.  I think

2 they serve as a basis for what can be done.  And I think the

3 Court in the guise of making sure that this plan in regards to

4 coverage issues is neutral, can do in the nature of what was in

5 the <u>Federal Mogul</u> stipulation to preclude parties in proper use

6 of the Court's findings in the confirmation order to gain an

7 advantage in coverage litigation.

8          Two more points, Your Honor, very quickly.  I think

9 Mr. Giannotto covered this, but in case he did not, the order

10 that was tendered by the plan proponents in regards to today's

11 matter has problems for a lot of -- all the reasons we've been

12 talking about with regard to neutrality, but also in the second

13 paragraph in its attempt to define what may happen in Phase II

14 depending on whether the Court finds the plan is insurance

15 neutral.  Clearly, the wrong standard is being used there.

16 It's an appellate standard.  There's that problem with the

17 order, along with the other problems with the order.  I don't

18 know if we're there anymore or we're well beyond that order,

19 but I wanted to note that.

20          And, finally, and I don't want to make a big point

21 about this, Your Honor, just to draw the Court's attention back

22 to the argument on Thursday with regard to the TAC conflict

23 issue and what the Court can and cannot do with that and

24 whether that's a Phase I or Phase II issue.  I don't think that

25 the issue is only raised in the context of a conflict.  I think

1  it also touches upon confirmation standard, specifically

2  1129(a)(3) and 1129(a)(5) and that argument was made on

3  Thursday.  I'm not going to repeat it.  Just I'm telling the

4  Court the Court has an independent duty to find that all the

5  1129(a) requirements are met.  So it's not just a conflict

6  issue.  I think the Court needs to look at that, would have to

7  look at that in the absence of any objection.  And I think

8  clearly an objection and the argument fleshed out by parties

9  whether they have standing or not in that technical sense is in

10 assistance to the Court in its independent duty to make all the

11 required 1129(a) findings.  And with that, Your Honor, I'll sit

12 down.

13         THE COURT:  Okay.  Thank you.  Anyone else on behalf

14 of the insurers?  Mr. Brown?

15         MR. BROWN:  Your Honor, would you mind if we picked

16 up with this tomorrow morning?  I think most parties were

17 planning on being here through the middle of tomorrow in any

18 event.

19         THE COURT:  Let me find out from other people.  Why?

20 Is there something you want to negotiate tonight because

21 otherwise I was planning to go to 5:30 tonight.  I'll go as

22 long as you want tomorrow, but Wednesday we're finished.  So I

23 would suggest that we --

24         MR. BROWN:  How about if we have a brief break right

25 now and --

1          THE COURT:  I'll be happy --

2          MR. BROWN:  -- confer with one another.

3          THE COURT:  -- to take a brief break.  Ten minutes.

4          MR. BROWN:  Thank you.

5          THE COURT:  Well, unless everybody wants to adjourn.

6  I guess maybe that's what I should ask.

7          MR. BROWN:  I --

8          THE COURT:  All right.  We'll take a 10-minute

9  recess.

10                      (Recess)

11          THE COURT:  Okay.  We can begin, again.  Mr. Brown.

12  Not Mr. Brown.  Okay.

13          MR. COHN:  Your Honor, Jacob Cohn for Federal

14  Insurance.  At the risk of being a little bit cumulative, I

15  just wanted to speak for Federal for a moment.  As you know,

16  frankly, we've always been a proponent of getting to acceptable

17  neutrality language and standing down.  And I just wanted to

18  reiterate that a situation that permits people to develop

19  findings that they then reserve the right to hit us over the

20  head with later by definition is not neutral.  And by

21  definition, I think that if that is where we are and we do not

22  have the protection we need to know that findings that are made

23  without our participation cannot be used against us at

24  subsequent coverage litigation, this Phase I they're showing

25  has not been met and they have not demonstrated that we have

1  been, you know, denuded of standing by their neutrality

2  language.

3          THE COURT:  I think you're playing wrap up today, Mr.

4  Brown.  Mr. Wisler?

5          MR. WISLER:  Good afternoon, Your Honor, Jeff Wisler

6  on behalf of Zurich.  Your Honor, Zurich is a Phase I objector.

7  We don't have anything to add.  We're here.  We have some

8  evidence to put in, perhaps some arguments to make if they

9  won't repeat others and we'll be here to do that.

10          THE COURT:  All right.

11          MR. BROWN:  Your Honor, Michael Brown for Seaton,

12 GEICO and Republic.  I'm coming back to a process issue I think

13 here, Your Honor, because during the break I discussed with the

14 other insurers what they had expected to happen tomorrow.  And

15 it was my understanding from the outset that what we just sat

16 through were opening statements in an evidentiary hearing.

17          THE COURT:  Yes.

18          MR. BROWN:  And I have some good news, I have some

19 better news, and then I've got some news I don't know how well

20 it will be received.  The good news at least from the

21 standpoint of my client is that we are prepared to waive our

22 opening statement.  We do have evidence that we want to put in

23 and I think there are going to be some issues with that

24 evidence.  And then following that evidence it had been my

25 anticipation to give an argument.

1          When we were here last Thursday, we had indicated

2    that we would be calling Professor Priest (phonetic) as an

3    expert.  The good news is, is that we have decided that we will

4    not call him live as a witness.  So that will, obviously, save

5    some of the time.  The better news is that late last night we

6    decided we were not going to call Peter Lockwood as a witness

7    which I think is a relief to all of us.

8          UNIDENTIFIED ATTORNEY:  In Phase I.

9          MR. BROWN:  Yes, in Phase I, Your Honor.  He received

10   two subpoenas last Thursday.  And the same goes for Professor

11   Priest.  We're reserving him for Phase II, as well.  At that

12   point what we had prepared to do was to introduce some evidence

13   into the record, Your Honor.  And I know some of the folks have

14   talked about evidence that they want to put in with the

15   anticipation that that's going to happen tomorrow.  We're

16   prepared to start that process today if that's what Your Honor

17   wants to do and then save the argument until tomorrow.

