# Deposition Designations for:

# RICHARD FINKE
# May 13, 2009

**Deposition Designation Key**

**CI = Certain insurers (green)**

**CNA = Continental Cas. Co & Continental Ins. Co. (red)**

**PP's = Plan Proponents (blue)**

**Obj: = Objection**

**Ctr = Counter Designation**

**R = Relevance**

**BE = Best Evidence**

**F = Foundation**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In Re: | Chapter 11 |
| | Case No. |
| W.R. Grace & Co., et al., | 01-01139 JKF |
| Debtors. | (Jointly Administered) |

* * * CONFIDENTIAL * * *

\- - -

May 13, 2009

\- - -

DEPOSITION of RICHARD FINKE, held at the offices of Kirkland & Ellis, 655 Fifteenth Street, N.W., Washington, DC, commencing at 9:32 A.M., on the above date, before Lisa Lynch, a Registered Merit Reporter, New Jersey Certified Court Reporter, License No. XI00825, and Certified Realtime Reporter

\- - -

MAGNA LEGAL SERVICES, LLP
7 Penn Center, 8th Floor
1635 Market Street
Philadelphia, PA 19103

Key
CI = Certain Insurers (green)
CNA = Continental Casualty Co. & Continental Ins. Co. (red)
PP = Plan Proponents (blue)
Obj: = Objection
Ctr = Counter Designation
R = Relevance
BE = Best Evidence
F = Foundation

CI

DEPOSITION SUPPORT INDEX


Direction to Witness Not To Answer

| Page | Line | Page | Line |
|---|---|---|---|
| 30 | 2 | 37 | 12 |
| 37 | 17 | 39 | 8 |
| 39 | 15 | 369 | 1 |

Request For Production of Documents

Page Line Page Line

(None)

Stipulations

Page Line Page Line

(None)

Questions Marked

Page Line Page Line

(None)


- - -



CI

RICHARD FINKE,
having been sworn by the Notary Public of the States of New York and New Jersey, was examined and testified as follows:

PP's Obj: R

CI

- - -

EXAMINATION BY
MR. BROWN:

**Q. Good morning, Mr. Finke. My name is Michael Brown. I represent One Beacon, Seaton, Geico and Republic for the objecting insurance companies in the Grace bankruptcy. You've been deposed several times before, correct?**

A. Yes, I have.

**Q. Okay. So we can dispense with the formalities of what a deposition's all about?**

A. Yes, we can.

**Q. Okay.**

MS. HARDING: Michael, would you mind if I made a quick statement on the record?

MR. BROWN: Sure.



PP's Obj: R

MS. HARDING: I just wanted to make a statement on the record that the debtors have designated Mr. Finke to answer certain appropriate questions related to certain 30(b)(6) topics.

As we've indicated, Mr. Finke will be available for seven hours today. We've also designated Mr. Hughes and Mr. LaForce to answer other 30(b)(6) topic questions. We are hoping and expecting that the parties seeking to ask questions have coordinated so that we can end in seven hours and we think it's a reasonable expectation.

The debtors have reviewed the deposition of Mr. Lockwood and agree, in essence, with Mr. Lockwood's answers with respect to how the Plan operates and so we think and are very hopeful that there will not be a need to go



PP's Obj: R

further than seven hours to get to the appropriate inquiry as to how the Plan operates. So I just wanted to get that on the record.

MR. BROWN: Okay. Actually, that's helpful. Maybe I could follow up with a question for Mr. Finke.

**Q. Mr. Finke, have you reviewed Mr. Lockwood's Rule 30(b)(6) deposition transcript?**

A. Yes, I have.

**Q. Okay. Is there anything that you read in that transcript that you disagreed with?**

A. No, nothing of substance.

**Q. Okay. How about anything not of substance?**

A. There are a few occasions, I think, where I either would have worded something differently or where I think Mr. Lockwood may have been either in error -- might have been in error depending on whether he was -- depending on the

PP's Obj: R

CI





context. Let me give you one example of that.

Q. **Sure.**

A. He, I think, made a statement at one point where he equated asbestos in place coverage or insurance coverage with the asbestos insurance reimbursement agreements. I believe he said he thought they were the same thing, and perhaps in substance or in concept they are. I'm not an insurance lawyer, but I know that under the Plan definitionally the definition of asbestos (sic) in place insurance coverage specifically excludes asbestos reimbursement agreements from the definition.

**Q. Okay.**

A. Which would suggest they are not the same.

**Q. All right. I'm going to suggest that Miss Alcabes, or one of the people whose issue that is, may want to follow up with you on that point.**



PP's Obj: R

CI

A. Sure.

**Q. But let's pass on that.**

**Other than what you've just described, is there anything else in Mr. Lockwood's deposition transcript that the debtors disagreed with?**

A. Nothing that comes to mind.

MR. BROWN: Okay. Let me have the first exhibit marked, and can we go off the record for a second.

(Off the record.)

(Notice of Deposition of Debtors Pursuant to Rule 30(b)(6) marked for identification as Exhibit Finke-1.)

