MS. HARDING: Which also were not designated 30(b)(6) topics by any person who --

MR. BROWN: Can I ask that we just let the witness answer the question?

MS. HARDING: Well, I think if you want to ask him questions about topics that were designated that you asked him to become familiar with, then --

MR. BROWN: I didn't ask him a question about the tax annex. It was in his answer.

MS. HARDING: Well, that's because you asked him about any provision of the Plan. You asked -- we tried to prepare the witness to answer questions about topics that everybody asked about.

MR. BROWN: All right. I'll ask my question again. If you have an objection and you want to instruct him not to answer, then do

it and we'll move on.

BY MR. BROWN:

**Q. Mr. Finke, as you sit here today looking at the Joint Plan, can you identify particular provisions that you do not understand?**

MS. HARDING: Object, asked and answered, but answer one more time if you'd like.

A. In addition to what I've already identified, the provision on the warrants is not entirely clear to me. And if I spent the time to go through the document page by page, there may be a few other sections that I don't feel very comfortable with in terms of the level of my understanding.

Speaking on behalf of W.R. Grace as a whole, there are individuals who understand those sections and, taken as a whole, I think W.R. Grace does have a good understanding of the Plan.

**Q. Okay. Well, let me take your counsel up on her offer and direct**

**your attention to page 87 of the Plan, Section 7.15, and what I would like you to do, because I have a series of questions about it, is why don't you take a few moments to review Section 7.15. In fact, if you want to take a break at this point --**

MR. BROWN: Does that make sense? Okay.

MS. HARDING: Well, I mean, how long is it, again?

THE WITNESS: Seven pages.

MS. HARDING: Five-minute break?

MR. BROWN: That's fine, yes.

(Recess taken.)

BY MR. BROWN:

**Q. Mr. Finke, we had a short break and before that I directed your attention to Section 7.15 of the Plan entitled Insurance Neutrality. Did you have an opportunity to review that section**

**during the break?**

A. Yes.

**Q. This was not one of the sections that you mentioned in your prior testimony that you were -- that you did not understand. Is it safe to say that this is a provision that you do understand? And I'm asking that question, really, in your capacity as an individual and as the designee on this subject for the debtors.**

MS. HARDING: Object to form.

A. Yes, I believe I understand it.

**Q. Okay. Can you turn to Section 11.9 of the Plan, and that's entitled Exculpation, and if you'd take a moment to review that section.**

**(The witness reviews the document.)**

A. Okay.

**Q. Given the language in Section 7.15, am I correct that asbestos insurance entities are not bound by the**

**exculpation provision in Section 11.9 of the Plan?**

MR. LIESEMER: Object to the form.

MS. HARDING: Object to the form.

A. I believe they -- the asbestos insurance companies are bound by Section 11.9.

**Q. They are bound?**

A. Yes.

**Q. If you go back to 7.15, where is that set forth?**

MS. HARDING: Object to form.

MR. LIESEMER: Same objection.

A. Well, of course, there's no provision in Section 7.15 that specifically states that the insurers are bound by Section 11.9. I assume that's not what you're asking, but -- well, literally, I think that is what you asked, so --

**Q. Yes, that is what I asked.**

A. -- that's my answer then.

**Q. So there's nothing in 7.15 that says that they're bound by 11.9 but your testimony is that they are in fact bound by 11.9?**

A. Yes.

**Q. Are there any other provisions in the Plan that are not specifically spelled out in Section 7.15 for which the insurers are bound notwithstanding Section 7.15?**

MS. HARDING: Objection to form, and I think it misstates his testimony.

THE WITNESS: I'm sorry. Could you read back the question?

(The reporter reads the pending question.)

MS. HARDING: Object to form. I think it's confusing, speculative. I don't see how you can possibly answer that question. But if you can answer it, go ahead.

It also calls for a legal conclusion.

(The witness reviews the document.)

A. Okay. I would direct you to Section 7.15(h) which states that "the asbestos insurance entities shall be subject to the releases and injunctions to the extent described in this Plan" so my answer to your question is that I believe any provisions in the Plan that would constitute a release or an injunction, and I would include 11.9 in that language, are binding on the asbestos insurance entities.

**Q. So your testimony is that 7.15(h) includes through its language Section 11.9?**

A. Yes, that is how I read it.

**Q. What consideration, if any, are Grace's insureds getting under the Plan in exchange for the exculpation provision in 11.9?**

MR. LIESEMER: Objection to

form.

MS. HARDING: Objection to form.

A. All right. First, your question assumes that the insurance entities would be entitled to some consideration in exchange for being bound by Section 11.9. I don't know that to be the case. I don't know that they're not entitled to it either.

But as far as consideration, if one had to justify being bound by Section 11.9 on the basis of consideration, I think the answer with respect to asbestos insurance entities would also apply to all parties involved in the Chapter 11, which is that the entities and individuals covered by the exculpation have been active in the business of these Chapter 11 cases, they have had to take positions, make arguments, make decisions, et cetera, that affect one or more parties involved in the Chapter 11 cases and have thereby exposed themselves to potential liability, I

suppose, for their acts or omissions. And the Chapter 11 itself could not proceed to the point of resolution without the efforts of these entities and these individuals. So to the extent -- so there is a -- in order to encourage and facilitate the activities of the parties listed in Section 11.9, it is my understanding that it is common in these types of bankruptcies to provide exculpation of those entities and individuals for their activities, and I'm quoting here from 11.9, "In connection with or arising out of the Chapter 11 cases." It is their participation and the fruits of their participation that would constitute consideration.

**Q. I want to circle back to a question that I asked a few questions ago concerning 7.15 and I asked you a question to the effect of other than what's specifically set forth in Section 7.15 are there any other provisions in the Plan or Plan documents that are binding upon**

**Grace's insurers, and in answer to that question you referred me to subsection (h) and how 11.9 in the debtor's view was encompassed within the language of (h).**

**So I want to go back to that question and ask: Other than 11.9, is there anything else?**

A. I'm --

MS. HARDING: Object to form. I think it's confusing and I'll leave it at that. If you can answer, go ahead.

