# Deposition Designations for:

# JAY HUGHES
# June 11, 2009

**Deposition Designation Key**

**CI = Certain insurers (green)**

**CNA = Continental Cas. Co & Continental Ins. Co. (red)**

**PP's = Plan Proponents (blue)**

**Obj: = Objection**

**Ctr = Counter Designation**

**R = Relevance**

**BE = Best Evidence**

**F = Foundation**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

\- - -

| In Re: | : Chapter 11 |
|---|---|
| | : |
| | : Case No. |
| W.R. GRACE & CO., et al, | : 01-01139 JKF |
| | : |
| | : (Jointly |
| Debtors | : Administered) |

\- - -

Thursday, June 11, 2009

\- - -

Oral deposition of JAY W. HUGHES, JR., ESQUIRE, taken pursuant to notice, was held at the offices of KIRKLAND & ELLIS, 665 Fifteenth Street, NW, Washington, DC 20005, commencing at 9:07 a.m., on the above date, before Lori A. Zabielski, a Registered Professional Reporter and Notary Public in and for the Commonwealth of Pennsylvania.

\- - -

MAGNA LEGAL SERVICES
Seven Penn Center
1635 Market Street
8th Floor
Philadelphia, Pennsylvania 19103

Key
CI = Certain Insurers (green
CNA = Continental Casualty Co. & Continental Ins. Co. (red)
PP = Plan Proponents (blue)
Obj: = Objection
Ctr = Counter Designation
R = Relevance
BE = Best Evidence
F = Foundation

CI PP's Obj: R

**with W.R. Grace?**

A. I am a senior litigation counsel in the legal department.

**Q. How long have you held that position?**

A. I have had that title probably since 1991.

**Q. When asbestos claims began accumulating against Grace in the '80s and '90s right up until the time of the bankruptcy, what was your role with respect to those claims?**

A. I was responsible for the day-to-day management and resolution of the asbestos personal injury claims filed against the company.

**Q. Who was your -- or who were your supervisors at that time, your direct reports?**

A. Since 1991, my supervisor was the general counsel, Bob Beber. Bob retired in 1998. In 1998, David Siegel became general counsel. I reported to Dave. Dave retired in -- well, it was

CI PP's Obj: R

after bankruptcy -- in 2005. Mark Shelnitz became general counsel. And at some point after Shelnitz became the general counsel, Richard Finke became assistant general counsel for litigation, and I reported to Richard since then.

**Q. We have taken the deposition of Mr. Finke. What documents have you reviewed to prepare to testify in this 30(b)(6) deposition?**

A. I've reviewed the deposition transcripts of Mr. Finke, of Mr. Posner, and I have taken a look at the Trust Distribution Procedures, the Trust Agreement, and some other insurance agreements, just to kind of refresh my recollection about the issues that I am testifying about.

**Q. Have you reviewed any written communications between insurers and Grace relating to resolution of disputes with insurance carriers in preparation for this deposition?**

A. No.

CI PP's Obj: R

**Q. Were you involved with resolution disputes with insurers during your time as senior litigation counsel assigned to the asbestos claims?**

A. Yes.

**Q. How would you describe your role in those insurance dispute resolutions, by settlement, I assume, primarily, right? That's a compound question.**

MS. HARDING: Object to form.

MR. LEWIS: I will rephrase the question.

CI

BY MR. LEWIS:

PP's Obj: R

**Q. How were you involved in resolving the disputes with the insurance companies?**

A. Well, my primary role involved what I would refer to as post-settlement or post-resolution disputes with insurance carriers. I wasn't directly involved, although I was obviously consulted because of my

CI PP's Obj: R

involvement in the underlying asbestos personal injury cases. I wasn't generally involved in the coverage litigation between Grace and coverage disputes and the insurance carriers.

I have had a much greater involvement in certain disputes that arose based on what I would call the kind of execution and implementation of the insurance and agreements and settlement agreements and coverage in place agreements and reimbursement agreements.

