Page 130

1  we filed with the court.  And I am
2  not going to list them all here,
3  but they are listed in that
4  category.
5      And as we have said in other
6  depositions we listed somebody for
7  every category, noting in our
8  objections and in our
9  communications with counsel, that
10  we didn't believe that all
11  categories were proper categories
12  for inquiry in the 30(b)(6)
13  deposition, as we believe this
14  category is not.
15      MR. LEWIS:  Do you direct
16  the witness not to answer any
17  questions in this category,
18  development of the --
19      MS. HARDING:  I have allowed
20  the witness to answer, and he's
21  answered he didn't know.  I just
22  wanted to note that for the record
23  to the extent that you are
24  complaining that he is not --

Page 131

1      MR. LEWIS:  I am not
2  complaining about anything.  I am
3  just asking questions.
4      I wanted to ask more
5  questions in this area, and I was
6  asking you if you are going to
7  direct -- you are claiming
8  privilege?
9      MS. HARDING:  I am not going
10  to have a blanket objection, but I
11  wanted to remind counsel of that
12  objection.  And then you can ask
13  questions, and we can go from
14  there.
15  BY MR. LEWIS:
16      Q.   So your involvement in the
17  development of the TDP was, as you
18  described earlier?  You just reviewed it,
19  correct?
20      A.   Yes, a draft.
21      Q.   Were there any negotiations
22  between you and the ACC concerning the
23  language of the TDP?
24      MR. LIESEMER:  Object to the

Page 132

1  question.
2      MS. HARDING:  Object to the
3  form, and I think the witness has
4  already asked and answered.
5      THE WITNESS:  I think I may
6  have participated in a phone call
7  where drafts were discussed in
8  discussions with ACC and FCR
9  representatives and Grace and
10  Grace's counsel, but I don't have
11  a specific recollection.
12  BY MR. LEWIS:
13      Q.   Do you have any knowledge of
14  the preparation of the documents,
15  including the drafts of the TDP?
16      A.   Again, I described my
17  involvement and the knowledge I have.  I
18  was provided with copies of the drafts
19  early on in the process and reviewed them
20  and advised Grace and Grace's counsel and
21  my comments based on my experience in
22  asbestos litigation.  But the primary
23  drafting role was with the ACC and FCR,
24  as it probably should be.

Page 133

1      Q.   Why do you say it probably
2  should be?
3      MS. HARDING:  Object to
4  form.
5      THE WITNESS:  Because their
6  constituency will ultimately be
7  the beneficiaries of the Trust.
8  BY MR. LEWIS:
9      Q.   Because, to Grace, Grace
10  will pay the same amount under the
11  settlement regardless of how the TDP is
12  drawn, correct?
13      MR. LIESEMER:  Object to the
14  form.
15      MS. HARDING:  Object to the
16  form.
17      THE WITNESS:  I guess that's
18  probably part of it but, again,
19  the terms of their constituency,
20  the ultimate beneficiaries of the
21  Trust and the way the Trust
22  operates and the distribution
23  procedure is something that they
24  probably -- the asbestos claimants

CI

PP's Obj: R

PP's Obj: R

PP's Obj: R

Page 134

1  and the Future Claimants'
2  Representative have a direct
3  interest in.
4  BY MR. LEWIS:
5      Q.   Did you review any TDPs in
6  other asbestos bankruptcy settlements?
7      A.   I have over the course of my
8  career.  I had reviewed them beforehand.
9      Q.   Did you review them in order
10 to provide input concerning the TDP in
11 this case?
12     A.   I think I may have pulled a
13 couple out and taken a look at when the
14 issue of the TDPs in this case came up.
15 I also -- you know, early on in
16 bankruptcies, Grace was a codefendant and
17 participated, and so I probably was
18 concerned at that point with what Trust
19 Distribution Procedures in earlier
20 bankruptcies said about, you know,
21 codefendant claims and so on.
22     Q.   When you say "probably," do
23 you mean that's one of the reasons you
24 would have reviewed them?

Page 135

1      A.   In the past, yes.
2      Q.   Okay.  Do you understand the
3  disease categories under the TDP that's
4  been offered by this Plan?
5      A.   Yes.
6      Q.   Have you reviewed the severe
7  pleural disease category under the TDP?
8      A.   Yes, I have.
9      Q.   Did you offer any input on
10 behalf of Grace concerning the severe
11 pleural disease category under the TDP?
12         MS. HARDING:  I will let you
13 answer if you recall any input.
14 But in terms of actual
15 negotiations and discussions about
16 the drafting, we are going to
17 avoid those.
18         THE WITNESS:  Yeah, I don't
19 recall, and I think that, as a
20 general rule, the issue of the
21 disease category and Grace's view
22 of it would be that it's primarily
23 an issue for experts.  And my
24 recollection was, again, that

Page 136

1  disease categories and the
2  criteria were consistent with the
3  understanding of the
4  asbestos-related disease and
5  myself as a non-expert, an
6  attorney involved in resolving
7  cases for many years, that they
8  accurately or at least were
9  consistent with the medical
10 criteria that were used in
11 evaluating cases by Grace and by
12 other defendants in the asbestos
13 litigation.
14 BY MR. LEWIS:
15     Q.   What is your understanding
16 -- as a person primarily responsible for
17 claims in Libby from 1985 to the date of
18 the bankruptcy filing, what is your
19 understanding of the nature of the
20 disease in Libby?
21         MS. HARDING:  Object to form
22 in terms of nature of disease.
23         But to the extent you can
24 answer, go ahead.

