CI PP's Obj: R



**you, by Casner & Edwards, and the other local firms that were defending cases?**

MS. HARDING: And I am just going to -- I think you have already taken this into consideration. I will object. To the extent it calls for attorney-client privilege or work product, do not answer. But I don't think you are asking him for that. So I just want to make it clear.

CI PP's Obj: R

THE WITNESS: With a couple of exceptions, which were important but were relatively infrequent, it would be handled by the local counsel. The exceptions are that if we received the deposition notice of a Grace or fact witness of a Grace former employee or an expert, kind of a national asbestos personal injury expert, and we had specific expertise and the fact witness

CI PP's Obj: R



case would generally be Bob Murphy.

But we might have somebody from an outside firm that wasn't specifically assigned a jurisdiction to handle that. But in terms of coworker depositions, plaintiff depositions, developing discovery with respect to a particular job site, that would be handled by the local counsel.

BY MR. BROWN:

**Q. Okay. Do I gather from your answer that local counsel, for example, in written discovery depositions would inquire into exposure to Grace products?**

A. Yes.

**Q. Okay. And product ID sometimes called?**

A. Yes.

**Q. And how about medical issues?**

A. Well, as you may know, if you had some prior involvement with it,

CI PP's Obj: R



the answer to the question is yes, although in many jurisdictions and certainly in the major jurisdictions, there tended to be a joint medical defense group. And one firm or one particular -- lawyers would often handle some of the medical records issues and the medical testimony issues in the case on behalf of all of the defendants.

**Q. Okay. And did your local counsel look for other causes to a particular claimant's injury? For example, if they were a long-term smoker, would that be an issue that Grace pursued in discovery?**

A. Sure.

**Q. What other sort of defenses in that regard would Grace inquire into?**

A. Smoking, alternative exposures, history, you know, whether the person -- where the person worked and exposure to other people's products, questionable diagnoses in a meso case. We would have it sent out to somebody

CI PP's Obj: R



else to review the pathology. All the kinds of things that a defense lawyer in an asbestos case and just more broadly in a personal injury case would do.

They were given relatively broad, they being the local counsel, authority to act on Grace's behalf in defending the cases.

**Q. Were they told to zealously defend Grace?**

MS. HARDING: Well, object to the extent it calls for attorney-client communications.

PP's Ctr.

CI PP's Obj: R

THE WITNESS: I certainly hope I wouldn't have to tell people to do that since they are members of the bar and they have that ethical obligation.

But, yeah, they were certainly told -- there was a management process, and there were guidelines provided to them to some degree of what they wanted to do and what they shouldn't do.

CI PP's Obj: R



And there were things that I did in terms of resolving cases that would have taken them out.

But, yeah, I think they understood that they were to zealously defend it, and we had some very good lawyers representing us.

BY MR. BROWN:

**Q. And was it your responsibility internally to make certain that that happened?**

A. Yes.

**Q. Now, did you work with any asbestos plaintiffs lawyers? When I say work with them, did you have interaction with any of the big guns in the asbestos bar?**

A. Personally?

**Q. Yes.**

A. Yes.

**Q. Who?**

A. And I was alluding to this earlier. Most of them, certainly in

CI PP's Obj: R



terms of the inventory settlement agreements and when we got into the process of settling larger groups, local defense counsel on the asbestos personal injury cases, when it's comes to resolving larger groups, have kind of conflicting motivations.

On one hand, they want to do their client a good service, and they want to get rid of cases as cheaply as possible, but on the other hand, inventory settlements where we might buy up or settle the docket for six months, eight months, even two, three months, settlements like that cause the defense lawyers to lose billable hours in terms of their own businesses, lawyers.

So when we started getting into those negotiations in the larger groups, I would handle them personally. And it was generally in that capacity that I dealt directly with plaintiffs' lawyers.

**Q. Okay.**

CI PP's Obj: R



A. And I dealt with most of them, at least at that time. It's been eight years. I am sure it's a new group. But at that point, many of them.

**Q. I am not so sure.**

**Give me some examples.**

A. You can go down geographically. I know Perry Weitz, and I have met with Perry Weitz. I know Joe Rice. I know Greitzer & Locks. I have dealt with Dino Vovet (phonetic), Peter Angelos' firm many times. I used to know Mike Kelly who has passed away. I know Jim Ferraro. I know Irving Gonzalez, who is in jail. I know -- who else? I have dealt with -- I know Russell Budd and Fred Baron. I have dealt with Peter Krauss.

