# Deposition Designations for:

# ELIHU INSELBUCH
# June 12, 2009

**Deposition Designation Key**

**CI = Certain insurers (green)**

**CNA = Continental Cas. Co & Continental Ins. Co. (red)**

**PP's = Plan Proponents (blue)**

**Obj: = Objection**

**Ctr = Counter Designation**

**R = Relevance**

**BE = Best Evidence**

**F = Foundation**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In Re: Chapter 11
Case No. 01-01139 JKF

W.R. Grace & Co., et al.,

Debtors. (Jointly Administered)

\- - -

June 12, 2009

\- - -

DEPOSITION of ELIHU INSELBUCH, held at the offices of Caplin & Drysdale, Chartered, 375 Park Avenue, New York, New York, commencing at approximately 9:37 A.M., on the above date, before Lisa Lynch, a Registered Merit Reporter, New Jersey Certified Court Reporter, License No. XI00825, and Certified Realtime Reporter

\- - -

MAGNA LEGAL SERVICES, LLP

7 Penn Center, 8th Floor
1635 Market Street
Philadelphia, PA 19103
1.866.MAGNA.21

Key
CI = Certain Insurers (green)
CNA = Continental Casualty Co. & Continental Ins. Co. Cred)
PP = Plan Proponents (blue)
Obj: = Objection
Ctr = Counter Designation
R = Relevance
BE = Best Evidence
F = Foundation

MR. FINCH: Object to form.

A. I don't know what you mean. I have served as, and do serve as, counsel to some of the trust advisory committees.

**Q. And would you explain for the record what a trust advisory committee is?**

MR. FINCH: Object to form.

A. Under the terms of these plans and under the terms of the TDPs that are part of the plan documents, an entity is created called a trust advisory committee which consists of one or more attorneys who have responsibilities that are defined within the TDP documents and within the trust agreement documents.

MR. J. COHN: Dan, let's just note the arrival of two more counsel. Would you identify yourselves?



MR. MUELLER: Alex Mueller from Mendes & Mount for certain London market insurance companies.

MS. DeCHRISTOFARO: Elizabeth DeChristofaro from Ford Marrin for Continental Casualty Company and Continental Insurance Company.

THE WITNESS: Those appearances are not part of the roles of the TACs, and I don't remember where I was in the middle of my answer.

MR. COHN: Well, let's help you by reading back as far as you got in this answer.

(Off the record.)

(The Reporter reads the last answer.)

BY MR. COHN:

**Q. Do you have anything to add?**



A. That's enough.

**Q. And in that capacity, have you been actually called upon to render advice to those trust advisory committees?**

A. From time to time.

**Q. Now, what is your role in the W.R. Grace Chapter 11 case?**

A. My firm is counsel to the asbestos creditors committee.

**Q. And what is your personal role in connection with that representation?**

A. I suspect that I am the lead counsel.

**Q. You suspect or is that what you are?**

A. What I am is in the eye of the beholder.

**Q. Did you participate in negotiations concerning the plan -- strike that.**

**Did you participate in negotiations that led to the filing**



**of the Chapter 11 plan that is now coming before the Bankruptcy Court?**

A. I did.

**Q. Would you describe your role in those negotiations?**

A. I was counsel to the asbestos creditors committee.

**Q. Would it be fair to say that you were the lead negotiator for the asbestos creditors committee?**

MR. FINCH: Object to form.

A. I wouldn't say so.

**Q. Who else participated in the negotiations on behalf of the ACC?**

A. Well, if we're talking about the part of the negotiations that involve the crafting and agreement to the term sheet or the economic arrangements with the debtor, the committee -- when I say "the committee", I mean the asbestos creditors committee -- the committee

CI

PP's Obj: R

CI

PP's Obj: R

PP's Ctr

CI

PP's Obj: R

C1 PP's Obj: R



appointed a negotiating subcommittee that attended those negotiations and I attended with them.

That negotiating subcommittee, as I remember, consisted of Mr. Rice; Mr. Weitz, W-e-i-t-z; Mr. Cooney, and one or both of Mr. Budd and/or Mr. Baron.

If we're talking about the negotiations thereafter that involved work with the futures rep and other plan proponent constituencies in developing what became the documents that reflect the plan, I played a minor role in that other than -- well, I should say I played a minor role in that other than in connection with the development of the trust agreement and the TDP.

The other documents and the negotiation of those documents were assigned by the committee to my partner, Mr. Lockwood, and others who worked under his leadership.

C1 PP's Obj: R



**Q. So is it fair to say on behalf of the ACC you were the person primarily responsible for the trust agreement and the TDP?**

A. I was the counsel primarily involved in that work.

MR. COHN: Let's mark this as Exhibit 2, please.

(Term sheet, 11 pages, marked for identification as Inselbuch Exhibit 2.)

BY MR. COHN:

**Q. Do you have Exhibit 2 in front of you?**

A. I do.

**Q. Do you recognize it?**

A. No.

**Q. If you would turn to the last four pages of that document, let me ask you whether you recognize those four pages.**

A. I do not. It purports to be the term sheet. I've never seen it in this form so I guess I

C1 PP's Obj: R



could compare it with my copy of the term sheet that I signed and figure out whether it's the same document, but I have no way of knowing. If you represent to me that it is, I'll accept your representation.

