# Deposition Designations for:

# PETER VAN N. LOCKWOOD
# May 1, 2009

**Deposition Designation Key**

**CI = Certain insurers (green)**

**CNA = Continental Cas. Co & Continental Ins. Co. (red)**

**PP's = Plan Proponents (blue)**

**Obj: = Objection**

**Ctr = Counter Designation**

**R = Relevance**

**BE = Best Evidence**

**F = Foundation**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - -

| | | |
|---|---|---|
| In Re: | : | Chapter 11 |
| | : | |
| | : | Case No. |
| W.R. GRACE & CO., et al, | : | 01-01139 JKF |
| | : | |
| | : | (Jointly |
| Debtors | : | Administered) |

- - -

Friday, May 1, 2009

- - -

Oral deposition of PETER VAN N. LOCKWOOD, ESQUIRE, taken pursuant to notice, was held at the offices of CAPLIN & DRYSDALE, One Thomas Circle N.W., Suite 1100, Washington, DC 20005, commencing at 9:43 a.m., on the above date, before Lori A. Zabielski, a Registered Professional Reporter and Notary Public in and for the Commonwealth of Pennsylvania.

- - -

MAGNA LEGAL SERVICES
Seven Penn Center
1635 Market Street
8th Floor
Philadelphia, Pennsylvania 19103

Key
CI = Certain Insurers (green)
CNA = Continental Casualty Co. & Continental Ins. Co. (red)
PP = Plan Proponents (blue)
Obj = Objection
Ctr = Counter Designation
R = Relevance
BE = Best Evidence
F = Foundation

CI

EXHIBITS (continued)

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 6 | Exhibit-19 to Exhibit Book | 83 |
| 7 | Settlement Agreement * CONFIDENTIAL * | 144 |
| 8 | Complaint for Declaration of the Relief... | 175 |
| 9 | Diagram | 175 |
| 10 | Exhibit-2 to Exhibit Book | 196 |
| 11 | Exhibit-4 to Exhibit Book | 224 |
| 12 | Exhibit-10 to Exhibit Book | 260 |
| 13 | Travelers Casualty and Surety Company's Notice of Deposition to the Official Committee of Asbestos Personal Injury Claimants... | 267 |
| 14 | Debtors' Disclosure... | 280 |
| 15 | Documents bearing Bates stamps TRAVAS0000019 through 141 * CONFIDENTIAL * | 289 |
| 16 | Notice of Service of Discovery | 324 |

- - -

CI

- - -

DEPOSITION SUPPORT INDEX

- - -

Direction to Witness Not to Answer:

Page Line Page Line

NONE

Request for Production of Documents:

Page Line Page Line

NONE

Stipulations:

Page Line Page Line

12 02

Area(s) Marked Confidential:

| Page | Line | | Page | Line |
|---|---|---|---|---|
| 152 | 01 | through | 168 | 03 |
| 292 | 01 | through | 311 | 14 |

PP's Obj: R

- - -

(It is hereby stipulated and agreed by and among counsel for the respective parties that the filing, sealing and certification of the deposition are waived; and that all objections, except as to the form of the question, will be reserved until the time of trial.)

- - -

PETER VAN N. LOCKWOOD, ESQUIRE, after having been first duly sworn, was examined and testified as follows:

- - -

EXAMINATION

- - -

(ACC 30(b)(6)-1 and 2 premarked for identification.)

- - -

BY MR. BROWN:

**Q. Good morning, Mr. Lockwood.**

A. Good morning, Mr. Brown.

**Q. You are appearing here today**

PP's Obj: R

**as the Rule 30(b)(6) designee for the ACC, correct?**

A. Correct.

**Q. And that is with respect to a number of 30(b)(6) notices, correct?**

A. A very large number, yes.

**Q. Can you look at the one that's been put before you and marked ACC Rule 30(b)(6)-1, which I will call ACC-1 here after.**

A. I have it.

**Q. Can you identify it?**

A. It is an Amended Notice of Deposition of Asbestos PI Committee Pursuant to Rule 30(b)(6) served by four insurance companies, One Beacon, Seaton, Geico, and Columbia. And it contains an attachment with definitions and topics which are the subject matter of testimony.

**Q. Okay. And can you look at the document that I put before you that's marked ACC-2.**

A. I have it.

CI PP's Obj: R

**Q. And identify that document, please.**

A. That document is the Objections of the Official Committee of Asbestos Personal Injury Claimants to Rule 30(b)(6) Notices of Deposition served by Certain Plan Objectors.

**Q. Okay. And is it correct that you are here today prepared to testify about the topics that are listed in ACC-1 subject to the objections that appear in ACC-2?**

A. The answer to that question is yes, subject to the following caveats: To the extent that the topics in this notice or any of the other notices are subjects that the ACC has a person with knowledge on, I am here to testify about it. To the extent that the ACC doesn't have a person with knowledge on certain topics, then I am here to testify that the ACC doesn't have knowledge on those topics.

**Q. Okay. And --**

CI PP's Obj: R

A. And to the extent that occurs, we will see how it occurs in the course of the questions.

**Q. Okay. And then you mentioned ACC and a person with the ACC.**

**How are you using the term "ACC"?**

A. I am using it as the entity that was appointed in the bankruptcy case by the U.S. Trustee.

MR. BROWN: ACC-3.

(ACC 30(b)(6)-3 marked for identification at this time.)

BY MR. BROWN:

PP's Obj: R

**Q. Okay. Mr. Lockwood, you now have before you a document that should have two exhibit labels on it. One is an Exhibit-12 from the deposition of Mr. Finke, and the other is ACC-3.**

**Could you identify the document that has been marked as ACC-3?**

A. It appears to be a Form 8-K file by W.R. Grace & Company dated April 6, 2008.

CI PP's Obj: R

**Q. Have you ever seen this document before?**

A. Frankly, I am not sure.

**Q. Okay.**

A. I may have. I may not have.

**Q. All right. Why don't you go to the back of the document, starting with page 9.**

A. Page 9 or page 8?

**Q. I am sorry. Page 8.**

A. I am there.

**Q. Can you identify that document?**

A. It appears to be a copy of a Term Sheet for the Resolution of Asbestos Personal Injury Claims entered into by a variety of parties, including the ACC.

