up some kind of derivative successor liability, veil piercing, alterego, whatever kind of claims, and the notion was that Grace's economic enterprise, which included the Non-Debtor affiliates, were going to be freed of asbestos liability.

So if there aren't any claims asserted against them, then nothing ever gets enjoined. The injunction only kicks in in the event that a claim actually attempts to assert derivative liability of Grace against one of these entities.

**Q. Do you know if any of them have asbestos liabilities for their own products or actions?**

A. I am not aware of any such allegations or claims by anybody. I have never seen them or heard of them.

**Q. Okay. Can you turn to page 33 of the Joint Plan, definition 178.**

A. I see it.

**Q. Definition 178 makes**

**reference to Exhibit-19 to the Plan.**

**Do you see that?**

A. Yes.

**Q. And that's entitled Retained Causes of Action Schedule. And actually I think we will get that marked.**

MR. FINCH: Are you going to mark Exhibit-19 to the Plan?

MR. BROWN: Yes.

THE WITNESS: This was supposed to be Exhibit-19. This is Exhibit-5 to the Plan.

MR. BOERGER: Sorry. Here you go.

(ACC 30(b)(6)-6 marked for identification at this time.)

BY MR. BROWN:

**Q. If you thumb through there, Mr. Lockwood, you would get to page 10 where it says Retained Causes of Action (Insurance Claims)?**

A. Uh-huh.

**Q. And then it goes on for several pages, listing multiple insurance**

**companies?**

A. Yes.

**Q. Among the insurance companies that are listed on this document is American Employers, which for now is OneBeacon; Employers Commercial Union, which is also OneBeacon; GEICO; Republic; and Unigard Security, which is now Seaton.**

**Do you have any understanding of what causes of action the Debtor is retaining with respect to those four insurance companies?**

A. No. My only understanding is that they don't include causes of action relating to asbestos insurance rights, which are referred to in the exclusion at the end of 178.

**Q. Do you have an understanding as to whether the Debtors will continue to be insurers under any of the policies issued by those companies or whether the Asbestos PI Trust will become the punitive insurer?**

MS. HARDING: Object to form.

MR. FINCH: Object to form.

THE WITNESS: When you say those insurance policies, which insurance policies are you talking about?

BY MR. BROWN:

**Q. Whatever ones are included within the Retained Causes of Action.**

MR. FINCH: Object to form.

THE WITNESS: I believe that if it's a retained cause of action, by definition, the Trust is not going to be the punitive insured under whatever cause of action. Indeed, I am not sure that the Trust -- there is sort of a sematic issue when you talk about the Trust becoming an insured.

The Trust has whatever rights under the insurance transfer it gets. Whether that

CI

PP's Obj: R; BE

CI

PP's Obj: R. BE

CI

PP's Obj: R; BE

CI

PP's Obj: R; BE

CI

PP's Obj: R; BE

would make it a, quote, insured, close quote, for purposes of insurance law, I have absolutely no idea. That's a terminological issue.

But my understanding of this is that whatever rights Grace is retaining against the four companies that you identified are mutually exclusive of any rights that the Asbestos PI Trust is getting.

And so since I don't know what policies Grace is retaining rights to or what coverages, all I can say is that whatever they are, they are not rights that were transferred to the Trust. Grace and the Trust aren't going to be trying to make claims on the same set of rights.

BY MR. BROWN:

**Q. But they may make claims on the same set of policies?**

CI

PP's Obj: R; BE

A. I don't think so, because I believe that the assignment of the asbestos insurance rights relates to policies that, as a general proposition, Grace is not retaining any rights in.

So I would speculate that you must be talking about other policies, but since I have no idea what retained rights Exhibit-19 or Retained Causes of Action refer to, I really can't answer the question.

**Q. Do you know whether anyone has any idea what retained rights are --**

A. I would assume that the Debtor knows what it thought it was retaining, because that particular exhibit was something that was prepared by the Debtor.

**Q. Okay. Is there any plan to your knowledge to update this exhibit so that it's a little more clear in terms of what is being retained other than simply putting the name of the entity and an address?**

MS. HARDING: Objection to form.

MR. FINCH: Objection.

CI

PP's Obj: R; BE

THE WITNESS: Prior to this deposition, I am not aware of any undertaking by anybody to do an update of this. Whether or not the result of this deposition or some other deposition, somebody might possibly make such a decision in the future, would be rank speculation at this point.

BY MR. BROWN:

**Q. Would it be fair to say that absent that, we are not really going to know what's retained?**

MR. FINCH: Object the form.

MS. HARDING: Object to form.

CI

PP's Obj: R; BE

THE WITNESS: I told you earlier, I would assume that somebody at Grace knows what is sought to be retained by this. I don't know who that person is, but

CI

PP's Obj: R; BE

somebody probably does.

BY MR. BROWN:

**Q. Okay. If you turn to page 37 of the Joint Plan, definition 200.**

A. Ah, yes. I see it.

**Q. Okay. I have a few questions on this one.**

**It says, "'Settled Asbestos Insurance Company' shall mean any Asbestos Insurance Entity that has entered into an Asbestos Insurance Settlement Agreement prior to the conclusion of the Confirmation Hearing..."**

**What's the basis for limiting it to prior to the confirmation hearing?**

MR. FINCH: Object. To the extent that calls for privileged information or work product, you are not allowed to answer. To the extent you can answer that without divulging privileged communications, you can do so.





BY MR. BROWN:

**Q. So that if prior to the issuance of the warrant, there is additional stock issued, you are going to adjust the strike price as well as the number of warrants; is that right?**

A. You are going to make the adjustments described in this section. I am not sure I want to summarize them the way you just did, but this section spells out in somewhat gory detail exactly the type of antidilution provision that's being offered for these warrants.

**Q. What if there is dilution after the issuance of the warrant? Is there any mechanism to deal with that situation?**

MS. HARDING: Object to form.

THE WITNESS: There is a warrant agreement around here somewhere -- I believe it's probably an exhibit to this Plan -- that specifies all of the

rights of the warrant holder.

I cannot, sitting here, tell you at the moment that I can recall whether there is a -- it's a one-year warrant, and I just don't remember whether during the one-year exercise period that there is or there is not anti-dilution provisions.

BY MR. BROWN:

**Q. Okay.**

A. But if there are, they will be in the warrant agreement as well as they might be referenced in this section of the Plan.

