CI PP's Obj: R

that's correct.

**Q. And no asbestos insurance entity was consulted about the terms of it, correct?**

MS. HARDING: Object to form.

MR. FINCH: Object to form.

THE WITNESS: At one level, that's certainly true. I mean, I will say that, in fact, I believe that there were -- because of the process that we went through of filing successive draft versions of this, in effect, the insurer saw earlier versions of the TDP, indeed, I think have objected to various provisions in them. And those objections could be reviewed as commenting on them. And then there were filed amended versions of them.

So to that extent, I guess, they did have an opportunity to, quote, comment on them, close

quote. But other than through the process that I have just described, no.

BY MR. BROWN:

**Q. Okay. The question was whether they were consulted concerning them.**

A. Well, I understand that, and sending you a -- serving a copy on you and having you make an objection or file some comment or argument in court could be viewed at some level as consulting.

But, as I said, we didn't do it other than in the manner that I just described. If you don't think that's consulting, that's fine.

**Q. And no asbestos insurance entity consented in writing or orally to the terms of the TDP, correct?**

MS. HARDING: Object to form.

MR. FINCH: Object to form.

THE WITNESS: Except for Equitas and KWELM in the manner

that I described earlier in my deposition. That's as far as I know, correct.

BY MR. BROWN:

**Q. Okay. Did any asbestos insurance entity play any role in the establishment of a medical criteria in the TDP?**

MS. HARDING: Object to the form.

THE WITNESS: Not to my knowledge.

BY MR. BROWN:

**Q. How about the exposure criteria?**

A. Same answer.

**Q. How about the claims resolution process?**

A. Same answer.

**Q. How about any other term in the TDP?**

MR. FINCH: Object to form, overly broad.

THE WITNESS: Again, the

only role that was played was -- well, let me back up a second. This TDP is in most particulars similar, if not identical, to TDPs that have been adopted in prior asbestos bankruptcy cases.

In many of those cases, the same insurers have objected to the same provisions of the TDPs that they object to now. And in some cases, over time the TDPs have actually been modified and, indeed, in some cases, some of the provisions that we talked about, like the one relating to providing access for insurance coverage, I believe was put into a TDP along the way, not this one for the first time, but some earlier TDP, because it became apparent that that was going to be needed to deal with insurance problems.

And to that extent, the insurers, as a result of this

CI

PP's Obj: R

cumulative iteration process, have had that sort of a role.
Obviously, that's not the kind of role you have in mind. The kind of role you have in mind is coming to you and saying we want to negotiate about it, we want to get your agreement to it, we want to get your approval of it. And that sort of a role, to my knowledge, you didn't have on this TDP.

BY MR. BROWN:

**Q. All right. Under this TDP, is there any role for any asbestos insurance entity --**

A. In --

**Q. Well, I hadn't finished.**

A. Sorry.

**Q. -- in connection with any of the claims resolution processes?**

A. Well, you yourself identified one a few questions back, which is if the claimant doesn't settle its claim with the Trust, brings the

CI

PP's Obj: R

claim against the Trust in the tort system, and the Trust has to defend it. It is certainly within the contemplation of these documents that the Trust could tender that defense in that claim to an insurer.

**Q. Okay.**

A. And that would be where the Trust -- while it doesn't spell that out in here, that would certainly be a place where an insurer might have an involvement.
Beyond that, there is nothing in the Trust that expressly addresses any participation by insurers in the claims resolution process.
That said, if some coverage court decides that the insurers have the right to participate in the claims resolution process, the TDP has amendment procedures in it, and the trustees might very well conclude that if the only way they could get access in the future to a lot of valuable assigned insurance rights

CI

PP's Obj: R

was to allow insurers to handle the claims, they would have to right under this document and the Trust Agreement with the consent of the TAC and the FCR to amend it to give the insurers a right. But, in its present form, there is no express provision involving the insurers in the claims resolution process.

**Q. And that's true for the expedited review, individual review, and arbitration, correct?**

A. It's certainly true of the expedited review and individual review. It's an interesting question whether or not the Trust could tender a claim for arbitration to an insurer. I don't know whether there is anything that would prohibit them from doing that.
Arbitration is, to some extent, like litigation, and they could certainly tender a claim for an insurer, a litigation claim to an insurer. They might be able to. I don't know of anything that would preclude them, I

CI

PP's Obj: R

guess, from tendering it to an insurer for arbitration. I don't know.

**Q. But the TDP doesn't spell out any role?**

A. The TDP doesn't spell it out, no.

PP's Ctr

**Q. Let's go to Section 2.6.**

A. Of which document?

**Q. Trust Distribution Procedures, ACC-11.**

A. Okay.

**Q. Now, the first question I have, that refers to indirect PI Trust claims?**

A. Correct.

**Q. There is in Section 5.12 and 5.13 a couple of other terms that are used. In 5.12, the term "insurer-related TDP claims" is used.**

A. Correct.

**Q. In 5.13, the term "indemnified insurer TDP claims" is used.**
**And my first question is whether those two terms are included**

CI

Page 234

**within the term "indirect PI Trust claim"?**

A. Well, that's, again, almost a metaphysical debate, because -- actually, if you really parse the definitions in the Plan, I remember concluding that there was probably a better argument that the claims that are identified in 5.12 and 5.13 were direct PI Trust claims and not indirect PI Trust claims.

But we decided, rather than to have to get into parsing things -- this is a classic example, these two provisions of how you change TDP provisions when insurers raise objections that you think are meritorious in some way or another. We decided to just have these specific provisions deal with claims that are being channelled to the Trust, whether they are direct claims or indirect claims, being sort of not a matter of great moment. They are one or the other or both. And so they are dealt

PP's Ctr

Page 235

with in these two specific provisions --

MR. FINCH: Which two are you referring to?

THE WITNESS: 5.12 and 5.13.

-- to make sure that everybody knew exactly how they were going to be dealt with.

