# Deposition Designations for:

# PETER VAN N. LOCKWOOD
# May 4, 2009

**Deposition Designation Key**

**CI = Certain insurers (green)**

**CNA = Continental Cas. Co & Continental Ins. Co. (red)**

**PP's = Plan Proponents (blue)**

**Obj: = Objection**

**Ctr = Counter Designation**

**R = Relevance**

**BE = Best Evidence**

**F = Foundation**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - -

In Re: : Chapter 11
:
: Case No.
W.R. GRACE & CO., et al, : 01-01139 JKF
:
: (Jointly
Debtors : Administered)

- - -

Monday, May 4, 2009

- - -

Continuation of oral deposition of PETER VAN N. LOCKWOOD, ESQUIRE, taken pursuant to notice, was held at the offices of CAPLIN & DRYSDALE, One Thomas Circle N.W., Suite 1100, Washington, DC 20005, commencing at 12:05 p.m., on the above date, before Lori A. Zabielski, a Registered Professional Reporter and Notary Public in and for the Commonwealth of Pennsylvania.

- - -

MAGNA LEGAL SERVICES
Seven Penn Center
1635 Market Street
8th Floor
Philadelphia, Pennsylvania 19103

Key
CI = Certain Insurers (green)
CNA = Continental Casualty Co. & Continental Ins. Co. Cred)
PP = Plan Proponents (blue)
Obj: = Objection
Ctr. = Counter Designation
R = Relevance
BE = Best Evidence
F = Foundation

seeking disproportionate shares of insurance through direct actions or otherwise, the injunction was crafted in, I might add, many earlier cases than this one, perhaps not in precisely the same language, but the concept has been around for a while, to protect the Trust and its beneficiaries from having people do what I would call jumping the queue in getting disproportionate or attempting to get disproportionate shares of insurance that should be shared by all.

MR. COHN: Let's go off the record for a second.

(There was a discussion held off the record at this time.)

BY MR. COHN:

**Q. Directing your attention to what has been marked ACC 30(b)(6) Exhibit-4.**

A. Yes.

**Q. Namely, the Asbestos Insurance Transfer Agreement?**

A. Yes.

**Q. Which is Exhibit-6 to the Plan Exhibit Book.**

A. Yes.

**Q. Does that agreement assign to the Asbestos PI Trust the claims of individual asbestos PI claimants against insurers for their own misconduct?**

MR. FINCH: Object to form.

MR. SCHIAVONI: Objection to form.

THE WITNESS: I don't believe this agreement assigns claims to the Trust at all. This agreement assigns insurance rights, according to my understanding of the agreement. How claims wind up in the Trust is by the Asbestos Permanent Channelling Injunction.

BY MR. COHN:

**Q. So --**

A. And the Asbestos Insurance Injunction indirectly, perhaps. But primarily Asbestos Permanent Channelling

Injunction.

**Q. So the Asbestos PI Trust will not end up holding -- strike that.**

**Would the committee agree that the Asbestos PI Trust will not end up holding claims of individual asbestos PI claimants against insurers for their own misconduct?**

PP's Ctr

MS. BAIER: Objection to form.

MR. SCHIAVONI: Objection to form, and, in addition, I would say that the question calls for the waiver of privilege. And I would also ask Mr. Cohn that you identify the topic of on your 30(b)(6) notice that this is responsive to.

MS. BAIER: I would also object to form, especially to the word "holding."

I think it mischaracterizes what the testimony has been and confuses the issue by asking what

the Trust holds. I don't think the Trust holds things.

MR. FINCH: I object to form. I disagree that it calls for privileged information.

MR. COHN: With that, would the witness do his best.

THE WITNESS: The Trust certainly isn't going to hold any claims. It's going to have claims asserted against it. The people that hold the claims are the claimants.

