# Deposition Designations for:

# MARK PETERSON
# June 9, 2009

**Deposition Designation Key**

**CI = Certain insurers (green)**

**CNA = Continental Cas. Co & Continental Ins. Co. (red)**

**PP's = Plan Proponents (blue)**

**Obj: = Objection**

**Ctr = Counter Designation**

**R = Relevance**

**BE = Best Evidence**

**F = Foundation**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In Re: Chapter 11
Case No. 01-01139 JKF

W.R. Grace & Co., et al.,

Debtors. (Jointly Administered)

\- - -

June 9, 2009

\- - -

DEPOSITION of MARK PETERSON, held at the Four Seasons Hotel Westlake Village, Two Dole Drive, Westlake, California, commencing at approximately 7:15 A.M., on the above date, before Lisa Lynch, a Registered Merit Reporter, New Jersey Certified Court Reporter, License No. XI00825, and Certified Realtime Reporter

\- - -

MAGNA LEGAL SERVICES, LLP

7 Penn Center, 8th Floor
1635 Market Street
Philadelphia, PA 19103
1.866.MAGNA.21

Key
CI = Certain Insurers (green)
CNA = Continental Casualty Co. & Continental Ins. Co. (red)
PP = Plan Proponents (blue)
Obj: = Objection
Ctr = Counter Designation
R = Relevance
BE = Best Evidence
F = Foundation

documents as exhibits to the deposition.

I have additional copies of the documents that I handed out here for people in the room, although I don't know if I have a copy for everyone.

MR. COHN: All right, let's get started. Let's mark this Exhibit 1.

(Notice of Deposition of Mark A. Peterson marked for identification as Peterson Exhibit 1.)

(Errata sheet for trust report marked for identification as Peterson Exhibit 2A.)

(Revised trust report marked for identification as Peterson Exhibit 2B.)

(Errata sheet for the estimation report marked for

identification as Peterson Exhibit 2C.)

(Full revised estimation report marked for identification as Peterson Exhibit 2D.)

EXAMINATION BY MR. COHN:

**Q. Good morning, Dr. Peterson.**

A. Good morning.

**Q. Do you recognize the document that I've placed in front of you marked Exhibit 1?**

A. Yes.

**Q. What is it?**

MR. SPEIGHTS: Hold it a minute.

(Off the record.)

A. It's the Notice of Deposition for this deposition directed to me.

**Q. And do you understand that you're here testifying this**

**morning in connection with confirmation of the plan that's been proposed by W.R. Grace and other proponents --**

A. Yes.

**Q. -- in this Chapter 11 case?**

A. Excuse me. Yes.

MR. COHN: Let me -- I need to go off the record again.

(Off the record.)

MR. COHN: Let's mark this Exhibit 2, please.

(Preliminary Expert Report on W.R. Grace trust, Mark A. Peterson, March 2009 marked for identification as Peterson Exhibit 2.)

**Q. Dr. Peterson, I hand you a document that has been marked as Exhibit 2 and ask whether you can identify it.**

A. Yes, I can. But

actually -- pause a minute. Yes.

**Q. What is it?**

A. It's a copy of my preliminary expert report on the W.R. Grace trust that I prepared in March 2009. Attached to it is a copy of my June 2007 expert report for projecting liabilities for tort liabilities of W.R. Grace as of April 2001. That was revised and dated January 2009. It has some but not all of the corrections that were passed to you earlier today and both of these have been marginally changed by the errata that we distributed.

**Q. Let's get to the errata in a moment.**

**Can we agree -- do you need another moment with the exhibit?**

A. It has my resume attached too. There may be other exhibits but that's -- I think that's what it is in its entirety.

**Q. Okay. Now, for ease of**

CI

PP's Obj: R

CI

PP's Obj: R

CI

PP's Obj: R

**report, that the criteria for the trust is tighter than what Grace historically paid. Is that a fair statement?**

A. I believe that's true, yes.

**Q. And that's what I'm trying to get at. There's a term in here -- I happen to have it because I was studying for Mr. Inselbuch's deposition -- but there's a term in here about credible exposure. Do you recall that term?**

A. I believe --

MR. FINCH: Term in the TDP?

MR. SPEIGHTS: In the TDP.

MR. FINCH: Okay.

A. I don't recall that specific language but it sounds reasonable that that's in there.

**Q. But I'm looking for that particular term, but it's something**

**to that particular effect and, yet, I don't understand what that means. Is this something that the trustees will later have to decide what the credible -- what a credible exposure is?**

A. Yes.

**Q. And when they decide that, if they operate typically as other trusts operate with TDPs, will they set that forth in some document or some guidelines?**

A. Likely so, yes.

**Q. So that in Manville in which you're a trustee, somewhere there Mr. Austern has some guidelines he can go to and say is this a credible exposure justifying payment?**

A. There are instructions that are given to the claims personnel who process claims. There's rules that are incorporated in computer programs and those

provide specifications of those kinds of things and other matters.

