# Deposition Designations for:

# JEFFREY POSNER
# May 6, 2009

**Deposition Designation Key**

**CI = Certain insurers (green)**

**CNA = Continental Cas. Co & Continental Ins. Co. (red)**

**PP's = Plan Proponents (blue)**

**Obj: = Objection**

**Ctr = Counter Designation**

**R = Relevance**

**BE = Best Evidence**

**F = Foundation**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

_____________________________X

In Re: Chapter 11

Case No. 01-01139 JKF

W.R. Grace & Co., et al.,

(Jointly Administered)

Debtors.

_____________________________X

\- - -

May 6, 2009

\- - -

DEPOSITION of JEFFREY POSNER, held at the offices of Kirkland & Ellis, 655 Fifteenth Street, N.W., Washington, DC, commencing at 9:08 A.M., on the above date, before Lisa Lynch, a Registered Merit Reporter, New Jersey Certified Court Reporter, License No. XI00825, and Certified Realtime Reporter

\- - -

MAGNA LEGAL SERVICES, LLP
7 Penn Center, 8th Floor
1635 Market Street
Philadelphia, PA 19103
1.866.MAGNA.21

Key
CI = Certain Insurers (green)
CNA = Continental Casualty Co. & Continental Ins. Co. (red)
PP = Plan Proponents (blue)
Obj = Objection
Ctr = Counter Designation
R = Relevance
BE = Best Evidence
F = Foundation

(Notice of Deposition of Jeffery Posner received and marked for identification as Posner Exhibit 1.)

(Curriculum vitae of Jeffery M. Posner received and marked for identification as Posner Exhibit 2.)

(Affidavit Under 11 USC 327(e) received and marked for identification as Posner Exhibit 3.)

J E F F R E Y P O S N E R,
having been sworn by the Notary Public of the States of New York and New Jersey, was examined and testified as follows:

PP's Obj: R

CI

EXAMINATION BY
MS. FORSHAW:
**Q. Good morning. Mr. Posner.**
A. Good morning.
**Q. Good to see you again. I**

CI

PP's Obj: R

**know you've been through this drill many times. If I talk too fast, just stop me. If you have any questions about my questions, let me know. If you need to take a break, let me know.**
A. Definitely.
**Q. Okay. I'm just --**
MR. KRAMER: I'm sorry. Who's asking the questions, please?
MS. FORSHAW: Sure. It's Mary Beth Forshaw from Simpson Thacher representing Travelers Casualty. If you guys have a hard team hearing us, will you let us know?
MS. KRIEGER: Yes, we will. Thank you.
**Q. Mr. Posner, I'm going to put before you a Notice of Deposition of Jeffery Posner. Do you understand you're here to testify in response to that notice today?**
A. Yes, I do.
MS. FORSHAW: I have eight

or nine copies of exhibits which I'll pass out through the deposition. You can put that aside. For the record, I've marked the Notice of Deposition of Jeffery Posner as Exhibit 1.

PP's Obj: R

CI

BY MS. FORSHAW:
**Q. Mr. Posner, let me put before you what I've marked as Exhibit 2, which is a resume of Jeffery Posner. Do you recognize this document as your resume?**
A. Yes, but it appears to me to be an outdated copy of it.
**Q. Okay. And for the record, can you tell us in what way is this resume outdated?**
A. My business address, it's an old business address which leads me to believe that's a version that I kept several years ago.
**Q. Is the professional experience described in your resume true and accurate?**

CI

PP's Obj: R

A. Yes, I'm sure it is.
**Q. And this resume indicates that you were employed at W.R. Grace & Company from 1982 to 1999. Is that correct?**
A. Yes, it is.
**Q. And for the record, can you give us an overview of your employment experience at W.R. Grace listing your positions and the approximate years you held each position?**
A. I started with Grace in 1982 as an assistant claims manager. In 1986 I assumed the duties of a risk analyst. Thereafter I became the assistant director of risk management sometime, I think, in 1987 and then in 1988 I was promoted to the director of risk management and I became an assistant vice president of the company.
**Q. And during your tenure at W.R. Grace, were you responsible for overseeing asbestos-related coverage litigations?**

