UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                     .    Case No.  01-01139 (JKF)
                           .    Jointly Administered
W.R. GRACE & COMPANY,      .
et al.,                    .    5414 U.S. Steel Tower
                           .    600 Grant Street
                           .    Pittsburgh, PA 15219
           Debtors.        .
                           .    June 18, 2009
. . . . . . . . . . . . ..      1:05 p.m.

TRANSCRIPT OF HEARING
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtors:          Kirkland & Ellis, LLP
                          By:  DAVID BERNICK, ESQ.
                               BARBARA HARDING, ESQ.
                               JANET BAER, ESQ.
                               LISA ESAYIAN, ESQ.
                          200 East Randolph Drive
                          Chicago, IL  60601

For the Debtors:          Kirkland & Ellis, LLP
                          By:  THEODORE FREEDMAN, ESQ.
                               JUSTIN BROOKS, ESQ.
                          Citigroup Center
                          601 Lexington Avenue
                          New York, NY  10022-4611


Audio Operator:           Janet Heller


Proceedings recorded by electronic sound recording, transcript
              produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609)586-2311     Fax No. (609) 587-3599**

APPEARANCES (CONT'D):

For W.R. Grace:              Pachulski Stang Ziehl & Jones, LLP
                             By:  JAMES E. O'NEILL, III, ESQ.
                             919 North Market Street, 17th Floor
                             Wilmington, DE  19899

For W.R. Grace:              W.R. Grace
                             By:  RONALD R. FINKE, ESQ.
                                  MARK SHELNITZ, ESQ.
                             7500 Grace Drive
                             Columbia, MD  21044

For the FCR:                 Orrick, Herrington & Sutcliffe
                                LLP
                             By:  ROGER FRANKEL, ESQ.
                             Washington Harbour
                             3050 K Street, N.W.
                             Washington, D.C.  20007

For the PD Committee:        Bilzin Sumberg Baena Price &
                                Axelrod LLP
                             By:  TARA TREVORROW, ESQ.
                             200 South Biscayne Boulevard
                             Suite 2500
                             Miami, FL  33131

For the ACC:                 Caplin & Drysdale, Chartered
                             By:  PETER LOCKWOOD, ESQ.
                             One Thomas Circle, NW
                             Washington, D.C.  20005

For the                      Stroock & Stroock & Lavan
Unsecured Creditors'         By:  KENNETH PASQUALE, ESQ.
Committee:                   ARLENE KRIEGER, ESQ.
                             180 Maiden Lane
                             New York, NY  10038-4982

For Committee of             Campbell & Levine
Asbestos Personal            By:  MARK T. HURFORD, ESQ.
Injury Claimants:            800 North King Street
                             Suite 300
                             Wilmington, DE  19701

APPEARANCES (CONT'D):


For Arrowwood/Royal:        Wilson Elser Moskowitz Edelman &
                             Dicker, LLP
                            By:  CARL J. PERNICONE, ESQ.
                            150 East 42nd Street,
                            New York, NY  10017


For Royal:                  O'Melveny & Myers LLP
                            By:  GARY SVIRSKY, ESQ.
                            7 Times Square
                            New York, NY  10036


For General Insurance       Sonnenschein Nath & Rosenthal LLP
Co. of America:             By:  ROBERT B. MILLNER, ESQ.
                            233 South Wacker Drive, Suite 7800
                            Chicago, IL  60606


For the Bank Lenders:       Paul Weiss Rifkind Wharton &
                             Garrison, LLP
                            By:  MARGARET PHILLIPS, ESQ.
                            1285 Avenue of the Americas
                            New York, NY  10019


For the Bank Lenders:       Landis, Rath & Cobb, LLP
                            By:  RICHARD COBB, ESQ.
                            919 Market Street, Suite 1800
                            Wilmington, DE  19899


For Bank Lenders:           Paul Weiss Rifkind Wharton &
                             Garrison, LLP
                            By:  DANIEL BELLER, ESQ.
                            1285 Avenue of the Americas
                            New York, NY  10019


For CNA:                    Goodwin Proctor
                            By:  MICHAEL S. GIANNOTTO, ESQ.
                            901 New York Avenue, N.W.
                            Washington, DC  20001


For CNA:                    Ford Marrin Esposito Witmeyer &
                             Gleser, LLP
                            By:  ELIZABETH M. DeCRISTOFARO, ESQ.
                            Wall Street Plaza, 23rd Floor
                            New York, NY  10005-1875

APPEARANCES (CONT'D):

For GEICO, Seaton          Drinker Biddle & Reath LLP
Ins. Co., Republic         By:  MICHAEL F. BROWN, ESQ.
Ins. Co.:                  One Logan Square
                           18th and Cherry Streets
                           Philadelphia, PA  19103

                           Drinker Biddle & Reath LLP
                           By:  WARREN T. PRATT, ESQ.
                           1100 N. Market Street, Suite 1000
                           Wilmington, DE  19801

For MCC & Zurich:          Connolly Bove Lodge & Hutz LLP
                           By:  JEFFREY WISLER, ESQ.
                           The Nemours Building
                           1007 North Orange Street
                           Wilmington, DE  19899

                           Wiley Rein, LLP
                           By:  RICHARD A. IFFT, ESQ.
                           1776 K Street NW
                           Washington, DC  20006

For Travelers:             Simpson, Thacher & Bartlett, LLP
                           By:  ELISA ALCABES, ESQ.
                           425 Lexington Avenue
                           New York, NY 10017-3954

For MCC & Zurich:          Eckert Seamans
                           By:  EDWARD D. LONGOSZ, ESQ.
                           1747 Pennsylvania Avenue, NW
                           Suite 1200
                           Washington, DC

For AXA Belgium:           Tucker Arensberg, P.C.
                           By:  MICHAEL A. SHINER, ESQ.
                           1500 One PPG Place
                           Pittsburgh, PA  15222

                           Mendes & Mount
                           By:  EILEEN McCABE, ESQ.
                           750 Seventh Avenue
                           New York, NY  10019

APPEARANCES (CONT'D):

For FFIC:                   Stevens & Lee
                            By:  JOHN D. DEMMY, ESQ.
                            1105 North Market Street
                            7th Floor
                            Wilmington, DE  19801

For Federal Insurance       Cozen O'Connor
Co.:                        By:  JACOB C. COHN, ESQ.
                            1900 Market Street
                            Philadelphia, PA  19103

TELEPHONIC APPEARANCES:

For the Debtors:            Kirkland & Ellis, LLP
                            By:  DEANNA BOLL, ESQ.
                            Citigroup Center
                            601 Lexington Avenue
                            New York, NY  10022-4611

For W.R. Grace & Co.:       W.R. Grace & Co.
                            By:  WILLIAM SPARKS

For the FCR:                Orrick, Herrington & Sutcliffe
                              LLP
                            By:  RICHARD WYRON, ESQ.
                                 JONATHAN GUY, ESQ.
                            Washington Harbour
                            3050 K Street, N.W.
                            Washington, D.C.  20007

For PD FCR:                 Law Office of Alan B. Rich
                            By:  ALAN RICH, ESQ.
                            1201 Main Street, Suite 1910, LB 201
                            Dallas, TX

For Libby Claimants:        Cohn Whitesell & Goldberg, LLP
                            By:  CHRISTOPHER M. CANDON, ESQ.
                            101 Arch Street
                            Boston, MA  02110

For the PD Committee:       Bilzin Sumberg Baena Price &
                              Axelrod LLP
                            By:  SCOTT BAENA, ESQ.
                                 JAY SAKALO, ESQ.
                                 MATTHEW KRAMER, ESQ.
                            200 South Biscayne Boulevard
                            Suite 2500
                            Miami, FL  33131

TELEPHONIC APPEARANCES (CONT'D):

For David T. Austern,          Phillips, Goldman & Spence, P.A.
the Future Claimants'          By:  JOHN C. PHILLIPS, ESQ.
Representative:                1200 North Broom Street
                               Wilmington, DE  19806


For Bloomberg, LLP:            Bloomberg, LLP
                               By:  STEVEN H. CHURCH


For Official Committee         Caplin & Drysdale, Chartered
of Asbestos Personal           By:  JEFFREY A. LIESEMER, ESQ.
Injury Claimants:                   WALTER SLOCOMBE, ESQ.
                               One Thomas Circle, NW
                               Washington, D.C.  20005


For State of Montana           Womble Carlyle Sandridge & Rice
& Her Majesty the Queen        By:  KEVIN J. MANGAN, ESQ.
in Right of Canada:            222 Delaware Avenue
                               Wilmington, DE  19801


For the ACC:                   Ferry Joseph & Pearce, P.A.
                               By:  THEODORE TACCONELLI, ESQ.
                               824 Market Street, Suite 19899
                               Wilmington, DE  19899


For the PD Committee:          Speights & Runyan
                               By:  DANIEL SPEIGHTS, ESQ.
                                    MARION FAIREY, ESQ.
                                    ALAN RUNYAN, ESQ.
                               200 Jackson Avenue, East
                               Hampton, SC  29924


For the Official              The Brandi Law Firm
Committee of Asbestos         By:  THOMAS J. BRANDI, ESQ.
Property Damage                    TERENCE D. EDWARDS, ESQ.
Claimants:                    354 Pine Street, Third Floor
                              San Francisco, CA  94104


For Official Committee         Lieff, Cabraser, Heimann & Bernstein
of Asbestos Property           By:  ELIZABETH J. CABRASER, ESQ.
Damage Claimants:              Embarcadero Center West
                               275 Battery Street, Suite 3000
                               San Francisco, CA  94111


For Anderson Memorial          Kozyak, Tropin & Throckmorton, PA
Hospital:                      By:  JOHN W. KOZYAK, ESQ.
                               200 S. Biscayne Blvd., Ste. 2800
                               Miami, FL  33131

TELEPHONIC APPEARANCES (CONT'D):

```
For Arrowwood              O'Melveny & Myers LLP
Indemnity Co.:             By:  TANCRED SCHIAVONI, ESQ.
                           7 Times Square
                           New York, NY  10036


For Burlington             Pepper Hamilton, LLP
Northern Santa Fe          LINDA J. CASEY, ESQ.
Railway:                   3000 Two Logan Square
                           Eighteenth and Arch Streets
                           Philadelphia, PA  19103

For Unifirst Corp.:        Pepper Hamilton, LLP
                           By:  JAMES C. CARIGNAN, ESQ.
                                DAVID M. FOURNIER, ESQ.
                           Hercules Plaza
                           Suite 5100
                           1313 Market Street
                           P.O. Box 1709
                           Wilmington, DE  19899-1709


For Scotts Company:        Vorys, Sater, Seymour & Pease LLP
                           By:  TIFFANY COBB, ESQ.
                           52 East Gay Street
                           Columbus, OH  43215

For Everest                Crowell & Moring LLP
Reinsurance Co.:           By:  LESLIE A. DAVIS, ESQ.
                                MARK PLEVIN, ESQ.
                           1001 Pennsylvania Avenue, N.W.
                           Washington, DC  20004

For AIG:                   Zeichner Ellman & Krause, LLP
                           By:  MICHAEL S. DAVIS, ESQ.
                                ROBERT GUTTMANN, ESQ.
                           575 Lexington Avenue
                           New York, NY  10022


For Official Committee     LECG
of Asbestos Property       By:  ELIZABETH DEVINE, ESQ.
Damage Claimants:

For Official Committee     Dies & Hile LLP
of Asbestos Property       By:  MARTIN DIES, ESQ.
Damage Claimants:          1009 Green Avenue
                           Orange, TX  77630
```

TELEPHONIC APPEARANCES (CONT'D):

For Hartford Financial        Wilmer Cutler Pickering Hale & Dorr,
Service Group, Inc.:            LLP
                              By:  MELANIE DRITZ, ESQ.
                              399 Park Avenue
                              New York, NY  10022

For Morgan Stanley            Katten Muchin Rosenman LLP
Senior Funding:               By:  JEFF FRIEDMAN, ESQ.
                                   NOAH HELLER, ESQ.
                                   MERRITT PARDINI, ESQ.
                              575 Madison Avenue
                              New York, NY  10022

For Bank Lender Group:        Landis Rath & Cobb, LLP
                              By:  JAMES S. GREEN, JR.
                              919 Market Street, Suite 1800
                              Wilmington, DE  19899

For the Bank Lenders:         Paul Weiss Rifkind Wharton &
                                Garrison, LLP
                              By:  ANDREW N. ROSENBERG, ESQ.
                              1285 Avenue of the Americas
                              New York, NY  10019

For Everest Reinsurance       Marks, O'Neill, O'Brien & Courtney LLP
Company, et al.:              By:  BRIAN L. KASPRZAK, ESQ.
                                   JOHN D. MATTEY, ESQ.
                              913 North Market Street
                              Suite 800
                              Wilmington, DE  19801

For the U.S. Trustee:         Office of the U.S. Trustee
                              By:  DAVID KLAUDER, ESQ.
                              844 King Street, Suite 2313
                              Wilmington, DE  19801

For W.R. Grace:               Onex Credit Partners
                              By:  STUART KOVENSKY

For Official Committee        Duane Morris, LLP
of Unsecured Creditors:       By:  MICHAEL LASTOWSKI, ESQ.
                              Suite 1200
                              1100 North Market Street
                              Wilmington, DE  19801

For the                       Stroock & Stroock & Lavan
Unsecured Creditors'          By:  LEWIS KRUGER, ESQ.
Committee:                    180 Maiden Lane
                              New York, NY  10038-4982

TELEPHONIC APPEARANCES (CONT'D):

For Asbestos Property          Pryor Cashman LLP
Damage Claimants:              By:  RICHARD LEVY, ESQ.
                               401 Park Avenue
                               New York, NY  10022

Share Holder for               Tocqueville Asset Management
W.R. Grace & Co.:              By:  PETER SHAWN

For Morgan Stanley             Edwards Angell Palmer & Dodge LLP
Senior Funding:                By:  R. CRAIG MARTIN, ESQ.
                               919 North Market Street, Suite 1500
                               Wilmington, DE  19801

For Sealed Air:                Skadden, Arps, Slate, Meagher &
                                 Flom, LLP
                               By:  DAVID TURETSKY, ESQ.
                               Four Times Square
                               New York, NY  10036

For Other Prof., David         Orrick, Herrington & Sutcliffe
T. Austern Future                LLP
Claims Rep.:                   By:  KATE ORR, ESQ.
                               Washington Harbour
                               3050 K Street, N.W.
                               Washington, D.C.  20007

For Arrowwood                  Bifferato Gentilotti LLC
Indemnity Co.:                 By:  GARVAN McDANIEL, ESQ.
                               800 North King Street
                               Wilmington, DE  19801

For London Market              Mendes & Mount
Company:                       By:  ALEX MUELLER, ESQ.
                               750 Seventh Avenue
                               New York, NY  10019

For Babson Capital             Babson Capital Management, Inc.
Management:                    By:  MARTI MURRAY

For Deborah Pace:              DebtWire
                               By:  DEBORAH PACE

For Various Claimant           Stutzman, Bromberg, Esserman & Pflika,
Firms:                           P.C.
                               By:  DAVID J. PARSONS, ESQ.
                                    SANDER L. ESSERMAN, ESQ.
                               2323 Bryan Street, Suite 2200
                               Dallas, TX  75201

TELEPHONIC APPEARANCES (CONT'D):

For Other Prof., David       Tre Angeli, LLC
T. Austern, Future           By:  JOSEPH RADECKI, ESQ.
Claimants Rep.:

For Grace Certain            Montgomery, McCracken, Walker &
Cancer Claimants:              Rhoads, LLP
                             By:  NATALIE D. RAMSEY, ESQ.
                             123 South Broad Street
                             Avenue of the Arts
                             Philadelphia, PA  19109

For the Official             Scott Law Group, P.C.
Committee of Asbestos        By:  DARRELL SCOTT, ESQ.
Property Damage              926 W. Sprague Ave., Suite 680
Claimants:                   Spokane, WA 99201

For Other Prof., David       Piper Jaffray & Co.
T. Austern, Future           By:  JASON SOLGANICK, ESQ.
Claimants Rep.:

For Ford Marrin:             Ford Marrin Esposito Witmeyer &
                               Gleser, LLP
                             By:  SHAYNE SPENCER, ESQ.
                             Wall Street Plaza, 23rd Floor
                             New York, NY  10005-1875

For Goldman Sachs &          Goldman Sachs & Company
Company:                     By:  ALEXANDER THAIN

For Official Committee       Richardson Patrick Westbrook &
of Asbestos Property         Brickman
Damage Claimants:            By:  EDWARD J. WESTBROOK, ESQ.
                             1037 Chuck Dawley Boulevard
                             Building A
                             Mount Pleasant, South Carolina

For Jennifer Whitener:       Dewey & LeBoeuf LLP
                             By:  JENNIFER WHITENER, ESQ.
                             125 West 55th Street
                             New York, NY  10019

For Allstate:                Cuyler Burk, P.C.
                             By:  STEFANO V. CALOGERO, ESQ.
                             4 Century Drive
                             Parsippany, NJ  07054

TELEPHONIC APPEARANCES (CONT'D):

For Official Committee        Kramer Levin Naftalis & Frankel, LLP
of Equity Holders:            By:  DAVID E. BLABEY, JR., ESQ.
                              1177 Avenue of the Americas
                              New York, NY  10036

For Insurance Counsel         Anderson Kill & Olick, P.C.
to ACC:                       By:  ROBERT M. HORKOVICH, ESQ.
                              1251 Avenue of the Americas
                              New York, NY

For Farallon Capital          Farallon Capital Management
Management:                   By:  MICHAEL LINN

1       THE COURT:  Please be seated.  This is the matter of

2  W.R. Grace, Bankruptcy Number 01-1139.  There are a number of

3  matters scheduled this afternoon.  The participants I have

4  listed by phone, Scott Baena, Janet Baer, Daniel Beller, David

5  Bernick, David Blabey, Deanna Boll, Thomas Brandi, Elizabeth

6  Cabraser, Stefano Calogero, Christopher Candon, James Carignan,

7  Linda Casey, Steven Church, Richard Cobb, Tiffany Cobb, Andrew

8  Craig, Leslie Davis, Michael Davis, Elizabeth DeCristofaro,

9  Elizabeth Devine, Martin Dies, Melanie Dritz, Terence Edwards,

10  Lisa Esayian, Sandy Esserman, Marion Fairey, David Fournier,

11  Theodore Freedman, Jeff Friedman, Michael Giannotto, James

12  Green, Robert Guttmann, Jonathan Guy, Barbara Harding, Noah

13  Heller, Robert Horkovich, Mark Hurford, Brian Kasprzak, David

14  Klauder, Stuart Kovensky, John Kozyak, Matthew Kramer, Lewis

15  Kruger, Michael Lastowski, Richard Levy, Jeffrey Liesemer,

16  Michael Linn, Peter Lockwood, Kevin Mangan, Robert Craig

17  Martin, John Mattey, Garvan McDaniel, Alex Mueller, Marti

18  Murray, Kate Orr, Deborah Pace, Merritt Pardini, David Parsons,

19  Carl Pernicone, Margaret Phillips, John phillips, Mark Plevin,

20  Joseph Radecki, Natalie Ramsey, Alan Rich, Andrew Rosenberg,

21  Alan Runyan, Jay Sakalo, Tancred Schiavoni, Darrell Scott,

22  Peter Shawn, Mark Shelnitz, Walter Slocombe, Jason Solganick,

23  William Sparks, Daniel Speights, Shayne Spencer, Gary Svirsky,

24  Theodore Tacconelli, Alexander Thain, David Turetsky, Edward

25  Westbrook, Jennifer Whitener, and Richard Wyron.  I'll take

1  entries in court, please.

2          MR. BERNICK:  David Bernick for Grace.

3          MR. FREEDMAN:  Theodore Freedman for Grace.

4          MS. HARDING:  Barbara Harding for Grace.

5          MS. BAER:  Janet Baer for Grace.

6          MR. O'NEILL:  James O'Neill for Grace.

7          MR. FRANKEL:  Roger Frank --

8          THE COURT:  Wait.  Excuse me one second.  Okay.

9  Thank you.

10          MR. FRANKEL:  Roger Frankel from Orrick Herrington

11 for David Austern, the PI Future Claims Representative.

12          MR. LOCKWOOD:  Peter Lockwood, Caplin & Drysdale, for

13 the Asbestos Claimants' Committee.

14          THE COURT:  Good morning.  Afternoon.

15          MR. SVIRSKY:  Gary Svirsky for Arrowwood Indemnity.

16          MR. PERNICONE:  Carl Pernicone, Your Honor, for

17 Arrowwood Indemnity.  Good afternoon.

18          THE COURT:  One second.  Okay.  Thank you.

19          MS. DeCRISTOFARO:  Good morning, Your Honor.

20 Elizabeth DeCristofaro for Continental Casualty Company and

21 Continental Insurance Company.

22          THE CLERK:  You have to make sure everybody uses a

23 microphone.  I did not pick you up.  Would you repeat it?

24          MS. DeCRISTOFARO:  Elizabeth --

25          THE COURT:  I don't think your microphone's on, Ms.

1 DeCristofaro.  If you just -- I know sometimes the green light

2 looks like it's on, but it actually isn't.  If you'd just hit

3 the green light?  Try it again.

4          MS. DeCRISTOFARO:  Elizabeth DeCristofaro --

5          THE COURT:  That's fine.

6          MS. DeCRISTOFARO:  -- for Continental Casualty

7 Company and Continental Insurance Company.

8          THE COURT:  Thank you.

9          UNIDENTIFIED SPEAKER:  It's on now.

10          THE COURT:  It's on now.  Thanks.

11          MR. GIANNOTTO:  Michael Giannotto for Continental

12 Casualty Company and Continental Insurance Company.

13          MS. PASQUALE:  Good afternoon, Your Honor.  Ken

14 Pasquale from Stroock for the Unsecured Creditors' Committee.

15          THE COURT:  I'm sorry.  Whoever is on the phone with

16 either a handheld device or a Blackberry of some sort, please

17 turn it off, because I really don't want to have to disconnect

18 the phone, but I will.  I'm not going to listen to the static

19 and have people disabled with that all day.  If the Court Call

20 operator can identify whoever has that, please, just disconnect

21 it the next time it happens.  I'm sorry.

22          COURT CALL OPERATOR:  Yes, Your Honor.

23          THE COURT:  Thank you.

24          MR. PASQUALE:  Ken Pasquale for the Unsecured

25 Creditors' Committee.  With me is my colleague Arlene Krieger.

1           THE COURT:  Thank you.

2           MS. KRIEGER:  Good afternoon, Your Honor.

3           THE COURT:  Good afternoon.

4           MR. MILLNER:  Good afternoon, Your Honor.  Robert

5    Millner, Sonnenschein, Nath & Rosenthal for General Insurance

6    Company of America.

7           THE COURT:  Thank you.

8           MR. COHN:  Good afternoon.  Jacob Cohn for Federal

9    Insurance Company.

10          MR. BROWN:  Good morning, Your Honor.  Michael Brown

11   for -- and Warren Pratt for GEICO, Republic, and Seaton

12   Insurance Company.

13          THE COURT:  Okay.  Thank you.  Good morning.

14          MR. HURFORD:  Good afternoon, Your Honor.  Mark

15   Hurford, Campbell & Levine, for the ACC.

16          MR. COBB:  Good afternoon, Your Honor.  Richard Cobb

17   on behalf of the bank lenders.  Your Honor, with me today is

18   Daniel Beller of the Paul Weiss firm.  Your Honor, we have

19   moved for his admission pro hac vice a few days ago.

20          THE COURT:  Has an order been entered?  I'm sorry.  I

21   haven't seen it.  It may have just gone through the system.

22          MR. COBB:  Your Honor, I could check with my office.

23   I don't believe as of yesterday at the close of business it had

24   been entered yet.

25          THE COURT:  All right.  I'll take care of making sure

1  that it has been.  Thank you.

2         MR. COBB:  Thank you, Your Honor.

3         MR. BELLER:  Thank you, Your Honor.

4         MS. PHILLIPS:  Margaret Phillips of Paul, Weiss,

5  Rifkind, Wharton & Garrison with the bank lenders.  Thank you.

6         MS. TREVORROW:  Good afternoon, Your Honor.  Tara

7  Trevorrow from Bilzin Sumberg for the Property Damage

8  Committee.  Three of my colleagues are also appearing

9  telephonically, Scott Baena, Jay Sakalo, and Matt Kramer.

10        THE COURT:  Thank you.

11        MR. DEMMY:  Your Honor, John Demmy of Stevens & Lee

12  for Fireman's Fund Insurance Company and the Allianz Insurers.

13        MS. ALCABES:  Good afternoon, Your Honor.  Elisa

14  Alcabes, Simpson, Thacher & Bartlett for Travelers Casualty &

15  Surety Company.

16        MR. SHINER:  Good afternoon, Your Honor.  Michael

17  Shiner for AXA Belgium, a successor to Royal Belge, and with me

18  is Eileen McCabe from Mendes & Mount.

19        MS. McCABE:  Good afternoon, Your Honor.

20        THE COURT:  Thank you.

21        MR. LONGOSZ:  Good afternoon, Your Honor.  Edward

22  Longosz on behalf of Maryland Casualty and Zurich.

23        MR. WISLER:  Good afternoon, Your Honor.  Jeffrey

24  Wisler on behalf of Maryland Casualty and Zurich.

25        THE COURT:  Thank you.

1          MR. BERNICK:  Good afternoon, Your Honor.  We have

2    some preliminary matters before we get to the agenda, and I

3    suppose that the first of the preliminary matters is not simply

4    preliminary but is important.  And that is that the plan

5    proponents have resolved their issues with Arrowwood, and folks

6    representing Arrowwood are present here today to address the

7    Court, but this means that all matters concerning Arrowwood at

8    this point that are contested is -- as concerns this plan have

9    now been resolved.

10          THE COURT:  Oh, good.

11          MR. SVIRSKY:  Your Honor, if I might just take a

12    moment.  Gary Svirsky from O'Melveny & Myers for Arrowwood

13    Indemnity.  While my partner Tanc Schiavoni did all the heavy

14    lifting, I have the privilege of coming here to announce that

15    we have resolved our issues and entered into a settlement with

16    the plan proponents.  This was a hard-fought negotiation among

17    contentious parties in what Your Honor is well aware is a very

18    complex case.

19          And I'd like to particularly thank the FCR, David

20    Austern, and his very able counsel, Roger Frankel, Rick Wyron,

21    Jonathan Guy, and Peri Mahaley for their really yeomen effort

22    and professionalism in bringing together the parties and

23    facilitating this settlement.  And while we're restrained in

24    what and how much we can say here now, they really did

25    exemplary work in bringing together very contentious parties

1  and helping us resolve this.  And I'd also like to thank the

2  Grace lawyers for their professionalism, Mr. Bernick, Barbara

3  Harding, Jan Baer, Ted Freedman, and the same goes for the ACC,

4  Mr. Horkovich and Peter Lockwood.

5        And, accordingly, though we filed numerous objections

6  here and numerous pleadings, including in connection with the

7  motion to strike Professor Priest, which I believe will be

8  argued today in our absence, we are suspending prosecution of

9  all of our objections and pleadings at this time by agreement

10  of the parties.  And now I'm just going to sit down and let all

11  these other folks get on with their business.

12        THE COURT:  All right.  Thank you.

13        MR. BERNICK:  A couple housekeeping matters for the

14  benefit of everybody who's here and on the phone.  We've had

15  two issues that have arisen concerning scheduling next week.

16  One of them I think has -- I know has been addressed, which is

17  that the agenda did not include the last day.  God help us.  I

18  hope we don't need the last day next week.

19        THE COURT:  Me, too --

20        MR. BERNICK:  Yeah, it --

21        THE COURT:  -- because I'm not planning to be here.

22        MR. BERNICK:  Well, that's -- now we'll have to go

23  back and change the agenda again, but be that as it may.

24        The other thing is that we want to make clear the

25  agenda for the hearing next week includes all of the plan

J&J COURT TRANSCRIBERS, INC.

1  objections, however, the objections that are purely Phase II

2  objections are not being addressed in the Phase I hearing.  And

3  I have a specific reference here to Libby and to Anderson

4  Memorial, and that's also outlined in the objection chart.  But

5  in case there's any ambiguity, we are not going to be pursuing

6  those matters next week, so that Mr. Speights and Mr. Cohn and

7  all the other folks who are interested for Anderson Memorial

8  and Libby can consider whether to be here for the -- for

9  whatever entertainment value they might derive.  But, in any

10 event, we're not going to be addressing --

11            THE COURT:  Does that include the Court?

12                      (Laughter)

13            THE COURT:  I guess not.  Okay.

14            MR. BERNICK:  Okay, so that's where we are on that.

15 With respect to the agenda today, we wanted to suggest to the

16 Court that we proceed in a somewhat different order than what's

17 set forth in the agenda.

18            THE COURT:  Could we seriously talk about the

19 schedule for next week first?  I really did think that when I

20 got the agenda, that we -- you needed only three days, and I

21 really was planning to go back to Maine because of the hopeful

22 birth of the baby that I thought was going to be born three

23 weeks ago and hasn't.  And so are you relying on four days or

24 not?

25            MR. BERNICK:  Yeah, I think that this is going to

1  come up again in connection with the pretrial conference, part

2  of the proceedings this afternoon, because it bears on the

3  question of, well, what issue is really going to be presented

4  to the Court next week.  And let me just say, so that we don't

5  have a whole series of people come up here right now, that will

6  be addressed later as the debtor and the plan proponents view

7  that next week is a very narrow matter.  We don't even see that

8  it'll take more than a day.

9       That said, the insurers have been -- they've been

10  careful to say that they may need more time.  They believe they

11  will need more time, but that really converges on the last

12  matter that we'd like to take up today, which is the pretrial

13  conference, before the end of the day today.  I think you'll

14  hear from everybody with respect to their views on next week.

15  So that -- so that Your Honor will know where we are.  And from

16  the debtors' point of view and the plan proponents' point of

17  view, I can say right now, insofar as we're concerned, there's

18  no reason why this proceeding should cause any inconvenience to

19  the Court in light of the Court's schedule.

20       THE COURT:  All right.  Well, okay.  We'll just have

21  to figure it out before today's over then.

22       MR. BERNICK:  Right.

23       THE COURT:  All right.

24       MR. BERNICK:  Right.

25       THE COURT:  Thank you.

1          MR. BERNICK:  So the first matter on the agenda

2  relates to the motion to strike the expert reports and

3  testimony of George Priest and James Shein.  We would propose

4  to move that back to the Number 3 slot and begin with the two

5  matters that relate to the general unsecured creditors, which

6  are Items 2 and 3.  They're both motions with respect to the

7  case management order.  We think that those can be taken up

8  together.

9          And then, Your Honor, we would proceed to -- with

10  Item 1, which is the motion regarding Priest and Shein and then

11  finish up the day with the pretrial conference on plan

12  confirmation Phase I.  So that would be our proposal to the

13  Court.  And because it is the motion of the general unsecureds

14  and the bank lenders, we'll let them address that, and we'll be

15  happy to respond.

16          THE COURT:  All right.

17          MR. PASQUALE:  Ken Pasquale for the unsecured

18  creditors.  While people are shuffling, Mr. Beller for the bank

19  lenders from Paul Weiss will be leading the argument.

20          THE COURT:  All right.

21          MR. PASQUALE:  The motions are substantially similar

22  though.

23          MR. BELLER:  Your Honor, I'm Daniel Beller with Paul,

24  Weiss, Rifkind, Wharton & Garrison.  I represent the bank

25  lender group.  Thank you very much for permitting me to appear

1  before you today.

2         Your Honor, I think, as you know, we are here on the

3  bank lenders' motion to amend the case management order.

4  Essentially what we're asking the Court to do is to defer

5  consideration of the Phase I issues scheduled for June 22nd,

6  this coming Monday, with respect to the bank lender group.

7  Creditors have a similar motion -- Creditors' Committee, in

8  particular, in relation to the issue of impairment and other

9  related issues that are scheduled for Monday.  The reason for

10 that Your Honor is that in our view we thought it even as a

11 matter of professionalism we should bring this to the Court's

12 attention.

13        We believe that the Court has been divested of

14 jurisdiction with respect to the subject matter involved in

15 determining the issue of impairment, and that's because the

16 lenders have appealed Your Honor's order, an opinion of May

17 19th, 2009, which sustained the debtors' objection to the

18 lenders' claims for post-petition default interest.  And I'm

19 hoping to argue to Your Honor today that under well-settled law

20 the appeal divests this Court of jurisdiction to proceed with

21 the impairment hearing with respect to the lenders on June

22 22nd.

23        THE COURT:  Actually, that's not what my opinion did.

24 I did not say that the bank lenders were not entitled to post-

25 petition interest.  I said they weren't entitled to post-

1 petition interest as part of the allowed claim under Section

2 502, and the statement of issues on appeal, in fact, contain

3 alleged findings that I made that, in fact, I did not make.

4 For example, an assertion that I said that the federal judgment

5 rate is the legal rate.  I specifically did not make such a

6 finding.

7          What I said was that regardless of the rate that

8 applied, it would not impact the Court's ruling.  I

9 specifically made no finding as to what the legal rate was

10 under the statute.  So I did not make the finding that the bank

11 lenders say I made.

12          MR. BELLER:  Well, let me -- for the bank lenders let

13 me see if I can review some of the grounds that Your Honor

14 addressed in disallowing post-petition default interest in the

15 opinion.  As Your Honor recalls, the order denies post-petition

16 default interest for the reasons set forth in the memorandum

17 opinion.

18          THE COURT:  Right.

19          MR. BELLER:  Let me go through some of them.  First

20 Your Honor said that the lenders were not entitled to post-

21 petition default interest, because the claim for interest was

22 unmatured.  Then Your Honor addressed Section 726 issues, and

23 the Court held that the lenders were not entitled to post-

24 petition interest, because there was no evidence of insolvency

25 before the Court.  The Court rejected the lenders' argument

1  that insolvency was established on the record before the Court

2  as a matter of law.

