**Attachment 1**

Copy of:

Sales Agreement dated March 3, 2009,

First Amendment to Sales Agreement dated March 30, 2009, and

Second Amendment to Sales Agreement dated July 1, 2009

February 27, 2009 draft

# MODIFIED VERSION OF
## ATLANTA COMMERCIAL BOARD OF REALTORS, INC.
## STANDARD COMMERCIAL SALES AGREEMENT 1998

### 1.   PURCHASE AND SALE:

RESOURCE RECOVERY AND TRADING, LLC ("Purchaser") agrees to buy, and W. R. GRACE & CO. - CONN. ("Seller") agrees to sell, all that tract of land containing approximately 73,062 SF office/warehouse on approximately 12.54 acres of land known as 5225 Phillip Lee Drive, Atlanta, Fulton County, Georgia, as more particularly described in Exhibit "A" attached hereto and by this reference made a part hereof, together with all improvements now located thereon, including all electrical, mechanical, plumbing and other systems and all fixtures and personalty located therein, as well as plants, trees and shrubbery thereon (collectively, the "Property"), but excluding therefrom the equipment, fixture and personalty items listed on <u>Exhibit "B"</u> attached hereto and made a part hereof by this reference.

### 2.   PURCHASE PRICE AND METHOD OF PAYMENT:

The purchase price of the Property shall be Eight Hundred Thousand and 00/100 DOLLARS (U.S.) ($800,000.00), to be paid as follows:

<u>All cash at Closing in immediately available funds.</u>

### 3.   EARNEST MONEY:

Within three (3) business days after the full execution by Purchaser and Seller of this Agreement, Purchaser shall deliver the sum of Twenty-Five Thousand Dollars ($25,000.00) (the "Earnest Money") to the Broker (as hereinafter defined) to be held in escrow by the Broker, which Earnest Money shall be applied as part payment of the purchase price of the Property at the time the sale is consummated. If Purchaser's check for the Earnest Money is returned by Purchaser's bank for any reason, Seller shall have the option to declare this Agreement null and void by written notice to Purchaser and Broker. Purchaser and Seller understand and agree that Broker shall deposit Earnest Money in Broker's escrow trust account within three (3) banking days following the execution of this Agreement by all parties.  The parties to this Agreement agree that Broker shall deposit the earnest money in an interest-bearing escrow trust account and that all interest earned on the Earnest Money shall accrue to the benefit of Purchaser. The parties to this Agreement understand and agree that the disbursement of Earnest Money held by the Broker as escrow agent can occur only (A) at Closing, (B) upon written agreement signed by all parties having an interest in the funds, (C) upon court order, or (D) pursuant to interpleader as set forth herein.  In the event of a dispute between Purchaser and Seller sufficient in the discretion of Broker to justify its doing so, Broker shall be entitled to interplead all or any disputed part of the Earnest Money into court, and thereupon be discharged from all further duties and liabilities hereunder. The filing of any such interpleader action shall not deprive Broker of any of its rights under this Agreement.   Purchaser and Seller agree that Broker shall be entitled to be compensated by the party who does not prevail in the interpleader action for its costs and

expenses, including reasonable attorney's fees, in filing said interpleader action. In such disputed cases, if Broker proposes to make a disbursal to which all parties to this Agreement do not expressly agree, Broker shall give all parties fifteen (15) days notice in writing of Broker's intent to disburse. Such notice shall be delivered by certified mail or by overnight courier such as Federal Express to the parties' last known addresses and must recite to whom and when the disbursal will be made. If either party objects by written notice to the Broker and the other party, Broker shall interplead.

4.    **WARRANTY OF TITLE:**

At the time the sale is consummated, Seller agrees to convey "good and marketable, fee simple title" to the Property to Purchaser by limited warranty deed. "Good and marketable, fee simple title" is hereby defined as title which is insurable by a national title insurance company at its standard rates on an ALTA Owner's Policy, without exception other than the following matters (the "Permitted Title Exceptions"): (A) zoning ordinances affecting the Property; (B) general utility, sewer and drainage easements of record upon which any buildings on the Property do not encroach; (C) subdivision restrictions of record; (D) current city, state and county ad valorem property and sanitary taxes not yet due and payable; and (E) other matters declared or deemed to constitute Permitted Title Exceptions pursuant to Paragraph 5 of this Agreement. Seller shall deliver to Purchaser within five (5) business days of the effective date of this Agreement a copy of Seller's vesting deed(s) and a copy, if any, of any title policies or surveys of the Property in Seller's possession.

5.    **TITLE EXAMINATION:**

Purchaser shall move promptly and in good faith after acceptance of this Agreement to examine title to the Property and to furnish Seller, on or before the thirtieth (30th) day following acceptance of this Agreement, with a written statement of objections materially and adversely affecting good and marketable, fee simple title to the Property, as defined in Paragraph 4 of this Agreement, other than the Permitted Title Exceptions. Seller shall have until the expiration of Purchaser's "Inspection Period" (as hereinafter defined) to either satisfy all valid and timely objections or to agree to satisfy same at or before Closing, and if Seller fails to satisfy or to agree to satisfy such valid objections on or before Closing, then at the option of the Purchaser, evidenced by written notice to Seller, (A) this Agreement shall be null and void, and all Earnest Money shall be promptly returned to Purchaser, or (B) Purchaser shall waive such objections and proceed to Closing in which event any such unsatisfied objection shall be conclusively deemed waived and shall thereupon become a Permitted Title Exception. In the event that Purchaser fails to make such election on or before Closing, Purchaser shall be deemed to have selected option (B) above. Seller agrees to satisfy any valid title objections that consist of monetary claims or encumbrances (i.e., security deeds, mortgages, liens of mechanics or materialmen) by payment at or before Closing or pursuant to other arrangements that shall allow the Property to be conveyed free and clear of the matters constituting such objections.

6.    **WARRANTIES:**

Seller represents that to the best of Seller's knowledge, there are no existing or proposed

governmental orders (except as may relate to the environmental condition of the Property, as may be disclosed in any of the reports identified in Section 13 hereinbelow) or condemnation proceedings affecting the Property and Seller has received no notice of any such orders or proceedings.

