# Exhibit A

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                              . Case No. 01-01139(JKF)
                                    .
W. R. GRACE & CO.,                  . 5414 USX Tower Building
                                    . Pittsburgh, PA  15222
            Debtors.                .
                                    . May 14, 2009
. . . . . . . . . . . . . . . .     . 9:04 a.m.

TRANSCRIPT OF MOTION HEARING
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtors:           Kirkland & Ellis, LLP
                           By:  DAVID BERNICK, ESQ.
                                BARBARA HARDING, ESQ.
                                JANET BAER, ESQ.
                                LISA ESAYIAN, ESQ.
                                CRAIG BRUENS, ESQ.
                                BRIAN STANSBURY, ESQ.
                           200 East Randolph Drive
                           Chicago, IL  60601

For the Debtors:           Kirkland & Ellis, LLP
                           By:  THEODORE FREEDMAN, ESQ.
                                CHRISTOPHER GRECO, ESQ.
                                DEANNA BOLL, ESQ.
                                RASHAD W. EVANS, ESQ.
                                MARC LEWINSTEIN, ESQ.
                                MAGALI LEE, ESQ.
                           Citigroup Center, 153 East 53rd St.
                           New York, NY  10022

For the Debtors:           Pachulski, Stang, Ziehl &Jones
                           By:  JAMES O'NEILL, ESQ.
                           919 North Market Street
                           17th Floor
                           Wilmington, DE  19899-8705

Audio Operator:            Cathy Younker

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

(609)586-2311 Fax No. (609) 587-3599

2

**APPEARANCES (Contd'):**

| | |
|---|---|
| For Official Committee: of Asbestos Personal Injury Claimants: | Caplin & Drysdale, Chartered<br>By:  PETER LOCKWOOD, ESQ.<br>     JEFF LIESEMER, ESQ.<br>     NATHAN FINCH. ESQ.<br>     WALTER SLOCOMBE, ESQ.<br>     BERNARD BAILOR, ESQ.<br>     JAMES WEHNER, ESQ.<br>One Thomas Circle, NW<br>Washington, D.C.  20005 |
| | Caplin & Drysdale, Chartered<br>By:  RITA TOBIN, ESQ.<br>375 Park Avenue<br>New York, NY  10152 |
| For the Unsecured Creditors' Committee: | Stroock & Stroock & Lavan<br>By:  KENNETH PASQUALE, ESQ.<br>     ARLENE KRIEGER, ESQ.<br>     LEWIS KRUGER, ESQ.<br>180 Maiden Lane<br>New York, NY  10038-4982 |
| For Official Committee of Unsecured Creditors: | Duane Morris LLP<br>By:  MICHAEL LASTOWSKI, ESQ.<br>1100 North Market Street, Ste 1200<br>Wilmington, DE  19801-1246 |
| For the Property Damage Committee: | Bilzin Sumberg Baena Price & Axelrod LLP<br>By:  MATTHEW KRAMER, ESQ.<br>     SCOTT BAENA, ESQ.<br>     JAY SAKALO, ESQ.<br>200 South Biscayne Boulevard<br>Suite 2500<br>Miami, FL  33131 |
| For the Ad Hoc Committee of Equity Sec. Holders: | Dewey & LeBoeuf, LLP<br>By:  JENNIFER WHITENER, ESQ.<br>125 West 55th Street<br>New York, NY  10019 |

**J&J COURT TRANSCRIBERS, INC.**

3

**APPEARANCES (Contd'):**

For the Future
Claimants
Representatives:

Orrick, Herrington & Sutcliffe, LLP
By:  ROGER FRANKEL, ESQ.
     RICHARD WYRON, ESQ.
Washington Harbour
3050 K Street, N.W.
Washington, D.C.  20007

For Maryland Casualty
and Zurich Intl.:

Connelly Bove Lodge & Hutz, LLP
By:  JEFFREY WISLER, ESQ.
The Nemours Building
1007 North Orange Street
Wilmington, DE  19899


Eckert Seamans Cherin & Mellott,
LLC
By:  EDWARD LONGOSZ, II, ESQ.
1747 Pennsylvania Avenue, N.W.
Suite 1200
Washington, D.C.  20006

For Sealed Air:

Skadden, Arps, Slate, Meagher &
Flom, LLP
By:  DAVID TURETSKY, ESQ.
     JAN BAKER, ESQ.
One Rodney Square
Wilmington, DE  19801

Co-Counsel to Libby
Claimants:

Cohn, Whitesell & Goldberg, LLP
By:  DANIEL C. COHN, ESQ.
     CHRISTOPHER CANDON, ESQ.
101 Arch Street
Boston, MA  02110

For the Bank Lenders:

Landis Rath & Cobb, LLP
By:  RICHARD S. COBB, ESQ.
     KERRI KING MUMFORD, ESQ.
     JAMES GREEN, JR., ESQ.
919 Market Street
Wilmington, DE  19801


Paul Weiss Rifkind Wharton
& Garrison, LLP.
By:  REBECCA ZUBATY, ESQ.
1285 Avenue of the Americas
New York, NY  10019

4

**APPEARANCES (Contd'):**

For Continental
Casualty Company:

Ford, Marrin, Esposito,
Witmeyer & Gleser, LLP
By: ELIZABETH DeCRISTOFARO, ESQ.
Wall Street Plaza, 23rd Floor
New York, NY  10005-1875

For Official Committee
of Asbestos Property
Damage Claimants:

Dies & Hile, LLP
By: MARTIN DIES, ESQ.
1601 Rio Grande, Suite 330
Austin, TX  78701

LECG
By: ELIZABETH DEVINE, ESQ.

For Various Claimant
Firms:

Stutzman, Bromberg, Esserman &
Plifka
By: DAVID J. PARSONS, ESQ.
    SANDER L. ESSERMAN, ESQ.
2323 Bryan Street
Suite 2200
Dallas, TX  75201

For Firemen's Fund:

Stevens & Lee, P.C.
By: JOHN DEMMY, ESQ.
1105 North Market Street, 7th Fl.
Wilmington, DE  19801

For Fireman's Fund:

Stevens & Lee
By: DAVID R. BEANE, ESQ.
111 North Sixth Street
P.O. Box 679
Reading, PA  19603

For Owens-Illinois:

McCarter & English
By: KATHARINE MAYER, ESQ.
Renaissance Centre, 405 N. King St.
Wilmington, DE  19801

For Asbestos Property
Damage Claimants:

Scott Law Group
By: DARRELL SCOTT, ESQ.
1001 East Main Street, Suite 500
Sevierville, TN  37864

**J&J COURT TRANSCRIBERS, INC.**

5

**APPEARANCES (Contd'):**

| | |
|---|---|
| For National Union Fire Insurance Co.: | Zeichner Ellman & Krause, LLP<br>By:  MATTHEW RUSSELL, ESQ.<br>     ROBERT GUTTMANN, ESQ.<br>     MICHAEL DAVIS, ESQ.<br>575 Lexington Avenue<br>New York, NY  10022 |
| For the Future Claimants Representatives: | Orrick, Herrington & Sutcliffe, LLP<br>By:  DEBRA FELDER, ESQ.<br>     JOSHUA CUTLER, ESQ.<br>     JONATHAN GUY, ESQ<br>Washington Harbour<br>3050 K Street, N.W.<br>Washington, D.C.  20007 For |
| For Federal Insurance Company: | Cozen O'Connor<br>By:  JACOB C. COHN, ESQ.<br>1900 Market Street<br>Philadelphia, PA  19103 |
| For Federal Insurance Company: | Cozen O'Connor<br>By:  JEFFREY WAXMAN, ESQ.<br>Chase Manhattan Centre<br>1201 North Market Street<br>Wilmington, DE  19801 |
| For Allstate Insurance: | Cuyler Burk, LLP<br>By:  ANDREW CRAIG, ESQ.<br>Parsippany Corporate Center<br>Four Century Drive<br>Parsippany, NJ  07054 |
| For W.R. Grace: | W.R. Grace<br>By: WILLIAM CORCORAN, ESQ.<br>    MARK SHELNITZ, ESQ.<br>    PAUL NORRIS, ESQ.<br>7500 Grace Drive<br>Columbia, MD  21044 |
| For State of Montana Department of Environmental Quality: | Womble Carlyle Sandridge & Rice<br>By:  FRANCIS MONACO, ESQ.<br>222 Delaware Avenue<br>Suite 1501<br>Wilmington, DE  19801 |

**J&J COURT TRANSCRIBERS, INC.**

6

**APPEARANCES (Contd'):**

| | |
|---|---|
| For State of Montana: | Christensen, Moore, Cockrell, Cummings & Axelberg, P.C. By:  DALE R. COCKRELL, ESQ. Two Medicine Building 160 Heritage Way, Suite 104 Kalispell, MT  59904 |
| For Official Committee of Asbestos Personal Injury Claimants: | Anderson Kill & Olick By:  ROBERT M. HORKOVICH, ESQ. 1251 Avenue of the Americas New York, NY  10020-1186 |
| For Official Committee ov Asbestos Personal Injury Claimants: | Campbell & Levine By:  MARK T. HURFORD, ESQ. 800 North King Street Suite 300 Wilmington, DE  19701 |
| For CNA: | Goodwin Procter, LLP By:  DANIEL GLOSBAND, ESQ. BRIAN MUKHERJEE, ESQ. Exchange Place Boston, MA  02109-2881 |
| For Grace Certain Cancer Claimants: | Montgomery, McCracken, Walker & Rhoads, LLP By:  NATALIE D. RAMSEY, ESQ. 300 Delaware Avenue, Ste. 750 Wilmington, DE  19801 |
| For David T. Austern, the Future Claimants' Representative: | Phillips, Goldman & Spence, P.A. By:  JOHN C. PHILLIPS, ESQ. 1200 North Broom Street Wilmington, DE  19806 |
| | Tre Angeli, LLC By:  JOSEPH RADECKI, ESQ. |
| For David T. Austern: | Piper Jaffray & Co. By:  JASON SOLGANICK |
| For the Property Damage Committee: | Ferry Joseph & Pearce, P.A. By:  THEODORE TACCONELLI, ESQ. 824 Market Street, Suite 19899 Wilmington, DE  19899 |

**J&J COURT TRANSCRIBERS, INC.**

**APPEARANCES (Contd'):**

| | |
|---|---|
| For Ford, Marin, Esposito, Witmeyer & Gleser: | Ford, Marrin, Esposito, Witmeyer & Gleser<br>By:  SHAYNE SPENCER, ESQ.<br>Wall Street Plaza<br>New York, NY  10005 |
| For Official Committee of Asbestos Property Damage Claimants: | Brandi Law Firm<br>By: THOMAS BRANDI, ESQ.<br>    TERENCE D. EDWARDS, ESQ.<br>44 Montgomery St., Suite 1050<br>San Francisco, CA  94104 |
| For the State of CA, Dept. of Gen. Services: | Hahn & Hessen, LLP<br>By:  CHRISTINA J. KANG, ESQ.<br>488 Madison Avenue, 14th Fl.<br>New York, NY  10022 |
| For Baron & Budd, et al.: | Hogan Firm Attorneys at Law<br>By:  DANIEL K. HOGAN, ESQ.<br>1311 Delaware Avenue<br>Wilmington, DE  19801 |
| For the PD Committee: | Speights & Runyan<br>By:  DANIEL SPEIGHTS, ESQ.<br>    ALAN RUNYAN, ESQ.<br>    MARION FAIREY, ESQ.<br>200 Jackson Avenue, East<br>Hampton, SC  29924 |
| For Anderson Memorial Hospital: | Kozyak, Tropin & Throckmorton PA<br>By:  JOHN KOZYAK, ESQ.<br>2525 Ponce de Leon, 9th Floor<br>Miami, FL |
| For Scotts Company: | Vorys, Sater, Seymour & Pease, LLP<br>By:  TIFFANY COBB, ESQ.<br>    ROBERT J. SIDMAN, ESQ.<br>52 East Gay Street<br>Columbus, OH  43216 |
| For Official Committee of Asbestos Property Claimants: | Richardson Patrick Westbrook & Brickman, P.C.<br>By:  EDWARD J. WESTBROOK, ESQ.<br>174 East Bay Street<br>Charleston, SC  29401 |

**J&J COURT TRANSCRIBERS, INC.**

**APPEARANCES (Contd'):**

For Official Committee
of Asbestos Property
Claimants:

Hamilton, Rabinovitz & Alschuler
By:  FRANCINE RABINOVITZ, ESQ.
26384 Carmel Rancho Lane, Suite 202
Carmel, CA  93923

Conway Del Genio, Gries & Co, LLC
By:  GREGORY BOYER, ESQ.

For Official Committee
of Asbestos Property
Claimants:

Lieff, Cabraser, Heinmann &
Bernstein
By:  ELIZABETH J. CABRASER, ESQ.
275 Battery Street, Suite 3000
San Francisco, CA  94111

Pryor Cashman LLP
By:  RICHARD LEVY, ESQ.
410 Park Avenue
New York, NY  10022

Riker, Danzig, Scherer, Hyland
& Perretti, LLP
By:  CURTIS PLAZA, ESQ.
One Speedwell Avenue
Morristown, NJ  07962

For W.R. Grace:

WILLIAM SPARKS, ESQ.

DAVID SIEGEL
PAUL NORRIS

For Lehman Brothers:

Lehman Brothers
By:  ANDREW CHAN

For Dow Jones
News Wires:

Dow Jones News Wires
By:  PEG BRICKLEY

For Citadel Investment
Group:

Citadel Investment Group
By:  ASHOK VASVANI

For Murray Capital
Management

Murray Capital Management, Inc.
By:  MARTI MURRAY

For ERISA:

Lowenstein Sandler PC
By:  IRA LEVEE, ESQ.
65 Livingston Avenue
Roseland, NJ  07068

**J&J COURT TRANSCRIBERS, INC.**

9

**APPEARANCES (Contd'):**

For Morgan Stanley          Katten, Muchin, Rosenman LLP
Senior Funding, Inc.:       By:  NOAH HELLER, ESQ.
                                 MERRITT PARDINI, ESQ.
                                 JEFF FRIEDMAN, ESQ.
                            575 Madison Avenue
                            New York, NY

For Her Majesty the         Office of the Attorney General
Queen in Right of           By:  JACQUELINE DAIS-VISCA, ESQ.
Canada:

For Bank of America:        Richards, Layton & Finger, P.A.
                            By:  JASON MADRON, ESQ.
                            One Rodney Square
                            920 N. King Street
                            Wilmington, DE 19899

For PD/FCR:                 ALAN RICH, ESQ.

