IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | * | |
| W.R. GRACE & CO., et al., | * | Chapter 11 |
| Debtors. | * | Case No. 01-01139 (JKF)<br>(Jointly Administered) |
| | * | Related Docket Nos. 20666, 21544, 21794 |

-------------------------------------------------------x

## PHASE II TRIAL BRIEF FOR CNA COMPANIES

FORD MARRIN ESPOSITO WITMEYER
   & GLESER, L.L.P.
Elizabeth DeCristofaro (*pro hac vice*)
Wall Street Plaza, 23rd Floor
New York, New York 10005-1875
Telephone: (212) 269-4900
Facsimile: (212) 344-4294

WILDMAN, HARROLD, ALLEN
   & DIXON LLP
Jonathan W. Young
Jeff Chang
225 West Wacker Drive
Chicago, Illinois 60606-1229
Telephone:  (312) 201-2662
Facsimile:  (312) 416-4524

ROSENTHAL, MONHAIT & GODDESS, P.A.
Edward B. Rosenthal (Bar No. 3131)
P.O. Box 1070
Wilmington, Delaware 19899
Telephone: (302) 656-4433x6
Facsimile: (302) 658-7567

GOODWIN PROCTER LLP
Daniel M. Glosband (*pro hac vice*)
Exchange Place
Boston, Massachusetts 02109
Telephone: (617) 570-1000
Facsimile: (617) 523-1231
-and-
Michael S. Giannotto (*pro hac vice*)
Frederick C. Schafrick (*pro hac vice*)
901 New York Avenue, N.W.
Washington, D.C. 20001
Telephone:  (202) 346-4000
Facsimile:  (202) 346-4444

*Counsel for Continental Casualty Company, Transportation Insurance Company and their
American insurance affiliates*

# TABLE OF CONTENTS

STATEMENT OF FACTS............................................................................................1

    **A.**    CNA's Interest as an Insurer...................................................................1

    **B.**    CNA's Interest as a Creditor..................................................................2

ARGUMENT ...........................................................................................................3

**I.**    CNA HAS STANDING TO RAISE ITS PHASE II OBJECTIONS...........................4

    **A.**    The Applicable Test...............................................................................4

    **B.**    CNA Has Standing as a Creditor Holding Indirect PI Trust Claims. .....................5

    **C.**    CNA Has Standing as a Insurer. ...........................................................7

    **D.**    CNA Has Standing Under the Third Circuit's *Congoleum* Decision to Object to the TAC Members' Violations of the Rules of Professional Conduct..............................................................................................8

    **E.**    CNA Has Standing to Raise All of Its Phase II Objections...................9

**II.**    THE TAC MEMBERS HAVE CONFLICTS OF INTEREST THAT VIOLATE THE PERTINENT RULES OF PROFESSIONAL CONDUCT. ............10

    **A.**    The TAC Can Exercise Extensive Control Over the Operation of the Trust........11

    **B.**    The Plan Does Not Comply with Applicable Law. .................................13

    **C.**    The Court Can Require Changes to the TAC. .......................................17

**III.**    THE PLAN DISCRIMINATES AGAINST INDIRECT PI TRUST CLAIMS.........19

    **A.**    The Plan May Make Indirect PI Trust Claims Subject to Disallowance. .............20

    **B.**    The Plan Discriminates Against Indirect PI Trust Claims in Other Respects. ............................................................................................22

**IV.**    THE PLAN IMPROPERLY LIMITS SECTION 524(g) PROTECTION TO SPECIFIED PARTS OF SETTLED POLICIES AND TO INSURERS WHO SETTLE BEFORE THE END OF THE CONFIRMATION HEARING..................23

    **A.**    The Limitations Violate Section 524(g). ..............................................23

    **B.**    The Limitations On The Section 524(g) Injunction Cause The Plan To Not Have Adequate Means For Its Implementation. ....................................26

**V.**    THE PLAN FAILS TO COMPLY WITH SECTION 524(g) FUNDING REQUIREMENTS..................................................................................27

    **A.**    The Plan Fails to Comply with the Section 524(g)(2)(B)(i)(II)............................27

**B.** The Plan Fails to Satisfy the Requirement that the Trust Own More Than 50% of the Shares of a Debtor Upon "Specified Contingencies." .........................30

**VI.** **THE PLAN CANNOT BE CONFIRMED BECAUSE IT MODIFIES CNA'S RIGHTS UNDER ITS POLICIES AND AGREEMENTS WITH DEBTORS** ............**32**

**A.** The Plan Impairs CNA's Rights Under Its Asbestos Insurance Reimbursement Agreement. .................................................................32

**B.** The Section 524(g) Injunction Fails to Include All of the CNA Policies Encompassed by CNA's Asbestos Insurance Reimbursement Agreement and Its Asbestos Insurance Settlement Agreement. ................................................34

**C.** The Plan Abrogates The Anti-Assignment Provisions In CNA Policies ...............36

**VII.** **THE PLAN SHOULD MAKE CLEAR THAT IT DOES NOT MODIFY THE PARTIES' RIGHTS UNDER CERTAIN INDEPENDENT INSURANCE PROGRAMS WITH THE FRESENIUS INDEMNIFIED PARTIES AND SEALED AIR INDEMNIFIED PARTIES.** .......................................**38**

**VIII.** **INCORPORATION BY REFERENCE OF CERTAIN OTHER OBJECTIONS** ...........................................................................................................**38**

**CONCLUSION** .............................................................................................................**39**

## TABLE OF AUTHORITIES

**CASES:**                                                                                                                      **Page**

*Baron & Budd, P.C. v. Unsecured Asbestos Claimants Comm.*, 321 B.R. 147 (D.N.J. 2005) ....................................................................................................................9, 14

*Beloit Liquidating Trust v. United Ins. Co.*, 287 B.R. 904 (N.D. Ill. 2002) ..................................33

*Cargill, Inc. v. JWH Special Circumstance LLC*, 959 A.2d 1096 (Del. Ch. 2008) .................14, 15

*Carle Place Plaza Corp. v. Excelsior Ins. Co.*, 534 N.Y.S.2d 397 (App. Div. 1988) ..................36

*Consolidated Freightways Corp. of Del. v. Osier*, 605 P.2d 1076 (Mont. 1979) ...........................3

*Danvers Motor Co. v. Ford Motor Co.*, 432 F.3d 286 (3d Cir. 2005) .............................................4

*Globecon Group, LLC v. Hartford Fire Ins. Co.*, 434 F.3d 165 (2d Cir. 2006) ...........................36

*Hartford Accid. & Indem. Co. v. Global Indus. Techs., Inc.*, 2008 U.S. Dist. LEXIS 108185 (W.D. Pa. July 26, 2008), *appeal pending*, No. 08-3650 (3d Cir.)...............................7

*Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149 (3d Cir. 1989) ........33

*In re ABB Lummus Global Inc.*, 2006 Bankr. LEXIS 1462 (Bankr. D. Del. June 29, 2006) ........30

*In re Abijoe Realty Corp.*, 943 F.2d 121 (1st Cir. 1991) .................................................................6

*In re ACandS, Inc.*, 297 B.R. 395 (Bankr. D. Del. 2003) .............................................................11

*In re ACandS, Inc.*, 311 B.R. 36 (Bankr. D. Del. 2004) .........................................................11, 20

*In re AOV Indus., Inc.*, 792 F.2d 1140 (D.C. Cir. 1986).................................................................19

*In re A.P.I., Inc.*, 331 B.R. 828 (Bankr. D. Minn. 2005), *aff'd sub nom. OneBeacon Am. Ins. Co. v. A.P.I., Inc.* 2006 WL 1473004 (D. Minn. May 25, 2006) ...............................10, 30

*In re Armstrong World Indus.*, 348 B.R. 136 (Bankr. D. Del. 2006) ...........................................30

*In re Baker & Drake, Inc.*, 35 F.3d 1348 (9th Cir. 1994) .............................................................14

*In re Beeler*, 173 B.R. 108 (Bankr. W.D. Tex. 1994).............................................................33, 37

*In re Chicago Rock Island & Pacific R. Co.*, 604 F.2d 1002 (7th Cir. 1979)...............................33

*In re Combustion Eng'g, Inc.*, 295 B.R. 459 (Bankr. D. Del. 2003), *modified on other grounds*, 391 F.3d 190 ..........................................................................................................11, 18

*In re Combustion Eng'g, Inc.*, 391 F.3d 190 (3d Cir. 2004)................................................. *passim*

*In re Congoleum Corp.*, 426 F.3d 675 (3d Cir. 2005) ............................................................ *passim*

*In re Congoleum Corp.*, 2005 Bankr. LEXIS 556 (Bankr. D.N.J. Mar. 24, 2005).........................9

*In re Congoleum Corp.*, 2009 Bankr. LEXIS 900 (Bankr. D.N.J. Feb. 26, 2009) .......................20

*In re Congoleum Corp.*, 362 B.R. 167 (Bankr. D.N.J. 2007) ..................................................28, 31

*In re Elisnore Shore Assocs.,* 91 B.R. 238 (Bankr. D.N.J. 1988) ..................................................35

*In re Enjet, Inc.,* 205 B.R. 803 (Bankr. E.D. La. 1997) ..................................................................33

*In re Federal Mogul,Inc.*, 402 B.R. 625 (D. Del. 2009) .................................................................38

*In re Federal-Mogul Global Inc.*, 2007 WL 4180545 (Bankr. D. Del. Nov. 16, 2007) ...............10

*In re Federal-Mogul Global Inc.*, 385 B.R. 560 (Bankr. D. Del. 2008), *aff'd* 402 B.R. 625
    (D. Del. 2009), *appeal pending,* No. 09-2230 (3d Cir.) ........................................................38

*In re Global Indus. Techs, Inc.*, Case No. 02-21626, Dkt. Nos. 7886, 7887 (W.D. Pa.
    Nov. 13, 2007) ........................................................................................................................38

*In re Haardt*, 65 B.R. 697 (Bankr. E.D. Pa. 1986) ........................................................................26

*In re Johns-Manville Corp.*, 68 B.R. 618 (Bankr. S.D.N.Y. 1986), *aff'd* 78 B.R. 407
    (S.D.N.Y. 1987), *aff'd sub nom. Kane v. Johns-Mansville Corp.*, 843 F.2d 636 (2d
    Cir. 1988) ...............................................................................................................................28

*In re Joint E.& S. Dist. Asbestos Litig.*, 982 F.2d 721 (2d Cir. 1992), *modified,* 993 F.2d 7
    (2d Cir. 1993) .........................................................................................................................16

*In re Justice Oaks II, Ltd.*, 898 F.2d 1544 (11th Cir. 1990) ...........................................................6

*In re Kaiser Alum. Corp.*, 456 F.3d 328 (3d Cir. 2006).................................................................19

*In re Kronemyer*, 2009 WL 1653127 (B.A.P. 9th Cir. May 27, 2009)............................................6

*In re Lisanti Foods, Inc.,* 329 B.R. 491 (D. N.J. 2005), *aff'd,* 242 F. App'x 1, (3d Cir.
    2007) .......................................................................................................................................26

*In re M. Frenville Co.*, 744 F.2d 332 (3d Cir. 1984) ...................................................................5, 6

*In re MCorp Fin., Inc.*, 137 B.R. 219 (Bankr. S.D. Tex. 1992).....................................................19

*In re Monroe Well Serv.,* 80 B.R. 324 (Bankr. E.D. Pa. 1987).....................................................35

*In re Pittsburgh Corning Corp.*, 308 B.R. 716 (Bankr. W.D. Pa. 2004) ..................................8, 11

*In re PWS Holding Corp.*, 228 F.3d 224 (3d Cir. 2000).............................................................4, 10

*In re Quigley Corp.*, 391 B.R. 695 (Bankr. S.D.N.Y. 2008) ........................................................10

*In re Stewart Foods, Inc.,* 64 F.3d 141 (4th Cir. 1995) ...............................................................33

*In re Walker*, 165 B.R. 994 (E.D. Va. 1994) ...........................................................................27

*In re Western Asbestos Co.*, 313 B.R. 822 (Bankr. N.D. Cal. 2003) .....................................24, 30

*Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988) ..................................................6, 32

