## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| W.R. Grace & Co., *et al.*, | : | Case No. 01-1139 (JKF) |
| | : | |
| Debtors. | : | Jointly Administered |

### PHASE II TRIAL BRIEF OF GENERAL INSURANCE COMPANY OF AMERICA IN SUPPORT OF OBJECTION TO W.R. GRACE & CO. FIRST AMENDED JOINT PLAN OF REORGANIZATION

In accordance with the Third Amended Case Management Order entered by the Court on May 5, 2009, General Insurance Company of America ("General Insurance") submits this Phase II trial brief in further support of its objections to confirmation of the First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code of W.R. Grace & Co., et al., the Official Committee of Asbestos Personal Injury Claimants, the Asbestos PI Future Claimants' Representative, and the Official Committee of Equity Security Holders (the "Plan").

### PRELIMINARY STATEMENT

The focus of this brief is claims relating to a Settlement Agreement and Mutual Release (the "Settlement Agreement"), attached hereto as Exhibit A, that General Insurance entered into with W.R. Grace & Co.-Conn. ("Grace"), effective March 3, 1994. The Settlement Agreement dealt with primary policies issued (or allegedly issued) by General Insurance to Vermiculite-Northwest, Inc. ("VNW") for the period from June 1, 1961 through June 1, 1967.[1]

General Insurance wants to be certain that its claims for breach of the Settlement Agreement by the Asbestos PI Trust are preserved and properly treated in the event a

---

[1] VNW was an entity engaged in the business of manufacturing and distributing of materials capable of use in construction work. It was a licensee of Zonolite Company ("Zonolite"), with rights to manufacture, sell and distribute certain products in all or part of a five-state area in the Northwestern United States. Grace acquired Zonolite in 1963 and became VNW's sole shareholder in 1966. General Insurance is not alleged to have ever insured any of the Debtors' operations in Libby, Montana or any of the Debtors' businesses other than VNW.

Section 524(g) plan is confirmed -- and most specifically it wants to (i) preserve setoff and recoupment rights against the Asbestos PI Trust; (ii) assure that its rights under the Settlement Agreement, including its rights to be indemnified for, defended against, and held harmless from all asbestos-related claims and its rights under Grace's warranty against tender of any asbestos-related claims, are properly treated and  preserved; and (iii) preserve any rights to be paid retrospective premiums under its policies in the event that General Insurance does pay any asbestos-related claims.

Under the plain language of the Settlement Agreement, the Agreement settled all disputes and issues between General Insurance and Grace as to all "Asbestos-Related Claims" against VNW, which are broadly defined in the Agreement to include all "Asbestos-Related Bodily Injury Claims" and all "Asbestos-Related Property Damage Claims" -- "regardless of  the cause of action or theory of recovery employed by the Person asserting such claims." (Agreement at 5-6; marked as Gen. Ins. Co. Ex. 1B.)

The Agreement could not be clearer on this point.  It contains a recital that Grace and General Insurance have entered into the Agreement to resolve "among other things, coverage for Asbestos-Related Claims and Products Claims…."  (Agreement at 4-5.)  It contains a representation, warranty and covenant that:

> Grace agrees that no further Asbestos-Related Claims or Products Claims will be presented or tendered by Grace to General under the Primary Policies for any reason or purpose regardless of the theory of coverage. (Agreement at 18.)

And the Agreement incorporates the definition of "Asbestos-Related Claims" into its definition of "Product Claims" (Agreement at 6), thus confirming the breadth of the Agreement and the

release set forth therein, which encompasses "Products Claims" -- defined to include all

"Asbestos-Related Claims." (Agreement at 9-10.)[2]

Until very recently, Grace apparently had the same understanding. For nearly 15 years

since the effective date of the Settlement Agreement, Grace never pursued coverage from

General Insurance for asbestos-related claims. Indeed, in this very Chapter 11 case, Grace's

initial Disclosure Statement filed in November 2004 [Dkt. No. 6896] states in Section 2.7.2.2.

that "[w]ith one exception, coverage disputes regarding the Grace and Zonolite primary policies

have been settled, and the settlement amounts paid in full." The only unsettled primary coverage

noted is a carrier not in any way related to General Insurance. No mention is made of General

