IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

IN RE:                                    )          CASE NO. 01-01139
                                          )          CHAPTER 11
W.R. GRACE & CO., et al.                  )
                                          )
                        Debtors.          )
                                          )
                                          )
_____ )

---

**PHASE II TRIAL BRIEF OF GARLOCK SEALING TECHNOLOGIES, LLC
IN OPPOSITION TO CONFIRMATION OF PROPONENTS'
FIRST AMENDED JOINT PLAN OF REORGANIZATION**

---

Dated:  July 13, 2009

Brett D. Fallon (DE Bar No. 2480)
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
P.O. Box 2306
Wilmington, Delaware  19899-2306
Telephone:  (302) 888-6800
Facsimile:  (302) 571-1750
Email:  bfallon@morrisjames.com

-and-

Garland Cassada
Richard C. Worf
ROBINSON, BRADSHAW & HINSON
101 North Tryon Street, Suite 1900
Charlotte, NC  28246
Telephone:  (704) 377-8135
Email:  GCassada@rbh.com
        RWorf@rbh.com

*Attorneys for Garlock Sealing Technologies LLC*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................... ii

PRELIMINARY STATEMENT ................................................................................. 1

STATEMENT OF FACTS ......................................................................................... 3

ARGUMENT ............................................................................................................. 8

I.  THE PLAN VIOLATES THE "FAIR AND EQUITABLE" TEST OF SECTION
    524(g)(4)(B)(ii). ............................................................................................... 8

    A.  History of "Fair and Equitable." ............................................................. 10

    B.  "Fair and Equitable" under Section 524(g). ........................................... 12

    C.  The Plan Is Not "Fair And Equitable" Within The Meaning of 524(g) .......... 16

II. INDEPENDENT OF THE PLAN'S VIOLATION OF ABSOLUTE PRIORITY,
    THE TDP ARE NOT FAIR AND EQUITABLE TO GARLOCK AND OTHER
    CO-DEFENDANTS ......................................................................................... 18

    A.  The TDP Prevent Co-Defendants From Receiving Credit For Future
        Payments By The Grace Trust. ................................................................. 19

III. GARLOCK HAS STANDING TO OBJECT TO THE PLAN ......................... 24

    A.  The Plan Profoundly Affects Garlock's Rights Under State Law ........... 24

    B.  Garlock Must Also Be Accorded Party-In-Interest Status Because No
        Other Party Represents Its Substantial Interests. ................................... 26

CONCLUSION ....................................................................................................... 29

2266228/1

# TABLE OF AUTHORITIES

**Cases**

*Abbott v. John E. Green Co.*, 233 Mich. App. 194, 592 N.W.2d 96 (1998)...................................4

*Adolf v. A.P.I., Inc.*, 726 F. Supp. 764 (D.N.D. 1989) .......................................................4

*Allied Signal, Inc. v. Ott*, 785 N.E.2d 1068 (Ind. 2003) .....................................................4

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) ......................................................28

*Baker v. AC & S, Inc.*, 562 Pa. 290, 755 A.2d 664 (2000) ..................................................4

*Bank of America Nat. Trust & Sav. Ass'n v. 203 North LaSalle St. P'ship*, 526 U.S. 434 (1999).............................................................................................................11

*Barnes v. Owens-Corning Fiberglas Corp.*, 201 F.3d 815 (6th Cir. 2000) .................................4

*Baron & Budd, P.C. v. Unsecured Asbestos Claimants Comm.*, 321 B.R. 147 (D.N.J. 2005)............................................................................................................25

*Baron & Budd, P.C. v. Unsecured Asbestos Claimants Committee*, 321 B.R. 147 (Bankr. D.N.J. 2005)...............................................................................................26

*Brennan v. Owens-Corning Fiberglas Corp.*, 134 Idaho 800, 10 P.3d 749 (2000)........................4

*Case v. L.A. Lumber Products Co.*, 308 U.S. 106 (1939)................................................10, 11, 17

*Central Wesleyan College v. W.R. Grace & Co.*, 6 F.3d 177 (4th Cir. 1993) ...............................4

*Chestang v. W.R. Grace & Co.-Conn.*, 709 So.2d 470 (Ala. 1998) ........................................4

*Ciccone v. Dominick's Finer Foods, Inc.*, 731 N.E.2d 312 (Ill. 1st Dist. 2000) ...............6, 19, 21

*Cole v. Celotex Corp.*, 599 So. 2d 1058 (La. 1992)....................................................6, 19

*Consolidated Rock Products Co. v. Dubois*, 312 U.S. 510 (1941) .........................................14

*Dentureholders Protective Committee of Continental Inv. Corp.*, 679 F.2d 264 (1st Cir. 1982)..............................................................................................................14

*Fendley v. Armstrong World Industries, Inc.*, 1988 WL 68908 (D.N.J. 1988) .............................4

*Gemco-Ware, Inc. v. Rongene Mold & Plastics Corp.*, 360 S.E.2d 342 (Va. 1987)................6, 19

*Giordano v. AC & S, Inc.*, 446 Pa. Super. 232, 666 A.2d 710 (1995) .......................................4

ii

*Goodyear Atomic Corp. v. Miller*, 486 U.S. 174 (1988) ............................................... 14

*Haislip v. Owens-Corning Fiberglas Corp.*, 86 F.3d 1150 (4th Cir. 1996)................................... 4

*Harahan v. AC & S, Inc.*, 2003 PA Super 28, 816 A.2d 296 (2003) ............................... 4

*Hecht v. Summerlin Life & Health Ins. Co.*, 536 F. Supp. 2d 1236 (D. Nev. 2008) ................... 20

*Ieropoli v. AC&S Corp.*, 577 Pa. 138, 842 A.2d 919 (2004) .......................................... 4

*In re Amatex Corp.*, 755 F.2d 1034 (3d Cir. 1985)....................................... 24, 25, 26, 27

*In re Armstrong World Indus., Inc.*, 320 B.R. 523 (Bankr. D. Del. 2005) .................................... 11

*In re Combustion Eng'g, Inc.*, 391 F.3d 190 (3d Cir. 2004)............................................ 24

*In re Congoleum Corp.*, 362 B.R. 167 (Bankr. D.N.J. 2007) ........................................ 13

*In re Congoleum Corp.*, 426 F.3d 675 (3d Cir. 2005) .......................................... 26, 27

*In re Fuller-Austin Insulation*, 1998 WL 812388 (D. Del. 1998)................................... 25

*In re Joint Eastern and Southern Dist. Asbestos Litigation*, 827 F. Supp. 1014 (S.D.N.Y 1993)................................................................................... 4

*In re Stone Barn Manhattan LLC*, 405 B.R. 68 (Bankr. S.D.N.Y. 2009)................................... 25

*In re Western Asbestos Company, et al.*, 313 B.R. 832 (Bankr. N.D. Ca. 2003) ........................ 13

*Ingenito v. AC & S, Inc.*, 430 Pa. Super. 129, 633 A.2d 1172 (1993) ............................ 4

*Jesensky v. A-Best Products*, 287 Fed. Appx. 968, 2008 WL 3917339 (3d Cir. 2008)................. 4

*Jones v. Owens-Corning Fiberglas Corp.*, 69 F.3d 712 (4th Cir. 1995) ........................... 4

*Kozak v. Armstrong World Industries, Inc.*, 213 Ill. App. 3d 1061, 572 N.E.2d 279 (1991) ......... 4

*La Ferry v. Ajax Truck Rentals*, 161 F. Supp. 707 (E.D. Tenn. 1958) ........................ 19

*Lonasco v. A-Best Products Co.*, 2000 PA Super 203, 757 A.2d 367 (2000) ............................ 4

*Louisville Trust Co. v. Louisville, New Albany & Chicago Ry. Co.*, 174 U.S. 674 (1899) .... 10, 17

*Malcolm v. National Gypsum Co.*, 995 F.2d 346 (2d Cir. 1993)...................................... 4

*Minneapolis, St. P. & S. S. M. R. Co. v. City of Fond du Lac*, 297 F.2d 583 (7th Cir. 1961)................................................................................... 19

