# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| W.R. GRACE & CO., et al.,[1] | Case No. 01-1139 (JKF) |
| Debtors. | Jointly Administered |
| | Re: Docket Nos. 19579, 20872, 21785 |

## THE STATE OF MONTANA'S PHASE II TRIAL BRIEF IN OPPOSITION TO CONFIRMATION OF THE FIRST AMENDED JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE OF W. R. GRACE & CO., ET AL., THE OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS, THE ASBESTOS PI FUTURE CLAIMANTS' REPRESENTATIVE, AND THE OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS

Dated: July 13, 2009

Francis A. Monaco, Jr. (#2078)
Kevin J. Mangan (#3810)
Matthew P. Ward (#4471)
Womble Carlyle Sandridge & Rice, PLLC
222 Delaware Avenue, Suite 1501
Wilmington, DE 19801
Ph: (302) 252-4320

Counsel for the State of Montana

---

[1] The Debtors are the following entities: W.R. Grace & Co. (f/k/a Grace Specialty Chemicals Inc.), W.R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), ECARG, Inc., Five Alewife Boston Ltd., GC Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), GC Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W.R. Grace Capital Corporation, W.R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, LB Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc. E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

# TABLE OF CONTENTS

Page

SUMMARY OF THE ARGUMENT .......................................................................... 1

STATEMENT OF THE CASE AND NATURE OF THE PROCEEDINGS ............... 6

STATEMENT OF THE FACTS .............................................................................. 7

ARGUMENT ........................................................................................................ 11

I.      THE PLAN FAILS TO COMPLY WITH BANKRUPTCY CODE SECTION 524(g). . 11

        A.      Montana's Claims for Contribution and Indemnification Are Not Subject to an
                Injunction Pursuant to Bankruptcy Code Section 524(g) Because They Are of a
                Different Nature than Asbestos Claims. .............................................. 11

        B.      Montana's Claims for Contribution and Indemnification Also Are Not Subject to
                an Injunction Imposed Pursuant to Bankruptcy Code Section 524(g) Because
                They Are Not "Claims" or "Demands". .............................................. 14

II.     THE PLAN FAILS TO COMPLY WITH BANKRUPTCY CODE SECTION 1122(a)
        BY CLASSIFYING CLAIMS THAT ARE NOT SUBSTANTIALLY SIMILAR
        WITHIN THE SAME CLASS. ........................................................................ 19

III.    THE PLAN VIOLATES THE ABSOLUTE PRIORITY RULE BY PROVIDING FOR
        FAVORABLE TREATMENT TO CLASSES THAT ARE JUNIOR IN PRIORITY TO
        CLASS 6 ASBESTOS PI CLAIMS. .................................................................. 21

IV.     THE PLAN VIOLATES THE PROHIBITION ON UNFAIR DISCRIMINATION BY
        PROVIDING FOR FAVORABLE TREATMENT TO CLASSES THAT ARE EQUAL
        IN PRIORITY TO CLASS 6 ASBESTOS PI CLAIMS ....................................... 25

V.      THE TRUST DISTRIBUTION PROCEDURES FAIL TO COMPLY WITH
        BANKRUPTCY CODE SECTIONS 1123(a)(4) AND 524(g)(2)(B) BY GIVING
        DISPARATE TREATMENT TO CLAIMS WITHIN A CLASS. ......................... 26

        A.      Bankruptcy Code Sections 1123(a)(4) and 524(g)(2)(B) Require that Each Claim
                of a Particular Class Receive the Same Treatment. ............................. 26

        B.      The Trust Distribution Procedures May Be Interpreted to Give Disparate
                Treatment by Providing for No Payout on Account of Contribution and
                Indemnification Claims. .................................................................... 27

        C.      The Trust Distribution Procedures Give Disparate Treatment by Implementing a
                First-in-First-out Mechanic. ............................................................... 28

D.    The Trust Distribution Procedures Give Disparate Treatment by Imposing Additional Restrictions or Requirements on Holders of Indirect PI Trust Claims. ...................................................................................................................... 31

VI.    THE TRUST DISTRIBUTION PROCEDURES AND THE PLAN ARE NOT FAIR AND EQUITABLE FOR ADDITIONAL REASONS..................................................... 33

VII.    THE PLAN IS INFEASIBLE. ........................................................................................ 36

VIII.    THE PLAN WAS NOT PROPOSED IN GOOD FAITH. ............................................... 37

INCORPORATION BY REFERENCE AND RESERVATION OF RIGHTS ........................... 38

WCSR 4147253

# TABLE OF AUTHORITIES

Page

**Cases**

ACandS, Inc., 311 B.R. 36 (Bankr. D. Del. 2004) .............................................................. passim

Avellino & Bienes v. M. Frenville Co. (In re M. Frenville Co.), 744 F.2d 332 (3d Cir. 1984) ........................................................................................................... 15, 16, 36

In re Armstrong World Indus., Inc., 432 F.3d 507  (3d Cir. 2005).................................... 4, 21, 22

In re Combustion Eng'g, Inc., 391 F.3d 190 (3d Cir. 2004)........................................... 12, 27, 33

In re Congoleum Corp., 362 B.R. 167 (Bankr. D.N.J. 2007) ................................................. passim

In re Coram Healthcare Corp., 271 B.R. 228 (Bankr. D. Del. 2001) ........................................... 37

In re Federal-Mogul Global Inc., Case No. 01-10578, 2008 Bankr. LEXIS 3517 (Bankr. D. Del. Sept. 30, 2008) ........................................................................................ 18

In re Penn Cent. Transp. Co., 71 F.3d 1113 (3d Cir. 1995)............................................. 15, 16, 36

JELD-WEN, Inc. v. Van Brunt (In re Grossman's, Inc.), 400 B.R. 429 (D. Del. 2009).. 15, 16, 36

Linder v. Missoula County, 251 Mont. 292,  824 P.2d 1004 (Mont. 1992) ........................... 16, 18

Norwest Bank Worthington v. Ahlers, 485 U.S. 197 (1988)....................................................... 22

Orr v. State of Montana, 2004 MT 354, P76, 324 Mont. 391, 106 P.3d 100 (2004)............. 16, 18

W.R. Grace & Co. v. Libby Claimants (In re W.R. Grace & Co.), Civ. A. No. 08-246 (RLB) (D. Del. Aug. 12, 2008) ................................................................................ 14, 17

**Statutes**

11 U.S.C. § 101(5) .................................................................................................................... 15

11 U.S.C. § 1129(a)(1)........................................................................................................ 11, 14, 19

11 U.S.C. § 1129(a)(11)............................................................................................................. 36

11 U.S.C. § 1129(a)(3)............................................................................................................... 37

11 U.S.C. § 1129(a)(8)............................................................................................................... 21

11 U.S.C. § 1129(b)(1) ............................................................................................................... 22

11 U.S.C. § 1129(b)(2)(B)(ii) .................................................................................................... 22

11 U.S.C. § 1141(c).................................................................................................................... 36

11 U.S.C. § 1141(d)(1)(A .......................................................................................................... 36

11 U.S.C. § 524(g)(1)(B) ..................................................................................................... 15, 18

11 U.S.C. § 524(g)(2)(A) ........................................................................................................... 12

11 U.S.C. § 524(g)(2)(B)(i) .................................................................................................. 13, 18

11 U.S.C. § 524(g)(2)(B)(i)(I) ................................................................................................... 13

11 U.S.C. § 524(g)(2)(B)(ii)(V) ................................................................. 26

11 U.S.C. § 524(g)(4)(B)(ii) ..................................................................... 33

11 U.S.C. § 524(g)(5) ......................................................................... 17, 18

140 Cong. Rec. H10,765 (daily ed. Oct. 4, 1994) ............................... 13, 29

H.R. Rep. No. 103-835, at 40 (1994), reprinted in 1994 U.S.C.C.A.N. 3340 ............................ 13

H.R. Rep. No. 103-835, at 41 (1994), reprinted in 1994 U.S.C.C.A.N. 3340 ....................... 13, 29

**Other Authorities**

Collier on Bankruptcy ¶ 524.01 (15th ed. rev. 2009) ................................ 12

Deluxe Black's Law Dictionary 429 (6th ed. 1990) ................................... 18

**Constitutional Provisions**

Mont. Const., art. VIII, § 13(1) ................................................................ 35

The State of Montana ("Montana"), by and through its undersigned counsel, hereby asserts its Phase II trial brief (the "Phase II Brief") in opposition to confirmation of the First Amended Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code of W. R. Grace & Co., et al., the Official Committee of Asbestos Personal Injury Claimants, the Asbestos PI Future Claimants' Representative, and the Official Committee of Equity Security Holders (Docket No. 20872) (as such plan has been or may be modified and/or amended, the "Plan")[2], and in support, states as follows:

## SUMMARY OF THE ARGUMENT

As set forth in more detail below, Montana filed proofs of claims against the debtors and debtors-in-possession in the above-captioned Chapter 11 cases (collectively, the "Debtors") for contribution and indemnification resulting from Montana's purported failure to warn about asbestos-containing vermiculite produced by the Debtors, allegedly in violation of a governmental duty imposed under Montana law.[3] Under the Plan, Montana's contribution and indemnification claims are classified as Class 6 Asbestos PI Claims, which are subject to an

---

[2]     Each capitalized term not otherwise defined herein shall have the meaning ascribed to it in the Plan.

