# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| W.R. Grace & Co., *et al.* | : | Case No. 01-01139 JKF |
| | : | |
| Debtors. | : | **Docket Reference No. 20872** |

## PHASE II TRIAL BRIEF OF *CREDITORS* ONEBEACON AMERICA INSURANCE COMPANY AND SEATON INSURANCE COMPANY IN OPPOSITION TO CONFIRMATION OF AMENDED JOINT PLAN OF REORGANIZATION

Dated:  July 13, 2009

Warren T. Pratt (4334)
David P. Primack (4449)
DRINKER BIDDLE & REATH LLP
1100 N. Market Street, Suite 1000
Wilmington, DE  19801-1254
Telephone:  302-467-4200

-- and --

Michael F. Brown (*Admitted Pro Hac*)
Jeffrey M. Boerger (*Admitted Pro Hac*)
DRINKER BIDDLE & REATH LLP
One Logan Square
Philadelphia, PA  19103-6996
Telephone:  215-988-2700

Counsel for Creditors
OneBeacon America Insurance
Company and Seaton Insurance Company

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. iii

I.      Introduction .......................................................................................................... 1

II.     Background ........................................................................................................... 3

        A.      The Commercial Union Settlement Agreements ................................... 3

                1.      The May 1993 CU Agreement ................................................... 3

                2.      The October 1998 CU Agreement ............................................. 4

        B.      The Unigard Settlement Agreements .................................................... 5

                1.      The August 1992 Unigard Agreement ...................................... 5

                2.      The May 1995 Unigard Agreement ........................................... 5

                3.      The March 1997 Unigard Agreement ....................................... 6

        C.      OneBeacon and Seaton Have Claims Against the Debtors and
                Non-Debtors Fresenius and Sealed Air Under the Settlement
                Agreements ............................................................................................ 7

                1.      The Scotts Adversary Proceeding Against OneBeacon and
                        Seaton ........................................................................................ 7

                2.      The Kaneb Coverage Claims Against OneBeacon and
                        Seaton ........................................................................................ 8

        D.      The Manner in Which OneBeacon's and Seaton's Claims Against
                the Debtors, Fresenius, and Sealed Air Are Addressed Under the
                Plan ...................................................................................................... 10

                1.      The Scotts-Related Claims ...................................................... 10

                2.      The Kaneb-Related Claims ..................................................... 11

III.    Argument ............................................................................................................ 12

        A.      The Plan Proponents Bear the Burden of Establishing That Their
                Plan Satisfies the Requirements of the Bankruptcy Code ................... 12

B. The Contract Claims of OneBeacon and Seaton Against the Debtors Are Not Properly Classified ....................................13

 1. The Contract Claims Asserted by OneBeacon and Seaton Are Not Substantially Similar to the Asbestos-Related Tort Claims that Dominate Class 6 ................................14

 2. The Contract Claims Asserted by OneBeacon and Seaton Are Treated Differently from Other Class 6 Claims................................16

 3. All the Contract Claims Asserted by OneBeacon and Seaton Should Be Classified as Class 9 General Unsecured Claims Rather than as Class 6 Asbestos PI Claims ...................................18

C. This Court Lacks Subject Matter Jurisdiction to Enjoin OneBeacon's and Seaton's Contract Claims Against Non-Debtors Fresenius and Sealed Air ....................................20

D. The Contract Claims of OneBeacon and Seaton Against Non-Debtors Fresenius and Sealed Air Cannot Be Enjoined and/or Channeled to the Asbestos PI Trust Under Bankruptcy Code § 524(g) or § 105(a) ....................................23

E. The Proposed TAC Members Are Burdened By Irreconcilable Conflicts of Interest and Should Not Be Approved By The Court ....................................25

 1. The Governance Structure of the Trust....................................25

 2. The Selection of the TAC Members and Their Dual Role ....................................27

 3. The Dual Role of the TAC Members Creates and Irreconcilable Conflict of Interest That Will Permeate All Trust Affairs....................................28

 4. OneBeacon and Seaton Are Holders of Class 6 Asbestos PI Claims With Standing to Object to the TAC's Conflicts of Interest....................................32

F. The Plan Does Not Comply With § 524(g)'s Requirements ....................................32

G. The Plan Has Impermissibly Overbroad Release and Exculpation Provisions....................................37

IV. Conclusion ....................................39

# TABLE OF AUTHORITIES

## CASES

*In re ACandS, Inc.*,
311 B.R. 36 (Bankr. D. Del. 2004) ......................................................................................31

*In re Combustion Eng'g, Inc.*,
391 F.3d 190 (3d Cir. 2004)..................................................... 15, 17, 19, 20, 21, 22, 25, 33-34

*In re Congoleum Corp.*,
362 B.R. 167 (Bankr. D. N.J. 2007) ............................................................ 18, 19, 20, 33, 38

*In re Congoleum Corp.*,
426 F.3d 675 (3d Cir. 2005)......................................................................28, 32, 33, 37

*In re Congoleum Corp.*,
Bankr. Case No. 03-51524, 2009 Bankr. LEXIS 900 (Bankr. D.N.J. Feb. 26, 2009) ........................................................................................................................12, 31

*In re Congoleum Corp.*,
Bankr. Case No. 03-51524, 2009 WL 499262 (Bankr. D.N.J. Feb. 26, 2009)......................31

*In re Dow Corning Corp.*,
280 F.3d 648 (6th Cir. 2002) ..............................................................................................25

*In re Federal-Mogul Global, Inc.*,
300 F.3d 368 (3d Cir. 2002)...............................................................................................21

*In re Frascella Enters., Inc.*,
360 B.R. 435 (Bankr. E.D. Pa. 2007) .................................................................................12

*In re Genesis Health Ventures, Inc.*,
266 B.R. 591 (Bankr. D. Del. 2001) ...................................................................12, 32, 38, 39

*In re Jersey City Med. Ctr.*,
817 F.2d 1055 (3d Cir. 1987).........................................................................................15, 19

*John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assoc.*,
987 F.2d 154 (3d Cir. 1993)...........................................................................................15, 19

*In re Johns-Manville Corp.*,
843 F.2d 636 (2d Cir. 1988).................................................................................................34

*In re Lernout & Hauspie Speech Prods., N.V.*,
  301 B.R. 651 (Bankr. D. Del. 2003) ..................................................................12

*Lewis v. Hanson*,
  128 A.2d 819 (Del. 1957), *aff'd sub nom. Hanson v. Denckla*, 357 U.S. 235
  (1958)...................................................................................................................26

*In re PWS Holding Corp.*,
  228 F.3d 224 (3d Cir. 2000)..............................................................................12

*Pacor, Inc. v. Higgins*,
  743 F.2d 984 (3d Cir. 1984)..........................................................................21, 22

*In re Pittsburgh Corning Corp.*,
  308 B.R. 716 (Bankr. W.D. Pa. 2004), *aff'd*, Case No. 04-1199, slip op.
  (W.D. Pa. Dec. 7, 2005) ....................................................................................32

*In re Resorts Int'l, Inc.*,
  372 F.3d 154 (3d Cir. 2004)...............................................................................21

*In re Union Meeting Partners*,
  165 B.R. 553 (Bankr. E.D. Pa. 1994) *aff'd*, 52 F.3d 317 (3d Cir. 1995) ...............12

*In re Zenith Elecs. Corp.,*,
  241 B.R. 92 (Bankr. D. Del. 1999) ....................................................................39

## STATUTES AND RULES

11 U.S.C. § 101....................................................................................................33

11 U.S.C. § 524.................................................................................23, 24, 27, 33, 37

11 U.S.C. § 1122..................................................................................................14

11 U.S.C. § 1123..................................................................................................17

28 U.S.C. § 1334..................................................................................................21

Model Rules of Prof'l Conduct, R. 1.7 ................................................................28

## OTHER AUTHORITIES

140 Cong. Rec. S4522 (daily ed. Apr. 20, 1994).................................................35

140 Cong. Rec. S4523 (daily ed. Apr. 20, 1994).................................................35

140 Cong. Rec. H10765 (daily ed. Oct. 4, 1994)....................................................................34, 35

140 Cong. Rec. S14464 (daily ed. Oct. 6, 1994) ..........................................................................35

Restatement (Third) of The Law Governing Lawyers § 135................................................... 28-29

Stephen Hudak & John F. Hagan, *Asbestos Litigation Overwhelms Courts*,
    Cleveland Plain Dealer, Nov. 5, 2002, *available at* 2002 WLNR 269888............................29

## I.    **Introduction**

The plan objections briefed herein are those raised by OneBeacon America Insurance Company ("OneBeacon") and Seaton Insurance Company ("Seaton") in their capacities as creditors.  OneBeacon and Seaton both have claims against the Debtors, as well as claims against non-debtors Fresenius Medical Care Holdings, Inc. f/k/a W. R. Grace & Co. (a New York corporation) ("Fresenius") and Sealed Air Corporation  f/k/a W. R. Grace & Co. (a Delaware corporation) ("Sealed Air").  Moreover, both OneBeacon and Seaton filed timely proofs of claim against the Debtors.  Thus, despite the inevitable attempts by the Plan Proponents to obfuscate the issues, the Court must be mindful that the objections discussed herein are creditor objections, not insurer objections.

OneBeacon's creditor status arises out various settlements agreements, dating back to the 1990s, pursuant to which it is undisputed that OneBeacon fully settled all of its coverage obligations under several Grace insurance policies by paying Grace a total sum of $150,800,000.  In exchange, and depending on the particular agreement, W.R. Grace & Co. – Conn. ("Grace-Conn."), Fresenius, and/or Sealed Air agreed to defend and indemnify OneBeacon against, *inter alia*, coverage claims asserted by third parties claiming coverage under the policies that were the subject of the settlement agreements.

Likewise, Seaton's creditor status arises out of several settlements agreements, dating back to the 1990s, pursuant to which Seaton settled its coverage obligations under two Grace insurance policies by paying Grace a total sum of $34,000,000.  In exchange, and depending on the particular agreement, Grace-Conn. and/or Fresenius agreed to defend and indemnify Seaton against, *inter alia*, certain coverage claims asserted by third parties claiming coverage under the settled policies.  In addition, Seaton has asserted

claims against both Fresenius and Sealed Air under one of the agreements based upon certain misrepresentations made by them in that agreement.

