# EXHIBIT 7

-----BEGIN PRIVACY-ENHANCED MESSAGE-----
Proc-Type: 2001,MIC-CLEAR
Originator-Name: webmaster@www.sec.gov
Originator-Key-Asymmetric:
 MFgwCgYEVQgBAQICAf8DSgAwRwJAW2sNKK9AVtBzYZmr6aGjlMyK3XmZv3dTINen
 TWSM7vrzLADbmYQaionwg5sDW3P6oaM5D3tderxMmn7z1T+B+twIDAQAB
MIC-Info: RSA-MD5,RSA,
 GyF8MFTrG2EfYwmOD4OMh4C5j5+NGLAnEhFHBM6+RtjQkOXUM783ZRSGkkEKzs3h
 tMkRz9mAy2J9tSAb7NEjOg==

<SEC-DOCUMENT>0000950103-98-000147.txt : 19980218
<SEC-HEADER>0000950103-98-000147.hdr.sgml : 19980218
ACCESSION NUMBER:        0000950103-98-000147
CONFORMED SUBMISSION TYPE:    S-4
PUBLIC DOCUMENT COUNT:        15
FILED AS OF DATE:        19980213
SROS:            NYSE

FILER:

        COMPANY DATA:
                COMPANY CONFORMED NAME:            WR GRACE & CO/DE
                CENTRAL INDEX KEY:                 0001012100
                STANDARD INDUSTRIAL CLASSIFICATION: UNSUPPORTED PLASTICS FILM & SHEET [3081]
                IRS NUMBER:                        650654331
                STATE OF INCORPORATION:            DE
                FISCAL YEAR END:                   1231

        FILING VALUES:
                FORM TYPE:            S-4
                SEC ACT:
                SEC FILE NUMBER:     333-46281
                FILM NUMBER:         98538898

        BUSINESS ADDRESS:
                STREET 1:            ONE TOWN CENTER RD
                CITY:                BOCA RATON
                STATE:               FL
                ZIP:                 33486-1010
                BUSINESS PHONE:      5613622000

        MAIL ADDRESS:
                STREET 1:            ONE TOWN CENTER RD
                CITY:                BOCA RATON
                STATE:               FL
                ZIP:                 33486-1010

        FORMER COMPANY:
                FORMER CONFORMED NAME:   GRACE HOLDING INC
                DATE OF NAME CHANGE:     19960805
</SEC-HEADER>
<DOCUMENT>
<TYPE>S-4
<SEQUENCE>1
<TEXT>

As filed with the Securities and Exchange Commission on February 13, 1998

Registration No. 333-____
========================================================================
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, DC 20549
------------
FORM S-4
REGISTRATION STATEMENT
UNDER
THE SECURITIES ACT OF 1933
------------
W. R. GRACE & CO.
(To be renamed Sealed Air Corporation)
(Exact name of Registrant as specified in its charter)
------------

| Delaware | 3081 | 65-0654331 |
|---|---|---|
| (State or Other Jurisdicition of Incorporation or Organization) | (Primary Standard Industrial Classification Code Number) | (IRS Employer Identification No.) |

One Town Center Road
Boca Raton, Florida 33486-1010
(561) 362-2000
(Address, including Zip Code, &
Telephone Number, including
Area Code, of Registrant's
Principal Executive Offices)
------------
Robert B. Lamm, Esq.
Vice President and Secretary
W. R. Grace & Co.
One Town Center Road
Boca Raton, Florida 33486-1010
(561) 362-2000

```
                    Name, Address, Including Zip Code,
                       and Telephone Number,
                     Including Area Code, of
                       Agent for Service)
                       ----------------
                          copies to:
Andrew R. Brownstein, Esq.   H. Katherine White, Esq.      Christopher Mayer, Esq.
Wachtell, Lipton,            Assistant General Counsel        Davis Polk & Wardwell
   Rosen & Katz                  and Secretary                  450 Lexington Avenue
51 West 52nd Street          Sealed Air Corporation         New York, New York 10017
New York, New York 10019         Park 80 East                    (212) 450-4000
(212) 403-1000               Saddle Brook, New Jersey 07663
                                 (201) 791-7600
```

Approximate Date of Commencement of Proposed Sale to Public: As soon as
practicable after the effectiveness of this Registration Statement and the
effective time (the "Effective Time") of the merger (the "Merger") of a wholly
owned subsidiary of the Registrant with and into Sealed Air Corporation ("Sealed
Air"), as described in the Agreement and Plan of Merger dated as of August 14,
1997.

    If the securities being registered on this Form are being offered in
connection with the formation of a holding company and there is compliance with
General Instruction G, check the following box. [ ]

    If this form is filed to register additional securities for an offering
pursuant to Rule 462(b) under the Securities Act of 1933, as amended (the
"Securities Act"), check the following box and list the Securities Act
registration statement number of the earlier effective registration statement
for the same offering. [ ]

    If this form is a post-effective amendment filed pursuant to Rule 462(d)
under the Securities Act, check the following box and list the Securities Act
registration statement number of the earlier effective registration statement
for the same offering. [ ]
                       ------------

<TABLE>
<CAPTION>

CALCULATION OF REGISTRATION FEE

| Title of each Class of Securities to be Registered | Amount to be Registered(1) | Proposed Maximum Offering Price Per Unit | Proposed Maximum Aggregate Offering Price(2) | Amount of Registration Fee(3) |
| --- | --- | --- | --- | --- |
| <S> | <C> | <C> | <C> | <C> |
| Common Stock, par value $0.10 per share............... | 83,519,426 | $33.57 | $2,803,762,031.25 | $827,109.80 |
| Convertible Preferred Stock, par value $0.10 per share. | 36,000,000 | 3.81 | 137,080,434.00 | 40,438.73 |

</TABLE>

- ------------
(1) Represents the number of shares of common stock and convertible preferred
    stock, each par value $0.10 per share, of the Registrant ("New Common Stock"
    and "Convertible Preferred Stock," respectively), to be issued (i) in the
    Merger to holders of common stock, par value $0.01 per share, of Sealed Air
    ("Sealed Air Common Stock"), determined according to the terms of the Merger
    (one share of New Common Stock for each share of Sealed Air Common Stock)
    and the number of shares of Sealed Air Common Stock outstanding on February
    11, 1998, and (ii) in the recapitalization ("Recapitalization") of the
    Registrant's common stock, par value $0.01 per share ("Old Common Stock"),
    determined using the maximum number of shares of New Common Stock
    (40,895,000 shares) and the total number of shares of Convertible Preferred
    Stock to be issued in the Recapitalization.
(2) Estimated solely for the purpose of calculating the registration fee
    pursuant to Rule 457(f)(1) & (2) and Rule 457(c) of the Securities Act,
    based on the average of the high and low prices of Sealed Air Common Stock
    on February 11, 1998 on the New York Stock Exchange, which was $62.125 , and
    the book value of the Old Common Stock to be exchanged in the
    Recapitalization, which was $292,800,000.
(3) The registration fee for the securities registered hereby of $867,548.53 is
    being paid herewith. This fee has been calculated pursuant to Rule 457(f)
    under the Securities Act as 0.000295 times $2,940,842,465.25.


    The Registrant hereby amends this Registration Statement on such date or
dates as may be necessary to delay its effective date until the Registrant
shall file a further amendment which specifically states that this
Registration Statement shall thereafter become effective in accordance with
Section 8(a) of the Securities Act or until this Registration Statement shall
become effective on such date as the Commission, acting pursuant to said Section
8(a), may determine.
================================================================================




                            [SEALED AIR LOGO]

                     Special Meeting of Stockholders

                 MERGER PROPOSED -- YOUR VOTE IS VERY IMPORTANT

The Board of Directors of Sealed Air Corporation has unanimously approved a

merger agreement under which the worldwide packaging business of W. R. Grace & Co. would be combined with Sealed Air. The merger would bring together Sealed Air, a leading manufacturer of a wide range of protective and specialty packaging materials and systems for industrial and consumer products, and Grace's packaging business, a leading supplier of high-performance packaging materials and systems for food and other products. By combining the complementary operations of these two companies, we believe the merger will create a preeminent protective and specialty packaging company with strong brand name recognition, a global marketing network, a commitment to technological innovation and significant growth opportunities.

The combined company will be named "Sealed Air Corporation". Sealed Air's existing stockholders will initially own common stock representing 37% of the combined company, and Grace's existing stockholders will initially own common and convertible preferred stock representing 63% of the combined company.

As a Sealed Air stockholder, you will receive one share of common stock of the combined company in exchange for each share of Sealed Air common stock that you own.

At a special meeting of Sealed Air stockholders, you will be asked to approve the merger.

Your Board of Directors has unanimously determined that the merger is fair to you and is in your best interests. The Board therefore recommends that you vote to approve the merger. The merger cannot be completed unless Sealed Air's stockholders approve it. YOUR VOTE IS VERY IMPORTANT.

The date, time and place of the special meeting are:

      March 23, 1998 11:00 a.m.
      Saddle Brook Marriott
      Garden State Parkway at I-80
      Saddle Brook, New Jersey 07663

This Joint Proxy Statement/Prospectus provides you with detailed information about the proposed merger. We encourage you to read this entire document carefully. In addition, you may obtain information about Sealed Air and Grace from documents filed with the Securities and Exchange Commission.

Whether or not you plan to attend the special meeting, please take the time to vote by completing and mailing the enclosed proxy card. If you sign and mail your proxy card without indicating how you wish to vote, your proxy will be (Ccounted as a vote to approve the merger. If you fail to return your card and do not vote in person at the special meeting, the effect will be a vote against the merger.

On behalf of the Board of Directors of Sealed Air, I urge you to vote "FOR" approval of the merger.

T.J. DERMOT DUNPHY
Chairman of the Board
and Chief Executive Officer

- ---------------------------------------------------------------------------

Neither the Securities and Exchange Commission nor any state securities regulators have approved the common stock or convertible preferred stock to be issued in the merger and related transactions or determined if this Joint Proxy Statement/Prospectus is accurate or adequate. Any representations to the contrary is a criminal offense. This Joint Proxy Statement/Prospectus does not constitute an offer to sell or a solicitation of an offer to buy any securities.

- ---------------------------------------------------------------------------

Joint Proxy Statement/Prospectus dated February 13, 1998 and first mailed to stockholders on February 17, 1998.

                          [Sealed Air logo]
                        SEALED AIR CORPORATION
                           PARK 80 EAST
                      SADDLE BROOK, NEW JERSEY  07663

                NOTICE OF SPECIAL MEETING OF STOCKHOLDERS
                     TO BE HELD ON MARCH 23, 1998


    A Special Meeting of the Stockholders of Sealed Air Corporation, a Delaware corporation, will be held at 11:00 a.m., Eastern Standard Time, on March 23, 1998 at Saddle Brook Marriott, Garden State Parkway at I-80, Saddle Brook, New Jersey 07663, for the following purpose:

    To consider and vote upon a proposal to approve and adopt an Agreement and Plan of Merger (the "Merger Agreement") dated as of August 14, 1997 among Sealed Air Corporation, W. R. Grace & Co., a Delaware corporation ("Grace"), and a wholly owned subsidiary of Grace.

The Merger Agreement and related agreements provide, among other things, that Grace will spin off its specialty chemicals businesses to its stockholders; a subsidiary of Grace will merge with Sealed Air; and Grace will be renamed "Sealed Air Corporation". In the merger, each share of Sealed Air common stock will be converted into one share of common stock of the new Sealed Air Corporation.

The Board of Directors has fixed the close of business on February 17, 1998 as the record date for the determination of the holders of Sealed Air common stock entitled to notice of, and to vote at, the Special Meeting or any adjournment or postponement.

YOUR BOARD OF DIRECTORS UNANIMOUSLY RECOMMENDS THAT YOU VOTE TO APPROVE AND ADOPT THE MERGER AGREEMENT, WHICH IS DESCRIBED IN DETAIL IN THE ACCOMPANYING JOINT PROXY STATEMENT/PROSPECTUS.

You are urged to complete, sign and return the proxy card in the enclosed envelope, whether or not you expect to attend the Special Meeting. The approval and adoption of the Merger Agreement requires the affirmative vote of a majority of the outstanding shares of Sealed Air common stock entitled to vote at the Special Meeting. You may revoke your proxy at any time prior to its exercise. If you attend the Special Meeting or any adjournment or postponement, you may revoke your proxy and vote in person at the meeting. Failure to return a properly executed proxy card or to vote at the Special Meeting will have the same effect as a vote against the Merger Agreement.

Dated: February 13, 1998            H. Katherine White
                                    Secretary

[GRACE LOGO]

Special Meeting of Stockholders

REORGANIZATION AND MERGER
PROPOSED -- YOUR VOTE IS VERY IMPORTANT

The Board of Directors of W. R. Grace & Co. has unanimously approved a merger agreement and related agreements under which Grace will spin off its specialty chemicals businesses to stockholders.  When the spin-off is completed, Grace will own only its packaging business.  Sealed Air Corporation will then combine with a subsidiary of Grace, and Grace will change its name to "Sealed Air Corporation."

When these transactions are completed, you will receive the following for each share of Grace common stock you own:

o  one share of common stock of the new specialty chemicals company (New Grace);

o  a fraction of a share of common stock of the combined packaging company (New Sealed Air); and

o a fraction of a share of convertible preferred stock of New Sealed Air.

We believe these transactions will enhance stockholder value by providing Grace stockholders, through a tax-free transaction, with a significant premium for Grace's packaging business, the opportunity to continue to participate in the future value of a preeminent packaging company, and a continuing ownership interest in a new, highly focused specialty chemicals company.

At a special meeting of Grace stockholders, you will be asked to approve the reorganization, merger and related matters.

Your Board of Directors has determined that the proposed transactions are fair to you and in your best interests. The Board therefore recommends that you vote to approve the reorganization, merger and related matters. The proposed transactions cannot be completed unless Grace's stockholders approve them. YOUR VOTE IS VERY IMPORTANT.

The date, time and place of the special meeting are:

    March 20, 1998
    10:00 a.m.
    W. R. Grace & Co.
    One Town Center Road
    Boca Raton, Florida 33486

This Joint Proxy Statement/Prospectus provides you with detailed information about the proposed reorganization, merger and related matters. We have also mailed to you, together with this Joint Proxy Statement/Prospectus, an Information Statement that describes New Grace and the proposed spin-off.

Whether or not you plan to attend the special meeting, please take the time to vote by completing and mailing the enclosed proxy card. If you sign and mail your proxy card without indicating how you wish to vote, your proxy will be counted as a vote to approve the reorganization, merger and related matters. If

you fail to return your card and do not vote in person at the special meeting,
the effect will be a vote against the reorganization, merger and related
matters.

On behalf of the Board of Directors of Grace, I urge you to vote "FOR" the
proposals.

ALBERT J. COSTELLO
Chairman, President
and Chief Executive Officer

- -------------------------------------------------------------------------

Neither the Securities and Exchange Commission nor any state securities
regulators have approved the common stock or convertible preferred stock to be
issued in the merger and related transactions or determined if this Joint Proxy
Statement/Prospectus is accurate or adequate. Any representations to the
contrary is a criminal offense. This Joint Proxy Statement/Prospectus does not
constitute an offer to sell or a solicitation of an offer to buy any securities.

- -------------------------------------------------------------------------

Joint Proxy Statement/Prospectus dated February 13, 1998 and first mailed to
stockholders on February 17, 1998.

[GRACE LOGO]
W. R. GRACE & CO.
ONE TOWN CENTER ROAD
BOCA RATON, FLORIDA 33486

NOTICE OF SPECIAL MEETING OF STOCKHOLDERS
TO BE HELD ON MARCH 20, 1998

A Special Meeting of the Stockholders of W. R. Grace & Co., a Delaware
corporation ("Grace"), will be held at 10:00 a.m., Eastern Standard Time, on
March 20, 1998 at the offices of W. R. Grace & Co., One Town Center Road, Boca
Raton, Florida 33486, for the following purposes:

   1.   To consider and vote upon a proposal to approve and adopt an
        Agreement and Plan of Merger (the "Merger Agreement") dated as of
        August 14, 1997 among Grace, Sealed Air Corporation, a Delaware
        corporation ("Sealed Air"), and a wholly owned subsidiary of
        Grace.  The Merger Agreement and related documents provide for
        the reorganization of Grace and the merger of Grace's packaging
        business with Sealed Air.  A vote to approve and adopt the Merger
        Agreement would constitute approval of, among other things:

        o the reorganization of Grace, including:

        o the spin-off of Grace's specialty chemicals businesses to its
          stockholders;

        o the amendment and restatement of Grace's certificate of
          incorporation (the "Grace Charter") (except for the repeal of
          certain provisions described in item 2 below);

        o the recapitalization of Grace common stock into new common
          and convertible preferred stock; and

        o the merger of Sealed Air with a subsidiary of Grace, including the
          issuance of common stock to the stockholders of Sealed Air.

   2.   To consider and vote upon a proposal to approve and adopt an amendment
        repealing certain provisions of the Grace Charter (which will become
        the New Sealed Air charter) that can only be amended or repealed by a
        supermajority stockholder vote.

     The Board of Directors has fixed the close of business on February 11, 1998
as the record date for the determination of the holders of Grace common stock
entitled to notice of, and to vote at, the Special Meeting or any adjournment or
postponement.

     YOUR BOARD OF DIRECTORS UNANIMOUSLY RECOMMENDS THAT YOU VOTE TO APPROVE AND
ADOPT THE MERGER AGREEMENT. IN CONNECTION WITH ITS APPROVAL OF THE MERGER
AGREEMENT, THE BOARD HAS AGREED TO APPROVE THE NEW SEALED AIR CHARTER AND
RECOMMENDS THAT YOU VOTE TO REPEAL THE SUPERMAJORITY PROVISIONS. THE PROPOSALS
ARE DESCRIBED IN DETAIL IN THE ACCOMPANYING JOINT PROXY STATEMENT/PROSPECTUS.

     You are urged to complete, sign and return the proxy card in the enclosed
envelope, whether or not you expect to attend the Special Meeting. Approval and
adoption of the Merger Agreement requires the affirmative vote of a majority of
the outstanding shares of Grace common stock entitled to vote at the Special
Meeting. Approval and adoption of the amendment to repeal the supermajority
provisions of the Grace Charter requires the affirmative vote of 80% of the
outstanding shares of Grace common stock entitled to vote at the Special
Meeting. You may revoke your proxy at any time prior to its exercise. If you
attend the Special Meeting or any adjournment or postponement, you may revoke
your proxy and vote in person at the meeting. Failure to return a properly
executed proxy card or to vote at the Special Meeting will have the same effect

as a vote against the Merger Agreement and against the amendment repealing the supermajority provisions.

Dated: February 13, 1998                    Robert B. Lamm
                                            Secretary

## TABLE OF CONTENTS

| | Page |
|---|---|
| QUESTIONS AND ANSWERS ABOUT THE REORGANIZATION AND MERGER........ | 1 |
| ADDITIONAL QUESTIONS AND ANSWERS ABOUT THE REORGANIZATION AND MERGER FOR SEALED AIR AND GRACE EMPLOYEES................ | 3 |
| SUMMARY..................................................... | 8 |
| SUMMARY SELECTED HISTORICAL AND PRO FORMA FINANCIAL DATA......... | 14 |
| Sealed Air | |
| Selected Historical Financial Information................ | 15 |
| Grace Packaging | |
| Selected Historical Financial Information................ | 17 |
| New Sealed Air | |
| Selected Pro Forma Financial Information................. | 18 |
| Unaudited Comparative Per Share Data........................ | 19 |
| COMPARATIVE PER SHARE MARKET PRICE AND DIVIDEND INFORMATION...... | 20 |
| CERTAIN RISK FACTORS........................................... | 21 |
| THE REORGANIZATION AND MERGER.................................. | 25 |
| Special Meetings to Vote on the Proposed Transactions........... | 25 |
| Structure of the Transactions.................................. | 25 |
| Background..................................................... | 26 |
| Sealed Air's Reasons for the Merger; Recommendation of the Sealed Air Board......................................... | 28 |
| Grace's Reasons for the Reorganization and Merger; Recommendation of the Grace Board...................... | 30 |
| Accounting Treatment and Considerations........................ | 32 |
| Certain United States Federal Income Tax Consequences.......... | 32 |
| Regulatory Matters............................................. | 35 |
| No Appraisal Rights............................................ | 35 |
| Federal Securities Laws Consequences; Resale Restrictions........ | 35 |
| THE NEW SEALED AIR CHARTER..................................... | 36 |
| Proposal to Repeal Supermajority Provisions of the Grace Charter..................................................... | 36 |
| Recommendation of the Grace Board.............................. | 37 |
| ROLE OF FINANCIAL ADVISORS..................................... | 38 |
| Opinion of Sealed Air Financial Advisor........................ | 38 |
| Opinions of Grace Financial Advisors........................... | 42 |
| BUSINESS OF NEW SEALED AIR..................................... | 49 |
| Overview of New Sealed Air..................................... | 49 |
| Business of Sealed Air......................................... | 49 |
| Business of Grace Packaging.................................... | 50 |
| GRACE PACKAGING SELECTED SPECIAL-PURPOSE COMBINED FINANCIAL DATA........................................................ | 52 |
| MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS FOR GRACE PACKAGING.................. | 53 |
| NEW SEALED AIR | |
| UNAUDITED PRO FORMA CONDENSED CONSOLIDATED FINANCIAL DATA... | 57 |
| THE DISTRIBUTION AND MERGER AGREEMENTS.......................... | 65 |
| General........................................................ | 65 |
| Reorganization of Grace........................................ | 65 |
| Merger of Sealed Air and Grace Packaging...................... | 68 |
| RELATIONSHIP BETWEEN NEW SEALED AIR AND NEW GRACE AFTER THE REORGANIZATION AND MERGER........................ | 75 |
| Tax Sharing Agreement.......................................... | 75 |
| Employee Benefits Agreement.................................... | 75 |
| Other Agreements............................................... | 76 |
| THE NEW CREDIT AGREEMENTS...................................... | 77 |
| General Terms.................................................. | 77 |
| Interest Rates and Fees........................................ | 77 |
| Covenants and Other Provisions of the New Credit Agreements...... | 78 |
| MANAGEMENT OF NEW SEALED AIR................................... | 78 |
| General........................................................ | 78 |
| Directors and Executive Officers.............................. | 78 |
| INTERESTS OF CERTAIN PERSONS................................... | 79 |
| Existing Officers and Directors Who Will Join New Sealed Air and New Grace at the Effective Time........................ | 79 |
| Indemnification of Officers and Directors...................... | 79 |
| Sealed Air Officers' and Directors' Interests under Stock Plans.. | 80 |
| Grace Officers' Ownership of Grace Stock Options................ | 80 |

THE SPECIAL MEETINGS........................................... 80
Times and Places; Purposes.................................... 80
Record Date; Voting Rights; Votes Required for Approval.......... 81
Proxies....................................................... 82

SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS................. 83

DESCRIPTION OF CAPITAL STOCK OF NEW SEALED AIR.................. 86
Authorized Capital Stock...................................... 86
New Sealed Air Common Stock................................... 86
New Sealed Air Preferred Stock................................ 86
Transfer Agent and Registrar.................................. 90
Stock Exchange Listing; Delisting and Deregistration of
    Sealed Air Common Stock................................... 90

COMPARISON OF STOCKHOLDER RIGHTS............................... 91
    General................................................... 91
Comparison of Current Sealed Air Stockholder Rights and Current
    Grace Stockholder Rights with the Rights of New Sealed Air
    Stockholders Following the Merger......................... 91

LEGAL MATTERS................................................. 94

EXPERTS...................................................... 95

FUTURE STOCKHOLDER PROPOSALS.................................. 95

WHERE YOU CAN FIND MORE INFORMATION........................... 95

LIST OF DEFINED TERMS......................................... 98

INDEX TO FINANCIAL STATEMENTS................................. F-1

LIST OF ANNEXES
Annex A - Agreement and Plan of Merger
Annex B - Distribution Agreement
Annex C - Opinion of Sealed Air's
          Financial Advisor
Annex D - Opinions of Grace's
          Financial Advisors
Annex E - New Sealed Air Charter

## QUESTIONS AND ANSWERS ABOUT THE REORGANIZATION AND MERGER

Q: Please briefly describe the proposed transactions.

A: Grace will spin off its specialty chemicals businesses to its
stockholders, and the spun-off company will be renamed "W. R. Grace & Co."

Sealed Air will then merge with and become a new subsidiary of Grace, and Grace
will be renamed "Sealed Air Corporation".

As a part of these transactions, Grace and a packaging subsidiary will borrow
approximately $1.2 billion, and transfer these funds to the specialty chemicals
businesses. The "new" Grace will use some or all of the borrowings to repay
debt, and "new" Sealed Air will be responsible for repaying the $1.2 billion.

In this Joint Proxy Statement/Prospectus, we refer to Grace's packaging
business (which does not include the container sealants and coatings business)
as "Grace Packaging"; we refer to the parent company formed by the combination
of Sealed Air and Grace Packaging as "New Sealed Air"; and we refer to the new
W. R. Grace & Co. as "New Grace".

Grace has sent its stockholders a separate document called the "New Grace
Information Statement". This describes New Grace and the proposed spin-off.

Q: What will I receive in these transactions?

A: If you are a Sealed Air stockholder, you will receive one share of common
stock of New Sealed Air in exchange for each share of Sealed Air common stock
that you own.

If you are a Grace stockholder, you will receive, for each share of Grace common
stock that you own, one share of New Grace common stock and fractions of a share
of New Sealed Air common stock and convertible preferred stock.

Grace stockholders will receive only whole shares of New Grace and New Sealed
Air stock. Grace stockholders will receive cash instead of any fractional shares
they would otherwise receive.

We will notify Grace stockholders of the actual amount each will receive as
promptly as possible after the merger.

Grace stockholders may call (800) 354-8917 to get updated information on the
estimated number of shares of New Sealed Air common and convertible preferred
stock that they will receive.

Q: What dividends will I receive in the future?

A: Sealed Air does not currently pay dividends on its common stock, and we do
not expect New Sealed Air to do so. Although Grace has paid quarterly cash

dividends on its common stock, we do not expect New Grace to do so. However, the Board of either company may change its policy based on business conditions, the company's financial condition, its earnings and other factors.

New Sealed Air will pay quarterly cash dividends of $0.50 per share on the convertible preferred stock.

Q:  What are the tax consequences to stockholders of these transactions?

A:  We believe these transactions will be tax-free for U.S. federal income tax purposes to the stockholders of Grace and Sealed Air, except for cash received instead of fractional shares.

To review the federal income tax consequences of the transactions in more detail, see pages 34 - 36.

Q:  When do you expect these transactions to be completed?

A:  We expect that the transactions will close promptly after the special meetings, late in the first quarter of 1998.

Q:  What do I need to do now?

A:  After reading this document carefully, you should complete and sign your proxy card and mail it in the enclosed return envelope as soon as possible, so that your shares may be represented at the stockholder meeting.

The Sealed Air Board recommends voting for approval of the merger agreement.

The Grace Board recommends voting for approval of the merger agreement. Approval of the merger agreement will constitute approval of the reorganization, the merger and the related transactions. As agreed with Sealed Air, the Grace Board also recommends approval of a proposal to repeal the "supermajority" provisions in the Grace charter (see pages 11 and 36).

Q:  What do I do if I want to change my vote?

A:  Just deliver a later-dated, signed proxy card to your company's Secretary before your meeting or attend your meeting in person and vote.

Q:  Should I send my stock certificates now?

A:  No.  After the merger is completed, we will send Grace stockholders instructions for exchanging their shares for New Sealed Air common stock and convertible preferred stock.  New Grace common stock certificates will be mailed to Grace stockholders without the need for any action on their part.

We will send Sealed Air stockholders instructions for exchanging their shares for New Sealed Air common stock, although Sealed Air stockholders will not be required to surrender their old Sealed Air stock certificates.

Q.  Whom should I call with questions?

A:  If you have any questions about the merger or the related transactions, please call Sealed Air at (800) 350-9512 or (201) 703-4167, or call Grace at (800) 354-8917.

If you would like copies of any of the documents we refer to or that we incorporate by reference in this Joint Proxy Statement/Prospectus, you should call (800) 350-9512 or (201) 703-4167 if the documents relate to Sealed Air or call Grace at (800) 354-8917 if the documents relate to Grace.

            ADDITIONAL QUESTIONS AND ANSWERS ABOUT THE REORGANIZATION
               AND MERGER FOR SEALED AIR AND GRACE EMPLOYEES

                             Sealed Air Employees
                             --------------------

Q: What will happen in the merger to Sealed Air common stock that remains subject to the company's repurchase option (i.e., "unvested" shares) under Sealed Air's Contingent Stock Plan?

