in respect of Adjusted Foreign Transfer Taxes on the Distribution Date so that Adjusted Foreign Transfer Taxes are borne in the proportions described above in this Section 8.04. Appropriate payment shall be made between the parties in respect of Adjusted Foreign Transfer Taxes and the amount calculated pursuant to clause (c) of the definition of "New Grace Capital Contribution" to the extent that such amounts estimated as of the Distribution Date may be recalculated in a more accurate manner. New Grace agrees that it shall pay, or cause Grace-Conn. to pay, all amounts payable by New Grace pursuant to Section 6.12(a) of the Merger Agreement. Any amount paid by one party to the other under this Agreement in respect of Transaction Costs shall be treated, for tax purposes, as an adjustment to the portion of the New Grace Capital Contribution contributed from Grace to New Grace.

SECTION 8.05  Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware (other than the laws regarding choice of laws and conflicts of laws that would apply the substantive laws of any other jurisdiction) as to all matters, including matters of validity, construction, effect, performance and remedies.

SECTION 8.06  Notices.  All notices, requests, claims, demands and other communications hereunder shall be in writing and shall be given (and shall be deemed to have been duly given upon receipt) by delivery in person, by standard form of telecommunications, by courier, or by registered or certified mail, postage prepaid, return receipt requested, addressed as follows:

If to Grace or any member of the Packco Group:

Sealed Air Corporation
Park 80 East
Saddle Brook, New Jersey  07663
Attention:  President
Fax:  (201) 703-4152

and

Davis Polk & Wardwell
450 Lexington Avenue
New York, NY  10017
Attention:  Christopher Mayer, Esq.
Fax:  (212) 450-4800

- 45 -

If to New Grace or any member of the New Grace Group:

W. R. Grace & Co.
One Town Center Road
Boca Raton, Florida  33486
Attention:  Secretary
Fax:  (561) 362-1970

with a copy to:

Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, New York  10019
Attention:  Andrew R. Brownstein, Esq.
Fax:  (212) 403-2000

or to such other address as any party hereto may have furnished to the other parties by a notice in writing in accordance with this Section.

SECTION 8.07  Amendment and Modification.  This Agreement may be amended, modified or supplemented only by a written agreement signed by all of the parties hereto and subject to the reasonable consent of SAC.

SECTION 8.08  Successors and Assigns; No Third-Party Beneficiaries.  This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their successors and permitted assigns, but neither this Agreement nor any of the rights, interests and obligations hereunder shall be assigned by any party hereto without the prior written consent of the other parties.  Except for the provisions of Sections 4.02 and 4.03 relating to indemnities, which are also for the benefit of the Indemnitees, this Agreement is solely for the benefit of the parties hereto and their Subsidiaries and Affiliates and is not intended to confer upon any other Persons any rights or remedies hereunder.

SECTION 8.09  Counterparts.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

SECTION 8.10  Interpretation.  (a)  The Article and Section headings contained in this Agreement are solely for the purpose of reference, are not part of the agreement of the parties hereto and shall not in any way affect the meaning or interpretation of this Agreement.

- 46 -

(b)   The parties hereto intend that the Distribution shall be a distribution pursuant to the provisions of Section 355 of the Code, so that no gain or loss shall be recognized for federal income tax purposes as a result of such transaction, and all provisions of this Agreement shall be so interpreted.   The parties hereto do not intend to submit the Distribution to the Internal Revenue Service for a private letter ruling with respect to such nonrecognition, and any ultimate ruling or decision that any gain or loss should be recognized for federal income tax purposes shall not permit a rescission or reformation of this Agreement or transactions contemplated hereby.

SECTION 8.11  Severability.  If any provision of this Agreement or the application thereof to any person or circumstance is determined by a court of competent jurisdiction to be invalid, void or unenforceable, the remaining provisions hereof, or the application of such provision to persons or circumstances other than those as to which it has been held invalid or unenforceable, shall remain in full force and effect and shall in no way be affected, impaired or invalidated thereby, so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner adverse to any party.

SECTION 8.12  References; Construction.  References to any "Article," "Exhibit," "Schedule" or "Section," without more, are to Articles, Exhibits, Schedules and Sections to or of this Agreement.  Unless otherwise expressly stated, clauses beginning with the term "including" set forth examples only and in no way limit the generality of the matters thus exemplified.

SECTION 8.13  Termination.  Notwithstanding any provision hereof, following termination of the Merger Agreement, this Agreement may be terminated and the Distribution abandoned at any time prior to the Distribution Date by and in the sole discretion of the Board of Directors of Grace without the approval of any other party hereto or of Grace's shareholders. In the event of such termination, no party hereto or to any Other Agreement shall have any Liability to any Person by reason of this Agreement or any Other Agreement.

SECTION 8.14  SAC Reasonable Consent.  The parties hereto agree that any actions to be taken by Grace or New Grace under this Agreement that are not specifically required herein and that relate to Packco or the Packaging Business (including, without limitation, the transactions described in Article II) must be reasonably satisfactory to SAC.

- 47 -

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

W. R. GRACE & CO.

By: _____
     Name:  Larry Ellberger
     Title: Senior Vice President

W. R. GRACE & CO.-CONN.

By: _____
     Name:  Robert B. Lamm
     Title: Vice President

GRACE SPECIALTY CHEMICALS, INC.
   (to be renamed W. R. Grace & Co.)

By: _____
     Name:  W.B. McGowan
     Title: Senior Vice President

- 48 -

coajn/grace/03901.0005/97docs/dist.agt6

<u>**Exhibit B**</u>

EXECUTION COPY

TAX SHARING AGREEMENT

by and among

W. R. GRACE & CO.,

W. R. GRACE & CO.-CONN.

and

SEALED AIR CORPORATION

Dated as of March 30, 1998

## TAX SHARING AGREEMENT

This TAX SHARING AGREEMENT (this "Agreement"), dated as of March 30, 1998, by and among W. R. Grace & Co., a Delaware corporation ("Grace"), W. R. Grace & Co.-Conn., a Connecticut corporation and a wholly owned subsidiary of Grace ("Grace-Conn."), and Sealed Air Corporation, a Delaware corporation ("Sealed Air").

### RECITALS

WHEREAS, Grace, Packco Acquisition Corp., a Delaware corporation and a wholly owned subsidiary of Grace, and Sealed Air have entered into an Agreement and Plan of Merger (the "Merger Agreement");

WHEREAS, Grace, Grace-Conn. and Grace Specialty Chemicals, Inc., a Delaware corporation and a wholly owned subsidiary of Grace ("New Grace"), have entered into the Distribution Agreement;

AND WHEREAS, Grace, on behalf of itself and the Packco Group, and Grace-Conn., on behalf of itself and the New Grace Group, wish to provide for the allocation between the Packco Group and the New Grace Group of all responsibilities, liabilities and benefits relating to or affecting Taxes (as hereinafter defined) paid or payable by either of them for all taxable periods, whether beginning before, on or after the Distribution Date (as hereinafter defined) and to provide for certain other matters.

NOW, THEREFORE, in consideration of the premises, and of the representations, warranties, covenants and agreements set forth herein, the parties hereto hereby agree as follows:

### ARTICLE I.

### DEFINITIONS

Capitalized terms used but not otherwise defined herein shall have the respective meanings assigned to them in the Distribution Agreement or the Merger Agreement. As used in this Agreement, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and the plural forms of the terms defined):

"Action": as defined in Section 5.3(a).

"Active New Grace Businesses": as defined in Section 5.2(b).

"Active Packco Business": as defined in Section 5.1(b).

"Adjusted Item":  as defined in Section 3.2(a)(v).

"Adjusted Party" means the party for the account of which is an Adjusted Item.

"Affiliated Group" means the affiliated group of which Grace is the common parent or any predecessor or successor thereto.

"Agreed Date":  as defined in Section 2.2(b).

"Code" means the Internal Revenue Code of 1986, as amended, and shall include corresponding provisions of any subsequently enacted federal tax laws.

"Conn Prepared Returns":  as defined in Section 2.2(a).

"Conn Prior Payments":  as defined in Section 3.2(c)(iii).

"Consistency/Basis Disagreement":  as defined in Section 2.2(b).

"Corresponding Item":  as defined in Section 3.2(a)(v).

"Corresponding Party" means the party for the account of which is a Corresponding Item.

"Del Prepared Returns":  as defined in Section 2.2(a).

"Discontinued Businesses":  shall mean (x) the can sealing and coating portion of the New Grace Business which portion is described in the proviso to the definition of the Packaging Business and (y) certain other businesses currently accounted for as discontinued operations.

"Distribution Date" means the date on which the Distribution occurs.  For purposes of this Agreement, the Distribution shall be deemed effective as of the close of business on the Distribution Date.

"Equity Securities" means any stock or other equity securities treated as stock for tax purposes, or options, warrants, rights, convertible debt, or any other instrument or security that affords any Person the right, whether conditional or otherwise, to acquire stock.

"Final Determination" means the final resolution of liability for any Tax for a taxable period (i) by a duly executed IRS Form 870 or 870-AD (or any successor forms thereto), on the date such Form is effective, or by a comparable form under the laws of other jurisdictions; except that a Form 870 or 870-AD or comparable form that reserves (whether by its terms or by operation of law) the right of the taxpayer to file a claim for

refund and/or the right of the taxing authority to assert a
further deficiency shall not constitute a Final Determination
with respect to the right so reserved; (ii) by a decision,
judgment, decree, or other order by a court of competent
jurisdiction, which has become final and unappealable; (iii) by a
closing agreement or accepted offer in compromise under
Section 7121 or 7122 of the Code, or comparable agreements under
the laws of other jurisdictions; (iv) by any allowance of a
refund or credit in respect of an overpayment of Tax, but only
after the expiration of all periods during which such refund may
be recovered (including by way of offset) by the jurisdiction
imposing Tax; or (v) by·any other final disposition, including by
reason of the expiration of the applicable statute of limitations
or by mutual agreement of the parties.

     "Foreign Cap" shall mean $3 million.

     "Foreign Packco Subsidiary" means a Packco Subsidiary
organized in a foreign jurisdiction.

     "Foreign Packco Tax Item" means a Tax Item of a Foreign
Packco Subsidiary arising in the Pre-Distribution Period
attributable to the Packaging Business conducted by such
Subsidiary other than any Tax Item of a Foreign Packco Subsidiary
arising as a result of a Foreign Transfer.

     "Foreign New Grace Subsidiary" means a New Grace
Subsidiary organized in a foreign jurisdiction.

     "Forwarding Party":  as defined in Section 4.1.

     "Forwarding Responsibilities":  as defined in
Section 4.1.

     "Hypothetical Pre-Distribution Tax":  as defined in
Section 2.2(d).

     "Hypothetical Pre-Distribution Overall Tax Benefit":
as defined in Section 2.2(d).

     "Indemnified Amount":  as defined in Section 4.1.

     "Indemnitee":  as defined in Section 4.2(a).

     "Indemnitor":  as defined in Section 4.2(a).

     "Indemnity Issue":  as defined in Section 4.2(a).

     "Interest":  as defined under "Taxes" below.

     "IRS" means the Internal Revenue Service.

     "New Grace Tax Item" means a Tax Item arising in the
Pre-Distribution Period attributable to (i) New Grace, Grace-

Conn., Packco, any Foreign New Grace Subsidiary, any member of
the Affiliated Group which was a member prior to the Distribution
Date or any member of the affiliated group for United States
federal income tax purposes of which W. R. Grace & Co., a New
York corporation, was the common parent or (ii) the New Grace
Business conducted by any Foreign Packco Subsidiary.

"Overall Tax Benefit" shall mean, for any taxable
period, the net operating loss, unused credits (taking into
account foreign tax credits when realized regardless of the
period for which the associated earnings and profits were earned)
and any other aggregate net unused Tax Benefit not used to reduce
Taxes for the period.

"Packco Prior Payments": as defined in
Section 3.2(c)(iii).

"Packaging Tax Item" means a Tax Item attributable to
Sealed Air, any member of the Packco Group or otherwise relating
to the Packaging Business or the Packaging Assets that is not a
New Grace Tax Item or a Foreign Packco Tax Item.

"Payee": as defined in Section 3.2(c).

"Payor": as defined in Section 3.2(c).

"Post-Distribution Period" means the Post-Distribution
Taxable Periods and the portion of any Straddle Period beginning
on the date after the Distribution Date.

"Post-Distribution Taxable Period" means any taxable
period beginning after the Distribution Date.

"Pre-Distribution Period" means the Pre-Distribution
Taxable Periods and the portion of any Straddle Period ending on
the Distribution Date.

"Pre-Distribution Schedules": as defined in
Section 2.2(b).

"Pre-Distribution Taxable Period" means any taxable
period ending on or before the Distribution Date

"Proceeding" shall mean any audit or other examination,
judicial or administrative proceeding relating to liability for
or refunds or adjustments with respect to Taxes.

"Recipient Group": as defined in Section 4.1.

"Restriction Period" means the period beginning on the
date hereof and ending on the two-year anniversary of the
Effective Time.

"Reviewing Party": as defined in Section 5.3(c).

-4-

"Ruling/Opinion Exception": as defined in Section 5.1.

"Sealed Air Parties" means Sealed Air and each of its past, present or future Affiliates, other than any member of the Packco Group.

"Straddle Period" means a taxable period that includes, but does not end on, the Distribution Date.

"Substantial Authority": as defined in Section 2.1.

"Tax Benefit" means any item of loss, deduction, credit or any other Tax Item which decreases Taxes paid or payable.

"Tax Deficiency" means an assessment of Taxes, as a result of a Final Determination.

"Tax Detriment" means any item of income, gain, recapture of credit or any other Tax Item which increases Taxes paid or payable.

"Tax-Free Status" means the qualification of the Distribution (i) as a transaction described in Section 355(a)(1) of the Code, (ii) as a transaction in which the stock distributed thereby is qualified property for purposes of Section 355(c)(2) of the Code and (iii) as a transaction in which each of Grace, Grace-Conn., Packco, New Grace and each member of the New Grace Group recognizes no income or gain.

"Tax Item" means any item of income, gain, loss, deduction, credit, recapture of credit or any other item which increases or decreases Taxes paid or payable, including an adjustment under Code Section 481 resulting from a change in accounting method.

"Tax Opinions" shall mean the tax opinions referred to in Section 7.1(e) of the Merger Agreement.

"Tax Refund" means a refund of Taxes as the result of a Final Determination.

"Tax Return" means any return, filing, questionnaire, information return or other document required to be filed, including requests for extensions of time, filings made with estimated tax payments, claims for refund and amended returns that may be filed, for any period with any taxing authority (whether domestic or foreign) in connection with any Tax or Taxes (whether or not a payment is required to be made with respect to such filing).

"Taxes" means all forms of taxation, whenever created or imposed, and whether of the United States or elsewhere, and whether imposed by a local, municipal, governmental, state, foreign, federation or other body, and, without limiting the

generality of the foregoing, shall include income, sales, use, ad valorem, gross receipts, trade, license, value added, franchise, transfer, recording, withholding, payroll, employment, excise, occupation, unemployment insurance, social security, business license, business organization, stamp, environmental, premium and property taxes, together with any related interest, penalties and additions to any such tax, or additional amounts imposed by any taxing authority (domestic or foreign) (such interest, penalties, additions and additional amounts, "Interest").

"Transaction Party":  as defined in Section 5.3(c).

## ARTICLE II.

### FILING OF TAX RETURNS

Section 2.1.  Manner of Filing.  All Tax Returns filed after the Distribution Date and the Pre-Distribution Schedules shall be prepared on a basis which is consistent with the consummation of the transactions as set forth in the Distribution Agreement, the Grace Tax Matters Certificate, the Sealed Air Tax Matters Certificate, the Tax Opinions and any opinions, rulings, agreements or written advice relating to Foreign Transfers (in the absence of a controlling change in law or circumstances) and shall be filed on a timely basis (including extensions) by the party responsible for such filing under this Agreement.  In the absence of a controlling change in law or circumstances, all such Tax Returns and Pre-Distribution Schedules shall also be prepared on a basis which is consistent with the treatment of each of the Foreign Transfers in the jurisdictions listed on Exhibit A hereto as a reorganization, pursuant to a plan of reorganization, within the meaning of Section 368(a)(1)(D) of the Code.  The Pre-Distribution Schedules and all Tax Returns in respect of a Pre-Distribution Taxable Period or portion, ending on the Distribution Date of any Straddle Period, that include any member of the New Grace Group or the Packco Group shall be prepared on the basis of substantial authority or on a reasonable basis with (if applicable) appropriate disclosure (each, "Substantial Authority"); provided, however, that such Schedules and Returns shall be prepared on a basis consistent with the elections (other than elections relating to carrybacks and carryforwards described in Section 3.3(a)), accounting methods, conventions and principles of taxation used for the most recent taxable periods of members of the New Grace Group for which Tax Returns involving similar Tax Items have been filed, to the extent that a failure to do so would result in a Tax Detriment, or a reduction in a Tax Benefit, to a member of the Packco Group, as long as such consistent position has Substantial Authority.  All Tax Returns in respect of a Post-Distribution Taxable Period or portion, beginning after the Distribution Date, of any Straddle Period, shall be prepared with Substantial Authority; provided, however, that such Returns shall be prepared on a basis consistent with the elections (other than elections relating to carrybacks and carryforwards described in Section 3.3(a)), accounting methods,

-6-

conventions and principles of taxation used for the most recent
taxable periods of members of the New Grace Group for which Tax
Returns involving similar Tax Items have been filed, to the
extent that a failure to do so would result in a Tax Detriment,
or a reduction in a Tax Benefit, to a member of the other Group,
as long as such consistent position has Substantial Authority.
In the event of a conflict with respect to a Straddle Period
between the requirements of the immediately preceding sentence
and the second preceding sentence, the second preceding sentence
shall prevail.  Subject to the provisions of this Agreement, all
decisions relating to the preparation of Tax Returns shall be
made in the sole discretion of the party responsible under this
Agreement for such preparation.  Grace shall provide Grace-Conn.
with copies of all Tax Returns filed after the Distribution Date
that relate to any member of the New Grace Group.  Grace-Conn.
shall provide Grace with a copy of any portion of a Tax Return
necessary to confirm Grace-Conn.'s entitlement to payment
hereunder in respect of a carryback or refund.

        Section 2.2.   <u>Pre-Distribution and Straddle Period Tax</u>
<u>Returns</u>.

        (a)   Grace shall prepare and file, or cause to be
prepared and filed, any Tax Returns required to be filed by a
member or members of the New Grace Group or the Packco Group for
any Pre-Distribution Taxable Period and any Straddle Period;
<u>provided</u>, <u>however</u>, that Grace-Conn. shall prepare and file, or
cause to be prepared and filed, any Tax Returns relating solely
to a member or members of the New Grace Group or their respective
assets or businesses (such Tax Returns to be prepared and filed,
or caused to be prepared and filed, by Grace, the "<u>Del Prepared</u>
<u>Returns</u>", and by Grace-Conn., the "<u>Conn Prepared Returns</u>",
respectively).

        (b)   With respect to any Del Prepared Return that has
not been filed as of the Distribution Date and relates to a Pre-
Distribution Taxable Period or a Straddle Period, Grace-Conn.
shall, 25 calendar days before the due date (including
extensions) for such Return, provide Grace with a schedule
(collectively, the "<u>Pre-Distribution Schedules</u>") detailing the
computation of (i) in the case of a Pre-Distribution Taxable
Period, the Tax and/or Overall Tax Benefit and (ii) in the case
of a Straddle Period, the Hypothetical Pre-Distribution Tax
and/or Hypothetical Pre-Distribution Overall Tax Benefit, in
either case, attributable to the member or members of the New
Grace Group or the Packco Group included in such Return.  Any
Pre-Distribution Schedule relating to a Pre-Distribution Taxable
Period shall be delivered to Grace in the form of a completed,
but unexecuted Tax Return.  If Grace so requests, Grace-Conn.
shall discuss with Grace the preparation of, and allow Grace
periodically to review major issues with respect to, any Pre-
Distribution Schedule.  In the event that Grace disagrees with
any Tax Item reflected (or anticipated to be reflected) on a Pre-
Distribution Schedule and demonstrates (by means of a written

-7-

explanation in sufficient detail to permit such conclusion to be
verified) its conclusion that Grace-Conn. has failed to comply
with the requirements of the third sentence of Section 2.1 hereof
(a "Consistency/Basis Disagreement"), Grace-Conn. shall explain
its calculation of such Tax Item within 14 days of receipt of
Grace's written explanation.  The parties shall attempt in good
faith mutually to resolve any Consistency/Basis Disagreements
prior to the due date for filing the relevant Tax Return.
Notwithstanding any other provision of this Agreement, with
respect to estimated Tax payments to a foreign governmental
authority for the first quarter of 1998 that are due before the
parties have agreed on the amount in connection therewith for
which Grace-Conn. is responsible hereunder, (I) Grace shall
estimate in good faith and in accordance with past practice and
make such estimated Tax payment, (II) Grace shall promptly
provide such estimate to Grace-Conn., (III) Grace-Conn. shall
deliver to Grace the applicable Pre-Distribution Schedule
reasonably promptly after the Distribution Date (provided that
Grace and its Affiliates reasonably and promptly cooperate with
Grace-Conn. in the preparation thereof), (IV) Grace-Conn. shall
not be required to make any payment in respect of such estimated
Taxes to Grace until five days after the date that the parties
agree on such Pre-Distribution Schedule (the "Agreed Date") (and
such payment shall not exceed the amount of such estimated Tax
paid, shall otherwise be determined based on the Pre-Distribution
Schedule as distinguished from the estimated Tax paid, and shall
be made in immediately available funds), and (IV) such payment
shall bear interest from the time that payment is due to the
applicable governmental authority until the earlier of the date
that payment is made by Grace-Conn. and five days after the
Agreed Date at the rate of interest charged for Eurodollar or
LIBOR loans under Grace-Conn.'s principal senior bank debt
agreement.  If such payment by Grace-Conn. is not made by the
fifth day after the Agreed Date, then such payment shall bear
interest from the fifth day after the Agreed Date until the date
that payment is made by Grace-Conn. at the rate that is two
percent in excess of the rate set forth in clause (IV) of the
preceding sentence.

          (c)  Whether or not any Consistency/Basis Disagreements
or any other disagreements relating to a Tax Item on a Pre-
Distribution Schedule have been resolved by the applicable due
date, Grace shall (i) prepare the Del Prepared Returns on the
basis of, and in a manner consistent with, the Pre-Distribution
Schedules, (ii) provide Grace-Conn. with a copy of each Del
Prepared Return 14 calendar days before such Return is filed and
reflect any comments thereon provided in good faith by Grace-
Conn. and (iii) provide Grace-Conn. with a copy of each Del
Prepared Return two business days after such Return is filed.  In
the event that any Consistency/Basis Disagreements relating to a
Pre-Distribution Schedule have not been resolved prior to the
filing of the relevant Tax Return, such disagreements shall be
promptly resolved pursuant to Section 6.7 hereof.

(d)   The "Hypothetical Pre-Distribution Tax" shall mean
the Tax that would have been due for the taxable period ending on
the Distribution Date if the Distribution Date were the last day
of the taxable period.   The "Hypothetical Pre-Distribution
Overall Tax Benefit" shall mean the Overall Tax Benefit that
would have arisen in the taxable period ending on the
Distribution Date if the Distribution Date were the last day of
the taxable period.   Such Tax or Overall Tax Benefit shall be
computed by determining items of income, expense, deduction, loss
and credit on a "closing of the books" basis, reflecting tax
accounting principles as of the close of business on the
Distribution Date.

      Section 2.3.   Post-Distribution Tax Returns.   Any Tax
Return for a Post-Distribution Taxable Period shall be the
responsibility of the New Grace Group if such Tax Return relates
solely to a member or members of the New Grace Group or their
respective assets or businesses, and shall be the responsibility
of the Packco Group if such Tax Return relates solely to a member
or members of the Packco Group or Sealed Air or their respective
assets or businesses.

ARTICLE III.

PAYMENT OF TAXES

      Section 3.1.   Allocation of Tax Liabilities With
Respect to Unfiled Returns.

      (a)   All Taxes shall be paid by the party responsible
under this Agreement for filing the Tax Return pursuant to which
such Taxes are due; provided, however, that

            (i)   in the case of Taxes due with respect to
Del Prepared Returns for Pre-Distribution Taxable Periods or
Straddle Periods, Grace-Conn. shall pay Grace the amount, if any,
of the Tax or Hypothetical Pre-Distribution Tax, as the case may
be, if any, reflected in the Pre-Distribution Schedule relating
to such Tax Return attributable to the member or members of the
New Grace Group or the Packco Group included in such Return (and
in the case of the Business Tax and Real Estate Tax due to France
or a political subdivision thereof (and other Taxes due to any
jurisdiction based on analogous principles), with respect to
Post-Distribution Periods in 1998, Grace-Conn. shall pay Grace
the amount of any Tax liability attributable to the New Grace
Business).   Such payment shall be made, at Grace-Conn.'s
discretion, either in immediately available funds on the morning
of the relevant date when payment is due to the governmental
authority in respect of such Tax Return or, if not in immediately
available funds, two business days prior to such due date.   Grace
shall forward any such payment that it receives from Grace-Conn.
to the appropriate taxing authority.

-9-

(ii) in the case of Del Prepared Returns for any taxable period, on the relevant date on which payment is due (or a refund is received) in respect of such Tax Return, Grace shall pay Grace-Conn. the amount, if any, of the actual reduction in Taxes, or the actual increase in the Tax refund, that would have been payable or receivable with respect to such Tax Return but for any Overall Tax Benefit (or Hypothetical Pre-Distribution Overall Tax Benefit) that is for the account of Grace-Conn. under Section 3.2(a)(iii), below. In the case of a payment by Grace in respect of a reduction in Taxes, such payment shall be made in immediately available funds on the morning of the relevant due date or, if not in immediately available funds, two business days prior to the due date.

(iii) the parties intend that, in implementing this Section 3.1(a), payment and reimbursement between the parties shall reflect the principles of Section 3.2(a).

(b) Notwithstanding anything to the contrary, any Tax Item resulting from any act or omission not in the ordinary course of business (other than transactions contemplated by this Agreement, the Distribution Agreement, the Merger Agreement or the Benefits Agreement) on the part of any member of the Packco Group or any of the Sealed Air Parties occurring on the Distribution Date after the Effective Time shall be deemed to arise in a taxable period which begins after the Distribution Date.

