# EXHIBIT 15

Page 1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE
————————————————————X
In Re:                              Chapter 11

                                    Case No.

                                    01-01139 JKF
W.R. Grace & Co., et al.,

                                    (Jointly
            Debtors.               Administered)
————————————————————X


        * * * CONFIDENTIAL * * *

              —    —    —

            May 13, 2009

              —    —    —

        DEPOSITION of RICHARD FINKE, held

at the offices of Kirkland & Ellis, 655

Fifteenth Street, N.W., Washington, DC,

commencing at 9:32 A.M., on the above

date, before Lisa Lynch, a Registered

Merit Reporter, New Jersey Certified Court

Reporter, License No. XI00825, and

Certified Realtime Reporter

              —    —    —

        MAGNA LEGAL SERVICES, LLP

        7 Penn Center, 8th Floor
            1635 Market Street
            Philadelphia, PA  19103

Page 2

```
 1   APPEARANCES:
 2
     DRINKER BIDDLE & REATH, LLP
 3   BY:  MICHAEL F. BROWN, ESQUIRE
     One Logan Square
 4   18th and Cherry Streets
     Philadelphia, Pennsylvania 19103-6996
 5   (brownmf@dbr.com)
     Representing OneBeacon America Insurance
 6   Company, Seaton Insurance Company,
     Government Employees Insurance Company,
 7   Columbia Insurance Company f/k/a Republic
     Insurance Company
 8
 9   CAPLIN & DRYSDALE, CHARTERED
     BY:  JEFFREY A. LIESEMER, ESQUIRE
10   One Thomas Circle NW
     Suite 1100
11   Washington, DD 20005
     202.862.7801
12   (jal@capdale.com)
     Representing Grace, Official Committee of
13   Asbestos Personal Injury Claimants ("ACC")
14
     KIRKLAND & ELLIS, LP
15   BY:  BARBARA M. HARDING, ESQUIRE
         THEODORE L. FREEDMAN, ESQUIRE
16   655 Fifteenth Street, N.W.
     Washington, DC  20005-5793
17   202.879.5081
     (barbara.harding@kirkland.com)
18   (tfreedman@kirkland.com)
     Representing the Debtors
19
20   THE LAW OFFICES OF JANET S. BAER, P.C.
     BY:  JANET S. BAER, ESQUIRE
21   70 West Madison Street
     Suite 2100
22   Chicago, Illinois 60602
     jbaer@jsbpc.com
23   Representing W.R. Grace
24
```

Page 3

```
 1   APPEARANCES: (continued)
 2   SIMPSON THACHER & BARTLETT, LLP
     BY:  ELISA ALCABES, ESQUIRE
 3   425 Lexington Avenue
     New York, New York 10017-3954
 4   212.455.2846
     (ealcabes@stblaw.com)
 5   Representing Travelers Casualty and Surety
     Company
 6
 7   VORYS, SATER, SEYMOUR AND PEASE, LLP
     BY:  WILLIAM J. POHLMAN, ESQUIRE*
 8       PHILIP DOWNEY, ESQUIRE*
     (*VIA TELECONFERENCE)
 9   52 East Gay Street
     Columbus, Ohio 43215
10   614.464.8349
     (wjpohlman@vorys.com)
11   Representing The Scotts Company, LLC
12
     LEWIS, SLOVAK & KOVACICH, PC
13   BY:  TOM L. LEWIS, ESQUIRE
     P.O. Box 2325
14   723 Third Avenue
     Great Falls, Montana 59403
15   406.761.5595
     tom@lsklaw.net
16   Representing the Libby Claimants
17
     SPEIGHTS & RUNYAN
18   BY:  DANIEL H. SPEIGHTS, ESQUIRE*
     (*VIA TELECONFERENCE)
19   200 Jackson Avenue East
     P.O. Box 685
20   Hampton, South Carolina 29924
     803.943.4444
21   (dspeights@speightsrunyan.com)
     Representing Anderson Memorial Hospital
22
23
24
```

Page 4

```
 1   APPEARANCES:(continued)
 2   MENDES & MOUNT, LLP
     BY:  ALEXANDER MUELLER, ESQUIRE
 3   750 Seventh Avenue
     New York, New York 10019
 4   212.261.8296
     (alexander.mueller@mendes.com)
 5   Representing London Market Companies
 6
     FORD MARRIN ESPOSITO & WITNEYER & GLESER
 7   BY:  ELIZABETH M. DeCRISTOFARO, ESQUIRE*
     (*VIA TELECONFERENCE)
 8   Wall Street Plaza
     New York, New York 10005-1875
 9   212.269.4900
     Representing Continental Casualty Company
10   and Continental Insurance Company
11
     BILZIN SUMBERG BAENA PRICE & AXELROD, LLP
12   BY:  MATTHEW I. KRAMER, ESQUIRE*
     (*VIA TELECONFERENCE)
13   200 South Biscayne Boulevard
     Suite 2500
14   Miami, Florida 33131-5340
     305.450.7246
15   (mkramer@bilzin.com)
     Representing Property Damage Committee
16
17   STROOCK & STROOCK & LAVAN, LLP
     BY:  ARLENE G. KRIEGER, ESQUIRE*
18       LEWIS KRUGER, ESQUIRE*
     (*VIA TELECONFERENCE)
19   180 Maiden Lane
     New York, New York 10038-4982
20   212.806.5400
     (akrieger@stroock.com)
21   Representing Official Committee of
     Unsecured Creditors
22
23
24
```

Page 5

```
 1   APPEARANCES: (continued)
 2
     CROWELL & MORING, LLP
 3   BY:  MARK D. PLEVIN, ESQUIRE
         NOAH S. BLOOMBERG, ESQUIRE
 4   1001 Pennsylvania Avenue, N.W.
     Washington, DC 20004-2595
 5   202.624.2913
     (mplevin@crowell.com)
 6   (nbloomberg@crowell.com)
     Representing Fireman's Fund Insurance
 7   (Surety Bond)
 8
     STEVENS & LEE, P.C.
 9   BY:  MARNIE E. SIMON, ESQUIRE
     1818 Market Street, 29th Floor
10   Philadelphia, Pennsylvania 19103-1702
     215.751.2885
11   (mes@stevenslee.com)
     Representing Fireman's Fund Insurance
12
13   LAW OFFICES OF ALAN B. RICH
     BY:  ALAN B. RICH, ESQUIRE
14   Elm Place, Suite 4620
     1401 Elm Street
15   Dallas, Texas 75202
     214.744.5100
16   (arich@alanrichlaw.com)
     Representing Property Damage PCR
17
18   CONNOLLY BOVE LODGE & HUTZ, LLP
     BY:  JEFFREY C. WISLER, ESQUIRE
19   The Nemours Building
     1007 North Orange Street
20   P.O. Box 2207
     Wilmington, Delaware 19899
21   302.888.6528
     (jwisler@cblh.com)
22   Representing Maryland Casualty
23
24
```

## Page 6

```
 1   A P P E A R A N C E S: (continued)
 2   ECKERT SEAMANS CHERIN & MELLOTT, LLC
       BY: EDWARD J. LONGOSZ, II, ESQUIRE
 3     1747 Pennsylvania Avenue, N.W.
       12th Floor
 4     Washington, DC 20006
       202.659.6619
 5     (elongosz@eckertseamans.com)
       Representing Maryland Casualty and Zurich
 6
 7   WILEY REIN, LLP
       BY: RICHARD A. IFFT, ESQUIRE
 8     1776 K Street NW
       Washington, DC 20006
 9     202.719.7170
       (rifft@wileyrein.com)
10     Representing Maryland Casualty and Zurich
11
     COZEN O'CONNOR
12     BY: JACOB C. COHN, ESQUIRE
       1900 Market Street
13     Philadelphia, Pennsylvania 19103-3508
       215.665.2147
14     (jcohn@cozen.com)
       Representing Federal Insurance Company
15
16   ORRICK HERRINGTON & SUTCLIFFE, LLP
       BY: PERI N. MAHALEY, ESQUIRE
17     Columbia Center
       1152 15th Street, N.W.
18     Washington, DC 20005-1706
       202.339.8516
19     (pmahaley@orrick.com)
       Representing PI Future Claimants'
20     Representative
21
     CUYLER BURK, P.C.
22     BY: ANDREW CRAIG, ESQUIRE
       4 Century Drive
23     Parsippany, New Jersey 07054
       973.734.3200
24     (acraig@cuyler.com)
```

## Page 7

```
 1   A P P E A R A N C E S: (continued)
 2   O'MELVENY & MEYERS LLP
       BY: TANCRED SCHIAVONI, ESQUIRE*
 3     (*VIA TELEPHONE)
       7 Times Square
 4     New York, New York 10036
       212.326.2267
 5     (tschiavoni@omm.com)
       Representing Arrowood Indemnity Company
 6
 7   WOMBLE CARLYLE SANDRIDGE & RICE, PLLC
       BY: KEVIN J. MANGAN, ESQUIRE*
 8     (*VIA TELECONFERENCE)
       222 Delaware Avenue
 9     Suite 1501
       Wilmington, Delaware 19801
10     302.252.4361
       (kmangan@wcsr.com)
11     Representing State of Montana
12
     PEPPER HAMILTON, LLP
13     BY: LINDA J. CASEY, ESQUIRE*
       (*VIA TELECONFERENCE)
14     3000 Two Logan Square
       Philadelphia, Pennsylvania 19103
15     215.981.4000
       (caseyl@pepperlaw.com)
16     Representing BNSF Railway Company
17   KRAMER LEVIN NAFTALIS & FRANKEL, LLP
       BY: SARAH SCHINDLER-WILLIAMS, ESQUIRE*
18     (*VIA TELECONFERENCE)
       1177 Avenue of the Americas
19     New York, New York 10036
       212.715.9515
20     (SSchindlerWilliams@kramerlevin.com)
       Representing the Equity Committee
21
22
23
24
```

## Page 8

```
 1           INDEX
           EXAMINATION
 2
     Witness Name              Page
 3   RICHARD FINKE
 4     BY MR. BROWN          12,333
 5     BY MS. ALCABES         129
 6     BY MR. LEWIS           187
 7     BY MR. PLEVIN          265
 8     BY MR. WISLER          285
 9     BY MR. COHN            289
10     BY MR. MANGAN          296
11     BY MR. DOWNEY       305, 371
12     BY MR. SCHIAVONI       343
13     BY MR. SPEIGHTS        347
14
15           EXHIBITS
     EXHIBIT   DESCRIPTION         ID
16
17   Exhibit 1  Notice of Deposition of   16
             Debtors Pursuant to Rule
18           30(b)(6)
19   Exhibit 2  Document entitled W.R.    16
             Grace/Confirmation Hearing
20           30(b)(6) Deposition Notice
21   Exhibit 3  SEC Form 8-K           25
22   Exhibit 4  Exhibit 6 to Exhibit Book, 41
             Asbestos Insurance
23           Transfer Agreement
24   Exhibit 5  Exhibit 19 to Exhibit    53
             Book, Retained Causes of
```

