# EXHIBIT 16

Page 1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - -

| | | |
|---|---|---|
| In Re: | : | Chapter 11 |
| | : | |
| | : | Case No. |
| W.R. GRACE & CO., et al, | : | 01-01139 JKF |
| | : | |
| | : | (Jointly |
| Debtors | : | Administered) |

- - -

Friday, May 15, 2009

- - -

Oral deposition of DAVID T. AUSTERN, ESQUIRE, taken pursuant to notice, was held at the offices of ORRICK HERRINGTON & SUTCLIFFE, LLP, Columbia Center, 1152 15th Street, N.W., Washington, DC  20005-1706, commencing at 10:07 a.m., on the above date, before Lori A. Zabielski, a Registered Professional Reporter and Notary Public in and for the Commonwealth of Pennsylvania.

- - -

MAGNA LEGAL SERVICES
Seven Penn Center
1635 Market Street
8th Floor
Philadelphia, Pennsylvania 19103

**Page 2**

```
 1  APPEARANCES:
 2
 3  DRINKER BIDDLE & REATH, LLP
    BY: MICHAEL F. BROWN, ESQUIRE
 4  One Logan Square
    18th & Cherry Streets
 5  Philadelphia, Pennsylvania 19103-6996
    215.988.2988
 6  (brownmf@dbr.com)
    (jeffrey.boerger@dbr.com)
 7  Representing OneBeacon America Insurance
    Company, Seaton Insurance Company,
 8  Government Employees Insurance Company,
    Columbia Insurance Company f/k/a Republic
 9  Insurance Company
10
11  ORRICK HERRINGTON & SUTCLIFFE, LLP
    BY: JONATHAN P. GUY, ESQUIRE
12      ROGER FRANKEL, ESQUIRE
        JOSHUA M. CUTLER, ESQUIRE
13  Columbia Center
    1152 15th Street, N.W.
14  Washington, DC 20005-1706
    202.339.8427
15  (jguy@orrick.com)
    Representing Future Claimants
16  Representative
17
18  CAPLIN & DRYSDALE, CHARTERED
    BY: JEFFREY A. LIESEMER, ESQUIRE
19  One Thomas Circle, NW
    Suite 1100
20  Washington, DC 20005
    202.862.5000
21  (jal@capdale.com)
    Representing Grace, Official Committee of
22  Asbestos Personal Injury Claimants
    ("ACC")
23
24
```

**Page 3**

```
 1  APPEARANCES (continued)
 2
 3  KIRKLAND & ELLIS, LLP
    BY: THEODORE L. FREEDMAN, ESQUIRE*
 4      (*VIA TELECONFERENCE)
    Citigroup Center
 5  153 East 53rd Street
    New York, New York 10022-4611
 6  212.446.4800
    (theodore.freedman@kirkland.com)
 7  Representing the Debtors
 8
 9  THE LAW OFFICES OF JANET S. BAER, P.C.
    BY: JANET S. BAER, ESQUIRE
10  70 West Madison Street
    Suite 2100
11  Chicago, Illinois 606002
    312.641.2162
12  Representing the Debtors
13
14  SIMPSON THACHER & BARTLETT, LLP
    BY: ELISA ALCABES, ESQUIRE
15      KAREN E. ABRAVANEL, ESQUIRE*
        (*VIA TELECONFERENCE)
16  425 Lexington Avenue
    New York, New York 10017-3954
17  212.455.3133
    (ealcabes@stblaw.com)
18  (kabravenel@stblaw.com)
    Representing Travelers Casualty and
19  Surety Company
20
21
22
23
24
```

**Page 4**

```
 1  APPEARANCES (continued)
 2
 3  VORYS, SATER, SEYMOUR AND PEASE, LLP
    BY: WILLIAM J. POHLMAN, ESQUIRE*
 4      TIFFANY STRELOW COBB, ESQUIRE*
        (*VIA TELECONFERENCE)
 5  52 East Gay Street
    Columbus, Ohio 43215
 6  614.464.8322
    (wjpohlman@vorys.com)
 7  (tscobb@vorys.com)
    Representing The Scotts Company, LLC
 8
 9
    COHN WHITESELL & GOLDBERG, LLP
10  BY: CHRISTOPHER M. CANDON, ESQUIRE
    101 Arch Street
11  Boston, Massachusetts 02110
    617.951.2505
12  (candon@cwg11.com)
    Representing the Libby Claimants
13
14
    SPEIGHTS & RUNYAN
15  BY: DANIEL H. SPEIGHTS, ESQUIRE*
        (* VIA TELECONFERENCE)
16  200 Jackson Avenue East
    P.O. Box 685
17  Hampton, South Carolina 29924
    803.943.4444
18  (dspeights@speightsrunyan.com)
    Representing Anderson Memorial Hospital
19
20
    TUCKER ARENSBERG, P.C.
21  BY: MICHAEL A. SHINER, ESQUIRE*
        (*VIA TELECONFERENCE)
22  1500 One PPG Place
    Pittsburgh, Pennsylvania 15222
23  412.594.5586
    (mshiner@tuckerlaw.com)
24  Representing Certain London Market
```

