# EXHIBIT 17

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

   -   -   -

In Re:                    : Chapter 11
                          :
                          : Case No.
W.R. GRACE & CO., et al,  : 01-01139 JKF
                          :
                          : (Jointly
           Debtors        : Administered)


           -   -   -


        Friday, May 1, 2009

        -   -   -


        Oral deposition of PETER VAN

N. LOCKWOOD, ESQUIRE, taken pursuant to

notice, was held at the offices of CAPLIN

& DRYSDALE, One Thomas Circle N.W., Suite

1100, Washington, DC  20005, commencing

at 9:43 a.m., on the above date, before

Lori A. Zabielski, a Registered

Professional Reporter and Notary Public

in and for the Commonwealth of

Pennsylvania.


        -   -   -

        MAGNA LEGAL SERVICES
          Seven Penn Center
         1635 Market Street
             8th Floor
   Philadelphia, Pennsylvania 19103

Page 2

1  APPEARANCES:
2
3  DRINKER BIDDLE & REATH, LLP
     BY:  MICHAEL F. BROWN, ESQUIRE
4      JEFFREY M. BOERGER, ESQUIRE
     One Logan Square
5  18th & Cherry Streets
     Philadelphia, Pennsylvania 19103-6996
6  215.988.2988
     (brownmf@dbr.com)
7  (jeffrey.boerger@dbr.com)
     Representing OneBeacon America Insurance
8  Company, Seaton Insurance Company,
     Government Employees Insurance Company,
9  Columbia Insurance Company f/k/a Republic
     Insurance Company
10
11
     CAPLIN & DRYSDALE, CHARTERED
12  BY:  NATHAN D. FINCH, ESQUIRE
        JEFFREY A. LIESEMER, ESQUIRE*
13     (*VIA TELECONFERENCE)
     One Thomas Circle N.W.
14  Suite 1100
     Washington, DC  20005
15  202.862.7801
     (ndf@capdale.com)
16  (jal@capdale.com)
     Representing Grace, Official Committee of
17  Asbestos Personal Injury Claimants
     ("ACC"), and Witness
18
19
     W.R. GRACE & CO.
20  BY:  RICHARD C. FINKE, ESQUIRE*
        ASSISTANT GENERAL COUNSEL
21     (*VIA TELECONFERENCE)
     5400 Broken Sound Boulevard, NW
22  Suite 300
     Boca Raton, Florida 33487
23  561.362.1533
     Representing W.R. Grace & Co.
24

Page 3

1  APPEARANCES (continued)
2
3  KIRKLAND & ELLIS, LLP
     BY:  BARBARA M. HARDING, ESQUIRE
4      THEODORE L. FREEDMAN, ESQUIRE
     655 Fifteenth Street, N.W.
5  Washington, DC  20005-5793
     202.879.5081
6  (barbara.harding@kirkland.com)
     (tfreedman@kirkland.com)
7  Representing the Debtors
8
9  SIMPSON THACHER & BARTLETT, LLP
     BY:  ELISA ALCABES, ESQUIRE
10  425 Lexington Avenue
     New York, New York  10017-3954
11  212.455.3133
     (ealcabes@stblaw.com)
12  Representing Travelers Casualty and
     Surety Company
13
14
     VORYS, SATER, SEYMOUR AND PEASE, LLP
15  BY:  TIFFANY STRELOW COBB, ESQUIRE*
        ROBERT J. SIDMAN, ESQUIRE*
16     (*VIA TELECONFERENCE)
     52 East Gay Street
17  Columbus, Ohio 43215
     614.464.8322
18  (tscobb@vorys.com)
     Representing The Scotts Company, LLC
19
20
     COHN WHITESELL & GOLDBERG, LLP
21  BY:  DANIEL C. COHN, ESQUIRE
     101 Arch Street
22  Boston, Massachusetts 02110
     617.951.2505
23  (cohn@cwg11.com)
     Representing the Libby Claimants
24

Page 4

1  APPEARANCES (continued)
2
3  SPEIGHTS & RUNYAN
     BY:  DANIEL H. SPEIGHTS, ESQUIRE*
4      (* VIA TELECONFERENCE)
     200 Jackson Avenue East
5  P.O. Box 685
     Hampton, South Carolina  29924
6  803.943.4444
     (dspeights@speightsrunyan.com)
7  Representing Anderson Memorial Hospital
8
9  TUCKER ARENSBERG
     BY:  MICHAEL A. SHINER, ESQUIRE
10  1500 One PPG Place
     Pittsburgh, Pennsylvania  15222
11  412.594.5586
     (mshiner@tuckerlaw.com)
12  Representing Certain London Market
     Insurers and AXA Belgium
13
14
     MENDES & MOUNT, LLP
15  BY:  CAROLINA ACEVEDO, ESQUIRE*
        (*VIA TELECONFERENCE)
16  750 Seventh Avenue
     New York, New York  10019
17  212.261.8262
     (carolina.acevedo@mendes.com)
18  Representing AXA Belgium as Successor to
     Royale Belge SSA
19
20
     MENDES & MOUNT, LLP
21  BY:  ALEXANDER MUELLER, ESQUIRE*
        (*VIA TELECONFERENCE)
22  750 Seventh Avenue
     New York, New York  10019-6829
23  212.261.8296
     (alexander.mueller@mendes.com)
24  Representing London Market Companies

Page 5

1  APPEARANCE (continued)
2
3  FORD MARRIN ESPOSITO & WITMEYER & GLESER
     BY:  ELIZABETH M. DeCRISTOFARO, ESQUIRE
4  Wall Street Plaza
     New York, New York  10005-1875
5  212.269.4900
     Representing Continental Casualty Company
6  and Continental Insurance Company
7
8  BILZIN SUMBERG BAENA PRICE & AXELROD, LLP
     BY:  MATTHEW I. KRAMER, ESQUIRE
9  200 South Biscayne Boulevard
     Suite 2500
10  Miami, Florida  33131-5340
     305.450.7246
11  (mkramer@bilzin.com)
     Representing Property Damage Committee
12
13
14  STROOCK & STROOCK & LAVAN, LLP
     BY:  ARLENE G. KRIEGER, ESQUIRE
15  180 Maiden Lane
     New York, New York  10038-4982
     212.806.5400
16  (akrieger@stroock.com)
     Representing Official Committee of
17  Unsecured Creditors
18
19  CROWELL & MORING, LLP
     BY:  MARK PLEVIN, ESQUIRE
20     NOAH S. BLOOMBERG, ESQUIRE
     1001 Pennsylvania Avenue NW
21  Washington, DC  20004-2595
     202.624.2913
22  (mplevin@crowell.com)
     (nbloomberg@crowell.com)
23  Representing Fireman's Fund Insurance
     (Surety Bond)
24

Page 6

```
 1   APPEARANCES (continued)
 2
     STEVENS & LEE, P.C.
 3   BY: JOHN D. DEMMY, ESQUIRE
         1105 North Market Street, 7th Floor
 4       Wilmington, Delaware 19801
         302.654.5180
 5       (jdd@stevenslee.com)
         Representing Fireman's Fund Insurance
 6
 7
     ALAN B. RICH LAW OFFICES
 8   BY: ALAN B. RICH, ESQUIRE
         Elm Place, Suite 4620
 9       1401 Elm Street
         Dallas, Texas 75202
10       214.744.5100
         (arich@alanrichlaw.com)
11       Representing Property Damage FCR
12
13   CONNOLLY BOVE LODGE & HUTZ, LLP
     BY: JEFFREY C. WISLER, ESQUIRE
14       The Nemours Building
         1007 North Orange Street
15       P.O. Box 2207
         Wilmington, Delaware 19899
16       302.88.6528
         (jwisler@cblh.com)
17       Representing Maryland Casualty
18
19   ECKERT SEAMANS CHERIN & MELLOTT, LLC
     BY: EDWARD J. LONGOSZ, II, ESQUIRE
20       1747 Pennsylvania Avenue, NW
         12th Floor
21       Washington, DC 20006
         202.659.6619
22       (elongosz@eckertseamans.com)
         Representing Maryland Casualty and Zurich
23
24
```

Page 7

```
 1   APPEARANCES (continued)
 2
     WILEY REIN, LLP
 3   BY: KARALEE C. MORELL, ESQUIRE
         1776 K Street NW
 4       Washington, DC 20006
         202.719.7520
 5       (kmorell@wileyrein.com)
         Representing Maryland Casualty and Zurich
 6
 7
     COZEN O'CONNOR
 8   BY: JACOB C. COHN, ESQUIRE
         1900 Market Street
 9       Philadelphia, Pennsylvania 19103-3508
         215.665.2147
10       (jcohn@cozen.com)
         Representing Federal Insurance Company
11
12
     ORRICK HERRINGTON & SUTCLIFFE, LLP
13   BY: JONATHAN P. GUY, ESQUIRE
         JOSHUA M. CUTLER, ESQUIRE
14       Columbia Center
         1152 15th Street, N.W.
15       Washington, DC 20005-1706
         202.339.8516
16       (jguy@orrick.com)
         Representing Future Claimants
17       Representative
18
19   CUYLER BURK, P.C.
     BY: ANDREW CRAIG, ESQUIRE
20       4 Century Drive
         Parsippany, New Jersey 07054
21       973.734.3200
         (acraig@cuyler.com)
22       Representing Allstate Insurance Company
23
24
```

Page 8

```
 1   APPEARANCES (continued)
 2
 3   WILSON ELSER MOSKOWITZ EDELMAN & DICKER,
     LLP
 4   BY: CARL PERNICONE, ESQUIRE*
         (*VIA TELECONFERENCE)
 5       150 East 42nd Street
         New York, New York 10017-5639
 6       212.915.5656
         (carl.pernicone@wilsonelser.com)
 7       Representing Arrowood Indemnity Company
 8
 9   WOMBLE CARLYLE SANDRIDGE & RICE, PLLC
     BY: KEVIN J. MANGAN, ESQUIRE*
10       (*VIA TELECONFERENCE)
         222 Delaware Avenue
11       Suite 1501
         Wilmington, Delaware 19801
12       302.252.4361
         (kmangan@wcsr.com)
13       Representing State of Montana
14
15   PEPPER HAMILTON LLP
     BY: LINDA J. CASEY, ESQUIRE*
16       (*VIA TELECONFERENCE)
         3000 Two Logan Square
17       Philadelphia, Pennsylvania 19103
         215.981.4000
18       (caseyl@pepperlaw.com)
         Representing BNSF Railway Company
19
20       - - -
21
22
23
24
```

Page 9

```
 1       - - -
 2       I N D E X
 3       - - -
 4
 5   Testimony of:
 6   PETER VAN N. LOCKWOOD, ESQUIRE
 7
 8   By Mr. Brown        Page 12
 9   By Ms. Alcabes      Page 267
10   By Ms. Cobb         Page 339
11   By Mr. Cohn         Page 368
12
13
14       - - -
15       E X H I B I T S
16       - - -
17   NO.   DESCRIPTION              PAGE
18   1     Amended Notice of Deposition
           of Asbestos PI Committee...    12
19
     2     Objections to the Official
20         Committee...        12
21   3     Form 8-K and Term Sheet     15
22   4     Exhibit-6 to Exhibit Book   26
23   5     First Amended Joint Plan of
           Reorganization...       27
24
```

Page 10

1    EXHIBITS (continued)
2
3    NO.   DESCRIPTION            PAGE
4    6    Exhibit-19 to Exhibit Book   83
5    7    Settlement Agreement
          * CONFIDENTIAL *          144
6
     8    Complaint for Declaration of
7         the Relief...              175
8    9    Diagram                    175
9    10   Exhibit-2 to Exhibit Book   196
10   11   Exhibit-4 to Exhibit Book   224
11   12   Exhibit-10 to Exhibit Book   260
12   13   Travelers Casualty and Surety
          Company's Notice of Deposition
13        to the Official Committee of
          Asbestos Personal Injury
14        Claimants...               267
15   14   Debtors' Disclosure...      280
16   15   Documents bearing Bates stamps
          TRAVAS0000019 through 141
17        * CONFIDENTIAL *          289
18   16   Notice of Service of Discovery 324
19
             - - -
20
21
22
23
24

Page 11

1                - - -
2        DEPOSITION SUPPORT INDEX
3                - - -
4
5    Direction to Witness Not to Answer:
6    Page Line       Page    Line
7    NONE
8
9
10   Request for Production of Documents:
11   Page Line        Page    Line
12   NONE
13
14
15   Stipulations:
16   Page Line        Page    Line
17   12   02
18
19
20   Area(s) Marked Confidential:
21   Page Line        Page    Line
22   152  01   through 168   03
     292  01   through 311   14
23
24

Page 12

1                - - -
2        (It is hereby stipulated and
3    agreed by and among counsel for
4    the respective parties that the
5    filing, sealing and certification
6    of the deposition are waived; and
7    that all objections, except as to
8    the form of the question, will be
9    reserved until the time of trial.)
10               - - -
11       PETER VAN N. LOCKWOOD,
12   ESQUIRE, after having been first
13   duly sworn, was examined and
14   testified as follows:
15               - - -
16          EXAMINATION
17               - - -
18       (ACC 30(b)(6)-1 and 2
19   premarked for identification.)
20               - - -
21   BY MR. BROWN:
22       Q.   Good morning, Mr. Lockwood.
23       A.   Good morning, Mr. Brown.
24       Q.   You are appearing here today

Page 13

1    as the Rule 30(b)(6) designee for the
2    ACC, correct?
3        A.   Correct.
4        Q.   And that is with respect to
5    a number of 30(b)(6) notices, correct?
6        A.   A very large number, yes.
7        Q.   Can you look at the one
8    that's been put before you and marked ACC
9    Rule 30(b)(6)-1, which I will call ACC-1
10   here after.
11       A.   I have it.
12       Q.   Can you identify it?
13       A.   It is an Amended Notice of
14   Deposition of Asbestos PI Committee
15   Pursuant to Rule 30(b)(6) served by four
16   insurance companies, One Beacon, Seaton,
17   Geico, and Columbia. And it contains an
18   attachment with definitions and topics
19   which are the subject matter of
20   testimony.
21       Q.   Okay. And can you look at
22   the document that I put before you that's
23   marked ACC-2.
24       A.   I have it.

