IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | CHAPTER 11 |
| | ) | |
| | ) | Case No. 01-01139 (JKF) |
| W.R. GRACE & CO., *et al.*, | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | Re: Docket No. 21991 |
| | ) | |

**ANDERSON MEMORIAL HOSPITAL'S RESPONSE TO
DEBTORS' MOTION FOR A PROTECTIVE ORDER AND OBJECTIONS TO
ANDERSON MEMORIAL'S NOTICE OF DEPOSITION OF MARK SHELNITZ**

Anderson Memorial Hospital ("Anderson") responds to the June 4, 2009 Motion for a Protective Order and Objections to Anderson Memorial's Notice of Deposition of Mark Shelnitz ("Motion") filed by the Debtors ("Grace") as follows:[1]

1.  Anderson has filed Objections to Confirmation of Debtors' First Amended Joint Plan ("Objections") in which it asserts, *inter alia*:

> The Debtors' Plan cannot be confirmed because it violates the fundamental tenet of "equality of treatment" required of any bankruptcy plan, it fails to afford creditors in the same class the same treatment, it improperly classifies creditors who are subjected to disparate treatment in the same class, it improperly releases third parties, it is not proposed in good faith, and it does not comply with the requirements of the Bankruptcy Code. [Doc. 21782 at 1].

2.  Although Grace told this Court at the beginning of this bankruptcy that seven asbestos property damage ("PD") cases, including Anderson's 1992 lawsuit, would be returned to the tort system,[2] Grace's First Amended Joint Plan ("Plan") proposes that *only* Anderson and its witnesses must travel over 600 miles for a nonjury trial by the

---

[1] Anderson will ignore Grace's oft-repeated inaccurate and irrelevant history, which is refuted by the record and corrected in multiple briefs Anderson has filed over the past four years.

[2] [Doc. 587 at 47].

RESPONSE TO SHELNITZ MOTION.DOCX

Bankruptcy Court. At the same time, according to Grace, a "substantial" number of traditional PD claims that are "likely" to be filed after the Effective Date,[3] will have the opportunity to return to the tort system; present and future personal injury ("PI") claims will be determined by a trust in accordance with procedures written by the personal injury ("PI") attorneys and interpreted by Trustees of their choice and later have the opportunity to return to the tort system; and present and future Zonolite Attic Insulation ("ZAI") claims will be determined in accordance with procedures written by ZAI's class counsel.

3.      On March 13, 2009, in accordance with the Plan CMO, and over two months before Anderson was required to file its Objections, Anderson filed its Preliminary Witness List in which it identified only two witnesses by name: Mark Shelnitz and Richard Finke [Doc. 21003].[4] Mr. Shelnitz has served as Grace's General Counsel since April 2005. Prior to the bankruptcy, Mr. Finke assisted Grace's prior General Counsel, Robert Beber, in the defense of asbestos property damage cases, including the defense of Anderson's lawsuit, and since April 2005, he has reported to Mr. Shelnitz. Despite Grace's efforts to minimize Mr. Shelnitz's role in its Motion – typically made without any record citation – according to Mr. Finke's sworn testimony, Mr. Shelnitz was the person at Grace "primarily responsible" for the restructuring effort. [Deposition of Richard Finke (September 30, 2008) (Doc. 21259) at 171].

---

[3] Grace's expert, Dr. Denise Martin, has opined in her report that "Grace Is Likely To Be Subject To Substantial Future Property Damage Demands" [Doc. 21033 at 4]. According to Dr. Martin, "more than 140,000 steel-frame building projects are estimated to have occurred over the period from 1959 through 1973," and "more than 324,000 construction projects involving the types of buildings in which acoustical plaster would have been used are estimated to have occurred over the period from 1940 through 1973." [Id. at 6].

[4] Grace acknowledges that *after* Anderson filed its preliminary witness list, it also designated Mr. Shelnitz as a witness in response to a series of 30(b)(6) notices served by Grace's insurers and later withdrew him after Anderson took Mr. Finke's deposition. [Motion at 5-6]. As discussed below, Anderson identified Mr. Shelnitz because it believes he is a crucial witness to understanding the Grace's position regarding most if not all of its Objections. However, the fact that Grace also listed him as a 30(b)(6) witness belies any suggestion that he is not someone with intimate knowledge of these matters.

