**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| IN RE | ) | Chapter 11 |
| | ) | |
| W.R. GRACE & CO., et al., | ) | Case No. 01-01139 (JKF) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| _____ | ) | |

**ANDERSON MEMORIAL HOSPITAL'S TRIAL BRIEF**
**ON PHASE II OBJECTIONS TO CONFIRMATION**
**OF DEBTORS' FIRST AMENDED JOINT PLAN**

Christopher D. Loizides (No. 3968)
LOIZIDES, P.A.
1225 King Street, Suite 800
Wilmington, DE 19801
Telephone:    (302) 654-0248
Facsimile:    (302) 654-0728
Email:        loizides@loizides.com

Daniel A. Speights
C. Alan Runyan
SPEIGHTS & RUNYAN
200 Jackson Avenue East
Post Office Box 685
Hampton, SC 29924
Telephone:    (803) 943-4444
Facsimile:    (803) 943-4599
Email:        dspeights@speightsrunyan.com

-    and-

John W. Kozyak
David L. Rosendorf
KOZYAK TROPIN & THROCKMORTON, P.A.
2525 Ponce de Leon, 9th Floor
Coral Gables, FL 33134
Telephone:    (305) 372-1800
Facsimile:    (305) 372-3508
Email:        drosendorf@kttlaw.com

# TABLE OF CONTENTS

TABLE OF CONTENTS................................................................ii

TABLE OF AUTHORITIES ..........................................................iii

PRELIMINARY STATEMENT ........................................................1

STATEMENT OF FACTS .............................................................2

I.      The Anderson Pre-Petition Litigation ...........................................3

II.     Bankruptcy, Bar Date and Notice Orders ......................................6

III.    Anderson's Claims .............................................................9

IV.     Post-Claims Bar Date Developments..........................................10

V.      The Debtors Declare War on S&R ...........................................12

VI.     Subsequent Proceedings on Anderson's Claims.............................14

VII.    Grace's Plan ..................................................................17

ARGUMENT ........................................................................20

I.      The Plan Does Not Provide Equality of Treatment ..........................20

II.     The Plan Treats Creditors in the Same Class Disparately ...................24

III.    The Plan Does Not Comply With 11 U.S.C. § 524(g)........................25

IV.     The Plan Impairs Class 7A Claimants .......................................27

V.      The Plan Provides No Meaningful Opt Out Option for ZAI Claimants ..............30

VI.     The Plan Should Not Improperly Release Third Parties......................31

VII.    The Plan Is Not Filed in Goo Faith..........................................34

VIII.   The Plan Does Not Comply with the Bankruptcy Code ......................36

CONCLUSION.......................................................................36

## TABLE OF AUTHORITIES

**Cases**

In re ACandS, Inc., 311 B.R. 36 (Bankr. D. Del. 2004)..........................................................34, 35

Adams-Arapahoe Sch. Dist. V. GAF Corp., 959 F.2d 868 (10th Cir. 1992)...................................6

In re American Reserve, 840 F.2d 487 (7th Cir. 1987) ..............................................................7, 8

Am. United Mut. Life Ins. Co. v. Avon Park, 311 U.S. 138 (1940)...............................................21

In re Amster Yard Assocs., 214 B.R. 122 (Bankr. S.D.N.Y. 1997) ..............................................25

In re Asbestos School Litigation, 104 F.R.D. 422 (E.D. Pa. 1984), *aff'd in part and vacated in part*, 789 F.2d 996 (3d Cir. 1986), *cert. denied*, 479 U.S. 852, 915 (1987) ...............................3

In re Asbestos School Litigation, 789 F.2d 996 (3d Cir. 1986)....................................................31

Central Wesleyan College v. W.R. Grace & Co., 143 F.R.D. 628 (D.S.C. 1992), *aff'd*, 6 F.3d 177 (4th Cir. 1993) ...........................................................................................................3

In re Charter Co., 876 F.2d 866 (11th Cir. 1989) .......................................................................15

City of Greenville v. W.R. Grace & Co., 640 F.Supp. 559 (D.S.C. 1986), *aff'd*, 827 F.2d 975 (4th Cir. 1987)...............................................................................................................................3

In re Combustion Engineering, Inc., 391 F.3d 190 (3d Cir. 2004)..................20, 21, 22, 24, 29, 34

In re Continental Airlines, 203 F.3d 203 (3d Cir. 2000)...........................................................32, 33

In re Coram Healthcare Corp., 315 B.R. 321 (Bankr. D. Del. 2004) ...........................................28

In re Dow Corning Corp., 280 F.3d 648 (6th Cir. 2002) ..........................................................22, 23

In re Dow Corning Corp., 255 B.R. 445 (E.D. Mich. 2000) ........................................................23

In re Exide Technologies, 303 B.R. 48 (Bankr. D. Del. 2003)................................................20, 33

In re Finova Group, Inc., 304 B.R. 630 (D. Del. 2004)................................................................22

In re Interregional Equity Corp., 227 B.R. 358 (D.N.J. 1998) ................................................7, 8, 9

MDU Resources Group v. W.R. Grace & Co., 14 F.3d 1274 (8th Cir. 1994)................................4

Ortiz v. Fibreboard Corp., 527 U.S. 815 (1999) .........................................................................31

In re PPI Enterprises (U.S.), Inc., 228 B.R. 339 (Bankr. D. Del. 1998) ........................................28

In re Rocha, 179 B.R. 305 (Bankr. M.D. Fla. 1995) .....................................................................28

In re United Artists Theater Co., 315 F.3d 217 (3d Cir. 2003) ................................................32, 33

In re Zenith Elecs. Corp., 241 B.R. 92 (Bankr. D. Del. 1999) ......................................................33

## Statutes & Rules

11 U.S.C. § 524 ...............................................................................................24, 25, 32, 34

11 U.S.C. § 1122 ............................................................................................................35

11 U.S.C. § 1123 ..................................................................................................22, 23, 24

11 U.S.C. § 1124 ......................................................................................................27, 29

11 U.S.C. § 1129 ..............................................................................20, 25, 30, 34, 35, 36

S.C. Code Anno. § 15-5-150 ..........................................................................................4

Fed.R.Bankr.P. 2019 ....................................................................................................11

## Other

Barliant, Karcazes & Sherry, "From Free-Fall to Free-For-All: The Rise of Pre-Packaged
Asbestos Bankruptcies," 12 Amer. Bankr. Inst. L. Rev. 441 (Winter 2004) ........................... 26-27

Anderson Memorial Hospital ("Anderson"),[1] by and through counsel, submits this trial brief in support of its "Phase II" objections to confirmation of the Debtors' First Amended Plan of Reorganization ("Plan"), in accordance with the schedule set forth in the Court's Third Amended Case Management Order Related to the First Amended Joint Plan of Reorganization ("Third CMO") (DE#21544).   Anderson reserves the right to make any other objections to confirmation, including objections to feasibility, not asserted herein.   Anderson further reserves the right to join in arguments made by other parties in their trial briefs in opposition to confirmation of the Plan.

## PRELIMINARY STATEMENT

As a result of the ordering of deadlines under the Third CMO, Anderson and other objectors are at a serious disadvantage in preparing a trial brief, in that the Plan Proponents – who bear the burden of proof as to the satisfaction of all of the requirements for confirmation under 11 U.S.C. § 1129 – are not required to file their trial brief until August 7, 2009, weeks after the objectors have filed their briefs and indeed after this Court has conducted the pretrial conference.   Further, discovery has not yet been concluded.

Moreover, by separate order entered on July 2, 2009, this Court has set a deadline of July 20, 2009 for all parties who intend to participate in the Phase II Confirmation Hearing to file (i) a Statement of Issues wherein each issue that a Participant intends to address is listed; (ii) a List of Witnesses who each Participant intends to call at the Phase II Confirmation Hearing along with a description of the evidence to be established by each witness and whether each witness will be called live or by deposition; and (iii) a List of the Exhibits to be introduced at trial by

---

[1] By its objection, Anderson seeks to protect the interests of itself and the putative class of claimants it has sought to represent, recognizing that the Court has denied Anderson's motion for class certification and that denial is now the subject of two pending appeals.

each Participant (DE#22347).  In light of those additional requirements, Anderson does not intend to detail in this submission all or every discrete piece of evidence it intends to present at the Phase II Confirmation Hearing.  Moreover, Anderson reserves the right to seek to supplement this brief upon the Plan Proponents submitting their Trial Brief.

As stated in Anderson's Objections to Confirmation filed on May 20, 2009, the Debtors' Plan cannot be confirmed because it violates the fundamental tenet of "equality of treatment" required of any bankruptcy plan, it fails to afford creditors in the same class the same treatment, it improperly classifies creditors who are subjected to disparate treatment in the same class, it improperly releases third parties, it is not proposed in good faith, and it does not comply with the requirements of the Bankruptcy Code.  The Plan is the culmination of the Debtors' strategy to disenfranchise unresolved property damage claimants and undermine efforts to deal with property damage claims globally through an appropriate class mechanism.

