IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
|                                 | \* |
| ------------------------------- | - |
| In re                           | \* |
|                                 | \* |
| W.R. GRACE & CO., *et al.*,      | \* |
|                                 | \* |
| Debtors.                        | \* |
|                                 | \* |
|                                 | \* |
|                                 | \* |
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Chapter 11
Case No. 01-01139 (JKF)
Jointly Administered

## TRIAL BRIEF OF LIBBY CLAIMANTS IN OPPOSITION TO CONFIRMATION OF FIRST AMENDED JOINT PLAN OF REORGANIZATION

Claimants injured by exposure to asbestos from the Debtors' operations in Lincoln County, Montana (the "Libby Claimants"),[1] by and through their counsel, Cohn Whitesell & Goldberg LLP and Landis Rath & Cobb LLP, and in accordance with the Third Amended Case Management Order ("CMO") [D.I. 21544], submit this Trial Brief in support of their Objection to the First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code of W.R. Grace & Co., et al., the Official Committee of Asbestos Personal Injury Claimants, the Asbestos PI Future Claimants' Representative, and the Official Committee of Equity Security Holders dated as of February 27, 2009 (the "Plan") [D.I. 20872].

---

[1] As identified in the Amended and Restated Verified Statement of Cohn Whitesell & Goldberg LLP and Landis Rath & Cobb LLP Pursuant to Fed. R. Bankr. P. 2019 [D.I. 21365], as it may be amended and restated from time to time.

# TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................1

II.  EXECUTIVE SUMMARY ................................................................................3

III. FACTS ..............................................................................................................5

    A.   Poisoning a Town and its People ..........................................................5

         1.    Discovery of Disease; Grace Cover-Up ....................................7

         2.    Dust Control at the Libby Mine and Mill was Feasible ............8

         3.    Families and the Community ....................................................9

    B.   Libby Asbestos Disease ......................................................................12

         1.    The CARD Mortality Study ....................................................14

    C.   Verdicts and Settlements Against Grace .............................................16

    D.   Other Asbestos PI Claims ...................................................................20

    E.   Grace Bankruptcy ...............................................................................22

    F.   Plan Negotiations Between the PI Committee and Grace ....................24

    G.   Treatment of Libby Claims Under the Plan .........................................26

         1.    Discriminatory TDP Provisions ..............................................27

             a.    Medical Criteria ..........................................................29

                 i.    Blunting of the costophrenic angle is not a requirement in the standard diagnosis of asbestos related disease.  Its use excludes over 42% of Libby Claimants who have died from non-malignant ARD ........30

                 ii.   The requirement of a minimum 3mm pleural thickening is not a standard requirement in the diagnosis of asbestos related disease.  Its use excludes over 16% of the Libby Claimants who have died from non-malignant ARD ..................32

        iii.    The requirement of pleural thickening coverage of over 25% is not a standard requirement in the diagnosis of asbestos related disease. Its use excludes over 18% of Libby Claimants who have died from non-malignant ARD. .........................................33

        iv.    The omission of DLCO measurement is arbitrary. Without DLCO the severity of the Libby Claimants' asbestos disease is not adequately observed. Of Libby Claimants who have died from non-malignant ARD, 47% had DLCO as the only number in the severe category.................................................34

        v.    The requirement that the FEV1/FVC ratio be over 65% discriminates against patients who have obstructive disease along with restrictive disease..............36

        vi.    The TDP precludes use of CT scans for diagnosis or evaluation under Level IV-B. This is not medically reasonable, and discriminates against those whose disease shows on CT scan..................................38

        vii.    The TDP medical criteria arbitrarily excludes patients with unilateral disease. .........................39

        viii.    Summary: Effect of Exclusionary Medical Criteria ........39

      b.    Exposure Criteria ...................................................41

      c.    Combined Effect of Exposure and Medical Criteria.....................43

      d.    Other Discriminatory TDP Provisions...........................................43

    2.    The Plan Deprives Libby Claims of the Benefit of Insurance Coverage for Which They Do Not Compete with Other Claims...............45

IV.    BURDEN OF PROOF...................................................................47

    A.    The Plan Proponents Carry the Burden of Proof to Establish Compliance With All Requirements of Plan Confirmation Under 11 U.S.C. § 1129...................................................................47

    B.    The Plan Proponents Should Be Required to Establish that the Plan is Fair and Equitable to the Libby Claimants By Clear and Convincing Evidence...................................................................48

V.    OBJECTIONS TO PLAN CONFIRMATION ...................................................................49

    A.    The Plan is Unconfirmable Because It Impermissibly Discriminates
           Against the Libby Claimants and Thereby Violates the Bankruptcy Code's
           Policy of Equal Distribution ...............................................................................50

    B.    The Plan Impermissibly Disenfranchises the Libby Claimants Through
           Impermissible Classification and Treatment of Their Claims ............................57

        1.    The Plan Impermissibly Places the Libby Claimants'
               Claims in a Class with Claims that Are Not Substantially Similar............61

              a.    The Libby Claimants' Rights Against Grace Require Them
                    to be Separately Classified ...........................................................62

              b.    The Libby Claimants' Rights Against Insurers Require
                    the Libby Claims to be Separately Classified ...............................64

        2.    The Plan is Unconfirmable Because It Provides Different Treatment
               to Claims of the Same Class ...................................................................68

               a.    The Plan Violates Section 1123(a)(4) by Providing Different
                    Treatment of Claims in the Allowance/Liquidation Process. ........70

              b.    The Plan Violates Section 1123(a)(4) by Providing Different
                    Payment Terms for Claims Based on Jury Verdicts ...................74

              c.    The Plan Violates Section 1123(a)(4) by Providing Different
                    Payment Terms to Later-Allowed Claims ...................................74

               d.    The Plan Violates Section 1123(a)(4) by Providing Different
                    Treatment of Punitive Damages Claims ......................................77

               e.    The Plan Violates Section 1123(a)(4) by Providing Different
                    Treatment of Wrongful Death Claims ........................................77

               f.    The Plan Violates Section 1123(a)(4) by Providing Different
                    Treatment of Loss of Consortium Claims....................................79

               g.    The Plan Violates Section 1123(a)(4) by Taking Away the
                    Libby Claimants' Valuable Insurance Rights...............................80

         3.    The Plan Takes Away the Rights of the Libby Claimants Without
                Providing Them With an Effective Right to Vote .....................................81

C.    The Plan is Unconfirmable Because It Denies the Libby Claimants Their
      Right to Trial by Jury ........................................................................82

D.    The Plan is Unconfirmable Because it Violates the Libby Claimants' Right
      to Have Their Claims Allowed in Accordance with Applicable
      Nonbankruptcy Law.............................................................................86

      1.    The Plan is Unconfirmable Because It Improperly Limits the
            Allowed Amount of Most Libby Claims .....................................86

      2.    The Plan is Unconfirmable Because It Improperly Disallows
            Punitive Damages Claims .........................................................87

      3.    The Plan is Unconfirmable Because It Improperly Disallows
            Wrongful Death and Loss of Consortium Claims.......................89

E.    The Plan is Unconfirmable Because It Provides for Injunctions, Releases
      and Exculpations that are Impermissibly Broad ......................................92

      1.    Injunctions May Protect Third Parties Only from Claims within the
            Four Categories Expressly Permitted by Section 524(g) and Only if
            the Third Party Will Make a Substantial Financial Contribution ............94

      2.    The Asbestos Insurance Entity Injunction Violates Section 524(g)
            by Protecting Third Parties from Claims Outside the Permissible
            Four Categories ........................................................................94

      3.    The Plan Injunctions and the Exculpations Provision Violate
            Section 524(g) by Protecting Third Parties Who Are Not Making a
            Substantial Financial Contribution ...........................................95

      4.    The Plan Impermissibly Enjoins the Libby Claimants' Pursuit of
            Insurance Coverage as to Which They do not Compete with Each
            Other or any Other Claimant ....................................................96

      5.    The Plan Impermissibly Enjoins the Libby Claimants Even Though
            the Plan is Not Fair and Equitable to the Libby Claimants .......................98

      6.    The Plan Impermissibly Releases the Fresenius Indemnified Parties .......99

F.    The Plan is Unconfirmable Because It Improperly Usurps the Courts'
      Function to Modify or Dissolve Preliminary Injunctions ..................................99

G.    The Plan Violates Section 1129(a)(7) of the Bankruptcy Code Because It
      Provides Less to the Libby Claimants Than They Would Receive or Retain
      In a Chapter 7 Liquidation of the Debtors ...........................................100

iv

VI.    CONCLUSION..................................................................................................................101

## TABLE OF AUTHORITIES

### Cases

Addington v. Texas, 441 U.S. 418 (1979) .................................................................48

Allied Products Corp. v. ITT Industries, Inc.
(In re Allied Products Corp.), 2004 WL 635212 (N.D. Ill.),
affirming 288 B.R. 533 (Bankr. N.D. Ill. 2003) ...........................................47

American Universal Ins. Co. v. Pugh, 821 F.2d 1352 (9th Cir. 1987) ..........................83

Bain v. Gleason, 726 P.2d 1153 (Mont. 1986) ...........................................................44

Beacon Theatres v. Westover, 359 U.S. 500 (1959) .....................................................85

Bear Medicine v. U.S., 192 F.Supp.2d 1053 (D. Mont. 2002) .....................................90

Beeler v. Butte and London Copper Development Co., 110 P. 528 (Mont. 1910).......................91

Begier v. IRS, 496 U.S. 53 (1990) ...........................................................................50

Burns v. Eminger, 276 P. 437 (Mont. 1929) .............................................................91

Butner v. United States, 440 U.S. 48 (1979) ........................................................ 86-89

Dawson v. Hill & Hill Truck Lines, 671 P.2d 589 (Mont. 1983) .................................91

F.D.A. v. Brown & Williamson Tobacco Corp., 529 U.S. 120 (2000) .........................76

Federal Home Loan Mortgage Corp. v. Bugg, 172 B.R. 781 (E.D. Pa. 1994).......................48, 49

Finstad v. W.R. Grace & Co., 8 P.3d 778 (Mont. 2000) .........................................6, 87

Granada Wines, Inc. v. New England Teamsters & Trucking
Indus. Pension Fund, 748 F.2d 42 (1st Cir. 1984) ...........................................68

Granfinanciera v. Nordberg, 492 U.S. 33 (1989) .....................................................82

Heartland Federal Savings & Loan Ass'n v. Brisco Enterprises, Ltd.
(In re Briscoe Enterprises, Ltd.), 994 F.2d 1160 (5th Cir. 1993)...........................47, 48

Hennessey v. Burlington Transp. Co., 103 F.Supp. 660 (D. Mont. 1950) ...................91

Hern v. Safeco Ins. Co. of Illinois, 125 P.3d 597 (Mont. 2005)........................44, 45, 90

In re 15375 Memorial Corp., 382 B.R. 652 (Bankr. D. Del. 2008)................................97

In re A. G. Financial Service Center, Inc., 395 F.3d 410 (7th Cir. 2005)................88, 89

In re A.H. Robins Co., Inc., 89 B.R. 555 (E.D. Va. 1988) ....................................89

In re AOV Indus., Inc., 792 F.2d 1140 (D.C. Cir. 1986)................................73, 80, 81

In re Armstrong World Industries, Inc., 348 B.R. 111 (D. Del. 2006) ...................47, 58

In re Cajun Elec. Power Coop., Inc., 432 F.3d 507 (3d. Cir. 2005) ...........................48

In re Celotex Corp., 204 B.R. 586 (Bankr. M.D. Fla. 1996) ..................................89

In re Clay, 35 F.3d 190 (5th Cir. 1994) ....................................................82

In re Combustion Engineering, Inc., 391 F.3d 190 (3d Cir. 2004)........................ passim

In re Congoleum Corp., 362 B.R. 167 (Bankr. D. N.J. 2007) ................................94

In re Dow-Corning Corp., 244 B.R. 721 (Bankr. E.D. Mich. 1999) .......................58, 89

In re Fairfield Executive Assoc., 161 B.R. 595 (D. N.J. 1993) ..............................61

In re Federal-Mogul Global, Inc., 300 F.3d 368 (3d Cir. 2002) ..............................93

In re G-I Holdings, Inc., 323 B.R. 583 (Bankr. D. N.J. 2005)............................82, 83

In re Genesis Health Ventures, Inc., 266 B.R. 591 (Bankr. D. Del. 2001)................77, 88

In re Greystone III Joint Venture, 995 F.2d 1274 (5th Cir. 1991) ............................61

In re Heron, Burchette, Ruckert & Rothwell, 148 B.R. 660 (Bankr. D. D.C. 1992)............64

In re Hoffinger Indus., Inc., 321 B.R. 498 (Bankr. E.D. Ark. 2005) ..........................48

In re Holywell Corp., 913 F.2d 873 (11th Cir. 1990) ....................................59, 61

In re Infiltrator Systems, Inc., 248 B.R. 707 (Bankr. D. Conn. 2000).........................88

In re Jersey City Medical Center, 817 F.2d 1055 (3d Cir. 1987) .........................61, 69

In re Johns-Manville Corp., 68 B.R. 618 (Bankr. S.D.N.Y. 1986).............................89

In re Lumber Exchange, 134 B.R. 354 (D. Minn. 1991) ..................................59, 61

In re Mahoney Hawkes, LLP, 289 B.R. 285 (Bankr. D. Mass. 2002)...........................................67

In re Northwestern Corp., 362 B.R. 131 (D. Del. 2007)...........................................74, 75

In re Rhodes, Inc., 382 B.R. 550 (Bankr. N.D. Ga. 2008)...........................................59, 68

In re Richard Buick, Inc., 126 B.R. 840 (Bankr. E.D. Pa. 1991)...........................................59, 68

In re Roman Catholic Archbishop of Portland in Or., 339 B.R. 215 (Bankr. D. Or. 2006) .........88

In re Union Fin. Services Group, Inc., 303 B.R. 390 (Bankr. E.D. Mo. 2003) ...........................48

In re United Missouri Bank of Kansas City N.A., 901 F.2d 1449 (8th Cir. 1990)...............82

In re United States Mineral Prods. Co., 2005 WL 5898300 (Bankr. D. Del. 2005)...............68

In re Zenith Electronics Corp., 241 B.R. 92 (Bankr. D. Del. 1999) ...........................................99

Jacob v. City of New York, 315 U.S. 752 (1942)...........................................86

Jim Walter Homes, Inc. v. Adams (In re Hillsborough Holdings Corp.), 146 B.R. 1015 (Bankr. M.D. Fla. 1992)...........................................89

Krohmer v. Dahl, 402 P.2d 979 (Mont. 1965)...........................................91

Linder v. Smith, 629 P.2d 1187 (Mont. 1981)...........................................82

Marinkovich v. Tierney, 17 P.2d 93 (Mont. 1932)...........................................92

Matter of Grabill Corp., 967 F.2d 1152 (7th Cir. 1992) ...........................................82

McLane v. Farmers Ins. Exchange, 432 P.2d 98 (Mont. 1967)...........................................47

Mickelson v. Montana Rail Link, Inc., 999 P.2d 985 (Mont. 2000)...........................................44

Mize v. Rocky Mountain Bell Telephone Co., 100 P. 971 (Mont. 1909)...........................................90

Novak v. Callahan (In re GAC Corp.), 681 F.2d 1295 (11th Cir. 1982) ...........................................89

Orr v. State of Montana, 106 P.3d 100 (Mont. 2004)...........................................17

Pacor v. Higgins, 743 F.2d 984 (3d Cir. 1984)...........................................93

Pence v. Fox, 813 P.2d 429 (Mont. 1991) ...........................................45

Swanson v. Champion Int'l Corp., 646 P.2d 1166 (Mont. 1982)...........................................90-92

United States v. Noland, 517 U.S. 535 (1996)....................................................87-90, 92

United States v. Reorganized CF & I Fabricators of Utah, Inc., 518 U.S. 213 (1996)...... 87-90, 92

United States v. Woodway Stone Co., 187 B.R. 916 (W.D. Va. 1995)...............................48, 49

Waltee v. Petrolane, Inc., 511 P.2d 975 (Mont. 1973) ....................................................91

**Statutes**

U.S. Const. Art. 1, § 8, cl.4 ..........................................................................................94

11 U.S.C. § 502 ............................................................................................................69

11 U.S.C. § 524(g) ................................................................................................ passim

11 U.S.C. § 524(e) ........................................................................................................69

11 U.S.C. § 726(a)(4) ....................................................................................................87

11 U.S.C. § 1122 ......................................................................................................61, 68

11 U.S.C. § 1122(a) ........................................................................................59, 61, 62, 69

11 U.S.C. § 1123(a)(4) ........................................................................................... passim

11 U.S.C. § 1126(c) .......................................................................................................58

11 U.S.C. § 1129................................................................................................... passim

28 U.S.C. § 1334(b) .......................................................................................................93

28 U.S.C. § 1411...........................................................................................................82

Fed. R. Bankr. P. 3007..................................................................................................69

Fed. R. Bankr. P. 3008..................................................................................................69

Mont. Code Ann. § 27-1-221 ..........................................................................................87

Mont. Code Ann. § 27-1-323 ..........................................................................................90

Mont. Code Ann. § 27-1-501 ..........................................................................................91

Mont. Code Ann. § 27-1-513 ......................................................................................44, 90

Mont. Code Ann. § 72-3-604 ..................................................................................91

Mont. Const. Art. II, § 26.......................................................................................82

**Treatise**

43 Am. Jur. 2d Insurance § 416 .............................................................................47

3 Collier on Bankruptcy ¶ 362.07[3][a].................................................................97

**Other Authorities**

AMA Guides to Permanent Impairment, (5th Ed.)...........................................35

An Air That Kills – How the Asbestos Poisoning of Libby,
Montana Uncovered a National Scandal, A. Schneider and
D. McCumber, G.H. Putnam's Sons, 2004 ...........................................................11

Asbestos-related Pleural Disease Due To Tremolite Associated With Progressive Loss
Of Lung Function:  Serial Observations In 123 Miners, Family Members And Residents
Of Libby, Montana, Whitehouse (2004), Am J Ind Med 46  ..................................16

Bankruptcy Injunctions And Complex Litigation: A Critical
Reappraisal of Non-Debtor Releases In Chapter 11 Reorganizations, Brubaker,
1997 U. Ill. L. Rev. 959 (1997)..........................................................................65, 81

Diagnosis and Initial Management of Non-Malignant Diseases Related to
Asbestos, Am. J. Respir. Crit. Care Med., Vol. 170:691-715 (2004).................... passim

Environmental Exposure to Libby Asbestos and Mesotheliomas, Whitehouse et al. (2008)..........6

Fatal Deception, M. Bowker, Rodale, 2003............................................................11

Fishman's Pulmonary Diseases and Disorders, (4th Ed. 2008) .......................34

Guidelines for the Use of the ILO International Classification of
Radiographs and Pneumoconioses, Revised Edition 2000..................................30

How United States v. Noland Prohibits the Disallowance of
Punitive Damage Claims in Chapter 11, Grant, 14 Bankr. Dev. J. 199 (1997)............88

Libby, Montana - Asbestos and the Deadly Silence
of an American Corporation, A. Peacock, Johnson Books, 2003.................................11

Standardisation of the Single-Breath Determination of Carbon Monoxide
Uptake in the Lung, Eur Respir. J. 2005; 26:720..................................................35

## I.    **INTRODUCTION**

"There is no question that the miners and their families suffered tragic losses as a consequence of the operation of this mine.  There is no question about that.  And the fact of that injury and that toll casts a dark shadow over Grace, over Libby and over this courtroom.  And I'm not denying that nobody can deny that." David M. Bernick, February 23, 2009.[2]

Nowhere have the effects of asbestos been so devastating as in Libby, Montana – a town of about 2,600 residents.  Libby is in Lincoln County, in the far northwest corner of Montana.  Lincoln County has the highest asbestos death rate in the United States, exceeding the next highest county by 21 percent.  See "Work Related Lung Disease Surveillance System," Table 1-10, and map, Fig. 1-3b, published by the National Institute of Occupational Safety and Health ("NIOSH"), attached as Exhibit A.  As of 2000, Lincoln County had the third highest death rate for mesothelioma in the United States.  See NIOSH "Work Related Lung Disease Surveillance System," Table 7-10, attached as Exhibit B.  Additional mesothelioma deaths since 2000 have likely increased Lincoln County's ranking.  One study reports a total of 31 mesotheliomas from exposure to Libby asbestos, including 11 from environmental exposures in the community of Libby.[3]  ***On June 17, 2009, the EPA formally declared Libby a Public Health Emergency. This is the first ever such designation in the United States.***  A copy of the Declaration of Public Health Emergency is attached as Exhibit C.

From 1963 to 1990, Grace owned and operated mining and manufacturing facilities in the Libby area, at which Grace produced vermiculite.  This ore was used to create zonolite, an insulating material.  Grace's operations blanketed the town with asbestos-laden dust.

---

[2] Transcript of proceedings in U.S. v. W.R. Grace Company et al., Case No. CR 05-07-M-DWM, U.S. District Court for the District of Montana (Missoula Division), February 23, 2009 at 1:00 p.m., at p. 112-13.
[3] Whitehouse, et al. (2008) "Environmental exposure to Libby asbestos and mesotheliomas," Am J Ind Med 51(11) 877-80.

The vermiculite ore was contaminated with dangerous levels of a rare form of amphibole asbestos consisting of 84% winchite asbestos. It is the predominant exposure to the rare winchite amphibole asbestos that sets apart those exposed to Libby asbestos as a separate group. The disease, which we will call "Libby Asbestos Disease," is not different in terms of tissue damage, but its incidence and severity are distinctly different from asbestos pleural disease elsewhere. Those diagnosed with asbestos disease from Libby exposures have a probability of early death due to asbestos-related disease. The death rate exceeds that of even the well studied asbestos insulator's cohort, who were generally more heavily exposed. Libby Asbestos Disease has several facets which are quite different from asbestos-related disease elsewhere. Over 1,800 people from the Libby community have been diagnosed with asbestos disease, approximately 950 of which are Libby Claimants. Over 295 people have died from Libby asbestos disease and many more are on oxygen, or severe.

In response to the Libby Claimants' proof on the severity of Libby Asbestos Disease, the Plan Proponents do not offer proof that the Libby Claimants are not sick. Despite the opportunity for eight years in this bankruptcy, Grace has not had a doctor perform a single examination on a Libby patient. Instead the Plan Proponents attempt to attack the credibility of the doctors treating the Libby Claimants, and the work they present, and seek to prevent them from testifying. In a sense, by offering no proof, the Plan Proponents pay the Libby Claimants a compliment.

In addition to the particular severity of Libby Asbestos Disease, the Libby Claimants carry an additional burden compared with other Asbestos PI Claimants.[4]  Where most asbestos claimants seek recovery from multiple producers of asbestos products and many have already obtained substantial recoveries, the claims of the Libby Claimants (the "Libby Claims") arise

---

[4] All terms not otherwise defined herein shall have the same meaning as in the Plan.

from exposure only to Grace's asbestos. As a result, the Libby Claimants' sources of recovery are limited. It would compound what is already a national tragedy if the Libby Claimants were left without adequate compensation for their injuries.

## II.    <u>EXECUTIVE SUMMARY</u>

Before the Petition Date, Libby Claimants obtained verdicts and settlements from Grace ranging from an average of $271,170 for unimpaired victims of nonmalignant pleural disease to $550,200 for impaired victims of nonmalignant disease, to $1,506,450 for mesothelioma. These amounts are substantially higher than the verdict/settlement averages for other Asbestos PI Claims, not only because of the greater severity of nonmalignant asbestos disease in Libby but also because the Libby Claimants' disease unquestionably resulted from Grace's asbestos. Other Asbestos PI Claimants—for example, a construction worker who may have handled products of Grace and/or dozens of other manufacturers—raise major issues of causation and relative fault.

The Plan purports to pay Asbestos PI Claims on a *pro rata* basis based on their value in the tort system. Yet as to the Libby Claims, the Plan will pay on the basis of a fraction of tort system value. For example, most Libby Claimants with severe pleural disease—meaning that they are not just impaired (lung function of 80%) but severely impaired (lung function of 65%)—will be paid based on an allowed claim of from $2,500 to $20,000, compared with the established prepetition tort system value of $550,200 for impaired nonmalignant Libby Claims. Other Libby Claims are the subject of similar discrimination, as set forth in detail below.

The Libby Claimants' right to a jury trial should serve as a safety valve against liquidation of claims by the Asbestos PI Trust at levels drastically different from tort system values. After all, a jury verdict by definition establishes the tort system value of a claim. But the Plan takes away this safety valve by capping the liquidated value of a claim at the maximum

3

amount that the Asbestos PI Trust itself is permitted to allow.  By overriding whatever jury verdicts aggrieved claimants might be able to obtain, the Plan denies them their Constitutional and statutory right to trial by jury.

The Plan further harms Libby Claimants by taking away their insurance rights, which are different from other Asbestos PI Claimants, and more valuable.  Although the Plan Proponents have admitted that virtually no claimants other than Libby Claimants have the right to access "non-products" coverage under Grace's liability policies, the proceeds of such coverage are thrown into the pool of Asbestos PI Trust assets for distribution almost entirely to non-Libby Claimants or—in the case of coverage from Maryland Casualty Company and Royal Indemnity Company—discarded altogether so that there will be no proceeds for any claimants.

