**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
|  | ) |  |
|  | ) | Chapter 11 |
| In re: | ) |  |
|  | ) | Case No. 01-01139 (JKF) |
| W. R. GRACE & CO., et al., | ) | (Jointly Administered) |
|  | ) |  |
| Debtors. | ) | Hearing Date: |
|  | ) | September 8, 2009 at 11:00 a.m. |

**JOINT PRE-TRIAL MEMORANDUM OF THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS AND BANK LENDER GROUP IN OPPOSITION TO
CONFIRMATION OF FIRST AMENDED JOINT PLAN OF
<u>REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE</u>**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .................................................................................. 1

STATEMENT OF FACTS ......................................................................................... 7

ARGUMENT ........................................................................................................... 19

I. THE THIRD CIRCUIT PRESUMES IMPAIRMENT FOR VOTING
      PURPOSES:   CLASS 9 CREDITORS ARE IMPAIRED PURSUANT TO
      SECTION 1124 AND PLAN PROPONENTS CANNOT REBUT THE
      PRESUMPTION OF IMPAIRMENT ............................................................. 19

      A.     Because There is No "*Ipso Facto*" Legal Defense to Grace's Post-
           Petition Defaults, Interest Accrues at the Default Interest Rate................21

      B.     Congress and Third Circuit Law Reject Grace's Argument that a Claim
           is Unimpaired Where a Plan Only Pays the Allowed Prepetition
           Amount of the Claim. .............................................................................34

II. BECAUSE GRACE IS SOLVENT, THE ABSOLUTE PRIORITY RULE
      COMPELS PAYMENT OF POST-PETITION INTEREST ........................ 40

      A.     Grace is Balance-Sheet Solvent. ..............................................................41

      B.     Grace's Market Capitalization Establishes Its Solvency. .........................41

      C.     The Proposed Asbestos Settlement Concedes That Grace is Solvent. .......43

      D.     In a Solvent Debtor Case, Unsecured Creditors Are Entitled to Payment
           of Post-Petition Interest. .........................................................................44

      E.     Grace Cannot Circumvent the Absolute Priority Rule Through the
           Proposed Asbestos Settlement. ................................................................46

III. UNDER THE FAIR AND EQUITABLE TEST, THE BANK LENDERS
      SHOULD RECEIVE POST-PETITION INTEREST AT THE
      CONTRACT DEFAULT RATE .................................................................... 49

IV. THE EQUITIES WARRANT PAYMENT OF POST-PETITION INTEREST
      AT THE CONTRACTUAL DEFAULT RATE ............................................. 54

      A.     The Bank Lenders Have Not Done Anything to Impede the
           Administration of These Chapter 11 Cases. .............................................54

      B.     The Contract Default Interest Rate Is Reasonable. ..................................55

      C.     All of Grace's Reliance Arguments Fail...................................................56

      D.     The Passage of Time Has Not Deprived the Bank Lenders of Their
           Right to Receive Contract Default Interest..............................................65

i

      E.      Grace's Argument that Paying Contract Default Interest to the Bank Lenders Would Jeopardize the Proposed Asbestos Settlement Is Not Tenable...................................................................................................67

**V. THE PLAN VIOLATES SECTION 1129(a)(3) BECAUSE IT WAS NOT PROPOSED IN GOOD FAITH** .................................................................. 68

**VI. THE PLAN VIOLATES SECTION 1129(a)(7)'S BEST INTERESTS OF CREDITORS TEST**........................................................................................ 69

RESERVATION OF RIGHTS................................................................................... 72

CONCLUSION ......................................................................................................... 73

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*In re 139-141 Owners Corp.*,
313 B.R. 364 (Bankr. S.D.N.Y. 2004).....................................................................27

*In re A.H. Robins Co., Inc.*,
89 B.R. 555 (E.D. Va. 1988)....................................................................................68

*In re Ace-Texas, Inc.*,
217 B.R. 719 (Bankr. D. Del. 1998)...................................................... 26, 37, 51, 55

*In re Adelphia Commc'ns*,
No. 02-41729 (Bankr. S.D.N.Y. Apr. 27, 2006) .................................................53, 70

*AM-Haul Carting, Inc.* v. *Contractors Cas. & Sur. Co.*,
33 F. Supp. 2d 235 (S.D.N.Y. 1998) .......................................................................24

*Anchor Resolution Corp.* v. *State Street Bank & Trust Co. of Conn. (In re Anchor Resolution Corp.)*,
221 B.R. 330 (Bankr. D. Del. 1998).................................................................22, 23

*Application of Lester*,
386 N.Y.S.2d 509, 514 (Sup. Ct. 1976)...................................................................64

*In re Aquila Inc.*,
805 A.2d 184 (Del. Ch. 2002) .................................................................................61

*In re Armstrong World Indus., Inc.*,
432 F.3d 507 (3d Cir. 2005)............................................................................passim

*In re Armstrong World Industries, Inc.*,
320 B.R. 523 (D. Del. 2005) ...................................................................................61

*Atherton* v. *FDIC*,
519 U.S. 213 (1997)................................................................................................72

*Auction of C and F Block Broadband PCS Licenses*,
15 F.C.C.R. 17500 (2000).......................................................................................30

*Billops* v. *Magness Const. Co.*,
391 A.2d 196 (Del. 1978) .......................................................................................64

*Bruning* v. *United States*,
376 U.S. 358 (1964)................................................................................................44

*Butler* v. *Bellwest Mgmt. Corp.* (*In re Butler*),
    14 B.R. 532 (Bankr. S.D.N.Y. 1981)........................................................................22

*Butner* v. *United States*,
    440 U.S. 48 (1979)................................................................................................32, 33

*In re Cardelucci*,
    285 F.3d 1231 (9th Cir. 2002)....................................................................................70

*In re Carter*,
    220 B.R. 411 (Bankr. D.N.M. 1998).........................................................................72

*In re Chicago, Milwaukee, St. Paul & Pac. R.R.*,
    791 F.2d 524 (7th Cir. 1986)............................................................. 31, 33, 44, 46

*In re Combustion Eng'g, Inc.*,
    391 F.3d 195 (3d Cir. 2004)......................................................................................68

*In re Consol. Operating Partners L.P.*,
    91 B.R. 113 (Bankr. D. Colo. 1988)....................................................................51, 55

*Consolidated Rock Prods.* v. *Du Bois*,
    312 U.S. 510 (1941).................................................................................................44

*In re Coram Healthcare Corp.*,
    315 B.R. 321 (Bankr. D.Del. 2004)..............................................................51, 52, 70

*In re Cybergenics*,
    226 F.3d 237 (3d Cir. 2000)......................................................................................69

*Debentureholders Protective Comm. of Cont'l Invest. Corp.* v. *Cont'l Inv. Corp.*,
    679 F.2d 264 (1st Cir. 1982).....................................................................................55

*Del Sontro* v. *Cendant Corp., Inc.*,
    223 F. Supp.2d 563 (D.N.J. 2002).............................................................................62

*Derry Finance N.V.* v. *Christiana Cos., Inc.*,
    616 F. Supp. 544 (D. Del. 1985)...............................................................................62

*DFI Commc'ns* v. *Greenberg*,
    363 N.E.2d 314 (N.Y. 1977).....................................................................................59

*Dow Chem. Co.* v. *Schaefer Salt & Chem. Co.*,
    No. 91-4027, 1992 WL 672289 (D.N.J. July 21, 1992)............................................62

*In re Dow Corning Corp.*,
    244 B.R. 678 (Bankr. E.D. Mich. 1999).............................................................50, 70

*In re Dow Corning Corp.*,
    456 F.3d 668 (6th Cir. 2006)...................................................................................passim

*EBC I, Inc.* v. *America Online (In re EBC I, Inc.)*,
    356 B.R. 631 (Bankr. D. Del. 2006) ........................................................................29

*Ernst Iron Works* v. *Duralith Corp.*,
    200 N.E. 683 (N.Y. 1936) .......................................................................................64

*In re FCC*,
    217 F.3d 125 (2d Cir. 2000) ....................................................................................30

*FCC* v. *NextWave Personal Commc'ns, Inc.*,
    537 U.S. 293 (2003)..................................................................................................30

*First Fidelity Bank* v. *Jason Realty, L.P. (In re Jason Realty)*,
    59 F.3d 423 (3d. Cir. 1995) .....................................................................................32

*Ford* v. *Unity Hosp.*,
    299 N.E.2d 659 (N.Y. 1973) ...............................................................................58, 63

*Gen. Elec. Capital Corp.* v. *Future Media Prods. Inc.*,
    547 F.3d 956 (9th Cir. 2008) .................................................................. 32, 52, 55, 70

*Gen. Elec. Co.* v. *Compagnie Euralair, S.A.*,
    945 F.Supp. 527 (S.D.N.Y. 1996) ...........................................................................62

*In re Good, et al.*,
    No. 08-40955, 2009 WL 1024651 (Bankr. E.D. Tex. Apr. 13, 2009)............ 43, 46, 51

*In re Global Crossing*,
    295 B.R. 726 (Bankr. S.D.N.Y 2003) ......................................................................69

*Hanna* v. *United States (In re Hanna)*,
    872 F.2d 829 (8th Cir. 1989) ...................................................................................45

*Heckler* v. *Cmty. Health Servs. of Crawford County, Inc.*,
    467 U.S. 51 (1984)....................................................................................................65

*Hepner* v. *PWP Golden Eagle Tree, LLC (In re K&J Props., Inc.)*,
    338 B.R. 450 (Bankr. D. Colo. 2005) ..................................................................27, 28

*In re Insilco Techs., Inc.*,
    480 F.3d 212 (3d Cir. 2007) ................................................................................40, 43

*Int'l Boiler Works Co.* v. *Gen. Waterworks Corp.*,
    372 A.2d 176 (Del. 1977) .........................................................................................64

*Iridium* v. *Motorola, Inc. (In re Iridium Operating LLC)*,
    373 B.R. 283 (Bankr. S.D.N.Y. 2007)......................................................................42

*Johnson* v. *Norris*,
    190 F. 459 (5th Cir. 1911)..................................................................................71

*In re Joshua Slocum, Ltd.*,
    103 B.R. 601 (Bankr. E.D. Pa. 1989) ....................................................................27

*In re Kensington Int'l Ltd.*,
    368 F.3d 289 (3d Cir. 2004)..........................................................................56, 57

*Kielisch* v. *Educ. Credit Mgmt. (In re Kielisch)*,
    258 F.3d 315 (4th Cir. 2001)..............................................................................45

*In re Leslie Fay Cos.*,
    207 B.R. 764 (Bankr. S.D.N.Y. 1997)..................................................................69

*In re Liberty Warehouse Assocs. Ltd. P'ship*,
    220 B.R. 546 (Bankr. S.D.N.Y. 1998)..................................................................55

*In re Loral Space & Commc'ns Ltd.*,
    No. 03-41710 (Bankr. S.D.N.Y. July 25, 2005)....................................................53

*Masuda* v. *Kawasaki Dockyard Co., Ltd.*,
    328 F.2d 662 (2d Cir. 1964)..............................................................................63

*Mims* v. *Fidelity Funding, Inc.*,
    307 B.R. 849 (N.D. Tex. 2002)..........................................................................25

*Moody* v. *Sec. Pac. Bus. Credit, Inc.*,
    971 F.2d 1056 (3d Cir. 1992)............................................................................41

*Motorola, Inc.* v. *Official Committee of Unsecured Creditors (In re Iridium)*,
    478 F.3d 452 (2d Cir. 2007)..........................................................................47, 48

*In re New Valley Corp.*,
    168 B.R. 73 (Bankr. D.N.J. 1994)..................................................................35, 36

*In re NextWave Personal Commc'ns, Inc.*,
    244 B.R. 253 (Bankr. S.D.N.Y. 2000)............................................................ 29, 30

*NextWave Personal Commc'ns, Inc.* v. *FCC*,
    254 F.3d 130 (D.C. Cir. 2001)...........................................................................30

*Northrop Corp.* v. *Triad Int'l Mktg., S.A.*,
    842 F.2d 1154 (9th Cir. 1988)............................................................................71

*Official Comm. of Unsecured Creditors* v. *Manville Forest Prods. Corp.* (*In re Manville Forest Prods. Corp.*),
    60 B.R. 403 (S.D.N.Y. 1986) ...................................................................................24

*In re Owens-Corning*,
    419 F.3d 195 (3d Cir. 2005) ....................................................................................68

*In re Phillips Petroleum Sec. Litig.*,
    881 F.2d 1236 (3d Cir. 1989) ..................................................................................62

*In re PPI Enters. (U.S.), Inc.*,
    228 B.R. 339 (Bankr. D. Del. 1998) ........................................................................38

*In re PWS Holding Corp.*,
    228 F.3d 224 (3d Cir. 2000) ..............................................................................41, 69

*In re Rachels Indus., Inc.*,
    109 B.R. 797 (Bankr. W.D. Tenn. 1990) .............................................................22, 24

*Ramone* v. *Lang*,
    No. Civ.A.1592-N, 2006 WL 905347 (Del. Ch. Apr. 3, 2006) ..................................61

*Realty Assocs. Secs. Corp.*,
    163 F.2d 387, 391 (2d Cir. 1947) ............................................................................71

*In re Refco, Inc.*,
    336 B.R. 187 (Bankr. S.D.N.Y. 2006) ..........................................................56, 57, 62

*In re Resorts Int'l, Inc.*,
    145 B.R. 412 (D.N.J. 1990)......................................................................................44

*Ripple's of Clearview, Inc.* v. *Le Havre Assocs.*,
    452 N.Y.S.2d 447 (2d Dep't 1982).........................................................................61

*In re Route One West Windsor Ltd. P'ship*,
    225 B.R. 76 (Bkrtcy.D.N.J.,1998) ..........................................................................27

*Ruskin* v. *Griffiths*,
    269 F.2d 827 (2d Cir. 1959) ...............................................................33, 46, 51, 54

*In re Skyler Ridge*,
    80 B.R. 500 (Bankr. C.D. Cal. 1987)...................................................................23, 55

*In re Smith*,
    No. 03-10666(1)11, 2008 WL 73318 (Bankr. W.D. Ky. Jan. 7, 2008) ......................51

*Solow* v. *PPI Enters. (U.S.), Inc* (*In re PPI Enters. (U.S.), Inc.*),
    324 F.3d 197 (3d Cir. 2003) ............................................................................passim

*In re Southland Corp.*,
  160 F.3d 1054 (5th Cir. 1998) ................................................................. 46, 51, 55

*In re Terry Ltd. P'ship*,
  27 F.3d 241 (7th Cir. 1994) ............................................................................ 51, 55

*In re U.S. West, Inc. Securities Litigation*,
  65 Fed. Appx. 856 (3d Cir. 2003) ......................................................................... 61

*In re Unisys Corp. Retiree Med. Benefit ERISA Litig.*,
  58 F.3d 896 (3d Cir. 1995) ................................................................................... 62

*United Merchants & Mfrs., Inc.* v. *Equitable Life Assurance Co. of the United States
  (In re United Merchants & Mfrs.)*,
  674 F.2d 134 (2d Cir. 1982) ................................................................................ 23

*United States* v. *AWECO, Inc. (In re AWECO, Inc.)*,
  725 F.2d 293 (5th Cir. 1984) ........................................................................ 47, 68

*United States* v. *Pepperman*,
  976 F.2d 123 (3d Cir. 1992) ................................................................................ 31

*UPS Capital Bus. Credit* v. *Gencarelli (In re Gencarelli)*,
  501 F.3d 1 (1st Cir. 2007) ..................................................................................... 51

*In re Vanderveer Ests. Holdings, Inc.*,
  283 B.R. 122 (Bankr. E.D.N.Y. 2002) ................................................................... 55

*Vanston Bondholders Protective Committee* v. *Green*,
  329 U.S. 156, 67 S.Ct. 237 (1946) ........................................................................ 53

*In re VFB LLC* v. *Campbell Soup Co.*,
  482 F.3d 624 (3d Cir. 2007) .......................................................................... 41, 42

*Volvo Trucks of N. Am., Inc.* v. *United States*,
  367 F.3d 204 (4th Cir. 2004) ............................................................................... 62

*In re W.R. Grace & Co., et al.*,
  No. 01-1139, 2009 WL 1469831 (Bankr. D. Del. May 19, 2009) .............................. 5

*Waltz* v. *County of Lycoming*,
  974 F.2d 387 (3d Cir. 1992) ................................................................................... 9

*In re WebSci Techs., Inc.*,
  234 Fed. Appx. 26 (3d Cir. 2007) .......................................................................... 40

# STATUTES

11 U.S.C. § 362 ...................................................................................................24, 30

11 U.S.C. § 363(l) ......................................................................................................25

11 U.S.C. § 365 ................................................................................. 22, 24, 27, 31

11 U.S.C. § 365(b) ................................................................................................22, 27

11 U.S.C. § 365(e) .............................................................................................. passim

11 U.S.C. § 502 ...........................................................................................................34

11 U.S.C. § 502(b)(2) ........................................................................ 35, 37, 38, 39

11 U.S.C. § 502(b)(6) ..........................................................................................38, 39

11 U.S.C. § 525(a) ......................................................................................................30

11 U.S.C. § 541(c) ......................................................................................................26

11 U.S.C. § 726(a)(5) ..........................................................................................70, 71

11 U.S.C. § 1103 .........................................................................................................57

11 U.S.C. § 1123 ................................................................................. 28, 31, 35

11 U.S.C. § 1124 ................................................................................................. passim

11 U.S.C. § 1124(1) ...........................................................................20, 27, 35, 36, 37

11 U.S.C. § 1124(2) ............................................................................................. passim

11 U.S.C. § 1124(3) ..........................................................................................35, 36, 38

11 U.S.C. § 1126(a) ....................................................................................................57

11 U.S.C. § 1129 ................................................................................................. passim

11 U.S.C. § 1129(a)(1) ...........................................................................................7, 19

11 U.S.C. § 1129(a)(3) ......................................................................... 2, 19, 68, 69

11 U.S.C. § 1129(a)(7) ........................................................................................ passim

11 U.S.C. § 1129(a)(11) ..............................................................................................19

11 U.S.C. § 1129(b) ............................................................................................. passim

28 U.S.C. § 1961 ..................................................................................................70, 71

## FEDERAL RULES

Fed. R. Evid. 201 ..........................................................................................................9

## STATE STATUTES

Del. Code Ann. tit. 6, § 2301(a) ................................................................................71

N.Y. C.P.L.R. § 5003.................................................................................................71

N.Y. C.P.L.R. § 5004.................................................................................................71

N.Y. Gen. Obl. Law § 15-301 (2001).......................................................................59

## OTHER AUTHORITIES

104 Cong. Rec. H10,768......................................................................................39, 46

H.R. Rep. No. 95-595 (1977).......................................................................23, 25, 29

H.R. Rep. No. 103-835 (1994)...................................................................................36

S. Rep. No. 95-989 (1978).........................................................................................20

Pursuant to the Bankruptcy Court's Third Amended Case Management Order, dated May 5, 2009 [Dkt. No. 21544], the Official Committee of Unsecured Creditors (the "Creditors' Committee") and certain lenders under the Prepetition Bank Credit Facilities[1] (the "Bank Lender Group"),[2] by their undersigned counsel, hereby object to the confirmation of the First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code [Dkt No. 20872] (the "Plan"),[3] filed by the above-captioned debtors ("Grace" or the "Debtors"), along with the Official Committee of Asbestos Personal Injury Claimants, the Asbestos PI Future Claimants' Representative, and the Official Committee of Equity Holders (together with Grace, the "Plan Proponents"), and in support thereof, respectfully represent as follows:

## PRELIMINARY STATEMENT

1.      During its over eight years in bankruptcy, Grace has not only failed to pay the Bank Lenders the $500 million in principal it owes them but has never paid any of the interest owed on that money.  Grace has proposed a plan by which it will—by its own

---

[1]     The Prepetition Bank Credit Facilities include (i) that certain Credit Agreement, dated May 14, 1998, among the W.R. Grace & Co. (the "Company"), W.R. Grace & Co.-Conn, The Chase Manhattan Bank, as Administrative Agent, Chase Securities Inc., as arranger, and certain Banks party thereto (the "1998 Credit Agreement"), and (ii) that certain 364-Day Credit Agreement, dated May 5, 1999, among the Company, W.R. Grace & Co.-Conn, Bank of America National Trust Savings Assoc., as documentation agent, The Chase Manhattan Bank, as administrative agent, Chase Securities Inc., as book manager, and certain Banks party thereto (as amended, including on May 3, 2000, the "1999 Credit Agreement", together with the 1998 Credit Agreement, the "Credit Agreements").  The Credit Agreements are attached as Exs. A and B to the Affidavit of Charles O. Freedgood of JPMorgan Chase Bank, N.A., admitted into evidence by agreement during the "Phase I" confirmation hearings and filed June 26, 2009 and June 30, 2009 [Dkt Nos. 22279, 22306] (the "Freedgood Affidavit"), attached as Ex. 1.

