**<u>EXHIBIT 3</u>**

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al. [1] | ) | Case No. 01-01139 (JKF) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |

**Hearing Date: July 21, 2008 at 1:00 p.m.**
**Responses Due: July 3, 2008 at 4:00 p.m.**

## DEBTORS' OBJECTION TO THE UNSECURED CLAIMS ASSERTED UNDER THE DEBTORS' CREDIT AGREEMENTS DATED AS OF MAY 14, 1998 AND MAY 5, 1999

The above-captioned debtors (the "Debtors") object to the claims of their prepetition

bank lenders, Claim Nos. 9159 and 9168 (together, the "Proofs of Claim"), filed by JPMorgan

Chase Bank ("JPMorgan Chase"), in its capacity as agent for the lenders (collectively, the

"Lenders") under (i) a Credit Agreement dated as of May 14, 1998, as amended, among W. R.

Grace & Co., W. R. Grace & Co.-Conn., the Banks Party Thereto, JPMorgan Chase (then known

---

[1]     The Debtors consist of the following 62 entities:  W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.),
W. R. Grace & Co. Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon,
Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc.,
Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC
(f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., GC Limited Partners I, Inc., (f/k/a
Grace Cocoa Limited Partners I, Inc.), GC Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC
Management Corporation, GN Holdings, Inc. GPC Thomasville Corp., Gloucester New Communities
Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary
Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe,
Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc.
(f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace
Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc.,
W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-
Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai
Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH,
Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings
Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (F/k/a Nestor-BNA, Inc.), MRA
Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental
Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin &
Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country
Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

as The Chase Manhattan Bank), as Administrative Agent, and Chase Securities Inc., as Arranger (the "1998 Credit Agreement") and (ii) a 364-Day Credit Agreement, dated as of May 9, 1999, as amended, among W. R. Grace & Co., W. R. Grace & Co.-Conn., the Banks Party Thereto, Bank of America National Trust and Savings Association, as Documentation Agent, JPMorgan Chase (then known as The Chase Manhattan Bank), as Administrative Agent, and Chase Securities Inc., as Book Manager (the "1999 Credit Agreement"). In support of this Objection, the Debtors state the following:

### Preliminary Statement

1.     The Debtors recently received notice from the Lenders demanding the payment of postpetition interest at 100% of the contract default rate on more than $500 million of prepetition claims against the Debtors under the 1998 and 1999 Credit Agreements as set forth in the Proofs of Claim. There is absolutely no basis to support this demand.

2.     As a threshold matter, the Lenders' position hinges entirely on the presumption that the Debtors are solvent as a matter of fact and law. But that presumption is only that and stands in service solely of the Lenders' demand for default interest. Since the very first day of these cases, the single overriding issue has been whether the Debtors' putative liability on account of asbestos personal injury claims renders the Debtors insolvent. While the Debtors would agree the value of that liability does not render them insolvent, the Official Committee of Asbestos Personal Injury Claimants (the "Asbestos Claimants Committee") and the Future Claims Representative have taken a very different view and have asserted values for their claims that would make the Debtors insolvent.

3.     Ultimately, after extensive litigation during the recent estimation proceedings, the Debtors, the Asbestos Claimants Committee, the Future Claims Representative and the Equity Committee reached the only type of settlement that was feasible under these circumstances –one

2

that did not require agreement to any particular estimate of liability or adjudication of solvency. The settlement is a delicately balanced one, which contemplates a substantial payment by the Debtors to a section 524(g) trust, but also permits the Debtors' shareholders to retain an interest in the reorganized Debtors. The settlement does not even address the issue of solvency. The settlement is a compromise predicated upon resolving all issues and allocating values to various constituencies. Significantly, as a corollary to that settlement, this Court is not required to make any determination regarding the Debtors' solvency. The Lenders' demand for interest at the default rate represents an attempt to leverage this settlement into a claim as to which they are simply not entitled.

4.      As such, the Lenders' demand is inherently in conflict with the proposed resolution of these cases. In that resolution, all constituencies have agreed to stand down from the litigation process. The asbestos personal injury claimants also have agreed to accept a certain value for their claims. Critically, the Debtors' equity holders have agreed to accept a certain value and, in exchange, will not insist that the Debtors continue the estimation process, notwithstanding that under the proposed settlement the equity holders will receive far less than what the Debtors' estimate in the litigation would call for. While the Lenders might prefer that equity accept a larger haircut, the fact is that it is within the rights of equity holders to insist upon continued litigation of the asbestos personal injury claims to resolve that issue.

5.      As is made clear by their notice, the Lenders would also have this Court believe that, if solvency is established, the Lenders are <u>automatically</u> entitled to postpetition interest at the contract rate of default. That, of course, is not an accurate statement of the law. To the contrary, this Court has wide discretion in determining the appropriate rate of postpetition interest, and any analysis in that regard must take into account <u>all equitable considerations</u>. As

3

set forth below, in light of the relevant equitable considerations here, the Lenders cannot argue that they are entitled to an award of postpetition interest at the highest contract default rate. By definition, and in fact, such an award can hardly be considered fair and equitable under the circumstances.

6.      For all these reasons, the Debtors' Objection should be sustained, and this Court should find that the Lenders are <u>not</u> entitled to postpetition interest at the contract default rate in connection with their Proofs of Claim.

<u>**Jurisdiction**</u>

7.      This Court has jurisdiction over this matter under 28 U.S.C. § 1334. This matter is a core proceeding within the meaning of 28 U.S.C. §§ 157(b)(2)(A) and (O).

