**EXHIBIT 5**

```
                    UNITED STATES BANKRUPTCY COURT
                    WESTERN DISTRICT OF PENNSYLVANIA

IN RE:                          .   Case No.  01-01139 (JKF)
                                .   Jointly Administered
W.R. GRACE & COMPANY,           .
et al.,                         .   5414 U.S. Steel Tower
                                .   600 Grant Street
                                .   Pittsburgh, PA 15219
            Debtors.            .
                                .   June 18, 2009
. . . . . . . . .  . . . . .        1:05 p.m.

                         TRANSCRIPT OF HEARING
                  BEFORE HONORABLE JUDITH K. FITZGERALD
                  UNITED STATES BANKRUPTCY COURT JUDGE
```

APPEARANCES:

For the Debtors:            Kirkland & Ellis, LLP
                            By:  DAVID BERNICK, ESQ.
                                 BARBARA HARDING, ESQ.
                                 JANET BAER, ESQ.
                                 LISA ESAYIAN, ESQ.
                            200 East Randolph Drive
                            Chicago, IL  60601

For the Debtors:            Kirkland & Ellis, LLP
                            By:  THEODORE FREEDMAN, ESQ.
                                 JUSTIN BROOKS, ESQ.
                            Citigroup Center
                            601 Lexington Avenue
                            New York, NY  10022-4611


Audio Operator:             Janet Heller


Proceedings recorded by electronic sound recording, transcript
             produced by transcription service.

---

                      J&J COURT TRANSCRIBERS, INC.
                         268 Evergreen Avenue
                      Hamilton, New Jersey 08619
                     E-mail:  jjcourt@optonline.net

              (609) 586-2311       Fax No. (609) 587-3599

There is no -- once it's gone there's no affirmative position, there's no affirmative provision that says, oh, well, you can still recover interest as a tack on under the Code. It does not exist. Moreover, to the extent that the argument might be made that in some fashion it's a residual, that because these provisions only relate to entitlement, it remains something to which they are contractually entitled, and thereby it gets swept into 1121. That's the same argument all over again. The Code is explicit in 502 about what you can get. There's no carve out for 502 that says, well, common law entitlements or contractual entitlements under common law are still preserved. Allowable means allowed. It means what you get in the Bankruptcy Code. So, 502 and 726 are themselves bars to the tack on.

They then say -- they then would say, well, wait a minute. The intention of Congress in repealing 1124(3) -- the repeal of 1124(3) says, and the record says, well, gee, the intent of that was to allow people to get post-petition interest. Now, it's interesting, go back into the record of what actually Congress did, and I think that's laid out in the most detail in the District Court's decision in PPIE, but Congress was seeking to preserve really a principle that allows recovery of post-petition interest only under the fair and equitable standard, which doesn't come into place unless there is impairment. And so, the -- in a sense what Congress

probably did in repealing 1124(3) was based perhaps upon a misunderstanding or an improper gloss on the law. But in any event it doesn't make a difference because while they repealed 1124(3), they did not repeal 1124(1). And it's 1124(1) that is the predicate of the Third Circuit's decision in PPIE. So, that then takes us to the last question, which is the dicta in PPIE that says the post-petition interest is recoverable. That's dicta that the Court reached in the course of disposing of Solo's argument that statutory limitation was still impairment. That whole argument got into -- they got into the whole argument of what it is that the repeal meant by way of dealing with the question of whether Solo was correct in saying that plan limitation is not the only basis for impairment, statutory limitation too. So, that was important to their decision, but it was not really a holding that related to the question of whether the repeal of 1124(3) actually extended in some fashion to 1124(1), which on its face it did not. And the proof in the pudding to this dicta is the plan in PPIE because the plan in PPIE provided for post-petition interest. That was never at issue in the case. The plan was there.

And if you take a look in the bank lender's brief they make the argument which is very difficult to figure out, they suggest that the dicta is not dicta, it really is the holding in the case. They then go on to say that the analysis, their feeling about what the analysis is by the Court was the

1  reason that the plan provided for post-petition interest.  Na-
2  ah.  The plan provided for post-petition interest before the
3  Third Circuit said anything.  So, what the Third Circuit said
4  with respect to post-petition interest was important because it
5  stood in service of a holding on a different proposition, which
6  is that statutory limitations on recovery do not comprise a
7  basis for arguing impairment.  It was not a holding that
8  related to 1124(1).  1124(1), indeed, was the predicate for the
9  Court's analysis saying that there is such as a thing as --
10 there is a difference between plan and statutory impairment.
11 So, I don't think that the dicta is germane, and I think that
12 the analysis remains completely consonant with where impairment
13 stands under the Third Circuit's decision in PPIE.
14         502, 726 set out limitations.  Because those are the
15 source of the limitations, there is no impairment.  There is no
16 basis for arguing an end run around that analysis by saying
17 that there's some other source, some other judicial or
18 juridical source of a right to post-petition interest.
19         Now, I think, therefore, PPIE is dispositive.  Their
20 efforts for tack on are -- I find no support, indeed, they run
21 contrary to it.  But what if -- what if we considered them and
22 we said, okay, you have a tack on right?  And now the question
23 is is it impaired?  That is, if somehow they can find a basis,
24 a juridical basis for saying interest gets tacked on, is it
25 impaired?  And what's that going to bring us back to?  Say,

