**<u>EXHIBIT 26</u>**



# Congressional Record

**United States of America**

PROCEEDINGS AND DEBATES OF THE $103^d$ CONGRESS, SECOND SESSION

| *Vol. 140* | WASHINGTON, TUESDAY, OCTOBER 4, 1994 | *No. 142* |
|---|---|---|

# *House of Representatives*

The House met at 10:30 a.m. and was called to order by the Speaker pro tempore, Mr. PETE GEREN of Texas.

## DESIGNATION OF SPEAKER PRO TEMPORE

The SPEAKER pro tempore laid before the House the following communication from the Speaker:

WASHINGTON, DC.
*October 4, 1994.*

I hereby designate the Honorable PETE GEREN to act as Speaker pro tempore on this day.

THOMAS S. FOLEY,
*Speaker of the House of Representatives.*

## MORNING BUSINESS

The SPEAKER pro tempore. Pursuant to the order of the House of February 11, 1994, and June 10, 1994, the Chair will now recognize Members from lists submitted by the majority and minority leaders for morning hour debates. The Chair will alternate recognition between the parties, with each party limited to not to exceed 30 minutes, and each Member except the majority and minority leaders limited to not to exceed 5 minutes.

The Chair recognizes the gentleman from Florida [Mr. GOSS] for 5 minutes.

## HAITI

Mr. GOSS. Mr. Speaker, yesterday marked 1 year since the United States mission in Somalia went tragically wrong and 18 American soldiers died. Seventy-nine more were wounded. I doubt that Americans will ever be able to forget the graphic pictures of our men in uniform being dragged through the streets of Mogadishu. As the Rules Committee meets today to consider a rule for the long-awaited Haiti resolution, that incident is likely to be in the minds of many Members who are wondering: Are we headed down the same

road in Haiti? With each day that passes it seems more likely. On Sunday, officials confirmed that the mission that once was to contain fewer than 15,000 American troops has swelled to 20,921. And, while the administration hailed the arrival of 262 Caribbean troops yesterday, it is abundantly clear that this is an American mission implemented with American tax dollars and American soldiers and, in the eyes of many of our allies, at the expense of American credibility. In the weeks before United States forces landed in Haiti, Americans were assured by the administration that our men and women in uniform would not be drawn into the middle of Haitian-on-Haitian violence; that they wouldn't become the policemen in a 200-year-old Haitian civil war. Today, it seems clear that that promise—like many others from this administration—is no longer operative. Saturday's headlines read "The Decision Not To Be Police Backfires" and "Pressure on U.S. To Disarm Haiti's Paramilitary Groups" and "At Least Five Killed in Clashes as GIs Stand Off." By the next morning the administration appeared to have responded to the pressure and the headlines were "U.S. Forces To Widen Role in Curbing Haiti Violence" by Monday morning: "In Haiti, U.S. Raid Finds Dancers Instead of Gunmen" or, from my district: "Armed-to-the-Teeth Americans Raid Harmless Garden" and "U.S. Raids Haiti Firms for Weapons." Today we read: "GIs Arrest Members of Notorious Haitian Militia." They just as easily could have read "U.S. Troops Drawn Further Into Haiti Quagmire." Yesterday, American troops raided a stronghold of the armed political group FRAPH in search of weapons and then had to turn around and protect the members of that organization from the mobs outside. All of this points to what this morning's Wall Street Journal called the "Schizophrenic Nature" of

United States relations with the different segments of Haitian society. The United States says it won't take over responsibility for policing Haiti. However, our troops are told they may intervene in the event that FRAPH and/ or the police mistreat Haitian civilians. Or, they may intervene to save the police and members of FRAPH if the mobs turn against them. No wonder many American soldiers are as confused and frustrated as one young man quoted in the weekend paper: "Ask anyone down here what we're doing and they'll say 'I don't know this is a joke.'" When the House adjourns this week, we will do so for the better part of 4 months. In that length of time, the United States mission in Haiti could evolve into almost anything. I don't support the Hamilton-Torricelli resolution that we will consider today in Rules because it seems to be a backhanded endorsement of a backward and dangerously undefined operation in Haiti. I do support the deliberative process and believe that we cannot leave here on Friday without having given careful and thorough attention to the more than 20,000 American troops in the middle of an explosive situation in Haiti.

I have just been advised on my way over this morning to speak here that the Committee on Rules that was supposed to take up the resolution today on how we will deal with Haiti has had that item withdrawn from its agenda. That means we will not be getting into this debate later in the week. The fact that we have been able not to have a debate in this body, the House of Representatives of the people of the United States of America, on a subject where we have now more than 20,000 troops committed in a dangerous situation is extraordinarily remarkable. I hope Members will not tolerate the idea of us delaying the debate longer and not allow us to go home until we have re-

---

□ This symbol represents the time of day during the House proceedings, e.g., □ 1407 is 2:07 p.m.

