**<u>EXHIBIT 30</u>**

1              UNITED STATES BANKRUPTCY COURT
               SOUTHERN DISTRICT OF NEW YORK
2

3
IN RE:                          .   Case No. 02-41729
4                               .
ADELPHIA COMMUNICATIONS,        .   New York, New York
5                               .   Thursday April 27, 2006
                    Debtors.    .   9:02 a.m.
6  . . . . . . . . . . . . . . .    **CORRECTED TRANSCRIPT**

7              TRANSCRIPT OF COURT DECISION
                   JOINT MOTION IN AID
8       RATE AND COMPUTATION OF POST-PETITION INTEREST
            BEFORE THE HONORABLE ROBERT E. GERBER
9              UNITED STATES BANKRUPTCY JUDGE

10 APPEARANCES:

11 For the Debtors:            Morris J. Massel, Esq.
                              Paul V. Shalhoub, Esq.
12                            Rachel C. Strickland, Esq.
                              WILLKIE, FARR & GALLAGHER, LLP
13                            787 Seventh Avenue
                              New York, New York 10014
14                            (212) 728-8000

15 For W.R. Huff:             Gary L. Kaplan, Esq.
                              Bonnie Steingart, Esq.
16                            FRIED, FRANK, HARRIS, SHRIVER
                                & JACOBSON, LLP
17                            One New York Plaza
                              New York, New York 10004
18                            (212) 859-8000

19 (Appearances continued)

20
   Audio Operator:            Electronically Recorded
21                            by Court Personnel

22 Transcription Company:     Rand Transcript Service, Inc.
                              311 Cheyenne Road
23                            Lafayette, New Jersey  07848
                              (973) 383-6977
24
   Proceedings recorded by electronic sound recording,
25 transcript produced by transcription service.

```
 1   APPEARANCES:    (Continued)

 2   For the Olympus
     Bondholders:         •          Robert J. Rosenberg, Esq.
 3                                    LATHAM & WATKINS, LLP
                                      885 Third Avenue
 4                                    New York, New York 10022
                                      (212) 906-1200
 5
     For the Bank of America
 6   Agent for the Century
     Lenders:                         Robin E. Phelan, Esq.
 7                                    HAYNES AND BOONE, LLP
                                      901 Main Street, Suite 3100
 8                                    Dallas, Texas 75202
                                      (214) 651-5612
 9
                                      Judith Elkin, Esq.
10                                    HAYNES AND BOONE, LLP
                                      153 East 53rd Street
11                                    New York, New York 10022
                                      (212) 659-4968
12
     For the Ad Hoc Committee
13   of Arahova Noteholders:          J. Christopher Shore, Esq.
                                      WHITE & CASE, LLP
14                                    1155 Avenue of the Americas
                                      New York, New York 10036
15                                    (212) 819-8394

16   For the ACC Senior
     Noteholders:                     James O. Johnston, Esq.
17                                    HENNIGAN, BENNETT & DORMAN, LLP
                                      865 South Figueroa Street
18                                    Suite 2900
                                      Los Angeles, California 90017
19                                    (213) 694-1200

20   For the Class Action
     Plaintiffs:                      Leonard Gerson, Esq.
21                                    COLE, SCHOTZ, MEISEL, FORMAN
                                       & LEONARD, P.A.
22                                    460 Park Avenue, 8th Floor
                                      New York, New York 10022
23                                    (212) 752-8000

24   (Appearances continued)

25
```

```
 1  APPEARANCES:   (Continued)

 2
    For the Equity Committee:    Gregory A. Blue, Esq.
 3                               Andrew Buck, Esq.
                                 MORGENSTERN, JACOBS & BLUE, LLC
 4                               885 Third Avenue
                                 New York, New York 10022
 5                               (212) 308-5858
    For the FrontierVision
 6  Ad Hoc Committee:            Kenneth H. Eckstein, Esq.
                                 Philip Bentley, Esq.
 7                               KRAMER, LEVIN, NAFTALIS
                                  & FRANKEL, LLP
 8                               1177 Avenue of the Americas
                                 New York, New York 10036
 9                               (212) 715-9100

10  For the Official Committee
    of Unsecured Creditors:      Adam L. Shiff, Esq.
11                               KASOWITZ, BENSON, TORRES &
                                  FRIEDMAN, LLP
12                               1633 Broadway
                                 New York, New York 10010
13                               (212) 506-1700

14  For U.S. Bank N.A., as
    Indenture Trustee:           David J. McCarty, Esq.
15                               SHEPPARD MULLIN
                                 48th Floor, 333 South Hope Street
16                               Los Angeles, California 90071
                                 (213) 620-1780
17
    For the "Eleven              Jeffrey S. Sabin, Esq.
18  Signatories":                SCHULTE, ROTH & ZABEL, LLP
                                 919 Third Avenue
19                               New York, New York 10022
                                 (212) 756-2000
20  For the Law Debenture
    Trust Co. of New York:       Arlene R. Alves, Esq.
21                               SEWARD & KISSEL, LLP
                                 One Battery Park Plaza
22                               New York, New York 10004
                                 (212) 547-1200
23

24

25
```

4

1

<u>I N D E X</u>

2

<u>Page</u>

3    <u>COURT DECISION</u>                                              5

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

1    (Proceedings commence at 9:02 a.m.)

