# EXHIBIT 33

Westlaw.

Not Reported in F.Supp.                                                                    Page 1
Not Reported in F.Supp., 1992 WL 672289 (D.N.J.)
**(Cite as: 1992 WL 672289 (D.N.J.))**

**C**Only the Westlaw citation is currently available.

United States District Court, D. New Jersey.
The DOW CHEMICAL COMPANY, Plaintiff,
v.
SCHAEFER SALT & CHEMICAL COMPANY
a/k/a Charles Schaefer & Sons, Inc.; Charles F.
Boeddinghaus; Judy L. Boeddinghaus; J.F. Barbour;
and Carole Barbour, Defendants.
**Civ. A. No. 91-4027.**

July 21, 1992.

Riker, Danzig, Scherer, Hyland & Perretti by Alan E.
Kraus, David P. Arciszewski, Morristown, NJ, for
plaintiff.

Ravin, Sarasohn, Cook, Baumgarten, Fisch & Baime
by Anthony J. Pasquariello, Roseland, NJ for defen-
dant Schaefer Salt & Chemical Co.

Fein Such Kahn & Shepard by James E. Shepard,
Parsippany, NJ for defendants Charles F. Boedding-
haus, Judy L. Boeddinghaus, J.F. Barbour and Carole
Barbour.

*OPINION*

BISSELL, District Judge.

**\*1** This matter arises before this Court pursuant to
several motions. First, plaintiff Dow Chemical Com-
pany ("Dow") has moved for summary judgment
against defendant Schaefer Salt & Chemical Com-
pany, a/k/a Charles Schaefer & Sons ("Schaefer").
Defendants Charles F. Boeddinghaus, Judy Boed-
dinghaus, J.F. Barbour and Carole Barbour ("the in-
dividual defendants") have moved for summary
judgment against the plaintiff Dow, and Dow has
cross-moved against these defendants for summary
judgment.

*I. FACTS AND BACKGROUND*

The facts and background of this matter were re-
cently considered by this Court in an Opinion dated
July 7, 1992, affirming an order of Magistrate Judge
Haneke. However, this Court will reassert these facts
herein as supplemented by the parties in the various
summary judgment motions.

Plaintiff Dow Chemical Company is a Delaware cor-
poration with its principal place of business in
Michigan. (Compl., ¶ 1). Defendants Charles F.
Boeddinghaus and Judy Boeddinghaus are husband
and wife and are residents of New Jersey. (*Id.*, ¶¶ 3,
4; First Amended Answer (hereinafter "Answer"), ¶¶
3, 4). Defendants J.F. Barbour and Carole Barbour
are husband and wife and are residents of New Jer-
sey. (Compl., ¶¶ 5, 6; Answer, ¶¶ 5, 6). Finally, de-
fendant Schaefer is a New Jersey corporation with its
principal place of business in Elizabeth, New Jersey.
(Compl., ¶ 2; Answer, ¶ 2). This Court's jurisdiction
is premised upon diversity of citizenship of the par-
ties and an amount in controversy in excess of
$50,000.

Many of the facts underlying this litigation are undis-
puted. Dow manufactures a variety of products, in-
cluding several calcium chloride products which are
used to melt ice and snow at temperatures below
freezing. (Dow's Br. in Support of Motion for Sum-
mary Judgment against Schaefer (hereinafter "Dow's
Br."), at 4). Dow sells calcium chloride products to
"repackers" and distributors nationwide. (*Id.*) The
repackers purchase the product in bulk form, and then
repack it into bags for sale to its end-users. (*Id.*) The
distributors purchase already packaged calcium chlo-
ride, thus avoiding the cost and expense in packaging
the product. (*Id.*) Not all repackers are distributors
and not all distributors are repackers. (*Id.*)

Schaefer was both an authorized distributor and a
repacker. (Barbour Dep. at 84:3-7, attached as Exh. A
to Arciszewski Aff. of June 5, 1992 (hereinafter
"Barbour Dep.")). Agreements as to each role were
strictly separate. (*Id.* at 84:8-16). Schaefer's relation-
ship with Dow as a repacker and distributor had

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1992 WL 672289 (D.N.J.)
**(Cite as: 1992 WL 672289 (D.N.J.))**

lasted for more than 15 years. (*Id.* at 29:9-25; 31:12-20).

Dow and Schaefer entered into a sales agreement on May 14, 1990 in which Schaefer promised to purchase calcium chloride pellets. (Compl., ¶ 9; Answer, ¶ 9; *see also* Kenneth Schultz Aff. (Dow's Account Manager) and Exh. A thereto). The agreement provided for a 500 ton minimum purchase, but the estimated quantity of goods Schaefer intended to purchase was 5,000 tons. (Compl., ¶ 9; Answer, ¶ 9).

**\*2** The price per unit for the pellets was set forth in a three-phase program, called the Pellet Repacker Program. (Compl., ¶ 10; Answer, ¶ 10). Phase I was "pre-season," covering the period from March 1, 1990 to June 30, 1990, and provided that pellets were $180 per ton with payment due January 1, 1991. (Compl., ¶ 11; Answer, ¶ 11). The pellets were shipped F.O.B. Ludington, Michigan, and Schaefer was required to purchase 35%, or 175 tons, of its minimum during Phase I. (Compl., ¶ 11; Answer, ¶ 11). Phase II, the "early season," was for purchases made between July 1, 1990 and October 31, 1990 at a price of $195 per ton with payment due March 15, 1991. (Compl., ¶ 12; Answer, ¶ 12). Phase III was "in season," and covered purchases between November 1, 1990 and February 28, 1991. (Compl., ¶ 13; Answer, ¶ 13). The price during Phase III was $205 per ton with payment due in 60 days. (Compl., ¶ 13; Answer, ¶ 13).

This sales agreement also contains a provision for "Temporary Voluntary Allowances" on prices:

Temporary voluntary allowances from the then current contract price may be instituted, changed or withdrawn at any time by [Dow] and shall not be deemed a change in price. [Dow] is not required to give Buyer any prior notice of the institution, change or withdrawal of any temporary voluntary allowances.

(Sales Agreement, ¶ 3 of "General Terms and Conditions," Exh. A to Schultz Aff. (hereinafter "Sales Agreement")). This provision "recogniz[es] that Dow from time to time wants to offer discounts or competitive credits to its repackers in order to assist them in meeting particular competitive situations."

(Schultz Aff., ¶ 4).

There are several other provisions which are relevant to the motions presently before this Court. Paragraph 2 of the "General Terms and Conditions" is entitled "Change of Price and Terms" and states as follows:

Seller may increase the price, change the transportation terms, terms of payment or minimum requirement per shipment at any time providing Seller gives Buyer thirty days prior written notice. Buyer's failure to object to the increase or change by written objection received by Seller prior to the effective date of the increase or change shall be considered acceptance. Seller shall advise Buyer within fifteen days from the receipt of timely written objection from Buyer whether Seller will (a) continue to supply on terms and conditions in effect prior to the announced increase or change, (b) enter into negotiations with Buyer or (c) cancel this contract if Seller elects to enter into negotiations under (b) and if within thirty days from the date of Seller's increase or change, agreement has not been reached and Seller has not agreed to continue to supply on the terms and conditions in effect prior to the announced increase or change, then either party may by written notice terminate the negotiations and cancel this contract. Unless otherwise agreed as part of the negotiations, price and other terms applicable during the negotiating period shall be those which Seller implemented by the notice.

**\*3** (Sales Agreement, "General Terms and Conditions," ¶ 2).

The Sales Agreement provided Dow with various options in the event that Schaefer failed to pay. Dow could defer shipments, alter payment terms or even cancel the contract. (Sales Agreement, "General Terms and Conditions," ¶ 16). If Schaefer's "financial responsibility" was unsatisfactory, Dow could accelerate due dates and demand immediate payment for any outstanding invoices. (*Id.*) Further, Schaefer agreed "to pay all costs and expenses including reasonable attorney's fees incurred by Seller in the collection of any sum payable." (*Id.*)

The contract also provided that it was the final complete and exclusive written expression of the contract

Not Reported in F.Supp.
Not Reported in F.Supp., 1992 WL 672289 (D.N.J.)
**(Cite as: 1992 WL 672289 (D.N.J.))**

between the parties. (*Id.,* ¶ 18(F)). Finally, any modification had to be in writing and signed by both parties to be effective. (*Id.*)

In addition to the Sales Agreement, Dow and Schaefer entered into a distributor agreement on January 1, 1990. A very small portion of Schaefer's debt to Dow arose under the distributorship agreement. This agreement contained all of the provisions described above, except for the Pellet Repacker Program. (Schultz Aff., ¶ 5).

Dow alleges that it shipped goods pursuant to the Sales Agreement and distributorship agreement such that by July 1, 1991, Schaefer had unpaid balances in the amount of $690,527.78. (Compl., ¶ 14; *see also* Max Muller Cert. (Manager of Collections for Dow) and Andre N. Balfour Cert. (Financial Manager for Dow)). Schaefer has admitted this unpaid balance, but denies that such amount is presently due and owing. (Answer, ¶¶ 14, 16). As will be more fully described below, Dow demanded payment on several occasions to no avail.

Defendant Charles F. Boeddinghaus is Executive Vice-President of Schaefer. (C. Boeddinghaus Aff. of June 29, 1992, ¶ 1). Defendant J.K. Barbour is President of Schaefer. (J.K. Barbour Aff. of June 5, 1992, ¶ 1). They are each 50% shareholders in Schaefer. (*Id.,* ¶ 3). On December 27, 1989, these two individuals and their wives signed personal guarantees of the obligations of Schaefer to Dow. (Compl., ¶¶ 25, 31, 37, 43). These guarantees will be more fully described in connection with the individual defendants' motion for summary judgment and Dow's cross-motion.

Dow filed its complaint on September 18, 1991, asserting eight counts. The First through Fourth Counts are directed at Schaefer, asserting breach of contract, wrongful failure to pay upon a book account, wrongful failure to pay the reasonable value of the goods, and account stated, respectively. The Fifth through Eighth Counts seek payment of the personal guarantees executed by each of the four individual defendants, respectively.

Schaefer has asserted affirmative defenses and a counterclaim against Dow based upon the following

disputed allegations. In the Sales Agreement, Dow agreed to extend protections to Northeast repackers (of which Schaefer is one) who purchased bulk quantities of chemical from Dow and repacked it for resale in the retail and wholesale markets, by "protecting" up to 35% of the gross volume minimum purchase requirements pursuant to a so-called Phase I/Option A under the 1990-1991 repacking program. (Answer, ¶ 49). Specifically, the Sales Agreement provides, within the Repacker Program, for an "Inventory Protection Program" as follows:

**\*4** In order to promote adequate inventories for the winter season at repacker facilities, Dow Chemical U.S.A. agrees to the following for those repackers who meet Phase I/Option A purchase requirements [*i.e.* 175 tons]:

-Calcium chloride pellet inventory remaining at repackers' facility or warehouses as of March 1, 1991, will be "protected" up to the 35% gross volume minimum required under Phase I/Option A in the 1990-1991 repacker program.

-Dow agrees to rebill "protected" volume under Phase I of the 1991-1992 repacker program at 1991-1992 Phase I price, and to reduce minimum purchase requirements by "protected" volume.

-Physical audit of material may be necessary and must be agreed to by the repacker prior to participation in the program.

(Sales Agreement, Repacker Program at 2). Schaefer asserts that, "[e]ssentially, this protection for repackers such as Schaefer required Dow to re-bill Schaefer the following year for product unsold during the prior year and required Dow to reduce the next year's required volume by the amount of unsold inventory during the previous season up to a thirty-five (35%) percent gross volume minimum (the 'Repacker Program')." (Answer, ¶ 49).

