Not Reported in A.2d
Not Reported in A.2d, 2006 WL 905347 (Del.Ch.)
(Cite as: 2006 WL 905347 (Del.Ch.))

COnly the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware.
Michael J. RAMONE, Plaintiff,
v.
Jeffrey E. LANG, Lang Development Group, LLC, a
Delaware limited liability company, South College
Property Associates, LLC, a Delaware limited liabil-
ity company, Defendants.
**No. Civ.A. 1592-N.**

Submitted Jan. 26, 2006.
Decided April 3, 2006.

Richard L. Abbott, Abbott Law Firm, Hockessin,
Delaware; Gary A. Bryde, Gary A. Bryde, P.A.,
Hockessin, Delaware, for Plaintiff.

M. Duncan Grant, Pepper Hamilton, LLP, Wilming-
ton, Delaware, for Defendants.

MEMORANDUM OPINION

STRINE, Vice Chancellor.

**\*1** This case involves a dispute between two local
businessmen who hoped to work together in some
fashion towards the opening of a swim and fitness
center, but who failed to achieve this despite six
months of efforts and negotiations. Before the plain-
tiff's involvement with the defendant, the defendant
had already signed a purchase agreement to buy the
property on which the swim and fitness center was to
be located. For months, the plaintiff and defendant
discussed varying deal terms all with the express con-
templation that they would formalize their relation-
ship in a written LLC agreement. Ultimately, the de-
fendant closed on the purchase of the property him-
self, frustrated by his inability to reach a final accord
with the plaintiff. The plaintiff then sued, obviating

any chance for reconciliation.

At trial, each side blamed the other for the failure of
their negotiations. The plaintiff alleges that the de-
fendant used his good name and reputation in the
community when that was to the defendant's advan-
tage, then cut him out of the deal. The plaintiff claims
that the defendant's conduct is actionable under vari-
ous theories, such as breach of fiduciary duty, breach
of contract, or promissory estoppel. For his part, the
defendant argues that the plaintiff's repeated delays,
changing desires, and inability to commit to deal
terms made reaching a final deal impractical and war-
rants no relief.

In this post-trial opinion, I find that because neither a
binding contract existed between the parties nor a de
facto partnership, the plaintiff's only valid claim is
based on the doctrine of promissory estoppel. Al-
though the plaintiff's own conduct was hardly exem-
plary, he did reasonably rely on a narrow expectation
created by the defendant, which was then dashed.
Consistent with the confined role of promissory es-
toppel in American law, on these facts, the plaintiff is
entitled to only very discrete and focused relief pro-
tective of his reliance interests.

I. *Factual Background*

A. *The Parties And The Properties*

Plaintiff Michael J. Ramone and defendant Jeffrey E.
Lang are both businessmen with longstanding com-
munity ties. Ramone owns and operates the Delaware
Swim & Fitness Center in New Castle, Delaware and
a similar facility in New Jersey. He works in various
capacities in the field of competitive swimming, in-
cluding as the head of the Delaware Swim Team and
Swim School, which has several hundred partici-
pants. Ramone also owns and has owned other local
businesses not related to swimming.

Lang is a real estate developer and property manager
in and around Newark, Delaware. In 2002 he started
Lang Development Group, LLC ("LDG") in which

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 905347 (Del.Ch.)
**(Cite as: 2006 WL 905347 (Del.Ch.))**

he is a 50% member. The other member is John Christopher Brown, Lang's life-long friend and regular business partner. Together, they have developed several properties.

The genesis of this case was the Jewish Federation of Delaware's (the "Federation") decision to sell the "Property" it owned in Newark. The Federation had operated the Jewish Community Center or JCC on the site. In 2004, the Federation decided to sell the Property. Independently, Ramone and Lang saw a business opportunity when this Property became available for sale.

**\*2** The Property previously was owned by the Newark YWCA, which had operated a community center, day care, and swim and fitness facility there since 1969. When Newark city officials became aware the YWCA was selling the Property, they expressed concern about losing the beneficial programs and community center and assisted the YWCA in finding a non-profit user. Therefore, they were pleased when the Federation purchased the Property with the intent to establish a JCC at that location.

For several years, Ramone has sought an opportunity to expand his swim operations and to obtain access to an indoor swimming pool in Newark because of the absence of other indoor pools where he could hold classes and practice sessions. Before the YWCA sold its Property to the Federation, Ramone investigated purchasing the Property. During the two years that the Federation operated the JCC, Ramone told the Federation's agent at Stoltz Realty, William Ganc, that he might be interested if the Property once again became available for sale. Upon learning the Federation was selling the Property in summer 2004, Ramone communicated his interest in the Property to Roy Lopata, the Newark City Planning Director. As before, some city officials expressed concerns about the loss of recreational opportunities in the community as a result of the Federation's sale of the Property. Lopata prepared a then-confidential memorandum that was forwarded to the Mayor and City Council discussing the City's concerns about the loss of a community center and the possibility of Ramone purchasing the Property and running programs similar to those historically operated by the YWCA and the JCC if the Property could be rezoned for a for-profit fitness center complex.[FN1] Around this time, Ramone testified that he made a written offer to purchase the Property but was unsuccessful in landing a deal.

FN1. Trial Ex. 56.

Lang also had a serious interest in developing the Property. Lang had explored that interest when the YWCA listed the Property for sale, but he decided it was not a viable opportunity once he heard at a public meeting that the Federation was planning to purchase it. In autumn 2004, Lang learned the Federation planned to sell the Property and was asking $2.2 million. Lang contacted Lopata and discussed the required zoning amendment that would be necessary for private businesses to utilize the Property.

Ganc scheduled Ramone and Lang successively to view the Property in late 2004. Ramone ran into Lang in the Property's parking lot. Lang recognized Ramone-who had coached his children in swimming-and inquired why Ramone was at the Property. Ramone explained his interest in developing a swimming and fitness facility for use by the Delaware Swim Team and other members of the public. In turn, Ramone learned Lang was interested in developing more real estate in Newark, including a parcel of land on back of the Property.

Nothing concrete came of these early discussions. But what happened independently is critical to the appropriate resolution of this case. Entirely without input or involvement by Ramone, Lang eventually secured for LDG an agreement of sale on the Property dated January 17, 2005 for a purchase price of $1.4 million. The contract with the Federation was conditioned in part on Lang obtaining the requisite rezoning of the Property for commercial use.

### B. *The Parties' Early Negotiations*

**\*3** In February, Ramone and Lang began to discuss seriously their mutual interest in utilizing the Property. In particular, they discussed a possible deal between the two of them focused on developing a portion of the Property for use as a swim and fitness facility. With the Property already under contract to

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 905347 (Del.Ch.)
**(Cite as: 2006 WL 905347 (Del.Ch.))**

LDG, Lang sent Ramone an email on February 15, 2005, stating that he wanted to move forward with Ramone to allow Ramone to place his business at the Property. Lang said he would send Ramone a set of keys and plans for the building located on the Property in order for Ramone to figure out what renovations were needed for a swim and fitness facility. On February 18, Ramone emailed Lang agreeing with Lang's general proposition and indicating that although he was "a little busy"[FN2] with finishing up the swim season he could meet Lang. Ramone and Lang met later that month and agreed conceptually to move forward together to develop the Property. During these early negotiations, they explored numerous possible deal structures, including the possibility that Ramone would later purchase the pool facility on the Property from Lang, with Lang retaining the rear portion to eventually subdivide.[FN3]

FN2. Trial Ex. 6.

FN3. Trial Ex. 7.

On February 28, Lang sent Ramone an email that identified proposed deal terms, including a purchase price, the closing costs, the particulars of the lease, and the rent, which would be $10 per square foot. Ramone and Lang met to discuss those terms and decided Ramone would send Lang comments on the proposed deal structure. In March 2005, Lang sent Ramone a form of LLC agreement that Lang had used in prior deals and asked Ramone to review and respond with comments. That LLC agreement proposed that he and Ramone would be 50% partners, with a lease of 85% of the building to Ramone and the remainder to be used by Lang for an office and other business uses.[FN4]

FN4. Trial Ex. 10.

Ramone agreed to review the LCC agreement right away. But he never did. Similarly, Lang provided Ramone with a draft lease for review and comment and additional information "as soon as possible"[FN5] because Wilmington Trust Company, Lang's bank, needed to review the lease to finalize Lang's loan to purchase the Property. Ramone and Lang met to discuss both the form LLC agreement and the lease. At this point, Ramone had not contacted his attorney, Gary Bryde, to review these documents and the meeting apparently stalled when Ramone was unable to provide comments.

FN5. Trial Ex. 104.

A few weeks later, Lang met with Lopata to discuss the redevelopment of the Property. In anticipation of this meeting, Lang called Ramone seeking the information he had requested when they last met but which he had never received from Ramone. On March 23, 2005, Lang made a formal submission to Lopata and the Newark City Planning Commission seeking approvals to operate a for-profit swim and fitness facility and business offices on the Property. In that letter, Lang represented that if redeveloped the Property would continue to be used in ways similar to past use and that "Michael Ramone and I have formed a partnership to purchase and reuse the [Property]."[FN6] Lang also submitted a formal rezoning plan for the proposed redevelopment.

FN6. Trial Ex. 15.

*4 During this same period, Lang was contacted by a reporter for The News Journal who had heard that Lang was purchasing the Property. Lang had the reporter speak with Ramone. The published article stated that Lang had agreed to purchase the former JCC Property and that Ramone's Delaware Swim Team and Swim School would be using the pool facilities.[FN7] Ramone received similar inquiries from a reporter for The Newark Post.[FN8]

FN7. Trial Exs. 14, 16.

FN8. Tr. at 29.

On April 25, 2005, Lopata recommended the proposed redevelopment of the Property be approved, including the requested zoning amendments. In his report to the Newark Planning Commission, Lopata noted that the Property would be developed pursuant to a partnership between Lang and Ramone and that the redeveloped facilities would be used in a manner similar to past uses. On May 3, Lopata presented his recommendation at the Newark Planning Commission meeting, at which the Commission considered

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                                                                    Page 4
Not Reported in A.2d, 2006 WL 905347 (Del.Ch.)
(Cite as: 2006 WL 905347 (Del.Ch.))

the proposed redevelopment and rezoning of the Property to determine what recommendation to make to the Newark City Council. Lang had to be out of town on May 3 and asked Ramone to attend in his place.

Ramone, however, failed to show up. The reason why is material. Ramone admitted that as of that time, he was unclear on his status in the deal and therefore chose to attend a political meeting instead.[FN9] As it happened, other representatives of LDG were present at the meeting and made the required presentation. Lang's engineer, Joe Charma, told the Commission that Ramone would be working with Lang in the development and operation of the Property.

FN9. Tr. at 170-71.

Also in May, Lang prepared two versions of an Investment Summary relating to the Property.[FN10] Although in each version Ramone and Lang were each to own 50% of the LLC that would be created to own the Property, the terms governing the rent per square foot and the various fees payable to LDG changed. The May Investment Summary also contemplated that LDG would receive a development fee on closing for its work in securing the Property and the necessary land use approvals. In addition, more specific information relating to the amount of construction costs and loan terms-some of which Ramone had to provide-were not finalized. Lang sent a copy of these Investment Summaries to Ramone, who never responded with the requested information, and to his banker at Wilmington Trust Company, Jeremy Abelson. Lang contacted Abelson in February 2005 to initiate the process of obtaining financing to purchase the Property. Lang informed Abelson that he and Ramone would develop the Property as partners. Accordingly, in mid-May, Abelson requested that Ramone send him certain financial information and tax records that were necessary to have the loan for the Property finalized.[FN11]

FN10. Trial Exs. 22, 24.

FN11. Tr. at 344. It was also during this general time period that Ramone and his wife signed a contract to sell a parcel of real estate they owned. Ramone maintains this sale was undertaken in order to help finance Ramone's share of the settlement costs of for his deal with LDG, but the property sold was listed initially in August 2004, well before any relationship developed between Lang and Ramone. Compl. ¶ 26; Tr. at 127-28, 199-201. For this and other reasons, I do not credit Ramone's claim that he sold the property in reliance on any statements or conduct by Lang.