18         But we have, for example, after protracted

19   negotiations, a policy stipulation, at least with respect to my

20   clients and we would like the policy stipulation accepted into

21   evidence.  We -- Your Honor may have seen it.  We also filed a

22   declaration of our client.  This would supercede the

23   declaration from our client because we worked out a stipulation

24   with Mr. Horkovich and the other parties this morning while we

25   were outside the courtroom.

1          Besides the policy stipulation and there's also some

2 settlement agreements that are attached to the -- to that

3 stipulation.  Besides those, we have a binder of deposition

4 designations.  And, Your Honor, those were filed -- I think we

5 began filing them last Thursday.  Some of them, I guess, were

6 filed on Thursday.  We have a binder with the deposition

7 designations for Your Honor.  It includes non-plan document

8 exhibits and then, as per your instructions, we kept copies of

9 the plan out because we figure there will be enough copies of

10 those floating around.

11          My understanding from the plan proponent side is that

12 there are objections to a number of those exhibits.  But, in

13 any event, that had been our intent to go to those next.

14 There's also some discovery responses that we would like Your

15 Honor to consider as part of the record.  And, at that point,

16 it's my intent to make an argument.

17          So I don't know if you want to begin that process.  I

18 don't know where the plan proponents are in that process.  I

19 know that last Thursday Ms. Harding had indicated, for example,

20 that the plan proponents may have counter-designations.  I

21 don't know if those are available or they're not available.  I

22 don't know how Your Honor wants to handle the evidentiary

23 objections.  So I'm sort of opening up because I'm not sure

24 what process you want to follow.

25          THE COURT:  Well, with respect to the

1 counter-designations, I understood that the debtor may not be

2 filing those yet because they got them so late that they may

3 not have had an opportunity to go through them all.  So I don't

4 know where that stands.  If they've been filed, I'm not aware

5 of them.

6          MS. HARDING:  No, Your Honor, you may or may not

7 recall since it was a long day last week.  At the end of the

8 hearing last week I asked the Court for permission that we

9 filed our counter-designations after the hearing, if necessary,

10 based on our relevance objection.  So we have not done that

11 yet.  We started the process, but it's just not complete

12 (indiscernible).

13          THE COURT:  Okay.  With respect to the other --

14          MR. BERNICK:  And also with the objections, as well.

15          MS. HARDING:  Right.  Well, have the objective chart,

16 but not specifically to the specific designation.

17          MR. BERNICK:  Well, that's what I'm saying.

18          MS. HARDING:  Yes.

19          MR. BERNICK:  We would file counters and objections.

20          MS. HARDING:  Yes.

21          THE COURT:  You don't have the objections that you

22 know about to the designations yet?

23          MS. HARDING:  When we got the -- originally had

24 received the exhibits, they were just the depositions

25 themselves, the whole deposition.  So we objected based on,

1  generally speaking, per se, and things like that.  But now the

2  designations have specific pages and they have exhibits

3  sometimes that go along with the designation, the questions

4  that they actually asked.  So there are objections that go

5  directly to specific, you know, transcripts.

6          MR. BERNICK:  Yeah, Your Honor, we -- the only party

7  from whom we received proper designations -- the idea that you

8  can put a whole deposition in as an exhibit, I don't think that

9  that exists under the rules.  Designations come under a

10  separate rule and they have to be made with specificity.  And

11  we received no such designations except from Arrowood.

12  Arrowood was the only one.  Your Honor then directed that that

13  take place last week and day by day we've now received specific

14  designations.  We're reviewing them to make counters and to

15  make objections.  And, at that point, they will be proper

16  tenders of designated testimony under the federal bankruptcy

17  rules.

18          MR. LOCKWOOD:  But, Your Honor --

19          UNIDENTIFIED ATTORNEY:  Your Honor --

20          MR. LOCKWOOD:  -- there is -- there has been an

21  objection, mass objection filed on --

22          MR. BERNICK:  Yes.

23          MR. LOCKWOOD:  -- relevance grounds to all of

24  their --

25          MR. BERNICK:  Right.

1          MR. LOCKWOOD:  -- evidence on the ground that it's

2   extraneous, et cetera.  It has been filed?

3          MS. HARDING:  Yes, filed this morning.

4          MR. LOCKWOOD:  It's been filed.  So, to that extent,

5   we're prepared tomorrow or now or whenever to argue that

6   evidence is wholly unnecessary for purposes of this proceeding.

7   What Mr. Bernick and he were talking about is beyond just

8   relevance, just sort of general relevance objections to the

9   notion that you need evidence at all to determine insurance

10  neutrality, to -- if there's specific competence, foundation --

11          MR. BERNICK:  Right.

12          MR. LOCKWOOD:  -- you know, the normal kind of

13  testimonial.  But those would be made only if Your Honor

14  overruled --

15          MR. BERNICK:  Well --

16          MR. LOCKWOOD:  -- the general relevance objections,

17  as I understand it.

18          MR. BERNICK:  Well, I -- it -- maybe I can answer Mr.

19  Brown's basic question which is how we react to their proposal

20  for how to proceed.  As I understand the proposal, it is that

21  they will tender this evidence and it'll be deposition

22  designations and it will be exhibits.  And then after that's

23  tendered, Mr. Brown wants to argue his case at that point in

24  time now with the benefit of a record.