(Document entitled W.R. Grace/Confirmation Hearing 30(b)(6) Deposition Notice marked for identification as Exhibit Finke-2.)

BY MR. BROWN:

**Q. Mr. Finke, I'm going to put**

CI



PP's Obj: R

**before you two exhibits marked -- we're using the term Finke 30(b)(6) 1 and Finke 30(b)(6) 2. For shorthand during the deposition I'll just refer to them as Finke-1 and Finke-2. Could you identify Finke-1 for me, please?**

A. It is a Notice of Deposition of Debtors Pursuant to Rule 30(b)(6) served by One Beacon, Seaton, Geico and Columbia.

**Q. Going forward, it would be more accurate to refer to Columbia as Republic. I know it says Columbia there. The date on here is April 28th, 2009 and the site is Drinker Biddle & Reath's offices but we obviously changed those by agreement after this was scheduled.**

**Is it your understanding that you're appearing here today in response to this Rule 30(b)(6) notice?**

A. Yes.

**Q. And there were several others served on you as well?**

A. Correct.

CI



PP's Obj: R

**Q. Correct, all right.**

**If you look at what's been marked as Finke-2, can you identify that for me?**

A. It is a chart 18 pages long entitled W.R. Grace/Confirmation Hearing 30(b)(6) Deposition Notice Witness Designations.

**Q. Okay. And is it your understanding that this document was prepared by your counsel?**

A. Yes, that's my understanding.

**Q. And have you seen it before today?**

A. Yes.

**Q. Okay. And am I correct that it basically lists all the various topics from all the 30(b)(6) notices that were served on Grace and then designates one of, I believe, three individuals to testify about the various topics?**

A. I would agree that it includes all 30(b)(6) notices that have

PP's Obj: R



C1

Page 18

been served as of the time that the chart was created.

MS. HARDING: And I just want to just object to the extent that Exhibit 2 does not include the cover letter that accompanied Attachment A which also set out our objections with respect to the 30(b)(6) notices.

I have no objection to him answering questions about it; I just wanted to make clear on the record that there was a cover letter that accompanied that.

MR. COHN: Which I actually have but I didn't --

MR. BROWN: Can we just go off the record a second?

(Off the record.)

BY MR. BROWN:

**Q. Mr. Finke, when we were just off the record, we were discussing another document, a copy of which I do not have and apparently no one else does,**

Page 19

**which was described as being objections to the various 30(b)(6) notices that were served on the debtors. Are you familiar with the document that I'm describing?**

A. No, I don't think I am.

PP's Obj: R

C1

**Q. Okay. In any event, you're appearing here today pursuant to the Rule 30(b)(6) notices for the topics for which you've been designated on Finke-2 and subject to whatever objections were asserted by the debtors, correct?**

A. Correct.

MR. BROWN: Okay. We don't have a document, but my recollection of the objections was that there was an objection to this witness testifying about any Plan negotiations or draft Plan documents. Is that right, Barbara?

MS. HARDING: That's correct.

MR. BROWN: Okay. At Mr. Lockwood's deposition we reached an agreement that we wouldn't go down

C1

Page 20

PP's Obj: R

the road of having all the people in this room ask questions about negotiations and draft documents only to draw objections and instructions not to answer.

Can we have that same arrangement for this deposition with the understanding that if there subsequently is a ruling by a court that entitles us to discovery on those subjects that the witness would be recalled for that purpose?

MS. HARDING: Subject to Judge Fitzgerald ordering the debtors to submit and answer questions to those, then we can have that agreement, yes.

MR. COHN: Just for my clarity, in all of these depositions we're talking about the relevance objection instruction that was asserted at Lockwood's deposition that I clarified on the record?

C1

Page 21

PP's Obj: R

MR. BROWN: That is correct, and I believe the document that we don't have, the objections to the 30(b)(6)'s, if I recall correctly, had a paragraph setting forth that objection and a number of different decisions by Judge Fitzgerald in other cases.

MS. HARDING: That's correct, and it relates -- our objection relates to the -- to the relevance to the extent that the questions seek information relating to settlement negotiations, drafting --

MR. COHN: The clarification that I thought that I made earlier that I'll make clear is still the clarification that this is a relevance objection, or are you asserting a privilege?

MS. HARDING: Well, I disagree with that characterization. The objection is

set out in our official objection to the 30(b)(6) notices which is filed on record. It includes attorney-client privilege, it includes work product, it includes joint interest privilege. I don't have it in front of me so I can't recite them, but it includes much more than relevance so --

MR. COHN: Just to be clear, because --

MS. HARDING: With respect to negotiations, you can -- there will be other objections other than just relevance, so --

MR. COHN: Well, but my understanding was there was a blanket instruction not to answer without any attempt to parse through potential privilege objections on the basis of a blanket relevance objection. Am I missing something?

MS. HARDING: I don't



disagree with that, but I think that in light of the blanket relevance objection with respect to negotiations that there was that agreement reached. That doesn't mean that with respect to everything that might fall under negotiations that there wouldn't be other objections as well.