A. I believe there is a more general provision relating to the binding nature of court orders, findings, et cetera. That is what I was looking for initially in response to your answer and then I remembered the provision in 7.15(h) and so I've directed you to that provision. If you want me to spend the time -- I do not know where in that Plan that more general provision is that I have in mind.

**Q. Well --**

A. I could spend the time to look for it if you'd like.

**Q. No, let's try this a little differently. Look at 7.15(a).**

A. Okay.

**Q. It says "Except to the extent provided in this Section 7.15, notwithstanding anything to the contrary in the Confirmation Order, the Plan or any of the Plan documents -- nothing in the Confirmation Order, the Plan or the Plan documents, including any other provision that purports to be preemptory or supervening, shall in any way operate to or have the effect of impairing any asbestos insurance entity's legal, equitable or contractual rights, if any, in any respect." Have I read that correctly?**

A. I believe so.

**Q. Okay. And what I'm asking is: Given that broad statement, are there any other provisions in the plan that are not set forth in 7.15 that override the**

**language in 7.15(a)?**

MS. HARDING: Object to form.

A. Based on the language of 7.15(a), and if I'm understanding it as it was intended, it states by its terms that nothing else in the Plan or any of the Plan documents would operate, you know, to impair the -- an asbestos insurance entity's rights.

**Q. So is your answer no?**

MS. HARDING: Object, asked and answered, but...

A. Based on the language in 7.15(a), my answer would be no, subject to -- subject to wanting to review the remainder of the Plan because, as I mentioned, I do have in mind that there is one or more general provisions concerning the applicability or binding nature of court orders, court findings and the like.

And while I understand 7.15(a) appears to act in such a way that would make my proviso in my answer irrelevant, I

PP's Obj: R; BE

CI

would still feel more comfortable having found and reviewed those other provisions before giving an unequivocal "no".

**Q. Let's do this because we don't want to waste time. Why don't we -- I'm going to continue on. We'll obviously have breaks. And during one of those breaks, why don't you look for whatever provision it is that you -- or provisions that you think you're talking about and then when we return from our break, even if I'm not the questioner, would you bring those one or two sections up to me? That will save us some time.**

A. That's fine.

**Q. All right. I want to focus your attention now on 7.15(b).**

**(The witness reviews the document.)**

A. Okay.

**Q. You see on the second line there rolling over to the third line the phrase "The beneficiaries of the Asbestos PI Trust"? Do you see that?**

A. Yes.

CI

**Q. What do you understand that term to mean?**

MR. LIESEMER: Object to the form.

CI PP's Obj: R; BE

**Q. What does that term mean?**

A. I understand it to mean holders of asbestos PI claims.

**Q. Okay. And does that include holders of indirect Asbestos PI Trust claims?**

MR. LIESEMER: Object to form.

CI PP's Obj: R; BE

A. Yes.

**Q. And does it include indemnified insurer -- does it -- excuse me.**

**Does that term include the holders of indemnified insurer TDP claims?**

MR. LIESEMER: Object to the form.

CI PP's Obj: R; BE

A. Is that a defined term?

**Q. Good question. It is a term that appears in Section 5.13 of the Trust Distribution Procedures. I don't**

CI PP's Obj: R; BE

**know that it is, per se, defined.**

MS. HARDING: Where is it in the TDP?

MR. BROWN: It's in Section 5.13.

MR. COHN: Is that on page 49 of the TDP?

MR. BROWN: I don't know the page number.

THE WITNESS: Page 49, yes.

A. Based on Section 5.13 of the TDP and on the basis that a holder of an indemnified insured TDP claim potentially may have that claim paid by the PI Trust in accordance with Section 5.13, I would interpret such a holder to be a beneficiary of the PI Trust.

**Q. Okay. So let's just take one of my clients, for example. Let's take Seaton Insurance Company. If Seaton Insurance Company has an indemnified insured TDP claim, then Seaton Insurance Company, as I understand 7.15(b), is bound**

CI

**by the Plan, the Plan documents and the confirmation order?**

MR. LIESEMER: Object to the form.

MS. HARDING: Object to the form.

PP's Ctr

CI PP's Obj: R; BE

**Q. Do I have that correct?**

A. I believe so, yes.

**Q. Okay. And is it bound by the Plan, Plan documents and confirmation order insofar as it may also be listed as being a partially settled insurer?**

MS. HARDING: Object to the form. And are you referring to 7.15(b)?

MR. BROWN: Yes.

MS. HARDING: Back to 7.15(b) when you asked that question?

MR. BROWN: Yes.

A. I'm not sure I see the connection between Section 5.13 of the TDP and your question, if there is any. The -- I believe the answer is they are

[Handwritten: PP's Obj: R; BE] [Handwritten: C1]

Page 90

bound to the same extent any asbestos insurance entity is bound under the Plan.

**Q. Mr. Finke, you understand, don't you, that -- well, let's not do it that way. Let's go to -- I think it's the asbestos insurance transfer agreement.**

MS. HARDING: Is that one of our exhibits?

MR. BROWN: No, I'm sorry, it's not that. It's Exhibit 5.

**Q. Do you have Exhibit 5?**

A. Retained causes of action?

**Q. No. This is Exhibit 5 to the Exhibit Book.**

A. To the Exhibit Book.

MS. HARDING: I have a copy. It's not his but you can look at it if you'd like.

MR. COHN: What is the document?

MS. BAER: It's Exhibit 5 to the Exhibit Book, Schedule of Settled Asbestos Insurers.

[Handwritten: C1] [Handwritten: PP's Obj: R; BE; F]

Page 91

(Exhibit 5 to Exhibit Book, Schedule of Settled Asbestos Insurers Entitled to 524(g) Protection marked for identification as Exhibit Finke-9.)

**Q. What I'd like you, Mr. Finke -- first of all, why don't you identify what we've just marked as Exhibit 9?**

A. Okay. Finke Exhibit 9 is Exhibit 5 to the Exhibit Book. It is entitled Schedule of Settled Asbestos Insurers Entitled to 524(g) Protection.