MS. HARDING: Wait one second. To everybody that's on the phone, could everybody please mute their lines while the questioning is going on here in the room. We hear a lot of rustling and talking and things. So please put your phones on mute. Thank you.

MS. ALCABES: Barbara, if the witness could speak up a little bit, it would be helpful,

too. Thanks.

MS. HARDING: The witness is talking pretty loudly, so there is not a whole lot we can do about that. Sorry.

MR. LEWIS: Can you hear me?

MS. ALCABES: Yes.

MR. LONGOSZ: Yes.

MS. HARDING: All right. Thank you.

BY MR. LEWIS:

**Q. Did you review your prior depositions or testimony relating to the Grace bankruptcy to prepare for this deposition?**

A. Yes, I did.

**Q. How many times have you been deposed with respect to the bankruptcy, once?**

A. Twice before today.

**Q. Okay. I have one deposition. Where were you deposed the first time?**

A. The first time I was deposed

in the fraudulent conveyance lawsuit, which was an adversary proceeding, I believe, in the bankruptcy, and that took place in 2002. And then I was deposed in 2007 in connection with the personal injury estimation trial.

**Q. Did you testify on behalf of Grace in the estimation trial?**

A. No, I didn't.

**Q. Well, I don't want to cover that. I have been through that deposition.**

PP's Obj: R

CI

**And I think what you are referring to when you talk about post-settlement disputes, just generally, you were talking about arranging for audits, reporting to settled insurers, and this sort of thing; is that generally correct?**

A. Yes, documenting settlements and issues that arose in terms of Grace's documentation of payment, in terms of reimbursements under the agreement.

**Q. One of the interesting**

**things to the Libby counsel that it involved when we became involved in this case was the way insurance was --**

MR. SCHIAVONI: Objection to form.

MS. HARDING: He didn't ask a question.

MR. LEWIS: Let me finish the question.

MR. SCHIAVONI: I wanted to give you a chance to start over.

MR. LEWIS: What did you say, sir?

MR. SCHIAVONI: I was giving you an opportunity to start over.

MR. LEWIS: Just let me complete my question. My question is going to be pretty benign. I just want to get this witness to another subject. And you can make your objection, and we will proceed.

BY MR. LEWIS:

**Q. When we got in the case, we**

**made interrogatory requests early on in all of our cases, inquiring as to whether there was liability insurance available to Grace to resolve these claims, and the answer we got was generally, don't worry about it, we have got enough money, you don't need to know about insurance. And no insurance information was provided.**

MR. SCHIAVONI: Objection.

MR. LEWIS: I am not done. Okay.

MR. SCHIAVONI: You are giving a speech. You are not asking a question.

BY MR. LEWIS:

**Q. Do you recall that sort of response early on?**

MS. HARDING: Object to form. I would have to --

MR. SCHIAVONI: Object to form.

THE WITNESS: I would have to see a response. I am familiar with our discovery responses

MS. HARDING: I am not telling him not to answer. I am just stating my objection.

MR. LEWIS: Thank you. Are you done?

MS. HARDING: Yes.

MR. SCHIAVONI: Counsel, you are asking for a legal conclusion, point-blank. It's obvious. You can certainly say otherwise, but that's what you are asking for. We object. And stop making speeches. Just answer [sic] questions.

MR. LEWIS: I think you should keep your composure and not get so upset, Counsel. I am going to conduct this deposition. You can object, and we will proceed. Okay?

All right. Read back the last question, please.

(The reporter read from the record as requested.)

BY MR. LEWIS:

**Q. With that preface --**

MR. SCHIAVONI: I object. If you are going to incorporate your statements about the law in questions, it's just objectionable. And you are a very experienced trial lawyer. You know that. You know better. Objection to form.

MR. LEWIS: Are you finished with your objection?

Okay.

BY MR. LEWIS:

**Q. With that preface and acknowledging your objection, was it important to you in your role in settling these cases that you have a passing knowledge of the laws of the various states in which the cases were brought?**

MS. HARDING: Object to form.

MR. SCHIAVONI: Objection to form.

THE WITNESS: Yes.