Page 137

1          THE WITNESS:  That the --
2          MR. SCHIAVONI:  No
3  foundation, calls for privileged
4  information, vague, ambiguous.
5          Do you want to know what you
6  are telling him and what you are
7  alleging?  The whole thing is sort
8  of --
9          MR. LEWIS:  Counsel, that's
10 a wide open question.  It's a
11 perfectly proper question.
12         Would you please read it
13 back?
14         (The reporter read from the
15 record as requested.)
16         MR. LIESEMER:  I object to
17 the form of the question.  No
18 foundation.
19         MR. SCHIAVONI:  The basis is
20 there is no personal knowledge of
21 this witness.  So you want him to
22 just speculate and say what the
23 plaintiffs' lawyers have told him?
24 Fine.  That's what you will get.

Page 154

1   answer, and now you have to move
2   on.
3       MR. LEWIS:  He never
4   answered the question, sir.
5       MR. SCHIAVONI:  You are not
6   happy with it.
7       MS. HARDING:  I think he
8   tried very hard to answer a
9   question that is...  *PP's Ctr.*
10  BY MR. LEWIS:
11      Q.   Okay.  Let me rephrase the
12  question slightly.  I am talking about
13  Libby employees here.
14          As you categorize them in
15  Exhibit-1, 91-1625 --
16      A.   Yes.
17      Q.   -- are those claims
18  substantially similar to the Construction
19  & Other claims set forth on line 38 of
20  that document?
21      MS. HARDING:  Object to  *PP's Ctr.*
22  form.  Again, I think it's a very
23  important objection.  It's overly
24  broad.  It assumes facts not in

Page 155

1   evidence.  It makes comparisons  *PP's Ctr.*
2   between claims without giving any
3   characteristics of the claims,
4   disease, levels of exposure, time
5   periods, all of those things.  I
6   think it's impossible to answer.
7       If you think you can answer
8   it, Jay, or do your best, go
9   ahead.  I think it's asked and
10  answered, but go ahead.
11      MS. BAER:  It also assumes
12  that you know what the definition
13  of "substantially similar" is,
14  which has not been defined here.
15      MR. LEWIS:  He's the one
16  that used the term "substantially
17  similar."  I just embraced it.  It
18  was his word.
19      MS. HARDING:  In any
20  event --
21      MR. LEWIS:  So that's why I
22  am entitled to inquire about it.
23      MR. SCHIAVONI:  You don't
24  understand what it means, either.

Page 156

1   I object.  No one in the room
2   understands.
3       MS. HARDING:  Sorry, Jay.
4       MR. LEWIS:  Do you want to  *PP's Ctr.*
5   answer the question please or we
6   can have it read back again.
7       THE WITNESS:  I do feel that
8   I answered the question, again.
9       There are obviously
10  differences.  There are
11  differences between every claim.
12  One claim of 328,000 claims that
13  were filed against Grace, there
14  were differences from one to the
15  other.
16      The Libby claims, in terms
17  of the value, the values are
18  reported here.  But to talk
19  about -- there are certainly
20  similarities.  They are all
21  asbestos personal injury claims
22  alleging pulmonary and lung
23  problems and mesothelioma, lung
24  cancer, pleural disease,

Page 157

1   asbestosis resulting from exposure  *PP's Ctr.*
2   to asbestos, and there are
3   substantial similarities between
4   the claims.
5       And, in my opinion, the
6   Trust Distribution Procedures, as
7   I read them, deal with these
8   differences in terms of value and
9   by providing, for example, an
10  exposure if a person is exposed
11  substantially to Grace products by
12  a five or eight times multiplier
13  of the value, they provide for
14  litigation in the tort system,
15  they provide for, you know, again,
16  both the forum and the criteria to
17  differentiate between different
18  kinds of cases.  And the Libby
19  cases are asbestos personal injury
20  cases, and there are differences
21  in severity.
22      So the extent to which the
23  Libby cases are different, the
24  Trust Distribution Procedures

Page 158

1    address those differences.
2  BY MR. LEWIS:
3       Q.   Under the TDP, would the
4  average Libby claim be valued anywhere
5  near $268,000 per claim?
6       MS. HARDING:  Object to the
7  form and to the use of the term
8  "average Libby claim."  I think
9  that's the problem with the entire
10 deposition.
11      But go ahead.
12      MR. LIESEMER:  Object to the
13 form.  Mr. Hughes is not going to
14 be valuing claims under the TDP.
15 It would be the Asbestos PI Trust.
16      MR. LEWIS:  Are they here
17 today?  Is the PI Trust here,
18 anybody on their behalf?
19      (No response.)
20      THE WITNESS:  Well, the PI
21 Trust doesn't exist.
22      MR. LEWIS:  I know.
23      THE WITNESS:  And we don't
24 know how they will be valued and