**Q. You mentioned Mr. Cooney earlier, I think.**

A. Cooney, I know John Cooney. I have met with him.

**Q. Any others that you can think of?**

CI PP's Obj: R



A. There is probably others I have met with, and I have missed some. But there are some that I haven't met, either because we didn't get into those kinds of discussions or I was comfortable with the ability of our local counsel to negotiate cases and just the need for me to meet with them didn't arise. Particularly in California, the traditional California firms, I don't recall meeting working with Steve Casner, and there are others out there.

**Q. All right. Again, we are still focused on the pre-petition time frame.**

**Was Grace required to obtain the consents of any of the members of the plaintiffs bar with respect to the manner in which Grace defended itself against asbestos claims, any of the gentlemen you just mentioned?**

MS. HARDING: Object to form.

PP's Ctr.

CI

THE WITNESS: You will have

PP's Obj: R

CI PP's Obj: R

Page 338

to repeat that.
MR. LEWIS: We will have it read back.
(The reporter read from the record as requested.)
MS. HARDING: I am sorry.
MR. LEWIS: I am sorry. I don't understand the question.
MR. BROWN: You are not answering it.
MR. LEWIS: I just object to the question as unintelligible as stated.
MR. BROWN: Do you understand the question?
THE WITNESS: I think so.
I think the answer is no, although they would occasionally volunteer information to tell Grace how to defend cases.
BY MR. BROWN:
**Q. And you didn't seek their consent?**
A. No.

Page 339

**Q. Did the plaintiffs bar participate in the internal decision-making regarding the manner in which Grace defended asbestos claims pre-petition?**
A. No.
**Q. Did Grace leave it up to the plaintiffs' attorneys to decide how much Grace would pay for a claim?**
A. No.
**Q. Did Grace consult with the plaintiffs bar with respect to the manner in which Grace and its outside counsel defended claims?**
A. No.
**Q. Did the plaintiffs' attorneys decide what medical criteria were satisfactory for a settlement with Grace?**
A. It was a product of negotiation if there were inventory settlements that had specific objective medical criteria. They didn't dictate to Grace what the medical criteria was.

Page 340

**Q. How about the exposure criteria? Did that dictate that to Grace?**
A. No, they didn't.
**Q. Did they dictate to Grace the types of proofs that Grace would accept for a settlement?**
A. Again, it was a negotiation. But, no, they didn't dictate it.
**Q. Did they decide what type of release Grace would accept in exchange for a settlement?**
A. No. It's a negotiation.
**Q. All right. Again, pre-petition, your title was senior litigation counsel?**
A. Yes.
**Q. Okay. Did the plaintiff's attorney have the power to remove you if they didn't like the way you were handling the defense of Grace claims?**
MS. HARDING: Objection. It's relevance at this point. Go ahead.

Page 341

THE WITNESS: No, they didn't.
BY MR. BROWN:
**Q. Did they control how much you were paid for your job at Grace?**
A. No.
MR. BROWN: I might be finished. Let me have a couple of minutes.
(There was a break from 4:11 p.m. to 4:16 p.m.)
BY MR. BROWN:
**Q. Mr. Hughes, can I ask you to take a look at what was previously marked Hughes-3?**
A. (Witness complies with request.)
MS. HARDING: Exhibit 4 to the Exhibit Book.
MR. LEWIS: Exhibit 4 to the Exhibit Book, which is Exhibit-3 to the deposition.
BY MR. BROWN:
**Q. Mr. Hughes, Exhibit-3, there**

CI

PP's Obj: R



**was a question earlier today. It's the Trust Distribution Procedures, correct?**
A. Yes.
**Q. And I think you indicated that you did not draft this document; do I have that correct?**
A. Yes.
**Q. I believe you said the ACC, asbestos claimants committee, drafted the document; is that correct?**
MR. LIESEMER: Object to the form of the question.
THE WITNESS: That was my understanding, yes.
BY MR. BROWN:
**Q. Okay. And you indicated that you had reviewed the document?**
A. Yes, I have.
**Q. And if I remember your testimony correctly, you indicated that you were given an opportunity to comment on the document?**
A. Yes.
**Q. I believe you also stated**