**Q. Well, yes, let me represent to you that's the same document that I have always seen and has always been represented to me to be the correct term sheet.**

A. Well, I have a book in front of me with three documents that I've been working with. One is the TDP as it exists in the plan, one is the trust agreement as it exists in the plan and the other is the term sheet that I signed.

MR. COHN: Let's go off the record.

(Off the record.)

(Term sheet, seven pages, marked for identification as Inselbuch

C1 PP's Obj: R



Exhibit 2A.)

(Preliminary Expert Report on W.R. Grace Trust by Mark Peterson dated March 2009 marked for identification as Inselbuch Exhibit 3.)

(Exhibit 4 to Exhibit Book, Trust Distribution Procedures, marked for identification as Inselbuch Exhibit 4.)

MR. COHN: All right, back on the record.

**Q. Do you now have in front of you a document that has been marked as Exhibit 2A?**

A. Yes, sir.

**Q. Do you recognize that one?**

A. I do.

**Q. Tell us what it is.**

A. It's the term sheet that was signed among the debtor, the futures rep, the committee and I

C1



believe the equity. Yes, the equity committee I guess they're called.

**Q. Okay. And when you said "the committee" in your answer, you meant the Asbestos Claimants Committee?**

A. Yes. I will mean that always.

**Q. Terrific. And that's also what we mean when we say ACC?**

A. Yes.

**Q. Now, does this document, Exhibit 2A, reflect the entire deal amongst those parties concerning the subject matter thereafter at the time that it was entered into?**

MR. FINCH: Object to form.

A. Like all term sheets, it reflects all the points that the people who signed it thought needed to be put on paper at the time.

**Q. And what points were agreed to but not put on paper?**



A. None that I recall. But for sure when you -- when you negotiate a term sheet, you understand that what will evolve in what are much more complicated documents are issues subsidiary to the issues that are agreed in the term sheet that will need to be resolved over time within the context of the term sheet agreement.

**Q. Were there any understandings reached in connection with this term sheet that would not rise to the level of an agreement?**

A. Not --

MR. FINCH: Object to form.

A. -- that I recall.

**Q. And specifically concerning treatment of Libby claims, were there any agreements or understandings?**

A. Not that I recall, other than what's provided in the

PP's Obj: R



document.

**Q. Have you reviewed a transcript of the recent deposition of Peter Lockwood?**

A. I read it briefly, quickly.

**Q. In that brief reading, did you come across any statements made by Mr. Lockwood with which you disagreed?**

MR. FINCH: Object to form, vague, overbroad.

A. Yeah, there was one place where he was talking about or answering questions that had to do with a provision in the term sheet -- in the TDP -- let's see -- in the extraordinary claims section as to whether or not that portion of the extraordinary claims criteria which requires that there not be the potential for substantial recovery elsewhere would apply to the extraordinary claim that would



satisfy the criteria otherwise for an eight times treatment. He was unclear about that, at best, and perhaps wrong. My understanding of that provision is that that requirement is included in either category of the extraordinary claims treatment.

**Q. All right. To qualify for the eight times multiplier under extraordinary claims treatment, you must, in addition to meeting the exposure criteria set forth in the TDP, also show little likelihood of substantial recovery elsewhere?**

A. Whatever that language is, yes, for sure.

**Q. Any other statements come to mind that you saw with which you did not agree?**

MR. FINCH: Object to form.

A. Not that I recall off the top of my head.






**Q. Have you reviewed a transcript of the recent deposition of Mark Peterson?**
A. No.
**Q. All right. Let me now hand you a document that has been marked as Exhibit 3. This is Dr. Peterson's report.**
MR. COHN: What I'm handing around the room are just the pages on which I intend to ask questions because otherwise the copying would have been voluminous.
**Q. I'm sorry. Did I --**
A. You didn't ask me anything.
**Q. Thank you. Do you recognize the document that has been marked Exhibit 3?**
A. I recognize it says what it says it is.
**Q. Which is what?**
A. It says it's the



Preliminary Expert Report on W.R. Grace Trust by Mark Peterson of Legal Analysis Systems dated March 2009.
**Q. And do you know Dr. Peterson?**
A. I do.
**Q. What is his capacity in this case?**
A. He is engaged as an expert to assist the asbestos -- to assist the committee.
**Q. Thank you.**
**Let me now hand you a document that's been marked as Exhibit 4. I will represent to everyone concerned this is a copy of the trust distribution procedures, or TDP, that has been attached to the plan.**
MR. COHN: In accordance with our custom at these depositions, the parties will use their own copies to refer to but we understand it is the same document.



**Q. Do you recognize Exhibit 4, Mr. Inselbuch?**
A. I accept your representation that it is what it says it is.
**Q. Okay, thank you.**
**Now, let me ask you to look at Exhibit 3, which is Dr. Peterson's report, and take a look at page five.**
A. I'm at page five.
**Q. All right.**
A. I should warn you I'm reading this for the first time.
**Q. Okay. Let me point you then to exactly the statement I want you to read. Would you read the first sentence of the second paragraph on page five?**
A. Yes.
**Q. Would you like to read it out loud, please, for the record?**
A. "The trust's TDP follows the standard form used for almost



every asbestos trust created since 2002."
**Q. Do you agree with that statement?**
A. Yes.
**Q. So when I talk about the standard form or a term such as that, you'll understand that I'm referring to what Dr. Peterson is referring to here, which is the standard form of TDP that has been used for almost every asbestos trust created since 2002?**
MR. FINCH: Object to form.
A. Is that a question?
**Q. Will you understand that that's what I mean by that term?**
A. Okay.
**Q. Now, in this case there were some departures from the standard form; is that correct?**
A. In each case there is some departures from the standard

PP's Obj: R

CI

form and there were some here too.