**Q. Okay. Have you seen the Term Sheet, either this Term Sheet or some iteration of it previously?**

A. I have seen the original of it.

**Q. Okay. Can you take a look at what you have before you and tell me**

CI PP's Obj: R

**whether it differs in any way from the original?**

MR. FINCH: Objection.

THE WITNESS: On the face of it, it does not appear to different. I mean, obviously, a comparison of the original and this copy would be the definitive way of determining whether there is a difference, but this looks to be the same, as best I can recall.

BY MR. BROWN:

**Q. Okay. And this document was negotiated by the parties that executed it, is that correct, or their counsel?**

A. Broadly speaking, yes. I mean, negotiated implies human beings in a room or in some communication, and these are all entities. So various representatives of the entities that are listed here in negotiated this document on behalf of their respective principals.

**Q. Is there anything in the Term Sheet that you can see that's**

CI

**inaccurate?**

MR. FINCH: Object to form. PP's Obj: R

THE WITNESS: To answer that question, I would have to read every word in the Term Sheet and determine whether or not there are statements in here which are contained facts which might be erroneously stated. I am not sure that there are any such things.

BY MR. BROWN:

**Q. Take a moment to review it, if you would. It's not that long.**

A. Well, I have read it. As far as I can tell, it is accurate in the sense that it states the terms of an agreement, and those are the terms of the agreement. It doesn't purport to recite facts.

**Q. Okay. Look at the first sentence. There is a reference there to certain of the principal terms and conditions.**

**Do you see that?**

CI

A. I do.

**Q. Were there other principal terms and conditions that were left off the Term Sheet?**

A. I don't believe there were that had been negotiated, agreed on.

It is common that a Term Sheet is subject to a definitive agreement. And in a complicated bankruptcy case, involving a complicated settlement, it would be my understanding and I believe the understanding of everybody else that was involved in this that this Term Sheet would only purport to set out certain of the most -- what the parties consider to be the most important terms, and other terms would remain to be negotiated as part of the drafting of either the definitive Plan or a more definitive settlement agreement or whatever document would be required to flesh out the details.

**Q. Okay. Can you turn to page 9, and you will see under the Romanette**

PP's Obj: R

**5, there is a sentence that begins, "Provided however..."?**

A. Yes.

**Q. Do you know to what that refers?**

MR. FINCH: Objection. I caution the witness not to reveal any privileged communications. If you can answer the question without divulging privileged information, you can do so.

MS. HARDING: And I am going to object also as to privilege as to the relevancy of negotiations, and I believe that -- well -- okay.

THE WITNESS: I am trying to remember what this phrase referred to at the time this Term Sheet was entered into. As best I can recall, at the time of the Term Sheet, the concept that was reflected by this language was that what was going to be

PP's Obj: R

transferred to the Trust was coverage for asbestos personal injury claims, and to the extent that there was coverage that didn't -- that somehow or another didn't cover asbestos personal injury claims, like, for example, workers' compensation insurance, that wouldn't be transferred to the Trust.

But since this Term Sheet was superseded by the Plan ultimately, I am not sure exactly what the significance of this particular term at this time is.

BY MR. BROWN:

**Q. Okay. Well, putting aside workers' compensation coverage, is there any other coverage that you are aware of that Grace has under the policies that are being transferred to the Asbestos PI Trust?**

MR. FINCH: Objection to the form.

THE WITNESS: The answer to that is certainly, yes.

I mean, for example, Grace has insurance beginning in -- I don't know -- 1986 or so that contains asbestos exclusions, running up through today, and none of that insurance is being transferred to the Trust because it doesn't provide any coverage for asbestos personal injury claims.

BY MR. BROWN:

**Q. What if we limited it to asbestos insurance rights? In other words, the policies -- the asbestos insurance rights are being transferred to the Trust by Grace, correct?**

A. Well, you are using a term that is a term that is defined in the Plan, and as defined in the Plan, the asbestos insurance rights under the terms of the Plan and the Insurance Transfer Agreement are being transferred to the

Trust.

**Q. Okay. And does that include all the coverages under the policies that are covered by that term?**

A. I have no idea, because asbestos insurance rights are not asbestos insurance policies, and I have not undertaken to examine each and every policy that does or might provide coverage for asbestos personal injury claims to determine whether or not there is some coverage under that policy that doesn't and that might not be transferred.

As a general proposition, my recollection is that the Plan is pretty specific about what's being transferred and what's not.

There is an Exhibit-5, for example, that lists various categories of policies and settlement agreements and things of that nature. There is the Insurance Transfer Agreement; there are schedules of insurance rights.

Trying to answer a question from memory that's as broad and all encompassing as that, I think frankly is virtually impossible, and I don't think I can do it any better than I just did.

CI

PP's Obj: R

MR. BROWN: Okay. And just so everyone knows how we are going to be handling the question regarding Plan documents, we are going to mark certain Plan exhibits as separate exhibits in the deposition.

Mr. Lockwood has a separately tabbed collection of all the Plan documents. He wants to work off of that. I have no problem with that. But, for purposes of the record, it will be the individual Plan documents that we are referring to.

THE WITNESS: For purposes of the record, what I have in front of me is the printed book called Exhibit Book to First

CI

PP's Obj: R

Amended Joint Plan of Reorganization and Disclosure Statement as of February 27, 2009, which is the document that was distributed to people to vote on the Plan. And the only -- there are no markings or anything in it.