**Q. Let's go to the heading 7.2 The Asbestos PI Trust.**

A. I see it.

**Q. Do you see the second full paragraph beings "The purpose of the Asbestos PI Trust"?**

A. I see it.

**Q. And it lists a few items there.**

A. Yes.

**Q. Does the asbestos PI Trust assume the duties and obligations of the Debtors under asbestos insurance policies?**

MR. FINCH: Object to form, overly broad.

MS. HARDING: Object to form.

THE WITNESS: As I understand it, the duties and the obligations of the Debtors under insurance policies are triggered only by the submission of claims by the Debtor or some other insured under the policies.

Absent an effort by the insured or successor to get coverage for claims, there are no independent remaining duties and obligations.

BY MR. BROWN:

**Q. If I can stop you, by successor in that sentence, you mean**

**Asbestos PI Trust?**

A. PI Trust.

**Q. Fair enough.**

A. When the Trust is assigned rights under the policies and the Debtors are given the right to assert any and all coverage defenses --

MR. FINCH: You mean insurers?

THE WITNESS: I am sorry. Let me start over again.

When the Trust is assigned rights under the policies and the insurers are retaining all of their coverage defenses with the two exceptions we discussed earlier, if the Trust proposes to demand in some way or another coverage from one or more insurers under those policies, then whatever the insurer asserts as a pre-condition to coverage, what you would call an obligation or a right, would have to be fulfilled

CI PPS Obj: R; BE

to the extent that a coverage court determines that there is a pre-condition to coverage.

And since the Trust is the one seeking the coverage, by hypothesis, it's the only one that has any incentive to make sure that the rights or -- excuse me -- that the obligations, the pre-conditions are satisfied as required by a coverage court.

And so to that extent, yes, the Trust, one way or another, to the extent determined by a coverage court or by negotiations with insurers, will have to perform what you have described as the obligations and rights under the assigned insurance coverage. That's my understanding.

BY MR. BROWN:

**Q. Do the Debtors, the Reorganized Debtors, retain any duties or obligations under the asbestos insurance**

CI PPS Obj: R; BE

**policies if this Plan is confirmed?**

A. There are provisions involving cooperation in the Plan documents which would allow the Trust to require, to the extent those cooperation provisions say so, the Debtors to help satisfy or wholly satisfy whatever the particular requirement might be that only the Debtor could do.

So there is, I guess, the answer is there is an indirect obligation on the Debtor's part. But the Debtor, qua-Debtor, vis-a-vie, the insurer, since the Debtor under the asbestos insurance rights will not on its own be seeking coverage, the Debtor sort of independent of the Trust would not have any rights, any obligations to the insureds except to the extent, as I say, that the cooperation with the Trust efforts to access that insurance trigger such cooperation obligations.

**Q. And the cooperation obligations that you described in the**

CI PPS Obj: R; BE

**beginning of your answer are set forth in the cooperation agreement; is that what you were referring to?**

A. They are set forth there. There may be -- I don't remember whether they are also set forth in other documents, such as the Insurance Transfer Agreement and/or the Plan itself. But they are set forth -- I think there may be some set forth in the Insurance Transfer Agreement. I am not sure. I would have to look at them.

**Q. Okay.**

A. But I do remember that there are cooperation arrangements.

**Q. If I understand your answer, the cooperation obligation of the Reorganized Debtors post-confirmation is not the asbestos insurance companies but rather to the Trust under the cooperation agreement?**

A. That's correct.

MS. HARDING: Object to form.

CI PPS Obj: R; BE

THE WITNESS: But the asbestos insurance companies, through the retention of asbestos coverage defenses, are the indirect beneficiaries of that provision.

BY MR. BROWN:

**Q. How so?**

A. Because if they don't -- if the Trust can't get Grace to perform the cooperation that the policies require, the insurance companies won't have to provide the coverage if the coverage court says such cooperation is mandatory.

There is nothing in the Plan that says that an insurance company -- if policy obligations are not performed as required by the policy by somebody, nevertheless they have to pay on the insurance. The only entity or person that could make such a determination would be a coverage court judge and only in the context of deciding that for whatever reason the particular obligation

CI

sought to be enforced by the insurer was not applicable or required.

**Q. Okay. I want to ask you the same series of questions with respect to two other types of documents, and we can try to short-circuit this or you can give me the long answer. I don't care.**

**Would your answers to the questions concerning the assumption of duties under the asbestos insurance policies or the retention of those duties, as you have just articulated, be the same if my questions dealt with the Asbestos Insurance Settlement Agreements?**

A. Well, sort of, except that the Asbestos Insurance Settlement Agreements, as far as I am aware, don't have any obligations. They fully performed. Well, strike that. There are two categories of asbestos insurance.

**Q. I want to get to the third one as well.**

A. There is a pre-petition where it's been fully performed, and

there is post-petition one where we make a settlement as the case is going on, such as the Equitas agreement that I mentioned before, and any others that might get entered into.

With respect to the former, the pre-petition settlement agreements, it's my understanding, rightly or wrongly, that both parties have essentially fully performed those agreements, both the Debtors and the insurers, at least to the extent described in Exhibit-5, which is where those are identified and described.

The only remaining obligation, quote/unquote, that I am aware of under those agreements is a potential indemnity obligation on the part of Grace in the event that somebody successfully or attempts to sue a settled insurer.

The Plan channels to the Trust any claims against those settled insurers, and, therefore, there should

PP's Obj: R; BE

never be any indemnity claim because the claim gets cutoff from the insurer before it reaches the point where the insurer has paid money, which would trigger an indemnity right. That's quite a bit different from the non-settled coverage that I was discussing earlier.

**Q. But that obligation, to the extent it exists, is being assumed by the Asbestos PI Trust?**

A. That obligation -- if one could hypothesize, on the one hand, a 524(g) order that created the Trust in the first place and protected the insurer at the same time, which is what this Plan does, and simultaneously somebody being able to violate the 524(g) injunction by successfully suing a protected party without blowing up the entire Plan and blowing up the Trust in the process, then in that almost unimaginable hypothetical situation, the protected insurer would have an indemnity claim against Grace, which would be channelled to the Trust

and either -- I forget whether it's Section 5.12 or 5.13 of the TDP says that the Trust has to honor that claim to the extent that it's valid.