BY MR. BROWN:

**Q. So is your answer that the terms "insurer-related TDP claims" and "indemnified insurer TDP claims" might be direct Trust claims or, on the other hand, might be indirect Trust claims?**

A. My own personal opinion is that they are direct PI Trust claims, if you go back to the Plan and look at the definitions.

PP's Ctr

PP's Obj: R

CI

**Q. Is that the ACC's position or your personal position or both?**

A. Well, I mean, I am the ACC representative, and I was the one who was most involved in drafting the Plan, so I guess it's the ACC's perspective.

I personally don't see

Page 236

frankly at the end of the day that it matters whether they are direct or indirect claims, and that's why we didn't attempt to change the definition. Remember, these two provisions are new.

PP's Obj: R

**Q. I know.**

A. They were drafted long after the definitions of direct and indirect PI Trust claims were put in both the Plan and in this TDP.

And so the question is, was there any utility having agreed to put these provisions in to deal with these particular kinds of claims to going back and trying to sort of re-write the definitions of direct claims and indirect claims to put them in one basket or the other, and we couldn't see that it mattered.

But if you, through your probing cross-examination, convince me that it does matter, then maybe we will have to go and fix it.

PP's Ctr

**Q. Well, we are using the term**

Page 237

**"direct PI Trust claim," and I am not sure there is such a term.**

A. Well, there may not be. I don't think there is an indirect PI Trust claim, and I don't remember what -- there is some term that we used for the claims that are going in here somewhere, I would assume.

**Q. Well, you have asbestos PI claims.**

A. Well, maybe that's the term. Yeah, it's asbestos PI claims.

**Q. So the ACC --**

A. It's on page 1, unnumbered page 1, second line. It says, "...provide for resolving all 'Asbestos PI Claims' as defined in the First Amended Joint Plan of Reorganization," et cetera.

**Q. I am sorry. What document are you in?**

A. TDP, page 1, second line on the page. There is the reference to asbestos PI claims in quotes as defined

in the First Amended Plan. That's the generic term. And indirect PI Trust claim is simply a subset of that. And I don't think it's an indirect PI Trust claim. I think it's an asbestos PI claim which, of course, happens to include in its definition indirect PI Trust claims.

(There was an interruption at this time.)

BY MR. BROWN:

**Q. Just to circle out this line of questioning, there is a Section in 5.6.**

A. Of the TDP?

**Q. Of the TDP.**

A. That's the section that deals with PI claims.

**Q. So based on your answers that you just gave, I presume that the ACC's position is that 5.6 has no application to insurer-related TDP claims or indemnify insurer TDP claims?**

A. Correct.

MS. HARDING: I think I

wanted to object to form before you answered, but that's all right.

BY MR. BROWN:

**Q. Okay. Let's go to page --**

MS. HARDING: Could you repeat the question, please?

(The reporter read from the record as requested.)

MS. HARDING: Object to form. I think it's very confusing.

THE WITNESS: To make it clear, the way in which the term of the so-called insurance related TDP claims are treated under the TDP is set forth in Section 5.12 of the TDP and not in Section 5.6 of the TDP.

Similarly, the way in which indemnified insurer TDP claims is defined in the TDP, are treated under the TDP is contained in Section 5.13 of the TDP and not in

Section 5.6 of the TDP.

BY MR. BROWN:

**Q. If I can direct your attention now to Section 4.3 of the TDP.**

A. I have it.

**Q. Let's see. The third full paragraph begins "There is uncertainty." I direct your attention to the second sentence there.**

A. Yes.

**Q. If federal or state law were to impose greater restrictions or limits on the asbestos PI claimants to recover in the tort system, is there a mechanism under the Trust Agreement or the Trust Distribution Procedures to incorporate such restrictions or limits into the TDP?**

A. Yes, you could amend them.

**Q. Okay. And does that amendment require the consent of the Trust Advisory Committee?**

A. Subject to the ability to go to court if the trustees disagree with the TAC's refusal to give such consent,

yes.

**Q. Okay.**

A. I would also observe, however, that to some extent, changes in federal or state law could show up without amendments to the TDP. Because in individual review, arbitration and claims that go through to the tort system, the trustees can apply applicable state or federal law principles that govern those claims.

The only claims for which there are specified criteria, which might or might not -- strike -- which might become superseded at some level by some hypothetical state or federal law would be the expedited review provisions. They are the ones that are written down.

Everything else is you have a claim, to the extent you have a valid claim under state law for individual review, arbitration, and the tort system.

So to the extent that you

CI

PP's Obj: R; BE

had such changes, they began to show up in the results of individual review, arbitration, or litigation in the tort system, that could affect the totality of the PI Trust claims to be paid over time, which is what this sentence is talking about.

**Q. All right. If you look at Section 5.3(a)(3), specifically the sentence that begins "thereafter."**

MR. FINCH: What page are you on, Mike?

MR. BROWN: Mine is page 23.

THE WITNESS: 23. I see it.

BY MR. BROWN:

**Q. Okay. Now, there are some limitations imposed by Section 524(g) and by the Trust Agreement on the types of changes that can be made under the TDP. Is that a fair statement?**

MR. FINCH: Object to form.

CI

THE WITNESS: I am not sure, actually. What sort of limitations do you have in mind?

CI

BY MR. BROWN:

**Q. Looking at the sentence that I just directed you to, are there any restrictions placed on the trustee in terms of how they can change any of these items, the disease levels, the scheduled values, the medical or exposure criteria, et cetera?**

A. Well, first, they have fiduciary obligations to the beneficiaries of the Trust which would preclude them from making arbitrary decisions that work to the detriment of claimants. So they have that sort of restriction, but that's sort of general.

They have a restriction of sorts in the need to go through the consent process. But at the end of the day, they could do it, as I said earlier, if a judge thought that either the FCR or the TAC or both were being unreasonable.