PP's Ctr

With respect to this, the question about whether claims involving the, quote, I think you phrased it, independent tort liability of insurers, close quote, the problem I have answering that question is that it attempts to summarize in a single phrase, which does not necessarily have a precise legal meaning, a complicated set of questions

having to do with how the Asbestos Permanent Channelling Injunction works.

The provisions in the Asbestos Permanent Channelling Injunction are very complex. As a general proposition, however, I would say that the claims that are being channelled to the Asbestos Personal Injury Trust are claims that are against the Debtors or against various other entities defined as asbestos-protected parties that arise in the manner that satisfies the requirements of Section 524(g), which has very specific language about what can and cannot be channelled to an Asbestos Personal Injury Trust under that section.

What you are, in effect, trying to ask is does the phrase you have used fit within or without the terminology of Section

524(g) where the term as such is not used. So I can't really answer the question yes or no as stated.

All I can tell you is that the Asbestos Permanent Channelling Injunction, in my understanding, is not intended to channel to the Trust claims that Section 524(g) does not authorize to be channelled to the Trust.

BY MR. COHN:

**Q. All right. We have gone a little afield from the question, so if I can go back and ask what I meant to, and let's try it again.**

MR. SCHIAVONI: Again, Mr. Cohn, we would ask you to identify in the notice where it is you identify this as a topic, because to the extent Mr. Lockwood is not designated by the committee on it, it's not really a proper question to pose to him by another

committee member.

MR. COHN: It's covered by several of the topics, and I would really like to just go on.

BY MR. COHN:

**Q. So the question is, will claims of individual asbestos PI claimants against insurers for their own misconduct be an asset of the Asbestos PI Trust?**

MS. BAIER: Objection.

MR. FINCH: Objection to form.

MR. SCHIAVONI: I would object, asked and answered.

And I would remind Mr. Lockwood he has addressed this issue in other cases like Pittsburgh Corning and to the extent you need to go any further here, I think it raises a whole host of issues about waiver.

MS. DeCRISTOFARO: Note my objection, too.

THE WITNESS: Would you read back the question, please?

(The reporter read from the record as requested.)

MS. DeCRISTOFARO: Objection.

MR. FINCH: Objection.

THE WITNESS: As phrased, the answer to that question is unequivocally no.

MR. COHN: Thank you.

BY MR. COHN:

**Q. Now, directing your attention to the Asbestos Insurance Entity Injunction, if an asbestos PI claimant has a claim against an insurer based on the insurer's own alleged misconduct, does the Asbestos Insurance Entity Injunction bar him from asserting that claim?**

MR. FINCH: Objection.

MR. SCHIAVONI: Objection, calls for a legal conclusion and objection to form and the other

extent that the proceeds of those settlements wind up in the Grace Trust as opposed to the Grace Estate for distribution to other people, they are a settlement part of Grace's contribution to the Trust.

**Q. Has the ACC attempted to apportion or value those portions of the contributions made by Grace that are upon Grace's behalf versus upon the insurer's behalf?**

MR. FINCH: You can answer that yes or no.

THE WITNESS: Well, I will answer it no and add I am not sure how anybody could go about doing that. It's what is known as a lump sum deal.

MS. CASEY: I have no further questions.

MR. SCHIAVONI: Actually, could we let Mr. Speights from South Carolina go first.

MR. FINCH: You are up, Dan.

CI

\- - -

EXAMINATION

\- - -

BY MR. SPEIGHTS:

**Q. Mr. Lockwood, were you involved in the negotiation of the 524 -- strike that.**

**Were you involved in the --**

MS. BAIER: Dan, can you speak up or come closer to the phone or something?

THE WITNESS: Nobody can hear you.

MR. SPEIGHTS: I picked up the phone. I am not on speaker.

MR. FINCH: Now we can hear you.

THE WITNESS: That's better.

MR. FINCH: That's better.

BY MR. SPEIGHTS:

**Q. Let me start over again. Mr. Lockwood, were you involved in the negotiation of the 524(g) statute?**

A. Me personally?

MR. FINCH: Objection, foundation.