**Q. And that will be something created by the trustees after the trust comes into existence; is that correct?**

A. Yes.

MR. SPEIGHTS: I'm hungry.

MR. FINCH: Let's take a break. We're going to take a lunch break now for 45 minutes.

MR. SPEIGHTS: That's good.

MR. FINCH: It's 2:19 Eastern time. I don't know what time it is in California, but we'll come back a little after 3:00 Eastern time.

THE WITNESS: Almost 11:20.

(Luncheon recess taken.)

CI

BY MR. SPEIGHTS:

PP's Obj: R

CI

**Q. Dr. Peterson, during your examination by Mr. Cohn you mentioned that you had some involvement with the TDP and Grace. Who did you work with on the TDP?**

A. Various lawyers at Caplin & Drysdale.

PP's Obj: R

**Q. Were you involved in the TDP for Mogul?**

A. Yes.

**Q. Suppose a person was exposed to asbestos as an applicator of Monokote manufactured by W.R. Grace and Limpet manufactured by Turner & Newall, later bought by Mogul, and those were the only known exposures.**

**Would there be any distinction in the payments received from either one of those bankruptcies because -- or bankruptcy trust because Limpet is a crysolite product and Monokote is a chrysotile product?**

MR. FINCH: Object to

**have in your mind?**
A. Just three or four.
**Q. Who were the participants?**
A. There was general counsel of Grace.
**Q. Mr. Shelnitz?**
A. Yes. Mr. Bernick. I think there was someone there from Grace. At one point I think the CEO or one of the principals attended a meeting. There were other attorneys from Kirkland & Ellis. There was several attorneys representing the SCB -- I mean the ACC. There were the attorneys for the FCR. There were -- Tom Florence and Amy Brockman from ARPC were there as experts for the debtor. Jenni Biggs, B-i-g-g-s, from Tillinghast and some of her partners were there for future representative and I was there for claimants.
**Q. What attorneys**

**representing the ACC were there?**
A. Inselbuch was there. I don't remember whether or not Finch was there. I don't remember who else was there.
**Q. Were any of the asbestos PI lawyers there?**
A. I think at some of the meetings some were. I don't recall who. Probably Rice but I can't say for sure.
**Q. Was anybody representing equity at any of those meetings?**
A. Yes, I believe there was a representative of equity but I'm not certain of whom. Mr. Inselbuch would have much better knowledge of the participants, and there were certain meetings that I wasn't at.
**Q. Were you at the meeting when the participants had a meeting of the mind?**
A. I think I was at a meeting when they figured out the

road they were going down wasn't going right. I don't necessarily believe there was a meeting of the mind. I don't think there was an actual settlement at that meeting. It's when Mr. Inselbuch started explaining the quantitative analyses that everyone threw up their hands.
MR. SPEIGHTS: Thank you, Dr. Peterson.
THE WITNESS: Thank you.
MR. FINCH: Does anybody else in the room have any questions for Dr. Peterson? Okay.
Does anyone on the telephone have questions for Dr. Peterson? If you could announce who you are and who you represent before you start questioning and that will help the court reporter.
MR. BROWN: Nathan, this is Mike Brown. I represent

Geico, Republic, Seaton and OneBeacon. I have a few questions for Dr. Peterson.
MR. FINCH: Okay, fire away.
MR. BROWN: Actually, could you do me a favor? Could you move, I guess, the microphone a little closer to Dr. Peterson? He was a little bit harder to hear than the questioners.
THE WITNESS: I'm just soft spoken.
MR. FINCH: Okay. We've switched chairs and Dr. Peterson is as close to the mic as we can get him so go ahead.

CI

PP's Obj: R

EXAMINATION BY
MR. BROWN:
**Q. Good afternoon, Dr. Peterson. I guess it's afternoon in California by now.**

**opinion in this bankruptcy case with respect to Grace's overall liability for asbestos personal injury claims for purposes of insurance coverage litigation?**

MR. FINCH: Object. Form, lack of foundation.

MR. DEMMY: Same objection.

A. Not so far.

**Q. Fair enough.**

**And am I correct that so far you have not provided such an opinion?**

MR. FINCH: Objection, form.

A. Not to my understanding -- but I don't know, again, uses. I've not explicitly done such -- made such an opinion.

MR. BROWN: I'm sorry. Can the court reporter read back that last comment by Dr. Peterson?

(The reporter reads the requested portion.)

MR. BROWN: Okay, all right.