CI PP's Obj: R

A. Yes, I was.
**Q. And when did those duties commence?**
A. Well, Grace's coverage litigation began in 1983 and I became involved at that time and ultimately assumed additional responsibilities as the litigation had progressed through the years.
**Q. And I note that your resume says at the top that you in the past have negotiated one billion of insurance settlements relating to asbestos and environmental litigation. Do you see that? It's under Summary of Qualifications.**
A. Yes, I do.
**Q. Were those negotiations, negotiations on W.R. Grace's behalf?**
A. Yes. I mean, there may have been some other negotiations but principally it's W.R. Grace.
**Q. Okay. And at W.R. Grace, did you negotiate settlements with my**

CI PP's Obj: R

**client, Aetna Casualty & Surety Company, which I'm going to call Travelers Casualty interchangeably because it's changed its name?**
A. Yes, I did.
**Q. And do you recall generally when those settlements with Travelers Casualty were signed up?**
A. The first one involving some old policies from one of the predecessor companies, I'm speculating a little, but it was probably sometime in the early '90's and then there was a settlement involving the excess policies, and that probably was later on in the '90's, I suspect. I can't remember the precise dates.
**Q. And were you the person at Grace who was principally responsible for negotiating with Travelers Casualty?**
A. Yes, I was.
**Q. With respect to both settlements?**
A. Yes.

CI PP's Obj: R

**Q. And after the settlements were signed, were you responsible for administering the settlements?**
MS. ESAYIAN: Objection to form. You can answer if you can.
CI PP's Obj: R
A. I was involved. There were people that were actually doing the detail work. You know, it involved keeping track of payments of claims and things of that nature and sending out bills. I didn't do that but I was involved and had some oversight responsibility for that.
**Q. Let me restate the question. Were you involved in ensuring that Grace performed its obligations under the settlements Grace had executed with Travelers Casualty?**
MR. HORKOVICH: Objection, compound.
CI PP's Obj: R
THE WITNESS: Can I have that read back, please?
(The reporter reads the pending question.)
A. I certainly had a role in

CI PP's Obj: R

that.
**Q. Who else was involved in making sure that Grace performed its obligations under the settlements Grace executed with Travelers Casualty?**
A. Well, the settlements required Grace to obtain certain information so we had to put procedures in place to ensure that that information was obtained, that we kept track of that information, and that we allocated -- allocated claim payments in accordance with the procedures set forth in the agreement. So there were a number of people. Obviously, outside counsel was involved in providing information to us, we had people in-house, we had computer programmers that were programming the computers and writing programs for the process. So there were a number of people in the process but certainly I was, you know, involved in ensuring that those procedures were in place and that the proper information was obtained and, you

CI PP's Obj: R

**Q. And what oversight responsibility have you had in that respect?**

A. Well, I think my duties have really not changed. I mean, I think Grace looks to me to ensure that we're complying with whatever requirements are in those settlement agreements and there are people at Grace, again, that perform various functions but I think it's fair to say that Grace relies on me to ensure that we're complying with whatever is necessary.

**Q. And since 1999, has Grace employed anyone in-house who has had insurance-related functions?**

A. No, I'm really the only person. And there are other people there who were there before I left who assisted, for example, in the allocation issue, computer programmers, people of that sort. But, no, Grace does not have an in-house insurance person. I'm really the only insurance person.

PP's Ctr.

**Q. Now, it's my understanding that you have worked for Grace during the period when Grace has been in Chapter 11. Is that correct?**

A. Yes.

CI PP's Obj: R

**Q. And I'm going to put before you what I've marked as Posner Exhibit 3, which is entitled Affidavit Under 11 USC 327(e). Do you recognize that document?**

**(The witness reviews the document.)**

A. I actually don't. I mean, it appears that I signed it. I don't remember it.

**Q. Does your handwriting appear on page one of the document, Mr. Posner?**

A. Yes, it does.

**Q. Okay. And if you could -- I actually couldn't read Paragraph 2. Can you read the handwriting that appears in Paragraph 2?**

A. It says, "The debtors have requested that the firm provide insurance and risk management" -- I think that says

CI PP's Obj: R

"consulting services to the debtors and the firm has consented to provide such services."