3         The Court also held that the legal rate of interest

4  contemplated by Section 726 is not the default rate.  Whatever

5  it is, it's not the default rate.  The 726 issues on Page 1 of

6  Your Honor's opinion, Your Honor said that the bank lenders are

7  not entitled to post-petition interest at the default rate, and

8  we will sustain debtors' objection on the limited 502(b) and

9  726 grounds asserted in the objection.  Of course, as I

10 understand it, the 726 grounds are grounds that only are

11 addressed in connection with 1129 matters, best interest and so

12 on.  So the Court clearly went beyond 502.

13        And, finally, among other things, the Court also held

14 that the lenders were not entitled to post-petition default

15 interest, because there were no defaults under the loans under

16 state or federal law.  So, as I said, the Court then entered an

17 order on the same date sustaining debtors' objection to the

18 claims of the bank lenders at -- I'm quoting -- for the reasons

19 expressed in the foregoing memorandum opinion.  That order,

20 Your Honor, was a final order for purposes of appeal.  We

21 appealed.  Really, we had no choice.

22        If we had not appealed, we would've been at risk that

23 later a party would argue that your determinations that, for

24 example, Grace is not insolvent as a matter of law, that there

25 were no defaults under the loans --

1          THE COURT:  I did not find that Grace is insolvent as

2    a matter -- not insolvent as a matter of law.  I said that

3    there was no evidence of insolvency presented on which I could

4    make any such finding of entitlement as a matter of law to

5    default interest.

6          MR. BELLER:  Right.  Your Honor said that the

7    evidence that had been presented to you on which we argue --

8    the bank lenders argue that the law determined that if the --

9    for example, if equity is receiving something of value in the

10   bankruptcy, that, as a matter of law, shows solvency.  Your

11   Honor rejected that as a matter of law.  What I'm saying --

12         THE COURT:  I wasn't given any evidence of solvency

13   or insolvency.  I was given a legal position that because

14   equity may get a distribution under a plan that isn't yet

15   confirmed, which I think I reserved as a plan confirmation

16   issue, because it is, a plan could be modified at any point in

17   time prior to confirmation, and I don't -- I'm not at the

18   confirmation hearing yet, that as a matter of law that means

19   that a debtor is solvent.  I could find no cases, and the banks

20   gave me none, that supported that view.

21         MR. BELLER:  Well, that's what I'm saying.  Your

22   Honor said there were no cases that supported the view.  I

23   think the position --

24         THE COURT:  And the bank lenders gave me none.

25         MR. BELLER:  I think the position of the lenders was,

1 as a matter of law, since you were considering the plan,

2 because the issue of solvency is related to 1129 issues --

3 1129(a)(7), which Your Honor pointed out, Your Honor concluded

4 that as a matter of law, the record before Your Honor did not

5 establish solvency.  You said there's --

6            THE COURT:  I concluded as an --

7            MR. BELLER:  -- no presumption solvency.  The fact

8 that the equity is receiving -- that the equity is receiving

9 value does not establish solvency.  We think that's an issue

10 that you decided as a matter of law in that opinion.

11            THE COURT:  I think I concluded that you gave me no

12 evidence, which is a matter of fact, not a matter of law --

13            MR. BELLER:  We think -- and our position --

14            THE COURT:  -- of solvency.

15            MR. BELLER:  Our position, respectfully, Your Honor,

16 is that we did.

17            THE COURT:  Okay.  Well, then I'd like you to point

18 it out, because I sure haven't seen it.  That's what I found.

19            MR. BELLER:  The plan that was before Your Honor --

20 the argument that was made by the other side included elements

21 that equity would receive approximately $2 billion of value.

22            THE COURT:  Yes.

23            MR. BELLER:  That's a fact.  We say that's a fact.

24 We say that that fact establishes solvency.  You said it's not

25 a fact, and it doesn't establish solvency.

1          THE COURT:  I said that I would reserve issues for

2    plan confirmation.  That plan is not confirmed.  It's a

3    proposal.  It's not a fact.

4          MR. BELLER:  In all events, Your Honor, whatever was

5    found in the opinion and adopted by the order put us in a

6    position where since Your Honor entered a final order for

7    purposes of appeal, we have appealed.  All of the conclusions

8    of law, whether they're determined -- dispositive or whether

9    they're what's called judicial dicta, those are in the opinion.

10   We have appealed all of Your Honor's conclusions with respect

11   to matters of law and matters of fact.

12         THE COURT:  There could only be one, and that is --

13   because I only made one, and that is as a matter of claims

14   allowance, the lenders are not entitled to default interest.

15   That's what I found --

16         MR. BELLER:  Well, I --

17         THE COURT:  -- and that's the basis for appeal, and

18   that has absolutely not one single thing to do with impairment

19   or the plan confirmation issues --

20         MR. BELLER:  Except --

21         THE COURT:  -- and so as a matter of fact and law, I

22   see no basis on which to defer what's happening next week.

23         MR. BELLER:  Well, Section 726 I don't think has to

24   do with claim allowance.  It has to do with plan confirmation

25   and doesn't get to --

1          THE COURT:  No, it has to do with the rate of

2  interest.

3          MR. BELLER:  And doesn't get to issues of 726, unless

4  you're in plan confirmation, at least for purposes of this

5  case.

6          THE COURT:  It has to do with the lenders' contention

7  that they're entitled to a default rate of interest, and I

8  raised 726 to define whether, as a matter of law, the Code

9  looks to a standard of default interest.  The only place that

10  the standard of interest is mentioned, that I can recall

11  offhand and having examined it, was in 726.  726 talks about

12  when interest is allowable on claims as an exception to 502.

13  It talks about the fact that if a debtor has sufficient funds

14  after paying all of the other allowed claims, then interest is

15  allowable and payable.  What rate of interest it says is not

16  the default rate but is the legal rate.  I then mentioned 726

17  to figure out what courts say constitutes the legal rate.

18  There is not a single court that has defined the legal rate to

19  be the default rate, not a single court.  That's why 726 is in

20  the analysis.  It is not a matter of plan confirmation.  It's a

21  matter of looking at the argument raised by the bank lenders to

22  see whether, as a matter of claims allowance and part of the

23  allowed claim, any rate of interest is part of the allowed

24  claim not an add-on to the allowed claim and a determination

25  that, in fact, it is not.  Whether the bank lenders are

permitted default rate of interest as a part of a plan

confirmation process and are required to have it as an

impairment issue is something that I specifically reserved and

that we're going to have to hear about next week.

MR. BELLER:  Well, if -- I have a little bit more to

say, but -- if that's permissible?

THE COURT:  Go ahead.  Sure.

MR. BELLER:  Okay.  Yeah, the -- here, actually, the

other side, as I read their papers, they are not actually

adopting the position that the Court has just asserted.  No one

has argued here that anything in the opinion and order is not

appealable.  I believe it is -- all of your findings are

appealable.

THE COURT:  Sure.

MR. BELLER:  It's up to the Judge in the District

Court to make a determination.  You're saying that you didn't

intend something, you didn't mean to do something, and you

didn't do something, but --

THE COURT:  Right.  I am saying --

MR. BELLER:  Right.

THE COURT:  -- I did not do what the lenders said I

did.

MR. BELLER:  Right.

THE COURT:  That is absolutely correct.

MR. BELLER:  But we are in the position that we

1 cannot be in the position that by not appealing the findings

2 and the conclusions that appear in your opinion later on when

3 rulings are made on those subjects again, as I think Your Honor

4 contemplates doing, that we are confronted with the argument,

5 as I'm certain we would be, that we --

6          THE COURT:  Oh, but, of course --

7          MR. BELLER:  -- that we have --

8          THE COURT:  -- that's not correct either, because you

9 can always file motions for reconsideration and make sure that

10 it's an interim ruling.  So that's absolutely not the case

11 either.

12          MR. BELLER:  Well, what _Venner_ says is that's exactly

13 what you cannot do.  You cannot -- you could not reconsider

14 your ruling of May 19 under _Venner_.  That's exactly what you're

15 not permitted to do.

16          THE COURT:  I can -- if you ask -- if you -- if the

17 bank lenders contend that somehow I made some error, which I

18 don't think I did, but if I did, and the bank lenders contend

19 that I did and think that, as a matter of error, somehow they

20 are impacted in not being able to bring forth an argument in

21 connection with the plan confirmation issues that they wish to

22 raise, which I reserved, their remedy is to say, wait, you need

23 to reconsider this argument in light of these plan confirmation

24 issues, not to take a piecemeal appeal.  I mean you can take a

25 piecemeal appeal.  I'm not arguing that.  I'm saying that you

1  have an alternative remedy.  It is not a foregone conclusion

2  that you have to appeal.  So the argument that you must appeal

3  in order to have the opportunity to raise both issues at the

4  same time is not correct.

5          MR. BELLER:  Well --

6          THE COURT:  You have an opportunity to raise them

7  both at the same time in the same court and to have both issues

8  brought before a district court at the same time.  So that

9  argument, number one, is not correct.

10         Number two, you do indeed have the right to appeal,

11  and I don't challenge that right, any findings that I made.

12  What you can't do is appeal findings I didn't make, and one

13  finding specifically that I didn't make is what rate of

14  interest applies.  And there are other things that are in the

15  statement of issues on appeal that I also did not make findings

16  regarding.

17         MR. BELLER:  No.  Well --

18         THE COURT:  So the District Court will set it out --

19  set it forth, but this Court, of course, can always interpret

20  its own orders, and I did reread my opinion to make sure that I

21  had not made that finding.  And, in fact, I did not make that

22  finding.

23         MR. BELLER:  Well, our position was that the Court

24  should find the default interest -- the default interest rate

25  to be the legal rate.  Your Honor said whatever the legal rate

1 is, it is not the default interest rate.  So that ends that

2 issue for us, because --

3          THE COURT:  Wait.  I don't -- I'm sorry.  I don't

4 remember in the pleadings seeing that the bank lenders were

5 saying anywhere that the default rate should be the legal rate.

6 What I understood the pleadings to say was that you were

7 entitled to the default interest under the contract as part of

8 the allowed claim, not ever that it should be part of -- that

9 it should be construed as the legal rate.

10          MR. BELLER:  I don't --

11          THE COURT:  If that's the case --

12          MR. BELLER:  I don't --

13          THE COURT:  -- point that out to me, because I don't

14 recall that argument anywhere.

15          MR. BELLER:  I didn't read the papers that way, Your

16 Honor.

17          THE COURT:  Well, then show it to me, please.

18          MR. BELLER:  We have the same papers.  I mean I --

19 it's nothing to --

20          THE COURT:  Well, show it to me.  You've got them

21 there.  I don't.  Show it to me.  I'd like to see it.

22 Otherwise, if that argument's there and I missed it, I'd like

23 to know.

24          MR. BELLER:  I'll do that when I sit down and get

25 up --

1              THE COURT:  All right.

2              MR. BELLER:  -- and get up for the reply.  I'm not

3    sure what you're asking me to show you but --

4              THE COURT:  What you just said I -- what you just

5    said you argued, that the default interest is the legal rate.

6              MR. BELLER:  All right.  I'll go through our --

7              THE COURT:  All right.

8              MR. BELLER:  -- our memo for that.  Now, so on the

9    issue of reconsideration, I'm not exactly sure I -- I just want

10   to be sure I'm responding to what you said.  The -- I suppose

11   that I haven't thought it through, but if there had been a

12   basis for reconsideration, it would've had -- that motion would

13   have to have been filed within the time of the appeal --

14             THE COURT:  Yes.

15             MR. BELLER:  -- once the -- all right, so you're not

16   suggesting that it's something that could be done now.

17             THE COURT:  No.

18             MR. BELLER:  All right.  All right, so, Your Honor,

19   our view is that all of the conclusions of law, all of the

20   findings that are in your opinion are necessarily subjects for

21   the appeal, because the appeal is a final -- the order is a

22   final order for appeal.  So whatever is in the order and

23   opinion is before the District Court on the appeal.

24             So the Supreme Court I think is -- we all know, and

25   all the courts in the United States -- I'm quoting from the

1   <u>Griggs</u> case -- has said that, "The timely filing of a notice of

2   appeal is an event of jurisdictional significance immediately

3   conferring jurisdiction on a court of appeals, divesting a

4   district court of its control over those aspects involved in

5   the appeal."  And so that's the <u>Griggs</u> case, and that's --

6           THE COURT:  And I don't disagree.

7           MR. BELLER:  -- somewhat elaborated on by the <u>Venner</u>

8   case.  So, Your Honor, we think that you have been divested of

9   jurisdiction to proceed with respect to an impairment hearing

10  with respect to the lenders, because Your Honor's ruling with

11  respect to insolvency, Your Honor's ruling that there were no

12  defaults under the loans, Your Honor's ruling that lenders are

13  not entitled to post-petition default interest, for all

14  practical purposes is a ruling that lenders are unimpaired.

15          The underpinnings of the conclusion with respect to

16  impairment are all subjects of the appeal.  They are, to use

17  the terms of <u>Griggs</u> and <u>Venner</u>, direct aspects involved in the

18  appeal.  So, for that reason, in our view the Court lacks

19  jurisdiction to go forward.  They said the plan proponents have

20  not argued that the order is not appealable or even that issues

21  in the order are not appealable.  In fact, the plan proponents

22  urged the Court on the prior hearing to address all these

23  issues.  They said that now is the time to address these

24  issues.

25          They argue that the issue of impairment is simply not

1  part of the appeal.  That's at Page 5 of their response.

2  That's their position.  In our view, it is, of course --

3  impairment is part of the appeal, because the lenders have

4  appealed from the entirety of the Court's memorandum and order.

5  The Court there held that the lenders were not entitled to

6  default interest.  That leaves nothing to decide on the merits

7  of the impairment dispute.

8          The plan proponents have argued that the filing of a

9  notice of appeal divests a bankruptcy court of jurisdiction

10 only over identical issues presented on the appeal.  That's not

11 the law.  The rule is -- I'm now quoting from the Strawberry

12 Square case, which is at Page 4 of our reply.  "The Bankruptcy

13 Court may not --" I've interpolated the may not "-- exercise

14 jurisdiction over those issues which, although not themselves

15 on appeal, nevertheless, so impact those on appeal as to

16 effectively circumvent the appeal process."

17         Another Court has put it, "Subject matter of the

18 appeal is not limited to issues specifically defined in the

19 appeal but includes all of those matters that can directly

20 affect the outcome of the appeal."  That's in the Whispering

21 Pines case, also at Page 4 of our reply.

22         Here, respectfully, Your Honor, the Court's finding

23 that, for example, there were no defaults, and, therefore, the

24 lender is not entitled to default interest is inextricably

25 intertwined with the issue of the lenders impairment.

1           THE COURT:  I didn't make findings that there were no

2  defaults.  I made findings that (a) the lenders agreed -- and

3  there's a transcript cite where they did agree on the record

4  that there were no pre-petition defaults.  So I made that

5  finding.  And I made a finding that there was insufficient

6  evidence before me of defaults post-petition to entitle the

7  lenders, as a matter of law, as part of the allowed claim to

8  make finding -- to impose default interest.  That's what I

9  found, no evidence of it.  Not that there were no defaults.

10  You have to be careful about the findings.

11           MR. BELLER:  Well, I think Your Honor's decision

12  addresses the arguments that have been --

13           THE COURT:  It does.

14           MR. BELLER:  -- that have been available.  I think

15  Your Honor was aware that there are no other arguments.  The

16  issue of whether there are defaults was presented to the Court.

17  Your Honor found, as a matter of law, that on the evidence

18  presented there were no defaults.

19           THE COURT:  I found, as a matter of law, that there

20  was no evidence presented that would entitle the -- under the

21  case law the bank lenders to interest at the default rate under

22  the applicable cases and standards.  There is a difference

23  between finding no default and finding no evidence presented of

24  default, and there was no evidence presented of defaults, as I

25  state in the opinion --

1          MR. BELLER:  There was evidence --

2          THE COURT:  -- post-petition.  And pre-petition there

3  was an agreement on the record by the lenders that there were

4  no pre-petition defaults, and, therefore, there was no interest

5  entitled pre-petition.

6          MR. BELLER:  There was evidence before Your Honor

7  that the -- that the debtors did not pay interest post-

8  petition.

9          THE COURT:  Exactly, yes.

10          MR. BELLER:  We said that that's a default, and we

11  said that means --

12          THE COURT:  Yes.

13          MR. BELLER:  -- we're entitled at the end of the day

14  to the contract default rate.  Your Honor said no.

15          THE COURT:  Well, yes, and the -- obviously, the

16  Bankruptcy Code and every applicable case says that that is not

17  an entitlement to post-petition default and does not constitute

18  a default, because the Bankruptcy Code prevents the debtor from

19  paying interest on those claims post-petition, but there was no

20  pre-petition interest applicable anyway, because there wasn't a

21  pre-petition default, and the lenders agreed to that on the

22  record.

23          MR. BELLER:  Your Honor, is kind of trying to decide

24  the appeal.  I'm only --

25          THE COURT:  No, sir, I --

1           MR. BELLER:  I'm only --

2           THE COURT:  I'm explaining what I decided in my

3  opinion.

4           MR. BELLER:  I'm only saying that that issue is a

5  subject of the appeal --

6           THE COURT:  Okay.

7           MR. BELLER:  -- and, therefore, it's intertwined with

8  the issue of impairment.

9           THE COURT:  No, it's not.  The issue of impairment

10 has to do with whether or not (a) the classification, as I

11 understand it, and the lenders -- the classification that the

12 lenders will contend that they -- the class the lenders will

13 contend they belong in, and I don't recall the specific classes

14 that that is right now, but 6 and 9, I believe.

15          The issue of impairment is much different.  This

16 issue that I decided was very simple.  It is whether as part of

17 an allowed claim default interest is a component of that claim,

18 and I determined that it is not, pure and simple.  That's my

19 holding.  How did I get there?  My opinion explains it.

20          MR. BELLER:  Well, Your Honor, we are probably going

21 to have a different view on the appeal.  We think whatever you

22 found is subject for the appeal.  If Your Honor is going to --

23 in our view, if you go and revisit issues about default,

24 although Your Honor has been told that the evidence presented

25 in connection with the prior submissions which went on both

1  sides well beyond 502, but that's the evidence of default.

2  Your Honor took the evidence that's available to the bank

3  lenders.  I don't know.  I -- it seems to me that Your Honor

4  addressed them, and you said -- whether you said there's no

5  evidence of default that allows me to reach the conclusion that

6  there was a default, or you said based on whatever has been

7  submitted, I find that there's no default, to me those are the

8  same.  You may disagree.

9          We think all of this is subject to the appeal, and

10 because these are subjects of the appeal, Your Honor cannot

11 actually address the issue of impairment.  If we were to come

12 before the Court on Monday and argue issues relating to

13 default, like, Your Honor, could you reconsider and conclude

14 that there was a default, I'm concerned that the <u>Venner</u>

15 decision says that you have no jurisdiction to address that.

16 Because you have no jurisdiction to address those issues, that

17 means you don't have jurisdiction to address what will be

18 addressed on Monday.

19          That's our argument.  I think that the Court is

20 stripped of jurisdiction.  I think it's our duty to advise the

21 Court that any conduct -- any actions it takes with respect to

22 impairment on Monday, in our view, will be a nullity.  It will

23 be a waste of judicial resources and a waste of --

24          THE COURT:  Well --

25          MR. BELLER:  -- the parties resources.

1          THE COURT:  -- I suppose if the bank lenders are

2    somehow or other going to now turn up to show me that the

3    debtors did, in fact, present -- pay interest post-petition

4    when the representation -- because I don't think I had any

5    evidence of it.  I had a representation of it, which I accepted

6    -- that the debtors didn't pay interest post-petition is

7    presented, such that I now have contrary evidence that I have

8    to consider.  I agree.  That would be a problem.

9          But, frankly, I don't think that that's likely to

10   happen, because everybody's agreed that the debtors didn't pay

11   interest post-petition.  So I don't think there is anything

12   that I'm going to have to reconsider in that view, so I'm at a

13   loss to understand what it is that I'm going to be

14   reconsidering, I think.

15         MR. BELLER:  I think the position was the debtors did

16   not pay interest post-petition, and that's a default.  Your

17   Honor said, well, they couldn't pay.

18         THE COURT:  Right.

19         MR. BELLER:  They didn't have to pay, and we say they

20   did have to pay.

21         THE COURT:  So how am I going to reconsider this?

22         MR. BELLER:  I'm not saying you will.  I don't think

23   you have the subject matter jurisdiction to address it at all.

24         THE COURT:  Okay, so whether I have subject matter

25   jurisdiction to or not, why would I re -- in what context would

1  I reconsider it?

2          MR. BELLER:  I'm not sure, Your Honor, if -- the

3  issues have been determined in your prior decision.

4          THE COURT:  Yes.

5          MR. BELLER:  So that's why it was appealed, and

6  that's why it's appealable, and that's why there's nothing for

7  you to do going forward, because you cannot do anything going

8  forward with respect to impairment.  That will not involve a

9  revisiting of issues that have already been determined.

10         THE COURT:  I don't need to revisit those issues.

11 That's -- I'm confused about what you're arguing, because to

12 the extent that the issues are already determined, I don't need

13 to revisit them.  To the extent that there is something in

14 addition that has to be argued with respect to impairment that

15 isn't considered as part of an allowed claim, I haven't

16 considered it, so it's not on appeal, it's not part of my

17 ruling, and it isn't stayed.  So I don't -- and jurisdiction

18 isn't divested, so I just don't understand where the issue is

19 -- where the rubber hits the road.  I'm missing the point.

20         I don't disagree at all with the analysis that as to

21 the issues that are -- that as to the facts that I found and

22 the conclusions of law that I've drawn that those are subject

23 to appeal, that I am divested of jurisdiction, and I in no way

24 intend to undertake any further analysis of those issues

25 whatsoever while they're on appeal.  But why the issues that

1 are set for the plan confirmation Phase I hearing cannot be

2 adjudicated in light of my very simple determination that the

3 bank lenders are not entitled to default interest as a matter

4 of law as part of their allowed claim any way -- in any way

5 impacts that -- the rest of the analysis going forward is where

6 I am lost.

7        MR. BELLER:  Well, Your Honor said that you had

8 addressed these issues in terms of allowance, and it doesn't

9 look to us as if you did.  But if you did, and you're not --

10 now going to plan confirmation, you would then begin to address

11 all of the issues in the context of plan confirmation.  But

12 Your Honor is foreclosed from doing that, because you've

13 already reached decisions with respect to defaults and whether

14 there was a default.  That's an issue on appeal.  So it's hard

15 to -- for us to understand how you can go ahead with a hearing

16 on impairment that necessarily, if it's something new, is going

17 to address certain issues which have already been determined

18 but which are on appeal.  So --

19        THE COURT:  All right.  What I determined, so I'm

20 clear, is that there's an agreement on the record regarding

21 pre-petition defaults, and that I was not presented evidence of

22 post-petition defaults.  So if I am presented evidence of post-

23 petition defaults, I clearly haven't considered it, because I

24 said I wasn't presented with it before.  So I can't be

25 reconsidering it, because I never considered it before, because

1  I wasn't given it before.  So I can't be stayed from

2  considering what I never had considered before that I wasn't

3  presented with.  So that has no logical -- that's a simple,

4  logical fallacy.  That simply can't happen.

5        As to the pre-petition defaults, the lenders agreed

6  on the record that there were none, so I don't need to

7  reconsider that.  That's a foregone conclusion.  That's why I

8  am not following this analysis.

9        MR. BELLER:  I think I've said whatever I am capable

10  of saying.

11        THE COURT:  Okay.

12        MR. BELLER:  I think Mr. Cobb wanted to make a point.

13        THE COURT:  All right.

14        MR. BELLER:  Thank you, Your Honor.

15        MR. COBB:  Good afternoon, Your Honor.

16        THE COURT:  Good afternoon.

17        MR. COBB:  Richard Cobb on behalf of the bank

18  lenders.  Your Honor, let me try very briefly to try to cut

19  through where I think Your Honor is a bit hung up on the rocks.

20  Your Honor, let -- and I think the issue is best illustrated

21  through the example we were just talking about.  That is a

22  finding that there was no evidence that supported a

23  determination that there was a post-petition default.  No

24  dispute on pre-petition defaults.  It's the post-petition

25  default that concerns us.  And for obvious reasons, if you

44

1  don't find that there was ever a default under the loan

2  agreements, under no circumstances are we entitled to default

3  interest.  I think that's fair to say.

4          And what Your Honor said is, well, I didn't make that

5  determination.  All I said was there was no evidence or

6  insufficient evidence before me during the proceedings where

7  the Court considered the debtors' claim objection in order to

8  make a ruling.  Your Honor, the sole evidence that was

9  presented to the Court, as I understand it, was the affidavit

10 of Charles Freedgood, and in that affidavit it lays out all the

11 bases for which the bank lender group believes that there were

12 post-petition defaults.

13          For example, the loans matured post-petition, and

14 they were not paid.  The principal was not paid.  Interest that

15 -- under the loans was due post-petition was not paid.  Your

16 Honor said, well, the Bankruptcy Code excuses the payment of

17 post-petition interest, and, therefore, there is no right to

18 default interest in that respect.  I don't believe the opinion

19 addressed the issue of the maturity of the principal, the

20 maturity of the loan agreements themselves, but I think Your

21 Honor may appreciate our perspective when we look at the

22 evidence that we have, this affidavit the Court has considered

23 and said there is no evidence of a post-petition default.

24          That's what we have, Your Honor.  And so faced with a

25 ruling where the Court says there is either insufficient or no

1  evidence leads to the same conclusion.  It means I'm not going

2  to find that there was a post-petition default.  We have to

3  appeal that, and that is the predicate -- and we'll hear about

4  this more later when we talk about scheduling for next week.

5  That is the entire foundation of our impairment argument for

6  next week.

7          If you have already made a determination that there

8  is insufficient evidence in the record, and it's all the

9  evidence you'll ever see that there was no post-petition

10 default, there's no point in going forward next week, and we

11 could -- but we'll talk about that later.  I think Mr. Bernick

12 -- we do share the same view on that with regard to impairment.

13 So I don't know whether that helps or hurts, but I felt

14 compelled to say that --

15          THE COURT:  Okay.

16          MR. COBB:  -- provide that description.  Your Honor,

17 I rise to specifically address the issue with regard to

18 solvency discovery, and I think you appreciate that the debtors

19 raised in their papers that on some basis that the bank lender

20 group has waived its ability now to pursue solvency discovery.

21 And I -- Your Honor, in our reply papers we made it very clear

22 and cited to the transcript where the Court had said to me,

23 with Mr. Bernick's either acquiescence or agreement or silence,

24 the record speaks for itself, that we would take up the issue

25 of solvency discovery after the Court had issued its ruling

1  with regard to the claim objection at the first omnibus hearing

2  following the issuance of that ruling.

3            THE COURT:  Yes.

4            MR. COBB:  And that's the end of this month, June

5  29th.  I'm happy to sit down now, Your Honor, if the Court

6  agrees with that proposition, and we can talk about it on June

7  29th, because I do think that's where we are at.  I had said to

8  the Court very respectfully I'm not going to ask Your Honor

9  when you're going to issue that opinion, and the Court had said

10 I'll do my best to get it out.  I think there was some

11 discussion of dates and times.  And nothing had changed in the

12 interim period, and here we are.  The opinion's been issued,

13 and we have no solvency discovery.

14            I had suggested let's do it with feasibility.  Mr.

15 Bernick had very good reasons why we shouldn't, but he did say

16 we should probably wait, because it might be a useless effort,

17 a useless act.  Here we are.  The next omnibus is June 29th.

18            THE COURT:  Okay.

19            MR. COBB:  That's all I have, Your Honor.  Thank you.

20            MR. PASQUALE:  Well, one second.  Ken Pasquale for

21 the Committee.  I'm not going to repeat anything that Mr.

22 Beller and Mr. Cobb said.  I did want, and at the risk of

23 shooting myself in the foot, advise the Court of one change I

24 guess since our motion.  Our motion went I guess a step

25 further, because the Committee, of course, represents the

1  entire constituency of unsecured creditors, everyone else in

2  Class 9 in addition to the bank lenders, and we made the point

3  that impairment of a class is not again limited to the bank

4  lender issues.  And when we filed the motion, that was prior to

5  the debtors filing their briefs and other papers.  At that

6  point in time we did see and we had filed our confirmation

7  objections and saw issues with respect to the other lenders.

8       I'm not sure we're quite there yet, Your Honor, but

9  in light of what the debtors -- plan proponents have put in

10 their papers and discussions we have, we may have at least for

11 the Committee objection as to non-lender claims close to

12 resolving those issues.  So I did want the Court to know that.

13      In addition, when we talk about impairment, there is

14 at least one other creditor who has separately filed its own

15 objection claiming that, you know, Class 9 is not impaired,

16 because it's claim is impaired.  So I wanted the Court to be

17 aware of that as well.

18      THE COURT:  I'm sorry.  One other creditor who --

19      MR. PASQUALE:  Morgan Stanley filed an objection on

20 impairment grounds as well, so whatever we discuss from the

21 lenders and the Committee, there is more out there, and that is

22 something that regardless would have to be taken up if the

23 Court decides, as I certainly sat and heard the Court, that

24 this is an issue the Court can hold on to, that you have not

25 lost jurisdiction.  We respectfully disagree, but I did want

J&J COURT TRANSCRIBERS, INC.

48

1    the Court to understand the rest of the issues.

2            THE COURT:  Okay.  Mr. Bernick.

3            MR. BERNICK:  Well, Your Honor, I guess they've read

4    you your rights.  It sounded kind of like we wanted to make

5    sure that you know before we go down this road.  Their motion

6    is a short little one, about six pages, but it's a particularly

7    nasty one, particularly in light of what it seeks to do with

8    respect to this proceeding.

9            Your Honor ruled, and I'm not going to go back over

10   the long history that preceded the ruling, although maybe we'll

11   have to do that.  But they clearly pounced on what they thought

12   was an opportunity.  They took an appeal that is on its face an

13   interlocutory appeal.  It affects only an issue within a whole

14   series of issues.  Counsel suggests that somehow we don't have

15   any quarrel with their taking an appeal.  Our time to move to

16   dismiss the appeal hasn't yet come on the grounds that it's

17   interlocutory.

18           But the best illustration of how interlocutory it is

19   is we have a case management order where we phased issues, and

20   everybody agreed to do this as an accommodation really to the

21   Court to say let's take it step by step by step.  And the first

22   step that was even before the case management order was our

23   motion -- our objection to their claim which we wanted to have

24   heard very, very early, and they ultimately agreed should be

25   heard to then be followed by impairment to then be followed by

1  the other confirmation issues.  That's a case management

2  sequence.  Courts every day of the week sequence issues.  They

3  don't decide everything all at once.  They sequence issues.

4          And if people went around taking appeals from those

5  issues and then were able to argue that the Court is divested,

6  as if you're powerless to act, because the issues would've been

7  sequenced, there would be no such thing as an appellate process

8  that works with a full package of issues.  You'd have piecemeal

9  appeals, and you'd have unbelievable delay.

10         And that's effectively what they've achieved here.

11 They've taken the case management order, used the fact that

12 Your Honor ruled before even the case management order, and

13 because this is all sequenced, said, oh, oh, we got your order.

14 What?  Now, it's all gone.  That's a misuse of -- mismanagement

15 that they're arguing for.

16         It is interlocutory.  It's plainly interlocutory.

17 It's interlocutory for the same reason that any sequencing of

18 issues in the case management order, if leading to appeals, all

19 those appeals would be interlocutory.

20         They do the second thing.  What they are arguing for

21 here is effectively a bootstrap stay.  They don't even have to

22 move for a stay, in their view.  All they do is on their own

23 take that interlocutory appeal, and they say Your Honor is

24 divested of jurisdiction.  Why would anybody ever move for a

25 stay?  This is so much easier.  They don't have to make a

1  motion.  They don't have to show irreparable harm.  They don't

2  have to address anything.  Just say, oop, here it goes.  Gone.

3  That's a bootstrap, and the flaw with a bootstrap is not only

4  would it make a mockery of the whole idea of stay procedure,

5  but it's predicated upon a fundamentally, absolutely incorrect

6  notion of jurisdiction.  I'm really surprised that the argument

7  even has been made.

8       The statement was made, Your Honor is deprived of

9  subject matter jurisdiction.  Now, subject matter jurisdiction

10  is a pretty well-known concept in the law.  It says as a matter

11  of statutory power, Your Honor lacks statutory power to

12  proceed.  That has nothing, nothing to do with the doctrine of

13  being, quote, divested of jurisdiction where there's an appeal

14  under the _Griggs_ decision.  That is not a subject matter

15  doctrine, is not a statutory doctrine power.  Your Honor is not

16  divested in the sense that you lack legal or judicial power to

17  do anything.  That is a jurisprudential doctrine, and the Third

18  Circuit has said so in words of one syllable.  This comes right

19  out of the decision of the Third Circuit in _Mary ann Pensiero_

20  decided after the _Griggs_ decision, in 1988.

21       It says, "The rule --" citing the rule that, "The

22  filing of a notice of appeal divests the District Court of

23  jurisdiction over the case pending disposition of the appeal,"

24  citing _Griggs_, it says of that, "The rule is a judge -- is

25  judge made rather than a statutory creation."  If that's so --

1  it's coming right out of the Third Circuit's mouth -- why is

2  the argument being that Your Honor lacks subject matter

3  jurisdiction?  Yes, if it's statutory -- it's just plain wrong.