## 7.    INSPECTIONS:

Commencing on the date of this Agreement and until the expiration of the Inspection Period (as hereinafter defined), Purchaser, and Purchaser's agents, employees and contractors, shall have the right during regular business hours, but without interfering with operations, if any, being carried on upon the Property, to enter the Property, for the purposes of making surveys, inspections, soil tests and other investigations (including without limitation Phase I and/or Phase II environmental site assessments) of the Property, the physical condition of any improvements and of mechanical and electrical systems thereof, and any service and management contracts affecting the Property. In addition, within five (5) business days after the full execution of this Agreement, Seller shall furnish to Purchaser a copy of each of the following, to the extent available to it:  plans and specifications for the building, the last three (3) years expense statements, including property tax amounts, the current operating statement, all as-built drawings, and all service agreements.   Purchaser shall and does hereby agree (a) to keep all information furnished to Purchaser or gathered as a result of its investigations and inspections confidential; (b) to promptly furnish Seller with copies of all inspection and investigation reports and materials received as a result of its investigations and inspections; (c) to obtain Seller's prior written approval (not to be unreasonably withheld or delayed) for any sampling or testing that is invasive of the land and improvements; and (d) to indemnify, defend and hold Seller and Broker harmless from any loss or damage suffered by Seller and Broker or others as a result of the exercise by Purchaser of the rights herein granted, including any damage resulting from the negligence of Purchaser or Purchaser's agents. The indemnity obligation of Purchaser shall include, without limitation, the duty to repair and restore the Property or any improvements situate on the Property to the condition that existed prior to Purchaser's investigations and inspections. The indemnity and other obligations of this Paragraph 7 shall survive the rescission, cancellation, termination or consummation of this Agreement.

## 8.    APPLIANCES AND MECHANICAL SYSTEMS:

Seller warrants and represents that at Closing all appliances remaining with the Property, if any, and the heating, air conditioning, plumbing, and electrical systems will be in the same condition as they are in on the date this Agreement is signed by Purchaser, natural wear and tear and damage caused by casualty or condemnation or by the exercise of Purchaser's inspection rights excepted. Purchaser shall have the privilege and responsibility of making inspections of said appliances and systems prior to Closing and, notwithstanding anything contained herein to the contrary, Seller's responsibility in connection with the foregoing shall cease at Closing.

## 9.    CONDITION OF PROPERTY:

Seller represents that at Closing the improvements on the Property will be in the same condition as they are in on the date this Agreement is signed by Purchaser, natural wear and tear

and damage caused by casualty or condemnation or by the exercise of Purchaser's inspection rights excepted. Until Closing, Seller shall, at Seller's expense, maintain in full force and effect the same fire and extended coverage insurance carried by Seller on the Property as of the date of this Agreement. However, should the Property be destroyed or substantially damaged before Closing, then at the election of Purchaser: (A) this Agreement may be canceled; or (B) Purchaser may consummate this Agreement and receive such insurance proceeds as are paid on the claim of loss. This election must be exercised within ten (10) days after Seller provides Purchaser written notice of the insurance proceeds, if any, which Seller will receive on the claim of loss. If Purchaser has not been so notified by Seller within forty-five (45) days subsequent to the occurrence of such damage or destruction, or by the date of Closing, whichever occurs first, Purchaser may at its option cancel this Agreement and receive a refund of its Earnest Money.

## 10.   AGENCY DISCLOSURE:

Purchaser and Seller acknowledge that E. Russell Epperson, III, of Wilson, Hull & Neal (the "Broker") has acted as a transaction broker and not as an agent for Purchaser or Seller with respect to the transaction contemplated herein.

## 11.   REAL ESTATE COMMISSION:

In negotiating this Agreement, Broker has rendered a valuable service for which Broker shall be paid by Seller, if and when (and only if and when) the transaction hereby contemplated actually closes, in an amount equal to five percent (5%) of the Purchase Price as follows:

<u>All cash at Closing.</u>

Upon payment of the aforesaid commission amount and as a condition thereto, Broker shall furnish such affidavits and lien waivers and releases as Seller and Purchaser shall reasonably require. In no event shall Purchaser be liable for any commission payable to Broker. Purchaser and Seller each hereby represent and warrant to the other that no party other than Broker is entitled as a result of the actions of Seller or Purchaser, as the case may be, to a commission or other fee resulting from the execution of this Agreement or the transactions contemplated hereby, and Seller and Purchaser hereby agree to indemnify, defend and hold each other harmless from and against any and all costs, damages and expenses, including attorneys fees, resulting directly or indirectly, from any such claim arising out of the actions of or contact with the indemnifying party, as the case may be. This representation, warranty and indemnity shall survive the rescission, cancellation, termination or consummation of this Agreement.

Broker hereby represents and warrants to Seller and Purchaser that no party other than Broker is entitled as a result of the actions of Broker to a commission or other fee resulting from the execution of this Agreement or the transactions contemplated hereby, and Broker hereby agrees to indemnify, defend and hold Seller and Purchaser harmless from and against any and all costs, damages and expenses, including attorneys fees, resulting directly or indirectly, from any such claim arising out of the actions of or contact with Broker. This representation, warranty and indemnity shall survive the rescission, cancellation, termination or consummation of this Agreement.

*A*

12.    **DISCLAIMER:**

Purchaser acknowledges that Purchaser has not relied upon the advice or representations, if any, of Seller or of Broker, or its associate brokers or salespersons, concerning, without limitation: (A) the legal and tax consequences of this Agreement or the sale or purchase of the Property; (B) the terms and conditions of financing or its availability; (C) the purchase and ownership of the Property; (D) the structural condition of the Property; (E) the financial condition of any party to this Agreement; (F) the operating condition of the electrical, heating, air conditioning, plumbing, water heating systems and appliances on the Property; (G) the availability of utilities to the Property; (H) the investment potential or resale value of the Property; (I) any conditions existing off the Property which may affect the Property; (J) any matter which could have been revealed through an accurate survey, comprehensive title search or thorough inspection of the Property; or (K) any other matter material to Purchaser's decision to enter into or consummate the transaction contemplated by this Agreement.    Purchaser acknowledges that if such matters have been a concern to them, it has sought and obtained independent advice relative thereto and has not relied upon information furnished by Seller or Broker or their officers, representatives or agents, including, without limitation, the reports referenced in Section 6 hereinabove.