For Loan Maker/Long Acre:   Pepper Hamilton
                            By:  DENNIS R. VERY, ESQ.
                            500 Grant Street, 50th Floor
                            Pittsburgh, PA

For Seaton Ins. Co.:        Drinker Biddle & Reath LLP
                            By:  MICHAEL F. BROWN, ESQ.
                                 WARREN PRATT, ESQ.
                            One Logan Square
                            18th & Cherry Streets
                            Philadelphia, PA  19103

For Arrowwood Indemnity     Wilson, Elser, Moskowitz, Edelman
f/k/a Royal Indemnity:      & Dicker, LLP
                            By: CARL PERNICONE, ESQ.
                            New York, NY 10019

                            Bifferato, Gentilotti, Biden
                            & Balick, LLC
                            By:  GARVAN McDANIEL, ESQ.
                            800 N. King Street
                            Wilmington, DE  19899

For Arrowwood Indemnity     O'Melveney & Meyers, LLP
f/k/a Royal Indemnity:      By:  TANCRID SCHIAVONI, ESQ.
                            Times Square Tower, 7 Times Square
                            New York, NY  10036

**J&J COURT TRANSCRIBERS, INC.**

10

**APPEARANCES (Contd'):**

For JD Capital:                    JD Capital
                                   By:  RYAN DUFFY, ESQ.
                                        TAI CURION

For the Equity Committee:          Kramer, Levin, Naftalis & Frankel,
                                   LLP
                                   By:  DOUGLAS MANNAL, ESQ.
                                        DAVID BLAVEY, ESQ.
                                   1177 Avenue of the Americas
                                   New York, NY  10036

For the Equity                     Kramer Levin Naftalis & Frankel
Committee:                         By:  GREGORY HOROWITZ, ESQ.
                                   919 Third Avenue
                                   New York, NY  10022

For the Blackstone                 The Blackstone Group
Group:                             By:  BRIAN BRESNAHAN

For the U.S. Trustee:              United States Trustee Department
                                   By:  DAVID KLAUDER, AUSA
                                   833 Chestnut Street
                                   Suite 500
                                   Philadelphia, PA  19107

For Fair Harbor Capital            Fair Harbor Capital, LLC
LLC:                               By:  FRED GLASS

For Fresenius Medical              McDermott, Will & Emery
Care Holdings, Inc.:               By:  DAVID S. ROSENBLOOM, ESQ.
                                   227 West Monroe Street
                                   Chicago, IL  60606

For Century Indemnity:             White & Williams, LLP
                                   By:  JOSEPH GIBBONS, ESQ.
                                   1800 One Liberty Place
                                   Philadelphia, PA  19103

For Loeb Partners:                 Paul Weiss Rifkind Wharton
                                   & Garrison, LLP.
                                   By:  ANDREW ROSENBERG, ESQ.
                                   1285 Avenue of the Americas
                                   New York, NY  10019

**J&J COURT TRANSCRIBERS, INC.**

**APPEARANCES (Contd'):**

| | |
|---|---|
| For Kaneb Pipe Line Operating Partnership, et al.: | Fulbright & Jaworski<br>By:  STEVE PEIRCE, ESQ.<br>300 Convent Street<br>Suite 2200<br>San Antonio, TX  78205 |
| For Bloomberg, LLP | Bloomberg, LLP<br>By:  STEVEN H. CHURCH |
| For Travelers: | Simpson, Thacher & Bartlett<br>By:  ELISA ALCABES, ESQ.<br>425 Lexington Avenue<br>New York, NY  10017 |
| For Anderson Hospital: | BUD FERRY, ESQ. |
| For Certain London Market Companies: | Mendes & Mount, LLP<br>By:  ALEXANDER MUELLER, ESQ.<br>750 Seventh Avenue<br>New York, NY  10019-6829 |
| For Certain London Market Companies: | Tucker Arensberg, P.C.<br>By:  MICHAEL A. SHINER, ESQ.<br>1500 One PPG Place<br>Pittsburgh, PA  15222 |
| For Everest Reinsurance Co. & McKinley Ins. Co.: | Marks, O'Neill, O'Brien & Courtney, P.C.<br>By:  JOHN D. MATTEY, ESQ.<br>    BRIAN KASPRZAK, ESQ.<br>913 North Market St., Suite 800<br>Wilmington, DE  19801 |
| For Everest Reinsurance Co. & McKinley Ins. Co.: | Crowell & Moring, LLP<br>By: MARK D. PLEVIN, ESQ.<br>    LESLIE A. EPLEY, ESQ.<br>    LESLIE DAVIS, ESQ.<br>1001 Pennsylvania Avenue, NW<br>Washington, DC  20004 |
| For Borrowers Committee: | Zuckerman Spaeder LLP<br>By:  VIRGINIA GULDI, ESQ.<br>1800 M. Street, N.W. Suite 1000<br>Washington, D.C.  20036 |

**J&J COURT TRANSCRIBERS, INC.**

**APPEARANCES (Contd'):**

For SNSF Railway Co:

    Pepper Hamilton, LLP
    By:  LINDA CASEY, ESQ.
    3000 Two Logan Square
    18th & Arch Streets
    Philadelphia, PA  19103

For Fee Auditor:

    Warren H. Smith & Associates PC
    By:  WARREN H. SMITH

For Hartford Financial
Service Group:

    Wilmer, Cutler, Pickering, Hale
    & Dorr LLP
    By:  MELANIE DRITZ, ESQ.
    399 Park Avenue
    New York, NY  10022

For Serengeti:

    Vinson & Elkins, LLP
    By:  ARI BERMAN, ESQ.
    Trammell Crow Center
    2001 Ross Avenue, Suite 3700
    Dallas, TX  75201

**J&J COURT TRANSCRIBERS, INC.**

1    MS. YOUNKER:  Parties on the phone and in the

2  courtroom, please identify yourself when you speak so everyone

3  everywhere knows who is speaking.

4    COURT CLERK:  All rise.

5    THE COURT:  Please be seated.  This is the matter of

6  W.R. Grace, Bankruptcy Number 01-1139.  The participants I have

7  listed by phone are Elisa Alcabes, Scott Baena, Janet Baer, Ari

8  Berman, David Bernick, David Blavey, Jeffrey Berger, Peg

9  Brickley, Michael Brown, Christopher Candon, Tiffany Cobb,

10  Jacob Cohn, Andrew Craig, Elizabeth DeCristofaro, John Demmy,

11  Martin Dies, Melanie Dritz, Lisa Esayian, Nathan Finch,

12  MaryBeth Forshaw, Roger Frankel, Theodore Freedman, James

13  Green, Jonathan Guy, Barbara Harding, Robert Horkovich, Gregory

14  Horowitz, Mark Hurford, John Kozyak, Matthew Kramer, Arlene

15  Krieger, Lewis Kruger, Michael Lastowski, Magali Lee, Jeffrey

16  Liesemer, Kevin Mangan, Garvan McDaniel, Alex Mueller, Brian

17  Mukherjee, Kerri Mumford, Marti Murray, James O'Neill, David

18  Parsons, Carl Pernicone, Margaret Phillips, John Phillips,

19  Joseph Radecki, Natalie Ramsey, Alan Rich, Andrew Rosenberg,

20  Alan Runyan, Jay Sakalo, Tancrid Schiavoni, Darrell Scott, Mark

21  Shelnitz, Marnie Simon, Walter Slocombe, Jason Solganick,

22  William Sparks, Daniel Speights, Shayne Spencer, Theodore

23  Tacconelli, David Turetsky, James Wehner, Jennifer Whitener,

24  Richard Wyron and Bernard Bailor.

25    And I'll take entries in court, please.  Good

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  All right.

2          MR. COHN:  Thank you, Your Honor.

3          THE COURT:  That's fine.  Okay, what's next?

4          MS. HARDING:  Your Honor, agenda item Number 2 is Mr.

5   Schiavoni's motion with respect to the Whitehouse discovery.

6          MR. SCHIAVONI:  Your Honor, this motion deals with

7   the expert report that was submitted by Dr. Whitehouse, who you

8   heard some reference to in connection with the last argument.

9   I think the basic facts that support the motion are relatively

10  simple and they all flow from the case management schedule that

11  the Court set from Rule 26 and Rule, I think 36, if my rule is

12  right.

13          THE COURT:  I'm sorry, I'm having trouble hearing you

14  Mr. Schiavoni.  Cathy, can you turn that microphone up?

15          MR. SCHIAVONI:  Oh.

16          THE COURT:  No, it doesn't move.  It has to be

17  controlled from here.  We had someone who had spoke very

18  vociferously yesterday, so it was probably turned down a little

19  bit.  Okay, thank you.

20          MR. SCHIAVONI:  Judge, the very basic facts in

21  connection with this motion is, Your Honor set a case

22  management order in December, it was modified slightly in

23  January.  There was a lot of debate in December about how much

24  time should be devoted to things and whether we all consider

25  this a short amount of time or not, there was an effort to sort

81

1  of logically layout the schedule going forward with each step

2  being tied closely to the intent of the next step.  So that we

3  had as a first step a deadline to serve written discovery, then

4  what flowed from that was, we had -- and that was January 23rd,

5  it was a deadline 30 days afterwards to actually produce

6  documents in connection with that.  Then there was a deadline

7  for doing expert -- for submitting expert reports, that was

8  March 16th, and then a deadline for rebuttal reports.

9        In connection with this issue about Dr. Whitehouse,

10  what happened here was, the written discovery was served on the

11  Libby claimants on January 23rd or before, they provided a

12  response 30 or so days after that.  The minute we got the

13  response we looked at it and we said, well, gee, they're

14  indicating they have all types of materials that they're going

15  to offer at the confirmation hearing and that support,

16  allegedly support, their case and Dr. Whitehouse, but they

17  haven't produced any of them to us.

18        So, we wrote letters immediately, we wrote them on

19  March 10, and we said, look, we'd like everything that's

20  attached.  We got a response back from the Libby claimants,

21  Chris Candon on the 11th, saying they weren't going to give

22  them to us, they engaged in a sort of lengthy exchange about

23  how they wanted to redact all of the documents to mask who the

24  people were that are their clients on the documents.  A

25  protracted exchange went on in connection with that.

**J&J COURT TRANSCRIBERS, INC.**

1      When the time came, then, for expert reports -- and

2  by the way they didn't seek a protective order as they should

3  have when there was a dispute -- when the time then came for

4  expert reports to be submitted on March 16th, we received,

5  among others, the report of Dr. Whitehouse.  The case

6  management order required that when the reports were tendered,

7  that the parties provide all the documents supporting the

8  report, that support the opinions in the report and, of course,

9  Rule 26 also contains the same exact requirement.  It requires

10  that when an expert report is tendered, that all of the

11  materials that support the opinion or provide grounds for the

12  opinion are tendered.

13      We got the report, we didn't get any of the

14  supporting materials, we didn't get the database, we didn't get

15  copies of any of the medical records.  We wrote the very next

16  day, we said, we got to have this stuff, we didn't get it.

17      The Libby claimants then went ahead with the

18  deposition of their expert, they produced him not on the east

19  coast, but they produced him in Spokane, Washington for

20  deposition.  I flew out there. I will tell you, Your Honor, I

21  travel all the time, Spokane is one of the most difficult

22  places in the Continental United States to get to.  It's a full

23  day there, it's a full day back.  We went out there.  Mr.

24  Stansbury was there, also.  He made requests in advance of this

25  deposition for materials, as well as I did, as is reflected in

1 the debtors' papers.  We got out there, the witness at the

2 deposition confirmed that yes, in fact, he had a database, it's

3 in his testimony.  He also testified about documents that

4 supported his report that were not produced to us.

5        The deposition was unlike professional depositions

6 I've been to.  Halfway through it, about four hours into it,

7 Dr. Whitehouse stood up, said he had had enough and he left.

8 So, there I was in Spokane, after lunch, with no good place to

9 eat dinner and no good options and when I asked the cab driver

10 on the way back to the hotel, should I stay, or -- he said, no,

11 get the first plane to Seattle.  I did, it took me the next 24

12 hours to get back.

13        We then pursued afterwards, please, could we have

14 these documents, we didn't get them.  The next date ran April

15 6th for the submission of rebuttal reports.  No documents

16 produced.

17        We then have since run forward, we ended up, you

18 know, not getting any resolution with this, no protective order

19 being sought by the Libby claimants.  We finally moved, it was

20 only after we filed this motion, after the date for rebuttal

21 expert reports had run, that the Libby claimants started to

22 produce documents.  We got documents the week of May 1st.  We

23 got dumped on us a huge number of documents which I think

24 demonstrate that there was, in fact, a large number of

25 documents required to be produced in connection with this

1  expert report that were not produced.  They weren't produced

2  timely.  We've been prejudiced not just in our inability to

3  have effectively cross examined Dr. Whitehouse, when he was

4  produced in Spokane, but in addition to that, by the fact that

5  the deadline for rebuttal reports had passed.  One might say,

6  well, we could, you know, set a new deadline but, you know,

7  this schedule is so tight that we're dealing with, this does

8  not really lend itself to this sort of situation, of sort of

9  well, let's sort of start everything over, all over again.

10          In addition to that, Your Honor, I say that the

11  production itself that we've gotten is still not complete, and

12  the most troubling thing about the production is the lack, at

13  this point, of the production of any kind of database for this

14  expert.  He is not going to offer testimony, as I understand,

15  just about, you know, Joe -- individual Joe Smith's claim, he

16  is going offer testimony as described in the papers that were

17  submitted in opposition to this motion, that is an

18  epidemiological study in nature.  The quote I have from his

19  report is, "Dr. Whitehouse study fits the definition of

20  epidemiology in that it tracked a patient population over time

21  and applied statistics to it.  It was a study of the

22  distribution and determinants of health-related states or

23  events in specified populations."  That's how they describe in

24  their opposition papers what Dr. Whitehouse did.

25          But, what they produced at this point, belatedly,

85

1 after the fact, are just actual -- just individual medical

2 records.  There's no production of any database that sets out

3 the tracking of patient populations over time with the

4 application of statistics.

5      Your Honor has heard testimony, I think, in a number

6 of cases from estimation experts like Dr. Peterson, it would be

7 as if Mr. Peterson showed up at trial having just produced the

8 individual claim records but no database showing that, you

9 know, how he had compared these.  We're dealing here with over

10 900 claimants that he's purporting to offer opinions on.

11 That's the population.  And he's supposedly applying statistics

12 to the population to draw conclusions from.  It is, I offer,

13 impossible to keep in your mind all of the 900 people, the

14 progression of their individual diseases, and then draw

15 opinions from it.  The man has to have a database.

16      And in fact when we looked at his report it says on

17 Paragraph 5 of his report for the estimation hearing -- this

18 was just submitted on September 25, 2006 -- and I'm quoting

19 from the report, "Since 1980 I have evaluated or treated over

20 700 patients for asbestos disease from Libby asbestos.  Since

21 about 2000 patient data has been tracked on a database."