*Law v. Law*, 1997 Del. Ch. LEXIS 134 (Del. Ch. 1997), *modified on other grounds,* 753 A.2d 443 (Del. 2000) ................................................................................................15

*MacArthur Co. v. Johns-Manville Corp.,* 837 F.2d 89 (2d Cir. 1988) .......................................23

*Pepper v. Litton,* 308 U.S. 295 (1939) ...................................................................................19

*Travelers Indem. Co. v. Bailey*, 129 S.Ct. 2195 (2009) ...........................................................25

## **STATUTES:**

U.S. Bankruptcy Code

    11 U.S.C. § 101(5)(A) ..............................................................................................6
    11 U.S.C. § 101(10)(A) ............................................................................................5
    11 U.S.C. § 101(49)(A) ..........................................................................................29
    11 U.S.C. § 365 ....................................................................................................33
    11 U.S.C. § 365(a) .................................................................................................33
    11 U.S.C. § 365(b) .................................................................................................33
    11 U.S.C. § 365(f) ..................................................................................................33
    11 U.S.C. § 502(e) .............................................................................................20, 21
    11 U.S.C. § 524(g) .......................................................................................... *passim*
    11 U.S.C. § 524(g)(1)(A) ........................................................................................23
    11 U.S.C. § 524(g)(2)(B)(i)(II) ................................................................................27
    11 U.S.C. § 524(g)(2)(B)(i)(III) ....................................................................30, 31, 32
    11 U.S.C. § 524(g)(2)(B)(ii)(V) ..........................................................................18, 21
    11 U.S.C. § 524(g)(3) ............................................................................................25
    11 U.S.C. § 524(g)(4)(A)(ii) ...................................................................................23
    11 U.S.C. § 524(g)(4)(A)(ii)(III) ....................................................................22, 25 27
    11 U.S.C. § 524(g)(4)(B)(ii) ...................................................................................24
    11 U.S.C. § 524(g)(5)(B) ........................................................................................22
    11 U.S.C. § 541(c)(1) .............................................................................................37
    11 U.S.C. § 1109(b) .....................................................................................4, 6, 9, 10

11 U.S.C. § 1123(a) ..............................................................................................22, 26
11 U.S.C. § 1123(a)(4) .............................................................18, 19, 21, 23, 35
11 U.S.C. § 1123(a)(5) ................................................................................26, 35, 38
11 U.S.C. § 1128(b) ...............................................................................................4
11 U.S.C. § 1129(a) ..............................................................................................22
11 U.S.C. § 1129(a)(1) .............................................................23, 26, 34, 37, 38
11 U.S.C. § 1129(a)(3) ................................................................14, 17, 34, 35, 37
11 U.S.C. § 1129(a)(5)(A) ....................................................................................21


U.S. Constitution, Art. III ...........................................................................4, 5, 7

Del. Code, tit 12, § 3313(a)...............................................................................14

Del. Code, tit 12, § 3801 *et seq.*......................................................................14

Mont. Code Ann. § 27-1-703(4) ..........................................................................3

**RULES AND REGULATIONS:**

ABA Model R. of Prof'l Conduct, 1.7(a) cmt. 9 ...........................................15

ABA Model R. of Prof'l Conduct R. 1.3, cmt. 1 ..........................................16

ABA Model R. of Prof'l Conduct R. 1.7(a).....................................................15

ABA Model R. of Prof'l Conduct R. 1.7(b)(1)...............................................17

Del. Lawyers' R. Prof'l Conduct R. 1.7 ........................................................15

Del. Lawyers' R. Prof'l Conduct R. 1.7 cmt. 9 ............................................15

**LEGISLATIVE HISTORY:**

*Special Problems in Bankruptcy:  Hearing Before the Subcomm. on the Courts and Administrative Practice of the S. Comm. on the Judiciary*, 102nd Cong., 1st Sess. 61-62 (1991) (statement of W.T. Stephens, CEO, Manville Corp.).  102nd Cong., 1st Sess. 61-62 (1991) (statement of W.T. Stephens, CEO, Manville Corp.)..............................28

H.R. Rep. No. 95-595 (1977) *reprinted in* 1978 U.S.C.C.A.N. 5963 ............................................6

140 Cong. Rec. H10752 (daily ed. Oct. 4, 1994) ...................................................23, 28

140 Cong. Rec. S4521 (daily ed. Apr. 20, 1994) ......................................................28

**OTHER AUTHORITIES:**

4 Alan N. Resnick & Henry J. Sommer, *Collier on Bankruptcy* ¶524.07[2] at 524-50
  (15th ed. 2008) ........................................................................................................................35

Restatement (Third) of Law Governing Lawyers (2000) ............................................................16

  § 16 ........................................................................................................................................16
  § 110 ......................................................................................................................................16

Pursuant to the Third Amended Case Management Order ("CMO") [Docket No. 21544], Continental Casualty Company and Continental Insurance Company, on their own behalf and on behalf of their predecessor companies, affiliates and subsidiaries which issued insurance policies to the Debtors (individually or collectively "CNA"), submit this Trial Brief in support of their Phase II Objections to the Proposed First Amended Joint Plan of Reorganization (the "Plan").

Phase II addresses, *inter alia*, the objections of: "(i) parties classified under the Plan as Holders of Indirect PI or PD Trust Claims (including insurers as Holders of Indirect PI or PD Trust Claims with respect to such Claims)" and "(iii) any other confirmation objections not addressed and resolved in Phase I." The latter category, number (iii), includes several issues that the Court determined at the Phase I hearing were better left to Phase II, such as whether the proposed composition of the Asbestos PI Trust Advisory Committee should be rejected due to conflicts of interest.

## STATEMENT OF FACTS

### A. CNA's Interest as an Insurer

CNA is an Asbestos Insurance Entity that issued several Asbestos Insurance Policies to the Debtors (the "CNA policies"). CNA is a "non-settled" Asbestos Insurance Entity with respect to certain high-level excess Asbestos Insurance Policies, and a Settled Asbestos Insurance Company with respect to other of its policies. *See* Plan Exhibit 5; Plan Exhibit 6 at Schedule 2. CNA has, moreover, entered into a settlement agreement that constitutes an "Asbestos Insurance Reimbursement Agreement" under the Plan. Under the Plan, the rights of the Debtors, Reorganized Debtors, and Non-Debtor Affiliates (the "Insurance Contributors") under the CNA Asbestos Insurance Policies, Asbestos Insurance Settlement Agreements, and Asbestos Insurance Reimbursement Agreement would be assigned to the Asbestos PI Trust (the "Trust"). *See* Plan §§ 1.1(13), 1.1(15), 7.2.2.

## B. CNA's Interest as a Creditor

CNA is also a creditor of the Debtors arising, *inter alia*, from its contribution and indemnity claims against the Debtors that would be channeled to the Asbestos PI Trust as Indirect PI Trust Claims.[1] Plan § 1.1(138). First, CNA has Indirect PI Trust Claims arising out of the adversary proceeding initiated in this Court by the Scotts Company ("Scotts"). Scotts asserts that it is entitled to coverage for asbestos-related liabilities under policies issued by CNA to the Debtors, pursuant to so-called vendor endorsements.[2] Among the policies for which Scotts seeks coverage are two policies issued by CNA (Policy Nos. 902-36-70 and 248-3440) that are the subject of a 1990 settlement agreement between CNA and the Debtors, such that the Debtors are obligated to indemnify CNA should any claims be made on those policies.[3] Absent this bankruptcy, CNA would have a contractual claim for indemnification against Grace in the event that Scotts were to prevail on its coverage claims.

CNA's Indirect PI Trust Claims also arise out of suits brought against CNA by the Libby Claimants, who maintain that CNA, in its capacity as an insurer of the Debtors, is somehow responsible for their injuries arising out of the Debtors' asbestos-related products and operations.[4] Those suits against CNA have been stayed by this Court. CNA expects, based upon statements made by counsel, that the Libby Claimants may attempt to revive such suits, although meritless, once the Plan is confirmed. Absent a stay or injunction in bankruptcy, CNA would have the right to pursue third-party claims against the Debtors for common law indemnity and contribution, given that Grace was the primary (indeed, the sole) wrongdoer in causing the Libby

---

[1] CNA has filed a proof of claim to recover indemnity or contribution with respect to these claims.

[2] *See* Complaint in *Scotts Co. v. American Employers Ins. Co. et al.*, No. 04-ap-55083-JFK (Bankr. D. Del. filed Sept. 2, 2004).

[3] Settlement Agreement (Aug. 1, 1990) at ¶ 5.

[4] *See, e.g.*, *Penncock et al. v. Md. Cas. Co. et al.*, No. CDV-2002-233 (Mont. 1st Jud. Dist. Ct., Lewis and Clark County, filed March 28, 2002).

Claimants' injuries, or at the very least must be called upon to contribute its share to their damages.[5]  CNA also would have indemnification rights against the Debtors arising out of the 1990 Settlement Agreement.

CNA also possesses Indirect PI Trust Claims arising out of the claims of the BNSF Railway Company ("BNSF").  BNSF has been named as a defendant in various actions brought by Libby Claimants, alleging that BNSF engaged in tortious conduct with respect to its handling of Debtors' asbestos-containing materials.  BNSF has claimed that it is entitled to coverage from Grace's insurers and has included in that claim the policy number of one of CNA's primary policies issued to the Debtors.  That policy is also subject to the 1990 settlement agreement between the Debtors and CNA, such that were BNSF to successfully obtain defense costs or coverage under that policy, CNA would be entitled to contractual indemnification from the Debtors.

## ARGUMENT

In this brief, CNA shows the merits of its Phase II objections filed on May 20, 2009 [Docket No. 21794].  Those objections fall into one of two major categories:  (a) objections relating to the improper structure, operation, or management of the Asbestos PI Trust[6]; and (b) objections relating to the Plan's elimination or diminution of rights CNA has under its Asbestos Insurance Policies, Asbestos Insurance Settlement Agreements, and Asbestos Insurance

---

[5] *See* Mont. Code Ann. § 27-1-703(4) ("On motion of a party against whom a claim is asserted for negligence resulting in death or injury to person or property, any other person whose negligence may have contributed as a proximate cause to the injury complained of may be joined as an additional party to the action…."); *Consolidated Freightways Corp. of Del. v. Osier*, 605 P.2d 1076, 1081 (Mont. 1979) (indemnity available when defendants are not *in pari delicto*).

[6] These include objections regarding the composition of the Asbestos PI Trust Advisory Committee; discrimination against Indirect PI Trust Claims; the funding of the Trust by Debtors; and the restricted scope of the § 524(g) channeling injunction. *See* Parts II through VI *infra*.

Reimbursement Agreement.[7]   In Part I below, CNA shows that it has standing to litigate its objections to the Plan, and in Parts II through VII, it then discusses the substance of those objections.

## I.     CNA HAS STANDING TO RAISE ITS PHASE II OBJECTIONS.

### A.     The Applicable Test

To have standing to object to Confirmation, an entity must both be a "party in interest" under the Bankruptcy Code and possess standing under Article III of the Constitution.   The applicable Code provisions are sections 1109(b) and 1128(b).   Section 1109(b) states:   "A party in interest including … a creditor … may raise and may appear and be heard on any issue in a case under this chapter."   Section 1128(b) further provides that "[a] party in interest may object to confirmation of a plan."   The Third Circuit has made clear that section 1109(b) "create[s] a broad right of participation in Chapter 11 cases."[8]   Standing under Article III "requires (1) injury-in-fact … (2) a causal connection between the injury and the conduct complained of; and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."   *Danvers Motor Co. v. Ford Motor Co.*, 432 F.3d 286, 290-91 (3d Cir. 2005).   "While it is difficult to reduce injury-in-fact to a simple formula, economic injury is one of its paradigmatic forms."   *Id.* at 291.

In this proceeding, CNA has standing to raise its objections to Confirmation as (a) a creditor whose rights to indemnity or contribution would be directly and adversely affected; (b) an insurer whose rights under its policies and pre-petition agreements with the Debtors would be

---

[7] These include objections regarding the modifications of CNA's rights under the Asbestos Insurance Reimbursement Agreement; the improper characterization in Plan Exhibit 5 of CNA's settlement agreements; and the abrogation of the anti-assignment provisions in CNA's policies.  *See* Parts VI and VII *infra*.