---

[2] Under the Settlement Agreement:

> A. "Asbestos-Related Bodily Injury Claims" shall mean any and all past, present, future, known or unknown, foreseeable or unforeseeable claims for bodily injury, sickness or disease asserted by any person against Grace, VNW or Zonolite (or any combination thereof), or against others trading under the name of such companies, where such bodily injury, sickness or disease claims arise out of, involve or relate in any way to asbestos, regardless of the cause of action or theory of recovery employed by the Person asserting such claims, or the theory of recovery or coverage employed by Grace or any other Person with respect to such claims. (Agreement at 5.)

> B. "Asbestos-Related Property Damage Claims" shall mean any and all past, present, future, known or unknown, foreseeable or unforeseeable claims asserted by any Person against Grace, VNW or Zonolite (or any combination thereof), or against others trading under the names of such companies, involving or relating in any way to asbestos in buildings or in or on property, regardless of the cause of action or theory of recovery employed by the Person asserting such claims, or the theory of recovery or coverage employed by Grace or any other Person with respect to such claims. (Agreement at 6.)

> C. "Asbestos-Related Claims" shall mean both Asbestos-Related Bodily Injury Claims and Asbestos-Related Property Damage Claims as those terms are defined above. (Agreement at 6.)

> E. "Products Claims" shall mean Asbestos-Related Claims and any other claim, demand, or lawsuit for Bodily Injury or Property Damage arising from the handling or use of, or the existence of any condition in, goods or products manufactured, sold, handled or distributed by Grace, Zonolite or VNW, regardless of the cause of action or theory of recovery or coverage employed by the Person asserting such claims (including claims based upon a failure to warn) or the cause of action or theory of recovery employed by Grace or any other Person with respect to such claims. (Agreement at 6; emphasis supplied.)

Insurance.  The text of the Amended Disclosure Statement filed in January 2005 [Dkt. No. 7559] is the same on this subject, and to make the point even clearer, Exhibit 10 to the Amended Disclosure Statement, entitled "Primary & Excess Insurance Policies That Were or Are Applicable to Asbestos-Related Claims," lists the General Insurance policies and describes them as "Resolved."[3]

What prompts General Insurance to object to the Plan is an apparent attempt, of recent origin, by Grace and the other Plan Proponents to try to rewrite and limit the scope of the Settlement Agreement.  On October 23, 2008, without any notice to General Insurance, the Debtors filed Exhibit 5 [Dkt. 19849] in connection with the then-proposed Plan and Disclosure Statement, entitled "Schedule of Settled Asbestos Insurers Entitled to 524(g) Protection."[4] This Exhibit indicates that only "products coverage" of the listed General Insurance policies is entitled to 524(g) injunctive protection as settled policies. The current Exhibit 5 in the Exhibit Book is the same as to General Insurance [Dkt. 20874], and  the current Plan defines "Settled Asbestos Insurance Company" as settled companies but  "only to the extent of, any Asbestos Insurance Policy (or any portion thereof) identified  as the subject of an Asbestos Insurance Settlement Agreement in Exhibit 5 in the Exhibit Book…." (Plan at 37.)

Moreover, Schedule 1 of current Exhibit 6 to the Plan (entitled "Asbestos Insurance Transfer Agreement") [Dkt. 20874] lists General Insurance policies as policies that the Insurance

---

[3] Indeed, neither the description of insurance coverage at Section 2.10.2.2 of the present Disclosure Statement approved in February 2009 [Dkt. No. 20667], nor any coverage description in any prior iteration thereof, makes any reference to unresolved General Insurance coverage. Instead, the Court-approved Disclosure Statement  states that with one "exception" -- not General Insurance or any related carrier -- "coverage regarding the Grace and Zonolite primary policies for 1953-1985 has been fully settled and the settlement amounts paid in full." (Feb. 27. 2009 Discl. St. at 41.)

[4] Plan Proponents never served General Insurance with Plan Exhibit 5, the Plan, the Disclosure Statement or the various Case Management Orders, or any claims bar date orders or notices -- doubtless because Grace itself understood that General Insurance had been fully released and settled as to all asbestos claims years ago and never added General Insurance to a service list after its change of mind in October 2008.