*Morissette v. United States*, 342 U.S. 246 (1952)....................................................... 14

iii

*MRRM, P.A. v. W.R. Grace & Co.*, 404 F.3d 863 (4th Cir. 2005)..................................................4

*Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950) ........................................26

*Nutt v. Owens-Corning Fiberglas Corp.*, 1997 WL 33353265 (Mich. App. 1997) ......................4

*Old Dominion Copper Mining & Smelting Co. v. Bigelow*, 203 Mass. 159 (1912) ......................5

*Olivo v. Exxon Mobil Corp.*, 377 N.J. Super. 286, 872 A.2d 814 (2005)......................................4

*Olivo v. Owens-Illinois, Inc.*, 186 N.J. 394, 895 A.2d 1143 (2006) .............................................4

*Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999) ........................................................................28

*Paul v. Bier*, 758 A.2d 40 (D.C. 2000) ..................................................................................6, 19

*Pendzsu v. Beazer East, Inc.*, 219 Mich. App. 405, 557 N.W.2d 127 (1996) ...............................4

*Prekler v. Owens-Corning Fiberglas Corp.*, 60 F.3d 824 (4th Cir. 1995) ....................................4

*Re' v. Owens-Corning Fiberglas Corp.*, 706 So.2d 660 (La. App. 1998) .....................................4

*Rowland v. Skaggs Companies, Inc.*, 666 S.W.2d 770 (Mo. 1984)..............................................19

*Sheetz, Inc. v. Bowles Rice McDavid Graff & Love, PLLC*, 547 S.E.2d 256 (W. Va. 2001).................................................................................................................. 6, 19, 21

*State Farm Mut. Auto. Ins. Co. v. Solem*, 622 P.2d 682 (Mont. 1981) ........................................20

*Wilkie v. Robbins*, 127 S. Ct. 2588 (2007)..................................................................................14

**Statutes**

11 U.S.C. § 1109(b) ...................................................................................................................24

11 U.S.C. § 1128(b) ...................................................................................................................24

11 U.S.C. § 1129(b)(1) ...............................................................................................................12

11 U.S.C. § 524(g)(2)(B)(ii) .......................................................................................................13

11 U.S.C. § 524(g)(4)(B)(ii) .........................................................................................................9

Cal. Civil Code § 1431 (2009).....................................................................................................5

Cal. Civil Code § 1431.2 (2009)...................................................................................................5

Ind. Code § 34-51-2-7 (2009) ......................................................................................................5

iv

Miss. Code Ann. § 85-5-7 (2009) ................................................................................. 5

N.J. Stat. Ann. § 2A:15-5.3(a) (2009) .......................................................................... 5

Tex. Civ. Prac. & Rem. Code Ann. § 33.013(a) (2009) ................................................ 5

Tex. Civ. Prac. & Rem. Code Ann. § 33.013(b) (2009) ................................................ 5

**Other Authorities**

140 Cong. Rec. H10752-01 ......................................................................................... 14

140 Cong. Rec. H10768 .............................................................................................. 14

**Treatises**

6 Wright & Miller, Federal Practice & Procedure § 1448 ............................................ 19

Richard Maloy, A Primer on Cramdown-How and Why It Works, 16 St. Thomas L. Rev.
    1 (2003).................................................................................................................. 11

Garlock Sealing Technologies, LLC ("Garlock"), through its undersigned counsel, hereby submits this Phase II Trial Brief in opposition to confirmation of the First Amended Joint Plan Of Reorganization Under Chapter 11 of the Bankruptcy Code of W.R. Grace & Co., Et Al., the Asbestos PI Future Claimants' Representative, and The Official Committee Of Equity Security Holders, dated February 27, 2009 (the "Plan").

## PRELIMINARY STATEMENT

Garlock, like Grace before the Petition Date,[1] defends and settles asbestos cases across the country. Before Grace exited the tort system, Garlock and Grace together defended cases brought by tens of thousands of workers alleging that asbestos-containing products of the two companies jointly contributed to their asbestos-related injuries. In many of these cases, Garlock was, by virtue of joint and several liability principles, a guarantor to plaintiffs against Grace's failure to pay its share. Coupled with this liability, however, Garlock held the right to join Grace immediately upon Garlock's being sued to ensure that Grace paid its share of liabilities, so that Garlock was not required to do so.

Under the Plan, Grace proposes to resolve its liability for Asbestos PI Claims, including claims by Garlock, by transferring assets to the WRG Asbestos PI Trust (the "Trust") that are projected to pay only 25% to 35% of the expected amount of such liability. The Asbestos PI Channeling Injunction (the "Channeling Injunction") would permanently enjoin Garlock and other co-defendants from ever suing Grace to recover the co-defendants' losses associated with Grace's failure to pay its full liability. As a result, the Plan saddles Garlock and similarly situated co-defendants with potentially hundreds of millions of dollars of joint and several liability for Grace's

---

[1] Unless otherwise stated, capitalized terms shall have the meanings ascribed to them in the Plan.

unpaid asbestos torts. Yet, Grace proposes to pay its financial creditors in full with post-petition interest and to permit Grace's shareholders to retain a billion or more dollars of equity in Grace.

In light of the inadequate benefits provided to the Trust by Grace, the Plan fails to accord Garlock "fair and equitable" treatment under Section 524(g)(4)(B)(ii). The Plan simply passes Grace's unfunded asbestos liabilities from Grace's shareholders to other companies. Congress did not intend for permanent injunctions under Section 524(g) to serve as mechanisms to secure the subordinate rights of stockholders at the expense of the prior contribution rights of co-defendants.

The Plan also fails the fair and equitable standard because the proposed Trust Distribution Procedures (the "TDP") contain a host of provisions designed to enable Asbestos PI Claimants to conceal, and avoid having to reduce their damage claims against co-defendants by, even the meager Trust payments:

- First, the TDP restrict Garlock from filing a claim against the Trust unless Garlock has defended a case in the tort system at trial and suffered and paid a judgment. This is a material departure from state law, which would permit Garlock to sue Grace as soon as a claimant sues Garlock, thus allowing the court to adjudicate Grace's liability at the same time as Garlock's.

- Second, the TDP permit holders of Asbestos PI Claims to file claims against the Trust in secrecy, which is also a departure from state law where plaintiffs file law suits in public courts, and present evidence in open court.

- Finally, the TDP permit claimants to qualify for Trust payments even after taking positions in their underlying tort actions against co-defendants that exposure to Grace's asbestos-containing products did not contribute to their injuries.

Combined, these TDP provisions would allow claimants to avoid giving Garlock credit for 25% to 35% Trust payments as state law would otherwise require. This is a predictable approach already followed by claimants in the context of existing asbestos trusts that have adopted similar trust distribution procedures. Plaintiffs routinely sue Garlock and other solvent defendants but

postpone making trust claims until after obtaining settlements or judgments from defendants in the tort system. During discovery in the tort system, plaintiffs profess to lack evidence of exposure to products of companies whose liabilities have been assumed by trusts. Then, plaintiffs suffer no consequence from such denials when they later file Trust claims with exposure evidence, in secret, after their tort claims are resolved. In this way, the TDP operate to permit plaintiffs to obtain full recovery from Garlock and other solvent defendants in the tort system, and then afterwards recover Trust payments for which non-bankrupt defendants never receive credit.

The double-dipping facilitated by the TDP is the only way to explain why present Asbestos PI Claimants, the Asbestos PI Committee, and the Asbestos PI Future Claimants' Representative (the "Futures Representative") would accept a Plan that pays Asbestos PI Claims no more than a third of their values while leaving a billion or more dollars on the table for Grace's shareholders. Under the TDP, Trust payments would be free money for many plaintiffs.

The consensus of Asbestos PI Claimants and their court-appointed representatives in favor of the Plan, therefore, gives a false impression of fairness to Asbestos PI Claimants. The Plan reflects a tainted bargain between asbestos bodily injury claimants, Grace and the Equity Committee. Bodily injury claimants waive their rights (as well as those of Garlock and other co-defendants) to Grace's equity in exchange for no more than one third of the value of their claims, but retain their ability to pursue Grace's *full* liability, funded and unfunded, from co-defendants. Because this bargain fails to accord fair and equitable treatment to Garlock and other co-defendants, the Court should deny confirmation of the Plan.