[3]     Additionally, Montana has filed proofs of claim against the Debtors in the approximate amount of $15.6 million (which amount Montana anticipates increasing through amended proofs of claim) for the cost of future and past Medicaid reimbursement. The Disclosure Statement provides that such claims will be classified as a Class 9 General Unsecured Claims to the extent that they are allowed. See Disclosure Statement § 2.8.1.3. The State of Montana Department of Environmental Quality ("MDEQ") also has filed proofs of claim against the Debtors for clean-up costs in excess of $55 million associated with the Libby, Montana site. Two of the proofs of claim were expunged. MDEQ and the Debtors have settled the remaining proofs of claim for $5,167,000, except for liabilities associated with the property in or around the Zonolite mine owned by the Debtors (OU-3), which liabilities were specifically reserved. On July 21, 2008, the Bankruptcy Court approved the settlement. Montana's contribution and indemnification claims based on its purported failure to warn are distinct from its Medicaid reimbursement claims and MDEQ's claims for clean-up costs.

injunction that the Plan attempts to impose pursuant to section 524(g) of title 11, United States Code (the "Bankruptcy Code").

Montana maintains that its contribution and indemnification claims are of a different nature (contribution and indemnification, as opposed to personal injury, wrongful death, or property damage) and based on different acts (alleged failure to warn, as opposed to production of asbestos-containing products) from the types of claims to which a section 524(g) injunction may apply. Accordingly, Montana's claims for contribution and indemnification should not be subject to the 524(g) trust. By attempting to expand the scope of section 524(g) to apply to those claims, the Plan fails to comply with the requirements of section 524(g)(2)(B), and accordingly does not comply with the "applicable provisions" of the Bankruptcy Code, as required by section 1129(a)(1). See infra Part I.A.

Even if Montana's contribution and indemnification claims were of the nature to which an injunction imposed under section 524(g) might be applicable, that section only enjoins "claims" or "demands." Under Montana law, Montana does not yet have a right to payment on such claims, and such claims are not yet due, because Montana has not yet made any payment for which it seeks contribution or indemnification, Montana has not entered into any settlement on the underlying failure to warn claims, and no judgment has been entered on those underlying claims. Therefore, under the controlling law in the Third Circuit, Montana's contribution and indemnification claims are not "claims" or "demands" for purposes of the Bankruptcy Code, and consequently do not fall within the scope of section 524(g) and should not be subject to a 524(g) injunction. See infra Part I.B.

Even if Montana's contribution and indemnification claims could be classified within Class 6 and be subject to the section 524(g) injunction as contemplated by the Debtors, the Plan

nonetheless fails for numerous reasons. As a preliminary matter, Montana objects to the Plan because its claims for contribution and indemnification are classified alongside personal injury and other claims that are not "substantially similar" to Montana's claims, as that term is used in Bankruptcy Code section 1122(a). Specifically, Montana's claims have a distinct nature (contribution and indemnification, as opposed to personal injury and death) and a distinct legal effect (not subject to a section 524(g) injunction). Therefore, Montana's claims should not be classified within the same class as personal injury claims. By attempting to do so, the Plan fails to comply with Bankruptcy Code section 1122(a), which provides that a plan may place a claim in a particular class only if such claim is "substantially similar" to the other claims in that class. See infra Part II.

Montana also objects to the Plan because it disregards the absolute priority rule and prohibition on unfair discrimination by seeking to cram down the Plan on the impaired Class 6 Asbestos PI Claims while, at the same time, leaving classes that are equal or junior in priority unimpaired. See infra Parts III & IV. As an example, the Plan concedes that Class 6 Asbestos PI Claims are impaired. See Plan § 3.1.6(d) ("Class 6 is impaired."). Yet the Plan provides that certain other classes of unsecured claims are unimpaired. See Plan § 3.1.5(c) (stating that Class 5 Intercompany Claims is "unimpaired"); id. § 3.1.7(c)(ii) (stating that Class 7A Asbestos PD Claims (except US ZAI PD Claims) its "unimpaired"); id. § 3.1.9(f) (stating that Class 9 General Unsecured Claims is "unimpaired"). Perhaps more tellingly, the Plan even provides for a distribution to holders of equity interests. See id. § 3.1.10(b) ("On the Effective Date, Class 10 Equity Interests in the Parent shall be retained, subject to the issuance of the Warrant, the terms of the Share Issuance Agreement, and the Stock Trading Restrictions Term Sheet."). Such a result directly violates the Third Circuit Court of Appeals' ruling in In re Armstrong World

3

<u>Industries, Inc.</u>, 432 F.3d 507, 518 (3d Cir. 2005) (affirming denial of confirmation because plan violated absolute priority rule).

Additionally, the Trust Distribution Procedures that are implemented by the Plan will result in disparate treatment among claims within the same class. Section 1123(a)(4) requires that a plan must provide the same treatment for all claims within a particular class. Similarly, section 524(g)(2)(B)(ii)(V) requires a section 524(g) trust to operate through mechanisms that reasonably assure that present claims and future demands involving similar claims will be paid in substantially the same manner. <u>See</u> <u>infra</u> Part V.A.

Here, the Trust Distribution Procedures will result in unfair disparate treatment of Indirect PI Trust Claims (including contribution and indemnification claims) in disregard of these requirements in at least three respects. First, the Trust Distribution Procedures may be interpreted to provide for no payment whatsoever to holders of claims for contribution and indemnification. <u>See</u> <u>infra</u> Part V.B. Second, the Trust Distribution Procedures implement a first-in, first-out timing mechanic for Class 6 Asbestos PI Claims that will result in especially negative disparate treatment against holders of contribution and indemnification claims (such as Montana) who must wait until any liability (such as on the underlying failure to warn allegations) is established before they may assert their contribution and indemnification claims. <u>See</u> <u>infra</u> Part V.C. Third, the Trust Distribution Procedures impose additional restrictions and requirements on holders of Indirect PI Trust Claims (including contribution and indemnification claims) that are not imposed on holders of other claims within Class 6. For example, the Trust Distribution Procedures limit the allowable amount of an Indirect PI Trust Claim to the amount paid to the underlying asbestos plaintiff, without inclusion of attorneys' fees or other defense costs; they require that for a claimant to assert a presumptively valid Indirect PI Trust Claim, it

must obtain a full release from the underlying asbestos creditor; and provide for a "maximum value" for Asbestos PI Claims which could result in negative disparate treatment to holders of Indirect PI Trust Claims in the event that a judgment is entered against it in an amount in excess of the maximum value. See infra Parts V.D. For all of these reasons, the Trust Distribution Procedures need to be revised in order for them to comply with Bankruptcy Code sections 1123(a)(4) and 524(g)(2)(B), and the Court should not confirm the Plan at this time.

The Trust Distribution Procedures and the Plan also are unfair and inequitable in a number of respects. First, the Trust Distribution Procedures fail to clarify the procedures pursuant to which Class 6 Asbestos PI Claims will be paid, or the percentage that claimholders in that class will receive on their claims. Second, the attorneys that are appointed as members of the trust advisory committee pursuant to the Asbestos PI Trust Agreement suffer from conflicts of interest because they also represent the underlying asbestos claimholders. Finally, the Plan is unfair and inequitable with respect to Montana by providing for a distribution to Montana that violates the Montana Constitution. (The Plan provides for a distribution of, among other things, stock to holders of Class 6 Asbestos PI Claims. In circumstances such as the Debtors' bankruptcy, the Montana Constitution prohibits Montana from holding such stock.) Before the Court confirms the Plan, these unfair and inequitable provisions should be revised. See infra Part VI.

Furthermore, in the event that Montana is successful in demonstrating that its claims are not yet "claims" for purposes of the Bankruptcy Code, and therefore, may not be discharged, Montana believes that the Plan is unfeasible because Montana will continue to assert up to $750

million[4] in non-dischargeable claims against the Debtors even after the Plan goes effective, thereby causing the need for the Debtors' further financial reorganization.  See infra Part IV.

Finally, Montana believes that the Plan was not proposed in good faith because the foundation for the Plan -- the Asbestos PI Settlement (as defined below) -- occurred without any participation from Montana and other key constituencies in the negotiations.  See infra Part V.

For all of these reasons, the Court should deny confirmation of the Plan as currently proposed.

### STATEMENT OF THE CASE AND NATURE OF THE PROCEEDINGS

On April 2, 2001 (the "Petition Date"), the Debtors filed their voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession.

On April 6, 2008, in the midst of litigation concerning the estimation of the Debtors' liability for asbestos personal injury claims, the Debtors, the Official Committee of Asbestos Personal Injury Claimants, the Asbestos PI Future Claimants' Representative, and the Official Committee of Equity Security Holders (collectively, the "Plan Proponents") reached an agreement in principle (the "Asbestos PI Settlement") to resolve all Asbestos PI Claims against the Debtors and to cooperate in the confirmation of a plan of reorganization.  See Disclosure Statement (as defined below) at p. 1.  Montana, which has filed indemnity and contribution claims relating to the Debtors' operations in Lincoln County, Montana, disagrees with the Asbestos PI Settlement.  Montana was neither told of nor included in the negotiations leading to that "settlement", yet the Asbestos PI Settlement is "the foundation for the Plan."  See id.

---

[4]     The plaintiffs in the State Court Actions have asserted claims that, based on their position, could total $750 million.  Specifically, there are approximately 1,000 known claimants, each of which maintains that their claims are subject to a statutory maximum of $750,000 pursuant to Mont. Code Ann. § 2-9-108(1).

On September 19, 2008, the Plan Proponents filed the Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code (Docket No. 19579), as well as an accompanying Disclosure Statement (Docket No. 19581).

Over the course of the following six months, the September 19, 2008 version of the plan and disclosure statement underwent numerous revisions and amendments. Ultimately, these revisions and amendments culminated in the versions of those documents that were filed on February 27, 2009. Specifically, on that date, the Plan Proponents filed the Plan that currently is up for confirmation before this Court, as well as the accompanying Disclosure Statement for the Plan (Docket No. 20873) (the "Disclosure Statement").

On March 9, 2009, this Court entered its order (Docket No. 20944) approving the Disclosure Statement. Pursuant to that order, the Court scheduled Phase I and Phase II hearings regarding confirmation of the Plan. The Court also set May 20, 2009 as the deadline for objections to confirmation of the Plan. Montana filed its Brief in Opposition to Confirmation of the Plan (Docket No. 21785) on May 20, 2009.