The OneBeacon and Seaton claims against the Debtors, Fresenius, and Sealed Air are not merely hypothetical. They are real claims. Indeed, certain claims have been triggered – with OneBeacon and Seaton already having incurred legal fees and cost – by, for example, (i) the coverage claims asserted by The Scotts Company ("Scotts") in its 2004 Adversary Proceeding against OneBeacon and Seaton and (ii) the coverage claims asserted by Kaneb Pipe Line Operating Partnership, L.P. and Support Terminal Services, Inc. (collectively, "Kaneb") against OneBeacon and Seaton.

Certain contract claims that OneBeacon and Seaton have against the Debtors are improperly classified under the Plan as Class 6 Asbestos PI Claims, while a substantially similar contract claim that OneBeacon has against the Debtors is classified as a Class 9 General Unsecured Claim. The Class 6 Asbestos PI Claims are to be channeled to the Asbestos PI Trust ("Trust") where – at best – they will be paid cents on the dollar. Likewise, certain claims that OneBeacon and Seaton have against non-debtors Fresenius and Sealed Air are improperly released and enjoined, without OneBeacon and Seaton receiving any compensation whatsoever.

To make matters worse, the Trust will be largely controlled by an Asbestos PI Trust Advisory Committee ("TAC") whose members have conflicting fiduciary duties. On the one hand, each TAC member has fiduciary duties to all current holders of Class 6 Asbestos PI Claims, including OneBeacon and Seaton, but on the other hand, each also has a conflicting fiduciary duty to his respective clients, not to mention a strong financial incentive in the form of a contingency fee, to obtain the best recovery possible from the

Trust, even for claims lacking any merit.  Beyond that, the Plan – through its improper

releases and exculpation provisions – insulates the TAC members, among others, not

only with respect to any past wrong-doing, but also with respect to future acts or

omissions.  The Trust's problems are further exacerbated by the fact that the Plan

Proponents have agreed upon a funding mechanism that utterly fails to comply with the

strict requirements of § 524(g) of the Bankruptcy Code.

In short, the Plan is illegal and should not be confirmed by this Court.[1]

## II.    Background

### A.    The Commercial Union Settlement Agreements.

OneBeacon is the successor-in-interest to Commercial Union Insurance Company

which, in turn, is the successor-in-interest to Employers' Commercial Union Insurance

Company of America and Employers' Commercial Union Insurance Company, and

American Employers' Insurance Company (collectively, "Commercial Union").

### 1.    The May 1993 CU Agreement.

In May 1993, Commercial Union entered into a settlement agreement with "W. R.

Grace & Co." and Grace-Conn. (the "May 1993 CU Agreement").  (*See* Ex. "1" at 270-

73, Ex. "15" thereto).  The company then named "W. R. Grace & Co." is now Fresenius,

a non-debtor.  (*See* D.I. 20872, § 1.1(115), § 1.1(124), § 1.1(130); Ex. "2" at  ¶¶ 14, 19;

Ex. "3" at ¶¶ 14, 19; Ex. "4" at 7-9, 16, 20-21, 57).  Pursuant to the May 1993 CU

Agreement, Commercial Union agreed to, and did, pay Grace-Conn and Fresenius the

aggregate amount of $81,200,000.  (*See* Ex. "1" at 270-73, Ex. "15" thereto at OB-

---

[1] In its capacity as an insurer, Seaton incorporates by reference, and reasserts, its Phase I Trial Brief (D.I. 21943) insofar as the objections raised therein are, or may later be deemed to be, Phase II objections.

000011).  In exchange, Grace-Conn. and Fresenius agreed to release Commercial Union

with respect to "Products Claims" and "Asbestos-Related Claims" (as defined therein),

under the Grace insurance policies listed on Exhibit "A" (the "CU Policies") to the May

1993 CU Agreement.  (*Id.* at OB-000013 to OB-000015).  Grace-Conn. and Fresenius

also agreed to defend and indemnify Commercial Union with respect to any subsequent

"Products Claims" and "Asbestos-Related Claims" asserted by any third parties.  (*Id.* at

OB-000015 to OB-000020).[2]

2.      The October 1998 CU Agreement.

In October 1998, Commercial Union entered into another settlement agreement

with "W. R. Grace & Co."  (the "October 1998 CU Agreement").  (*See* Ex. "1" at 277-79,

Ex. "17" thereto).  The company then known as "W. R. Grace & Co." is still W. R. Grace

& Co. today, *i.e.*, the lead Debtor.  Pursuant to the October 1998 CU Agreement,

Commercial Union agreed to, and did, pay W. R. Grace & Co. the aggregate amount of

$57,600,000.  (*Id.* at OB-000072).  In exchange, W. R. Grace & Co. agreed to release

Commercial Union with respect to all "Claims" (as defined therein), under the CU

Policies.  (*Id.* at OB-000072 to OB-000075).  It also agreed to defend and indemnify

Commercial Union with respect to any subsequent "Claims" asserted by third parties.

(*Id.* at OB-000076 to OB-000078).[3]

---

[2]  The descriptions herein of various the settlement agreements are not intended to fully describe the breadth of the releases and indemnification provisions set forth therein and should not be construed as limiting the scope of the releases or indemnity provisions.  The actual settlement agreements control.

[3] In December 1996, Commercial Union entered into another settlement agreement with Grace-Conn. and non-debtors Fresenius and Sealed Air pursuant to which Commercial Union paid them $12 million for a specific environmental coverage site release.  In exchange, the Debtors and Sealed Air agreed to defend and indemnify OneBeacon against, *inter alia*, third-party coverage claims related to the site.  (*See* Ex. "1" at 273-77, Ex. "16" thereto and D.I. 21763 at ¶¶ 7-8).

B.    **The Unigard Settlement Agreements**

Seaton is the successor-in-interest to Unigard Security Insurance Company,

formerly Unigard Mutual Insurance Company.

1.    The August 1992 Unigard Agreement.

In August 1992, Unigard Security Insurance Company ("Unigard") entered into a

settlement agreement with Grace-Conn. (the "August 1992 Unigard Agreement"). (*See*

Ex. "1" at 279-80, Ex. "18" thereto). Pursuant to the August 1992 Unigard Agreement,

Unigard agreed to, and did, pay Grace-Conn. the aggregate amount of $10,000,000. (*Id.*

at SEA-000005 to SEA-000006). In exchange, Grace-Conn. agreed to release Unigard

with respect to "Products Claims" (as defined therein), under Unigard Policy No. 1-2517.

(*Id.* at SEA-000006 to SEA-000007). It also agreed to indemnify Unigard, and pay its

attorneys' fees and costs, with respect to any subsequent "Products Claims," again as

defined therein, asserted by any third parties relating to Unigard Policy No. 1-2517. (*Id.*

at SEA-000007 to SEA-000009).

2.    The May 1995 Unigard Agreement.

In May 1995, Unigard entered into another settlement agreement with Grace-

Conn. and "W.R. Grace & Co." (the "May 1995 Unigard Agreement"). (*See* Ex. "1" at

280-83, Ex. "19" thereto). The company then known as "W. R. Grace & Co." is now

Fresenius. (*See* D.I 20872, § 1.1(115), § 1.1(124), § 1.1(130); Ex. "2" at ¶¶ 14, 19; Ex.

"3" at ¶¶ 14, 19; Ex. "4" at 7-9, 16, 20-21, 57). Pursuant to the May 1995 Unigard

Agreement, Unigard agreed to, and did, pay Grace-Conn. and Fresenius the aggregate

amount of $32,500,000. (*See* Ex. "1" at 280-83, Ex. "19" thereto at SEA-000021 to

SEA-000022). In exchange, Grace-Conn. and Fresenius agreed to release Unigard with

respect to "Products Claims" and "Asbestos-Related Claims" (both as defined therein), under Unigard Policy No. 1-0589.  (*Id.* at SEA-000022 to SEA-000023).  They also agreed to indemnify Unigard, and pay its attorneys' fees and costs, with respect to any subsequent "Products Claims" and "Asbestos-Related Claims," again as defined therein, asserted by any third parties relating to Unigard Policy No. 1-0589.  (*Id.* at SEA-000023 to SEA-000025).

3.      The March 1997 Unigard Agreement.

In March 1997, Unigard entered into yet another settlement agreement with Grace-Conn., "W. R. Grace & Co. (a Delaware Corporation)," and "W. R. Grace & Co. (a New York corporation which changed its name to Fresenius National Medical Care Holdings, Inc.)"  (the "March 1997 Unigard Agreement").  (*See* Ex. "1" at 285-90, Ex. "21" thereto).  The company then known as "W. R. Grace & Co. (a Delaware Corporation)" is now Sealed Air.  (*See* D.I. 20872, § 1.1(92), § 1.1(152), § 1.1(192); Ex. "5" at ¶¶ 15, 20; Ex. "6" at ¶¶ 15, 20; Ex. "7" at 10, 23, 51-52).  The other company then known as "W. R. Grace & Co. (a New York corporation which changed its name to Fresenius National Medical Care Holdings, Inc.)" is now Fresenius.  (*See* D.I. 20872, § 1.1(115), § 1.1(124), § 1.1(130); Ex. "2" at ¶¶ 14, 19; Ex. "3" at ¶¶ 14, 19; Ex. "4" at 7-9, 16, 20-21, 57).  Pursuant to the March 1997 Unigard Agreement, Unigard agreed to, and did, pay Grace-Conn, Sealed Air, and Fresenius the aggregate sum of $2,000,000.  (*See* Ex. "1" at 285-90, Ex. "21" thereto at SEA-000052).  In exchange, Grace-Conn., Sealed Air, and Fresenius agreed to release Unigard with respect to "Environmental Claims" (as defined therein), under Unigard Policy Nos. 1-2517 and 1-0589.  (*Id.* at SEA-

000053 to SEA-000054).[4]

C.     **OneBeacon and Seaton Have Claims Against the Debtors and Non-Debtors Fresenius and Sealed Air Under the Settlement Agreements.**

Both OneBeacon and Seaton filed timely proofs of claim with respect to the Debtors' obligations to defend and indemnify each of them against certain types of third-party claims under respectively the CU Settlement Agreements and the Unigard Settlement Agreements. (*See* Ex. "8," Exs. "A" and "B" thereto). The Debtors' defense and indemnity obligations to OneBeacon and Seaton are not merely "theoretical" as the Plan Proponents feign; they are real obligations which the Debtors agreed to assume in exchange for $150+ million from OneBeacon and $34 million from Seaton. Moreover, the Debtors' obligations to OneBeacon have already been triggered under the May 1993 CU Agreement and the October 1998 CU Agreement. Similarly, the Debtors' obligations to Seaton have also been triggered under the August 1992 Unigard Agreement and the May 1995 Unigard Agreement.