A: Unvested shares issued under Sealed Air's Contingent Stock Plan will be exchanged for unvested shares of New Sealed Air common stock and will remain subject to the repurchase option, based on the original vesting period.

Q:  What will happen in the merger to Sealed Air common stock held in Sealed Air's Profit-Sharing Plan?

A: The shares of Sealed Air common stock held in Sealed Air's Profit-Sharing Plan will be exchanged in the merger for shares of common stock of New Sealed Air, just like any other shares of Sealed Air common stock.

Q:  How will shares of Sealed Air common stock held in Sealed Air's Profit-Sharing Plan be voted?

A: Shares held in Sealed Air's Profit-Sharing Plan will be voted by the plan trustee as the participants direct. If you are a participant with Sealed Air common stock allocated to your account, you will receive a voting instruction card enabling you to direct the voting of those shares. If you do not direct how to vote your shares, they will be voted in the same proportion for and against the proposal as shares in the plan are voted by participants who do provide voting instructions.

                             Grace Employees

---------------

Q:  What will happen in the reorganization and merger to employee stock
options held by Grace's employees?

A: The outstanding options to purchase Grace common stock that are held by
employees of Grace Packaging will become options to purchase common stock of New
Sealed Air. All other Grace options will become options to purchase common stock
of New Grace. The number of shares of New Sealed Air or New Grace that can be
purchased when the stock options are exercised, and the exercise price, will be
adjusted using formulas that are designed to maintain the approximate economic
value of the options at the time of the reorganization and merger. See page 71
for more information.

Q:  May I exercise stock options and sell Grace common stock between now
and the completion of the reorganization and merger?

A: Yes, subject to limitations on trading by persons defined as Grace
"affiliates", which are summarized beginning on page 37, and other restrictions
on "insider trading" under securities laws.

Q:  What will happen in the reorganization and merger to Grace common stock
held in Grace's Savings and Investment Plans?

A: When the Grace common stock is recapitalized, the shares of Grace common
stock held in Grace's Savings and Investment Plans will be exchanged for shares
of New Grace common and convertible preferred stock, just like any other
shares of Grace common stock. In addition, shares of New Grace common stock will
be allocated to accounts that hold Grace common stock under Grace's Savings and
Investment Plans. You will receive additional information at a later date
regarding the New Sealed Air stock that will be held in your account.

Q:  How will shares of Grace common stock held in Grace's Savings and
Investment Plans be voted?

A: Shares held in Grace's Savings and Investment Plans will be voted by the plan
trustee as the participants direct. If you are a participant with Grace common
stock allocated to your account, you will receive a proxy card enabling you to
direct the voting of those shares. If you do not direct how to vote your shares,
they will be voted in the same proportion for and against the proposals as all
other shares in the plans are voted.

    The following diagrams illustrate the proposed transactions in general
terms and are not comprehensive. For a more complete description of the proposed
transactions, see "The Reorganization and Merger" on Page 24 and "The
Distribution and Merger Agreements" on page 65.

[GRAPHIC OMITTED]

    Diagram showing the current structure of Sealed Air and Grace: (1) Sealed
Air, which owns U.S. and foreign subsidiaries engaged in the packaging business,
is owned by the existing Sealed Air stockholders and (2) Grace, which owns U.S.
and foreign subsidiaries engaged in the packaging and specialty chemicals
businesses, is owned by the existing Grace stockholders.

[GRAPHIC OMITTED]

    Diagram showing (1) the separation of Grace's packaging business and
specialty chemicals businesses, (2) the $1.2 borrowing by Grace and a packaging
subsidiary of Grace and (3) the $1.2 billion cash transfer to New Grace or a
subsidiary of New Grace.

[GRAPHIC OMITTED]

    Diagram showing the spinoff of New Grace to the Grace stockholders.

[GRAPHIC OMITTED]

    Diagram showing the recapitalization of Grace, indicating that after the
spin-off, the Grace stockholders will own common and convertible preferred stock
of Grace (which will own Grace's packaging business) and common stock of New
Grace (which will own Grace's specialty chemicals businesses).

[GRAPHIC OMITTED]

    Diagram showing the merger of a subsidiary of Grace (to be renamed Sealed
Air Corporation) into Sealed Air.

[GRAPHIC OMITTED]

    Diagram showing the post-transaction structure of New Sealed Air and New
Grace: (1) New Sealed Air, which will own "old" Sealed Air and Grace's packaging
business, will be owned 37% by the existing Sealed Air stockholders (in common
stock) and 63% by the existing Grace stockholders (in common and convertible
preferred stock) and (2) New Grace, which will own Grace's specialty chemicals
businesses, will be owned 100% by the existing Grace stockholders.

## SUMMARY

    This summary highlights selected information from this Joint Proxy
Statement/Prospectus and may not contain all of the information that is
important to you. To understand the reorganization and merger more fully, you
should carefully read this entire document and the documents we refer to. See
"Where You Can Find More Information" on page 100.

The Companies

Sealed Air Corporation
Park 80 East
Saddle Brook, New Jersey 07663
(201) 791-7600

    Sealed Air is a leading global manufacturer of a wide range of protective
and specialty packaging materials and systems that are used to protect a variety
of products from damage during manufacture, shipment, storage and handling.
Sealed Air's principal classes of products include protective packaging
products, primarily engineered products and surface protection and other
cushioning products, and specialty packaging products, primarily certain food
packaging products. Sealed Air conducts its operations primarily in the U.S. and
in 26 other countries in North America, Europe, the Asia/Pacific region and
Latin America and distributes its products in these areas as well as in other
parts of the world.

W. R. Grace & Co.
One Town Center Road
Boca Raton, Florida 33486
(561) 362-2000

    Grace is one of the world's leading packaging and specialty chemicals
companies. Its principal businesses are packaging, catalysts and silica-based
products, construction chemicals and specialty building materials, and container
sealants and coatings.

    Grace Packaging is a leading supplier of high- performance packaging
materials and systems for food and other products. Its principal packaging
products and services are divided into three product groups: specialty
packaging, marketed extensively under the Cryovac[Registered] registered
trademark, Formpac[Trademark] foam trays and Omicron[Trademark] rigid plastic
containers. Grace Packaging conducts its operations primarily in the U.S. and in
45 other countries worldwide, and distributes its products in these areas as
well as in many other countries.

    For further information on Sealed Air and Grace Packaging, see "Business of
New Sealed Air" on page 51.

The Proposed Merger and Related Transactions (See page 26)

    The merger agreement and form of distribution agreement that together
provide for the reorganization and merger are attached as Annexes A and B to
this Joint Proxy Statement/Prospectus. We encourage you to read these documents
carefully.

    Here is some additional detail about the proposed transactions.

    Sealed Air and Grace are proposing a combination of Sealed Air and Grace
Packaging. Because Grace is engaged not only in the packaging business but also
in various specialty chemicals businesses, it will take the following steps to
reorganize itself before the proposed merger:

    o   Grace will separate its packaging business and its specialty chemicals
        businesses into separate groups of subsidiaries.

    o   The specialty chemicals businesses will be spun off to Grace's
        stockholders as a new public company that will be renamed "W.R. Grace &
        Co." The management of the "new" Grace will be substantially the same
        as that of "old" Grace.

    o   Prior to the spin-off, Grace and a packaging subsidiary will borrow
        approximately $1.2 billion and transfer these funds to the specialty
        chemicals businesses. New Grace will use some or all of the borrowings
        to repay debt, and New Sealed Air will be responsible for repaying the
        $1.2 billion.

    o   The outstanding common stock of old Grace will be exchanged for new
        common and convertible preferred stock.

    A wholly owned subsidiary of old Grace will then merge with Sealed Air. Old
Grace will be renamed "Sealed Air Corporation," and Sealed Air's existing
stockholders will receive common stock of New Sealed Air.

New Sealed Air After the Merger

    The proposed merger of Sealed Air and Grace Packaging to form New Sealed
Air will create a leading worldwide protective and specialty packaging company
that should be well positioned for further growth. New Sealed Air will enjoy
strong brand name recognition, a commitment to technological innovation and a
global marketing network.

    Here are a few points that highlight how New Sealed Air would have looked
in 1996:

    o   New Sealed Air would have had annual net sales of more than $2.5
        billion.

    o   Approximately 60% of New Sealed Air's net sales would have come from
        specialty (primarily food) packaging products and 40% from protective
        packaging and other products.

    o   New Sealed Air would have had operations in 46 countries, with 51% of

its revenues generated in the U.S. and 49% outside the U.S.

Following these transactions, New Sealed Air will:

o  be an independent company, initially owned 37% by the existing Sealed
   Air stockholders and 63% by the existing Grace stockholders;

o  own and operate the businesses of Sealed Air and Grace
   Packaging; and

o  be obligated to repay the approximately $1.2 billion that will be
   borrowed and transferred to Grace's specialty chemicals businesses.

New Grace After the Merger

After the spin-off, New Grace will be a highly focused specialty chemicals
company. Grace stockholders should review the New Grace Information Statement.

New Grace will:

o  initially be owned 100% by the existing Grace stockholders;

o  own and operate Grace's specialty chemicals businesses; and

o  be essentially debt-free following the approximately $1.2 billion cash
   transfer from Grace, which will be used to repay borrowings.

                    -------------------------------

Considerations for Sealed Air Stockholders

The Sealed Air stockholders will be asked to approve the merger agreement.
The favorable vote of a majority of the outstanding shares of Sealed Air common
stock is required to approve the merger.

Recommendation to Sealed Air Stockholders

The Board of Directors of Sealed Air believes the merger is fair to you and
in your best interests and recommends that you vote "FOR" the merger proposal.

In reaching its recommendation in favor of the merger, the Sealed Air Board
considered the challenges and risks associated with combining the companies and
achieving the benefits anticipated from the merger, as discussed in "Certain
Risk Factors" beginning on page 22.

What Sealed Air Stockholders Will Receive

If these transactions are completed, Sealed Air stockholders will receive
one share of New Sealed Air common stock for each share of Sealed Air common
stock that they own.

Sealed Air's Reasons for the Proposed Merger (See page 29 and 31)

Sealed Air believes the merger will:

o  offer a strategic business opportunity to bring together two leading
   packaging companies with Sealed Air's entrepreneurial management team;

o  combine complementary product lines to create marketing
   opportunities;

o  bring together innovative technologies and worldwide marketing
   networks and distribution channels; and

o  create opportunities for efficiencies through the integration of the
   two companies' operations.

Opinion of Financial Advisor (See page 39)

In deciding to approve the merger, the Sealed Air Board received and
considered the opinion of Donaldson, Lufkin & Jenrette Securities Corporation,
its financial advisor, as to the fairness of the consideration to be received by
its stockholders from a financial point of view. The opinion is attached as
Annex C to this Joint Proxy Statement/Prospectus.
We encourage you to read the opinion.

                    -------------------------------

Considerations for Grace Stockholders

The Grace stockholders will be asked:

o  to approve the merger agreement (which will constitute approval of the
   spin-off, certain charter amendments, the recapitalization of the Grace
   common stock and the issuance of shares in the merger); and

o  to approve a charter amendment to repeal certain provisions requiring
   supermajority stockholder approval (see below).

The favorable vote of a majority of the outstanding shares of Grace common stock
is required to approve the reorganization and merger. The favorable vote of 80%
of the outstanding shares of Grace common stock is required to approve the
repeal of the charter provisions requiring supermajority approval.

Recommendation to Grace Stockholders

    The Board of Directors of Grace believes the reorganization and merger are
fair to you and in your best interests and recommends that you vote "FOR" the
proposal to approve the reorganization and merger. As agreed with Sealed Air,
the Board recommends that you vote "FOR" the proposal to repeal the charter
provisions requiring supermajority approval.

    In reaching its recommendation in favor of the proposed transactions, the
Grace Board considered the challenges and risks associated with combining the
companies and achieving the benefits anticipated from the reorganization and
merger, as discussed in "Certain Risk Factors" beginning on page 22.

    Grace's Reasons for the Proposed Merger and Related Transactions (See
page 31)

    Grace believes the reorganization and merger will:

    o   enhance stockholder value by giving its stockholders, through a
        tax-free transaction, a significant premium for Grace Packaging and
        participation in the ownership of both New Sealed Air and New Grace;

    o   create a preeminent packaging company with complementary packaging
        products; and

    o create New Grace, a highly focused specialty chemicals company.

    What Grace Stockholders Will Receive (See page 70)

    If these transactions are completed, Grace stockholders will receive, for
each share of Grace common stock that they own:

    o   one share of New Grace common stock, and

    o   an estimated .53 to .54 of a share of New Sealed Air common stock and
        an estimated .46 to .48 of a share of New Sealed Air convertible
        preferred stock.

    These estimates are based upon information as of February 11, 1998. The
actual amount of New Sealed Air stock that Grace stockholders will receive will
be determined shortly after the merger based on the formulas described on page
70.

    Grace stockholders will receive only whole shares of New Grace and New
Sealed Air stock. Grace stockholders will receive cash instead of any fractional
shares they would otherwise receive.

    Opinions of Financial Advisors (See page 44)

    In deciding to approve the proposed transactions, the Grace Board
considered opinions from Merrill Lynch & Co. and Credit Suisse First Boston
Corporation, its financial advisors, as to the fairness of the consideration to
be received by its stockholders from a financial point of view. These opinions
are attached as Annex D to this Joint Proxy Statement/Prospectus. We encourage
you to read these opinions.

    Proposal to Repeal Supermajority Provisions of the Grace
Charter (See page ?)

    As part of the merger, the Grace charter will be amended and restated in
its entirety so that the New Sealed Air charter will be substantially identical
to the existing Sealed Air charter. Except for the repeal of certain provisions
described below, Grace stockholders will vote on the necessary charter
amendments as part of the proposal to approve the reorganization and merger.

    In a separate proposal, Grace's stockholders will be asked to approve the
repeal of three provisions in the Grace charter, which will become the charter
of New Sealed Air, for which supermajority approval is needed. These provisions
relate to stockholder amendments to the by-laws, actions by written consent of
stockholders, and the classification of the board of directors into staggered
terms. Repeal of these provisions is necessary to adopt the New Sealed Air
charter in its entirety.

    The favorable vote of 80% of the outstanding shares of Grace common stock
is required to approve the repeal of these provisions. If they are not repealed,
we intend to proceed with the reorganization and merger (assuming that the other
conditions to the transactions are satisfied or waived), and the New Sealed Air
charter would include the supermajority provisions.

                     -------------------------------

    Additional Considerations for Sealed Air and Grace Stockholders

    Board of Directors and Management of New Sealed Air after the Merger
(See page 81)

    The directors of New Sealed Air will consist of the seven current directors
of Sealed Air plus four current outside directors of Grace -- Hank Brown,
Christopher Cheng, Virginia A. Kamsky and John E. Phipps -- none of whom will be
directors of New Grace. New Sealed Air will be managed by the current management
of Sealed Air, including  Dunphy, Chairman of the Board and Chief
Executive Officer, and William V. Hickey, President and Chief Operating Officer.
In addition, J. Gary Kaenzig, Jr., a Senior Vice President of Grace and
President of Grace Packaging, and Leonard R. Byrne and Alan S. Weinberg,

executives of Grace Packaging, will become officers of New Sealed Air.

Following the merger, New Sealed Air and New Grace will have no officers or directors in common.

Interests of Officers and Directors in the Reorganization and Merger (See page 82)

When considering the recommendations of the Sealed Air Board and the Grace Board, you should be aware that officers and directors of Sealed Air and Grace have interests and arrangements that may be different from your interests as stockholders:

- o   The directors and officers of Sealed Air and four directors of Grace and certain executives of Grace Packaging are expected to become directors and officers of New Sealed Air.

- o   The directors and officers of Grace, except for those joining New Sealed Air, are expected to become directors and officers of New Grace.

- o   Officers and directors of Sealed Air and Grace will be indemnified if the proposed transactions give rise to certain liabilities.

- o   Officers of Grace own options to purchase Grace common stock. Each of these options will be converted into options to purchase New Sealed Air or New Grace common stock, depending on which company the option holder joins after the merger, unless the options are exercised earlier. The treatment of options gives officers more options than stockholders have.

Conditions to the Reorganization and Merger (See page 74)

The reorganization and merger will be completed only if certain conditions, including the following, are satisfied (or waived in certain cases):

- o   the approval of the Sealed Air and Grace stockholders;

- o   the absence of legal restrictions that prevent the completion of the transactions;

- o   the receipt of all material governmental and other consents and approvals required;

- o   the receipt of legal opinions that the reorganization and merger will qualify as tax-free reorganizations for U.S. federal income tax purposes; and

- o   the accuracy of representations and warranties and performance of covenants in the merger agreement.

Termination of the Merger Agreement (See page 75)

Sealed Air and Grace may mutually agree to terminate the merger agreement without completing the merger.

The merger agreement may also be terminated in certain other circumstances, as follows:

- o   Either company may terminate the merger agreement if:

  the merger is not completed by April 30, 1998 (but neither company may terminate the agreement if its own breach is the reason the merger is not completed by then);

  the stockholders of Sealed Air or Grace do not approve the transactions; or

  Sealed Air or Grace enters into an agreement with a third party on terms that its board believes in good faith to be better for its stockholders than the merger agreement.

- o   Sealed Air may terminate the merger agreement if:

  Grace fails to comply materially with its obligations in certain circumstances;

  the average closing price of Grace common stock for the 20 trading days preceding the merger is less than $45 3/8 per share; or

  the Grace Board fails to recommend that Grace stockholders approve the merger, or changes its recommendation in a manner materially adverse to Sealed Air;

- o   Grace may terminate the merger agreement if:

  Sealed Air fails to comply materially with its obligations in certain circumstances;

  the average closing price of Sealed Air common stock for the 20 trading days preceding the merger is less than $37 per share; or

  the Sealed Air Board fails to recommend that Sealed Air stockholders approve the merger, or changes its recommendation in a manner materially adverse to Grace.

Termination Fees and Expenses (See page 76)

If the merger agreement is terminated for certain reasons, as explained on page 76, Grace must pay Sealed Air a termination fee of either $25 million or $150 million, depending on the circumstances, plus out-of-pocket expenses in certain cases.

If the merger agreement is terminated for certain other reasons, as explained on page 76, Sealed Air must pay Grace a termination fee of either $25 million or $75 million, depending on the circumstances, plus out-of-pocket expenses in certain cases.

Regulatory Approvals (See page 36)

Sealed Air and Grace have made certain filings and taken other actions necessary to obtain approvals from certain U.S. and foreign regulatory authorities in connection with the reorganization and merger, including U.S. and certain foreign antitrust authorities. The waiting period under the Hart-Scott-Rodino Antitrust Improvements Act expired on December 18, 1997. It is expected that Sealed Air and Grace will obtain all material required regulatory approvals before the special meetings. However, it is not certain that Sealed Air and Grace will obtain all required regulatory approvals by then, and approvals may include conditions that would be detrimental to Sealed Air or Grace.

Accounting Treatment and Considerations (See page 33)

The merger will be accounted for under the purchase method of accounting, with Grace treated as the acquirer. As a result, New Sealed Air will record the assets and liabilities of Sealed Air at their estimated fair values and will record as goodwill the excess of the purchase price (i.e., the market capitalization of Sealed Air for a period before and after the merger was announced, plus certain merger-related costs) over such estimated fair values.

As required by accounting rules, New Sealed Air's net earnings will be reduced by the dividends to be paid on the convertible preferred stock before calculating basic earnings per share. Diluted earnings per share cannot initially be presented because treating the convertible preferred stock as if it had been converted would be antidilutive (i.e. would increase earnings per share).

Certain Federal Income Tax Consequences (See page 34)

We have structured the proposed transactions so that our legal counsel will be able to deliver opinions that neither Sealed Air, Grace nor our stockholders will recognize any gain or loss for U.S. federal income tax purposes as a result of the reorganization and merger (except for the cash received by Grace's stockholders instead of fractional shares). Completion of the merger is conditioned on the receipt of these legal opinions, and such condition may not be waived.

Tax matters are very complicated, and the tax consequences of the proposed transactions to you will depend on the facts of your own situation. Consult your tax advisors for a full understanding of the tax consequences to you of the spin-off, the recapitalization and the merger.

No Appraisal Rights (See page 36)

Under Delaware law, neither Sealed Air stockholders nor Grace stockholders have any right to an appraisal of the value of their shares in connection with the reorganization or merger.

Comparative Per Share Market Price Information (See page 21)

Sealed Air common stock and Grace common stock are both listed on the New York Stock Exchange. On August 13, 1997, the last full trading day prior to the public announcement of the proposed merger, Sealed Air common stock closed at $47 5/8 and Grace common stock closed at $66 1/2. On February 12, 1998, Sealed Air common stock closed at $61(1)/(16) and Grace common stock closed at $77 7/8.

Listing of New Sealed Air and New Grace Stock (See page 94)

New Sealed Air will list its common stock under the ticker symbol "SEE" and its convertible preferred stock under the ticker symbol "SEEprA" on the New York Stock Exchange. New Grace will list its common stock on the New York Stock Exchange under the ticker symbol "GRA".

SUMMARY SELECTED HISTORICAL AND PRO FORMA FINANCIAL DATA

Sources of Information

We are providing the following selected financial information concerning Sealed Air, Grace Packaging and New Sealed Air to help you in your analysis of the financial aspects of the proposed reorganization and merger. This information was derived from the audited and unaudited financial statements for Sealed Air and Grace Packaging for the periods presented. The information is only a summary and you should read it in conjunction with the financial information included or incorporated by reference in this Joint Proxy Statement/Prospectus. See "Where You Can Find More Information" on page 100, "Grace Packaging Special-Purpose Combined Financial Statements" on page F-1, and "New Sealed Air Unaudited Pro Forma Condensed Consolidated Financial Data" on page 59.

For financial information concerning New Grace, Grace stockholders should

Page 15 of 185

also read the financial information in the New Grace Information Statement.

How the Unaudited Pro Forma Consolidated Financial Information Was Prepared

The unaudited pro forma consolidated financial information is presented to show you how Sealed Air and Grace Packaging might have looked if Grace Packaging had been an independent company and Grace Packaging and Sealed Air had been combined for the periods presented. The pro forma financial information was prepared using the purchase method of accounting, with Grace treated as the acquirer. See "The Reorganization and Merger-- Accounting Treatment" on page 33.

Certain assets and liabilities shown on the financial statements for Grace Packaging will be transferred to New Grace in the reorganization, so the pro forma financial information for New Sealed Air has been adjusted accordingly. We did not adjust the pro forma amounts for certain operating efficiencies that may be realized as a result of the merger.

If the companies had been combined in the past, they might have performed differently. You should not rely on the pro forma financial information as an indication of the results that would have been achieved if the reorganization and merger had taken place earlier or the future results that New Sealed Air will experience after the merger. See "New Sealed Air Unaudited Pro Forma Condensed Consolidated Financial Data."

Reorganization and Merger-Related Expenses

Sealed Air and Grace estimate that the reorganization and merger will result in fees and expenses totaling approximately $180.1 million, of which approximately $65.1 million will be borne by New Sealed Air and $115.0 million by New Grace. After the merger, New Sealed Air may incur certain charges and expenses relating to restructuring and integrating the operations of Sealed Air and Grace Packaging. We did not adjust the pro forma information for certain of these charges and expenses or for certain operating efficiencies that may be realized as a result of the merger.

Sealed Air
Selected Historical Financial Information
(In thousands, except per share data)

<TABLE>
<CAPTION>

| | Nine Months Ended September 30, | | Years Ended December 31, | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 1997 | 1996 | 1996 | 1995(1) | 1994 | 1993 | | 1992 |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| Consolidated Statement of Earnings Data: | | | | | | | | |
| Net sales..................... | $620,769 | $575,578 | $789,612 | $723,120 | $519,186 | $451,694 | | $446,058 |
| Gross profit.................. | 233,405 | 214,528 | 294,427 | 256,168 | 191,763 | 169,547 | | 167,631 |
| Operating profit.............. | 105,988 | 94,607 | 130,072 | 108,880 | 83,909 | 74,113 | | 72,190 |
| Other expense, net........... | 2,837 | 10,958 | 15,477 | 21,726 | 22,706 | 28,652 | | 33,372 |
| Earnings before income taxes... | 103,151 | 83,649 | 114,595 | 87,154 | 61,203 | 45,461 | | 38,818 |
| Earnings..................... | 62,509 | 50,604 | 69,329 | 52,728 | 37,216 (2) | 25,914 (3) | | 20,768 |
| Earnings per share(4)......... | 1.47 | 1.19 | 1.63 | 1.25 | 0.94 (2) | 0.66 (3) | | 0.54 |
| Consolidated Balance Sheet Data (at period end): | | | | | | | | |
| Working capital.............. | $84,104 | $61,296 | $58,910 | $41,945 | $15,767 | $33,828 | | $29,417 |
| Total assets................. | 483,228 | 484,220 | 467,119 | 443,545 | 331,117 | 279,818 | | 268,264 |
| Notes payable and current installments of long-term debt | 24,599 | 26,310 | 15,565 | 36,840 | 30,508 | 15,618 | | 18,724 |
| Long-term debt, less current installments......... | 48,718 | 128,781 | 99,900 | 149,808 | 155,293 | 190,058 | | 225,278 |
| Shareholders' equity (deficit)(5)................ | 247,626 | 165,380 | 186,649 | 106,338 | 11,012 | (29,419) | | (66,311) |
| Other Data: | | | | | | | | |
| EBIT(6)...................... | 108,765 | 93,911 | 127,531 | 105,973 | 80,044 | 71,677 | | 67,243 |
| Depreciation and amortization................ | 33,658 | 29,427 | 39,897 | 35,280 | 23,520 | 24,544 | | 23,607 |
| Non-cash compensation......... | -- | -- | 3,242 | 3,556 | 3,256 | 2,293 | | 1,836 |
| EBITDA(7).................... | 142,423 | 123,338 | 170,670 | 144,809 | 106,820 | 98,514 | | 92,686 |
| EBITDA as % of net sales....... | 22.9% | 21.4% | 21.6% | 20.0% | 20.6% | 21.8% | | 20.8% |
| Ratio of earnings to fixed charges(8)................. | 13.1x | 7.2x | 7.7x | 4.9x | 3.8x | 2.4x | | 2.2x |

- -------------------------

(1) Includes the operations of Trigon Industries Limited from the date of its acquisition in January 1995.

(2) Does not reflect an after-tax charge to earnings ($5.6 million or $0.14 per share) arising from the early redemption in 1994 of subordinated notes.

(3) Does not reflect cumulative credit to earnings ($1.5 million or $0.04 per share) from the implementation as of January 1, 1993 of Financial Accounting Standard No. 109, "Accounting for Income Taxes".

(4) Per share data has been adjusted for periods prior to 1995 to reflect the effect of a two-for-one stock split in the form of a 100% stock dividend distributed in 1995.

(5) The deficits in shareholders' equity in 1993 and 1992 resulted from a special dividend of approximately $329 million paid to stockholders in 1989.

(6) EBIT is defined as earnings before interest expense (including the non-cash amortization of deferred financing fees) and provision for income taxes.

(7) EBITDA is defined as EBIT plus depreciation, goodwill amortization, amortization of other intangible assets and non-cash compensation. This definition may differ from that used by other companies (including Grace Packaging) since it includes non-cash compensation. EBITDA is a frequently used measure of a company's ability to generate cash to service its obligations, including debt service obligations, and to finance working capital and other expenditures. EBITDA does not purport to represent net income or net cash provided by operating activities, as those terms are defined under generally accepted accounting principles, and should not be considered as an alternative to such measurements as an indicator of the company's performance.

(8) For the purpose of calculating the ratio of earnings to fixed charges, "earnings" represents earnings before income taxes plus fixed charges. "Fixed charges" consist of interest on all indebtedness, amortization of deferred financing costs and the portion (approximately one-third) of rental expense that management believes is representative of the interest component of rental expense.

</TABLE>

Recent Results of Sealed Air

Sealed Air recently reported record net sales, operating profit and net earnings for the year and quarter ended December 31, 1997.

Net sales increased 7% to $842.8 million for 1997, compared with $789.6 million for 1996, and to $222.1 million for the fourth quarter of 1997, 4% above their level of $214.0 million for the fourth quarter of 1996. Excluding the negative effect of foreign currency translation, the increase in net sales would have been 10% for the year and 8% for the fourth quarter compared to the respective 1996 periods.

The increase in net sales in 1997 was due primarily to increased unit volume in Sealed Air's major classes of products, partially offset by the negative effect of foreign currency translation as the U.S. dollar strengthened against most foreign currencies. Net sales also benefited modestly from additional net sales from recent acquisitions. The recent Asian currency problems have not had a significant effect on Sealed Air's operating results.