Section 3.2. Indemnities; Redetermined Tax Liabilities. Except as otherwise provided in Article V:

(a) Indemnities.

(i) Grace-Conn. shall be responsible for (w) any Tax for a Pre-Distribution Taxable Period (and any Hypothetical Pre-Distribution Tax for a Straddle Period) of Grace, Grace-Conn., Packco, any Foreign New Grace Subsidiary, any current or former member of the Affiliated Group which was a member prior to the Distribution Date or any current or former member of the affiliated group for United States federal income tax purposes of which W. R. Grace & Co., a New York corporation, was the common parent, (x) any Tax for a Pre-Distribution Taxable Period (and any Hypothetical Pre-Distribution Tax for a Straddle Period) of a Foreign Packco Subsidiary attributable to the Packaging Business reflected on a Tax Return filed by such Subsidiary on or before the Distribution Date or on a Pre-Distribution Schedule, (y) any Tax of any member of the New Grace Group or a Foreign Packco Subsidiary, in either case, to the extent attributable to the New Grace Business and (z) 75% (or if the Packco Group has borne an amount of Tax in respect of adjustments to Foreign Packco Tax Items (and fees and expenses in Proceedings relating to such adjustments) that exceeds the Foreign Cap, then 100%) of any increase in Tax of a member of the

Packco Group attributable to an adjustment to a Foreign Packco Tax Item.

(ii)   Grace shall be responsible for any Taxes (x) of any member of the Packco Group or otherwise relating to the Packaging Business or the Packaging Assets (except to the extent that Grace-Conn. is responsible for such Taxes pursuant to clause (i) above) and (y) of any of the Sealed Air Parties, whether arising before, on or after the Distribution Date.

(iii)   Any Overall Tax Benefit (or Hypothetical Pre-Distribution Overall Tax Benefit) shall be for the account of Grace-Conn. to the extent that such Overall Tax Benefit (or Hypothetical Pre-Distribution Overall Tax Benefit) is attributable to (w) Grace, Grace-Conn., Packco, any Foreign New Grace Subsidiary, any current or former member of the Affiliated Group which was a member prior to the Distribution Date or any current or former member of the affiliated group for United States federal income tax purposes of which W. R. Grace & Co., a New York corporation, was the common parent, in each case, for the Pre-Distribution Period, (x) the Packaging Business of a Foreign Packco Subsidiary for the Pre-Distribution Period reflected on a Tax Return filed by such Subsidiary on or before the Distribution Date or on a Pre-Distribution Schedule (other than the Foreign NOLs), (y) a Pre-Distribution Period of any member of the New Grace Group or a Foreign Packco Subsidiary, in either case, to the extent attributable to the New Grace Business (other than the Foreign NOLs) or (z) any adjustment to a Foreign Packco Tax Item.

(iv)   For purposes of determining the amount for which Grace or Grace-Conn. is responsible for paying the other party, or entitled to receive from the other party, in the event of any adjustment, including a Final Determination, of a Tax Item of a Foreign Packaging Subsidiary (other than a Tax Item that arises as a result of a Foreign Transfer), Tax Items that are clearly attributable to the Packaging Business or the New Grace Business, respectively, shall be allocated to such Business and Tax Items that are not so attributable shall be allocated in the proportion that the earnings from operations of such Business operated by such Subsidiary bears to the total earnings from operations of such Subsidiary, as reflected in audited financial statements for the most recent, as of the end of such taxable period, full-year accounting period.  Tax Items so allocated shall be treated for all purposes of this Agreement as attributable to the Business to which they are allocated.

(v)   Timing Adjustments.  In the event of any adjustment, including a Final Determination, of a Tax Item (the "Adjusted Item") which results in a Tax Benefit or Tax Detriment for the account of one party and a corresponding Tax Detriment or Tax Benefit (the "Corresponding Item") for the account of the other party, then (I) if the Corresponding Item is a Tax Benefit, the Corresponding Party shall pay the Adjusted Party and (II) if

-11-

the Corresponding Item is a Tax Detriment, the Adjusted Party shall pay the Corresponding Party, in either case, for each taxable period in which a member of the Group of the party entitled to payment under this Section 3.2(a)(v) actually realizes the Tax Benefit, in the case of (I), or the Tax Detriment, in the case of (II), by reason of the adjustment, an amount equal to such realized Tax Benefit, in the case of (I), or realized Tax Detriment, in the case of (II), including interest (computed at a 5% annual rate) from the original due date (without extensions) for filing of the Return for such taxable period through the date of payment under this Section 3.2(a)(v).

(b)  Final Determinations.  In the case of any Final Determination regarding a Tax Return, any Tax Deficiency shall be paid to the appropriate taxing authority by, and any Tax Refund received from the appropriate taxing authority shall be paid to, the party which filed such Return; provided, however, that whether or not there is a Tax Deficiency or Tax Refund and whether or not a payment is required to or from the appropriate taxing authority, Grace shall make payments to, or receive payments from, Grace-Conn. based upon the following principles:

(i)  Grace-Conn. shall make a payment to Grace in an amount equal to (x) any increase in the Tax of any of the Sealed Air Parties or any member of the Packco Group resulting from any adjustment to a New Grace Tax Item and (y) 75% (or, if the Packco Group has borne an amount of Tax in respect of adjustments to Foreign Packco Tax Items (and fees and expenses in Proceedings relating to such adjustments) that exceeds the Foreign Cap, then 100%) of any increase in the Tax of any of the Sealed Air Parties or any member of the Packco Group resulting from any adjustment to a Foreign Packco Tax Item, in either case (x) or (y), together with any Interest relating thereto that is or has been imposed by the relevant taxing authority (or would have been imposed but for an offsetting Packaging Tax Item).

(ii)  Grace shall pay to Grace-Conn. an amount equal to (x) any decrease in the Tax of any of the Sealed Air Parties or any member of the Packco Group resulting from any adjustment to a New Grace Tax Item and (y) any decrease in the Tax of any of the Sealed Air Parties or any member of the Packco Group resulting from any adjustment to a Foreign Packco Tax Item, in either case (x) or (y), together with any Interest relating thereto that is or has been paid by the relevant taxing authority (or would have been paid but for an offsetting Packaging Tax Item).

(iii)  The parties intend that, in implementing this Section 3.2(b), payment and reimbursement between the parties shall reflect the principles of Section 3.2(a).

(iv)  Payments otherwise required to be made under this Section 3.2(b) with respect to a single Final

-12-

Determination shall be netted and offset against each other so
that either Grace shall make a payment to Grace-Conn. or Grace-
Conn. shall make a payment to Grace, but not both.

        (c)  Calculation and Payment of Amounts.

                (i)  All calculations and determinations
required to be made pursuant to this Article III shall initially
be made by the party obligated to make such payment (the "Payor")
in its good faith.  If the party entitled to receive a payment
(the "Payee") so requests, the Payor shall present its
calculations and determinations to the Payee in writing.  The
Payee shall be deemed to consent to such calculations and
determinations unless the Payee notifies the Payor in writing
within 30 days of receiving such calculations and determinations.
If the Payee disagrees with the Payor's calculations and
determinations, the parties shall attempt in good faith mutually
to resolve the disagreement.  In the event that they cannot so
resolve the disagreement, it shall be resolved promptly pursuant
to Section 6.7 hereof.

                (ii)  For all tax purposes, the parties
hereto agree to treat, and to cause their respective affiliates
to treat, (x) any payment required to be paid to a member of the
other Group by this Agreement as an adjustment to the portion of
the New Grace Capital Contribution that is contributed from Grace
to New Grace and (ii) any payment of interest or Taxes (other
than U.S. Federal income taxes) by or to a taxing authority as
taxable or deductible, as the case may be, to the party entitled
under this Agreement to retain such payment or required under
this Agreement to make such payment, in either case except as
otherwise mandated by the law or a Final Determination.  In the
event of such a Final Determination, the payment in question
shall be adjusted to place the parties in the same after-tax
position that they would have enjoyed absent such Final
Determination.  Any payment required by this Agreement that is
not made on or before the date required hereunder shall bear
interest, from and after such date through the date of payment,
at the rate that is two percent in excess of the rate of interest
charged for Eurodollar or LIBOR loans under the principal senior
bank debt agreement of the party required to make such payment.

                (iii)  Payment of any amount required to be
made pursuant to this Article III as a result of a Final
Determination shall become due and payable after such Final
Determination has been made within ten business days of the
receipt of written notice from the party entitled to receive such
payment to the party required to make such payment.  Any amounts
required to be paid in respect of Taxes or Overall Tax Benefits
pursuant to this Article III shall be adjusted to avoid
duplication of payments and to take into account the sum of any
payments previously made by any member of the Packco Group on or
prior to the Distribution Date or by Grace-Conn. or any other
member of the New Grace Group at any time in respect of such

Taxes or Overall Tax Benefits (the "Conn Prior Payments") and the sum of any payments previously made by any member of the Packco Group after the Distribution Date in respect of such Taxes or Overall Tax Benefits (the "Packco Prior Payments"). Appropriate payments will be made between the parties in the event that the Conn Prior Payments or the Packco Prior Payments, respectively, exceed the amounts for which Grace-Conn. or Packco, respectively, is responsible under the principles of Section 3.2(a).

(d)    Other Tax Liabilities and Refunds. Any Tax or Tax refund that is not otherwise covered by Section 3.1 or 3.2(b) shall be allocated, and payment shall be made by Grace-Conn. or Grace, using the principles of Sections 3.2(a); provided, however, that any Tax refund (whether or not governed by Section 3.1 or 3.2(b)) arising as a result of an adjustment of a Foreign Packco Tax Item shall be allocated in the same manner and to the same extent as Taxes and expenses in respect of adjustments of Foreign Packco Tax Items have been borne (it being agreed and understood that to the extent that the Foreign Cap has been exceeded, such refund shall be entirely for the benefit of Grace-Conn. and to the extent that refunds are shared 75% by Grace-Conn. and 25% by Grace the Foreign Cap shall be increased by the amount refunded to Grace). Any Tax refund received by one party that is for the account of the other party shall be paid to such other party promptly upon receipt thereof. Any Tax paid by one party that is the responsibility of the other party shall be reimbursed promptly by the other party.

Section 3.3.    Carrybacks and Refund Claims.    (a) Any Tax refund resulting from the carryback by any member of the New Grace Group of any Tax Item arising after the Distribution Date to a Pre-Distribution Taxable Period or a Straddle Period shall be for the account of Grace-Conn., and Grace shall promptly pay over to Grace-Conn. any such Tax refund that it receives. In the event that a member of the New Grace Group, on the one hand, and a member of the Packco Group or a Sealed Air Party, on the other hand, are each entitled to carryback a Tax Item to a Pre-Distribution Taxable Period or a Straddle Period, the respective Tax Items shall be utilized under the rules of applicable law (which shall be, in the case of carrybacks to such periods of the Affiliated Group and carrybacks under foreign or State law with respect to which there is no applicable rule regarding the priority of such utilization, the rules contained in Treasury Regulation § 1.1502-21T). Any election affecting the carryback or carryforward of any Tax Item of any member of the New Grace Group, or a payment to or by such a member under this Agreement in respect of a carryback or carryforward, including the elections under Section 172(b)(3) of the Code and Treasury Regulation §§ 1.1502-21T(b)(3) and 1.172-13(c) with respect to the taxable years of the Affiliated Group that begin on each of January 1, 1997, and January 1, 1998, shall not be made without the consent of Grace-Conn. and shall be made if Grace-Conn. so requests.

-14-

(b)  Grace-Conn. shall be permitted to file, and Grace shall fully cooperate with Grace-Conn. in connection with, any refund claim.  To the extent that such a refund claim (other than a claim arising from a carryback) does not result in a Tax refund (or would not result in a refund if a claim were filed) as the result of an offsetting Packaging Tax Item (including a Packaging Tax Item carried back to a Pre-Distribution Taxable Period or a Straddle Period), Grace shall remit to Grace-Conn. the amount of any decrease in Tax that results or would have resulted from such refund claim.

Section 3.4.  Liability for Taxes with Respect to Post-Distribution Periods.  Unless otherwise specifically provided in this Agreement or the Distribution Agreement, the New Grace Group shall pay all Taxes and shall be entitled to receive and retain all refunds of Taxes with respect to periods beginning after the Distribution Date which are attributable to the New Grace Business.  Unless otherwise provided in this Agreement, the Packco Group shall pay all Taxes and shall be entitled to receive and retain all refunds of Taxes with respect to periods beginning after the Distribution Date which are attributable to the Packaging Business.

ARTICLE IV.

INDEMNITY, COOPERATION AND EXCHANGE OF INFORMATION

Section 4.1.  Breach.  Grace-Conn. shall be liable for and shall indemnify, defend and hold harmless the Packco Indemnitees from and against, and Grace shall be liable for and shall indemnify, defend and hold harmless the New Grace Indemnitees from and against, any payment required to be made as a result of the breach by a member of the New Grace Group or the Packco Group, respectively, of any obligation under this Agreement.  If any member of the Packco Group or the New Grace Group, fails to comply in any respect whatsoever with any of its responsibilities under this Agreement relating to promptly forwarding to any member of the other Group (the "Recipient Group") any communications with and refunds received from any taxing authority ("Forwarding Responsibilities"), then Grace or Grace-Conn., as the case may be, (the "Forwarding Party") shall be liable for and shall indemnify and hold the New Grace Indemnitees or the Packco Indemnitees, as the case may be, harmless from and against any costs or expenses (including, without limitation, Taxes and reasonably incurred lawyers' and accountants' fees) ("Indemnified Amount") incurred by or imposed upon any member of the Recipient Group arising out of, in connection with or relating to such communication; provided, however, that the liability of the Forwarding Party with respect to any one such failure shall be equal to that portion of the Indemnified Amount that a member of the Recipient Group demonstrates is caused (directly or indirectly) by such failure.

-15-

Section 4.2.  Contests.  (a)  Whenever a party hereto
(the "Indemnitee") becomes aware of the existence of an issue
that could increase the liability for any Tax, or decrease the
amount of any refund, of the other party hereto or any member of
its Group or require a payment hereunder (an "Indemnity Issue"),
the Indemnitee shall in good faith promptly give notice to such
other party (the "Indemnitor") of such Indemnity Issue.  The
failure of any Indemnitee to give such notice shall not relieve
any Indemnitor of its obligations under this Agreement, except to
the extent that such Indemnitor or its affiliate is actually
materially prejudiced by such failure to give notice.

(b)  The Indemnitor and its representatives, at the
Indemnitor's expense, shall be entitled to participate (i) in all
conferences, meetings or proceedings with any taxing authority,
the subject matter of which is or includes an Indemnity Issue in
respect of a Pre-Distribution Period and (ii) in all appearances
before any court, the subject matter of which is or includes an
Indemnity Issue in respect of a Pre-Distribution Period.

(c)  Except as provided in Section 4.2(d), Grace-Conn.
shall have the right to decide as between the parties hereto how
any Indemnity Issue for a Pre-Distribution Taxable Period is to
be dealt with and finally resolved with the appropriate taxing
authority and shall control all Proceedings relating thereto.
Grace agrees to cooperate with Grace-Conn. in the settlement of
any such Indemnity Issue; provided, however, that Grace-Conn.
shall act in good faith in the conduct of such Proceedings and
shall keep Grace reasonably informed of any developments which
can reasonably be expected to affect adversely Grace.  Such
cooperation shall include permitting Grace-Conn. to litigate or
otherwise resolve any such Indemnity Issue.  It is expressly the
intention of the parties to this Agreement to take, and the
parties shall take, all actions necessary to establish Grace-
Conn. as the sole agent for Tax purposes of each member of the
Affiliated Group, as if Grace-Conn. were the common parent of the
Affiliated Group, with respect to all combined, consolidated and
unitary Tax Returns of the Affiliated Group for the Pre-
Distribution Taxable Periods.

(d)  The parties jointly shall represent the interests
of (i) the Affiliated Group in any Proceeding relating to any
Straddle Period and (ii) any Foreign Packco Subsidiary in any
Proceeding relating to any taxable period that involves an
Indemnity Issue.  Neither party shall settle any dispute relating
to any such period without the consent of the other party (which
consent shall not be unreasonably withheld); provided, however,
that if either party proposes a settlement and the other party
does not consent thereto, the nonconsenting party shall assume
control of the Proceeding (and bear all subsequently incurred
costs, fees and expenses relating thereto) and the respective
liabilities of the parties shall be determined pursuant to
Section 6.7 based on the magnitude and likelihood of success of
the issues involved in the Proceeding, the reasonableness of the

-16-

settlement offer, the expense of continuing the Proceeding and other relevant factors. Any other disputes regarding the conduct or resolution of any such Proceeding shall be resolved pursuant to Section 6.7. All costs, fees and expenses paid to third parties in the course of such Proceeding shall be borne by the parties in the same ratio as the ratio in which, pursuant to the terms of this Agreement, the parties would share the responsibility for payment of the Taxes asserted by the taxing authority in its claim or assessment if such claim or assessment were sustained in its entirety; provided, however, that in the event that any party hereto retains its own advisors or experts in connection with any Proceeding, the costs and expenses thereof shall be borne solely by such party.

Section 4.3. Cooperation and Exchange of Information.

(a) Grace shall, and shall cause each appropriate member of the Packco Group to, prepare and submit to Grace-Conn., as soon as practicable, but in no event later than the date that is 30 days after a request from Grace-Conn. (i) all information as Grace-Conn. shall reasonably request to enable Grace-Conn. to file any Conn Prepared Return or prepare any Pre-Distribution Schedule (which information shall be provided in the form and of the quality in which comparable information was provided prior to the Distribution) and (ii) any Del Prepared Return (including any amended return) for any year within the carryback or carryforward period for an Overall Tax Benefit or Hypothetical Pre-Distribution Overall Tax Benefit that is for the account of Grace-Conn. or for any year with respect to which Grace is entitled to a payment under Section 3.2(a)(v). Grace-Conn. shall bear any out-of-pocket marginal expense paid by any member of the Packco Group in preparing and submitting such information in respect of a Pre-Distribution Schedule relating to a Pre-Distribution Taxable Period, and the parties shall share equally any such expenses in respect of a Pre-Distribution Schedule relating to a Straddle Period.

(b) Each party on behalf of itself and each member of its Group, agrees to provide the other party and the members of such party's Group with such cooperation and information as the second party or its Group members shall reasonably request in connection with the preparation or filing of any Tax Return, Pre-Distribution Schedule or claim for refund not inconsistent with this Agreement or in conducting any Proceeding in respect of Taxes. Such cooperation and information shall include, without limitation, (i) execution and delivery of a power of attorney by Grace or any other member of the Packco Group to Grace-Conn. or another member of the New Grace Group or designation of an officer of Grace-Conn. or another member of the New Grace Group as an officer of Grace or any other member of the Packco Group for the purpose of signing Tax Returns, cashing refund checks and conducting Proceedings if Grace-Conn. could not otherwise exercise its rights under this Agreement with respect to such Returns, refunds or Proceedings, (ii) promptly forwarding copies

-17-

of appropriate notices and forms or other communications received
from or sent to any taxing authority which relate to the
Affiliated Group, the Packaging Business or the New Grace
Business and (iii) providing copies of all relevant portions of
Tax Returns, accompanying schedules, related workpapers,
documents relating to rulings or other determinations by taxing
authorities, including, without limitation, foreign taxing
authorities, and records concerning the ownership and Tax basis
of property, which either party may possess. Each party shall
make, and shall cause the members of the Packco Group to make,
their employees and facilities available on a mutually convenient
basis to provide explanation of any documents or information
provided hereunder.

        (c)  Grace and Grace-Conn. agree to retain all Tax
Returns, related schedules and workpapers, and all material
records and other documents as required under Section 6001 of the
Code and the regulations promulgated thereunder relating thereto
existing on the date hereof or created through the Distribution
Date, until the expiration of the statute of limitations
(including extensions) of the taxable years to which such Tax
Returns and other documents relate and until the Final
Determination of any payments which may be required in respect of
such years under this Agreement. Grace-Conn. and Grace agree to
advise each other promptly of any such Final Determination. Any
information obtained under this Section shall be kept
confidential, except as may be otherwise necessary in connection
with the filing of Tax Returns or claims for refund or in
conducting any audit or other proceeding.

        (d)  If (i) any member of the Packco Group fails to
provide any information requested pursuant to Section 4.3(a) by
the dates and in the manner specified in Section 4.3(a) hereof or
(ii) with respect to information not requested pursuant to
Section 4.3(a) hereof, any member of either Group fails to
provide any information requested pursuant to this Section 4.3,
within a reasonable period, then the requesting party shall have
the right to engage a "Big Six" public accounting firm of its
choice to gather such information. Each party agrees upon two
business days' notice, in the case of a failure to provide
information pursuant to Section 4.3 hereof to permit any such
"Big Six" public accounting firm full access to all appropriate
records or other information in the possession of any member of
the party's Group during reasonable business hours, and promptly
to reimburse or pay directly all costs and expenses in connection
with the engagement of such public accountants.

        (e)  If any member of either Group supplies information
pursuant to this Agreement and an officer of any member of the
other Group signs a statement or other document under penalties
of perjury in reliance upon the accuracy of such information and
so requests, then a duly authorized officer of the member
supplying such information shall certify, under penalties of
perjury, the accuracy and completeness of the information so

-18-

supplied. Grace agrees to indemnify and hold harmless each New
Grace Indemnitee, and Grace-Conn. agrees to indemnify and hold
harmless each Packco Indemnitee, from and against any cost, fine,
penalty or other expense of any kind attributable to the gross
negligence or willful misconduct of a member of the Packco Group,
or New Grace Group, as the case may be, in supplying a member of
the other Group with inaccurate or incomplete information.

ARTICLE V.

CERTAIN POST-DISTRIBUTION TRANSACTIONS

Section 5.1    Sealed Air and Packco Group Covenants.

Unless, in the case of any of Sections 5.1(a) through
(f) below, Grace has obtained a ruling letter from the IRS or an
opinion of nationally recognized counsel to Grace, in either
case, to the effect that, without material qualification, such
act or omission will not adversely affect the federal income tax
consequences of the Distribution to any of Grace, Grace-Conn. or
the stockholders of Grace-Conn., as set forth in the Tax
Opinions, and the substance of, and basis for, such conclusion in
such ruling or opinion is reasonably satisfactory to Grace-Conn.
in its good faith solely with regard to preserving the Tax-Free
Status of the Distribution (the "Ruling/Opinion Exception"):

(a)    No Sealed Air Party at any time nor any member of
the Packco Group at any time after the Effective Time shall take
any action, or fail or omit to take any action, that would cause
any representation made in the Sealed Air Tax Matters Certificate
or the Grace Tax Matters Certificate to be untrue in a manner
that would have an adverse effect on the Tax-Free Status of the
Distribution.

(b)    Until the first day after the Restriction Period,
the Packco Group shall continue the active conduct of the
Packaging Business (the "Active Packco Business").  The Packco
Group shall not liquidate, dispose of, or otherwise discontinue
the conduct of any material portion of the Active Packco Busi-
ness.  The Packco Group shall continue the active conduct of the
Packaging Business primarily through officers and employees of
the Packco Group (and not through independent contractors).

(c)    Until the first day after the Restriction Period,
no Sealed Air Party nor any member of the Packco Group shall sell
or otherwise issue to any Person, or redeem or otherwise acquire
from any Person (other than any member of the Packco Group), any
Equity Securities of Grace or any other member of the Packco
Group; provided, however, that (i) purchases that, in the
aggregate, meet the requirements of Section 4.05(1)(b) of Revenue
Procedure 96-30 shall not constitute a redemption or acquisition
of stock of Grace for purposes of this Section 5.1(c), (ii) if
required by law, any member of the Packco Group may issue a de
minimis number of Equity Securities of such member to any person

-19-

in order to qualify such person to serve as an officer or director of such member and (iii) Grace may issue, as compensation for services or pursuant to the exercise of compensatory stock options, Equity Securities of Grace that do not exceed in the aggregate ten percent of the Equity Securities of Grace.

(d)   Until the first day after the Restriction Period, no Sealed Air Party nor any member of the Packco Group shall (i) solicit any Person to make a tender offer for, or otherwise acquire or sell, the Equity Securities of Grace, (ii) participate in or support any unsolicited tender offer for, or other acquisition, disposition or issuance of, the Equity Securities of Grace or (iii) approve or otherwise permit any proposed business combination or any transaction which, in the case of (i), (ii) or (iii), individually or in the aggregate, together with the transactions contemplated under the Distribution Agreement, the Merger Agreement, the Benefits Agreement and this Agreement, results in one or more Persons acquiring (other than in acquisitions not taken into account for purposes of Section 355(e)) directly or indirectly stock representing a 50 percent or greater interest (within the meaning of Section 355(e) of the Code) in Grace.  In addition, no Sealed Air Party nor any member of the Packco Group shall at any time, whether before or subsequent to the expiration of the Restriction Period, engage in any action described in clauses (i), (ii) or (iii) of the preceding sentence if it is pursuant to an arrangement negotiated (in whole or in part) prior to the Distribution, even if at the time of the Distribution it is subject to various conditions, nor shall any such Party or member take any action, or fail or omit to take any action, that would cause Section 355(d) or (e) to apply to the Distribution.

(e)   Until the first day after the Restriction Period, no Sealed Air Party nor the members of the Packco Group shall sell, transfer, or otherwise dispose of or agree to dispose of assets (including, for such purpose, any shares of capital stock of a Subsidiary) that, in the aggregate, constitute more than 60% of the gross assets of Packco, nor shall they sell, transfer, or otherwise dispose of or agree to dispose of assets (including, for such purpose, any shares of capital stock of a Subsidiary) that, in the aggregate, constitute more than 60% of the con- solidated gross assets of the Packco Group.  The foregoing sentence shall not apply to sales, transfers, or dispositions of assets in the ordinary course of business.  The percentages of gross assets or consolidated gross assets of Packco or the Packco Group, as the case may be, sold, transferred, or otherwise disposed of, shall be based on the fair market value of the gross assets of Packco and the Packco Group as of the Effective Time, and for this purpose, the values set forth in the Packaging Business Disclosure Letter Balance Sheet shall be conclusive.