## Page 9

```
 1           EXHIBITS
     EXHIBIT   DESCRIPTION         ID
 2
 3   Exhibit 6  Exhibit 2 to Exhibit Book, 55
             Asbestos PI Trust Agreement
 4
 5   Exhibit 7  Exhibit 4 to Exhibit Book, 55
             Trust Distribution
 6           Procedures
 7   Exhibit 8  First Amended Joint Plan 70
             of Reorganization
 8   Exhibit 9  Exhibit 5 to Exhibit Book, 92
             Schedule of Settled
 9           Asbestos Insurers Entitled
             to 524(g) Protection
10
     Exhibit   Settlement Agreement   98
11   10    Bates stamped OB 1 through
           33
12
     Exhibit   Travelers/Allstate     135
13   11    30(b)(6) deposition notice
     Exhibit   Travelers 30(b)(6)     136
14   12    supplemental deposition
           notice
15
16   Exhibit   Grace/Aetna Asbestos   149
     13    Settlement Agreement dated
17         May 22, 1996
18   Exhibit   Exhibit 25 to Exhibit   178
     14    Book, CMO for Class 7A
19         Asbestos PD Claims
20
21
22
23
24
```

Page 10

1    DEPOSITION SUPPORT INDEX
2
3
     Direction to Witness Not To Answer
4    Page  Line    Page  Line
      30    2       37   12
5     37   17       39    8
      39   15      369    1
6
     Request For Production of Documents
7    Page  Line    Page  Line
     (None)
8
     Stipulations
9    Page  Line    Page  Line
     (None)
10
     Questions Marked
11   Page  Line    Page  Line
     (None)
12
13              - - -
14
15
16
17
18
19
20
21
22
23
24

Page 11

1    R I C H A R D   F I N K E,
2       having been sworn by the Notary
3       Public of the States of New York
4       and New Jersey, was examined and
5       testified as follows:
6
7    EXAMINATION BY
8    MR. BROWN:
9       Q.  Good morning, Mr. Finke.
10   My name is Michael Brown.  I represent One
11   Beacon, Seaton, Geico and Republic for the
12   objecting insurance companies in the Grace
13   bankruptcy.  You've been deposed several
14   times before, correct?
15      A.  Yes, I have.
16      Q.  Okay.  So we can dispense
17   with the formalities of what a
18   deposition's all about?
19      A.  Yes, we can.
20      Q.  Okay.
21      MS. HARDING:  Michael,
22   would you mind if I made a quick
23   statement on the record?
24      MR. BROWN:  Sure.

Page 12

1       MS. HARDING:  I just wanted
2    to make a statement on the record
3    that the debtors have designated
4    Mr. Finke to answer certain
5    appropriate questions related to
6    certain 30(b)(6) topics.
7       As we've indicated, Mr.
8    Finke will be available for seven
9    hours today.  We've also designated
10   Mr. Hughes and Mr. LaForce to
11   answer other 30(b)(6) topic
12   questions.  We are hoping and
13   expecting that the parties seeking
14   to ask questions have coordinated
15   so that we can end in seven hours
16   and we think it's a reasonable
17   expectation.
18      The debtors have reviewed
19   the deposition of Mr. Lockwood and
20   agree, in essence, with Mr.
21   Lockwood's answers with respect to
22   how the Plan operates and so we
23   think and are very hopeful that
24   there will not be a need to go

Page 13

1    further than seven hours to get to
2    the appropriate inquiry as to how
3    the Plan operates.  So I just
4    wanted to get that on the record.
5       MR. BROWN:  Okay.
6    Actually, that's helpful.  Maybe I
7    could follow up with a question for
8    Mr. Finke.
9       Q.  Mr. Finke, have you
10   reviewed Mr. Lockwood's Rule 30(b)(6)
11   deposition transcript?
12      A.  Yes, I have.
13      Q.  Okay.  Is there anything
14   that you read in that transcript that you
15   disagreed with?
16      A.  No, nothing of substance.
17      Q.  Okay.  How about anything
18   not of substance?
19      A.  There are a few occasions,
20   I think, where I either would have worded
21   something differently or where I think Mr.
22   Lockwood may have been either in error --
23   might have been in error depending on
24   whether he was -- depending on the

Page 14

1    context. Let me give you one example of
2    that.
3        Q.  Sure.
4        A.  He, I think, made a
5    statement at one point where he equated
6    asbestos in place coverage or insurance
7    coverage with the asbestos insurance
8    reimbursement agreements.  I believe he
9    said he thought they were the same thing,
10   and perhaps in substance or in concept
11   they are.  I'm not an insurance lawyer,
12   but I know that under the Plan
13   definitionally the definition of asbestos
14   (sic) in place insurance coverage
15   specifically excludes asbestos
16   reimbursement agreements from the
17   definition.
18       Q.  Okay.
19       A.  Which would suggest they
20   are not the same.
21       Q.  All right.  I'm going to
22   suggest that Miss Alcabes, or one of the
23   people whose issue that is, may want to
24   follow up with you on that point.

Page 15

1        A.  Sure.
2        Q.  But let's pass on that.
3        Other than what you've just
4    described, is there anything else in Mr.
5    Lockwood's deposition transcript that the
6    debtors disagreed with?
7        A.  Nothing that comes to
8    mind.
9            MR. BROWN:  Okay.  Let me
10   have the first exhibit marked, and
11   can we go off the record for a
12   second.
13           (Off the record.)
14           (Notice of Deposition of
15   Debtors Pursuant to Rule
16   30(b)(6) marked for identification
17   as Exhibit Finke-1.)
18           (Document entitled W.R.
19   Grace/Confirmation Hearing 30(b)(6)
20   Deposition Notice marked for
21   identification as Exhibit
22   Finke-2.)
23   BY MR. BROWN:
24       Q.  Mr. Finke, I'm going to put

Page 16

1    before you two exhibits marked -- we're
2    using the term Finke 30(b)(6) 1 and Finke
3    30(b)(6) 2.  For shorthand during the
4    deposition I'll just refer to them as
5    Finke-1 and Finke-2.  Could you identify
6    Finke-1 for me, please?
7        A.  It is a Notice of
8    Deposition of Debtors Pursuant to Rule
9    30(b)(6) served by One Beacon, Seaton,
10   Geico and Columbia.
11       Q.  Going forward, it would be
12   more accurate to refer to Columbia as
13   Republic.  I know it says Columbia there.
14   The date on here is April 28th, 2009 and
15   the site is Drinker Biddle & Reath's
16   offices but we obviously changed those by
17   agreement after this was scheduled.
18       Is it your understanding that
19   you're appearing here today in response to
20   this Rule 30(b)(6) notice?
21       A.  Yes.
22       Q.  And there were several
23   others served on you as well?
24       A.  Correct.

Page 17

1        Q.  Correct, all right.
2        If you look at what's been marked
3    as Finke-2, can you identify that for
4    me?
5        A.  It is a chart 18 pages long
6    entitled W.R. Grace/Confirmation Hearing
7    30(b)(6) Deposition Notice Witness
8    Designations.
9        Q.  Okay.  And is it your
10   understanding that this document was
11   prepared by your counsel?
12       A.  Yes, that's my
13   understanding.
14       Q.  And have you seen it before
15   today?
16       A.  Yes.
17       Q.  Okay.  And am I correct
18   that it basically lists all the various
19   topics from all the 30(b)(6) notices that
20   were served on Grace and then designates
21   one of, I believe, three individuals to
22   testify about the various topics?
23       A.  I would agree that it
24   includes all 30(b)(6) notices that have

| Page 18 | Page 20 |
|---|---|

**Page 18**

1  been served as of the time that the chart
2  was created.
3  　　　　MS. HARDING: And I just
4  want to just object to the extent
5  that Exhibit 2 does not include the
6  cover letter that accompanied
7  Attachment A which also set out our
8  objections with respect to the
9  30(b)(6) notices.
10  　　　　I have no objection to him
11  answering questions about it; I
12  just wanted to make clear on the
13  record that there was a cover
14  letter that accompanied that.
15  　　　　MR. COHN: Which I actually
16  have but I didn't --
17  　　　　MR. BROWN: Can we just go
18  off the record a second?
19  　　　　(Off the record.)
20  BY MR. BROWN:
21  　　**Q.　Mr. Finke, when we were**
22  **just off the record, we were discussing**
23  **another document, a copy of which I do not**
24  **have and apparently no one else does,**

**Page 19**

1  **which was described as being objections to**
2  **the various 30(b)(6) notices that were**
3  **served on the debtors. Are you familiar**
4  **with the document that I'm describing?**
5  　　A.　No, I don't think I am.
6  　　**Q.　Okay. In any event, you're**
7  **appearing here today pursuant to the Rule**
8  **30(b)(6) notices for the topics for which**
9  **you've been designated on Finke-2 and**
10  **subject to whatever objections were**
11  **asserted by the debtors, correct?**
12  　　A.　Correct.
13  　　　　MR. BROWN: Okay. We don't
14  have a document, but my
15  recollection of the objections was
16  that there was an objection to this
17  witness testifying about any Plan
18  negotiations or draft Plan
19  documents. Is that right, Barbara?
20  　　　　MS. HARDING: That's
21  correct.
22  　　　　MR. BROWN: Okay. At Mr.
23  Lockwood's deposition we reached an
24  agreement that we wouldn't go down

**Page 20**

1  the road of having all the people
2  in this room ask questions about
3  negotiations and draft documents
4  only to draw objections and
5  instructions not to answer.
6  　　　　Can we have that same
7  arrangement for this deposition
8  with the understanding that if
9  there subsequently is a ruling by a
10  court that entitles us to discovery
11  on those subjects that the witness
12  would be recalled for that purpose?
13  　　　　MS. HARDING: Subject to
14  Judge Fitzgerald ordering the
15  debtors to submit and answer
16  questions to those, then we can
17  have that agreement, yes.
18  　　　　MR. COHN: Just for my
19  clarity, in all of these
20  depositions we're talking about the
21  relevance objection instruction
22  that was asserted at Lockwood's
23  deposition that I clarified on the
24  record?