**Page 5**

```
 1  APPEARANCES (continued)
 2
 3  BILZIN SUMBERG BAENA PRICE & AXELROD, LLP
    BY: MATTHEW I. KRAMER, ESQUIRE*
 4      (*VIA TELECONFERENCE)
    200 South Biscayne Boulevard
 5  Suite 2500
    Miami, Florida 33131-5340
 6  305.450.7246
    (mkramer@bilzin.com)
 7  Representing Property Damage Committee
 8
 9  STROOCK & STROOCK & LAVAN, LLP
    BY: DANIEL J. HARRIS, ESQUIRE*
10      (*VIA TELECONFERENCE)
    180 Maiden Lane
11  New York, New York 10038-4982
    212.806.5400
12  (djharris@stroock.com)
    Representing Official Committee of
13  Unsecured Creditors
14
15  CROWELL & MORING, LLP
    BY: MARK PLEVIN, ESQUIRE
16      NOAH S. BLOOMBERG, ESQUIRE
    1001 Pennsylvania Avenue NW
17  Washington, DC 20004-2595
    202.624.2913
18  (mplevin@crowell.com)
    (nbloomberg@crowell.com)
19  Representing Fireman's Fund Insurance
    (Surety Bond)
20
21
    STEVENS & LEE, P.C.
22  BY: JOHN D. DEMMY, ESQUIRE
    1818 Market Street, 29th Floor
23  Philadelphia, Pennsylvania 19103-1702
    215.751.2885
24  (jdd@stevenslee.com)
```

**Page 6**

APPEARANCES (continued)

ALAN B. RICH LAW OFFICES
BY: ALAN B. RICH, ESQUIRE
Elm Place, Suite 4620
1401 Elm Street
Dallas, Texas 75202
214.744.5100
(arich@alanrichlaw.com)
Representing Property Damage FCR

CONNOLLY BOVE LODGE & HUTZ, LLP
BY: JEFFREY C. WISLER, ESQUIRE
The Nemours Building
1007 North Orange Street
P.O. Box 2207
Wilmington, Delaware 19899
302.88.6528
(jwisler@cblh.com)
Representing Maryland Casualty

ECKERT SEAMANS CHERIN & MELLOTT, LLC
BY: EDWARD J. LONGOSZ, II, ESQUIRE
1747 Pennsylvania Avenue, NW
12th Floor
Washington, DC 20006
202.659.6619
(elongosz@eckertseamans.com)
Representing Maryland Casualty and Zurich

COZEN O'CONNOR
BY: JACOB C. COHN, ESQUIRE
1900 Market Street
Philadelphia, Pennsylvania 19103-3508
215.665.2147
(jcohn@cozen.com)
Representing Federal Insurance Company

**Page 7**

APPEARANCES (continued)

CUYLER BURK, P.C.
BY: STEFANO V. CALOGERO, ESQUIRE
Parsippany Corporate Center
Four Century Drive
Parsippany, New Jersey 07054
973.734.3200
(scalogero@cuyler.com)
Representing Allstate Insurance Company

GOODWIN PROCTER, LLP
BY: BRIAN H. MUKHERJEE, ESQUIRE*
  (*VIA TELECONFERENCE)
901 New York Avenue, N.W.
Washington, DC 20001
202.346.4124
(bmukherjee@goodwinprocter.com)
Representing CNA Insurance

WOMBLE CARLYLE SANDRIDGE & RICE, PLLC
BY: KEVIN J. MANGAN, ESQUIRE*
  (*VIA TELECONFERENCE)
222 Delaware Avenue
Suite 1501
Wilmington, Delaware 19801
302.252.4361
(kmangan@wcsr.com)
Representing State of Montana