Page 14

1      Q.   And identify that document,
2  please.
3      A.   That document is the
4  Objections of the Official Committee of
5  Asbestos Personal Injury Claimants to
6  Rule 30(b)(6) Notices of Deposition
7  served by Certain Plan Objectors.
8      Q.   Okay.  And is it correct
9  that you are here today prepared to
10  testify about the topics that are listed
11  in ACC-1 subject to the objections that
12  appear in ACC-2?
13      A.   The answer to that question
14  is yes, subject to the following caveats:
15  To the extent that the topics in this
16  notice or any of the other notices are
17  subjects that the ACC has a person with
18  knowledge on, I am here to testify about
19  it.  To the extent that the ACC doesn't
20  have a person with knowledge on certain
21  topics, then I am here to testify that
22  the ACC doesn't have knowledge on those
23  topics.
24      Q.   Okay.  And --

Page 15

1      A.   And to the extent that
2  occurs, we will see how it occurs in the
3  course of the questions.
4      Q.   Okay.  And then you
5  mentioned ACC and a person with the ACC.
6          How are you using the term
7  "ACC"?
8      A.   I am using it as the entity
9  that was appointed in the bankruptcy case
10  by the U.S. Trustee.
11          MR. BROWN:  ACC-3.
12          (ACC 30(b)(6)-3 marked for
13      identification at this time.)
14  BY MR. BROWN:
15      Q.   Okay.  Mr. Lockwood, you now
16  have before you a document that should
17  have two exhibit labels on it.  One is an
18  Exhibit-12 from the deposition of
19  Mr. Finke, and the other is ACC-3.
20          Could you identify the
21  document that has been marked as ACC-3?
22      A.   It appears to be a Form 8-K
23  file by W.R. Grace & Company dated April
24  6, 2008.

Page 16

1      Q.   Have you ever seen this
2  document before?
3      A.   Frankly, I am not sure.
4      Q.   Okay.
5      A.   I may have.  I may not have.
6      Q.   All right.  Why don't you go
7  to the back of the document, starting
8  with page 9.
9      A.   Page 9 or page 8?
10      Q.   I am sorry.  Page 8.
11      A.   I am there.
12      Q.   Can you identify that
13  document?
14      A.   It appears to be a copy of a
15  Term Sheet for the Resolution of Asbestos
16  Personal Injury Claims entered into by a
17  variety of parties, including the ACC.
18      Q.   Okay.  Have you seen the
19  Term Sheet, either this Term Sheet or
20  some iteration of it previously?
21      A.   I have seen the original of
22  it.
23      Q.   Okay.  Can you take a look
24  at what you have before you and tell me

Page 17

1  whether it differs in any way from the
2  original?
3          MR. FINCH:  Objection.
4          THE WITNESS:  On the face of
5      it, it does not appear to
6      different.  I mean, obviously, a
7      comparison of the original and
8      this copy would be the definitive
9      way of determining whether there
10      is a difference, but this looks to
11      be the same, as best I can recall.
12  BY MR. BROWN:
13      Q.   Okay.  And this document was
14  negotiated by the parties that executed
15  it, is that correct, or their counsel?
16      A.   Broadly speaking, yes.  I
17  mean, negotiated implies human beings in
18  a room or in some communication, and
19  these are all entities.  So various
20  representatives of the entities that are
21  listed here in negotiated this document
22  on behalf of their respective principals.
23      Q.   Is there anything in the
24  Term Sheet that you can see that's

Page 106

1  to the extent that a coverage
2  court determines that there is a
3  pre-condition to coverage.
4          And since the Trust is the
5  one seeking the coverage, by
6  hypothesis, it's the only one that
7  has any incentive to make sure
8  that the rights or -- excuse me --
9  that the obligations, the
10  pre-conditions are satisfied as
11  required by a coverage court.
12          And so to that extent, yes,
13  the Trust, one way or another, to
14  the extent determined by a
15  coverage court or by negotiations
16  with insurers, will have to
17  perform what you have described as
18  the obligations and rights under
19  the assigned insurance coverage.
20  That's my understanding.
21  BY MR. BROWN:
22      Q.  **Do the Debtors, the**
23  **Reorganized Debtors, retain any duties or**
24  **obligations under the asbestos insurance**

Page 107

1  **policies if this Plan is confirmed?**
2      A.  There are provisions
3  involving cooperation in the Plan
4  documents which would allow the Trust to
5  require, to the extent those cooperation
6  provisions say so, the Debtors to help
7  satisfy or wholly satisfy whatever the
8  particular requirement might be that only
9  the Debtor could do.
10          So there is, I guess, the
11  answer is there is an indirect obligation
12  on the Debtor's part.  But the Debtor,
13  qua-Debtor, vis-a-vie, the insurer, since
14  the Debtor under the asbestos insurance
15  rights will not on its own be seeking
16  coverage, the Debtor sort of independent
17  of the Trust would not have any rights,
18  any obligations to the insureds except to
19  the extent, as I say, that the
20  cooperation with the Trust efforts to
21  access that insurance trigger such
22  cooperation obligations.
23      Q.  **And the cooperation**
24  **obligations that you described in the**

Page 108

1  **beginning of your answer are set forth in**
2  **the cooperation agreement; is that what**
3  **you were referring to?**
4      A.  They are set forth there.
5  There may be -- I don't remember whether
6  they are also set forth in other
7  documents, such as the Insurance Transfer
8  Agreement and/or the Plan itself.  But
9  they are set forth -- I think there may
10  be some set forth in the Insurance
11  Transfer Agreement.  I am not sure.  I
12  would have to look at them.
13      Q.  Okay.
14      A.  But I do remember that there
15  are cooperation arrangements.
16      Q.  **If I understand your answer,**
17  **the cooperation obligation of the**
18  **Reorganized Debtors post-confirmation is**
19  **not the asbestos insurance companies but**
20  **rather to the Trust under the cooperation**
21  **agreement?**
22      A.  That's correct.
23          MS. HARDING:  Object to
24  form.

Page 109

1          THE WITNESS:  But the
2      asbestos insurance companies,
3      through the retention of asbestos
4      coverage defenses, are the
5      indirect beneficiaries of that
6      provision.
7  BY MR. BROWN:
8      Q.  How so?
9      A.  Because if they don't -- if
10  the Trust can't get Grace to perform the
11  cooperation that the policies require,
12  the insurance companies won't have to
13  provide the coverage if the coverage
14  court says such cooperation is mandatory.
15          There is nothing in the Plan
16  that says that an insurance company -- if
17  policy obligations are not performed as
18  required by the policy by somebody,
19  nevertheless they have to pay on the
20  insurance.  The only entity or person
21  that could make such a determination
22  would be a coverage court judge and only
23  in the context of deciding that for
24  whatever reason the particular obligation

Page 110

1  sought to be enforced by the insurer was
2  not applicable or required.
3      Q.   Okay. I want to ask you the
4  same series of questions with respect to
5  two other types of documents, and we can
6  try to short-circuit this or you can give
7  me the long answer. I don't care.
8          Would your answers to the
9  questions concerning the assumption of
10  duties under the asbestos insurance
11  policies or the retention of those
12  duties, as you have just articulated, be
13  the same if my questions dealt with the
14  Asbestos Insurance Settlement Agreements?
15      A.   Well, sort of, except that
16  the Asbestos Insurance Settlement
17  Agreements, as far as I am aware, don't
18  have any obligations. They fully
19  performed. Well, strike that. There are
20  two categories of asbestos insurance.
21      Q.   I want to get to the third
22  one as well.
23      A.   There is a pre-petition
24  where it's been fully performed, and

Page 111

1  there is post-petition one where we make
2  a settlement as the case is going on,
3  such as the Equitas agreement that I
4  mentioned before, and any others that
5  might get entered into.
6          With respect to the former,
7  the pre-petition settlement agreements,
8  it's my understanding, rightly or
9  wrongly, that both parties have
10  essentially fully performed those
11  agreements, both the Debtors and the
12  insurers, at least to the extent
13  described in Exhibit-5, which is where
14  those are identified and described.
15          The only remaining
16  obligation, quote/unquote, that I am
17  aware of under those agreements is a
18  potential indemnity obligation on the
19  part of Grace in the event that somebody
20  successfully or attempts to sue a settled
21  insurer.
22          The Plan channels to the
23  Trust any claims against those settled
24  insurers, and, therefore, there should

Page 112

1  never be any indemnity claim because the
2  claim gets cutoff from the insurer before
3  it reaches the point where the insurer
4  has paid money, which would trigger an
5  indemnity right. That's quite a bit
6  different from the non-settled coverage
7  that I was discussing earlier.
8      Q.   But that obligation, to the
9  extent it exists, is being assumed by the
10  Asbestos PI Trust?
11      A.   That obligation -- if one
12  could hypothesize, on the one hand, a
13  524(g) order that created the Trust in
14  the first place and protected the insurer
15  at the same time, which is what this Plan
16  does, and simultaneously somebody being
17  able to violate the 524(g) injunction by
18  successfully suing a protected party
19  without blowing up the entire Plan and
20  blowing up the Trust in the process, then
21  in that almost unimaginable hypothetical
22  situation, the protected insurer would
23  have an indemnity claim against Grace,
24  which would be channelled to the Trust

Page 113

1  and either -- I forget whether it's
2  Section 5.12 or 5.13 of the TDP says that
3  the Trust has to honor that claim to the
4  extent that it's valid.
5      Q.   Okay. I know some others in
6  the room have probably a question about
7  another type of agreement.
8          Asbestos Insurance
9  Reimbursement Agreements, are the
10  obligations of the Debtors under those
11  documents being assumed by the Trust?
12      A.   That cannot be answered yes
13  or no, because the Trust and its handling
14  of claims is obviously going to be in
15  some sense different from Grace in its
16  handling of the claims because Grace
17  didn't have a TDP.
18          The Plan proponents are
19  seeking in the Plan and in the
20  confirmation process a ruling from the
21  court under applicable bankruptcy
22  principles that the Debtors can transfer
23  those agreements to the Trust and the
24  Trust's performance under those

Page 114

1  agreements, under the TDP, will satisfy
2  the obligations of the Debtors to those
3  insurers, such that they will have to
4  perform under those agreements.
5      The asbestos -- the insurers
6  holding such agreements have indicated
7  that they disagree with that legal
8  principle, or proposition.  There will be
9  in Phase 2 of the confirmation
10  proceedings evidence taken as to the
11  extent to which the substitution for the
12  Trust and the TDP process for Grace is
13  sufficiently materially different and
14  adverse to, what I will call, the
15  reimbursement insurers that it is not
16  legally permissible for the court to say
17  that under bankruptcy preemption
18  principles, those insurers have to
19  perform under those agreements.
20      That's clearly going to be a
21  confirmation issue, and we have conceded
22  under other circumstances that that is
23  something that we don't contend the
24  Insured's neutrality provision applies

Page 115

1  to.
2      Q.  Can I turn you now to
3  Section 7.22, subsection (d), Romanette
4  (ii).
5      A.  I see it.
6      Q.  The last sentence of that
7  section says, "Asbestos Insurance Rights
8  shall be so vested free and clear of all
9  Encumbrances, liens, security interests,
10  and other Claims or causes of action,
11  except that all Asbestos Insurance
12  Coverage Defenses is preserved."
13      What does that mean?
14      MS. HARDING:  Object to
15  form.
16      THE WITNESS:  Well, it
17  basically means that if somebody
18  thinks that they have got a lien
19  on asbestos insurance rights that
20  are purporting to be transferred
21  to the Trust, they better show up
22  and complain about it because the
23  purpose of the Plan is to provide
24  a transfer that is free of such

Page 116

1  liens or encumbrances or whatever.
2      The exception is put in
3  frankly because in other cases, I
4  think Federal-Mogul, some insurers
5  -- or maybe it was Kaiser -- I
6  don't know -- some insurers took
7  the position that this kind of a
8  clause might be read to override
9  the asbestos insurance coverage
10  defense carve-out.  And so for
11  avoidance of doubt, we threw in
12  the exception.
13  BY MR. BROWN:
14      Q.  Okay.  You are familiar, are
15  you not, with various claims that have
16  been asserted or threatened by Scotts,
17  Kaneb, BNSF, and Libby with respect to
18  asbestos insurance policies, aren't you?
19      A.  Yes.
20      Q.  Are whatever claims they
21  have, if any, through any of the
22  insurance asbestos policies, are they
23  being extinguished by virtue of this
24  sentence?

Page 117

1      MS. HARDING:  Object to
2  form.
3      THE WITNESS:  My
4  understanding of the Plan, and I
5  have to confess that I have that I
6  am not sure I thought about that
7  question before, is that those
8  types of claims are being
9  channelled to the Trust to the
10  extent that there are Grace
11  indemnities of insurers with
12  respect to such claims.
13      I think there is a TDP
14  provision -- again, it's 5.12 or
15  5.13 -- that is, in essence, an
16  acknowledgment that those types of
17  claims are treated as indirect PI
18  Trust claims.
19      And so I would have to say
20  that I don't believe that this
21  provision is intended by some sort
22  of self-operative effect to
23  extinguish -- this provision, to
24  me, is more like a C363B type of

Page 118

1  provision, essentially that we are
2  going to transfer the assets to
3  the Trust and if you got a claim
4  or an interest in the assets, then
5  you can litigate that claim
6  against the Trust.
7       But we are going, I guess,
8  have potential confirmation
9  objections about whether there are
10 any such claims.  I mean, the mere
11 assertion of a claim doesn't mean
12 that it's valid.
13 BY MR. BROWN:
14      Q.   Okay.  If I can direct your
15 attention down to 7.2.4, which is
16 entitled Assignment and Enforcement of
17 Asbestos PI Trust Causes of Action.
18      A.   Yes.
19      Q.   I must confess, I am a bit
20 baffled by this one, so I need some help
21 with it.
22      How do Asbestos PI Trust
23 causes of action differ from asbestos
24 insurance rights?