4. Anderson proceeded in chronological order and took Mr. Finke's deposition on March 30, 2009. Grace now argues that Mr. Shelnitz's deposition is "unnecessary and duplicative" of Mr. Finke's deposition. [Motion at 4-5]. While Anderson should not have to give Grace a preview of what it intends to ask a corporate officer who speaks for and can bind the opposing party in litigation, and who has been, in fact, primarily responsible for Grace's restructuring effort, Anderson has no interest in taking an unnecessary or duplicative deposition.

5. Upon information and belief, Mr. Shelnitz has had more involvement in Grace's decisions regarding the litigation against and the proposed treatment of PD claims in general and Anderson in particular than any other Grace official. Among other things, immediately upon his elevation to General Counsel, Mr. Shelnitz, not Mr. Finke, terminated ongoing 2005 discussions between Grace (Messrs. Beber and Finke) and Mr. Speights to resolve S&R's claims, directed Mr. Finke not to respond to Mr. Speights, and effectively canned a stipulation dealing with hundreds of claims [Deposition of Richard Finke (March 30, 2009) (Doc. 21259) at 74-77]. Apparently Mr. Shelnitz, or someone to whom he reported (not Mr. Finke), approved and/or promoted Grace's 2005 decision to smear S&R and therefore all other property damage claimants through a series of *ex parte* and false attacks to gain some advantage with this Court, personally attending the primary hearing where this effort was advanced, and the disposition of PD claims was converted from a concise estimation proceeding to an objections proceeding, without due notice to Anderson or other PD claimants. [Hearing (July 19, 2005) (Doc. 9105)].

6. Mr. Shelnitz, not Mr. Finke, was also the a member of the Grace team which negotiated the Plan with the PI Committee and Equity (PD was excluded). During

these negotiations, the PI Committee and the FCR took the position (and Grace agreed) that the treatment of traditional PD claims "was Grace's problem and they had to fix it . . . and none of that would come out of our hide." [Deposition of Elihu Inselbuch (June 12, 2009) at 174, 193-194; *see* Deposition of David Austern (May 15, 2009) at 223; Deposition of Richard Finke (March 30, 2009) (Doc. 21259) at 180].

7.  Mr. Shelnitz, not Mr. Finke, was also the senior Grace representative who negotiated the ZAI settlement with Ed Westbrook and Darrel Scott, who represented several ZAI claimants, rather than the PD Committee, which represented all ZAI claimants. Mr. Shelnitz participated in the two meetings which concluded the "deal," the first in Washington, D. C. (which included the Equity Committee represented by Ted Weschler and the PI Committee represented by Joe Rice) and the second in Mt. Pleasant South Carolina (which included the PD FCR). [Deposition of Richard Finke (September 30, 2008) (Doc. 21259) at 95-96, 111]. Mr. Shelnitz then executed the ZAI Term Sheet on behalf of Grace.

8.  In summary, Mr. Shelnitz, not Mr. Finke, is the one Grace official in a position to explain Grace's justification for the disparate treatment of Anderson in the Plan.

9.  Finally, Grace argues that, "Importantly Anderson Memorial appeared at this [insurers' 30(b)(6)] deposition, and its counsel, Dan Speights, asked questions on the issues for which Mr. Finke had been designated." [Motion at 5]. The argument is disingenuous at best. As Grace knows, during this subsequent deposition, which Anderson attended and waited all day for its turn to ask a few questions, Grace took the unheard of and meritless position that Anderson, a party to these proceedings, had no

right to ask questions unless it had served its own 30(b)(6) notice, even though the witness was produced regarding PD issues. When Anderson attempted to examine Mr. Finke on the PD report of Grace's expert, Denise Martin, Grace actually instructed Mr. Finke not to answer the questions in violation of Rule 30(c)(2):