## STATEMENT OF FACTS

On April 3, 2001, the Debtors filed their Chapter 11 petition.  At the time, the Debtors faced exposure to present and future personal injury claims from people who had been exposed to asbestos-containing product ("PI Claims).  Their liabilities also included present and future claims on behalf of building owners for the recovery of costs associated with the management and abatement of fireproofing and ceiling products ("Surface Treatment") typically spray or trowel applied to steel frames and ceilings in commercial and governmental buildings and to ceilings in churches and all types of residences ("Traditional PD Claims"); and claims on behalf of homeowners whose attics contained Grace's loose filled vermiculite product, Zonolite Attic Insulation, which was naturally contaminated with asbestos ("ZAI Claims").

I.        **The Anderson Pre-Petition Litigation**

For many years prior to the Grace bankruptcy, Anderson's counsel, Speights & Runyan, had been extensively involved in the prosecution of property damage claims. Anderson's counsel, Speights & Runyan, was one of the first, one of the most active, and one of the most successful law firms to assert and successfully prosecute claims on behalf of building owners for asbestos property damage claims, including against Grace. This often included the assertion of class action claims against manufacturers and distributors of asbestos-containing products. As the Debtors have acknowledged, "the debtor had a long history with Speights" (DE 9349, pp. 11-12).

Commencing in the early 1980s, Dan Speights was among the first lawyers to bring lawsuits on behalf of school districts against Grace and other manufacturers, including an action in which Grace consented to an order conditionally certifying a mandatory nationwide class action, In re Asbestos School Litigation, 104 F.R.D. 422 (E.D. Pa. 1984), *aff'd in part and vacated in part*, 789 F.2d 996 (3d Cir. 1986), *cert. denied*, 479 U.S. 852, 915 (1987). In early 1986, Mr. Speights as lead trial counsel obtained the first asbestos verdict in the nation against Grace for the abatement of Grace's Monokote fireproofing product from the Greenville, South Carolina City Hall. City of Greenville v. W.R. Grace & Co., 640 F.Supp. 559 (D.S.C. 1986), *aff'd*, 827 F.2d 975 (4th Cir. 1987). Later, over Grace's objection, the United States District Court for the District of South Carolina certified a class action on behalf of the nation's colleges ("Colleges Class"), which the Fourth Circuit upheld. Central Wesleyan College v. W.R. Grace & Co., 143 F.R.D. 628 (D.S.C. 1992), *aff'd*, 6 F.3d 177 (4th Cir. 1993). Several State Courts also certified asbestos PD class actions.

In 1992, after Grace obtained a verdict in a North Dakota case determining that the statute of limitations began to run when the building owner should have known that Grace's product contained asbestos and might be hazardous (and before the ruling was reversed by the Eighth Circuit in <u>MDU Resources Group v. W.R. Grace & Co.</u>, 14 F.3d 1274, 1277 (8th Cir. 1994)), Speights & Runyan decided to bring another asbestos property damage class action, essentially on behalf of all commercial building owners.  On December 23, 1992, Anderson Memorial Hospital, with Speights & Runyan as class counsel, filed a class action against Grace and several other former manufacturers of asbestos-containing material on behalf of "all persons, corporations, partnerships, unincorporated associations or other entities which own in whole or in part any building which contains asbestos-containing surfacing materials."

The parties litigated the putative class action in State and Federal Court for more than eight years before Grace's Chapter 11 petition. During the course of the litigation the defendants moved to strike all reference to non-South Carolina class members based upon the South Carolina "Door Closing Statute" (S.C. Code Anno. § 15-5-150).  After hearing, the South Carolina Court issued an order striking out-of-state class members from the Anderson Complaint. Because the order did not conclude the case, it was not subject to immediate appeal and Anderson could only reserve its appellate arguments for the conclusion of the case.

In 1998, Anderson moved for certification of the state class.  The South Carolina circuit court, based on Grace's bankruptcy threat, entered an *ex parte* order conditionally certifying a state-wide asbestos property-damage action against Grace on February 9, 2001.  At the time the order was entered, the class certification motion had been pending for more than three years and the parties were five months removed from a two-day evidentiary hearing on class certification, and the parties had filed their post-hearing briefs.  Resolution of the class certification issue had

been repeatedly delayed by Grace's requests to amend the scheduling order and for post-hearing briefing.  Grace was later given an opportunity to brief the propriety of the certification order, and after the close of briefing and a further hearing, the South Carolina circuit court kept the certification order in effect.  Grace filed its Chapter 11 petition on April 2, 2001 before any notice to the class could issue.

After filing bankruptcy Grace acknowledged that "Until recently, Grace's most significant asbestos litigation involved, not personal injury, but [traditional] property damage" claims.[2]  Indeed, prior to bankruptcy, Grace had settled and paid nearly $783 million to resolve Traditional PD Claims – more than $3.6 million per case – while paying a total of 163,698 PI Claims $645.6 million – less than $4,000 per case.[3]  Grace advised the Court that at the time it filed its petition, it was facing only seven Traditional PD lawsuits, and that none had been filed since 1998.

That representation was misleading, however, for a number of reasons: (i) Grace had "omitted" a Texas class action that had been field in early 2001; (ii) Grace knew that the number of lawsuits was not representative of the number of claims or buildings, since it had previously settled many lawsuits involving large numbers of buildings; (iii) Grace recognized that – as in all previous asbestos bankruptcies – there were an undefined number of unfiled Traditional PD Claims, and indeed later insisted on a bar date and proof of claim form in order to attempt to extinguish those liabilities; (iv) Grace's judicially determined alter ego, the "Safe Buildings Alliance" ("SBA"), represented by the Debtors' law firm, Kirkland & Ellis ("K&E") and with its offices at K&E's law firm, had lobbied Congress and the Environmental Protection Agency

---

[2] W.R. Grace's Status Report (June 21, 2004) (D.E. # 5858), at 4-6.
[3] Status Report of the Official Committee of Asbestos Property Damage Claimants (June 21, 2004) (D.E. #5860) at 4-5.

("EPA") to prevent the application of proactive school regulations to private building owners, and to issue publications dissuading building owners from removing ACM until demolition activities conducted years later; and (v) Grace knew that SBA had conducted massive public relations campaigns to discourage building owners from abating ACM.  Indeed, Grace would later tell this Court that a building owner does not even have a right to bring a lawsuit until asbestos from the product at issue is released and causes injury, a theory which formed the basis of appellate decisions holding that the statute of limitations does not begin to run until there has been such injury.[4]  Finally, this list did not account for *future* asbestos PD claims, an omission which might be explained by the Debtors' early insistence in this case that there was no such thing as a future PD claim, as to which the Debtors subsequently reversed themselves when they decided to support the appointment of a PD future claimants' representative and seek a 11 U.S.C. § 524(g) injunction with respect to PD claims and demands.

## II.    **Bankruptcy, Bar Date and Notice Orders**

After Grace filed Chapter 11, the Debtors sought a Case Management Order which would impose a bar date for property damage claims.  As a component of the proposed bar date, the Debtors also proposed a "Notice Program" which essentially provided for notice by publication without any direct notice to unrepresented building owners who could be reasonably identified through Grace's records.[5]  The Bar Date Notice as originally proposed by the Debtors expressly prohibited class proofs of claim, and further sought to inform claimants that they could not rely

---

[4] Debtors' Consolidated Reply in Support of Their Motion for Entry of a Case Management Order, Establishment of a Bar Date, Approval of the Claim Forms and Approval of the Notice Program (D.E. # 587), citing <u>Adams-Arapahoe Sch. Dist. v. GAF Corp.</u>, 959 F.2d 868 (10th Cir. 1992).

[5] In contrast, in at least three other asbestos cases in this district, Judge Newsome required direct notice to building owners who could be identified from the Debtors' records: <u>In re Federal-Mogul Global, Inc.</u>, Case No. 01-10578;  <u>In re U.S. Mineral Products Co.</u>, Case No. 01-2471; <u>In re USG Corp.</u>, Case No. 01-2094.

on class actions to protect their rights in bankruptcy.  In a subsequent brief in support of the Bar Date and Notice, the Debtors argued that "class certification can and should be dealt with down the road, after the claims have come in."  The Debtors initially argued against following the procedures for class certification described in In re American Reserve, 840 F.2d 487 (7th Cir. 1987) and that even if the Court did adopt those procedures, "a bar date would still need to be set and a class proof of claim filed."

At a February 25, 2002 hearing, this Court advised the parties that for class proofs of claim, it was inclined to follow Judge Gambardella's opinion in In re Interregional Equity Corp., 227 B.R. 358 (D.N.J. 1998).  In so doing, the Court explained that "most of the other Courts that looked at this issue, decided you do not need the individual claims if you permit the class proof of claim" but that it was "not sure in every given case that you don't also need either an individual claim form or an identification of the Claimant."  The Court suggested that class representatives probably needed to supply either individual claim forms for class members **or** a list of class members as a part of the class claim.