The Libby Claimants submit that the Plan is unconfirmable as a matter of law.  These objections, set forth in greater detail below, include:

- The Plan is Unconfirmable Because It Impermissibly Discriminates Against the Libby Claimants and Thereby Violates the Bankruptcy Code's Policy of Equal Distribution

- The Plan Impermissibly Disenfranchises the Libby Claimants Through Impermissible Classification and Treatment of Their Claims

  - The Plan Impermissibly Places the Libby Claimants' Claims in a Class with Claims that Are Not Substantially Similar

  - The Plan is Unconfirmable Because It Provides Different Treatment to Claims of the Same Class

- The Plan is Unconfirmable Because It Denies the Libby Claimants Their Right to Trial by Jury

- The Plan is Unconfirmable as a Matter of Law Because it Violates the Libby Claimants' Right to Have Their Claims Allowed in Accordance with Applicable Nonbankruptcy Law

  - The Plan is Unconfirmable Because It Improperly Limits the Allowed Amount of Most Libby Claims

- o The Plan is Unconfirmable Because It Improperly Disallows Punitive Damages Claims

- o The Plan is Unconfirmable Because It Improperly Disallows Wrongful Death and Loss of Consortium Claims

- The Plan is Unconfirmable Because It Provides for Injunctions, Releases and Exculpations that are Impermissibly Broad

  - o The Plan Injunctions and Releases May Protect Third Parties Only from Claims within the Four Categories Expressly Permitted by Section 524(g) and Only if the Third Party Will Make a Substantial Financial Contribution

  - o The Asbestos Insurance Entity Injunction Violates Section 524(g) by Protecting Third Parties from Claims Outside the Permissible Four Categories

  - o The Plan Injunctions and the Exculpation Provision Violate Section 524(g) by Protecting Third Parties Who Are Not Making a Substantial Financial Contribution

  - o The Plan Impermissibly Enjoins the Libby Claimants' Pursuit of Insurance Coverage as to Which They do not Compete with Each Other or any Other Claimant

  - o The Plan Impermissibly Enjoins the Libby Claimants Even Though the Plan is Not Fair and Equitable to the Libby Claimants

  - o The Plan Impermissibly Releases the Fresenius Indemnified Parties

- The Plan is Unconfirmable Because It Improperly Usurps the Courts' Function to Modify or Dissolve Preliminary Injunctions

- The Plan Violates Section 1129(a)(7) of the Bankruptcy Code Because It Provides Less to the Libby Claimants Than They Would Receive or Retain In a Chapter 7 Liquidation of the Debtors

## III.    FACTS

### A.    Poisoning a Town and its People

Libby is set in the scenic northwestern corner of Montana, framed by the peaks of the northern Rocky Mountains and the winding Kootenai River. Once known as an outdoor paradise, Libby is inextricably linked to what the Environmental Protection Agency (the "EPA")

5

has called "the worst case of community wide exposure to a toxic substance in U.S. history;"[5] just recently, the EPA formally declared Libby to be a Public Health Emergency – the first ever such designation by the EPA.  From 1963-1990, Grace operated a vermiculite mine and mill seven miles northeast of Libby.  Before 1963, the mine was operated by The Zonolite Company.[6]

Grace's Vermiculite Mountain near Libby was the largest source of vermiculite in the world, supplying two-thirds of the vermiculite used in the United States.  The vermiculite itself was harmless.  It was an excellent product for insulation, ceiling plaster, building materials and potting soil.  However, the Libby vermiculite ore was contaminated with a naturally-occurring amphibole asbestos.  The vermiculite ore contained up to 26 percent asbestos,[7] leading to airborne dust in the workplace consisting of up to 40 percent asbestos.[8]

The mining operation was open cut, reducing the top of Vermiculite Mountain to benches.[9]  Blasting loosened the ore, which was then loaded into trucks.[10]  Half or more of the loads were asbestos or other waste materials, which were dumped down the side of the mountain.  The vermiculite ore was dumped to a conveyor belt, leading to the dry mill.  The dry mill was a seven-level refining process, with the raw ore introduced at the top level.  It then passed through shakers, crushers, hammermills and down chutes to screens for sorting out asbestos and other impurities.[11]  The result of this process was vermiculite concentrate, which traveled on a railroad car down the mountain to storage, then by truck to storage by the river, then by conveyor across

---

[5] www.highplainsfilm.org/rev_libby_ifp.html
[6] The Zonolite Company name was acquired by Grace, and a successor shell company, Montana Vermiculite Company survived until it was dissolved in 1964.
[7] Whitehouse et al. (2008), "Environmental Exposure to Libby Asbestos and Mesotheliomas," p.1.
[8] The facts come from the transcript and exhibits in Finstad v. W.R. Grace & Co., 8 P.3d 778 (Mont. 2000).  The proof met Montana's high standard for punitive damages, and Grace was found guilty by a jury of intentional, reckless and/or malicious conduct.  Mont. Code Ann. § 27-1-221 (1997); see also Expert Report of Dr. Terry Spear dated December 29, 2008 ("Spear Report"), p. 5.
[9] Spear Report, p. 3; Affidavit of Dr. Terry Spear ("Spear Aff."), ¶5 [Adversary Proc. D.I. 363, Exh. S].
[10] Spear Report, p. 3; Spear Aff. ¶6.
[11] Spear Report, p. 3; Spear Aff. ¶5.

the river to be loaded onto railroad cars, which were pushed to Libby.[12] Every time the

vermiculite was moved it produced clouds of dust, containing a high percentage of asbestos

fiber.[13] The blasting produced clouds of dust. The railroad cars hauling concentrate produced

clouds of dust. Workers have testified that inside the dry mill, they could not see a light bulb at

15 feet.[14] A 1967 study by Grace on the dust from the large stack on the dry mill showed 24,000

pounds of dust *per day*.[15] At 25-30 percent asbestos, that meant 8,000 pounds of asbestos rained

down on the workers in the service area near the mill each and every day.[16]

### 1.    Discovery of Disease; Grace Cover-Up

The operators of the Libby mine knew of the asbestos in the ore from the 1920s forward.

In 1956 the State of Montana, Division of Disease Control, performed an industrial hygiene

inspection. The State did a thorough report finding asbestos levels far in excess of the standard,

and citing medical literature on the hazards of asbestos. The Zonolite Company recognized in

1956 that the asbestos was toxic and fatal—a "serious hazard." The State reports also listed

many recommendations on dust control. These were not followed. The State continued

inspections, and repeatedly objected to poor progress on dust control. But the workers were

never told of the inspection reports, or the asbestos hazard.

Management did, however, begin monitoring the health of the workers. In 1959, then in

1964 and every year thereafter, chest x-rays were taken.[17] Each year 25-30 percent of the

workers had abnormal chest x-rays.[18] In 1961, three workers died of asbestosis.[19] The Zonolite

Company did not tell the workers, nor did Grace after it acquired the mine in 1963 and employed

---

[12] Spear Report, p. 3; Spear Aff. ¶5.
[13] Spear Report, p. 3-4; Spear Aff. ¶¶ 9-11.
[14] Spear Aff. ¶5.
[15] Spear Report, p. 8.
[16] Spear Report, p. 8.
[17] Spear Report, p. 6.
[18] Spear Report, p. 6.
[19] Spear Report, p. 7.

the same management personnel.[20]  In 1964, Grace was informed of the greatly elevated risk of

lung cancer with asbestos exposure.[21]  A 1965 study of chest x-rays and lung function tests

showed that 20 percent of the workforce had asbestosis.[22]  By 1973, 16 were dead.  Yet Grace

told the workers the dust was no more harmful than farm dust.  The Chief Engineer was famous

for saying "you can breathe a ton of it, it won't hurt you."  He knew otherwise.  Grace

intentionally exposed the workers to asbestos fibers, knowing workers were dead and dying.  As

to the period through 1974, Grace has publicly acknowledged that "[t]here is no question, and

Grace does not deny, that workplace conditions at the Libby mill . . . were dangerous, and

tragically caused or contributed to disease and/or death as a result of asbestos exposure."[23]

By 1979, when Grace finally told the workers of the hazard of asbestos exposure, 30

were already dead of asbestos disease.  By 1999, deaths from asbestos disease had risen to at

least 97.  Others have certainly died of asbestos disease as well, but exact numbers will never be

known because not all workers have been tracked, and because the family doctors were not

informed and generally were not equipped to diagnose asbestos disease.

## 2.    Dust Control at the Libby Mine and Mill was Feasible

Vacuum trucks and baghouses were available in the 1950s and before.[24]  The owners of

the Libby mine, including Grace after 1963, chose not to use them.  The State reports give long

lists of maintenance measures not undertaken.  Change houses and showers were standard at

other Montana mines since the 1950s.  Grace never had a change house or showers for workers

all the way to end in 1990.[25]  As a result, Grace workers went home dusty.[26]  The asbestos dust

---

[20] Spear Report, p. 7-8.
[21] Spear Report, p. 8.
[22] Spear Report, p. 10.
[23] U.S. v. W.R. Grace & Co., No. 03-35924 (9th Cir.), Appellant's Brief dated April 26, 2004, at 8.
[24] Spear Report, p. 13.
[25] Spear Report, p. 14.
[26] Spear Report, p. 14.

permeated their houses and cars, resulting in a 24-hour exposure for the workers, and extending the asbestos exposure to the workers' families and neighbors.

Grace executives visited other similar plants and reported "the lack of dust laden air [and] excellent housekeeping." Eventually Grace made some improvements. In 1974, Grace replaced the old dry mill with a new wet mill. In the 1970s and 1980s, Grace added other dust control measures. However, at no point did Grace meet industrial hygiene standards. The operation remained dusty to the end. Workers often worked in visible dust, which at the Grace mine and mill meant a violation at over 100 times the asbestos standard. In the final demolition of most of the facilities from 1991-1993, workers were exposed to extreme asbestos dust.

Others besides Grace are responsible for failing to protect workers and the community from Grace's asbestos. As one example, Maryland Casualty Company ("Maryland Casualty"), Grace's workers' compensation carrier from 1962 through 1973,[27] had an engineering division and a medical division which undertook in 1964 to design an industrial hygiene program for the Libby mine. Maryland Casualty was fully aware of the magnitude of the problem. Indeed, the 1965 study showing 20 percent incidence of asbestosis was conducted by Maryland Casualty's own consulting pulmonologist.[28] Nevertheless, the industrial hygiene program designed by Maryland Casualty did not provide for adequate dust control measures, did not provide for proper medical monitoring, did not provide for workers to be told of their exposure to asbestos, and did not provide for workers or their families to be educated about how to protect themselves.

### 3.    Families and the Community

Asbestos fibers are so small that they go right through a vacuum cleaner. They are reported to remain in houses over ten years after entry. The Libby community became

---

[27] Continental Casualty Company, which became Grace's insurer in 1973, may have taken on a similar role at that time.
[28] Spear Report, p. 10.

contaminated with vermiculite and its associated asbestos fibers.  Vermiculite provided superb

insulation for houses.  Members of the community could obtain pickup loads free from Grace's

piles along the railroad tracks on the edge of downtown Libby.  Asbestos-contaminated

vermiculite was also used in gardens as a soil enhancer.  The piles of slippery shale-like

vermiculite concentrate were great for kids to slide on.  Grace even donated the contaminated ore

to the town to use on the little league baseball fields and high school track.  Grace did not

prevent children from using the piles on the Grace property along the railroad.  More Grace piles

and storage areas were across from the swimming pool and public parks.

Libby is in a small bowl-like valley in the Rocky Mountains.  Dust entering this bowl can

be re-circulated for years.  On a typical day, 12 to 16 railroad cars per day full of dusty

vermiculite were shipped out of Libby.[29]  In addition, another 15-20 trains of 100 cars went

through Libby each day at 50 mph, recycling Grace's dust into the community.  Libby was a

dusty place.  The dust was permeated with asbestos.

As a result, there are now more cases of community asbestos disease than there are cases

for workers or family members of workers.  The Libby Claimants consist of:

299 ex-workers

225 family members of workers

440 other members of the Libby community

964 total cases[30]

According to the Center for Asbestos Related Disease in Libby (the "CARD Clinic"), more than

1,800 people from the Libby community have been diagnosed with asbestos disease[31]—a terrible

---

[29] Spear Report, p. 3.
[30] These figures are as of May 19, 2009.
[31] Sur-Rebuttal and Supplemental Expert Report of Dr. Alan C. Whitehouse dated May 14, 2009 ("Whitehouse Report"), ¶35.

concentration of misery in one small community.

This American tragedy has drawn national media attention, including a major documentary "Dust to Dust," by Michael Brown, shown on PBS. The Libby story has been the subject of NBC Dateline, ABC 20/20, CBS 48 Hours, CNN Time, and other investigative news reporting. Libby has also been the subject of three books:

> An Air that Kills - How the Asbestos Poisoning of Libby, Montana, Uncovered a National Scandal, by A. Schneider and D. McCumber, (Putnam, 2004).
>
> Libby, Montana - Asbestos and the Deadly Silence of an American Corporation, by A. Peacock (Johnson, 2003).
>
> Fatal Deception, by M. Bowker (Rodale, 2003).

For decades Libby has suffered from an unprecedented 24-hour-per-day contamination of the community's homes, playgrounds, gardens and air, such that the entire community has been designated a Superfund site and is listed on the EPA's National Priorities List. Through the Superfund program, the EPA projects to spend as much as $350 million on cleaning up property in and around the Libby area.[32] This Court approved a settlement allowing the United States to collect past and future costs incurred by the EPA at the Libby Superfund site for a total of $250 million, with payment to be made within 30 days of this Court's approval.[33] Meanwhile, the vast majority of the injury *to people* remains uncompensated. Victims of advanced asbestos disease in Libby die of strangulation as their lungs become unable to take in enough oxygen to support life. While these victims have struggled for every breath, Grace's Chapter 11 case has moved at a snail's pace for more than eight years.

Despite the overwhelming evidence of the severity of asbestos disease in Libby and Grace's admitted wrongdoing, Grace's medical response has been woefully inadequate. Not until

---

[32] D.I. 18271.
[33] D.I. 18848.

the year 2000, when the widespread community disease was confirmed through asbestos health screening conducted by the federal Agency for Toxic Substances and Disease Registry (the "ATSDR"), did Grace feel compelled by the ensuing national media attention to establish a medical plan to care for the people it had poisoned. This was nearly 40 years after Grace first recognized the disease and 10 years after it closed operations. Predictably, the Grace medical plan has serious shortcomings. The Grace medical plan can be terminated at Grace's discretion, and the Plan presents no assurance that Grace will maintain the medical plan to care for those afflicted with the asbestos disease it caused. More alarmingly, the medical plan is available only to those whom Grace itself deems qualified.[34] Even for people admitted to the plan, it fails to cover essential services. Among other medical expenses the Grace medical plan refuses to cover are end stage 24-hour care and home assistance.[35] For Libby Claimants with impaired lung capacity, especially those on oxygen, these services are critical as they are unable to care for themselves. Exhausted family members bear the burden, with no help from Grace.

### B.    Libby Asbestos Disease

The ore Grace mined near Libby was contaminated with naturally occurring amphibole asbestos. In 2003 it was determined that the Libby asbestos was 84% winchite, 11% richterite, and 6% tremolite.[36] Before 2003 the Libby asbestos was thought to be tremolite. Winchite and richterite are rare and have been little studied. Those predominantly exposed to Libby asbestos form a definite identifiable group, and feature a severe form of asbestos pleural disease. The Plan Proponents have recognized this, and have created a new category for Libby, Level IV-B "Severe and Disabling Pleural Disease."[37] Unfortunately, the criteria for Level IV-B are so

---

[34] Affidavit of Dr. C. Brad Black, ¶14 [D.I. 363, Exh. C] ("Black Aff.").
[35] Black Aff. ¶6.
[36] Whitehouse Report, ¶ 11, citing Meeker, et al (2003).
[37] Deposition of Peter Van N. Lockwood, Esq., 5/17/09, p. 407.

rigorous that few Libby Claimants qualify for compensation. In the CARD mortality study, only 14% of patients deceased due to non-malignant asbestos-related disease would qualify for Level IV-B.

As noted, Libby is located in Lincoln County, Montana, which has the nation's highest asbestosis death rate.[38] (Lincoln County's age-adjusted asbestos death rate exceeds the next highest county by 21%.) As of 2000, Lincoln County had the third highest death rate for mesothelioma in the United States,[39] and has likely moved higher once more recent mesothelioma deaths are included. There are now 295 documented deaths by asbestos disease.[40] Peipins, et al. (2003) describes the 2000-2001 screenings by the ATSDR of 61% of the Libby area population, finding 18% of those screened with pleural abnormalities.[41] This is an extremely high rate. *On June 17, 2009, the EPA formally declared Libby a Public Health Emergency.[42] This is the first ever such designation in the United States.*

The high asbestosis death rate and the high mesothelioma rate indicate that Libby winchite asbestos is highly toxic. Winchite asbestos is amphibole asbestos, which is generally thought to be more toxic than the more common chrysotile asbestos. Amphibole asbestos is like microscopic needles which penetrate the lung and travel to the far lining of the lung (the pleura); whereas chrysotile asbestos is more curly and tends to get trapped in the body of the lung (the parenchyma). Chrysotile asbestos is cleared from the lungs more readily than is amphibole asbestos, and causes less disease.

---

[38] See NIOSH report, "Work Related Lung Disease Surveillance System," Table 1-10, "Asbestosis: Counties with Highest Age Adjusted Death Rates (per million population), U.S. Residents Aged 15 and Over, 1995-2004," and map Fig. 1-3b.
[39] Id., at Table 7-10.
[40] Whitehouse Report, ¶ 47.
[41] Whitehouse Report, ¶ 36.
[42] A copy of the Declaration of Public Emergency is attached as Exhibit C.

Most authors view amphibole asbestos as significantly more toxic in causing lung cancer and fibrosis, as compared to chrysotile asbestos.[43]  Amphibole asbestos is considered by most authors to be over 100 times as toxic in causing mesothelioma, as compared to chrysotile asbestos.[44]

Amphibole asbestos tends to be more than twice as likely as chrysotile asbestos to produce asbestosis and asbestos pleural disease that is radiographically progressive.[45]  Mossman and Churg (1998), p. 1669 state:  "Bio-persistence is probably responsible for the much greater tendency of amosite and crocidolite-induced asbestosis to progress, compared to chrysotile-induced asbestos."[46]  (Amosite and crocidolite, like winchite, are amphibole asbestos.)

In the CARD mortality study, all subjects had pleural disease to some degree, and 88% had diffuse pleural thickening.[47]  Light and Lee, Textbook of Pleural Diseases, p. 501, states:  "Diffuse pleural thickening appears more closely related to amphibole than chrysotile exposure."[48]  On chest x-rays, more pleural effusions and more severe pleural disease than is seen in amphibole cohorts are seen than is the case with predominantly chrysotile exposure cohorts.

1.    **The CARD Mortality Study**

Dr. Alan C. Whitehouse and Dr. Arthur L. Frank performed a study on deceased patients who has been examined at the CARD Clinic in Libby or by Dr. Whitehouse in Spokane, Washington.[49]  Dr. Whitehouse made determinations on whether asbestos-related disease was a

---

[43] Whitehouse Report, ¶ 53-55, citing research.
[44] Whitehouse Report, ¶ 57, citing research.
[45] Whitehouse Report, ¶ 59, and Chart Exh. 13 summarizing research.
[46] Whitehouse Report, ¶ 59.
[47] Whitehouse Report, Exh. 7 spreadsheet "CARD Mortality Study, 76 non-malignant deaths, chx readings by Dr. Frank."
[48] Whitehouse Report, ¶ 28.
[49] Whitehouse Report, ¶ 31.

significant contributing factor in each death.[50]  Of 186 deceased patients diagnosed with

asbestos-related disease, 110 had died of malignant and non-malignant asbestos disease as of

July 9, 2008.[51]  This is a proportional mortality due to asbestos-related disease of 59%.  This

appears to be the highest reported for any cohort in the United States.  CARD patients once

diagnosed have a probability of death by asbestos disease.

To make the CARD mortality study more comparable to the study on asbestos insulators

by Markowitz, et al. (1998), Dr. Whitehouse reevaluated the CARD study deaths in terms of

only primary cause.  The result was 52% (96/186) died of asbestos disease.[52]  The insulators

mortality rate due to asbestos disease was 45%.[53]  The asbestos insulators had extremely heavy

exposures to asbestos dust.  The Libby patients on the other hand are mostly community

members many of whom had relatively light exposures to asbestos from casual exposure, such as

breathing the air in the Libby area.  Only 34% (37/110) of the CARD patients who died of

asbestos disease were mine workers.[54]  Another major difference between the insulators and the

CARD patients is that the insulators had predominantly interstitial disease, reflecting

predominantly chyrsotile exposure, while the CARD patients had predominantly pleural disease,

reflecting amphibole exposure.

The CARD mortality study also highlighted the differences in disease presentation and

severity, as compared to asbestos disease elsewhere.  (1)  55% died with moderate or extensive

pleural disease, and a majority of those had minimal or no interstitial fibrosis.[55]  This is not

reported elsewhere.  (2)  14 died with pure pleural disease.[56]  Only five pleural deaths are

---

[50] Whitehouse Report, Exh. 7.
[51] Id., ¶ 31.
[52] Id., Exh. 7A.
[53] Id., ¶ 32, Table at p. 24.
[54] Id., ¶ 32.
[55] Whitehouse Report, ¶ 31, Item 4.
[56] Whitehouse Report, ¶ 31, Item 3.

reported elsewhere. (3) 45% had "isolated DLCO" meaning that diffusion capacity (DLCO) was the only number under 65% of normal, among DLCO, FVC and TLC.[57] This is not reported elsewhere. (4) 42% had no blunting of the costophrenic angle. This is not reported elsewhere for patients with severe pleural disease.

The pleural disease from Libby winchite exposures is highly progressive, and often fatal. The CARD mortality study shows that Libby Asbestos Disease carries a probability of death by asbestos disease. A further study confirms the deadly nature of Libby asbestos disease.[58] This study evaluated all Dr. Whitehouse's patients who had two sets of lung function tests to determine the percentage who had progressed and the amount of progression in lung function loss. Seventy-six percent (76%) progressed and the losses were 2.2% per year for forced vital capacity (FVC), 2.3% per year for total lung capacity (TLC) and 3.0% per year for diffusion capacity (DLCO). The author noted that the 76% progression rate is "excessive compared to other published reports," p. 223.[59] Since publication, 36 of the subjects have died. Eighty-three percent (83%) (30/36) died of asbestos disease.[60]

C.    **Verdicts and Settlements Against Grace**

Many of the Libby victims of asbestos disease brought suit against Grace. To do so, they engaged Montana lawyers[61] rather than the personal injury law firms that have gathered hundreds of thousands of asbestos claims to assert in litigation and bankruptcy cases nationwide, and who regularly serve on Chapter 11 creditors' committees such as the Asbestos PI Committee.

---

[57] Whitehouse Report, Item 7.
[58] Whitehouse (2004), "Asbestos-related Pleural Disease Due To Tremolite Associated With Progressive Loss Of Lung Function: Serial Observations In 123 Miners, Family Members And Residents Of Libby, Montana," Am J Ind Med 46:219-225.
[59] Whitehouse Report, Exh. 2.
[60] Whitehouse Report, ¶ 38.
[61] McGarvey, Heberling, Sullivan & McGarvey of Kalispell, Montana, and Lewis, Slovak & Kovacich, P.C. of Great Falls, Montana.

Prior to Grace's Chapter 11 filing, Libby Claimants obtained a series of verdicts and settlements against Grace. Libby Claimants also sued others who they assert share legal responsibility.[62]

Not surprisingly, the highly progressive and deadly nature of pleural disease in Libby resulted in an established course of verdicts and settlements that are far greater than for pleural disease in other asbestos cases elsewhere. Libby average settlements for pleural disease have ranged from $212,000 (unimpaired claimant) to $343,000 (impaired claimant) compared with, for example, $2,500 (unimpaired) and $7,500 (impaired) fixed as the pleural disease claim levels under the Asbestos PI TDP (the "TDP") proposed by Grace and the Asbestos PI Committee.[63] Across the board, similar disparities exist between historic Libby claim values and those proposed by the TDP based, according to the Plan Proponents, on historic claim values for Asbestos PI Claims as a whole:

---

[62] Other actions include: (1) Libby Claimants who worked at the Libby mine before it was purchased by Grace in 1963 have brought suit against the mine's former owner, Montana Vermiculite Company (then named The Zonolite Company); while MVC is not believed to have assets of its own, the Libby Claimants believe that insurance through Royal Indemnity Company is available to be applied toward any recovery. (2) Libby Claimants commenced actions in Montana state courts against the State of Montana for breaching its duty to warn. See Orr v. State of Montana, 106 P.3d 100 (Mont. 2004) (permitting these lawsuits to proceed). (3) Libby Claimants brought actions in Montana state courts against BNSF Railway Company and its predecessors, premised on common negligence and strict liability relating to the railroad's transportation of asbestos and asbestos contamination on the railroad's property. (4) Libby Claimants have sued Maryland Casualty Company, asserting that by undertaking to implement an industrial hygiene program at the Libby mill and then failing to develop a program that met then-prevailing standards for such programs, Maryland Casualty breached a duty to the Libby Claimants. Libby Claimants may have similar claims against CNA but have been unable to pursue them to date.