[2]     The Bank Lender Group includes (i) Anchorage Advisors, LLC; (ii) Avenue Capital Group; (iii) Babson Capital Management LLC; (iv) Bass Companies; (v) Caspian Capital Advisors, LLC; (vi) Catalyst Investment Management Co., LLC; (vii) Cetus Capital, LLC; (viii) DE Shaw Laminar Portfolios, LLC; (ix) Farallon Capital Management, L.L.C., (x) Goldman Sachs & Co. (as ex officio member); (xi) Halcyon Asset Management LLC; (xii) Intermarket Corp.; (xiii) JP Morgan Chase, N.A. Credit Trading Group; (xiv) Loeb Partners Corporation; (xv) MSD Capital, L.P.; (xvi) Normandy Hill Capital, L.P.; (xvii) Onex Debt Opportunity Fund Ltd.; (xviii) P. Schoenfeld Asset Management, LLC; (xix) Restoration Capital Management, LLC; and (xx) Royal Bank of Scotland, PLC.  The Bank Lender Group, together with all holders of claims under the Credit Agreements, including the previous holders of such claims, are collectively referred to as the "Bank Lenders."

[3]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan.

admission—provides that shareholders retain between $430 million and $821 million of value. Remarkably, Grace claims that it is somehow neither in default nor definitively solvent. Based on these legal fictions, Grace has proposed a Plan that seeks to retain value for shareholders before paying creditors in full under their contracts. For these reasons, Grace's Plan violates the absolute priority rule of Bankruptcy Code section 1129(b) and the best interest of creditors test of Bankruptcy Code section 1129(a)(7).[4]

2.    In a solvent debtor case, which the evidence will establish that this case is, a plan *must* pay a class of dissenting creditors all interest due under their contracts before shareholders retain anything, absent compelling equitable considerations. Under Grace's Plan, its shareholders will retain equity that the Plan Proponents themselves admit is worth between $430 million and $821 million[5] while simultaneously depriving the Bank Lenders of approximately $100 million of default interest that has accrued pursuant to their Credit Agreements over eight years (and counting) on the Bank Lenders' prepetition claims of more than $503 million.

3.    Grace has made every effort in these cases to avoid confronting the fact that there are no considerations at all (much less compelling ones) that justify denying the Bank Lenders' their contractual rights. At the outset, Grace contends that it is somehow not in default, and thus, the Bank Lenders have no right to any contractual default-rate interest. But Grace's bankruptcy filing itself constituted a default under the Credit Agreements—one that accelerated all of Grace's obligations under the loan documents. The Bankruptcy Code is unequivocal that

---

[4]    The Plan also violates section 1129(a)(3) because it has not been proposed in good faith.

[5]    *See* Debtors' Disclosure Statement for the First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code of W.R. Grace & Co., et al., the Official Committee of Asbestos Personal Injury Claimants, the Asbestos PI Future Claimants' Representative, and the Official Committee of Equity Security Holders Dated as of February 27, 2009, § 2.11.2.6 at 49 [Dkt No. 20873] (the "Disclosure Statement"), attached as Ex. 2.

credit agreements do not qualify as executory contracts subject to the Code's prohibition on the enforcement of so-called *ipso facto* clauses. Grace's failure to pay $500 million in principal upon acceleration, and its failure to pay any of the interest owed on that principal amount or on unpaid interest, are also defaults that triggered the default interest provisions under the Credit Agreements. No provision of the Bankruptcy Code absolves Grace from these payment defaults. Finally, Grace's failure to pay the $500 million in principal at the stated maturity dates (in 2001 and 2003, respectively) automatically provides thereafter for payment under the Credit Agreements of the default interest rate without reliance upon any default or any need to otherwise accelerate the loans.

4.      Next, Grace contends that even if it is in default or must otherwise pay the default rate upon the stated maturity, Grace does not have to pay the Bank Lenders in accordance with their contracts because the Bank Lenders must establish solvency and they have not yet done so. Not only is Grace wrong, as a matter of law, on the need to establish solvency, but it is a burden easily met, in this case, in at least three ways. First, there is no real dispute as to the value of Grace's assets or the amount of its non-asbestos liabilities. Grace (supported at the time by the Creditors' Committee) put forward in the asbestos estimation trial an estimate as to the amount of its asbestos personal injury liability—an amount that would conclusively establish solvency when added to the value of Grace's assets and the amount of its other liabilities, with respect to which there is no real dispute. Grace, of course, is bound by its own liability estimate. The Bank Lender Group and Creditors' Committee intend to submit Grace's estimation case into evidence at confirmation; that case more than meets any burden as to solvency.

5.      Second, because the Third Circuit treats market capitalization as an important consideration in determining solvency, and Grace has a market capitalization of more than $825 million,[6] any trial to determine the issue will result in a determination of solvency.

6.      Third, and most importantly, "evidence" of solvency does not have to be established at all in this case.  Outside a consensual plan, section 1129(b)'s absolute priority rule tolerates shareholders retaining property in only a single circumstance:  payment of the impaired unsecured creditor class in full—in short, in the circumstance of "solvency."  No other way exists under the Bankruptcy Code for equity holders to retain value.  With or without a solvency trial, equity holders' retention of any value must equate to "solvency" for the proposed plan to be lawful.  Grace's solvency is established by its own estimate of the value that is to be retained by current shareholders under the Plan—stock that Grace concedes is worth at between $430 million and $821 million.

7.      With both the defaults and solvency established (whether proven by Grace's admissions and market capitalization, or conclusively determined by the terms of the Plan), the Bank Lenders must receive default interest as provided under their contracts unless compelling equitable considerations exist to overcome the strong presumption in favor of paying the Bank Lenders post-petition interest at the contract default rate.  The rule, not the exception, is that courts apply the contract interest default rate, and no other rate, when a contest over value boils down to a fight between creditors and shareholders.  If shareholders retain value, the rule applies.  Any other outcome—like the one urged by Grace on the basis of "doing equity" (that is, allowing the shareholders to retain 100% of their interests, which Grace estimates to be up to

---

[6]      As of July 13, 2009, based on the price of $11.52 per share, Grace's market capitalization is $831 million.  *See* W.R. Grace & Co. stock quote at http://www.nyse.com/about/listed/lcddata.html?ticker=GRA, attached as Ex. 27.  The Bank Lenders and Creditors' Committee will request that the Court take judicial notice of Grace's market capitalization, in connection with the confirmation hearing.

$821 million in value, without Grace satisfying its contractual obligations to the Bank

Lenders)—would produce the polar opposite of equity.

8.      No recognized equitable consideration—much less a compelling one—

overcomes the presumption in favor of contract default interest here.  The Bank Lenders have

done nothing to impede these cases.  In fact, they have involuntarily funded Grace for more than

eight years through what were structured as short term, prepetition credit facilities featuring the

low interest rates typical for an investment grade credit, not a chapter 11 debtor.  Courts have

almost unanimously found that the 2% default interest rate provided for under the Credit

Agreements is reasonable for the added time and risk associated with an investment-grade-

borrower-turned-chapter-11 debtor.

9.      Based on earlier filings in these cases,[7] the Creditors' Committee and

Bank Lender Group suspect that Grace will seek to overcome this presumption by concocting

reliance-based arguments to establish that the Bank Lenders have somehow agreed to accept less

than their contract rate as proposed by the Plan.  The Creditors' Committee and Bank Lender

Group will be prepared to rebut these contentions at the confirmation hearing if necessary.  Such

arguments are incorrect as a matter of fact and black-letter law.  At most, Grace has alleged that

it had a "deal" with the Creditors' Committee over co-sponsorship of a long-dead plan.  This

Court has already found that the relevant letter agreements between the Creditors' Committee

and Grace are "no longer in effect."[8]  The Bank Lenders never signed anything and were not

---

[7]     *See, e.g.*, Debtors' Objection to the Unsecured Claims Asserted Under the Debtors' Credit Agreements Dated as of May 14, 1998 and May 5, 1999, dated June 13, 2008 [Dkt. No. 18922] (the "Objection"), attached as Ex. 3.

[8]     Memorandum Opinion, *In re W.R. Grace & Co., et al.*, No. 01-1139, 2009 WL 1469831, at 2 n.3 (Bankr. D. Del. May 19, 2009) ("May 19 Opinion"), attached as Ex. 4.  The May 19 Opinion, together with the Accompanying Order Sustaining Debtors' Objection to Unsecured Claims Insofar as Claims Include Postpetition Interest at the Contract Default Rate (the "May 19 Order") are referred to collectively as the "May

parties to any deal, and black-letter law establishes that the Creditors' Committee cannot bind any individual creditor, including the Bank Lenders, to an agreement altering such creditor's contract rights in any manner.

10.    The facts will establish that there is simply no act to which Grace can point on the part of the Bank Lenders, much less some inequitable act, that can serve as the basis for depriving them of contract default interest pursuant to section 1129(b) of the Bankruptcy Code. The law in the Third Circuit has also clearly held that Grace's real complaint—that the Bank Lenders' refusal to accept less than their contracts provide for will allegedly cause the Equity Committee to walk away from its "deal" with the asbestos personal injury plaintiffs— cannot serve as a basis for this Court to impose a lower rate of interest.

11.    To improve the odds of confirming its flawed Plan, Grace has tried to end-run the heightened confirmation requirements of section 1129(b). Grace seeks to disenfranchise the Bank Lenders in violation of section 1124 by categorizing their claims as "*un*impaired," thereby eliminating the possibility of a "no vote." This Court should not countenance Grace's attempts to shirk its statutory burdens under section 1129(b) by depriving creditors of their fundamental rights to vote and to be heard through the designation of their claims as "unimpaired."[9] Nor should this Court permit Grace to elevate equity holders' interests over

---

19 Decision") [Dkt. No. 21747]. Although the Court stated that the May 19 Decision relates only to claims allowance and has no binding effect at the confirmation phase of these cases, these other findings are instructive. Hearing Tr. 27:12; 38:15-19; 61:4-11; 207-09, June 18, 2009 [Dkt. No. 22371], attached as Ex. 5.

[9]    Although the impairment issues pursuant to section 1124 were heard during "Phase I" of the confirmation hearings on June 22 and 23, 2009, the Court did not issue any ruling and ordered subsequent briefing on the impairment issues to be filed by July 17, 2009. Hearing Tr. 281:12-13, June 22, 2009 [Dkt. No. 22294], attached as Ex. 6; *see also* Order Regarding Further Matters Related to the Phase I Confirmation Hearing With Respect to Class 9 Impairment, *In re W.R. Grace & Co., et al.*, No. 01-1139, at ¶ 3 (Bankr. D. Del. July 9, 2009) [Dkt. No. 22374]. In the interests of completeness and efficiency, the Creditors' Committee and Bank Lender Group are providing their joint subsequent briefing on the impairment issues now, as part of this pre-trial brief.

those of Grace's creditors in violation of Grace's fiduciary duties to creditors and the good faith requirements of the Bankruptcy Code.

12.     Accordingly, the Court should deny confirmation of the Plan unless the Bank Lenders are paid post-petition interest at the contractual default rate.[10]

## STATEMENT OF FACTS

13.     A review of the pleadings and documents filed with this Court (including the Plan and Disclosure Statement), affidavits, and documents produced in discovery reveals that very few facts are in dispute.  With respect to the issue of whether the contractual default rate of interest has been triggered, the only issue in dispute is legal—which is whether Grace has some type of "*ipso facto*" defense that would render those provisions triggering the default rate of interest legally unenforceable.[11]  With respect to the issue of whether the Bank Lenders agreed to receive a rate of interest lower than the rate provided in the Credit Agreements, the dispute is not over who said what or to whom, but over the legal significance of these facts.

**The Credit Agreements and Proofs of Claim**

14.     Prepetition, Grace entered into the Credit Agreements.  Under them, Grace owes the Bank Lenders $500 million in aggregate principal amount plus an additional $3 million

---

[10]     The Creditors' Committee also objected to confirmation of the Plan because section 11.8 of the Plan calls for dissolution of the Creditors' Committee on the Effective Date, notwithstanding the pendency of litigation with respect to the Bank Claims, in violation of 11 U.S.C. § 1129(a)(1).  No evidence is necessary to prosecute this objection and, therefore, the issue is not discussed herein and the Creditors' Committee respectfully refers the Court to its objection to the Plan in this regard.  *See* Objection of the Official Committee of Unsecured Creditors to Confirmation of the First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code of W.R. Grace & Co., et al., the Official Committee of Asbestos Personal Injury Claimants, the Asbestos PI Future Claimants' Representative, and the Official Committee of Equity Security Holders, Dated February 27, 2009, dated May 20, 2009 [Dkt. No. 21790] (the "Creditors' Committee Plan Objection").

[11]     At the hearing held on June 22, 2009, this Court aptly recognized that the Plan Proponents could not invoke the "*ipso facto*" defense of section 365(e) of the Bankruptcy Code with respect to any provision of the Credit Agreements because such defense is expressly not applicable to loan agreements—which the Court acknowledged the Credit Agreements are.  *See* Hearing Tr. 117, June 22, 2009 [Dkt. No. 22294].

of interest that accrued pre-petition.[12]  The scheduled maturity of the 1998 Credit Agreement

occurred over five years ago on May 16, 2003.  (1998 Credit Agreement §§ 1.1, 2.2.)  It has a

non-default interest rate equal to the Alternate Base Rate, with a default rate of the Alternate

Base Rate plus 2%.  (*Id.* §§ 1.1, 5.1(b), 5.1(c), 5.5.)  The scheduled maturity of the 1999 Credit

Agreement occurred over eight years ago on May 2, 2001.  (1999 Credit Agreement §§1.1, 2.2;

Amendment to 1999 Credit Agreement, dated as of May 3, 2000, § 1.2 (amending definition of

Termination Date); Freedgood Aff. ¶ 9.)  It has a non-default interest rate equal to the Alternate

Base Rate, with a default rate of the Alternate Base Rate plus 2%.  (1999 Credit Agreement §§

1.1, 5.1(b), 5.1(c), 5.5.)  The Credit Agreements are governed by New York law.  (Credit

Agreements § 13.11.)

       15.     JPMorgan Chase Bank, N.A. ("JPMorgan") serves as administrative agent

(the "Administrative Agent") under the Credit Agreements.  It timely submitted proofs of claim

nos. 9159 and 9168 dated March 27, 2003 (the "Proofs of Claim")[13] for amounts owed on

account of, but not limited to, principal, interest, and fees on the loans and advances made under

the Credit Agreements.[14]

**Events of Default**

       16.     Grace filed for bankruptcy on April 2, 2001.  Grace's bankruptcy filing

was an event of default under the Credit Agreements.  (Credit Agreements § 10(f)(i)(A).)  The

---

[12]    *See* 1998 Credit Agreement at Sch. 1 ($250 million aggregate commitment); 1999 Credit Agreement at Sch. 1 ($250 million aggregate commitment).

[13]    *See* Proofs of Claim, Exs. C & D to Freedgood Affidavit; Freedgood Aff. ¶ 14; Objection at 1-2; Resp. & Obj. of Debtors to Off. Comm. of Unsecured Creditors of W.R. Grace & Co. and Bank Lender Group's First Request for Production of Documents, First Set of Interrogatories, and First Request for Admissions at 24 ("Debtors' Resp. & Obj."), attached as Ex. 7.

[14]    In addition to default interest rate, the Credit Agreements provide for payment of facility fees, attorneys' fees and specified method for calculating interest.  (Credit Agreements §§ 1.1, 5.2, 5.7, 5.13.)  The Plan seeks to exclude the Bank Lenders' claims for postpetition interest calculated at the default rate (Plan § 3.1.9(b)(A), attached as Ex. 8), but Grace owes the Bank Lenders these other amounts as well pursuant to the terms of the Credit Agreements.

bankruptcy filing event of default automatically accelerated the loans without the need for any

demand or notice.  (Credit Agreements § 10 (providing that if a bankruptcy filing default occurs

with respect to any Borrower, "*automatically* the Commitments to such Borrower shall

immediately terminate and the Loans made to such Borrower hereunder (with accrued interest

thereon) and all other amounts owing under this Agreement and the Notes of such Borrower

shall *immediately* become due and payable") (emphasis supplied).)[15]  Grace's bankruptcy filing

thus accelerated all principal and interest outstanding as of April 2, 2001.  The undisputed

evidence will establish that $500 million of principal was outstanding on April 2, 2001, and

approximately $3 million of unpaid interest had accrued up until April 2, 2001 (the $503 million

amount owing as of April 2, 2001, the "Petition Date Claim Amount").

　　　　　　17.　　Grace cannot dispute that it did not pay (and has not to this day paid) the

Petition Date Claim Amount when it became due on April 2, 2001.  (Freedgood Aff. ¶ 13.)[16]

Under the Credit Agreements, Grace's failure to make a payment of principal or interest when

due post-petition (whether by acceleration or otherwise) in accordance with the Credit

Agreements *automatically* triggered the default rate of interest on such missed payment from the

date of non-payment until payment in full.  (*See* Credit Agreements § 5.1(c) (applying the default

interest rate "if all or a portion of (i) the principal amount of any Loan or (ii) any interest payable

thereon shall not be paid when due (whether at the stated maturity, by acceleration or

otherwise")".)  Because Grace did not pay the Petition Date Claim Amount when it became due,

---

[15]　This automatic acceleration provision contrasts with other defaults under the Credit Agreements that
specifically require notice to terminate the commitments and accelerate the loans.

[16]　The Court may take judicial notice of pleadings filed on the docket in these bankruptcy cases.  *See* Fed. R. Evid.
201 (a court may take notice of judicially noticed facts "not subject to reasonable dispute"); *Waltz* v. *County of
Lycoming*, 974 F.2d 387, 389 (3d Cir. 1992) (pleadings, motions, and briefs that were part of the record were
"subject to judicial notice" without further proof).

interest on the Petition Date Claim Amount *automatically* and without the need for any notice has accrued at the default rate since April 2, 2001.

18.     Even overlooking that the loans accelerated automatically on April 2, 2001, the Petition Date, the Credit Agreements provided that the actual scheduled maturity dates of the Credit Agreements occurred in 2001 and 2003, respectively.  (1998 Credit Agreement §§ 1.1, 2.2; Amendment to 1999 Credit Agreement, dated as of May 3, 2000, § 1.2 (amending definition of Termination Date).)  Grace cannot dispute that it has made no payments of principal under the Credit Agreements after April 2, 2001.  (Freedgood Aff. ¶ 13.)  At a minimum then, under section 5.1(c) of the Credit Agreements, the natural maturity of the principal amounts due in 2001 and 2003, respectively, *automatically* resulted in accrual of interest on such unpaid amounts after 2001 and 2003 at the default rate, without the need for either the occurrence of any "Event of Default" or notice of any kind.

19.     Furthermore, the Credit Agreements provide for quarterly payments of interest.  (Credit Agreements § 1.1.)  Grace, again, cannot dispute that it made no payments of interest during the pendency of these cases.  (Freedgood Aff. § 13.)  The failures to pay interest on the loans and notes after such interest became due in accordance with the terms of the Credit Agreements constituted "Events of Default" that entitled the Bank Lenders to accelerate the entire outstanding amount of the loans and notes.  (*See* Credit Agreements § 10(a).)

20.     Grace further defaulted on a number of non-monetary reporting obligations under the Credit Agreements.  As outlined in the Freedgood Affidavit, Grace failed to furnish each bank all certificates and other information required by section 8.2(a)-(c) of the Credit Agreements, failed to promptly give notices to JPMorgan Chase Bank, N.A. as required by section 8.7, and failed to remedy such breaches within 30 days.  (*See* Freedgood Aff. ¶ 13.)

These defaults constitute "Events of Default" that entitled the Bank Lenders to accelerate the entire outstanding amount of the loans and notes.  (*See* Credit Agreements § 10(d).)

21.     In addition, the Creditors' Committee and the Bank Lender Group will establish that during the pendency of these cases, the Administrative Agent complied with the terms of the Credit Agreements and did not engage in any wrongdoing or inequitable conduct. (Debtors' Resp. & Obj. at 20 (Adm. No. 8); Off. Comm. of Equity Holders' Resp. & Obj. to the Off. Comm. of Unsecured Creditors of W.R. Grace & Co.'s and Bank Lender Group's First Set of Interrogatories at 5 (Interr. No. 3) ("Equity's Resp. & Obj."), attached as Ex. 9.)

22.     In sum, Grace failed, among other things, to repay the $500 million principal amount of the loans due under the Credit Agreements as they matured in 2001 and 2003 or upon acceleration, and to pay certain interest payments, all as required by the Credit Agreements.  In addition, the Credit Agreements provide that Grace's failures to pay interest and principal of the loans upon maturity or acceleration are events that automatically trigger the default rate of interest set forth in the Credit Agreements.  (Credit Agreements §§ 1.1, 2.2(a), 5.1(c), 8.3, 10(a).)  Finally, the evidence will establish that neither the Administrative Agent nor the Bank Lenders engaged in any inequitable or illegal conduct during the pendency of these chapter 11 cases.

**The Plan**

23.     Grace's Plan provides that each holder of an allowed general unsecured claim in Class 9 shall be paid "the Allowed Amount of its Allowed General Unsecured Claim" with "post-petition interest."  (Plan § 3.1.9(b).)  Under the Plan, interest accruing after the Petition Date on the Bank Lenders' allowed claims is "calculated at the rate of 6.09% from the Petition Date through December 31, 2005 and thereafter at floating prime, in each case compounded quarterly through the Effective Date."  (*Id.* § 3.1.9(b)(i)(A).)  This is less than the

contractual default rate set forth in the Credit Agreements.  The Plan also appears to deprive the Bank Lenders of the facility fees and attorneys' fees due under their agreements because it fails to recognize such entitlements as part of the "allowed claim."