8.      The statutory bases for relief requested herein include 11 U.S.C. §§ 105(a), 502(b), 726 and 1129 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "<u>Bankruptcy Code</u>") and Rules 3001 and 3007 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>").

<u>**Relief Requested**</u>

9.      The Debtors seek entry of an order disallowing the Proofs of Claim to the extent that they assert a right to recovery of postpetition interest calculated at the default rate of interest under the 1998 and 1999 Credit Agreements.

<u>**Statement of Facts**</u>

10.      The Debtors, who filed for bankruptcy protection on April 2, 2001 (the "<u>Petition Date</u>"), are borrowers under the Credit Agreements with the Lenders. JPMorgan Chase serves as the administrative agent for the Lenders under the 1998 and 1999 Credit Agreements. As of the Petition Date, there were no defaults under the Credit Agreements.

4

11.    On March 27, 2003, JPMorgan Chase filed the Proofs of Claim on behalf of the Lenders with respect to both the 1998 and 1999 Credit Agreements. (A copy of the Proof of Claim with respect to the 1998 Credit Agreement is attached hereto as Exhibit A; a copy of the Proof of Claim with respect to the 1999 Credit Agreement is attached hereto as Exhibit B). The Proofs of Claim assert an outstanding aggregate principal amount owing under the Credit Agreements of not less than $500 million, together with prepetition interest, postpetition interest, and other fees and expenses. The Lenders' claim for postpetition interest is the primary subject of this Objection.

12.    More specifically, although the Proofs of Claim are silent as to the claimed rate of postpetition interest, the Lenders have recently made clear that they are demanding postpetition interest at the contract default rate under the Credit Agreements, which was 7.77% as of the Petition Date.[2] To put that rate in perspective, the non-default contract rate of interest under the Credit Agreements as of the Petition date was 5.77%,[3] and the federal judgment rate of interest at that time was 4.19%.

13.    As this Court is well aware, from the outset, the Debtors' solvency has always been the primary issue in these chapter 11 cases. One of the biggest challenges facing these Debtors, and their viability, has been determining the extent of their liability related to asbestos personal injury claims pending as of the Petition Date and arising thereafter (the "Asbestos PI

---

[2]    Under both the 1998 and 1999 Credit Agreements, the default rate of interest is 2% above the stated contract rate. The Lenders may try to argue that the 2% spread between the default rate and the contract rate is de minimis and weighs in favor of granting their request for default interest. The 2% spread, though, is far from de minimis. Indeed, payment of default interest could result in an increased payment to the Lenders of over $100 million due to the large principal amount outstanding and the duration of these chapter 11 cases.

[3]    Under the 1999 Credit Agreement, the contract rate of interest as of the Petition Date was LIBOR plus 100 basis points. Under the 1998 Credit Agreement, it was LIBOR plus 40 basis points.

Claims"), which in turn directly affects the Debtors' solvency.  The Debtors, with the support of the Official Committee of Equity Security Holders (the "Equity Committee"), litigated the valuation issue aggressively and extensively in the recent estimation proceeding.  To date, this litigation has dominated these chapter 11 cases.  But, in an effort to bring this case to closure, the Debtors, the Asbestos Claimants Committee, the Future Claims Representative and the Equity Committee agreed to settle the Debtors' liability for the Asbestos PI Claims (the "Proposed Asbestos Settlement").  The terms and conditions of the Proposed Asbestos Settlement are memorialized in a Term Sheet for Resolution of Asbestos Personal Injury Claims, dated April 6, 2008, by and among the Debtors, the Equity Committee, the Asbestos Claimants Committee and the Future Claimants Representative, which contemplates implementation of the Proposed Asbestos Settlement in the context of a chapter 11 plan.

14.    The term sheet for the Proposed Asbestos Settlement contemplates that equity holders will receive an interest in the Debtors under the Plan (a concession by the asbestos personal injury claimants) but that equity's position will be substantially diluted by the issuance of the warrant and the potential deferred asbestos payments (a concession by the equity holders). Solvency is not addressed in the settlement.

15.    One of the key components of the Proposed Asbestos Settlement is the postpetition rate of interest to be paid to the Lenders under the 1998 and 1999 Credit Agreements.  In that regard, the Proposed Asbestos Settlement provides that the Lenders shall receive "100% of allowed amount plus . . . postpetition interest at the rate of 6.09% from the filing date through December 31, 2005 and thereafter at floating prime, in each case compounded quarterly" (the "Negotiated Bank Debt Interest Rate").  (A copy of the Proposed Asbestos Settlement is attached hereto as Exhibit C.)

6

16.    The prior course of dealing between the Debtors and all stakeholders, including the Lenders, explains the Negotiated Bank Debt Interest Rate. In particular, in January 2005, the Creditors' Committee, which represents the interests of these Lenders (and others), agreed to become co-proponents of a plan of reorganization that, critically, both provided value for equity and offered the Lenders postpetition interest at a rate (6.09%) that was more than the base contract rate, but was not the default rate. There was no agreement to pay the Lenders interest at the contract default rate. In February 2006, the Creditors' Committee again acknowledged that the Lenders had agreed to accept postpetition interest at 6.09% from the Petition Date through December 31, 2005, and, going forward, further agreed that the Lenders would accept postpetition interest at a floating prime rate (compounded quarterly) in conjunction with an overall settlement under a chapter 11 plan.