1  that were before Your Honor.  One was the declaration of Robert
2  Torola (phonetic), and the second was the declaration of Mark
3  Shelnitz.  In both -- Mr. Shelnitz, in connection with his
4  affidavit, he talks about, in Paragraph 7 he talks about the
5  fact that there were semi-monthly conference calls that took
6  place, participation in the calls, and then there were also
7  direct conversations with Mr. Kruger.  At no point during any
8  of the conversations with Mr. Kruger prior to April 2008 did
9  Mr. Kruger or anyone else at Stroock state that the creditors'
10 committee demanded that debtors pay interest under the joint
11 plan at default rate set forth in the credit agreements as a
12 condition to continuing the creditor committee's support.  And
13 this is germane because it supports Your Honor's determination
14 in the opinion that nobody ever expressed any dissatisfaction.
15         We also have Mr. Torola.  And Mr. Torola's affidavit
16 talks about -- extensively about the agreements -- the meetings
17 that took place during the process, during the plan process.
18 Paragraph 11.  In addition to these quoted conference calls,
19 Grace management team also attended annual conferences with
20 representatives of the creditors' committee, etcetera,
21 etcetera.  And basically this is all the -- these are -- this
22 is an attestation as to the flow of information that took place
23 in connection with the bankruptcy process squarely supporting
24 Your Honor's finding that there -- that the debtors had
25 complied with the reporting requirements of the Bankruptcy

1  think there's any dispute on that. I think we also agree that
2  --
3      THE COURT: Well, apparently if you had provided the
4  notices and so forth. I mean, you're going to -- you --
5      MR. GOLDBERG: Well, I think as a matter -- outside
6  of bankruptcy I don't think even the debtor would dispute that
7  if you didn't pay the -- any of the interest, 42 interest
8  payments, or $500 million of principal due in 2003, that would
9  have to be a default outside of bankruptcy. I would hope so.
10     THE COURT: It may be a default, but I think what Mr.
11 Bernick has just argued is that to get the default interest
12 rate you have to dot the i's and cross the t's, and the problem
13 here that the bank lenders would face is they didn't. But
14 assuming that they did all of that --
15     MR. GOLDBERG: We're going -- we're assuming that --
16     THE COURT: -- pre-petition --
17     MR. GOLDBERG: -- you complied --
18     THE COURT: Okay.
19     MR. GOLDBERG: Let's take this -- we're assuming that
20 you complied with the contract. There is no bankruptcy. Mr.
21 Cobb will address all of these --
22     THE COURT: All right.
23     MR. GOLDBERG: -- issues. I'm trying to just follow
24 the chart, so to speak, that's been laid out to me by the
25 debtor.

61

1        MR. COBB:  It's not an evidentiary hearing.
2        THE COURT:  Here we go.  I have --
3        MR. BERNICK:  Well, you can offer it --
4        THE COURT:  I think I do have the binder.
5        MR. BERNICK:  -- and then it will be in evidence.
6        MR. COBB:  I tell you what.  Why don't --
7                    (Pause)
8        THE COURT:  Okay.  I do have your binder, and I do
9   have the exhibits.
10       MR. COBB:  Very good.
11       THE COURT:  All right.
12       MR. COBB:  Your Honor, let's turn to Section 10.
13       THE COURT:  Of?
14       MR. COBB:  On Exhibit A, and I'll represent to the
15  Court that there is no meaningful -- but I can walk through it
16  if Your Honor would like -- difference between loan Agreement A
17  behind Exhibit Tab A or the loan agreement behind Exhibit Tab
18  B.  And if we turn to Section 10 --
19       THE COURT:  Can you give me the Bates stamp number?
20  It might be --
21       MR. COBB:  -- on these provisions -- Your Honor, I
22  don't have a Bates-stamped section.  I apologize for that.
23       THE COURT:  Well, Section 9.  Section 10, Events of
24  Default?
25       MR. COBB:  Section 10 --