Matter set in this **typeface** indicates words inserted or appended, rather than spoken, by a Member of the House on the floor.



Printed on recycled paper containing 100% post consumer waste

H 10683

Case 01-01139-AMC    Doc 22443-19    Filed 07/13/09    Page 3 of 3

ficiency owing to creditors to the extent the partner would be personally liable for claims against the partnership. It is unclear how this provision would be construed to apply with regard to registered limited liability partnerships which have been authorized by a number of States since the advent of the 1978 Bankruptcy Code. This section clarifies that a partner of a registered limited liability partnership would only be liable in bankruptcy to the extent a partner would be personally liable for a deficiency according to the registered limited liability statute under which the partnership was formed.

*Section 213. Impairment of Claims and Interests*

The principal change in this section is set forth in subsection (d) and relates to the award of postpetition interest. In a recent Bankruptcy Court decision in *In re New Valley Corp.*, 168 B.R. 73 (Bankr. D.N.J. 1994), unsecured creditors were denied the right to receive postpetition interest on their allowed claims even though the debtor was liquidation and reorganization solvent. The *New Valley* decision applied section 1124(3) of the Bankruptcy Code literally by asserting, in a decision granting a declaratory judgment, that a class that is paid the allowed amount of its claims in cash on the effective date of a plan is unimpaired under section 1124(3), therefore is not entitled to vote, and is not entitled to receive postpetition interest. The Court left open whether the good faith plan proposal requirement of section 1129(a)(3) would require the payment of or provision for postpetition interest. In order to preclude this unfair result in the future, the Committee finds it appropriate to delete section 1124(3) from the Bankruptcy Code.

As a result of this change, if a plan proposed to pay a class of claims in cash in the full allowed amount of the claims, the class would be impaired entitling creditors to vote for or against the plan of reorganization. If creditors vote for the plan of reorganization, it can be confirmed over the vote of a dissenting class of creditors only if it complies with the "fair and equitable" test under section 1129(b)(2) of the Bankruptcy code and it can be confirmed over the vote of dissenting individual creditors only if it complies with the "best interests of creditors" test under section 1129(a)(7) of the Bankruptcy Code.

The words "fair and equitable" are terms of art that have a well established meaning under the case law of the Bankruptcy Act as well as under the Bankruptcy Code. Specifically, courts have held that where an estate is solvent, in order for a plan to be fair and equitable, unsecured and undersecured creditors' claims must be paid in full, including postpetition interest, before equity holders may participate in any recovery. See, e.g., *Consolidated Rock Products Co. v. Dubois*, 312 U.S. 510, 527, 61 S.Ct. 675, 685 (1941); *Debtsholders Protective Committee of Continental Inv. Corp.*, 679 F.2d 264 (1st Cir.), cert. denied, 459 U.S. 894 (1982) and cases cited therein.

With respect to section 1124(1) and (2), subsection (d) would not change the beneficial 1984 amendment to section 1129(a)(7) of the Bankruptcy code, which excluded from application of the best interests of creditors test classes that are unimpaired under section 1124.

The other subsections deal with the issue of late-filed claims. The amendment to section 502(b) is designed to overrule *In re Hausladen*, 146 B.R. 557 (Bankr. D. Minn. 1992), and its progeny by disallowing claims that are not timely filed. The amendment also specifies rules relating to the filing of certain governmental claims. These changes are not intended to detract from the ability of the court to extend the bar date for claims when authorized to do so under the Federal Rules of Bankruptcy Procedure. The amendments to section 726(a) of the Code, governing the distribution of property of the estate in a chapter 7 liquidation, conform to the amendments to section 1129(b) and 502(b). The amendments to paragraphs (2) and (3) of section 726(a) assure that the disallowance of late-filed claims under new section 502(b)(4) does not affect their treatment under section 726(a).