2          THE COURT:  Have seats, everybody.

3          I have some decisions to announce and some matters

4    of a preliminary nature to address.  We'll use this time

5    between now and about 9:45 for those matters and then proceed

6    with the disclosure statement hearing at 9:45.

7          On Monday I took under advisement the separate

8    matters as to the appropriate rate of pendency interest and

9    the interest rate component of the debtors' settlement with

10   the holders of the trade claims.  For the reasons that will

11   follow, I am ruling that the payment at the rate the debtors

12   propose is appropriate.  I am further ruling that the

13   interest rate level aspect of the settlement with the holders

14   of trade claims should be approved.  Though, if time permits

15   or if circumstances require, I'll issue a superseding

16   discussion in writing.  I'm going to advise you now, in a

17   dictated summary on the record, of my determinations.

18          Turning first to the interest rate.

19          Section 502(b)(2) of the Code provides for the

20   allowance of claims except to the extent that they are "for

21   unmatured interest."  That means, at least as a practical

22   matter, interest after the filing date.  But while Section

23   502(b)(2) provides that an allowed unsecured claim doesn't

24   include unmatured interest, 502(b)(2) doesn't prohibit the

25   award of interest to creditors in all circumstances.  See

1   <u>Coram Healthcare</u> at 315 B.R. 344 (citing <u>Dow II</u>, 244 B.R.

2   691.)   Many courts have recognized that the payment of

3   pendency interest to unsecured creditors is appropriate when

4   a debtor is solvent.

5           Courts have carved out two exceptions to the general

6   rule disallowing post-petition interest on unsecured claims.

7   Both apply only when a debtor is solvent.   The first is based

8   on Section 726(a)(5) of the Code, made relevant to Chapter 11

9   cases by the "Best Interests of Creditors" rule of Section

10  1129(a)(7).   The best interests test is triggered when a

11  member of an impaired class of creditors rejects a plan of

12  reorganization.   It requires courts to examine what such

13  dissenting creditor would receive in a hypothetical Chapter 7

14  liquidation.   Section 726(a)(5) provides that unsecured

15  creditors in a Chapter 7 liquidation must receive interest at

16  the "legal rate" from the date of the filing of the petition.

17          Courts differ as to the appropriate interpretation

18  of "the legal rate," and the Second Circuit has not decided

19  the issue.   For reasons that I'll discuss at length if I have

20  the luxury of doing a full-blown written opinion, I agree

21  with the Ninth Circuit's conclusion in <u>Cardelucci</u>, to the

22  extent that it addresses Section 726(a)(5) "legal rate" and

23  Best Interests of Creditors considerations (which seem to be

24  the only issues it focused on), Judge Spector's decision in

25  <u>Dow I</u>, and the majority of the cases, which hold similarly.

1  It is by far the better view, in my opinion, that "legal
2  rate" is the federal judgment rate and not the same as that
3  authorized under Section 506(b), which is a contract rate.
4  Though Cardelucci is the only decision at the Circuit Court
5  of Appeals level addressing the matter, I come to its "legal
6  rate" result not so much because it is a Circuit Court
7  decision, or for the quality of its analysis (which I frankly
8  think is inadequate in its discussion of 1129(b)
9  considerations), but rather for many of the reasons Judge
10  Spector articulated in Dow I and by reason of the difference
11  -- significant, in my view -- in the manner of addressing
12  pendency interest in Section 506(b), with respect to secured
13  creditor entitlements, and Sections 502(b) and 726, with
14  respect to unsecured creditor entitlements.
15      Thus, any proposal that paid pendency interest at
16  either the contract rate, a rate close to the contract rate
17  (which is what the debtors proposed and which I'll call the
18  "Adjusted Contract Rate"), or the federal judgment rate would
19  pass muster under the Best Interests of Creditors Rule,
20  insofar as creditors of Adelphia subsidiaries were concerned.
21      But turning to the area where I think the Cardelucci
22  Court might have done a little better job, the Best Interests
23  of Creditors requirement is not the only requirement that
24  must be satisfied, and it is at that point that I must
25  diverge from the positions of the parent creditors, even

1  though <u>Cardelucci</u> says what they say it says.  The second

2  exception is based on the "fair and equitable" standard of

3  Section 1129(b), which would need to be considered in the

4  event certain classes reject the plan, as some threaten to

5  do, and the debtors then seek to cram the dissenters down, or

6  the debtors' plan gives creditors a proxy for having done

7  that (as it does here) by saying that they can support the

8  plan and still reserve their "fair and equitable" rights.  To

9  satisfy the fair and equitable test under Section 1129(b), a

10  rejecting class of impaired creditors must be paid in full

11  before junior creditors may receive any distribution under a

12  plan.