Schaefer alleges that the Repacker Program was designed by Dow to alleviate the concern of Northeast repackers that Midwest repackers and foreign importers were flooding the Northeast market at prices with which the Northeast repackers could not com-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1992 WL 672289 (D.N.J.)
**(Cite as: 1992 WL 672289 (D.N.J.))**

pete. (*Id.,* ¶ 50). The foreign importers had lower production, labor and other costs than the Northeast repackers, creating the "Importer Problem." (*Id.*) The Midwest repackers were geographically closer to Dow's central manufacturing location and therefore engendered lower freight costs, creating the "Midwest Repacker Problem." (*Id.*) Thus, both foreign and Midwest repackers could sell calcium chloride to a customer or potential customer of Schaefer at prices which were too low for Schaefer and the other Northeast repackers to meet. (*Id.,* ¶ 52). Schaefer asserts that the Repacker Program did not adequately address either the Importer Problem or the Midwest Repacker Problem. (*Id.,* ¶ 51).

Barbour [FN1] attended a repacker meeting convened by Dow in Scottsdale, Arizona in January 1991. (*Id.,* ¶ 53). Barbour informed Dow that the Midwest Repacker Problem and the Importer Problem were continuing, and that he was going to formally raise the issues at the meeting. (*Id.*) Dow's Products/Marketing Manager Doug Brownfield, Sales Representative Ken Schultz, [FN2] and District Manager Peter Cera pleaded with Barbour not to raise the problems, asserting that Dow would "take care of" Schaefer so that Schaefer "would not get hurt by either" problem. (*Id.,* ¶ 54).

Specifically, Dow representatives promised to guarantee Schaefer a minimum 15% return on Schaefer's investment, to be determined on a "cost basis." (*Id.,* ¶ 55). In order to qualify for the 15% minimum guarantee, Schaefer was required to provide a quotation letter from a competent Midwest repacker or an importer, showing substantially lower prices, addressed to Schaefer's customers or potential customers. (*Id.,* ¶ 56). However, Dow did not respond to Schaefer's request for minimum guarantees quickly enough in order to meet such reduced prices, so that Schaefer lost the customers anyway. (*Id.,* ¶ 57). "In addition, Dow would set the reduced prices based on other than Schaefer's actual costs basis, thereby rendering the minimum price guarantee worthless to Schaefer." (*Id.*) The effect, according to Schaefer, "was to induce Schaefer to purchase more chemical product from Dow than Schaefer would have done" absent such a guarantee. (*Id.,* ¶ 58).

**\*5** Based on these allegations, Schaefer has asserted two affirmative defenses: first, that Dow intentionally or negligently misrepresented that the Repacker Program and/or the minimum guarantee would alleviate any harm to Schaefer resulting from the Midwest Repacker Problem or the Importer Problem, and second, that Dow knew or reasonably should have known that it was not going to abide by the letter and spirit of either the Repacker Program or the minimum guarantee. (*Id.,* ¶¶ 62, 65).[FN3] Furthermore, Schaefer has asserted a counterclaim for damages. Specifically, Schaefer alleges that as a result of Dow's inequitable conduct, it has suffered actual damages in the amount of approximately $700,000, the amount of calcium chloride it ordered from Dow. (*Id.,* ¶ 69). Schaefer has also lost profits in the approximate amount of $250,000 as a result of Dow's failure to keep its promise of a 15% minimum profit, and $450,000 as a result of a lost business opportunity with AKZO, a Northeast chemical manufacturer. (*Id.,* ¶¶ 70, 71).

There are presently four applications before this Court. First, Dow has moved for summary judgment against Schaefer for the amount due under the contract plus interest, costs, and so forth. Dow also seeks summary judgment dismissing Schaefer's affirmative defenses and counterclaim. In response, Schaefer has opposed the motion on the merits and has submitted a Fed.R.Civ.P. 56(f) application for continued discovery. This application was based in part upon Schaefer's appeal from an order of Magistrate Judge Haneke which had denied Schaefer's motion to compel production of certain documents and its motion for an extension of the discovery deadline. By Opinion and Order dated July 7, 1992, this Court affirmed the decision of the Magistrate Judge, concluding that the present motions should proceed.

Also before this Court are cross-motions for summary judgment on the guarantees signed by the individual defendants.

## II. DISCUSSION

### A. Standards Governing Motions for Summary Judgment

Under Federal Rule of Civil Procedure 56(c), summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admis-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1992 WL 672289 (D.N.J.)
**(Cite as: 1992 WL 672289 (D.N.J.))**

sions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See also Chipollini v. Spencer Gifts, Inc.,* 814 F.2d 893, 896 (3d Cir.) (*en banc* ), *cert. dismissed,* 483 U.S. 1052 (1987). In deciding a motion for summary judgment, the facts must be viewed in the light most favorable to the nonmoving party and any reasonable doubt as to the existence of a genuine issue of fact is to be resolved against the moving party. *Continental Insurance Co. v. Bodie,* 682 F.2d 436, 438 (3d Cir.1982). The moving party has the burden of establishing that there exists no genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317 (1986). The Supreme Court has stated that in applying the criteria for granting summary judgment,

*6 the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict....

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986). A fact is "material" only if it will affect the outcome of a lawsuit under the applicable law, and a dispute over a material fact is "genuine" if the evidence is such that a reasonable fact finder could return a verdict for the nonmoving party. (*Id.*)

*B. Analysis of Dow's Motion Against Schaefer*

As indicated above, many of the facts are not disputed. Schaefer has not contested the existence of the Sales Agreement or distributorship agreement or their terms, or the fact that it received considerable shipments under these agreements. Rather, Schaefer claims that Dow made an additional promise to the effect that Schaefer would recognize a 15% guaranteed profit on all of the calcium chloride it purchased under these agreements.

In support of its motion, Dow argues that it is entitled to summary judgment under various theories. First, Dow asserts that Schaefer has admitted that it owes the full amount sought. (Dow's Br. at 17-21). Further, Dow argues that it is undisputed that Schaefer has breached its contracts. (*Id.* at 21-22). Dow also argues that the parol evidence rule, the integration clause in the contracts, and the Statute of Frauds bar Schaefer's claim that there is a 15% minimum guarantee. (*Id.* at 22-29). In addition, Dow argues that Schaefer's claims are implausible and too ambiguous to be enforceable. (*Id.* at 29-31). Finally, Dow argues that to the extent Schaefer's counterclaim asserts that Dow tortiously interfered with Schaefer's business relations, the claim fails as a result of a lack of evidence. (*Id.* at 31-33).

Before addressing the merits of the parties' positions, this Court must address Schaefer's application for denial of this motion and an extension of discovery made pursuant to Fed.R.Civ.P. 56(f). In addition, this Court must address the question of the applicable law.

*1. Schaefer's Rule 56(f) Application*

Schaefer argues that this Court must deny Dow's motion for summary judgment and reverse Magistrate Judge Haneke's Order of June 16, 1992 in which he denied Schaefer's motion to compel the production of documents and its application for an extension of the discovery deadline in order to continue with depositions. This request is now moot in light of this Court's Opinion and Order of July 7, 1992, affirming the Order of Magistrate Judge Haneke in its entirety.

*2. Choice of Law*

*7 The parties' Sales Agreement provides that it will be governed by Michigan law, including that State's version of the Uniform Commercial Code. The distributorship agreement provides that it will be governed by New Jersey law and that State's version of the Uniform Commercial Code. Dow asserts that there is no conflict between these States on any relevant issue, and Schaefer does not disagree. This Court's research suggests that the parties are correct that there is no conflict, and accordingly, this Court will primarily utilize references to New Jersey's Uni-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1992 WL 672289 (D.N.J.)
**(Cite as: 1992 WL 672289 (D.N.J.))**

form Commercial Code for simplicity.

*3. Analysis of Dow's Motion*

Dow asserts that it is entitled to summary judgment as to its claim, contained in the First Count of its complaint, that Schaefer has breached the Sales Agreement and the distributorship agreement by virtue of its failure to pay. Attached to the complaint are copies of all of the invoices and a demand letter. (Compl., Exhs. A, B. C). Dow also relies upon Schaefer's pre-litigation and pre-answer negotiating letters, in which Schaefer admitted its obligation. For example, in June 1991, Charles Boeddinghaus wrote to Andre Balfour, Dow's Financial Manager, proposing a future business plan between the parties. (Balfour Cert., ¶ 4 and Exh. B). This proposal specifically recognized "our obligation to eliminate our outstanding balance to you." (Balfour Cert., Exh. B at 4). Dow refused to review the proposal until the debt was paid in full. (Balfour Cert., ¶ 5 and Exh. C). On July 10, 1991, Mr. Boeddinghaus submitted another proposal to Dow which, *inter alia,* addressed paying the outstanding balances. (Balfour Cert., ¶ 6, Exh. D). Dow again rejected the proposal. (Balfour Cert., ¶ 6 and Exh. E). During this process, Balfour spoke with Mr. Boeddinghaus and Mr. Barbour by telephone several times. (Balfour Cert., ¶ 7). Neither ever stated that Schaefer did not owe Dow the money or that Dow owed Schaefer more credits or that Dow breached a promise that Schaefer would recognize a 15% minimum profit. (*Id.*)

Schaefer engaged in further discussions with Max Muller, Dow's Manager of Collections. On August 8, 1991, Mr. Boeddinghaus wrote to Mr. Muller offering to transfer title and return its entire inventory of calcium chloride product, valued at $300,000, in order to reduce its outstanding balance with Dow. (Muller Cert., ¶ 4 and Exh. B). This did not occur, for reasons which are not disclosed. (Muller Cert., ¶ 4). On September 12, 1991, Mr. Boeddinghaus again wrote to Muller, proposing another payment schedule pursuant to a proposed promissory note for the full amount. (*Id.,* ¶ 5 and Exh. C). Dow responded on September 17, 1991 with several changes which it would require, including an irrevocable letter of credit securing the amount owed. (Muller Cert., ¶ 6 and Exh. D). Schaefer never responded in writing to

the letter. (Muller Cert., ¶ 6). Throughout this period, Muller spoke with Schaefer representatives by telephone on several occasions. (*Id.,* ¶ 7). Schaefer never disputed the amount due, but rather recognized its obligation. (*Id.*) There was never any mention of a 15% guarantee on all products sold in competition with the Midwest repackers or foreign importers. (*Id.*)

*8 Ken Schultz states that he "never promised Schaefer, orally or in writing, that Dow would guarantee Schaefer a minimum 15 percent gross profit on sales made in competition with Dow's Midwest repackers." (Schultz Aff., ¶ 6). Indeed, "Dow would never make any such guarantee because it does not make good economic sense to guarantee a buyer's resale profit margin at the ultimate expense of Dow's own profit margin." (*Id.*) Peter Cerra, District Sales Manager, similarly asserts that he never promised that Dow would guarantee a 15% profit to Schaefer. (Cerra Aff., ¶ 3).

As indicated above, Dow filed its complaint on September 18, 1991. On November 7, 1991, Boeddinghaus and Barbour wrote to Dow's President, Frank Popov, seeking his assistance in resolving its difficulties in satisfying its indebtedness to Dow. (Muller Cert., Exh. E). At this point in time, Schaefer had not yet answered the complaint. Its answer with affirmative defenses and a counterclaim based upon the alleged 15% minimum guarantee was not filed until December 17, 1991, at which time Dow first became aware of such claims. (*Id.,* ¶ 7). The amended answer was filed on April 3, 1992.

It is clear from Schaefer's pre-litigation admissions and its answer to the complaint that unless Schaefer can prove that Dow breached the alleged 15% minimum guarantee (thus entitling Schaefer to avoid its debt to Dow), Dow is entitled to summary judgment on its claim for breach of contract.[FN4] Schaefer's answer admits the contracts, the shipments and that it has not paid on the invoices. Accordingly, the question of whether Dow is entitled to summary judgment depends on whether Schaefer's counterclaim and defenses survive summary judgment.