By late June, Lang became more anxious to provide his bank with supporting documentation related to Ramone's lease of most of the building on the Property. He was beginning to feel legitimate frustration at Ramone's delays and inability to respond to the documents with comments.[FN12] In addition, Abelson informed Lang that he had not yet received Ramone's financial information. Ramone-still interested in moving forward-claims to have signed both the lease and LLC agreement in draft form to provide this documentation for the bank.[FN13] Ramone testified, however, that Lang refused to accept the copies with Ramone's signature urging Ramone to review the documents with his attorney, Gary Bryde, which Ramone then arranged to do. Around this same time, Lang learned that the Federation wanted to close the sale of the Property around July 15 or 18. Lang wanted to finalize specific deal terms with Ramone before leaving on a vacation scheduled for the end of July.

FN12. Tr. at 467, 474.

FN13. I do not credit this testimony. Even if I did, it was clear that Ramone had not as of that time (or any later time) committed himself to accept any binding and complete agreement with Lang regarding ownership, leasing, or use of the Property.

*5 On June 24, Lang, Ramone, and Bryde met to discuss three possible deal structures, including a completely new alternative that would involve Ramone buying out the purchase agreement on the Property from LDG as well as earlier structures such as the 50/50 ownership structure and an option where Ramone would have no interest in the Property initially but would have the option to buy out the front

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 905347 (Del.Ch.)
(Cite as: 2006 WL 905347 (Del.Ch.))

portion of the Property from Lang in the future. Bryde recapped this meeting in an email to Ramone and Lang to which Lang responded on July 8.[FN14] In this July 8 email exchange, Lang selected the 50/50 option described by Bryde, modified it somewhat, and suggested that the framework he outlined was a basis for moving the deal forward. In this July 8 email, Lang proposed the following terms relevant to this dispute:

FN14. Trial Ex. 35.

• Ramone and Lang would join a LLC on a 50% basis with a closing on July 20, 2005;

• Ramone would lease the building for $10 per square foot triple net;

• Lease payments would be held in an operating account only used for capital needs if they occur;

• Ramone would have the option to buy out Lang's 50% interest in the LLC one year and one day after the closing for $150,000 plus any equity that Lang put into the deal, approximately $70,000, for a total purchase price of $1.55 million;

• Ramone would transfer the back parcel on the Property to Lang for development; and

• Improvements to the building and pool would be completed in order for both to be open by September 1 for use by Ramone.

Ramone responded to Lang's email and copied Bryde stating that "[t]his sounds like what I am looking for. I do not understand the ... tax implications. I am also uncertain of some details concerning the additional parcel, however I think we are close enough to warrant us getting this done."[FN15] Ramone also suggested a meeting the morning of July 11-the date of the Newark City Council meeting at which the zoning amendment would be adopted or rejected-to finalize the details. Lang responded to Ramone suggesting a specific time and place for the July 11 meeting to discuss the deal further, but the meeting never occurred because Ramone's attorney Bryde, who was on vacation during that time, never responded

whether or not he could attend. The parties did not reschedule that meeting although the vacations of Abelson, Lang, and Ramone all were imminent.

FN15. Trial Ex. 29.

Lang and Ramone, however, both attended the Newark City Council meeting the night of July 11. Both Lang and Ramone knew members of the City Council because each had personal and business ties to the community. Ramone also served as the executive regional director of the Newark Regional Republican Committee and had campaigned for several sitting council members. Lang presented on behalf of LDG, and during this presentation, Lang explained that he and Ramone would be working together on the redevelopment. The City Council approved the rezoning request.

*6 Ramone alleges that around this time he first began soliciting for new children to join the Delaware Swim Team in Newark by posting and handing out around 3,000 fliers. Ramone also began to investigate potential sub-tenants for the Property.

### C. Negotiations Continue After The Zoning Redesignation

After the events around July 11, including the City Council meeting, Lang spoke with Ramone and proposed new terms for the deal. With the regulatory approvals now in place, Lang became impatient to finalize deal terms and close on the Property. The purchase agreement with the Federation required that LDG go to closing within thirty days after receiving final, non-appealable approval from the City of Newark. The deadline to close, therefore, was around mid-October 2005. Lang perceived the Federation as desiring to close the purchase of Property as soon as practicable after City Council's approval.[FN16] Lang also hoped to close so that the Property could begin to be used for swim team purposes in September as Ramone desired. Lang emailed Ramone and Bryde on July 15 stating that he was attaching a revised Investment Summary reflecting "the recently revised understanding that I believe Mike and I share with regard to the project" and informing Ramone and Bryde that closing on the purchase of the Property was set for August 2.[FN17] The July Investment Sum-

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 905347 (Del.Ch.)
(Cite as: 2006 WL 905347 (Del.Ch.))

mary was different than the last version, circulated at the end of May, in that it included more specifics on loan terms, construction costs, construction timing, and occupancy. It also identified other related costs for the first time and removed the buyout option for the first time.[FN18] The removal of the buyout option stemmed from the knowledge Lang gleaned on July 11 that the parties were unlikely to receive approval to subdivide and rezone the back parcel that Lang had desired to retain for himself after a partial buyout. Therefore, an essential economic premise of the buyout option was compromised.[FN19] The Investment Summary, however, continued to state that Ramone and Lang each would each own 50% of the LLC.

FN16. Tr. at 487; Trial Ex. 30.

FN17. Trial Ex. 41.

FN18. Trial Ex. 38.

FN19. Ramone points to the removal of the buyout option after the July 11 meeting as support for his claim that Lang exploited his participation in the deal in order to obtain the requisite zoning approvals but then excluded Ramone once those approvals were achieved. I do not believe this to be so. A careful review of the record demonstrates there was a compelling business reason that justified removal of the buyout option rather than any bad faith by Lang. Early in this process, Lang had a particular interest in trying to develop the back parcel on the Property while Ramone's primary interest was in the pool facility. Based on their respective business interests, the parties attempted to negotiate a complicated buyout option for several months although ultimately it never reached a final form. As a developer, Lang generally does not sell developed properties in the short term or flip properties, but the logic of the buyout option for Lang in this case was that Ramone would buy out Lang's interest in the pool facility thereby providing Lang with a healthy return on his investment in the Property while Lang retained the back parcel of the Property for potential future development. After the July 11 zoning meet-

ing, however, it became clear to Lang that obtaining the required approvals for redevelopment and rezoning of the back parcel was not feasible. Accordingly, Lang's interest in selling the building and front portion of the Property became significantly less attractive from a business perspective.

In this same email, Lang asked for all comments by July 18 to be followed by a meeting the next day to execute copies of the proposed LLC agreement and lease, which Lang's attorney, Christopher Lamb, had sent to Bryde.[FN20] Lang wrote that they needed to meet then and move forward in order to get permission from the Federation to begin pre-closing work on the Property in time for use of the facilities in September 2005. Neither Bryde nor Ramone responded to these draft proposals except that on July 18 Bryde informed Lamb that he was meeting with Ramone on July 19 to discuss the documents.

FN20. Trial Ex. 41.

After meeting with Ramone and conveying the outcome of this meeting to Lamb, Bryde received an email from Lamb following up on an earlier conversation. This email was in important in signaling a shift in Lang's attitude towards Ramone's participation in the deal. In this email sent to Bryde-but not Ramone-on July 20, Lamb stated that the proposal Bryde had described to him as Ramone's preference on how to structure the deal had not been "on the table" for several days.[FN21] At that point, Lamb explained that what was acceptable to his client was the deal structure described in the July Investment Summary, which did not include a buyout option but still contemplated that Ramone would have a 50% interest in the LLC owning the Property, that was sent as well as the draft LLC agreement and lease sent around the same time. Significantly, Lamb included a firm deadline by which Ramone needed to respond if he wished to remain an owner in the proposed LLC. Lamb stated "[i]f Mr. Ramone does not accept that proposal by mid-afternoon, Mr. Lang intends to proceed to purchase the Property with other partners, but would still be interested in discussing a lease with Mr. Ramone."[FN22] That email was sent to Bryde at 12:34 p.m. and Ramone did not respond to this email by mid-afternoon.[FN23] Lang testified that by this point

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                                                    Page 7
Not Reported in A.2d, 2006 WL 905347 (Del.Ch.)
**(Cite as: 2006 WL 905347 (Del.Ch.))**

in the process he was concerned that he was leaving on vacation in a few days with the deal terms unsettled but yet LDG was scheduled to close on the purchase of the Property the day after he returned from his vacation.[FN24]

>FN21. Trial Ex. 42.

>FN22.*Id.*

>FN23. He testified that it was past mid-afternoon by the time he learned of Lang's deadline from his attorney. Tr. at 72-73.

>FN24. Tr. at 385.

*7 The introduction of other potential partners into this deal originated with Wilmington Trust's concerns about Lang's other real estate development projects. Wilmington Trust advocated adding other partners to reduce the financial demands the redevelopment would place on Lang. In addition, as of July 15, Abelson still had not received Ramone's financial information, which he had requested more than a month and a half earlier. This information was needed to close the financing for the Property. A series of missteps then followed, for which Ramone bears primary responsibility. As a result, Ramone's financial information did not reach Abelson until late July-almost two months after requested. These delays were commercially unreasonable, and any diligent potential investor would have assured more timely delivery.

On the day Lang was leaving for a family vacation, July 23, Lang saw Ramone at a swim meet. By this time, if not earlier, Lang was aware of Ramone's advertising and recruitment efforts for a program at the Property and Lang assured Ramone that he would be able to lease the pool ready for use in September. In the days before that swim meet, they had briefly discussed a revised structure, which involved a third party, Brown, as an additional and equal investor in the LLC. Ramone and Lang also discussed reducing the rent to $6 per square foot from the $10 per square foot. Lang emailed Abelson stating that he had discussed with Ramone this new three member structure, the proposal that Ramone would lease the pool

and fitness areas for $6 per square foot, and the plan that the remainder of the building would be leased to other tenants.[FN25] Lang also informed both Abelson and Lamb that he hoped they would finalize documents and collect the funds needed from each party for the closing the next week. Lang immediately followed up the email to his advisors with an email to Ramone stating that he had "explained the revised deal structure to Jeremy Abelson ... and [I] hope that he will be able to finalize all documents next week."[FN26] Lang also noted that Lamb would revise the LLC agreement but would need some information from Ramone to include him as a member of the LLC and that Ramone should send this information to Lamb by July 25. Ramone responded to Lang's email by replying to Lang and then Lamb with the requested information.

>FN25. Trial Exs. 35, 43. Ramone testified that he was unhappy with the revised deal structure, including the loss of the buyout option, but still hoped to remain in the deal. Tr. at 135-38.

>FN26. Trial Ex. 29.

While on vacation in Denmark, Lang responded to Ramone's email supplying the requested personal information for the LLC agreement by asking Ramone to respond to the following issues: (i) whether Ramone had reviewed the lease agreement and Bryde had commented, (ii) whether Ramone was comfortable with the $30,000 development fee payable to LDG; (iii) whether it would be okay to extend closing until August 4 after Lang returned home; and (iv) whether LDG could receive a fee for managing the building as proposed in the July Investment Summary, if Ramone did not lease the entire building.[FN27] Ramone responded shortly thereafter stating "I believe that we are going to move forward with renting the entire building after all." He requested staggered rent for the first few months, asked how much money he needed to invest, and stated that he could sign the LLC agreement and loan papers on July 29. Ramone did not agree to the development fee, and wrote instead "the $30,000 fee seems a little steep. But I do not know the business. I thought at one point you said there would be no fees from your company. Please straighten me out,

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 905347 (Del.Ch.)
**(Cite as: 2006 WL 905347 (Del.Ch.))**

[t]hanks."[FN28] Although Ramone responded directly to certain issues raised by Lang, he did not comment on the LLC agreement or lease but Bryde never provided comments to Lamb. This was the last email exchange between Ramone and Lang before Lang decided to close on the Property without Ramone.

FN27. Trial Ex. 35.

FN28. *Id.* As noted earlier, this development fee appeared in the first May Investment Summary as a 2% fee of total project costs and in the second May Investment Summary as a fee of $30,000. Trial Exs. 22, 24.

*8 Lang also emailed Abelson while on vacation asking whether everything was arranged for an August 4 closing. Lang stated that if Ramone did not complete his paperwork before closing then Abelson should move forward with only Brown and Lang as members of the LLC. Specifically, he stated that "I am anticipating that Mike will be part of the LLC ... if he fails to complete his paperwork prior to closing ... we will add Mike to the LLC and bank guarantee when he gets his paperwork complete."[FN29] During the latter part of Lang's vacation, Ramone departed for a family vacation to return on August 10. The closing date had not been set, but before leaving Ramone gave Bryde his power of attorney in order to sign documents and possibly close in Ramone's absence. Also, while on vacation and once he knew Lang had returned home, Ramone called Lang and left him messages asking to discuss where the deal stood. Although Lang never returned Ramone's phone calls, both their attorneys were in touch during this time.