25          And what I would say in response to that is we can

1    respond to the exhibits as they come in because we're prepared

2    to do that.  With respect to the deposition designations, we're

3    not.  And the reason that we're not is that they weren't timely

4    submitted.  So tomorrow we will not be able.  They can make all

5    the tenders that they want.  We're not going to be in a

6    position to articulate our specific objections and we're not

7    obliged to because they weren't timely submitted.  We'll do

8    that later and we will also make -- again, all this is with the

9    Court's permission -- also make our counter-designations later.

10           So that then has implications for the argument.  Mr.

11   Brown wants to make an argument and he doesn't want to make it

12   now, he wants to make it later.  And presumably the reason he

13   wants to make it later is he wants to make reference to those

14   matters that are contained in the factual record.  And I can

15   understand that, but given the time with which the or the

16   lateness with which this evidence was submitted, we're not

17   going to be able to respond completely because we will not be

18   able to point out to the Court the parts of the record that we

19   will be bringing to the Court's attention as we deal with the

20   deposition designations.  Now --

21           THE COURT:  All right.  Well, then we need the July

22   hearing.

23           MR. BERNICK:  Well, it may be that we need the July

24   hearing, but I think that really there might be a simpler way

25   to proceed which is --

1          MR. BROWN:  Your Honor, can I -- I just want to

2  interject --

3          MR. BERNICK:  Excuse me.

4          MR. BROWN:  Excuse me.  I'm at the podium.

5          MR. BERNICK:  Well, I understand that, but you asked

6  a question about how we reacted to this.

7          MR. BROWN:  I want to react, Your Honor, to the

8  statement that the designations were late because that is just

9  ridiculous.  The designations -- let me back up.  We had

10  exhibits due and at the time that our exhibits were due, Your

11  Honor, we were still in the process of taking depositions.  We

12  put the deposition transcripts in as our exhibits as simply as

13  a placeholder with a notation that we would be providing the

14  designations.  And we subsequently provided the designations.

15  And they began -- it wasn't in reaction to anything that was

16  said last Thursday.

17          We started doing it, I believe, on Wednesday evening

18  before the hearing even began.  And I indicated to Your Honor

19  at that time that we were in the process of filing that

20  designation which I might add was a day earlier than the debtor

21  had insisted that we get them to them.  So the suggestion that

22  we did this late and that that's the problem is -- it's just

23  simply not true.

24          And this is, you know, this is the debtor's and the

25  proponent's CMO.  We have not come in here asking for it to be

1  changed.  We have done our best to get everything done in that

2  timely fashion and we have.

3         MR. BERNICK:  Yeah, that I completely disagree.  It

4  may be that --

5         THE COURT:  It doesn't matter.

6         MR. BERNICK:  It doesn't --

7         THE COURT:  It really doesn't matter.  Let's get to

8  something substantive.

9         MR. BERNICK:  Okay.

10        THE COURT:  What's substantive is this.

11        MR. BERNICK:  Okay.  Yeah.

12        THE COURT:  Mr. Brown is prepared to put his evidence

13 in.  The debtor -- the plan proponents are not prepared to

14 react to it.  I will never again to go any trial, any trial in

15 my life, except maybe for a real estate valuation on a

16 residence, without a pretrial narrative, never, as a result of

17 this.  This makes no sense, this process.  You know, I rely on

18 you folks who are litigators to get this process ready for

19 court.  We've got a CMO and we're here on the day of trial and

20 nobody has a clue what you're putting in yet.  This makes no

21 sense.

22        MR. BERNICK:  Well, in --

23        THE COURT:  Now, Mr. Bernick, don't interrupt because

24 I'm on a rant and I'm going to finish my rant.  I'm not going

25 to do this process again.  So if we need to continue this

1  hearing, the next time through I want some form of pretrial

2  statement that is going to tell me what it is that's coming up.

3  You said you had a better suggestion, Mr. Bernick.

4         MR. BERNICK:  Yes.

5         THE COURT:  What is it?

6         MR. BERNICK:  And, Your Honor, from our point of

7  view, we've been totally candid about what our record is and I

8  don't think that we're the cause of this delay.  And

9  incidently, we didn't receive any of those narratives until

10 like last night.

11        THE COURT:  What's the better process, Mr. Bernick?

12 I'm beyond that.

13        MR. BERNICK:  The better process is that if Mr. Brown

14 wants to make his argument based upon the record that he

15 already knows he wants to create, then he should go ahead and

16 make the argument.  I don't have any problem with his making

17 the argument.  He can go make the argument on the basis of the

18 record that he wants to submit.

19        But to go through a process that's not a real process

20 that says, well, we're now going to create the record that he's

21 going to argue from, that's a fiction.  We won't really have

22 the opportunity.  Your Honor will not have ruled on all of the

23 objections.  I don't expect that Your Honor will by the time

24 that we're done with this whole process tomorrow.  You can't

25 because you won't have the objections as to the testimony.

1          So what I think ought to happen, frankly, is that

2  tomorrow morning Mr. Brown can make his argument based upon

3  whatever he believe he's going to submit into the record just

4  as some of the others did.  You make the argument and then at

5  that point we can have -- we'll respond and Your Honor can have

6  this whole thing argued.  Our position with respect to that

7  whole record that I suspect he's going to make is that it's

8  irrelevant for all the reasons that Your Honor has already

9  heard from us.

10         So I expect that very concretely he makes the

11  argument, we then do replies.  The whole matters has been

12  heard.  They then make an evidentiary submission and Your Honor

13  can hear that evidentiary submission.  We will respond to it

14  and we will object.  And then Your Honor can decide in the

15  context of having heard all of the arguments, can decide

16  whether the objections are well taken or the evidence should

17  come in and also can decide this issue so that we don't have to

18  wait on that decision.