MR. COHN: I'm not suggesting that --

MS. HARDING: Okay.

MR. COHN: -- if there's a valid privilege objection here that you've somehow waived your right to assert that by asserting a blanket objection, but my understanding is we didn't start down that path because there was a relevance objection.

I'm sorry, Michael.

MR. BROWN: That's all right. Suffice it to say that if we ask questions concerning the



negotiations of the Plan or the draft Plan documents that that will draw an instruction not to answer.

MS. HARDING: That's correct.

MR. BROWN: Okay, thank you.

(SEC Form 8-K marked for identification as Exhibit Finke-3.)

BY MR. BROWN:

**Q. Mr. Finke, you have before you now another document that has been marked for this deposition as Finke-3. You'll note that there is a prior deposition exhibit number on there, Number 12, and that was from your deposition as a fact witness. Do you see that?**

A. Yes, I do.

**Q. We obviously had some questioning about this at your prior deposition but that was not in your capacity as a designee for Grace and I**



**have some additional questions. So the first one is: Can you identify the document?**

A. Yes. This is a Form 8-K report that was filed by W.R. Grace with the Securities and Exchange Commission on April 6, 2008.

**Q. And the document has a couple of attachments, correct?**

A. Yes.

**Q. What are they?**

A. Let's see. The first attachment is, in essence, a press release in which Grace announced the -- its settlement of asbestos personal injury claims in the context of the Chapter 11 cases and the second attachment is a term sheet for resolution of asbestos personal injury claims.

**Q. And was the press release actually issued?**

A. I do not know.

**Q. Okay. If it was issued, was it issued on or about the time that**

CI PP's Obj: R; BE; F

PP's Obj: R; BE; F

CI



**this document was filed, to your knowledge?**

A. Yes.

**Q. Let's focus on the term sheet. Who are the parties to the term sheet?**

A. The debtors, the Official Equity Security Committee, the Official Committee of Personal Injury Claimants and the Future Claimants' Representative.

**Q. And what is the date of the term sheet?**

A. April 6, 2008.

**Q. I want you to focus now on the period -- for purposes of my next series of questions -- the period prior to April 6, 2008. And am I correct that prior to April 6, 2008 that Grace did not consult with any of its insurers concerning the terms that appear in this term sheet?**

MS. HARDING: I'm going to object to the extent that it seems to me that this is going right into

CI

PP's Obj: R; BE; F



the issue of negotiations and settlement negotiations with respect to the Plan. I thought we weren't going to go there.

MR. COHN: I think there was no -- if there was no contact, how are we going into that?

MR. BROWN: Yeah, we ought to see what his answer is. I'm not asking him about negotiations with the parties that signed the term sheet. I'm asking about whether Grace consulted with any of its insurers concerning the terms of the term sheet prior to executing it.

MS. HARDING: First of all, I'm going to object. I think that the -- this is not a topic of the 30(b)(6) notice and we're prepared to answer questions about how the Plan operates. I think that that's what Judge Fitzgerald would instruct the debtors to do and

CI

PP's Obj: R; BE; F



we're here to do that.

We're not here to talk about and have the witness testify about how it was negotiated, how it came about, the prior drafts, who was consulted, who wasn't consulted, and all that. I don't think that's the proper scope of this deposition.

MR. BROWN: I'm not asking who was consulted. I'm asking him whether the insurers -- I'm asking him to affirm that the insurers were not consulted.

MS. HARDING: Right. But the problem with that is if we answer that question, then we have opened the door to answering that question with respect to any party and I think that that's not the proper subject of this deposition.

MR. BROWN: I can assure you the only one I'm going to ask



about is the insurers.

MS. HARDING: Well, I understand that you are, but I don't want to spend any of the time of the seven hours talking about any of the negotiations or what led up to the drafting of the document. We didn't agree to that. It wasn't asked for in the 30(b)(6) topics with respect to how the term sheet came about and so I think that we've got an agreement.

If you all want to seek an order compelling us to answer those kinds of questions, then I think you should do that. Otherwise, we're here to talk about how the Plan operates. So --

MR. BROWN: I thought you just --

MS. HARDING: That's what he's here to answer questions about.

MR. BROWN: Are you

instructing him not to answer?

MS. HARDING: I'm instructing him not to answer because I think it leads into a series of questions that we all have already agreed is not proper under the current law.

MR. COHN: Oh, wait, wait, wait, wait, wait.

MR. BROWN: I'm not sure --

MS. HARDING: Actually, I understand that you don't agree with the law, but we've agreed for purposes of this deposition that we weren't going to do that.

MR. BROWN: I don't know that we agreed to any such thing. I asked the same series of questions of Mr. Lockwood. I don't know if you were at his deposition or not --

MS. HARDING: I was.

MR. BROWN: -- but he



answered those questions and he left open in his answers about whether Grace had discussed with its insurers these topics and that's why I'm asking these questions. It was perfectly fine when I asked them of Mr. Lockwood; he answered them and so should this witness.