**Q. Now, you understand, don't you, that at least some of the insurance companies that are listed on this schedule have indemnity claims against the debtors?**

MR. LIESEMER: Object to the form of the question.

[Handwritten: C1] [Handwritten: PP's Obj: R; BE; F]

A. Yes, I believe that's correct.

**Q. And to the extent that**

Page 92

**there are indemnity claims against the debtor and to the extent that those are asbestos-related, those fit within the defined term "indemnified insured TDP claims", correct?**

MS. HARDING: Object to form.

MR. LIESEMER: Join.

MS. HARDING: Are you looking for 7.15?

MS. ALCABES: 5.13.

MS. HARDING: There you go.

A. No, I don't agree.

MR. BROWN: Could you read back the last question?

(The reporter reads the requested portion.)

A. No, I don't agree. My understanding of Section 5.13 is this provision would take effect only upon confirmation of the Plan since the definition indicates, or requires, that the indemnified insuror TDP claim is channeled to the PI Trust, which it can't

Page 93

be at this point.

**Q. All these questions are in the context of the Plan being confirmed.**

A. Well, then I don't --

**Q. Let me back up. I think the record's kind of muddled at this point.**

A. Okay.

**Q. Why don't you -- if you look at the schedule of settled asbestos insurance companies, I believe you'd testified -- that's Exhibit 9 -- I believe you'd testified that some of the companies that are listed on there have contractual indemnity claims against the debtors.**

A. That was under the assumption we were talking about current claims. I didn't realize you had -- that your questions were all in the context of the assumption of a confirmed plan.

[Handwritten: C1] [Handwritten: PP's Obj: R; BE; F]

**Q. All right. If you look at the schedule, you understand that the insureds that are listed on here have settlement agreements with the debtors,**

CI

PP's Obj: R; BE; F

correct?
A. Yes.
Q. And you also understand that certain of those settlement agreements have contractual indemnity provisions in them, correct?
A. Yes.
Q. And I believe you testified that those contractual indemnity provisions are under the Plan to be treated as indemnified insured TDP claims under Section 5.13 of the TDP. Is that correct?
A. No, no, that certainly wasn't my intent.

CI

PP's Obj: R; BE; F

Q. Okay. How are they being treated under the Plan?
A. As indirect PI Trust claims.
Q. Okay. Do you understand indemnified insured TDP claims to be a class of indirect PI Trust claims?
A. It appears to me to be that, that they are the same. Or at least

CI

I don't see a distinction. Whether they are intended to be or not, I don't know. Since we really were not involved in the drafting of the TDP, my --
Q. The "we" you're referring to is Grace?
A. Grace, yes. My bigger problem is that once the plan is confirmed I don't understand -- have not understood and don't today how there can be such a claim under 5.13 since my understanding of the mechanics of the asbestos PI channeling injunction is that any claim against a settled insurer which is an asbestos protected party would be barred and that claim would be channeled to the PI Trust and that that holder of that PI claim, the sole resolution -- not resolution -- the sole source for any recovery for the holder of that claim is the PI Trust.
So I have not understood, and still don't, how any indemnified insurer TDP claim could arise.

PP's Ctr

CI

PP's Obj: R; BE; F

Q. Let's get back to the insurance neutrality provision then, which is 7.15.
A. Okay.
Q. Getting back to 7.15(b), this line of questioning talked with or started with the reference to the term, the phrase, "the beneficiaries of the Asbestos PI Trust".
A. Uh-huh.
Q. I'm a little confused by your testimony at this point. If you are the holder of an indemnified insurer TDP claim post-confirmation, are you a beneficiary of the Asbestos PI Trust?

PP's Ctr

MR. LIESEMER: Object to the form of the question.
MS. HARDING: Object to form.

CI

PP's Obj: R; BE; F

A. Assuming for the sake of argument such a claim could arise, my understanding would be yes.
MR. BROWN: All right. I'm going to shift gears. We'll mark

another document. The document I'm about to mark is one of our settlement agreements so we can mark this portion of the deposition subject to the protective order but what I would like to do with this one, like we did with Mr. Posner, to the extent that no one objects to the extent that we, my clients, would like to use this portion of the testimony without having it under seal, we would be able to do so without asking all parties to agree. Is that fair?
MS. HARDING: That's up to you.
MR. BROWN: All right.
MR. LEWIS: Did you say Mr. Posner?
MR. BROWN: Yes.
MR. LEWIS: Okay.
(Settlement Agreement Bates stamped OB 1 through 33 marked for identification as

about or been asked about the scenario you're describing.

**Q. But if the claim is asserted by the insurers against Fresenius Medical Care Holdings, it's being asserted against a non-debtor, correct?**

MS. HARDING: Object to form.

A. In the first instance, yes.

**Q. And that would then take it outside the definition of indirect PI Trust claims which by definition have to be against the debtor, right?**

MS. HARDING: Just object to form in terms of the hypothetical. I'm not sure where we are in the hypothetical, but go ahead.

A. Well, I understand what you're saying and, yes, if you were to stop right there I would agree with you. But when you add in what I think is a fact, which is that Grace would owe an

indemnification obligation to FMCH in those circumstances, the reality of your hypothetical is that the claim would be ultimately a claim against the debtors.

**Q. So is it your testimony on behalf of Grace that the claim I've described, running from the insurers against Fresenius, that is in fact an indirect PI Trust claim?**

MS. HARDING: Object to form.

MR. LIESEMER: Object to form.

A. That is my view, yes.

**Q. Is it also your view that that claim would be an indemnified insurer TDP claim as described in Section 5.13 of the TDP?**

MS. HARDING: Same objection.

MR. LIESEMER: Object to form.

A. Yes, it does appear to fit

the definition or description of an indemnified insured TDP claim.

**Q. Okay. Let me ask you this then: What is the operative injunction in the Plan that accomplishes both the enjoining and channeling of the claim that we're talking about; namely, a claim for contractual indemnity running from the insurers against Fresenius Medical Care Holdings, Inc.?**

A. The --

MS. HARDING: Object to form.

MR. LIESEMER: Object to form.

A. The asbestos PI channeling injunction.

**Q. Does the successor claims injunction in the Plan also enjoin the claim?**

MR. LIESEMER: Object to form.