BY MR. LEWIS:

**Q. For example, you settle cases in a multitude of states, correct?**

A. Yes.

MS. HARDING: Just object to form in terms of you.

But go ahead.

BY MR. LEWIS:

**Q. When I say "you," I am referring to you on behalf of Grace.**

**If you want me to use Grace, I will use Grace. Would that be better? I will use Grace if that bothers you so much.**

CI

**Were you mindful of what jurisdiction or even venue you were in when you evaluated cases for settlement?**

A. Yes.

**Q. And why is that?**

A. Well, I think there obviously can be legal distinctions in terms of the law with respect to personal injury cases that would be relevant to

PP's Obj: R

CI

the value of the case. And also there are differences in historical verdicts, the amount of the verdicts in a case, so the jurisdiction would be relevant there as well.

**Q. For example, whether there is joint and several liability in a state or not might impact your valuation of the settlement; is that true?**

A. Yes.

**Q. What factors did you consider in evaluating a case for settlement?**

A. Well, I think I have testified in both of my prior depositions in this case in a fairly detailed manner on that question.

But I think the same types of factors that any individual involved in resolving asbestos cases, specifically in personal injury cases, generally the quality of the evidence in terms of the exposure of the particular plaintiff to Grace's products, the particular

PP's Obj: R

CI

individual in terms of his age, the seriousness of the disease. In the asbestos arena, there is a distinction between, say, lung cancer and mesothelioma. Primarily it is due to the fact that lung cancer, there are established alternative causes to it. And those are -- that's kind of an overview.

**Q. Would the nature and extent of the exposure in most cases be of paramount importance to you in evaluating a case for settlement?**

MS. HARDING: Object to form.

PP's Obj: R

CI

THE WITNESS: I don't know if it would be paramount importance, but I think that certainly the evidence of exposure to Grace products was something that was one of the primary issues in terms of evaluating the case against Grace and what it might be worth.

BY MR. LEWIS:

**Q. What percentage of the cases, if you know, that are claims that were brought against Grace were primarily Monokote exposure cases?**

MS. HARDING: Object to form, foundation, and overly broad.

But if you can answer, go ahead.

THE WITNESS: I couldn't give a specific percentage, but a substantial portion of the cases historically involved exposures to Monokote 3 and other products to which a commercially chrysotile asbestos had been added commercially.

BY MR. LEWIS:

**Q. Do you consider the Monokote cases as primarily chrysotile cases?**

MS. HARDING: Object to form.

THE WITNESS: I think that

PP's Obj: R

in terms of the percentage of asbestos in the products, they were overwhelmingly chrysotile. The only other asbestos that would have been involved would have been that which was incidental to the vermiculite, if it originated from Libby.

BY MR. LEWIS:

**Q. Was there any other source amphibole asbestos besides the asbestos that contaminated the vermiculite in Libby and products manufactured by Grace?**

MR. SCHIAVONI: Objection, no foundation, speculation.

THE WITNESS: It's fairly well-known that chrysotile deposits in Quebec, I believe, and other parts of the world may have some tremolite contamination as well. Besides that, I would say only the vermiculite and the potential for -- Libby vermiculite and the potential for Libby

amphibole.

BY MR. LEWIS:

**Q. So if I suggested that most amphibole asbestos used in Grace products came from Libby, would you agree or not agree with that?**

MS. HARDING: Just object to form.

You can answer.

THE WITNESS: I don't have a basis for agreeing because I don't have --

MR. SCHIAVONI: Objection, calls for speculation, no foundation.

MR. LEWIS: I think he was saying that, Counsel. But don't interrupt the witness again. You can make your objections, but don't interrupt the witness. I don't interrupt the witness. Let's have some decorum here.

Would you like to finish your answer, sir?

MR. SCHIAVONI: I think he just acknowledged that the question called for speculation.

MR. LEWIS: I think he did, but allow him to answer. That was a foundational question.

THE WITNESS: I said I don't know enough about the issue of contamination -- amphibole contamination in chrysotile to answer that question.