Page 159

1  the average is.  So for me to
2  answer your question would involve
3  several layers of speculation, and
4  I am not going to do it, quite
5  frankly.
6  BY MR. LEWIS:
7       Q.   Your average settlement for
8  all mesotheliomas was on the order of
9  $90,000, correct?
10      MR. LIESEMER:  Object to the
11 form.
12      THE WITNESS:  Pre-petition?
13 BY MR. LEWIS:
14      Q.   Pre-petition.
15      A.   That sounds right, but I
16 don't have the date right in front of me.
17      Q.   Why does a TDP evaluate
18 mesotheliomas at $180,000 per claim --
19      MS. HARDING:  Object to
20 form.
21      MR. LEWIS:  Can I finish?
22      MS. HARDING:  I am sorry.  I
23 thought you were finished.  Sorry.
24 BY MR. LEWIS:

Page 160

1       Q.   Why does a TDP value
2  mesothelioma claims at $180,000 if the
3  average settlement for mesothelioma
4  claims system-wide for Grace was on the
5  order of $90,000?
6       MS. HARDING:  Object to
7  form, foundation.
8       Go ahead.
9       THE WITNESS:  I think that
10 the values that are included in
11 the TDP are based upon the Grace
12 historical settlement averages.
13 But I am not familiar with the
14 methodology in terms of how the
15 relationship between those and --
16 it's my understanding that it was
17 done with the guidance of experts
18 in the area, and I am not an
19 expert in terms of the
20 relationship between the two
21 numbers.
22 BY MR. LEWIS:
23      Q.   So we have an average
24 settlement for mesothelioma that was 90,

Page 161

1  but under the TDP, you get 180.  And you
2  got an average settlement in Libby of
3  268, and under the TDP, the most they
4  could ever get, if they don't have
5  mesothelioma, is 50,000 times the payment
6  percentage?  Is that what you understand
7  the TDP to say?
8       MS. HARDING:  Object to
9  form.
10      MR. LIESEMER:  Object to the
11 form of the question, speculative,
12 no foundation.
13      MS. HARDING:  I think it is
14 improperly characterized.
15 BY MR. LEWIS:
16      Q.   You understand the question,
17 right?
18      A.   If you could repeat the
19 question, I would appreciate it.
20      MR. LEWIS:  Why don't we
21 read it back?  And I will withdraw
22 it, if I think it's an unfair
23 question.
24      (The reporter read from the

Page 162

1    record as requested.)
2         MR. LIESEMER:  Same
3    objection.
4         MS. HARDING:  Same
5    objection.
6         THE WITNESS:  I mean, in
7    this area, the TDP says what it
8    says.
9         MR. LEWIS:  Okay.
10        THE WITNESS:  I am not going
11   to start giving my interpretation.
12   The values are set forth
13   specifically.
14   BY MR. LEWIS:
15        Q.   Do you take the position
16   that the TDP is fair, or do you not take
17   a position on that issue?
18        A.   I think I said that I think
19   the TDP is -- in terms of the differences
20   between the claims, that the criteria in
21   terms of exposure, disease and so on,
22   that differentiate between the hundreds
23   of thousands of asbestos personal injury
24   claims that were filed against Grace

Page 163

1    pre-petition, that the Trust Distribution
2    Procedure adequately addresses the
3    difference in valuing the claims and
4    provides a forum for those -- a procedure
5    and forum for those claimants who differ
6    with the valuation of the claims to
7    litigate the issues.
8         Q.   Do you agree that the best
9    estimate of the historical value of
10   claims would be based on the information
11   that's provided in Exhibit-1, page
12   91-1625?
13        A.   That's --
14        MS. HARDING:  I am just
15   going to object to the form again
16   with respect to the vague
17   reference to claims and whether
18   you are talking about what claims
19   you are trying to value now.
20        MR. LIESEMER:  Object to the
21   form of the question.
22        MR. LEWIS:  Would you read
23   back it back?  He was starting to
24   answer.

Page 164

1         (The reporter read from the
2    record as requested.)
3         THE WITNESS:  I think that,
4    like any valuation, when you are
5    looking at a large population,
6    that this information is a good
7    measure.  When you try to -- for
8    example, when you talk about Libby
9    claims, you have identified a much
10   smaller population.  And while
11   it's a measure, there is always
12   the potential which I think I
13   believe is the case in the Libby
14   situation, that there is a
15   fundamental shift in terms of the
16   types of claims we are seeing at
17   Libby that were filed that
18   were 15, 20 years ago from those
19   that I see that are being filed
20   currently, both in terms of the
21   exposure and the disease.
22        So while I agree that this
23   is valuable data and most
24   important data because it

Page 165

1    accurately reflects Grace's
2    experience in the tort system, I
3    think that, as you get into
4    smaller groups, there is the
5    potential that the smaller
6    population can change over time.
7    And so you are better off using
8    criteria that addresses value,
9    medical exposure that reflects a
10   much broader population.
11   BY MR. LEWIS:
12        Q.   What claims are being filed
13   since Grace went into bankruptcy that you
14   are relying on in your answer?
15        MS. HARDING:  Object to
16   form.
17   BY MR. LEWIS:
18        Q.   Claims to date?
19        MS. HARDING:  I don't know
20   if he said filed or asserted.
21        THE WITNESS:  I meant
22   asserted.
23   BY MR. LEWIS:
24        Q.   What claims are there; do

Page 294

1  prepare this witness for those
2  questions because we weren't aware
3  you were going to ask him about
4  it.
5      MS. CASEY:  I join in the
6  objection.  He was listed as the
7  30(b)(6) deponent for insurance
8  issues related to BNSF, which is
9  why I prepared my questions for
10 today.
11     But I have no further
12 questions.
13     MR. SCHIAVONI:  If you feel
14 there aren't any questions that
15 have been answered, ask them now.
16     MS. HARDING:  Right.  He's
17 answering all of your questions.
18     MS. CASEY:  He's already
19 answered my questions and now said
20 he does not know.
21     MR. SCHIAVONI:  If there are
22 any questions that you feel
23 haven't been answered, you should
24 state them right now, Counselor.