**that you didn't recall any comment that you had on the document; is that correct?**
A. I didn't recall any specific comment. I recall that there were some comments I had made.
**Q. Okay. Do you recall what those comments were?**
A. Not as I sit here today, no.
**Q. Okay. I think you were also asked who else at Grace reviewed the document, and I believe your answer was your outside counsel did, reviewed it; do I have that right?**
A. Yes.
**Q. Other than you and your outside counsel, are you aware of anyone else that reviewed and drafted the TDP on the Grace side?**
A. I don't know if Richard Finke or Mark Shelnitz, our general counsel, had taken a look at it at that time. Perhaps Richard was asked about that question when he was deposed. But they would be the other logical



candidates who may have taken a look at it.
**Q. Okay. And the Trust Distribution Procedures are the procedures pursuant to which asbestos personal injury claims are to be handled if the Plan is confirmed, correct?**
A. Right, by the Trust.
MR. BROWN: Okay. All right. I am going to pass you to Mr. Cohn. Thank you.
- - -
EXAMINATION
- - -
BY MR. JACOB COHN:
**Q. Good afternoon, Mr. Hughes. Jacob Cohn for Federal Insurance Company. How are you?**
MS. HARDING: Did you all join in somebody's 30(b)(6)?
MR. JACOB COHN: No. I am participating as a party in interest here.
MS. HARDING: So just to be



clear, you didn't notice the dep and you didn't join anybody else's notice?
MR. JACOB COHN: No. I am just a party to the case, and I came to the deposition. And I am entitled to cross-examine, so I am.
BY MR. JACOB COHN:
**Q. Now, Mr. Hughes --**
MS. HARDING: There are a lot of people who want to ask questions today. Do you have a sense of how long it will take?
MR. JACOB COHN: I would think no more than 15 to 20 minutes, hopefully less.
MS. HARDING: All right. I think in the interest of not having to come back, I will go forward, but I --
MR. JACOB COHN: You are burning --
MS. HARDING: I will State

an objection on the record that you didn't notice the deposition.

MR. JACOB COHN: I don't understand that to be a bona fide deposition objection.

MS. DeCRISTOFARO: At one point, there was an email that said in the interest of not having a notice, that not everyone needed to serve separate notices.

MR. JACOB COHN: Everything is on the record.

CI PP's Obj: R

BY MR. JACOB COHN:

**Q. From 1989 to 2001, you were principally in charge of handling asbestos claims against Grace, correct?**

A. Asbestos personal injury claims, yes.

**Q. And from 1989 to 2001 Grace was a for-profit business corporation, correct?**

A. Yes.

**Q. So your goal was to minimize the amount of money that Grace had to pay**



CI

**in the defense and settlement and resolution of asbestos PI claims, correct?**

A. Yes.

**Q. Now, just looking for a moment at what was marked Hughes-12, which is Exhibit 6 to the Exhibit Book from the Plan, if you would just take a quick look at the Schedule 2.**

**Now, Schedule 2, am I correct, these are insurance companies that had settlement agreements where they paid a lump sum of money to Grace and received a release for policy obligation; would that be correct?**

A. That's my understanding.

**Q. Okay. And, for example, Federal Insurance Company, my client, has a settlement for one of its policies, and I will represent to you that they paid $300,000 in 1997 to settle a $500,000 sub-limit.**

**Now, that $300,000 was put into Grace's treasury; is that right?**



MS. HARDING: Object to form and foundation.

PP's Ctr

MR. JACOB COHN: Whatever. You can answer.

CI PP's Obj: R

THE WITNESS: I assume so, yes.

BY MR. JACOB COHN:

**Q. So that became part of the money that would be available to you, whatever settlement would come in to pay for the resolution of asbestos PI claims, correct?**

MS. HARDING: Object to form.

CI PP's Obj: R

THE WITNESS: Well, again, I don't -- yeah. I mean, perhaps indirectly. But there was $300,000 that was settled and $300,000 was entered -- became Grace's property, and Grace settled cases as part of its business operations.

BY MR. JACOB COHN:

**Q. And Grace would typically**



CI

**have to promise the insurer to use those funds to pay for the resolution of asbestos claims; is that accurate?**

MS. HARDING: Object to form, in terms of typically.

PP's Ctr.

CI PP's Obj: R

THE WITNESS: Yeah, I guess it's an accounting matter they would apply it to asbestos liabilities.