**Q. Who drafted the TDP in this case?**

A. The TDP that evolved into the one in this case?

**Q. Yes.**

A. That's now on file?

**Q. Exhibit 4.**

A. The first draft, my office, probably Anne McMillan.

**Q. And how did the document evolve from that first draft into Exhibit 4?**

A. Okay. You will recall that at some point the Court relieved the debtor's exclusivity. At that point the committee and the futures rep determined to file their own plan, proposed plan of reorganization.

In that connection, it was understood that there would be the need for a trust agreement and a TDP and it was at that point, which I



PP's Obj: R

CI

believe was somewhere in the fall of 2007, that we began the preparation of the TDP.

A draft was crafted by our office for consideration by the committee. After the committee considered the draft and considered input from Dr. Peterson, the draft was put in a form that was then submitted to the futures rep's counsel for their consideration. And after we received their comments and suggestions, the draft was further edited and reconsidered by the committee and sometime by the beginning/early part of 2008 there was a TDP that was agreeable to the committee and to the futures rep.

Prior to that time we had actually filed a plan, I believe, that was proposed by the committee and the futures rep but I believe -- my best memory is that plan was filed before there was agreement between



CI

PP's Obj: R

the committee and the futures rep on the terms of the TDP.

Events then overtook that plan. In fact, the events that you make reference to with this term sheet which was signed -- I'm referring to Exhibit 2A -- in early April of 2008 and now there was a TDP that needed to be considered by the other plan proponents because it would now not be associated with a separate plan that had been filed by the committee and the futures rep but, rather, would evolve into a plan that would be filed by the plan proponents as part of that plan.

PP's Ctr

In the spring of 2008 the committee and the futures rep were already aware of criticisms that counsel for some of the Libby claimants had with the terms of the TDP and we entered into a dialogue at the instructions of the committee with you and with Mr. Heberling to



PP's Ctr

see whether points that you were making were of sufficient validity to cause us to consider changes in the TDP. Some of those points were so considered and resulted in changes in the TDP that evolved in the spring and summer of 2008 and are reflected in the plan as filed.

CI

PP's Obj: R

There were also comments to the TDP that were received from other parties who had an interest and a right to consider the documents. I'm mindful of the representatives that counsel for Sealed Air participated in some parts of the TDP and trust agreement and there may have been comments as well from the debtor. I'm not -- I don't recall. But the effect of all of that was it was -- the result of all of that was the TDP that is now your Exhibit 4. That's the general history of its evolution.

**Q. Let's turn to Section 5.3(b)(3) of the TDP at pages 31 and**

into two parts. The first part is the greater of the trust's last offer to the claimant or the award that the claimant declined in non-binding arbitration. That's what it says the first part is. However, that amount should not exceed the amount that the jury decides.

Now, the balance, it says, gets divided into five equal installments in years 6 through 10 following the year of the initial payment, all of that again subject to the applicable payment percentage, the maximum available payment and the claims payment ratio provisions. So that's how it gets paid out. And it doesn't get any sequencing adjustments.

**Q. And is it subject to maximum value or is it --**

A. Yes, and it's subject to the maximum values.

**Q. So that the amount of the trust's last offer or the**



**non-binding arbitration award --**

A. Yes.

**Q. -- assuming that they -- that the jury verdict is not less than those amounts --**

A. Yes.

**Q. -- will get paid on the same basis as though the claim had been allowed -- excuse me -- liquidated upon expedited review?**

A. That's what it seems to say.

**Q. The next traunch, if you will, of the jury verdict is the amount between that initial payment and the maximum value for the claim. Is that correct?**

MR. FINCH: Object to form. Maximum value or maximum extraordinary value as the case may be.

THE WITNESS: Could I have the question back?

(The reporter reads the



pending question.)

MR. FINCH: Object to form.

A. No. It's the amount between whatever the award was and what was paid, limited by the maximum value.

**Q. Right. So --**

A. Could be less.

**Q. That's a very fair point. So let's assume that the jury verdict is in excess of the --**

A. Then it would be the difference between the maximum --

**Q. -- maximum value.**

A. -- value and what was already paid.

**Q. And when we say "maximum value", to Mr. Finch's point --**

A. Yeah.

**Q. -- we are including -- that is the greater of the maximum value set forth in the matrix or the scheduled value multiplied by the**



**extraordinary claims multiplier if the claim is an extraordinary claim?**

A. Well, maximum value is a defined term. It's a defined term with respect to extraordinary claims too.

**Q. And then to the extent that there is remaining value to the jury verdict over and above those two traunches that we spoke about, how does that get paid?**

A. It doesn't.

C1

PPs Obj: R

**Q. I just want to make sure I understand your testimony a few minutes ago. Did I hear you correctly that, to your knowledge, no claimant has ever exercised the right to pursue its claim in the tort system under one of these standard form TDPs?**

A. That's my best recollection.

**Q. And you would most**

C1



**likely have been aware if such an event had taken place?**

A. I think so, but I can't be sure of that.

**Q. All right. Let's talk about the extraordinary claims multiplier under Section 5.4(a).**

A. Yes.

MR. J. COHN: I'm sorry, Dan. Where are you?