What I have had done is, so that I could have ready access to the multiple -- well, there are 33 exhibits in this book, and I have simply had numerical tabs placed on the first page of each separate exhibit, so that if somebody wants me to find an exhibit, I can look to the tab rather than pawing through hundreds of pages of documents to see where the exhibit, in fact, can be found.

BY MR. BROWN:

**Q. All right. Mr. Lockwood, can you take a look at Exhibit 6?**

MR. BROWN: And we will have that marked as ACC-4.

CI

PP's Obj: R

(ACC 30(b)(6)-4 marked for identification at this time.)

THE WITNESS: I have it.

BY MR. BROWN:

**Q. Okay. And why don't you identify that document?**

A. That is Exhibit 6 to Exhibit Book captioned Asbestos Insurance Transfer Agreement.

**Q. Okay. And it has certain attachments to it, correct?**

A. It does.

**Q. Okay. Can you look at Schedule 1?**

A. I am looking at it.

**Q. Okay. Am I correct that all of the policies that are listed on Schedule 1 fit within the definition of asbestos insurance policies under the Plan?**

A. I will need to look at this a little bit here.

As I understand it, and I am going to read from this document, "All

CI

PP's Obj: R

insurance policies that the Insurance Contributors have reason to believe potentially or actually provide insurance coverage for Asbestos Pi Claims are listed and described accurately on the attached Schedule 1." That, to my knowledge, is what Schedule 1 is.

**Q. All right. Now, what I would like you to do is to look at Exhibit 1, which is the Joint Plan itself, and specifically page 5, definition 13.**

MR. BROWN: And we will mark that as ACC-5.

(ACC 30(b)(6)-5 marked for identification at this time.)

MR. FINCH: What page do you want him to go to?

MR. BROWN: Page 5, definition 13.

THE WITNESS: Looking at it.

BY MR. BROWN:

**Q. Asbestos Insurance Rights?**

A. That is correct.

CI

PP's Obj: R

**Q. My question is, well, you will see the asbestos insurance rights starts off, "shall mean any and all rights, titles, privileges," and so forth.**

**Do you see that language?**

A. I do.

**Q. And that's with respect to asbestos insurance policies?**

A. Well, among other things, yes.

**Q. And those are all being transferred to the Asbestos PI Trust, correct?**

MR. FINCH: Object to form.

PP's Ctr

THE WITNESS: The reason I am hesitating is I am not sure I can recall whether or not the general -- to answer the question, I have to look to see what the Plan says about the transfer and whether or not the Plan statement about what's being transferred. This is simply the definition.

PP's Ctr

There are other provisions that describe what is transferred to the Trust. I would have to look to the Plan to see what the definition of the assets being transferred is and then look at the Insurance Transfer Agreement, which was Exhibit-4, ACC Exhibit-4, and see whether those two are coextensive. I think they are, but that's what I would have to do to make sure.

CI

PP's Obj: R; BE

BY MR. BROWN:

**Q. Well, if you look at page 2 of the Transfer Agreement, the very first sentence is, "Effective upon the Effective Date, the Insurance Contributors hereby irrevocably transfer, convey, and grant to the Asbestos PI Trust all of their Asbestos Insurance Rights."**

A. Okay.

**Q. Now, bearing in mind that language and turning back to the**

CI

**definition of asbestos insurance rights, which does have some restrictions at the end of it, after the provided that language on page 6 --**

A. Yes, I see it.

**Q. Other than what's excluded from asbestos insurance rights in that language in the definition, are all of the Debtors' interests in the policies that are on Schedule 1 of the asbestos Insurance Transfer Agreement being transferred to the Asbestos PI Trust, or are some others being retained by the Debtors?**

A. All I can say is that what is being transferred is all of the asbestos insurance rights as defined in the Plan. And if there are, in fact, some other rights that are not asbestos insurance rights, then the Plan does not appear to transfer those.

**Q. Okay. And the workers' compensation coverage is one of those items?**

CI

A. That's my recollection, that is workers' comp rights are not transferred.

**Q. Okay. Are you aware of anything else that is not transferred?**

A. Not as I sit here right now. I do not recall having any knowledge of anything that specifically carved out of the policies, but, again, I mean, the definitions say what they say.

**Q. Okay. Can you go back to the --**

A. I mean, if you have some specific item in mind that you want to ask me about whether it is or it isn't transferred, I will try and answer that. But asked globally the way you are doing it, I don't have any recollection of anything.

**Q. Okay. Can you turn back to ACC-3, please.**

MR. FINCH: What's that, the Term Sheet?

MR. BROWN: Yes.

PP's Obj: R; BE

THE WITNESS: That's the 8-K with the Term Sheet in it, I believe.

MR. BROWN: Yes.

THE WITNESS: I have it.

BY MR. BROWN:

**Q. On page 10, Roman 4, if you will just take a look at that for a moment?**

A. The provision captioned Binding Effect?

**Q. Correct.**

A. I have read it.

**Q. Okay. Does the ACC understand the Term Sheet to be binding on the parties to it?**

MS. HARDING: Object under 408 and instruct the witness not to answer if it reveals settlement negotiations.

THE WITNESS: The ACC --

MR. BROWN: Wait.

MR. JACOB COHN: Does that create an evidentiary privilege in

PP's Obj: R; BE

discovery as opposed to admissibility in trial?

MS. HARDING: I have made my objection for the record.

MR. JACOB COHN: Jacob Cohn, Federal Insurance Company.

BY MR. BROWN:

**Q. I don't know that the Debtor should be instructing a Rule 30 --**

A. The Debtor hasn't instructed the witness not to do anything as far as I am aware.

MR. JACOB COHN: I heard her try.

MS. HARDING: Suggest.

THE WITNESS: Would you read back the question, please?

(The reporter read from the record as requested.)