**Q. Okay. I know some others in the room have probably a question about another type of agreement.**

**Asbestos Insurance Reimbursement Agreements, are the obligations of the Debtors under those documents being assumed by the Trust?**

A. That cannot be answered yes or no, because the Trust and its handling of claims is obviously going to be in some sense different from Grace in its handling of the claims because Grace didn't have a TDP.

The Plan proponents are seeking in the Plan and in the confirmation process a ruling from the court under applicable bankruptcy principles that the Debtors can transfer those agreements to the Trust and the Trust's performance under those

provision, essentially that we are going to transfer the assets to the Trust and if you got a claim or an interest in the assets, then you can litigate that claim against the Trust.

But we are going, I guess, have potential confirmation objections about whether there are any such claims. I mean, the mere assertion of a claim doesn't mean that it's valid.

BY MR. BROWN:

**Q. Okay. If I can direct your attention down to 7.2.4, which is entitled Assignment and Enforcement of Asbestos PI Trust Causes of Action.**

A. Yes.

**Q. I must confess, I am a bit baffled by this one, so I need some help with it.**

**How do Asbestos PI Trust causes of action differ from asbestos insurance rights?**

A. Well, I have to go back and look at the definitions to answer that question.

Well, I think asbestos PI Trust causes of action does include asbestos insurance rights.

**Q. What else does it include?**

A. Well, if you look at the definition, it includes defenses such that, for example, if a claimant says, I have a valid claim against Grace that's channelled to the Trust and the Trust disagrees with it, the Trust retains all the defenses to that claim that Grace would have had. That's clause A under definition 47.

**Q. Okay.**

A. Clause B is, for example, contribution rights, et cetera. So, for example, if the Trust has -- if Grace has contribution rights that it has not asserted and that which are still valid against a codefendant in a tort system and the codefendant brings in indirect

Asbestos PI Trust claim against the Trust, the Trust could assert Grace's contribution rights as a counterclaim to that. That's two categories of things that this is intended to include.

CI

**Q. Okay. Let's go to page 64, 7.2.6, Creation and Termination of the Asbestos PI TAC.**

A. Correct.

**Q. It says, "On or before the Confirmation Date, the initial members of the Asbestos PI TAC shall be selected by the Asbestos PI Committee."**

**That has already occurred, correct?**

A. Correct. They are identified in the Asbestos PI Trust Agreement.

**Q. Okay. How many actual committee members are there on the Asbestos PI Committee?**

A. I don't remember. But we have the Disclosure Statement here. I could pretty quickly find out by just

PP's Obj: R

CI

looking at it where they are identified.

**Q. Okay.**

A. It's certainly more than the four that are going to be on the TAC.

**Q. Okay. Is it fair to say that the actual committee members who are asbestos claimants act through their tort counsel in connection with their obligations as committee members?**

A. As a general proposition, that's true. In any given committee on any given issue, an individual member might choose to show up and act on their own behalf, and there have been some examples in the past where that has occurred.

But, as a general proposition, the committee members are blue-collar folks of limited legal knowledge, and they delegate to their personal injury lawyers their sort of activities acting for them as an agent on these committees.

**Q. Okay. You are counsel to**

PP's Obj: R

CI PP's Obj: R

**the Asbestos PI Committee. You don't have occasion, do you, to deal directly with the actual claimants?**

MR. FINCH: Object to the form.

CI PP's Obj: R

THE WITNESS: That's not entirely true. I get calls periodically that I just got this incomprehensible Disclosure Statement from Grace and could you please tell me what it means or something. But as a general proposition --

MR. FINCH: Transfer to it to Finch.

THE WITNESS: Or where do I file my proof of claim.

But, as a general proposition, I don't nor do other folks at Caplin & Drysdale deal directly with original committee members.

BY MR. BROWN:

**Q. You deal with personal**

CI PP's Obj: R

**injury attorneys, correct?**

A. As a general proposition, we deal with the PI lawyers who have been appointed by their client committee member to act on their behest in the committee.

**Q. Now, the TAC members are John Cooney, Perry Weitz, Joe Rice, and -- who was the fourth one?**

A. Well, I can tell you by looking at the PI Trust Agreement, which is Exhibit-2 to the Plan and looking at the signature page, we should have, which is --

**Q. Russell Budd.**

A. Russell Budd, John Cooney, Joseph Rice, and Perry Weitz.

**Q. And each of them works for a law firm, correct?**

A. Each of them is a partner a law firm, yes.

**Q. Sorry. I didn't mean to...**

**Now, does each of those law firms have a client that sits on the**

CI PP's Obj: R

**committee?**

A. Yes.

**Q. And do those committee members for those firms act through those four gentlemen?**

A. On the committee?

**Q. Yes.**

A. Generally, yes.

**Q. Okay. So is it fair to say that Mr. Rice, Mr. Weitz, Mr. Cooney, and Mr. Budd selected themselves to be members of the TAC?**

A. No, because there are many other members of the committee, and the committee as a whole, which, in this particular case, I believe has a majority of members that are not these four gentlemen, decided which of their members they thought would be appropriate persons to put on the TAC.

**Q. And how was that decided?**

A. As far as I know, they had informal discussions, and they had a committee meeting. I don't remember

CI PP's Obj: R

whether there were votes or anything like that. But at the end of the day, through some sort of nomination or informal self-nomination or self-nomination, speeches, lobbying, discussions, what have you, there came a time at which the committee voted to select these four people.

**Q. Okay.**

A. And I might add that the Future Claimants Representative had a sort of a generalized oversight in the sense that while the Plan contemplates that the committee would nominate the TAC. If the FCR thought, for some reason or another, that somebody had been put on the TAC that was a real bad idea, the committee would probably have had to listen to the Future Representative's views on that even though the Futures Rep did not have sort of a formal veto or role in that process.

PP's Obj: R; BE

**Q. Okay. I want to now turn to page -- well, it's 69 on my version,**

CI

**Section 7.7, Conditions to Occurrence of the Confirmation Date, and I want to focus your attention first on (g).**

A. I see it.

**Q. What are the securities that are funding the Asbestos PI Trust?**

A. The warrant and the Deferred Payment Agreement, which is a debt obligation, which also includes, I believe, a promissory note or promissory notes.