I suppose, to go back to your earlier question, that one could hypothesize -- at some level, the

CI

PP's Obj: R; BE

trustees are obligated to make sure that the Trust continues to comply with 524(g). There is no question about that. It's just hard to know what sort of changes you could imagine that would be consistent with their fiduciary duties to the claimants that would jeopardize that. So, yeah, it's a restriction, I guess, but how it would actually ever come into play, I don't know.

**Q. There is a reference on page 28 to foreign claims.**

A. Yes.

**Q. Which does not include claims in U.S. jurisdictions or Canada.**

A. Correct.

**Q. Are there other claims pending out there in other jurisdictions right now?**

A. Against Grace?

**Q. Yes.**

PP's Obj: R; BE

A. I am not personally aware of any such claims, but there have been claims brought against other trusts by

PP's Obj: R; BE

non-residents of the United States and Canada. So, therefore, since it's possible, you put in a provision that deals with the possibility that it might occur in this case.

I mean, this is sort of a standard provision nowadays in these trusts. I don't think it's responsive to anything particular in the Grace case. But, as I say, I just don't remember any such claims.

**Q. All right. Can you turn to page 31?**

A. I am there.

**Q. The paragraph that begins, "with respect"?**

A. Yes.

**Q. About halfway down the sentence that begins "The choice of law provision..."?**

A. Yes.

**Q. What is the purpose of this provision?**

A. Let me refresh my memory on

this. Well, the first sentence has to be taken into context with the second.

**Q. Okay.**

A. The first sentence was put in because there is a prohibition on the payment of punitive damages. At some point along the way, through an objection to one of the prior plans, it was brought to the attention of the ACCs that in Alabama, the only way you could assert a wrongful death claim is to call it a punitive damage claim, even though you were getting compensatory damages under the wrongful death statute. And that was felt to be basically unfair to Alabama wrongful death claimants.

But, on the other hand, you didn't simply want to eliminate the prohibition on real punitive damages in Alabama. So what you did was you said we will apply a different jurisdiction; we will apply Pennsylvania, which is where the court was sitting in that Plan in which this Plan was copied, which makes a

distinction between wrongful death claims and punitive damage claims.

So if an Alabama claim comes in, you look to Pennsylvania law to see whether it would be treated as a punitive damages claim or a wrongful death compensatory damages claim.

The second sentence has to do with let's assume an Alabama claimant brings a claim in Texas and the Texas court was going to apply Alabama law, you would want to have the same provision apply to that choice of law claim as applied if the claim had been brought in Alabama in the first place. And I think that kicks you back up to -- and there was also the notion that with respect to -- this was put in with respect to insurers who were taking the position that it was arbitrary to sort to reclassify Alabama punitive damages claims as something else.

So it basically says this reclassification only applies to the

Trust, and if the Trust presents some Alabama claim, decided under Pennsylvania law to be not a punitive damages claim to an insurer for reimbursement and the insurer says this is a punitive damage claim, I am not going to pay it because my policy doesn't cover punitive damage claims, then what this does is preserve that argument in a form of insurance neutrality, if you will, to that insurance company because it says that this provision is binding only on the Trust and the claimants. It's not binding on the insurance company.

CI

**Q. Okay. That was a fair explanation.**

**I am going to skip over 5.6 because we have been there.**

**Okay. Let me direct your attention to Section 5.7(b)(3), specifically the last full paragraph and the last sentence of that paragraph.**

A. Yes.

**Q. What's the purpose of that**

PP's Obj: R; BE

CI

**provision?**

A. As I understand it, that provision is intended to deal with the following situation: A plaintiff in the court system isn't suing the Trust because the Trust has a channelling injunction to go through a proof of claim process. Similarly, a claimant making a proof of claim against another bankruptcy trust under the TDPs for those trusts is only generally required to produce evidence of exposure to the product of the Debtor, whose liability is that bankruptcy trust has assumed.

As a result, plaintiffs would not normally identify Grace products as among the asbestos-containing products to which they were exposed and a suit against other defendants or in a claim against another bankruptcy trust.

And what this says is the Trust can't say, well, gee, you sued Owens Illinois and you said you were exposed to Owens Illinois products, but

PP's Obj: R; BE

CI

PP's Obj: R; BE

nothing in your complaint says you were exposed to Grace products, so I am going to treat the absence of an allegation of exposure to Grace products in the Owens Illinois suit as an omission that you weren't exposed to Grace products. Having said that, you still have to prove that you were exposed to Grace products to get money out of this Trust.

**Q. And how do you do that? Let's assume for the moment that the theoretical plaintiff we are talking about in the tort case was asked in a deposition, tell me all the products that you were exposed to that contained asbestos and he went through a list of all the products of all the defendants in that case but didn't mention any products from Grace.**

**He still gets to come in and make a claim against the Grace Trust, correct?**

A. Let me put it to you this way: Anybody can commit fraud. If a

CI

PP's Obj: R; BE

plaintiff files under oath statements that this is 100 percent guaranteed the only products, asbestos-containing products, that I was ever exposed to and then turns around without any new or additional discovered evidence or anything else and basically lies in the declaration of -- the various evidentiary materials that he produces in support of his proof of claim, then that plaintiff could probably get away with defrauding this Trust, just like plaintiffs can get away with lying whether they got exposed to Owens Illinois products in the suit against Owens Illinois.

So, yes, there is nothing much you can do to write in a document that says thou shalt not commit fraud and get away with it.

**Q. All right. Let's go to Section 5.8, Claims Audit Program.**

A. Yes.

**Q. I want to direct your attention to the first paragraph, last**

CI

PP's Obj: R; BE

**sentence, "In the event that PI Trust reasonably determines that any individual or entity has engaged in a pattern or practice providing unreliable medical evidence to the PI Trust, it may decline to accept additional evidence from such provider in the future."**

**It's not required to; it may, correct?**

A. Yes.

**Q. Okay. What role, if any, does the TAC play in deciding whether the PI Trust will accept additional evidence from that provider in the future?**

A. I don't know that there is anything specific in the TDP that tells you the answer to that.

I believe in practice, the trustees would probably consult the TAC to get the TAC's views on the subject, which they might or might not accept, depending on what the views were. Certainly, a number of trusts have refused to take B reads from some or all

CI

PP's Obj: R; BE

of the so-called Judge Jack doctors.