BY MR. SPEIGHTS:

**Q. Yes, you personally.**

A. No.

**Q. Was your law firm?**

MR. FINCH: Objection, form, foundation, relevance.

THE WITNESS: It depends on how you define negotiations when it comes to dealing with a congressional enactment. My partner, Mr. Inselbuch, to my knowledge, had at least one meeting with Senator Heflin on the subject of the statute.

What other discussions, either in committee or outside committee or whatever, Mr. Inselbuch might have been involved with, I really don't know. But he's being deposed on June 12th, and I guess you could ask him.

PP's Obj: R, BE

BY MR. SPEIGHTS:

**Q. Would you agree with me that the 524(g) statute always refers to the word "Trust" in singular rather than plural?**

A. I would have to go back and look at the statute to be sure of that. If you tell me it does, I am not going to argue with you about it.

**Q. Well, I am actually not going to tell you anything. But if you don't recall without looking at the statute, I certainly would accept that answer.**

A. I do not specifically recall without looking at the statute.

**Q. Do you recall any bankruptcy that was contested and provides for two asbestos trusts, two or more asbestos trusts?**

A. Do you mean a bankruptcy where the Plan proposed to create two trusts, and somebody said there could only be one and that was the contest and

CI

the court ruled on that?
**Q. I will accept that.**
A. I don't think I do recall any such bankruptcy.
**Q. How many bankruptcies do you recall where there had been separate trusts of property damage and personal injury?**
A. As I sit here right now, I can't think of one. I believe there have been some, but I am hard-pressed to identify one from memory. This was not a topic I was prepared to deal with:
My recollection, however, is there were a number of bankruptcies in which there was no property damage trust at all, whether separate or as part of a single trust to which PI trusts were also channelled.
**Q. Mr. Lockwood, what was the status of the PI estimation proceedings when the ACC agreed, at least in principle, with the Debtors to resolve this bankruptcy?**

A. There are others that are probably better equipped to be precise about that than I, but my general recollection was that I believe that Grace had basically completed putting on its case. And it was before the PI and FCR were putting on their case.
But I really was not -- unlike Mr. Finch, who is sitting here next to me, who actually was involved in trying that case, I wasn't. So I could be wrong about that.
**Q. Well, maybe you could represent Mr. Finch, and I could question him.**
**Regardless -- and by the way --**
A. Suffice it to say, there had been a lot of witnesses put on by Grace at the time the case was over -- excuse me -- was postponed.
**Q. What was your understanding of Grace's position of the total amount that should be paid to asbestos PI**

PP's Obj: R, BE

**claimants, both present and future, whenever it ended its presentation of the estimation?**
MS. BAIER: Objection as to form.
MR. FINCH: Object to form.
THE WITNESS: My recollection is that Grace had various numbers on the table from various witnesses, but they were all way too low.
BY MR. SPEIGHTS:
**Q. Well, what is your recollection of the last number they were using before you settled?**
MS. BAIER: Objection as to form.
MR. FINCH: Object form and lack of -- well, maybe not lack of foundation but lack of recall.
THE WITNESS: When you say "they were using," using in what context?
BY MR. SPEIGHTS:

**Q. Well, what is your understanding of Grace's last position of the total amount that should be paid to asbestos present and future PI claimants before the deal was negotiated with the ACC?**
MS. BAIER: Objection to form.
MR. FINCH: Mr. Speights, are you asking for his recollection of what is the estimate of the total present and future liability for asbestos PI claims put forward through the testimony of Tom Florence in his expert report and testimony that occurred on March 31st, 2008, two days before the company rested its case?
MR. SPEIGHTS: Well, that wasn't my question, but I will ask that. If Mr. Lockwood knows the answer to that, maybe that will suffice.

nature of the general objection?

MR. FREEDMAN: The nature of the general objection is that they are presenting hypotheticals, which the witness can't answer and, as a result, require him to set forth opinions about things that are beyond what he should be testifying to in the 30(b)(6) deposition.