**Q. Dr. Peterson, am I correct that the ACC has not retained you to provide an opinion regarding the asbestos PI trust's liability for indemnified insurer TDP claims?**

A. That's a safe assumption, yes. Not -- again, not until -- not so far.

**Q. Okay. And would your answer be the same with respect to insurance-related TDP claims?**

MR. FINCH: Object to form.

A. I don't even know what that is so I've not been asked to do -- to provide any opinions about that so far.

**Q. Okay. Have you been asked to provide any opinions regarding the asbestos PI trust's**

**liability for indirect PI trust claims?**

A. Not as a separate matter, no.

**Q. I think you said earlier, but correct me if I'm wrong, that the Grace trust will be insolvent. Do I have that correct?**

MR. FINCH: Object to form.

A. I don't think I said that explicitly. I think I said it would be impaired.

**Q. Okay. Well, let me ask it then. Do you have an opinion on whether the Grace trust, asbestos PI trust, is insolvent?**

MR. FINCH: Object to form, lack of foundation.

A. Its liabilities will be far in excess of its assets.

CI

**Q. Okay. I know someone asked you a question very similar to this; I'm not sure I heard the**

PP's Obj: R

CI

**answer.**

**What role did you play in developing the TDP disease values in this case?**

PP's Obj: R

MR. FINCH: Objection, asked and answered. You can answer it again.

CI

A. I did analyses of what the historic settlements were and what I believe the current values of the various kinds of disease claims were against the trust. I made alternative recommendations of possible TDP values derived from those analyses and probably discussed that with members of the committee as well as committee professionals.

**Q. Is that pretty typical of the role that you played in connection with your retention in other asbestos bankruptcy cases?**

A. It's typical of one role I play, yes.

**Q. Okay. I'm not sure what**

PP's Obj: R

CI

PP's Obj: R

**the exhibit number is because I was a little bit confused even after Mr. Speights went through it. You have an Exhibit 2 in front of you; is that correct?**
A. Just a moment. Yes.
**Q. Is that -- I just want -- is that the big, thick packet? I mean, it's about three-quarters of an inch or so thick?**
A. Yes. It's the thickest of the exhibits.
**Q. Okay. Is there a CV in there?**
A. Yes.
**Q. Can you turn to the CV?**
A. Yes, it's Exhibit 1 which follows the -- what we've called the trust report and precedes the estimation report and I have that.
**Q. Okay. Can you turn**

CI

PP's Obj: R

**to -- well, let's see. Starting at the bottom of page three but carrying over to page four, the last bullet point on page three is "Expert to 20 Asbestos trusts Regarding Claims, Procedures and Liability Estimation".**
A. I see that.
**Q. And on page four the last one looked to there is the API trust?**
A. Yes.
**Q. And you were an expert for the representative of future claimants, otherwise known as the FCR is what we typically call them?**
A. Yes.
**Q. And that gentleman's name was Thomas Carey; is that correct?**
A. Still is.
**Q. Still is, okay. What role are you playing for the API trust for the moment?**
MR. FINCH: Objection.

CI

PP's Obj: R

What's the relevance of this to the Grace bankruptcy confirmation hearings, Mr. Brown?
MR. BROWN: Well, it's part of the CV. That would be maybe part of it.
A. I am providing consultation and expert judgments and liabilities estimates and helping calculating payment percentages for Mr. Brownson, the trustee, as well as consulting with the FCR and the one-person TAC so I talk with all three parties. Formally my retention is by the trust.
**Q. Who is the TAC -- who is the one-person TAC?**
A. Well, it's Mike Polk of Sieben Polk.
**Q. Okay.**
A. It may be Sieben Polk as a whole, but Mike Polk tends to be the one that's involved with it.

CI

PP's Obj: R

**Q. Okay. I think Ed Longosz has a document that I'd like you to take a look at if, you would, and it's the -- it's the one marked 13.**
MR. BROWN: Could you hand him a copy of that? Ed, did you have a chance to make copies for everyone?
MR. LONGOSZ: I did. This is a new role for me. I'm discharging my duties and obligations.
THE WITNESS: Very well.
MR. LONGOSZ: Thank you.
**Q. Dr. Peterson, you can take a moment to review -- well, let me actually make a couple of comments about it first.**
**The document that you have should be a two-page document. It has a deposition exhibit number on it which says 13 Polk in the lower**

PP's Obj: R

PP's Obj: R

CI

**right-hand corner. It has two numbers below that as well, ACC 2352, and then below that A204.**

**I will represent to you that the exhibit label is an exhibit label from the deposition of Mr. Polk in the API case, the ACC number is the Bates number from the ACC in that case and the A204 is the number from the appendix that accompanied the a cert appeal in that case.**

**But other than those markings, which there's some similar markings on the second page, could you identify for me the document I guess we're going to mark as Exhibit 6?**

MR. BROWN: Is that what we're up to?