**Q. And have you in fact provided such services to the debtor during the pendency of its bankruptcy?**

A. Yes, I have.

**Q. And can you outline for us generally the nature of the services you provided to Grace during its bankruptcy?**

A. Again, I think it's many of the services that I provided while I was an employee. I continue to purchase their insurance and I'm responsible for the administration of all of their worldwide insurance policies and I continue to be involved in asbestos insurance coverage issues and environmental insurance coverage issues as they arise. I've negotiated some settlements, you know, since I left the firm with insurance carriers, I think principally ones in bankruptcy. As I recall, there may have been some others. So again I'm performing

CI PP's Obj: R

many of the same functions that I performed while an employee and I've been involved in issues related to bankruptcy as they pertain to insurance coverage.

PP's Obj: R

**Q. And what are your compensation arrangements with Grace?**

A. I think my retainer is either 130 or $135,000 a year. I can't remember the precise number.

**Q. And is that a flat fee that you're paid for providing insurance-related services to Grace?**

A. Yes. I mean, it gets negotiated every year but basically they deposit money in my bank. I don't get any hourly rate. I don't get additional compensation beyond that nor do I get less compensation.

**Q. I am sorry, I didn't --**

A. Nor do I get less compensation. I get what the agreed-upon amount is.

**Q. It's a flat fee?**

A. It's a flat fee, yes.

**Q. And have you been involved in drafting Grace's Plan of Reorganization; yes or no?**

MS. ESAYIAN: Objection to form. You can answer if you can.

MR. HORKOVICH: Objection, overbroad.

A. I'm not sure I can answer that yes or no. I was involved in some of the insurance provisions. I don't know that I drafted them but they were given to me to look at and I commented on them and I may have changed the wording in some of the provisions that were drafted. I didn't directly draft it but I have had input into some of the insurance issues.

**Q. Have you read the plan cover to cover?**

A. No.

**Q. Are you familiar with the W.R. Grace Asbestos Personal Injury Trust Agreement?**

A. I believe I've seen it.

**Q. Did you comment on that**

**document?**

A. Can you show me that document? I don't believe I did but if you show me the document, I'd be able to tell you. I can't -- I can't talk in a vacuum.

**Q. Okay, we'll do that later in your deposition. We'll go through each document.**

**Are you being paid for providing testimony here today?**

A. No.

**Q. Did you prepare for this deposition?**

A. Well, I met with Miss Esayian yesterday and I looked at some documents.

**Q. How long did you meet with Miss Esayian?**

A. Probably just about two hours or so yesterday afternoon.

**Q. And how many documents did you review?**

A. Well, she put in front of

me some of the Plan documents. I really didn't look at them, to be honest with you. She had them available. I just skimmed them.

**Q. Have you reviewed any objections filed by insurers in W.R. Grace's bankruptcy proceeding?**

A. I may have. I don't know, sitting here.

**Q. Are you familiar with the nature of the objections filed by W.R. Grace's insurers in its bankruptcy proceeding?**

MS. ESAYIAN: Objection to form.

A. I couldn't give you specifics, sitting here.

**Q. Do you have any understanding of the nature of the objections that the insurers have posed in W.R. Grace's bankruptcy proceeding?**

MR. HORKOVICH: Objection to form.

A. I have a recollection of

some issues relating to insurance neutrality. Beyond that, I'm not sure I know.

**Q. Were you consulted by Grace with respect to Grace's responses to any requests for admission served in Grace's bankruptcy proceeding?**

A. I probably was.

**Q. Do you recall specifically?**

A. I don't.

MS. FORSHAW: I'd like to mark Asbestos Settlement Agreement between W.R. Grace & Company-Conn. and the Aetna Casualty & Surety Company dated May 12th, 1996 as Posner Exhibit 4.

(Asbestos Settlement Agreement between W.R. Grace & Company-Conn. and the Aetna Casualty & Surety Company dated May 12th, 1996 received and marked for identification as Posner Exhibit 4.)