4  It's founded on prudential considerations.  It is designed to

5  prevent the confusion and inefficiency that would result if

6  both the District Court and the Court of Appeals were

7  adjudicating the same issues simultaneously.  As a prudential

8  doctrine, the rule should not be applied.  "When to do so would

9  defeat its purpose of achieving judicial efficiency," citing

10 the Bennett case, which was cited by counsel.

11          So the Doctrine of Divestiture is a prudential

12 doctrine, and as a prudential doctrine, it incorporates exactly

13 the same kind of prudential considerations that go into a

14 motion for stay.  In a motion for stay, one of the principal

15 considerations is, well, what is the effect of delay on the

16 proceeding?  Is it going to harm the proceeding?  Is it

17 balanced out by a showing of irreparable harm?  They made none

18 of those showings.  They've made none of those showings.  In

19 fact, the only prudential consideration that would cut in this

20 case, cuts completely against them, because they're acting to

21 stop this proceeding concerning a central issue in the case

22 dead in its tracks until the Court of Appeals rules at some

23 point way down the road.  That's delay, delay, delay.

24          Where's the irreparable harm to them?  It doesn't

25 exist.  Where's probability of success on the merits?  It's

1 never been shown.  They don't even want to attempt to

2 demonstrate the predicates for a stay, and that hurts them on

3 every single point to the same extent when they talk about the

4 doctrine -- the prudential doctrine of the divestiture of

5 jurisdiction.

6        The idea that somehow a party can come in and by fiat

7 mount an interlocutory appeal and say, Your Honor, I'm sorry

8 I'm going to read you your rights.  This case is dead in its

9 tracks, would wreak a profound change in the landscape of how

10 proceedings took place in this court.  God knows what would've

11 happened earlier in this case with all the appeals that have

12 been taken on an interlocutory basis -- some of them, many of

13 them unsuccessful -- if that doctrine had been applied here.

14 And now after years and years and years and service of delaying

15 the case is being invoked here.

16        And, of course, Your Honor well knows that even the

17 predicate for the prudential doctrine doesn't exist.  You have

18 to have the same issue.  Now, counsel says it doesn't have to

19 be exactly the same issue as anything that affects the --

20 that's just wrong.  The whole idea of the doctrine -- the

21 prudential doctrine of the divestiture of jurisdiction was to

22 avoid the, quote, confusion and inefficiency that would result

23 when you have two different courts considering exactly the same

24 issue.  That's the whole purpose of it.  It's a judicial

25 economy and clarity point.  It has nothing whatever to do with

1  the idea that somehow there's a broad ambit that reaches all

2  aspects of the decision including dicta.

3       Your Honor, I'm not going to read through your

4  decision.  There's no point in doing that.  Your Honor has

5  reread it.  Nothing could be clearer.  I went back over it

6  myself.  The holding of the Court is crystal, crystal clear.

7  It's in the context of 502©, which was allowance.  That is the

8  argument that specifically we made.  We made a bunch of other

9  arguments.  We've set out a whole menu of other things that the

10  Court could consider, and we believe at some point should

11  consider, but we certainly know that we separated out that

12  issue as an independent ground for determination, and that's

13  the one that Your Honor decided to rule on, and you expressly

14  said that you weren't ruling on the others.

15       For them to say Your Honor didn't really mean what --

16  I'm going to tell Your Honor what you meant in your order, and

17  I'm going to remove your ability to even speak to that issue,

18  because on the basis of my construction I've taken it over to

19  the Court of Appeals, and Your Honor was -- Your Honor can't

20  even talk about it, because -- that is just -- that is just --

21  that's an outrageous position.  It's that nasty -- and the

22  nastiness is this.

23       We're sitting here now in the middle of a schedule

24  that contemplated -- always contemplated that we were going to

25  be done with confirmation in September.  That's the way it was

1  going to be.  Everyone has worked unbelievably to get to that

2  point.  We now have a central issue in the case, indeed an

3  issue that's written into -- into the plan as being a pre-

4  condition for confirmation of the plan.  And these folks are

5  saying let's just wait until the Court of Appeals rules on our

6  decision, on our issue.

7         So you go up to the District Court, then we go up to

8  the Court of Appeals, and how long is that going to take?

9  Well, we all know it's going to take at least a year to get

10 that decision, maybe more.  So to suit their convenience, the

11 issue that they like, that they've carved out, this case is on

12 ice in terms of being a consummated case until that happens,

13 and then it comes back down, if it comes back down for any

14 further proceedings, and they want to have all kind of

15 proceedings down the road.  It's an unbelievable position.

16        Now, they can't get there on the basis of stay.  They

17 can't there on the basis of prudential doctrine.  To argue

18 otherwise is disingenuous.  And so now the question is where do

19 we go, and I -- they've already introduced that issue, and

20 their motion is a motion for modification of the case

21 management order.  So the scheduling issue, which they now --

22 they now want to parse their own motion to say all they want to

23 argue about today is jurisdiction and then somehow they're

24 going to argue scheduling as part of some other process.  No,

25 their motion is a motion to modify the case management order.

1  It's all before the Court.  They've now spoken to it, so I'm

2  going to speak to the scheduling issue.

3          Now, it's true, Your Honor, that at the time that we

4  were putting the CMO in place, the CMO is put in place in the

5  context of an already existing track -- litigation track with

6  respect to the default interest issue.  We teed it up early,

7  because it was such an important issue.  Your Honor held the

8  briefing.  We argued the whole thing before we even had the

9  case management order.  It was on an earlier track.  And we had

10 the case management order.  It came up for discussion, and it's

11 true at that time Your Honor was thinking that you'd be able to

12 rule shortly after the first of the year.  So, of course, they

13 reserve their rights to make some kind of modification.

14         Now, Mr. Cobb, bless his soul, seemed to suggest that

15 somehow I was okay with the idea that we'll all come back and

16 revisit this and extend the entire schedule some time later on.

17 All I said was what I did.  I said all rights are reserved.

18 That was true with respect to all parties.  It was Mr. Cobb

19 that initiated the discussion with the Court.  The Court said

20 yes, after the first -- the first omnibus after the ruling

21 we'll consider that.

22         Now, at that time it was expected that things would

23 happen more promptly, and God knows we've all been extremely

24 busy, and it wasn't to be, so time passed.  Now, throughout

25 that time, since the beginning of the year, it's not like --

1  it's not like it was just a month.  It was two months, three

2  months, four months, five months.  And during this whole time

3  the lenders who are looking at this case very diligently, they

4  know exactly what's going on.  They know that the clock is

5  ticking as against the ultimate schedule, which is the

6  confirmation hearing in September.

7          And they could easily have come back to Court at that

8  time and said, gee, you know, Your Honor, the deadlines are

9  coming up for us to do things, and we understand Your Honor

10  hasn't yet ruled, but these confirmation issues are real

11  issues.  If they had won -- if they had won on this issue, that

12  it might be part of an allowable claim, then maybe -- maybe

13  they would've wanted to address some of those issues as well.

14          So -- but they didn't do any of that.  They just

15  waited, because they knew that the longer that passed, the more

16  difficult it would be, and the greater their leverage would be

17  if they were to come in and ask for an extension of the final

18  confirmation hearing to get that extension and maybe their --

19  greater their leverage to get a better deal that they were

20  trying to negotiate, because they would have everybody else

21  under their thumb, because everybody else wants the

22  confirmation to go forward.  They didn't do any of that.  They

23  didn't do any of that.  They just sat there, and then when the

24  decision came out, boom, they pounced.  It's out of Your

25  Honor's hands.

1        THE COURT:  But, Mr. Bernick, they're the post-

2   petition lenders.  Between the debtor and the post-petition

3   lenders, if anybody already knows the solvency issues of the

4   company, it certainly ought to be the post-petition lenders.  I

5   mean to the extent that the debtors have filed every report,

6   have dealt with the same lenders pre- and post-petition, how

7   complex can discovery be?  So if they need 30 days for

8   discovery, what difference does it make?

9        MR. BERNICK:  Well, it does -- it shouldn't make a

10  difference -- it shouldn't make a difference if it -- if --

11  depending upon what it is that they need discovery of.  That's

12  really where I was going.  Where I was going is that where we

13  should really go from here is exactly what the case management

14  order says.

15       The first order of business is impairment, and Your

16  Honor needs to go ahead and decide impairment.  The second

17  order of business is going to be the other confirmation

18  standards, and it may be that Your Honor reaches exactly the

19  same conclusion there, and then there are alternative bases for

20  Your Honor's ultimate order regarding default interest.  Gee,

21  that would be unprecedented for a court to have alternative

22  bases for a decision before the whole thing goes up on appeal,

23  and that's where the -- at least the debtor is and I believe

24  the plan proponents are, although I won't speak for anybody but

25  the debtor.

1            We've got a schedule.  We've got certainly a

2    sequence, and under that sequence the next issue is impairment

3    and then the other standards for confirmation.  We ought to

4    have the confirmation hearing in September as planned, and Your

5    Honor can address all these other issues.  Now, what happens

6    during that period of time we can talk about.  We don't really

7    know that there's anything more really that needs to be done.

8    It's their burden to go forward and establish whatever they

9    believe their argument might be to be able to say that it's

10   inequitable to treat them in this fashion, and they've had the

11   opportunity, and they've been prepared forever to deal with it.

12   That's fine.  So we don't believe that the case management

13   order should change at all.

14           If they want to make some specific application to

15   come in and get a little bit of extra time that falls within

16   the parameters of our September date, we'll certainly consider

17   that, and indeed we would be, because I know from a long

18   experience with the Court that if I don't consider it, Your

19   Honor will consider it.  So we're happy to undertake that

20   consideration but not this motion.

21           This motion asks for way too much and asks for way

22   too much in the context of a process that's been extremely well

23   managed, and everybody in this courtroom and on the telephone

24   has paid a little bit in their own blood and time and heartache

25   and a lot of money to keep on track.  Very, very important for

1  the plan proponents and all the other constituencies in the

2  case who want to get paid, want to get paid, that we continue

3  to go forward towards the confirmation in September.  Thank

4  you, Your Honor.

5          THE COURT:  Well, I don't see any basis on which to

6  delay the confirmation either next week, because I don't

7  believe I'm divested of jurisdiction, and I agree that there

8  are prudential concerns in some instance, and I don't intend to

9  revisit issues I've already decided.  I tried very vigorously

10  to separate out issues that could be decided without the need

11  for an evidentiary hearing which I thought might be necessary

12  in the plan context and/or legal arguments that I thought might

13  be necessary in the plan context and tried very hard to

14  bifurcate those out.  So I don't in any way think I'm divested

15  of the ability to consider those issues next week, and I don't

16  see any basis to hold up the confirmation hearing in September.

17          If the lenders want, you know, 30 days to take a look

18  at solvency issues, certainly, the lenders have received

19  significant fees as this case has gone on for continuing to

20  lend to the debtor.  They have looked at the debtor's

21  condition, both from a solvency perspective and an ability to

22  repay perspective several times throughout the case.  If it's a

23  matter of updating that issue, 30 days certainly ought to do

24  it.  I have no problem --

25          MR. BERNICK:  And the other --

1          THE COURT:  -- letting them have 30 days to do it.

2          MR. BERNICK:  We -- and they have their own expert.

3  They've had their expert in connection with the estimation

4  forever.  They participated in all of those different

5  proceedings, Your Honor.

6          THE COURT:  And, well, in fact, I'm not -- I don't

7  recall when in September this case starts, but, you know, it

8  may even take a little longer than 30 days.  Fine.  But I don't

9  see a basis to hold this up.  The lenders, if anybody, ought to

10  be able to get that issue teed up quickly.

11          MR. BERNICK:  Thank you.

12          THE COURT:  Mr. Pasquale.

13          MR. PASQUALE:  Thank you, Your Honor.  Just very

14  quickly address a couple of Mr. Bernick's points.  First of

15  all, Mr. Bernick's right.  This design was the debtor's making.

16  They filed a claim objection to the bank lenders' claim.  I

17  don't think there's any argument that a decision on a claim

18  objection is a final appealable order.  Mr. Bernick seemed to

19  say to the contrary.  I think that's wrong.

20          1129 issues, which the Court plainly did in the

21  decision defer, are Phase II issues.  The only issue impacting

22  general unsecured creditors and the bank lenders next week is

23  potentially impairment.  That's it.

24          THE COURT:  That's also a confirmation issue.  I

25  think --

1           MR. PASQUALE:  Agreed.

2           THE COURT:  Okay.

3           MR. PASQUALE:  Let --

4           THE COURT:  I think I said I deferred all

5   confirmation issues.  I didn't limit it to 1129.

6           MR. PASQUALE:  Well, and that goes to the point Mr.

7   Cobb made, which we do agree with, which is in light of the

8   Court's findings that there is no bases -- and I recognize the

9   Court's explana -- clarification on that, that no evidence was

10  presented.

11          THE COURT:  Right.

12          MR. PASQUALE:  But, as Mr. Cobb said, the same

13  evidence is present -- will be presented next week.

14          THE COURT:  Well, I don't know that.  You may know

15  that.  I don't know that.

16          MR. PASQUALE:  Okay, but the point is the bifurcation

17  here of the confirmation hearing again was the plan proponents

18  making.

19          THE COURT:  Well, it was their --

20          MR. PASQUALE:  We are not here --

21          THE COURT:  Wait --

22          MR. PASQUALE:  I'm sorry, Your Honor.

23          THE COURT:  -- Mr Pasquale.  I'm sorry.  The plan

24  proponents proposed that.  Everybody agreed to it.  Everybody

25  signed off on it.  Now, this is not a time for a pot calling

1  the kettle black.

2          MR. PASQUALE:  Yup.

3          THE COURT:  This is the order that's been governing

4  these proceedings for about a year now.

5          MR. PASQUALE:  And that's the -- and the point I was

6  starting to make with that, Your Honor, is that we're talking

7  about the difference now between now and September.

8          THE COURT:  Right.

9          MR. PASQUALE:  We are expediting these appeals.  I

10  can't control the appellate courts, but we will be expediting

11  the appeals.  The impairment issue itself is not a big issue

12  next week.  It is not going to take a lot of time to do.  So to

13  defer the issue from here to September I don't think is this

14  nastiness that Mr. Bernick is talking about.  I think it is

15  efficient, and, frankly, to tie to my last point on the

16  solvency, there is no point in spending resources of the court

17  or the parties on solvency until the decision was entered.  And

18  that's why Your Honor said let's take it up at the next omnibus

19  after issuing my decision.

20          THE COURT:  That's right.

21          MR. PASQUALE:  So for Mr. Bernick to say we didn't do

22  anything there in that period of time I think is unfair.  We

23  have been talking about what, if anything, we will do.  We will

24  be prepared to advise the Court on that issue on the 29th,

25  what, if anything, we will -- we think we need to do, and we

1 certainly recognize that there is a schedule in place.  That,

2 you know, we're not the only parties to this case, and we

3 understand that.  Thank you, Your Honor.

4        MR. BELLER:  Your Honor, I just want to address the

5 issue that you asked me to address --

6        THE COURT:  Yes, sir.

7        MR. BELLER:  -- and bring to your attention.  At

8 Pages 45 through 47 of the pretrial memorandum of the bank

9 lenders I think this is what I was saying.  I hope it is what I

10 was saying.  We were arguing that the legal rate, in our view,

11 in this case certainly is the default rate.  I don't think I

12 intended to say -- I hope I didn't say that in every case the

13 legal rate is the default rate.  Our position was that the

14 legal rate, as provided in 726, is the default rate of

15 interest.  I think Your Honor has effectively ruled here.

16        I just think that we're on the way to having a highly

17 confusing situation where Your Honor will address something

18 presumably on Monday.  We're still hoping that you won't, but

19 if you do, and eventually we'll have a series of appeals in the

20 District Court perhaps, or we'll have motions to vacate or

21 we'll have arguments by the parties that there have been

22 waivers.

23        So I just think that the jurisdiction that the Court

24 had it no longer has, because, as I've said, the subject matter

25 of the appeal is intertwined with the issue Your Honor will

1  address on Monday, and, therefore, Your Honor does not have

2  jurisdiction, has been divested of jurisdiction, and there are

3  very good reasons and sound reasons for not going forward.  And

4  so unless Your Honor has some questions, I'm finished.

5             THE COURT:  No, thank you.

6             MR. BERNICK:  I just had a very short point, Your

7  Honor, if I could make it?

8             THE COURT:  All right.

9             MR. BERNICK:  The impairment issue that would be up

10 for -- impairment, with respect to the general unsecureds, was

11 always scheduled to take place as part of Phase I.  Even though

12 it was a confirmation hearing, the issue -- the whole idea was

13 to phase confirmation issues between the two phases.  So we

14 believe it's very consistent with the CMO to have the

15 impairment matter heard next week.  We believe that next week

16 the only thing that's really necessary is to take up whether

17 the general unsecureds can argue impairment on the basis of the

18 -- they have an allowable claim that's not being allowed by the

19 Court, and that probably undoubtedly is extremely closely tied

20 to Your Honor's opinion.  You know Your Honor has to actually

21 address that.

22            With respect to the balance of the issues, the fair

23 and equitable test, technically, those also do go to

24 impairment, but there are somewhat different bases for

25 impairment argument.  And -- but fair and equitable should be

1  left over to September.  We would agree with that.

2          So we think the matters concerning impairment insofar

3  as the Court can address them in Phase I are very limited.

4  It's -- you know, can be a 15-minute argument.  They do take

5  out the proposition that they are impaired notwithstanding the

6  Court's order, and that should be resolved next week as the

7  schedule calls for it to be resolved.

8          With respect to solvency and what further matters

9  they want to put in the record, sure, they can come and say

10  here's what further matters we want to put into the record.

11  They're out of time on that.  They should've done that before,

12  but Your Honor has indicated that you're prepared to give them

13  some leeway.  That's fine, but we should note that today is the

14  pretrial conference with respect to anything next week that

15  needs to be resolved.

16          UNIDENTIFIED SPEAKER:  Your Honor, I'm sorry.  Mr.

17  Bernick, I think, is speaking but he cannot be heard.

18          THE COURT:  Okay.  Thank you.

19          MR. BERNICK:  I guess the light was not on.  I hope I

20  don't have to go over all that I did.  I won't.  But the point

21  is that -- the point is that impairment insofar as 502 is

22  concerned should be heard next week.  We have a pretrial

23  conference today.  We believe that they wanted to raise

24  anything with regard to solvency, because that matter is past

25  due under the deadlines.  They should be raising it today.  But

1  if they want to raise it next week in the -- what we hope would

2  be a modest discussion next week, we wouldn't have a problem

3  with that either.  We can talk about what discovery they need.

4       What I am most concerned about, Your Honor, is Mr.

5  Pasquale still seems to believe that this case should be in

6  some fashion, any fashion, affected by their effort to take an

7  appeal.  He says they're going to conduct an expedited appeal,

8  and, you know, we have to wait and see what happens with that,

9  et cetera, et cetera.  I think that that's an invitation for

10 Your Honor either to say nothing or to say something that they

11 can then take to the District Court and the Circuit to say in

12 some fashion that this proceeding here has got flexibility, and

13 that we can accommodate their effort to take an expedited

14 appeal.  And I think that that is -- I think we should do

15 nothing of the kind.

16      If they want to take an expedited appeal of some

17 kind, that's their prerogative, but Your Honor is not divested

18 of jurisdiction, doesn't have to behave as if you are or might

19 be divested of jurisdiction.  It is their decision to take a

20 piecemeal appeal.  It's not ours and not the Court's, and we

21 should go about our business as if that appeal is not pending,

22 because, otherwise, we're going to find a self-fulfilling

23 prophecy, which is that, oh, well, don't do this and give us

24 another 30 days, another 45 days, so we can get guidance from

25 the Circuit.  And, oh, why should anybody spend any money on

1  solvency?  God knows, they're spending tons of money.  They've

2  got different firms, different constituencies all here.  They

3  spent a ton of money on this case.  They've already spent their

4  money on solvency, so the idea that there's somehow a cost

5  savings associated with wait until the Circuit rules or the

6  District Court rules to save money on solvency is totally

7  disingenuous.

8         So, Your Honor, we would stress the importance of

9  sticking to the CMO, so that we get to September on time.  Let

10  them do whatever they want with their appeal.  I think that the

11  only matter that really should remain before the Court for

12  further discussion next week beyond the argument on impairment

13  is some application they make to get within 30 days some kind

14  of discovery that they believe somehow is necessary and they

15  haven't been able to obtain in all the millions of dollars that

16  they've spent on the solvency issue to date.

17         So we would very strenuously ask the Court stand by

18  the CMO.  Don't do anything that they can quote to the Court of

19  Appeals in saying that somehow the expedited appeal can be

20  accommodated here.  Let's just go on and get this issue

21  resolved.

22         MR. COBB:  Your Honor, very briefly.

23         THE COURT:  Mr. Cobb.

24         MR. COBB:  Your Honor had intimated that my clients

25  have received payments post-petition.

1    THE COURT:  No.

2    MR. COBB:  I thought Your Honor had said that we know

3 -- we should know all about solvency, because we've been

4 receiving fees, or we've been receiving something post-

5 petition.  Maybe I misheard the Court.

6    MR. BERNICK:  Information.

7    MR. COBB:  Oh, information.

8    THE COURT:  I'm sorry.  If I said that, I --

9    MR. COBB:  Thank you, Your Honor.

10    THE COURT:  If I said that, that's not what I meant.

11 I apologize if I did.

12    MR. COBB:  Thank you.  That's --

13    THE COURT:  Okay.

14    MR. COBB:  That's fine, Your Honor.  Your Honor, I'm

15 not sure where we're at on scheduling for next week.  I thought

16 that was to be heard later in the hearing after Your Honor had

17 made a decision on the motion.  It's starting to creep in here.

18    THE COURT:  Okay.  I guess the issue is this.  If you

19 know what discovery you need, we ought to probably just talk

20 about it now and not wait until next week.  So that may be the

21 issue.  Do you know what you need?

22    MR. PASQUALE:  No, Your Honor, we haven't had a

23 chance to confer.  I spoke to Mr. Bernick last night.  He

24 didn't want to put the issue off, so we do need time to confer

25 with the Committee and Mr. Cobb with the bank lenders.  I don't

1 think it's next week, Your Honor.  I think it's the next

2 omnibus hearing, which is the end of June, and that's what your

3 order previously advised us.

4        THE COURT:  Well, the order did say the next omnibus

5 hearing, but, you know, this opinion's been out for a couple

6 weeks now.

7        MR. PASQUALE:  And we can -- we will be prepared to

8 discuss it next week --

9        THE COURT:  All right.

10        MR. PASQUALE:  -- Your Honor.  That's fine.

11        THE COURT:  I think next week probably makes some

12 sense.  I don't know what's on the agenda for the omnibus.  I

13 haven't had a chance to look at it.  Is it a big hearing day?

14        MR. BERNICK:  I don't know.  I'm more concerned about

15 just getting the request out on the table.

16        THE COURT:  It is.

17        MR. PASQUALE:  But I do want to comment, Your Honor,

18 if I may?

19        MR. BERNICK:  I'm sorry.

20        MR. PASQUALE:  And let me come to the podium.

21        MR. BERNICK:  And, Jan, is it a big hearing date?

22        MS. BAER:  It is, and it's not until the 29th.

23        MR. BERNICK:  Not until the 29th.

24        THE COURT:  Why don't we address this issue with

25 respect to what, if any, discovery is necessary on the solvency

1  question this coming Monday.  I think everybody will be here.

2  The relevant parties will be here, so let's take it up this

3  coming Monday rather than June 29th.  I think that may make

4  some sense anyway.  I don't know how much time we're going to

5  need for whatever proceedings are scheduled for four days next

6  week anyhow.  I do want to address that today before we're

7  finished, so it may be appropriate to use some of that time as

8  opposed to -- Ms. Baer's nodding yes.  It's a big calendar for

9  the 29th, so it may be better just to take this issue on

10 Monday, the 22nd anyway.

11          MR. PASQUALE:  We'll be prepared to do that, Your

12 Honor.

13          THE COURT:  All right, Mr. Pasquale.

14          MR. PASQUALE:  Thank you.

15          THE COURT:  I'm sorry.  Were you going to say

16 something?

17          MR. PASQUALE:  No, that's fine, Your Honor.  Thank

18 you.

19          THE COURT:  Okay.  Mr. Cobb.

20          MR. COBB:  Your Honor, I only rise -- I know that we

21 have a large group.  Our clients are not one person.

22          THE COURT:  Yes.

23          MR. COBB:  And so it may be difficult for us to

24 develop the necessary consensus by Monday.  I only rise to say

25 that, Your Honor.  We'll do our best --

1          THE COURT:  It's been a --

2          MR. COBB:  -- to do by Monday.

3          THE COURT:  It's been a month since the opinion came

4   out.  I have every confidence that you can get it done by

5   Monday.  Okay.

6          The modification that's requested to the CMO I really

7   don't think is necessary at this point.  To the extent that the

8   lenders need some discovery because of the order that I

9   entered, that I think may be appropriate.  I did agree to

10  address that issue.  I'm willing to -- certainly willing to

11  consider that, but I want to talk about it Monday.

12          To the extent that that may be a modification of the

13  CMO, I would like to put this issue off until Monday, so that I

14  -- if an order is appropriate to modify the CMO for that

15  purpose, then I'll address it again on Monday, June 22nd.  So

16  we'll take that up before we start any other proceedings on

17  Monday.

18          So Item -- I guess Items 2 and 3 are continued until

19  Monday at -- I think we were starting --

20          MR. BERNICK:  Nine.

21          THE COURT:  -- at 9:00.

22          MR. BERNICK:  Although there maybe a Father's Day

23  movement here at some point.  I have to say -- well, I won't

24  say anything.  Even maybe a --

25          UNIDENTIFIED ATTORNEY:  Thank you, David.

1           MR. BERNICK:  Even maybe a couple hours, so people

2  can travel.

3           THE COURT:  We have 8:30 listed on the calendar.  Oh,

4  was there a different argument that was set?

5                        (Pause)

6           MR. BERNICK:  Your Honor, we'll just take it on

7  Monday, and then we'll go back to the scheduling issue when we

8  talked about next week generally on scheduling here and

9  we'll --

10          THE COURT:  All right.  We'll put this first on the

11 calendar on Monday.  Okay.

12          MR. BERNICK:  I think this brings us then to what was

13 originally Item 1, which relates to a joint motion in limine to

14 strike the expert reports and testimony of George Priest and

15 James Shein.  And this now relates to the insurance part of the

16 case, and I want Mr. Lockwood -- is there something -- is there

17 going to be a --

18          UNIDENTIFIED ATTORNEY:  Rearrange it.

19          MR. BERNICK:  Rearrange it.  Oh, okay.

20          UNIDENTIFIED ATTORNEY:  If you're done with the bank

21 lenders --

22          MR. BERNICK:  Oh, I see.  I see.  Okay.  I didn't

23 realize this was -- Mr. Lockwood is going to be addressing this

24 motion substantively, but -- and we're going to come back to

25 this in a minute, but I wanted to use this as an opportunity

1 from the debtors' point of view to tee up what I think is going

2 to be an issue that Your Honor's going to have to grapple with

3 this afternoon significantly in talking about what's going to

4 happen next week, and we were concerned that if we didn't flag

5 this issue at the outset, it would emerge in the course of

6 discussing this motion in kind of an odd way.  So I'm going to

7 just spend a minute on it -- two minutes, and then Mr. Lockwood

8 is going to address the motion.

9        But essentially, if we think about the insurers as

10 having rights by virtue of there being rights vis-a-vis Grace

11 in the broadest possible way, as a result of or during the

12 course of litigation of other cases, including most prominently

13 Combustion Engineering.  The issue got teed up of, well, how

14 far, to what degree, and what context do the insurers have

15 standing, because if they don't have standing, they shouldn't

16 be able to address the plan in any shape or form at all.

17        And so there's a lot of focus that took place about

18 how to basically preserve the rights of carriers, so that they

19 would be, quote, neutral, treated neutrally under the plan, and

20 as a result, they wouldn't have to come in and make all kinds

21 of arguments about the plan, and the plan process also would

22 not encroach on their rights, and that led to this whole

23 concept of insurance neutrality.  And neutrality was really

24 focused on what for purposes of our discussion here we'll call

25 coverage.  That is their obligation to pay out under the

1 policies, and that was the context in which this issue was

2 litigated all the way up to the Third Circuit, and the Third

3 Circuit made a ruling saying that certain language -- if

4 certain language is included in the plan, the plan will be

5 neutral as concerns the rights and obligations to coverage, and

6 because it will be neutral, at that point there won't be

7 standing with respect to other matters concerning the plan --

8 the plan over here.  And that's how things were.

9         And Your Honor is well familiar with the fact,

10 because you created this concept in large part and certainly

11 implemented it, that in connection with a whole wide variety of

12 other cases this whole concept of insurance neutrality has been

13 pursued.  Now, in this case we've seen the insurers begin to

14 explore the possibility -- their possibility of arguing that

15 there are other rights or other interests or other some things

16 that are affected by the plan thereby giving them standing to

17 object to the plan.  And there are a wide variety of different

18 theories that have been adopted.  Some of them are set forth in

19 the affidavits or the expert reports of Messrs. Shein and

20 Priest.

21         The reason that I raise all of -- and so this is kind

22 of a new world that they would seek to open up.  Now, I don't

23 mean to in any way, shape, or form endorse this move or say

24 that it has any credibility or substance, but I am here to say

25 that the effort of the case management order was to develop and

1 resolve issues on a phased basis.  And the case management

2 order reads out that, "Matters relating to the standing of

3 insurers as insurers would be taken up in Phase I."  Now,

4 that's somewhat ambiguous.  So during -- what it was intended

5 to do was to cover this, in a sense the traditional or the --

6 the traditional neutrality concept.  And so what we believe is

7 up for decision next week is whether this plan is neutral in

8 the traditional way vis-a-vis the insurers with two carve outs,

9 and they're explicit carve outs, and one relates to insurance

10 assignment, that is assignability, and the other one relates to

11 what?

12         UNIDENTIFIED ATTORNEY:  Reimbursement.

13         MR. BERNICK:  Reimbursement.  Reimbursement.  These

14 are carved out.  We know that it's not -- we're not asserting

15 neutrality with respect to these items.  They're deferred to

16 Phase II.  So you don't intend to take them up.

17         We also say that also deferred to Phase II are other

18 arguments that certain rights or interests are affected.  That

19 we're not going to deal with them here.  So the narrow issue

20 that's carved out for treatment as part of Phase I is this

21 neutrality.  Is it neutrality in the coverage sense?  And then,

22 in light of that, do the carriers have standing to -- as a

23 matter of law, do they have standing to address a variety of

24 different objections that they've lodged as to the plan?

25         And if Your Honor takes a look at the roadmap for the

1  objections, the roadmap for the objections lists specifically

2  and with citations to their briefs which objections we believe

3  that they don't have standing to raise.  Those are the matters

4  that we would seek to take up next week.

5         Now, it may be that the carriers will argue, well,

6  you can't do this.  That all this has to be done at once, and

7  I'm sure that that's an argument that they will make today.

8  But before Mr. Lockwood got up to talk about Shein and Priest,

9  we wanted to make sure that Your Honor's understood that

10 there's going to be an issue out here today about case

11 management.  That is in what sequence issues should be taken

12 up, and we've carved out and we believe is the right way to

13 sequence the issues.

14         Now, maybe we're wrong about that.  Maybe there's

15 another way to sequence them, but Phase I was not designed to

16 be the whole kit and caboodle with respect to insurance

17 standing.  That's not what it's designed to be.  It was

18 designed to confront very specific issues.  So when Your Honor

19 asked how long are we going to be here next week, we think that

20 this issue -- this neutrality issue can be decided as a matter

21 of law and on the basis of the plan language, because the plan

22 was specifically written, so that this matter could be resolved

23 as a matter of law.

24         So we don't think that there is any evidence that the

25 Court needs to consider next week, including evidence relating

1  to Messrs. Priest and Shein.  So with that said as a backdrop,

2  and now Mr. Lockwood will probably correct what I've said, but,

3  in any event, he'll address the merits of the motion.

4          MR. GIANNOTTO:  Your Honor, could I address that

5  backdrop before Mr. --

6          THE COURT:  All right.

7          MR. GIANNOTTO:  -- Lockwood gets to the motion?

8                          (Pause)

9          MR. GIANNOTTO:  Your Honor, there is confusion as to

10  what's Phase I or Phase --

11          THE CLERK:  Will you please state your name?

12          MR. GIANNOTTO:  Oh, I'm sorry.  This -- I'm Michael

13  Giannotto representing Continental Casualty Company.  There is

14  confusion as to what's Phase I versus Phase II.  I think if you

15  look at the case management order, on its face it's not clear

16  that the first issue for Phase I that's listed there is just

17  what Mr. Bernick refers to as the traditional <u>Combustion</u>

18  <u>Engineering</u> neutrality issue.  And it's unclear whether we have

19  to now raise issues where we believe we have any standing as an

20  insurer and actually litigate those issues if they're more than

21  the <u>Combustion Engineering</u> issues.

22          And, in fact, in our -- Continental's objections and

23  trial briefs we noted that a lot of these issues, like the

24  issue that Mr. Shein is testifying to, it's not clear whether

25  they're Phase I or Phase II, and so we listed them in both,

1  because we didn't want to be in a position of waiving it

2  somehow by not putting it one or the other.  And I think that

3  the -- when we have the pretrial conference, we should sort out

4  where we want these things to be.  I mean one of the things Mr.