13.    **ENVIRONMENTAL PROVISIONS:**

A.    **Environmental Reports.**  Seller has furnished to Purchaser for its use, without any representation or warranty whatsoever, a copy of each of the following reports prepared for Seller regarding the environmental condition of the Property:

- July 22, 2002 Report of Phase I Environmental Site Assessment prepared by Law Engineering and Environmental Services, Inc.
- August 8, 2003 Phase II Environmental Assessment Report prepared by MACTEC Engineering and Consulting.
- July 15, 2002 Report of Limited Asbestos Containing Materials Survey, prepared by Law Engineering and Environmental Services, Inc.
- Revised, Amended Corrective Action Plan prepared by RMT dated March 2006.
- March 12, 2008 Semiannual Groundwater Monitoring Report.
- September 15, 2008 Semiannual Groundwater Monitoring Report.

B.    **Environmental Undertakings/Right of Access.**

1.    Seller shall remove all solvent based process related equipment, including mixers, blend tanks, and raw material and product piping in Building 2, which Seller may accomplish, to the extent necessary in its judgment, by removing and/or capping certain utilities.    Such work will be executed and completed within twelve (12) weeks after Closing.

2.    Seller shall provide and install traffic rated monitoring well covers for the temporary well points currently in paved areas of the plant yard within four (4) weeks after Closing.

3. Purchaser acknowledges that Seller is currently executing activities required under an existing Amended Corrective Action Plan under the authority of the United States Environmental Protection Agency (EPA) Region IV (the "CAP"). The activities under the CAP include operation of a multiphase extraction system ("MPE") and monitoring for light non aqueous phase liquid ("LNAPL") in the plant yard and dissolved constituents present in groundwater located under property located within the flood plain. Purchaser grants to Seller and its agents, consultants and contractors permission to enter the Property after Closing in order to perform the activities under the CAP, any other work or activities that may be required by EPA or any other governmental jurisdiction having authority over the Property, or any other remedial work that Purchaser may choose to perform because it is more effective than continued operation of the MPE system. The right of entry shall include, without limitation, the right to enter onto the Property for routine as well as emergency maintenance of the MPE system, as well as the quarterly and semi annual monitoring events until no further action is required by EPA ("Completion of CAP Work"). At the time of Completion of CAP Work, Seller shall remove the treatment shed and vapor phase carbon, and shall abandon all wells not previously abandoned during implementation of the CAP Work. Seller shall require its agents, consultants and contractors to perform all activities in a workmanlike manner, to use their best efforts not to interfere with Purchaser's business operations, and to provide advance notice prior to taking any on-site action.

**C.    Environmental Indemnification.**

1. As used herein, the term "Hazardous Substance(s)" shall have the meaning ascribed in and shall include those substances listed under the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. 9601 et seq. and the regulations promulgated thereunder (as amended from time to time) and the Clean Air Act, 42 U.S.C. 7401, et seq. and the regulations promulgated thereunder (as amended from time to time) and includes oil, waste oil, and used oil as those terms are defined in the Clean Water Act, 33 U.S. C. 1251 et seq. and regulations promulgated thereunder (as amended from time to time) and the Resource Conservation and Recovery Act, 42 U.S.C. 6901 et seq. and regulations promulgated thereunder (as amended from time to time) and the Oil Pollution Act of 1990, 33 U.S.C. 2701 et seq. and regulations promulgated thereunder (as amended from time to time) and shall include any other pollutant or contaminant designated as such by Congress or the United States Environmental Protection Agency (EPA) or defined by any other federal, state or local statute, law, ordinance, code, rule, regulation, order or decree regulating, relating to, or imposing liability or standards of conduct concerning any hazardous, toxic or dangerous waste, substance or material, as now or at any time hereafter in effect.

2. As used herein, the term "Environmental Law(s)" shall mean any federal, state or local statute, law, ordinance, code, rule, regulation, order or decree regulating, relating to, or imposing liability or standards of conduct concerning the protection or regulation of the environment, including the management, handling, investigation and clean-up of any Hazardous Substance, as of now or at any time hereafter in effect.

3.   As used herein, the term "Claim" shall mean any written action, suite, proceeding, hearing, investigation, litigation, charge, complaint, claim or demand.

4.   As used herein, the term "Environmental Claim" shall mean any and all obligations, liabilities, losses, administrative, regulatory or judicial actions, suits, demands, decrees, demand letters, claims, liens, judgments, notice of noncompliance or violation, investigations, proceedings, removal or remedial actions or orders, or damages, penalties, fees, out-of-pocket costs, expenses, disbursements, attorney's or consultants' fees, relating in any way to any Environmental Law or any permit issued under any such law, including, without limitation (A) any and all Claims by governmental or regulatory authorities for enforcement of non-compliance, clean-up, removal, response, remedial or other actions or damages pursuant to any applicable Environmental Law, and (B) any and all claims by any third party seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief resulting from Hazardous Substances or arising from alleged injury or threat of injury to health, safety or the environment.

5.   Seller agrees to defend, indemnify and hold harmless Purchaser (including its officers, directors, employees and agents) from and against all Environmental Claims which arise from, respond to, or are in connection with (i) the noncompliance with any applicable Environmental Law relating to or arising out of activities or operations on the Property before the date of Closing hereunder, or (ii) the generation, manufacture, refining, transportation, use, treatment, storage, handling, or disposal, discharge or release before the date of Closing hereunder of any Hazardous Substances on, in, under, or released from the Property.  Seller shall have the right to control at its expense the defense of any such matter or its settlement.  Notwithstanding anything stated in this Agreement to the contrary, Seller shall not be liable to Purchaser for consequential or indirect loss or damage, including but not limited to loss of profit, loss of use, loss of operating time, loss of revenue, increased costs of producing revenues, cost of capital, or loss of goodwill.