22 That's what we would expect from someone who's offering

23 testimony as an epidemiological expert.  That database has not

24 been produced to this day.  We received as part of this

25 exchange the -- a proffer of like six pages of sort of printed

1 material and we were told this is the database.  It can't be

2 the database.

3         We then later got an email from Mr. Heberling who's

4 one of the Libby plaintiff's lawyer who said something -- the

5 email suggests that somehow Dr. Whitehouse may have lost the

6 database, it was corrupted or something, and is now gone.  And

7 then he goes on in the email to say well, he had a copy, too,

8 on his computer, but as luck would have it his was corrupted

9 too, or something.  It's gone.  Whether the database was

10 destroyed, corrupted or doesn't exist there's a very, very core

11 problem here because if this fellow doesn't have a database I

12 think it really shows what Judge Molloy said, he can't testify

13 as an expert just based on, look, I've seen a lot of patients

14 and here's sort of my gut feeling about how the statistics

15 apply over 900 people.  You either have to have to have the

16 database or you're not -- you can't offer expert testimony in

17 this field.

18         So, Judge, what this -- when I -- I sort of said the

19 facts were sort of simple.  Those are the facts.  The law that

20 applies to these facts are Rule 26, it's a mandatory disclosure

21 rule that says that an expert must disclose all of his reliance

22 materials when he produces his report.  In the case management

23 order Paragraph 4 of the order which everyone got, everyone

24 knew about in September and I quoted, said, "Simultaneously

25 with the service of the expert report, the party shall also

87

1  serve other interested parties with all documents on which the

2  expert relies in forming his or her opinions which are not

3  publicly available.  And the rule that applies to noncompliance

4  with those two -- with Rule 26 and with the case management

5  order is Rule 37(c)(1) which requires a Court to exclude

6  opinions of experts where they fail to comply with their

7  production obligations.  There's authority in the circuit that

8  completely supports the notion that these are mandatory rules,

9  that if you don't apply to them the expert should be struck.

10       The leading Third Circuit case in this is cited in

11  both the debtors' papers and ours.  Its U.S. v. 68.94 Acres of

12  Land.  It's at 918 F.2d 389 and it's a 1990 Third Circuit

13  decision.  And there's a series of decisions that go along as

14  Johnson v. Vanguard and Higgins v. Huey.  Those are all Third

15  Circuit decisions that uphold trial courts in excluding expert

16  testimony where there has not been compliance with Rule 26.

17  The nature of the review for striking an opinion when there has

18  been noncompliance is de novo review.  It's not abuse of

19  discretion because this is a mandatory rule.

20       We can go forward on allowing Mr. Whitehouse to go

21  forward.  If the Whitehouse report isn't struck it's going to

22  cause some chaos with the schedule because of how these

23  documents have not been produced, the fact that we still don't

24  have the database.  We would ask if the Court is so inclined

25  not to strike Dr. Whitehouse, for us to first just simply have

**J&J COURT TRANSCRIBERS, INC.**

1  an evidentiary hearing on whether or not he's -- what he's done

2  with the database and where we can get it, because we're not

3  going to really be able to effectively cross examine him

4  without it.  And if it was destroyed, under what circumstances

5  it was destroyed, because we think that would bear directly on

6  whether he should ultimately testify.

7         But I think ultimately here the much better course is

8  to deal with this on this flat out, noncompliance issue,

9  otherwise we're going to be going forward both with an extended

10 schedule dealing with this issue and hearing, and you know,

11 Grace has now designated almost an army of experts to basically

12 confirm what Judge Molloy has confirmed about the nature of how

13 this work is put together.  So for all those reasons, Judge,

14 we'd ask that you strike Dr. Whitehouse's expert report.

15         THE COURT:  Ms. Harding.

16         MS. HARDING:  Thank you, Your Honor.  The issue that

17 I think that the -- that we think that the Court needs to

18 address today and that's important, is the -- what the sanction

19 in effect should be for the noncompliance of the Libby

20 claimants with respect to the reliance materials associated

21 with Dr. Whitehouse's report.  Under no circumstances should

22 the Libby claimants or Dr. Whitehouse's noncompliance with

23 their obligations with respect to their expert reports be

24 permitted to impact the schedule that we've all worked so hard

25 to make sure that we maintain.

1          So I think that the question is what do we do about

2    the noncompliance?  And first, Your Honor, I want to just make

3    sure that the Court understands a little bit more precisely

4    what it is that Dr. Whitehouse has done or not done with

5    respect to his reliance materials.  And I put a time line up on

6    the easel so Your Honor can see.  But essentially --

7          UNIDENTIFIED ATTORNEY:  May I please have a copy?

8          THE COURT:  Me, too?

9          MS. HARDING:  Yes.

10          THE COURT:  Thank you.

11          MS. HARDING:  On December 29th -- the Libby claimants

12    submitted Dr. Whitehouse's report, and there were numerous

13    reliance materials not provided with that expert report.  And

14    as Mr. Schiavoni just explained over the course of the next

15    several months, and only in response to the debtors' attempt to

16    finally raise this -- Mr. Schiavoni's attempt to raise this

17    with the Court and the debtors contacting the Court to say we

18    needed probably some kind of an expedited hearing on this, did

19    we start to get actual -- some of the documents that were

20    supportive of Dr. Whitehouse's expert report.  So without going

21    into the history of kind of what's been produced to date, the

22    bottom line is that with respect to a very large portion of the

23    underlying medical records that Dr. Whitehouse relies upon, the

24    Libby claimants to date not only have not produced them, but

25    essentially are saying they cannot produce them in a format

1 that could be usable and relevant to the debtors or anybody

2 else that tries to evaluate his opinions.

3       THE COURT:  Well, then how can he testify?

4       MS. HARDING:  That is my point, Your Honor.  The

5 bottom line is that if the expert doesn't provide the

6 foundation for his expert opinion, then he simply can't provide

7 the opinion to the Court.  And there's no ifs, ands, or buts

8 about it.  There's no way around it.  If he doesn't present and

9 provide the underlying foundation for the opinion he can't

10 present the testimony.  And so it has nothing to do with the

11 record -- with the schedule or anything else.  But he hasn't

12 produced the foundation, and he can't present the opinions.  So

13 I think that -- and as I understand it, it's even -- some

14 extent it's even worse than that, it's that -- it's not the

15 Libby claimants -- well, I'll say this, Dr. Whitehouse is the

16 person that is relying upon these documents, and apparently

17 half, I don't know the exact number, but a large number of

18 them, six, seven, 800 of these patients are not clients of Mr.

19 Heberling apparently.

20       But they are patients of Dr. Whitehouse's and he has

21 purported to rely on their records in forming an opinion that

22 he submitted to this case, to this Court.  And so it is

23 essentially Dr. Whitehouse's reliance materials that are at

24 issue.  It's not an issue with respect to whether they're

25 clients or not of Mr. Heberling.  They are Dr. Whitehouse's

1  reliance materials.  And that's the part of this, Your Honor,

2  that we wanted the Court to focus on, because I don't think

3  that there's anyway for the Libby claimants to fix that at this

4  point.  It is way too late for that, and it should have been

5  resolved before they submitted a report that relied upon all of

6  these documents.  They should have had something in place that

7  would -- that gave them permission -- that gave Dr. Whitehouse

8  permission to use them, gave them permission to produce them to

9  us, and, you know, had something in place that they could have

10  given them to us.  So I think that it's -- at this point in

11  time, Your Honor, the issue is the foundation for his opinions,

12  he hasn't produced the records, and the opinions that are

13  relying upon those records cannot be offered in this case.

14         MR. FINCH:  Your Honor, the ACC will -- joins in the

15  debtors' motion to the extent that it is based on the failure

16  to produce reliance materials.  I'll reserve the balance of my

17  comments for after Mr. Cohn addresses the Court.

18         MR. GUY:  Your Honor, Jonathan Guy for the FCR.  May

19  I be heard very quickly?

20         THE COURT:  Yes, sir.

21         MR. GUY:  We also join.  I don't think the issue here

22  is whether the opinion is admissible because of whether or not

23  Dr. Whitehouse is an expert in epidemiology.  It's really a

24  question as to whether he produced the reliance material.  He

25  didn't and the parties were not allowed to question him fully

92

1 at his deposition.  He terminated it as is shown in the

2 debtors' papers.  And we join in asking that his will be

3 stricken.  Thank you, Your Honor.

4        THE COURT:  Okay, one second, please.  Okay, Mr.

5 Wisler.

6        MR. WISLER:  Good morning, Your Honor, Jeffrey Wisler

7 on behalf of Maryland Casualty Company.  Your Honor, we join

8 the motion to strike, but we don't have anything to add to what

9 counsel has already argued at this point.

10        THE COURT:  All right.  Thank you.  Ms. DeCristofaro.

11        MS. DeCRISTOFARO:  Yes.  Good morning, Your Honor.  I

12 would only like to amplify as an illustration of the real

13 problem that this is, that Mr. Schiavoni was addressing, that

14 almost every time that Mr. Cohn has submitted a motion to Your

15 Honor, he has attached a different report by Dr. Whitehouse.

16 And if you put those side by side and try to figure out the

17 subsets, the numbers, if Your Honor had nothing to do and

18 wanted to do that you would understand what the problem is

19 about not having the database, about whether they're Mr.

20 Heberling's clients, and there are other people that Dr.

21 Whitehouse saw, and what do we do about the people that Dr.

22 Whitehouse saw who are not parties?  It's all very, very

23 convoluted and a mess.

24        And every time Mr. Cohn made a motion to Your Honor

25 there would be another Dr. Whitehouse report.  It might have

1  been predated two years ago, it may not have been.  But you try

2  to reconcile all of those and it's impossible.  And that's why

3  the whole business of not having claimant names or

4  identification or not having a database all makes this fatally

5  defective and a complete mess.  And we join in the other

6  arguments, Your Honor.

7          THE COURT:  Anyone else on the objecting side?  Mr.

8  Cohn.

9          MR. COHN:  Your Honor, may I please have a ten minute

10  recess?

11          THE COURT:  Sure.  We'll take a recess for ten

12  minutes.

13          MR. COHN:  Thank you, Your Honor.

14                    (Recess)

15          THE COURT:  Please be seated.  Mr. Cohn.

16          MR. COHN:  Thank you, Your Honor.  Let's start off

17  with where we are in the process, Your Honor.  As you've heard

18  there was a deposition of Dr. Whitehouse in Spokane and I do

19  sympathize with Mr. Schiavoni's travel woes.  We've all had to

20  travel extensively for these depositions.  I'm going to be

21  going to California next month because there's a deponent who

22  has important family reasons why he can't be far from home.

23  And these are just accommodations that all of us have to make.

24          And in the case of Dr. Whitehouse, you might recall

25  that when we were here a few hearings ago there was discussion

94

1  of a need to depose him twice and you said that indeed that

2  would be done.  And that has always been the agreement among --

3  since that ruling has been the agreement among the parties that

4  there would be a certain number of hours for the deposition,

5  that it would be divided between two different times.  And so I

6  really regard it as a distraction the fact that Dr. Whitehouse

7  was ill the day of the first deposition.  People had been told

8  that beforehand.  In fact, the deposition had been moved up to

9  an earlier start time because of his illness.  And when it just

10 reached a point where he couldn't continue, he said so, and

11 that was the end of the deposition for that day.  But there

12 will be an opportunity to -- it was always contemplated to be

13 an opportunity for that deposition to continue.  So the issue

14 that we should be focusing on, I would respectfully suggest, is

15 the production of materials that has been the subject of the

16 great focus of the argument that you've heard.

17        Now, Mr. Schiavoni said, you know, where's the

18 database?  And the references that he was making to things

19 being corrupted and disappearing from people's computers and so

20 on, are really quite misleading.  They do not relate to

21 anything that Dr. Whitehouse relied upon.  It was a database,

22 the so-called 550 database which for a while he was trying to

23 build, and did rely upon for purposes of an earlier report, but

24 it proved impossible for that database to be maintained.  And

25 it is not something that he is relying upon for his report

1  concerning plan confirmation.  It is not a reliance material,

2  it is not required to be produced in that regard.

3         When Mr. Schiavoni started making noise about it, we

4  produced it in the best form that we had it, just, you know, so

5  that we could say that we had produced everything that there

6  was.  But it is not a reliance material, it is not something

7  that was required to have been produced, and we produced it

8  really just in order to see whether we could, you know, nip any

9  issue there in the bud.

10        When you look at his motion, and you know, as

11 distinct from what he's argued today, that's what he complains

12 about.  He complains about the lack of the 550 database.  The

13 second thing that he complains about is the -- is a law firm

14 database that he thought he should have access to.  Again, Dr.

15 Whitehouse did not rely upon any law firm database per se.  Dr.

16 Whitehouse did -- there are data on claimants that are in --

17 similar to a law firm -- a law firm database.  All that data

18 has been supplied in connection with his report.

19        And there are other databases that were supplied with

20 his report.  There is a database for his -- the so-called CARD

21 -- CARD by the way, Your Honor, is Center for Asbestos

22 Respiratory Disease in a clinic out of Libby, Montana.  There

23 was a CARD mortality study.  There was database in connection

24 with that which was delivered as Exhibit 7 to his report.  He

25 did a study of mesothelioma cases in Libby.  And that's the so-

1 called Whitehouse 2008 report.  That database was delivered.

2 That's Exhibit 9.  And there's a database for his -- the

3 so-called Whitehouse 2004 study.  And that database was

4 delivered.  Mr. Schiavoni is well aware of all of that.

5         And then the third thing that is complained about in

6 his papers and in Grace's, is the subject of medical records.

7 And that's a serious topic and that's one that we need to --

8 that we do need to address.  We do not regard medical records,

9 per se, as reliance materials.  And apparently none of the

10 experts do.  If you look at, for example, the report of Daniel

11 Henry, who's a Grace expert, when he talks about, you know, how

12 -- let me step back for a second.  When you think about medical

13 experts, Your Honor, how do they acquire their expertise?

14 Well, a lot of it comes from looking at medical record after

15 medical record after medical record.  And so, for example, Mr.

16 Henry says -- Dr. Henry, I'm sorry, says, "By conservative

17 estimate I have interpreted thousands of chests CTs and

18 hundreds of thousands of chests radiographs over my 32 year

19 career as a chest radiologist.  I have interpreted close to

20 2000 chest CTs for pulmonary embolism alone each including HRCT

21 studies of the lungs."  That's where his expertise comes from.

22         Similarly, you have Gail Stockman, MD that's an

23 expert designated by the ACC who says, "During my practice of

24 medicine in Longview, Texas I diagnosed and cared for patients

25 with asbestosis, lung cancer, and malignant mesothelioma in

**J&J COURT TRANSCRIBERS, INC.**

1 addition to chest injuries, chronic obstructive pulmonary

2 disease, asthma, et cetera.  In addition, I saw large volumes

3 of patients for independent medical evaluations between about

4 1995 and 2005.  Most of these patients had been exposed to

5 asbestos or silica or both."  That's where that doctor's

6 expertise comes from.