[8] *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 214 n.21 (3d Cir. 2004); *In re PWS Holding Corp.*, 228 F.3d 224, 249 (3d Cir. 2000) (section 1109(b) "confers broad standing at the trial level").

directly and adversely affected; and (c) an interested party bringing ethical violations to the Court's attention pursuant to *In re Congoleum Corp.*, 426 F.3d 675 (3d Cir. 2005).

### B. CNA Has Standing as a Creditor Holding Indirect PI Trust Claims.

As discussed above, the Libby Claimants, Scotts, and BNSF have asserted asbestos-related claims against CNA. CNA believes that these claims are without merit and should ultimately be rejected by the courts. Nonetheless, those claimants have come forward, and each has concretely asserted to the Court that they have claims against CNA. As to each of those claims, CNA has rights to indemnity or contribution from the Debtors in the event that the claimants were to prevail against CNA. The Plan would channel CNA's claims to the Trust as Indirect PI Trust Claims. Plan § 1.1(138). As holder of those Claims, CNA has standing as a creditor under both the Code and Article III to litigate objections relating to the operation, funding and management of the Trust.

Under section 101(10)(A) of the Code, a creditor is any "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor." The definition of "claim" includes the "right to payment, ***whether or not*** such right is reduced to judgment, liquidated, unliquidated, fixed, ***contingent***, matured, ***unmatured***, ***disputed***, undisputed, legal, equitable, secured, or unsecured …." Bankruptcy Code § 101(5) (emphasis added). As numerous cases have noted, Congress purposefully defined "claim" to provide "the broadest possible definition," to include "all legal obligations of the debtor, ***no matter how remote or contingent***…." H.R. Rep. No. 95-595 at 274 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6266 (emphasis added). *See, e.g.*, *In re M. Frenville Co.*, 744 F.2d 332, 336 (3d Cir. 1984). Under the plain statutory language, a "creditor" (including one whose claim is

contingent) is a party in interest under section 1109(b) with standing to object to plan confirmation. *See*, *e.g.*, *In re Justice Oaks II, Ltd.*, 898 F.2d 1544, 1551 n.5 (11th Cir. 1990).[9]

Where the Debtor has agreed to indemnify a party, that party has a contingent claim and is, consequently, a creditor. As the Third Circuit noted in *In re M. Frenville Co.*: "When parties agree in advance that one party will indemnify the other party in the event of a certain occurrence, there exists a right to payment, albeit contingent, upon the signing of the agreement…. Such a surety relationship is the classic case of a contingent right to payment under the Code — the right to payment exists as of the signing of the agreement, but is dependent on the occurrence of a future event." 744 F.2d at 336-37. And such a creditor has standing even if its right to indemnity is disputed and possibly not allowable at all. For example, the Eleventh Circuit in *In re Justice Oaks II* ruled that guarantors of a third mortgage loan on the debtor's property with a contingent claim for indemnity were "parties in interest" as "creditors" with a "claim," "albeit a contingent or unmatured claim," even though the claim was not an "allowable claim." 898 F.2d at 1551 nn. 5-6. As the court stated, "[A]ny party in interest may object to confirmation…. [I]t is clear that an allowable claim is not a necessary element of such a party's interest." *Id.* at 1551 n.6.[10]

Thus, CNA has standing as a creditor to object to the confirmation of the Plan even assuming that the Plan is insurance neutral. The *Global Industrial Technology* bankruptcy is

---

[9] *See also*, *e.g.*, *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 642 (2d Cir. 1988) ("As a general rule, creditors have standing to appeal orders of the bankruptcy court disposing of property of the estate because such orders directly affect the creditors' ability to receive payment of their claims.").

[10] *Accord*, *e.g.*, *In re Abijoe Realty Corp.*, 943 F.2d 121, 125 (1st Cir. 1991) ("The matter of claim 'allowability' is altogether distinct … from whether the holder of a claim enjoys creditor status, since Bankruptcy Code § 101([5])(A) plainly defines 'claim' as a 'right to payment, whether or not such right is … disputed ….'"); *In re Kronemyer*, 2009 WL 1653127, at *4 (B.A.P. 9th Cir. May 27, 2009) ("The bankruptcy court properly concluded that because [the surety] possessed a claim to payment against Mr. Kronemyer, even though that claim was contingent both as of the petition date and as of the date of the Motion, [the surety] is a creditor within the meaning of the Bankruptcy Code. As a creditor, [the surety] had standing as a party in interest to bring the Motion.").

illustrative. There, the AIG Companies were granted standing to appeal from confirmation as a

creditor even though the appeals of other insurers were dismissed on the ground that the plan was

insurance neutral.[11]

At a minimum, CNA has standing under the Code and Article III to object to those

aspects of the Plan that directly and adversely affect its right as a creditor to achieve the

maximum recovery possible on its Indirect PI Trust Claims. These include:

- The objection that the TAC is composed of lawyers representing certain claimants to the Trust, which will lead them to favor the claims of their own clients over the claims of Indirect PI Trust Claimants, including CNA (*see* Part II *infra*);

- The objection that the Plan treats Indirect PI Trust Claims in a discriminatory fashion, which directly and adversely impacts CNA as a holder of Indirect PI Trust Claims (*see* Part III *infra*);

- The objection that the Plan limits the Asbestos PI Channeling Injunction protection to Asbestos Protected Parties that settle insurance coverage prior to Confirmation because that will lead to lesser coverage settlements with other insurers, which directly and adversely affects CNA inasmuch as there will be less funds available to pay CNA's Indirect PI Trust Claims (*see* Part IV infra); and

- The objection that the Plan fails to comply with the requirements of section 524(g) for the Debtors' funding of the Trust, which likewise directly and adversely affects CNA as a holder of Indirect PI Trust Claims because it means that there will be lesser funds in the Trust and lesser recoveries on such claims (*see* Part V *infra*).

**C.      CNA Has Standing as a Insurer.**

As the Plan Proponents appear to concede, CNA also has a standing as an insurer to

object in Phase II to the Plan's (a) abrogation of the anti-assignment clauses in CNA's policies;

and (b) elimination or modification of CNA's rights under pre-petition settlement agreements

(including an Asbestos Insurance Reimbursement Agreement) entered into with the Debtors.

---

[11] *Hartford Accid. & Indem. Co. v. Global Indus. Techs., Inc.*, 2008 U.S. Dist. LEXIS 108185, at *6 (W.D. Pa. July 26, 2008) ("AIG is a creditor of GIT and had standing both to participate in the Bankruptcy proceedings and to bring this appeal."), *appeal pending*, No. 08-3650 (3d Cir.).

These modifications of CNA's rights under its insurance policies and pre-petition agreements unquestionably directly and adversely affect CNA.

###    D.    CNA Has Standing Under the Third Circuit's *Congoleum* Decision to Object to the TAC Members' Violations of the Rules of Professional Conduct.

CNA also has standing to object to selection of TAC Members who will be in violation of the Rules of Professional Conduct because they will have conflicting duties as Trust fiduciaries and as lawyers representing, under contingent fee arrangements, individual clients who will be pursuing claims before the Trust. That is the holding of *In re Congoleum Corp.*, 426 F.3d 675 (3d Cir. 2005). In *Congoleum*, the Third Circuit held that insurers had standing to challenge the retention of debtor's special insurance counsel based on conflicts-of-interest concerns. *Id.* at 685-87. The court noted that "counsel for the insurers [have] a responsibility, if not a duty, to alert the Court to ethical conflicts," and that "insurers' counsel [have] the right to raise the issue under the Rules of Professional Conduct and require adjudication by the court." *Id.* at 686-87; *accord In re Pittsburgh Corning Corp.*, 308 B.R. 716, 721 (Bankr. W.D. Pa. 2004) ("Lumbermens' counsel has standing to object to the application to employ GHR. Any attorney, not just a former client's attorney, has standing, and, indeed, the obligation, to call a conflict of interest to the attention of the court because attorneys must report any actual or potential ethical violations.").

The Plan Proponents in their Phase I Brief (Docket No. 22021, at 6 n.5) dispute this standing to raise ethical objections. They describe *Congoleum* as applying only to ethical challenges involving "preliminary issues" and thus imply that *Congoleum* would not provide standing to challenge ethical conflicts that would arise upon or after Confirmation. This is incorrect. The Third Circuit in *Congoleum* emphasized that it was "support[ing] the long-standing role of lawyers practicing before federal courts in monitoring and reporting ethical

violations." 426 F.3d at 687. The Court further noted that the general standard for bankruptcy appellate standing "is a jurisprudential and not a strict statutory requirement for standing." *Id.* An argument that tries to limit *Congoleum* standing only to "preliminary issues" is in effect positing that, as a "jurisprudential" matter, the Court should ignore ethical conflicts that will occur later in the proceeding or after confirmation, even though those conflicts are embodied in the Plan and the Plan Documents presented for confirmation. That contention has nothing to commend it as a matter of policy or legal ethics. This Court should not turn a blind eye to possible ethical violations when asked to confirm a plan of reorganization.

   **E.     CNA Has Standing to Raise All of Its Phase II Objections.**

   As a creditor, as an insurer, and under *Congoleum*, CNA has standing to raise all of its Phase II objections because as to each of them individually it is directly and adversely affected by the Plan. That is, CNA has standing even if one examines its standing on an issue-by-issue basis. But, in addition, unless the Plan is adjudged insurance neutral, CNA has standing as an insurer to raise any issue at Confirmation. *In re Congoleum Corp.*, 2005 Bankr. LEXIS 556, at *5 (Bankr. D.N.J. Mar. 24, 2005). As the C*ongoleum* court held, if the Plan is not insurance neutral, the "'insurers' stake in plan confirmation includes a stake in the fundamental fairness of the Plan ….' [and a] determination of fundamental fairness cannot be tied to discrete" issues. *Id.* at *10 (quoting *Baron & Budd, P.C. v. Unsecured Asbestos Claimants Committee*, 321 B.R. 147, 160 (D.N.J. 2005)). Further, limiting bankruptcy court standing to specific issues would be contrary to the explicit language of section 1109(b) allowing a party in interest to be heard on "any issue." *Id.* at *11.

   The Plan Proponents' Phase I Brief (at 20) argues that standing must be determined on an issue-by-issue basis and that *Congoleum* is "contrary to governing precedent." Concededly,

there are bankruptcy court decisions that support the position of the Proponents.[12] But that position conflates the requirements for standing in the bankruptcy court with the requirements for standing to appeal from confirmation. The Plan Proponents concede as much by asserting that the "same general principles of prudential standing apply" in both judicial levels.[13] Their position accordingly is at odds with decisions of the Third Circuit making clear that the requirements for standing in the Bankruptcy Court are less strict than standing to appeal.[14]

In short, while CNA has standing to raise its Phase II objections even under the issue-by-issue standing analysis urged by the Plan Proponents, that analysis is wrong.

## II. THE TAC MEMBERS HAVE CONFLICTS OF INTEREST THAT VIOLATE THE PERTINENT RULES OF PROFESSIONAL CONDUCT.

If the proposed Plan is confirmed, certain fiduciaries of the Asbestos PI Trust — specifically, the proposed members of the Asbestos PI Trust Advisory Committee ("TAC") — would have conflicts of interest that violate the Rules of Professional Conduct. These conflicts directly impact CNA as a creditor with Indirect PI Trust Claims, for CNA would be adversely affected by a Trust structure that places extensive influence over Trust procedures and claim validity criteria in the hands of lawyers who have an incentive and duty to maximize the recoveries from the Trust of their individual clients at the potential expense of other claimants, such as CNA. Nor are these abstract concerns, for certain of the proposed TAC members have

---

[12] *See, e.g., In re Quigley Co.*, 391 B.R. 695 (Bankr. S.D.N.Y. 2008); *In re A.P.I., Inc.*, 331 B.R. 828 (Bankr. D. Minn. 2005), *aff'd sub nom. OneBeacon Am. Ins. Co. v. A.P.I., Inc.*, 2006 WL 1473004 (D. Minn. May 25, 2006); *see also, e.g., In re Federal-Mogul Global Inc.*, 2007 WL 4180545 (Bankr. D. Del. Nov. 16, 2007) (no standing because plan is insurance neutral).