Contributors "have reason to believe potentially or actually provide insurance for Asbestos PI

Claims" and hence are among the Asbestos Insurance Rights to be transferred to the Asbestos PI

Trust.[5]  Exhibit 6 (Asbestos Insurance Transfer Agreement) to the Plan also lists (on Schedule 2

thereof) the General Insurance Settlement Agreement, which it describes as an agreement "that

the Insurance Contributors have reason to believe potentially affect[s] any right under any

Asbestos Insurance Policy…." (Plan Ex. 6 at § 3(a)(ii).)

**PHASE II OBJECTIONS**
**THE PLAN IS NOT CONFIRMABLE**

The point of General Insurance's objections is not to involve the Court in interpretation

of the Settlement Agreement, including whether Grace or other Plan Proponents have

understated the scope of the settlement and release thereunder, but rather to preserve setoff,

recoupment, and other basic claim rights and remedies *vis-à-vis* the Asbestos PI Trust in

accordance with the Bankruptcy Code.  General Insurance's claims appear to fall within the

Plan's definition of Indirect PI Trust Claims (Plan § 1.1(138)), which are not to be Allowed or

Disallowed but rather resolved by the Asbestos PI Trust pursuant to the terms of Asbestos PI

TDP.  (Plan § 3.1.6(a)(ii)).  General Insurance, moreover, has decided not to seek affirmative

claim recovery from the Debtors (as opposed to the Asbestos PI Trust).  Therefore there should

be no occasion for the Court to resolve any issue of interpretation of the Settlement Agreement

as part of a claim objection.

I.      **The Plan Violates §§ 1129(a)(1) And 553(a) By**
        **Attempting To Cut Off Recoupment And Setoff Rights.**

If there had been no bankruptcy and Grace sued General Insurance for payment of

asbestos claims, General Insurance would not only have a defense based on the release in the

---

[5] Capitalized terms that are defined in the Plan are used herein with the same meaning, unless otherwise indicated.

Settlement Agreement, but also a counterclaim and rights of setoff and recoupment based on Grace's breach of the Settlement Agreement.

Under the Plan, however, Asbestos Insurance Rights are transferred to the Asbestos PI Trust "free and clear of all encumbrances, liens, security interests, and other Claims or causes of action, except that all Asbestos Insurer Coverage Defenses are preserved."  (Plan § 7.2.2(d)(ii).) Nowhere does the Plan expressly state that Grace's <u>obligations</u> under Asbestos Insurance Policies or under Asbestos Insurance Settlement Agreements (like the General Insurance Settlement Agreement and Mutual Release) are transferred to the Asbestos PI Trust.  In fact, the Asbestos Insurance Transfer Agreement states that the "Transfer is not an assignment of any insurance policy" (Plan Ex. 6 at § 1(d))  -- indicating an intent to sever the benefits (which are assigned) from the burdens (which are not).  Moreover, Section 7.13 of the Plan states that the Asbestos PI Trust will not have "transferee liability of any kind" except for obligations "specified in this Plan."[6]

The Insurance Neutrality provision in the Plan (§ 7.15) is not clear in preserving recoupment and setoff rights; in fact, one might say it is a "mess" on this issue.  Section 7.15(a) states that it preserves the "legal, equitable or contractual rights" of the insurers "notwithstanding anything to the contrary in the ... Plan ...."  But Section 7.15(a) begins with the caveat: "Except to the extent provided in this Section 7.15 ...."  Next, Section 7.15(g) states that "Notwithstanding the provisions of Section 7.15, Asbestos Insurance Entities shall be bound by the Court's findings and conclusions that, under the Bankruptcy Code, the transfer of rights and the Asbestos Insurance Transfer Agreement is valid and enforceable ...."  In turn, the Asbestos Insurance Transfer Agreement (Plan Ex. 6 at § 1(a)) and the Plan (§ 7.2.2(d)(ii)) state that the

---

[6] Likewise, under Section 8.1.1 of the Plan, the Reorganized Debtors are not responsible for any obligations of the Debtors "except those expressly assumed by the Reorganized Debtors pursuant to the Plan."

transfer of Asbestos Insurance Rights is "free and clear" of all claims, "except that Asbestos Insurer Coverage Defenses are preserved."