## STATEMENT OF FACTS

The evidence Garlock will offer at the Phase II Confirmation Hearing is briefly summarized below. Most of it should be undisputed.

Background.   Prior to the April 2, 2001 petition date, Grace and Garlock routinely were named together in thousands of asbestos cases annually.[2]  In these suits, plaintiffs alleged that the products of multiple defendants—including Grace and Garlock—were substantial contributing causes of the plaintiffs' indivisible asbestos-related injuries.   Grace and Garlock were named together so frequently in part because plaintiffs alleged that the asbestos-containing products of the companies were often used in close proximity or that plaintiffs' occupations brought them into contact with such products.  If a plaintiff alleged a claim against Grace, it often alleged a claim against Garlock as well.[3]

Since the Petition Date, countless plaintiffs whose asbestos injuries were caused in part by Grace have continued to sue Garlock.   The automatic bankruptcy stay has prevented the plaintiffs and Garlock from joining Grace to adjudicate its share of liability.  Although no record exists of the identity of holders of Asbestos PI Claims that have arisen since the Petition Date, it is certain that a very high percentage of these claimants have sued Garlock alleging that it jointly

---

[2] The frequency with which plaintiffs sued Grace and Garlock together for allegedly jointly contributing to asbestos injuries varied by state and plaintiffs' firm. Complaints filed by the most active plaintiffs' firms routinely sued Garlock and Grace together. In Kentucky, for example, approximately 95% of the complaints served on Garlock alleged that Grace also contributed to their injuries.

[3] So often have Garlock and Grace defended asbestos cases together that they appear as defendants in 26 reported appellate opinions in asbestos cases in federal and state courts: *Jesensky v. A-Best Products*, 287 Fed. Appx. 968, 2008 WL 3917339 (3d Cir. 2008); *MRRM, P.A. v. W.R. Grace & Co.*, 404 F.3d 863 (4th Cir. 2005); *Barnes v. Owens-Corning Fiberglas Corp.*, 201 F.3d 815 (6th Cir. 2000); *Haislip v. Owens-Corning Fiberglas Corp.*, 86 F.3d 1150 (4th Cir. 1996); *Jones v. Owens-Corning Fiberglas Corp.*, 69 F.3d 712 (4th Cir. 1995); *Prekler v. Owens-Corning Fiberglas Corp.*, 60 F.3d 824 (4th Cir. 1995); *Central Wesleyan College v. W.R. Grace & Co.*, 6 F.3d 177 (4th Cir. 1993); *Malcolm v. National Gypsum Co.*, 995 F.2d 346 (2d Cir. 1993); *In re Joint Eastern and Southern Dist. Asbestos Litigation*, 827 F. Supp. 1014 (S.D.N.Y 1993); *Adolf v. A.P.I., Inc.*, 726 F. Supp. 764 (D.N.D. 1989); *Fendley v. Armstrong World Industries, Inc.*, 1988 WL 68908 (D.N.J. 1988); *Olivo v. Owens-Illinois, Inc.*, 186 N.J. 394, 895 A.2d 1143 (2006); *Olivo v. Exxon Mobil Corp.*, 377 N.J. Super. 286, 872 A.2d 814 (2005); *Ieropoli v. AC&S Corp.*, 577 Pa. 138, 842 A.2d 919 (2004); *Allied Signal, Inc. v. Ott*, 785 N.E.2d 1068 (Ind. 2003); *Harahan v. AC & S, Inc.*, 2003 PA Super 28, 816 A.2d 296 (2003); *Brennan v. Owens-Corning Fiberglas Corp.*, 134 Idaho 800, 10 P.3d 749 (2000); *Lonasco v. A-Best Products Co.*, 2000 PA Super 203, 757 A.2d 367 (2000); *Baker v. AC & S, Inc.*, 562 Pa. 290, 755 A.2d 664 (2000); *Abbott v. John E. Green Co.*, 233 Mich. App. 194, 592 N.W.2d 96 (1998); *Re' v. Owens-Corning Fiberglas Corp.*, 706 So.2d 660 (La. App. 1998); *Chestang v. W.R. Grace & Co.-Conn.*, 709 So.2d 470 (Ala. 1998); *Nutt v. Owens-Corning Fiberglas Corp.*, 1997 WL 33353265 (Mich. App. 1997); *Pendzsu v. Beazer East, Inc.*, 219 Mich. App. 405, 557 N.W.2d 127 (1996); *Giordano v. AC & S, Inc.*, 446 Pa. Super. 232, 666 A.2d 710 (1995); *Ingenito v. AC & S, Inc.*, 430 Pa. Super. 129, 633 A.2d 1172 (1993); and *Kozak v. Armstrong World Industries, Inc.*, 213 Ill. App. 3d 1061, 572 N.E.2d 279 (1991).

contributed to their injuries. In fact, Garlock currently is defending numerous cases in which plaintiffs allege, or plaintiffs or co-workers have testified, that Grace's products contributed to the asbestos injuries at issue, and plaintiffs in these cases are seeking to recover Grace's share of liability from Garlock.

State Law.  Outside of bankruptcy, under applicable state law, if a jury finds both Grace and Garlock liable for a plaintiff's injuries, Garlock is protected from having to bear Grace's share.  Applicable law varies by state but generally can be divided into three categories.  First, many states have "several" liability rules under which each of Grace and Garlock would be responsible for paying only its respective share of liability, which in most such states would mean a part of a judgment proportional to its determined degree of fault.  *See, e.g.*, Miss. Code Ann. § 85-5-7 (2009); Ind. Code § 34-51-2-7 (2009).  Second, other states have "joint and several" liability rules, pursuant to which plaintiffs can recover their entire damages from any defendant found liable, regardless of its determined degree of fault.  *See, e.g.*, Cal. Civil Code §§ 1431, 1431.2 (2009) (economic damages); *Old Dominion Copper Mining & Smelting Co. v. Bigelow*, 203 Mass. 159, 219 (1912).  Finally, a third group of states follows hybrid or "modified joint and several" liability rules, pursuant to which defendants have several liability for judgments unless their comparative fault exceeds a threshold amount at which point they have joint and several liability.  *See, e.g.*, Tex. Civ. Prac. & Rem. Code Ann. §§ 33.013(a), 33.013(b) (2009) (50 percent threshold); N.J. Stat. Ann. § 2A:15-5.3(a) (2009) (60 percent threshold).

The majority of states follow some form of joint and several liability, either pure or modified.  A defendant in these states that is compelled to pay more than its share of a judgment generally has a right under applicable contribution rules to recover the shares of other joint tortfeasors paid by such defendant.

5

In states with joint and several liability and in which a plaintiff sues both parties, therefore, Garlock and Grace would hold rights to contribution against one another. This right would arise from the moment such plaintiff brings suit. In any case in which a plaintiff sues Garlock but not Grace, absent a bankruptcy stay, Garlock need not wait until sustaining and paying a judgment before suing Grace. Garlock may join Grace as a defendant when Garlock is sued. *See, e.g., Sheetz, Inc. v. Bowles Rice McDavid Graff & Love, PLLC*, 547 S.E.2d 256, 267 (W. Va. 2001); *Paul v. Bier*, 758 A.2d 40, 46 (D.C. 2000); *Ciccone v. Dominick's Finer Foods, Inc.*, 731 N.E.2d 312, 318 (Ill. 1st Dist. 2000); *Cole v. Celotex Corp.*, 599 So. 2d 1058, 1072 (La. 1992); *Gemco-Ware, Inc. v. Rongene Mold & Plastics Corp.*, 360 S.E.2d 342, 344 (Va. 1987). This is a material right ensuring Garlock that Grace's share of fault for any injury can be adjudicated at the same time as Garlock's in a single action, so that Garlock will not be forced to pay Grace's share of the plaintiff's damages and pursue Grace for its share in a second action.