On May 5, 2009, this Court entered its Third Amended Case Management Order Related to the Plan (Docket No. 21544). Pursuant to that order, the Court set July 13, 2009 as the deadline for trial briefs with respect to the Phase II hearings regarding confirmation. This is Montana's Phase II Brief in opposition to confirmation.

## STATEMENT OF THE FACTS

Montana has been named as defendant in at least one hundred and forty-two (142) cases in various Montana state courts (the "State Court Actions"). However, with the exception of one complaint, Montana was not named as a defendant in any of the State Court Actions until after the Petition Date.

Plaintiffs in the State Court Actions (the "Plaintiffs") allege periods of employment with or exposure from W.R. Grace and/or its predecessors' operations ranging from 1947 through 1993. The various State Court Actions relate to claims arising from the mining and processing of vermiculite ore containing asbestos within Montana. The various Plaintiffs in the State Court Actions include former employees of W.R. Grace and/or its predecessors, subcontractor employees, individuals that lived near the Debtors' operations, as well as their respective family members.

Pursuant to the Agreement and Plan of Reorganization between W.R. Grace & Co. and Zonolite Company, dated January 17, 1963, W.R. Grace acquired substantially all of the properties and assets of Zonolite, including mining properties in Montana, and assumed all debts and liabilities of Zonolite. W.R. Grace & Co. is liable for the conduct of the predecessor and subsidiary companies, including W.R. Grace & Co. – Conn. and Zonolite Company, with respect to the claims as set forth in the State Court Actions. More than 50 of the State Court Actions include claims that Montana "aided and abetted" W.R. Grace in its actions.

Montana denies that it is in any manner responsible for the events giving rise to the various Plaintiffs' claims for relief set forth in the State Court Actions, or for injuries and damages allegedly sustained by those Plaintiffs. If, however, liability is imposed on Montana as a result of the matters alleged in the various State Court Actions, such liability was caused by the Debtors because the Debtors had a duty to:

(a)     furnish a place of employment that was safe for employees, including the Plaintiffs in the State Court Actions;

(b) furnish and require the use of safety devices and safeguards, such as respiratory protective devices, by employees, including the Plaintiffs in the State Court Actions; and

(c) adopt and use such methods, processes, practices, means, and operations as reasonably adequate to render the place of employment safe, and to do every other thing reasonably necessary to protect the life and safety of employees, including the Plaintiffs in the State Court Actions.

W.R. Grace breached the aforementioned duties, and that breach was the proximate, intervening, and superseding cause of the alleged injuries and damages of the Plaintiffs in the State Court Actions.

On or about March 25, 2003, Montana filed contribution and indemnification claims against the Debtors, seeking contribution and indemnification from the Debtors in the pending State Court Actions against Montana.

The Disclosure Statement provides that Montana's contribution and indemnification claims, if pursued, would be treated as Indirect PI Trust Claims -- a subset of the Class 6 Asbestos PI Claims that are subject to the Asbestos PI Trust. See Disclosure Statement § 2.8.1.3 ("To the extent that the State of Montana ultimately pursues its claim, it will be treated as an Indirect PI Trust Claim and will be channeled to the Asbestos PI Trust.").

While the Plan itself does not expressly discuss Montana's contribution and indemnification claims, the Plan does make it clear that Indirect PI Trust Claims are part of Class 6 Asbestos PI Claims. See Plan § 1.1.33 (defining "Asbestos PI Claim" to include an "Indirect PI Trust Claim").[5]

---

[5] As set forth below, Montana maintains that its contribution and indemnification claims are not "claims" or "demands" as such terms are used in Bankruptcy Code section

The Plan then provides that all Asbestos PI Claims, including Indirect PI Claims (including Montana's claims, to the extent that they are permitted to be treated as Indirect PI Trust Claims, as contemplated by the Disclosure Statement), are channeled to the Asbestos PI Trust. See Plan § 3.1.6(c) ("The sole recourse of the Holder of an Asbestos PI Claim on account of such Asbestos PI Claim . . . shall be to the Asbestos PI Trust pursuant to the provisions of the Asbestos PI Channeling Injunction, the Asbestos PI Trust Agreement, and the Asbestos PI TDP."). The Plan Proponents' purported basis for channeling the Asbestos PI Claims to the Asbestos PI Trust is Bankruptcy Code section 524(g). See Plan § 1.1.42 ("'Asbestos PI Trust' shall mean the . . . statutory trust, established pursuant to section 524(g) of the Bankruptcy

---

524(g). See infra Part I.B. However, in the event that such claims are "claims" that are classifiable under the Plan, Montana further maintains that such claims may not fall within the Plan's express definition of "Indirect PI Trust Claim". The Plan defines "Indirect PI Trust Claim" as follows:

> "Indirect PI Trust Claim" shall mean any Claim or remedy, liability, or Demand against the Debtors, . . . that is (x)(i) held by (A) any Entity . . . who has been, is, or may be a defendant in an action seeking damages for death, bodily injury, sickness, disease, or other personal injuries (whether physical, emotional, or otherwise) to the extent caused or allegedly caused, directly or indirectly, by exposure to asbestos or asbestos-containing products for which the Debtors have liability or (B) any assignee or transferee of such Entity and (ii) on account of alleged liability of the Debtors for payment, repayment, reimbursement, indemnification, subrogation, or contribution of any portion of any damages such Entity has paid or may pay to the plaintiff in such action or (y) [relates to insurance or other financial assurance].

Plan § 1.1.138. While Montana has been named as a defendant in various actions in which the plaintiffs are "seeking damages for death, bodily injury, sickness, disease, or other personal injuries" (and therefore its contribution and indemnification claims may technically fall within the definition of "Indirect PI Trust Claim"), the claims against Montana are based on its purported failure to warn, not based upon death, injury, sickness, or disease. Accordingly (and notwithstanding the Disclosure Statement's language to the contrary), Montana maintains that its contribution and indemnification claims arguably do not fall within the Plan's definition of Indirect PI Trust Claims, and therefore should not be classified as Class 6 Asbestos PI Claims but should instead be classified as Class 9 General Unsecured Claims.

Code . . . ."); id. § 1.1.32 ("'Asbestos PI Channeling Injunction' shall mean the order(s) entered or affirmed by the District Court, in accordance with and pursuant to Bankruptcy Code § 524(g), permanently and forever staying, restraining, and enjoining any Entity from taking any action against any Asbestos Protected Party . . . with respect to any Asbestos PI Claims, all of which shall be channeled to the Asbestos PI Trust for resolution as set forth in the Asbestos PI TDP.").

## ARGUMENT

## I. THE PLAN FAILS TO COMPLY WITH BANKRUPTCY CODE SECTION 524(g).

Bankruptcy Code section 1129(a)(1) provides that a plan may be confirmed only if it "complies with the applicable provisions of this title." 11 U.S.C. § 1129(a)(1). As explained below, the Plan does not comply with the "applicable provisions" of the Bankruptcy Code found in section 524(g). Therefore, the Court should deny confirmation of the Plan.

### A. Montana's Claims for Contribution and Indemnification Are Not Subject to an Injunction Pursuant to Bankruptcy Code Section 524(g) Because They Are of a Different Nature than Asbestos Claims.

The Disclosure Statement contemplates classifying Montana's claims for contribution and indemnification as Class 6 Asbestos PI Claims that are subject to an injunction imposed pursuant to Bankruptcy Code section 524(g). See supra at p. 9. As set forth below, as a threshold matter, an injunction imposed pursuant to section 524(g) is inapplicable to indemnification and contribution claims. By attempting to classify Montana's contribution and indemnification claims within Class 6 and expand the scope of section 524(g) to apply to such claims in disregard of the statute's terms, the Plan fails to comply with the "applicable provisions" of the Bankruptcy Code. As a result, confirmation should be denied. 11 U.S.C. § 1129(a)(1).

11

Specifically, in order to impose an injunction pursuant to section 524(g), a plan must satisfy all of the requirements of section 524(g)(2)(B). See 11 U.S.C. § 524(g)(2)(A) (providing that an injunction under section 524(g) will be effective only "if the requirements of subparagraph (B) are met at the time an injunction described in paragraph (1) is entered"). Therefore, before imposing an injunction under section 524(g), the Court must affirmatively find that each of the requirements of paragraph 524(g)(2)(B) are met. See In re Congoleum Corp., 362 B.R. 167, 176 (Bankr. D.N.J. 2007) ("The Court must determine whether [the plan's provisions] satisfy the requirements of § 524(g)."); Collier on Bankruptcy ¶ 524.01 (15th ed. rev. 2009) ("Only in a case meeting all of the requirements of this subsection can the debtor and other parties take advantage of the protections that the subsection provides."). This is true even if a party does not raise an objection. See In re ACandS, Inc., 311 B.R. 36, 42 (Bankr. D. Del. 2004) ("Section 524(g)(2)(A) makes clear that as a condition to obtaining the relief provided by the statute, the court must find that all of its requirements have been met, even if no one objects.").

If the Court determines that any of the requirements of section 524(g)(2)(B) remain unsatisfied, the injunction may not be imposed pursuant to section 524(g). See ACandS, 311 B.R. at 42 ("Because compliance with all of the subpart of § 524(g)(2)(B) is a prerequisite to the issuance of a channeling injunction, and because this subpart clearly has not been met, no such injunction may enter."). Nor may the Court ignore the literal requirements of section 524(g) by imposing an injunction under its general equitable authority pursuant to Bankruptcy Code section 105(a). See In re Combustion Eng'g, Inc., 391 F.3d 190, 237 (3d Cir. 2004) (reversing plan confirmation because "the general powers of § 105(a) cannot be used to achieve a result not contemplated by the more specific provisions of § 524(g)"). Instead, the Court must deny confirmation of the plan for failure to comply with the "applicable provisions" of the Bankruptcy

Code. See Congoleum, 362 B.R. at 179, 198 (concluding that plan failed to comply with requirements of section 524(g)(2)(B) and granting summary judgment denying confirmation); ACandS, 311 B.R. at 42 (because plan failed to comply with the requirements of section 524(g)(2)(B), "the plan does not comply 'with the applicable provisions of this title' under § 1129(a)(1), and therefore confirmation of the plan must be denied").