1.     The Scotts Adversary Proceeding Against OneBeacon and Seaton.

As this Court knows, Scotts filed an Adversary Proceeding (No. 04-55083) against Grace and certain of its insurers, including OneBeacon and Seaton. (*See* Ex. "9"). In that action, which the Court stayed at Grace's urging, but over the repeated objections of OneBeacon and Seaton, Scotts claims to be a "vendor" of Grace's alleged asbestos-contaminated vermiculite. As an alleged "vendor" of Grace products, Scotts claims that it is entitled to coverage under certain Grace insurance policies, including the CU Policies

---

[4] In July 1996, Unigard entered into another settlement agreement with Grace-Conn. and non-debtors Fresenius and Sealed Air pursuant to which Unigard paid them $2 million for a specific environmental coverage site release. In exchange, they agreed to defend and indemnify Unigard against, *inter alia*, third-party coverage claims related to the site. (*See* Ex. "1" at 283-85, Ex. "20" thereto and D.I. 21763 at ¶¶ 16-17).

and the Unigard Policies (*See id.,*¶¶ 22-23).  Thus, the Scotts Adversary Proceeding

triggers the Debtors' obligations to defend and indemnify OneBeacon under the May

1993 CU Agreement and the October 1998 CU Agreement.  It also triggers the

obligations of Fresenius to do the same under the May 1993 CU Agreement.  In addition,

it triggers the Debtors' obligations to indemnify Seaton, and to pay Seaton's attorneys'

fees and costs, under the August 1992 Unigard Agreement and the May 1995 Unigard

Agreement.  And, it also triggers the obligations of Fresenius to do the same under the

May 1995 Unigard Agreement.

           2.      The Kaneb Coverage Claims Against OneBeacon and Seaton.

In addition to Scotts' claims, Kaneb has asserted environmental insurance

coverage claims against OneBeacon and Seaton under a CU Policy (No. EY-8220-005)

and a Unigard Policy (No. 1-2517) respectively with respect to two allegedly

contaminated sites – namely, the Otis Pipeline site in Massachusetts and another site in

Macon, Georgia.  (*See, e.g.*, D.I. 20538 and DI 20846).  According to Kaneb, the

Department of Justice is seeking $70 million in damages against Kaneb with respect to

the Otis Pipeline site alone.  (D.I. 21262, at 5).  This Court recently denied, without

prejudice, Kaneb's two Motions for an Order Modifying the Automatic Stay to permit

Kaneb to sue OneBeacon and Seaton, among other Grace insurers, for insurance

coverage.  (D.I. 22373).  Nevertheless, both OneBeacon and Seaton have already

incurred legal fees and expenses in connection with Kaneb's claims.  Moreover, it is

inevitable that Kaneb will press its claims for coverage at the first opportunity.

Kaneb's coverage claim against OneBeacon relating to CU Policy EY-8220-005

and the Otis Pipeline site triggers the Debtors' obligations under the October 1998 CU

Agreement.  That same agreement, as noted earlier, was also triggered by Scotts' claims against OneBeacon.

Kaneb's coverage claims against Seaton raise a different issue.  The March 1997 Unigard Agreement, executed by Grace-Conn., Sealed Air, and Fresenius, released Seaton with respect to all insurance coverage for environmental claims.  But, unlike the other Unigard Settlement Agreements, it lacks a contractual indemnity provision. Nevertheless, Seaton has claims against non-debtors Sealed Air and Fresenius for breach of contract, misrepresentation, or otherwise.  In the agreement, "Grace" is defined as "W. R. Grace & Co. – Conn., a Connecticut corporation, W. R. Grace & Co., a New York Corporation which changed its name to Fresenius National Medical Care Holdings, Inc. [*i.e.*, Fresenius], and W. R. Grace & Co., a Delaware Corporation [*i.e.*, Sealed Air], and their respective predecessors, successors, and subsidiary companies or corporations." (*See* Ex. "1," Ex. "21" thereto at SEA-000050).  In Section V, "Grace represents that as of the date of execution of this Agreement [*i.e.*, March 3, 1997], it is not aware of any Environmental Claims contemplated being made against the Unigard Policies by any former subsidiary of Grace or any other entity which may be entitled to coverage under the Unigard Policies." (*Id.* at SEA-000053 to SEA-000054).  This representation appears to have been false when "Grace" made it.

In June 1997, Grace Energy Corporation ("GEC"), a Debtor, filed a complaint against, *inter alia*, Support Terminal Services, Inc. ("STS"), a company that is alleged by Kaneb to be a "former Grace subsidiary."  (D.I. 20538 at 17).  In the complaint, GEC sought a declaration that STS, not GEC, bore legal responsibility for environmental liabilities arising from the Otis Pipeline site in Massachusetts.  (*See* D.I. 20538, Ex. D-1).

In April 1997, two months before it filed its complaint, GEC admits to having discussed the matter with Kaneb.  (*See* D.I. 20538, Ex. D-1 at ¶ 12).  GEC also admits that it first learned of the Otis Pipeline environmental liabilities in January 1997, at which time it "conducted a review of the ownership of the Otis Pipeline."  (*Id.* at ¶ 9).  After that, but before the April discussion with STS, "Grace" represented to Unigard in the March 1997 Unigard Agreement that it was "not aware of any Environmental Claims contemplated being made against the Unigard Policies by any former subsidiary of Grace or any other entity which may be entitled to coverage under the Unigard Policies."  (Ex. "1" at 285-90, Ex. "21" thereto at SEA-000054).  If STS was, in fact, a former subsidiary of Grace, that representation appears to have been false when made.  If so, Seaton has claims for breach of contract, misrepresentation, or otherwise against both Sealed Air and Fresenius.

**D.     The Manner in Which OneBeacon's and Seaton's Claims Against the Debtors, Fresenius, and Sealed Air Are Addressed Under the Plan.**[5]

1.      The Scotts-Related Claims.

Under the Plan, the contract claims that OneBeacon and Seaton have against the Debtors arising from Scotts' coverage claims against them are classified as Class 6 Asbestos PI Claims.[6]  (*See* Exs. "10 and "11").  Depending on which Plan Proponent is asked, the OneBeacon and Seaton Class 6 Asbestos PI Claims are either Indirect PI Trust Claims or Indemnified Insurer TDP Claims, or perhaps both.  Either way, the claims are

---

[5] This section only addresses the OneBeacon and Seaton claims that have already been triggered by actual third-party claims asserted against OneBeacon and Seaton – namely, those asserted by Scotts and Kaneb.  It does not attempt to address all other claims held by OneBeacon and Seaton under their various settlement agreements.

[6] These claims arise under (i) the May 1993 CU Agreement, (ii) the October 1998 CU Agreement, (iii) the August 1992 Unigard Agreement, and (iv) the May 1995 Unigard Agreement.

discharged as against the Debtors and channeled to the Asbestos PI Trust pursuant to the

§ 524(g) Asbestos PI Channeling Injunction.  They are to be resolved under § 5.13 of the

Asbestos PI Trust Distribution Procedures ("TDP").  They will also be subject to the

Payment Percentage, which is currently estimated to be between 25% and 35%.  (*See* D.I.

20873 at 14).

The contract claims that OneBeacon and Seaton have against non-debtor

Fresenius arising from the coverage claims asserted by Scotts are enjoined by the Plan.

(*See, e.g.*, D.I. 20872, §§ 1.1(50), 1.1(115), 1.1(117), 1.1(119), 7.15(h), 8.2.1, 8.5.1, and

8.6).[7]  In addition, the Plan releases these contract claims without providing any

compensation to OneBeacon and Seaton.  (*See* D.I. 20872, §§7.15(h) and 8.8.7).

    2.    The Kaneb-Related Claims.

Under the Plan, the contract claim that OneBeacon has against the Debtors arising

from Kaneb's insurance coverage claim against OneBeacon with respect to the Otis

Pipeline site is classified as a Class 9 General Unsecured Claim.  (*See, e.g.,* Ex. "12").[8]

This claim is supposed to be paid in full by Grace under the Plan, and the related

contractual indemnity claims against Fresenius are enjoined without any compensation.

The misrepresentation claim, and other claims, that Seaton has against Sealed Air

and Fresenius arising from Kaneb's coverage claims against Seaton appear to be enjoined

by the § 105 Successor Claims Injunction.  (*See* D.I. 20872, §§7.15(h), 8.5, and 8.6).  In

addition, the Plan purports to release Seaton's claims against Fresenius arising from

Kaneb's coverage claims.  (*See* D.I. 20872, §§7.15(h) and 8.8.7).  Again, the Plan grants

---

[7] These claims arise under (i) the May 1993 CU Agreement and (i1) the May 1995 Unigard
Agreement.

[8] This claim arises under the October 1998 CU Agreement.

this release to Fresenius without providing any compensation to Seaton.

Oddly enough, in addition to enjoining and releasing OneBeacon's and Seaton's claims against Fresenius and Sealed Air, the Debtors and Reorganized Debtors have also agreed in the Plan to defend and indemnify both of them against a multitude of claims, including the foregoing claims that OneBeacon and Seaton have against them which are to be both enjoined and released under the Plan.  (*See* D.I. 20872, §§ 8.8.1 and 8.8.3).

### III.    <u>Argument</u>

#### A.    **The Plan Proponents Bear the Burden of Establishing That Their Plan Satisfies the Requirements of the Bankruptcy Code.**

"[A] plan proponent has the affirmative burden of proving that its plan satisfies the provisions of § 1129(a) by the preponderance of the evidence, even in the absence of an objection."  *In re Union Meeting Partners*, 165 B.R. 553, 574 (Bankr. E.D. Pa. 1994) *aff'd*, 52 F.3d 317 (3d Cir. 1995) (footnote omitted); *see also In re Lernout & Hauspie Speech Prods., N.V.*, 301 B.R. 651, 656 (Bankr. D. Del. 2003).  Moreover, courts have a mandatory, independent duty to determine whether plans meet all the requirements necessary for confirmation, even absent valid objections to confirmation.  *See Lernout & Hauspie*, 301 B.R. at 656;  *see also*, *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 599 (Bankr. D. Del. 2001); *In re Congoleum Corp.*, Bankr. Case No. 03-51524, 2009 Bankr. LEXIS 900, at *7 (Bankr. D.N.J. Feb. 26, 2009).