Before giving effect to $8.4 million of transaction expenses that were incurred in 1997, primarily relating to the Merger, Sealed Air's operating profit for 1997 would have increased 13% to $146.5 million compared with 1996 operating profit of $130.1 million. Net earnings would have increased 24% to $86.0 million, or $2.02 per share, compared with net earnings of $69.3 million, or $1.63 per share, in 1996. After such transaction expenses, operating profit was $138.1 million and net earnings were $79.9 million, or $1.88 per share, in 1997.

For the fourth quarter of 1997, before giving effect to $7.6 million of transaction expenses mentioned above, Sealed Air's operating profit would have increased 12% to $39.7 million compared with $35.5 million for the fourth quarter of 1996. Net earnings for the fourth quarter of 1997 would have increased 23% to $23.0 million, or $0.54 per share, compared with 1996 net earnings of $18.7 million, or $0.44 per share, for the fourth quarter of 1996. After such transaction expenses, operating profit was $32.1 million and net earnings were $17.4 million, or $0.41 per share, for the fourth quarter of 1997.

Grace Packaging
Selected Historical Financial Information
(In thousands)

<TABLE>

|  | Nine Months Ended September 30, | | Years Ended December 31, | | | | |
|---|---|---|---|---|---|---|---|
| <CAPTION> | 1997 | 1996 | 1996 | 1995 | 1994 | 1993 | 1992 |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| Statement of Earnings Data: |  |  |  |  |  |  |  |
| Net sales.............. | $1,347,739 | $1,271,612 | $1,741,602 | $1,705,642 | $1,428,459 | $1,256,132 | $1,236,659 |
| Gross profit........... | 473,883 | 431,278 | 590,596 | 627,542 | 545,313 | 492,911 | 483,803 |
| Operating profit....... | 191,918 | 139,106 | 173,500 | 248,062 | 237,349 | 219,474 | 218,863 |
| Other expense, net..... | 2,215 | 5,036 | 3,678 | 12,589 | 9,597 | 12,949 | 9,101 |
| Earnings before income taxes................. | 189,703 | 134,070 | 169,822 | 235,473 | 227,752 | 206,525 | 209,762 |
| Net earnings........... | 111,545 | 78,813 | 99,830 | 140,892 | 139,511 | 125,980 | 127,955 |
| Combined Balance Sheet Data (at period end): |  |  |  |  |  |  |  |
| Working capital........ | $323,510 |  | $277,583 | $289,605 | $224,815 | $194,284 | $176,502 |
| Total assets........... | 1,683,432 |  | 1,702,888 | 1,477,360 | 1,179,937 | 914,669 | 839,310 |
| Total liabilities...... | 301,614 |  | 321,098 | 303,398 | 282,176 | 214,950 | 219,787 |
| Total equity .......... | 1,381,818 |  | 1,381,790 | 1,173,962 | 897,761 | 699,719 | 619,523 |

Other Data:

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| EBIT(1)................. | 189,703 | 134,070 | 169,822 | 235,473 | 227,752 | 206,525 | 209,762 |
| Depreciation and amortization......... | 78,701 | 69,586 | 94,380 | 80,357 | 61,924 | 51,508 | 52,641 |
| EBITDA(2)............. | 268,404 | 203,656 | 264,202 | 315,830 | 289,676 | 258,033 | 262,403 |
| EBITDA as % of net sales............... | 19.9% | 16.0% | 15.2% | 18.5% | 20.3% | 20.5% | 21.2% |

- --------------------
(1) EBIT is defined as earnings before interest expense and provision for income taxes.

(2) EBITDA is defined as EBIT plus depreciation, goodwill amortization and amortization of other intangible assets. EBITDA is a frequently used measure of a company's ability to generate cash to service its obligations, including debt service obligations, and to finance capital and other expenditures. EBITDA does not purport to represent net income or net cash provided by operating activities, as those terms are defined under generally accepted accounting principles, and should not be considered as an alternative to such measurements as an indicator of the company's performance.

</TABLE>

Recent Results of Grace Packaging

Grace Packaging's net sales for the year ended December 31, 1997 increased more than 5% to approximately $1.8 billion compared to 1996. For the fourth quarter of 1997, net sales increased by about 4% to approximately $486 million compared to the fourth quarter of 1996. Excluding the negative effect of foreign currency translation, the increase in net sales would have been approximately 10% for the year and approximately 9% for the fourth quarter.

The increase in net sales was due primarily to increased unit volume of Grace Packaging's major products, partially offset by the negative effect of foreign currency translation. In the fourth quarter of 1997, the currency translation effect of the recent currency problems in Asia more than offset higher unit volume in the Asia/Pacific region.

New Sealed Air
Selected Pro Forma Financial Information
(In thousands, except per share data)

<TABLE>
<S>

| | Nine months ended September 30, 1997 | Year ended December 31, 1996 |
|---|---|---|
| Unaudited Pro Forma Consolidated Statement of Earnings Data: | | |
| Net sales.......................................................... | $1,967,529 | $2,529,645 |
| Gross profit....................................................... | 699,563 | 874,723 |
| Operating profit................................................... | 286,335 | 268,655 |
| Other expense, net................................................. | 61,539 | 93,355 |
| Earnings before income taxes....................................... | 224,796 | 175,300 |
| Net earnings....................................................... | 121,129 | 88,178 |
| Earnings available to common stockholders.......................... | 67,129 | 16,178 |
| Earnings per common share(1)....................................... | 0.80 | 0.19 |
| Shares used in computing earnings per common share(1)............... | 83,595 | 83,595 |

| | September 30, 1997 |
|---|---|
| Unaudited Pro Forma Consolidated Balance Sheet Data: | |
| Working capital.................................................... | $160,331 |
| Total assets....................................................... | 4,095,651 |
| Notes payable and current installments of long-term debt........... | 265,399 |
| Long-term debt, less current installments.......................... | 1,048,718 |
| Total liabilities.................................................. | 1,822,761 |
| Convertible preferred stock........................................ | 1,800,000 |
| Stockholders' equity............................................... | 472,890 |

| | | |
|---|---|---|
| Other Pro Forma Data: | | |
| EBIT(2)............................................................ | 286,897 | 262,436 |
| Depreciation and amortization...................................... | 146,244 | 179,036 |
| Non-cash compensation.............................................. | -- | 11,242 |
| EBITDA(3).......................................................... | 433,141 | 452,714 |
| EBITDA as % of net sales........................................... | 22.0% | 17.9% |
| Ratio of earnings to fixed charges and preferred dividends(4)....... | 1.8x | 1.2x |

- ----------------
(1) Pro forma earnings per common share is calculated based upon 83,595 shares of New Sealed Air common stock, which is the estimated weighted average number of common shares that will be outstanding upon the consummation of the merger (excluding shares of common stock into which the preferred stock is convertible because the effect of conversion is antidilutive).

(2) See footnote (6) on page 15.

(3) See footnote (7) on page 16.

(4) For the purpose of calculating the ratio of earnings to fixed charges and preferred dividends, "earnings" represents earnings before income taxes plus fixed charges. "Fixed charges" consist of interest on all indebtedness, amortization of deferred financing costs and the portion (approximately

one-third) of rental expense that management believes is representative of
the interest component of rental expense.

</TABLE>

Unaudited Comparative Per Share Data

The following table (1) compares certain historical Sealed Air per share
information with New Sealed Air pro forma equivalent per share information and
(2) compares certain historical Grace per share information with New Sealed Air
and New Grace pro forma equivalent per share information. The table should be
read in conjunction with the financial information for Sealed Air, Grace, Grace
Packaging, New Sealed Air and New Grace that is included or incorporated by
reference in this Joint Proxy Statement/Prospectus and the New Grace Information
Statement. You should not rely on the pro forma financial information as an
indication of the results that would have been achieved if the reorganization
and merger had taken place earlier or of the results of New Sealed Air and New
Grace after the merger. New Sealed Air and New Grace are not expected to pay
dividends on their common stock.

<TABLE>
<CAPTION>

|  | Sealed Air Stockholders | | Grace Stockholders | | | |
|  | Sealed Air Historical | Pro Forma Equivalent Per Share-New Sealed Air (1) | Grace Historical | Pro forma Equivalent Per Share(1) | | |
|  |  |  |  | New Sealed Air | New Grace | Total |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> |
| Earnings per share from continuing operations (2)(3): |  |  |  |  |  |  |
| Year ended December 31, 1996.......... | $1.63 | $0.19 | $2.26 | $0.10 | $1.53 | $1.63 |
| Nine months ended September 30, 1997.. | 1.47 | 0.80 | 2.91 | 0.44 | 1.77 | 2.21 |
| Dividends per share (2)(4): |  |  |  |  |  |  |
| Year ended December 31, 1996.......... | -- | -- | 0.50 | 0.96 | -- | 0.96 |
| Nine months ended September 30, 1997.. | -- | -- | 0.42 | 0.72 | -- | 0.72 |
| Book value per share at period end (2): |  |  |  |  |  |  |
| September 30, 1997................... | 5.81 | 5.66 | 6.48 | 3.11 | 2.53 | 5.64 |

- ------------------------------------

(1) The pro forma equivalent per share information for Sealed Air stockholders
    was calculated using the exchange ratio of one share of New Sealed Air
    common stock for each share of Sealed Air common stock. The pro forma
    equivalent per share information for Grace stockholders was calculated using
    the exchange ratio in the spin-off (one share of New Grace common stock for
    each share of Grace common stock) and the estimated exchange ratios in the
    recapitalization ( .55 shares of New Sealed Air common stock and .48 shares
    of New Sealed Air convertible preferred stock for each share of Grace common
    stock).

(2) The pro forma earnings per share, dividends per share and book value per
    share were calculated using only the number of common shares expected to be
    outstanding immediately after the merger, assuming that none of the
    convertible preferred stock was converted.

(3) As discussed in Note G to the "New Sealed Air Unaudited Pro Forma Condensed
    Consolidated Financial Data" on page 59, the conversion of New Sealed Air
    convertible preferred stock into New Sealed Air common stock would have an
    antidilutive effect (i.e., would increase average per common share).
    Accordingly, the table above presents only basic pro forma earnings per
    share, which were calculated by subtracting the dividends on the convertible
    preferred stock from net earnings and dividing this amount by the number of
    common shares expected to be outstanding immediately after the merger,
    assuming that none of the convertible preferred stock was converted.

    If earnings per share were calculated assuming that all the convertible
    preferred stock had been converted, the unaudited earnings per share data in
    the table above would instead be as follows:

</TABLE>

<TABLE>
<CAPTION>

|  | Pro Forma Equivalent Per Share (assuming conversion) | |
|  | Sealed Air | Grace - Total |
| <S> | <C> | <C> |
| Earnings per share from continuing operations: |  |  |
| Year ended December 31, 1996........................ | $0.76 | $1.95 |
| Nine months ended September 30, 1997................ | 1.05 | 2.35 |

(4) The historical Grace dividends per share were paid on Grace common stock.
    The pro forma dividends per share are the annual dividends of $2.00 to be
    paid on New Sealed Air convertible preferred stock.

COMPARATIVE PER SHARE MARKET PRICE AND DIVIDEND INFORMATION

Sealed Air common stock and Grace common stock are listed on the New York Stock Exchange. The Sealed Air ticker symbol is SEE, and the Grace ticker symbol is GRA.

The following table sets forth the high and low sale prices for a share of Sealed Air common stock and Grace common stock and the dividends declared on such stock. The prices are as reported on the New York Stock Exchange Composite Transaction Tape and are based on published financial sources.

|  | Grace Common Stock | | | Sealed Air Common Stock (1) | |
|  | Market Price(2) | | Cash Dividends Declared | Market Price(3) | |
|  | High | Low |  | High | Low |
| 1995 |  |  |  |  |  |
| First Quarter | $55 1/4 | $38 1/4 | $0.35 | $22 3/4 | $17 15/16 |
| Second Quarter | 65 1/4 | 51 | 0.35 | 22 7/8 | 20 1/8 |
| Third Quarter | 71 5/8 | 61 | 0.35 | 28 1/4 | 22 1/8 |
| Fourth Quarter | 66 7/8 | 53 | 0.125 | 30 3/4 | 24 1/4 |
| 1996 |  |  |  |  |  |
| First Quarter | $81 3/4 | $53 5/8 | $0.125 | $35 1/4 | $26 |
| Second Quarter | 83 | 70 | 0.125 | 38 1/4 | 32 3/8 |
| Third Quarter | 76 1/2 | 60 1/2 | 0.125 | 39 | 30 1/8 |
| Fourth Quarter | 56 3/4 | 45 5/8 | 0.125 | 44 1/8 | 37 |
| 1997 |  |  |  |  |  |
| First Quarter | $57 1/2 | $46 1/2 | $0.125 | $48 | $39 3/4 |
| Second Quarter | 60 1/8 | 44 3/8 | 0.145 | 49 5/8 | 41 1/4 |
| Third Quarter | 74 | 54 7/8 | 0.145 | 55 3/8 | 45 15/16 |
| Fourth Quarter | 81 1/8 | 63 1/2 | 0.145 | 63 | 49 3/4 |
| 1998 |  |  |  |  |  |
| First Quarter (through February 12) | 80 5/8 | 70 5/8 | -- | 64 1/2 | 55 3/16 |

---------------------

(1) Sealed Air paid no cash dividends during the periods presented.

(2) On September 28, 1996, W. R. Grace & Co., a New York corporation subsequently renamed Fresenius Medical Care Holdings, Inc. ("Grace New York"), spun off Grace (including its packaging and specialty chemicals businesses) to its stockholders as part of a reorganization. The spun-off company retained the name "W. R. Grace & Co." The historical share prices listed above have not been adjusted to account for such reorganization and, for periods prior to such spin-off, are the share prices of Grace New York.

(3) Adjusted for two-for-one stock split which occurred on September 29, 1995.

On August 13, 1997, the last full trading day before the public announcement of the proposed merger, the closing prices on the New York Stock Exchange Composite Transaction Tape were $47 5/8 per share of Sealed Air common stock and $66 1/2 per share of Grace common stock. On February 12, 1998, the most recent practicable date before the printing of this Joint Proxy Statement/Prospectus, the closing prices on the New York Stock Exchange Composite Transaction Tape were $61(1)/(16) per share of Sealed Air common stock and $77(7)/(8) per share of Grace common stock. Stockholders are urged to obtain current market quotations prior to making any decision with respect to the reorganization and merger.

Sealed Air does not pay dividends on its common stock, and New Sealed Air is not expected to do so. Although Grace has paid quarterly cash dividends on its common stock, New Grace is not expected to do so. However, after the merger, the Board of either company may change its policy based on business conditions, the company's financial condition, its earnings and other factors. Holders of New Sealed Air convertible preferred stock will receive quarterly cash dividends of $0.50 per share, as declared by the Board of New Sealed Air.

CERTAIN RISK FACTORS

In addition to the other information included in this Joint Proxy Statement/Prospectus, you should carefully consider the following risk factors in determining whether to vote in favor of the reorganization, merger and related proposals. Grace stockholders should also carefully read "Certain Risk Factors" in the New Grace Information Statement.

We also caution you that this Joint Proxy Statement/Prospectus contains forward-looking statements, which include all statements regarding Grace's, Sealed Air's, New Sealed Air's and New Grace's expected financial position, results of operations, cash flows, dividends, financing plans, business strategies, operating efficiencies or synergies, budgets, capital and other expenditures, competitive positions, growth opportunities for existing products, benefits from new technology, plans and objectives of management, and markets for stock. Although Sealed Air and Grace believe their expectations reflected in such forward-looking statements are based on reasonable

assumptions, such expectations may not prove to be correct. Important factors
that could cause actual results to differ materially from the expectations
reflected in our forward-looking statements include those set forth below, as
well as general economic, business and market conditions, customer acceptance of
new products, efficacy of new technology, changes in U.S. and foreign laws and
regulations, costs or difficulties relating to the reorganization, the merger
and related transactions and increased competitive and/or customer pressures.

                    Potential Difficulties in Combining the Operations of the
               Companies

               Sealed Air and Grace Packaging have previously operated
separately. New Sealed Air may not be able to integrate the operations of Sealed
Air and Grace Packaging without a loss of key employees, customers or suppliers,
loss of revenues, increases in operating or other costs or other difficulties.
In addition, New Sealed Air may not be able to realize the operating
efficiencies and other benefits that are sought from the merger. See "The
Reorganization and Merger--Sealed Air's Reasons for the Merger; Recommendation
of the Sealed Air Board" on page 29.

                    Different Factors Affecting New Sealed Air's Business

               New Sealed Air's range of products, geographic scope of
operations, customers, competitors and suppliers will differ from those of
Sealed Air, Grace and Grace Packaging. As a result, the results of operations
and prospects for New Sealed Air, as well as its stock price, may be affected by
factors that are different from those that have affected either Sealed Air or
Grace in the past.

                    Restrictions on New Sealed Air and New Grace to Protect
               Tax-free Treatment

               To protect the tax-free treatment of the reorganization and
merger under U.S. federal income tax laws, Sealed Air and Grace have agreed to
certain restrictions on New Sealed Air. For two years after the merger:

o    New Sealed Air and its affiliates may not repurchase 20% or more of New
     Sealed Air's equity securities (subject to certain additional
     limitations).

o    New Sealed Air and its affiliates may not issue or sell equity securities
     of New Sealed Air or Grace Packaging, and they may not solicit, support or
     participate in any tender offer for New Sealed Air equity securities, or
     approve or permit any business combination or other transaction that
     (alone or together with the merger) will result in one or more persons
     obtaining a 50% or greater interest in New Sealed Air.

o    New Sealed Air must continue to operate Grace Packaging's business and may
     not sell or otherwise dispose of more than 60% of Grace Packaging's assets
     except in the ordinary course of business.

o    The subsidiaries engaged in Grace Packaging's business may not voluntarily
     dissolve, liquidate, merge, consolidate or reorganize, subject to certain
     exceptions.

New Grace will be subject to similar restrictions.

               These restrictions may limit the ability of New Sealed Air and
New Grace to engage in certain business transactions that otherwise might be
advantageous for the companies and their stockholders, and could deter potential
acquisitions of control of New Grace or New Sealed Air. The restrictions are
designed to protect the tax-free treatment of the reorganization for U.S.
federal income tax purposes. Accordingly, New Sealed Air or New Grace may engage
in a restricted transaction so long as it (i) obtains a ruling from the Internal
Revenue Service ("IRS") or an opinion of tax counsel that the transaction will
not adversely affect the tax-free treatment of the reorganization and (ii)
indemnifies the other party against adverse tax consequences arising from the
transaction. See "Certain United States Federal Income Tax Consequences"
beginning on page 34 and "Relationship Between New Sealed Air and New Grace
After the Reorganization and Merger--Tax Sharing Agreement" beginning on page
78, 78.

                    Liabilities of New Grace, Fraudulent Transfer and Related
               Considerations

               Grace's primary U.S. operating subsidiary has significant
liabilities relating to previously sold asbestos-containing products. As a
result, Grace and the subsidiary are currently defendants in numerous
asbestos-related lawsuits and are likely to be named as defendants in additional
lawsuits in the future. At September 30, 1997, the liability recorded on Grace's
books with respect to the defense and disposition of asbestos-related lawsuits
and claims was $910.5 million, including a current liability of $135.0 million.
In addition, at September 30, 1997, Grace had recorded a receivable of $295.4
million, reflecting amounts that Grace believes will ultimately be recovered
from insurance carriers with respect to its asbestos-related lawsuits and
claims. Grace and its subsidiaries also have substantial environmental and other
liabilities.

               After the merger and related transactions, New Grace will be
responsible for all of the asbestos-related liabilities, substantially all of
the environmental liabilities (other than certain liabilities relating to Grace
Packaging) and other liabilities of Grace and its subsidiaries that are
unrelated to Grace Packaging. Based on currently available information and
advice provided by their respective financial, legal and other advisors, Sealed
Air and Grace believe that New Grace will be able to satisfy its liabilities as

they become due. Nevertheless, claimants might seek to hold New Sealed Air liable for obligations of New Grace. New Grace has agreed to indemnify New Sealed Air for liabilities and costs that New Sealed Air may incur relating to New Grace's liabilities; however, New Grace may not be able to fulfill its indemnity obligations to New Sealed Air.

Claimants may also bring suit seeking recovery from New Sealed Air or its subsidiaries by claiming that the transfers of assets and liabilities in connection with the reorganization of Grace, including the separation of Grace's packaging and specialty chemicals businesses and the cash transfer to and spin-off of New Grace, were "fraudulent transfers". A transfer would be a fraudulent transfer if the transferor received less than reasonably equivalent value and the transferor was insolvent at the time of the transfer, was rendered insolvent by the transfer or was left with unreasonably small capital to engage in its business. A transfer may also be a fraudulent transfer if it was made to hinder, delay or defraud creditors. If any transfers in connection with the reorganization of Grace are found to be fraudulent transfers, the recipient (including New Sealed Air and its subsidiaries) might be required to return the property to the transferor. Similar consequences would result if a court were to find that any transfers were made in violation of laws restricting dividends.

Sealed Air, New Grace and their subsidiaries are adequately capitalized and will be adequately capitalized after the reorganization, and that none of the transfers contemplated to occur in the reorganization is a fraudulent transfer. Sealed Air and Grace also believe that the reorganization of Grace and the spin-off of New Grace will comply with applicable dividend laws. However, a court applying the relevant legal standards may not reach the same conclusions.

More information regarding Grace's asbestos and other liabilities is included in Grace's filings with the Securities and Exchange Commission ("SEC"). See "Where You Can Find More Information" on page 100 and the New Grace Information Statement.

No Prior Market for New Sealed Air Stock

There is no current public trading market for New Sealed Air common and convertible preferred stock. New Sealed Air will apply to list its common and convertible preferred stock on the New York Stock Exchange, and we expect "when-issued" trading in New Sealed Air common and convertible preferred stock to develop before the merger is consummated. This means that shares can be traded before the share certificates are issued, and before the actual numbers of shares to be issued in the reorganization and merger are determined.

We cannot predict the prices at which New Sealed Air common and convertible preferred stock may trade, either before the merger on a "when-issued" basis or after the merger. Such trading prices will be determined by the marketplace and may be influenced by many factors, including the depth and liquidity of the market for such shares, investor perceptions of New Sealed Air and the industries in which it participates, New Sealed Air's dividend policy and general economic and market conditions. Until an orderly market develops, the trading prices for these shares may fluctuate significantly.

The New Sealed Air common and convertible preferred stock will be freely transferable, except for shares received by Sealed Air or Grace "affiliates", as that term is defined under the Securities Act of 1933, as amended (the "Securities Act"). See "The Reorganization and Merger--Federal Securities Laws Consequences; Resale Restrictions" on page 37.

Shares Issued to Stockholders Will Not Be Adjusted for Changes in the Price of Sealed Air or Grace Stock

Stockholders of Sealed Air and Grace will receive shares initially representing 37% and 63%, respectively, of New Sealed Air, measured on an as-converted basis. These percentages will not change even if the price of Sealed Air common stock or Grace common stock changes relative to the price of the other company's common stock. On the other hand, Sealed Air or Grace may terminate the merger agreement if the other company's stock price drops below certain levels before the merger. See "The Distribution and Merger Agreements--Termination of the Merger Agreement and Distribution Agreement" on page 75.

U.S. Federal Income Tax Consequences if Reorganization and Merger Do Not Qualify for Tax-Free Treatment

Sealed Air and Grace believe that, for U.S. federal income tax purposes, the reorganization and merger will be tax-free to Sealed Air, Grace and their stockholders (except for cash received by Grace stockholders instead of fractional shares). Sealed Air and Grace must receive opinions of tax counsel to that effect before the merger is completed. Despite such opinions, the transactions may not qualify for tax-free treatment at the time of the merger or thereafter.

In general, if the reorganization of Grace (including the spin-off of New Grace) is not tax-free, New Sealed Air would recognize a taxable gain equal to (i) the amount by which the fair market value of the New Grace common stock exceeds Grace's tax basis in the New Grace common stock and (ii) the amount by which the fair market value of Grace Packaging exceeds the tax basis of a subsidiary of Grace in Grace Packaging. New Grace has agreed to indemnify New Sealed Air for any adverse corporate-level income tax consequences resulting from the failure of the reorganization to qualify for tax-free treatment, although New Sealed Air would be liable to the extent that the failure is attributable to actions of New Sealed Air.

In addition, if the spin-off of New Grace is not tax-free, and if

(as expected) New Sealed Air's earnings and profits at the end of 1998 exceed the fair market value of the New Grace common stock, each Grace stockholder would be treated as having received a taxable dividend equal to the fair market value of the New Grace common stock that the stockholder receives.

An acquisition of New Grace or New Sealed Air after the reorganization and merger could give rise to the corporate-level taxes described above. Such an acquisition of New Grace or New Sealed Air, if taxable, could also cause the spin-off to fail to qualify for tax-free status and, if so, would give rise to the corporate-level and stockholder-level taxes described above.

In general, if the merger between Sealed Air and Grace Packaging is not tax-free, each Sealed Air stockholder would be treated as having sold its Sealed Air shares at a price equal to the fair market value of the New Sealed Air common stock that it receives. This would require the stockholder to recognize a taxable gain or loss based on the difference between the fair market value of the stockholder's New Sealed Air common stock and the tax basis of the stockholder's Sealed Air common stock.

See "The Reorganization and Merger--Certain United States Federal Income Tax Consequences" for a more complete discussion of the tax aspects of the reorganization and merger.

Year 2000 Issues

Like most other companies, New Sealed Air will have to ensure that its information systems are able to recognize and process date-sensitive information properly as the year 2000 approaches. Systems that do not properly recognize and process this information could generate erroneous data or even fail.

Sealed Air and Grace Packaging have conducted comprehensive reviews of their key computer systems and have identified a number of systems that could be affected by the "year 2000" issue. Both companies have undertaken steps to ensure that these systems will function properly, including installing vendor-supplied upgrades or new software or modifying existing software. Sealed Air and Grace Packaging believe that these steps will be substantially completed by the end of 1998 and that the year 2000 issue will not pose significant problems for New Sealed Air. Nevertheless, if these steps are not completed successfully in a timely manner, New Sealed Air's operations and financial performance could be adversely affected. Also, both companies are contacting key suppliers, banks, customers and other unaffiliated companies that will be important to New Sealed Air to assess their year 2000 compliance programs, since New Sealed Air could be adversely affected by the failure of these unaffiliated companies to address adequately the year 2000 issue.

New Sealed Air Will Guarantee Certain Outstanding Public Debt

Grace currently is the guarantor of certain debt, including approximately $644 million in outstanding public debt of a subsidiary that will be a subsidiary of New Grace after the spin-off. Although the subsidiary intends to repurchase this public debt, some or all of it may remain outstanding after the merger. Because Grace will become New Sealed Air, New Sealed Air will remain the guarantor of any such debt remaining outstanding. As a result, a holder of public debt may seek to recover from New Sealed Air if New Grace's subsidiary fails to pay this public debt, and New Sealed Air may have to make payments under its guarantee. New Grace will indemnify New Sealed Air against any liability arising from the guarantee. In addition, if more than $50 million of this public debt remains outstanding after the merger, New Sealed Air will receive a letter of credit (in the amount of the public debt in excess of $50 million) to cover any payments it must make under its guarantee, up to the amount of the letter of credit. Sealed Air and Grace believe that New Grace will be able to meet its public debt obligations and, if it fails to do so, that the letter of credit will prove sufficient to protect New Sealed Air. Nevertheless, New Sealed Air may have to make payments for amounts not covered by the letter of credit.

THE REORGANIZATION AND MERGER

The discussion in this Joint Proxy Statement/Prospectus of the reorganization and merger and the principal terms of the distribution agreement (the "Distribution Agreement"), merger agreement (the "Merger Agreement") and certain related agreements (the Distribution and Merger Agreements and related agreements, collectively, the "Transaction Agreements") is subject to, and qualified in its entirety by reference to, the Merger Agreement and the Distribution Agreement, copies of which are attached to this Joint Proxy Statement/ Prospectus as Annexes A and B, respectively, and are incorporated herein by reference.

Special Meetings to Vote on the Proposed Transactions

Sealed Air and Grace are furnishing this Joint Proxy Statement/Prospectus to their stockholders in connection with the solicitation of proxies by Sealed Air for use at a special meeting of its stockholders and the solicitation of proxies by Grace for use at a special meeting of its stockholders.

The Sealed Air special meeting will be held at Saddle Brook Marriott, Garden State Parkway at I-80, Saddle Brook, New Jersey 07633, on March 23, 1998, at 11:00 a.m. At the Sealed Air special meeting, Sealed Air stockholders will be asked to vote upon a proposal to approve and adopt the Merger Agreement.