(f)   Until the first day after the Restriction Period, neither Packco nor its Subsidiaries shall voluntarily dissolve or

-20-

liquidate or engage in any merger, consolidation or other re-organization. The foregoing sentence shall not apply to trans-actions in which Grace or Packco acquires another corporation, limited liability company, limited partnership, general partnership or joint venture solely for cash or other consideration that· is not Equity Securities. Reorganizations of Grace or Packco or their respective Subsidiaries with their Affiliates, and liquidations of Packco's Affiliates, are not subject to Section 5.1(b) or this Section 5.1(f) to the extent not inconsistent with the structure necessary for the Distribution to qualify for Tax-Free Status.

(g)   Until the first day after the Restriction Period, Grace shall furnish Grace-Conn. with a copy of any ruling request that Sealed Air, Grace or any of their Affiliates may file with the IRS and any opinion received that relates to or otherwise reasonably could be expected to have an effect on the Tax-Free Status of the Distribution.

Section 5.2   New Grace Covenants.

Unless, in the case of any of Sections 5.2(a) through (e) below, Grace-Conn. has obtained a ruling letter from the IRS or an opinion of nationally recognized counsel to Grace-Conn., in either case, to the effect that, without material qualification, such act or omission will not adversely affect the federal income tax consequences of the Distribution to any of Grace, Grace-Conn. or the stockholders of Grace-Conn., as set forth in the Tax Opinions, and the substance of, and basis for, such conclusion in such ruling or opinion is reasonably satisfactory to Grace in its good faith solely with regard to preserving the Tax-Free Status of the Distribution:

(a)   No member of the New Grace Group shall take any action, or fail or omit to take any action, that would cause any representation made in the Sealed Air Tax Matters Certificate or the Grace Tax Matters Certificate to be untrue in a manner that would have an adverse effect on the Tax-Free Status of the Distribution.

(b)   Until the first day after the Restriction Period, the New Grace Group shall continue the active conduct of one of the Active New Grace Businesses. "Active New Grace Businesses" shall mean each of the Grace Davison business and the Grace Construction Business. The New Grace Group may dispose of, liquidate or discontinue the conduct of the Grace Davison business or the Grace Construction Products business if it actively continues the conduct of the other. The New Grace Group shall continue the active conduct of at least one of the Active New Grace Businesses primarily through officers and employees of the New Grace Group (and not through independent contractors).

(c)   Until the first day after the Restriction Period,

-21-

no member of the New Grace Group shall sell or otherwise issue to
any Person, or redeem or otherwise acquire from any Person (other
than any member of the New Grace Group), any Equity Securities of
New Grace or any other member of the New Grace Group; provided,
however, that (i) purchases that, in the aggregate, meet the
requirements of Section 4.05(1)(b) of Revenue Procedure 96-30
shall not constitute a redemption or acquisition of stock of New
Grace for purposes of this Section 5.2(c), (ii) if required by
law, any member of the New Grace Group may issue a de minimis
number of Equity Securities of such member to any person in order
to qualify such person to serve as an officer or director of such
member and (iii) New Grace may, pursuant to shareholder-approved
equity compensation plans, issue, as compensation for services or
pursuant to the exercise of compensatory stock options, Equity
Securities of New Grace.

          (d)    Until the first day after the Restriction Period,
no member of the New Grace Group shall (i) solicit any Person to
make a tender offer for, or otherwise acquire or sell, the Equity
Securities of New Grace, (ii) participate in or support any
unsolicited tender offer for, or other acquisition, disposition
or issuance of, the Equity Securities of New Grace or (iii)
approve or otherwise permit any proposed business combination or
any transaction which, in the case of (i), (ii) or (iii), indivi-
dually or in the aggregate, together with the transactions
contemplated under the Distribution Agreement, the Merger Agree-
ment, the Benefits Agreement and this Agreement, results in one
or more Persons acquiring (other than in acquisitions not taken
into account for purposes of Section 355(e)) directly or in-
directly stock representing a 50 percent or greater interest
(within the meaning of Section 355(e) of the Code) in New Grace.
In addition, no member of the New Grace Group shall at any time,
whether before or subsequent to the expiration of the Restriction
Period, engage in any action described in clauses (i), (ii) or
(iii) of the preceding sentence if it is pursuant to an arrange-
ment negotiated (in whole or in part) prior to the Distribution,
even if at the time of the Distribution it is subject to various
conditions, nor shall any such member take any action, or fail or
omit to take any action, that would cause Section 355(d) or (e)
of the Code to apply to the Distribution.

          (e)    Until the first day after the Restriction Period,
no member of the New Grace Group shall sell, transfer, or other-
wise dispose of or agree to dispose of assets (including, for
such purpose, any shares of capital stock of a Subsidiary) that,
in the aggregate, constitute more than 60% of the gross assets of
New Grace, nor shall they sell, transfer, or otherwise dispose of
or agree to dispose of assets (including, for such purpose, any
shares of capital stock of a Subsidiary) that, in the aggregate,
constitute more than 60% of the consolidated gross assets of the
New Grace Group.   The foregoing sentence shall not apply to
sales, transfers, or dispositions of assets in the ordinary
course of business or to a sale, transfer or disposition of any
or all of the Discontinued Businesses and either of the Active

-22-

New Grace Businesses; provided, however, that in the event of a sale, transfer or disposition of one of the Active New Grace Businesses, the retained Active New Grace Business shall be conducted by a member of the New Grace Group at substantially the same level as on the Distribution Date.  The percentages of gross assets or consolidated gross assets of New Grace or the New Grace Group, as the case may be, sold, transferred, or otherwise disposed of, shall be based on the fair market value of the gross assets of New Grace and the New Grace Group as of the Effective Time, and for this purpose, the values set forth in the Registration Statements shall be conclusive.

(f)    Until the first day after the Restriction Period, Grace-Conn. shall furnish Grace with a copy of any ruling request that Grace-Conn. or any of its Affiliates may file with the IRS and any opinion received that relates to or otherwise reasonably could be expected to have an effect on the Tax-Free Status of the Distribution.

Section 5.3.  Responsibility for Taxes.

(a)    Sealed Air and Grace agree to indemnify and hold the Grace-Conn. Indemnitees harmless from and against all Indemnifiable Losses resulting from (x) any Action which causes the Distribution to fail to have Tax-Free Status or (y) the Merger failing to qualify as a reorganization under Section 368 of the Code.  An "Action" shall mean any act or omission which fails to comply with any of the representations in the Sealed Air Tax Matters Certificate or the covenants in Section 5.1 and any act or omission which would fail to comply with any of the covenants in Section 5.1 but for compliance with the Ruling/Opinion Exception.  An "Action" shall also include an action or omission which would be a breach of the covenant contained in the first sentence of Section 5.1(d), if such covenant were in effect until the day which is five years after the Effective Time instead of until the first day after the Restriction Period.

(b)    Grace-Conn. agrees to indemnify and hold the Packco Indemnitees harmless from and against any Tax resulting from the failure of the Distribution to have Tax-Free Status, except where such failure is attributable to an Action.

(c)    For purposes of Sections 5.1 and 5.2 hereof, when a tax opinion or ruling of one party (the "Transaction Party") is required to be reasonably satisfactory to the other party (the "Reviewing Party"), the Reviewing Party at the request of the Transaction Party shall designate nationally recognized counsel to review such opinion or ruling without revealing the substance of the underlying transaction to the Reviewing Party and the concurrence of such outside counsel to the sufficiency of such opinion or ruling shall constitute "reasonable satisfaction" to the Reviewing Party for purposes of this Agreement.

-23-

Section 5.4.  Injunction.  The parties hereto agree that the payment of monetary compensation would not be an adequate remedy for a breach of the obligations contained in Article V hereof, and each party consents to the issuance and entry of an injunction against the taking of any action by it or a member of its Group that would constitute such a breach; provided, however, that the foregoing shall be without prejudice to and shall not constitute a waiver of any other remedy either party may be entitled to at law or at equity hereunder.

Section 5.5.  Distribution.  For purposes of this Article V only, "Distribution" shall mean the contribution by Grace-Conn. of assets and liabilities to Packco, the distribution of cash by Packco to Grace-Conn., the distribution by Grace-Conn. of the stock of Packco to Grace, the contribution of cash and the stock of Grace-Conn. to New Grace, the loan from New Grace to Grace-Conn. and the distribution by Grace of the stock of New Grace to the shareholders of Grace, each as provided in the Distribution Agreement.

ARTICLE VI.

MISCELLANEOUS

Section 6.1.  Expenses.  Unless otherwise expressly provided in this Agreement, the Distribution Agreement or the Merger Agreement, each party shall bear any and all expenses that arise from their respective obligations under this Agreement.

Section 6.2.  Foreign Transfer Taxes.  Adjusted Foreign Transfer Taxes shall be shared by the parties as provided in the Distribution Agreement.  Audit adjustments and Final Determinations of such Taxes shall be governed by the Distribution Agreement.  This Agreement governs responsibilities of the parties with respect to filing Tax Returns relating to Foreign Transfer Taxes, paying Foreign Transfer Taxes reflected on such Tax Returns to the applicable governmental authority and conducting Proceedings relating to Foreign Transfer Taxes.  For purposes of determining indemnity and reimbursement obligations of the parties under this Agreement, Tax Items arising as a result of the Foreign Transfers (but not Tax Items arising from any actual distribution of Subsidiary Excess Cash) shall be disregarded, and the Pre-Distribution Schedules shall not reflect such Tax Items.

Section 6.3.  Payments Paid or Received on Behalf of Indemnitees; Right to Designate Payee.  Each of Grace-Conn. and Grace shall be entitled to designate an Affiliate of such party as payee with respect to any payment that would otherwise be made to Grace-Conn. or Grace, respectively, under this Agreement.  Any payment received by Grace-Conn. or Grace, respectively, or its respective designees shall be received on behalf of the relevant Grace-Conn. Indemnitees or Packco Indemnitees.

-24-

Section 6.4.  <u>Foreign Exchange Rate</u>.  If any amount required to be paid hereunder is determined by reference to a Tax, Tax refund, Tax Benefit or Tax Detriment that is denominated in a currency other than United States dollars, such payment shall be made in United States dollars and the amount thereof shall be computed using the Foreign Exchange Rate for such currency determined as of the date that such Tax is paid, such Tax refund is received or such Tax Benefit or Tax Detriment reduces or increases the amount of Tax or Tax refund that would otherwise be paid or received.

Section 6.5.  <u>Amendment</u>.  This Agreement may not be amended except by an agreement in writing, signed by the parties hereto.  Anything in this Agreement or the Distribution Agreement to the contrary notwithstanding, in the event and to the extent that there shall be a conflict between the provisions of this Agreement and the Distribution Agreement, the provisions of this Agreement shall control.

Section 6.6.  <u>Notices</u>.  All notices and other communications hereunder shall be in writing and shall be delivered by hand including overnight business courier or mailed by registered or certified mail (return receipt requested) to the parties at the following addresses (or at such other addresses for a party as shall be specified by like notice) and shall be deemed given on the date on which such notice is received:

(a)  To Grace-Conn. or any member of the New Grace Group:

W. R. Grace & Co.-Conn.
One Town Center Road
Boca Raton, Florida  33486-1010
Attention:  Secretary
Fax:  (561) 362-1635

with a copy to:

Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, New York  10019
Attention:  Andrew R. Brownstein, Esq.
Fax:  (212) 403-2000

(b)  To Grace or any member of the Packco Group:

care of Sealed Air
Park 80 East
Saddle Brook, New Jersey  07663
Attention:  President
Fax:  (201) 703-4152

with a copy to:

Davis Polk & Wardwell
450 Lexington Ave.
New York, New York  10017
Attention:  Christopher Mayer, Esq.
Fax:  (212) 450-4800

Section 6.7.  Resolution of Disputes.  Any disputes
between the parties with respect to this Agreement regarding the
practice and preparation of returns or the calculation of amounts
shall be resolved by a "Big Six" public accounting firm whose
determination shall be conclusive and binding on the parties.
The fees and expenses of such firm shall be shared equally by
Grace-Conn. and Grace, except as otherwise provided herein.  Any
other disputes shall be resolved by a "Big Six" public accounting
firm or a law firm or by any other procedure that the parties may
choose.

Section 6.8.  Application to Present and Future
Subsidiaries.  This Agreement is being entered into by Grace-
Conn. and Grace on behalf of themselves and each member of the
New Grace Group and Packco Group, respectively.  This Agreement
shall constitute a direct obligation of each such member.  Grace-
Conn. and Grace hereby guarantee the performance of all actions,
agreements and obligations provided for under this Agreement of
each member of the New Grace Group and the Packco Group, respec-
tively.  Grace-Conn. and Grace shall, upon the written request of
the other, cause any of their respective Group members formally
to execute this Agreement.  This Agreement shall be binding upon,
and shall inure to the benefit of, the successors and assigns of
any of the corporations bound hereby.

Section 6.9  Term.  This Agreement shall commence on
the date of execution indicated below and shall continue in
effect until otherwise agreed to—in writing by Grace-Conn. and
Grace, or their successors.

Section 6.10.  Titles and Headings.  Titles and head-
ings to Sections herein are inserted for the convenience of
reference only and are not intended to be a part or to affect the
meaning or interpretation of this Agreement.

Section 6.11.  Legal Enforceability.  Any provision of
this Agreement which is prohibited or unenforceable in any juris-
diction shall, as to such jurisdiction, be ineffective to the
extent of such prohibition or unenforceability without invalidat-
ing the remaining provisions hereof.  Any such prohibition or
unenforceability in any jurisdiction shall not invalidate or
render unenforceable such provision in any other jurisdiction.
Without prejudice to any rights or remedies otherwise available
to any party hereto, each party hereto acknowledges that damages
would be an inadequate remedy for any breach of the provisions of
this Agreement and agrees that the obligations of the parties
hereunder shall be specifically enforceable.

-26-

Section 6.12.  Governing Law.  This Agreement shall be governed by the laws of the State of Delaware.

IN WITNESS WHEREOF, the parties hereto have caused this
Agreement to be executed as of the date first above written.

W. R. GRACE & CO.


By: _____
    Name:  Larry Ellberger
    Title: Senior Vice President


W. R. GRACE & CO.-CONN.


By: _____
    Name:  Robert B. Lamm
    Title: Vice President


SEALED AIR CORPORATION


By: _____
    Name:
    Title:


-28-

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the date first above written.

W. R. GRACE & CO.

By: _____
    Name:
    Title:

W. R. GRACE & CO.-CONN.

By: _____
    Name:
    Title:

SEALED AIR CORPORATION

By: _____
    Name: William V. Hickey
    Title: President

-28-

Exhibit A

Argentina

Australia

Belgium

Brazil

Canada

Chile

Colombia

Germany

Hong Kong

Italy

Japan

Mexico

Netherlands

New Zealand

Poland

Russia

South Africa

Spain

Sweden

United Kingdom

Venezuela



## ALEXANDER FORBES

*Consulting Actuaries*

Robyn Kow                                          26 January 1998
William M Mercer
10 South Wacker Drive
Chicago, Illinois

                                                   Tel:  269 0760

**Fax 091 312 9027626**

Dear Robyn

### GRACE AFRICA PENSION FUND
### TRANSFER OF MEMBERS TO "PACKCO"

The Grace Africa Pension Fund is valued using the actuarial basis set out below.

In respect of past service liabilities (and Transfer Values), the liability for each member is the present value of the accrued benefits in terms of the Grace Africa Pension Fund Rules in respect of service prior to the effective date with no allowance for any future service deficit or surplus arising from future contribution shortfalls or excesses.

### Actuarial Assumptions

The valuation is conducted on the basis of the following assumptions:

1.      **Interest**

        It was assumed that the Fund would earn 15% per annum on its investments including capital appreciation.   This rate was reduced to 5½% in respect of the period after retirement in order to make some allowance for increases to pensioners.

2.      **Mortality**

        Post-retirement          :       PA (90) ult.
        Pre-retirement           :       SA 72/77 ult (rated down three
                                         years for females).

                                                                    .../2

☎ P O Box 787268, Sandton, 2146
Alexander Forbes Place, 61 Katherine Street, Sandown. Telephone (011) 269-0000, Telefax (011) 269-3333. http://www.aforbes.co.za

A Division of Forbes Financial Services Group (Pty) Limited and Managers for Forbes Financial Services Group (Pty) Limited  Registration Number 69/3844/07
Actuaries
EC Brewer  GF Brown  RE Cheater  JR Clark*  JCH Coyer  RI Gordon  MNJC Oakley  CW Herbert  GN V Kerrigan*  F Knowles  RJ Lansberry  LD Louis  NJ Lloyd  PH Martha
A Nhterts*  EL Nowal  ID Pearlds  GJB Pollu  AR Powers  T Smeyman  NV Towey  M van den Berg  LK van Zyl  H Walker  AD Whetw  RJS Niland
FL Holmes
EL Helmes  (Chairman & Managing Director)  RR Addison  DJ Bergman  GvR Chowely  AGR Hofmeyr  GN V Kerrigan*  LD Louis  MT Molodo  PJJ van der Matt  JH Victors  *British  **Zimbabwean

- 2 -

3.  **Salary Increases**

It was assumed that salary increments would be at a rate of 13,5% per annum.

4.  **Withdrawals**

It was assumed that withdrawals would be in accordance with the following table:

| Age Group | Annual Rate of Withdrawal | |
|-----------|---------|---------|
| | Males | Females |
| 20 – 24 | 15% | 20% |
| 25 – 29 | 10% | 15% |
| 30 – 34 | 7% | 10% |
| 35 – 39 | 4% | 6% |
| 40 – 44 | 2% | 3% |
| 45  + | Nil | Nil |

5.  **Proportion Married**

It was assumed that, at Normal Retirement Date, 90% of all members would be married to wives four years younger (males) or husbands four years older (females).

6.  **Early Retirements**

It has been assumed that all members who reach retirement age will retire on that date. No allowance has been made for ill-health early retirements in view of the existence of a reassured Disability Income Continuance Scheme.

7.  **Minimum Reserves**

For each Member on the transfer date, a minimum reserve will be set up equal to the member's withdrawal benefit at that date.

No credit will be taken for a Member's future contributions in excess of the cost of benefits accruing in the future.

8.  **Market Value Adjustment**

No market value adjustment will be required as it is the intention to allocate the appropriate assets and transfer them into whichever portfolio or portfolios the Sealed Air management require.

..../3

- 3 -

9.   **Calculation of Transfer Values**

The rationale and approach in calculating the transfer value to a Packco arrangement is to provide a proportion of the total assets in relation that the liabilities of the Packco members of the Grace Africa Pension Fund bear to the total liabilities of the Grace Africa Pension Fund.   The transfer value will consist of the transferring members' full actuarial reserves, determined on the basis of the methods and assumptions employed for the most recent statutory actuarial valuation of the Grace Africa Pension Fund enhanced by a proportion of the surplus as described above.

Assets equal to the transfer value (the total of the Packco members' share of the Grace Africa Pension Fund) will be segregated at the Transfer Date and maintained in a separate portfolio until such time as the local Packco Fund is established.   The transfer value will be increased by the yield on the segregated assets between the Transfer Date and the eventual date of transfer.

10.   **Pension Increases**

The W R Grace Pension Fund has granted increases in the past having regard for the Fund earnings and the inflation rate in South Africa.   These have been as high as 15% (1990 and 1992) and as low as 7% (1996).   The average since 1988 has been 11,11%.

Yours sincerely

**P N MARTIN**
*Fellow of the Institute of Actuaries*
*Fellow of the Faculty of Actuaries*
*Valuator of the Fund and employee of*
*Alexander Forbes Consulting Actuaries*



## Sedgwick Noble Lowndes

Sedgwick Noble Lowndes Limited
St Martin's House, 31-35 Clarendon Road, Watford, Hertfordshire WD1 1JA
Telephone 01923-218911 · Facsimile 01923-243228

**Private and Confidential**

Mr John Forgach
Senior Benefits Counsel
W R Grace & Co
One Town Center Road
Boca Raton
FL33486-1010

31 March 1998

Dear Mr Forgach

Transfer of Cryovac from the Grace UK Pension Plan

### Background

The pension plan contains pension members, deferred members with entitlement to pensions payable in the future, and active members. The active members include employees who will be transferred to PackCo, a subsidiary of Sealed Air, and those who will remain with the new Grace companies which may well be renamed. The first group of active members includes those transferring to PackCo but who work outside the UK and have deferred pensions in the Grace Plan.

The deferred and pensioner members will not be split. They will remain in the existing plan, whose principal employer will become one of the continuing companies remaining in the Grace Group of Companies. It is intended to set up a mirror image plan to receive the assets and liabilities from the Grace UK Pension Plan for the Cryovac transferring members.

It is intended that the assets would be apportioned in proportion to the liabilities. Thus if the assets do not exactly match the liabilities - on most acceptable measures of funding the Grace UK Pension Plan has assets in excess of liabilities - then the share of assets attributed to each section would reflect this position.

The Transfer Amount at the Effective Date from the Grace UK Pension Plan in respect of the Cryovac members would, therefore, be the assets attributable to those members representing the proportion of the total assets which their past service liabilities represent as a proportion of the total liabilities.

Similarly the assets attributable to the other active employees, and all the deferred and pensioner members would remain behind in the Grace UK Pension Plan.

There will be an adjustment in relation to the "Time for Change" Programme. In accordance with a separate agreement, the cost of the improvement is to be met by Sealed Air, and thus the transfer amount will be adjusted as set out in the following paragraphs.

The new mirror image plan would be sponsored by PackCo, a subsidiary of Sealed Air.

A member of the Sedgwick Group
Registered office, Sedgwick House, Walbrook Road, Croydon CR9 3CB
Registered in England number 437858
Regulated by the Personal Investment Authority

O:\WRLE\INCLUSIV\CONTRACT\GOREV\DXOMO-3.LM3

1



The proportion transferred out of the Grace Plan will be in accordance with Clause 15 (in particular 15(3)) of the Second Schedule of the Trust Deed of the Grace UK Pension Plan dated 24 February 1988. Before the transfer takes place, the trustees must have the amount calculated in accordance with that Clause, and the Inland Revenue Pensions and Superannuation Office must give the consent for the bulk transfer to take place. The members transferring would have given their consent to such a transfer, and a discharge of the ongoing Grace UK Pension Plan trustees from any further liability for their benefits. In the event that this consent process takes place, no further certification by the Grace UK Pension Plan actuary is required.

**Effective Date**

The intended effective date for the establishment of the Cryovac mirror image plan is 31 March 1998. Members would start accruing benefits in respect of post transfer service in that plan from that date, and that date would be used as the effective date for calculations for the bulk transfer calculation.

**Determination of Transfer Amount as at the Effective Date**

Liabilities will be calculated using the assumptions set out below for all members of the Plan. Plan Salaries for those transferring active Cryovac members included in the "Time for Change" exercise will be their plan salaries at 31 March 1997 increased by the assumed rate of salary growth set out later in this letter, rather than actual salary. Consent to transfer will be required. Members who will have indicated that they do not want to transfer, will receive deferred benefit entitlements as if they were leaving active service on 31 March 1998. Their liability will be calculated appropriately. The Transfer Amount will be calculated as the appropriate portion of the total assets as described above, after deduction of the value as at 31 March 1998 of any bulk transfer values due to be paid out of the Grace Plan due to previous business sales.

**Asset Valuation**

Assets for transfer will be calculated on a proportionate basis as described above. There is, therefore, no reason for valuing assets in any other way at the effective date other than at market value. The amount calculated for transfer at the effective date will be the relevant proportion of the market value of assets on that date.

**Adjustment between Effective Date and Asset Transfer Date**

The Assets transferred shall be adjusted to reflect the period between Effective Date and Asset Transfer Date by multiplying the Transfer Amount as at the Effective Date by the FT-SE Actuaries All Share Total Return Index ("the Index") on the day before Asset Transfer Date and dividing by the Index on the day before the Effective Date.

The Value of Benefit will be calculated using the assumptions set out below. These assumptions are consistent with those in the most recent funding valuation.

## Summary of Assumptions

| | | | |
|---|---|---|---|
| (a) | Investment return | : | 9.0% pa |
| (b) | Plan Salary Increases | : | 7.0% pa |
| (c) | Pension Increase in Retirement | : | 4.0% pa on all pension up to State Pension Age and after State Pension Age on pension in excess of the GMP; 3.0% p.a. on GMP accrued after 6 April 1988; 0% p.a. on GMP accrued before 6 April 1988. |
| (d) | Revaluation of pension in excess of GMP after withdrawal up to Retirement | : | 4.5% p.a. |
| | Revaluation on GMP | : | 6½% p.a. |
| (e) | Pension commuted for cash | : | The maximum allowed in each case. |
| (f) | Mortality | : | PMA80 Table for males and PFA80 Table for females. |
| (g) | Marital status at death or retirement | : | 90% of male members and 75% of female members will be married. On average wives will be 3 years younger than the member, and husbands 2 years older. |
| (h) | Leaving Service | : | A specific allowance has been made; sample rates are given below: |

| Age | Men % | Women % |
|---|---|---|
| 20 | 15.0 | 15.0 |
| 25 | 10.4 | 18.4 |
| 30 | 6.9 | 12.4 |
| 35 | 3.5 | 5.6 |
| 40 | 1.7 | 2.1 |
| 45 | 0.6 | 1.8 |

| | | | |
|---|---|---|---|
| (i) | Early Retirements from active status | : | 20% of female members who joined after 1 October 1990 and all male members retire early at each age between 60 and 64. All other female members will retire at 60. No retirement at normal pension age. |
| (j) | Retirements of Deferreds | : | At Normal Retirement Age of member on exit. |

Yours sincerely

David B Martin
Fellow of the Faculty of Actuaries

**SCHEDULE B**
**CERTAIN NON-U.S. EMPLOYEES**

Part 1:
        Terence J. Kennett
        Lee Frot
        Bruno Vicente
        Peter Leyland
        Frederic Amiet
        Philippe Simon
        Georges Ermakoff
        Isabelle Bodet
        Guy Brou
        Jean Paragot
        Frederic Barrier
        Bruno Leret
        Miereille Gallerne
        Marie-France Mallinger
        Didier Ladone

Part 2:
        Cheryl Hubbard
        Pauline Behan
        Elaine Thorpe
        Sarah Maud
        David Line
        Peter Cannon
        Paul Bird
        Leslie Daniel
        Patricia Saunders
        Gus Franck
        Yves Barrault

Part 3:
        See attached.