**Page 21**

1  　　　　MR. BROWN: That is
2  correct, and I believe the document
3  that we don't have, the objections
4  to the 30(b)(6)'s, if I recall
5  correctly, had a paragraph setting
6  forth that objection and a number
7  of different decisions by Judge
8  Fitzgerald in other cases.
9  　　　　MS. HARDING: That's
10  correct, and it relates -- our
11  objection relates to the -- to the
12  relevance to the extent that the
13  questions seek information relating
14  to settlement negotiations,
15  drafting --
16  　　　　MR. COHN: The
17  clarification that I thought that I
18  made earlier that I'll make clear
19  is still the clarification that
20  this is a relevance objection, or
21  are you asserting a privilege?
22  　　　　MS. HARDING: Well, I
23  disagree with that
24  characterization. The objection is

Page 22

1    set out in our official objection
2    to the 30(b)(6) notices which is
3    filed on record.  It includes
4    attorney-client privilege, it
5    includes work product, it includes
6    joint interest privilege.  I don't
7    have it in front of me so I can't
8    recite them, but it includes much
9    more than relevance so --
10         MR. COHN:  Just to be
11   clear, because --
12         MS. HARDING:  With respect
13   to negotiations, you can -- there
14   will be other objections other than
15   just relevance, so --
16         MR. COHN:  Well, but my
17   understanding was there was a
18   blanket instruction not to answer
19   without any attempt to parse
20   through potential privilege
21   objections on the basis of a
22   blanket relevance objection.  Am I
23   missing something?
24         MS. HARDING:  I don't

Page 23

1    disagree with that, but I think
2    that in light of the blanket
3    relevance objection with respect to
4    negotiations that there was that
5    agreement reached.  That doesn't
6    mean that with respect to
7    everything that might fall under
8    negotiations that there wouldn't be
9    other objections as well.
10         MR. COHN:  I'm not
11   suggesting that --
12         MS. HARDING:  Okay.
13         MR. COHN:  -- if there's a
14   valid privilege objection here that
15   you've somehow waived your right to
16   assert that by asserting a blanket
17   objection, but my understanding is
18   we didn't start down that path
19   because there was a relevance
20   objection.
21         I'm sorry, Michael.
22         MR. BROWN:  That's all
23   right.  Suffice it to say that if
24   we ask questions concerning the

Page 24

1    negotiations of the Plan or the
2    draft Plan documents that that will
3    draw an instruction not to
4    answer.
5         MS. HARDING:  That's
6    correct.
7         MR. BROWN:  Okay, thank
8    you.
9         (SEC Form 8-K marked for
10   identification as Exhibit
11   Finke-3.)
12   BY MR. BROWN:
13       Q.   Mr. Finke, you have before
14   you now another document that has been
15   marked for this deposition as Finke-3.
16   You'll note that there is a prior
17   deposition exhibit number on there, Number
18   12, and that was from your deposition as a
19   fact witness.  Do you see that?
20       A.   Yes, I do.
21       Q.   We obviously had some
22   questioning about this at your prior
23   deposition but that was not in your
24   capacity as a designee for Grace and I

Page 25

1    have some additional questions.  So the
2    first one is:  Can you identify the
3    document?
4        A.    Yes.  This is a Form 8-K
5    report that was filed by W.R. Grace with
6    the Securities and Exchange Commission on
7    April 6, 2008.
8        Q.    And the document has a
9    couple of attachments, correct?
10       A.    Yes.
11       Q.    What are they?
12       A.    Let's see.  The first
13   attachment is, in essence, a press release
14   in which Grace announced the -- its
15   settlement of asbestos personal injury
16   claims in the context of the Chapter 11
17   cases and the second attachment is a term
18   sheet for resolution of asbestos personal
19   injury claims.
20       Q.    And was the press release
21   actually issued?
22       A.    I do not know.
23       Q.    Okay.  If it was issued,
24   was it issued on or about the time that

**Page 26**

1  this document was filed, to your
2  knowledge?
3      A.   Yes.
4      Q.   Let's focus on the term
5  sheet. Who are the parties to the term
6  sheet?
7      A.   The debtors, the Official
8  Equity Security Committee, the Official
9  Committee of Personal Injury Claimants and
10 the Future Claimants' Representative.
11     Q.   And what is the date of the
12 term sheet?
13     A.   April 6, 2008.
14     Q.   I want you to focus now on
15 the period -- for purposes of my next
16 series of questions -- the period prior to
17 April 6, 2008. And am I correct that
18 prior to April 6, 2008 that Grace did not
19 consult with any of its insurers
20 concerning the terms that appear in this
21 term sheet?
22     MS. HARDING: I'm going to
23 object to the extent that it seems
24 to me that this is going right into

**Page 27**

1  the issue of negotiations and
2  settlement negotiations with
3  respect to the Plan. I thought we
4  weren't going to go there.
5      MR. COHN: I think there
6  was no -- if there was no contact,
7  how are we going into that?
8      MR. BROWN: Yeah, we ought
9  to see what his answer is. I'm not
10 asking him about negotiations with
11 the parties that signed the term
12 sheet. I'm asking about whether
13 Grace consulted with any of its
14 insurers concerning the terms of
15 the term sheet prior to executing
16 it.
17     MS. HARDING: First of all,
18 I'm going to object. I think that
19 the -- this is not a topic of the
20 30(b)(6) notice and we're prepared
21 to answer questions about how the
22 Plan operates. I think that that's
23 what Judge Fitzgerald would
24 instruct the debtors to do and

**Page 28**

1  we're here to do that.
2      We're not here to talk
3  about and have the witness testify
4  about how it was negotiated, how it
5  came about, the prior drafts, who
6  was consulted, who wasn't
7  consulted, and all that. I don't
8  think that's the proper scope of
9  this deposition.
10     MR. BROWN: I'm not asking
11 who was consulted. I'm asking him
12 whether the insurers -- I'm asking
13 him to affirm that the insurers
14 were not consulted.
15     MS. HARDING: Right. But
16 the problem with that is if we
17 answer that question, then we have
18 opened the door to answering that
19 question with respect to any party
20 and I think that that's not the
21 proper subject of this
22 deposition.
23     MR. BROWN: I can assure
24 you the only one I'm going to ask

**Page 29**

1  about is the insurers.
2      MS. HARDING: Well, I
3  understand that you are, but I
4  don't want to spend any of the time
5  of the seven hours talking about
6  any of the negotiations or what led
7  up to the drafting of the document.
8  We didn't agree to that. It wasn't
9  asked for in the 30(b)(6) topics
10 with respect to how the term sheet
11 came about and so I think that
12 we've got an agreement.
13     If you all want to seek an
14 order compelling us to answer those
15 kinds of questions, then I think
16 you should do that. Otherwise,
17 we're here to talk about how the
18 Plan operates. So --
19     MR. BROWN: I thought you
20 just --
21     MS. HARDING: That's what
22 he's here to answer questions
23 about.
24     MR. BROWN: Are you

Page 30

1   instructing him not to answer?
2       MS. HARDING: I'm
3   instructing him not to answer
4   because I think it leads into a
5   series of questions that we all
6   have already agreed is not proper
7   under the current law.
8       MR. COHN: Oh, wait, wait,
9   wait, wait, wait.
10      MR. BROWN: I'm not
11  sure --
12      MS. HARDING: Actually, I
13  understand that you don't agree
14  with the law, but we've agreed for
15  purposes of this deposition that we
16  weren't going to do that.
17      MR. BROWN: I don't know
18  that we agreed to any such thing.
19  I asked the same series of
20  questions of Mr. Lockwood. I don't
21  know if you were at his deposition
22  or not --
23      MS. HARDING: I was.
24      MR. BROWN: -- but he

Page 31

1   answered those questions and he
2   left open in his answers about
3   whether Grace had discussed with
4   its insurers these topics and
5   that's why I'm asking these
6   questions. It was perfectly fine
7   when I asked them of Mr. Lockwood;
8   he answered them and so should this
9   witness.
10      MS. HARDING: Well, I
11  believe that I objected and I
12  wasn't the person defending Mr.
13  Lockwood. And Mr. Lockwood --
14  that's between him and his counsel.
15  I'm Mr. Finke's counsel. I'm
16  instructing Mr. Finke not to answer
17  questions relating to how the
18  settlement -- how the term sheet,
19  the Plan or any of the documents
20  related to it were drafted or put
21  together and who was consulted and
22  who wasn't consulted and how that
23  came about.
24      MR. COHN: On the basis of

Page 32

1   relevance?
2       MS. HARDING: I think
3   that's an appropriate scope of the
4   objection.
5       MR. COHN: On the basis of
6   relevance?
7       MS. HARDING: On the basis
8   of all of the objections that were
9   stated in our objection to the
10  30(b)(6) notice --
11      MR. COHN: No, I want you
12  to state on the record --
13      MS. HARDING: Let me
14  finish.
15      MR. COHN: -- here and now
16  what the basis for a yes or no
17  question of whether or not people
18  were consulted. If there was no
19  communication, there's no arguable
20  privilege and I want the basis now
21  because I think we are going to
22  litigate this.
23      MS. HARDING: Well, I
24  think --

Page 33

1       MR. BROWN: I think I have
2   the floor on this, but thank you,
3   Jack.
4       I think we have a
5   disconnect between what constitutes
6   negotiations. I'm not asking him
7   about how this was negotiated
8   between these parties. I
9   understand your position on that.
10  I'm simply asking whether Grace
11  consulted with its insurers with
12  regard to any term that appears in
13  the term sheet prior to executing
14  it on April 6, 2008. I don't think
15  that gets into negotiations at all.
16  In point of fact, I suspect he's
17  going to say no, in which case it
18  doesn't involve negotiations at
19  all.
20      MS. HARDING: Well, I
21  suggest this: I think that the
22  question "did you negotiate with
23  anyone" gets into that question.
24      MR. BROWN: That wasn't the

Page 34

1   question.
2       MS. HARDING: Well, by
3   asking him -- I think it does. I
4   think we disagree about that. I
5   think why don't we move forward.
6   At a break I'm happy to talk about
7   it further but right now I'm
8   instructing him not to answer the
9   questions.
10      MR. BROWN: Well, I'll ask
11  a series --
12      MR. LEWIS: Hold on just a
13  second. My name is Tom Lewis. I
14  represent the Libby claimants, and
15  I've never seen a deposition like
16  this. I'm in practice 30 some
17  years.
18      I thought the examiner
19  makes a question and if there's an
20  objection, the objection is stated
21  clearly as to that particular
22  question and we don't sit here and
23  debate for 15 or 20 minutes whether
24  the question should be answered.