PEPPER HAMILTON, LLP
BY: LINDA J. CASEY, ESQUIRE*
  (*VIA TELECONFERENCE)
3000 Two Logan Square
Philadelphia, Pennsylvania 19103
215.981.4000
(caseyl@pepperlaw.com)
Representing BNSF Railway Company

**Page 8**

- - -
INDEX
- - -

Testimony of:
DAVID T. AUSTERN, ESQUIRE

| | |
|---|---|
| By Mr. Brown | Page 12, 242 |
| By Ms. Alcabes | Page 95 |
| By Mr. Candon | Page 123, 251 |
| By Mr. Demmy | Page 164 |
| By Mr. Cohn | Page 173 |
| By Mr. Plevin | Page 192 |
| By Ms. Cobb | Page 207 |
| By Ms. Casey | Page 219 |
| By Mr. Mangan | Page 221 |
| By Mr. Speights | Page 222 |

**Page 9**

- - -
EXHIBITS
- - -

NO.   DESCRIPTION   PAGE

Austern-1
  Amended Notice of Deposition
  Of David T. Austern       31

Austern-2
  Exhibit 2 to Exhibit Book
  Asbestos PI Trust Agreement   32

Austern-3
  First Amended Joint Plan of
  Reorganization...    43

Austern-4
  Exhibit 6 to Exhibit Book
  Asbestos Insurance Transfer
  Agreement       80

Austern-5
  Exhibit 4 to Exhibit Book
  Trust Distribution Procedures  90

Austern-6
  Exhibit 10 to Exhibit Book
  Cooperation Agreement    92

Austern-7
  Notice of Deposition of
  David Austern       95

Austern-8
  Debtors' Disclosure Statement
  for the First Amended Joint
  Plan of Reorganization...   118

Austern-9
  Notice of Deposition of
  David T. Austern     124

Page 10

1  EXHIBITS (continued)
2
   NO.    DESCRIPTION         PAGE
3
   Austern-10
4      Form 8-K              124
5  Austern-11
       Exhibit 8 to Exhibit Book
6      Best Interests Analysis    156
7
       - - -

Page 11

DEPOSITION SUPPORT INDEX
- - -

Direction to Witness Not to Answer:
Page  Line      Page  Line
181   13        225   16
229   04        239   03

Request for Production of Documents:
Page  Line      Page  Line
NONE

Stipulations:
Page  Line      Page  Line
NONE

Area(s) Marked Confidential:
Page  Line      Page  Line
NONE

Page 12

           - - -
        PROCEEDINGS
           - - -
       MR. GUY: We will follow the
federal rules.
           - - -
       DAVID T. AUSTERN, ESQUIRE,
after having been first duly
sworn, was examined and testified
as follows:
           - - -
        EXAMINATION
           - - -
BY MR. BROWN:
   Q.  Good morning, Mr. Austern.
My name is Michael Brown. I represent
OneBeacon American Insurance Company,
Seaton Insurance Company, GEICO, and
Republic Insurance Company.
       Could you state your full
name for the record, please?
   A.  David Thomas Austern.
   Q.  Have you ever been deposed
before?

Page 13

   A.  Yes.
   Q.  How many times?
   A.  Somewhere between 25 and 30
times.
   Q.  So it's fair to say that you
are familiar with the protocol for a
deposition then?
   A.  I am.
   Q.  Okay. Can you give me a
summary of your professional background?
   A.  I was an assistant district
attorney in the New York County District
Attorney's Office for four years; I was
an assistant United States attorney in
the United States Attorney's Office in
Washington, D.C. for four years; I was a
law professor for two years; I was in the
private practice of law for something
like 12 years; and I've been general
counsel of the Manville Personal Injury
Settlement Trust, and I have had some
other asbestos matters for the last 21
and a half years. That doesn't add up to
45, and it should, but...

Page 14

1  Q. Those are estimates, I take
2  it?
3  A. Those are estimates, yes.
4  Q. What did you do in
5  preparation for today's deposition?
6  A. I reviewed some documents,
7  and I spoke to counsel.
8  Q. What documents did you
9  review?
10  A. I also reviewed some
11  transcripts.
12      I reviewed the Personal
13  Injury Trust Agreement; the Trust
14  Distribution Process -- the Personal
15  Injury Trust Distribution Process; the
16  Transfer Agreement; the Cooperation
17  Agreement; I reviewed Ms. Biggs' latest
18  estimation report; Dr. Peterson's latest
19  report; Dr. Florence's latest report;
20  Dr. Whitehouse's -- one of
21  Dr. Whitehouse's reports -- I am sorry --
22  two of Dr. Whitehouse's reports; the
23  rebuttal to those reports from Dr. Welsh
24  and Dr. Freedman; the objections filed by