Page 119

1       A.   Well, I have to go back and
2  look at the definitions to answer that
3  question.
4       Well, I think asbestos PI
5  Trust causes of action does include
6  asbestos insurance rights.
7       Q.   What else does it include?
8       A.   Well, if you look at the
9  definition, it includes defenses such
10 that, for example, if a claimant says, I
11 have a valid claim against Grace that's
12 channelled to the Trust and the Trust
13 disagrees with it, the Trust retains all
14 the defenses to that claim that Grace
15 would have had.  That's clause A under
16 definition 47.
17      Q.   Okay.
18      A.   Clause B is, for example,
19 contribution rights, et cetera.  So, for
20 example, if the Trust has -- if Grace has
21 contribution rights that it has not
22 asserted and that which are still valid
23 against a codefendant in a tort system
24 and the codefendant brings in indirect

Page 120

1  Asbestos PI Trust claim against the
2  Trust, the Trust could assert Grace's
3  contribution rights as a counterclaim to
4  that.  That's two categories of things
5  that this is intended to include.
6       Q.   Okay.  Let's go to page 64,
7  7.2.6, Creation and Termination of the
8  Asbestos PI TAC.
9       A.   Correct.
10      Q.   It says, "On or before the
11 Confirmation Date, the initial members of
12 the Asbestos PI TAC shall be selected by
13 the Asbestos PI Committee."
14      That has already occurred,
15 correct?
16      A.   Correct.  They are
17 identified in the Asbestos PI Trust
18 Agreement.
19      Q.   Okay.  How many actual
20 committee members are there on the
21 Asbestos PI Committee?
22      A.   I don't remember.  But we
23 have the Disclosure Statement here.  I
24 could pretty quickly find out by just

Page 121

1  looking at it where they are identified.
2       Q.   Okay.
3       A.   It's certainly more than the
4  four that are going to be on the TAC.
5       Q.   Okay.  Is it fair to say
6  that the actual committee members who are
7  asbestos claimants act through their tort
8  counsel in connection with their
9  obligations as committee members?
10      A.   As a general proposition,
11 that's true.  In any given committee on
12 any given issue, an individual member
13 might choose to show up and act on their
14 own behalf, and there have been some
15 examples in the past where that has
16 occurred.
17      But, as a general
18 proposition, the committee members are
19 blue-collar folks of limited legal
20 knowledge, and they delegate to their
21 personal injury lawyers their sort of
22 activities acting for them as an agent on
23 these committees.
24      Q.   Okay.  You are counsel to

Page 122

1  the Asbestos PI Committee. You don't
2  have occasion, do you, to deal directly
3  with the actual claimants?
4       MR. FINCH: Object to the
5  form.
6       THE WITNESS: That's not
7  entirely true. I get calls
8  periodically that I just got this
9  incomprehensible Disclosure
10  Statement from Grace and could you
11  please tell me what it means or
12  something. But as a general
13  proposition --
14       MR. FINCH: Transfer it to it
15  to Finch.
16       THE WITNESS: Or where do I
17  file my proof of claim.
18       But, as a general
19  proposition, I don't nor do other
20  folks at Caplin & Drysdale deal
21  directly with original committee
22  members.
23  BY MR. BROWN:
24       Q.  You deal with personal

Page 123

1  injury attorneys, correct?
2       A.  As a general proposition, we
3  deal with the PI lawyers who have been
4  appointed by their client committee
5  member to act on their behest in the
6  committee.
7       Q.  Now, the TAC members are
8  John Cooney, Perry Weitz, Joe Rice,
9  and -- who was the fourth one?
10       A.  Well, I can tell you by
11  looking at the PI Trust Agreement, which
12  is Exhibit-2 to the Plan and looking at
13  the signature page, we should have, which
14  is --
15       Q.  Russell Budd.
16       A.  Russell Budd, John Cooney,
17  Joseph Rice, and Perry Weitz.
18       Q.  And each of them works for a
19  law firm, correct?
20       A.  Each of them is a partner a
21  law firm, yes.
22       Q.  Sorry. I didn't mean to...
23       Now, does each of those law
24  firms have a client that sits on the

Page 124

1  committee?
2       A.  Yes.
3       Q.  And do those committee
4  members for those firms act through those
5  four gentlemen?
6       A.  On the committee?
7       Q.  Yes.
8       A.  Generally, yes.
9       Q.  Okay. So is it fair to say
10  that Mr. Rice, Mr. Weitz, Mr. Cooney, and
11  Mr. Budd selected themselves to be
12  members of the TAC?
13       A.  No, because there are many
14  other members of the committee, and the
15  committee as a whole, which, in this
16  particular case, I believe has a majority
17  of members that are not these four
18  gentlemen, decided which of their members
19  they thought would be appropriate persons
20  to put on the TAC.
21       Q.  And how was that decided?
22       A.  As far as I know, they had
23  informal discussions, and they had a
24  committee meeting. I don't remember

Page 125

1  whether there were votes or anything like
2  that. But at the end of the day, through
3  some sort of nomination or informal
4  self-nomination or self-nomination,
5  speeches, lobbying, discussions, what
6  have you, there came a time at which the
7  committee voted to select these four
8  people.
9       Q.  Okay.
10       A.  And I might add that the
11  Future Claimants Representative had a
12  sort of a generalized oversight in the
13  sense that while the Plan contemplates
14  that the committee would nominate the
15  TAC. If the FCR thought, for some reason
16  or another, that somebody had been put on
17  the TAC that was a real bad idea, the
18  committee would probably have had to
19  listen to the Future Representative's
20  views on that even though the Futures Rep
21  did not have sort of a formal veto or
22  role in that process.
23       Q.  Okay. I want to now turn to
24  page -- well, it's 69 on my version,

Page 126

1    **Section 7.7, Conditions to Occurrence of**
2    **the Confirmation Date, and I want to**
3    **focus your attention first on (g).**
4         A.   I see it.
5         **Q.   What are the securities that**
6    **are funding the Asbestos PI Trust?**
7         A.   The warrant and the Deferred
8    Payment Agreement, which is a debt
9    obligation, which also includes, I
10   believe, a promissory note or promissory
11   notes.
12        **Q.   Can you describe for me the**
13   **circumstances under which the asbestos PI**
14   **claim -- excuse me -- the Asbestos PI**
15   **Trust will be funded with dividends?**
16        A.   In the event that it
17   exercises the warrant and acquires stock
18   pursuant to that exercise and the stock
19   pays dividends, it will get dividends.
20        **Q.   And if the warrant is not**
21   **exercised?**
22        A.   Then it won't get dividends.
23        **Q.   What about if there is a**
24   **default under the deferred payment note?**

Page 127

1         A.   My recollection is that the
2    Trust has the right to get 50.1 percent
3    of the stock of the Debtor under those
4    circumstances.
5              But, again, the terms of --
6    that's a very complicated set of
7    documents, and the precise terms of that
8    are whatever the document states.  I can
9    only give you a sort of a very
10   generalized description.
11        **Q.   Okay.  Let me draw your**
12   **attention now down to (l), condition (l).**
13        A.   Yes, I see it.
14        **Q.   What does that mean?**
15             MS. HARDING:  Object to
16   form.
17             THE WITNESS:  Well, what it
18   means is that if you didn't have a
19   TDP, which includes things like a
20   payment percentage and mechanisms
21   for trying to trying to limit the
22   ways in which the Trust expends
23   monies on claims, and you just had
24   sort of a come in, sue the Trust

Page 128

1    and the tort system, et cetera,
2    you would have a
3    first-come-first-serve operation
4    where there was the distinct
5    possibility that, as it happened
6    in the Manville Trust at the very
7    beginning, all the money would run
8    out the door at the front end, and
9    there wouldn't be anything left
10   for future claimants, which would
11   violate 524(g).
12   BY MR. BROWN:
13        **Q.   Okay.  Well, the way that**
14   **this provision is written suggests that**
15   **any procedures other than those that are**
16   **set forth in this Plan would defeat the**
17   **purposes of Section 524(g).**
18             **Is that what is intended**
19   **here?**
20             MR. FINCH:  Object to form.
21             MS. HARDING:  Object to
22   form.
23   BY MR. BROWN:
24        **Q.   Are there other options, is**

Page 129

1    the question?
2         A.   If the question is could one
3    hypothesize a somewhat different set of
4    TDPs that had somewhat different
5    procedures, the answer is depending on
6    what that different TDP set of procedures
7    was, you might be able to say the same
8    thing about it.
9              The purpose of this thing is
10   to say that this structure, according to
11   the court, satisfies the requirements of
12   524(g) that say that you have to
13   establish this requirement.
14             I mean, this is a finding of
15   fact that is intended to have the court
16   rule that the Plan does, in fact, meet
17   the requirements of a subsection of
18   524(g).
19        **Q.   You could, in fact, have a**
20   **Plan that met the qualifications for**
21   **524(g) that actually had a role for**
22   **asbestos insurance entities, correct?**
23             MR. FINCH:  Object to form.
24             MS. HARDING:  Object to

Page 130

1    form.
2         THE WITNESS:
3    Hypothetically, probably yes. It
4    would be more difficult, but,
5    hypothetically, yes. You could
6    have -- we have had some plans
7    that had coverage in place
8    agreements with insurers, for
9    example, that we felt satisfied
10   524(g). But you have to get the
11   insurers' agreement to have a
12   coverage in place agreement.
13   BY MR. BROWN:
14        Q.   Okay. Let's go now to
15   condition (r) -- I am sorry. Condition
16   (s).
17        A.   Yes.
18        Q.   Now, for purposes of my
19   question, I want you to assume that when
20   I use the term "settled asbestos
21   insurance companies," I want you to
22   assume that those that are pre-petition.
23        A.   Okay.
24        Q.   And my question is a very

Page 131

1    general one, because I have heard
2    different views, and that is, what
3    benefits are being provided by or on
4    behalf of settled asbestos insurance
5    companies listed on Exhibit-5?
6         A.   It is the position of the
7    ACC that Grace is paying close to
8    $3 billion of value to the Trust on
9    behalf of not only itself but a variety
10   of other protected parties, including
11   Non-Debtor affiliates and, in this
12   particular case, settled asbestos
13   insurers.
14        And it is doing so on behalf
15   of settled asbestos insurers because
16   those insurers have indemnity claims
17   against Grace, which are being, if they
18   hypothetically could ever occur, are
19   being channelled to the Trust as a means
20   of protecting Grace against such -- well,
21   let me back up.
22        The purpose of putting
23   settled asbestos insurers in here is not
24   to provide a gratuitous asbestos insurers

Page 132

1    because we think they are nice folks.
2         Q.   I didn't think so.
3         A.   Settled asbestos insurers,
4    by definition, are insurers that have
5    indemnity rights against Grace.
6         Q.   They have also paid a lot of
7    money?
8         A.   And they paid a lot of money
9    in the past. But the past money -- money
10   is fungible. The past money went into
11   Grace's coffers, went out or didn't go
12   out, et cetera. But they are not being
13   asked for any new money.
14        But Grace has an economic
15   interest in not having asbestos PI claims
16   brought against those insurers that could
17   then trigger an indemnity obligation of
18   Grace to the insurer against which that
19   asbestos PI claim was asserted. They
20   have an economic interest in preventing
21   that.
22        So the deal is channel any
23   such claim that might give rise to the
24   asbestos indemnity claim to the Trust,

Page 133

1    and in exchange for that, part of what
2    Grace is paying you is to get rid of
3    asbestos PI claims which include indirect
4    asbestos PI claims for indemnity or
5    direct asbestos PI claims for indemnity.
6         Q.   Okay.
7         A.   And that's the basis.
8         Q.   I think you said at the very
9    beginning of either the last question or
10   the one before that Grace was
11   contributing 3 million?
12        A.   Billion.
13        Q.   That's what I thought.
14   Okay. I just wanted to make sure I had
15   the number correct.
16        A.   I mean, that's our view of
17   the approximate amount of what they were
18   contributing at the time we made the
19   deal, I guess would be a better way to
20   put it. There are other people that
21   might value it differently.
22        Some of things that were
23   worth more at the time the deal was made
24   are worth less today but hopefully will

Page 134

1   be worth more in the future.  So it's a
2   moving target.  But 3 billion is
3   notionally the deal we thought we made.
4       Q.   I want to now turn your
5   attention to Section 7.8, which is
6   entitled Conditions to Occurrence of the
7   Effective Date, and specifically
8   condition (s), the last condition.
9       A.   I see it.
10      Q.   I just want to make sure I
11  understand this.  If the court were to
12  enter an order, saying that contractual
13  indemnity claims of settled insurers are
14  not properly classified as indirectly PI
15  Trust claims, then the Plan can't go
16  effective even if it's confirmed?
17      A.   Unless somebody waives this
18  provision, that is correct.
19      Q.   Okay.  And among the parties
20  that need to waive it are Sealed Air and
21  Fresenius?
22      A.   Among the parties are, yes.
23      Q.   That holds true, I gather,
24  in the event that Scotts' claim or BNSF's

Page 135

1   claim or Montana's claim was determined
2   not to be an indirect PI Trust claim?
3       A.   Well, yes and no.  I mean,
4   to be precise about it, if something is
5   included -- if one of those claims is
6   included within the definition of an
7   indirect PI Trust claim and instead is
8   held to be a general unsecured claim,
9   that's triggered.  This provision is
10  triggered.
11          There could be a dispute
12  about whether a particular claim was, in
13  fact, defined as an indirect PI Trust
14  claim and, therefore, whether this
15  provision was triggered or not.
16      Q.   Okay.  Can you now look at
17  Section 7.13, specifically the language
18  that is underscored.
19      A.   I see it.
20      Q.   To the extent that my
21  clients, OneBeacon or Seaton, have claims
22  against Fresenius or Sealed Air, are they
23  released under this provision?
24          MS. HARDING:  Object to

Page 136

1   form.
2           MR. FINCH:  Object to form.
3           THE WITNESS:  Well, it would
4   depend upon whether you had
5   something called an
6   asbestos-related claim.  I mean,
7   the --
8   BY MR. BROWN:
9       Q.   Or an asbestos claim?
10      A.   Or an asbestos claim or an
11  SA claim.
12          This isn't a blanket release
13  of all claims.  It purports to be a
14  release of certain specified claims as
15  set out in the definitions that are
16  incorporated in this language.
17      Q.   Let me --
18      A.   But to that extent, the
19  answer is yes.
20      Q.   So if OneBeacon or Seaton
21  had a claim that fits within the
22  definition of Asbestos Claim, initial cap
23  A, initial cap C, against Fresenius or
24  Sealed Air, that claim is released

Page 137

1   pursuant to this provision; is that
2   correct?
3       A.   As those claims are defined,
4   yes.
5       Q.   Does this provision release
6   claims that constitute asbestos claims
7   that Scotts may have against settled
8   asbestos insure companies?
9           MS. HARDING:  Object to
10  form.  Also, I think it calls for
11  legal conclusion.
12          THE WITNESS:  I have to say
13  that that does.  The problem is
14  that the claims are being
15  channelled, and so the question
16  that you are raising of release is
17  whether, for example, the claims
18  simply are released and vanish or
19  whether they are released in the
20  sense of you can't assert them
21  against the particular entity
22  because they are going somewhere
23  else, i.e. to the Trust -- this is
24  in general -- let me make two

Page 190

1    still a fundamental disconnect in the
2    sense that the asbestos permanent
3    channelling injunction either applies or
4    it doesn't apply.
5          If it applies, it cuts off
6    the claims before they reach some. If it
7    doesn't apply, it doesn't channel your
8    indemnity claims to the Trust.
9          The only exception to that,
10   which might be covered under some other
11   provision of the Plan, is if Scotts has a
12   non-asbestos claim, which is determined
13   to be eligible for vendor coverage under
14   your policies and they are not exhausted
15   and blah, blah, blah and it ultimately
16   gets determined that there is actual
17   liability on your part and that liability
18   was indemnified by Grace, then the
19   asbestos permanent channelling injunction
20   doesn't apply.
21         Whether there is some other
22   provision in the Plan that would preclude
23   that claim from being asserted, I don't
24   remember.