> Q.     Do you know Denise Martin?
>
> MS. HARDING: All right, Mr. Speights, I haven't -- I mean, maybe I'm missing something. I was trying to be co-operative but I don't -- I haven't seen any 30(b)(6) notice where you've asked anybody to answer any questions about these topics. I mean, I might be missing it but...
>
> MR. SPEIGHTS: Well, I just moved to a new topic so my present question is does he know Denise Martin. That gets a yes or no.
>
> MS. HARDING: You can answer if you know a Denise Martin.
>
> A.     I know who she is. I have not met her personally.
>
> Q.     Have you -- as I understand it, Denise Martin is a PD estimation expert listed by the debtors, perhaps other Plan proponents, in this case. Have you supplied her with any information?
>
> MS. HARDING: Object to form. And I'm just going to -- Mr. Speights, have you filed a 30(b)(6) notice with respect to Grace?
>
> MR. SPEIGHTS: I --
>
> MS. HARDING: I don't think you have.
>
> MR. SPEIGHTS: I have not filed a 30(b)(6) notice, that I can.
>
> MS. HARDING: Right. I don't think you have either and I was trying to be cooperative and allowing you to ask questions about the Plan but if you're going to ask questions outside the scope of the operation of the Plan directly, then I'm just going to instruct the witness not to answer. We've been here all day long and I don't think it would be appropriate. And the witness has already been subject to a whole other day of deposition related to -- related to the topic that you're trying to ask questions about now so we not going to go there at this point. I think it's improper.
>
> MR. SPEIGHTS: Respectfully, I have not kept Mr. Finke there all day aim and I'm going to be less than 30 minutes with him and I am asking him whether he

supplied information to an estimation expert that Grace has listed in support of the PD provisions in the Plan of Reorganization.

MS. HARDING: And I –

MR. SPEIGHTS: May I finish, please?

MS. HARDING: Sure.

MR. SPEIGHTS: I understand you've instructed Mr. Finke not to answer my question as to whether he supplied Denise Martin any materials and if you'll stand on -- and I assume you're going to stand on that objection. And if that's what you're going to stand on, I'm going to stop my inquiry now and I'll take the matter up with the court at the appropriate time and reserve our rights to continue the deposition.

MS. HARDING: Well, I want the to record reflect that I'm objecting to your questions because you did not file a 30(b)(6) notice, you did not ask Grace to designate any witness with respect to any 30(b)(6) topics and the -- none of -- and therefore I think that your questions are improper and I am instructing the witness not to answer. If you have -- if you have -- well, that's fine, we can stop the deposition if you'd like.

MR. SPEIGHTS: Well, I did not serve a 30(b)(6) but others did serve a 30(b)(6) and one of the categories is the --

THE REPORTER: I'm sorry, I can't hear.

MR. SPEIGHTS: The record will reflect that the outstanding question is whether Mr. Finke supplied any materials to Denise Martin. I understand your position and that's all I have asked at this time.

MS. HARDING: Is that -- Well, you know what? Do you want -- he can answer that question, go ahead. If we can avoid litigation, go ahead. Are you still there?

MR. SPEIGHTS: Yes, I'm still here.

MS. HARDING: The question is did you supply information to Denise Martin.

A.   Yes.

Q.   What did you supply to Denise Martin?

A.   I supplied her with a list of buildings that were at issue in property damage litigation.

Q. Is that all?

A. I'm trying to recall. Oh, boy.

MS. HARDING: You're just asking for what he recalls, right?

A. There may have been something else. I honestly just cannot recall right now.

Q. How did you supply that to her? By e-mail, by letter, in person or some other way?

MS. HARDING: All right.

A. Let's see. I believe it was sent by e-mail.

Q. Did you see any drafts of her report before the final draft that was filed with the court?

MS. HARDING: Object to form, object to the extent it calls for attorney-client communications, settlement negotiations, plans, drafts, work product. To the extent that you can answer without revealing any privileged communications or information relating to drafts, go ahead.

A. Yes, I did.

Q. How did you receive that draft or those drafts?

MS. HARDING: You know, what Mr. Speights, we've had an agreement early on that we -- the debtors have objected to answering questions about drafts of negotiations, drafts of documents, all kinds of things, and --

MR. SPEIGHTS: Well, I don't have any such understanding.

Q. My question is, Mr. Finke: How did you receive those drafts? By e-mail? By letter or --

MS. HARDING: You know what? This is really going beyond the scope of any 30(b)(6) topic that anyone was asked to answer in this deposition and you also deposed Mr. Finke for -- it was an entire day there was an entire day before this and I think it's totally improper to be exploring these kinds of questions in this deposition especially when you didn't even issue a 30(b)(6) deposition notice in this matter. So I just think you should -- I mean ask your questions as they relate to how the Plan operates.