After extensive colloquy, Anderson's counsel left the hearing having understood that the Court intended to follow the Interregional case, which adopted American Reserve in all respects: it permitted class proofs of claim; and it permitted a putative class representative to seek certification of a class that included persons who did not file individual claims by the Bar Date. Anderson's counsel understood that he probably would need to supply a list, either as part of a class claim or individual claims, and that the Court agreed with Grace that building owners could be identified through discovery after the claims had been filed.

After the February 25, 2002 hearing, the ZAI Claimants, perhaps in an abundance of caution, filed a motion seeking permission to file a class proof of claim.  Unknown to Anderson

at the time, Grace immediately and strongly reacted with a letter to the Court in which it urged the Court to follow American Reserve and Interregional.  Grace also took the absolute position that "Rule 23 is not even applicable until claims are filed and objected to."[6] In subsequent hearings, the Court encouraged the Debtors to litigate common issues on the Zonolite claims – a prospect which Grace initially resisted out of concern that a united class of ZAI Claimants would "create an enormous economic dynamic to the case." The Court continued to suggest that existing state court classes including "State of Washington [Barbanti] and the other in South Carolina [Anderson]" could file class proofs of claim, and the Debtors acknowledged that Barbanti was a ZAI class and that Anderson "went through a long briefing process" and was "certified on an *ex parte* basis in the weeks just before we filed for Chapter 11" and that it dealt with PD issues generally and "may include Zonolite."[7]

The Bar Date Notice which the Court ultimately approved omitted the language prohibiting class proofs of claim, and omitted the language stating that property damage claimants could not rely on a class proof of claim.  The Bar Date Order set a March 31, 2003 deadline for filing traditional property damage claims, and contained a provision that "all counsel of record for holders of Asbestos Property Damage Claims" were required to provide the Debtors with certain information about "their clients" who have or may have claims against the Debtors, "so that the Debtors will be able to provide their clients with the Bar Date Package" or a "certification" that counsel "has contacted or attempted to contact all of their clients whom they represent, provided them with the Bar Date Package and advised them regarding their rights to assert a claim against the Debtors and their need to file their proofs of claim on the court-

---

[6] Letter from David M. Bernick to the Honorable Judith K. Fitzgerald (March 13, 2002) (D.E. 1795).
[7] Hearing (March 18, 2002) at 58-62.

approved Proof of Claim forms by the deadlines set forth herein." The Property Damage Committee sought to appeal the Bar Date Order, but the appeal was rejected as interlocutory.

The Debtors' Notice Plan, as eventually approved by the Court, did not contemplate that the Debtors would provide direct notice to buildings or building owners with asbestos property damage claims who could be identified through the Debtors' sales records and other documents, and indeed the Debtors made no effort to identify asbestos property claimants from their sales records, but instead argued that such an effort would have been "unreasonable." Contrary to what the Debtors have represented to this Court, during the confirmation discovery proceedings, Grace has admitted that it had the ability to identify buildings where its product had been placed. Nevertheless, for almost forty years since Grace was served with its first proposed regulations, its lobbying efforts with the EPA both directly and through its alter ego, the SBA, through and including its failure to service the Bar Date Notice on easily identified building owners, Grace has resisted every effort to inform building owners of the hazards they face from ACM product.

In contrast to PD Claims, the Debtors have not sought and no claims bar date has been established for the filing of PI Claims against the Debtors.

## III.    Anderson's Claims

In accordance with the requirements imposed in this case, Anderson did what is directed by most courts by timely filing a class proof of claim. In fact, Anderson filed three proofs of claim: a "worldwide" class proof of claim (#9911); a statewide class proof of claim (#9914); and an individual proof of claim (#11008). Anderson also did what this Court indicated class representatives should do, as referenced in Interregional: it attached a list of over 3,000 putative claimants (including 121 South Carolina claimants) to its worldwide class proof of claim form. It also attached an affidavit to its statewide class proof of claim identifying hundreds of

shipments of Grace's asbestos products to South Carolina.  Anderson later supplemented both class claims with extensive additional information: the index alone for the supplement to the worldwide class was 835 pages, and the index for the supplement to the statewide class was 104 pages.  In addition, in an abundance of caution, Speights & Runyan also filed both a Class Proof of Claim and Proof of Claim forms for each claimant/class member it could identify through the Debtors' sales records.  Each of those claims referenced Anderson in their proof of claim, and their reliance on the Anderson class action was not concealed.

**IV.    Post-Claims Bar Date Developments**

After the PD claims bar date passed, the Court began applying increasing pressure on the Debtors to negotiate a consensual resolution of their issues.  At an August 25, 2003 hearing on the Debtors' motion to extend exclusivity, the Court coupled its order granting an extension "with a directive to the debtor to start meeting independently with the different constituent groups to find out what it is they want and how on earth the debtor may be able to come to some accommodation."[8]  Again at a February 23, 2004 hearing, the Court pushed Grace as to when it was going to file a plan and expressed concern as to whether it was necessary to replace the debtor as a debtor-in-possession.[9]

In September 2004, Anderson's counsel initiated discussions with the newly appointed Future Claimants Representative about trying to resolve the case, leading to a meeting on October 14, 2004 among Grace's officers and in-house counsel, the FCR, and the members of the Asbestos Committees.  The parties emerged from that meeting with a meeting of the minds as to how to resolve this bankruptcy case once and for all.  Robert H. Beber, Grace's former General Counsel, filed an affidavit with this Court in which he averred that "At that meeting, I

---

[8] Hearing (August 25, 2003) at 24.
[9] Hearing (February 23, 2004).

believe that the parties came very close to agreement on the important economic terms of a consensual plan." Mr. Beber averred that those discussions "ultimately broke down" but acknowledged, "I was not sure why they broke down."[10]

In November 2004, Grace filed its Plan of Reorganization (D.E.#6895) and related pleadings including a motion for entry of a case management order regarding litigation of asbestos claims (D.E.#6898) and a motion for estimation of asbestos claims (D.E.#6899). The Plan was conditioned upon a finding that the aggregate amount of all asbestos claims was not greater than $1,613,000,000. Grace's proposal with respect to PD claims was that the claims would first be culled by prosecution of "Gateway Objections" (an idea which Grace had initiated but not pursued for several months prior); then Grace and the PD Committee would file expert reports on the value of all remaining PD Claims in light of Grace's liability defenses; and finally, an estimation hearing would be conducted. The proposal to resolve matters through "common issues" trials was, ironically, largely consistent with Anderson's efforts for the prior 12 years to proceed on a class basis to resolve PD Claims asserted against Grace.

On December 20, 2004, in accordance with a Court order, Speights & Runyan ("S&R") filed a Fed.R.Bankr.P. 2019 statement setting forth, *inter alia*, the basis of the firm's authority to file multiple claims. The Rule 2019 Statement was filed consistent with S&R's right and, indeed, fiduciary duty, as it had been advised by an ethics expert, to preserve claims on behalf of absent members of the putative Anderson class, other than those who, after the filing of the claims, advised S&R that they did not want to proceed with such claims. The Rule 2019 Statement provided authority for the filing of the claims including: a copy of the retainer agreement for the 100 Pine claim; a copy of the retainer agreement for Board of Regents; a copy

---

[10] February 13, 2006 Affidavit of Robert H. Beber (D.E. # 11756, Ex. A).

of the retainer agreement for California State Universities; copies of retainer agreements, written authorizations or other written authority for several claims included in the Anderson class; a copy of the Anderson complaint for the Anderson South Carolina certified class; and a copy of the original Anderson complaint on behalf of several members of the putative class which S&R identified primarily from Grace's own records. The filing of such claims was consistent with the suggested course of action following the February 25, 2002 bar date hearing to provide identification of the claimant by means of a claim form or list of the putative claim holders.

Shortly after filing the Rule 2019 Statement, S&R was contacted by Mr. Beber, which led to a meeting on February 16, 2005 at Grace's offices in Boca Raton, and discussions regarding the potential withdrawal or resolution of certain claims filed by S&R. In fact, S&R had already reviewed the filed claims and had its own list of claims that it was prepared to withdraw. The parties also discussed a stipulation to "put on the shelf" claims for conspiracy filed by S&R. After additional discussions and exchanges of drafts between Dan Speights and Richard Finke, communication from Grace abruptly ceased in mid-March 2005 despite repeated follow-up inquiries from Mr. Speights to Mr. Finke.

Meanwhile, discussions continued regarding a proposed case management order for the estimation process for PD claims. As a predicate to the estimation process and prerequisite to its prosecution of "Gateway Objections," Grace sent out a Notice of intent to object to certain claims. Upon receipt of the notice, S&R developed and served on Debtors' counsel extensive supplementation of claims.

## V.    The Debtors Declare War on S&R

Shortly thereafter, it became clear that the Debtors' strategy had changed, and that their new mission was to aggressively smear Anderson's claims in particular, and property damage

claims generally, through an underhanded campaign against Anderson's counsel, S&R.  Despite prior negotiations, the Debtors' new game plan was to go to war with property damage claims and to use S&R as their scapegoat.  Indeed, at a meeting on July 13, 2005, Grace's counsel Mr. Bernick rejected an invitation to stipulate that the basis for many of the S&R claims was the Anderson putative class, so that the issue of legal authority could be quickly addressed, instead advising that he intended to smear Mr. Speights and in turn all property damage claimants, because in his opinion it was in Grace's best interest to do so.  This strategy manifested itself in part through a series of *ad hominem* attacks, often made to the Court but without notice to S&R and without its presence.