[63] A Severe Disabling Pleural Disease category is also included in the TDP grid ($50,000) but, as discussed below, is so exclusionary in medical criteria that only about 14% of Libby severe pleural cases would qualify.

| Historic Libby Claim Values vs. TDP Values | | | | |
|---|---|---|---|---|
| Disease | Settlement/ Verdict Amts.[64] | Adjustment Factor[65] | Adjusted Libby Settlements/Verdicts | TDP Values |
| Mesothelioma | $605,000 | 2.49 | $1,506,450 | $180,000 |
| Lung Cancer | 315,000 | 1.69 | 532,350 | 42,000 |
| Other Cancer | N/A[66] | 1.73 | 544,950 | 20,000 |
| Libby Impaired | 420,000 | 1.31 | 550,200 | 7,500 |
| Libby Unimpaired | 207,000 | 1.31 | 271,170 | 2,500 |
| Libby Wrongful Death[67] | 250,000 | 1.31 | 327,500 | 0 |

This is a shocking but not unexpected result. The Disclosure Statement indicates that before the Petition Date, Grace's asbestos personal injury claims were disposed of (settlements and verdicts) for an average of approximately $4,000 per claimant.[68] The prepetition Libby average settlement and verdict amount was $387,000—nearly 100 times the amount received by the average Grace claimant. Grace's own records show that the average prepetition settlement for Grace's Libby mine and mill workers and their family members was $268,000 per asbestos diseased claimant, compared to less than $2,500 per non-Libby claimant.[69] Clearly, the severity of Libby Asbestos Disease in the form of high progressivity and probability of death, coupled with the fact that the Libby Claimants were exposed only to Grace's asbestos while other claimants had multiple sources of asbestos exposure, required compensation from Grace on a

---

[64] In the course of discovery, Grace brought to the Libby Claimants' attention some very old settlements that Grace claims should be included in the verdict/settlement averages. It does not appear that inclusion of these settlements would have a material effect on the averages. The Libby Claimants are still in the process of analyzing this issue, and will update the figures if appropriate.

[65] The Libby Claim figures have been brought current using the same adjustment developed by Asbestos PI Committee's estimation expert, Dr. Mark Peterson, to bring Grace's pre-bankruptcy verdict/settlement figures into line with current values for purposes of the TDP.

[66] The Libby Claimants did not obtain any prepetition verdicts or settlements for Other Cancer claims. The adjusted figure assumes that the Libby Claimants would obtain the same verdict/settlement for Other Cancer as they in fact obtained for Lung Cancer.

[67] Dr. Peterson did not develop an adjustment for wrongful death claims. Accordingly, the lowest adjustment that he developed for other types of claims was utilized.

[68] Disclosure Statement § 2.7.1.

[69] See transcript of June 11, 2009 deposition of Mr. Jay Hughes, Grace's designated corporate representative witness under Fed. R. Civ. P. 30(b)(6), at pp. 109-113, and deposition Exhibit, Attachment 5A (Bates-stamped 91-1625).

much greater scale.  Grace acknowledges that the magnitude of its prepetition settlements with Libby claimants stemmed in large part from the fact that Grace was the only defendant in Libby cases and that there was strong objective evidence of exposure to Grace asbestos in Libby not present in most non-Libby cases.[70]

The cases of Les Skramstad and Jerry Finstad tell only part of the suffering experienced in Libby:

Les Skramstad came to Libby when he was 17 years old.  Shortly after his arrival, he met his future wife, Norita.  They raised five children together.  Les had several jobs at the mine from 1959-1961, first working as a sweeper and then in the experimental lab.  During those years he was exposed to high levels of asbestos dust on a daily basis.  As a sweeper, he would often be required to wade through up to 10 inches of the contaminated dust.  His nose would become so packed with it, he could hardly breathe.  There was no washhouse, no shower at the mine on the hill for the workers to clean up before they went home to their families.  So at the end of the day, Les went home to his wife and young children covered with dust.  He didn't know and the company never told him of the dangers of asbestos.  In 1995, at the age of 57, Les was diagnosed with asbestosis.  He required oxygen for the simplest of activities.  He struggled with the disease and the hardship it brought upon his family.  The most difficult part was that his wife and two of his children were also diagnosed with asbestosis.  Les filed suit against Grace and received a jury verdict of $660,000.  He had hoped to live to see the outcome of the criminal trial, but in January 2007 at the age of 70, he died of mesothelioma, having lived his final years in terrible pain.

Jerry Finstad started working for Grace in Libby in 1965.  Like Les Skramstad, Jerry started out as a sweeper in the dry mill.  He too suffered the horribly dusty conditions. Supervisors at the mine told Jerry and other workers that the dust was not harmful.  After his

_____

[70] Id.

time as a sweeper, Jerry worked in and around other parts of the mine.  Conditions were dusty

wherever he went.  Jerry was unaware of the harm of asbestos and was never told about it.  He

continued to work for Grace for about two years.  Three decades later, in 1998, Jerry was

diagnosed with asbestosis.  At the time, Jerry was only in his middle 50s.  His condition

deteriorated and he soon found it difficult getting up and down stairs.  He required oxygen for

periods of the day.  In 1998, Jerry filed suit against Grace and obtained a verdict of $483,000,

including $83,000 in punitive damages.

### D.    Other Asbestos PI Claims

The vermiculite mine in Libby was only a part of Grace's global business.  Grace is best

known for its construction and insulating products, many of which contained asbestos.  As a

result, like other asbestos companies, Grace increasingly became a defendant in suits alleging

personal injury claims from asbestos exposure as well as asbestos-related property damage

claims.  By the Petition Date, nearly 130,000 personal injury claims were pending against

Grace.[71]  Only 171 of these lawsuits were brought by Libby Claimants.[72]

While Libby Asbestos Disease is a result of the Libby amphibole asbestos, Grace's

overwhelming asbestos liability is due to chrysotile asbestos that was incorporated into its

construction and insulation products.  Grace was one of many companies in the construction

industry that sold products containing chrysotile asbestos.  Because construction and insulation

workers were exposed to asbestos-containing products sold by different companies, the typical

asbestos personal injury claimant, a construction or insulation worker, often files claims against

many, even dozens of defendants.  Throughout this case, Grace has complained that it is the

victim of (a) phony claims from mass screenings; (b) claimants with pulmonary function tests

---

[71] Disclosure Statement § 2.7.1.
[72] Libby Claimants now number over 960 and more Libby Claims can be expected in the future.

that do not conform to American Thoracic Society (the "ATS") standards; (c) use of peripatetic,

hired gun doctors for diagnoses; (d) claims based on minimal or no proof of exposure to Grace's

products; (e) claimants who shifted their attention to Grace as a new target defendant; and (f)

claimants whose lung function will never actually be impaired.[73]  It is important for this Court to

understand that none of these complaints apply to the Libby Claimants:

- **Phony claims from mass screenings**.  There has never been a mass screening in Libby
  paid for by a law firm.  The two screenings done in Libby were conducted by the federal
  ATSDR and the State of Montana.  As a result of these government screenings, the
  number of diagnosed cases increased dramatically.  In the case of the Libby Claimants,
  virtually all saw their doctor before ever contacting an attorney about a claim.  The recent
  motion to strike Dr. Whitehouse's testimony drew this Court's attention to the fact that
  three of Dr. Whitehouse's patients had been referred by personal injury lawyers.[74]  Three
  patients out of approximately 1800 that the CARD Clinic has diagnosed with Libby
  Asbestos Disease is, self evidently, a very small number.

- **Pulmonary function tests which do not conform to American Thoracic Society
  standards**.  The CARD Clinic in Libby and the Klock and Whitehouse Clinic in
  Spokane, Washington have consistently and rigorously applied ATS standards.  In fact,
  Dr. Whitehouse's technician Mary Kay Collins won U.S. respiratory therapist of the year
  for her excellence.

- **Use of peripatetic, hired gun doctors**.  Long before there was any litigation, a large
  number of the Libby Claimants sought treatment from Dr. Whitehouse.  As noted above,
  he has treated victims of Libby Asbestos Disease since 1980.  The CARD Clinic has been
  treating patients since 2000.  In virtually all cases, a Libby patient's medical records come
  from the treating physician, with a standard chart consisting of medical reports, physical
  exam, chest x-ray and/or CT scan, and full pulmonary function tests.  In Libby it is Grace
  that has brought in peripatetic, hired gun doctors to counter the testimony of the patient's
  own physician.  Not surprisingly, no judge or jury has relied upon Grace's doctors in any
  of the civil litigation on medical issues.

- **Minimal or no proof of exposure to Grace's products.**  In Libby, Grace was
  unquestionably the source of the asbestos that has caused the Libby Claimants' asbestos
  disease.  Grace does not contest this.  There is no issue of inadequate exposure histories.
  It is well documented that Grace's asbestos dust pervaded the community, and only a few

---

[73]  Memorandum of Points and Authorities in Support of W.R. Grace & Co.'s Motion to Approve PI CMO and
Questionnaire dated May 10, 2005 [D.I. 8395], Tab 2.
[74]  Motion of Arrowood Indemnity Company f/k/a Royal Indemnity Company to Strike Whitehouse Expert Report
or, Alternatively, Compel the Production of Documents and Databases on Which He Relies and for Entry of a
Confidentiality Order [D.I. 21245].

of the Libby Claimants have any significant asbestos exposure outside of Libby, Montana.

- **A shift to new target defendant.**  In Libby, Grace is not a victim of a shift in defendants.  Grace was always named defendant in cases brought by Libby Claimants before the Petition Date.

- **Payments to litigants who will never be impaired.**  Asbestos disease can be diagnosed radiographically before impairment sets in.  In Libby, as elsewhere, the current status is that most patients are unimpaired (*i.e.*, no lung function under 80% of normal).  However, with Libby Asbestos Disease, there is at least a 76% probability of progression.  Thus, unlike other Asbestos PI Claimants who are unimpaired, even a currently unimpaired Libby Claimant is very likely to become impaired and eventually to die of asbestos disease.

### E.    Grace Bankruptcy

On April 2, 2001, Grace filed a petition for relief under Chapter 11 of the Bankruptcy Code.  Shortly thereafter, the Official Committee of Asbestos Personal Injury Claimants was formed (the "Asbestos PI Committee").[75]  Except for the inclusion of a sole Libby representative, membership of the Asbestos PI Committee was a reunion of the same lawyers who serve together on personal injury committees in most of the significant asbestos bankruptcy cases in this country.  The initial members included: Frederick M. Baron, Esq., John D. Cooney, Esq., Mark C. Meyer, Esq., Robert Jacobs, Esq., Steven L. Kazan, Esq., Michael V. Kelley, Esq., Thomas M. Wilson, Esq., Joseph F. Rice, Esq., Nancy W. Davis, Esq., Ian P. Cloud, Esq., Steven T. Baron, Esq., and Perry Weitz, Esq.  Most of these members belong to the largest of the mass filer law firms.

On May 24, 2004, the Bankruptcy Court approved the appointment of David T. Austern as the legal representative for the future asbestos personal injury claimants.[76]  As Asbestos PI

---

[75] D.I. 95.
[76] D.I. 5645.

FCR, Mr. Austern has nominal responsibility for future Libby Claimants, but has taken no steps whatsoever to protect their interests.[77]

As this Chapter 11 case began to develop, it became apparent that members of the Asbestos PI Committee were concerned only to maximize their own revenues and would not provide a fair deal for the Libby Claimants. By acting exclusively in their own interests, the members of the Asbestos PI Committee have chosen to ignore the Libby-related issues that—as has been recognized even by Grace[78]—separate this case from the numerous other cases in which the members of Asbestos PI Committee similarly serve. This could not have been more evident than at the outset of the personal injury estimation proceeding. Although Grace had designated a number of Libby-specific expert witnesses, the Asbestos PI Committee informed the Libby Claimants' counsel that the committee would not designate witnesses to respond to Libby-specific issues. The Asbestos PI Committee instead advised the Libby Claimants' lawyers that, if they concluded such experts might be necessary, they must designate their own. More broadly, the Asbestos PI Committee told the Libby Claimants that the committee did not plan to defend against Libby-specific evidence or positions that Grace may assert. Thus, the Asbestos PI Committee was prepared to let Grace's evidence concerning Libby Claims go unanswered in the estimation proceeding, even if the result were to be this Court's determination of a lower overall estimate of Grace's asbestos liability.

The Libby Claimants determined that they needed to defend against Grace's attack and present evidence on Libby-specific medical issues. Accordingly, the Libby Claimants filed a

---

[77] Libby Claimants that have retained Montana counsel postpetition have "claims" under the Bankruptcy Code and are represented by those firms, not the Asbestos PI FCR. However, it is estimated that there will be hundreds more who will be diagnosed with Libby Asbestos Disease in the future.

[78] Grace itself, in a Status Report on the Progress of the Case [D.I. 11756], recognized the separate interests of the Libby Claimants by listing them as a separate agenda item ("Provisions regarding Libby claimants to be negotiated") in their checklist for the negotiation of a consensual plan. Exhibit C, Item III.A.2.

motion seeking to be treated analogously to a subcommittee whereby they could be represented

separately from the Asbestos PI Committee on issues where their interests diverge from the rest

of the committee, with the expense of such representation borne by the bankruptcy estate.[79]  This

Court denied the Libby Claimants' motion without prejudice, reserving the right to consider a

later request for compensation from the Libby Claimants.[80]  As the estimation proceeding

developed, it became apparent that Grace's statistical experts had not separately broken out

Grace's liability for Libby Claims.[81]  The Libby Claimants were able to negotiate with Grace to

be removed from the estimation proceeding, with all parties agreeing that the estimation trial

would be Libby-neutral.[82]  The estimation trial was called off when Grace, the Asbestos PI

Committee and certain other parties reached agreement on a term sheet that ultimately led to the

Plan.

F.    **Plan Negotiations Between the PI Committee and Grace**

From the outset, Grace vowed that this case would be different from other asbestos

bankruptcy cases.  Grace claimed to be solvent if asbestos claims were reduced to their true

value.  To determine the true value of its asbestos liability, Grace declared war on unimpaired

claims.  In November 2004, Grace filed a plan and plan-related motions intended to disallow

invalid and overstated claims of mass filers, with all valid Asbestos PI Claims to be paid in full.

This aspect of Grace's plan had promise for the Libby Claimants.  Even though Grace could be

anticipated to object even to legitimate Asbestos PI Claims, the Libby Claimants could have

---

[79] Libby Claimants' Motion for Payment of Certain Expenses In Connection with Claims Estimation and Plan Process dated February 20, 2006 [D.I. 11865].
[80] D.I. 12450.
[81] Neither had the Asbestos PI Committee's.  The Asbestos PI FCR's expert did have an exhibit containing data, largely inaccurate, about Libby Claims.
[82] Agreed Order Granting Libby Claimants' Motion In Limine Concerning Estimation Proceeding Evidence [D.I. 17431].  This order reserved the rights of all parties to later address the medical criteria for Libby Asbestos Disease, the extent to which Libby Asbestos Disease has separate characteristics from other asbestos disease, and whether and in what amount any particular claim based on Libby Asbestos Disease should be allowed.

expected, by prevailing on their claims, to obtain settlement payments approaching the full value of the Libby Claims.

The Asbestos PI Committee opposed Grace's initial plan, claiming that Grace was insolvent by reason of an aggregate asbestos personal injury liability that the committee's expert estimated would most likely be between $5.0 and $5.8 billion.[83]  Then, in the course of the estimation trial, Grace and the Asbestos PI Committee struck the deal that led to the Plan.  Grace gave up its position that invalid and overstated Asbestos PI Claims would be disallowed, instead agreeing to be cleansed of asbestos liability upon turning over to an asbestos trust assets with an announced value of $2.9 billion.  The Asbestos PI Committee gave up its position that Grace was insolvent, agreeing that Grace would emerge from Chapter 11 with existing shareholders not only owning the company but having equity worth up to $821 million.[84]  Non-asbestos creditors, too, would receive treatment reflecting Grace's solvency.[85]  Indeed, one of the issues on which this Court recently ruled is the rate of interest that unsecured bondholders will be paid on their prepetition claims.[86]  Asbestos PI Claimants, however, will not be paid 100% plus interest. Instead they are limited to a fixed pool of assets, to be divided as the Asbestos PI Committee sees fit.  The TDP devised by the Asbestos PI Committee will pay only a fraction of the proposed value of asbestos claims, with an initial Payment Percentage projected to be between 25% and 35%.[87]

There are only two possible explanations for this otherwise unfathomable turn of events: either the Asbestos PI Committee breached its duty to its constituents by accepting a plan that

---

[83] See W.R. Grace Projected Liabilities for Asbestos Personal Injury Claims As of April 2001, by Mark A Peterson dated June 2007, revised January 2009.
[84] Disclosure Statement § 2.11.2.6.
[85] Disclosure Statement § 4.3.
[86] Memorandum Opinion dated May 19, 2009 [D.I. 21747].
[87] TDP § 4.2.

severely discriminates against Asbestos PI Claims in comparison to other general unsecured

claims, or the personal injury constituency is in fact receiving much more than 30 percent of the

aggregate amount of *valid* Asbestos PI Claims, but have rigged the TDP to overpay claims that

are invalid or weak. Whichever explanation is true (maybe both are), the outcome is severely

detrimental to the Libby Claimants, who suffer from serious asbestos disease unquestionably

caused by Grace's asbestos, and who cannot file a raft of claims against other asbestos producers.

### G.    Treatment of Libby Claims Under the Plan

While negotiations proceeded in fits and starts between Grace and the Asbestos PI

Committee, there were internal negotiations between representatives for the Libby Claimants and

the rest of the members of the Asbestos PI Committee concerning the treatment of Libby Claims.

The pace of these negotiations accelerated when Grace and the Asbestos PI Committee reached

an agreement.[88] The other members of the Asbestos PI Committee had all the resources of the

Asbestos PI Committee. The Asbestos PI FCR and counsel also aligned themselves with the

Asbestos PI Committee majority.

Without commenting on the specific substance of the negotiations, the Libby Claimants

presented two alternative approaches for the fair and equitable treatment of their claims: (1)

adjustment of the TDP to provide liquidated values for Libby Claims consonant with the

prepetition history of settlements and verdicts versus Grace, or (2) establishment of a separate

trust or sub-trust to be funded by the estimated total amount that would be paid to Libby Claims

under the first approach.[89] The Asbestos PI Committee and the Asbestos PI FCR declined to

adopt either approach. Instead, they have proposed the Plan under which most Libby Claims are

---

[88] When the agreement was introduced and brought before the Asbestos PI Committee for approval, the Libby
Claimants voted against it as failing to provide adequate treatment for the Libby Claims.
[89] Under either approach, Libby Claimants were to have the benefit of insurance available on an uncapped basis to
pay non-products claims, and were to be free to pursue their independent claims against third parties.

not even permitted, never mind entitled to, a liquidated value reflecting verdict and settlement history.  Thus, even if the Libby Claimants were to accept the injustice of a low Payment Percentage resulting from dilution of their claims by hundreds of thousands of Asbestos PI Claims that Grace has condemned as invalid, the Libby Claimants still face (1) terms of the TDP that have been crafted so as to deprive the Libby Claimants of their fair *pro rata* share of the funds of the Asbestos PI Trust and (2) prejudicial treatment of the insurance coverage for Libby Claims.

### 1.        Discriminatory TDP Provisions

The TDP declares as its goal "paying all claimants over time as equivalent a share as possible of the value of their claims based on historical values for substantially similar claims in the tort system."[90]  The TDP sets a Payment Percentage applicable to all claims.  To determine the amount paid to each claimant, the Payment Percentage is applied to the liquidated value of each Asbestos PI Claim as determined pursuant to the TDP.[91]  Most of the TDP is devoted to the criteria and process for liquidating claims.

Under the TDP, each claimant initially elects to be treated in accordance with Expedited Review[92] or Individual Review.[93]  Under Expedited Review, the claim is valued in accordance with a grid specifying a different Scheduled Value for different types of claims based on medical and exposure criteria.  If the claimant provides evidence that he was exposed to Grace's asbestos and meets the criteria for a particular Disease Level, the claim is valued at the Scheduled Value for the Disease Level without the delay or uncertainty of Individual Review.[94]

---

[90]  TDP § 2.1.
[91]  TDP §§ 2.3, 4.2 and 4.3.
[92]  TDP § 5.3(a).
[93]  TDP § 5.3(b).
[94]  TDP § 5.3(a)(1)-(3).

Under Individual Review, the Asbestos PI Trust makes a largely discretionary determination of the value of the claim in the tort system based on consideration of factors specified in the TDP.[95]  However, the claim may not be valued at more than the Maximum Value for the particular Disease Level specified in the TDP unless it is an Extraordinary Claim.[96]  The Asbestos PI Trust may designate an Extraordinary Claim where the claimant's exposure was largely to Grace's asbestos and the claimant has little likelihood of substantial recovery other than from the Asbestos PI Trust.[97]  The Asbestos PI Trust may in its discretion value an Extraordinary Claim at up to five times the Scheduled Value (in the case of 75% exposure to Grace's asbestos) or eight times the Scheduled Value (in the case of 95% exposure to Grace's asbestos), with the determination of the trust's Extraordinary Claims Panel being final.[98]  In any other instance where the claimant is dissatisfied with the valuation resulting from Individual Review, the claimant may proceed to mediation,[99] then to binding or non-binding arbitration[100] and then (if non-binding arbitration was elected) to obtain a verdict through the tort system.[101] *The TDP specifies that even a verdict obtained through the tort system will be capped at the Maximum Value for the particular Disease Level.*[102]

Under this regime, the Scheduled Value and Maximum Value applicable to each claim are critical.  These are determined by the Disease Level for which the claim satisfies medical and exposure criteria.  The TDP treats Libby Claims unfairly in both respects.

---

[95]  TDP § 5.3(b)(2).
[96]  TDP § 5.3(b)(1)(B).
[97]  TDP § 5.4(a).
[98]  TDP § 5.4(a).
[99]  TDP § 5.10(b).
[100]  TDP § 5.10(a).
[101]  TDP §§ 5.11 and 7.6.
[102]  TDP §§ 5.10(c) (as to arbitration awards) and 7.7 (as to litigation verdicts).

a.    **Medical Criteria**

In its present form, the TDP excludes legitimate Libby Claims by creating disease criteria

that are not a part of the standard diagnosis and that do not measure the of severity of asbestos-

related disease (ARD).  Criteria for diagnosing asbestos disease have been adopted by the

American Thoracic Society ("ATS").  See "Diagnosis and Initial Management of Non-Malignant

Diseases Related to Asbestos," Am. J. Respir. Crit. Care Med., Vol. 170:691-715 (2004) ("ATS

(2004)").[103]   The diagnosis of asbestos disease generally requires at a minimum, a history of

exposure to asbestos and a 15-year latency period.[104]  The ATS (2004) sets the diagnostic criteria

as follows:

- Evidence of structural pathology consistent with asbestos-related disease as documented by imaging or histology.

- Evidence of causation by asbestos as documented by the occupational and environmental history, markers of exposure (usually pleural plaques), recovery of asbestos bodies, or other means.

- Exclusion of alternative plausible causes for the findings.[105]

It is standard medical practice to use the ATS (2004) definition.  The Libby Claimants who are

under the treatment of Dr. Whitehouse and the other doctors at the CARD Clinic have been

diagnosed in accordance with ATS (2004).[106]  However, the TDP adds to the ATS (2004)

standard diagnosis for pleural disease several additional requirements that discriminate against

Libby Claimants.

It is not discriminatory to categorize claimants by severity for compensation purposes.  It

is discriminatory to add certain elements to the diagnosis for groups of claimants and not add

them for other groups.  For the cancer claims (mesothelioma, lung cancer and other cancers) a

---

[103] Whitehouse Report, ¶¶ 15-16.
[104] Whitehouse Report, ¶ 16.
[105] Whitehouse Report, ¶ 16 (citing ATS (2004)).
[106] Whitehouse Report, ¶ 15.

diagnosis is all that is required for compensation.[107]  But for Severe Disabling Pleural Disease—

a category for which many Libby Claimants *should* qualify—additional requirements of

blunting, 3mm thickness, and extent greater than 25% are wrongfully added to the diagnostic

requirements.  In addition, some patients with a low FVC, but who have an FEV1/FVC ratio >

65 are excluded.  Most importantly the TDP does not use diffusion capacity (DLCO) as a

measure of severity, contrary to standard medical practice.  These requirements are different

from the ATS (2004) requirements for diagnosis of pleural disease, and operate to exclude many

Libby Claimants with severe disease.  They are discriminatory.  Moreover, they appear to be

intentionally discriminatory; counsel for the Plan Proponents have stated on the record that the

Severe Disability Pleural Disease (Level IV-B) was **created** for Libby.  The effect of this

discrimination can perhaps most tellingly be seen from the fact that only 14% of the Center for

Asbestos Related Disease (CARD) patients who died of non-malignant asbestos-related disease

would have qualified for Level IV-B under the TDP. [108]  Surely these patients were severe before

they died!

> i. **Blunting of the costophrenic angle is not a requirement in the standard diagnosis of asbestos related disease.  Its use excludes over 42% of Libby Claimants who have died from non-malignant ARD.**

The TDP defines "Severe Disabling Pleural Disease" to include "diffuse pleural

thickening" of at least extent "2" and at least width "a" as defined in the International Labour

Organization's ("ILO") *Guidelines for the Use of the ILO International Classification of*

---

[107] Of course, evidence of exposure to Grace's asbestos is also required.  Throughout this discussion, evidence of exposure to Grace's asbestos is presumed.
[108] Percentage figures cited herein are based upon the spreadsheet "CARD Mortality Study, 76 Non-Malignant Deaths, CHX readings by Dr. Frank."  Whitehouse Report, Exh. 7.

*Radiographs and Pneumoconioses*, Revised Edition 2000.[109]  As noted in the TDP,[110] the ILO

Guidelines (2000) for "diffuse pleural thickening" require "associated blunting of the

costophrenic angle."[111]  The requirement of blunting is contrary to the ATS (2004) Official

Statement of standard practice in diagnosis of asbestos related disease.[112]  The ATS (2004)

Official Statement, p.707 recognizes blunting of the costophrenic angle, but does not require that

it always be present.  Page 707 also discusses forms of diffuse pleural thickening without

blunting of the angle.

The CARD mortality study provides many examples of extensive diffuse pleural

thickening without blunting.[113]  The Plan Proponents' experts Dr. Parker and Dr. Welch

acknowledged that there are such cases.  The Plan Proponents insist that any pleural thickening

without blunting be called "pleural plaques."  However, ATS (2004) did not make such a change

to the definition of "pleural plaques."  It continues to define "pleural plaques" as circumscribed

areas of fibrosis.  Therefore, under ATS (2004), there are three categories of pleural thickening.