24.    Class 9 has voted to reject the Plan.[17]  Nonetheless, the Plan Proponents classify the Bank Lenders' claims as "unimpaired" to establish the irrebuttable presumption that the Bank Lenders have accepted the Plan and to avoid the rigorous requirements of section 1129. (*See id.* § 3.1.9(c).)

**Evidence of Solvency**

25.    To the extent that solvency must be proven in connection with the Bank Lender Group's and Creditors' Committee's objections to the Plan (and we contend that it does not because Grace's solvency is already established by the Plan itself by permitting equity holders to retain significant value, and by Grace's market capitalization), then the Bank Lender Group and Creditors' Committee will establish at confirmation that Grace is solvent on a balance sheet basis.  Solvency is easily established here.  Exhibit 12 to the Plan, as revised, sets forth the financial information upon which the Plan is premised, and thus establishes the assets and liabilities of Grace, both before and after the assumed Effective Date of the Plan.  The only real variable is the value of Grace's asbestos personal injury liabilities, which under the Plan is resolved by the settlement.  Grace has already taken a position as to the value of those asbestos claims and, supported by the Creditors' Committee, completed its direct case during the estimation trial of the asbestos personal injury liabilities.  During the estimation trial, Grace advocated a net present value of those liabilities at a median of $468 million.  Grace is plainly

---

[17]    Declaration of Kevin A. Martin Certifying Tabulation of Ballots Regarding Vote on First Amended Joint Plan of Reorganization Dated June 8, 2009, at ¶ 29 [Dkt No. 22020] ("Martin Declaration"), attached as Ex. 10. However, Class 9's vote to reject the Plan may not be counted if the Court concludes that Class 9 creditors are "unimpaired" pursuant to section 1124.  *See generally supra* ¶ 11, and *infra* ¶¶ 44, 46, 89, 144.

solvent using this value for its asbestos personal injury liabilities and taking into account the Plan

Proponents' representations in the Plan and Disclosure Statement of Grace's assets and other

liabilities.

        26.     Nothing more need be proven to demonstrate as a factual matter the Bank

Lenders' right to be paid post-petition interest at the default rate in these cases, consistent with

11 U.S.C. § 1129.

**Potential Rebuttal Issue:  The Creditors' Committee's Expired Agreements with Grace and the Equity Committee**

        27.     Grace previously argued, in connection with its Objection to the Bank

Lenders' Proof of Claim, that the Bank Lenders, through the prior actions of the Creditors'

Committee, agreed to the treatment provided for their claims under the current Plan.  (Objection

at 15.)  This Court recently found, in its ruling on that Objection, that the relevant letter

agreements between the Creditors' Committee and Grace are "no longer in effect."[18]  However,

to the extent Grace and the other Plan Proponents attempt to reassert this position at

confirmation, the Creditors' Committee and Bank Lender Group will be prepared to rebut that

contention and demonstrate the facts outlined below.

        28.     After almost four years in bankruptcy and with its asbestos liability still

unresolved, Grace proposed filing a plan with its major non-asbestos constituents.  By letter

agreement dated January 12, 2005 (the "2005 Letter", attached as Ex. 11), the Creditors'

Committee agreed "to be a Plan Proponent with the Debtors and Equity Committee of the

Amended Joint Plan of Reorganization to be filed with the Bankruptcy Court on or about January

13, 2005 as such plan may be amended from time to time with the consent of the Creditors'

Committee . . ."  Although the 2005 Letter did not specify a post-petition interest rate, Grace's

---

[18]   May 19 Opinion at 2 n.3.

Amended Joint Plan of Reorganization dated January 13, 2005 (the "Joint Plan") included a post-petition interest rate on the Bank Lenders' claims of 6.09% fixed, compounded quarterly.  (*See* Joint Plan § 3.1.9(b) [Dkt. No. 7560], attached as Ex. 12.)  Grace's Joint Plan also provided for the Bank Lenders to receive an equity stake in reorganized Grace.  (*Id.*).

29.     The evidence will establish that there was no agreement or amendment of the Credit Agreements of any kind between Grace and the Bank Lenders altering the rate of interest set forth in the Credit Agreements.  Significantly, Grace publicly acknowledged that its agreement with the Creditors' Committee "did not commit any member of the Unsecured Creditors' Committee or any creditor to vote for the Plan."  (*See* Amended Disclosure Statement for the Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code, dated Jan. 13, 2005, at 59 n.18 (the "2005 Disclosure Statement"), attached as Ex. 13 [Dkt. No. 7559].)  The unapproved 2005 Disclosure Statement filed with Grace's Joint Plan and filed as an exhibit to Grace's 10-K dated March 7, 2005 merely stated—without any corroboration or reference to any agreement—that "certain [unnamed] substantial Claimants" had agreed to support Grace's Joint Plan.[19]  Furthermore, footnote 18 of the 2005 Disclosure Statement provided that the Creditors' Committee and Grace "intend to memorialize their agreement in a plan support agreement."  (2005 Disclosure Statement at 59 n.18.)  If necessary in rebuttal, the Creditors' Committee and Bank Lender Group will establish that although the Creditors' Committee and Grace never executed a plan support agreement, the Creditors' Committee drafted and proposed one, and Grace's counsel commented on it.[20]  Consistent with the parties' negotiations, Grace left unchanged language in such plan support agreement stating

---

[19]   2005 Disclosure Statement at 59 n.18; Grace's Form 10-K & Ex. 99-1, Mar. 7, 2005, attached as Ex. 14.

[20]   *See* E-mail from Arlene Krieger to Janet Baer (with draft plan support agreement attached) (Feb. 18, 2005), attached as Ex. 15; E-mail from Janet Baer to Arlene Krieger (with K&E comments to draft plan support agreement attached) (Mar. 16, 2005), attached as Ex. 16.

that the Creditors' Committee's agreement to support Grace's Joint Plan did not bind individual members of the Creditors' Committee or individual creditors.[21]

30.    JPMorgan was a member of the Creditors' Committee.[22]  There is no evidence that JPMorgan ever made any agreement with Grace in any capacity other than as a member of the Creditors' Committee.  Moreover, even if JPMorgan had done so, Grace, as a party to the Credit Agreements, knew that under those instruments, JPMorgan served merely as the Administrative Agent and had no authority to bind the Bank Lenders to any modification of the interest rate of the Credit Agreements, or to agree to a non-contract rate of interest.  (Credit Agreements §§ 11.1, 13.1.)

31.    In sum, there is no evidence that establishes that the Bank Lenders— including the "substantial claimants"—entered into any agreement with Grace, the Creditors' Committee, or the Administrative Agent to accept a non-contract interest rate on the Bank Lenders' claims or to support Grace's Joint Plan.

32.    Further, under the terms of the 2005 Letter, the Creditors' Committee could withdraw as a plan proponent for a host of reasons, including (a) if this Court did not approve the Disclosure Statement incorporating Grace's Joint Plan by November 30, 2005, (b) if Grace's exclusive period to file its Joint Plan terminated, or (c) if its Joint Plan failed to become effective on or before January 1, 2007.[23]  This Court never approved the 2005 Disclosure Statement incorporating Grace's Joint Plan, and the Joint Plan did not become effective on or before January 1, 2007.  This Court terminated Grace's exclusive period by order dated July 26, 2007.  [Dkt. No. 16396.]

---

[21]    *Id.*

[22]    Notices of Appointment of Off. Comm. of Unsecured Creditors, Dec. 3, 2003 [Dkt. No. 352], and July 10, 2006 [Dkt. No. 12767].

[23]    *See* 2005 Letter.

33.    In 2006, e-mails between representatives of Grace and the Creditors'
Committee further confirmed Grace's understanding that it was negotiating with the Creditors'
Committee alone, and that it was seeking the Creditors' Committee's continued support and
views in connection with its Joint Plan, and the documentation for any amended plan—not the
support or views of the Administrative Agent, or any of the Bank Lenders.  (*See* E-mail from R.
Tarola, CFO of Grace, to T. Maher, Chairman of Creditors' Committee (Feb. 14, 2005), attached
as Ex. <u>17</u>.)

34.    In February 2006, Grace and the Creditors' Committee (but again, none of
the individual Bank Lenders) agreed to amend Grace's Joint Plan (the "<u>2006 Letter</u>", attached as
Ex. <u>18</u>) to "modify the treatment of the Class of General Unsecured Creditors to provide that
commencing January 1, 2006 the current 6.09% fixed, compounded quarterly, post-petition
interest rate accruing for the Holders of the Debtors' prepetition bank credit facilities shall
change to a floating Adjusted Base Rate, compounded quarterly …"  The 2006 Letter's adjusted
rate came as a result of negotiations between representatives of Grace and the Creditors'
Committee through its counsel and Chairman, whereby Grace sought the Creditors' Committee's
continued support as a co-proponent of Grace's Joint Plan.  (*See* Ex. <u>17</u>, E-mail from R. Tarola,
CFO of Grace, to T. Maher, Chairman of Creditors' Committee (Feb. 14, 2005); E-mail from J.
Baer to R. Tarola, M. Shelnitz, et al. (Feb. 27, 2006), attached as Ex. <u>19</u>.)

35.    As with the 2005 Letter, the Creditors' Committee under the 2006 Letter
could withdraw as a plan proponent for a host of reasons, including (a) if this Court did not
approve a disclosure statement incorporating Grace's amended Joint Plan by December 31, 2006,
(b) if Grace's exclusive period to file its amended Joint Plan terminated, or (c) if its amended
Joint Plan failed to become effective on or before February 28, 2007.  As with the conditions set

forth in the 2005 Letter, this Court never approved any disclosure statement, Grace's amended

Joint Plan never became effective, and, as noted, this Court terminated Grace's exclusive period

by order dated July 26, 2007 [Dkt. No. 16396].

36.    If necessary on rebuttal, the Bank Lender Group and the Creditors'

Committee will also demonstrate that the circumstances that existed at the time of the 2005

Letter and the 2006 Letter have undisputedly changed dramatically.  Then, it was uncertain

whether equity holders would retain *any* interest under a plan because of the litigation over the

value of the asbestos personal injury claims—hence the Creditors' Committee's conditional

support for a plan in which unsecured creditors would receive equity themselves.  (*See* Joint Plan

§ 3.1.9(b).)

37.    The evidence will also reflect that beginning in approximately April 2005,

counsel for each of Grace (and sometimes Grace personnel) and counsel for the Creditors'

Committee participated in regularly scheduled conference calls, typically twice a month.  During

such calls, the participants discussed, among other topics, the state of any settlement discussions

with the asbestos personal injury claimants.  As early as 2007, counsel for the Creditors'

Committee advised Grace that the bank debt was trading in the market at a value reflecting

recovery of contract default interest, and that certain Bank Lenders had advised the Creditors'

Committee's professionals that they expected to receive post-petition interest at the contract

default rate.

38.    Well before commencement of the negotiations that resulted in the Term

Sheet dated April 6, 2008, the Creditors' Committee's counsel advised Grace that,

notwithstanding any position that the Creditors' Committee itself might take, any consensual

plan should provide for post-petition interest payable at the contract default rate if Grace

expected the Bank Lenders to vote in favor of Grace's plan.  The evidence will establish that

Grace never invited the Creditors' Committee or any of the Bank Lenders to participate in the

plan related discussions that culminated in the Proposed Asbestos Settlement, notwithstanding

the Creditors' Committee's counsel's repeated warnings to Grace that the Bank Lenders

expected to receive post-petition interest at the contract default rate as part of any global

resolution.

**The April 2008 Term Sheet**

        39.      On or about April 7, 2008, Grace publicly announced the April 2008 Term

Sheet outlining the Proposed Asbestos Settlement.  ( Tr. of Grace's Conf. Call, Apr. 7, 2008,

attached as Ex. 20.)

        40.      The parties to the April 2008 Term Sheet include Grace, the Asbestos

Claimants Committee, the Future Claims Representative, and the Equity Committee.  (*See* Id.)

The evidence will establish that, in addition to not inviting the Creditors' Committee, the

Administrative Agent, or any of the Bank Lenders to participate in the negotiations that

ultimately resulted in the April 2008 Term Sheet, Grace did not ask any of them to sign that

document as a party.  (*See* Freedgood Aff. ¶ 17.)

        41.      Promptly upon learning of the April 2008 Term Sheet, the Bank Lenders

by letter dated April 21, 2008, wrote to Grace's counsel and set forth their position that the

failure to provide for the payment of contract default interest on the Bank Lenders' claims

rendered any plan based on the April 2008 Term Sheet unconfirmable.  (Ex. 21.)

**The Claim Objection**

        42.      No party objected to the Proofs of Claim before Grace filed its Objection

to the Bank Lenders' Proof of Claim on June 13, 2008.  (Debtor's Resp. & Obj. at 25; Freedgood

Aff. ¶ 16.)  Grace objected to the Proofs of Claim to the extent that such claims sought to include

post-petition interest at the contract default rate as part of the "allowed" amount of the Bank Lenders' claims.[24]  This Court rendered a decision on the Objection on May 19, 2009.  (May 19 Decision [Dkt. No. 21747].)

## ARGUMENT

43.       Section 1129(a)(1) of the Bankruptcy Code requires, as a condition to confirmation, that the plan must "comply with applicable provisions of this title."  The Plan does not satisfy section 1129(a)(1) because it violates: (a) section 1124 by classifying the Bank Lenders' claims as "unimpaired"; (b) section 1129(b)'s fair and equitable test and absolute priority rule; (c) section 1129(a)(3) because the Plan is not proposed in good faith; and (d) section 1129(a)(7)'s best interests of creditors test, which requires the payment of interest on allowed claims at the legal rate before equity holders retain any interest.[25]

## I.
## THE THIRD CIRCUIT PRESUMES IMPAIRMENT FOR VOTING PURPOSES: CLASS 9 CREDITORS ARE IMPAIRED PURSUANT TO SECTION 1124 AND PLAN PROPONENTS CANNOT REBUT THE PRESUMPTION OF IMPAIRMENT

44.       The Plan violates sections 1129(a)(1) and 1124 of the Bankruptcy Code by improperly classifying the claims of the Bank Lenders as "unimpaired."  (*See* Plan at §3.1.9(f).)  The Third Circuit *presumes* impairment and creditors' rights to vote under a plan.  *Solow* v. *PPI Enters. (U.S.), Inc.*, (*In re PPI Enters. (U.S.), Inc.*), 324 F.3d 197, 203 (3d Cir. 2003).   Grace can only overcome the presumption and satisfy its burden if it demonstrates that the plan leaves creditors' legal, equitable, and contractual rights unaltered.  *Id.*

---

[24]    Briefing and argument on the Objection was completed on September 29, 2008.  All pleadings and arguments filed by the Bank Lender Group and Creditors' Committee are herein incorporated by reference as though fully set forth herein.  *See* Dkt. Nos. 19072, 19073, 19477, 19478-19487, 19538, and 19601.

[25]    To date, the Plan Proponents have not filed any documents regarding proposed exit financing, and thus, the Plan may also violate section 1129(a)(11) because it is not feasible; briefing on this issue under the Third Amended Case Management Order is reserved until August 25, 2009.

45.    Under section 1124(1) of the Bankruptcy Code, a class of claims is impaired under a plan if such plan alters the legal, equitable, or contractual rights to which such claim entitles the holder of such claim.[26]  The legal, equitable, and contractual rights of the Bank Lenders include the right to post-petition interest at the contract default rate and the right to be paid facility fees and attorneys' fees due under such contracts.  The Plan impairs the Bank Lenders' claims because it alters their legal, equitable, and contractual rights by, among other reasons, (i) failing to pay the Bank Lenders' claims in full, in cash, including with post-petition interest at the applicable contract rate set forth in the Credit Agreements, and (ii) failing to assure payment of the Bank Lenders' claims in full on the Plan's Effective Date.[27]

46.    Congress and the Third Circuit are crystal clear on the law on "impairment."  If the chapter 11 plan does not leave the creditor's legal, equitable, and contractual rights "*entirely 'unaltered*,' the creditor's claim will be labeled as impaired under § 1124(1) of the Bankruptcy Code."  *In re PPI Enters. (U.S.), Inc.*, 324 F.3d at 202 (emphasis supplied); S. Rep. No. 95-989, at 120 (1978), attached as Ex. 22.  By proposing to pay the Bank Lenders' claims at an interest rate *other* than the applicable contract rate—which is the default rate as triggered by Grace's bankruptcy filing, occurrence of the stated maturity of the loans, and

---

[26]    The Creditors' Committee also objected to confirmation of the Plan on grounds including that the non-Bank Claims in Class 9 were impaired because they were not assured that their legal, equitable, or contractual rights were unaltered by the Plan's protocol for such claims.  *See* Creditors' Committee Plan Objection [Dkt. No. 21790].  During the "Phase I" hearings on June 22, the Debtors committed to certain language modifications designed to resolve this objection.  Hearing Tr. 127:16-21, June 22, 2009 [Dkt. No. 22294].  The Creditors' Committee reserves its objection in this regard until such time as the language proposed by the Debtors (which the Debtors have yet to provide) is acceptable to the Creditors' Committee.

[27]    The Plan fails to pay the Bank Lenders in full inasmuch as the Bank Lenders will receive no payment of interest on the Effective Date of the Plan—including interest that accrued before the Petition Date and interest that Grace concedes the Bank Lenders are entitled to—in the event that no Final Order resolving the Objection has been entered by such time.  *See* Plan § 3.1.9(d)(iii).  Second, it prohibits the accrual after the Effective Date of *any* interest on past due unpaid amounts of interest.  *Id.*  Moreover, the Plan does not contain a reserve to assure payment of amounts owed to the Bank Lenders and not paid on the Plan's Effective Date.  The reserve issue may be further addressed connection with briefing on feasibility, which is due on August 25, 2009 in accordance with the Third Amended Case Management Order.

uncontested payment defaults—the Plan clearly alters the Bank Lenders' rights such that they are impaired and entitled to vote.

A.    **Because There is No "*Ipso Facto*" Legal Defense to Grace's Post-Petition Defaults, Interest Accrues at the Default Interest Rate.**

47.    Grace's position boils down to one never accepted by any court:  that the Bank Lenders are not impaired because their contractual right to default interest, as a result of some type of "*ipso facto*" legal defense, is unenforceable in bankruptcy.  This is simply wrong as a matter of law.

48.    Under the Credit Agreements, Grace's bankruptcy filing automatically accelerated the maturity of the $503 million Petition Date Claim Amount (comprising $500 million of principal and $3 million of interest earned Prepetition).  In addition, the actual stated maturity dates of the loans occurred in 2001 and 2003, respectively, at which point the loans unquestionably became due.  Finally, interest was payable quarterly on such amounts.  Grace's failure to satisfy these monetary contractual obligations when due post-petition (whether due upon acceleration or on the stated maturity and/or on interest payment dates assuming there had been no acceleration) automatically triggered the default interest rate without the need for the Bank Lenders to send a notice.  (*See* Freedgood Aff. ¶ 13; Credit Agreements §§ 1.1, 2.2(a), 5.1(c), 8.3, 10(a), 10(f)(i)(A).)

49.    The fact that Grace failed to satisfy these contractual payment obligations post-petition is, and will remain, uncontested.  Instead, Grace asserts that it has a legal defense while in bankruptcy because of the doctrine of "*ipso facto*."  (Hearing Tr. 116:8-10, June 22, 2009, attached as Ex. 6 [Dkt. 22294] ("With respect to the payment [default] … we thought before that that was disposed of because it's, effectively, an *ipso facto* provision…").)  Neither the express language of the Bankruptcy Code nor any implied "*ipso facto*" legal defense shields

a debtor from a default, even one occurring post-petition, on its obligations under a loan

agreement.  Moreover, even assuming *arguendo*, that any type of *ipso facto* defense was

applicable (none is), it cannot in any event be used as a defense to alter the interest rate payable

upon the loans once they reached their scheduled maturity dates in 2001 and 2003.

**Bankruptcy Code's Recognition of Defaults**

50.    *First*, numerous Bankruptcy Code provisions expressly recognize that

defaults survive and must be considered whether they occurred pre- or post-petition.  *See* 11

U.S.C. § 365(b)(1); *Butler* v. *Bellwest Mgmt. Corp.* (*In re Butler*), 14 B.R. 532, 535 (Bankr.

S.D.N.Y. 1981); *In re Rachels Indus., Inc.*, 109 B.R. 797, 811-12 (Bankr. W.D. Tenn. 1990)

("[T]he debtor, when attempting to assume under § 365, must cure both prepetition and

postpetition defaults."); *see also* 11 U.S.C. § 1124(2)(A).  Most importantly, section 1124(2)(A)

provides that *a claim can only be unimpaired if* the plan "cures any such default that occurred

before *or after* the commencement of the case." (emphasis supplied).