17.    However, now that the Debtors are getting closer to emerging from chapter 11, the same Negotiated Bank Debt Interest Rate no longer is acceptable to the Lenders. In fact, notwithstanding their prior agreement and after benefiting from the several years that the Debtors spent litigating the Asbestos PI Claims, on April 21, 2008, the Lenders sent the Debtors a letter rejecting the Negotiated Bank Debt Interest Rate reflected in the Proposed Asbestos Settlement and demanding interest at the contract default rate. In that demand, the Lenders took the position that they are entitled to this exorbitant rate of interest as a matter of law. The Lenders also asserted that the previous proposed plan and related negotiations were completely irrelevant, notwithstanding that the Debtors negotiated the Proposed Asbestos Settlement in reliance upon the Lenders' previous agreements. To date, despite in-person meetings and negotiations, the Lenders have shown no inclination to withdraw their demand.

7

18.    Accordingly, because the Lenders' exorbitant demand is <u>inequitable</u>, and immediately threatens the Proposed Asbestos Settlement, this Objection ensued.

<b><u>Argument</u></b>

19.    The analysis as to the appropriate rate of postpetition, or pendency, interest on account of unsecured claims starts with section 502(b)(2) of the Bankruptcy Code, which prohibits allowance of a claim for "unmatured interest." 11 U.S.C. § 502(b)(2). In other words, under the plain text of the Bankruptcy Code, the Lenders are not entitled to any postpetition interest much less interest accruing at the default rate. There are two exceptions to the general prohibition against pendency interest for unsecured claims, both of which are only applicable in solvent debtor cases. The first results from the "best interests" test of section 1129(a)(7), and the second results from the "fair and equitable" requirement of section 1129(b). Here, given that the Debtors' solvency is still in dispute, this Court need not look beyond section 502(b)(2) to conclude that the Lenders are not entitled to <u>any</u> postpetition interest, let alone interest at the contract <u>default</u> rate. Nor would payment of postpetition interest at the contract default rate be warranted under the "best interests" test, and it certainly would not be "fair and equitable" under the circumstances here. Thus, the 6.09% rate included in the term sheet stands by the Debtor's course of dealings with the Lenders, is more generous than the law arguably provides, and is plainly equitable.

I.

### The Lenders Are Not Entitled To Any Postpetition Interest Under Section 502(b)(2).

20.    Section 502 of the Bankruptcy Code governs the allowance of claims and interests in chapter 11 cases. Section 502(b)(2) expressly provides that a proof of claim shall not be allowed if "such claim is for unmatured interest." 11 U.S.C. § 502(b)(2). That is exactly what we have here.

8

21.     The Proofs of Claim make clear that the Lenders are seeking postpetition interest on claims for principal of more than $500 million. The Lenders' notice of April 21, 2008, adds that the rate of postpetition interest sought by the Lenders is the contract default rate under the 1998 and 1999 Credit Agreements. Because the Debtors were not in default of the Credit Agreements as of the Petition Date, the postpetition or future interest was not due and payable. As result, the Lenders' claim for "postpetition interest" is undoubtedly a "claim . . for unmatured interest," and thus this aspect of the Lenders' Proofs of Claims must be denied pursuant to section 502(b) of the Bankruptcy Code.

22.     Although there are limited exceptions to the rule denying the payment of postpetition interest on account of unsecured claims -- which exceptions are discussed below -- this Court need not consider those exceptions here. This is so because those exceptions only apply in cases where the debtor's solvency has been established. That is not this case. Notwithstanding the Lenders' "presumption" of solvency, the fact remains that the Debtors' actual solvency remains in dispute, has not yet been determined, and will never be determined unless the Proposed Asbestos Settlement falls through and the estimation litigation relating to the Asbestos PI Claims is revived and completed.

## II.

### The Lenders Are Not Entitled To Contract Default Interest Under Section 1129.

23.     The Lenders' notice demanding the contract default rate of interest makes clear that they intend to rely, at least in part, on exceptions to the denial of postpetition interest derived from the "best interests" test and the absolute priority rule's "fair and equitable" test under section 1129 of the Bankruptcy Code. But these exceptions are not available to the Lenders.

24.     Most importantly, as discussed above, the Lenders' reliance on these exceptions hinges on their presumption that the Proposed Asbestos Settlement establishes the Debtors'

9

solvency as a matter of fact and law. This presumption is flawed. First, it is black letter law that for the Lenders to be entitled to claim any postpetition interest under either test, the Debtors' solvency must be established, which is not the case here, and not merely presumed.

25.    Moreover, a key component of the Proposed Asbestos Settlement is the payment of postpetition interest to the Lenders at the rate of 6.09% from the petition date through December 31, 2005 and thereafter at floating prime. The Lenders have objected to that proposed rate of interest, and are instead demanding interest at the higher default rate under the Credit Agreements. In other words, the Lenders want to cherry pick among the terms of the Proposed Asbestos Settlement. They embrace the Proposed Asbestos Settlement to the extent they believe it helps them establish the Debtors' solvency, but they reject a material provision of the settlement, which is the payment of postpetition interest to the Lenders at a rate that is lower than their default contract rate, but higher than their non-default contract rate.

26.    The Lenders cannot have it both ways. The fact remains that the Debtors' solvency simply is neither agreed nor adjudicated. If the Lenders were to prevail on their demand for postpetition interest at the contract default rate, that would represent a material change to the Proposed Asbestos Settlement. In that event, the various stakeholders who currently support the Proposed Asbestos Settlement, such as the Equity Committee, would likely pull their support for the settlement. Were that to happen, the litigation over the Asbestos PI Claims would necessarily resume, which would add further expense and delay.