**J&J COURT TRANSCRIBERS, INC.**

1  just -- I'm not sure what we're --
2          MR. BERNICK: Yes, I --
3          THE COURT: -- what the issue is.
4          MR. MARTIN: I think the Committee's reserving its
5  rights to make arguments in addition to what I'm making.
6          MR. BERNICK: Oh, I haven't addressed Morgan Stanley,
7  but that's okay.
8          THE COURT: Go ahead.
9          MR. MARTIN: Thank you, Your Honor. A lot has been
10 said about the bank lender issues, and I want to focus
11 specifically on my client's claim, and I want to focus on three
12 key principles that I divined from the case law on impairment
13 when I reviewed all of these cases over the weekend. And those
14 key principles are that I believe an unsecured claim is
15 impaired, unless it's paid in full plus interest. I also
16 believe that, as Mr. Cobb stated on Page 203 of the Third
17 Circuit's opinion in PPIE, that there is a presumption of
18 impairment for unsecured claims, and that the debtor has the
19 burden to rebut that presumption.
20         Your Honor, those concepts will permeate my arguments
21 on behalf of Morgan Stanley, who has an allowed claim by
22 stipulation, which is Docket Number 21835, for approximately
23 16.5 million, and by further stipulation that claim falls in
24 Class 9.
25         Your Honor, under the plan Section 3.1.9(b) says

1  without our consent. And so we could litigate that. Is that a
2  reasonable settlement for that claim? What we don't want them
3  to be able to do, is to say that because these TDP were part of
4  a confirmed bankruptcy plan, by they're very nature they're
5  reasonable or at least it evidenced that they're reasonable.
6      THE COURT: Each individual payout under the TDP or
7  settlement of claim or whatever words you want to use to
8  explain the process by which an individual personal injury
9  claimant presents a claim to the trust, has it evaluated, and
10 gets paid, is not before me. I couldn't make findings with
11 respect to that. That's the whole purpose of 524(g), to avoid
12 that issue and put it into a trust or other process for
13 purposes of prosecuting those claims elsewhere and not in the
14 bankruptcy court.
15     So, nothing that I find in terms of the fact that the
16 TDP itself was negotiated in good faith, that the amounts that
17 are being put in by whoever is going to be governed by the
18 524(g) injunctions is reasonable affects any determinations,
19 any individual claim. That's not before me.
20     MR. GIANNOTTO: I understand that.
21     THE COURT: Okay.
22     MR. GIANNOTTO: I understand that and we just want to
23 make sure that's clear or clearer, at least, to some coverage
24 court down the line.
25     THE COURT: You know, at this point, almost every

1  major company in the country has been through one of these
2  cases, and I have my doubts that any coverage court in the
3  country doesn't get it at this point. But, you know, if that's
4  the issue, it seems to me that the place to put that is in the
5  findings of fact and conclusions of law of the Court. That's a
6  determination this Court has to make. How do you bargain for
7  that in the plan? You can't compel me to make a finding that
8  there's something either reasonable or unreasonable. That's
9  what I have to do as a matter of my judicial determination.
10           MR. GIANNOTTO: No, we don't want you to make a
11  finding that something is unreasonable or reasonable for
12  coverage purposes. That's exactly what we don't want you to
13  do. What we want to make clear to the coverage court is that
14  no findings you are making in connection with the plan have an
15  effect on our coverage arguments.
16           THE COURT: No. But they're -- that I am not making
17  any findings that will -- that have anything to do with the
18  coverage determination I think is the way to say it. There may
19  be consequences that affect everybody as the result of the plan
20  confirmation. A coverage court may determine that there are.
21  Just like I'm not going to say that there are in advance, I'm
22  also not going to say that there aren't in advance. Those
23  issues are preserved. That's the whole point of insurance
24  neutrality, that everything that can be preserved to a coverage
25  court gets preserved to a coverage court. That's the purpose.

1          MR. GIANNOTTO: I agree with you a hundred percent,
2  Your Honor.
3          THE COURT: Okay.
4          MR. GIANNOTTO: I just want to make sure that's done.
5  But I think that we're just -- I understand your position, Your
6  Honor, and --
7          THE COURT: I want to make sure it's done too.
8          MR. GIANNOTTO: Okay.
9          THE COURT: Okay. So, I'm not arguing about the fact
10 that it should be clear. It's just I'm trying to figure out
11 what the objection is and why there is some assertion that the
12 plan has to be modified because it seems to me that your rights
13 are preserved in this section unless the definition of asbestos
14 insurance coverage defense is too narrow and that I don't know
15 about.
16         MR. GIANNOTTO: Okay.
17         THE COURT: If that's what you're arguing, then
18 that's a different focus.
19         MR. GIANNOTTO: No, that is what we are -- that that
20 could be misused. That's what we are arguing.
21         THE COURT: Okay. And why can it be misused?
22         MR. GIANNOTTO: Because our concern is that, since
23 you found that the plan -- let's say you confirm the plan. You
24 find that it was negotiated in good faith. Somebody argues,
25 the trust lawyers argues down the road to a coverage court