*Section 214. Protection of security interest in postpetition rents*

Under current section 552 of the Bankruptcy Code, real estate lenders are deemed to have a security interest in postpetition rents only to the extent their security interest has been "perfected" under applicable State law procedures, *Butner v. United States*, 440 U.S. 48 (1979). Inclusion under section 552, in turn, allows such proceeds to be treated as "cash collateral" under section 363(a) of the Bankruptcy Code, which prohibits a trustee or debtor-in-possession from using such proceeds without the consent of the lender or authorization by the court. In a number of States, however, it is not feasible for real estate lenders to perfect their security interest prior to a bankruptcy filing; and, as a result, courts have denied lenders having interests in postpetition rents the protection offered under sections 552 and 363 of the Bankruptcy Code. See, e.g., *In re Multi-Group III Ltd. Partnership*, 99 B.R. 5 (Bankr. D. Ariz. 1989); *In re Association Center Ltd. Partnership*, 87 B.R. 142 (Bankr. W.D. Wash. 1988); *In re TM Carlton House Partners, Ltd.*, 91 B.R. 349 (Bankr. E.D. Pa. 1988); *In re Metro Square*, 93 B.R. 990 (Bankr. D. Minn. 1988). Section 214 provides that lenders may have valid security interests in postpetition rents for bankruptcy purposes notwithstanding their failure to have fully perfected their security interest under applicable State law. This is accomplished by adding a new provision to section 552 of the Bankruptcy Code, applicable to lenders having a valid security interest which extends to the underlying property and the postpetition rents.

Section 214 also clarifies the bankruptcy treatment of hotel revenues which have been used to secure loans to hotels and other lodging accommodations. These revenue streams, while critical to a hotel's continued operations, are also the most liquid and most valuable collateral the hotel can provide to its financiers. When the hotel experiences financial distress, the interests of the hotel operations, including employment for clerks, maids, and other workers can collide with the interests of persons to whom the revenues are pledged. Section 214 recognizes the importance of this revenue stream for the two competing interests and attempts to strike a fair balance between them. Thus, subsection (a) expressly includes hotel revenues in the category of collateral in which postpetition revenues are subject to prepetition security interests, and subsection (b) includes such revenues in "cash collateral" as defined in section 363.

These clarifications of the rights of hotel financiers are, however, circumscribed. A critical limit in the "equities of the case" provision in subsection (a) which is designed, among other things, to prevent windfalls for secured creditors and to give the courts broad discretion to balance the protection of secured creditors, on the one hand, against the strong public policies favoring continuation of jobs, preservation of going concern values and rehabilitation of distressed debtors, generally. Further circumscription is supplied by the list of exceptions at the beginning of subsection (a). Thus, among other things, the reference to section 363 permits use of pledged revenues if adequate protection is provided; the reference to section 506(c) permits broad categories of operating expenses—such as the cost of cleaning and repair services, utilities, employee payroll and the like—to be charged against pledged revenues; the reference to section 522 protects individual debtors' rights; and the reference to sections 544, 545, 547 and 548 protect the debtor's right to use all its avoiding powers against the lienholder. These rights, preserved by the list of sections, would not be waivable by the debtor, either pre- or postpetition.

*Section 215. Netting of swap agreements*

Parties active in the foreign exchange market generally document spot and forward foreign exchange transactions under a netting agreement. The Bankruptcy Code's definition of "swap agreement" refers only to foreign exchange contracts, but is silent as to whether spot transactions fall within the definition. This section confirms the market understanding that spot foreign exchange contracts are included in the term "swap agreement." It is expected that contracts that mature in a period of time equalling 2 days or less will fall under the umbrella of "swap agreements."

*Section 216. Limitation of avoiding powers*

This section clarifies section 546(a)(1) of the Bankruptcy Code which imposes a 2-year statute of limitations within which an appointed trustee must bring an avoidance action. The purpose of a statute of limitations is to define the period of time that a party is at risk of suit. This section defines the applicable statute of limitations as 2 years from the entry of an order of relief or 1 year after the appointment of the first trustee if such appointment occurs before the expiration of the original 2-year period. The section is not intended to affect the validity of any tolling agreement or to have any bearing on the equitable tolling doctrine where there has been fraud determined to have occurred. The time limits are not intended to be jurisdictional and can be extended by stipulation between the necessary parties to the action or proceeding.

*Section 217. Small business*

This section amends title 11 to expedite the process by which small businesses may reorganize under chapter 11. For the purposes of this section, a small business is defined as one whose aggregate noncontingent liquidated secured and unsecured debts are less than $2,000,000 as of the date of the bankruptcy filing. A qualified small business debtor who elects coverage under this provision would be permitted to dispense with creditor committees; would have an exclusive period for filing a plan of 100 days; and would be subject to more liberal provisions for disclosure and solicitation of acceptances for a proposed reorganization plan under Code section 1125. This section permits an extension with respect to the debtor's original filing time if the debtor shows there were circumstances beyond its control.

*Section 218. Single asset real estate*

This section will add a new definition to the Code for "single asset real estate," meaning real property that constitutes a single property or project (other than 'residential property with fewer than four units) which generates substantially all of the gross income of the debtor and has aggregate noncontingent, liquidated secured debts in an amount up to $4 million. It amends the automatic stay provision of section 362 to provide special circumstances under which creditors of a single asset real estate debtor may have the stay lifted if the debtor has not filed a "feasible" reorganization plan within 90 days of filing, or has not commenced monthly payments to secured creditors.