13        But the threshold issue is:  What does "paid in

14  full" mean?  The answer to that, in my mind, is quite clear,

15  particularly as a statutory matter.  Section 1129(b)(2) says

16  that the condition that a plan be "fair and equitable" with

17  respect to a class "includes" certain requirements. and its

18  Subsection (b)(2)(B) says, with respect to a class of

19  unsecured claims, that before any junior creditor or interest

20  holder gets anything, the plan must provide that the more

21  senior creditor receives property of a value, as of the

22  effective date of the plan, "equal to the allowed amount of

23  such claim."  As I discussed at the outset, under Section

24  502(b) of the Code the allowed amount of an unsecured claim

25  doesn't include unmatured interest, and instead would be

1    merely for principal and interest accrued and unpaid as of

2    the filing date.  So as a statutory matter, in order to

3    satisfy the "fair and equitable" requirement, you don't have

4    to pay pendency interest, even at the federal judgment rate.

5              But Section 1129(b)(2) precedes its three

6    subsections of requirements that have to be satisfied -- one

7    for secured claims, one for unsecured claims, and one for

8    interests -- with the expression "includes."  As I noted in

9    my recent decision on the Arahova Trustee motion, as Judge

10   Spector noted in Dow II, and most importantly, as Code

11   Section 102(3) expressly provides, the expression "includes"

12   is not limiting, so it does not by its terms foreclose the

13   possibility that other requirements for "fair and equitable"

14   might be imposed under common law.  And here I think there

15   are additional requirements, as embodied in the case law in

16   reorganization cases applicable to those rare cases in which

17   we have solvent debtors.

18             Judge Drain addressed these issues, though at least

19   arguably in dictum, in his bench decision in Loral.  I'm on

20   record as having said that the interests of predictability in

21   this District (and not just Circuit) are of considerable

22   importance to the financial community, and that as a personal

23   matter, while the decisions of fellow Southern District of

24   New York Bankruptcy Judges technically are not binding on me,

25   I follow them in the absence of manifest error.  Here we not

1   only don't have such manifest error; I think Judge Drain

2   described the applicable law perfectly.  Thus, to the extent

3   his analysis is relevant here, I believe I should follow

4   Judge Drain's statements of the law in Loral in full, and

5   then to take them into account in deciding the extent to

6   which I have discretion, and in exercising my discretion.

7           As Judge Drain noted, the fair and equitable basis

8   for post-petition interest reaches way back, at least as far

9   back as the Supreme Court decision in Vanston Bondholders.  I

10  think those pre-Code cases and Loral collectively stand for

11  the proposition that where an estate is solvent, in order for

12  a plan to be fair and equitable, at least some pendency

13  interest must be paid.

14          But how much?  Some of the litigants here have

15  mentioned remarks read into the Congressional Record in

16  dealing with the 1994 amendments to the Code that deleted the

17  Subsection 3 that used to exist in Section 1124 of the Code,

18  to override the New Valley decision.  As stated in the

19  Congressional record:

20          "Specifically, courts have held that where an estate

21          is solvent, in order for a plan to be fair and

22          equitable, unsecured and undersecured creditors'

23          claims must be paid in full, including post-petition

24          interest, before equity holders may participate in

25          any recovery."

1        Counsel for the parent bondholders has pointed out
2   that the quoted language was not with respect to Section
3   1129, but rather Section 1124 of the Code, and that the
4   snippets from the Congressional record followed, by more than
5   fifteen years, the enactment of the statutory language in
6   Section 1129 that I need here to interpret.  But Judge Drain
7   considered that quotation worthy of mention and took it into
8   account, albeit to a limited extent, and I think I should do
9   likewise.  In favor of considering it, I think I should take
10  into account the statutory language Congress repealed, the
11  old Section 1124(3), which until then had permitted a debtor
12  to pay a creditor in full but without interest, and for that
13  creditor then to be unimpaired, thereby denying it the
14  opportunity to vote against a plan and invoke its rights, on
15  a cram-down, to fair and equitable treatment.
16        I think it's fair to read that legislative history
17  and the deletion of old Section 1124(3) as indicating a
18  Congressional comfort with the notion of solvent debtors
19  paying post-petition interest (even though no such explicit
20  requirement exists under the Code).  But I think it's less
21  fair to read it as specifying the amount, and I am wary of
22  considering that legislative history quote as a substitute
23  for the case law.  I think the greatest danger in mechanical
24  reliance on that legislative history is not its procedural
25  context or any hard and fast rules about when legislative

1   history should or should not be considered, but rather the

2   legislative history's shorthand for a body of law that's

3   considerably more refined and sophisticated than the quoted

4   language reveals.  And the very words in that legislative

5   history make it rather clear that they do not express a

6   Congressional policy judgment, but rather a capsulization by

7   the speaker of cases that I could (and did) read myself.  I

8   think the best evidence of what the Supreme Court and other

9   courts have held can be found in the decisions themselves, as

10  compared and contrasted to what this legislative history says

11  those cases say.