Dow asserts that the principals of Schaefer do not agree on when the alleged 15% minimum guarantee

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1992 WL 672289 (D.N.J.)
**(Cite as: 1992 WL 672289 (D.N.J.))**

Page 7

was made. Mr. Boeddinghaus testified that the promise of a 15% gross profit was made in 1988 or 1989, before the Sales Agreement and distributorship agreement were signed (May 14, 1990 and January 1, 1990 respectively). (C. Boeddinghaus Dep. at 60:6-11, attached as Exh. B to Arciszewski Aff. of June 5, 1992 (hereinafter "Boeddinghaus Dep.")). Mr. Barbour, on the other hand, asserts that the promise was made during the winter of 1990-1991, after the agreements were signed. (J.F. Barbour Dep. at 159:4-24).

The obvious place to begin this analysis is with the parol evidence rule, as the Sales Agreement and the distributorship agreement both purport to constitute the entire agreement between the parties. Related to the parol evidence rule is the question of whether this Court will enforce the parties' agreements to the extent such agreements prohibit oral modifications.

The parol evidence rule of the Uniform Commercial Code provides:

Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented

*9 (a) by course of dealing or usage of trade (12A:1-205) or by course of performance (12A:2-208); and

(b) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.

(Uniform Commercial Code ("UCC") § 2-202, N.J.S.A 12A:2-202). This provision prohibits the use, as a matter of law rather than as an evidentiary matter, of evidence of contradictory terms created prior to or contemporaneous with a written agreement where that agreement is the final expression of the parties. Such a written agreement may, however, be explained or supplemented by course of dealing or

course of performance. It may also be supplemented by proof of consistent additional terms, but only where the writing was not intended to be a complete and exclusive statement of the terms of the agreement. *See generally Flavorland Ind., Inc. v. Schnoll Packing Corp.,* 167 N.J.Super. 376 (Essex County Ct.1979); *NAG Enterprises v. All State Industries,* 285 N.W.2d 770, 771-72 (Mich.1979).

The Sales Agreement and distributorship agreements both specifically provide that they are the "final, complete and exclusive written expression of the contract between the parties." (Sales Agreement, "General Terms and Conditions," ¶ 21(G)). Both documents are signed by the parties, and their validity is not challenged herein. Furthermore, such provisions are generally given conclusive effect in determining whether the contract is integrated. *See, e.g., United States v. Clementon Sewerage Authority,* 365 F.2d 609, n. 1 (3d Cir.1966). Therefore, this Court finds that, as a matter of law, these contracts constitute a final expression of the parties' agreement with respect to the repacker relationship and distributorship relationship, respectively.

The next question is whether a 15% minimum guarantee allegedly made prior to these agreements, as asserted by Mr. Boeddinghaus, contradicts the terms of those agreements. Under the terms of this alleged promise, Schaefer would, as a result of credits granted by Dow on the price of calcium chloride, recognize a 15% return on Schaefer's investment in the calcium chloride. (Answer, ¶ 55). In order to get these credits Schaefer would have to show that a competitor was selling to Schaefer's customers and/or potential customers at substantially lower prices than Schaefer could meet. (*Id.,* ¶ 56).

In contrast, the Sales Agreement provides for a particular purchase price depending on the date of purchase under the Pellet Repacker Program. (Sales Agreement, Schedule P-1). It further provides that Dow may increase the price or make any other changes so long as it provides notice and Schaefer does not object. (*Id.* at "General Terms and Conditions," ¶ 2). The Sales Agreement also provides that Dow may, in its sole discretion, provide temporary allowances as to price. (*Id.,* ¶ 3). Finally, it provides for "protection" of a certain amount of inventory as

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1992 WL 672289 (D.N.J.)
**(Cite as: 1992 WL 672289 (D.N.J.))**

detailed in the "Repacker Inventory Protection Program." (*Id.* at "Pellet Repacker Program"). The distributorship agreement is identical to the Sales Agreement with respect to these provisions, except that it does not contain a Pellet Repacker Program; prices are "those then in effect to Dow distributors" pursuant to Product Riders. (Distributorship Agreement, ¶ 3).

**\*10** This comparison of the alleged 15% minimum guarantee with the provisions in the agreements shows that the alleged guarantee is inconsistent with those provisions. Therefore, to the extent that Schaefer is asserting that there is a pre-agreement promise of a 15% minimum profit, Dow is entitled to summary judgment. Such an inconsistent term is barred by the parol evidence rule. *See, e.g., Fr. Winkler KG v. Stoller,* 839 F.2d 1002, 1005-1006 (3d Cir.1988) (guarantor's allegation of an oral promise not to enforce was an inconsistent term barred by the parol evidence rule).

Schaefer argues that proof of the alleged 15% minimum guarantee is not barred by the parol evidence rule because it was a promise upon which it relied to its detriment, citing *Restatement (Second) Contracts,* § 139. By making this argument, Schaefer fails to distinguish the two possible scenarios created by the deposition testimony of its principals: (a) the alleged promise was made *before* the agreements were signed; and (b) the alleged promise was made *after* the agreements were signed. Only the latter situation could, under certain circumstances, be ameliorated by the concept of promissory estoppel relied upon by Schaefer. (*See§ 139,* specifically referring to avoiding the Statute of Frauds).

To the extent that Schaefer is asserting that Dow made the promise after the Sales and distributorship agreements were signed, the issue is whether an alleged oral modification (*i.e.* the 15% guarantee) is effective. Both agreements specifically require any modifications to be in writing. Section 2-209(2) of the U.C.C. addresses such provisions:

(2) A signed agreement which excludes modification or rescission except by a signed writing cannot be otherwise modified or rescinded, but except as between merchants such a requirement on a form supplied by the merchant must be separately signed by the other party.

(U.C.C. § 2-209(2); N.J.S.A. 12A:2-209(a)). The comment to the Code provides that "[s]ubsection (2) permits the parties in effect to make their own Statute of Frauds as regards any future modification of the contract by giving effect to a clause in a signed agreement which expressly requires any modification to be by signed writing." (Comment 3).

In the present matter, both Dow and Schaefer are "merchants" within the definition of that term. Section 2-104 provides that a merchant "means a person who deals in goods of the kind ... involved in the transaction." (U.C.C. § 2-104(l); N.J.S.A. 12A:2-104(l)). Therefore, it is not necessary that the provision requiring written modifications be separately signed to be enforceable.

It is undisputed that the alleged 15% minimum guarantee was never put into writing. As a matter of law, then, the alleged attempt at modification of the parties' agreements to provide for a 15% minimum guarantee is not valid. *See, e.g., Green Construction Co. v. First Indemnity of America Insurance,* 735 F.Supp. 1254, 1261 (D.N.J.1990), *aff'd,* 935 F.2d 1281 (3d Cir.1991). This is particularly true in light of the provision in § 2-209(3) that the requirements of the Statute of Frauds, § 2-201, must also be met if the agreement as modified would be within it. The Statute of Frauds would clearly apply to the agreements herein as modified by virtue of the fact that they are for the sale of goods in excess of $500. (U.C.C. § 2-201(1); N.J.S.A. 12A:2-201(1)).[FN5]

**\*11** Schaefer further argues that Dow should be estopped from denying the validity of the alleged 15% minimum guarantee because of Schaefer's reliance on such a promise. Section 139 of the *Restatement (Second) Contracts* provides:

(1) A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce action or forbearance is enforceable notwithstanding the Statute of Frauds if injustice can be avoided only by enforcement of the promise. The remedy granted for breach is to be limited as justice requires.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1992 WL 672289 (D.N.J.)
**(Cite as: 1992 WL 672289 (D.N.J.))**

(2) In determining whether injustice can be avoided only by enforcement of the promise, the following circumstances are significant:

(a) the availability and adequacy of other remedies, particularly cancellation and restitution;

(b) the definite and substantial character of the action or forbearance in relation to the remedy sought;

(c) the extent to which the action or forbearance corroborates evidence of the making and terms of the promise, or the making and terms are otherwise established by clear and convincing evidence;

(d) the reasonableness of the action or forbearance;

(e) the extent to which the action or forbearance was foreseeable by the promisor.

Schaefer argues that it relied upon Dow's promise of a 15% minimum profit, and that its reliance was reasonable especially given its importance to Dow in the Northeast region. (Schaefer's Br. in Opp. at 12). This Court disagrees. Defendant J.K. Barbour described the alleged 15% minimum guarantee and his reliance thereon. In contrast, however, he admitted that under the contracts, Dow had complete discretion whether or not to give Schaefer credits:

Q: As I understand your testimony and your contention, sometime early in the winter of 1990, Mr. Schultz [of Dow] initiated discussions with you that in situations where Dow decided to give you a competitive allowance that the price that they would consider for such competitive allowance would be one that would get you a 15 per cent return over what they regarded as appropriate costs?

A: Yes.

Q: Is that a fair summary?

A: That's a fair summary of what this initial proposal was to us.

Q: And as those discussions went on in the winter of 1990, it got a little further refined and you and Dow disagreed about what were an appropriate level of costs to measure against, right?

A: Yes. In effect I was setting the stage for a postseason negotiation for additional credits, yes.

Q: So the net result of these discussions is that Dow has, as you claim, promised that in situations where it decided to give credits, they will be of a certain minimum level?

A: Yes.

Q: But Dow has not changed the underlying principle that Dow has the discretion to decide whether it's going to give credits at all. Isn't that right?

A: The problem with your question is Dow prior to me making substantial additional purchases for that season made it clear to me that, despite them being able to come up with a uniform across the nation type of an answer to the Midwest repacker problem, would in fact make sure that I didn't lose business and/or profit to the Midwest repackers this particular season. Based on that, I made substantial purchases which I told them I would not make if I wasn't given basically their assurances as they had in the past that I would be protected. In the past, the solution always would be I would make demands at the end of the season and pretty much get what I had wanted.

**\*12** Q: But nobody committed to you that they would change the underlying principle of competitive credits that Dow had the election as to whether or not to give, did they?

A: I'm not sure I understand that question.

Q: We've established, haven't we, that the written agreements, the written repacker sales contract and the written distributorship agreement, reserve to Dow the discretion to decide whether to give a credit and how much to give, right?

A: That's correct.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1992 WL 672289 (D.N.J.)
**(Cite as: 1992 WL 672289 (D.N.J.))**

Q: You agree with that?

A: Yes.

(Barbour Dep. at 159:4-24; 161:7-162:20, attached as Exh. A to Pasquariello [FN6] Aff. of June 29, 1992 (hereinafter "Barbour Dep. II)).

This deposition testimony makes it clear that any alleged reliance upon Dow's assertion that Schaefer would be "protected" by a 15% minimum guarantee was unreasonable. Barbour specifically acknowledges that whether to give Schaefer credits was within Dow's discretion, and that its assurances were not meant to eliminate that discretion. Reliance upon an alleged promise of protection at the same time that the promisor admittedly has discretion on the issue is unreasonable as a matter of law.

Another factor to consider is "the definite and substantial character of the action or forbearance in relation to the remedy sought." Schaefer seeks to avoid its obligation to Dow and collect damages for its alleged injuries. The alleged action taken in reliance was the purchase of calcium chloride pursuant to the terms of the Sales Agreement and the distributorship agreement. However, Schaefer has not provided any "substantial" or "definite" evidence concerning this alleged reliance other than the conclusory allegations of its principals. For example, Schaefer could have shown that, compared to prior years, it purchased significantly more calcium chloride due to the alleged promise. Since no such evidence was presented, however, it is evident that avoidance of the alleged promise is not necessary to avoid injustice.

Another factor which weighs against enforcement of the alleged 15% minimum profit guarantee is "the extent to which the action or forbearance corroborates evidence of the making and terms of the promise, or the making and terms are otherwise established by clear and convincing evidence." The alleged action taken in reliance upon the alleged 15% profit guarantee is the purchase of calcium chloride, which is also consistent with the parties' practice over more than 15 years and is consistent with fulfilling the obligations under the Sales and distributorship agreements. Thus, it is inconclusive as to the making and terms of the alleged promise. Furthermore, the

making and terms of the 15% minimum profit guarantee are not supported by "clear and convincing evidence" elsewhere in the record. Of course, a party does not need to meet that standard at the summary judgment stage; in the face of categorical denials of such a promise, however, it is incumbent upon the party asserting the promise to come forward with more than conclusory allegations. This Court determines that it is not necessary to enforce the alleged 15% minimum guarantee in order to avoid injustice, and therefore Schaefer's claim for promissory estoppel fails.