FN29. Trial Ex. 109.

Abelson responded to Lang's email on August 1 reporting that he had not heard back from Bryde. At this point, Lang was frustrated and out of patience with Ramone's failure to finalize deal points. Therefore, Lang made the decision to continue the deal without Ramone although noting in an email that "I will have to close and either bring Mike in next week or lease to Team Delaware,"[FN30] another local swim organization that was the primary competition of Ramone's Delaware Swim Team. On August 3, Lang again checked in with Abelson informing him that

the owners of the LLC would be himself, Brown, and two other previous investors in Lang's real estate developments.

FN30. Trial Ex. 44.

On the evening of August 3, Bryde asked Lamb for information on the closing-by now rescheduled for August 10-stating that he had not been contacted regarding the schedule for the closing. Lamb responded stating that he was told Ramone would not respond to finalize deal points and that although Ramone would not be able to have an ownership interest in the LLC, Lang remained willing to lease the pool and additional space to Ramone.[FN31] Bryde, in return, inquired about the open deal points. Bryde and Lamb spoke on August 5 to discuss the unresolved deal terms, including the amount of space Ramone wanted to lease, the rental rate, the development fee, and the percentage vote needed to approve LLC decisions. The percentage vote issue was raised for the first time. Bryde and Lamb were not able to resolve all the open deal terms at this time in large part because Bryde, although he held a power of attorney from Ramone, was unwilling to agree to the substantive "business" aspects of the deal for his absent client.

FN31. Trial Ex. 48.

Ramone, however, on August 8, sent Lang an email stating that he wanted to know whether or not he was going to be able to remain involved in the Property and that it was fine if he was out of the deal but that he needed "some answers." [FN32] Lang never responded to Ramone directly. He never informed Ramone that he had considered that at least as of the upcoming closing Ramone would not be an LLC member but potentially could be in the future. He also did not inform Ramone that he was willing to lease him the pool space, as previously discussed. Instead, Lang left the discussion to Lamb.

FN32. Trial Ex. 111.

*9 Finally, on the morning of August 10, Bryde faxed a letter to Lamb stating that he understood the closing might be that day and that he was ready, willing, and able to attend closing on behalf of Ramone using his

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 905347 (Del.Ch.)
(Cite as: 2006 WL 905347 (Del.Ch.))

power of attorney.[FN33]That is, Bryde now claimed to be willing to wield authority he had recently disclaimed. Bryde also stated that the July 23 email from Lang to Ramone reflected an agreement and that he had attempted to address the open deal points. Lang and his counsel, however, found Bryde's statements about Ramone's agreement to the revised deal structure to be too equivocal and proceeded to close without Ramone in the deal.[FN34]That same day Wilmington Trust Company approved the loan on the Property and an LLC agreement was signed between Lang, Brown, and two additional persons.

> FN33. Trial Ex. 52.

> FN34. In the letter Bryde sent to Lamb the morning of the closing, Bryde used language that continued to hedge on the open deal points. He wrote that Lang "would rent the pool and probably the fitness area," that he was "presum[ing]" the answer to the question on the voting requirements for the members of the LLC, and that "I am sure that Mr. Ramone would not let this become a deal breaker and would agree."Trial Ex. 52.

A little over two weeks later, Ramone filed this action seeking equitable relief, or in the alternative, monetary damages. Regrettably, the filing of this suit hardened already strained relations to the point whereby it apparently became impossible for Lang and Ramone to piece a deal together after the purchase of the Property had closed.[FN35]

> FN35. It appears that there was some back-and-forth between Lang and Ramone in this period, but these brief email exchanges primarily involved Ramone trying to communicate with Lang and voicing frustration as to what was going on. In particular, Ramone was concerned about whether he needed to cancel his team's schedule in Newark. Trial Ex. 112. There also was an in-person encounter at the Property where Ramone inquired whether he was going to be able to lease the Property. Tr. at 492-93. Lang testified that he "did not go out of [his] way" to contact Ramone in response. Tr. at 494.

### D. The Nature Of The Relief Sought By Ramone

Ramone seeks equitable relief and damages against Lang, LDG and South College Property Associates, LLC ("SCPA"), the special purpose entity used by Lang to purchase the Property. For the sake of simplicity, I refer to the defendants singularly as Lang. Specifically, Ramone asks this court for the following:

• Injunctive relief prohibiting the conveyance or encumbrance of the Property because of Lang's exclusion of Ramone from the closing of the loan and the signing of the LLC Agreement for SCPA;

• Specific performance of an agreement with Lang based upon contract or quasi-contract, including (1) a 50% interest in the Property via membership units in SCPA, (2) a five-year lease at $10 per square foot rent for the entire 17,200 square foot building located on the Property; and (3) an option to purchase Lang's 50% interest in SCPA within one year from the date of closing on the Property for the amount of $245,000; and

• Reimbursement of his litigation costs and fees.

Ramone premises this request on three alternative theories. The initial theory is grounded in contract. Ramone claims that Lang and he actually forged, by email, a final, binding agreement on the nature of the LLC they would form, and their respective rights and obligations regarding the Property. Second, Ramone alleges that Lang and he had become general partners and that Lang breached fiduciary duties he owed to Ramone by excluding him from an interest in the Property. Finally, Ramone says that he is entitled to relief under the doctrine of promissory estoppel, because he reasonably relied to his detriment on a promise by Lang that he would participate in the use of the Property.

After a two-day trial, this court granted an oral injunction on October 10, 2005, prohibiting Lang from leasing out the pool facility to Ramone's competitor, Team Delaware, or any other competitor, and required that a sixty-day termination provision be in-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 905347 (Del.Ch.)
**(Cite as: 2006 WL 905347 (Del.Ch.))**

cluded in any leases on the Property pending the court's ultimate decision. Lang has abided by that injunction. With the history of the failed negotiations set out, I turn to the claims raised by Ramone.

## II. *Legal Analysis*

### A. *Was A Contract Formed Between The Parties?*

**\*10** Ramone contends that a contract exists based on the offer Lang made in a July 8 email to Ramone. As described previously, the offer Ramone maintains was made to him in this email involved a proposal for joint ownership, a lease for a majority of the building on the Property, and an option for Ramone to buy out Lang's interest in the Property. Ramone argues he accepted this offer first in writing and then orally. Ramone points to his email response as evidence of his written acceptance to Lang's July 8 email offer. He highlights that in this email he stated the terms were "acceptable" and that he neither contradicted nor added to the terms of the July 8 email. In this way, Ramone contends a contract between himself and Lang exists, but that Lang unilaterally excluded him from any deal related to the Property or lease of the pool facility once he had the benefits of Ramone's participation during the rezoning process.

Before addressing the relevant law, it is important to discuss my overall impression of Ramone as a negotiating partner. Although Ramone might well have believed he proceeded in a commercially sensible and timely way, as an objective matter, he did not. His pace for most of the negotiating period was leisurely and erratic. He did not provide requested information in a timely manner. He did not engage a legal advisor until very late and did not provide that advisor with consistent guidance or adequate authority. Most of all, Ramone's desires regarding the amount of space to lease and at what price shifted, and he never focused in the standard way on reducing his desires to a final, written document. Anyone experienced with the typical procession of commercial negotiations would have found Ramone hard to pin down.

This is not to say that Lang's end-stage behavior was entirely admirable. Knowing by then that Ramone's approach to business was untraditionally lax and meandering, Lang could have more clearly signaled the

need for Ramone to focus, get serious, and finalize a deal. This is especially so given how often Lang had thrown around the term "partner" in reference to Ramone. Rather than stepping aside and allowing his counsel Lamb to deal with Ramone, Lang could have dealt more directly with Ramone. But the reality is that Lang had good reason to be impatient with Ramone and to desire closure. With that critical perspective in mind, I now set forth the governing contract law principles.

In Delaware, the formation of a contract requires a bargain in which there is manifestation of mutual assent to the exchange and consideration.[FN36] Overt manifestations of assent rather than subjective intent control contract formation.[FN37] Delaware, which has adopted the mirror-image rule, requires that acceptance be identical to the offer.[FN38] In addition, a contract must contain all material terms in order to be enforceable, and specific performance will only be granted when an agreement is clear and definite and a court does not need to supply essential contract terms.[FN39] The record demonstrates that Ramone did not manifest objective assent and that he and Lang never reached a complete meeting of the minds on all material terms. Thus, because Ramone and Lang never formed a contract, Ramone has no basis for recovery under a claim for breach of contract.

FN36. *Wood v. State,* 815 A.2d 350, 2003 WL 168544 at \*2 (Del.2003) (citing RESTATEMENT (SECOND) OF CONTRACTS § 18 (1981)). *See also Indus. America, Inc. v. Fulton Indus., Inc.,* 285 A.2d 412, 415 (Del. Ch.1971) ("It is basic that overt manifestation of assent-not subjective intent-controls the formation of a contract; that the 'only intent of the parties to a contract which is essential is an intent to say the words or do the acts which constitute their manifestation of assent'; that 'the intention to accept is unimportant except as manifested.' ") (internal citations omitted).

FN37. RESTATEMENT (SECOND) OF CONTRACTS § 17 (1981); E. ALLEN FARNSWORTH, FARNSWORTH ON CONTRACTS § 3.6, at 210 (3rd ed.2004).

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 905347 (Del.Ch.)
**(Cite as: 2006 WL 905347 (Del.Ch.))**

FN38.*See Friel v. Jones,* 206 A.2d 232, 233-34 (Del. Ch.1964), *aff'd,* 212 A.2d 609 (Del.1965); *PAMI-LEMB I Inc. v. EMB-NHC, L.L.C.,* 857 A.2d 998, 1015 (Del.Ch.2004).

FN39.*See In Matter of Beaty,* 1996 WL 560183, at *7 (Del. Ch. Sept. 30, 1996) (quoting *M.F. v. F.,* 172 A.2d 274, 276 (Del. Ch.1961).

*11 First, the text of Ramone's email response to Lang's July 8 email offer obviously does not manifest assent. Ramone wrote:

This sounds like what I was looking for. I do not understand the NOI nor the tax implications. I also am uncertain of some details concerning the additional parcel, however, I think we are close enough to warrant us getting this done. Could we meet Monday to finalize the details so we can move forward with the Zoning meeting....[FN40]

FN40. Trial Ex. 29.

For Ramone's email to have constituted acceptance, it must have included three general components: (i) an expression of commitment; (ii) the commitment must not be conditional on any further act by either party; and (iii) the commitment must be one on the terms proposed by the offer without the slightest variation.[FN41] Although in that email Ramone signals his general agreement in moving forward on the structure Lang described, Ramone's words in the email do not reflect a commitment to the exact terms outlined by Lang-as reflected in his caveats that he does not understand certain aspects of Lang's proposal and that he is uncertain about another aspect. Ramone's own subjective and after-the-fact view that this email was acceptance is not sufficient to prove he manifested objective assent.[FN42] In addition, through his suggestion that they meet "to finalize the details," Ramone's response (e.g., that they were "close enough") indicates that further negotiation was needed in order for a contract to have been created. "Since acceptance is the ultimate step in making a contract, the commitment cannot be conditioned on some final step to be taken by the offeror."[FN43] For these reasons, Ramone's response to Lang's July 8 email cannot be considered acceptance that created a binding contract between them. Ramone and Lang were merely moving forward in their negotiations to reach an agreement.[FN44]

FN41.FARNSWORTH ON CONTRACTS § 3.13, at 272-74.

FN42.*See Indus. America,* 285 A.2d at 415 (noting subjective intent was not relevant to determine whether an offer was accepted); *Shah v. Shah,* 1988 WL 81159, at *2 (Del. Ch. Aug. 3, 1988) ("It is hornbook law that in interpreting a contract, the court must look to the objectively manifested ... not the subjective ... intent of the parties.").

FN43.FARNSWORTH ON CONTRACTS § 3.13, at 273.

FN44.*See Leeds v. First Allied Connecticut Corp.,* 521 A.2d 1095, 1101 (Del. Ch.1986) (noting that negotiations typically move forward over time with agreements on points being reached along the way towards a completed negotiation).