19         This is not a situation where you need to have live

20  testimony in order to assess the credibility of witnesses or

21  any such thing.  So we can have the entire argument.  We can

22  have the matter submitted to Your Honor with a record including

23  proposed evidence and our objections and then the matter can be

24  under submission to the Court.  Otherwise, I don't know why we

25  need to hear a bunch of argument because Your Honor is not

1  going to have had the opportunity to finalize the record

2  anyhow.

3          And the record that we would submit would really be

4  as, you know, subject to our whole argument about relevance.

5  We're not going to have some earth shattering new evidence.

6  It's going to be evidence that's necessary to flesh out the

7  record, but our threshold position is it's irrelevant because

8  this is a matter of law.

9          THE COURT:  Okay.  Mr. Brown?

10          MR. BROWN:  Your Honor, the procedure that he has set

11  forth, I think, is acceptable.  I mean, I -- but I must say

12  that I'm a little bit taken aback by the comments.  I mean, we

13  have been doing what we can to streamline the process.  We had

14  a conversation with Your Honor last Thursday about not bringing

15  a parade of claims people in here, we've worked to get the

16  stipulations done.  I, frankly, don't know what Mr. Bernick is

17  talking about.  This is his evidentiary hearing.  This is what

18  he asked for and four days were set aside to deal with this

19  issue and we complied with every deadline in the CML.  I really

20  don't understand what this criticism is about.

21          THE COURT:  Okay.

22          MR. BROWN:  But I am prepared, Your Honor, to go

23  forward as he's proposed.  I don't want to put this off until

24  July.  We can have the argument tomorrow morning based upon the

25  record that will be presented and they can submit their

1  objections to the record thereafter.

2          THE COURT:  All right.  As I understood the insurance

3  policies and settlement agreements, there is some form of

4  either stipulation or agreement that those policies, subject to

5  relevance, those policies can come in so that the insurers can

6  make use of them in making the arguments, correct?  So, is

7  there some reason they can't be, basically, tendered in a group

8  by each -- whoever the relevant insurer is?

9          MR. BROWN:  I don't know if they can be tendered in a

10  group, Your Honor.

11          THE COURT:  Well --

12          MR. BROWN:  Mr. Horkovich was in the corner out here

13  wheeling and dealing about stipulations this morning.  And I

14  don't know how many there are at this point.  I know from my

15  three clients we have a stipulation.  I understand that some of

16  the other carriers likewise have stipulations.  I don't know

17  how many there are all together.

18          THE COURT:  Okay.  Well, when I say in a group, I

19  mean is there some reason why that's going to take any time

20  other than each attorney handing up stipulations --

21          MR. BROWN:  I don't --

22          THE COURT:  -- and everybody saying that?

23          MR. BROWN:  -- think so, Your Honor.

24          THE COURT:  Okay.  Then I think we can start with

25  that tomorrow morning --

**J&J COURT TRANSCRIBERS, INC.**

1              MR. BROWN:  Okay.

2              THE COURT:  -- so that we can go through anything

3  that's agreed upon in the morning.  Have your stipulation and

4  your documents pre-marked for identification so that you can

5  hand them up in a group and put on the record an identification

6  of what they are.  I understand that there will be a relevance

7  objection and after I get all of them in, I'll hear the

8  relevance objection.  I will accept them subject to a relevance

9  objection because I think it'll expedite the process if I do it

10 that way.

11             MR. DEMMY:  Your Honor, John Demmy for Fireman's

12 Fund.  That's perfectly acceptable.  My issue is a practical

13 one because we just agreed on the universe of the policies

14 relating to the Fireman's Fund literally over the weekend and

15 perhaps into the early morning hours last night.  I'll get the

16 set that I will tender to the Court depending on when FedEx

17 delivers it.  So, subject to that caveat, I'll be prepared to

18 do what Your Honor suggests.

19             THE COURT:  Okay.  That's fine.  If they have to come

20 in at a later time, then I guess you can submit it after the

21 fact.  Apparently, I'm not going to get all this closed

22 tomorrow anyway.

23             MR. DEMMY:  Thank you, Your Honor.

24             THE COURT:  Mr. Shiner?

25             MR. SHINER:  Your Honor, Michael Shiner for AXA

1  Belgium.  My clients are similarly situated with Mr. Brown's --

2              UNIDENTIFIED ATTORNEY:  I'm sorry.  I can't -- I just

3  can't hear.  Could you --

4              MR. SHINER:  Michael Shiner for AXA Belgium.  Excuse

5  me.  My clients are similarly situated with Mr. Brown's clients

6  in so far as that we are solely unsettled excess insurers.

7  We're willing to proceed under the same procedures.  We get the

8  evidence in subject to whatever objections the debtor wants to

9  make and we can argue as if we have a record to argue from

10 tomorrow.

11             THE COURT:  All right.

12             MR. LOCKWOOD:  Your Honor, just as a process

13 question, the insurers are not planning to read to the Court

14 and the rest of us all their policy provisions and all their

15 deposition designations and all their discovery responses and,

16 therefore, how do they expect the Court to know what's in this

17 evidence that they're going to be presenting?  I mean, you

18 could spend --

19             THE COURT:  I'm going to get post-trial briefs, Mr.

20 Lockwood.  That's how it's going to happen with proposed

21 findings because at this point, I don't have another structure

22 in place to do it.

23             MR. LOCKWOOD:  Okay.  That makes some sense for once.

24             THE COURT:  I beg your pardon?

25             MR. LOCKWOOD:  I meant as a proposal from the

1  insurers as to how you were going to be able to deal with all

2  this evidence --

3            MR. BERNICK:  If we can get --

4            MR. LOCKWOOD:  -- they're going dump on you in the

5  morning.

6            THE COURT:  Is somebody going to call him as a

7  witness in Phase I after all?