MS. HARDING: Well, I believe that I objected and I wasn't the person defending Mr. Lockwood. And Mr. Lockwood -- that's between him and his counsel. I'm Mr. Finke's counsel. I'm instructing Mr. Finke not to answer questions relating to how the settlement -- how the term sheet, the Plan or any of the documents related to it were drafted or put together and who was consulted and who wasn't consulted and how that came about.

PP's Ctr

MR. COHN: On the basis of



PP's Ctr

relevance?

MS. HARDING: I think that's an appropriate scope of the objection.

MR. COHN: On the basis of relevance?

MS. HARDING: On the basis of all of the objections that were stated in our objection to the 30(b)(6) notice --

MR. COHN: No, I want you to state on the record --

MS. HARDING: Let me finish.

MR. COHN: -- here and now what the basis for a yes or no question of whether or not people were consulted. If there was no communication, there's no arguable privilege and I want the basis now because I think we are going to litigate this.

MS. HARDING: Well, I think --



MR. BROWN: I think I have the floor on this, but thank you, Jack.

I think we have a disconnect between what constitutes negotiations. I'm not asking him about how this was negotiated between these parties. I understand your position on that. I'm simply asking whether Grace consulted with its insurers with regard to any term that appears in the term sheet prior to executing it on April 6, 2008. I don't think that gets into negotiations at all. In point of fact, I suspect he's going to say no, in which case it doesn't involve negotiations at all.

MS. HARDING: Well, I suggest this: I think that the question "did you negotiate with anyone" gets into that question.

MR. BROWN: That wasn't the

question.

MS. HARDING: Well, by asking him -- I think it does. I think we disagree about that. I think why don't we move forward. At a break I'm happy to talk about it further but right now I'm instructing him not to answer the questions.

MR. BROWN: Well, I'll ask a series --

MR. LEWIS: Hold on just a second. My name is Tom Lewis. I represent the Libby claimants, and I've never seen a deposition like this. I'm in practice 30 some years.

I thought the examiner makes a question and if there's an objection, the objection is stated clearly as to that particular question and we don't sit here and debate for 15 or 20 minutes whether the question should be answered.



I think we should proceed in a proper question and answer proceeding here or we're never going to get done and we're going to have an impossible record.

So I object to the form of the examination and the failure of counsel for this witness to make a proper objection on the record of this deposition and I join in the objection that this gentleman to my right --

MR. COHN: Mr. Cohn.

MR. LEWIS: Thank you.

MS. HARDING: I think I've stated the objection very clearly and I instruct the witness not to answer.

MR. LEWIS: I disagree with that. I have not heard an objection on the record of this deposition.

MS. HARDING: The objection is relevance. It's not relevant



under 408. The objection relates -- the rules of the bankruptcy law do not require the debtors to answer questions relating to Plan negotiations and settlement with respect to their Plan and attorney-client privilege, work product and joint interest privilege.

MR. BROWN: Okay.

MR. COHN: Wait, I'm sorry. I don't mean to -- I would like to know with whom you assert a common interest exists.

MS. HARDING: You know what? My objection's on the record and I'm not stating any more. I've instructed the witness not to answer and I think we should move forward.

MR. BROWN: I think we should, too, and I'm going to say for purposes of stating your objections to this series of



questions let's just use the shorthand, you know, same as before so that we don't have to repeat it.

BY MR. BROWN:

**Q. Mr. Finke, I'm correct, am I not, that prior to signing this term sheet that we've been discussing that Grace did not obtain the consent of any of its insurers with respect to any of the terms in the term sheet?**

MS. HARDING: Same objection. Instruct the witness not to answer.

**Q. Why did Grace exclude its insurers?**

MS. HARDING: Same objection. Instruct the witness not to answer.

**Q. The initial Joint Plan, Mr. Finke, was filed on September 19th, 2008, correct?**

A. I believe that's correct.

**Q. Okay. And it included, did**

PP's ctr

C1

PPi ctr

**it not, the initial version of the Asbestos PI Trust agreement and the Asbestos PI TDP?**

MS. HARDING: I'm sorry, Mike, can you repeat the question? I'm sorry.

(The reporter reads the pending question.)

MS. HARDING: And "it" was the --

MR. BROWN: The Plan.

MS. HARDING: Thank you, okay.

A. I don't recall which documents were -- or exhibits were filed with the Plan.

**Q. Okay. Do you know whether a press release was issued by Grace in conjunction with the filing of the initial Plan in September of 2008?**

A. I don't recall.

**Q. Am I correct that in the period between April 6, 2008 and September 19th, 2008 that the Plan proponents were**



**engaged in negotiating the terms of the plan and drafting Plan documents?**

A. Yes.

**Q. Okay. In that time frame, did Grace consult with any of its insurers concerning the terms of the Joint Plan or any of the Plan documents?**

MS. HARDING: Same objection. Instruct the witness not to answer.

**Q. In that time frame, did Grace obtain the consent of any of its insurers with respect to any of the terms in the Plan or the Plan documents?**

MS. HARDING: Same objection. Instruct the witness not to answer.