MS. HARDING: Object to form to the extent we're still

talking about the hypothetical.

A. No, I don't believe so.

**Q. All right, I want to ask you now, Mr. Finke, a sort of more broad question. Class 6 includes, among other things, individual asbestos claimants' claims against Grace, correct?**

MS. HARDING: Object to form.

MR. LIESEMER: Join.

A. Did you say asbestos claims or asbestos PI claims?

**Q. I'm using it generically. Fair enough, that's a fair -- the purpose -- Grace has been sued in a number of asbestos personal injury claims, correct?**

A. Yes.

**Q. Okay. And those claims, among other claims, are classified as Class 6 under the Plan, right?**

A. Yes.

**Q. And indirect PI Trust claims that we've just been discussing,**

PP's Cr

PP's Ctr

**they're also Class 6 claims, correct?**
A. Correct.
**Q. And indemnified insurer TDP claims are also Class 6 claims, correct?**
A. I believe so but I'm going to go back and reread the definition again.
**Q. Okay.**
**(The witness reviews the document.)**
A. Yes.
**Q. Can you describe for me the factual basis for putting all of those claims in the same class?**
MS. HARDING: Object to form. Calls for -- to the extent that it calls for a legal conclusion and --
A. I would refer to the --
THE WITNESS: I'm sorry.
MS. HARDING: -- and attorney-client work product privileges to the extent that they apply. But if you can still answer, go ahead.

A. My answer would be to refer to the terms of the Plan and the definitions. The definitions of asbestos PI claims would incorporate the factual basis of those claims.
**Q. All right. I'm asking a broader question, I think, Mr. Finke, and I'm not asking for a legal conclusion.**
MS. HARDING: Okay. And --
**Q. I'm asking for what is it that's factually similar about these claims that warrants in the debtor's view placing them all into Class 6.**
MS. HARDING: Object to form.
MR. LIESEMER: Object to form.
MS. HARDING: Foundation and it...
A. I may be misunderstanding your broad question, but I have to again respond by referring to the factual circumstances laid out in the definition

of asbestos PI claims. It is those -- those set of circumstances that result in all of these claims being classified as Class 6 claims.
**Q. What are the similarities between the claims; that is, between the personal injury claims and the contractual indemnity claims, if any?**

PP's Obj: R; BE

MS. HARDING: Object to form.
MR. LIESEMER: Object to form.
A. Assuming you're referring to contractual indemnity claims arising out of, directly or indirectly, an asbestos PI claim, the similarity is that the underlying claim is by a person who alleges -- and I'm just paraphrasing because I don't want to read this entire definition -- but alleges that he has contracted an asbestos-related disease due to exposure to asbestos from a Grace product or operation.

PP's Obj: R; BE

**Q. Anything else?**

MS. HARDING: Object to form.
A. I don't understand your question.
**Q. My question is: Is there any other basis for classifying the contractual indemnity claims that we've just been discussing with the personal injury claims, the asbestos personal injury claims?**

PP's Obj: R; BE

MS. HARDING: Object to form.

PP's Ctr

A. The basis I've laid out for the definition of asbestos PI claims.
**Q. Okay. Mr. Finke, why are contractual indemnity claims arising from the asbestos claims that you just described placed into Class 6 while other contractual indemnity claims against Grace are placed into Class 9?**

PP's Obj: R; BE

MS. HARDING: Object to form and to the -- and object to the extent it calls for a legal conclusion. If you can answer, go

PP's Ctr

C1

ahead.

PP's Ctr

A. Because the contractual indemnity claims that arise based out of an asbestos PI claim all seek to impose liability upon the debtors as a result of the debtors' asbestos-related products or operations.

PP's Obj: R; BE

**Q. Okay. Is Fresenius a separate entity from any of the debtors today?**

MS. HARDING: Object to form.

**Q. Separate legal entity.**

A. Yes.

**Q. How about Sealed Air Corporation? Is that a separate legal entity?**

A. Yes.

**Q. And they're both non-debtors, correct?**

A. Correct.

**Q. Are they -- do they have separate -- does Fresenius and the debtors have separate management?**

A. Yes.

**Q. And would your answer be the same with respect to Sealed Air and the debtors?**

A. Yes.

**Q. Does Fresenius and the debtors or do Fresenius and the debtors have any shared operations?**

A. Not that I'm aware of.

**Q. Do Sealed Air and the debtors have any shared operations?**

A. Not that I'm aware of.

**Q. Do any of the debtors have any ownership interest in Fresenius?**

MS. HARDING: Object to form.

A. I don't know but I'm not aware of any.

**Q. Do any of the debtors have any ownership interest in Sealed Air?**

MS. HARDING: Same objection.

A. Again, I don't know but I'm not aware of any.

**Q. Do any of the debtors control Fresenius?**

A. No.

**Q. Do any of the debtors control Sealed Air?**

A. No.

MR. BROWN: How did we mark the transfer agreement?

MS. BAER: The insurance transfer agreement is Exhibit 4.

(Off the record.)

BY MR. BROWN:

**Q. We talked about this earlier. Can you take a look at Schedule 1 to Exhibit 4?**

A. Yes.

**Q. My question is: Does Fresenius have any rights under the policies listed on Schedule 1?**

MS. HARDING: Object to form.

A. I don't believe so.

**Q. How about Sealed Air?**

A. I don't believe so.

MR. BROWN: Why don't we take a five-minute break. I may be finished.

MS. HARDING: Okay.

(Recess taken.)

C1

BY MR. BROWN:

**Q. Mr. Finke, I have a few more questions for you and then I'll pass you along to the next questioner.**

**Can you take a look at Section 11.9 of the Plan again? That's the exculpation provision.**

A. Yes.

**Q. Do you understand the scope of the exculpation provision in terms of the entities and individuals that are actually exculpated under this provision?**

PP's Obj: R; BE

MS. HARDING: Object to form.