BY MR. LEWIS:

**Q. Fair enough.**

**Do you have enough understanding of the asbestos that was generated from Grace's and Zonolite's operations in Libby was amphibole?**

MS. HARDING: Object to form, generated.

But go ahead.

THE WITNESS: Yes.

BY MR. LEWIS:

**Q. Was it all amphibole as far as you know?**

MS. HARDING: Object to form.

MR. SCHIAVONI: No foundation, calls for speculation. We have a lawyer testifying here, not a fact witness from Libby or a scientist or anything else.

MR. LEWIS: Go ahead and answer.

THE WITNESS: Well, I was going to start by saying what counsel down the table just said.

But my understanding is amphibole, but I am not a mineralogist and I don't have that kind of expertise.

CI

BY MR. LEWIS:

PP's Obj: R

**Q. Yes, but one of the things that you said was important and a factor in evaluating a claim was the nature of the exposure, correct?**

MS. HARDING: Object to form.

Go ahead.

CI

PP's Obj: R

THE WITNESS: But that's not what I meant by nature of the exposure. By nature of the exposure I meant the extent, the duration of the exposure and the extent to which the activity that was involved in terms of was the individual applying our product, was he working in a work space where someone else was applying it, did they mix our product. That's what I am talking about, the kind of factors that an industrial hygienist would use in assessing the nature of the exposure and the risk to the worker, who was the plaintiff.

BY MR. LEWIS:

CI

PP's Obj: R

**Q. Another factor you talked about was the quality of the evidence.**

**What did you mean by that?**

A. What I meant is that if there were -- in a typical asbestos personal injury case, you might have

CI

PP's Obj: R

coworkers who said a Monokote product and/or Zonolite product was present at this work site. And if the individual again, if the plaintiff himself recalled it and accurately described it in deposition testimony, that, in my opinion, would be better evidence and would be more persuasive to a jury than if a coworker who had no personal relationship with or didn't work alongside the plaintiff gave the same kind of testimony and it was an indirect connection between that.

And also there was documentary evidence. If we had evidence in our files that our product was used at a particular building at a particular time period, then I would consider that higher quality evidence than if we had no documents, which was often the case, no documents actually which showed shipments or sale of our product for installation in a particular building and an individual coworker or person at the

CI

site, sometimes somebody who wasn't even involved in the application of the product, testified about it.

**Q. Have you ever been to Libby?**

A. Yes, I have.

**Q. How many times did you go there?**

A. I have been there twice.

**Q. Did you go up to the mine?**

A. No, I haven't been to the mine. It was closed.

**Q. Have you ever reviewed documents concerning the kinds of exposures at Libby?**

A. Yes, I have.

**Q. Libby claims did not involve products claims; is that correct?**

MS. HARDING: Object to form.

MR. SCHIAVONI: Objection, calls for a legal conclusion, overly broad.

MS. HARDING: And it's overly broad.

MR. LIESEMER: I join in the objection.

MR. SCHIAVONI: Lacks foundation, overly ambiguous.

MR. LEWIS: Do you want the question read back or do you remember?

THE WITNESS: You should probably read it back.

MR. LEWIS: I will just restate it.

BY MR. LEWIS:

**Q. Did Libby claims involve products claims?**

MS. HARDING: I am just going to object to form in terms of Libby claims. There is a wide variety of Libby claims and a wide variety of people. I don't know --

MR. LEWIS: Do you want me to define Libby claims? That's fine.

MS. HARDING: I will object

PP's Obj: R

to form and let the witness answer.

MR. LEWIS: The witness knows exactly what I am asking about here.

MS. HARDING: I don't know that the witness knows what you are talking about.

MR. SCHIAVONI: Are you contending that all the policies have same definitions for products in asking this question? Because when you say the witness understands, I mean, you seem to be coaching the witness. Is that your contention, that every policy has the same definition for products?

MR. LEWIS: I am not even referring to policies here, sir. I am referring to common law, tort law. Okay. Those kinds -- the distinction is between products claims --

MR. SCHIAVONI: And what?