Page 295

1      MS. CASEY:  He answered the
2  questions.
3      Excuse me?
4      MS. HARDING:  Never mind.
5  He answered -- you asked a
6  question, and he answered it.
7      THE WITNESS:  Well, you
8  didn't ask a question, actually.
9  But...
10     MS. CASEY:  Can you read the
11 last question, please, and the
12 answer if there was one?
13     (The reporter read from the
14 record as requested.)
15     THE WITNESS:  My point -- my
16 answer is that -- the answer to
17 the question is in the settlement
18 agreement with CNA at Continental
19 Casualty Company in assuming that
20 the Exhibit 5 is accurate,
21 policies, which have the policy
22 number CCP 4834440, appear on
23 Exhibit 5 and listed as settled
24 insurance policies under the Plan.

Page 296

1      MS. CASEY:  I have no
2  further questions, but I would
3  like to, in addition to the
4  objections that have already been
5  stated on the record, also object
6  on the basis that the Debtors had
7  not produced the insurance
8  policies prior to Mr. Posner's
9  deposition but has produced the
10 insurance policies prior to
11 Mr. Hughes' deposition.  With
12 that, I pass the witness.
13     MR. BROWN:  Why don't we
14 mark that as 11.
15     (Hughes-11 marked for
16 identification at this time.)
17         - - -
18     EXAMINATION
19         - - -
20 BY MR. BROWN:
21     Q.  Good afternoon, Mr. Hughes.
22 My name is Michael Brown.  I represent
23 GEICO, Republic Insurance Company, Seaton
24 Insurance Company, and OneBeacon America

Page 297

1  Insurance Company.
2      We have just had marked as
3  Hughes-11 a document that I would like
4  you to take a look at and tell me if you
5  can identify it.
6      A.  It's a letter indicted April
7  25th, 2009 from Barbara Harding to
8  counsel, and attached is the witness
9  designations and topics of deposition and
10 a listing of the designated witness based
11 on deposition notices that have been
12 filed in this case and the confirmation
13 hearing.
14     Q.  Okay.  And have you seen
15 this document before today?
16     A.  I have.
17     Q.  And just so it's clear, this
18 is a compilation of all the various
19 topics and particular Grace witness that
20 is prepared to testify about the subjects
21 where his name appears, correct?
22     A.  Right.
23     Q.  Okay.  You can put that
24 aside.

CI

PP's
Obj:
R

Page 298

1    Are you generally familiar
2  with Grace's liability insurance program?
3      A.  Yes.
4      Q.  Okay.  Do you understand
5  that Grace has various layers of
6  insurance?
7      A.  Yes.
8      Q.  Okay.  Could you describe
9  for me your understanding of that?
10      A.  Well, under the period of
11  time from, say, pre-1985 when there was
12  asbestos insurance available, Grace would
13  each year or -- and it would have a
14  primary policy with CNA from 1973 through
15  '85, Maryland Casualty before that, and
16  that there would be additional policies,
17  excess policies, which would provide
18  coverage for losses or claims in the
19  event that the aggregate limits of the
20  primary policies were exhausted.
21          And so a company like Grace
22  would go up and buy, you know, coverage,
23  insurance coverage for a particular year,
24  a particular policy period, and they

Page 299

1  would have a primary policy.  And then
2  they would have policies above that, say,
3  you know, at $5 million level, $10
4  million level, depending on how they
5  assess their risk.
6      Q.  Okay.  And you have a
7  general familiarity with the concept of a
8  coverage chart, correct?
9      A.  Yes.
10      Q.  Okay.  And you understand
11  that there is various layers of coverage
12  from the primary to the umbrella and the
13  excess above that?
14      A.  Yes.
15      Q.  And Grace, as you just
16  testified, purchased policies in each
17  policy year at each of those levels?
18      A.  Yes.
19      MR. BROWN:  Let me mark a
20  second document, and this will be
21  Hughes-12.
22      (Hughes-12 marked for
23  identification at this time.)
24      (Mr. Speights re-joined the

Page 300

1  deposition via teleconference at
2  this time.)
3  BY MR. BROWN:
4      Q.  Mr. Hughes, you have before
5  you a document we marked as Hughes-12.
6  Can you take a few moments to familiarize
7  yourself with it?
8      A.  Sure.
9      MS. HARDING:  I am going to
10  note for the record that we
11  did designate Mr. Finke with
12  respect to the Transfer Agreement.
13  But if you want to ask prosecute
14  Hughes a question --
15      MR. BROWN:  I am not going
16  to ask him a lot about the
17  agreement.  I am going to ask
18  about the attachment to the
19  agreement.
20      MS. HARDING:  I don't think
21  it changes the notation for the
22  record.  But go ahead and ask him
23  questions, and to the extent he
24  can answer without speculating...