BY MR. JACOB COHN:

**Q. All right. Now, Schedule 3 is listed as schedule Asbestos Insurance Reimbursement Agreements, right?**

A. Right.

**Q. Now, those are what would be typically called a coverage in place agreement; would you agree with that terminology?**

A. Yes.

**Q. Okay. So as I understand from Grace's Securities and Exchange Commission filings, most of these agreements require the insurer to pay a portion of every claim that Grace settles**

CI PP's Obj: R



**that triggers their policy; would that be right?**

MS. HARDING: Object to form and object to asking him questions about generally insurance settlement agreements.

MR. JACOB COHN: Okay.

MS. HARDING: Every agreement is different.

MR. JACOB COHN: That's fine.

PP's Obj: R

BY MR. JACOB COHN:

CI

**Q. Can I rely upon Grace's SEC filings?**

A. Yes.

**Q. Okay. So can you describe to me the policies that are identified in those filings as policies that pay on a pro rata basis, how the money would be spent and recouped from those insurers?**

MS. HARDING: Object to form.

PP's Ctr

CI

THE WITNESS: We certainly had arrangements with insurance

PP's Obj: R



CI

companies that provided that they would pay us a percentage or a pro rata portion of the money we spent that triggered their policy that we spent on asbestos claims.

BY MR. JACOB COHN:

**Q. And Grace itself paid a portion of every dollar that was spent to resolve an asbestos claim, correct?**

A. I think we generally paid it in the first instance and was reimbursed under these kinds of agreements, but yes.

**Q. And typically how much of every dollar that you paid out would you be reimbursed from one of these agreements?**

MS. HARDING: Object to form, foundation.

PP's Obj: R

Go ahead.

CI

THE WITNESS: Again, it would vary, but based on valuation we do on the 1.7 billion and the 500 million I referred to earlier, I think 25 cents on the dollar, 30

CI



PP's Obj: R

cents on the dollar.

BY MR. JACOB COHN:

**Q. Would come back in?**

A. Again, it would vary depending on where we were in terms of the coverage, yes, we would be reimbursed. And it varied when, you know, during the time period. There is a lot of factors that go into that. And I don't think you can answer it definitively, but it certainly would be in the range I mentioned for some period of the time.

**Q. And Grace believed it could do a better job of handling the claims by itself without having the insurers be involved; is that accurate?**

MS. HARDING: Object to form.

PP's Ctr

CI

PP's Obj: R

THE WITNESS: Whether or not we thought we could do a better job or the insurance carriers would prefer that we did it, the evolution of it was that Grace

CI



handled it itself?

BY MR. JACOB COHN:

**Q. Okay. And at all times, while you were there, Grace endeavored to minimize the amount of money it had paid to resolve asbestos claims; is that fair to say?**

A. Yes.

**Q. Now, in 2005, there was a conference call between Grace and its insurers. Were you a participant in that call?**

A. I don't specifically recall, but I may have been.

**Q. Do you remember any discussion between Grace and its insurers to the effect that Grace was not ready to deal with its high level excess insurers?**

A. In what sense not ready?

**Q. In the sense of, in the course of the bankruptcy proceedings, W.R. Grace communicating that sentiment to its non-settled high level insurers?**

A. I don't recall that





conversation.

**Q. You said you were given a chance to review the TDPs in 2008 -- I am sorry. Was it 2008?**

A. Yeah, it would have been 2008.

**Q. Okay. Now, at that point in time, Grace's obligations pursuant to the settlement it reached in April 2008 were established, correct?**

MS. HARDING: Object to form.

THE WITNESS: Yes. There had been a Term Sheet and an agreement reached.

BY MR. JACOB COHN:

**Q. There was a defined amount of money and other things that Grace was going to give to the Trust to settle its asbestos liabilities; is that right?**

A. Yes.

MS. HARDING: Well, just object to form.

THE WITNESS: Asbestos



personal injury liabilities.

BY MR. JACOB COHN:

**Q. And is it fair to say that thereafter, the most significant interest that Grace had in the TDPs was insuring that it obtained the 75 percent or greater vote from the asbestos PI claimants?**

MS. HARDING: Object to form.

THE WITNESS: It was important to Grace that we emerge from bankruptcy and that the Trust and so on and the Plan proceed so that the reorganized company could emerge from bankruptcy and be free from its asbestos liabilities. That was the purpose of the Chapter 11, and that was obviously Grace's interest.