MR. COHN: Section 5.4(a) in the TDP.

MR. FINCH: Page 32.

**Q. Now, is it fair to say that to obtain liquidation of a claim as an extraordinary claim a claimant must meet two criteria, one having to do with exposure and one having to do with little likelihood of a substantial recovery elsewhere?**

A. I don't know whether it's fair to say that. I think that's correct.

**Q. Now, focusing first on**



**the exposure criteria, how do these vary from standard form TDPs that we've been referring to?**

A. The variance is the additional provision toward the bottom of the runover paragraph on page 33 that provides for an additional category where the exposure was 95 percent the result of exposure to Grace products.

**Q. So under the standard form of TDP, there is an extraordinary claim treatment for exposures that are 75 percent the result of the debtor's asbestos?**

A. Correct.

**Q. And those provide a five times multiplier for such claims?**

A. That's correct.

**Q. And here the change is that there's an eight times multiplier for exposures of 95 percent?**

A. That's correct.



PP's Obj: R

**Q. How did this change come about?**

A. Based upon discussions that I and members of the committee had with you and Mr. Heberling, the idea was that, as distinguished from the usual situation where asbestos claimants were generally exposed to more than one defendant's product, it would be the case in Libby or for people exposed in Libby that there would be only exposure to Grace's product and, thus, that was a little different from what was normally provided.

To put in context what the extraordinary claims provision is trying to accomplish, as you know, the scheduled values or even the individual review values are meant to reflect the respective defendants' share of the responsibility for the claim as kind of evidenced historically by what the defendant



had paid to settle claims.

In most jurisdiction, the defendant, which would be Grace here but it could be any of the others, would be jointly and severally liable with others for the tort responsibility and, thus, if the case went to verdict, they would be a single recovery, a single amount, and any one of the jointly and severally responsible tort feasors would have to pay that if called upon to pay that. And that would develop into, under the state law, rules that would involve contribution or things like that among joint tort feasors.

The TDP is designed to provide for an award in the normal case where there are multiplicity of available defendants of that defendant's respective share. When we first worked with this concept, which I believe goes back to the original Manville, maybe even the Manville

defendant would have specific liability to the particular claimant because of the exposure to the particular product which was caused in part by this defendant even if they didn't manufacture it.

MR. SPEIGHTS: Thank you, sir.

THE WITNESS: Next?

MR. FINCH: Lunch break?

(Off the record.)

C1

PP's Obj: R, BE, F

EXAMINATION BY MR. BROWN:

**Q. Good afternoon, Mr. Inselbuch. Michael Brown. I represent Geico, Republic Insurance Company, Seaton Insurance Company and OneBeacon America Insurance Company.**

A. How fortunate for you.

**Q. I want to follow up on some of Mr. Cohn's questioning of you earlier this morning and I think --**



C1

PP's Obj: R, BE, F

**I'm not sure I followed all of the exhibits but I believe Exhibit 2A is the term sheet, at least your copy of the term sheet, the one you were familiar with. Is that correct?**

A. Yes, sir. It's the one I signed.

**Q. Okay. Do you have that in front of you?**

A. I do.

**Q. Okay. I'm correct, am I not, that it's dated April 6, 2008?**

A. That's correct.

**Q. And you executed it on behalf of the official committee of asbestos personal injury claimants, otherwise known as the committee, or the ACC, correct?**

A. That's correct.

**Q. Okay. You indicated earlier in response to one of Mr. Cohn's questions that the ACC had a negotiating subcommittee and I understood you to be saying that that**



C1

PP's Obj: R, BE, F

**was a subcommittee in connection with the negotiations leading to the term sheet. Is that correct?**

A. That's correct.

**Q. Okay. And those individuals were Joe Rice, Perry Weitz, John Cooney and Fred Baron and/or Russell Budd. Am I correct?**

A. No, not Fred, no. Steve Baron --

**Q. Steve Baron. I'm sorry.**

A. -- and/or Russell Budd.

**Q. All right. Am I correct that counsel for the ACC was also involved in those negotiations?**

A. Correct.

**Q. And would that be you and Mr. Lockwood?**

A. It would certainly be me. I don't recall whether Lockwood was there for some or all of that.

**Q. Okay. Did the other parties that ultimately became the**



C1

PP's Obj: R, BE, F

**plan proponents -- did they also have negotiating teams?**

A. The debtor certainly did, the futures claimants certainly did, the equity security holder certainly did, yes.

**Q. Okay. Can you identify the debtor's negotiating team?**

A. Their chairman was there, their general counsel was there, their chief financial officer was there, Mr. Bernick was there, the chief legal officer was there. There may have been others but those are the people I remember.

**Q. Okay. The chairman was Mr. Festa?**

A. Yes, sir.

**Q. And the general counsel was Mr. Shelnitz?**

A. Yes, sir.

**Q. And the CFO was Mr. LaForce?**

A. I don't recall his

C1 PP's Obj: R, BE, F



name.
Q. Okay. Who was the chief legal officer?
A. That would have been Mr. Shelnitz.
Q. Okay. And who was the negotiating team for the FCR?
A. Mr. Frankel, at some points David Austern I believe was there. There may have been others.
Q. You don't recall them?
A. I don't recall now.
Q. Okay. And how about the equity committee?
A. Mr. Weschler.
Q. Is that it?
A. As far as I recall.
Q. Now, other than the four parties that ultimately signed the term sheet, were there any other parties or entities or individuals that were involved in the negotiations leading up to the April 6, 2008 term sheet?