THE WITNESS: The ACC understands that the Plan, when the Plan is confirmed, will be binding on it and everybody else that is bound by a confirmed Plan.

The ACC does not consider the Term Sheet to have any binding effect at this particular time in the bankruptcy process.

BY MR. BROWN:

**Q. Did the Term Sheet have a binding effect prior to the filing of a Plan?**

MR. FINCH: Objection to the extent that it calls for either a legal conclusion or privileged information.

You can answer, if you can.

THE WITNESS: Well, it calls for the former, and I am not going to refuse to answer.

If you want my opinion, it's a question of contract law. I personally doubt very much that as a matter of contract law or bankruptcy law, the Term Sheet was binding, because, number one, as under contract law, it wouldn't, as I said earlier, have contained

all the material terms and conditions. And so it would be very difficult under doctrines having to do with completeness of contracts to be enforceable for it to have been binding.

And, secondly, it wasn't a Plan, and it wasn't a settlement agreement that was separate from the Plan. It recites by its terms that "The parties shall use their best efforts to incorporate the terms in this Term Sheet into a mutually agreeable Plan of Reorganization to be filed with the Bankruptcy Court as soon as possible."

And, therefore, almost by definition, it recognizes that as a stand-alone document in a bankruptcy context, it's not binding on anybody, in my opinion. But that's just my opinion.

BY MR. BROWN:

**Q. Okay. Put that aside.**

**Just note the date. It's April 6, 2008. So the next series of questions I have pertains to the period prior to that.**

A. Okay.

**Q. Were any asbestos insurance entities involved in the negotiation of the Term Sheet?**

MS. HARDING: Object --

THE WITNESS: Not that I recall.

MS. HARDING: Object under 408.

BY MR. BROWN:

**Q. Were any asbestos insurance entities invited to participate in the negotiations of the Term Sheet?**

MS. HARDING: Same objection.

THE WITNESS: Well, to the extent that the Term Sheet negotiations involve people sitting down together and/or being

on telephone calls together to discuss it and agree on it, to my knowledge, I don't recall any.

Whether or not the Debtors, for example, had communications unknown to the ACC with their insurers on the subject matter that ultimately was reflected in the Term Sheet, I don't know.

BY MR. BROWN:

**Q. Okay. Well, for purposes of this question, I am asking for the ACC's knowledge.**

A. I understand. But I want to make it clear what the limitations of the ACC's knowledge is.

**Q. I understand.**

**To the ACC's knowledge, were any asbestos insurance entities consulted regarding any provision in the Term Sheet?**

MS. HARDING: Same objection.

THE WITNESS: To the ACC's

CI CI CI CI CI

PP's Obj: R PP's Obj: R PP's Obj: R PP's Obj: R PP's Obj: R

CI PP's Obj: R

knowledge, they are unaware of any such consultations.

BY MR. BROWN:

**Q. Did any asbestos insurance entity consent to the assignment of the policy or proceeds thereof prior to the execution of the Term Sheet?**

A. Not to the knowledge of the ACC as an entity or me, in particular. My make statements about the ACC's knowledge, I am speaking obviously of both its and my knowledge at the same time.

**Q. Did any asbestos insurance entity agree to any term in this Term Sheet before the parties in the Term Sheet executed it?**

A. I have no idea.

**Q. Do you have any knowledge of any such --**

A. I have no knowledge that they did and I have no knowledge that they didn't.

**Q. Okay. The initial Joint**

**Plan was filed on September 19th, 2008, correct?**

A. I don't, as I sit here, right now, unrefreshed by looking at the document, recall that that's the specific date, but A, it sounds about right, and B, I will take your word for it, if you are representing that that's the date.

**Q. Okay. And along with the filing of the initial Plan, there was also a filing of the Asbestos PI Trust Agreement and the Asbestos PI TDP, correct?**

A. I don't recall actually whether those documents were filed at exactly the same time the Plan was filed or whether they were filed on some later day.

They were certainly filed at some approximation of the same time, but it could have been a month later or something like that. Again, what was filed with the court is a matter of record, so...

CI PP's Obj: R

**Q. Okay. Between April 6, 2008 and September of 2008, is it fair to say that the Plan documents were being drafted?**

MS. HARDING: Object under 408.

THE WITNESS: Of course.

BY MR. BROWN:

**Q. And who were the parties that were involved in the negotiation of Plan documents?**

MS. HARDING: Object under 408.

MR. FINCH: Are you talking about entities or people?

THE WITNESS: A lot.

MR. BROWN: Let's start with entities.

MR. FINCH: That, you can answer.

THE WITNESS: Entities, representatives of the Debtors, the Equity Committee, the Future Claimants' Representative and the

ACC, and I can't remember whether there was any involvement by representatives of the Unsecured Creditors' Committee or not. I just don't remember at this point.

BY MR. BROWN:

**Q. How about any of the Sealed Air indemnified parties?**

MS. HARDING: Object under 408.

THE WITNESS: At some point, representative of the Sealed Air indemnified parties were involved in reviewing drafts and commenting on drafts, et cetera. I think they were involved before we filed the first Plan, but I am not -- I mean, I know they were -- right now, we are looking at the Amended Plan filed in February 27, 2009. I am quite confident that they were involved in discussing -- reviewing and discussing this Plan.

CI

PP's Obj: R

I just don't remember for sure whether they were involved in the first Plan or whether they got involved between the first Plan and this Plan. I think they were involved in the first Plan.

BY MR. BROWN:

**Q. Okay. Would your answer be the same for the Fresenius indemnified parties?**

MS. HARDING: Object under 408. I think we should take a break. I would like to consult with counsel.

MR. BROWN: Okay.

THE WITNESS: Does that include me or do you want to just talk to him?

MS. HARDING: I will talk to Nate.

(There was a break from 10:15 a.m. to 10:17 a.m.)