**Q. Can you describe for me the circumstances under which the asbestos PI claim -- excuse me -- the Asbestos PI Trust will be funded with dividends?**

A. In the event that it exercises the warrant and acquires stock pursuant to that exercise and the stock pays dividends, it will get dividends.

**Q. And if the warrant is not exercised?**

A. Then it won't get dividends.

**Q. What about if there is a default under the deferred payment note?**

A. My recollection is that the Trust has the right to get 50.1 percent of the stock of the Debtor under those circumstances.

But, again, the terms of -- that's a very complicated set of documents, and the precise terms of that are whatever the document states. I can only give you a sort of a very generalized description.

**Q. Okay. Let me draw your attention now down to (l), condition (l).**

A. Yes, I see it.

**Q. What does that mean?**

MS. HARDING: Object to form.

THE WITNESS: Well, what it means is that if you didn't have a TDP, which includes things like a payment percentage and mechanisms for trying to trying to limit the ways in which the Trust expends monies on claims, and you just had sort of a come in, sue the Trust

PP's Obj: R; BE

and the tort system, et cetera, you would have a first-come-first-serve operation where there was the distinct possibility that, as it happened in the Manville Trust at the very beginning, all the money would run out the door at the front end, and there wouldn't be anything left for future claimants, which would violate 524(g).

BY MR. BROWN:

**Q. Okay. Well, the way that this provision is written suggests that any procedures other than those that are set forth in this Plan would defeat the purposes of Section 524(g).**

**Is that what is intended here?**

MR. FINCH: Object to form.

MS. HARDING: Object to form.

BY MR. BROWN:

**Q. Are there other options, is**

**the question?**

A. If the question is could one hypothesize a somewhat different set of TDPs that had somewhat different procedures, the answer is depending on what that different TDP set of procedures was, you might be able to say the same thing about it.

The purpose of this thing is to say that this structure, according to the court, satisfies the requirements of 524(g) that say that you have to establish this requirement.

I mean, this is a finding of fact that is intended to have the court rule that the Plan does, in fact, meet the requirements of a subsection of 524(g).

CI

PP's Obj: R

**Q. You could, in fact, have a Plan that met the qualifications for 524(g) that actually had a role for asbestos insurance entities, correct?**

MR. FINCH: Object to form.

MS. HARDING: Object to

CI PPS Obj: R

form.

THE WITNESS: Hypothetically, probably yes. It would be more difficult, but, hypothetically, yes. You could have -- we have had some plans that had coverage in place agreements with insurers, for example, that we felt satisfied 524(g). But you have to get the insurers' agreement to have a coverage in place agreement.

BY MR. BROWN:

**Q. Okay. Let's go now to condition (r) -- I am sorry. Condition (s).**

A. Yes.

**Q. Now, for purposes of my question, I want you to assume that when I use the term "settled asbestos insurance companies," I want you to assume that those that are pre-petition.**

A. Okay.

**Q. And my question is a very**

**general one, because I have heard different views, and that is, what benefits are being provided by or on behalf of settled asbestos insurance companies listed on Exhibit-5?**

A. It is the position of the ACC that Grace is paying close to $3 billion of value to the Trust on behalf of not only itself but a variety of other protected parties, including Non-Debtor affiliates and, in this particular case, settled asbestos insurers.

And it is doing so on behalf of settled asbestos insurers because those insurers have indemnity claims against Grace, which are being, if they hypothetically could ever occur, are being channelled to the Trust as a means of protecting Grace against such -- well, let me back up.

The purpose of putting settled asbestos insurers in here is not to provide a gratuitous asbestos insurers

because we think they are nice folks.

**Q. I didn't think so.**

A. Settled asbestos insurers, by definition, are insurers that have indemnity rights against Grace.

**Q. They have also paid a lot of money?**

A. And they paid a lot of money in the past. But the past money -- money is fungible. The past money went into Grace's coffers, went out or didn't go out, et cetera. But they are not being asked for any new money.

But Grace has an economic interest in not having asbestos PI claims brought against those insurers that could then trigger an indemnity obligation of Grace to the insurer against which that asbestos PI claim was asserted. They have an economic interest in preventing that.

So the deal is channel any such claim that might give rise to the asbestos indemnity claim to the Trust,

and in exchange for that, part of what Grace is paying you is to get rid of asbestos PI claims which include indirect asbestos PI claims for indemnity or direct asbestos PI claims for indemnity.

**Q. Okay.**

A. And that's the basis.

**Q. I think you said at the very beginning of either the last question or the one before that Grace was contributing 3 million?**

A. Billion.

**Q. That's what I thought. Okay. I just wanted to make sure I had the number correct.**

A. I mean, that's our view of the approximate amount of what they were contributing at the time we made the deal, I guess would be a better way to put it. There are other people that might value it differently.

Some of things that were worth more at the time the deal was made are worth less today but hopefully will

at that injunction.
I can't recall ever having spent a lot of time thinking about that issue before, but it seems possible that that hypothetical claim could be enjoined by the successor claims injunction in Section 8.5 of the Plan as against Fresenius and Sealed Air.

PP's Obj: R; BE

CI

**Q. I want to turn your attention now to Section 7.15. We have talked about it a little bit already, Insurance Neutrality.**

A. I have it.

**Q. Okay. Other than the conditions set forth in (g) under 7.15, are asbestos insurance entities bound by any other findings or conclusions contained in the Plan?**

A. Yes, potentially under Section 7.15(j).

**Q. Okay. Anything else?**

A. Well, yes, two other categories of things. One would be rulings on compliance with the bankruptcy

PP's Obj: R; BE

CI

code provisions, which are not under the definition of asbestos coverage defenses preserved, as we had discussed earlier.

**Q. Okay.**

A. And, secondly, there is a race judicata provision in Section 7.15(e) that, in effect, says that if an asbestos insurer actually litigates some claim in the bankruptcy case, it could be -- assuming that otherwise non-bankruptcy principles of race judicata or collateral estoppel would apply, it could be bound by the outcome of any such litigation that it initiated.

**Q. Okay.**

A. Other than that, I believe the answer to your question, those are the only conditions that I am aware of.

**Q. Okay. Would it be correct to say that this provision overrides the exculpation provision in the Plan which appears at Section 11.9?**

MR. FINCH: Object to form.

MS. HARDING: Object to

CI

form.