**Q. I was going to call this the Judge Jack provision.**

**Does an individual TAC member have a role in that decision even if the medical provider was for one of that TAC member's clients?**

CI

MR. FINCH: Object to form.

PP's Obj: R

THE WITNESS: Well, again, the TAC doesn't have any role in the decision other than consultation. I suppose theoretically a TAC member could express his views on whether or not a particular medical provider that had done work for him or his clients was a sufficiently bad actor to be disqualified. The trustees, however, are the ones that are going to make that decision, not the TAC member.

MR. BROWN: I am going to suggest a short break because I think I am getting close to the

the indemnity covers that claim, which, if it does and you can't get it back from the plaintiff, then it would be channelled to the Trust, I guess.

BY MR. BROWN:

**Q. And subject to the payment percentage?**

A. And subject to the payment percentage.

**Q. Okay. Let me direct your attention again to 6.4, which is entitled Filing Requirements and Fees.**

A. Yes.

**Q. It says, "The trustees shall have the discretion to determine, with the consent of the TAC and Futures Representative, (a) whether a claimant must have previously filed an asbestos-related personal injury claim in the tort system to be eligible to file the claim with the PI Trust..."**

**What exactly does that mean?**

A. That is a provision that it

was put in as a precautionary mechanism to deal with the possibility that the trustees could conclude that a large number of plaintiffs lawyers were only filing claims against bankruptcy trusts, that were not filing the claims against solvent defendants in the tort system.

And the concept would be that if that practice arose and became widespread, it would create a possible indicia of claims that were really not legitimate, that people were violating -- it would mostly come up -- the concern was where it would come up with is in the Category 1 claims, which you would get a minimal amount of money on minimal amount of proof. It was sort of what in bankruptcy cases would be regarded as a convenience class.

And the idea would be if you were filing a bunch of claims with a bunch of trusts and not in the tort system and were getting a hundred bucks from this Trust and 200 bucks from that

Trust and whatever, that if a Trust put in either a requirement that you had to file the claim against somebody in the tort system or alternatively you imposed a filing fee in the Trust of 50 or a hundred bucks, it would render the practice unprofitable enough that it would go away.

To my knowledge, I don't think any -- this is a fairly standard provision in these Trust TDPs. I don't think it's ever been invoked by any trust so far, because I don't think that the perception has arisen that the problem of the sort I described has become widespread, but that's my understanding of the rationale behind it.

**Q. Okay. Now, I would like to direct you to --**

A. Again, Mr. Inselbuch would have more definitive knowledge on that subject than I would. So if he says something different, I would stand to be corrected by him.

**Q. Okay. His answers will supersede yours then?**

A. Almost assuredly.

MR. SHINER: Are you volunteering him for deposition?

THE WITNESS: He's already been identified. His deposition is set for June 12th.

CE

PP's Obj: R, BE

BY MR. BROWN:

**Q. Let's put the TDPs aside, Mr. Lockwood. Did we mark earlier the Cooperation Agreement?**

A. Not that I recall.

**Q. I know we talked about it.**

**(ACC 30(b)(6)-12 marked for identification at this time.)**

THE WITNESS: Okay.

BY MR. BROWN:

**Q. Mr. Lockwood, we talked about this document, titled the Cooperation Agreement, marked ACC-12, a bit earlier in your deposition.**

**And as I understand this, this document is designed, in part, to**

CI

**enable the Asbestos PI Trust to comply with whatever obligations it might have under asbestos insurance policies in the event that it elects to seek insurance coverage for claims. And it requires the Reorganized Debtors to maintain a whole host of documents in various databases and so forth that are described.**

**Is that a fair generalization of the document?**

A. Yeah, I think so.

**Q. Okay. Now, is there any requirement vis-a-vie the Reorganized Debtors and the asbestos insurance entities that this information be preserved for purposes of coverage litigation or frankly underlying litigation?**

A. Do you mean is there somewhere in the Plan documents a direct undertaking writing for the Reorganized Debtors to the insurers as opposed to the Reorganized Debtors to the Trust?

**Q. Right.**

CI

A. I don't believe so.

**Q. Does the Trust contemplate maintaining these documents imperpituity or requiring the Reorganized Debtors to do so?**

A. The Trust doesn't exist, so the Trust doesn't contemplate anything.

**Q. All right. Does the ACC contemplate that the Trust will, for the life of the Trust, have these documents preserved?**

A. The ACC contemplates that the trustees will, based on the facts and circumstances in the future as to what their relationships are with respect to insurers, do what their fiduciary obligations to maximize insurance coverage for the benefit of their beneficiaries will require.

**Q. All right. You can put that aside.**

**The TDPs have a payment percentage that we talked about?**

A. Correct.

PP's Obj: R, BE

**Q. And to the extent that a claim gets paid, it's subject to the payment percentage; is that your understanding?**

A. Correct.

**Q. Now, if the Asbestos PI Trust pays as PI claim and it only pays the schedule value times the payment percentage to the claimant, is the Asbestos PI Trust able to recoup the entire schedule value from the insurers?**

A. That depends on, A, whatever agreements might exist that relate to that subject that bind the Trust and, B, what some coverage court might decide are the insurers' coverage obligations if there is some dispute over that issue.

**Q. Is there a difference between insurers that have Insurance Pi Reimbursement Agreements, I believe they are called, as opposed to insurers that are unsettled?**

A. I would say potentially, yes.

PP's Obj: R, BE

**Q. What's the nature of the difference?**

A. As a general proposition, the reimbursement agreements --

(There was an interruption at this time.)