MR. SCHIAVONI: That's been 90 percent of the testimony, hypotheticals.

MR. FREEDMAN: Well, I am stating this objection to this line of questions. You have done well on everything else.

BY MR. SPEIGHTS:

**Q. Mr. Lockwood, I am going to try to wind up in less than ten minutes.**

MR. FINCH: Mr. Speights, before you wind up, can we take a two-minute break?

MR. SPEIGHTS: That will be

fine, if it's two minutes.

MR. FINCH: It's two minutes. Off the record.

(There was a break from 3:17 p.m. to 3:20.)

PP's Obj: R, BE

CI

BY MR. SPEIGHTS:

PP's Obj: R, BE

CNA

**Q. Mr. Lockwood, has trustees been selected for the PI Trust?**

A. Yes.

**Q. Have they been revealed?**

A. Their names are set forth at the end of the PI Trust Agreement. The second-to-last page is a signature page which names three individuals, Harry Huge, Lewis Sifford, and Dean Trafelet, as the three prospective trustees.

**Q. Did the ACC choose these three people?**

A. The ACC and the FCR consulted each other on these three prospective individuals and then proposed them to the co-proponents and the co-proponents accepted them.

**Q. Had the ACC or the FCR**

CI

PP's Obj: R, BE

**proposed any other person to the co-proponent which they did not accept?**

A. Not that I recall.

**Q. Has the ACC chosen an entity to administer the Trust?**

A. Not to my knowledge. Indeed, I don't believe the ACC is capable of making that choice. I believe under the Trust Agreement, the trustees are the only parties with the authority to make that decision.

**Q. Is statute of limitations a legal defense in the Trust Distribution Procedures?**

A. To the extent --

**Q. To any claim?**

A. Yes, to the extent so provided in the TDPs. What I mean by that is there are one or more provisions that address that subject in which the statute of limitations is made applicable.

**Q. And if I sit down tonight and very carefully review again this**

**Trust Distribution Procedure for the Grace PI Trust, I will find statute of limitations somewhere?**

A. Somewhere in there, it is my best recollection that there is a provision, one or more provisions, that address statute of limitations.

I might be able to find it, if you really wanted me to root around in it for a while here. I can't from memory remember exactly where it shows up, but I am --

**Q. Well, I actually don't want you to do that.**

A. Okay.

**Q. But I would request you or your attorney --**

A. Okay. It's Section 5.1(a)(2) of the TDP is at least one place. It's captioned Effect of Statutes of Limitation and Repose. It starts at page 16 of the TDP and extends over to page 17. There may be possibly other places where statute of limitations

the same position and give the same instruction.

If you ask about questions that Libby claimants have taken in papers filed in the court, for example, in a Disclosure Statement objections and the bullet point Plan objections and the committee's responses made to that in open court, I will permit Mr. Lockwood certainly to answer those questions.

But anything that gets into communications with between the Libby claimants with the rest of the ACC or counsel for the ACC about their respective views of insurance coverage, I am going to take the position as privileged.

And so I think you have to do it on a question-by-question basis, but that's my general position.

BY MR. SCHIAVONI:

**Q. Okay. Mr. Lockwood, I just have one other brief topic. And here is the first question on that: Does the Plan purport to release claims that may exist between insurers and Non-Debtors?**

MR. FINCH: Objection, form, broad, vague.

THE WITNESS: Phrased as broadly as you have, I think the answer is yes.

MR. SCHIAVONI: Okay. Thank you. I have no further questions.

MR. FINCH: Is there anyone else in the room who has questions?

MR. BROWN: I have some follow-ups.

MR. FINCH: Is there anyone else on the telephone who has not asked questions yet who has questions?

(No response.)

MR. FINCH: Hearing no affirmative response, I will let

you have follow-up until we run out of time.

(There was a discussion held off the record at this time.)