MR. LONGOSZ: You want this marked 6?

MR. BROWN: I want it marked as Peterson-6.

(E-mail Bates stamped ACC 2352 through 2353 marked

CI

PP's Obj: R

for identification as Peterson Exhibit 6.)

A. Is there a particular part of this document you want me to look at?

**Q. You can read the whole thing. The only question I have for you is: Would you identify it for me?**

A. Let me look at it.

(The witness reviews the document.)

A. All right, I've read this. Your question is?

MR. FINCH: What was the question?

**Q. Can you identify it for me?**

A. I don't recall this document, but it purports to come from me in a time frame when I was working with these individuals and I have no reason to think it isn't something I authored.

CI

**Q. Okay. And when you say "these individuals", if you can see on the top of the first page, it was indicated as having been sent from you to a Steven Meyer with copies to a Michael Meyer, Mike Polk, Mike Sieben, Thomas Carey and another copy to you, correct?**

A. Yes.

**Q. All right. And you have no reason to doubt that you sent this e-mail?**

A. Well, I just -- I don't -- I don't recall this document at all. The subject matter is familiar to me. I don't recall the particular language of this but it very well might have come from me.

**Q. Mr. Longosz is going to hand you another document.**

MR. LONGOSZ: 7?

MR. BROWN: We'll mark this one Peterson-7.

(E-mail chain Bates

CI

PP's Obj: R

stamped ACC 2483 through 2485 marked for identification as Exhibit 7.)

**Q. Just so we're looking at the same thing, Dr. Peterson, the document you have should be a three-page document with an exhibit tab on the front that says 14 Polk. Do you see that.**

A. Yes, I see that.

**Q. Okay. I actually don't need you to read this entire document if it will save some time. I can direct your attention to page two at the bottom which purports to be an e-mail sent from you to Thomas Carey and Steven Meyer, if you could read that e-mail for me, and then I've got a question or two.**

**(The witness reviews the document.)**

MR. DEMMY: Michael, this is Jonathan. Could I have someone from your team PDF to

me those e-mails because we Obviously don't have them here? I mean, I don't need them this second.

MR. BROWN: Yes, we'll PDF them to you.

MR. DEMMY: Thanks.

CI PP's Obj: R

A. All right, I've read this.

**Q. Okay. Can you identify that e-mail that begins at the bottom of page two of what we've marked as Peterson-7?**

A. Well, again, it purports to come from me and it has my e-mail address and it's a subject matter that I would have -- would have been likely to discuss with these persons but I don't recall it.

**Q. You don't recall it?**

A. No.

**Q. Do you have any reason to doubt that you sent this e-mail?**

A. Not particularly.

CI PP's Obj: R

**Q. If you look above there, you'll -- right above what I directed you to on page two there's a -- well, let me back up.**

**You would agree with me, wouldn't you, that what we've marked as Exhibit 7 is an e-mail chain?**

A. Yes.

**Q. Okay. And it begins with your e-mail that I just referred you to, correct?**

A. Yes.

**Q. And that's the one dated Friday, August 27, 2004 at 4:43 PM?**

A. Actually, the -- apparently the Mike Polk e-mail doesn't have a date but it appears to follow those. I'm sorry. What was your observation -- you asked -- you're talking about the time and date of the --

**Q. Yes. The first e-mail, the one which I directed you to, is dated Friday, August 27th, 2004 at**

CI PP's Obj: R

**4:43 PM, correct?**

A. It's the last in the -- on the document, but yes.

**Q. Okay. And you understand the one right above that from Mr. Meyer -- that's Mr. Steven Meyer -- to be a response to your e-mail dated August 31st, 2004 at 9:26 AM?**

A. It appears to be. That's what it says it is.

**Q. Okay. And the e-mail that begins on the first page you noted earlier doesn't seem to have a date on it but that appears to be a comment from Mr. Polk, correct?**

A. Apparently.

**Q. And it was directed to you, among others?**

A. Yes.

**Q. And do you recognize that to be your e-mail address, at least your e-mail address back in 2004?**

CI PP's Obj: R

A. It was and is.

**Q. Okay. all right, you can put that aside, Dr. Peterson.**

**I just -- I noted earlier from your earlier testimony, and I want to make sure I have this correct, that you have had various involvement, as I understand it, or engagements in connection with the asbestos liabilities of W.R. Grace. And let me try to summarize them and then you just tell me whether I have it right.**

**I understood you to testify earlier that you played some role back in 1998 and that thereafter you were involved in the fraudulent transfer litigation involving Sealed Air and Fresenius in or around 2002, that thereafter you were also involved in the estimation trial and that you are obviously involved now in connection with the plan confirmation proceeding. Is that correct.**