A. In what sense? I don't --

**Q. Well, are you aware of any of the obligations provided for, for example, the release or indemnity obligations under the settlement agreements, that the Trust will not be able to perform?**

MS. ESAYIAN: Objection to form.

MR. HORKOVICH: Objection to form.

A. You keep saying "not be able to". You mean not be able to because they don't have the money to do it or they don't have the manpower? I'm not trying to be cute. But you're saying "would not be able to". Why wouldn't --

**Q. Well, are you aware of any?**

MR. HORKOVICH: Objection to form.

A. I mean, I don't really know that much about the Trust to know what their capabilities are, whether it be financial capabilities or otherwise. I

mean, my assumption is that they will do that but I don't know what their capabilities are. I don't even know that it's been formed yet.

**Q. Is it your understanding that the Trust will indemnify Maryland Casualty under the settlement agreements in the same way that Grace agreed to indemnify Maryland Casualty?**

MR. HORKOVICH: Objection to form.

A. Again, that's my non-legal assumption.

**Q. Okay. And that would apply to Zurich as well --**

MR. HORKOVICH: Objection.

**Q. -- under a settlement agreement, to the extent there's obligations.**

A. To the extent --

MR. HORKOVICH: Objection.

A. To the extent there's an

indemnity agreement, again, that's my non-legal assumption.

**Q. You would agree that the settlement agreements with Maryland Casualty and Zurich are being transferred and will be transferred to the asbestos PI Trust upon confirmation and that all rights and obligations thereunder? You would agree with me on that?**

MR. HORKOVICH: Objection to form.

A. You know, the Plan speaks for itself. Again, that is what I understand but I'm not an expert on the Plan but that's my understanding.

**Q. And that understanding is consistent with your prior testimony today with respect to Travelers? It's the same answer?**

A. Correct, yes.

MR. LONGOSZ: Just bear with me. I'm trying to cut down on the questions.

That's it. Thank you.

THE WITNESS: Thank you, sir.

(Off the record.)

MR. BROWN: We've just had a discussion off the record concerning Grace policies and the proposal on the table to avoid the necessity of showing Mr. Posner a whole bunch of policies is that the parties, or at least certain of the parties, who were interested in having a stipulation only on the authenticity and admissibility of policies will work outside this deposition on such a stipulation with the notion being that that stipulation would apply for purposes of the bankruptcy case only.

And for my clients, GEICO, Republic and Seaton in particular, it would involve our policies as well as the underlying policies issued by London and possibly CNA

CI

PP's Obj: le

CI

that may have implications for the terms of our policies.

Does that accurately state what we're attempting to do?

MR. HORKOVICH: It's fine with the ACC that we enter into a stipulation with regard to the terms and conditions of the insurance policies limited -- the stipulation limited only for purposes of the bankruptcy proceeding and not being applicable for any ensuing insurance coverage litigation.

MR. BROWN: Is that true for the debtors as well?

MS. ESAYIAN: It's fine for the debtors. I'm happy to do it that way.

MR. MUELLER: On behalf of the London Market Companies, I don't think we're opposed in principle to a stipulation, but today is really the first time it's

been discussed with me so I'm not prepared to say that we'd be willing to enter into one today.

MR. COHN: And what's Royal's position on that in terms of authentication of those policies?

MR. SCHIAVONI: If policies are missing or there's no proof of their existence, I'm not going to stipulate to them. Why should I? I don't understand your position.

MS. ESAYIAN: I'm not sure that that's what anybody said.

MR. COHN: As to the former policies that can be -- where somebody can produce a copy of a policy, are you prepared --

MR. SCHIAVONI: Didn't you listen to the testimony about the settlements? There was disputes about the existence of the policies.

MR. COHN: I understood his

PP's Obj: R

testimony to be that there were disputes as to pre-1953 policies.

MR. SCHIAVONI: Are you going to ratify the settlement agreement --

MS. ESAYIAN: Okay, wait a minute. Time out. Michael has the floor for questioning. He either has questions about his insurance policies or not. You guys, we can work this out separately for the Royal policies. It's not -- we shouldn't be taking Mr. Posner's time on this right now because that's not --

MR. HORKOVICH: OneBeacon has the floor.