5  Bernick didn't mention -- and because it wasn't really directly

6  relevant to what he said -- is that a lot of the insurers are

7  also creditors here of this -- of Grace, and, as a result,

8  they'll be claiming against the asbestos trust, and that's what

9  Professor Shein is testifying as to.  And so -- and we know

10 that our standing as creditors is Phase II, and our ability to

11 attack the trust or trust procedures as creditors, that's

12 clearly Phase II.  What's not clear is -- and is a Phase I

13 issue is whether we have standing as insurers, not as creditors

14 but as insurers to attack the trust, and that is teed up as a

15 Phase I issue.  But again what wasn't clear was if you found we

16 had standing, or in addition to arguing we have standing, did

17 we have to actually attack it in Phase I?  And so we can sort

18 that out in the pretrial conference, and we can decide what we

19 have to do.  But what I heard Mr. Bernick saying was basically

20 that, you know, he was sort of making in another guise a motion

21 to exclude Shein from testifying on the ground that it's really

22 a Phase II issue, so he doesn't have to testify in Phase I.

23 And that may ultimately, you know, be what you decide, that he

24 should be Phase II rather than Phase I.  But I just wanted to

25 point out there is confusion here, and I think Mr. Bernick

1 recognized that, that, you know, he read the order or what he

2 intended was the traditional Combustion Engineering.  But

3 that's not what the order says on its face, and so we were

4 confused as well.

5        THE COURT:  All right.  Well, you know, it may be

6 worthwhile taking just a ten-minute recess and seeing whether

7 or not you can't, now that this representations on the record,

8 straighten this out.  I never understood that the insurers had

9 to raise substantive plan issues in Phase I.  I thought that

10 the issue was going to be this traditional standing issue.

11 That -- maybe that was my misunderstanding from the beginning,

12 but --

13        MR. LOCKWOOD:  Your Honor, could -- we had an almost

14 two-hour meet and confer with the insurers on this exact

15 subject the other day, and ten minutes isn't going to resolve

16 it.  Mr. Bernick correctly described the -- the fourth item is

17 the pretrial conference on Phase I, and I would respectfully

18 suggest that that's the time for us --

19        THE COURT:  All right.

20        MR. LOCKWOOD:  -- to try and sort this out and not

21 kind of -- we'd like to get the Priest/Shein motions in limine

22 sort of out of the way and in the can, if you will, and then we

23 can let a thousand flowers bloom, which is I suspect what's

24 likely to happen when we get to the --

25        THE COURT:  All right.  Then --

1          MR. LOCKWOOD:  -- confirmation.

2          THE COURT:  Then let's defer discussion of the order

3 until Item 4.

4          MR. GIANNOTTO:  Thank you, Your Honor.

5          THE COURT:  All right.  If it's about Item 4, can we

6 just defer it then, because, otherwise, we might as well take

7 Item 4?

8          MR. MILLNER:  Which is --

9          THE COURT:  You know, I'm hearing everybody's

10 arguments now.

11          MR. MILLNER:  Which is Item 4, Your Honor?  Pretrial.

12          THE COURT:  That's the pretrial conference.

13          MR. MILLNER:  This is about what I don't think it is.

14 It's just a -- to make one point lest this get lost.  Robert

15 Millner for General Insurance.  Mr. Bernick's chart is not an

16 accurate chart.  He's done something very subtle.  It's almost

17 subliminal.  He tried to convince Your Honor that traditional

18 insurance neutrality only had to do with something called

19 coverage.  The actual words from Your Honor were that the

20 rights of the insurers were not impaired, period.

21          THE COURT:  I know what my words were, Mr. Millner.

22 The only thing that I got right in Combustion Engineering was

23 insurance neutrality.

24          MR. MILLNER:  Okay.  Your Honor did not use in its

25 phasing of the neutrality that word coverage.  Now -- now, it

1  may be -- it may be that for purposes of a case, you can take

2  from the realm of all the rights, which is what Your Honor did,

3  being not impaired or affected and carve out things and say we

4  are going to affect this, this, and this, and so we'll have a

5  hearing at confirmation in Phase II on that.  But what he did

6  is very dangerous, because his notion of coverage I think

7  probably relates to his plan, which actually has a definition

8  of insurance coverage defenses, which in effect has additional

9  carve outs to the two he mentioned, which are dangerous.  But I

10 think the way that his additional carve outs -- and this is

11 sort of subtle -- work out -- and I get this even from talking

12 with Mr. Lockwood yesterday -- is that the Court's findings and

13 the Court's conclusions and the Court's confirmation order, all

14 those are useable as evidence --

15         MR. LOCKWOOD:  Your Honor, I object to this.

16         MR. MILLNER:  -- in a coverage case --

17         MR. LOCKWOOD:  This is not only --

18         MR. MILLNER:  -- but that the plan is still neutral.

19         MR. LOCKWOOD:  -- arguing the merits of the insurance

20 neutrality provision.

21         MR. MILLNER:  I'm arguing that --

22         MR. BERNICK:  It's far more subtle than I intended it

23 to be.

24         MR. MILLNER:  I'm arguing that that chart is simply

25 set up to do something subtle with which I disagree with, and

82

1  I'm alerting the Court.

2          THE COURT:  Mr. Millner, let's just throw the chart

3  away.  I didn't copy it down.

4          MR. MILLNER:  Good.

5          THE COURT:  I was using it only as --

6          MR. MILLNER:  Okay.

7          THE COURT:  -- Mr. Bernick's illustrative --

8          MR. MILLNER:  Okay.

9          THE COURT:  -- chart anyway.  I was not copying the

10  chart down.  And to the extent that Mr. Bernick was attempting

11  simply to use it as an illustration of why there was another

12  issue that the Court needed to address, let's just throw it

13  away.

14          MR. MILLNER:  Throw it away.

15          THE COURT:  Mr. Bernick, I'm throwing away your

16  chart.

17          MR. BERNICK:  I'll never forget it.

18          MR. BROWN:  Your Honor, I'll be 30 seconds.  I'm

19  happy to hear the chart's going to be thrown away.  I just --

20          MR. LOCKWOOD:  We'll just --

21          THE COURT:  Wait, Mr. Lockwood.

22          MR. LOCKWOOD:  -- flip the page.  How about that?

23          MR. BROWN:  Thank you, Peter.

24          MR. LOCKWOOD:  Remove the polluting visual objects

25  from Your Honor's sight.

1          THE COURT:  All right.  The --

2          MR. BROWN:  Your Honor, I just want to -- I mean the

3 motion that is up right now is the motion on Shein and Priest.

4 I --

5          THE COURT:  Yes.

6          MR. BROWN:  Sometimes these arguments tend to have a

7 tendency to stray off into subjects like that one.  I do think

8 that issue should be dealt with at the end, and there's going

9 to be a lot of talk I think on that particular issue.

10          THE COURT:  All right.  I'm still going to take a

11 five-minute recess, just so we can -- I'm sorry, Mr. Lockwood,

12 but, you know, like you, I have hit the age where occasionally

13 I need a recess.

14                              (Laughter)

15          MR. LOCKWOOD:  Touche.

16                              (Recess)

17          THE COURT:  Can you just get the other people, so we

18 can let Mr. Lockwood get started?

19                              (Pause)

20          THE COURT:  When you're ready, Mr. Lockwood.

21                              (Pause)

22          MR. LOCKWOOD:  Your Honor --

23          THE COURT:  Yes, sir?

24          MR. LOCKWOOD:  -- I'm here to address the motion in

25 limine filed by the plan proponents to strike the expert

1  reports and testimony of Professors George L. Priest and James

2  B. Shein.  I think in order to make this a little bit better

3  tied to some of the other things that are going on here, I

4  should start out by observing that as the record presently

5  stands, these professors have both -- have been designated

6  experts for both Phase I and Phase II.  So I'm going to try and

7  address separately their appropriateness in Phase I and then

8  discuss Phase -- their appropriateness as a Phase II witness

9  after I go through the Phase I.

10            I think this is fairly straightforward.  There's not

11 vast quantities of briefing and documentation that the Court

12 needs to deal with.  And, moreover, I don't want to waste the

13 Court's time.  Has the Court had the time to read the --

14            THE COURT:  I have.

15            MR. LOCKWOOD:  Okay, so I won't repeat stuff.  The --

16 dealing with Phase I first, and I'd like to start with

17 Professor Shein.  Professor Shein has been tendered as an

18 expert in -- it's not exactly clear to me what his professed

19 expertise that he's being offered to the Court is.  He --

20 because he -- and the briefing in opposition to our motion to

21 strike asserts that he's not -- even though he's a lawyer, he's

22 not offering legal opinion, so he's not a expert about law.

23 And even though he cites the Delaware Code of Ethics, he's not

24 being proffered as an expert in legal ethics.

25            Instead, his testimony I think can fairly be boiled

1 down to the proposition that as a professed expert in some sort

2 of organizational structures and the avoidance of, I don't

3 know, conflicts of interest within organizational structures,

4 he's being tendered to say that he doesn't like the way the

5 trust agreement and the TDPs work insofar as the Trust Advisory

6 Committee has a role created by the trust agreement and in the

7 administration of the trust.  He thinks there's a potential or

8 actual conflict of interest in their role as what we'll call

9 TAC members where they have a fiduciary duty to the general

10 constituency of present claimants and their -- the fact that

11 they will also be tendering claims to the trust on behalf of

12 clients at their individual law firms.

13        I'm not going to address the substantive merits of

14 his views on that subject, but with respect to Phase I at

15 least, they have absolutely no relevance to the question of

16 whether the plan is insurance neutral.  I mean essentially he's

17 being tendered by some insurers who, if the plan is insurance

18 neutral, will have their rights to object to claims that are

19 presented to those insurers by the trust on the ground that

20 those claims are in some way or another tainted by conflicts of

21 interest that arose in the resolution of those claims by the

22 trust because of this role.

23        Again, whatever you might say about that position, it

24 doesn't tell the Court anything about whether or not Section

25 7.15 of the plan, which contains the insurance neutrality

1  provisions that Phase I will be all about, does or doesn't do

2  what it says.  And indeed, as we will hear probably some length

3  in the next portion of the discussion on the pretrial, it at

4  least is the plan proponent's view -- and I'm not sure really

5  that the insurers in their heart of hearts disagree with this

6  -- that the question of whether the plan is insurance neutral

7  or phrased differently impairs adversely if -- impacts the

8  rights of insurers is a legal issue.

9       I mean the -- as Mr. Bernick pointed out, the concept

10  originated with the Court in the context of a legal dispute

11  about the confirmation of a bankruptcy plan.  It's hard to

12  imagine anything more quintessentially legal than that.  But

13  Professor Shein, if you read his expert report, basically says

14  I don't think this is a good provision, and I -- we submit that

15  whatever else that might or might not have to say about

16  something, it doesn't address whether the plan is insurance

17  neutral, and, therefore, it has no possible relevance to Phase

18  I.

19       Now, the insurers in response to that have sort of

20  taken the position of, well, gee, it's not a jury trial, and so

21  motions to eliminate witnesses when it's a bench trial, you

22  know, let it all in, and the Court can decide whether to give

23  it weight or not.  But with all due respect, as you can tell

24  from their citation by Professor Shein of his own self-help

25  expert qualification, which is when he was tendered as a

1 witness in the <u>Thorpe Insulation</u> case, the Court in the process

2 of refusing to permit him to testify made some offhand comment

3 to the effect that oh, yeah, he's an expert in corporate

4 governance.  And, you know, they -- so once you let him in --

5 into Phase I, or for that matter, in Phase II, but we're

6 talking about Phase I at the moment, you have now qualified him

7 as an expert to testify, which they will -- can then cite in

8 other cases or to you -- either to you or other people.

9        Secondly, if they put him on, we're going to have to

10 spend time cross examining him, since we don't know what the

11 Court's ruling is going to be when he's tendered live as to

12 what, if any, relevance the Court thinks his testimony has, and

13 particularly if it's in Phase I, but the record in Phase I can

14 spill over into Phase II, because we don't want to necessarily

15 repeat the same evidence in two different phases.  It's going

16 to require us to cross examine him and redirect and all.  It

17 could use up a lot of time, and there's really no point to it

18 if we're right and his testimony simply has no relevance to

19 whether the plan is insurance neutral or not.

20        Professor Priest, again a Phase I witness, is a

21 little bit different, because although Professor Priest is also

22 a lawyer and indeed a law professor and indeed has no degrees

23 in economics, he professes, as quoted by the insurers in their

24 papers, to be testifying only about economics.  And insofar as

25 whether or not the plan is insurance neutral, he has -- which

1  is the Phase I issue, he has precisely four paragraphs of his

2  expert report that address that topic, Paragraphs 52 through

3  55.  And what do those paragraphs say?

4        Paragraph 52 says in part, "The plan claims to

5  incorporate a policy of insurance neutrality," in quotes, and

6  then he quotes Section -- portions of Section 7.15 of the plan.

7  That's Paragraph 52.  The Court doesn't need an expert to quote

8  portions of the plan to it.

9        Paragraph 53, "In terms of the economic structure of

10  rights and responsibilities established by Grace's policies,

11  there are multiple problems with the claim that this provision

12  establishes, quote, insurance neutrality, close quote, for the

13  plan."  And then he proceeds to -- he says, "First, the

14  provision is needlessly circular and, therefore, confusing."  I

15  don't believe that's an opinion of economics.  And I don't

16  believe -- and, Your Honor, if you've read the Phase I trial

17  briefs of the insurers, you may recognize that argument.  And

18  if you've read our briefs, you may see that we've responded to

19  it.

20        And he then proceeds to quote various sections of --

21  subsections of 7.15, and he ends up with a question.  "Since

22  the other insurer provisions of Section 7.15 declare the

23  primacy of the plan, e.g. Section 7.15B, are the insurers

24  contractual rights and coverage defenses preserved or excepted

25  from preservation?"  That's not an economic opinion.  That's

1 just argument, and it's just -- you don't need an expert.  It's

2 not appropriate to try and put lawyer brief arguments in the

3 mouth of a witness.  And that's it for Paragraph 53.

4       Paragraph 54 addresses whether or not the carve out

5 for the assignment of the insurance rights to the trust is

6 insurance neutral.  We agree it's not insurance neutral.

7 That's why it's a carve out.  Our argument as lawyers in the

8 appropriate time in Phase II, when it comes to addressing the

9 assignment issue, which is we all said all along is a Phase II

10 issue, is that even in <u>Combustion Engineering</u> in the Third

11 Circuit, where the issue of insurance neutrality was addressed

12 and the Court said that it was insurance neutral, they

13 simultaneously ruled that the transfer of insurance rights was

14 okay and preempted by the Bankruptcy Code.

15       So the Third Circuit didn't seem to find any

16 necessary conflict between insurance neutrality and a ruling on

17 the assignment issue.  But, in any event, number one, the

18 assignment issue is a Phase II issue, so it's -- so citing it

19 in the economist's brief as an example of an exception to

20 insurance neutrality is not offering any assistance to the

21 trier of fact either.

22       So we get to Paragraph 55.  "Even if plan Section

23 7.15 were interpreted to preserve all contractual rights and

24 coverage defenses of Grace's insurers, the assertion of a

25 contractual right or a coverage defense does not place an

90

1  insurer in the position for which it bargained to possess

2  control over the settlement of asbestos personal injury claims

3  brought against Grace," and it goes on.

4        What Paragraph 54 fairly read amounts to is a

5  statement as a matter of economics that there is no such thing

6  as insurance neutrality.  Even if you preserve all of the

7  rights, it still adversely affects them, and, therefore,

8  inferentially, the plan cannot be determined to be insurance

9  neutral, I guess.  Again, that has -- that's in -- to the

10 extent that that's relevant to anything, it's argument.  It's

11 not economics, and it certainly isn't something that the Court

12 needs to hear a live witness tell the Court the same thing

13 that's in a bunch of lawyer's briefs and will be an oral in

14 Phase II of the case as well as presumably, I believe, also in

15 Phase I.  I think we're going to hear -- when we get to the

16 Phase I argument, I think you will hear insurers basically

17 saying insurance neutrality either doesn't exist, or if there's

18 any exceptions to it, it doesn't exist, and we're prepared to

19 deal with all of that.  But Professor Priest offers up nothing

20 that is appropriate expert testimony on that subject.

21       Okay.  Now, let's turn to Phase II where we do get

22 into some of these issues.  Going back to Professor Shein,

23 Professor Shein, as we have pointed out earlier, testifies that

24 he doesn't think it's good policy, his words, to have a TAC

25 that has, as he describes it, these conflicting roles.  There's

1 a whole lot of problems with the analysis that he's gone

2 through, including the fact that he's not saying it violates

3 any law.  If we have to deal with his actual testimony, he

4 doesn't really have any explanation of how, why it's okay for

5 an Asbestos Claimants Committee to have lawyers on it that have

6 claims against the debtor as well as a fiduciary duty to all

7 the present claimants for the Committee.

8          If anything, he sort of suggests that, well, that's

9 the way it works as a matter of law.  Well, if it works that

10 way as a matter of law there, why doesn't it work that way for

11 an asbestos trust?  But again, that's sort of arguing on the

12 merits.  But the question is he's -- he's a professor of

13 business organization, and he's -- his testimony boils down to

14 asking this Court to tell the plan proponents that they should

15 rewrite the trust documents.  Trust documents, by the way,

16 which are identical to those of a number of other plans that

17 this Court has already confirmed.  Should rewrite those,

18 because the Court has been persuaded by Professor Shein that

19 they could be done better.

20          Mind you, these documents were not only sent -- they

21 were sent out for a vote by a class whose interests, unlike

22 with the insurers, were directly affected by these, and they've

23 said we can live with it.  We think it's okay.  And as Your

24 Honor has said from time to time, as we discussed confirmation

25 issues over the year, you don't get a line item veto here.  So

1 while -- even if Your Honor decided that you agree with

2 Professor Shein that the trust would be better off if the TAC

3 members didn't represent any individual clients, even though

4 they would -- there would be utility for representing the group

5 of present claimants, it would be markedly diminished, because

6 if they don't have any clients, then what are they going to

7 know about how client's claims and client's interests should be

8 protected.

9       But the -- putting that aside, that's really not

10 something that Your Honor at the end of the day has the power

11 to do, unless you decide that there's something illegal about

12 it.  It's a violation of law or ethics rules or something.  But

13 Professor Shein, as the insurers who sponsor him admit in their

14 papers, is not testifying that there's violations of law, nor

15 could he, or violations of ethical rules, which he's not an

16 expert on.  He's just in here sort of saying, Judge, I think it

17 would be a better way if we did it this way.  And with all due

18 respect to Professor Shein, that's not expert testimony that's

19 admissible in a controverted case where what you're talking

20 about is the legality of a plan that somebody has put up for a

21 vote and is seeking confirmation of.

22       Professor Priest is basically somewhat similar in the

23 sense that excluding the paragraphs that we've talked about on

24 the subject of insurance neutrality already.  Most of his

25 expert report talks -- contains generalities about the

1  economics of the interrelationship between insurers and

2  insureds, which while making interesting reading, doesn't

3  directly bear on any issue before the Court.  The Court is not

4  being asked to determine, make rulings on the economics of the

5  relationship between insurers and insureds.  And indeed the

6  testimony of those economics would largely be relevant, if to

7  anything, to coverage disputes as to whether or not certain

8  behavior by an insured was inconsistent not only with the

9  letter of an insurance policy but with the underlying economic

10 underpinnings of an insurance policy.

11         But this Judge -- excuse me -- this Court and the

12 insurers themselves coming to this Court are not seeking

13 coverage rulings from the Court.  They're not seeking -- we

14 haven't tendered to the Court the question -- a bunch of legal

15 questions, which when asked of Professor Priest, he eschewed

16 any intention to testify about, as to what exactly are the

17 circumstances under which, for example, the insurer's right to

18 consent to the settlement of claims is waived or can be

19 overridden by reasonable settlements or what have you.

20         There's a lot of case law out there, depending on the

21 facts and circumstances, and nobody has -- is asking this Court

22 to hypothesize an action by the trust against the insurers for

23 coverage and seeking a determination based on the hypothetical

24 facts and circumstances relating to that tender of claims by

25 the trust to the carriers as to whether or not the trust's

1 handling of those claims, hypothetically, does or does not

2 under applicable non-bankruptcy insurance law comport with the

3 provisions of their policies.  And Professor Priest, for sure,

4 professes not to be talking about that.

5         So what is he talking about?  Well, he's got a

6 section of his report called -- Roman V, Problematic Features

7 of the Grace Plan from the Standpoint of Economics, and it

8 basically runs from Paragraph 39 to Paragraph 50.  And I'm not

9 going to take the Court through all of those paragraphs, but if

10 you read them, it's clear that essentially if -- if the plan is

11 insurance neutral, then all of the so-called defects in the

12 plan that Professor Priest is talking about again as an

13 economist are preserved to be the subject of defenses to

14 coverage raised by insurers down the road.  And Professor

15 Priest, other than the economic patina that he professes to add

16 to these -- to the points he's making in these paragraphs is

17 making the exact same arguments about why the plan is adversely

18 impacting insurer's rights that the insurers lawyers in their

19 briefs are making.  So again, he's not contributing anything to

20 the trier of fact that the lawyers aren't contributing, and,

21 therefore, we would submit that his testimony on that subject

22 is improper expert testimony.

23         And at the end he even delivers an opinion on the

24 subject of -- in Paragraphs 50 and 51 about why the transfer of

25 insurance rights is a violation of the economic expectations of

1 insurers where we litigated that in front of Your Honor on a

2 number of occasions now, and as far as I'm aware, Your Honor

3 has never indicated a need to hear an economist tell you that

4 some -- that that economist is of the opinion that even if

5 there's bankruptcy preemption, that nevertheless you shouldn't

6 do it, because it has an economic effect on the insurer's

7 expectations or something like that.

8 So bottom line is we don't think that Professor Shein

9 and Professor Priest have either relevant or, for want of a

10 better word, competent expert testimony to contribute to this

11 case at either Phase I or Phase II stages, and we would request

12 -- respectfully request Your Honor to grant the motion in

13 limine to exclude their testimony.  Thank you.

14 THE COURT:  Good afternoon.

15 MR. PRATT:  Good afternoon, Your Honor.  Warren Pratt

16 representing GEICO Republic Insurance Company and Seaton

17 Insurance Company.  We respectfully submit that the motion in

18 limine should be denied for three reasons, and I'll cover these

19 quickly.

20 First, these proffered experts are imminently

21 qualified.  Second, their opinions are reliable as required by

22 Rule 702 of the Federal Rules of Evidence.  And third, we

23 believe their opinions will be helpful to the Court.  I'm just

24 going to start very briefly with qualifications.

25 Professor Priest is a professor of law and economics

1 at Yale Law School.  He has studied, taught, published

2 extensively for many years in the fields of insurance,

3 economics, and the economics of insurance.  And he's also

4 presented testimony on insurance and economics in many cases

5 including the <u>Manville</u> bankruptcy case before Judge Lifland.

6         Professor Shein is a professor of management and

7 strategy at Kellogg School of Business at Northwestern

8 University, and he similarly has researched, written, and

9 taught courses on fiduciary duties in organizational behavior

10 for many years.  He's an expert on corporate governance and the

11 governance of trusts, and he was held to be qualified as an

12 expert on governance in the <u>Thorpe</u> bankruptcy case.  As Mr.

13 Lockwood indicated, he did not testify in that case, but he was

14 held to be qualified to do that.

15         Now, both these gentlemen are imminently qualified to

16 testify as experts in this case based on their knowledge,

17 experience, training, and education as set forth in the

18 evidence rules.  Second of all, we think that their

19 observations and conclusions are reliable as required by Rule

20 702.  They clearly did not conduct scientific experiments about

21 the Grace case, but their testimony is nevertheless admissible.

22         And on this point, Your Honor, I think the

23 proponents' motion cites cases dealing with scientific

24 evidence, but I would just -- I thought very pertinent was the

25 Advisory Committee note to the 2000 amendments, the most recent

1  amendments to Rule 702, because they were put in after <u>Daubert</u>

2  and <u>Kumho</u>, and it actually quotes briefly from a monograph of

3  the American College of Trial Lawyers that's published in the

4  Federal Rules of Decision, 157 FRD 571, and that monograph

5  talks, among other things, about non-scientific testimony, and

6  I just want to read just one snippet from Page 579.

7          "When the testimony concerns --" this is talking

8  about non-scientific testimony.  "When the testimony concerns

9  economic principles -- economic principles, accounting

10 standards, property valuation, or other non-scientific

11 subjects, it should be evaluated by reference to the knowledge

12 and experience of that particular field -- that particular

13 field."  And Professor Priest is an expert in the field of

14 economics and especially the field of the economics of

15 insurance.  And Professor Shein is an expert in the fields of

16 organizational behavior and corporate governance and the

17 governance of trusts.

18         Nobody can reasonably contend that those fields of

19 expertise are unreliable, and they're governed by principles,

20 and those principles are taught at prestigious institutions of

21 higher learning including Yale, including Northwest University,

22 and it's taught there by these very same experts that are

23 proffered here.  Now, the Court might or might not ultimately

24 agree or disagree with their observations and conclusions, but

25 their testimony is certainly admissible within the principles

1  set forth under Rule 702.

2       Now, Mr. Lockwood says, look, at bottom they're just

3  legal opinions.  But if you read the reports, which were

4  attached both to the motion and our opposition, you'll see that

5  they're not in substance legal opinions.  Professor Priest

6  talks about the economic effects -- the economic effects of

7  Grace's proposed plan on its insurance relationships, and

8  Professor Shein talks about whether the trust governance

9  mechanisms proposed in the plan and the TDP are sound

10 regardless of whether they're legal, and he said that in his

11 deposition.  They may be legal, but the question is what I'm

12 talking about is are they sound.  Is it a good idea.

13      Now, those --

14      THE COURT:  But do I get -- again with respect to the

15 latter issue --

16      MR. PRATT:  Yes, Your Honor.

17      THE COURT:  -- whether the trust mechanisms are

18 sound, do I get the option of rejecting a plan, because I don't

19 like the particular mechanisms that I think there may be a

20 better way to do it provided that I can't make a finding that

21 the mechanism selected by the parties who voted on the plan is

22 not illegal and doesn't violate some law?  I mean do I have

23 that option?  Because if I don't, it's not an issue before me.

24      MR. PRATT:  Your Honor, I think really the Court has

25 extremely broad discretion whether to confirm a plan, and if to

1 confirm, then what kind of plan should be confirmed.  And you

2 might decide after hearing these experts -- after hearing these

3 experts that on balance, in your view, you're going to let it

4 go, because the proponents did vote on it.  Well, did they

5 really vote on it?  We know that master ballots were submitted

6 and votes were cast, but did those voters in whose name those

7 ballots were cast, did those claimants really get into this

8 issue and really understand it?  Did they understand the

9 conflicts?  And I don't think that Your Honor can make that

10 kind of a nuance decision without an adequate record, and part

11 of that record is to understand the nuances of the relationship

12 in the governance context, and that's what Professor Shein

13 talks about.

14            THE COURT:  But wait.  I have master ballots.  I have

15 the assertion by the parties who signed the master ballots as

16 required by the orders that the person who signs the master

17 ballot has done what's required, which is get the vote of the

18 entity and the consent of the entity for whom -- or person for

19 whom the ballot's submitted.  So are you suggesting that the

20 Court has to go behind every ballot to go back to the

21 individual and say did you really authorize your client to

22 submit this ballot on your behalf?

23            MR. PRATT:  No.

24            THE COURT:  I can't trust counsel who are --

25            MR. PRATT:  No, not at all, Your Honor.

1          THE COURT:  -- officers of the court?

2          MR. PRATT:  Not at all.

3          THE COURT:  Well, then all right.  If that's the

4   case, then I have to take the ballots at face value.

5          MR. PRATT:  You have to take -- you will, I'm sure,

6   Your Honor, take, whether you have to or not -- the Court's

7   already taken the ballots at face value I think --

8          THE COURT:  Well --

9          MR. PRATT:  -- in the context of this case.

10          THE COURT:  -- I mean if I have a reason not to --

11          MR. PRATT:  Well, there were --

12          THE COURT:  -- then I wouldn't, but --

13          MR. PRATT:  -- there were mechanisms set up for the

14   master ballots to be cast --

15          THE COURT:  Right.

16          MR. PRATT:  -- in the first place, and there was some

17   tension about that, but the Court authorized that, and I don't

18   expect the Court to revisit that ruling.  But in the context of

19   whether the members of the TAC -- whether it's appropriate for

20   members of the TAC to be -- to have these kind of divergence of

21   interest pulling and tugging on them, I don't think there's any

22   harm in the Court considering that in the overall context of

23   confirmation --

24          THE COURT:  But here's the --

25          MR. PRATT:  -- as to whether that's appropriate.

1          THE COURT:  But here's the problem.  I'm not making

2    findings.  Let me just assume for a moment that it isn't

3    appropriate.  Okay?  Just period, it's not appropriate.  It

4    would be better to have somebody neutral, not insurers, because

5    if there's a conflict by TAC members, there has to be a

6    conflict by insurers.  Right?  Because they have just as much

7    of a bias, if that's the issue, in making sure that claims are

8    not adjudicated favorably as TAC members would have in making

9    sure the claims are adjudicated favorably.  I would think

10   that's how the report would have to be read.  That I'm looking

11   for somebody neutral.

12         So now I've got to find somebody neutral.  So let me

13   just assume that that's what I need to do.  That's what the

14   optimal is.  I've got to find somebody neutral.  I don't get --

15   I don't get a line item veto.  This isn't my plan.  This is the

16   plan of the plan proponents, and 1129 tells me what I need to

17   do to confirm a plan.  How do I read the confirmation standards

18   of the Code to say that because I don't like a particular

19   provision, and I -- and again, for purposes of this discussion,

20   I'm just -- I'm hypothetically saying I don't like this

21   provision.  I don't like the fact that the TAC members have

22   this alleged conflict.  Okay?  I don't like it.

23         So how do I get to say this plan's not confirmable,

24   because there's a better way to do this?  I don't like this

25   provision.  Because if I don't get to do that, I don't know

1 where the issue is, and I don't know how the testimony's

2 relevant.

3         MR. PRATT:  Your Honor, I don't think plan

4 confirmation is a matter of right, even if all the statutory

5 requirements in 1129 are met.

6         THE COURT:  Oh, wait.  It says the plan's -- the

7 Court shall confirm a plan if the following things are done.  I

8 don't have an option if the following things are met --

9         MR. PRATT:  But --

10         THE COURT:  -- not to  confirm a plan.

11         MR. PRATT:  Yeah, but if there's a defect in the

12 plan, Your Honor -- and this goes to the governance of the

13 trust, and there are all kinds of findings that the Court has

14 to make under 524(g) about that.

15         THE COURT:  Oh, sure.

16         MR. PRATT:  And whether it's fair to these future

17 claimants is one of them.  And the tension --

18         THE COURT:  They've decided it's fair.  Do I -- can I

19 set aside --

20         MR. PRATT:  Well, the future --

21         THE COURT:  -- their determination?

22         MR. PRATT:  Your Honor, the future claimants didn't

23 vote, obviously.  We don't know who they are.

24         THE COURT:  Well, no, but they have a representative

25 who's a plan proponent.

1          MR. PRATT:  Well, that's right, but you have to make

2  findings yourself.  The Court has to find that it's fair.  Now,

3  I don't see any harm in the Court being informed by a corporate

4  governance expert or a -- this isn't a corporation, obviously.

5          THE COURT:  Right.

6          MR. PRATT:  It's a trust.  But he's an expert on --

7          THE COURT:  Yes.

8          MR. PRATT:  -- governance of trusts, to point out

9  what the pitfalls are in this particular structure.  And you --

10 I think the Court has to take that into account, can certainly

11 take it into account as part of the Court's ultimate 524(g)

12 determination.  So I think it's relevant.  Clearly, it does --

13 also it touches on the law, but I don't think it constitutes an

14 impermissible legal opinion.

15         I mean Professor Shein is talking about governance

16 issues.  Professor Priest is talking about economic issues.

17 Their opinions and conclusions may touch on the law, but

18 they're not impermissible legal opinion.  I point out on this

19 legal opinion issue that the proponent's expert, Dr. Peterson,

20 happens to be a lawyer, but nobody's saying, you know, that he

21 can't talk about the plan.  So at bottom, Your Honor, I don't

22 think they're legal opinions, and I think that the opinions are

23 relevant and admissible.

24         Now, the -- probably the most important thing is

25 whether these are going to be helpful to the Court, because 702

1  says, you know, expertise comes in if it will assist the trier

2  of fact, assist the Court in this case to understand the

3  evidence.  Now, if it's not helpful, it shouldn't come in.

4  It's a waste of everybody's time.  But at least from the

5  standpoint of the insurers, we think this testimony, Professor

6  Priest's testimony and Professor Shein's testimony, is going to

7  be helpful.

8          Now, I have to refer to Mr. Bernick's chart, which is

9  now turned over, but --

10          THE COURT:  The one I threw away?

11          MR. PRATT:  Yeah.  And I think --

12          MR. LOCKWOOD:  Am I rehabilitated, Your Honor?

13          MR. PRATT:  Well, you have to --

14          MR. BERNICK:  I'm not sure I'll agree to that.

15          MR. PRATT:  I'm happy to have it turned back over as

16  long as we don't look too closely at the middle of it.

17          THE COURT:  All right.

18          MR. PRATT:  But this is really the significance of a

19  lot of this, Your Honor.  The proponents' template in this case

20  is Combustion Engineering, and what they're trying to do

21  ultimately is to say if the plan is insurance neutral, whatever

22  that means, you know -- and there's some law about what that

23  means and what it doesn't mean.  But if the plan doesn't affect

24  the insurers' rights, and that's the way this Court put it in

25  the case management order, the first phase will address whether

1  the plan improperly affects the rights of the debtors'

2  insurers.  So if their rights are not affected -- if their

3  rights are not affected, or if it's a matter on which the

4  Court's going to hold that, well, their rights are affected,

5  but it's okay.  That's legal.  Okay?  In either event, the

6  insurers wouldn't have standing if their rights are not

7  affected at all, and that's the template here that the

8  proponents want to use as articulated in Combustion

9  Engineering.

10        Now, from the standpoint of the insurers, Your Honor,

11  this case, the Grace case, is different from Combustion

12  Engineering in very important respects, and I think our

13  experts, especially Professor Priest, will assist the Court in

14  understanding the ramifications of those differences.  And I

15  want to start with just reading a couple of sentences out of

16  the Combustion Engineering decisions, and I'm going to start

17  with yours.  This is five years old, but the cite is 295 BR 459

18  at Page 473.