6.  Purchaser agrees to defend, indemnify and hold harmless Seller (including its officers, directors, employees and agents) from and against all Environmental Claims which arise from, respond to, or are in connection with (i) the noncompliance with any applicable Environmental Law relating to or arising out of activities or operations on the Property after the date of Closing hereunder, or (ii) the generation, manufacture, refining, transportation, use, treatment, storage, handling, or disposal, discharge or release after the date of Closing hereunder of any Hazardous Substances on, in, under, or released from the Property, including, without limitation, to the extent Purchaser's noncompliance or act exacerbates the existing contamination.  Purchaser shall have the right to control at its expense the defense of any such matter or its settlement.  Notwithstanding anything stated in this Agreement to the contrary, Purchaser shall not be liable to Seller for consequential or indirect loss or damage, including but not limited to loss of profit, loss of use, loss of operating time, loss of revenue, increased costs of producing revenues, cost of capital, or loss of goodwill.

7. Seller shall have the burden of proof relating to defense, indemnification, and hold harmless rights hereunder until three (3) years from the date of Closing. Purchaser shall have the burden of proof relating to defense, indemnification, and hold harmless rights hereunder after three (3) years from the date of Closing.

## 14. ASSIGNMENT:

This Agreement, and the rights and obligations hereunder, may not be assigned by Purchaser without the prior written consent of Seller, which consent may not be unreasonably withheld. Notwithstanding anything contained herein to the contrary, however, any such approved assignee shall assume in writing all of the obligations and liabilities of Purchaser hereunder, and a copy of such assignment shall be provided to Seller in writing within two (2) days after it is signed by Purchaser and assignee. Purchaser and any subsequent assignor of this Agreement shall be and remain liable jointly and severally for the performance of all obligations of Purchaser hereunder, including, without limitation, for the payment of the Purchase Price at Closing.

## 15. BINDING EFFECT:

This Agreement shall bind and inure to the benefit of Seller, Purchaser and Broker, and their respective heirs, executors, legal representatives, successors and assigns.

## 16. RESPONSIBILITY TO COOPERATE:

Seller and Purchaser agree that such documentation as is reasonably necessary to carry out the terms of this Agreement shall be produced, executed and/or delivered by such parties within the time required to fulfill the terms and conditions of this Agreement.

## 17. NOTICES:

Except as may otherwise be provided for in this Agreement, all notices required or permitted to be given hereunder shall be in writing and shall be deemed delivered either (A) in person, (B) by overnight delivery service prepaid, (C) by facsimile (fax) transmission, receipt to be confirmed by telephone conference with the recipient, or (D) by U.S. Postal Service, postage prepaid, registered or certified, return receipt requested, to the party being given such notice at the appropriate address set forth below:

*As to Purchaser:*

Name:
Address:
City, State, ZIP:
Fax No.

*As to Seller:*       <u>W. R. Grace & Co.- Conn.</u>

Name:      Jon Yoder
Address:      W. R. Grace & Co.
City, State, ZIP:      7500 Grace Dr.
Fax No.      Columbia, MD  21044
410-531-8789

with copy to (which shall not
constitute notice):

with copy to (which shall not
constitute notice):

Vicki B. Finkelstein, Esq.
W. R. Grace & Co.
7500 Grace Drive
Columbia, MD 21044
Fax:  (410) 531-4783

*As to the Broker:*      <u>Wilson, Hull & Neal</u>
Name:      Rusty Epperson
Address:      1600 Northside Drive, Suite 100
City, State, ZIP:      Atlanta, GA 30318
Fax No.      404-351-2701

**18.    TIME:**

Time is of the essence of this Agreement and all terms hereof.

**19.    ENTIRE AGREEMENT; AMENDMENT:**

This Agreement constitutes the sole and entire agreement between the parties hereto with respect to the subject matter hereof, and no modification of this Agreement shall be binding unless signed by all parties to this Agreement. No representation, promise, or inducement not included in this Agreement shall be binding upon any party hereto.

**20.    MISCELLANEOUS:**

A.    Real estate taxes on the Property for the calendar year in which the sale is closed shall be prorated as of the date of Closing.

B.    Utilities, including all sanitary taxes and charges applicable to the Property, shall be prorated as of the date of Closing.

C.    Seller shall pay the State of Georgia property transfer tax and, if applicable, Purchaser shall pay Georgia intangible taxes for any security deed obtained in connection with Purchaser's financing, if any.

D.    The sale of the Property shall be closed on or before the thirtieth (30th) day following the later to occur of (1) the expiration of the Inspection Period, or (2) the date on which Seller notifies Purchaser that Seller has fully and finally perfected its authorization to complete the sale contemplated by this Agreement

pursuant to the "De Minimis Asset Order" (as set forth in Paragraph C of Section 21), at a date, place and time acceptable to Purchaser and Seller, provided, however, if Purchaser and Seller fail to agree on a time and place, the Closing shall be held on the aforesaid fifteenth (15th) day at 10:00 A.M. in the Atlanta, Georgia office of Nelson Mullins Riley & Scarborough, L.L.P. at the address shown above, or at another location mutually agreeable to the parties. If the time period by which any right, option or election provided under this Agreement must be exercised, or by which any act required hereunder must be performed, or by which the Closing must be held, expires on a Saturday, Sunday or legal holiday, then such time period shall be automatically extended to the close of business on the next regular business day.

E.  Possession of the Property shall be granted by Seller to Purchaser no later than Closing.

F.  Conditions precedent to the obligation of either party to close hereunder, if any, are for the benefit of such party only, and any and all of said conditions may be waived in the discretion of the party benefited thereby.

G.  Seller and Purchaser agree to comply with and to execute and deliver such certifications, affidavits and statements as are required at the Closing in order to meet the requirements of Internal Revenue Code Section 1445 (Foreign/Non-Foreign Sellers) and any comparable requirements of state law.