7           Where Dr. Whitehouse's expertise comes from is, he

8 has reviewed, I won't say thousands, because the number appears

9 to be about 1800, but about 1800 medical records of Libby

10 asbestos disease victims.  He also has examined perhaps 500

11 records of other patients he's treated with non-Libby asbestos

12 disease.  People who are exposed to chrysotile asbestos which

13 is the less harmful form.  That's where his expertise comes

14 from.

15           Now none of these other experts have produced those

16 medical records that made them into experts.  That were the --

17 that's really the source of their expertise, and those are not

18 reliance materials, per se.  The reliance materials are only

19 the specific things that an expert relies upon in producing a

20 specific report on a specific topic.  Now, there is the issue

21 --

22           THE COURT:  But isn't the difference that what I

23 thought, and maybe I'm just getting this from the pleadings not

24 from his reports, but what I thought the issue was is that he

25 is allegedly going to testify that there is something different

1   about Libby asbestos disease than everybody else's asbestos

2   disease.  And if that is the case and he's basing that on the

3   fact that he's studied the medical history of the Libby

4   asbestos plaintiffs and there is something different in those

5   medical records than there is from everybody else's medical

6   records, that's why the medical records are significant because

7   everybody else's expertise comes from looking at the volume of

8   medical records, but they're not saying Patient A's medical

9   record is significantly different from Patient B's.  And so

10  therefore there's a different -- not a different disease -- as

11  I understood it Dr. Whitehouse is essentially being called to

12  say that there is something -- these are my words, not his --

13  more carcinogenic about Libby asbestos than other asbestos.

14  And the only way you can get to that is to look at the data

15  that he looked at and have somebody else's expert evaluate that

16  data.

17          MR. COHN:  I understand, Your Honor.  I'm just saying

18  -- I'm saying though that to ask him to -- that to produce what

19  amounts to his entire career's worth of medical records is not

20  necessarily -- well, first of all it's not -- in most expert's

21  cases it wouldn't be practical because the records are all over

22  the place.  But there's also a legal problem, a severe legal

23  problem which has to do with the privacy laws protecting

24  patients.  Now, as it happens, Your Honor, in his case, when

25  you talk about the 1800, approximately, cases of Libby asbestos

1  disease where he's looked at medical records, about half of

2  those people are Libby claimants in the sense that they're

3  represented here today.  And that takes away the -- that takes

4  away the issue of -- that takes away the legal bar to

5  disclosure, because the privacy statutes do not protect a

6  plaintiff who places his own medical condition at issue.

7          And there were requests for production of documents

8  that were put out there.  And in response to those we have now

9  produced medical records for the Libby claimants.  And so --

10 now, we can talk about -- there's been a lot of discussion

11 about the timeliness of it, and while I don't like in general

12 to pursue the sort of, who shot John, kinds of exercises in

13 court, in this case, to the extent that we're being challenged

14 on the timeliness of it, I think it's important for you to

15 understand the history of the confidentiality order process.

16         THE COURT:  Okay, but what about the other 900 first?

17         MR. COHN:  Well, the other -- the problem with the

18 other 900 is that we have no way legally to produce those.

19 They are not our clients.

20         THE COURT:  But then he can't rely on the opinion

21 based on the fact that he's examined that data and says that

22 those records fall within the same population, and based on

23 this large population which is virtually everybody in Libby

24 with some form of this particular type of disease, they have a

25 different disease than everybody else who has a similar disease

1  not based on living in Libby.

2          MR. COHN:  Well, Your Honor, first of all 900

3  patients, which is the population of the Libby claimant, in

4  other words, our client database, that's a huge amount of data

5  for one of these studies.  Most medical studies are not going

6  to be based on anything nearly like that.  And all of the

7  phenomenon that Dr. Whitehouse says are associated with

8  asbestos disease in Libby, manifest themselves in the clients

9  and therefore are present in the client medical records which

10 have been produced.

11         THE COURT:  But Mr. Cohen --

12         MR. COHEN:  So why people need the other records is,

13 you know --

14         THE COURT:  Because it's a self-selecting database.

15 I mean, the problem is that from an epidemiological study you

16 draft things from a scientific methodology.  You don't back

17 into it picking the database first in a self-selected form.

18 You do it from a scientific methodology where you set the

19 hypothesis in a -- it doesn't necessarily, I guess, have to be

20 a blind study, although that would certainly be better.  This

21 is clearly not a blind study.  This is self-selecting the

22 population and then figuring out with the criteria that you've

23 set, whether that population fits.  And then saying that, and

24 oh, by the way, none of the rest of the world fits this.  But

25 you haven't examined the rest of the world.  So you have to

1  produce the database.

2          MR. COHN:  Well, Your Honor, we're not -- I first

3  need to make it clear that we have no objection, per se, to

4  producing it if we could produce it.  If we could produce it

5  then we would.  The problem that we have -- and by the way,

6  this was briefed back in the estimation proceeding at Docket

7  Number 12065.  There's an extensive discussion of the privacy

8  statute that we have to deal with in Montana as well as the

9  Federal HIPAA statute.  But the Montana statute actually has

10  its own requirements.  And essentially those requirements would

11  necessitate notifying each of the patients who are not clients

12  so therefore we can't speak for them to permit their medical

13  records to be disclosed.  And that's, you know, that, as a

14  practical matter, Your Honor, that cannot be done, and no other

15  expert is being asked to do that.

16          THE COURT:  Because no other expert is opining that

17  the database that they've used is somehow exclusive or

18  inclusive of a particular subset of claims.  That's the

19  problem.  He's --

20          MR. COHN:  Well, this is what -- I'm sorry, Your

21  Honor, he is an expert -- he is an expert in asbestos disease

22  and in particular in Libby asbestos disease.

23          THE COURT:  But there's the assumption, and that's

24  the problem.  You're making an assumption that there is Libby

25  asbestos disease.  I don't know that there's Libby asbestos

1  disease as opposed to the rest of the world asbestos disease.

2  And he's apparently the person who's going to tell me that.  In

3  order for me to evaluate his opinion I need to know what he

4  relied on.  And the reliance is going, at large part it appears

5  to be based on the medical records that he evaluated -- these

6  are all his patients, first of all, so he's the one apparently

7  who made the diagnosis, now he's doing the study, as I

8  understand it.

9        MR. COHN:  Yes.

10        THE COURT:  If I'm wrong -- okay.  So he's doing the

11  study.  And then he's applying some criteria, which I don't

12  know about yet, to determine whether there is such a thing as

13  Libby asbestos disease.  Well, I can't evaluate that until I

14  know what it is that he's basing this opinion on.  And if he's

15  being called as an expert he knows he has to disclose the

16  underlying data.  He should have taken care of that issue

17  before he relied on it.  I mean --

18        MR. COHN:  Well, Your Honor, in light of the

19  statutory bar I'm not sure that we have a solution.  Possibly

20  the data could be produced in redacted form.  That is to say --

21  and let me back up for a second.  What we've talked about in

22  terms of a protective order regarding Libby claimant medical

23  data is that in testimony, or that which will go into the

24  record, they will be identified by number rather than name in

25  order to protect their privacy.

1          THE COURT:  Correct.  That's fine.

2          MR. COHN:  Right.  However, those -- the medical

3  records are being produced and have been produced in their raw

4  form, if you will, with the personal identifying information --

5          THE COURT:  Confidentiality stipulation.

6          MR. COHEN:  -- on them.  Yes.

7          THE COURT:  Yes.

8          MR. COHN:  The problem with the non-Libby medical

9  data is that apart from going through this very cumbersome

10  procedure which probably -- where we probably wouldn't succeed

11  in getting the patient's permission or at least, you know, any

12  kind of unanimity of patient permission, then there's no way to

13  do it -- there's no way to produce this in nonredacted form

14  because then it's personally identified medical information

15  which is just forbidden by law from being disclosed.  And there

16  are huge fines for this, Your Honor.  This is not, you know,

17  this is serious stuff.  And so --

18          THE COURT:  Which is one reason why you don't usually

19  have the treating physician be the epidemiologist.

20          MR. COHN:  Your Honor --

21          THE COURT:  But that's the choice.

22          MR. COHN:  Right.  Well, it's not -- you know, you

23  could say it's a choice, Your Honor.  This happens -- this is

24  the situation that we have in Libby.  And we are not -- we

25  don't have the resources of, you know, a multi-million dollar

1 corporation.  We don't have the resources of these insurance

2 companies to go out and just hire experts at the drop of a hat.

3 What we have is the person who's treated them and who has

4 published peer reviewed work on the subject of Libby disease in

5 -- I'm sorry, asbestos disease in Libby.  This is what we have.

6 This is the reality, Your Honor.  And if the fact that that's

7 all that we have, and I would respectfully suggest that in some

8 ways what we have should be more persuasive than the kind of

9 standard medical expert reports that you're familiar with, but

10 if that's to prevent us from -- and it's going to relegate --

11 if that's to relegate the Libby claimants to a position where

12 they're discriminated against under the trust distribution

13 procedures because the one way by which we would prove the

14 nature of that discrimination is going to be barred to us, then

15 you've really left us in a position where --

16        THE COURT:  I haven't left you anywhere, Mr. Cohn.

17 The Libby claimants have chosen to proceed in this fashion.

18 They don't need the medical -- their treating physician to be

19 their epidemiological expert.  If they do choose to do that, I

20 didn't make the rules either.  I live by them just like

21 everybody else does.  They're binding on the Court like they're

22 binding on everybody else.  This Court hasn't put any party in

23 any position.  The parties have chosen the positions that

24 they've picked, and the rules are binding on the parties.  So

25 the rules say that you have to disclose the databases.  Now, he

1   asked -- or the underlying documents on which you've relied.

2          If he's relied on this information to come up with

3   the theory, and again, I'm only going from the pleadings.  So

4   if I'm incorrect about the theory then stop me, because this is

5   what I understand this issue to be about.  If he is going to

6   opine that there is something special about Libby asbestos

7   disease that separates it from the rest of the asbestos claims

8   that are likely to come through this trust distribution

9   process, and the reason he's gotten to that opinion is because

10  he's looked at this population of the 1800 -- whatever the

11  number is -- 1800 claims and in that population he's identified

12  whatever these factors are, then that population database has

13  to be disclosed so that other people can take a look at it.

14         They may agree with it at the end of the day.  They

15  may disagree with it, but they have the opportunity to assess

16  how Dr. Whitehouse came to his conclusion as an expert using

17  that database.  That's the point, they've got the right to do

18  it.  Just like if you want to see what they relied on you've

19  got the right to ask for it.  And they've got to disclose it.

20         MR. COHN:  Well, apparently not, because their

21  experts are not disclosing any medical records whatsoever.

22         THE COURT:  If they've reviewed medical records and

23  relied on medical records performing their opinions in these

24  cases and you want them they have to disclose them.

25         MR. COHN:  Well --

1          THE COURT:  What's good for the goose is good for the

2   gander.  They've relied on them and you want them, you get

3   them.

4          MR. COHN:  Well, Your Honor, the distinction that I'm

5   offering to you, and you know, I understand that you see some

6   difficulties with it, but we have offered the underlying

7   databases for the studies that he has done, but it is

8   inevitably the fact that in rendering his expert opinion he is

9   relying upon his entire career's worth of examination of

10  medical records and that includes these non-patient -- sorry,

11  non-claimant records.

12         THE COURT:  Well, I thought -- I'm sorry, maybe I am

13  missing something.  I thought that the database that had been

14  provided which you've described as the 550 database, you said

15  he was not relying on.

16         MR. COHN:  Correct.

17         THE COURT:  Okay.  So what database has been produced

18  on which he is relying?

19         MR. COHN:  I'm sorry, Your Honor, I described the

20  three of them which was the database for the CARD mortality

21  study which is a --

22         THE COURT:  Okay.  But those are different opinions

23  that he's rendered than the current opinion which is the one

24  they want the database for.

25         MR. COHN:  Well, no, those are all -- those are the

1  -- it's just a subset.

2          MR. SCHIAVONI:  Those are -- it's a very small subset

3  of the overall population.

4          MR. COHN:  It is certainly true that it's a subset of

5  the population, Your Honor, but those are the databases on

6  which he has relied in rendering his opinions.  There are no

7  other databases upon which he has relied.  We're not

8  withholding a database.  There is no -- there is literally

9  physically no database in any computer anywhere that we have

10  not produced.

11          THE COURT:  Provided.

12          MR. COHN:  Yes.  There are, however, the medical

13  records.  And that's the issue that's being raised here.  What

14  people want are the medical records of non-Libby claimants.

15          MS. HARDING:  Your Honor, could I be heard, perhaps?

16          THE COURT:  If this is going to clarify something,

17  yes, go ahead.

18          MS. HARDING:  I hope it will.

19          THE COURT:  I'll hear the rest of your argument, Mr.

20  Cohn.  I'm wrestling with the issue. I'm trying to get my hand

21  around the issue.  So I'm not having a rebuttal argument, Ms.

22  Harding, I'm just trying to get clarification.

23          MS. HARDING:  I'll just try to give clarification and

24  then I'll sit down and save my rebuttal argument.

25          THE COURT:  All right.

1        MS. HARDING:  Your Honor, I'm just going to put on

2    the screen this -- what I've drawn.  Just a box with 1800.  And

3    you are absolutely correct, Your Honor, self-selected group of

4    patients essentially.  And Dr. Whitehouse has stated in his

5    report, the Libby claimants have stated in their pleadings, and

6    he testified under oath in his deposition that in forming the

7    opinions that he reached in this case, that he relied upon his

8    diagnosis treatment and review of this group of 1800 patients.

9    And he also purports to have formed what can only be called

10   epidemiologically based opinions based on this population of

11   1800 people.  And without producing any database because

12   they're saying it doesn't exist.

13       So there's never been a database of the 1800 people

14   into which, for a typical epidemiological study, you would have

15   entered the data, entered the people.  Are they male, are they

16   female?  What is their age?  What were their exposures?  What

17   is their disease?  What are their other exposures?  The types

18   of data that would be compiled in a database from which you can

19   perform an epidemiological analysis.  So Your Honor was right

20   on exactly what would be expected.  That does not exist.  Okay.

21   The debtors believe that without question Dr. Whitehouse is

22   incapable of forming opinions -- epidemiological opinions based

23   on that group of people.  So that very fact alone --

24       THE COURT:  Okay, but that should be the subject of a

25   Daubert hearing.

**J&J COURT TRANSCRIBERS, INC.**

1          MS. HARDING:  No, no, and I'm just trying to set it

2     up for Your Honor, because what I'm trying to get at, Your

3     Honor, is having said all that what they're telling us is that

4     -- so we said, you know what, just give us the underlying

5     records so we at least understand where your opinions are

6     coming from.  And so we've now gotten over the course of this

7     several months, some of them.  We've had some of them before.