[13] *See* Plan Proponents' Phase I Brief at 10-11 n.10.

[14] *See In re Combustion Engineering*, 391 F.3d at 214 n.21 ("[The] restrictive approach to bankruptcy appellate standing contrasts with the broad right of participation in the early stages of a bankruptcy proceeding."); *In re PWS Holding Corp.*, 228 F.3d at 249 (section 1109(b) "confers broad standing at the trial [bankruptcy court] level").

overreached in the past.[15]  In addition, as the Third Circuit held in *Congoleum*, 426 F.3d at 686-87, CNA has the right to object in any event to conflicts of interest that result in ethical violations.

## A.      The TAC Can Exercise Extensive Control Over the Operation of the Trust.

The proposed TAC members (Messrs. Budd, Cooney, Rice, and Weitz) were selected by the Official Committee of Asbestos Personal Injury Claimants ("ACC").  Plan § 7.2.6.  This is not surprising, given that each of these individuals are counsel to asbestos claimants who are members of the ACC.  Their law firms represent tens of thousands of claimants who will claim against the Trust,[16] and the TAC members will be representing claimants submitting claims to the Trust pursuant to contingent fee arrangements with their clients.[17]

The ACC, in conjunction with the Future Claimants' Representative ("FCR"), also drafted the proposed Trust Agreement and TDP,[18] and selected the proposed Trustees (Messrs.

---

[15] *See In re Combustion Eng'g, Inc.*, 295 B.R. 459, 477 n. 28 (Bankr. D. Del. 2003), *modified on other grounds*, 391 F.3d 190 (3d Cir. 2004) (ruling that two of the proposed TAC members here (Mr. Rice and Mr. Budd (as Mr. Rice's counsel)) could not serve on the TAC on the ground that "Mr. Rice wears too many hats with respect to this Debtor and its creditors ...."); *In re ACandS, Inc.*, 311 B.R. 36, 39, 42-43 (Bankr. D. Del. 2004) (plan not proposed in good faith where "the plan was largely drafted by and for the benefit of the prepetition committee" composed of leading plaintiffs' counsel, including Messrs. Budd, Cooney, Rice, and Weitz); *In re ACandS, Inc.*, 297 B.R. 395 (Bankr. D. Del. 2003) (refusing to authorize the retention of a firm for "independent" screening of asbestos claims when that firm, among other things, had paid $2 million for work by another firm whose sole principal was a paralegal allegedly on leave from Ness Motley (now Motley Rice)); *see also In re Pittsburgh Corning Corp.*, 308 B.R. 716 (Bankr. W.D. Pa. 2004) (denying application of ACC, comprised, *inter alia*, of clients of the firms of Messrs. Budd, Rice, and Weitz, to employ law firm as its insurance counsel when that firm had a conflict of interest, having previously represented the debtor's parent).

[16] Lockwood Dep., Tr. 5/1/09 at 200:3-8 ("I am sure it's more than 10,000.  Again, it could be 20,000; it could be 30,000.  I just don't know"); Amended Statement of Baron & Budd under Bankruptcy Rule 2019, ¶ 4 (Feb. 25, 2009) ("As of the date of this Amended Statement, the Firm represents thousands of personal injury claimants ....").

[17] *See* ACC's Response to CNA's Request for Admission No. 11.

[18] Lockwood Dep. Tr. 5/1/09 at 381:12 to 383:3; Lockwood Dep. Tr. 5/4/09 at 637:11 to 642:4.  CNA, along with other objecting insurers, was entirely excluded from the drafting process, only seeing the proposed Trust Agreement and TDP when filed with the Court.  *See* Plan Proponents' Responses to CNA's Request for Admission No. 7.

Huge, Sifford, and Trafelet),[19] all of whom have served similar roles in other asbestos personal injury trusts drafted and approved by the same asbestos personal injury lawyers that are involved in this case.[20]

Finally, section 2.2 of the Trust Agreement requires that the TAC consent to virtually any change of significance in the TDP. The Expert Report of Professor James Shein of the Kellogg School of Management at Northwestern University (Docket No. 21020) describes these requirements in detail, but to give a few examples, the Trustees must obtain the consent of the TAC and FCR to:

- Adopt or amend PI Trust Bylaws, amend the Trust Agreement, or amend the TDP (Trust Agreement §§ 2.2(f)(xi), (xii));

- Change the Claim Payment Ratio between amounts paid for (i) claims for severe asbestosis, severe disabling pleural disease, and cancer and (ii) claims for asbestosis or pleural disease (Trust Agreement § 2.2(f)(ii); TDP § 2.5);

- Amend the Medical/Exposure Criteria for payable claims (Trust Agreement § 2.2(f)(iii); TDP § 5.3(a)(3));

- Require claimants to provide additional kinds of medical evidence (Trust Agreement § 2.2f(v); TDP § 7.1);

- Revise the Scheduled, Maximum or Average Values applicable to various categories of claims (Trust Agreement § 2.2(f)(iii), TDP § 5.3(b)(1), (3));

---

[19] *See* Lockwood Dep., Tr. 5/4/09 at 603:19-23: "The ACC and the FCR consulted each other on [the] three prospective individuals and then proposed them to the co-proponents and the co-proponents accepted them."

[20] Mr. Huge has served as a Trustee for the Owens Corning/Fibreboard and Armstrong World Industries Trusts; Mr. Sifford has served as a Trustee for the Armstrong World Industries, Inc. and USG Trusts; and Mr. Trafelet has served as a Trustee for the ABB Lummus and Owens Corning/Fibreboard Trusts and as FCR for the Armstrong World Industries Trust. *See Order* (A) Approving Disclosure Statement and Solicitation Procedures, (B) Confirming and Recommending Affirmance by the U.S. District Court of Debtor's Plan of Reorganization as Modified Through June 8, 2006, and (C) Setting Bar Dates to File Certain Claims in Paragraphs 51, 52, 53, and 74, *In re ABB Lummus Global, Inc.,* Dkt. No. 255, No. 06-10401 (Bankr. D. Del. June 29, 2006); Order Confirming the Fourth Amended Plan of Reorganization of Armstrong World Indus., as Modified, *In re Armstrong World Indus., Inc.,* Dkt. No. 9755, No. 00-4471 (Bankr. D. Del. Aug. 18, 2006); Order Confirming the Sixth Amended Joint Plan of Reorganization for Owens Corning and its Affiliated Debtors and Debtors-in-Possession (as modified), *In re Owens Corning/ Fibreboard Corp.,* Dkt. No. 19366, No. 00-03837 (Bankr. D. Del. Sept. 26, 2006); Annual Report and Account of the United States Gypsum Asbestos Personal Injury Settlement Trust for the Fiscal Year Ending December 31, 2008, *In re USG Corp.*, Dkt. No. 12554, No. 01-2094 (Bankr. D. Del. Apr. 30, 2009).

- Determine whether to allow a second claim for malignancy by a claimant who previously recovered on a claim for asbestosis or pleural disease (TDP § 6.4); or

- Revise the criteria and determine the procedures for the Payment of Indirect PI Trust Claims, such as the Indirect PI Trust Claims that will be submitted by CNA (Trust Agreement § 2.2(f)(xi); TDP § 5.6).

The Trustees must also consult with the TAC on a periodic basis regarding the general administration and implementation of the Trust (Trust Agreement § 2.2(e)).

Moreover, the TAC has a significant role in determining how the Trustees will be compensated and whether they will keep their jobs. The Trustees must obtain the consent of the TAC and FCR to change their compensation other than to reflect cost-of-living adjustments or, alternatively, seek Court approval (*id.* § 2.2(f)(ix)). Also, if a trustee position falls vacant, the TAC and FCR can veto (subject to Court review) the recommendation of the remaining Trustees for a replacement (*id.* § 4.3(a)). Finally, a Trustee can be removed at the recommendation of the TAC and FCR with Court approval for "good cause" (*id.* § 4.2(c).

In short, the TAC can exercise enormous control over the operation of the Trust and TDP on matters that can impact CNA — such as approving or vetoing the procedures to pay Indirect PI Trust Claims and the criteria to be applied to such claims. It is no answer to these concerns to say that the Trustees can always override a TAC veto of a proposed action by obtaining approval of the action in arbitration, followed by review by this Court. *See id.* § 7.13. That is surely an option that the Trustees would not take without the greatest of reluctance — particularly since their employment as trustees in this proceeding and other proceedings depends on the continuing good will of the leading members of the plaintiffs' bar.

**B. The Plan Does Not Comply with Applicable Law.**

The Plan places members of the TAC in an irreconcilable legal conflict in violation of their ethical duties as attorneys — either they breach their duties under Delaware law as

13

fiduciaries to the Trust or their duties under the Rules of Professional Conduct as attorneys to their clients.  State ethical rules are encompassed by the Bankruptcy Code and are not preempted by its provisions.  *See, e.g., Baron & Budd*, 321 B.R. at 163 & n.6.  Accordingly, a plan that results in violations of such rules does not comply with section 1129(a)(3) of the Code.  *See In re Baker & Drake, Inc.*, 35 F.3d 1348, 1354 (9th Cir. 1994).

First, the TAC members owe a fiduciary duty of fair dealing under Delaware law to all Trust beneficiaries, including Indirect PI Trust Claimants such as CNA.[21]  The Trust is proposed as a statutory trust under Delaware Law, Del. Code Ann. tit. 12, § 3801 *et seq*.  Trust Agreement § 1.1.  With the exception of express carve-outs, the Delaware Statutory Trust Act explicitly "subjects Delaware statutory trusts to existing trust law concepts."  *Cargill, Inc. v. JWH Special Circumstance LLC*, 959 A.2d 1096, 1111 (Del. Ch. 2008).  That Delaware trust law provides that "[w]here 1 or more persons are given authority by the terms of a governing instrument to direct, **consent to** or disapprove a fiduciary's actual or proposed investment decisions, **distribution decisions or other decisions** of the fiduciary, such persons shall be considered to be **advisers and fiduciaries** when exercising such authority unless the governing instrument otherwise provides."  Del. Code Ann. tit. 12, § 3313(a) (emphasis added).

Accordingly, under general Delaware trust law, the members of the TAC serve as fiduciaries to the Trust when exercising authority over the Trust.  Given the substantial power of the TAC over the Trust and TDP, the TAC members should be considered fiduciaries for all Trust beneficiaries.   At the least, the TAC members are, as the Trust Agreement states, fiduciaries for "all holders of present PI Trust Claims."  Trust Agreement § 5.2.  This means that, with respect to any decision by the TAC where its consent is required, the members of the TAC

---

[21] Both the Trust Agreement and the TDP provide that they are to be governed by Delaware law.  Trust Agreement § 7.11; TDP § 8.3.

act as fiduciaries with respect to all present holders of Asbestos PI Claims at that particular time — whether those claimants be their own clients, the clients of other firms, or insurance companies.

Delaware law requires fiduciaries "to consider impartially the interests of all beneficiaries." *Law v. Law*, 1997 Del. Ch. LEXIS 134, at *7 (Del. Ch. Sept. 20, 1997), *modified on other grounds,* 753 A.2d 443 (Del. 2000). Delaware law also imposes a duty of loyalty on fiduciaries. *Cargill*, 959 A.2d at 1113 & n.68. Thus, the TAC members have a duty to ensure that any changes, amendments and/or modifications to the TDP (or any decision not to amend the TDP) are for benefit of all Trust beneficiaries, rather than just for the subset with whom they have a contingent fee arrangement. For instance, TAC members have a duty to ensure that the Trust has in place procedures that deny payments to unmeritorious claims in order to preserve the corpus of the Trust for meritorious claims, even if that means that the unmeritorious claims of their own clients are rejected. It similarly means that other, competing claimants to Trust funds, including clients of other law firms and insurance companies, must be treated fairly even if that means that the TAC members' individual clients receive less.