Accordingly, under the Plan, whether the recoupment and setoff rights (or other rights) are preserved, likely turns on the definition of "Insurance Coverage Defense." That definition, at Section 1.1(16) of the Plan, states that such defense "shall mean all rights and defenses at law or in equity that any Asbestos Insurance Entity may have under any Asbestos Insurance Policy, Asbestos Insurance Settlement Agreement ... or applicable law to a claim seeking insurance coverage."

But this definition, too, has exceptions. "Asbestos Insurer Coverage Defenses do not include any defenses that (i) the Plan or any of the Plan Documents do not comply with the Bankruptcy Code, or (ii) the transfer of Asbestos Insurance Rights pursuant to the Asbestos Insurance Transfer Agreement is prohibited by any Asbestos Insurance Policy, any Asbestos Insurance Settlement Agreement ... or applicable non-bankruptcy law." Thus, if the Court rules that Asbestos Insurance Transfer Agreement and Plan provisions as to the transfer of Asbestos Insurance Rights comply with Section 1123(a)(5) of the Bankruptcy Code, and indeed preempt any contrary state law principles (as the Plan Proponents will doubtless request), then presumably the Trust would argue, in a later lawsuit against General Insurance, that any assertion by General Insurance of a defense based on recoupment and setoff rights is really an assertion that the Plan, which it will say cuts off such rights, does "not comply with the Code" or an assertion by General Insurance that the transfer "free and clear" of such rights -- which are state law rights -- is prohibited by "applicable non-bankruptcy law" -- in either event, a defense barred by the carve outs in the definition of "Asbestos Insurer Coverage Defense."

In short, the Plan is at best ambiguous as to preservation of setoff and recoupment rights arising under Asbestos Insurance Policies and Asbestos Insurance Settlement Agreements. The

Bankruptcy Code, however, is not ambiguous on this point.  Section 553(a) of the Code, 11

U.S.C. § 553(a), affirmatively preserves setoff rights.  It provides in relevant part:

> (a)  Except as otherwise provided in this section and in
> sections 362 and 363 of this title, this title does not affect any right
> of a creditor to offset a mutual debt owing by such creditor to the
> debtor that arose before the commencement of the case under this
> title against a claim of such creditor against the debtor that arose
> before the commencement of the case . . . .

The case law confirms that a plan that attempts to cutoff setoff rights is not confirmable:

> Hays also complains that the Plan improperly extinguishes any
> setoff rights he may have.  We do agree with this argument.  While
> Hays' claim may be extinguished affirmatively [court subordinated
> claim to equity status], there is no basis in the Code to eliminate
> his setoff rights.[FN5]  In fact section 553 expressly preserves
> whatever setoff rights Hay may have under state law.[7]

*In re ALTA+CAST, LLC,* 2004 WL 484881 at *6 (Bankr. D. Del. 2004); *see In re Phoenix*

*Petroleum Co.*, 278 B.R. 385, 400 (Bankr. E.D. Pa. 2001)("[A] creditor does not lose its setoff

right when it properly asserts that right prior to confirmation").

Recoupment rights, unlike setoff, are not preserved by Code provision but rather by case

law:

> The doctrine of recoupment is an equitable remedy that allows the
> offset of mutual debts when the respective obligations originate
> from the same transaction or occurrence.  *In re Telephone*
> *Warehouse, Inc.*, 259 B.R. 64, 67 (Bankr.Del.2001).  The doctrine
> of recoupment is defined as "the setting up of a demand arising
> from the same transaction as the plaintiff's claim or cause of
> action, strictly for the purpose of abatement or reduction of such
> claim."  *University Med.*, 973 F.2d at 1079 (quoting 4 COLLIER
> ON BANKRUPTCY § 553.03, at 553-15-17 (Lawrence P. King
> Ed., 15th ed.1992)).  The Third Circuit explained:

---

[7] Footnote 5 in *ALTA+CAST, LLC* states in relevant part

> A plan of reorganization may eliminate a creditor's right of setoff if not raised
> until after confirmation.  *See, e.g., In re Continental Airlines*, 134 F.3d 536 (3d
> Cir.1998).  In this case, however, Hays asserted his right to setoff prior to
> confirmation and is entitled to preserve them.  *See e.g., In re Phoenix Petroleum*,
> 278 B.R. 385, 400 (Bankr.E.D.Pa. 2001). . . .