Plan Treatment of Asbestos Claims. Under the Plan, Grace and other protected parties would transfer assets to the Trust that are projected to provide holders of Asbestos PI Claims between 25% and 35% of the value of their claims against Grace. Debtors' Disclosure Statement at 14. In states with joint and several liability, plaintiffs would pursue Garlock and other solvent defendants to pay the 65% to 75% of Grace's unfunded liability. The Plan would forever bar Garlock from seeking to recover this amount from Grace.

In the meantime, however, the Plan does not similarly impair Grace's financial creditors. Just the opposite, Grace would pay financial claims in full with post-petition interest. Moreover, although co-defendants' claims against Grace to recover the unfunded asbestos liability would be barred, Grace's shareholders would retain their stock in Grace as it emerged from bankruptcy an asbestos-free company.

Trust Distribution Procedures.   The proposed TDP contain provisions that govern distribution of Trust assets to holders of Asbestos PI Claims, which would include bodily injury claimants injured by Grace products and co-defendants that have contribution rights against Grace.   Under a straightforward application of state law, when a bodily injury claimant provides evidence to the Trust that Grace injured him and receives a 25% to 35% payment, state law would reduce the amount of Grace's liability share that the claimant can recover from Garlock by at least the amount of the payment.   In this way, Garlock's losses under the Plan should be equal to, and certainly no greater than, 65% to 75% of Grace's unfunded asbestos liability.

If bodily injury claimants could conceal evidence of Grace exposure from the co-defendants, however, and pursue Trust claims only after resolving claims with other co-defendants, they could secure Grace's full share from co-defendants in an action[4] and subsequently obtain an additional payment from the Trust without giving credit to co-defendants. The tort system does not permit this type of gamesmanship. This is true first because the claiming process in federal and state courts is transparent, preventing claimants from keeping their claims and evidence against Grace secret. Second, if claimants do not sue Grace in the tort system, co-defendants can join it in actions and, if the claimants fail to provide evidence of Grace exposure, the claimants are barred from later pursuing Grace.   Claimants therefore are accountable for withholding Grace evidence.

The TDP would remove these fundamental features of the tort system that protect co-defendants from being saddled with Grace's share and thereby enable bodily injury claimants to avoid giving state law credit to co-defendants for even the meager 25% to 35% payments they

---

[4] Claimants would do so by withholding evidence of Grace exposure and arguing that Grace does not have a share of liability, the effect of which would be to spread Grace's undisclosed liability among the co-defendants against which claimants offer evidence.

would receive from the Trust. To begin with, the TDP would not permit co-defendants to initiate determination of Grace's responsibility for an Asbestos PI Claim when they were sued in the tort system by the claim holder. Garlock could never file a Trust claim unless Garlock suffered and paid a judgment to the claimant. TDP § 5.6. In the meantime, the claim holder could wait until her underlying tort action was resolved before seeking resolution of a Trust claim. TDP §§ 5.1(a)(2) and 6.3. The transparency required by state and federal courts would also be absent— submissions to the Trust, including the POC form and evidence of Grace exposure would be filed in secrecy. TDP § 6.5. Moreover, bodily injury claimants who deny Grace exposure in tort actions to enhance their claims against co-defendants would not be bound by their positions but could still qualify for Trust payments:

> [F] ailure to identify Grace products in the claimant's underlying tort action, or to other bankruptcy trusts, does not preclude the claimant from recovering from the PI Trust, provided the claimant otherwise satisfies the medical and exposure requirements of this TDP.

TDP § 5.7(b)(3).

In sum, although Trust beneficiaries must include *all* holders of Asbestos PI Claims (bodily injury claimants and contribution claimants alike), claimant representatives consenting to the TDP intentionally stacked the deck in a way that favors bodily injury claimants at the expense of co-defendants with contribution rights. As a result, Garlock effectively would be denied the benefits of the Trust.

## ARGUMENT

## I.   THE PLAN VIOLATES THE "FAIR AND EQUITABLE" TEST OF SECTION 524(g)(4)(B)(ii).

In order to issue the Channeling Injunction, the Court must determine, before confirmation, that "identifying such debtor or debtors . . . in such injunction with respect to such

demands for purposes of this subparagraph is fair and equitable with respect to the persons that might subsequently assert such demands, in light of the benefits provided, or to be provided, to such trust on behalf of such debtor or debtors . . . ." 11 U.S.C. § 524(g)(4)(B)(ii). The words "fair and equitable" have a long established meaning under bankruptcy law: unless the prior claims of creditors are paid in full, stockholders may not retain their stock in a reorganized debtor. This principle is known as the absolute priority rule. The Plan's provisions permitting Grace's shareholders to retain their stock while higher priority creditors (Asbestos PI Claimants, including Garlock and other co-defendants) receive one third or less of the value of their claims violates the absolute priority rule therefore preventing confirmation of the Plan.

Few courts have considered in detail what it means for the identification of a debtor in a Channeling Injunction to be "fair and equitable." All of the available evidence demonstrates, however, that Congress' use of the term was deliberately intended to apply the strict "fair and equitable" standard that prevailed before adoption of the Code in 1978. Under pre-Code law, a plan could not depart from absolute priority without the consent of *all* affected creditors—not just the class of affected creditors. If they did not consent, the plan was unconfirmable. In the Code, Congress saw fit to allow departures from absolute priority in somewhat broader circumstances: where a class of creditors consents to a Plan that departs from absolute priority, non-consenting creditors are bound by that consent so long as the Plan satisfies the best interests test.

But the language of 524(g)(4)(B)(ii) and the legislative history of the Bankruptcy Reform Act of 1994 show that Congress intended for plans to satisfy the strict version of absolute priority before a debtor may acquire the special benefits of a 524(g) injunction. The Plan fails

9

absolute priority because the shareholders will retain shares even though objecting defendants (including Garlock) will not be paid in full.

A.     **History of "Fair and Equitable."**

Long before the enactment of the Bankruptcy Code in 1978, "fair and equitable" was a term of art that incorporated a strict version of the absolute priority rule. Section 77B(f) of the Bankruptcy Act of 1898 (added in 1934) provided that a reorganization plan could be confirmed only if it "is fair and equitable." The Supreme Court soon held in *Case v. L.A. Lumber Products Co.*, 308 U.S. 106, 114 (1939) that the words "fair and equitable" incorporated a strict rule of absolute priority that had developed in the equity receivership context. The Court noted that "[t]he words 'fair and equitable' as used in s. 77B are words of art which prior to the advent of s 77B had acquired a fixed meaning through judicial interpretations in the field of equity receivership reorganizations," and Congress was presumed to incorporate that meaning when it enacted 77B. *Id.*

The interpretations that the Court found Congress incorporated held that reorganization plans must respect each creditor's absolute right to priority over shareholders. *See, e.g., Louisville Trust Co. v. Louisville, New Albany & Chicago Ry. Co.*, 174 U.S. 674, 684 (1899) ("[A]ny arrangement of the parties by which the subordinate rights and interests of the stockholders are attempted to be secured at the expense of the prior rights of either class of creditors comes within judicial denunciation."). If equity received property under the plan, and a single unsecured creditor objected, the plan could not be confirmed, even if the vast majority of unsecured creditors had approved the plan, and even if the holdout's claim was very small. *Case*, 308 U.S. at 114. "The reason for such a limitation [under the Act] was the danger inherent in any reorganization plan proposed by a debtor . . . that the plan will simply turn out to be too

good a deal for the debtor's owners." *Bank of America Nat. Trust & Sav. Ass'n v. 203 North LaSalle St. P'ship*, 526 U.S. 434, 444 (1999).

The plan at issue in *Case* was held to fail the fair and equitable test for a simple reason: a bondholder objected, the bondholders were not being paid in full, yet "they will be required under the plan to surrender to the stockholders 23 per cent of the value of the enterprise." *Case*, 308 U.S. at 119. The plan was unconfirmable—even though ninety percent of bondholders had approved it—for the sole reason that it violated the strict rule of absolute priority. *See also In re Armstrong World Indus., Inc.*, 320 B.R. 523, 533 (Bankr. D. Del. 2005) (summarizing this history); *LaSalle*, 526 U.S. at 444 (under the Act, "fairness and equity required that the creditors be paid before the stockholders could retain equity interests for any purpose whatever") (citation and punctuation omitted).