One of the requirements of section 524(g)(2)(B) is that the injunction address liabilities of a debtor that, as of the petition date, was named as a defendant in personal injury, wrongful death, or property-damage actions. See 11 U.S.C. § 524(g)(2)(B)(i)(I) (requiring that "the injunction is to be implemented in connection with a trust that . . . is to assume the liabilities of a debtor <u>which at the time of entry of the order for relief has been named as a defendant in personal injury, wrongful death, or property-damage actions</u>" (emphasis added)).

The section's express language is consistent with Congress's intent, which was to provide a means to address <u>personal injury claims</u>. See H.R. Rep. No. 103-835, at 40 (1994), reprinted in 1994 U.S.C.C.A.N. 3340, 3348 ("This section adds a new subsection (g) to section 524 of the Code, establishing a procedure for dealing in a chapter 11 reorganization proceeding with future <u>personal injury claims</u> against the debtor based on exposure to asbestos containing products." (emphasis added)); 140 Cong. Rec. H10,765 (daily ed. Oct. 4, 1994) (same).

Here, the Plan attempts to enlarge the scope of section 524(g) by having the injunction apply not only to "personal injury, wrongful death, and property-damage actions", but also to Montana's claims, which are of an entirely different nature. Montana holds claims for contribution and indemnification, not personal injury, wrongful death, or property damage.

Moreover, as the United States District Court for the District of Delaware has already recognized, Montana's claims for contribution and indemnification result not from the

production of asbestos, but rather from Montana's purported liability arising from its own alleged failure to warn under a governmental duty imposed by Montana law.  See W.R. Grace & Co. v. Libby Claimants (In re W.R. Grace & Co.), Civ. A. No. 08-246 (RLB) (D. Del. Aug. 12, 2008), at pp. 10-11 ("Montana's liability is predicated on its own alleged violation of a governmental duty imposed under Montana law.").[6]

Therefore, Montana's claims are of a different nature (contribution and indemnification, as opposed to personal injury, wrongful death, or property damage) and based on different acts (alleged failure to warn, as opposed to asbestos production) from the types of claims to which a section 524(g) injunction applies.  Moreover, with only one exception, the underlying failure to warn claims against Montana arose after the petition date.

By attempting to classify Montana's contribution and indemnification claims within Class 6 and expand the scope of section 524(g) to apply to Montana's claims, the Plan fails to comply with the requirements of section 524(g)(2)(B).  Accordingly, the Plan does not comply with the "applicable provisions" of the Bankruptcy Code, and on this basis alone, the Court should deny confirmation of the Plan.  See 11 U.S.C. § 1129(a)(1); Congoleum, 362 B.R. at 179, 198; ACandS, 311 B.R. at 42.

> **B.**    **Montana's Claims for Contribution and Indemnification Also Are Not Subject to an Injunction Imposed Pursuant to Bankruptcy Code Section 524(g) Because They Are Not "Claims" or "Demands".**

Even if Montana's claims were of the nature to which an injunction imposed under section 524(g) might apply, in any event that section only enjoins "claims" or "demands."  See

---

[6]    In doing so, the district court affirmed this Court's conclusion that the preliminary injunction that has been imposed in these cases should not extend to claims against Montana.  Montana has appealed that decision to the Third Circuit Court of Appeals, and that appeal is still pending.

11 U.S.C. § 524(g)(1)(B).  As set forth below, Montana's claims are neither "claims" nor "demands" for purposes of this section.

For purposes of the Bankruptcy Code, a "claim" is defined as a "right to payment."  11 U.S.C. § 101(5).  In applying this definition in the context of contribution and indemnification claims, the Third Circuit Court of Appeals has determined that such claims were not "claims" for purposes of the Bankruptcy Code because a right to payment had not yet arisen.  See Avellino & Bienes v. M. Frenville Co. (In re M. Frenville Co.), 744 F.2d 332, 335-36 (3d Cir. 1984) (reversing district court, and concluding that the automatic stay did not apply to indemnification and contribution claims that relate to a debtor's prepetition acts but for which the claimant did not have a right to payment until after the petition date).

Frenville remains controlling law in the Third Circuit, notwithstanding the enactment of Bankruptcy Code section 524(g).  See, e.g., In re Penn Cent. Transp. Co., 71 F.3d 1113, 1115 (3d Cir. 1995) (holding that under Frenville, "claims for contribution and indemnity could not accrue until the [underlying] complaints were filed" and therefore because the claimants "could not have filed [claims] during the . . . bankruptcy, . . . their claims could not have been discharged"); JELD-WEN, Inc. v. Van Brunt (In re Grossman's, Inc.), 400 B.R. 429, 432 (D. Del. 2009) (affirming bankruptcy court's decision that tort claims did not arise prior to the effective date, and therefore were not discharged, citing Frenville).  Indeed, the district court has even applied Frenville in an adversary proceeding in these cases.  See Official Committee of Asbestos Personal Injury Claimants v. Fresenius Med. Care Holdings, Inc. (In re W.R. Grace & Co.), 281 B.R. 852, 860 (Bankr. D. Del. 2002) (stating that "Frenville remains the law of this Circuit" regarding the determination of when a claim arises).

In their analyses, the <u>Frenville</u>, <u>Penn Central</u>, <u>Grossman's</u>, and <u>W.R. Grace</u> courts all turned to state law to determine when a right to payment (and, consequently, a "claim" for purposes of the Bankruptcy Code) arose.  <u>See</u> <u>Frenville</u>, 744 F.2d at 337 (applying New York law); <u>Penn Cent.</u>, 71 F.3d at 1115 (applying Ohio law); <u>Grossman's</u>, 400 B.R. at 432 (applying New York law, but noting that result would have been the same had federal law been applicable); <u>W.R. Grace</u>, 281 B.R. at 860-61 (applying New Jersey law).

In this regard, Montana law is the same as the New York law referenced in <u>Frenville</u> and <u>Grossman's</u> (which is the same as the law in most states).  Namely, under Montana law, "a cause of action accrues 'when all elements of the claim . . . exist or have occurred.'"  <u>Orr v. State of Montana</u>, 2004 MT 354, P76, 324 Mont. 391, 416, 106 P.3d 100, 117 (2004) (quoting Mont. Code Ann. § 27-2-102(1)(a)).  Under Montana law, "the right of indemnity does not arise until the obligation arises . . . the absolute right does not arise until payment has been made."  <u>Linder v. Missoula County</u>, 251 Mont. 292, 299, 824 P.2d 1004, 1008 (Mont. 1992).  Additionally, under Montana law, "[t]he contribution claim . . . does not arise until judgment or settlement is paid or discharged."  <u>Id.</u>  No settlements or judgments have been entered with or against Montana, and no payments in the State Court Actions have been made by Montana.  Thus, Montana does not presently have a right to payment (and therefore does not have a "claim" as defined in Bankruptcy Code section 101) for contribution and indemnification against the Debtors.[7]

_____

[7] For the same reason, Montana believes that its claims may not be "claims" for purposes of the Bankruptcy Code that are subject to the automatic stay, and therefore there is no prohibition on Montana joining the Debtors as third-party defendants in the State Court Actions (whether now or later), including for the purpose of liquidating its indemnification and contribution claims against them.  Montana reserves its right to do so.  Moreover, to the extent that the automatic stay does apply, Montana reserves all rights and arguments, including (i) to seek relief from the automatic stay and/or the permanent injunction, or (ii) to seek permission in the State Court Actions to introduce

16

Indeed, the United States District Court for the District of Delaware has already observed that Montana's claims for contribution and indemnification have not yet arisen, but rather would arise only when and if a judgment is entered against Montana in the State Court Actions. Specifically, in affirming this Court's denial of Montana's request to expand this Court's preliminary injunction to apply to the State Court Actions, the Delaware District Court concluded:

> Notwithstanding the State of Montana's pending proof of claim in the bankruptcy proceedings, their potential indemnification claim against Debtors is not contractual and thus insufficient to establish 'related-to' jurisdiction under the well established Third Circuit precedent . . . . [T]he state court actions simply have the <u>potential</u> to give rise to a common law indemnification claim against Debtors <u>pending the outcome</u>.

See <u>W.R. Grace & Co. v. Libby Claimants (In re W.R. Grace & Co.)</u>, Civ. A. No. 08-246 (RLB) (D. Del. Aug. 12, 2008), at pp. 8, 11 (emphases added).

Nor are Montana's claims "demands" as that term is defined in section 524(g). Section 524(g)(5) states that "the term 'demand' means a demand for payment, present or future, that [meets certain enumerated criteria]." 11 U.S.C. § 524(g)(5). The section does not provide any further clarification on what constitutes a "demand for payment." Nor does the legislative history provide any insight regarding what constitutes a "demand for payment" for purposes of this section.

When neither the express language nor the legislative history of the Bankruptcy Code (including section 524(g) in particular) provide insight into the meaning of an undefined term, courts consider secondary sources. See <u>In re Congoleum Corp.</u>, 362 B.R. 167, 176 (Bankr. D.N.J. 2007) (looking to treatises to obtain insight on the definition of "specified contingencies" in Bankruptcy Code section 524(g)); <u>In re Federal-Mogul Global Inc.</u>, Case No. 01-10578, 2008

---

evidence of the Debtors' conduct as a superseding intervening cause of the plaintiffs' alleged damages and to conduct necessary discovery.