Section 1129(a)(1) of the Bankruptcy Code provides that a court may confirm a plan only if it "complies with the applicable provisions" of Title 11.  *In re PWS Holding Corp.*, 228 F.3d 224, 243 (3d Cir. 2000).  A plan is not confirmable if it fails to comply with *any* provision in Title 11.  *See In re Frascella Enters., Inc.*, 360 B.R. 435, 441 (Bankr. E.D. Pa. 2007).  The Plan, as discussed below, fails to comply with, *inter alia*,

Bankruptcy Code §§ 1129(a)(1), 1129(a)(3), 1129(a)(5)(A)(ii), and 524(g).

**B.      The Contract Claims of OneBeacon and Seaton**
         **Against the Debtors Are Not Properly Classified.**

Under the Plan, certain claims that OneBeacon and Seaton have against the

Debtors – *e.g.*, those arising from Scotts' asbestos-related insurance coverage claims

against OneBeacon and Seaton – are improperly classified as Class 6 Asbestos PI Claims.

Those contractual indemnity claims are substantially dissimilar to, and broader in scope

than, the asbestos-related tort claims that dominate Class 6.  Moreover, these contract

claims are treated differently from other Class 6 claims, and less favorably than other

contractual indemnity claims – *i.e.*, those of Fresenius and Sealed Air – that are, in fact,

substantially similar.

Certain of OneBeacon's contract claims arise out of the May 1993 CU Agreement

and the October 1998 CU Agreement.  Under the May 1993 CU Agreement, the Debtors

(and Fresenius) are obligated to indemnify OneBeacon with respect to "Products Claims"

and "Asbestos-Related Claims" asserted by any third parties, which expressly includes

payment of attorneys' fees and costs incurred in the defense of OneBeacon.  (*See* Ex. "1"

at 270-73, Ex. 15 thereto at OB-000015 to OB-000020).  Similarly, under the October

1998 CU Agreement, the Debtors are obligated to indemnify OneBeacon with respect to

"Claims" asserted by third parties, which again expressly includes payment of attorneys'

fees and costs incurred in the defense of OneBeacon.  (*See* Ex. "1" at 277-79, Ex. 17

thereto at OB-000076 to OB-000078).

Certain of Seaton's contract claims arise out of the August 1992 Unigard

Agreement and the May 1995 Unigard Agreement.  Under the former, the Debtors are

obligated to indemnify Seaton with respect to "Products Claims" asserted by third parties

relating to Unigard Policy No. 1-2517, which expressly includes payment of attorneys'
fees and costs incurred in the defense of Seaton. (*See* Ex. "1" at 279-80, Ex. 18 thereto at
SEA-000007 to SEA-000009). Similarly, under the May 1995 Unigard Agreement, the
Debtors (and Fresenius) are obligated to indemnify Seaton with respect to "Products
Claims" and "Asbestos-Related Claims" asserted by third parties relating to Unigard
Policy No. 1-0589, which also expressly includes payment of attorneys' fees and costs
incurred in the defense of Seaton. (*See* Ex. "1" at 280-83, Ex. 19 thereto at SEA-000023
to SEA-000025).

The Plan provides that "Class 6 consists of all Asbestos PI Claims against the
Debtors." (*See* D.I. 20872 at § 3.16(a)). The term "Asbestos PI Claim" is defined
broadly to include, among other things, contract-based indemnity claims against the
Debtors "based on, or arising out of, resulting from, or attributable to, directly or
indirectly," asbestos-related wrongful death or personal injury. (*See* D.I. 20872 at 11-
13). Thus, under the Plan, OneBeacon's and Seaton's contractual indemnity claims
against the Debtors with respect to asbestos-related coverage claims asserted by third
parties against them, such as those asserted by Scotts, appear to be Class 6 claims. This
classification is improper.

    1.    The Contract Claims Asserted by OneBeacon and
        Seaton Are Not Substantially Similar to the
        <u>Asbestos-Related Tort Claims that Dominate Class 6</u>.

Section 1123(a)(1) of the Bankruptcy Code provides that a plan must designate
classes of claims and interests. Under Section 1122(a), "a plan may place a claim or an
interest in a particular class only if such claim or interest is substantially similar to the
other claims or interests of such class." 11 U.S.C. § 1122(a). Claims that are not

"substantially similar" may not be placed in the same class.  *See In re Combustion Eng'g, Inc.*, 391 F.3d 190, 239 (3d Cir. 2004); *John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assoc.*, 987 F.2d 154, 158 (3d Cir. 1993); *In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1060 (3d Cir. 1987).  The contract claims asserted by OneBeacon and Seaton are not "substantially similar" to the asbestos-related tort claims that dominate Class 6.  These contractual indemnity claims are substantially dissimilar to, and broader in scope than, the asbestos-related tort claims that dominate Class 6.

*First*, the claims asserted by OneBeacon and Seaton are dissimilar in nature to those asserted by asbestos-related tort claimants.  OneBeacon and Seaton assert contract claims, the scope and nature of which are defined and governed by the terms of the written agreements negotiated and specifically subscribed to by the Debtors, on the one hand, and OneBeacon and Seaton, on the other, whereas the personal injury claims that dominate Class 6 are tort claims defined and governed by statute or by common law.

*Second*, the OneBeacon and Seaton contract claims are substantially broader than those asserted by the tort claimants.  Their respective contracts with the Debtors entitle OneBeacon and Seaton to reimbursement for any indemnity payments they are compelled to make to third parties who successfully assert direct claims for coverage, presumably as alleged former subsidiaries of the Debtors or as alleged additional insureds.  For example, Scotts alleges that it is entitled to coverage for certain asbestos-related liabilities directly as an additional insured pursuant to certain "vendor" endorsements, rather than derivatively as a judgment creditor against the Debtors.  (*See* Ex. "9").  If Scotts were to prevail and OneBeacon or Seaton were compelled to make indemnity payments to Scotts under the CU Policies or Unigard Policies respectively, then pursuant to OneBeacon's

-15-

and Seaton's contracts with the Debtors, they would be entitled to full reimbursement of any amounts paid to Scotts.

But in addition to reimbursement for indemnity payments made to third parties, the contracts further entitle OneBeacon and Seaton to reimbursement for attorney fees and expenses incurred by them in defending against such coverage claims. Once again, the Scotts claim to coverage illustrates this point. Scotts filed its adversary action against OneBeacon and Seaton in September 2004. As a result, OneBeacon and Seaton have incurred legal expenses evaluating and addressing the Scotts claim. These expenses are not "theoretical," as the Plan Proponents suggest, but rather are real, liquidated costs that give rise to claims for indemnity against the Debtors pursuant to their contracts with OneBeacon and Seaton. It is this component of OneBeacon's and Seaton's claims, a purely contractual aspect not at all derivative of the underlying asbestos-related tort claims, that most clearly sets OneBeacon and Seaton apart from the asbestos-related tort claimants who dominate Class 6 – the *source* of liability for those defense costs is the contractual agreement to indemnify, not the underlying lawsuit itself. While tort claimants may seek to recover personal injury damages, they do not seek, nor are they entitled to, reimbursement for legal expenses incurred in connection with their claims. But OneBeacon and Seaton are entitled to reimbursement of their legal expenses, each as a matter of an express contractual right.

> 2.    The Contract Claims Asserted by OneBeacon and Seaton
> <u>Are Treated Differently from Other Class 6 Claims</u>.

Moreover, OneBeacon's and Seaton's Class 6 contract claims are treated differently from other Class 6 claims. Not only are OneBeacon's and Seaton's contract claims treated differently from the tort claims that dominate Class 6, they are also treated

less favorably than other substantially similar contractual indemnity claims – namely, those of Fresenius and Sealed Air.

Section 1123(a)(4) requires that a plan "provide the same treatment for each claim or interest of a particular class, unless the holder of the claim or interest agrees to a less favorable treatment of such particular claim or interest."  11 U.S.C. § 1123(a)(4); *see also Combustion Eng'g*, 391 F.3d at 239.  While the TDP provides a comprehensive mechanism for payment of asbestos-related tort claims, it provides no adequate mechanism for payment of contractual indemnity claims.  Nor does it provide any mechanism to pay the direct "vendor" coverage claims asserted against OneBeacon and Seaton by Scotts, or claims for reimbursement of attorneys' fees and expenses incurred by OneBeacon and Seaton in defending such coverage claims.  This dissimilar treatment of OneBeacon's and Seaton's contract claims under the Plan and TDP violates the "same treatment" requirement imposed by Section 1123(a)(4).

Also, and perhaps more importantly, OneBeacon's and Seaton's contract claims are treated differently from other Class 6 contract claims.  Fresenius and Sealed Air each have submitted proofs of claim against the Debtors asserting prepetition claims for contractual indemnity with respect to asbestos-related, environmental, and other liabilities, pursuant to indemnity agreements executed in connection with the Fresenius Transaction and the Cryovac Transaction.  (*See* Ex. "13" and Ex. "14").  But unlike OneBeacon and Seaton, or any other creditor that has asserted a contractual indemnity claim against the Debtors, the Plan includes broad indemnification provisions with respect to Fresenius and Sealed Air, under which the Reorganized Debtor is obligated to fully indemnify Fresenius and Sealed Air for asbestos-related claims, including attorneys'

fees and expenses.  (*See* D.I. 20872, §§ 8.81, 8.83).  The protection afforded by these

indemnification provisions is over and above any (partial) recovery that may be obtained

by submitting an asbestos-related contractual indemnity claim to the Asbestos PI Trust

for payment.  Thus, by virtue of these post-confirmation indemnity provisions, any

asbestos-related loss by Fresenius and Sealed Air will be made whole by the Reorganized

Debtors, whereas any other contractual indemnitees are limited to partial recovery,

capped by the prevailing Payment Percentage, as provided by the TDP.  This amounts to

preferential treatment of one claim over another substantially similar claim, and thus

violates the Bankruptcy Code's "bedrock principle of equality of distribution."  *See In re

Congoleum Corp.*, 362 B.R. 167, 185 (Bankr. D. N.J. 2007).

> 3.      All the Contract Claims Asserted by OneBeacon and Seaton
>         Should Be Classified as Class 9 General Unsecured
>         <u>Claims Rather than as Class 6 Asbestos PI Claims</u>.

Finally, OneBeacon and Seaton contend that all of their contract claims should be

Class 9 claims, not Class 6 claims, and that the improper placement of some in Class 6

(dominated by substantially dissimilar tort claims) results in those claims being treated

less favorably than other contractual indemnity claims with which they are, in fact,

substantially similar.[9]  The Plan provides that all Asbestos PI Claims against the Debtors

are in Class 6, which is impaired.[10]  That includes the contractual indemnity claims of

OneBeacon and Seaton arising from Scotts coverage claims against them.  By contrast,

the Plan provides that General Unsecured Claims are in Class 9, which is unimpaired.