The Grace special meeting will be held at Grace's offices, located at One Town Center Road, Boca Raton, Florida 33486, on March 20, 1998, at 10:00 a.m. At the Grace special meeting, Grace stockholders will be asked to vote upon:

    (1) a proposal to approve and adopt the Merger Agreement (which will constitute approval of the reorganization, merger and other transactions contemplated thereby, including the spin-off of New Grace, certain charter amendments, the recapitalization of Grace common stock and the issuance of New Sealed Air common stock to Sealed Air stockholders in the merger); and

    (2) a proposal to repeal certain provisions contained in Grace's existing charter, which are described under "The New Sealed Air Charter--Proposal to Repeal Supermajority Provisions of the Grace Charter" on page 37.

Structure of the Transactions

    Stockholder approval is needed to enable Sealed Air and Grace to proceed with the proposed merger of Sealed Air and Grace Packaging, which will require a series of related transactions:

o    Separation. Grace's worldwide packaging business will be separated from Grace's specialty chemicals businesses. Grace and a packaging subsidiary will then borrow $1.2 billion, subject to adjustment, and transfer these funds to the specialty chemicals group of subsidiaries (the "Cash Transfer").

o    Spin-off. Grace will spin off its specialty chemicals businesses to the Grace stockholders in the form of a new public company that will be named "W.R. Grace & Co." (the "Spin-off").

o    Recapitalization. The Grace common stock will be recapitalized (the "Recapitalization"), with Grace stockholders receiving a total of 40.895 million newly issued shares of common stock, subject to adjustment, and 36 million newly issued shares of convertible preferred stock, each on a pro rata basis based on the number of shares of Grace common stock owned as of the record date set by the Grace Board.

o    Merger. A wholly owned subsidiary of Grace will then merge with Sealed Air (the "Merger"), and Grace will change its name to "Sealed Air Corporation" and amend its charter to be substantially identical to Sealed Air's charter. In connection with the Merger, Sealed Air stockholders will receive one share of New Sealed Air common stock for each share of Sealed Air common stock owned immediately prior to the Merger.

    The Merger will become effective when a certificate of merger is filed with the Secretary of State of Delaware or at such other time as will be specified in the certificate of merger (the "Effective Time"). The Effective Time will occur as soon as practicable after the last of the conditions in the Merger Agreement has been satisfied or waived. We expect the Merger to occur promptly after the Special Meetings, late in the first quarter of 1998.

    Following the Merger:

o    Sealed Air's stockholders will initially own shares of common stock representing 37% of New Sealed Air, on an as-converted basis; and

o    Grace's stockholders will initially own 100% of the outstanding common stock of New Grace and shares of common stock and convertible preferred stock representing 63% of New Sealed Air, on an as-converted basis.

    For ease of reference, we will refer to the Cash Transfer, Spin-off and Recapitalization and other transactions contemplated in the reorganization of Grace (other than the Merger) as the "Reorganization". For a more complete description and understanding of the principal terms and conditions of the Reorganization and Merger, please refer to "The Distribution and Merger Agreements" beginning on page 68 and the copies of the agreements attached as Annexes A and B.

Background

    In pursuing their strategies for enhancing stockholder value, Sealed Air and Grace each regularly consider opportunities for acquisitions, joint ventures and other strategic alliances.

    Sealed Air and Grace initially discussed the possibility of a combination of Sealed Air and Grace Packaging from mid-1994 until early 1995. These discussions were discontinued in early 1995, without resulting in any agreement.

    Beginning in early 1997, Grace and Sealed Air began to pursue discussions about a possible combination of Sealed Air and Grace Packaging. After retaining legal and financial advisors, Sealed Air and Grace executed a confidentiality agreement and began exchanging certain information on or about May 12, 1997. The parties agreed that, to avoid market speculation, business disruption and similar market events, it was essential to maintain the confidentiality of the discussions and to limit the participation in these discussions to those executives and advisors who were necessary to complete the negotiations.

    In May and early June 1997, Sealed Air, Grace and their respective legal and financial advisors held various conference calls and

meetings to discuss a possible transaction that would involve a spin-off of Grace's specialty chemicals businesses to its stockholders and a merger of Sealed Air and Grace Packaging. In early June 1997, Sealed Air, through its financial advisor, proposed that Sealed Air stockholders would own 40% of the combined company and Grace stockholders would own 60% of the combined company.

On June 10, 1997, Grace, through its financial advisors, responded with a proposal in which Sealed Air stockholders would own 35% of the combined company and Grace stockholders would own 65% of the combined company. Over the following weeks, Sealed Air, Grace and their respective financial and legal advisors conducted due diligence and proceeded to discuss alternative terms for a merger between Sealed Air and Grace Packaging.

By early July, the management teams of Sealed Air and Grace had reached a consensus on some of the principal terms of the transaction and certain aspects of the proposed transaction structure, including that Grace would be reorganized to separate Grace Packaging from Grace's specialty chemicals businesses; to the extent practicable, the spin-off of New Grace and the merger of Sealed Air and Grace Packaging should be tax-free to both companies and their stockholders; after the proposed merger Sealed Air stockholders would initially own common stock representing 37% of New Sealed Air and Grace stockholders would initially own common stock and convertible preferred stock representing 63% of New Sealed Air, measured on an as-converted basis; and Grace and a packaging subsidiary would borrow approximately $1.2 billion to make a cash transfer to New Grace and its subsidiaries prior to the proposed merger.

On July 10, 1997, the Sealed Air Board held a special meeting. At the meeting, Sealed Air management reviewed with the Board the status of negotiations, due diligence, potential synergies and remaining open issues, including Grace's contingent and other liabilities. Donaldson, Lufkin & Jenrette Securities Corporation ("DLJ") discussed their preliminary financial analysis of the proposed Merger with the Board. After discussion, the Board unanimously authorized the officers of Sealed Air to continue negotiations.

On July 10, 1997, the Grace Board held a regular meeting. At that meeting, Grace management presented detailed background information on the business and financial performance of Sealed Air, Grace Packaging and Grace's specialty chemicals businesses, as well as the background and proposed structure of the transactions and the status of negotiations. Credit Suisse First Boston Corporation ("Credit Suisse First Boston") and Merrill Lynch & Co. ("Merrill Lynch") discussed a preliminary financial analysis of the proposed reorganization and merger. In addition, Wachtell, Lipton, Rosen & Katz reviewed various legal issues with the Board. After discussion, the Board unanimously authorized management to continue negotiations.

On July 24, 1997, the principal terms and conditions of the proposed transactions negotiated as of that date were presented to the Sealed Air Board by its management and financial and legal advisors. The Board authorized management to proceed to negotiate definitive agreements for the proposed transactions.

Following their respective board meetings, Sealed Air and Grace, advised by their respective legal and financial advisors, negotiated the terms and conditions of the Transaction Agreements. Among the subjects of negotiation were the allocation of Grace's assets and liabilities between Grace Packaging and New Grace, arrangements for sharing various transaction expenses (including the costs of separating Grace Packaging from New Grace, certain severance costs and the expenses associated with retiring Grace's outstanding debt), the allocation of employees between Grace Packaging and New Grace and the responsibilities for benefits for employees of Grace Packaging.

On August 14, 1997, the Sealed Air Board held a special meeting. At that meeting, Sealed Air's management reviewed the status of negotiations (including the resolution of previously open issues), the principal terms of the proposed transactions and results of due diligence. Davis Polk & Wardwell reviewed the Merger Agreement, the Distribution Agreement and the other Transaction Agreements. KPMG Peat Marwick LLP then reviewed certain tax aspects of the transaction and the terms of the tax sharing arrangements between New Sealed Air and New Grace. DLJ made a presentation that included a discussion of the valuation methodologies and analyses used in arriving at DLJ's fairness opinion (the "DLJ Opinion"). DLJ gave its opinion to the Sealed Air Board that, as of such date, and based upon and subject to the assumptions, limitations and qualifications in such opinion, the exchange ratio pursuant to which Sealed Air's stockholders would receive one share of New Sealed Air common stock for each share of Sealed Air common stock (the "Exchange Ratio"), was fair to Sealed Air stockholders from a financial point of view. See "Role of Financial Advisors--Opinion of Sealed Air Financial Advisor" beginning on page 39. After concluding that the Merger and related transactions were fair and in the best interests of Sealed Air and its stockholders, the Sealed Air Board voted to approve the Merger, to authorize the execution of the Merger Agreement and to recommend that Sealed Air's stockholders approve the Merger Agreement.

On August 14, 1997, the Grace Board held a special meeting. At that meeting, Grace's management reviewed the status of negotiations (including the resolution of previously open issues), the principal terms of the proposed transactions and results of due diligence, and Wachtell, Lipton, Rosen & Katz reviewed the Merger Agreement, the Distribution Agreement and the other Transaction Agreements. Credit Suisse First Boston and Merrill Lynch made a presentation that included a discussion of their valuation methodologies and analyses used in arriving at their fairness opinions. Credit Suisse First Boston and Merrill Lynch gave their opinions to the Grace Board that, as of such date, and based upon and subject to the assumptions, limitations and qualifications in such opinions, the terms of the Spin-off, the Recapitalization and Merger, taken as a whole, were fair, from a financial point of view, to the holders of Grace

common stock. See "Role of Financial Advisors--Opinions of Grace Financial
Advisors" beginning on page 44. After concluding that the Reorganization, Merger
and related transactions were fair and in the best interests of the Grace
stockholders, the Grace Board voted to approve the Reorganization, Merger and
related transactions, to authorize the execution of the Merger Agreement and to
recommend that Grace's stockholders approve the Reorganization, Merger and
related transactions.

          Shortly after the Board meetings concluded, the parties executed
the Merger Agreement, and Sealed Air and Grace issued a joint press release
announcing the execution of the Merger Agreement.

          Since the commencement of discussions in early 1997, neither
Sealed Air nor Grace has considered any merger, acquisition or joint venture
opportunities with others in the packaging industry as an alternative to the
Merger.

Sealed Air's Reasons for the Merger; Recommendation of the Sealed Air Board

          The following briefly describes the material reasons, factors and
information taken into account by the Sealed Air Board in deciding to approve
the Merger and to recommend that Sealed Air stockholders approve the Merger
Agreement.

Sealed Air's Reasons for the Merger

     o    Strategic Business Opportunity. Sealed Air believes the Merger offers
          a strategic business opportunity to combine Sealed Air's strengths in
          protective and specialty packaging and its entrepreneurial management
          team, with its proven record of increasing shareholder value, with
          Grace's superior position in the food packaging industry,
          technological strengths and extensive international presence.

     o    Complementary Product Lines. Sealed Air believes that
          advantages will be gained by combining companies with
          complementary packaging products.  Sealed Air is a leading
          global manufacturer of a wide range of protective and specialty
          packaging materials and systems primarily for industrial and
          consumer products.  Grace Packaging is a leading global supplier
          of high-performance materials and systems used primarily for
          packaging food.  Sealed Air believes that the Merger offers new
          marketing and cross-selling opportunities that may expand the
          customer base for the products of both companies.

     o    Combined Marketing Networks, Distribution Channels and Technologies.
          Sealed Air believes that a consolidation of the marketing
          networks, distribution channels and technologies of the two
          companies is an important element of the Merger.  New Sealed Air
          will have operations in approximately 45 countries and a global
          marketing and distribution network.  Sealed Air believes the
          Merger will accelerate its expansion into new international
          markets and enhance distribution of the products of both
          companies through the combined marketing and distribution
          network.  Sealed Air also believes the Merger will offer
          opportunities for cross-fertilization of technologies.  The
          companies expect to share and combine technologies relating to
          films, coextrusion, food science, chemical formulations,
          systems, package design and printing.

     o    Shared Priorities. Sealed Air and Grace Packaging have many shared
          priorities. Both emphasize putting the customer first and working
          with their customers to find solutions to their packaging needs. Both
          companies also stress technological innovations to maintain market
          leadership. Each manufactures high-quality products to world-class
          standards, while maintaining a focus on improving cash flow and
          earnings.

     o    Efficiencies. Sealed Air believes the integration of the two
          companies' operations will result in certain efficiencies, including
          in the areas of purchasing, distribution, marketing, administration,
          financing and treasury.

                    Information and Factors Considered by the Sealed Air Board

          In connection with its approval of the merger and recommendation
that stockholders approve the Merger Agreement, the Sealed Air Board considered
the following factors:

     (i) the reasons described above under "Sealed Air's Reasons for the
Merger";

     (ii) the terms and conditions of the proposed transactions and related
agreements, including, among other things, the proportion of New Sealed Air to
be owned by Sealed Air's stockholders, the requirement for approval by Sealed
Air's stockholders, the other conditions to consummation of the Merger and the
circumstances under which the agreements could be terminated;

     (iii) the tax treatment of the Reorganization and Merger for U.S. federal
income tax purposes;

     (iv) the accounting treatment of the Merger, including the goodwill that
will be recorded on the financial statements of New Sealed Air;

     (v) the business rationale for the transactions, including the strategic
fit between Sealed Air and Grace Packaging, the belief that the combination of

Sealed Air and Grace Packaging has the potential to enhance stockholder value through additional opportunities for global expansion and operating efficiencies (although such opportunities may not be achieved);

(vi) the anticipated operating and financial condition of New Sealed Air;

(vii) the potential for appreciation in the value of New Sealed Air, and the ability of Sealed Air's stockholders to have a significant participation in any such appreciation through their initial ownership of approximately 37% of New Sealed Air (measured on an as-converted basis);

(viii) the challenges and potential costs of combining the businesses of two major companies of this size and the attendant risks of not achieving the expected operating efficiencies or improvements in earnings, and of diverting management focus and resources from other strategic opportunities and from operational matters for an extended period of time;

(ix) the risk that the Merger will not be consummated;

(x) the presentations by Sealed Air's management and its financial, legal, accounting and other advisors regarding the Reorganization and Merger;

(xi) the opinion of DLJ that, as of August 14, 1997, the Exchange Ratio was fair to the stockholders of Sealed Air from a financial point of view (a copy of the DLJ Opinion, setting forth the assumptions, limitations and qualifications to such opinion, is attached as Annex C, and the DLJ Opinion is described under "Role of Financial Advisors--Opinion of Sealed Air Financial Advisor" beginning on page 39);

(xii) the familiarity of the Board with the business, properties and prospects of Sealed Air, including the opportunities and alternatives available to Sealed Air if the Merger were not to be undertaken;

(xiii) information obtained during the due diligence process concerning the business, properties and prospects of Grace Packaging;

(xiv) information obtained during the due diligence process concerning the business, properties and prospects of New Grace, including an analysis of its liabilities (including existing asbestos, environmental and other significant liabilities) and New Grace's ability to satisfy those liabilities;

(xv) the interests of the officers and directors of Sealed Air and Grace in the Reorganization and Merger, including the matters described under "Interests of Certain Persons" beginning on page 82, and the impact of the Merger on the customers and employees of each company; and

(xvi) the various factors enumerated under "Certain Risk Factors" beginning on page 22.

The foregoing discussion of the information and factors considered and given weight by the Sealed Air Board is not intended to be exhaustive but includes the material factors considered by the Sealed Air Board. In view of the wide variety of factors considered in connection with its evaluation of the Merger and the complexity of these matters, the Sealed Air Board did not find it practicable to and did not attempt to quantify, rank or otherwise assign relative weights to these factors. The Sealed Air Board relied on the experience and expertise of DLJ for a quantitative analysis of the financial terms of the Merger. See "Role of Financial Advisors--Opinion of Sealed Air Financial Advisor" beginning on page 39. In addition, the Sealed Air Board did not undertake to make any specific determination as to whether any particular factor (or any aspect of any particular factor) was favorable or unfavorable to Sealed Air, but rather conducted an overall analysis of the factors described above, including thorough discussions with and questioning of Sealed Air's management and legal, financial and accounting advisors. In considering the factors described above, individual members of the Sealed Air Board may have given different weight to different factors. However, discussions among the Sealed Air Board members evidenced that factors (iv), (ix), (xii), (xiii) and (xv) were considered as part of the general mix of available information without being clearly favorable or unfavorable, factors (viii), (xiv) and (xvi) were considered uncertainties or negative factors relating to the transaction, and the other reasons and factors described above were generally considered favorable. The full Sealed Air Board considered all these factors as a whole, and overall considered the factors to be favorable to and to support its determination.

Recommendation of the Sealed Air Board

The Sealed Air Board recommends that Sealed Air's stockholders vote "FOR" the approval and adoption of the Merger Agreement.

Grace's Reasons for the Reorganization and Merger; Recommendation of the Grace Board

The following briefly describes the material reasons, factors and information taken into account by the Grace Board in deciding to approve the Reorganization and Merger and to recommend that Grace stockholders approve and adopt the Merger Agreement.

Grace's Reasons for the Reorganization and Merger

o   Enhanced Stockholder Value.  Grace believes that the combination of the Spin-off of New Grace and the Merger of Sealed Air and Grace Packaging will enhance stockholder value by providing Grace stockholders, through a transaction that will be tax-free for U.S. federal income tax purposes to both Grace and its

stockholders, with a premium valuation for Grace Packaging, the
opportunity to continue to participate in the future value of a
preeminent packaging company and a continuing ownership interest
in what will be a highly focused New Grace.

o   Opportunity to Merge Complementary Packaging Businesses.
    Grace believes the Merger offers a strategic business opportunity
    to bring together complementary product lines.  Grace Packaging
    is a leading global supplier of high-performance materials and
    systems used in packaging food and other products.  Sealed Air is
    a leading global manufacturer of a wide range of protective and
    specialty packaging materials and systems, primarily for
    industrial and consumer products.  This combination will bring
    together Grace's superior position in the food packaging
    industry, technological strengths and extensive international
    presence and Sealed Air's strengths in protective and specialty
    packaging.

o   Benefits of the Spin-off of New Grace.  After the Spin-off,
    New Grace will be a focused specialty chemicals company; its
    businesses will be catalysts and silica-based products,
    construction chemicals and specialty building materials, and
    container sealants and coatings.  Furthermore, New Grace's
    financial position will give it flexibility to invest in new
    product development, geographic expansion and strategic
    acquisitions.

Information and Factors Considered by the Grace Board

        In connection with its approval of the Reorganization and Merger
and its recommendation that Grace stockholders approve and adopt the Merger
Agreement, the Grace Board considered, among other things, the following
factors:

        (i) the reasons described above under "Grace's Reasons for the
Reorganization and Merger";

        (ii) the terms and conditions of the proposed transactions and related
agreements, including, among other things, the proportion of New Sealed Air to
be owned by Grace's stockholders, the severance plan and other benefit plans to
be afforded to Grace's employees who will become employees of New Sealed Air,
the requirement for approval by Grace stockholders, the other conditions to
consummation of the Merger and the circumstances under which the agreements
could be terminated;

        (iii) the accounting treatment of the Reorganization and Merger and related
transactions, including the goodwill that will be recorded on the financial
statements of New Sealed Air;

        (iv) the business rationales for the transactions, including the strategic
fit between Sealed Air and Grace Packaging, the belief that the combination of
Grace Packaging and Sealed Air has the potential to enhance stockholder value
through operating efficiencies as an integrated packaging company, Sealed Air's
lack of interest in combining with Grace's specialty chemicals businesses, and
the fact that the Cash Transfer would enable New Grace to reduce debt and
enhance New Grace's ability to become a highly focused specialty chemicals
company (although such operating efficiencies may not be achieved);

        (v) the anticipated operating and financial position of New Sealed Air and
New Grace;

        (vi) the potential for appreciation in the value of New Sealed Air common
stock and convertible preferred stock as a result of the Merger and the ability
of Grace's stockholders to have a significant equity participation in any such
appreciation through their initial ownership of 63% of New Sealed Air (measured
on an as-converted basis);

        (vii) the convertible preferred stock is approximately 43% of the
consideration to be received by Grace's stockholders in the Recapitalization (on
an as-converted basis) and has a higher dividend yield per share than the
historic dividend yield per share on Grace common stock and also has the benefit
of a liquidation preference;

        (viii) the potential for appreciation in the value of New Grace common stock,
which will initially be owned 100% by Grace stockholders;

        (ix) the likelihood of obtaining required regulatory approvals, the
possibility that regulatory authorities may impose conditions to the grant of
such approvals and the extent of the commitment of the parties to take actions
necessary to obtain required regulatory approvals;

        (x) the presentations of Grace's management and its advisors with respect
to the assets and liabilities of Grace;

        (xi) the presentations by representatives of Credit Suisse First Boston and
Merrill Lynch, including valuation analyses with respect to Sealed Air and Grace
and each firm's opinion that, as of the date of such opinion, the terms of the
Spin-off, the Recapitalization and the Merger, taken as a whole, were fair, from
a financial point of view, to holders of Grace common stock, such opinions and
presentations being based on certain assumptions and subject to certain
conditions (a copy of the written opinions, dated August 14, 1997, of Merrill
Lynch and Credit Suisse First Boston are attached as Annex D, and the opinions
are described under "Role of Financial Advisors--Opinions of Grace Financial
Advisors" on page 44);

(xii) the familiarity of the Grace Board with the business and properties of Grace, Grace Packaging and Grace's other businesses;

(xiii) the interests of the officers and directors of Sealed Air and Grace in the Reorganization and Merger, including the matters described under "Interests of Certain Persons" beginning on page 82, and the impact of the Reorganization and Merger on the customers and employees of each company; and

(xiv) the various factors enumerated under "Certain Risk Factors" beginning on page 22 and under "Risk Factors" in the New Grace Information Statement.

The foregoing discussion of the information and factors considered and given weight by the Grace Board is not intended to be exhaustive but includes the material factors considered by the Grace Board. In view of the wide variety of factors considered in connection with the evaluation of the Reorganization and Merger and the complexity of these matters, the Grace Board did not assign any relative or specific weights to these factors. The Grace Board relied on the experience and expertise of Merrill Lynch and Credit Suisse First Boston for quantitative analyses of the financial terms of the Reorganization and Merger. See "Role of Financial Advisors--Opinions of Grace Financial Advisors" beginning on page 44. In addition, the Grace Board did not undertake to make any specific determination as to whether any particular factor (or any aspect of any particular factor) was favorable or unfavorable to Grace, but rather conducted an overall analysis of the factors described above, including thorough discussions with and questioning of Grace's management and legal, financial and accounting advisors. In considering the factors described above, individual members of the Grace Board may have given different weight to different factors. However, the full Grace Board considered all these factors as a whole, and overall considered the factors to be favorable to and to support its determination.

Recommendation of the Grace Board

The Grace Board recommends that Grace's stockholders vote "FOR" the approval and adoption of the Merger Agreement (which will constitute approval of the Reorganization, Merger and other transactions contemplated thereby, including the Spin-off), certain amendments to its charter, the Recapitalization and the issuance of shares in the Merger).

Accounting Treatment and Considerations

The Merger will be accounted for under the purchase method of accounting, with Grace treated as the acquirer. As a result, New Sealed Air will record the assets and liabilities of Sealed Air at their estimated fair values and will record as goodwill the excess of the purchase price (i.e., the market capitalization of Sealed Air, based on an average trading price for a period before and after the announcement of the Merger, plus certain Merger-related costs) over such estimated fair values. The operating results of Sealed Air will be combined with the results of Grace Packaging from the date of the Merger. As a result, New Sealed Air's earnings for 1998 will not include Sealed Air's 1998 earnings prior to the Merger. See "New Sealed Air Unaudited Pro Forma Condensed Consolidated Financial Data" beginning on page 59 for a description of the adjustments expected to be recorded to the financial statements of New Sealed Air.

As required by generally accepted accounting principles, New Sealed Air will not initially report diluted earnings per share (which are calculated by treating the New Sealed Air convertible preferred stock as the common stock into which it is convertible and eliminating the preferred stock dividend), because such treatment would be antidilutive to earnings per common share (i.e., would increase earnings per common share). New Sealed Air will initially report only basic earnings per share, calculated by subtracting the dividends on the convertible preferred stock from net earnings, and dividing this amount by the weighted average number of outstanding shares of common stock (not including the shares issuable upon convertible preferred stock). Generally accepted accounting principles will permit the reporting of diluted earnings per share when treating the convertible preferred stock as the common stock into which it is convertible would have a dilutive effect on earnings per share. In addition, because the convertible preferred stock is subject to mandatory redemption after 20 years, it will be recorded in New Sealed Air's balance sheet as an item between debt and stockholders' equity.

The "Unaudited Comparative Per Share Data" on page 20 and the "New Sealed Air Unaudited Pro Forma Condensed Consolidated Financial Data" on page 59 show the dilutive effect on earnings per common share of the convertible preferred stock on a pro forma basis for 1996 and part of 1997.

Certain United States Federal Income Tax Consequences

Tax Opinions. As conditions (that may not be waived) to the Reorganization and Merger (i) Grace must receive an opinion of Wachtell, Lipton, Rosen & Katz, special counsel to Grace, to the effect that the transfers in the U.S. of Grace's packaging and specialty chemicals businesses to separate groups of subsidiaries, the distribution of the packaging group of subsidiaries to Grace, the Spin-off and the Recapitalization will be tax free to Grace and its stockholders (except to the extent that cash is paid instead of fractional shares) under the Internal Revenue Code of 1986, as amended (the "Code"), and (ii) Sealed Air must receive an opinion of Davis Polk & Wardwell, special counsel to Sealed Air, to the effect that the Merger will be tax-free to Sealed Air and its stockholders under the Code.

In rendering these opinions, Wachtell, Lipton, Rosen & Katz and Davis Polk & Wardwell will rely upon representations contained in letters from Sealed Air and Grace delivered for purposes of the opinions. The opinions will also be based on the assumption that the Reorganization and Merger will be

consummated in accordance with the provisions of the Transaction Agreements.

Certain Consequences of the Spin-off. Assuming that the transfers of Grace's packaging and specialty chemicals businesses to separate groups of subsidiaries, the distribution of the packaging group of subsidiaries to Grace and the Spin-off each qualify for tax-free treatment under the Code:

(a) No gain or loss will be recognized by Grace, New Sealed Air or New Grace as a result of the transfers in the U.S. of Grace's packaging and specialty chemicals businesses to separate groups of subsidiaries, the distribution of the packaging group of subsidiaries to Grace and the Spin-off.

(b) Except as described in (c) below, Grace stockholders will not recognize any income, gain or loss as a result of the Spin-off.

(c) Cash received by a Grace stockholder instead of a fractional share of New Grace common stock will be treated as received in exchange for such fractional share and the holder will recognize gain or loss for federal income tax purposes measured by the difference between the amount of cash received and the holder's basis in the fractional share. Such gain or loss will be capital gain or loss to the holder, provided that the Grace common stock to which the fractional share pertains is held as a capital asset by such stockholder at the time of the Spin-off.

(d) A Grace stockholder's holding period for the New Grace common stock received in the Spin-off will include the holding period for the Grace common stock with respect to which he or she receives shares in the Spin-off, provided that the Grace common stock is held as a capital asset by such stockholder as of the time of the Spin-off.

(e) The earnings and profits of Grace will be allocated between New Sealed Air and New Grace.

Current U.S. Treasury regulations require each Grace stockholder who receives New Grace common stock in the Spin-off to attach to his or her federal income tax return for the year in which the Spin-off occurs a detailed statement setting forth such data as may be appropriate in order to show the applicability of Section 355 of the Code to the Spin-off. New Grace will provide the appropriate information to Grace's stockholders after the Spin-off.

Certain Consequences of the Recapitalization. Assuming that the issuance of New Sealed Air common and convertible preferred stock by Grace pursuant to the Recapitalization qualifies as a tax-free transaction under the Code to Grace and its stockholders (except for the cash received by Grace's stockholders instead of fractional shares):

(a) No gain or loss will be recognized by Grace or New Sealed Air as a result of the issuance of New Sealed Air common and convertible preferred stock in the Recapitalization.

(b) Except as described in (c) below, no gain or loss will be recognized by Grace's stockholders upon the receipt of New Sealed Air common and convertible preferred stock.

(c) Cash received by a stockholder instead of a fractional share of New Sealed Air common or convertible preferred stock will be treated as received in exchange for such fractional share and the holder will recognize gain or loss measured by the difference between the amount of cash received and the holder's basis in the fractional share. Such gain or loss will be capital gain or loss to the holder, provided that the Grace common stock to which the fractional share pertains is held as a capital asset by such stockholder at the time of the Recapitalization.

(d) A Grace stockholder's holding period for New Sealed Air common and convertible preferred stock received in the Recapitalization will include the period during which such stockholder held the shares of Grace common stock exchanged in the Recapitalization, provided that such Grace common stock is held as a capital asset by the stockholder at the time of the Recapitalization.