Part 3:

|  | Position | Country | (1) Severance |
|---|---|---|---|
| (1) | Factory Assistant | Chile | $ 2,633 |
| (2) | Factory Assistant | Chile | 2,600 |
| (3) | Accounting Analyst | Chile | 4,667 |
| (4) | Accounting Analyst | Chile | 5,000 |
| (5) | Accounting Chief | Chile | 9,089 |
| (6) | Collector | Chile | 4,618 |
| (7) |  |  | 28,588 |
|  |  |  |  |
| (8) | System Administrator | Mexico | 10,000 |
| (9) | Voice / Data | Mexico | 20,000 |
| (10) | Systems Analyst | Argentina | 3,500 |
| (11) | Systems Analyst | Argentina | 3,750 |
| (12) | Systems Analyst | Brazil | 18,139 |
| (13) | Systems Programer | Brazil | 9,237 |
| (14) |  |  | 64,625 |
|  |  |  |  |
| (15) | Total All |  | $ 93,213 |

**SCHEDULE C**
**CERTAIN EMPLOYEES AT DUNCAN, S.C.**

Jim Hansen
Henry Lyons

## SCHEDULE D
## CERTAIN RELOCATING EMPLOYEES

Clarence Wittenburg
Jerry Witkowski

**SCHEDULE E**

Robert Green, UK

SCHEDULE F
CERTAIN EXPATRIATE EMPLOYEES

Part 1. US Expatriates:

Mark Becker
Sean Dempsey
Gary Hayes
Betsy Kuo
Chin-lin Lo
Peter Luxemburger
John Mark
David Newsome
James Oddo, Jr.
Stephen Ostercamp
M. Henry Piedra
Phillip Su
Kyle Tebbs

Part 2. Non-US "Inpatriates":

Fernando Guzman
Mauro Kernkraut
Alejandro Nigro
Amanda Wong
Christopher Woodbridge

**Exhibit C**

## EMPLOYEE BENEFITS ALLOCATION AGREEMENT

This EMPLOYEE BENEFITS ALLOCATION AGREEMENT (this "Agreement"), dated as of March 30, 1998, by and among W. R. Grace & Co., a Delaware corporation ("Grace"), W. R. Grace & Co.-Conn., a Connecticut corporation and a wholly owned subsidiary of Grace ("Grace-Conn."), and General Specialty Chemicals, Inc. (to be renamed W. R. Grace & Co.), a Delaware corporation and a wholly owned subsidiary of Grace ("New Grace").

### RECITALS

A.  *The Merger Agreement.*  Grace and Sealed Air Corporation, a Delaware corporation ("SAC"), have entered into an Agreement and Plan of Merger, dated as of August 14, 1997 (the "Merger Agreement"), pursuant to which, at the Effective Time (as defined therein), a wholly owned subsidiary of Grace will merge with and into SAC, with SAC being the surviving corporation (the "Merger"), and Grace being renamed Sealed Air Corporation.

B.  *The Distribution Agreement.*  The Distribution Agreement dated as of March 30, 1997, by and among Grace, Grace-Conn. and New Grace (the "Distribution Agreement") and the Other Agreements (as defined in the Distribution Agreement) set forth certain transactions that SAC has required as a condition to its willingness to consummate the Merger, and the purpose of the Distribution Agreement is to make possible the Merger by divesting Grace of the businesses and operations to be conducted by New Grace and its subsidiaries, including New Grace-Conn.

C.  *The Contribution.*  Prior to the Effective Time, and subject to the terms and conditions set forth in the Distribution Agreement, Grace intends to cause the transfer to a wholly owned subsidiary of Grace-Conn. ("Packco") of certain assets and liabilities of Grace and its subsidiaries predominantly related to the Packaging Business (the "Contribution"), as contemplated by the Distribution Agreement and the Other Agreements.

D.  *The Distribution.*  Following the Contribution and prior to the Effective Time, subject to the conditions set forth in the Distribution Agreement, (i) the capital stock of Packco will be distributed to Grace, (ii) the capital stock of Grace-Conn. will be contributed to New Grace and (iii) all of the issued and outstanding shares of the common stock of New Grace (together with the New Grace Rights, "New Grace Common

Stock") will be distributed (the "Distribution") to the holders
as of the Record Date of the common stock of Grace, par value
$.01 per share ("Grace Common Stock"), other than shares held
in the treasury of Grace, on a pro rata basis.

        E.  *This Agreement.*  This Agreement is one of the
Other Agreements contemplated by the Distribution Agreement,
and its purpose is to set forth the agreement of Grace, Grace-
Conn. and New Grace with respect to certain matters relating to
employees and employee benefit plans and compensation arrange-
ments;

        NOW, THEREFORE, in consideration of the premises, and
of the representations, warranties, covenants and agreements
set forth herein, the parties hereto hereby agree as follows:


                         ARTICLE I

                        DEFINITIONS

        SECTION 1.01  **General.**  Capitalized terms used but
not defined herein shall have the meanings set forth in the
Distribution Agreement or the Merger Agreement, as applicable.
As used in this Agreement, the following terms shall have the
following meanings (such meanings to be equally applicable to
both the singular and plural forms of the terms defined):

        *Agreement:*  has the meaning assigned to it in the
preamble hereof.

        *ABO:*  has the meaning assigned to it in Section
4.01(b).

        *AICP:*  the Annual Incentive Compensation Program of
Grace.

        *Alternate Payee:*  an alternate payee under a domestic
relations order which qualifies under Section 414(p) of the
Code and Section 206(d) of ERISA and which creates or recog-
nizes an alternate payee's right to, or assigns to an alternate
payee, all or a portion of the benefits payable to a partici-
pant under any Plan, or an alternate recipient under a medical
child support order which qualifies under Section 609(a) of
ERISA and which creates or recognizes the existence of an al-
ternate recipient's right to, or assigns to an alternate re-
cipient the right to, receive benefits for which a participant
or beneficiary is eligible under any Plan.

                           -2-

*ASA:* has the meaning assigned to it in Section 4.01(b).

*Benefit Plan:* any Plan established, sponsored or maintained by any member of the Packco Group, any member of the New Grace Group, or any predecessor or affiliate of any of the foregoing, existing as of the Distribution Date or prior thereto, to which any member of the Packco Group or the New Grace Group contributes, has contributed, is required to contribute or has been required to contribute, on behalf of any employee of a member of the Packco Group or a member of the New Grace Group, or under which any employee of a member of the Packco Group or a member of the New Grace Group, former employee of a member of the Packco Group or a member of the New Grace Group, or any beneficiary or dependent thereof, is covered, is eligible for coverage or has benefits rights.

*Change in Control Severance Agreements:* the agreements listed on Schedule I hereto.

*Change in Control Severance Plan:* the Grace Change in Control Severance Program for U.S. Employees (April 3, 1996- April 3, 1998).

*Current Performance Period:* any three-year performance period under the Grace LTIP that begins before and ends after the Effective Time.

*Current Plan Year:* the plan year or fiscal year, to the extent applicable with respect to any Plan, during which the Distribution Date occurs.

*Cypress 401(k) Plans:* the Cypress Packaging, Inc. Union Employees 401(k) Pension Plan and the Cypress Packaging, Inc. 401(k) Retirement Plan.

*Deferred Compensation Plan:* the W. R. Grace & Co. Deferred Compensation Program.

*Distribution Agreement:* has the meaning assigned to it in the fourth paragraph hereof.

*Employee:* with respect to any entity, an individual who is considered, according to the payroll and other records of such entity, to be employed by such entity, regardless of whether such individual is, at the relevant time, actively at work or on leave of absence (including vacation, holiday, sick leave, family and medical leave, disability leave, military leave, jury duty, layoff with rights of recall, and any other leave of absence or similar interruption of active employment

-3-

that is not considered, according to the policies or practices of such entity, to have resulted in a permanent termination of such individual's employment), but excluding any individual who is, as of the relevant time, on long-term disability leave.

*Foreign Plan:*  has the meaning assigned to it in Section 6.01.

*Grace:*  has the meaning assigned to it in the first paragraph hereof.

*Grace Dependent Care Plan:*  the W. R. Grace & Co. Dependent Care Plan.

*Grace LTIP:*  the Grace Long Term Incentive Program.

*Grace Medical Expense Plan:*  the W. R. Grace & Co. Health Care Reimbursement Account Plan.

*Grace Option:*  an option to purchase shares of Grace Common Stock granted pursuant to any Grace Stock Incentive Plan.

*Grace Severance Pay Plan:*  the W. R. Grace & Co. Severance Pay Plan for Salaried Employees, as amended effective July 1, 1996.

*Grace Stock Incentive Plans:*  the Grace 1996 Stock Incentive Plan, the Grace 1994 Stock Incentive Plan, the Grace 1989 Stock Incentive Plan, the Grace 1986 Stock Incentive Plan, and the Grace 1981 Stock Incentive Plan.

*Hourly Non-Union Retirement Plan:*  the W. R. Grace & Co.-Conn. Retirement Plan for Non-Union Employees of Subsidiary Corporations.

*Hourly SIP:*  the W. R. Grace & Co. Hourly Employee Savings and Investment Plan.

*Insured Foreign Plan:*  a Foreign Plan that provides retirement or pension benefits and that is funded through individually allocated insurance contracts, each of which is identified as such in the Packaging Business Disclosure Letter to the Merger Agreement.

*IRS:*  the Internal Revenue Service.

*Local Actuary:*  has the meaning assigned to it in Section 6.01.

-4-

*LTIP Awards:* has the meaning assigned to it in Section 3(a) hereof.

*Newco Ratio:* the amount obtained by dividing (i) the average of the arithmetic mean between the highest and lowest sales prices of a share of Grace Common Stock on the New York Stock Exchange Composite Tape on each of the five trading days immediately preceding the ex-dividend date for the Distribution, by (ii) the average of the arithmetic mean between the highest and lowest sales prices of a share of Newco Common Stock on the New York Stock Exchange Composite Tape on each of the five trading days beginning on the ex-dividend date for the Distribution.

*New Grace Benefit Plan:* any Benefit Plan that is sponsored or maintained by a member of the New Grace Group as of the Distribution Date.

*New Grace Employee:* any Employee who is allocated to the New Grace Group pursuant to Section 2.01 of this Agreement and who is not hired by any member of the Packco Group pursuant to Section 6.11(b) of the Merger Agreement.

*New Grace Participant:* any individual who is a New Grace Employee or a beneficiary, dependent or Alternate Payee of such an individual.

*New Grace Ratio:* the amount obtained by dividing (i) the average of the arithmetic mean between the highest and lowest sales prices of a share of Grace Common Stock on the New York Stock Exchange Composite Tape on each of the five trading days immediately preceding the ex-dividend date for the Distribution by (ii) the average of the arithmetic mean between the highest and lowest sales prices of a share of New Grace Common Stock on the New York Stock Exchange Composite Tape on each of the five trading days beginning on the ex-dividend date for the Distribution.

*Noninsured Foreign Pension Plan:* a Foreign Plan that is a defined benefit pension plan and is not an Insured Foreign Plan, each Noninsured Foreign Pension Plan being identified as such in the Packaging Business Disclosure Schedule to the Merger Agreement.

*Packco Benefit Plan:* any Benefit Plan that is sponsored or maintained by a member of the Packco Group following the Distribution Date.

*Packco Employee:* any Employee who is allocated to the Packco Group pursuant to Section 2.01 of this Agreement or who is hired by any member of the Packco Group pursuant to Section 6.11(b) of the Merger Agreement.

*Packco Health Plan:* the Blue Cross Blue Shield Health Plan for Cryovac and Formpac Employees.

*Packco Hourly Non-Union Retirement Plan:* has the meaning assigned to it in Section 4.01(d).

*Packco Medical and Dependent Care Expense Plan:* the Health Care and Dependent Care Spending Account Plan for Cryovac and Formpac Employees.

*Packco Participant:* any individual who is a Packco Employee or a beneficiary, dependent or Alternate Payee of such an individual.

*Packco Savings Plan:* a Qualified Plan designated by Grace to receive a transfer of assets from the Hourly SIP and/or the Salaried SIP pursuant to Section 4.02(b).

*Pension Plan:* any Benefit Plan that is an "employee pension benefit plan" (within the meaning of section 3(2) of ERISA), whether or not that Plan is a Qualified Plan.

*Plan:* any bonus, incentive compensation, deferred compensation, pension, profit sharing, retirement, stock purchase, stock option, stock ownership, stock appreciation rights, phantom stock, company car, fringe benefit, leave of absence, layoff, vacation, day or dependent care, legal services, cafeteria, life, health, medical, accident, disability, workman's compensation or other insurance, severance, separation or other employee benefit plan, practice, policy or other arrangement of any kind (including, but not limited to, any "employee benefit plan" (within the meaning of section 3(3) of ERISA)).

*Qualified Plan:* any Benefit Plan that is an "employee pension benefit plan" (within the meaning of section 3(2) of ERISA) and which is intended to qualify under section 401(a) of the Code.

*Salaried Retirement Plan:* the W. R. Grace & Co. Retirement Plan for Salaried Employees.

*Salaried SIP:* the W. R. Grace & Co. Salaried Employees Savings and Investment Plan.

*Salary Protection Plan:* the W.R. Grace & Co. Executive Salary Protection Plan.

*Schurpack 401(k) Plan:* the Schurpack Employees 401(k) Thrift Plan.

-6-

*SERP:* the W. R. Grace & Co. Supplemental Executive Retirement Plan.

*Split Dollar Program:* the W. R. Grace & Co. Executive Split Dollar Life Insurance Program.

*Terminated Grace Employee:* any individual who is, as of the Distribution Date, a former Employee of any member of the New Grace Group or the Packco Group.

*Terminated Grace Participant:* a Terminated Grace Employee or a beneficiary, dependent or Alternate Payee of a Terminated Grace Employee.

*Termination Benefits:* has the meaning assigned to it in Section 2.02(a) hereof.

*Union Retirement Plan:* the Retirement Plan of W. R. Grace & Co.-Conn. Chemical Group (Cedar Rapids Plant).

*U.S. Welfare Plan:* a Welfare Plan other than a Welfare Plan that is maintained outside of the United States primarily for the benefit of individuals substantially all of whom are nonresident aliens with respect to the United States.

*Welfare Plan:* any Benefit Plan that is an "employee welfare benefit plan" (within the meaning of section 3(1) of ERISA).

## ARTICLE II

### TRANSFER OF EMPLOYEES; TERMINATION BENEFITS

SECTION 2.01  Transfer of Employees.  (a)  Grace and New Grace shall take all steps necessary or appropriate so that all of the Employees of Grace and its subsidiaries are allocated between the New Grace Group and the Packco Group in accordance with the principles set forth in the Section 2.01(b), and so that each individual who is so allocated to the Packco Group is, as of the Distribution Date, an Employee of a member of the Packco Group, and each other individual who is, as of the Distribution Date, an Employee of Grace or any of its Subsidiaries is an Employee of a member of the New Grace Group.

(b)  In making the allocation provided for in Section 2.01, Grace and New Grace shall allocate each Employee who is exclusively employed in the Packaging Business to the Packco Group and each Employee who is exclusively employed in the New Grace Business to the New Grace Group.  All other Employees

shall be allocated in a mutually agreeable manner that, to the
extent possible, takes into account the Employees' expertise,
experience and existing positions and duties and does not un-
reasonably disrupt either the Packaging Business or the New
Grace Business and maximizes the ability of each of the Packco
Group and the New Grace Group to manage and operate their re-
spective businesses after the Distribution Date, taking into
account the respective needs of such businesses as established
by past practice.

          SECTION 2.02  Change of Control Benefits; Termination
Benefits.  (a)  No New Grace Employee and no Packco Employee
shall be deemed, as a result of the steps called for by Section
2.01 or otherwise as a result of the consummation of the trans-
actions contemplated by the Distribution Agreement and the
Merger, to have become entitled to any benefits under any Ben-
efit Plan, contract, agreement, statute, regulation or other
arrangement that provides for the payment of severance pay,
salary continuation, pay in lieu of notice, unused vacation
pay, or similar benefits in connection with actual or construc-
tive termination or alleged actual or constructive termination
of employment (collectively, "Termination Benefits").  Without
limiting the generality of the foregoing, none of the transac-
tions contemplated by the Distribution Agreement and the Merger
Agreement constitute a "change in control" for purposes of any
Benefit Plan.  Grace shall take all steps necessary and ap-
propriate so that any Change in Control Severance Agreement
between Grace and any Packco Employee terminates before the
Distribution Date.

          (b)  All Liabilities (other than for Severance Costs
as defined in Section 8.04 of the Distribution Agreement) re-
lating to or arising out of claims made by or on behalf of New
Grace Participants or Packco Participants for, or with respect
to, Termination Benefits relating to the actual or constructive
termination or alleged actual or constructive termination of
employment of any New Grace Employee or Packco Employee with
any member of the Packco Group or the New Grace Group, which
claims arise as a result of the consummation of the transac-
tions contemplated by the Distribution Agreement, shall be con-
sidered other Transaction Costs that are governed by clause
(ii) of the first sentence of Section 8.04 of the Distribution
Agreement.

          (c)  Except as specifically provided otherwise in
Section 2.02(b) above and in Section 8.04 of the Distribution
Agreement, effective as of the Distribution Date, the New Grace
Group shall assume or retain, as appropriate, all Liabilities
relating to or arising out of claims made by or on behalf of
New Grace Participants for, or with respect to, Termination

-8-

Benefits relating to the actual or constructive termination or
alleged actual or constructive termination of employment of any
New Grace Employee with any member of the Packco Group or the
New Grace Group, whether before, on or after the Distribution
Date.  In addition, the New Grace Group shall assume or retain,
as appropriate, all Liabilities (including with respect to
Packco Employees) pursuant to the Change in Control Severance
Plan and the Change in Control Severance Agreements.

(d)    Except as specifically provided otherwise in
Sections 2.02(b) and (c) above and in Section 8.04 of the Dis-
tribution Agreement, effective as of the Distribution Date, the
Packco Group shall assume or retain, as appropriate, all Li-
abilities relating to or arising out of claims made by or on
behalf of Packco Participants for, or with respect to, Termina-
tion Benefits relating to the actual or constructive termina-
tion or alleged actual or constructive termination of employ-
ment of any Packco Employee with any member of the Packco Group
or the New Grace Group, whether before (in the case of con-
structive termination), on or after the Distribution Date.

ARTICLE III

INCENTIVE PLANS

SECTION 3.01  Grace LTIP.  (a)  The contingent awards
for Current Performance Periods held by New Grace Participants
and Packco Participants (such contingent awards, the "LTIP
Awards") under the Grace LTIP shall be adjusted and paid in
cash by New Grace in accordance with such methodology as New
Grace determines in its sole discretion.

(b)    Effective as of the Distribution Date, the New
Grace Group shall assume or retain, as appropriate, all Li-
abilities relating to or arising out of awards payable under
the Grace LTIP.

SECTION 3.02  Grace Options.  (a)  New Grace shall
assume and adopt, effective as of the Distribution Date, each
of the Grace Stock Incentive Plans, with such changes as may be
necessary to reflect the change in the issuer of awards there-
under and such other changes as New Grace shall, in its sole
discretion, determine.  As soon as practicable after and effec-
tive as of the Distribution Date, all Grace Options that are
then outstanding shall be adjusted or replaced as set forth in
this Section 3.02, or in such other manner as the parties
hereto shall agree.

-9-

(b)   Each such Grace Option that is held by a New Grace Employee or a Terminated Grace Participant shall be replaced with an option (a "New Grace Option") to acquire a number of New Grace Common Shares that equals the number of shares subject to such Grace Option immediately before such replacement, times the New Grace Ratio (rounded up to the nearest whole share), with a per-share exercise price that equals the per-share exercise price of such Grace Option immediately before such replacement, divided by the New Grace Ratio (rounded up to the nearest one hundredth of a cent).  Each New Grace Option shall otherwise have the same terms and conditions as the Grace Option it replaces, except that references to employment by or termination of employment with Grace and its affiliates shall be changed to references to employment by or termination of employment with New Grace and its affiliates.  Effective as of the Distribution Date, New Grace shall assume all Liabilities relating to or arising under the New Grace Options or the Grace Stock Incentive Plans.

(c)   Each such Grace Option that is held by a Packco Employee shall be adjusted so that the number of Newco Common Shares subject to such Grace Option equals the number of shares subject to such Grace Option immediately before such adjustment, times the Newco Ratio (rounded down to the nearest whole share), and the per-share exercise price equals the per-share exercise price of such Grace Option immediately before such adjustment, divided by the Newco Ratio (rounded up to the nearest whole cent).  Each Grace Option as so adjusted shall otherwise have the same terms and conditions as were in effect before such adjustment.  Effective as of the Distribution Date, Grace shall retain all Liabilities relating to or arising under the Grace Options held by Packco Employees.

SECTION 3.03   **Annual Incentive Compensation Plan.**
(a)   New Grace shall pay, or cause to be paid by another member of the New Grace Group, all bonuses earned by Packco Employees and New Grace Employees for the 1997 calendar year under the AICP, in accordance with the terms of the AICP as interpreted by New Grace in its sole discretion.  Effective as of the Distribution Date, the New Grace Group shall assume all Liabilities relating to or arising under the AICP.

(b)   Packco Employees shall not be eligible to earn bonuses under the AICP for 1998 or any subsequent year.  However, if the Distribution Date occurs later than March 31, 1998, then Grace and New Grace shall use reasonable best efforts to develop and implement an annual incentive program for Packco Employees, the cost of which will be shared between the New Grace Group and the Packco Group in a manner relating to

the relative portions of the 1998 calendar year that precede
and follow the Distribution Date.

## ARTICLE IV

### PENSION AND SAVINGS PLANS

SECTION 4.01  Retirement Plans and Supplemental Re-
tirement Plan.  (a)  Grace, New Grace and Grace-Conn. shall
take all steps necessary or appropriate so that, effective no
later than the Distribution Date:  (i) one or more members of
the New Grace Group are the sole sponsors of the Salaried Re-
tirement Plan, the SERP and the Hourly Non-Union Retirement
Plan; and (ii) one or more members of the Packco Group are the
sole sponsors of the Union Retirement Plan.  Such steps shall
include, without limitation, the appointment or reappointment
by New Grace (by action after the Distribution Date to approve
or ratify such appointment or reappointment) of all named fidu-
ciaries, trustees, custodians, recordkeepers and other fiducia-
ries and service providers to the Salaried Retirement Plan, the
SERP and the Hourly Non-Union Retirement Plan, and the appoint-
ment or reappointment by Grace of all named fiduciaries, trust-
ees, custodians, recordkeepers and other fiduciaries and ser-
vice providers to the Union Retirement Plan.

(b)  Effective as of the Distribution Date, the
Packco Employees shall cease accruing benefits under the Sala-
ried Retirement Plan, the SERP and the Hourly Non-Union Retire-
ment Plan.  As promptly as practicable following the Distribu-
tion Date, and effective as of the Distribution Date, Grace in-
tends to implement a program for Packco Employees who partici-
pated in the Salaried Retirement Plan before the Distribution
Date designed to substantially make up for any anticipated ma-
terial adverse impact on them resulting from the termination of
such participation as of the Distribution Date.  Such program
will assume that each such Packco Participant works as an em-
ployee until normal retirement (age 65) and that he or she will
achieve a reasonable investment return on his or her account in
the Sealed Air Corporation Profit Sharing Plan.  Upon the
implementation of such program by Grace, New Grace shall (i)
cause the Salaried Retirement Plan to be amended so that, ef-
fective immediately before the Distribution Date: (A) the ac-
crued benefit of each Packco Employee who is a participant
therein is increased by crediting such Packco Employee with an
additional year of service; (B) the accrued benefit of each
such Packco Employee who is at least 40 years old as of the
Distribution Date is also increased by an amount equal to the
lesser of (x) 13 percent of the amount of such accrued benefit
(after giving effect to the increase described in clause (A) of

-11-

this sentence) or (y) the increase that results from crediting
such Packco Employee with an additional four years of service,
and (C) the accrued benefits of all such Packco Employees, as
so increased, shall be fully vested as of the Distribution
Date; or (ii) provide additional retirement benefits to such
Packco Employees as a group having, in the aggregate, a value
substantially equivalent to the increased benefits described in
clause (i); provided, that the aggregate expense associated
with the benefits described in clause (i) or (ii) (as ap-
plicable) shall be limited to the extent necessary so that the
Accrued Benefit Obligation, calculated in accordance with FAS
87 ("ABO"), of such benefits does not exceed $15 million. Such
ABO shall be determined by Actuarial Sciences Associates
("ASA") in accordance with the actuarial assumptions set forth
in Schedule II hereto and in a manner consistent with past
practice with respect to the Salaried Retirement Plan.

      (c)   Effective as of the Distribution Date, the New
Grace Group shall assume or retain (as applicable) all Li-
abilities relating to or arising under the Salaried Retirement
Plan and the SERP, including without limitation for benefits
payable thereunder to Packco Participants. Effective as of the
Distribution Date, the Packco Group shall assume or retain (as
applicable) all Liabilities relating to or arising under the
Union Retirement Plan.

      (d)   (i)   Effective immediately after the Effective
Time, Grace shall establish, cause to be established or desig-
nate a defined benefit pension plan (the "Packco Hourly Non-
Union Retirement Plan") to provide benefits and assume liabil-
ities and accept a transfer of assets from the Hourly Non-Union
Retirement Plan, as provided for in this Section 4.01(d).

      (ii)   As soon as practicable after the Effective
Time, following (A) the receipt by New Grace of a copy of a
favorable determination letter or Grace's certification to New
Grace, in a manner reasonably acceptable to New Grace, that the
Packco Hourly Non-Union Retirement Plan is qualified under Sec-
tion 401(a) of the Code and the related trust is exempt from
taxation under Section 501(a) of the Code, and (B) the receipt
by Grace of a copy of a favorable determination letter or New
Grace's certification to Grace, in a manner reasonably accept-
able to Grace, that the Hourly Non-Union Retirement Plan is
qualified under Section 401(a) of the Code and the related
trust is exempt from taxation under Section 501(a) of the Code,
New Grace shall direct the trustee of the trust funding the
Hourly Non-Union Retirement Plan to transfer to the trustee of
the trust established to fund the Packco Hourly Non-Union Re-
tirement Plan the amount described in Section 4.01(d)(iii) be-
low. Such transfer shall be in cash unless otherwise agreed by

-12-

Grace and New Grace.  As of the date of such transfer, and ef-
fective immediately after the Effective Time, the Packco Group
and the Packco Hourly Non-Union Retirement Plan shall assume
all Liabilities for benefits payable to Packco Participants
under the Hourly Non-Union Retirement Plan, and the New Grace
Group and the Hourly Non-Union Retirement Plan shall retain no
Liabilities for such benefits.