Page 35

1       I think we should proceed
2   in a proper question and answer
3   proceeding here or we're never
4   going to get done and we're going
5   to have an impossible record.
6       So I object to the form of
7   the examination and the failure of
8   counsel for this witness to make a
9   proper objection on the record of
10  this deposition and I join in the
11  objection that this gentleman to my
12  right --
13      MR. COHN: Mr. Cohn.
14      MR. LEWIS: Thank you.
15      MS. HARDING: I think I've
16  stated the objection very clearly
17  and I instruct the witness not to
18  answer.
19      MR. LEWIS: I disagree with
20  that. I have not heard an
21  objection on the record of this
22  deposition.
23      MS. HARDING: The objection
24  is relevance. It's not relevant

Page 36

1   under 408. The objection
2   relates -- the rules of the
3   bankruptcy law do not require the
4   debtors to answer questions
5   relating to Plan negotiations and
6   settlement with respect to their
7   Plan and attorney-client privilege,
8   work product and joint interest
9   privilege.
10      MR. BROWN: Okay.
11      MR. COHN: Wait, I'm sorry.
12  I don't mean to -- I would like to
13  know with whom you assert a common
14  interest exists.
15      MS. HARDING: You know
16  what? My objection's on the record
17  and I'm not stating any more. I've
18  instructed the witness not to
19  answer and I think we should move
20  forward.
21      MR. BROWN: I think we
22  should, too, and I'm going to say
23  for purposes of stating your
24  objections to this series of

Page 37

1   questions let's just use the
2   shorthand, you know, same as before
3   so that we don't have to repeat
4   it.
5   BY MR. BROWN:
6       Q.  Mr. Finke, I'm correct, am
7   I not, that prior to signing this term
8   sheet that we've been discussing that
9   Grace did not obtain the consent of any of
10  its insurers with respect to any of the
11  terms in the term sheet?
12      MS. HARDING: Same
13  objection. Instruct the witness
14  not to answer.
15      Q.   Why did Grace exclude its
16  insurers?
17      MS. HARDING: Same
18  objection. Instruct the witness
19  not to answer.
20      Q.   The initial Joint Plan, Mr.
21  Finke, was filed on September 19th, 2008,
22  correct?
23      A.   I believe that's correct.
24      Q.   Okay. And it included, did

Page 54

1       A.   No, no, I'm not aware of
2   any general claims.  I'm not aware of any
3   claims that I could identify with respect
4   to any given insurer.
5           MR. BROWN:  Let's mark the
6       next exhibit, which will be the
7       Asbestos PI Trust agreement.
8           (Exhibit 2 to Exhibit Book,
9       Asbestos PI Trust Agreement  marked
10      for identification as Exhibit
11      Finke-6.)
12          (Exhibit 4 to Exhibit Book,
13      Trust Distribution Procedures,
14      marked for identification as
15      Exhibit Finke-7.)
16  BY MR. BROWN:
17      Q.   Okay.  Mr. Finke, you have
18  before you Exhibits 6 and 7.  Exhibit 6 --
19  well, why don't you tell me if you can
20  identify both of those documents?
21      A.   Exhibit 6 is the Asbestos
22  PI Trust agreement.  I should say the
23  proposed Asbestos PI Trust agreement that
24  is also known as Exhibit 2 to the Exhibit

Page 55

1   Book.  Finke Exhibit 7 is the Trust
2   Distribution Procedures relevant to the
3   Asbestos PI Trust and also known as
4   Exhibit 4 to the Exhibit Book.
5       Q.   Okay.  What role, if any,
6   do either of those two documents
7   contemplate for Grace's insurers in the
8   handling, resolution, settlement, defense
9   of asbestos claims asserted against or
10  submitted to the Trust?
11          MS. HARDING:  Object to the
12      form.
13          MR. LIESEMER:  Object to
14      the form.
15          MS. HARDING:  Could you
16      read back the question, please?
17          (The reporter reads the
18      pending question.)
19          MS. HARDING:  Okay, and I
20      object to it asbeing overly broad
21      with respect to Grace's insurers
22      without reference to any particular
23      insurer or policy.  And, Michael,
24      do you have -- are you asking him

Page 56

1       to look at a specific provision of
2       the policy or...
3           MR. BROWN:  I'm just asking
4       the question I asked.
5       A.   I don't know the answer to
6   your question.  I'm not that familiar with
7   the two agreements to know whether these
8   two documents set forth the role of the
9   asbestos insurers with respect to the
10  handling, settlement, resolution, payment,
11  et cetera of asbestos PI claims.
12      In general, the Plan includes the
13  asbestos insurance coverage that is
14  transferred to the Trust to be available
15  to either pay asbestos PI claims or
16  reimburse the PI Trust for its payment of
17  claims.  Sitting here today, I just -- I
18  do not recall to what extent, if any,
19  these two documents contain provisions
20  that relate to that role.
21      Q.   Let me broaden the scope of
22  the question to not just these two
23  documents but the Plan or any of the Plan
24  documents.  Would that change your

Page 57

1   answer?
2           MS. HARDING:  Object to
3       form.
4           MR. LIESEMER:  Join.
5       A.   I thought I just answered
6   that question so maybe I don't understand
7   the question.
8       Q.   Well, my initial question
9   to you focused on the two documents, the
10  Trust agreement and the asbestos PI TDP.
11  I'm asking the question more broadly now.
12      If you look at the Plan -- at all
13  the Plan documents, do any of them
14  contemplate any role for Grace's insurers
15  in the handling, defense, resolution, of
16  any asbestos PI claim submitted to the
17  asbestos PI Trust for resolution?
18          MS. HARDING:  Object to
19      form.  I think it's overly broad.
20      And by Plan, do you mean all of the
21      exhibits, including all of the
22      documents and policies listed in
23      exhibits?
24          MR. BROWN:  I'm using the

Page 58

1    term "Plan" and "Plan documents" as
2    defined in the Plan.
3        MR. LIESEMER: Object to
4    the form of the question.
5        A.    The Plan certainly contains
6    provisions that posit a role for the
7    asbestos insurers to act as a source of
8    funds for payment of asbestos PI claims
9    and reimbursement of asbestos PI claims
10   paid by the Trust.  In terms of the
11   insurers' role in handling or defense, et
12   cetera, of -- in connection with asbestos
13   PI claims, it is my understanding that the
14   insurers' role is whatever it is under the
15   policies and that that role is -- remains
16   the same notwithstanding the transfer of
17   the asbestos insurance rights to the
18   Trust.
19       Q.    Would you look at pages 43
20   and 44 of the Trust agreement, which I
21   think is 6.
22       A.    Yes.
23       MS. HARDING: 43, did you
24   say?  What page?

Page 59

1        MR. BROWN: Yes. Bear with
2    me one second here.
3        THE WITNESS: 43 and 44.
4        MR. BROWN: 43 and 44, yes.
5        Q.    Do you see on pages 43 and
6    44 there are some gentlemen listed as
7    members of the TAC?
8        A.    Yes.
9        Q.    Do you know any of those
10   gentlemen?
11       A.    I have met Mr. Cooney, Mr.
12   Rice and Mr. Weitz.  I have not had much
13   contact with them, though.
14       Q.    What do you understand to
15   be their professional background, the
16   three you met?
17       A.    They are attorneys.  They
18   have represented asbestos personal injury
19   plaintiffs in litigation against Grace and
20   other defendants.
21       Q.    Do you have any idea as to
22   how many claims each of these gentlemen's
23   firms has asserted on behalf of claimants
24   against Grace?

Page 60

1        MR. LIESEMER: Object to
2    the form of the question.
3        A.    No.
4        MS. HARDING: You're asking
5    him personally? Is that what you
6    mean, personally? I mean, W.R. --
7    well, you ask him.
8        Q.    Do you know whether --
9    let's try it a different way.
10       Mr. Cooney.  Mr. Cooney is with the
11   firm of Cooney & Conway, correct?
12       A.    That's my understanding,
13   yes.
14       Q.    How many clients does
15   Cooney & Conway have with asbestos claims
16   against Grace, to your knowledge?
17       MR. LIESEMER: Object to
18   the form.
19       MS. HARDING: Objection
20   just because of the relevance, but
21   go on.
22       A.    I don't know.
23       Q.    Would your answer be the
24   same for the other gentlemen?

Page 61

1        A.    Yes.
2        Q.    The TAC members, there's
3    four individuals listed there.  They were
4    selected by the ACC, correct?
5        A.    That is my understanding,
6    yes.
7        Q.    And the ACC is made up of a
8    collection of asbestos personal injury
9    claimants, the actual committee,
10   correct?
11       MS. HARDING: Object to the
12   form.
13       A.    That is my understanding.
14       Q.    Is it your understanding
15   that those individual asbestos claimants
16   delegate their responsibilities as ACC
17   members to their personal injury
18   counsel?
19       A.    It's my understanding that
20   their counsel often act on the claimants'
21   behalf in connection with the business of
22   the ACC.
23       Q.    Okay.
24       A.    Whether there's any

Page 62

1  delegation, I wouldn't know.
2      Q.  Okay.  Does each of the
3  firms that's listed on pages 43 and 44 --
4  just for the record, Baron & Budd, PC;
5  Cooney & Conway; Motley Rice, LLC and
6  Weitz & Luxenberg -- do each of those
7  firms have a client who's a member of the
8  ACC?
9      A.  I don't recall.
10     Q.  What do you understand to
11 be the role of the asbestos PI T-A-C, or
12 TAC, in connection with the Asbestos PI
13 Trust?
14         MS. HARDING:  Object to the
15     form of the question.
16     A.  To provide advice to the
17 Trust with respect to the matters set
18 forth in the Trust agreement and the
19 TDP.
20     Q.  Do they owe any fiduciary
21 duties to -- in their role as members of
22 the TAC?
23         MS. HARDING:  Objection to
24     form.

Page 63

1          MR. LIESEMER:  Object to
2     form.
3          MS. HARDING:  Calls for a
4     legal conclusion.
5     A.  I don't know.  Offhand, I
6  could look it up in the documents to see
7  if the documents ascribe such a duty to
8  them.
9     Q.  Why don't you look at
10 Section 5.2.
11     A.  Of which?
12     Q.  The Trust agreement.
13         MS. HARDING:  So Exhibit 2
14     of the Plan but Exhibit 6?
15         MR. BROWN:  Correct.
16         THE WITNESS:  Finke Exhibit
17     6.
18     Q.  Does Section 5.2 refresh
19 your recollection as to whether the
20 members of the TAC have any fiduciary
21 duties in connection with their role as
22 TAC members?
23     A.  Yes.
24     Q.  Okay.  And they do,

Page 64

1  correct?
2      A.  Yeah, well, specifically
3  Section 5.2 states that "the members of
4  the TAC shall serve in a fiduciary
5  capacity representing all holders of
6  present PI Trust claims."
7      Q.  Okay.  Do you have any
8  further understanding as to what the
9  nature of the fiduciary duties is that
10 they owe to all holders of present PI
11 Trust claims?
12         MS. HARDING:  Object to
13     form.
14     A.  I'm afraid I do not
15 understand your question.
16     Q.  I'll try to rephrase it
17 then.
18     What are the fiduciary duties that
19 the TAC members owe to holders of PI Trust
20 claims?
21         MR. LIESEMER:  Object to
22     form.
23         MS. HARDING:  Same
24     objection.