Page 15

1  the Libby claimants and by one or more
2  insurance companies, and I am not sure I
3  know which ones; my prior deposition in
4  this case; my prior deposition in the
5  Combustion Engineering case; my testimony
6  in the Combustion Engineering case. I
7  may have left something out, but I think
8  those are most of the documents I
9  reviewed.
10  Q. Okay. And you also
11  mentioned that you had reviewed some
12  transcripts?
13  A. Those were the depositions
14  and trial testimony -- oh, excuse me.
15  Yes. I reviewed Mr. Lockwood's
16  deposition.
17  Q. Did you actually review the
18  Amended Plan of Reorganization?
19  A. Yes -- and excuse me -- and
20  the Disclosure Statement.
21  Q. And over what period of time
22  did you review all these materials in
23  preparation for your deposition?
24  A. Two weeks. I did one other

Page 16

1  thing in preparation of the deposition.
2  I listened to parts of, albeit not all,
3  of the Lockwood deposition.
4  Q. Did you meet with counsel in
5  preparation for the deposition?
6  A. Yes.
7  Q. When?
8  A. Last Friday and yesterday.
9  Q. And for how long last
10  Friday? What period of time did you meet
11  with counsel?
12  A. I confess I don't remember,
13  but it was several hours.
14  Q. And the more recent meeting?
15  A. I would say three hours.
16  Q. Was it just counsel for the
17  Future Claimants' Representative or were
18  other Plan proponent counsel present?
19  A. No. There were no other
20  Plan proponent counsel.
21  Q. In reviewing Mr. Lockwood's
22  deposition testimony, was there anything
23  in his transcript with which you
24  disagreed?

Page 17

1  A. I don't remember -- nothing
2  occurs to me, although if you showed me a
3  question and answer, I might say I
4  disagreed. But I don't recall anything.
5  Q. Okay. When you listened in
6  on a portion of the deposition, was there
7  anything that you heard by way of an
8  answer by Mr. Lockwood that struck you as
9  inaccurate?
10  A. Not that I recall.
11  Q. Okay. Now, you mentioned
12  that you had reviewed the Disclosure
13  Statement, the Plan, the PI Trust
14  Agreement I assume you were referring to,
15  the PI Trust Distribution Procedures, the
16  Transfer Agreement, and the Cooperation
17  Agreement?
18  A. Yes.
19  Q. Do you understand all of
20  those documents?
21  A. No.
22  Q. Are there particular
23  documents that you understand better than
24  others?

Page 66

1  them, I am a fiduciary.
2      Q.  Okay. And what is the
3  **nature of your fiduciary duties?**
4      A.  To make sure the Trust has
5  sufficient funds and the funds to pay
6  them.
7      Q.  **Anything else?**
8      A.  It's more than to just pay
9  them. It's to pay them in the same
10 manner that people who preceded them were
11 paid.
12     Q.  **Is that all future**
13 **claimants?**
14     A.  It's all future personal
15 injury claimants.
16     Q.  **Does it matter whether they**
17 **have meritorious claims or not?**
18     A.  Oh, I don't know. I
19 haven't -- if it's not a meritorious
20 claim -- let me back up a second. These
21 claimants are people I have never met,
22 and I dare say the day I meet them, they
23 are no longer my clients.
24     Q.  **It's a convenient**

Page 67

1  arrangement.
2      A.  I am principally responsible
3  for making sure there are funds available
4  to pay them in the same manner in which
5  claimants in the FIFO Queue of the Trust
6  were paid. In that respect, I have a
7  fiduciary obligation to them.
8      Q.  **Okay. Can you turn to**
9  **Section 5.2 of the Trust Agreement, and**
10 **that appears on page 28.**
11     A.  Yes.
12     Q.  **Now, the first sentence of**
13 **Section 5.2 says, "The members of the TAC**
14 **shall serve in a fiduciary capacity**
15 **representing all holders of present PI**
16 **Trust Claims." And we have already gone**
17 through earlier the members of the TAC:
18 Mr. Weitz, Mr. Cooney, Mr. Rice, and
19 Mr. Budd.
20         Do you have an understanding
21 as to what their fiduciary duties are to
22 all holders of present PI Trust claims?
23     A.  All holders of present PI
24 Trust claims?