Page 191

1          Q.   I think we are talking past
2    each other.  Let's just move on.
3          Let's go to Section 8.4,
4    which is the Asbestos Insurance Entity
5    Injunction.
6          A.   I have it.
7          Q.   What is the purpose of this
8    injunction?
9          A.   The purpose of this
10   injunction --
11         MS. HARDING:  Object to
12   form.
13         THE WITNESS:  Excuse me?
14         MS. HARDING:  I just object
15   to form.
16         THE WITNESS:  From the ACC's
17   perspective, the purpose of this
18   injunction is to protect the
19   insurance assets being transferred
20   to the Trust from being
21   intercepted, if you will, or --
22         MR. FINCH:  Looted.
23         THE WITNESS:  -- looted or
24   pillaged, or whatever, by claims

Page 192

1    from claimants, direct action type
2    claims.
3          This is intended to be a
4    communal asset for the benefit of
5    the present of future claimants in
6    the Trust, and allowing individual
7    claimants to go around the back
8    door, if you will, and bring
9    claims against the insurers whose
10   coverage was being assigned for
11   the communal benefit of the Trust
12   would be inequitable, in our view,
13   and that's the purpose of this
14   injunction.
15   BY MR. BROWN:
16         Q.   Okay.  You are aware that
17   Scotts and BNSF have asserted certain
18   rights under certain asbestos insurance
19   policies, correct?
20         A.   Correct.
21         Q.   Does this injunction enjoin
22   those two entities from pursuing coverage
23   for asbestos-related claims under the
24   settled asbestos insurance policies or

Page 193

1    frankly under any asbestos insurance
2    policies?
3          MR. FINCH:  Object to form,
4    compound.
5          THE WITNESS:  Not if what we
6    are suing for is not based upon or
7    arising out of an asbestos PI
8    claim against the Debtors or any
9    asbestos insurance rights.
10         If they are asserting -- you
11   have to look at the definition of
12   asbestos PI claim; you have to
13   look at the definition of asbestos
14   insurance rights.
15         The asbestos insurance
16   rights are the rights of the
17   Debtor.  They are not the rights
18   of Scotts or BNSF.  So you have --
19   and asbestos PI claims are
20   personal injury claims arising out
21   of exposure to Grace products.
22         So it would depend upon,
23   again, the type of claim that was
24   being asserted by Scotts or BNSF.

Page 194

1     BNSF, for example, purports to
2  have, at least in one instance, I
3  think it's Royal, claims issued
4  directly to it by Royal that were
5  somehow procured by Grace but
6  which don't cover Grace.  I don't
7  believe that this injunction would
8  preclude suits by BNSF on that
9  sort of insurance claim.
10 BY MR. BROWN:
11     Q.   Would the prior injunction
12 enjoin that type of claim?
13     A.   The asbestos personal
14 injury?
15     Q.   Yes.
16     A.   No, because those policies
17 are not within the definition -- they are
18 not covered in Exhibit-5, and so Royal
19 wouldn't be an asbestos-protected party
20 with respect to those policies.
21     We are now talking about
22 non-settled coverage here, aren't we?
23 Wasn't that what your question was?
24     Q.   I don't know.  This was your

Page 195

1  hypothetical.
2     A.   You asked me were the claims
3  as additional insureds of BNSF and Scotts
4  covered by this injunction, and I am
5  trying to tell you it depends on what
6  kind of claims against whom.
7     I mean, it's got -- first,
8  unlike the 524(g) injunction, which
9  applies only to protected parties, this
10 applies to people with settled coverage,
11 unsettled coverage, reimbursement
12 coverage, as long as it's coverage that's
13 being transferred to the Trust.  If it's
14 coverage that's not being transferred to
15 the Trust, then there is no effort to
16 protect it.
17     Q.   Okay.
18     A.   The complexity of your
19 question arises out of the fact that you
20 could have coverage that's being
21 transferred to the Trust, which somebody
22 nevertheless claims to be an additional
23 insured on, such as Scotts under a vendor
24 endorsement.  And there, I think this

Page 196

1  injunction probably does preclude Scotts
2  from seeking that coverage, although I
3  really have to think about that.
4     I don't know.  I have to
5  confess that I haven't really -- I would
6  really have to parse this to make sure
7  whether -- if you are talking about
8  unsettled coverage, not settled coverage,
9  but unsettled coverage.  And I am not
10 sure Scotts -- so if it's unsettled,
11 then, by definition, it hasn't been
12 indemnified by Grace.  So the claims
13 don't go to the Trust on that basis.
14     I guess I have to just say I
15 think it may very well be enjoined by
16 this, but, really, to be more confident
17 about that, I would really have to spend
18 more time parsing this and thinking about
19 it.
20     Q.   Okay.
21     A.   I think it would be
22 channelled -- not channelled but
23 enjoined.
24     Q.   I am going to move at this

Page 197

1  point from the Plan to another document,
2  so why don't we take a quick break.
3     A.   Okay.
4     (There was a break from 2:10
5  p.m. to 2:22 p.m.)
6  BY MR. BROWN:
7     Q.   Mr. Lockwood, can you take a
8  look at Exhibit-2.  That's Exhibit-2 to
9  the Plan, which we are going to mark as
10 ACC1-10.
11     (ACC 30(b)(6)-10 marked for
12     identification at this time.)
13 BY MR. BROWN:
14     Q.   Can you identify it?
15     A.   ACC Exhibit-10 is the
16 Asbestos PI Trust Agreement, which is
17 attached as Exhibit-2, to the February
18 27, 2009 Plan reorganization of W.R.
19 Grace.
20     Q.   Can I direct your attention
21 to Section 2.2 entitled General
22 Administration and specifically
23 subsection (e).
24     A.   Yes.

Page 198

1     **Q.**   **There is a reference in**
2 **subsection (e) to the TAC, T-A-C, which**
3 **is the Trust Advisory Committee, correct?**
4     A.   Correct.
5     **Q.**   **And the Futures**
6 **Representative, which is the Asbestos PI**
7 **Futures Representative, correct?**
8     A.   Correct.
9     **Q.**   **And earlier today, we went**
10 **through a list of the individuals who are**
11 **on the TAC, and you mentioned Russell**
12 **Budd, John Cooney, Joe Rice, and Perry**
13 **Weitz.**
14     A.   Correct.
15     **Q.**   **Am I correct that each of**
16 **those gentlemen or their respective firms**
17 **represent asbestos claimants with claims**
18 **against Grace?**
19     A.   Correct.
20     **Q.**   **Can you give me some idea of**
21 **how many claims Mr. Budd's firm has**
22 **against Grace?**
23     MR. FINCH: Objection, lack
24     of foundation.

Page 199

1     THE WITNESS: No, except
2     that it's -- I think we
3     established when we were doing
4     request for admission or something
5     to somebody that all four of
6     those, each one of those firms
7     represents at least 1,000
8     claimants against Grace.
9 BY MR. BROWN:
10     **Q.**   **We did.**
11     A.   What I don't know is how
12 many more than a thousand any of them may
13 represent.
14     **Q.**   **Okay.**
15     A.   The proofs of claim are on
16 file. Somebody could go and ascertain
17 that, if it mattered.
18     **Q.**   **Okay. Do you know how many**
19 **-- the firms that those four TAC members**
20 **are members of collectively how many they**
21 **have? In other words, if you took the**
22 **four firms, do you have an idea or**
23 **estimate as to the number of claims that**
24 **they have against Grace?**

Page 200

1     MR. FINCH: Objection,
2     foundation.
3     THE WITNESS: Only in the
4     sort of vaguest and most general
5     terms. Well, I am sure it's more
6     than 10,000. Again, it could be
7     20,000; it could be 30,000. I
8     just don't know.
9     Those firms -- with the
10     exception of Mr. Cooney's firm,
11     those firms represent a lot of
12     people. And in the case of
13     Mr. Rice, he has co-counsel
14     relationships, his firm does, with
15     a lot of other firms. So it gets
16     into the question of, quote, what
17     do you mean by representation,
18     sole representation, joint
19     representation. But, suffice it
20     to say, they represent a lot of
21     claimants.
22 BY MR. BROWN:
23     **Q.**   **Okay. And in their capacity**
24 **as counsel for those claimants, they have**

Page 201

1 **fiduciary duties to their clients,**
2 **correct?**
3     A.   However those are
4 established by the local bars, et cetera,
5 before which they practice, yes,
6 generally.
7     **Q.**   **And they get paid to**
8 **represent those clients, correct?**
9     A.   Generally speaking, I assume
10 that's correct.
11     **Q.**   **And is it your understanding**
12 **that, generally speaking, that's through**
13 **a contingency arrangement?**
14     A.   Again, generally speaking,
15 correct.
16     **Q.**   **And is it your understanding**
17 **that the contingent fee that is typically**
18 **charged by those firms is somewhere**
19 **between 33 and a third and 40 percent of**
20 **the recovery?**
21     MR. FINCH: Objection, lack
22     of foundation, calls for
23     speculation.
24     THE WITNESS: I really don't

Page 202

1     have firsthand knowledge of that.
2  BY MR. BROWN:
3     Q.   Okay.  Well, if it's a
4  contingent fee arrangement and there is
5  no recovery, there is no payment to the
6  firm, generally speaking, correct?
7     A.   Except for reimbursed
8  expenses in those states that permit you
9  to advance expenses and require that you
10  seek recovery from your client under
11  their ethical rules, but yes.
12     Q.   So is it fair to say that
13  Mr. Budd, Mr. Cooney, Mr. Weitz, and
14  Mr. Rice are motivated by their fiduciary
15  obligations and their own personal gain
16  to obtain a recovery on behalf of their
17  clients against the Asbestos PI Trust?
18     A.   When they are acting as
19  counsel for their individual clients,
20  yes.
21     Q.   Okay.  How about when they
22  are acting as TAC members?
23     A.   When they are acting as TAC
24  members, they have a fiduciary

Page 203

1  obligation, as they do as ACC members, to
2  look out for the interests of the
3  constituency they represent as a whole.
4     Q.   Okay.  And the fiduciary
5  duties that they owe to their clients, on
6  the one hand, and to all beneficiaries of
7  the Asbestos PI Trust, on the other hand,
8  are they the same?
9     A.   I don't know how to answer
10  that question.
11     Q.   Let me --
12     A.   Because they are acting in
13  different capacities.  So when you say
14  are they the same, do you mean do they
15  come from the same source?  I can't
16  answer that.
17     Q.   Are the fiduciary duties
18  that they have to their clients, on the
19  one hand, and to all claimants against
20  the Asbestos PI Trust in conflict with
21  one another at any level?
22     A.   As a general proposition, I
23  don't think so, because when they process
24  individual claims against the Trust, they

Page 204

1  are not acting as TAC members.  And when
2  they are acting as TAC members, they are
3  not involved in processing individual
4  claims or evaluating individual claims or
5  having anything to do with individual
6  claims any more than they are as ACC
7  members with respect to individual claims
8  and their clients in the bankruptcy case.
9     Q.   Well, if you look at (e),
10  the section that I referred you to at the
11  outset, it says that the TAC members
12  should consult with the trustees on
13  matters of general implementation and
14  administration of the PI Trust.
15     MR. FINCH:  Object to form.
16     The document doesn't say that.
17  BY MR. BROWN:
18     Q.   All right.  Mr. Lockwood,
19  just take a look at Section 8, if you
20  would.
21     A.   It says, "The Trustees shall
22  consult with the TAC and the Futures
23  Representative on the general
24  implementation and administration of the

Page 205

1  PI Trust."
2     Q.   Okay.  What's covered by
3  Romanette (i), would that involve how the
4  Trust should deal with meritless claims?
5     A.   That question is hard to
6  answer in the sense that I am not sure
7  what you mean by meritless claims.  I
8  mean, the TDPs identify what claims are
9  eligible for compensation and what
10  aren't.
11     If you are of the personal
12  opinion that certain categories of claims
13  under the TDP, under the criteria are,
14  quote, meritless, close quote, well, the
15  TAC and the Futures Rep take the TDP as
16  it finds it.
17     So they don't have a
18  fiduciary obligation to render personal
19  opinions about the TDP criteria as it
20  applies to individual clients or
21  individual claims.
22     That said, at some level, I
23  suppose they have a generalized -- if the
24  trustees raise with them the question, on

Page 206

1   some generalized basis, whether there is
2   some large category of claims that are,
3   quote, meritless that are not otherwise
4   prescribed by the Trust, I could
5   hypothesize the situation where they
6   might be consulted on that subject.
7       Q.   Okay.  And that would be
8   true even if their firm was the firm that
9   submitted those claims, correct?
10      A.   Well, if their firm was the
11  firm that submitted their claims, I would
12  assume that they would recuse themselves,
13  just like any organization, if there was
14  a specific conflict of interest on a
15  subject like that, the party involved
16  would recuse themselves.
17      Q.   Is there anything in the
18  Trust Agreement or the TDP that requires
19  them to recuse themselves?
20      A.   No, but there is nothing in
21  the TDP that requires them to act in any
22  way different from any set of fiduciaries
23  that are they are confronted in a
24  particular factual context, some conflict

Page 207

1   of interest between their personal
2   interests and their interest of the
3   entity that they are involved with.
4       Q.   Well, to the extent that
5   their fiduciary duties to their clients
6   in any particular case are in conflict
7   with their fiduciary duties to all
8   beneficiaries of the Asbestos PI Trust,
9   are they required to step aside from the
10  decision-making?
11      MR. FINCH:  Objection, form.
12      THE WITNESS:  Yeah, I
13  mean -- if you take the position
14  that prosecuting an individual
15  claim is a conflict with the
16  interest of the Trust as a whole
17  because if the claim is
18  successful, it will reduce the
19  amount in the Trust that would be
20  available to other people; if the
21  claim were unsuccessful, then no,
22  they don't have an obligation not
23  to prosecute individual claims.
24      It's well understood that

Page 208

1   the whole function of the TAC is
2   to represent the interest of
3   people with individual claims,
4   albeit on a collective basis.
5       If you are saying the
6   hypothetical you gave earlier that
7   if there was some -- the trustees
8   were proposing a change that
9   somehow or another focused on the
10  individual claims of a particular
11  firm as opposed to categories of
12  claims that virtually all lawyers,
13  asbestos lawyers represented, then
14  you might have a recusal issue.
15      And/or the trustees might be
16  motivated to discount the advice
17  they were getting.  Because this
18  is a consultation provision.  It
19  doesn't say the trustees having
20  consulted with the TAC; all of a
21  sudden have to agree with whatever
22  the TAC tells them.  It just says
23  they have to consult with them.
24  BY MR. BROWN:

Page 209

1       Q.   What about the next
2   subsection, which is (f), which sets
3   forth a whole series of items on which
4   the trustees must obtain the consent of
5   the TAC and the Futures Representative?
6       A.   Subject to certain other
7   provisions that apply if the TAC and the
8   FCR don't give their consent, yes.  What
9   do you mean what about it?  There are --
10  it exists in the TDP, in the Trust
11  Agreement.  And there are specified
12  things that they have to obtain consent
13  from the TAC on and the FCR, and if they
14  don't get the consent, they can get them
15  overruled by the judge.
16      Q.   Let me ask you a more
17  general question.  What is the need to
18  have the TAC?
19      A.   The TAC goes back -- the
20  concept goes back at least to the
21  Manville TDP.  And the notion was that
22  this was -- this Trust was created --
23  well, let me start out by saying that my
24  partner, Mr. Inselbuch, who you are going

Page 210

1  to take the deposition of on June 12th --
2  **Q.  Somebody is.**
3  A.  -- is a lot better to
4  equipped to give you the historical
5  overview of these kind of TDP provisions
6  than I am, and anything I say on this
7  subject frankly is subject probably to be
8  corrected by him.
9        But, in general, as I
10  understand the history of the concept,
11  the idea was that this is a settlement
12  between a whole lot of people who are
13  agreeing to have their claims taken away
14  from the Debtor and put in a Trust, and
15  the Trust is going to deal with the
16  claims.
17        And the notion was that --
18  first, it was always a criteria you would
19  not put a asbestos personal injury lawyer
20  or anybody would submit claims in as a
21  trustee. So the trustee, by definition,
22  therefore, in order to avoid that sort of
23  conflict, were not going to have any real
24  knowledge about asbestos personal injury

Page 211

1  litigation and asbestos personal injury
2  claims.
3        And, as I understand, the
4  notion was that it would be a good idea
5  to do two things: First, have
6  experienced personal injury lawyers
7  around who could, to the extent needed,
8  educate trustees who come to the job with
9  no real knowledge of how the system works
10  to give them input. That's the
11  consultation notion.
12        And the same for the FCR,
13  who would be a counterbalance, to some
14  extent, because to the extent that the
15  TAC represents present claimants, it
16  would have, even as a collective group
17  representing present claimants, some kind
18  of incentive to try and get more money
19  out sooner than might be in the
20  beneficial interests of the future
21  claimant. So you have the Future
22  Claimants' Representative who has got
23  coequal status in the TAC in advising the
24  trustees.

Page 212

1        With respect to the consent
2  process, the notion was there was a deal in
3  the bankruptcy case. That deal was
4  embodied in the Trust Agreement and the
5  TDP. If people are going to start
6  changing that deal after the fact, then
7  representatives who knew and were
8  involved with making the original deal
9  ought to at least presumptively have some
10  voice in whether or not it's okay to
11  change it.
12        However, there is the safety
13  valve on that, which is if the TAC, for
14  example, decides that they want to
15  resist -- let's assume you needed to
16  change the payment -- lower the payment
17  percentage because you thought there was
18  going to be more future claims coming in
19  than had been predicted.
20        Well, the TAC might have an
21  institutional interest in keeping the
22  payment percentage high, and the Futures
23  Rep might want to see it lowered and the
24  trustees might want to see it lowered.

Page 213

1  So how do you deal with that?
2        Well, the TAC is supposed to
3  be representing the present claimants.
4  That's where their fiduciary is. So if
5  they don't consent, you go to the judge,
6  and you say, judge, "The TAC is being
7  unreasonable here." And that's how you
8  resolve it. So, in an overview sense,
9  that's the concept behind it.
10        **Q.  Okay.  The statute 524(g)**
11  **does not require a TAC in connection with**
12  **an asbestos Trust, does it?**
13        A.  It doesn't require a TAC,
14  and it doesn't require a Futures Rep.
15  But the legislative history says it was a
16  modeled on Manville and Manville has had
17  an SEB on the Futures Representative,
18  vis-a-vie the Trust, at least since the
19  Trust was reorganized in the mid-1990s or
20  early 1990s. Again, Inselbuch can tell
21  you more about that because he was there.
22        **Q.  The TAC, if I understand the**
23  **Trust Agreement, has fiduciary duties to**
24  **indirect PI Trust claimants as well,**

Page 214

1    **correct?**
2        A.    As a general proposition,
3    that's true.
4        **Q.    Now --**
5        A.    But I will say -- it's a
6    little tricky because it's clear that the
7    vast bulk of the claimants whose claims
8    were being channelled to the Trust are
9    direct claimants.  And, moreover, the
10   individual -- the indirect claimants
11   generally tend to be entities that have
12   the financial and legal wherewithal to
13   look at their own interests.
14       So my own personal
15   perspective on it, while you can make a
16   general statement on the fiduciary
17   obligation, the major focus of the TAC
18   and the FCR is direct claimants, not
19   indirect claimants.
20       **Q.    To the extent that the TAC**
21   **acts in a manner that the indirect**
22   **asbestos PI claimants feel is in their**
23   **interest, is the TAC insulated from any**
24   **liability to indirect asbestos PI**

Page 215

1    **claimants?**
2        A.    Could you reread that
3    question, please?
4            (The reporter read from the
5        record as requested.)
6            THE WITNESS:  Aren't you
7        missing a "not" in that question?
8    BY MR. BROWN:
9        **Q.    Against their interest is**
10   **what I meant.**
11       A.    There is, I think, in here
12   some kind of a -- I don't know what you
13   call it -- exculpation provision or
14   something.  But it doesn't cover bad
15   faith.
16           So the answer is we would
17   have to look at the document to determine
18   exactly what potential liability the TAC
19   has.
20           And, moreover, given the
21   TAC's role, which is it doesn't have the
22   unilateral power to make any decisions.
23   The trustees make the decision, and the
24   TAC consults or consents.  It's a little

Page 216

1    hard to hypothesize the claim that you
2    talk about.
3            But, in any event, I am
4    looking for the -- I am pretty sure there
5    is a Trust Agreement provision here
6    somewhere that addresses -- Section 4.6.
7    Essentially, it provides for indemnity
8    and exculpation to the extent that that's
9    permitted by a statutory trust law, Trust
10   organized under the laws of Delaware.  So
11   whatever the laws of Delaware permit you
12   to indemnify fiduciaries for is what's
13   provided.
14           And that's obviously both
15   fact-specific and depends.  And I don't
16   know what Delaware law does or doesn't
17   provide on hypothetical fact
18   circumstances.
19       **Q.    Let's go to page 13 on my**
20   **draft.**
21       A.    Of the Trust Agreement?
22       **Q.    Yes.**
23       A.    I am there.  What Section is
24   this, just to make sure we have the same

Page 217

1    pagination?
2        **Q.    It's under the Consent**
3    **provision.  It's (f), Romanette (xiv).**
4        A.    I see it.
5        **Q.    I am not sure I understand**
6    **this, the latter part of this, and I want**
7    **to ask you what it means.**
8            **Do you see where it says,**
9    **"...or to comply with an applicable**
10   **obligation under an insurance policy or**
11   **settlement agreement pursuant to Section**
12   **[6.5] of the TDP"?**
13       A.    Yes.
14       **Q.    Does this mean that the**
15   **trustees need the consent of the TAC in**
16   **order to comply with obligations under**
17   **insurance agreements, insurance policies?**
18       A.    Well, first, since it
19   incorporates Section 6.5 of the TDP, you
20   have to look to see what that is, because
21   it certainly -- if there is any
22   limitations on their ability to comply
23   with obligations under transfer insurance
24   rights, it's got to be spelled out in

Page 218

1    6.5. There is no other limitation
2    expressed in that paragraph.
3         6.5 deals with the
4    confidentiality of claimants'
5    submissions. In general, it takes the
6    position that claimants' submissions to
7    the Trust are made in the course of
8    settlement negotiations and, therefore,
9    would be treated as confidential. To the
10   extent state law provides a privilege,
11   the privilege is not going to be
12   eliminated.
13        There is then a provision --
14   there is a provision about subpoenas
15   getting information. And then there is
16   the sentence, "Notwithstanding anything
17   in the foregoing to the contrary, with
18   the consent of the TAC and the Futures
19   Representative, the PI Trust may, in
20   specified limited circumstances, disclose
21   information, documents or other materials
22   reasonably necessary in the PI Trust's
23   judgment to preserve, litigate, resolve
24   or settle coverage, or to comply with any

Page 219

1    applicable obligation under an insurance
2    policy or settlement agreement within the
3    Asbestos Insurance Policies or the
4    Asbestos Insurance Settlement Agreements;
5    provided...," and then it takes steps
6    reasonably feasible in its judgment to
7    preserve the further confidentiality of
8    such documents, et cetera.
9         That's the scope of this.
10   It basically has to do with the
11   confidentiality of medical information
12   and personal information that's submitted
13   in claims files.
14        Q.   So if an insurance company
15   wants to see that information because the
16   Trust is seeking recovery under an
17   insurance policy for that claim, the
18   trustees need the consent of the TAC to
19   provide that information to the insurer;
20   is that correct?
21        A.   Voluntarily. And, again, if
22   the TAC were to refuse to consent to it,
23   there is dispute resolution provisions.
24   The Trust could go to the bankruptcy

Page 220

1    court, and indeed there have been some
2    instances in which there has been
3    litigation, existing trusts by the Trust,
4    trying to get the court to determine that
5    certain claims information has to be
6    turned over to certain insurers in
7    connection with settlement agreements,
8    for example.
9         And in some instances, the
10   Trust has issued orders saying that
11   effect. So this is not an absolute veto
12   power on the part of the TAC.
13        But, as I say, the
14   plaintiffs bar and their clients have a
15   general feeling that their personal
16   medical information shouldn't be
17   indiscriminately disseminated to anybody
18   who says they have a desire to do so --
19   excuse me -- to use it for whatever
20   purposes they may wish to use it.
21        Q.   I want to turn your
22   attention now to Section 5.5.
23        A.   Of the Trust Agreement?
24        Q.   Yes.

Page 221

1         A.   Okay.
2         Q.   Now, there is a provision,
3    as I understand it, under the TDP
4    pursuant to which an asbestos PI claim
5    can resort to the tort system after going
6    through a bunch of hoops; is that
7    correct?
8         A.   Correct.
9         Q.   If the asbestos PI claimant
10   elects to do that, then I presume that
11   the Trust will have defense counsel to
12   defend that claim; is that correct?
13        A.   One would assume that would
14   be the case. It's happened to
15   infrequently in practice that it's hard
16   to know, but I can't imagine that they
17   would defend themselves in court without
18   a lawyer.
19        Q.   Okay. And would that lawyer
20   be a Trust professional as that term is
21   used in Section 5.5(a)?
22        MR. FINCH:  5.5(a) talks
23        about TAC employment of
24        professionals.

Page 222

1          THE WITNESS:  But it also
2    talks about Trust professionals.
3          You would have to go back
4    and look at the definition of
5    Trust professional.
6          That's an interesting
7    question.  I don't know whether
8    they would be considered to be a
9    Trust professional or not,
10   actually.
11   BY MR. BROWN:
12       Q.   I don't think I can find a
13   definition of Trust professional.
14       A.   It's in Section 4.8(a), the
15   fourth line.  As a general proposition,
16   the Trust professionals are clearly
17   people who represent the Trust in a sort
18   of generalized sense, but it does include
19   counsel.  Whether or not it would include
20   counsel in a particular case -- suffice
21   it to say that if the question is would
22   the TAC and members of the TAC have
23   access to the files of a counsel for the
24   Trust that was the defending case --

Page 223

1        Q.   That's the question.
2        A.   -- brought by the TAC's law
3    firm, the answer is no.
4        Q.   Where does it say that?
5        A.   It doesn't have to say that
6    because the TAC's role is a generic role.
7    It talks about the general administration
8    of the Trust, et cetera.
9          Asking for information about
10   an individual claim that that guy is
11   pursuing in a tort system against the
12   Trust has nothing to do with the general
13   administration of the Trust and would be
14   a blatant exercise in abuse of kind of
15   fiduciary power, and no trustee would
16   accept it.  And I don't believe it would
17   ever cross the mind of any TAC member
18   that they could even try it, much less
19   skied succeed it at it.
20       Q.   But this provision does give
21   them complete access, correct, as
22   written?  It says, "...complete access to
23   all information generated by them or
24   otherwise available to the PI Trust..."

Page 224

1        A.   It says provided -- it says
2    "...complete access to all information
3    generated by them...," and it talks about
4    the TAC as a group.
5          An individual tort claim
6    would not be litigated by the TAC as a
7    group.  At best, it would be litigated by
8    one of the TAC members.  And the TAC
9    members -- I can't imagine the TAC
10   members saying, that as a group, we want
11   to find out how you are defending a
12   particular claim against did Trust so we
13   can give that information to the
14   plaintiff's lawyer that's part of our
15   group so we can help win the case.
16         I mean, it's just a
17   preposterous suggestion, quite frankly.
18   I mean, yeah, you are right, the document
19   doesn't prohibit that particular abuse of
20   fiduciary authority.  But, you know,
21   documents generally don't hypothesize
22   every possible breach of fiduciary duty.
23   You could create a laundry list, 50 pages
24   long, of all of those possible abuses and

Page 225

1    say thou shall not commit each one of
2    them.
3        Q.   Mr. Lockwood, I am correct,
4    am I not, that there was no asbestos
5    insurance entity that was involved in the
6    drafting of the Asbestos PI Agreement?
7        A.   To the best of my knowledge,
8    that's correct.
9        Q.   Let's turn to Plan
10   Exhibit-4.
11       A.   I have it.
12         (Exhibit-11 marked for
13   identification at this time.)
14         THE WITNESS:  Do you want me
15   to identify it?
16         MR. BROWN:  Yes.
17         THE WITNESS:  It's the Grace
18   Trust Distribution Procedures.
19   BY MR. BROWN:
20       Q.   Okay.  Now, no asbestos
21   insurance entity was invited to
22   participate in the drafting of the TDP,
23   correct?
24       A.   To the best of my knowledge,

Page 226

1  that's correct.
2      Q.   And no asbestos insurance
3  entity was consulted about the terms of
4  it, correct?
5          MS. HARDING:  Object to
6  form.
7          MR. FINCH:  Object to form.
8          THE WITNESS:  At one level,
9  that's certainly true.  I mean, I
10  will say that, in fact, I believe
11  that there were -- because of the
12  process that we went through of
13  filing successive draft versions
14  of this, in effect, the insurer
15  saw earlier versions of the TDP,
16  indeed, I think have objected to
17  various provisions in them.  And
18  those objections could be reviewed
19  as commenting on them.  And then
20  there were filed amended versions
21  of them.
22      So to that extent, I guess,
23  they did have an opportunity to,
24  quote, comment on them, close