MR. SPEIGHTS: Counsel, you certainly have every right to object, you certainly have every right to instruct Mr. Finke not to the answer but you do not have the right to tell me what questions to ask.

MS. HARDING: Well, I can't object -- I can also attempt to limit the deposition to relevant inquiry. And having reviewed all of the transcripts relating to 30(b)(6) depositions and topics that Judge Fitzgerald has previously asked the debtors to respond to and answer questions about in similar proceedings, I think that you've gone way beyond the scope of questions that Judge Fitzgerald would find to be reasonable and relevant to the Plan confirmation proceedings and on that ground I'm limiting.

MR. SCHIAVONI: If it's outside the scope of the 30(b)(6) notice, you're just wasting our time. It's just not proper for today.

MS. HARDING: I agree.

MR. SPEIGHTS: I'm going to continue now. I'm pulling out the Travelers Casualty & Surety Company's supplemental Notice of Deposition which brings us, among others, as the first subject that the witness is being produced with respect to the provisions of the revised Joint Plan that relate to asbestos PD claims. And so I'll assure you that your objections thus far have taken longer than the rest of my questions would take. I'm trying to get some information about the estimation expert that Grace proposes to use in support of the PD provisions of the Plan.

MS. HARDING: Well, and --

MR. SPEIGHTS: I'd ask that you -- and, by the way, I did not take Mr. Finke's deposition on the prior day. Having said all that, I'm going to ask the question and either you'll instruct him not to answer or he'll answer the question to the best of his ability.

Q. My question is, Mr. Finke: How was the draft or drafts of the estimation prepared by Denise Martin passed between you and her?

MS. HARDING: Object. I object again with respect to questions regarding drafts of any documents related to the Plan confirmation proceedings because I think that those are not proper subject of this 30(b)(6) deposition.

* * *

MS. HARDING: I don't know who that was but I won't object. But, Mr. Speights, do you have further questions?

MR. SPEIGHTS: There's a question outstanding.

MS. HARDING: Subject to -- well, I'm going to instruct the witness not to answer we're not going to answer questions about drafts of documents and the Plan confirmation proceedings.

MR. SPEIGHTS: I understand, but you did not instruct him not to answer previously. Do you instruct him not to answer that?
MS. HARDING: Yes.

MR. SPEIGHTS: Then I will end my examination at this point and seek the leave that I deem is appropriate.

MS. HARDING: Okay. Somebody -- somebody else wanted to ask a question?

[Deposition of Richard Finke (May 13, 2009) at 346-359]. After an examination by another party, Grace returned to Anderson and threatened sanctions if Mr. Speights had the temerity to pursue his examination:

MS. HARDING: Mr. Speights, are you still on?

MR. SPEIGHTS: Yes.

MS. HARDING: I just want to make sure that I state on the record in response to your claim that you'll -- whatever you're considering filing that I want to make it clear to you that if you file any kind of paper, motion or otherwise, seeking some kind of relief with respect to the questions that you were not permitted to ask during this deposition, the debtors will seek costs, sanctions and fees for any amount of time that we have to spend responding to it in light of the fact that you didn't even serve a notice with respect to the deposition. So I just wanted to make sure that was on the record. Does anybody else have any questions?

[Id. at 361-362].

10. For the foregoing reasons, the Motion should be denied.

DATED: July 13, 2009

_____
Christopher D. Loizides (No. 3968)
LOIZIDES, P.A.
1225 King Street, Suite 800
Wilmington, DE 19801
Telephone:     (302) 654-0248
Facsimile:      (302) 654-0728
E-mail:          loizides@loizides.com

Daniel A. Speights (SC Fed. ID No. 4252)
C. Alan Runyan (SC Fed ID No.3683)
SPEIGHTS & RUNYAN
200 Jackson Avenue, East
Post Office Box 685
Hampton, SC 29924
Telephone:    (803) 943-4444
Facsimile:    (803) 943-4599

John W. Kozyak
David L. Rosendorf
KOZYAK TROPIN & THROCKMORTON, P.A.
2525 Ponce de Leon, 9th Floor
Coral Gables, FL 33134
Telephone:    (305) 372-1800
Facsimile:    (305) 372-3508

*Counsel for Anderson Memorial Hospital*