On June 17, 2005, Grace filed its 12th Omnibus Objection, challenging S&R's authority to file ten claims (D.E.#8640).  Instead of limiting its discussion to those ten claims, however, Grace asserted that "on information and belief, S&R filed hundreds of similarly unauthorized claims against the Debtors," claimed that "S&R has a pattern and practice of filing these sort of claims in other bankruptcies," and asserted that Grace had "provided S&R with ample opportunities to withdraw the Unauthorized Claims," citing three attached emails of Mr. Finke. The Notice accompanying the Objection indicated that S&R had until July 28, 2005 to file a response and that the hearing on the Objection would be conducted on August 29, 2005.

Well before S&R had an opportunity to respond to the Objection, however, Grace relied on the objection to voice accusations against S&R in two *ex parte* arguments before the Court at which S&R was not present and had no notice that matters relating to it would be raised.  By the time S&R finally had an opportunity to be heard, it was in the unfortunate position of having to try to convince the Court that what it had already repeatedly been told – without objection or

opposition—was not accurate, even though many of Grace's accusations were disingenuous at best and false at worst.

At an omnibus hearing on June 27, 2005 (the day before a response to the 12th Objection was even due, and without Mr. Speights present), in connection with discussion of the Debtors' latest motion to extend exclusivity, Grace used the pretext of exclusivity as an opportunity for attacking the absent S&R.  The attack included an implication – which the Court now knows is false – that S&R filed a claim on behalf of a property owner after having been told not to do so. At another hearing on July 19, 2005 – again, a hearing for which no motion involving an S&R client was pending or on the agenda (other than a motion filed by Grace the night before the hearing which S&R had not even seen yet, and which was not set to be heard for another rmonth), and at which Mr. Bernick knew Mr. Speights would not be in attendance – Mr. Bernick launched into an hour-long diatribe which, among other things, misled the Court into believing that S&R had filed a claim on behalf of AMA "after getting notice" that they were not to file it (something that Mr. Bernick knew not to be the case).  Without Mr. Speights even being present, Grace's counsel had convinced the Court that "this is going to be a major litigation issue."[11]

With the stage already having been set by Grace's counsel without any opportunity for response from S&R, the next three years would be spent in litigation over Anderson and other S&R claims.

## VI.    Subsequent Proceedings on Anderson's Claims.

Shortly thereafter, on September 15, 2005 the Debtors objected to Anderson's class proofs of claim.   In response, on October 21, 2005 Anderson filed a Motion for Class Certification, consistent with case law recognized by the Debtors holding that a class claimant

---

[11] Hearing (July 19, 2005) at 19-20.

cannot seek certification until there is a contested matter commenced by the filing of an objection. In re Charter Co., 876 F.2d 866 (11th Cir. 1989).

On October 31, 2005, the Court, on the Debtors' objection, determined that 535 individual proofs of claim filed by the Speights & Runyan firm should be stricken on the basis that Anderson did not provide the law firm with the authority to file individual claims. Because the Court made it clear that its ruling was without prejudice to the rights of these claimants to seek recovery through Anderson if it later certified a class action, these claimants did not appeal this ruling.

On April 17, 2007, the Court, on the Debtors' objection, determined that 44 individual proofs of claim filed by the Speights & Runyan firm on behalf of claimants who retained the Speights & Runyan firm shortly after the Bar Date should be stricken on the basis that the law firm "failed to establish authority to file as of the March 31, 2003 Proof of Claims Bar Date." That ruling was recently upheld by the Third Circuit Court of Appeals. Again, this ruling was without prejudice to the right of these claimants to seek recovery through Anderson if later certified as a class.

On May 29, 2008, the Court denied Anderson's motion for class certification, holding that only claimants who filed individual proofs of claim could be considered for numerosity purposes. Anderson attempted to appeal the class certification order and was rebuffed on jurisdictional grounds by the District Court, which is now on appeal to the Third Circuit. On April 13, 2009, the Court sua sponte entered an order which "reduced to zero" the Anderson worldwide class proof of claim and Anderson statewide class proof of claim. Anderson has now filed a notice of appeal of that order which will permit review of the class certification ruling.

On April 14, 2009, the Court entered an Order disallowing 35 claims filed on behalf of Canadian property damage claimants who had claims encompassed within the Anderson class. The claims were disallowed as time-barred by the purportedly applicable Canadian limitations periods. That ruling is also presently subject to a pending appeal.

In addition, in accordance with a separate claims process for ZAI Claimants, Anderson also submitted a ZAI proof of claim (#17909) on behalf of all buildings encompassed in its certified statewide class action. Although the ZAI claim was merely a component of the broader class action filed by Anderson in South Carolina, the Court's claims procedures necessitated the filing of a separate claim. In a final certification order (entered after the petition date), the South Carolina court specifically stated that the Anderson statewide class included attic insulation claims.

There were other prepetition ZAI claims asserted by other parties against the Debtors, but there had not been any nationwide class certified in any such litigation prior to the petition date. In late 2001, the ZAI Claimants, represented by Darryl Scott, Esq. and Edward Westbrook, Esq., moved to certify a nationwide class which specifically excluded, *inter alia*, the Anderson claimants. After numerous hearings, this Court determined that a "science trial" should be conducted to determine the hazardousness of ZAI product, before considering a ZAI claims bar date or class certification. The court permitted the ZAI Claimants' counsel to be compensated by the bankruptcy estate as special counsel for conducting that trial. The Court further made clear that the results of the trial would not be binding on any other ZAI claimant. After conducting the trial, the Court found that ZAI does not create an "unreasonable" risk of harm.

Other claimants, and the Property Damage Committee, were excluded from negotiations and mediation in connection with the resolution of the ZAI Claims. When the ZAI Class

Settlement was announced, it was unclear whether the original commitment to exclude the Anderson claims was still being followed, and ultimately it became clear that it was not. Moreover, while the ZAI Class Settlement purported to preserve the right of ZAI claimants to opt out of the settlement, the Debtors' proposed Plan and Disclosure Statement were less than clear as to the treatment of opt-out claimants.  Normally, it would be assumed that a claimant who opts out of a class settlement would have the opportunity to pursue their claim outside of the settlement and preserve the right to recover in full on their claim if successful.

However, in response to Anderson's objection on this ground, the Debtors made clear that in fact notwithstanding a ZAI claimants' decision to opt out of the ZAI Class Settlement, the claim would nonetheless be treated under the Plan exactly the same as the ZAI Class claims: the claims will be processed and paid only in accordance with the ZAI Trust Distribution Procedures.  On April 1, 2009, the Court approved the ZAI Class Settlement, but made clear that the issue of the treatment of opt-outs was a confirmation issue which could be addressed at the appropriate time.

On March 13, 2009, the Debtors filed an objection to Anderson's ZAI claim.  Anderson acknowledged to the Court that the claim would be governed by the same ruling on class certification that this Court had made on Anderson's traditional property damage class claims, and on April 27, 2009 the Court entered an order disallowing the Anderson ZAI Claim.  That order is now on appeal to the District Court.

VII.   **Grace's Plan**

Despite its many complexities, the Debtors' Plan with respect to the treatment of property damage claims is, theoretically at least, fairly simple.  All property damage claims are included in Class 7.  However, Class 7 is sub-divided into Class 7A for "traditional" property damage

claims, and Class 7B for "US ZAI PD Claims" asserted by United States claimants arising from Zonalite Attic Insulation product. The Plan purports to provide for the payment of allowed "traditional" property damage claims (classified as Class 7A claims) in full, but without interest, through the Asbestos PD Trust. Class 7B ZAI claims are to be paid in accordance with the terms of a class action settlement negotiated by one group of ZAI claimants, pursuant to which the claimants will received a compromised amount on account of their ZAI claims. Although the class action settlement purported to preserve the opportunity for ZAI claimants to opt out of the ZAI settlement, the treatment of ZAI claims is identical regardless of whether or not the claimant opts out – the claims are to be paid in accordance with the ZAI Trust Distribution Procedures.

Grace has settled virtually all filed property damage claimants other than the claims of Anderson. Indeed, the only other unresolved property damage claim other than Anderson, and two Canadian claimants asserting claims through the Anderson class action, is the claim of Sheldon H. Solow and Solow Development Corp. (the "Solow Claim"). Although not included in the Plan itself, the Plan documents contain other provisions that effectively control how unresolved PD claims will be resolved. Specifically, the Plan references the proposed Class 7A Case Management Order which is Exhibit 25 to the Plan. The Class 7A CMO, in turn, sets forth certain procedures that are directed – either expressly or implicitly – exclusively to Anderson.