Diffuse pleural thickening with blunting, diffuse pleural thickening without blunting, and pleural

plaques.

Diffuse pleural thickening and blunting are two separate findings on chest films.  They

may or may not appear on the same patient.  Blunting of the costophrenic angle occurs in the

very bottom corner of the lung.  Pleural thickening may extend up the chest wall covering 50%,

even 80% of the chest wall.  Blunting and diffuse pleural thickening do not always appear

together.  Libby pleural disease generally does not cause blunting of the costophrenic angle.[114]

---

[109] TDP § 5.3(a)(3).
[110] TDP § 5.3(a)(3), n.7.
[111] Costophrenic angles are the angles formed between the inner surface of the ribs and the dome of the diaphragm.
[112] Whitehouse Report, ¶ 72.
[113] Whitehouse Report, Exh. 7 Spreadsheets.
[114] Whitehouse Report, ¶ 75.

*In the CARD mortality study, of the patients who died of non-malignant asbestos disease, 42%*

*had no blunting of a costophrenic angle on chest x-ray.*[115]  The blunting requirement will

exclude many legitimately severe Libby Claims.  The cancer claimants have no such additional

bar to recovery.  The blunting requirement discriminates against patients with severe pleural

disease who do not have the additional requirements of blunting.  It is particularly discriminatory

against the Libby Claimants.

> **ii.    The requirement of a minimum 3mm pleural thickening is not a standard requirement in the diagnosis of asbestos related disease.  Its use excludes over 16% of the Libby Claimants who have died from non-malignant ARD.**

The TDP's definition of "diffuse pleural thickening" for Severe Disabling Pleural Disease

requires "at least width 'a'."[116]  Per ILO (2000) Guidelines, this is pleural thickening of a 3mm

minimum width.  Like the blunting requirement, the 3mm requirement in pleural thickening is

contrary to the ATS (2004) diagnostic standards.[117]  Dr. Parker and Dr. Welch acknowledged

that the 3mm requirement is not diagnostic and is not included within the ATS (2004) diagnostic

criteria.  There is no specific scientific basis for a requirement of 3mm thickness to diagnose

"diffuse pleural thickening."[118]  Dr. Parker and Dr. Welch also acknowledged that the 3mm

requirement is not a measure of severity of ARD.  As stated by the President of the American

Thoracic Society, "diffuse pleural scarring can be associated with greatly diminished FVC

(Forced Vital Capacity) regardless of the extent or thickness of the scarring or its bilaterality."[119]

---

[115] Whitehouse Report, ¶ 75.
[116] TDP § 5.3(a)(3).
[117] Whitehouse Report, ¶ 73.
[118] Whitehouse Report, ¶ 73.
[119] Whitehouse Report, ¶ 73, Exhibit 18.

*In the CARD mortality study, of the patients who died of non-malignant asbestos disease, 16% would be excluded by the 3mm requirement.*[120]   As described by Dr. Whitehouse, some have thin diffuse pleural thickening extensively in the lung.  The 3mm requirement is improperly exclusionary upon the Libby Claimants.  It is discriminatory, as the cancer claimants have no such additional bar beyond basic diagnostic requirements.

> iii.   **The requirement of pleural thickening coverage of over 25% is not a standard requirement in the diagnosis of asbestos related disease.  Its use excludes over 18% of Libby Claimants who have died from non-malignant ARD.**

The TDP's definition of "diffuse pleural disease" for Severe Disabling Pleural Disease requires "at least extent '2'."[121]   Per the ILO (2000) Guidelines, extent "2" is pleural thickening of 26-50% "of the extension of the lateral chest wall."  This requirement is contrary to the ATS (2004) diagnostic standards.[122]   Dr. Parker and Dr. Welch acknowledged that the 25% extent requirement is not diagnostic and is not included within the ATS (2004) diagnostic criteria. They also acknowledged that the 25% extent requirement is not a measure of severity of ARD. There is no specific scientific basis for it.

*In the CARD mortality study, of the patients who died of non-malignant asbestos disease, 18% did not have extent of pleural thickening greater than 25% of the chest wall on chest x-ray.*[123]   The extent greater than 25% requirement is improperly exclusionary upon the Libby Claimants.  It is discriminatory, as the cancer claimants have no such additional bar beyond the diagnostic requirements.

---

[120] Whitehouse Report, ¶ 73.
[121] TDP § 5.3(a)(3).
[122] Whitehouse Report, ¶ 77.
[123] Whitehouse Report, ¶ 77.

iv.    **The omission of DLCO measurement is arbitrary. Without DLCO the severity of the Libby Claimants' asbestos disease is not adequately observed.  Of Libby Claimants who have died from non-malignant ARD, 47% had DLCO as the only number in the severe category.**

It is proper to categorize claims by severity.  However, all three standard measures of severity of asbestos must be available.  The TDP's definitions of "Severe Disabling Pleural Disease" and moderate "Asbestosis/Pleural Disease" employ forced vital capacity (FVC) and total lung capacity (TLC), but omit diffusion capacity (DLCO).  DLCO is one of the three standard measures for severity of asbestos disease.[124]  There are a number of Libby Claimants with severe disease and impairment whose only number under 65% of normal is DLCO.  DLCO needs to be included as an option to prove severity of disease along with FVC and TLC.

DLCO measures the lungs' efficiency in transferring oxygen into the blood stream.  The DLCO measurement is a key indicator of severity and impairment in asbestos disease,[125] especially with the Libby Claimants.[126]  The ATS (2004), p.697, states:

> Evaluation of subjects with suspected asbestos-related disease should include spirometry . . . all lung volumes and the carbon monoxide diffusing capacity.  In addition to diminished lung volumes, the carbon monoxide diffusing capacity is commonly reduced due to diminished alveolar - capillary gas diffusion, as well as ventilation - profusion mismatching.

Fishman's Pulmonary Diseases and Disorders (4th Ed. 2008), p.950, states:

---

[124] Whitehouse Report, ¶ 79.

[125] The importance of DLCO as an indicator of severity in asbestos pleural disease is long established.  Whitehouse Report, ¶ 17 (citing Cookson (1983) "Pleural Thickening and Gas Transfer in Asbestosis," Thorax 1983; 38:657-661.)  In the Cookson study (a study of a cohort exposed to amphibole asbestos) it was determined that "the ratio of transfer factor [the British term for diffusion capacity] to effective alveolar volume correlated directly with the degree of pleural thickening as alveolar volume fell with increasing severity of pleural disease."  Whitehouse Report, ¶ 51.

[126] Whitehouse Report, ¶ 79.

> The characteristic pulmonary function changes of asbestosis are a restrictive impairment with a reduction in lung volumes (especially FVC and total lung capacity), decreased diffusion capacity, and arterial hypoxemia.

Similarly, the AMA Guides to Permanent Impairment (5th Ed.) uses diffusion capacity as a basis for assessment of permanent impairment due to respiratory disorders.[127]  All doctors agreed with the above quotes.  Diffusing capacity is available at any lung center, and is standardized.[128]  The Center for Asbestos Related Disease in Libby applies this standard technique.[129]

DLCO is a particularly important indicator of the severity of restrictive disease in the Libby Claimants.[130]  The Whitehouse (2004) study found that:

> In a group of 123 patients, including those with improved FVC, the average yearly loss was 2.2% for FVC, 2.3% for TLC, and 3.0% for DLCO as calculated over an average of 35 months.[131]

Of the 123 patients in the Whitehouse study, 76% had progressive loss of lung function.[132]  In the Libby cohort, DLCO shows progressive decline along with FVC and TLC.[133]  In many individual cases, there is significant asbestos disease on the chest x-ray, and only the DLCO is reduced, not the FVC or TLC.[134]  Some patients with severe shortness of breath are severe only in the DLCO defect.[135]  DLCO defect is often the leading indicator of severity in the Libby cohort, and has the greatest correlation with shortness of breath and the timing of the patients' entry to oxygen treatment.[136]  *In the CARD mortality study, of the patients who died of non-*

---

[127] Whitehouse Report, ¶ 20.
[128] ATS/ERS (2005), "Standardisation of the Single-Breath Determination of Carbon Monoxide Uptake in the Lung."  Eur Respir J 2005; 26:720-735.
[129] Whitehouse Report, ¶ 79.
[130] Whitehouse Report, ¶ 79.
[131] Whitehouse Report, ¶ 79 (citing Whitehouse (2004) at p. 224).
[132] Whitehouse Report, ¶ 79.
[133] Whitehouse Report, ¶ 79.
[134] Whitehouse Report, ¶ 79.
[135] Whitehouse Report, ¶ 79.
[136] Whitehouse Report, ¶ 79.

*malignant asbestos disease, 47% had only DLCO under 65%.*[137] These patients were all severe and are now dead.[138] Yet, none would qualify as a "severe pleural" under the TDP. Failure to provide DLCO as a measure of severity wrongly excludes many Libby Claimants.

The Dr. Welch report 3/09, p.19, states that DLCO should not be used because it is a variable test. It is less variable than forced vital capacity, which the TDP does use. The Dr. Welch report, 12/08, p.17, states that "a reduced DLCO in the setting of asbestos related pleural disease would be more likely to be due to emphysema, asbestosis or some other interstitial lung disease (ILD)." At her deposition Dr. Welch withdrew the statement about asbestosis. As to emphysema and other ILD, where asbestos related disease is diagnosed other conditions must be ruled out, ATS (2004), p.691. If the physician's report required for Level IV-B rules out emphysema and ILD, then the DLCO decrease is likely due to pleural disease. Accordingly, DLCO must be retained as a measure of disease severity. Its omission clearly discriminates against the Libby Claimants.

> **v.    The requirement that the FEV1/FVC ratio be over 65% discriminates against patients who have obstructive disease along with restrictive disease.**

The TDP uses forced vital capacity (FVC) as a measure of severity of asbestos disease in both severe pleural (Level IV-B) and moderate asbestosis/pleural disease (Level III). But the TDP qualifies use of FVC at Level IV by also requiring an "FEV1/FVC ratio greater than 65%."[139] The FEV1/FVC ratio is the hallmark for measuring the presence of obstructive disease,[140] meaning that the patient's ability to exhale is obstructed.[141] Asbestos disease causes

---

[137] Whitehouse Report, ¶ 79.
[138] Whitehouse Report, ¶ 79.
[139] Inexplicably, the TDP uses "FEV1/FVC ratio greater than  65%" for Level IV-B (severe pleural disease) and "FEV1/FVC ratio greater than or equal to 65%" for Level III (moderate "asbestosis/pleural disease"). TDP § 5.3(a)(3).
[140] Whitehouse Report, ¶ 64.
[141] Id.

both restrictive disease (meaning that the patient's ability to inhale is restricted) and obstructive disease.[142]  Indeed, diffuse pleural thickening causes obstructive defect.[143]  This is particularly the case with the Libby Claimants.[144]  Accordingly, imposing a FEV1/FVC ratio requirement of 65% or higher—indicating the *absence* of obstructive disease—discriminates against the large group of patients, especially in Libby, who have an obstructive defect along with asbestos disease.

An FEV1/FVC ratio of 70% or above is considered normal.  For patients over the age of 60, 65% may be considered normal.  This is important for Libby Claimants, because the average age at diagnosis in the CARD mortality study was 69 and the average age at death was 76.  In the CARD mortality study, among those who died of non-malignant asbestos disease, 40% (29/72) had an FEV1/FVC ratio of 65% or less.  The concern voiced by the Plan Proponents' medical witnesses is that without use of the ratio for exclusion, patients with smoking disease may be compensated.  But claimants who reach this point have a diagnosis of asbestos-related disease.  The only question is whether the asbestos-related disease is a substantial factor in causing the obstructive defect.  Additionally, the diagnosis of asbestos-related disease requires "exclusion of alternative plausible causes for the findings."[145]  Where the physician's report rules out smoking disease, then that should be sufficient.  It is not medically reasonable and is discriminatory to arbitrarily apply the requirement that the FEV1/FVC ratio exceed 65% in order to meet the TDP definition of "Severe Asbestosis" and "Severe Disabling Pleural Disease."

---

[142] Whitehouse Report, ¶ 63.
[143] Whitehouse Report, ¶ 29, 66.
[144] Id.
[145] Whitehouse Report, ¶ 16, citing ATS (2004).

vi.    **The TDP precludes use of CT scans for diagnosis or evaluation under Level IV-B.  This is not medically reasonable, and discriminates against those whose disease shows on CT scan.**

The TDP provides that "evidence of bilateral asbestos-related non-malignant disease" specially includes use of CT scans for Levels II (mild asbestosis/pleural disease), III (moderate asbestosis/pleural disease), V and VI (cancers), but not for Level IV-A (severe asbestosis) or Level IV-B (severe pleural disease).  This is not medically reasonable, since the same diagnostic criteria are used for asbestos-related disease whether mild, moderate, or severe.

At the deposition of Asbestos PI Committee's medical expert, Dr. Laura Welch, on June 3, 2009, the Libby Claimants discovered that the Plan Proponents interpret the TDP medical criteria as not permitting use of CT scans for Level IV.  This means the TDP will not permit the use of CT scans in the diagnosis and evaluation of severe disease (Level IV), but allows it for moderate and mild disease (Levels II and III).  This is not at all medically reasonable, and discriminates against patients whose asbestos-related disease appears more clearly on CT scan.

Use of CT scans in diagnosing and evaluating asbestos-related disease is standard practice.  ATS Official Statement (2004), p.696 states:  "Only 50/80% of cases of documented pleural thickening demonstrated by autopsy, conventional CT or high resolution CT are detected by chest radiographs (42/43)."  In other words, x-rays miss up to half of the cases of pleural thickening.  With CARD patients it has been observed that HRCT is far superior to plain chest film x-ray in identifying pleural abnormalities.  Blunting of the costophrenic angle can be visualized on CT and measurement of extent and thickness of pleural thickening is better on CT scan than on plain chest x-ray.[146]

---

[146] Whitehouse Report, ¶ 77a.

Denial of the use of CT scans at Level IV is not medically reasonable and is discriminatory against the class of patients—many of them Libby Claimants—whose disease is more clearly seen on CT scan.

### vii.    The TDP medical criteria arbitrarily excludes patients with unilateral disease.

The TDP is not clear whether the requirements of blunting of the costophrenic angle, extent greater than 25%, and 3mm thickness are met if present in either the right or left lung, or must be present in both lungs.[147]  If all requirements must be met in both lungs, the TDP medical criteria arbitrarily exclude patients with unilateral disease.  This is not medically reasonable and operates to exclude many legitimate claims.

### viii.    Summary:  Effect of Exclusionary Medical Criteria.

The cumulative effect of applying these exclusionary criteria to the Libby Claimants is dramatic.  Of CARD patients deceased due to non-malignant asbestos-related disease, 86% are excluded from Level IV-B (Severe Pleural Disease) by the blunting, 3mm thickness, 25% extent, and FEV1/FVC ratio > 65% requirements, and the omission to use diffusion capacity (DLCO) for severity.  The arbitrary discriminations may be summarized as follows:

1.    **Diagnosis.**  Cancers qualify by standard diagnosis, whereas severe pleurals must qualify by standard diagnosis plus the additional hurtles of blunting, 3mm thickness, and 25% extent, which exclude most CARD patients who are deceased due to non-malignant asbestos-related disease.

2.    **CT scans.**  Use of CT scans in addition to chest x-rays is permissible in Level II (mild "asbestosis/pleural disease") and Level III (moderate

---

[147]Through interrogatory responses, the Asbestos PI Committee has informed the Libby Claimants that unilateral blunting, extent greater than 25%, and 3mm thickness "will suffice, as long as there is some radiographic evidence of bilateral pleural disease."  See Objections and Answers of Official Committee of Asbestos Personal Injury Claimants to Elmer Biladeau's and Robert Barnes's Interrogatories Propounded Upon Asbestos PI Committee.

"asbestosis/pleural disease"), but not for Level IV-A (severe asbestosis) and IV-B (severe pleural disease). This arbitrarily discriminates against Level IV claimants, since CT scans are more effective in evaluating pleural abnormalities.

3.    **Severity.** Level III and IV-B discriminate against Libby Claimants by arbitrarily omitting to use diffusion capacity (DLCO) to measure severity, and by requiring that the FEV1/FVC ratio be over 65%. Of CARD Clinic patients who are deceased due to non-malignant asbestos-related disease, 47% are excluded from Level IV-B eligibility by failure to use DLCO as a measure of severity.

4.    **Unilaterals.** The TDP criteria arbitrarily exclude patients with unilateral disease.[148]

As a result of the above discriminatory medical criteria  (collectively, the "Discriminatory Criteria"), at least 86% of the CARD patients who are deceased due to non-malignant asbestos-related disease would be excluded from compensation under Level IV-B.[149]

In theory, the process of Individual Review might allow a claimant to be placed at an appropriate Disease Level despite failing to meet the medical criteria.[150] However, the Individual Review process is wholly discretionary, and requires no physician. It cannot justify discrimination in the medical criteria. Individual Review is supposed to be for exceptional claims, which need to be handled on a discretionary basis outside the set of rules applicable to other claims in order to provide compensation to the claimant at a level reflecting what he could recover in the tort system. Claimants electing Individual Review pay a penalty by reason of the delay and uncertain outcome inherent in Individual Review. Although the Plan Proponents have

---

[148] Whitehouse Report, ¶ 78.
[149] This percentage reflects application of the Discriminatory Criteria summarized at items 1 and 3;  the percentage could be higher if there were deceased CARD patients whose disease showed only on CT scan (item 2) or was unilateral (item 4).
[150] TDP § 5.3(b)(1)(A).

not disclosed the percentage of claimants expected to successfully utilize Individual Review
based on experience with similar trusts in other cases, it is not likely to be a large percentage.
The TDP written by the Asbestos PI Committee unfairly discriminates against the Libby
Claimants by requiring that most Libby Claimants (at least 86% of deceased Libby Claimants)
must resort to Individual Review, while all cancer claims will be compensated at Scheduled
Value levels without the need for Individual Review.

### b.    Exposure Criteria

The TDP establishes three levels of exposure criteria.  For a claim to be paid at all, an
Asbestos PI Claimant must demonstrate Grace Exposure.[151]  Libby Claimants will have no
problem meeting this criterion.  Claims meeting the second and third levels of exposure criteria
are categorized as Extraordinary Claims.  At the second level of exposure, requiring that at least
75% of the claimant's exposure be to Grace's asbestos, a claimant may at the PI Trust's discretion
receive up to five times the Scheduled Value for his Disease Level.[152]  At the third level of
exposure, requiring that at least 95% of the claimant's exposure be to Grace's asbestos, a claimant
may at the PI Trust's discretion receive up to eight times the Scheduled Value for his Disease
Level.[153]  Properly designed, the Extraordinary Claims provisions can serve to assure appropriate
compensation of claimants who have much stronger claims against Grace in the tort system,
because their exposure is largely or solely to Grace's asbestos—thus eliminating defenses of
causation, comparative fault, etc.

Under the Plan, however, treatment as an Extraordinary Claim is subject to a further
requirement: "there is little likelihood of a substantial recovery elsewhere."[154]  Although the

---

[151]  TDP § 5.7(b)(3).
[152]  TDP § 5.4(a).
[153]  TDP § 5.4(a).
[154]  TDP § 5.4(a).

language is opaque, presumably "elsewhere" means from a party other than Grace.  Libby

Claimants have asserted claims against various other parties.  However, as this Court has pointed

out on numerous occasions in enjoining the pursuit of those claims, Grace is the party with

primary liability to the Libby Claimants, because it was Grace's asbestos that made them sick.

The likelihood of Libby Claimants obtaining a substantial recovery from any other party is

unknown and unknowable at this time.  Yet the Extraordinary Claims Panel established under the

TDP will have unfettered discretion ("All decisions of the Extraordinary Claims Panel shall be

final and not subject to any further administrative or judicial review"[155]) to determine whether

any particular Libby Claim will be limited to the minimal Scheduled Value—same as a

construction worker who can recover from 20 other asbestos producers, and probably has—or

receive a more appropriate liquidated value.  This renders the Extraordinary Claims multiplier

illusory.

The Disclosure Statement does not disclose the nature and amount of Asbestos PI Claims

that are expected to seek or obtain designation as Extraordinary Claims.  The Libby Claimants,

who live in a small town blanketed by Grace's asbestos, are obviously the most qualified to

receive this designation.  Few others can meet the 95% Grace exposure requirement.  However,

complete discretion is conferred on the Extraordinary Claims Panel.  The Panel is chosen by the

trustees of the Asbestos PI Trust, who are chosen by the Asbestos PI Committee, which is

controlled by a majority hostile to the Libby Claimants.  This situation renders illusory any

expectation that Libby Claims will receive the multiple of Scheduled Values that they deserve by

reason of their strength on the exposure issue.

---

[155]  TDP § 5.4(a).

c.    **Combined Effect of Exposure and Medical Criteria**

Even if a Libby Claim were designated an Extraordinary Claim and provided with the maximum multiple of eight times Scheduled Value, the claim would still not be liquidated at an amount consistent with its value in the tort system.[156]  In other words, under the terms of the TDP, Libby Claims may not be allowed for their tort system value even if the trustees were inclined to do so.  The TDP contains no escape valve.  While the TDP permits an Asbestos PI Claimant dissatisfied with the liquidated value offered by the Asbestos PI Trust to obtain a judgment in the tort system, the liquidated value of the claim for purposes of the TDP will be the *lesser* of the judgment amount or the maximum amount that the Asbestos PI Trust was permitted to offer.[157]  And any increment by which the judgment exceeds the Asbestos PI Trust's last offer will be paid on a discriminatory basis: payment does not even start until at least five years after the judgment, and is then paid in five equal installments.[158]  Thus, claimants who exercise their constitutional right to trial by jury first incur the delay of going through Individual Review, mediation and arbitration.[159]  Then they must bring suit and obtain a judgment in the tort system. Then they must wait an additional ten years to be paid.

d.    **Other Discriminatory TDP Provisions**

*Punitive Damage Claims.*  Because of Grace's horrific conduct in Libby, the Libby Claimants have particularly strong claims for punitive damages.  Yet, the TDP provides for disallowance of punitive damages claims, "notwithstanding their availability in the tort system."[160]

---

[156]  The figures are presented in detail at Point V.A below.
[157]  TDP § 7.7.
[158]  TDP § 7.7.
[159]  These are required prerequisites to seeking judgment in the tort system.  TDP §§ 5.10, 5.11.
[160]  TDP § 7.4.  Punitive damage claims are included within the definition of Asbestos PI Claims (Plan § 33(i)) and are therefore part of Class 6 (Plan § 3.1.6).

43

*Wrongful Death Claims.*  Unlike many jurisdictions, Montana recognizes a statutory action for wrongful death: "When injuries to and the death of one person are caused by the wrongful act or neglect of another, the personal representative of the decedent's estate may maintain an action for damages against the person causing the death . . . "  Mont. Code Ann. § 27-1-513.  According to the Montana Supreme Court, "[g]enerally, damages under a wrongful death claim will include loss of consortium by a spouse, loss of comfort and society of the decedent suffered by the surviving heirs, and the reasonable value of the contributions in money that the decedent would reasonably have made for the support, education, training and care of the heirs had she lived. . . . wrongful death damages are personal to those who survive [the decedent]."  Hern v. Safeco Ins. Co. of Illinois, 125 P.3d 597, 604-05 (Mont. 2005).  Yet (although the TDP is mysteriously silent on the point), the Asbestos PI Committee expects that wrongful death claims will not be paid at all, but instead the Asbestos PI Trust will require that wrongful death claims that would arise from the death of the asbestos victim be released as a pre-condition to paying the victim's claim.[161]  This amounts to paying zero on account of the wrongful death claim.

*Loss of Consortium Claims.*  Montana recognizes a cause of action for loss of consortium.  The Montana Supreme Court states that "a cause of action for consortium of the deprived spouse is separate and distinct from the claim of the injured spouse and . . . the basis for a consortium claim lies in the Montana statutes in which the husband and wife contract for obligations of mutual respect, fidelity, and support . . . [which] includes a legal right to the aid, protection, affection and society of the other spouse."  Bain v. Gleason, 726 P.2d 1153, 1155 (Mont. 1986).  But cf. Mickelson v. Montana Rail Link, Inc., 999 P.2d 985 (Mont. 2000) (holding in the context of Montana comparative negligence law that "while a loss of consortium claim is independent as

---

[161] Deposition of Elihu Inselbuch, Esq., pp. 127-129.

to damages, it is derivative as to liability"). "[L]oss of consortium embrace[s] all of those values-tangible and intangible-inherent in the family relationship." Hern, 125 P.3d at 606 (discussing child's right to a 'filial' loss of consortium claim after parental loss) (quoting Pence v. Fox, 813 P.2d 429, 432 (Mont. 1991)). Yet, as in the case of wrongful death claims, the TDP is silent on how claims for loss of consortium will be treated and the Asbestos PI Committee indicated in discovery that it expects such claims will not be paid. Instead, loss of consortium claims will be treated in the same way as wrongful death claims, i.e., before paying an asbestos victim's claim, the Asbestos PI Trust will require release of any potential loss of consortium claims, with the result that such claims will be liquidated for zero.[162] These provisions of the TDP impermissibly discriminate against Libby Claimants, and for that matter against all Asbestos PI Claimants who hold punitive damage, wrongful death, and loss of consortium claims.

## 2.    The Plan Deprives Libby Claims of the Benefit of Insurance Coverage for Which They Do Not Compete with Other Claims.