51.    Accordingly, bankruptcy courts can and do recognize both bankruptcy-

triggered defaults, as well as other post-petition defaults.  For example, in this district, Judge

Walsh in *Anchor Resolution Corp.* v. *State Street Bank & Trust Co. of Conn. (In re Anchor

Resolution Corp.)*, 221 B.R. 330, 336-37 (Bankr. D. Del. 1998) enforced a make-whole

provision triggered by an event of default where the "default" was the filing of a bankruptcy

petition.  The noteholders filed a proof of claim seeking the full make-whole amount under their

note purchase agreement, arguing that they were entitled to the full make-whole amount as a

result of the bankruptcy filing because the bankruptcy filing was a contractual event of default

under the note purchase agreement and the note restructuring agreement, which triggered the

obligation to pay the full make-whole amount.  *Id.* at 334.

52.    The debtor in *Anchor Resolution* argued that the bankruptcy filing was not enforceable as a default pursuant to section 365(e)(1)(B) of the Bankruptcy Code, and thus, the noteholders were only entitled to a lesser adjusted make-whole amount under the note restructuring agreement.  *Id.* at 335.  Judge Walsh unequivocally held that because the note restructuring agreement was not an executory contract as a matter of law, section 365(e) was inapplicable to the note restructuring agreement and, therefore, "[t]he Debtor's filing of its Chapter 11 petition created a restructuring event of default."  *Id.* at 337; *see also, e.g.*, *United Merchants & Mfrs., Inc.* v. *Equitable Life Assurance Co. of the United States (In re United Merchants & Mfrs.)*, 674 F.2d 134, 143-44 (2d Cir. 1982) (enforcing a liquidated damages provision triggered by the filing of a Chapter XI petition).

53.    Nor can there be any doubt that the Credit Agreements' bankruptcy-triggered acceleration clauses are enforceable, given that a bankruptcy filing already automatically accelerates the maturity of debts as a matter of law, as this Court has aptly noted. (*See* Hearing Tr. 58:16-18, June 22, 2009 [Dkt. 22294] ("The Bankruptcy Code will accelerate all the obligations up to the point of the filing of the bankruptcy.")); *see also* H.R. Rep. No. 95-595, at 353 (1977), attached as Ex. 23 ("[B]ankruptcy operates as the acceleration of the principal amount of all claims against the debtor."); *In re Skyler Ridge*, 80 B.R. 500, 507 (Bankr. C.D. Cal. 1987) ("The automatic acceleration of a debt upon the filing of a bankruptcy case is well established."); *cf.* 11 U.S.C. § 1124(2)(C) (statutory provision permitting reinstatement of the maturity date necessarily and expressly assumes enforceability of contractual acceleration provision).

54.    In any event, without deciding whether Grace's bankruptcy filing accelerated the maturity of the loans either as a matter of contract or by operation of law, the

stated maturity dates of the loans in 2001 and 2003, respectively, as well as the quarterly interest payment dates, came and went without Grace performing its obligations under the Credit Agreements. Such post-petition defaults are recognized in bankruptcy; there is no basis to ignore them. For example, in *AM-Haul Carting, Inc.* v. *Contractors Cas. & Sur. Co.*, 33 F. Supp. 2d 235, 241-43 (S.D.N.Y. 1998), the Court found that the debtor defaulted on its obligations in the wake of its May 1997 bankruptcy, and that the automatic stay provisions of the Code neither prohibited nor nullified that default and the triggering of the surety's obligations. *See also Official Comm. of Unsecured Creditors* v. *Manville Forest Prods. Corp.* (*In re Manville Forest Prods. Corp.*), 60 B.R. 403, 404 (S.D.N.Y. 1986) (where debtor defaulted on payments of principal and interest while in chapter 11, cure required payment of interest on the missed payments); *In re Rachels Indus.*, 109 B.R. at 811-12 (noting that debtor must cure both prepetition and post-petition defaults to assume an executory contract under § 365). The automatic stay of section 362 of the Bankruptcy Code merely prevents creditors from immediately enforcing the consequences of a pre or post-petition default; it does not insulate Grace from the occurrence of a default in the first instance.

**Enumerated *Ipso facto* Defenses Do Not Apply**

55.     *Second*, while Congress has enumerated specific instances, in specific types of contracts, where so-called *ipso facto* clauses are unenforceable, none of those provisions apply here. Every *ipso facto* reference codified in the Bankruptcy Code operates to prevent the forfeiture, modification, or termination of the debtor's (a) interest in property or (b) rights in an *executory* contract. There is no property interest being forfeited, modified, or terminated here, and the Credit Agreements are not executory contracts.

56.     For example, section 365(e) provides in pertinent part that an executory contract and any right or obligation under such contract may not be terminated or modified (i) at

any time after the commencement of the case (ii) solely because of a provision that is

conditioned on the insolvency or financial condition of the debtor at any time before the closing

of the case or on the commencement of a case under title 11.[28]  As this Court recognized at the

hearing on June 22, 2009, section 365(e) does not apply.  (Hearing Tr. 117:6, June 22, 2009

[Dkt. 22294] ("I don't think 365 applies.").)  Section 365(e)(2)(B) specifically exempts contracts

to make a loan from the prohibition on *ipso facto* clauses.  Therefore, not only does the

Bankruptcy Code fail to prohibit such clauses in loan agreements, it explicitly allows them.  As a

result, courts recognize that the *ipso facto* defense of section 365(e) does *not* prevent automatic

acceleration of loan maturity upon the filing of a bankruptcy petition.  *See Mims* v. *Fidelity

Funding, Inc.*, 307 B.R. 849, 858 (N.D. Tex. 2002) ("Thus, it is clear that the Bankruptcy Code's

invalidation of *ipso facto* clauses does not apply in this situation involving a contract to make a

loan for the benefit of the debtor.  Accordingly, the Court reverses the Bankruptcy Court's

holding that the Loan was not accelerated.  The Loan's maturity date was accelerated upon [the]

bankruptcy filing on the Petition Date.").

       57.     Similarly, the other provisions of the Bankruptcy Code that refer to

prohibited *ipso facto* clauses are inapplicable here.  Section 363(l) of the Bankruptcy Code

provides that the trustee may use, sell, or lease property notwithstanding any provision in a

contract, a lease or applicable law (i) conditioned on the commencement of a case that (ii) may

effect a "*forfeiture, modification, or termination* of the debtor's interest in such property."  11

U.S.C. § 363(l) (emphasis supplied).  The payment of default interest has nothing to do with

---

[28]     As noted in the legislative history of section 365(e) of the Bankruptcy Code, Congress was particularly
concerned with the fact that the mere filing of a bankruptcy could force a debtor to forfeit its rights under a
valuable executory contract.  *See* H.R. Rep. No. 95-595 at 348 (1977), attached as Ex. 24.  Here, no right of
Grace is being forfeited, modified, or terminated.

Grace's right to use, sell, or lease its property nor does it effect a forfeiture, modification, or termination of Grace's interests in property or its contractual rights.

58.    Section 541(c) is similarly inapplicable.  Section 541(c) defines property of the estate to include any interest of the debtor in property notwithstanding any provision in an agreement (i) conditioned on the commencement of a case and (ii) that effects "a forfeiture, modification, or termination of the debtor's interest in property."  The Bank Lenders do not seek to take away any property interest of Grace or assert that such property is not included in its estate.

59.    Finding support nowhere else in the Bankruptcy Code, Grace's counsel, during the June 22 hearing, turned to the reinstatement provisions of section 1124(2) of the Bankruptcy Code.  (Hearing Tr. 120-22, June 22, 2009 [Dkt. No. 22294].)  As an initial matter, those provisions are irrelevant here because the loans in question matured over five years ago and thus cannot be reinstated.  *See In re Ace-Texas, Inc.*, 217 B.R. 719, 726 (Bankr. D. Del. 1998) ("[I]t makes no sense to reinstate the maturity of a claim that has already matured.").  In any event, section 1124(2) does not support (either explicitly or implicitly) Grace's attempt to ignore the contractual default-rate interest.

60.    First, Grace's counsel made much of the fact that a debtor need not cure certain types of defaults pursuant to section 1124(2) in order to reinstate a claim.  (Hearing Tr. 121-22, June 22, 2009 [Dkt. No. 22294].)  However, it should come as no surprise that a debtor need not cure historical insolvency, a bankruptcy filing, or the appointment of a trustee, as these defaults are all impossible to cure (*e.g.* a debtor cannot turn back time and undo its bankruptcy filing).  Further, as indicated above, nothing in section 1124(2) states that a contractual provision in a loan agreement may not accelerate the claim.  Not only would such a reading be wholly

inconsistent with section 365(e)(2), but section 1124(2) presumes that an acceleration has occurred by explicitly allowing a debtor to de-accelerate by reinstating the maturity of the claim as it existed before such default.  *See* 11 U.S.C. § 1124(2)(B).

61.    Second, while section 1124(2) exempts from the cure requirement *ipso facto* defaults of the kind specified in or otherwise exempted by section 365(b)(2), cure amounts payable under section 1124(2) (to reinstate accelerated debt) or section 365 (to assume an executory contract) must *always* include past due amounts of principal, interest, or rent, as applicable.  *See, e.g.*, *In re Route One West Windsor Ltd. P'ship*, 225 B.R. 76, 85 (Bkrtcy.D.N.J.,1998) (no question that payment of missed interest and principal payments  is required to reinstate debt); *In re Joshua Slocum, Ltd.*, 103 B.R. 601, 604 (Bankr. E.D. Pa. 1989) (no dispute that rent payments in arrears post-petition were to be paid as part of the cure amount).  Grace cannot have it both ways.  A payment default is either *ipso facto* and not subject to the cure requirement, or not *ipso facto* and thus not subject to the cure requirement.  Because payment defaults are not exempt from cure under sections 1124 or 365, payment defaults are not excusable.

62.    Third, section 1124(2) concerns only the "de-acceleration and reinstatement of the original maturity date of the loan *upon curing of a default*.  [It] say[s] nothing about eliminating otherwise enforceable, accrued default interest which would have to be paid as part of the default cure."  *See Hepner* v. *PWP Golden Eagle Tree, LLC (In re K&J Props., Inc.)*, 338 B.R. 450, 461 (Bankr. D. Colo. 2005) (emphasis supplied); *see also In re 139-141 Owners Corp.*, 313 B.R. 364, 368 (Bankr. S.D.N.Y. 2004) (finding no statutory basis in section 1124(2) for judicial nullification of a contract right to default rate interest, and *holding that denial of a creditor's contractual right to interest at a default rate does alter the creditor's*

*contractual rights within the meaning of section 1124(2)(D)*) (emphasis supplied).  Simply put, no aspect of section 1124(2) excuses a debtor from the failure to make post-petition payments of principal or interest.

63.      *Finally*, Grace's reading of section 1124 is incompatible with section 1123.  On this point, Grace's counsel, at the June 22 hearing, argued that the Plan "cures the default to the extent that there was non-payment of principal and interest."  (Hearing Tr. 120:23-25, June 22, 2009 [Dkt. No. 22294].)  Although Grace may claim to have attempted to cure these defaults, they did so improperly.  In 1994 Congress added section 1123(d) to the Bankruptcy Code, which states that "if it is proposed in a plan to cure a default the amount necessary to cure the default *shall be determined in accordance with the underlying agreement* and applicable nonbankruptcy law."  *See In re K&J Props., Inc.*, 338 B.R. at 461 ("The 1994 amendments to section 1123 appear specifically to address this matter, requiring ' . . . the amount necessary to cure the default, shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law.'  *Section 1123(a)(5)(G) and section 1124(2) provide no basis to nullify the post-petition default interest . . . to the extent it is otherwise allowable under [the] loan documents and applicable nonbankruptcy law.*") (emphasis supplied).  The underlying agreement, which the Bank Lenders seek to enforce, unequivocally provides for a default rate of interest.  Section 1123 thus requires that any "cure payment" reflect this default rate of interest.

**No Unenumerated *Ipso Facto* Defense Exists**

64.      Unable to identify a statutory *ipso facto* provision that is on point, Grace goes outside of the Bankruptcy Code in search of a broad "penumbra-like" *ipso facto* defense to the enforcement of any contractual right triggered either by the bankruptcy filing or by the debtor's failure to make payments during the pendency of its bankruptcy case.  Specifically, Grace contends that a provision that triggers the default rate of interest upon a missed payment

28

constitutes a prohibited *ipso facto* clause.  (Objection at 16-17.)  This argument ignores the very definition of the type of clause from which Congress sought to protect debtors—a clause that effectuated a forfeiture, modification, or termination of a contract right *based solely on a bankruptcy filing*.  *See* H.R. Rep. No. 95-595 at 348 (1977) ("These clauses . . . *automatically terminate* the contract or lease, in the event of bankruptcy.") (emphasis supplied).

65.     Grace cites to two cases in support of its impermissible attempt to broaden the definition of a prohibited *ipso facto* clause—*In re NextWave Personal Commc'ns, Inc.*, 244 B.R. 253, 276 (Bankr. S.D.N.Y. 2000) and *EBC I, Inc.* v. *America Online* (*In re EBC I, Inc.*), Inc., 356 B.R. 631 (Bankr. D. Del. 2006).[29]  Both cases are inapposite as each involves a purported *termination* of non-loan executory contracts constituting a forfeiture of a valuable asset of the debtors' estates—the very consequence that Congress intended to prevent in rendering such "*ipso facto*" clauses unenforceable pursuant to the aforementioned provisions of the Bankruptcy Code.  We could find *no case* that stands for the proposition that a debtor is *excused* from the obligation to pay default interest where the default is the failure to pay the interest itself.[30]

66.     Grace relies on *NextWave* for its statement that "[i]t is senseless to speak of a default when, as a matter of bankruptcy law, the debtors had neither the authority nor the ability to make such payments absent notice and court approval."  *See NextWave*, 244 B.R. at 276.  This pronouncement simply is not good law.  The *NextWave* bankruptcy court did not cite to a single authority (in the statute or case law) in support of this conclusion.  Moreover, the

---

[29]    Hearing Tr. 119, June 22, 2009 [Dkt. No. 22294].

[30]    There are many cases in which default interest was awarded, and based on the facts it appears that the only contractual basis for such interest was either maturity of the loans (by acceleration or natural maturity) or post-petition payment defaults.  This factual circumstance was not cited as a basis for these rulings because the debtors in these cases did not raise any type of *ipso facto* defense.  A compendium of such cases will be presented to the Court and the Plan Proponents.

decision was reversed by the Second Circuit on a writ of mandamus due to lack of subject-matter jurisdiction. *See In re FCC*, 217 F.3d 125 (2d Cir. 2000).[31]

67.     In any event, even if it had not been reversed on other grounds, *NextWave* did not hold and does not support the proposition that post-petition defaults need not be cured: to the contrary, in *NextWave* the FCC purported to terminate NextWave's licenses *despite* the fact that the "economic consequence of [delayed payment to the FCC] will be fully cured by payment in full of all applicable interest, *penalties and late fees* upon confirmation under the debtor's modified Plan." *See NextWave*, 244 B.R. at 270 (emphasis supplied).

68.     In contrast to *NextWave*, *In re Chicago, Milwaukee, St. Paul & Pac. R.R.*, 791 F.2d 524 (7th Cir. 1986), involved the exact question at issue here:  whether certain debenture holders should receive principal plus interest on their bonds where the indenture trustee declared a default after the debtor filed its petition. *Id.* at 525-26.  In *Chicago*, the debtor objected to the debenture holders' claims for principal plus interest on principal during the

---

[31]     Apparently, because the case caption before the Second Circuit differs from the bankruptcy court case, the reversal does not register in Westlaw subsequent history.  Following the Second Circuit's reversal, NextWave filed a petition with the FCC seeking reconsideration of the license cancellation, which the FCC denied. *Auction of C and F Block Broadband PCS Licenses, Order on Reconsideration,* 15 F.C.C.R. 17500 (2000). NextWave appealed directly to the Court of Appeals for the D.C. Circuit, with the U.S. Supreme Court eventually hearing the case.  Both the D.C. Circuit and U.S. Supreme Court acknowledge the Second Circuit's reversal of the bankruptcy court decision reported at 244 B.R. 253.  *See FCC* v. *NextWave Personal Commc'ns, Inc.*, 537 U.S. 293, 299 (2003) ("NextWave sought emergency relief in the Bankruptcy Court, which declared the FCC's cancellation of respondent's licenses 'null and void' as a violation of various provisions of the Bankruptcy Code.  *In re NextWave Personal Commc'ns, Inc.*, 244 B.R. 253, 257-58 (Bankr. S.D.N.Y. 2000). Once again, the Court of Appeals for the Second Circuit reversed.  *In re FCC,* 217 F.3d 125 (2000).") (citations in original); *NextWave Personal Commc'ns, Inc.* v. *FCC*, 254 F.3d 130 (D.C. Cir. 2001) ("The dispute then returned to the bankruptcy court, which declared the Commission's cancellation of NextWave's licenses 'null and void' as a violation of various provisions of the Bankruptcy Code, including the automatic stay provisions of section 362(a).  *In re NextWave Personal Commc'ns, Inc.,* 244 B.R. 253, 257-58, 267-68 (Bankr. S.D.N.Y. 2000) . . . . Again, the Second Circuit reversed.  *In re FCC,* 217 F.3d 125 (2000).") (citations in original).

Despite the extensive history and opportunity to adopt the bankruptcy court's reasoning, no subsequent court ever adopted the bankruptcy court's view that post-petition non-payment defaults are not cognizable.  As indicated above, the FCC denied the petition for reconsideration.  The D.C. Circuit ruled in favor of NextWave on the narrow ground that the FCC's action violated section 525(a) of the Bankruptcy Code, which does not apply in this case as the Bank Lenders are not government actors. *NextWave,* 254 F.3d at 156.  The Supreme Court's opinion was likewise limited to section 525.  *See NextWave,* 537 U.S. at 295.

default years, arguing that "repayment of the principal should not be accelerated, that no interest

is due for the years in which there was no available net income, and that interest on interest

should not be allowed." *Id.* at 526. The Seventh Circuit upheld the lower court's decision to

permit acceleration of the principal and interest in accordance with the terms of the indentures,

based on the occurrence of the default declaration and payment defaults after commencement of

the bankruptcy case. *Id.*

   69. Significantly, the Seventh Circuit flatly rejected arguments identical to

those previously advanced here; the Court summarily dismissed the debtor's argument that it

should be excused from the consequences of its default because it could not make payments in

bankruptcy and rejected the debtor's "appeal to equity" on those grounds:

> It is not a good answer that, once bankruptcy was declared, a
> default under clause (a) [a payment default] was impossible
> because the debtor could not have repaid the principal immediately
> even if it had wanted to do so. Defaults are often involuntary.

*Id.* at 529. The Third Circuit agrees with *Chicago* that the mere fact that "'a [bankruptcy]

proceeding is equitable does not give the judge a free-floating discretion to redistribute rights . . .

.'" *United States* v. *Pepperman*, 976 F.2d 123, 131 (3d Cir. 1992) (quoting *Chicago*, 791 F.2d at

528).

   70. That *Chicago* was decided under the old Bankruptcy Act, which was

admittedly tolerant of *ipso facto* provisions, is particularly instructive here. In enacting the new

Bankruptcy Code, Congress had the opportunity to render post-petition payment defaults

unrecognizable, and chose not to do so. Instead, numerous Code provisions expressly

acknowledge that defaults can and do occur, and rather than excuse debtors from complying with

their non-bankruptcy law obligations, the Code often compels debtors' performance in exchange

for receiving certain benefits. *See, e.g.*, 11 U.S.C. §§ 365, 1123, 1124.

71.    In the absence of any evidence in the Bankruptcy Code or the legislative history to extend the notion of an "*ipso facto*" clause beyond one which effects a forfeiture, modification, or termination of rights based solely on a bankruptcy filing, adopting Grace's all-encompassing definition of an *ipso facto* clause is wholly impermissible.  *See Gen. Elec. Capital Corp.* v. *Future Media Prods. Inc.*, 547 F.3d 956, 960 (9th Cir. 2008) ("[T]he default rate should be enforced, subject only to the substantive law governing the loan agreement, unless a provision of the Bankruptcy Code provides otherwise.").

**There Is No Compelling Basis for an "Equitable Exception" to the Statute**

72.    Courts enforce creditors' rights in accordance with their contracts because the Supreme Court mandates that they must.  *See Butner* v. *United States*, 440 U.S. 48, 55 (1979).  Absent a compelling federal interest, there is no ability of the court to excuse Grace's performance of its state law contract obligations.  The Supreme Court held that:

> Property interests are created and defined by state law.  *Unless some federal interest requires a different result*, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding. Uniform treatment of property interests by both state and federal courts within a State serves to reduce uncertainty, to discourage forum shopping, and to prevent a party from receiving "a windfall merely by reason of the happenstance of bankruptcy."

*Id.* (quoting *Lewis* v. *Mfrs. Nat'l Bank*, 364 U.S. 603, 609 (1961)) (emphasis supplied).  *See also First Fidelity Bank* v. *Jason Realty, L.P. (In re Jason Realty),* 59 F.3d 423, 427 (3d. Cir. 1995) (citing *Butner* and finding that goal must be to ensure that creditor "is afforded in federal bankruptcy court the same protection [it] would have under state law if no bankruptcy had ensued.").

73.    There is no compelling federal interest that would permit the Court to allow Grace to read the default interest provisions out of the Credit Agreements.  Congress has

already decided when a default should be excused, and this circumstance is not one of them.