27.    Thus, the indefiniteness as to the Debtors' solvency and the corresponding fact that this is not a "solvent debtor" case, establishes that the "best interests" and "fair and equitable" exceptions are not applicable here. Moreover, an analysis of the relevant factors

10

demonstrates that such exceptions in no way support, much less mandate, an award to the Lenders of postpetition interest at the contract default rate.

A.    **The "Best Interests" Test Does Not Mandate A Default Rate Of Interest.**

28.    Under section 1129(a)(7), the so-called "best interests" test requires a plan of reorganization to provide each dissenting creditor or interest holder in an impaired class of claims with value that is not less than the amount such holder would receive if the debtor was liquidated under chapter 7. *See Kane v. Johns-Manville Corp., (In re Johns-Manville Corp.),* 843 F.2d 636, 649 (2d Cir. 1988) (holding that the presentation of liquidation analysis showing lesser probable recovery in chapter 7 satisfies section 1129(a)(7)). In essence, the best interests test contemplates a comparison of distributions under a proposed chapter 11 plan of reorganization with those that would be realized in a hypothetical chapter 7 liquidation. *See In re Jartran, Inc.,* 44 B.R. 331, 390 (Bankr. N.D. Ill. 1984). A chapter 7 liquidation, in turn, is governed by the priority scheme set forth in section 726 of the Bankruptcy Code. Under section 726(a)(5), in a chapter 7 liquidation, a creditor must receive pendency interest on its claim "at the legal rate from the date of the filing of the petition" before distributions may be made back to the debtor. 11 U.S.C. § 726(a)(5).

29.    The Bankruptcy Code does not define the "legal rate" of interest. Courts, however, have consistently interpreted the "legal rate" of interest to be the federal judgment rate. *See, e.g., In re Cardelucci,* 285 F.3d 1231, 1234-35 (9th Cir. 2002); *In re Coram Healthcare Corp.,* 315 B.R. 321, 346 (Bankr. D. Del. 2004) ("Most courts, however, conclude that [the legal rate] means the federal judgment rate") (citations omitted); *see also In re Adelphia Commc'ns,* Case No. 02-41729, Bench Ruling, tr. at 7 (Bankr. S.D.N.Y. April 27, 2006) (Gerber, J.) ("It is

11

by far the better view, in my opinion, that 'legal rate' is the federal judgment rate and not the same as that authorized under section 506(b), which is a contract rate.").[4]

30.    As of the Petition Date, the federal judgment rate was 4.19%, which was below the contract rate and default rate under the 1998 and 1999 Credit Agreements at that time. Clearly, then, the Lenders cannot argue that the best interests test warrants the payment of pendency interest at the contract default rate. And, given that the best interests test requires a comparison of a chapter 11 plan treatment to the liquidation of a debtor, the Lenders may not even be entitled to *any* postpetition interest absent evidence that the Debtors would be solvent using a chapter 7 liquidation valuation. *See, e.g., In re Lisanti Foods, Inc.*, 329 B.R. 491, 500 (Bankr. D. N.J. 2005) ("In making [a section 1129(a)(7)] showing, the liquidation value of the debtor's assets is controlling."); *but see In re Coram Healthcare*, 315 B.R. at 345 ("In this case, though, it is relevant to compare the amount of debt to the confirmation value ($317 million) because the Debtors are reorganizing instead of liquidating."). There is simply no record that would support a <u>presumption</u> of the Debtors' solvency in a liquidation.

B.    <u>The "Fair and Equitable" Test Does Not Mandate A Default Rate Of Interest</u>.

31.    In addition to the application of section 726(a)(5) to chapter 11 cases through the best interests test, certain courts have required the payment of postpetition interest to unsecured creditors at a rate sufficient to satisfy the "fair and equitable" test within section 1129(b).[5] That section allows a bankruptcy court to confirm a plan of reorganization over the objection of a

---

[4]    A copy of Judge Gerber's bench ruling is attached hereto as Exhibit D.

[5]    Notably, these courts diverge from the leading bankruptcy treatise, which states that the federal judgment rate is the only interest rate required for determining the payment of postpetition interest. *See* 4 Collier on Bankruptcy ¶ 502.03[3][c] (15th ed. rev. 2008) ("[W]hen interest is payable because a debtor proves to be solvent, the proper rate of interest is the statutory or legal rate. The purpose for this rule is because allowing a contractual rate over the statutory rate would benefit some creditors over others.").

dissenting class of creditors provided that the plan does not "discriminate unfairly" and is "fair and equitable." 11 U.S.C. § 1129(b); *see In re PPI Enters. (U.S.), Inc.*, 324 F.3d 197, 205 n.14 (3d Cir. 2003) ("An impaired creditor in a solvent debtor case can demand postpetition interest under the 'fair and equitable' test of § 1129(b)(2).") (citations omitted); *In re Butler*, 42 B.R. 777, 787 (Bankr. E.D. Ark. 1984) (holding that unsecured creditors of chapter 11 solvent debtor are entitled to postpetition interest for two reasons -- under section 1129(a)(7) and under the cram down requirements of section 1129(b)(1) that treatment of all classes of dissenting creditors be fair and equitable).

32.    The determination of the appropriate rate of postpetition interest under section 1129(b) is a matter within the Court's discretion and must be based on the equitable considerations of each particular case. Indeed, the fair and equitable basis for postpetition interest traces back to the United States Supreme Court's decision in *Vanston Bondholders Protective Committee v. Green*, 329 U.S. 156 (1946), where the Court stated: "It is manifest that the touchstone of each decision on allowance of interest in bankruptcy, receivership and reorganization has been a balance of equities between creditor and creditor or between creditors and the debtor." *Id*. at 165.