12        Now what those cases say, as Judge Drain noted, is

13  that "the touchstone of each decision on allowance of

14  interest in bankruptcy, receivership and reorganization has

15  been a balance of equities between creditor and creditor or

16  between creditors and the debtor."  Like Judge Drain, I've

17  just quoted from <u>Vanston Bondholders</u>, a decision of the

18  Supreme Court that's binding on all of us.

19        And Judge Drain noted, consistent with the great

20  bulk, if not all of the cases of which I'm aware, that "the

21  Court has a large amount of discretion" in deciding "what the

22  appropriate rate of interest should be" under a Chapter 11

23  plan for a solvent debtor.  (Note, by the way, that he made

24  that observation after quoting the legislative history

25  referred to above, confirming his understanding, which is

13

1  also mine, that the loose language in the legislative history

2  did not speak to what the appropriate rate of interest should

3  be.)

4          The cases addressing pendency interest under the

5  1129(b) standard consistently note the wide latitude of

6  discretion courts have in determining what constitutes a fair

7  and equitable rate of interest.  As Judge Spector noted in

8  Dow II, the "prevailing and better view is that the phrase

9  'fair and equitable' is as broad as it sounds."  Dow II, 244

10  B.R. 694.  The Dow II Court -- that's Judge Spector --

11  emphasized "the wide parameters associated with the fairness

12  inquiry" and "the discretion ... [courts] are generally

13  accorded in matters concerning post-petition in interest."

14  Id. at 695.

15          In Coram Healthcare, which Judge Drain cited with

16  approval and which I also believe warrants consideration,

17  Judge Walrath similarly concluded that the specific facts of

18  each case will determine what rate of interest is fair and

19  equitable.  In In Re:  Anderson Carter, 220 B.R. 411 (Bankr.

20  D. New Mexico), a Section 726 case addressed by Judge Drain

21  in the 1129(b) context, the Court likewise noted that "[c]ase

22  law also provides that payment of post-petition interest on

23  unsecured claims in a Chapter 11 setting is a matter within

24  the Court's discretion and depends on the equities of the

25  case."

14

1    So now, in an area where I have wide discretion, I
2    need to determine what's fair here.  Assuming (which I will
3    for the purposes of this discussion only) that any given
4    debtor group is solvent, I think it would be an abuse of my
5    discretion to deny the payment of any pendency interest
6    whatever.  And though the matter is closer, I believe that on
7    the facts here, the adjusted contract rate, and not the
8    default and/or compounded rate on the one hand, or the
9    federal judgment interest rate, on the other, is the rate
10   that is fair and equitable.  The arguments cut both ways, but
11   on balance I believe the debtors' proposal most closely
12   tracks the applicable precedents and what Adelphia told its
13   creditors to expect, and I believe it should be approved.
14       Creditors of the subsidiaries argue that this --
15   excuse me.
16       Creditors of the parent argue that this situation is
17   quite different from the paradigm case in which equity, often
18   held by insiders, benefits at the expense of the creditor
19   community, and in this respect, they are of course right.
20   Under the facts of this case, awarding interest at a lower
21   rate won't reward insiders, or for that matter, even innocent
22   public equity; as a practical matter, it will merely shift
23   value from one creditor constituency to another.
24       The creditors of the parent -- and the non-Rigas
25   preferred stock and common stock equity, for that matter --

1   were indeed victims, just as the creditors of the

2   subsidiaries were.  And the parent creditors are also correct

3   when they observe that they didn't bargain for equity-style

4   upside and lacked the ability to manage the affairs either of

5   the subsidiaries or of the parent.

6          I understand and sympathize with the parent

7   bondholders' points, but in the exercise of my discretion, I

8   think the countervailing factors outweigh them.  On balance,

9   I think the fact that parent creditors must recover from the

10  entity with whom they dealt -- and that the parent's interest

11  in its subs was in law and substance equity -- is a matter

12  not just of form, but also of substance.  For purposes of

13  analysis in a multi-debtor, parent/subsidiary, case where

14  creditors would have justifiably focused on what we refer to

15  in bankruptcy parlance as "structural seniority," that

16  structural seniority must be taken into account.  And I

17  believe that the "structural seniority" of subsidiaries and

18  subsidiary creditors' rights of priority to subsidiary assets

19  was something that senior creditors know about, or should

20  have when they bought their bonds.  Quoting from one of the

21  prospectuses for parent-level bonds:

22          "The operations of the Adelphia Parent Company are

23              conducted through its subsidiaries.  Therefore, the

24              Adelphia Parent Company is dependent on the

25              earnings, if any, and cash flow of and distributions

1       from its subsidiaries, to meet its debt obligations,

2       including its obligations with respect to the notes.

3       Because the assets of its subsidiaries and other

4       investments constitute substantially all of the

5       assets of Adelphia Parent Company and because those

6       subsidiaries and other investments will not

7       guarantee the payment of principal of and interest

8       on the notes, the claims of holders of the notes

9       effectively will be subordinated to the claims of

10      creditors of those entitles."

11      Similarly, it stated in its Risk Factors:

12      "In the event of a foreclosure, dissolution,

13      winding-up, liquidation, reorganization or other

14      bankruptcy proceeding of Adelphia Parent Company and

15      our subsidiaries, the creditors and holders of

16      preferred stock of our subsidiaries must be paid in

17      full before any of the subsidiaries' assets would be

18      available to Adelphia Parent Company, *as the*

19      *subsidiaries' equity holder* for our creditors,

20      including the holders of the notes."