**\*13** Dow's motion for summary judgment as to its claim of breach of contract is therefore granted. In light of this determination, it is unnecessary to consider at length the Second through Fourth Counts of Dow's complaint as they simply assert alternative theories supporting the same relief. Summary judgment is granted as to the Second Count (book account) and the Fourth Count (account stated) for the reasons set forth above. Plaintiff's *quantum meruit* claim (Third Count) is dismissed as moot. Summary judgment is also granted as to Schaefer's defenses and counterclaims. Those defenses and counterclaims are predicated upon allegations of "inequitable conduct" and "unclean hands." (*See, e.g.*, Second Affirmative Defense, ¶¶ 66, 67). These equitable defenses are inapplicable in the case at bar, an action at law for the collection of a debt. Pursuant to the terms of the contracts, Dow is entitled to costs and expenses including attorneys' fees. Accordingly, Dow shall submit a detailed application for such costs and expenses within 15 days of the date of this Opinion and accompanying Order. Schaefer shall have 15 days from the date of such application in which to challenge the reasonableness of those fees and expenses. Upon receipt of Schaefer's opposition, this Court will consider the application without oral argument and without any further reply papers.

*C. The Motions as to the Guarantees*

The basic contours of the facts concerning the personal guarantees executed by the individual defendants are essentially undisputed, with some notable exceptions. Prior to December 1989, Schaefer had a $1,000,000 line of credit with Dow. As of November 1989, Schaefer owed Dow approximately $637,000

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1992 WL 672289 (D.N.J.)
**(Cite as: 1992 WL 672289 (D.N.J.))**

under a roll-over invoice due for payment on January 1, 1990. This invoice meant that there was only approximately $363,000 remaining in its credit, an amount insufficient to meet Schaefer's orders for the 1989-1990 season.

Since the available credit was insufficient, Dow offered to increase Schaefer's credit but only if the principals would personally guarantee Schaefer's obligations. On December 22, 1989, Andre Balfour wrote to Barbour and to Boeddinghaus (separately, but with identical terms) enclosing the guarantee forms, one for each married couple. (Individual Defs'. Br., Exhs. A, B). Balfour stated that "[t]he guarantee is in consideration of a $1,500,000 line of credit." (*Id.*) Further, when completing the form, Barbour and Boeddinghaus should note that the dollar amount being guaranteed should be $500,000, that their spouses "should" sign the guarantee form, and that it should be dated and notarized. (*Id.*) Barbour and Boeddinghaus agreed, and on December 27, 1989 they each signed a personal guarantee. (Individual Defs' Br., Exhs. C, D). They each also had their wives sign the guarantee.

The individual defendants make the following allegations in support of their motion for summary judgment. Schaefer had a $1,000,000 credit limit with Dow prior to November 1989, which was not secured by any personal guarantees. (J. Barbour Aff. of June 5, 1992, ¶ 9).[FN7] Given Schaefer's outstanding debt to Dow at that time, there was only $362,860 in available credit. (*Id.*, ¶ 9). Barbour negotiated with Dow, and acquired a foreign competition price protection credit of $67,821.60 against the amount due under the invoices. (*Id.*, ¶ 11). Barbour personally guaranteed this amount, which expired upon payment of the balance. (*Id.*) The invoice in question is not a part of this litigation. (*Id.*)

*14 Because of the limited available credit, Schaefer had not made any substantial orders for the 1989-1990 season. (*Id.*, ¶ 12). Ken Schultz approached Barbour, and as an inducement to purchase, advised that he would be able to get pricing support from Dow in connection with price concessions on the initial order and competition it was experiencing. (*Id.*) Barbour also discussed the credit limit situation with Schultz, and after discussions with Dow's credit

department, Schultz informed Barbour that it could be increased with personal guarantees. (*Id.*, ¶ 13).

Barbour's understanding of the content of the guarantee was that doing so would increase Schaefer's credit limit from $1,000,000 to $1,500,000. (*Id.*, ¶ 14). The personal guarantees would only be for $500,000, "and only to the extent and for the period of time that the credit actually extended by Dow to Schaefer exceeded $1,000,000." (*Id.*, ¶ 15). Barbour further states that Schaefer did not need to purchase any calcium chloride from Dow because it had a left-over inventory from the previous season, and it could obtain calcium chloride from other sources. (*Id.*)

Barbour describes the guarantee as follows:

It was further understood and agreed that any time Schaefer's balance due and owing to Dow fell below $1,000,000.00 the requested personal guaranties would not be in effect. However, if Schaefer again placed an order with Dow which put the amount outstanding over $1,000,000.00 the guaranties would again become effective as to that amount up to an additional $500,000.00 over the original $1,000,000.00 line of credit.

(*Id.*, ¶ 16). When Barbour received the guarantee forms, he "had certain questions concerning whether or not it correctly embodied the agreement I had reached with Dow through Ken Schultz in our oral discussions." (*Id.*, ¶ 19). He therefore called Andre Balfour, at which time Mr. Balfour confirmed the content of the personal guarantee. (*Id.*, ¶ 20). As a result of this conversation, Barbour and Boeddinghaus were satisfied that the guarantees complied with their understanding, and accordingly, they signed them. (*Id.*, ¶ 21).

Charles Boeddinghaus has substantially agreed with Barbour's testimony, asserting that the guarantee was meant to "guaranty only an amount up to a total of $500,000.00 and only to the extent and for the period of time that the credit actually extended by Dow to Schaefer exceeded $1,000,000.00." (C. Boeddinghaus Aff. of June 5, 1992, ¶ 8). Boeddinghaus also spoke with Balfour concerning the guarantees, in which Balfour confirmed Boeddinghaus' understanding of the guarantees. (*Id.*, ¶ 10).

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1992 WL 672289 (D.N.J.)
**(Cite as: 1992 WL 672289 (D.N.J.))**

Judy Boeddinghaus and Carole Barbour do not own an interest in Schaefer and are not employed by Schaefer in any capacity. (C. Boeddinghaus Aff., ¶ 14; J. Barbour Aff., ¶ 22; J. Boeddinghaus Aff., ¶ 6; C. Barbour Aff., ¶ 6). They each signed the personal guarantees at the request of their husbands, without knowing what it was. (C. Barbour Aff., ¶ 7; J. Boeddinghaus Aff., ¶ 7).

**\*15** These individual defendants seek summary judgment on various grounds. First, Carole Barbour and Judy Boeddinghaus assert that the guarantees fail because there is a lack of consideration and the guarantees constitute mere offers of guarantee. (Individual Defs.' Br. at 8-16). Next, Carole Barbour and Judy Boeddinghaus argue that Dow's requirement that they sign the guarantees constitutes a violation of the Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq.*(*Id.* at 17-22). Finally, all four defendants argue that the personal guarantees are not valid in the present action because Dow is seeking repayment of an amount less than Schaefer's original $1,000,000 line of credit. (*Id.* at 23-27).

Dow has opposed the motion and has cross-moved for summary judgment, asserting that the personal guarantees are valid as written and that any alleged oral understandings to the contrary are barred by the parol evidence rule.

Before reaching the merits of these motions, this Court recognizes the individual defendants' position that Dow's cross-motion is untimely because of Magistrate Judge Haneke's scheduling order asserting that all dispositive motions must be filed by June 7, 1992. (*See* Individual Defs'. Reply Br. at 2). The cross-motion was filed on June 29, 1992. In this Court's view, the cross-motion is not improper despite Magistrate Judge Haneke's order. First, there was no reason for Dow to seek summary judgment on the guarantees unless and until it succeeded on its claims against Schaefer, since the guarantees do not take effect until Schaefer is liable. Second, the cross-motion was timely filed in response to the individual defendants' motion for summary judgment. Third, this Court's view is that wherever possible, the merits of an action should be reached. Even if Dow could have filed this motion pursuant to Magistrate Judge

Haneke's order rather than as a cross-motion, it cannot be said that the individual defendants have in any way been prejudiced by the cross-motion. They have had an opportunity to submit papers in opposition and an opportunity for oral argument. This Court will consider the cross-motion.

The first issue raised by the individual defendants is an asserted lack of consideration, based on Carole Barbour's and Judy Boeddinghaus' statements that they never received any benefit or inducement to execute the guarantees. (C. Barbour Aff., ¶ 5; J. Boeddinghaus Aff., ¶ 5). This argument is without merit. The question of consideration is not whether the guarantors have received any, but whether the debtor whose liability is being guaranteed has received consideration. *See, e.g., Public Loan Co. v. Federal Deposit Insurance Co.,* 803 F.2d 82, 85-86 (3d Cir.1986) (review of whether the debtor actually received the loan which was guaranteed); *Conoco Inc. v. Inman Oil Co., Inc.,* 774 F.2d 895, 909 (8th Cir.1985) (in response to the guarantor's allegation that he received no consideration for his guarantee, the Court asserted that the contention was without merit by virtue of the fact that the debtor received a line of credit); *Kelly-Springfield Tire Co. v. Action Automotive,* 648 F.Supp. 731, 734 (N.D.Ill.1986) ("It is hornbook law that '[a] guaranty of the payment of past and future indebtedness is supported [by consideration] by an agreement to extend future credit or by the making of a loan to the debtor in addition to an existing obligation'") (citing 38 Am.Jur.2d Guaranty, § 43 (1968)); *cf. Continental Bank of Pa. v. Barclay Riding Academy,* 93 N.J. 153, 171 (1983), *cert. denied sub. nom, Barclay Equestrian Center, Inc. v. Continental Bank of Pa.,* 464 U.S. 994 (1983) (holding that a third party can issue an enforceable mortgage to secure the obligation of another, derived from the principle that one may enter into a binding contract for the benefit of another; so long as the contract is bargained for by the promisee, it is immaterial that the consideration runs to a designated third-party beneficiary) (other citations omitted). There is no dispute, in the present matter, that Dow made additional substantial sales to Schaefer after the guarantees were signed. Accordingly, there is no failure of consideration for the guarantees.

**\*16** Carole Barbour and Judy Boeddinghaus next

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                                                                Page 13
Not Reported in F.Supp., 1992 WL 672289 (D.N.J.)
**(Cite as: 1992 WL 672289 (D.N.J.))**

argue that the guarantees constitute mere unaccepted offers, not guarantees, relying on *Union National Bank in Minot v. Schimke*, 210 N.W.2d 176 (N.D.1973). In *Schimke*, Norbert Schimke signed two promissory notes in favor of the plaintiff on September 18, 1970 and on March 10, 1971. (*Id.* at 177). On May 28, 1971, the bank prepared a guaranty contract and gave it to Norbert Schimke for his signature and that of his wife, Fern. (*Id.*) The custom in the Schimke household was that Norbert handled business matters and Fern handled household matters; in accordance therewith, Fern signed the guaranty without reading it or discussing it. (*Id.*) No one with the plaintiff bank ever spoke with Fern regarding the guaranty or why her signature was necessary. (*Id.*)

Norbert Schimke died, and the bank filed a claim against his estate. (*Id.* at 178). When it was not paid, the bank brought suit against Fern Schimke on the guarantee. (*Id.*) The Supreme Court of North Dakota considered the trial court's dismissal for lack of consideration on the guarantee, and particularly noted that North Dakota has a statutory provision to the effect that an offer to guarantee is not binding until notice of its acceptance is communicated. (*Id.*) In the matter before the Court, the bank never communicated with Fern Schimke and therefore the guaranty agreement was never consummated, but rather only an unaccepted offer of guaranty was made. (*Id.* at 179).

The defendants' reliance upon the decision in *Schimke* is misplaced for several reasons. First, that decision interpreted North Dakota law, including a particular statutory provision, which is not relevant to this action. Second, the guarantee in that action did not have adequate consideration as the underlying loans were made prior to the execution of the guarantee. In the present matter, there is consideration for the guarantees.