Next, a contract must contain all material terms in order to be enforceable. If terms are left open or uncertain, this tends to demonstrate that an offer and acceptance did not occur.[FN45] "Until it is reasonable to conclude, in light of all ... surrounding circumstances, that all of the points that the parties themselves regard as essential have been expressly or (through prior practice or commercial custom) implicitly resolved, the parties have not finished their negotiations and have not formed a contract."[FN46] Here, Lang and Ramone never agreed on all the material terms. For example, material issues that remained unresolved by the July 8 email and response, included whether capital expenditures would be paid by the owners or the tenant, the particulars of the buyout option, including what would be included in the option and rights of first refusal, and details of the management fee to LDG, if any.[FN47]

FN45.RESTATEMENT (SECOND) OF CONTRACTS § 33(3) (1981).

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                    Page 12
Not Reported in A.2d, 2006 WL 905347 (Del.Ch.)
**(Cite as: 2006 WL 905347 (Del.Ch.))**

FN46. *Leeds,* 521 A.2d at 1101.

FN47. Lang contends as many as sixteen open issues remained after the July 8 email exchange. *See* Lang Post-Trial Br. at 2 n. 1. I credit his testimony because it is the version of events consistent with the objective evidence in the record.

Moreover, negotiations continued throughout July, over various terms, including the possibility of a buyout option, the amount of space Ramone would lease, and the price per square foot. These further negotiations on substantive issues demonstrate that an enforceable contract between Ramone and Lang was not in place based on the July 8 email exchange.[FN48] There also was much discussion about whether Ramone might lease the entire building on the Property or a merely portion of that building. In addition, a third partner, Brown, was added in late July. Once Brown was brought into the deal, a price term changed-the rent per square foot decreased from $10 to $6. In the months preceding this exchange, negotiations between Ramone and Lang moved slowly without major progress. At best, Lang's July 8 email and Ramone's written and oral responses reflect a renewed interest to negotiate a deal structure together of some sort. The fact that the July 8 email does not constitute a contract in itself is, of course, not surprising. Ramone knew that any contract was to be embodied in a formal LLC agreement and lease. The record is clear that Lang and he never reached accord on the final terms of those instruments.[FN49] Because a binding contract was never formed, Ramone is not entitled to specific performance or other relief based on breach of contract.

FN48. *See Cohen Dev. Co. v. JMJ Prop., Inc.,* 317 F.3d 729, 736 (7th Cir.2003) (finding that negotiations following an alleged acceptance of an offer showed the parties had not entered a contract).

FN49. Further, proving the absence of a definitive agreement is the fact that Ramone's attorney Bryde indicated to Lamb that Ramone and Lang had a deal embodied in a later July 23 email.

**B.** *Did Ramone And Lang Form A Partnership Through Their Conduct?*

**\*12** Next, Ramone argues that Lang owed him not only contractual duties but also fiduciary duties because, during the course of their relationship, he and Lang formed a partnership. Under 6 Del. C. § 15-202(a), a partnership is formed through "the association of two or more persons (i) to carry on as co-owners a business for profit ... whether or not the persons intend to form a partnership...."[FN50] It is important to note that "[w]here the suit is between the parties as partners, stricter proof is required of the existence of a partnership than where the action is by a third person against either actual partners or persons sought to be charged as partners."[FN51] In Delaware, there is no singularly dispositive consideration that determines whether or not a partnership existed between two parties. To conclude that a partnership existed, though, a court must find that there was "a common obligation to share losses as well as profits."[FN52] A court also may consider the "acts, the dealings and conduct of the parties, and admissions of the parties" to establish that a partnership existed.[FN53] I, therefore, will examine the relationship between Ramone and Lang to determine whether, in contemplation of a joint interest in the Property, they formed a partnership that would give rise to fiduciary duties, thus rendering Lang's exclusion of Ramone a breach of those duties.

FN50. This language tracks the Revised Uniform Partnership Act ("RUPA"), which clarifies that "the drafters did not intend to change the law by adding to the statute the words 'whether or not the persons intend to form a partnership.'These words merely are intended to put into the statute what is clear upon an examination of the case law: that the intent of the parties to be classified as partners or to avoid partnership classification is not determinative. Rather, the question is whether or not the partners have intended to enter into a relationship ... the essence of which is partnership ."RUPA § 15-202 (2005) (Author's Comments). Therefore, it is still the case in Delaware that "[t]he creation of a partnership is a question of intent." *Hynansky v. Vietri,* 2003 WL

21976031, at *5 (Del. Ch. Mar. 6, 2003); *see Acierno v. Branmar, 1976 WL 3, at *4 (Del. Ch. Feb. 19, 1976); In re Estate of Fenimore, 1999 WL 959204, at *5 (Del. Ch. Oct. 8, 1999).*

FN51. *Ellison v. Stuart, 43 A. 836, 838 (Del.Super.1899); see also Hynansky, 2003 WL 21976031, at *5.*

FN52. *Branmar, 1976 WL 3, at *4.*

FN53. *Fenimore, 1999 WL 959204, at *5.*

The prospective commercial relationship between Ramone and Lang began in earnest in February 2005, after Lang obtained an agreement to purchase the Property. Ramone alleges that they agreed to become partners in March 2005, which defined the working relationship between them through July 2005. As of February 18, though, it was clear that Ramone was waiting for "the details of how the partnership could be formed" in response to Lang's proposal that the two potentially could "develop a partnership to own the entire property."[FN54] Rather than forming a partnership in March, Ramone and Lang spent the next several months attempting to haggle out the details of a partnership for the ownership of the Property-that is, they agreed at that point to seek to negotiate an acceptable final agreement to become partners.

FN54. Trial Ex. 7.

In this regard, it is undisputed that the structure and terms of their relationship continued to be negotiated between March and July of 2005 and never were finalized in any document or definitive oral agreement. Throughout these months when Ramone alleges that a general partnership existed, he and Lang exchanged several versions of an LLC agreement with various terms that were changed. Ramone even decided not to attend the Newark Planning Commission's May 3 meeting about the Property because he was not certain as of that time what role, if any, he would have in owning the Property.

How, then, can one find that a Delaware general partnership was formed? Although the absence of a written agreement is not necessarily conclusive of whether a partnership exists in all circumstances,[FN55] here it is. What terms of what partnership agreement, express or implied, would I be charged with enforcing? It is of course true that Lang and Ramone referred to each other colloquially as "partners" during this period. They did so, however, in a particular context-one in which they hoped and expected that Lang, as a developer, and Ramone, as a swimming entrepreneur, could forge a final agreement involving use of the Property. Both knew they had yet to settle on the material terms of a binding relationship but were committing themselves to negotiate to get there. To put it in romantic terms, they were engaged "to get engaged."

FN55. *See Hynansky, 2003 WL 21976031, at *6;see also* 59A AM.JUR.2D § 185 (2005) ("The absence of a written contract of partnership is not conclusive of whether a partnership exists, but it is an element for serious consideration."). Even in cases where both parties signed a document titled "Partnership Agreement," Delaware courts have found that the parties did not intend to form a partnership at that time. *See Chaiken v. Employment Sec. Comm'n, 274 A.2d 707, 709 (Del.Super.1971); Branmar, 1976 WL 3, at *4-*5;see also* 59A AM.JUR.2D P'SHIP § 183 (2005) ("The best evidence of partnership consists of the parties' written agreement or contract ... [but][e]ven a written agreement designating a person as a partner is inconclusive in the absence of other partnership elements.").

**\*13** This type of agreement to agree is not sufficient to form a general partnership.[FN56] In *Acierno v. Branmar,* this court was confronted with two parties who both signed a document that stated: "The parties are, for all legal and equitable purposes, equal partners in the shopping center venture from July 1, 1974 forward. A partnership agreement will be executed as promptly hereafter as possible and the same will provide for the 50/50 interest of the parties."[FN57] The parties, though, never reached a firm agreement, and the court held that "the law of partnerships and the nature of that relationship requires that more exist than a mere intention expressed in writing."[FN58] Here, Lang

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                    Page 14
Not Reported in A.2d, 2006 WL 905347 (Del.Ch.)
**(Cite as: 2006 WL 905347 (Del.Ch.))**

and Ramone never went so far as to finalize the material economic terms of their hoped-for partnership, and finding that their relationship falls short of constituting a partnership is consistent with the principle that "[p]ersons who have entered into a contract to become partners at some future time or on the happening of some future contingency do not become partners until or unless the agreed time has arrived or the contingency has happened."[FN56]In fact, some jurisdictions require that the business be operating before a partnership is found to exist.[FN60]The relationship between Ramone and Lang was still inchoate, and the process that Ramone and Lang began in February 2005 of working out the terms of their hoped-for association continued without any concrete result.[FN61]

> FN56. Throughout the process, as discussed, material terms such as whether Ramone would lease the entire building or just the pool and whether Ramone would be provided with a buyout option never were agreed upon. In Delaware, an agreement is not enforceable if "it is nothing but an agreement to agree in the future without any reasonably objective controlling standards." _Hammond & Taylor, Inc. v. Duffy Tingue, Co., 161 A.2d 238, 239 (Del. Ch.1960)._ That is, "the parties [must] have reached agreement on all material terms before an 'agreement to agree' will be enforced." _Int'l Equity Capital Growth Fund, L.P. v. Clegg, 1997 WL 208955, at *8 n .3 (Del. Ch. Apr. 22, 1997)._ That, of course, did not happen here.

> FN57. _Branmar, 1976 WL 3, at *4._

> FN58._Id._ at *5.

> FN59.68 _C.J.S. Partnership_ § 16 (2005).

> FN60._See id._("The enterprise in which the parties are engaged must be launched under the agreement before the parties become partners.").

> FN61._See Branmar, 1976 WL 3, at *4._

In this case, aside from the lack of agreement on material terms, it would be very odd to find that a general partnership existed because both Ramone and Lang seem to have agreed that any binding relationship they would form as co-fiduciaries (rather than as lessor and lessee) would be as fellow members of an LLC. In that respect, _6 Del. C._ § 15-502(b) provides that "an association formed under a statute other than (i) this chapter, (ii) a predecessor statute or (iii) a comparable statute of another jurisdiction, is not a partnership under this chapter."The clear import of this provision, as noted in the comments to the RUPA, is that the formation of an LLC does not also result in the formation of a partnership.[FN62]Consistent with the logic inherent in this statute, when parties clearly intend to effect a formal business relationship through a written limited liability company agreement rather than through a general partnership, that reality serves as an important factor that cuts against concluding that they had earlier formed a general partnership because their attempt to forge an agreement on the material terms of a written LLC contract eventually came to naught.[FN63]

> FN62._See_RUPA § 202 (2005) (Official Comments) ("Subsection (b) provides that business associations organized under other statutes are not partnerships. Those statutory associations include corporations, limited partnerships, and limited liability companies.").

> FN63. Cases from other jurisdictions support this view. In _Longview Aluminum, L.L.C. v. Indus. General, L.L.C.,_ for example, two parties engaged in several prior dealings involving business conducted through LLCs, but they referred to each other as partners. 2003 WL 21518585, at *6 (N.D.Ill. July 2, 2003). One party, then, claimed that a partnership existed in the time leading up to the creation of each LLC, but the court rejected this as contrary to the intent of the parties. _Id._ at *7. There, the court stated that it was the parties' "intent and action in creating limited liability companies" that led to the conclusion that "a partnership ... was not created between them."_Id._

Not Reported in A.2d                                                    Page 15
Not Reported in A.2d, 2006 WL 905347 (Del.Ch.)
**(Cite as: 2006 WL 905347 (Del.Ch.))**

One could imagine, I suppose, circumstances when parties intending to form an LLC would be held to be general partners because 6 Del. C. § 15-202(a) states that a partnership can be formed "whether or not the persons intend to form a partnership."[FN63] Had Lang and Ramone agreed to all the material terms of the business relationship, including how they would share profits and losses as partners, and Lang later balked on signing the final documents, it *might* have been possible to conclude they had formed a general partnership even though their stated intent was to form an LLC. But that did not happen, and to find that their failure to reach accord on an LLC agreement, without more, left them as general partners would be inequitable and unprincipled, given the reality that they never agreed on their obligations to one another. To do so would create an odd situation where the mere exchange of draft LLC agreements, none of which were signed by both parties, would establish a general partnership.