8            MR. BERNICK:  If we can --

9            MR. LOCKWOOD:  I deny any other implication.

10           MR. BERNICK:  If we can get -- if we can -- the

11 policies are one thing that's pretty easily handled.  There are

12 on the exhibit list, you know, kind of a collection of

13 additional documents.  They're not -- it's not a huge

14 collection.  They're not policies.  And so Your Honor has said

15 let's do the policies first thing, fine.  Do we then have the

16 argument?

17           THE COURT:  No, I think we need the whole evidentiary

18 submission so that everybody can make whatever argument it is

19 and then it'll have to be subject to the debtor's

20 counter-designations, counter -- rebuttal case.  I'll just say

21 rebuttal case.  And I think I'm going to have to continue this

22 for that purpose to a date certain so that if the debtor --

23 because you've got the right to put in rebuttal.  If you -- the

24 plan proponents.  If you tell me you're not going to, fine, but

25 until you see what they have, I don't know how you're going to

1  make that determination.  So, I think --

2              MR. BERNICK:  Well, it's not --

3              THE COURT:  -- we need a schedule.

4              MR. BERNICK:  -- yeah, I'm sorry, Your Honor.  The

5  post-trial submission, I think, obviously, would be fine, but I

6  want to just, you know, urge the Court to the proposition that

7  the real action here is not counter-designations or further

8  exhibits.  It's not.  There will be some things.  It really

9  is --

10             THE COURT:  If I can urge you, the real action ought

11 to be that you folks use my conference room or do what I urged

12 in <u>Federal Mogul</u>, go buy each other some drinks tonight and get

13 this insurance neutrality issue resolved.  If the debtors

14 really want to have -- if the plan proponents really want to

15 have insurance neutrality without these objections from the

16 insurers, so far what I've heard doesn't have you very far away

17 from each other.  It does not -- and nothing that the insurers

18 have asked for that I can recall off-hand hasn't been done in

19 some other case.  That's not to say it has to be done, but it

20 doesn't -- I'm not making findings that it has to be done.  But

21 it has been done in some other case.  So clearly to the extent

22 that those other cases have been confirmed with a finding that

23 there's insurance neutrality, what they're asking for isn't

24 going to violate that proposition.

25             MR. BERNICK:  Yeah, I --

1          THE COURT:  So if you folks can talk, you'll

2   eliminate the need for all of this.

3          MR. BERNICK:  I'm sure that that's --

4          MR. LOCKWOOD:  Your Honor, we haven't gotten from the

5   insurers as a group a single proposal.  What we've gotten is

6   different people proposing different things and some people

7   proposing nothing.  And if we --

8          THE COURT:  Well, Mr. Lockwood, you had two different

9   insurance neutrality provisions in <u>Federal Mogul</u> and that was

10  okay with everybody.  They agreed that one form of neutrality

11  would bind London Market Insurers and the rest would go get --

12  would bind everyone else and there were slightly different

13  versions.

14         MR. LOCKWOOD:  The joke about they know my phone

15  number had to do with the notion that if we could get all of

16  the insurers, it would be worth talking about because then we

17  could save the Court's and everybody else's time.

18         THE COURT:  It would be.

19         MR. LOCKWOOD:  If there's one insurer who takes the

20  position that insurance neutrality isn't good enough to take

21  care of their standing, if you will, to raise issues that don't

22  concern them, I mean, what I'm concerned about, let me make

23  this clear.

24         THE COURT:  But we've heard today that they're not

25  making that argument.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. LOCKWOOD:  I'm concerned about somebody telling

2    me here's a great insurance neutrality provision.  Now, you

3    agree to it, we'll put it in the plan, but, oh, by the way, I'm

4    going to make all the same substantive objections to the plan

5    that the insurance neutrality provision was intended to get rid

6    of.

7          THE COURT:  But --

8          MR. LOCKWOOD:  Then I haven't gotten anything and

9    neither have you, Your Honor.

10          THE COURT:  All right.  Then here's the issue.  I

11    want to -- somebody at the podium if, in fact, you disagree

12    with this statement.  Okay.  That's what I want to hear from.

13    Is there an insurer here who if there is acceptable insurance

14    neutrality language put into this plan still intends to raise

15    substantive plan objections in your capacity as an insurer?

16          MR. BROWN:  Your Honor, I'm not one of those.  We

17    are --

18          THE COURT:  Well, let me hear from the people who

19    may.

20          MR. BROWN:  But I just wanted to clarify your

21    question --

22          THE COURT:  All right.

23          MR. BROWN:  -- because it relates to something that

24    Mr. Bernick and Mr. Lockwood were talking about earlier and

25    that is a Phase II issue which is the chart that talks about

1  injunctions.

2          THE COURT:  No, the -- I'm only talking about the

3  insurance neutrality Phase I issue.  I apologize --

4          MR. BROWN:  With respect to coverage defenses.

5          THE COURT:  As to coverage defenses.

6          MR. BROWN:  I'll step away from the podium.

7          THE COURT:  We're not to Phase II yet.  Your Phase II

8  objections are preserved.  I'm talking about the Phase I issues

9  regarding coverage defenses.  Is there anybody, any insurer who

10 would continue to prosecute an insurance coverage type --

11 that's not what I mean to say -- objections to the plan in the

12 event that there is acceptable insurance neutrality language

13 that covers the Phase I issues?  Okay.  This is a speak now or

14 forever hold you peace, folks.

15         MR. BROWN:  Your Honor, the bottom line is I think

16 what you're hearing is that the insurers are receptive to

17 trying work out some acceptable insurance neutrality language

18 which is in the eye of the beholder and that the only exception

19 to that is you can have unsettled insurers that have these

20 other issues which concern the scope of the injunctions and

21 cutting off contribution rights and so forth.  My understanding

22 that any insurance neutrality language would not relate to that

23 type of claim and that's a Phase II issue.