MR. BROWN: Okay. Let's mark another exhibit. The next document we're going to mark is Exhibit 6 to the Exhibit Book which is the asbestos insurance transfer agreement, and by convention I brought one copy to be marked and



one for counsel.

MS. HARDING: Thank you.

(Exhibit 6 to Exhibit Book, Asbestos Insurance Transfer Agreement, marked for identification as Exhibit Finke-4.)

BY MR. BROWN:

**Q. Mr. Finke, you have before you the document marked as Finke-4. Can you identify the document for me, please?**

A. This is the proposed asbestos transfer agreement also referred to as Exhibit 6 to the Exhibit Book.

**Q. And what is your understanding as to what this document accomplishes?**

A. It is --

MS. HARDING: Object to form but --

A. It is intended once it is signed to transfer the asbestos insurance rights to the Asbestos PI Trust.



**Q. Okay. It has a -- it has a few schedules. Look at Schedule 1, if you will, and can you just identify what Schedule 1 is?**

A. Schedule 1 is a, I think, 20-page list of primary and excess insurance policies that were or are applicable to asbestos-related claims.

**Q. And who is the insured under those policies?**

A. My understanding is that the insured under the policies would be one or more of the debtors in these Chapter 11 cases. I don't recall if a non-debtor affiliate would have been an insured under any of these. I'd have to check on that.

**Q. By non-debtor affiliate, who were you -- what entities or individual are you thinking of?**

A. Any Grace-affiliated entity that is not a debtor.

**Q. Okay. Who owns the policies at this point?**





A. The debtors, or the -- I should say the insurance contributors.

**Q. And that includes the debtors?**

A. Debtors, and I believe the non- -- I believe that the non-debtor affiliates as well.

**Q. And I think they are described somewhere. I think Mr. Lockwood told us they were.**

A. Who are you referring to when you say "they"?

**Q. The non-debtor affiliates.**

A. They are listed on an exhibit.

**Q. You're right, there was another exhibit that had that.**

A. The number of which I don't recall offhand.

MS. ALCABES: Exhibit 16.

MR. BROWN: Oh, yes, Exhibit 16.

**Q. Exhibit 16 to the Exhibit Book?**



A. Correct.

MR. BROWN: Okay. I'm not going to bother marking that.

**Q. If the Joint Plan is confirmed and if the asbestos insurance transfer agreement is executed as contemplated by the Joint Plan, who are or will be the insureds under the policies on Schedule 1?**

MS. HARDING: Object to form.

MR. LIESEMER: Join.

MS. HARDING: And also object to the extent it calls for speculation and a legal conclusion as well.

A. My understanding is that the named insureds would remain the same as they currently are but that the rights and interests in the policies themselves are transferred to the PI Trust.

**Q. Who will be the owner of the policies?**

MS. HARDING: Same



objections.

MR. LIESEMER: Object to the form.

A. Again, I'm not an insurance attorney but I believe -- since the policies themselves are not being assigned, I believe the ownership of the policies does not change.

**Q. Are you familiar with the basic responsibilities of an insured under a general liability insurance policy?**

MR. LIESEMER: Object to the form.

MS. HARDING: Object to the form in terms of basic.

MR. BROWN: Well, let me rephrase it.

**Q. Are you familiar with any of the responsibilities of an insured under a standard general liability policy?**

MS. HARDING: Object to form as to foundation but...

A. Yes.



**Q. Why don't you tell me which ones you're familiar with?**

A. There's an obligation to provide notice to the insurer of a claim or an event that gives rise to a claim, an obligation to provide relevant documentation in support of a claim under a policy. Offhand, I can't think of any other specific obligations.

**Q. Have you heard of the duty to cooperate under the policy?**

MS. HARDING: Object to form. It assumes facts not in evidence. With respect to what policy? There are hundreds of different insurance policies.

MR. BROWN: Yes, there are, and I'm asking him just about general provisions in a general liability policy.

**Q. Are you familiar with the concept of the duty to cooperate on the part of an insured under a general liability insurance policy?**

MS. HARDING: Again object to form.
MR. LIESEMER: Join in that objection.
MS. HARDING: And foundation.
A. Yes.
**Q. Okay. Are you familiar with the right to defend or to associate in the defense of claims under a general liability policy?**
MS. HARDING: Same objection.
MR. LIESEMER: Object to the form.
A. No, I'm not.
**Q. Let me ask you a different -- to your knowledge, does Grace have any duties to the insurers listed on Schedule 1 of the transfer agreement?**
MS. HARDING: Object to the form.
MR. LIESEMER: Object to the form.



A. Does Grace currently have any duties? Is that the question?
**Q. Well, let's break it up. Let's say: Did Grace pre-petition have any duties to the insurers listed on Schedule 1?**
MS. HARDING: Same objection.
A. Whatever -- whatever duties and obligations are spelled out in the policy, yes.
**Q. Okay. If the Plan is confirmed, what happens to those duties and obligations?**
MR. LIESEMER: Object to the form.
MS. HARDING: Same objection. And I am going to object, I think, to -- are you -- what particular -- are you talking about any particular policy or with respect to all of the policies listed in the exhibit or -- object to the form.