C1

A. Yes, I believe I do.

**Q. Okay. Well, let me give you a couple of examples. It's includes the Asbestos PI Committee, correct?**

PP's Obj: R; BE

C1

PP's Obj: R; BE

A. Yes.
**Q. And we talked a little about the Asbestos PI Committee being individual asbestos claimants, correct?**
A. Yes.
**Q. And you testified that, by and large, they perform their duties as committee members through their asbestos personal injury counsel, correct?**
A. Correct.
**Q. Okay. And that would include, among other individuals, Mr. Rice and his law firm, correct?**
A. Yes, I believe that's right.
**Q. And Mr. Cooney and his law firm?**
A. Well, I guess what I don't know is which of the -- which of the asbestos plaintiffs' attorneys we've identified are -- or have clients that are members of the committee. I just don't recall.
**Q. Okay, fair enough.**

C1

**There are also -- the TAC is within the scope of this exculpation provision, correct?**
A. Yes.
**Q. So it would include the TAC members, Mr. Weitz, Mr. Cooney, Mr. Budd and Mr. Rice, correct?**
A. Correct.
**Q. And to the extent that the firms -- to extent that any members of the Asbestos PI Committee are represented by the firms of Mr. Cooney, Mr. Rice, Mr. Weitz and Mr. Budd, they too would be covered by it, correct?**
A. Correct.
MS. HARDING: Object to form.

C1

PP's Obj: R; BE

**Q. All right. Now, about halfway down the provision it has a phrase that says "or any of their respective Representatives". Do you see that?**
A. Yes.
**Q. And Representatives is in initial cap R, correct?**

C1

PP's Obj: R; BE

A. Yes.
**Q. Why don't you go to the defined term Representatives which appears at 33 of the Joint Plan. It's definition number 177.**
MS. HARDING: I think I lost the line of -- did you previously ask if the TAC was covered --
MR. BROWN: Yes.
MS. HARDING: -- by the exculpation in 11.9?
MR. BROWN: Yes.
MS. HARDING: I'm just looking and I don't see that so I just wanted to make sure that the record wasn't unclear.
MS. BAER: Barbara.
MR. BROWN: Asbestos PI Trust Advisory Committee.
MS. HARDING: All right.
MR. BROWN: We're happy to have it taken out.
MS. HARDING: No, no. I

was talking because I was going too fast and I just didn't see it and I wanted to make sure.

C1

PP's Obj: R; BE

A. Okay.
**Q. Sitting here today and looking at the defined term Representatives and seeing its use in Section 11.9 of the Plan, do you have any idea of the scope of this exculpation provision in terms of who's covered by it?**
MS. HARDING: Object to form.

C1

PP's Obj: R; BE

A. Well, certainly the definition of Representatives gives me an idea as to the scope of the exculpation provision.
**Q. Okay. But I mean the actual identities of the individuals, you couldn't -- you couldn't give me a list today, could you?**
A. No.
**Q. Okay.**
A. I could not.

PP's Obj: R; BE
C1
PP's Ctr
PP's Obj: R; BE
PP's Ctr
PP's Obj: R; BE
PP's Obj: R; BE
PP's Obj: R; BE; F
PP's Obj: R; BE; F

**Q. Do you have any idea who the advisors or consultants are of Mr. Cooney's firm or Mr. Weitz's firm or Mr. Rice's firm or --**

A. No.

MS. HARDING: Object to form.

A. No, I do not.

**Q. Okay. How does the court know if it confirms this Plan who all's covered by the exculpation provision, given the breadth of the definition of Representatives?**

MS. HARDING: Object to form --

MR. LIESEMER: Object to form.

MS. HARDING: -- to the extent it calls for a legal conclusion.

A. I would be speculating that perhaps they'll be -- those individuals would be identified to the court at some point, but I don't know.

**Q. Do you know how far back the exculpation provision goes in terms of time?**

A. No, because it's -- it's not set up to be framed in terms of a beginning date and an end date. It's -- the scope of the provision relates to conduct in connection with or arising out of the Chapter 11 cases so that, to my understanding, that could encompass conduct before the Chapter 11 cases were commenced, conduct afterwards.

**Q. How long before it was commenced?**

MS. HARDING: Object to form.

A. The provision does not say.

MR. BROWN: Okay. All right. I think with that I'm going to pass you along to Miss Alcabes, and I may -- I'll reserve the right for any follow-up questions after the others have finished. Thank

you.

THE WITNESS: You're welcome.

EXAMINATION BY MS. ALCABES:

**Q. Good afternoon, Mr. Finke. My name is Elisa Alcabes. I'm counsel for Travelers Casualty & Surety Company. We've met before.**

A. Yes.

**Q. Can you just tell me what you did to prepare for your deposition today?**

A. I reviewed the Plan; a number of the exhibits to the Plan, some more than once; met with counsel, Grace's bankruptcy counsel, to discuss various provisions of the Plan and related documents. I'm trying to think if there is anything else. Read the deposition transcript of Peter Lockwood and listened to the -- listened in on the deposition of Jeff Posner which I viewed as preparation for this deposition. That's all I can

recall at this point.

**Q. About how much time did you spend with Grace's bankruptcy counsel preparing?**

A. About 15 hours.

**Q. And you said you listened in on the Posner deposition. Do you agree with the testimony that Mr. Posner provided?**

MS. HARDING: Object to form.

A. Yes, I do. I can't think of anything that I disagreed with so I would say, in general, yes.

**Q. And you said previously that you generally agreed with the deposition testimony of Mr. Lockwood as well, correct?**

A. Correct.

**Q. You mentioned that there was one point in his deposition where he seemed to have equated coverage in place with the reimbursement agreements. Is that right.**

A. Yes.

**Q. Do you recall whether there was a substantive issue that you had with it or whether he just seemed to have inadvertently referred to reimbursement agreements as coverage in place?**

A. I would -- I don't know if there was -- I don't recall having a substantive disagreement. At the time I was -- I had focused on the defined terms and if he was using those terms as defined terms in the Plan, then it occurred to me that he was making an incorrect statement since, of course, he's speaking and didn't identify them as whether or not he was referring to them as defined in the Plan. He may or may not be incorrect in equating the two; I don't know.