MR. LEWIS: -- injuries that result from exposures to products as opposed to injury in Libby that related to exposure to the mining and manufacturing of products or sub-products. So I am not talking about insurance policies right here right now. I will later.

MR. JACOB COHN: If there is a question, I object to the form.

MS. HARDING: I just object to the form, and I think you can answer. Did we get the question back yet?

MR. LEWIS: I might take eight hours here today if we keep doing this.

MS. HARDING: Well, I don't want to take eight hours, but I do want to make sure the witness understands the question.

MS. DeCRISTOFARO: And I join.

A. The McDonald study, Amanda study, 1986.

**Q. Do you believe that the exposures at the dry mill were substantially similar to the exposures to Monokote 3 on construction sites?**

MS. HARDING: Object to form and foundation. This witness is not an expert, and I think it's an improper question to ask this witness.

But you can answer.

MR. LIESEMER: Object to the form of the question.

MR. SCHIAVONI: On a more fundamental basis, this witness is a 30(b)(6) witness. He is not an expert; he is not a fact witness. And this is not a topic that is designated.

MR. LEWIS: Yes, it is.

MR. SCHIAVONI: Really? Which one?

MR. LEWIS: Just look a

them, Counsel. I am not going to answer your questions. I don't have to answer to you. You make your objections on the record, and we will proceed. Or otherwise we will be here forever.

MR. SCHIAVONI: If you can't identify it --

MS. HARDING: Let's just answer. I don't think he can answer, but go ahead.

MR. LEWIS: Do you want to the question read back? Let's read the question back so he can get a complete record.

(The reporter read from the record as requested.)

MR. SCHIAVONI: I object to form, and I object to Grace offering this testimony. It's not designated as corporate testimony. If that's what Grace is going to do, then you have my objection on the record.

MS. HARDING: Grace has already made its objections, and the witness can answer to the extent that --

THE WITNESS: Again, I am not an industrial hygienist, and I really -- having my opinion on whether they are quote/unquote substantially similar, I don't think I can do that.

They both involve asbestos exposures. I have described in my earlier testimony the conditions were different, that one involved the spray application of a finished product at the construction site, the Libby exposures involved working at a mine and mill operation. And the data that does exist is available, and I would rather rely on the data that's available. And I don't have that in front of me.

BY MR. LEWIS:

**Q. Do you recall when we started this deposition that I asked you to testify in the role of senior litigation counsel, settling asbestos claims?**

A. Yes.

**Q. We talked about that.**

**Do you agree that to perform that role well for your employer, you had to know something about asbestos exposure?**

A. Absolutely.

MS. HARDING: Object to form.

Go ahead.

BY MR. LEWIS:

**Q. And you differentiated -- let me withdraw that question.**

**In every case that you looked at as an individual case, would the nature and extent of the exposure be fundamental to your evaluation of the case?**

MS. HARDING: Objection to

PP's Obj: R

PP's Obj: R

form.
THE WITNESS: Yes.
BY MR. LEWIS:
**Q. The Libby cases were largely settled on a case-by-case basis, correct?**
MS. HARDING: Object to Libby cases. It's overly broad.
But go ahead.
THE WITNESS: Yes.
BY MR. LEWIS:
**Q. Again, I am talking about Libby cases, as you earlier defined them, correct?**
A. Yes.
MS. HARDING: Who defined them?
MR. LEWIS: He agreed that we were talking about Libby cases, we were talking about cases that arose in Lincoln County, and he's testified that they were not -- that they were manufactured -- they were exposure cases different from Monokote exposures in the

sense -- and that's what I am asking about.
MS. HARDING: Okay. I object to the form. I think the terminology of "Libby cases" is overly broad.
But go ahead.
MR. SCHIAVONI: Can you just add to that those are a pre-petition cases, right?
MR. LEWIS: Please answer the question.
MR. SCHIAVONI: Objection to form, overly broad.
MS. DeCRISTOFARO: I join.
THE WITNESS: Prior to bankruptcy, the cases in Libby involving Libby employees and family members that were settled generally were settled individually, although in the period of time just prior to the bankruptcy, there were cases that were settled in small groups of