Page 301

1  BY MR. BROWN:
2      Q.  Let me start by asking you
3  whether you have seen the document marked
4  Hughes-12 before?
5      A.  I have seen the agreement
6  before.
7      Q.  Okay.  Can you look at the
8  back of it, and you will note that the
9  agreement has some schedules?
10      A.  Yes.
11      Q.  I believe there are three of
12  them.
13          Have you seen those
14  schedules before today?
15      A.  I can't say that I have seen
16  these schedules.  I have seen similar
17  documents.
18      Q.  Okay.  Have you seen ones
19  similar to what's been marked or what is
20  identified as Schedule 1?
21      A.  Yes.
22      Q.  Okay.  In what connection
23  did you see the document that is attached
24  as Schedule 1 to Hughes-12?



*CI*

**PP's Obj: R**

Page 302

1    A.    Just in connection with the
2  case, in connection with, you know, my
3  involvement in asbestos litigation and
4  the coverage issues associated with it to
5  Jeff Posner and others within Grace. I
6  think I have seen this policy list
7  before.
8         Q.    Okay.  Is this a document
9  that Mr. Posner prepared; do you know?
10        A.    Not specifically, no.
11        Q.    Okay.  Is it a document that
12 someone at Grace prepared?
13        A.    I don't know this specific
14 version of the document, but Mr. Posner
15 certainly would be the person that if I
16 were to have undertaken the task of
17 creating this document, I would have
18 consulted with Mr. Posner.
19        Q.    Okay.  Can you take a look
20 at the first page?  It's a -- the
21 Schedule is a 20-page document.  And you
22 will see that there are -- well, first of
23 all, what do you understand the schedule
24 generally to be?

*CI*

**PP's Obj: R**

Page 303

1    A.    The list of policies that
2  were available to Grace to pay
3  asbestos-related claims.
4         Q.    Okay.  Would these be
5  policies that would have been in the part
6  of the general liability program that you
7  indicated you were generally familiar
8  with?
9         A.    Yes.
10        Q.    Okay.  Can you describe for
11 me what each of the headings along the
12 top of the first page, what you
13 understand those to mean?
14        A.    Well, the policy year is the
15 year that the insurance policy covered in
16 terms of losses that occurred in the year
17 or at least triggered the insurance
18 coverage for that period of time.
19 Insurer is obviously the insurer.  And
20 then insurance company that's providing
21 the coverage is obligated to provide
22 insurance for losses that triggered the
23 policy.
24        The policy number identifies

*CI*

Page 304

**PP's Obj: R**

1  the specific insurance policies.
2  Generally, you have a policy number
3  identifying which policy.  And then the
4  layers, when we were talking about before
5  about the program and how you have to
6  umbrella policies and excess policies,
7  and they are layered based on the amount
8  of the coverage available for a
9  particular policy period.  That
10 identifies which policy -- excuse me --
11 which layer the particular policy is in
12 the Grace coverage block.
13        Q.    If it says primary, that's
14 the very bottom level of insurance; is
15 that correct?
16        A.    Yes.
17        Q.    And then if it has a one
18 next to it, is that the first layer
19 excess?
20        A.    First layer excess would be
21 the way I understand it.
22        Q.    And it goes up to -- the
23 highest number I thought I saw was 8 and
24 would be the highest level for any policy

*CI*

Page 305

**PP's Obj: R**

1  year?  That is the highest level of
2  excess insurance?
3         A.    That's the highest I saw.
4         Q.    Okay.  Now, I think you
5  testified earlier that you were the
6  person that was primarily responsible for
7  handling the day-to-day defense of Grace
8  PI claims at least internally at Grace;
9  is that right?
10        A.    Yes.
11        Q.    Okay.  And in that capacity,
12 did you have occasion to deal with
13 insurance issues?
14        A.    Yes.  Again, as I have
15 described, primarily in the context of
16 Grace's obligations under insurance
17 arrangements with reimbursement or
18 coverage in place arranged.  Grace had
19 obligations to insurers in making sure we
20 met those obligations and getting
21 reimbursed under the agreements.
22        Q.    Okay.
23        A.    And the policies as well, I
24 suppose.

Page 310

```
1    to.  I think it's unquestionably
2    clear that we have gone over and
3    beyond our requirements under
4    30(b)(6) in this whole process.
5        MR. BROWN:  Okay.  Can I ask
6    my next question?
7        MS. HARDING:  Yes, you may.
8   BY MR. BROWN:
9        Q.  Mr. Hughes, let's go to
10   other schedules for the moment.  Let's
11   take a look at the second schedule.
12       MS. HARDING:  Again,
13   Mr. Hughes wasn't even designated
14   with respect to this schedule or
15   this exhibit, but go ahead.  I am
16   happy to let him answer the
17   question.
18       MR. BROWN:  We was
19   designated as a person that would
20   be produced on insurance issues.
21   There are nine topics on that
22   chart that had his name next to
23   it.  We don't need to quarrel
24   about it.  If he doesn't know the
```