BY MR. JACOB COHN:

**Q. So is the answer to my prior question yes, getting 75 percent super majority approval by the asbestos**



**constituencies was the most important consideration to Grace in reviewing the TDPs?**

MR. LIESEMER: Object to the form.

MS. HARDING: Object to the form.

THE WITNESS: I think that the most important consideration to Grace in the TDP was that they were, from a legal standpoint, sufficiently consistent with, to the extent they had to be, consistent with the prior practice and that they were a reasonable means of processing and paying claims so that the Plan would be confirmed.

BY MR. JACOB COHN:

**Q. So it was important at this point -- strike that.**

**At this point, Grace had no additional financial interest in how asbestos claims were handled; is that**



**correct?**

MS. HARDING: Object to the form.

THE WITNESS: Well, that's not necessarily correct. But we certainly had -- since our obligation to fund the Trust, personal injury Trust, was fixed, both in terms of the payments that were to be made at the time of emergence and the payments off in the future, then I guess to that extent, yeah, we had already established what our liability was. And our concern was that the Trust Distribution Procedures were met whatever legal criteria that were necessary and that the Plan be confirmed.

BY MR. JACOB COHN:

**Q. So as of the time that the settlement was reached, your concern with the TDPs was that they enable a Plan to be confirmed in a way that would enable**

**Grace to have finality with respect to its asbestos obligations and emerge as a for-profit corporation again?**

MS. HARDING: Object to form. I think it mischaracterizes and doesn't completely accurately summarize what he just said regarding legal criteria.

BY MR. JACOB COHN:

**Q. Would you agree with what I just said?**

A. No. We operated in bankruptcy as a for-profit company. I think our goal would be to operate as a corporation unencumbered by asbestos liabilities.

MR. JACOB COHN: No further questions. Thanks.

\- - -

EXAMINATION

\- - -

BY MS. SIMON:

**Q. Good afternoon. My name is Marnie Simon. I represent Fireman's Fund**



**Insurance Company and the Allianz related entities.**

A. Sure.

**Q. I believe you testified when speaking with Michael Brown that reviewing the GEICO policies under, I think it was, Exhibit-12 here and Exhibit 6 to the Plan Asbestos Insurance Transfer Agreement, I believe you testified there that to your knowledge, GEICO had not -- there were no agreements between Grace and GEICO in terms of GEICO ceding or waiving its rights under those excess policies; is that correct?**

A. Yes.

**Q. And would you answer --**

A. That I was aware of.

**Q. That you were aware of.**

**And would your answer be the same for the Fireman's Fund and Allianz companies?**

A. You are talking with respect to the excess insurance policies?

**Q. The excess policies of**



**Allianz on page 1 of Schedule 1, the Fireman's Fund policies on page 7 of Schedule 1, and then the Reunion - Adriatica policy on page 16.**

MS. MAHALEY: I object to the form of the question.

BY MS. SIMON:

**Q. Are you aware of any agreements with those insurance companies to waive their rights under their excess policies that was in place with Grace pre-petition?**

A. No, I am not.

MS. HARDING: Object to form.

MS. SIMON: That's all.

\- - -

EXAMINATION

\- - -

BY MS. McCABE:

**Q. Good afternoon, Mr. Hughes. My name is Eileen McCabe, and I here today --**

A. I remember you Eileen.



**Q. I am here today on behalf of AXA Belgium as a successor to Royale Belge.**

**And just to make this go quickly, if I could follow up with the same questions that were just asked to you with regard to the Royale Belge policies that appear on page 16 of what's been designated Hughes Exhibit-12. There are three policies that are identified there for excess policies.**

**Are you aware of any agreement that Royale Belge had pre-petition pursuant to Royale Belge ceded or waived any of its excess policies as listed on that policy?**

MS. HARDING: Object to form.

THE WITNESS: No, I am not.

MS. McCABE: That's it.

\- - -

EXAMINATION

\- - -

BY MR. SCHIAVONI:

was correct, that you didn't -- it was one of those backwards things.

THE WITNESS: Sorry.