PP's Obj: R, BE, F

MR. FINCH: Object to form.
C1
A. Not that I recall.
Q. Were any of the debtor's insurers involved in the negotiations that resulted in the term sheet?
A. None that I attended.
Q. To your knowledge, were any of them asked or invited to participate in the negotiations that led up to the term sheet?
PP's Obj: R, BE, F
MR. FINCH: Objection, lack of foundation.
C1
A. I don't know.
Ctr
Q. Were you ever advised by any other party to the negotiations that they did not want the insurers to participate in the negotiations?
PP's Obj: R, BE, F
MS. BAER: Objection.
A. No.
C1
Q. Did any other party to the negotiations suggest that they did want the insurers involved in the negotiations?

C1 PP's Obj: R, BE, F



A. Not that I recall.
PP's Obj: R, BE
Q. All right. I think you testified earlier this morning that after the term sheet -- Well, let me back up.
You indicated in your earlier testimony, I believe, that Anne McMillan from your office prepared the initial draft of the TDP. Is that correct?
A. I said it may have been Anne McMillan.
Q. Okay. Do you know whether whoever created it -- well, let me back up.
Was it someone from Caplin & Drysdale that created the initial draft?
A. Correct.
Q. Do you know whether that draft still exists today?
A. No.
PP's Ctr
Q. Do you know what model -- I think I heard the term



PP's Ctr

earlier in your testimony that there was a model that was used.
Do you know what model was used to create the first draft of the TDP?
A. My ex -- I don't know the answer. My expectation would be that she or someone else in the firm would have started with the then-most-recent rendition of the TDP sometime in 2007 that had been approved either by a committee in some other bankruptcy or in court and used that as the beginning place to start. I don't recall what that might have been.
C1 PP's Obj: R, BE
Q. Okay. Now, you indicated that that initial draft was created by your office in the fall of two thousand --
A. Two thousand --
Q. Sorry -- in the fall of 2007 for consideration by the committee.

C1 PP's Obj: R, BE



A. I think that's correct.

**Q. Is that right?**

A. I believe that's correct.

**Q. And that was after your office had received input from Mark Peterson on the draft, as I understood your earlier testimony?**

A. No, before.

**Q. Okay.**

A. The draft would have had blanks for all of the numbers and for the payment percentage.

**Q. Okay. Did it go to Mark Peterson first or did it go to your client first?**

A. I don't recall. It certainly would not have gone to Peterson first. It might have gone to him simultaneously.

**Q. And Mr. Peterson, I gather, provided you with his comments?**

C1 PP's Obj: R, BE



A. Provided the committee with his thoughts, yes.

**Q. Okay. And what were the nature of his thoughts or comments on the draft that was provided to him?**

A. He doesn't comment on the draft. He provides information --

**Q. What does he comment on?**

A. He doesn't comment. He provides information that will facilitate the committee's decisions as to what figures to place in the matrix and also to deal with the -- just a second. I've got to get the right word for you -- the claims payment ratio.

**Q. Does he actually provide the committee with figures for the matrix?**

A. He does. He provides his recommendations, he provides them with considered -- sometimes with

C1 PP's Obj: R, BE



alternate recommendations based upon different concepts. He sometimes provides them with ranges of recommendations for them to consider.

**Q. Okay. You indicated earlier that in or around early 2008 that the committee shared its then working draft of the TDP with the FCR. Do I have that correct?**

A. I think that timing is correct but I'm not sure. It could have been a little earlier than that.

**Q. And had there been a plan filed, a joint plan, proposed plan, by the ACC and FCR at that point?**

A. That's my recollection.

**Q. All right. You then indicated that the -- the plan I suppose you were talking about was superseded by events was, I think,**

C1 PP's Obj: R, BE



**the term that you've used and that's what ultimately led up to the term sheet. What events were you alluding to?**

A. Well, soon thereafter we began the estimation hearings and in the course of the estimation hearings what the -- the negotiations that led to the term sheet began. And once there was agreement on the term sheet with the debtor, there was no need to pursue the separate plan that the committee and the futures rep had filed because we would be pursuing a plan with the debtor and the equity committee.

**Q. When did the estimation hearing begin?**

A. I don't recall offhand, but my best guess would be sometime in March of 2008.

THE WITNESS: Earlier than that?

A. Well, I've got that

wrong. I'm told I got that wrong. It was earlier in 2008.

PP's Obj: R, BE

CI

**Q. You indicated also that at some point -- it wasn't clear to me when in this process -- the draft TDP was shared with Sealed Air. Can you tell me when that was?**

A. It would have been later on, after there was pretty much a draft of plan documents because they didn't just see the TDP; they saw a whole bunch of plan documents to provide their comments. I can't give you a date, but it would have been in 2008 at some point.