MR. FINCH: Can we read back the pending question?

CI

PP's Obj: R

(The reporter read from the record as requested.)

MR. FINCH: You can answer that question.

THE WITNESS: In general, yes, although their involvement was less.

BY MR. BROWN:

**Q. Okay. What was the involvement of Sealed Air and Fresenius in the drafting of the Plan documents?**

MR. FINCH: Objection, instruct the witness not to answer.

MS. HARDING: Objection.

MR. JACOB COHN: Basis, please.

MR. FINCH: Basis is Judge Fitzgerald's ruling that Plan negotiations and the draft Plan Agreement are not relevant to the confirmability of the Plan.

MS. HARDING: Same objection.

CI

PP's Obj: R

BY MR. BROWN:

**Q. Let me, Mr. Lockwood, refer you back to ACC-2, which was the objection, and direct your attention specifically to paragraph 3.**

A. I see it.

MR. BROWN: Okay. This is more directed to Nate than anyone else. There are, as you might guess, a whole host of questions that lots of people in this room, including myself, would want to ask concerning the negotiations of the Plan and the Plan documents as well as questions about prior drafts that weren't filed.

Is it safe to say that you will object to those questions and instruct the witness not to answer?

MR. FINCH: That is correct.

MR. BROWN: Okay. Then with the caveat that we won't ask them simply because we are not here to

CI

PP's Obj: R

waste everyone's time, I am going to move forward and not ask questions about the negotiations.

Can we have an agreement on that ground?

MR. FINCH: Sure. We can have an agreement on that point.

MR. BROWN: And in the event that that is ever reversed or your position is not upheld by the court, we would have an opportunity to come back and ask questions about the drafting as well as the negotiations.

MR. FINCH: If Judge Fitzgerald reverses herself on what she has ruled in various other cases, you would have that opportunity.

MR. BROWN: Or some higher court.

MR. FINCH: Or some higher court.

MR. BROWN: Fair enough.

CI

PP's Obj: R

MR. JACOB COHN: I want to be perfectly clear here that you are not relying upon not a ruling that you don't need to answer questions at these depositions on this subject, but your position is that this is a relevance objection and you are instructing not to answer on the basis of relevance.

MR. FINCH: That's right.

MR. JACOB COHN: And you are aware of the local Delaware rules on this subject?

MR. FINCH: Yes, I am.

MR. JACOB COHN: I am.

MR. BROWN: Thanks, Jacob.

MR. SPEIGHTS: Excuse me. This is Dan Speights, representing Anderson Memorial Hospital.

Mr. Finch, would you advise us of what rulings you are referring to?

MR. FINCH: Sure. If you look at the ACC's objections to

CI

PP's Obj: R

the 30(b)(6) notice, Dan --

MR. SPEIGHTS: If it's contained in there, just refer to. I want to make sure if we want to file a motion, we have the basis of your objection.

MR. FINCH: Yes. The basis of the objection is set forth on page 2, paragraph number 3, and ACC deposition Exhibit-2 to this deposition.

MR. SPEIGHTS: Thank you, Mr. Finch.

BY MR. BROWN:

**Q. Okay. Mr. Lockwood, in the period between the Term Sheet and the filing of the initial Plan in September, was any asbestos insurance entity invited to participate in the negotiation of the Plan documents or the drafting of the Plan documents?**

MS. HARDING: Same objection.

THE WITNESS: I have no

CI

PP's Obj: R

knowledge whether they were or were not.

BY MR. BROWN:

**Q. To your knowledge, did any asbestos insurance entity actually participate?**

MS. HARDING: Same objection.

CI

PP's Obj: R

THE WITNESS: I have no knowledge that they did.

BY MR. BROWN:

**Q. Was any asbestos insurance entity consulted concerning any term or provision in the Joint Plan or any Plan documents?**

MS. HARDING: Same objection.

CI

PP's Obj: R

THE WITNESS: In the same period?

MR. BROWN: Correct.

BY MR. BROWN:

**Q. From April 2008 to September, when the initial Plan was filed in September of 2008.**

CI

PP's Obj: R

A. I have no knowledge that anyone was.

**Q. Were any asbestos insurance entities consulted regarding the assignment or transfer of their policies or proceeds under their policies to the Asbestos PI Trust in that time period?**

MS. HARDING: Same objection.

CI

PP's Obj: R

THE WITNESS: I have no knowledge that they were or were not.

BY MR. BROWN:

**Q. Did any consent?**

A. I have no knowledge --

MS. HARDING: Same objection.

CI

PP's Obj: R

THE WITNESS: -- that anyone did, in fact, consent.

BY MR. BROWN:

PP's Obj: R

**Q. Okay. Now, I want to focus your attention now on the period after the initial Plan was filed.**

**In that period, after the**

CI PP's Obj: R

**initial Plan and Plan documents were filed, did GEICO consent to the Joint Plan or any Plan document or any provision in the Plan or Plan documents?**

A. Not to my knowledge.

**Q. Okay. Would your answer be the same for Republic Insurance Company?**

A. Yes.

**Q. And OneBeacon American Insurance Company?**

A. Yes.

**Q. And Seaton Insurance Company?**

A. Yes.

**Q. How about any other asbestos insurance entity? Would your answer be the same?**

A. No, I don't think it would, actually. I believe -- and I would have to sort of try and reconstruct and recollect the timing, but I believe there was a settlement agreement entered into with Equitas during some time period. It actually might have predated. It might

CI PP's Obj: R

have predated the Plan.

But, in any event, the settlement agreement with Equitas to my recollection involved its agreeing to either this Plan or a 524(g) Plan that this Plan would qualify as.

And I believe that there was also a settlement agreement with the KWELM Companies that either by its terms or implicitly represented the KWELM Companies' consent to this Plan, to the first Plan. Those are the only two that come to mind.