PP's Obj: R; BE

THE WITNESS: Let me turn to Section 11.9. I don't think so, because I think the exculpation provision comes under the heading bankruptcy issues.

The exculpation provision is pretty limited. What it applies to are acts or omissions in connection with or arising out of the Chapter 11 cases. And my understanding of what is intended to be covered by that is some claim that one of the parties covered by it engaged in some sort of misconduct during the course of the bankruptcy case -- I don't know -- a claim, to put it personally, the Asbestos Claimants Committee somehow or another breached a fiduciary duty to its constituency by proposing a Plan that this exculpation provision would apply to that sort of a

CI

PP's Obj: R; BE

claim or a similar claim against the Debtors.

But those types of claims are not insurance coverage claims or defenses. They would just be some sort of -- and, indeed, it's almost inconceivable to me how an insurance company could ever have the sort of claim that would be exculpated by Section 11.9, frankly.

BY MR. BROWN:

**Q. Well, if they did --**

MR. FINCH: Object to the form.

CI

PP's Obj: R; BE

BY MR. BROWN:

**Q. -- would the exculpation provision take precedence over Section 7.15?**

MR. FINCH: Object to form.

MS. HARDING: Object to form.

CI

PP's Obj: R

THE WITNESS: That question is almost impossible to answer,

CI

PP's Obj: R

because without knowing what the claim is -- I mean, 7.15 addresses specific types of situations having to do with insurance.

11.9 addresses claims that, on their face, have no apparent relationship to insurance, and, therefore, to know whether there is any overlap between the two to determine which one would prevail in the event that there was an overlap, you would have to have some idea what kind of claim you are talking about. And, frankly, I have no idea what kind of claim you want me to hypothesize for purposes of that question.

BY MR. BROWN:

**Q. All right. There are some releases that are mentioned in Section 7.15, and I want you to put those aside for a moment.**

**Other than the releases that are cited in 7.15, are any other releases**

CI

PP's Obj: R

**that appear in the Plan or Plan documents binding on asbestos insurance entities?**

MS. HARDING: Object to form.

CI

PP's Obj: R; BE

THE WITNESS: I would have to give you a very similar answer to the one I just gave you on exculpation because I would have to know what kind of claims you are talking about.

7.15 is intended to deal with insurance policy/settlement, insurance settlement, insurance reimbursement situations, and preservation of insurer rights with respect to those types of agreements. Releases in the Plan may or may not cover those situations.

As a general proposition, I don't think the Plan purports to release claims by asbestos insurers sort of generically against a whole lot of different

CI

PP's Obj: R; BE

people. There are some specific releases that we have talked about already.

Without knowing what sort of a claim you believe the Plan releases and being able to figure out whether that claim ties into the sort of relationships that 7.15 -- policy type relationships that 7.15 is intended to address, I really can't answer. I am not trying to evade the question. I just can't answer it for the reasons I stated.

MR. BROWN: Okay.

(ACC 30(b)(6)-8 and 9 marked for identification at this time.)

PP's Obj: R, BE, F

BY MR. BROWN:

**Q. All right. Mr. Lockwood, you have before you two documents, ACC-8 and ACC-9. Let's start with 8.**

A. I have it.

**Q. Have you ever seen that document before?**

CI

A. Yes.

**Q. What is it?**

A. It is a complaint by The Scotts Company attempting to initiate an adversary proceeding in the Grace bankruptcy case against various insurers and Grace.

**Q. Okay. And is the relief that is sought by Scotts in this adversary complaint as against the insurers that are defendants, who are also settled asbestos insurance companies, enjoined in its totality?**

A. As of right now or under the Plan?

**Q. Under the Plan.**

A. I want to say yes to that, but I would have to say this: I believe that Scotts is asserting claims in this action as asserted additional insured under vendor coverage in W.R. Grace insurance policies, point one.

I believe the basis is suits against Scotts for Scotts' liability for

BNSF, for example, purports to have, at least in one instance, I think it's Royal, claims issued directly to it by Royal that were somehow procured by Grace but which don't cover Grace. I don't believe that this injunction would preclude suits by BNSF on that sort of insurance claim.

BY MR. BROWN:

**Q. Would the prior injunction enjoin that type of claim?**

A. The asbestos personal injury?

**Q. Yes.**

A. No, because those policies are not within the definition -- they are not covered in Exhibit-5, and so Royal wouldn't be an asbestos-protected party with respect to those policies.

We are now talking about non-settled coverage here, aren't we? Wasn't that what your question was?

**Q. I don't know. This was your**

**hypothetical.**

A. You asked me were the claims as additional insureds of BNSF and Scotts covered by this injunction, and I am trying to tell you it depends on what kind of claims against whom.

I mean, it's got -- first, unlike the 524(g) injunction, which applies only to protected parties, this applies to people with settled coverage, unsettled coverage, reimbursement coverage, as long as it's coverage that's being transferred to the Trust. If it's coverage that's not being transferred to the Trust, then there is no effort to protect it.

**Q. Okay.**

A. The complexity of your question arises out of the fact that you could have coverage that's being transferred to the Trust, which somebody nevertheless claims to be an additional insured on, such as Scotts under a vendor endorsement. And there, I think this

injunction probably does preclude Scotts from seeking that coverage, although I really have to think about that.

I don't know. I have to confess that I haven't really -- I would really have to parse this to make sure whether -- if you are talking about unsettled coverage, not settled coverage, but unsettled coverage. And I am not sure Scotts -- so if it's unsettled, then, by definition, it hasn't been indemnified by Grace. So the claims don't go to the Trust on that basis.

I guess I have to just say I think it may very well be enjoined by this, but, really, to be more confident about that, I would really have to spend more time parsing this and thinking about it.

**Q. Okay.**

A. I think it would be channelled -- not channelled but enjoined.

CI

**Q. I am going to move at this**

PP's Obj: R

CI

PP's Obj: R

**point from the Plan to another document, so why don't we take a quick break.**

A. Okay.

(There was a break from 2:10 p.m. to 2:22 p.m.)

BY MR. BROWN:

**Q. Mr. Lockwood, can you take a look at Exhibit-2. That's Exhibit-2 to the Plan, which we are going to mark as ACC1-10.**

**(ACC 30(b)(6)-10 marked for identification at this time.)**

BY MR. BROWN:

**Q. Can you identify it?**

A. ACC Exhibit-10 is the Asbestos PI Trust Agreement, which is attached as Exhibit-2, to the February 27, 2009 Plan reorganization of W.R. Grace.