THE WITNESS: My recollection is that as a general proposition, the reimbursement agreements provide for a specific amount of reimbursement expressed as a percentage or for some other basis of amounts that Grace paid in claims prior to the bankruptcy.

There is obviously a much stronger argument that if the Trust succeeds to those agreements, as we advocate that it should, that the Trust rights would be the same as Grace's were.

There might be arguments to a different effect, but certainly, there is a pretty strong argument that based on the pre-petition

I hear you; I understand that you are hypothesizing something. But I can't see how it can ever come to pass. And so I have no idea. If a PD claim -- I mean, I have never considered -- I don't know the answer to that hypothetical question. I just know I don't think it can happen.

**Q. Okay. Under Travelers' other agreement, which was a fully settled agreement -- and I am not going to put it in front of you right now; I don't think it's necessary -- but to the extent there is indemnification for non-asbestos claims, how does that indemnification claim get addressed in the Plan?**

A. I think --

MS. HARDING: Objection to form.

MR. FINCH: Objection, asked and answered, I think.

MS. ALCABES: I don't think it's been answered.

THE WITNESS: I think the answer was I am not aware of any non-asbestos claims that could be brought against that coverage. But if it's not an asbestos PI claim, then it isn't channelled to the Trust and it's a claim against Grace. And it would be handled however claims against Grace get handled under the Plan.

BY MS. ALCABES:

**Q. Potentially as a Class 9 claim?**

A. To the extent, however the Class 9 claims get treated, presents, futures, contingent, whatever.

**Q. So, for example, if an environmental claim came up that had nothing to do with asbestos and there is a claim against Travelers that would trigger the indemnity in its fully settled agreement, that's a claim that would be addressed separate and apart from how claims were addressed in Class 6**

**and Class 7, right?**

MR. FINCH: Objection.

MS. HARDING: Objection to form.

THE WITNESS: That's my understanding of the way the Plan works.

BY MS. ALCABES:

**Q. Just getting back to one follow-up question along the lines that Michael was asking you about the retention of any rights under policies that are being transferred under the Transfer Agreement.**

**Can you just turn to the TDPs -- I am sorry. Let me strike that. I will get back to that.**

**You agree that the reimbursement agreements are not subject to the insurance neutrality provisions, correct?**

A. Correct.

MS. ALCABES: Can you give me five minutes, and I will take a

break for five minutes and re-group and see if we can wrap it up.

(There was a break from 5:02 p.m. to 5:19 p.m.)

BY MS. ALCABES:

**Q. Can you turn to Lockwood Exhibit-4, which is Exhibit-6 to the Plan. It is the Transfer Agreement.**

A. Yes.

**Q. And turn to page 3. It's Section 2(c). And this is going back to some other questions that Michael asked you about, the rights that Grace may be retaining under the policies that are being transferred.**

**The last sentence of that paragraph starts, "Upon the Effective Date, the Insurance Contributors shall cede to the Asbestos PI Trust all control of the pursuit of any and all claims with respect to any Asbestos Insurance Policy..."**

**Do you see that?**

CI

PP's Obj: R, BE

CI

PP's Obj: R, BE

A. Yes.

**Q. Actually let me finish it.**

**"...under any Asbestos Insurance Policy, Asbestos Insurance Settlement Agreement, Asbestos In-Place Insurance Coverage, or Asbestos Insurance Reimbursement Agreement, and the Asbestos PI Trust shall have the right to control and direct the choice of counsel and conduct of all such proceedings."**

**So that seems to suggest that, in fact, Grace is retaining no control over the policies that are the subject of the Transfer Agreement; would you agree?**

MS. HARDING: Object to the form.

CI PP's Obj: R, BE

THE WITNESS: Well, I don't know whether there is a distinction between control of the policies. I mean, what this talks about is control, the pursuit of any and all claims with respect to the policies.

CI

And it is my understanding that as to the asbestos insurers policies that are illuminated in the various schedules and definition and the other agreements, that Grace is transferring the rights under those policies and the Trust has control over them.

For example, if it wants to settle with an insurer, it can settle the entire policy buyback, if you will, and that there is no retained insurance rights that Grace has under those policies, yes.

BY MS. ALCABES:

**Q. So if Grace wanted to tender a claim a non-asbestos claim under the policies, it would have to go to the Trust?**

A. I don't think --

MS. HARDING: Object to the form.

CI

PP's Obj: R, BE

THE WITNESS: I don't think it has any right to tender any claims, period. The Trust hasn't agreed to act as some sort of front person for Grace to tender non-asbestos claims. This is an economic deal.

These policies that don't have asbestos exclusions, et cetera, et cetera, that are defined in this thing are the rights under those policies for coverage are being assigned to this Trust as part of the deal. And Grace isn't retaining some economic interest in those policies, according to my understanding of this Plan.

MS. ALCABES: Okay. Let's mark one last exhibit.

(ACC 30(b)(6)-16 marked for identification at this time.)

THE WITNESS: I have it.

BY MS. ALCABES:

PP's Obj: R, BE

**Q. Okay. These are Travelers -- sorry -- the Debtors' Responses to RFA served by Travelers.**

**Do you see that?**

A. Yes.

**Q. Did you see these RFA responses before they were served on Travelers?**

A. Yes.

**Q. And do you concur with all the responses were provided by the Debtors?**

A. Best I can recall, we did.

**Q. So can you turn to Request to Admit Nos. 15 and 16. They sort of go hand in hand. It's on the last page, page 13 of the RFA responses.**

A. Yes, I see them.

**Q. And the request is to admit that the 1996 agreement is an executory contract, and that request is denied.**

A. I thought it was 1992 agreement.

**Q. I am reading from page 13.**

A. Well, the answer to that is, first, normally the punitive or potential indirect claimant, as a defendant in the state court action, would have the right to get discovery from the plaintiff. And that discovery in many jurisdictions, if not most, would include discovery of the plaintiff as to whether that plaintiff had filed claims with any Trust, including the prospective Grace Trust.