(There was a break from 3:55 p.m. to 4:03 p.m.)

\- - -

EXAMINATION

\- - -

BY MR. BROWN:

**Q. Mr. Lockwood, just a couple of follow-ups. The court reporter is actually going to read back a question and answer. I think it's probably easier to do that, and then I will ask my follow-up question. It was end of Mr. Wisler's questioning of you.**

A. Okay.

(The reporter read from the record as requested.)

BY MR. BROWN:

**Q. And after that, Mr. Lockwood, Mr. Wisler asked you a follow-up as to what type of claim it**

**would be.**

**And is it correct that the ACC does not have a position on what type of claim it would be if it's not a Class 6 claim?**

A. Well, the ACC doesn't, as such, have positions on hypothetical questions. So, yes, the ACC doesn't have a position on that issue. The ACC -- well, I will leave it at that.

**Q. On Friday, Mr. Cohn asked you a question, who drafted the TDP. That was the question, and you gave an answer which I am happy to show you the full answer. But I WANT to repeat a portion of your answer. You said: "The participants that did it were basically counsel for the ACC, counsel for the FCR, and members of the ACC itself in terms of reviewing and commenting on things, and the FCR himself."**

**When you said the ACC itself, what did you mean?**

A. I meant --

PPs Ctr

**Q. I am sorry. When you said members of the ACC itself, what members are you talking about?**

A. Well, I was referring to the personal injury counsel who were the delegated representatives of the individual ACC members, if that's what you are driving at.

**Q. That's what I am driving at. And who specifically were they?**

A. As far as I know -- well, the way in which the process works, in general, is sometimes the ACC has in-person meetings, sometimes it has telephonic meetings, sometimes documents get sent to it by email as PDF attachments or whatever, and the ACC has asked do you want to have a meeting or is this good enough for you. So there is a variety of ways in which the ACC views an input as obtained.

And my answer was simply that at the conclusion of a process, the

PPs Ctr

members of the ACC had weighed in in one or more of the ways in which I had described some of them had; they all had the opportunity to express their views; and, therefore, the final product was the product of their input. And there was a final vote to go forward with the document.

**Q. Okay. And when you say the members, you are talking about their actual personal injury counsel?**

A. As far as I know. But, again, I couldn't tell you whether an individual personal injury lawyer might have consulted with his client, the member, on one or more aspects of the TDP or, for that matter, even sent the client a copy of the entire TDP and had a discussion with him about it. I certainly couldn't exclude that.

**Q. Can you tell me the list of counsel that you are talking about, the actual names?**

A. They would be -- as a

general proposition, I believe they are in the Disclosure Statement. If they are, it's a hell of a lot better description of them than my memory. I just --

MR. FINCH: There is also an order entered by the U.S. Trustee that identifies the 11 individual members of the ACC and their counsel, care of their firms.

BY MR. BROWN:

**Q. That's what I am driving at. I would like to know who the individuals were at their firms that were involved.**

A. Well, let me just see. I am somewhat surprised. The Disclosure Statement does not appear to contain the members of the ACC. It just lists the counsel representing the committee as a whole. I had misremembered. I had thought that it did.

I can't really remember. I mean, I know the four -- I identified four earlier as being involved in the

discussions with Grace. They are included. I think there is at least nine members of the ACC. I do not recall, as I sit here, who the other five members of the ACC are. I mean, they are of record -- strike that. I do not recall who the other five lawyers for the members of the ACC are. They are of record.

**Q. But the four to which you are referring is Mr. Budd, Mr. Rice, Mr. Cooney, and Mr. Weitz?**

A. Correct.

**Q. You were talking about the Trust Distribution Procedures and who drafted them.**

**Would your answer be the same with respect to the Trust Agreement?**

A. On the Trust Agreement, I think there was more input from Grace, and, indeed, I think there may have been some from counsel from Sealed Air, as I think about it. And, indeed, now that I think about it, I think there may have