MS. ESAYIAN: -- what Michael's issue is.

MR. BROWN: Jonathan, on behalf of the PI FCR, you're on board with this proposal?

MR. GUY: On behalf of the PI FCR, we are on board with trying

to work through the authenticity and admissibility of insurance policies by stipulating as to those particular policies.

MR. BROWN: All right.

MR. SCHIAVONI: Dan, if you have questions about the policy, you should ask them now.

MR. BROWN: After I finish.

CI

PP's Obj: R

EXAMINATION BY MR. BROWN:

**Q. Mr. Posner, Michael Brown. I'm here on behalf of OneBeacon American Insurance Company, Seaton Insurance Company, GEICO and Republic.**

**Are you generally familiar with the restructuring transactions involving Grace, the one that took place in or around May -- excuse me -- in or around September 1996 and the other in March of 1998?**

A. I'm generally familiar, yes.

**Q. Okay.**

A. This is the settlement agreement entered into by Grace and Commercial Union in 1998, I'm going to call it, relating to environmental claims but it may encompass more than that but I remember it as the environmental settlement agreement.

**Q. Okay. Do you recognize the signatures on page 25 and 26?**

A. Yes, I do.

**Q. Who signed on behalf of W.R. Grace & Co.?**

A. Paul McMahon signed on behalf of Grace and James McKay signed on behalf of Commercial Union.

**Q. Were you involved in the negotiation of this settlement agreement?**

A. Yes, I was.

**Q. And were the payments that were contemplated by this settlement agreement made?**

A. Yes, they were.

**Q. Do you know whether the**

**company on page 35 that's listed as W.R. Grace & Co. is the lead debtor in this bankruptcy case today?**

MS. ESAYIAN: Page 25, you mean?

MR. BROWN: Yes, page 25. OB 91 is the Bates number.

A. I assume that it is but it's an assumption.

**Q. Okay.**

CI

PP's Obj: R

**(Settlement Agreement, Release and Indemnification/Hold Harmless Agreement Bates stamped SEA 1 through 16 received and marked for identification as Posner Exhibit 18.)**

**Q. You have before you a document marked Posner-18 and my first question is: Can you identify this document?**

A. This is a settlement agreement entered into by Grace with Unigard -- it's called Unigard Insurance Company here -- relating to

CI

PP's Obj: R

asbestos-related claims under an excess policy issued by Unigard to Grace.

**Q. Were you involved in the negotiation of this agreement?**

A. Yes, I was.

**Q. Can you identify the signatures that appear on page 16, SEA 16?**

A. Yeah, Brian Burns signed it on behalf of W.R. Grace and I can't make out the signature of the Unigard person.

**Q. Okay. Were the payments contemplated by this agreement made?**

A. Yes.

(Settlement Agreement, Release and Indemnification/Hold Harmless Agreement Bates stamped SEA 17 through 31 received and marked for identification as Posner Exhibit 19.)

**Q. All right, Mr. Posner, you now have before you Posner-19 and my first question with respect to this document is: Can you identify it for me?**

A. This is another agreement between Grace and Unigard -- here it says Unigard Security Insurance Company. I guess the other one does as well -- involving another excess policy that Unigard had issued to Grace and this settlement appears to relate to asbestos-related claims.

**Q. And it's dated from May of 1995?**

A. That is correct.

**Q. And the two Grace entities that executed the agreement are W.R. Grace & Co.-Conn. and W.R. Grace & Co., correct?**

A. Correct.

**Q. And you signed it on behalf of both of those entities?**

A. That is correct.

**Q. Can you tell me what name W.R. Grace & Co. goes by today that is the entity that signed this agreement?**

A. Well, W.R. Grace & Co.-Conn. still exists. W.R. Grace & Co.

a sub of one of the entities.

MR. BROWN: Okay, all right. Subject to --

A. That's an assumption.

MR. BROWN: Subject to other -- follow-up after others have questioned, I am complete. Thank you, Mr. Posner.

THE WITNESS: Thank you.

MS. DeCRISTOFARO: Could we take a five-minute break?

MS. ESAYIAN: Sure.

(Recess taken.)