19        And, of course, what happened in Combustion

20  Engineering is that claims were handled pre-petition by a

21  claims agent.  It was Connecticut Valley Claim Service Company.

22  CVCSC was the acronym.  And the President of that claims agent

23  was a man named John Dickhoff, and he testified before Your

24  Honor in Combustion Engineering, and what the Court concluded

25  based on the evidence before you in that case -- on the record

1 in that case -- and now I'm reading 295 BR 473, "Under the plan

2 the trust distribution procedures are essentially the same as

3 those historically used by CVCSC."  And then you cite the notes

4 of testimony of Mr. Dickhoff.  Now, that's a factual finding,

5 and it was based on evidence in that case.

6      The Third Circuit ultimately endorsed that

7 conclusion, and I'm now reading from the Third Circuit's

8 decision 391 F 3d at Page 217, and the Circuit Court said, "The

9 trust distribution procedures do not permit insurers to

10 participate in the payment of claims, paren, the Asbestos P.I.

11 Trust Trustee and claims reviewers evaluate them.  But as the

12 Bankruptcy Court found, the insurers did not have this right

13 pre-petition."  That's what the Court held affirming Your

14 Honor's determination based on the evidence in that case.

15      This case is different, because in this case the

16 asbestos claims pre-petition were vigorously defended in the

17 tort system, and the evidence is going to show that.  Now, we

18 can talk about what that means, but certainly, our view is that

19 the Combustion Engineering template certainly does not work as

20 a matter of law, as Mr. Bernick said, or as a legal -- you

21 know, that this is simply a legal issue, as Mr. Bernick and Mr.

22 Lockwood said.  It's going to require a factual record, and

23 we're charting some new territory here.  I mean this case is

24 different from Combustion Engineering, and the economic effects

25 of the proposed plan on insurance relationships is relevant,

1  and, you know, how can the Court decide in the abstract as a

2  matter of law without any evidence before the Court that the

3  plan is insurance neutral when the policies aren't even in the

4  record and when the Court has no idea what the pre-petition

5  claims handling experience was and how it's going to be

6  different under the trust distribution procedures?  And by the

7  same token, you know, with respect to the Trust Advisory

8  Committee, the TAC, Mr. Lockwood said, look, you always have a

9  TAC.  Well, it's -- I don't know that this has ever been

10  brought to light before in a case.  So we're -- you know,

11  there's going to be -- we're cutting some new ground, charting

12  some new territory perhaps.

13         THE COURT:  It's all -- I don't know that it's ever

14  been objected to.  I think it may have been with respect to one

15  TAC member or perhaps one trustee.  I -- my recollection's not

16  clear about that before, but it's always evident when you look

17  at who the TAC members are and know who shows up in Court

18  representing --

19         MR. PRATT:  Oh, sure.

20         THE COURT:  -- asbestos plaintiffs, who they are.

21  So --

22         MR. PRATT:  Oh, they -- you know, they're -- clearly,

23  Your Honor, they're disclosed.  I think they have to be.

24         THE COURT:  Right.

25         MR. PRATT:  They're in the disclosure statement in

1 this case, but the point is the 50,000 foot level point I'm

2 trying to make is that we think that expert testimony would be

3 helpful to the Court's understanding of the ramifications of

4 the differences between the <u>Combustion Engineering</u> case and

5 this case, and they are fact driven.

6         Now, you know, as I said before, I think the Court

7 has broad discretion on what kind of plan to confirm, because

8 of all the specific findings, especially in an asbestos case,

9 that you have to make under 524(g) going to fairness and so on.

10 And the Court we think should have an adequate record on which

11 to base the exercise of the Court's discretion.

12        Here the testimony of these proffered experts is

13 admissible under Rule 702.  Now, I don't know whether it comes

14 in Phase I or Phase II.  The motion in limine didn't

15 distinguish.  It just said we move to strike it and exclude it,

16 and, Your Honor, that motion should be denied.

17        THE COURT:  Good afternoon.

18        MR. GIANNOTTO:  Good afternoon, again, Your Honor.

19 Michael Giannotto for Continental.  I think Mr. Pratt and I got

20 our wires crossed a little, because my plane was late.  I was

21 going to speak about Shein, and I think he very graciously

22 cobbled together an argument on Shein, because it was unclear

23 whether I was going to make it.

24        In Mr. Lockwood's motion or Mr. Lockwood's argument

25 as concerns Professor Shein is very different than the motion

1  papers before you.  I think that his arguments today were more

2  in the nature of why is he relevant at all to anything, and you

3  brought that up in a question to Mr. Pratt, and I will address

4

5

6  that.  And also, why would we even have standing as insurers to

7  raise these issues?  And the standing issue is an issue that's

8  going to be addressed in Phase I.  Everyone agrees to that.

9         Just to let you know our view that we stated in the

10  brief is that we're a creditor of the trust, the CNA companies

11  are creditor of the trust and therefore we believe we have

12  standing to object to trust provisions that adversely affect

13  our rights as a claimant to the trust.  We also believe that to

14  the extent the plan is not ultimately ruled insurance neutral,

15  and you have not ruled it's neutral yet, that we have standing

16  to object as insurers, not as creditors, but as insurers to

17  anything in the plan.  And I know there are rulings the other

18  way, and they're rulings from you, but there are also rulings

19  our way on that.  But we're going to be arguing that.

20         There's also rulings both by you and Pittsburgh

21  Corning and by the Third Circuit in Congoleum that to the

22  extent that there are ethical violations, and by that I mean

23  violations of rules of professional conduct not only the

24  insurers, but their lawyers, like me individually has the right

25  to bring those to the attention of the Court.  So that's how

1 we're going to argue standing.  I'm not asking you to rule on

2 that now.  That's Phase I.  What do we have standing to do?

3 But it's not just nonsense that we're not affected by this, we

4 are directly affected by this particularly in our role as

5 creditor.  And I realize that's Phase II.

6          The other thing is the relevance of this testimony.

7 Before I get to that, you know, I can say a whole lot about

8 Professor Shein's qualifications.  He's qualified up the

9 whazoo, and I don't know whether you want to hear about it.  I

10 mean, he's been a professor at North Western Business School,

11 Kellogg School of Business and at Loyola University of Chicago

12 combined for, I don't know, ten, 15 years.  What he teaches is

13 corporate governance.  And what that is is his students and he

14 study cases of why have corporations failed or why have other

15 corporations done well.  It's not just corporations.  It's

16 pension funds, it's not-for-profit companies.

17          And from that, those courses, and from that study you

18 distill certain principles that you want to incorporate in any

19 kind of a business entity including this business trust to make

20 sure that it satisfies its goals.  And here the goals of the

21 trust are to make sure that all of the claimants are treated

22 fairly and equitably, and that the finite resources of the

23 trust, you know, are not squandered on unmeritorious claims.

24 And what he studies and what he teaches is how you structure an

25 entity like that so that it will be fair to all the

1 stakeholders, whether they're shareholders of a corporation or

2 they're beneficiaries of a pension fund.

3        And that includes trying to make sure there aren't

4 untoward conflicts of interest.  Sometimes you have to have

5 conflicts of interest and you deal with them.  But other times

6 you don't.  It also deals with when you have exculpation and

7 indemnification clauses that protect people.  Does that lead to

8 bad behavior or mischief?  And do you want checks and balances?

9 And do you want someone in charge of entire business structure

10 that has an interest apart from the business as a whole?  So

11 that's what they study.  That's what he teaches.

12        He also serves as a trustee on two pension funds

13 where he puts this right into practice.  He also serves on the

14 corporate governance committees of numerous -- several

15 corporations where he puts these into practice.  And what he

16 does is what he is an expert in is creating structures or

17 looking at, reviewing, and revising structures to make sure

18 they accomplish their goals, that there are not untoward

19 incentives, to make sure that those governing those entities

20 have the proper incentives and have no incentive to do mischief

21 as he would say.

22        And so, you know, he has not been offered by us as an

23 expert except in the <u>Thorpe</u> case.  And Mr. Lockwood referenced

24 that where the Court said he couldn't testify on standing

25 grounds, but the Court said he was an expert.  We don't know

1   that anyone else in any of these asbestos trust have raised

2   this issue before.  And he's not going to give a legal opinion.

3   He's not going to testify whether this trust is legal under

4   Delaware trust law or whether the TAC members have an

5   inappropriate conflict of interest under the rules of

6   professional conduct.

7          What he's going to testify to is that basically the

8   way this thing is set up these TAC members have divided

9   loyalties.  They have -- on the one sense they have loyalties

10  to their clients who are making claims against the trust, and

11  on the other hand, they have loyalties to a larger group of

12  beneficiaries which include people who aren't their clients.

13  They include people who are represented by other lawyers.  They

14  include, I believe we'll show in Phase II, insurance companies

15  who are going to have claims against this trust.  And what he's

16  going to testify to is given these divided loyalties there is

17  this incentive for them to favor their clients over the group

18  as a whole, or it's impossible for them to satisfy both,

19  because they have so much power under the trust to do that.

20  And by having brought indemnification and exculpation clauses

21  you in effect just compound that that they're not answerable to

22  anyone.

23         You asked what is the relevance of that, or to your

24  decision making.  Like, if you -- let's say you agreed with us.

25  In the best of all worlds you'd pick different TACs.  Well,

1 Your Honor, I'd submit to you that under 524(g) for this trust

2 to satisfy 524(g), and you have to find it satisfies 524(g),

3 you have to -- one of the findings in that is that it has to be

4 shown that this trust is going to operate in such a way that

5 similar claims are going to be treated similarly.  And I think

6 that Professor Shein's testimony goes to that.

7        What he's saying is there is a big risk they're not

8 going to be treated similarly.  That the clients of these TAC

9 members are going to be treated differently.  They have the

10 power to amend or veto amendments to -- they don't have the

11 power themselves to amend the trust, but their permission is

12 needed to amend the trust.  And they can veto amendments the

13 trustee wants to change disease values, to change medical

14 criteria, to change exposure criteria.  They also under this

15 trust are going to have to consent to the procedures to deal

16 with indirect PI trust claims such as the types of claims that

17 my client's going to be making.

18        And so, Your Honor -- and Professor Shein's going to

19 testify not only that there is an incentive for mischief here,

20 but that given the studies he's done, given his experience in

21 pension funds, in businesses, the case studies he does in

22 school these influences often do lead to bad results and they

23 lead to shareholders not being treated equally, not being

24 treated fairly and so there is the risk that that's going to

25 happen here.

1          THE COURT:  But if they change -- see, where I can't

2  -- I know this may be an issue on the merits so -- and if it is

3  then this is not appropriate and have to defer it.  But where

4  I'm confused as to why this is not a legal opinion is because

5  or perhaps is a fact that I am -- maybe it's a fact that I'm

6  having some trouble with, to the extent that the TAC has to

7  consent to, for example, a change in a disease level criteria,

8  and the trustees for whatever reason want to make that change,

9  and I don't know, again, I'll just hypothesize, something in

10  the medical literature has convinced the trustees that

11  something in the trust ought to be changed and he approaches

12  the TAC and the TAC says fine, we should make that change.

13          That's not going to change that criteria just for any

14  group of people.  It's going to change it for the entire group

15  of people who would be affected by that criteria.  So whether

16  or not their clients are affected, I mean, if their clients are

17  -- if they have clients in that group of people who would be

18  affected then their clients would be affected, but so would

19  everybody else's clients who were in that group.

20          So in exercising that duty to determine whether it's

21  appropriate to make that change they are acting as the TAC

22  member.  Now, if they feel that it's inappropriate to make that

23  change, for whatever reason, maybe it's because in looking at

24  their own client base they think their clients would be harmed,

25  and they represent the large majority of claimants against the

1 trust.  Then in making that decision on behalf of their clients

2 they're making that decision on behalf of all clients.  So no

3 one would be -- the criteria wouldn't be changed for anyone.

4 So in exercising the fiduciary duty to the larger group they're

5 acting similarly to all claimants.  All claimants will have to

6 be similarly treated because all claimants in the similar

7 category will be affected the same way by all the decisions

8 that the trustee makes.

9        MR. GIANNOTTO:  And I submit to Your Honor I look at

10 it a different way.  I look at it as to say these TAC members

11 have clients who have a particular disease or they can't

12 satisfy the criteria for a particular disease that's in there

13 now and they approach the trustee.  And, you know, these same

14 trustees and TAC members are in all these trusts.  They've got

15 --

16        THE COURT:  Yes, they are.

17        MR. GIANNOTTO:  -- you know, they know each other.

18 And that's not to say they're going to act unethically.  But

19 they certainly know they have to do business with each other

20 and try to cooperate and get things done.  They don't want to

21 run to the bankruptcy court every five minutes because they

22 can't reach agreement.  And so the TAC member goes to the

23 trustee and says -- because he has clients that'll benefit from

24 something -- let's change the criteria a little to do this.

25 You know, maybe it'll benefit other people who have that same

1  disease, but maybe it's because his -- the TAC member's clients

2  particularly have that disease.

3          I mean, one example, and I'm not saying it's true or

4  not because I'm not involved in this whole Libby thing, but I

5  know the Libby claimants, for instance, are arguing here that

6  somehow the medical criteria for plural disease doesn't fit

7  them or something and it should be changed or something or

8  other.  And I don't know whether they're right or wrong and

9  express no view on that.  But the point is that there you have

10 -- and those lawyers are not on the TAC.  You have lawyers on

11 the TAC who are representing clients, but they're not -- the

12 TAC members are not the Libby claimants' lawyers.

13         And, you know, so it's not in their interest to amend

14 or not amend or whatever.  I mean, they have an interest in

15 keeping money more for their client than the Libby client.

16 It's not in their interest to make sure that the insurers get

17 paid more, get paid less.  You can change medical criteria

18 going forward.  And so I understand the point you're making

19 that since these four guys represent thousands and thousands of

20 claimants or maybe it's tens of thousands for all I know, that

21 somehow by changing it as to them it's benefitting the world.

22 And I suggest that it's not.  That they're going to be looking

23 out for themselves and their own clients and not the group as a

24 whole, and that there's no reason not to have a neutral person

25 here.  There's no reason you can't have a medical person.

1          The FCR, for instance, is not a lawyer representing

2     other claimants, he's an independent person.  And he's

3     evidently or supposedly up to speed and can make decisions.

4     You can have a nonindependent person -- I mean, you can have an

5     independent person.  And again, you know, to your point that

6     just because that would make me happier or you happier, you

7     know, do you have the power to do it?  I think you do, because

8     I think it really does impact what people are going to get and

9     it does impact your decision under 524(g) as to whether this

10    thing is being, you know, this is being run as a good railroad

11    that's going to achieve those goals of the trust.  And the

12    goals of the trust or principles are stated to make sure

13    there's fair and equitable treatment for substantially similar

14    people.  That's what the goals are.

15          THE COURT:  Well, it may make more sense to argue

16    that before confirmation that some things that haven't been

17    finished yet need to be finished.  For example, the criteria

18    for the indirect claims.  You know, to the extent that the

19    documentation for the indirect claims -- when I say the

20    documentation of claim forms, for example, for the indirect

21    claims isn't finished so that the people who -- entities who

22    may claim indirect claims know what they're subject to, that

23    may be one thing.  But I'm having a little bit of difficulty, I

24    think, understanding when it's the trustees who have the

25    fiduciary duty to all entities why the advisors to that entity

1  can't be whoever the trustees feel they need to ask advice of.

2  I mean, it is the -- I think we can agree it's the trustees who

3  have the fiduciary duty, correct?

4         MR. GIANNOTTO:  Well, they do.

5         THE COURT:  Okay.

6         MR. GIANNOTTO:  But I believe also the TAC members

7  do.

8         THE COURT:  All right, where --

9         MR. GIANNOTTO:  And in fact the document says they

10  have a fiduciary --

11         THE COURT:  Have a fiduciary duty.

12         MR. GIANNOTTO:  -- duty to all present claim holders.

13  The document says that.

14         THE COURT:  To the present claims.  Right.

15         MR. GIANNOTTO:  Right.

16         THE COURT:  The trustees have a fiduciary duty though

17  to everyone.

18         MR. GIANNOTTO:  I agree with you.

19         THE COURT:  Okay.

20         MR. GIANNOTTO:  Every beneficiary of the trust.

21         THE COURT:  Right.  That's what I mean.  Every

22  beneficiary.

23         MR. GIANNOTTO:  Right.

24         THE COURT:  So the TAC's obligations to the claimants

25  within the trust are not coextensive with that of the trustee.

1          MR. GIANNOTTO:  Under the trust documents they're

2 not.

3          THE COURT:  Correct.

4          MR. GIANNOTTO:  I would argue as a legal point, but

5 not Shein as a legal point that they should -- they are under

6 law.  But that's not for us today.  But under the documents as

7 stated you're absolutely correct.  But the point, Your Honor,

8 is that look, if the trustee wants to ask advice of people and

9 they're not formally fiduciaries to the trust, if the trustee

10 wanted to call me up one day and say, Mike, what do you think

11 we should do about CNA, I could give him advise.  And if he

12 wanted to call, you know, John Cooney, I think is one of the

13 TAC members here, and say John, what do you think I should do?

14 I'm unsure.  Maybe that would be okay.

15          But here John Cooney is in an official position.  He

16 has the ability to reject things the trustee wants to do so the

17 trustee has to in effect deal with him better than he would

18 have to deal with me off the street.  He's got to at least work

19 with him and deal with him.  He knows that if he wants to be

20 appointed trustee in other trusts he's got to play ball with

21 these guys because they get appointed by this same group of the

22 ACC.  So if he likes being, you know, a trustee and wants to be

23 in other trusts he's got to -- he's, I mean, I'm not saying

24 anyone's going to do anything illegal.  I just mean that it's

25 the nature of the thing.  And he's got to play ball with these

1 guys.

2      THE COURT:  Okay.  But the problem I still go back to

3 is you're saying under 524 the issue that this testimony is

4 relevant to is the fairness and the consistency of

5 distributions that have to be made by the trust going forward

6 to similar claims.  So this issue that I need to determine for

7 confirmation purposes is whether 524(g) is satisfied by the

8 composition of the trust and the TAC, and whether or not it's

9 set up in a fashion so that it will satisfy 524.

10      MR. GIANNOTTO:  I think that's part of it.  I think

11 part of it is also that we're going to be arguing as a legal

12 matter and have argued that this is an improper conflict of

13 interest among the TAC members that as a matter of law, not as

14 a matter of Shein, but as a matter of law it's improper.  And

15 you shouldn't -- and therefore it's contrary to law to approve

16 -- and under 1129 to approve this trust.  And Shein, in effect,

17 adds a factual background to show how those conflicts of

18 interest why they're wrong and how they'll come into play.  It

19 sort of puts meat on the bones of that legal argument that

20 there really is an improper conflict of interest here.

21      And I think just in general that it shows whether

22 this whole plan has been entered into in good faith.  Where

23 the, you know, good faith construed liberally -- not good faith

24 versus I'm a bad guy, bad faith, but, you know, whether it's

25 reasonable and in good faith where you have a plan -- a trust

agreement, at least, and a TDP that were drafted primarily by

the ACC and the FCR, and they sort of, you know, they draw it

up in a certain way and then they put their guys as fiduciaries

on this plan to make sure it works, you know, in a way that

doesn't do their members any -- doesn't do their constituencies

any harm.  So I think those are ways in which this impacts your

decision making here.  I think it's -- you know, the original

motion made was that this is legal, Shein is legal.  He's not

legal.  He's talking about the practical effect of these trusts

and how they're set up and how you avoid these bad results from

happening.  So I don't think he's legal.

THE COURT:  But I thought he said he'd never

evaluated any before, and hadn't --

MR. GIANNOTTO:  No, he said he never evaluated an

asbestos trust before.

THE COURT:  Okay.  And hadn't participated in looking

at any before.

MR. GIANNOTTO:  Other than in the Thorpe case, I step

back, he had not participated in one of these standard asbestos

trusts.  But as part of his job as a professor and as part of

his role as trustee of pension funds, he has seen provisions

like this in action, the bad result, or studied them in class,

and the bad results that can result.  But, no, other than in

Thorpe where he was presented as an expert he read a, you know,

a thing that was similar to this one.  It probably had some

1  differences, but it was the basic same thing, and he gave a

2  similar opinion.  You know, so he studied it from that

3  perspective.  He has not studied these trusts to determine

4  whether over the past 20 years or whatever long they've been in

5  effect that bad things have actually happened.  I don't know

6  that anyone's done that.

7          THE COURT:  Wouldn't that be relevant?

8          MR. GIANNOTTO:  Well, it would add to the weight if

9  he could show that, but he's going to testify that these types

10  of provisions in other trusts have led to these bad situations.

11  But certainly, sure, if he had studied it and we offered him

12  for that purpose that would be another part of the relevance

13  determination.  But that doesn't make his testimony irrelevant

14  because of what he's going to say.  And I think as Mr. Pratt

15  said that he is going to be helpful to the trier of fact.

16          Now whether it's Phase I or Phase II we can argue

17  about that on Point 4.  I'm not even going to go through that

18  again.  We can argue -- not argue -- we can discuss where that

19  should be.  But I think that ultimately we are going to be

20  raising -- we have raised this issue that there's an

21  impermissible conflict as a matter of law and you can't confirm

22  for that reason.  And we are creditors and we want to make sure

23  that, you know, we are not treated unfairly by having

24  representatives of one constituency in effect as the

25  representatives of this trust.  And so we do believe it's

1  relevant, and we do believe that if this Court finds that there

2  is an improper conflict or even if there's not a legal conflict

3  that bad results will occur that you can change it.

4          THE COURT:  Okay.

5          MR. GIANNOTTO:  Thank you, Your Honor.

6          THE COURT:  Mr. Demmy.

7          MR. DEMMY:  Your Honor, I'll be very brief.  John

8  Demmy for Firemen's Fund Insurance Company.  At the outset I'll

9  just note that Firemen's Fund had filed a proof of claim in the

10 case asserting a claim in excess of $40 million.  It's been

11 classified as a Class 6 claim, and we have voted that claim

12 although we've reserved our right to argue that it's a Class 9

13 claim.  Of course that is a Phase II issue, and I'm not here to

14 argue that point.  Just noting that for -- to preface my

15 comments.

16         Your Honor, I'm going to respond to a question I

17 think you put to Mr. Pratt where you said, can you reject a

18 plan based on not liking the TDP structure if it was accepted

19 by the voters in Class 6?  And I think you can.  The Court,

20 clearly as a matter of black letter law, has an independent

21 duty to look at the plan regardless of whether objections are

22 filed, and regardless of the vote and determine whether the

23 plan meets the requirements of 1129(a).  And I'll direct Your

24 Honor's attention to Section 1129(a)(5).  And I'll not read the

25 entire section to you, but it talks about, "the successor to

1 the debtor under the plan, and the appointment to or

2 continuance in office of individuals is consistent with the

3 interest of creditors and equity security holders and with

4 public policy."

5       What it deals with there is that the people who are

6 going to run successors to the debtor, and I would suggest that

7 this trust is a successor to the debtor with respect to

8 asbestos claims, that the interest there, the Court's interest

9 there is to determine whether or not those -- the continued

10 role of those TAC advisors and the trustee is consistent with

11 the interest of creditors and with public policy.  It has

12 nothing to do with the vote, and the Court can make an

13 independent determination of that.  And if the Court believes

14 that the TDP structure is not a good structure even if it's not

15 illegal in the sense -- in the sense I think the Court was

16 using that word you can reject the plan.  And that was the

17 entirety of my remarks.  You have that authority.

18       THE COURT:  All right.  Thank you.  Somebody who

19 thinks the Court has discretion.  Gee.

20       MR. BERNICK:  We'll see if they stand by that

21 position when Your Honor rules.

22       MR. LOCKWOOD:  Well, I'd really like to see whether

23 they'd stand by Mr. Demmy's last argument, because if the trust

24 is a successor to the debtor then we don't really have much

25 trouble with, for example, things like assigning the insurance.

1 Because the trust -- it's not an assignment.  The trust is a

2 successor, it just -- the insurance just goes over.  And I

3 won't be here arguing with the reimbursement insurers over

4 whether or not the trust stands in the shoes of Grace when it

5 comes to resolving claims, et cetera.  The fact of the matter

6 is the only decided cases under 1129(a)(5) have specifically

7 held that it doesn't apply to trustees of -- trusts of this

8 order or liquidating trust or anything else.  And that's kind

9 of spur of the moment stab, but it really -- I'm going to carry

10 the day.

11         Let's go back to a couple points, Your Honor.  First,

12 Mr. Pratt was arguing about, you know, voting and nuances and

13 stuff like that.  What Mr. Pratt ignores which he would know if

14 he actually looked at the votes in this, is that the vast

15 majority of the master ballots were cast by law firms that are

16 not members of the TAC.  And those lawyers were operating on

17 their view of their fiduciary duties to their clients, and they

18 voted in master ballots to have these people be on the TAC.  So

19 they made a decision that it was okay.

20         They were willing to trust the TAC members to fulfill

21 as they did when they were ACC members.  I mean, somebody, Mr.

22 Pratt or Mr. Giannotto made the comment about the fact that the

23 TAC members were generally, if not invariably, chosen from

24 members of the ACC which was, of course, appointed by the U.S.

25 Trustee.  And so the idea that there's some sort of voting

1 issue here or that the people that are voting don't know that

2 the TAC members have their own clients that will be presenting

3 claims to the trust is, with all due respect, absurd.  It's

4 just not true.

5       Now, another question was raised, well, is it fair to

6 future claimants?  And indeed that ties to the notion about the

7 Court has to make sure that similar -- 524(g) says that similar

8 claims have to be treated similarly.  Actually if you look at

9 that particular provision it says that the presents and the

10 futures have to be treated similarly.  Not that the presents

11 among themselves all have to be treated similarly.  And that

12 points up the fact that the futures representative, who is in

13 fact the effective guardian ad litem for the future claimants,

14 has signed off on the TAC.  And I would suggest that with all

15 due respect David Austern, who was chief claims handling

16 executive for the Manville Trust for the last 20 years,

17 probably has a whole lot better idea about what's in the

18 interest of asbestos claimants than Professor Shein who

19 concededly has never had anything to do with an asbestos trust.

20 And as for Mr. Giannotto's assertion that he's going to testify

21 in his role involved in some pension trust he's had -- he's

22 seen similar situations that have given rise to similar

23 problems, there's not one word in his expert report that says

24 that.  And if the idea is that having had his deposition taken

25 and his nose rubbed in the fact that he doesn't know anything

1 about any of the way these trusts operate and has no experience

2 with them and is sauntering in here and making opinions about

3 conflicts that he's now going to show up at trial live and

4 start talking about stuff that he didn't talk about in his

5 report and he didn't say anything about in his deposition is

6 totally unacceptable as a basis for trying to defend against a

7 motion in limine to exclude his testimony.

8         Don't take my word for it, read his opinion, and see

9 if you -- when you get right down to it Professor Shein has one

10 thing to contribute to the Court as the trier of fact, one

11 thing, which is the observation that the TAC members are going

12 to have fiduciary duties to the present claimants as a whole,

13 and are going to be submitting claims to the trust on behalf of

14 their individual clients, and that there's theoretically the

15 possibility for conflicts there.  That's not in dispute.  We

16 don't need Professor Shein to make that observation.  But

17 that's the only fact that he's testified about in his expert

18 report.  Everything else is hypothetical speculation about

19 conflicts of interest.

20         And you heard Mr. Giannotto up here testifying quite

21 vigorously about all the hypothetical conflicts that he

22 personally sees.  He can make those arguments as good as

23 Professor Shein.  Indeed, he appears to be able to make them

24 better, because he certainly made a lot more of them than

25 Professor Shein made.  So, I mean --

1        MR. GIANNOTTO:  Can I testify then?

2        MR. LOCKWOOD:  The point being that if you don't have

3 expertise in the way trusts are run, and you don't have

4 expertise in the way in which a complex mechanism where you

5 have, as the Court pointed out, the trustees with overall

6 fiduciary duty, a futures rep who doesn't represent claimants,

7 and a TAC who have co-equal rights as advisors, that if you

8 don't know how that works, it is not helpful to the trier of

9 fact to have you come in and speculate about how it might work

10 because of the undisputed fact that you act in both capacities.

11 The Court can speculate to that extent just as well as

12 Professor Shein can, and maybe as well as Mr. Gianotto can, I

13 don't know.  But we're not here to test the speculative

14 capacity of either the professor, Mr. Giannotto or the Court.

15        The question again comes back to the notion of under

16 Rule 702, what facts is Professor Shein going to be presenting

17 to the Court that the Court can't figure out for itself, that

18 will help the Court in resolving issues that are before the

19 Court?

20        And my final point is that nobody ever satisfactorily

21 answered the question about what legal provision is being

22 violated by the trust structure that this Court would have the

23 power to deny confirmation over.  If they want to make that

24 argument, and if they have standing to make that argument, they

25 can do it in Phase II.  We're not here today to resolve plan

1  confirmation objections.  We're only here today to determine

2  whether Professor Shein and Professor Priest have helpful

3  testimony that this Court needs the assistance of in deciding

4  the legal issues that Mr. Giannotto has told the Court will be

5  presented allegedly in the capacity of insurers as creditors in

6  Phase II.  We will get to in Phase II the question of whether

7  they are creditors.  Again, that's not here in connection with

8  this motion in limine.

9         The final point I would make is be careful what you

10  wish for.  The citation to Combustion Engineering about the

11  claims -- the insurers not having any right to handle claims

12  prior to the petition, that's what the reimbursement agreement

13  trial was all about in Phase II.  Because they didn't -- the

14  ones that were paying, unlike the ones that are here today

15  arguing about this, didn't have any right to handle claims

16  either.  Grace was the one that was handling the claims.  And

17  we're going to litigate that issue.

18         Now, if the nonsettling insurers, not the

19  reimbursement insurers, but the nonsettling insurers would like

20  to participate in that noninsurance neutral litigation so that

21  the Court could rule that the plan -- that the TDPs don't

22  violate their rights because no insurers prior to the petition

23  had the right to handle claims and the nonsettling insurers if

24  and when their coverage was reached would be in no different

25  position because they're excess insurers than the reimbursement

1 insurers were well, there's a provision in the plan in the

2 neutrality provision that allows them to do that.  They can go

3 in and litigate that, and if they lose it then they're going to

4 be bound by res judicata or collateral estoppel.

5        But I don't really think they want to litigate that

6 issue, Your Honor.  I think that again was just kind of a make

7 weight argument to make it sound like Professors Priest and

8 Shein had admissible testimony here that would help the Court

9 in determining whether or not somebody, you know, had a claim

10 or something like that.  But the bottom line is nobody has

11 identified to you, I believe, a single fact that the purported

12 expertise of these two professors is presenting to you that's

13 going to help you decide any issue that you're facing in this

14 case.  And certainly not in Phase I.

15        THE COURT:  I am a little, I guess, confused as to

16 how these experts have anything to offer with respect to the

17 neutrality issue that's coming up for Phase I.  I can have a

18 different view, perhaps about Phase II.  But I'm really not

19 seeing it so much for the Phase I issues.  So perhaps somebody

20 can tell me what you think is relevant to the neutrality

21 provisions that we're going to be talking about.

22        MR. PRATT:  In terms of Professor Shein, he's not

23 relevant to the neutrality provisions.  The issue we had is is

24 he still encompassed in Phase I, because we weren't -- it's not

25 clear -- it wasn't clear to us from the wording of the order

1  that neutrality is the only thing in Phase I.  In fact, it's

2  not.  Even if you interpret the first part of that order which

3  says something like how insurers are improperly affected or

4  something.  If you interpret that as meaning just as to

5  neutrality which is what, I think, Mr. Bernick intended it to

6  be or something, but, you know, I wasn't there when it was put

7  together.

8          But even assuming that just means neutrality there's

9  a second part of it that says the standing of the insurers as

10 insurers to raise other issues.  And what I was not certain of,

11 and we'll flesh out in Point 4, I guess, when we get to the

12 fourth point is the first point where it says how you're

13 impaired as insurers encompass more than neutrality.  Because

14 if it encompasses how are you hurt as an insurer even aside

15 from if we made the plan insurance neutral in this respect at

16 least from CNA the plan -- we don't view the plan as insurance

17 neutral now.  Okay.  We don't know that assuming you ruled in

18 our favor that it's not insurance neutral now.  We don't know

19 that you'd fix it or the plan proponents would fix it to make

20 it insurance neutral.

21         So assuming you ruled the plan was not insurance

22 neutral then we believe that as insurers we would be affected

23 by other aspects of this plan because it's now not insurance

24 neutral.  So that's where the -- to us at least the confusion

25 came in as to whether Shein is Phase I or Phase II.  So that

1  may be dealt with when we decide what's going to go on next

2  week, I think.  And I think that, you know, we just want to put

3  him on.

4           And one thing I just want to say in response to Mr.

5  Lockwood is, you know, I'll go back to the first point he made

6  which is that oh, the insurers argue that since this is not a

7  jury trial what's the harm?  Let's put him on.  You know, I

8  would say the converse of that.  I'd say there is no harm.

9  And, you know, Mr. Lockwood wants to say it won't help you,

10 we'll help you.  You know, you can hear him out.  If you decide

11 that he's of no help you can throw it away.  Or you can listen

12 to it and maybe you'll find that it is helpful to you.