H.  This Agreement shall be construed under the laws of the State of Georgia.

21.  **SPECIAL STIPULATIONS**:
The following Special Stipulations shall, if conflicting with any of the foregoing, control:

A.  Inspection Period: Purchaser shall have the right for a period of forty-five (45) days commencing upon the full execution of this Agreement by both Seller and Purchaser and expiring at the close of business forty-five (45) days thereafter (the "Inspection Period") to conduct such studies (including environmental site assessments) as will reasonably satisfy Purchaser that the Property is suitable for the purposes for which Purchaser has entered into this Agreement. If Purchaser shall not in good faith find the Property to be so suitable, then Purchaser shall have the right to terminate this Agreement and receive a full refund of the Earnest Money and the parties shall have no further obligation to each other or to Broker.

B.  The Property (and all improvements) shall be sold to Purchaser at Closing "as is" with all faults. Seller shall have no obligation before or after Closing to make any repairs or to remedy any title or survey defects or (except as required pursuant to Section 13 hereinabove) any environmental condition affecting the Property.

C.  On April 1, 2001, the Seller, and sixty-one (61) of its affiliated entities, each filed

10

a voluntary petition for relief under chapter 11 of Title 11 of the United States Code (the "Chapter 11 Cases") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The Chapter 11 Cases have been consolidated for administrative purposes only; they have been assigned Case No. 01-01139, and they are currently pending before Judge Judith K. Fitzgerald. Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Seller continues to operate its business and manage its properties as a debtor in possession.

Pursuant to the Bankruptcy Court's <u>Order Establishing Procedures for the Sale or Abandonment of De Minimis Assets</u> (herein the "De Minimis Asset Order" or "DMAO", a copy of which has been furnished to the Purchaser), dated August 2, 2001, the Seller is not authorized to dispose of assets until it has satisfied certain guidelines, and the appropriate guidelines are determined by the price of the assets being sold. Given the purchase price herein, the De Minimis Asset Order requires the Seller to give certain third-parties (the "Notice Parties") notice of the transaction contemplated herein, along with the opportunity to (i) make an alternative offer <u>or</u> (ii) object to the within offer (collectively, "Notice Party Veto Rights"). The Seller shall take reasonable steps to resolve any objections filed by the Notice Parties. **If a Notice Party successfully exercise its Notice Party Veto Rights, the terms of this Agreement shall be rendered null and void.** In the event that a Notice Party makes a superior offer, the Seller shall promptly notify the Purchaser of the existence and terms of such offer. In the event that a Notice Party successfully objects to the sale contemplated herein, the Seller shall notify Purchaser within five (5) business days of the Bankruptcy Court's order denying the sale contemplated herein. If this Agreement is not consummated because of the Notice Party Veto Rights, then the Seller shall return the Earnest Money within five (5) business days of such event.

The perfection of full and final authorization for Seller to complete the sale of the Property pursuant to the foregoing De Minimis Asset Order, including without limitation the resolution of any appeals filed thereto or the expiration of any appeal periods without the filing of any appeals, shall be and constitute a condition precedent to the obligations of Seller under this Agreement.

Seller shall give prompt notice of the proposed sale under this Agreement to all parties entitled to notice thereof under the DMAO. Seller shall furnish Purchaser with prompt notice of any objections to the proposed sale filed or served by any party under the DMAO. If Purchaser has not received notice from Seller within sixty (60) days of the date of this Agreement that Seller is authorized under the DMAO to sell the Property to Purchaser pursuant to this Agreement, then Purchaser shall have the right to terminate the Agreement and receive a refund of its Earnest Money.

D.    Seller shall vacate the Property at Closing. Any items of personalty or equipment left on the Property after Closing, except for the equipment described in

### TRACT ONE

All that tract or parcel of land lying and being in Land Lots 86 and 87 of the
16th FF District, Fulton County, Georgia, and being Lots 7, 8 and 9 of the Atlantic
Coast Line Railroad Industrial Site No. 1 of the Fulton Industrial District, as
shown on plat of property of Davry and Alny Chemical Division, W. R. Grace & Co.,
made by Ernest L. Boggus, Surveyor, dated February 1965, revised to show three
tracts northwest of Railroad, on February 17, 1965, and recorded in Plat Book 82,
page 16, in the Office of the Clerk of the Superior Court of Fulton County,
Georgia, being composed of two parcels of land separated by Philip Lee Drive, and
more particularly described as follows:

PARCEL NO. 1: BEGINNING at a point on the southwesterly side of Philip Lee Drive,
Philip Lee Drive being 100 feet in width, which point is 2,020 feet northwesterly
from the intersection of the southwesterly side of Philip Lee Drive with the north-
westerly side of Georgia State Highway No. 74, Georgia State Highway No. 74 being
200 feet in width; and from said point of beginning extending south 52 degrees 55
minutes west 405 feet to the easterly side of a proposed Lead Track of Atlantic
Coast Line Railroad, said proposed Lead Track right of way being 100 feet in width;
thence north 37 degrees 05 minutes west along the easterly side of said proposed
railroad right of way 190.4 feet to a point; thence along the arc of curve on the
easterly side of said proposed railroad right of way, 322.1 feet to a point, said
arc of curve being subtended by a chord having a bearing of north 23 degrees 08
minutes west and a length of 319 feet; thence continuing northerly and northeasterly
along the arc of curve of said easterly side of proposed railroad right of way 455.2
feet to the intersection of the easterly side of said proposed railroad right of way
with the southwesterly side of Philip Lee Drive, said arc of curve on the easterly
side of said proposed railroad right of way being subtended by a chord having a
bearing of north 10 degrees 07 minutes east and a length of 446.5 feet; thence
south 37 degrees 05 minutes east along the southwesterly side of Philip Lee Drive
803.2 feet to the point of place of beginning; being Lot 7 and the west part of
Lot 9 of Atlantic Coast Line Railroad Industrial Site No. 1.