8     And what they're basically telling us is, half of them you

9     simply can't have.  So the half of the population from which he

10    purports to have formed epidemiological opinions, is not

11    available for a review in any form whatsoever.  And so that is

12    the problem.  He simply cannot -- that's why I was trying to

13    make the point earlier, Your Honor.

14          If there are certain limited opinions in Dr.

15    Whitehouse's report that relate to a particular study, his

16    progression study, he has produced that and we were perfectly

17    willing to take that on with respect -- if there's something

18    else.  I don't think there is.  But to the extent that there

19    is, that's fine, but he has testified under oath that his

20    opinions about the Libby claimants, he's expressing here and

21    that he intends to testify to in this hearing, are based on his

22    epidemiological analysis of this group.  And we're saying he

23    cannot offer those opinions having not provided that database.

24          THE COURT:  Okay.

25          MS. HARDING:  And the fact that they can't be

1  produced, I think is -- I will save that part.  Because the

2  bottom line is they didn't have authority to use them in this

3  type of a setting and he shouldn't have.  And we don't want --

4          THE COURT:  Well, that's a different issue.

5          MS.  HARDING:  -- we don't want redacted copies of

6  medical records that they don't have permission to turn over.

7          THE COURT:  Yes, that's a different issue.  Whether

8  he had the authority to do what he did with them as a treating

9  physician rather than as an expert witness without their

10  authority is a different issue.  I don't need to go there.

11  I've got problems of my own to deal with in this case.  I'll

12  just take my own on.  Thank you.  Okay, Mr Cohn.

13          MR. COHN:  I would say to characterize that as a

14  self-selected population is not quite right.  I guess they're

15  self-selected in a sense that anybody who has asbestos disease,

16  you know, and starts coughing is self-selected because they

17  went to the doctor.  But the 1800 are people who --

18          THE COURT:  They went to this doctor and he's only

19  used his patients.  That's the problem.  He hasn't done an

20  epidemiological study in the sense that he has looked at every

21  person within a, you know, a five mile city-wide radius.  He's

22  looked at the patients who came to him.

23          MR. COHN:  No, no, I'm sorry, Your Honor.  He's

24  looked at -- there were screenings in Libby and the patients

25  basically -- the 1800 patients are people who were diagnosed

1  with asbestos disease at the CARD clinic.  And he's not the

2  only doctor at the CARD clinic, Your Honor.  He does have

3  access to all of those records because he's a doctor who is

4  affiliated with the CARD clinic.  But these are not -- it would

5  not be fair to say that this is a self-selected population in

6  the sense of these are people who are Dr. Whitehouse's

7  patients.

8         THE COURT:  Oh, well, then if they're not even his

9  patients then he has to have had some database somewhere

10 because he can't possibly have had access to their medical

11 records unless he's gotten them from somebody with authority.

12 So he has --

13        MR. COHN:  Well, he practices --

14        THE COURT:  -- if they're not even his patients he's

15 not even a percipient fact witness with respect to them.

16        MR. COHN:  Well, he practices at the CARD clinic,

17 Your Honor, and all doctors rely on medical records that are

18 maintained by other doctors.  So that's not --

19        THE COURT:  They do for treatment and diagnosis.  But

20 you're offering him as an expert, and I don't disagree that an

21 expert looking for some medical treatment is going to rely on

22 another doctor's medical history or information in the file.

23 But that's not what you're producing him for.  I don't see

24 anyway out of getting the underlying data.  If there is no

25 database in which the information that would typically support

1  a study of this nature is -- exists then I don't see anyway out

2  of giving the underlying data.

3      Now, it can be produced in a fashion that deletes,

4  for example, you know, name, uses -- the type of thing that we

5  did for the 2019 reports if necessary, use the last four digits

6  of the Social Security Number so that there can be patient

7  privacy protection and limit it, certainly, only to the use for

8  plan confirmation purposes.  That's what it's for, nothing

9  more.  We can build those protections in, but it has -- the

10  database has to be produced or I don't see how there is an

11  underlying foundation that assesses Dr. Whitehouse's opinion.

12      MR. COHN:  You said database, but I think you meant

13  underlying medical records, right?

14      THE COURT:  Because there is no database.  Yes.  I'm

15  sorry.

16      MR. COHN:  Right.  Well, Your Honor, then I'm going

17  to -- I'm just going to need to check whether there is a way

18  around this.  And the -- it involves, as I said, not just Dr.

19  Whitehouse, but it involves the CARD clinic and I think it

20  involves the hospital in Libby because I think that's where

21  some of the records are.  And so we just need to see whether a

22  court order from you saying they shall be produced, but, you

23  know, with those privacy protections will essentially -- well,

24  when I say pass muster with them I mean, you know, I am told in

25  the past they have gone to court in Montana to get protective

1   orders.  And we certainly don't want that.  So we should --

2           THE COURT:  Well, if they want to go to a state court

3   and tell a state court that the federal preemption statutes

4   don't apply they can do that.

5           MR. COHN:  No, no, I think it would be in district

6   court in Montana.

7           THE COURT:  Oh, fine.

8           MR. COHN:  But as I say, I think it would be better

9   to develop a solution that would not provoke that.  So that's

10  the best I could do, Your Honor, is to try and see whether I

11  can --

12          THE COURT:  Okay, I want to go back to something you

13  said earlier.  You said there was a screening and these

14  patients somehow or other passed the screening and then they

15  were sent to the CARD clinic and that's where this database

16  came from.

17          MR. COHN:  Again, you say database.

18          THE COURT:  Data of patients.  This group of

19  patients.  I'm sorry.

20          MR. COHN:  That's largely correct.  I cannot say -- I

21  mean, obviously there were some people who were screened who

22  just never, you know, just like never followed up.  So I can't

23  -- it's not 100 percent correlation between somebody being

24  screened, told they had asbestos disease, and seeking treatment

25  at the CARD clinic.  Obviously people can bury their heads in

1    the sand.

2            THE COURT:  Okay.  So --

3            MR. COHN:  And also, Your Honor, I guess, you know,

4    some people.  It's not a large turnover population, but some

5    people do leave.

6            MS. HARDING:  Your Honor --

7            MR. COHN:  There are some of those people, too.

8            MS. HARDING:  I just need to correct the record, Your

9    Honor.  This is -- because I don't want to spend too much time,

10   and I've spent a lot of time on this so I'm fairly certain that

11   I'm accurate when I say this.  The ATSDR, which is the federal

12   agency that responded to Libby and has performed

13   epidemiological analysis on the population of Libby, has

14   conducted an epidemiological analysis of the Libby community

15   with respect to whether there is disease in the community as

16   opposed to within the worker population.  And that is an

17   epidemiological study upon which Dr. Whitehouse chooses not to

18   rely.

19           There is also a separate screening study which Your

20   Honor is already familiar, with which is not an epidemiological

21   study upon which some people were screened and found

22   abnormalities and were -- and some of them absolutely did go

23   see Dr. Whitehouse and perhaps went to see other people, we

24   don't know.  But that has -- there is, as far as I know, and I

25   think there would be no dispute about this, there's no

1  suggestion that the 1800 patients of Dr. Whitehouse is somehow

2  related whatsoever with respect to the 1800 or I don't know

3  actually, 2300.  I don't know how many people were actually

4  screened in Libby.

5         So there may be some patients of Dr. Whitehouse's

6  that were -- I'm sure there are, some patients that were

7  screened of Dr. Whitehouse's and some that were not.  And I

8  don't know if counsel is trying to suggest that there's somehow

9  some relationship epidemiologically to, you know, Dr.

10  Whitehouse's population of, you know, quote, 1800 people or

11  patients and some other population that the ATSDR dealt with.

12  So I just wanted to make sure that the Court wasn't confusing

13  those two.

14         MR. COHN:  I don't believe I said anything about the

15  ATSDR, Your Honor.

16         MR. SCHIAVONI:  There was testimony at the deposition

17  that some of these people were just simply referred to Dr.

18  Whitehouse by the plaintiff's lawyers.  I mean, --

19         MR. COHN:  Yes.  Several of them, Your Honor, and of

20  course Mr. Schiavoni wishes to point that out.  But, Your

21  Honor, the suggestion here is not that the -- that there's 100

22  percent, you know, correlation between the screening and the

23  patient base at the CARD clinic.  If that was the -- and I

24  don't think I said that, but --

25         THE COURT:  Well, that's what I inferred.  Maybe you

1 didn't say it, but that's where I was going with it.  So all

2 right.

3        MR. COHN:  Well, then I'm glad we did make the

4 correction.

5        THE COURT:  All right.  Thank you.  All right, so

6 what are you suggesting, Mr. Cohn?

7        MR. COHN:  Well, I'm suggesting, Your Honor, the best

8 I can do, and I will undertake to do it, is to see whether it

9 will be feasible to produce on a reasonably quick basis,

10 because obviously everybody is sensitive about time, redacted

11 medical records for the non-clients who are among the 1800

12 patients of Dr. Whitehouse.

13        THE COURT:  Okay.  When you say redacted what I'm

14 talking about is taking out a name and assigning a number --

15        MR. COHN:  Yes.

16        THE COURT:  -- so that everybody knows what the

17 records are, for example.

18        MR. COHN:  Right.  It's making it anonymous, but not

19 otherwise -- not changing any of the data or withholding any of

20 the data.

21        THE COURT:  That's correct.

22        MR. COHN:  Yes.

23        THE COURT:  All right.  Ms. Harding.

24        MS. HARDING:  Your Honor, I don't -- the first thing

25 I want to say is that -- is what I alluded to at the beginning

1  of my first argument which is that we are five months into

2  discovery in this case which is cut off on June 15th, and that

3  Dr. Whitehouse's report was issued at the end of December.  And

4  I think that -- I don't think it's an adequate remedy for the

5  noncompliance to simply allow them to produce them now without

6  any sanction.  So that's first.

7          THE COURT:  Well, it seems to me that if the

8  information is produced that some additional discovery is going

9  to be required, that's obvious.  And one of those things, I'm

10  sure, will be a followup deposition of Dr. Whitehouse.  For

11  that purpose, Dr. Whitehouse is going to have to either travel

12  or do it by video conference, if that's feasible, or something

13  where the parties do not have to travel to Spokane, because the

14  extraordinary expense to this estate in doing that is not

15  warranted under these circumstances.  This data should have

16  been produced with the report.  And it is -- I think the

17  Court's bending over backwards, forwards, and every other which

18  way that any entity could possibly bend to get this information

19  available to the parties at this stage of the game.

20          So, yes, followup discovery obviously will be

21  authorized, and I'll have to simply work with you to find out

22  where.  But the cost of that discovery, to the extent that it's

23  going to involve a deposition, will not involve travel to where

24  Dr. Whitehouse is.  It will involve Dr. Whitehouse, if travel

25  is necessary, traveling to where the parties are.

1      MS. HARDING:  Your Honor, I'm not going to --

2      THE COURT:  And if he does not appear, I will not

3 permit his testimony.  I want to make it clear that if there is

4 necessary -- if it is necessary for a followup deposition as

5 the result of these documents, and I am assuming that parties

6 will want to follow up deposition as a result, I'm making that

7 assumption.  If you don't, fine.  You can say you don't.  But

8 if the parties do, then that cost of travel is -- Dr.

9 Whitehouse's cost of his travel is the responsibility of the

10 Libby plaintiffs not of the parties and he is to go to a

11 reasonable location where the other parties can travel to.  Or

12 if you agree to do it by video deposition, you may agree to

13 that.

14      MS. HARDING:  Okay.  Your Honor, the one thing I want

15 to clarify though is the Court -- I understand what the -- I

16 understand that the Court is not ordering, there will be no

17 change to the CMO and to the schedule as result of the Libby

18 claimants' actions, correct?

19      THE COURT:  I'm not ordering a change to the

20 schedule.  The only problem is you're going to have rebuttal

21 reports that may have to be due and we'll have to build a date

22 in for that.

23      MS. HARDING:  Well, here's what I suggest, Your

24 Honor.  To the extent the Libby claimants can provide the

25 material in time for review under the current schedule and in

1  time for it to be utilized, that's fine.  But I don't think

2  that our right to -- I think that we should still retain our

3  right to argue to the Court that his opinions that rely upon

4  this data that was not produced, should not be admissible at

5  the point in time when you're going to take his testimony to

6  the extent that we have not had adequate time to review and

7  prepare and rebut them.

8          THE COURT:  I would certainly consider that argument,

9  but I think what I need is the time limit now within which they

10  need to be produced, too.  Because, for example, your discovery

11  ends June 15th.  If you don't get these documents within a week

12  you have no hope of making use of them.

13          MS. HARDING:  That's exactly right.  And so I was

14  going to suggest that if they can get them to us within a week

15  -- I'm not suggesting that we can -- that we will have time to

16  review and adequately -- in order to do anything with them, but

17  if they get them to us within a week we will make the best

18  attempt.  But I don't think that their neglect over the past

19  five months should become our burden.

20          THE COURT:  I agree.

21          MS. HARDING:  So I just want to make sure that that's

22  clear and that we do not -- and then I also want to reserve and

23  make sure that we have the opportunity to make the arguments to

24  the Court that they have not -- they did not provide the

25  adequate foundation for those opinions and did not provide

**J&J COURT TRANSCRIBERS, INC.**

1  adequate time for review of that -- of those documents.

2          THE COURT:  Well, I'm wondering whether the schedule

3  with respect only to supplemental reports -- I'm saying

4  supplemental, I guess it's rebuttal actually, but additional

5  expert reports on behalf of the parties opposing Dr.

6  Whitehouse's view can -- if that deadline can be extended

7  without extending the rest of the schedule, I just don't know.

8  But it's possible -- the evidentiary hearing isn't going to

9  start for a couple of months so the question is whether you can

10  -- we can build in some additional time to look at these

11  documents assuming they're produced within a week.

12          If they're not produced in a week then I'm going to

13  say that it's prima facie evidence that any later production is

14  'too late for anybody to make reasonable use of the additional

15  information, because it's already very late when you're trying

16  to look at medical records as opposed to a database.  But I

17  understand the problem that the Libby claimants have faced.

18  They should have dealt with it earlier, they didn't.

19  Nonetheless there are a couple of months 'til trial so I'll

20  give them this last chance.  But it has to be produced within a

21  week.  So.  Now, having said that, is there some flexibility to

22  getting the rebuttal reports just for purposes of this issue,

23  Dr. Whitehouse's opinion pushed back?

24          MR. FINCH:  Can I confer with Ms. Harding about that

25  before we address the Court?