In this case, however, the members of the TAC cannot act in such an impartial fashion without violating their professional duties to their individual clients. Both Rule 1.7(a) of the American Bar Association ("ABA") Model Rules and Rule 1.7 of the Delaware Lawyers' Rules of Professional Conduct provide that a lawyer "shall not represent a client" if "there is a significant risk that the representation … will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer." Comment 9 to this provision in both the ABA and Delaware versions makes clear that this bar on conflicting duties applies when a lawyer takes on duties as a fiduciary to a trust that

conflict with the representation of the lawyer's client: "a lawyer's duties of loyalty and independence may be materially limited ... by the lawyer's responsibilities to other persons, such as **fiduciary duties arising from a lawyer's service as a trustee**, executor or corporate director." (Emphasis added.)

Here, there is a conflict between the fiduciary duties that TAC members owe to all Trust beneficiaries and their duty to represent their individual clients. For example, a TAC member is obliged to act with "zeal in advocacy" on behalf of a client's claim so long as the claim is non-frivolous, even though the claim may well be without merit. *See* ABA Model Rule 1.3, cmt. 1; Restatement (Third) of Law Governing Lawyers §§ 16, 110 (2000)**.** As a fiduciary of the Trust, however, the TAC member should insist that the Trust have procedures that ensure that unmeritorious claims are rejected so that the Trust is not depleted by them and that more funds are available to pay meritorious claims. Similarly, as an impartial Trust fiduciary, a TAC member might conclude that certain claims of insurers are valid and should be paid by the Trust, but as an advocate for his clients, the TAC member should advocate for procedures that result in denial of those same claims as diminishing the funds available to pay his clients.

This is an irreconcilable conflict. A TAC member cannot comply with both sets of fiduciary obligations — either the TAC member's obligations to the Trust beneficiaries as a whole or the obligations to the TAC member's clients will go by the board. In analogous circumstances, the Second Circuit held, in connection with efforts to revise the Manville Personal Injury Settlement Trust, that subclasses had to be formed so that individual lawyers for the class were not purporting to represent class members whose interests were in fact adverse.[22] The same principle applies here: lawyers who represent one subset of claimants to the Trust

---

[22] *In re Joint E. & S. Dist. Asbestos Litig.*, 982 F.2d 721, 739-45 (2d Cir. 1992), *modified*, 993 F.2d 7 (2d Cir. 1993).

cannot be expected to act as impartial fiduciaries on behalf of other claimants to the Trust with conflicting interests.

This conflict cannot be circumvented by the TAC members obtaining the consent of their clients to their proposed membership on the TAC. It is doubtful that any such waivers could be valid in a case as complex as this one. *See In re Congoleum Corp.*, 426 F.3d at 691. In any event, a conflict cannot be waived unless a lawyer reasonably believes that "the lawyer will be able to provide competent and diligent representation to each affected client." ABA Model Rule 1.7(b)(1). In this case, as shown above, a lawyer cannot satisfy the obligations owed both as a Trust fiduciary and as a lawyer representing individual clients. Even if the conflict could be waived, however, there is no reason why this Court should approve a TDP that requires the obtaining of thousands of written conflict waivers.

Nor can the problem be solved by individual TAC members recusing themselves, because the conflict exists at a systemic level. To give one example, it might be in the interest of all beneficiaries to adopt more demanding criteria for claims as a means of weeding out unmeritorious claims, but such a change might be against the interest of clients of TAC members who would fail to satisfy the more stringent criteria. In that event, the TAC members would be conflicted between breaching their obligations as Trust fiduciaries by not consenting to the revisions or breaching their obligations to their clients by allowing the change to go into effect.

### C. The Court Can Require Changes to the TAC.

This Court has authority to require a change in the composition of the TAC as a condition of Confirmation in order to eliminate conflicts of interest that contravene Delaware trust law and the applicable Rules of Professional Conduct, for a Plan cannot be implemented under section 1129(a)(3) using a "means forbidden by law." And this Court in fact previously removed Mr. Rice and Mr. Budd (as Mr. Rice's counsel) from the TAC in *Combustion Engineering* on the

ground that "Mr. Rice wears too many hats with respect to this Debtor and its creditors ...." *In re Combustion Eng'g*, 295 B.R. at 477 n. 28.

In addition to violating applicable Rules of Professional Conduct, and as explained in the Shein expert report (at 2), the present structure of the Trust and TAC is at odds with good management practice and sound policy because it "creates a potential for abuse and for the Trustees and TAC to act contrary to the governing principle in the Trust Agreement that all claimants be treated fairly and equitably in connection with claims made against the Trust and that the Trust not deplete its assets by paying undeserving claims." The Court also has the power to require a change in the composition of the TAC on the ground that, independent of any violations of law, sound management practice and public policy requires that Trust fiduciaries be disinterested to the extent feasible.

Establishment of a TAC whose members are not disinterested, but instead have personal interests in furthering the recovery of some Trust claimants over the recovery of others, "implicates the fundamental bankruptcy policy of 'equality of distribution among creditors.'" *In re Combustion Eng'g,* 391 F.3d at 241-42 & n. 55. Consistent with this policy, section 1123(a)(4) requires a Plan "to provide the same treatment for each claim or interest of a particular class ...," and section 524(g)(2)(B)(ii)(V) requires that the Trust "provide reasonable assurance that the trust will ... pay[] present claims and future demands that involve similar claims in substantially the same manner." Compliance with these fundamental requirements is jeopardized when the Trust and TDP are placed under the influence of TAC members who are personally interested in the recovery of only some of the claimants.

As the Third Circuit stated in another asbestos case, "leaving the procedures for allocation of resources predominantly in the hands of ***private, conflicting interests has led to***

*problems of fair and equal resolution*.  The need for **counsel with undivided loyalties is more**

**pressing in cases of this nature than in more familiar conventional litigation**.

Correspondingly, the level of court supervision must be of a high order."  *In re Congoleum*

*Corp.*, 426 F.3d at 693 (emphasis added).  And this Court has authority as a court of equity to

conduct that supervision by only confirming a Plan that does not have built-in conflicts of

interest.  "The Supreme Court has long recognized that bankruptcy courts are courts of equity

that apply equitable principles in the administration of bankruptcy proceedings."  *In re Kaiser*

*Alum. Corp.*, 456 F.3d 328, 339 (3d Cir. 2006).  Thus, "bankruptcy courts have broad authority

to act in a manner that will prevent injustice or unfairness in the administration of bankruptcy

estates."  *Id.* at 340 (citing *Pepper v. Litton*, 308 U.S. 295, 304 (1939)).

## III.    THE PLAN DISCRIMINATES AGAINST INDIRECT PI TRUST CLAIMS.

"The Bankruptcy Code furthers the policy of 'equality of distribution among creditors' by

requiring that a plan of reorganization provide similar treatment to similarly situated claims."  *In*

*re Combustion Eng'g,* 391 F.3d at 239.  Section 1123(a)(4) requires that a plan "provide the

same treatment for each claim or interest of a particular class."  11 U.S.C. § 1123(a)(4).  This is a

"fundamental premise" of the Bankruptcy Code.  *In re MCorp Fin., Inc.*, 137 B.R. 219, 227

(Bankr. S.D. Tex. 1992).  "Even though neither the Code nor the legislative history precisely

defines the standards of equal treatment, the most conspicuous inequality that § 1123(a)(4)

prohibits is payment of different percentage [recoveries]."  *In re AOV Indus., Inc.*, 792 F.2d

1140, 1152 (D.C. Cir. 1986).

In a like manner, section 524(g)(2)(B)(ii)(V) requires a court to "determine that the plan

treats 'present claims and future demands that involve similar claims in substantially the same

manner.'"  *In re Combustion Eng'g*, 391 F.3d at 234 n.45.  This requirement is analogous to

section 1123(a)(4) but expands the requirement to include Demands (*i.e.*, prospective claims),

and requires that Demands be treated similarly to Claims. The legislative history further clarifies: "In order for future claimants to be bound by a trust/injunction, section [524(g)] requires that the trust operate in a structure and manner necessary to give reasonable assurance that the trust will value, and be able to pay, similar present and future claims in substantially the same manner." 140 Cong. Rec. H10752, H10765 (daily ed. Oct. 4, 1994).

Thus, confirmation has been denied where a plan provided that certain asbestos claimants were to receive substantially greater recovery than other asbestos claimants on account of those claims having been secured by insurance proceeds. *See In re ACandS, Inc.*, 311 B.R. at 42-43. But the requirement that a plan treat similar claims in substantially the same manner is not limited to the amount of recovery a claimant is certain to receive. Indeed, in *Congoleum,* the Bankruptcy Court recently denied confirmation because, *inter alia*, the proposed plan had, in defiance of the court's prior rulings, allowed only selected claimants the right to litigate their asbestos claims to completion. *In re Congoleum Corp.*, 2009 Bankr. LEXIS 900, at *19-32 (Bankr. D.N.J. Feb. 26, 2009).

Article 3 of the Plan provides that all Asbestos PI Claims, including Indirect PI Trust Claims, are Class 6 claims channeled to the Asbestos PI Trust. Plan § 3.1.6. As described above, CNA is the holder of at least three types of Indirect Asbestos PI Trust Claims. The Plan improperly discriminates against Indirect PI Trust Claims in the several respects.

**A.     The Plan May Make Indirect PI Trust Claims Subject to Disallowance.**

First, the Plan may discriminate against Indirect PI Trust Claims by making them potentially subject to disallowance by the Court under section 502(e) of the Code on the ground that they are contingent and unliquidated on the date of Plan confirmation. No such disallowance procedure is permitted with respect to Direct Asbestos PI Claims, including those that are likewise contingent and unliquidated on the date of Confirmation. To the extent that the

Plan is construed to permit disallowance of Indirect PI Trust Claims, it would discriminate against Indirect Claims and in favor of Direct Claims in contravention of section 1123(a)(4). Moreover, the Plan would violate section 524(g)(2)(B)(ii)(V) if it were construed to allow disallowance of Indirect PI Trust Claims that constitute Demands (as opposed to Claims) on the ground that they are contingent. Demands are by definition prospective and wholly contingent, but section 524(g)(2)(B)(ii)(V) expressly provides that the Trust is to pay such Demands in "substantially the same manner" as present Claims.

Witnesses for the Plan Proponents, in their deposition testimony, have stated that Indirect PI Trust Claims are not subject to disallowance on the above grounds.[23] That stance is called into question, however, by Debtors' Objection To Proofs of Claim for Contractual Indemnity Claims Filed By Maryland Casualty Company (the "Objection to MCC Claim") [Docket No. 21345]. MCC's claims arise from lawsuits against it by Libby Claimants. In the Objection to MCC Claim, the Debtors assert that the MCC claims should be disallowed by application of section 502(e) and also by application of a bar date, even though MCC's claims fall within the definition of Indirect PI Trust Claims, which are supposedly not to be allowed or disallowed under the Plan. *See* Plan § 3.1.6(b)(ii). It thus appears possible that the Debtors would assert (and consequently, the Asbestos PI Trust could also assert) that claims (including future Demands) for contribution and indemnity by CNA might not be within the definition of Indirect PI Trust Claims or might be disallowed by the Bankruptcy Court. If the former were the case, then the Plan would fail to provide for such claims at all, a more egregious discriminatory result than the discriminatory treatment of such claims discussed above. If the latter (disallowance by the Bankruptcy Court) were the case, then claims for indemnity and contribution would be

---

[23] *See, e.g.*, Lockwood Dep., Tr. 5/1/09 at 73:18-24.

discriminated against since no other Class 6 claims are to be allowed or disallowed by the Court. Either result would violate sections 1123(a), 524(g)(5)(B), and 1129(a) of the Code.

**B.      The Plan Discriminates Against Indirect PI Trust Claims in Other Respects.**

The Plan also requires that Indirect PI Trust Claimants make a greater showing than Direct PI Trust Claimants in order to recover from the Trust.  Direct Claims are paid from the Trust upon a showing that the claimant satisfies the disease and exposure requirements set forth in the TDP (which purport to be surrogates for the showing that would have been required in the State law tort system).  Indirect PI Trust Claimants (such as CNA), on the other hand, cannot be paid on their rights to contribution or indemnity under applicable State law; instead they must also prove that they fully paid a liability for which Grace, and not the Indirect PI Trust Claimant, is liable and that they obtained a release for the benefit of the Trust.  *See* TDP § 5.6.