> The doctrine is justified on the grounds that "where the creditor's claim against the debtor arises from the same transaction as the debtor's claim, it is essentially a defense to the debtor's claim against the creditor rather than a mutual obligation, and application of the limitations on setoff in bankruptcy would be inequitable."
>
> *University Med.*, 973 F.2d at 1079 (*quoting Lee v. Schweiker*, 739 F.2d at 875).
>
> In the bankruptcy context, the application of recoupment is not codified in the Bankruptcy Code, but it has been developed through case law.  *See Anes v. Dehart (In re Anes)*, 195 F.3d, 177, 182 (ed Cir. 1999) ….

*In re Communication Dynamics, Inc.*, 300 B.R. 220, 225-26 (D. Del. 2003).

It should be noted that what is involved here is not the assignment of a contract (for which benefits and burdens both must be assigned under the *cum onere* principle).  *E.g., NLRB v. Bildisco and Bildisco*, 465 U.S. 513, 531-32 (1984).  The contracts involved, certain Asbestos Insurance Policies and the Settlement Agreement, are not being assumed or assigned.  Nor is it the sale of an asset under the Plan (which might be sold in a plan free and clear of a lien under Code §1123(a)(5)(D), but not free of recoupment and setoff rights).  The asset -- insurance policies, as limited and released by the Settlement Agreement -- is simply not being sold.

Instead, the rights (Asbestos Insurance Rights) contained in the insurance contracts are to be severed and decoupled from the obligations in those same contracts -- and by that legerdemain defenses of setoff and recoupment are to vanish.  After the Plan is confirmed, the entity that would sue General Insurance for payment -- the Asbestos PI Trust -- would say that the warranty in Section 15D of the Settlement Agreement -- providing "that no further Asbestos-Related Claims or Products Claims will be presented or tendered by Grace . . ." -- was not transferred to the Trust; the only thing transferred was the right to seek coverage under the released policies.  And so, the Trust would argue, General Insurance cannot assert a defense of

setoff or recoupment or other monetary remedy against the Trust for the monetary damage it causes. Fortunately, the Code and the case law do not permit such a bizarre result. The Plan is not confirmable unless, among other things, it is changed expressly to preserve General Insurance's recoupment and setoff rights.

## II.   The Plan Violates Sections 1129(a)(1), 1129(a)(3) And 1123(a)(3) Of The Bankruptcy Code Because The Plan Does Not Provide Treatment For General Insurance PI Trust Claims And Improperly Attempts To Extinguish Them.

The intent of the Plan appears to be to channel any and all claims by General Insurance relating to its Settlement Agreement, including claims under its contractual indemnity and Grace's warranty against tender of claims, to the Asbestos PI Trust. The Plan defines Asbestos PI claim to include Indirect PI Trust Claims (Plan § 1.1(33)), and Indirect PI Trust Claims, in pertinent part, includes claims for "payment, repayment, reimbursement, indemnification . . . from the Debtors with respect to any insurance settlement agreement . . . issued or entered into by an Entity on account of, or with respect to, Asbestos PI Claims." (Plan § 1.1(138).) Under Section 3.1.6 of the Plan (Class 6. Asbestos PI Claims), all Asbestos PI Claims are channeled to the Asbestos PI Trust, for payment "as and to the extent provided by the Asbestos PI TDP."

Grace's indemnity obligation to General Insurance is broad, encompassing not only reimbursement for any Asbestos Claim that General Insurance ever has to pay, but also payment of all "costs or expenses incurred by, General in connection with such claims. . . ." (Settlement Agreement, § 8.) The contractual indemnity in the Settlement Agreement also includes the defense of such claims. (Id., § 8(e).) In addition, the Settlement Agreement includes a release and a warranty that Asbestos Claims of any kind, "regardless of theory of coverage" will not be "presented or tendered by Grace to General…." (Settlement Agreement, § 15.D.)