When it enacted the Code in 1978, Congress retreated from the strict absolute priority rule that had obtained under the "fair and equitable" standard in the Act. Congress provided that a Plan could be confirmed despite an absolute priority violation if the *class* of impaired creditors consented. *See* Richard Maloy, A Primer on Cramdown-How and Why It Works, 16 St. Thomas L. Rev. 1, 34 (2003) ("Congress did not codify the Absolute Priority Rule in the form it had developed, which would prohibit any favoritism of claims and interests of higher priority, but rather an Absolute Priority Rule which would apply only if a prior, but impaired, class objected to the plan and a claim junior to that of the objecting party receives property under the plan. It would not be applied if all classes accepted it."), *cited in Armstrong*, 320 B.R. at 534 (noting that in section 1129, "Congress codified a modified version of the absolute priority rule").

The language that accomplished this change in the absolute priority rule is contained in section 1129(b), the so-called cramdown provision. It provides that a plan to which an impaired

class has objected will nevertheless be confirmed if it is "fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." 11 U.S.C. § 1129(b)(1). This indicates that the fair and equitable standard is to be applied on a class-by-class and not a claim-by-claim basis. Then, "[f]or the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements," the relevant one for unsecured creditors being section 1129(b)(2)(B)(ii), which enacts a version of absolute priority: "the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property." The upshot of section 1129 is that if an impaired class objects, the plan is confirmable only if absolute priority is respected.    Conversely, if absolute priority is not respected, the plan is confirmable if the impaired classes approve it and the plan meets all the other requirements of section 1129.

In sum, before the enactment of section 524(g), the law knew two meanings of the term "fair and equitable": strict absolute priority recognized in *Case*, and the class-by-class absolute priority recognized "for the purpose of" subsection 1129(b).

    **B.**    <u>**"Fair and Equitable" under Section 524(g).**</u>

Besides subsection 1129(b), the term of art "fair and equitable" appears in the Code only two other times, in sections 524(g) and 524(h), both added by the Bankruptcy Reform Act of 1994.    Section 524(g)(4)(B)(ii) provides that a court may not confirm a section 524(g) plan unless "the court determines, before entering the order confirming such plan, that identifying such debtor or debtors ... in such injunction with respect to such demands for purposes of this subparagraph is fair and equitable with respect to the persons that might subsequently assert such demands, in light of the benefits provided, or to be provided, to such trust on behalf of such debtor or debtors . . ." "Demands" are defined as "a demand for payment, present or future" that

"was not a claim during the proceedings leading to the confirmation of a plan of reorganization," arises out of the debtor's asbestos liability, and is to be paid by a trust.   The injunction is available only if "the actual amounts, numbers, and timing of such future demands cannot be determined" and "pursuit of such demands outside the procedures prescribed by such plan is likely to threaten the plan's purpose to deal equitably with claims and future demands."   11 U.S.C. § 524(g)(2)(B)(ii).

Despite the large number of bankruptcies employing the 524(g) mechanism, "[t]he courts have yet to define what 'fair and equitable' means in the § 524(g) context." *In re Congoleum Corp.*, 362 B.R. 167, 176 (Bankr. D.N.J. 2007).   It is therefore an issue of first impression for this Court whether the fair and equitable standard in section 524(g) permits Grace's equity holders to receive value in the reorganization, where the Trust will pay no more than 35% of its asbestos liabilities.[5]

As a matter of statutory construction, the only plausible reading of section 524(g)(4)(B)(ii) is that it incorporates the pre-Code, strict understanding of "fair and equitable." In the first place, just as Congress was presumed in *Case* over seventy years ago to know the longstanding meaning of "fair and equitable," the same principle holds true today.   Congress chose to use the term "fair and equitable," unadorned, when it enacted section 524(g).   "Where Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken." *Wilkie v. Robbins*, 127 S.

---

[5] In a footnote with no reasoning or explanation, the bankruptcy court in *In re Western Asbestos Company, et al.*, 313 B.R. 832, 850 n.25 (Bankr. N.D. Ca. 2003) stated "[t]he Plan Proponents ask the Court to rule as a matter of law at this time that 'fair and equitable' as used in 11 U.S.C. § 524(g)(4)(B)(ii) does not have the same meaning as in 11 U.S.C. § 1129(b).  The Court agrees that it does not and will so hold at this time."  As discussed *infra*, Garlock agrees: § 524(g) requires strict absolute priority, from which § 1129(b) retreated.

Ct. 2588, 2605 (2007) (*quoting Morissette v. United States*, 342 U.S. 246, 263 (1952)); *see also Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 184-5 (1988) ("We generally presume that Congress is knowledgeable about existing law pertinent to the legislation it enacts.").

The usual presumption is reinforced in this case by the legislative history of the Bankruptcy Reform Act of 1994. The history shows that Congress understood that "fair and equitable" was a term of art with a precise meaning under longstanding pre-Code practice. The House Report that accompanied the Act observed the following (in the course of discussing the deletion of an unrelated section):

> The words 'fair and equitable' are terms of art that have a well established meaning under the case law of the Bankruptcy Act as well as under the Bankruptcy Code. Specifically, courts have held that where an estate is solvent, in order for a plan to be fair and equitable, unsecured and undersecured creditors' claims must be paid in full, including postpetition interest, before equity holders may participate in any recovery.

In footnote 15, appended to the last sentence, the Report cites two cases, *Consolidated Rock Products Co. v. Dubois*, 312 U.S. 510, 527 (1941) and *Dentureholders Protective Committee of Continental Inv. Corp.*, 679 F.2d 264 (1st Cir.), *cert. denied*, 459 U.S. 894 (1982). Both of these were cases decided under the Act rather than the Code. *See Dentureholders*, 679 F.2d at 266; *Consolidated Rock Products*, 312 U.S. at 514.[6] The very same analysis is contained in the records of the floor debate in the House. *See* 140 Cong. Rec. H10752-01, H10768.

These passages from the legislative history show that Congress in 1994 was well aware of the meaning "fair and equitable" had under the Act when it enacted section 524(g). Thus, in

---

[6] Despite the reference to "solvent" estates, the passage from the Report should not be read to imply that the absolute priority rule did not apply to insolvent estates as well. *See Consolidated Rock Products*, 312 U.S. at 527 ("**Whether a company is solvent or insolvent** in either the equity or the bankruptcy sense, any arrangement of the parties by which the subordinate rights and interests of the stockholders are attempted to be secured at the expense of the prior rights of creditors comes within judicial denunciation.") (emphasis added, citation and punctuation omitted). The solvency of the Grace estate is therefore not material in deciding whether the Plan accords with strict absolute priority.

addition to the usual presumption regarding terms of art, the legislative history proves that Congress' use of the pre-Code term was knowing and intentional.

"Fair and equitable," of course, now has another meaning: the form of absolute priority enacted in 1978 by section 1129. But it is not plausible that Congress intended to incorporate that meaning into section 524(g), for a number of reasons. First, unlike in 1129(b)(2), which provides that 1129's special definition of "fair and equitable" is "[f]or the purpose of this subsection" only, Congress inserted no similar qualification in 524(g), nor any reference to section 1129. In the absence of such a qualification, it must be presumed that Congress was adopting the meaning the unadorned term has always had: strict absolute priority.

Second, 524(h) *does* incorporate the section 1129 meaning of "fair and equitable," showing that the very Congress that enacted 524(g) knew how to incorporate that special meaning when it wanted to. Section 524(h) is a grandfather provision, which allowed pre-524(g) channeling injunctions to reside in the safe harbor of section 524(g) if they met certain conditions. One of the conditions is that "the court determined at the time the plan was confirmed that the plan was fair and equitable in accordance with the requirements of section 1129(b)." The same Congress that enacted section 524(g) recognized such a thing as "fair and equitable in accordance with the requirements of section 1129(b)," yet deliberately chose *not* to make a similar qualification in section 524(g) itself. This is unassailable evidence that Congress intended to incorporate the historical meaning of "fair and equitable" in section 524(g): not the explicitly qualified meaning contained in section 1129.