Bankr. LEXIS 3517, at \*46-47 (Bankr. D. Del. Sept. 30, 2008) (looking to treatises to obtain insight on the definition of "predecessor in interest" in Bankruptcy Code section 524(g)).

Black's Law Dictionary defines a "demand" as, among other things, a "[r]equest for payment of debt or amount <u>due</u>." Deluxe Black's Law Dictionary 429 (6th ed. 1990) (emphasis added). Here again, Montana's claims for contribution or indemnification are not yet due. <u>See</u> <u>Orr</u>, 2004 MT 354, P76, 324 Mont. at 416, 106 P.3d at 117; <u>Linder</u>, 251 Mont. at 299, 824 P.2d at 1008. Therefore, Montana's claims do not constitute a "demand" for purposes of section 524(g).

In addition, section 524(g)(5) requires that in order to constitute a "demand" under the section, the demand must "aris[e] out of the same or similar conduct or events that gave rise to the claims addressed by the injunction issued under paragraph (1)." 11 U.S.C. § 524(g)(5)(B). Paragraph (1), in turn, applies to "any claim or demand that . . . is to be paid in whole or in part by a trust described in paragraph (2)(B)(i)." 11 U.S.C. § 524(g)(1)(B). Paragraph (2)(B)(i), in turn, as discussed above, only addresses "liabilities of a debtor which at the time of entry of the order for relief has been named as a defendant in <u>personal injury, wrongful death, or property-damage actions</u>." 11 U.S.C. § 524(g)(2)(B)(i) (emphasis added); <u>see also</u> <u>supra</u> Part I.A. Montana is not alleging personal injury, wrongful death, or property-damage claims. Therefore, Montana's claims do not "aris[e] out of the same or similar conduct or events that gave rise to the claims addressed by the injunction," and therefore Montana has not presented a "demand" for purposes of section 524(g).

Finally, the <u>Congoleum</u> court observed that when interpreting undefined terms within section 524(g), the court should "discern the meaning of the phrase in light of the overall purpose of § 524(g)." <u>Congoleum</u>, 362 B.R. at 176. The legislative history behind section 524(g)

demonstrates that the purpose of the section was to establish a procedure for dealing with personal injury claims, not contribution and indemnification claims. See supra Part I.A (citing legislative history). Thus, to interpret the undefined phrase "demand for payment" as including claims for contribution and indemnification would be inconsistent with the overall purpose of section 524(g).

For these reasons, Montana's claims are not "claims" or "demands" as such terms are utilized in the Bankruptcy Code, and therefore are not subject to any injunction imposed pursuant to Bankruptcy Code section 524(g). Consequently, by trying to subject Montana's claims to such an injunction, the Plan fails to comply with section 524(g) and should not be confirmed. See 11 U.S.C. § 1129(a)(1); Congoleum, 362 B.R. at 179, 198; ACandS, 311 B.R. at 42.

## II. THE PLAN FAILS TO COMPLY WITH BANKRUPTCY CODE SECTION 1122(a) BY CLASSIFYING CLAIMS THAT ARE NOT SUBSTANTIALLY SIMILAR WITHIN THE SAME CLASS.

Bankruptcy Code section 1129(a)(1) provides that a plan may be confirmed only if it "complies with the applicable provisions of this title." 11 U.S.C. § 1129(a)(1). As explained below, the Plan does not comply with the "applicable provisions" of the Bankruptcy Code found in section 1122(a). Therefore, the Court should deny confirmation of the Plan.

Section 1122(a) requires that all claims in a class be substantially similar. Specifically, that section provides, in pertinent part, that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." 11 U.S.C. § 1122(a) (emphasis added); see also Aetna Cas. & Sur. Co. v. Clerk (In re Chateaugay Corp.), 89 F.3d 942, 949 (2d Cir. 1996) ("Dissimilar claims may not be classified together."); Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning

Corp.), 280 F.3d 648, 661 (6th Cir. 2002) (stating that dissimilar claims may not be classified together).

To determine whether claims are "substantially similar" for purposes of this section, courts look at the nature of the claim. See In re FF Holdings Corp., Case No. 98-37, 1998 U.S. Dist. LEXIS 10741, at *13 (D. Del. Feb. 17, 1998) ("A proper determination of what claims are 'substantially similar' focuses on the nature of the claim."); see also H.R. Rep. No. 95-595, at 406 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6362 (observing that section 1122(a) requires "classification based on the nature of the claims or interests classified"); S. Rep. No. 95-989, at 118 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5904 (same); 7 Collier on Bankruptcy ¶ 1122.03[3] (15th ed. rev. 2009) ("[O]nly the nature of the claim or interest is relevant to classification.").

In considering the nature of claims, courts look at the "the legal attributes of the claims." FF Holdings, 1998 U.S. Dist. LEXIS 10741, at *13; see also 7 Collier on Bankruptcy ¶ 1122.03[3] (observing that nature of claims for purposes of section 1122(a) is determined by looking at "legal character or effect [of the] claim against the debtor's assets").

Here, Montana's claims are of an entirely different nature than the other asbestos claims within Class 6. Specifically, Montana's claims are for contribution and indemnification, as opposed to personal injury, wrongful death, or disease. They also are based on different acts (alleged failure to warn, as opposed to asbestos production) from the asbestos personal injury claims within Class 6. See supra Part I.A. Moreover, Montana's claims also have a different legal effect against the debtor's assets. Specifically, Montana's claims are not subject (or should not be subject) to an injunction imposed pursuant to Bankruptcy Code section 524(g). See supra Part I.

Because Montana's claims are of a different nature, let alone have a distinct legal effect, they are not substantially similar to asbestos personal injury claims, and accordingly should not be classified within Class 6 alongside asbestos personal injury claims. See FF Holdings, 1998 U.S. Dist. LEXIS 10741, at *13 (finding that because "the Debtors' obligations to [the claimants] and the [claimants'] remedies and rights vary significantly . . . the nature of the claims . . . are not substantially similar [and] different classifications are appropriate under Section 1122(a)").

By classifying Montana's claims alongside asbestos personal injury claims within Class 6, the Plan fails to comply with Bankruptcy Code section 1122(a) and should not be confirmed.

## III.   THE PLAN VIOLATES THE ABSOLUTE PRIORITY RULE BY PROVIDING FOR FAVORABLE TREATMENT TO CLASSES THAT ARE JUNIOR IN PRIORITY TO CLASS 6 ASBESTOS PI CLAIMS.

Montana further objects to the Plan because it violates the absolute priority rule. Specifically, notwithstanding the fact that Class 6 Asbestos PI Claims are impaired under the Plan, the Plan provides favorable treatment to holders of equity security interests that are junior in priority to Class 6. Indeed, very tellingly, the Official Committee of Equity Security Holders is even one of the Plan Proponents. Such a result directly violates the absolute priority rule and the Third Circuit Court of Appeals' ruling in In re Armstrong World Industries, Inc., 432 F.3d 507, 518 (3d Cir. 2005) (affirming denial of confirmation because plan violated absolute priority rule).

By way of background, the Bankruptcy Code provides that a plan normally may be confirmed if it meets certain requirements, including that each and every class either accepts the plan or does not suffer any impairment under the plan. See 11 U.S.C. § 1129(a)(8) ("The court shall confirm a plan only if all of the following requirements are met: . . . (8) With respect to each class of claims or interests—(A) such class has accepted the plan; or (B) such class is not impaired under the plan.").

The Bankruptcy Code, however, provides an alternative regime for confirmation, commonly referred to as "cram down." Specifically, a court may confirm a plan even if one of the impaired classes does not accept the plan, so long as the plan is (among other things) fair and equitable. See id. § 1129(b)(1) (stating that "if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met[, the court] shall confirm the plan notwithstanding the requirements of such paragraph if the plan . . . is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan").

To meet the "fair and equitable" requirement of this cram down regime, the plan must (among other things) comply with what is known as the "absolute priority rule." Specifically, it must be the case that each creditor in the dissenting class either receives the full value of the allowed amount of its claim, or alternatively that the creditors in junior classes do not receive any distribution. See 11 U.S.C. § 1129(b)(2)(B)(ii) (requiring that for "a plan [to] be fair and equitable with respect to a class" for purposes of cram down, it must be the case that "the plan provides that each holder of a claim of such class receive . . . the allowed amount of such claim" or, alternatively, "the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property . . . ."); see also In re Armstrong World Indus., Inc., 432 F.3d 507, 518 (3d Cir. 2005) (affirming denial of confirmation because plan violated absolute priority rule).[8]

---

[8]  Nor may the Plan Proponents escape the confines of the requirements of the Bankruptcy Code (including the absolute priority rule) by appealing to the Court's general equitable power. See Norwest Bank Worthington v. Ahlers, 485 U.S. 197, 206 (1988) (after concluding that plan violated absolute priority rule, court rejected debtors' attempt to appeal to court's equitable authority in contravention of that rule, stating that "whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code").