---

[9] To the extent, as the Plan Proponents contend, that Seaton owes unsettled coverage obligations
to the Debtors, Seaton's contractual indemnity claims should be Class 2 Secured Claims.

[10] Except, of course, for any Fresenius and Sealed Air contractual indemnity claims, which
although limited in their recovery from the Asbestos PI Trust, are ultimately made whole by the
Reorganized Debtors pursuant to separate indemnification provisions in the Plan.  (*See* D.I.
20872, §§ 8.81, 8.83).

That includes the contractual indemnity claim that OneBeacon has against the Debtors arising from Kaneb's Otis Pipeline environmental coverage claim against OneBeacon.

There is no substantive distinction between contractual indemnity claims involving underlying asbestos-related liabilities, which are relegated to the impaired Class 6, and contractual indemnity claims involving non-asbestos-related underlying liabilities, which are placed in the unimpaired Class 9.  Both sets of claims arise under contract – indeed, perhaps even the same contracts – seeking enforcement of obligations defined by and limited to the terms of written agreements negotiated by and subscribed to by the Debtors and their counterparties.  Neither set would exist at common law in the absence of an underlying contract.  Yet by separating these substantially similar contract claims into asbestos-related Class 6 claims, which are impaired, and general unsecured Class 9 claims, which are not, the Plan arbitrarily treats the Class 6 contractual indemnity claims less favorably than it does Class 9 contractual indemnity claims.

The Bankruptcy Code does not necessarily prohibit the placement of substantially similar claims in different classes, but the classification scheme itself must be reasonable. *See John Hancock*, 987 F.2d at 158, 159; *Jersey City Med. Ctr.*, 817 F.2d at 1060-61. Separate classification and disparate treatment of substantially similar claims renders a plan unconfirmable, because "'[e]quality of distribution among creditors is a central policy of the Bankruptcy Code.'"  *See Congoleum*, 362 B.R. at 182 (quoting *Combustion Eng'g*, 391 F.3d at 239).  The Plan's separate classification and less favorable treatment of OneBeacon's and Seaton's Class 6 contractual indemnity claims, which are substantially similar to the unimpaired Class 9 contractual indemnity claims, violates the

Bankruptcy Code's "bedrock principle of equality of distribution," and thus renders the

Plan unconfirmable.  *See Congoleum*, 362 B.R. at 185.

C.     **This Court Lacks Subject Matter Jurisdiction to
        Enjoin OneBeacon's and Seaton's Contract Claims
        <u>Against Non-Debtors Fresenius and Sealed Air</u>.**

The contract claims that OneBeacon and Seaton have against non-debtors

Fresenius and Sealed Air are direct claims; that is, they are not in any way derivative of

claims against the Debtors.  The reason for that is simple: The claims that OneBeacon

and Seaton have against Fresenius and Sealed Air arise from contracts (*i.e.*, settlement

agreements) that Fresenius and Sealed Air signed on their own behalf.  Thus, their

liability to OneBeacon and Seaton under the indemnity provisions contained in those

contracts is not derivative of the Debtors' liability under those contracts.  Both the

Debtors and non-debtors Fresenius and Sealed Air signed the contracts and, therefore,

they have independent, non-derivative contractual obligations to OneBeacon and Seaton.

To the extent that the contractual indemnity claims held by OneBeacon and

Seaton against non-debtors Fresenius and Sealed Air arise from, for example, the

underlying asbestos-related coverage claims asserted by non-debtor third-parties such as

Scotts, the Plan – through its proposed Asbestos PI Channeling Injunction – proposes to

enjoin such claims and channel them to the Asbestos PI Trust for resolution under § 5.6

and/or § 5.13 of the TDP.  This Court, however, lacks subject matter jurisdiction to issue

an injunction that enjoins the direct contract claims that non-debtors OneBeacon and

Seaton have against non-debtors Fresenius and Sealed Air.  *See Combustion Eng'g*, 391

F.3d at 227-33.

"The source of the bankruptcy court's subject matter jurisdiction is neither the

Bankruptcy Code nor the express terms of the Plan.  The source  . . .  is 28 U.S.C.

§§ 1334 and 157." *In re Resorts Int'l, Inc.*, 372 F.3d 154, 161 (3d Cir. 2004) (citation

omitted).  Section 1334(b) confers upon the district courts "original and exclusive

jurisdiction of all cases under title 11," and "original but not exclusive jurisdiction of all

civil proceedings arising under title 11, or arising in or related to cases under title 11."  28

U.S.C. § 1334(b).  "Section 157(a) of the Bankruptcy Code permits district courts to refer

most matters to a bankruptcy court." *Combustion Eng'g*, 391 F.3d at 225.  Here, the

issue is whether this Court has "related to" jurisdiction to issue an injunction that enjoins

non-derivative contract claims, and other claims, that non-debtors OneBeacon and Seaton

have against non-debtors Fresenius and Sealed Air.

   "Proceedings 'related to' a title 11 case include causes of action owned by the

debtor that become property of the bankruptcy estate under 11 U.S.C. § 541(a), *as well as*

*suits between third parties that conceivably may have an effect on the bankruptcy estate*."

*Combustion Eng'g*, 391 F.3d at 226 (emphasis added) (citation omitted); *In re Federal-*

*Mogul Global, Inc.*, 300 F.3d 368, 385 (3d Cir. 2002); *Pacor, Inc. v. Higgins*, 743 F.2d

984, 986 (3d Cir. 1984).  "The test articulated in *Pacor* for whether a lawsuit could

'conceivably' have an effect on the bankruptcy proceeding inquires whether the allegedly

related lawsuit would affect the bankruptcy proceeding without the intervention of yet

another lawsuit." *Federal-Mogul*, 300 F.3d at 382.  Here, the "allegedly related lawsuit"

would be a action by OneBeacon or Seaton against Fresenius and/or Sealed Air based on

one or more of the settlement agreements to which Fresenius and/or Sealed Air are

parties.

   Fresenius and Sealed Air appear to have certain indemnity rights against the

Debtors.  However, a successful lawsuit by OneBeacon or Seaton against Fresenius or

Sealed Air would not "automatically" (*i.e.*, without the intervention of yet another

lawsuit) result in indemnification liability against the Debtors, as required by *Pacor*, 743

F.2d at 995.  To the contrary, it is quite possible that the Debtors would contest the scope

of their indemnity obligations to Fresenius and Sealed Air, which would thereby require

the intervention of another lawsuit.

    In *Combustion Eng'g*, the Third Circuit considered various factors that might bear

upon a bankruptcy court's subject matter jurisdiction over non-derivative claims against

non-debtors.  391 F.3d at 227-34.  Those factors were (1) Corporate Affiliation, (2)

Financial Contributions, (3) Related Liability, and (4) Shared Insurance.  *Id.* at 227-33.

None of those factors, however, weighs in favor of the exercise of subject matter

jurisdiction here.  First, there is no "corporate affiliation" or relationship between the

Debtors, on the one hand, and Fresenius and Sealed Air, on the other.  (*See* Ex. "15" at

118-20).  Second, the financial contributions of Fresenius and Sealed Air to the Debtors'

estates, just like the financial contribution of ABB in the *Combustion Eng'g* case, cannot

support subject matter jurisdiction.  391 F.3d at 228 ("If that were true, a debtor could

create subject matter jurisdiction over any non-debtor third party by structuring a plan in

such a way that it depended upon third-party contributions.  As we have made clear,

'subject matter jurisdiction cannot be conferred by consent of the parties.  Where a court

lacks subject matter jurisdiction over a dispute, the parties cannot create it by agreement

even in a plan of reorganization.'").  Third, although the Debtors may owe indemnity

obligations to Fresenius and Sealed Air, as noted earlier, a successful contract claim by

OneBeacon or Seaton against Fresenius or Sealed Air would not "automatically" (*i.e.*,

without the intervention of yet another lawsuit) result in indemnification liability against

the Debtors.  Fourth, there is apparently no "shared insurance" between the Debtors and

Fresenius or Sealed Air.  (*See* Ex. "15" at 120-21).  As a result, this Court lacks subject

matter jurisdiction to issue any injunction – whether the Asbestos PI Channeling

Injunction, the Asbestos PD Channeling Injunction, or the Successor Claims Injunction –

insofar as it purports to enjoin the claims of non-debtors OneBeacon and Seaton against

non-debtors Fresenius and/or Sealed Air.

> **D.   The Contract Claims of OneBeacon and Seaton Against Non-Debtors Fresenius and Sealed Air Cannot Be Enjoined and/or Channeled to the Asbestos PI Trust Under Bankruptcy Code § 524(g) or § 105(a).**

Subject matter jurisdiction aside, however, this Court lacks the statutory authority

under Bankruptcy Code § 524(g) to issue a channeling injunction that would enjoin the

direct contract claims of OneBeacon and Seaton against non-debtor Fresenius.  In

relevant part, § 524(g) states:

> (4)(A)(i)  Subject to subparagraph (B), an injunction described in paragraph (1) shall be valid and enforceable against all entities that it addresses.
>
> (ii)  Notwithstanding the provisions of section 524(e), such an injunction may bar any action directed against a third party who is identifiable from the terms of the injunction (by name or as part of an identifiable group) and *is alleged to be directly or indirectly liable for the conduct of, claims against, or demands on the debtor* to the extent such alleged liability of such third party arises by reason of . . . .

11 U.S.C. § 524(g)(4)(A)(i) and (ii) (emphasis added).

Here, the claims at issue are the contract claims that OneBeacon and Seaton have

against Fresenius under certain settlement agreements.  Specifically, the Asbestos PI

Channeling Injunction purports to enjoin, *inter alia*, the contractual indemnity claims that

OneBeacon and Seaton have against Fresenius that arise from or are triggered by, for

example, the "vendor" coverage claims that have been asserted by Scotts.  With respect

to those contract claims, Fresenius is not "*alleged to be directly or indirectly liable for*

*the conduct of, claims against, or demands on the debtor."*  11 U.S.C. § 524(g)(4)(A)(ii)

(emphasis added).  To the contrary, Fresenius' liability to OneBeacon and/or Seaton is a

direct liability of its <u>own</u> based upon the simple fact that Fresenius is a party to the very

contracts that give rise to its <u>own</u> indemnity obligations to OneBeacon and Seaton.  Thus,

to the extent that the Asbestos PI Channeling Injunction purports to enjoin such claims, it

is illegal because it exceeds the statutory authority afforded by § 524(g).