(e) Under certain circumstances, Section 305(c) of the Code requires that any excess of the redemption price of preferred stock over its fair market value on the date of issuance be included in income, prior to receipt on a constant yield basis, by holders of such stock as a constructive dividend to the extent of the issuing corporation's earnings and profits. Grace believes that it is unlikely that holders of the convertible preferred stock will be required to include any portion of the redemption price of such stock in income as a constructive dividend. If, however, the fair market value of a share of the convertible preferred stock on the date of the Recapitalization is $47.50 or less, then holders will be required to include amounts in income prior to receipt, as described above in this paragraph (e), reflecting the excess of $50 over the fair market value of the convertible preferred stock on the date of the Recapitalization.

Tax Basis of Grace Stockholders in New Grace and New Sealed Air Stock. A Grace stockholder's aggregate tax basis in the shares of New Grace common stock received in the Spin-off and the shares of New Sealed Air common and convertible preferred stock received immediately thereafter in the Recapitalization will be the same as the stockholder's aggregate tax basis in the stockholder's Grace common stock. The stockholder's tax basis in each share of New Grace common stock and New Sealed Air common and convertible preferred stock will equal a percentage of such aggregate tax basis based on the relative fair market values of the stockholder's shares of New Grace common stock and New Sealed Air common and convertible preferred stock at the Effective Time. New Grace will provide the appropriate information to Grace's stockholders after the Merger.

Certain Consequences of the Merger. Assuming that the Merger constitutes a reorganization within the meaning of Section 368(a) of the Code:

(a) No gain or loss will be recognized by Sealed Air, Grace or New Sealed Air as a result of the Merger.

(b) No gain or loss will be recognized by the stockholders of Sealed Air upon their exchange of Sealed Air common stock for New Sealed Air common stock in the Merger.

(c) The aggregate adjusted tax basis of the shares of New Sealed Air common stock to be received by a stockholder of Sealed Air in the Merger will be the same as the aggregate adjusted tax basis of the shares of Sealed Air common stock surrendered in exchange therefor.

(d) The holding period for the New Sealed Air common stock received in the Merger by a Sealed Air stockholder will include the holding period for the stockholder's Sealed Air common stock, provided that such Sealed Air common stock is held as a capital asset at the Effective Time.

The foregoing discussion is intended only as a summary of the material U.S. federal income tax consequences of the Reorganization and Merger and does not purport to be a complete analysis or description of all potential tax effects of these transactions. In addition, the discussion does not address all of the tax consequences that may be relevant to particular taxpayers in light of their personal circumstances or to taxpayers subject to special treatment under the Code (for example, insurance companies, financial institutions, dealers in securities, tax-exempt organizations, foreign corporations, foreign partnerships or other foreign entities and individuals who are not citizens or residents of the U.S.).

No information is provided herein with respect to the tax consequences, if any, of the Reorganization and Merger under applicable foreign, state, local and other tax laws. The foregoing discussion is based upon the provisions of the Code, applicable Treasury regulations thereunder, IRS rulings and judicial decisions in effect as of the date of this Joint Proxy Statement/Prospectus. Future legislative, administrative or judicial changes or interpretations could affect the accuracy of the statements or conclusions set forth herein. Any such change could apply retroactively and could affect the accuracy of such discussion. No rulings have been or will be sought from the IRS concerning the tax consequences of the Reorganization and Merger. Each stockholder of Grace and Sealed Air is urged to consult such stockholder's own tax advisor as to the specific tax consequences to such stockholder of the Reorganization and Merger under U.S. federal, state, local or any other applicable tax laws.

Regulatory Matters

Under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations promulgated thereunder (the "HSR Act"), the Merger may not be consummated until notifications have been given and certain information has been furnished to the Federal Trade Commission (the "FTC") and the Antitrust Division of the United States Department of Justice (the "Antitrust Division") and specified waiting period requirements have been satisfied. Sealed Air and Grace have filed the required notification and report forms under the HSR Act with the FTC and the Antitrust Division, and the applicable waiting period expired at midnight on December 18, 1997. Notwithstanding expiration of the waiting period, the FTC, the Antitrust Division and others could take action under the antitrust laws to challenge the Merger, including seeking to enjoin the consummation of the Merger, or to require a divestiture of assets of Sealed Air, Grace Packaging or New Sealed Air, before or after the Merger is completed.

Each state in which Sealed Air or Grace has operations may also review the Merger under state antitrust laws. In addition, regulatory approvals or filings will be required with the appropriate regulatory authorities in certain other countries where Sealed Air or Grace conducts business.

Sealed Air and Grace believe that they will obtain all material required regulatory approvals prior to the Special Meetings. However, it is not certain that all such approvals will be received by such time, and governmental authorities may impose unfavorable conditions for granting the required approvals.

No Appraisal Rights

Sealed Air is a Delaware corporation. Section 262 of the Delaware General Corporation Law ("Delaware Law") provides appraisal rights (sometimes referred to as "dissenters' rights") to stockholders of a Delaware corporation that is involved in a merger under certain circumstances. However, Section 262 appraisal rights are not available to stockholders of a corporation whose securities are listed on a national securities exchange and whose stockholders are not required to accept in exchange for their shares anything other than stock of another corporation listed on a national securities exchange and cash in lieu of fractional shares. Because Sealed Air common stock is traded on the New York Stock Exchange, and because Sealed Air's stockholders will receive New Sealed Air common stock in the Merger, which will also be traded on the New York Stock Exchange, stockholders of Sealed Air will not have appraisal rights with respect to the Merger.

Because Grace is not a party to the Merger (a wholly owned subsidiary of Grace will merge with Sealed Air), and because Delaware Law does not provide appraisal rights in connection with the Reorganization, Grace's stockholders will not be entitled to appraisal rights under Delaware Law in

connection with the Reorganization and Merger.

Federal Securities Laws Consequences; Resale Restrictions

All shares of New Sealed Air common and convertible preferred stock that will be distributed to stockholders of Sealed Air and Grace in the Merger and Recapitalization will be freely transferable, except for certain restrictions on "affiliates" of Sealed Air or Grace. Shares of New Sealed Air stock received by persons who are deemed to be affiliates of Sealed Air or Grace may be resold by them only in transactions permitted by the resale provisions of Rule 145 (or Rule 144 in the case of such persons who become affiliates of New Sealed Air) or as otherwise permitted under the Securities Act. Persons who may be deemed to be affiliates of Sealed Air or Grace generally include certain officers, directors and significant stockholders of Sealed Air or Grace. The Merger Agreement requires Sealed Air and Grace to use their reasonable efforts to cause each of their affiliates to execute a written agreement to the effect that such persons will not offer or sell or otherwise dispose of any of the shares of New Sealed Air stock issued to them in the Merger or Recapitalization in violation of the Securities Act or the rules and regulations promulgated by the SEC thereunder.

This Joint Proxy Statement/Prospectus does not cover resales of New Sealed Air common and convertible preferred stock to be received by the stockholders of Sealed Air and Grace in the Recapitalization and Merger, and no person is authorized to make any use of this Joint Proxy Statement/Prospectus in connection with any such resale.

THE NEW SEALED AIR CHARTER

In connection with the Merger, Sealed Air and Grace have agreed that the certificate of incorporation of New Sealed Air (the "New Sealed Air Charter") will be substantially identical to the existing certificate of incorporation of Sealed Air (the "Sealed Air Charter"), with the following differences (assuming repeal of certain "Supermajority Provisions" that are currently included in the Grace Charter, as discussed below):

(1) the par value of its common and preferred stock will be changed to $0.10 per share (from $0.01 and no par value, respectively);

(2) the total number of authorized shares of common stock will be increased to 400 million (from 125 million) and the total number of authorized shares of preferred stock will be increased to 50 million (from one million); and

(3) the provisions regarding the indemnification and exculpation of officers and directors would be substantially the same as the provisions in the Grace Charter.

The form of the proposed New Sealed Air Charter, which incorporates all of the proposed amendments, is attached as Annex E to this Joint Proxy Statement/Prospectus. Please read the section entitled "Comparison of Stockholder Rights" beginning on page 95 for a description of the rights that New Sealed Air stockholders will have under the New Sealed Air Charter and a comparison to the rights that stockholders have under the Sealed Air Charter and the Grace Charter.

Approval of the Merger Agreement by Grace stockholders will constitute approval of the New Sealed Air Charter, other than the repeal of the Supermajority Provisions discussed below. The proposal to repeal the Supermajority Provisions has been made as a separate proposal to Grace's stockholders.

Proposal to Repeal Supermajority Provisions of the Grace Charter

The Grace Charter currently contains three provisions that conflict with the proposed New Sealed Air Charter and cannot be amended or repealed without the approval of stockholders owning at least 80% of the outstanding Grace shares (the "Supermajority Provisions"):

(1) stockholders may alter, amend or repeal the Grace By-laws only if approved by stockholders with at least 80% of the voting power of the outstanding shares of Grace stock then entitled to vote;

(2) stockholder action must be taken at an annual or special meeting of stockholders, and action by written consent in lieu of a meeting is prohibited; and

(3) the Grace Board is divided into three classes with staggered, three-year terms; the election of directors need not be by written ballot; and directors may be removed by stockholders only for cause.

The existing Sealed Air Charter does not include the Supermajority Provisions, and the existing Sealed Air Board is opposed to charter provisions that may make it more difficult for stockholders to take actions. Accordingly, Sealed Air believes the Supermajority Provisions should be repealed so the New Sealed Air Charter will not include these provisions. As agreed with Sealed Air, Grace proposes and recommends that Grace stockholders repeal the Supermajority Provisions for purposes of the New Sealed Air Charter, and the Grace Board has adopted a resolution proposing the repeal of the Supermajority Provisions.

For the New Sealed Air Charter to be adopted in its entirety, the Supermajority Provisions must be repealed. The repeal of the Supermajority Provisions will require the approval of stockholders owning at least 80% of the

outstanding Grace shares. If repeal of the Supermajority Provisions is not approved by Grace stockholders but the other conditions to the Reorganization and Merger are satisfied or waived, Sealed Air and Grace intend to proceed with the Reorganization and Merger and the New Sealed Air Charter would include the Supermajority Provisions. The form of the New Sealed Air Charter attached as Annex E to this Joint Proxy Statement/Prospectus has been marked to show how it would be different if the Supermajority Provisions are not repealed.

The Grace Charter will not be amended if the Merger is not completed.

Recommendation of the Grace Board

As agreed with Sealed Air, the Grace Board recommends that Grace's stockholders vote "FOR" the amendment repealing the Supermajority Provisions.


ROLE OF FINANCIAL ADVISORS

In connection with the proposed Reorganization and Merger, Sealed Air and Grace retained financial advisors to assist the respective companies and their Boards in their evaluation of the transactions contemplated by the Transaction Agreements. In this regard, Sealed Air retained DLJ as its financial advisor, and Grace retained Credit Suisse First Boston and Merrill Lynch as its financial advisors (the "Grace Financial Advisors"). Each of Sealed Air and Grace entered into engagement agreements with its respective financial advisors providing for customary fee, expense reimbursement and indemnification terms.

The financial advisors to Sealed Air and Grace assisted in conducting the due diligence investigation of the other company and advised the relevant management and board of directors regarding the structure and terms of the Reorganization and Merger and the negotiation of the Transaction Agreements.

In deciding to approve the Reorganization and Merger, the Sealed Air and Grace Boards considered opinions from their respective financial advisors as to the fairness of the Reorganization and Merger to their respective stockholders from a financial point of view.

Opinion of Sealed Air Financial Advisor

Sealed Air asked DLJ, in its role as financial advisor to Sealed Air, to render an opinion to the Sealed Air Board as to the fairness to Sealed Air stockholders, from a financial point of view, of the Exchange Ratio, pursuant to which Sealed Air stockholders would receive one share of New Sealed Air common stock for each share of Sealed Air common stock.

On August 14, 1997, DLJ rendered its written opinion to the effect that, as of such date, based upon and subject to the assumptions, limitations and qualifications set forth in the DLJ Opinion, the Exchange Ratio was fair to Sealed Air stockholders from a financial point of view.

The full text of the DLJ Opinion is attached hereto as Annex C. The summary of the DLJ Opinion set forth in this Joint Proxy Statement/Prospectus is qualified in its entirety by reference to the full text of the opinion of DLJ. Sealed Air stockholders are urged to read the DLJ Opinion carefully and in its entirety for the procedures followed, assumptions made, other matters considered and limits of the review by DLJ in connection with such opinion.

The DLJ Opinion was prepared for the Sealed Air Board and was directed only to the fairness from a financial point of view, as of the date thereof, of the Exchange Ratio to Sealed Air stockholders. DLJ expressed no opinion in the DLJ Opinion as to the prices at which New Sealed Air's securities would actually trade at any time. The DLJ Opinion does not constitute a recommendation to any stockholder of Sealed Air as to how such holder should vote on the Merger at the Sealed Air Special Meeting.

Sealed Air selected DLJ to act as its financial advisor because of DLJ's familiarity with Sealed Air and its qualifications and expertise in providing advice to companies in the businesses in which Grace and Sealed Air are engaged, as well as its reputation as a nationally recognized investment banking firm engaged in the valuation of businesses and their securities in connection with mergers and acquisitions, negotiated underwritings, secondary distributions of listed and unlisted securities, leveraged buy-outs and valuations for corporate and other purposes. Sealed Air did not impose any restrictions or limitations upon DLJ with respect to the investigations made or the procedures followed by DLJ in rendering the DLJ Opinion.

In arriving at the DLJ Opinion, DLJ reviewed the Merger Agreement and the Distribution Agreement. DLJ also reviewed other and other information that was publicly available or furnished to DLJ by Sealed Air and Grace, including information provided during discussions with their respective managements. Included in the information provided during such discussions were certain financial analyses and projections of Grace Packaging and New Grace prepared by the management of Grace and certain financial analyses and projections of Sealed Air and New Sealed Air prepared by the management of Sealed Air. These projections were substantially similar to then publicly available estimates of research analysts with respect to the future financial performance of each company. In addition, DLJ compared certain financial data of Sealed Air and Grace Packaging, under certain assumptions, with publicly available information concerning various other companies whose securities are traded in public markets, reviewed the historical stock prices and trading volumes of Grace common stock and Sealed Air common stock, reviewed prices and

premiums paid in certain other business combinations and conducted such other
financial studies, analyses and investigations as DLJ deemed appropriate for
purposes of rendering the DLJ Opinion.

In rendering the DLJ Opinion, DLJ relied upon and assumed the
accuracy and completeness of all of the financial and other information that was
available to it from public sources, that was provided to it by Sealed Air,
Grace, their respective managements or other representatives, or that was
otherwise reviewed by DLJ. In particular, DLJ relied upon the estimates of
*management of Sealed Air of the operating efficiencies (the "Synergies") that*
might be achievable as a result of the Merger (annual increases in EBITDA
ranging from approximately $20 million to $100 million in later years) and upon
DLJ's discussions of such Synergies with the management of Grace. In supplying
information regarding possible operating efficiencies to DLJ, the managements of
Sealed Air and Grace advised DLJ that estimates regarding operating efficiencies
were necessarily based on incomplete information and subject to significant
risks and uncertainties. Accordingly, DLJ performed certain analyses assuming
that Synergies would be realized, and certain other analyses assuming that
Synergies would not be realized. With respect to the financial analyses and
projections supplied to DLJ, DLJ assumed that they were reasonably prepared on a
basis reflecting the best currently available estimates and judgments of the
managements of Sealed Air and Grace as to the future operating and financial
performance of Sealed Air, Grace Packaging and New Sealed Air. DLJ did not
assume responsibility for making any independent evaluation of the assets,
liabilities or contingent liabilities of Sealed Air, New Sealed Air, Grace or
New Grace, or for making any independent verification of the information
reviewed by DLJ. DLJ relied as to certain legal matters on advice of Grace's
special counsel and Sealed Air's special counsel, including that the
transactions contemplated under the Distribution Agreement would qualify as
tax-free transactions under the Code and that the Merger will be tax-free under
the Code to Grace, Sealed Air and their respective stockholders.

*The DLJ Opinion was necessarily based on economic, market,*
financial and other conditions as they existed on, and on the information made
available to it as of, the date of the DLJ Opinion. The DLJ Opinion states that,
although subsequent developments may affect the DLJ Opinion, DLJ does not have
any obligation to update, revise or reaffirm its opinion. DLJ did not express
any opinion regarding the financial impact of Grace's contingent liabilities on
*New Grace or New Sealed Air*, and was not requested to and did not express any
opinion in the DLJ Opinion regarding the financial impact of Grace's contingent
liabilities on New Grace and New Sealed Air.

The following is a summary of the presentation made by DLJ to the
Sealed Air Board at its August 14, 1997 meeting in connection with the DLJ
Opinion. For purposes of the presentation and opinion, DLJ analyzed Grace
Packaging as if the Spin-off and Cash Transfer, but not the Merger, had
occurred.

Comparable Company Analyses.  DLJ compared selected historical
and projected operating information and financial ratios for Grace Packaging
to selected historical and projected operating information, stock market data
and financial ratios for certain publicly traded specialty packaging and
specialty chemicals companies, the two market segments with which Sealed Air
is usually compared by the investment community. The specialty packaging
companies were Sealed Air, Bemis Company, Inc., Sealright Co., Inc. and Sonoco
Products Company (collectively, the "Specialty Packaging Comparable
Companies").  The specialty chemicals companies were Avery Dennison
Corporation, The Dexter Corporation, Ferro Corporation, H.B. Fuller Company,
Morton International, Inc. and Rohm and Haas Company (collectively, the
"Specialty Chemicals Comparable Companies").

*DLJ analyzed the equity value of each of the Specialty Packaging*
Comparable Companies and Specialty Chemicals Comparable Companies (using the
stock price around the time of the DLJ Opinion), measured as a multiple of
selected financial data, and the enterprise value of each of the Specialty
Packaging Comparable Companies and Specialty Chemicals Comparable Companies
(with enterprise value defined as equity value plus long-term debt plus the
liquidation value of the preferred stock, if any, minus cash and short-term
investments), measured as a multiple of selected financial data, and compared
these multiples to the implied equity value and enterprise value of Grace
Packaging, measured as a multiple of the same financial data. In this
comparison, DLJ used an implied equity value of Grace Packaging of approximately
$3.7 billion, and an implied enterprise value of approximately $5.0 billion. The
implied equity value was determined by adding the estimated value of the New
Sealed Air common stock to be issued to the Grace stockholders, based on an
estimated 40.9 million shares of New Sealed Air common stock to be issued in the
Recapitalization and an estimated stock price of $46.19 per share of New Sealed
Air common stock (the approximate market price of Sealed Air common stock on the
date of the DLJ Opinion), and the $1.8 billion liquidation Value of the New
Sealed Air convertible preferred stock. The implied enterprise value of Grace
Packaging was determined by adding the implied equity value and the $1.2 billion
estimated amount of the Cash Transfer.

For the Specialty Packaging Comparable Companies, DLJ's analysis
*of equity value as a multiple of (i) latest twelve month ("LTM") net earnings*
yielded a range of 18.0x to 25.5x with a mean of 22.5x, compared to 25.7x for
Grace Packaging, (ii) projected 1997 net earnings for the Specialty Packaging
Comparable Companies yielded a range of 17.5x to 25.3x with a mean of 22.1x,
compared to 24.5x for the implied equity value of Grace Packaging (based on 1997
earnings before interest and taxes ("EBIT"), minus projected pro forma interest
expense and taxes) and (iii) projected 1998 net earnings for the Specialty
Packaging Comparable Companies yielded a range of 15.2x to 20.1x with a mean of
17.5x, compared to 19.7x for Grace Packaging (based on projected 1998 EBIT,
minus projected pro forma interest expense and taxes). The preceding analysis of
multiples of equity value showed that the implied equity value of Grace

Packaging was within the range of multiples for the Specialty Packaging
Comparable Companies in (ii) and (iii), and above the range in (i). DLJ's
analysis of enterprise value for the Specialty Packaging Comparable Companies as
a multiple of (i) LTM revenue yielded a range of 0.8x to 2.5x with a mean of
1.5x , compared to 2.8x for Grace Packaging, (ii) LTM earnings before interest,
taxes, depreciation and amortization ("EBITDA") yielded a range of 8.3x to 11.3x
with a mean of 9.7x, compared to 12.0x for Grace Packaging and (iii) LTM EBIT
yielded a range of 12.0x to 24.4x with a mean of 16.6x, compared to 15.6x for
Grace Packaging. The analysis of multiples of enterprise value showed that the
implied enterprise value of Grace Packaging was within the range of multiples
for the Specialty Packaging Comparable Companies in (iii), and above the range
in (i) and (ii).

        For the Specialty Chemicals Comparable Companies, DLJ's analysis
of equity value as a multiple of (i) LTM net earnings yielded a range of 16.4x
to 23.5x with a mean of 19.5x, compared to 25.7x for Grace Packaging, (ii) 1997
projected net earnings yielded a range of 15.8x to 22.7x with a mean of 18.0x,
compared to 24.5x for Grace Packaging (based on projected 1997 EBIT, adjusted as
described above) and (iii) projected 1998 net earnings for the Specialty
Chemicals Comparable Companies yielded a range of 14.5x to 19.4x with a mean of
15.7x, compared to 19.7x for Grace Packaging (based on projected 1998 EBIT,
adjusted as described above). The preceding analysis of multiples of equity
value showed that the implied equity value of Grace Packaging was above the
range of multiples for the Specialty Chemicals Comparable Companies in (i), (ii)
and (iii). DLJ's analysis of enterprise value for the Specialty Chemicals
Comparable Companies as a multiple of (i) LTM revenue yielded a range of 0.7x to
1.8x with a mean of 1.3x, compared to 2.8x for Grace Packaging, (ii) LTM EBITDA
yielded a range of 6.9x to 13.5x with a mean of 9.7x, compared to 12.0x for
Grace Packaging, and (iii) LTM EBIT yielded a range of 9.9x to 18.2x with a mean
of 12.1x, compared to 15.6x for Grace Packaging. The analysis of multiples of
enterprise value showed that the implied enterprise value of Grace Packaging was
within the range of multiples for the Specialty Chemicals Comparable Companies
in (ii) and (iii), and above the range in (i).

        Comparable Acquisition Analysis. DLJ reviewed four acquisitions
involving specialty packaging companies during the period from January 1995 to
July 1997: Printpack Inc.'s acquisition of James River Corporation's flexible
packaging division, Tenneco Inc.'s acquisition of Amoco Foam Company, AEP
Industries Inc.'s acquisition of Borden Packaging and Tenneco, Inc.'s
acquisition of Mobil Oil Corporation's plastics division. In examining these
acquisitions, DLJ compared the enterprise value of the acquired company implied
by each of these transactions as a multiple of LTM revenue, LTM EBITDA and LTM
EBIT, to the $5.0 billion implied enterprise value for Grace Packaging as a
multiple of the same financial data. DLJ's analysis of enterprise value as a
multiple of (i) LTM revenue yielded a range of 0.6x to 1.1x with a mean of 0.9x,
compared to 2.8x for Grace Packaging, (ii) LTM EBITDA yielded a range of 8.3x to
13.1x with a mean of 10.1x, compared to 12.0x for Grace Packaging and (iii) LTM
EBIT yielded a range of 11.2x to 19.2x with a mean of 15.1x, compared to 15.6x
for Grace Packaging. The analysis of multiples of enterprise value showed that
the implied enterprise value of Grace Packaging was within the range of
multiples for the comparable acquisitions in (ii) and (iii), and above the range
in (i).

        Discounted Cash Flow Analysis. DLJ performed a discounted cash
flow ("DCF") analysis of Grace Packaging using projections and assumptions
provided by Grace and Sealed Air (the "Base Case"), and projections and
assumptions based on more conservative sales growth and margins provided by
Sealed Air's management (the "Conservative Case"), in each case with and without
Synergies. The DCFs for Grace Packaging were estimated using discount rates
ranging from 12.5% to 13.5%, based on estimates of the weighted average costs of
capital of Grace Packaging, and estimated terminal EBITDA multiples in 2002 for
Grace Packaging ranging from 10.0x to 12.0x. The Base Case analysis yielded
total equity values for Grace Packaging ranging from approximately $3.8 billion
to $4.9 billion (with Synergies, net of projected costs to achieve the
Synergies) and from approximately $3.3 billion to $4.3 billion (without
Synergies). The Conservative Case analysis yielded total equity values for Grace
Packaging ranging from approximately $3.5 billion to $4.5 billion (with net
Synergies, as described above) and from approximately $3.0 billion to $3.9
billion (without Synergies).

        Contribution Analysis. DLJ analyzed the relative contributions of
Sealed Air and Grace Packaging to New Sealed Air based on selected financial
data, assuming the Base Case without Synergies. In this analysis, DLJ estimated
Sealed Air's stand-alone enterprise value at approximately $2.0 billion, based
on 42.7 million shares of Sealed Air common stock then outstanding and a stock
price of $46.19 per share (the approximate market price of Sealed Air common
stock on the date of the DLJ Opinion). Based on the implied total enterprise
value of New Sealed Air ($2.0 billion estimated enterprise value for Sealed Air
plus the $5.0 billion implied enterprise value for Grace Packaging), DLJ
estimated that Sealed Air would contribute 29.2% and Grace Packaging would
contribute 70.8% of New Sealed Air's total enterprise value.

        DLJ compared Sealed Air's 29.2% contribution to New Sealed Air's
total enterprise value with the relative contribution of Sealed Air to certain
financial data for New Sealed Air, including net sales, EBITDA and EBIT for
1996, the LTM ended June 30, 1997, projected 1997 and projected 1998. In each
case, the financial data for New Sealed Air was determined by adding the
financial data for Sealed Air and Grace Packaging. This analysis indicated that
Sealed Air would contribute 31.3%, 31.6%, 32.2% and 32.0%, respectively, of New
Sealed Air's net sales for 1996, the LTM ended June 30, 1997, projected 1997 and
projected 1998, respectively. This analysis also indicated that Sealed Air would
contribute 30.9%, 30.5%, 30.6% and 29.0%, respectively, of New Sealed Air's
EBITDA for 1996, the LTM ended June 30, 1997, projected 1997 and projected 1998,
respectively. This analysis also indicated that Sealed Air would contribute
30.2%, 30.2%, 30.6% and 29.3%, respectively, of New Sealed Air's EBIT for 1996,

the LTM ended June 30, 1997, projected 1997 and projected 1998, respectively.

DLJ also compared the 37% ownership interest that Sealed Air stockholders will have in New Sealed Air with the relative contribution of Sealed Air to the estimated net earnings of New Sealed Air (determined by adding the net earnings of Sealed Air and Grace Packaging, adjusted as described above) for 1996, the LTM ended June 30, 1997, projected 1997 (using projected 1997 EBIT, adjusted as described above) and projected 1998 (using projected 1998 EBIT, adjusted as described above). This analysis indicated that Sealed Air would contribute 34.6%, 34.9%, 36.2% and 34.3% of the net earnings of New Sealed Air for 1996, the LTM ended June 30, 1997, projected 1997 and projected 1998, respectively.

Earnings per Share Impact Analysis. Using the projected earnings of Sealed Air for the years 1997 through 2002 provided by Sealed Air's management and the projected earnings of Grace Packaging for the same years (using the Base Case and Conservative Case, each with Synergies), DLJ compared the projected cash and book earnings per share ("EPS") of Sealed Air on a stand-alone basis (assuming the Merger does not occur) to the projected cash and book EPS of New Sealed Air. In each case, DLJ's analysis measured cash and book EPS of New Sealed Air on an as-converted basis (i.e., assuming that all shares of convertible preferred stock were converted into common stock at the beginning of the relevant period). Cash earnings per share are earnings per share plus goodwill amortization per share.

Based on the Base Case with Synergies, the accretive effect of the Merger on cash EPS to Sealed Air stockholders was an estimated 8.5%, 9.3%, 19.0%, 25.3%, 26.7% and 26.3% in 1997, 1998, 1999, 2000, 2001 and 2002, respectively. Based on the Conservative Case with Synergies, the accretive effect of the Merger on cash EPS to Sealed Air stockholders was an estimated 8.3%, 3.9%, 13.2%, 19.3%, 20.9% and 20.8% in 1997, 1998, 1999, 2000, 2001 and 2002, respectively. Based on the Base Case with Synergies, the accretive (dilutive) effect of the Merger on book EPS to Sealed Air stockholders was an estimated (1.4)%, 0.6%, 7.5%, 15.3%, 17.8% and 18.3% in 1997, 1998, 1999, 2000, 2001 and 2002, respectively. Based on the Conservative Case with Synergies, the accretive (dilutive) effect of the Merger on book EPS to Sealed Air stockholders was an estimated (1.6)%, (5.1)%, 1.5%, 9.2%, 11.9% and 12.6% in 1997, 1998, 1999, 2000, 2001 and 2002, respectively.