       (iii)   The amount transferred pursuant to this
Section 4.01(d) shall be an amount equal to (A) less (B), as
adjusted by (C); where (A) equals a portion of the assets of
the Hourly Non-Union Retirement Plan having a fair market value
equal to the ABO as of the Distribution Date attributable to
Packco Participants; where (B) equals the aggregate payments
made from the trust funding the Hourly Non-Union Retirement
Plan in respect of Packco Participants from the Effective Time
through the date the transfer occurs; and where (C) equals the
amount of the net earnings or losses, as the case may be, from
the Effective Time through the date the transfer occurs, on the
average of the daily balances of the foregoing and based upon
the actual rate of return earned by the Hourly Non-Union Re-
tirement Plan during such period.  All of the foregoing calcu-
lations shall be made by ASA in accordance with the assumptions
set forth on Schedule III hereto.  Grace shall be entitled to
review and comment on such calculations as ASA is in the pro-
cess of performing them.  Notwithstanding the foregoing, how-
ever, in no event shall the amount so transferred be less than
the amount necessary to comply with, nor more than the maximum
amount permitted by, Section 414(l) of the Code and the regu-
lations promulgated thereunder, as determined by ASA.

       (iv)   Grace, New Grace and Grace-Conn. shall, in
connection with the transfer described in this Section 4.01(d),
cooperate in making any and all appropriate filings required
under the Code or ERISA, and the regulations thereunder and any
applicable securities laws, and take all such action as may be
necessary and appropriate to cause such transfers to take place
as soon as practicable after the Effective Time.  New Grace and
Grace-Conn. agree, during the period ending with the date of
the transfer of assets to the Packco Hourly Non-Union Retire-
ment Plan, to cause distributions in respect of Packco Par-
ticipants to be made in the ordinary course from the Hourly
Non-Union Retirement Plan in accordance with applicable law and
pursuant to plan provisions.

       SECTION 4.02  **Savings Plans.**  (a)  Grace, New Grace
and Grace-Conn. shall take all steps necessary or appropriate
so that, effective no later than the Distribution Date:  (i)
one or more members of the New Grace Group are the sole spon-
sors of the Hourly SIP and the Salaried SIP; and (ii) one or

more members of the Packco Group are the sole sponsors of the
Cypress 401(k) Plans and the Schurpack 401(k) Plan.  Effective
as of the Distribution Date, the Packco Group shall assume all
Liabilities relating to or arising under the Cypress 401(k)
Plans and the Schurpack 401(k) Plan.  Such steps shall include,
without limitation, the appointment or reappointment by New
Grace (by action after the Distribution Date to approve or
ratify such appointment or reappointment) of all named fiducia-
ries, trustees, custodians, recordkeepers and other fiduciaries
and service providers to the Hourly SIP and the Salaried SIP,
and the appointment or reappointment by Grace of all named fi-
duciaries, trustees, custodians, recordkeepers and other fidu-
ciaries and service providers to the Cypress 401(k) Plans and
the Schurpack 401(k) Plan.

        (b)   Each of the transfers provided for in this Sec-
tion 4.02(b) shall be implemented only if both Grace and New
Grace so agree after the Distribution Date.

        (i)   Grace, New Grace and Grace-Conn. shall take
all steps necessary or appropriate in order to transfer to a
Packco Savings Plan and the related trust, as soon as practi-
cable after the Effective Time, all account balances (including
the pre-tax, after-tax and rollover account balances) under
each of the Hourly SIP and the Salaried SIP of all Packco Par-
ticipants.  Such assets shall be transferred in kind, to the
extent elected by New Grace with the consent of Grace (which
consent shall not be unreasonably withheld), and otherwise
shall be made in cash; provided, that in any event, unless the
parties agree otherwise, any outstanding participant loans and
FMC American Depositary Receipts shall be transferred in kind.
It is the intention of Grace, New Grace and Grace-Conn. to
carry out such transfer so as to preserve, to the extent prac-
ticable, the investment elections of participants as in effect
immediately before the transfer, unless the parties agree oth-
erwise.

        (ii)   Grace, New Grace and Grace-Conn. shall co-
operate in making all appropriate filings required under the
Code or ERISA, and the regulations thereunder and any applica-
ble securities laws, implementing all appropriate communica-
tions with participants, maintaining and transferring appro-
priate records, and taking all such other actions as may be
necessary and appropriate to implement the provisions of this
Section 4.02(b) and to cause the transfers of assets pursuant
to this Section 4.02(b) to take place as soon as practicable
after the Effective Time; provided, that each of such transfers
shall take place only after (A) the receipt by New Grace of a
favorable determination letter or Grace's certification, in a
manner reasonably acceptable to New Grace, that the relevant

-14-

Packco Savings Plan is qualified under Section 401(a) of the
Code and the related trust is exempt from taxation under Sec-
tion 501(a) of the Code, and (B) the receipt by Grace of a fa-
vorable determination letter or New Grace's certification, in a
manner reasonably acceptable to Grace, that the Hourly SIP or
the Salaried SIP, as applicable, is qualified under Section
401(a) of the Code and the related trust is exempt from taxa-
tion under Section 501(a) of the Code.

(c)    If Grace and New Grace agree to implement the
transfers provided for in Section 4.02(b), subject to the com-
pletion of such transfer and effective as of the Distribution
Date, the members of the Packco Group and the SAC Savings Plan
shall assume all Liabilities to or relating to Packco Partici-
pants relating to or arising under the Hourly SIP and the Sala-
ried SIP.    Effective as of the Distribution Date, the New Grace
Group shall assume or retain (as applicable) all Liabilities
relating to or arising under the Hourly SIP and the Salaried
SIP, including without limitation for benefits payable thereun-
der to Packco Participants, that are not assumed by the Packco
Group and the relevant Packco Savings Plan pursuant to the pre-
ceding sentence.

SECTION 4.03   Qualification of Plans.   The New Grace
Group shall be responsible for all Liabilities incurred by the
Packco Group as a result of the failure of any of the Hourly
Non-Union Retirement Plan, the Union Retirement Plan, the
Hourly SIP, the Salaried SIP, the Cypress 401(k) Plans or the
Schurpack 401(k) Plan to be qualified under Section 401(a) of
the Code on or before the date assets are transferred from such
Plan to a Packco Benefit Plan, or the date sponsorship of such
Plan is assumed by any member of the Packco Group, as ap-
plicable.   The Packco Group shall be responsible for all Li-
abilities incurred by the New Grace Group as a result of the
failure of the Packco Hourly Non-Union Retirement Plan or any
Packco Savings Plan to be qualified under Section 401(a) of the
Code on or before the date assets are transferred to such Plan
from a New Grace Benefit Plan.   The parties hereto agree that
to the extent any of them becomes aware that any such Plan
fails or may fail to be so qualified, it shall notify the other
parties and the parties shall cooperate and use best efforts to
avoid such disqualification, including using the Internal Rev-
enue Service's Voluntary Compliance Resolution program or simi-
lar programs, and taking any steps available pursuant to such
program to avoid disqualification, as determined by the party
who is made responsible under this Section 4.03 for the Li-
abilities that would result from such disqualification (and the
Liabilities for which such party is responsible shall include
all costs and expenses resulting from such steps, including

-15-

fines, penalties, contributions, attorneys' fees and expenses and administrative expenses).

## ARTICLE V

### WELFARE AND OTHER BENEFITS

SECTION 5.01  **Benefits for Active Employees.**  (a) Grace, New Grace and Grace-Conn. shall take all steps necessary or appropriate so that, effective no later than the Distribution Date, one or more members of the Packco Group are the sole sponsors of the Packco Health Plan.  Such steps shall include, without limitation, the appointment or reappointment by Grace of all named fiduciaries, trustees, custodians, recordkeepers and other fiduciaries and service providers to the Packco Health Plan, to the extent such appointments or reappointments are necessary.

(b)  Effective as of the Distribution Date, the New Grace Group shall assume or retain (as applicable) all Liabilities relating to or arising out of claims for benefits under U.S. Welfare Plans by New Grace Participants and Terminated Grace Participants, whenever such claims are incurred, and (ii) by Packco Participants to the extent such claims are incurred before the Distribution Date and reported within 365 days thereafter.  Effective as of the Distribution Date, the Packco Group shall assume or retain (as applicable) all Liabilities relating to or arising out of all other claims for benefits under U.S. Welfare Plans by Packco Participants, except as specifically provided in Section 5.02.

SECTION 5.02  **Retiree Welfare Benefits.**  Effective as of the Distribution Date, the New Grace Group shall assume all Liabilities for providing post-retirement medical and life insurance benefits under U.S. Welfare Plans sponsored by Grace or any of its subsidiaries before the Distribution Date or any members of the New Grace Group on or after the Distribution Date, to:  (i) Terminated Grace Participants; (ii) Packco Participants who would have been eligible to receive such benefits if they had retired at any time on or before the first anniversary of the Distribution Date (regardless of when they actually do retire); and (iii) any New Grace Participants who become eligible for such benefits after the Distribution Date pursuant to the Grace Severance Pay Plan as a result of a termination of employment as of the Distribution Date.  Effective as of the Distribution Date, the Packco Group shall provide Packco Participants who retire after the Distribution Date for whom the New Grace has not assumed Liabilities for providing post-retirement medical and life insurance benefits pursuant to the

-16-

preceding sentence with such benefits pursuant to one or more
group insurance or group self-insured programs; provided, that
the Packco Group may require such Packco Participants to bear
the entire cost of such benefits, together with a reasonable
fee for their allocable share of the Packco Group's costs of
administering such programs.

SECTION 5.03   Severance.   The Packco Group shall
adopt, effective as of the Distribution Date, and shall main-
tain in effect without amendment adverse to participants, at
least through the first anniversary of the Distribution Date, a
severance plan providing Packco Employees with severance ben-
efits as outlined in Exhibit A hereto.

SECTION 5.04   Split Dollar Plan; Deferred Compensa-
tion Plan; Salary Protection Plan.   Effective as of the Distri-
bution Date, each Packco Employee who participates in the Split
Dollar Plan, the Deferred Compensation Plan or the Salary Pro-
tection Plan shall be treated as a terminated participant under
such Plan, and shall have the same options with respect to such
Plan as are available to any other participant in such Plan
upon termination of employment, in accordance with the terms of
such Plan as in effect immediately before the Distribution
Date.   Effective as of the Distribution Date, the New Grace
Group shall assume all Liabilities relating to or arising under
the Split Dollar Plan, the Deferred Compensation Plan and the
Salary Protection Plan.

SECTION 5.05   Dependent Care and Medical Expense
Plans.   (a)   Grace, New Grace and Grace-Conn. shall take all
steps necessary or appropriate so that, effective no later than
the Distribution Date, one or more members of the New Grace
Group are the sole sponsors of the Grace Dependent Care Plan
and the Grace Medical Expense Plan, and the New Grace Group
shall assume all Liabilities under such Plans.   Such steps
shall include, without limitation, the appointment or reap-
pointment by New Grace (by action after the Distribution Date
to approve or ratify such appointment or reappointment) of all
named fiduciaries, trustees, custodians, recordkeepers and
other fiduciaries and service providers to such Plans, to the
extent such appointments or reappointments are necessary.

(b)   Grace, New Grace and Grace-Conn. shall take all
steps necessary or appropriate so that, effective no later than
the Distribution Date, one or more members of the Packco Group
are the sole sponsors of the Packco Medical and Dependent Care
Expense Plan, and the Packco Group shall assume all Liabilities
under such Plan.   Such steps shall include, without limitation,
the appointment or reappointment by Grace of all named fiducia-
ries, trustees, custodians, recordkeepers and other fiduciaries

-17-

and service providers to such Plan, to the extent such appoint-
ments or reappointments are necessary.  No employer contribu-
tions to such Plan shall be made or promised with respect to
the 1998 plan year unless the parties otherwise agree.

ARTICLE VI

NON-U.S. PLANS

SECTION 6.01  **Non-U.S. Plans Generally.**  As soon as
practicable after the date of this Agreement, the parties here-
to shall enter into one or more agreements or memoranda of un-
derstanding (collectively, the "<u>Foreign Plans Agreement</u>") re-
garding the treatment and allocation of Liabilities relating to
or arising under Benefit Plans (the "Foreign Plans") for Em-
ployees located outside the United States, including without
limitation expatriates, and to expatriate employees located in
the United States.  The Foreign Plans Agreement shall provide
for the treatment of each Foreign Plan, which treatment may
include (without limitation) (i) the retention or assumption of
such Foreign Plan by the Packco Group, (ii) the retention or
assumption of such Foreign Plan by the New Grace Group, or
(iii) an allocation of the liabilities and assets (if any) of
the Foreign Plan between a Plan (which may include the Foreign
Plan) that is intended to be maintained by the New Grace Group
and a Plan (which may include the Foreign Plan) that is in-
tended to be maintained by the Packco Group, after the Distri-
bution Date; provided, that the insurance contracts funding
each Insured Foreign Pension Plan (and any assets related
thereto) shall be divided between the appropriate Packco Ben-
efit Plan and New Grace Benefit Plan by the insurer in accor-
dance with applicable law, regulation and practice.  Any trans-
fers of assets or liabilities from a Noninsured Foreign Pension
Plan shall be made on the basis of reasonable methods and as-
sumptions determined by the local actuarial firm that is, as of
the date of this Agreement, serving as the actuary for such
Noninsured Foreign Pension Plan (or another actuarial firm if
the parties hereto so agree) (the "<u>Local Actuary</u>"), in ac-
cordance with applicable legal and regulatory requirements,
local practice and the past practice of Grace; provided, that
each of Grace, Grace-Conn. and New Grace shall be entitled to
review such methods and assumptions and object to them if they
are unreasonable, and to review all calculations and determina-
tions of the Local Actuary for accuracy.  It is the intention
of the parties hereto that the Packco Group will assume or re-
tain Liabilities for Packco Employees under Foreign Plans and
that to the extent permitted and practicable under legal and
regulatory requirements and local practice, assets transferred
from Noninsured Foreign Pension Plans pursuant to the Foreign

-18-

Plans Agreement shall equal the Projected Benefit Obligation, calculated in accordance with FAS 87, for the liabilities assumed by Packco Benefit Plans pursuant to the Foreign Plans Agreement.

### ARTICLE VII

### GENERAL

SECTION 7.01  **Preservation of Rights to Amend or Terminate Plans and to Terminate or Change Terms of Employment.** No provision of this Agreement shall be construed as a limitation on the rights of any member of the Packco Group or the New Grace Group to amend or terminate any Benefit Plan or other plan, program or arrangement relating to employees.  No provision of this Agreement shall be construed to create a right in any employee or former employee or beneficiary or dependent of such employee or former employee under a Benefit Plan which such employee or former employee or beneficiary would not otherwise have under the terms of the Benefit Plan itself.  Nothing contained in this Agreement shall confer upon any individual the right to remain an employee of any member of the Packco Group or the New Grace Group or restrain any member of the Packco Group or the New Grace Group from changing the terms and conditions of employment of any individual at any time following the Distribution Date, except as provided in Section 5.03 of this Agreement.

SECTION 7.02  **Other Liabilities; Guarantee of Obligations.**  Effective as of the Distribution Date, the New Grace Group shall assume or retain (as applicable) all Liabilities relating to or arising out of claims for compensation and benefits made by or on behalf of any New Grace Participant, including salary, wages, bonuses, incentive compensation, severance benefits, separation pay, accrued sick, holiday, vacation, health, dental or retirement benefits, or other compensation under applicable law or otherwise, relating to or arising out of employment by Grace or any of its subsidiaries before the Distribution Date or employment by any member of the New Grace Group on or after the Distribution Date.  Effective as of the Distribution Date, the Packco Group shall assume or retain (as applicable) responsibility for all Liabilities relating to or arising out of claims for compensation and benefits made by or on behalf of any Packco Participant, including salary, wages, bonuses, incentive compensation, severance benefits, separation pay, accrued sick, holiday, vacation, health, dental or retirement benefits, or other compensation under applicable law or otherwise, relating to or arising out of employment by Grace

or any of its subsidiaries before the Distribution Date or employment by any member of the Packco Group on or after the Distribution Date. Notwithstanding the foregoing, this Section 7.02 shall not apply to any Liability that is specifically provided for elsewhere in this Agreement.

SECTION 7.03  **Assumption of Plans; Termination of Participation.**  Except as specifically provided otherwise in this Agreement, Grace, New Grace and Grace-Conn. shall take all steps necessary or appropriate so that, effective no later than the Distribution Date, one or more members of the New Grace Group are the sole sponsors of all Benefit Plans that are, as of the date of this Agreement, sponsored by Grace, and the New Grace Group shall assume or retain (as applicable) all Liabilities relating to or arising under such Benefit Plans. Such steps shall include, without limitation and where appropriate, the appointment or reappointment by New Grace (by action after the Distribution Date to approve or ratify such appointment or reappointment) of all named fiduciaries, trustees, custodians, recordkeepers and other fiduciaries and service providers to such Benefit Plans. Except as specifically provided otherwise in this Agreement or in the agreement provided for in Section 6.01 of this Agreement, the accrual of benefits by Packco Participants in any New Grace Benefit Plan shall cease not later than the Distribution Date.

SECTION 7.04  **Information.**  The parties hereto shall, before the Distribution Date or as soon as practicable thereafter, provide each other with all information as may reasonably be requested and necessary to administer each Benefit Plan effectively in compliance with applicable law. Such information shall be provided in the form requested if, at the time of such request, it exists in such form or can readily be converted to such form. If a request would require a party providing information to incur any expenses in order to receive advice from any actuary, consultant or consulting firm, the information need not be provided unless the requesting party reimburses the party providing the information for all such expenses.

SECTION 7.05  **Complete Agreement; Coordination with Tax Sharing Agreement.**  (a)  This Agreement, the Exhibits and Schedules hereto and the agreements and other documents referred to herein, shall constitute the entire agreement between the parties hereto with respect to the subject matter hereof (other than the Distribution Agreement, the Merger Agreement and the schedules and exhibits thereto) and shall supersede all previous negotiations, commitments and writings with respect to such subject matter.

-20-

(b)   This Agreement, and not the Tax Sharing Agreement, constitutes the sole agreement of the parties regarding responsibility for any excise taxes, penalties or similar levies that may be imposed by any taxing authority on, or with respect to, any Benefit Plan, except as otherwise specifically provided in the Tax Sharing Agreement with respect to payroll taxes.

SECTION 7.06   **Governing Law.**   This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Delaware (other than the laws regarding choice of laws and conflict of laws that would apply the substantive laws of any other jurisdiction) as to all matters, including matters of validity, construction, effect, performance and remedies, except to the extent preempted by federal law.

SECTION 7.07   **Notices.**   All notices, requests, claims, demands and other communications hereunder shall be in writing and shall be given as provided in the Distribution Agreement.

SECTION 7.08   **Successors and Assigns; No Third-Party Beneficiaries.**   This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their successors and permitted assigns, but neither this Agreement nor any of the rights, interests and obligations hereunder shall be assigned by any party hereto without the prior written consent of the other party (which consent shall not be unreasonably withheld).   Without limiting the generality of the foregoing, it is expressly acknowledged that at the Effective Time, the Certificate of Incorporation of Grace will be amended (the "<u>Newco Amendment</u>") to change the name of Grace to "Sealed Air Corporation" and that references herein to "Grace" include, from and after the Effective Time, such corporation (which is also referred to in the Merger Agreement as Newco). Accordingly, to the extent this Agreement calls for the agreement of "Grace" or of "the parties" from and after the Effective Time, the agreement of Newco (as defined in the Merger Agreement) will be required.   This Agreement is solely for the benefit of the parties hereto and their Subsidiaries and is not intended to confer, nor shall it confer, upon any other Persons (including New Grace Participants and Packco Participants) any rights or remedies hereunder.

SECTION 7.09   **Amendment and Modification.**   This Agreement may be amended, modified or supplemented only by a written agreement signed by all of the parties hereto.

-21-

SECTION 7.10  **Counterparts.**  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

SECTION 7.11  **Interpretation.**  The Article and Section headings contained in this Agreement are solely for the purpose of reference, are not part of the agreement of the parties hereto and shall not in any way affect the meaning or interpretation of this Agreement.

SECTION 7.12  **Indemnity Procedures.**  The provisions of Article IV of the Distribution Agreement shall apply with respect to Liabilities allocated under this Agreement.

SECTION 7.13  **Severability.**  If any provision of this Agreement or the application thereof to any person or circumstance is determined by a court of competent jurisdiction to be invalid, void or unenforceable, the remaining provisions hereof, or the application of such provision to persons or circumstances other than those as to which it has been held invalid or unenforceable, shall remain in full force and effect and shall in no way be affected, impaired or invalidated thereby, so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner adverse to any party.

SECTION 7.14  **References; Construction.**  References to any "Article," "Exhibit," "Schedule" or "Section," without more, are to Articles, Exhibits, Schedules and Sections to or of this Agreement.  Unless otherwise expressly stated, clauses beginning with the term "including" set forth examples only and in no way limit the generality of the matters thus exemplified.

SECTION 7.15  **SAC Reasonable Consent.**  The parties hereto agree that any actions to be taken by Grace, Grace-Conn. or New Grace to implement the terms of this Agreement that are not specifically required herein that relate to Packco or the Packaging Business, and any actions that are to be taken pursuant to this Agreement only by agreement of the parties, must be reasonably satisfactory to SAC.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

W. R. GRACE & CO.

By: _____
    Name:  Larry Ellberger
    Title: Senior Vice President


W. R. GRACE & CO.-CONN.

By: _____
    Name:   Robert B. Lamm
    Title: Vice President


GRACE SPECIALTY CHEMICALS, INC.

By: _____
    Name:   W.B. McGowan
    Title: Senior Vice President


-23-

## SCHEDULE I

### Change in Control Severance Agreements

Change in Control Severance Agremeents with:

Albert J. Costello
Robert H. Beber
Robert J. Bettacchi
Larry Ellberger
Pamela J. Hamilton
James R. Hyde
J. Gary Kaenzig, Jr.
W. Brian McGowan
Kathleen A. Browne
Stephen E. Karinshak
Mary Lou Kromer
Robert B. Lamm
Paul McMahon
William L. Monroe
Bernd A. Schulte
David B. Siegel

52029v2

SCHEDULE II

## W.R. GRACE & CO. RETIREMENT PLAN
## SALARIED EMPLOYEES

Assumptions Underlying Cost Estimates For Cryovac Plan Participants

1. Interest       7.50%

2. Mortality      1983 Group Annuity Mortality Tables for Males and Females

3. Termination    Sample Rates are as follows:

Year of Service from Date of Hire

| Age | 1 | 2 | 3 | 4 | 5 | 6 + Over |
|-----|------|------|-------|-------|-------|----------|
| 25 | 22.0% | 22.0% | 18.2% | 18.4% | 13.0% | 7.0% |
| 35 | 18.4 | 16.5 | 13.6 | 14.5 | 10.7 | 6.8 |
| 45 | 14.4 | 13.8 | 10.8 | 11.7 | 9.2 | 6.3 |
| 55 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |

4. Disability     Sample Rates are as follows:

| Age | |
|-----|------|
| 25 | .04% |
| 35 | .06% |
| 45 | .16% |
| 55 | .56% |

5. Retirement     Rates are as follows:

| Age | |
|-------|--------|
| 55-56 | 6.0% |
| 57-59 | 7.0% |
| 60 | 9.0% |
| 61 | 10.0% |
| 62 | 26.0% |
| 63 | 14.0% |
| 64 | 18.0% |
| 65 | 38.0% |
| 66 | 22.0% |
| 67 | 30.0% |
| 68 | 29.0% |
| 69 | 26.0% |
| 70 | 100.0% |

SCHEDULE III



An AT&T Company

Ana Rachel Quesada, A.S.A.
Consulting Actuary

August 6, 1997

Mr. John Forgach
Benefits Counsel
Legal Services Group
W.R. Grace & Co.
One Town Center Road
Boca Raton, FL 33486

Dear John:

As requested, enclosed is a table outlining the assumptions to be used to determine the amount of assets to be transferred for the Formpac Hourly Plan from the W.R. Grace & Co. Retirement Plan for Non-Union Hourly Employees of Subsidiary Corporations (Grace Non-Union Plan).

The qualifications requirements under IRC Section 401(a)(12) require that the spinoff of assets and liabilities from a qualified plan must satisfy IRC Section 414(l). We believe IRC Section 414(l) is satisfied by transferring assets equal to the present value of accrued benefits.

IRS Reg. 1.414(l) - 1(b)(9) states that "...the present value of an accrued benefit must be determined on the basis of reasonable actuarial assumptions". At the 1994 Enrolled Actuaries Meeting, the IRS representatives stated that it is likely that any interest rate within the allowable range for current liabilities, defined as 90% to 110% of the 4 year weighted average of 30 year Treasuries, would be considered reasonable (i.e., 6.18% to 7.56% for June, 1997).

Thus based on current interest rates, as shown on the attached table, we will use an interest rate of 7.5%. All other assumptions shown on the attached table are the assumptions used for the January 1, 1997 actuarial valuation of the Grace Non-Union Plan.

If you have any questions, please call.

Sincerely,

Rachel

cc:    B. Landstrom
       J. Nemeth

ACTUARIAL SCIENCES ASSOCIATES, INC.