Page 65

1          MR. LEWIS:  I object as to
2     foundation.
3      A.  I am not able to identify
4  specific duties.  As a fiduciary they're
5  obligated to act in the best interests of
6  the holders of present PI Trust claims.
7      Q.  And when you say holders,
8  you mean all holders of present --
9      A.  Yes.
10     Q.  -- PI Trust claims?
11     A.  Yes.
12     Q.  And all holders includes
13 holders of PI Trust claims that are not
14 clients of TAC members' respective law
15 firms, correct?
16     A.  It includes them, yes.
17     Q.  Now, in the role of
18 personal injury counsel for their
19 individual clients, they have a separate
20 set of fiduciary duties, correct?
21         MS. HARDING:  Object to
22     form and also calls for a legal
23     conclusion and outside the scope of
24     the designation of this 30(b)(6)

Page 66

1      witness, I believe, but...
2            MR. LIESEMER: Join in the
3      objections.
4            THE WITNESS: I'm sorry.
5      Can you read the question again?
6            (The reporter reads the
7      pending question.)
8        A.   They have fiduciary
9      obligations to their clients, yes.
10       Q.   Okay. And to your
11     knowledge, do those fiduciary duties
12     differ from -- that is, the duties that
13     they owe to their respective clients --
14     differ from the fiduciary duties that each
15     of these TAC members has in their role as
16     a TAC member?
17           MR. LIESEMER: Objection to
18     form.
19           MS. HARDING: Same
20     objection as I had to the previous
21     question.
22       A.   In general, they owe the
23     same obligation to fulfill the role of a
24     fiduciary, which is to act in the best

Page 67

1      interests of their clients. Whether there
2      are specific duties in their role as TAC
3      members that are different from specific
4      duties in their role as counsel
5      representing their clients, I don't
6      know.
7        Q.   Do you have an
8      understanding as to how the TAC members
9      will deal with the situation where the
10     best interests of their individual clients
11     differs from the best interest of all
12     holders of present PI Trust claims?
13           MS. HARDING: Object to
14     form.
15           MR. LIESEMER: Objection to
16     form.
17           MS. HARDING: Calls for
18     speculation.
19       A.   I don't know.
20       Q.   Is there any mechanism in
21     any of the Plan documents, to your
22     knowledge, that addresses that issue?
23           MS. HARDING: Object to
24     form.

Page 68

1        A.   I am not aware of any.
2        Q.   Okay. Now, you're familiar
3      with the term "PI Trust claims" as it's
4      used in the Trust agreement, correct?
5            MR. LIESEMER: Objection to
6      form.
7        A.   Yes, I am.
8        Q.   And if you look at Footnote
9      1 to the Trust agreement, if you would,
10     Footnote 1 says that what is defined as
11     asbestos PI claims in the plan will be
12     referred to as PI Trust claims in the
13     Trust agreement, correct?
14       A.   Yes.
15       Q.   And are you familiar with
16     the scope of the defined term "asbestos PI
17     claims" as it appears in the Plan?
18       A.   Yes.
19       Q.   I'm correct, am I not, that
20     it includes the term "indirect PI Trust
21     claim"?
22       A.   Yes.
23       Q.   So based on that
24     definitional connection, is it fair to say

Page 69

1      that Mr. Weitz, Mr. Cooney, Mr. Budd
2      and -- I missed someone -- Mr. Budd, Mr.
3      Cooney, Mr. Rice and Mr. Weitz are
4      fiduciaries to the holders of indirect PI
5      Trust claims?
6            MS. HARDING: Object to
7      form.
8            MR. LIESEMER: Join in the
9      objection.
10       A.   I believe that to be
11     correct.
12       Q.   Are you generally familiar
13     with my client, OneBeacon's, contractual
14     indemnity claims?
15       A.   No.
16       Q.   Okay, we'll get to that
17     later then.
18           MR. BROWN: Let's mark this
19     next.
20           (First Amended Joint Plan
21     of Reorganization marked for
22     identification as Exhibit
23     Finke-8.)
24       Q.   Mr. Finke, you have before

Page 70

1   you now what has been marked as Exhibit 8
2   to this deposition and what is Exhibit 1
3   to the Exhibit Book.  First question is:
4   Would you identify the document, please?
5       A.   Yes.  I think Exhibit 8 is
6   the First Amended Joint Plan of
7   Reorganization that was filed by Grace and
8   its co-proponents.
9       Q.   Okay.
10      A.   And the date is February --
11  date on the document is February 27,
12  2009.
13      Q.   Okay.  Have you reviewed
14  this document in its entirety?
15      A.   Yes.
16      Q.   How many times?
17      MS. HARDING:  You mean in
18  its entirety how many times?
19      MR. BROWN:  Well, let's
20  start-up with that question.
21      A.   Interpreting review as
22  meaning a detailed word-for-word reading
23  of the entire document, I would say
24  once.

Page 71

1       Q.   Okay.  And how many times
2   have you partially reviewed the
3   document?
4       A.   Many times.
5       Q.   Okay.  Do you understand
6   it?
7       A.   I have an understanding of
8   it.  I would not profess to have a
9   complete understanding of it.
10      Q.   Okay.  Are there particular
11  provisions in the Plan that you're quite
12  certain you don't understand?
13      MS. HARDING:  Object to
14  form and relevance and concern that
15  we're not going to the seven
16  hours -- I mean, if you have a
17  specific question about a specific
18  provision that you don't understand
19  as an insured, then I think you
20  should ask him questions about
21  that.  I think...
22      MR. BROWN:  Is that an
23  instruction not to answer the
24  question?

Page 72

1       MS. HARDING:  No, it's
2   not.
3       MR. BROWN:  Okay.  It's
4   just --
5       MS. HARDING:  It's just an
6   objection that...
7       A.   I'm sure that I do not
8   understand the annex or annexes that I
9   believe relate to tax issues.
10      MS. HARDING:  I guess --
11  are you asking him in his personal
12  capacity?
13      MR. BROWN:  I don't think
14  he's here in his personal capacity.
15  I think he's here in his capacity
16  as a designee for W.R. Grace or for
17  the debtors.
18      MS. HARDING:  Okay.  Are
19  you asking him if there's anybody
20  at W.R. Grace that has an
21  understanding of different
22  provisions of the Plan as lawyers
23  and --
24      MR. BROWN:  I think he's

Page 73

1   here to testify about the operation
2   of the Plan.  I think that was --
3   isn't he?  So my question is
4   what --
5       MS. HARDING:  He's here to
6   answer questions to help you
7   understand the Plan.
8       MR. BROWN:  Barbara, can
9   we --
10      MS. HARDING:  So I think if
11  there are questions that you don't
12  understand, I think you should ask
13  him those.
14      MR. BROWN:  I would like to
15  know whether there are particular
16  provisions in the Plan that the
17  witness can identify that he is not
18  familiar with or that he doesn't
19  understand.
20      MS. HARDING:  Well, I think
21  he's asked and answered, so...
22      A.   Yes, for myself there are
23  provisions that I do not understand, such
24  as the tax annexes.  This --

Page 74

1          MS. HARDING:  Which also
2    were not designated 30(b)(6) topics
3    by any person who --
4          MR. BROWN:  Can I ask that
5    we just let the witness answer the
6    question?
7          MS. HARDING:  Well, I think
8    if you want to ask him questions
9    about topics that were designated
10    that you asked him to become
11    familiar with, then --
12          MR. BROWN:  I didn't ask
13    him a question about the tax annex.
14    It was in his answer.
15          MS. HARDING:  Well, that's
16    because you asked him about any
17    provision of the Plan.  You
18    asked -- we tried to prepare the
19    witness to answer questions about
20    topics that everybody asked about.
21          MR. BROWN:  All right.
22    I'll ask my question again.  If you
23    have an objection and you want to
24    instruct him not to answer, then do

Page 75

1    it and we'll move on.
2    BY MR. BROWN:
3          Q.   Mr. Finke, as you sit here
4    today looking at the Joint Plan, can you
5    identify particular provisions that you do
6    not understand?
7          MS. HARDING:  Object, asked
8    and answered, but answer one more
9    time if you'd like.
10          A.   In addition to what I've
11    already identified, the provision on the
12    warrants is not entirely clear to me.  And
13    if I spent the time to go through the
14    document page by page, there may be a few
15    other sections that I don't feel very
16    comfortable with in terms of the level of
17    my understanding.
18          Speaking on behalf of W.R. Grace as
19    a whole, there are individuals who
20    understand those sections and, taken as a
21    whole, I think W.R. Grace does have a good
22    understanding of the Plan.
23          Q.   Okay.  Well, let me take
24    your counsel up on her offer and direct

Page 76

1    your attention to page 87 of the Plan,
2    Section 7.15, and what I would like you to
3    do, because I have a series of questions
4    about it, is why don't you take a few
5    moments to review Section 7.15.  In fact,
6    if you want to take a break at this
7    point --
8          MR. BROWN:  Does that make
9    sense?  Okay.
10          MS. HARDING:  Well, I mean,
11    how long is it, again?
12          THE WITNESS:  Seven
13    pages.
14          MS. HARDING:  Five-minute
15    break?
16          MR. BROWN:  That's fine,
17    yes.
18          (Recess taken.)
19    BY MR. BROWN:
20          Q.   Mr. Finke, we had a short
21    break and before that I directed your
22    attention to Section 7.15 of the Plan
23    entitled Insurance Neutrality.  Did you
24    have an opportunity to review that section

Page 77

1    during the break?
2          A.   Yes.
3          Q.   This was not one of the
4    sections that you mentioned in your prior
5    testimony that you were -- that you did
6    not understand.  Is it safe to say that
7    this is a provision that you do
8    understand?  And I'm asking that question,
9    really, in your capacity as an individual
10    and as the designee on this subject for
11    the debtors.
12          MS. HARDING:  Object to
13    form.
14          A.   Yes, I believe I understand
15    it.
16          Q.   Okay.  Can you turn to
17    Section 11.9 of the Plan, and that's
18    entitled Exculpation, and if you'd take a
19    moment to review that section.
20          (The witness reviews the document.)
21          A.   Okay.
22          Q.   Given the language in
23    Section 7.15, am I correct that asbestos
24    insurance entities are not bound by the

Page 110

1    about or been asked about the scenario
2    you're describing.
3        Q.    But if the claim is
4    asserted by the insurers against Fresenius
5    Medical Care Holdings, it's being asserted
6    against a non-debtor, correct?
7        MS. HARDING:  Object to
8        form.
9        A.    In the first instance,
10   yes.
11       Q.    And that would then take it
12   outside the definition of indirect PI
13   Trust claims which by definition have to
14   be against the debtor, right?
15       MS. HARDING:  Just object
16       to form in terms of the
17       hypothetical.  I'm not sure where
18       we are in the hypothetical, but go
19       ahead.
20       A.    Well, I understand what
21   you're saying and, yes, if you were to
22   stop right there I would agree with you.
23   But when you add in what I think is a
24   fact, which is that Grace would owe an