Page 68

1      Q.  **Yes. I am just reading from**
2  **Section 5.2.**
3      A.  They are, as I am to some
4  extent, an advisor to the trustees who
5  are there to protect the rights of
6  present claimants.
7      Q.  **Okay. And when you say**
8  **present claimants, all present claimants,**
9  **right?**
10     A.  Yes.
11     Q.  **If you compare the language**
12 **in the second sentence of 6.1 with the**
13 **first sentence in 5.2, the wording is a**
14 **little different.**
15         Do you see that?
16     A.  Yes.
17     Q.  **What's the reason for the**
18 **different wording, if you know?**
19         MR. LIESEMER: Object to the
20     form of the question.
21         MR. GUY: Objection as to
22     what difference you are referring
23     to.
24 BY MR. BROWN:

Page 69

1      Q.  **Okay. In 6.1, it says that**
2  **"he," meaning you, "shall serve in a**
3  **fiduciary capacity," and then it goes on**
4  **to say, "representing the interest of**
5  **holders of future PI Trust Claims..."**
6         Do you see that?
7      A.  Yes.
8      Q.  **And then there is another**
9  **phrase, and it says, "for the purpose of**
10 **protecting the rights of such persons."**
11        Do you see that?
12     A.  Yes.
13     Q.  **Now, if you go to 5.2, that**
14 **latter phrase, "for the purpose of**
15 **protecting the rights of such persons,"**
16 **is not there.**
17        Is there a reason?
18     A.  I don't know.
19     Q.  **Do you understand the TAC**
20 **members to have the same fiduciary**
21 **obligations to all holders of present PI**
22 **Trust claims that you have to all holders**
23 **of future PI Trust claims?**
24        MR. LIESEMER: Object to the

Page 70

1    form of the question.
2         THE WITNESS: Well, I don't
3    think 6.1 says "all," but I will
4    accept the way you phrased it.
5  BY MR. BROWN:
6    Q.  Okay.
7    A.  I can't think of any
8  difference, as I sit here now, in terms
9  of -- it's a different population, but
10 other than that, I can't I can't think of
11 any difference.
12   Q.  You rightly noted that the
13 word "all" does not appear in 6.1.
14       Is there any particular
15 reason for that?
16   A.  Not that I know of.
17   Q.  Let me ask you a more
18 general question. What is the purpose of
19 the TAC?
20       MR. LIESEMER: Object to the
21   form of the question.
22       THE WITNESS: To advise the
23   trustees with respect to present
24   claimants and the operation of the

Page 71

1  Trust.
2  BY MR. BROWN:
3    Q.  And what do you mean by
4  advise?
5    A.  Well, present their views to
6  the trustees and under some
7  circumstances, in the Trust Agreement,
8  either give or do not give their consent
9  to certain trustee action.
10   Q.  Is there a reason why the
11 TAC members are personal injury asbestos
12 lawyers?
13   A.  I can give you my personal
14 view.
15   Q.  Okay.
16   A.  They represent the
17 beneficiaries of the Trust, and I don't
18 know who else you would appoint.
19   Q.  You are familiar, are you
20 not, with the consultation provisions
21 that appear in Section 2.2(e) of the
22 Trust Agreement, correct?
23       MR. GUY: What page?
24       MR. BROWN: Page 10.

Page 72

1        MS. ALCABES: Page 10.
2        THE WITNESS: Yes.
3  BY MR. BROWN:
4    Q.  Why don't you tell me what
5  the general purpose of the consultation
6  provisions is for? Well, it's actually
7  for the TAC and for the Futures'
8  Representative.
9    A.  There are a lot of decisions
10 trustees have to make. This is
11 consultation, not carving out consent for
12 a moment, in terms of investments, in
13 terms of selecting vendors, in terms of
14 things that are not in the Trust
15 Distribution Process, and that
16 consultation is described in (e).
17   Q.  Okay. You mentioned in your
18 answer the consent provisions.
19   A.  There are consent
20 provisions.
21   Q.  And those appear in (f),
22 correct, on page 11?
23   A.  Yes.
24   Q.  What is the rationale for

Page 73

1  the consent provisions that appear in the
2  Trust Agreement?
3    A.  As distinguished from
4  consultation?
5    Q.  Or as distinguished from not
6  having them at all?
7    A.  As I understand it, there
8  are certain decisions that trustees make
9  that are so important, they can only be
10 made with the consent of both the TAC and
11 the Future Claims Representative.
12   Q.  And that was a negotiated
13 term of the overall Plan, correct?
14   A.  Well, it's been negotiated a
15 lot before, and I am not sure if any
16 specific provision was negotiated in this
17 Plan.
18   Q.  Why can't the trustees make
19 these decisions on their own?
20       MR. GUY: Objection as to
21   "these decisions."
22       MR. BROWN: Well, let's back
23   up.
24 BY MR. BROWN:

Page 74

1   Q. You will agree with me that
2   Section 2.2(f) sets forth a number of
3   different items for which the trustees
4   need the consent of the TAC and the
5   Future Claimants' Representative,
6   correct?
7   A. Yes.
8   Q. It goes on from Romanette 1
9   to Romanette 15, correct?
10  A. Yes.
11  Q. Why is there a need to have
12  the consent of the Future Claimants'
13  Representative and the TAC on these
14  particular items rather than simply
15  consultation?
16  A. My answer is the same, and I
17  will speak forgetting the TAC, as the
18  Future Claimants' Representative, I want
19  the right to under certain circumstances
20  not agree to a decision by the trustees
21  and have that be the end of the decision.
22  Q. Well, it's not actually the
23  end of the decision, is it?
24  A. No. There are ways of

Page 75

1   resolving that difference.
2   Q. And what are those?
3   A. Well, I may confuse this
4   with the Manville Trust, but you can
5   seek, shall we say, guidance from the
6   bankruptcy court.
7   Q. By that, you mean a ruling?
8   A. Yes, yes.
9   Q. If your consent has been
10  unreasonably withheld in the views of the
11  trustees?
12  A. That's correct.
13  Q. Is there anything in Section
14  524(g) to your knowledge that requires a
15  Trust, an asbestos Trust, to have a
16  consultation and consent provisions that
17  are set forth in this Trust Agreement?
18  A. I do not know of anything in
19  524(g) like that.
20  Q. Do you know who the
21  designated trustees are for the Asbestos
22  PI Trust?
23  A. Yes.
24  Q. Okay. Who are they? Or

Page 76

1   list of them.
2   A. Dean Trafelet, Lewis
3   Sifford, and Harry Huge.
4   Q. And do you know each of
5   those gentlemen?
6   A. Well, in the case of
7   Mr. Huge and Mr. Trafelet, I do know
8   them. In the case of Mr. Sifford, I have
9   met him on a number of occasions.
10  Q. Okay. What is the
11  professional background of Mr. Huge?
12  A. Let's see. I first met him
13  about 40 years ago at the Justice
14  Department. I am sorry. He is a lawyer.
15  He has been with the government. He has
16  been in private practice. Do you want
17  more?
18  Q. Does he have experience with
19  asbestos trusts?
20  A. Yes, he does.
21  Q. What is that experience?
22  A. He is a trustee of Armstrong
23  and I believe a trustee of OCF.
24  Q. How long has he had the role

Page 77

1   of trustee in Armstrong?
2   A. I met with him shortly after
3   he was appointed, and I should be able to
4   remember that. I think four or five
5   years.
6   Q. And how about as a trustee
7   in OCF?
8   A. I don't know.
9   Q. Okay. Why don't you tell me
10  what the professional background of
11  Mr. Sifford is?
12  A. I know him less well.
13  Mr. Sifford is a practicing lawyer in a
14  law firm, and he is an Armstrong trustee,
15  I believe. And that's, I believe, the
16  first time I met him, and thus I looked
17  him up. And according to
18  Martindale-Hubbell, he does both personal
19  injury plaintiff's work and personal
20  injury defense work. I am getting close
21  to exhausting my knowledge of him.
22  Q. Okay. Is the personal
23  injury work that he does, both defense
24  and plaintiff's work, asbestos-related?

Page 78

1    A.   It is not as far as I know.
2    Q.   Do you know what it does
3 relate to?
4    A.   No.
5    Q.   Okay. Do you know how long
6 he has been a trustee of the Armstrong
7 Trust?
8    A.   The same period of time
9 Mr. Huge has been, but I don't remember
10 when that started.
11   Q.   I thought you said that one
12 was four to five years ago?
13   A.   Four to five years ago. I
14 don't remember exactly.
15   Q.   All right. And what is the
16 professional background of Mr. Trafelet?
17   A.   Before I get to that, let me
18 explain. Armstrong was confirmed, and
19 for a long time, there was no activity
20 for reasons that allude me. So I can't
21 remember exactly when I got involved in
22 talking to those people.
23   Q.   Okay.
24   A.   Mr. Trafelet is a lawyer who