Page 227

1      quote.  But other than through the
2  process that I have just
3  described, no.
4  BY MR. BROWN:
5      Q.   Okay.  The question was
6  whether they were consulted concerning
7  them.
8      A.   Well, I understand that, and
9  sending you a -- serving a copy on you
10  and having you make an objection or file
11  some comment or argument in court could
12  be viewed at some level as consulting.
13      But, as I said, we didn't do
14  it other than in the manner that I just
15  described.  If you don't think that's
16  consulting, that's fine.
17      Q.   And no asbestos insurance
18  entity consented in writing or orally to
19  the terms of the TDP, correct?
20          MS. HARDING:  Object to
21  form.
22          MR. FINCH:  Object to form.
23          THE WITNESS:  Except for
24  Equitas and KWELM in the manner

Page 228

1  that I described earlier in my
2  deposition.  That's as far as I
3  know, correct.
4  BY MR. BROWN:
5      Q.   Okay.  Did any asbestos
6  insurance entity play any role in the
7  establishment of a medical criteria in
8  the TDP?
9          MS. HARDING:  Object to the
10  form.
11          THE WITNESS:  Not to my
12  knowledge.
13  BY MR. BROWN:
14      Q.   How about the exposure
15  criteria?
16      A.   Same answer.
17      Q.   How about the claims
18  resolution process?
19      A.   Same answer.
20      Q.   How about any other term in
21  the TDP?
22          MR. FINCH:  Object to form,
23  overly broad.
24          THE WITNESS:  Again, the

Page 229

1      only role that was played was --
2  well, let me back up a second.
3  This TDP is in most particulars
4  similar, if not identical, to TDPs
5  that have been adopted in prior
6  asbestos bankruptcy cases.
7      In many of those cases, the
8  same insurers have objected to the
9  same provisions of the TDPs that
10  they object to now.  And in some
11  cases, over time the TDPs have
12  actually been modified and,
13  indeed, in some cases, some of the
14  provisions that we talked about,
15  like the one relating to providing
16  access for insurance coverage, I
17  believe was put into a TDP along
18  the way, not this one for the
19  first time, but some earlier TDP,
20  because it became apparent that
21  that was going to be needed to
22  deal with insurance problems.
23      And to that extent, the
24  insurers, as a result of this

Page 230

1    cumulative iteration process, have
2    had that sort of a role.
3    Obviously, that's not the kind of
4    role you have in mind.  The kind
5    of role you have in mind is coming
6    to you and saying we want to
7    negotiate about it, we want to get
8    your agreement to it, we want to
9    get your approval of it.  And that
10   sort of a role, to my knowledge,
11   you didn't have on this TDP.
12   BY MR. BROWN:
13       Q.   All right.  Under this TDP,
14   is there any role for any asbestos
15   insurance entity --
16       A.   In --
17       Q.   Well, I hadn't finished.
18       A.   Sorry.
19       Q.   -- in connection with any of
20   the claims resolution processes?
21       A.   Well, you yourself
22   identified one a few questions back,
23   which is if the claimant doesn't settle
24   its claim with the Trust, brings the

Page 231

1    claim against the Trust in the tort
2    system, and the Trust has to defend it.
3    It is certainly within the contemplation
4    of these documents that the Trust could
5    tender that defense in that claim to an
6    insurer.
7        Q.   Okay.
8        A.   And that would be where the
9    Trust -- while it doesn't spell that out
10   in here, that would certainly be a place
11   where an insurer might have an
12   involvement.
13       Beyond that, there is
14   nothing in the Trust that expressly
15   addresses any participation by insurers
16   in the claims resolution process.
17       That said, if some coverage
18   court decides that the insurers have the
19   right to participate in the claims
20   resolution process, the TDP has amendment
21   procedures in it, and the trustees might
22   very well conclude that if the only way
23   they could get access in the future to a
24   lot of valuable assigned insurance rights

Page 232

1    was to allow insurers to handle the
2    claims, they would have to right under
3    this document and the Trust Agreement
4    with the consent of the TAC and the FCR
5    to amend it to give the insurers a right.
6    But, in its present form, there is no
7    express provision involving the insurers
8    in the claims resolution process.
9        Q.   And that's true for the
10   expedited review, individual review, and
11   arbitration, correct?
12       A.   It's certainly true of the
13   expedited review and individual review.
14   It's an interesting question whether or
15   not the Trust could tender a claim for
16   arbitration to an insurer.  I don't know
17   whether there is anything that would
18   prohibit them from doing that.
19       Arbitration is, to some
20   extent, like litigation, and they could
21   certainly tender a claim for an insurer,
22   a litigation claim to an insurer.  They
23   might be able to.  I don't know of
24   anything that would preclude them, I

Page 233

1    guess, from tendering it to an insurer
2    for arbitration.  I don't know.
3        Q.   But the TDP doesn't spell
4    out any role?
5        A.   The TDP doesn't spell it
6    out, no.
7        Q.   Let's go to Section 2.6.
8        A.   Of which document?
9        Q.   Trust Distribution
10   Procedures, ACC-11.
11       A.   Okay.
12       Q.   Now, the first question I
13   have, that refers to indirect PI Trust
14   claims?
15       A.   Correct.
16       Q.   There is in Section 5.12 and
17   5.13 a couple of other terms that are
18   used.  In 5.12, the term "insurer-related
19   TDP claims" is used.
20       A.   Correct.
21       Q.   In 5.13, the term
22   "indemnified insurer TDP claims" is used.
23       And my first question is
24   whether those two terms are included

Page 449

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - -

In Re:                          : Chapter 11
                                :
                                : Case No.
W.R. GRACE & CO., et al,        : 01-01139 JKF
                                :
                                : (Jointly
              Debtors           : Administered)


- - -

Monday, May 4, 2009

- - -

Continuation of oral

deposition of PETER VAN N. LOCKWOOD,

ESQUIRE, taken pursuant to notice, was

held at the offices of CAPLIN & DRYSDALE,

One Thomas Circle N.W., Suite 1100,

Washington, DC  20005, commencing at

12:05 p.m., on the above date, before

Lori A. Zabielski, a Registered

Professional Reporter and Notary Public

in and for the Commonwealth of

Pennsylvania.

- - -

MAGNA LEGAL SERVICES
Seven Penn Center
1635 Market Street
8th Floor
Philadelphia, Pennsylvania 19103

Page 450

1  APPEARANCES:
2
3  DRINKER BIDDLE & REATH, LLP
   BY: MICHAEL F. BROWN, ESQUIRE
4  One Logan Square
   18th & Cherry Streets
5  Philadelphia, Pennsylvania 19103-6996
   215.988.2988
6  (brownmf@dbr.com)
   (jeffrey.boerger@dbr.com)
7  Representing OneBeacon America Insurance
   Company, Seaton Insurance Company,
8  Government Employees Insurance Company,
   Columbia Insurance Company f/k/a Republic
9  Insurance Company
10
11 CAPLIN & DRYSDALE, CHARTERED
   BY: NATHAN D. FINCH, ESQUIRE
12     JEFFREY A. LIESEMER, ESQUIRE*
       (*VIA TELECONFERENCE)
13 One Thomas Circle N.W.
   Suite 1100
14 Washington, DC 20005
   202.862.7801
15 (ndf@capdale.com)
   (jal@capdale.com)
16 Representing Grace, Official Committee of
   Asbestos Personal Injury Claimants
17 ("ACC"), and Witness
18
   ANDERSON KILL & OLICK, P.C.
19 BY: ROBERT M. HORKOVICH, ESQUIRE
   1251 Avenue of the Americas
20 New York, New York 10020
   212.278.1322
21 (rhorkorvitz@andersonkill.com)
   Representing the ACC
22
23
24

Page 451

1  APPEARANCES (continued)
2
3  KIRKLAND & ELLIS, LLP
   BY: THEODORE L. FREEDMAN, ESQUIRE
4  655 Fifteenth Street, N.W.
   Washington, DC 20005-5793
5  202.879.5081
   (tfreedman@kirkland.com)
6  Representing the Debtors
7
8  THE LAW OFFICES OF JANET S. BAER, P.C.
   BY: JANET S. BAER, ESQUIRE
9  70 West Madison Street
   Suite 2100
10 Chicago, Illinois 606002
   312.641.2162
11 Representing the Debtors
12
13 SIMPSON THACHER & BARTLETT, LLP
   BY: SAMUEL J. RUBIN, ESQUIRE*
14     (*VIA TELECONFERENCE)
   425 Lexington Avenue
15 New York, New York 10017-3954
   212.455.3122
16 (srubin@stblaw.com)
   Representing Travelers Casualty and
17 Surety Company
18
19 VORYS, SATER, SEYMOUR AND PEASE, LLP
   BY: TIFFANY STRELOW COBB, ESQUIRE*
20     (*VIA TELECONFERENCE)
   52 East Gay Street
21 Columbus, Ohio 43215
   614.464.8322
22 (tscobb@vorys.com)
   Representing The Scotts Company, LLC
23
24

Page 452

1  APPEARANCES (continued)
2
3  COHN WHITESELL & GOLDBERG, LLP
   BY: DANIEL C. COHN, ESQUIRE
4  101 Arch Street
   Boston, Massachusetts 02110
5  617.951.2505
   (cohn@cwgll.com)
6  Representing the Libby Claimants
7
8  SPEIGHTS & RUNYAN
   BY: DANIEL H. SPEIGHTS, ESQUIRE*
9     (*VIA TELECONFERENCE)
   200 Jackson Avenue East
10 P.O. Box 685
   Hampton, South Carolina 29924
11 803.943.4444
   (dspeights@speightsrunyan.com)
12 Representing Anderson Memorial Hospital
13
14 TUCKER ARENSBERG
   BY: MICHAEL A. SHINER, ESQUIRE*
15     (*VIA TELECONFERENCE)
   1500 One PPG Place
16 Pittsburgh, Pennsylvania 15222
   412.594.5586
17 (mshiner@tuckerlaw.com)
   Representing Certain London Market
18 Insurers and AXA Belgium
19
20 FORD MARRIN ESPOSITO & WITMEYER & GLESER
   BY: ELIZABETH M. DeCRISTOFARO, ESQUIRE
21 Wall Street Plaza
   New York, New York 10005-1875
22 212.269.4900
   Representing Continental Casualty Company
23 and Continental Insurance Company
24

Page 453

1  APPEARANCES (continued)
2
3  BILZIN SUMBERG BAENA PRICE & AXELROD, LLP
   BY: MATTHEW I. KRAMER, ESQUIRE*
4     (*VIA TELECONFERENCE)
   200 South Biscayne Boulevard
5  Suite 2500
   Miami, Florida 33131-5340
6  305.450.7246
   (mkramer@bilzin.com)
7  Representing Property Damage Committee
8
9  STROOCK & STROOCK & LAVAN, LLP
   BY: ARLENE G. KRIEGER, ESQUIRE*
10    (*VIA TELECONFERENCE)
   180 Maiden Lane
11 New York, New York 10038-4982
   212.806.5400
12 (akrieger@stroock.com)
   Representing Official Committee of
13 Unsecured Creditors
14
15 CROWELL & MORING, LLP
   BY: MARK PLEVIN, ESQUIRE
16     NOAH S. BLOOMBERG, ESQUIRE
   1001 Pennsylvania Avenue NW
17 Washington, DC 20004-2595
   202.624.2913
18 (mplevin@crowell.com)
   (nbloomberg@crowell.com)
19 Representing Fireman's Fund Insurance
   (Surety Bond)
20
21
22
23
24

Page 454

```
 1  APPEARANCES (continued)
 2
 3  STEVENS & LEE, P.C.
      BY: JOHN D. DEMMY, ESQUIRE*
 4        (* VIA TELECONFERENCE)
      1105 North Market Street, 7th Floor
 5  Wilmington, Delaware 19801
      302.654.5180
 6  (jdd@stevenslee.com)
      Representing Fireman's Fund Insurance
 7
 8
      ALAN B. RICH LAW OFFICES
 9  BY: ALAN B. RICH, ESQUIRE*
        (*VIA TELECONFERENCE)
10  Elm Place, Suite 4620
      1401 Elm Street
11  Dallas, Texas 75202
      214.744.5100
12  (arich@alanrichlaw.com)
      Representing Property Damage FCR
13
14
      CONNOLLY BOVE LODGE & HUTZ, LLP
15  BY: JEFFREY C. WISLER, ESQUIRE
      The Nemours Building
16  1007 North Orange Street
      P.O. Box 2207
17  Wilmington, Delaware 19899
      302.88.6528
18  (jwisler@cblh.com)
      Representing Maryland Casualty
19
20
      ECKERT SEAMANS CHERIN & MELLOTT, LLC
21  BY: EDWARD J, LONGOSZ, II, ESQUIRE
      1747 Pennsylvania Avenue, NW
22  12th Floor
      Washington, DC 20006
23  202.659.6619
      (elongosz@eckertseamans.com)
24  Representing Maryland Casualty and Zurich
```

Page 455

```
 1  APPEARANCES (continued)
 2
 3  WILEY REIN, LLP
      BY: KARALEE C. MORELL, ESQUIRE
 4  1776 K Street NW
      Washington, DC 20006
 5  202.719.7520
      (kmorell@wileyrein.com)
 6  Representing Maryland Casualty and Zurich
 7
 8  COZEN O'CONNOR
      BY: ILAN ROSENBERG, ESQUIRE*
 9        (*VIA TELECONFERENCE)
      1900 Market Street
10  Philadelphia, Pennsylvania 19103-3508
      215.665.4621
11  (irosenberg@cozen.com)
      Representing Federal Insurance Company
12
13
      ORRICK HERRINGTON & SUTCLIFFE, LLP
14  BY: JONATHAN P. GUY, ESQUIRE
        JOSHUA M. CUTLER, ESQUIRE
15  Columbia Center
      1152 15th Street, N.W.
16  Washington, DC 20005-1706
      202.339.8516
17  (jguy@orrick.com)
      Representing Future Claimants
18  Representative
19
20  CUYLER BURK, P.C.
      BY: TANYA M. MASCARICH, ESQUIRE*
21        (*VIA TELECONFERENCE)
      4 Century Drive
22  Parsippany, New Jersey 07054
      973.734.3200
23  (tmascarich@cuyler.com)
      Representing Allstate Insurance Company
24
```