In Paragraph 1B of the CMO, the Debtors propose that for any PD claims which have been disallowed and are subject to pending appeals, or for which class certification has been denied and an appeal of which is pending, (1) the appeals shall proceed to completion; (2) the "Anderson Memorial class claims (Nos. 09911 and 09914) shall remain inactive unless and until there is a final, appealable order with respect to the Anderson Memorial individual claim (No.

011008)"; and (3) any such claims which are reversed on appeal "shall be remanded to the Bankruptcy Court for proceeding[s] consistent with this PD CMO".

Aside from the Anderson related claims, there is one other pending unresolved PD claim – the Solow Claim. That claim was originally filed in state court and was on appeal from a split verdict as of the petition date. Under the plan, the Solow Claim will return to state court for resolution. The Debtors' proposed "Amended Order Setting Various Deadlines Regarding Asbestos Property Damage Claims" (an exhibit to the Class 7A CMO) in Paragraph 7 sets forth that for that claim, "the Court hereby lifts the stay so that the parties may proceed with the pre-petition appeal that was filed in the New York Supreme Court, Appellate Division – First Department". Presumably if that case is remanded for further proceedings, those proceedings will take place in state court.

For any other claims (including future PD claims that may be asserted), the claimants, subject to certain procedures set forth in the Class 7A CMO, are permitted to prosecute such claims in the United States District Court for the District of Delaware or any other United States District Court that has jurisdiction over the action. (Class 7A CMO Paragraph II.C.1.).

The treatment of PI Claims is quite different. The Plan establishes a separate Asbestos PI Trust. The Asbestos PI Trust is presided over by Trustees selected by the personal injury constituency, it is funded by specified initial and subsequent cash contributions from the Debtors, it observes procedures for simplified resolution of claims that provide for lessened standards of proof and evidentiary burdens.

Anderson is effectively the only asbestos-related claim which, if the denial of class certification is reversed on appeal, will be required to return to the Bankruptcy Court for disposition, notwithstanding that Anderson's action, in which it would be entitled to a trial by

jury, had been pending in state court for nearly a decade in South Carolina prior to the petition date.

## ARGUMENT

In making these objections, Anderson reminds the Court that the plan proponents bear the burden of establishing that the Plan complies with each of the requirements set forth in 11 U.S.C. § 1129(a).  In addition, if an impaired class does not vote to accept the Plan, the plan proponents also bear the burden of demonstrating that the Plan satisfies the additional requirements of 11 U.S.C. § 1129(b), including that the Plan does not unfairly discriminate and is fair and equitable with respect to dissenting classes.  In re Exide Technologies, 303 B.R. 48, 58 (Bankr. D. Del. 2003).

## I.    The Plan Does Not Provide Equality of Treatment.

The promise of "equality among creditors" is among the most fundamental tenets of bankruptcy.  This promise is explained in detail by the Third Circuit Court of Appeals in In re Combustion Engineering, Inc., 391 F.3d 190 (3d Cir. 2004).  In Combustion Engineering, the debtor asked the court to approve a "two-trust structure" by which it intended to deal with asbestos claims.  Prior to bankruptcy, the debtor had reached settlements with several asbestos claimants, and had funded $400 million into the CE Settlement Trust to pay their claims. Payments from the Trust were based on the length of time the creditor's claim had been pending. Creditors who had settled and were awaiting payment would be paid 95% of the full liquidated value of their claim; creditors who had settled or agreed to dispute resolution but were not yet due payment would be paid 85%; and all other creditors would receive an initial payment of 37.5%, with a promise of up to 75% depending on what funds were available.  Another group of

creditors who were late to the game agreed to receive a lesser sum.  The "stub claim" held by the creditors enabled them to participate in voting on the debtor's plan.

Certain asbestos creditors who had been excluded from the settlement objected that this "two-trust" structure violated the Bankruptcy Code's "equality among creditors" principle, and also that the creation of the "stub claims" violated the Code by "artificially impairing" the claims of the participants in order to manipulate the voting process.  The Third Circuit vacated and remanded the order confirming the Combustion Engineering Plan on both grounds.

As to the first issue, the Court in <u>Combustion Engineering</u> explained that the promise of "equality among creditors" is inherent in several provisions of the Bankruptcy Code:

> "Equality of distribution among creditors is a central policy of the Bankruptcy Code." *Begier v. IRS*, 496 U.S. 53, 58 (1990). … The Bankruptcy Code furthers the policy of "equality of distribution among creditors" by requiring that a plan of reorganization provide similar treatment to similarly situated claims.  Several sections of the Code are designed to ensure equality of distribution from the time the bankruptcy petition is filed.  Section 1122(a) provides that only "substantially similar" claims may be classified together under a plan of reorganization.  Section 1123(a)(4) requires that a plan of reorganization "provide the same treatment for each claim or interest of a particular class."  And § 524(g) states that "present claims and future demands that involve similar claims" must be paid "in substantially the same manner."

391 F.3d at 239.

Moreover, in evaluating whether a plan provides "equality among creditors," the Court must consider the "bankruptcy scheme as an integrated whole in order to evaluate whether Plan confirmation is warranted."  <u>Id.</u> at 241.  This analysis includes consideration of "the totality of circumstances surrounding a reorganization plan" in order to exercise the "informed, independent judgment which is an essential prerequisite for confirmation of a plan."  <u>Id.</u>, fn. 55, *citing* <u>Am. United Mut. Life Ins. Co. v. Avon Park</u>, 311 U.S. 138, 146 (1940):

> Where such investigation discloses the existence of unfair dealing, a breach of fiduciary obligations, profiting from a trust, special benefits for the reorganizers,

or the need for protection of investors against an inside few, or of one class of investors from the encroachments of another, the court has ample power to adjust the remedy to meet the need.

Id.  In Combustion Engineering, the Third Circuit remanded out of concern that the plan structure did not ensure equality among creditors because of the risk that the creditors who were not favored under the pre-petition settlement would unfairly suffer by receiving an unequal share of the settlement fund.

The requirement of equality of treatment is more specifically mandated by 11 U.S.C. § 1123(a)(4), which requires that a plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest."  The District Court explained in In re Finova Group, Inc., 304 B.R. 630 (D. Del. 2004) that § 1123(a)(4) guarantees not "equality of payment" but rather "equality of treatment."  In Finova, the debtors' plan provided for the payment provided for the payment of "utilization fees" as a component of interest to certain creditors, but not to all creditors.  The Bankruptcy Court ruled that the debtors were required to pay such fees to all lenders as a condition of confirmation under § 1123(a)(4), and the District Court affirmed. Upon finding that the excluded creditors were similarly situated to the ones who the debtors had agreed to pay, the District Court held: "To treat [appellees] differently would be to ignore the economic realities of their Credit Agreements, elevate form over substance and violate the equal treatment mandate of Section 1123(a)(4)."  Finova, 304 B.R. at 637.

The extension of the "equality of treatment" requirement not merely to payment provisions but to procedural treatment is further demonstrated by In re Dow Corning Corp., 280 F.3d 648 (6th Cir. 2002).  In Dow Corning, the Sixth Circuit found that a plan which put governmental subrogation claims together in one class, and purported to pay that class in full in

order to satisfy the "cram down" requirements of 11 U.S.C. § 1129(b)(2)(B), did not demonstrate

adequate protection of the full payment requirement and did not comply with § 1123(a)(4) where

different governmental units were afforded different procedures to protect their interests under

the plan.  In <u>Dow Corning</u>, the plan incorporated a settlement with Canadian governmental units

that provided for notice to the governmental authority before payment would be made to a

beneficiary so that the government could determine if it had a subrogation claim; the payment

would not be released until the payee and the governmental unit confirmed they had agreed upon

an appropriate allocation.  The plan provided no similar mechanism or protections to the United

States.  The Court held that the failure to do so precluded approval unless the plan afforded the

United States with "recovery rights sufficiently similar to the Canadian governmental payers to

ensure equal treatment of Class 15 claimants as required by section 1123(a)(4)."  <u>Id.</u> at 661.  *See*

*also* <u>In re Dow Corning Corp.</u>, 255 B.R. 445, 500-01 (E.D. Mich. 2000) ("As to whether the

claim is being treated fairly within the class, the inquiry is whether the claim is subject to the

same process in satisfying the claim as the other claims within the class. … The requirement

under 11 U.S.C. § 1123(a)(4) that all claims be treated equally is satisfied when the class

members are subject 'to the *same process* for claim satisfaction.'" <u>Id.</u> (citations omitted,

emphasis in original).

    Here, the Debtors' Plan singles out Anderson for a treatment not afforded to any other

asbestos creditor.  Every other asbestos claim either: (1) has been settled and will be paid on the

effective date; (2) is subject to alternative resolution procedures with lowered proof thresholds;

or (3) is permitted to litigate in its chosen forum.  Only Anderson, of all the asbestos claims filed

against the Debtors, is required to litigate its claims in order to be entitled to payment, but is

precluded from doing so in the forum it chose nearly a decade before this bankruptcy case was

commenced. The disparate treatment of Anderson's claims – which reflects a continuation of the Debtors' intentional and ongoing efforts to undermine Anderson's claims – violates the fundamental principle of "equality of treatment" mandated by the Bankruptcy Code and expressly recognized by the Third Circuit Court of Appeals in <u>Combustion Engineering</u>.  As such, the Debtors' Plan can not be confirmed.