Like other comprehensive general liability policies of the same era, Grace's insurance distinguishes between "non-products" claims and "products" claims. Products (a/k/a completed operations) coverage addresses liability from products that have been placed in the stream of commerce either through sale/transfer of a product or completion of an operation or service.[163] In addition to being subject to per-claim and per-occurrence limits, products coverage is subject to an aggregate cap on claims. By contrast, non-products (a/k/a non-completed operations) coverage addresses liability that arises from operations (including harmful materials that have not yet been placed in the stream of commerce). While subject to per-claim and per-occurrence

---

[162]  Deposition of Elihu Inselbuch, Esq., p. 132.
[163]  For example, a construction worker exposed to the Grace's asbestos-containing products would have a products/completed operations claim because the harmful material had left Grace's possession at the time the injury occurred.

limits, non-products coverage is *not* subject to any aggregate limit.  This means that even in a

mass tort case, injured people do not compete with each other for non-products coverage.  The

only issue is whether an injury is covered by the policy, not whether the coverage has been

exhausted.[164]

Unlike the vast majority of Asbestos PI Claims which are products claims because they

result from exposure to Grace's products, Libby Claims are non-products claims because the

Libby Claimants were injured by harmful materials generated in the course of Grace's operations.

Comprehensive general liability insurance, including coverage of non-products and products

claims, was supplied by Royal Indemnity Company[165] for the period from 1954-1963,[166]

Maryland Casualty Company for the period from 1962-1973, and Continental Casualty Company

("CNA") from 1973-1985.  According to Grace, all primary policies have been settled except for

"assertions of coverage for premises personal injury claims" by CNA.[167]  The Libby Claimants

assert that non-products coverage against Royal Indemnity Company is also unresolved because

Grace's prepetition settlement with Royal is limited solely to products claims, leaving non-

products coverage intact.[168]  Finally, with respect to Maryland Casualty Company, the Libby

Claimants assert that they are not bound to Grace's settlement because their rights against

Maryland Casualty had already vested at the time of the settlement and (again, because there is

no aggregate cap on non-products coverage) the insurance was not exhausted either before or by

---

[164] Assuming the insurer is solvent.  In the case of Grace's three insurers described below, there has been no suggestion of insolvency.

[165] N/k/a Arrowood Indemnity Company.

[166] The insurance was purchased by The Zonolite Company, n/k/a Montana Vermiculite Company.  As part of the purchase of Zonolite's assets, Grace "obtained all rights under the insurance policies purchased by Zonolite." Disclosure Statement § 2.10.2.1.

[167] Disclosure Statement § 2.10.2.2.

[168] The Grace/Royal Settlement Agreement provides, Section 2.0, Royal agrees to pay Grace the sum of [REDACTED] in full satisfaction of Royal's alleged obligation to indemnify Grace, Zonolite, and any Other Insureds for Loss arising out of **Products Claims** under the Primary Policies and in full satisfaction of Royal's alleged obligation to defend Grace, Zonolite or any Other Insureds or to pay Defense Expenses arising out of **Products Claims** under the Primary Policies. (Emphasis added).

reason of the settlement.[169]  The same rationale would apply to the settlement with Royal if somehow non-products coverage were in fact settled.

Policies providing coverage for non-products claims are an important potential source of recovery for the Libby Claimants.  Pursuit of this coverage by the Libby Claimants would harm no other Asbestos PI Claimant because, as noted, non-products claims do not compete with each other since there is no aggregate cap on coverage.  Yet under the Plan, this special coverage for Libby Claims is thrown into the pool of other Asbestos Insurance Rights,[170] to be administered by the Asbestos PI Trust and used to pay Asbestos PI Claims, including the vast majority of claims that have no right to non-products coverage.[171]

## IV.    Burden of Proof

### A.    The Plan Proponents Carry the Burden of Proof to Establish Compliance With All Requirements of Plan Confirmation Under 11 U.S.C. § 1129.

To confirm the Plan, this Court must determine that the Plan satisfies all requirements for Plan confirmation under Section 1129 of the Bankruptcy Code.  The Plan Proponents bear the burden of proof to establish such compliance.  Heartland Federal Savings & Loan Ass'n v. Brisco Enterprises, Ltd. (In re Briscoe Enterprises, Ltd.), 994 F.2d 1160 (5th Cir. 1993), cert. denied, 510 U.S. 992 (1993); In re Armstrong World Industries, Inc., 348 B.R. 111 (D. Del. 2006).  The specific objections to Plan confirmation interposed by the Libby Claimants (or by other creditors) do not relieve the Plan Proponents of their burden of proof to establish

---

[169] An injured party's rights vest at the time their injuries occur, and cannot thereafter be defeated by actions of the insurer and insured. See Allied Products Corp. v. ITT Industries, Inc. (In re Allied Products Corp.), 2004 WL 635212 (N.D. Ill.), affirming 288 B.R. 533 (Bankr. N.D. Ill. 2003); McLane v. Farmers Ins. Exchange, 432 P.2d 98 (Mont. 1967); 43 Am. Jur. 2d Insurance § 416.  In McLane, the Montana Supreme Court held that the injured party's rights "vested either at the time of the accident or at the time of the [insurance company's] implied waiver of the right to rescind. . . .  In either case, [the insured] and [the insurance company] cannot do anything either in concert or through the failure of [the insured] to defend to affect the rights of [the injured party] after they vested." McLane, 432 P.2d at 100.

[170]  Plan § 1.1(12).

[171]  Plan § 7.2.2(d).

compliance with Section 1129 with respect to such objection.  See, e.g., In re Hoffinger Indus., Inc., 321 B.R. 498, 502, 505-09 (Bankr. E.D. Ark. 2005) (plan proponent has burden of proof to overcome objection that plan's classification scheme was unfair); In re Union Fin. Services Group, Inc., 303 B.R. 390, 421-23 (Bankr. E.D. Mo. 2003) (same); In re Cajun Elec. Power Coop., Inc., 230 B.R. 715, 728-29 (Bankr. M.D. La. 1999) (plan proponent has burden of proof on every element of Section 1129, whether or not valid objection to confirmation is interposed).

### B.    The Plan Proponents Should Be Required to Establish that the Plan is Fair and Equitable to the Libby Claimants By Clear and Convincing Evidence.

The Bankruptcy Code does not set forth the standard of proof required of the Plan Proponents, *i.e.*, whether the Plan Proponents must establish the confirmation requirements by a preponderance of evidence, or by the heightened standard of clear and convincing evidence.  As noted by the Fifth Circuit in Briscoe Enterprises, the clear and convincing standard is appropriately utilized when the "interests at stake are deemed to be more substantial than the mere loss of money."  Briscoe Enterprises, 994 F.2d at 1164 (citing Addington v. Texas, 441 U.S. 418, 424 (1979)).  In the bankruptcy context, courts have required debtors to satisfy the clear and convincing standard to obtain, over the objection of a secured creditor, plan confirmation under the "cramdown" provisions of Section 1129(b).  See, e.g., United States v. Woodway Stone Co., 187 B.R. 916, 918 (W.D. Va. 1995); Federal Home Loan Mortgate Corp. v Bugg, 172 B.R. 781, 784-85 (E.D. Pa. 1994).

In this case, the interests of the Libby Claimants in receiving fair and equitable treatment under the Plan are more substantial than the mere loss of money.  As a group, the Libby Claimants have suffered greatly and, compared to other asbestos claimants, disproportionately, from the Debtors' actions.  Their suffering can be seen in the severity of asbestos disease suffered by the Libby Claimants, the number of Libby Claimants who have already died from asbestos

disease, and the prospect of premature death facing many surviving Libby Claimants.  The Libby

Claimants' interests at stake under the Plan involve more than "just money" – they involve the

fundamental right of individuals to receive fair and equitable recompense for their diminished

health and lifespans.

Moreover, the unique rights of the Libby Claimants to products coverage insurance are

analogous to the rights of a secured creditor against its collateral that have supported courts'

decisions to require a clear and convincing standard of proof for plan confirmation order Section

1129(b).  See Woodway Stone and Bugg, supra.  The Plan's restriction on the Libby Claimants'

ability to pursue their rights to non-products coverage – in a real sense, collateral for their claims

against the Debtors – supports this Court's determination that the Plan Proponents must establish,

by clear and convincing evidence, that the Plan is fair and equitable to the Libby Claimants.  Id.

## V.        OBJECTIONS TO PLAN CONFIRMATION

As a procedural matter, the Libby Claimants object to being required to file this Trial

Brief in support of their objection to confirmation of the Plan at a time when the Plan Proponents

have not yet fully disclosed their contentions with respect to confirmation of the Plan and,

specifically, in response to the Plan Objection filed by the Libby Claimants.  Accordingly, the

Libby Claimants reserve the right to amend and/or supplement this Trial Brief—as they continue

to reserve their right to supplement their Plan Objection—as the Plan Proponents' contentions are

finally revealed.[172]

---

[172] As noted, the Plan Proponents have agreed that the Libby Claimants may wait until after they have been provided further discovery by the Plan Proponents to file their Trial Brief relating to their objection that the Plan fails to satisfy the "best interests of creditors" test under Section 1129(a)(7) of the Bankruptcy Code.

A.    **The Plan is Unconfirmable Because It Impermissibly Discriminates Against the Libby Claimants and Thereby Violates the Bankruptcy Code's Policy of Equal Distribution**

In the context of another major asbestos case, the United States Court of Appeals for the Third Circuit has emphasized:  "Equality of distribution among creditors is a central policy of the Bankruptcy Code."  In re Combustion Engineering, 391 F.3d 190, 239 (3d Cir. 2004), quoting Begier v. IRS, 496 U.S. 53, 58 (1990).  Even though it "complies with the literal terms of the Bankruptcy Code . . . , [a] Plan may impermissibly discriminate against certain asbestos personal injury claimants."  Id.  Thus, courts must "consider the bankruptcy scheme as an integrated whole in order to evaluate whether Plan confirmation is warranted."  Id. at 241.  Noting that the various groups of asbestos personal injury claimants in Combustion Engineering "appear to receive a demonstrably unequal share of the limited Combustion Engineering fund," and that no findings had been made by the bankruptcy court or the district court concerning "whether the most seriously injured asbestos claimants received fair treatment under the Plan," the Third Circuit remanded the case.  Id. at 242.

Although the discriminatory scheme hatched by the asbestos claimants' committee in Combustion Engineering was different from the Plan's blatant discrimination against the Libby Claimants, the pattern of behavior is characteristic.  The asbestos claimants' committee was controlled by the same majority and represented by the same counsel as in this case.  Members of the committee in Combustion Engineering and in this case include the same personal injury lawyers who have filed hundreds of thousands of claims in other asbestos bankruptcies.  The Libby Claimants have not appeared in other bankruptcies.  For them, Grace is the only debtor from whom they have a right to recover, their claims indisputably result from exposure to Grace's asbestos, and their medical condition is in all instances serious or highly likely to

50

become so. Despite (or perhaps because of) their compelling circumstances, the Libby

Claimants have been frozen out of the Plan—an easy target because they are outsiders.

The ruin of Libby is Grace's foremost shame. With no other asbestos producer to look to,

Grace's victims in Libby have the greatest need for recovery in this case. On occasions when the

Libby Claimants appeared in this Court seeking to pursue claims against third parties who

contributed to their distress, this Court regarded those claims as an indirect way to get at Grace,

which this Court viewed as the proper source of recovery for the Libby Claimants. Now the

Libby Claimants need this Court's help in obtaining a proper recovery from Grace.

The Plan's discriminatory treatment of the Libby Claimants is achieved (i) by classifying

the Libby Claimants together with other asbestos claimants even though the Libby Claimants, as

compared to non-Libby claimants, were exposed to a more deadly form of asbestos, which

exposure was indisputably caused by Grace, and which exposure has caused significantly more

severe disease, (ii) by establishing exclusionary medical criteria that unfairly restrict the Libby

Claimants' eligibility for severity-of-disease-level payments under the Plan, (iii) by establishing

claim allowance levels and caps that limit allowance of the Libby Claimants' claims (but not

non-Libby claimants) to less than what could be obtained in the tort system, and (iv) by funding

payments to the class of asbestos claimants partly from proceeds of insurance that, outside of

bankruptcy, only the Libby Claimants would have had the right to pursue, thereby benefiting the

non-Libby claimants at the expense of the Libby Claimants. In its overall treatment of the Libby

Claimants, the Plan violates the "equality of distribution" principle embedded in the Bankruptcy

Code and required by Combustion Engineering.

The pitifully inadequate compensation that the Libby Claimants are slated to receive

under the Plan results largely from discrimination against the Libby Claimants in the medical

criteria and other terms of the TDP, and the relative inflation of the amounts siphoned to other claimants and their lawyers. The announced goal of the TDP is to pay all claimants "as equivalent a share as possible of the value of their claims based on historical values for substantially similar claims in the tort system."[173] Presumably this goal has been achieved—perhaps more than achieved—for Asbestos PI Claimants other than the Libby Claimants. For the Libby Claimants, however, the TDP does not even attempt to meet this goal. Indeed, the TDP's utilization of the Discriminatory Criteria,[174] which the Plan Proponents created especially for the Libby Claimants, ensures that the goal cannot be met.

***Severe Disabling Pleural Disease.*** Libby Claimants with impairment (lung capacity of less than 80%) have obtained verdicts and settlements averaging $550,200.[175] The TDP establishes a Scheduled Value of $50,000 for Disease Level IV-B, which is labeled Severe Disabling Pleural Disease.[176] As discussed earlier, even in the case of Libby Claimants with severe pleural disease (lung capacity of less than 65%), only about 14% will qualify under the improper medical criteria for Severe Disabling Pleural Disease contained in the TDP.[177] For these claimants, seeking a greater amount than the Scheduled Value requires that the claimant elect Individual Review with its attendant costs, uncertainties, and delays. Maximum Value is the most that can be allowed to a claim other than an Extraordinary Claim under the TDP, whether the claim is determined by Individual Review, mediation, arbitration, or obtaining a

---

[173] TDP § 2.1.

[174] See III.G.1.viii and preceding discussion in III.G.1.

[175] See III.C. This and all figures for historic verdicts and settlements have been adjusted to bring forward prepetition figures to current value. This is a necessary step to provide an apples-to-apples comparison between the Libby Claimants' verdict/settlement record and the Scheduled Values used in the TDP. The adjustment factor, which was developed by the Asbestos PI Committee's experts, is the same factor the Asbestos PI Committee used to establish the Scheduled Values under the TDP. The Asbestos PI Committee claims that the Scheduled Values reflect Grace's prepetition verdict/settlement history of Asbestos PI Claims converted to current values through use of the adjustment factor.

[176] TDP § 5.3(a)(3).

[177] See III.G.1.a.i.-vii.

judgment in the tort system.[178]  For Severe Pleural Disease claims, the Maximum Value is

$100,000—a mere 18% of tort system value.  In dollars, the Maximum Value falls short of tort

system value by more than $450,000.

Upon Individual Review, in the sole discretion of the Extraordinary Claims Panel, a

Libby Claim may be liquidated for up to eight times the Scheduled Value, but there is no

assurance that this will be done, and the Panel's decision is apparently non-appealable, even to an

arbitrator.[179]  The Extraordinary Claims Panel, appointed by the trustees of the Asbestos PI Trust,

can be expected to consist of lawyers associated with the Asbestos PI Committee, as it does in

other cases.[180]  These are the very lawyers who have engineered the unfair treatment of Libby

Claims under the Plan.

Even if the claim were liquidated for the full 8x multiple, the liquidated amount would be

$400,000.  This is $150,000 less than the tort system value of the claim.  By electing Individual

Review, a claimant forfeits the right to obtain even the Scheduled Value.[181]  Assuming, however,

that the claimant would receive not less than the Scheduled Value even if Extraordinary Claims

treatment were denied, the liquidated value of the claim would be from $50,000 (the Scheduled

Value) to $100,000 (the Maximum Value)[182]—i.e., as little as 9% of tort system value.  This

represents a shortfall of between $450,000 and $500,000 compared to the tort system value of

$550,200.   Thus, the Asbestos PI Trust is not even permitted, let alone required, to liquidate

Libby Claims for severe pleural disease—even Libby Claimants who meet the inappropriate

---

[178]  See discussion at III.G.1.
[179]  See extensive discussion at III.G.1.
[180]  For example, the Committee's chief bankruptcy counsel, Elihu Inselbuch, serves on the Extraordinary Claims Panel in Manville, Celotex and other cases.  Deposition of Elihu Inselbuch, Esq., p. 17.
[181]  "[T]he liquidated value of any PI Trust Claim that undergoes Individual Review may be determined to be less than the Scheduled Value the claimant would have received under Expedited Review."  TDP § 5.3(b)(1)(B).
[182]   TDP § 5.3(b)(3).

medical criteria for Severe Disabling Pleural Disease set forth in the TDP—at the tort system value of the claim.

The result will be even worse for the many Libby Claimants who have been diagnosed with severe pleural disease but who do not meet the TDP's improper medical standard for Severe Disabling Pleural Disease. Many will qualify only for Disease Level II, labeled Asbestosis/Pleural Disease,[183] with a Scheduled Value of $2,500.[184] Once again, to seek a greater amount than the Scheduled Value requires the claimant to elect Individual Review with its attendant costs, uncertainties, and delays. The result will be a liquidated claim value from one to eight times the Scheduled Value, in the sole discretion of the Extraordinary Claims Panel.

Even if the claim were liquidated for the full 8x multiple, the liquidated amount would be $20,000—less than 4% of the tort system value of $550,200 and a shortfall in dollars of $530,000. If Extraordinary Claims treatment were denied altogether, the liquidated value of the claim would be from $2,500 (the Scheduled Value) to $5,000 (the Maximum Value)[185]—i.e., as little as 0.5% of tort system value. Thus, the Asbestos PI Trust is not even permitted, let alone required, to allow the claim at a figure anywhere close to its tort system value.

***Pleural Disease (Impaired).*** Libby Claimants with pleural disease who are impaired but not severe (lung capacity between 65% and 80%) are in the same boat as severe claimants who do not meet the TDP's medical criteria for Severe Disabling Pleural Disease. Despite the tort system value of $550,200 based on verdict/settlement history for all impaired Libby Claimants, these claims will be compensated based on liquidated claim values of from $7,500 to $60,000 under the terms of the TDP. Their liquidated claim values will range from 1.4% of tort system

---

[183] As discussed earlier, many cannot meet the improperly exclusionary requirement of FEV1/FVC ratio greater than or equal to 65%. Since this requirement is also part of the medical requirement for Disease Level III (TDP § 5.3(a)(3)), these Libby Claimants will fall to Disease Level II.
[184] TDP § 5.3(a)(3).
[185] TDP § 5.3(b)(3).

value, to a "high" of less than 11% of tort system value. Here again, the Asbestos PI Trust is not even permitted, let alone required, to allow the claim at a figure anywhere close to its tort system value.

*Pleural Disease (Unimpaired).* Unimpaired Libby Claimants with pleural disease have claims with a tort system value of $271,170 based on pre-bankruptcy verdicts and settlements.[186] Under the TDP, these claims fall within Disease Level II, with a Scheduled Value of $2,500.[187] Even if Extraordinary Claims Panel in its sole discretion were to liquidate a claim for the maximum permitted 8x multiple, the liquidated amount of the claim would be $20,000. This is about 7% of the tort system value of $271,170 and a shortfall in dollars exceeding $250,000. If Extraordinary Claims treatment were denied altogether, and again assuming that the claim would be liquidated for not less than the Scheduled Value even though this is permitted under the TDP, the liquidated value of the claim would be from $2,500 (the Scheduled Value) to $5,000 (the Maximum Value)[188]—*i.e.*, as little as 0.9% of tort system value. Thus, as with all other Libby Claims, the Asbestos PI Trust is not even permitted, let alone required, to allow the claim at a figure anywhere close to its tort system value.

*Mesothelioma.* Libby Claimants with mesothelioma have obtained verdicts and settlements of $1,506,450.[189] The TDP establishes a Scheduled Value of $180,000 for Disease Level VIII, which is Mesothelioma.[190] In order to obtain a greater amount, a Libby Claimant with mesothelioma must elect Individual Review with its attendant costs, uncertainties, and delays. Upon Individual Review, in the sole discretion of the Extraordinary Claims Panel, a Libby Claim may be liquidated for up to eight times the Scheduled Value, but there is no

---

[186] See III.C and footnote 175 above.
[187] TDP § 5.3(a)(3).
[188]  TDP § 5.3(b)(3).
[189] See III.C and footnote 175 above.
[190] TDP § 5.3(a)(3).

assurance that this will be done, and the Panel's decision is apparently non-appealable, even to an arbitrator.[191]  It would require the full 8x multiple to obtain a liquidated amount ($1,440,000) that would even approximate the tort system value of the claim ($1,506,450).

If Extraordinary Claims treatment were denied, assuming that the claim would not be liquidated at less than the Scheduled Value even though this is permitted under the TDP,  the liquidated value of the claim would be from $180,000 (the Scheduled Value) to $450,000 (the Maximum Value).[192]    Maximum Value results in a shortfall of $1,056,000 to $1,326,000 from tort system value.  In sum, the Asbestos PI Trust is not even permitted, let alone required, to liquidate Libby Claims for mesothelioma at the tort system value of the claim.

*Lung Cancer.*  Libby Claimants with lung cancer have a verdict and settlement history of $532,350.[193]  The TDP establishes a Scheduled Value of $42,000 for Disease Level VII, which is Lung Cancer 1.[194]  As was just described in the case of mesothelioma, a Libby Claimant with lung cancer may seek a greater amount than the Scheduled Value only by electing Individual Review with its attendant uncertainties and delays.  The result will be a liquidated claim value of from one to eight times the Scheduled Value, in the sole discretion of the Extraordinary Claims Panel.

Even if the claim were liquidated for the full 8x multiple, the liquidated amount would be $336,000.  This is $196,000 less than the tort system value of a Libby Claim for lung cancer.  If Extraordinary Claims treatment were denied, and again assuming that the claim would not be liquidated at less than the Scheduled Value, the liquidated value of the claim would be from

---

[191]  See extensive discussion at III.G.1.
[192]  TDP § 5.3(b)(3).
[193]  See III.C.
[194]  TDP § 5.3(a)(3).

$42,000 (the Scheduled Value) to $95,000 (the Maximum Value).[195]  The $42,000 figure

represents 8% of tort system value (a shortfall of $437,000 to $490,000 from the tort system

value of $532,350).  Thus, the Asbestos PI Trust is not even permitted, let alone required, to

liquidate Libby Claims for lung cancer at the tort system value of the claim.[196]

In sum, the Plan falls far short of meeting Combustion Engineering's requirement for

equality of distribution.  The TDP has been designed to liquidate Asbestos PI Claims other than

Libby Claims at not less than their value in the tort system.  For Libby Claims, however, the

TDP will result in liquidation at far less than tort system value.  Because of the pervasive

discrimination against the Libby Claimants, the Plan is unconfirmable as a matter of law.

**B.**     **The Plan Impermissibly Disenfranchises the Libby Claimants Through Impermissible Classification and Treatment of Their Claims**

When a class of claimants is the object of unfair discrimination in comparison to another

class of equal rank, the Bankruptcy Code provides a solution: the class may vote against the plan,

in which case the plan may not be confirmed.[197]  Here, the proponents of the Plan have

disenfranchised the Libby Claimants by including them in a single class consisting of all

Asbestos PI Claims.  This stratagem violates specific provisions of the Bankruptcy Code

regarding classification of claims, and uniform treatment of claims within a class.

The Bankruptcy Code's requirements concerning classification and uniform treatement

are of fundamental importance in a Chapter 11 case because they assure the integrity of the

voting process concerning acceptance of a plan.  Plan confirmation requires acceptance of the

---

[195]   TDP § 5.3(b)(3).
[196]   The analysis and figures for cancers other than mesothelioma or lung cancer are likely to be similar to lung cancer, but there is no verdict/settlement history for this type of Libby Claim.
[197]   See 11 U.S.C. § 1129(b)(1) (providing for confirmation of a plan "if the plan does not discriminate unfairly . . . with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.").

plan by each unimpaired class of claims or interests.  11 U.S.C. § 1129(a)(8).[198]  If a class votes

against the plan, then the plan may be confirmed only if it meets the "cramdown" requirements

of Section 1129(b) as to the non-assenting class.  To be crammed down on a class of unsecured

claims, a plan must conform to the absolute priority rule, meaning that either the class of

unsecured claims must be paid in full or no junior class, such as stockholders, may receive or

retain any property under the plan.  11 U.S.C. § 1129(b)(2)(B).  And, as just noted, cramdown

requires the proponents of a plan to demonstrate that the plan does not discriminate unfairly.  11

U.S.C. § 1129(b)(1).  This statutory scheme is intended to, and does, create negotiating leverage

for classes of unsecured claims.  See In re Armstrong World Industries, Inc., 432 F.3d 507, 514-

515 (3d Cir. 2005) (noting Congress's intent in enacting Section 1129(b)(2)(B) was to give

unsecured creditors negotiating leverage in plan formulation).  When a debtor wishes (as Grace

does) to leave stock in the hands of its current stockholders yet is incapable of paying unsecured

creditors in full, the debtor can accomplish this result only by striking a deal with each class of

unsecured creditors so as to gain its acceptance of the plan.  See In re Dow-Corning Corp., 244

B.R. 634, 649 (Bankr. E.D. Mich. 1999) (plan may be confirmed despite non-assenting class of

unsecured creditors only if plan satisfies best interests of creditors test and absolute priority rule).

　　　　If a plan proponent were permitted to classify dissimilar claims together, or to provide

disparate treatment of claims within a class, and then obtain acceptance of the plan by the

improperly created class, the plan proponent would effectively disenfranchise the holders of the

improperly classified claims and thereby circumvent the protections afforded such creditors by

Section 1129(b).  In the most obvious example, suppose a secured creditor were placed in a class

dominated by general unsecured creditors.  A plan that proposed to pay, say, 50 cents on the

---

[198] The required vote consists of a majority in number and two-thirds in dollar amount of claims for which ballots
are cast.  11 U.S.C. § 1126(c).

dollar to all class members, might seem just fine to general unsecured creditors.  But to the

secured creditor, who has superior legal rights by reason of his lien, 50 cents might seem like a

rotten deal.  While it would be fair for this creditor to be outvoted by other creditors holding

liens of equal rank in the same collateral, if they were to reach a different conclusion about the

plan, it would not be fair at all for the secured creditor to be outvoted by general unsecured

creditors, who have different legal rights.