What's more, echoed for decades in case after case, courts agree that no federal purpose is served

by affording a windfall to shareholders at the expense of creditors. "The only good reason for

refusing to give a creditor in reorganization all that he bargained for when he extended credit is

to help other creditors." *Chicago*, 791 F.2d at 527-28; *see also, e.g.*, *Ruskin* v. *Griffiths*, 269

F.2d 827, 832 (2d Cir. 1959) ("No benefit will be given to the debenture holders at the expense

of any other class of creditors. The burden of this payment will fall entirely on the interest of the

stockholders. They cannot complain that they are treated inequitably when their interest is cut

down by the payment of a sum to which the debenture holders are clearly entitled by the express

provisions of the trust indenture.") (citation omitted). No possible federal interest is served by

allowing shareholders to use the Bank Lenders' money for more than eight years at a rate lower

than the contract provides so that Grace's shareholders can get a greater recovery for themselves.

74.     Any ruling that would extinguish the Bank Lenders' state property rights,

governed by New York law, in the wake of these uncontested defaults would violate the

Supreme Court's express mandate in *Butner*.

**At a Minimum Bank Lenders Are Entitled to Default Interest After May 2001 and May 2003**

75.     Finally, regardless of whether (i) the bankruptcy filing itself resulted in

legal acceleration of the loans or caused acceleration under the terms of the Credit Agreements,

or (ii) the failure to pay interest when due caused such acceleration, the loans matured by their

own terms in May 2001 (1999 Credit Agreement) and May 2003 (1998 Credit Agreement). At

that point, section 10 of the Credit Agreements (Events of Default) is unnecessary and

inapplicable. Once the loans are due, section 5.1(c) of the Credit Agreements provides the

interest rate for the loans without the need to resort to Section 10 (Events of Default). That

interest rate is the Alternate Base Rate plus 2%—the so-called "default rate." Such interest rate

is not a consequence of a default; instead, it is simply the rate that applies if the principal is still

outstanding after natural maturity. There can be no *ipso facto* defense to a change in the rate of

interest under the Credit Agreements that does not even result from a default, but rather, simply

flows from the natural maturity of the loans themselves.

**B.     Congress and Third Circuit Law Reject Grace's Argument
        that a Claim is Unimpaired Where a Plan Only Pays
        the Allowed Prepetition Amount of the Claim.**

76.     Grace has previously argued (including at the hearing before this Court on

June 22, 2009), that even if defaults did occur, the Bank Lenders nevertheless still are not

"impaired" for purposes of voting on a plan if the plan pays a creditor the allowed prepetition

amount of its claim in full, but excluding payment of any post-petition interest.[32] Grace's

position at the June 22, 2009 hearing was that a claim is unimpaired for purposes of section 1124

even where the plan proposes to pay a creditor no amount of post-petition interest so long as

Grace pays the "allowed" amount of the claim in accordance with section 502 of the Bankruptcy

Code—on the infirm legal theory that section 502 of the Bankruptcy Code "trumps" or

effectively adversely alters a creditor's state law rights embodied in its contract.[33] There is no

doubt that Grace's position is wrong: as detailed in the legislative history, Congress expressly

*rejected* this argument through its amendment to section 1124.

77.     Grace further maintains, in the alternative, that even if a creditor must

receive *some* interest on its allowed claim to qualify as "unimpaired," for purposes of

impairment, the law does not require that such interest be paid at the default contract rate. In so

---

[32]   Debtors' Trial Br. in Support of Obj. to the Unsecured Claims Asserted Under the Debtors' Credit Agreement
       dated as of May 14, 1998 and May 5, 1999, dated Sept. 5, 2008, at ¶ 48 [Dkt No. 19476], attached as Ex. 25.

[33]   *See* Hearing Tr. 110-11, June 22, 2009 [Dkt. No. 22294].

arguing, Grace ignores the fundamental requirement that to be "unimpaired" under section 1124(1), a creditor's legal, contractual, and equitable rights must not be altered.  For impairment purposes, a debtor does not have license to choose a rate of post-petition interest different from the loan documents.  Grace's Plan alters the Bank Lenders' contractual rights because it proposes to pay them an interest rate other than that provided in their contracts.  The Plan clearly alters the Bank Lenders' contractual rights.  The Bank Lenders' claims are impaired.

1.      **Repeal of New Valley.**

78.     The Plan Proponents' approach to impairment resurrects the discredited analysis of *In re New Valley Corp.*, 168 B.R. 73 (Bankr. D.N.J. 1994), a decision that Congress repudiated in its 1994 repeal of section 1124(3).  The repealed provision specified that a creditor receiving full payment of an "allowed claim" was not impaired.[34]  In *New Valley*, the debtor objected to certain lenders' claims and sought declaratory judgment rulings that (a) payment under the plan of the full amount of the lenders' allowed prepetition claims rendered such claims unimpaired, and (b) the debtor had no obligation to pay post-petition interest on unimpaired claims.  168 B.R. at 74.  The conclusion reached by the *New Valley* court rested on the interplay of sections 502(b)(2), 1129(a)(7)(A), and the now-repealed section 1124(3).  While acknowledging the reorganization-solvent debtor exception to non-payment of post-petition interest, the bankruptcy court in *New Valley* held that "§ 1124(3) allowed a solvent debtor to pay the 'allowed' claims of unsecured creditors in full, *excluding post-petition interest, without risking impairment.*"  *PPIE*, 324 F.3d at 205 (citing *New Valley*, 168 B.R. at 77-80) (emphasis supplied).

---

[34]     The language of repealed section 1124(3) provided as follows:  "Except as provided in section 1123(a)(4) of this title, a class of claims or interests is impaired under a plan unless, with respect to each claim or interest of such class, the plan -(3) provides that, on the effective date of the plan, the holder of such claim or interest receives, on account of such claim or interest, cash equal to -(A) with respect to a claim, the allowed amount of such claim . . . ."  11 U.S.C. § 1124(3) (repealed).

79.    The *New Valley* decision not only denied unsecured creditors the post-petition interest to which they were entitled, but also deprived them of the opportunity to challenge the fairness of their treatment under the plan at confirmation.  To prevent a repeat of the anomalous result reached in *New Valley*, Congress repealed section 1124(3) to make it clear that in a case where the junior equity class is to retain any interest, the failure to pay a creditor a separate amount of post-petition interest in addition to the "allowed" prepetition amount of its claim constitutes impairment as a matter of law.  *See PPIE*, 324 F.3d at 206.  As reflected in the unambiguous legislative history, Congress's motivation in deleting section 1124(3) was to overturn the *New Valley* decision and "preclude this unfair result in the future."  *Id.* at 206 (citing H.R. Rep. No. 103-835, at 47-48 (1994)).

80.    Subsequently, the Third Circuit dispelled any doubt as to Congress's intent in eliminating section 1124(3) in *PPIE* by upholding the lower bankruptcy court's conclusion that in repealing section 1124(3):

> [Congress] intended that to be unimpaired, the claim must receive
> post-petition interest.

*PPIE*, 324 F.3d at 206 (quoting *In re PPI Enters. (U.S.), Inc.*, 228 B.R. 339, 352 (Bankr. D. Del. 1998)) (emphasis supplied).  A cash payment equal to the allowed prepetition amount of the claim, but without post-petition interest, "could not qualify for nonimpairment under section 1124(1) because the failure to pay post-petition interest does not leave unaltered the contractual or legal rights of the claim."  *Id.* at 207 (quoting *PPIE*, 228 B.R. at 352).

## 2.    Impairment Is Determined On a Creditor-by-Creditor Basis.

81.    Grace maintains that even if *PPIE* compels the payment of some post-petition interest, it does not for impairment purposes require payment at the default rate.  Of course, *PPIE* did not specify that "default rate" interest be paid in *every* case to satisfy section

1124(1).  Nor did *PPIE* in any way preclude the payment of default rate interest.  The takeaway

from *PPIE* and the legislative history of section 1124 is that the impairment determination must

be made on a *creditor-by-creditor* basis, depending on the relevant legal, contractual, and

equitable rights at stake.  The "presumption of impairment is overcome only if the plan 'leaves

unaltered the [creditor's] legal, equitable, and contractual rights.'"  *PPIE*, 324 F.3d at 203

(quoting section 1124(1)).  "When the agreement requires a higher post-default rate of interest,

this means the higher rate must be paid.  Any other treatment would alter the creditor's rights."

*In re Ace-Texas, Inc.*, 217 B.R. 719, 727 (Bankr. D. Del. 1998) (internal quotation omitted).

       82.     Where the contract provides for default interest (as is the case here), a plan

that does not provide for the payment of such default interest undoubtedly alters the claimant's

contractual rights for purposes of section 1124(1).  If Grace must make a separate post-petition

interest payment, it must be paid under *PPIE* at the contract rate to render the Bank Lenders'

claims unimpaired, and as such, Grace's attempt to pay such interest at a rate lower than that

provided for in the loan documents alters the Bank Lenders' contractual rights.  It's that simple.

Classifying the Bank Lenders as unimpaired even where the Plan proposes payment at an interest

rate other than the applicable contract violates the unambiguous terms of section 1124(1).

    **3.**      **Section 502(b)(2) Concerns The Allowed Amount of a Claim;**
             **It Does Not Limit or Determine The Legal, Equitable and**
             **Contractual Entitlement to Post-Petition Interest.**

       83.     Grace also argues, purportedly relying on *PPIE*, that section 502(b)(2),

and not the Plan, is the source of impairment of the Bank Lenders' legal and contractual rights,

and therefore, that its classification scheme complies with *PPIE*.  Grace's *PPIE* argument is

meritless.

       84.    *PPIE* dealt with whether a plan improperly classified a landlord's allowed

claim as "unimpaired" where the plan proposed to pay the full amount of the "allowed" claim as

reduced by section 502(b)(6) plus post-petition interest on his allowed claim. The creditor

contended that his claim was impaired by operation of section 502(b)(6) and the plan itself.

*PPIE*, 324 F.3d at 203-04. The Third Circuit rejected the creditor's "impairment by statute

argument," but at the same time held that a claim must receive post-petition interest *on* the

allowed prepetition claim, as capped under section 502(b)(6), *to be unimpaired*. This clearly

establishes that for purposes of *impairment*, the entitlement to post-petition interest on the

allowed prepetition claim is something *separate* and *in addition* to the allowed prepetition claim.

85. Grace's argument that section 502(b)(2), and not the Plan, is the source of

impairment of the Bank Lenders' legal and contractual rights is untenable. Besides flying in the

face of Congress' amendment to section 1124 repealing section 1124(3)—which thereby

mandates that creditors receive a post-petition interest payment—Grace's 502(b)(2) argument

fails because section 502(b)(2), like section 502(b)(6), only determines the "allowed amount" of

a creditor's prepetition claim. It has nothing to do with a creditor's *separate legal and*

*contractual entitlement to a post-petition interest payment on the allowed amount of such*

*creditor's claim* in the circumstances specified in section 1129 of the Bankruptcy Code, as

discussed below. By this distinction, the Third Circuit on the one hand concluded that full

payment of the allowed prepetition claim as limited by section 502(b)(6) would initially render

the claim unimpaired, but held, on the other hand, that a creditor must receive a post-petition

interest payment on the allowed amount of the claim for such claim to be unimpaired. That is

why the *PPIE* plan provided for interest on the allowed prepetition claim of the landlord as

limited by section 502(b)(6) to render such claim unimpaired.[35]

---

[35] The *PPIE* plan paid the complaining creditor post-petition interest in addition to the allowed amount of such
creditor's claim as reduced by section 502(b)(6). *See PPIE,* 228 B.R. at 343.

86.    Section 502(b)(6), as *PPIE* explained, is just the first step: it only determines the "allowed amount" of a landlord's prepetition claim.  *See PPIE*, 324 F.3d at 205. That provision, though, does not affect the landlord's right to receive a post-petition interest payment on the "allowed amount" of the landlord's prepetition claim because the entitlement to a post-petition interest payment—the second step—is separate and in addition to the allowed amount of its prepetition claim.  *Id.* at 206.  Questions regarding whether an impaired creditor is entitled to post-petition interest and at what rate are answered in the first instance by the applicable contracts (which in this case are the Credit Agreements), other sections of the Bankruptcy Code, like section 1129, and decades of caselaw.  A creditor not receiving all that the creditor's contract provides is undeniably impaired.[36]

87.    Therefore, while post-petition interest may be disallowed under section 502(b)(2) as part of the "allowed" prepetition amount of such creditor's claim, section 502(b)(2) does not eliminate, and has nothing to do with, a creditor's entitlement to post-petition interest. As made clear by Congress in the legislative history and recognized in *PPIE*, the right to post-petition interest is *separate* and *in addition* to the allowed amount of a creditor's prepetition claim.  *See* 140 Cong. Rec. H10,768 (daily ed. Oct. 4, 1994), attached as Ex. 26.

88.    Because Class 9 is impaired and has voted against the Plan, Grace and its co-Plan Proponents must satisfy the cramdown standards of section 1129.

---

[36]    Grace's own Plan makes it clear that a creditor's entitlement to post-petition interest is in addition to the allowed amount of a creditor's claim.  "Each Holder of an Allowed General Unsecured Claims shall be paid the Allowed Amount of its Allowed General Unsecured claim *with post-petition interest* . . . *Post-petition interest on* Allowed General Unsecured Claims shall be determined as follows:  . . ."  *See* Plan at §3.1.9(b). (emphasis supplied).

## II.
## BECAUSE GRACE IS SOLVENT, THE ABSOLUTE PRIORITY RULE COMPELS PAYMENT OF POST-PETITION INTEREST

89.     Class 9 has voted to reject the Plan.[37]  Accordingly, the Plan Proponents must satisfy the requirements of section 1129(b) of the Bankruptcy Code, including the absolute priority rule, which mandates that "senior classes receive full compensation for their claims before other [junior] classes can participate."  *In re WebSci Techs., Inc.*, 234 Fed. Appx. 26, 30 (3d Cir. 2007); *In re Insilco Techs., Inc.*, 480 F.3d 212, 218 n.10 (3d Cir. 2007).

90.     To deflect attention from the substantive requirements of section 1129(b) and decades of relevant case law, Grace has argued that "payment in full" does not require making a payment in respect of post-petition interest in accordance with the Credit Agreements unless Grace is balance-sheet solvent—which Grace maintains is impossible to establish in light of the asbestos settlement.  (Objection § 14.)  Grace's claim of impossibility is senseless.  First, Grace's own asbestos personal injury liability estimates—which will be introduced into evidence by the Creditors' Committee and the Bank Lender Group at confirmation—demonstrate that Grace is pre-confirmation balance-sheet solvent.  Second, the Creditors' Committee and Bank Lender Group will demonstrate that Grace is solvent based on its market capitalization, which is consistent with Grace's own valuation and Third Circuit precedent.  Finally, because solvency provides the only lawful basis for shareholders to retain value under section 1129(b) over the objection of dissenting creditors as a matter of law, by permitting shareholders to retain more than $825 million in value, the Plan Proponents unequivocally concede Grace's solvency, as they must.[38]

---

[37]     Martin Declaration, at ¶ 29.

[38]     *See supra* note 6.

A.      **Grace is Balance-Sheet Solvent.**

91.     There is no basis in the law for Grace's apparent belief that solvency for purposes of determining the Bank Lenders' entitlement to post-petition interest involves a different analysis than does valuation for all other plan confirmation purposes.  Grace has maintained since the filing of its Objection that due to the settlement of asbestos claims, there will be no adjudication of solvency in these cases, no evidence of solvency presented at plan confirmation, and thus no basis to conclude that Bank Lenders may be entitled to post-petition interest in accordance with their contracts.  (Objection at §§ 3, 45.)

92.     Grace's contention is wrong.  The Plan Proponents' presentation of evidence (in particular the information contained in Exhibit 12 to the Plan) concerning (i) the value of Grace's assets as set forth in the Plan and Disclosure Statement over the sum of both (ii) Grace's non-asbestos liabilities as also set forth in the Plan and Disclosure Statement and (iii) Grace's own estimate of its asbestos personal injury liabilities (median of $468 million) as presented in its direct case during the estimation hearing, will more than satisfy any burden on the part of the Bank Lenders and the Creditors' Committee to show balance-sheet solvency. There should be no factual dispute on this point since these amounts and estimates are all Grace's own.

B.      **Grace's Market Capitalization Establishes Its Solvency.**

93.     If Grace's own estimation of its assets and liabilities does not establish its "solvency," then Grace's substantial market capitalization conclusively puts to rest the specious argument that Grace might not be solvent.  In this Circuit, courts rely on a "going concern" or "market price" valuation to establish the value of a company with continuing day-to-day operations.  *In re PWS Holding Corp.*, 228 F.3d 224, 233 (3d Cir. 2000); *Moody* v. *Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1067 (3d Cir. 1992) (citing cases).  In *VFB LLC* v. *Campbell*

41

*Soup Co.*, 482 F.3d 624 (3d Cir. 2007), the Third Circuit held that a company's market

capitalization provides a reliable measure of its value, since "it reflects all the information that is

publicly available about a company at the relevant time of valuation."  *Id.* at 631 (citing *Basic

Inc.* v. *Levinson*, 485 U.S. 224, 243 (1988) (plurality opinion)).  It concluded that the market's

valuation of the company at issue as solvent was "strong evidence" of its solvency.  *Id.* at 633.

Thus, "[a]bsent some reason to distrust it, the market price is 'a more reliable measure of the

stock's value than the subjective estimates of one or two expert witnesses.'"  *Id.* (quoting *In re

Prince*, 85 F.3d 314, 320 (7th Cir. 1996)); *see also Iridium* v. *Motorola, Inc. (In re Iridium

Operating LLC)*, 373 B.R. 283, 346-47 (Bankr. S.D.N.Y. 2007).  At the July 13, 2009 market

price of $11.52 per share, Grace has a market capitalization of approximately $830 million,

meaning that the public market values Grace's equity at approximately $830 million.[39]

94.    According to the Equity Committee, a co-proponent of Grace's Plan, this

$825 million market capitalization ends the solvency debate.  Remarking at a time when Grace's

market capitalization was closer to $1.8 billion, the Equity Committee (a Plan Proponent) wrote:

> Grace stock is publicly traded and highly liquid . . .  At the current
> market price of about $26  . . . the market capitalization of Grace's
> equity is more than $1.8 billion.  If there is any truth to market
> efficiency and the 'wisdom of the crowd'—and there assuredly
> is—there can be no question about Grace's solvency.[40]

95.    Furthermore, the market's current estimation of Grace's value reflected in

its stock price of $11.52 per share is perfectly consistent with Grace's own estimate in the

Disclosure Statement.  Remarkably, in the face of (i) Grace's current market capitalization of

more than $825 million, (ii) Grace's assertion in the Disclosure Statement that the reorganized

---

[39]   *See supra* note 6.

[40]   Off. Comm. of Equity Security Holders' Mem. in Support of Debtors' Mot. to Exclude Certain Expert Opinions
Relating to Current Future Asbestos Personal Injury Liability, dated Dec. 7, 2007, at 2 [Dkt. No. 17577] (citing
*VFB LLC*, 482 F.3d at 633), attached as Ex. 28.

stock will be worth between $430 million and $821 million, and (iii) these Third Circuit

precedents, the Plan Proponents challenge the reliability of Grace's own stock price as a basis for

establishing its solvency.

**C.     The Proposed Asbestos Settlement Concedes That Grace is Solvent.**

96.     Finally, if Grace is acting lawfully in giving its shareholders more than

$800 million of value, Grace has to be solvent (i.e., there must be surplus value after all non-

consenting creditors are paid in full).  (Objection ¶¶ 3, 14; Debtors' Resp. & Obj. at 18 (Adm.

No. 2).)

97.     As the Third Circuit explained in *Armstrong*, "[i]n its initial form, the

absolute priority rule required that 'creditors …be paid before the stockholders could retain

equity interests for any purpose whatsoever.'"  *Armstrong*, 432 F.3d at 512 (quoting *Bank of Am.

Nat'l Trust & Sav. Ass'n* v. *203 N. LaSalle St. P'ship*, 526 U.S. 434, 444 (1999).  The Third

Circuit further held that a plan is "fair and equitable" if:  (1) it pays the class's claims in full, or if

(2) it does not allow holders of any junior claims or interests to receive or retain any property

under the plan 'on account of' such claims or interests.  *Id.* (quoting 11 U.S.C.

§ 1129(b)(2)(B)(i)-(ii); and *LaSalle*, 526 U.S. at 441-42); *In re Insilco Techs., Inc.*, 480 F.3d 212,

218 n.10 (3d Cir. 2007) ("Even in the flexible world of Chapter 11 reorganizations, the absolute

priority rule, 11 U.S.C. § 1129(b)(2)(B), requires that equity holders receive nothing unless all

creditors are paid in full."); *see also In re Good, et al.*, No. 08-40955, 2009 WL 1024651, at *5-

6, *8  (Bankr. E.D. Tex. Apr. 13, 2009) (in a case where the shareholder "retain[ed] his equity

interest in the [d]ebtors under the plan" there was no dispute that the debtors were "solvent").