33.    Courts have formulated different articulations for determining what rate of postpetition interest will satisfy the "fair and equitable" standard of section 1129(b). In *Coram Healthcare*, Chief Judge Walrath applied what can best be termed a "bottom-up" approach that starts with the premise that the federal judgment rate represents the minimum rate of interest necessary to satisfy the "fair and equitable" standard of section 1129(b). *In re Coram Healthcare Corp.*, 315 B.R. at 346. As Chief Judge Walrath recognized, the federal judgment rate is merely the minimum, and the specific equities of a given case can compel the application

13

of a higher rate of postpetition interest. *Id.* Of course, in that case, the federal judgment rate also turned out to be the maximum. The Sixth Circuit, on the other hand, has articulated what can be termed a "top-down" approach, which starts with the presumption "that default interest should be paid to unsecured claim holders in a solvent debtor case." *In re Dow Corning Corp.*, 456 F.3d 668, 680 (6th Cir. 2006).[6] This presumption, however, is subject to a downward adjustment based upon "the consideration of any equitable factors affecting the interest rate." *Id.*

34.    No court, however, has adopted the rigid, formulaic approach taken by the Lenders in their demand letter of April 21, 2008. There, the Lenders take the position that, once solvency is established, unsecured creditors are automatically entitled to postpetition interest at the full contract default rate of interest -- period, full stop.

35.    The Lenders could not be more wrong. Indeed, regardless of the articulation, courts that have analyzed the appropriate rate of postpetition interest payable to unsecured creditors in solvent estates over the years agree that, consistent with *Vanston*, the analysis ultimately hinges upon "a balance of equities." *See In re Coram Healthcare Corp.*, 315 B.R. at 346 ("[T]he specific facts of each case will determine what rate of [postpetition] interest is 'fair and equitable.'"); *In re Dow Corning Corp.*, 456 F.3d at 680 (remanding the issue of the appropriate rate of postpetition interest for "consideration of any equitable factors affecting the interest rate"); *In re Loral Space & Commc'ns Ltd.*, Bench Ruling, No. 03-41710, tr. at 39-40 (Bankr. S.D.N.Y. July 25, 2005) (Drain, J.) ("In my view . . . the court has a large amount of discretion in deciding what the appropriate rate of interest should be under a Chapter 11 plan for

---

[6]    The Third Circuit has not yet addressed the question of the appropriate rate of postpetition interest to be paid to unsecured creditors in a solvent chapter 11 proceeding. Neither has the Second Circuit for that matter.

a solvent debtor.").[7]  Depending on the balancing of these equitable factors, courts have held that the appropriate rate of postpetition interest can be tied to the legal rate, the contract rate or the contract default rate.

36.     Here, there can be no question that the Lenders' recent demand for payment of postpetition interest at the contract default rate is unwarranted and inequitable.

37.     First, the Lenders' rejection of the Negotiated Bank Debt Interest Rate and their demand for the contract default rate represent a clear departure from their prior agreements and course of conduct in these chapter 11 cases.  As noted above, these same Lenders previously agreed to accept postpetition interest at the rate of 6.09% under a proposed plan of reorganization that just as plainly left value for equity.

38.     Moreover, despite the fact that the Proposed Asbestos Settlement is the product of meaningful concessions by all parties thereto, the Lenders want to accept all of the benefits of that agreement but none of what they perceive to be the burdens, such as the payment of postpetition interest at the rate of 6.09%.  In other words, the Lenders want to profit from the concessions of others, while making no concessions of their own.  By any definition, that is the opposite of equity.

39.     Second, the Lenders' attempt to take back their prior agreement as to the appropriate postpetition interest rate inevitably jeopardizes the Proposed Asbestos Settlement.  As stated above, the proposed settlement that equity holders have bought into assumes a Negotiated Bank Debt Interest Rate starting at 6.09% until December 31, 2005 and then at floating prime thereafter.  If that rate were to change as a result of the Lenders' demand, the

---

[7]     A copy of Judge Drain's bench ruling is attached hereto as Exhibit E.

15

equity holders would be well within their rights to resume the estimation litigation over the estimated Asbestos PI Claims. Should that occur, any hope the Debtors currently have of achieving a consensual resolution would be seriously compromised. This potentially disastrous impact of an award of postpetition interest at the contract default rate is reason enough to reject the Lenders' demand. *Cf. In re A.H. Robins Co., Inc.,* 89 B.R. 555, 562 (E.D. Va. 1988) (disallowing claim for punitive damages in a chapter 11 case because of the potential impact on the debtor's plan of reorganization).

40.     This also proves that the Lenders' demand frustrates a fundamental purpose of the Bankruptcy Code, which is to provide a forum for various constituents to build agreements that allow debtors to manage their liabilities, reorganize their businesses and successfully emerge from bankruptcy. *See In re Mirant Corp.,* 334 B.R. 800, 811 (Bankr. N.D. Tex. 2005) ("One of the goals of Congress in fashioning the Bankruptcy Code was to encourage parties in a distress situation to work out a deal among themselves.").

41.     Third, the Lenders' demand for postpetition interest at the contract default rate is inequitable in light of the fact that any so-called default -- or failure to make timely payment -- exists solely because the Debtors have been legally precluded from making such payments during these proceedings. There was no prepetition default or failure to make timely payment. As a result, there can be no "default" now to substantiate a claim for default interest. *See In re Nextwave Personal Commc'ns, Inc.,* 244 B.R. 253, 276 (Bankr. S.D.N.Y. 2000) ("It is senseless to speak of a 'default' when, as a matter of bankruptcy law, the debtors had neither the authority nor the ability to make such payments absent notice and court approval.").