21      I have read from two places in that prospectus, but

22 there are other similar statements elsewhere in that

23 prospectus, and at least three other prospectuses are similar

24 in words or substance.

25      Now I need to emphasize something here.   These

1   statements, which come from exhibits that are in evidence in

2   the hearings on the MIA, speak to the upstreaming of value,

3   from subsidiaries to their ultimate parent, in the form of

4   *dividends or liquidation payments* or their equivalents -- the

5   basic entitlement of equity -- to Adelphia Parent, *as the*

6   *subsidiaries' equity holder.*   And it is at least arguable, if

7   not strongly arguable, that those statements have nothing to

8   do with whether subsidiaries owe money to Adelphia Parent, or

9   to other subsidiaries, as *creditors* of those subsidiaries --

10  where the parent entitlement is in the nature of debt owed to

11  it, not equity.   That is an issue in the MIA, and I am not

12  deciding it today.   But what I am saying today is that when

13  we're talking about what's fair and equitable to creditors of

14  the subsidiaries on the one hand, and of the parent on the

15  other, the debtors' pendency interest proposal -- which

16  comports with what parent bondholders were told in the

17  prospectuses covering their bonds, and which is consistent

18  with the fact that higher- level debtors are equity holders

19  of their subsidiaries -- is, despite the fact that all

20  creditors are victims in the Adelphia cases, "fair and

21  equitable."   It is also consistent with my colleague Judge

22  Drain's conclusions in Loral, and those of Judge Spector in

23  Dow II.   Though I recognize once more that these cases are

24  fact-specific, I read the applicable case law authority the

25  same way they do, and think I should rule similarly.

18

1          I think Judge Walrath's decision in <u>Coram Healthcare</u>

2  makes clear that in these fact-specific cases, bankruptcy

3  judges have the power to reduce the pendency interest

4  entitlement, at least down to the level of the federal

5  judgment rate, and perhaps even down to zero, in instances of

6  creditor misconduct, such as the situation Judge Walrath

7  faced there and, at least arguably, in other instances in

8  which an award of contract interest or adjusted contract

9  interest simply wouldn't be fair.  Now I considered whether

10 that principle was applicable here.

11         But I don't think the circumstances here are as

12 serious or unfair as those she encountered there, and on

13 balance are insufficient to warrant such a treatment in this

14 case.  The desire of creditors at the subsidiary level to

15 wish to litigate the merits of the issues in the MIA is

16 understandable, and well within their rights.  And the fact

17 that the litigation of the MIA has taken time, and likely

18 will take longer, can't be laid at the feet of any

19 particularized subset of the MIA participants.

20         The bulk of the longer-than-average four years

21 duration of this case was occasioned (in no particular order)

22 by the complexity of these cases, the need to deal with the

23 legacy of the Rigases, the difficulty in ascertaining the

24 company's true financial condition and true obligations, both

25 to the outside world and as between debtors, and, of course,

19

1    in marketing the company for what has turned out to be the

2    proposed Comcast-Time Warner sale.   The MIA arose, in

3    material respects, less than a year ago, and MIA issues have

4    accounted for only about a fourth of the total duration of

5    these cases, at the most.

6         Plainly the conduct of some of the subsidiary

7    creditors in trying to maximize their distributions at the

8    expense of all of the other creditors has been a matter of

9    concern to me, but those concerns can be addressed in other

10   ways, and it would be grossly inappropriate, at the least, to

11   penalize all of the creditors who did not act likewise, but

12   who may be in the same creditor classes (or who may have

13   similar claims for pendency interest), based on the conduct

14   of a subset of them.

15        Also, I should emphasize that we are only talking

16   about pendency interest; that is, interest for the period

17   from the filing date to the effective date of the plan.   We

18   are not talking about the interest that will be recoverable

19   after that date.   If the holdback plan is confirmed, huge

20   amounts will be held in reserve, and it could be argued that

21   if a creditor constituency believes its debtor group will be

22   held to be solvent, it might have a perverse incentive to

23   drag out the MIA process at the expense of its opponents, in

24   the belief that interest accruals will augment its recovery

25   at the expense of the other creditors.   I am not addressing

1  that now, only to note that the considerations applicable to

2  such a scenario might be very different from those presented

3  here, and that if we get to that point, people should be

4  prepared to address these matters, as they are a matter of

5  concern to me.

6          A word about the requests, by the Olympus

7  bondholders and others, for interest at more than the simple

8  interest rate, at higher default rates or as a consequence of

9  compounding.  I don't doubt that the Olympus creditors are

10  right when they say that applicable state law, in this case

11  the law of the State of New York, would permit them to

12  collect default interest and compound interest in a non-

13  bankruptcy situation.  But here we have a bankruptcy

14  situation and do not have secured creditors, who have

15  statutory rights to their contractual entitlements under

16  Section 506(b).  As I've discussed at length above, this is a

17  matter where I have wide discretion, and where the common

18  law, as enunciated by the Supreme Court in _Vanston_

19  _Bondholders_ and its predecessors, tells us that the

20  touchstone of a decision of this character is the "balance of

21  equities between creditor and creditor or between creditors

22  and the debtor."