Finally, the guarantee contract in the *Schimke* action is different in at least one significant respect from the guarantees executed herein. The guarantees in the present matter specifically provide that "[t]he Guarantor waives all notices, including but not limited to notice of acceptance." (Barbour Guarantee, Exh. C to J. Barbour Aff.; Boeddinghaus Guarantee, Exh. B to C. Boeddinghaus Aff. (collectively referred to herein

as "guarantee")). This waiver of notice is unambiguous as a matter of law. *See Anthony L. Petters Diner, Inc. v. Stellakis*, 202 N.J.Super. 11, 27 (App.Div.1985) (construction of a written agreement is a matter of law for the court unless it is uncertain or ambiguous).

Thus, both Carole Barbour and Judy Boeddinghaus waived any requirement of notice of acceptance of the guarantee. The fact that neither read the documents or questioned the content thereof is simply not a defense.

The next question is whether Dow's requirement that Carole Barbour and Judy Boeddinghaus sign the guarantees constitutes a violation of the Equal Credit Opportunity Act ("ECOA"). The defendants argue that it is unlawful under the ECOA for any creditor to discriminate against an applicant on the basis of, *inter alia,* marital status. (Individual Defs'. Br. at 17). They argue that Dow is subject to this statute, and that it discriminated by virtue of the requirement that the spouses sign the guarantees. (*Id.* at 17-22). They therefore assert that the guarantees are void and unenforceable.

**\*17** This argument is without merit. ECOA provides specific remedies to civil litigants asserting ECOA violations. Section 1691e(a) provides that any creditor who fails to comply with ECOA is liable to the aggrieved applicant for actual damages, and (b) provides that such creditor may be liable for punitive damages under certain circumstances and as limited by that section. (15 U.S.C. § 1691e(a), (b)). Subsection (c) further provides that the aggrieved applicant may seek equitable and declaratory relief "as is necessary to enforce the requirements imposed under this title." (15 U.S.C. § 1691e(c)). Finally, Subsection (d) provides that the aggrieved applicant who is successful is entitled to costs and attorney's fees. (15 U.S.C. § 1691e(d)). The statute does not, however, provide that transactions completed in violation of the ECOA are void or unenforceable.

At least one court faced with the issue concluded that there is no authority for the contention that ECOA provides a defense to non-payment of a promissory note. *United States v. Joseph Hirsch Sportswear Co., Inc.*, 1989 WL 20604 (E.D.N.Y.1989), *aff'd*, 923

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1992 WL 672289 (D.N.J.)
**(Cite as: 1992 WL 672289 (D.N.J.))**

F.2d 842 (2d Cir.1990). Since ECOA provides on its face only for a civil action for actual damages, it may only be employed as a counterclaim, not a defense. (*Id.*) This Court agrees with this assessment of ECOA. Since the statute provides a detailed description of relief which is available, this Court will not impute an additional form of relief by holding that ECOA avoids the liability created in violation thereof, assuming such a violation exists.[FN8]

There is an additional reason why ECOA does not provide relief to Carole Barbour and Judy Boeddinghaus. The civil action provisions of the statute provide that "an aggrieved applicant" may seek damages. 15 U.S.C. § 1691e(a). Section 1691e(b) defines "applicant" as "any person who applies to a creditor directly for an extension, renewal, or continuation of credit, or applies to a creditor indirectly by use of an existing credit plan for an amount exceeding a previously established credit limit." 15 U.S.C. § 1691a(b). The regulations provide that for purposes of Reg. § 202.7(d) (quoted above at n. 8), the term "applicant" includes "guarantors, sureties, endorsers and similar parties." 12 C.F.R. § 202.2(e). Under these principles, both Charles Boeddinghaus and James Barbour are "applicants" within the statute who may seek relief for violations thereof. However, their wives are not "aggrieved applicants," only spouses of applicants. Therefore, they do not have standing to assert an ECOA claim. *See, e.g., Morse v. Mutual Federal S. & L. Ass'n of Whitman,* 536 F.Supp. 1271, 1278 (D.Mass.1982) (determining that the guarantor's wife is not an "aggrieved applicant" with standing to bring an action under ECOA; "[i]f requiring Cynthia's signature was improper ... the affront was not to her, but to Allen, who was unable to secure 'credit' without the signature of his wife."). Since they do not have standing to bring a claim under ECOA, Carole Barbour and Judy Boeddinghaus are also prohibited from asserting it as a defense.

**\*18** The next issue concerns the scope of the guarantee. As indicated above, the individual defendants argue that the guarantee was meant only to cover the extent to which Schaefer's liability exceeded $1,000,000, and only up to an additional $500,000. Dow asserts that the alleged conversations to this effect, even if they took place, are barred by the parol evidence rule.

As the discussion concerning the motion against Schaefer indicates, the first question is whether the guarantees constitute the "final expression" of the parties. Unlike the contracts with Schaefer, these guarantee contracts do not contain a clause stating that they are the sole and final expression of the parties. However, review of the entire guarantees as well as the record before this Court reveals no evidence challenging the status of the guarantees as a final expression of the terms contained herein. Accordingly, this Court finds, as a matter of law, that the personal guarantee documents constitute a final expression between the parties as to the terms contained therein.

Under the parol evidence rule, any terms contained in the guarantees may not be contradicted by evidence of any prior or contemporaneous oral agreement. U.C.C. § 2-202; N.J.S.A. 12A:2-202). The agreement may be explained or supplemented by evidence of consistent additional terms, but only if the writing was not intended as a complete and exclusive statement of the terms of the agreement. (*Id.*)

Dow argues that the offered parol evidence contradicts the terms of the guarantees, and therefore cannot be considered. Specifically, Dow relies upon the language in the guarantees as follows:

[T]he Guarantor hereby guarantees payment when due to Dow of all indebtedness [*] which Charles Schaefer & Sons, Inc., hereinafter referred to as the "Customer", has already incurred or is now under, or at any time after this date hereof may incur or be under, to Dow, arising out of Dow supplying materials or services to Customer.

> FN* The maximum amount for which the Guarantor shall be liable under this Agreement, exclusive of interest shall be $500,000.

(Footnote in original). Dow also relies upon the "continuing debt" language:

It is expressly understood and agreed that this shall be a continuing guaranty and that it shall cover all of

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1992 WL 672289 (D.N.J.)
(Cite as: 1992 WL 672289 (D.N.J.))

the indebtedness which the Customer now owes, or may incur, or come under to Dow ...

Dow argues that this unambiguous language clearly shows that the guarantee covers *all* debts to Dow, not just debt over $1,000,000. Andre Balfour has certified that this was the agreement of the parties. (Balfour Cert. of June 25, 1992, ¶ 7).

The defendants assert that the guarantees are ambiguous and that the proposed parol evidence aids this Court in interpreting the contract. Specifically, they argue that the phrase "indebtedness which [Schaefer is] *now* under" is ambiguous. (Individual Defs'. Reply Br. at 4). They also argue that the waiver of notice provision is ambiguous, as is the typewritten limitation of $500,000. (*Id.* at 5). Defendants also argue that the provision that the guarantors are responsible for the costs of collection is ambiguous, as is the subordination provision. (*Id.* at 5-6).

**\*19** It has long been the rule that "[e]vidence of the circumstances is always admissible in aid of the interpretation of an integrated agreement." *Atlantic Northern Airlines v. Schwimmer*, 12 N.J. 293, 301 (1953). "This is so even when the contract on its face is free from ambiguity." (*Id.*) Furthermore, "[t]he polestar of construction is the intention of the parties to the contract as revealed by the language used, taken as an entirety; and, in the quest for the intention, the situation of the parties, the attendant circumstances, and the objects they were thereby striving to attain are necessarily to be regarded." (*Id.*) At the same time, of course, parol evidence "is adducible only for the purpose of interpreting the writing-not for the purpose of modifying or enlarging or curtailing its terms, but to aid in determining the meaning of what has been said." (*Id.* at 302).

The language of the guarantees concerning the extent of the guarantors' liability is not ambiguous when read as a whole. The guarantors guaranteed payment of *all* of Schaefer's debt to Dow; the remaining provisions further describe the breadth of the word "all." In addition, the guarantees stated that "[t]he word 'indebtedness' is used through this Agreement in its broadest and most comprehensive sense and is intended to include not only debts voluntarily contracted, both principal and interest, but every debt,

obligation or liability, however arising, and whether the same is due or owing, absolute or contingent, determined or undetermined." Read in conjunction with the portions of the guarantee relied upon by Dow, these guarantees clearly and unambiguously bind the guarantors as to all debt incurred by Schaefer to Dow.

The limitation provision is similarly unambiguous: "The maximum amount for which the Guarantor shall be liable under this Agreement, exclusive of interest shall be $500,000." The proposed parol evidence contradicts the clear import of this phrase, because the proposed parol evidence would serve to alter this provision as follows: "The maximum amount for which the Guarantor shall be liable under this Agreement, exclusive of interest shall be $500,000 except that the Guarantor is not liable at all unless and until the Customer is indebted to Dow in excess of $1,000.000." The latter additional term would drastically alter the provisions of the guarantees. Accordingly, the parol evidence rule bars the introduction of evidence of such additional inconsistent terms.

The Court finally notes that all sums presently sought from the guarantors represent debt incurred after the guarantees were executed.

The individual defendants' motion for summary judgment is therefore denied, and Dow's cross-motion for summary judgment is granted. Dow may enforce the guarantees, including the provisions therein for attorneys' fees.

### III. CONCLUSION

Schaefer's application under Fed.R.Civ.P. 56(f) for additional discovery is denied. Dow's motion for summary judgment against Schaefer is granted. The individual defendants' motion for summary judgment is denied, and Dow's cross-motion for summary judgment is granted. Pursuant to the terms of the contracts and the guarantees, Dow is entitled to costs and expenses including attorneys' fees. Accordingly, Dow shall submit a detailed application for such costs, expenses and attorneys' fees within 15 days of the date of this Opinion and accompanying Order. Schaefer shall have 15 days from the date of such applica-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1992 WL 672289 (D.N.J.)
**(Cite as: 1992 WL 672289 (D.N.J.))**

tion in which to challenge that submission. Upon receipt of Schaefer's opposition, this Court will consider the application without oral argument and without any further reply papers.

> FN1. Presumably, this reference to "Barbour" means James, not Carole, since James Barbour is a shareholder and the President of Schaefer.

> FN2. Schultz asserts that he is an account manager for Dow, which appears to be the same thing as "sales representative."

> FN3. Despite this broad language in the Answer to the effect that Dow breached its responsibilities concerning the Pellet Packer Program, the parties have not addressed this issue at all. As there is no evidence submitted concerning such a claim, Dow is entitled to summary judgment dismissing such claim.

> FN4. At no point in its answer or motion papers does Schaefer assert that Dow perpetrated a fraud upon Schaefer with any representation of the 15% minimum guarantee.

> FN5. Section 2-209(4) provides that "[a]lthough an attempt at modification ... does not satisfy the requirements of subsection (2) or (3) it can operate as a waiver." In other words, this provision permits courts to find that both the contractual statute of frauds and the U.C.C.'s statute of frauds, have been waived by the parties' actual conduct. *Green Construction Co., 735 F.Supp. at 1262* (other citations omitted). At oral argument Schaefer's counsel argued that a trier of fact could find that the oral commitment to a 15% guarantee constitutes a waiver of the requirement that modifications be in writing. This argument, however, does not remove Dow's entitlement to summary judgment. "Such waiver must be demonstrated by more than mere parol evidence; course-of-performance/conduct evidence indicating a waiver is necessary." (*Id.*) (other citations omitted, and *see also* explanatory

n. 6, *id.*). The only evidence in the present matter concerning the alleged 15% guarantee is parol evidence. Dow's motion for summary judgment is, therefore, properly granted.

> FN6. Anthony J. Pasquariello is counsel for Schaefer.

> FN7. There are two paragraphs in this affidavit numbered "9"; this reference is the first of these.