> FN64. What if, for example, two parties agreed on all material terms of an LLC agreement, conducted business in accordance with that agreement for a time, but one party later refused to sign the LLC agreement and claimed exclusive rights? Might they be deemed general partners? Those circumstances are not present here.

**\*14** In sum, no static and ascertainable relationship existed between Ramone and Lang that could be considered a Delaware general partnership under 6 Del. C. § 15-202; they were simply trying to get to a point where they would have a mutually binding, formal relationship as members of an LLC. To consider Ramone and Lang partners would make it hazardous for businesspersons to agree to negotiate the formation of an LLC together without risking a judicial declaration that they thereby created a de facto, informal partnership if their negotiations fail. The mere fact that Lang colloquially used the word "partners" publicly at certain meetings and in certain documents does not overcome, as between Ramone and Lang, their inability to establish a binding, business relationship by contract.

*C. Does Ramone Have A Right To Recovery Based*

*On Promissory Estoppel?*

Ramone pleads in the alternative that, assuming he and Lang did not have an enforceable contract, that Lang promised to lease or otherwise make available to him the pool facilities on the Property for the Delaware Swim Team and Swim School. Ramone alleges that he relied on this promise and that Lang knew he was relying on use of the pool facility for the upcoming swim season no matter what the final deal structure. Based on this promissory estoppel claim, Ramone seeks damages and litigation costs.

Promissory estoppel involves "informal promises for which there was no bargained-for exchange but which may be enforceable because of antecedent factors that caused them to be made or because of subsequent action that they caused to be taken in reliance."[FN65] The purpose of the promissory estoppel doctrine is to prevent injustice.[FN66] Under Delaware law, to have a valid claim based on promissory estoppel, Ramone must show by clear and convincing evidence that (1) a promise was made; (2) it was the reasonable expectation of the promisor-in this case Lang-to induce action or forbearance on the part of the promisee; (3) the promisee, Ramone, reasonably relied on the promise and acted to his detriment; and (4) that such a promise is binding because injustice will be avoided only by enforcement of the promise.[FN67]

> FN65. *Chrin v. Ibrix, Inc.,* 2005 WL 2810599, at \*8 (Del. Ch. Oct. 19, 2005) (citing ERIC MILLS, ET. AL., CORBIN ON CONTRACTS,, § 8 .1, at 5 (Rev. ed.1996)). Promissory estoppel is viewed as a consideration substitute for promises which are reasonably relied upon, but which would otherwise not be enforceable. *See* CORBIN ON CONTRACTS, § 8.12, at 101 (Rev. ed.1996).

> FN66. *See Lord v. Souder,* 748 A.2d 393, 398-99 (Del.2000) (citing *Chrysler Corp. v. Quimby,* 144 A.2d 123, 133 (Del.1958)).

> FN67. *E.g., Chrysler Corp. v. Chaplake Holdings, Ltd.,* 822 A.2d 1024, 1032 (Del.2003); *Lord,* 748 A.2d at 398-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                                                    Page 16
Not Reported in A.2d, 2006 WL 905347 (Del.Ch.)
**(Cite as: 2006 WL 905347 (Del.Ch.))**

99;RESTATEMENT (SECOND) OF CON-
TRACTS § 90 (1981); FARNSWORTH ON
CONTRACTS § 2.19, at 174.

This case is well-suited for the application of the remedy of promissory estoppel as a gap filler. For some time, the application of promissory estoppel in our law has seemed a short-cut to obtaining even greater relief than would be available if a binding contract had been formed, without the necessity for complying with the greater strictures of contract law.[FN68] But promissory estoppel is fundamentally a narrow doctrine, designed to protect the legitimate expectations of parties rendered vulnerable by the very processing of attempting to form commercial relationships. For that reason, although it is permissible to award a party prevailing on a claim for promissory estoppel expectation damages comparable to that it would have received had the hoped-for contract actually been effected, the more routine role of promissory estoppel should be to assure that those who are reasonably induced to take injurious action in reliance upon non-contractual promises receive recompense for that harm.[FN69] Even when used in that careful manner, the doctrine of promissory estoppel hazards unfairness, as many possible contractual relationships in commerce require the hopeful partners to expend costs and put aside other opportunities in the hopes of forging an agreement. Therefore, courts must be chary about invoking the doctrine lightly, lest the normal failure of parties to reach a binding contract be penalized by an imprecise judicial cost-shifting exercise. Although the issue is not free from doubt, Ramone has convinced me that there exists a narrow basis to award him relief under the doctrine of promissory estoppel, even taking these important factors into account.

> FN68. As stated in Vice Chancellor Lamb's incisive concurring opinion in *Lord v. Souder,* "Corbin on Contracts, in describing Delaware promissory estoppel cases, begins by saying 'Sometimes less is more.' This implies that plaintiffs who succeed in arguing promissory estoppel in Delaware are awarded greater damages than if their cases were analyzed as enforceable contracts. To the extent this observation is true, it points out the need both to pay closer attention to

the distinction between contract and promissory estoppel in particular cases and to award remedies in cases of promissory estoppel with the same 'conservative judgment and extreme care' that characterizes common law courts' willingness to recognize reasons to enforce informal promises." 748 A.2d at 404 (internal citations omitted).*See* CORBIN ON CONTRACTS § 8.12, at 101 ("[I]n Delaware promissory estoppel has evolved and matured beyond being only a contract consideration substitute to support expectancy relief.").

> FN69.*See Doll v. Grand Union Co.,* 925 F.2d 1363 (11th Cir.1991) ( "[Defendant] urges the court to find that unless the agreement between the parties is legally enforceable, promissory estoppel is an inappropriate avenue for recovery. Such a holding would utterly eviscerate the doctrine of promissory estoppel which was designed specifically to address cases where the plaintiff has no legally enforceable rights but has suffered a loss due to reliance on the defendant's promises.").

**\*15** From February 2005 onward, Lang conducted himself towards Ramone in a manner that led Ramone to be trusting. In particular, Lang continually led Ramone and others to believe that Ramone would be using the pool facilities at the Property. A promisor's liability when based on reliance is limited by the scope of the promise and must be clear and definite.[FN70]"A promise is an expression of commitment to act in a specified way, or to bring about a specified result in the future, or to take responsibility that the result ... will occur, communicated in such a way that the addressee of the expression may justly expect performance...."[FN71] Lang made statements publicly to Lopata, the Newark Planning Commission, reporters, and the Newark City Council that Ramone would be involved in the redevelopment of the Property. In particular, Ramone's presence in the redevelopment was highlighted to show that the building's past use as a community center would continue because Ramone would operate his swim business, including opening the pool to the general public, from the Property.[FN72]In addition, Lang promised Ramone that

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 905347 (Del.Ch.)
**(Cite as: 2006 WL 905347 (Del.Ch.))**

no matter what might happen with the ownership structure of the LLC, Ramone could lease the pool at the very minimum.[FN72] Ramone's testimony on this issue is supported by the fact that all the deal structures contemplated by Lang and Ramone over the six months of negotiation all assumed Ramone's lease of the pool area.

FN70. FARNSWORTH ON CONTRACTS § 2.19, at 174-75.

FN71. CORBIN ON CONTRACTS § 8.9, at 29.

FN72. Lang's statements regarding Ramone's involvement in the deal, in particular as to Ramone's use of the pool, were taken seriously by the City Council. After Ramone was excluded from the final redevelopment, Lopata contacted Lang to inform him there were concerns on the City Council that the Property was not going to be used in the way that it had been represented it would be. Tr. at 412-13.

FN73. Tr. at 63-65.

It is significant also that Lang's email communications to his advisors through July reflect that Lang was planning on leasing the pool to Ramone even if Ramone did not become an owner in the LLC that owned the Property. Only in early August did Lang start to backtrack on this promise by informing his advisors that he might not lease to Ramone but to Ramone's competitor Team Delaware.[FN74] Even then, however, Lang had not closed off the possibility that Ramone might still be the one to lease the pool, and on August 3 Lamb told Bryde that although Ramone was out as an owner Ramone could lease the pool facility.[FN75] In sum, these representations constitute a "promise" for the purposes of the promissory estoppel doctrine. Lang's repeated representations suggested that the lease of the pool facility to Ramone was definite although other aspects of their business relationship might change. In these circumstances, Lang's representations and related conduct as to Ramone's lease of the pool constitute a clear and definite promise that Ramone would lease the pool.

FN74. Trial Ex. 46.

FN75. Trial Ex. 48.

Second, Lang reasonably could have expected that his statements and conduct would influence Ramone's behavior and cause him to pass on other opportunities to obtain access to an indoor pool. The second prong of the promissory estoppel standard requires a factual finding that the promisor-Lang-must have had reason to expect the reliance that occurred. The standard for testing expectation is an objective one.[FN76] I find that this standard was met. Statements of a promissory nature can reasonably be expected to induce reliance.[FN77] Lang publicly represented to the press and city officials that Ramone would be running his swim business from the Property. In addition, Lang knew of Ramone's timing requirements for an indoor pool [FN78] that Ramone needed the pool by early September-and many of Lang's email communications to Ramone, Abelson, and Lamb reference this timing constraint. Lang's repeated acknowledgment of this timing constraint also highlights that Lang had reason to know that Ramone would rely on being able to lease the pool on the Property. In fact, at one point Lang used the need to begin pre-closing construction on the facilities so that the pool could be ready by early September, which was when Ramone needed it, as justification that the deal needed to move forward more quickly. Thus, Lang's conduct between mid-February and the end of July sufficiently indicates that Lang was not only aware that he was inducing Ramone's reliance on rental of the pool area beginning in September, but that he actively encouraged Ramone to rely. Based on the above, Ramone believed Lang's promise and reasonably relied that he had the use of the pool facility.

FN76. FARNSWORTH ON CONTRACTS § 2.19, at 176.

FN77. ERIC MILLS HOLMES, CORBIN ON CONTRACTS § 8.9, at 29 (Rev. ed.1996).

FN78. Tr. at 337, 342.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 905347 (Del.Ch.)
**(Cite as: 2006 WL 905347 (Del.Ch.))**

**\*16** Third, to a discrete and modest extent necessary to support very tailored relief, Ramone reasonably relied on Lang's promise and acted to his detriment because of it. Actual reliance on the promise is necessary, and the reliance must have been the sort to have been reasonably expected.[FN79] As already described, Lang assured Ramone that he would be leasing the pool area. In reliance on Lang's statements, Ramone began advertising the new swim program in July. Ramone testified he distributed between 2,500 and 3,000 fliers and used word of mouth to promote the Delaware Swim Team and Swim School at a Newark location.[FN80] Lang admits that he knew about the fliers Ramone was using to promote the new Newark youth swim program by at least July 23.[FN81] Upon learning that Ramone was advertising his swim program as occurring at the Property, Lang never indicated to Ramone that Ramone's lease of the pool facility was uncertain or unresolved. By the time Ramone found out that he was not included in the LLC and that he was not going to be able to lease the pool facility on the Property, he already had children signed up for his Newark swim program, which he then had to cancel. Thus, Ramone reasonably relied on Lang's promise and acted detrimentally in reliance.[FN82]

FN79. FARNSWORTH ON CONTRACTS § 2.19, at 177.

FN80. Tr. at 65. In addition, Ramone testified that solely due to his interest in retaining access to the pool he was willing to agree to the revised deal structure proposed in late July that added a third partner and excluded a buyout option although this was not his preference. Tr. at 135-38, 143.

FN81. Tr. at 122-24, 382.

FN82. Ramone also testified that in reliance on Lang's promise he abandoned an alternate pool rental opportunity that he explored in January and February 2005 when this dialogue began with Lang. That opportunity involved the placement of bubbles over pools at a facility in Pike Creek, which he testified he had started to look into in early 2005. The record, however, does not support that Ramone's reliance at that early stage in his negotiations with Lang-taking place in January and February-can be considered reliance that was reasonably expected by Lang. Tr. at 52-53, 166-67, 215-16.