24         THE COURT:  Well, yes, if you can negotiate that

25 acceptable language, that would be wonderful, too, but that's a

1  Phase II issue.  That's not what I'm asking about right now.

2          MR. LOCKWOOD:  Your Honor, one thing is the one form

3  of insurance neutrality language that we've been proposed that

4  Mr. Giannotto was talking about earlier is 11 pages long.

5  Federal Mogul, which is the most complicated one that we had

6  ever done, it was longer than Kaiser, et cetera, it has two

7  different things.  It was about two or three pages long.  This

8  is taken from some case called T-H-A-N or Quigley (phonetic) or

9  some combination of the two and it goes way beyond anything

10  we've ever done.

11          My concern isn't the substance of it, although I'm

12  not wildly enthusiastic about it, but the time table.  We're in

13  the middle of a hearing as to whether or not our insurance

14  neutrality is good enough.  You made the comment about how long

15  it took us to get an agreement in Federal Mogul.  We can't

16  postpone the resolution of Phase I for six months while we

17  negotiate an 11-page insurance neutrality provision down to

18  three pages or whatever we ultimately would come up with.

19  That's my problem.

20          THE COURT:  Well, I haven't heard that many, at least

21  today, comments that need to be incorporated.  Now, I haven't

22  heard anybody arguing that all 11 pages of that stipulation

23  need to go in.  I've heard some pretty basic and some pretty

24  uniform arguments from the insurers.  They have several things,

25  probably three that they're adamant about that if the plan

1  proponents can get in, the rest of it probably isn't going to

2  be so problematic.

3         MR. LOCKWOOD:  Well, if we're working off of our

4  language and we're tinkering or tweaking or whatever the words

5  that were used earlier about some of this very specific

6  provisions that have been identified as problematic, then I

7  would tend to agree with you.  I am not at all sure that that's

8  what -- that there's some uniformity among the insurers is that

9  that's all that would be necessary to resolve their objections.

10  And I'm just --

11         THE COURT:  Well, why don't we do it the way we've

12  done it in other cases and tell the insurers.  And since Mr.

13  Shiner started the process several times and he's here and he's

14  in Pittsburgh, so I can -- I know where I can find him, I can

15  ask whether he can't at least get the group together to see

16  whether or not the insurers can't come up with a uniform

17  proposal that they present to the plan proponents.  And if they

18  can, fine.  If they can't, then you'll know that it's not going

19  to be a uniform proposal and tomorrow we will be off to the

20  races.

21         MR. BERNICK:  If I -- and I don't want to interrupt

22  what obviously would be a terrific process were it to work out.

23  My only concern is not -- is I'm assuming that Mr. Lockwood and

24  those people who have -- will do a great job and if we get a

25  group that's terrific.  But my only concern is that we have a

**J&J COURT TRANSCRIBERS, INC.**

1 parallel track such that if there's not an agreement we know

2 with some degree of certainty when this matter is going to be

3 submitted and how it's going to be submitted.

4       So if Your Honor has a plan for that, that's what I

5 was trying to get to was, okay, tomorrow we'll do policies,

6 then we'll do what, then we'll have argument, then we'll have a

7 final brief which, as I was going to suggest, I don't think we

8 need a new hearing.  We'll just have a final brief and the

9 matter will be submitted.  If this whole thing can be obviated

10 by an agreement, that's great.  But I would like to get a

11 timetable such that it's not obviated by agreement, we have a

12 matter that's finally submitted to Your Honor for a decision.

13 And all that I was saying is that we can incorporate into that

14 timetable submitting any further designations or objections --

15       THE COURT:  That's fine.

16       MR. BERNICK:  -- so that if you give us a date for

17 the final submission, we'll have all the argument tomorrow,

18 final submission, da, da, da, da, and in between we'll get --

19 we'll figure out how to get the other material to Your Honor --

20       THE COURT:  All right.

21       MR. BERNICK:  -- if there is much.

22       THE COURT:  My view is this.  You've got July 20 and

23 21 set aside and you've got July 27th.  Pick one of those dates

24 and tell me when you want this issue continued to because I

25 want all of the documents submitted and all of the final

1 briefing that I think can be done consecutively by the parties,

2 at this point, I think.  If you disagree, you can let me know

3 that in the morning.

4          But my view at the moment is I want all of that

5 briefing done at least a week plus a day so that I have it for

6 a weekend, you know, Friday before whenever this argument's

7 going to start, so I have two weekends is what I'm trying to

8 get to, to be able to review what everybody's done.  So that

9 would be -- if it's July 20, the documents would be due on the

10 10th.  And if it's July 27, they'd be due on the 17th.

11          MR. BERNICK:  I think that the two dates were the

12 21st and 20 --

13          THE COURT:  Second.  I'm sorry.

14          MR. BERNICK:  21st and --

15          THE COURT:  I think it's the 20th and 21st.

16          MR. BERNICK:  20th and 21st.

17          THE COURT:  I believe.

18          MR. BERNICK:  I don't think I'm going to be necessary

19 for that anyhow, so we would pick either one of those dates.

20 Take the 21st because it's a little -- it's a day later.  And

21 then we would ask, I think, that we're in agreement with

22 respect to the lender issue being -- if there's any remaining

23 issues on solvency, discovery for purposes of the lenders, that

24 that would be something that we would take up on the 27th.

25 That was the -- is that the tag along issue on the lenders?

1            THE COURT:  Okay.  So --

2            MR. BERNICK:  And I have to arrange that with Mr.

3   Rosenberg, but he assured me that the scheduling is not a

4   problem that way.  So we would keep the 21st and we would make

5   the 21st final Phase I day, whatever it is.

6            THE COURT:  That's Tuesday.

7            MR. BERNICK:  Yeah.  That okay with you folks?

8                 (Attorney/attorney conversation)

9            UNIDENTIFIED ATTORNEY:  I just want to make sure that

10  I understand this.

11           MR. BERNICK:  So that what we would do is that

12  tomorrow you make your tender of evidence, make your argument.