MR. BROWN: Okay.
MS. HARDING: I don't see how he could answer that question with respect to all policies.
A. The duties and obligations are still owed to the insurance companies since the Plan is intended to be insurance-neutral. I don't have an answer as to specific duties in terms of whether the PI Trust has a given duty and obligation or whether that given duty or obligation remains with a Grace entity. I think it would depend on the nature of the duty or obligation.
**Q. Okay. How about the duty to cooperate in the defense of a claim?**
MS. HARDING: Same objection as before.
MR. LIESEMER: Join.
**Q. Is that a duty that would remain with the reorganized debtors or is that a duty that would be assumed by the Trust or both or something different?**
A. I don't -- I don't know the



answer to that because I'm not aware of any attempt or effort by either Grace or the ACC or the FCR to try to parse out specific duties, obligations, et cetera under the policies since it is the intent of the joint co-proponents that the Plan and the transfer of insurance rights be insurance-neutral aside from, you know, the fact of the assignment that it has not -- that no one -- none of the co-proponents have felt it necessary to engage in that effort.
**Q. Under the Joint Plan, is the Asbestos PI Trust the successor to the debtors with respect to asbestos-related liabilities?**
MR. LIESEMER: Object to form.
MS. HARDING: Object to form.
MR. BROWN: Let me rephrase that.
**Q. With respect to -- well, back up.**

A. No, no, I'm not aware of any general claims. I'm not aware of any claims that I could identify with respect to any given insurer.

PP's Obj: R; BE; F

CI

MR. BROWN: Let's mark the next exhibit, which will be the Asbestos PI Trust agreement.

(Exhibit 2 to Exhibit Book, Asbestos PI Trust Agreement marked for identification as Exhibit Finke-6.)

(Exhibit 4 to Exhibit Book, Trust Distribution Procedures, marked for identification as Exhibit Finke-7.)

BY MR. BROWN:

**Q. Okay. Mr. Finke, you have before you Exhibits 6 and 7. Exhibit 6 -- well, why don't you tell me if you can identify both of those documents?**

A. Exhibit 6 is the Asbestos PI Trust agreement. I should say the proposed Asbestos PI Trust agreement that is also known as Exhibit 2 to the Exhibit



PP's Obj: R; BE; F

CI

Book. Finke Exhibit 7 is the Trust Distribution Procedures relevant to the Asbestos PI Trust and also known as Exhibit 4 to the Exhibit Book.

**Q. Okay. What role, if any, do either of those two documents contemplate for Grace's insurers in the handling, resolution, settlement, defense of asbestos claims asserted against or submitted to the Trust?**

MS. HARDING: Object to the form.

MR. LIESEMER: Object to the form.

MS. HARDING: Could you read back the question, please?

(The reporter reads the pending question.)

MS. HARDING: Okay, and I object to it asbeing overly broad with respect to Grace's insurers without reference to any particular insurer or policy. And, Michael, do you have -- are you asking him

PP's Ctr



to look at a specific provision of the policy or...

PP's Ctr

MR. BROWN: I'm just asking the question I asked.

CI

A. I don't know the answer to your question. I'm not that familiar with the two agreements to know whether these two documents set forth the role of the asbestos insurers with respect to the handling, settlement, resolution, payment, et cetera of asbestos PI claims.

In general, the Plan includes the asbestos insurance coverage that is transferred to the Trust to be available to either pay asbestos PI claims or reimburse the PI Trust for its payment of claims. Sitting here today, I just -- I do not recall to what extent, if any, these two documents contain provisions that relate to that role.

PP's Obj: R; BE; F

**Q. Let me broaden the scope of the question to not just these two documents but the Plan or any of the Plan documents. Would that change your**



CI

**answer?**

MS. HARDING: Object to form.

MR. LIESEMER: Join.

CI

A. I thought I just answered that question so maybe I don't understand the question.

**Q. Well, my initial question to you focused on the two documents, the Trust agreement and the asbestos PI TDP. I'm asking the question more broadly now. If you look at the Plan -- at all the Plan documents, do any of them contemplate any role for Grace's insurers in the handling, defense, resolution, of any asbestos PI claim submitted to the asbestos PI Trust for resolution?**

PP's Obj: R; BE; F

MS. HARDING: Object to form. I think it's overly broad. And by Plan, do you mean all of the exhibits, including all of the documents and policies listed in exhibits?

MR. BROWN: I'm using the

PP's Ctr

term "Plan" and "Plan documents" as defined in the Plan.

MR. LIESEMER: Object to the form of the question.

A. The Plan certainly contains provisions that posit a role for the asbestos insurers to act as a source of funds for payment of asbestos PI claims and reimbursement of asbestos PI claims paid by the Trust. In terms of the insurers' role in handling or defense, et cetera, of -- in connection with asbestos PI claims, it is my understanding that the insurers' role is whatever it is under the policies and that that role is -- remains the same notwithstanding the transfer of the asbestos insurance rights to the Trust.