**Q. I'm going to represent that we've looked through the Lockwood transcript and I'm not sure which reference you're talking about and we would like to understand what it is that you were disagreeing with to the extent it**

**may be substantive so we would ask during a break or subsequent to the deposition if you would please let us know which portion of the transcript you're referring to.**

C1

**Right now, can you turn to what's been marked as Finke Exhibit 4, which is the transfer agreement, and turn to Schedule 2. That's the schedule of asbestos insurance settlement agreements, correct?**

PP's Obj: R; BE; F

A. Correct.

**Q. And in preparation for your deposition, did you review any of these agreements?**

A. No, I did not.

**Q. Are you generally familiar with any of the agreements?**

A. No, I am not.

**Q. Do you have a general understanding of what the agreements provide?**

A. Very general.

**Q. What's your general understanding?**

C1

A. That the insurance company agreed to pay a definite amount of money in exchange for an indemnification agreement from Grace to indemnify the insurer in the event that claims were made against -- in the event that asbestos claims were made against the policy.

PP's Obj: R; BE; F

**Q. And can you turn to Schedule 3 which is the schedule of asbestos insurance reimbursement agreements?**

A. Yes.

**Q. Did you review any of those agreements prior to your deposition?**

A. No.

**Q. Have you ever seen any of the agreements?**

A. No, I have not.

**Q. Are you generally familiar with what the agreements say?**

A. Again, on a very general level.

**Q. What's your general understanding?**

A. That the parties to the agreement worked out procedures or protocols pursuant to which the insurers would reimburse the insured party in whole or in part for asbestos claims paid by the insured.

**Q. To your understanding, who was the insured party that you're referring to?**

A. Grace or one of the Grace debtors.

**Q. Do you have an understanding of the obligations that Grace undertook in executing those agreements?**

A. No.

**Q. Do you have a general understanding?**

A. No, I don't.

**Q. Do you have an understanding that Grace undertook to perform a certain allocation with respect to claims that were going to be -- with respect to claims that they were going to**

to our rights.

MR. LIESEMER: Well, wait a minute. There was a dialogue between the Libby claimants' representatives and the ACC with respect to the TDP. They weren't completely shut out of the --

MR. LEWIS: That's the only thing that was discussed with us, that is correct, counsel.

**Q. In any event, I'll get on to the next area because counsel's directed you not to answer any questions concerning the first matters relating to the Plan. The second one is the funding of the asbestos PI Trust including value at time of negotiation of assets to be used to fund the Asbestos PI Trust. Oh, I'm sorry, I've got the wrong man there. That's LaForce.**

**Go to asbestos -- go to injunctions on page 10. The first area is the asbestos PI channeling injunction. You're designated to testify about that?**

A. Yes.

**Q. And you're familiar with the asbestos PI channeling injunction and the effect it has on those of interest to this litigation?**

MS. HARDING: Object to form.

A. Yes.

**Q. First of all, what is a channeling injunction?**

A. It's --

MS. HARDING: Just object. Are you asking him under the -- the definition of channeling injunction under this Plan or just generally?

MR. LEWIS: I'm just asking him what a channeling injunction is, what is his understanding of a channeling injunction.

A. An injunction that requires holders of certain types of claims to pursue those claims only against, as in this case, the Asbestos PI Trust. It makes the Trust the sole recourse for

holders of those claims.

**Q. And that's covered in Section 8.2 --**

A. Correct.

**Q. -- of the amended Plan of Reorganization, correct?**

A. Correct.

**Q. By the way, you indicated in earlier testimony that there are -- or suggested that there might be more discussion or more changes or changes coming to this Plan.**

A. I don't recall discussing that, but --

**Q. I thought you said that there were issues that hadn't been resolved related to this Plan. Maybe I misunderstood you.**

A. There are details -- what I recall talking about are details with respect to some of the Plan documents that need -- still need to be worked out. I don't recall addressing whether there would be changes to the Plan, although I

believe there -- well, the Plan itself provides for the ability to modify it.

C1

**Q. Now, this is the first Amended Joint Plan. Is there a second Amended Joint Plan in the offing or does this look like it, for the most part?**

A. I expect there will be some changes to this Plan before -- before final confirmation.

PP's Obj: R; BE; F

**Q. Let's go to Section 8.1 relating to channeling injunctions -- the channeling injunction -- excuse me -- and 8.2. I apologize.**

A. Uh-huh.

**Q. Does that treat the Libby claimants, PI claimants, just like all other PI claimants?**

A. Yes.

(Mr. Plevin enters the deposition room)

**Q. Okay. Now, the second area of inquiry was development of asbestos PI channeling injunction among Plan proponents, including negotiations, other**

**gave relating to the 17 Maryland Casualty topics to which you as the Grace designated representative disagree?**

A. No.

**Q. I wanted to ask you some questions about the so-called independent claims against Maryland Casualty that Mr. Lewis asked you about. During his deposition, Mr. Lockwood gave an example of what he deemed to be an independent claim, and I'll quote from page 517 of his deposition transcript.**

**Mr. Lockwood said: "I mean, if somebody in Libby, Montana is run over by an insurer's truck on the way to work, of course the injunction doesn't bar the claimant from suing that insurer."**

**My question for you, Mr. Finke: Is do you agree with that example as an example of an independent claim --**

A. Yes.

**Q. -- if it existed?**

A. Yes.

**Q. Now, as to the Plan's**

**treatment of any other so-called independent claims by the Libby claimants, I'm going to ask you to please read from page 525, line 1 through 527, line 24 of the transcript of Mr. Lockwood's deposition and then I'm going to ask you a question.**

A. Okay.

**Q. I'm going to ask you a couple of questions.**

A. Okay.

**Q. Take your time, please.**

MS. HARDING: 525, line one through 527, line 24?

MR. WISLER: Correct.

(The witness reviews the document.)

A. Okay.

**Q. As the designated Grace representative, do you agree with the testimony of Mr. Lockwood that you just read?**

A. I do, yes.

**Q. And does that testimony clarify your earlier testimony about the**

**Plan treatment of so-called independent claims against Maryland Casualty?**

A. Yes, because I hadn't -- I hadn't considered my earlier answer viewing it from the perspective of the terms or scope of the indemnification obligation by Grace, which is what this testimony relates to.