five to ten cases.
BY MR. LEWIS:
**Q. Was that with the Heberling firm?**
A. Yes.
**Q. There were other settlements where you settled cases, 10,000 claims at a time, correct?**
A. Yes. Not Libby cases. Cases in other parts of the country involving exposures to finished products.
**Q. Right.**
**In those cases where you settled them 10,000 at a time or several thousand at a time, did you evaluate the quality of evidence for each individual claim in those cases?**
MS. HARDING: Object to form.
THE WITNESS: Generally, the agreement set forth specific requirements for a case, qualifying materials, and we reviewed, individually reviewed

the qualifying materials that were submitted for each case before the case was settled.
I have testified about this and how those settlement agreements or inventory settlements worked in both of my prior depositions in this case.
BY MR. LEWIS:
**Q. Did you evaluate the exposure for each individual claim?**
A. Exposure --
MS. HARDING: Object to form, and I am just going to not -- I am not going to instruct the witness not to answer, but he has had prior deposition testimony on how these cases were settled. And counsel has indicated that you have reviewed those transcripts, so I just would request that we try not to repeat the same questions that were asked previously since the witness has

already testified so we can try to get through this today. I am not going to -- with that, I am just making a request.

MR. LEWIS: Could you read back the question, please?

(The reporter read from the record as requested.)

THE WITNESS: Well, the qualifying materials that were required under the settlement agreements generally included evidence of exposure, and that would have been evaluated before the settlement was made.

BY MR. LEWIS:

**Q. As I recall your testimony, you were highly critical of the nature of evidence of exposure in most products cases; is that true?**

MS. HARDING: Object to form.

THE WITNESS: I was critical as to the credibility of the

exposure evidence in many cases historically that were being filed in the period from -- well, throughout the period of the asbestos litigation, but specifically in the late '90s and early 2000.

BY MR. LEWIS:

**Q. Did you feel that plaintiffs' counsel were inventing evidence for their clients?**

MS. HARDING: Object to form.

MR. LIESEMER: Object to form.

THE WITNESS: Inventing evidence implies something that -- I questioned the validity of the process through which the evidence was created. Whether it's invented, I don't know. But there are people's memories, and the way memory works, in my experience as a human being and also from people

who are experts in the area, a lot this evidence seemed inconsistent with it.

BY MR. LEWIS:

**Q. It was inconsistent with your own documents relating to where your asbestos was located or Grace's asbestos was located, correct?**

MS. HARDING: Object to form.

THE WITNESS: I don't know if it was inconsistent because we unfortunately didn't have a complete set of documents which would have told us where our products were located.

It was often inconsistent with what we knew about our products and how they were used and, you know, the product formulas and the type of material and the conditions that were being used, they were being applied under.

BY MR. LEWIS:

**Q. Okay. In the Finch deposition that I read, I could not understand how you went through the information submitted for each claimant in this inventory or mass settlements, I would call them.**

**Did you do that post-settlement or pre-settlement?**

A. Post-settlement --

MS. HARDING: Object to form.

THE WITNESS: -- generally.

BY MR. LEWIS:

**Q. So if you settled 10,000 cases for $50 million, as you did in one case, does that mean that you paid the $50 million regardless of whether there was proof, actual proof, in each individual case?**

MR. JACOB COHN: Object to form.

MS. HARDING: Object to form.

PP's Ctr.

THE WITNESS: We paid them 50 million -- it varied from settlement to settlement, quite frankly. In certain situations, we paid the money, but the authority for the attorneys representing the claimants to release the money and pay the money was subject to receiving communications from us that the qualifying materials met the requirements of the agreement.

CI

BY MR. LEWIS: PP's Obj: R

**Q. In any one of those settlements, did Grace ever reject the proof offer to support the individual claims post settlement?**

A. Yes.

**Q. How many times did that happen?**

MS. HARDING: Object to form. PP's Obj: R

CI

THE WITNESS: It happened more times than I could -- it

CI

happened on a fairly regular basis, although it wasn't a substantial percentage of the cases.