*PP's Obj: R*

Page 311

```
1    answer, fine.
2   BY MR. BROWN:
3        Q.  Mr. Hughes, my question with
4    respect to Schedule 2 of Hughes-12 is, do
5    you understand what the schedule
6    reflects?
7        A.  Yes.
8        Q.  What is that?
9        A.  It's a list of the insurance
10   settlement agreements -- settlement
11   agreements which resolved coverage
12   disputes with liability insurers that
13   provided Grace with insurance coverage
14   for asbestos-related personal injury and
15   property damage claims and the dates of
16   those agreements.
17       Q.  If you could take a look at
18   Schedule 3, which is a couple pages
19   along, do you have an understanding of
20   what is reflected on Schedule 3?
21       A.  It's a similar list of
22   insurers where we have what's
23   characterized here as a asbestos
24   reimbursement agreements.
```

*PP's Obj: R*

Page 312

```
1        Q.  All right.  Let's go back to
2    Schedule 1 and specifically page 7 of
3    Schedule 1.
4        A.  Okay.
5        Q.  And you heard me when I
6    introduced myself that one of my clients
7    is GEICO.  You will see in the middle of
8    the page that there are three policies
9    for GEICO listed on page 7.
10       Do you see those?
11       A.  Yes.
12       Q.  Okay.  Did Grace to your
13   knowledge have any settlement with GEICO?
14       A.  Not to my knowledge.
15       Q.  Okay.  Let's go a little bit
16   further on to page 16.  Another one of
17   the companies that I indicated I
18   represent is Republic, and you will see
19   toward the top of that page there are two
20   policies listed for Republic.
21       To your knowledge, did Grace
22   have any settlements with Republic
23   Insurance Company?
24       A.  Again, I am familiar with
```

*PP's Obj: R*

Page 313

```
1    and maintain a list in my office because
2    of my involvement in terms of what -- I
3    don't know and don't recall specifically
4    an agreement with Republic.
5        But the other issue, of
6    course, when you come with insurance
7    companies is kind of the changing
8    landscape of who they are.  But I don't
9    specifically recall Republic Insurance.
10   I think there are over 60 or 70
11   agreements, settlement agreements with
12   different kinds.
13       Q.  Would you agree with me that
14   Republic Insurance Company does not
15   appear on either Schedule 3 -- excuse me
16   -- either 2 or 3?
17       A.  No.
18       Q.  Does that help refresh your
19   recollection as to whether Grace had --
20       MR. LEWIS:  That sounds like
21   a double negative.  I don't know
22   that the record is clear on that.
23       MR. SCHIAVONI:
24       No, he doesn't agree or not?
```

*PP's Obj: R*

Page 314

1    MR. LEWIS:  Can you read it
2  back?  I might have muddled it.
3    (The reporter read from the
4  record as requested.)
5    THE WITNESS:  I agree that
6  it's correct.
7  BY MR. BROWN:
8    Q.   We were talking about
9  Republic.  Why don't we try to fix that.
10    I am correct, am I night
11  knot that Republic Insurance Company does
12  not appear on Schedule 2 or 3?
13    A.   Yes, you are correct.  It
14  does not appear on Schedule 2 or 3.
15    Q.   Does that refresh your
16  recollection as to whether Grace had a
17  settlement agreement with Republic?
18    A.   I have no recollection that
19  it does, and since it doesn't appear on 2
20  and 3 and my understanding is 2 and 3 are
21  accurate, then I would say my
22  understanding would be no, that there is
23  no settlement agreement with Republic.
24    Q.   Okay.  You indicated at the

Page 315

1  outset that you were generally familiar
2  with Grace's insurance program.
3    Are you generally familiar
4  with the rights and duties of the
5  insured, on the one hand, and the
6  insurer, on the other, under an excess
7  policy?
8    MS. HARDING:  Object to
9  form.
10    Go ahead.
11    THE WITNESS: Yes, I am
12  generally familiar.
13  BY MR. BROWN:
14    Q.   Okay.  Can you describe your
15  familiarity in terms of -- what do you
16  understand to be the insurer's, the
17  excess insurer's rights under an excess
18  policy?
19    MS. HARDING:  I am just
20  going to object to form and to the
21  extent it's overly broad and
22  doesn't refer to a specific
23  policy.
24    But if you can answer the

Page 316

1  question, go ahead.
2    THE WITNESS:  Well, to
3  provide insurance coverage and to
4  provide indemnity payments when
5  the underlying policies under the
6  terms of the insurance contract.
7  If a loss covered within the scope
8  of the coverage provided to the
9  insured and that the underlying
10  policies have been exhausted, that
11  it would trigger an obligation on
12  the part of the excess insurer to
13  pay the claim, again, in a manner
14  consistent with the insurance
15  policy.
16  BY MR. BROWN:
17    Q.   Okay.  And just following up
18  on that latter phrase at the end of your
19  answer, do you understand generally --
20  and I understand that it may be different
21  from policy to policy.  But do you
22  understand generally that the insurer has
23  a duty to cooperate with the excess
24  insurer?