BY MR. SCHIAVONI:

**Q. Some of your data may be in Exhibit-1, but you didn't prepare Exhibit-1 and you didn't supervise the preparation of Exhibit-1; is that right?**

A. I did not prepare Exhibit-1, nor did I supervise the preparation of Exhibit-1.

**Q. The 1995 Grace/Royal settlement covered policies issued to the Zonolite Company; is that generally right?**

A. Yes.

**Q. Okay. Are you aware whether Royal's also alleged to have issued, entirely separate from that, a high level excess policy in the 1980s to Grace?**

A. I learned that in connection with the bankruptcy. I am not sure I knew that beforehand.

**Q. Okay. But sitting here**



**today, you are familiar with the fact that there is a separate high level excess policy that Royal has issued in '80s to Grace; is that right?**

A. I believe so, yes.

**Q. And Mr. Brown asked you some questions about whether or not rights to associate in the defense and to cooperated had been ceded by his clients to Grace.**

**Do you remember those questions generally?**

MS. HARDING: Object to form.

But go ahead.

MR. SCHIAVONI: All right.

THE WITNESS: There are questions about it. I think the question was whether we had waived or all agreed, and the answer was no, I wasn't aware of any such agreement.

BY MR. SCHIAVONI:

**Q. Has either Royal or**



**Arrowwood ceded or in any way waived or given up any of its rights to associate in the defense or cooperate or any other rights under its high level excess policy?**

A. Not that I am aware of.

MS. HARDING: Object the form with respect to rights.

BY MR. SCHIAVONI:

**Q. And am I correct that prior to the bankruptcy filing, Grace hadn't tendered any claims to Royal under that high level excess policy?**

A. I don't know the extent to which we were tendered claims pre-petition to high level excess policies. Generally, the notice of the claims was done by our insurance broker.

**Q. Okay. So you don't know one way or the other?**

A. I don't.

MR. SCHIAVONI: That's all I have. Thank you, Mr. Hughes.

\- - -



EXAMINATION

\- - -

BY MR. IFFT:

**Q. Good afternoon, Mr. Hughes.**

A. Good afternoon.

**Q. My name is Richard Ifft. I represent Maryland Casualty Company and two Zurich entities, Zurich Insurance Company and Zurich Insurance Bermuda Company.**

A. Okay.

**Q. I am not, I think, going to ask many questions about Maryland Casualty today.**

**With respect to Zurich, I will represent to you that the two Zurich entities issued a number of high level excess policies, and I will direct your attention to what we have marked as Exhibit-12, the Exhibit 6 to the Exhibit Book for the Plan.**

**Directing your attention to Schedule 1, page 20, you will see there is about 11 or so participations on that**

CI

PP's Obj: R, BE

CI

PP's Obj: R,

CI

CI

PP's Obj: R

CI

PP's Obj: R

CI

PP's Obj: R





**last page.**

A. Yes.

**Q. If I were to ask you the same questions that other carriers have asked you, if you are aware of any waivers by any of the Zurich entities of their rights under the policy, are you aware of that with respect to those policies?**

A. No, I am not.

MS. HARDING: Object to form --

MR. LIESEMER: Object to form.

MS. HARDING: -- as to rights.

BY MR. IFFT:

**Q. You are aware, Mr. Hughes, that the excess insurers under their policies typically have certain rights with respect to their ability to be involved with respect to the handling of the claims against Grace?**

A. Yes.



MR. LIESEMER: Object to the form.

BY MR. IFFT:

**Q. And is it your testimony that you are not aware of any waiver of any such rights by the Zurich companies with respect to their policies?**

MS. HARDING: Object to form again.

But go ahead.

MR. IFFT: You can answer.

THE WITNESS: I am not aware of any.

BY MR. IFFT:

**Q. Let me direct your attention to Schedule 3. I will represent to you that this is the Schedule of Asbestos Insurance Reimbursement Agreements, and you will see at the bottom there is one agreement with Zurich International with respect to, I will represent to you, one of those 11 policies.**

**Do you happen to be familiar with that agreement, sitting here today?**



A. No, I am not.

**Q. I think you testified that you had some familiarity with Asbestos Insurance Reimbursement Agreements generally, correct?**

A. Yes.

**Q. And what's your understanding as to how those typically work?**

A. They typically would work that as the costs were incurred under -- we would agree in terms of how it was allocated, but Grace had a model in terms of how the terms were allocated on different policies. And to the extent the policy was triggered that the party, in this case Zurich International, would pay Grace or reimburse Grace for some portion of the costs that were incurred for those claims.