PP's Ctr

**Q. Would it have been after the term sheet was signed but before the initial plan documents were filed in September of 2008?**

A. I don't recall.

CI

PP's Obj: R, BE

**Q. Do you have an understanding as to why Sealed Air had an interest in the TDPs?**

A. There was a settlement



CI

agreement with Sealed Air and Fresenius under which they would pay considerable sums that would be available to compensate some of the claimants here. And under the terms of that settlement agreements, there were requirements that had to be accomplished in order to trigger their obligation to pay the monies. Some of those obligations involved protections and language in plans -- in a plan of reorganization for their benefit.

**Q. At the time that the TDPs were shared with Sealed Air for their review, were they also shared with the debtor's insurers for the debtor's insurers' review?**

A. I have no idea.

**Q. Let me shift gears for a moment because I gather Mr. Cohn is not back with the copies.**

MR. J. COHN: I am.

MR. BROWN: Oh, you



are.

MR. J. COHN: Yes.

MR. BROWN: Do you want to, I guess, give the witness the one-page bio first?

MR. J. COHN: Sure.

(Biography page of Elihu Inselbuch marked for identification as Inselbuch Exhibit 5.)

**Q. Mr. Inselbuch, you should have before you a one-page document that I'm going to bet that you don't have any trouble identifying but I'll ask the question anyway. Can you identify it?**

A. It's a biography of me that is, I believe, put together by my firm and is either on the website or in other material where the firm collects a rogues gallery of its lawyers.

**Q. I will represent to you that I pulled it off your website.**



PP's Obj: R, BE

**In the second paragraph there are a number of cases that are referenced --**

A. Yes.

**Q. -- some of which you have mentioned earlier in your testimony today, and what I want to ask you about each of those cases is whether Mark Peterson was involved in those cases. So can you run down the list that is in the bio and tell me, one, whether Mark Peterson was involved and, two, as to each what his role was?**

A. Okay.

MR. FINCH: Object to form. You can answer.

THE WITNESS: I can answer this?

MR. FINCH: Yes.

A. The best I can do, let's see. Johns-Manville, he was not involved in the original bankruptcy proceeding. In the restructuring

throughout the country, how information might be made available to the trust, how the process can be made less cumbersome, things like that.

**Q. Are the members of the plaintiffs' asbestos bar the only ones that have that knowledge?**

A. In that detail, yes.

**Q. There's no defense attorneys in asbestos litigation that would have that knowledge?**

A. No, not all of it. Very little of it. The defense attorneys will be familiar with what's in their files and what they do.

**Q. And how does that differ --**

MR. FINCH: Object to form.

**Q. -- from what the plaintiffs' asbestos attorneys do?**

A. It's like day and night.



**Q. In your experience with other asbestos trusts, does the trust agreements provide that the trustees will be required to consult with the TAC members on various issues?**

A. The documents say what they say. They often call for consultation on specific issues.

**Q. And do they often also call for the trustees to obtain the consent of the TAC and the future claimants' representative before certain actions can be taken?**

A. Yes. And failing that consent, there are provisions for overriding the refusal of consent.

**Q. What is the necessity of having these consent provisions in the trust agreement?**

MR. FINCH: Object to form.

A. So that as -- as the trust is administered, it will be administered in a way that is



consistent with the expectations of the constituencies that care about it.

**Q. And the only constituencies that care about it, I gather, are the asbestos claimants?**

A. And the futures representative.

**Q. Do the insurers have any interest in it?**

A. The insurers have an interest in what they're required to pay. What they're required to pay is defined by their contracts.

MR. BROWN: All right. I think, Mr. Inselbuch, that may be all I have. I'll pass to the next questioner.

MR. J. COHN: I'll follow up. I think it makes sense.

C1

EXAMINATION BY
MR. J. COHN:



C1

**Q. Mr. Inselbuch, Jacob Cohn for Federal Insurance Company.**

**If we could go to the TDPs for a moment, Exhibit --**

A. I'd ask you to speak a little louder --

**Q. Sure. You know what? Why don't I come down there?**

A. -- because you're talking in my bad ear.

**Q. All right. You have the --**

A. I have the TDP.

**Q. -- TDPs. If you take a look at page 31, the end of 5.3(b)(1)(B) --**

A. Yeah.

**Q. -- it's the paragraph above the scheduled value paragraph --**

A. Yes.

**Q. -- beginning provision.**

A. Yes.

**Q. It has a reference to**

PP's Obj: R, BE, F

C1 PP's Obj: R, BE, F



**choice of law.**
A. Yes.
**Q. And it says -- there's a reference to the Alabama wrongful death statute and there's a reference to "shall only govern the rights between the PI trust and the claimant, and, to the extent the PI trust seeks recovery from any entity that provided insurance coverage to Grace, the Alabama wrongful death statute shall govern."**
A. Uh-huh.
**Q. Are you familiar with that provision?**
A. I see it.
**Q. What is the purpose of that provision?**
A. Which part of it?
**Q. The part that applies -- at least purports to apply a rule to insurer disputes.**
MR. FINCH: Object to form.

C1 PP's Obj: R, BE, F



(The witness reviews the document.)
A. The point of this whole provision was to ameliorate a problem that existed under the law of Alabama. As you know, under the terms of the TDP, no punitive damages are included in the recovery. As this was all explained to me at the time, in Alabama the recovery for wrongful death is couched in terms of punitive damages. So that, read literally, there could be no recovery under this document for a wrongful death that would have as its operative jurisdiction the State of Alabama.
This provision was inserted to cure that problem, to make it possible for what we would all -- what we all regarded as run-of-the-mill ordinary death claims that happened to occur in Alabama to recover under the terms of the trust.