**Q. Why don't we turn to the first Amended Joint Plan, which is Exhibit-1 in your book.**

PP's Obj: R; BE

A. Okay. I have it.

MR. FINCH: Exhibit-5 to the deposition.

THE WITNESS: It's ACC Exhibit-5.

BY MR. BROWN:

**Q. All right. Could you turn to the first page?**

CI PP's Obj: R; BE

A. The cover page?

**Q. No, no. The first --**

A. Numbered page.

**Q. -- well, it's actually not numbered, but it's 1. It should be 1.**

A. Okay. I have it.

**Q. All right. Midway down the page, it says, "This Plan constitutes a settlement of all Claims in the Demands against the Debtors on, and subject to, the terms described herein and the other Plan Documents."**

**Are the Debtors settling the asbestos PI claims against them through this Plan?**

A. I think --

MS. HARDING: Object to form.

CI PP's Obj: R; BE

THE WITNESS: I think it would be a fair characterization that the Plan embodies a compromise between the class of claimants consisting of the asbestos PI claimants and others.

CI PP's Obj: R; BE

And if the Plan were confirmed that that compromise could be called a settlement between the Debtors and those entities, under which there would be a Trust created and the claims would be brought to the Trust, not against the Debtors, I think that would be a fair characterization, yes.

BY MR. BROWN:

**Q. Is it a settlement of the demands that have not yet even been asserted against the Debtors?**

MS. HARDING: Object to form.

MR. FINCH: Object to form.

CI PP's Obj: R; BE

THE WITNESS: That calls for a legal conclusion at an almost metaphysical level, frankly.

I guess you could conceive of it as that or you could just say that the Plan itself is what it is. I mean, it has the effect under 524(g) of the bankruptcy

CI PP's Obj: R; BE

code on the holders of future demands that the bankruptcy code prescribes.

It's hard to come to an answer because settlement sort of implies -- I mean, to the extent that the Future Claimants Representative is regarded as the equivalent of a guardian ad litem for the Future Claimants, which is one way of looking at it, you could characterize it as a settlement.

But, again, the Future Claimants Representative exists, only in a legal capacity of somebody appointed by the bankruptcy court for that purpose, has no independent ability to settle things. So, as I said before, I mean, I am not sure the question, A, could be answered and, B, is meaningful.

BY MR. BROWN:

CI PP's Obj: R; BE

**Q. To the extent it is a settlement, is it binding on the asbestos insurance entities in the view of the ACC?**

MS. HARDING: Object to the form. Calls for a legal conclusion.

CI PP's Obj: R; BE

THE WITNESS: That question is unanswerable as phrased because, I mean, binding for what purpose?

BY MR. BROWN:

**Q. For purposes of insurance coverage.**

MS. HARDING: Same objection.

CI PP's Obj: R; BE

THE WITNESS: The extent of which, A, it's a settlement within the meaning of, for example, insurance comprehensive general liability insurance policies that talk about settlements, B, it could be made without the consent of insurance companies, under the

CI PP's Obj: R; BE

Plan that's an issue that will only get resolved by some other court in the event there is a dispute between the Trust and any asbestos insurance company over whether it is a, quote, settlement that's binding on them.

That is not something that the Plan or the Confirmation Order under the insurance neutrality provisions of this Plan purports to resolve.

BY MR. BROWN:

**Q. Is it intended to be binding?**

MS. HARDING: Object to form.

CI PP's Obj: R; BE

THE WITNESS: Intended by whom?

BY MR. BROWN:

**Q. By the ACC?**

MR. FINCH: Object to the question to the extent it calls for privileged or work product

analysis. To the extent the ACC has a position on that, that it's not privileged and work product, you can answer.

CI PP's Obj: R; BE

THE WITNESS: I guess the best answer I could give you on that from the ACC's perspective is that -- well, let me back up a little bit. When you say "is it intended," you are describing the settlement. The settlement is a 125-page Plan with multiple exhibits.

In light of the insurance neutrality provisions, there are clearly aspects that are not binding on the insurers, but the question of whether -- I guess the best way I could put it is the ACC would hope that in the event that post-consummation, the Trust sought coverage from any particular set of insurers, whose asbestos insurance rights were

CI PP's Obj: R; BE

assigned to the Trust, that the Trust would be able to obtain such coverage, either by agreement with the asbestos insurance companies or through coverage litigation in some coverage court, which coverage litigation might entail a decision by a judge that in some manner or another what the Trust was doing pursuant to the Plan in terms of resolving individual asbestos claims was, in fact, binding on the insurers. That's about the best I can do.

BY MR. BROWN:

**Q. Okay. To the extent it constitutes a settlement of asbestos PI claims, is it superseded by Section 7.15 entitled Insurance Neutrality?**

A. That question is almost incomprehensible to me, because Section 7.15 is sort of a form selection provision. Essentially, in my view of it, what it does is it says to the extent

CI PP's Obj: R; BE

that there are disagreements about the Trust's rights under transferred insurance assets, those disputes are going to get resolved by the parties, the insurers, and the Trust at a later date in front of a later court.

And so some later court would determine whether it was a settlement or not. The 7.15 itself doesn't purport to say whether it is or isn't a settlement. It says essentially that some other court, if necessary, will have to decide that issue because the insurers don't want to have coverage litigation in this bankruptcy case.

**Q. All right. But the sentence that we are referring to on page 1 says, "The Plan constitutes a settlement of all Claims and Demands against the Debtors on, and subject to, the terms described herein and the other the Plan Documents."**

A. That is --

**Q. My question is, is that language superseded by the insurance**

CI PP's Obj: R; BE

**neutrality language that appears in 7.15?**

MS. HARDING: Objection.

MR. FINCH: Objection, asked and answered.

CI

THE WITNESS: I cannot give you any better answer to that than the one I gave you already.