**Q. Can I direct your attention to Section 2.2 entitled General Administration and specifically subsection (e).**

A. Yes.



Q. There is a reference in subsection (e) to the TAC, T-A-C, which is the Trust Advisory Committee, correct?
A. Correct.
Q. And the Futures Representative, which is the Asbestos PI Futures Representative, correct?
A. Correct.
Q. And earlier today, we went through a list of the individuals who are on the TAC, and you mentioned Russell Budd, John Cooney, Joe Rice, and Perry Weitz.
A. Correct.
Q. Am I correct that each of those gentlemen or their respective firms represent asbestos claimants with claims against Grace?
A. Correct.
Q. Can you give me some idea of how many claims Mr. Budd's firm has against Grace?
MR. FINCH: Objection, lack of foundation.

THE WITNESS: No, except that it's -- I think we established when we were doing request for admission or something to somebody that all four of those, each one of those firms represents at least 1,000 claimants against Grace.
BY MR. BROWN:
Q. We did.
A. What I don't know is how many more than a thousand any of them may represent.
Q. Okay.
A. The proofs of claim are on file. Somebody could go and ascertain that, if it mattered.
Q. Okay. Do you know how many -- the firms that those four TAC members are members of collectively how many they have? In other words, if you took the four firms, do you have an idea or estimate as to the number of claims that they have against Grace?

MR. FINCH: Objection, foundation.
THE WITNESS: Only in the sort of vaguest and most general terms. Well, I am sure it's more than 10,000. Again, it could be 20,000; it could be 30,000. I just don't know.
Those firms -- with the exception of Mr. Cooney's firm, those firms represent a lot of people. And in the case of Mr. Rice, he has co-counsel relationships, his firm does, with a lot of other firms. So it gets into the question of, quote, what do you mean by representation, sole representation, joint representation. But, suffice it to say, they represent a lot of claimants.
BY MR. BROWN:
Q. Okay. And in their capacity as counsel for those claimants, they have

fiduciary duties to their clients, correct?
A. However those are established by the local bars, et cetera, before which they practice, yes, generally.
Q. And they get paid to represent those clients, correct?
A. Generally speaking, I assume that's correct.
Q. And is it your understanding that, generally speaking, that's through a contingency arrangement?
A. Again, generally speaking, correct.
Q. And is it your understanding that the contingent fee that is typically charged by those firms is somewhere between 33 and a third and 40 percent of the recovery?
MR. FINCH: Objection, lack of foundation, calls for speculation.
THE WITNESS: I really don't

CI

PP's Obj: R

have firsthand knowledge of that.
BY MR. BROWN:
**Q. Okay. Well, if it's a contingent fee arrangement and there is no recovery, there is no payment to the firm, generally speaking, correct?**
A. Except for reimbursed expenses in those states that permit you to advance expenses and require that you seek recovery from your client under their ethical rules, but yes.
**Q. So is it fair to say that Mr. Budd, Mr. Cooney, Mr. Weitz, and Mr. Rice are motivated by their fiduciary obligations and their own personal gain to obtain a recovery on behalf of their clients against the Asbestos PI Trust?**
A. When they are acting as counsel for their individual clients, yes.
**Q. Okay. How about when they are acting as TAC members?**
A. When they are acting as TAC members, they have a fiduciary

CI

PP's Obj: R

obligation, as they do as ACC members, to look out for the interests of the constituency they represent as a whole.
**Q. Okay. And the fiduciary duties that they owe to their clients, on the one hand, and to all beneficiaries of the Asbestos PI Trust, on the other hand, are they the same?**
A. I don't know how to answer that question.
**Q. Let me --**
A. Because they are acting in different capacities. So when you say are they the same, do you mean do they come from the same source? I can't answer that.
**Q. Are the fiduciary duties that they have to their clients, on the one hand, and to all claimants against the Asbestos PI Trust in conflict with one another at any level?**
A. As a general proposition, I don't think so, because when they process individual claims against the Trust, they

CI

PP's Obj: R

are not acting as TAC members. And when they are acting as TAC members, they are not involved in processing individual claims or evaluating individual claims or having anything to do with individual claims any more than they are as ACC members with respect to individual claims and their clients in the bankruptcy case.
**Q. Well, if you look at (e), the section that I referred you to at the outset, it says that the TAC members should consult with the trustees on matters of general implementation and administration of the PI Trust.**
MR. FINCH: Object to form. The document doesn't say that.
BY MR. BROWN:
**Q. All right. Mr. Lockwood, just take a look at Section 8, if you would.**
A. It says, "The Trustees shall consult with the TAC and the Futures Representative on the general implementation and administration of the

CI

PP's Obj: R

PI Trust."
**Q. Okay. What's covered by Romanette (i), would that involve how the Trust should deal with meritless claims?**
A. That question is hard to answer in the sense that I am not sure what you mean by meritless claims. I mean, the TDPs identify what claims are eligible for compensation and what aren't.
If you are of the personal opinion that certain categories of claims under the TDP, under the criteria are, quote, meritless, close quote, well, the TAC and the Futures Rep take the TDP as it finds it.
So they don't have a fiduciary obligation to render personal opinions about the TDP criteria as it applies to individual clients or individual claims.
That said, at some level, I suppose they have a generalized -- if the trustees raise with them the question, on

CI

PPS Obj: R

Page 206

some generalized basis, whether there is some large category of claims that are, quote, meritless that are not otherwise prescribed by the Trust, I could hypothesize the situation where they might be consulted on that subject.

**Q. Okay. And that would be true even if their firm was the firm that submitted those claims, correct?**

A. Well, if their firm was the firm that submitted their claims, I would assume that they would recuse themselves, just like any organization, if there was a specific conflict of interest on a subject like that, the party involved would recuse themselves.

**Q. Is there anything in the Trust Agreement or the TDP that requires them to recuse themselves?**

A. No, but there is nothing in the TDP that requires them to act in any way different from any set of fiduciaries that are they are confronted in a particular factual context, some conflict

CI

PPS Obj: R

Page 207

of interest between their personal interests and their interest of the entity that they are involved with.