If the state court, for some reason or another, said that that discovery against the plaintiff would not be permitted, it seems unlikely that discovery of the same information from a Trust would be permitted because the hypothesis -- by hypothesis, the state law doesn't regard it as relevant. So under normal circumstances, it's hard to imagine why an indirect claimant would ever need discovery from a Trust.

That stated, there are provisions in Section 6.5 that allow indirect claimants or anybody else to try

and get a subpoena from a court, either the Bankruptcy Court or the Delaware Court or the United States Court for the District of Delaware, for such records. And whichever court that subpoena is sought to be issued from will decide whether or not the prospective indirect claimant, because you won't be an indirect claimant until you lose the suit with the plaintiff -- whether that prospective indirect claimant will or will not be given access to that information by the Trust. But the first line of attack is getting it from the plaintiff.

And I might add, other than the recitation that the submission and the proof of claim is part of settlement discussions, which is simply a view like any defendant and a plaintiff might say we agree that our settlement discussions and our settlement agreement is confidential, whether or not that makes it non discoverable to a third party that

isn't bound by the settlement agreement is a matter, again, of federal or state applicable non-bankruptcy law.

**Q. But as you interpret the TDP then, there is not an outright prohibition from a Payne in discovery against the Trust?**

A. No.

**Q. Okay.**

MS. COBB: Well, those are my questions, and I reserve the right to ask follow-up questions, depending upon the progression of the questioning by the insurers. But I will pass the witness to Mr. Cohn.

MR. DANIEL COHN: Thank you.

MS. COBB: And thank you for your courtesy, Dan.

MR. DANIEL COHN: You are very welcome.

\- - -

EXAMINATION

\- - -

CI

BY MR. DANIEL COHN:

PP's Obj: R

**Q. All right. Mr. Lockwood, you are the representative of the Asbestos PI Committee who is most knowledgeable on the topics as to which the Libby claimants have designated a Rule 30(b)(6) deposition?**

A. Most knowledgeable about the full range of the topics. There might be individual topics that I might defer, as I have in a few questions earlier, for example, to my partner, Mr. Inselbuch, whose deposition is scheduled, but yes.

**Q. And if I may, I want to start off with a couple of matters of terminology. When I use the term "Libby claimants," I am referring to the clients of my firm who are people who allege that they have suffered personal injury from exposure to asbestos of Grace in Lincoln County, Montana.**

A. Okay.

**Q. And the other terminological matter I want to get straight is that,**

**whenever possible, I will try to use terms that are defined in the Plan for the sake of clarity. And when I use a term that is defined in the Plan, I am using it with the meaning so defined.**

A. Okay.

**Q. And may I ask that when you give answers, that you use terms that are defined in the Plan, and that unless you otherwise explain it to me, I will assume that you are using that term with the definition defined in the Plan?**

A. If I use the term in an answer, I will try and make sure that I am using it as defined in the Plan.

CI PP's Obj: R

**Q. All right. Referring to Exhibit-3, which is -- and I am sorry. Not Plan Exhibit-3.**

A. Okay.

**Q. ACC Exhibit-3.**

MS. HARDING: Can you remind me what that is, please?

CI PP's Obj: R

MR. DANIEL COHN: That's the Form 8-K with the Term Sheet

CI PP's Obj: R

attached.

THE WITNESS: I have it.

BY MR. DANIEL COHN:

**Q. Who negotiated the deal that's embodied in that Term Sheet on behalf of the Asbestos PI Committee?**

MR. FINCH: Objection.

MS. HARDING: Objection.

MR. FINCH: To the extent it enters into Plan negotiations, I am not sure how it relevant to the confirmation here.

MS. HARDING: Same objection.

CI PP's Obj: R

THE WITNESS: Are you instructing me to answer it?

MR. FINCH: I will let you answer that question, and we will see how far it goes.

CI PP's Obj: R

THE WITNESS: I am not entirely sure I remember accurately who the parties were, and it also depends on what you mean by involved in negotiating.

CI PP's Obj: R

There were direct negotiations between sort of principals, if you will, and then there were other people, like, myself, that were involved in commenting on drafts of the Term Sheet to other people on their side.

But taking the term and meaning of who was face-to-face, my recollection is that on behalf of the ACC, it was a combination of what was designated or called a negotiating subcommittee of the ACC, and my partner, Mr. Inselbuch.

The people on the negotiating subcommittee, I believe, included Joe Rice, Russell Budd, and I think Perry Weitz and John Cooney, but I am not positive about that. But I believe it was those four. It could have been three, but I think it was those four.

BY MR. DANIEL COHEN:

**Q. And was the Libby claimant representative on the committee a member of the negotiating subcommittee?**

A. Not to the best of my recollection.

**Q. Was the Term Sheet submitted to a vote by the committee?**

MS. HARDING: Objection.

THE WITNESS: Well, I don't know whether the Term Sheet in precisely the form that it exists in Exhibit-3 was submitted for a vote, but certainly a document embodying the terms of the Term Sheet was submitted to a vote of the committee.

BY MR. DANIEL COHEN:

**Q. And did that vote result in approval of the deal?**

A. Yes.

**Q. How did the Libby claimants vote?**

A. I don't recall, but I am

terms from the previous plans that I am aware of.

**Q. As the ACC's designee to take this 30(b)(6) deposition, would you be aware if there were such an agreement?**

A. I believe I would be, yeah.

**Q. What agreements, if any, were struck at the time of ACC Exhibit-3 concerning how Libby claimants' claims would be treated?**

A. Other than that they would be part of the asbestos claimants whose claims would be channelled to the Trust and whose consideration would be paid out of the assets that were to be contributed to the asbestos Trust under the Term Sheet, there were no agreements that I am aware of.

**Q. Were there any agreements concerning who would bear responsibility for restitution claims, if any, in connection with the criminal trial now going on in Montana?**

MS. HARDING: Object to

form.

THE WITNESS: I don't believe there were at that time, no.