(LexisNexis printout in re: Maryland Casualty v. Grace, et al. received and marked for identification as Posner Exhibit 22.)

PP's Ctr.

EXAMINATION BY MS. DeCRISTOFARO:

**Q. Good afternoon, Mr. Posner.**

A. Good afternoon.

**Q. I'm Elizabeth DeCristofaro. I represent Continental Casualty. I have**

PP's Ctr.

**a few follow-up questions to issues that you addressed earlier.**

**I just asked the reporter to mark a copy of a legal case in one of the series of cases known as Maryland Casualty v. W.R. Grace. It's a decision of the Second Circuit. It is generally referred to as the installation trigger case, and I do not have any questions related to the law or the holding. I'm only marking this as a matter of convenience with respect to some of the factual recitation.**

**And I direct you to what is considered page four of the exhibit and in the right-hand column, the first full paragraph, the next to the last sentence says: "According to Grace, as of early 1992, it had spent 184.6 million dollars to settle claims or satisfy judgments in property damage asbestos lawsuits and 194 million to defend itself."**

**Now, is that statement generally consistent with your recollection of Grace spending large amounts of money to defend**

**itself in asbestos litigation?**

A. Yes. As I indicated before, you know, Grace had spent significant amounts of money. And, obviously, if they put this in here, then we must have submitted information or stated that we had spent that amount of money so it would be consistent with what I knew at the time, I think.

CI

PP's Obj: R

**Q. And during the course of this afternoon you indicated that you were involved in the negotiations of the settlement agreements both with the primary and the excess insurers --**

A. Correct.

**Q. -- of Grace; is that correct?**

**And you generally included where it was proper a provision that those agreements would provide reimbursement to Grace for defense costs. Is that correct?**

A. Correct. Some of the agreements are what I'm going to call

CI

PP's Obj: R

coverage in place agreements that had ongoing obligations for the insurance carriers to reimburse Grace for defense costs. Some of the agreements were I'm going to call buy-outs of the policies in which there was no ongoing obligation.

**Q. And when negotiating those agreements, it was the understanding of both parties that Grace was going to vigorously defend itself and probably expend money in defense costs; is that correct?**

MR. HORKOVICH: Objection to form.

CI

PP's Obj: R

A. Well, yeah. I mean, I think it was the understanding that, you know, Grace would use its best efforts to defend itself as best it could, you know, considering all factors.

**Q. And the next sentence of that paragraph, the last sentence says, "Continental has exhausted the limits of its insurance coverage by paying 117 million dollars in defense costs and 70**

**million dollars indemnity in Grace." Is that generally consistent with your recollection?**

MS. ESAYIAN: Just so the record is clear, it says "and 70 million in indemnity to Grace".

MS. DeCRISTOFARO: I'm sorry. Did I misread it?

MS. ESAYIAN: A little bit.

MS. DeCRISTOFARO: Sorry.

A. You know, it's a little strange to me because the indemnity -- I believe this opinion relates to the primary policies that CNA had issued to Grace. My recollection of those policies is that there was a two million dollar per year annual aggregate. So I'm trying to sort out in my mind, you know, how CNA paid 70 million in indemnity. I'm just trying to think how they got to that figure, sitting here today. I need to think about that.

**Q. Well, does the figure for**

**defense costs seem reasonable to you?**

A. I --

**Q. Or does it refresh your recollection? Let me make it a simpler question. If it doesn't, it doesn't but --**

A. Well, again, we're talking about what numbers were in 1992. I do have a recollection, for example, that when we entered into the CNA settlement agreement in 1990, you know, that CNA had paid significant amounts of money in defense costs and probably over 100 million dollars. It's just the 70 million in indemnity that I'm trying to figure out how they got to that number because sitting here today it doesn't make sense to me, not to say it's not right. I would need to think about it a little more.

**Q. Okay. But when you mentioned a little bit earlier in addition to the amounts set out in the settlement agreement there are amounts -- other amounts paid to Continental, this is some**

**of what you were referring to; is that correct?**

A. Yeah. I mean, Continental had been defending Grace for many years and had expended --

**Q. Large amounts of money?**

A. -- large amounts of money. Some of that money was billed back to Grace and some Continental Casualty ultimately had to bear and the amounts were significant and were in addition to the 21 million dollars referenced in the settlement agreement, correct.