13          You know, we can argue back and forth about whether

14 Mr. Lockwood believes that it's helpful or whether I do.  But

15 if you listen to it you can make the decision yourself.  So

16 that's why -- and in Phase II we believed he was relevant

17 because we are a creditor.  And I know they're going to dispute

18 that.  But if we are a creditor then we believe we have

19 standing to object to the way the trust is set up.  And also we

20 believe we have standing under <u>Congoleum</u> to object to conflicts

21 of interest by the lawyers on the TAC.  Thank you.

22          MR. BROWN:  Your Honor, Michael Brown for Geico,

23 Republic, and Seaton.  I just want to address a particular

24 question that Your Honor asked in terms of the pertinence of

25 Professor Shein to Phase I.  I was going to save this for our

1  discussion on Item 4.  I'm going to violate my own suggestion
2  here just so I can respond to the question.
3          What Your Honor -- I think Your Honor understands,
4  but I just want to reiterate it, that there are essentially
5  three types of -- perhaps four types, but at least three types
6  of insurance companies that are involved in the bankruptcy.
7      You have insurance companies that are completely settled.
8  One, Beacon, one of my clients is an example of that.  It
9  doesn't have a role as an insurer because it bought back its
10 policies.  Its role will be in Phase II because it's a
11 creditor.  You then have insurance companies that at least from
12 the plan proponents' perspective, are both settled, at least in
13 some respect, but for whom the plan proponents claim that there
14 may be some residual types of coverage left.  And so they wear
15 both hats.  They are both creditors and they are insurers.  And
16 then you have insurance companies that are completely
17 unsettled.  And they are not creditors, they are just insurers.
18          And the arguments to which Professor Shein's report
19 relates are made on behalf of all three of those different
20 types of insurers.  And so Mr. Giannotto was up here, his
21 client is both settled and unsettled or however you want to
22 describe it.  It's a creditor.  It's also an insurer.  That
23 issue can be pushed, I think, for CNA to Phase II.  There are,
24 however, certain insurers like Geico and Republic, two of mine,
25 who are only insurers.  And as I understand the CMO the issue

1 that Your Honor is going to be addressing is, however you want

2 to couch it, insurance neutrality and the rights of the

3 insurers as insurers to raise issues.  So the problem in a

4 sense is that if you postpone that to Phase II that's fine

5 except that we can't have a ruling in Phase I that we don't

6 have the standing to raise that issue in Phase II.

7           THE COURT:  I guess I'm still not seeing what the

8 relevance is to the concept of insurance neutrality if we're

9 limiting this to, and I apologize for pointing to the box, that

10 only with respect to --

11           UNIDENTIFIED ATTORNEY:  I thought we got rid of that.

12           THE COURT:  All right.  Yes, we did get rid of it,

13 but --

14           MR. LOCKWOOD:  No, we didn't.  It got brought back --

15           THE COURT:  Well, it's gone again.  But the --

16           MR. LOCKWOOD:  Mr. Pratt, Mr. Brown's partner I

17 believe.

18           THE COURT:  Just --

19           MR. LOCKWOOD:  I'll turn it back over.

20           THE COURT:  Just to the core issue of neutrality as

21 it affects coverage issue, all right, not to the -- any other

22 two or four, however many accepted issues there may be.  But

23 simply to the traditional, you know, are coverage issues

24 preserved to coverage courts type of neutrality which is what I

25 thought Phase I issues were going to be about.  It seems to me

1 that that's pretty much based on a legal argument.  I mean, the

2 plan either contains appropriate language to protect the

3 insurers in that respect or it doesn't.  And if it doesn't then

4 the plan proponents either have to agree to modify it or the

5 insurers have standing to raise issues that affect their rights

6 within the plan.  And if it does then they don't have those

7 rights, and it seems to me that neither of these witnesses are

8 going to help me on that score.

9       MR. BROWN:  Well, Your Honor, just -- the CMO

10 describes, at least insofar as it concerns the insurers, it

11 says, "The first Phase shall address 1) whether the plan

12 improperly affects the rights of the debtors' insurers in their

13 capacity as insurers, but not creditors.  2) The standing of

14 the debtors' insurers in their capacity as insurers but not as

15 creditors to litigate confirmation objections that involve

16 issues other than those described in Section 1."  There aren't

17 really any described in Section 1.  That's part of the problem,

18 I think, the vagueness that Mr. Bernick was talking about.

19       The point here is that I think what's going on is

20 that the plan proponents are trying to narrowly tailor Phase I

21 to this concept of insurance neutrality, whereas the scope of

22 the third amended CMO is more broad.  And the concern that we

23 have is that there will be a global standing ruling made by the

24 Court except as to the two items that Mr. Bernick mentioned,

25 the assignment issue and the reimbursement issue.  And then

1  that to the extent that we pushed these issues, these

2  substantive issues off into Phase II we will be cutoff from

3  raising them in Phase II as insurers because of the standing

4  ruling that they're asking for in Phase I.

5          THE COURT:  Well, if I'm asked -- perhaps the better

6  way to go about this is to take a look at specific sections of

7  the plan, and determine whether the plan sections, as written,

8  affect the insurers in their capacity as insurers, affect the

9  rights of the insurers in their capacity as insurers.  So from

10 here on out I'm not talking about the insurers as creditors

11 anymore.  I'm only talking about the insurers as insurers.

12         So if we take a look at the particular provisions of

13 the plan that anybody is objecting to saying this section

14 should be insurance neutral, and isn't, then that ought to be,

15 I think, an issue where we look at the plan and say okay why

16 you think it isn't, and some insurer counsel says because it

17 says this and it should say that.  And the plan proponents will

18 say but it says this and if it says that then this, and just

19 like every other time we've gone through this, eventually that

20 issue, I think, will get resolved.  Now, -- I think.  It's

21 happened in every other case.  I don't have any doubt that that

22 issue ought to get resolved.

23         The rest of these issues, the exceptions, I think

24 ought to be pushed to the Phase II phase.  Now, what all those

25 issues are if we -- I can't identify as I sit here right now.

1 But if we go through each of those plan provisions I think we

2 will identify them in that capacity next week.

3          UNIDENTIFIED ATTORNEY:  Can I make a --

4          MR. LOCKWOOD:  Your Honor, I would like to make a

5 procedural point here.  Mr. Brown got up supposedly to talk

6 about additional comments on the motion in limine.  In fact

7 what he's done is highjack agenda Item 4, the pretrial

8 conference on Phase I --

9          THE COURT:  Well, I think I --

10          MR. LOCKWOOD:  -- and started --

11          THE COURT:  I think I did it, Mr. Lockwood --

12          MR. LOCKWOOD:  Well, maybe, but --

13          THE COURT:  -- and it's a --

14          MR. LOCKWOOD:  -- and normally the debtor would get

15 the opportunity to kind of say this is what we think Phase I

16 ought to be about.  And Mr. Brown is now up here telling us

17 what CMO does, and you --

18          THE COURT:  Well, that's fair enough.  But the issue

19 that I'm trying to get to is where these experts are relevant

20 to Phase I.  And in order to make that decision I need to know

21 what Phase I is.  So I'm not quite sure until I get through

22 Number 4 how I can address Number 1.

23          MR. LOCKWOOD:  That may well be, and I would invite

24 Mr. Bernick to have an opportunity to explain what the plan

25 proponents -- I mean, this is our confirmation here, and with

1 all due respect to Mr. Brown, who I'm sure would like to take

2 control of the discussion, that's always a good position to be

3 in, I would urge that the Court give Mr. Bernick an opportunity

4 to address this.

5          MR. BERNICK:  I appreciate being represented.

6          MR. BROWN:  Your Honor, I believe I was being

7 responsive to a specific inquiry the Court raised, and --

8          MR. BERNICK:  With due respect to Mr. Brown, you

9 know, I know this is going to have lots and lots of -- but I

10 really do believe it would be appropriate even if Mr. Brown is

11 answering the Court's question.  The question Your Honor has

12 asked about the scope of Phase I, I really do believe can be

13 much more neatly addressed.  And if Your Honor wants to hold

14 off until later on this afternoon of actually announcing what

15 you're going to do with respect to Messrs. Shein and Priest, I

16 don't know if Mr. Lockwood would like that, but maybe that

17 makes sense.  But to shoehorn that central issue into the

18 discussion of Shein and Priest by way of answering Your Honor's

19 question I don't think is fair to Mr. Lockwood who made a

20 motion.  And we ought to get done arguing that and then we'll

21 talk about this issue.

22          THE COURT:  All right, let me stop this.  Mr. Brown

23 has the podium.  Mr. Brown, let's get back to just the one

24 point.  I want to know how Mr. Shein and Mr. Priest are

25 relevant to Phase I, because I'm having some difficulty seeing

1 it.

2          MR. BROWN:  Well, again, I guess part of the -- I was

3 actually going to take Mr. Bernick up on his suggestion that if

4 Your Honor deferred a ruling on this until we got to 4 that

5 might make sense.

6          THE COURT:  All right.

7          MR. BROWN:  I actually do think that would make

8 sense, and I just wanted to be responsive so that Your Honor

9 didn't make a ruling and then have to come back and try to deal

10 with it.

11          THE COURT:  Do it again.  Okay.

12          MR. BROWN:  I'm happy to sit down and let Mr. Bernick

13 resurrect his diagram.

14          THE COURT:  Okay.  Based on the arguments that I've

15 heard so far what I am contemplating doing, so you can all

16 consider this as we move into the Item 4, and I'm not making

17 any final rulings on Item 1, but this is where I sit so far,

18 I don't see a relevance to Phase I of either of these

19 gentlemen.  I'm having some difficulty understanding where

20 there is some relevance.  I'm going to reserve ruling as to

21 whether they are relevant on Phase II until I have a chance to

22 find out, and go back and take a look at the arguments and

23 their reports.

24          I have read their reports, and I've read your briefs,

25 but having heard your arguments, I am not convinced at this

1  point that their testimony is really going to assist in making

2  findings, but I want to think about that very carefully,

3  because it is a nonjury trial and it may simply be better to

4  hear testimony and then weigh the relevance rather than not

5  hear it at all and then, you know, wish that I had.  So I want

6  to think about that very carefully.  I'm going to take the

7  issue with respect to Phase II, I believe, under advisement

8  unless something in the discussion about Item 4 convinces me

9  otherwise.

10       So I'm inclined to think that I don't see relevance

11  in Phase I, I may see it in Phase II.  I'm going to think about

12  that a little longer.  You don't need an immediate ruling on

13  that since Phase II's not coming up for a couple months anyway.

14  That's where I stand right now.  Why don't we talk about Item 4

15  and see --

16       MR. BROWN:  Thank you, Your Honor.

17       THE COURT:  -- where we go from there.

18       MR. BERNICK:  Peter, could you flip over that chart,

19  please?  And I asked for that only so that my good friend Mr.

20  Millner, whom I know from many other cases, can get up and with

21  passion again argue that it is completely misleading for subtle

22  ways that I never thought of when I put it up there to begin

23  with.  And then we'll flip it over again.

24       But seriously, Your Honor, I think that the key thing

25  in addressing the fourth issue on the agenda, and Your Honor's

1  concerned about the schedule next week, which concern all of

2  us, share, really comes down to a question of case management.

3  It is not a substantive -- there's not a substantive impact

4  that it has in some magical kind of way.  And therefore as case

5  management, the real question is what's the most efficient way

6  to get these matters before Your Honor so that Your Honor can

7  rule?  And we're not talking about a threat of somebody being

8  bound in Phase I who really hasn't been there because they're

9  in Phase II.  Anybody who wants to participate in Phase I can

10 come and participate.  No one's being barred from

11 participating.  Everybody can speak up whether they're settled,

12 nonsettled, whatever.  All the four categories, three

13 categories, endless permutations, we're all here.  So it's

14 purely a question of what is best for the Court in figuring out

15 what to do.

16         So, when we went down the road of putting together

17 the case management order Your Honor will recall that this was

18 something that the plan proponents were very, very active in

19 pursuing in order to bring it to bear a defined schedule and

20 some rational procedure for sequencing discovery and

21 adjudication.  And God knows we had endless meet and confers,

22 everybody pitched in, and we dealt with feasibility and all the

23 different moving parts so that instead of having nine different

24 case management orders or no real case management order,

25 everybody was reading off the same page.  And so this then gave

1 rise after long discussion to what we see.  And, you know,

2 could you have just like a -- could you have figured out a

3 better way with the benefit of hindsight to do it?  Well,

4 maybe.  Maybe there was a, quote, a better way to do it, but

5 it's done pretty well so far to keep this case on track.

6          Now, when that case management order was put together

7 and it came to Phase I, the Phase I language reads out as

8 Brother Brown has indicated.  And at least we all know that the

9 creditor portion is moved off to Phase II on the merits.  And

10 that we're talking in Phase I about the rights of insurers as

11 insurers.  What came about though is due to the imagination and

12 determination and, I give them complete credit for having

13 imagination and determination, of the insurance companies

14 they've now unpacked what used to be a fairly traditional

15 notion of neutrality which related to the carriers.  And they

16 said oh, it's richer than what you're thinking.  And as they've

17 done that, for example, with respect to reimbursement we've

18 responded.

19          So we've said as they've raised issues,

20 reimbursement, that's a carve out put it in Phase II.  With

21 respect to insurance assignment we always knew that that was

22 going to be -- have to be a carve out.  That's in Phase II.  So

23 what's happened is that this document, this case management

24 order was put together several months ago, has been refined so

25 that it's more effective as a case management tool.

143

1        In the last week, because of what we knew was an

2   inability to communicate clearly on what actually was going to

3   be up in Phase I, we initiated these -- a meet and confer.  It

4   was very difficult to schedule, but we finally got there,

5   precisely so that we could try to reach agreement on how to

6   even talk about these things.  And this led to a process, a two

7   hour call the other day.  It just went on and on and on.  And

8   the problem really is that people are looking at this phasing

9   as if it's a strategic or substantive matter.  It's not.  It's

10  purely a question of what matters get presented to Your Honor.

11  It doesn't even necessarily mean that Your Honor has to decide

12  any of these matters at any particular time.

13        THE COURT:  And I may not.

14        MR. BERNICK:  And you may not.  So it's just that

15  you're going to hear about it.  And the reason that we put in

16  Phase I the standing, the neutrality issue is that we hoped

17  that maybe it would facilitate, you know, narrowing the number

18  of people that had to submit briefs, be heard and all the rest

19  of that in Phase II.  And that after all is -- well, the whole

20  idea is about standing, is to control who it is that's actually

21  able to come forward and make arguments and participate.  So

22  the idea was it'll help.  So we put it out there.  We still

23  think it'll help.

24        But in service of further refining as a matter of

25  case management what Your Honor actually hears next week we

1  said okay, you are now -- you, the insurers, are now saying

2  your rights as insurers are broader than what you, the debtors

3  or plan proponents say they are.  So we've listened.  We said

4  okay, we understand what you're saying.  And we're now saying

5  whatever the case management order said, and whatever its

6  language might be, and maybe it is arguably broader than what

7  we originally anticipated it meant, here is what we are

8  proposing as the plan proponents actually get put before Your

9  Honor next week.

10        And we went back to the traditional notion of

11 neutrality.  Instead of simply saying insurance neutrality,

12 because that's not specific enough, and instead of simply

13 saying neutrality insofar as the insurers are insurers, because

14 apparently that's not specific enough, a lot of nuances, we

15 said look, the subject matter is really the preservation of

16 defenses to insurance coverage.  That was the whole idea is

17 that basically what happened in the bankruptcy case would not

18 adjudicate issues that would then be used to establish coverage

19 in the subsequent coverage proceeding which really was the

20 whole concern that the insurance industry used to have is that

21 the effect of a confirmation of a plan was to say there is in

22 fact coverage.

23        So neutrality said no, that's not going to be.  The

24 whole focus was coverage so we said okay, let's just make it

25 coverage so that the Combustion Engineering decision which said

1 this language here means that you're protected on coverage

2 defenses, that we were saying okay, we want to be just like

3 that, this case is the same thing, it can be decided as matter

4 of law.  So we're now saying as the plan proponents, we think

5 that consistent with what Mr. Lockwood has said it ought to be

6 up to the plan proponents and certainly up to the debtor to

7 make a proposal about case management, we're saying that is the

8 only issue that we want to have addressed next week is is this

9 plan neutral in the sense that it preserves with the language

10 that the Third Circuit has blessed the rights to cover -- to

11 defend against coverage claims in some subsequent coverage

12 proceeding.  That's the only issue that we're focused.  We're

13 not focused on the collateral question of well -- were the

14 prepetition settlement practices the same or not.  What does

15 that have to do with the price of eggs in China?

16        The question is whether the language in the plan

17 means that their rights to defend against coverage are

18 preserved for another day?  That is what we're seeking to have

19 determined as a matter of law in the plan.  Then we say if the

20 answer to that is yes here are the implications of that for

21 purposes of standing.  And we've got a whole bunch of

22 objections that we list in Category B, 1B of the list of

23 objections.  I call it a road map.  It's not.  It's a chart.

24 That the chart 1B are the objections as to which we say the

25 carrier should not have standing.  And we list them

1 specifically.

2       That's our proposal.  It's nothing else.  And I think
3 it's up to Your Honor to say well, is that the order in which
4 Your Honor wants to hear it or not?  If we're right, or if Your
5 Honor should say -- not if we're right -- if Your Honor accepts
6 that proposal then back on the scheduling issue, I think that
7 next week is going to be a very, very brief process.

8       So that's where we are.  Now, we're also prepared to
9 say in light of the dialogue that's taken place today and
10 perhaps some guidance Your Honor can give us, let us talk
11 again.  Peter was skeptical -- Mr. Lockwood was skeptical that
12 the first meet and confer would do anything.  I think it
13 actually did do something, but maybe another one could so that
14 we don't have nine people get up this afternoon and go through
15 19 different arguments.  But then we can come back on Monday
16 and address it again.

17       The only thing I think it really affects beyond the
18 Shein and Priest motion is all the evidence that might be
19 presented.  And there on Item 4 I will say the following.  I
20 think -- how many exhibits are there altogether?  Four hundred
21 plus exhibits.  It's a huge number of exhibits.  Many of them
22 are insurance policies or documents that relate to insurance
23 policies.  We could take another three hours this afternoon,
24 which we don't have, to go through all of those different
25 exhibits.

1      I believe that when Your Honor gives us some guidance

2 about what's going to be decided next week maybe we don't need

3 to have the insurance policies in and to worry about

4 authenticity issues because, lo and behold, there are some

5 authenticity issues.  I'm talking about insurance policies.

6 But that's the vast bulk of them.  The other evidence is either

7 live testimony.  We're only aware really of two witnesses that

8 have been tendered for live testimony, and that's Shein,

9 Priest.  Oh, Mr. Lockwood's been subpoenaed.  I have a personal

10 view of that which is he should have to testify because I don't

11 want to cross examine him.

12      But there has also been a lot of people listed by way

13 of deposition.  A lot of the exhibits are just whole deposition

14 transcripts.  Now, where I come from if you want to use a

15 deposition you got to have a designation.  To my knowledge

16 there's only one designation set that's been received.  It's

17 from Arrowood, and they've now resolved their differences.  So

18 we have these exhibits that are entire deposition transcripts

19 that aren't even designated.  So I'm a little bit leery to

20 simply say let's just put it all off until Monday, but at the

21 same time I don't know how really else to get into it unless we

22 get some guidance from Your Honor on what you want to hear.  If

23 you want -- if you gave us that guidance then I think that that

24 would probably -- I'm supposing it'll probably get a lot of

25 impact on what people really want to present.  And that maybe

1 then it won't be 400 exhibits.  And that's really what I asked

2 for in the call.  I said what I want is here's what -- we said

3 here's what the issue is that what we want to present, and what

4 I said was meet and confer on pretrial means you tell us now

5 with that issue who you really -- what depositions you want for

6 what reason, and what documents you want for what reason.  The

7 problem with the call is that we never got that first issue

8 resolved so we couldn't even get to the meet and confer on the

9 second set of issues which are what actually is going to be

10 tendered to the Court.

11        So that's the conundrum, Your Honor, is the -- we got

12 the issue, and then we got all the stuff that may or may not be

13 relevant to that issue.  And as much as we've tried we haven't

14 been able to get to the point of having even really a true meet

15 and confer on the details of -- not that we haven't tried.

16        MR. LOCKWOOD:  Your deposition estimation.

17        MR. BERNICK:  Oh, okay.

18        MR. LOCKWOOD:  They were filed today.

19        MR. BERNICK:  Oh, okay.  I got it.  Well, we have a

20 different problem.  Oh, I'm sorry, that's progress.  But we

21 have a different problem which is that there's just no way that

22 this is going to get done today, we just received it.

23        THE COURT:  Well, Mr. Brown.

24        MR. BROWN:  Your Honor, I want to just address a few

25 items both from the beginning here.  We have, on the issue of

1  authenticity of policies and so forth, three of my clients

2  Geico, Republic and Seaton have been working for two months

3  with Mr. Horkovich on a stipulation.  It's right here.  We got

4  the plan proponents' last changes to it last week.  We asked --

5  I asked Mr. Horkovich if their only dispute about the policies

6  was the relevance to Phase I.  I didn't get an answer from Mr.

7  Horkovich, but I did get an answer from Ms. Harding today that

8  that is in fact the case.  I have signed the stipulation, there

9  are signature blocks there for the plan proponents.  At least

10  for my clients that would take care of that issue.

11        It was requested that we get the deposition

12  designations to the debtor by tomorrow.  We began filing them,

13  I believe, last night.  I don't know if they're all yet filed,

14  but our intent is to have them all filed by today.  So I think

15  that issue has been resolved.  The plan -- this is their case.

16  This is the plan proponents' case.  And what they've told Your

17  Honor is they don't intend to put on a case.  They've told you

18  they have no witnesses, and that they have no exhibits.

19        And in terms of what should happen on Monday morning

20  is Mr. Bernick should come in on behalf of the plan proponents

21  and say we rest.  And then we should go.  And we should have

22  the opportunity to make our record, because Your Honor's being

23  asked to make a standing rule.  Now, with the diagram over here

24  there's been an effort, because the CMO is not entirely clear

25  to redefine what the issues in Phase I are going to be.  We're

1  certainly in agreement with that.  And I have a suggestion as

2  to how we might do that and really possibly cut through a lot

3  of this.  And it's something we've already asked for.  And that

4  is, at the end of Phase I what will the form of order look like

5  that the plan proponents will present to Your Honor for

6  signature?

7           If I had that form of order it would be a lot easier

8  to cut through some of those issues.  And with what Mr. Bernick

9  said was the CMO is a little vague on what we do in Phase I.

10 Well, vagueness isn't going to help my client if we sort of try

11 to take a guess at what is in Phase I.  So we've prepared, we

12 filed our briefs, we filed our plan objections, we're filing

13 our designations.  We're doing all the things we're supposed to

14 in a timely fashion.  And here we are on a Thursday before the

15 Monday when this begins, and we're redefining what we're going

16 to be deciding next week.

17          CMO says, "The first phase shall address whether the

18 plan improperly affects the rights of the debtors' insurers in

19 their capacity as insurers, but not creditors."  It doesn't say

20 whether the plan is insurance neutral.  That was a phrase known

21 when we were -- when this thing was drafted.  If that's what

22 they intended at the time perhaps they could have said that.

23 But they didn't.  So if we want to cut through some of this,

24 and we want to make it streamlined show us the order that they

25 want Your Honor to sign.  That will define what the issues are

1  in Phase I far more than a meet and confer between the insurers

2  and the plan proponents on these issues.  And if we could have

3  that then we could probably have an intelligent discussion

4  about what proceeds.  But in our vision right now based upon

5  this CMO we have deposition designations, we intend to call Mr.

6  Lockwood as a witness, and we have our experts.

7         Now, one of the objections that's been raised to some

8  of the earlier -- what we -- just so Your Honor knows -- I

9  don't know if Your Honor had a chance to look at the exhibit

10 binders.

11        THE COURT:  I have not.

12        MR. BROWN:  Okay.  The exhibit binders were due

13 before we could get to doing deposition designations.  Indeed,

14 depositions were being taken on Friday of last week.  So what

15 we did was we put the depositions in our exhibit binders with

16 at least those exhibits that were used in the depositions that

17 we thought would be pertinent to Phase I.  We indicated in the

18 table of contents that designations would follow, and that's

19 what Mr. Lockwood has today and are being filed today.  So

20 we're doing everything we can to advance the ball under a

21 schedule that was really dictated by the plan proponents and

22 not us.  We're ready to go on Monday, and present our case, but

23 they don't have a case.  Their case consists of two things.

24 Look at 7.15 and look at Combustion Engineering.  That's what

25 their case is.  And what we would like to do is respond to that

1  by putting on our case.

2          THE COURT:  Okay.  And I guess that's what I'm not

3  clear about.  What is your case going to be?  What are the

4  essential points of the insurers' case?

5          MR. BROWN:  Well, I would say that one -- again, not

6  knowing precisely what's going to be -- what the form of order

7  is going to look like, but certainly I think we're all in

8  agreement that insurance neutrality, whatever that means it

9  means different things to different people, is whether 7.15

10 truly accomplishes what the plan proponents say it does.  And

11 Mr. Lockwood should be able to help us with that because I

12 think he crafted most of it.  And that's why we have served him

13 with a subpoena and would like to have him testify.

14          MR. BERNICK:  Can I make a suggestion to Mr. Brown?

15 With Mr. Brown's permission I'd like to do that.  I think we're

16 all probably past the point of pointing fingers about how all

17 of this came about, because it's not really very productive,

18 and I'm not going to respond to the et cetera, et cetera.  The

19 question is what's going to be best for the Court?  There was a

20 request earlier this week for us to craft an order.  And given

21 the discussion that took place we weren't getting really

22 anywhere.  I think given what Your Honor has observed today,

23 and what we have specified today I think our position is very

24 clear, but there's no magic from our point of view.  We can

25 certainly put together an order.  I don't think that that

1 really is -- needs to be an impediment.  And I say that easily

2 because Mr. Lockwood's going to do it.

3        But beyond that there hasn't been any question since

4 the meet and confer, and even before the meet and confer that

5 we at least were going to address this issue of, we'll call it

6 the tradition neutrality and insurance coverage defense rights.

7 Mr. Brown's correct, I would agree, that yeah, we go up and put

8 our case on and our case is pretty much as he said.  It is a

9 legal argument based upon <u>Combustion Engineering</u>.  The reason

10 we put the language in the plan was that we wouldn't have a lot

11 of evidence or anything else.  We would build on a lot of

12 experience and a lot of pain and time that's been taken in

13 connection with prior cases.  So, yeah, that's right.  And it's

14 also right that then it's their time to do their defense.

15        We appreciate that in service of that at least Mr.

16 Brown and his clients have been diligent and have created a lot

17 of paper for us all to go into, but I'm assuming it still

18 preserves all the different things that they may want to do.

19 The purpose of a pretrial conference is to, as I have it here,

20 Rule 7016 is to, "Expedite the disposition of the action,

21 establish control, discourage wasteful activities, improve the

22 quality of the trial.  And that includes formulating and

23 simplifying issues and eliminating frivolous claims or

24 defenses, obtaining admissions and stipulations, avoiding

25 unnecessary proof."

1          I think that we will work on an order, a proposed

2    order and circulate it early tomorrow.  But I do believe that

3    it is going to be exactly as we said.  And the real issue is

4    the one that Your Honor has indicated which is if that's the

5    issue what will their proofs be?  And I think we really need to

6    know what those proofs are going to be immediately.  Presumably

7    they know what they are.  If they really want to call Mr.

8    Lockwood I guess Mr. Lockwood will figure out whether he likes

9    that or not.  But I don't think that we should have to use the

10   time that it takes to put together a piece of paper tomorrow

11   morning in order to then have a further round of long meet and

12   confer where we go through 400 exhibits and inches and inches

13   of deposition designation.

14          There's got to be a concept that drives their case,

15   and that they could articulate to us as easily as they would

16   answer Your Honor's question.  Well, if the plan proponents

17   believe that it's <u>Combustion Engineering</u> language with that

18   blessing adopted in this plan in words of one syllable why's

19   that wrong?  And then what evidence is necessary?  So I guess

20   to cut to the chase on it we want, if we can, if we're going to

21   defer this issue at all to have a real discussion where the

22   feedback from the carriers is, you know, in words of one

23   syllable here are the facts that we think we need to prove up,

24   and here's who we need to do it and the following, you know,

25   documents, and the following -- so it's really specific.  So we

1  don't go through this again on Monday and basically have the

2  continuation of this pretrial by taking up two hours on Monday.

3          THE COURT:  No, I think we're going to get to the

4  evidence on Monday, but for the fact that I've continued the

5  one issue.  I think we need to get to evidence.  I think the

6  mistake is not having forced parties to put together a pretrial

7  narrative early on.  So to the extent that the pretrial

8  statement does not require that for Phase II I'm amending the

9  CMO.  That issue we will talk about on Monday.  So whatever

10 meet and confer you folks have discuss it, because I am not

11 going into Phase II without pretrial narratives from anybody.

12 And I think we're going back to what I did in every other case

13 but this one.  This was a mistake.

14          We're going to do pretrial narratives.  You'll have

15 to identify your documents, premark them for identification and

16 file binders, and give me pretrial statements because otherwise

17 it's too disorganized, and then we get down to the wire.  And

18 although you may individually be prepared, collectively you're

19 not prepared and therefore I'm not prepared.  And that's not a

20 good use of anybody's time.  So I don't think that's an

21 appropriate way to go about this.  So it's kind of late to try

22 to get pretrial statements in, but it's not unreasonable,

23 perhaps.  If the plan proponents really are going essentially

24 to say we're relying on the plan language and nothing else and

25 here's the plan language that'll be pretty easy for them.

1         MR. LOCKWOOD:  Your Honor, that's what we've said in

2    our witness list, in our -- we're on record as saying we're

3    relying on plan provisions.  And the insurers at least in part

4    have responded by arguments that said the plan provisions don't

5    work.  And so that certainly -- that part of it is certainly

6    capable of being in effect argued on the basis of briefing

7    that's been done, and oral argument that could occur.

8         THE COURT:  I guess the question is what witnesses

9    you need in order to substantiate the position that the plan

10   provisions don't work?  I'm not -- I think for sure Professor

11   Shein is not addressing that issue at this stage.  He may at

12   Phase II.  I don't think that's an issue for now.  I'm clearly

13   not to trust provisions yet.

14        MR. BROWN:  Your Honor, perhaps I could start with

15   maybe what ought to be, I think, the easiest issue which

16   unfortunately is not yet resolved.  The plan proponents'

17   position appears to be that the language in the insurance is

18   wholly irrelevant to whether the plan is insurance neutral.

19   Now that is a point on which, I think, the insurers disagree

20   which is --

21        THE COURT:  The language in the policies?

22        MR. BROWN:  Yes.  Which is the reason why we started

23   this exercise with Mr. Horkovich two months ago so that we

24   could avoid the necessity of having to parade before Your Honor

25   one representative after another for the insurance companies to

1  authenticate policies and settlement agreements and so forth.

2  So, you know, I would like to think, although I don't know

3  whether the plan proponents are agreeable that we could agree

4  that these are admitted into evidence for the purpose for which

5  they're being offered which is to demonstrate the standard

6  types of provisions that Your Honor is aware of.

7          The cooperation clause, the no assignment clause, the

8  right to associate in a defense, voluntary payments.  None of

9  that should be controversial.  And what we had done with Mr.

10  Horkovich was to negotiate a stipulation that would permit

11  these documents to be admitted into evidence without parading

12  witnesses before Your Honor with the caveat that no one wanted

13  to commit that everything was complete because people have

14  different, you know, versions of the same policy, and so it

15  would be for purposes of this bankruptcy proceeding only so

16  people wouldn't have to worry about a stipulation being used in

17  coverage litigation and so forth.

18          We haven't even gotten to that point.  I mean, I

19  think we are with my clients.  I'm not sure whether we are with

20  all the other insurers.  But, I mean, that's, you know, the

21  discussions do breakdown when out of the box the plan

22  proponents are telling you we don't care what your policies

23  say, they're irrelevant to what the Court has to decide in

24  Phase I.  We think it's important to have the policies in the

25  record.

1          MR. LOCKWOOD:  Just so we're clear on why we think

2   it's irrelevant although I would hope we could work out a

3   stipulation.  The reason we think it's irrelevant is simply

4   because we -- our position is the insurance neutrality language

5   effectively says whatever is in your policy that gives you any

6   rights at all as to deny coverage if not complied with you

7   preserve that right.  So you don't have to itemize all the

8   various rights.  And some insurers may have different ways of

9   raising their rights, but we're not going to engage in coverage

10  litigation as to whether or not they really have those rights.

11  And that's really the only reason.  That plus the fact that we

12  figured Your Honor probably wouldn't want several feet worth of

13  insurance policies on that issue.

14          THE COURT:  Well, I've had several feet worth of

15  insurance policies in other cases on that issue.  What I would

16  make you do is point out to me where the standard places are

17  that you want me to read.  I'm not going to, you know, delve

18  through hundreds of policies.  It seems to me that if you want

19  the language in standard clauses in evidence I don't care

20  whether they're in evidence, but I also think that the purpose

21  of the language in Combustion Engineering is to preserve those

22  issues to coverage litigation.  So if the issue is -- I think

23  the issue still comes back to what is on the table for next

24  week which is whether or not the plan language actually does

25  make the plan insurance neutral.  And if it does regardless of

1 what the defense issues are then whatever the language of the

2 policies is is preserved to the appropriate coverage court.

3 The defenses are preserved.

4         Your economic defense that's been argued in some

5 other cases, but not to the extent that you've raised it here.

6 To the extent that that is an issue that is going to be pursued

7 I think you have to decide whether it's a Phase I or Phase II

8 issue.  If it's a Phase II issue then I guess that's the

9 question.  Where is it going to come up?  If it's a Phase I

10 issue then perhaps the best thing to do is accept Professor

11 Priest's testimony on that score -- expert report on that score

12 or his testimony for whatever relevance it's going to have just

13 so we can get it into the record.  I don't know whether I would

14 not end up striking it after I hear it, and saying that it was

15 inadvertently entered.  I mean, I haven't made that

16 determination.