PARCEL NO. 2: BEGINNING at a point on the northeasterly side of Philip Lee Drive,
Philip Lee Drive being 100 feet in width, and said point of beginning being 2,012
feet northwesterly from the point of intersection of the northeasterly side of
Philip Lee Drive with the northwesterly side of Georgia State Highway 74, Georgia
State Highway 74 being 200 feet in width; thence north 37 degrees 05 minutes west
along the northeasterly side of Philip Lee Drive 836.9 feet to the intersection of
the northeasterly side of Philip Lee Drive with the southeasterly side of proposed
right of way of Lead Track of Atlantic Coast Line Railroad, said proposed Lead
Track right of way being 100 feet in width; thence northeasterly along the arc of
curve on the easterly side of said proposed railroad right of way 90.5 feet, said
arc of curve being subtended by a chord having a bearing of north 42 degrees 42
minutes east and a length of 90.4 feet; thence continuing north 46 degrees 35 minutes
east along the easterly side of said proposed Atlantic Coast Line Railroad right
of way 622.3 feet to the intersection of said proposed right of way of Lead Track
of Atlantic Coast Line Railroad with the westerly side of a proposed track of
Atlantic Coast Line Railroad, said proposed track right of way being 100 feet in
width; thence southerly along the arc of curve on the westerly side of said proposed
Atlantic Coast Line right of way 530 feet to a point, said arc being subtended by a
chord having a bearing of south 1 degree 13 minutes east and a length of 519.7
feet; thence continuing southeasterly along the arc of curve on the westerly side
of said proposed right of way of Atlantic Coast Line Railroad 258.5 feet to a point,
said arc of curve on the westerly side of said proposed Atlantic Coast Line Railroad
right of way being subtended by a chord having a bearing of south 30 degrees 48
minutes east and a length of 257.2 feet; thence continuing south 40 degrees 21
minutes east along the westerly side of said proposed Atlantic Coast Line Railroad
right of way 244.9 feet to a point; thence south 52 degrees 55 minutes west 388.6
feet to the northwesterly side of Philip Lee Drive at the point or place of be-
ginning; being Lot 8 and the east part of Lot 9 of Atlantic Coast Line Railroad
Industrial Site No. 1.

### TRACT TWO

ALL that tract or parcel of land lying and being in Land Lot 86 of the 14th FF
District of Fulton County, Georgia, and being Tract No. 2 northwest of the Atlantic
Coast Line Railroad right of way as shown on plat of property of Dewey and Almy
Chemical Division, W. R. Grace & Co., made by Ernest L. Boggs, Surveyor, dated
February 1965, revised to show three tracts northwest of Railroad, on February 17,
1965, and recorded in Plat Book _82_, page _16_, in the Office of the Clerk
of the Superior Court of Fulton County, Georgia, and more particularly described
as follows:

TO FIND THE POINT OF BEGINNING, start at the corner formed by the intersection
of the southwesterly side of Philip Lee Drive with the northwesterly side of
Georgia State Highway No. 74, Georgia State Highway No. 74 being 200 feet in
width, and from said point extend thence northwesterly along the southwesterly
side of Philip Lee Drive 2020 feet to a point marked by an iron pin; thence north
37 degrees 05 minutes west along the southwesterly side of Philip Lee Drive
803.2 feet to an iron pin marking the intersection of the southwesterly side of
Philip Lee Drive with the southeasterly right of way line of Lead Track of Atlantic
Coast Line Railroad; thence north 57 degrees 29 minutes west across said Atlantic
Coast Line Railroad right of way 100.1 feet to an iron pin on the northwesterly
line of said right of way; thence northeasterly along the arc of curve of the north-
westerly side of said Atlantic Coast Line Railroad right of way 215.9 feet to a
point marked by an iron pin, said arc of curve being subtended by a chord having a
bearing of north 38 degrees 23 minutes east and a length of 215.8 feet, said iron
pin being the POINT OF BEGINNING of the Tract herein described; thence from said
point of beginning extend north 37 degrees 05 minutes west 525 feet to an iron pin
on the bank of the southeasterly side of Chattahoochee River; thence north 49 de-
grees 44 minutes east along the southeast bank of Chattahoochee River 269.9 feet;
thence continuing north 55 degrees 05 minutes east along the southeast bank of the
Chattahoochee River 69 feet to a point marked by an iron pin; thence south 37
degrees 05 minutes east 500 feet to a point marked by an iron pin on the north-
westerly right of way line of the Lead Track of Atlantic Coast Line Railroad; thence
south 46 degrees 33 minutes west along the northwesterly right of way line of said
Railroad 330.5 feet to a point marked by a hub; thence continuing south 46 degrees
04 minutes west along the northwesterly right of way line of Lead Track of Atlantic
Coast Line Railroad 4.5 feet to the iron pin at the point of beginning.

Paragraph 13(B)(1) hereinabove, shall pass to Purchaser with the title and shall become the property of Purchaser, unless otherwise specified herein.

E.   Purchaser shall have the right to assign this Agreement to an affiliated entity subject to the assumption obligations specified in Section 14 above.

F.   In the event of a default by Seller under this Agreement, Purchaser shall have the following election of remedies: (a) Purchaser may terminate this Agreement and demand the return of its Earnest Money and the amount actually incurred, not to exceed $5,000.00, of Purchaser's out of pocket due diligence expenses; or (b) Purchaser may seek specific performance of this Agreement. The foregoing remedies shall not be cumulative. Purchaser's election of (a) or (b) as set forth above shall constitute a waiver of the other remedy available to Purchaser. In no event shall Seller be liable to Purchaser for damages or for any cost or expense incurred by Purchaser in connection with such breach or Purchaser's election and pursuit of remedies for Seller's breach.

G.   In the event of a default by Purchaser under this Agreement, Seller as its sole remedy may terminate this Agreement and retain the Earnest Money as liquidated damages for Purchaser's breach. In no event shall Purchaser be liable to Seller for damages or for any cost or expense incurred by Seller in connection with such breach or Seller's election and pursuit of remedies for Purchaser's breach (except for forfeiture of the Earnest Money as herein provided).

**Purchaser acknowledges that Purchaser has read and understood the terms of this Agreement and has received a copy of it.**

The date of this Agreement is _3 / 3 /_ , 2009.