**J&J COURT TRANSCRIBERS, INC.**

1          MS. HARDING:  I was just going to say --

2          THE COURT:  Yes.

3          MR. FINCH:  And not -- just like two minutes.

4  Everybody stay here --

5          THE COURT:  Yes.

6          MR. FINCH:  -- so we don't leave.

7          MR. SCHIAVONI:  Can I be heard, Your Honor, while --

8          THE COURT:  Yes.  Well, you may want to wait until,

9  or don't you care?

                        (Pause)

11          THE COURT:  Ms. Harding.

12          MS. HARDING:  Your Honor, I'm sorry to report that

13  it's -- we find it almost impossible to figure out a way to

14  kind of -- to deal with this because the schedule is tight and

15  there's so much going on between now and the close of discovery

16  and then feasibility discovery is still going on after that as

17  well.

18          THE COURT:  You'll figure out a way.  How much time

19  do you need to get the rebuttal reports done assuming you get

20  the documents this week?  What's the last date by which

21  anything has to happen in this case in order to get the

22  information filed with the Court before trial?

23          MS. HARDING:  Well, Your Honor, you're just talking

24  about reports from us then.

25          THE COURT:  I'm talking about anybody who wants to

1  file a rebuttal report in response to Dr. Whitehouse's opinion

2  based on the fact that the information wasn't previously

3  disclosed.   Knowing that, you're probably going to want to take

4  another deposition of Dr. Whitehouse in the meantime.

5          MS. HARDING:   Right.   Well, then, Your Honor, what I

6  suggest then if it's the parties that will be taking the

7  deposition of Dr. Whitehouse we'll confer and we'll submit a

8  date if we get the documents by -- in the next week.

9          THE COURT:   Yes.   If you don't get the documents

10  within the week it's a moot point.

11          MS. HARDING:   Okay.   All right.   Then I think we'll

12  pursue that course.

13          THE COURT:   All right.

14          MS. HARDING:   Because then we can look at the

15  information that comes in and determine, you know, how large it

16  is once we get it.

17          THE COURT:   Okay.   So then the order that I will

18  enter when I get it just concerning the schedule, not

19  concerning the confidentiality issue, just concerning the

20  schedule is that the documents are to be produced within a week

21  from today.   Failure to do so is going to bar Dr. Whitehouse's

22  opinion concerning any epidemiological studies he purports to

23  have conducted or on which he's purporting to offer an opinion

24  based on those documents.   And if the document is produced then

25  incorporated within this order, the parties also will extend

1  the schedule for producing Dr. Whitehouse for deposition and a

2  rebuttal -- or I should say rebuttal reports concerning his

3  opinion within the CMO allotted times.

4            MS. HARDING:  Your Honor, can I clarify one thing?  I

5  just want to make sure, and I think I'm correct about this, but

6  the -- even if they are able to provide the documents the

7  debtors' position is that Dr. Whitehouse is not and has not

8  performed an epidemiological analysis.

9            THE COURT:  I understand.

10            MS. HARDING:  Okay.

11            THE COURT:  I think you need a Daubert hearing on

12  that.

13            MS. HARDING:  Yes, that's correct.

14            THE COURT:  That's not the subject for this discovery

15  motion.

16            MS. HARDING:  Okay.  Thank you, Your Honor.

17            MR. SCHIAVONI:  Judge, the related point I wanted to

18  be heard on is as I understand it, in essence, the Rule 37

19  issue that I brought up on this motion we'll have the ability

20  to bring that same -- we're not dispositively dealing with this

21  issue.  We're going to see how things sort of happen going

22  forward and I'll be able to bring back before the Court the

23  Rule 37 issue in connection with any Daubert hearing as an

24  alternative ground for Your Honor to rule with regard to Dr.

25  Whitehouse.

1          THE COURT:  I'm not issuing any sort of sanctions

2     orders now.  I'm setting up a discovery schedule that I hope is

3     going to accommodate the needs of the parties.  It may be moot

4     if these documents can't produce within a week.  So I don't

5     need to trudge down that road right now.

6          MR. SCHIAVONI:  Okay.  I understand you're not

7     sanctioning, but you're also not adjudicating the motion on its

8     merits.  You're not denying it on the merits.  We'll hear that

9     in connection with the Daubert if the issue is still alive at

10    that point.  That's how I --

11         THE COURT:  I think -- I just said that I was barring

12    any testimony in the event that the documents aren't produced

13    within a week.  That's granting the motion as I understand it.

14         MR. SCHIAVONI:  And, Your Honor, just there are two

15    other points.  This thing about the database it's -- look, you

16    know, what I heard from Mr. Cohn is well, he's not relying on

17    it, he doesn't have to give it to us.  I -- fundamentally, I

18    mean, this would be like Mr. Peterson coming in and saying well

19    --

20         THE COURT:  No, he said it doesn't exist.

21         MR. SCHIAVONI:  Could you read the email, please that

22    we got from Mr. Heberling.  He copied Mr. Stansbury.  He's got

23    a copy of it on his computer.

24         THE COURT:  Okay.  I apologize for interrupting, but

25    I just heard from Mr. Cohn that everything they have has been

1 produced.  So, okay.

2            MR. STANSBURY:  This is the email dated --

3            COURT CLERK:  Speak into the microphone.

4            MR. STANSBURY:  Sure.

5            THE COURT:  You can sit down, so that --

6            MR. STANSBURY:  Brian Stansbury for W.R. Grace.  This

7 is an email from Jon Heberling dated May 4th, 2009.  "Dear Tank

8 and Nate, I understand you have requested the database in

9 electronic form.  I do not have it in electronic form.  I sent

10 what I had in a file.  Since initially receiving it I had a

11 computer crash.  Dr. Whitehouse was unable to find it in his

12 computer.  He has had crashes also and probably lost it.  As he

13 has testified he has not used it for quite some time now, Jon."

14            MR. SCHIAVONI:  Judge, this is not about Mr. Cohn --

15 obviously Mr. Cohn has no personal knowledge about this, and

16 I'm in no way impugning his representation to the Court.  I

17 just don't think he personally knows one way or the other.

18 It's just -- you've heard the email.  This is just not

19 plausible, the guy doesn't have -- he either has no ability to

20 testify as an expert in this case or he prepared a database and

21 he hasn't adequately conducted a search for it.  I just ask for

22 the ability of -- if he can't find it in his computer we can

23 send an expert over and we can look in his computer.

24            THE COURT:  I thought I just heard from Mr. Cohn that

25 this is the, quote, 550 database that has been produced by Mr.

1  Cohn in the fashion in which it exists.  Mr. Cohn, am I missing

2  something?

3          MR. SCHIAVONI:  They produced six pages of paper.

4          MR. COHN:  Excuse me.  And that is what --

5          COURT CLERK:  Use the mic.  Please don't talk until

6  you use the mic.

7          MR. COHN:  Excuse me.  Yes.  And that is what Mr.

8  Heberling's email says.  It says that in electronic form it no

9  longer exists which is completely understandable since nobody

10 has maintained it for several years.  It is not, once again I

11 have to say, it is not anything upon which Dr. Whitehouse is

12 relying for the opinions that he has offered in his expert

13 reports.  And so I would respectfully submit that that database

14 is simply irrelevant.  But nevertheless, we have produced it

15 and we have produced what we have relating to the 550 database.

16         MR. SCHIAVONI:  What the email says is that Dr.

17 Whitehouse probably doesn't have it.  And there's no affidavit

18 from Dr. Whitehouse one way or the other on it.

19         THE COURT:  Fine.  Let's get an affidavit from Dr.

20 Whitehouse as to what does or doesn't exist and if he had it

21 and doesn't have it any longer, let's get an explanation as to

22 why and what happened to it.  If it's some electronic crash and

23 the computer still exists, it can probably be recreated.

24         MR. SCHIAVONI:  And, Judge, just a very last point

25 I'd make --

**J&J COURT TRANSCRIBERS, INC.**

1        THE COURT:  But if he's not relying on it you're not

2  entitled to it.

3        MR. SCHIAVONI:  Judge, the last point is this issue

4  about redacting the names of the people that we're dealing

5  with.  I understood why this made sense in the context of the

6  estimation hearing, because basically in the case of the

7  individual files you were listing data about just simply data,

8  you know, numbers, when they settled, this and that.  You know,

9  we saw very first hand in that, you know, the four hours of

10  examination of Dr. Whitehouse, what it was like when you

11  presented them with a file where the names were redacted.

12        Basically we got no testimony at all because he said

13  he couldn't tell you who the person was that we were presenting

14  him with information on.  And this was materially important

15  because one of the files, for instance, that he was cross

16  examined on was someone that he had said had an asbestos

17  related disease and there was good reason to believe that this

18  particular person had an entirely different disease and ended

19  up committing suicide.  And it was impossible to cross him

20  because he could simply sit back and say well, I don't know who

21  this is.  And that's exactly what happened.  I just ask you to

22  --

23        THE COURT:  But what difference does the individual

24  person make in this context?  What you're looking at, as I

25  understand it, is to figure out for epidemiological purposes

1  whether the standards that are set up in the TDP recognized

2  from Dr. Whitehouse's perspective, that is, whether there is in

3  fact a unique disease attributable to people who live in Libby

4  and whether the data that he's collected, because he doesn't

5  have a database, that's informed by the underlying patients'

6  records is somehow different from the data that has now been

7  collected and is available in summary form by your

8  epidemiologist who are going to say, I take it, that there is

9  no -- nothing unique about the examination of these patients'

10  databases when you aggregate it all and put it into a database

11  than there was from anybody else's. It doesn't matter who the

12  patient is.

13          MS. HARDING: Your Honor, if I could respond to that.

14  I can represent to the Court right now having attempted to

15  analyze past medical records of Libby claimants to the extent

16  that we had them, that the debtors, and I'm certain other

17  parties in this case, will not be able to assemble a database

18  of these records and perform an epidemiological evaluation on

19  it which we believe would not be proper to begin with because

20  of the fact that it's self-selected.

21          THE COURT: Well, then that's going to be part of

22  your Daubert motion.

23          MS. HARDING: That's right, but I just --

24          THE COURT: Okay.

25          MS. HARDING: -- wanted to make sure that the Court

1  was aware that the only reason we even think that these records

2  are -- at the fundamental level the records cannot support, in

3  and of themselves, cannot support an epidemiological analysis.

4      THE COURT:  Well, then you don't need to know who the

5  person is for that purpose.

6      MS. HARDING:  Well, except that, Your Honor, to the

7  extent that we contest Dr. Whitehouse's claims that these

8  people are exposed solely to exposure Libby --

9      THE COURT:  Then you're opening up what Mr. Cohn

10  wants which is the depositions.  You go down this road he's

11  entitled to do the depositions.  You folks pick.  You can't

12  have it one way and not the other.  You choose.

13      MS. HARDING:  No, no, no, Your Honor.

14      THE COURT:  Yes, Ms. Harding, you choose.

15      MS. HARDING:  I understand what you're saying.  I

16  just think that maybe I've confused you, Your Honor.

17      MR. SCHIAVONI:  Judge, this may come out -- I would

18  just ask you to sort of keep an open mind on this when we get

19  to the Daubert hearing because you're going to see how we were

20  prejudiced by this.  Because among other things it's not a

21  matter of one record --

22      THE COURT:  I don't want to know how I'm prejudicing

23  you then.  I want to know how you're prejudiced now.

24      MR. SCHIAVONI:  Well, I'm telling you.  I'm going to

25  tell you right now.  This is exactly how.  It's not just --

**J&J COURT TRANSCRIBERS, INC.**

1  unlike the estimation hearing, there isn't one record, this is

2  what they settled for, this is the dollar amount, you pull it

3  all out of there.  He's drawing opinions about how quickly they

4  got sick.  Once they got exposed he's saying that this is a

5  unique disease because they get -- the impairment happens much

6  faster.  So he's taking a group of medical records that take

7  place over multiple years and he's making comparisons within

8  them.  To the extent you're sitting there with a whole group of

9  records that are all redacted you've got problems about

10 comparing them.

11         THE COURT:  Well, the only thing you've got that's

12 redacted is that if my name, Judith K. Fitzgerald, is on that

13 medical record I'm going to be identified as A.  If your name

14 is on that medical record you're going to be identified as B.

15 So instead of saying my name as A on the medical record -- or

16 as Judith K. Fitzgerald on the medical record I'm going to be

17 known as A.  And that's the only change that's going to be made

18 to the medical record.  Now, Dr. Whitehouse will have the whole

19 record there, and he's going to have the list of patients that

20 he can match up.  So if you show him Exhibit A, he can look at

21 his chart and say, hmm, okay, I know who A is, it was Judith K.

22 Fitzgerald.  Now, is he going to put that on the record?  He

23 doesn't have to.  But can he then go through the analysis and

24 say, oh, yes, I see what the issue was with respect to why I

25 think that she had severe pleural disease and it's this.  Yes,

1   he can do that.  And you folks, I see no reason why you need to

2   know who the individual plaintiff is.  You're telling me you

3   need to see the medical records because you don't have a

4   database.  I'm agreeing with you.  But that doesn't mean you

5   need all of the data that is going to cause a conflict for the

6   doctors from HIPAA violation purposes and Montana State

7   violation purposes.

8           Now, I don't understand it one bit.  If you can tell

9   me why that name is of crucial significance when the doctor can

10  know who it is, and you can ask him about it, and the doctor

11  can still answer every single question, and why the doctor

12  didn't answer it from that perspective when he had that

13  information available, I don't know, maybe you should have

14  raised that issue during the deposition.

15          MR. SCHIAVONI:  Well, we did actually.  We cited

16  those portions of the transcript.  I mean, here's another

17  example of a way that we had problems with him.

18          THE COURT:  Well, wait.

19          MR. SCHIAVONI:  It said --

20          THE COURT:  Mr. Schiavoni, how could you raise it

21  when he's got the list?  He knows who patient A is because he's

22  the person who's redacting, or somebody on his behalf is.  He

23  can't claim that he doesn't know who A is.  He's got the list

24  of who A is.

25          MR. SCHIAVONI:  Well, actually he did claim he didn't

132

1  know who they were and he didn't have the list with him.

2          THE COURT:  Then you challenge his credibility at a

3  trial if that's the case.  Mr. Cohn, you make sure the doctor

4  has the complete list of who the redacted people are for any

5  and every proceeding in which he's called to testify in the

6  future.  That's part of this order.

7          MR. GUY:  Your Honor, it's Jonathan Guy from the FCR.

8  May I be heard for ten seconds?

9          THE COURT:  No, Mr. Schiavoni isn't finished yet or

10  unless it's on this issue.

11          MR. SCHIAVONI:  Judge, I'll make one last point.  But

12  I see I've tried your patience so I'm going to be very, very

13  quick.

14          THE COURT:  No, it's not trying my patience.  It's

15  that I don't understand why, you know, you're getting

16  everything you're asking for and you're shooting yourself in

17  the foot.  Okay.