To avoid this discriminatory result, the TDP should be modified to adopt the procedures adopted for the Manville Trust, which were negotiated in a process that included input from co-defendants.[24]  The Manville procedures give Indirect PI Trust Claimants the option either (i) pursuing a contribution claim against the Trust under the TDP or (ii) receiving a credit against any verdict in the tort system that would treat the Trust (standing in the Debtors' stead) as a settled tortfeasor.  In the latter case, the TDP provides that the Trust will appear in a case at the request of a defendant for the limited purpose of being on verdict forms.

Certain Indirect PI Trust Claims are also placed in a less favorable position in the FIFO payment queue than are Direct PI Claims.  Post-Effective Date Direct PI Claims are placed in the FIFO Queue as of the date they are filed (TDP § 5.1(a)(1)), while Indemnified Insurer TDP Claims are only placed in the FIFO Queue after an agreement is reached with the Trust as to the

---

[24] The current Manville TDP was approved at *In re Joint E.&S. Dist. Asbestos Litig.*, 237 F. Supp. 2d 297 (E.D. & S.D.N.Y. 2002), and is reproduced at http://www.mantrust.org/FTP/C&DTDP.pdf.   An earlier version  of that TDP is appended to *In re Joint E.&S. Dist. Asbestos Litig.*, 878 F. Supp. 473, 580-613 (E.D. & S.D.N.Y. 1995).

amount due or after an ADR award is made. *See* TDP § 5.13. This dissimilar treatment of Class 6 Claims results in the Plan's violating Sections 1123(a)(4) and 1129(a)(1).

## IV. THE PLAN IMPROPERLY LIMITS SECTION 524(g) PROTECTION TO SPECIFIED PARTS OF SETTLED POLICIES AND TO INSURERS WHO SETTLE BEFORE THE END OF THE CONFIRMATION HEARING.

The Plan provides that "Settled Asbestos Insurance Companies" will enjoy the protection of a section 524(g) injunction. See Plan §§ 1.1(50), 8.2, 8.3. However, the term "Settled Asbestos Insurance Company" is limited to "any Asbestos Insurance Entity that has entered into an Asbestos Insurance Settlement Agreement ***prior to the conclusion of the Confirmation Hearing; but only with respect to, and only to the extent of, any Asbestos Insurance Policy***" identified in Plan Exhibit 5. Plan § 1.1(200) (emphasis added). These provisions render the Plan unconfirmable because they do not allow for a court to modify a section 524(g) injunction to extend its benefits to insurance providers who settle following confirmation and may preclude the court from issuing injunctive relief to the full extent allowable under section 524(g).

### A. The Limitations Violate Section 524(g).

Under the Code, if a Plan satisfies the requirements of section 524(g), the court may issue an injunction "to supplement the injunctive effect of a discharge." 11 U.S.C. § 524(g)(1)(A). These section 524(g) requirements are modeled on the trust and injunction approved in the Johns-Manville bankruptcy case.[25] One such requirement is that the third party to be protected by the supplemental injunction must be "alleged to be directly or indirectly liable for the conduct of, claims against, or demands on the debtor." 11 U.S.C. § 524(g)(4)(A)(ii). Another requirement is that the court must determine that including the third party in the injunction "is

---

[25] *See MacArthur Co. v. Johns-Manville Corp.,* 837 F.2d 89, 91 (2d Cir. 1988) (setting forth the terms of the injunction)*; In re Combustion Eng'g,* 391 F.3d at 235 n.47 (noting that section 524(g) was enacted in response to the Johns-Manville case);140 Cong. Rec. H10752, H10765 (daily ed. Oct. 4, 1994) (noting that Congress, in codifying the Manville "trust/injunction mechanism" in § 524(g), set forth "explicit requirements simulating those met in the Manville case").

fair and equitable with respect to [future asbestos claimants] in light of the benefits provided, or to be provided, to such trust on behalf of . . . such third party." 11 U.S.C. § 524(g)(4)(B)(ii).

An insurer such as CNA qualifies for the benefits of the section 524(g) supplemental relief if it settles with the Debtors on terms that satisfy the fair and equitable standard. *See* 11 U.S.C. § 524(g)(4)(a)(ii)(III) (authorizing the issuance of an injunction in favor of any third party whose alleged liability arises from "the third party's provision of insurance to the debtor or a related party"). If these requirements are satisfied, and the Plan is otherwise confirmable, then an insurer is entitled to be protected under the supplemental injunction issued pursuant to section 524(g). *See In re Western Asbestos Co.*, 313 B.R. 832, 855 (Bankr. N.D. Cal. 2003) ("While an injunction is an equitable remedy, in this instance, the equities are built into [section 524(g)]. If those equities are satisfied, the Court does not believe that it has the discretion to limit the effect of the supplemental injunction to something less than that permitted by statute.").

Section 524(g) does not provide that the Plan Proponents may impose any restrictions, whether temporal or otherwise, on a court's power to find that an insurer has made a "fair and equitable" contribution to the Trust justifying the extension of the Channeling Injunction to such insurer. Rather, section 524(g) authorizes an injunction against any and all suits where the insurer "is alleged to be directly or indirectly liable for the conduct of, claims against, or demands on the debtor to the extent such alleged liability … arises by reason of … provision of insurance to the debtor or a related party." 11 U.S.C. § 524(g)(4)(A)(ii)(III). This is consistent with the *Manville* injunction, on which section 524(g) was premised. The *Manville* Plan provided that both pre- and post-confirmation settling insurers were eligible for inclusion in the channeling injunction.[26] Moreover, the *Manville* injunction protected insurers from any and all

---

[26] *See* Second Amended and Restated Plan of Reorganization, *In re Johns-Manville Corp.*, No. 82-11656 (Bankr. S.D.N.Y.) at Exhibit A (Glossary), p. 13 ("Settling Insurance Company means any insurance company or

claims "based upon, arising under, or relating to" their settled insurance policies — not merely from claims seeking coverage under particular policies. *See Travelers Indem. Co. v. Bailey*, 129 S. Ct. 2195, 2203 (2009)

As the Plan now stands, the Channeling Injunction (which is geared specifically to particular policies or particular parts of policies) can be circumvented by creative plaintiffs' counsel by claiming that post-confirmation suits against insurance companies allegedly arise out of a policy provision not specifically identified in the Plan or out of some alleged "independent duty" of insurers, but not out of the policies themselves. This is precisely what certain plaintiffs' counsel attempted to do recently in order to circumvent the *Manville* Channeling Injunction. The Bankruptcy Court in that case, recognizing this situation, issued a supplemental order precluding plaintiffs from circumventing the reach of its intended injunction, and that order was recently upheld by the Supreme Court. *Travelers Indem. Co. v. Bailey*, 129 S. Ct. 2195. This Court should prevent such a future situation from arising, by gearing the section 524(g) injunction to the words of the statute, thereby precluding any and all claims against settling insurers where the insurer "is alleged to be directly or indirectly liable for the conduct of, claims against, or demands on the debtor to the extent such alleged liability … arises by reason … provision of insurance to the debtor or a related party." 11 U.S.C. § 524(g)(4)(A)(ii)(III).

Federal courts, and not the Plan Proponents, enjoy the authority and responsibility to decide whether an injunction may issue and the terms of the injunction. The statute at issue here is explicit in conferring that responsibility exclusively on the District Court. *See* 11 U.S.C. § 524(g)(3) (the channeling injunction is valid only if the confirmation order is "issued or affirmed by the district court that has jurisdiction over the reorganization case"). Nowhere does

---

insurance broker which has entered into, or *subsequently enters* into, a Settlement Agreement."(emphasis added)); Section 9.2.A (stating that it is a condition to confirmation of the plan that the court enter an injunction barring suits against a Settling Insurance Company).

section 524(g) provide that a debtor or any other party may seize for itself the court's statutory obligation and power to determine which persons or entities are entitled to section 524(g) protection, nor does the statute purport to limit when the District Court may exercise its statutory power. Indeed, this is evidenced by the fact that other section 524(g) plans, as legatees of *Manville*, regularly provide for a district court's power to provide insurers with the protection of a channeling injunction subsequent to confirmation.[27] Because the Plan seeks unlawfully to transfer the District Court's power to Debtors, the Plan violates sections 524(g) and 1129(a)(1) and cannot be confirmed.

### B. The Limitations On The Section 524(g) Injunction Cause The Plan To Not Have Adequate Means For Its Implementation.

Section 1129(a)(1) of the Code requires a plan to comply with all other provisions of the Bankruptcy Code, including section 1123(a). That section, in turn, "sets forth the mandatory requirements for a plan of reorganization." *In re Haardt*, 65 B.R. 697, 700 (Bankr. E.D. Pa. 1986). Chief among those requirements is that a plan contain adequate means for its implementation. 11 U.S.C. § 1123(a)(5). While the Bankruptcy Code provides a list of examples of "adequate means," the list is not exhaustive. *In re Lisanti Foods, Inc.,* 329 B.R. 491, 506 (D.N.J. 2005), *aff'd*, 242 F. App'x 1 (3d Cir. 2007). Where a Debtor has significant asbestos-related liabilities, the injunction allowed under section 524(g) of the Bankruptcy Code

---

[27] *See, e.g.*, Fourth Amended Joint Plan of Reorganization (As Modified), *In re Federal-Mogul Global, Inc.*, No. 01-10578 (JKF), Dkt. No. 12620 (Bankr. D. Del. Jun. 5, 2007) § 1.1.198 ("Settling Asbestos Insurance Company means each Asbestos Insurance Company listed on Exhibit 1.1.198 (as the same may be amended from time to time, including following entry of the Confirmation Order) and any other Asbestos Insurance Company that enters into an Asbestos Insurance Settlement Agreement that is determined by the District Court to justify treating such Asbestos Insurance Company as a Protected Party."); Debtor's Third Amended, First Modified Plan Of Reorganization Under Chapter 11 Of The Bankruptcy Code, *In re Porter-Hayden Co.*, No. 02-54152, Dkt. No. 967 at 13 (Bankr. D. Md. Mar. 10, 2006)("'Settling Asbestos Insurance Company' means any Asbestos Insurance Company that, (a) after the Petition Date enters into an Asbestos Insurance Settlement Agreement with Debtor that resolves obligations and liabilities of such Asbestos Insurance Company under one or more Asbestos Insurance Policies for Asbestos Bodily Injury Claims, and (b) is identified in the Confirmation Order or any other order of the District Court as protected by the Supplemental Injunction.").

is considered a primary means for adequately implementing a plan of reorganization. *See In re Armstrong World Indus.*, 348 B.R. 136, 156 (Bankr. D. Del. 2006).[28]

Since the transfer of Asbestos Insurance Rights to the Trust is designed to partially fund the Trust's ability to pay Asbestos PI Claims, it should be structured to permit the maximum potential recovery from Asbestos Insurance Entities. If the Plan does not permit an insurance company that has not settled by the Confirmation Date to obtain the protection of the Channeling Injunction permitted by section 524(g)(4)(A)(ii)(III), the likelihood of future settlements with insurance companies will be diminished, and those insurance companies that do settle will not be willing to pay as much as they would have if they had been able to obtain the benefit of the section 524(g) injunction. So, failing to extend the Channeling Injunction to the full extent allowable by section 524(g) will lead to fewer settlements with insurance companies and lesser settlement amounts from those insurers that do settle. These deficiencies result in the Plan lacking sufficient means for implementation, and therefore makes it unconfirmable.

## V.     THE PLAN FAILS TO COMPLY WITH SECTION 524(g) FUNDING REQUIREMENTS.

As a holder of Indirect PI Trust Claims, CNA has a direct interest in ensuring the long-term viability of the Trust. Section 524(g) of the Code prescribes specific requirements for funding of asbestos trusts to ensure such long term viability. Because the Plan does not comply with these requirements, it cannot be confirmed.