The claims that are channeled to the Asbestos PI Trust as Indirect PI Trust Claims therefore include:

1. Claims for indemnity in the event that General Insurance ever pays an Asbestos Claim;

2. Claims for costs and expenses associated with any Asbestos Claim presented or tendered to General Insurance, including costs of defense;

3. Claims for damages in the event that the Asbestos PI Trust chooses to breach the Settlement Agreement, including by presenting Asbestos Claims to General Insurance or seeking payment from General for such Claims.

As an initial matter, if the Plan Proponents wish to channel all claims by General Insurance relating to its Settlement Agreement to the Asbestos PI Trust, there must be a provision in the Plan whereby the Trust assumes responsibility for those obligations.  Otherwise -- as with the recoupment and setoff analysis in the preceding section -- the Trust could breach the Settlement Agreement, ignore the warranty against tender of Asbestos Claims and other obligations, and simply say that all those obligations are contractual obligations of Grace, not the Trust and that the Plan does not provide any remedy for breach by the Trust (as opposed to the breach by the Debtors) of the Settlement Agreement.

If such severing and decoupling of rights from obligations under integrated contracts were permitted by the Court, then the Plan Proponents will have succeeded in rewriting Asbestos Insurance Settlement Agreements and Asbestos Insurance Policies, to the great prejudice of General Insurance and other insurers.  Fortunately, nothing in the Code authorizes the rewriting of insurance policies or settlement agreements for the benefit of the Debtors or tort claimants. To the contrary, a debtor must take its contracts as it finds them.  *Zartman v. First Nat'l Bank of Waterloo*, 216 U.S. 134, 135 (1910) ("[T]he trustee takes the property of the bankrupt . . . as the debtor had it at the time of the petition. . . ."); *Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1213 (7th Cir. 1984) ("Thus, whatever rights a debtor has in property at the commencement of the case continue in bankruptcy -- no more, no less."); *In re Joshua Slocum Ltd.*, 922 F.2d 1081, 1091 (3d

Cir. 1990). Moreover, bankruptcy courts have long recognized that they lack the power to alter

the rights and obligations of insurers. *Amatex Corp. v. Aetna Cas. & Sur. Co.* (*In re Amatex*

*Corp.*), 97 B.R. 220, 221 (Bankr. E.D. Pa.), *aff'd sub nom. Amatex Corp. v. Stonewall Ins. Co.*,

102 B.R. 411 (E.D. Pa. 1989).

A further major failing in the Plan is that the Asbestos PI TDP, which governs the

treatment of Indirect PI Trust Claims, does not provide for treatment of those Claims. To the

contrary, the TDP appears to contemplate that such claims will be only for reimbursement if and

when General Insurance pays a direct Asbestos Claim -- not for costs, expenses, damages, and

attorneys' fees.

The TDP has two provisions potentially applicable to Indirect PI Trust Claims,

Section 5.6 which is entitled "Indirect PI Trust Claims" and deals generally with such claims and

Section 5.13, entitled "Indemnified Insurer TDP Claims," which deals only with "claim[s] of a

Settled Asbestos Insurance Company seeking indemnification based upon or arising out of an

Asbestos PI Claim. . . ."

Recall that the Plan Proponents, in Exhibit 5 to the Plan, take the position that General

Insurance is not a Settled Asbestos Insurance Company as to any coverage other than products

coverage. Thus, any claim by General Insurance relating to a non-products claim, such as a

claim against the Trust for damages for its breach of the Settlement Agreement or for indemnity

and defense costs relating to payment or tender of a non-products claim would fall under Section

5.6 of the TDP. That Section has no treatment for anything other than a claim for reimbursement

for payment of a direct claim. Therefore such Indirect PI Trust Claim by General Insurance

would have no treatment whatsoever. That claim simply vanishes under the Plan.

Of course, the Bankruptcy Code does not permit such an unjust result. Section 1123(a)(3)

of the Code, 11 U.S.C. § 1123(a)(3), requires that a Plan "specify the treatment of any class of

claims or interests that is impaired under the plan." A plan that is "completely devoid of specificity" as to how a claim will be treated is not confirmable. *In re Sandy Ridge Dev. Corp.*, 881 F.2d 1346, 1353 (5th Cir. 1989).