Most decisively, the language of 524(g)(4)(B)(ii) itself supports the older, creditor-by-creditor sense of "fair and equitable." It provides that the injunction must be "fair and equitable" with respect to "the persons that might subsequently assert such demands": not with respect to

the *class* of persons that might subsequently assert such demands. This language indicates that section 524(g) requires absolute priority on a demand-by-demand, not on a class-by-class, basis. The very language of 524(g) confirms that Congress intended to adopt the "fair and equitable" standard that was consistent with historical practice. Debtor shareholders may not receive property in a 524(g) reorganization unless all demands will be fully paid.

### C.   The Plan Is Not "Fair And Equitable" Within The Meaning of 524(g).

Under the Plan, holders of demands (as defined in section 524(g)) will have sole recourse to a Trust to be funded with assets admittedly insufficient to pay expected demands in full. On the Effective Date, the Trust will be funded, Plan § 7.2.2; the Trust will assume the liabilities of the Debtors for all Asbestos PI Claims (the definition of which includes all section 524(g) "demands"), Plan § 7.2.3; the Debtors will be discharged of all liabilities to holders of Asbestos PI Claims, Plan § 8.1.2; the sole recourse of all holders of Asbestos PI Trust Claims will be to the Trust, Plan § 3.1.6; and holders will be enjoined from pursuing any action against the Debtors based on those claims, Plan § 8.2.1.

As a result, demand holders will have to look solely to the Trust to pay the demands that may arise against the Debtors. The Trust will pay these claims "pursuant to the terms of the TDP." Plan § 3.1.6. The Trust assets will not, however, be sufficient to pay those claims in full. The class of Asbestos PI Claims is admittedly impaired. *Id.* Moreover, under the proposed TDP, an Asbestos PI Claimant will receive only the liquidated value of its claim multiplied by the Payment Percentage, which will initially be between 25% and 35%. TDP §§ 4.1, 4.2. This Payment Percentage may be adjusted downward in the future. TDP § 4.2. Thus, Asbestos PI Claimants, including demand holders, will receive at most 25-35% of the value of their claims.

Despite this substantial impairment of demands should the Plan become effective, equity holders will retain their interests in the Parent, in full. Plan § 3.1.10 ("Equity Interests in the

Parent shall be retained, subject to the issuance of the Warrant and the terms of the Share Issuance Agreement."). The value of these interests will be substantial. Even though the confirmation of the Plan is uncertain, the market capitalization of the Parent as of July 13, 2009 is over $800 million. Should the Plan be confirmed, the equity interests in the Parent may be worth over $1 billion.

Regardless of how valuable the equity interests turn out to be, the Plan's transfer of *any* property to equity holders—much less their entire interests in the Parent—violates the version of absolute priority that Congress required when it imposed the "fair and equitable" requirement of section 524(g). Under the time-honored meaning of "fair and equitable," "any arrangement of the parties by which the subordinate rights and interests of the stockholders are attempted to be secured at the expense of the prior rights of ... creditors comes within judicial denunciation." *Louisville Trust*, 174 U.S. at 684 (*cited in Case*, 308 U.S. at 114). When Congress required that the channeling injunction be "fair and equitable with respect to the persons that might subsequently assert such demands," it made subordination of equity a condition of the availability of the extraordinary benefits a section 524(g) injunction provides. Section 524(g) does not countenance this naked transfer of wealth—possibly over $1 billion—from demand holders to shareholders in a debtor about to be cleansed, for all time, of its asbestos liability.

In the case of Garlock and other co-defendants, the Plan's proposed preservation of existing equity interests will be shockingly unfair. In cases in the majority of states that follow some form of joint and several liability, asbestos plaintiffs will continue to collect their full damages from co-defendants. Equity holders in Grace will pay nothing, as a result of the Plan and the Channeling Injunction. Co-defendants, meanwhile, will pick up the share for which Grace was formerly responsible. The Plan will have served as a conduit to transfer wealth from

17

co-defendants to Grace shareholders.  In many cases, the effect will be to punish co-defendants who have been able to remain in the tort system precisely because they made less harmful products and are less culpable than Grace.  A wealth transfer from shareholders of more culpable defendants to shareholders of less culpable defendants is not what Congress intended when it enacted section 524(g).

Instead, Congress incorporated the traditional "fair and equitable" standard into section 524(g).  To achieve the extraordinary benefits of a 524(g) injunction, a debtor must give up its equity.  Or it must pay demands in full.  The Plan does neither.  Therefore, the Plan is not confirmable.

## II.   INDEPENDENT OF THE PLAN'S VIOLATION OF ABSOLUTE PRIORITY, THE TDP ARE NOT FAIR AND EQUITABLE TO GARLOCK AND OTHER CO-DEFENDANTS

The TDP explain why bodily injury claimants and their representatives would approve a reorganization plan that permits equity to keep $1 billion or more in value, while they only receive 25% to 35% of the value of their claims.  Because the TDP would effectively prevent co-defendants from receiving credit for Grace payments to which they would be entitled under state law, the Plan would permit bodily injury plaintiffs to recover the full amount of Grace's share from non-bankrupt co-defendants, and separately gain extra payments—the Grace Trust payments.  Those extra payments, unaccounted for in the tort system, will more than compensate plaintiffs for the equity give up.

With respect to Garlock, the Channeling Injunction would permanently enjoin it from taking action against Grace to ensure that Grace, and not Garlock, paid Grace's share of liability for asbestos injuries jointly caused by Grace.  Instead of courts in the tort system, Garlock would be channeled to the Trust to protect its interests, but the Trust would pay no more than one third

18

of Grace's share of liability and would have TDP designed to minimize Garlock's ability to get credit even for the Trust's one third payment.  Stripping Garlock of its state law remedies and sending it to an underfunded Trust is not fair and equitable with respect to Garlock and similarly situated co-defendants.

### A.    The TDP Prevent Co-Defendants From Receiving Credit For Future Payments By The Grace Trust.

In state court, when a plaintiff sues fewer than all potential joint tortfeasors, Garlock may implead the absent joint tortfeasors and have their liability to the plaintiff adjudicated at the same time as Garlock's.  *See, e.g.*, *Sheetz, Inc. v. Bowles Rice McDavid Graff & Love, PLLC*, 547 S.E.2d 256, 267 (W. Va. 2001); *Paul v. Bier*, 758 A.2d 40, 46 (D.C. 2000); *Ciccone v. Dominick's Finer Foods, Inc.*, 731 N.E.2d 312, 318 (Ill. 1st Dist. 2000); *Cole v. Celotex Corp.*, 599 So. 2d 1058, 1072 (La. 1992); *Gemco-Ware, Inc. v. Rongene Mold & Plastics Corp.*, 360 S.E.2d 342, 344 (Va. 1987); *Rowland v. Skaggs Companies, Inc.*, 666 S.W.2d 770, 772 (Mo. 1984); *Minneapolis, St. P. & S. S. M. R. Co. v. City of Fond du Lac*, 297 F.2d 583, 585 (7th Cir. 1961); *La Ferry v. Ajax Truck Rentals*, 161 F. Supp. 707, 710 (E.D. Tenn. 1958).

Even though a right to receive contribution is not ripe until Garlock pays a judgment to a plaintiff, the law does not force Garlock to wait until it pays a judgment to bring a contribution claim.  The law permits Garlock to implead all potential joint tortfeasors, and adjudicate their liability to the plaintiff in one action, at the same time.  Then, if Garlock and a contribution defendant are found liable, the court typically enters a conditional judgment against the contribution defendant, which is fully effective the instant Garlock pays its judgment.  *See* 6 Wright & Miller, Federal Practice & Procedure § 1448.