Here, Montana objects to the Plan because it blatantly disregards the absolute priority rule, as set forth in Bankruptcy Code section 1129(b), in the event that Class 6 rejects the Plan. Specifically, Montana's claims have been classified within Class 6 Asbestos PI Claims (although Montana disputes this classification). See supra at pp. 9-10 & n.5 & Part I.A (discussing, and disputing, classification of Montana's claims). Class 6 Asbestos PI Claims are impaired under the Plan. See Plan § 3.1.6(d) ("Class 6 is impaired."); see also Disclosure Statement § 1.2.1 (stating that Class 6 Asbestos PI Claims will be resolved pursuant to the Asbestos PI Trust Agreement, and that holders of such claims will receive an "[u]nknown" estimated percentage recovery).[9]

Notwithstanding that Class 6 is impaired under the Plan, the Plan provides favorable treatment for classes that are junior to Class 6 in priority. For example, the Plan provides favorable treatment to holders of equity interests. See Plan § 3.1.10(b) ("On the Effective Date, Class 10 Equity Interests in the Parent shall be retained, subject to the issuance of the Warrant, the terms of the Share Issuance Agreement, and the Stock Trading Restrictions Term Sheet."). Indeed, the Official Committee of Equity Security Holders is one of the Plan Proponents and is supporting the Plan. In further violation of the absolute priority rule, the Plan provides that the Debtors' inter-debtor equity interests are unimpaired. See Plan § 3.1.11(b) (stating with respect to Class 11 Equity Interests in the Debtors Other than the Parent that "[t]his Plan leaves unaltered the legal, equitable, and contractual rights to which each such Equity Interest in the Debtors other than the Parent entitles the Holder of such Equity Interest"); see also Disclosure Statement § 1.2.1 (listing estimated percentage recovery for Class 11 as "100%"). Such a result directly

---

[9]    Class 8 CDN ZAI PD Claims and Class 10 Equity Interests in the Parent also are impaired under the Plan. See Plan § 3.1.8(d) & 3.1.10(c).

violates the Third Circuit Court of Appeals' ruling in <u>Armstrong</u>, and violates the absolute priority rule.

The Plan has thus disregarded Bankruptcy Code section 1129(b). Even if a class (such as Class 6 Asbestos PI Claims) does not accept the Plan, the Plan Proponents nonetheless are seeking confirmation of the Plan pursuant to the cram-down regime. <u>See</u> Plan § 6.5.1 ("With respect to impaired Equity Interests in the Parent, and subject to Section 6.4 of this Plan [addressing acceptance by Classes 6, 7, and 8 pursuant to Bankruptcy Code section 524(g)], with respect to any impaired Class of Plan Claims that fail to accept this Plan in accordance with Bankruptcy Code §§ 1126 and 1129(a), the Plan Proponents request, to the extent consistent with applicable law, that the Court confirm this Plan in accordance with Bankruptcy Code § 1129(b) with respect to such non-accepting Class of Equity Interests and such non-accepting Class of Plan Claims (if any), and this Plan constitutes a motion for such relief."); <u>see also</u> Disclosure Statement § 4.6 ("Impaired Equity Interests in the Parent and/or impaired Classes of Plan Claims that fail to accept the Plan may be 'crammed down' in accordance with Bankruptcy Code § 1129(b)."); <u>id.</u> § 8.2.1 (summarizing cram-down regime and stating that "[i]n the event one or more Classes of impaired Claims or Equity Interests rejects the Plan, subject to Section 6.4 of the Plan [addressing acceptance by Classes 6, 7, and 8 pursuant to Bankruptcy Code section 524(g)], the Debtors reserve the right to proceed with confirmation pursuant to Bankruptcy Code § 1129(b), and the Bankruptcy Court will determine, at the Confirmation Hearing, whether the Plan is fair and equitable and does not discriminate unfairly against any rejecting impaired Class of Claims or Equity Interests"). This is so despite the fact that the Plan, in the event of a cram down, would violate the absolute priority rule, in direct contravention of Bankruptcy Code section 1129(b).

Because the Plan fails to comply with the absolute priority rule in disregard of the requirements of Bankruptcy Code section 1129(b), Montana objects to the Plan, and the Plan should not be confirmed.

## IV. THE PLAN VIOLATES THE PROHIBITION ON UNFAIR DISCRIMINATION BY PROVIDING FOR FAVORABLE TREATMENT TO CLASSES THAT ARE EQUAL IN PRIORITY TO CLASS 6 ASBESTOS PI CLAIMS

The "cram down" provision of the Bankruptcy Code further requires that the plan not discriminate unfairly. See id. § 1129(b)(1) (stating that "if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met[, the court] shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly . . . with respect to each class of claims or interests that is impaired under, and has not accepted, the plan").

Montana objects to the Plan because it blatantly disregards the prohibition against unfair discrimination, as set forth in Bankruptcy Code section 1129(b), in the event that Class 6 rejects the Plan. Specifically, Montana's claims have been classified within Class 6 Asbestos PI Claims (although Montana disputes this classification). See supra at pp. 9-10 & n.5 & Part I.A (discussing, and disputing, classification of Montana's claims). Class 6 Asbestos PI Claims are impaired under the Plan. See Plan § 3.1.6(d) ("Class 6 is impaired."); see also Disclosure Statement § 1.2.1 (stating that Class 6 Asbestos PI Claims will be resolved pursuant to the Asbestos PI Trust Agreement, and that holders of such claims will receive an "[u]nknown" estimated percentage recovery).[10]

Notwithstanding that Class 6 is impaired under the Plan, other classes of unsecured claims that are the same in priority to Class 6 are unimpaired under the Plan. See Plan § 3.1.5(c)

---

[10] Class 8 CDN ZAI PD Claims and Class 10 Equity Interests in the Parent also are impaired under the Plan. See Plan § 3.1.8(d) & 3.1.10(c).

(stating that Class 5 Intercompany Claims is "unimpaired"); id. § 3.1.7(c)(ii) (stating that Class 7A Asbestos PD Claims (except US ZAI PD Claims) its "unimpaired"); id. § 3.1.9(f) (stating that Class 9 General Unsecured Claims is "unimpaired").  Such a result directly violates the prohibition on unfair discrimination.

Because the Plan fails to comply with the prohibition on unfair discrimination in disregard of the requirements of Bankruptcy Code section 1129(b), Montana objects to the Plan, and the Plan should not be confirmed.

## V.   THE TRUST DISTRIBUTION PROCEDURES FAIL TO COMPLY WITH BANKRUPTCY CODE SECTIONS 1123(a)(4) AND 524(g)(2)(B) BY GIVING DISPARATE TREATMENT TO CLAIMS WITHIN A CLASS.

### A.   Bankruptcy Code Sections 1123(a)(4) and 524(g)(2)(B) Require that Each Claim of a Particular Class Receive the Same Treatment.

Montana further objects to the Plan on the grounds that the Trust Distribution Procedures that are implemented by the Plan may result in disparate treatment among claims within the same class in violation of Bankruptcy Code sections 1123(a)(4) and 524(g)(2)(B).  Accordingly, the Plan does not "compl[y] with the applicable provisions of this title" as required by Bankruptcy Code section 1129(a)(1).  11 U.S.C. § 1129(a)(1).

Bankruptcy Code section 1123(a)(4) provides that a plan must "provide the same treatment for each claim or interest of a particular class, unless the holder . . . agrees to a less favorable treatment."  11 U.S.C. § 1123(a)(4).

Additionally, Bankruptcy Code section 524(g)(2)(B)(ii)(V) requires that the trust established pursuant to a plan must reasonably assure that claims and demands involving similar claims be paid in substantially the same manner.  See 11 U.S.C. § 524(g)(2)(B)(ii)(V) (requiring that "the trust will operate through mechanisms . . . that provide reasonable assurance that the trust will value, and be in a financial position to pay, present claims and future demands that

26

involve similar claims _in substantially the same manner_" (emphasis added)); _see also_ Combustion Eng'g, 391 F.3d at 234 n.45; Congoleum, 362 B.R. at 182.

This requirement of section 524(g) reinforces the need for equality of distribution among creditors, which is one of the central policies of the Bankruptcy Code. _See_ Congoleum, 362 B.R. at 182 ("'[E]quality of distribution among creditors is a central policy of the Bankruptcy Code.' For asbestos cases, the need for equality of distribution is reenforced in § 524(g)[(2)(B)(ii)(V)]." (quoting Combustion Eng'g, 391 F.3d at 239)); _id._ at 185 (referring to "equality of distribution" as "the Code's bedrock principle").

Here, while the Plan does not classify different Asbestos PI Claims into different classes, it is the case that the Trust Distribution Procedures may result in disparate treatment of different Asbestos PI Claims in several ways, as set forth below.

**B.    The Trust Distribution Procedures May Be Interpreted to Give Disparate Treatment by Providing for No Payout on Account of Contribution and Indemnification Claims.**

As a preliminary matter, the Trust Distribution Procedures may be interpreted to unfairly discriminate amongst Asbestos PI Claims by failing to provide for any payment on account of Montana's contribution and indemnification claims.

Specifically, the Trust Distribution Procedures provide for payment on account of an indirect claim only if the holder of such a claim has paid for a direct claim that the PI Trust would have otherwise been liable to pay. _See_ Trust Distribution Procedures (attached as Exh. 4 to the Exhibit Book to the Plan) (Docket No. 20874) (hereinafter "TDP") § 5.6 (providing that indirect claim is presumptively valid only if, among other things, "the Indirect Claimant has paid in full the liability and obligation of the PI Trust to the individual claimant _to whom the PI Trust would otherwise have had a liability or obligation_ under this TDP" (emphasis added)); _id._ (providing that indirect claim that is not presumptively valid is allowable only if, among other

27

things, "the Indirect Claimant has paid all or a portion of a liability or obligation that the PI Trust had to the Direct Claimant").

As set forth above, Montana's claims for contribution and indemnification arise from Montana's alleged failure to warn, claims for which the PI Trust may not otherwise have been liable (absent Montana's right to contribution and indemnification). Therefore, there is a possibility that the Trust Distribution Procedures could be interpreted to result in Montana receiving no payment on account of its contribution and indemnification claims, even though they are attempted to be classified within the same Class 6 as other Asbestos PI Claims that will receive a payment.[11]

Accordingly, the Court should deny confirmation of the Plan based on its failure to comply with sections 1123(a)(4) and 524(g)(2)(B)(ii)(V). See ACandS, 311 B.R. at 42; Congoleum, 362 B.R. at 182, 198. At a minimum, the Court should require the Plan Proponents to amend the Trust Distribution Procedures to make clear that indirect contribution and indemnification claims (such as those held by Montana) will receive a payment, even if they do not result from an indirect claimholders' payment of a claim for which the Asbestos PI Trust would have been liable.