Putting aside the Asbestos PI Channeling Injunction, which is purely a § 524(g)

injunction, the Plan also has a so-called Successor Claims Injunction.  (*See* D.I. 20872,

§ 8.5).  The purported legal authority for this injunction – which appears to be primarily

designed to protect Fresenius and Sealed Air – is Bankruptcy Code § 105(a).  The scope

and purpose of the Successor Claims Injunction is difficult to ascertain.  By its terms, it

enjoins the pursuit of "Successor Claims," which includes so-called "SA Successor

Claims and/or Grace-Related Claims."  (D.I. "20872" at 38).  The term "Grace-Related

Claim" includes "Asbestos-Related Claims (as defined in the Fresenius Settlement

Agreement)."  (*Id.* at 28).  The same term "Asbestos-Related Claim" appears both in the

Plan and the Fresenius Settlement Agreement, but to confuse matters, it has a totally

different definition in each.  (Compare D.I. 20872 at 16 with D.I. 20874, Ex. "13" thereto

at A-1).  Suffice it to say, however, that while not entirely clear, it appears that the

§ 105(a) Successor Claims Injunction would enjoin some or all of the contract claims that

non-debtors OneBeacon and Seaton have against non-debtor Fresenius and, therefore, it

has the effect of circumventing the more specific requirements of § 524(g).   That is not

permitted.  *See Combustion Eng'g*, 391 F.3d at 235-38.

Seaton and OneBeacon also have, or may have, contract claims or other claims against non-debtors Fresenius and/or Sealed Air arising from the settlement agreements that released products and/or environmental coverage under their policies.  Even if the Court had jurisdiction, Bankruptcy Code § 105(a) may not be used to enjoin such claims absent a significant showing that the Plan Proponents cannot make here.  *Cf. In re Dow Corning Corp.*, 280 F.3d 648, 658 (6th Cir. 2002).

Under the circumstances presented here, an injunction barring the claims of OneBeacon and Seaton against non-debtors Fresenius and Sealed Air would violate the Fifth Amendment of the U.S. Constitution by depriving them of their property, increasing their burdens, and impairing their rights without due process of law.

### E.    The Proposed TAC Members Are Burdened By Irreconcilable Conflicts of Interest and Should Not Be Approved By The Court.

#### 1.    The Governance Structure of the Trust.

Pursuant to the Trust Agreement, the proposed Trust is to be a Delaware statutory trust.  (D.I. 20874, Ex. "2" thereto, § 1.1).  It is to have three Asbestos PI Trustees (the "Trustees").  They are Harry Huge, Lewis Sifford, and Dean Trafelet, each of whom has several years of experience with one or more asbestos bankruptcy trusts.  (*See* Ex. "16" at 76-80).  Despite its experienced trustees, the Trust will also have a "Futures Representative" and a "Trust Advisory Committee."  (*See* D.I. 20874, Ex. "2" thereto).  The designated Futures Representative for the Trust is David Austern, the same individual appointed by this Court as the statutory "legal representative" under 11 U.S.C. § 524(g)(4)(B)(i).  The designated members of the TAC are Russell W. Budd, Esq. of the firm Baron & Budd, PC; John D. Cooney, Esq. of the firm Cooney & Conway; Joseph F.

Rice, Esq. of the firm Motley Rice LLC; and Perry Weitz, Esq. of the firm Weitz & Luxenberg.  (*See* D.I. 20874, Ex. "2" thereto, at 43-50).  The Trust Agreement states: "The members of the TAC shall serve in a *fiduciary capacity representing all holders* of present PI Trust Claims [*i.e.*, Asbestos PI Claims]." (D.I. "20874," Ex. "2" thereto, at § 5.2) (emphasis added).  In this capacity, the TAC members will be effectively co-trustees.  *Lewis v. Hanson*, 128 A.2d 819, 828 (Del. 1957), *aff'd sub nom. Hanson v. Denckla*, 357 U.S. 235 (1958) ("[A] trust advisor is a fiduciary, somewhat in the nature of a co-trustee, and is sometimes described as a quasi-trustee . . . .").

The TAC members will exercise considerable control and influence over the Trustees and the Trust.  The Trustees must <u>consult</u> with the TAC on a variety of issues including, among others, the general implementation and administration of the Trust and TDP.  (*See* D.I. "20874", Ex. "2" thereto, at § 2.2(e), Ex. "4" thereto).  They must also obtain the <u>consent</u> of the TAC before they may take any of a multitude of different actions including, but not limited to, changing the Payment Percentage, changing Disease Levels, Scheduled Values, and/or Medical/Exposure Criteria, establishing or changing Claims Materials, settling with any insurer, amending the Trust Agreement or TDP, complying with the Trust's obligations under insurance policies, *etc.*  (*See* D.I. "20874", Ex. "2" thereto at § 2.2(f), Ex. "4" thereto).  In addition, the TAC members play a significant role with respect to the continued service of the Trustees, and the Trustees' compensation, which gives the TAC even more control and influence over Trustee decision making. (*See* D.I. "20874," Ex. "2" thereto, at §§ 2.2(f)(ix), 4.2(c), and 4.3(a)).  By contrast, nothing in the Trust Agreement gives the Trustees the power to remove TAC members.  The net effect of these features, and others, is that the TAC, not the Trustees,

will have the paramount and preemptive power over the affairs of the Trust.[11]

2.      The Selection of the TAC Members and Their Dual Role.

Messrs. Budd, Cooney, Rice, and Weitz were selected to be the TAC members by the ACC. (*See* D.I. 20872, § 7.2.6). The ACC – which consists of asbestos personal injury claimants – was appointed by the U.S. Trustee. (*See* D.I. 20873 No. at 53). Each TAC member's law firm has a client on the ACC, and those clients delegate to the law firm that represents them their duties as a member of ACC. (Ex. "17" at 121-25). So, as a practical matter, Messrs. Budd, Cooney, Rice, and Weitz were directly involved in their own selection as TAC members. (*Id.* at 124-25).

Beyond their proposed role as TAC members, Messrs. Budd, Cooney, Rice, and Weitz are also asbestos personal injury lawyers. Each of their law firms currently represents at least 1,000 individual holders of an Asbestos PI Claim. (*See* Ex. "18" at 32). Indeed, collectively, their law firms represent at least 10,000 holders of Asbestos PI Claims, and perhaps 30,000 or more. (Ex. "17" at 199-200).[12] As lawyers, Messrs. Budd, Cooney, Rice, and Weitz – and their law firms – will assert claims against the Trust on behalf of their clients each of whom claims to have an Asbestos PI Claim. Their law firms will submit Claim Materials to the Trust on behalf of firm clients – *i.e.*, the same Claims Materials that the Trustees can only establish or change with the consent of the TAC. (*See* D.I. 20874, Ex. "2" thereto, § 2.2(f)(iv)). In submitting Claims Materials,

---

[11] It should be noted that § 524(g) does not require the Trust to have a TAC. Nor does it require it to have a "Futures Representative." The statute only requires the Court to appoint a legal representative to protect the rights of the holders of future demands in connection with the proceedings leading to the issuance of the channeling injunction, not thereafter. *See* 11 U.S.C. § 524(g)(4)(B)(i).

[12] The full Bankruptcy Rule 2019 statements filed by each TAC member's law firm are not publicly available but the Court has access to them. (*See* D.I. 12979, 20777, 20840, and 20895).

these lawyers will be acting as advocates for their clients against the Trust.

3.     The Dual Role of the TAC Members Creates an Irreconcilable
       Conflict of Interest That Will Permeate All Trust Affairs.

As lawyers for holders of Asbestos PI Claims, each TAC member is bound by the

applicable Rules of Professional Conduct.  Every state, except Texas, has adopted Rule

1.7 of the Model Rules of Professional Conduct.  Rule 1.7 (entitled "Conflict of Interest:

Current Clients") provides, in part, as follows:

> (a)     Except as provided in paragraph (b), a lawyer shall not represent a
>         client if the representation involves a concurrent conflict of
>         interest.  A concurrent conflict of interest exists if: … (2)  there is
>         a significant risk that the representation of one or more clients will
>         be materially limited by the lawyer's responsibilities to another
>         client, a former client *or a third person* or by a personal interest of
>         the lawyer.

Model Rules of Prof'l Conduct, R. 1.7 (emphasis added).  Paragraph (b) of Rule 1.7

requires, *inter alia*, "informed consent" from the affected clients.  Here, there is no

evidence that each TAC members' law firm obtained such consent; nor as a practical

matter could they obtain informed consent.  *See In re Congoleum Corp.*, 426 F.3d 675,

690-91 (3d Cir. 2005).  The Explanatory Comment to this Rule 1.7 says: "In addition to

conflicts with other current clients, a lawyer's duties of loyalty and independence may be

materially limited … *by the lawyer's responsibilities to other persons, such as fiduciary*

*duties arising from a lawyer's service as a trustee*, executor or corporate director"

(emphasis added).[13]

---

[13] The Restatement (Third) of The Law Governing Lawyers maintains a prohibition similar to that
found in Model Rule 1.7.  Unless the affected client consents, "[a] lawyer may not represent a
client in any matter with respect to which the lawyer has a fiduciary or other legal obligation to
another if there is a substantial risk that the lawyer's representation of the client would be
materially and adversely affected by the lawyer's obligation."  Restatement (Third) of The Law
Governing Lawyers § 135 (2009).  This risk of conflict often exists when a lawyer serves as the
trustee of a trust.  *See* Restatement (Third) of The Law Governing Lawyers § 135 cmt. c (2009)

Here, the fiduciary duties that Messrs. Budd, Cooney, Rice, and Weitz have under the Trust Agreement as TAC members to the holders of <u>all</u> Asbestos PI Claims are in direct conflict with their ethical obligations to their respective clients under Rule 1.7.  As lawyers, they are ethically bound to act as zealous advocates for their clients in pursuit of the maximum recovery possible.  They are likewise financially motivated to do so by virtue of their contingent fees, which can be up to 40% of their clients' recoveries.  *See* Stephen Hudak & John F. Hagan, *Asbestos Litigation Overwhelms Courts*, Cleveland Plain Dealer, Nov. 5, 2002, at A1 (40 percent contingency fee typical among asbestos plaintiffs' lawyers), *available at* 2002 WLNR 269888.  By contrast, as TAC members, they have a fiduciary duty to treat <u>all</u> holders of Asbestos PI Claims fairly, not just those for whom they, or their respective law firms, act as counsel.  This fiduciary duty extends not only to asbestos personal injury claimants for whom they do not act as counsel, it also includes OneBeacon and Seaton, as holders of Class 6 Asbestos PI Claims that are to be channeled to the Trust.  (*See, e.g.*, Ex. "17" at 213-24; Ex. "15" at 62-69).  Since the Trust's assets are limited, every dollar paid out to OneBeacon and Seaton reduces the funds available to pay the TAC members' clients.  In fact, every dollar paid out to any non-client holder of an Asbestos PI Claim will (at least potentially) reduce what the TAC members' clients recover from the Trust.  As a result, the TAC members' conflicting roles cannot be reconciled.  (*See, e.g.,* Ex. "19").