The summary set forth above does not purport to be a complete description of the analyses performed by DLJ but describes, in summary form, the principal elements of the presentation made by DLJ to the Sealed Air Board on August 14, 1997. The preparation of a fairness opinion involves various determinations as to the most appropriate and relevant methods of financial analysis and the application of these methods to the particular circumstances and, therefore, such an opinion is not readily susceptible to summary description. Each of the analyses conducted by DLJ was carried out in order to provide a different perspective on the transaction and to add to the total mix of information available. DLJ did not form a conclusion as to whether any individual analysis, considered in isolation, supported or failed to support an opinion as to fairness from a financial point of view. Rather, in reaching its conclusion, DLJ considered the results of the analyses in light of each other and ultimately reached its opinion based on the results of all analyses taken as a whole. Accordingly, notwithstanding the separate factors summarized above, DLJ has indicated to Sealed Air that it believes that its analyses must be considered as a whole and that selecting portions of its analyses and the factors considered by it, without considering all analyses and factors, could create an incomplete view of the evaluation process underlying its opinion. In performing its analysis, DLJ made numerous assumptions with respect to industry performance, business and economic conditions and other matters. The analyses performed by DLJ are not necessarily indicative of actual values or future results, which may be significantly more or less favorable than suggested by such analyses.

Pursuant to the terms of an engagement agreement dated August 14, 1997, Sealed Air (i) has paid DLJ a fee of $3,750,000 ($2,000,000 of which was payable on account of past financial advisory services unrelated to the Reorganization and Merger rendered by DLJ to Sealed Air) and (ii) will pay an additional $11,250,000, payable upon consummation of the Merger. Sealed Air has also agreed that if the Merger or similar transaction is not consummated and Sealed Air receives a $150 million termination fee, Sealed Air will pay DLJ $7,500,000 (in addition to the $3,750,000 fee already paid) in cash upon Sealed Air's receipt of the termination fee, provided that, if the termination fee is less than $150 million, DLJ's compensation shall be proportionately reduced. In addition, Sealed Air agreed to reimburse DLJ, upon request by DLJ from time to time, for all out-of-pocket expenses (including the reasonable fees and expenses of counsel) incurred by DLJ in connection with its engagement thereunder and to indemnify DLJ and certain related persons against certain liabilities in connection with its engagement, including liabilities under U.S. federal securities laws. DLJ and Sealed Air negotiated the terms of the fee arrangement, and the Sealed Air Board was aware of such arrangement, including the fact that a significant portion of the aggregate fee payable to DLJ is contingent upon consummation of the Merger. DLJ believes that the terms of this fee arrangement are customary in transactions of this nature.

In the ordinary course of business, DLJ and its affiliates may own or actively trade the securities of Sealed Air and Grace for their own accounts and for the accounts of their customers and, accordingly, may at any time hold a long or short position in Sealed Air or Grace securities. See "Security Ownership of Certain Beneficial Owners" on page 87 for a description of the security ownership of The Equitable Companies, an affiliate of DLJ. DLJ, as part of its investment banking services, is regularly engaged in the valuation of businesses and securities in connection with mergers, acquisitions, underwritings, sales and distributions of listed and unlisted securities, private placements and valuations for corporate and other purposes. DLJ has

performed investment banking and other services in the past for Sealed Air (including delivery of a fairness opinion for Sealed Air in connection with the $57 million acquisition of Trigon Industries in 1995) and for Grace (including acting as advisor to Grace in the sale of its remaining interest in The Restaurant Enterprises Group, Inc. in 1994). In addition, in 1996 DLJ was lead manager in a $360 million high-yield offering for Fresenius Medical Care AG. (Fresenius Medical Care AG is the parent company of a predecessor of Grace, but has always been unrelated to Grace.) DLJ has received usual and customary compensation for its past services for Sealed Air, Grace, and Fresenius Medical Care AG.

Opinions of Grace Financial Advisors

        Credit Suisse First Boston and Merrill Lynch were retained to act as the Grace Financial Advisors in connection with the Reorganization and Merger. The Grace Financial Advisors were selected by Grace because of their familiarity with Grace and Sealed Air and their respective businesses and their qualifications and expertise in providing advice to companies in the businesses in which Grace and Sealed Air are engaged, as well as their reputations as internationally recognized investment banking firms. Each of the Grace Financial Advisors has consented to the reprinting of its fairness opinion and the summary of such firm's activities included herein.

        At the request of the Grace Board, each of the Grace Financial Advisors delivered a written opinion to the Grace Board on August 14, 1997 to the effect that, as of such date, and based upon the assumptions made, general procedures followed, factors considered and limitations on the review undertaken as set forth in such opinions, the terms of the Spin-off, the Recapitalization and the Merger, taken as a whole, were fair, from a financial point of view, to the holders of Grace common stock. In preparing these opinions, these firms performed a variety of financial and comparative analyses and made a detailed presentation to the Grace Board with respect to the Reorganization and Merger. The Grace Board, in accepting the opinions of the Grace Financial Advisors, was aware that the Grace Financial Advisors relied upon certain financial information, projections and other information provided by Grace's management and that the opinions of such firms relied, in part, on certain assumptions and were subject to certain limitations. While the Grace Board did not perform an independent review of the financial information, projections and other information provided to the Grace Financial Advisors, the Grace Financial Advisors and management did review certain financial information and projections with the Grace Board. The Grace Board relied on the Grace Financial Advisors, whom it considered to be experts in such matters, to select appropriate methodologies to determine fairness. No updates of such opinions have been requested because such opinions were provided solely in connection with the decisions of the Grace Board taken on August 14, 1997.

        The full texts of the written opinions of Credit Suisse First Boston and Merrill Lynch, which set forth the assumptions made, general procedures followed, factors considered and limitations on the review undertaken by Credit Suisse First Boston and Merrill Lynch in rendering their opinions, are set forth in Annex D to this Joint Proxy Statement/Prospectus and are incorporated herein by reference. The opinions of Credit Suisse First Boston and Merrill Lynch are directed only to the fairness from a financial point of view, as of the date thereof, of the terms of the Spin-off, the Recapitalization and the Merger, taken as a whole, to the holders of Grace's existing common stock and do not address the merits of the underlying decision by Grace to engage in the Reorganization and Merger and do not constitute a recommendation to any stockholder of Grace as to how such stockholder should vote on any proposal related to the Reorganization and Merger. The summary of the opinions of Credit Suisse First Boston and Merrill Lynch set forth in this Joint Proxy Statement/Prospectus are qualified in their entirety by reference to the full text of the opinions of Credit Suisse First Boston and Merrill Lynch. Holders of shares of Grace common stock are urged to, and should, read the opinions of Credit Suisse First Boston and Merrill Lynch in their entirety.

        Opinion of Credit Suisse First Boston. In arriving at its opinion, Credit Suisse First Boston reviewed certain publicly available business and financial information relating to Grace and Sealed Air, as well as the Merger Agreement, the Distribution Agreement and the forms of related agreements attached as exhibits thereto. Credit Suisse First Boston also reviewed certain other information, including financial forecasts and certain information with respect to potential operating efficiencies which may result from the Merger, provided to Credit Suisse First Boston by Grace and Sealed Air, and met with the managements of Grace and Sealed Air to discuss the business and prospects of Grace, Sealed Air and New Grace. Projections provided by Sealed Air and Grace concerning Sealed Air, Grace Packaging and New Grace were substantially similar to then publicly available estimates of research analysts with respect to the future financial performance of each company. Credit Suisse First Boston also considered certain financial and stock market data of Grace and Sealed Air and compared that data with similar data for other publicly held companies in businesses similar to those of Grace and Sealed Air, and considered the financial terms of certain other business combinations and other transactions. Credit Suisse First Boston also considered such other information, financial studies, analyses and investigations and financial, economic and market criteria as Credit Suisse First Boston deemed relevant.

        In connection with its review, Credit Suisse First Boston did not assume any responsibility for independent verification of any of the foregoing information and relied on its being complete and accurate in all material respects. With respect to the financial forecasts, including the estimates of any potential future liabilities relating to asbestos, Credit Suisse First Boston assumed that they were reasonably prepared on bases reflecting the best currently available estimates and judgments of the managements of Grace and Sealed Air as to the future financial performance of Grace, Sealed Air and New Grace. Credit Suisse First Boston also relied upon the views of the managements

of Grace and Sealed Air concerning the business, operational and strategic
benefits and implications of the Merger, including financial forecasts provided
to Credit Suisse First Boston by Grace and Sealed Air relating to benefits from
operating efficiencies. Credit Suisse First Boston did not make an independent
evaluation or appraisal of the assets or liabilities (contingent or otherwise)
of Grace or Sealed Air. Credit Suisse First Boston's opinion was necessarily
based upon financial, economic, market and other conditions as they existed and
could be evaluated on the date of its opinion. Credit Suisse First Boston
expressed no opinion as to what the value of New Grace common stock or New
Sealed Air common or convertible preferred stock actually would be following the
consummation of the Reorganization and Merger or the prices at which New Grace
common stock or New Sealed Air common or convertible preferred stock would trade
following the consummation of the Reorganization and Merger. Credit Suisse First
Boston also understood that the financial statements, pro forma financial
statements and registration statement of New Grace had not yet been prepared.
*Credit Suisse First Boston was not requested to, and did not, solicit*
third-party indications of interest in acquiring all or any part of Grace.
Credit Suisse First Boston was not requested to opine on, and Credit Suisse
First Boston's opinion did not in any manner address, Grace's underlying
business decision to effect the Reorganization and Merger.

        Credit Suisse First Boston assumed, with Grace's consent, that
the Reorganization and Merger would comply with applicable foreign, U.S. federal
and state laws, including, without limitation, laws relating to the payment of
dividends, bankruptcy, insolvency, reorganization, fraudulent conveyance,
fraudulent transfer and other similar laws now or hereafter in effect affecting
creditors' rights generally. Credit Suisse First Boston assumed, with Grace's
consent, that the receipt of New Sealed Air common and convertible preferred
stock in connection with the Recapitalization and New Grace common stock in
connection with the Spin-off would be tax-free for U.S. federal income tax
purposes to the stockholders of Grace and that none of Grace, Sealed Air or New
Grace would recognize material income, gain or loss for U.S. federal income tax
purposes as a result of the Reorganization and Merger. In addition, Credit
Suisse First Boston assumed, with Grace's consent, that following the
consummation of the Reorganization and Merger, Grace (i.e., New Sealed Air) and
its subsidiaries and New Grace and its subsidiaries would perform their
respective indemnification obligations that may arise under the Distribution
Agreement (including the forms of related agreements attached as exhibits
*thereto) in accordance with their respective terms. Credit Suisse First Boston*
further assumed, with Grace's consent, that in the course of obtaining the
necessary regulatory or other consents or approvals (contractual or otherwise)
for the Reorganization and Merger, no restrictions, including any divestiture
requirements or amendments or modifications, would be imposed that would have a
material adverse effect on the contemplated benefits of the Reorganization and
Merger. Credit Suisse First Boston was not requested to opine on, and Credit
Suisse First Boston's opinion did not in any manner address, any matters
relating to the solvency of any entity, and Credit Suisse First Boston assumed
that Grace and New Grace would be solvent following the consummation of the
Reorganization and Merger.

        Based upon and subject to the foregoing, Credit Suisse First
Boston gave its written opinion that, as of the date of such opinion, the terms
of the Spin-off, the Recapitalization and the Merger, taken as a whole, were
fair, from a financial point of view, to the holders of Grace common stock.

        Merrill Lynch Opinion. In arriving at its opinion, Merrill Lynch,
among other things: (i) reviewed certain publicly available business and
financial information relating to Grace and Sealed Air that it deemed to be
relevant; (ii) reviewed certain information, including financial forecasts,
relating to the business, earnings, cash flow, assets, liabilities and prospects
of Grace, Sealed Air and New Grace, as well as the amount and timing of the cost
*savings and related expenses and operating efficiencies expected to result from*
the Merger (the "Expected Efficiencies") furnished to Merrill Lynch by Grace and
Sealed Air, respectively; (iii) conducted discussions with members of senior
management and representatives of Grace and Sealed Air concerning the matters
described in clauses (i) and (ii) above, as well as the respective businesses
and prospects of Grace, Sealed Air and New Grace before and after giving effect
to the Reorganization and Merger and the Expected Efficiencies; (iv) reviewed
the market prices and valuation multiples for Grace common stock and Sealed Air
common stock and compared them with those of certain publicly traded companies
that Merrill Lynch deemed to be relevant; (v) reviewed the results of operations
of Grace and Sealed Air and compared them with those of certain publicly traded
companies that Merrill Lynch deemed to be relevant; (vi) compared the proposed
financial terms of the Reorganization and Merger with the financial terms of
certain other transactions that Merrill Lynch deemed to be relevant; (vii)
participated in certain discussions and negotiations among representatives of
Grace and Sealed Air and their financial and legal advisors; (viii) reviewed the
potential pro forma impact of the Reorganization and Merger; (ix) reviewed the
Merger Agreement, the Distribution Agreement and the forms of related agreements
attached as exhibits thereto; and (x) reviewed such other financial studies and
analyses and took into account such other matters as Merrill Lynch deemed
necessary, including Merrill Lynch's assessment of general economic, market and
monetary conditions. Projections provided by Sealed Air and Grace concerning
Sealed Air, Grace Packaging and New Grace, mentioned in (ii) above, were
*substantially similar to then publicly available estimates of research analysts*
with respect to the future financial performance of each company.

        In preparing its opinion, Merrill Lynch assumed and relied on the
accuracy and completeness of all information supplied or otherwise made
available to, discussed with or reviewed by or for Merrill Lynch, or publicly
available, and Merrill Lynch did not assume any responsibility for independently
verifying such information or undertake an independent evaluation or appraisal
of any of the assets or liabilities of Grace or Sealed Air, nor was Merrill
Lynch furnished with any such evaluation or appraisal. In addition, Merrill
Lynch did not assume any obligation to conduct, nor did it conduct, any physical

inspection of the properties or facilities of Grace or Sealed Air. With respect
to the financial forecast information, including the estimates of any potential
future liabilities relating to asbestos, and the Expected Efficiencies, in each
case furnished to or discussed with Merrill Lynch by Grace or Sealed Air,
Merrill Lynch assumed that such information was reasonably prepared and
reflected the best currently available estimates and judgment of Grace or Sealed
Air management as to the expected future financial performance of Grace, Sealed
Air and New Grace, as the case may be, and the Expected Efficiencies.

        Merrill Lynch's opinion was necessarily based upon market,
economic and other conditions as they existed and could be evaluated, and the
information made available to Merrill Lynch, as of the date of its opinion.
Merrill Lynch assumed, with Grace's consent, that in the course of obtaining the
necessary regulatory or other consents or approvals (contractual or otherwise)
for the Reorganization and Merger, no restrictions, including any divestiture
requirements or amendments or modifications, would be imposed that would have a
material adverse effect on the contemplated benefits of the Reorganization and
Merger. Merrill Lynch assumed, with Grace's consent, that the Reorganization and
Merger would comply with applicable foreign, U.S. federal and state laws,
including, without limitation, laws relating to the payment of dividends,
bankruptcy, insolvency, reorganization, fraudulent conveyance, fraudulent
transfer and other similar laws then or thereafter in effect affecting
creditors' rights generally. Merrill Lynch also assumed, with Grace's consent,
that receipt of New Sealed Air common and convertible preferred stock in
connection with the Recapitalization and New Grace common in connection with the
Spin-off would be tax-free for U.S. federal income tax purposes to the
stockholders of Grace and that none of Grace, Sealed Air or New Grace would
recognize material income, gain or loss for U.S. federal income tax purposes as
a result of the Reorganization and Merger. In addition, Merrill Lynch assumed,
with Grace's consent, that following the consummation of the Reorganization and
Merger, New Sealed Air and its subsidiaries and New Grace and its subsidiaries
would perform their respective indemnification obligations which may arise under
the Distribution Agreement (including the forms of related agreements attached
as exhibits thereto) in accordance with their respective terms. Merrill Lynch
was not requested to opine on, and its opinion does not in any manner address,
any matters relating to the solvency of any entity, and Merrill Lynch assumed
that Grace and New Grace would be solvent following the consummation of the
Reorganization and Merger.

        Merrill Lynch did not express any opinion as to the prices at
which New Sealed Air common or convertible preferred stock or New Grace common
stock would trade following the announcement or consummation of the
Reorganization and Merger. Merrill Lynch was not authorized by Grace or the
Grace Board to solicit, nor did it solicit, third-party indications of interest
for the acquisition of all or any part of Grace. Merrill Lynch was not requested
to and did not express any opinion as to the underlying decision by Grace to
engage in the Reorganization and Merger.

        Based upon and subject to the foregoing, Merrill Lynch gave its
written opinion that, as of the date of such opinion, the terms of the Spin-off,
the Recapitalization and the Merger, taken as a whole, were fair, from a
financial point of view, to holders of Grace common stock.

        In preparing their opinions for the Grace Board, the Grace
Financial Advisors performed a variety of financial and comparative analyses,
including those described below performed in connection with their presentation
to the Grace Board on August 14, 1997. The summary of the Grace Financial
Advisors' analyses set forth below does not purport to be a complete description
of the analyses underlying the Grace Financial Advisors' opinions. The
preparation of a fairness opinion is a complex analytic process involving
various determinations as to the most appropriate and relevant methods of
financial analyses and the application of those methods to the particular
circumstances and, therefore, such an opinion is not readily susceptible to
summary description. In arriving at their opinions, the Grace Financial Advisors
made qualitative judgments as to the significance and relevance of each analysis
and factor considered by each of them. Accordingly, the Grace Financial Advisors
believe that their analyses must be considered as a whole and that selecting
portions of their analyses and factors, without considering all of their
analyses and factors as a whole, could create a misleading or incomplete view of
the processes underlying such analyses and their respective opinions. In their
analyses, the Grace Financial Advisors made numerous assumptions with respect to
Grace, Sealed Air, industry performance, regulatory, general business, economic,
market and financial conditions and other matters, many of which are beyond the
control of Grace and Sealed Air. No company, transaction or business used in
such analyses as a comparison is identical to Grace, Sealed Air or the
Reorganization and Merger, nor is an evaluation of the results of such analyses
entirely necessarily mathematical; rather, it involves complex considerations and judgments
concerning financial and operating characteristics and other factors that could
affect the acquisition, public trading or other values of the companies,
business segments or transactions being analyzed. The estimates contained in
such analyses and the valuations resulting from any particular analysis are not
necessarily indicative of actual values or predictive of future results or
values, which may be significantly more or less favorable than those suggested
by such analyses. In addition, analyses relating to the value of businesses or
securities do not purport to be appraisals or to reflect the prices at which
businesses or securities actually may be sold. Accordingly, because such
estimates are inherently subject to substantial uncertainty, none of Grace,
Sealed Air, the Grace Financial Advisors or any other person assumes
responsibility for their accuracy. As described above, the Grace Financial
Advisors' opinions and financial analyses were only one of a number of factors
considered by the Grace Board in its evaluation of the Reorganization and Merger
and should not be viewed as determinative of the views of the Grace Board or
management with respect to the Spin-off, the Recapitalization and the Merger,
taken as a whole.

Presentation by Grace Financial Advisors

        At the meeting of the Grace Board on August 14, 1997, the Grace
*Financial Advisors made a presentation of their analyses as of such date*
delivered in connection with their opinions, a summary of which appears below.

        Comparable Company Analysis--New Sealed Air. The Grace Financial
Advisors compared certain financial and market information for two selected
publicly traded packaging companies that the Grace Financial Advisors deemed to
be comparable to New Sealed Air for purposes of their analysis: Sealed Air and
Bemis Company Inc. ("Bemis", and collectively, the "Comparable Companies"). The
Grace Financial Advisors compared (based upon management estimates for New
Sealed Air and research analysts' and Institutional Broker's Estimate Service
("IBES") estimates for the Comparable Companies) (i) estimated 1998 revenues;
(ii) estimated 1998 EBITDA margins; and (iii) long-term earnings growth figures.
The Grace Financial Advisors also compared the following credit statistics for
New Sealed Air and the Comparable Companies: (i) ratios of net debt to book
capitalization, which were 29.7%, 25.1% and 34.4% for New Sealed Air, Sealed Air
and Bemis, respectively, and (ii) estimated net debt to EBITDA multiples, which
were 1.3x, 0.4x and 1.0x, respectively. The Grace Financial Advisors analyzed
the current market valuations of the Comparable Companies, comparing estimated
1998 price to earnings multiples ("P/E Multiples") and estimated 1998 EBITDA
multiples for the Comparable Companies. The P/E Multiples for Sealed Air and
Bemis were 20.4x and 19.3x, respectively. Based upon this information and other
relevant factors, the Grace Financial Advisors derived an estimated 1998 P/E
Multiple range for New Sealed Air of 20.0x to 22.0x. This P/E Multiple range
*implies EBITDA multiples for New Sealed Air of 8.6x to 9.3x as compared to*
EBITDA multiples for Sealed Air and Bemis of 10.0x and 9.1x, respectively.

        Comparable Company Analysis--New Grace. The Grace Financial
Advisors compared certain financial and market information for selected publicly
traded specialty chemicals companies that the Grace Financial Advisors deemed to
be comparable to New Grace for purposes of their analysis: Engelhard Corporation
("Engelhard") and a specialty chemicals index consisting of the following
companies: Air Products and Chemicals, Inc., Albermarle Corporation,
BetzDearborn Inc., Crompton & Knowles Corporation, Nalco Chemical Company, Great
Lakes Chemical Corporation, Praxair, Inc. and Witco Corporation (collectively,
the "Index Companies"). The Grace Financial Advisors compared (based upon
management estimates for New Grace and research analysts and IBES estimates for
Engelhard and the Index Companies) (i) estimated 1998 revenues (not including
the Index Companies); (ii) estimated 1998 EBITDA margins; and (iii) estimated
long-term earnings growth figures. The Grace Financial Advisors also compared
the following credit statistics for New Grace (based on the low point of the
value for New Grace derived below), Engelhard and the Index Companies: (i)
ratios of net debt to total market capitalization for New Grace, Engelhard and
the Index Companies, which were 0.7%, 18.0% and 20.9%, respectively; (ii) ratios
of debt to book capitalization for New Grace, Engelhard and the Index Companies,
which were 1.9%, 44.9% and 47.4%, respectively; and (iii) net debt to EBITDA
multiples for New Grace, Engelhard and the Index Companies, which were not
*meaningful, 1.7x and 1.7x, respectively. The Grace Financial Advisors analyzed*
the current market valuation of Engelhard and the Index Companies, comparing
estimated 1998 P/E Multiples and estimated 1998 EBITDA multiples. The P/E
Multiples for Engelhard and the Index Companies were 15.2x and 17.2x,
respectively. Based upon this information and other relevant factors, the Grace
Financial Advisors derived an estimated 1998 P/E multiple range for New Grace of
14.0x to 16.0x. This P/E Multiple range implies EBITDA multiples for New Grace
(treating estimated asbestos liabilities as debt) of 7.6x to 8.5x as compared to
EBITDA multiples for Engelhard and the Index Companies of 9.3x and 7.6x,
respectively.

        No company in the comparable company analysis was identical to
either Grace, New Sealed Air or New Grace. Accordingly, an analysis of the
results of such a comparison is not purely mathematical but instead involves
complex considerations and judgments concerning differences in historical and
projected financial and operating characteristics of the comparable companies
and other factors that could affect the public trading values of the comparable
companies or the company to which they are being compared.

        Valuation of New Sealed Air Common and Convertible Preferred
Stock. The Grace Financial Advisors performed an analysis to determine the
estimated value per share of the consideration to be received by the holders of
Grace common stock in connection with the Reorganization and Merger using the
1998 P/E multiple range for New Sealed Air derived in the comparable company
analysis above. The Grace Financial Advisors analyzed the projected trading
values per share of New Sealed Air common and convertible preferred stock based
upon assumed multiples of 20x, 21x and 22x estimated 1998 New Sealed Air EPS,
and an assumed 76.476 million shares of Grace common stock outstanding
immediately before the Recapitalization. Based upon the foregoing assumptions
*and analyses, the trading values per share of New Sealed Air common stock would*
be $49.80, $52.29 and $54.78, respectively, and assuming an exchange ratio of
0.532, the value of the fraction of a share of New Sealed Air common stock to be
received for each Grace share would be $26.49, $27.81 and $29.14, respectively.
Additionally, the trading values of convertible preferred stock to be received
for each share of Grace common stock at multiples of 20x, 21x, and 22x New
Sealed Air 1998 EPS were estimated to be $24.00, $24.75 and $25.75,
respectively. Accordingly, based upon the foregoing assumptions and analyses,
the value received in New Sealed Air common and convertible preferred stock per
share of Grace common stock at multiples of 20x, 21x and 22x New Sealed Air 1998
EPS would total an estimated $50.49, $52.56 and $54.89, respectively.

        Valuation of New Grace Common Stock. The Grace Financial Advisors
performed an analysis to determine the estimated trading value of New Grace
common stock to be received by holders of Grace common stock after giving effect
to the Recapitalization, the Spin-off and the Cash Transfer using trading
multiples of 14x, 15x and 16x New Grace estimated 1998 EPS. Based upon the

foregoing assumptions and analyses, the Grace Financial Advisors estimated the projected trading values per share of New Grace common stock to be $24.50, $26.25 and $28.00, respectively.

Sensitivity Analysis. The Grace Financial Advisors analyzed the estimated fully distributed value to be received per share of Grace common stock in connection with the Reorganization and Merger using the 1998 P/E Multiple ranges for New Sealed Air and New Grace derived in the comparable company analysis above. The Grace Financial Advisors analyzed the projected trading values per share of New Grace common stock based upon a range of three trading multiples of estimated 1998 EPS and based upon an assumed 76.476 million shares of Grace common stock outstanding immediately before the Recapitalization. Based upon estimated trading multiples of 1998 EPS of 14x, 15x and 16x and the foregoing assumptions, the Grace Financial Advisors estimated the projected trading values per share of New Grace common stock. Based upon the Grace Financial Advisors' analysis of the estimated value of New Sealed Air common and convertible preferred stock to be received per Grace share, and the assumptions relating to such analysis, all set forth above, the Grace Financial Advisors estimated the aggregate trading values of the New Sealed Air common stock, convertible preferred stock and New Grace common stock to be received per Grace share to be $74.99, $77.06 and $79.39 (using a 14x EPS trading multiple for New Grace and 20x, 21x and 22x EPS trading multiples for New Sealed Air); $76.74, $78.81 and $81.14 (using a 15x EPS trading multiple for New Grace and 20x, 21x and 22x EPS trading multiples for New Sealed Air); and $78.49, $80.56 and $82.89 (using a 16x EPS trading multiple for New Grace and 20x, 21x and 22x EPS trading multiples for New Sealed Air).

Credit Analysis of New Grace. The Grace Financial Advisors also analyzed certain credit statistics for New Grace, based upon certain forecasted financial information and certain information with regard to possible operating efficiencies resulting from the Reorganization and Merger provided by management of Grace. Such analyses were based upon management estimates of New Grace's total debt, asbestos liability and shareholders' equity for 1998, 1999 and 2000. Based upon the foregoing management estimates, the Grace Financial Advisors analyzed certain credit statistics for New Grace involving ratios of estimated debt and asbestos liability to book capitalization for the years 1998, 1999 and 2000 of 46.5%, 38.5% and 32.4%, respectively, and ratios of debt and asbestos liability to EBITDA for the years 1998, 1999 and 2000 of 1.6x, 1.3x and 1.2x, respectively.

The foregoing is a summary of the material terms of the presentation by the Grace Financial Advisors to the Grace Board on August 14, 1997, and does not purport to be a complete description of such presentation. The analyses by the Grace Financial Advisors in connection with such presentation do not purport to be appraisals or necessarily to reflect the prices at which businesses or securities may be sold. As described above, the opinions of the Grace Financial Advisors and their presentation to the Grace Board were one of a number of factors considered by the Grace Board in connection with its approval of the Reorganization and Merger.

Each of Credit Suisse First Boston and Merrill Lynch, as part of its investment banking business, is continually engaged in the valuation of businesses and their securities in connection with mergers and acquisitions, negotiated underwritings, competitive biddings, secondary distributions of listed and unlisted securities, private placements and valuations for estate, corporate and other purposes. Grace selected Credit Suisse First Boston and Merrill Lynch as its financial advisors because they are nationally recognized investment banking firms that have substantial experience in transactions similar to the Reorganization and Merger.