5200 Town Center Circle, Suite 201, Boca Raton, FL 33486
Phone (561) 362-7906  Fax (561) 362-7901

### W.R. GRACE & CO. RETIREMENT PLAN
### FOR NON-UNION HOURLY EMPLOYEES
### OF SUBSIDIARY CORPORATIONS

Spinoff of Assets for Formpac Hourly Plan

I. Amount of Assets to be Transferred Equals the Present Value of Accrued Benefits

II. Actuarial Assumptions

Interest        7.50%

Mortality       1983 Group Annuity Mortality Tables for Males and Females

Termination     Sample Rates are as follows:

| | | | Year of Service from Date of Hire | | | |
|---|---|---|---|---|---|---|
| Age | 1 | 2 | 3 | 4 | 5 | 6 + Over |
| 25 | 25.6% | 19.8% | 18.5% | 16.3% | 14.9% | 11.3% |
| 35 | 22.5 | 17.7 | 15.8 | 13.5 | 12.9 | 6.0 |
| 45 | 20.0 | 16.0 | 12.9 | 11.4 | 11.0 | 4.0 |
| 55 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |

Disability      Sample Rates are as follows:

| Age | |
|---|---|
| 25 | .05% |
| 35 | .08% |
| 45 | .15% |
| 55 | .54% |

Retirement      Rates are as follows:

| Age | |
|---|---|
| 55-59 | 2.5% |
| 60 | 3.5% |
| 61 | 6.0% |
| 62 | 25.0% |
| 63-64 | 10.0% |
| 65 | 40.0% |
| 66 | 25.0% |
| 67-68 | 20.0% |
| 69 | 60.0% |
| 70 | 100.0% |



EXHIBIT A

SEVERANCE BENEFITS FOR PACKCO EMPLOYEES

Covered Employees:

All individuals who are Packco Employees as of the
Effective Time and are regular, full-time salaried or non-
union hourly employees, excluding temporary or part-time
employees and employees covered by collective bargaining
agreements.

Effective Date of the Plan:

The date on which the Effective Time occurs.

Entitlement to Benefits:

A Covered Employee is entitled to severance benefits as
set forth below upon any termination of his or her
employment by the Company, other than:

- layoff or leave of absence (paid or unpaid);

- termination by the Covered Employee for any
  reason, including resignation or retirement, prior
  to the Covered Employee's last scheduled
  employment date;

- termination by the Company for (i) misconduct with
  respect to the Covered Employee's obligations to
  the Company, (ii) "Cause" (as defined below),
  (iii) violation of any agreement between the
  Covered Employee and the Company, (iv) failure to
  follow policies, rules or procedures of the
  Company or of the Covered Employee's business
  unit, or similar reasons;

- the Covered Employee refuses to accept an offer to
  transfer to another position at the Company for a
  Base Salary (in the case of a salaried Covered
  Employee) or hourly rate of pay (in the case of a
  non-union hourly Covered Employee) that is not
  less than the Covered Employee's then-current Base
  Salary (as defined below) or then-current hourly
  rate of pay, as applicable, where the principal
  work location of the position is within a
  reasonable commuting distance of the Covered
  Employee's residence;

     ° the Covered Employee fails to follow policies,
rules or procedures of the Company or of the
Covered Employee's business unit or (ii) fails to
adhere to any agreement between the Covered
Employee and the Company;

     ° the Covered Employee is entitled to receive long-
term disability payments under any plan or program
sponsored by the Company;

OR

     ° the Company sells or transfers all or a portion of
the stock or assets of a business of the Company
to another person or entity and the Covered
Employee becomes an employee of, or is offered
employment with, such other person or entity.

"Cause" means the willful refusal by the Covered Employee
to substantially carry out his or her assigned duties and
responsibilities, or the Covered Employee engaging in
actions that are injurious to the Company (monetarily or
otherwise.

<u>Severance Benefits</u>:

1-1/2 Weeks' Pay for each Year of Service (subject to a
minimum of 4 Weeks' Pay and a maximum of 52 Weeks' Pay),
plus 13 Weeks' Pay, and, for the same period, continuation
of medical and life insurance benefits, on the same terms
and conditions as would be applicable if the Covered
Employee had remained an active employee.

A "Week's Pay" means, with respect to a salaried Covered
Employee, his or her most current annual Base Salary,
divided by 52, and with respect to a non-union hourly
Covered Employee, his or her most current hourly rate of
pay, multiplied by 40. "Base Salary" means the regular
earnings paid by the Company to a Covered Employee, and
does not include (a) overtime, commission, incentive,
special, premium or bonus compensation or (b) any amount
attributable to Company-sponsored employee benefit plans,
whether or not such compensation or amount is taxable as
income. A "Year of Service" means a period of twelve
consecutive months of "Service," and "Service" includes
service with W. R. Grace & Co. and its subsidiaries before
the Distribution Date as well as service with members of
the Packco Group.

<u>Amendment and Termination</u>:

The plan may not be amended or terminated in any manner
that would have adverse effect on any Covered Employee

- 2 -

whose termination of employment occurs on or before the
first anniversary of the Effective Date (as defined above.

**Exhibit D**

●                    ●

## AGREEMENT REGARDING
## FOREIGN PENSION AND EMPLOYEE MATTERS

This AGREEMENT REGARDING FOREIGN PENSION AND EMPLOYEE MATTERS (this "Agreement"), dated as of March 30, 1998, by and among W.R. Grace & Co., a Delaware corporation ("Grace"), W.R. Grace & Co.-Conn., a Connecticut corporation and a wholly owned subsidiary of Grace ("Grace-Conn."), Grace Specialty Chemicals, Inc., a Delaware corporation and a wholly owned subsidiary of Grace ("New Grace"), and Sealed Air Corporation, a Delaware corporation ("SAC").

### RECITALS

A.   *The Merger Agreement.*  Grace, Packco Acquisition Corp. and SAC have entered into an Agreement and Plan of Merger, dated as of August 14, 1997 (the "Merger Agreement"), pursuant to which, at the Effective Time (as defined therein), a wholly owned subsidiary of Grace will merge with and into SAC, with SAC being the surviving corporation (the "Merger"), and Grace being renamed "Sealed Air Corporation".

B.   *The Distribution Agreement.*  The Distribution Agreement dated as of March 30, 1998, by and among Grace, Grace-Conn. and New Grace (the "Distribution Agreement"), the Employee Benefits Allocation Agreement dated as of March 30, 1998 by and among Grace, Grace Conn. and New Grace (the "EBA") and the Other Agreements (as defined in the Distribution Agreement) set forth certain transactions that SAC has required as a condition to its willingness to consummate the Merger, including the divestiture by Grace of the businesses and operations to be conducted by New Grace and its subsidiaries, including Grace-Conn.

C.   *This Agreement.*  This Agreement sets forth certain agreements of the parties pertaining to foreign pension and employee matters.

NOW, THEREFORE, in consideration of the premises, and of the representations, warranties, covenants and agreements set forth herein, the parties hereto hereby agree as follows:

### ARTICLE I

### AMENDMENTS TO DISTRIBUTION AGREEMENT; MAKE-UP PAYMENT

SECTION 1.01 **Definitions.**  Capitalized terms used but not defined in this Article I shall have the meanings ascribed to them in the Distribution Agreement (as amended by this Agreement).

SECTION 1.02  **Amendments to "Net Benefit Amount"
Definition.**  (a)   The definition of "Net Benefit Amount"
contained in Article I of the Distribution Agreement is hereby
amended by deleting the third sentence of the last paragraph
thereof.

(b) The definition of "Net Benefit Amount" contained in
Article I of the Distribution Agreement is hereby further amended
by amending the first sentence of such definition to read in its
entirety as follows:  "the amount (whether positive or negative)
equal to (i) the Foreign Plan Assets minus (ii) the Foreign
Benefit Plan Liabilities (each as defined below)."

(c) The definition of "Net Benefit Amount" contained in
Article I of the Distribution Agreement is hereby further amended
by inserting the following new material at the end thereof:

The Net Benefit Amount shall be calculated by AON,
based upon the actual employee allocations between the
Packco Group and the New Grace Group as of the
Distribution Date, and the actual market value of
retirement plan assets (including any contribution
receivables) as of the Distribution Date.  Such
calculation shall be completed by AON by no later than
May 31, 1998, unless AON and the parties hereto
determine that the calculation cannot be completed by
that date, in which case AON and the parties hereto
shall agree upon a different, subsequent date for such
completion.  All calculations made by AON shall be
subject to the review of New Grace and SAC, and their
respective advisors, and such calculations shall become
final and binding only after New Grace, SAC and their
respective advisors have had an adequate opportunity to
comment thereon.

The Net Benefit Amount, as calculated as set forth
in the preceding paragraph, shall be multiplied by a
fraction, the numerator of which is 21 and the
denominator of which is 58 (the result of such
multiplication being referred to herein as the
"Adjustment Amount").  If the Adjustment Amount is
between $19 million and $23 million (inclusive of $19
million and $23 million), then the parties to this
Agreement shall not make any payments related to the
calculation of the Net Benefit Amount and there shall
be no Adjustment Surplus and no Adjustment Deficit.  If
the Adjustment Amount is greater than $23 million, then
there shall be an Adjustment Surplus equal to the
Adjustment Amount minus $21 million.  If the Adjustment
Amount is less than $19 million, then there shall be an

-2-

Adjustment Deficit equal to $21 million minus the Adjustment Amount.

If the amount of the U.S. Plan Assets exceeds the amount of the U.S. Benefit Plan Liabilities (each as defined above), there shall be a U.S. Plan Surplus in an amount equal to such excess. If the amount of the U.S. Benefit Plan Liabilities exceeds the amount of the U.S. Plan Assets, there shall be a U.S. Plan Deficit in an amount equal to such excess. If the amount of the U.S. Plan Assets equals the amount of the U.S. Benefit Plan Liabilities, there shall be no U.S. Plan Surplus or U.S. Plan Deficit. It is understood that U.S. Plan Assets shall include any contribution receivables.

SECTION 1.03  **Amendment to "New Grace Capital Contribution" Definition.**  The definition of "New Grace Capital Contribution" contained in Article I of the Distribution Agreement is hereby amended by deleting the phrase "the Net Benefit Amount" and inserting in its place the following:

$21,000,000, plus the Adjustment Surplus or minus the Adjustment Deficit, whichever (if any) is applicable, plus the U.S. Plan Surplus or minus the U.S. Plan Deficit, whichever (if any) is applicable (each such term as defined in the definition of "Net Benefit Amount" above).

SECTION 1.04  **Post-Distribution-Date Adjustment.**  Since it will not be determined until after the Distribution Date whether there is a U.S. Plan Surplus, a U.S. Plan Deficit, an Adjustment Surplus or an Adjustment Deficit, any change to the New Grace Capital Contribution that may result from such determination shall be reflected by a payment made by the appropriate party as soon as practicable after all necessary calculations have been completed and have become final, in accordance with the provisions of the Distribution Agreement, as amended by this Article I.

## ARTICLE II

### AMENDMENTS TO EBA; FOREIGN PLANS AGREEMENT

SECTION 2.01  **Amendments to Section 6.01.**  (a)  Section 6.01 of the EBA is amended by inserting "(a)" before the first sentence thereof and deleting the last sentence thereof.

(b)  Section 6.01 of the EBA is further amended by inserting additional subsections (b) through (f) at the end thereof, reading in their entirety as follows:

-3-

(b)   The assets of each Noninsured Foreign Pension
Plan shall be allocated between a Packco Benefit Plan and a
New Grace Benefit Plan that are to be maintained in the same
country after the Distribution Date (such Packco Benefit
Plan and New Grace Benefit Plan, respectively, a "Packco
Mirror Plan" and a "New Grace Mirror Plan"), based upon the
methods and assumptions specified by the applicable Local
Actuary's letter included in Schedule A hereto (each such
letter, a "Local Actuary's Letter").   The basic principle
underlying such methods shall be as follows:   (i) the
liabilities attributable to Packco Participants shall be
allocated to the Packco Mirror Plan, and the liabilities
attributable to the New Grace Participants shall be
allocated to the New Grace Mirror Plan, in each case as
calculated by the applicable Local Actuary as of the
Distribution Date; then (ii) a percentage of the actual
total assets (if any, and including any contribution
receivables), determined as of the Distribution Date, of the
Noninsured Foreign Pension Plan, equal to the percentage of
such liabilities that are so allocated to the Packco Mirror
Plan, shall be allocated for the benefit of the Packco
Mirror Plan, and the remainder of such assets shall be
allocated for the benefit of the New Grace Mirror Plan.   The
appropriate percentage of the assets (if any) of each
Noninsured Foreign Pension Plan shall actually be
transferred to the Packco Mirror Plan or New Grace Mirror
Plan, as appropriate, to which they are so allocated as soon
as practicable after the Distribution Date.   Each such
transfer shall be in cash, unless the parties agree
otherwise or a transfer of cash is not practicable.

(c)   Notwithstanding the definitions of "New Grace
Participant" and "Packco Participant" contained in Article I
of this Agreement, for purposes of this Article VI, inactive
participants in the Noninsured Foreign Pension Plans in
Australia, New Zealand, Canada and Ireland (including, but
not limited to, retirees, terminated vested participants,
disabled participants and dependents of former participants)
shall be regarded as "Packco Participants," and inactive
participants in other Noninsured Foreign Pension Plans shall
be regarded as "New Grace Participants."

(d)   With respect to each Noninsured Foreign
Pension Plan, from the Distribution Date and until the
assets of such Plan are actually transferred to a Packco
Mirror Plan or a New Grace Mirror Plan, as appropriate,
pursuant to Section 6.01(b) above, the liabilities and
assets allocated for the benefit of the Packco Mirror Plan
and the liabilities and assets allocated for the benefit of
the New Grace Mirror Plan in accordance with Section 6.01(b)

-4-

shall be accounted for separately, as if they were
liabilities and assets of separate plans, including, without
limitation, for purposes of payments, contributions,
liabilities and earnings allocations.

(e) Notwithstanding the provisions of Section
6.01(b), for purposes of the determination of the allocation
of assets of The Grace UK Pension Plan pursuant to Section
6.01(b), the liabilities of The Grace UK Pension Plan
attributable to the Packco Mirror Plan shall not be
considered to include the liabilities of the Packco Mirror
Plan attributable to the change in the definition of
pensionable compensation pursuant to the Time For Change
Benefit Enhancement Program. The requirements of this
Section 6.01(e) shall be reflected in the applicable Local
Actuary's Letter.

(f)   All contributions required to be made to
Noninsured Foreign Pension Plans for any period ending on or
before the Distribution Date shall be made by the New Grace
Group and shall be reflected by the parties in subsequent
calculations and adjustments as if they had been made on or
before the Distribution Date.

SECTION 2.02  **Foreign Plans Agreement.**  Section 2.01(b)
of this Agreement and Schedule A to this Agreement shall be
regarded as comprising the "Foreign Plans Agreement" referred to
in Section 6.01(a) of the EBA.

SECTION 2.03  **Certain Deferred Compensation.**  (a)
Section 3.01 of the EBA is amended by adding a new subsection (c)
at the end thereof, reading in its entirety as follows:

(c)   Notwithstanding Section 3.01(b) above,
effective as of the Distribution Date:  (i)  the Packco
Group shall assume all Liabilities under the Grace LTIP
relating to or arising out of the cash awards payable
thereunder to Mr. Kaenzig and Mr. Weinberg with respect to
the 1995-1997 performance period (the "1997 Deferred LTIP
Awards") and the cash award payable thereunder to Mr.
Weinberg with respect to the 1994-1996 performance period
(the "1996 Deferred LTIP Award"), payment of which awards
has been deferred, including without limitation any
Liabilities relating to or arising out of such deferral; and
(ii) in consideration of such assumption, the New Grace
Group shall pay the Packco Group, as promptly as practicable
after the Distribution Date, an amount in cash equal to the
excess of (x)  63% of the amount of the 1997 Deferred LTIP
Awards as accrued through the Distribution Date over (y) the
amount deducted from the amount of cash held by Packco and

-5-

the Packco Subsidiaries pursuant to Section 2.01(a)(v) of
the Supplemental Agreement dated as of March 30, 1998 among
Grace, Cryovac, Inc., Grace-Conn. and New Grace.

(b)   Section 5.04 of the EBA is amended by inserting
"(a)" at the beginning thereof, deleting all references in the
first paragraph thereof to the "Deferred Compensation Plan," and
adding a new subsection (b) at the end thereof, reading in its
entirety as follows:

(b)   Effective as of the Distribution Date, the
Packco Group shall assume all Liabilities to or with respect
to Packco Employees relating to or arising out of the
Deferred Compensation Plan (it being understood that the
deferred stock award of Mr. Kaenzig under the Grace LTIP is
not a Liability under the Deferred Compensation Plan).  The
New Grace Group and the Packco Group shall take all steps
necessary or appropriate so that, as soon as practicable
after the Distribution Date, one or more members of the
Packco Group are the owners of any insurance policies
relating to the Liabilities assumed by the Packco Group
pursuant to the preceding sentence (such insurance policies,
the "Transferred Policies").  As soon as practicable
following the Distribution Date, the New Grace Group shall
cause the Todd Organization of New York, Inc. (the "Todd
Organization"), to update its valuation of the Transferred
Policies and of the Liabilities assumed pursuant to this
Section 5.04(b) and the 1996 Deferred LTIP Award
(collectively, the "Assumed Deferred Liabilities") to
reflect events through the Distribution Date, and to deliver
such updated valuation to SAC and New Grace.  Such updated
valuation shall be prepared using the same methodologies as
were used in preparing the letter dated February 4, 1998
from Kevin Hicke of the Todd Organization to Barry Levine of
KPMG Peat Marwick LLP.  If such updated valuation shows that
the amount of the Assumed Deferred Liabilities exceeds the
value of the Transferred Policies as of the Distribution
Date, then New Grace shall promptly pay 63% of the amount of
such excess in cash to SAC.

### ARTICLE III

### MISCELLANEOUS EMPLOYEE MATTERS

SECTION 3.01  **Further Amendments**.  The provisions of
this Article III shall apply notwithstanding anything to the
contrary contained in the Merger Agreement, the Distribution
Agreement, the EBA, or any Other Agreement. Capitalized terms
used but not defined in this Article III shall have the meanings

-6-

ascribed to them in the Distribution Agreement (as amended by
this Agreement).

SECTION 3.02  **Certain Non-U.S. Employees.**  (a) Pursuant
to the Contrat d'Apport Partiel d'Actif (Contribution Agreement)
dated February 23, 1998, between Grace S.A. and W.R. Grace
S.A.S., under which the New Grace Business in France was
transferred to W.R. Grace S.A.S., all individuals employed as
part of the central computer staff of Grace S.A., including the
individuals listed on part 1 of Schedule B hereto (the "Schedule
B-1 Employees"), remain employees of Grace S.A. and thus are
Packco Employees as defined in the EBA.  If the employment of any
Schedule B-1 Employee with Grace S.A. is terminated on or before
December 31, 2000 because of the reduction or termination of
computer support services provided by Grace S.A. to the New Grace
Business after the Distribution, Grace-Conn. shall, or shall
cause W.R. Grace S.A.S. to, reimburse Grace S.A., upon receipt of
appropriate documentation, for the severance benefits payable to
such employees on account of such termination.

(b) Certain other individuals listed on part 2 of
Schedule B hereto (the "Schedule B-2 Employees") shall become
employees of a member of the Packco Group as of the Distribution
Date, and are thus Packco Employees as defined in the EBA.  If
the employment of any Schedule B-2 Employee with the Packco Group
is terminated on or before December 31, 2000, Grace-Conn. shall
reimburse, or shall cause the appropriate member of the Grace
Group to reimburse, the appropriate member of the Packco Group,
upon receipt of appropriate documentation, for the severance
benefits (if any) payable to such employees on account of such
termination.

(c) Certain other individuals identified on part 3 of
Schedule B hereto (the "Schedule B-3 Employees") shall become
employees of a member of the Packco Group as of the Distribution
Date, and are thus Packco Employees as defined in the EBA.  If
the employment of any Schedule B-3 Employee with the Packco Group
is terminated on or before the second anniversary of the
Distribution Date, New Grace shall reimburse, or shall cause the
appropriate member of the Grace Group to reimburse, the
appropriate member of the Packco Group, upon receipt of
appropriate documentation, for the severance benefits (if any)
payable to such employees on account of such termination;
provided, that New Grace and the Grace Group shall not be
obligated to reimburse the Packco Group for such severance
benefits in excess of $100,000.

SECTION 3.03  **Duncan Information Services Center
Employees.**  All individuals employed, as of the Distribution
Date, at the Duncan Information Services Center of Grace located

-7-

in Duncan, South Carolina, other than the individuals listed on
Schedule C hereto (the "Schedule C Employees"), shall be Packco
Employees as defined in the EBA.  The Schedule C Employees shall
be New Grace Employees as defined in the EBA.

SECTION 3.04 **Relocating Employees.**  The individuals
listed on Schedule D hereto (the "Schedule D Employees") are
Packco Employees who have been, or are being, relocated from Boca
Raton, Florida to Duncan, South Carolina pursuant to the terms of
the relocation policy of Grace.  SAC shall promptly reimburse New
Grace, upon presentation of proper documentation, for all costs
and expenses incurred by Grace in connection with such
relocations of the Schedule D Employees in accordance with such
relocation policy.

SECTION 3.05 **UK Manager.**  (a) The individual listed on
Schedule E hereto (the "Schedule E Employee") shall remain an
employee of W.R. Grace Limited after the Distribution.  However,
the Schedule E Employee will perform certain services for Cryovac
U.K. Limited while he is an employee of W.R. Grace Limited, until
his date of termination from W.R. Grace Limited or, if sooner,
until such date that W.R. Grace Limited notifies Cryovac U.K.
Limited that the Schedule E Employee's services are no longer
available or Cryovac U.K. Limited notifies W.R. Grace Limited
that the Schedule E Employee's services are no longer desired
(the "Packco Services Period").  Cryovac U.K. Limited shall pay
W.R. Grace Limited a fee with respect to the Schedule E Employee
that is equal to the total of the following for the Packco
Services Period: (i) salary, wages and other compensation
(including, but not limited to, vacation pay) paid by W.R. Grace
Limited to the Schedule E Employee; (ii) the amount of taxes,
fees or contributions paid to any governmental entity or program
by W.R. Grace Limited on behalf of, or with respect to, the
Schedule E Employee; and (iii) any contributions that are made by
W.R. Grace Limited to any plan or program for benefits provided
to on behalf of the Schedule E Employee (collectively, the
"Employment Costs").  W.R. Grace Limited shall bill Cryovac U.K.
Limited monthly for the amount of the Employment Costs that are
attributable to the prior calendar month.  Packco shall pay such
bill promptly upon receipt.  Notwithstanding the foregoing, if
the Schedule E Employee performs any services for W.R. Grace
Limited during any month during the Packco Services Period, then
the amount of Employment Costs that are payable by Cryovac U.K.
Limited for that month shall be reduced by a percentage that is
equal to the estimated percentage of working time that the
Schedule E Employee expended to perform services for W.R. Grace
Limited during that month.

(b) With respect to services performed for Cryovac U.K.
Limited by the Schedule E Employee during the Packco Services

Period, W.R. Grace Limited shall not be liable for any act or
omission of the Schedule E Employee, and SAC, Cryovac U.K.
Limited and the other members of the Packco Group shall indemnify
and hold harmless the Grace Group from and against all
liabilities, costs, claims and proceedings arising from or
relating to such services, including, but not limited to, damage
to or loss of property.

SECTION 3.06 **U.S. Welfare Benefits.** (a) From the
Distribution Date through April 30, 1998 (the "Medical
Administration Period"), New Grace shall continue to administer
the Cryovac/Formpac Basic Medical Plan, including the
prescription drug program thereunder (the outside administrators
of which Plan are Blue Cross/Blue Shield and, as to the
prescription drug program, Medco) and the Cryovac Network Plan
(together, the "Cryovac Medical Plans") for eligible Packco
Employees in the United States. SAC shall adopt, or shall cause
another member of the Packco Group to adopt, a plan (the "Mirror
Dental Plan") that is substantially identical to the New Grace
dental plan (the outside administrator of which is MetLife) for
the benefit of eligible Packco Employees, and New Grace shall
administer the Mirror Dental Plan during the Medical
Administration Period. SAC shall reimburse New Grace for all
claims incurred by Packco Employees under the Cryovac Medical
Plans and the Mirror Dental Plan during the Medical
Admiministration Period, together with the administrative fees
associated with such claims. Such reimbursement shall be made
from time to time, promptly upon receipt by Packco of appropriate
documentation thereof.

(b) New Grace shall continue to administer the self-
insured short-term disability payments under the current payment
arrangement administered by MetLife (the "STD Arrangement") for
eligible hourly Packco Employees, during the following periods:
with respect to such Packco Employees located in Cedar Rapids,
Iowa and Reading, Pennsylvania, from the Distribution Date until
April 26, 1998; and with respect to such Packco Employees located
in Indianapolis, Indiana, from the Distribution Date until April
30, 1998 (each such period, an "STD Administration Period"). SAC
shall reimburse New Grace for all short-term disability payments
made pursuant to the STD Arrangement during the applicable STD
Administration Period. Such reimbursement shall be made from
time to time, promptly upon receipt by Packco of appropriate
documentation thereof.

SECTION 3.07 **Expatriate Employees.** (a) New Grace
shall continue to administer and pay the compensation and housing
and other allowances, and to provide other employee benefits, to
the individuals listed on part 1 of Schedule F hereto through the
earlier of April 30, 1998 or such earlier date as SAC shall

-9-

designate.  SAC shall reimburse Grace, promptly upon receipt of appropriate documentation, for all direct costs and expenses incurred by Grace in complying with the preceding sentence.

(b) New Grace shall continue to administer the housing and other allowances for the individuals listed on part 2 of Schedule F hereto (each of whom is a Packco Employee who is neither a United States citizen nor a permanent resident of the United States, but who is working in the United States for the Packco Group), and for one such employee, to manage his U.K. residence, through the earlier of April 30, 1998 or such date as SAC shall designate.  SAC shall reimburse New Grace, promptly upon receipt of appropriate documentation, for all direct costs and expenses incurred by New Grace in complying with the preceding sentence.

SECTION 3.08 **Miscellaneous.**  (a)  For purposes of Section 2.01(a) of the EBA, any individual who is not designated as allocated to the Packco Group shall be deemed to be allocated to the New Grace Group.

(b)  The New Grace Group and the Packco Group shall take all steps that may reasonably necessary or appropriate to implement, as promptly as practicable, the benefit strategies detailed in the report enclosed under cover of a letter dated March 24, 1998 from Robyn Kow of William M. Mercer, Incorporated to Mary Coventry of SAC and Dennis M. Polisner of KPMG Peat Marwick LLP (the "Benefits Strategies").