Page 111

1    indemnification obligation to FMCH in
2    those circumstances, the reality of your
3    hypothetical is that the claim would
4    be ultimately a claim against the
5    debtors.
6        Q.    So is it your testimony on
7    behalf of Grace that the claim I've
8    described, running from the insurers
9    against Fresenius, that is in fact an
10   indirect PI Trust claim?
11       MS. HARDING:  Object to
12       form.
13       MR. LIESEMER:  Object to
14       form.
15       A.    That is my view, yes.
16       Q.    Is it also your view that
17   that claim would be an indemnified insurer
18   TDP claim as described in Section 5.13 of
19   the TDP?
20       MS. HARDING:  Same
21       objection.
22       MR. LIESEMER:  Object to
23       form.
24       A.    Yes, it does appear to fit

Page 112

1    the definition or description of an
2    indemnified insured TDP claim.
3        Q.    Okay.  Let me ask you this
4    then:  What is the operative injunction in
5    the Plan that accomplishes both the
6    enjoining and channeling of the claim that
7    we're talking about; namely, a claim for
8    contractual indemnity running from the
9    insurers against Fresenius Medical Care
10   Holdings, Inc.?
11       A.    The --
12       MS. HARDING:  Object to
13       form.
14       MR. LIESEMER:  Object to
15       form.
16       A.    The asbestos PI channeling
17   injunction.
18       Q.    Does the successor claims
19   injunction in the Plan also enjoin the
20   claim?
21       MR. LIESEMER:  Object to
22       form.
23       MS. HARDING:  Object to
24       form to the extent we're still

Page 113

1    talking about the hypothetical.
2        A.    No, I don't believe so.
3        Q.    All right, I want to ask
4    you now, Mr. Finke, a sort of more broad
5    question.  Class 6 includes, among other
6    things, individual asbestos claimants'
7    claims against Grace, correct?
8        MS. HARDING:  Object to
9        form.
10       MR. LIESEMER:  Join.
11       A.    Did you say asbestos claims
12   or asbestos PI claims?
13       Q.    I'm using it generically.
14   Fair enough, that's a fair -- the
15   purpose -- Grace has been sued in a number
16   of asbestos personal injury claims,
17   correct?
18       A.    Yes.
19       Q.    Okay.  And those claims,
20   among other claims, are classified as
21   Class 6 under the Plan, right?
22       A.    Yes.
23       Q.    And indirect PI Trust
24   claims that we've just been discussing,

Page 114

1   they're also Class 6 claims, correct?
2       A.   Correct.
3       Q.   And indemnified insurer TDP
4   claims are also Class 6 claims, correct?
5       A.   I believe so but I'm going
6   to go back and reread the definition
7   again.
8       Q.   Okay.
9       (The witness reviews the document.)
10      A.   Yes.
11      Q.   Can you describe for me the
12  factual basis for putting all of those
13  claims in the same class?
14          MS. HARDING: Object to
15      form.  Calls for -- to the extent
16      that it calls for a legal
17      conclusion and --
18      A.   I would refer to the --
19          THE WITNESS: I'm sorry.
20          MS. HARDING: -- and
21      attorney-client work product
22      privileges to the extent that they
23      apply.  But if you can still
24      answer, go ahead.

Page 115

1       A.   My answer would be to refer
2   to the terms of the Plan and the
3   definitions.  The definitions of asbestos
4   PI claims would incorporate the factual
5   basis of those claims.
6       Q.   All right.  I'm asking a
7   broader question, I think, Mr. Finke, and
8   I'm not asking for a legal conclusion.
9           MS. HARDING: Okay.
10          And --
11      Q.   I'm asking for what is it
12  that's factually similar about these
13  claims that warrants in the debtor's view
14  placing them all into Class 6.
15          MS. HARDING: Object to
16      form.
17          MR. LIESEMER: Object to
18      form.
19          MS. HARDING: Foundation
20      and it...
21      A.   I may be misunderstanding
22  your broad question, but I have to again
23  respond by referring to the factual
24  circumstances laid out in the definition

Page 116

1   of asbestos PI claims.  It is those --
2   those set of circumstances that result in
3   all of these claims being classified as
4   Class 6 claims.
5       Q.   What are the similarities
6   between the claims; that is, between the
7   personal injury claims and the contractual
8   indemnity claims, if any?
9           MS. HARDING: Object to
10      form.
11          MR. LIESEMER: Object to
12      form.
13      A.   Assuming you're referring
14  to contractual indemnity claims arising
15  out of, directly or indirectly, an
16  asbestos PI claim, the similarity is that
17  the underlying claim is by a person who
18  alleges -- and I'm just paraphrasing
19  because I don't want to read this entire
20  definition -- but alleges that he has
21  contracted an asbestos-related disease due
22  to exposure to asbestos from a Grace
23  product or operation.
24      Q.   Anything else?

Page 117

1           MS. HARDING: Object to
2       form.
3       A.   I don't understand your
4   question.
5       Q.   My question is:  Is there
6   any other basis for classifying the
7   contractual indemnity claims that we've
8   just been discussing with the personal
9   injury claims, the asbestos personal
10  injury claims?
11          MS. HARDING: Object to
12      form.
13      A.   The basis I've laid out for
14  the definition of asbestos PI claims.
15      Q.   Okay.  Mr. Finke, why are
16  contractual indemnity claims arising from
17  the asbestos claims that you just
18  described placed into Class 6 while other
19  contractual indemnity claims against Grace
20  are placed into Class 9?
21          MS. HARDING: Object to
22      form and to the -- and object to
23      the extent it calls for a legal
24      conclusion.  If you can answer, go

Page 118

1   ahead.
2       A.    Because the contractual
3   indemnity claims that arise based out of
4   an asbestos PI claim all seek to impose
5   liability upon the debtors as a result of
6   the debtors' asbestos-related products or
7   operations.
8       Q.    Okay.  Is Fresenius a
9   separate entity from any of the debtors
10  today?
11          MS. HARDING:  Object to
12      form.
13      Q.    Separate legal entity.
14      A.    Yes.
15      Q.    How about Sealed Air
16  Corporation?  Is that a separate legal
17  entity?
18      A.    Yes.
19      Q.    And they're both
20  non-debtors, correct?
21      A.    Correct.
22      Q.    Are they -- do they have
23  separate -- does Fresenius and the debtors
24  have separate management?

Page 119

1       A.    Yes.
2       Q.    And would your answer be
3   the same with respect to Sealed Air and
4   the debtors?
5       A.    Yes.
6       Q.    Does Fresenius and the
7   debtors or do Fresenius and the debtors
8   have any shared operations?
9       A.    Not that I'm aware of.
10      Q.    Do Sealed Air and the
11  debtors have any shared operations?
12      A.    Not that I'm aware of.
13      Q.    Do any of the debtors have
14  any ownership interest in Fresenius?
15          MS. HARDING:  Object to
16      form.
17      A.    I don't know but I'm not
18  aware of any.
19      Q.    Do any of the debtors have
20  any ownership interest in Sealed Air?
21          MS. HARDING:  Same
22      objection.
23      A.    Again, I don't know but I'm
24  not aware of any.

Page 120

1       Q.    Do any of the debtors
2   control Fresenius?
3       A.    No.
4       Q.    Do any of the debtors
5   control Sealed Air?
6       A.    No.
7          MR. BROWN:  How did we mark
8      the transfer agreement?
9          MS. BAER:  The insurance
10     transfer agreement is Exhibit 4.
11         (Off the record.)
12  BY MR. BROWN:
13      Q.    We talked about this
14  earlier.  Can you take a look at Schedule
15  1 to Exhibit 4?
16      A.    Yes.
17      Q.    My question is:  Does
18  Fresenius have any rights under the
19  policies listed on Schedule 1?
20          MS. HARDING:  Object to
21      form.
22      A.    I don't believe so.
23      Q.    How about Sealed Air?
24      A.    I don't believe so.

Page 121

1          MR. BROWN:  Why don't we
2   take a five-minute break.  I may be
3   finished.
4          MS. HARDING:  Okay.
5          (Recess taken.)
6   BY MR. BROWN:
7       Q.    Mr. Finke, I have a few
8   more questions for you and then I'll pass
9   you along to the next questioner.
10         Can you take a look at Section 11.9
11  of the Plan again?  That's the exculpation
12  provision.
13      A.    Yes.
14      Q.    Do you understand the scope
15  of the exculpation provision in terms of
16  the entities and individuals that are
17  actually exculpated under this
18  provision?
19          MS. HARDING:  Object to
20      form.
21      A.    Yes, I believe I do.
22      Q.    Okay.  Well, let me give
23  you a couple of examples.  It's includes
24  the Asbestos PI Committee, correct?

Page 122

1    A.   Yes.
2    Q.   And we talked a little
3 about the Asbestos PI Committee being
4 individual asbestos claimants, correct?
5    A.   Yes.
6    Q.   And you testified that, by
7 and large, they perform their duties as
8 committee members through their asbestos
9 personal injury counsel, correct?
10    A.   Correct.
11    Q.   Okay. And that would
12 include, among other individuals, Mr. Rice
13 and his law firm, correct?
14    A.   Yes, I believe that's
15 right.
16    Q.   And Mr. Cooney and his law
17 firm?
18    A.   Well, I guess what I don't
19 know is which of the -- which of the
20 asbestos plaintiffs' attorneys we've
21 identified are -- or have clients that are
22 members of the committee. I just don't
23 recall.
24    Q.   Okay, fair enough.

Page 123

1       There are also -- the TAC is within
2 the scope of this exculpation provision,
3 correct?
4    A.   Yes.
5    Q.   So it would include the TAC
6 members, Mr. Weitz, Mr. Cooney, Mr. Budd
7 and Mr. Rice?
8    A.   Correct.
9    Q.   And to the extent that the
10 firms -- to extent that any members of the
11 Asbestos PI Committee are represented by
12 the firms of Mr. Cooney, Mr. Rice, Mr.
13 Weitz and Mr. Budd, they too would be
14 covered by it?
15    A.   Correct.
16       MS. HARDING: Object to
17 form.
18    Q.   All right. Now, about
19 halfway down the provision it has a phrase
20 that says "or any of their respective
21 Representatives". Do you see that?
22    A.   Yes.
23    Q.   And Representatives is in
24 initial cap R, correct?