Page 79

1 was a judge of, I believe, the Circuit
2 Court in Cook County, Illinois for a
3 period of time, and he is an asbestos
4 trustee of -- it seems to me, he is the
5 sole trustee of the Loomis Trust and also
6 a Futures Rep, I believe, at Armstrong.
7    Q.   Okay. And he was one of the
8 gentlemen that you mentioned that, if I
9 remember correctly, the Asbestos PI
10 Committee, otherwise known as the ACC,
11 wanted to have the role that you have?
12   A.   Yes.
13   Q.   Do you know how long he has
14 been a trustee of the Loomis Trust?
15   A.   Since it was confirmed. And
16 this I really should know, but I think it
17 was confirmed about three years ago.
18   Q.   Okay. And do you know
19 whether he was the FCR in Armstrong
20 before a plan was confirmed?
21   A.   I do not know.
22   Q.   Okay. But he is the FCR for
23 the Trust?
24   A.   Yes, I believe he is.

Page 80

1    Q.   And would I be correct that
2 he's been that for four or five years?
3    A.   Yes.
4    Q.   Let's go to Section 4.9 of
5 the Trust Agreement. Take a moment to
6 read that, if you would.
7    A.   Okay.
8    Q.   The second-to-the-last
9 sentence in Section 4.9 says, "No Trustee
10 shall act as an attorney for any person
11 who holds an asbestos claim."
12        Do you see that?
13   A.   Yes.
14   Q.   What's the reason for that?
15   A.   To avoid conflicts.
16   Q.   What type of conflicts?
17   A.   Well, you are a trustee of a
18 Plan paying somebody; you shouldn't be
19 paying your client.
20   Q.   Is there any other reason?
21   A.   Not that I know of.
22        MR. BROWN: Mark this as
23 Austern-4.
24        (Austern-4 marked for

Page 81

1   identification at this time.)
2 BY MR. BROWN:
3    Q.   Exhibit-4, Mr. Austern, is
4 Exhibit 6 to the Exhibit Book. My first
5 question for you is, can you identify it?
6    A.   It's the Asbestos Insurance
7 Transfer Agreement, which is part of the
8 Plan, as you point out.
9    Q.   And I believe you said this
10 is one of the documents that you had
11 reviewed; am I correct?
12   A.   Yes.
13   Q.   Do you understand this
14 agreement?
15   A.   Not in its entirety.
16   Q.   Okay. Are there particular
17 provisions of this agreement that you do
18 not understand that you could direct my
19 attention to?
20   A.   Well, I would have to look
21 at it for a moment. I am not sure I
22 understand all of the representations and
23 warranties and some of the terms in them.
24 There are two schedules, if I remember

Page 82

1  correctly, here.
2      Q.  I think there is three.
3      A.  All right. I was never
4  quite sure I understood the constant or
5  individual differences between the
6  Schedules 2 and 3.
7      Q.  Okay. Other than what you
8  what you just described, do you generally
9  have a good handle on the Asbestos
10 Insurance Transfer Agreement?
11     A.  I wouldn't describe it as a
12 good handle, but I recognize some of the
13 paragraphs.
14     Q.  All right. Let me direct
15 your attention -- let's look at Section 1
16 on page 2, and you should probably look
17 at subsection (a). And then (d) is the
18 one I have the question on.
19     A.  Yes.
20     Q.  In (d), it says, "The
21 Transfer is not an assignment of any
22 insurance policy."
23         Do you see that?
24     A.  Yes.

Page 83

1      Q.  What is it?
2      A.  It's an assignment of a --
3  do you mean what is the Transfer
4  Agreement?
5      Q.  Yes. What is the transfer,
6  which is a defined term?
7      A.  Being transferred?
8      Q.  Yes.
9      A.  The proceeds.
10     Q.  Anything else?
11     A.  Well, I confess as the
12 Futures Claims Rep, I never got past the
13 proceeds because the money was what
14 interested me.
15     Q.  Okay. Have you reviewed any
16 of the Debtors' insurance policies?
17     A.  No.
18     Q.  Have you ever reviewed a
19 general liability insurance policy?
20     A.  Yes.
21     Q.  Do you have a general
22 understanding as to the duties and
23 obligations of an insured under general
24 liability insurance policy?