Page 456

```
 1  APPEARANCES (continued)
 2
 3  WILSON ELSER MOSKOWITZ EDELMAN & DICKER,
      LLP
 4  BY: CARL PERNICONE, ESQUIRE
      150 East 42nd Street
 5  New York, New York 10017-5639
      212.915.5656
 6  (carl.pernicone@wilsonelser.com)
      Representing Arrowood Indemnity Company
 7
 8  O'MELVENY & MYERS, LLP
      BY: TANCRED SCHIAVONI, ESQUIRE*
 9        (*VIA TELECONFERENCE)
      Times Square Tower
10  7 Times Square
      New York, New York 10036
11  212.326.2267
      (tschiavoni@omm.com)
12  Representing Arrowood Indemnity Company
13
14  WOMBLE CARLYLE SANDRIDGE & RICE, PLLC
      BY: KEVIN J. MANGAN, ESQUIRE*
15        (*VIA TELECONFERENCE)
      222 Delaware Avenue
16  Suite 1501
      Wilmington, Delaware 19801
17  302.252.4361
      (kmangan@wcsr.com)
18  Representing State of Montana
19
20  PEPPER HAMILTON, LLP
      BY: LINDA J. CASEY, ESQUIRE*
21        (*VIA TELECONFERENCE)
      3000 Two Logan Square
22  Philadelphia, Pennsylvania 19103
      215.981.4000
23  (caseyl@pepperlaw.com)
      Representing BNSF Railway Company
24
```

Page 457

```
 1
      APPEARANCES (continued)
 2
 3
      GOODWIN PROCTER, LLP
 4  BY: DANIEL M. GLOSBAND, ESQUIRE*
        (*VIA TELECONFERENCE)
 5  Exchange Place
      53 State Street
 6  Boston, Massachusetts 02109
      617.570.1930
 7  (dglosband@goodwinprocter.com) .
      Representing CNA Insurance
 8
 9
      KRAMER LEVIN NAFTALIS & FRANKEL, LLP
10  BY: GREGORY A. HOROWITZ, ESQUIRE
      1177 Avenue of the Americas
11  New York, New York 10036
      212.715.9571
12  (ghorowitz@kramerlevin.com)
      Representing Official Committee of Equity
13  Holders
14
               - - -
15
16
17
18
19
20
21
22
23
24
```

Page 458

1           - - -
2           INDEX
3           - - -
4
5   Testimony of:
6       PETER VAN N. LOCKWOOD, ESQUIRE
7
8   By Mr. Cohn         Page 462
9   By Mr. Wisler       Page 531
10  By Mr. Mangan        Page 544
11  By Ms. Casey        Page 549
12  By Mr. Speights     Page 563
13  By Mr. Plevin       Page 606
14  By Mr. Schiavoni     Page 624
15  By Mr. Brown        Page 636
16
17          - - -
18       E X H I B I T S
19          - - -
20  NO.   DESCRIPTION        PAGE
21   17   Notice of Deposition of
22        Asbestos PI Committee Pursuant
        to Rule 30(b)(6)       460
23   18   Exhibit 8 to Exhibit Book   460
24          - - -

Page 459

1           - - -
2   DEPOSITION SUPPORT INDEX
3           - - -
4
5   Direction to Witness Not to Answer:
6   Page  Line      Page   Line
7   620   11        632    14
8
9
10  Request for Production of Documents:
11  Page  Line      Page   Line
12  NONE
13
14
15  Stipulations:
16  Page  Line      Page   Line
17   12   02
    (Previously)
18
19
20  Area(s) Marked Confidential:
21  Page  Line      Page   Line
22  NONE
23
24

Page 460

1           - - -
2       PETER VAN N. LOCKWOOD,
3   ESQUIRE, after having been first
4   duly sworn, was examined and
5   testified as follows:
6           - - -
7       PROCEEDINGS
8           - - -
9       (ACC 30(b)(6)-17 and 18
10  premarked for identification at
11  this time.)
12          - - -
13      MR. COHN:  Go ahead,
14  Mr. Schiavoni.
15      MR. SCHIAVONI:  I just
16  wanted to object.  We have written
17  the Libby claimants separately
18  about this, but we object to them
19  doing any questioning of
20  Mr. Lockwood on the grounds that
21  the Libby claimants are members of
22  the committee; they have not
23  objected to Mr. Lockwood's
24  designation to testify on behalf

Page 461

1   of the committee; nor have they
2   offered in response to requests
3   any alternative witness to testify
4   on any topics on which they
5   disagree with Mr. Lockwood.
6       We see Mr. Lockwood's
7   testimony and the failure of the
8   Libby claimants to object to the
9   designation of Mr. Lockwood as an
10  adoptive omission by the Libby
11  claimants, and we object to any
12  questioning by them as essentially
13  questioning seeking to impeach
14  their own witness.  Thank you.
15      MR. COHN:  You are welcome.
16  We will respond to your
17  correspondence, but, for the
18  moment, let's simply say that we
19  reject the basis for your
20  objection.
21      MR. SCHIAVONI:  If there are
22  any topics that the Libby
23  claimants object to Mr. Lockwood's
24  designation on, we need to know

Page 462

1    what those topics are before this
2    deposition is completed so we can
3    question on those topics.
4        MR. COHN:  So far as the
5    Libby claimants are aware,
6    Mr. Lockwood has been properly
7    designated as the spokesman for
8    the Asbestos PI Committee as an
9    entity.
10       So with that, why don't we
11   start.
12           - - -
13       EXAMINATION
14           - - -
15   BY MR. COHN:
16       Q.  We didn't do this last time,
17   so let me hand you what has been marked
18   as ACC 30(b)(6) Exhibit-17 and ask
19   whether you recognize it.
20       A.  I do.
21       Q.  And what is it?
22       A.  It's a Notice of Deposition
23   of the ACC by the Libby claimants.
24       Q.  Okay.  And that's a

Page 463

1    deposition under Rule 30(b)(6)?
2        A.  Correct.
3        Q.  And you are the person who
4    has been designated by the Asbestos
5    Claimants Committee to appear on behalf
6    of the committee?
7        A.  To my great good fortune,
8    yes.
9        Q.  Okay.  Now, this deposition
10   was begun on Friday, May 1st; is that
11   correct?
12       A.  Yes.
13       Q.  And we suspended at about
14   7:45 in the evening?
15       A.  As best I can recall, that
16   seems about right.
17       Q.  Since that time, have you
18   spoken with your counsel at all?
19       A.  Do you mean Mr. Finch?
20       Q.  Or any of the lawyers
21   representing you?
22       A.  Well, Mr. Finch and I were
23   on a conference call this morning on
24   matters wholly unrelated to this case.  I

Page 464

1    haven't discussed my testimony with him,
2    if that's what you are inquiring about.
3        Q.  Yes.  The next question
4    would be whether you have discussed
5    either the testimony that you have given
6    or the testimony that you are going to
7    give in this deposition.
8        A.  I have not discussed that
9    with anybody --
10       Q.  Okay.
11       A.  -- since Friday, which, I
12   guess, was your question.
13       Q.  That was the question.
14       All right.  Is it the case
15   that any asbestos PI claimant may elect
16   individual review of his claim?
17       MS. BAIER:  Objection to
18       form.  Basis?  What are you
19       talking about, in the world?
20       MR. COHN:  Okay.  Let me
21       start again.
22   BY MR. COHN:
23       Q.  Let me refer you to the TDP,
24   which has been marked as ACC Exhibit-11.

Page 465

1        A.  I have it.
2        Q.  And ask you under the TDP
3    whether any asbestos PI claimant may
4    elect individual review of his claim?
5        A.  As best I can recall,
6    assuming the claimant has not previously
7    elected expedited review and subject to
8    the provisions relating to expedited
9    review, the answer to that question is
10   yes.  There are specific provisions in
11   the TDP that address individual review
12   and how it's to be elected and how it's
13   to proceed.
14       Q.  And when a claimant properly
15   in accordance with the TDP elects
16   individual review, what happens next?
17       A.  Well, that depends, frankly,
18   on how the trustees after consummation of
19   the Plan proceed to establish the claims
20   handling or resolution facility.  As of
21   right now, the Grace Trust doesn't exist,
22   doesn't have claims handling facility,
23   and, therefore, there is no specific set
24   of personnel or internal procedures that

Page 466

1   have yet been created for the mechanical
2   process of claims review.
3       Q.   Based on how similar trusts
4   have functioned in other cases, how would
5   you expect the Asbestos PI Trust to go
6   about the process of deciding what offer
7   to make on individual review?
8           MR. FINCH: Objection, form,
9   foundation.
10          You can answer.
11          THE WITNESS: I do not have
12      enough personal experience with
13      the actual practices of other
14      asbestos trusts to answer that
15      question.
16          It is possible Mr. Inselbuch
17      might be able to better answer
18      that question, although, to some
19      extent, what you are asking for is
20      speculation, because at the end of
21      the day, it's the trustees that
22      will decide how the Trust proceeds
23      to handle claims and not me,
24      Mr. Inselbuch, or the committee

Page 467

1       beyond what is set forth in the
2       TDP itself.
3   BY MR. COHN:
4       Q.   All right. Referring,
5   again, to Exhibit-11, if a person does
6   not fit the medical criteria for a
7   particular disease category set forth in
8   Section 5.3(a)(3), does the Trust have
9   discretion to allow the claim in that
10  category anyway?
11          MR. FINCH: Objection to
12      form and to the word "allow."
13          MR. COHN: Then why don't I
14      rephrase that.
15  BY MR. COHN:
16      Q.   Referring to the TDP, if a
17  person doesn't fit the medical criteria
18  for a particular disease category set
19  forth in Section 5.3(a)(3), does the
20  Trust have discretion to liquidate the
21  claim as a claim in that category?
22          MR. FINCH: Object to form.
23          THE WITNESS: Again, this is
24      something that Mr. Inselbuch might

Page 468

1       be able to give you a somewhat
2       more informed answer.
3           But my understanding of the
4       TDP is that the criteria that you
5       are referring to, which are set
6       forth in Section 5.3(a)(3) are, as
7       a general proposition, applicable
8       to what's called the expedited
9       review process.
10          And, by hypothesis, if you
11      are talking about individual
12      review, you are talking about
13      somebody who is not elected
14      expedited review. And it's my
15      understanding that, again, subject
16      to the specific provisions of the
17      TDP on this, that the trustees can
18      determine to liquidate and pay any
19      claim that they believe based on
20      whatever process they undertake,
21      would be legitimately compensable
22      under applicable state or federal
23      nonbankruptcy law.
24  BY MR. COHN:

Page 469

1       Q.   So failure to meet any
2   particular medical criterion that would
3   be required to have a claim allowed by
4   expedited review -- I didn't mean
5   allow -- I mean liquidated expedited
6   review would not be fatal to liquidating
7   the claim in that category upon
8   individual review?
9       A.   That's my understanding,
10  yes.
11      Q.   So, specifically, may the
12  Trust choose to liquidate a claim for
13  severe disabling pleural disease at the
14  level of compensation provided for claims
15  for severe disabling pleural disease even
16  though the claimant does not have
17  blunting of the costophrenic angle?
18          MR. FINCH: Object to form.
19          THE WITNESS: That is a very
20      compound question, because you
21      started talking about the value.
22      The values, just like the other
23      criteria, are set in the expedited
24      review errors. Individual review

Page 634

1    the same position and give the
2    same instruction.
3        If you ask about questions
4    that Libby claimants have taken in
5    papers filed in the court, for
6    example, in a Disclosure Statement
7    objections and the bullet point
8    Plan objections and the
9    committee's responses made to that
10   in open court, I will permit
11   Mr. Lockwood certainly to answer
12   those questions.
13       But anything that gets into
14   communications with between the
15   Libby claimants with the rest of
16   the ACC or counsel for the ACC
17   about their respective views of
18   insurance coverage, I am going to
19   take the position as privileged.
20       And so I think you have to
21   do it on a question-by-question
22   basis, but that's my general
23   position.
24   BY MR. SCHIAVONI:

Page 635

1        Q.   Okay. Mr. Lockwood, I just
2    have one other brief topic. And here is
3    the first question on that: Does the
4    Plan purport to release claims that may
5    exist between insurers and Non-Debtors?
6        MR. FINCH: Objection, form,
7    broad, vague.
8        THE WITNESS: Phrased as
9    broadly as you have, I think the
10   answer is yes.
11       MR. SCHIAVONI: Okay. Thank
12   you. I have no further questions.
13       MR. FINCH: Is there anyone
14   else in the room who has
15   questions?
16       MR. BROWN: I have some
17   follow-ups.
18       MR. FINCH: Is there anyone
19   else on the telephone who has not
20   asked questions yet who has
21   questions?
22       (No response.)
23       MR. FINCH: Hearing no
24   affirmative response, I will let

Page 636

1    you have follow-up until we run
2    out of time.
3        (There was a discussion held
4    off the record at this time.)
5        (There was a break from 3:55
6    p.m. to 4:03 p.m.)
7        - - -
8        EXAMINATION
9        - - -
10   BY MR. BROWN:
11       Q.   Mr. Lockwood, just a couple
12   of follow-ups. The court reporter is
13   actually going to read back a question
14   and answer. I think it's probably easier
15   to do that, and then I will ask my
16   follow-up question. It was end of
17   Mr. Wisler's questioning of you.
18       A.   Okay.
19       (The reporter read from the
20   record as requested.)
21   BY MR. BROWN:
22       Q.   And after that,
23   Mr. Lockwood, Mr. Wisler asked you a
24   follow-up as to what type of claim it

Page 637

1    would be.
2        And is it correct that the
3    ACC does not have a position on what type
4    of claim it would be if it's not a Class
5    6 claim?
6        A.   Well, the ACC doesn't, as
7    such, have positions on hypothetical
8    questions. So, yes, the ACC doesn't have
9    a position on that issue. The ACC --
10   well, I will leave it at that.
11       Q.   On Friday, Mr. Cohn asked
12   you a question, who drafted the TDP.
13   That was the question, and you gave an
14   answer which I am happy to show you the
15   full answer. But I WANT to repeat a
16   portion of your answer. You said: "The
17   participants that did it were basically
18   counsel for the ACC, counsel for the FCR,
19   and members of the ACC itself in terms of
20   reviewing and commenting on things, and
21   the FCR himself."
22       When you said the ACC
23   itself, what did you mean?
24       A.   I meant --

Page 638

1      Q.   I am sorry. When you said
2   members of the ACC itself, what members
3   are you talking about?
4      A.   Well, I was referring to the
5   personal injury counsel who were the
6   delegated representatives of the
7   individual ACC members, if that's what
8   you are driving at.
9      Q.   That's what I am driving at.
10          And who specifically were
11   they?
12      A.   As far as I know -- well,
13   the way in which the process works, in
14   general, is sometimes the ACC has
15   in-person meetings, sometimes it has
16   telephonic meetings, sometimes documents
17   get sent to it by email as PDF
18   attachments or whatever, and the ACC has
19   asked do you want to have a meeting or is
20   this good enough for you. So there is a
21   variety of ways in which the ACC views an
22   input as obtained.
23          And my answer was simply
24   that at the conclusion of a process, the