## II.   <u>The Plan Treats Creditors in the Same Class Disparately.</u>

Aside from the general requirement of "equality of treatment" recognized in <u>Combustion Engineering</u>, the Bankruptcy Code specifically requires that a Plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest."  11 U.S.C. § 1123(a)(4). The Debtors' Plan, for the reasons explained above, clearly does not do so, and accordingly does not satisfy the requirements for confirmation.

Moreover, since the Plan provides disparate treatment for Anderson's claims as distinguished from every other property damage claimant, both present and future, the Plan's classification scheme violates the Bankruptcy Code and cannot be confirmed.

The flaws in the Debtors' classification scheme also render meaningless any vote that is made on the Plan.  The Debtors purport to solicit Class 7 only for purposes of the requirement in 11 U.S.C. § 524(g) that to obtain a § 524(g) injunction the Plan must be approved by a 75% vote of "a separate class or classes of the claimants whose claims are to be addressed by a trust." Since the classification of disparately treated claims together is improper – to say nothing of the improper lumping together of Class 7A (which is supposedly "unimpaired") with Class 7B (the

ZAI Claims, which are impaired) for voting purposes – the Debtors cannot establish that they

have satisfied the requirements for confirmation. [12]

### III.    The Plan Does Not Comply With 11 U.S.C. § 524(g).

For the same reasons that the Plan violates the requirement of "equality of treatment," the

Plan also fails to satisfy the requirements of 11 U.S.C. § 524(g), pursuant to which the Debtors

seek an injunction protecting various settling third parties.   Specifically, § 524(g) requires that

"present claims and future demands that involve similar claims" must be paid "in substantially

the same manner."   Since the Plan mandates disparate treatment for similarly situated property

damage claims, it does not satisfy the requirements of § 524(g). [13]

---

[12] Anderson notes as well that the entire solicitation process with respect to Class 6 Personal Injury Claims is fundamentally flawed.  The Debtors have never sought to establish a claims bar date for Personal Injury Claims.  As a result, any vote by the Class 6 claimants is solely by those claimants who have voluntarily elected to file proofs of claim despite the absence of a deadline for doing so.  It is unfair and inappropriate to bind an entire class of creditors in this manner where the universe of claimants has not been defined through the establishment of a claims bar date. *See, e.g.*, In re Amster Yard Assocs., 214 B.R. 122, 125 (Bankr. S.D.N.Y. 1997) ("Debtor has not identified any emergent circumstances that warrant expedited action, and as a practical matter, it could not obtain approval of the disclosure statement, solicit votes or confirm a plan until it has determined the outer universe of potentially allowable claims.").  Moreover, to the extent the Debtors intend to rely on Class 6 as an impaired, accepting class for purposes of satisfying 11 U.S.C. § 1129(a)(10), Anderson would object because of the flaws in the solicitation process for Class 6.

[13] Anderson notes as well that §524(g) does not provide support for the multiple-trust structure proposed by the Debtors in their Plan.  The Plan establishes an Asbestos PI Trust and a separate Asbestos PD Trust, each of which deal separately with the respective personal injury and property damage liabilities.  However, all references in § 524(g) are to a single-trust structure:

> The requirements of this  subparagraph are that – the injunction is to be implemented in conjunction with *a trust* that, pursuant to the plan of reorganization … is to assume the liabilities of a debtor … as part of the process of seeking confirmation of the plan … a separate class or classes of the claimants whose claims are to be addressed by *a trust* described in clause (i) is established and votes, by at least 75 percent of those voting, in favor of the plan; and … *the trust* will operate through mechanisms … that provide reasonable assurance that

Moreover, for purposes of Class 7A claimants, the Asbestos PD Trust is not a genuine "trust" in any meaningful sense.  Rather, the "Trust" is simply a conduit for the payment of funds by the Debtors or Reorganized Debtors, inserted primarily if not exclusively to obtain the benefits of the § 524(g) injunction.  Under the Plan, the Asbestos PD Trust will be funded on the Effective Date with enough money to pay the settled Property Damage Claims.  If additional unresolved PD Claims are subsequently allowed, or if future PD Claims are successfully asserted, once again the Trust simply looks to the Reorganized Debtors to fund the Trust with a sufficient amount to pay the claims as they are subsequently determined.

It is effectively the Reorganized Debtors and not the Trust that are assuming the liabilities, without any meaningful trust mechanisms or procedures for determining or valuing claims. Instead, unresolved claims and future claims are simply re-directed back into litigation (pursuant to the Class 7A CMO, in whatever forum the Debtors may have designated for the particular claim), the defense of which is controlled by the Reorganized Debtors.  The Asbestos PD Trust effectively operates as nothing other than a check-writing facility for Class 7A Claimants.  Even worse, the structure of the Plan and Trust and related agreements actually make it harder for the claimants to recover than if Reorganized Grace simply assumed liability for the unresolved PD claims.

Indeed, there is a fundamental illogic to extending § 524(g) to claims which are supposedly "unimpaired" under the Plan.  If indeed PD Claims are unimpaired and are to be paid 100% upon successfully prosecuting their claims in litigation with the Reorganized Debtors, what is the purpose of channeling such claims to a trust?  *See, e.g.*, Barliant, Karcazes & Sherry,

---

*the trust* will value, and be in a financial position to pay, present claims and future demands that involve similar claims in substantially the same manner.

"From Free-Fall to Free-For-All: The Rise of Pre-Packaged Asbestos Bankruptcies," 12 Amer.

Bankr. Inst. L. Rev. 441, 453 (Winter 2004):

> But there is no such justification for channeling future claims to a limited trust when a company can afford to pay 100 cents on the dollar to all future claimants as their claims arise.  Exchanging the right to pursue all of a company's assets (and the right to take ownership of the company, since creditor claims have absolute priority over equity interests) for the right to pursue a thinly-capitalized trust could be detrimental to future claimants, if the trust assets later prove to be insufficient. … Given this critical divergence from the facts of the Johns-Manville on which section 524(g) was based, that statute should be narrowly construed to apply only to situations where a company demonstrates that it cannot continue to pay asbestos-related claims.  Indeed, the fact that the channeling injunction is available only in the context of a chapter 11 bankruptcy plan signifies this relief should be limited to companies with a legitimate need for bankruptcy protection and reorganization.  Otherwise, the good faith of the debtor must be seriously questioned.

This disconnect is further evidenced by the Debtors' waffling on the question of whether there will be future PD claims.  On the one hand, the Debtors have produced an expert to testify that the Debtors are likely to be subject to substantial future property damage demands, and that the amounts, numbers, and timing of such demands are indeterminate (D.E.#20622); but on the other hand, the Debtors' Plan and Disclosure Statement presumes for purposes of estimating the amounts due for distribution to Class 7 claims that there will be **no** additional allowed PD claims or future demands.  The Debtors' Plan represents an impermissible misuse of § 524(g) as applied to the Class 7A Claims.

## IV.    **The Plan Impairs Class 7A Claimants.**

A claim is unimpaired under a plan if the plan "leaves unaltered the legal, equitable and contractual rights to which such claim or interest entitles the holder of such claim or interest." 11 U.S.C. § 1124(1).  Contrary to the Debtors' assertion that Class 7A is unimpaired, however, Class 7A claims are impaired in at least two ways.

First, as explained in the Disclosure Statement, Class 7A claimants are not entitled to recover interest: "No interest shall be payable on account of Asbestos PD Claims Allowed as of the Effective Date except to the extent provided in a PD Settlement Agreement." (Disclosure Statement, p. 8). Since the Debtors' Plan provides for equity holders to retain their interests, in order for Class 7A to be unimpaired, claimants must be entitled to receive interest on their claims. In analyzing the 1994 amendments to § 1124, this Court noted that the amendments clarified that "to be unimpaired, the claim must receive postpetition interest." In re PPI Enterprises (U.S.), Inc., 228 B.R. 339, 352 (Bankr. D. Del. 1998), citing In re Rocha, 179 B.R. 305, 307 n. 1 (Bankr. M.D. Fla. 1995) ("[A] solvent debtor must now pay post-petition and pre-confirmation interest on a claim to have a class considered 'unimpaired.'"); In re Coram Healthcare Corp., 315 B.R. 321 (Bankr. D. Del. 2004). While settling Class 7A claimants may have agreed to waive any assertion of a right to interest, Anderson has not done so. Second, Anderson's claims in particular are impaired as a result of the Class 7A CMO's denial of Anderson's ability to pursue its claim in its chosen forum, which among other things has the effect of denying Anderson a right to trial by jury. Coram Healthcare, 315 B.R. at 351 ("if the proposed plan of reorganization does not leave the creditor's rights entirely unaltered, the creditor's claim is impaired.").