In order to ensure fairness in the voting process, courts closely scrutinize classification of

claims, and uniformity of treatment of claims within a class.  See In re Holywell Corp., 913 F.2d

873, 880 (11th Cir.1990) (a plan cannot be confirmed if the classification is designed to

manipulate class voting); In re Lumber Exchange, 134 B.R. 354, 357 (D. Minn. 1991)

(classifications designed to manipulate voting should be closely scrutinized); In re Richard

Buick, Inc., 126 B.R. 840, 854 (Bankr. E.D. Pa. 1991) (disparate treatment of claims within class

impermissibly skews voting process); In re Rhodes, Inc., 382 B.R. 550, 556 (Bankr. N.D. Ga.

2008) (one important purpose of Section 1123(a)(4) is to protect the integrity of the voting

process in a Chapter 11 case).   The integrity of the voting process is particularly important in an

asbestos case.  "[M]anipulation is especially problematic in the asbestos context, where a voting

majority can be made to consist of non-malignant claimants whose interests may be adverse to

those of claimants with more severe injuries."  In re Combustion Engineering, Inc., 391 F.3d

190, 244 (3d Cir. 2004).

As demonstrated below, the Plan effectively disenfranchises the Libby Claimants by

violating the protections afforded the Libby Claimants by Sections 1122, 1123(a)(4) and

1129(b)(2)(B) of the Bankruptcy Code.  In violation of Section 1122(a)—which permits claims

to be classified together only if "substantially similar"—the Libby Claims have been placed in a class where they are overwhelmed by a vast ocean of claims that have different legal rights:

- claimants whose exposure to Grace's asbestos is difficult to prove, whereas Libby Claimants' injuries are unquestionably caused by exposure to Grace's asbestos;

- claimants with asbestos disease that is not life-threatening (if, indeed, they are sick at all), whereas the Libby Claimants face probability of death from asbestos disease; and

- claimants whose only access to insurance consists of a ratable share of capped products coverage, whereas (but for the provisions of the Plan) the Libby Claimants would have access to uncapped non-products insurance coverage.

Many other significant differences between Libby Asbestos Disease and asbestos disease elsewhere demonstrate that the Libby Claimants' claims are not "substantially similar" to other asbestos claims, and should be classified separately.[199]

In violation of Section 1123(a)(4)—which requires uniform treatment of all claims within a class—the Libby Claims are treated differently (and worse) than the other Asbestos PI Claims included in the same class:

- Libby Claims are subjected to medical criteria that are arbitrary and exclusionary in comparison to the medical criteria governing the other claims;

- Libby Claimants must surrender valuable insurance rights that other claims in the class do not possess; and

- Libby Claims are liquidated at a small fraction of their value in the tort system whereas the other claims are liquidated at or above tort system value.

---

[199] See discussion of these differences at Section III.B.

As a result of these violations, the Libby Claimants' votes against the Plan in its current form are overwhelmed by the accepting votes of a vast number of claims that are dissimilar to, and dissimilarly treated from, the Libby Claims.  By robbing the Libby Claimants of the ability to use Section 1129(b) to protect their rights, the Plan Proponents seek to escape the necessity of doing what the statutory scheme is meant to require: negotiating with the Libby Claimants to achieve a mutually-acceptable plan.

This iniquity has been accomplished by crafting a Plan that is unconfirmable by reason of rampant violation of the provisions of Sections 1122 and 1123(a)(4) that exist to give meaning to Section 1129(b).  Accordingly, for the reasons specifically set forth below, confirmation of the Plan must be denied.

1.     **The Plan Impermissibly Places the Libby Claimants' Claims in a Class with Claims that Are Not Substantially Similar**

Section 1122(a) of the Bankruptcy Code provides that a "plan may place a claim or an interest in a particular class if such claim or interest is substantially similar to the other claims or interests of such class."  11 U.S.C. § 1122(a).  Whether claims are "substantially similar" is determined with reference to the legal rights and priority inherent in the claim.  E.g., In re Fairfield Executive Assoc., 161 B.R. 595, 600 (D. N.J. 1993) (citing In re Greystone III Joint Venture, 995 F.2d 1274, 1278 (5th Cir. 1991)).  The statute flatly forbids placing dissimilar claims in the same class.  In re Jersey City Medical Center, 817 F.2d 1055, 1060 (3d Cir. 1987). The purpose of this restriction is to assure the integrity of the voting process.  See In re Holywell Corp., 913 F.2d 873, 880 (11th Cir.1990) (a plan cannot be confirmed if the classification is designed to manipulate class voting); In re Lumber Exchange, 134 B.R. 354, 357 (D. Minn. 1991) (classifications designed to manipulate voting should be closely scrutinized).  On the critical issue of whether to waive the absolute priority rule and the other protections of Section

61

1129(b), it is only fair that creditors may only be outvoted by other creditors who start off with the same rights.  See Combustion Engineering, 391 F.3d at 244 ("[Classification] manipulation is especially problematic in the asbestos context, where a voting majority can be made to consist of non-malignant claimants whose interests may be adverse to those of claimants with more severe injuries.").

The Plan creates a single class of asbestos personal injury claims.[200]  In so doing, the Plan violates Section 1122(a) by placing the Libby Claims in the same class as claims that are not substantially similar to them.

a.    **The Libby Claimants' Rights Against Grace Require Them to be Separately Classified**

As discussed earlier, most asbestos personal injury claims against Grace result from alleged exposure to Grace's construction and insulation products.[201]  From a legal standpoint, this means their rights against Grace differ from the Libby Claimants' in two important ways.  First, the construction materials produced by Grace contain predominantly chrysotile asbestos—a different type of asbestos fiber than the amphibole asbestos from Libby.  When exposure to Grace's products results in nonmalignant asbestos disease, there is about a 20% chance that it will progress.  By contrast, for Libby Claimants there is a high probability that their disease will progress.[202]  With a probability of death, the Libby Claimants may recover for future medical expenses.  With no probability of death, other claimants may not so recover.  No doubt the probability of death is an important reason why Libby Claimants obtain significantly larger

---

[200]  This is *not* required by Section 524(g) of the Bankruptcy Code.  To the contrary, Section 524(g) refers to a "class or classes of the claimants whose claims are to be addressed by a trust."  11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb).
[201]  See III.D.
[202]  See III.B.

verdicts and settlements from Grace than other Asbestos PI Claimants, even (indeed, especially) during the early stages of asbestos disease.[203]

Second, claimants who allege exposure to Grace's products face the legal issue of causation: was it Grace's asbestos, or someone else's, that is responsible for the disease?  A person exposed to Grace's products (typically, a construction worker) handled asbestos-containing products of many different manufacturers, and might not have handled Grace's products at all.  The Libby Claimants, by contrast, were unquestionably exposed to Grace's asbestos and have no meaningful exposure to asbestos generated by anyone else.  As a result, in the tort system Grace has no causation defense to liability claimed by the Libby Claimants, and Grace has no right to diminish its liability by proving that other asbestos producers bear part of the responsibility for the claimant's injuries.

Before settling with the Asbestos PI Committee, Grace consistently argued the overwhelming majority of Asbestos PI Claimants were not exposed to sufficient Grace asbestos to cause any disease.  At the estimation hearing in this case, Grace advised the Court that 95% of the Asbestos PI Claimants had exposures below one fiber per milliliter per year.[204]  Grace's medical experts, in turn, testified such low level exposures could not produce any disease.[205]  By contrast, the Libby Claimants experienced much higher exposures to Grace asbestos.  For example, based on Grace's own industrial hygiene data, certain Libby claimants who worked at the mine and mill would have accumulated exposures of dozens of fibers per milliliter per year after less than a year of work.[206]  Despite these radical differences in the nature of their claims,

---

[203]  See Section III.C detailing such verdicts and settlements, and Section III.B, discussing many other significant differences between Libby Asbestos Disease and asbestos disease elsewhere that demonstrate that the Libby Claimants' claims are not "substantially similar" to other asbestos claims.
[204]  Estimation hearing transcript, 1/14/08, p. 42.
[205]  Estimation hearing transcript, 3/26/08, p. 112.
[206]  Spear Report, Exhibits 110-17.

the Plan classifies such Libby Claimants together with claimants lacking any meaningful exposure to Grace asbestos.

These differences in the Libby Claimants' legal rights go to the heart of why the Plan is a rotten deal for the Libby Claimants, while the other members of the Asbestos PI Committee have concluded that it is a favorable deal for their clients. The Libby Claimants have much stronger claims against Grace than most Asbestos PI Claimants, resulting in a history of higher average verdicts and settlements. The Libby Claimants have stronger insurance rights than other Asbestos PI Claimants, because coverage for their claims is not subject to aggregate limits. Because of their very different legal rights, the Libby Claims must be separately classified from other Asbestos PI Claims.

### b.    The Libby Claimants' Rights Against Insurers Require the Libby Claims to be Separately Classified

In cases where only the debtor is being discharged or otherwise protected from liability, the issue whether claims are "substantially similar" focuses on the legal character of the claim *as it relates to the debtor*. E.g., In re Heron, Burchette, Ruckert & Rothwell, 148 B.R. 660, 670 (Bankr. D. D.C. 1992). Thus, if two creditors have equal rights against the debtor, their claims are substantially similar even if one of the creditors also has rights against a third party such as a guarantor. Of course, this rule makes perfect sense if the creditor's rights against the third party are unaffected by the plan.

Where a creditor's rights against a third party are affected by the plan, the rule must be different.

> [C]reditors that have recourse against non-debtors are not similarly situated with creditors that have no such rights; therefore, permitting creditors to pursue non-debtors in no way violates the policy of equal treatment for similarly situated creditors. In fact, a plan of reorganization that classifies together, for equal treatment, creditors both with and without non-debtor recourse, *while eliminating*

*the rights of those with non-debtor recourse*, actually undermines the Bankruptcy Code's classification and treatment scheme.  It is an attempt to impose equal treatment amongst creditors whose rights are not "substantially similar," within the meaning of section 1122(a).

\*   \*   \*   \*   \*

The creditor rights that are relevant to assessing substantial similarity for purposes of classification are those rights being affected by the plan, *which includes non-debtor rights when the plan extinguishes such rights through non-debtor releases.*  Although it is true that Congress' intended reach for both section 1122(a) and section 1123(a)(4) likely was limited to creditors' claims against the debtor, it is also true that Congress clearly intended that creditors' rights against non-debtors, as a norm, would remain untouched by the debtor's plan of reorganization by virtue of section 524(e).  Assuming arguendo that section 524(e) does not prohibit the plan from altering creditors' non-debtor claims, if the plan does release non-debtor claims, this expanded treatment of claims must lead to a more expansive role for the Bankruptcy Code's treatment and classification provisions.  To put it another way, if the plan departs from the debtor-only default mode with respect to section 524(e), the debtor-only default rules of sections 1122(a) and 1123(a)(4) are no longer appropriate.

Brubaker, "Bankruptcy Injunctions And Complex Litigation: A Critical Reappraisal of Non-Debtor Releases In Chapter 11 Reorganizations", 1997 U. Ill. L. Rev. 959, 982-83 (1997) (emphasis added).

In this case, the Plan affects the Libby Claimants' rights not only against Grace, but also Grace's insurers.  The Asbestos PI Channeling Injunction and the Asbestos Insurance Entity Injunction purport to eliminate any right of the Libby Claimants to pursue rights against Grace's insurers.  Thus, this Court must apply the rule articulated by Professor Brubaker:  when a plan affects creditors' rights against third parties, the issue of whether creditors' claims are "substantially similar" for purposes of classification must be measured with reference to the creditors' rights against the third parties as well as their rights against the debtor.

The Libby Claimants must be separately classified because their rights against third parties—specifically, Grace's insurers—are not substantially similar to the rights of the

remaining personal injury claimants. The Libby Claims were generated as a result of Grace's operations, as distinct from exposure to Grace's finished products. As described above,[207] Grace's insurance policies contain separate and distinct provisions concerning non-products claims (*i.e.*, the Libby Claims) and products claims (*i.e.*, the other Asbestos PI Claims, which result from exposure to Grace's products).

The most important distinction is that Grace's insurance policies contain an aggregate cap on products claims but not non-products claims,[208] with two important effects. First, since products claims vastly exceed the caps under Grace's products coverage, this coverage will pay only a small portion of the products claims against Grace.[209] Second, the aggregate caps create the need for pursuit of products coverage to be controlled by the Asbestos PI Trust in order to avoid a race to the courthouse whereby the first claimants to obtain judgment against the insurers would obtain a recovery, but there would be nothing left for later claimants once the aggregate caps were exhausted. Indeed, Section 524(g) arguably requires that when insurance proceeds are subject to an aggregate cap, they be administered by an asbestos trust and divided between present and future claims on a non-discriminatory basis.[210]

The Libby Claimants bear an entirely different relationship to Grace's insurance coverage. The lack of any aggregate cap on insurers' liability for Libby Claims means that there is no barrier to a very high percentage recovery by the Libby Claimants from the insurers.[211] Moreover, there is no need for centralized pursuit of the insurers, because there is no aggregate cap that will be exhausted by the first claimants to achieve recovery. These distinct legal rights

---

[207] See III.G.2.

[208] Id.

[209] See Disclosure Statement § 2.10.2.4 describing Grace's estimated products coverage. Even assuming Grace's insurers actually stepped up to the plate and paid the face amount of the coverage ($916 million), it would be far less than the Asbestos PI Claims that will be allowed by the Asbestos PI Trust.

[210] 11 U.S.C. § 524(g)(2)(B)(V).

[211] Recovery of 100% is unlikely because of deductibles, potential issues of allocation among insurers for different years of coverage, and other defenses that insurers can be counted on to attempt.

require separate classification.  The Plan Proponents contend some claims outside of Libby may be covered by non-products coverage as well.  However, Jeffrey Posner, the individual primarily responsible for claiming coverage on Grace's behalf prior to its bankruptcy petition, testified that virtually all of the claims against Grace were products claims subject only to products coverage: "I think that every claim that was pending against Grace was a product claim with the exception of the Libby claims.  And, again, maybe there's an isolated case here and there but, I mean, all of the claims are basically products claims other than the Libby claims, as a practical matter."[212]

The rights of the Libby Claimants in relation to Grace's insurance go right to the heart of the Bankruptcy Code's scheme for classification and voting.  As a result of their distinct rights, the Libby Claimants have starkly different considerations from other personal injury claimants in voting whether to accept or reject the Plan.  For other claimants, the insurance provisions of the Plan are an unalloyed benefit.  By sharing in insurance proceeds attributable to the Libby Claims, the non-Libby claimants will receive more insurance money per claim than they are entitled to on their own.  In addition, centralization of collection and distribution of insurance money will avoid the injustice of earlier claimants' receipt of a disproportionate share of the insurance and ensure compliance with the mandate of Section 524(g) requiring non-discrimination against future claims.  For Libby Claimants, by contrast, sharing their insurance money with the other claimants is dilutive of their recovery, and centralized collection/distribution of insurance money is not required either to assure fairness among existing Libby Claimants or non-discrimination against future claims.  The integrity of process of voting on the Plan requires that the Libby Claims be separately classified.

Divergent insurance rights formed the basis for separate classification of certain unsecured claims in In re Mahoney Hawkes, LLP, 289 B.R. 285 (Bankr. D. Mass. 2002).

---

[212] Deposition of Mr. Jeffrey Posner, pp. 195-96.

Mahoney Hawkes involved liquidation of a law firm. Unsecured claims entitled to recovery under the debtor's malpractice insurance were placed in a separate class. Id. at 289. Over objection, the court determined that this classification was permissible (which, in the First Circuit, is the same as a determination that separate classification was required[213]) because, while the rights of all general unsecured creditors were the same in relation to the debtor, one class also had rights against the insurer. Id. at 295. This Court, too, has upheld separate classification of creditors with otherwise identical rights on the basis of insurance. In re United States Mineral Prods. Co., 2005 WL 5898300, *23 (Bankr. D. Del. 2005) (Fitzgerald, J.) (claims covered by products liability insurance classified separately from uninsured claims).

### 2.    The Plan is Unconfirmable Because It Provides Different Treatment to Claims of the Same Class

Section 1123(a)(4) requires that, for confirmation to be granted, a plan shall "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." 11 U.S.C. § 1123(a)(4). Favoring one group of class members is unacceptable because, among other things, such treatment skews the class voting. In re Richard Buick, Inc., 126 B.R. 840, 854 (Bankr. E.D. Pa. 1991). "Although one purpose of section[] ...1123(a)(4) is to insure equality of distribution, an equally, if not more, important purpose is to protect the integrity of the voting process in a Chapter 11 case. Voting on a plan is by class. Section 1123(a)(4) prevents a plan proponent from rigging the vote of a particular class by providing for more favorable treatment to a claim that by virtue of its amount controls whether or not the class accepts the plan." In re Rhodes, Inc., 382 B.R. 550, 556 (Bankr. N.D. Ga. 2008). The requirement of "equal treatment" is separate and apart from the "substantially similar" standard of Section 1122, such that a

---

[213] Granada Wines, Inc. v. New England Teamsters & Trucking Indus. Pension Fund, 748 F.2d 42, 46 (1st Cir. 1984).

violation of Section 1123(a)(4) prohibits confirmation regardless of whether the requirements of Section 1122(a) have been satisfied.  In re Jersey City Medical Center, 817 F.2d 1055, 1061 (3d Cir. 1987).

A typical Chapter 11 plan will provide equal treatment to claims within a class by paying each claim, on uniform terms, either a specified percentage of its allowed amount or providing each claim a *pro rata* share of a specified pool of assets, again based on the allowed amount of the claim.  The typical Chapter 11 plan does not govern allowance of claims (which is handled by the bankruptcy court through the statutory claims allowance process[214]) or disposition of rights against third parties (which are left to each individual claimant to pursue[215]).  Thus, in a non-asbestos case, equal treatment of class members is achieved simply by paying all of them the same percentage of their allowed claim.

In asbestos cases where a Section 524(g) trust is established, the practice has arisen for the function of allowing claims to be assumed by the trust.  Thus, the Plan provides that Asbestos PI Claims will not be allowed or disallowed, but instead "shall be resolved in accordance with the terms, provisions and procedures of the Asbestos PI Trust and the Asbestos PI TDP."[216]  For the most part, the TDP refers to "liquidation" rather than "allowance" of claims, but it amounts to the same thing: the process whereby the trust will determine the amount of the claim which, when multiplied by the Payment Percentage, will constitute the claimant's distribution from the trust.

In asbestos cases where a Section 524(g) trust is established, the practice has arisen for disparities among claimants' rights against third parties (or against different debtors in a multi-debtor case) either to be ignored or addressed through establishment of sub-trusts.  The Plan

---

[214] See 11 U.S.C. § 502; Fed. R. Bankr. P. 3007, 3008.
[215] See 11 U.S.C. § 524(e).
[216] Plan § 3.1.6(b)(i).

elects the former approach, ignoring rights against third parties.  The Plan provides that all claims will be paid from a single trust with a single pool of assets, regardless of the claimants' divergent rights against third parties, the pursuit of which is being enjoined by the Plan.

Because asbestos plans depart from the Chapter 11 norm by including provisions governing allowance of claims and rights against third parties, disparities of treatment regarding claims allowance and third-party rights may form the basis for violation of Section 1123(a)(4).  Compliance with Section 1123(a)(4) cannot be assessed, as in a non-asbestos case, simply by determining whether all class members will receive the same percentage and on the same terms.

The Plan lumps all Asbestos PI Claims in a single class[217] but treats them differently, not only concerning claims allowance and rights versus third parties but also the classic subject matter of Section 1123(a)(4): terms on which claims are paid.  Specifically, and as more fully explained below, the TDP violates Section 1123(a)(4) by providing differential treatment of Asbestos PI Claims based on (a) the type of asbestos disease, (b) whether the claim is based on a jury verdict, (c) when the claim is liquidated by the Asbestos PI Trust, (d) whether the claim is for wrongful death or loss of consortium, and (e) whether the claim is for compensatory or punitive damages.  For purposes of Section 1123(a)(4), the issue is not whether different treatment is legally permissible.  Even where different treatment is permitted, different treatment of claims *within the same class* is not.

> a.      **The Plan Violates Section 1123(a)(4) by Providing Different Treatment of Claims in the Allowance/Liquidation Process**

Concerning allowance of claims, the TDP provides for each claimant to initially elect to be treated in accordance with Expedited Review[218] or Individual Review.[219]  Under Expedited

---

[217] Plan § 3.1.6(a).
[218] TDP § 5.3(a).
[219] TDP § 5.3(b)(1).

Review, the claim is valued in accordance with a grid specifying a different Scheduled Value for different claims based on medical/exposure criteria.  If the claimant provides evidence that meets the criteria for a particular Disease Level, the claim is valued at the Scheduled Value for the Disease Level.[220]  Under Individual Review, the Asbestos PI Trust makes a largely discretionary determination of the value of the claim in the tort system based on consideration of factors specified in the TDP.[221]  However, the claim may not be valued at more than the Maximum Value for the particular Disease Level specified in the TDP.[222]  If dissatisfied with the valuation resulting from individual review, the claimant may proceed to mediation,[223] then to binding or non-binding arbitration[224] and then (if non-binding arbitration was elected) to obtain a verdict through the tort system[225]—again capped at the Maximum Value for the particular Disease Level.[226]

The above-described provisions concerning allowance of claims violate Section 1123(a)(4).  Although it has become standard practice in asbestos cases to specify different treatment for different claims within the same class, it is questionable that this practice (which has never been addressed in a reported decision) passes muster under Section 1123(a)(4).  The nine Disease Levels range from Mesothelioma, with a Scheduled Value of $180,000, to Other Asbestos Disease, with a Scheduled Value of $300.  Even if this disparate treatment is permissible, it surely is *different*.  Section 1123(a)(4) requires that all class members be treated the same.

---

[220]  TDP § 5.3(a)(1)-(3).
[221]  TDP § 5.3(b)(2).
[222]  TDP § 5.3(b)(1)(B).
[223]  TDP § 5.10(b).
[224]  TDP § 5.10(a).
[225]  TDP §§ 5.11 and 7.6.
[226]  TDP §§ 5.10(c) (as to arbitration awards) and 7.7 (as to litigation verdicts).

The payment of claims based upon vastly different Scheduled Values might be defended as the "same treatment" on the basis that the Scheduled Values reflect a uniform standard, namely, the value of the claim in the tort system.  Indeed, the TDP sets as the goal of the Asbestos PI Trust "paying all claimants over time as equivalent a share as possible of the value of their claims based on historical values for substantially similar claims in the tort system."[227] However, for the Libby Claimants, this goal is not met (indeed, was not even attempted) by the terms of the TDP.  As explained above, Libby Claims are entitled to receive only a fraction of their tort system value.

The failure to provide Libby Claims with the *right* to be liquidated at tort-system value might be defended on the basis that the Asbestos PI Trust has the *discretion* to liquidate Libby Claims at tort-system value.  This defense must fail for two reasons.  First, since the TDP does not contain medical criteria reflective of reality for Libby Claims, many Libby Claimants will not qualify for a Disease Level where even the Maximum Value, increased for Extraordinary Claims treatment, would reach the level of tort-system value.[228]  Second, relegating virtually all of the Libby Claimants to the discretion of the Asbestos PI Trust, even if it could be defended as reasonable, does *not* constitute the same treatment as the TDP provides other claimants.  Others are provided the right to fair (if not overly generous) treatment *on a non-discretionary basis*. The Plan may not include the Libby Claimants in the same class as other claimants without providing them the same treatment as other claimants, namely, the *right* to have their claims liquidated at tort-system value.

The TDP's failure to provide or even permit fair treatment of the Libby Claimants might be defended on the basis that the TDP provides every claimant with the option to obtain a verdict

---

[227]  TDP § 2.1.
[228]  See thorough discussion of this issue at V.A.

in the tort system if dissatisfied by the liquidated claim value offered by the trust. This defense must fail for three reasons. First, the TDP compels virtually all Libby Claimants to pursue jury verdicts in order to obtain tort-system value while almost none of the hundreds of thousands of other claimants will be forced to utilize this option.[229] For this reason, the TDP most certainly does not provide the same treatment to both groups of claimants. Second, when a Chapter 11 plan provides all creditors with the option to settle or litigate, the fact that any creditor may elect to litigate does not save the plan from violating Section 1123(a)(4) when the settlement option provides different treatment to members of the same class. In re AOV Indus., Inc., 792 F.2d 1140, 1152 (D.C. Cir. 1986).[230]

Third, while the TDP does confer on every claimant the right to obtain a verdict in the tort system, the TDP *does not require the claim to be allowed in the amount of the verdict*. Rather, the trust's payment of the claim will be based on the *lesser* of the verdict amount or the Maximum Value for the claimant's Disease Level.[231] For purposes of Section 1123(a)(4), it does not matter whether the treatment is permissible, only whether it is uniform throughout the class. While the TDP assures other claimants that they will receive the tort-system value of their claims, Libby Claimants who actually resort to the tort system certainly will not. Because the medical criteria used to establish Maximum Values do not reflect the reality of Libby Claims, the cap on jury verdicts will fall disproportionately—perhaps solely—on Libby Claimants. This is not the uniform treatment that Section 1123(a)(4) requires.

---

[229] The Libby Claimants understand that under other asbestos trusts, it is unheard of for claimants to seek judgment through the tort system.
[230] The AOV decision is discussed in greater detail at V.B.2.g.
[231] TDP § 7.7.

In sum, the terms of the TDP relating to liquidation of claims do not provide the same treatment to Libby Claimants as to other class members.  Therefore, the Plan is unconfirmable under Section 1123(a)(4).