98.     Critically, "[i]mplicit in this [absolute priority] rule is that stockholders

cannot participate in a reorganization plan unless it is established that the debtor is solvent."  *In*

*re Resorts Int'l, Inc.*, 145 B.R. 412, 483 (D.N.J. 1990) (citing *In re Toy & Sports Warehouse,*

*Inc.*, 37 B.R. 141, 152 (Bankr. S.D.N.Y. 1984)).  The absolute priority rule's prohibition on

equity holders retaining value until non-consenting creditors receive full payment of all amounts

due under their contracts applies regardless of any balance-sheet solvency determination; that is,

regardless of "[w]hether a company is solvent or insolvent in either the equity or the bankruptcy

sense," because "'any arrangement of the parties by which the subordinate rights and interests of

the stockholders are attempted to be secured at the expense of the prior rights' of creditors

'comes with judicial denunciation.'"  *Consolidated Rock Prods.* v. *Du Bois*, 312 U.S. 510, 527

(1941) (quoting *Louisville Trust Co.* v. *Louisville, New Albany & Chicago Ry. Co.*, 174 U.S. 674,

684 (1899)).

**D.      In a Solvent Debtor Case, Unsecured Creditors Are Entitled to Payment of Post-Petition Interest.**

99.      With a solvent debtor, "full payment" includes post-petition interest at the

contract rate.  This comports with the purpose of the solvent debtor requirement for post-petition

interest:  the requirement protects one creditor group from receiving post-petition interest at the

expense of another creditor group; the requirement never "protects" shareholders from creditors

receiving post-petition interest.  Once equity holders receive a recovery, the inquiry into

solvency simply becomes an academic exercise, which of course shows the absurdity of Grace's

argument that unsecured creditors are only entitled to post-petition contractual interest in a

"solvent" debtor case and not a case where equity holders retain, by the Plan Proponents' own

calculation, between $430 million and $821 million in value without a solvency determination.

100.      The caselaw drives home this point.  *See Bruning* v. *United States*, 376

U.S. 358, 362 n.4 (1964) (quoting *Am. Iron & Steel Mfg. Co.* v. *Seaboard Air Line Ry.*, 233 U.S.

261, 266 (1911)):

> [I]n case funds are not sufficient to pay claims of equal dignity, the distribution is made only on the basis of the principal of the debt. But that rule did not prevent the running of interest during the receivership; and if, as a result of good fortune or good management, the estate proved sufficient to discharge the claims in full, interest as well as principal should be paid.

101.    Modern cases have reaffirmed this basic principle under the current Bankruptcy Code:

> The general rule "disallowing" the payment of unmatured interest out of the assets of the bankruptcy estate is a rule of administrative convenience and fairness to all creditors.  The rule makes it possible to calculate the amount of claims easily and assures that creditors at the bottom rungs of the priority ladder are not prejudiced by the delays inherent in liquidation and distribution of the estate.  But when concerns for administrative convenience and fairness are not present, postpetition interest will be "allowed.". . . Postpetition interest is also payable out of the assets of the bankruptcy estate—if the debtor ultimately proves to be solvent— before any sums are returned to the debtor.

*Hanna* v. *United States (In re Hanna)*, 872 F.2d 829, 830-31 (8th Cir. 1989); *see also Kielisch* v. *Educ. Credit Mgmt. (In re Kielisch)*, 258 F.3d 315, 322 (4th Cir. 2001) (same).

102.    Circuit courts have also reinforced this concept for decades:

> The only good reason for refusing to give a creditor in reorganization all that he bargained for when he extended credit is to help other creditors, the debtor's assets being insufficient to pay all creditors in full.  All of [the debtor's] creditors will be paid in full, even if the debenture holders are paid out at the highest valuation of their claim. *The only competing equities are those of [the debtor's] stockholders, and are weak . . . .*
>
> . . . .
>
> The fact that a proceeding is equitable does not give the judge a free-floating discretion to redistribute rights in accordance with his personal views of justice and fairness, however enlightened those views may be.  The function of equitable considerations in a bankruptcy proceeding is to guide the division of a pie that is too small to allow each creditor to get the slice for which he originally contracted. *Hence if the bankrupt is solvent the task for the*

> *bankruptcy court is simply to enforce creditors' rights according*
> *to the tenor of the contracts that created those rights.*

*In re Chicago, Milwaukee, St. Paul & Pac. R.R. Co.*, 791 F.2d 524, 527-28 (7th Cir. 1986)

(emphasis supplied) (citations omitted); *see also Ruskin* v. *Griffiths*, 269 F.2d 827, 832 (2d Cir.

1959) ("No benefit will be given to the debenture holders at the expense of any other class of

creditors.  The burden of this payment will fall entirely on the interest of the stockholders.  They

cannot complain that they are treated inequitably when their interest is cut down by the payment

of a sum to which the debenture holders are clearly entitled by the express provisions of the trust

indenture.") (citation omitted).

103.    A review of the Plan and Disclosure Statement makes clear that making a

payment of post-petition interest at the contract default rate to the Bank Lenders would not

reduce the payout to other creditors.  Rather, the value needed to pay the Bank Lenders can come

from value currently being retained by equity holders under the Plan, as it should, in compliance

with the absolute priority rule.  *See In re Southland Corp.*, 160 F.3d 1054, 1060 (5th Cir. 1998)

(holding that it was "especially significant" that no junior creditors would be harmed by the

award of default interest); *see also In re Good*, 2009 WL 1024651, at * 8 (creditor entitled to

payment at the contract default rate when it "would simply reduce the $85,000,000 in equity that

may be available to the [shareholder] at the conclusion of the plan").

**E.    Grace Cannot Circumvent the Absolute Priority**
**Rule Through the Proposed Asbestos Settlement.**

104.    The law in the Third Circuit is unequivocal:  under the absolute priority

rule, equity holders cannot retain *any* interest if an impaired dissenting class of senior creditors

does not receive full payment, including post-petition interest.  *See In re Armstrong World*

*Indus., Inc.*, 432 F.3d 507, 513 (3d Cir. 2005); 140 Cong. Rec. H10, Section 213 (daily ed. Oct 4,

1994), attached as Ex. 29 ("[I]n order for a plan to be fair and equitable, *unsecured and*

*undersecured* creditors' claims must be *paid in full, including postpetition interest*, before equity

holders may participate in any recovery.") (emphasis supplied), *cited in In re Dow Corning*

*Corp.*, 456 F.3d 668, 678 (6th Cir. 2006).  If Grace has no surplus value after paying all its

creditors in full (that is, if Grace is neither presumed nor determined to be solvent), but its

shareholders nonetheless will retain value, then that value retention can only result from

"gifting" from the asbestos claimants—an impermissible value transfer forbidden by *Armstrong*.

Said another way, solvency provides the only lawful basis for shareholders to retain value under

section 1129(b), and solvency requires paying post-petition interest at the contract default rate.

105.    While Grace sees in the Proposed Asbestos Settlement a substantive

justification for overlooking the absolute priority rule, a bankruptcy court cannot confirm a plan

that transfers value to an equity class over the objection of an impaired senior creditor class, even

in the context of a purported "settlement" of the case.  *Armstrong*, 432 F.3d at 514; *Motorola,*

*Inc.* v. *Off. Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 464 (2d

Cir. 2007); *United States* v. *AWECO, Inc. (In re AWECO, Inc.)*, 725 F.2d 293, 298 (5th Cir.

1984).  After *Armstrong*, it is beyond dispute in the Third Circuit that the absolute priority rule

bars equity holders from receiving anything, including under a settlement, if an impaired creditor

class objects.

106.    In *Armstrong*, the company, like Grace, filed a chapter 11 case to deal

with its significant contingent asbestos-related liability.  Three classes were at the core of the

*Armstrong* plan:  Class 6 claimants—consisting of unsecured creditors, including bank lenders,

that would receive a 59% recovery; Class 7 claimants—consisting of present and future asbestos-

related claimants, *pari passu* with Class 6, who agreed to receive a 20% recovery, and Class

47

12—consisting of shareholders, whose equity interest would be wiped out. *Id.* at 509. If Class 6

voted against the plan, then Class 7 asbestos claimants would receive warrants, which they

would automatically "waive" in favor of Class 12, the equity class. *Id.* The Third Circuit

reversed the lower court's confirmation of the *Armstrong* plan on the basis that this scheme

violated the absolute priority rule:

> The absolute priority rule, as codified, ensures that "the holder of
> any claim or interest that is junior to the claims of [an impaired
> dissenting] class will not receive or retain under the plan on
> account of such junior claim or interest any property. The plain
> language of the statute makes it clear that a plan cannot give
> property to junior claimants over the objection of a more senior
> class if that class is impaired."

*Armstrong*, 432 F.3d at 513 (alteration in original) (quoting 11 U.S.C. § 1129(b)(2)(B)(ii)).

107.    The Court of Appeals rejected the argument that the asbestos claimants

could do whatever they wanted with their plan distributions, observing that the absolute priority

rule "arose from the concern that because a debtor proposed its own reorganization plan, the plan

could be 'too good a deal' for that debtor's owners, *Armstrong*, 432 F.3d at 512 (citing *LaSalle*,

526 U.S. at 444), "encourag[ing] parties to impermissibly sidestep the carefully crafted strictures

of the Bankruptcy Code, and …undermin[ing] Congress's intention to give unsecured creditors

bargaining power in this context." *Armstrong*, 432 F.3d at 514-15.

108.    As did the company in *Armstrong*, Grace previously maintained that

existing equity holders will retain their ownership interests through "a concession by the asbestos

personal injury claimants" and that the value to be retained by equity holders exists solely on

account of the "delicately balanced" settlement between the asbestos claimants and current

equity holders, under which the asbestos claimants have agreed to give up a certain amount of

claimed value and "equity holders have agreed to accept a certain value." (Objection ¶¶ 3-4, 14.)

This arrangement is precisely what *Armstrong* forbids.  If anything, this case is more egregious

than *Armstrong* in its violation of the absolute priority rule:  instead of giving its shareholders

out-of-the money warrants, Grace proposes to allow them to retain their primary equity interests

worth more than $800 million.[41]

## III.
## UNDER THE FAIR AND EQUITABLE TEST, THE BANK LENDERS SHOULD RECEIVE POST-PETITION INTEREST AT THE CONTRACT DEFAULT RATE

109.    With the default and solvency "issues" now in their proper place, and with

the right to post-petition interest established, attention turns to whether the Bank Lenders must

receive contract default interest on their claims to satisfy the Plan Proponents' burden under

section 1129(b).  As recognized by the majority of courts (most comprehensively by the Sixth

Circuit in *Dow Corning*), under the "fair and equitable" test, a court must enforce the contract

default interest rate absent compelling equitable considerations warranting a different outcome.

With a solvent debtor (here, either proven or presumed as a matter of law), a bankruptcy court

enforces the contractual rights of the parties, and the role of equitable principles in the allocation

of competing interests is "significantly reduced."  *Dow Corning*, 456 F.3d at 679.

110.    In *Dow Corning*, a class of unsecured commercial debt holders holding

approximately $2 billion of claims objected to a plan proposed by the solvent debtor and the tort

claimants' committee.  The plan proposed paying the principal amount of all of the unsecured

---

[41]    The Court of Appeals for the Second Circuit held that the absolute priority rule applies to distribution schemes under pre-plan settlements, as well; that is, creditor groups cannot through settlement give junior classes recoveries unless senior creditors are paid in full.  *Iridium*, 478 F.3d at 463 & n.18 (citing *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc.* v. *Anderson (TMT Trailer Ferry)*, 390 U.S. 414, 424 (1968)).  In *Iridium*, Motorola, which held administrative claims, objected to the pre-plan settlement because it distributed assets to more junior creditors (the litigation trust and the creditors' committee) before Motorola received payments on its more senior claims.  *Id.* at 456, 462.  The Second Circuit vacated approval of the settlement and remanded the decision after concluding that the distribution of the residual litigation recoveries to the unsecured creditors violated the absolute priority rule.  *Id.* at 466.

debt, along with post-petition interest at the federal judgment rate rather than the contract default

rate.  The unsecured creditors argued that:

> [T]he bankruptcy court's imposition of the federal judgment
> interest rate, as opposed to the rates required by the debt contracts,
> meant that *Class 4 was not being paid the full interest it was owed,*
> *while Dow Corning's two shareholders, both in a class*
> *undisputedly junior to Class 4, were retaining millions of dollars*
> *in equity.*

*Dow Corning*, 456 F.3d at 672 (emphasis supplied) (citing *Dow Corning*, 244 B.R. at 680).

> 111.   On appeal, the Sixth Circuit held that:

> [I]n solvent debtor cases, rather than considering equitable
> principles, courts have generally confined themselves to
> determining and enforcing whatever pre-petition rights a given
> creditor has against the debtor. . . . When a debtor is solvent, then,
> the *presumption is that a bankruptcy court's role is merely to*
> *enforce the contractual rights of the parties, and the role that*
> *equitable principles play in the allocation of competing interest is*
> *significantly reduced.*

> Based on this application of the absolute priority rule in solvent
> debtor cases, Class 4 argues that we should enforce their rights
> under the contract, including their right to interest awarded at the
> default rate as set forth in the terms of their contract.  To do
> otherwise (i.e., to interpret the amended plan as not requiring the
> payment of default interest), they argue, *would violate § 1129(b)'s*
> *fair and equitable standard.*  We agree.  Default interest rates are
> intended to transfer some of the risk of default from creditors to the
> debtor.  By interpreting the plan as allowing interest only at the
> non-default rate, the bankruptcy court effectively transferred that
> risk back to the Class 4 creditors.  *Despite the equitable nature of*
> *bankruptcy proceedings, the bankruptcy judge does not have*
> *"free-floating discretion to redistribute rights in accordance with*
> *his personal views of justice and fairness."  Rather, absent*
> *compelling equitable considerations, when a debtor is solvent, it is*
> *the role of the bankruptcy court to enforce the creditors'*
> *contractual rights.*

*Id.* at 679 (emphasis supplied) (citations omitted).  *Dow Corning* recognized that "[c]ourts in

solvent debtor cases have overwhelmingly concluded that there is a presumption that the default

interest rate should be allowed." *Id.* at 680. Numerous other courts have upheld the strong

presumption in favor of the contract rate of interest in solvent debtor cases. *See, e.g.*, *In re Good*,

2009 WL 1024651, at *7, *8 (holding that the "fundamental principles" addressed in *Dow* should

apply with equal force to secured creditors, and vacating the confirmation order on a motion for

reconsideration because the debtor had "failed to rebut the presumption that [the creditor] is

entitled to interest at the contractual default rate of 15% per annum"); *In re Smith*, No. 03-

10666(1)11, 2008 WL 73318, at *1 (Bankr. W.D. Ky. Jan. 7, 2008) (awarding creditors the

contract interest rate because "in most cases where a debtor is solvent, courts generally confine

themselves to determining and enforcing whatever pre-petition rights a creditor has against the

debtor. Solvent debtors should not receive a windfall simply because they sought bankruptcy

protection.") (citing *Dow Corning*, 456 F.3d at 679)).[42]

112.    Recent circuit level decisions have expressly endorsed *Dow Corning*'s

recognition of the importance of creditor contract rights as well. *See UPS Capital Bus. Credit* v.

*Gencarelli (In re Gencarelli)*, 501 F.3d 1, 7 (1st Cir. 2007) (in awarding secured creditor's

claims for prepayment penalties, the court held: "Let us be perfectly clear. This is a solvent

debtor case and, as such, the equities strongly favor holding the debtor to his contractual

obligations as long as those obligations are legally enforceable under applicable non-bankruptcy

---

[42]    Indeed, courts have even held that "[w]hen the Debtor is solvent, the equities *dictate* that additional interest be paid to the . . . creditor rather than to the debtor." *In re Consol. Operating Partners L.P.*, 91 B.R. 113, 116 (Bankr. D. Colo. 1988) (emphasis supplied); *see also Ruskin*, 269 F.2d at 831 (holding that it is "the opposite of equity to allow the [solvent] debtor to escape the expressly-bargained-for result of its act"); *cf. Southland*, 160 F.3d at 1059-60 (holding that the "default interest rate is generally allowed" subject to equitable considerations, and ultimately ruling that creditors must receive the "bargained-for default interest," which "compensates them for the unforeseeable costs of default"); *In re Terry Ltd. P'ship*, 27 F.3d 241, 243 (7th Cir. 1994) (recognizing a "presumption in favor of the contract rate subject to rebuttal based upon equitable considerations," but that "[c]reditors have a right to bargained-for postpetition interest and bankruptcy judges are not empowered to dissolve rights in the name of equity") (citation omitted); *In re Ace-Texas*, 217 B.R. at 723-24 (awarding contract default rate of interest after debtor failed to overcome the presumption in favor of the contract rate); *Chicago*, 791 F.2d at 528 ("[I]f the bankrupt is solvent the task for the bankruptcy court is simply to enforce creditors' rights according to the tenor of the contracts that created those rights.").

law." (citing *Dow Corning*, 456 F.3d at 679)); *see also Gen. Elec. Capital Corp.* v. *Future Media Prods.*, 547 F.3d 956, 961-62 (9th Cir. 2008).

113.    Grace has previously tried to muddle the presumption in favor of the contract default rate—and the Plan Proponents' overwhelming burden to overcome that presumption—by mischaracterizing the court's holding in *In re Coram Healthcare Corp.*, 315 B.R. 321 (Bankr. D. Del. 2004).  Grace reads that decision as supporting a "'bottom-up' approach that starts with the premise that the federal judgment rate represents the minimum rate of interest necessary to satisfy the 'fair and equitable' standard of section 1129(b)" and that "the specific equities of a given case can compel the application of a higher rate of post-petition interest." (Objection ¶ 33.)  While the federal judgment rate may set the *minimum* interest rate that creditors may receive, Grace erroneously has implied that the court in *Coram* recognized a presumption that the federal judgment rate applies, subject to equitable considerations that might justify a higher rate.

114.    The *Coram* court though, merely stated the unremarkable proposition that "the specific facts of each case will determine what rate of interest is 'fair and equitable.'" *Coram*, 315 B.R. at 346.  In fact, while Grace previously argued that "[o]f course, in [*Coram*], the federal judgment rate also turned out to be the maximum" (Objection ¶ 33), it failed to mention that the *Coram* court applied the federal judgment rate solely because the largest noteholder employed the debtors' CEO as a consultant, creating an "actual conflict of interest that tainted the [d]ebtors' restructuring of its debt, the [d]ebtors' negotiation of a plan, and the [d]ebtors' ultimate emergence from bankruptcy." *Coram*, 315 B.R. at 346.  The *Coram* court held that "[a]s a result of these *peculiar facts*," allowing post-petition interest at the contract default rate would not be "fair and equitable." *Id.* at 347 (emphasis supplied).  Thus, *Coram*

remains fully consistent with the Sixth Circuit's holding in *Dow Corning* that only "compelling equitable considerations" will overcome the presumption that the contract default rate of interest applies. *Dow Corning*, 456 F.3d at 679.[43]

115.    The other decisions that Grace previously cited, *Adelphia*[44] and *Loral*,[45] have no bearing here. *Adelphia* involved a contest between *creditors*, not creditors versus equity holders. In weighing the interests of "parent" creditors versus "subsidiary" creditors, the court observed that "[u]nder the facts of this case, awarding interest at a lower rate won't reward insiders, or for that matter, even innocent public equity; as a practical matter, it will merely shift value from one creditor constituency to another." (*See* Transcript, *Adelphia*, No. 02-41729, at 14:16-23.) That concern does not arise here, because shareholder interests remain subordinate to creditor claims; equitable rules governing contests between creditors simply do not apply. *Loral* is also inapposite. There, the court found that the debtor was *insolvent* and that equity holders would not receive any recovery, regardless of whether the contract rate of interest or the federal judgment rate of interest applied. (*See* Transcript, *Loral Space & Commc'ns Ltd.*, No. 03-41710, at 21:20, 37:7-10.)

116.    In sum, *Dow Corning* and its progeny stand for the proposition that where, as here, a debtor is solvent, a chapter 11 plan that fails to pay contract default interest to creditors is not "fair and equitable" and cannot be confirmed. These cases apply a presumption in favor of

---

[43]    Grace erroneously relied on *Vanston Bondholders Protective Committee* v. *Green*, 329 U.S. 156 (1946), where the debtor was insolvent, as well. In *Vanston*, the Supreme Court rejected a claim of oversecured mortgage bondholders to postpetition interest, finding that the interest on interest was in the nature of a penalty for nonpayment and that subordinate creditors would have borne a greater loss if interest on interest were paid. *Id.* at 166. The Court, however, observed that in other cases, "where an estate was ample to pay all creditors and to pay interest even after the petition is filed, equitable considerations were invoked to permit payment of this additional interest to the secured creditor rather than to the debtor." *Id.* at 164.

[44]    Transcript, *In re Adelphia Commc'ns*, No. 02-41729 (Bankr. S.D.N.Y. Apr. 27, 2006), attached as Ex. <u>30</u>.

[45]    Transcript, *In re Loral Space & Commc'ns Ltd.*, No. 03-41710 (Bankr. S.D.N.Y. July 25, 2005), attached as Ex. <u>31</u>.

enforcing the creditors' contractual rights, a presumption only overcome by compelling equitable considerations.  Let us turn, then, to a consideration of the equities here.