42.     In essence, the Lenders' claim for default interest is a veiled attempt to circumvent the well-established principles that a creditor's rights are fixed as of the petition date,

16

and that creditors may not modify their contractual rights against a debtor based upon the debtor's reorganization under the Bankruptcy Code. *See, e.g.*, 11 U.S.C. §§ 502(b) and 365(e)(1); *Carrieri v. Jobs.com, Inc.*, 393 F.3d 508, 527 (5th Cir. 2004) ("Under § 502(b), the rights of holders of claims and interests are fixed as of the Petition Date."); S. Rep. No. 95-989 at 62 (1978), reprinted in 198 U.S.C.C.A.N. 5787, 5848 ("Whether interest is matured or unmatured on the date of bankruptcy [under section 502(b)] is to be determined without reference to any *ipso facto* or bankruptcy clause in the agreement creating the claim."); *cf. In re EBC I, Inc.*, 356 B.R. 631, 640 (Bankr. D. Del. 2006) ("Ipso facto clauses (by which a contract is terminated as a result solely of the debtor's insolvency or bankruptcy) are generally disfavored, if not expressly void, under the Bankruptcy Code.").

43.     Fourth, and finally, the Lenders' rejection of the Negotiated Bank Debt Interest Rate, which is greater than the Lenders' bargained for standard contract rate of interest and is significantly greater than the federal judgment rate of interest, is particularly inequitable in light of the fact that, but for the Debtors' litigation and reorganization efforts throughout the case, which have resulted in the Proposed Asbestos Settlement following the recent claims estimation proceedings, the Lenders might not be in a position to demand full repayment of their principal, let alone postpetition interest at the contract default rate.

### III.

### Now Is The Time To Resolve The Postpetition Default Interest Issue.

44.     The Debtors' chapter 11 cases are nearing a critical juncture. After years of litigating the Debtors' solvency in relation to the estimation of the Asbestos PI Claims, the Debtors are poised to proceed with the Proposed Asbestos Settlement and emerge from chapter 11. The Lenders' most recent demand, however, threatens to derail this process. Although the Lenders may argue that this Objection should be heard at confirmation of a plan based upon the

Proposed Asbestos Settlement, the fact of the matter is that any effort to move forward with a plan without resolving this issue would only invite unnecessary delay and expense and threaten the closure which now is at hand. Simply put, there is no Proposed Asbestos Settlement on which to formulate a chapter 11 plan if the Lenders are entitled to postpetition interest at the contract default rate.

45.    Importantly, the Debtors' chapter 11 cases have been pending for more than seven years. As a result, this Court has before it a vast record of the Debtors' potential liabilities and knows well the extent to which the Debtors' solvency has been disputed from the outset of these cases. Given this extensive record, no further fact development is needed before determining whether or not the Lenders are entitled to postpetition interest at their contract default rate under a plan based upon the Proposed Asbestos Settlement. Indeed, at confirmation, this Court will not be presented with any additional information concerning the Debtors' solvency. As mentioned earlier, the Proposed Asbestos Settlement does not determine the Debtors' solvency -- it merely represents the terms by which the plan proponents have agreed to cease litigating the very issues affecting the Debtors' solvency.

46.    Finally, the Lenders have taken the position in their April 21, 2008 letter that any plan based upon the Proposed Asbestos Settlement is "unconfirmable" due to the default interest issue. As a result, this issue is ripe for consideration now given that the Debtors intend to file a plan and disclosure statement based upon the Proposed Asbestos Settlement. *See, e.g., In re Phoenix Petroleum Co.*, 278 B.R. 385, 394 (Bankr. E.D. Pa. 2001) ("Courts generally have agreed that it may, on occasion, be appropriate to consider issues at the disclosure hearing stage which could otherwise be raised at confirmation, if the described plan is fatally flawed so that confirmation would not be possible."); *In re Felicity Assocs., Inc.*, 197 B.R. 12, 14 (Bankr. D.

18

R.I. 1996) ("It has become standard Chapter 11 practice that 'when an objection raises substantive plan issues that are normally addressed at confirmation, it is proper to consider and rule upon such issues prior to confirmation, where the proposed plan is arguably unconfirmable on its face.'").

IV.

### The Debtors Reserve Their Rights To Amend And Supplement This Objection And To File A Reply To Any Response By The Lenders.

47.     As noted above, the Debtors' primary objection to the Proofs of Claim relates to the Lenders' demand for postpetition default interest.  In addition, the Debtors reserve their rights to further object to the Proofs of Claim on other grounds, including to the extent that the Lenders seek (a) the compounding of interest contrary to the terms of the 1998 and 1999 Credit Agreements, (b) interest on interest and (c) facility and other fees, including attorney fees, which are generally described in the Proofs of Claim, but for which the Lenders have not provided any backup or documentation.[8]  The Debtors reserve also their right to file a reply to any response of the Lenders to this Objection.

### Conclusion

48.     The Debtors' Objection should be sustained and the Proofs of Claim should be disallowed to the extent they seek postpetition interest at the default rate of interest under the 1998 and 1999 Credit Agreements.

---

[8]     The Debtors do not believe that Local Rule 3007-1(f)(iii) applies to restrict their ability to assert additional substantive objections to the Proofs of Claim, because this Objection is not an "Omnibus Objection." In the event that the Court determines that Local Rule 3007-1(f)(iii) is applicable, the Debtors request that their reservation of rights in this Objection be deemed their objection to the Proofs of Claim in relation to the additional matters described herein.