23          Here, because the amount of time it has taken to

24  administer these cases has to some degree benefitted all

25  creditors, the debtors' plan has evidenced a determination

1  that awarding compound and/or default interest to subsidiary

2  creditors at the expense of recoveries of creditors of the

3  parent would not be fair because those subsidiary creditors

4  would receive not only the benefit of the time it took to

5  restructure the debtors' business, address the Rigases'

6  fraud, and maximize the estate's value, but also the benefit

7  of the highest possible return on capital available to those

8  subsidiary creditors, all to the detriment of junior

9  stakeholders.  Such a result is inequitable.  Giving

10  subsidiary bondholders the core of their bargain -- principal

11  and simple interest -- is, as I have discussed, a necessity

12  to honor basic expectations under the fair and equitable

13  requirement, even though it comes at the expense of

14  structurally junior creditors.  But giving subsidiary

15  creditors the further incremental recovery they also desire

16  is not.  The fact that the Supreme Court included "between

17  creditors and the debtor," along with "creditor and

18  creditor," in Vanston Bondholders leads me to conclude that,

19  at least in a case like this one, where entitlements of

20  creditors affect entitlements of structurally junior

21  creditors, of debtors that are the equity holders of lower-

22  level subs, there is much more than sufficient authority to

23  make adjustments in certain creditor groups' non-bankruptcy

24  interest entitlements to achieve greater overall fairness.

25  For instance, even as adjusted by the debtors' proposal, the

1   Olympus Bondholders will receive, by my computation, about

2   144 percent of their claims, with about four years of

3   pendency interest, at nearly eleven percent per year.  Where,

4   as here, insider equity would not be the beneficiary of

5   giving the Olympus Bondholders even greater entitlements, and

6   the recoveries instead would be going to creditors who will

7   not even get 100 percent of their claims, I cannot regard the

8   balance of equities as having been inappropriately distorted

9   by the debtors, especially in a material fashion.  To the

10  contrary, distributions of the type the debtors propose --

11  providing payment in full of principal, plus pendency

12  interest in full at a simple interest rate; for example, the

13  nearly eleven percent rate to be awarded to the Olympus

14  bondholders -- do indeed, as the debtors argue, strike the

15  appropriate balance between delivering the essence of their

16  contractual promise and avoiding excessive payments at the

17  expense of other creditors.  In the exercise of my

18  discretion, I hold it to be entirely acceptable.

19          Now turning to the interest rate component of the

20  settlement on the trade claims.

21          I don't need to speak at length, or clutter up my

22  discussion with numerous citations, on the standards for

23  approval of a settlement in this Circuit.  I dealt with it at

24  length in my discussion in this case on the debtors' motion

25  to approve their settlement with the DoJ and SEC, which

1    decision was affirmed on appeal.  See In Re:  Adelphia

2    Communications Corp., 327 B.R. 143 (Bankr. S.D.N.Y. 2005),

3    aff'd. 337 B.R. 475 (S.D.N.Y. 2006).  As set forth in that

4    decision, the legal standard for determining the propriety of

5    a bankruptcy settlement is whether the settlement is in the

6    "best interests of the estate."  I note in that connection,

7    as I noted in oral argument, that I am not applying a

8    "business judgment" test.

9          To determine that a settlement is in the best

10   interests of the estate, the Supreme Court held in TMT

11   Trailer Ferry that the settlement must be "fair and

12   equitable."  [Id. at 424, 88 S.Ct. 1157.]  Such a finding is

13   to be based on "the probabilities of ultimate success should

14   the claim be litigated," and:

15          "[A]n educated estimate of the complexity, expense,

16          and likely duration of ... litigation, the possible

17          difficulties of collecting on any judgment which

18          might be obtained, and all other factors relevant to

19          a full and fair assessment of the wisdom of the

20          proposed compromise.  Basic to this process in every

21          instance, of course, is the need to compare the

22          terms of the compromise with the likely rewards of

23          litigation."

24          Importantly, the settlement need not be the best

25   that the debtor could have obtained.  Rather, as the Second

1   Circuit held in <u>Penn Central</u>, the settlement must fall

2   "within the reasonable range of litigation possibilities."

3   And as the Circuit held in <u>W.T. Grant</u>, a bankruptcy court

4   need only "canvass the issues and see whether the settlement

5   falls below the lowest point in the range of reasonableness."

6   A decision whether to accept or reject a compromise lies

7   within the sound discretion of the Bankruptcy Court.