> FN8. The Code of Federal Regulations promulgated under ECOA states that "a creditor shall not require the signature of an applicant's spouse or other person, other than a joint applicant, on any credit instrument if the applicant qualifies under the creditor's standards of creditworthiness for the amount and terms of the credit requested." 12 C.F.R. § 202.7(d)(2). These regulations have been interpreted by the staff of the Federal Reserve Board to apply to guarantees:

>> A guarantee on an extension of credit is part of a credit transaction and therefore subject to the regulation. The rules in § 202.7(d) bar a creditor from requiring the signature of a *guarantor's spouse* just as they bar the creditor from requiring the signature of an *applicant's spouse*.

>> 12 C.F.R. pt. 202, supp. 1 at 55. (Emphasis in original). Thus, it appears that Dow's requirement of the signatures of Carole Barbour and Judy Boeddinghaus may be in violation of ECOA. The parties dispute whether Dow in fact "required" such signatures by virtue of Dow's letter indicating they "should" execute the guarantees. This dispute is not material to the present motion, however, by virtue of this Court's determination that ECOA is not a defense.

D.N.J.,1992.

Not Reported in F.Supp.
Not Reported in F.Supp., 1992 WL 672289 (D.N.J.)
**(Cite as: 1992 WL 672289 (D.N.J.))**

Dow Chemical Co. v. Schaefer Salt & Chemical Co.
Not Reported in F.Supp., 1992 WL 672289 (D.N.J.)

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

Slip Copy                                                                                                  Page 1
Slip Copy, 2009 WL 1024651 (Bkrtcy.E.D.Tex.)
**(Cite as: 2009 WL 1024651 (Bkrtcy.E.D.Tex.))**

Only the Westlaw citation is currently available.

United States Bankruptcy Court,
E.D. Texas,
Sherman Division.
In re Kenneth Marston GOOD, KG Legacy Ozarks,
LLC, Legacy Capital Investments, LLC, KG Legacy
Premier, LLC, LMI LBL, LLC, LMI 1 New, LP, KG
Legacy Josey, LLC, LMI 1 New Parkway, L.P.,
Debtors.
**No. 08-40955.**

April 13, 2009.

Frank J. Wright, Paul B. Geilich, Wright Ginsberg
Brusilow P.C., Dallas, TX, for Debtors.

*MEMORANDUM OPINION REGARDING MO-
TION FOR RECONSIDERATION OF CONFIR-
MATION ORDER*

ROBERT C. McGUIRE, Bankruptcy Judge.

**\*1** On February 19, 2009, the Court entered an Order
Confirming Debtors' First Amended Joint Plan of
Reorganization, as Modified (the "*Confirmation Or-
der*"). Within ten days of the entry of the Confirma-
tion Order, on March 1, 2009, RMR Investments, Inc.
("*RMR*") filed a Motion to Alter or Amend Judgment
and Motion for Reconsideration (the "*Motion for
Reconsideration*") pursuant to Federal Rule of Civil
Procedure ("*Rule*") 59(e).*See*FED. R. BANKR.P.
9023. The Court conducted a hearing on the Motion
for Reconsideration on March 24, 2009, and, at the
conclusion of the hearing, took the matter under ad-
visement.

**JURISDICTION**

This contested matter is a core proceeding pursuant
to 28 U.S.C. § 1334 and 28 U.S.C. § 157(a), and the
Court has authority to enter a final order pursuant to
28 U.S.C. § 157(b)(2)(A), (L) and (O). The following

constitutes the Court's findings of fact and conclu-
sions of law. *See*FED. R. BANKR.P. 9014, 7052.**FN1**

> **FN1.** To the extent that any finding of fact is
> construed to be a conclusion of law, it is
> hereby adopted as such. Likewise, to the ex-
> tent any conclusion of law is construed to be
> a finding of fact, it is hereby adopted as
> such.

**RELEVANT BACKGROUND**

Kenneth Good has been involved in real estate for
more than 40 years, and he does business through
many different legal entities. Between April 15, 2008
and June 30, 2008, each of the following debtors filed
a voluntary petition for relief under Chapter 11 of
Title 11 of the United States Code (the "*Bankruptcy
Code*"): Kenneth Marston Good ("*Mr. Good* "), KG
Legacy Ozarks, LLC ("*KG Legacy Ozarks* "), Legacy
Capital Investments, LLC ("*LCI*"), KG Legacy Pre-
mier, LLC ("*KG Legacy Premier* "), LMI LBL, LLC
("*LMI* "), LMI 1 New, L.P. ("*LMI 1 New* "), KG
Legacy Josey, LLC ("*KG Legacy Josey*"), and LMI 1
New Parkway, L.P. ("*LMI 1 New Parkway* ") (collec-
tively, the "*Debtors*"). The Debtors' cases have been
jointly administered by this Court.

The Debtors' First Amended Joint Plan of Reorgani-
zation and First Amended Disclosure Statement were
filed on October 24, 2008. The Debtors and Legacy
Roach, LLC, a non-debtor related entity, were the
proponents of the plan. In their joint plan, the Debtors
proposed to pay all of their creditors in full by devel-
oping and selling various real estate assets over four
years. The Debtors anticipated that they would have a
balance of approximately $85,000,000 at the conclu-
sion of the four years, assuming these funds were not
reinvested in real estate during the term of their plan.

Numerous creditors filed objections to confirmation
of the Debtors' proposed plan of reorganization. The
various modifications filed by the Debtors resolved
all objections except those raised by RMR. At the
confirmation hearing on December 9, 2008, which

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2009 WL 1024651 (Bkrtcy.E.D.Tex.)
**(Cite as: 2009 WL 1024651 (Bkrtcy.E.D.Tex.))**

the Court continued to January 27, 2009 (the "*Confirmation Hearing*"), RMR appeared and opposed confirmation of the Debtors' plan.

RMR holds an allowed secured claim against LCI and an unsecured guaranty claim against Mr. Good. In particular, on or about June 27, 2007, RMR and LCI entered into a promissory note whereby RMR loaned the principal amount of $7,860,000 to LCI. The terms of the note required LCI to make monthly interest payments to RMR beginning on August 1, 2007 and continuing until the maturity date. The initial maturity date under the note was the earlier of one year after the date of the note or upon an event of default. The applicable rate of interest under the note was the higher of the prime rate plus 2.75% or 11% per annum. The note provided that the applicable rate of interest would increase by 4%, not to exceed the maximum lawful rate, upon the occurrence of an event of default.

**\*2** In connection with the execution of the promissory note, LCI executed a Deed of Trust in favor of RMR on or about June 27, 2007. The Deed of Trust granted RMR a first priority security interest in 86.56 acres of land located in Flower Mound, Texas. The Deed of Trust also granted RMR, among other things, a first priority security interest in all mineral rights and contracts that LCI had or could acquire relating to the property. In addition, Mr. Good executed a guaranty agreement on or about June 27, 2007 whereby he guaranteed the obligation of LCI to repay the amounts due and owing to RMR.

On February 4, 2008, LCI granted ELAND ENERGY, INC. a second lien on the 86.56 acres. This was in direct violation of RMR's Deed of Trust, which states in Section 5.6 that LCI will not create or place a second lien on the property. RMR promptly notified LCI that an event of default had occurred. RMR and LCI then entered into an agreement pursuant to which LCI agreed to remove the lien no later than March 31, 2008. LCI, however, failed to remove the second lien. On April 7, 2008, RMR sent LCI another letter indicating that LCI had defaulted under the loan documents.

Mr. Good filed his voluntary petition on April 17, 2008. On June 3, 2008, LCI filed its voluntary petition. The principal balance owed to RMR as of LCI's petition date was $7,760,000. Since there is no dispute that RMR is oversecured, RMR's claim against LCI has continued to accrue interest and other charges. *See* 11 U.S.C. § 506(b). RMR asserts that it was owed the total sum of $9,584,829.95 as of February 2009, which includes $7,760,000 in principal, unpaid interest at the contractual default rate of 15% per annum, interest on interest due, late charges, post-maturity consulting fees, and attorney's fees and expenses.

According to its bankruptcy schedules, LCI owned nine parcels of vacant property when it filed for bankruptcy relief. LCI estimated that all of these properties, including the 86.56 acres in which RMR has an interest, had a total market value of $60,000,000 exclusive of the value of any associated mineral interests. LCI estimated that the total secured debt relating to these properties was approximately $43,202,000.

In addition to its real estate assets, LCI disclosed in its bankruptcy schedules that it is the 100% owner of three of the Debtors-KG Legacy Ozarks, KG Legacy Premier, and KG Legacy Josey-as well as Legacy Roach. LCI valued its interest in these entities at approximately $13,000,000. LCI also listed as an asset the accounts receivable due from these and several other entities totaling nearly $7,000,000.

RMR obtained two valuations of the tract of land in which it has a secured interest during the pendency of LCI's bankruptcy case. RMR obtained an appraisal dated July 29, 2008, which stated that the value of the 86.56 acres was $11,500,000 as of that date and that the property would take approximately 12 months to sell. RMR obtained a second appraisal dated November 19, 2008, which stated that the value of the 86.56 acres was $9,840,000 as of that date and that the property would take approximately 18-24 months to sell. With respect to the value of the mineral interests in which RMR also has a secured interest, the Debtors presented evidence that, if the 86.56 acres is considered together with several adjoining tracts of land owned by the Debtors or in which the Debtors plan to acquire an interest, all of the combined mineral interests have a total value of approximately $12,000,000.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

*3 Mr. Good has signed several operating reports for LCI since its petition date. Each of these operating reports lists the "total equity" in LCI as $16,797, 453. According to LCI's Statement of Financial Affairs, which LCI filed with its original bankruptcy schedules, Mr. Good owns 20% of the stock of LCI. The remainder of the stock is owed by KMG-GS Trust, which shares the same address as Mr. Good.

RMR's secured claim against LCI is treated in Class 10 of the Debtors' plan. Class 10 "consists of the Allowed Secured Claim of RMR in the approximate amount of $7,760,000."First Amended Plan at § 3.10. The plan provides that RMR will receive quarterly interest on its secured claim at the Plan Rate, which is defined as the Prime Rate plus 1% "or such other rate as is determined by the Court at the Confirmation Hearing."First Amended Plan at § 1.47. The plan further provides that RMR will receive minimum principle payments of 5% at the end of each calendar year until the promissory note matures under the plan. Although LCI originally proposed developing the mineral interests underlying the property securing RMR's claim, LCI deleted this provision and modified other aspects of its plan in response to RMR's objections to confirmation.

The plan, as confirmed by this Court, provides that ELAND ENERGY, INC. will release its liens on RMR's collateral. RMR will retain its liens on the 86.56 acres of raw land and associated mineral interests. However, the terms of the loan documents are modified to extend the maturity date of the promissory note to four years, lower the interest rate to the Plan Rate, and to provide that RMR will release its liens in the event LCI is able to sell certain tracts of the property for prices set forth in the plan. The plan contains a detailed procedure to determine the appropriate prices at which RMR must release its liens. The plan further provides that the total value of the collateral remaining after the sale of any portion of the tract must be at least 110% of the remaining amount of RMR's allowed secured claim.

Other than RMR, there were five lenders secured by Dallas-area commercial real property in these jointly administered cases. Mr. Good testified that he believed these lenders faced nominal risk in light of the fact that each lender was substantially oversecured.

The Debtors reached agreements on post-confirmation interest rates and loan maturity dates with all of these lenders except RMR after extensive negotiation. Of these lenders, Century Bank, N.A. and First Community Bank agreed to and voted in favor of an interest rate fixed at prime plus 2%, Southwest Securities FSB and Charter FL, L.P. agreed to and voted in favor of a fixed interest rate of 6%, and Liberty Bankers Life Insurance Company agreed to and voted in favor of a fixed interest rate of 5% (after an initial three-month period in which interest would accrue at the contract rate).