Finally, the standard for promissory estoppel requires that "a promise is binding because injustice can be avoided only by enforcement of the promise."[FN83] Frankly, the wording of this element of the promissory estoppel test-i.e., that injustice can be avoided only by enforcing the promise-is unfortunate, as it seems to require the court to grant specific performance or something like expectation damages as if an actual contract had been formed. Fortunately, sophisticated readers of the language recognize that it must not be taken literally. As one learned commentator notes, this aspect of the standard may seem like a foregone conclusion if the other three prongs of the standard are satisfied, but this standard has "the merit ... of invoking Justice and reminding the court that this particular rule cannot be applied by a mechanical process ... the clause is a suggestion that sometimes the answer should be No."[FN84]

FN83. "[P]romissory estoppel is more accurately described as a particular application or subcategory of the general doctrine of equitable estoppel, rather than as a principle of contract law that operates as a substitute for consideration." *Keating v. Bd. of Educ. of Appoquinimink Sch. Dist.,* 1993 WL 460527, at \*3 n. 3 (Del. Ch. Nov. 3, 1993) (citing John N. Pomeroy, *Equity Jurisprudence* § 808(b), at 212 (5th ed.1941)).

FN84. CORBIN ON CONTRACTS § 8.9, at 33.

Relatedly, the words "enforcement of a promise" have not been read as referring solely to specific performance or expectation damages but to an appropriate, case-specific remedy for the plaintiff, fashioned by the court using all of its powers from equity and the common law.[FN85] The quintessential remedy for promissory estoppel is an award of damages measured by the reliance costs reasonably incurred by the plaintiff.[FN86]

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 905347 (Del.Ch.)
**(Cite as: 2006 WL 905347 (Del.Ch.))**

FN85.CORBIN ON CONTRACTS § 8.9, at 33.

FN86.*See*CORBIN ON CONTRACTS § 8.8, at 22 ("The remedy given to a plaintiff who sues for breach of a promise on which plaintiff reasonably relied (but for which plaintiff gave no bargained-for equivalent) can be made dependent on the extent of the action or forbearance in reliance (reliance damages)."). Reliance damages are defined as "reimbursement of the expenditures and losses incurred by the promisee with the value of the promised performance."*Id.*

To this point, the Restatement (Second) of Contracts provides some guidance as to recovery under promissory estoppel. It states recovery "may be limited as justice requires,"<sup>FN87</sup> which allows the court to award recovery based on either expectation or reliance interests.<sup>FN88</sup>In addition, a Comment to <u>Restatement (Second) of Contracts section 90</u> provides:

FN87.RESTATEMENT (SECOND) OF CONTRACTS § 90(1) (1981).

FN88. As to which is appropriate, black letter law provides little guidance. *See* FARNSWORTH ON CONTRACTS § 2.19, at 182. Factors courts may consider include the disparity between an expectation interest of great value and a reliance interest of lesser value, which will encourage an award of reliance; and the difficulty of calculating recovery under one measure, which will encourage a court towards the other. *Id.* at 183 n. 49-52.

**\*17** [R]elief may sometimes be limited to restitution or to damages or to specific relief measured by the extent of the promisee's reliance rather than by the terms of the promise.... Unless there is unjust enrichment of the promisor, damages should not put the promisee in a better position than performance of the promise would have put him.<sup>FN89</sup>

FN89.RESTATEMENT (SECOND) OF CONTRACTS § 90, cmt. d.

In this case, the equities do not warrant an award of expectation damages. For starters, Ramone has not come close to meeting his burden of proving that Lang and he reached agreement on all material terms. This is not a case where the promisor induced reliance by the plaintiff that was uniquely valuable to the plaintiff by agreeing to a specific set of material terms, and then disavowed those terms once the promisor had reaped the benefits of the plaintiff's acts.<sup>FN90</sup> In this case, for the reasons I have already explained, there is no reliable basis to enforce any specific deal or to use any specific deal as the foundation for an award of expectation damages.

FN90. A case where this occurred and expectation damages were awarded is <u>RGC Int'l Investors, LDC v. Greka Energy Corp.</u> <u>2001 WL 984689, at \*14-\*15 (Del. Ch. Aug. 22, 2001)</u>. In that case, the defendant breached its contractual obligation to negotiate in good faith *and* was found liable under the doctrine of promissory estoppel. In particular, the defendant induced the plaintiff's acquiescence in a merger through the execution of a very detailed term sheet that was subject to completion of final documentation. After the merger that the defendant sought was approved, the defendant refused to conclude a contract by reneging on material issues that were already agreed upon in the prior term sheet. Thus, based on both the presence of defendant's bad faith and reasonable reliance, the court held that the plaintiff should receive its expectation interest. In its decision, the court highlighted that the defendant already had received all the consideration it had bargained for because it had reaped the benefits of the plaintiff's reliance, and more importantly, explained that the award of expectation damages was guided not by speculation but by how the parties themselves had agreed to value the defendant's obligations to the plaintiff in the term sheet. *Id.* at \*16.

Next, this is not a case where equity demands a capacious award. To the contrary, Ramone has fallen far

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 905347 (Del.Ch.)
**(Cite as: 2006 WL 905347 (Del.Ch.))**

short of convincing me that Lang acted in bad faith towards him.[FN91] After careful consideration, I am persuaded that Lang acted in the manner he did at the end of the negotiations out of genuine frustration with Ramone. Ramone's lackadaisical attitude and changing desires would have exasperated even the patient, among whose number are not typically counted real estate developers. Indeed, Ramone's behavior comes close to causing me to conclude that no remedy at all should be afforded to him. But, in the end, the equities do not incline me in that direction. Recovery based on Ramone's reliance interest is needed to remedy the harm that came to Ramone as a result of the actions he took in reasonable reliance upon Lang's promise. Thus, I find that under the fourth prong of the promissory estoppel standard injustice will occur if Ramone cannot recover damages to compensate him for his actions taken in reliance on Lang's promise.

> FN91. One learned commentator has stated that whether there was a lack of good faith on the part of the promisor may encourage a court towards use of expectation rather than simply reliance damages. *See* FARNSWORTH ON CONTRACTS § 2.19, at 183 n. 49-52.

Although I do not view Ramone's role in the zoning process to have been essential to Lang's success in that forum, Lang himself concedes that Ramone's help in that process was useful.[FN92] That help also placed Ramone in a publicly exposed and vulnerable position. By the mid-summer of 2005, Ramone had invested a good deal of (admittedly slow moving) activity in the expectation that the pool at the Property would be available for use by him. Rather than look for other opportunities, he reasonably focused on the pool, having received assurances that in some reasonable form or another (as a co-owner or lessee) access would be his. Lang himself encouraged the press to focus on Ramone's expected role at the Property, increasing the reputational pressure on Ramone to participate and deliver services there. During the summer, Ramone relied on the assurances of Lang by foregoing an examination of other opportunities to secure access to an indoor pool and by circulating fliers announcing that he would be running a swim program at the Property in autumn 2005. By August,

Ramone was in a more vulnerable position than Lang. Lang had other investors to help him share the risk in purchasing the Property. Lang also had reason to believe that he could find another lessee for the pool at the Property, a lessee that happened to be Ramone's principal competitor.

> FN92. Ramone also contends that because his role in structuring the transaction and obtaining the necessary zoning amendment was as important, and with regards to the latter possibly more important than Lang's, he should receive damages equal to half the LLC or half the gain from the redevelopment of the Property. This, however, would be an award of specific performance or expectancy that is not justified. Besides the lack of a contract or a de facto partnership, Ramone has overstated his role in obtaining the zoning approvals. There is no doubt that Ramone's reputation in the community brought credibility to the redevelopment plan and use of the Property. Although Lang's process for obtaining needed approvals may have been more difficult without Ramone, there is nothing in the record suggesting that without him Lang would not have secured the zoning changes.

**\*18** In these unique circumstances, I conclude that it would unjust to permit Lang to walk away without providing Ramone with succor for the harm he suffered in reliance upon Lang's assurances that the pool would be available to him in autumn 2005 on reasonable terms. However frustrating Ramone's conduct was to Lang, he was not justified in pulling the rug out from under Ramone completely.

Most particularly, Lang's conduct in proposing to lease the pool to Ramone's principal competitor during the 2005-2006 swim season threatened to punish Ramone for his reasonable reliance. After telling the press that Ramone was his partner and would have access to the pool at the Property, Lang turned around and sought to give access to the pool to Ramone's competitor at a time when Ramone could not protect himself by making other arrangements. If that plan had been accomplished, Ramone would have faced not only competitive injury but some de-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 905347 (Del.Ch.)
**(Cite as: 2006 WL 905347 (Del.Ch.))**

gree of public humiliation.

The problem for Ramone at this stage is that the court has already taken serious remedial action that largely protected his reliance interest. Since trial in this case, an injunction has prevented Lang from leasing the pool to Team Delaware or from entering any other lease of the pool to any party that is not terminable on sixty-days notice. The only other relief that might be in order to protect Ramone's reliance interest is monetary relief of some exceedingly modest variety, tailored to his costs for advertising for the 2005-2006 swim program in Newark, and, as only a possibility for later consideration, the value of the modest time Ramone spent helping in the zoning approval process.[FN93]

Because of the expedited nature of the trial, the parties agreed to leave the quantification of monetary damages for a separate proceeding. But what is clear now and not subject to further litigation is the scope of any claim of damages.[FN93] In that respect, I conclude that there is no basis for Ramone to seek recompense for Bryde's fees in the negotiation process with Lamb, as those costs are no different from the legal fees incurred by Lang in trying to reach accord with Ramone. No evidence regarding the cost of Bryde's services shall be presented at the further trial. Likewise, there is no basis to believe that Ramone forewent a specific pool acquisition opportunity in reasonable reliance on Lang and he will not be afforded an opportunity to improve his unconvincing trial testimony on that score. In sum, the trial will be very narrow and will likely involve the accrual of litigation costs out of proportion to what Ramone is likely to obtain.[FN94]

> FN93. Ramone should plan to submit proof of the expenses he incurred in promoting the Newark-based youth swim program and any concrete costs of canceling the program. Although new costs within these categories are appropriate, such as promotion expenses other than the fliers, new categories of reliance costs are not. *See* Ct. Order (Case Scheduling Order dated Oct. 20, 2005).

> FN94. For that reason, the parties should again consider whether they cannot settle

their differences. Obviously, a trial also will involve expense for Lang.

Finally, the injunction in place shall be terminated to allow for the unrestricted leasing of the pool at the Property, effective September 1, 2006. Ramone has been on fair notice for a long time of the need to secure another facility. If, as he contends, he was in a position to acquire the Property by himself, he has the financial wherewithal to figure out an alternative. Through the current injunction, Ramone has been protected against the potential of unfair and humiliating competition from a competitor. Ramone must use the lengthy breathing space he has been afforded to make alternate arrangements or even enter a lease with Lang. An injunction beyond September 1 would be inequitably disproportionate.

**\*19** Likewise, the equities do not come close to justifying fee shifting, which Ramone seeks. Under the American rule, fee shifting is justified only under extraordinary circumstances. Lang's conduct, while not praiseworthy, falls well short of the egregious bad faith conduct that warrants fee shifting.[FN95]

> FN95.*See* _Delaware Correctional Officers Ass'n v. State,_ 2003 WL 23021927, at *8 n. 37 (Del. Ch. Dec. 18, 2003) (stating that "a party must pay its own legal fees unless ... the opposing party has engaged in bad faith, vexatious, or oppressive conduct."); _Kirkpatrick v. Caines Landing Wildlife Preserve Ass'n,_ 1992 WL 332104, at *6 (Del. Ch. Nov. 12, 1992) ("Delaware courts follow the American Rule under which each party to a litigation pays its own attorneys' fees. Equity recognizes only limited exceptions to that doctrine.").

### III. *Conclusion*

For the foregoing reasons, neither a contract nor a partnership existed between Lang and Ramone. Ramone, however, is entitled to reliance damages based on promissory estoppel. Each side to bear its own costs. The parties together will contact the court to schedule a time for the hearing on damages.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 905347 (Del.Ch.)
**(Cite as: 2006 WL 905347 (Del.Ch.))**

Del.Ch.,2006.
Ramone v. Lang
Not Reported in A.2d, 2006 WL 905347 (Del.Ch.)

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

Slip Copy                                                                                                    Page 1
Slip Copy, 2009 WL 1469831 (Bkrtcy.D.Del.), 51 Bankr.Ct.Dec. 184
**(Cite as: 2009 WL 1469831 (Bkrtcy.D.Del.))**

**H**Only the Westlaw citation is currently available.

United States Bankruptcy Court,
D. Delaware.
In re W.R. GRACE & CO., et al., Debtors.
**No. 01-1139-JKF.**

May 19, 2009.