13  We have a final brief, we have a supplemental brief that covers

14  all of these matters if they're not resolved.  And the

15  supplemental brief would then be due a week and a day --

16           THE COURT:  It would be due on the 10th.

17           MR. BERNICK:  It would be due on the 10th of July.

18  And prior to the 10th of July, obviously, we would have to give

19  you the counters and the Court the counters and the objections,

20  although -- yeah, we'd have to give you the counters and the

21  objections.

22           MR. GIANNOTTO:  And then the 21st would be --

23           THE CLERK:  Speak into a mic.

24           MR. GIANNOTTO:  I'm sorry.  This is Michael Giannotto

25  for Continental.  And so the 21st would then be the equivalent

1 of closing arguments or arguments on the brief --

2          UNIDENTIFIED ATTORNEY:  If it's --

3          MR. GIANNOTTO:  -- if it's necessary?

4          THE COURT:  If it's necessary or if you folks have

5 been able to come up -- that gives you until the 21st,

6 essentially, to determine that you can come up with acceptable

7 neutrality language.

8          MR. GIANNOTTO:  Right, what I don't want to --

9          THE COURT:  But you're working on a parallel track.

10          MR. GIANNOTTO:  No, I understand that.  What I don't

11 want to -- Mr. Brown will put in his evidence tomorrow and make

12 a statement and we'll all put in our evidence.  And what I just

13 want to obviate is all of us coming up and saying the same

14 thing all over again.  If we're going to be doing that on the

15 21st after the evidence comes in, we can save the time tomorrow

16 doing that.

17          MR. BERNICK:  What I was going to suggest is that we

18 not -- we make all the -- I mean, the only thing that's not

19 going to be in the record tomorrow is basically anything that's

20 supplemental that we would submit.  So I don't think it's going

21 to be necessary to reargue the whole thing on the 21st.

22          THE COURT:  All right.  So I need a date.  Actually,

23 you're correct.  I need a date when the debtor will submit the

24 supplemental evidence because everyone else needs it in order

25 to make their post-trial submissions.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. BERNICK:  Okay.  So, when do you think we could

2     do that, ten days?

3          THE COURT:  Well, I don't know if you have that much

4     time.

5          MR. BERNICK:  Well --

6          THE COURT:  Today's the 22nd.

7          MR. BERNICK:  It's the 22nd.

8          THE COURT:  Well, the 31st.  You could do it by the

9     31st -- I'm sorry, I'm looking at July.  I apologize.  Let me

10    look at June.

11         UNIDENTIFIED ATTORNEY:  Look at the 2nd, July 2nd.

12         THE COURT:  That helps.

13         MR. BERNICK:  July 2nd?  That way they have a week

14    before the briefs are due.

15         THE COURT:  Is that enough time?

16         MS. BAER:  Your Honor --

17         THE COURT:  You need a microphone, Ms. Baer, I can't

18    hear you.

19         MS. BAER:  Your Honor, actually a week and a day

20    would take us to July 13th because we were having --

21         THE COURT:  No, I want the two weekends.

22         MS. BAER:  You want it -- okay.

23         THE COURT:  I specifically said July 10.

24         MS. BAER:  Okay.

25         THE COURT:  That's fixed.  That's when I need the

1  information so that I have time to go through this.

2          MR. BERNICK:  We would ask to have until the 2nd of

3  July for the counters and anything else.  I think we're talking

4  about -- for the depositions and counters, we're not talking

5  about an awful lot anyhow.  And I don't know that there's going

6  to be -- what there's going to be by way of exhibits.

7          THE COURT:  Is that sufficient time for the insurers

8  to see what the plan proponent's counter-designations and

9  objections and anything else will be to get everybody's briefs

10 due by July 10?

11         UNIDENTIFIED ATTORNEY:  What's the 4th, it's a

12 Saturday or Friday?

13         THE COURT:  The 4th -- yes.  The 4th is Saturday.

14 The 3rd is a holiday if anybody's taking it off.  So the 2nd is

15 Thursday.

16         MR. DEMMY:  Your Honor, one thing that occurs to me

17 is this is something I think Mr. Bernick suggested, I'm not

18 sure if anybody disagrees, if there's not to be another

19 argument because we'll, in effect, have already argued it today

20 and tomorrow.  So the July 20, 21 date is kind of irrelevant

21 and you could back up our submission just a couple of days

22 because there is a 4th of July holiday and, therefore, it

23 really doesn't hamstring you because you don't have to prepare

24 for a July 21 -- 20, 21 hearing.  There isn't really going to

25 be one.  That's my suggestion.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Well, there isn't going to be one if

2    everybody has articulated where in the record your evidence is

3    and given it to me in a fashion that's not going to take me

4    months and months to go through.  If, in fact, I get it the way

5    it's sitting, you know, here like this, there is going to be a

6    supplemental argument, I can assure you.  So --

7          MR. DEMMY:  I would assume that we'd present it in a

8    proper way.

9          MR. BERNICK:  Yeah, I don't think that we're

10   really -- again, it's very abstract to think about, but

11   overwhelmingly the exhibits are insurance policies.  There's

12   then a relatively small collection of documents that are not

13   insurance policies.  I think it's kind of yay high.  And then

14   the deposition designations are not -- they're not massive

15   designations, I don't think.