**Q. Would you look at pages 43 and 44 of the Trust agreement, which I think is 6.**

A. Yes.

MS. HARDING: 43, did you say? What page?



MR. BROWN: Yes. Bear with me one second here.

THE WITNESS: 43 and 44.

MR. BROWN: 43 and 44, yes.

**Q. Do you see on pages 43 and 44 there are some gentlemen listed as members of the TAC?**

A. Yes.

**Q. Do you know any of those gentlemen?**

A. I have met Mr. Cooney, Mr. Rice and Mr. Weitz. I have not had much contact with them, though.

**Q. What do you understand to be their professional background, the three you met?**

A. They are attorneys. They have represented asbestos personal injury plaintiffs in litigation against Grace and other defendants.

**Q. Do you have any idea as to how many claims each of these gentlemen's firms has asserted on behalf of claimants against Grace?**



MR. LIESEMER: Object to the form of the question.

A. No.

MS. HARDING: You're asking him personally? Is that what you mean, personally? I mean, W.R. -- well, you ask him.

**Q. Do you know whether -- let's try it a different way.**

**Mr. Cooney. Mr. Cooney is with the firm of Cooney & Conway, correct?**

A. That's my understanding, yes.

**Q. How many clients does Cooney & Conway have with asbestos claims against Grace, to your knowledge?**

MR. LIESEMER: Object to the form.

MS. HARDING: Objection just because of the relevance, but go on.

A. I don't know.

**Q. Would your answer be the same for the other gentlemen?**



A. Yes.

**Q. The TAC members, there's four individuals listed there. They were selected by the ACC, correct?**

A. That is my understanding, yes.

**Q. And the ACC is made up of a collection of asbestos personal injury claimants, the actual committee, correct?**

MS. HARDING: Object to the form.

A. That is my understanding.

**Q. Is it your understanding that those individual asbestos claimants delegate their responsibilities as ACC members to their personal injury counsel?**

A. It's my understanding that their counsel often act on the claimants' behalf in connection with the business of the ACC.

**Q. Okay.**

A. Whether there's any

PP's Obj: R; BE; F

CI



delegation, I wouldn't know.

**Q. Okay. Does each of the firms that's listed on pages 43 and 44 -- just for the record, Baron & Budd, PC; Cooney & Conway; Motley Rice, LLC and Weitz & Luxenberg -- do each of those firms have a client who's a member of the ACC?**

A. I don't recall.

**Q. What do you understand to be the role of the asbestos PI T-A-C, or TAC, in connection with the Asbestos PI Trust?**

MS. HARDING: Object to the form of the question.

PP's Ctr

CI

A. To provide advice to the Trust with respect to the matters set forth in the Trust agreement and the TDP.

PP's Obj: R; BE; F

**Q. Do they owe any fiduciary duties to -- in their role as members of the TAC?**

MS. HARDING: Objection to form.

PP's Ctr



MR. LIESEMER: Object to form.

MS. HARDING: Calls for a legal conclusion.

PP's Ctr

CI

A. I don't know. Offhand, I could look it up in the documents to see if the documents ascribe such a duty to them.

PP's Obj: R; BE; F

**Q. Why don't you look at Section 5.2.**

A. Of which?

**Q. The Trust agreement.**

MS. HARDING: So Exhibit 2 of the Plan but Exhibit 6?

MR. BROWN: Correct.

THE WITNESS: Finke Exhibit 6.

**Q. Does Section 5.2 refresh your recollection as to whether the members of the TAC have any fiduciary duties in connection with their role as TAC members?**

A. Yes.

**Q. Okay. And they do,**

CI



PP's Obj: R; BE; F

**correct?**

A. Yeah, well, specifically Section 5.2 states that "the members of the TAC shall serve in a fiduciary capacity representing all holders of present PI Trust claims."

**Q. Okay. Do you have any further understanding as to what the nature of the fiduciary duties is that they owe to all holders of present PI Trust claims?**

MS. HARDING: Object to form.

PP's Ctr

CI

A. I'm afraid I do not understand your question.

PP's Obj: R; BE; F

**Q. I'll try to rephrase it then.**

**What are the fiduciary duties that the TAC members owe to holders of PI Trust claims?**

MR. LIESEMER: Object to form.

MS. HARDING: Same objection.



MR. LEWIS: I object as to foundation.

CI

A. I am not able to identify specific duties. As a fiduciary they're obligated to act in the best interests of the holders of present PI Trust claims.