**Q. Mr. Lockwood's testimony?**

A. Yes. Sorry.

**Q. And, Mr. Finke, would you agree with me that there's no provision of the Plan that expressly carves out Libby's so-called independent claims against Maryland Casualty from the asbestos PI channeling injunction?**

A. I would agree with that.

MR. WISLER: That's all I have. Thank you.

C1

PP's Obj: R

EXAMINATION BY MR. COHN:

**Q. Mr. Finke, Jay Cohn for Federal Insurance Company.**

**Earlier you weren't able to testify**

C1

**about the TDPs. Is that because Grace had nothing to do with the formulation of the TDPs?**

A. No.

MS. HARDING: Object to form but go ahead.

C1

PP's Obj: R

THE WITNESS: Sorry.

A. No. The primary reason is that Grace -- while Grace was not a principal drafter of the TDPs, when we were provided with a draft, I asked Jay Hughes to review it and provide any comments that he had on it, and of course we all -- our outside counsel also reviewed it. But, in essence, I delegated responsibility to Jay since he is much more familiar with the personal injury litigation, claims history, disease levels, et cetera. So I personally am not the most knowledgeable at Grace about the TDPs.

**Q. Does W.R. Grace have an understanding of what the concept of insurance neutrality means?**

PP's Obj: R

C1

A. Yes.

**Q. Could you explain to me what W.R. Grace's concept -- understanding of that concept is?**

MS. HARDING: Just object to form to the extent it calls for a legal analysis or legal conclusions. To the extent that you can answer...

PP's Ctr

C1

A. I think our understanding of insurance neutrality is well worded in Section 7.15(a), which is that none of the Plan provisions, other than a few specific exceptions, will operate to impair any of the asbestos company's contractual rights under their policies or settlement agreements or reimbursement agreements.

**Q. Okay. So if you were to carve out the first independent clause of 7.15(a) which reads: "Except to the extent provided in this Section 7.15," the balance of that paragraph sets forth W.R. Grace's understanding of the concept of insurance neutrality; is that right?**

PP's Obj: R

MS. HARDING: Object to form.

PP's Ctr

C1

A. I don't entirely agree with your statement or your question because I think the definitions of certain terms, and in particular the asbestos insurance coverage defenses, also relates to our understanding of insurance neutrality. Specifically, that that -- that definition identifies a couple of defenses that the insurance companies would not be able to assert after confirmation.

**Q. Those would be exceptions to a true insurance neutrality, right?**

PP's Obj: R

MS. HARDING: Object to form and to the extent that it calls for a legal conclusion.

PP's Ctr

C1

A. Yes.

**Q. Thank you.**

**Are you familiar with the UNR decision from the Seventh Circuit?**

A. I've heard of it. I've not read it. I have a very general understanding of --

PP's Obj: R

C1

**Q. Could you tell me --**

A. -- what the holding --

**Q. Could you tell me your understanding of what happened in UNR?**

PP's Obj: R

MS. HARDING: Object to form, object to the extent that it calls for Mr. Finke's legal analysis of the decision and I think it's overly broad and impossible to answer. But to the extent that you can answer...

PP's Ctr

C1

MR. FREEDMAN: Do you have a copy of the case or citation, just to make sure we're talking about --

MR. COHN: 992 Fed 2nd. 1101.

PP's Obj: R

MS. HARDING: And I also object to the extent that the questioning is seeking to have a discussion with the witness about the legal conclusions that the Court might or might not reach as to the Plan and the application of

PP's Ctr

certain precedent in law. I think it's improper.

PP's Ctr

C1

**Q. Do you need to hear the question again?**

A. Yes, I do.

(The reporter reads the record as follows:

"QUESTION: Could you tell me your understanding of what happened in UNR?")

PP's Obj: R

MS. HARDING: Object. Are you asking about the decision or what happened in the case?

PP's Ctr

C1

MR. COHN: What the result was to the insurer in that case.

A. My understanding is that the court --

PP's Obj: R

MS. HARDING: Same objections but go ahead.

PP's Ctr

C1

A. -- held that the confirmation of a Plan of Reorganization triggered insurers' obligations to pay.

**Q. Okay. I will represent to you that UNR as part of its settlement was**

PP's Obj: R

PPs Obj: R

C1

**to pay 150 million dollars of its stock into the Trust and that the holding was that the confirmation of that Plan required the insurer to immediately pay UNR the value of that stock. And my question to you is: Is it the intention of the insurer neutrality Plan provision in this Plan to protect the insurers from such a result in this case?**

A. I believe that it is Grace's intent, yes.

MR. COHN: Okay, I have no other questions.

MR. BROWN: I have a couple of follow-ups.

MS. HARDING: Anybody on the phone that has questions?

MR. KRAMER: I know Dan Speights will have questions.

MR. DOWNEY: I have questions. This is Phil Downey for Scotts but I'm happy to wait my turn.

MR. COHN: If I may suggest

that PD be held to the end?

MS. HARDING: Yeah, so we'll wait for PD folks to the end. Are there insurers on the phone that have any questions? Any insurers on the phone? No?

MR. MANGAN: I may have questions. This is Kevin Mangan on behalf of the State of Montana.

MS. HARDING: Okay, great.

EXAMINATION BY

MR. MANGAN:

**Q. Good afternoon, Mr. Finke. Can you hear me all right on the phone?**

A. Yes.

**Q. Okay, great.**

**Are you aware the State of Montana's filed a claim for contribution and indemnification against Grace?**

A. Yes.

**Q. And in this bankruptcy, obviously?**

A. Yes.

**Q. And a proof of claim.**

**How is the State classified under the Plan?**

MS. HARDING: Object to form. Go ahead, to the extent you know.

A. As a Class 6 indirect PI Trust claim.

**Q. What is the basis for that classification?**

A. Well --

MS. HARDING: I'm just going to object to the extent that it calls for attorney-client privilege or work product communications. To the extent you can answer without divulging that, then go forward. And to the extent that -- I do agree that it's broad and I'm not sure I understand what he's asking about, but if you do, Richard, go ahead.