BY MR. LEWIS:

**Q. So if you settle a case for 50 -- 10,000 claims for $50 million, and 100 of those claims, for example -- I am asking you to assume a hypothetical here -- didn't show substantial proof of exposure or disease, the proof was defective in some manner, would the amount allocated for those 100 claimants be deducted from the settlement?**

A. Yes.

**Q. In every case?**

A. Not in every case, but, I mean, there were other -- it's difficult to say. I mean, in the administration of cases like that, you could assume a certain percentage of cases weren't going to meet the requirements in valuing the cases. There are all kinds of ways you could do it, but there was definitely a

process in place.

And, again, I am -- and I think as I have testified in the past, there was a process was in place, and I was confident that in the process that we had in place was reviewing the qualifying materials and we were paying places only where they had submitted qualifying materials consistent with the agreement.

I think my opinion as to the relative credibility of some of the qualifying materials, both medical and exposure, I have testified before and that is --

**Q. You have so testified. I am not going to get into that.**

A. Okay.

**Q. Do you recall the case, the specific case where you settled 10,000 claims for $50 million, the firm you settled with?**

A. I believe it was Baron & Budd.

**Q. Were those 10,000 claims**

**just asbestosis claims or were there cancer and mesos in those claims?**

A. There were cancers and mesos.

**Q. Did the settlement provide that the mesos would get a different amount than the asbestosis claims?**

A. As I recall, yes.

**Q. Who made the decision as to who got what, how much each claimant was individually paid? Did Grace have any input in that?**

MS. HARDING: Just object to the extent it calls for attorney-client work product information. And to the extent -- I instruct the witness not to answer to the extent that it calls for that. To the extent that it doesn't, you can answer.

MR. LEWIS: I think the that's a fair objection because the question is not very precise. I will rephrase the question.

**disease of each individual claimant involved in an inventory settlement before settling the case?**

MS. HARDING: Object to form.

Go ahead.

THE WITNESS: Well, there is a couple things. One is that, as I said, there were medical documentation requirements in the inventory settlements, and we reviewed the medical evidence that was submitted as part of the qualifying materials to make sure that it met the requirements of the particular inventory settlement.

The other thing you need to keep in mind is that in the evolution of the litigation, many of the inventory settlements, if not most, involved or were agreed to after a substantial amount of time in litigation with the

particular law firm, so we were familiar with their clientele, the disease that was involved, the quality of the medical evidence in terms of the specific doctors that were submitting it and so on.

MR. LEWIS: To the extent that that response is nonresponsive so my question, I move to strike it.

BY MR. LEWIS:

**Q. I am asking you about what knowledge you had concerning the seriousness of the disease of each individual claimant before you entered into these inventory settlements. And I am not arguing with you. Did you understand that was my inquiry?**

MS. HARDING: Object to form. I think it's confusing. Are you talking about their complaints? I don't understand the question, and I object.

BY MR. LEWIS:

PP's Ctr.

**Q. You listed the four factors that you used to decide whether a claim -- what settlement value was assigned to a claim.**

A. Right.

**Q. Did you have information as to all of these four factors for each claimant in inventory settlements before you entered into the settlement agreement, the inventory settlement agreement?**

MS. HARDING: Object to form.

If you can answer, go ahead.

THE WITNESS: Again, not necessarily for all of the claimants, but we had procedures in the settlement agreement itself that required that kind of information to be submitted to us. And, as I said before -- and I feel was responsive -- we generally had a course of dealing and history with the particular

PP's Ctr.

firm so we knew something about the clients and we knew something about the quality of evidence we expected to see as far as exposure and the medical condition of the plaintiff.

BY MR. LEWIS:

**Q. So does that mean if Grace had a good relationship with a particular firm, that firm's claimants got to settle their cases and other unfamiliar plaintiffs' lawyers couldn't settle their cases?**

MR. LIESEMER: Object to the form.

MS. HARDING: Object to the form.

THE WITNESS: No.

BY MR. LEWIS:

**Q. Well, for example, you had a good relationship with Worthington, right?**

MS. HARDING: Object to form.