Page 317

1    MS. HARDING:  Object to
2  form.  Again, same objection.
3    THE WITNESS:  I know
4  generally that in terms of
5  insurance policies, an insured has
6  a duty to cooperate.
7  BY MR. BROWN:
8    Q.   And the insured has a duty
9  to give notice of claims; you are
10  familiar with that as well?
11    A.   Yes.
12    Q.   And are you generally
13  familiar at that the excess layer, the
14  insure has a right to associate in the
15  defense of claims?
16    MS. HARDING:  Object to
17  form.
18    THE WITNESS:  To associate
19  in defense of claims?
20  BY MR. BROWN:
21    Q.   Yes.
22    A.   Yes, although I think that,
23  again, that's something that you alluded
24  to earlier that I would think varied from



CI

PP's
Obj: R, BE, F

**Page 318**

1  policy to policy in specific relation.
2      Q.   Okay.  To your knowledge,
3  does Grace have any agreement with GEICO
4  pursuant to which GEICO gave up any of
5  its rights or ceded any of its rights
6  under the policies that appear page 7 of
7  Schedule 1 of Hughes-12?
8      MS. HARDING:  Object to        PP's
9  form.                              ctr
10     THE WITNESS:  Not to my        PP's
11  knowledge.                        Obj:
12  BY MR. BROWN:                     R, BE, F
13     Q.   And would your answer be the
14  same with respect to Republic?
15     A.   Yes.
16     Q.   To your knowledge, has GEICO
17  or Republic given up any of its claims
18  handling rights pursuant to any agreement
19  with Grace?
20     MS. HARDING:  Just objection   PP's
21  to form.  That assumes facts not  ctr
22  in evidence.                      PP's
23     But go ahead.                  Obj: R, BE, F
24     THE WITNESS:  Not to my

CI

PP's
Obj: R

**Page 319**

1  knowledge.
2  BY MR. BROWN:
3      Q.   Okay.  You indicated earlier
4  that your title is senior litigation
5  counsel; is that correct?
6      A.   Yes.
7      Q.   And I guess at the time of
8  the petition you reported to Mr. Siegel;
9  is that correct?
10     A.   Yes.
11     Q.   And he was the general
12  counsel at the time?
13     A.   Yes.
14     Q.   How would you describe your
15  responsibilities with respect to asbestos
16  personal injury claims pre-petition?
17     MS. HARDING:  I am just
18  going to object to the form to the
19  extent it's overly broad, requires
20  an overly broad interpretation.
21     But to the extent you can
22  answer it --
23     MR. LEWIS:  I am not.
24     MR. BROWN:  I am not asking

**Page 320**

1  for an exhaustive list.
2      MS. HARDING:  Right.
3      THE WITNESS:  As I said            PP's
4  earlier, I was responsible for the       Obj:
5  day-to-day management and                R
6  resolution of the claims
7  internally.  And as such, I worked
8  with the outside law firms in
9  litigating the cases and settling
10  cases, and internally I worked
11  with different groups within the
12  company to appropriately record
13  and manage the provision of
14  services from outside counsel
15  firms, payment of the firms,
16  payment of the settlements.
17  BY MR. BROWN:
18     Q.   Okay.  What was the period
19  of time over which you had that role?
20     A.   I would say from 1989
21  through 19 -- excuse me -- through 2001,
22  April of 2001.
23     Q.   Okay.  And that was the
24  petition date?

CI

PP's
Obj: R

**Page 321**

1      A.   Yes.
2      Q.   Is it fair to say that you
3  are the person at Grace most
4  knowledgeable with respect to the manner
5  in which asbestos personal injury claims
6  were handled pre-petition?
7      A.   Yes.
8      Q.   Did Grace have national          PP's
9  coordinating counsel with respect to      Obj:
10  asbestos bodily injury claims?            R
11     A.   It depends on how you define
12  national coordinating counsel.  We had a
13  national -- Casner & Edwards in Boston
14  handled all our documents, and Bob
15  Murphy, a partner there, would
16  participate in trials and work with
17  outside counsel.  And there were some
18  other lawyers around the country who I
19  would call upon to do that as well.
20     Q.   Okay.  I gather from your
21  answer that he didn't have the official
22  title national coordinating counsel?
23     A.   Well, also, I think after
24  1989, the outside counsel didn't report

CI                                    PP's Obj: R          Page 322

1  to him.  I view national coordinating
2  counsel kind of strictly as I understand
3  it is when the outside counsel in a
4  particular jurisdiction report on a
5  day-to-day basis to the firm, and then
6  the national counsel, in turn, reports to
7  the client and the corporation.
8          And we had it set up a
9  little differently, that after 1989 --
10  again, before that, I viewed Bob Murphy
11  as serving what I would call traditional
12  national coordinating counsel and that
13  the outside firms reported to him.  But
14  we kind of reversed that.
15      Q.   Okay.  If I understood your
16  answer then, is it fair to say from 1989
17  to 2001, that effectively you acted as
18  the national coordinating counsel?
19      A.   Yeah, with the assistance of
20  Casner & Edwards and Bob Murphy and
21  others.
22      Q.   Mr. Finke, I believe,
23  testified that in addition to Casner &
24  Edwards Grace had approximately 25 other

CI                                    PP's Obj: R          Page 323

1  firms around the country that were
2  defending Grace in various jurisdictions
3  against asbestos PI claims.
4          Does that sound about right
5  to you?
6      A.   It sounds a little low,
7  actually, since there are 50 different
8  states and then I think we had cases in
9  virtually every state and in some
10  jurisdictions, California, Texas, would
11  have more than one counsel.
12      Q.   So what would be your
13  estimate or number?
14      A.   My estimate would be 50.
15      Q.   Now, what was your
16  interaction with each of those 50 or so
17  law firms in terms of defending against
18  asbestos claims?
19      A.   They would report on a
20  regular basis in terms of developments,
21  they would -- again, obviously when you
22  talk about 50 firms, a lot of the level
23  of activity of some of the firms was lot
24  less than others.