**Q. Pursuant to a defined percentage in the agreement?**

A. Defined percentage, generally, yes.



**Q. Do those agreements also typically have any provisions that on their face alter the rights that otherwise might exist under the policy with respect to the insurer's involvement in the claims?**

MS. HARDING: Object to form.

MR. LIESEMER: Join.

THE WITNESS: I think that would vary. My understanding would be generally no, but I think that it certainly -- I would have to look at the individual agreement to comfortably say that.

BY MR. IFFT:

**Q. Okay. You are not sure, sitting here today?**

A. I am not sure, but you are also ask asking me specifically about agreements. And your other questions were generally in the absence, but here there were agreements. And I have to look at the individual agreements before

CI

PP's Obj: R, BE



making a blanket statement about what they provide and what they don't provide.

**Q. Fair enough. They may or may not have, and you would have to look at the agreement?**

A. Right.

MR. IFFT: I don't have anything further.

- - -

EXAMINATION

- - -

CI

PP's Obj: R

BY MS. DeCRISTOFARO:

**Q. Good afternoon, Mr. Hughes, my name is Elizabeth DeCristofaro. I represent a group of insurance companies Continental Insurance Company, Continental Casualty, generally referred to as the CNA Insurance Companies.**

**And you are familiar that the CNA Insurance Companies issued insurance policies to Grace?**

A. Yes.

**Q. I am trying to do this without having to take you through a**

CI



**number of names and policies.**

**You are aware that some of the policies issued by the CNA Companies to Grace were high level excess policies; is that correct?**

A. Yes.

**Q. And there has been no settlement or other agreements affecting those high level high level excess policies; is that correct?**

MS. HARDING: Object to form.

Go ahead.

CI

PP's Obj: R

THE WITNESS: That's my understanding, yes.

BY MS. DeCRISTOFARO:

**Q. So to follow up on the questions you were asked previously, you are not aware of any agreement in which the companies that issued those high level excess policies waived or surrendered any rights under those policies?**

MR. LIESEMER: Object to



form.

MS. HARDING: Object the form.

CI

PP's Obj: R

THE WITNESS: No, I am not aware of any agreement.

MS. DeCRISTOFARO: Then I have no further questions.

MS. HARDING: We are done in the room. Elisa, do you want to go?

- - -

EXAMINATION

- - -

BY MS. ALCABES:

**Q. Hi. This is Elisa Alcabes from Simpson, Thacher & Bartlett, Mr. Hughes. I am counsel for Travelers Casualty and Surety Company previously known AETNA.**

A. Yes.

**Q. You mentioned before that you had involvement in the reimbursement agreement pre-petition; is that correct?**

A. Yes.



**Q. And I believe you said that you were in part responsible for insuring that Grace undertook its obligations under the reimbursement agreement?**

A. Yes. And I was involved in disputes that arose concerning those obligation.

**Q. With respect to allocation, I believe you just mentioned that there was a model that Grace used; is that correct?**

MS. HARDING: Object to form. It misstates the testimony but go ahead.

THE WITNESS: Yes.

BY MS. ALCABES:

**Q. Can you just explain a little bit more how Grace allocated or performed allocation that was necessary under the reimbursement agreement?**

A. I can tell you who did it, I can tell you that it was done, but I can't give you specifics and the details of how that was done.

I think that's a question that's overly broad, and I think it really -- it's specific to an insurance company and to law firms and to jurisdictions.

But, again, we worked with insurance companies in settling and resolving these claims and resolving their coverage over the course of the 15, 20 years I was involved in it.

BY MR. LEWIS:

**Q. Did any insurer that had coverage for Grace, any insurer, object to the manner in which you were conducting the defense of the claims for asbestos-related disease against Grace?**

MR. SCHIAVONI: Object to form.

THE WITNESS: None that I recall.

MR. LEWIS: That's all I have.

MR. BROWN: Let's mark



Hughes-15.

(Hughes-15 marked for identification at this time.)

MS. HARDING: Just to save time, again, Exhibit 5 to the Plan was topic upon which Mr. Finke was designated to testify and I think did. But to the extent that the witness can answer the questions related to it, go ahead.

MR. BROWN: It's an insurance-related question.

MS. HARDING: I understand.

\- - -

EXAMINATION

\- - -

BY MR. BROWN:

**Q. Mr. Hughes, can you look at what's been marked Exhibit-6, Schedule 1, we talked about that earlier? I think that's 5 there in front of you.**

A. Yes.

**Q. If you look at Exhibit 6.**

MS. HARDING: Which is



Hughes Exhibit-12.