C1 PP's Obj: R, BE, F



Whether or not this provision, as it states, also will govern the relationship with insurers is something that I guess the insurers can debate at some point in court.
**Q. Is this, therefore, intended to be a carve-out from the insurer neutrality provision of the plan?**
MR. FINCH: Object to form, lack of foundation.

C1 PP's Obj: R, BE, F

(The witness reviews the document.)
A. I don't know the answer to that.
**Q. You are familiar with the insurance neutrality provision of the plan?**
A. Only very generally.
**Q. Would reviewing that give you any help in answering this question?**
A. No. That's something you ought to ask Mr. Lockwood.

C1 PP's Obj: R, BE, F



**Q. You've represented numerous what have come to be known as asbestos creditors committees, or ACCs, correct?**
A. Yes.
**Q. And as counsel you are representing the members of that committee, correct?**
MR. FINCH: Object to form.

C1 PP's Obj: R

A. Yes.
**Q. And those members have fiduciary duties; is that correct?**
A. Yes.
**Q. To whom do those fiduciary duties run?**
A. The entire constituency.
**Q. Who is the constituency?**
A. All asbestos claimants against the particular debtor.
**Q. Irrespective of the validity of their claims; is that**

correct?
MR. FINCH: Object to form.
A. Well, when I say "a claimant", I presuppose that they have a claim.
**Q. So you operate on the assumption, is it correct, that somebody that is represented by a lawyer that is asserting a claim has a valid claim against that particular debtor?**
A. No. You asked me to whom did the fiduciary duty extend. It extends to those folks who have claims.
**Q. Is there a fiduciary duty of the committee to attempt to ferret out those people who have come before the Bankruptcy Court but do not have meritorious claims?**
A. No. The committee's duty is to participate in the preparation of a TDP and a plan that



will, as best possible, pay claims that are valid and in as an efficient manner as possible.
**Q. And as representatives of existing claimants, the ACC wants to get as much money as possible for the existing claimants, correct?**
A. First of all, the ACC are the victims who are appointed to the committee. You seem to be fudging over talking about their lawyers.
**Q. I don't think that I am, but please --**
A. Okay. I'm talking about the claimants. Surely, their job is to see in the debates among the various creditor constituencies how much of the pie that's available to all creditors can be allocated to asbestos claimants.
**Q. Okay. And the FCR has a different constituency. Those are --**



A. Yet-to-come claimants.
**Q. -- yet-to-come claimants?**
A. But he also is interested in seeing to it that as much money as possible goes in the pot.
**Q. They have a common interest in maximizing the size of the pot, correct?**
A. I believe so.
**Q. And it is therefore in the interest of the asbestos creditors committee and the FCR to see as much insurance money paid into that pot as quickly as possible, correct?**
A. Sure.
**Q. And when the trust is established, the trust owes a fiduciary duty to its beneficiaries, correct?**
A. Correct.
**Q. And --**



A. The trustees do.
**Q. The trustees.**
**And the beneficiaries of the trust --**
A. Yes.
**Q. -- are existing and future claimants against that debtor who's established a trust, correct?**
A. Correct.
**Q. And the trust has a fiduciary duty to maximize the compensation to its beneficiaries, correct?**
MR. FINCH: Object to form. Mischaracterizes the document.
A. Sure.
**Q. And the main issue between the current claimants and the future claimants is ensuring that enough money is available going out in time to assure as much as possible the non-preferential treatment of each claim. Is that correct?**

CI
PP's Obj: R
PP's Obj: R
CI
PP's Obj: R
CI
PP's Obj: R
CI
PP's Obj: R; BE
CI
PP's Obj: R; BE






A. You could -- that's fair. That's a fair way to put it.

**Q. And the trust, similarly, shares an interest in getting as much money into the trust from whatever source as quickly as possible. Is that correct?**

MR. FINCH: Object to form.

A. Yes. The trustees also have a fiduciary responsibility in addition to the futures rep to see to it that all claimants that come before the trust are treated more or less equitably.

**Q. Do the trustees have any duty at all to the insurers?**

A. As insurers?

**Q. Yes.**

A. Not that I can think of.

**Q. In fact, with respect to the insurance relationship, typically insurers are in an adversarial**



**position with the trust, correct?**

A. Yes.

**Q. You've been involved, as you said, as counsel for what we could colloquially call the Manville TAC, correct?**

A. Correct, yes. Still am.

**Q. Are you familiar with the Manville trust's having issued pronouncements that it will no longer honor claims that are submitted based upon the diagnosis of certain doctors whose reliability has been called into question?**

A. I am.

**Q. Would you take a look at page 40 of the TDPs, please, 5.7(a)(2), regarding the credibility of medical evidence?**

A. Yes.

**Q. There's no reference to the doctors who have been discredited -- strike that.**



**There's no reference in these TDPs to the doctors who the Manville trust will no longer consider paying claims based upon their diagnosis, is there?**

A. That's correct.

**Q. Do you know why those doctors are not identified here?**

A. Because it's for the trustees to decide whether or not they will list one or another facility as being a facility whose evidence they will not credit.

**Q. And the trustees are supposed to consult with TAC members about that; is that correct?**

MR. FINCH: Object to form.