You are asking me whether a descriptive sentence in a Plan supersedes a form selection clause in some other part of the Plan, and, to me, that's just -- I don't even understand how one could supersede the other in the first place. I mean, if you can explain to me why you think it supersedes it, maybe I could have a more specific answer.

BY MR. BROWN:

**Q. Well, why don't you look at 7.15 A on page 87 of the Plan.**

A. Okay.

**Q. As I read that sentence, other than what appears in the other**

CI PP's Obj: R; BE

**portions of 7.15, nothing in the Plan, the Plan documents, the Confirmation Order, is to operate or shall operate -- "shall in any way operate to, or have the effect of, impairing any Asbestos Insurance Entity's legal, equitable or contractual rights, if any, in any respect."**

A. Yeah?

MS. HARDING: Object to form. Is there a question?

MR. BROWN: I am reading the language first. Can I finish?

MS. HARDING: I am sorry. I thought you were asking a question. I didn't hear it.

CI PP's Obj: R; BE

BY MR. BROWN:

**Q. To the extent that the Plan or the Confirmation Order constitutes a settlement of asbestos PI claims against the Debtors, is that going to then be binding upon the insurers in coverage litigation?**

MS. HARDING: Object to

form. It calls for a legal conclusion.

CI

PP's Obj: R; BE

THE WITNESS: If a coverage court decides that it's a settlement and that it's a settlement that's reasonable and that it doesn't have to be consented to by insurers, then the coverage court will have decided that the settlement isn't impairing the insurers' rights under their policies.

That's what I mean by it's up to the coverage court. Your question assumes that for it to be a settlement, it would have to impair the insurers' rights. My limited understanding of insurance law is that that may be true or it may not be true. But what this says is that the Plan and the Confirmation Order aren't purporting to resolve that issue.

Your rights are what they

CI

PP's Obj: R; BE

are; you will be able to present them to a coverage court. And the coverage court, if it agrees with you, will say, first, the Plan doesn't control the outcome of this decision because that's what 7.15(a) says, and, secondly, you are correct in asserting that this is an unconsented-to settlement or it's not a settlement or whatever defense you have applies. And it will say you win, you don't have any coverage obligations for this claim or these claims or whatever. That's my understanding of how this is supposed to work.

BY MR. BROWN:

**Q. Okay. I am going to go through the Plan and various items. We are going to jump around a little bit. So why don't we first turn to page 5.**

A. I have it.

**Q. And the definition -- we looked at this earlier -- 13,**

**specifically (a) under 13.**

A. I see it.

**Q. Is that language intended to include any property damage-related causes of action?**

A. It depends on what you mean by included. What it basically means is that, as I understand it, that the Trust gets the rights; nobody else gets the rights. The Trust can then seek coverage from the insurers.

Since the Trust has no asbestos property damage claims to assert against the insurers, it will not be asserting asbestos property claims against the insurers. But the effect of the transfer would mean that, for example, Grace or a property damage claimant could not assert property damage claims under that insurance coverage because those rights have been assigned to the Trust and they are, therefore, no longer available to be invoked or utilized by anybody else.

CI

PP's Obj: R; BE

**Q. Okay. Let's turn to page 6, Asbestos Insurance Coverage Defenses, 6 and 7.**

A. Definition 16.

**Q. Correct.**

A. I see it.

**Q. Did you have a chance to read it?**

A. Yes.

**Q. And there are two exceptions that are listed there to asbestos insurance coverage defenses?**

A. Correct.

**Q. And the first one says, "...the Plan or any of the Plan documents do not comply with the Bankruptcy Code..."**

**So, as I understand that, if in a subsequent coverage action, an insurer sought to argue that the Plan or Plan documents don't comply with the bankruptcy code, they would be precluded from doing so by virtue of the confirmation of the Plan; is that**

CI

PP's Obj: R; BE

**correct?**
A. Correct.
**Q. And the second one has to deal with the assignment of policy rights, correct?**
A. Correct.
**Q. And asbestos insurance entities would be prohibited from litigating that issue?**
A. If the bankruptcy court decided that those consent rights were effectively preempted by the bankruptcy code. If it decided the other way, then they wouldn't be precluded from doing so.
**Q. Okay. If you go before the two exceptions, it describes "Asbestos Insurer Coverage Defenses include any defense based on the terms of the Plan or the Plan documents or the manner in which the Plan or Plan documents were negotiated..."**
**What if an asbestos insurance entity wanted to argue in subsequent coverage litigation that the**

CI

PP's Obj: R; BE

**resolution of asbestos PI claims was the product of some sort of collusion between the Plan proponents? Could that be argued by the asbestos insurance companies in the subsequent coverage litigation?**
MS. HARDING: Object to form.
MR. FINCH: Objection to form.

CI

PP's Obj: R; BE

THE WITNESS: First, it's hypothetical. Second, it's a question sort of to some extent of insurance law.
But subject to that, and the fact that I don't profess to be an expert on this subject, it is my understanding that an asbestos insurer could argue any state law coverage defense that it had, including collusion.
It is also my understanding that the Trust in this hypothetical scenario in which

CI

PP's Obj: R; BE

this dispute is arising could argue that it's not collusion because of the insolvency clauses in the CGL policies and that, therefore, almost by definition, a bankruptcy case doesn't involve collusion.
They couldn't argue that the bankruptcy court had decided that it wasn't collusion, because the insurance neutrality provision would preclude that argument. But it could certainly argue to the coverage court that the type of agreement that is entered into here, as a result, as I said, of state law -- of the facts and the state law didn't amount to collusion. But as such, the collusion defense is not, in my opinion, precluded by this language.
BY MR. BROWN:
**Q. Okay.**

PP's Ctr

PP's Obj: R; BE

PP's Ctr

A. Again, that's my legal opinion. You got it, for whatever it's worth.
**Q. Let's back up then. Is it intended to prevent such an argument -- let's back up.**
A. Intended by who?
**Q. For purposes of these questions -- and I will try to fix my questions -- the ACC, because that's you are here to speak for.**
MR. FINCH: Object to form. It assumes there is an intent. Object to form.
MS. HARDING: Object to form, too.
THE WITNESS: The intent of the ACC in this language, frankly, is to satisfy what we perceive to be the requirements of the Third Circuit decision in combustion engineering for rendering a Plan sufficiently, quote, neutral, close quote, as to its impact on

the rights of insurers such that the insurers will not have legal standing to object to confirmation of the Plan. That's the intent.