**Q. Well, to the extent that their fiduciary duties to their clients in any particular case are in conflict with their fiduciary duties to all beneficiaries of the Asbestos PI Trust, are they required to step aside from the decision-making?**

MR. FINCH: Objection, form.

THE WITNESS: Yeah, I mean -- if you take the position that prosecuting an individual claim is a conflict with the interest of the Trust as a whole because if the claim is successful, it will reduce the amount in the Trust that would be available to other people; if the claim were unsuccessful, then no, they don't have an obligation not to prosecute individual claims.

It's well understood that

CI

Page 208

PPS Obj: R

the whole function of the TAC is to represent the interest of people with individual claims, albeit on a collective basis.

If you are saying the hypothetical you gave earlier that if there was some -- the trustees were proposing a change that somehow or another focused on the individual claims of a particular firm as opposed to categories of claims that virtually all lawyers, asbestos lawyers represented, then you might have a recusal issue.

And/or the trustees might be motivated to discount the advice they were getting. Because this is a consultation provision. It doesn't say the trustees having consulted with the TAC; all of a sudden have to agree with whatever the TAC tells them. It just says they have to consult with them.

BY MR. BROWN:

CI

Page 209

PPS Obj: R

**Q. What about the next subsection, which is (f), which sets forth a whole series of items on which the trustees must obtain the consent of the TAC and the Futures Representative?**

A. Subject to certain other provisions that apply if the TAC and the FCR don't give their consent, yes. What do you mean what about it? There are -- it exists in the TDP, in the Trust Agreement. And there are specified things that they have to obtain consent from the TAC on and the FCR, and if they don't get the consent, they can get them overruled by the judge.

PPS Ctr

**Q. Let me ask you a more general question. What is the need to have the TAC?**

A. The TAC goes back -- the concept goes back at least to the Manville TDP. And the notion was that this was -- this Trust was created -- well, let me start out by saying that my partner, Mr. Inselbuch, who you are going

to take the deposition of on June 12th --
**Q. Somebody is.**
A. -- is a lot better to equipped to give you the historical overview of these kind of TDP provisions than I am, and anything I say on this subject frankly is subject probably to be corrected by him.

But, in general, as I understand the history of the concept, the idea was that this is a settlement between a whole lot of people who are agreeing to have their claims taken away from the Debtor and put in a Trust, and the Trust is going to deal with the claims.

And the notion was that -- first, it was always a criteria you would not put a asbestos personal injury lawyer or anybody would submit claims in as a trustee. So the trustee, by definition, therefore, in order to avoid that sort of conflict, were not going to have any real knowledge about asbestos personal injury

litigation and asbestos personal injury claims.

And, as I understand, the notion was that it would be a good idea to do two things: First, have experienced personal injury lawyers around who could, to the extent needed, educate trustees who come to the job with no real knowledge of how the system works to give them input. That's the consultation notion.

And the same for the FCR, who would be a counterbalance, to some extent, because to the extent that the TAC represents present claimants, it would have, even as a collective group representing present claimants, some kind of incentive to try and get more money out sooner than might be in the beneficial interests of the future claimant. So you have the Future Claimants' Representative who has got coequal status in the TAC in advising the trustees.

With respect to the consent process, the notion was we made a deal in the bankruptcy case. That deal was embodied in the Trust Agreement and the TDP. If people are going to start changing that deal after the fact, then representatives who knew and were involved with making the original deal ought to at least presumptively have some voice in whether or not it's okay to change it.

However, there is the safety valve on that, which is if the TAC, for example, decides that they want to resist -- let's assume you needed to change the payment -- lower the payment percentage because you thought there was going to be more future claims coming in than had been predicted.

Well, the TAC might have an institutional interest in keeping the payment percentage high, and the Futures Rep might want to see it lowered and the trustees might want to see it lowered.

So how do you deal with that?

Well, the TAC is supposed to be representing the present claimants. That's where their fiduciary is. So if they don't consent, you go to the judge, and you say, judge, "The TAC is being unreasonable here." And that's how you resolve it. So, in an overview sense, that's the concept behind it.

**Q. Okay. The statute 524(g) does not require a TAC in connection with an asbestos Trust, does it?**
A. It doesn't require a TAC, and it doesn't require a Futures Rep. But the legislative history says it was a modeled on Manville and Manville has had an SEB on the Futures Representative, vis-a-vie the Trust, at least since the Trust was reorganized in the mid-1990s or early 1990s. Again, Inselbuch can tell you more about that because he was there.
**Q. The TAC, if I understand the Trust Agreement, has fiduciary duties to indirect PI Trust claimants as well,**

CI PP's Obj: R

**correct?**
A. As a general proposition, that's true.
**Q. Now --**
A. But I will say -- it's a little tricky because it's clear that the vast bulk of the claimants whose claims were being channelled to the Trust are direct claimants. And, moreover, the individual -- the indirect claimants generally tend to be entities that have the financial and legal wherewithal to look at their own interests.
So my own personal perspective on it, while you can make a general statement on the fiduciary obligation, the major focus of the TAC and the FCR is direct claimants, not indirect claimants.
**Q. To the extent that the TAC acts in a manner that the indirect asbestos PI claimants feel is in their interest, is the TAC insulated from any liability to indirect asbestos PI**

CI

**claimants?**
A. Could you reread that question, please?
(The reporter read from the record as requested.)
THE WITNESS: Aren't you missing a "not" in that question?
BY MR. BROWN:
**Q. Against their interest is what I meant.**
A. There is, I think, in here some kind of a -- I don't know what you call it -- exculpation provision or something. But it doesn't cover bad faith.
So the answer is we would have to look at the document to determine exactly what potential liability the TAC has.
And, moreover, given the TAC's role, which is it doesn't have the unilateral power to make any decisions. The trustees make the decision, and the TAC consults or consents. It's a little

hard to hypothesize the claim that you talk about.
But, in any event, I am looking for the -- I am pretty sure there is a Trust Agreement provision here somewhere that addresses -- Section 4.6. Essentially, it provides for indemnity and exculpation to the extent that that's permitted by a statutory trust law, Trust organized under the laws of Delaware. So whatever the laws of Delaware permit you to indemnify fiduciaries for is what's provided.
And that's obviously both fact-specific and depends. And I don't know what Delaware law does or doesn't provide on hypothetical fact circumstances.