BY MR. DANIEL COHN:

**Q. Have there been any agreement on that subject since then?**

A. Well, there is provisions in the Plan that speak to that, so yes.

**Q. Apart from provisions of the Plan, are there any agreements between the Asbestos PI Committee and any of the other Plan proponents on the subject matter of the Plan?**

A. The Plan embodies the agreements. There are no side agreements, oral or written, that vary from the Plan that I am aware of. And, indeed, I would be very surprised if I was not aware -- if there were any that I was not aware of.

**Q. All right. And one last question on this subject. It has been known from time to time for the**

**co-proponents of a Plan to enter into a co-proponent agreement governing that relationship. Is there any such agreement, written or orally?**

A. No. Well, you say written or oral. There is certainly no written agreement of that. I mean, the Plan itself -- other than the Plan itself. I mean, when you sign on to a Plan, is the Plan proponent with somebody else is a Plan proponent. That's in a written document, and we have sort of agreed.

But if you are talking about some oral agreement that says this binds us outside the Plan or -- I am not sure really what kind of agreement you have in mind. But, as far as I am aware, there isn't any such other than what's reflected in the Plan itself.

MR. FINCH: The parties to the Plan also, to the extent there are issues in common, there may well be a common interest privilege for purposes of

discovery and litigation of confirmation objections. But those are not -- I would not regard those as any types of agreements you are questioning about.

BY MR. DANIEL COHN:

**Q. All right. Directing your attention now to ACC Exhibit-11, which is the TDP.**

A. I have it.

**Q. All right. Who drafted the TDP?**

MR. FINCH: Objection. This gets into Plan negotiations and drafting. I will let you answer that question, but we will see how it goes from there.

THE WITNESS: To some extent, Mr. Inselbuch may know more about this than I do. But I have a pretty good knowledge of it.

As I have previously

CI

CNA

CI

PP's Obj: R

PP's Obj: R

PP's Obj: R

CI CNA PP's Obj: R

mentioned in this deposition, this TDP in its inception was a sort of mark-up job on one of the previous TDPs from one of the previous bankruptcies that that had been confirmed. I don't recall, as I sit here today, which one it was, but it would have been one of the more recent ones.

It then, of course, had to be modified to reflect the particularities of Grace and the claims against Grace and what have you. And you have heard some testimony about things like Sections 5.12 and 5.13. The participants that did it were basically counsel for the ACC, counsel for the FCR, and members of the ACC itself in terms of reviewing and commenting on things, and the FCR himself.

The actual, physical drafting as opposed to the

CI CNA PP's Obj: R

commenting and what have you was, I believe, done by Caplin & Drysdale.

BY MR. DANIEL COHN:

**Q. What input, if any, did Grace have concerning the TDP?**

MS. HARDING: Objection with respect to negotiations.

CI PP's Obj: R

THE WITNESS: Well, it was a general proposition. Grace was furnished copies of drafts and afforded the opportunity to comment on them.

BY MR. DANIEL COHN:

CNA PP's Obj: R

**Q. And were any changes made to what sounds like an ACC FCR draft at the behest of Grace?**

MS. HARDING: Same objection.

CI PP's Obj: R, BE

THE WITNESS: I don't really recall.

BY MR. DANIEL COHN:

**Q. Directing your attention to Section 2.1 of the TDP.**

PP's Obj: R

A. I have it.

**Q. In the second sentence, there is reference to, and I quote, "...the intention of paying all claimants over time as equivalent a share as possible of the value of their claims based on historical values for substantially similar claims in the tort system."**

A. Yes.

**Q. Now, is that, in fact, the intention of the Asbestos PI Committee in respect to how the TDP should operate?**

A. The intention of the ACC on how the TDP should operate is expressed in all of the terms of the TDP. That particular aspirational sentence that you have plucked from the beginning of the TDP is not is not somehow or another a super-preemptory provision that controls all the other provisions in the Trust that somebody might think either were or were not in agreement with it.

**Q. In that phrase that I just**

PP's Obj: R

**read, what does the term "historical values" mean?**

A. Again, Mr. Inselbuch probably would have a more definitive knowledge of this, but my understanding is that it refers to the historical claims data primarily in this particular case from Grace with respect to settlements and judgments in the tort system as the starting point.

**Q. If that's the starting point, what else is meant by historical value?**

A. Well, again, this is boiler plate language from TDPs. In some cases, depending upon the facts of the case, the claims history of comparable defendants in the tort system is looked at.

The TDPs are generally drafted in consultation with the committees asbestos claims advisor which is usually, if not invariably, Mark Peterson, and depending on the amount of claims data available to Mr. Peterson

some extent, subject to referring you to Mr. Inselbuch about more specifics, the expedited review values are an average of a certain level nationally of claims of that category.

But an election to take expedited review is simply an election by the claimant or the claimant's lawyer that they will accept that amount for their claim. The historical value of that claim -- it could be higher or lower. I mean, the claim itself has no historical value, so you would be talking about the historical value of some other similar claim. And depending on what level of similarity you were opting for, the historical value of the claim might be higher or lower. So, I mean, the answer is no.

BY MR. DANIEL COHN:

**Q. All right. Let's add the assumption that both claims elect individual review and that the Trust upon examination of the claims concludes that each claim has an historical value of $100,000.**

**Should those claims be each liquidated for $100,000?**

MR. FINCH: Object to form.

MS. HARDING: Object to form.

THE WITNESS: The individual review process has a number of factors that are taken into account that are spelled out in the TDP, and some of those factors, as best I can recall -- and, again, this is something you probably want to explore with Mr. Inselbuch.

But, in general, some of those factors are related to history, and a lot of the factors are related to who the claimant is

and what the nature of his disease is. They are very individual specific.

And in individual review, the claims handlers, under my understanding, don't go back to the files and try and find some claim that's identical to this claim that they can could use to say it has a historical value of X and, therefore, we are going to apply it. They look at think claim, and they apply the criteria. And that's the value they come up with.