**Q. Correct. And through its relationship with Grace and its payment of these defense costs, Continental Casualty had an understanding that Grace was vigorously defending itself?**

MS. ESAYIAN: Objection to form.

MR. HORKOVICH: Objection to form.

A. Well, I mean, you're asking what Continental Casualty understood.

It's difficult for me to answer. I mean, I could tell you that Grace had always attempted to defend itself and of course it wanted to pay out as little money as possible and didn't want to take on additional risk by trying cases where it was inappropriate. What Continental understood, I'm not quite sure.

**Q. Okay. When the primary policies were exhausted, is it correct to say that Grace turned to seek coverage from its excess insurers?**

A. Well, I think -- you know, I think some of the time periods overlap in the sense that Grace was seeking coverage from its primary carriers, CNA, Royal and Maryland, and then there came a point in time when the excess coverage litigation got instituted so the time frames may have overlapped in the sense that Grace was -- might have been simultaneously seeking money from the primary and the excess. But certainly after it settled with CNA it was certainly

CI

PP's Obj: R

PP's Ctr.

CI

PP's Obj: R

CI

PP's Obj: R

PP's Obj: R

CI

CI PP's Obj: R

seeking money from the excess as well.

**Q. And the excess insurers -- the recovery it was seeking from the excess insurers included payment of these ongoing defense costs which were substantial?**

A. Yes.

MR. HORKOVICH: Objection to form.

PP's Ctr. CI PP's Obj: R

A. Grace was seeking ongoing defense costs that were unreimbursed and that we believed were properly attributable to the excess carriers.

**Q. So the excess carriers also -- excuse me before I go there.**

**There was another litigation called Maryland Casualty v. Grace generally referred to as the asbestos excess litigation.**

A. Yes.

**Q. And that included at the outset all of Grace's excess insurers. Is that correct?**

A. It certainly included a lot

CI

of them. I think it included all but I'm not quite sure. It probably did but I don't remember specifically.

**Q. And in that lawsuit Grace was seeking a declaration that those excess carriers owed them defense and indemnity. Is that correct?**

A. Correct, yes.

**Q. Okay. And that litigation was ultimately resolved in large part by settlement agreements. Is that correct?**

A. Yes. I mean, ultimately what had happened was I think we had settled with all excess carriers up to the 50 million dollar layer and I think the court ruled that excess carriers above the 50 million dollar layer were not ripe, so to speak, at the time because Grace -- I think Grace's liabilities, you know, at least at that time wasn't anticipated that we were going to get to that level.

So we settled with the carriers up to the 50 million dollar level and as a practical matter I think we preserved our

CI PP's Obj: R

right to institute later proceedings against the carriers above that level.

**Q. But the carriers who entered into settlement agreements with Grace understood through these litigations that Grace was incurring substantial defense costs; is that correct?**

MR. HORKOVICH: Objection to form.

CI PP's Obj: R

A. I think that's a fair statement.

**Q. And they understood on that basis that Grace was vigorously defending itself for asbestos defense cases?**

MR. HORKOVICH: Objection to form.

CI PP's Obj: R

A. Well, again, I mean, you're asking me to put what they understood. I mean, I don't know. I mean, Grace, I think, was -- it's fair to say was vigorously defending itself and I think they would have to know that. Now, what they understood or didn't understand, you'd have to ask them.

PP's Obj: R

**Q. Okay. Now, there were also a series of questions in which the term "products" was used during the course of the afternoon. Is that correct?**

A. Yes.

**Q. But in none of those questions the term "products" was defined or the definition in the policies was referred to. Is that correct?**

A. I think one of the gentlemen asked me to distinguish a products claim from a premises claim and then I did that without looking at a policy. I gave him, you know, my general understanding of the distinction between two kinds of claims under an insurance policy.

**Q. And do you have any present understanding as to whether the term "products" includes any operations coverage? Let me make --**

MR. HORKOVICH: Objection.

**Q. -- that specific.**

MR. HORKOVICH: Objection