17         But to the extent that he's ready to go, you're ready

18 to go it may be worth just doing it if it's a Phase I issue.  I

19 don't know.  Because it seems to me that to the extent that

20 you're going to argue that there are economic aspects of this

21 polity that go beyond coverage defenses maybe that's the

22 relevance of his report.  I think you can make those arguments

23 without his expert report.  In fact, they've been made in other

24 cases.  Again, not to the extent you're making them here, and

25 in a slightly different context.  But they've been made by the

1  lawyers in other cases.  I'm not really sure that you need an

2  expert to point that fact out in the context that Professor

3  Priest's report's done it.

4          In some other cases there have actually been

5  mathematical computations, and that, I think, is the subject of

6  an expert report.  But Professor Priest's report is a little

7  bit different.  It's just taking the language of policies and

8  applying it in a fact.  I'm not really sure that it's not

9  really legal analysis as opposed to economic.  It's very hard

10 at this point without hearing it maybe in context to judge.  It

11 seems to me that it's pushing a line at least.

12         So I don't know whether it would be helpful.  I

13 really don't know.  That's why I wanted to take the matter

14 under advisement, go back and look at it in connection with the

15 issues.  But, you know, if you want to bump it up to Phase I

16 maybe the best thing to do is let him testify, but subject to

17 the fact that after having heard it I may say it was a mistake

18 and strike it all including the fact that I shouldn't have

19 permitted him to testify as an expert at all.  I don't know at

20 this stage.  So I preserve everybody's rights to do it if you

21 want to do that in Phase I.

22         Other than that I think with respect to the coverage

23 issues we still get back to the question of whether the plan

24 does or doesn't sufficiently address the neutrality language

25 that the circuit has approved.  And if it does I think the

1 insurers have the protections that are available in this

2 circuit for coverage defenses.

3      MR. BROWN:  Well, Your Honor, let me just say this.

4 I can assure you that it does not.  I can also point out what

5 was pointed out I think earlier and that is that the factual

6 predicate upon which the Combustion Engineering language was

7 based was a different record than the one that Your Honor would

8 be presented with.

9      THE COURT:  Okay.  Well, then that may be the case,

10 too.  But even if it's a different record, even if the insurers

11 had the right to participate in the defense and -- here in

12 Grace and didn't have the right to participate in the defense,

13 I'll use that.  I know it's broader than Combustion, but let me

14 just use it in that broad a term.  If the right to raise that

15 as the coverage defense is preserved because of neutrality

16 language you've still got what the policy provides for the

17 insurance coverage which is the right to deny coverage because

18 there was a breach of the policy language.  So I still don't

19 see where the neutrality language of the plan doesn't protect

20 the insurers.  Because the purpose of the policy provisons is

21 to give the insurers the right to deny coverage in the event

22 that all of the provisions of the policy aren't complied with.

23 So if they're not complied with --

24      MR. BROWN:  Your Honor, I'm not sure when the

25 insurance companies entered into these policies that what they

1 were looking to do was preserve their defenses.  I think that

2 they had certain rights that they negotiated and they

3 anticipated that they would actually have an opportunity to

4 exercise those rights.

5          THE COURT:  They may have, but --

6          MR. LOCKWOOD:  Your Honor, aren't we getting into the

7 merits of the Phase I hearing?

8          THE COURT:  We are to a certain extent, Mr. Lockwood,

9 but it's significant because at this point I want to know

10 whether we're looking at evidentiary hearings.  I want to know

11 if we're looking at legal arguments.  And frankly if it's

12 something I've already ruled on and this plan doesn't do

13 anything any different from other plans I don't know where

14 we're going.

15          MR. BERNICK:  That's exactly where we are.

16          MR. LOCKWOOD:  Let me make this suggestion.  I

17 believe that Mr. Brown has articulated that they are prepared

18 to argue in Phase I, they've briefed it already, they're

19 prepared to argue it, that because of various exceptions that

20 we have built into this language that it doesn't provide

21 insurance neutrality.  That's a legal argument you can make.

22 You don't need evidence for that.  They want to argue that CE

23 doesn't apply to the less -- even apart from the exception that

24 somehow or another the CE holding of that insurance neutrality

25 doesn't apply in this case because of what they want -- they

1  say is a different record.  The Court can decide that.

2       What we're trying to avoid doing -- let's be

3  perfectly clear about this -- the plan proponents are not

4  trying to litigate with evidence on the merits at the Phase I

5  hearing whether this plan is confirmable over the objections of

6  insurers.  And if the insurers, for example, can persuade Your

7  Honor that because Combustion Engineering is "Distinguishable,"

8  because there's some sort of different record, and that

9  distinction matters then they will have successfully defeated.

10 At least for the time being.  Our effort to get the insurance

11 neutrality ruling at Phase I that we're seeking.  We may still

12 be litigating their standing to do various things in Phase II,

13 but we're not proposing to try and prove in Phase I that the

14 fact pattern of Grace is the same as the fact pattern of

15 Combustion Engineering.  Are we, Mr. Bernick?

16       MR. BERNICK:  No, we're not.  I only stand because

17 I'm a little bit queasy.  Your Honor, asked a very

18 straightforward question which is what is the case that would

19 be presented?  And you further put an edge on it by saying I

20 don't see how there in a sense could be a case if the issue was

21 so narrow.  Mr. Brown, with all respect hasn't told you what

22 the case is except he says we need all the policies to make it

23 out thereby inferring that somehow the policies have a

24 relevance which really hasn't been specified.

25       Your Honor, has now tried to articulate what some of

1 the arguments might be.  But if the argument is this case is

2 factually different from Combustion Engineering then that's

3 something that can easily be taken up by way of a statement

4 right now about what is the operative fact in Combustion

5 Engineering that is material to the determination made by the

6 Third Circuit such that Combustion Engineering should be

7 distinguished on its facts?

8        If the argument is that the prepetition litigation of

9 Grace -- claims against Grace was different from the

10 prepetition litigation of claims against Combustion Engineering

11 I understand that, and that's pretty easily disposed of, it has

12 nothing to do with insurance neutrality.  But at least we

13 understand what the proposition is.  Mr. Dickhoff testified, we

14 put on his testimony in Combustion Engineering in order to

15 establish that there's really parity in the treatment of both

16 settled and unsettled claims, because we had the stud.

17        So what we want to demonstrate was same treatment of

18 current and future claims, settled, not settled, because the

19 TDP was continuous with how claims had been settled and

20 therefore the stud payments associated with them prepetition.

21 That was completely irrelevant to neutrality in the sense of

22 coverage defenses.  It's completely irrelevant to the

23 neutrality issue here.  That's something Your Honor can

24 determine in half a heartbeat.  So if that's the purpose of the

25 -- we're now all speculating about what in the world their case

1  could be.

2          A pretrial conference, and Ms. Harding was prescient

3  and said why don't we just show what 7016 says.  It says

4  formulating and simplifying issues, avoiding unnecessary proof.

5  They should have come here -- I won't say that.  To say oh,

6  well, our case will start says that there shouldn't be a

7  pretrial conference.  So pretty simple.  What's the fact that

8  they believe -- maybe we can say for purposes of this

9  proceeding we won't contest it.  What's the fact?

10          MR. BROWN:  I'll give you a few, Your Honor.

11          THE COURT:  All right.

12          MR. BROWN:  Your Honor, will no doubt recall in

13  Pittsburgh Corning that the principle issue in the first

14  confirmation hearing that was at issue, of course, how is this

15  plan intended to operate?  Indeed we had a parade of witnesses

16  get up on the stand and were asked specific questions about how

17  is this intended to operate?  We want to do the same thing here

18  particularly with 7.15.  I think Your Honor could look at 7.15

19  and compare it with the language in Combustion Engineering if

20  that were the operative language under the factual predicate we

21  have here and conclude that it doesn't even come close.

22          Sure, it has some of the same words, but it's got a

23  whole litany of exceptions.  It starts off with this language,

24  "Except to the extent provided in Section 7.15," and then it

25  basically parrots the language from Combustion Engineering and

1 then it has subsections B through J which I don't recall

2 reading in the Third Circuit's opinion.  And there's been

3 considerable factual testimony from the deponents who have

4 testified so far about how some of these provisions are

5 intended to operate, and I can tell you right now that they

6 don't even see it consistently.

7        Mr. Austern -- I asked Mr. Austern in his deposition

8 whether he read the plan, he had.  I asked him if he understood

9 the plan, he said I have.  And he said I understand most of it.

10 And I said well, is there any particular provision you don't

11 understand?  And the first one out of the box was 7.15.  Mr.

12 Austern who we heard about earlier who was extremely

13 knowledgeable in this field, has been involved in it for 20

14 years he didn't even understand this.

15        THE COURT:  Okay.  But what evidence is -- I think

16 you're still talking specifically about 7.15.  What's the

17 evidence that's going to --

18        MR. BROWN:  I think the evidence is the interaction

19 between 7.15 and other provisions in the plan, Your Honor.

20        THE COURT:  Okay.  But we're still talking about the

21 plan.  So isn't that just going to be legal argument?

22        MR. BROWN:  I don't think it was in Pittsburgh

23 Corning, Your Honor.  We made a record in Pittsburgh Corning.

24        THE COURT:  Okay.  So you're going to call Mr.

25 Lockwood about that.

1          MR. BROWN:  I am.  And Your Honor, we have deposition

2     designations where various deponents were asked about how

3     provisions of the plan operated, and they gave their answers.

4     To the extent that -- in the case of Mr. Austern he just didn't

5     understand how 7.15 operated.

6          THE COURT:  Okay.

7          MR. BROWN:  Frankly the fact that one of the plan

8     proponents, one of the most knowledgeable people in this field

9     doesn't understand the language in a plan that he's a co-

10    proponent of I think it's pretty telling right off the back.

11         THE COURT:  Okay.  I just want to get to what it is

12    that we're doing next week.  So the first thing we're going to

13    do is look at the language in the plan to conclude that some of

14    it is unintelligible and therefore the neutrality provisions

15    can't be interpreted as neutral, because they're not

16    intelligible.  That's Number 1.

17         MR. BROWN:  I think the first thing is the policies.

18         THE COURT:  Okay.

19         MR. BROWN:  We'd like to see the policies.

20         THE COURT:  What about the policies?

21         MR. BROWN:  We'd like to have the policies in the

22    record.  Because the question is insurance neutrality whether

23    our rights under the policies are being adversely affected.

24    That's the issue.  I think, you know, if this issue ever gets

25    up to an appellate court they may be curious about what the

1 policy say.  So it would be nice to have the policies in the

2 record.  I don't think it should be controversial, it's been

3 done in almost every case.  I have a stipulation here that I've

4 signed, but it's just awaiting the signature from the

5 proponents.

6        THE COURT:  If the policies can be authenticated I

7 don't see an issue about putting the policies in the --

8        MR. BERNICK:  I think what we're going to find, Your

9 Honor, --

10        THE COURT:  -- record.

11        MR. BERNICK:  Your Honor, the reason they're so

12 adamant about it is not that they've actually explained how

13 they're relevant to whether the whole idea of super peremptory

14 language is super peremptory.  It's a negative.  It says

15 whatever's there doesn't matter.

16        THE COURT:  Exactly.  But to the extent that they

17 want to show what's there I don't see that it's harmful.

18        MR. BERNICK:  It sounds so innocent to me, too.  But

19 the fact that they're so adamant in doing it when it's so

20 completely irrelevant makes you a little bit suspicious.  And

21 the suspicions don't end there.  The whole idea that you're

22 going to have people -- the plan is a court approved document.

23 It's a contract and a court approved document.  That plan means

24 whatever it is that this Court says that it means by way of

25 approval.  If in fact there is some part of a plan that's

1 ambiguous, and they explained why we don't have to have

2 witnesses to come in and testify.  We don't have -- or Mr.

3 Austern to say I don't know.

4       They should say this is different from Combustion

5 Engineering, it's unclear, and Your Honor then has the

6 opportunity to say how.  They explain why and if Your Honor --

7 it says we think it's -- Your Honor says it's necessary to

8 embellish upon Combustion Engineering or supplement the

9 language or subtract from the language that's what the lawyers

10 and the Court do.  We don't have to have a parade of deposition

11 designations and testimony of witnesses.  This thing is -- this

12 is going to get -- in another case you had somebody come and

13 say here's how the plan's going to work.  That's entirely

14 irrelevant.  It's what the plan says.

15       THE COURT:  Okay.  Let me go back to what they want

16 to do, Mr. Bernick, so I can find out what it is that the

17 expectations are.  What else.

18       MR. BROWN:   All right.  Your Honor, let me --

19 actually we're trying to make this easier.

20       MR. BERNICK:  Apparently.

21       MR. BROWN:  The deposition designations from the

22 insurers have been done electronically, and they're being

23 filed.  The relevant pages are being filed with relevant

24 exhibits.  We recognize that obviously they may wish to, I

25 don't know whether they do, counter designate portions of the

1  transcript.  So what we're trying to do is get disks to them

2  that have our designations and then they can electronically

3  designate their portions which would make that very easy.  In

4  Pittsburgh Corning I recall Your Honor didn't want to have

5  people get up there and pretend to be Bill Eggers --

6          THE COURT:  No.

7          MR. BROWN:  -- and, you know, you took them for

8  reading, I guess, over the weekend in terms of deciding those

9  issues.

10          THE COURT:  Many weekends.  Yes.

11          MR. BROWN:  Well, I don't think it will take many

12  weekends with these, Your Honor.  I think it's been culled down

13  substantially.

14          THE COURT:  Okay.

15          MR. BROWN:  But there are portions of some of these

16  depositions where you're, you know, you're only getting a

17  handful of pages.  There are others like Mr. Lockwood's where

18  you're going to get more.

19          THE COURT:  All right.  But in any event the first

20  thing you want to do is take a look at provisions of the plan

21  that you think are not insurance neutral and explain why.  The

22  second thing you want to do is look at the policies and say

23  which portions of the policies are not going to be -- I'm

24  sorry.  Let me put it affirmatively.  Which portions of the

25  policies will be adversely affected by the plan?  What else is

1 it that you want to do?

2        MR. BROWN:  I guess I'm a little hesitant.  I mean,

3 what we want to do is put on our case.

4        THE COURT:  Well, yes, but what are the aspects of

5 the case?  That's what I'm trying to get to.

6        MR. BROWN:  Well, I think we would put the policies

7 in.  We would have the deposition designations.  They may have

8 objections to certain portions of those.  There are exhibits

9 that have been authenticated through the deposition process.

10 We would want those introduced into evidence.  We want to call

11 Mr. Lockwood as on cross.  I'm only speaking for, you know,

12 some of the insurers.  The other insurers may have other ideas

13 in terms of where they want to go as well.  But that's

14 certainly what I'm looking at from the perspective of my

15 clients.

16        THE COURT:  But I'm still trying to get to the issues

17 that you're trying to address, not the process.

18        MR. BROWN:  Well, again, I mean, I think we come back

19 to Mr. Bernick's suggestion.  Show me the order.  I'll have a

20 much better idea of defining what the issues are once I know

21 what the order looks like, because I think everybody's in

22 agreement that the CMO is not entirely clear on that subject.

23        THE COURT:  Okay.  Well, that's what we're doing

24 right now.  We're defining what the CMO is going to constitute

25 for next week.  So my understanding --

1          MR. LOCKWOOD:  Your Honor, maybe I could be helpful.

2          THE COURT:  All right.

3          MR. LOCKWOOD:  Mr. Bernick has helpfully designated

4  me as the person that's going to do the order.  The order would

5  say along with -- consistent with 1A of the objection chart

6  that Section 7.15 of the plan and its various subsections

7  renders the plan insurance neutral insofar as the debtor -- the

8  insurers' coverage obligations and defenses are concerned.  The

9  second part of the order will consist of the then asked Section

10  1B of the chart says that because of the ruling in 1A on

11  insurance neutrality the following objections proffered by

12  insurers -- nonsettling insurers to the plan identified in the

13  chart are they lack standing to pursue in Phase II of the

14  confirmation hearing, end of order.  I mean, that's what the

15  order would say.  And it's out there.  They've got it.  The

16  chart was served on them, what, a week ago, several days ago?

17          UNIDENTIFIED ATTORNEY:  Wednesday.

18          MR. LOCKWOOD:  Wednesday.

19          UNIDENTIFIED ATTORNEY:  Monday.  Monday night.

20          UNIDENTIFIED ATTORNEY:  It was four o'clock Tuesday

21  morning.

22          MR. LOCKWOOD:  Four o'clock Tuesday morning.  I mean,

23  but, you know, it's there.  We're not trying to conceal stuff.

24  We're not trying to snake something by anybody.

25          THE COURT:  All right.  So the plan proponents are

1  still going back to what they said at the outset of today a

2  couple hours ago that they're looking only to a fact the

3  insurance neutrality concept as it affects coverage defenses

4  and nothing more.

5          MR. BROWN:  I guess I'm not sure what that means,

6  Your Honor.  I'm not trying to be difficult here, but as Your

7  Honor -- and Your Honor may want to do this before Monday.  To

8  look at 7.15 and compare it with what Combustion Engineering.

9  I know Your Honor has said that Combustion Engineering is, I

10  think you said the gold standard.  I think it may be the gold

11  standard in certain cases.  I'm not sure it's the gold standard

12  in this case.  But, I mean, as an initial matter I think what

13  you're going to be looking at is whether it even comes close to

14  what was in Combustion Engineering.  Then we can decide whether

15  that's the appropriate language for this particular case.

16          But, I mean, one of the problems, Your Honor, is that

17  Section 7.15 has some language in here about exceptions to what

18  -- because it starts off the first clause in A is, "Except to

19  the extent provided in Section 7.15," and then there's a whole

20  list of things.  I don't know how you'd necessarily describe

21  them which could be construed as being exceptions.  And we

22  would like to put on testimony to learn a little bit more, have

23  the Court learn a little bit more about how those exceptions

24  operate.  I'll just give you an example.

25          It probably will come as no surprise to the Court

1  that one of the things that the insurer -- well, first of all,

2  it is undisputed through the testimony that the insurers were

3  not invited to participate in the negotiations that led to the

4  term sheet, that they were not invited to participate in the

5  drafting of the TDP or the trust agreement, and that they've

6  had no involvement with a couple of minor exceptions that Mr.

7  Lockwood testified to at his deposition.  The plan has a carve

8  out.  And the carve out is that the insurers cannot claim in

9  coverage litigation that the plan didn't comply with the

10  bankruptcy code.

11          Well, that sounds fairly innocuous the way it's

12  written, except what does that mean?  I'll give you an example.

13  If the insurers want to say that the settlement that's referred

14  to on Page 1 of the plan, and Page 1 says, "This plan

15  constitutes a settlement of all claims and demands against the

16  debtors on and subject to the terms described herein and the

17  other plan documents."  Make sure I have the right language

18  here.  If the insurers want to argue in the bankruptcy that the

19  resolution of the debtors' asbestos liabilities current and

20  future as set forth in the TDP and in the trust agreement was

21  the product of collusion, was the product of -- was a voluntary

22  payment, any issues of that nature on a global basis we have a

23  concern that the exception in that language, the exception to

24  the insurance neutrality language will in fact impair that --

25  our ability to make that argument.

1          Now, if you look at their brief the plan proponents'

2    brief is where it says we can argue as to any particular claim.

3    But can we argue that as to the whole deal?  If the plan is

4    confirmed, and the plan goes effective and a claim is tendered

5    or not tendered, but assume the claim is tendered to the

6    insurers, and the insurers say no, no, no, we had nothing to do

7    with that deal.  That was a deal between the debtors and the

8    claimants' committee.  And the debtors basically handed it to

9    the claimants' committee to decide how much people are going to

10   get paid, how they were going to get paid, all of those issues.

11   If we want to bring a DJ on that issue in the coverage

12   litigation are we going to be able to do that?  I don't think

13   it's clear in this plan.

14          THE COURT:  Okay.  Then perhaps what you folks need

15   to do --

16          MR. LOCKWOOD:  Your Honor, with all due respect,

17   first, Mr. Brown is making his unintelligibility argument --

18          THE COURT:  Yes.

19          MR. LOCKWOOD:  -- on the merits.  Secondly, we have

20   responses to that, on the merits, which is collusion is an

21   insurance coverage defense.  Violation of 1129(A)(3) of the

22   bankruptcy code proposed in good faith is a bankruptcy code

23   defense.  They can't argue that the plan violated 1129(A)(3).

24   They can agree that if there was some settlement embodied in

25   the plan it was collusive.  And we can have that argument.

1          THE COURT:  The only point that I want to make,

2  folks, is I don't see that that's the basis for an evidentiary

3  hearing.

4          MR. LOCKWOOD:  I don't either.  That's the point I'm

5  trying to make.

6          THE COURT:  I don't see where evidence is going to

7  affect that kind of an argument.  You've clearly got a legal

8  argument.  If you think the plan is unclear then I've got to

9  make some rulings.  And if the plan's unclear then they're

10  going to have to fix it or the confirmation order's going to

11  have to fix it.  And I understand Mr. Millner's concern as to

12  what's going to govern the confirmation order or not.  I can

13  assure you the confirmation order is going to govern.  There is

14  not going to be an order entered by this Court that will not

15  say that the confirmation order won't govern over every other

16  document.  To the extent that the order's entered it will

17  govern.  Regardless of what the plan says the confirmation

18  order will govern.  So let's just get that one straight right

19  now.  Okay.

20          MR. BROWN:  All right.  Your Honor, just on that

21  point.  If Your Honor were to find that we don't have any

22  standing then when they present their confirmation order and we

23  come in and say wait, that's not what it's supposed to say what

24  do we do at that point?

25          THE COURT:  What the order says?

1         MR. BROWN:  Yeah.

2         THE COURT:  You clearly will have standing to say

3 that the confirmation order was supposed to say X and it

4 doesn't.  You clearly will have standing to remind me that I

5 said that I would do X and I'm not doing X.  I hereby grant

6 standing to that purpose.

7         MR. BERNICK:  Your Honor, I have a process point here

8 which is that apparently the weather continues to be terrible.

9 My last flight out is 6:45 so I'm going to have to --

10         THE COURT:  All right.  Well, let me suggest this.  I

11 think what we should do is the following.  I think I need to

12 order you folks to speak.  It seems to me that we should be

13 restricting the -- or that we should schedule the proceedings

14 next week in this fashion.  We should start with apparently the

15 plan proponents saying the plan is insurance neutral, 7.15

16 makes it so.  And if that's what they're going to rely on and

17 introduce nothing else and that's what they're representing

18 then the insurers can say that isn't the case and here's why.

19         You folks need to, I believe, for my purpose tell me

20 in what order you are going to present your cases, who you're

21 going to call, and to what end.  So in essence I want a brief

22 pretrial statement from anybody who's going to present evidence

23 that tells me what I need to look at.  To the extent that you

24 are doing deposition designations that's fine.  I will read

25 them at a later date.  Probably during the connection of --

1 during the proceeding unless there's something that you need me

2 -- to point me to.  And if that's the case then have a copy you

3 can hand up to me, please at that time.

4        It seems to me that what I should do if the plan

5 proponents really are going to stand up and say it's neutral

6 that will be their evidence.  We will then spend -- I'll give

7 you a day and a half for the insurance companies for evidence.

8 We will spend -- that takes us to Tuesday afternoon.  We will

9 spend Tuesday afternoon arguing, and that should be sufficient

10 to get through whatever issues you choose to present.  All

11 related to insurance neutrality.

12        MR. BERNICK:  On coverage defenses.

13        THE COURT:  On coverage defenses.  And if you have a

14 difference as to what coverage defenses mean, fine, I will rely

15 on the insurance company to say this is how we define insurance

16 defenses.  I will take the lead from you.  So the debtors can

17 do -- the plan proponents can disagree, I will take the lead

18 from the insurance company.

19        MR. BROWN:  All right.  Just two housekeeping

20 matters.  I know a lot of people want to get up here.

21        THE COURT:  Yes.

22        MR. BROWN:  The first one is, Your Honor, a lot of us

23 have people waiting to come in, to fly in here to authenticate

24 policies.  I really think that's a silly exercise.  I'm sure

25 that's not what the Court wants.

1          THE COURT:  I do not want witnesses to have to

2  authenticate policies.  This is what we will do with respect to

3  the policy issues.  If you want particular policies in evidence

4  you bring them here along with an affidavit from a

5  representative of your client that indicates where they came

6  from in your records to show that they're authentic.  And then

7  if there is an issue with respect to authenticity I'll hear it

8  after the proceedings are over.  So you bring the policies

9  along with an affidavit from a witness who is a custodian of

10  records to show how they're kept in the ordinary course, and

11  that they are in fact authentic documents.  And then if there

12  is an issue I'll hear it later.  So I may strike it if it turns

13  out not to be authentic.

14          MR. BROWN:  Okay.  Your Honor, I know a lot of folks

15  want to speak so I'm going to --

16          MR. MILLNER:  Three minutes, Your Honor.

17          THE COURT:  Yes, sir.

18          MR. MILLNER:  On the policy front where we have an

19  agreement with the proponents that the copy is authentic then I

20  see no point in bringing an authenticity --

21          THE COURT:  That's correct.

22          MR. MILLNER:  Correct.

23          THE COURT:  If you've got an agreement you can just

24  introduce it.  That's fine.

25          MR. MILLNER:  I think we're practically there on all

1 the policies.  The objection, I think, on that and settlement

2 agreements is going to be relevance as I understand it.  I

3 think Ms. Harding has addressed that.

4          MR. BERNICK:  Whatever we can do, Bob.

5          MR. MILLNER:  Whatever you can do.  Two, I take

6 exception with the idea that the whole idea of neutrality is

7 coverage defenses.  That's not what the language says in your

8 own opinion.  It says the insurers' rights.  And just to be

9 very clear if the insurer has a right to defend the neutrality

10 language defends that right.  If they decide to breach it by

11 not tendering a claim for defense that may generate a defense.

12 We see it more broadly.  Third point --

13          THE COURT:  I'm not trying to limit --

14          MR. MILLNER:  I understand.  That's why I make --

15 that's why I was taking an exception to his -- Mr. Bernick's

16 chart.  I know you're not.  But as we throw language for our

17 third point, and this is just to be constructive here.  I was

18 listening to all the argument, and Mr. Bernick and Mr. Brown,

19 and whatever.  One of the big problems, and actually, Your

20 Honor was pointing it out is what exactly does this neutrality

21 mean?  What are the plan terms?  We seem to be throwing around

22 words and we have -- it's almost like semantic argumentation.

23 Let me make one suggestion.  And I don't want to get into the

24 merits because Mr. Lockwood will jump down on me.  Although I

25 will say that the language can be shown to be non-neutral

1 easily.  Well, we hear the arguments, I won't get into it.

2          MR. BERNICK:  May I please be excused?

3          THE COURT:  Yes, sir.

4          MR. BERNICK:  Thank you very much.

5          MR. MILLNER:  What I would ask is only this.  That

6 when we -- Monday morning when we give this argument, this

7 presentation which is what you're requiring that the insurers

8 not like -- unlike a normal opening trial statement which says

9 here's what the evidence will show which would be summarising

10 Mr. Lockwood's deposition or something like that that the

11 insurers actually have an opportunity to say here is what we

12 think the neutrality should be, here are the plan provisions we

13 think don't meet it, here is why they don't meet it, et cetera,

14 so that there's at least a focus.  And then we can talk more

15 about whether it's just an ambiguity, whether we need evidence

16 to put in.  But then we have good focus on what we're talking

17 about.

18          THE COURT:  I would hope that some of that's going to

19 come up in your pretrial statement so that it can be addressed

20 early on.

21          MR. MILLNER:  It's in some of the briefs, --

22          THE COURT:  Some of the briefs.

23          MR. MILLNER:  -- but the problem we have here quite

24 honestly, Your Honor, and I'm just trying to be constructive,

25 there are so many briefs and so many plan objections that we

1  don't get a focus.  I think in an hour or so listening to the

2  people talk you'll hear it.  And I think at that point you'd

3  also be able to give some guidance to us saying here's what I

4  think the neutrality has to be, give some guidance perhaps as

5  to here I see ambiguity or something, and give some focus to

6  this process.  Otherwise we're just banding around too many

7  words without anchor or direction and we're slipping here and

8  there.  That's my constructive suggestion, Your Honor.

9        THE COURT:  All right, that's fine.  I will hear an

10  issue as to what the insurance companies think neutrality

11  should say and why it does not -- where the plan in their view

12  falls apart in terms of what it should say.

13        MR. MILLNER:  Right.

14        MR. LOCKWOOD:  Your Honor, in essence isn't that just

15  a suggestion for opening statements?

16        THE COURT:  Yes.

17        MR. MILLNER:  It is.  But instead of a traditional --

18        MR. LOCKWOOD:  We don't have any objection for

19  opening statements.

20        MR. MILLNER:  No.  But instead -- but these opening

21  statements will actually give more what I would call

22  argumentation about what we think is wrong with your plan.

23        MR. LOCKWOOD:  That's fine.

24        MR. MILLNER:  That's fine.  But I think that at least

25  will give us some -- and at the end of that my hope, and this

1  is just constructive, is that Judge Fitzgerald can give some

2  guidance saying, you know, I think there is a problem here, et

3  cetera et cetera.  At least that will give us some focus for

4  what we're doing.

5          MR. LOCKWOOD:  Keep in mind, however, that there are

6  some insurers who don't believe that insurance neutrality

7  language exists --

8          MR. MILLNER:  That will come out then.

9          MR. LOCKWOOD:  -- even in CE.

10         MR. MILLNER:  That will come out in the argument, and

11  we can get guidance from Judge Fitzgerald also as to whether

12  she wants to hear more on whether it exists or not.

13         THE COURT:  Well, look, I'm bound by the Third

14  Circuit.  I mean, you know, the Third Circuit says there are

15  insurance neutral plans.  Whether this is one or not I don't --

16  at this point I haven't opined.  But the Third Circuit has told

17  me that they do exist.  So clearly in this circuit they can

18  exist.

19         MR. MILLNER:  Okay.  But we'll at least get on the

20  table if we want to take or some of us want to take a run at

21  getting you to rethink -- Your Honor to rethink that.  It'll be

22  out there and --

23         THE COURT:  That's fine.

24         MR. MILLNER:  -- to everybody's benefit, I think.

25         THE COURT:  Okay.  And Mr. Millner, I want to make

1  sure I'm clear.  When I'm talking about insurance neutrality

2  I'm talking about the rights of the insurers.  Okay.  That's

3  what the Combustion Engineering language intended to protect.

4  It's just that in that case particularly it was looking at

5  coverage defenses.  That was the focus of Combustion

6  Engineering.

7           MR. MILLNER:  Right.  It's the rights --

8           THE COURT:  And that's what I expect the focus here

9  is going to be.

10           MR. MILLER:  It's the rights of the insurers under

11  their insurance contracts which are either policies, or in my

12  case also a settlement agreement, and state law.  And they're

13  preserved.  And if they choose to violate it it may generate a

14  defense.  I should add that in Combustion --

15           THE COURT:  Mr. Millner, it may not be state law.

16           MR. MILLNER:  Or applicable law.  It was preemption.

17  Or applicable law.  And I'll say this also.  In Combustion to

18  be very clear the rights that were preserved were both rights

19  relating to coverage, also rights relating to creditors,

20  because Judge Lawler tried to limit it just to the creditor

21  rights.  Third Circuit said no.  In this case Mr. Bernick who

22  is not here, but Mr. Freedman is, actually has a third carve

23  out, big one, which is any rights quad creditor is carved out

24  of that neutrality.  He just doesn't list it that way.  I think

25  if we go through this more methodically we're going to --

1          THE COURT:  That's what I thought I suggested at the

2  beginning that we should take a look at the plan.

3          MR. MILLNER:  I was actually going to say to you

4  you're on the right track, but I didn't know if you were going

5  to take that the wrong way.

6          THE COURT:  I have usually thicker skin.  Okay.

7          MR. MILLNER: May I be excused also?

8          THE COURT:  Yes, sir.  Thank you.

9          MR. MILLNER:  Thank you.

10          MS. ALCABES:  Your Honor, Elisa Alcabes for

11  Travelers.  I just have a quick housekeeping matter which I've

12  already spoken to Ms. Baer about.  It has to do with this chart

13  that was submitted to the Court which has been referenced a

14  number of times today.  There are some errors in the chart.  I

15  spoke with Ms. Baer for Travelers.  We are only a reimbursement

16  agreement insurer.  We are only objecting on that basis.  We

17  will not be here next week.  We are all Phase II.  My

18  understanding based on my discussion with Ms. Baer is that

19  they're going to correct the chart to reflect that.  I just

20  wanted you to be aware of that before you started reading

21  through it.

22          THE COURT:  Okay.

23          MS. ALCABES:  Thank you, Your Honor.

24          THE COURT:  Thank you.  When am I going to get a

25  correction, Ms. Baer?

1          MS. BAER:  Your Honor, I have to do it tomorrow.

2 We'll do it as fast as we can.

3          MR. LOCKWOOD:  Am I still, by the way, under order to

4 prepare the proposed order?

5          THE COURT:  Yes, sir.

6          MR. LOCKWOOD:  Okay.

7          MR. COHN:  Your Honor, Jacob Cohn for Federal

8 Insurance Company.  If I may just speak for a few moments about

9 the practicalities here.  7.15 we'll show on Monday, it's a

10 mess.  It doesn't accomplish it.  If this -- we're going to

11 rise and fall on 7.15 being sufficient they would fail to meet

12 their burden, you know, their Phase I would be unsuccessful.  I

13 don't suspect that's where the Court is going, because that's

14 not where we go in these cases.  Combustion Engineering

15 language is a paragraph.  This is a page and a half.  And, as I

16 said, we'll show it's a mess.