IN WITNESS WHEREOF, Purchaser, Seller and Broker have hereunto set their hands and seals as of the date indicated below.

PURCHASER:

RESOURCE RECOVERY AND TRADING, LLC

By: _W. John Margnowski_
Its: _owner_

Date executed by Purchaser: _3/3/09_

12

SELLER:

W. R. GRACE & CO. - CONN.

By: _WB mc Dowan_

Its: _Senior Vice President_

Date executed by Seller: _3. 6 -09_

BROKER:

Wilson Hull & Neal

By: _____

Its: _____

13

## EXHIBIT A

### Legal Description

See attached Tracts One and Two as set forth in Warranty Deed recorded in Deed Book 4395, Page 227, in the Office of the Clerk of Superior Court, Fulton County, Georgia.

## EXHIBIT "B"

### EXCLUDED PROPERTY ITEMS

Office equipment consisting of a copier and a fax machine shall be removed by Seller from the Property prior to Closing or abandoned to Purchaser.

Forklift shall be removed by Seller or abandoned to Purchaser.

Multiphase extraction treatment shed and associated equipment including vapor phase carbon unit.

**First Amendment**
**to**
**Sales Agreement**

THIS FIRST AMENDMENT TO SALES AGREEMENT (this "Amendment") is entered into this 30 day of March 2009, by and between W. R. Grace & Co. – Conn. ("Seller") and Resource Recovery and Trading, LLC ("Purchaser").

### WITNESSETH:

WHEREAS, Seller and Purchaser entered into that certain purchase and sale agreement captioned "Modified Version of Atlanta Commercial Board of Realtors, Inc. Standard Commercial Sales Agreement 1998" dated March 3, 2009 (the "Agreement"), for the purchase and sale of that certain property containing approximately 73,062 square feet of office/warehouse space on approximately 12.54 acres of land known as 5225 Phillip Lee Drive in Atlanta, Fulton County, Georgia (the "Property"), and

WHEREAS, Seller and Purchaser desire to extend the term of the "Inspection Period" for the limited purpose, and on the terms, set forth herein,

NOW THEREFORE, for and in consideration of the foregoing recitals, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Seller and Purchaser do hereby agree as follows:

1.      <u>Earnest Money</u>.  Within three (3) business days after the full execution by Purchaser and Seller of this Amendment, Purchaser shall deliver the additional sum of Fifty Thousand Dollars ($50,000.00) (the "Additional Deposit") to the Broker, to be held as part of the Earnest Money in accordance with the provisions of Section 3 of the Agreement.  All references in the Agreement to the Earnest Money shall hereafter include the Additional Deposit.

2.      <u>Inspection Period.</u>  The parties acknowledge and agree that the "Inspection Period," as such term is defined in Section 21.A. of the Agreement, runs until the close of business on April 20, 2009.  The parties hereby further agree that the Inspection Period shall be extended until the close of business on August 3, 2009 for the limited purpose, and only for the purpose, of giving Purchaser additional time to try to obtain approval for a special use permit for the Property.  At any time until the close of business on April 20, 2009, Purchaser shall have the right to terminate the Agreement and receive a full refund of the Earnest Money (including the Additional Deposit) if for any reason it determines in good faith that the Property is not suitable for its purposes.  After such date, and at any time until the close of business on August 3, 2009, Purchaser shall have the right to terminate the Agreement and receive a full refund of the Earnest Money (including the Additional Deposit) if, and only if, it determines that it is unable to obtain approval for the special use permit for the Property.

3.    Closing. The references to the Inspection Period in Section 20.D. of the Agreement, with respect to when closing shall occur, shall be and refer to the Inspection Period, as extended pursuant to the provisions of Paragraph 2 immediately hereinabove.

4.    Miscellaneous.

A.    Seller and Purchaser hereby ratify and confirm all of the terms and conditions of the Agreement, as amended hereby. Except as modified, amended or supplemented by this Amendment, all of the terms and provisions of the Agreement shall remain in full force and effect.

B.    This Amendment may be executed in counterparts, each of which shall constitute an original, and both of which, when taken together, shall constitute but one and the same instrument.

C.    Each party shall be authorized to accept, and may rely upon, a facsimile transmission of this Amendment executed by the other party, and such document shall be binding upon the executing party.

IN WITNESS WHEREOF, Seller and Purchaser have executed this Amendment as of the day and year first above written.

SELLER

W. R. Grace & Co. – Conn.

By: _W B mc Sowan_

PURCHASER

Resource Recovery and Trading, LLC

By: _W. John Marzynowski_

Second Amendment
to
Sales Agreement

THIS SECOND AMENDMENT TO SALES AGREEMENT (this "Amendment") is entered into this 1ˢᵗ day of July, 2009, by and between W. R. Grace & Co. – Conn. ("Seller") and Resource Recovery and Trading, LLC ("Purchaser").

WITNESSETH:

WHEREAS, Seller and Purchaser entered into that certain purchase and sale agreement captioned "Modified Version of Atlanta Commercial Board of Realtors, Inc. Standard Commercial Sales Agreement 1998" dated March 3, 2009 (the "Original Agreement"), for the purchase and sale of that certain property containing approximately 73,062 square feet of office/warehouse space on approximately 12.54 acres of land known as 5225 Phillip Lee Drive in Atlanta, Fulton County, Georgia (the "Property"), and

WHEREAS, Seller and Purchaser amended the Original Agreement by First Amendment to Sales Agreement dated March 30, 2009 (the "First Amendment;" the Original Agreement as amended by the First Amendment hereinafter referred to as the "Agreement"); and

WHEREAS, Seller and Purchaser desire to further modify the Agreement on the terms set forth herein,

NOW THEREFORE, for and in consideration of the foregoing recitals, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Seller and Purchaser do hereby agree as follows:

1.    Section 4, Warranty of Title, is hereby modified as follows: The following sentence is inserted in Section 4 after the period at the end of the first sentence:

> The deed shall contain a deed restriction prohibiting the use of the Property, or any part thereof, for residential use, and prohibiting the use of the groundwater under the Property.