18          MR. SCHIAVONI:  That might be a good cue to not say

19  anything else.  Judge, thank you very much.

20          THE COURT:  No, no, go ahead you had another.

21          MR. SCHIAVONI:  Thank you, Judge.

22          THE COURT:  Mr. Schiavoni, I was not attempting to

23  stop you from raising your last issue.

24          MR. SCHIAVONI:  I didn't interpret it that way.  I'm

25  exercising my own free will.

1          THE COURT:  All right.  Mr. Guy.

2          MR. GUY:  Yes, Your Honor.  I would just ask that if

3   -- because I see troubled waters ahead, that we have a firm

4   date by which the follow on deposition of Dr. Whitehouse will

5   take place.  I know that we have to work with the plan

6   proponents on the rebuttal report issue once we've had the --

7   got the data or the medical reports, but, you know, we

8   obviously like to move that deposition forward as quickly as we

9   can because we don't want to delay anything.

10         THE COURT:  Well, can you know that until you see the

11  content of the reports?  If so, I'm happy to give you a date.

12  But, Ms. Harding --

13         MR. GUY:  Well, the idea, I think, is that we're

14  going to get these reports in a week, and if we don't then the

15  whole issue is moot?

16         THE COURT:  Yes.

17         MR. GUY:  I mean, really it's to the debtors to speak

18  to that issue because they're the most familiar with the

19  medical information.  But I do think we need a firm date

20  because otherwise we could be dragging this out for --

21         MS. HARDING:  Your Honor, we intended -- we're

22  intended -- we think that we should, and Dr. Whitehouse should

23  be required to provide that deposition within the dates that

24  are already set up in the CMO by June 15th.  So we'll work with

25  Mr. Cohn to try to make sure that -- to set up a date.  But we

134

1   would like to stay within the CMO and have it before June 15th.

2          THE COURT:  All right.  That's fine.

3          MR. FINCH:  Your Honor, I would just add that we

4   would, you know, for the convenience of a particular witness or

5   a particular lawyer, it has to spill over a week or something,

6   we'll be flexible about that.  But we definitely want to get

7   this done within the deadlines of the CMO.  And as far as the

8   location of the deposition I think the most convenient and cost

9   effective place for the estate to have it is in Washington, DC

10  where I'm located and Ms. Harding is located and Mr. Stansbury

11  is located.  Which would be the people who will be taking that

12  deposition.

13         THE COURT:  All right, Mr. Guy.

14         MR. GUY:  That's fine, Your Honor.  That's exactly

15  what I was looking for.

16         THE COURT:  All right.  So, right now, on or before

17  June 15th in Washington, DC.  Ms. DeCristofaro.

18         MS. DeCRISTOFARO:  Your Honor, just one simple little

19  point that I think everyone was sort of hinting to Your Honor

20  is, even if the medical records were to be supplied, there may

21  be additional issues regarding the deficiency of Dr.

22  Whitehouse's opinion and the sufficiency of his basis for that

23  opinion that we --

24         THE COURT:  That's the subject of a Daubert hearing.

25         MS. DeCRISTOFARO:  Right.  Exactly.  And then we're

**J&J COURT TRANSCRIBERS, INC.**

1   just saying that that may not be resolved by this.  And that

2   was my only point.

3           MS. HARDING:  I think it -- the party asserted that

4   we do not think it will be resolved, but we will take that up

5   at the Daubert proceeding, Your Honor.

6           MR. COHN:  Your Honor, just to clarify because we've

7   gone quite far with this notion to producing these records

8   within a week.  You know, what I spoke before was not a

9   representation that they could be produced at all --

10          THE COURT:  I understand.

11          MR. COHN:  -- never mind in a week.  So I just -- I

12  really want that to be understood.  And in that context, I

13  would like to reserve the Libby claimants' rights in the sense

14  that we do object to that order and believe that Dr.

15  Whitehouse's report should not be stricken for the reasons that

16  I've argued and I will not argue again.

17          The other thing I think that we should cover, Your

18  Honor, is -- because we just did, was the only remaining issue

19  in terms of the form of the protective order relating to

20  medical information, was the names versus numbers.

21          THE COURT:  Yes.

22          MR. COHN:  There was an additional provision relating

23  to use of the medical information in the criminal trial which

24  is obviously mooted by the completion of the criminal trial.

25  So under those circumstances, I would request that the form of

1 protective order that was submitted with the Libby claimants'

2 response to the Arrowood motion, should be entered so as to

3 protect the privacy of medical information going forward.

4          MS. HARDING:  Your Honor, I think that that was the

5 order that was stricken by the Court last week because it came

6 in as an affirmative request attached to a response.

7          THE COURT:  Yes.

8          MS. HARDING:  But in light of the Court's order about

9 the production we will obviously enter a protective order to

10 allow the provision of the documents as the Court has ordered.

11 So we will do that.  I don't have the order in front of me so I

12 don't want to look at it, but I think it's a very short order.

13          MR. COHN:  There's a whole -- I'm sorry, did you want

14 to finish?

15          MS. HARDING:  I mean, we'll do what the Court said.

16 We will -- the documents should be redacted with respect to

17 names.  They should be assigned an identifying number or letter

18 and then --

19          MR. COHN:  I'm sorry, there are two different orders.

20 Maybe I should be clear on this.

21          UNIDENTIFIED ATTORNEY:  Non-clients only.

22          MR. COHN:  Exactly.  What Ms. Harding was referring

23 to is that with respect to non-clients we would produce the

24 information in redacted form in just the way that you

25 described.

1          THE COURT:  Right.

2          MR. COHN:  That, I think, is a separate order which

3 still needs to be drafted.  What is already available for entry

4 is the protective order concerning medical information of the

5 Libby claimants.  That information has been produced in

6 unredacted form and is currently being used by the parties

7 based on the assumption that there was going to be a --

8          THE COURT:  Protective order.  Right.

9          MR. COHN:  -- protective order issued in short order.

10 The difference is between our protective order and the one that

11 Mr. Schiavoni submitted were only those two points that I

12 mentioned.  One being the criminal trial which is now moot, the

13 other point being names versus numbers on which he said names,

14 we said numbers.  So ours is now the correct, and I believe,

15 agreed upon form of the protective order and would ask that it

16 be entered.  And on the procedural point that the cross motion

17 was struck the paper itself is still in the record.  It was

18 just that -- and it's legitimate to respond to a request for a

19 protective order to say, yeah, please enter it, Your Honor, but

20 here's a slightly different form.  So, I don't think that we --

21 that that should stand in the way of entry of the protective

22 order.

23          THE COURT:  I just -- I don't know that I have it

24 here.

25          MS. HARDING:  And, Your Honor, I would request that

1  in light of the hearing today and the Court's orders an

2  opportunity to review it to determine and make sure that it's

3  consistent with the Court's orders today.  And we'll be happy

4  to try to do that in the next 24 hours and submit it to the

5  Court.

6           THE COURT:  All right, that's fine.

7           MR. COHN:  That would be —-

8           THE COURT:  I'll wait 24 hours.  If I don't get

9  something I want a protective order entered.  If I have to

10 create one of my own, I will.  Don't make me go there.

11          MS. HARDING:  That's fine, Your Honor.  We will

12 submit something by the end of the day tomorrow.

13          MR. COHN:  Right.  And just to, I think, keep the

14 record clear that will be a protective order that just governs

15 medical information as opposed to governing the specific issue

16 of the one week deadline and the redaction of the non-Libby

17 claimant --

18          THE COURT:  That's right.

19          MR. COHN:  -- information which should be a separate

20 order.

21          THE COURT:  But actually, I'm not sure that the terms

22 of the order on the confidentiality side, the protective order

23 side are different between the medical and the non -- I'm sorry

24 between the Libby clients that you represent and the non-

25 clients from Libby.  The information, I think, needs to be

139

1    protected in the same way.

2         MR. COHN:  Exactly.  Exactly, Your Honor.  So we use

3    the same mechanism --

4         THE COURT:  It's just that some has already been

5    produced and some hadn't.  And that's the issue.

6         MR. COHN:  Yes.  And being produced in unredacted

7    form.  So that's -- so it is, in effect, a different provision

8    because it has to do with how it's to be used --

9         THE COURT:  I see.

10        MR. COHN:  -- as opposed to how it's to be produced.

11        THE COURT:  Yes.  If it's to be used, then it should

12   be used in some fashion that protects the name of the

13   individual so that you can assign, I'm saying a number, you

14   know.  But again, I want Dr. Whitehouse to make sure that in

15   the event that he's asked about it he knows who that number

16   relates to.

17        MR. COHN:  Absolutely.  There has to be a key.  In

18   fact, with respect to the Libby claimants, Your Honor, it would

19   be a key that all parties have.

20        THE COURT:  Exactly.  That's fine.  I think that

21   makes perfect sense.  It's just that for the public record

22   purposes that key should not be spread on the public record.

23        MR. COHN:  Correct.  Thank you very much, Your Honor.

24        MS. HARDING:  And, Your Honor, I do want to make

25   clear that all costs related to the production of these

1  documents and anything related to the redaction and all of that

2  is to be borne by the Libby claimants, correct?

3         THE COURT:  Yes. Yes. I mean, that's what the rule

4  would require.  Yes.  All right, so I'm going to get how many,

5  one or two protective orders?  Is it just going to be one order

6  that will deal with both Libby clients and non-clients?

7         MS. HARDING:  I think we could do one order, Your

8  Honor.

9         MR. COHN:  Your Honor, with respect, since the one

10  order is already drafted dealing with the Libby claimants, I

11  think we should just submit that one and then separately submit

12  since it will not be the subject of an agreement it will be

13  submitted over our protest, if you will, the one about Dr.

14  Whitehouse.  It would just make a clearer record that way, Your

15  Honor.

16         THE COURT:  All right, that's fine.

17         MR. COHN:  Thank you.

18         THE COURT:  Two orders to come in.

19         THE COURT:  And who am I going to get that order

20  from?  I know Mr. Cohn's already drafted one and Ms. Harding's

21  going to look at it, but who's actually going to submit it,

22  the debtor on the COC?

23         MS. HARDING:  Your Honor, we'll submit the order that

24  you ordered today with respect to the non-client records.  We

25  will draft and submit -- get Mr. Cohn's agreement with it and

**J&J COURT TRANSCRIBERS, INC.**

1  submit it to you.

2          THE COURT:  All right.

3          MS. HARDING:  It probably makes sense for Mr. Cohn to

4  submit the other one since he's already drafted it.

5          MR. COHN:  And we'd be happy to, Your Honor.

6          THE COURT:  Okay.  So you're going to run it by Ms.

7  Harding --

8          MR. COHN:  Oh, yes.

9          THE COURT:  -- then you'll submit a new one on a COC.

10         MR. COHN:  Right.  She already has it.  She just, as

11 she said needs to look at it in light of whatever.

12         THE COURT:  Yes.  But you're going to resubmit it.

13         MR. COHN:  Oh, yes.

14         THE COURT:  That's all I wanted.  All right.  Fine.

15         MR. SCHIAVONI:  And me, too.

16         MR. COHN:  Yes.  And Mr. Schiavoni.

17         THE COURT:  I'm sure everybody wants to see it.  So

18 just send it around and let everybody have a chance to see it.

19 And can I expect to get that by Monday?  Both orders?

20         MS. HARDING:  Yes, Your Honor.  Yes.  I see no reason

21 why we can't.

22         MR. COHN:  Yes, Your Honor.  But I do -- what I want

23 to say to the people who are in the courtroom is that the Libby

24 claimants' proposed form of protective order is the order that

25 was submitted and that they have been served with and that they

1  already have.  And so what I'm expecting from them is not for

2  them to wait to get something new from me, but rather they

3  should send whatever comments they have to me over the next 24

4  hours so that I can --

5         THE COURT:  And that's ordered.  They've already got

6  it.  They should comment to you within the next 24 hours so

7  that if there is some further modification to that order you

8  know about it and can redraft.

9         MR. COHN:  Correct.

10        THE COURT:  Otherwise if you don't hear a thing from

11  anybody by the close of business tomorrow resubmit a new order

12  on Monday.  Or the same order on Monday on a COC.

13        MR. COHN:  Right.  Thank you, Your Honor.

14        THE COURT:  Okay.  I think I've dealt with the

15  protective orders.  I believe I have addressed the Dr.

16  Whitehouse deposition, and I've addressed the Dr. Whitehouse

17  discovery requests for the documents, and I've looked at the 18

18  other deposition issues.  Are there any other matters today?

19  Another one?

20        MS. BAER:  Your Honor, the last matter, matter Number

21  3 on the agenda is the Libby claimants' motion to amend the

22  case management order and postpone the confirmation hearing.

23        THE COURT:  All right.  Mr. Cohn.

24        MR. COHN:  Yes, Your Honor.  This motion was brought

25  because we have -- we're now, as you've heard, really, you

1 know, halfway through the process of getting from the beginning

2 to the plan confirmation, and we have yet to receive a set of

3 meaningful responses to our contention interrogatories, or for

4 that matter by any other means to have had disclosed to us just

5 exactly what the position of the plan proponents are on the

6 Libby claimants' objections.  You might recall the Libby

7 claimants' objections were put forward in detailed form back at

8 the disclosure statement stage.  And we then filed in

9 accordance with the CMO, a bullet point preliminary plan

10 objection which referred, in effect, to the earlier very

11 detailed set of objections that we have filed.  So people have

12 been on notice really since last fall of what the Libby

13 claimants' objections are, or of most of Libby claimants'

14 objections to the plan.

15          Now, as part of the negotiation of the CMO, one of

16 the things that we asked for and did not achieve, was to have a

17 response, albeit a preliminary response, to preliminary plan

18 objections.  What we were told was that, oh, you can just do

19 contention interrogatories, that would be a fine way to get --

20 to find out what the parties' positions are in response to your

21 objections.  And so that was the way that we agreed to proceed.

22 And the result has been to leave us still, really, entirely in

23 the dark about the contentions of the plan proponents.  And you

24 saw an example of that earlier today, Your Honor, when we found

25 out for the first time what the plan proponents' contentions

144

1  were in relation to wrongful death and loss of consortium

2  claims.

3         We have submitted, Your Honor, with our motion,

4  copies of the contention interrogatory responses that we

5  received from the plan proponents.  You know, a typical example

6  of this is to, you know, is I'm sure you look through them,

7  they will refer us either to an expert report.  And by the way,

8  in some cases referring to the expert report has been helpful

9  in terms of understanding responses to contentions.  And then

10 other cases refer us to, well, expert reports that do not

11 exist.  For example, we're referred to a report by Mr. Dunbar

12 and then we're referred to reports by Mr. Florence on a subject

13 that it was -- again, it was wrongful death and loss of

14 consortium where he doesn't say anything about those things.