### A.     The Plan Fails to Comply with the Section 524(g)(2)(B)(i)(II).

Section 524(g)(2)(B)(i)(II) requires that an asbestos trust be "funded in whole or in part by the securities of 1 or more debtors … and by the obligation of such debtor or debtors to make

---

[28] *See also In re Walker*, 165 B.R. 994, 1003 (E.D. Va. 1994) (providing examples of plans which, although attempting to utilize some form of the enumerated examples of "adequate means" contained in section 1123(a), were found not adequate to ensure success).

future payments, including dividends."  Section 524(g) is "modeled on the trust/injunction in the Johns-Manville case."  140 Cong. Rec. H10765.  The Manville trust received, upon plan confirmation, 24 million shares of Reorganized Manville common stock, all of its series A preferred stock, and the right to a significant share of its profits as long as needed to pay asbestos-related health claims.[29]  As a result, asbestos claimants had "a stake in Johns-Manville's successful reorganization, because the company's success would increase both the value of the stock held by the trust and the company profits set aside for it."  140 Cong. Rec. H10765.  As Senator Heflin explained:  "The reorganized company [became] the goose that lays the golden egg by remaining a viable operation and maximizing the trust's assets to pay claims."  140 Cong. Rec. S4521, S4523 (daily ed. Apr. 20, 1994).

By requiring that "securities" be placed in asbestos trusts, Congress modeled section 524(g) on the *Manville* Plan, so that, as in *Manville*, asbestos trusts would have an equity stake in the reorganized debtors and therefore have a greater long-term ability to pay asbestos personal injury claims.[30]  And the Third Circuit has understood that this was Congress' intent.  *See In re Combustion Eng'g*, 391 F.3d at 248 ("The implication of [section 524(g)(2)(B)(i)(II)] is that the reorganized debtor must be a going concern, such that it is able to make future payments into the trust to provide an 'evergreen' funding source for future asbestos claimants.");  *see also In re Congoleum Corp.*, 362 B.R. 167, 175 (Bankr. D.N.J. 2007) ("Despite the express requirements of § 524(g), and explicit concern expressed by the Third Circuit, it was not until the Seventh

---

[29] *In re Johns-Manville Corp.*, 68 B.R. 618, 621 (Bankr. S.D.N.Y. 1986), *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd sub nom. Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988); Second Amended and Restated Plan of Reorganization, art. 4.1, *In re Johns-Manville Corp.*, No. 82-11656 (Bankr. S.D.N.Y.).

[30] During hearings prior to enactment of Section 524(g), Manville's CEO told Congress that the "asbestos victims 'own' the company and are the principal beneficiaries of any value the company creates."  *Special Problems in Bankruptcy:  Hearing Before the Subcomm. on the Courts and Administrative Practice of the S. Comm. on the Judiciary*, 102d Cong., 1st Sess. 61-62 (1991) (statement of W.T. Stephens, CEO, Manville Corp.).

Modified Joint Plan was filed . . . that the Debtors [or the debtors' parent] proposed contributing any equity toward the Plan Trust.").

Here, the Plan Proponents do not claim that the Trust will be able to pay all Asbestos PI Claims at their Scheduled Value; instead, the TDP calls for calculation of a "Payment Percentage." TDP § 4.2. This apparent shortfall in the ability of the Trust to pay claims notwithstanding, the Plan does not give the Trust any equity in the Debtor. Instead, The Plan Proponents purport to satisfy the "securities" requirement with: (a) a Warrant for ten million shares of Reorganized Grace common stock, with an exercise price of $17 per share and an expiration date of approximately one year from the Effective Date of the Plan; and (b) an Asbestos PI Deferred Payment Agreement to make deferred payments of $110 million per year for five years beginning in 2019, and $100 million per year for ten years beginning in 2024. Although the Warrant and the Asbestos PI Deferred Payment Agreement appear to fall within the literal definition of "security" in section 101(49)(A) of the Code, they are not even remotely close to what Congress intended by requiring "securities of [the] debtors" in section 524(g).

The Warrant does not ensure that the Trust will receive any equity in the Reorganized Debtors. While, theoretically, the Trust could exercise the Warrant during the year following Confirmation in order to acquire stock in the Reorganized Debtor, there is no requirement in the Plan that it do so. In addition, the current price of Reorganized Grace stock is below the "strike price" of $17 per share, and the expert retained by CNA and other insurers (Mr. Mathis) will testify at the Phase II hearing that it is unlikely that the price of Reorganized Grace stock will exceed $17 per share by December 31, 2011 (the presumed date that is one year after Plan Confirmation), such that the Trust would have any economic incentive to exercise the Warrant. While, theoretically, the warrant might be able to be sold to a third party in order to bring some

— albeit small — cash into the Trust, this would not result in the Trust obtaining any equity in the Reorganized Debtors, and thus, again, would not result in any "securities" — as contemplated by the Manville Plan and section 524(g) — being placed in the Trust.

Nor does the Asbestos PI Deferred Payment Agreement qualify as "securities" for purposes of section 524(g). Rather than providing a means for the Trust to grow along with the Reorganized Debtors, the Asbestos PI Deferred Payment Agreement has a fixed value that cannot increase no matter how well Reorganized Grace does in the future. Asbestos Claimants will thus be excluded from any upside of Reorganized Grace's successful reorganization. Concededly, plans have been approved where similar notes from the debtor have been a principal means for financing,[31] but as shown above, that is contrary to what Congress intended.

## B. The Plan Fails to Satisfy the Requirement that the Trust Own More Than 50% of the Shares of a Debtor Upon "Specified Contingencies."

Pursuant to section 524(g)(2)(B)(i)(III), a Trust must also "own, or by the exercise of rights granted under such plan [of reorganization] be entitled to own if specified contingencies occur, a majority of the voting shares" of the debtor or certain named affiliates of the debtor. The Plan purports to satisfy this requirement by giving the Asbestos PI Trust, in conjunction with the Asbestos PD Trust, the right to obtain jointly 50.1% of the common stock of Reorganized Grace if Grace defaults on the deferred payments due to these entities. This, however, does not satisfy section 524(g).

The purpose of the contingency requirement "is to ensure that, if there are not sufficient funds in the trust otherwise, the trust may obtain control of the debtor company."[32] Under the

---

[31] *See*, *e.g.*, *In re ABB Lummus Global Inc.*, 2006 Bankr. LEXIS 1462 at *23-24 (Bankr. D. Del. June 29, 2006); *In re Western Asbestos Co.*, 313 B.R. 832, 851 (Bankr. N.D. Cal. 2003); *cf. In re A.P.I.*, 331 B.R. at 866 (holding insurers lack standing to raise the issue).

[32] 4 Alan N. Resnick & Henry J. Sommer, *Collier on Bankruptcy* ¶ 524.07[2] at 524-50 (15th ed., rev. 2008) (citing 140 Cong. Rec. H10765 (daily ed. Oct. 4, 1994) (summary submitted by Cong. Brooks)).

Plan, the "contingency" that must occur for the PI and PD Trusts jointly to own more than 50% of the voting shares of the Debtor or an affiliate is the Reorganized Debtor's default on its deferred payment obligation. That contingency would not be realized unless and until the Reorganized Debtor was unable to pay its debt obligations and therefore *in extremis*. At that point the common stock that could be obtained by the Trust would be worthless.

As discussed in the recent decision by the Bankruptcy Court for the District of New Jersey, the term "contingency" when used in section 524(g) cannot be interpreted to mean a "contingency" that is only triggered when the stock would have no value because "[t]hat cannot be the type of contingency Congress envisioned when it drafted § 524(g)(2)(B)(i)(III)." *In re Congoleum Corp.,* 362 B.R. at 179. Rather, as that Court pointed out, the "contingency" must be such that the right to obtain control of the voting shares of the Debtor will be able to be exercised at a time when those shares will have a value and will allow the Trust to use that on-going value to fund Asbestos PI Claims. *Id.*

In this regard, the Deferred Payment Agreements are between the subsidiary W.R. Grace & Co.-Conn. ("Grace-Conn.") and the respective Trusts. Grace-Conn.'s obligations under the Deferred Payment Agreements are deeply subordinated to all other obligations of the Reorganized Debtors so that obligations to the Trusts cannot be satisfied until all senior indebtedness has been satisfied. Plan Exhibit 11, § 7. Although the obligations of Grace-Conn. to the Trusts are guaranteed by the parent, W.R. Grace & Co., the parent's obligations to the Trusts are also deeply subordinated such that, in the event of the parent's insolvency, exercise of default remedies will be stayed and the Trusts will be unable to demand issuance of the shares. *See* Plan Exhibit 15. The likelihood that the Parent Common Stock will provide value to the

Trusts under the Plan if there is a default in making the deferred payments is accordingly highly speculative.

Moreover, section 524(g)(2)(B)(i)(III) provides that, upon occurrence of a contingency, the Trust must be entitled to own a majority of the voting shares of the Debtor or an affiliate. The Plan does not comply with this requirement. While the Asbestos PI Deferred Payment Agreement is secured against payment default by 50.1% of the common stock of Reorganized Grace (Plan § 1.1(36)), the Class 7A and Class 7B Asbestos PD Deferred Payment Agreements are secured by the same 50.1% of the Parent Common Stock. Plan §§ 1.1(76), (78). Thus, in the event of default, neither Trust would be able to obtain majority voting control of the Reorganized Grace, contrary to the express requirement of section 524(g)(2)(B)(i)(III).

## VI. THE PLAN CANNOT BE CONFIRMED BECAUSE IT MODIFIES CNA'S RIGHTS UNDER ITS POLICIES AND AGREEMENTS WITH DEBTORS.

### A. The Plan Impairs CNA's Rights Under Its Asbestos Insurance Reimbursement Agreement.

On May 22, 1997, CNA entered into a settlement agreement with Grace-Conn, W.R. Grace & Co., and Fresenius Medical Holdings, Inc. pursuant to which CNA agreed to reimburse the "Grace Group" for a portion of the actual costs incurred by Grace in connection with resolving asbestos-related claims (the "May 1997 Agreement"). The May 1997 Agreement imposes no obligation on CNA to make payments to claimants (or anyone else) on Grace's behalf, and is subject to modification only upon consent of both parties. The May 1997 Agreement also imposes on Grace certain obligations — including an obligation to follow a specific payment formula, provide information, allow for inspection of Grace's and its counsel's files, and, significantly, indemnify CNA to the extent of CNA's payments under the May 1997 Agreement. The May 1997 Agreement was, moreover, premised on CNA's knowledge and

understanding that the Insured would continue to vigorously defend itself against asbestos-related claims.

The May 1997 Agreement is listed on Schedule 3 to the Insurance Transfer Agreement (Plan Exhibit 6) as an "Asbestos Insurance Reimbursement Agreement." Asbestos Insurance Reimbursement Agreements are explicitly carved out from the Plan's insurance neutrality provision. Plan § 7.15(j). Instead, the Plan provides that the Trust's payments under the TDP "shall be deemed to constitute settlement and payment of such claim by or on behalf of the Debtors ... within the meaning of, and in full compliance with, each Asbestos Insurance Reimbursement Agreement." Plan § 7.2.2(d)(iv). Additionally, section 7.13 of the Plan provides that the Debtors or any other of the listed parties: "will not … agree to perform, pay, or indemnify creditors or otherwise have any responsibilities for any liabilities or obligations of the Debtors …." Similarly, the Insurance Transfer Agreement (Plan Exhibit 6) purports to transfer the Debtors' rights under the May 1997 Agreement to the Trust, but makes no provision for the transfer of the Debtors' obligations. These provisions, read together, abrogate the Debtors' unfulfilled non-monetary duties under the May 1997 Agreement in violation of applicable law.

Section 365 of the Bankruptcy Code allows a limited modification of rights only under executory contracts and unexpired leases, not under non-executory contracts.[33] The Code, however, contains no provision allowing modification or assignment of *non-executory* contracts. Courts generally hold that insurance contracts are non-executory after expiration of the policy period. *See, e.g., Beloit Liquidating Trust* v. *United Ins. Co.,* 287 B.R. 904, 906 (N.D. Ill. 2002). This is true of the CNA policies covered by the May 1997 Agreement, for all had expired and

---

[33] *See* 11 U.S.C. § 365(a), (b), and (f); *see also Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 885 F.2d 1149, 1153 (3d Cir. 1989); *In re Stewart Foods, Inc.,* 64 F.3d 141, 145 (4th Cir. 1995); *In re Chicago Rock Island & Pacific R. Co.,* 604 F.2d 1002 (7th Cir. 1979) (holding that a contract of guaranty was not executory and thus could not be disaffirmed by the trustee); *In re Beeler,* 173 B.R. 108, 114 (Bankr. W.D. Tex. 1994); *In re Enjet, Inc.,* 205 B.R. 803, 810-812 (Bankr. E.D. La. 1997).

coverage under them had nearly been exhausted prior to the filing of these Chapter 11 cases. Thus, the May 1997 Agreement is non-executory and cannot be modified by the Plan. Unless the Plan clarifies that the Debtors and the Asbestos PI Trust retain the Debtors' obligations under the May 1997 Agreement, the Plan violates applicable provisions of the Code and non-bankruptcy law, and thus does not comply with sections 1129(a)(1) and (a)(3).