Even as to products claims, which the Plan Proponents seem to concede in Plan Exhibit 5 are settled and therefore subject to "treatment" under Section 5.13 of the TDP, the Plan is still deficient. Section 5.13 pertains to claims for "indemnification." It provides for no express treatment of claims for costs and expenses, including cost of defense. It provides no treatment whatsoever for breach of contract damages in the event the Trust seeks payment from General Insurance for products claims.

The Plan is thus unconfirmable unless it is changed to include appropriate treatment fixes, as set forth at page 14 *infra*.

## III. The Plan Violates Sections 1129(a)(1) And 1122 Because It Misclassifies General Insurance's Contract Claims.

The Plan's broad definition of Indirect PI Trust Claims reflects an apparent economic deal -- Grace funds the Asbestos PI Trust, and any claim having to do with asbestos claims or asbestos insurance goes to the Trust; such claims are not Grace's problem. Therefore, any claim "with respect to any insurance settlement agreement" goes to the Trust. If the Trust breaches the settlement agreement, it -- not Grace -- pays.

General Insurance understands, and respects, that deal. But the fact remains that unlike asbestos tort claims, General Insurance's claims arise out of contract. Even assuming *arguendo* that a claim for indemnity in the event that General Insurance has to pay an Asbestos Claim could be classified in the same class as direct Asbestos PI Claims, the remaining claims of General Insurance, although defined in the Plan as Indirect PI Trust Claims, surely cannot be so classified.

Most obviously, any claim by General Insurance for breach of the Settlement Agreement if the Trust tenders an Asbestos Claim to General Insurance, or seeks payment for such claims, does not in any way derive from payment of an Asbestos Claim. Such a claim seeks damages for breach of a promise. In fact, such a claim by definition can be established only if a court of competent jurisdiction finds that General Insurance is <u>not</u> liable for asbestos-related claims, as Grace agreed years ago in the Settlement Agreement. Such a claim is a simple contract claim, not based in any way on payment of an Asbestos Claim.[8] Such contract claims properly belong in Class 9 of the Plan, General Unsecured Claims, which are to be paid in full.[9]

The fix here is not to undo the basic deal between Asbestos and Grace. If Asbestos chooses to breach the General Insurance Settlement Agreement, then Asbestos PI Trust should pay. The Plan should be modified to say that the treatment to be accorded any breach of contact claim by General Insurance, including breach of the warranty against tender of Asbestos Claims of any kind whatsoever, breach of the release, reimbursement for fees and costs in defending claims -- all such claims should be given the same treatment as Class 9 General Unsecured Claims, *i.e.*, payment in full, not fractional payment that asbestos tort claims are given under the Asbestos PI TDP.

A further fix, however, is also needed. Under the Asbestos PI TDP (Plan Ex. 4) and the Asbestos PI Trust Agreement (Plan Ex. 2), the Asbestos PI Trustees, with the consent of the

---

[8] Likewise, if General Insurance is required to defend an Asbestos Claim, its costs and expenses are not derivative of payment of such claim. Indeed, if the defense succeeds, there would be no Asbestos Claim payment.

[9] Section 1122 of the Bankruptcy Code requires that all claims in a class be "substantially similar." "[C]lassification is constrained by two straight-forward rules: Dissimilar claims may not be classified together; similar claims may be classified separately only for a legitimate reason." *The Aetna Cas. & Sur. Co. v. Clerk, U.S. Bankruptcy Court, New York, New York (In re Chateaugay Corp.)*, 89 F.3d 942, 949 (2d Cir. 1996); *see also Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.)*, 280 F.3d 648, 661 (6th Cir. 2002) (stating that dissimilar claims may not be classified together). Here, the Plan places General Insurance's contract claims in the same class as dissimilar tort claims (Class 6, Asbestos PI Claims) and in a different class from similar claims, Class 9, General Unsecured Claims.