The right to implead all potential joint tortfeasors is important for Garlock and other asbestos defendants because it eliminates the ability of plaintiffs to take divergent or inconsistent

positions with respect to the facts at issue in the case. A plaintiff is not able to sue and settle with defendants seriatim, taking new, divergent, or inconsistent positions as to liability along the way. Instead, defendants have the right to bring all other defendants into a single suit, where the plaintiff will have to commit, in public, to a single version of facts that will bind her for all time. In this way, impleader prevents inconsistent results and encourages integrity in the administration of justice. *See State Farm Mut. Auto. Ins. Co. v. Solem*, 622 P.2d 682, 684 (Mont. 1981) ("The rule is designed . . . to prevent inconsistent judgments on the same facts . . ."); *Hecht v. Summerlin Life & Health Ins. Co.*, 536 F. Supp. 2d 1236, 1241 (D. Nev. 2008) ("The costs and pitfalls associated with litigating multiple suits on the same subject matter, and the attendant possibility of inconsistent verdicts, are not insubstantial or abstract."). This ensures that Garlock will receive credit for payments made by joint tortfeasors.

By contrast with state law's policy of liberal impleader, the proposed TDP are tailor-made to relieve plaintiffs from the burdens of transparency, consistency, and even handedness required by state law. First, the TDP deprive defendants (termed Indirect Claimants in the TDP) of the ability to initiate resolution of the Trust's liability at the inception of litigation. Section 5.6 provides that an Indirect Claim is "presumptively valid" only if "the Indirect Claimant has paid in full the liability and obligation of the PI Trust to the individual claimant to whom the PI Trust would otherwise have had a liability or obligation under this TDP (the 'Direct Claimant')." Similarly, Indirect Claims that are not presumptively valid are allowable under the TDP only if "the Indirect Claimant can establish under applicable state law that the Indirect Claimant has paid all or a portion of a liability or obligation that the PI Trust had to the Direct Claimant as of the Effective Date." TDP § 5.6. The TDP thus explicitly preclude a defendant from initiating liquidation of the Trust's liability to the plaintiff during the pendency of the underlying tort suit.

To ensure plaintiff's right to delay making Trust claims until after settling with or obtaining a judgment from solvent defendants, the TDP provide long statutes of limitations and lengthy deferral periods. TDP §§ 5.1(a)(2), 6.3.

The TDP thus give plaintiffs a prerogative they would not have in state court: the right to defer a claim against the Trust until after they resolve their underlying tort case. This allows precisely the result impleader aims to prevent: plaintiffs bringing claims seriatim, based on divergent or inconsistent positions, with consequent damage to the integrity of the justice system and the rights of defendants. The provision plainly deprives Garlock and other co-defendants of the right they have under state law to compel liquidation of the plaintiff's claims against other defendants during the pendency of the underlying tort suit. *See Sheetz*, 547 S.E.2d 256, 267 (W. Va. 2001); *Ciccone*, 731 N.E.2d at 318. It allows a plaintiff to settle with Garlock on the position that Grace is not liable, and then turn around to file evidence of Grace exposure with the Trust and pocket Trust money. This results in Garlock failing to receive credit for a Grace payment to which it would be entitled under state law.

Confidentiality provisions in the TDP also encourage inconsistent or divergent positions. The TDP require the Trust to keep confidential both the fact that a plaintiff has filed a claim as well as evidence the plaintiff submits to the Trust to prove Grace liability. See TDP § 6.5 ("All submissions to the PI Trust by a holder of a PI Trust Claim or a proof of claim form and materials related thereto shall be . . . intended by the parties to be confidential and to be protected by all applicable state and federal privileges . . ."). This is evidence that would be public in state and federal court. The tort system does not permit a plaintiff to bring secret claims against co-defendants. Whether the plaintiff sues the defendant or another defendant impleads it, the fact of the plaintiff's claim and the evidence to support it are matters of public record. By departing

21

from this practice, the TDP allow plaintiffs to take divergent or inconsistent positions with respect to the Trust and with respect to defendants in the tort system. Should a plaintiff make Trust claims before obtaining a judgment against tort system defendants, the secrecy of claims made against the Trust allows plaintiffs to make assertions to the Trust that will not be known or taken into account as the liability of tort system defendants is adjusted.

The TDP most blatantly decouple plaintiffs' Trust claims from their claims in the tort system by providing that the Trust is prohibited from considering a plaintiff's failure to identify the Trust's products in state court as evidence that the Trust is not liable:

> Evidence submitted to establish proof Grace Exposure is for the sole benefit of the PI Trust, not third parties or defendants in the tort system. The PI Trust has no need for, and therefore claimants are not required to furnish the PI Trust with evidence of, exposure to specific asbestos or asbestos-containing products other than those for which Grace has legal responsibility, except to the extent such evidence is required elsewhere in this [sic] TDP. *Similarly, failure to identify Grace products in the claimant's underlying tort action, or to other bankruptcy trusts, does not preclude the claimant from recovering from the PI Trust, provided the claimant otherwise satisfies the medical and exposure requirements of this TDP.*

TDP § 5.7(b)(3) (emphasis added). This provision too departs from state law, which allows defendants to implead other defendants, and require the plaintiffs to tell a consistent story that will have binding effect on the plaintiff as to all defendants.

The TDP are thus tailor-made to allow plaintiffs to take inconsistent positions before the Trusts and in the tort system. Plaintiffs can bring claims seriatim, they may keep claims secret, and they may take positions in state court that have no effect on their ability to recover Trust money. By decoupling claims against the Trust from the tort system, the TDP prevent Trust money from being taken into account in state court, and thus deprive Garlock and other co-defendants of credit for Trust benefits they would otherwise be entitled to receive under state

law.   Conversely, they allow plaintiffs to recover full satisfaction, and simultaneously recover from the Trust on new, inconsistent, or divergent theories.

The gamesmanship facilitated by the proposed TDP is not hypothetical.   It has been occurring for years under similar provisions in TDPs of existing asbestos trusts.   Garlock will present extensive evidence of this at the confirmation hearing.

Furthermore, the TDP of the Manville Trust demonstrate that it is possible for a trust to ensure that defendants receive appropriate credit for trust payments made to plaintiffs.   First, the Manville TDP give defendants the right to make claims against the Manville Trust from the inception of litigation, and thus prevent plaintiffs from deferring trust claims until the conclusion of litigation against solvent defendants.   Manville TDP § I.1(c).   Second, under the Manville TDP, the existence of plaintiffs' claims is not kept secret: the Manville Trust is required to disclose to co-defendants before trial, without the need for a subpoena, the existence of a claim by the plaintiff, as well as "information regarding the amount and terms of any . . . settlement at the time and with the detail required by applicable law."   Manville TDP § I.1(f).   Finally, the TDP contain no provision immunizing a plaintiff's failure to mention Manville products in state court litigation, belying any claim that such a provision is necessary in well-functioning TDP.

The absence of similar provisions in the proposed Grace TDP should tell the Court all it needs to know about why the asbestos bodily injury claimants have left more than $1 billion in shareholder equity on the table in this case.   In return, asbestos bodily injury claimants have received access to Trust payments that will not be accounted for in the tort system, allowing them to collect their full damages from solvent defendants such as Garlock, and then add on payments from the Trust.   For this reason too, the Plan is not fair and equitable and should not be confirmed.

23

## III.    GARLOCK HAS STANDING TO OBJECT TO THE PLAN

The Plan Proponents may argue that this Court should not hear Garlock's objections to the Plan because Garlock lacks standing to object. This argument, if made, is incorrect. As demonstrated above, the Plan will affect Garlock's rights and interests in profound ways, which gives Garlock both Article III and bankruptcy standing to make the objection. Indeed, it is fair to say that the Plan has been *intended* by its principal drafters—Grace shareholders and asbestos plaintiffs—to foist Grace's asbestos liabilities onto the backs of solvent defendants in the tort system. Further, a holding that Garlock does not have standing would leave Grace open to claims because then Garlock, having been denied due process, would not be bound by the Channeling Injunction in the many future cases where Garlock and Grace products are both implicated, which will be in derogation of the Plan's purpose to resolve finally Grace's asbestos-related liability.