> **C.**      **The Trust Distribution Procedures Give Disparate Treatment by Implementing a First-in-First-out Mechanic.**

Second, even if the Trust Distribution Procedures are not interpreted to result in no payment to indirect contribution and indemnification claims, those procedures nonetheless

---

[11]      Even to the extent that the Plan does contemplate a distribution on account of indirect contribution and indemnification claims, the requirement that the contribution and indemnification claimholder must first make payment to the purportedly injured direct claimholder disregards applicable state law, which allows a tort system defendant the right to pursue contribution prior to paying a judgment or settlement to the plaintiff. See Objection of Garlock Sealing Techs., LLC to Confirmation of the Plan, at Part A (Docket No. 21795). Montana joins, incorporates herein by reference, and adopts as its own Part A of Garlock Sealing Technologies, LLC's objection.

implement a first-in, first-out timing mechanic that will result in adverse disparate treatment regarding such claims in comparison with the other claims that are classified within Class 6.

The Bankruptcy Code prohibits trust distribution procedures from providing disparate treatment to claims based upon the timing of when such claims are asserted. See ACandS, 311 B.R. at 42 (denying confirmation because plan failed to comply with section 524(g)(2)(B)(ii)(V) because the trust discriminated between claims based upon which such claims were asserted); Congoleum, 362 B.R. at 182, 198 (same). Such prohibition is consistent with Congress's intent. See H.R. Rep. No. 103-835, at 41 (1994), reprinted in 1994 U.S.C.C.A.N. 3340, 3350 ("[S]ection 111 requires that the trust operate in a structure and manner necessary to give reasonable assurance that the trust will value, and be able to pay, similar present and future claims in substantially the same manner." (emphasis added)); 140 Cong. Rec. H10,765 (daily ed. Oct. 4, 1994) (same).

In the Congoleum case, for example, the court determined that the plan was "unconfirmable on its face" because it placed asbestos personal injury creditors into four different classes that received different treatment. 362 B.R. at 182. Different treatment was afforded based upon the timing of when such claims were asserted. See id. at 184 ("[T]he Debtors' separate classification of the Class 2 claims is tied exclusively to the timing of the claim while ignoring the legal nature of the claim."). In particular, the plan attempted to provide more favorable treatment to claims that were asserted sooner rather than later. See id. ("The Debtors' logic is that because the Class 2 tort cases were either filed earlier or proceeded through the tort system faster, they are entitled to vastly superior treatment than the tort cases filed later or at a less advanced stage of litigation."). The court flatly rejected that approach and found that it violated the express terms of section 524(g)(2)(B)(ii)(V). See id. ("Under that logic it would be

29

impossible for any future tort claims to receive equal treatment; a result expressly prohibited by § 524(g)(2)(B)(ii)(V).”); see also id. at 185 (“The Court finds as a matter of law that the Class 2 claims are substantially similar to the asbestos personal injury claims in the other classes; thus, the preferential treatment of Class 2 violates the Code’s bedrock principle of equality of distribution.”). As a result, the court granted a motion for summary judgment and denied confirmation. See id. at 198.

Here, the Trust Distribution Procedures unfairly discriminate amongst Asbestos PI Claims based upon the timing of when such claims are asserted. In particular, the Trust Distribution Procedures operate on a first-in first-out mechanic, thereby potentially resulting in higher payout for the claimholders that rush to assert their claims. See TDP § 2.1 (stating that claims will be processed and paid “on an impartial, first-in-first-out (‘FIFO’) basis”); id. § 2.2 (“PI Trust Claims shall be processed based on their place in the FIFO Processing Queue.”); id. § 5.1(c) (“PI Trust Claims . . . shall be paid in FIFO order based on the date their liquidation became final.”).

Such disparate treatment based upon the timing of when a claim is asserted was flatly rejected by the Congoleum court as set forth above, and would result in an inequality of distribution that would prejudice people who have not raced to assert their claims, in disregard of the requirements of sections 1123(a)(4) and 524(g)(2)(B)(ii)(V).[12]

The first-in first-out mechanic is particularly unfair to Montana with respect to its assertion of contribution and indemnification claims. The assertion of contribution and

---

[12] The Trust Distribution Procedures further discriminate among claims based on purported exigent hardships. See TDP § 5.4(b) (“An Exigent Hardship Claim, following its liquidation, shall be placed first in the FIFO Payment Queue ahead of all other liquidated PI Trust Claims except Pre-Petition Liquidated Claims, Disease Level I Claims and Existing Claims . . . .”). For this reason alone, the Plan’s implementation of the Trust Distribution Procedures violates Bankruptcy Code sections 524(g)(2)(B)(ii)(V) and 1123(a)(4).

indemnification claims is a two-step process, whereby Montana will first be required to defend itself against all claims asserted against it. Only after the extent of Montana's liability (if any) on such claims is adjudicated by a court (or, alternatively, a settlement is reached with Montana) will Montana be able to assert contribution and indemnification claims against the Debtors. See supra Part I.B (explaining the timing of when Montana's claims will arise). Therefore, it necessarily will be the case that Montana's claims against the Debtors will be delayed, which delay could result in Montana's recovery against the Debtors diminishing significantly (or, indeed, altogether) in light of the first-in first-out mechanic. Accordingly, if Montana's claims are found to be subject to the Trust Distribution Procedures (which Montana does not think they should be), then Montana maintains that the only fair mechanic for the Trust Distribution Procedures is for no distributions to be made until all of Montana's claims against the Debtors for contribution and indemnification have arisen and been asserted.

### D. The Trust Distribution Procedures Give Disparate Treatment by Imposing Additional Restrictions or Requirements on Holders of Indirect PI Trust Claims.

The Trust Distribution Procedures also will result in adverse disparate treatment against Indirect PI Trust Claims (including contribution and indemnification claims) by imposing additional restrictions or requirements on holders of such claims (as opposed to all other Asbestos PI Claims within Class 6) in at least three ways.

First, the Trust Distribution Procedures limit the allowable amount of an Indirect PI Trust Claim to the amount paid to the underlying asbestos plaintiff, without inclusion of attorneys' fees or other defense costs. See TDP § 5.6 ("[N]o Indirect PI Trust Claim may be liquidated and paid in an amount that exceeds what the Indirect Claimant has actually paid the related Direct Claimant.").

Second, the Trust Distribution Procedures require that for a claimant to assert a presumptively valid Indirect PI Trust Claim, it must obtain a full release from the underlying asbestos creditor.  See TDP § 5.6 (requiring that "the Direct Claimant and the Indirect Claimant have forever and fully released the PI Trust from all liability to the Direct Claimant").  And while the procedures allow the holder of the indirect claim instead to engage in arbitration or take its claim to the tort system if it does not obtain such a release, the increased costs that would be incurred by such tortured and bureaucratic processes for proving its claim is not justified.

Third, the Trust Distribution Procedures provide for a "maximum value" for each and every Asbestos PI Claim.  See TDP § 2.1 (establishing "maximum values").  This includes Indirect PI Trust Claims.  See TDP § 2.6 ("Indirect PI Trust Claims, if any, shall be subject to the same categorization, evaluation, and payment provisions of this TDP as all other PI Trust Claims.").  This results in disparate treatment particularly to a holder of an Indirect PI Trust Claim in the event that a judgment is entered against it in an amount in excess of the maximum value.  In that instance, the Trust Distribution Procedures may prevent the holder of the Indirect PI Trust Claim from having its claim allowed in the full amount (in excess of the "maximum value") as already liquidated by the judgment against it.  See TDP §§ 5.6, 5.10(c), 7.7.

All of these requirements resulting in disparate treatment of the holders of Indirect PI Trust Claims in comparison with the other Asbestos PI Claims within Class 6 violate Bankruptcy Code section 1123(a)(4) and 524(g)(2)(B).  See, e.g., In re Planet Hollywood Int'l, 274 B.R. 391, 400 (Bankr. D. Del. 2001) (rejecting modification of plan that would have resulted in one creditor within a class being treated differently from other creditors within that class); In re Smith, 123 B.R. 863, 865 (Bankr. C.D. Cal. 1991) (finding that disparate treatment of proposed plan modification "alone, is enough to deny the Debtor confirmation of her plan, for it violates

the dictates of 11 U.S.C. § 1123(a)(4) which requires that all claims within a given class receive 'the same treatment'").

## VI.    THE TRUST DISTRIBUTION PROCEDURES AND THE PLAN ARE NOT FAIR AND EQUITABLE FOR ADDITIONAL REASONS.

As set forth above, one of the requirements of the cram-down regime is that the plan be "fair and equitable." See 11 U.S.C. § 1129(b)(1); see also supra Part III.[13] Montana objects to the Plan on the grounds that the Trust Distribution Procedures are unfair and inequitable for several reasons.[14]

First, the Trust Distribution Procedures lack certainty regarding the amount of distributions and the procedure for distributions. The Trust Distribution Procedures fail to clarify the payment amount and payout percentage that claimants subject to the trust may expect to receive. See TDP § 2.3 ("Because there is uncertainty in the prediction of both the number and severity of future PI Trust Claims, and the amount of the PI Trust's assets, no guarantee can be made of any Payment Percentage of a PI Trust Claim's liquidated value."); id. § 4.1 ("[T]here is inherent uncertainty regarding the amounts that holders of PI Trust Claims shall receive."); id. § 7.3 ("[T]here can be no guarantee of any specific level of payment to claimants."). The Trust

---

[13]    Additionally, Bankruptcy Code section 524(g)(4) requires that the Court determine that the injunction is fair and equitable with respect to persons asserting future demands. See 11 U.S.C. § 524(g)(4)(B)(ii) (requiring that "the court determines, before entering the order confirming such plan, that . . . such injunction with respect to such demands for purposes of this subparagraph is fair and equitable with respect to the persons that might subsequently assert such demands"). This requirement is "tailored to protect the due process rights of future claimants." Combustion Eng'g, 391 F.3d at 234 n.45 (citing section 524(g)(4)(B)(ii)). Courts should deny confirmation of plans that fail to comply with section 524(g)(4)(B)(ii). See Congoleum, 362 B.R. at 181-82, 198 (concluding as a matter of law that plan failed to fully comply with section 524(g)(4)(B)(ii) and granting, in part, summary judgment denying confirmation).