If the TAC member fully complies with his fiduciary duties to <u>all</u> holders of

---

("A lawyer's service as . . . trustee of a trust can create conflicts between the duties of the lawyer as such a fiduciary and the interests of clients whom the lawyer represents. When those duties would materially and adversely affect the lawyer's representation of the client, the lawyer must either withdraw from the representation, withdraw from the conflicting office, or, after making suitable adjustments in order to provide adequate legal services to the client, obtain the informed consent of the client.").

Asbestos PI Claims under the Trust Agreement by, for example, consenting to a Trustee proposal calling for more stringent claims criteria (*e.g.*, medical or exposure criteria), the TAC member would necessarily be compromising his ethical obligations to his own clients.  Indeed, he would be making it more difficult for some, or perhaps all, of his clients to recover from the Trust.  Yet, the Trustee proposal may well be one that is in the best interest of <u>all</u> – as opposed to just some – holders of Asbestos PI Claims.  Similarly, if the TAC member complies with his ethical obligations to his own clients, he necessarily will be violating his fiduciary duties as a TAC member to the remaining holders of Asbestos PI Claims for whom he is not counsel.  Thus, it is not a question of whether he will, or will not, act properly.  There is simply a structural infirmity because the Trust Agreement permits TAC members to represent asbestos claimants.  Moreover, this structural defect, which creates a built-in conflict of interest, is further exacerbated by the indemnification and exculpation provisions contained in the Plan and Trust Agreement.  (*See, e.g.*, D.I. 20872, § 11.9).  Those provisions significantly immunize TAC members from any liability resulting from their negligent breach of fiduciary duties to the Trust, its beneficiaries, and to their individual clients.  (*See* Ex. "19" at ¶¶ 29-37).

        This obvious conflict is not permitted of the Trustees: "No Trustee shall act as an attorney for any person who holds an asbestos claim."  (*See* D.I. "20874," Ex. "2" thereto at § 4.9).  There is a good reason for this prohibition, as noted by Mr. Austern: "Well, you are a trustee of a Plan paying somebody; you shouldn't be paying your client."  (*See* Ex. "16" at 80).  Yet, that is precisely what the TAC members would be doing here. They are effectively acting as "co-trustees" of the Trust, but unlike the Trustees, they are permitted to represent claimants.  This should not be authorized by the Court, for

precisely the reason cited by Mr. Austern.  In short, if the Plan Proponents want the Trust

to have a TAC, its members, like the Trustees, must be prohibited from acting as lawyers

for asbestos claimants.  This is especially important given the undue influence that TAC

members will wield over the Trustees and Trust affairs.

This is not just a theoretical concern; it is a real problem, regardless of the specific

lawyers chosen to be TAC members.  (*See, e.g.*, Ex. "19").  Here, however, the problem

is especially acute given the four TAC members that self-selected themselves to serve in

this case, *i.e.*, Messrs. Budd, Cooney, Rice, and Weitz.  Each has been involved in at least

one asbestos bankruptcy case in which a court found that the lawyer had advanced his

own clients' interests to the detriment of other claimants.  *See, e.g.*, *In re ACandS, Inc.*,

311 B.R. 36, 39 (Bankr. D. Del. 2004) (finding that a "pre-petition asbestos plaintiffs

committee" that included Messrs. Budd, Cooney, Rice, and Weitz engaged in "obvious

self-dealing" to the detriment of claimants that were not their clients); *In re Congoleum

Corp.*, Bankr. Case No. 03-51524, 2009 WL 499262, at *7 (Bankr. D.N.J. Feb. 26, 2009)

(ruling that a § 524(g) plan, negotiated by Messrs. Weitz and Rice, was unconfirmable

because it failed to achieve equality of distribution among creditors).

In short, because the Plan permits TAC members, and their firms, to represent

asbestos claimants, there is an inherent conflict of interest in the Trust's governance

structure.  Given that structural defect, not to mention the proposed TAC members

involved, it will invariably result in the TAC members either violating their ethical

obligations to their clients or, much more likely, breaching their fiduciary duties to

holders of Asbestos PI Claims that are not their clients, including OneBeacon and Seaton.

This arrangement clearly violates Bankruptcy Code §§ 1129(a)(3) and 1129(a)(5)(A)(ii),

not to mention § 524(g), which requires the Trust to treat all claimants fairly.

> 4.     OneBeacon and Seaton Are Holders of Class 6 Asbestos PI Claims
> With Standing to Object to the TAC's Conflicts of interest.

As the holders of Class 6 Asbestos PI Claims (specifically, Indemnified Insurer

TDP Claims), OneBeacon and Seaton have standing to object to the TAC members'

conflicts of interest.  They, as well as their counsel, also separately have standing to raise

the TAC conflict issue because it adversely impacts the Plan's centerpiece – namely, the

Trust.  *See In re Congoleum Corp.*, 426 F.3d 675, 685-87 (3d Cir. 2005) ("[w]e are

persuaded that, in the circumstances here, the insurers and their attorneys have standing

to present this appeal"); *In re Pittsburgh Corning Corp.*, 308 B.R. 716, 721 (Bankr. W.D.

Pa. 2004) ("Lumbermens' counsel has standing to object to the application to employ

GHR"), *aff'd*, *In re Pittsburgh Corning Corp.*, Case No. 04-1199 (W.D. Pa. 2005)

(objecting insurers "had standing to object to the application to employ GHR and have

standing to defend the order denying that application") (Ex. "20").  Moreover, the

objections of OneBeacon and Seaton aside, this Court has a mandatory independent duty

not to confirm a plan such as this one that violates the Bankruptcy Code.  *See, e.g.,*

*Genesis*, 266 B.R. at 599.

> **F.     The Plan Does Not Comply With § 524(g)'s Requirements.**

Bankruptcy Code § 524(g) has strict trust funding requirements:

> The requirements of this subparagraph are that –

> (i) the injunction is to be implemented in connection with a trust that,
> pursuant to the plan of reorganization – …

>> (II) is to be funded in whole or in part by the *securities of 1 or*
>> *more debtors involved in such plan and by the obligation of such*
>> *debtor or debtors to make future payments, including dividends*;

(III) *is to own, or by the exercise of rights granted under such plan would be entitled to own if specified contingencies occur, a majority of the voting shares of –*

(aa) each such debtor;

(bb) the parent corporation of each such debtor; or

(cc) a subsidiary of each such debtor that is also a debtor …

11 U.S.C. § 524(g)(2)(B)(i)(II) and (III) (emphasis added).  The Plan fails to comply with these funding requirements.  The Trust will not be funded in whole or in part by the *securities of 1 or more debtors involved in such plan and by the obligation of such debtor or debtors to make future payments, including dividends*.  The Plan Proponents will argue that both the Warrants and the Asbestos PI Deferred Payment Agreement purportedly qualify as "securities" as that term is used in § 524(g)(2)(B)(i)(II).  (*See* Ex. "17" at 126-27).  They are, no doubt, relying upon the definition of "security" set forth in § 101(49), which includes both a "warrant" and a "note."  11 U.S.C. § 101(49).  However, neither the Warrant nor the Asbestos PI Deferred Payment Agreement qualifies as "securities" as that term is used in § 524(g).

In the Third Circuit, the term "securities" as used in § 524(g) has been construed to mean equity in the debtor.  *See Congoleum*, 426 F.3d at 680 ("***Notably, neither Congoleum nor related entities were required to contribute equity to the trust***") (emphasis added); *Congoleum*, 362 B.R. at 175 ("Despite the express requirements of § 524(g), and explicit concern expressed by the Third Circuit, it was not until the Seventh Modified Joint Plan was filed on February 3, 2006, that the Debtors or ABI proposed contributing any equity toward the Plan Trust"); *see also Combustion Eng'g*, 391 F.3d at 248 ("[t]he implication of this requirement is that the reorganized debtor must be a going

-33-

concern, such that it is able to make future payments into the trust to provide an

*'evergreen' funding source* for future asbestos claimants") (emphasis added).  The Third

Circuit's reading of the "securities" requirement contained in § 524(g)(2)(B)(i)(II) is not

only correct, it is the only rational reading in light of the statute's legislative history.

Congress modeled § 524(g) on the plan of reorganization in *In re Johns-Manville*

*Corp.,* 843 F.2d 636 (2d Cir. 1988).  (*See* Ex. "21" (140 Cong. Rec. H10765 (daily ed.

Oct. 4, 1994)).  Its purpose was to remove uncertainty concerning the validity of the

Johns-Manville plan, and to provide a statutory basis for other asbestos companies to

structure their own plans.  *See Id.*  In *Johns-Manville*, the Second Circuit observed:

> The cornerstone of the Plan is the Asbestos Health Trust (the "Trust"), a
> mechanism designed to satisfy the claims of all asbestos health victims,
> both present and future.  The Trust is funded with the proceeds from
> Manville's settlements with its insurers; certain cash, receivables, and
> *stock of the reorganized Manville Corporation*; long term notes; and the
> right to receive up to 20% of Manville's yearly profits for as long as it
> takes to satisfy all health claims.

843 F.2d at 640 (emphasis added).  The legislative history of § 524(g) underscores

precisely what Congress had in mind in enacting the statute – namely, a trust-funding

mechanism that includes stock.  Indeed, the Congressional Committee that recommended

adoption of § 524(g) said:

> Asbestos claimants would have a stake in Johns-Manville's successful
> reorganization, because the company's success would *increase both the
> value of the stock held by the trust* and the company profits set aside for it
> . . . the Committee also recognizes that the interests of future claimants are
> ill-served if Johns-Manville *and other asbestos companies* are forced into
> liquidation and lose their ability to *generate stock value* and profits that
> can be used to satisfy claims.