Each of Credit Suisse First Boston and Merrill Lynch provides a full range of financial, advisory and brokerage services and in the course of its normal trading activities may from time to time effect transactions and hold positions in securities or options on securities of Grace, Sealed Air, New Sealed Air or New Grace for its own account and for the account of customers. Each of Credit Suisse First Boston and Merrill Lynch is familiar with Grace from having acted as its financial advisors in connection with, and having participated in certain of the negotiations leading to, the Merger Agreement and the Distribution Agreement, and certain other previous transactions entered into by Grace. Each of Credit Suisse First Boston and Merrill Lynch has also provided certain investment banking services to Grace from time to time, and may provide investment banking services to Grace and New Grace in the future.

Pursuant to separate engagement agreements dated July 9, 1997 (the "Financial Advisors Engagement Letters"), Grace engaged Credit Suisse First Boston and Merrill Lynch to act as its financial advisors in connection with the Reorganization and Merger. Pursuant to the terms of the Financial Advisors Engagement Letters, Grace agreed to pay each of Credit Suisse First Boston and Merrill Lynch (i) a fee of $2,500,000, payable upon execution of a definitive agreement with respect to the Reorganization and Merger, creditable (to the extent paid) against the Transaction Fee (as defined below); (ii) a transaction fee of $5,000,000 upon consummation of the Reorganization and Merger (the "Transaction Fee"); and (iii) in addition, an incentive fee based upon the market value of the consideration received by Grace stockholders in connection with the Reorganization and Merger in an amount up to, but not exceeding, $10,000,000. Grace has also agreed to reimburse each of Credit Suisse First Boston and Merrill Lynch for its reasonable out-of-pocket expenses, including attorneys' fees, and to indemnify each of the Grace Financial Advisors against certain liabilities, including certain liabilities under U.S. federal securities laws.

BUSINESS OF NEW SEALED AIR

Overview of New Sealed Air

        The combination of Sealed Air and Grace Packaging to create New
Sealed Air will join two leaders in the manufacture and sale of protective and
specialty packaging materials and systems. Here are a few points that highlight
how New Sealed Air would have looked in 1996, on a pro forma basis (assuming
that Sealed Air and Grace Packaging had been combined before 1996):

o    New Sealed Air would have had annual net sales of more than $2.5 billion.

o    Approximately 60% of New Sealed Air's net sales would have come from
     specialty (primarily food) packaging products and 40% from protective
     packaging and other products.

o    New Sealed Air would have had operations in 46 countries, with 51% of its
     revenues generated in the U.S. and 49% outside the U.S.

        New Sealed Air is expected to continue to pursue the following
corporate priorities--putting its customers' needs first, carefully managing its
financial resources, implementing principles of World Class Manufacturing (which
emphasize employee involvement, product quality and efficient manufacturing),
and introducing innovative new products. New Sealed Air will seek to provide
worldwide leadership in protective and specialty packaging by producing and
selling differentiated, proprietary packaging materials and systems designed to
provide cost-effective solutions to the packaging needs of a wide variety of
products and customers throughout the world. New Sealed Air will seek to
emphasize materials and systems that will enable its customers to provide a high
degree of protection in packaging their products, while reducing shipping,
storage, labor and materials costs and minimizing the amount of packaging waste.

        New Sealed Air's strategy for growth is expected to be directed
toward the following four areas:

o    New product development, both internally and through acquisitions and
     strategic alliances.

o    Global expansion to meet the worldwide protective and specialty packaging
     needs of its customers and to benefit from opportunities presented by
     economic growth and emerging markets outside the U.S. and the other
     countries in which it will operate.

o    Identifying and pursuing opportunities in protective and specialty
     packaging that offer economic characteristics similar to its products and
     that offer synergies with its marketing expertise, distribution channels
     and technological capabilities.

o    Exploiting its core technologies in extrusion, chemical formulation, food
     science, packaging systems and packaging design and evaluation for both
     packaging and non-packaging applications.

Business of Sealed Air

        Sealed Air is a leading global manufacturer of a wide range of
protective and specialty packaging materials and systems. The company's
operations are conducted primarily in the U.S. and in 26 other countries in
North America, Europe, the Asia/Pacific region and Latin America. During 1996,
1995 and 1994, approximately 39%, 38% and 29%, respectively, of Sealed Air's
total net sales were generated outside the U.S.

        Sealed Air's principal classes of products include engineered
products, surface protection and other cushioning products, and food packaging
products.

o    Engineered products, which accounted for approximately 36% of 1996 net
     sales, include Sealed Air's Instapak[Registered] polyurethane foam
     packaging systems, specialty polyethylene foams for packaging and
     non-packaging uses and Korrvu[Registered] suspension and retention
     packaging products.

o    Surface protection and other cushioning products, which accounted for
     approximately 47% of 1996 net sales, are a complementary line of materials
     that include BubbleWrap[Registered] air cellular cushioning materials,
     Cell-Aire[Registered] polyethylene foam sheeting, various paper protective
     packaging materials and a comprehensive line of protective and durable
     mailers and bags, including products sold under the Jiffy[Trademark]
     trademark and other related trade names.

o    Food packaging products, which accounted for approximately 13% of 1996 net
     sales, consist primarily of Dri-Loc[Registered] absorbent pads, which are
     used in the pre-packaging of meat, fish and poultry to absorb excess
     fluids, and a complementary line of flexible films, bags, pouches and
     related equipment that are used to package a broad range of food products.

Sealed Air's other products include specialty adhesive products, loose-fill
polystyrene packaging, paper products, products that control static electricity,
and recreation and energy conservation products.

        Sealed Air believes it has achieved a leadership position in
protective and specialty packaging by putting its customers' needs first, by
providing products with measurable economic benefits, by pursuing innovation and
new product development and by growing to meet the needs of customers around the
world. In pursuing global growth, the company has emphasized consistent
strategic principles, including seeking market leadership through differentiated
proprietary products because market leadership optimizes profits, fostering
technological innovation because innovation is the only long-term guarantee of

market leadership, exploiting the greater market potential of global operations, and emphasizing products with high margins, low capital intensity and low labor intensity.

Further information concerning the business of Sealed Air is set forth in Sealed Air's 1996 Annual Report on Form 10-K (the "Sealed Air 10-K"). See "Where You Can Find More Information" on page 100.

Business of Grace Packaging

Grace Packaging is a leading global supplier of high-performance materials and systems used in packaging food, industrial and consumer products. Grace Packaging operates in the U.S. and in 45 other countries in North America, Europe, the Asia/Pacific region, Latin America and Africa. During 1996, 1995 and 1994, approximately 54%, 53% and 51%, respectively, of Grace Packaging's total net sales were generated outside the U.S.

Grace Packaging's principal products are various food packaging products and shrink and non-shrink films for industrial and consumer products.

o    Approximately 80% of Grace Packaging's net sales in 1996 were of food packaging products. These products include (i) shrink bags, shrink films, laminated films and other specialty packaging systems (including material, equipment and services) marketed under the Cryovac[Registered] registered trademark for a broad range of perishable foods such as fresh, smoked and processed meat products, cheese, poultry, prepared foods (including soups and sauces for restaurants and institutions), baked goods and produce; (ii) polystyrene foam prepackaging trays for supermarkets and poultry and other food processors, marketed under the Formpac[Trademark] trademark; and (iii) rigid plastic containers for dairy and other food and nonfood products, marketed under the Omicron[Trademark] trademark.

o    Approximately 20% of Grace Packaging's net sales in 1996 were of shrink films and other films used in packaging a variety of non-food industrial and consumer products, such as housewares, toys, electronics and medical products.

Grace Packaging has maintained a leading position in specialty packaging, principally by emphasizing technological innovation combined with superior customer service. Grace Packaging seeks to maintain technological leadership through continuous and innovative research and development. Grace Packaging's core technologies include coextrusion technology, which permits the production of packaging materials suited to specific customer needs, and food science expertise, which provides a better understanding of the interaction between packaging materials and packaged products. Grace Packaging believes that combining its technological strengths with superior customer service leads to product differentiation and market leadership, which optimize profits.

In addition, Grace Packaging has been reorganized so that its product lines are managed on a global basis. As a result, Grace Packaging believes it is better able to serve its multinational customers in all global regions. Worldwide, Grace Packaging employs approximately 10,000 people and operates 30 production facilities (10 in North America, 9 in Europe, 5 in each of the Asia/Pacific region and Latin America and 1 in Africa).

Further information concerning Grace Packaging is set forth in the Grace 10-K. See "Where You Can Find More Information" on page 100.

GRACE PACKAGING SELECTED SPECIAL-PURPOSE COMBINED FINANCIAL DATA

The following selected special-purpose combined financial data present only selected financial data for Grace Packaging prior to the Reorganization and Merger. The financial data for the years ended December 31, 1996, 1995 and 1994 are derived from the Grace Packaging Special-Purpose Combined Financial Statements, which were audited by Price Waterhouse LLP (except for the Balance Sheet Data at December 31, 1994). The financial data for the nine months ended September 30, 1997 and 1996 and the years ended December 31, 1993 and 1992 and the balance sheet data at September 30, 1997 and December 31, 1994, 1993 and 1992 are derived from Grace Packaging's unaudited financial statements. To understand this selected financial data more fully, you should read the Grace Packaging Special-Purpose Combined Financial Statements, including the notes thereto, and "Management's Discussion and Analysis of Financial Condition and Results of Operations for Grace Packaging" included elsewhere in this Joint Proxy Statement/Prospectus.

<TABLE>
<CAPTION>

|  | Nine Months Ended September 30, | | Years Ended December 31, | | | | |
|---|---|---|---|---|---|---|---|
|  | 1997 | 1996 | 1996 | 1995 | 1994 | 1993 | 1992 |
|  | | | (In thousands) | | | | |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| Combined Statement of Earnings Data: | | | | | | | |
| Net sales.............. | $1,347,739 | $1,271,612 | $1,741,602 | $1,705,642 | $1,428,459 | $1,256,132 | $1,236,659 |
| Gross profit.......... | 473,883 | 431,278 | 590,596 | 627,542 | 545,313 | 492,911 | 483,803 |
| Operating profit....... | 191,918 | 139,106 | 173,500 | 248,062 | 237,349 | 219,474 | 218,863 |
| Other expense, net..... | 2,215 | 5,036 | 3,678 | 12,589 | 9,597 | 12,949 | 9,101 |
| Earnings before income taxes................ | 189,703 | 134,070 | 169,822 | 235,473 | 227,752 | 206,525 | 209,762 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Net earnings.......... | 111,545 | 78,813 | 99,830 | 140,892 | 139,511 | 125,980 | 127,955 |

Combined Balance Sheet Data (at end of period):

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Working capital........ | $323,510 | | $277,583 | $289,605 | $224,815 | $194,284 | $176,502 |
| Total assets........... | 1,683,432 | | 1,702,888 | 1,477,360 | 1,179,937 | 914,669 | 839,310 |
| Total liabilities...... | 301,614 | | 321,098 | 303,398 | 282,176 | 214,950 | 219,787 |
| Total equity .......... | 1,381,818 | | 1,381,790 | 1,173,962 | 897,761 | 699,719 | 619,523 |

</TABLE>

MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND
RESULTS OF OPERATIONS FOR GRACE PACKAGING

Results of Operations

For the Nine Months Ended September 30, 1997 and 1996

Net sales increased 6% in the first nine months of 1997 compared
with the 1996 period, primarily due to increased unit volume, sales from
businesses acquired, and higher average selling prices. These increases were
partially offset by the negative effect of foreign currency translation and, to
a lesser extent, the continuing effect of negative publicity surrounding bovine
spongiform encephalopathy, commonly referred to as "mad cow disease," which led
to reduced consumption of beef products and accordingly lower sales of certain
Grace Packaging products, particularly in Europe. Excluding the effect of
foreign currency translation, the increase in net sales would have been 10% for
the first nine months of 1997 compared with the 1996 period.

Cost of sales increased 4% in the first nine months of 1997
compared with the 1996 period, primarily reflecting the increase in net sales
and higher levels of manufacturing-related depreciation as a result of the
completion of several major expansion programs, discussed below, partially
offset by the cost savings realized as a result of the worldwide restructuring
program implemented in 1995, described below. As a result of this program, cost
of sales decreased as a percentage of net sales to 64.8% in the first nine
months of 1997 compared with 66.1% in the 1996 period.

Marketing, administrative and development expenses increased 7%
in the first nine months of 1997 compared with the 1996 period, primarily
reflecting increased corporate allocations from Grace and the increase in net
sales, partially offset by the cost savings realized as a result of the
worldwide restructuring program discussed below. As the realized cost savings
only partially offset the increased corporate allocation in the first nine
months of 1997 compared to the 1996 period, marketing, administrative and
development expenses as a percentage of sales increased to 20.3% in the first
nine months of 1997 compared with 20.1% in the 1996 period.

Charges for restructuring costs under Grace Packaging's worldwide
restructuring program (discussed below) were $8.4 million and $37.0 million in
the first nine months of 1997 and 1996, respectively. The 1997 charge primarily
related to employee termination benefits. The 1996 charge primarily related to
the restructuring of Grace Packaging's European operations and consisted of
costs related primarily to employee termination benefits and lease termination
costs.

Operating profit increased 38% and net earnings increased 42% in
the first nine months of 1997 compared to the 1996 period, primarily due to the
lower level of restructuring costs in the 1997 period and the other changes in
costs and expenses discussed above.

Grace Packaging's effective income tax rate was 41.2% for the
first nine months of both 1997 and 1996.

For the Three Years Ended December 31, 1996:

Net sales increased 2% in 1996 compared with 1995 and 19% in 1995
compared with 1994. The increase in 1996 was due primarily to increased unit
volume in certain products, partially offset by the effect of the negative
publicity surrounding "mad cow disease," which led to reduced consumption of
beef products and accordingly lower sales of certain Grace Packaging products,
particularly in Europe, and by changes in product mix. The increase in 1995 was
due primarily to increased unit volume in certain products, the favorable effect
of foreign currency translation and the sales of a European laminates business
acquired in November 1994.

Cost of sales increased 7% in 1996 compared with 1995 and 22% in
1995 compared with 1994. The disproportionate increase in cost of sales in 1996
resulted primarily from higher indirect manufacturing costs, including
depreciation resulting from the completion of certain major expansion projects
begun in 1995, which were not offset by increased net sales. Cost of sales also
increased due to changes in product mix. These changes in costs of sales were
partially offset by certain lower raw material costs. The disproportionate
increase in cost of sales in 1995 primarily reflected certain higher raw
material costs and, to a lesser extent, higher depreciation, as certain property
and equipment was placed in operation at the end of 1995 as part of the
expansion program. As a result of the factors discussed above, primarily the
higher indirect manufacturing costs in 1996 compared to 1995 and higher raw
material costs in 1995 compared to 1994, cost of sales as a percentage of net
sales was 66.1%, 63.2% and 61.8% in 1996, 1995 and 1994, respectively.

Marketing, administrative and development expenses decreased 5%
in 1996 compared with 1995 but increased 20% in 1995 compared with 1994. The
decrease in 1996 was primarily due to the cost savings realized from the

restructuring programs implemented in 1995, discussed below, and a decrease in
corporate allocations, partially offset by increased research and development
costs in 1996. The increase in 1995 primarily reflected the increase in net
sales. Marketing, administrative and development expenses as a percentage of net
sales were 19.6%, 21.2% and 21.1% in 1996, 1995 and 1994, respectively.

Restructuring costs and asset impairments were $74.9 million,
$17.7 million and $6.0 million in 1996, 1995 and 1994, respectively. In 1995,
Grace Packaging began implementing a worldwide restructuring program focused on
streamlining processes and reducing operating costs, and continued to implement
additional cost reductions and efficiency improvements beyond those initiated in
1995 as it further evaluated and reengineered its operations. In connection with
these programs, Grace Packaging recorded restructuring charges of $47.9 million
in 1996 and $11.1 million in 1995. These charges primarily related to the
restructuring of European operations and consisted of costs related mainly to
employee termination benefits and lease termination costs. In 1994, prior to the
implementation of the worldwide program, Grace Packaging recorded a
restructuring charge of $6.0 million related to the closing of certain
facilities in connection with efforts to reduce costs and implement efficiency
improvements. Also during 1996 and 1995, certain long-lived assets and related
goodwill were determined to be impaired, which resulted in non-cash pre-tax
charges of $27.0 million and $6.6 million, respectively.

Operating profit decreased 30% and net earnings decreased 29% in
1996 compared with 1995, primarily due to the level of restructuring costs and
asset impairments in 1996 compared to the 1995 period and the other changes in
costs and expenses discussed above. Operating profit increased 5% and net
earnings increased 1% in 1995 compared with 1994, primarily due to the changes
in costs and expenses discussed above.

Grace Packaging's effective income tax rates were 41.2%, 40.2%
and 38.7% in 1996, 1995 and 1994, respectively. The higher effective tax rates
in 1996 and 1995 resulted from higher U.S. and foreign taxes on foreign
operations in each period.

Liquidity and Capital Resources

Grace Packaging's principal sources of liquidity are cash flows
from operations and funding through Grace's centralized cash management
services, whereby cash received from operations is transferred to, and
disbursements are funded from, Grace's centralized accounts. As a result, any
cash needs in excess of cash flows from operations are funded by Grace and any
cash flows from operations in excess of cash needs are transferred to Grace and
used for other purposes. Grace Packaging's participation in Grace's centralized
cash management services will be terminated effective upon the Merger.
Thereafter, any cash needs of Grace Packaging not provided by operations are
expected to be funded by New Sealed Air, including through borrowings and lines
of credit available through New Sealed Air, including the New Credit Agreements.
See the "New Credit Agreements" on page 76 for further information.

Net cash provided by operating activities amounted to $163.0
million and $165.5 million in the first nine months of 1997 and 1996,
respectively. The decrease in operating cash flows in the 1997 period was
primarily due to cash payments made during the 1997 period under the
restructuring program implemented in 1995, which more than offset the increased
net earnings.

Net cash provided by operating activities amounted to $207.6
million, $156.7 million and $179.1 million in 1996, 1995 and 1994, respectively.
The increase in operating cash flows in 1996 was primarily due to increased net
earnings (excluding the non-cash portion of restructuring costs and asset
impairments in both periods) and improved inventory management, partially offset
by higher investments in equipment leased to customers. The decrease in
operating cash flows in 1995 compared with 1994 was primarily due to a higher
use of working capital, largely as a result of an increase in inventory levels,
partially offset by increased net earnings (excluding the non-cash portion of
restructuring costs and asset impairments).

Net cash used for investing activities amounted to $91.4 million
and $248.6 million in the first nine months of 1997 and 1996, respectively. The
decrease in the 1997 period was primarily due to the lower level of capital
expenditures in the 1997 period compared with the 1996 period, as several major
manufacturing expansion programs begun in 1995 neared completion.

Net cash used for investing activities amounted to approximately
$309.1 million, $293.0 million and $192.4 million in 1996, 1995 and 1994,
respectively. Capital expenditures in 1996, 1995 and 1994 were $294.5 million,
$293.3 million and $185.9 million, respectively, reflecting increases in 1996
and 1995 over the prior periods as a result of the global expansion program
begun in 1995. The increase in 1996 compared with 1995 also reflected cash used
in connection with an acquisition.

Net cash used for financing activities of $71.6 million in the
first nine months of 1997 represented a net advance to Grace; net cash provided
by financing activities of $83.2 million in the 1996 period represented a net
advance from Grace, in part to fund the expansion program discussed above.

Net cash provided by financing activities amounted to $101.5
million, $136.3 million and $13.3 million in 1996, 1995 and 1994, respectively,
representing net advances from Grace, partially offset, in 1994, by principal
payments on long-term debt assumed in connection with an acquisition made in
1994.

Grace Packaging has no capital structure, and there has been no
allocation of Grace's borrowings and related interest expense, except for

interest capitalized as a component of properties and equipment. Therefore, the financial position of Grace Packaging is not indicative of the financial position that would exist if it were an independent stand-alone entity.

Other Matters

### Environmental Matters

Grace Packaging is subject to loss contingencies resulting from environmental laws and regulations. Grace Packaging accrues for anticipated costs associated with investigatory and remediation efforts when an assessment has indicated that a loss is probable and can be reasonably estimated. These accruals do not take into account any discounting for the time value of money and are not reduced by potential insurance recoveries, if any. Environmental liabilities are reassessed whenever circumstances become better defined and/or remediation efforts and their costs can be better estimated. These liabilities are evaluated periodically based on available information, including the progress of remedial investigation at each site, the current status of discussions with regulatory authorities regarding the methods and extent of remediation and the apportionment of costs among potentially responsible parties. As some of these issues are decided (the outcomes of which are subject to uncertainties) and/or new sites are assessed and costs can be reasonably estimated, Grace Packaging will adjust the recorded accruals, as necessary. However, Grace Packaging believes that it is adequately reserved for all probable and estimable environmental exposures.

### Non-Grace Packaging Contingent Liabilities

In connection with the Merger, New Grace has agreed to indemnify New Sealed Air (including Grace Packaging) against all liabilities of Grace, whether relating to events occurring before or after the Reorganization, other than liabilities arising from or relating to Grace Packaging's operations (except those retained by New Grace under the terms of the Transaction Agreements). Grace believes that, in view of New Grace's financial position giving effect to the Reorganization, New Grace's agreement to indemnify Grace Packaging, and the nature of the non-Grace Packaging liabilities and other liabilities retained by New Grace, the risk of loss to Grace Packaging from these liabilities is remote.

### Guarantee of New Grace Outstanding Public Debt

Grace currently is the guarantor of certain debt, including approximately $644 million in outstanding public debt of a subsidiary that will be wholly owned by New Grace after the Spin-off. Although the subsidiary intends to repurchase this public debt, some or all of it may remain outstanding after the Merger. Because Grace will become New Sealed Air, New Sealed Air will remain the guarantor of any such debt remaining outstanding. New Grace will indemnify New Sealed Air against any liability arising from the guarantee. In addition, if more than $50 million of this public debt remains outstanding after the Merger, New Sealed Air will receive a letter of credit (in the amount of the public debt in excess of $50 million) to cover any payments it must make under its guarantee, up to the amount of the letter of credit. Based upon the foregoing and New Grace's expected financial position, giving effect to the Reorganization, Grace believes such guarantee obligations are not material to the financial condition of New Sealed Air.

### Year 2000 Computer System Compliance

Grace Packaging has conducted a comprehensive review of its computer systems to identify systems that could be affected by the "Year 2000" issue and is implementing a plan to resolve the issue. Grace Packaging presently believes that, with modifications to existing software and by converting to new software, the Year 2000 issue will not pose significant operational problems for its computer systems. However, if such modifications and conversions are not completed in a timely manner, the Year 2000 issue may have a material impact on the operations of Grace Packaging. It is anticipated that the costs associated with modifying the existing systems will not be material. The modification costs incurred in connection with Year 2000 compliance are expensed as incurred.

### NEW SEALED AIR
### UNAUDITED PRO FORMA CONDENSED CONSOLIDATED FINANCIAL DATA

The unaudited pro forma condensed consolidated financial data of New Sealed Air are presented to show how Sealed Air and Grace Packaging might have looked if Grace Packaging had been an independent company and Grace Packaging and Sealed Air had been combined for the periods presented. These pro forma data are based on, and should be read together with, the historical financial statements for Sealed Air and Grace Packaging that are included or incorporated by reference in this Joint Proxy Statement/Prospectus. The pro forma financial data were prepared using the assumptions described below and in the related notes thereto.

The pro forma earnings data were prepared as if the Reorganization and Merger took place on January 1, 1996 and the pro forma balance sheet data were prepared as if the transactions took place on September 30, 1997. The financial statements give pro forma effect to (i) borrowings of approximately $1.241 billion (subject to adjustment) to fund the Cash Transfer, (ii) the issuance of 40.895 million shares of New Sealed Air common stock and 36 million shares of New Sealed Air convertible preferred stock in the Recapitalization and the issuance of approximately 42.7 million shares of New Sealed Air common stock in the Merger, (iii) certain quantifiable adjustments to reflect New Sealed Air's results of operations on a stand-alone basis, and (iv) adjustments for certain Grace Packaging assets and liabilities that will be

retained by New Grace in the Reorganization. The pro forma financial statements have not been adjusted for certain operating efficiencies that may be realized as a result of the Merger.

For accounting purposes, the Merger will be treated as a purchase of Sealed Air by Grace Packaging. Accordingly, the net assets of Sealed Air will be adjusted to their fair values, and the excess of the purchase price for Sealed Air (the total market value of Sealed Air's common stock around the time the Merger was announced plus certain acquisition costs) over the fair value of its net assets will be recorded as goodwill. The preliminary adjustments to net assets and goodwill which are shown in these pro forma financial data may be adjusted based on a valuation study to be conducted. Sealed Air does not expect these adjustments to be material.

Because Grace Packaging is a part of Grace rather than a stand-alone company, a portion of Grace's corporate, marketing, administrative and development expenses were allocated to Grace Packaging when the Special-Purpose Combined Financial Statements for Grace Packaging were prepared. In the opinion of Grace's management, these allocations are reasonable. However, these expenses may not be indicative of, and it is not feasible to estimate, the nature and level of expenses which might have been incurred had Grace Packaging operated as an independent company for the periods presented. The Grace Packaging Special-Purpose Combined Financial Statements do not include any of Grace's debt and related interest expense (except for the interest capitalized as a component of properties and equipment used in Grace Packaging's business).

After the Merger, New Sealed Air may incur certain charges and expenses related to restructuring and integrating the operations of Sealed Air and Grace Packaging. New Sealed Air will assess the combined operating structure, business processes and circumstances that bear upon the operations, facilities and other assets of the business as part of developing a combined strategic and operating plan. The objective of such plan will be to enhance productivity and efficiency of combined operations by reducing duplicate functions, facilities and overhead costs. The nature of any such charges and expenses may include provisions for severance and related costs, facilities closures or other charges identified in connection with the assessment and plan development. The unaudited pro forma condensed consolidated financial data do not reflect such provisions nor do they include certain cost savings or operating synergies that may result from the Merger, as such amounts are not currently determinable.

The unaudited pro forma condensed consolidated financial data are provided for illustrative purposes only. They do not purport to represent what New Sealed Air's results of operations and financial position would have been had the Reorganization and Merger actually occurred as of the dates indicated, and they do not purport to project New Sealed Air's future results of operations or financial position.

NEW SEALED AIR
UNAUDITED PRO FORMA CONDENSED CONSOLIDATED STATEMENT OF EARNINGS
(In thousands, except per share data)

| | Year Ended December 31, 1996 | | | |
|---|---|---|---|---|
| | Historical Grace Packaging | Historical Sealed Air | Adjustments for Reorganization and Merger | Pro Forma |
| Net sales | $1,741,602 | $789,612 | $(1,569) (A) | $2,529,645 |
| Cost of sales | 1,151,006 | 495,185 | (1,569) (A) 500 (B) 9,800 (D) | 1,654,922 |
| Gross profit | 590,596 | 294,427 | | 874,723 |
| Marketing, administrative and development expenses | 342,149 | 164,355 | 42,491 (B) (39,342) (C) 21,468 (D) | 531,121 |
| Restructuring costs and asset impairments | 74,947 | -- | | 74,947 |
| Operating profit | 173,500 | 130,072 | | 268,655 |
| Other: | | | | |
| Interest expense | -- | (13,350) | (74,200) (E) | (87,550) |
| Other, net | (3,678) | (2,127) | | (5,805) |
| Other, net | (3,678) | (15,477) | | (93,355) |
| Earnings before income taxes | 169,822 | 114,595 | | 175,300 |
| Income taxes | 69,992 | 45,266 | 28,136 (F) | 87,122 |
| Net earnings | $99,830 | $69,329 | | $88,178 |
| Preferred stock dividend | | | | $72,000 (G) |
| Earnings available to common stockholders | | | | $16,178 |
| Weighted average common shares outstanding | | | 83,595 | 83,595 (G) |
| Earnings per common share | | | | $ 0.19 (G) |

</TABLE>

See Accompanying Notes to the Unaudited Pro Forma Condensed
Consolidated Financial Data.