(c)  Without limiting the generality of the provisions of Section 3.08(b), it is acknowledged that pursuant to the Benefits Strategies, with respect to certain Packco Employees or New Grace Employees who are employed outside the United States and who participate immediately before the Distribution Date in any Plan (as defined in the EBA) that is sponsored by a member of the New Grace Group or of the Packco Group, respectively, immediately after the Distribution Date, if it is not possible for such individuals to be covered by a Plan sponsored by a member of the Packco Group or of the New Grace Group, respectively, immediately after the Distribution Date, the New Grace Group or the Packco Group, respectively, shall continue the pre-Distribution Date coverage of such individuals until such new coverage can be arranged, and the Packco Group or the New Grace Group, respectively, shall reimburse the other for the premium and other costs of such coverage, all as more fully set forth in the Benefits Strategies.

IN WITNESS WHEREOF, the parties hereto have caused this
Agreement to be duly executed as of the date first above written.

W.R. GRACE & CO.

By: _____
    Name:
    Title:

W.R. GRACE & Co.-Conn.

By: _____
    Name:
    Title:

GENERAL SPECIALTY CHEMICALS, INC.

By: _____
    Name:
    Title:

SEALED AIR CORPORATION

By: _____
    Name:    William V. Hickey
    Title: President

-11-

SCHEDULE A
LOCAL ACTUARIES' LETTERS

 

# Towers Perrin

São Paulo, March 31, 1998

Robyn Kow
William M. Mercer, Inc.
10 South Wacker Drive
Chicago, IL 60606
USA

*Fax.: (312) 902.7626*

*Re:    <u>W.R. Grace – Actuary's Letter (Pension Plan)</u>*

Dear Robyn,

Attending your request and in complement of our letter of 02/02/96, we have:

### Background

As per your request the assets split will be in accordance with the Brazilian pension legislation which is proportional to the liabilities i.e., the percentage of the Division (Cryovac) in relation to the total entity liabilities applied to total plan assets.

Packco will be establishing an identical plan for its employees.

### Legal

In accordance with Brazilian Legislation, all process will be necessary to receive formal approval from government, i.e., create a new plan sponsor in Darexprev creation of a new entity, and transference from Darexprev to a new entity.

### Effective Date

March 31, 1998

### Determination of Transfer Amount as of the Effective Date

In this valuation the following methods/assumptions were considered:

-   Actuarial Cost Method        Unit Credit
-   Mortality Table              GAM – 1971
-   Disability Table             RRB – 1944
-   Turnover                     Not considered
-   Assumptions:
    -   Investment Return        5% p.a. (real)
    -   Salary Increase          3,5% p.a. (real)
    -   Social Security Increase  Not considered because the plan uses a Step Rates system
    -   Benefit readjustment     -3,5% p.a. (real)

Robyn Kow

Page 2.


*Towers Perrin*

### Inactives

The inactives participants will remain in the existing plan.

### Employees Electing Not to Transfer

All involved employees will be transfering to a new plan. It will be possible because the new plan will have the same design.

### Assets Valuation

In accordance, of Brazilian Legislation the assets will be in accordance of Darexprev's account books, that was audit by government.

### Bases of adjusting the asset transfer amount betweem the Effective Date and the actual transfer date

The assets at actuarial valuation date

+  contributions made by on behalf of transfering employees after the effective date;

–  benefit payments paid to employees who are identified as transfering employees but who have service prior to the asset transfer date;

–  expenses incurred with respect to transfering employees (administration expenses, government process, etc.)

+  actuarial assumption for Investment Return (inflation plus 5% p.a.) applied on the all Itens above. It is in accordance of Brazilian Legislation.

Yours sincerely,

Roberto L. Donke
Principal

RLD-071/98
RLD:rt

cc:  Jay Albert – W. R. Grace (Fax.: (561) 362.2637)

S:\09791\PENSION\CRONO98\RLD071.DOC



WILLIAM M.
MERCER

26 March 1998

Mr John Forgach
Senior Benefits Counsel
W R Grace & Co
One Town Centre Road
Boca Raton
Florida 33486-1010
UNITED STATES OF AMERICA

Dear Mr Forgach

**GRACE MANAGEMENT FUND (GMF)**
**W R GRACE AUSTRALIA EMPLOYEE BENEFIT FUND (GEBF)**
**SALE OF GRACE PACKAGING BUSINESS**

1.    **Background**

We understand that W R Grace is selling its packaging business to Sealed
Air. As a result, those employees of W R Grace Australia who are not part
of the packaging business will transfer their employment to "ChemCo". The
existing Grace entity will then comprise the packaging business ("PackCo")
and its shares will be distributed to Sealed Air on the distribution date.

We further understand that:

- the two superannuation funds operated by Grace Australia will
  migrate to Sealed Air. In effect, PackCo would remain as the
  Principal Employer for the purpose of the trust deeds governing these
  funds;

- the benefit structures of these two funds will be replicated for
  employees of ChemCo, most probably as part of a master trust
  (multi-employer superannuation fund);

- the assets of each Fund are to be equitably divided between members
  employed by ChemCo and PackCo. The proposed apportionment
  basis is described later in this letter.

J:\ACTUAL\HMMRCO\THX\A\CHK\GK15\C143.DOC\ss

William M. Mercer Pty Ltd            Tel   (03) 9245 5555
ACN 005 315 917                      Fax   (03) 9654 5635            A Marsh & McLennan Company
101 Collins Street
Melbourne 3000

Mailing Address:
GPO Box 1925H
Melbourne 8060



WILLIAM M.
MERCER

## 2.   Legal Considerations

The employees of ChemCo who are members of either GEBF or GMF will
be transferring to a new fund. The relevant provisions in each Fund's trust
deed are as summarised below.

### GEBF

The minimum benefit to be transferred is the benefit to which the Member
would have been entitled if he or she had voluntarily left employment on the
date of transfer. The transfer amount may be increased, at the determination
of the Principal Company, to an amount not exceeding the Member's
equitable share of the Fund.

### GMF

The amount to be transferred is an amount agreed or determined in a manner
agreed by the Trustees and Employer, but not exceeding the Member's
Equitable share.

Equitable Share is defined as "the amount determined by the Trustees, after
obtaining the advice of the Actuary, to be that person's equitable share of the
Fund." In this case we recommend that a Member's equitable share be
determined as that portion of the net assets of the fund equal to the ratio of
the Member's accrued benefit liability to the total accrued benefit liabilities
of all Members.

In essence the provisions are the same under both Funds. That is: each
trustee body and Grace Australia determine the amount of each member's
equitable share on actuarial advice, and that amount can be transferred to
another fund with the consent of the member unless the Successor Fund
approach is adopted. It will therefore be necessary to obtain the approval of
each trustee body to the proposed calculation basis for determining
members' equitable shares.

Each trustee body has been advised of the proposed calculation basis, and we
will assume that approval has been given as no comments have been made to
date.

## 3.   Effective Date

We understand that, in those countries such as Australia, where an internal
corporate reorganisation is necessary, the effective date for the
apportionment of each Fund's assets is to be the "reorganisation date". This
is likely to be 31 March 1998.



In this event, unless prior action is taken in good time, ChemCo employees who are members of GEBF or GMF will need to remain in their respective Fund until the transfer to a new fund can be arranged and effected. Their continuing basis of membership may need to be documented in the deed of participation mentioned above.

**4.**    **Calculation Basis of Equitable Shares at the Reorganisation Date**

A member's equitable share will be calculated in the manner described below. The calculation uses a member's Discounted Accrued Retirement Benefit as a measure of the member's accrued benefit liability. For a calculation of this nature, where the emphasis is on the relative value of liabilities rather than the absolute value, we believe this method (as opposed to a PBO based method), is suitable. The method is also easily understood and perceived as equitable by members.

**GEBF**

We will first calculate a member's Discounted Accrued Retirement Benefit (DARB) as a lump sum equal to the greater of (A) and (B) calculated in the following manner.

(A)    Actuarial Benefit Value

This represents an estimate of the present value of the accrued retirement benefit under the Fund, and is calculated as:

*Accrued Retirement Pension Multiple at Reorganisation Date*
*x Commutation Factor x Salary x (1 - Discount Factor)*

where:

Accrued Retirement Pension Multiple is calculated in accordance with Rule 4, 5 or 6, as appropriate, of the Trust Deed

Commutation Factor equals

- 12 in the case of a Pre-1979 Female Member, as defined in the Trust Deed

- the factor determined from the table in part (b) of Table 1 of the Trust Deed in the case of a member who has attained the Normal Retirement Date on the Reorganisation Date, and

- 10 in the case of any other member,

Salary is taken as the member's annual salary rate for superannuation purposes at the Reorganisation Date, and



WILLIAM M.
MERCER

Discount Factor is

- zero in the case of a member who has attained their 60th birthday on the Reorganisation Date,

- one-twelfth of 2% for a pre-1971 Member or a Pre-1979 Female Member (as defined in the Trust Deed) for each complete month in the period between the Reorganisation Date and the date of the member's 55th birthday,

- for any other member, the sum of:

  o one-twelfth of 3% for each complete month in the period between the later of the Reorganisation Date and the date of the member's 55th birthday, and the date of the member's 60th birthday, and

  o one-twelfth of 2% for each complete month in the period between the Reorganisation Date and the date of the member's 55th birthday.

(B)    Vested Benefit

The benefit calculated in accordance with Rule 15 of the Trust Deed for a member who has not attained their 55th birthday on the Reorganisation Date.

Members who are entitled to a deferred pension pursuant to Rule 15.(b) of the Trust Deed will be included in this part of the calculation.

We will then take the value of the net assets of the Fund as at the Reorganisation Date and calculate the Adjusted Net Assets Value as:

total net assets of the Fund at the Reorganisation Date,

minus    the sum of the value of the additional benefits for all members entitled to such a benefit either pursuant to Rule 15A or as a result of having transferred an amount into the Fund pursuant to Rule 3.(1)

Each member's DARB will then be increased in the ratio:

$$\frac{\text{Adjusted Net Assets Value}}{\text{Total DARBs for all members}}$$

to which will be added any additional benefit entitlement pursuant to Rule 15A or roll-over entitlement pursuant to Rule 3.(1) with the resultant amount forming that member's equitable share of the Fund.



WILLIAM M.
MERCER

## GMP

We will first calculate a member's Discounted Accrued Retirement Benefit (DARB) as a lump sum equal to the greater of (A) and (B) calculated in the following manner.

(A)    Actuarial Benefit Value

This represents an estimate of the present value of the accrued retirement benefit under the Fund, and is calculated as:

*Accrued Retirement Benefit Multiple at Reorganisation Date*
*x Salary x (1 - Discount Factor)*

where:

Accrued Retirement Benefit Multiple is calculated in accordance with Clause 2.5 of the Trust Deed

Salary is taken as the member's annual salary rate for superannuation purposes at the Reorganisation Date, and

Discount Factor is

- zero in the case of a member who has attained their 55th birthday on the Reorganisation Date, and

- in the case of any other member, one-twelfth of 2% for each complete month in the period between the Reorganisation Date and the date of the member's 55th birthday.

(B)    Vested Benefit

The benefit calculated in accordance with Clause 2.7 of the Trust Deed for a member who has not attained their 55th birthday on the Reorganisation Date.

We will then take the value of the net assets of the Fund as at the Reorganisation Date and calculate the Adjusted Net Assets Value as:

total net assets of the Fund at the Reorganisation Date,

minus    the sum of the value of the additional benefits for all members entitled to such a benefit either pursuant to Clause 2.8 or as a result of having transferred an amount into the Fund pursuant to Clause 1.38,



Each member's DARB will then be increased in the ratio:

<u>Adjusted Net Assets Value</u>
Total DARBs

to which will be added any additional benefit entitlement pursuant to Clause 2.8 or roll-over entitlement pursuant to Clause 1.38, with the resultant amount forming that member's equitable share of the Fund.

**5.    Treatment of Inactive Members**

Neither GEBF nor GMF has any current pensioners. However, GEBF has a number of members who elected the deferred pension option on leaving service. It is proposed to treat these deferred pensioners in a similar manner to active members.

**6.    ChemCo Members Electing not to Transfer**

If the Successor Fund approach is not used, then as stated in section 2 above, a ChemCo member's consent will be required to transfer to the new arrangement. If a ChemCo member declines to transfer then:

(i)    that member's appropriate benefit entitlement would be calculated in accordance with the trust deed of the relevant Grace Fund;

(ii)    an amount sufficient to meet that benefit liability will be calculated in accordance with the methodology set out in section 4;

(iii)    this amount will be deducted from that part of the Fund calculated as being attributable to ChemCo members and will be transferred to that part of the Fund calculated as being attributable to PackCo members.

**7.    Method of Valuing Benefits**

Assets of both Funds are invested in pooled superannuation trusts. These assets will be valued using the appropriate unit redemption price at the Reorganisation Date. Any other assets, such as deposits in a bank account, will be valued at their net market value on that date.

Both Funds have a prospective entitlement to shares in the AMP. In this event, although the shares will not have been issued or listed as at the Reorganisation Date, we will make an estimate of the probable value and include this amount in the total net market value of each Fund.



8.    **Adjustment of Asset Transfer Amount**

The actuarial calculations to determine members' equitable shares of the Fund will not be completed until some time after the Reorganisation Date. Hence the apportioned amounts will need to be updated to the date on which the actual transfer of assets is made for ChemCo members.

We envisage that amounts in each Fund attributable to ChemCo members will be adjusted as follows:

|        | net amount of assets attributable to ChemCo members at the Reorganisation Date |
|--------|--------------------------------------------------------------------------------|
| plus   | any member and company contributions made in respect of a period after the Reorganisation Date |
| plus   | any insurance proceeds received in respect of ChemCo members |
| plus   | benefits paid to ChemCo members who leave service after the Reorganisation Date |
| minus  | tax, insurance premiums and expenses incurred in respect of ChemCo members after the Reorganisation Date |
| plus   | investment earnings on the above amounts, adjusted for cash flows. |

Subject to practicability, it is our intention to express the ChemCo transfer amount as units in each pooled superannuation trust as at the Reorganisation Date using the proportions invested in each trust as at that date. Subsequent cashflows would also be converted into units at the relevant date using the same proportions. Hence at the actual transfer date, the net ChemCo transfer amount for each Fund will be expressed as a number of units in each trust and that number of units can be redeemed at the then prevailing unit price. The proceeds can then be transferred to the investment media used under the new arrangement for ChemCo members.

We would be pleased to provide further detail on any of the issues contained in this letter.

Yours sincerely

Andrew Sach
Fellow of the Institute of Actuaries of Australia

KAC\HARPPM\COHKV\HCTK\KK12K142.DOC=fz

7



## WILLIAM M.
## MERCER

Direct    (416) 868-2127

Private & Confidential

March 23, 1998

Mr. John P. Forgach
Benefits Counsel
W.R. Grace & Co.
One Town Center Road
Boca Raton, FL
33486-1010

Dear John:

Re:    Canadian Pension Plans - Actuary's Letter

The purpose of this letter is to set out the information requested in Robyn Kow's
letter of October 29 concerning the split of the Canadian defined benefit pension
plans (the Salaried and Hourly Plans) as a result of the Sealed Air/W.R. Grace
transaction.

### Background

As a result of the Sealed Air/W.R. Grace transaction, we understand that W.R. Grace
of Canada Limited will be internally reorganizing its operations into two divisions
Packco (currently Cryovac) and Chemco (all other Grace divisions). · Following the
restructuring, the salaried and hourly plans will each be split into two mirror plans,
one for Packco and one for Chemco.

The assets of the plan will be split based on an equitable share of the assets (i.e.
including surplus). The Packco plan will maintain the liabilities and the assets for
most of the non-active participants in the current plans.

The equitable share approach allocates the assets between the two plans based on
the proportion of liabilities. The liabilities will be determined from the going-
concern basis used for the funding of the pension plans. The guidelines of the
Pension Commission of Ontario (PCO) on transfers arising from the sale of a
business for plans with surplus provisions like those in the Grace plans, specify that
the determination of the amount of transfer be based upon plan's funding liabilities.

William M. Mercer Limited          Tel 416 868 2000
BCE Place, 161 Bay Street, P.O. Box 501
Toronto, Ontario  M5J 2S5



## WILLIAM M. MERCER

March 23, 1998
Page 2

### Regulatory Considerations

The current pension plan will be amended to recognize the reorganization of the plan. Plan amendments must be filed with the Pension Commission of Ontario and Revenue Canada. A new plan document will be created for the Chemco plan (as Packco group is remaining under the current plan). This document will require registration with the provincial and tax authorities.

The fund will be split by transferring assets from the existing plan, which will be retained by Packco, to the Chemco pension fund. This transfer must be approved by the PCO. In addition, any members and former members, affected by the asset transfer and any union representing those members, must be provided with notice that the asset transfer is taking place.

### Effective Date

The reorganization date is March 31, 1998.

### Determination of Asset Transfer Amount as of the Effective Date

As of the effective date of the reorganization, the assets allocated to the respective entities will be determined on the proportion of their funding liabilities determined in accordance with the assumptions contained in Appendix A which summarizes the funding assumptions used to value the plan's liabilities in the last funding valuation. Since both the hourly and salaried plans are expected to be in surplus positions at the effective date, surplus will be included in the transfer.

### Non-Active Participants

Most non-active participants of the pension plan will remain with the Packco entity. Only suspended members of the pension plan who are active employees of Chemco in Canada or outside Canada and members on long term disability will be included in the Chemco group.

### Employee Option

Chemco employees do not have the option as to whether to stay in the Packco plan. It is possible that Chemco or Packco employees could voice objection to the proposed transfer. However, this is unlikely given the equitable share method currently being contemplated. As long as the transfer follows PCO guidelines, the transfer should be approved by the regulators.



WILLIAM M.
MERCER

March 23, 1998
Page 3

## Asset Valuation

The assets will be valued at market for the purposes of the asset transfer.

## Asset Adjustments Between Effective Date and Actual Transfer Date

The asset transfer amount will be adjusted following determination on the effective date to the actual transfer date by:

➤ crediting employee and company contributions made by or in respect of transferring employees;

➤ deducting benefit payments and plan expenses in respect of transferring employees; and

➤ crediting the initial transfer amount (i.e. determined on the effective date) and the above cashflows with the actual investment return of the W.R. Grace Canada pension fund, net of investment expenses, from March 31, 1998 or subsequent date of cash flow to the actual transfer date.

## Other Issues

An appropriate adjustment to the value of the plan assets will be made in respect of the transfer of assets and liabilities for former Dearborn members.

If you have any questions, please call Doug or me.

Yours very truly,

Robert Stapleford

Copies to:    Jay Albert, W.R. Grace
Robyn Kow, William M. Mercer - Chicago
Doug Johnson, William M. Mercer Limited

f:\01\grace\doug\1998\f-mr23.doc

## Appendix A    -    Summary of Methods and Assumptions

| | |
|---|---|
| Liability valuation: | Accrued benefit actuarial cost method, based on benefits accrued to the valuation date with salary projection. |
| Investment return: | 7% (net of investment and administrative expenses estimated to be 1.0%) |
| Salary increases: | 5.5% per annum |
| YMPE increases: | 4% per annum |
| Maximum pension increases: | No increases in maximum pension of $1722.22 per year of service |
| Mortality: | 1983 Group Annuity Mortality Table with margins |
| Terminations of employment: | Ontario Medium Termination Scale. The scale is age related with rates ranging from 40% per annum at age 18 to about 1.8% at age 52. |
| Retirement rates: | Scale of age related rates, including 5% at age 55, 30% age 62 and 100% age 65. |
| Form of Pension: | 85% of employees are assumed to be married at death or retirement with female spouse three years younger than male spouse. Married members are assumed to elect a joint and 60% survivor pension. Single members are assumed to elect a life guaranteed for 10 years pension. |

William M. Mercer Limited



## IPT Actuarial Services Limited

25/28 Adelaide Road, Dublin 2
Telephone 01-804 8100.   Facsimile 01-676 4863

23/25 South Terrace, Cork
Telephone 021-317888.   Facsimile 021-314282

**Private & Confidential**                                                          **25 March 1998**

Mr. John Forgach,
Senior Benefits Counsel,
W. R. Grace & Co.,
1 Town Centre Road,
Boca Raton,
FL33486-1010

Dear Mr. Forgach,

### Transfer of Construction Business from
### W. R. Grace (Ireland) Limited and Associated Companies Pension Plan

This is the actuary's letter relating to the transfer of Construction employees from W. R. Grace (Ireland) Limited and Associated Companies Pension Plan.

Background:

The pension plan contains members in receipt of pension, deferred members with entitlement to pensions payable in the future and active members.

The active members include one or more employees who will be transferred to a separate Company called Grace Construction Ireland Limited.

The deferred and pensioner members will not be split. They will remain in the existing plan whose principal employer will be W. R. Grace Ireland Limited and will remain the operating Company for Cryovac.

It is intended that the assets would be apportioned in proportion to the liabilities with the exception of former Amicon Ireland Limited employees who consent to transfer from the W. R. Grace (Ireland) Limited and Associated Companies Pension Plan to the "Vermeer Plan". The basis for calculating the transfer amount in respect of the former Amicon employees transferring to Vermeer has already been established and gives a value lower than that which would be calculated using the actuarial assumptions outlined below.

Thus, if the assets less the Amicon liability amount do not exactly match the liabilities (excluding any liability in respect of any transferring Amicon employees) then the share of assets attributed to each section would reflect this position.

The amount to be transferred at the effective date from the W. R. Grace (Ireland) Limited and Associated Companies' Pension Plan in respect of Construction employees would, therefore be the assets attributable to those members representing the proportion of the total assets less the Amicon liability amount which their liabilities (excluding any liability in



A member of the Sedgwick Dineen Group

Directors: M Wren, BSc, FIA (Managing); WJ Bell, BSc, FIA, ASA, FIPMI; JF Brophy, BSc, FIA, APMI; M Madden, FIA; E O'Donovan, FIA; M Whyms, FIA; Secretary E Synnott
Associate Directors: GN Farrell, MA, FIPMI; AF O'Brien, MA FIPMI
Registered in Ireland 154704. Registered Office 25/28 Adelaide Road, Dublin 2.

respect of transferring former Amicon employees) represent as a proportion of the total liabilities.

Similarly the assets attributable to the other active employees and all the deferred members and pensioners would remain behind in the W. R. Grace (Ireland) and Associated Companies Pension Plan.

The new plan for Construction employees would be sponsored by the continuing Grace Company.

Members' consent to transfer will be required.

The consent of the Irish Revenue Commissioners may also be required which may not be forthcoming if a substantial excess over "past service reserve" is to be transferred.

The effective date of the transfer is 31 March 1998.

Determination of Amount to be Transferred as at the Effective Date of the Transfer:

Liabilities will be calculated using the assumptions set out below for all members of the Plan. Consent to transfer will be required. Members who do not consent to transfer will receive deferred pension benefits as if they left service on the effective date of transfer. Their liability will be calculated appropriately.

The amount to be transferred will be calculated as the appropriate proportion of total assets as set out above.

Assets will be valued at market value.

Adjustment Between Effective Date and Asset Transfer Date

The assets shall be adjusted to reflect the period between the effective date of the transfer and Asset Transfer Date by multiplying the Transfer amount as at the Effective Date by the bid price of the Standard Life Managed Fund at the Asset Transfer Date divided by the bid price of the Standard Life Managed Fund at the effective date of the transfer.

Actuarial Assumptions:

| (a) | Investment return | 7% p.a. |
|---|---|---|
| (b) | Plan pensionable salary increase | 5% p.a. |
| (c) | Pension increases in retirement | Allowance for discretionary increases at 3% p.a. |
| (d) | Pension commuted for cash | The maximum permitted |

| (e) | Mortality | No mortality allowed for pre-retirement, PMA80 and PFA 80 tables for males and females respectively post-retirement |
|---|---|---|
| (f) | Marital Status | All members will be married at retirement age |
| (g) | Leaving Service | No withdrawals are allowed for. |
| (h) | Early Retirement | All members will retire on their 62nd birthday. |

Yours sincerely,

Sean O'Donovan, F.I.A.,
IPT Actuarial Services Limited



## Nippon Life Insurance Company

International Corporate Marketing Department
1-2-2, Yurakucho, Chiyoda-ku, Tokyo 100, Japan
Phone: Tokyo (03) 3507-1254  Facsimile: (03) 5251-7304

**NLI**

January 12, 1998

Ms. Robyn Kow
William M. Mercer
Chicago

Dear Ms. Kow:

My reply to your fax of December 27, 1997 is provided below. This letter includes the
situation in regard to Grace Japan's tax qualified pension plan and actuarial basis of the New
Plan.

The overall philosophy for splitting the assets between entities
The assets of the tax qualified pension plan (TQPP) of a corporation, when the management
of that corporation is transferred to or taken over by another corporate entity, are handled in
the following manner pursuant to Japanese Corporate Tax Law:

When employees are transferred and the corporation to which they will be transferred has
a TQPP in place, the portion of the TQPP for the transferees at the pre-transfer entity is
terminated and the necessary amount for each such employee is transferred to the post-
transfer entity where it is applied as PSL premium.

Determining the transfer amount
The necessary amount for each person to be transferred is calculated from the total
liability reserves of the Grace TQPP.   This figure is totaled and its percentage value in
regard to the total liability reserves ascertained.   It is this percentage of the pension
assets of the Grace TQPP which is to be transferred to the New Plan.
If liability reserves under the New Plan equal or exceed the amount to be transferred
from the Grace TQPP, the full amount of transferable assets is appropriated to the
accumulated funds of the New Plan.   If however, the liability reserves under the New
Plan are less than the assets to be transferred from the Grace TQPP, the amount in
excess of the liability reserves of the New Plan must be administered under the New Plan
to be paid to transferees as an additional payment (at transfer or retirement) separate to

the benefits paid under the New Plan.   This procedure is fixed under Japanese
Corporate Tax Law and therefore cannot be altered to meet individual client
requirements.

Having said that, given what we know, the current Grace TQPP does not have sufficient
funds, and therefore the necessary amount to be transferred is not likely to exceed the
amount of the liability reserves of the New Plan.

The New Plan is to be established as of February 1, 1998, and owing to the process that
must be followed in accordance with Corporate Tax Law, it is not until after that date
(probably mid-March) that we will know the exact transfer amount.   Nonetheless, the
process can be outlined as follows: the transferable amount will be calculated based on
the assets of the Grace TQPP as of January 31, 1998, and adjustment of the applicable
amount between the effective date and the actual transfer date will include interest
earned on the assets between these two dates.   Premium payments and contributions
between this period will be deferred until the transfer of assets is concluded.