Page 124

1    A.   Yes.
2    Q.   Why don't you go to the
3 defined term Representatives which appears
4 at 33 of the Joint Plan. It's definition
5 number 177.
6       MS. HARDING: I think I
7 lost the line of -- did you
8 previously ask if the TAC was
9 covered --
10       MR. BROWN: Yes.
11       MS. HARDING: -- by the
12 exculpation in 11.9?
13       MR. BROWN: Yes.
14       MS. HARDING: I'm just
15 looking and I don't see that so I
16 just wanted to make sure that the
17 record wasn't unclear.
18       MS. BAER: Barbara.
19       MR. BROWN: Asbestos PI
20 Trust Advisory Committee.
21       MS. HARDING: All right.
22       MR. BROWN: We're happy to
23 have it taken out.
24       MS. HARDING: No, no. I

Page 125

1 was talking because I was going too
2 fast and I just didn't see it and I
3 wanted to make sure.
4    A.   Okay.
5    Q.   Sitting here today and
6 looking at the defined term
7 Representatives and seeing its use in
8 Section 11.9 of the Plan, do you have any
9 idea of the scope of this exculpation
10 provision in terms of who's covered by
11 it?
12       MS. HARDING: Object to
13 form.
14    A.   Well, certainly the
15 definition of Representatives gives me an
16 idea as to the scope of the exculpation
17 provision.
18    Q.   Okay. But I mean the
19 actual identities of the individuals, you
20 couldn't -- you couldn't give me a list
21 today, could you?
22    A.   No.
23    Q.   Okay.
24    A.   I could not.

Page 126

1      Q.   Do you have any idea who
2  the advisors or consultants are of Mr.
3  Cooney's firm or Mr. Weitz's firm or Mr.
4  Rice's firm or --
5      A.   No.
6          MS. HARDING:  Object to
7      form.
8      A.   No, I do not.
9      Q.   Okay.  How does the court
10 know if it confirms this Plan who all's
11 covered by the exculpation provision,
12 given the breadth of the definition of
13 Representatives?
14         MS. HARDING:  Object to
15     form --
16         MR. LIESEMER:  Object to
17     form.
18         MS. HARDING:  -- to the
19     extent it calls for a legal
20     conclusion.
21     A.   I would be speculating that
22 perhaps they'll be -- those individuals
23 would be identified to the court at some
24 point, but I don't know.

Page 127

1      Q.   Do you know how far back
2  the exculpation provision goes in terms of
3  time?
4      A.   No, because it's -- it's
5  not set up to be framed in terms of a
6  beginning date and an end date.  It's --
7  the scope of the provision relates to
8  conduct in connection with or arising out
9  of the Chapter 11 cases so that, to my
10 understanding, that could encompass
11 conduct before the Chapter 11 cases were
12 commenced, conduct afterwards.
13     Q.   How long before it was
14 commenced?
15         MS. HARDING:  Object to
16     form.
17     A.   The provision does not
18 say.
19         MR. BROWN:  Okay.  All
20     right.  I think with that I'm going
21     to pass you along to Miss Alcabes,
22     and I may -- I'll reserve the right
23     for any follow-up questions after
24     the others have finished.  Thank

Page 128

1      you.
2          THE WITNESS:  You're
3      welcome.
4  EXAMINATION BY
5  MS. ALCABES:
6      Q.   Good afternoon, Mr. Finke.
7  My name is Elisa Alcabes.  I'm counsel for
8  Travelers Casualty & Surety Company.
9  We've met before.
10     A.   Yes.
11     Q.   Can you just tell me what
12 you did to prepare for your deposition
13 today?
14     A.   I reviewed the Plan; a
15 number of the exhibits to the Plan, some
16 more than once; met with counsel, Grace's
17 bankruptcy counsel, to discuss various
18 provisions of the Plan and related
19 documents.  I'm trying to think if there
20 is anything else.  Read the deposition
21 transcript of Peter Lockwood and listened
22 to the -- listened in on the deposition of
23 Jeff Posner which I viewed as preparation
24 for this deposition.  That's all I can

Page 129

1  recall at this point.
2      Q.   About how much time did you
3  spend with Grace's bankruptcy counsel
4  preparing?
5      A.   About 15 hours.
6      Q.   And you said you listened
7  in on the Posner deposition.  Do you agree
8  with the testimony that Mr. Posner
9  provided?
10         MS. HARDING:  Object to
11     form.
12     A.   Yes, I do.  I can't think
13 of anything that I disagreed with so I
14 would say, in general, yes.
15     Q.   And you said previously
16 that you generally agreed with the
17 deposition testimony of Mr. Lockwood as
18 well, correct?
19     A.   Correct.
20     Q.   You mentioned that there
21 was one point in his deposition where he
22 seemed to have equated coverage in place
23 with the reimbursement agreements.  Is
24 that right.

W R GRACE & CO NEW                                              *Filing Date: 04/06/08*

UNITED STATES

SECURITIES AND EXCHANGE COMMISSION

WASHINGTON, DC 20549

FORM 8-K

CURRENT REPORT PURSUANT

TO SECTION 13 OR 15(D) OF THE

SECURITIES EXCHANGE ACT OF 1934

Date of report (Date of earliest event reported) April 6, 2008

W. R. GRACE & CO.

(Exact Name of Registrant as Specified in Its Charter)

Delaware

(State or Other Jurisdiction of Incorporation)



                                    1-13953                    65-0773649
(Commission File Number)        (IRS Employer Identification No.)
7500 Grace Drive                                                21044

Columbia, Maryland
(Address of Principal Executive Offices) (Zip Code)



(410) 531-4000

(Registrant's Telephone Number, Including Area Code)

(Former Name or Former Address, if Changed Since Last Report)

Check the appropriate box below if the Form 8-K filing is intended to
simultaneously satisfy the filing obligation of the registrant under any of the
following provisions (see General Instruction A.2. below):

o    Written communications pursuant to Rule 425 under the Securities Act (17
CFR 230.425)

o    Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR
240.14a-12)

o    Pre-commencement communications pursuant to Rule 14d-2(b) under the
Exchange Act (17 CFR 240.14d-2(b))

o    Pre-commencement communications pursuant to Rule 13e-4(c) under the
Exchange Act (17 CFR 240.13e-4(c))

--------------------------------------------------------------------------------

W. R. GRACE & CO.

FORM 8-K

CURRENT REPORT


Item 7.01.                    Regulation FD Disclosure.



On April 6, 2008, W. R. Grace & Co., on behalf of itself and its subsidiaries
and affiliates that are debtors in the Chapter 11 cases, (the "Company")
entered into an agreement in principle (the "Agreement") with the Official
Committee of Asbestos Personal Injury Claimants, the Future Claimants
Representative and the Official Committee of Equity Security Holders, all
parties-in-interest in the Company's Chapter 11 case, that would settle all
present and future asbestos-related personal injury claims against the Company
on the terms and conditions set forth therein.  Certain terms and conditions of
the Agreement are described in the press release attached hereto as Exhibit
99.1.  The description of the terms and conditions of the Agreement is
qualified in its entirety by reference to the provisions of the Agreement
attached hereto as Exhibit 99.2.



The information furnished pursuant to this Item 7.01, including Exhibit 99.1
and Exhibit 99.2, shall not be deemed to be "filed" for purposes of Section 18
of the Securities Exchange Act of 1934, as amended, (the "Exchange Act"), or
otherwise subject to the liabilities of such section, nor shall such
information be deemed incorporated by reference in any filing under the
Securities Act of 1933, as amended, or the Exchange Act, except as shall be
expressly set forth by specific reference in such a filing.


Item 9.01.                    Financial Statements and Exhibits.



(d)  Exhibits



99.1                          Press Release



99.2                          Term Sheet for Resolution of Asbestos Personal
Injury Claims dated as of April 6, 2008



2
--------------------------------------------------------------------------------

SIGNATURES


Pursuant to the requirements of the Securities Exchange Act of 1934, the
Registrant has duly caused this report to be signed by the undersigned,
thereunto duly authorized.


W. R. GRACE & CO.
(Registrant)
By /s/ Mark A. Shelnitz
Mark A. Shelnitz
Secretary


Dated:   April 7, 2008



                                        3
---------------------------------------------------------------------------

*W R GRACE & CO NEW*                                                    *Filing Date: 04/06/08*

Exhibit 99.1

Grace News #2919

Media Relations:            Investor Relations:
William Corcoran            Bridget Sarikas
T +1 410.531.4203           T +1 410.531.4194
Ewilliam.corcoran@grace.com Ebridget.sarikas@grace.com

### GRACE ANNOUNCES SETTLEMENT OF ASBESTOS PERSONAL INJURY CLAIMS

COLUMBIA, Maryland, April 7, 2008 -- W. R. Grace & Co. (NYSE: GRA) today
announced an agreement in principle that would settle all present and future
asbestos-related personal injury claims. The agreement, reached with the
Official Committee of Asbestos Personal Injury Claimants, the Future Claimants
Representative and the Official Committee of Equity Security Holders, requires
the following assets to be paid into a trust to be established under Section
524(g) of the United States Bankruptcy Code:

Cash in the amount of $250 million;

Warrants to acquire 10 million shares of Grace common stock at an
exercise price of $17.00 per share, expiring one year from the effective date
of a plan of reorganization;

Rights to proceeds under Grace's asbestos-related insurance
coverage;

The value of cash and stock under the litigation settlement
agreements with Sealed Air Corporation and Fresenius Medical Care Holdings,
Inc.; and

Deferred payments at $110 million per year for five years beginning in 2019, and $100 million per year for ten years beginning in 2024; the deferred payments would be obligations of Grace backed by 50.1% of Grace's common stock to meet the requirements of Section 524(g).

The agreement in principle contemplates the filing of a plan of reorganization and related documents with the Bankruptcy Court. The plan will be subject to approval of its co-proponents, exit financing, and Bankruptcy Court and District Court approvals.

"This agreement in principle is a very important step in emerging from Chapter 11," said Fred Festa, Grace's Chairman, President and Chief Executive Officer. "In this challenging global marketplace, we need to be able to focus all of our efforts on increasing shareowner value and continued improvement in our core businesses. The agreement and the Plan of Reorganization that will be based on it will be good for our shareholders, customers, creditors, and our employees. A lot of work remains to be done before we can confirm a Plan of Reorganization, but I am optimistic we will be successful in reaching that goal by the end of this year or early in 2009."

1
--------------------------------------------------------------------------------

"Also, I want to point out that the Plan of Reorganization will preserve all employee benefits. During the seven years we have been in Chapter 11, our people have nearly doubled Grace's sales and dramatically improved the core businesses. We look forward to final approval of our Plan of Reorganization when we can once again operate without the constraints of Chapter 11," said Festa.

*      *      *      *      *

Grace is a leading global supplier of catalysts and other products to petroleum refiners; catalysts for the manufacture of plastics; silica-based engineered and specialty materials for a wide-range of industrial applications; sealants and coatings for food and beverage packaging, and specialty chemicals, additives and building materials for commercial and residential construction. With annual sales of more than $3.1 billion, Grace has about 6,500 employees and operations in over 40 countries. For more information, visit Grace's web site at www.grace.com.