Page 84

1      A.  In general.
2      Q.  Could you describe for me
3  what some of those duties are?
4      A.  Well, you have to report
5  claims.
6      Q.  Okay.
7      A.  And you have to, under
8  certain policies, confer with the
9  insurance company about what you are
10 settling and why and for how much. And,
11 forgetting individual policies for a
12 minute, under corporate policies, there
13 are certain audit rights that sometimes
14 exist as a condition of payment to the
15 insured.
16     Q.  Are you familiar with the
17 requirement in some policies that the
18 insurer have a right to defend the
19 insured?
20         MR. LIESEMER: Object to
21 form.
22         THE WITNESS: As well as an
23 obligation.
24 BY MR. BROWN:

Page 85

1      Q.  Okay. And are you aware
2  that in some policies there is a right on
3  the part of the insurer to associate in
4  the defense of the insured?
5          MR. LIESEMER: Object to
6  form.
7          THE WITNESS: I am not sure
8  I am familiar with that.
9  BY MR. BROWN:
10     Q.  Okay. Well, you indicated
11 that the one thing you knew that was
12 being transferred was proceeds.
13         Are you aware of anything
14 else that's being transferred pursuant to
15 the Asbestos Insurance Transfer
16 Agreement?
17     A.  I am not sure what you mean
18 by anything else, other than the money.
19     Q.  That's it?
20     A.  Well, other things may be
21 being transferred, but I can't think of
22 anything right now.
23     Q.  Okay. Do you have an
24 understanding as to whether the Asbestos

Page 86

1  PI Trust will become the insured under
2  the policies that are listed on Schedule
3  1 to this agreement?
4         MR. GUY: Objection, calls
5     for a legal conclusion.
6         THE WITNESS: Mr. Brown, I
7     don't know. I certainly hope so.
8  BY MR. BROWN:
9     Q.  Do you have an understanding
10 as to what, if anything, happens to the
11 obligations of the insured under the
12 policies on Schedule 1 if the Plan is
13 confirmed?
14        MR. GUY: Objection to form.
15        MR. LIESEMER: I join in
16    that objection.
17        THE WITNESS: Let me make
18    sure I understand the question.
19    What happens to the obligations of
20    -- if the policy was still in the
21    hands of the Debtor, what would
22    happen to the obligations of the
23    Debtor and the rights of the
24    insurance company?

Page 87

1  BY MR. BROWN:
2     Q.  I am not sure I understood
3  the qualification. Let me try it a
4  little differently.
5         To the extent that the
6  Debtor has duties and obligations under
7  one or more of its insurance policies, if
8  this Plan is confirmed, what happens to
9  those duties and obligations, as you
10 understand it?
11        MR. LIESEMER: Object to the
12    form.
13        MS. BAER: I join in the
14    objection.
15        THE WITNESS: The Plan is
16    going to be administered pursuant
17    to the Trust Distrubution Process
18    as it affects personal injury
19    asbestos claims.
20        To that extent, the personal
21    injury Trust, as far as I know, is
22    not going to call up each and
23    every insurance company and say
24    "Can I settle this claim?" I hope

Page 88

1     that's responsive to your
2     question.
3  BY MR. BROWN:
4     Q.  What is it going to do?
5  What is the Trust going to do?
6         MS. BAER: Objection to
7     form.
8         MR. LIESEMER: I join.
9         THE WITNESS: It's going to
10    settle claims pursuant to the
11    Trust Distrubution Process.
12 BY MR. BROWN:
13    Q.  Okay. Will the Debtors'
14 insurers have any role in the handling
15 defense or settlement of any claim
16 submitted to the Asbestos PI Trust?
17        MR. GUY: Objection.
18        MR. LIESEMER: Objection to
19    form.
20        MR. GUY: Objection, calls
21    for speculation.
22        MS. BAER: Objection, same.
23        THE WITNESS: Let me address
24    audit rights. In my copious free

Page 89

1     time, Mr. Brown, I am the claims
2     administrator of the Dow Corning
3     Trust -- that is not an asbestos
4     Trust -- and this issue has arisen
5     in that context. And I dare say
6     it may arise in the context of the
7     W.R. Grace Trust.
8         If insurance companies
9     object to paying because they do
10    not have audit rights or because
11    of any other input into the Trust,
12    I dare say they are going to bring
13    that to the attention of the
14    trustees. And either that will be
15    worked out between the trustees
16    and the insurance company or
17    some -- I don't like this phrase
18    because I am not sure I know what
19    it means -- but some coverage
20    court will have to determine the
21    rights of the insurance company as
22    a function of the trustees'
23    duties.
24        MR. BROWN: Could you read