Page 639

1   members of the ACC had weighed in in one
2   or more of the ways in which I had
3   described some of them had; they all had
4   the opportunity to express their views;
5   and, therefore, the final product was the
6   product of their input. And there was a
7   final vote to go forward with the
8   document.
9      Q.   Okay. And when you say the
10   members, you are talking about their
11   actual personal injury counsel?
12      A.   As far as I know. But,
13   again, I couldn't tell you whether an
14   individual personal injury lawyer might
15   have consulted with his client, the
16   member, on one or more aspects of the TDP
17   or, for that matter, even sent the client
18   a copy of the entire TDP and had a
19   discussion with him about it. I
20   certainly couldn't exclude that.
21      Q.   Can you tell me the list of
22   counsel that you are talking about, the
23   actual names?
24      A.   They would be -- as a

Page 640

1   general proposition, I believe they are
2   in the Disclosure Statement. If they
3   are, it's a hell of a lot better
4   description of them than my memory. I
5   just --
6          MR. FINCH: There is also an
7      order entered by the U.S. Trustee
8      that identifies the 11 individual
9      members of the ACC and their
10      counsel, care of their firms.
11   BY MR. BROWN:
12      Q.   That's what I am driving at.
13   I would like to know who the individuals
14   were at their firms that were involved.
15      A.   Well, let me just see. I am
16   somewhat surprised. The Disclosure
17   Statement does not appear to contain the
18   members of the ACC. It just lists the
19   counsel representing the committee as a
20   whole. I had misremembered. I had
21   thought that it did.
22          I can't really remember. I
23   mean, I know the four -- I identified
24   four earlier as being involved in the

Page 641

1   discussions with Grace. They are
2   included. I think there is at least nine
3   members of the ACC. I do not recall, as
4   I sit here, who the other five members of
5   the ACC are. I mean, they are of
6   record -- strike that. I do not recall
7   who the other five lawyers for the
8   members of the ACC are. They are of
9   record.
10      Q.   But the four to which you
11   are referring is Mr. Budd, Mr. Rice,
12   Mr. Cooney, and Mr. Weitz?
13      A.   Correct.
14      Q.   You were talking about the
15   Trust Distribution Procedures and who
16   drafted them.
17          Would your answer be the
18   same with respect to the Trust Agreement?
19      A.   On the Trust Agreement, I
20   think there was more input from Grace,
21   and, indeed, I think there may have been
22   some from counsel from Sealed Air, as I
23   think about it. And, indeed, now that I
24   think about it, I think there may have

Page 642

1    even been a little input from the Sealed
2    Air counsel on the TDP. But, again, the
3    primary draftspersons were counsel for
4    the ACC and the FCR.
5        **Q. Okay. Can I direct your**
6    **attention to the Plan, which I guess is**
7    **ACC-5, and specifically it's page 70 on**
8    **my copy. It's under Section 7.7**
9    **Conditions to Occurrence of the**
10   **Confirmation Date, specifically condition**
11   **(j).**
12       A.   I see it.
13       **Q. Can you just take a moment**
14   **to read that? I have one question on**
15   **that.**
16       A.   I have read it.
17       **Q. In the portion of that**
18   **condition dealing with asbestos PD**
19   **claims, second-to-the last line, you will**
20   **see the words "if any" appear there, but**
21   **the same language doesn't appear for**
22   **asbestos PI claims.**
23       **Why?**
24       MR. FINCH: Objection,

Page 643

1    foundation.
2        THE WITNESS: I need to talk
3    to my counsel about this one.
4        (There was a discussion held
5    off the record between the witness
6    and counsel at this time.)
7        MR. FINCH: The discussion
8    was with respect to whether I need
9    to instruct him not to answer the
10   question. He is allowed to answer
11   the question as long as doing so
12   doesn't reveal privileged
13   communication.
14       I think you can answer.
15       THE WITNESS: Barely.
16       The "if any" is in there, as
17   best I can recall, because the
18   Plan proponents -- in contrast of
19   PI, "if any" is under PD. Because
20   the Plan proponents are quite
21   confident that there is going to
22   be lots of future PI demands and
23   are less confident that there is
24   going to be lots of future PD

Page 644

1    demands, or if there are, they
2    will be valid.
3        MR. BROWN: Okay. That's
4    all I have.
5        MR. FINCH: Could you go
6    back to the question I asked you
7    to find and read that question and
8    read the answer, and I will see if
9    I have got any redirect.
10       Does anybody else have any
11   questions?
12       (No response.)
13       MR. FINCH: Hearing none,
14   let me just hear that back.
15       (The reporter read from the
16   record as requested.)
17       MR. FINCH: No questions.
18       I think that is the end of
19   the deposition.
20       (The deposition concluded at
21   4:19 p.m.)
22
23
24

Page 645

1        CERTIFICATE
2
3
4        I HEREBY CERTIFY that the witness
5    was duly sworn by me and that the
6    deposition is a true record of the
7    testimony given by the witness.
8
9
10
11
12   _____
13   Lori A. Zabielski
14   Registered Professional Reporter
15   Dated: May 5, 2009
16
17
18
19
20       (The foregoing certification
21   of this transcript does not apply to any
22   reproduction of the same by any means,
23   unless under the direct control and/or
24   supervision of the certifying reporter.)

Page 646

INSTRUCTIONS TO WITNESS

1
2
3      Please read your deposition over
4  carefully and make any necessary
5  corrections.  You should state the reason
6  in the appropriate space on the errata
7  sheet for any corrections that are made.
8      After doing so, please sign the
9  errata sheet and date it.
10  You are signing same subject to the
11  changes you have noted on the errata
12  sheet, which will be attached to your
13  deposition.
14      It is imperative that you return
15  the original errata sheet to the deposing
16  attorney within thirty (30) days of
17  receipt of the deposition transcript by
18  you.  If you fail to do so, the
19  deposition transcript may be deemed to be
20  accurate and may be used in court.
21
22
23
24

Page 648

ACKNOWLEDGEMENT OF DEPONENT

1
2      I, _____, do
3  hereby certify that I have read the
4  foregoing pages,  1-   PGS, and that
5  the same is a correct transcription of
6  the answers given by me to the questions
7  therein propounded, except for the
8  correction or changes in form or
9  substance, if any, noted in the attached
10  Errata Sheet.
11
12
    _____
13  WITNESS NAME          DATE
14
15
16
17  Subscribed and sown
18  to before me this
19  _____ day of _____, 20_____.
20  My commission expires:
21  _____.
22
23  _____
24  Notary Public

Page 647

1      - - - - -
2      E R R A T A
3      - - - - -
4  PAGE  LINE  CHANGE
5  ____  ____  _____
6  ____  ____  _____
7  ____  ____  _____
8  ____  ____  _____
9  ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  ____  ____  _____
22  ____  ____  _____
23  ____  ____  _____
24  ____  ____  _____

Page 649

1      LAWYER'S NOTES
2  PAGE  LINE
3  ____  ____  _____
4  ____  ____  _____
5  ____  ____  _____
6  ____  ____  _____
7  ____  ____  _____
8  ____  ____  _____
9  ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  ____  ____  _____
22  ____  ____  _____
23  ____  ____  _____
24  ____  ____  _____



1  ACKNOWLEDGEMENT OF DEPONENT

2      I, _Peter Van N. Lockwood_____, do

3  hereby certify that I have read the

4  foregoing pages,   1-    PGS, and that

5  the same is a correct transcription of

6  the answers given by me to the questions

7  therein propounded, except for the

8  correction or changes in form or

9  substance, if any, noted in the attached

10 Errata Sheet.

11

12 _____  _6/1/09_____

    WITNESS NAME                 DATE

13

14

15

16

17 Subscribed and sown

18 to before me this

19 __1__ day of _June_____, 20_09__.

20 My commission expires:

Jeanne G. Katz
Notary Public, District of Columbia
My Commission Expires 12/14/2012

21

22

23 _____

   Notary Public

24

```
 1                  —    —    —    —    —
 2                  E R R A T A
 3                  —    —    —    —    —
 4      PAGE    LINE    CHANGE
 5      17      5       "to" to "to be"
 6      17      21      "here in" to "herein"
 7      21      21      "are" to "are not"
 8      37      16      "is" to "are"
 9      38      10      "My" to "When I"
10      41      12      "representative" to "representatives"
11      69      21-22   "combuston engineering" to "Combustion Engineering"
12      80      13      "pre-petitioned" to "pre-petition"
13      80      22      "consultancy and cleaning" to "Consultancy and Cleaning"
14      82      2       "alterego" to "alter ego"
15      84      18      "178" to "Definition 178"
16      84      21      "insurers" to "insureds"
17      85      15      "punitive" to "putative"
18      90      7       "the" to "an"
19      96      19      "engineering" to "Engineering"
20      98      1       "is" to "are"
21      98      19-20   "and insurance protection" to "any insurance injunction"
22      100     14      "is" to "in"
23      104     18      "or" to "or its"
24      107     13      "-vie" to "-vis"
```

```
 1              —    —    —    —    —

 2                    E R R A T A

 3              —    —    —    —    —

 4    PAGE    LINE    CHANGE

 5    111     20      delete "or"

 6    112     2       "cutoff" to "cut off"

 7    115     12      "is" to "are"

 8    117     24      "C363B" to "section 363(b)"

 9    118     3       "you" to "you've"

10    118     8       "have" to "to have"

11    119     24      "in" to "an"

12    131     24      "gratuitous" to "gratuitous benefit to"

13    134     14      "indirectly" to "indirect"

14    142     16      "transfers" to "transfer"

15    143     1       "adjoining" to "enjoining"

16    158     9       "does" to "the"

17    171     6 & 11  "race" to "res"

18    178     11      "channel" to "channeled"

19    178     12      "Trust" to "Trust claims"

20    183     4       "an all set" to "a null set"

21    192     5       "of" to "or"

22    193     5       "we" to "they"

23    194     3       "claims" to "policies"

24    205     16      "it finds" to "they find"
```

| | PAGE | LINE | CHANGE |
|---|---|---|---|
| 1 | | - - - - | |
| 2 | E R R A T A | | |
| 3 | | - - - - | |
| 4 | PAGE | LINE | CHANGE |
| 5 | 220 | 3 | "trusts by the Trust" to "trusts, by the trust" |
| 6 | 220 | 10 | "Trust" to "court" |
| 7 | 223 | 19 | delete "skied" |
| 8 | 224 | 12 | "did" to "(the" |
| 9 | 226 | 14 | "insurer" to "insurers" |
| 10 | 226 | 18 | "reviewed" to "viewed" |
| 11 | 232 | 2 | "to" to "the" |
| 12 | 238 | 17 | "PI" to "indirect PI" |
| 13 | ~~244~~ | ~~13~~ | ~~delete "is"~~ |
| 14 | 244 | 13 | "liability is" to "liabilities" |
| 15 | 250 | 5 | "omission" to "admission" |
| 16 | 258 | 24 | delete "it" |
| 17 | 266 | 12 | delete "a" |
| 18 | 266 | 22 | insert "The" after "worded." |
| 19 | 267 | 12 | "-vie" to "-vis" |
| 20 | 269 | 19 | "P;" to "PI" |
| 21 | 270 | 11 | "evaluate" to "evaluates" |
| 22 | 272 | 7 | "the fact of law" to "fact and law" |
| 23 | 272 | 14 | delete "of" |
| 24 | 272 | 21 | insert "were" before "in force" |

```
 1                   -   -   -   -   -

 2                E R R A T A

 3                   -   -   -   -   -

 4    PAGE      LINE    CHANGE

 5    279        5     "sure that" to "sure"

 6    279        6     "subject." to "subject,"

 7    288        8     "Grace's had" to "Grace's, had"

 8    289        8     insert "Grace" before "has"

 9    294       24     delete "position"

10    297        1     "IN" to "In"

11    297        6     "rights" to "right"

12    297       16     "gray" to "Grace"

13    308        3     "agreement" to "agreements"

14    310        8     "injunction. It" to "injunction if"

15    310       11     "then" to "than"

16    324       13     insert "that" before "are"

17    338        1     "COBB" to "FINCH"

18    346       18     insert "it" before "depends"

19    361       20     "[Table" to "liability"

20    366        2     "punitive" to "putative"

21    368        6     "a Payne" to "obtaining"

22    377        7     "pre-filed" to "previously filed"

23    379        8     "is" to "are"

24    385       21     "committees" to "committee's"
```

| | | |
|---|---|---|
| 1 | | – – – – – |
| 2 | | E R R A T A |
| 3 | | – – – – – |
| 4 | PAGE | LINE | CHANGE |

| PAGE | LINE | CHANGE |
|---|---|---|
| 388 | 2' | "history" to "historical" |
| 402 | 12 | "about" to "with" |
| 403 | 24 | delete "for" |
| 416 | 3 | "entitled" to "entitle" |
| 416 | 8 | "or" to "on" |
| 419 | 3 | "to" to "at" |
| 419 | 23-24 | "in all" to "a null" |
| 425 | 18 | "Indiana" to "Inselbuch" |
| 425 | 20 | "arguably" to "arguable" |
| 435 | 9 | "met" to "me" |
| 468 | 13 | "is" to "has" |
| 469 | 24 | "errors" to "criteria" |
| 471 | 8 | "pressed" to "met" |
| 472 | 13 | "to" to "of" |
| 491 | 16 | "respected" to "respective" |
| 491 | 17 | "conference" to "categories" |
| 492 | 8 | "obtain" to "obtained" |
| 493 | 19 | ~~these~~ "by" to "from" |
| 526 | 22 | "combustion engineering" to "Combustion Engineering" |
| 535 | 9 | insert "a" after "go" |

```
1                    -   -   -   -   -
2                    E R R A T A
3                    -   -   -   -   -
4    PAGE      LINE      CHANGE
5    536        8        "exercise" to "excise"
6    539        23       "claim that" to "claims, that"
7    539        24       "exhaustion" to "exhausted"
8    546        17       delete "as" after "by"
9    550        6        "at that name insurer" to "named insured"
10   551        1-2      delete "be in" before "BNSF"
11   554        11       "turn, Have" to "turn have"
12   557        16       insert "by" before "hypothesis"
13   559        24       "present" to "presenting"
14   572        9        insert "we" after "what"
15   581        15       insert "of" after "Plan"
16   588        6        "have" to "as"
17   594        8        insert "to" before "deal"
18   614        17       "adjudicata" to "judicata"
19   626        11       "an" to "a"
20   633        10       insert "of" before "my"
21   633        21       "THE WITNESS" to "MR. FINCH"
22   634        3        "questions" to "positions"
23   638        18       insert "been" after "has"
24   644        1        "are;" to "are, that"
```