Since Class 7A Claims are in fact impaired (at least those that have not waived a right to interest or are being denied substantive rights by virtue of the Plan or the Class 7A CMO), this raises the issue of the manner in which Class 7A should be permitted to vote on the Plan. Anderson submits that it is fundamentally unfair to permit the settling Class 7A Claimants, who will be paid exactly what they settled for under the Plan, to determine the fate of unresolved Class 7A claims – which almost exclusively refers to the Anderson claims. The issue is

comparable to the concerns with "artificial impairment" that has previously been recognized by this Court. As explained in Combustion Engineering, "artificial impairment" occurs when a plan imposes "an insignificant or de minimus impairment on a class of claims to qualify those claims as impaired under § 1124." Combustion Engineering, 391 F.3d at 243. The Third Circuit recognized that "The chief concern with such conduct is that it potentially allows a debtor to manipulate the Chapter 11 confirmation process by engineering literal compliance with the Code while avoiding opposition to reorganization by truly impaired creditors." Id.

In Combustion Engineering, the debtor settled with several asbestos claimants pre-petition under terms by which those creditors agreed to receive payment of a substantial portion of their claims (generally between 85-95%), and preserve a small "stub claim" which enabled them to participate in the bankruptcy proceedings and vote on the plan. The Court was sufficiently concerned that the debtor's "pre-petition side arrangement with a privileged group of asbestos claimants, who as a consequence represented a voting majority despite holding, in many cases, only slightly impaired 'stub claims,'" id. at 244, ran a significant risk of interfering with the requirements and intentions of the Bankruptcy Code. This concern was heightened because "a disfavored group of asbestos claimants, including the future claimants and the Certain Cancer Claimants, were not involved in the first phase of this integrated settlement." Id. at 245. As a result, the Third Circuit remanded the confirmation order for further consideration on the issue of "artificial impairment."

The Debtors' Plan here provides with respect to Class 7A that all allowed property damage claims will be paid in full, but without interest. Class 7A consists overwhelmingly of creditors who have already settled with the Debtors. Indeed, the only unresolved Class 7A claims are the claims of Anderson, and the Solow Claim. To the extent that settled Class 7A

claims are permitted to vote and thereby control the Class 7 vote, and thereby control the fate of the disparately treated Anderson claims, the Plan's classification scheme is flawed and cannot be approved.  Moreover, if Anderson – as effectively the only unresolved property damage claim subjected to the particular treatment described in the Class 7A CMO, were separately classified, it would reject the Plan and the Debtors would be required to demonstrate that the Plan does not discriminate unfairly and is fair and equitable with respect to the Anderson claims under 11 U.S.C. § 1129(b).  Anderson submits that the Debtors could not satisfy those requirements.

**V.      The Plan Provides No Meaningful Opt Out Option for ZAI Claimants.**

In an earlier proceeding, Anderson – whose class claims include claims for ZAI – expressed its concern with provisions in the US ZAI Class Settlement regarding the treatment of opt-outs.  Specifically, although the ZAI settlement purports to provide for opt-out rights for claimants who elect not to participate in the class settlement, those rights are effectively illusory because under the Plan, opt-out ZAI claimants are subject to the same exact treatment as the ZAI class members.  As clarified in Section 2.7.3 of the Disclsoure Statement (in response to Anderson's objection), "Notwithstanding a decision by a Holder of a US ZAI PD Claim to opt out of the class for purposes of the US ZAI Settlement, such Claimant remains a member of Class 7B for purposes of the Plan and will be treated as such."  As a result, such claims are to be paid in accordance with the ZAI Trust Distribution Procedures, which provide for recovery of only a fraction of the creditors' claims.

By denying ZAI opt-outs the ability to assert their claims outside of the ZAI Trust Distribution Procedures, the Plan strips them of any meaningful "opt out" option.  To the extent that the ZAI settlement is in effect a *sub rosa* mandatory class, the standards for approval would be substantially different and have not been addressed by the Debtors or by ZAI Counsel. *See,*

*e.g.*, Ortiz v. Fibreboard Corp., 527 U.S. 815 (1999); In re Asbestos School Litigation, 789 F.2d

996 (3d Cir. 1986). Anderson raised these issues at the hearing on approval of the ZAI settlement

and was advised by the Court that this issue was properly raised at confirmation:

> If ZAI claimants believe that they have an opt out issue, and ought to be in a different class under the plan, that's a classification issue and their rights to either vote against the plan, or to seek classification are still preserved. That's not a settlement issue, that's a plan confirmation issue.

Transcript of April 1, 2009 hearing, P. 39 L. 20-25. In order to treat ZAI opt outs – who have

not consented to the treatment provided under the class settlement – the same as other Class 7

creditors, the Plan must permit those claimants to assert their claims outside of the ZAI Trust

Distribution Procedures and be paid in full if their claims are allowed.

## VI.    The Plan Should Not Improperly Release Third Parties.

Section 8.8.7 of the Plan provides a broad release by "each Holder of a Claim or Equity

Interest who votes in favor of the Plan" in favor of all of the "Asbestos Protected Parties," the

various committees, representatives and counsel in the case. The Section further provides that

"In addition to the foregoing, each Holder of a Claim or Equity Interest who receives or retains

any property under this Plan shall also be deemed to unconditionally release the Fresenius

Indemnified Parties to the same extent as the release in the preceding sentence." To the extent

the second quoted sentence purports to extend the broad release of the Asbestos Protected

Parties, committees, representatives and counsel to any person receiving property under the Plan

(and not merely those who affirmatively vote in favor of the Plan), it would violate restrictions

on non-consensual third-party releases through a Plan.

In similarly overbroad fashion, Section 11.9 of the Plan purports to exculpate a huge cast

of characters, including the Reorganized Debtors, the Debtors, the Non-Debtor Affiliates, the

Sealed Air Indemnified Parties, the Fresenius Indemnified Parties, the Asbestos PI Trustees, the

Asbestos PI Trust Advisory Committee, the Asbestos PD Trustees, the Asbestos PD Trust Advisory Committee, the Asbestos PI Committee, the Asbestos PD Committee, the Unsecured Creditors Committee, the Equity Committee, the Asbestos PI FCR, the Asbestos PD FCR, and any of their respective Representatives, from any liability in connection with arising out of this case, unless "gross negligence or willful misconduct."

The limitations on a debtors' ability to provide for releases to third parties, including its own professionals and the professionals of other interested parties, was alluded to by the Third Circuit Court of Appeals in In re United Artists Theater Co., 315 F.3d 217 (3d Cir. 2003). In United Artists, the Court was asked to consider whether objections to a financial advisor's retention which provided for exemption from liability for ordinary negligence, were rendered moot by the provisions of the confirmed plan which released the debtors and their professionals from potential negligence claims. The Court expressed skepticism as to the effectiveness of the plan provisions in doing so absent specific findings to support such relief:

> Debtors and their professionals can not exempt themselves from liability to non-consenting parties merely by saying the word. The "hallmarks of permissible non-consensual releases" are "fairness, necessity to the reorganization, and specific factual findings to support these conclusions." *In re Continental Airlines*, 203 F.3d 203, 214 (3d Cir. 2000). Added to these requirements is that the releases "were given in exchange for fair consideration." *Id.* at 215.

Id. at 227. Absent specific factual findings to support the releases – and even though the releases were approved in the "conclusions of law" portion of the confirmation order – the Court found that the plan provisions could not render moot a subsequent challenge to the terms of a professionals' retention regarding indemnification rights. Id.

The United Artists decision made reference to the Third Circuit's earlier decision in In re Continental Airlines, 203 F.3d 203 (3d Cir. 2000). In Continental Airlines, the Court noted that the release of non-debtor third parties was generally inconsistent with 11 U.S.C. § 524(e), which

specifies that "Except as provided in subsection (a)(3) of this section, discharge of a debt of a debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt."   After reviewing the applicable case law, the Third Circuit, without adopting a particular standard or even affirmatively stating that such third-party releases were ever permissible, enunciated the baseline standard cited in United Artists above.

Lower courts within this district have defined narrow parameters within which such third-party releases may be considered.  In In re Exide Technologies, 303 B.R. 48 (Bankr. D. Del. 2003), the Court recognized, citing Continental Airlines, that non-consensual releases of non-debtors may be approved only in "extraordinary cases."  Id. at 72.  Citing to In re Zenith Elecs. Corp., 241 B.R. 92 (Bankr. D. Del. 1999), it identified several factors which may be considered:

(1)      such an identity of interests between the debtor and non-debtor releasee that a suit against the non-debtor is in essence a suit against the debtor;

(2)      substantial contribution by the non-debtor to the reorganization;

(3)      the essential nature of the injunction to the reorganization;

(4)      support by an overwhelming majority of creditors for the injunction;

(5)      provision for payment of all claims affected by the injunction.

Id.  The Exide Court found that such extraordinary circumstances did not exist in that case to permit release of the debtors' officers, directors and professionals.  The exculpatory provisions of the Plan likewise go well beyond the permissible scope of any such clause, particularly as to the broad cast of characters supposedly protected.