### b.    The Plan Violates Section 1123(a)(4) by Providing Different Payment Terms for Claims Based on Jury Verdicts

The TDP provides for claims liquidated through obtaining a judgment in the tort system to be paid differently from other claims.  Other claims are generally paid in a lump sum, based (with some exceptions) on order of allowance.[232]  Claims based on judgments, however, are bifurcated, with an initial payment (capped at the greater of the PI Trust's last offer to the claimant or the award declined by the claimant in non-binding arbitration) based on order of allowance and the balance *paid in years six through ten following the initial payment*.[233] Whatever may be said of this discriminatory provision as a substantive matter, claims based on future judgments are most assuredly being treated differently from other claims.  By failing to provide the same payment provisions to all claims of the class, the Plan is unconfirmable under Section 1123(a)(4).

### c.    The Plan Violates Section 1123(a)(4) by Providing Different Payment Terms to Later-Allowed Claims

Where the economic deal is that funds to pay a particular class will be made available over time rather than paid in full on the effective date, the typical Chapter 11 plan will provide the same treatment to all class members by paying them in accordance with the same schedule of installments.  See, e.g., In re Northwestern Corp., 362 B.R. 131, 133 (D. Del. 2007) (describing plan providing for subsequent *pro rata* distributions).  If a creditor's claim has not yet been allowed or disallowed when the first installment is due, the creditor's installment is set aside in

---

[232]  TDP §§ 5.1(c), 5.4(a), 5.4(b).
[233]  TDP § 7.7.

reserve, to be paid if and when the claim is allowed.  See, e.g., id. at 134 (describing plan

providing for distribution of surplus funds when claim is allowed for less than reserved amount).

The TDP takes a radically different approach.  The TDP provides for the first funds

received by the Asbestos PI Trust to be used to pay the earliest-allowed claims.[234]  If the

Asbestos PI Trust does not have sufficient funds on hand to pay a claim when it is allowed, the

claim is placed in a queue for payment in order of allowance.[235]  These provisions subject later-

allowed claims to later payment and greater risk of non-payment than earlier-allowed claims.

This hazard especially awaits claims based on judgments in the tort system, where the TDP

stretches out payment over a period of more than ten years.[236]  Thus, the Plan does not treat later-

allowed claims the same as earlier-allowed claims. This is a self-evident violation of Section

1123(a)(4).

Section 524(g) does not excuse compliance with Section 1123(a)(4).  In fact, the two

provisions are consistent.  Section 1123(a)(4), which requires "the same treatment for each

claim," applies by its terms only to present claims, not future demands.  Recognizing that future

demands cannot possibly receive the exact same treatment as claims because demands do not yet

exist when the plan is confirmed, Section 524(g) sets a different standard for demands, namely,

that the asbestos trust be set up in a way that provides "reasonable assurance" that future

demands will be treated "in substantially the same manner" as present claims.[237]  The full text of

Section 524(g)(2)(B)(ii)(V) states that

> the trust will operate through mechanisms such as structured, periodic, or
> supplemental payments, pro rata distributions, matrices, or periodic review
> of estimates of the numbers and values of present claims and future

---

[234]  TDP § 5.1.
[235]  Id.  See also TDP § 2.4 concerning establishment of the maximum annual amount to be distributed by the
Asbestos PI Trust regardless of greater amount of claims that may have been allowed.
[236]  TDP § 7.7.
[237]  11 U.S.C. § 524(g)(2)(B)(ii)(V).

> demands, or other comparable mechanisms, that provide reasonable
> assurance that the trust will value, and be in a financial position to pay,
> present claims and future demands that involve similar claims in
> substantially the same manner.[238]

This language does not apply the "reasonable assurance" standard to present claims, only to future demands.  Indeed, the Third Circuit has described this provision as "specifically tailored to protect the due process rights of *future claimants*."  In re Combustion Engineering, Inc., 391 F.3d 190, 234, n.45 (3d Cir. 2004) (emphasis added).  If the language is at all ambiguous in this regard, then it must be construed to apply only to future demands so as to harmonize with Section 1123(a)(4), which would otherwise be given no effect.[239]

Moreover, the provisions of Grace's proposed TDP imposing discriminatory risks and delays on later-allowed claims are contrary to the spirit, as well as the letter, of Section 524(g).  That section's reference to "structured, periodic, or supplemental payments" and to "pro rata distributions" strongly suggests that the TDP should not simply pay the earliest claims in a lump sum at what is expected to be the full and final percentage for all claims.  Rather, the trust should hold back sufficient reserves so that later-allowed claims get paid, immediately upon allowance, the same percentage that earlier-allowed claims have received, and with no greater risk.

The terms of the deal struck between Grace and the Asbestos PI Committee generate particular risk for claims that are not allowed promptly after the effective date of the Plan.  Section 524(g) contemplates that "a debtor emerging from a Chapter 11 reorganization as a going-concern cleansed of asbestos liability will provide the asbestos personal injury trust with an 'evergreen' source of funding to pay future claims."  Combustion Engineering, 391 F.3d at 234.  The Plan, however, does not provide an "evergreen source of funding" from Grace—far

---

[238] Id.
[239] F.D.A. v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 133 (2000) (statutes should be interpreted so as to fit all parts into an harmonious whole).

from it.  After receiving substantial assets on the Effective Date (largely from sources other than Grace), the Asbestos PI Trust will receive no new assets whatsoever for the next ten years.  The payments to be received by the trust in 2019 and thereafter will depend entirely on Grace's financial position at the time.[240]  These provisions mean that later-allowed claims are subject to significantly greater risk of delay or failure of payment than are earlier-allowed claims.  This risk falls heavily on the Libby Claimants since, as explained above, the TDP has been structured to relegate the Libby Claimants to the most drawn-out course of claims liquidation.  Even if this discrimination against later-allowed claims could somehow be defended on the merits, it violates Section 1123(a)(4) by failing to provide the same treatment of present claims without regard to date of allowance.

### d.    The Plan Violates Section 1123(a)(4) by Providing Different Treatment of Punitive Damages Claims

The TDP provides for disallowance of punitive damages claims, "notwithstanding their availability in the tort system."[241]  This definitely constitutes different treatment from other Asbestos PI Claims.  For this reason, Section 1123(a)(4) requires that the Plan either place punitive damages claims in a separate class or treat them the same as other claims.  See In re Genesis Health Ventures, Inc., 266 B.R. 591, 600 (Bankr. D. Del. 2001) (example of punitive damages claims placed in a separate class, where treated differently).

### e.    The Plan Violates Section 1123(a)(4) by Providing Different Treatment of Wrongful Death Claims

The TDP provides for wrongful death claims—claims a spouse or other related party for damages from loss of a loved one—to be included in the same class as other Asbestos PI

---

[240]  See Plan §§ 1.1(36) (defining Asbestos PI Deferred Payment Agreement as obligation of Reorganized Grace-Conn.), 1.1(6) defining Asbestos PI Trust Assets, which include the Asbestos PI Deferred Payment Agreement), and 7.2.2. (providing for Asbestos PI Trust to be funded with the Asbestos PI Trust Assets).

[241]  TDP § 7.4.  Punitive damage claims are included within the definition of Asbestos PI Claims (Plan § 33(i)) and are therefore part of Class 6 (Plan § 3.1.6).

Claims[242] but treated differently in two ways.  First, in contrast to the detailed treatment of bodily

injury claims,[243] Indirect PI Claims,[244] Insurance-Related TDP Claims[245] and Indemnified Insurer

TDP Claims,[246] the TDP does not specify how wrongful death claims will be paid, or even that

they will be paid at all.  Thus, wrongful death claimants are subjected to a level of uncertainty

regarding treatment of their claims which—apart from the separate issue of whether this is

permissible—surely constitutes *different treatment* from other Asbestos PI Claims in violation of

Code Section 1123(a)(4).  Second, as discussed above,[247] the Asbestos PI Committee expects

that the Asbestos PI Trust will require that wrongful death claims that would arise from the death

of the asbestos victim be released as a pre-condition to paying the victim's claim.  This amounts

to paying zero on account of the wrongful death claim.

     This is not a mere abstraction for the Libby Claimants.  Many of them will die of asbestos

disease.  Unlike many jurisdictions, Montana recognizes a statutory action for wrongful death.

Categorically disallowing wrongful death claims (whether or not permissible—the subject of a

separate argument below[248]) most assuredly represents different treatment from other Asbestos

PI Claims.  For this reason, inclusion of wrongful death claims in the same class as other

Asbestos PI Claims violates Section 1123(a)(4).

---

[242]  Wrongful death claims are included within the definition of Asbestos PI Claims (Plan § 33(i)(a)) and are therefore part of Class 6 (Plan § 3.1.6).
[243]  See TDP §§ 5.3-5.5.
[244]  See TDP § 5.6.
[245]  See TDP § 5.12.
[246]  See TDP § 5.13.
[247]  See III.G.1.d.
[248]  See V.D.3.

**f.      The Plan Violates Section 1123(a)(4) by Providing Different Treatment of Loss of Consortium Claims**

Certain of the Libby Claimants have claims for loss of consortium under Montana law.[249] The TDP provides for loss of consortium claims to be included in the same class as other Asbestos PI Claims.[250]  As in the case of wrongful death claims, it is not apparent from the terms of the TDP how such claims will be treated.  Thus, loss of consortium claimants are subjected to a level of uncertainty regarding treatment of their claims which—apart from the separate issue of whether this is permissible—surely constitutes *different treatment* from other Asbestos PI Claims in violation of Code Section 1123(a)(4).  Even more importantly, the Asbestos PI Committee expects that loss of consortium claims will be treated in the same way as wrongful death claims, *i.e.*, before paying an asbestos victim's claim, the Asbestos PI Trust will require release of any potential loss of consortium claims, with the result that such claims will be liquidated for zero.[251] Regardless of whether this treatment is permissible—the subject of a separate argument below[252]—it is clear that loss of consortium claims are being treated differently from bodily injury claims contained in the same class.

For this reason, inclusion of loss of consortium claims in the same class as other Asbestos PI Claims violates Section 1123(a)(4).

---

[249]  See III.G.1.d.
[250]  Loss of consortium claims are included within the definition of Asbestos PI Claims (Plan § 33(i)(a)) and are therefore part of Class 6 (Plan § 3.1.6).
[251]  Deposition of Elihu Inselbuch, Esq., p. 132.
[252]  See V.D.3.

g.    **The Plan Violates Section 1123(a)(4) by Taking Away the**
**Libby Claimants' Valuable Insurance Rights**

As explained earlier,[253] Libby Claims are covered by a different type of insurance than

other Asbestos PI Claims.  Unlike the products liability insurance covering other claims, the non-

products insurance for Libby Claims is not subject to an aggregate cap.  Yet the Plan provides for

insurance proceeds resulting from Libby Claims to be put in the same pool as other insurance

proceeds.  Because Libby Claimants are being deprived of more valuable rights in order to

receive the same benefit (a *pro rata* share of the entire insurance pool), the Libby Claims are

being treated differently.

Assessing equality of treatment under a plan requires analysis of not only what the

creditor will receive but also what the creditor must give up.  In re AOV Indus., Inc., 792 F.2d

1140, 1152 (D.C. Cir. 1986).  Requiring similarly-situated creditors to give up unequal

consideration for the same treatment under a plan necessarily results in unfair treatment.  Id.  In

AOV Industries, all unsecured creditors were placed in one class and each member of that class

was given an "option": (i) tender a release to the third parties funding the plan in exchange for a

13% dividend; or (ii) retain its claim and seek a more substantial recovery by pursuing litigation

against the plan funders.  Id. at 1150.  The creditors within the class, however, had different

types of claims against the third parties funding the plan.  Some creditors held direct (although

unliquidated and disputed) contract claims against the plan funders, while the remaining

creditors possessed only derivative claims against the third parties.  The D.C. Circuit held that

the proposed treatment of unsecured creditors under the plan was inherently unequal, even

though unsecured creditors had the option to forego distributions from the plan funders and

prosecute their claims against those third parties:

---

[253]  See III.G.2.

> The most conspicuous [type of] inequality . . . is payment of different percentage settlements to co-class members. The other side of the coin of unequal payment, however, has to be unequal consideration tendered for equal payment. It is disparate treatment when members of a common class are required to tender more valuable consideration — be it their claim against specific property of the debtor or some cognizable chose in action — in exchange for the same percentage of recovery.

Id. at 1152.

So it is with the Libby Claimants.  Because they are giving up more valuable insurance rights than other members of the same class, the Libby Claimants are not receiving the same treatment as other class members.  This is a violation of Section 1123(a)(4).

### 3.    The Plan Takes Away the Rights of the Libby Claimants Without Providing Them With an Effective Right to Vote

To conclude, the Plan Proponents' inclusion of the Libby Claimants in the same class as other asbestos claimants, and the disparate treatment afforded the Libby Claimants' claims,  rob the Libby Claimants—probably by design—of the very rights that the Bankruptcy Code's classification and voting scheme was designed to uphold.  As Professor Brubaker expresses it: "The danger of inappropriate classification, by combining creditors with substantially different rights, is that classes can be manipulated to produce class assent by diluting the voice of dissenters, placed in classes filled with agreeable creditors."  Brubaker, "Bankruptcy Injunctions And Complex Litigation: A Critical Reappraisal of Non-Debtor Releases In Chapter 11 Reorganizations", 1997 U. Ill. L. Rev. 959, 987 (1997).  This case presents the very situation that concerned the Third Circuit in Combustion Engineering whereby asbestos personal injury claimants with weaker legal rights will swamp other class members with stronger legal rights when all are placed in the same class.  Combustion Engineering, 391 F.3d at 244.  The Plan is unconfirmable because it permits the Libby Claimants to be outvoted by Asbestos PI Claimants whose legal rights are not substantially similar, and whose claims are treated more favorably.

81

### C.    The Plan is Unconfirmable Because It Denies the Libby Claimants Their Right to Trial by Jury

The Seventh Amendment to the United States Constitution guarantees the right to trial by jury in civil cases.  The constitutional right to trial by jury extends to asbestos personal injury claims in Chapter 11 cases.  In re G-I Holdings, Inc., 323 B.R. 583, 607 (Bankr. D. N.J. 2005). In addition, the right to trial by jury of personal injury claims in bankruptcy cases is protected by statute:  "This chapter [Chapter 87 of Title 28] and title 11 do not affect any right to trial by jury that an individual has under applicable nonbankruptcy law with regard to a personal injury or wrongful death tort claim."[254]  28 U.S.C. § 1411(a).

In the case of the Libby Claimants, their jury trial rights for their claims against Grace arise not only under the U.S. Constitution, but also under the Montana constitution.  The right to trial by jury under Article II, Section 26, of the Montana constitution is "the same as that guaranteed by the Seventh Amendment."  Linder v. Smith, 629 P.2d 1187, 1189 (Mont. 1981).

The Supreme Court has recognized that Section 1411(a) guarantees personal injury and wrongful-death claimants the right to jury trials against a debtor notwithstanding its bankruptcy. Granfinanciera v. Nordberg, 492 U.S. 33, 64 n.17 (1989) ("Congress itself, in enacting 28 U.S.C. § 1411, explicitly provided for jury trials of personal injury and wrongful-death claims.")  The courts of appeals have also emphasized this right.  See In re Clay, 35 F.3d 190, 197 (5th Cir. 1994)(recognizing that Section 1411 singles out personal injury and wrongful death cases for jury trials); Matter of Grabill Corp., 967 F.2d 1152, 1153 (7th Cir. 1992)("[the] only provision related to jury trials, 28 U.S.C. § 1411, preserves this right for personal injury and wrongful death actions"); In re United Missouri Bank of Kansas City N.A., 901 F.2d 1449, 1453 (8th Cir.

---

[254] The only exception to this rule, concerning involuntary cases (see 11 U.S.C. § 1411(b)), is irrelevant here.  The reference to "this chapter" means Chapter 87 of Title 28, United States Code, concerning jurisdiction and venue in bankruptcy cases.  The reference to title 11 subsumes the entire Bankruptcy Code.

1990) (same); American Universal Ins. Co. v. Pugh, 821 F.2d 1352, 1354-55 (9th Cir. 1987)(same).

These judicial statements faithfully follow the legislative history of Section 1411. During floor debate, Senator Heflin stated that "Congress never intended that the filing of a bankruptcy petition by a debtor act as an escape hatch from jury trials." 130 Cong. Rec. S7619 (daily ed. June 19, 1984). Representative Kastenmeier, a ranking majority member of the conference committee, stated unequivocally during House debate on the conference report that "the parties do not lose any right any right to a jury trial that they may have had if the claim had been cognizable outside the bankruptcy context." 130 Cong. Rec. 20,228 (June 29, 1984), reprinted in 1984 U.S.C.C.A.N. 579, 580. Although it may be possible, without use of a jury, to estimate personal injury claims for purposes other than liquidation,[255] there is no doubt that for purposes of liquidation the Libby Claimants' right to trial by jury is sacrosanct. As counsel for the Asbestos PI Committee explained during the estimation hearing, "this court doesn't have the power to, either through estimation or otherwise address the allowance of personal injury claims." Rather, "[y]ou have to empanel juries for all claims not summarily adjudicated and you then have to try the resulting cases including individual issues such as specific causation and damages."[256] Each Libby Claimant's right to have a jury determine the amount of his or her claim remains intact despite the Asbestos PI Committee's desire to settle without his or her consent.

The Plan is unconfirmable as a matter of law because the TDP overrides the right of the Libby Claimants, and for that matter all other Asbestos PI Claimants, to have the amount of their claims determined by a jury. The TDP limits any jury verdict to the lesser of the amount

---

[255] Cf. G-I Holdings, 323 B.R. at 607-617 (extensive discussion of jury right in context of estimation proceeding).
[256] Estimation hearing transcript, 1/14/08, pp. 114-15.

determined by the jury or the Maximum Value imposed by the TDP (the "Jury Verdict Cap").[257] To say "in case of conflict between the jury verdict and the TDP, the TDP controls" renders meaningless the opportunity to have the amount of a tort claim determined by a jury.

The TDP's terms of payment also blatantly discriminate against Asbestos PI Claimants who seek to exercise their right to a jury trial by providing that if the jury verdict exceeds the last offer from the Asbestos PI Trust, the increment will not be paid for five years, and even then payment will be stretched out over years six through ten.[258] This delay in payment is on top of the delay imposed by the TDP in getting to court. Even though the Libby Claimants are barred by the very terms of the TDP from obtaining a liquidated claim value corresponding to tort-system value,[259] they must go through the time-consuming process of Individual Review, followed by mediation, followed by non-binding arbitration before they may proceed in the tort system.[260] Courts have held that a reasonable delay for the purpose of mandatory mediation does not violate the right to trial by jury. But the terms of the TDP, whereby the lapse of time from claim filing to final payment will approach 15 years for those who elect trial by jury compared with a few months for those who obtain Expedited Review, place an undue burden on the exercise of a Constitutional right and are clearly meant for that purpose. The injury is compounded because payment of interest is barred, even during the period of artificial delay caused by the discriminatory terms of the TDP.[261] Those who obtain jury verdicts are also denied "sequencing adjustments"[262] (the TDP equivalent of interest[263]) even when available to claimants who are otherwise similarly situated.

---

[257] TDP § 7.7.
[258] Id.
[259] See discussion above at V.A.
[260] See discussion above at III.G.1.
[261] TDP § 7.7.
[262] Id.
[263] See TDP § 7.5. The term "sequencing adjustment" is used instead of "interest" in order to avoid unfavorable tax treatment.

The Jury Verdict Cap has an even more drastic effect on the Libby Claimants. The TDP purports to liquidate Asbestos PI Claims at their value in the tort system. Yet, as demonstrated above, the terms of the TDP do not permit, let alone require, that Libby Claims be liquidated at their tort-system value. For example, the claim of a Libby Claimants with impaired lung function (less than 80%) has an average tort system value of $550,200, yet may be liquidated for as little as $7,500 under the TDP. The same goes for a Libby Claimant in severe condition (lung function less than 65%) but who does not meet the arbitrary and medically unwarranted criteria of the TDP for Severe Pleural Disease (Level IV-B). Libby Claimants who are currently unimpaired will have a liquidated claim of $2500 to $20,000 under the TDP even though such claims have a demonstrated average tort-system value of $271,170.

Where the Asbestos PI Trust does not (or, under the terms of the TDP, cannot) liquidate an Asbestos PI Claim for an amount approximating its real tort system value, the right to a trial by jury serves as an essential a safety valve. By definition, obtaining a jury verdict demonstrates the tort system value of a particular claim. But the Jury Verdict Cap eliminates this safety valve just as surely as if the TDP expressly barred trials by jury. The Asbestos PI Trust is free to act in arbitrary and discriminatory fashion toward Libby Claims, knowing that the Libby Claimants' recourse to the tort system is illusory. Libby Claimants themselves will be unable to obtain counsel to pursue a jury trial where the maximum permissible outcome, under the Jury Verdict Cap, is so much smaller than the tort system would otherwise permit. In sum, the effect of the Jury Trial Cap is exactly the same as if the right to a jury trial were eliminated outright.

The Supreme Court has repeatedly emphasized that courts must zealously guard against impingement of the right to trial by jury. E.g., Beacon Theatres v. Westover, 359 U.S. 500, 501 (1959) ("Maintenance of the jury as a fact-finding body is of such importance and occupies so

firm a place in our history and jurisprudence that any seeming curtailment of the right to a jury trial should be scrutinized with the utmost care."); Jacob v. City of New York, 315 U.S. 752, 753 (1942) ("The right of jury trial in civil cases at common law is a basic and fundamental feature of our system of federal jurisprudence which is protected by the Seventh Amendment.  A right so fundamental and sacred to the citizen . . . should be jealously guarded by the courts.").  The Supreme Court's mandate that this Court jealously guard the Libby Claimants' right to trial by jury requires that this Court deny confirmation of the Plan.

### D. The Plan is Unconfirmable Because it Violates the Libby Claimants' Right to Have Their Claims Allowed in Accordance with Applicable Nonbankruptcy Law

Under state law, the valid amount of a personal injury claim is the amount provided by a final judgment obtained through the tort system.  Claims in bankruptcy cases must be allowed or disallowed under state law except where the Bankruptcy Code otherwise provides.  Butner v. United States, 440 U.S. 48 (1979).  The Plan violates this rule in three fundamental ways. First, the Plan unfairly limits the allowed amount of most Libby Claims.  Second, the Plan improperly disallows punitive damage claims.  Third, the Plan improperly disallows wrongful death and loss of consortium claims.

### 1. The Plan is Unconfirmable Because It Improperly Limits the Allowed Amount of Most Libby Claims

As explained above, for most Libby Claims the TDP does not permit the Asbestos PI Trust to voluntarily allow the claim in the amount that could be obtained in the tort system. Second, once the Libby Claimant obtains a judgment through the tort system, the TDP caps the liquidated value of the claim at less than the judgment.  If a bankruptcy court (other than by reason of a specific provision of the Bankruptcy Code) were to allow a claim for less than the amount required by applicable nonbankruptcy law, its judgment would be summarily reversed.

The Bankruptcy Code, if indeed it permits at all the delegation to the Asbestos PI Trust of the

bankruptcy and district courts' claims-allowance function, provides no authority for claims to be

allowed in a different amount than would be required of the courts themselves.

## 2. The Plan is Unconfirmable Because It Improperly Disallows Punitive Damages Claims

The Plan, through the TDP, categorically disallows punitive damages even while

acknowledging that they are available in the tort system.[264]  Punitive damages are available to the

Libby Claimants under Montana law.  Mont. Code Ann. § 27-1-221.  Indeed, two of the Libby

Claimants obtained an award of punitive damages in the amount of $83,000, but the Montana

Supreme Court set aside the award at the Libby Claimants' request and remanded for a new trial

on punitive damages because of an improper and prejudicial ruling by the trial judge.  Finstad v.

W.R. Grace & Co., 8 P.3d 778, 787 (Mont. 2000).  The new hearing on punitive damages had

not commenced when Grace entered Chapter 11 in April 2001.

Claims in bankruptcy cases are allowed or disallowed under state law except where the

Bankruptcy Code otherwise provides.  Butner v. United States, 440 U.S. 48 (1979).

Disallowance of punitive damages claims is not required or permitted by Section 502(b) of the

Bankruptcy Code.  Indeed, the sole provision of the Bankruptcy Code addressing punitive

damages applies only to Chapter 7 cases.  See 11 U.S.C. § 726(a)(4).

The Supreme Court has held that categorical disallowance of claims is not permitted

under the Bankruptcy Code.  United States v. Noland, 517 U.S. 535 (1996).  Noland concerned

post-petition tax penalty claims asserted by the Internal Revenue Service.  Id. at 537.  The

---

[264]  Punitive damage claims are included within the definition of Asbestos PI Claims (Plan § 33(i)) and are therefore part of Class 6 (Plan § 3.1.6(a)), which provides for Class 6 claims to be resolved in accordance with the terms, provisions and procedures of the Asbestos PI Trust Agreement and the Asbestos PI TDP (Plan § 3.1.6(b)(i)). Section 7.4 of the TDP states:  "[I]n determining the value of any liquidated or unliquidated Asbestos PI Trust Claim, punitive or exemplary damages, i.e., damages other than compensatory damages, shall not be considered or allowed, notwithstanding their availability in the tort system."

bankruptcy court had subordinated the claims based on what the judge described as the

Bankruptcy Code's "preference for compensating actual loss claims." Id.  The Supreme Court

determined that the bankruptcy court had exceeded its powers under the Bankruptcy Code by

subordinating penalty claims on a categorical basis. Id. at 543.  Although Noland was a Chapter

7 case, its holding has been extended to Chapter 11.  United States v. Reorganized CF & I

Fabricators of Utah, Inc., 518 U.S. 213 (1996).