## IV.
## THE EQUITIES WARRANT PAYMENT OF POST-PETITION INTEREST AT THE CONTRACTUAL DEFAULT RATE

117.    The Creditors' Committee and the Bank Lender Group will demonstrate at confirmation that any equitable arguments advanced by the Plan Proponents to justify imposition of a lower rate of interest are meritless.

**A.    The Bank Lenders Have Not Done Anything to Impede the Administration of These Chapter 11 Cases.**

118.    The undisputed evidence will show that the Administrative Agent and the Bank Lenders, including the Bank Lender Group, have done nothing to impede the administration of these chapter 11 cases.[46]  Rather than impede progress, the Creditors' Committee and the Bank Lender Group will show that the Bank Lenders have made the administration of these cases possible because Grace has had the use of the Bank Lenders' low-interest loans (the contract rate was as low as 6% at one point and the average rate of contract interest was less than 8%) over the course of the last eight years to fund numerous strategic acquisitions and otherwise reinvest in Grace's business.

119.    The Bank Lender Group and Creditors' Committee will also demonstrate that Grace's business has dramatically improved since it commenced these chapter 11 cases, its share price has dramatically increased, and its shareholders' return on their investment is substantially greater than that of the Bank Lenders.[47]  Nevertheless, Grace essentially argues that

---

[46]    *See Ruskin*, 269 F.2d at 832 ("[W]here there is no showing that the creditor entitled to the increased interest caused any unjust delay in the proceedings, it seems to us the opposite of equity to allow the debtor to escape the expressly-bargained-for result of its act.").

[47]    *See Debentureholders Protective Comm. of Cont'l Invest. Corp.* v. *Cont'l Inv. Corp.*, 679 F.2d 264, 269 (1st Cir. 1982) (enforcing contract provision is "fair and equitable inasmuch as the solvent debtor's estate will have

equity permits further exaggerating this disparity by taking away the contract default interest due

to the Bank Lenders and transferring it to Grace's shareholders.  We will show that the amount

of value that shareholders would have to "give up" to ensure full payment of the post-petition

interest at the rate set forth in the Credit Agreements is minimal.  Under these circumstances,

equity overwhelmingly weighs in favor of payment of contract default interest to creditors, not

against it.

**B.     The Contract Default Interest Rate Is Reasonable.**

120.    Grace has previously attacked the contract default rate as exorbitant and

thus inequitable,[48] but, if necessary, the Bank Lender Group and Creditors' Committee will show

on rebuttal that the default rate represents only a 2% increase from the Credit Agreements' base

interest rate,[49] and that the Credit Agreements' default rate is not "exorbitant," but rather

conforms to the industry standard.  As a number of cases make clear, the 2% default rate also

falls well within the range regularly accepted by courts,[50] and Grace can put forward no facts or

law to the contrary.

---

been enriched by the bankruptcy trustee's use of money which the debtor had promised to pay promptly to creditor, and, correspondingly, the creditor will have been deprived of the opportunity to use the money to *his* advantage") (emphasis supplied); *Consol. Operating Partners*, 91 B.R. at 117 ("The equities of this case do not favor any deviations from the imposition of the Late Payment Rate.  The benefit derived from any reduction in the contract rate would not inure to the creditors but instead would be a windfall to the debtor.  Such a result would mean that any solvent debtor seeking to avoid the cost of default rate interest could file for Chapter 11.  No such result was intended by Congress.").

[48]    *See* Objection ¶ 17.

[49]    *See* Credit Agreements § 5.1(c); Freedgood Aff. ¶¶ 8, 11.

[50]    *See, e.g., Gen. Elec. Capital Corp.* v. *Future Media Productions*, 547 F.3d 956, 958 (9th Cir. 2008) (2% spread between default and non-default rate); *Southland*, 160 F.3d at 1059-60 (2% spread between default and non-default interest rates was considered small); *Terry*, 27 F.3d at 244 (3% spread not unreasonable); *Ace-Texas*, 217 B.R. at 723-24 (2% spread reasonable and appropriate in the light of other cases allowing 3% and 4.3%); *In re Vanderveer Ests. Holdings, Inc.*, 283 B.R. 122, 134 (Bankr. E.D.N.Y. 2002) (5% difference between default and non-default rate reasonable); *Vest*, 217 B.R. at 703 (same); *In re Skyler Ridge*, 80 B.R. 500, 510-11 (Bankr. C.D. Cal. 1987) (4% difference between default and non-default rate was enforceable); *see also Ace-Texas*, 217 B.R. at 724 (suggesting that rate of 26% and 36% would be exorbitant); *In re Liberty Warehouse Assocs. Ltd. P'ship*, 220 B.R. 546, 551-52 (Bankr. S.D.N.Y. 1998) (22.8% rate is *not* exorbitant when the debtor is solvent).

C.      **All of Grace's Reliance Arguments Fail.**

121.    Grace's ultimate equitable argument previously boiled down to the contention that the Bank Lenders have "reneged" on failed agreements to which *none* of the Bank Lenders were *ever* parties, and that Grace reasonably relied on the Bank Lenders' commitment to a lower interest rate.  Whether viewed through the prism of bankruptcy law, contract law, or traditional doctrines of apparent authority and estoppel, the Bank Lender Group and Creditors' Committee will demonstrate on rebuttal, should the Debtors again press this contention, that on the facts nothing could be further from the truth.

122.    In its May 19 Opinion, this Court appears to have made two factual findings that bear directly on these issues and eviscerate Grace's arguments.  First, the Court found that the 2005 Letter and 2006 Letter had expired by their own terms and were no longer in effect.  (May 19 Opinion at 2 n.3.)  Second, the Court found that the expired agreements were made on behalf of the entire Creditors' Committee—and not, as Grace had previously alleged— by individual institutions on their own behalf.  (*Id.*)  The Court, however, then appears to conclude as a legal matter that an agreement entered into on behalf of the Committee as a whole could bind individual creditors.  We believe that this is likely a drafting issue in the May 19 Opinion (involving the use of "former and "latter" in note 3 of the May 19 Opinion) and that the Court likely meant to say that a decision made by the committee chair in its capacity as committee chair on behalf of the whole committee could *not* bind individual creditors, a result consistent with Third Circuit law.  *See, e.g.*, *In re Kensington Int'l Ltd.*, 368 F.3d 289, 315 (3d Cir. 2004) (holding that an official creditors' committee does not have the authority to bind each individual creditor); *see also In re Refco, Inc.*, 336 B.R. 187, 197 (Bankr. S.D.N.Y. 2006) (noting that "a committee's assent to a plan or a transaction does not bind its members, let alone its

constituents"). In any event, based on the Court's first finding that any agreement expired, the legal conclusion would be of no impact anyway.

> **1.      The Bank Lenders Were Not a Party to Any Post-petition Agreement Among Grace or Others, and the Creditors' Committee Could not bind the Bank Lenders.**

123.      It is incontrovertible that no Bank Lender was a party to any post-petition agreement among Grace and others, and specifically, that neither the 2005 Letter nor the 2006 Letter purport by their express terms to bind any Bank Lender. (2005 Letter; 2006 Letter.) The Creditors' Committee and the Bank Lender Group believe that Grace may again argue that it believed that the terms of the 2006 Letter with the Creditors' Committee had been discussed with certain Bank Lenders. Again, regardless of any belief Grace may have had, it is black-letter law that the Creditors' Committee had neither the authority nor the power to bind the Bank Lenders to either the 2005 Letter or the 2006 Letter. *Kensington*, 368 F.3d at 315; *Refco*, 336 B.R. at 197. Nor can a Creditors' Committee "lock up" the votes of its constituents or vote on their behalf. *See* 11 U.S.C. §§ 1103, 1126(a). Section 1103 of the Bankruptcy Code sets forth the scope of a committee's powers and duties, and nowhere does the text of the statue provide that an official creditors' committee has the right to vote for or against a plan on behalf of its constituents. 11 U.S.C. § 1103. The Bankruptcy Code instead expressly grants the holder of a claim or interest the power to accept or reject a plan. 11 U.S.C. § 1126(a); *Armstrong*, 432 F.3d at 518.

124.      Grace also previously claimed that the Chairman of the Creditors' Committee, Mr. Maher (a designee of JPMorgan), was acting in his capacity as the Administrative Agent and on behalf of all of the Bank Lenders when he negotiated with Grace over the 2005 and 2006 Letters executed by the Creditors' Committee and that this again somehow bound the Bank Lenders to some deal. However, the Bank Lender Group and

Creditors' Committee will establish that there is not a single document signed by the Bank

Lenders nor a single specific statement ascribed to Mr. Maher that could be cited by Grace that

supports any such "understanding." In fact, the evidence will show that every statement ascribed

to Mr. Maher by Grace indicates that the only support that he could promise to Grace was that of

the Creditors' Committee: a result consistent with the Court's May 19 Opinion.

        125.    Other evidence will reinforce the certainty that Grace was dealing with

Mr. Maher in his capacity as Chairman of the Creditors' Committee, alone. (*See* Ex. <u>17</u>, E-mail

from R. Tarola, CFO of Grace, to T. Maher, Chairman of Creditors' Committee (Feb. 14, 2006).

In recounting his discussion with Mr. Maher, Mr. Tarola expressly and repeatedly confirms that

"the *committee* of general unsecured creditors will continue to be co-proponents of Grace's

current plan of reorganization until an event or events (to be defined by you after consultation

with the committee) occur." (*Id.* (emphasis supplied).[51]  The evidence will show that Mr. Tarola

never refers to the Bank Lenders, any agreement with the Bank Lenders,' or any effort to obtain

the Bank Lenders' continuing support.

        126.    Moreover, even assuming that Mr. Maher was somehow acting in a dual

capacity as Chairman of the Creditors' Committee and as the Administrative Agent in his

discussions with Grace, Mr. Maher's actions or statements, as a matter of contract, could not

bind the individual Bank Lenders. An agent's power to bind his principal is coextensive with the

principal's grant of authority. *Ford* v. *Unity Hosp.*, 299 N.E.2d 659, 666 (N.Y. 1973). The

Credit Agreements clearly delineate the limited scope of the Administrative Agent's authority,

---

[51]    In the same e-mail, Mr. Tarola also asks Mr. Maher "how best to describe the *committee's* continued support for [Grace's] plan of reorganization" along with the "*committee's* view of required documentation and bankruptcy court disclosure." (*Id.*) (emphasis supplied).

and Grace is a party to the Credit Agreements.[52]  The Credit Agreements expressly prohibit the

Administrative Agent (or anyone, for that matter) from obtaining any modification or waiver of

the interest rate without the express written consent of the Majority Banks (as defined by the

Credit Agreement), the consent of each Bank affected thereby, *and Grace*.[53]  In addition, the

Credit Agreements contained a "no oral modifications" clause, and thus, the scope of authority

granted to the Administrative Agent under the Credit Agreements could not be expanded,

altered, or supplemented by any contract other than a writing signed by the requisite parties,

including the Majority Banks, the Administrative Agent, *and Grace*.[54]  There will be no evidence

of any such writings, because none exists.

---

[52]  Credit Agreements § 11.1 ("[E]ach such Bank hereby designates and appoints Chase, as the Administrative Agent of such Bank, to take such action on its behalf under the provisions of this Agreement and the other Loan Documents and to exercise such powers and perform such duties as are *expressly delegated to the Administrative Agent by the terms of this Agreement* and the other Loan Documents, together with such other powers as are reasonably incidental thereto.  Notwithstanding any provision to the contrary elsewhere in this Agreement, the Administrative Agent shall not have any duties or responsibilities, except those expressly set forth herein, or any fiduciary relationship with any Bank, and *no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement* or any other Loan Document or otherwise exist against the Administrative Agent.") (emphasis supplied).

[53]  Credit Agreements § 13.1(a) ("*With the written consent of the Majority Banks*, the Administrative Agent, the Parent and the Company may, from time to time, enter into written amendments, supplements or modifications hereto … *provided, however*, that no such waiver and no such amendment, supplement or modification shall (i) reduce the amount or extend the maturity of any Loan or Note or any installment thereof, or *reduce the rate or extend the time of payment of interest thereon*, or *reduce any fee payable to any Bank hereunder*, or change the amount of any Bank's Commitment, in each case *without the consent of the Bank affected thereby*.") (emphasis supplied).

[54]  Credit Agreements § 13.1(a) ("Neither this Agreement, any Note, any other Loan Document, nor any terms hereof or thereof may be amended, supplemented or modified except in accordance with the provisions of this subsection.  *With the written consent of the Majority Banks*, the Administrative Agent, the Parent and the Company may, from time to time, enter into written amendments, supplements or modifications hereto . . . *provided, however*, that no such waiver and no such amendment, supplement or modification shall … (ii) amend, modify or waive any provision of this subsection [13.1(a)] . . . without the *written consent of all the Banks*, or (iii) amend, modify or waive any provision of Section 11 without the *written consent of the then Administrative Agent*.") (emphasis supplied); N.Y. Gen. Obl. Law § 15-301 (2001) ("A written agreement or other written instrument which contains a provision to the effect that it cannot be changed orally, cannot be changed by an executory agreement unless such executory agreement is in writing and signed by the party against whom enforcement of the change is sought or by his agent."); *DFI Commc'ns* v. *Greenberg*, 363 N.E.2d 314, 314-16 (N.Y. 1977).

### 2.    Grace Did Not Reasonably Rely on any Conduct of the Bank Lenders.

127.    Unable to point either to any actual agreement with the Bank Lenders, or any authority for any other party to bind the Bank Lenders to any agreement, Grace may well fall back on reliance-based arguments based on the doctrines of apparent authority or estoppel to defeat the Bank Lenders' claims.  Grace previously stated that it relied on the "deal" with the Bank Lenders and that Grace's reliance should prevent the Bank Lenders from receiving contract default interest.  This argument also fails.

### (a)    Third Circuit Law Prohibits Invocation of any Reliance Exception to the Absolute Priority Rule.

128.    The Third Circuit has ruled that there is no reliance based exception to the absolute priority rule.  In *Armstrong*, the Third Circuit flatly rejected the argument that creditor participation in the plan process, even where that participation includes an agreement on recovery and the allocation of reorganization value, justifies departing from, or even flexibly applying, the absolute priority rule.  *Armstrong*, 432 F.3d at 518.  In *Armstrong*, the debtors based their plan on an *actual* agreement with the creditors' committee and the asbestos personal injury plaintiffs on the split of reorganization value, an agreement recited in the disclosure statement that went out to all creditors.  Just as here, the creditors' committee changed its position as circumstances changed.  And the evidence will show that circumstances have changed dramatically here; the terms of the currently contemplated Plan differ substantially from the Joint Plan in that the Plan no longer provides for an equity recovery for the Bank Lenders, equity value has soared since 2005, reorganized companies in other asbestos cases have paid their creditors in full when their shareholders have retained value, numerous termination events have occurred and, of course, over four years have passed since Grace and the Creditors' Committee executed the 2005 Letter.

129.    In upholding the right of the creditors' committee to change its mind, the

District Court in *Armstrong* observed:

> [I]n the absence of bad faith, which was not alleged here, and
> particularly in light of the changed circumstances, until a party
> consents and the consent is final, that party may walk away from
> the table for a good or bad reason or no reason at all.

*In re Armstrong World Industries, Inc.*, 320 B.R. 523, 534 n.24 (D. Del. 2005) (citing *In re*

*Huckabee Auto. Co.*, 33 B.R. 141, 149 (Bankr. M.D. Ga. 1981)).

**(b)    Grace Cannot Satisfy any Estoppel or other Reliance Based Exception.**

130.    Even if the Third Circuit permitted such a reliance based "exception,"

Grace cannot satisfy the elements of any known reliance doctrine.  Promissory estoppel certainly

does not apply here.  Under that doctrine, a party must prove not by a preponderance, but by

clear and convincing evidence, that (i) a definite and certain promise was made; which was (ii)

reasonably expected to induce reliance by promisee; (iii) the alleged promisee acted in reliance

on the promise (i.e. action was unequivocally referable to the alleged promise and inconsistent

with any other explanation); and (iv) the alleged promisee sustained an unconscionable injury

such that enforcement of the promise is necessary to avoid injustice.[55]

131.    A review of elements (i) and (ii) alone defeat Grace's ability to invoke

promissory estoppel.  Grace will not be able to show any clear and convincing evidence of any

express written or oral representation that the Creditors' Committee's offer to accept the 6.09%

interest rate would remain irrevocable, once the conditions expired.[56]  To the contrary, the

---

[55]    *See generally, e.g., In re Aquila Inc.,* 805 A.2d 184, 193 (Del. Ch. 2002) (quoting *Lord* v. *Souder*, 748 A.2d 393, 399 (Del. 2000)), *cited in In re U.S. West, Inc. Securities Litigation*, 65 Fed. Appx. 856, 863-64 (3d Cir. 2003); *Ripple's of Clearview, Inc.* v. *Le Havre Assocs.*, 452 N.Y.S.2d 447, 449 (2d Dep't 1982).

[56]    "A promise is an expression of commitment to act in a specified way, or to bring about a specified result in the future, or to take responsibility that the result ... will occur, communicated in such a way that the addressee of the expression may justly expect performance...."  *Ramone* v. *Lang*, No. Civ.A.1592-N, 2006 WL 905347, at *15 (Del. Ch. Apr. 3, 2006) (ellipses in original) (citation omitted).

January 2005 Disclosure Statement indicated that Grace and the Creditors' Committee
"intend[ed] to memorialize their [2005 Letter, and, as amended, the 2006 Letter] in a plan
support agreement," but they never did so. (2005 Disclosure Statement at 59 n.18.)[57]  Nor will
Grace be able to show by clear and convincing evidence that its purported continued reliance on
the Creditors' Committee's agreements to suspend temporarily its right to object to certain
treatment of its constituents was foreseeable or reasonable.  By Grace's admission, once the
conditions failed to materialize by a date certain, the "Debtors and the Creditors' Committee
agree[d] that the Creditors' Committee had the right to withdraw as Plan Proponent…"  (2006
Letter.)[58]  Furthermore, there can be no clear and convincing evidence that Grace could
justifiably rely on the "old deal" since the current Plan differs from the Joint Plan previously
supported by the Creditors' Committee, in that it no longer provides for an equity recovery for
unsecured creditors.   Finally, because the legal inability of a creditors' committee to bind an
individual creditor is well-established, Grace could never have reasonably relied on the
Creditors' Committee's alleged promises as binding on the Bank Lenders.[59]

---

[57]  "A truthful statement as to the present intention of a party with regard to his future acts is not the foundation
upon which an estoppel may be built.  The intention is subject to change." *Derry Finance N.V.* v. *Christiana
Cos., Inc.,* 616 F. Supp. 544, 550 (D. Del. 1985), *aff'd,* 797 F.2d 1210 (3d Cir. 1986) (quoting *Metro. Life Ins.
Co.* v. *Childs Co.,* 130 N.E. 295, 298 (N.Y. 1921)).  In other words, an "agreement[] to agree" does not
constitute a sufficiently definite to form a basis of a promissory estoppel claim against the Creditors'
Committee.  *In re Phillips Petroleum Sec. Litig.,* 881 F.2d 1236, 1250 (3d Cir. 1989).

[58]  An "indefinite proposal, subject to modification or withdrawal at [defendant's] sole discretion, cannot form the
basis of a promissory estoppel claim." *Del Sontro* v. *Cendant Corp., Inc.,* 223 F. Supp.2d 563, 575 (D.N.J.
2002); *Dow Chem. Co.* v. *Schaefer Salt & Chem. Co.,* No. 91-4027, 1992 WL 672289, at *12 (D.N.J. July 21,
1992) (same); *see also, e.g., Gen. Elec. Co.* v. *Compagnie Euralair, S.A.,* 945 F.Supp. 527, 536 (S.D.N.Y. 1996)
(reliance for promissory estoppel claim destroyed by contract language vesting sole discretion in defendant); *In
re Unisys Corp. Retiree Med. Benefit ERISA Litig.,* 58 F.3d 896, 907-08 (3d Cir. 1995) (reliance on employer
representations regarding benefits "may never be 'reasonable' where the participant is in possession of a written
document notifying him of the conditional nature of such benefits").

[59]  *Refco,* 336 B.R. at 197 (noting that "a committee's assent to a plan or a transaction does not bind its members,
let alone its constituents" (citing 7 Collier on Bankruptcy ¶ 1103.05[1][d][i] at 1103-26; and *Armstrong,* 432
F.3d at 518)).  "It is well-settled that reliance upon statement or actions *contrary to law* is not reasonable."
*Volvo Trucks of N. Am., Inc.* v. *United States,* 367 F.3d 204, 212 (4th Cir. 2004) (citing, e.g., *Fredericks* v.
*Comm'r,* 126 F.3d 433, 443 (3d. Cir. 1997)).

132.    In any event, it is undisputed that before Grace's entry into the Proposed

Asbestos Settlement (and after January 2007, when the Creditors' Committee's right to withdraw

vested), the Creditors' Committee repeatedly communicated to Grace that the Bank Lenders

expected contract default interest and that Grace should not enter into any settlement that did not

provide for payment of such interest (precisely what Grace went ahead and did anyway).  If

Grace was so certain that the Creditors' Committee still supported the interest rate under the

2006 Letter, then why didn't Grace just ask it to agree to the settlement?  The answer is both

self-evident and demonstrated by Grace's public statements at the time.[60]

### 3.    The Administrative Agent Lacked Apparent Authority to Waive or Amend the Bank Lenders' Rights Under the Credit Agreements.