19

**Notice**

49.    The Debtors will serve copies of this Objection on (i) the Office of the United States Trustee; (ii) JPMorgan Chase, as Administrative Agent for the Lenders; (iii) counsel to the ad hoc group of Lenders; (iv) counsel to each of the official committees appointed by the United States Trustee; (v) counsel for the Future Claimants' Representative; (vi) counsel to the debtor in possession lender; and (vii) all parties that have requested that they be served with all pleadings filed in these cases pursuant to Federal Rule of Bankruptcy Procedure 2002.

50.    The Debtors submit that notice of this Objection as outlined above is sufficient under Bankruptcy Rule 3007 and that no further notice is necessary.

**No Previous Request**

51.    No previous request for the specific relief set forth herein has been made to this or any other court.

20

WHEREFORE, the Debtors respectfully request that the Court (a) enter an order disallowing the Proofs of Claim to the extent they seek postpetition interest at the default rate of interest under the 1998 and 1999 Credit Agreements and (b) grant any further and related relief as it may deem appropriate.

Dated: June 13, 2008

Respectfully submitted,

KIRKLAND & ELLIS LLP
David M. Bernick, P.C.
Theodore L. Freedman
Janet S. Baer
200 East Randolph Drive
Chicago, IL 60601
(312) 861-2000

and

PACHULSKI STANG ZIEHL & JONES LLP

Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
Kathleen P. Makowski (Bar No. 3648)
Timothy P. Cairns (Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
(302) 652-4100

Co-Counsel for Debtors and Debtors in Possession

21

## **EXHIBIT C**

### **Proposed Asbestos Settlement**

Exhibit 99.2

**W. R. GRACE & CO., et al.**
**CASE NO. 01-1139 (JFK)**

**TERM SHEET FOR RESOLUTION OF**
**ASBESTOS PERSONAL INJURY CLAIMS**

This Term Sheet sets forth certain of the principal terms and conditions under which the Debtors, the Official Equity Security Committee, the Official Committee of Personal Injury Claimants ("ACC") and the Future Claimants Representative ("FCR") in the above-captioned Chapter 11 cases are prepared to file a plan of reorganization ("Plan") as co-proponents providing for the resolution of all asbestos personal injury claims and liabilities, including without limitation all asbestos personal injury claims pending at the filing date of the Chapter 11 cases and those arising subsequent thereto (collectively, "Asbestos PI Claims"). This Term Sheet also sets forth the proposed treatment of other key classes of claims asserted in the Chapter 11 cases. This Term Sheet has been produced for settlement purposes only and is subject to the provisions of Rule 408 of the Federal Rules of Evidence.

I.    **Treatment of Claims**

A.    **Asbestos PI Trust**

All Asbestos PI Claims will be channeled to a trust (the "Asbestos PI Trust") that is established in accordance with Section 524(g) of the United States Bankruptcy Code. The Asbestos PI Trust will pay claims from trust assets in accordance with a trust agreement and trust distribution procedures established by the ACC and FCR in connection with the Plan.

1.    **Funding of Asbestos PI Trust at Emergence.** On the Effective Date of the Plan, the Asbestos PI Trust shall receive the following, each of which shall be a condition to the Plan becoming effective:

a.    Cash Payment: $250 million, plus, if the Effective Date occurs after December 31, 2008, interest from January 1, 2009 to the Effective Date accrued at the same rate applicable to Grace's senior debt.

b.    Insurance: the assignment by W. R. Grace & Co.-Conn. ("Grace") and all of its affiliates to the Asbestos PI Trust, of all insurance policies and all insurance proceeds available for payment of Asbestos PI Claims, effective as of the Effective Date, including without limitation:

i.    Any such proceeds from the date hereof of all settlements with insurance companies, and all interest accrued thereon;

Source: W R GRACE & CO, 8-K, April 07, 2008

ii.      Any proceeds of the settlement with Equitas held in escrow with all interest accrued thereon;

iii.     Any proceeds of all settlements with all insurance companies under coverage in place agreements or installment payment arrangements where payment has not yet occurred;

iv.     Assignment of and the right to recover on all outstanding insurance policies potentially applicable to personal injury claimants; and

v.     The right to recover from all insolvent insurance estates as to which Grace or its affiliates has made a claim and the proceeds of all payments received by Grace or its affiliates from those insolvent estates after the date hereof, and all interest accrued thereon.

Provided however that Grace is in the process of examining its policies and the foregoing will not affect Grace's separate coverages, if any, for losses not arising from asbestos personal injury claims.

The ACC and FCR (or, after the Effective Date, the Asbestos PI Trust) shall control (and Grace shall cooperate in connection with) any negotiations or legal proceedings related to the underlying policies or settlement agreements applicable to Asbestos PI Claims.

c.     Warrant: a warrant for 10 million shares of W. R. Grace & Co. ("Parent") common stock, exercisable at $17 per share, and expiring one year after the Effective Date.

d.     Cryovac, Inc. Payment: The consideration contemplated by the Sealed Air Settlement Agreement.

e.     Fresenius Medical Care Payment: The proceeds of the payment contemplated by the Fresenius Settlement Agreement.