8          At this juncture, I am asked only to gauge the

9   reasonableness of the eight percent pendency rate to be

10  provided to holders of trade claims, and I find that this

11  aspect of the settlement easily passes muster under the

12  standards of <u>TMT Trailer Ferry</u>, the Second Circuit cases, and

13  the decision of Judge Schwartzberg in <u>Texaco</u>, where he

14  articulated factors similar to, but a little more detailed

15  than, those set forth in <u>TMT Trailer Ferry</u> for consideration

16  when deciding whether or not to approve settlements.  Those

17  included:

18          (1)  The balance between the likelihood of

19               plaintiff's or defendants' success should the case

20               go to trial vis-a-vis the concrete present and

21               future benefits held forth by the settlement without

22               the expense and delay of a trial and subsequent

23               appellate procedures;

24          (2)  The prospect of complex and protracted

25               litigation if the settlement is not approved;

1     (3) The proportion of the class members who do not

2     object or who affirmatively support the proposed

3     settlement;

4     (4) The competency and experience of counsel who

5     support the settlement;

6     (5) The relative benefits to be received by

7     individuals or groups within the class;

8     (6) The nature and breadth of releases to be

9     obtained by the directors and officers as a result

10     of the settlement; and,

11     (7) The extent to which the settlement is truly the

12     product of arm's length bargaining, and not of fraud

13     or collusion.

14    Whether articulated in the _TMT Trailer Ferry_ terms -

15 - "the probabilities of ultimate success should the claim be

16 litigated" -- or in _Texaco_ terms, those focusing on the

17 likelihood of success in the form in which I quoted them

18 above -- I think the first factor, which I weigh heavily,

19 plainly favors approval.

20    In my view, if the debtors were to litigate

21 entitlements to interest on the thousands of trade proofs of

22 claim, they would have mixed results, with mixed incremental

23 gains and losses, by reason of the variances in contractual

24 terms from one agreement to the next, differences in the law

25 amongst the thirty-one states whose substantive law would

1   have to be applied, and differences in the application of the

2   law to each of those agreements.  It is arguable, but by no

3   means clear, that the debtors could prevail on the argument

4   that a common federal judgment interest rate would apply to

5   all non-interest-bearing claims, and it is even less clear

6   that they would necessarily prevail on claims where a stated

7   interest rate appeared on an invoice.

8           In that connection, many of the vendors' invoices

9   called for interest on unpaid amounts of one and a half to

10  two percent per month, which, if honored, would have resulted

11  in claims for interest of from eighteen percent to twenty-

12  four percent annum.  Though it's now nearly forty years ago,

13  I still remember the difficult "Battle of the Forms" issues

14  we dealt with in law school, and I consider them, at the

15  least, more than fair game for litigation.  And once one gets

16  past the offer and acceptance issues associated with battles

17  of the forms, there are separate issues as to whether

18  contracts seemingly including such interest provisions should

19  or should not be regarded as contracts of adhesion --

20  remembering that here we are not talking about

21  unsophisticated consumers being bound by those forms, but

22  rather by a multi-billion-dollar business entity.

23          I also recognize that the litigation might also

24  involve, apart from contractual and civil procedure issues,

25  issues as to discrimination amongst creditors or the

1   equitable fairness of the proposed settlement, in a manner

2   akin to those I've addressed above on pendency interest.  In

3   this respect, Adelphia could certainly argue for a lower

4   rate, but it would have to do so in the context of other

5   creditors getting pendency interest of from six percent on

6   the low end to 11.875 percent on the high end -- a rate

7   environment in which the eight percent that would go to the

8   trade claims holders would hardly stand out.  There would be

9   differences in circumstances of course -- not the least of

10  which is that the interest rate is typically one of the most

11  heavily bargained-for aspects of funded debt.  But on the

12  other hand, the holders of trade claims could legitimately

13  argue that of all the creditor groups, they were the ones

14  that benefitted least from the substantial time that this

15  case took to reorganize.  They were structurally senior to

16  almost everybody, and didn't need such a long time to

17  generate enough value to pay them in full.  They were denied

18  the opportunity to get their distributions quickly and

19  reinvest those distributions elsewhere, while the debtors

20  focused on maximizing value for everyone else.  On the

21  merits, this argument would have some force.

22          Turning to the second factor, the burden and

23  complexity of the litigation, which I also weigh heavily, the

24  facts here likewise strongly support approval of the

25  settlement.  The debtors have spoken of having 18,000 proofs

1   of claim, and while the number of those that are trade claims
2   has not been made clear, it is at least likely that they
3   represent a large proportion of the total.  They were filed
4   against debtors doing businesses in thirty-one states, and
5   representing thousands of individual contracts. (Since some
6   proofs of claim may combine claims on multiple contracts, and
7   others may involve master contracts, I assume this number may
8   be more or less, but plainly it would require review of all
9   those proofs of claims to find out.)  If the matter were to
10  be litigated, the debtors would be faced with the significant
11  burdens of (a) reviewing each agreement or instrument
12  supporting a particular rate of interest payable on the
13  claims; (b) in the event no agreement exists, determining the
14  state in which the claim arose to award the correct state
15  judgment rate of interest; and (c) litigating the entitlement
16  to interest reflected in invoices and purchase orders and
17  litigating whether such documents constitute "contracts" for
18  purposes of payment of pendency interest.  And then, as I
19  noted, addressing the battle of the forms, and then
20  addressing the extent to which they might be regarded as
21  contracts of adhesion.