In light of the modifications made to the plan, the following objections to confirmation of the Debtors' plan, as modified, remained at the time of the Confirmation Hearing on January 27, 2009:

*4 (1) RMR contended that the plan unfairly discriminated against creditors holding guaranty claims;

(2) RMR contended that the plan was not feasible as it related to two of the Debtors-Mr. Good and LCI;

(3) RMR contended that the plan did not satisfy the best interest of creditors' test in violation of 11 U.S.C. § 1129(a)(7);

(4) RMR contended that the treatment of its claim was unfair and inequitable; and

(5) RMR contended that Mr. Good and LCI filed the plan in bad faith.

The Court specifically addressed and overruled all but one of RMR's objections in its Confirmation Order. With respect to RMR's contention that the Debtors' proposed plan failed to satisfy the best interest of creditors' test set forth in § 1129(a)(7) of the Bankruptcy Code, the Court confirmed the plan based on the Debtors' representation that the plan would be modified to allow unsecured creditors to receive interest, as follows:

Where an estate's assets exceed claims, as is the case here, § 726(a)(5) of the Bankruptcy Code provides that an unsecured creditor is entitled to "interest at the legal rate from the date of the filing of the peti-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

tion."Accordingly, pursuant to the agreement of the Debtors announced at the January 27, 2009 hearing on confirmation of the Plan, unsecured claimants in Class 19 under the Plan shall receive interest on their Allowed Unsecured Claims equal to the federal post-judgment interest rate effective under 28 U.S.C. § 1961 on January 27, 2009, accruing from the later of the Effective Date or the date any such Claim becomes liquidated and non-contingent. The federal post-judgment interest rate effective under 28 U.S.C. § 1961 on January 27, 2009 was .43%.

Confirmation Order, ¶ 38.

### ANALYSIS

#### A. RMR's Arguments for Relief Under Rule 59(e)

Motions to alter or amend a judgment under Rule 59(e) "serve the narrow purpose of allowing a party to correct manifest errors of law or fact or to present newly discovered evidence." *Waltman v. Int'l Paper Co.*, 875 F.2d 468, 473 (5th Cir.1989) (citations omitted). Altering, amending, or reconsidering a judgment is an extraordinary measure, which courts should use sparingly. *Southern Constructors Group, Inc. v. Dynalectric, Corp.*, 2 F.3d 606, 611 (5th Cir.1993) (noting that the standards applicable to Federal Rule 59(e) favor the denial of motions to alter or amend a judgment). A Rule 59(e) motion should not be granted unless there is: (1) an intervening change in controlling law; (2) the availability of new evidence not previously available; or (3) the need to correct a clear error of law or fact or to prevent a manifest injustice. *See, e.g., Schiller v. Physicians Resource Group, Inc.*, 342 F.3d 563, 567 (5th Cir.2003); *Russ v. Int'l Paper Co.*, 943 F.2d 589, 593 (5th Cir.1991). A Rule 59(e) motion "cannot be used to raise new arguments which could, and should, have been made before the judgment issued." *Simon v. United States*, 891 F.2d 1154, 1159 (5th Cir.1990) (citing *Federal Deposit Insurance Corp. v. Meyer*, 781 F.2d 1260, 1268 (7th Cir.1986)).

**\*5** Here, RMR argues that the Court's confirmation of the Debtors' reorganization plan was a manifest error of law. A "manifest error" is generally understood as "[e]vident to the senses, especially to the sight, obvious to the understanding, evident to the mind, not

obscure or hidden, and is synonymous with open, clear, visible, unmistakable, indubitable, indisputable, evident, and self-evident." *Bank One, Texas, N.A. v. F.D.I.C.*, 16 F.Supp.2d 698, 713 (N.D.Tex.1998) (quoting BLACK'S LAW DICTIONARY 962 (6th ed.1990)). "Error" is generally understood as "[a] mistaken judgment or incorrect belief as to the existence or effect of matters of fact, or a false or mistaken conception or application of the law" and "[a]n act involving a departure from truth or accuracy; a mistake; an inaccuracy; as, an error in calculation."*Id.* (quoting BLACK'S LAW DICTIONARY at 542-34 (6th ed.1990))."Under these definitions, a "manifest error" is an obvious mistake or departure from the truth."*Id.*

In its Motion for Reconsideration, RMR argues that the Court erred in concluding that the plan is "fair and equitable" as defined in Bankruptcy Code § 1129(b)(2). RMR argues that a solvent debtor such as LCI is required to pay the contractual default rate of interest as a matter of law and that the extension of the maturity date of its loan to four years violates the absolute priority rule by allowing Mr. Good to enjoy his equity interest in the Debtors while RMR remains unpaid. RMR further argues that the partial release provisions in the plan impose a material risk on RMR. RMR argues that Court should have required LCI to preserve the equity cushion it claimed as of the petition date-145% (*i.e.,* $11,500,000 /$7,951,269.58 = 145%)-especially in light of the declining value of its collateral. RMR seeks to vacate the Confirmation Order or, alternatively, to require LCI to modify the confirmed plan to increase the rate of interest to be paid to RMR to the contractual default rate, shorten the maturity date under the plan to three years (at most), and modify the calculation for the partial release of RMR's collateral.

#### B. The "Fair and Equitable" Requirement for Confirmation

As previously discussed, the Debtors proposed a joint plan that collectively addressed all secured and unsecured obligations of each of the Debtors. LCI's secured obligation to RMR is addressed in Class 10. RMR is the sole creditor in Class 10, and RMR objected to confirmation of the Plan.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                                    Page 5
Slip Copy, 2009 WL 1024651 (Bkrtcy.E.D.Tex.)
**(Cite as: 2009 WL 1024651 (Bkrtcy.E.D.Tex.))**

In order to "cram down" a plan over the objection of a dissenting class such as RMR, all requirements of § 1129(a) must be met (except for requirement in § 1129(a)(8) that plan must be accepted by each impaired class of claims or interests). Critical among these requirements is the condition that the plan may be confirmed only if it is fair and equitable with respect to each impaired class of claims or interests which did not accept the plan. By incorporating the fair and equitable standard in § 1129(b) of the Bankruptcy Code, Congress codified the absolute priority rule, which provides that, absent full satisfaction of a creditors allowed claims, no member of a class junior in priority to that creditor may receive anything on account of their claim or equity interest. *See In re Dow Corning Corp.*, 244 B.R. 678, 688-96 (Bankr.E.D.Mich.1999) (discussing the historical underpinnings and legislative history of the "fair and equitable" standard).

*\*6* Section 1129(b)(2) defines the meaning of "fair and equitable" as it pertains to certain classes of claims. Section 1129(b)(2)(A) provides three express alternatives in order that a plan may be found to be fair and equitable with respect to a class of secured claims. This provision states that, with respect to a class of secured claims, the condition that a plan be fair and equitable includes a requirement that the plan must provide one of the following: (i) the claimant retains its liens and receives deferred cash payments totaling its allowed claim; (ii) the claimant's collateral be sold with liens attaching to the proceeds of sale; or (iii) the claimant receives the indubitable equivalent of its secured claim. 11 U.S.C. § 1129(b)(2)(A)(i)-(iii). A plan which does not meet the standards set forth in § 1129(b)(2) of the Bankruptcy Code cannot be "fair and equitable." *See, e.g., In re D & F Construction, Inc.*, 865 F.2d 673, 675 (5th Cir.1989) (discussing the cramdown of a reorganization plan).

A bankruptcy court may approve a reorganization plan that "include[s] any ... appropriate provision not inconsistent with the applicable provisions of [the Bankruptcy Code]." 11 U.S.C. § 1123(b)(6). In most cases, the role of the bankruptcy court in approving a plan of reorganization is to "guide the division of a pie that is too small to allow each creditor to get the slice for which he originally contract." *In re Chicago*, 791 F.2d 523, 528 (7th Cir.1986). This case, how-

ever, involves a solvent borrower-a relatively rare situation in bankruptcy. The primary issue at the Confirmation Hearing and in the Motion for Reconsideration is whether, as a matter of law, RMR is entitled to receive its contractual default rate of interest from LCI rather than the Plan Rate as determined by the Court.

*1. The "Cramdown" Interest Rate*

As previously discussed, the plan provides that LCI will pay RMR the "Plan Rate," which is defined as the prime rate plus 1% "or such other rate as is determined by the Court at the Confirmation Hearing...." First Amended Plan at § 1.47. The Confirmation Order reflects that the prime rate of interest was 3.25% as of January 27, 2009. RMR's arguments at the Confirmation Hearing on January 27, 2009, focused on whether the Plan Rate appropriately accounted for the risks to RMR under the Plan. *See Till v. SCS Credit Corporation*, 541 U.S. 465 (2004) (adopting a two-part "prime-plus" formula for purposes of compliance with § 1325(a)(5)(B)(ii)). RMR presented no credible evidence establishing that its risks were any greater than those faced by similarly situated secured creditors who agreed to a post-confirmation interest rate of 5-6% under the plan. The Court, based on the record before it, concluded that interest at the rate of prime plus 2% satisfied the requirement that the Debtors' plan must be fair and equitable.

In the Motion for Reconsideration, RMR elaborates on an argument raised at the Confirmation Hearing on December 8, 2008. RMR argues that, since LCI is solvent, the Court should have enforced the contractual rights of the parties by awarding RMR post-confirmation interest at the default rate of 15% per annum or no less than the contractual rate of interest of 11 % per annum. RMR alternatively argues that the evidence at the Confirmation Hearing was insufficient to support a finding that the applicable market rate of interest was 5-6% per annum. Mr. Good retains his equity interest in the Debtors under the plan, and RMR asserts that LCI's "sole purpose in reducing the interest rate is to benefit the equity interest of Mr. Good."Motion at ¶ 24.

*\*7* LCI responds that none of the cases cited by RMR

Slip Copy
Slip Copy, 2009 WL 1024651 (Bkrtcy.E.D.Tex.)
**(Cite as: 2009 WL 1024651 (Bkrtcy.E.D.Tex.))**

in support of its argument relate to the interest rate awarded to a secured creditor pursuant to a plan of reorganization. LCI argues that applying these cases to confirmation and requiring a debtor to pay post-confirmation interest at the contract rate would run afoul of the debtor's right to "cram down" a lower rate of interest on a secured creditor under § 1129(b)(2)(A) of the Bankruptcy Code. However, one of the cases cited by RMR in its arguments to this Court did, in fact, address whether the contractual default rate of interest is the appropriate interest rate under a plan of reorganization in a case involving a solvent debtor. *See In re Dow Corning Corp.*, 456 F.3d 668 (6th Cir.2006) (addressing whether unsecured commercial contract creditors should have been awarded interest at the contractual default rate under the plan). Although *Dow Corning* involved several unsecured creditors, as LCI points out in its response to RMR's Motion for Reconsideration, the fundamental principles addressed by the Sixth Circuit apply with equal force to LCI's treatment of RMR.

In cases involving solvent debtors, courts "have overwhelmingly concluded that there is a presumption that the default interest rate should be allowed." *Dow Corning,* 456 F.3d at 380. "In this context, the rational for use of the contract rate is straightforward: A debtor with the financial wherewithal to honor its contractual commitments should be required to do so." *In re Dow Corning,* 244 B.R. at 695. "The only good reason for refusing to give a creditor in reorganization all that he bargained for when he extended credit is to help other creditors, the debtor's assets being insufficient to pay all creditors in full."*Id.* (quoting *Matter of Chicago, Milwaukee, St. Paul & Pac. Ry.,* 791 F.2d 524, 527 (7th Cir.1986)).*See also Johnson v. Norris,* 190 F. 459 (5th Cir.1911) (an unsecured claimant may collect post-petition interest if the estate is solvent).

The Fifth Circuit has not addressed the enforcement of the contractual rights of an unsecured creditor in a bankruptcy case involving a solvent debtor. However, in cases involving insolvent debtors, the Fifth Circuit has expressed a bias towards or preference for the use of the contact rate when determining the appropriate cramdown interest rate. In *Heartland Fed. Sav. & Loan Assoc. v. Briscoe Enters., Ltd., II (In re Briscoe Enters., Ltd., II),* 994 F.2d 1160 (5th

Cir.1993), for example, the Fifth Circuit found that "often the contract rate will be an appropriate rate but reference to a similar maturity Treasury rate is instructive. The Treasury rate is helpful because it includes all necessary factors except the risk premium."*See id.* at 1169.