**Related to Doc. No. 18922, Debtors' Objection to
the Unsecured Claims Asserted Under the Debt-
ors' Credit Agreements Dated as of May 14, 1998,
and May 5, 1999.**

**MEMORANDUM OPINION**[FN1]

> FN1. This Memorandum Opinion consti-
> tutes the court's findings of fact and conclu-
> sions of law.

JUDITH K. FITZGERALD, Bankruptcy Judge.

**\*1** The matter before the court is Debtors' objection
to the claims of their prepetition Bank Lenders. The
objection is premised on §§ 502(b), 105(a), 726, and
1129 of the Bankruptcy Code. JPMorgan Chase
Bank, in its capacity as agent for the Bank Lenders,
filed Claim Numbers 9159 and 9168 as unsecured
claims but included postpetition default inter-
est.[FN2] See Exhibits A and B to Doc. No. 18922. It is
the default interest portion of the claims to which
Debtors object. For the reasons which follow we hold
that the Bank Lenders are not entitled to postpetition
interest at the default rate and we will sustain Debt-
ors' objection on the limited § 502(b) and § 726
grounds asserted in the objection. We defer decision
regarding § 1129.

> FN2. The proofs of claim also include de-
> mands for interest that was due on the date
> of the filing of the bankruptcy but the parties
> agree there was no prepetition default and
> that no such interest is owed.

Relevant to the way the parties framed the issue is
how the pending plan treats the Bank Lenders'
claims. The plan of reorganization filed in 2008 pro-
vides for payment in full of the principal amount of
the Bank Lenders' claims plus interest in a percentage
in excess of the nondefault contract rate but less than
the contract default rate.[FN3] The 2008 plan is the result
of agreement among Debtors, the Asbestos Claim-
ants' Committee (ACC") and the Future Claims Rep-
resentative ("FCR"). The plan has not yet been con-
firmed [FN4] and does not propose to pay all allowed
claims at 100 percent of the amounts they would re-
ceive absent the intervention of a § 524(g) trust. [FN5]

> FN3. Under a plan negotiated in 2005 an in-
> terest rate of 6.09 percent was negotiated
> and memorialized in a letter agreement. See
> Doc. No. 19072, Exh. A, Letter Agreement
> dated January 12, 2005, from Lewis Kruger,
> Counsel for Creditors' Committee, to Janet
> S. Baer, Counsel for Debtors ("the 2005 Let-
> ter Agreement"). A further agreement was
> entered into between Debtors and the Credi-
> tors' Committee in February of 2006 which
> provided that, in exchange for the Commit-
> tee's continued support of the 2005 plan,
> Debtors would pay Lenders postpetition in-
> terest at 6.09 percent through December 31,
> 2005, and, beginning January 1, 2006, inter-
> est at a floating adjusted interest rate tied to
> the prime. See Doc. No. 19476 at 8, ¶ 18.
> See Doc. No. 19072, Exh. B, Letter Agree-
> ment dated February 27, 2006 ("the 2006
> Letter Agreement"). Under the 2005 Letter
> Agreement, the Creditors' Committee was
> permitted to withdraw as a proponent of the
> 2005 plan if certain events did not occur,
> one of which was confirmation of that plan.
> That plan was never presented for confirma-
> tion and is no longer before the court. There-
> fore, it would appear that the 2005 Letter
> Agreement, as amended by the 2006 Letter
> Agreement, is no longer in effect.

The question was raised as to whether the
Creditors' Committee as constituted in

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

2005 agreed on the rate in 2005 and 2006 as a committee which represented all its members or whether Committee members each agreed on their own behalf and not as authorized representatives of other Committee members and the Committee as a whole. In the former instance successors in interest such as the current Bank Lenders would be bound by the agreement. In the case before us the 2005 letter agreement was signed only by the Creditors' Committee chairman, Thomas F. Maher, of J.P. Morgan Chase & Co., agent for the Bank Lenders, on behalf of the entire Committee. Mr. Maher was the "point person" for the 2005 Plan negotiations. Doc. No. 19476, Debtors' Trial Brief in Support of Objection to Unsecured Claims Asserted Under Credit Agreements, at 5; Doc. No. 19323, Declaration of Robert M. Tarola, Senior Vice President-Corporate Strategy and former Chief Financial Officer of W .R. Grace & Co., in Support of Debtors' Objection, at 2, ¶ 3. Thus, the agreement was entered into on behalf of the entire Committee. Distinguish *In re Adelphia Communications Corp., 368 B.R. 140, 232 (Bankr.S.D.N.Y.2007)*(agreement executed by members only in their individual capacities, not as authorized representatives of any other entity).

FN4. The plan confirmation hearing begins in June, 2009, and continues in July and September.

FN5. For example, the ZAI property damage claims to be paid through a § 524(g) trust will receive a contribution toward the cost of removal of asbestos-containing Zonolite Attic Insulation ("ZAI"). The personal injury asbestos claims will be paid according to matrix values.

Bank Lenders make three arguments. First, Bank Lenders base their assertion to payment of interest at the default rate in their contracts on the presumption that Debtors have conceded solvency because the

2008 plan as proposed permits equity to retain an interest. As to the solvency issue, we conclude that the Bank Lenders' presumption that Debtors are solvent is not established. The Bank Lenders also assert that the default rate is required to satisfy the fair and equitable standard and best interests of creditors test applicable in some circumstances at the plan confirmation phase of the case. We find that issues concerning whether the plan is fair and equitable or is in the best interests of creditors must be reserved for the plan confirmation hearing. Finally, the Bank Lenders assert entitlement to the default rate based on alleged postpetition defaults by the Debtors. However, we find no evidence presented to substantiate a default on Bank Lenders' claims.

To begin the analysis, we note that under § 502(b)(2) allowed claims do not include unmatured interest. As stated in *In re Dow Corning Corp., 244 B.R. 678, 685 (Bankr.E.D.Mich.1999)*, if a claim is entitled to interest the interest is paid on the allowed claim, not as the allowed claim. Here, Bank Lenders hold unsecured claims. The question then becomes what kind of interest is the creditor entitled to receive. The presumption is that unsecured creditors receive no interest at all. There are exceptions to that rule: under § 506(b) when a creditor is oversecured and under § 726(a)(5) when the debtor is shown to have sufficient funds on hand to pay interest after distributions authorized by § 726(a)(1)-(a)(4) are made. At this stage of these proceedings the Bank Lenders do not meet the standard under either exception as we explain in more detail below.

*2 We address first the last of Bank Lenders' assertions, i.e., that Debtors defaulted under the loan agreements by (a) incurring postpetition nonmonetary covenant defaults, (b) filing bankruptcy, and (c) failing to make quarterly interest payments postpetition.

### (a) Postpetition Nonmonetary Defaults

The only default mentioned in this category is Debtors' alleged failure to meet certain reporting requirements under the loan documents. Bank Lenders did not specify the reporting requirements that were not met and do not deny that during the course of this case Debtors have complied with the reporting requirements of the Bankruptcy Code. Moreover, the

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2009 WL 1469831 (Bkrtcy.D.Del.), 51 Bankr.Ct.Dec. 184
**(Cite as: 2009 WL 1469831 (Bkrtcy.D.Del.))**

Bank Lenders, which continued to serve as lenders postpetition, have never, in the 8-year life of this case, expressed dissatisfaction with Debtors' reporting or filed any requests in connection therewith until they responded to Debtors' objection to their claims. For purposes of this Memorandum Opinion, we have insufficient evidence that any alleged reporting failures under the loan documents constitute a default of a type that would trigger any default interest provision in the loan documents.

(b) *Filing Bankruptcy as an Event of Default Giving Rise to Obligation to Pay Default Interest Rate*

As a matter of law, the bankruptcy filing *per se* is not a permissible basis for invoking the contract default interest rate. Section 365(e) of the Bankruptcy Code prohibits enforcement of *ipso facto* clauses in contracts. *See* In re IT Group, Inc., Co., 302 B.R. 483, 486 (D.Del.2003).

(c) *§ 502(b) and Postpetition Quarterly Interest Payments*

The Bank Lenders' proofs of claim include, *inter alia,* pre- and postpetition interest. It is undisputed that there were no prepetition defaults with respect to the obligations to the Bank Lenders and so no prepetition interest is owed.

As noted above, an unsecured creditor is not entitled to unmatured postpetition interest unless (a) debtor is shown to be solvent after all distributions are made, 11 U.S.C. § 726, or (b) the creditor is oversecured. 11 U.S.C. § 506. *See also* Matter of Plunkett, 191 B.R. 768, 779 (Bankr.E.D.Wis.1995), *affirmed* 82 F.3d 738 (7th Cir.1996).Section 502(b)(2) prohibits the allowance of unmatured interest as part of an allowed unsecured claim. *In re Coram Healthcare Corp.,* 315 B.R. 321, 324 (Bankr.D.Del.2004). If interest is paid with respect to an unsecured claim at all, it is paid *on* an allowed claim, not *as* an allowed claim. *In re Dow Corning Corp.,* 244 B.R. 678, 685 (Bankr.E.D. Mich.1999). Furthermore, nonpayment of postpetition interest is not a default. The fact that the Bankruptcy Code precluded Debtors from paying postpetition interest means that Debtors will not be held to have defaulted for that reason. *See* In re NextWave Personal Communications, Inc., 244 B.R. 253, 264

(Bankr.S.D.N.Y.2000)(failure to make postpetition payments cannot be deemed a default when the payments are prohibited by the Bankruptcy Code). In general, the Bankruptcy Code prohibits payment of postpetition interest on unsecured claims and the Bank Lenders hold only unsecured claims.[FN6]For these reasons, Bank Lenders have not shown entitlement to default interest.

FN6."The age-old rule in bankruptcy, adopted from the English system, is that interest on claims stops accruing when the bankruptcy petition is filed.... In other words, creditors cannot recover postpetition interest.... One justification for the rule is that it promotes certainty.... By setting a date when interest stops, the rule saves the trustee from having to continuously recalculate the amount due each creditor.... It also saves the estate from having to pay extra for the delay in payment when that delay is necessary if the courts are to preserve and protect the estate for the benefit of all creditors.... Further, the rule prevents any unmerited gain or loss by creditors whose claims have different interest rates ...; all are treated equally." Matter of Fesco Plastics Corp., Inc., 996 F.2d 152, 155 (7th Cir.1993).

**\*3** Turning next to the issue of solvency, Bank Lenders argue that the issue is not governed by § 502 but by the "fair and equitable" requirements of § 1129. Bank Lenders assert that if they are not paid the default rate of interest, the plan cannot be found to be fair and equitable. The argument is premised on their assertion that Debtors have conceded solvency. Bank Lenders cite no cases, and our research has pointed us to no authority, that stand for the proposition that a debtor is presumed to concede solvency when a proposed plan provides for retention of interest by, or distribution to, equity. Debtors' solvency or lack thereof has not been established in this case. Furthermore, § 1129 concerns plan confirmation standards and we are not at that stage of these proceedings. This is a claims objection matter.

(d) *Exceptions to § 502(b)(2)*

Section 502(b)(2) prohibits allowance of unmatured

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 01-01139-AMC    Doc 22444-1    Filed 07/14/09    Page 26 of 29

Slip Copy                                                                                              Page 4
Slip Copy, 2009 WL 1469831 (Bkrtcy.D.Del.), 51 Bankr.Ct.Dec. 184
**(Cite as: 2009 WL 1469831 (Bkrtcy.D.Del.))**

interest as included within an allowed claim. There are two exceptions to § 502(b)(2)-one is under § 506(b) when a creditor is oversecured and the second is under § 726(a)(5) when a debtor has sufficient funds left after paying other allowed claims (i.e., those in § 726(a)(1)-(a)(4)) to pay interest, in which case the creditor is entitled to interest at the legal rate.[FN7] *See In re Shoen,* 176 F.3d 1150, 1153 at n. 2 (9th Cir.1999), *cert. denied* 528 U.S. 1075 (2000).

> FN7. According to Debtors, the federal judgment rate of interest when the bankruptcy was filed was 4.19 percent. As of the date of filing of the bankruptcy the contract default rate was 7.77 percent and the nondefault contract rate was 5.77 percent. As noted, the proposed interest rate under the plan is 6.09 percent. Doc. No. 18922 at 5, ¶ 12. *See* note 3, *supra.*

*(i) § 506(b), Oversecured Creditors*

Section 506(b) provides that an oversecured creditor shall be paid interest on its claims as "provided for under the agreement or State statute under which the claim arose." The Bank Lenders are unsecured, not oversecured, and, therefore, § 506 does not apply.