16         MS. HARDING:  I think a small notebook --

17         MR. BERNICK:  A small notebook total of all the

18   deposition testimony.  And our counters will be, of course,

19   shorter than that.  So the answer to your question is yes.  The

20   briefs certainly should do that.  But Your Honor shouldn't

21   think that this a complex mass of materials because really the

22   bulk of it are policies and then basically snippets of

23   testimony from mostly Grace witnesses about how things were

24   done in the litigation --

25         THE COURT:  All right.

1          MR. BERNICK:  -- pre-Grace.

2          THE COURT:  Then I'll do this.  I'll make the briefs

3  due on, well, July the 16th instead of the 10th, but I'm

4  limiting the number of pages.  No one -- and don't ask me for

5  any exceptions, they're denied right now.  No brief can exceed

6  20 pages.  No one's.

7          UNIDENTIFIED ATTORNEY:  Well --

8          THE COURT:  And I'm expecting that the insurers are

9  not going to duplicate arguments.  So you collectively, to the

10 extent that you have duplicate exhibits, you figure out who's

11 going -- or duplicate arguments, you figure out who's raising

12 it because collectively I'm expecting 20 pages.

13         MR. BERNICK:  Okay.  Your Honor --

14         THE COURT:  One from the plan proponent, one from the

15 insurer, 20 pages.  Otherwise, I can't make this work.

16         MR. BERNICK:  Right.  On the --

17         THE COURT:  If you think 20 pages is unreasonable,

18 you can convince me up to 30.  That's it.  I need an

19 opportunity to be able to read this.

20         MR. BERNICK:  Okay.  So those would be on the 16th of

21 July?

22         THE COURT:  The 16th.

23         MR. BERNICK:  Okay.  And on the deposition

24 designations, we will give Your Honor, and I think this would

25 be most convenient, we'll give Your Honor a marked up

1 transcript of each deposition with color for their

2 designations, color for our designations and one transcript and

3 then we will handwrite objections other than relevance to --

4 we'll --

5        THE COURT:  All right.

6        MR. BERNICK:  -- handwrite objections to their

7 designations.  We'll provide you all with a copy of the same

8 thing so that you can see it.  You don't have to sit there and

9 go matching and stuff like that with spreadsheets.

10        THE COURT:  And then the insurers could do the same

11 thing in conjunction with your brief submission.  If you have

12 objections to any portion of the debtor's counter-designations,

13 you could identify what they are at the time you submit your

14 briefs.

15        MR. BERNICK:  And, in fact, if you let us know, we

16 can give the Court one transcript, both designations --

17        THE COURT:  Okay.

18        MR. BERNICK:  -- both sets of objections written in.

19        THE COURT:  Well, if there are anymore issues, you

20 folks are going to have to resolve them tonight.  I really -- I

21 have an appointment at 6:30 and I've got to leave because I'm

22 simply not going to make it if I don't leave.  So I'm happy to

23 stay as long as you like tomorrow night, but tonight I have

24 to -- I must leave.

25        UNIDENTIFIED ATTORNEY:  Your Honor, then just let us

1 talk about this and we'll finalize the scheduling issues

2 tomorrow.

3        THE COURT:  Yes, sir.

4        MR. BROWN:  Yeah, we're a little confused, but I

5 think we can take it up tomorrow morning.

6        THE COURT:  Well, this is what I have so far, if this

7 will help, but, you know, if you want to modify it, you can let

8 me know in the morning.  The debtor is to submit all of their

9 evidence to the insurers by July 2nd.  Well, let's start with

10 tomorrow.  We'll put all of the insurer evidence in tomorrow.

11 Then the debtors will do their counter-designations by July

12 2nd.  By July 16, everybody's briefs are due, limited to 30

13 pages.  So I expect one collective insurance brief and one

14 collective plan proponent brief.  If you can't do it

15 collectively, you can divide up the number of pages among you,

16 but 30 pages.  That's what I'm aiming for because I already

17 have massive briefs.

18        I don't want you to restate a single thing.  What I'm

19 looking for is a post-trial submission, not a pretrial

20 submission.  Don't redo it.  I don't want to read it again.

21 I've been through it already.  It took me a long time.  I don't

22 want -- and I don't want it repeated.  Okay.  Argument, if I

23 need it, would be on July 22nd which is Tuesday at 9:00.

24        UNIDENTIFIED ATTORNEY:  21st, Your Honor.

25        UNIDENTIFIED ATTORNEY:  21st.

1          THE COURT:  I'm sorry.  I apologize.  July 21st at

2    9:00.  Whether I need it, I won't know until I see the briefs

3    on July 16.  So --

4          MR. SHINER:  Do you know if that's Pittsburgh or

5    Wilmington at this point?

6          THE COURT:  Pittsburgh.  That's what I have so far.

7    The debtor indicates that it will mark up the designations,

8    submit the objections in -- along with the designations that

9    they're going to submit and the insurers can do the same along

10   with their briefs.  Okay.  So if that schedule -- if you want

11   to vary it, let me know tomorrow.  Okay.  We're in recess until

12   9:00.

13         UNIDENTIFIED ATTORNEYS:  Thank you, Your Honor.

14                           *  *  *  *  *

15

16

17

18

19

20

21

22

23

24

25

**J&J COURT TRANSCRIBERS, INC.**

# C E R T I F I C A T I O N

We, TAMMY DeRISI, PAT REPKO, ELAINE HOWELL, RITA BERGEN, KIM UPSHUR, CEIL ASHBOCK, and KELLI PHILBURN, court approved transcribers, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of our ability.


/s/ Tammy DeRisi
TAMMY DeRISI

/s/ Pat Repko
PAT REPKO

/s/ Elaine Howell
ELAINE HOWELL

/s/ Rita Bergen
RITA BERGEN

/s/ Kim Upshur
KIM UPSHUR

/s/ Ceil Ashbock
CEIL ASHBOCK

/s/ Kelli Philburn
KELLI PHILBURN
J&J COURT TRANSCRIBERS, INC.          DATE:  JUNE 24, 2009




**J&J COURT TRANSCRIBERS, INC.**