PP's Obj: R; BE; F

**Q. And when you say holders, you mean all holders of present --**

A. Yes.

**Q. -- PI Trust claims?**

A. Yes.

**Q. And all holders includes holders of PI Trust claims that are not clients of TAC members' respective law firms, correct?**

A. It includes them, yes.

**Q. Now, in the role of personal injury counsel for their individual clients, they have a separate set of fiduciary duties, correct?**

MS. HARDING: Object to form and also calls for a legal conclusion and outside the scope of the designation of this 30(b)(6)

PP's Ctr

witness, I believe, but...
MR. LIESEMER: Join in the objections.
THE WITNESS: I'm sorry. Can you read the question again?
(The reporter reads the pending question.)
A. They have fiduciary obligations to their clients, yes.
**Q. Okay. And to your knowledge, do those fiduciary duties differ from -- that is, the duties that they owe to their respective clients -- differ from the fiduciary duties that each of these TAC members has in their role as a TAC member?**
MR. LIESEMER: Objection to form.
MS. HARDING: Same objection as I had to the previous question.
A. In general, they owe the same obligation to fulfill the role of a fiduciary, which is to act in the best



interests of their clients. Whether there are specific duties in their role as TAC members that are different from specific duties in their role as counsel representing their clients, I don't know.
**Q. Do you have an understanding as to how the TAC members will deal with the situation where the best interests of their individual clients differs from the best interest of all holders of present PI Trust claims?**
MS. HARDING: Object to form.
MR. LIESEMER: Objection to form.
MS. HARDING: Calls for speculation.
A. I don't know.
**Q. Is there any mechanism in any of the Plan documents, to your knowledge, that addresses that issue?**
MS. HARDING: Object to form.



A. I am not aware of any.
**Q. Okay. Now, you're familiar with the term "PI Trust claims" as it's used in the Trust agreement, correct?**
MR. LIESEMER: Objection to form.
A. Yes, I am.
**Q. And if you look at Footnote 1 to the Trust agreement, if you would, Footnote 1 says that what is defined as asbestos PI claims in the plan will be referred to as PI Trust claims in the Trust agreement, correct?**
A. Yes.
**Q. And are you familiar with the scope of the defined term "asbestos PI claims" as it appears in the Plan?**
A. Yes.
**Q. I'm correct, am I not, that it includes the term "indirect PI Trust claim"?**
A. Yes.
**Q. So based on that definitional connection, is it fair to say**



**that Mr. Weitz, Mr. Cooney, Mr. Budd and -- I missed someone -- Mr. Budd, Mr. Cooney, Mr. Rice and Mr. Weitz are fiduciaries to the holders of indirect PI Trust claims?**
MS. HARDING: Object to form.
MR. LIESEMER: Join in the objection.
A. I believe that to be correct.
**Q. Are you generally familiar with my client, OneBeacon's, contractual indemnity claims?**
A. No.
**Q. Okay, we'll get to that later then.**
MR. BROWN: Let's mark this next.
(First Amended Joint Plan of Reorganization marked for identification as Exhibit Finke-8.)
**Q. Mr. Finke, you have before**

CI
PP's Ctr
PP's Obj: R; BE; F
PP's Obj: R; BE

PP's Obj: R; BE

C1



**you now what has been marked as Exhibit 8 to this deposition and what is Exhibit 1 to the Exhibit Book. First question is: Would you identify the document, please?**

A. Yes. I think Exhibit 8 is the First Amended Joint Plan of Reorganization that was filed by Grace and its co-proponents.

**Q. Okay.**

A. And the date is February -- date on the document is February 27, 2009.

**Q. Okay. Have you reviewed this document in its entirety?**

A. Yes.

**Q. How many times?**

MS. HARDING: You mean in its entirety how many times?

MR. BROWN: Well, let's start-up with that question.

A. Interpreting review as meaning a detailed word-for-word reading of the entire document, I would say once.



**Q. Okay. And how many times have you partially reviewed the document?**

A. Many times.

**Q. Okay. Do you understand it?**

A. I have an understanding of it. I would not profess to have a complete understanding of it.

**Q. Okay. Are there particular provisions in the Plan that you're quite certain you don't understand?**

MS. HARDING: Object to form and relevance and concern that we're not going to the seven hours -- I mean, if you have a specific question about a specific provision that you don't understand as an insured, then I think you should ask him questions about that. I think...

MR. BROWN: Is that an instruction not to answer the question?



MS. HARDING: No, it's not.

MR. BROWN: Okay. It's just --

MS. HARDING: It's just an objection that...

A. I'm sure that I do not understand the annex or annexes that I believe relate to tax issues.

MS. HARDING: I guess -- are you asking him in his personal capacity?

MR. BROWN: I don't think he's here in his personal capacity. I think he's here in his capacity as a designee for W.R. Grace or for the debtors.

MS. HARDING: Okay. Are you asking him if there's anybody at W.R. Grace that has an understanding of different provisions of the Plan as lawyers and --

MR. BROWN: I think he's



here to testify about the operation of the Plan. I think that was -- isn't he? So my question is what --

MS. HARDING: He's here to answer questions to help you understand the Plan.

MR. BROWN: Barbara, can we --

MS. HARDING: So I think if there are questions that you don't understand, I think you should ask him those.

MR. BROWN: I would like to know whether there are particular provisions in the Plan that the witness can identify that he is not familiar with or that he doesn't understand.

MS. HARDING: Well, I think he's asked and answered, so...

A. Yes, for myself there are provisions that I do not understand, such as the tax annexes. This --