A. My answer is going to be the definition of indirect PI Trust claim in the Plan.

**Q. Is it your position that contribution and indemnification claims fit within the indirect PI definition?**

A. Yes.

**Q. Mr. Lewis had asked you a series of questions with regard to the treatment of Libby claimants' claims under the Plan and their claims specifically as to Maryland Casualty, the State of Montana and Burlington Northern. Do you recall that questioning?**

A. Yes.

**Q. I believe you testified -- and obviously correct me if I'm wrong -- that the Libby claimants' claims against the State that give rise to the State's claims against the debtors for indemnification or contribution go into the Trust.**

MS. HARDING: Object to form.

**Q. Is that your testimony?**

A. That the Montana -- that the State of Montana's claims for

**settlement agreement in front of you involving Commercial Union?**
A. Yes.
**Q. And there was a contractual indemnity provision in there? Do you recall that?**
A. Yes.
**Q. And we had a discussion as to what type of claim that was and you indicated that that was an insurer indemnified TDP claim?**
MR. LIESEMER: Object to the form.
**Q. Do you recall that?**
MS. HARDING: Object to form and to the question to the extent that it's maybe mixing apples and oranges; I'm not sure. I'm just confused.
A. I believe -- I don't think I identified it as such. I think I might have agreed that it fit the definition that's in the TDP.
**Q. Yes. I thought you said**

**that's what it was, but maybe I'm wrong.**
A. Okay, maybe I'm wrong. At this hour, it could go either way.
**Q. Well, I'm not sure what to make of that. Maybe I should go fishing here.**
C1
**What I'm driving at, is to the extent that settled asbestos insurance entities have contractual indemnity claims against Grace under their respective settlement agreements, those are classified as Class 6 claims, are they not?**
A. Yes.
PP's Obj: R; BE; F
MR. LIESEMER: Object to form.
C1
**Q. That's why my client, One Beacon, got a Class 6 ballot, I presume?**
A. Yes.
**Q. And that's why my other client, Seaton, got a Class 6 ballot, correct?**
A. Yes.
PP's Obj: R; BE; F
MS. HARDING: Object to

form. To the extent you know, but...
**Q. So would those be examples of other contractual indemnity claims in response to Mr. Plevin's question to you of earlier today that are classified as Class 6 claims?**
A. Yes, I believe they would be.
**Q. Okay. And I think you mentioned -- you reiterated here just a moment ago that the classification of the Fireman's Fund Insurance Company contractual indemnity claim was something that was under discussion, I think was the term you used.**
A. Yes, sir.
**Q. Is that also true of the contractual indemnity claims held by settled asbestos insurance companies?**
MS. HARDING: Object to form.
A. Not to my knowledge.
**Q. With respect to the**

**Fireman's Fund Insurance Company claim, when you say it's under discussion, do you mean to suggest that it may be classified differently than Class 6?**
MS. HARDING: Object to the extent that it calls for attorney-client, work product or joint interest communications. If you can answer without divulging those, go for it.
A. Yeah, I think that follows from that, that it's some aspect that's under discussion.
**Q. Is one of the other classifications being considered Class 9?**
A. I don't feel I can answer that.
C1
**Q. Different subject.**
**Earlier today I was asking you a series of questions regarding Section 7.15 in the Plan. That's the insurance neutrality provision. We had a lengthy discussion about 7.15 and its interaction**
PP's Obj: R; BE

CI

**with 11.9, you'll recall?**

A. Yes.

**Q. That's the exculpation provision.**

A. Yes.

**Q. You indicated that you had some doubt, you thought there was some other provision that you were thinking about but couldn't recall that might -- I'm paraphrasing -- take precedence over the insurance neutrality provision in 7.15. Do you recall that testimony?**

A. I recall that, yes.

**Q. Okay. Since or during one of the many breaks we've had today, have you been able to figure out what provision it was that you were thinking of?**

A. Yes, I believe so, and it would not have the effect of overriding the 7.15(a). The provision I was thinking of related to the court retaining exclusive jurisdiction over a number of issues, but even with -- first of all, that would not -- I don't think that would

PP's Obj: R; BE

CI

apply here. But especially with respect to insurance issues, as you probably know, the jurisdiction is not exclusive.

**Q. That was the only other provision?**

A. Yeah, that was -- that is the only one that I had in mind.

MS. HARDING: And object to the form of your question with the use of the term "other" because I don't think that he testified that there was --

MR. BROWN: I think he mentioned that there was at least one other provision, there might have been two, and I'm just trying to clarify whether the one he just referred to involving the retention of jurisdiction is the only other provision.

MS. HARDING: That he was thinking about.

MR. BROWN: That he was thinking of --

THE WITNESS: Yes.

MR. BROWN: -- when he was suggesting that there was an additional section to Section 7.15 in the Plan.

CI

A. Yes. Yes, that's the only one.

PP's Obj: R; BE

MR. BROWN: All right.

MS. HARDING: I think -- object to -- I'm just going to object to the form of the question, Mike, because I think your -- maybe I'm wrong, but I think that your questions are suggesting that he testified that there was a provision in the Plan that overrode -- overrides Section 7.15(a) and I don't think that was his testimony. He said he was going to look for one and he said he didn't find one.

MR. BROWN: The one he had in mind was the one he just testified to.

MS. HARDING: Yes, yes.

THE WITNESS: Correct.

MS. HARDING: Okay, sorry. I just wanted to make sure we're clear.

MR. BROWN: Thank you, Mr. Finke.

MS. HARDING: Mr. Speights, are you on?

MR. SCHIAVONI: Barbara, I just had 10 minutes of questioning. I can do it after Mr. Speights or before, whenever you want. This is Tanc Schiavoni.

MS. HARDING: Oh, Tanc, Mr. Schiavoni.

MR. SCHIAVONI: I'll be quick. I had to get off the line to book a flight to Pittsburgh.

MS. HARDING: Is Mr. Speights on the line?

MR. SPEIGHTS: I'm on, and I don't mind if the gentleman wants to go first.