CI                                               Page 324         PP's Obj: R

1  But, again, there were
2  communications on the status of cases on
3  what was going on, on working with Grace
4  witnesses, expert, fact, was done through
5  me.  And I made the arrangements.  The
6  only exception to that was, again, with
7  Casner & Edwards that the process worked
8  that discovery responses, Grace's
9  discovery responses in the underlying
10  cases, those would be -- I would be
11  copied on them.  But they would be
12  directly sent to Casner & Edwards and Bob
13  Murphy or the associates at that firm
14  that were actually prepared and would
15  work directly with the local counsel in
16  preparing responses.
17      Q.   Okay.  Is it fair to say
18  that you and the local firms, the 50 or
19  so firms that you testified that defended
20  Grace, and the Casner & Edwards firm
21  acted as a group in the defense of
22  asbestos claims asserted against Grace?
23      A.   Yes.
24      MS. HARDING:  Object to

                                                 Page 325         PP's Obj: R

1  form.
2  CI    Go ahead.
3  BY MR. BROWN:
4      Q.   Can you describe for me the
5  types of things that that group did in
6  defending Grace against asbestos claims?
7      A.   Virtually everything an
8  attorney would do representing the
9  company in asbestos or any kind of toxic
10  tort case.  You know, they responded to
11  complaints, they responded to discovery,
12  they appeared on Grace's behalf at
13  depositions, they tried cases, they
14  negotiated settlements, they participated
15  in defense groups.
16      Q.   Let me just give you an
17  example.  A complaint comes in the door.
18  Was it the responsibility of whatever
19  counsel was handling that particular case
20  to look at the complaint, to see if the
21  complaint had procedural defects or the
22  statute of limitations had expired, to do
23  those sort of things?
24      A.   Yeah.  The complaints came

PP's Obj: R

Page 326

1  and generally were served through us. I
2  know some people had systems where local
3  counsel accepted service. We did not do
4  that.
5          We had a system where when
6  the complaint was entered into the case
7  management system, it automatically sent
8  the complaint to the firm that had been
9  designated as local counsel in that
10  jurisdiction, and that local counsel,
11  once they received the complaint, review
12  the complaint and file an appropriate
13  response and then handle the case.
14      Q.   And an appropriate response
15  might be a motion to dismiss? It could
16  be an Answer?
17      A.   It could be an Answer; it
18  could be a motion to dismiss. You have
19  to keep in mind we don't have to get --
20  we have to keep in mind the asbestos
21  personal injuries cases in a lot of
22  jurisdictions, a lot of this was kind of
23  institutionalized through case management
24  orders that in some cases, all you had to

PP's Obj: R

Page 327

1  do was enter an appearance. There
2  wasn't -- some of the analysis because of
3  the repetitious nature of it, that
4  typically if I was involved in a lawsuit
5  today as an in-house lawyer and sent it
6  to somebody, we might sit down and talk
7  about what the Answer is and what the
8  allegations are.
9          In an asbestos case, again,
10  because there were thousands of them --
11  in some cases there were actually what I
12  would call form Answers and form
13  Complaints and so on. So it was highly
14  managed by a case management order and
15  the court.
16      Q.   Let me give you an example
17  from my own experience and ask you
18  whether Grace did these sort of things.
19          I used to do some of the
20  that work when I was a junior associate,
21  and one of the things I was charged with
22  was reviewing complaints and finding out
23  if there were procedural defects with
24  complaints. And sometimes the complaints

Page 328

1  would come in in a box load and you would
2  look through them and see if they made
3  the statute of limitations, whether they
4  had other procedural defects that might
5  have been peculiar to the given
6  jurisdiction, and, if appropriate, file
7  motions, file preliminary objections.
8  It's called different things in different
9  jurisdictions.
10          Were your local counsel
11  doing that sort of thing pre-petition?
12      A.   Yes.
13      MS. HARDING:  Object to
14  form. Are you asking him
15  generally did that happen or did
16  it happen with all cases?
17      MR. BROWN:  I am trying to
18  get a sense of how the cases were
19  handled pre-petition, whether
20  motions were filed if it was
21  appropriate.
22      MS. HARDING:  Right. But
23  they have hundreds of thousands of
24  cases. Are you just saying did

PP's Obj: R

PP's Ctr.

Page 329

1  that ever happen or are you asking
2  if that happened in every case?
3      MR. BROWN:  No.
4      MS. HARDING:  I am asking
5  you because it's not clear.
6      MR. BROWN:  I am asking him
7  whether in the course of
8  evaluating a case that came in the
9  door, whether it was the
10  responsibility of counsel to look
11  at it for procedural defects and,
12  if appropriate, file a motion and
13  if appropriate, file an answer.
14      THE WITNESS:  Yes.
15  BY MR. BROWN:
16      Q.   You also mentioned
17  discovery, and I think you said the
18  Casner & Edwards firm, if I understood
19  you correctly, handled Grace's responses
20  to discovery; is that correct?
21      A.   Asbestos personal injury
22  cases, yes.
23      Q.   Okay. How was the discovery
24  that Grace took of claimants handled by

PP's Obj: R