BY MR. BROWN:

**Q. Can you go to Schedule 1 of that document?**

A. Yes.

**Q. And specifically, page 18, I direct your attention down toward the bottom of the document, you will see Unigard Security.**

**Do you see that?**

A. Yes.

**Q. And do you see in the policy number column that there are two policies listed?**

A. Yes.

**Q. Okay. There is one 1-0589 and 1-2517. Do you see those?**

A. Yes.

**Q. Now, could you go to what's been marked as Exhibit-15, which is Exhibit 5 to the Exhibit Book, and turn to page 9.**

**If you see at the bottom of that there is a reference there to two**



**settlement agreements for Unigard Security Insurance Company? Do you see those?**

A. Yes.

**Q. And it says "now known as Seaton"?**

A. Yes.

**Q. Okay. Do you understand those two settlement agreements to pertain to the two policies that are on the first exhibit that I had you look at?**

MS. HARDING: Object on foundation, to the extent that you know. And --

BY MR. BROWN:

**Q. You can look at the policy numbers.**

A. Yeah, they have the same policy numbers.

**Q. Okay. Now, would you look at Schedule 2 to Exhibit 6? Do you see that there are two settlement agreements listed there for Unigard Security Insurance Company?**

PP's Obj: R

CI

PP's Obj: R

CI

PP's Obj: R, BE

CI

PP's Obj: R

CI

PP's Obj: R, BE



CI

A. Yes.

**Q. Do you understand those two settlement agreements to relate to the references of the prior document?**

MS. HARDING: Object on foundation. Mr. Finke testified that he prepared these schedules.

But to the extent that you know, go ahead.

CI

THE WITNESS: I mean, they have the same policy numbers -- excuse me. They don't have policy numbers on Schedule 2, but they have the same dates in the agreement.

PP's Obj: R

BY MR. BROWN:

**Q. It's your understanding it's the same agreement, correct?**

MS. HARDING: Object on foundation.

CI

THE WITNESS: Yes.

PP's Obj: R

BY MR. BROWN:

**Q. Okay. Are you aware of any other agreements between Grace and**



CI

**Unigard, or its successor, Seaton, regarding Unigard policy number 1-0589 or 1-2517 relating to asbestos-related coverage other than the two that are listed there?**

A. Settlements, did you say?

**Q. Yes.**

A. No, I am not.

**Q. Are you aware of any other agreements between Grace and Unigard, or Seaton, regarding claims handling under any coverage that is alleged to exist under policy number 1-0589 or 1-2517?**

A. No, I am not.

MR. BROWN: Thank you.

MR. SCHIAVONI: Just four or five things, sir.

\- - -

EXAMINATION

\- - -

BY MR. SCHIAVONI:

**Q. Is it fair to say that you have no personal knowledge concerning the circumstances under which Exhibits 6**



**through 9 were prepared?**

A. No.

MS. HARDING: Is it fair to say?

THE WITNESS: I am sorry.

BY MR. SCHIAVONI:

**Q. Let me ask again. That was a mistake right that you just said?**

A. Yes, it was.

**Q. Is it fair to say that you have no personal knowledge concerning the circumstances under which Exhibits 6 through 9 were prepared?**

A. I have no personal knowledge of the circumstances through which Exhibits 6 through 9 were prepared.

**Q. All right. Those are exhibits at this deposition, 6 through 9, right?**

A. Yes.

**Q. And I am sorry to ask you this, I apologize, but how old were you in 1963?**

MR. LEWIS: I object.



That's an impertinent question.

THE WITNESS: I was 6 years old.

MR. SCHIAVONI: It demonstrates how silly your questions were, sir.

BY MR. SCHIAVONI:

**Q. How old were you in 1963?**

A. I was 6.

**Q. Is it fair to say you didn't work at Grace in the '50s and '60s, right?**

A. No, I didn't.

**Q. And you never worked at the Zonolite Company; is that right?**

A. No, I didn't.

**Q. Is it fair to say that you, Mr. Hughes, have no personal knowledge as to whether or not any policies were actually issued to BNSF in the '50s or '60s, do you, because you weren't around then?**

A. No, I don't.

MR. SCHIAVONI: Thank you.