A. Not necessarily.

**Q. In Manville, is there a cap on the contingent fee that plaintiffs' attorneys can recover?**

A. There is.

**Q. And that is how much?**



A. 25 percent.

**Q. Is the rationale for that because it's a lot easier to recover from a trust than it is to recover from a defendant in the tort system?**

A. No.

MR. FINCH: Objection.

**Q. Is there a rationale for that?**

A. Jack Weinstein insisted on it.

**Q. To your knowledge, has any trust, other than the one that the judge insisted upon imposing a fee cap, ever imposed a contingent fee cap on the recovery of plaintiffs' attorneys?**

A. No. And remember that Weinstein was sitting over the question of the fairness of a class action settlement. He was not sitting as a bankruptcy judge.

**Q. Is that fair to say that**

C1

**you were the most responsible -- sorry -- the ACC is the most responsible for preparing the TDPs; is that right?**

MR. FINCH: Object to form.

PP's Obj: R

C1

A. As among what group?

**Q. Well --**

A. We were more responsible than the New York City Police Department.

**Q. Well, in the course of negotiating TDPs and plans generally when you are representing --**

A. Yes.

**Q. -- ACCs, is it typical for the ACC's counsel to draft the first draft?**

A. Of the TDP?

**Q. Yes.**

A. Yes.

**Q. And then it's typical that the FCR would do further comment on it?**



C1

A. Have to, yes.

**Q. Is it fair to say that the FCR and the ACC are the constituencies that are most concerned with the contents of a TDP?**

MR. FINCH: Object to form.

PP's Obj: R

C1

A. Yes.

**Q. Is it fair to say that once a debtor has cut an economic deal with the asbestos constituencies that its interest in the TDPs are primarily to ensure that they will garner the necessary supermajority vote and comply with 524g so that a plan could be confirmed?**

MR. FINCH: Objection to form.

MS. BAER: Objection. Objection to form, lack of foundation.

A. You'd have to ask them.



PP's Obj: R

**Q. Is that your experience, however?**

MS. BAER: Objection.

MR. FINCH: Object to form, foundation.

A. I don't read their minds.

**Q. Typically, is the involvement of debtors in such situations in the negotiation of TDPs limited to the issues that I've just mentioned?**

MS. BAER: Objection.

MR. FINCH: Object to form.

MS. BAER: Form, foundation.

A. No, no. The debtors have an interest in dealing with objectors that might have objections to the TDP and they'll address those issues with us and with the futures rep, and it would depend on the particular case.



MR. J. COHN: I pass the witness. Thank you.

THE WITNESS: Anybody else?

MR. FINCH: Anybody else?

EXAMINATION BY MS. ABRAVANEL:

**Q. Mr. Inselbuch, my name is Karen Abravanel. I'm from Simpson Thacher and I represent Travelers Casualty & Surety.**

**You said that you haven't reviewed any of the insurance policies at issue in these procedures. Is that right?**

A. That's my best recollection.

**Q. Have you reviewed any of the settlement agreements entered into between Grace and its insurers pre-petition?**

A. I do not believe so.

**claim?**

MR. FINCH: Objection. Form, foundation, calls for speculation, hypothetical.

A. As a general proposition, an indirect claimant steps into the shoes of the claimant because the basis for the indirect claim is that he have absolved the trust from the direct claimant's claim. So they could step into the shoes of the claimant, they could proceed as an expedited claim, they could proceed as an individual review claim. If there were an entitlement to extraordinary treatment, that would apply.

**Q. Okay.**

A. Whatever -- whatever the rules that would apply to the direct claimant would apply to the indirect claimant.

**Q. Okay. And let me just be a little bit more specific. Would**



**the PI -- will the PI trust apply the payment percentage of a payment --**

A. Yes.

**Q. -- on an indirect PI trust claim?**

A. Yes.

**Q. Okay. Can you tell me, on the flip side, if the plan is confirmed how will the asbestos PI trust calculate an insurer's payment obligation under an asbestos reinsurance agreement?**

A. I have no idea.

MR. FINCH: Objection.

**Q. Sorry, sorry. Asbestos reimbursement agreement.**

MR. FINCH: Objection to form and foundation.

A. I have no idea.

MS. ABRAVANEL: Okay, I have no further questions. Thank you.

THE WITNESS: Anybody else?



MR. DEMMY: I'll do them from down here. If you can't hear me, just let me know.

THE WITNESS: I can hear you.

MR. FINCH: Who are you and who do you represent? I know who you are. Who do you represent?

MR. DEMMY: I will do that.

- - -

EXAMINATION BY
MR. DEMMY:

**Q. My name is John Demmy and I represent Firemen's Fund Insurance Company and some other related insurers.**

**In the Grace case, does the committee conduct its business through periodic meetings?**

A. Yes.

**Q. Do you participate in those meetings?**



A. I do.

**Q. Who typically participates in those meetings?**

A. Counsel for each of the individual committee members, counsel for the committee, and whoever else in a particular situation might be asked to participate.

**Q. Do the appointed committee members, the holders of claims, ever participate in the committee meetings?**

A. Not usually.

**Q. Do they ever?**

A. There have been an occasion where they did but it's -- it would be most unusual.

MR. DEMMY: Okay, that's all the questions I have. Thank you.

THE WITNESS: Anybody else?

MR. FINCH: Next?

MR. DOWNEY: Phil

C1 C1 PP's Obj: R