You are now drilling down several layers under that generalized intent to ask about specific hypothetical applications of fact and law in a subsequent coverage litigation which this insurance neutrality provision creates. And I don't think the ACC has an intent on that subject, because the ACC has not, in fact, attempted to drill down that level of this thing, of this language.

All I can tell you is that looking at the language as somebody who was involved in creating it, it's my understanding and belief that this language preserves your state law collusion defense, and it's up to some coverage court to determine on the

PP's Ctr

facts and the context whether the behavior of the Plan and the Plan participants in some way or another in the context of a bankruptcy and under all the relevant policy provisions which include insolvency clauses does or doesn't include the kind of collusion that would allow under applicable insurance law the insurer to disclaim coverage. That's the best I can do on that.

PP's Ctr

BY MR. BROWN:

**Q. All right. Let's go to page 11, and specifically I am looking at definition 29 which begins on page 10, Asbestos PD Trust Causes of Action, appearing on page 10 and going to page 11.**

A. I see it.

**Q. Okay. And do you see the sentence that begins, "notwithstanding the foregoing" in the center of that definition?**

A. Yes.

**Q. We discussed this, I think, a little bit earlier, if I am correct.**

**The assets that are described in that sentence, are they going into the Asbestos PI Trust?**

A. No.

**Q. Where are they going, if anywhere?**

A. I think they are being retained by the Debtors, keeping in mind that we are talking here about a very generic set of rights.

**Q. Right. All right. Let's go to page 23, please, definition 96.**

A. I see it.

**Q. There is a parenthetical that excepts out from the definition of Disallowed, and it contains asbestos PI claim and U.S. ZAI PD claim. What is the reason for that exception?**

A. Basically, the reason is that with respect to, first, asbestos PI claims, they are being sent to a Trust

for resolution and they will never be allowed or disallowed in this bankruptcy case. And the way the term "disallowed" is used is to describe things that happen in the bankruptcy case under Section 502 of the bankruptcy code.

I believe, although I am not really all that familiar with the negotiations of the U.S. ZAI PD, that essentially the same outcome or process is contemplated by that, namely, the U.S. ZAI PD claims are being channelled to PD Trust for resolution, and they are not going to get resolved, i.e. allowed or disallowed in the bankruptcy case. So this is simply to note that fact, if you will.

**Q. Okay. Just so I understand you, asbestos PI claims then are not subject to 502(e) disallowance under the Plan; is that correct?**

MR. FINCH: Object to form.

THE WITNESS: That is correct.

**is Insurance Contributor.**

A. I see it.

**Q. "'Insurance Contributor' shall mean any of the Debtors, the Reorganized Debtors, and the Non-Debtor Affiliates identified in the Asbestos Insurance Transfer Agreement."**

**Can you turn to that agreement, which is Exhibit-6 to the Plan, ACC-4, in this deposition.**

**And I couldn't find where the Non-Debtor affiliates are identified in this agreement.**

A. If you look at the first page, third line, it refers to including "without limitation, the Non-Debtor Affiliates identified in Exhibit 16 to the Plan."

If you turn to Exhibit-16 to the Plan, you will see a three-page list of Non-Debtor affiliates.

**Q. Can I -- I don't have that in front of me. Can I just take a look at that?**

A. Certainly. It's Exhibit-16. It's an incorporation by reference.

**Q. Mr. Lockwood, I just took a look at Exhibit-16 in the Plan, and I didn't see Fresenius or Sealed Air on that.**

**Is that correct?**

A. Yes, I think that's correct. This is a list, as I understand it, of affiliates of the Debtor, and I don't believe the Debtor regards Fresenius and Sealed Air as its affiliate.

PP's Ctr

**Q. Okay. What is the basis for the assignment of policy rights of Non-Debtor affiliates?**

MS. HARDING: Object to form.

MR. FINCH: Object.

You can answer.

THE WITNESS: Well, in my personal view of this, there are two answers to that question. One is that in order to have the Trust have the ability to deal with

PP's Ctr

assigned insurance rights from the Debtor, you can't have a lot of other Debtor-owned entities retaining possible rights to that insurance, because you could never resolve it with the insurers.

And so from my perspective, it's important to make sure that there aren't going to be competing claims. These Non-Debtor affiliates, for the most part, if not entirely, are not companies that were pre-petitioned defendants in asbestos litigation. And the purpose of this is really more to prevent them -- it's almost more like a forbearance or a give-up-your-rights provision than it is the actual assignment.

The Trust is not likely to be asserting claims on behalf of AA consultancy and cleaning Company, Limited, to use the first name on the Non-Debtor affiliate

PP's Ctr

list. But if there were some sort of derivative liability that would -- remember, these are all entities that are asbestos-protected parties as well.

BY MR. BROWN:

**Q. Right.**

A. So the claims against them are going to the Trust. So the insurance covering those claims, if any existed, ought to go to the Trust as well.

**Q. I think you mentioned that most of them were not involved to your knowledge in any kind of asbestos litigation.**

**Do you know of any of them that were?**

A. I really don't know. I have never made and I am not sure anybody for the committee has ever made any effort to determine whether there were.

The concern obviously was that somebody could start trying to dream