CI PP's Obj: R

**Q. Let's go to page 13 on my draft.**
A. Of the Trust Agreement?
**Q. Yes.**
A. I am there. What Section is this, just to make sure we have the same

PP's Obj: R

pagination?
**Q. It's under the Consent provision. It's (f), Romanette (xiv).**
A. I see it.
**Q. I am not sure I understand this, the latter part of this, and I want to ask you what it means.**
**Do you see where it says, "...or to comply with an applicable obligation under an insurance policy or settlement agreement pursuant to Section [6.5] of the TDP"?**
A. Yes.
**Q. Does this mean that the trustees need the consent of the TAC in order to comply with obligations under insurance agreements, insurance policies?**
A. Well, first, since it incorporates Section 6.5 of the TDP, you have to look to see what that is, because it certainly -- if there is any limitations on their ability to comply with obligations under transfer insurance rights, it's got to be spelled out in

CI PP's Obj: R

6.5. There is no other limitation expressed in that paragraph.

6.5 deals with the confidentiality of claimants' submissions. In general, it takes the position that claimants' submissions to the Trust are made in the course of settlement negotiations and, therefore, would be treated as confidential. To the extent state law provides a privilege, the privilege is not going to be eliminated.

There is then a provision -- there is a provision about subpoenas getting information. And then there is the sentence, "Notwithstanding anything in the foregoing to the contrary, with the consent of the TAC and the Futures Representative, the PI Trust may, in specified limited circumstances, disclose information, documents or other materials reasonably necessary in the PI Trust's judgment to preserve, litigate, resolve or settle coverage, or to comply with any

CI PP's Obj: R

applicable obligation under an insurance policy or settlement agreement within the Asbestos Insurance Policies or the Asbestos Insurance Settlement Agreements; provided...," and then it takes steps reasonably feasible in its judgment to preserve the further confidentiality of such documents, et cetera.

That's the scope of this. It basically has to do with the confidentiality of medical information and personal information that's submitted in claims files.

**Q. So if an insurance company wants to see that information because the Trust is seeking recovery under an insurance policy for that claim, the trustees need the consent of the TAC to provide that information to the insurer; is that correct?**

A. Voluntarily. And, again, if the TAC were to refuse to consent to it, there is dispute resolution provisions. The Trust could go to the bankruptcy

CI PP's Obj: R

court, and indeed there have been some instances in which there has been litigation, existing trusts by the Trust, trying to get the court to determine that certain claims information has to be turned over to certain insurers in connection with settlement agreements, for example.

And in some instances, the Trust has issued orders saying that effect. So this is not an absolute veto power on the part of the TAC.

But, as I say, the plaintiffs bar and their clients have a general feeling that their personal medical information shouldn't be indiscriminately disseminated to anybody who says they have a desire to do so -- excuse me -- to use it for whatever purposes they may wish to use it.

**Q. I want to turn your attention now to Section 5.5.**

A. Of the Trust Agreement?

**Q. Yes.**

CI PP's Obj: R

A. Okay.

**Q. Now, there is a provision, as I understand it, under the TDP pursuant to which an asbestos PI claim can resort to the tort system after going through a bunch of hoops; is that correct?**

A. Correct.

**Q. If the asbestos PI claimant elects to do that, then I presume that the Trust will have defense counsel to defend that claim; is that correct?**

A. One would assume that would be the case. It's happened to infrequently in practice that it's hard to know, but I can't imagine that they would defend themselves in court without a lawyer.

**Q. Okay. And would that lawyer be a Trust professional as that term is used in Section 5.5(a)?**

MR. FINCH: 5.5(a) talks about TAC employment of professionals.

CI PP's Obj: R

THE WITNESS: But it also talks about Trust professionals.

You would have to go back and look at the definition of Trust professional.

That's an interesting question. I don't know whether they would be considered to be a Trust professional or not, actually.

BY MR. BROWN:

**Q. I don't think I can find a definition of Trust professional.**

A. It's in Section 4.8(a), the fourth line. As a general proposition, the Trust professionals are clearly people who represent the Trust in a sort of generalized sense, but it does include counsel. Whether or not it would include counsel in a particular case -- suffice it to say that if the question is would the TAC and members of the TAC have access to the files of a counsel for the Trust that was the defending case --

CI PP's Obj: R

**Q. That's the question.**

A. -- brought by the TAC's law firm, the answer is no.

**Q. Where does it say that?**

A. It doesn't have to say that because the TAC's role is a generic role. It talks about the general administration of the Trust, et cetera.

Asking for information about an individual claim that that guy is pursuing in a tort system against the Trust has nothing to do with the general administration of the Trust and would be a blatant exercise in abuse of kind of fiduciary power, and no trustee would accept it. And I don't believe it would ever cross the mind of any TAC member that they could even try it, much less skied succeed it at it.

**Q. But this provision does give them complete access, correct, as written? It says, "...complete access to all information generated by them or otherwise available to the PI Trust..."**

CI PP's Obj: R

A. It says provided -- it says "...complete access to all information generated by them...," and it talks about the TAC as a group.

An individual tort claim would not be litigated by the TAC as a group. At best, it would be litigated by one of the TAC members. And the TAC members -- I can't imagine the TAC members saying, that as a group, we want to find out how you are defending a particular claim against did Trust so we can give that information to the plaintiff's lawyer that's part of our group so we can help win the case.

I mean, it's just a preposterous suggestion, quite frankly. I mean, yeah, you are right, the document doesn't prohibit that particular abuse of fiduciary authority. But, you know, documents generally don't hypothesize every possible breach of fiduciary duty. You could create a laundry list, 50 pages long, of all of those possible abuses and

CI PP's Obj: R

say thou shall not commit each one of them.

**Q. Mr. Lockwood, I am correct, am I not, that there was no asbestos insurance entity that was involved in the drafting of the Asbestos PI Agreement?**

A. To the best of my knowledge, that's correct.

PP's Obj: R

**Q. Let's turn to Plan Exhibit-4.**

A. I have it.

(Exhibit-11 marked for identification at this time.)

THE WITNESS: Do you want me to identify it?

MR. BROWN: Yes.

THE WITNESS: It's the Grace Trust Distribution Procedures.

BY MR. BROWN:

**Q. Okay. Now, no asbestos insurance entity was invited to participate in the drafting of the TDP, correct?**

A. To the best of my knowledge,