BY MR. DANIEL COHEN:

**Q. So if they do not do exactly what you said they don't do, which is to look for the closest historical analog to the claim, what standard do they apply?**

MS. HARDING: Object to form.

MR. FINCH: Objection to form.

THE WITNESS: They apply the standards set by the Trust when they go for individual review which are set forth in Section 5.3(b)(2) of the TDP. In Romanette -- well, it says, "The PI Trust shall thus take into consideration all of the factors that affect the severity of damages and values within the tort system," which would include the tort system as existed today, "including, but not limited to, credible evidence of..." Romanette (i) through (vi), some of which involve as in Romanette (vi) and Romanette (v), history.

BY MR. DANIEL COHN:

**Q. All right. Let me ask the question but not in terms of historical value but in terms of value in the tort system today.**

**Is the purpose of the 5.3(b)(2) criteria that you just referred**

PP's Ctr

**to to best approximate the value of the claim in the tort system today?**

MS. HARDING: Object to form.

MR. FINCH: Objection to form.

THE WITNESS: The purpose of the criteria -- again, Mr. Inselbuch may be better to this than I am.

But the purpose of the criteria is to negotiate about the claimant and his lawyer a deal that is acceptable to both of them. Because if you don't negotiate an acceptable deal in individual review, then you go to mediation, binding or nonbinding arbitration, and the tort system.

So at the end of the day, this is referred to as an alternative dispute resolution system for a reason, because that's what it is. You start out

with standing settlement offers in an effort to get rid of most of the claims without a lot of processing costs on the basis of values that are perceived to be likely to be acceptable because they are plus or minus some reasonable amount from various plaintiffs law firms' historical values. You move to individual review for people that want more than that and who think they can show they are entitled to it. And if you don't persuade them in the negotiation of individual review, you can wind up in the tort system with a judge and a jury deciding what the claim is worth, applying applicable non-bankruptcy law, which will not include, to my knowledge, anything about the historical settlements or the historical judgments experienced by the Debtor for whose

liabilities the Trust has assumed.

BY MR. DANIEL COHN:

**Q. Right. So the ultimate end point, if the alternative dispute resolution process does not succeed, is to go to the tort system and have a jury or judge, if that that gets elected, actually demonstrate the value of the claim in the tort system?**

A. That's correct. And these plans are drafted in the hope that you will eliminate that from happening in very many cases because, A, it produces widely disparate results and, B, it increases claims processing expenses by a very large margin.

And the experience of most of these trusts in other cases is that there are vanishingly few cases that ever wind up going into the tort system.

**Q. Well, let's talk for a minute about experience in other cases.**

**In other cases, if you can generalize, approximately what percentage**

**of claims are settled upon expedited review?**

MR. FINCH: Objection, lack of foundation.

MS. HARDING: Objection to form.

THE WITNESS: I have no knowledge of that. You can ask Mr. Inselbuch that. My bet is that he doesn't have any knowledge of that, either, but he might.

BY MR. DANIEL COHN:

**Q. You did say a moment ago, though, that vanishingly few claims in other cases end up in the tort system?**

A. That much, I have been told by people that work with the other trusts, but that's a narrative description.

I couldn't actually tell you whether it's one case a year or five cases or none. It's just not very many.

But when you start moving backward from that, how many cases go to

PP's Ctr

CI

PP's Ctr

PP's Ctr

PP's Ctr

PP's Obj: R BE

arbitration, how many cases go to individual review, what percentage goes to expedited review, each Trust does have records from which they can derive that information. And it may be that Mr. Inselbuch might have knowledge of some of that. I don't.

MR. FINCH: Grace ACC certainly doesn't.

BY MR. DANIEL COHN:

**Q. You have earlier testified that the starting point for the TDP was the TDP in some recent case; is that correct?**

A. That's my recollection.

**Q. And revisions were then made to address the specific needs of the Grace case; is that correct?**

A. Revisions over time were made. There had been multiple drafts of the TDP over the last -- I don't know -- eight months. And some of the earlier drafts got filed as in the September filing, and --

(There was an interruption at this time.)

BY MR. DANIEL COHN:

**Q. All right. Were any of those revisions made with the specific intention of addressing issues that had been raised by the Libby claimants?**

A. Yes.

**Q. Which ones? Or why don't you start off with one, and then we will go through it.**

A. I don't know that I will get a hundred percent of them, but for example, in expedited review categories in Section 5.3(a)(3), the category of severe disabling pleural disease, Level IV-B with its value and all of its criteria, to my knowledge, has never existed in any other TDP, in any other case before and was entirely a function of attempting to address concerns and demands raised by the Libby claimants. That's one that I know.

In addition to that, under

the Section 5.4(a) of the TDP, the creation of a eight times multiple for claimants whose exposure was 95 percent a result of exposure to an asbestos-containing product of Grace was new, and the standard one is the five times provision, which is also in here for 75 percent exposure.

There was another one that I was thinking about. Those are the two that jump out. I know there is at least another one that I was just thinking about and I have forgotten about.

MR. DANIEL COHN: Why don't we take a five-minute break, and perhaps you will remember in that period.

THE WITNESS: Well, I would just assume not take a five-minute break because I would like to get as much of this done as I can, and if every time I can't remember something we take a five-minute break, we will be here for a very

long time.

MR. DANIEL COHN: No, no. I was not meaning to set a precedent. But if you would like --

THE WITNESS: If it comes to me, I will volunteer it.

BY MR. DANIEL COHN:

**Q. All right. Then let's turn our attention to disease Level IV-B.**

**Is that the level that's labeled severe disabling pleural disease?**

A. Correct.

**Q. Would you please explain to me how that provision was designed to address Libby claims?**

MS. HARDING: Object to form to the extent that it's designed to address just Libby claims.

MR. FINCH: I join in that.

THE WITNESS: It was --

MS. HARDING: I think that's what you said, right?

MR. DANIEL COHN: Well --