17          The Court is, as it has been in other cases,

18 dedicated to making sure that we have, at least in the Court's

19 eyes, adequate insurance neutrality.  I don't want to debate

20 what that is.  That can make a difference.  We started with

21 Mid-Valley.  We ended up with a stipulation.  We got to Kaiser,

22 I remember moving for the production of the 2019 information

23 and you're leaning very hard on the Kaiser debtors and saying

24 this is going to be insurance neutral by the time I confirm it

25 denying my motion saying get together and work this out.  And

1 that pushed things along.  And PS Kaiser then became the basis

2 for the Federal Mogul stipulation.  And I just wanted to

3 suggest if that's where you're heading here perhaps a statement

4 from the Court that a confirmation order is going to be at

5 least in what is your eyes satisfactorily insurance neutral may

6 move the ball forward.

7 　　　　　THE COURT:  Well, here's the issue in this plan, Mr.

8 Cohn, and this is the reason I have not been that adamant in

9 this case.  This case has a lot of insurance companies claiming

10 status as creditors which has really not happened in most of

11 the other cases.  And I don't know whether, as a result of

12 that, it's even worth worrying about whether this plan is

13 insurance neutral.  And so I haven't been pushing that issue as

14 I have in every other case, because I simply don't know whether

15 it's even that significant.

16 　　　　　To the extent that the insurers think it is you

17 haven't really been stepping up to the plate and telling me

18 that as you have in other cases.  So I've just sort of been

19 taking my cue from the parties that it doesn't seem to be that

20 much of an issue to everybody.  And so if you're not that

21 concerned about it I'm not sure the plan is -- I don't think a

22 plan is unconfirmable because a plan is not insurance neutral.

23 It's simply that you have standing rights if it's not, that you

24 don't have if it is.  And so if the debtor -- if the plan

25 proponents are willing to go forward with a plan, and I'm not

1  making findings, please, I'm just pontificating.  If the plan

2  for some reason turns out not to be insurance neutral and the

3  plan proponents don't want to make it insurance neutral then

4  the insurers will have standing to raise certain issues that

5  they haven't had in other plans, that's all.

6         MR. COHN:  One thing I would point out is <u>Combustion</u>

7  <u>Engineering</u> attempted to be global.  And I do question the

8  extent to which debtors should be entitled to try to pick us

9  off an issue at a time without in fact offering us at least

10  what this Court has found to be a global protection.

11         THE COURT:  As to neutrality?

12         MR. COHN:  Yes.

13         MR. LOCKWOOD:  Your Honor, again, this is merits

14  argument.  We disagree with it.  I mean, <u>Combustion Engineering</u>

15  itself as I said earlier had the preemption ruling in it.  That

16  wasn't part of the "global."  I mean, this is all -- we're

17  going to have two days of arguing that.  Why are we doing it at

18  5:30 in the pretrial?

19         MR. COHN:  Because my point, Mr. Lockwood, is so what

20  happens when we demonstrate that this doesn't work?

21         MR. LOCKWOOD:  Well, if you --

22         MR. COHN:  Then you say then it doesn't work.  Fine.

23  we have standing --

24         UNIDENTIFIED ATTORNEY:  You'll have standing in Phase

25  II.

1          MR. COHN:  Is that where it's going to be or is it

2     going to be we have to go through jot and tiddle and make this

3     work?

4          THE COURT:  Well, that'll be up to the plan

5     proponents.  If the plan --

6          MS. HARDING:  Based on the order we're seeking that

7     if we do not -- if we are not successful in our position then

8     the point is that you will have standing in Phase II to make

9     your objections to the plan.

10          THE COURT:  Okay.

11          MR. LOCKWOOD:  And to follow up on the Court's

12     comment, in the other cases you cite where there were

13     stipulations part of the stipulation was the insurers would

14     stop objecting.  It wasn't a stipulation that said that some

15     insurers would go away and leave us alone because we've now

16     satisfied insurance neutrality.  But they were still going to

17     object as creditors, for example, or they were going to object

18     because they wouldn't sign the stipulation because they didn't

19     think that there could be such a thing.  If you're telling us

20     you've got a stipulation with 100 percent of the insurers on it

21     so we can all go to confirmation without having to worry about

22     you we're interested.

23          MR. COHN:  That's fine.  But if the purpose of Phase

24     I is up or down, okay.  That clarifies a lot for me as opposed

25     to the sort of moving target.  That's all that --

1          THE COURT:  No, I've understood that the issue is

2    whether or not the plan is in fact insurance neutral and if it

3    is then you have no standing for the issues as insurers.  And

4    if it isn't then you do.  And if you folks can get together and

5    resolve the issue so that it can be insurance neutral and we

6    can get past that, wonderful.  That would certainly make the

7    Court happy, but I don't necessarily, you know, my views about

8    happy, unhappy generally don't count in this process.

9          MR. LOCKWOOD:  One other point that we should

10   probably make which is that if the insurers convince you that

11   the plan is not insurance neutral the plan proponents will not

12   -- they will not only have standing to object to everything,

13   but the plan proponents may very well decide, okay, we'll just

14   delete 7.15 in it's entirety.

15         THE COURT:  That's right.  I mean --

16         MR. LOCKWOOD:  Because there's no point in giving

17   them half a loaf if half a loaf doesn't buy you anything.

18         THE COURT:  Well, those are all issues that will have

19   to be addressed in the event that there's a ruling along those

20   line.  So, you know, would it better to make it absolutely, you

21   know, dead bang certain that there is insurance neutrality?

22   Yes, of course, it would, but this is a very unusual case.

23   It's just a very unusual case.  So if the plan proponents, you

24   know, are in the position they're in and the insurers are in

25   the position they're in so be it.  So I think we're adjourned.

1          MR. COHN:  Thank you, Your Honor.

2                  (Everyone speaking at once)

3          MS. HARDING:  ... one process point real quickly.

4          THE COURT:  Yes.  I'm sorry.  We're not adjourned.

5   I'm sorry.  Anybody who has to leave may, but I'm continuing to

6   make rulings.  So you leave at your peril.  Ms. Harding.

7          MS. HARDING:  The only process point I wanted to --

8   had to do with the deposition designations that we are getting

9   served with today.  We will not be able to counter -- we don't

10  think that they're relevant.  And Your Honor said that you're

11  not going to look at them again until afterward.

12         THE COURT:  Right.

13         MS. HARDING:  To the extent that we think that it's

14  relevant we'll counter designate afterward and you can look at

15  all of them.

16         THE COURT:  That's fine.

17         MS. HARDING:  Okay.

18         THE COURT:  Yes.  I don't see how --

19         MS. HARDING:  I just wanted to reserve that right.

20         THE COURT:  -- getting them today based on the fact

21  that you've got to do the order and the amended chart.

22         MR. LOCKWOOD:  There's one other thing which we might

23  as well get on the table now is if they're going to call me as

24  an adverse witness I don't want to see some motion like we saw

25  in Federal Mogul that says invokes the lawyer's witness rule,

1 and I am now bounced from the rest of the case for representing

2 the committee because somebody took my deposition as a 30(b)(6)

3 witness, and now has made me into a trial witness, and I'm

4 gone.

5          MR. BROWN:  Your Honor, I believe that's already

6 dealt with in the third amended CMO.

7          MR. LOCKWOOD:  Well, --

8          MR. BROWN:  Mr. Lockwood's not gone, and we have no

9 intention of moving to disqualify.

10          THE COURT:  Okay.  Well, double check to be sure.

11 Okay.  I think I have rulings that I've got to make with

12 respect to your experts.  I'm still not sure whether your

13 experts are relevant to this Phase I proceeding.  I do not see

14 how at this point Professor Shein is relevant to the Phase I.

15 I don't see how we're going to get into TDP issues in any event

16 in these next two and a half days.  I just don't see how.  If

17 I'm incorrect about that somebody raise it again next week.  So

18 it seems to me that Professor Shein will not be called in Phase

19 I.  I'll reserve whether or not he should be relevant in Phase

20 II.

21          With respect to professor Priest, who was planning to

22 call him?  Only Arrowood?

23          MR. LOCKWOOD:  Oh, no.

24          THE COURT:  No.

25          MR. LOCKWOOD:  All of them.

1          THE COURT:  All of them?

2          MR. BROWN:  No, Your Honor, there were several

3  insurers.

4          THE COURT:  Okay.  Are you still going to need to do

5  that, Mr. Brown, with this economic issue in Phase I, or is

6  that -- if in fact it's determined that you have no standing to

7  raise other -- I guess you have to do it in Phase I.

8          MR. BROWN:  I think that's correct, Your Honor.

9          THE COURT:  All right.  I'm going to let him testify,

10  but subject to everything I said in the record earlier about

11  considering whether or not to strike it after I hear the

12  testimony, and find out whether or not it's relevant.  I cannot

13  determine at this stage that it's relevant to anything.  But I

14  haven't received pretrials so I'm ruling in a vacuum.  I just

15  don't know.  So I'm going to permit him to testify so that you

16  can alert him to come.  But it's with the caveat that I may

17  strike it all.

18          MS. HARDING:  And then the only other -- just want to

19  make sure on the record, there is no intention to subpoena any

20  other witnesses.

21          THE COURT:  No.  No one else has been mentioned on

22  the witness list.

23          MR. BROWN:  No, Your Honor, there --

24          MR. LOCKWOOD:  Actually there's a number of people

25  that are mentioned on the witness list, and the question is how

1  many of them are getting subpoenaed?

2          MS. HARDING:  ... today and there's been no subpoenas

3  and we don't --

4          UNIDENTIFIED ATTORNEY:  That we know of.

5          MS. HARDING:  -- we are expecting not to have any

6  other witnesses.

7          THE COURT:  Mr. Brown.

8          MR. BROWN:  Your Honor, I think I can address that.

9  Mr. Lockwood was the only one who received a subpoena.  In the

10 objections that we received from the debtor to certain of the

11 depositions there was an objection that we had not demonstrated

12 that the declarant was unavailable.  If that objection is

13 dropped and we can use those deposition transcripts I would

14 expect that the only person we would call would be Mr. Lockwood

15 from the plan proponents' side.

16         MS. HARDING:  And we're willing to waive that

17 objection, we're not waiving the relevance objection.

18         THE COURT:  Okay.

19         MS. HARDING:  Still think they're not relevant.

20         THE COURT:  All right.

21         MR. LOCKWOOD:  How about if you waived it as to me?

22         THE COURT:  There is that possibility.  The

23 deposition --

24         MS. HARDING:  Yeah, why don't they just designate it?

25 I mean, I don't understand.

1          THE COURT:  The deposition is pretty substantial so

2  it may be something that you want to consider if you don't

3  really need anything additional.  Mr. Cobb.

4          MR. COBB:  Your Honor, on behalf of the Bank Lender

5  Group, again, I sat here for three and a half hours waiting to

6  conduct our pretrial conference.  And I missed my flight up,

7  but apparently others didn't miss theirs.  I guess we'll try

8  and work it out between now and Monday.  It's the best I can

9  say, Your Honor, because we have right now issues with

10 exhibits, and we have issues with what actually will go forward

11 based upon Your Honor's jurisdictional ruling this afternoon.

12         THE COURT:  Oh.

13         MR. LOCKWOOD:  If it'll make you feel better I missed

14 my flight, and that means I'm missing David Sutor's retirement

15 dinner tonight.

16         THE COURT:  I didn't realize that there was anything

17 more after the rulings that you needed, Mr. Cobb.

18         MR. COBB:  Your Honor, it's not my CMO.

19         MS. HARDING:  There's only two exhibits.  We're happy

20 to talk over the weekend then.

21         THE COURT:  Okay.  I didn't realize there was

22 something else with respect to the bank lenders.  I thought the

23 issue was clear that we were just going to go forward on the

24 bank lenders' claims.

25         MR. COBB:  I understand, Your Honor, but based --

1  it's more than that.  I'm not going to tie up everyone to go

2  through that, because it's not relevant or important at this

3  point.

4            MS. BAER:  Well, Your Honor, --

5            MR. COBB:  We'll talk over the weekend.

6            THE COURT:  All right.

7            MR. COBB:  See you on Monday, Your Honor.

8            MS. BAER:  They've not designated any witnesses.

9  They've never indicated they're going to call any witnesses.

10  If that's what he's referring to we better know now.

11            MR. COBB:  We're not calling any witnesses.

12            MS. BAER:  Okay.

13            MR. COBB:  Not at Phase I.  Unless you're going to

14  stand on the hearsay objection with regard to Charles Freedgood

15  which we have not been able to resolve.  So now I'm in a

16  position, Your Honor, that -- let me set the stage, Your Honor.

17  We submitted the very same affidavit that we submitted back

18  with the claim objection motion.  There was no objection on

19  hearsay or authenticity raised by the debtors.

20            UNIDENTIFIED ATTORNEY:  There were objections raised

21  by the debtors with respect to the Freedgood affidavit.

22            MR. COBB:  There were no objections raised, Your

23  Honor, during the process that we set forth before this Court

24  that you approved with regard to authenticity or hearsay.  That

25  is a fact, Your Honor.  We submitted a binder to the Court

1  after that hearing, and they had only made two objections with

2  regard to two paragraphs that we agreed that's fine, Your

3  Honor.  You can strike them out and maintain the affidavit.

4  And now they've raised these two issues which mean Mr.

5  Freedgood may have to appear on Monday or whenever that goes

6  forward to authenticate, to prove it is not hearsay.  I think

7  Your Honor, can make a very simple ruling that they've waived

8  the ability to make those -- to assert those objections.

9          THE COURT:  Well, I guess the question is is he going

10 to be needed for cross examination?  If he's going to be needed

11 for cross examination he's going to have to be here.

12         MS. HARDING:  Your Honor, in all honesty I don't know

13 the answer to that.  So --

14         THE COURT:  Okay, why don't --

15         MR. FREEDMAN:  We're not quite sure, Your Honor, what

16 the issues are that they would propose to have Mr. Freedgood

17 testify on in Phase I.  And we have serious objections to their

18 having any role for him in Phase II.  But that's a Phase II

19 issue.  With respect to the Phase I issue if they're going to

20 seek to put his affidavit in then -- and we're hearing about

21 this now for the first time we would object to that and he may

22 need to be called.

23         MR. COBB:  Your Honor, let's step back further.  We

24 submitted the affidavit pursuant to the CMO as an exhibit that

25 we desire to put before the Court.  So there's no surprise

1 here.

2      MS. HARDING:  And we object --

3      MR. COBB:  On grounds of hearsay and authentication.

4 When the affidavit was already accepted by the Court without an

5 objection from the debtors with regard to authentication or

6 hearsay several months before.

7      THE COURT:  But that's with respect to a different

8 issue than a trial though.  I mean, I --

9      MR. COBB:  I'm sorry, Your Honor, but it's the exact

10 same affidavit and it was a hearing that they didn't say that

11 it wasn't authentic and they didn't say that it was an out of

12 court statement.

13      THE COURT:  Well, it may be authentic.  The

14 authenticity issue to the extent that he signed it I'm not sure

15 where there's an authenticity issue.  But to the extent that

16 it's a hearsay statement it's clearly a hearsay statement.

17 However, if he's needed for cross examination he's going to

18 need to be here.  It was relevant, and the hearsay aspect of it

19 was fine in the context that it came up in before because we

20 weren't doing a full blown evidentiary hearing.  But this may

21 be one.  I think the issue is this though, I've already read it

22 so unless somebody wants me to completely strike it from my

23 mind, and that's going to be the bank lender's evidence then

24 I've considered it once already.  I don't know why I can't

25 consider it again.  But if he's needed for cross examination he

1  hasn't been cross examined.  He's going to have to be here.  So

2  I think you folks should consider it in that fashion.  If you

3  want me to strike it from my mind and not use it I won't use it

4  again based on this evidence unless he's presented as a

5  witness.  He will --

6           MR. FREEDMAN:  Your Honor, we'll address it with them

7  over the --

8           THE COURT:  The weekend.

9           MR. FREEDMAN:  -- period.  Over the weekend.  And I'm

10  hopeful we'll be able to resolve it.  My only purpose is that

11  we don't want to have this record be that we've agreed to have

12  him come in.

13          THE COURT:  Okay.  That's fine.

14          MR. COBB:  I understand, Your Honor.  He's a senior

15  executive at a major financial institution and to alert him of

16  this -- you appreciate, Your Honor, --

17          THE COURT:  I do appreciate.

18          MR. COBB:  And we will try to work this out with the

19  debtors.  And I expect they will be as reasonable as they can

20  be.

21          THE COURT:  All right.

22          MR. COBB:  As we will try to be, too.

23          THE COURT:  Okay.

24          MR. COBB:  Thank you.

25          MS. HARDING:  Thank you, Your Honor.

1          THE COURT:  All right.

2          MR. FREEDMAN:  Your Honor, I assume we're starting at

3  nine o'clock.

4          THE COURT:  Nine o'clock on Monday.

5          MR. MARTIN:  Your Honor, this is Craig Martin.  May I

6  be heard?

7          THE COURT:  Yes, sir.

8          MR. MARTIN:  Just a housekeeping matter.  We

9  represent Morgan Stanley Senior Lending.

10         THE COURT:  Yes, sir.

11         MR. MARTIN:  We're one of the parties that objected

12  to confirmation on grounds of impairment.

13         THE COURT:  Yes.

14         MR. MARTIN:  And as a matter of scheduling I'm

15  wondering if since we're essentially making a legal argument

16  that that might be something that is appropriate to go forward

17  on Monday perhaps before insurance issues are dealt with,

18  because insurance, since you sound like they're going to take

19  almost a day and a half, and although certainly happy to appear

20  on Monday and wait until it's our turn, but if our terms

21  impairment issues are relatively straightforward and can be

22  handled in a quick fashion then --

23         THE COURT:  Frankly I'm wondering whether the bank

24  lenders' issue and the Morgan Stanley issue shouldn't wait

25  until the insurance issues are finished.  And that would give

1 you more time to work out this issue with respect to the

2 affidavit anyway.

3        MR. MARTIN:  Your Honor, I'm certainly willing to do

4 it whenever you think it's appropriate.  I just don't want to

5 make travel plans or hotel plans if, you know, if I need to be

6 in Pittsburgh all week that's fine.  I just want to plan

7 accordingly.

8        MR. PASQUALE:  I have a personal problem, Your Honor.

9 I had requested that our issue, the committees', the lenders'

10 issue on impairment be put first.  My daughter graduates on

11 Wednesday, --

12        THE COURT:  Oh.

13        MR. PASQUALE:  -- and so I was not going to be here

14 that day.  That raises a personal problem for me.  I know

15 there's a lot of other parties involved, but that's my personal

16 issue.

17        THE COURT:  All right, I release -- I mean, half the

18 people have left.  So it's going to be difficult to redo this.

19 How much time will the bank lenders and Morgan Stanley and the

20 creditors' committee need?

21        MR. COBB:  Well, Your Honor, for the bank lenders it

22 raises the $64,000 question which is if it is the law of the

23 case that we are not entitled to default interest --

24        THE COURT:  As a matter of your allowed claim.  As

25 part of your allowed claim.

1        MR. COBB:  Your Honor, found that there were no post

2   petition defaults.

3        THE COURT:  I found that you didn't produce any

4   evidence that I could consider in that hearing.

5        MR. COBB:  And I'm telling Your Honor that you will

6   see the exact same evidence that was acceptable at that

7   hearing, but apparently it may not be for this hearing, but

8   you'll see the exact same evidence.  The exact same affidavit.

9   There's no difference.  And so, Your Honor, if that's the case

10  and the Court can say well, if it's the same affidavit I'm not

11  going to rule any differently then I think our issues should be

12  -- the bank lender objection can be resolved pretty quickly.

13       MR. FREEDMAN:  Putting it slightly more pointedly,

14  Your Honor, I believe that the debtors, the general unsecured

15  creditors' committee and the bank lenders all agree that taking

16  your May 19th decision and then asking the question whether or

17  not if that decision is the law of the case the lenders are

18  impaired by the plan the answer is they're not impaired by the

19  plan under the terms of just applying that decision and not

20  looking to any other issues that they might want to raise.  So

21  with respect to the issue of impairment I think that we would

22  all agree that you can find based on that decision that the

23  lenders are not impaired.

24       MR. PASQUALE:  I'm not sure I now agree, Your Honor,

25  in light of the things you've said today that that was that

1  issue, this is this issue.  It may be you come to the same

2  conclusion, but I don't think I can now agree with what Mr.

3  Freedman said.

4           MR. FREEDMAN:  Oh.  There's been a change of mind.

5           MR. PASQUALE:  There's been comments from the Judge

6  today.

7           THE COURT:  All right.  The question that I have is

8  you're telling me you don't know how long.  What I'm trying to

9  do is figure out whether I can adjust the schedule?  Do you

10 need a half a day so that I can have the debtor --

11          MR. PASQUALE:  I still don't think it would take very

12 long, Your Honor, regardless of the semantics we're now

13 discussing.

14          MS. HARDING:  I think if we set aside an hour from

15 nine o'clock to ten o'clock.  Would that be sufficient?

16          MR. COBB:  I think an hour or two at the most.

17          THE COURT:  Okay.  Then why don't we start --

18          UNIDENTIFIED ATTORNEY:  It depends on the testimony.

19          MR. COBB:  It depends.  I mean, if they for some

20 reason are going to cross Mr. Freedgood that opens up a whole

21 new --

22          THE COURT:  Well, that's the issue.

23          MS. HARDING:  Why don't we say an hour to two, and if

24 there's going to be no witness testimony it shouldn't take more

25 than an hour.

1              THE COURT:  All right.  Why don't we do this.  Why

2   don't we say that we will start at nine o'clock with the Morgan

3   Stanley issue.  I'll have to ask the debtor to do a notice to

4   everybody that says that although I said we'd start with the

5   insurance issue we'll start with Morgan Stanley, then we'll get

6   back to the issue that I reserved regarding -- I don't even

7   remember what it was, Items 3 and 4, I think, on the --

8              UNIDENTIFIED ATTORNEY:  It's the bank lenders and the

9   -- it's the same thing, the bank lenders and --

10             THE COURT:  Oh, okay.  So we'll start with you two,

11  that issue, Items 3 and 4 on the hearing list, and then we'll

12  start with the instance companies after that.  So tell the

13  insurance companies if they're not interested in the bank

14  lender claims they don't need to be here until, let's say,

15  10:30.  And then we'll start with the lender claim -- I'm

16  sorry, with the insurer claims at 10:30.

17             MR. FREEDMAN:  Your Honor, I apologize for --

18  Theodore Freedman.  I apologize for continuing this, but in

19  view of what Mr. Pasquale said and the lenders' counsel I want

20  to make something very clear.  It's our view, and we've been

21  operating up to this moment on the proposition that there was

22  not going to be any evidence presented by the lenders that is

23  relevant to the impairment issue because it all flowed from the

24  decision by this Court in the May 19th order.  If in fact the

25  lenders are now going to come in and argue on Monday that there

1 is evidence which is relevant to the issue of impairment then,

2 number one, we've got a big problem with the way in which that

3 is going to be produced.  We're not -- we haven't frankly

4 thought through all the ramifications on that in terms of the

5 proper way in which this trial should proceed.  We'll have

6 objections about the relevance of that evidence.

7          In other words, what they would have -- it sounds

8 like what they're going to be thinking about over the weekend

9 is whether or not they want to open up the record that this

10 Court decided in connection with the May 19th decision and

11 somehow demonstrate that this Court could reconsider what's in

12 the Freedgood affidavit or maybe even get Freedgood to come in

13 and testify about other kinds of defaults that weren't made

14 clear to this Court in the May 19th affidavit for purposes of

15 impairment.  And we would -- we don't think that that would be

16 appropriate, and we don't think that the procedural posture of

17 this case would allow for that.  But if that's what they want

18 to do then there are going to be arguments about their being

19 permitted to do that before they can proceed.

20          THE COURT:  Look.  I don't think you're ready to deal

21 with this issue of impairment.  Maybe what we need is to simply

22 continue this issue and discuss it at the omnibus, and just

23 deal with the interest issues, because you folks aren't on the

24 same page with how this is going to happen.  My construction of

25 1124 and the reason that I said that I was deferring -- I

1 didn't even address impairment in the initial opinion -- is

2 because the focus is on the plan.  It says that the plan has to

3 leave unaltered the legal equitable and contractual rights to

4 which a claimant is entitled.  And so I wasn't looking at all

5 at the plan.  So I don't know how, until we get to the plan

6 confirmation hearing and in that context I can address the

7 concept of impairment at all.

8       MR. FREEDMAN:  Your Honor, I'd ask the Court not to

9 defer argument on whether or not what you are now speaking to

10 is the right reading of 1124 and what the Court can find until

11 Monday.  I'd like to proceed on Monday on that argument.  But

12 the issue of witnesses that would seek to introduce into the

13 record things that were already decided by this Court with

14 respect to the default interest ruling is an entirely different

15 issue.

16       THE COURT:  Well, the -- I think the best thing to do

17 is go with Plan A which is what I've already ruled.  We're

18 going to start with the insurance issues.  I've got a good

19 schedule, people seem to know what they're doing.  I think what

20 we can do, if you want to talk over the weekend you folks

21 decide what you need to do with respect to the impairment issue

22 and any other what is supposed to be a Phase I issue on the

23 lenders group.  We will discuss it.  You can appear by phone.

24 You do not need to be here.  I will not be doing an evidentiary

25 hearing on that issue on Monday.  You may appear by phone if

1 you choose to.  But I do want to know what the schedule will

2 be, because we may do it -- I'm not sure when.

3          UNIDENTIFIED ATTORNEY:  Tuesday or --

4          THE COURT:  Yes.

5          MR. COBB:  Your Honor, let me be very clear for the

6 bank lenders.  We are not submitting new witnesses.  We are not

7 planning to submit a live witness.  We are not planning to

8 submit other evidence.  Okay.  Your Honor has seen all the

9 evidence.  They have seen all the evidence.  There's no curve

10 ball or trick or got you we're trying to play here.

11          MR. FREEDMAN:  Then I think that that solves our

12 problem.  And if Mr. Pasquale also agrees with that then I

13 think we can proceed forward and have a relatively short

14 argument then on impairment.

15          MR. COBB:  But to close that the issue is is the

16 evidence, should it be taken and heard by the Court, because we

17 on this side of the bar, so to speak, believe that Your Honor's

18 already made a factual determination that that evidence is

19 insufficient to demonstrate a default post-petition.  That's

20 all.

21          THE COURT:  Can I just tell you what I thought I

22 ruled?  I thought that I was saying with respect to the default

23 interest rate only that because the debtors were not satisfying

24 the claim post-petition or paying interest post-petition that

25 did not constitute a default because of operation of the

1  bankruptcy code.  Whether it's a factual default or not you

2  can't use that as a default for purposes of the case law that

3  defines the parameters under which default interest can be

4  awarded.  Every case that I looked at applied default interest

5  in an equitable context as a plan confirmation standard.  There

6  wasn't a single case that applied it as claims allowance.  So

7  what I was doing, I thought, was ruling on the simple issue of

8  the claims allowance and nothing more reserving every issue

9  with respect to the equitable nature.  Whether there is a

10 factual default or not may very well fit into everything else

11 for plan confirmation, but it has absolutely no bearing on the

12 502 issue.  That's what I thought I was ruling.

13         Now, you folks will be taking your appeals and the

14 District Court will decide whether I did or didn't make that

15 ruling, and whether I was right or wrong, but that's what I

16 thought I was ruling.  Plain and simple.  Now, in that context

17 it doesn't matter whether you had, you know, an affidavit that

18 said the debtors had a post-petition nonpayment, because the

19 bankruptcy code says the debtor doesn't have to make that post-

20 petition nonpayment to an unsecured creditor, in fact, they

21 can't make that payment to an unsecured creditor therefore

22 there can't be a default that entitles you to post-petition

23 default rate of interest when the code says they can't make the

24 payment.

25         You can't put the debtor into that kind of a

1  conundrum.  That's the end of that issue for claims allowance.

2  It doesn't affect impairment.  It doesn't affect the default

3  interest rate as a matter of fair and equitable determinations

4  under the plan.  So I specifically reserved all of those issues

5  for plan confirmation.  I don't know why you folks want to

6  appeal on this issue.  If you do, fine, go ahead and appeal.  I

7  think to -- I don't think the issues are the same at all.  I

8  can't see how I am tied up from getting to the plan

9  confirmation issues, the standards are not the same.  And the

10  evidence even if it's the same doesn't apply the same way.  End

11  of story.

12        Now, you want me to look at the affidavit in this

13  context, it may very well be relevant.  If they want to cross

14  examine you have to have a witness here.  That's all I can tell

15  you.

16        MR. PASQUALE:  And that's -- what Your Honor just

17  said I heard earlier in a shortened version which is why I

18  disagreed with Mr. Freedman's comment.  Very simple.

19        THE COURT:  Okay.  Now, back to Morgan Stanley who

20  started this.  I'm sorry.  How long do you think -- what is it

21  that you're going to present, and how long do you think your

22  case will take?

23        MR. MARTIN:  Your Honor, this is Craig Martin, for

24  the record.  We had intended on making legal argument, and I

25  think I agree with the time estimates that have been stated.

1 We did participate briefly in a meet and confer and it seems

2 that based on legal arguments that two hours would be

3 sufficient.  We filed a short objection.  It's a relatively

4 straightforward argument, and I think that the one to two hour

5 time frame would work for us.

6          MR. FREEDMAN:  Your Honor, frankly we agree that two

7 hours would be more than sufficient.  The argument they're

8 going to make is that they're entitled to both the deal that

9 was offered in the plan unless they can get more money by

10 showing the Court that under their contract that they're

11 entitled to interest.  That's not what the papers -- that

12 wasn't what the plan says.  We can argue about whether or not

13 that's a defect in the plan.

14          THE COURT:  Okay.  If you want to do this Monday

15 morning, if we can do it at an hour and a half I'll have the

16 debtors alert the insurers that they don't need to show up

17 until 10:30, and I'll give you the first hour and a half if

18 it's going to be legal argument.  If you need the witness here

19 for cross examination purposes then you have to get -- you're

20 going to have to get it done within that hour and a half.

21          MR. PASQUALE:  We don't know that the witness --

22 we'll have to contact the witness, Your Honor.

23          THE COURT:  Well, that's the other thing.

24          MR. PASQUALE:  We'll do that first thing tomorrow

25 morning.

1          THE COURT:  And here's the other thing, you may be

2    able to make your legal arguments and substitute the evidence

3    later, because we all know -- you know, I know what your

4    arguments are going to be.  You know what your arguments are

5    going to be, and it may be just a matter of getting the

6    evidence in later.

7          MR. PASQUALE:  And frankly what we've been hearing

8    all day is, and we're doing it again now, are all these issues

9    that arise over this fiction of Phase I and Phase II.  Really

10   we've spent the whole day talking about.

11         THE COURT:  Okay.

12         MR. COBB:  I think we understand Your Honor's ruling.

13   I am gravely concerned that if somehow they say that they need

14   him here to cross examine him we just will not have him

15   available.  We'll try to work that out, Your Honor.

16         THE COURT:  If that's the case then notify the debtor

17   so that the debtor does not tell the insurers not to come at

18   10:30.  I want to start at nine o'clock with something, because

19   I need to be done on time on the schedule.

20         MR. COBB:  Your Honor, we can have legal argument

21   without question on the bank lender issues, the impairment

22   issues without question.  The only issue is can the witness be

23   live here at that time?  Hopefully we'll work that out.

24         THE COURT:  Okay.  Then if need be I think we can

25   substitute if he has to come later the evidence at a later

1  time.

2          MR. COBB:  Thank you.

3          THE COURT:  Because if it needs -- if you have to

4  change your argument based on the testimony you'll do it.  You

5  know what he's going to say, his affidavit says it already.  He

6  may change on cross examination.  If it does then you'll change

7  your argument after the fact.

8          MR. COBB:  Thank you, Your Honor.

9          THE COURT:  Okay.  You'll work it out.

10          MS. HARDING:  And that's the only evidence at issue

11  is this --

12          COURT CLERK:  You have to use the microphone.  I

13  can't --

14          MS. HARDING:  Just going to clarify, that's the only

15  evidence at issue is this witness.  It's not as if they're

16  going to come forward with any more.  So --

17          MR. COBB:  Correct.

18          THE COURT:  Mr. Cobb's already said --

19          MR. COBB:  Subject to being disbarred.

20          MS. HARDING:  You don't have to.

21          MR. COBB:  They're the only -- that's the only

22  evidence that we were submitting.  We have complied with the

23  CMO.

24          THE COURT:  All right.  And Mr. Pasquale, that's the

25  only evidence -- you have no further witnesses.

1        MR. PASQUALE:  Correct, Your Honor.

2        THE COURT:  And Mr. Martin, you've got no witnesses.

3        MR. MARTIN:  That's correct, Your Honor.

4        THE COURT: Okay.  Fine.  We will have argument.  If

5   the witness is available and necessary we'll do it that way.

6   If you want to take a short deposition and produce him by

7   deposition that's okay.  Whatever you want to do I'll work with

8   you.  Okay.

9        THE ATTORNEYS:  Thank you, Your Honor.

10        THE COURT:  Have safe travels.

11        THE ATTORNEYS:  Thank you, Your Honor.

12                    * * * * *

13              **C E R T I F I C A T I O N**

14   _____We, PATRICIA REPKO, and KIMBERLY UPSHUR, court

15   approved transcribers, certify that the foregoing is a correct

16   transcript from the official electronic sound recording of the

17   proceedings in the above-entitled matter, and to the best of

18   our ability.

19

20   /s/ Patricia Repko                    DATE:  July 9, 2009

21   PATRICIA REPKO

22

23   /s/ Kimberly Upshur

24   KIMBERLY UPSHUR

25   J&J COURT TRANSCRIBERS, INC.