2.    Section 9, Condition of Property, is hereby modified by the following understanding: Notwithstanding anything stated in Section 9 of the Agreement to the contrary, Purchaser acknowledges that, since the date of the Agreement, some heavy rains damaged the roof, which caused leaking, which caused damage to the main electrical breaker and buss duct. Purchaser acknowledges that Seller has satisfactorily repaired the roof and the electrical breaker and buss duct and that these conditions, as they currently exist, are acceptable to Purchaser. All references in the Agreement to the condition of the Property as of the date of the Agreement shall refer to the condition of the Property as of the date of this Amendment.

- 1 -

3.    Section 13, Environmental Provisions, is hereby modified as follows: Section 13.B.1. is hereby deleted in its entirety, and the following new Section 13.B.1 is hereby inserted in its place:

Indoor Air Quality.

a.    Prior to Closing, Seller shall (a) remove all solvent based process related equipment, including mixers, blend tanks, and raw material and product piping in Building 2, which Seller may accomplish, to the extent necessary in its judgment, by removing and/or capping utilities and (b) cause a reputable environmental consultant and testing laboratory to re-test the indoor air quality within Building 2 in the manner described below. Such work shall commence within ten (10) business days of the earlier to occur of (i) receipt of notice from Purchaser that it has obtained its special use permit for the Property or (ii) August 3, 2009. Purchaser acknowledges that ATC Associates is a reputable environmental consultant and that Galson Laboratories is a reputable testing laboratory.

Seller shall promptly provide Purchaser with a copy of the results of such testing and any associated report (the "Air Quality Results"). In the event the Air Quality Results show average air concentrations greater than 320 ppbv of n-hexane, then Purchaser shall have the right, for a period of twenty (20) days after receipt of the Air Quality Results, to elect either to terminate this Agreement, in which event the Agreement shall be null and void, and all Earnest Money shall be promptly returned to Purchaser, or to waive such right of termination and proceed to Closing. In the event Purchaser fails to elect to terminate this Agreement within such twenty (20) day period, then Purchaser shall be deemed to have elected to waive such right of termination.

The indoor air testing shall be performed using the following test methodology, in a non-enclosed environment, and will include three (3) summa canisters with a test period of eight (8) hours analyzed via EPA method TO-15 for benzene, toluene, cyclo-hexane, and n-hexane. At least five (5) days prior to and during the testing period, the existing ventilation system for Building 2 will be in operation.

b.    Seller shall take all appropriate remedial action required by the United States Environmental Protection Agency or any applicable regulatory agency to address indoor air quality conditions in Building 2, to the extent such conditions arise from pre-closing subsurface environmental conditions and/or from the Revised Amended Corrective Action Plan dated March 2006 currently being implemented. If, as part of such remedial action, a regulatory agency (including USEPA Region IV) requires that indoor air criteria are met, based on then-current appropriate

- 2 -

vapor intrusion guidance, Seller shall be responsible for the costs of any associated response actions, provided that the response results from pre-closing site conditions. The provisions of this paragraph shall survive Closing (i) until Completion of CAP Work (as defined in Section 13.B.3), as documented by a letter to USEPA Region IV confirming agreement that no further action is needed to complete work pursuant to the Revised Amended Corrective Action Plan, or (ii) for a period of three (3) years, whichever is later.

4.    Section 20. A., Miscellaneous, is hereby modified as follows: The following sentence is added following the period at the end of the first sentence:

In the event the property taxes are reduced for the 2009 tax year after consummation of Closing, the amount of the reduction shall be pro-rated between Seller and Purchaser as of the date of Closing, and Purchaser shall promptly pay to Seller its pro-rata share.

5.    Section 20.D., Miscellaneous, is hereby modified as follows: The following language is deleted:

The sale of the Property shall be closed on or before the thirtieth (30th) day following the later to occur of (1) the expiration of the Inspection Period, or (2) the date on which Seller notifies Purchaser that Seller has fully and finally perfected its authorization to complete the sale contemplated by this Agreement pursuant to the "De Minimis Asset Order" (as set forth in Paragraph C of Section 21),

and the following language is inserted in its place:

The sale of the Property shall be closed on or before the thirtieth (30th) day following the last to occur of (1) the expiration of the Inspection Period, (2) the date on which Seller notifies Purchaser that Seller has fully and finally perfected its authorization to complete the sale contemplated by this Agreement pursuant to the "De Minimis Asset Order" (as set forth in Paragraph C of Section 21), or (3) the expiration of the twenty (20) day period in Section 13.B.1 of this Agreement during which Purchaser may terminate this Agreement based on the Air Quality Results,

6.    Section 21.C. is hereby modified as follows: In the last paragraph, line 5, the words "sixty (60) days of the date of this Agreement" are hereby modified to read "sixty (60) days of the date of this Amendment."

7.    Miscellaneous.

A.    Seller and Purchaser hereby ratify and confirm all of the terms and conditions of the Agreement, as amended hereby. Except as modified, amended or

- 3 -

supplemented by this Amendment, all of the terms and provisions of the Agreement shall remain in full force and effect.

   B.  This Amendment may be executed in counterparts, each of which shall constitute an original, and both of which, when taken together, shall constitute but one and the same instrument.

   C.  Each party shall be authorized to accept, and may rely upon, a facsimile transmission of this Amendment executed by the other party, and such document shall be binding upon the executing party.

   IN WITNESS WHEREOF, Seller and Purchaser have executed this Amendment as of the day and year first above written.

      SELLER
      W. R. Grace & Co. – Conn.

      By: _____

      PURCHASER
      Resource Recovery and Trading, LLC

      By: _____

B.    This Amendment may be executed in counterparts, each of which shall constitute an original, and both of which, when taken together, shall constitute but one and the same instrument.

C.    Each party shall be authorized to accept, and may rely upon, a facsimile transmission of this Amendment executed by the other party, and such document shall be binding upon the executing party.

IN WITNESS WHEREOF, Seller and Purchaser have executed this Amendment as of the day and year first above written.

SELLER
W. R. Grace & Co. – Conn.

By: _____

PURCHASER
Resource Recovery and Trading, LLC.
By: _____