15        And we're referred to -- and we've been, you know,

16 told that we can have the opportunity to take 30(b)(6)

17 depositions.  And so -- and we did indeed, by the way, prepare

18 a detailed list of 30(b)(6) deposition topics.  And what

19 happens?  Well, first of all the case of Mr. Lockwood.  On a

20 number of key issues he deferred to Mr. Inselbuch of his firm.

21 Mr. Inselbuch's deposition is scheduled for June, either 12th

22 or 15th, right at the end of the deposition.

23        UNIDENTIFIED ATTORNEY:  12th.

24        MR. COHN:  12th.  Yeah, June 12th right at the end of

25 the deposition period.  And so I guess the proposal is for us

**J&J COURT TRANSCRIBERS, INC.**

1  to wait until the very end of the oral deposition period in

2  order to find out really, again, for the first time what the

3  contentions of the plan proponents are.  So what we propose as

4  a solution, Your Honor, is that they ought to either provide

5  proper responses to contention interrogatories or in some other

6  form provide us very quickly with responses that state in

7  detail what their contentions are in response to each of the

8  plan objections that we have filed.  I won't go so far as to

9  say it has to be a precisely equivalent detail, because we were

10  very detailed, but it should be in enough detail for us to

11  understand what position they're taking on these key issues.

12          And we've also suggested that really there just isn't

13  going to be enough time for the whole process to work out and

14  so according to the confirmation hearing it should be put off

15  for two months.

16          THE COURT:  Ms. Harding.

17          MR. COHN:  Thank you.

18          MS. HARDING:  May I approach, Your Honor?

19                    (Pause)

20          MS. HARDING:  Your Honor, with all due respect to Mr.

21  Cohn, I do believe that this particular motion can be dispelled

22  of fairly quickly.  I've got a time line here.  The Libby

23  claimants filed their contention interrogatories on December

24  23rd, 2008.  Under the rules in the CMO they were due 60 days

25  later and thus were due February 23rd, 2009.  The debtors did

1  not even file their final plan and disclosure statement until
2  February 27th, 2009.  So the contention that interrogatories
3  are premature, and we did attempt to answer them as best we
4  could.  We provided names of witnesses that we expected that
5  would testify, pointed them to the plan, different documents,
6  things like that.  But they were places where they were just
7  premature aside from the fact that they have all kinds of
8  problems with respect to whether they're appropriate and proper
9  contention interrogatories.

10          The Libby claimants did not file a motion to compel
11  with respect to the contention interrogatories.  So I think
12  that procedurally it's -- that their motion as it stands right
13  now is just inappropriate.  They never filed a motion to
14  compel, and quite frankly, the notion that they have not had an
15  opportunity to understand what the plan proponents' contentions
16  are or how the plan operates and how it would impact the Libby
17  claimants, at this point I find to be just not credible.  Not
18  from Mr. Cohn's contention, Your Honor, but just the amount of
19  information that's out there that they've had the opportunity
20  to review and to learn, and indeed themselves have had the
21  opportunity to take the 30(b)(6) depositions of Mr. Lockwood,
22  of Mr. Finch.  We've got depositions that are coming that are
23  scheduled which they did not object to the scheduling of those
24  depositions on those dates.  So I just don't -- I think that
25  the contention interrogatories were premature.  They were -- we

1 responded to them and they did not file a motion to compel.

2 We've responded to all kinds of other discovery from the Libby

3 claimants and other plan proponents.

4           The assertion earlier today which I decide -- I just

5 have waited to respond to -- that the Libby claimants have not

6 been provided any documents, I don't know whether Mr. Cohn is

7 just simply not aware, but the Libby claimants have been

8 provided access like all of the other objectors to the virtual

9 database.  They've been offered password like all other

10 objectors.  There's thousands, and probably millions of pages

11 of documents available on that -- through that process which

12 was agreed to by all the parties and they didn't object to.  So

13 we simply don't understand the context of this.  We don't

14 understand why it was brought.  And there's clearly no

15 foundation or basis for it.  There's still plenty of

16 opportunity.  If they still don't understand certain provisions

17 we've got at least three 30(b)(6) depositions that remain, and

18 other discovery as well.  So, Your Honor, if you have any

19 questions I'm happy to answer them, Your Honor.  But I think

20 that the -- that the motion is just not grounded in any real

21 factual basis that would require some kind of movement of the

22 schedule.

23           THE COURT:  All right.

24           MS. HARDING:  Thank you.

25           THE COURT:  Mr. Finch.

1      MR. FINCH:  Your Honor, I think it'll be useful to

2  look at the contention interrogatories.  They're Exhibit C to

3  the Libby claimants' papers.  And what they -- normally -- and

4  the debtor pointed out in his paper, normally contention

5  interrogatories are proper only at the close of discovery after

6  all of the evidence has been developed through identification

7  of witnesses, review of documents, taking depositions.  Then it

8  might be appropriate to say list for us all the bases on which

9  the plaintiff believes that the defendant engaged in securities

10  fraud or something like that.  And even there the courts, as we

11  pointed out in our papers say the contention interrogatories

12  are not a proper vehicle and cannot be used to basically

13  require a party to give a laundry list of everything that it

14  might prove at trial with respect to a particular point.  The

15  Libby claimants' contention interrogatories, and I -- we quoted

16  some of them in our papers, and I'll just give you a flavor.

17      "Please state in detail your contentions what proof

18  you may offer at trial to prove such contentions and witnesses

19  concerning the Libby claimants' objection that the TDP excludes

20  legitimate claims of the Libby claimants by creating disease

21  criteria that are not consistent with standard medical

22  practice."  Well, we answered that interrogatory by saying,

23  "Subject to our not having to provide you with rebuttal

24  opinions at this juncture, we're going to have an expert

25  testify as to why the TDP criteria are consistent with standard

1  medical practice.  And that expert is Dr. Laura Welsh and

2  you're going to get a report from her."  And we have provided

3  the Libby claimants with almost 400 pages of expert witness

4  reports in large response both to the -- and we identified the

5  experts that were going to testify, and identified them in our

6  responses to contention interrogatories.

7       They have questions about explain why -- provide your

8  contentions about whether or not the Libby claims are paid

9  court system value.  We said look at the expert report of Dr.

10  Mark Peterson.  We're going to have Dr. Mark Peterson testify.

11  He's got his report here and his report from the estimation

12  case which is sort of a background to his report here.  You can

13  go look at that.  The backup materials on which our experts

14  rely if you were actually to print all that material out

15  including the publicly available medical records which we don't

16  have to recopy, but also the databases -- historical claims

17  database that Grace made available in the data room would

18  literally probably fill this room.

19       So the argument that they haven't been provided with

20  a lot of information to allow them to understand the plan

21  proponents' contentions about the plan is a bit disingenuous.

22  For every of their contention interrogatories, the ACC, to the

23  extent we understand it, said this is the evidence on which we

24  will rely to rebut your objection or deal with your objection

25  that, for example the plan discriminates you because it

1  eliminates punitive damages.  There we referred them directly

2  to the testimony of Mr. Inselbuch.  We answered these

3  contention interrogatories at the end of February.  They agreed

4  to the dates when we produced people for depositions.

5           They had the opportunity to ask Mr. Lockwood in a

6  30(b)(6) deposition, which is a highly unusual procedure, and

7  frankly the way we did it is because you ordered Mr. Lockwood

8  to sit for deposition in other cases where people say I don't

9  understand what the plan means, or I don't understand how the

10  plan is going to affect me.  We think that the plan documents

11  are, although complex, are fairly -- and comprehensive -- are

12  clear and unambiguous and do lay out what's going to happen to

13  the Libby claims.  Mr. Cohn's argument that they don't

14  understand the plan proponents' position on wrongful death

15  claims, I believe, is a bit disingenuous given a) the plan says

16  that wrongful death claims are a channel to the trust, and b)

17  there is a TDP.  And no, the TDP doesn't spell out in detail

18  exactly how every potential claim might be provided for, but

19  the TDP is the TDP and the trust is going to have to deal with

20  those claims.

21           And moreover, more to the point the Libby claimants

22  have had dialogue with my partner, Mr. Inselbuch, both in

23  writing and on the telephone about what the TDP does and what

24  the TDP doesn't do.  So I think it's a little bit unfair for

25  them to say they don't understand the ACC or the plan

1  proponents' position about various items of the TDP which the

2  vast majority of these contention interrogatories relate to.

3          So I think there is absolutely no basis for them to

4  complain about the level of information they have been given in

5  discovery.  I think that there is absolutely no basis to move

6  back the deadlines in this case or certainly to move the

7  confirmation hearing.  I mean, there are a lot of other plan

8  objectors, there are a lot of insurance companies who have, you

9  know, armies of lawyers scouring this plan and had all kinds of

10  interesting and creative questions for Mr. Lockwood.  But you

11  don't hear any of them coming in and saying, oh, gee, we'd like

12  to push back the confirmation hearing.  I mean, insurance

13  companies I'm sure would love to push off the confirmation

14  hearing for years and years.  But they're not doing it.  So

15  that, I think, tells you something about whether there really

16  is a valid basis for delay here.  I'd suggest to you that there

17  isn't, submit to you there isn't.

18          I submit to you that we have properly answered

19  contention interrogatories early in discovery which in the

20  ordinary course would not be proper until the end of discovery.

21  Your Honor has set forth a pretrial schedule where there'll be

22  an exchange of trial briefs which will marshal the evidence and

23  the law in support of the plan and the time frame submitted by

24  the CMO.  And therefore, for all those reasons I suggest -- or

25  request that you deny the Libby claimants' motion.

1          THE COURT:  Mr. Guy, are you taking a position on

2   this?

3          MR. GUY:  The same position as the debtors and the

4   ACC, Your Honor.

5          THE COURT:  Anyone else wish to be heard?

6          MR. SCHIAVONI:  Judge, I don't have an army of

7   lawyers.  That's all I can say.

8          THE COURT:  Only half an army.  Is a battalion

9   smaller than army?  Yes.  Battalion.  Right.

10          MS. PHILLIPS:  Your Honor, this is Margaret Phillips

11  of Paul, Weiss, Rifkin, Wharton & Garrison on behalf of certain

12  bank lenders.  We filed a very limited objection.  There's

13  really nothing I can add that already hasn't been argued with

14  respect to not pushing back the confirmation hearing by another

15  60 days.

16          THE COURT:  All right.  Okay, I think, Mr. Cohn, that

17  this request is premature.  And I know the rest of the parties

18  won't like that, but that's my view.  I think at this time and

19  in the stage of the discovery that you're in with the 30(b)(6)

20  depositions not finished, that there is plenty of opportunity

21  to get the contentions that Libby is asking for, responded to,

22  to the extent that you feel that the responses have been

23  inadequate.  I did take a look at the contention

24  interrogatories and to the responses.  I thought given the

25  stage at which they were filed and the stage at which they were

1 required to be answered, that they were pretty inclusive.  They

2 are not required to be supplemented because it's not that form

3 of discovery.  And so I think at the stage at which they were

4 proposed they did state what the parties thought the

5 contentions would be and the responses would be.

6        To the extent that there is something more that will

7 be added in the pretrial statements that will be required to be

8 filed you'll find out about it there because that's the whole

9 purpose for building that process into the CMO in the first

10 place.  So I think that at this stage there is still time for

11 Libby, if it really doesn't understand what these contentions

12 are and what the plan proponents' evidence is expected to be,

13 to ferret that out through the discovery process.  And so I

14 don't think that this motion is really brought in a proper time

15 frame at this time.

16        So I'm denying this motion now.  To the extent that

17 it comes up and it's relevant at a later time at the close of

18 the discovery, I'll hear it from parties who want to raise that

19 issue if they want to raise it then.  But I don't think it's

20 relevant -- or I shouldn't say that.  I don't think it's

21 appropriate to be -- to push back the confirmation schedule

22 now.  It seems to me that the issues that have been addressed

23 today should get the parties moving quite expeditiously.  To

24 the extent that there is the data room and it's available to

25 all parties, that should contain quite a bit of data.  I don't

154

1  know how much of it Libby wants to access, but it's certainly

2  there.

3          To the extent that your clients do feel some need to

4  access that information, if you haven't and need a password,

5  maybe there was some miscue or whatever, I don't know.  But to

6  the extent that you need that information and don't have it,

7  talk to Ms. Harding because you can certainly get a password

8  and access to that information.

9          So for now I'm denying the motion without prejudice.

10          MR. FINCH:  Thank you, Your Honor.

11          MS. HARDING:  Thank you, Your Honor.

12          THE COURT:  Ms. Baer.

13          MS. BAER:  Your Honor, on that motion, I assume you

14  wanted an order?

15          THE COURT:  Please.

16          MS. BAER:  Because it's been denied without prejudice

17  the debtors are happy to prepare that unless Mr. Cohn has a

18  strong desire to do so.

19          THE COURT:  That's all that it needs to say.  Is that

20  it's denied without prejudice.

21          MS. BAER:  Okay.

22          THE COURT:  So, Mr. Cohn, I'll just take it from the

23  debtor on a COC?

24          MR. COHN:  Absolutely.  Of course run it by me, but

25  we'll respond very quickly.


**J&J COURT TRANSCRIBERS, INC.**

155

1           THE COURT:  All right, that's fine.

2           MS. BAER:  Thank you.  Your Honor, there's just one

3   matter we wanted to bring to the Court's attention and it

4   related to Phase I which is set to go forward on June 22nd

5   through the 25th.  As you might recall, Your Honor, one of the

6   issues in Phase I is, and I'll quote from the third amended

7   CMO, "The confirmation objections raised on behalf of, and

8   specific to lenders under the prepetition credit facilities..."

9           THE COURT:  Yes.  I hoped to get an opinion out on

10  that next week.

11          MS. BAER:  We appreciate, Your Honor, and that's why

12  we wanted to bring it to your attention because that has a

13  significant impact on it and in fact that is the issue in Phase

14  I that we need to address.

15          THE COURT:  You probably will be addressing some

16  issues in Phase I about that.  But I will get an opinion out

17  next week.

18          MS. BAER:  Thank you, Your Honor.  We appreciate it.

19          THE COURT:  Okay.

20          MS. BAER:  I think that concludes the matters that

21  are up today.

22          THE COURT:  Anybody else?  Okay, we're adjourned.

23  Thank you.

24          THE ATTORNEYS:  Thank you, Your Honor.

25                      * * * * *


**J&J COURT TRANSCRIBERS, INC.**

156

# C E R T I F I C A T I O N

   We, ELAINE HOWELL, and KIMBERLY UPSHUR, court approved transcribers, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of our ability.

/s/ Elaine Howell      DATE: May 21, 2009
ELAINE HOWELL

/s/ Kimberly Upshur
KIMBERLY UPSHUR
J&J COURT TRANSCRIBERS, INC.