### B. The Section 524(g) Injunction Fails to Include All of the CNA Policies Encompassed by CNA's Asbestos Insurance Reimbursement Agreement and Its Asbestos Insurance Settlement Agreement.

Prior to the commencement of these cases, CNA had made substantial payments under the May 1997 Agreement, nearly exhausting all of the coverage under the four policies covered by it. As a result, Grace's obligation to indemnify CNA against claims made by third parties seeking coverage under those policies to the extent of CNA's prior payments had already matured. The Plan, however, would not enjoin third-party claims against those polices under the section 524(g) supplemental injunction, but instead would allow such third-party claims to proceed and would then channel CNA's indemnity claims against Debtors to the Trust as Indirect PI Trust Claims.

CNA is also party to a February 18, 1997 Settlement Agreement (the "February 1997 Agreement") with Grace, which the Debtors have identified as an Asbestos Insurance Settlement Agreement in Plan Exhibit 5. The Plan would protect CNA under the section 524(g) supplemental injunction against claims seeking coverage under the policies covered by the February 1997 Agreement, but only to the extent of the "Products" coverage portion of the policies. The February 1997 Agreement, however, settled coverage disputes between Grace and CNA that related to more than just the "Products" coverage portion of these policies.

The Plan is defective in that it fails to protect CNA with a supplemental injunction under section 524(g) from claims for which the Debtors would be obligated to indemnify CNA under

34

either: (a) the May 1997 Agreement; or (b) settled portions of the covered policies other than "Products" coverage under the February 1997 Agreement. This failure causes the Plan to have inadequate means of implementation in violation of section 1123(a)(5), because claims that could be enjoined as to CNA will be allowed to proceed, with the result that CNA's indemnity claims against Debtors will be channeled to the Trust, thus reducing the funds available to pay other Trust claimants (*see* Part IV.B *supra*). Of equal importance, giving some Settled Asbestos Insurance Companies with contingent and noncontingent Class 6 claims or demands for indemnification from the Debtors the full protection of the section 524(g) injunction, while not providing such protection to other settled insurers, such as CNA, that also hold Class 6 claims for indemnification, violates sections 1123(a)(4) and 524(g) by failing to give the same treatment to each claim of a particular class. *See* Part III *supra*. That certain settled insurers will be required to expend valuable resources in defending and, perhaps, satisfying asbestos claims, while other settled insurers are afforded enhanced injunctive protection, is precisely the sort of disparate treatment that these sections are designed to prevent. See *In re Monroe Well Serv.*, 80 B.R. 324, 335 (Bankr. E.D. Pa. 1987); *In re Elsinore Shore Assocs.*, 91 B.R. 238 (Bankr. D.N.J. 1988).

Rather than discriminating among settled insurers or inadequately trying to re-state complex policy and settlement terms, the Plan should instead provide, at a minimum, that the section 524(g) protection will be co-extensive to the Debtors' indemnity obligations under the applicable agreements.[34] Indeed, making the scope of the injunction co-extensive with terms of

---

[34] CNA is not asking the Court to construe its settlement agreements with Debtors as part of the confirmation process, just that the Court direct that the scope of the injunction be co-extensive with the scope of the indemnity obligation. In addition, as shown above, the injunction should follow the language of section 524(g) and preclude suits where the settling insurer "is alleged to be directly or indirectly liable for the conduct of, claims against, or demands on the debtor to the extent such alleged liability … arises by reason … provision of insurance to the debtor or a related party." 11 U.S.C. § 524(g)(4)(A)(ii)(III).

the settlements is the only way to be entirely consistent with this Court's repeated admonition that in confirming the Plan, the Court intends to make no coverage determinations.

### C.  The Plan Abrogates The Anti-Assignment Provisions In CNA Policies.

Section 1129(a)(3) of the Bankruptcy Code requires that a plan be "proposed in good faith and not by any means forbidden by law."  The Plan does not comply with these provisions because: (1) it allows the Debtors to assign all Asbestos Insurance Rights in contravention of the express provisions of the CNA Policies; (2) CNA is entitled to enforce the anti-assignment provisions contained in the CNA Policies under applicable state law; and (3) the Bankruptcy Code does not preempt the anti-assignment provisions.

The Plan states that, on the Effective Date, all Asbestos Insurance Rights "shall be irrevocably transferred to and vested in the Asbestos PI Trust."  Plan § 7.2.2(d).  Asbestos Insurance Rights include, *inter alia,* all rights, titles, privileges, and interests with respect to any Asbestos Insurance Policy.  Plan §§ 1.1(11), (13).  This would include, among other things, all rights that Debtors have under non-settled Asbestos Insurance Policies issued by CNA.

The Transfer Agreement violates the express terms of the CNA Policies that preclude the assignment of interests in the policies without the insurer's consent.[35]  CNA has not consented to the transfer of the Asbestos Insurance Rights under its policies — a fact that Debtors (and the other Plan Proponents) have admitted in their responses to CNA's Requests for Admission.[36]  If a coverage action were brought against CNA by the Debtors or the Asbestos PI Trust, CNA would interpose as a defense that interests in the policies had been assigned without its consent

---

[35] *See, e.g.*, Harbor Insurance Policy No. 12034.

[36] *See* Plan Proponents' Response to CNA Request for Admission No. 1.

— a defense that would be upheld under the applicable state law (New York) governing the interpretation and enforcement of CNA's policies.[37]

Contrary to statements made by the Plan Proponents in their Phase I Brief (at 22-23), the Third Circuit has not, either in the *Combustion Engineering* case or otherwise, determined that State law precluding the assignment of rights under a policy is pre-empted by the Bankruptcy Code. Rather, the Third Circuit Court has stated only that "[s]ection 541 [of the Code] effectively preempts any contractual provision that purports to limit or restrict the rights of a debtor to transfer or assign[] its interests in bankruptcy." *In re Combustion Eng'g.*, 391 F. 3d at 219 n.27. Section 541 only preempts contractual provisions that would invalidate an assignment of a debtor's prepetition insurance policy to a debtor's estate. *See* 11 U.S.C. § 541(c)(1). The Asbestos Insurance Transfer Agreement does not purport to transfer the Asbestos Insurance Rights to the Debtor's estate; rather it purports to transfer those rights to the Asbestos PI Trust. While the Third Circuit, in *Combustion Engineering*, did hold that the rights to insurance "proceeds" could be transferred to an Asbestos Trust — notwithstanding anti-assignment provisions in the pertinent insurance policies — it has ***never*** ruled that all of a Debtors rights under the policies can be so transferred. 391 F.3d at 218.

The proposed assignment of Asbestos Insurance Rights also violates sections 1129(a)(1) and (3) to the extent it imposes on the Asbestos Insurance Entities modifications of contract rights that are not authorized by the Bankruptcy Code and that violate applicable state law. While the Plan transfers the rights of the Debtors under the Policies to the Asbestos PI Trust, it is not clear that the attendant obligations of the Debtors remain with them or are also transferred. Nothing in the Bankruptcy Code or in applicable state law permits a unilateral modification of

---

[37] *See, e.g.*, *Globecon Group, LLC v. Hartford Fire Ins. Co.*, 434 F.3d 165 (2d Cir. 2006); *Carle Place Plaza Corp. v. Excelsior Ins. Co.*, 534 N.Y.S.2d 397 (App. Div. 1988).

contract rights. *See In re Beeler,* 173 B.R. 108, 114 (Bankr. W.D. Tex. 1994). Moreover, the Bankruptcy Code contains no provision allowing modification or assignment of *non-executory* contracts. CNA's policies are non-executory and non-assignable.

CNA acknowledges that this Court has recently upheld similar assignment provisions in other cases,[38] but raises this objection to the abrogation of the anti-assignment provisions in its policies to preserve the point for appeal.[39]

## VII. THE PLAN SHOULD MAKE CLEAR THAT IT DOES NOT MODIFY THE PARTIES' RIGHTS UNDER CERTAIN INDEPENDENT INSURANCE PROGRAMS WITH THE FRESENIUS INDEMNIFIED PARTIES AND SEALED AIR INDEMNIFIED PARTIES.

The Plan releases certain claims against the Fresenius Indemnified Parties and the Sealed Air Indemnified Parties. Plan §§ 8.5, 8.6. CNA maintains separate, on-going insurance programs for certain of the Fresenius Indemnified Parties and the Sealed Air Indemnified Parties, and wishes assurance that none of the Plan's releases or exculpations modifies the parties' rights under those programs. If the Plan does purport to so modify CNA rights, the Plan would be inconsistent with applicable law, and not confirmable under section 1129(a)(1). CNA is working with the Plan Proponents to resolve this issue.

## VIII. INCORPORATION BY REFERENCE OF CERTAIN OTHER OBJECTIONS

CNA reserves the right to join the Phase II Trial Briefs filed by other Objectors.

---

[38] *In re Federal-Mogul Global Inc.*, 385 B.R. 560, 567 (Bankr. D. Del. 2008), *aff'd,* 402 B.R. 625 (D. Del. 2009), *appeal pending,* No. 09-2230 (3d Cir.); *In re Global Indus. Techs, Inc.*, Case No. 02-21626, Dkt. Nos. 7886, 7887 (W.D. Pa. Nov. 13, 2007), a*ppeal pending* No. 08-3650 (3d Cir.).

[39] The objecting insurers in the *Federal Mogul* case articulated several reasons why §1123(a)(5) did not pre-empt the restrictions on assignment contained in their policies. *In re Federal Mogul,Inc.*, 402 B.R. 625 (D. Del. 2009). CNA adopts those contentions, as follows, for the purpose of preserving its rights: the presumption against pre-emption has not been overcome; § 1123(5) does not pre-empt private contracts; the § 1123(a)(5) pre-emption only applies to laws relating to financial condition; and, while insurance proceeds may be transferred pursuant to § 1123(a)(5), insurance rights may not.

## CONCLUSION

CNA respectfully requests that the Court not confirm the Plan unless the Plan is modified

to satisfy CNA's objections, and that it provide such further relief as is just and proper.


Dated: July 13, 2009

FORD MARRIN ESPOSITO WITMEYER &
GLESER, L.L.P.
Elizabeth DeCristofaro (*pro hac vice*)
Wall Street Plaza, 23rd Floor
New York, New York 10005-1875
Telephone: (212) 269-4900
Facsimile: (212) 344-4294

ROSENTHAL, MONHAIT &
GODDESS, P.A.

By: _____
Edward B. Rosenthal (*Bar No. 3131*)
P.O. Box 1070
Wilmington, Delaware 19899
Telephone: (302) 656-4433x6
Facsimile: (302) 658-7567


WILDMAN, HARROLD, ALLEN
& DIXON LLP
Jonathan W. Young
Jeff Chang
225 West Wacker Drive
Chicago, Illinois 60606-1229
Telephone: (312) 201-2662
Facsimile: (312) 416-4524

GOODWIN PROCTER LLP
Daniel M. Glosband (*pro hac vice*)
Exchange Place
Boston, Massachusetts 02109
Telephone: (617) 570-1000
Facsimile: (617) 523-1231
-and-
Michael S. Giannotto (*pro hac vice*)
Frederick C. Schafrick (*pro hac vice*)
901 New York Avenue, N.W.
Washington, D.C. 20001
Telephone: (202) 346-4000
Facsimile: (202) 346-4444


*Counsel for Continental Casualty Company, Transportation Insurance Company
and their American insurance affiliates*

39