Asbestos PI Trust Advisory Committee, have broad power to change the Asbestos PI TDP.  (*See* Asbestos PI TDP § 2.2(f).)  Any treatment accorded to General Insurance would be illusory if the Trustees and the TAC could change it at whim.  The TAC members are all prominent asbestos PI attorneys plus the Futures Representative.  They all owe fiduciary duties to their constituents; they all have an interest in maximizing insurance recovery.  None have an interest in paying damage or indemnity payments to General Insurance. Therefore the Plan should be changed to prevent the Trustees and TAC from changing the treatment of General Insurance's claims in any way prejudicial to General Insurance.

As explained in *Sandy Ridge Development*, *supra*, treatment "devoid of specificity" violates Code § 1123(a)(3).  *A fortiori*, illusory treatment -- meaning treatment that can be altered at the whim of Trust fiduciaries with obligations to claimants adverse to General Insurance -- is no treatment at all.

## IV.    The Plan Violates Code §§ 1129(a)(1), 1122 And 1123(a)(4) Unless Fixed By Specifying That The Trust Will  Pay Retrospective Premiums In Full.

The General Insurance policies involved herein include provisions whereby the premium amounts thereunder are subject to change and are determined retrospectively on the basis of, among other things, loss experience and claims paid.  For example, the policy marked as General Insurance Substitute Exhibit 1A (and attached hereto as Exhibit B) states at page MDC 233, numbered paragraph 3:

> "Premium.  The premium stated in the declarations is estimated only.  Upon the anniversary, termination, or cancellation date of this policy, the earned premium shall be computed in accordance with the company's rules, rates, rating plans, premiums and minimum premiums.  If the earned premium exceeds the estimated advance premium paid, the named insured shall pay the excess;  if less, the company shall returned the unearned portion paid by such insured. . . ."

If General Insurance is required to pay any Asbestos Claims, a retro premium may be generated. Such claim may be an Indirect PI Trust Claim under the Plan because it may be viewed as "on account of alleged liability of the Debtors for payment. . . of any damages such Entity has paid or may pay to the plaintiff in such actions." (Plan, § 1.1(138), subparagraph(x)(ii).) Such claim may also be an Indirect PI Trust Claim because it falls under the indemnity provision of the General Insurance Settlement Agreement. (Agreement § 8.) In either event, General Insurance believes it likely that the intent of the Plan is that if the Asbestos PI Trust gets the benefit of insurance, it will pay the premium. The Plan should be clarified as to who will pay claims for retro premium on Asbestos Insurance Policies.

More to the point, a claim for retro premium is a contract claim. It is not a claim to be indemnified for paying an Asbestos Claim; it is the price of the insurance contract itself. As with other simple contract claims, it should be paid in full, and the Asbestos PI TDP should be amended to so provide. As with the contract claims discussed in Section III above, a new TDP provision for paying retro premium should not be subject to the whim of the Trustees and the TAC. Without such a fix, the Plan violates Bankruptcy Code sections 1129(a)(1) and § 1123(a)(3) because it is unclear as to treatment of retro premiums claims. The Plan also violates Bankruptcy Code section 1122 because it misclassifies such claims as Asbestos PI claims, which they are not.

**V.     Joinder.**

General Insurance joins in the arguments set forth in the Phase II Trial Brief for CNA Companies; provided, however, that it does not join in any suggestion or statement, if any, that the Court should construe or interpret any Asbestos Insurance Settlement Agreement, such construction and/or interpretation being a matter to be dealt with elsewhere, in the context of coverage determination.

## CONCLUSION

For the reasons stated, the Court should <u>not</u> confirm the Plan.

Dated:  July 13, 2009                Respectfully submitted,


/s/ Frederick B. Rosner
Frederick B. Rosner (DE #3995)
MESSANA ROSNER & STERN LLP
1000 N. West Street, Suite 1200
Wilmington, DE  19801
Telephone: 302-777-1111
Facsimile: 302-295-4801

- and-

Robert B. Millner
SONNENSCHEIN NATH & ROSENTHAL LLP
233 S. Wacker Drive, Suite 7800
Chicago, Illinois  60606
Telephone: 312-876-8000
Facsimile: 312-876-7934
*Counsel for General Insurance Company of
America*