### A.    The Plan Profoundly Affects Garlock's Rights Under State Law

Garlock has standing to object to the Plan if it is a "party in interest," which "may raise and may appear and be heard on any issue in a case under this chapter." 11 U.S.C. § 1109(b); *see also* 11 U.S.C. § 1128(b) ("A party in interest may object to confirmation of a plan.").[7] The Code does not define "party in interest" but the term "has been construed to create a broad right of participation in Chapter 11 cases." *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 214 n.21 (3d Cir. 2004). A party in interest need not be a bankruptcy claimant. *See In re Amatex Corp.*, 755 F.2d 1034 (3d Cir. 1985) (holding that future holders of asbestos claims are parties in interest even if they do not have bankruptcy claims). Rather, party-in-interest status extends to all

---

[7] Garlock must also have Article III standing, but Article III standing is even broader than party in interest standing, and as discussed in more detail below, Garlock plainly has it.

entities that "have a practical stake in the outcome of the proceedings," not just to current creditors of the debtor. *Amatex*, 755 F.2d at 1041.[8]

The courts agree that an entity is a party in interest if it will suffer pecuniary harm as a result of Plan confirmation. "It is generally understood that a pecuniary interest directly affected by the bankruptcy proceeding provides standing under § 1109(b)." *In re Stone Barn Manhattan LLC*, 405 B.R. 68, 74 (Bankr. S.D.N.Y. 2009); *see also Baron & Budd, P.C. v. Unsecured Asbestos Claimants Comm.*, 321 B.R. 147, 158 (D.N.J. 2005) ("Generally speaking, a 'sufficient stake' to be considered a party-in-interest can be a pecuniary interest that is directly or adversely affected."); *In re Fuller-Austin Insulation*, 1998 WL 812388 at *3 (D. Del. 1998) ("Courts have interpreted 'parties in interest' to mean all persons whose pecuniary interests are directly affected by the Bankruptcy Proceeding.").

Garlock has standing because the Plan will directly and profoundly impair its state law rights and pecuniary interests. First, as discussed above, asbestos bodily injury plaintiffs will attempt to hold Garlock responsible for unpaid portions of Grace's share of liability in many pending and future cases in joint and several jurisdictions where plaintiffs allege injury by exposure to both companies' products. The Plan's provisions permitting Grace shareholders to retain their equity in lieu of paying a higher percentage of the Grace share, in violation of absolute priority, is a direct pecuniary harm to Garlock that by itself gives Garlock standing to object to this Plan. *See In re Stone Barn Manhattan LLC*, 405 B.R. at 74; *In re Fuller-Austin Insulation*, 1998 WL 812388 at *3.

---

[8] Garlock has Code claims (because of its rights in pending cases where Grace exposure is evident) and will have section 524(g) demands (because it will be a defendant in future cases where Grace exposure is evident). Garlock has standing to object in both capacities.

25

In a very real sense, Garlock and other non-bankrupt co-defendants may suffer more harm than many bodily injury claimants as a result of Grace's bankruptcy. Many plaintiffs will be able to recover Grace's unpaid share of liability from other defendants, regardless of Trust payments that fall short of Grace's share. If future asbestos plaintiffs are parties in interest within the meaning of 1109(b), as the Third Circuit has held, *see Amatex*, 755 F.2d at 1041, then Garlock is necessarily a party in interest as well.

Second, Garlock is a party in interest because, as also described in detail above, the proposed TDP would prejudice Garlock's state-law rights in ways that would prevent Garlock from obtaining credit for the meager payments the Trust would make to asbestos plaintiffs. The TDP undercutting of Garlock's rights imposes additional pecuniary harm on Garlock that gives it standing to object to this Plan.[9]

### B.   Garlock Must Also Be Accorded Party-In-Interest Status Because No Other Party Represents Its Substantial Interests.

Furthermore, Garlock cannot be bound to any confirmation order that so profoundly impairs Garlock's pecuniary interests unless Garlock is accorded due process of law under the Constitution. "An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to appraise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314-15 (1950). When it found that future asbestos claimants are parties in interest, regardless of whether

---

[9] Garlock must also have Article III standing, but Article III standing is necessarily broader than person-in-interest standing because "Article III standing need not be financial and only need be fairly traceable to the alleged illegal action." *In re Congoleum Corp.*, 426 F.3d 675 (3d Cir. 2005). Because Garlock will suffer direct financial harm if the Plan is confirmed, Garlock *a fortiori* has Article III standing. *See also Baron & Budd, P.C. v. Unsecured Asbestos Claimants Committee*, 321 B.R. 147, 161 (Bankr. D.N.J. 2005) (finding parties had Article III standing because Plan "directly impacts their financial interests," and the harm would be redressed by a denial of confirmation).

they hold bankruptcy claims, the Third Circuit relied in part on the fact that "none of the parties currently involved in the reorganization proceedings have interests similar to those of future claimants." *Amatex*, 755 F.2d at 1042. The Court gave future claimants party-in-interest status to "permit them to have a voice in proceedings that will vitally affect their interests." *Id.* at 1043; *see also In re Congoleum Corp.*, 426 F.3d 675, 687 (3d Cir. 2005) (finding standing where "as a practical matter . . . in circumstances such as those present here, it is highly unlikely that any of the parties other than the insurers or their attorneys would challenge" the order at issue).

The Court has appointed no representative for Grace's co-defendants, and the charge of the Futures Representative expressly excludes co-defendants. Under *Mullane* and *Amatex*, this is an additional reason why Garlock must have party-in-interest standing.

The appointment of the Futures Representative to represent persons that might assert demands against Grace in the future does not, and was not intended to, protect the rights of Garlock and other co-defendants. This Court made clear when it appointed the Futures Representative that his constituency would include *only* holders of demands who alleged asbestos-caused bodily injury:

> My definition of the [Future Representative's] constituency up front is all future demand holders, period, who have some asbestos-related disease. Period. End of story . . . ."

*See* Tr. of Hearing Before Honorable Judith K. Fitzgerald (May 24, 2004) at 42.[10]

The Court reinforced this point by comparing the Futures Representative to the Asbestos Claimants' Committee, both of which would represent individuals with bodily injury but not co-defendants:

---

[10] The transcript of the May 24, 2004 hearing on Grace's motion to appoint the Futures Representative is attached hereto and incorporated herein as Exhibit A.

>       This constituency for the [Futures Representative] will be all future demand
>       holders who claim exposure to or asbestos injury, just like that's what the ACC
>       has for presence [sic][11]."

*Id* at 44.

The Court's delineation of the Futures Representative's constituency is consistent with limits that constitutional due process places on legal representatives.  While individuals who will allege bodily injury, on the one hand, and co-defendants with future contribution claims, on the other, will both hold demands, they have sharply conflicting interests.  A legal representative cannot, consistent with due process, adequately represent classes of parties that have conflicting interests. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) (rejecting class action settlement based in part on lack of adequate representation of class members because of conflicts within the class); *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999) (same).

Finally, the Futures Representative has not  purported to protect the interests of co-defendants.  To the contrary, he has advanced the interests of future bodily injury claimants at the expense of co-defendants by negotiating and consenting to TDP that are stacked heavily in favor of bodily injury claimants and against co-defendants.

---

[11] Presumably, "presence" referred to "presents," a reference to present asbestos bodily injury claim holders.

28

## CONCLUSION

WHEREFORE, Garlock respectfully requests that this Court deny confirmation of the Plan unless the TDP and Trust Agreement are amended to address Garlock's objections and for all other relief the Court deems just and proper.

Dated:  July 13, 2009

MORRIS JAMES LLP

*Brett D. Fallon*

Brett D. Fallon (DE Bar No. 2480)
500 Delaware Avenue, Suite 1500
P.O. Box 2306
Wilmington, Delaware  19899-2306
Telephone:  (302) 888-6800
Facsimile:  (302) 571-1750
Email:  bfallon@morrisjames.com

-and-

Garland Cassada
Richard C. Worf
ROBINSON, BRADSHAW & HINSON
101 North Tyron Street, Suite 1900
Charlotte, NC  28246
Telephone:  (704) 377-8135
Email:  GCassada@rbh.com
          RWorf@rbh.com

*Attorneys for Garlock Sealing Technologies LLC*

2266228/1