[14]    In addition to the reasons set forth below, Montana incorporates by reference its arguments asserted in Part V of this Phase II Brief, and maintains that for the reasons set forth in Part V regarding negative disparate treatment towards holders of Indirect PI Trust Claims, the Plan is unfair and inequitable on those bases as well, and consequently does not comply with Bankruptcy Code section 1129(b)(1).

Distribution Procedures further fail to clarify the procedures pursuant to which Indirect PI Trust Claims will be processed, and instead contemplate the trustee establishing such procedures in the future. See TDP § 5.6 (stating that Indirect PI Trust Claims "shall be processed in accordance with procedures to be developed and implemented by the Trustees"). It is unfair and inequitable for claimholders to lack clarity regarding the amount and percentage that they are expected to receive and the procedures pursuant to which their claims will be paid.

Second, pursuant to the Asbestos PI Trust Agreement, certain attorneys for underlying asbestos claimholders are appointed as members of the trust advisory committee. See WRG Asbestos PI Trust Agreement (Docket No. 20874, Exh. 2), at pp. 49-50 (appointing Russell Budd, John Cooney, Joseph Rice, and Perry Weitz as members of the trust advisory committee). The law firm of each of the trust advisory committee members has a client on the Asbestos PI Committee. See Lockwood Rule 30(b)(6) Deposition, at pp. 121-25, attached hereto as Exhibit A. There is no requirement under Bankruptcy Code section 524(g) for the trust to have a trust advisory committee. The statute only requires that the Court appoint a legal representative for the purpose of protecting the rights of the holders of future demands in connection with the proceedings leading to the issuance of the channeling injunction, not thereafter. See 11 U.S.C. § 524(g)(4)(B)(i). Under the trust agreement, the trust advisory committee wields considerable control and influence over the trustees and the governance of the trust. See, e.g., TDP § 2.2(e), 2.2(f), 4.2(c), and 4.3(a). Under these circumstances, it is fundamentally unfair and inequitable (let along an impermissible conflict of interest) to have the attorneys for the personal injury claimants have such influence.[15]

---

[15]     Certain parties have elaborated on this conflict of interest in their respective objections to the Plan. Montana joins, incorporates herein by reference, and adopts as its own Part B of the Objection of Garlock Sealing Technologies, LLC to Confirmation of the Plan (Docket No. 21795); Part I.I of the Final Plan Objections of CNA Companies to the First

Finally, Montana maintains that the Plan is unfair and inequitable because it provides for a distribution of stock to Montana in violation of the Montana Constitution. In circumstances such as the Debtors' bankruptcy, the Montana Constitution prohibits Montana from holding stock in a corporation. See Mont. Const., art. VIII, § 13(1) ("[N]o public funds shall be invested in private corporate capital stock."). As set forth above, Montana's claims have been classified within Class 6 Asbestos PI Claims (although Montana disputes this classification). See supra at pp. 9-10 & n.5 & Part I.A (discussing, and disputing, classification of Montana's claims). The Plan provides that such claims will be paid "solely from the Asbestos PI Trust Assets." Plan § 3.1.6(b)(ii). The Asbestos PI Trust Assets are defined to include, among other things, "the Share Issuance Agreement and all rights of the Asbestos PI Trust pursuant to the Share Issuance Agreement." Plan § 1.1.46(d). The Share Issuance Agreement, in turn, is defined as "the agreement setting forth the obligation of the Reorganized Parent to issue a number of shares of Parent Common Stock to the Trusts' Representative, on behalf of the Asbestos PI Trust and the Asbestos PD Trust, in the form included as Exhibit 20 of the Exhibit Book . . . ." Plan § 1.1.201. Accordingly, part of the distribution to be provided to holders of Class 6 Asbestos PI Claims (which, as contemplated by the Disclosure Statement, includes Montana) is in the form of shares of Parent Common Stock. Because Montana is not permitted to hold any stock in corporations in circumstances such as the Debtors' bankruptcy, Montana maintains that the Plan is unfair and inequitable.

---

Amended Joint Plan of Reorganization (Docket No. 21794); and the section entitled "The Proposed TAC Members Are Burdened by Irreconcilable Conflicts of Interest and Should Not Be Approved By The Court" found on pages 17 through 22 of the Final Objections of Government Employees Insurance Co. and Republic Insurance Company n/k/a Starr Indemnity & Liability Company to Confirmation of Amended Joint Plan of Reorganization (Docket No. 21771).

## VII.    THE PLAN IS INFEASIBLE.

Pursuant to the Bankruptcy Code, a plan may be confirmed only if it is feasible. Specifically, section 1129(a)(11) provides that a plan may be confirmed only if, among other things, "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor . . . ."  11 U.S.C. § 1129(a)(11).

As set forth above, Montana believes that its claims are not "claims" as such term is used in the Bankruptcy Code.  See supra Part I.B (citing Frenville, 744 F.2d at 335-36, Penn Cent., 71 F.3d at 1115, Grossman's, 400 B.R. at 432, and W.R. Grace, 281 B.R. at 860-61).  Therefore, even if the Plan is confirmed and goes effective, Montana's claims will not be discharged by the Plan.  See 11 U.S.C. § 1141(c) (providing that after confirmation of a plan, property of the estate is free and clear only of all "claims and interests"); id. § 1141(d)(1)(A) (providing for a discharge only of "any debt that arose before the date of such confirmation"); Grossman's, 400 B.R. at 432 (affirming bankruptcy court's decision that tort claims did not arise prior to the effective date, and therefore were not discharged, citing Frenville).  Accordingly, Montana fully reserves its right to assert and prosecute its claims against the Debtors, notwithstanding any confirmation of a plan of reorganization and notwithstanding any injunction contained in any such plan.

In the event that Montana has a claim of $750 million or more for indemnification or contribution that is not discharged by the Plan, Montana believes that confirmation of the Plan likely is to be followed by the need for liquidation or further financial reorganization of the Debtors.  Therefore, the Plan does not comply with section 1129(a)(11), and, as a result, should not be confirmed.

WCSR 4147253

## VIII. THE PLAN WAS NOT PROPOSED IN GOOD FAITH.

The Bankruptcy Code requires that a plan be "proposed in good faith." 11 U.S.C. § 1129(a)(3). In addressing this requirement, courts have "considerable judicial discretion" and should "evaluat[e] the totality of circumstances surrounding a plan." In re Coram Healthcare Corp., 271 B.R. 228, 234 (Bankr. D. Del. 2001). If a court determines that a plan was not proposed in good faith, the court should deny confirmation. See ACandS, 311 B.R. at 42-43 (denying confirmation of plan because, among other things, plan was not proposed in good faith); Coram Healthcare, 271 B.R. at 237, 240 (same).

Montana objects to the Plan because it was not proposed in good faith. As a preliminary matter, Montana maintains that the Plan has not been proposed in good faith because, as set forth above, the Plan blatantly disregards the absolute priority rule and prohibition on unfair discrimination, fails to comply with the applicable provisions of the Bankruptcy Code, and is infeasible. See supra Parts I-IV.

Furthermore, Montana maintains that the Plan has not been proposed in good faith because, as discussed above, Montana was not involved in any of the negotiations leading up to the Asbestos PI Settlement that "is the foundation for the Plan." Disclosure Statement at p. 1. The Plan's effectuation of the Asbestos PI Settlement does not reflect an agreement with Montana on how its claims should be treated, and instead constitutes a concerted action among the Plan Proponents to satisfy asbestos personal injury claimants while leaving Montana with no assurance of a fair distribution.[16]

---

[16] The Plan Proponents have attempted to classify Montana's claims as Class 6 Asbestos PI Claims (although Montana disputes this classification). See supra at pp. 9-10 & n.5 & Part I.A (discussing, and disputing, classification of Montana's claims). During his deposition, the Debtors' Rule 30(b)(6) designee, Richard Finke, suggested that Montana's claims would not qualify under the trust. See Finke Rule 30(b)(6) Deposition, at pp. 298-301, attached hereto as Exhibit B. To the extent that the Plan Proponents are

For these reasons, Montana maintains that the Plan was not proposed in good faith and, consequently, should not be confirmed.

### INCORPORATION BY REFERENCE AND RESERVATION OF RIGHTS

Montana hereby incorporates by reference its previously filed objections to the Plan. Montana also reserves all rights to raise additional arguments and objections to the Plan or any amended plan (including, without limitation, by means of filing supplemental objections to the Plan), and to join, incorporate by reference, and/or adopt as its own any arguments or reservations of rights regarding the Plan or any amended plan, either at or prior to any hearing with respect to any such plan.

WHEREFORE, Montana respectfully requests that this Court (i) sustain the objections articulated in this Phase II Brief, (ii) deny confirmation of the Plan, and (iii) grant Montana such other and further relief as it deems just and proper.

Dated: July 13, 2009                    Respectfully submitted,

                                        Womble Carlyle Sandridge & Rice, PLLC


                                        _____/s/ Matthew P. Ward_____
                                        Francis A. Monaco, Jr. (#2078)
                                        Kevin J. Mangan (#3810)
                                        Matthew P. Ward (#4471)
                                        222 Delaware Avenue, Suite 1501
                                        Wilmington, DE 19801
                                        Ph: (302) 252-4320
                                        Fax: (302) 252-4330

                                        Counsel for the State of Montana

---

now taking a position that is inconsistent with the Plan and Disclosure Statement, Montana reserves all rights to take discovery and to object to confirmation, including on the grounds that the Plan Proponents have not acted in good faith based on such inconsistency.