(Ex. "21" emphasis added)).  This legislative intent was also evident in the Senate:

> [T]he proposed amendment would codify a court's existing authority to
> issue a permanent injunction to channel claims to an independent trust

*funded by the securities and future earnings of the debtor.* In plain English, this means that when an asbestos-producing company goes into bankruptcy and is faced with present and future asbestos-related claims, the bankruptcy court can set up a trust to pay the victims. *The underlying company funds the trust with securities* and the company remains viable. Thus, the company continues to generate assets to pay claims today and into the future. In essence, *the reorganized company becomes the goose that lays the golden egg by remaining a viable operation and maximizing the trust's assets to pay claims.*

Without a clear statement in the code of a court's authority to issue such injunctions, *the financial markets tend to discount the securities of the reorganized debtor. This in turn diminishes the trust's assets and its resources to pay victims. The amendment is intended to eliminate that speculation so that the marketplace values the trust's assets fairly.*

*This amendment is about growing the pie available to victims. The result could be significant. In the case of one such trust, for instance, every dollar increase in the value of the reorganized company's stock translates to $96 million more for compensating asbestos victims.*

(Ex. "22" (140 Cong. Rec. S4522, S4523 (daily ed. Apr. 20, 1994)) (emphasis added);

Ex. "23" (140 Cong. Rec. S14464 (daily ed. Oct. 6, 1994)). Nowhere does the legislative

history mention a warrant or deferred payment agreement, in lieu of stock, as a funding

source for an asbestos trust. Rather, the references are to stock or securities. And, where

the latter term is used, the context makes clear that stock was intended.

With the backdrop of *Johns-Manville*, the legislative intent of Congress is

obvious. It wanted a statutory scheme to legitimize the concept of the channeling

injunction to deal with future demands. That would eliminate the lingering doubts in the

financial markets as to whether Manville would remain free of asbestos liability. That, in

turn, would enable the Manville Trust to realize the full value of the Manville stock it

owned in order to satisfy future claims. The statutory scheme represents a delicate

balance pursuant to which future claimants have their rights against the debtor cut off in

exchange for, *inter alia*, an equity stake in and, therefore, potential upside in the company

that injured them, which by virtue of the injunction is free of its asbestos liability.

The Warrants are, of course, not stock.  Rather, they are a right to purchase stock at a given price (*i.e.*, the strike price) within a given period of time.  Here, the Warrant Agreement provides for Warrants to purchase in the aggregate, 10,000,000 shares of common stock of W.R. Grace & Co. at a strike price of $17.00 per share.  (D.I. "20874," Ex. "24" thereto, at 3).  The Warrants have a term of one year from the Issue Date.  (*Id.* at 2).  The share price of W.R. Grace & Co. stock is currently well below the $17.00 strike price.  On April 7, 2008, the day after the Plan Proponents executed their Term Sheet, which included the Warrants with a $17.00 strike price, Grace stock closed at $26.83 per share.  (*See* Ex. "15" at 24-26, Ex. "3" thereto).  By contrast, on Friday, July 10, 2009, the stock closed at $11.44  per share.  Thus, the Warrants are currently well "out of the money."  Moreover, the Plan Proponents have not shown that the $17.00 strike price will be reached within the one year term.  If they are not exercised, the Trust will not be funded with "securities" (*i.e.*, stock) of Grace.  Nor will the Trust be funded with "dividends" because dividends would only be paid to the Trust if it owned Grace stock. Thus, the Warrants do not satisfy the funding requirements of § 524(g)(2)(B)(i)(II).

Likewise, the Asbestos PI Deferred Payment Agreement does not qualify as "securities" of the Debtors.  It has a set value – *i.e.*, the present value of $1.55 billion in future payments.  (D.I. 20874, Ex. "11" thereto, at 12-13).  No matter how well Grace does in the future – once freed of its asbestos liabilities – the payments Grace is obliged to make under the agreement will not change.  Nor will the agreement generate any interest income during its term.  In short, the Asbestos PI Deferred Payment Agreement does not qualify as "equity" and, therefore, does not satisfy the funding requirements of

§ 524(g)(2)(B)(i)(II).  *See Congoleum*, 426 F.3d at 680.

The Plan also fails to comply with 11 U.S.C. § 524(g)(2)(B)(i)(III).  The Plan

calls for two separate and distinct § 524(g) trusts – namely, the Asbestos PI Trust and the

Asbestos PD Trust.  (*See* D.I. 20874, Exs. "2" and "3" thereto).  Each is to be governed

pursuant to a different trust agreement, and each trust will have its own trustees, TAC,

Futures Representative, and TDP (or its equivalent).  Each of these trusts must, of course,

comply with the funding requirements of § 524(g)(2)(B)(i)(III), but because there are to

be two separate and distinct trusts, neither can comply.  There can be, for example, no

"specified contingency" that would entitle each of the Asbestos PI Trust and the Asbestos

PD Trust to own a majority of voting shares of Grace because, for each to have a

majority, the total would have to exceed 100%.  In the event of a default under the

Asbestos PI Deferred Payment Agreement, it appears that – at best – the Asbestos PI

Trust and the Asbestos PD Trust might share ownership of a majority of the voting shares

of Grace.  (*See* D.I. 20874, Ex. "26" thereto).  This funding scheme does not satisfy

§ 524(g)(2)(B)(i)(III).

The Plan may also fail to satisfy § 524(g)(2)(B)(II)(I), (II), and (III), as there

appears be to little or no evidence that the Debtors will face asbestos-related "future

demands" involving property damage.  (*See* D.I. 20872, § 7.7(j); Ex. "17" at 642-44).

### G.    The Plan Has Impermissibly Overbroad <u>Release and Exculpation Provisions.</u>

The release and exculpation provisions in the Plan are overly broad and illegal.

For example, the Plan's exculpation provision provides broad immunity from liability to

the "Reorganized Debtors, the Debtors, the Non-Debtor Affiliates, the Sealed Air

Indemnified Parties, the Fresenius Indemnified Parties," and various official committees

-37-

and professionals, and to their respective "Representatives."  (*See* D.I. 20872, § 11.9).

The term "Representatives" is broadly defined to include, *inter alia*, past and present

directors, officers, employees, accountants, advisors, attorneys, consultants, or other

agents of the various referenced entities.  (*See* D.I. 20872 at § 1.1(177)).  This

exculpation provision extends far beyond the official committees and professionals

authorized by § 1103, to include the Debtors, Reorganized Debtors, and a host of non-

debtors, without providing any factual support to justify it.  *See Congoleum*, 362 B.R. at

190, 195-96; *Genesis*, 266 B.R. at 606-07.  Indeed, it goes even further, seeking to confer

immunity from liability not only for activities related to the prosecution of the bankruptcy

case and related proceedings, but also for activities related to "administration of this Plan

or the property to be distributed under this Plan," which includes the post-Effective Date

administration of the Trust.  This prospective immunity from liability is plainly improper.

The Plan also contains improper non-debtor releases.  For example:

> In addition to the foregoing, each Holder of a Claim or Equity Interest
> who receives or retains any property under this Plan shall also be deemed
> to unconditionally release the Fresenius Indemnified Parties  . . . .

(*See* D.I. 20872, § 8.8.7).  This release is illegal on its face: "For a release to be

consensual, the creditor must have 'unambiguously manifested assent to the release of the

nondebtor from liability on its debt."  *Congoleum*, 362 B.R. at 194 (citation omitted).

This release is even more egregious because it is triggered by the Claim Holder's *mere*

*receipt* of a distribution under the Plan, which may occur even over the Claim Holder's

vote against the Plan.

Moreover, this Court has held that releases of non-derivative third-party claims

against a non-debtor generally "cannot be accomplished without the affirmative

agreement of the creditor affected." *See In re Zenith Elecs. Corp.,*, 241 B.R. 92, 111 (Bankr. D. Del. 1999); *see also Genesis*, 266 B.R. at 607-08 (only in "rare" and "exceptional circumstances" may a non-consensual release be validated, and only if the release is necessary to the feasibility of the plan, and the non-consenting creditors receive fair consideration in exchange for the release). Here, there has been no showing that the § 8.8.7 release is necessary to the feasibility of the Plan. And, for their part, OneBeacon and Seaton definitively state that they have not consented to the release of any claims they have, or may have, now or in the future, against the released parties, nor have they received any, let alone "fair," consideration in exchange for this, and other, non-consensual releases.

## IV.    Conclusion

Between them, OneBeacon and Seaton paid the Debtors, Fresenius, and Sealed Air nearly $185 million pursuant to various settlement agreements that resolved OneBeacon's and Seaton's insurance coverage obligations. In exchange, the Debtors, Fresenius, and Sealed Air agreed to defend and indemnify OneBeacon and Seaton against, *inter alia*, coverage claims asserted by third parties with respect to certain insurance policies settled under those agreements. They also represented certain facts as true, at least one of which now appears to have been false when it was made. Since 2004, OneBeacon and Seaton have been targeted by Scotts and Kaneb for coverage under settled policies, thereby triggering their defense and indemnity rights. The Plan, however, adversely and improperly impacts these rights. Certain OneBeacon and Seaton claims against the Debtors are improperly placed in Class 6, which is impaired, as opposed to Class 9, which is not. The Class 6 claims are channeled to the Trust, which

has a TAC burdened by irreconcilable conflicts of interest.  The Trust also fails to satisfy

the strict funding requirements of § 524(g).  Moreover, OneBeacon's and Seaton's claims

against non-debtors Fresenius and Sealed Air are improperly enjoined and released,

without their consent and without any compensation.  And, finally, the Plan has an

overly-broad and improper exculpation provision.

　　　　In short, the Plan is illegal and this Court must deny confirmation.


Dated:  July 13, 2009　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　*/s/ David P. Primack*
　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　Warren T. Pratt (4334)
　　　　　　　　　　　　　　　　　　David P. Primack (4449)
　　　　　　　　　　　　　　　　　　DRINKER BIDDLE & REATH LLP
　　　　　　　　　　　　　　　　　　1100 N. Market Street, Suite 1000
　　　　　　　　　　　　　　　　　　Wilmington, DE  19801-1254
　　　　　　　　　　　　　　　　　　Telephone:  302-467-4200


　　　　　　　　　　　　　　　　　　Michael F. Brown
　　　　　　　　　　　　　　　　　　Jeffrey M. Boerger
　　　　　　　　　　　　　　　　　　DRINKER BIDDLE & REATH LLP
　　　　　　　　　　　　　　　　　　One Logan Square
　　　　　　　　　　　　　　　　　　Philadelphia, PA  19103-6996
　　　　　　　　　　　　　　　　　　Telephone:  215-988-2700


　　　　　　　　　　　　　　　　　　Counsel for Creditors
　　　　　　　　　　　　　　　　　　OneBeacon America Insurance
　　　　　　　　　　　　　　　　　　Company and Seaton Insurance Company