NEW SEALED AIR
UNAUDITED PRO FORMA CONDENSED CONSOLIDATED STATEMENT OF EARNINGS
*(In thousands, except per share data)*

<TABLE>
<CAPTION>

|  | Nine Months Ended September 30, 1997 | | | | |
|  | Historical Grace Packaging | Historical Sealed Air | Adjustments for Reorganization and Merger | | Pro Forma | |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> |
| Net sales.................................. | $1,347,739 | $620,769 | $(979) | (A) | $1,967,529 | |
| Cost of sales............................. | 873,856 | 387,364 | (979) | (A) | 1,267,966 | |
|  |  |  | 375 | (B) |  | |
|  |  |  | 7,350 | (D) |  | |
|  | ---------- | ---------- |  |  | ---------- | |
| Gross profit........................... | 473,883 | 233,405 |  |  | 699,563 | |
| Marketing, administrative and development |  |  |  |  |  | |
| expenses................................. | 273,594 | 127,417 | 32,648 | (B) | 404,857 | |
|  |  |  | (44,439) | (C) |  | |
|  |  |  | 15,637 | (D) |  | |
| Restructuring costs........................ | 8,371 | -- |  |  | 8,371 | |
|  | ---------- | ---------- |  |  | ---------- | |
| Operating profit....................... | 191,918 | 105,988 |  |  | 286,335 | |
| Other: |  |  |  |  |  | |
| Interest expense......................... | -- | (5,683) | (56,487) | (E) | (62,170) | |
| Other, net............................... | (2,215) | 2,846 |  |  | 631 | |
|  | ---------- | ---------- |  |  | ---------- | |
|  | (2,215) | (2,837) |  |  | (61,539) | |
|  | ---------- | ---------- |  |  | ---------- | |
| Earnings before income taxes.............. | 189,703 | 103,151 |  |  | 224,796 | |
| Income taxes............................... | 78,158 | 40,642 | 15,133 | (F) | 103,667 | |
|  | ---------- | ---------- |  |  | ---------- | |
| Net earnings............................... | $111,545 | $62,509 |  |  | $121,129 | |
|  | ========== | ========== |  |  | ========== | |
| Preferred stock dividend................... |  |  |  |  | $54,000 | (G) |
|  |  |  |  |  | ========== | |
| Earnings available to common stockholders.. |  |  |  |  | $67,129 | |
|  |  |  |  |  | ========== | |
| Weighted average common shares |  |  |  |  |  | |
| outstanding............................... |  |  | 83,595 |  | 83,595 | (G) |
|  |  |  |  |  | ========== | |
| Earnings per common share................. |  |  |  |  | $    0.80 | (G) |
|  |  |  |  |  | ========== | |

</TABLE>

See Accompanying Notes to the Unaudited Pro Forma Condensed
Consolidated Financial Data.

NEW SEALED AIR
UNAUDITED PRO FORMA CONDENSED CONSOLIDATED BALANCE SHEET
*(In thousands)*

<TABLE>
<CAPTION>

|  | September 30, 1997 | | | | | | |
|  | Historical Grace Packaging | Historical Sealed Air | Adjustments | | | | Pro Forma |
|  |  |  | Reorganization | | Merger | | |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| Assets |  |  |  |  |  |  | |
| Current assets: |  |  |  |  |  |  | |
| Accounts receivable, net..................... | $272,807 | $127,801 |  |  |  |  | $400,608 |
| Inventories.................................. | 228,874 | 62,217 |  |  | $17,800 | (O) | 308,891 |
| Other current assets......................... | 27,744 | 46,999 |  |  |  |  | 72,925 |
|  |  |  | $(1,818) | (J) |  |  | |
|  | ---------- | ---------- |  |  |  |  | ---------- |
| Total current assets....................... | 529,425 | 237,017 |  |  |  |  | 782,424 |
|  | ---------- | ---------- |  |  |  |  | ---------- |
| Properties and equipment, net................ | 1,082,356 | 166,961 |  |  | 5,000 | (O) | 1,254,317 |
| Excess of cost over fair value of net assets |  |  |  |  |  |  | |
| acquired, net............................... | 13,118 | 41,003 |  |  | (41,003) | (O) | 1,942,130 |
|  |  |  |  |  | 1,929,012 | (O) | |
| Other assets................................. | 58,533 | 38,247 |  |  | 20,000 | (O) | 116,780 |
|  | ---------- | ---------- |  |  |  |  | ---------- |
| Total assets................................. | $1,683,432 | $483,228 |  |  |  |  | $4,095,651 |
|  | ========== | ========== |  |  |  |  | ========== |

| | | | | | |
|---|---|---|---|---|---|
| **Liabilities, Convertible Preferred Stock and Stockholders' Equity** | | | | | |
| Current liabilities: | | | | | |
| Notes payable and current installments of long-term debt........................... | -- | 24,599 | 240,800 (I) | | 265,399 |
| Accounts payable.............................. | 111,108 | 47,295 | | | 158,403 |
| Other current liabilities.................... | 94,807 | 81,019 | (4,783) (J) | 7,298 (O) | 198,291 |
| | | | | 19,950 (O) | |
| Total current liabilities................. | 205,915 | 152,913 | | | 622,093 |
| Long-term debt, less current installments...... | -- | 48,718 | 1,000,000 (I) | | 1,048,718 |
| Deferred income taxes......................... | 2,119 | 21,477 | 20,000 (H) | 12,729 (O) | 86,637 |
| | | | 15,489 (J) | | |
| | | | 14,823 (K) | | |
| Deferred credits and other liabilities........ | 93,580 | 12,494 | (40,761) (J) | | 65,313 |
| Total liabilities............................ | 301,614 | 235,602 | | | 1,822,761 |
| Convertible preferred stock.................... | -- | -- | 1,800,000 (L) | | 1,800,000 |
| Stockholders' Equity: | | | | | |
| Common stock.................................. | -- | 428 | 4,090 (L) | 4,270 (M) | 8,360 |
| | | | | (428) (N) | |
| Additional paid-in capital.................... | -- | 172,120 | (1,562,651) (L) | 2,110,234 (M) | 577,583 |
| | | | | (172,120) (N) | |
| | | | | 30,000 (O) | |
| Retained earnings (deficit)................... | -- | 78,530 | (20,000) (H) | (78,530) (N) | (20,000) |
| Cumulative translation adjustment............. | (87,007) | 740 | | (740) (N) | (87,007) |
| Net assets................................... | 1,468,825 | | (1,240,800) (I) | | -- |
| | | | 28,237 (J) | | |
| | | | (14,823) (K) | | |
| | | | (241,439) (L) | | |
| Less: | | | | | |
| Deferred compensation........................ | -- | 4,034 | | (4,034) (N) | 6,046 |
| | | | | 6,046 (O) | |
| Treasury stock at cost....................... | -- | 158 | | (158) (N) | -- |
| Stockholders' equity......................... | 1,381,818 | 247,626 | | | 472,890 |
| Total Liabilities, Convertible Preferred Stock and Stockholders' Equity...................... | $1,683,432 | $483,228 | | | $4,095,651 |

  </TABLE>

See Accompanying Notes to the
Unaudited Pro Forma Condensed Consolidated Financial Data.

New Sealed Air
Notes to the Unaudited Pro Forma Condensed Consolidated
Financial Data
(amounts in thousands, except share and per share data)

(A) Represents the elimination of sales between Sealed Air and Grace Packaging, assuming that all such sales are subsequently made to third parties.

(B) Represents (i) the amount by which the amortization of the goodwill resulting from the Merger on a straight-line basis over 40 years ($48,225 per year or $36,169 for nine months) exceeds the amortization of Sealed Air's historical goodwill ($7,734 and $5,021 for the year ended December 31, 1996 and the nine months ended September 30, 1997, respectively) and (ii) increased depreciation and amortization resulting from the allocation of the purchase price to certain tangible and intangible assets over an average remaining useful life of approximately 10 years ($500 in depreciation and $2,000 in amortization per year or $375 and $1,500, respectively, for nine months). See Note (O).

(C) Reflects the elimination of certain Grace cost allocations and certain compensation and benefit programs in which employees of Grace Packaging have participated but which will not be assumed by New Sealed Air, as shown below:

<TABLE>
<CAPTION>

| | Year ended December 31, 1996 | Nine months ended September 30, 1997 |
|---|---|---|
| <S> | <C> | <C> |
| Allocated corporate overhead:  (1) | | |
| Personnel and related costs........................... | $9,775 | $15,751 |
| Corporate incentive compensation costs................. | 2,000 | 2,500 |
| Corporate facility costs............................... | 2,000 | 2,500 |
| Network/information systems costs...................... | 1,400 | 4,800 |
| Subtotal........................................ | 15,175 | 25,551 |
| Corporate allocated development costs.................. | 5,074 | -- |
| Long-term incentive compensation plan (2).............. | 11,193 | 14,226 |
| Certain U.S. pension plans (2)......................... | 5,300 | 2,562 |
| Other post-retirement benefits (3).................... | 2,600 | 2,100 |

|  | $39,342 | $44,439 |
|---|---|---|

  </TABLE>
- -------------------

(1)  Represents the corporate overhead expenses of Grace allocated to Grace
     Packaging in accordance with SAB 55.  Allocated corporate overhead will
     not be assumed by New Sealed Air.  The corporate overhead allocated to
     Grace Packaging for the nine months ended September 30, 1997 exceeded the
     allocation for the year ended December 31, 1996 because Grace Packaging
     represented a larger portion of Grace's total business in 1997.  Grace's
     corporate overhead costs were $54.0 million for the year ended December
     31, 1996 (of which 28% was allocated to Grace Packaging) and $46.3
     million for the nine months ended September 30, 1997 (of which 55% was
     allocated to Grace Packaging).

(2)  Represents the costs related to the participation of Grace Packaging
     employees in Grace's long-term incentive compensation plan and certain U.S.
     defined benefit pension plans.  These plans will not be continued by New
     Sealed Air.  New Sealed Air intends to replace such pension plans with
     defined contribution retirement plans currently provided by Sealed Air to
     its employees.

(3)  Represents the approximate cost of post-retirement health and life
     insurance benefits for current retirees of Grace Packaging and current
     employees of Grace Packaging who are eligible to retire within one year.
     New Grace will retain responsibility for providing these benefits.
     New Sealed Air does not intend to provide company-paid post-retirement
     health and life insurance benefits.  For further discussion of the
     treatment of employee benefits, see "Employee Benefits Agreement"
     beginning on page 78.

(D) Reflects the following incremental costs of New Sealed Air after the Merger:

  <TABLE>
  <CAPTION>

|  | Year ended December 31, 1996 | Nine months ended September 30, 1997 |
|---|---|---|
| <S> | <C> | <C> |
| Corporate overhead: (1) |  |  |
| Personnel and related costs........................ | $ 4,000 | $ 3,000 |
| Corporate incentive compensation costs.............. | -- | -- |
| Corporate facility costs............................ | -- | -- |
| Network/information systems costs................... | 1,000 | 750 |
| Subtotal.......................................... | 5,000 | 3,750 |
|  |  |  |
| Deferred compensation............................... | 1,768 | 862 |
| Profit-sharing and other retirement plans (2)........ | 24,500 | 18,375 |
|  |  |  |
|  | $31,268 | $22,987 |

  </TABLE>
- ----------

(1)  Represents the incremental costs to New Sealed Air of providing corporate
     accounting, finance, human resources and other corporate services. New
     Sealed Air intends to remain in the current Sealed Air corporate
     headquarters after the Merger.

(2)  Represents the incremental cost to New Sealed Air of the participation by
     Grace Packaging's eligible employees in Sealed Air's defined contribution
     retirement plans, principally the Profit-Sharing Plan, and other
     incremental costs of maintaining existing foreign pension plans for
     certain employees of Grace Packaging following the Merger.  For further
     discussion of the treatment of employee benefits, see "Employee Benefits
     Agreement" beginning on page 78.

     The unaudited pro forma condensed consolidated statements of earnings do not
     include certain other cost savings or operating synergies that may result
     from the Merger, as such amounts are not currently determinable.

(E) Reflects the additional interest expense resulting from borrowings of
    approximately $1,240,800 under the New Credit Agreements (see "The New
    Credit Agreements" on page 80 for further information). Such borrowings are
    expected to bear interest at LIBOR plus an estimated 0.375%, plus an
    additional 0.05% whenever outstanding borrowings exceed $800,000. For
    purposes of the unaudited pro forma condensed consolidated statements of
    earnings, assumed interest rates of 5.98% and 6.07% have been used to
    calculate interest expense for the year ended December 31, 1996 and nine
    months ended September 30, 1997, respectively. Such interest rates are
    representative of the interest rates that would have been in effect under
    the New Credit Agreements, including the effect of assumed interest rate
    swap agreements on a portion of the amount borrowed, had such amount been
    borrowed on January 1, 1996 and remained outstanding throughout the periods
    presented. A 0.125% increase or decrease in LIBOR (related to the portion of
    the borrowings not affected by the interest rate swap) would have resulted
    in a $931 and $698 adjustment to interest expense for the year ended
    December 31, 1996 and the nine months ended September 30, 1997,
    respectively.

(F) Represents the income tax effect of increased interest expense, additional
    depreciation and amortization (excluding goodwill amortization) and other

adjustments. The effective income tax rate of New Sealed Air is expected to be higher than that of Sealed Air or Grace Packaging because the amortization of goodwill will not be deductible for tax purposes.

(G) For purposes of calculating unaudited pro forma earnings per common share, net earnings have been reduced by the 4% dividend payable on New Sealed Air's convertible preferred stock ($72,000 and $54,000 for the year ended December 31, 1996 and nine months ended September 30, 1997, respectively) to arrive at earnings available to common stockholders.

The weighted average number of outstanding common shares is assumed to be the shares of New Sealed Air common stock expected to be issued in the Recapitalization and Merger (40.895 million and 42.7 million shares, respectively). For purposes of this calculation, all shares are assumed to be outstanding throughout each period presented. Options to purchase Grace common stock that are held by Grace Packaging employees and that will become options to purchase New Sealed Air common stock have an immaterial effect on the unaudited pro forma earnings per common share. Generally accepted accounting principles do not permit the presentation of diluted earnings per share or the elimination of the preferred stock dividend if the treatment of the convertible preferred stock as the common stock into which it is convertible would be antidilutive (i.e., would increase earnings per common share). If the shares of New Sealed Air convertible preferred stock to be issued in the Merger were converted into common stock at their conversion price of $56.525 per share (which would result in the issuance of 31.8 million shares of common stock), pro forma earnings per common share would increase by $0.57 and $0.25 for the year ended December 31, 1996 and the nine months ended September 30, 1997, respectively.

In February 1997, the Financial Accounting Standards Board issued Statement No. 128, "Earnings per Share," which is required to be adopted on December 31, 1997. The adoption of such statement is expected to have an immaterial impact on the unaudited pro forma earnings per common share.

(H) Following the Merger, New Sealed Air intends to provide for income taxes on the assumed repatriation of earnings of Grace Packaging's foreign subsidiaries. This would result in a non-recurring charge to income tax expense of approximately $20,000 to reflect the cumulative effect of this provision for income taxes. Such charge has been reflected in the unaudited pro forma condensed consolidated balance sheet. The unaudited pro forma condensed consolidated statements of earnings do not include this non-recurring charge. They also do not include the effect of providing additional income taxes on the assumed repatriation of Grace Packaging's foreign earnings in the periods presented, as the impact is expected to be immaterial.

(I) Reflects the assumed borrowings under the New Credit Agreements to finance the Cash Transfer of $1,240,800 (subject to adjustment), including an estimated $40,800 for Grace Packaging's share of the costs of the Reorganization (see "Expenses" on page 77 for further information). Deferred financing costs relating to such borrowings are expected to be immaterial.

(J) Reflects the adjustments to the historical Grace Packaging liabilities and related deferred tax assets that will be retained by New Grace, as provided in the Transaction Agreements. The adjustments include the reduction of the following: (i) pension liability for certain U.S. retirement plans of $5,228, (ii) post-retirement medical and life insurance liability of $23,500 related to current retirees and Grace Packaging employees who are eligible to retire within one year following the Merger, (iii) environmental liabilities of $4,433 related to certain of Grace Packaging's current and former operating sites, (iv) certain restructuring reserves of $3,283 related to a lease obligation, (v) long-term and annual incentive compensation plans of $9,100 and (vi) related deferred tax assets of $17,307.

(K) Reflects the elimination of a Grace Packaging deferred tax asset of $14,823 related to certain foreign net operating loss carryforwards and other credits which, pursuant to the Distribution Agreement and Tax Sharing Agreement (defined under "Tax Sharing Agreement" on page 78, 78), New Sealed Air will not realize following the Reorganization.

(L) As provided for in the Distribution Agreement, these amounts assume the issuance of 40.895 million shares of New Sealed Air common stock and 36 million shares of New Sealed Air convertible preferred stock in the Recapitalization. The net assets of Grace Packaging are reclassified as additional paid-in capital. Each share of convertible preferred stock is convertible into .8845644 shares of New Sealed Air common stock at any time. The convertible preferred stock, which has a liquidation value of $50.00 per share, votes with the common stock on an as-converted basis, will be redeemable at the option of New Sealed Air beginning in 2001, subject to certain conditions, and will be subject to a mandatory redemption after 20 years at $50.00 per share. Because it is subject to mandatory redemption, the convertible preferred stock is classified outside of the stockholders' equity section of the unaudited pro forma condensed consolidated balance sheet. The pro forma condensed consolidated financial statements assume that the convertible preferred stock was issued at September 30, 1997. At such date, the estimated fair value of the convertible preferred stock exceeded its mandatory redemption amount by approximately $190 million primarily due to the common stock conversion feature of such preferred stock. Accordingly, the carrying amount of the convertible preferred stock is reflected in the pro forma condensed consolidated balance sheet at its mandatory redemption value. If the fair value of the convertible preferred stock is less than its mandatory redemption amount at the actual date of issuance, the carrying value of such preferred stock would be reflected at its fair value. The carrying amount would be increased by periodic accretions over the mandatory

redemption period (i.e., 20 years) so that the carrying amount would equal the mandatory redemption amount at the mandatory redemption date. The periodic accretions to the mandatory redemption amount would be reflected as a direct reduction of retained earnings and would reduce income available to common shareholders in calculating earnings per share.

See "Convertible Preferred Stock" beginning on page 91 for a complete description of the terms of the convertible preferred stock.

(M) Reflects the issuance in the Merger of approximately 42.7 million shares of New Sealed Air common stock in exchange for the same number of shares of Sealed Air common stock.

(N) Reflects the elimination of the historical Sealed Air equity balances.

(O) Reflects the allocation of the purchase price to the net assets of Sealed Air. Under purchase accounting, the assets and liabilities of Sealed Air are required to be adjusted to their fair values. The purchase price of $2,144,504 is the sum of (i) the product of multiplying approximately 42.7 million shares of Sealed Air common stock exchanged in the Merger by $49.52 per share, the average market price of Sealed Air common stock for a period around the time the Merger was announced and (ii) an estimated $30,000 of certain Grace Packaging costs of the Merger.

The following are the pro forma adjustments made to reflect the preliminary allocation of the purchase price to the estimated fair value of the net assets acquired based upon available information. These adjustments may change based on the results of appraisals and other analyses. Sealed Air does not expect these changes to be material.

| | |
|---|---|
| Purchase price.......................................... | $2,144,504 |
| Net assets of Sealed Air (1)............................ | (213,058) |
| | ---------- |
| Subtotal | 1,931,446 |
| | |
| Fair value adjustments: | |
| Inventory.......................................... | 17,800 |
| Properties and equipment, net...................... | 5,000 |
| Other assets (patents and other intangibles)........ | 20,000 |
| Deferred compensation.............................. | 6,046 |
| Deferred tax liabilities, net...................... | (26,462) |
| Liabilities assumed(2)............................. | (19,950) |
| | ---------- |
| Subtotal | 2,434 |
| | ---------- |
| Excess of cost over fair value of net | |
| assets acquired (goodwill)............................ | $1,929,012 |
| | ========== |

- -----------
(1)  Reflects the historical Sealed Air net assets adjusted to eliminate historical goodwill of $41,003 and net deferred tax liabilities of $6,435.

(2)  Reflects the estimated additional transaction-related expenses to be incurred by Sealed Air between September 30, 1997 and the date of the Merger. Such expenses have not been reflected in the unaudited pro forma condensed consolidated statements of earnings because they are nonrecurring in nature.


                         THE DISTRIBUTION AND MERGER AGREEMENTS

         This section describes the material provisions of the Distribution Agreement and the Merger Agreement. This description does not purport to be complete and is qualified in its entirety by reference to the Distribution Agreement and Merger Agreement, copies of which are attached hereto as Annexes A and B, respectively, and which are incorporated herein by reference. All stockholders are urged to read the Distribution Agreement and Merger Agreement carefully in their entirety.

General

         The Distribution Agreement sets forth the terms and conditions on which Grace will be reorganized in connection with the Merger, including (1) the separation of Grace Packaging from Grace's specialty chemicals businesses and the Cash Transfer to New Grace, (2) the Spin-off of New Grace and (3) the Recapitalization of Grace common stock into new common and convertible preferred stock.

         The Merger Agreement sets forth the terms and conditions on which the Merger will be effected.

Reorganization of Grace

              Separation of Grace Packaging from Grace's Other Businesses

         Before the Spin-off, Grace Packaging and Grace's specialty chemicals businesses will be separated into different groups of subsidiaries.

    o  In the U.S., Grace will transfer its packaging business to a subsidiary, Cryovac, Inc., and Grace's existing subsidiary, W. R. Grace & Co.-Conn., will retain the specialty chemicals businesses.

    o  Outside the U.S., where Grace conducts its business through local

subsidiaries, Grace will cause its local subsidiaries to transfer either the packaging business or the specialty chemicals businesses to a newly formed local subsidiary.  The local subsidiaries will then be transferred, if necessary, so that Cryovac, Inc. will become the owner (directly or indirectly) of all of the local packaging subsidiaries and W. R. Grace & Co.-Conn. will become the owner (directly or indirectly) of all of the local specialty chemicals subsidiaries.

o   Cryovac, Inc. will be transferred to become a direct, wholly owned subsidiary of Grace, and ownership of W. R. Grace & Co.-Conn. will be transferred to New Grace, another wholly owned subsidiary of Grace.

        The packaging subsidiaries worldwide will become the owners of (or will be given rights to use) the assets currently used or held for use in Grace's packaging business. When assets are used both in the packaging business and in the specialty chemicals businesses, these assets will generally be separated so the packaging subsidiaries will own and control the portion used in the packaging business and New Grace and its subsidiaries will own and control the portion used in Grace's specialty chemicals businesses. In cases where separation is not practicable, ownership generally will be allocated to the packaging subsidiaries or to New Grace based on which group is the predominant user of the asset, and the other group will have the right to use the asset (and the obligation to pay a proportionate share of the asset's costs and expenses during the first two years after the Spin-off and a market rate thereafter).

        The assets to be owned by the packaging subsidiaries generally will not include any cash or marketable securities and will not include certain general corporate or corporate service operations such as those conducted by Grace at its headquarters in Boca Raton, Florida. Generally, the packaging subsidiaries' assets will include vacant or unoccupied property only if used or held for use by Grace's packaging business or located at sites that are used exclusively by, or engaged predominantly in, the packaging business.

        With certain exceptions, the packaging subsidiaries will assume all of the liabilities associated with Grace's packaging business, and New Grace and its subsidiaries will be liable for and indemnify the packaging subsidiaries with respect to all liabilities that are not assumed. The packaging subsidiaries will not assume:

o   liabilities relating to asbestos or asbestos-containing materials manufactured and/or sold by Grace, its subsidiaries or any of their respective subsidiaries, affiliates or predecessors;

o   environmental liabilities at two of Grace's former packaging sites (in Woburn, Massachusetts and Laurens County, South Carolina);

o   environmental liabilities at other formerly used or divested packaging sites (and off-site disposal sites) and liabilities relating to any business, product line, facility or asset that was previously divested by Grace Packaging, except that the packaging subsidiaries will be responsible for 25% of these liabilities, up to $10 million;

o   intercompany debt (subject to certain exceptions);

o   liability for preclosing taxes, except that the packaging subsidiaries will be responsible for 25% of certain preclosing foreign tax liabilities, up to $3 million; and

o   other actual or potential liabilities relating to any existing interim service and tolling agreements, violations of securities laws and breaches of fiduciary duties by officers and directors.

        Cash Transfer.  Before the Spin-off, Grace and Cryovac, Inc. will borrow funds under the New Credit Agreements (as defined below) to enable them to make the Cash Transfer to New Grace and W. R. Grace & Co.-Conn.  The New Credit Agreements will remain the obligation of New Sealed Air and Cryovac, Inc. following the Merger.  The amount of the Cash Transfer will be $1.2 billion plus the sum of:

   (1)   the excess of the total amount of cash held by the packaging subsidiaries immediately prior to the Spin-off over the total amount of withholding and certain other taxes that would be payable if certain excess cash held by the foreign packaging subsidiaries were to be distributed to a U.S. packaging subsidiary immediately before the Spin-off;

   (2)   the amount by which the aggregate assets transferred to New Sealed Air relating to Grace's foreign and certain U.S. pension plans exceeds certain aggregate projected benefit obligations under those plans attributable to employees of Grace Packaging (or, if these obligations exceed the assets, the shortfall will reduce the Cash Transfer); and

   (3)   the total amount of transaction costs that must be paid by Grace to New Grace under the Distribution Agreement as of the date of the Spin-off ("Distribution Date"). See "Expenses" on page 77.

        New Grace intends to use approximately $1.1 billion of the Cash Transfer to repay outstanding bank and other borrowings. A portion of the Cash Transfer may be used to make a cash tender offer for, or otherwise retire, the outstanding 7.4% Notes due 2000, 7.75% Notes due 2002 and 8.0% Notes due 2004 (collectively, the "Public Debt") issued by W. R. Grace & Co.-Conn. and guaranteed by Grace. Approximately $644 million of Public Debt is currently outstanding. If any Public Debt remains outstanding after the Merger, it will continue to be the obligation of W. R. Grace & Co.-Conn., with New Sealed Air as

guarantor. If more than $50 million of Public Debt remains outstanding, New
Grace will obtain a letter of credit (the "Letter of Credit") for the benefit of
New Sealed Air, in the amount of the Public Debt remaining outstanding in excess
of $50 million, which will permit New Sealed Air to draw on the Letter of Credit
if it is required to make any payments on the Public Debt under its guarantee,
up to the amount of the Letter of Credit.

### Spin-off

After the separation of Grace's businesses and the Cash Transfer
but before the Merger, Grace will distribute all outstanding shares of New Grace
to Grace's stockholders. As a result of the Spin-off, Grace and its subsidiaries
will own and operate only the packaging business, and New Grace will be a
separate, publicly traded company owned by Grace's stockholders that will own
and operate Grace's specialty chemicals businesses.

### Recapitalization of Grace Common Stock

Immediately before the Merger occurs, each outstanding share of
Grace common stock will be recapitalized into a fraction of a share of a new
common stock (the "Common Consideration") and a fraction of a share of a new
convertible preferred stock (the "Preferred Consideration").

The Common Consideration will be equal to:

$$\frac{40,895,000 + (1.7027 \times \text{Net Increase in Sealed Air Shares}) - \text{Net Option Number}}{\text{Outstanding Grace Shares}}$$

The Preferred Consideration will be equal to:

$$\frac{36,000,000}{\text{Outstanding Grace Shares}}$$

Where:

| | |
|---|---|
| "Outstanding Grace Shares" means: | The total number of shares of Grace common stock outstanding as of the record date set by the Grace Board for the Recapitalization (the "Record Date"). |
| "Net | Increase in Sealed Air Shares" means: The net increase, if any, in the number of outstanding shares of Sealed Air common stock between August 14, 1997 and the Distribution Date. |

"Net Option Number" means:

$$\frac{\text{Option Shares} \times (\text{New Sealed Air Price} - \text{Average Exercise Price})}{\text{New Sealed Air Price}}$$

| | |
|---|---|
| "Option Shares" means: | The total number of shares of New Sealed Air common stock for which outstanding Grace options held by Grace Packaging employees are or may be exercisable, as described below. |
| "New Sealed Air Price" means: | The average of the arithmetic mean between the highest and lowest sales prices of a share of New Sealed Air common stock on the New York Stock Exchange Composite Tape on each of the five trading days beginning on the Distribution Date. |
| "Exercise Price" means: | The weighted average per-share exercise price of the options to purchase New Sealed Air common stock held by Grace Packaging employees. |

The Record Date and Distribution Date are expected to be the same
date as the Effective Time. The Record Date may, if necessary, precede the
Distribution Date and Effective Time by one day.

No fractional shares of New Sealed Air common or convertible
preferred stock will be issued in the Recapitalization. Instead, Grace
stockholders that would otherwise be entitled to receive fractional shares will
receive cash in the amount of the proceeds realized from a sale of those shares
in the market, net of sale expenses.

In the Recapitalization, Grace stockholders will receive an
estimated .53 to .54 of a share of New Sealed Air common stock and an estimated
.46 to .48 of a share of New Sealed Air convertible preferred stock for each
share of Grace common stock that they own. These estimates are based on the
relevant stock prices, numbers of outstanding shares, number of outstanding
Grace stock options, and other information available as of February 11, 1998.