Grace TQPP actuarial assumptions

A periodical actuarial valuation (every 5 years) is just now being carried out on the Grace
TQPP, and the actuarial assumptions of the plan are being reviewed.   This procedure is
in line with Corporate Tax Law requirements and is planned to be completed by the end
of February 1998.

The new actuarial assumptions for the Grace TQPP will be as follows.
1.   Funding Method:   Entry Age Method (specified age of 24)
2.   Interest Rate: 5.5%
3.   Assumed Mortality Rate: 85% of the Fifteenth Japanese National Life Table for men
4.   Assumed Withdrawal Rate: based on Grace's experience, an average rate of 3.15%
5.   Salary Index: based on Grace's salaries, an average increase rate of 3.78%

New Plan actuarial assumptions
Although the New Plan will be identical to that of the Grace TQPP, some of the actuarial
assumptions will differ for the following reasons.

Japanese TQPP's are categorized into those with over 100 participants and those with
under 100 participants.   The funding method used and assumed withdrawal rate differ
depending on which of these two categories applies.   In Grace's case the New Plan is
likely to have less than 100 participants and as such, the assumptions will be determined
as follows:

1.  **Funding Method**

    Normal premium is calculated for those benefits required at normal retirement using an assumed mortality rate and an assumed withdrawal rate.   However, as is the case with the existing insurance, it is calculated for benefits required by those reaching normal retirement only.   In other words, normal premium does not accumulate resources for the payment of midterm withdrawal or death retirement benefits. Therefore, when a survivors pension rider is in place, a survivors' pension rider premium is calculated at the beginning of each year to provide the funds for death benefit payments over a one year period.

2.  **Assumed Withdrawal Rate**

    When participants number less than 100, an assumed withdrawal rate calculated from the experience of one plan alone would fluctuate dramatically with every actuarial valuation.   Owing to this, it is usual for a model withdrawal rate (the average of all such plans) to be used.

The following are the actuarial assumptions for the New Plan:

1.  Funding Method: Entry Age Method plus Unit Credit Method
2.  Interest Rate: from 3.1% ~ 5.5%, determined upon discussion between Grace Japan and Nippon Life
3.  Assumed Mortality Rate: 85% of the Fifteenth Japanese National Life Table for men
4.  Assumed Withdrawal Rate: model withdrawal rate
5.  Salary Index: N/A.   An annually calculated lump sum amount is paid as premium to account for salary increases.

Actuarial calculation is now in process based on the assumptions stated above.

I believe that I have provided all the information you require herein and will be happy to answer any further questions that you may have.

Yours sincerely,

Hideyuki Tomita
Manager
International Corporate Marketing Department

# Towers Perrin

January 21, 1998

Mr. John Forgach
Senior Benefits Counsel
W.R. Grace & Co.
One Town Center Road
Boca Raton, FL  33486-1010

Dear Mr. Forgach:

GRACE PACKAGING MEXICO - RETIREMENT PROGRAM SPIN OFF

Regarding the reorganization and sale process your company is facing on a worldwide basis, this document sets out the principles on which the defined benefit retirement plan assets will be split between the new Grace's entities in Mexico.

Background

As a part of a global transaction process, Sealed Air is going to acquire Grace Packaging division in Mexico, whose employees are provided with a local defined benefit pension plan.

On the other hand, New ChemCo entity was created for retaining just Grace Davison and Construction's assets, being their employees transferred to Grace Container.

As apart of the business transaction, Sealed Air will retain the pension plan for the Packaging group of employees while New ChemCo Grace division will establish a new identical plan for the rest of the employees.

Since Grace has created a local pension fund in Mexico according to the Mexican pension regulations, the fund will be split between both resulting entities: Packaging Co. and New Chemical Co. divisions on an equitable shared basis. Thus, the corresponding retirement liabilities and assets of the active employees acquired by Sealed Air will be transferred to such company.

It is important to mention that there are no inactive employees receiving pension benefits in Mexico.

Mr. John Fo███h 
January 21, 1998
Page 2.

*Towers Perrin*

### Legal Issues

There are no specific legal requirements or plan regulations to be met related to the assets split. Nevertheless, the financial institution in charge of the fund investment (Banamex, S.A.) should be informed in advance about the assets split in order to reallocate the pension financial resources into each fund.

### Effective Transference Date

The effective date of the assets split will take place on December 31, 1997 since it has been scheduled as the reorganization date.

### Calculation Basis of the Transfer Amount

To determine the assets transfer amount as of the effective reorganization date, the employees pension accrual liabilities will be determined through an actuarial valuation under the following assumptions.

- Cost Method:                                    Projected Unit Credit

  This funding method is currently being used for local accounting purposes according to Bulletin D-3, which is the Mexican FAS-87 counterpart of accounting principles in the US.

- Economic Assumptions

  | | |
  |---|---|
  | - Discount Rate | 5.0% |
  | - Salary Increases | 2.0% |
  | - Minimum Wage Increses | 0.0% |
  | - Commutation Rate of Interest | 9.0% |

- Demographic Assumptions:

  | | |
  |---|---|
  | - Mortality | GAM-83 |
  | - Disability | Hunter |
  | - Turnover | Mexican Experience |
  | - Retirement | TP 60-65 |
  | - Retirement Age | Normal: 65 |
  | | Early: 60 |

- Assets valuation                                Fair market value

Mr. John Forgach
January 21, 1998
Page 3.

*Towers Perrin*

Representative rates for each table are as follows:

| Age | Mortality | Dissmisal | Turnover | Age | Retirement |
|-----|-----------|-----------|----------|-----|------------|
| 20 | .00062 | .0003 | .240 | 60 | .12 |
| 30 | .00099 | .0004 | .136 | 61 | .14 |
| 40 | .00200 | .0009 | .069 | 62 | .19 |
| 50 | .00648 | .0031 | .011 | 63 | .24 |
| 60 | .01556 | .0098 | .000 | 64 | .48 |
| 65 | .02442 | .0270 | .000 | 65 | .99 |

Since the assets split approach will be done on an equitable shared basis, the pension fund will be divided according to the projected benefit obligation (accrued liability under the projected unit credit method) on a proportional basis as of the reorganization date.

To adjust the assets transfer amount between the effective reorganization and the actual transfer dates, the following components should be considered for both resulting funds to calculate the corresponding balance amounts as of the actual transfer date:

■  Balance amount as of the reorganization date, plus

■  Actual company contributions made to the fund, minus

■  Benefits paid from the fund, minus

■  Trustee's administration expenses, plus

■  Actual return on assets earned by the fund

The actuarial assumptions used to perform the latest actuarial valuation of the plan's liabilities to be transferred are the same as those used to split the assets. Therefore, the cost method and valuation assumptions used for the calculation of the transfer amount are also the same as those used for the funding purposes.

25132146

#4/5         (920) 205 215

Mr. John F____ch
January 21, 1998
Page 4.

*Towers Perrin*

Finally, once the reorganization process is concluded, Sealed Air will not be responsible of recognizing neither retirement nor termination benefits to those employees who start collaborating with ChemCo division.

Should you have any questions or need additional information, do not hesitate to contact us.

Sincerely,

Enrique Marin
Senior Consultant

cc:  Kyle Tebbs — Grace de Mexico
     Gilberto Pacheco — Grace de Mexico
     Martha Camacho — Towers Perrin Mexico



*Aon Consulting*

*Actuaries & Consultants*

JOHN ERRINGTON

Director & Actuary
Direct Dial : 474 7551
errington@ausmail.co.nz

29 January 1998

Mr J Forgach
Senior Benefits Council
W.R. Grace & Co
1 Town Centre Road
Boca Raton, FL 33486-1010
USA

Dear John

SALE TO SEALED AIR – NEW ZEALAND

The purpose of this letter to set out the actuarial aspects regarding the sale and the W.R. Grace (N.Z.) Limited Superannuation Scheme.

*Background*

The Scheme is a defined benefit pension scheme with approximately 120 active members and 20 pensioners. The four active members who work in the chemical operations will continue working for W.R. Grace. The remaining active members will be employed by Sealed Air and control of the Scheme will also pass to Sealed Air.

The reorganisation and sale of companies will take place as follows:

(a)     Grace N.Z. establishes a subsidiary company – ChemCo.

(b)     The chemical employees cease working for Grace N.Z. and commence working for ChemCo on the Reorganisation Date (yet to be finalised).

(c)     The ownership of ChemCo is changed from Grace N.Z. to the parent company in the United States.

(d)     Grace N.Z.'s name is changed to PackCo.

(e)     The ownership of PackCo is transferred to Sealed Air.

*Aon Consulting New Zealand Limited • Formerly The Alexander Consulting Group Limited*
PO Box 2764, Wellington, New Zealand • Level 1, 108 The Terrace • Tel: ((64-4) 474 7530 • Fax: (64-4) 471 0100 • E-mail: wellington@nz.aon.co.nz



*Aon Consulting*

*Actuaries & Consultants*

In terms of the Scheme the process will be as follows:

(a) ChemCo establishes a scheme for its future employees (the ChemCo scheme).

(b) On or before the Reorganisation Date, the prospective ChemCo members are given notice of the opportunity to transfer their benefits to the ChemCo scheme. NZ law requires at least one month's notice and also specifies that each member must consent to the transfer of his or her benefits.

(c) The ChemCo members who have agreed to the transfer will be admitted to the ChemCo scheme with membership commencing on the Reorganisation Date and will have their Transfer Amounts (see below) paid to that scheme. Those who do not consent will not be admitted to the ChemCo scheme and will be paid their resignation benefits (calculated as at the Reorganisation Date).

(d) When the ownership of PackCo is transferred to Sealed Air, control of the Scheme will automatically pass to Sealed Air.

*Legal*

The above structure ensures that the legal process and any associated problems are kept to a minimum. In terms of the Scheme the relevant provision of the Trust Deed is Clause A10.17.which states:

"(1) If a full Member is transferred in his employment to an Affiliate Company and becomes a member of any other superannuation arrangement Instituted by such Affiliate Company no amount shall be payable to the Member on his leaving the Scheme In these circumstances and from the date of such transfer contributions to the Fund by that Member shall cease and the provisions of Sub-clause (2) of this Clause shall apply.

(2) The Trustee shall in its absolute discretion either:

(i) pay to the trustees of any such aforementioned superannuation arrangement for the benefit of that Member the Member's equitable share of the Fund at his date of transfer as determined by the Actuary based on projected Final Average Salary in a uniform and equitable manner, or

(ii) (provisions for retaining the Member's benefit in the Fund)"

An Affiliate Company is defined as WR Grace and Co – Conn. or one of its subsidiaries other than the Principal Company or an Associated Company.

*Aon Consulting New Zealand Limited • Formerly The Alexander Consulting Group Limited*
PO Box 2764, Wellington, New Zealand • Level 1, 108 The Terrace • Tel: (64-4) 474 7550 • Fax: (64-4) 473 0100 • E-mail: wellington@aonconsulting.co.nz

Page 2 of 4



*Aon Consulting*

*Actuaries & Consultants*

*Determination of Transfer Amount as at the Reorganisation Date*

It is proposed that the Transfer Amounts be calculated in accordance with the following formula:

Transfer amount in respect of a ChemCo member =

$$\frac{\text{actuarial reserve in respect of ChemCo member} \times \text{market value of assets}}{\text{total actuarial reserves}}$$

All values are determined as at the Reorganisation Date. The assumptions underlying the actuarial reserve calculation are given in the Appendix and are the same as those used for the last actuarial review of the Scheme (as at 31 December 1994).

*Inactives*

We note that, in accordance with our recommendation, all inactive participants of the Scheme will remain in the Scheme, the control of which will pass to Sealed Air.

Yours sincerely

John Errington

C:\CLIENTS\3014\Let17F17.doc

*Aon Consulting New Zealand Limited • Formerly The Alexander Consulting Group Limited*
PO Box 2764, Wellington, New Zealand • Level 1, 105 The Terrace • Tel. (64-4) 474 7530 • Fax (64-4) 472 1900 • E-mail: wellington@aon.co.nz

Page 3 of 4

*Aon Consulting*

## APPENDIX

The actuarial reserve is calculated on the basis of benefits accrued in respect of service to date.

*Economic Assumptions*

| | |
|---|---|
| After tax investment return: | 5% per annum net of tax and expenses |
| Salary increases: | 3% plus salary scale* |
| Pension increases: | 1% per annum |

*salary scale equals 1% per annum compound for male monthly paid members and nil otherwise.

*Demographic Assumptions*

Death in service:  New Zealand 1990-92 Total Population Life Tables reduced by two years in age

Disablement and Resignation:  Sample decrement rates are:

| Age | Disablement % | Resignation % |
|---|---|---|
| 20 | .02 | 10.70 |
| 30 | .05 | 7.10 |
| 40 | .10 | 3.80 |
| 50 | .22 | 1.70 |
| 60 | .82 | 0.00 |

Retirement:  All members are assumed to retire at age 65

Pension:  Mortality assumption is the same as that for death in-service. Value of pension of $1 per annum at age 65 is $12.11 for males and $13.63 for females.



## ALEXANDER FORBES

*Consulting Actuaries*

Robyn Kow                                                    26 January 1998
William M Mercer
10 South Wacker Drive
Chicago, Illinois
                                                             Tel:  269 0760
**Fax 091 312 9027626**

Dear Robyn

### GRACE AFRICA PENSION FUND
### TRANSFER OF MEMBERS TO "PACKCO"

The Grace Africa Pension Fund is valued using the actuarial basis set out below.

In respect of past service liabilities (and Transfer Values), the liability for each member is the present value of the accrued benefits in terms of the Grace Africa Pension Fund Rules in respect of service prior to the effective date with no allowance for any future service deficit or surplus arising from future contribution shortfalls or excesses.

### Actuarial Assumptions

The valuation is conducted on the basis of the following assumptions:

1.    **Interest**

      It was assumed that the Fund would earn 15% per annum on its investments including capital appreciation.  This rate was reduced to 5½% in respect of the period after retirement in order to make some allowance for increases to pensioners.

2.    **Mortality**

      Post-retirement            :      PA (90) ult.
      Pre-retirement             :      SA 72/77 ult (rated down three years for females).

                                                                          .../2

PO Box 787246, Sandton 2146

Alexander Forbes Place, 61 Katherine Street, Sandown, Telephone (011) 269-0000, Telefax (011) 269-3333. http://www.aforbes.co.za

A Division of Forbes Financial Services Group (Pty) Limited and Managers for Forbes Financial Services Group (Pty) Limited. Registration Number 69/02986/07
Actuaries

AZ Brummer  GF Brown  KL Chalet  JK Clark*  JON Geyer  JD Gordon  NKQC Oosthuy  CPV Herbert  CPV Kerrigan*  F Knezovic  BJ Courtney  LD Louw  MJ Lloyd  JN Marais
A Ndove**  SL Howat  JD Patrick  SJR Pohr  AR Penney  T Sargeant  JV Tanney  M van der Berg  LK van Zyl  H Walker  AD Webr  RBR Wood
Directors of Forbes Financial Services Group (Pty) Ltd
H Hulana

   (Chairman & Managing Director)  RR Addison  DJ Sargeant  GvR Connolly  AOL Hufonger  CPV Kerrigan*  LD Louw  MT Nakala  PJ van der MDT  JN Vickers  Twizeh**Zimbabwean

- 2 -

3.    **Salary Increases**

It was assumed that salary increments would be at a rate of 13,5% per annum.

4.    **Withdrawals**

It was assumed that withdrawals would be in accordance with the following table:

| Age Group | Annual Rate of Withdrawal | |
|---|---|---|
| | **Males** | **Females** |
| 20 - 24 | 15% | 20% |
| 25 - 29 | 10% | 15% |
| 30 - 34 | 7% | 10% |
| 35 - 39 | 4% | 6% |
| 40 - 44 | 2% | 3% |
| 45 + | Nil | Nil |

5.    **Proportion Married**

It was assumed that, at Normal Retirement Date, 90% of all members would be married to wives four years younger (males) or husbands four years older (females).

6.    **Early Retirements**

It has been assumed that all members who reach retirement age will retire on that date. No allowance has been made for ill-health early retirements in view of the existence of a reassured Disability Income Continuance Scheme.

7.    **Minimum Reserves**

For each Member on the transfer date, a minimum reserve will be set up equal to the member's withdrawal benefit at that date.

No credit will be taken for a Member's future contributions in excess of the cost of benefits accruing in the future.

8.    **Market Value Adjustment**

No market value adjustment will be required as it is the intention to allocate the appropriate assets and transfer them into whichever portfolio or portfolios the Sealed Air management require.

.../3

- 3 -

9.    **Calculation of Transfer Values**

The rationale and approach in calculating the transfer value to a Packco arrangement is to provide a proportion of the total assets in relation that the liabilities of the Packco members of the Grace Africa Pension Fund bear to the total liabilities of the Grace Africa Pension Fund.  The transfer value will consist of the transferring members' full actuarial reserves, determined on the basis of the methods and assumptions employed for the most recent statutory actuarial valuation of the Grace Africa Pension Fund enhanced by a proportion of the surplus as described above.

Assets equal to the transfer value (the total of the Packco members' share of the Grace Africa Pension Fund) will be segregated at the Transfer Date and maintained in a separate portfolio until such time as the local Packco Fund is established.    The transfer value will be increased by the yield on the segregated assets between the Transfer Date and the eventual date of transfer.

10.   **Pension Increases**

The W R Grace Pension Fund has granted increases in the past having regard for the Fund earnings and the inflation rate in South Africa.  These have been as high as 15% (1990 and 1992) and as low as 7% (1996).  The average since 1988 has been 11,11%.

Yours sincerely

**P N MARTIN**
*Fellow of the Institute of Actuaries*
*Fellow of the Faculty of Actuaries*
*Valuator of the Fund and employee of*
*Alexander Forbes Consulting Actuaries*



# Sedgwick Noble Lowndes

Sedgwick Noble Lowndes Limited
St Martin's House, 31-35 Clarendon Road, Watford, Hertfordshire WD1 1JA
Telephone 01923-24491 · Facsimile 01923-243226

**Private and Confidential**

Mr John Forgach
Senior Benefits Counsel
W R Grace & Co
One Town Center Road
Boca Raton
FL33486-1010

31 March 1998

Dear Mr Forgach

Transfer of Cryovac from the Grace UK Pension Plan

Background

The pension plan contains pension members, deferred members with entitlement to pensions payable in the future, and active members. The active members include employees who will be transferred to PackCo, a subsidiary of Sealed Air, and those who will remain with the new Grace companies which may well be renamed. The first group of active members includes those transferring to PackCo but who work outside the UK and have deferred pensions in the Grace Plan.

The deferred and pensioner members will not be split. They will remain in the existing plan, whose principal employer will become one of the continuing companies remaining in the Grace Group of Companies. It is intended to set up a mirror image plan to receive the assets and liabilities from the Grace UK Pension Plan for the Cryovac transferring members.

It is intended that the assets would be apportioned in proportion to the liabilities. Thus if the assets do not exactly match the liabilities - on most acceptable measures of funding the Grace UK Pension Plan has assets in excess of liabilities - then the share of assets attributed to each section would reflect this position.

The Transfer Amount at the Effective Date from the Grace UK Pension Plan in respect of the Cryovac members would, therefore, be the assets attributable to those members representing the proportion of the total assets which their past service liabilities represent as a proportion of the total liabilities.

Similarly the assets attributable to the other active employees, and all the deferred and pensioner members would remain behind in the Grace UK Pension Plan.

There will be an adjustment in relation to the "Time for Change" Programme. In accordance with a separate agreement, the cost of the improvement is to be met by Sealed Air, and thus the transfer amount will be adjusted as set out in the following paragraphs.

The new mirror image plan would be sponsored by PackCo, a subsidiary of Sealed Air.

A member of the Sedgwick Group
Registered office: Sedgwick House, The Sedgwick Centre, London E1 8DX
Registered in England number 467838
Regulated by the Personal Investment Authority

1

The proportion transferred out of the Grace Plan will be in accordance with Clause 15 (in particular 15(8)) of the Second Schedule of the Trust Deed of the Grace UK Pension Plan dated 24 February 1988. Before the transfer takes place, the trustees must have the amount calculated in accordance with that Clause, and the Inland Revenue Pensions and Superannuation Office must give the consent for the bulk transfer to take place. The members transferring would have given their consent to such a transfer, and a discharge of the ongoing Grace UK Pension Plan trustees from any further liability for their benefits. In the event that this consent process takes place, no further certification by the Grace UK Pension Plan actuary is required.

**Effective Date**

The intended effective date for the establishment of the Cryovac mirror image plan is 31 March 1998. Members would start accruing benefits in respect of post transfer service in that plan from that date, and that date would be used as the effective date for calculations for the bulk transfer calculation.

**Determination of Transfer Amount as at the Effective Date**

Liabilities will be calculated using the assumptions set out below for all members of the Plan. Plan Salaries for those transferring active Cryovac members included in the "Time for Change" exercise will be their plan salaries at 31 March 1997 increased by the assumed rate of salary growth set out later in this letter, rather than actual salary. Consent to transfer will be required. Members who will have indicated that they do not want to transfer, will receive deferred benefit entitlements as if they were leaving active service on 31 March 1998. Their liability will be calculated appropriately. The Transfer Amount will be calculated as the appropriate portion of the total assets as described above, after deduction of the value as at 31 March 1998 of any bulk transfer values due to be paid out of the Grace Plan due to previous business sales.

**Asset Valuation**

Assets for transfer will be calculated on a proportionate basis as described above. There is, therefore, no reason for valuing assets in any other way at the effective date other than at market value. The amount calculated for transfer at the effective date will be the relevant proportion of the market value of assets on that date.

**Adjustment between Effective Date and Asset Transfer Date**

The Assets transferred shall be adjusted to reflect the period between Effective Date and Asset Transfer Date by multiplying the Transfer Amount as at the Effective Date by the FT-SE Actuaries All Share Total Return Index ("the Index") on the day before Asset Transfer Date and dividing by the Index on the day before the Effective Date.

The Value of Benefit will be calculated using the assumptions set out below. These assumptions are consistent with those in the most recent funding valuation.



## Summary of Assumptions

| | | | |
|---|---|---|---|
| (a) | Investment return | : | 9.0% p.a. |
| (b) | Plan Salary Increases | : | 7.0% p.a. |
| (c) | Pension Increase in Retirement | : | 4.0% pa on all pension up to State Pension Age and after State Pension Age on pension in excess of the GMP; 3.0% p.a. on GMP accrued after 6 April 1988; 0% p.a. on GMP accrued before 6 April 1988. |
| (d) | Revaluation of pension in excess of GMP after withdrawal up to Retirement | : | 4.5% p.a. |
| | Revaluation on GMP | : | 6½% p.a. |
| (e) | Pension commuted for cash | : | The maximum allowed in each case. |
| (f) | Mortality | : | PMA80 Table for males and PFA80 Table for females. |
| (g) | Marital status at death or retirement | : | 90% of male members and 75% of female members will be married. On average wives will be 3 years younger than the member, and husbands 2 years older. |
| (h) | Leaving Service | : | A specific allowance has been made; sample rates are given below: |

| Age | Men % | Women % |
|---|---|---|
| 20 | 15.0 | 15.0 |
| 25 | 10.4 | 1b.4 |
| 30 | 6.9 | 12.4 |
| 35 | 3.5 | 5.6 |
| 40 | 1.7 | 2.1 |
| 45 | 0.6 | 1.8 |

| | | | |
|---|---|---|---|
| (i) | Early Retirements from active status | : | 20% of female members who joined after 1 October 1990 and all male members retire early at each age between 60 and 64. All other female members will retire at 60. No retirement at normal pension age. |
| (j) | Retirements of Deferreds | : | At Normal Retirement Age of member on exit. |

Yours sincerely

David B Martin
Fellow of the Faculty of Actuaries

**SCHEDULE B**
**CERTAIN NON-U.S. EMPLOYEES**

Part 1:                    Terence J. Kennett
                           Lee Frot
                           Bruno Vicente
                           Peter Leyland
                           Frederic Amiet
                           Philippe Simon
                           Georges Ermakoff
                           Isabelle Bodet
                           Guy Brou
                           Jean Paragot
                           Frederic Barrier
                           Bruno Leret
                           Miereille Gallerne
                           Marie-France Mallinger
                           Didier Ladone

Part 2:                    Cheryl Hubbard
                           Pauline Behan
                           Elaine Thorpe
                           Sarah Maud
                           David Line
                           Peter Cannon
                           Paul Bird
                           Leslie Daniel
                           Patricia Saunders
                           Gus Franck
                           Yves Barrault

Part 3:                    See attached.

Part 3:

|  | Position | Country | (1) Severance | (2) |
|---|---|---|---|---|
| (1) | Factory Assistant | Chile | $ | 2,633 |
| (2) | Factory Assistant | Chile | | 2,800 |
| (3) | Accounting Analyst | Chile | | 4,867 |
| (4) | Accounting Analyst | Chile | | 5,000 |
| (5) | Accounting Chief | Chile | | 9,069 |
| (6) | Collector | Chile | | 4,618 |
| (7) | | | | 28,588 |
| | | | | |
| (8) | System Administrator | Mexico | | 10,000 |
| (9) | Voice / Data | Mexico | | 20,000 |
| (10) | Systems Analyst | Argentina | | 3,500 |
| (11) | Systems Analyst | Argentina | | 3,750 |
| (12) | Systems Analyst | Brazil | | 18,139 |
| (13) | Systems Programer | Brazil | | 9,237 |
| (14) | | | | 64,625 |
| | | | | |
| (15) | Total All | | $ | 93,213 |

**SCHEDULE C**
**CERTAIN EMPLOYEES AT DUNCAN, S.C.**

Jim Hansen
Henry Lyons

SCHEDULE D
CERTAIN RELOCATING EMPLOYEES

Clarence Wittenburg
Jerry Witkowski

**SCHEDULE E**

Robert Green, UK



**SCHEDULE F**
**CERTAIN EXPATRIATE EMPLOYEES**

Part 1. US Expatriates:

> Mark Becker
> Sean Dempsey
> Gary Hayes
> Betsy Kuo
> Chin-lin Lo
> Peter Luxemburger
> John Mark
> David Newsome
> James Oddo, Jr.
> Stephen Ostercamp
> M. Henry Piedra
> Phillip Su
> Kyle Tebbs

Part 2. Non-US "Inpatriates":

> Fernando Guzman
> Mauro Kernkraut
> Alejandro Nigro
> Amanda Wong
> Christopher Woodbridge