*    *    *    *    *

This announcement contains forward-looking statements, that is, information
related to future, not past, events.  Such information generally includes the
words "believes," "plans," "intends," "targets," "will," "expects,"
"anticipates," "continues" or similar expressions.  For these statements, Grace
claims the protection of the safe harbor for forward-looking statements
contained in the Private Securities Litigation Reform Act of 1995.  Grace is
subject to risks and uncertainties that could cause actual results to differ
materially from those projected in the forward-looking statements or that could
cause other forward-looking information to prove incorrect.  Factors that could
cause actual results to materially differ from those contained in the
forward-looking statements include: Grace's bankruptcy, plans of reorganization
proposed by Grace and others, Grace's legal proceedings (especially the Montana
criminal proceeding and environmental proceedings), the cost and availability
of raw materials and energy, Grace's unfunded pension liabilities, costs of
environmental compliance, risks related to foreign operations, especially,
security, regulation and currency risks and those factors set forth in Grace's
most recent Annual Report on Form 10-K, quarterly report on Form 10-Q and
current reports on Form 8-K, which have been filed with the Securities and
Exchange Commission and are readily available on the Internet at www.sec.gov.
Reported results should not be considered as an indication of future
performance.  Readers are cautioned not to place undue reliance on
forward-looking statements, which speak only as of the date thereof. Grace
undertakes no obligation to publicly release any revisions to the
forward-looking statements contained in this announcement, or to update them to
reflect events or circumstances occurring after the date of this announcement.

### 

Corporate Communications

W. R. Grace & Co.-Conn.

7500 Grace Drive

Columbia, MD 21044

2

---

Exhibit 99.2

W. R. GRACE & CO., et al.
CASE NO. 01-1139 (JFK)


TERM SHEET FOR RESOLUTION OF
ASBESTOS PERSONAL INJURY CLAIMS


This Term Sheet sets forth certain of the principal terms and conditions under
which the Debtors, the Official Equity Security Committee, the Official
Committee of Personal Injury Claimants ("ACC") and the Future Claimants
Representative ("FCR") in the above-captioned Chapter 11 cases are prepared to
file a plan of reorganization ("Plan") as co-proponents providing for the
resolution of all asbestos personal injury claims and liabilities, including
without limitation all asbestos personal injury claims pending at the filing
date of the Chapter 11 cases and those arising subsequent thereto
(collectively, "Asbestos PI Claims").  This Term Sheet also sets forth the
proposed treatment of other key classes of claims asserted in the Chapter 11
cases.  This Term Sheet has been produced for settlement purposes only and is
subject to the provisions of Rule 408 of the Federal Rules of Evidence.


I.              Treatment of Claims

A.              Asbestos PI Trust

All Asbestos PI Claims will be channeled to a trust (the "Asbestos PI Trust")
that is established in accordance with Section 524(g) of the United States
Bankruptcy Code.  The Asbestos PI Trust will pay claims from trust assets in
accordance with a trust agreement and trust distribution procedures established
by the ACC and FCR in connection with the Plan.

1.              Funding of Asbestos PI Trust at Emergence.  On the Effective
Date of the Plan, the Asbestos PI Trust shall receive the following, each of
which shall be a condition to the Plan becoming effective:

a.              Cash Payment:  $250 million, plus, if the Effective Date occurs
after December 31, 2008, interest from January 1, 2009 to the Effective Date
accrued at the same rate applicable to Grace's senior debt.

·b.             Insurance:  the assignment by W. R. Grace & Co.-Conn. ("Grace")
and all of its affiliates to the Asbestos PI Trust, of all insurance policies
and all insurance proceeds available for payment of Asbestos PI Claims,
effective as of the Effective Date, including without limitation:

i.              Any such proceeds from the date hereof of all settlements with
insurance companies, and all interest accrued thereon;

-------------------------------------------------------------------------------
ii.             Any proceeds of the settlement with Equitas held in escrow with
all interest accrued thereon;

ii.             Any proceeds of all settlements with all insurance companies

under coverage in place agreements or installment payment arrangements where payment has not yet occurred;

iv.            Assignment of and the right to recover on all outstanding insurance policies potentially applicable to personal injury claimants; and

v.            The right to recover from all insolvent insurance estates as to which Grace or its affiliates has made a claim and the proceeds of all payments received by Grace or its affiliates from those insolvent estates after the date hereof, and all interest accrued thereon.

Provided however that Grace is in the process of examining its policies and the foregoing will not affect Grace's separate coverages, if any, for losses not arising from asbestos personal injury claims.

The ACC and FCR (or, after the Effective Date, the Asbestos PI Trust) shall control (and Grace shall cooperate in connection with) any negotiations or legal proceedings related to the underlying policies or settlement agreements applicable to Asbestos PI Claims.

c.            Warrant: a warrant for 10 million shares of W. R. Grace & Co. ("Parent") common stock, exercisable at $17 per share, and expiring one year after the Effective Date.

d.            Cryovac, Inc. Payment: The consideration contemplated by the Sealed Air Settlement Agreement.

e.            Fresenius Medical Care Payment:  The proceeds of the payment contemplated by the Fresenius Settlement Agreement.

2.            Deferred Payment Obligations:  Grace shall make additional payments to the Asbestos PI Trust over a 15 year period as follows:  five annual payments of $110 million commencing on January 2, 2019; and 10 annual payments of $100 million commencing on January 2, 2024.  Such payment obligations shall be subordinate to any bank debt or bonds outstanding and shall be guaranteed by Parent or any successor ultimate parent entity of Grace.  Such guaranty shall be secured by an obligation of Parent to issue to the Asbestos PI Trust, in the event an additional payment is not made, the number of shares of Parent common stock which, when

2

----------------------------------------------------------------------------
added to the number of shares of common stock issued and outstanding as of the Effective Date, shall constitute 50.1% of the voting shares of Parent as of the Effective Date (such number of shares shall be equitably adjusted for stock splits, stock dividends, recapitalizations, corporate reorganizations or changes in control of Parent after the Effective Date).

B.            Other Classes

1.            Administrative Claims: 100% of allowed amount in cash.

2.            Priority Tax Claims: 100% of allowed amount in cash.

3.            Priority Non-Tax Claims: 100% of allowed amount in cash.

4.            Secured Claims: 100% of allowed amount either in cash or by reinstatement.

5.            Unsecured Employee Claims (post-retirement health and special pension): 100% of allowed amount by reinstatement.

6.            Workers Compensation Claims: 100% by reinstatement.

7.            Allowed General Unsecured Claims: 100% of allowed amount plus

post-petition interest as follows: (i) for holders of pre-petition bank credit
facilities, post-petition interest at the rate of 6.09% from the filing date
through December 31, 2005 and thereafter at floating prime, in each case
compounded quarterly; and (ii) for all other unsecured claims, interest at
4.19%, compounded annually, or if pursuant to an existing contract, interest at
the non-default contract rate.

8.          Allowed Environmental Claims: 100% of allowed amount in cash.

9.          Traditional Asbestos Property Damage Claims:  100% of allowed
amount in cash for settled claims.  The Plan shall set forth procedures for the
allowance of all Asbestos PD Claims that are disputed as of the Effective Date.

10.          ZAI Claims: Unless the Plan Proponents agree otherwise as to the
treatment of ZAI Claims, the court shall estimate, for purposes of allowance
and distribution, any liability on account of ZAI Claims prior to or in
connection with the confirmation of the Plan.  ZAI Claims shall be paid 100% of
their allowed amount up to the amount of the court's estimate.

II.                          Channeling Injunctions.  The Plan shall
contain injunctions under Sections 524(g) and Section 105(a) of the Bankruptcy
Code to protect the Debtors, Cryovac, Sealed Air, Fresenius, their affiliates,
officers, directors and employees, and other parties in interest and certain
insurers.  The Plan shall also contain such provisions, injunctions and releases

3

-----------------------------------------------------------------------

(i) as are necessary to comply with the terms of the Sealed Air Settlement
Agreement and the Fresenius Settlement Agreement; and (ii) to the full extent
permitted by law, to indemnify, and release all of Grace's officers, directors,
employees and professionals, and the members of all official committees, the
FCR and their professionals, from any liability on account of claims against
Grace, or arising in or in connection with these Chapter 11 cases.  The
foregoing injunctions, indemnifications and releases shall be at least as
extensive as, and consistent with, the injunctions, indemnifications and
releases provided for under Grace's Amended Plan currently filed in the Chapter
11 Cases to the extent such latter injunctions, indemnifications and releases
are not inconsistent with this Term Sheet.

III.          Resolution of Outstanding Issues.   The parties agree to
cooperate in seeking a resolution of outstanding issues material to or not
otherwise resolved in connection with the confirmation of a plan of
reorganization.

IV.          Binding Effect.  This Term Sheet has been approved by all
necessary corporate or organizational action of the Board of Directors of

Parent and Grace, the ACC, the FCR and the Equity Committee, and shall be binding upon the parties and each of their respective successors and assigns to the fullest extent permitted by applicable law. The parties shall use their best efforts to incorporate the terms of this Term Sheet into a mutually agreeable plan of reorganization to be filed with the Bankruptcy Court as soon as possible.

V.                    Confidentiality.


The parties shall treat all negotiations regarding this Term Sheet as confidential. Neither the contents nor the existence of this Term Sheet shall be disclosed by any party, either orally or in writing, except to its directors, officers, employees, legal counsel, financial advisors, accountants and clients on a confidential basis until the Debtors have issued a press release announcing the terms and conditions contained herein. Notwithstanding the foregoing, the parties agree that this Term Sheet or the terms of this Term Sheet may be disclosed to the Official Committee of Unsecured Creditors and the Official Committee of Asbestos Property Damage Claimants. Grace will provide counsel to the ACC and counsel to the FCR an opportunity to review and comment on any press release relating to this Term Sheet prior to its issuance.

4

---------------------------------------------------------------------------

AGREED TO AND ACCEPTED BY:
Dated: April 6, 2008
THE DEBTORS:
W. R. GRACE & CO., on behalf of itself and its subsidiaries and affiliates that are Debtors in the Chapter 11 cases
By:                                    /s/ Fred Festa
Name:                                  Fred Festa
Title:                                 Chairman, President and Chief Executive
                                       Officer
THE OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS
By:                                    /s/ R. Ted Weschler
Name:                                  R. Ted Weschler
Title:                                 Chair of the Committee
THE OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS:
CAPLIN & DRYSDALE, CHARTERED, on behalf of and in its capacity as counsel to the ACC
By:                                    /s/ Elihu Inselbuch
Name:                                                       Elihu Inselbuch
THE FUTURE CLAIMANTS REPRESENTATIVE:
ORRICK, HERRINGTON & SUTCLIFFE LLP, on behalf of and in its capacity as counsel to the FCR
By:                                    /s/ Roger Frankel
Name:                                                       Roger Frankel



5

---------------------------------------------------------------------------