Here, the broad scope of the Debtors' proposed releases of non-debtor third parties and exculpatory provisions in favor of a broad universe , to the extent applied to non-consenting parties, fails to satisfy the baseline standard of being supported by fairness, necessity to the

reorganization, and having been given in exchange for fair consideration, all supported by specific factual findings.

## VII.   The Plan Is Not Filed in Good Faith.

In Combustion Engineering, the disparate treatment of similarly situated asbestos creditors, and the risk of artificial impairment in order to control voting on the plan, caused the court to express concern that the plan did not comply with the "good faith" requirement of 11 U.S.C. § 1129(a)(3) and remand for further consideration.  The "good faith" requirement was further explained in In re ACandS, Inc., 311 B.R. 36 (Bankr. D. Del. 2004).  In ACandS, the debtors sought approval of a plan which memorialized a prepetition settlement between the debtors and certain asbestos claimants who were part of a "prepetition committee".  The settlement provided for payment of asbestos claims in a descending order of priority, with "Category A" having been paid pre-bankruptcy, "Category B" and "Category C" being fully secured        by       assets       of       the       debtors,       "Category       D"       claims being partially secured up to 75% of their claims, and entitled to recover up to 50% of available insurance proceeds, and the remaining 50% of the insurance proceeds reserved for future claims. Anyone not in one of those categories was treated as unsecured.  The court noted that "members of the prepetition committee appear prominently in all of the secured categories."  Id. at 40.

The Court found that the disparate treatment of similar asbestos claims based on the election to afford preferential treatment to certain claimants violated the requirements of § 524(g) and § 1129(a)(1).  Further, the Court found that even if the requirements of §524(g) and § 1129(a)(1) were met, the court would deny confirmation of the plan "as not having been proposed in good faith under § 1129(a)(3)."  Id.  The standard enunciated by the Court was that "the plan be proposed with honesty, good intentions and a basis for expecting that a

reorganization can be effected with results consistent with the objectives and purposes of the Bankruptcy Code … with the most important feature being an inquiry into the fundamental fairness of the plan." Id. at 43 (internal citations omitted).

In so finding, the Court noted that the plan was, by and large, drafted by and for the benefit of the prepetition committee to the exclusion of other claimants, which subsequently exercised "continued influence" from its majority status on the post-petition creditors committee. As a result, the Court held that "it is impossible to conclude that the plan was consistent with the objectives and purposes of the Bankruptcy Code." Id. at 43. The Court went further and said "It is also impossible to conclude that this plan is imbued with fundamental fairness." Although the plan might satisfy the "technical classification requirements of § 1122 and § 1129(b)," the Court found it to be "fundamentally unfair" that similarly situated creditors might be treated differently under the plan's structures: "Both should be compensated based on the nature of their injuries, not based on the influence and cunning of their lawyers."

The Plan here is likewise imbued with the same lack of good faith. The Plan's proposed treatment of the Anderson claims represents the culmination of the Debtors' efforts to suppress Anderson's ability to pursue class claims on behalf of property damage claimants, and to disenfranchise the class Anderson seeks to represent. The Debtors' singling out of Anderson for disparate treatment, coupled with the Debtors' conduct during the course of the case, evidence that the Plan is not proposed in good faith. Indeed, Anderson submits that the Plan's disparate and inequitable treatment of its claim is the culmination of a bad faith effort to undermine and disenfranchise property damage claimants, and more particularly, S&R's efforts to deal with such claims on a class-wide basis, as described herein and as will be proven at the confirmation hearing. Accordingly, the Plan violates § 1129(a)(3) and cannot be confirmed.

## VIII.    **The Plan Does Not Comply With the Bankruptcy Code.**

For the reasons described herein, the Debtors' Plan does not comply with the provisions of the Bankruptcy Code and accordingly cannot be confirmed under 11 U.S.C. § 1129(a)(1).

## **CONCLUSION**

For all of the foregoing reasons, the Court should deny confirmation of the Debtors' Plan.

DATED:  July 13, 2009

/s/_____
Christopher D. Loizides (No. 3968)
LOIZIDES, P.A.
1225 King Street, Suite 800
Wilmington, DE  19801
Telephone:    (302) 654-0248
Facsimile:    (302) 654-0728
Email:            loizides@loizides.com

-    and –

Daniel A. Speights
C. Alan Runyan
SPEIGHTS & RUNYAN
200 Jackson Avenue East
Post Office Box 685
Hampton, SC 29924
Telephone:    (803) 943-4444
Facsimile:    (803) 943-4599

-    and-

John W. Kozyak
David L. Rosendorf
KOZYAK TROPIN & THROCKMORTON, P.A.
2525 Ponce de Leon, 9th Floor
Coral Gables, FL  33134
Telephone:    (305) 372-1800
Facsimile:    (305) 372-3508

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served on the parties on the attached service list in the manner indicated thereon this 13th day of July, 2009.

By:    /s/_____

David L. Rosendorf

**SERVICE LIST**

**VIA FACSIMILE AND FIRST CLASS MAIL**

Laura Davis Jones, Esquire
James E. O'Neill, Esquire
Timothy Cairns, Esquire
PACHULSKI STANG ZIEHL & JONES LLP
919 No. Market Street, 17th Floor
Wilmington, DE  19801
*Fax:     (302) 652-4400*

Teresa K. D. Currier, Esquire
BUCHANAN INGERSOLL & ROONEY PC
1000 West Street, Suite 1410
Wilmington, DE  19801
*Fax:     (302) 552-4295*

Marla R. Eskin, Esquire
Mark T. Hurford, Esquire
CAMPBELL & LEVINE LLC
800 N. King Street, Suite 300
Wilmington, DE  19801
*Fax:     (302) 426-9947*

Michael R. Lastowski, Esquire
DUANE MORRIS LLP
1100 N. Market Street, Suite 1200
Wilmington, DE  19801
*Fax:     (302) 657-4901*

David M. Klauder, Esquire
OFFICE OF THE UNITED STATES TRUSTEE
844 N. King Street, Room 2207
Wilmington, DE  19801
*Fax:     (302) 573-6497*

Theodore Tacconelli, Esquire
FERRY JOSEPH & PEARCE PA
824 Market Street, Suite 904
P. O. Box 1351
Wilmington, DE  19899-1351
*Fax:     (302) 575-1714*

John C. Phillips, Jr., Esquire
PHILLIPS GOLDMAN & SPENCE PA
1200 N. Broom Street
Wilmington, DE  19806
*Fax:     (302) 655 4210*

David M. Bernick, Esquire
Theodore L. Freedman, Esquire
Deanna D. Boll, Esquire
KIRKLAND & ELLIS LLP
153 East 53rd Street
New York, NY  10022
*Fax:    (212) 446-4900*

Janet S. Baer, PC
LAW OFFICES OF JANET S. BAER PC
780 W. Madison Street, Suite 2100
Chicago, IL  60602
*Fax:    (312) 641-2165*

Lewis Kruger, Esquire
STROOCK & STROOCK & LAVAN
180 Maiden Lane
New York, NY  10038-4982
*Fax:    (212) 806-1230*

Elihu Inselbuch, Esquire
CAPLIN & DRYSDALE, CHARTERED
375 Park Avenue, 35th Floor
New York, NY  10152-3500
*Fax:    (212) 644-6755*

Peter Van N. Lockwood, Esquire
Ronald Reinsel, Esquire
Jeffrey Liesemer, Esquire
CAPLIN & DRYSDALE, CHARTERED
One Thomas Circle, N.W.
Washington, DC  20005
*Fax:    (202) 429-3301*

Philip Bentley, Esquire
Douglas Mannal, Esquire
KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, NY  10036
*Fax:    (212) 715-8000*

Roger Frankel, Esquire
Richard H. Wyron, Esquire
Debra L. Felder, Esquire
ORRICK HERRINGTON & SUTCLIFFE LLP
1152 15th Street, NW
Washington, DC  20005-1706
*Fax:    (202) 339-8500*

Scott Baena, Esquire
Jay Sakalo, Esquire
BILZIN SUMBERG BAENA PRICE & AXELROD LLP
First Union Financial Center
200 So. Biscayne Bl., Suite 2500
Miami, FL  33131-2336
*Fax:     (305) 374-7593*

James Restivo, Jr., Esquire
REED SMITH LLP
435 Sixth Avenue
Pittsburgh, PA  15219
*Fax:     (412) 288-3063*

Karl Hill, Esquire
Seitz Van Ogtrop & Green PA
222 Delaware Avenue, Suite 1500
P.O. Box 68
Wilmington, DE  19899-0068
*Fax:     (302) 888-0606*

**VIA FIRST CLASS MAIL**

David B. Siegel
W.R. GRACE & CO.
7500 Grace Drive
Columbia, MD  21044

**VIA ELECTRONIC MAIL (per his 3/16/09 request)**

Alan B. Rich, Esquire
Law Office of Alan B. Rich
1401 Elm Street
Dallas, TX  75202
**Email: arich@alanrichlaw.com**

Jeffrey M. Boerger, Esquire
Drinker Biddle LLP
One Logan Square
18th & Cherry Streets
Philadelphia, PA  19103-6996
**Email: Jeffrey.Boerger@dbr.com**