Based on Noland and CF&I, courts do not have the power to categorically disallow

punitive damage claims in Chapter 11 cases.  In re A. G. Financial Service Center, Inc., 395 F.3d

410, 413-14 (7th Cir. 2005).  Accord, In re Roman Catholic Archbishop of Portland in Or., 339

B.R. 215, 227 (Bankr. D. Or. 2006);[265] In re Genesis Health Ventures, Inc., 266 B.R. 591, 600-01

(Bankr. D. Del. 2001); In re Infiltrator Systems, Inc., 248 B.R. 707, 711-12 (Bankr. D. Conn.

2000).  See also Grant, How United States v. Noland Prohibits the Disallowance of Punitive

Damage Claims in Chapter 11, 14 Bankr. Dev. J. 199 (1997).  As Judge Easterbrook of the

Seventh Circuit explained:

> Both the bankruptcy judge and the district judge said that punitive
> damages are unavailable in bankruptcy, because their award would be
> unfair to other creditors, but neither judge attempted to locate this rule in
> the text of the Bankruptcy Code.  Bankruptcy law enforces non-
> bankruptcy entitlements, unless they are modified according to the Code.
> See, e.g., Butner v. United States, 440 U.S. 48 (1979). . . .  [T]he Supreme
> Court has rejected the contention that tax penalties may be disfavored
> categorically, see United States v. Noland, 517 U.S. 535 (1996), strongly
> implying that case-by-case administration of the Code's authority for
> equitable subordination is the right way to deal with all punitive financial
> claims.  Thus if state law deems punitive damages unavailable against an
> insolvent defendant, federal bankruptcy courts would follow suit on the

---

[265] Curiously, even after holding that Noland and CF&I prohibited disallowance of punitive damages claims, the bankruptcy court in the Portland Archdiocese case indicated that it would be permissible to place punitive damages claims in a separate class and provide for them to recover only after compensatory claims were paid in full. 339 B.R. at 227-28. Of course, subordination was precisely what Noland and CF&I forbade.  In any event, the Plan provides for punitive damages claims against Grace to be entirely disallowed rather than subordinated.

Butner principle; but if state law allows punitive awards against insolvent parties, there is no federal bar . . . .

A.G. Financial, 395 F.3d at 413-14.  Cases predating Noland and CF&I that permit categorical disallowance of punitive damages claims[266] are no longer valid.[267]

In sum, the Plan is unconfirmable as a matter of law by reason of providing for the categorical disallowance of punitive damages claims.  Moreover, as a matter of equity, it is truly stunning that Grace proposes with the connivance of the Asbestos PI Committee to escape all financial penalty for its history of reprehensible conduct that would fully justify the imposition of massive punitive damages, while at the same time preserving what the Disclosure Statement estimates to be as much as over $800 million of value for its shareholders.[268]

### 3.    The Plan is Unconfirmable Because It Improperly Disallows Wrongful Death and Loss of Consortium Claims

The Plan, through the TDP, provides for automatic disallowance of wrongful death claims[269] and loss of consortium claims[270]—a violation of Supreme Court precedent barring categorical disallowance of legally valid claims.

Claims in bankruptcy cases are allowed or disallowed under state law except where the Bankruptcy Code otherwise provides.  Butner v. United States, 440 U.S. 48 (1979).  Disallowance of wrongful death or loss of consortium claims is not required or permitted by Section 502(b) of the Bankruptcy Code.  As already demonstrated (see Section V.D.2

---

[266] E.g., Novak v. Callahan (In re GAC Corp.), 681 F.2d 1295, 1301 (11th Cir. 1982); In re A.H. Robins Co., Inc., 89 B.R. 555 (E.D. Va. 1988); In re Celotex Corp., 204 B.R. 586, 613, 632 (Bankr. M.D. Fla. 1996); Jim Walter Homes, Inc. v. Adams (In re Hillsborough Holdings Corp.), 146 B.R. 1015, 1021-22 (Bankr. M.D. Fla. 1992); In re Johns-Manville Corp., 68 B.R. 618, 627-28 (Bankr. S.D.N.Y. 1986), aff'd in part, rev'd in part, 78 BR 407 (S.D.N.Y. 1987), aff'd 843 F.2d 636 (2nd Cir. 1988).

[267] The same can be said of a post-Noland decision that fails to cite Noland or CF&I.  In re Dow Corning Corp., 244 B.R. 721, 728-29 (Bankr. E.D. Mich. 1999), rev'd on other grounds, 255 B.R. 445 (E.D. Mich. 2000), aff'd and remanded, 280 F.3d 648 (6th Cir. 2002).

[268] Disclosure Statement § 2.11.2.6.

[269] See III.G.1.d and V.B.2.e.

[270] See III.G.1.d and V.B.2.f.

immediately above), the Supreme Court has held that the Bankruptcy Code does not permit categorical disallowance of claims. United States v. Noland, 517 U.S. 535 (1996); United States v. Reorganized CF & I Fabricators of Utah, Inc., 518 U.S. 213 (1996). Although these cases dealt with penalty rather than wrongful death claims or loss of consortium claims, the Supreme Court's rationale—that categorical disallowance of claims is the province of Congress rather than the courts[271]—equally applies to both types of claims. Indeed, Section 524(g) of the Bankruptcy Code expressly requires an asbestos trust established thereunder to "assume the liabilities of a debtor which . . . has been named as a defendant in . . . wrongful death . . . actions seeking recovery for damages allegedly caused by [asbestos]." 11 U.S.C. § 524(g)(2)(B)(i)(I). It hardly seems plausible that Section 524(g) would expressly require wrongful death claims to be assumed by asbestos trusts only to have them be categorically disallowed.

Wrongful death claims are established by statute in Montana. Mont. Code Ann. § 27-1-513. It is clear under Montana law that this right of action extends to at least the spouse and the surviving heirs,[272] including children of the deceased, whether they be minors or adults.[273] It may also extend to a grandchild or sibling of the deceased, who can establish a special relationship or dependency on the decedent for support and care.

In a wrongful death action, "damages may be given as under all the circumstances of the case may be just."[274] Generally the damages under this cause of action will include loss of consortium by a spouse,[275] the loss of comfort and society of the decedent suffered by the surviving heirs, and the reasonable value of the contributions in money that the decedent would

---

[271] Noland, 517 U.S. at 543.
[272] Hern v. Safeco Ins. Co. of Illinois, 125 P.3d 597, 605-06 (Mont. 2005), citing Swanson v. Champion Int'l Corp., 646 P.2d 1166 (Mont. 1982).
[273] Bear Medicine v. U.S., 192 F. Supp. 2d 1053, 1067 (D. Mont. 2002).
[274] Mont. Code Ann. § 27-1-323.
[275] Mize v. Rocky Mountain Bell Telephone Co., 100 P. 971, 974 (Mont. 1909).

reasonably have made for the support, education, training and care of the heirs during the respective life expectancies of the decedent and the survivors.[276]  No specific pecuniary loss need be shown.[277]  Montana is somewhat unique in providing for damages for the sorrow, mental distress or grief recoverable in a wrongful death action:

> Montana, unlike many jurisdictions, allows recovery in a wrongful death action for loss of care, comfort, society and companionship, holding that the speculative nature of such awards is no objection.
>
> *  *  *
>
> Although Montana has consistently adhered to the requirement [206 Mont. 330] that the loss of society and companionship be susceptible of "pecuniary loss" translation, this Court has refused to require a yardstick for measurement.  If a jury can evaluate the intangible loss suffered from not having the decedent's care, comfort and companionship, surely that same jury can be trusted to ascribe damages to grief.[278]

The Montana wrongful death action is separate and distinct from a survival action, which arises under a different statute[279] and allows personal causes of action, including tort actions existing during the lifetime of a person, to survive his death.  A survival action belongs to the decedent's estate and may only be pursued by the decedent's personal representative.[280]  Damages recoverable in a survival action for the death of the decedent through tort include his lost earnings from the time of his injury to his death, the present value of his reasonable earnings during his life expectancy,[281] the medical and funeral expenses incurred by him as a result of the tort, reasonable compensation for his pain and suffering, and other special damages.[282]  The

---

[276] Hennessey v. Burlington Transp. Co., 103 F.Supp. 660, 665 (D. Mont. 1950).
[277] Waltee v. Petrolane, Inc., 511 P.2d 975, 978 (Mont. 1973).
[278] Dawson v Hill & Hill Truck Lines, 671 P.2d 589, 591-92 (Mont. 1983), citing Burns v. Eminger, 276 P. 437 (Mont. 1929).
[279] Mont. Code Ann. 27-1-501.
[280] See Mont. Code Ann. § 72-3-604; Swanson v. Champion Int'l Corp., 646 P.2d 1166, 1169 (Mont. 1982).
[281] Krohmer v. Dahl, 402 P.2d 979, 982 (Mont. 1965).
[282] Beeler v. Butte and London Copper Development Co., 110 P. 528, 532 (Mont. 1910).

damages recoverable in the survival action are personal to the decedent; they do not include any damages suffered by the decedent's widow, children or other heirs.[283]

Given that the survival action and the wrongful death action are separate and distinct under Montana law, are for the benefit of different people and involve different and non-duplicative damages, the TDP's disallowance of wrongful death claims cannot—as to a Montana wrongful death claim, at least—be justified on the basis that the wrongful death claim will somehow be satisfied through the Asbestos PI Trust's allowance and payment of the claim of the asbestos victim or his estate. Indeed, the wrongful death claim will not even have arisen if the asbestos victim's claim is paid during his lifetime. There is no basis in law for the Plan to make no provision for the allowance and payment of wrongful death claims (at least those arising under Montana law). Such treatment is tantamount to disallowance and forbidden by Noland and CF&I. In sum, the Plan is unconfirmable as a matter of law by reason of providing for the categorical disallowance of wrongful death claims.

Montana also recognizes a cause of action for loss of consortium, as discussed in Section V.B.2.f above. As with wrongful death claims, the Plan's categorical disallowance of loss of consortium claims renders the Plan unconfirmable.

> **E.     The Plan is Unconfirmable Because It Provides for Injunctions, Releases and Exculpations that are Impermissibly Broad**

The Plan is unconfirmable because it contains injunctions, releases and exculpations that are impermissibly broad. As will be explained below,

- The Asbestos Insurance Entity Injunction[284] and the exculpation provision contained in Section 11.9 of the Plan (the "Exculpation Provision") impermissibly bar the Libby Claimants and holders of future Libby Claims from pursuing their independent claims;

---

[283] Swanson, 646 P.2d at 1169, citing Marinkovich v. Tierney, 17 P.2d 93, 96 (Mont. 1932).
[284] Plan § 8.4.1.

- The Asbestos Insurance Entity Injunction impermissibly bars the Libby Claimants and holders of future Libby Claims from pursuing insurers for payment under non-products coverage containing no aggregate cap on insurers' liability;

- The Asbestos PI Channeling Injunction, the Asbestos Insurance Entity Injunction and the Exculpation Provision may not be imposed on the Libby Claimants and on future Libby Claimants because the Plan is not fair and equitable as to them; and

- The Plan Impermissibility Releases the Fresenius Indemnified Parties

Because these provisions overstep the bounds of the Bankruptcy Code, the Plan is unconfirmable as a matter of law.

As an initial matter, to the extent that the Plan's proposed injunctions, releases and exculpations enjoin the pursuit of claims against third parties that would not directly result in liability of the Debtors, they fall outside of the jurisdiction of this Court.  This Court's jurisdiction is created by 28 U.S.C. § 1334(b), providing, *inter alia*, for jurisdiction of civil proceedings "related to cases under title 11."  In the Third Circuit, a proceeding is "related to" a Chapter 11 case if the outcome of the proceeding would affect the bankruptcy estate.  Pacor v. Higgins, 743 F.2d 984, 994-95 (3d Cir. 1984); see also In re Combustion Engineering, 391 F.3d 190, 232 (3d Cir. 2004) (no related to jurisdiction in the absence of unity of interest between the debtor and non-debtors such that "the third party claim would not directly result in liability for the debtor."); In re Federal Mogul Global, Inc., 300 F.3d 368, 382 (3d Cir. 2002) (determination of "related to" jurisdiction requires inquiry into whether allegedly related lawsuit "would affect the bankruptcy without the intervention of yet another lawsuit.")  To the extent that the proposed injunctions, releases and exculpations purport to enjoin the Libby Claimants from pursuing their independent claims against third parties that, absent an intervening lawsuit, would not affect the Debtors' estate, this Court lacks jurisdiction to authorize them.  Id.  Although Pacor and its progeny rest on statutory interpretation, the power of the federal courts in bankruptcy matters is

subject to Constitutional limitations as well.  See U.S. Const. art. 1, § 8, cl. 4.  Construing any

provision of the Judicial Code or the Bankruptcy Code, including Section 524(g), to permit an

injunction against litigation among non-debtor parties *not* reasonably related to a bankruptcy

case would run afoul of the bankruptcy power conferred on Congress under the Constitution.

> **1.    Injunctions May Protect Third Parties Only from Claims within the
> Four Categories Expressly Permitted by Section 524(g) and Only if
> the Third Party Will Make a Substantial Financial Contribution**

In conjunction with a Chapter 11 plan governed by Section 524(g), courts may not enter

injunctions inconsistent with the limitations of Section 524(g).  In re Combustion Engineering,

391 F.3d 190, 235-38 (3d Cir. 2004).  Section 524(g) permits injunctions to protect claims

arising out of the four specific relationships with the debtor set forth in Section 524(g)(4)(A)(ii)

(the "Four Categories").  In a plan based on Section 524(g), an injunction may not bar claims

based other than on the Four Categories.

Even if a claim against a third party falls within the Four Categories, the third party may

be protected by an injunction only if "fair and equitable . . . in light of the benefits provided, or to

be provided, to [the asbestos] trust on behalf of such . . . third party."  11 U.S.C. §

524(g)(4)(B)(ii).  Largely this has been construed to mean that in order to be protected by an

injunction, a third party must make a substantial financial contribution to the plan.  In re

Congoleum Corp., 362 B.R. 167, 179-80 (Bankr. D. N.J. 2007), and authorities cited therein.

> **2.    The Asbestos Insurance Entity Injunction Provision Violates
> Section 524(g) by Protecting Third Parties from Claims
> Outside the Permissible Four Categories**

The Asbestos Insurance Entity Injunction, by its terms, would enjoin the Libby Claimants

from pursuing independent claims against entities that happen to be insurers of Grace.  The

Asbestos Insurance Entity Injunction bars assertion of "any claim or cause of action against any

Asbestos Insurance Entity, based upon, or arising out of, any Asbestos PI Claim against the

Debtors or any Asbestos Insurance Rights . . . ."[285]  An Asbestos Insurance Entity may properly

be protected against claims based on its "provision of insurance to the debtor or a related party"

since that is one of the Four Categories of claims as to which an injunction is permitted.[286]  But

since the Asbestos Entity Injunction contains no such limitation, it will by its terms bar the

assertion even of independent claims against entities that happen to be Asbestos Insurance

Entities.  This problem can (and must) be solved by expressly reserving independent claims from

the effect of the Asbestos Insurance Entity Injunction.

> 3.    **The Plan Injunctions and the Exculpations Provision Violate Section 524(g) by Protecting Third Parties Who Are Not Making a Substantial Financial Contribution**

The Asbestos PI Channeling Injunction, the Asbestos Insurance Entity Injunction and the

Exculpation Clause are all impermissible as they apply to any protected party that does not make

a substantial financial contribution under the Plan.  In order to comply with Section 524(g), these

provisions must all be limited to named individuals and entities determined by this Court, after

notice and an opportunity for the Libby Claimants and all other interested parties to be heard, to

be making a substantial financial contribution to the Plan.  So far as has been disclosed, the

Asbestos PI Committee, the Asbestos PI FCR and their Representatives are not making a

financial contribution; they are being, and will continue to be, paid by the bankruptcy estate for

their efforts.  The Asbestos PI Trust and the Trust Advisory Committee do not even exist; they

are certainly not making a financial contribution under the Plan.  So far as has been disclosed,

Montana Vermiculite Company, Grace's predecessor in Libby, is not making a financial

contribution to the Plan.  The company is inactive, and all of its assets (including insurance) were

---

[285]  Plan § 8.4.1.1(a).
[286]  11 U.S.C. 524(g)(4)(A)(ii)(III).

taken over by Grace many years ago.  The Plan does not even require that a Settled Asbestos

Insurance Company make a substantial financial contribution to the Plan, only that the insurer be

a party to an Asbestos Insurance Settlement Agreement and be listed by the Plan Proponents in

Exhibit 5 to the Exhibit Book.

The Plan Proponents should be required to disclose which persons are providing

consideration under the Plan, and describe the consideration they are providing.  This Court

should require Grace to prove, at the Confirmation Hearing, that the consideration provided by

each such person is sufficiently substantial so that an injunction, release and/or exculpation in

that person's favor is fair and equitable as required by Section 524(g).  Since the Asbestos PI

Channeling Injunction, the Asbestos Insurance Entities Injunction and the Exculpation Clause

appear to protect persons regardless of whether they are supplying consideration, these

provisions render the Plan unconfirmable as a matter of law.

### 4.    The Plan Impermissibly Enjoins the Libby Claimants' Pursuit of Insurance Coverage as to Which They do not Compete with Each Other or any Other Claimant

The Asbestos Insurance Entity Injunction by its terms would preclude Asbestos PI

Claimants from pursuing various of Grace's insurers to collect under Grace's insurance policies,

without regard to whether or not the coverage being pursued by such claimants is subject to an

aggregate cap.  These provisions are overbroad, and render the Plan unconfirmable unless an

exception is carved out for Grace's insurance that is not subject to an aggregate cap on the

insurer's liability.

It is routine in bankruptcy cases for creditors to be freed from any bankruptcy

impediment to collecting from the debtor's insurers.  In mass tort cases, however, it is common

for collection of product liability insurance to be centralized in the bankruptcy estate or a trust

for the benefit of creditors whose claims are covered by the insurance. This is necessary

because, as previously discussed, the standard products liability insurance policy is subject to an

aggregate cap on the insurance.[287]  If claimants were left free to pursue the insurers on their

own, the first to collect would get paid and then, once the aggregate limit of coverage was

exhausted, later claimants would collect nothing. This would be unfair under any circumstances,

and in an asbestos case would most likely violate the statutory mandate to provide reasonable

assurance that future claims will be treated the same as present claims.[288]

The Collier treatise explains as follows:

> When the court is reasonably confident that the policy proceeds will be
> sufficient to satisfy all creditors with claims that may be paid under the
> policy, the court should grant relief from the stay to permit an action either
> against the debtor, if necessary, or directly against the insurer. Because the
> policy proceeds will be available only to creditors with the type of claims
> covered by the policy, there is no depletion of assets that would otherwise
> be available to satisfy general, unsecured claims, and there is therefore no
> reason to delay the creditor seeking to recover under the policy.

3 Collier on Bankruptcy ¶ 362.07[3][a] at 362-85. In In re 15375 Memorial Corp., 382 B.R. 652

(Bankr. D. Del. 2008), rev'd on other grounds, 400 B.R. 420 (D. Del. 2009) (stayed pending

appeal, 2009 WL 393948 (D. Del. Feb. 18, 2009)), the court found that the availability of

insurance on an uncapped basis was a reason for granting a claimant relief from the automatic

stay. The court observed that "there can be no legitimate complaint that the estates will be

dissipated by allowing the litigation to go forward" because, *inter alia*, the subject polices

"contain no aggregate coverage limits for a given policy period." Id. On that basis, the court

granted relief from the automatic stay.

---

[287] See discussion above at III.G.2.
[288] 11 U.S.C. § 524(g)(2)(B)(ii)(V).

For the same reason, the Libby Claimants may not be barred from pursuing insurance that is not subject to aggregate coverage limits. As discussed earlier,[289] the Libby Claims are covered by non-products rather than products insurance, and unlike Grace's products insurance, Grace's non-products insurance is not subject to an aggregate cap. Since the rationale for centralizing collection of insurance proceeds does not exist in the case of Grace's non-products insurance, there is no basis for enjoining the direct pursuit of Grace's non-products insurers by present and future Libby Claimants. For this reason, the injunctions proposed in the Plan must be rejected as not being fair and equitable. 11 U.S.C. § 524(g)(4)(B)(ii) (court may not enter an injunction protecting insurers unless the court determines that the injunction is fair and equitable).

In sum, the Plan will be unconfirmable unless an exception is carved out from the Asbestos Insurance Entity Injunction so as to permit the Libby Claimants to pursue Grace's insurers directly for non-products coverage.

5.    **The Plan Impermissibly Enjoins the Libby Claimants Even Though the Plan is Not Fair and Equitable to the Libby Claimants**

The Plan pays other Asbestos PI Claimants based on the tort system value of their claims while the Libby Claimants will receive as little as one-half of one percent of the tort system value of their claims.[290] For this reason and because of the other provisions of the Plan cited in this brief that treat present and future Libby Claimants on an unfair and discriminatory basis, the Plan is not fair and equitable as to them. Accordingly, the Libby Claimants may not be the subject of an injunction under Section 524(g). 11 U.S.C. § 524(g)(4)(B)(ii) (court may not enter an injunction protecting insurers unless the court determines that the injunction is fair and equitable). The Plan is unconfirmable because it impermissibly enjoins present and future Libby Claimants through the Asbestos PI Channeling Injunction, Asbestos Insurance Entity Injunction

---

[289] See discussion above at III.G.2.
[290] See V.A.

and the Exculpation Provision.

### 6.    The Plan Impermissibly Releases the Fresenius Indemnified Parties

Section 8.8.7 of the Plan provides that "each Holder of a Claim . . . who *receives or retains any property under this Plan* shall also be deemed to unconditionally release the Fresenius Indemnified Parties . . . ."[291]  A provision deeming a creditor to give a release by reason of receiving a distribution under a plan is impermissible.  In re Zenith Electronics Corp., 241 B.R. 92, 111 (Bankr. D. Del. 1999) (Walrath, J.) ("[A] release of third party claims . . . cannot be accomplished without the affirmative agreement of the creditor affected."), and authorities cited therein.  This Court indicated from the bench at the October 27, 2008 hearing that claimants may not be deemed to grant a release solely by reason of receiving or retaining property under the Plan.  See Hr'g Transcript, October 27, 2008, pp. 102, 107.  Thereafter, the Plan was amended to scale back but not eliminate this provision.  The Plan is unconfirmable as a matter of law unless the words "or receives or retains any property under this Plan" are stricken from this provision of the Plan.

### F.    The Plan is Unconfirmable Because It Improperly Usurps the Court's Function to Modify or Dissolve Preliminary Injunctions

Section 8.7.1 of the Plan provides:

> All of the injunctions and/or automatic stays provided for in or in connection with the Chapter 11 Cases . . . in existence immediately prior to the Confirmation Date shall remain in full force and effect until the injunctions set forth in this Plan become effective, and thereafter if so provided by this Plan, the Confirmation Order, or by their own terms.

This provision is improper insofar as it purports to freeze in place an injunction—such as the preliminary injunction in the Chakarian Case that now prevents the Libby Claimants from pursuing claims against BNSF—even though (a) there is cause for this Court to dissolve the

---

[291]  Plan § 8.8.7 (emphasis added).

injunction, or (b) the injunction is reversed on appeal. Confirmation of the Plan will provide no authority for this provision since, as explained above, the permissible scope of the injunctions that may be granted under a plan is narrower than the preliminary injunctions that this Court has imposed during the Chapter 11 case. Most notably, it is clear that the Plan may not enjoin the Libby Claimants from pursuing claims against third parties whose relationship to the debtor is outside the ambit of Section 524(g)(4)(A)(ii) of the Bankruptcy Code. Therefore, during the period from the Confirmation Date to the Effective Date, existing injunctions in the Chakarian Case must stand or fall in accordance with this Court's pre-Effective Date jurisdiction.

Plan Section 8.7.1 is also improper insofar as it could be construed to carry forward past the Effective Date any of the preliminary injunctions granted in the Chakarian Case. Section 8.7.1 carries forward existing injunctions until the Effective Date "and thereafter if so provided . . . by their own terms." If the language just quoted is intended to include injunctions, such as those entered in the Chakarian Case, then the provision is improper; if the language is not intended to include such injunctions, then the Plan must be clarified.

### G.    The Plan Violates Section 1129(a)(7) of the Bankruptcy Code Because It Provides Less to the Libby Claimants Than They Would Receive or Retain In a Chapter 7 Liquidation of the Debtors

The Plan fails to meet the "best interests of creditors" requirement set forth in Section 1129(a)(7) of the Bankruptcy Code, because the Libby Claimants would receive or retain more property in a Chapter 7 liquidation of the Debtors than they are entitled to receive or retain under the Plan. The Libby Claimants have articulated the basis for this objection in detail in their Plan Objection, which is incorporated herein by reference. In return for the Libby Claimants' agreement to the Plan Proponents' request to defer certain depositions related to this objection, the Plan Proponents have agreed that the Libby Claimants may defer their Trial Brief objection

based on Section 1129(a)(7) until after such discovery is completed.  The Libby Claimants

intend, and reserve the right, to augment this Trial Brief with their 1129(a)(7) objection.

## VI.    <u>CONCLUSION</u>

Based on the foregoing, confirmation of the Plan must be denied.

Dated: July 13, 2009                         LIBBY CLAIMANTS

                                             By their attorneys,

                                             _____
                                             Adam G. Landis, Esq. (No. 3407)
                                             Kerri Mumford, Esq. (No. 4186)
                                             LANDIS RATH & COBB LLP
                                             919 Market Street, Suite 1800
                                             P.O. Box 2087
                                             Wilmington, DE 19801
                                             (302) 467-4400

                                             and

                                             Daniel C. Cohn
                                             Christopher M. Candon
                                             COHN WHITESELL & GOLDBERG LLP
                                             101 Arch Street
                                             Boston, MA  02110
                                             (617) 951-2505

G:\Data\877p\Trial Brief 8.doc