133.    Unable in the past to point to justifiable reliance on the outdated 2005 and

2006 Letters with the Creditors' Committee, Grace previously insinuated that the Administrative

Agent had the apparent authority to bind the Bank Lenders and that it relied on that apparent

authority.  Fundamental, black-letter agency law disposes of this argument.  Under the doctrine

of apparent authority, if a third party changes position in reliance on the reasonable belief that an

agent is acting within the scope of his authority, "the principal is estopped to deny that the

agent's act was not authorized."[61]  However, "[t]he existence of 'apparent authority' depends

upon a factual showing that the third party relied upon the misrepresentations of the agent

because of some misleading conduct on the *part of the principal*—not the agent."  *Ford*, 299

N.E.2d at 664 (emphasis supplied).  Accordingly, the misrepresentations of the agent are "an

---

[60]    *See* Ex. 20, Tr. of Grace's Conf. Call, Apr. 7, 2008 at 7-8, where Grace's management publicly stated in connection with the announcement of the April 2008 Term Sheet that it was unsure of the Creditors' Committee's support for the old 2006 Letter interest rates included therein.

[61]    *Masuda* v. *Kawasaki Dockyard Co., Ltd.*, 328 F.2d 662, 665 (2d Cir. 1964).

insufficient basis for reliance upon 'apparent authority.'" *Id.*[62]  And the Plan Proponents will not

be able to submit evidence that the Bank Lenders (as opposed to the Administrative Agent)

engaged in any conduct, misleading or otherwise, that would lead them to believe that the

Administrative Agent had the authority to waive rights under, or amend or modify, the Credit

Agreements.

        134.    Moreover, a third party on notice of an express "limitation of an agent's

authority … cannot subject the principal to liability upon a transaction with the agent in violation

of such limitation."[63]  Here, the Plan Proponents have ignored numerous provisions in the Credit

Agreements *to which Grace and the Bank Lenders were parties* expressly disclaiming the

authority of the Administrative Agent or any other person to effect any waiver or amendment

that would operate to reduce the interest rate obligation without the express written consent of

the Majority Banks (as defined by the Credit Agreements), the Administrative Agent, *and Grace*,

along with the consent of each affected Bank.[64]  If such a departure from the apparent scope of

the authority of the Administrative Agent had occurred, Grace would also have had a duty to

investigate such a departure.  The primary obligation to ascertain the true authority of one

purporting to act as agent rests upon the individual dealing with the purported agent, not upon

the principal.[65]  There will not be sufficient evidence that Grace did anything to confirm the

Administrative Agent's supposed apparent authority.

---

[62]    To the extent it could apply, Delaware law on apparent authority is the same.  *See Billops* v. *Magness Const. Co.*, 391 A.2d 196, 198 (Del. 1978).

[63]    *Ernst Iron Works* v. *Duralith Corp.*, 200 N.E. 683, 684 (N.Y. 1936); *see also Int'l Boiler Works Co.* v. *Gen. Waterworks Corp.*, 372 A.2d 176, 177 (Del. 1977) (third party is not permitted to claim protection if he ignores facts illustrating the agent's lack of authority).

[64]    *See* discussion *supra* notes 52-54 and accompanying text.

[65]    *Application of Lester*, 386 N.Y.S.2d 509, 514 (Sup. Ct. 1976); *Int'l Boiler Works*, 372 A.2d at 177 (same, under Delaware law).  The doctrine of equitable estoppel is similar to that of apparent authority.  The doctrine of equitable estoppel only applies when the truth concerning material facts is unknown to the party claiming the benefit of the estoppel, "not only at the time of the conduct which amounts to a representation or concealment,

**D.**  **The Passage of Time Has Not Deprived the Bank Lenders of Their Right to Receive Contract Default Interest.**

135.    Grace has also previously tried to cobble together some low order equitable arguments.  It implied that the Bank Lenders have forfeited or waived their right to contract default interest by somehow "laying in wait" to object to Grace's proposal to re-write the Credit Agreements, so as to maximize their leverage in negotiating more than they deserve. (Objection ¶¶ 3, 17.)  Grace has also suggested that the Bank Lenders somehow "slept on their rights," and thus forfeited their right to contract default interest, including by proving solvency at trial, if necessary.  (Hearing Tr. 87:18-19, July 21, 2008 [Dkt. No. 19210], attached as Ex. 32.) These arguments are baseless.

**1.**  **The Bank Lenders Have Not Forfeited or Waived Their Right to Contract Default Interest.**

136.    The Bank Lenders did not forfeit or waive any right.  The Administrative Agent on behalf of all of the lenders timely filed the Proofs of Claim, thereby asserting and preserving their right to post-petition interest.[66]  The Proofs of Claim ask for amounts owed on account of, but not limited to, principal, interest and fees and expenses on the loans and advances made under the Credit Agreements, which includes claims for interest at the default rate.  (Proofs of Claim, Exs. C & D to Freedgood Affidavit.)

---

but also at the time when that conduct is acted upon by him."  *Heckler* v. *Cmty. Health Servs. of Crawford County, Inc.*, 467 U.S. 51, 59 (1984) (emphasis supplied).  "If, at the time when he acted, *such party had knowledge of the truth, or had the means by which with reasonable diligence he could acquire the knowledge so that it would be negligence on his part to remain ignorant by not using those means*, he cannot claim to have been misled by relying upon the representation or concealment."  *Id.* (emphasis supplied).  For the same reason that the Debtors cannot make out a defense to the Bank Lenders' right to contractual default rate interest based on apparent authority, any equitable estoppel claim must also fail.

[66]    *See* Proofs of Claim, Exs. C & D to Freedgood Affidavit; Freedgood Aff. ¶ 14; Objection at 1-2; Ex. 7, Resp. & Obj. of Debtors to Off. Comm. of Unsecured Creditors of W.R. Grace & Co. and Bank Lender Group's First Request for Production of Documents, First Set of Interrogatories, and First Request for Admissions at 24 ("Debtors' Resp. & Obj.").

137.    Grace in its Objection complained that the Administrative Agent or the Bank Lenders for some reason had to do more than file the Proofs of Claim to preserve their claims for contract default interest.  What were the Bank Lenders supposed to do?  The substance of the 2005 Letter ended up in the disclosure statement to the Joint Plan.  That 2005 Disclosure Statement expressly provided that individual creditors were not bound or committed to vote in favor of Grace's Joint Plan and that the parties intended to memorialize this agreement in a plan support agreement.  (2005 Disclosure Statement at 59 n.18.)  The 2005 Disclosure Statement was never subject to a hearing, and the plan support agreement was never executed.  Accordingly, creditors never had an opportunity to object before this Court to the proposed terms of the "Joint Plan" that incorporated the expired terms of the 2005 Letter.

138.    As for the various interest rate assumptions that Grace incorporated into its public filings or other public statements, they were just that, assumptions.  They imposed no obligation on the Bank Lenders to do anything.  To the extent that Plan Proponents assert that creditors should have objected to the terms of an unapproved deal embodied in Grace's Joint Plan because the terms may have been included in Grace's SEC filings, and that a creditor's lack of objection constituted some form of waiver or acceptance of the terms, that assertion is absurd and without a doubt, not the law.  How was a creditor to object to Grace's public filings and in what forum?  Were creditors to file an objection to Grace's SEC filings on the bankruptcy docket or file a motion with this Court to compel Grace to amend its SEC filings despite the fact that such SEC filings were not before the Court?  Were creditors to write a letter to the SEC objecting to Grace's SEC filings?  There is simply no basis in law to support a finding that the Bank Lenders' failure to "object" to Grace's public SEC filings or other public statements constitutes a

waiver of such creditor's ability to object to attempts by Grace to alter such creditor's legal and contractual rights as defined by state law.

139.    Put simply, prior to seeking confirmation of the Plan, Grace has never sought approval of the Proposed Asbestos Settlement, so no objection was possible—and thus, the Bank Lenders did not sleep on or waive their rights.  Moreover, once Grace publicly announced its terms, certain Bank Lenders (the Bank Lender Group) responded promptly by writing the April 21, 2008 letter to Grace's counsel and expressing their position on contract default interest.

**E.    Grace's Argument that Paying Contract Default Interest to the Bank Lenders Would Jeopardize the Proposed Asbestos Settlement Is Not Tenable.**

140.    Grace has previously stated that paying the Bank Lenders contract default interest would "seriously compromise" any hope of achieving a consensual resolution and jeopardize these cases.  (Objection ¶ 39.)  The Third Circuit in *Armstrong* rejected this very argument in the context of a settlement between asbestos claimants and existing equity holders as a justification for circumventing the absolute priority rule:

> We recognize that the longer that the reorganization process takes, the less likely that the purposes of Chapter 11 (preserving the business as a going concern and maximizing the amount that can be paid to creditors) will be fulfilled.  Nevertheless, we conclude that the absolute priority rule applies [and] we . . . deny confirmation of [Armstrong's] plan.

*Armstrong*, 432 F.3d at 518.  Indeed, on three separate occasions in three different asbestos cases, the Third Circuit has rejected the need to resolve complex protracted cases as a justification for overriding the substantive demands of bankruptcy law.  *Id.* at 518-19; *In re*

*Owens-Corning*, 419 F.3d 195, 211 (3d Cir. 2005); *In re Combustion Eng'g, Inc.*, 391 F.3d 195, 209, 211 (3d Cir. 2004).[67]

   141. The decision to which Grace has previously pointed, *A.H. Robins*, does not hold otherwise.  There, the district court only disallowed creditors' claims for punitive damages because the size of the potential liability was so "staggering" that it jeopardized other creditor recoveries.  *In re A.H. Robins Co., Inc.*, 89 B.R. 555, 558 (E.D. Va. 1988).  The District Court concluded that it "would not be fulfilling its duties in the oversight of this bankruptcy if it were to allow a windfall claim to certain creditors that could jeopardize the full compensation of claims to all others."  *Id.* at 563-64.  Here, allowing the Bank Lenders' claims in full, including interest at the contract default rate, would not impact other creditors' recoveries; it would merely reduce equity holders' recovery.

## V.
## THE PLAN VIOLATES SECTION 1129(a)(3) BECAUSE IT WAS NOT PROPOSED IN GOOD FAITH

   142. The Plan violates section 1129(a)(3) because by Grace proposing a plan that seeks to maximize the value retained by its equity holders at the expense of its creditors, the Plan represents a breach of Grace's fiduciary duties to its creditors and thus was not proposed in good faith.  Section 1129(a)(3) requires that a plan be proposed in good faith and not by any means forbidden by law.  This generally means that there is a reasonable likelihood that the plan will fairly achieve a result consistent with the Bankruptcy Code, in light of the particular facts

---

[67] The Third Circuit's view is consistent with that of other Circuits.  In *AWECO*, the Fifth Circuit ruled that a court could not approve a pre-plan confirmation settlement unless it complies with the absolute priority rule.  752 F.2d at 298.  While observing that testimony at the lower court indicated that a settlement of the litigation would give the debtor its only chance at reorganization, and expressing sympathy for the bankruptcy judge "who has suffered the travails of months filled with the problems of the debtor and its creditors"  . . . and acknowledging that "preserving a settlement potentially advantageous to the debtor and its creditors is a worthy goal," the Fifth Circuit vacated the lower court's decision because it could not conclude that the settlement complied with the absolute priority rule.  *Id.* at 297-300.  Indeed the Fifth Circuit found that a "bankruptcy court abuses its discretion in approving a settlement with a junior creditor unless the court concludes that priority of payment will be respected as to objecting senior creditors."  *Id.* at 298.

and circumstances.  *See In re PWS Holdings Corp.*, 228 F.3d 224, 242 (3d Cir. 2000); *In re*

*Leslie Fay Cos.*, 207 B.R. 764, 781 (Bankr. S.D.N.Y. 1997).

143.    "A paramount duty of a trustee or debtor in possession in a bankruptcy

case is to act on behalf of the bankruptcy estate, that is, for the benefit of the creditors."  *In re*

*Cybergenics*, 226 F.3d 237, 243 (3d Cir. 2000); *In re Global Crossing*, 295 B.R. 726, 745

(Bankr. S.D.N.Y 2003) (noting that "it is well established that when a corporation gets into the

zone of insolvency, the fiduciary duties of its board expand from the corporation's stockholders

to its creditors").

144.    The Plan permits shareholders to "ride through" and retain between $430

million and $821 million in value while at the same time, it seeks to deprive its creditors, the

Bank Lenders, of approximately $100 million by paying such creditors less than the interest rate

set forth in the Credit Agreements.  By seeking confirmation of a plan that benefits shareholders

at the expense of creditors, and also by seeking to deprive creditors of their right to vote on the

Plan and to dilute their votes, Grace has failed to comply with its fiduciary duties to act on behalf

of creditors.  Accordingly, the Plan cannot be confirmed because the Plan Proponents have not

proposed it in good faith as required by section 1129(a)(3).

## VI.
## THE PLAN VIOLATES SECTION 1129(a)(7)'S BEST INTERESTS OF CREDITORS TEST

145.    The Plan violates the best interests of creditors test of section 1129(a)(7),

which requires the payment of interest on allowed claims at the legal rate before equity holders

retain any interest.[68]

---

[68]    While the Court addressed section 1129(a)(7) in its May 19 Opinion, because the Court ruled that those findings
were limited to the claim objection context, the Bank Lenders and Creditors' Committee find it appropriate to
revisit section 1129(a)(7) issues herein.  Hearing Tr. 22:23-25; 23:4-11; 27:12; 38:15-19; 61:4-11; 207-09, June
18, 2009 [Dkt. No. 22371].

146.    Grace has maintained that under the "best interest of creditors" test of

section 1129(a)(7) of the Bankruptcy Code, the federal judgment rate constitutes the only interest

rate available to the Bank Lenders pursuant to section 1129 of the Bankruptcy Code.  (Objection

¶¶ 28-30.)  Grace's argument that the Bank Lenders can only receive the federal judgment rate of

interest under the "best interest of creditors" test of section 1129(a)(7) is simply wrong.

147.    The "best interests of creditors" test of section 1129(a)(7):

> requires that an impaired claim-holder who does not accept
> the proposed plan must "receive … under the plan …
> property of a value … that is not less than the amount that
> such holder would … receive … if the debtor were
> liquidated under chapter 7."

*In re Dow Corning Corp.*, 244 B.R. 678, 686 (Bankr. E.D. Mich. 1999).  In chapter 7 cases,

section 726(a)(5) entitles creditors to interest calculated "at the legal rate from the date of the

filing of the petition" before the debtor can receive any excess liquidation proceeds.  Some courts

have recognized that while creditors of a solvent chapter 7 estate may not receive less than post-

petition interest based on the federal judgment rate under 28 U.S.C. § 1961(a), that rate is by no

means the maximum rate in a chapter 11 solvent debtor case.  *Id.*; *see also PPIE,* 324 F.3d at 206

n.14 (3d Cir. 2003) ("An impaired creditor in a solvent debtor case can demand postpetition

interest under the 'fair and equitable' test of § 1129(b)(2).").[69]

---

[69]    Although Grace cites three cases for the proposition that courts have "consistently interpreted the 'legal rate' of interest to be the federal judgment rate" (Objection ¶ 29), none of these cases impose a ceiling on recovery.  *See Coram*, 315 B.R. at 346 (stating that "we are not convinced that Congress intended to supplant a party's contractual right to interest in all circumstances under chapter 11" and *rejecting* the proposition that the section 1129(b) requires post-petition interest at the federal judgment rate); Bench Ruling at 13-14, *In re Adelphia Commc'ns*, No. 02-41729 (Bankr. S.D.N.Y. April 27, 2006), attached as Ex. 30 (holding that under the "fair and equitable test" of section 1129(b), the court had the discretion to determine the equitable rate of pendency interest and that under the facts of that case, an adjusted contract rate was permitted); *In re Cardelucci*, 285 F.3d 1231 (9th Cir. 2002) (reasoning that the federal judgment rate was an appropriate rate for post-petition interest on a state court judgment, where there *was no* otherwise applicable contract rate).

As for *Cardelucci*, the recent Ninth Circuit ruling in *General Electric Capital Corp.* v. *Future Media Productions*, 547 F.3d 956 (9th Cir. 2008), confirms that *Cardelucci* only establishes the legal rate in the Ninth Circuit under section 726(a)(5) and has no applicability to section 1129(b)'s fair and equitable test.

148.    It is simply incorrect to read, even in the context of a chapter 7 case,

section 726(a)(5) as some courts recently have (*see*, *e.g.*, *Cardelucci*, 285 F.3d at 1234-35) as

evidence of Congressional intent to override state law with a uniform federal post-petition

interest rate.  When Congress enacted the Bankruptcy Code in 1978, no uniform "federal"

judgment rate even existed;[70] the "legal rate" under section 726(a)(5) meant either a state

statutory rate or the applicable contractual rate—including any applicable "default" rate.  *See*

*Realty Assocs. Secs. Corp.*, 163 F.2d 387, 391 (2d Cir. 1947), *cert. denied*, 332 U.S. 835 (1947)

(enforcing the 5% contractual default rate instead of the 6% New York judgment rate where

there were "no equities to override the bargain which the parties made for themselves").

Application of a state statutory rate *higher* than the applicable contract rate could be justified if

the debtor was solvent, *id.* at 392 (Clark, J., dissenting), and application of a statutory rate lower

than the contract rate if the contract rate was usurious.  *Johnson* v. *Norris*, 190 F. 459, 463-64

(5th Cir. 1911).  Both New York's postjudgment rate of 9%, and Delaware's postjudgment rate

of approximately 5% above the federal judgment rate, exceed the default rate under the Credit

Agreements.  *See* N.Y. C.P.L.R. §§ 5003, 5004; Del. Code Ann. tit. 6, § 2301(a)—and if applied

would likely lead to a higher recovery for the Bank Lenders.

149.    The 1982 amendment to 28 U.S.C. § 1961, which for the first time

imposed a uniform postjudgment interest rate on *money judgments* obtained in federal courts,

calculated from the date of the entry of the judgment, does not alter the analysis that state law

controls.  No judgment allowing the Bank Lenders' claim was entered on the Petition Date or

when the Bank Lenders' Proofs of Claim was filed.  The Effective Date of the Plan would be the

event most similar to the entry of a money judgment, and that date has not yet occurred.

---

[70]    *Northrop Corp.* v. *Triad Int'l Mktg., S.A.*, 842 F.2d 1154, 1156 (9th Cir. 1988).

150.    Absent evidence that Congress sought to impose a uniform rate of post-petition interest, and absent the furtherance of a legitimate federal policy, this Court should respect, not displace, state law.[71]  *See also In re Carter*, 220 B.R. 411, 416-17 (Bankr. D.N.M. 1998) (observing that courts applying the uniform federal judgment rate to claims have "overlooked the underlying policy of the Code to avoid producing a windfall for the debtor"). Because Grace's argument that Bank Lenders can only receive the federal judgment rate of interest under the "best interests of creditors" test is wrong, the Plan may not be confirmed because Grace has failed to satisfy its burden under section 1129(a)(7).

## RESERVATION OF RIGHTS

151.    The Bank Lender Group and Creditors' Committee repeat and expressly reserve their rights to object further to confirmation of the Plan on any and all grounds, including but not limited to, feasibility and those grounds set forth herein, and in response to any arguments to be raised by the Plan Proponents.

---

[71]  "Whether latent federal power should be exercised to displace state law is primarily a decision for Congress, not the federal courts."  *Atherton* v. *FDIC*, 519 U.S. 213, 218 (1997).

## CONCLUSION

WHEREFORE, the Bank Lender Group and Creditors' Committee respectfully request that the Court deny confirmation of the Plan.

Dated:    Wilmington, Delaware
          July 13, 2009

**PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP**
Stephen J. Shimshak
Andrew N. Rosenberg
Margaret A. Phillips
Rebecca R. Zubaty
1285 Avenue of the Americas
New York, New York  10019-6064
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990

-and-

**LANDIS RATH & COBB LLP**


/s/ James S. Green, Jr.
Richard Cobb (No. 3157)
James Green (No. 4406)
919 Market Street, Suite 600
Post Office Box 2087
Wilmington, Delaware  19899
Telephone:  (302) 467-4400
Facsimile:  (302) 467-4450

Counsel for the Bank Lender Group

**STROOCK & STROOCK & LAVAN
LLP**
Lewis Kruger
Kenneth Pasquale
Arlene Krieger
180 Maiden Lane
New York, New York 10038
Telephone:  (212) 806-5400
Facsimile:  (212) 806-6006

-and-

**DUANE MORRIS LLP**


/s/ Richard W. Riley
Michael R. Lastowski (No. 3892)
Richard W. Riley (No. 4052)
1100 North Market Street, Suite 1200
Wilmington, Delaware 19801-1246
Telephone: (302) 657-4942
Facsimile:  (302) 657-4901

-and-

William S. Katchen**,** Esquire
744 Broad Street, Suite 1200
Newark, New Jersey  07102-3889
Telephone: (973) 424-2031
Facsimile: (973) 556-1380

Counsel for the Official Committee
of Unsecured Creditors of W.R. Grace &
Co. *et al.*