2.     **Deferred Payment Obligations:** Grace shall make additional payments to the Asbestos PI Trust over a 15 year period as follows: five annual payments of $110 million commencing on January 2, 2019; and 10 annual payments of $100 million commencing on January 2, 2024. Such payment obligations shall be subordinate to any bank debt or bonds outstanding and shall be guaranteed by Parent or any successor ultimate parent entity of Grace. Such guaranty shall be secured by an obligation of Parent to issue to the Asbestos PI Trust, in the event an additional payment is not made, the number of shares of Parent common stock which, when

2

added to the number of shares of common stock issued and outstanding as of the Effective Date, shall constitute 50.1% of the voting shares of Parent as of the Effective Date (such number of shares shall be equitably adjusted for stock splits, stock dividends, recapitalizations, corporate reorganizations or changes in control of Parent after the Effective Date).

**B.    Other Classes**

1.    **Administrative Claims**: 100% of allowed amount in cash.

2.    **Priority Tax Claims**: 100% of allowed amount in cash.

3.    **Priority Non-Tax Claims**: 100% of allowed amount in cash.

4.    **Secured Claims**: 100% of allowed amount either in cash or by reinstatement.

5.    **Unsecured Employee Claims (post-retirement health and special pension)**: 100% of allowed amount by reinstatement.

6.    **Workers Compensation Claims**: 100% by reinstatement.

7.    **Allowed General Unsecured Claims**: 100% of allowed amount plus post-petition interest as follows: (i) for holders of pre-petition bank credit facilities, post-petition interest at the rate of 6.09% from the filing date through December 31, 2005 and thereafter at floating prime, in each case compounded quarterly; and (ii) for all other unsecured claims, interest at 4.19%, compounded annually, or if pursuant to an existing contract, interest at the non-default contract rate.

8.    **Allowed Environmental Claims**: 100% of allowed amount in cash.

9.    **Traditional Asbestos Property Damage Claims**:  100% of allowed amount in cash for settled claims.  The Plan shall set forth procedures for the allowance of all Asbestos PD Claims that are disputed as of the Effective Date.

10.    **ZAI Claims**: Unless the Plan Proponents agree otherwise as to the treatment of ZAI Claims, the court shall estimate, for purposes of allowance and distribution, any liability on account of ZAI Claims prior to or in connection with the confirmation of the Plan.  ZAI Claims shall be paid 100% of their allowed amount up to the amount of the court's estimate.

**II.    Channeling Injunctions.**  The Plan shall contain injunctions under Sections 524(g) and Section 105(a) of the Bankruptcy Code to protect the Debtors, Cryovac, Sealed Air, Fresenius, their affiliates, officers, directors and employees, and other parties in interest and certain insurers.  The Plan shall also contain such provisions, injunctions and releases

3

Source: W R GRACE & CO, 8-K, April 07, 2008

(i) as are necessary to comply with the terms of the Sealed Air Settlement Agreement and the Fresenius Settlement Agreement; and (ii) to the full extent permitted by law, to indemnify, and release all of Grace's officers, directors, employees and professionals, and the members of all official committees, the FCR and their professionals, from any liability on account of claims against Grace, or arising in or in connection with these Chapter 11 cases. The foregoing injunctions, indemnifications and releases shall be at least as extensive as, and consistent with, the injunctions, indemnifications and releases provided for under Grace's Amended Plan currently filed in the Chapter 11 Cases to the extent such latter injunctions, indemnifications and releases are not inconsistent with this Term Sheet.

III.     **Resolution of Outstanding Issues.**   The parties agree to cooperate in seeking a resolution of outstanding issues material to or not otherwise resolved in connection with the confirmation of a plan of reorganization.

IV.     **Binding Effect.**   This Term Sheet has been approved by all necessary corporate or organizational action of the Board of Directors of Parent and Grace, the ACC, the FCR and the Equity Committee, and shall be binding upon the parties and each of their respective successors and assigns to the fullest extent permitted by applicable law. The parties shall use their best efforts to incorporate the terms of this Term Sheet into a mutually agreeable plan of reorganization to be filed with the Bankruptcy Court as soon as possible.

V.     **Confidentiality.**

The parties shall treat all negotiations regarding this Term Sheet as confidential. Neither the contents nor the existence of this Term Sheet shall be disclosed by any party, either orally or in writing, except to its directors, officers, employees, legal counsel, financial advisors, accountants and clients on a confidential basis until the Debtors have issued a press release announcing the terms and conditions contained herein. Notwithstanding the foregoing, the parties agree that this Term Sheet or the terms of this Term Sheet may be disclosed to the Official Committee of Unsecured Creditors and the Official Committee of Asbestos Property Damage Claimants. Grace will provide counsel to the ACC and counsel to the FCR an opportunity to review and comment on any press release relating to this Term Sheet prior to its issuance.

4

---

Source: W R GRACE & CO, 8-K, April 07, 2008

AGREED TO AND ACCEPTED BY:
Dated: April 6, 2008

**THE DEBTORS:**
W. R. GRACE & CO., on behalf of itself and its subsidiaries and affiliates that are Debtors in
the Chapter 11 cases

By:     /s/ Fred Festa
Name:   Fred Festa
Title:     Chairman, President and Chief Executive Officer


**THE OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS**


By:     /s/ R. Ted Weschler
Name:   R. Ted Weschler
Title:     Chair of the Committee

**THE OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS:**
CAPLIN & DRYSDALE, CHARTERED, on behalf of and in its capacity as counsel to the ACC


By:     /s/ Elihu Inselbuch
Name:       Elihu Inselbuch


**THE FUTURE CLAIMANTS REPRESENTATIVE:**
ORRICK, HERRINGTON & SUTCLIFFE LLP, on behalf of and in its capacity as counsel to the FCR


By:     /s/ Roger Frankel
Name:       Roger Frankel

5

Created by 10KWizard   www.10KWizard.com

Source: W R GRACE & CO, 8-K, April 07, 2008