22          At the outset of argument, I wondered whether the
23  interest rate agreed on might be slightly high, thinking that
24  I would have regarded the perfect settlement amount to be six
25  percent, rather than eight percent.  But I came to realize

1   that this was an insufficient basis to disapprove the

2   settlement, both for factual reasons, which I'll discuss

3   momentarily, and legal ones; the latter referring to the

4   point that I previously discussed:  That a bankruptcy court's

5   review is not based on such a test, what the Bankruptcy Court

6   might have done or what it might have preferred, but rather

7   on whether the settlement falls below the lowest point in a

8   range of reasonableness.

9          At the outset, I had assumed -- now I believe

10  unrealistically -- that because at the time Adelphia had its

11  headquarters in Pennsylvania, which has a six percent

12  interest rate, its claims would bear at most the six percent

13  interest rate under Pennsylvania law.  But it later became

14  clear that the trade claims at least arguably arose much more

15  locally, where Adelphia has its subscribers and field

16  operations, resulting in an array of arguably applicable

17  interest rates, with those in several jurisdictions where

18  Adelphia has the most subscribers - for example, California,

19  with its ten percent interest rate, and New York, with its

20  nine percent rat -- higher than the eight percent that was

21  agreed on.  I also was reminded of the invoices claiming

22  interest entitlements of from eighteen to twenty-four percent

23  per year, as I have noted above, dramatically increasing the

24  stakes in losses over applicable interest rate issues.  All

25  of this would make litigating all of these issues a

1  litigation nightmare.  To say there would be a "prospect of

2  complex and protracted litigation if the settlement is not

3  approved" would be the understatement of the decade.

4           With respect to the third <u>Texaco</u> factor, which is

5  adapted from civil class action litigation and which

6  translates imperfectly into a bankruptcy context, I consider

7  this factor, but give it only modest weight.  Here, some

8  constituencies favor the settlement, but I sense that a

9  greater number oppose it.  But as I held in my ruling on the

10  DoJ-SEC settlement, the approval of a settlement cannot be

11  regarded as a counting exercise.  Rather, it must be

12  considered in light of the *reasons* for any opposition, and

13  the more fundamental factors -- such as benefits of

14  settlement, likely rewards of litigation, costs of

15  litigation, and downside risk -- described above.  And as

16  counsel for the FrontierVision Bondholders observed, making a

17  point that I regarded as significant, there can come a time

18  in a case when it's important to get issues resolved and to

19  reach closure on outstanding issues.  And some constituencies

20  recognize this sooner than others do.

21           I also note in this connection that the settlement

22  interest rate is the same as the settlement interest rate in

23  the settlement recommended by the Creditors' Committee in the

24  fall of 2004.  Of course, the circumstances now are not quite

25  identical to those then.  But the underlying issues that

1  would be the meat of any litigation do not differ, especially

2  in material respects, and since that time the estate has had

3  a greater need to get issues behind it to bring this case to

4  a successful conclusion; and, if it can meet the standards

5  for confirmation, getting its deal with Time Warner and

6  Comcast done, so that it can deliver value to creditors in

7  these cases.

8          The fourth _Texaco_ factor -- the competency and

9  experience of counsel who support the settlement -- while not

10  as important as factors such as the chances of success and

11  the burdens of litigation -- likewise favors approval of the

12  settlement.  The fifth and sixth _Texaco_ factors are not

13  applicable to any material extent here.  The seventh factor -

14  - the extent to which the settlement is the result of arm's

15  length bargaining and is not collusive -- is, as I noted in

16  my earlier settlement decision, of great importance when it

17  is lacking, but of only modest importance in other cases.

18  Here, there is no basis for a conclusion that the settlement

19  at this rate was anything other than an arm's length deal.

20          For the foregoing reasons, I can easily make the

21  _Penn Central_ and _W.T. Grant_ findings.  This settlement falls

22  well "within the reasonable range of litigation

23  possibilities."  I find that the eight percent rate to be

24  provided under the settlement is fair and equitable, and it

25  is approved.

32

1        We're now going to take a five-minute recess, at

2   which time counsel can get ready for the disclosure statement

3   hearing.

4        I will note only one other thing before we take the

5   recess.

6        As most of you know, we have had discussions as to

7   whether one of my judicial colleagues should act as a

8   facilitator; in fact, I think we used the words "hall

9   monitor," to assist parties in the resolution of the MIA.  My

10  colleague Judge Morris will act in such a role.

11       I would request either or both of the debtors or the

12  Creditors' Committee to act as a mechanical facilitator to

13  help get the parties together with Judge Morris, so that she

14  can assist me in that regard.

15       We will now take a five-minute recess, at which time

16  I'll take the disclosure statement matters immediately

17  thereafter.

18       (Proceedings concluded at 9:54 a.m.)

19                              *****

20

21

22

23

24

25

33

1          <u>CERTIFICATION</u>

2          I certify that the foregoing is a correct transcript

3    from the electronic sound recording of the proceedings in the

4    above-entitled matter to the best of my knowledge and

5    ability.

6

7

8    _____          April 28, 2006
     Coleen Rand
9    Certified Court Transcriptionist/Agency Director
     For Rand Transcript Service, Inc.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25