The Fifth Circuit revisited the issue in *In re T-H New Orleans Ltd. P'ship,* 116 F.3d 790, 801 (5th Cir.1997). The debtor in that case had requested that the Fifth Circuit develop a formula for determining an appropriate cramdown interest rate. In declining to do so, the Fifth Circuit recognized that "[c]ourts have used a wide variety of different rates as benchmarks in computing the appropriate interest rate (or discount rate as it is frequently termed) for the specific risk level in their cases."*See id.*(citation omitted). As the determination of the appropriate rate of interest is a fact intensive one, the Fifth Circuit refused to "tie the hands of the lower courts as they make the involved factual determination in establishing an appropriate interest rate."*See id.*After considering the contract rate and the treasury rate, the Fifth Circuit upheld the bankruptcy court's determination that the contract rate was the appropriate rate of interest. *See id.*("The bankruptcy court concluded that the contract rate of 11.5% included a risk premium to account for the increased risk FSA would bear as a claimant under the Plan and for not receiving its money today. In other words, the contract rate was a reasonable rate that adequately compensated for risk.").*See also Green Tree Fin. Servs. v. Smithwick (In re Smithwick),* 121 F.3d 211, 213 (5th Cir.1997) ( "Applying the requirements of § 1129(b)(2)(A)(i)(II), the bankruptcy court is to make a factual determination of the interest rate appropriate under all the circumstances and to evaluate whether the payments under the plan will provide the creditor with the present value of his allowed secured claim. This court has declined to 'establish a particular formula' for the cramdown interest rate in Chapter 11 cases. However, we have noted that '[o]ften the contract rate will be an appropriate rate' and that '[n]umerous courts have chosen the contract rate if it seemed to be a good estimate as to the appropriate discount rate.'") (citations omitted).

**\*8** In this case, there is no dispute that LCI was in default of its contractual obligations to RMR when it

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

filed for bankruptcy protection, that LCI is solvent, or that RMR is oversecured. RMR, therefore, seeks to collect interest on its allowed secured claim in LCI's bankruptcy case at the contractual default rate of 15%. Payment of interest to RMR at the contractual default rate would not reduce the payment that any other secured or unsecured creditor is entitled to receive under the plan. While payment of the default rate of interest would involve a significant amount of money in this case, [FN2] such payment would simply reduce the $85,000,000 in equity that may be available to Mr. Good at the conclusion of the plan in four years. As Mr. Good testified during the Confirmation Hearing, "I will be paid $20,000 a month [by LCI] ... [b]ut my main compensation is the results at the end of the plan because I am the primary beneficiary."Tr. at p. 90 (Dec. 8, 2008). The Court concludes that, under the circumstances of this case, LCI failed to rebut the presumption that RMR is entitled to interest at the contractual default rate of 15% per annum.

> FN2. In an amended proof of claim filed on March 12, 2009, RMR states that $1,030,306.04 in accrued interest was due and owing to it as of February 19, 2009 based on the contractual default rate of interest.

### 2. The "Indubitable Equivalent"

Even if a plan fails to satisfy § 1129(b)(2)(A)(i) by providing for an appropriate cramdown rate of interest, § 1129(b)(2)(A)(iii) provides that a plan may nonetheless be confirmed as "fair and equitable" if the secured creditor will realize the "indubitable equivalent" of its secured claim under the plan. It is settled that the concept of indubitable equivalence is rooted in the language of *In re Murel Holding Corp.*, 75 F.2d 941 (2nd Cir.1935).*See* 124 Cong. Rec. H 11089 (daily ed. September 28, 1978) (statement of Rep. Edwards), *reprinted in*1978 U.S.Code Cong. & Admin. News 6436 at 6475. In *Murel*, the Second Circuit stated that

> a creditor who fears the safety of his principal will scarcely be content with ... [interest payments alone]; he wishes to get his money or at least the property. We see no reason to suppose that the statute was intended to deprive him of that ...

unless by a substitute of the most indubitable equivalence.

*Murel*, 75 F.2d at 942. The doctrine of absolute priority provides that senior classes must receive full compensation for their claims, or a substitute of indubitable equivalence, before other creditors and shareholders can participate. *See, e.g., Consolidated Rock Products Co. v. DuBois*, 312 U.S. 510 (1941); *Case v. Los Angeles Lumber Products Co.*, 308 U.S. 106 (1939).

Where a secured creditor will receive payment in full on its allowed secured claim over a reasonable period of time with an appropriate interest rate, the indubitable equivalent standard is satisfied. *See, e.g., Matter of Sandy Ridge Development Corp.*, 881 F.2d at 1350 (discussing "indubitable equivalence"). The Court has previously concluded that the appropriate interest rate in this case as to RMR is 15% per annum, and LCI proposes to pay RMR in full under the plan.[FN3]With respect to the LCI's proposal to repay RMR over four years, the plain terms of the Bankruptcy Code provide that a plan may extend the maturity date of a loan. *See*11 U.S.C. § 1123(a)(5) ("[A] plan [of reorganization] shall ... provide adequate means for the plan's implementation, such as ... modification of any lien; ... extension of a maturity date or a change in an interest rate or other term of outstanding securities.").

> FN3. In the Motion for Reconsideration, RMR acknowledges that a business justification exists for extending the maturity date for up to two years. RMR states in its reply to the Debtor's response to the Motion for Reconsideration that it would be willing to accept a term of three years if this Court establishes an appropriate rate of interest that is no less than the contract rate.

**\*9** RMR acknowledges that a business justification exists for extending the maturity date of its loan for at least two years based on the current real estate market. However, RMR argues, and the Court agrees, that LCI failed to establish a maturity date of four years is necessary to effectuate its plan. LCI is solvent, and Mr. Good anticipates that his continued operation of the Debtors, including LCI, will generate

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2009 WL 1024651 (Bkrtcy.E.D.Tex.)
**(Cite as: 2009 WL 1024651 (Bkrtcy.E.D.Tex.))**

approximately $85,000,000 in equity over the next four years. It would offend the priorities of the Bankruptcy Code to allow Mr. Good to accumulate or reinvest this equity over the next four years, without fully satisfying RMR's claim, when the undisputed evidence shows that RMR's allowed secured claim could be satisfied in less than four years. The Court concludes, upon reconsideration, that LCI has established grounds for extending the maturity date for, at most, three years based on the current real estate market.

The Court recognizes that RMR will receive only minimal principal and payments from LCI unless and until LCI sells some portion of RMR's collateral, which constitutes a negative amortization of its loan balance. A plan containing a negative amortization provision is not per se impermissible. *See, e.g., In re M & S Associates, Ltd.,* 138 B.R. 845, 850-51 (Bankr.W.D.Tex.1992). The Court in this case has determined that LCI's plan is feasible and was filed in good faith. Although the value of the real property securing RMR's claim appears to have declined during the pendency of this case, RMR remains oversecured. Moreover, RMR's argument regarding its eroding equity cushion does not assign any value to its security interest in the mineral rights associated with the real property. *Compare In re Pikes Peak Water Co.,* 779 F.2d 1456, 1459 and 1461 (10th Cir.1985) ($3,500,000 value securing $2,887,000 debt is both adequate protection and an indubitable equivalent for purposes of § 1129(b)(2)(A)(iii)). RMR has failed to establish that the Court erred in determining that its equity cushion in this case is sufficient to protect its secured claim from erosion. *See In re TMA Associates, Ltd.,* 160 B.R. 172, 177 (D.Colo.1993). RMR's contractual default rate of interest as well as the continuing equity cushion provided under the plan adequately compensates RMR for any risk imposed by the extended, three-year maturity date of its note.

## CONCLUSION

For the foregoing reasons, the Court concludes that RMR has established grounds for relief from the Confirmation Order under Rule 59(e). The Motion for Reconsideration shall be granted, in part, with respect to the cramdown rate of interest and the ma-

turity date of RMR's loan under the plan. Further, the Confirmation Order shall be vacated as it relates to LCI's treatment of RMR. The Court will enter a separate Order consistent with this Memorandum Opinion and will schedule a status conference on LCI's plan of reorganization.

Bkrtcy.E.D.Tex.,2009.
In re Good
Slip Copy, 2009 WL 1024651 (Bkrtcy.E.D.Tex.)

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in B.R.                                                                                    Page 1
Not Reported in B.R., 2008 WL 73318 (Bkrtcy.W.D.Ky.)
**(Cite as: 2008 WL 73318 (Bkrtcy.W.D.Ky.))**

**H**Only the Westlaw citation is currently available.

United States Bankruptcy Court,
W.D. Kentucky.
In re W.J. SMITH, Betty B. Smith, Debtor(s).
**No. 03-10666(1)11.**

Jan. 7, 2008.

W.J. Smith, Jr., Bowling Green, KY, pro se.

Betty B. Smith, Bowling Green, KY, pro se.

### *MEMORANDUM-OPINION*

<u>JOAN A. LLOYD</u>, United States Bankruptcy Judge.

**\*1** This matter is before the Court for a determination of the appropriate rate of interest on the claim of Hart County Bank ("the Bank") in the Second Amended Plan of Reorganization ("the Plan") of Debtors W.J. Smith and Betty B. Smith ("the Debtors"). In the Plan, Debtors proposed to pay interest at the rate of 1.32% per annum on the unsecured claim of $232,207.05 as of February 6, 2004. In other words, Debtors proposed to pay the claim at the federal legal rate in effect on the date of the filing of the Petition. The Bank, however, contends it is entitled to receive interest at the rate of 7%. The 7% rate was awarded to the Bank by the Warren Circuit Court in its Judgment determining the amount of the deficiency, attorney's fees and costs on its claim against the Debtors. The 7% figure is the contract rate of interest provided in the debt instruments entered into between the Debtors and the Bank.

This Court addressed the issue of post-petition interest in <u>In re Best, 365 B.R. 725 (Bankr.W.D.Ky.2007)</u>. In that case, this Court determined that the "legal rate of interest" for post-petition interest under <u>11 U.S.C. § 726(a)(5)</u> was limited to the federal rate of interest under <u>28 U.S.C. § 1961(a)</u> as of the date of the filing of the petition. The holding

in *Best* was limited to the facts of that case, a Chapter 7 case with funds in excess of allowable claims. In *Best* this Court specifically acknowledged that a mechanical application of the federal rate could result in a windfall for solvent debtors and therefore limited the ruling to the facts specific to that case.

This case presents a different factual scenario than was present in *Best.*Here, there is but one creditor. Therefore, there is no need to balance the equities between competing creditors. Next, application of the federal interest rate would indeed create a windfall for the Debtors.

The Warren Circuit Court awarded the Bank 7% interest in accordance with the terms of the loan documents between the parties. The Sixth Circuit acknowledged in <u>In re Dow Corning Corp., 456 F.3d 668, 679 (6th Cir.2006)</u>, that in most cases where a debtor is solvent, courts generally confine themselves to determining and enforcing whatever pre-petition rights a creditor has against the debtor. Solvent debtors should not receive a windfall simply because they sought bankruptcy protection.

The reasoning of the *Best* case is not applicable to the matter at bar. The Court finds no basis for disturbing the Warren Circuit Court Judgment. Accordingly, the appropriate rate of interest on the Bank's post-petition claim is 7%.

### *CONCLUSION*

For all of the above reasons, the Court awards Hart County Bank 7% interest on its post-petition claim.

### *ORDER*

Pursuant to the Memorandum-Opinion entered this date and incorporated herein by reference,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that Hart County Bank is awarded post-petition interest at the rate of 7% on its unsecured claim.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in B.R.

Not Reported in B.R., 2008 WL 73318 (Bkrtcy.W.D.Ky.)

**(Cite as: 2008 WL 73318 (Bkrtcy.W.D.Ky.))**

Page 2

Bkrtcy.W.D.Ky.,2008.

In re Smith

Not Reported in B.R., 2008 WL 73318 (Bkrtcy.W.D.Ky.)

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.