Bank Lenders rely heavily on one case discussing default interest to unsecured creditors, *In re Dow Corning Corp.,* 456 F.3d 668, 679-80 (6th Cir.2006), *cert. denied* 549 U.S. 1317 (2007). The case is inapposite. Again, the underpinning of Bank Lenders' arguments is a presumption that Debtors are solvent, a fact not established here. Even if Debtors are presumed to be solvent solely for purposes of this discussion, payment of interest at the default rate depends on the equities of the case. *Dow Corning* recognized that "[c]ourts in solvent debtor cases have overwhelmingly concluded that there is a presumption that the default interest rate should be allowed .... unless the higher rate would produce an inequitable result." 456 F.3d at 680.[FN8] *Dow Corning* noted that, in solvent debtor cases, "courts have generally confined themselves to determining and enforcing whatever prepetition rights a ... creditor has against the debtor," absent compelling equitable considerations. *Id.* at 679. Thus, even in the case Bank Lenders rely on, payment of the default rate depends on the equi-

ties of the case and is not an entitlement. *Dow Corning* also noted that, because solvent bankruptcy estates are somewhat rare, most courts considering whether to award default interest "have done so in the context of an insolvent debtor" and have concluded that "default interest need not be awarded in every instance for a plan to pass muster under § 1129(b)(1)." 456 F.3d at 678-79.

> FN8. Furthermore, the issue in *Dow Corning* was different. Under the plan in *Dow Corning* all unsecured creditors were to be paid in full with interest at the federal judgment rate. Most of their contracts provided for *nondefault* interest at a rate that exceeded the federal judgment rate in effect at the time and they objected to confirmation. Here, Bank Lenders will be paid interest at a rate higher than their nondefault rate.

*\*4* The cases *Dow Corning* relied upon, moreover, had no factual similarity to the case at bench. *Dow Corning* looked at, *inter alia, Matter of Southland Corp.,* 160 F.3d 1054 (5th Cir.1998), *Matter of Terry Ltd. Partnership,* 27 F.3d 241 (7th Cir.), *cert. denied sub nom. Invex Holdings, N.V. v. Equitable Life Ins. Co. of Iowa,* 513 U.S. 948 (1994); *In re Casa Blanca Project Lenders, L.P.,* 196 B.R. 140 (9th Cir. BAP1996). All three cases involved oversecured creditors and *Casa Blanca* and *Terry Limited Partnership* involved sales of collateral securing the creditors' claims, not payment of claims through reorganization in a plan confirmation. Most, if not all, of the cases relied on in *Dow Corning* involved prepetition defaults as well as oversecured creditors. The cases involving § 506 oversecured creditors or sales of oversecured creditors' collateral are inapplicable here.[FN9]

> FN9. *Matter of Southland Corp.,* 160 F.3d 1054 (5th Cir.1998)(debtor defaulted prepetition and had been notified prepetition by oversecured creditors that the default interest rate was in effect; oversecured creditors held entitled to default interest); *Matter of Terry Limited Partnership,* 27 F.3d 241, 243 (7th Cir.1994)(collateral of an oversecured mortgagee was sold postpetition; debtor had defaulted prepetition; there is a "presump-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 01-01139-AMC    Doc 22444-1    Filed 07/14/09    Page 27 of 29

Slip Copy                                                                                    Page 5
Slip Copy, 2009 WL 1469831 (Bkrtcy.D.Del.), 51 Bankr.Ct.Dec. 184
**(Cite as: 2009 WL 1469831 (Bkrtcy.D.Del.))**

tion in favor of the [default] contract rate subject to rebuttal based upon equitable considerations"); *In re Casa Blanca Project Lenders, L.P.,* 196 B.R. 140 (9th Cir. BAP1996) (oversecured creditor's collateral was sold during the course of a chapter 11; the court held that the nondefault contract rate applied subject to rebuttal for equitable considerations).

*General Elec. Capital Corp. v. Future Media Productions, Inc.,* 536 F.3d 969 (9th Cir.2008), criticized the holding in *Casa Blanca* insofar as it "transposed the concept of 'cure' from § 1124 and § 365 into ... § 363." 536 F.3d at 974. The Court of Appeals in *General Electric Capital* held that the Bankruptcy Code does not preclude an oversecured creditor from collecting interest at the contract default rate when the claim was being paid from the proceeds of a sale of assets securing the claim and the debtor was not curing a prepetition default under the plan.

The only issue ripe for adjudication is whether, as unsecured creditors, Bank Lenders are entitled to the default rate of interest as a matter of claim allowance and we conclude that they are not. Whether as a matter of plan confirmation default interest should be awarded on the Bank Lenders' claims is not before us as: (a) we are not at the plan confirmation stage; (b) we have no evidence of solvency or insolvency; (c) Bank Lenders are unsecured creditors who will be paid in full with interest at a rate higher than their contract rate; (d) there is no prepetition default; and (e) there is no evidence of postpetition defaults that would trigger any default interest provisions in the loan documents.

*(ii) § 726(a)(5) Solvency*

Bank Lenders face another obstacle. Section 726(a)(5) provides that, if a debtor is solvent, interest is to be paid at the legal rate, not at the contract default rate.[FN10] Section 726(a)(5) is applicable to chapter 11 cases through § 1129(a)(7) and provides for payment of interest "at the legal rate" if the creditor has not accepted the plan.[FN11] *In re Coram Health-*

*care    Corp.,    315    B.R.    321,    346 (Bankr.D.Del.2004)* (citing cases). There are three approaches to the definition of "the legal rate of interest." One is the state law approach which provides that if a contract establishes an interest rate that contract rate is the legal rate. The second is that when a specific state statute sets a rate of interest, that rate is the legal rate. The third, the federal judgment rate approach, dictates that the legal rate is that established by 28 U.S.C. § 1961. *See In re Beguelin,* 220 B.R. 94, 99 (9th Cir. BAP1998). The Ninth Circuit Court of Appeals, in a well-reasoned opinion, has concluded that the "legal rate" for purposes of § 726(a) is the federal judgment rate. *See In re Cardelucci,* 285 F.3d 1231, 1235 (9th Cir.), *cert. denied* 537 U.S. 1072 (2002)(award of postjudgment interest is dictated by federal law). Regardless of which approach would be selected here, *none* would be the default rate.

FN10. In a slightly different context, the U.S. Supreme Court addressed the purpose of § 726(a)(5) and found that it "requires no more than that undersecured creditors receive postpetition interest from a solvent debtor on equal terms with unsecured creditors rather than ahead of them...." *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Associates, Ltd.,* 484 U.S. 365, 379 (1988).

FN11. Under § 1129(a)(7)(A)(ii), an impaired class of claims must receive or retain property under the plan on account of each claim of a value, as of the plan effective date, that is not less than the holder would retain or receive if the debtor were liquidated under chapter 7 on that date.

*5 Bank Lenders argue that Debtors are presumed to be solvent because the 2008 plan provides a distribution to, or retention of interest by, equity. Bank Lenders cite no authority for the proposition that a debtor is presumed solvent simply because equity is to retain an interest under the plan. Likewise, they cite no cases for the proposition that a debtor concedes solvency when equity retains an interest under a proposed plan. *See Matter of West Texas Marketing Corp.,* 54 F.3d 1194, 1198 (5th Cir.), *cert. denied sub*

Slip Copy                                                                                                        Page 6
Slip Copy, 2009 WL 1469831 (Bkrtcy.D.Del.), 51 Bankr.Ct.Dec. 184
**(Cite as: 2009 WL 1469831 (Bkrtcy.D.Del.))**

nom. _Kellogg v. U.S.,_ 516 U.S. 991 1995)(implicit in § 726 obligation to pay postpetition interest on unsecured claims sufficient assets must remain following distributions under § 726(a)(1)-(a)(4). The obligation "is ignored until the time the court determines whether the debtor's assets can meet the obligation ." _Id._ at 1203.

Bank Lenders concede that the doctrine that unsecured creditors are entitled to postpetition interest only when a debtor is solvent is based upon Congressional policy that one creditor group should not benefit at the expense of another. Bank Lenders do not explain why paying the contract default rate of interest only to them is consistent with that policy but it does not matter-the law simply does not _entitle_ any creditor in the position of the Bank Lenders to a default rate of interest. Our research has indicated, at best, a presumption of postpetition default interest payable to unsecured creditors only when solvency has been determined as a matter of fact which, in this case, it has not, or where the creditor is oversecured, which Bank Lenders are not. Even oversecured creditors do not have an absolute right to default interest; equitable considerations come into play.

Next, we address the plan confirmation issues.

### (e) _§ 1129_

Bank Lenders argue that if they are not paid the default interest, the plan is not fair and equitable under § 1129(b), does not meet the best interests of creditors test of § 1129(a)(7), and does not comport with the absolute priority rule. As stated above, these issues cannot be addressed until the plan confirmation hearing. They are not ripe at this time.

### (f) _Inapplicability of Other Cases Cited by Bank Lenders_

Other cases cited by the Bank Lenders do not support their position. For example, the Bank Lenders cite _In re Armstrong World Industries, Inc.,_ 432 F.3d 507 (3d Cir.2005), where the plan did not pay unsecured creditors the allowed amount of their claims in full but ensured that equity retained an interest, whether or not a class senior to equity consented. _Armstrong_

is of no use to the Bank Lenders here inasmuch as the 2008 plan proposes to pay them 100 percent of the allowed amount of their claims in accord with § 1129(b)(2)(B), plus interest in excess of the nondefault rate provided in their contract.

Bank Lenders point to the default interest rate to be paid to unsecured creditors in plans confirmed in _In re USG Corporation,_ Bankruptcy No. 01-2094 (Bankr.D.Del.), and _In re Owens Corning,_ Bankruptcy No. 00-3837 (Bankr.D.Del.). _USG_ and _Owens Corning_ involved plans in which the interest rate was not contested so are not germane. Neither involved a determination by the bankruptcy court that the default interest rate was required or appropriate.

**\*6** The parties dispute the effect of the decision in _In re PPI Enterprises (U.S.), Inc.,_ 324 F.3d 197 (3d Cir.2003). In _PPI Enterprises_ the Court of Appeals for the Third Circuit agreed with the bankruptcy court's holding that a solvent debtor must pay postpetition preconfirmation interest on a claim in order for that claim to be unimpaired. However, the court said nothing about the interest being paid at the default rate and the case cannot be read to require the default rate to be paid.

### (g) _Summary_

In summary, we find that the Bank Lenders are not entitled to the postpetition default rate of interest as part of their allowed claims pursuant to § 502 because Debtors have not been established to be solvent and Bank Lenders are unsecured creditors that, pursuant to the proposed plan, will be paid 100 percent of the principal balance of their claims plus interest thereon at a rate greater than the nondefault rate provided in their contracts. Thus, as a matter of claims allowance in the current posture of this case, Debtors' objection to the claims with respect to default interest is sustained and default interest is disallowed as part of the allowed claim. Whether default interest is appropriate to be paid on the Bank Lenders' allowed claims in the context of plan confirmation must await the plan confirmation hearing and the evidence adduced at that time.

An appropriate order will be entered.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                    Page 7
Slip Copy, 2009 WL 1469831 (Bkrtcy.D.Del.), 51 Bankr.Ct.Dec. 184
**(Cite as: 2009 WL 1469831 (Bkrtcy.D.Del.))**

**ORDER SUSTAINING DEBTORS' OBJECTION TO UNSECURED CLAIMS INSOFAR AS CLAIMS INCLUDE POSTPETITION INTEREST AT THE CONTRACT DEFAULT RATE**

**AND NOW**, this **19th** day of **May, 2009,** for the reasons expressed in the foregoing Memorandum Opinion, it is **ORDERED** that Debtors' objection to the claims of Bank Lenders is **SUSTAINED** insofar as there is no entitlement to postpetition interest at the contract default rate on the principal balance of claims 9159 and 9168, which are unsecured. Plan confirmation issues are preserved.

It is **FURTHER ORDERED** that Debtors shall serve a copy of this Memorandum Opinion on and Order all parties in interest who do not receive electronic notice and shall file a certificate of service forthwith.

Bkrtcy.D.Del.,2009.
In re W.R. Grace & Co.
Slip Copy, 2009 WL 1469831 (Bkrtcy.D.Del.), 51 Bankr.Ct.Dec. 184

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.