UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                       .   Case No.  01-01139 (JKF)
                             .   Jointly Administered
W.R. GRACE & COMPANY,        .
et al.,                      .   5414 U.S. Steel Tower
                             .   600 Grant Street
                             .   Pittsburgh, PA 15219
          Debtors.           .
                             .   June 23, 2009
. . . . . . . . . . . . . ..     9:10 a.m.


TRANSCRIPT OF HEARING
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtors:          Kirkland & Ellis, LLP
                          By:  DAVID BERNICK, ESQ.
                               BARBARA HARDING, ESQ.
                               JANET BAER, ESQ.
                               LISA ESAYIAN, ESQ.
                          200 East Randolph Drive
                          Chicago, IL  60601

For the Debtors:          Kirkland & Ellis, LLP
                          By:  JUSTIN BROOKS, ESQ.
                          Citigroup Center
                          601 Lexington Avenue
                          New York, NY  10022-4611

For the Debtors:          Kirkland & Ellis, LLP
                          By:  THEODORE FREEDMAN, ESQ.
                          Citigroup Center
                          601 Lexington Avenue
                          New York, NY  10022-4611

Audio Operator:           Janet Heller

Proceedings recorded by electronic sound recording, transcript
                produced by transcription service.

---

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609)586-2311     Fax No. (609) 587-3599**

APPEARANCES (CONT'D):

| | |
|---|---|
| For W.R. Grace: | Pachulski Stang Ziehl & Jones, LLP<br>By:  JAMES E. O'NEILL, III, ESQ.<br>919 North Market Street, 17th Floor<br>Wilmington, DE  19899 |
| For W.R. Grace: | W.R. Grace<br>By:  MARK SHELNITZ, ESQ.<br>7500 Grace Drive<br>Columbia, MARK DELEEEUW  21044 |
| For the Equity<br>Committee: | Kramer Levin Naftalis & Frankel LLP<br>By:  GREGORY A. HOROWITZ, ESQ.<br>1177 Avenue of the Americas<br>New York, NY  10036 |
| For the PD Committee: | Bilzin Sumberg Baena Price &<br>  Axelrod LLP<br>By:  MATTHEW KRAMER, ESQ.<br>200 South Biscayne Boulevard<br>Suite 2500<br>Miami, FL  33131 |
| For the ACC: | Caplin & Drysdale, Chartered<br>By:  PETER LOCKWOOD, ESQ.<br>     KEVIN C. MACLAY, ESQ.<br>One Thomas Circle, NW<br>Washington, D.C.  20005 |
| For the<br>Unsecured Creditors'<br>Committee: | Stroock & Stroock & Lavan<br>By:  KENNETH PASQUALE, ESQ.<br>     ARLENE KRIEGER, ESQ.<br>     180 Maiden Lane<br>     New York, NY  10038-4982 |
| For Committee of<br>Asbestos Personal<br>Injury Claimants: | Campbell & Levine<br>By:  MARK T. HURFORD, ESQ.<br>800 North King Street<br>Suite 300<br>Wilmington, DE  19701 |
| For Arrowood/Royal: | Wilson Elser Moskowitz Edelman &<br> Dicker, LLP<br>By:  CARL J. PERNICONE, ESQ.<br>150 East 42nd Street,<br>New York, NY  10017 |
| For General Insurance<br>Co. of America: | Sonnenschein Nath & Rosenthal LLP<br>By:  ROBERT B. MILLNER, ESQ.<br>233 South Wacker Drive, Suite 7800<br>Chicago, IL  60606 |

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (CONT'D):

For PD FCR:              Law Office of Alan B. Rich
                         By:  ALAN RICH, ESQ.
                         1201 Main Street, Suite 1910, LUCAS
BERGEN 201
                         Dallas, TX

For CNA:                 Goodwin Proctor
                         By:  DANIEL GLOSBAND, ESQ.
                              MICHAEL S. GIANNOTTO, ESQ.
                         901 New York Avenue, N.W.
                         Washington, DC  20001

For Sealed Air:          Skadden, Arps, Slate, Meagher &
                           Flom, LLP
                         By:  DAVID TURETSKY, ESQ.
                              J. GREGORY ST. CLAIR, ESQ.
                         Four Times Square
                         New York, NY  10036

For GEICO, Seaton        Drinker Biddle & Reath LLP
Ins. Co., Republic       By:  MICHAEL F. BROWN, ESQ.
Ins. Co.:                     JEFFREY M. BOERGER, ESQ.
                         One Logan Square
                         18th and Cherry Streets
                         Philadelphia, PA  19103

                         Drinker Biddle & Reath LLP
                         By:  WARREN T. PRATT, ESQ.
                         1100 N. Market Street, Suite 1000
                         Wilmington, DE  19801

For Fresenius:           McDermott Will & Emery
                         By:  NATHAN F. COCO, ESQ.
                         227 West Monroe Street
                         Chicago, IL  60606

For MCC & Zurich:        Connolly Bove Lodge & Hutz LLP
                         By:  JEFFREY WISLER, ESQ.
                         The Nemours Building
                         1007 North Orange Street
                         Wilmington, DE  19899

For MCC & Zurich:        Eckert Seamans
                         By:  EDWARD D. LONGOSZ, ESQ.
                         1747 Pennsylvania Avenue, NW
                         Suite 1200
                         Washington, DC

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (CONT'D):

For AXA Belgium:          Tucker Arensberg, P.C.
                          By:  MICHAEL A. SHINER, ESQ.
                          1500 One PPG Place
                          Pittsburgh, PA  15222

For AXA Belgium:          Mendes & Mount
                          By:  EILEEN McCABE, ESQ.
                          750 Seventh Avenue
                          New York, NY  10019

For CNA:                  Ford Marrin Esposito Witmeyer &
                            Gleser, LLP
                          By:  ELIZABETH M. DeCRISTOFARO, ESQ.
                          Wall Street Plaza, 23rd Floor
                          New York, NY  10005-1875

For FFIC:                 Stevens & Lee
                          By:  JOHN D. DEMMY, ESQ.
                          1105 North Market Street
                          7th Floor
                          Wilmington, DE  19801

For Federal Insurance     Cozen O'Connor
Co.:                      By:  JACOB C. COHN, ESQ.
                          1900 Market Street
                          Philadelphia, PA  19103

For the Future            Orrick, Herrington & Sutcliffe, LLP
Claimants                 By:  ROGER FRANKEL, ESQ.
Representatives:               JONATHAN GUY, ESQ.
                               RICHARD WYRON, ESQ.
                          Washington Harbour
                          3050 K Street, N.W.
                          Washington, D.C.  20007

TELEPHONIC APPEARANCES:

For the Debtors:          Kirkland & Ellis, LLP
                          By:  DEANNA BOLL, ESQ.
                          Citigroup Center
                          601 Lexington Avenue
                          New York, NY  10022-4611

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

For the PD Committee:       Bilzin Sumberg Baena Price &
                              Axelrod LLP
                            By:  SCOTT BAENA, ESQ.
                                 JAY SAKALO, ESQ.
                            200 South Biscayne Boulevard
                            Suite 2500
                            Miami, FL  33131

For the Bank Lenders:       Landis, Rath & Cobb, LLP
                            By:  RICHARD COBB, ESQ.
                            919 Market Street, Suite 1800
                            Wilmington, DE  19899

For David T. Austern,       Phillips, Goldman & Spence, P.A.
the Future Claimants'       By:  JOHN C. PHILLIPS, ESQ.
Representative:             1200 North Broom Street
                            Wilmington, DE  19806

For the ACC:                Ferry Joseph & Pearce, P.A.
                            By:  THEODORE TACCONELLI, ESQ.
                            824 Market Street, Suite 19899
                            Wilmington, DE  19899

For the PD Committee:       Speights & Runyan
                            By:  DANIEL SPEIGHTS, ESQ.
                                 MARION FAIREY, ESQ.
                                 ALAN RUNYAN, ESQ.
                            200 Jackson Avenue, East
                            Hampton, SC  29924

For D.E. Shaw:              By:  BRANDON BAER

For CL King & Assoc.:       By:  JIM BARRETT

For Bank Lenders:           Paul Weiss Rifkind Wharton &
                              Garrison, LLP
                            By:  DANIEL BELLER, ESQ.
                                 STEPHEN SHIMSHAK, ESQ.
                                 REBECCA ZUBATY, ESQ.
                            1285 Avenue of the Americas
                            New York, NY  10019

For the Official            The Brandi Law Firm
Committee of Asbestos       By:  THOMAS J. BRANDI, ESQ.
Property Damage                  TERENCE D. EDWARDS, ESQ.
Claimants:                  354 Pine Street, Third Floor
                            San Francisco, CA  94104

TELEPHONIC APPEARANCES (CONT'D):

| | |
|---|---|
| For Insurance Counsel<br>to ACC: | Anderson Kill & Olick, P.C.<br>By:  ROBERT M. HORKOVICH, ESQ.<br>1251 Avenue of the Americas<br>New York, NY |
| For Dow Jones<br>News Wires: | By:  PEG BRICKLEY |
| For Oliver Butt: | JP Morgan Chase & Co.<br>By:  OLIVER BUTT |
| For Official Committee<br>of Asbestos Property<br>Damage Claimants: | Lieff, Cabraser, Heimann & Bernstein<br>By:  ELIZABETH J. CABRASER, ESQ.<br>Embarcadero Center West<br>275 Battery Street, Suite 3000<br>San Francisco, CA  94111 |
| For Normandy Hill<br>Capital: | Normandy Hill Capital LP<br>By:  MATTHEW CANTOR |
| For Burlington<br>Northern Santa Fe<br>Railway: | Pepper Hamilton, LLP<br>LINDA J. CASEY, ESQ.<br>3000 Two Logan Square<br>Eighteenth and Arch Streets<br>Philadelphia, PA  19103 |
| For Scotts Company: | Vorys, Sater, Seymour & Pease LLP<br>By:  TIFFANY COBB, ESQ.<br>52 East Gay Street<br>Columbus, OH  43215 |
| For Everest<br>Reinsurance Co.: | Crowell & Moring LLP<br>By:  LESLIE A. DAVIS, ESQ.<br>      MARK PLEVIN, ESQ.<br>1001 Pennsylvania Avenue, N.W.<br>Washington, DC  20004 |
| For AIG: | Zeichner Ellman & Krause, LLP<br>By:  MICHAEL S. DAVIS, ESQ.<br>      ROBERT GUTTMAN, ESQ.<br>575 Lexington Avenue<br>New York, NY  10022 |

TELEPHONIC APPEARANCES (CONT'D):

```
For Official Committee     LECG
of Asbestos Property       By:  ELIZABETH DEVINE, ESQ.
Damage Claimants:

For Official Committee     Dies & Hile LLP
of Asbestos Property       By:  MARTIN DIES, ESQ.
Damage Claimants:          1009 Green Avenue
                           Orange, TX  77630

For Hartford Financial     Wilmer Cutler Pickering Hale & Dorr,
Service Group, Inc.:          LLP
                           By:  MELANIE DRITZ, ESQ.
                           399 Park Avenue
                           New York, NY  10022

For RBS:                   RBS Greenwich Capital
                           By:  JEFFREY FARKAS

For Travelers Casualty     Morris Nichols Arsht & Tunnell, LLP
& Surety Company of        By:  ERIN FAY, ESQ.
America:                   1201 North Market Street, 18th Fl.
                           Wilmington, DE  19801

For Pentwater Capital      Pentwater Capital Management
Management:                By:  JORDAN FISHER

For Morgan Stanley         Katten Muchin Rosenman LLP
Senior Funding:            By:  JEFF FRIEDMAN, ESQ.
                                NOAH HELLER, ESQ.
                                MERRITT PARDINI, ESQ.
                           575 Madison Avenue
                           New York, NY  10022

For Bank Lender Group:     Landis Rath & Cobb, LLP
                           By:  JAMES S. GREEN, JR.
                           919 Market Street, Suite 1800
                           Wilmington, DE  19899

For Halcyon Asset          By:  JOHN GREENE
Management, LLC:

For Canadian ZAI:          Hogan Firm, Attorneys at Law
                           By:  DANIEL K. HOGAN, ESQ.
                           1311 Delaware Avenue
                           Wilmington, DE  19806
```

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

```
For Everest Reinsurance   Marks, O'Neill, O'Brien & Courtney LLP
Company, et al.:          By:  BRIAN L. KASPRZAK, ESQ.
                                  JOHN D. MATTEY, ESQ.
                          913 North Market Street
                          Suite 800
                          Wilmington, DE  19801


For the U.S. Trustee:     Office of the U.S. Trustee
                          By:  DAVID KLAUDER, ESQ.
                          844 King Street, Suite 2313
                          Wilmington, DE  19801


For Official Committee    Duane Morris, LLP
of Unsecured Creditors:   By:  MICHAEL LASTOWSKI, ESQ.
                          Suite 1200
                          1100 North Market Street
                          Wilmington, DE  19801


For Asbestos Property     Pryor Cashman LLP
Damage Claimants:         By:  RICHARD LEVY, ESQ.
                          401 Park Avenue
                          New York, NY  10022


For Arrowwood             Bifferato Gentilotti LLC
Indemnity Co.:            By:  GARVAN McDANIEL, ESQ.
                          800 North King Street
                          Wilmington, DE  19801


For Deborah Pace:         DebtWire
                          By:  DEBORAH PACE


For Other Prof., David    Tre Angeli, LLC
T. Austern, Future        By:  JOSEPH RADECKI, ESQ.
Claimants Rep.:


For Grace Certain         Montgomery, McCracken, Walker &
Cancer Claimants:            Rhoads, LLP
                          By:  NATALIE D. RAMSEY, ESQ.
                          123 South Broad Street
                          Avenue of the Arts
                          Philadelphia, PA  19109


For the Official          Scott Law Group, P.C.
Committee of Asbestos     By:  DARRELL SCOTT, ESQ.
Property Damage           926 W. Sprague Ave., Suite 680
Claimants:                Spokane, WA 99201
```

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

For  FFIC:                    Stevens & Lee
                             By:  MARNIE SIMON, ESQ.
                             1105 North Market Street
                             7th Floor
                             Wilmington, DE  19801

For Other Prof., David       Piper Jaffray & Co.
T. Austern, Future           By:  JASON SOLGANICK, ESQ.
Claimants Rep.:

For Ford Marrin:             Ford Marrin Esposito Witmeyer &
                                Gleser, LLP
                             By:  SHAYNE SPENCER, ESQ.
                             Wall Street Plaza, 23rd Floor
                             New York, NY  10005-1875

For Goldman Sachs &          Goldman Sachs & Company
Company:                     By:  ALEXANDER THAIN

For Official Committee       Richardson Patrick Westbrook &
of Asbestos Property         Brickman
Damage Claimants:            By:  EDWARD J. WESTBROOK, ESQ.
                             1037 Chuck Dawley Boulevard
                             Building A
                             Mount Pleasant, South Carolina

For Jennifer Whitener:       Dewey & LeBoeuf LLP
                             By:  JENNIFER WHITENER, ESQ.
                             125 West 55th Street
                             New York, NY  10019

For Allstate:                Cuyler Burk, P.C.
                             By:  STEFANO V. CALOGERO, ESQ.
                             4 Century Drive
                             Parsippany, NJ  07054

For London Market            Mendes & Mount
Company:                     By:  ALEX MUELLER, ESQ.
                             750 Seventh Avenue
                             New York, NY  10019

For Babson Capital           Babson Capital Management, Inc.
Management:                  By:  MARTI MURRAY

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

For Other Prof., David        Orrick, Herrington & Sutcliffe
T. Austern Future               LLP
Claims Rep.:                  By:  PERI MAHALEY, ESQ.
                                   KATE ORR, ESQ.
                              Washington Harbour
                              3050 K Street, N.W.
                              Washington, D.C.  20007

For Various Claimant          Stutzman, Bromberg, Esserman & Pflika,
Firms:                          P.C.
                              By:  DAVID J. PARSONS, ESQ.
                              2323 Bryan Street, Suite 2200
                              Dallas, TX  75201

For the Bank Lenders:         Paul Weiss Rifkind Wharton &
                                Garrison, LLP
                              By:  ANDREW N. ROSENBERG, ESQ.
                                   MARGARET PHILLIPS, ESQ.
                              1285 Avenue of the Americas
                              New York, NY  10019


                              - - -


                    **J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Please be seated.  This is the

2  continuation of the Phase I plan confirmation hearing in the

3  matter of W.R. Grace, Bankruptcy Number 01-1139.

4          I have a list of participants by phone.  Scott Baena,

5  Brandon Baer, Jim Barrett, Daniel Beller, Deanne Boll, Thomas

6  Brandi, Peg Brickley, Oliver Butt, Elizabeth Cabraser, Linda

7  Casey, Richard Cobb, Tiffany Cobb, Leslie Davis, Michael Davis,

8  Elizabeth DeCristofaro, Elizabeth Devine, Martin Dies, Melanie

9  Dritz, Terence Edwards, Marion Fairey, Erin Fay, Jordan Fisher,

10  Jeff Friedman, James Green, John Greene, Robert Guttmann, Noah

11  Heller, Daniel Hogan, Robert Horkovich, Brian Kasprzak, David

12  Klauder, Matthew Kramer, Michael Lastowski, Richard Levy, Alan

13  Madian, Peri Mahaley, John Mattey, Garvan McDaniel, Alex

14  Mueller, Marti Murray, Kate Orr, Merritt Pardini, David

15  Parsons, Margaret Philips, John Phillips, Mark Plevin, Joseph

16  Radecki, Natalie Ramsey, Andrew Rosenberg, Alan Runyan, Jay

17  Sakalo, Darrell Scott, Stephen Shimshak, Marnie Simon, Jason

18  Solganick, Daniel Speights, Shayne Spencer, Theodore

19  Tacconelli, Alexander Thain, Edward Westbrook, Jennifer

20  Whitener, Richard Wyron and Rebecca Zubaty.  I guess I'll take

21  entries in the court. It looks like there have been some

22  changes.  Good morning.

23          MR. BERNICK:  Good morning, Your Honor.  David

24  Bernick for Grace.

25          MS. HARDING:  Good morning, Your Honor, Barbara

1 Harding for Grace.

2      MS. BAER:  Good morning, Your  Honor, Janet Baer for

3 Grace.

4      MS. ESAYIAN:  Your Honor, Lisa Esayian for Grace.

5      MR. FREEDMAN:  Theodore Freedman for Grace.

6      COURT CLERK:  Hold on please.

7      MR. FRANKEL:  Good morning, Your Honor, Roger Frankel

8 for the PI future claimants representative.  Also with me is

9 Richard Wyron and Jonathan Guy, my partners.

10      THE COURT:  Thank you.

11      MR. HOROWITZ:  Good morning, Your Honor.  Gregory

12 Horowitz from Kramer Levin for the Official Equity Committee.

13      MR. LOCKWOOD:  Good morning, Your  Honor, Peter

14 Lockwood for the ACC.  And with me is my colleague, Kevin

15 Maclay.

16      MR. BROWN:  Good morning, Your  Honor.  Michael

17 Brown, Warren Pratt and Jeff Boerger for Geico, Republic

18 Insurance Company and Seaton Insurance Company.

19      MR. GLOSBAND:  Good morning, Your  Honor.  Dan

20 Glosband from Goodwin Proctor, and Michael Giannotto from

21 Goodwin Proctor.

22      THE COURT:  Your microphone's not on, Mr. Glosband.

23 Just press the button.  Thank you.

24      MR. GLOSBAND:  Good morning, Your  Honor.  Dan

25 Glosband and Michael Giannotto from Goodwin and Proctor for CNA

1  Insurance.

2          MS. DeCRISTOFARO:  Good morning, Your  Honor.

3  Elizabeth DeCristofaro, Ford Marrin, for Continental Insurance

4  Company and Continental Casualty Company.

5          THE COURT:  Just a second please.  Thank you.

6          MR. MILLNER:  Good morning, Your Honor.  Robert

7  Millner for General Insurance Company of America.

8          MR. COHN:  Good morning, Your Honor.  Jacob Cohn for

9  Federal Insurance Company.

10          MR. O'NEILL:  Good morning, Your Honor.  James

11  O'Neill for Grace.

12          MR. HURFORD:  Good morning, Your Honor.  Mark

13  Hurford, Campbell Levin, for the ACC.

14          MR. KRAMER:  Good morning, Your Honor.  Matt Kramer,

15  Bilzin Sumberg, on behalf of the PD Committee.

16          MR. SHINER:  Good morning, Your Honor.  Michael

17  Shiner, and with me, Eileen McCabe for AXA Belgium.

18          MR. RICH:  Good morning, Your Honor.  Alan Rich for

19  the PD FCR.

20          MR. PASQUALE:  Good morning, Your Honor.

21          THE COURT:  Good morning.

22          MR. PASQUALE:  Ken Pasquale.  And with me is Arlene

23  Krieger from Strook for the Unsecured Creditors Committee.

24          MR. PERNICONE:  Good morning, Your Honor.  Carl

25  Pernicone for Arrowood Indemnity.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. TURETSKY:  Good morning, Your Honor.  David

2     Turetsky of Skadden for Sealed Air Corporation.  Also with me

3     is J. Gregory St. Clair, also of Skadden.

4          THE COURT:  Thank you.  Good morning.

5          MR. COOK:  Good morning, Your Honor.  Nathan Cook on

6     behalf of Fresenius Medical Care Holdings Inc.

7          THE COURT:  Good morning.

8          MR. DEMMY:  Your Honor, John Demmy of Stevens and Lee

9     for Fireman's Fund Insurance Company and the Allianz insurers.

10         THE COURT:  Good morning.

11         MR. LONGOSZ:  Good morning, Your Honor.  Edward

12    Longosz for Maryland Casualty and Zurich.

13         MR. WISLER:  Good morning, Your Honor.  Jeffrey

14    Wisler for Zurich International Limited and Zurich Insurance

15    Company and Allstate Maryland Casualty Company.

16         THE COURT:  Okay, thank you.  All right.  Mr.

17    Bernick?  No, Mr. Brown?  Okay.

18         MR. BROWN:  Your Honor, just a process question

19    yesterday.  I think we contemplated yesterday that we would

20    present evidence to Your Honor followed by argument.  It seems

21    to me that that's likely to be a mechanical exercise and if the

22    Court will permit, I'd prefer to go forward with the argument

23    first while the courtroom's still cool and we deal with the

24    mechanical issues afterwards.

25         THE COURT:  That's fine.

1          MR. BROWN:  This is not going to be particularly long

2  I don't think, Your Honor.

3          Your Honor, yesterday Mr. Bernick told you that the

4  purpose of Section 7.15 of the plan was to prevent the Asbestos

5  PI Trust from using the bankruptcy proceeding as a sword

6  against the insurers and subsequent coverage litigation.  It

7  took Mr. Bernick and Mr. Lockwood an hour and a half to explain

8  one and a half pages of the plan to Your Honor and how it was

9  intended to operate.  And they admitted in the process that

10  Your Honor was in fact the author of the operative language in

11  7.15, which is correct.

12          As Your Honor considers whether 7.15 is clear and

13  does the trick, I think the most important thing you need to

14  keep in mind is who is the audience?  And the audience for that

15  language is no one in this court.  It's a coverage judge

16  somewhere in some court that none of us know the identity of.

17  And that coverage judge isn't going to be familiar with that

18  type of language.  He or she is not likely to be familiar with

19  the Bankruptcy code or bankruptcy plans, and he or she is

20  likely to have as much aversion to learning about those as Your

21  Honor has to getting involved in coverage litigation.

22          So the question is how is Section 7.15 likely to be

23  received by this individual?  And I think that the best way to

24  illustrate that reception that 7.15 will get in that coverage

25  litigation is the reception it got from one of the plan

1 proponents himself, and that is Mr. Austern.  I've been accused

2 of picking on Mr. Austern in connection with his deposition

3 testimony, and that is not my intent at all.  I know Your Honor

4 knows him well, he's well respected.  He has been a practicing

5 attorney for 40 years, has been a law professor, he's been a

6 prosecutor.  He's the general counsel of the Manville Trust,

7 and he's the FCR in <u>Combustion Engineering</u>.  And at his

8 deposition, Your Honor, I asked him a series of questions about

9 Section 7.15.  Your Honor, this appears in the trial brief of

10 <u>Geico, et al</u> at Pages eight -- seven and eight.  And it also

11 appears in Mr. Austern's deposition testimony at Pages 44 to

12 61.

13 "Q   Are there particular provisions in the plan that you don't

14 understand?

15 "A   Yes.

16 "Q   Are there any that stick out in your mind in that regard?

17 "A   Can I look at the plan for a moment?

18 "Q   Sure.

19 "A   By way of example, 7.15 of the documents.

20 "Q   That's the one you don't understand?

21 "A   Well, it's one that I have trouble trying to understand.

22 "Q   Do you believe Section 7.15 to be unclear?

23 "A   To me."

24        I then proceeded to ask Mr. Austern a series of

25 questions of the sort that Mr. Lockwood went through with the

1  Court yesterday, about how 7.15 operates, how it's intended to

2  interplay between it and other provisions of the plan.  In

3  response to every one of those questions, he said, "I don't

4  know."  Now, in their trial brief, Your Honor, the plan

5  proponents say, big deal, he wasn't a 30(b)(6) witness.  Well,

6  my answer as to that, Your Honor, is the judge in the coverage

7  case isn't going to be a 30(b)(6) witness either, but that's

8  the audience and that's the person who will need to understand

9  what is intended by Section 7.15.

10        Now, I mentioned yesterday, Your Honor, that we

11  wanted to go through some evidence, and we'll present that

12  after I give my argument.  I want to make clear what the

13  purpose of putting this evidence into the record is.  The

14  purpose, Your Honor, is not to ask Your Honor to make coverage

15  decisions.  I think the one thing we can all agree on,

16  including Your Honor, is that's not what you want to do, that's

17  not what's intended here, but I want Your Honor to have at

18  least an idea in the record of what has actually transpired and

19  an example of what the insurers are trying to preserve for

20  purposes of subsequent coverage litigation.

21        So I'm going to run you through, Your Honor, what I

22  believe to be undisputed facts.  And we'll have citations to

23  the record at the appropriate time.  Two of my -- I'm going to

24  focus, Your Honor, on two of my clients, because they're the

25  easy ones.  They're the ones that Mr. Lockwood described as

1  totally unsettled.  And he was correct in that.  And they are

2  Geico and Republic.  Geico and Republic issued certain

3  liability insurance policies to Grace.  Grace has admitted that

4  Geico and Republic have not breached any of their obligations

5  under those policies.  Grace has also admitted that Geico and

6  Republic have not waived and have not ceded any of the rights

7  under those policies.  The policies, Your Honor, which we'll

8  introduce into evidence subject to a relevance objection, have

9  a number of provisions that Your Honor has heard countless

10 times in these asbestos bankruptcy cases.  They have an anti-

11 assignment provision.  That's a Phase II issue.  They have a

12 notice provision.  They have a duty to cooperate.  They have a

13 provision relating to voluntary payments and the excess

14 policies have a provision dealing with the insurers' right to

15 associate in the defense of claims.

16         THE COURT:  Are these all excess policies?

17         MR. BROWN:  Yes.  Now on April 6th of 2008, Your

18 Honor, the debtors and the ACC, the FCR and the Equity

19 Committee executed a term sheet.  And the term sheet provided

20 for the resolution of the debtors' asbestos liabilities, both

21 current and future.  Your Honor, that was attached to an 8K

22 filed by the debtors back in April of 2008.

23         It's undisputed that the debtors, the ACC and the FCR

24 did not consult with or seek the consent of the debtors'

25 insurers with respect to any term in that term sheet before

1  they executed it.  The term sheet has, not surprisingly,

2  provisions in it providing for the assignment of asbestos

3  insurance policies, proceeds, rights, whatever the term is you

4  want to use.  The term sheet also provides that the ACC and FCR

5  will establish the trust agreement and the TDPs.

6          Now, prior to executing that term sheet, the ACC and

7  the FCR filed a plan with this Court.  And in connection with

8  that plan, the ACC prepared a set of TDPs, which it then shared

9  with the FCR and the two of them agreed to a set of TDPs.  That

10 happened before the term sheet was executed.

11          On April 6th -- excuse me -- between April 6th and

12 September of 2008, the plan proponents were working on plan

13 documents.   In connection with that work on those plan

14 documents, they didn't consult with and they didn't seek the

15 consent of any of the objecting insurers here today regarding

16 any provision in the plan or plan documents.

17          We know that the debtors were given an opportunity to

18 comment on the TDPs.  And at his deposition, Mr. Hughes

19 testified that while he recalls having an opportunity to

20 comment, he could not remember a specific comment that he made.

21 Similarly, Mr. Inselbuch, who was the principal attorney on the

22 ACC side, could not recall a single comment that the debtors

23 had to the TDPs.  Now, by their terms, and this is on the face

24 of the document, Your Honor, the TDPs provide for absolutely no

25 role whatsoever for any insured.  You won't find, it you can

1  read it front to back, you won't find any role for the

2  insurers.

3          The TDPs set forth a number of processes pursuant to

4  which asbestos claims against the trust are to be resolved.  It

5  has an expedited review process, it has an individual review

6  process, it has arbitration, it has claimants going back out

7  into the tort system.  It is undisputed that in these cases the

8  overwhelming majority of cases that get submitted to the trust

9  are resolved through the expedited review process.  Some

10 perhaps through individual review.

11         Mr. Lockwood testified that the TDPs might provide or

12 could provide for a role for the insurers in connection with

13 those claims that windup in the tort system.  Mr. Austern

14 testified that in the 20-year history of the Manville Trust, he

15 can recall one such claim.  Mr. Vincent testified that in all

16 the asbestos bankruptcy cases that he has been involved in,

17 which, Your Honor, I know, knows is quite a few, he couldn't

18 remember a single case that wound up in the tort system.

19         So the bottom line is, Your Honor, the way that the

20 TDPs are put together, it is contemplated that the overwhelming

21 majority of claims that get submitted to the trust are going to

22 wind up getting paid through the expedited review process on a

23 matrix, all of which were terms that were established by the

24 ACC and the FCR.

25         Mr. Austern testified that in connection with that

1  claims resolution process in the TDP that he did not think the

2  trust was going to, "Call up each and every insurance company

3  and say, can I settle this claim?"  In other words, the trust

4  is going to settle the claims pursuant to the procedures set

5  forth, notwithstanding the insurers' rights under their

6  policies, for example, to associate a defense.

7          Now, the plan proponents -- and, Your Honor, I don't

8  know if you have this.  Did you receive a copy of the proposed

9  order that you ordered --

10          THE COURT:  No, I did not.

11          MR. BROWN:  -- Mr. Lockwood to prepare?  I don't know

12  if someone has a clean copy of that.

13          MR. BERNICK:  I apologize, Your Honor.  Yesterday I

14  thought Your Honor had it, otherwise I would have furnished it

15  to the Court.

16          THE COURT:  Well, you had it on the screen, Mr.

17  Bernick, I just haven't physically seen it.  Thank you.

18          MR. BROWN:  Now, Your Honor, if you look at the,

19  after the windup, it says, "That it is hereby ordered that the

20  plan properly preserves all rights and coverage defenses of the

21  insurers that issued non-settled insurance policies."  One of

22  the problems I have with this proposed order, Your Honor, is I

23  don't know what it means to preserve all rights.  One of the

24  rights that we've outlined, and we're not asking Your Honor to

25  find that we have this right, we're just putting the policies

1  in the record so Your Honor understands that there are policies

2  and they have these words in them.  It's a coverage court that

3  will ultimately decide that.  But one of the rights we have is

4  a right to associate in the defense of claims.  The TDPs are

5  not going to defend claims by and large, except that one for

6  the Manville Trust and maybe one or so here or there.  They're

7  going to settle them pursuant to the matrix negotiated by the

8  ACC and FCR.

9          THE COURT:  But isn't that a defense?  I mean, that's

10  a negotiation.  You have to have a claim submitted and then you

11  have to process it.  So I don't know whether defense is exactly

12  the correct word, but that's not anything different than

13  happens in the tort system.

14          MR. BROWN:  Sure it is, Your Honor.  In the tort

15  system, a case is defended.  Lawyers come into a courtroom,

16  plaintiff, defendant.

17          THE COURT:  Well, no generally speaking, most of the

18  cases haven't hit the courtroom and most of the claims have

19  been settled.  And virtually every case, I'm not sure about

20  this one, I don't know how far we got with the claims

21  resolution and the settlement history, but most of the cases

22  have been settled.  Most of the tort system cases have been

23  settled.

24          MR. BROWN:  Your Honor, most cases, period, are

25  ultimately settled.

1          THE COURT:  Okay.  But they're settled without the

2   need for commencing litigation in advance.  There is a claim

3   presented to somebody, potentially the debtor outside the tort

4   system, but that doesn't mean that there is a lawsuit that's

5   been filed.

6          MR. BROWN:  Your Honor, we don't need to get into

7   this, but I mean, Mr. Hughes testified --

8          THE COURT:  Okay.

9          MR. BROWN:  -- he's the individual in charge of the

10  defense of Grace in the tort system.  Grace had 50 law firms

11  around the country defending these cases.

12         THE COURT:  Yes.

13         MR. BROWN:  They were filing motions, they were

14  taking discovery, they were responding to discovery, they were

15  doing everything that everyone does in a lawsuit.

16         THE COURT:  Okay.

17         MR. BROWN:  The point is, if there's a lawsuit and

18  the case is being defended, it may ultimately be settled,

19  there's an opportunity to associate in the defense of the case.

20  On the other hand, if the case is just being settled pursuant

21  to a matrix, there's no opportunity to associate in the

22  defense.

23         But again, Your Honor, that's not an issue we're

24  asking this Court to find.  Those are coverage issues.  I'm

25  just asking --

1          THE COURT:  Okay, but then you're right to raise it

2   as a defense to coverage is preserved.

3          MR. BROWN:  Right.  But here's the point, Your Honor,

4   that I want to draw.  And the point that I want to make here is

5   that what we're really talking about here is the preservation

6   of our coverage defenses and our remedies, or the breach of our

7   rights.  There's a little danger in suggesting that in fact our

8   rights have been preserved when in point of fact, what's really

9   be preserved is our remedy for the breach of the rights.

10          Now, Your Honor doesn't have to make a decision as to

11   whether the rights have or have not been breached.  Again,

12   that's the issue for the coverage case.  But I wanted to go

13   through this exercise with Your Honor so that you understand

14   what it is, at least one example, of what we are trying to

15   preserve with Section 7.15.

16          THE COURT:  But that's still a circuitous reasoning,

17   because you don't have a right to a remedy unless you've got a

18   breach of a contract.  You don't have a breach unless you've

19   got the right.  So if the right to the remedy is preserved,

20   then the right to assert the defense is preserved, and that's

21   essentially what the insurers have.  They've got the right to

22   associate, and if the debtor breaches, they have a right to a

23   remedy, which is to deny coverage.  That's all preserved.

24          MR. BROWN:  Exactly.

25          THE COURT:  Okay.


**J&J COURT TRANSCRIBERS, INC.**

1         MR. BROWN:  I don't disagree with that, Judge.

2         THE COURT:  All right.

3         MR. BROWN:  That's what we're driving at.  But

4  there's a danger in saying that the right is actually -- I

5  mean, to use an example, if I'm going to sell you a car and we

6  enter into an agreement, you have a right to receive that car.

7  If I give the car to Mr. Lockwood and he drives off to

8  Washington, do you still have a right to the car?

9         THE COURT:  Yes.

10         MR. BROWN:  You have a -- well, it's a matter of

11  semantics then, Your Honor.  I think what you have is you have

12  a remedy for my breach of the agreement to sell you the car.

13         THE COURT:  It hasn't changed my right.  It's just

14  changed the practical application of how I can collect on my

15  right.  So I mean your right is still preserved.  You can't

16  have a remedy without a right.  So if the right to that -- to

17  associate in the defense is preserved and it's breached, then

18  you have a remedy.  But you don't need a remedy if the right is

19  properly exercised.

20         MR. BROWN:  Your Honor, we don't -- this is not, I

21  mean this is not the point I'm trying to drive home.  The point

22  is, we are trying through this language and through this

23  proceeding to make certain that the rights we have, the

24  remedies we have, however you want to term it, are preserved.

25         THE COURT:  Okay.


**J&J COURT TRANSCRIBERS, INC.**

1          MR. BROWN:  Now, there is a ramification.  I took

2    Your Honor through a series of facts which the debtors and the

3    plan proponents, they may dispute.  I don't think they really

4    can be disputed, about the manner by which we got to where we

5    are today in terms of the exclusion of the insurers from the

6    process pursuant to which the TDPs came about.  There are

7    ramifications.  Or there may be.  Your Honor doesn't have to

8    decide that.  But there are potential ramifications in coverage

9    litigation for the exclusion of the insurers from the process.

10   And it is important to the insurers that they have the

11   opportunity to raise that defense and litigate that issue in

12   the subsequent coverage litigation.

13          THE COURT:  What claim has been settled by the TDP?

14   Because as I understand it, the insurance company has the right

15   to participate in the defense of a claim.  What claim has been

16   settled by the TDP processes?

17          MR. BROWN:  Your Honor, on Page one of the plan, it

18   says, "This plan constitutes a settlement of all claims and

19   demands against the debtors on and subject to the terms

20   described herein in other plan documents."  In other words,

21   Your Honor, the plan itself, and the mechanism by which the

22   plan proponents have decided to deal with asbestos claims, can

23   be viewed as a settlement.

24          THE COURT:  Okay.

25          MR. BROWN:  Not of an individual claim.  And that's

1  really one of the points that I wanted to drive home.

2  Yesterday, Your Honor was talking about --

3           THE COURT: But that's begging the question.  I think

4  the answer is, the TDP isn't settling any claims.  It's setting

5  up a process by which the trust mechanism can decide what

6  claims should and shouldn't be paid.  And then if whoever has

7  the right at that time to present a claim that has been

8  processed in this fashion to the insurers, does present that

9  claim, then the insurers have the right to decide whether it

10 was done in a fashion that comports with the insurance policies

11 or not.

12          MR. BROWN:  Your Honor, that is certainly one

13 scenario pursuant to which the coverage issues could come up.

14          THE COURT:  Okay.

15          MR. BROWN:  And I think that that's certainly one

16 that Your Honor has focused on in the past.  But the other

17 scenario is that the actual overall global resolution, as

18 reflected in the plan, to the exclusion of the insurers in and

19 of itself -- in other words, Your Honor, you shouldn't expect

20 that there is going to be a separate piece of coverage

21 litigation for every single claim that gets run through the

22 trust, okay?  The reality is, is that if and when this plan

23 gets confirmed, one of the things that the insurers may well

24 decide to do is to file a declaratory judgment action against

25 the trust.  And in that declaratory judgment action, take the

1  position that their exclusion from the process pursuant to

2  which this whole mechanism was established in and of itself

3  gives rise to coverage defenses.  Your Honor doesn't have to

4  decide that.  And we're not asking Your Honor to decide that.

5  That's a coverage issue.  And the important thing for our

6  purposes is that that issue be preserved.

7          THE COURT:  I don't even see necessarily why it is a

8  coverage issue.  Until there is a claim presented to the

9  insurers by which the insurers have an obligation under the

10 policies to determine whether there has been a breach that

11 would give rise to a defense, I don't see that there's a

12 coverage issue.  So I can't even agree with the basic premise

13 that that's a coverage issue.  You need to explain to me what

14 I'm missing.  I do not see that as a coverage issue.

15         MR. BROWN:  Well, Your Honor, it is not infrequent in

16 coverage litigation when it appears as though the insured is

17 going to be submitting claims that the insurer files a

18 declaratory judgment action.

19         THE COURT:  Okay.

20         MR. BROWN:  I'm not saying waiting until a claim

21 comes in, but we could.  The first claim comes in, let's assume

22 the plan gets confirmed, the first claim gets tendered to the

23 insurers.  The lawsuit isn't going to be necessarily I'm not

24 going to pay that claim for X, Y or Z reasons.  The lawsuit

25 could be much broader than that, because you're not going to

1  have a series of covered -- pieces of coverage litigation over

2  and over and over and over again.  These things get decided in

3  big cases.

4          THE COURT:  Okay.

5          MR. BROWN:  And so the point here is that there --

6          THE COURT:  But you still have to have a coverage

7  issue.

8          MR. BROWN:  Yes.

9          THE COURT:  Okay.  So how is the formation of a TDP a

10  coverage issue?  The insurers, to the extent that there is --

11  well, there isn't an analogy that I can think of.  Maybe there

12  is one, but I can't come up with one that would fit this

13  squarely so I'm at a loss for that at the moment.  But the

14  undertaking by a group of entities to set up a process to

15  adjudicate claims, in and of itself doesn't impact the

16  coverage.  What impacts the coverage is the fact that a claim

17  actually gets processed through that system and then gets

18  presented to an insurer.  So if you have a declaratory judgment

19  action on the basis that a claim at some point is going to be

20  presented to the insurer, but you still need to know whether or

21  not that claim is even going to be processed through that

22  particular policy.  And if your excess insurance carriers -- at

23  some point, I would expect that your excess policies are

24  probably going to be tapped because there is a lot of money

25  that's expected to be paid to tort victims.  But that could be

1  a generation from now.  So whether rights and liabilities can

2  even potentially be affected is pretty speculative.  But to the

3  extent that it can, it has to be considered in light of the

4  claims that would be submitted, doesn't it?

5          MR. BROWN:  Well, Your Honor, I can't predict the

6  future on necessarily how this is going to transpire in

7  coverage litigation.  I can tell you various scenarios in which

8  it might come up.  It is conceivable that the trust, post

9  confirmation, would initiate coverage litigation against all of

10  the unsettled insurers.  There's a -- I can tell you that that

11  happened prepetition with the debtors, so it's certainly a

12  possibility that that happens.  That puts the coverage issues

13  immediately in play.  Okay?

14          Similarly, the insurers could do the same.  The DJ

15  can go either way.  It can be filed by either party.  So you're

16  right, it may not necessarily happen, but it certainly can

17  happen.  And the plan itself contemplates the preservation of

18  coverage defenses that arise by virtue of the manner in which

19  the plan was negotiated.  And indeed, Your Honor, the operative

20  language on that particular point is in the definition of

21  asbestos insurer coverage defenses.  Because that says, "shall

22  mean all rights and defenses at law or in equity that any

23  asbestos insurance entity may have under any asbestos insurance

24  policy, asbestos insurance settlement agreement, asbestos in

25  place insurance coverage or applicable law to a claim seeking

1 insurance coverage."  Asbestos insurance coverage defenses

2 include any defenses based on the terms of the plan or the plan

3 documents or the manner in which the plan or plan documents

4 were negotiated.  Okay?

5          THE COURT:  All right.  So they're giving you a

6 defense.

7          MR. BROWN:  They are.  As they should.  It's not

8 giving us a defense.  We have that defense.

9          THE COURT:  Well, I'm not sure.  But okay.

10          MR. BROWN:  But again, that's for a coverage court to

11 decide.

12          THE COURT:  No, I don't actually think it is.  To the

13 extent it's not a coverage defense, I'm not sure that the whole

14 issue at this point in time is a relevant issue.  The problem I

15 think is that the insurers -- I haven't read all the policies,

16 Mr. Brown and I don't purport to have read all the policies, so

17 if there's something out there that I'm missing, feel free to

18 jump in at any time, because I haven't even attempted to read

19 all the policies.  But the policies that I have looked at seem

20 to involve a process where individual claims will be presented

21 to an insurer and an insurer will have the right to determine

22 whether to associate in that defense, whether to settle the

23 claim, whether to pay it.  Anything that insurers typically

24 would do.  But it's on a claim by claim basis.

25          So now we've got a process by which more than one

1  claim at a time might be presented, but that was true

2  prepetition as well where more than one claim could be resolved

3  against an insurance policy.  But nonetheless, the insurer has

4  the right to look at each individual claim and determine

5  whether there is coverage and whether there has been a breach

6  that would abrogate the need of the insurer to pay for that

7  claim.  I'm really missing what isn't preserved.

8           MR. BROWN:  Your Honor, I'm not sure that there's --

9  well, let me back up and try to tackle this.  The question I

10 don't think is whether it's preserved.  The question is whether

11 it's clear that it's preserved.  And in answer to your

12 question, I mean, Your Honor, we don't want to get into

13 coverage issues, I understand that you don't, and we're not

14 asking you to do that.  I'm not asking you to accept that these

15 are viable coverage defenses, because that's what a coverage

16 court is going to do.  I mean, that's why we're here.  We're

17 here trying to excise from this proceeding those issues which

18 we all agree should be taken care of in the coverage

19 litigation.

20          THE COURT:  Right.

21          MR. BROWN:  And it does not necessarily work the way

22 Your Honor described in coverage litigation, that, you know, we

23 just deal with these things on a claim by claim basis.  They

24 are often dealt with on a much more global basis.

25          THE COURT:  Well, I think I said that.  But the

1  policy issue is a claim by claim adjudication.  How you choose

2  to deal with them may come in in more than one claim at a time,

3  but, you know, the debtor may say -- I'm talking about

4  individual claims.  There may be other types of coverage, but

5  I'm not attempting to address anything other a personal injury

6  claim, and I think that's what you're trying to address too,

7  correct?

8             MR. BROWN:  Yes.

9             THE COURT:  Okay.  Each claimant who claims against

10 the debtor or against the trust has to substantiate that in

11 fact they suffered the injury that would be covered by the

12 policy.  If they can't substantiate that, they have no right to

13 payment from the trust at the outset.  The second level is that

14 the trust, or whoever's holding the policy, then determines if

15 that entity says that there's a legitimate claim, that there's

16 a right to insurance coverage and they make a demand on the

17 insurer.  So, yes, it may come in that you've got more than one

18 claim at any time, but the policy, I think, still covers

19 individual claims.  You wouldn't just say that any, you know,

20 400 people can come in and make a demand without meeting the

21 terms of the policy and showing the liability on behalf of the

22 insured, correct?

23            MR. BROWN:  I'm not sure I understand the question,

24 Your Honor.

25            THE COURT:   You wouldn't just go on down the street

1  and pull 400 people off the street and say, okay, here, make a

2  claim against the insurance company.  That's not what the

3  policy is intended to cover.  It's intended to cover the

4  debtors' liability.  The debtors' liability has to be

5  adjudicated on a claim by claim personal injury basis.  Each

6  claimant has to substantiate that they have got the right to

7  claim against the debtor and then the debtor has the right to

8  demand coverage from the insurer.  So even though you may

9  process it on a more than one claim at a time basis through

10  settlements or agreements or whatever, at bottom line, each

11  individual claimant is what the policy is intended to cover,

12  isn't it?  Am I missing something?

13        MR. BROWN:  Well, Your Honor.  I don't know.  Let me

14  put it this way, because I want to sort of cut to the chase

15  here.  I mean, there can be coverage defenses that would arise

16  as Your Honor has described on a claim by claim basis.

17  Certainly there could be that. And there can be coverage

18  defenses that arise on a much more global basis based upon much

19  more broad principles than what Your Honor is articulating.  We

20  don't -- I'm not asking you to get into those.  The point I'm

21  trying to drive at is that in this Phase I of this confirmation

22  hearing, we're being asked to stand down because this is not a

23  process that is supposedly affecting our rights.  And the

24  important thing, the thing that we have to make certain of, is

25  that if that's the case, that we will have our defenses,

1  coverage defenses and remedies preserved.  That's the point.

2       THE COURT:  And I agree.  But the problem is, if I

3  don't understand where you're coming from, I don't understand

4  where there is a lack in preserving those defenses in the

5  language that exists.  So you've got to somehow or other show

6  me what I'm missing so that I can understand the point that

7  you're making.  That's all I'm trying to do.  I'm not trying to

8  adjudicate any coverage issue.

9       MR. BROWN:  I can give you the example, Your Honor,

10  that Mr. Lockwood gave us last Thursday.  Well, it relates to

11  7.15(f).  You heard a lot about this yesterday, Your Honor.

12  7.15(f) is the provision of the plan, the neutrality provision,

13  that introduces this concept of asbestos insurer coverage

14  defenses.  And I think one of the things that the insurers are

15  concerned about is whether that language is being used for some

16  mischievous purpose on the part of the plan proponents.  Now, I

17  raised at the pretrial, Your Honor, a possible defense that the

18  insurance companies might wish to assert.  And that was that

19  the process by which the debtor settled its asbestos

20  liabilities, resolved its asbestos liabilities with the ACC and

21  FCR, was the product of collusion.  And the concern that under

22  1129(a)(3) that somehow because Your Honor has to find that it

23  complies with 1129(a)(3), that that finding could then be used

24  to preclude the insurers from asserting the defense I just

25  described.  And Mr. Lockwood got up and frankly said what we

1  wanted him to say, and that is, it doesn't.  And the concern we

2  have is that while he says that for that particular defense,

3  it's not entirely clear in the language that that's in fact

4  what was intended.

5          Mr. Giannotto and Mr. Millner, both yesterday, talked

6  about the difference between using the language that they use

7  in the asbestos insured coverage defenses and having a rule

8  that, you know, the confirmation of the plan can't be

9  collaterally attacked.  I think we're all in agreement that

10  we're not going to be able to, and shouldn't be able to

11  necessarily go into a coverage court and say, the plan didn't

12  comply with the bankruptcy code and Your Honor can probably

13  imagine what kind of reception that would get by a coverage

14  judge.  What do you mean?  I mean, that's not an issue.  The

15  issue is whether the confirmation of this plan can be construed

16  as cutting off various coverage defenses.  And that's really

17  what we're concerned about on that particular point.  And

18  that's where we think the plan -- is one of the areas where we

19  think the plan is particularly unclear.

20          That needs to be fixed.  It can be fixed, and I think

21  what Your Honor heard yesterday is that there is a fair amount

22  of agreement, not entirely.  I mean, you know, if parties are

23  going to sit down and discuss it, we may have differences.  But

24  Mr. Lockwood and Mr. Bernick, both -- the theme of both of

25  their presentations were, don't worry insurance companies, your

1  defenses are preserved.  And what the insurers are concerned

2  about is that that's not entirely clear.  And as I started with

3  at the outset of my presentation, the concern is, if the plan

4  proponents themselves don't understand this language, okay,

5  what's the chance that a coverage judge that doesn't have the

6  benefit of the Bernick/Lockwood tutorial on 7.15 is actually

7  going to understand it.  And that's what we're driving at.  And

8  that's where the problem is.

9          Now I can give you -- because, Your Honor wanted to

10  run through another example, and this is a slightly different

11  example, but it impacts one of my clients, Seaton.  And it was

12  kind of glossed over yesterday.  Mr. Lockwood, in his

13  presentation, told you at the outset that there are three types

14  of insurers in this case.   He said that there were those that

15  were settled prepetition, and he said there are the asbestos

16  reimbursement carriers, Phase II, and then he said there are

17  the unsettled insurance carriers.  He mentioned, but sort of

18  glossed over the fact that some insurers fall into more than

19  one of those categories.  And one of my clients, Seaton, is one

20  of those insurers, at least according to the plan proponents.

21  I'm not sure we agree with their description, but be that as it

22  may, they view us to be in two buckets.  And that's Seaton

23  Insurance Company, Your Honor.

24          Seaton Insurance Company is a settled asbestos

25  insurance company.  At least it appears on, I think it's

1   Exhibit 5.  But when you look at Exhibit 5 you'll find that

2   they have construed the status to be limited to products

3   coverage.  Which mean indirectly that what they're saying is

4   that there is some type of residual coverage that may be

5   available under the policy that the trust may wish at some

6   point to try to tap.  And so what that means, at least again

7   from their perspective, is that Seaton is a settled insurer and

8   it is also an unsettled insurer.

9           Now, if you look at 7.15(a), which was discussed at

10  length yesterday, the language that Mr. Bernick pointed out to

11  you after the windup clause is in fact drawn from your decision

12  in Combustion Engineering.  The windup, of course, says except

13  to the extent provided in this section, 7.15, which therefore

14  appears to refer to all the rest of 7.15, which would include

15  7.15(b).  And 7.15(b), we're told, was put in there in an

16  abundance of caution.  There is a phrase in 7.15(b), Your

17  Honor, that says the beneficiaries of the Asbestos PI Trust.

18  That is not a defined phrase.  And I asked Mr. Fink, in his

19  deposition, what his understanding of that meant.  And frankly

20  his understanding of that was consistent with my own, and that

21  is if you are something that's defined as an Asbestos PI

22  Claimant, you're a beneficiary of the trust.  Well, the

23  definitions in the plan work in such a fashion, Your Honor,

24  that if you are an insurer with an indemnity claim, you have

25  either an indirect PI trust claim or you have a new type of

1  claim which is described in the TDP, it's called an indemnified

2  insurer TDP claim.

3         It doesn't matter for purposes of this argument which

4  you are.  There doesn't seem to be agreement on the plan

5  proponents' side as to which the insurers are in.  But they're

6  in one or the other.   And both of those fit within the

7  definition of Asbestos PI Claim.  And Mr. Fink testified that

8  his understanding of this language was that if you have an

9  indemnified insurer TDP claim, then you are a beneficiary of

10 the trust.  And under B, if you are a beneficiary of the trust,

11 you are bound by the plan.

12        So what happens with all the protection provided in A

13 is taken away by B.  Now, Mr. Lockwood says, well, it depends

14 what capacity you're coming in.  And if you come into the court

15 and you're wearing your indemnified insurer TDP claimant hat,

16 then you're bound.  But if you come in just holding your

17 insurer hat, you're not bound.  That's not going to be clear to

18 a coverage judge, Your Honor.  I mean, that's just ridiculous.

19        These are the kinds of problems we're talking about.

20 And the bottom line, Your Honor, is that having sat through

21 everything that we sat through yesterday, Mr. Bernick says that

22 the purpose of 7.15 is that our defenses are preserved,

23 whatever they are.  Mr. Lockwood pretty much says the same

24 thing, subject to a couple of exceptions.  There's the

25 reimbursement insurers Phase II, there's the assignment issue,

1  that's also Phase II, and then there's this concept of asbestos

2  insurer coverage defenses, which it appears the plan proponents

3  mean simply that you cannot collaterally attack this Court's

4  confirmation order, which by the way, we wouldn't be able to do

5  anyway.

6          So the question is, can we make this language

7  clearer?  Now I don't know -- Your Honor can't force them to

8  change the plan, I understand that.  But Your Honor has control

9  of the confirmation order and Your Honor has control over

10 whether the plan gets confirmed.  And if the plan proponents

11 themselves don't understand this provision, you don't have to

12 confirm a plan.

13         And there's a lot of ways that this cat can be

14 skinned.  One way it can be skinned is through a stipulation

15 which was discussed yesterday that's agreed upon and we all

16 live with.  One way is through the confirmation order that we

17 clear up these ambiguities.  But on that score, I just want to

18 point out that 7.15(a), by its terms, purports to preempt the

19 confirmation order.

20         THE COURT:  I know it does, and frankly I don't think

21 it can, nor will I sign a plan that attempts to do that.  So

22 that is a problem.

23         MR. BROWN:  I thought you might find that that was a

24 problem in light of your comments at the pretrial, Your Honor.

25         The other problem I think that we have, at least at

1  this stage in the proceeding, is both Mr. Lockwood and Mr.

2  Bernick went through 7.15 in painful detail yesterday.  And I

3  think the common theme that Your Honor kept hearing was that

4  large sections of 7.15 were issues in Phase II.  And indeed, if

5  you go through each of the subsections in the Insurance

6  Neutrality Provision, you will find that some are clearly Phase

7  II, some are partially Phase II, some are -- I'm not sure any

8  are completely Phase I.  I mean, you could look at 7.15(a) and

9  other than the windup clause, I would agree that the language

10 there is a Phase I issue.  With respect to 7.15(c), again,

11 other than the windup clause, I would say that too is a Phase I

12 issue.

13         Once you get beyond those two, Your Honor, I'm a bit

14 perplexed as to what we're in Phase I and what's in Phase II.

15 And they're trying to use Section 7.15 in order to deal with a

16 variety of what they're calling neutrality issues that pertain

17 to issues that are going to be or may be litigated in Phase II

18 of the confirmation hearing.  And I would submit that I don't

19 see how Your Honor could make a decision on this issue at this

20 point the way that they want you to parse this out.

21         THE COURT:  Okay.

22         MR. BROWN:  Thank you.

23         THE COURT:  I understand when you raise the collusion

24 issue, that put in context the type of global issue that you're

25 attempting to raise.  So now at least I understand the issue

1  that you're raising.

2        MR. BROWN:  Okay.  Thank you, Your Honor.

3        THE COURT:  Okay.  Any other insurer who wants to be

4  heard today?  Mr. Shiner?

5        MR. SHINER:  Good morning, Your Honor.

6        THE COURT:  Good morning.

7        MR. SHINER:  May it please the Court, Michael Shiner

8  for AXA Belgium.  AXA is an extremely high level excess

9  insurer.  We'll offer a declaration of Eileen McCabe later

10 today with some policy related materials that have been agreed

11 to by the ACC's insurance counsel.  Essentially there are three

12 policies at issue.  A 77-78 alleged policy with an attachment

13 point at 100 million.  Another one in 78 and nine again with an

14 attachment point at 100 million.

15        MR. LOCKWOOD:  Mr. Shiner, could you please speak a

16 little louder?  Even with the microphone, we can't hear you.

17        MR. SHINER:  Sure.  Sorry, Mr. Lockwood.

18        THE COURT:  Jan, can you turn that mic up, please?

19 You can adjust it there Mr. Shiner.

20        All right, 77-78 policy with 100 million and that's

21 where I lost you.

22        MR. SHINER:  78-79 policy with an attachment point at

23 100 million, and an 84-85 policy with an attachment point in

24 excess of 75 million.  These are completely unsettled policies

25 sort of in the same vein as Mr. Brown's clients.  No claims

1  have been submitted, tendered yet to AXA on these policies.

2          You know, I'm not going to replow everything that Mr.

3  Brown has done, but suffice it to say that it's clear the

4  insurers are a significant source of funding for this plan and

5  the trust.  It's also clear that the insurers weren't invited

6  to participate in the formation of the underlying documentation

7  or the deal that's brought us all here today.

8          As you said repeatedly, the one thing you got right

9  in the Combustion opinion was the Insurance Neutrality language

10 and the gold standard, as we all like to refer to it.  I think

11 it's important to just take a minute and refer back to that

12 language from CE for a second, because there's something about

13 the shortness and the simplicity of what you wrote in CE that

14 sort of draws into contrast and highlights some of the problems

15 with the Insurance Neutrality Provisions in the current plan.

16         As you wrote in CE, "Notwithstanding anything to the

17 contrary in this order, the plan or any of the plan documents,

18 nothing in this order, the plan or any of the plan documents,

19 including any provision that purports to be peremptory or

20 supervening shall in any way operate to or have the effect of

21 impairing the insurers' legal, equitable or contractual rights,

22 if any, in any respect.  The rights of the insurer shall be

23 determined under the subject insurance polices," et cetera, et

24 cetera.  When we compare that to 7.15, we can find each of

25 your pieces from CE tucked into the different sections.  But

**J&J COURT TRANSCRIBERS, INC.**

1  yet when we start with 7.15(a), we start with, "except to the

2  extent provided in this Section 7.15."  So basically, you know,

3  yes, you can have CE, except to the extent we take it away in

4  the rest of these provisions.

5       Now, 7.15(b) tells us that the plan, the plan

6  documents and the confirmation order will be binding on the

7  debtors, the reorganized debtors in the trust, and that the

8  obligations, if any, of the trust, to pay the holders of the

9  asbestos PI claims, shall be determined with the plan, the plan

10 documents and the confirmation order.

11      So if you read this section with the carve out later

12 on from asbestos insurance coverage defenses, can an insurer in

13 subsequent coverage litigation, and I think this was a point

14 Mr. Brown was trying to get to, challenge the appropriateness

15 and the reasonableness of the entire deal that's put together.

16 In Mr. Lockwood and the plan proponents' brief clearly make the

17 point that, you know, an individual claim, when it's tendered

18 to an insurer for payment by the trust, well, you can raise all

19 of your coverage defenses then.  But, you know, the

20 assignment's happening now.  The assignment's happening when

21 Your Honor confirms this plan.  The assignment is expressly

22 carved out from insurance neutrality.

23      So even if my policies, my client's policies, which

24 are being transferred now, even if they're not going to be

25 accessed for years, there's an assignment going on, and that

1  assignment and these provisions here in 7.15 can operate to cut

2  off rights now.  They can operate to cut off what defenses can

3  be asserted now.  And that, I think, Your Honor, you were

4  asking, where's the issue with something that's happening to

5  the insurance company that's going to give them a right to

6  possibly assert a defense?  Well, their rights are being

7  transferred, their potential defenses are being cut off now.

8  And I think that, you know, when one attempts later on if we

9  sit and wait, as Your Honor suggests, until there's a request

10 for coverage, a request to pay a claim, we run a big risk that

11 these defenses would be perceived as the falling in that

12 collateral -- no collateral attack on the confirmation order

13 exception.

14         And I'm not saying we want to collaterally attack the

15 confirmation order, but we do need to make sure this construct

16 which, you know, with one, two, three, four, five, six, seven,

17 eight, nine, ten sub parts is intelligible to a Court that's

18 going to be figuring out what's going on in the future, and to

19 the parties who are trying to work with it and understand

20 what's happening to their rights.  Because I think to confirm

21 this plan, this Court has to feel that it understands how each

22 of the provisions of the plan operate.  How else are you going

23 to be able to make the findings that are required under 1129?

24         THE COURT:  All right.  If B were fixed to say that

25 the plan documents and the confirmation order shall be binding

1  on the debtors, the reorganized debtors, the Asbestos PI Trust

2  and the personal injury beneficiaries of the Asbestos PI Trust,

3  does that fix B?

4          MR. SHINER:  It might.  I can't tell you right now

5  without sitting down and thinking about it --

6          THE COURT:  Yes.

7          MR. SHINER:  -- and going through a lot of different

8  scenarios with my co-counsel.

9          THE COURT:  Because I think the problem may be that

10  the definitions -- well, if there is a problem -- I think from

11  the insurers' perspective, the problem may be that not every

12  term is a defined term and you can't define every term, because

13  otherwise you'd never get through the plan.  But maybe --

14          MR. SHINER:  We already defined too many terms in

15  this plan.

16          THE COURT:  -- so that may be an issue where to the

17  extent that Mr. Lockwood and Mr. Bernick both say that this is

18  essentially overkill is a way to make sure what the Neutrality

19  Provision really does.  And the intent is to have the personal

20  injury claimants govern, because the next sentence then talks

21  about the fact that the trust would pay the holders of those

22  claims according to the plan, the plan documents and the

23  confirmation order.  That clearly is not something that is

24  binding on the insurance companies, that's a direction to the

25  trust as to how to pay the claims.

1      So to the extent the trust acts in derogation of the

2  policies, at that point, your defenses clearly are preserved.

3  So perhaps the "fix" for B is to make it clear who the

4  beneficiaries are.

5      MR. SHINER:  It may be a potential fix.  I mean, I

6  think there's an inherent structural problem in the insurance

7  companies and the -- an inherent structural problem in the

8  trust inasmuch as it exists to -- it states it has fiduciary

9  duties to the PI holder, ths holders of Asbestos PI Claims and

10  future demands where your insurance companies are being forced

11  into that situation given the natural -- into that definition

12  -- given the natural adversity between the two types of groups

13  and how, whether there could be a fiduciary obligation and

14  trustees could fulfill fiduciary obligations to both of those

15  groups.

16      THE COURT:  Well, are you talking about the trustees

17  or the TAC?  Because the Advisory Committee -- I understood

18  that the issue involved the members of the Advisory Committee

19  and not who the trustees are going to be.  And I guess that's

20  where my issue or my concern, I guess, will be as to what those

21  independent fiduciary obligations are.  The trustees' may be

22  different from the TAC's.

23      MR. SHINER:  I think the trustees and the TAC sit

24  differently.  But, I think the trustees generally are, you

25  know, to answer the question, to the benefit of all of the

potential beneficiaries, claim holders who are seeking to receive distributions under the trust while the TAC exists for the benefit of the present claimants under the trust and, you know, the FCR is out there and will be for the benefit of the future claimants under the trust, theoretically, each the TAC and the FCR watching over their respective -- you know, at least advocating, I guess, to the trustees for their respective group of claimants.

But, again, I query whether if insurance claims are going in there, and this is something that has just developed to me as we've been going through this exercise over the last day and a half, whether the fiduciary duties that are supposed to be exercised by the trustees as to all claimants when those claimants include both insurance companies and, you know, personal injury claim, and structurally, that's something that can work.

THE COURT:  Well, okay, I mean, again, somebody is going to have to inform my understanding probably better than I have it right now, but the way the insurance company should have, I'll call it an indirect claim, is because it paid something that would have been a direct claim.  So, essentially, you're being substituted for who would have been the beneficiary but for the fact that the claim had been paid by the insurance company.

So, I'm not sure how, in that sense, the fiduciary

1  obligation of the trustee changes because the trustee would

2  have had to evaluate the claim and pay the claim.  So, it's the

3  same problem that the insurers face which is the liability is

4  already fixed because the policy period's expired but the

5  claims are already there.  So, the fact that you then assign

6  the right to the proceeds doesn't change the risk.

7        Well, conversely for the trust, it doesn't change the

8  fiduciary obligation because the obligation is to pay the

9  claim, whoever holds the claim is entitled to be paid.  So, I'm

10 not sure I see a conflict there, specifically.  If you have a

11 different status that's coming into the trust, that may be an

12 issue.

13       MR. SHINER:  Well, you know, as we proceed a little

14 bit further down through the section, you know, I think we also

15 run into another structural problem with this insurance

16 neutrality provision when we're attempting to address, you

17 know, the protection that's being provided under 7.15D for

18 settled asbestos insurance companies where we're protecting

19 them from contribution claims, or the debtor is protecting them

20 from contribution claims.  Here, it might be brought by, you

21 know, unsettled insurers who are, you know, required to pay a

22 claim in the future.

23       Now, I think a contribution claim comes up when, you

24 know, an insurer pays a claim and they feel that there's

25 somebody else out there who is responsible for all or part of

1  that claim, so they make a contribution claim, typically by

2  filing a lawsuit against the people that they believe are also

3  responsible for those claims.  I'm told by the coverage lawyers

4  that I work with -- you know, I don't do this on a regular

5  basis, you know I'm a bankruptcy lawyer -- that these are very

6  common in the coverage world and that, you know, they can be

7  made against all sorts of parties, not just against other

8  insurance companies, but also against, you know, the holders of

9  the insurance policies for various reasons they might have

10 years where they have responsibility against third parties who

11 might also be responsible, as well.

12         And, you know, what we have again is an injunction

13 that's prohibiting us from asserting these claims, at least

14 against certain defined groups, maybe not all of the groups.

15 We have the effect of the discharge and that the discharge

16 injunction as to whether or not these claims can be asserted

17 against the reorganized debtor.  And we have claims against

18 potential third parties, as well, and then we have injunctions

19 protecting other third parties here, as well.

20         Now, there's a judgment reduction clause.  So, what

21 you're doing in the neutrality provision is taking the insurer

22 who has a bundle of rights right now and you're taking that

23 bundle of rights and you're trimming it off and you're saying

24 well, no, you can't have this, and you can't have this, and you

25 can't have this, but we'll give you a judgment reduction clause

1 and, you know, hopefully that will address and provide

2 protection for you.

3       And I think the situation again is, you know, we're

4 sitting here and saying, is this neutral, is this protecting

5 the insurance companies the same way, you know, the gold

6 standard does?  And then we look at the gold standard.  It's

7 simple.  I think it's three sentences long and it makes its

8 point.  Here, we have all of these subsections attempting to

9 interrelate and the more and more we look at them, the more and

10 more that bundle of rights that our client has are being

11 trimmed off one after the other, after the other to pigeon hole

12 him into the smallest area possible and obtain certain

13 advantages for whether it's the trust later on or at least, you

14 know, with respect to eliminating coverage defenses like, for

15 instance, the assignment provision where we preempt that out,

16 we're going to take that away.

17       And I know there are Phase II issues here, there are

18 Phase I issues here and that adds to the additional confusion

19 of trying to understand exactly what 7.15 does because what

20 we're dealing with 7.15A today and 7.15C but, you know, 7.15I

21 has been pulled out and various sections have been pulled out.

22 We had the interesting chart yesterday.  But, it makes the

23 interpretation and the determination of what the effect of this

24 is on our clients, extremely difficult, and it really calls

25 into question whether we're being provided the neutrality,

1  whether we're getting, as you said the Circuit said, the one

2  thing you got right in CE was making sure there was no effect

3  on these insurers.  Well, the more and more we go through this,

4  it's affecting these insurers.  And, again, I'm not trying to

5  replow the ground that everyone else has covered, but I did

6  want to make these points.

7       THE COURT:  Any other insurer?  Okay.  I'll have some

8  brief rebuttal, and I do mean brief, because I heard the

9  arguments for three hours yesterday so I understand the plan

10 proponent's position.

11      MR. LOCKWOOD:  Believe it or not, Your Honor, I think

12 this is going to be brief.  First, I would just like to address

13 Mr. Shiner's last point which is essentially, as I understand

14 it, that we should just have the CE provision all by itself.

15 And, in effect, he points out to the Court that the fact that

16 we have put in the provision -- one of the things that we put

17 in the provision was the carve out for the protection for

18 settled insurers of contribution claims against them under the

19 524G injunction.  So, as I understand Mr. Shiner's proposal, we

20 should use the CE language and that language would mean that it

21 overrides the 524G protection granted settling insurers because

22 nothing in the plan or the confirmation order, whether it

23 purports to be preemptory or super meaning, shall interfere

24 with the insurers' coverage rights, in effect, short form.

25      THE COURT:  But, if they settled, they've already

1  agreed to what those rights are.

2          MR. LOCKWOOD:  No, but Mr. Shiner -- Mr. Shiner is a

3  non-settling insurer.

4          THE COURT:  Yes.

5          MR. LOCKWOOD:  He has come to this court and said I

6  want to bring contribution claims against settling insurers and

7  he says we need -- I need to be protected by the CE insurance

8  neutrality language which doesn't say, in its terms, that a

9  non-settling insurer cannot sue a settling insurer.  So, under

10  his reading -- under what he proposes, a settling insurer

11  that's gotten the protection of a 524G injunction could, under

12  CE, if there was no carve out for the injunction, sue a

13  settling insurer for contribution.

14          There's a lot of settling insurers on this side of

15  the room.  I don't think that they're of the view that the

16  Court in Combustion Engineering -- or you, in Combustion

17  Engineering in approving the CE language in effect said, this

18  insurance neutrality provision overrides the 524G injunction.

19          THE COURT:  No --

20          MR. LOCKWOOD:  I don't think you intended it to

21  override it.  I don't think --

22          THE COURT:  -- I don't think it could override it.

23          MR. LOCKWOOD:  Well, if you say nothing in the

24  confirmation order, or the plan, or the plan documents that

25  purports to be superpreemptory or -- let's look at the language

1  again, Your Honor, which we took from <u>Combustion Engineering</u>.

2           THE COURT:  Well, the issue then would be simply that

3  somebody would be bringing a lawsuit against an enjoined party

4  and the defense would be that the confirmation order prohibits

5  that injunction, and that suit would probably come here.  That

6  probably wouldn't be a coverage action.  That would be an issue

7  as to whether or not the plan was being carried out

8  appropriately.  So, I'm still missing the point.

9           MR. LOCKWOOD:  Your Honor, I'm going to put your --

10  the language from <u>CE</u> on the Elmo here.  You raised a question

11  earlier about the fact that in 7.15A it referred to the

12  confirmation order.

13           THE COURT:  Yes.

14           MR. LOCKWOOD:  And that was a problem?

15           THE COURT:  No, it says --

16           MR. LOCKWOOD:  Well --

17           THE COURT:  It says that -- I'm sorry, that's not

18  what I meant, and yes, I may have said that, Mr. Lockwood, I

19  apologize.  That's not what I meant.  What I meant to say was

20  that nothing in the plan is going to say that it overrides the

21  confirmation order.  That kind of plan I can't confirm.

22           MR. LOCKWOOD:  I understand that.

23           THE COURT:  Okay.

24           MR. LOCKWOOD:  And all we're saying is that there's a

25  provision in the plan by which the plan proponents, themselves,

1  agree that nothing in the confirmation order would take away

2  insurance rights.  Now, all that's saying is what the plan

3  proponents are agreeing to.  And the reason that that language

4  was in there, the reference to the confirmation order, is

5  because the insurers have insisted that it be in there.  Why

6  have they insisted?  If you look at the language of <u>Combustion</u>

7  <u>Engineering</u> itself, it says notwithstanding anything to the

8  contrary in this order.

9           THE COURT:  Right.

10           MR. LOCKWOOD:  This order was the confirmation order.

11           THE COURT:  Yes.

12           MR. LOCKWOOD:  That's where this language appeared.

13           THE COURT:  And that language will have to go into

14  neutrality --

15           MR. LOCKWOOD:  Okay.

16           THE COURT:  -- in the confirmation order in this

17  case, too.

18           MR. LOCKWOOD:  I agree.

19           THE COURT:  Okay.

20           MR. LOCKWOOD:  I agree.  But, now let's look -- what

21  else is in the confirmation order?  The 524G injunction.

22           THE COURT:  Yes.

23           MR. LOCKWOOD:  So, this says, notwithstanding

24  anything to the contrary in this order --

25           THE COURT:  Yes.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. LOCKWOOD:  -- including the 524G injunction shall

2    in any way operate to or have the effect of impairing the

3    insurer's legal, equitable or contractual rights in any

4    respect.  What Mr. Shiner is arguing -- let me -- what we're

5    trying to do is to clarify things that we think the CE language

6    itself, with all due respect to the gold standard, might

7    possibly have some internal inconsistencies in it.  And what

8    Mr. Shiner is doing here is pointing up one of those internal

9    inconsistencies because the confirmation order contains a 524G

10   injunction protecting settling insurers.

11         THE COURT:  Okay.

12         MR. LOCKWOOD:  And that protection includes not being

13   sued for claims arising out of asbestos personal injury claims

14   asserted by non-settling insurers.  Okay?

15         THE COURT:  Okay.

16         MR. LOCKWOOD:  So, we say -- we put in the exception

17   clause in our language that says, "Except if provided in

18   Section 7.15."  One of the exceptions that we have put in that

19   Mr. Shiner was just complaining about was -- pardon me, I'm

20   rooting around here -- Section 7.15D is one of the exceptions,

21   and what does it say?  It says, "Nothing in the plan or the

22   plan documents shall affect, or limit or be construed as

23   affecting or limiting the protection afforded to any settled

24   asbestos insurer's company by the asbestos PI channeling

25   injunction."

1       What we're trying to do, and what Mr. Shiner, if his

2  coverage gets settled in this case would want us to be doing,

3  is to say that the superpreemptory provision from CE doesn't

4  override the 524G injunction.  And yet if you look at the

5  literal language from the CE order which says nothing --

6  notwithstanding anything to the contrary in this order,

7  couldn't that be read, notwithstanding anything to the contrary

8  in this order which includes the 524G injunction, couldn't that

9  be read, arguably, to override the 524G injunction?  The answer

10  is, read literally, it not only could be read to override it,

11  it does override it.

12       But, we don't think that either the Third Circuit,

13  Your Honor, or indeed, any of the settling insurers would think

14  that that was a reasonable or sustainable interpretation of the

15  CE language, and in many of the cases in which Mr. Shiner and I

16  have made deals under which his clients have become settling

17  insurers, I don't think Mr. Shiner in those cases would be

18  making that argument.

19       So, that's, I think, a telling illustration of one of

20  the reasons why this version of the CE language has provisions

21  in it that contain clarifying carve outs to make very precise

22  what we think the Court intended in the CE superpreemptory

23  language which we have attempted to incorporate with these

24  clarifying modifications in this plan.  And, in particular, I

25  think the argument Mr. Shiner made about contribution claims

**J&J COURT TRANSCRIBERS, INC.**

1  falls within that.   That's point one.

2         Point two is, Mr. Shiner admitted, as Mr. Bernick

3  pointed out in his chart the other day, we have agreed

4  repeatedly that issues of the scope of the injunction, the

5  scope of the releases, the scope of the exculpation, whether

6  the insurers, in fact, have some kind of claims or rights not

7  related to their coverage obligations but claims such as

8  contributions that are Phase II issues and that's for another

9  day.  And so I don't know how many times we have to say it in

10 open court before the insurers will accept the notion that

11 we're not here to re-argue those types of claims today.

12        I'd like to go back now and briefly touch on some of

13 the points that were made over the last full day, including

14 yesterday afternoon and today.  And I agree with those

15 insurance counsel who said, when you really sift through all of

16 this, there's not all that much dispute once we've sort of

17 clarified the standing of people to raise claims and rights

18 being impaired that are not coverage defenses being impaired in

19 Phase II.

20        Virtually, all of the insurers, including Mr. Brown

21 again this morning, have seized on the language of 7.15B which

22 talks about the plan beneficiaries which Your Honor was just

23 discussing a few moments ago and whether it might be changed

24 and whether it's confusing.  I, as Your Honor I'm sure recalls,

25 made the point in my original presentation that the reference

**J&J COURT TRANSCRIBERS, INC.**

1  here to the beneficiaries of the asbestos PI trust could, under

2  some theoretical circumstances or hypothetical circumstances,

3  include insurers and it can because if an insurer has, and as

4  Mr. Brown pointed out, an indemnified claim under the TDP, it's

5  Section 5.12 or 5.13, that claim will be brought against the

6  trust pursuant to the channeling injunction and in that

7  capacity that insurer will be bound by the plan, by the TDP.

8         I mean, it says -- the TDP expressly provides

9  provisions as to how those claims will be resolved and paid by

10 the trust.  And in that capacity, which Mr. -- I must say, Mr.

11 Brown's argument that you need to look at the capacity that an

12 insurance company is acting and whether they're wearing a hat

13 as a claimant or wearing a hat as an insurer is ridiculous.

14 With all due respect, it's his argument that's ridiculous.  I

15 mean, he knows perfectly well that if his client -- he comes in

16 here as representing a settled insurer and announces that he's

17 got an indemnity claim against Grace and complains that it's

18 being channeled to the trust and not paid by Grace as a Class 9

19 claim.  That's a Phase II issue that we're going to face, but

20 that's what he's here for.

21        And he knows perfectly well that that is a different

22 kind of capacity in this case as some insurance carrier who's

23 asked by the insurer -- excuse me -- by the trust to live up to

24 its insurance obligations.  There's nothing ridiculous about

25 making that distinction.  In fact, if we're going to talk about

1 clarifying this provision, what we ought to do is after the

2 words "beneficiaries of the asbestos PI trust," we should put,

3 "in their capacities as such."  Would that explain what we're

4 talking about, Your Honor?

5          THE COURT:  The beneficiaries of the asbestos PI

6 trust in their capacities as such?  No.  That doesn't --

7          MR. LOCKWOOD:  Because it would point out that

8 they're talking about that the plan only binds people when they

9 are, in fact, acting as a beneficiary of the trust.

10          THE COURT:  In other words, when they submit a claim.

11          MR. LOCKWOOD:  When is an insurer acting -- let's --

12          THE COURT:  When it submits a claim.

13          MR. LOCKWOOD:  Yes.

14          THE COURT:  Fine.  Then say that, the beneficiaries

15 of the asbestos PI trust who submit claims to the trust.

16          MR. LOCKWOOD:  Well, okay.

17          THE COURT:  Claims or demands.

18          MR. LOCKWOOD:  We could do it another way.  That's

19 another way of doing it.  But, the point is that what the

20 insurers -- what Mr. Brown and the other insurers that have

21 been here are arguing is saying that this provision should be

22 read as either explicitly or ambiguously, depending on whether

23 they're talking about clarity or not, as saying that this

24 provision overrides Section 7.15A, C and F, which are the core

25 insurance neutrality provisions in the plan, because an

1  insurance company who has a claim -- who has a claim, is a plan

2  beneficiary and therefore this says they're bound by the plan

3  and therefore it's an exception to the insurance neutrality and

4  therefore --

5          THE COURT:  Well, it's confusing.

6          MR. LOCKWOOD:   -- the insurance neutrality is

7  completely voided.

8          THE COURT:  Well, it's confusing.  It can be

9  straightened out.  It can be straightened out by making B, you

10  know, two sub parts, one dealing with personal injury

11  beneficiaries and one dealing with insurers, and to the --

12          MR. LOCKWOOD:  Well --

13          THE COURT:  -- extent that the insurers have to

14  submit a claim or a demand, then it can be carved out.  You

15  don't want that limitation with respect to the asbestos

16  personal injury folks because you want everyone who thinks they

17  ever have a claim or a demand against Grace to be bound by this

18  order.

19          MR. LOCKWOOD:  The only point I'm trying to make

20  here, Your Honor, is that this provision is clearly not --

21          THE COURT:  It's not clear.

22          MR. LOCKWOOD:  -- an override.

23          THE COURT:  That is not clear, Mr. Lockwood, that's

24  the problem.  Because these -- A, and C and F all start off

25  with --

1          MR. LOCKWOOD:   -- with except.

2          THE COURT:   -- "except to the extent provided in this

3 section."

4          MR. LOCKWOOD:   So --

5          THE COURT:   And it says this Section 7.15.   It

6 doesn't say 7.15A, 7.15C.   It says, "except as provided in this

7 section."   So, I offhand don't really understand whether it's

8 attempting to limit those clauses to everything else that's in

9 this section, or only to the particular paragraph.   I don't

10 think that this is clear.   I think it can be fixed, but I don't

11 think it's perfectly clear, those -- in that sense.

12          MR. LOCKWOOD:   So, you think it would be a fair

13 reading that having gone to the trouble of putting all these

14 other provisions in 7.15 that the plan proponents, as the

15 insurers are suggesting are sort of deviously written 7.15B to

16 completely vitiate everything else in 7.15 --

17          THE COURT:   No, I don't --

18          MR. LOCKWOOD:   -- because that's what their argument

19 is.

20          THE COURT:   I don't think there's any evil motive.

21 I'm not attributing any evil motive to anyone.   What I'm

22 suggesting simply is this.   I think Mr. Brown is quite correct.

23 Everybody's intent, I'm assuming, is of the highest order.

24 But, the folks in this room aren't going to determine what the

25 meaning of this provision is if it's asserted by way of either

1    affirmative litigation or by a defense.

2            So, to make it clear what it means, it can be

3    tweaked.  It doesn't seem as though the tweak will be that

4    difficult to do.

5            MR. LOCKWOOD:  We can certainly put something in

6    there that says, you know, the plan beneficiaries who submit

7    claims to the trust, or something like.  But, the problem I

8    have is that I don't think the insurers will necessarily accept

9    that.  So, I guess the bottom line is, we've said we'll talk to

10   them about insurance neutrality language and we'll talk about

11   tinkering with 7.15B.  But, the basic -- I take it, Your Honor

12   --

13           THE COURT:  But, the issue with respect to the

14   beneficiaries though is, I think the problem is that the

15   beneficiaries that you're really -- that the trust is going to

16   be dealing with most frequently are asbestos personal injury

17   claimants, not the insurers.  The insurers may have some claims

18   that will be processed through the trust, but in that sense,

19   yes, they may be beneficiaries, but I don't think that's what

20   this paragraph, in the form that it's written, is clear about.

21   It is clear as to the personal injury beneficiaries.  So,

22   perhaps you just need two subsections, one that deals with

23   everybody but the insurers who may make claims and one that

24   deals with the insurers who may make claims or demands so that

25   you can make it -- that clarify that for the insurers it's

1 those who are submitting claims --

2 　　　　MR. LOCKWOOD:  But, again, it's those who are

3 submitting claims only as claimants.

4 　　　　THE COURT:  Fine.

5 　　　　MR. LOCKWOOD:  Because --

6 　　　　THE COURT:  Right, yes.

7 　　　　MR. LOCKWOOD:  -- what the insurers keep arguing is

8 even if we put in it only applies to insurers who are

9 submitting claims, Mr. Brown is going to be up here saying

10 well, I'm going to submit a claim and therefore, 7.15B means

11 that the rest of 7.15A, F -- C and F don't apply to me, and

12 that's not what it says and that's not what it's intended to

13 say.

14 　　　　THE COURT:  Right, so you can define that.

15 　　　　MR. LOCKWOOD:  So we'll -- you know, we'll tinker

16 with this.

17 　　　　THE COURT:  You know, maybe you need a whereas clause

18 that indicates at the beginning of this that there are

19 statuses, different statuses, that the insurers hold and define

20 that fact if that's what would help.  I'm not sure, because the

21 more words, I think, sometimes the less clear.  But,

22 nonetheless, if the problem simply is that the insurers have

23 different capacities and they want to make sure that this

24 language is only affecting them in their capacity as insurers

25 who submit claims to the trust and not in some other capacity,

65

1  I don't see why that's so difficult to put in a --

2          MR. LOCKWOOD:  I don't think it is, myself, and we'd

3  be happy to put that in.  I mean, that was what I was

4  attempting to do when I wrote my little, in their capacities as

5  such.  If it needs more words to make the same point --

6          THE COURT:  Okay.

7          MR. LOCKWOOD:  -- we're certainly happy to do that,

8  Your Honor.

9          The other issue -- another issue has to do with the

10 definition of asbestos insured coverage defenses, and in

11 particular to the carve out for the bankruptcy, Romanette (i),

12 the plan or any of the plan documents do not comply with the

13 bankruptcy code.  Again, this is another one of these sort of

14 arguments which Your Honor has had, considerably, back and

15 forth with the insurance company lawyers, about, you know, why

16 -- what's wrong with it?  I mean, there's nothing -- and as far

17 as I could tell, other than the fact that it's not specifically

18 contained in the language of the CE decision itself, the

19 argument boils down to the proposition that we could somehow or

20 another treat a coverage defense as a bankruptcy code defense.

21         And, with all due respect, I don't -- nobody has yet

22 articulated, no insurance company lawyer, including the

23 eloquent Mr. Brown, has explained in any meaningful way how

24 this bankruptcy code defense is a coverage defense.  I mean, I

25 pointed out yesterday that it preserves all your coverage

J&J COURT TRANSCRIBERS, INC.

1  defenses and that those include, for example, collusion, which

2  -- and the fact that if you sort of -- you could also make a

3  collusion-like argument on bad faith.  All it says is you can't

4  make an 1129 -- an argument that 1129(a)(3) of the code wasn't

5  satisfied.  It doesn't say that you couldn't argue collusion.

6  And let's look at the language here.  Mr. Brown himself read it

7  to you.

8         The language that precedes the Romanette (i) says is,

9  "Asbestos insurance coverage defenses include any defense based

10 on the terms of the plan, or the plan documents or the manner

11 in which the plan or the plan documents were negotiated."  What

12 does "or the manner in which the plan or plan documents

13 negotiated" mean?  It means, that -- Mr. Brown kept talking

14 about, we weren't included in the negotiations.  Well, that's

15 part of the manner in which the plan was negotiated.  They were

16 excluded.  He claims we didn't consent.  Well, that's part of

17 the manner in which the plan was negotiated.

18        The other insurers have made arguments, essentially,

19 that the ACC and the FCR drafted the TDP and the debtors didn't

20 really participate in it, and that sort of smacks of the notion

21 that the debtors violated some insurance policy provisions

22 relating to collusion because they sort of agreed to waive

23 their rights to draft or complain about the TDPs by giving --

24 and, again, that's either the terms of a plan document, the TDP

25 or the trust agreement, or the manner in which the plan

1  document was negotiated, both of which are expressly stated to

2  be asbestos insurer coverage defenses.

3        So, again, it's like what we just went through.  They

4  say, well, we're giving you expressly the arguments that you

5  want to make about coverage defenses and then because we carve

6  out a defense that the plan doesn't comply with the bankruptcy

7  code, we've sort of deviously and subtly taken back with the

8  left hand what we just gave you with the right hand.  And with

9  all due respect, Your Honor, those are not bankruptcy code

10 defenses.  There is no defense in the bankruptcy code, other

11 than bad faith, that says that creditors and debtors can't

12 negotiate the terms of a plan.

13       Indeed, I believe Your Honor has on other occasions

14 noted that the bankruptcy code contemplates creditors and

15 debtors negotiating the terms of a plan.  So, the notion that

16 you can sort of use the, what I'll call, swallow up argument

17 which has been made by some of these insurers by focusing on

18 this Romanette to take away express provisions of the very same

19 paragraph that grants the provisions is, if we're going to use

20 terms like ridiculous, that's ridiculous.

21       I think Your Honor accurately responded to, and I

22 just want to emphasize the fact, that there is no distinction

23 between having your rights preserved and having your remedies

24 preserved.  There is no freestanding right in an insurance

25 policy for an insurer to do something unless the insured has

1  tendered a claim to the insurer for defense.

2          And while Mr. Brown is correct that the insurers can

3  certainly go out and file declaratory relief actions about

4  whether various plan provisions, if implemented in the ways

5  that the insurers believe that they will be implemented,

6  violate their policy rights, they certainly can do that under

7  this plan and under the insurance neutrality provisions.  Your

8  Honor was also correct that one of the defenses to such an

9  action might very well be, it's not ripe, the trust hasn't

10 decided how they're going to handle any claims, et cetera.

11         And another point that Mr. Brown made that's related

12 to that in the colloquy that you and he had, has to do with the

13 process in the future by which the trust actually will do

14 things.  If we're going to talk about hypothetical post

15 consummation declaratory judgment actions, one could certainly

16 hypothesize the following scenario.  The insurers go to some

17 court either with a claim that's been tendered to them by the

18 trust for which there's the demand for payment or in a

19 declaratory relief situation.

20         And the coverage court says, you know, you can't do

21 it that way, you cannot use expedited review to cut off the

22 insurer's claims handling rights.  At that point, the trustees

23 have the power under the plan documents, the trust agreement in

24 the TDP, to amend them and they could do exactly what these

25 insurers say they should do right now which is they could say

1  okay, we're going to have a new process under which claims are

2  submitted to the insurers before they are processed by the

3  trust at which point you would have now a new set of coverage

4  issues as to whether or not this hypothetical change in the

5  future was or wasn't binding on the insurers and didn't cure

6  the problem.

7          And Mr. Brown and the others have repeatedly agreed

8  with the point I made at the very beginning of my presentation

9  the other day which is this Court is not being asked to decide

10  coverage issues which means, among other things, that it is not

11  being asked to determine that the TDP expedited review

12  procedures violate the insures' policy rights.  The question

13  before the Court in Phase I is a very limited question which

14  is, have the insurer's rights to deny coverage for claims

15  resolved under the TDP been preserved?  And the answer I submit

16  to Your Honor is, they clearly have been preserved and there's

17  no lack of clarity about that.

18          There's been a whole lot of discussion about, which I

19  think was framed actually most cogently by Mr. Brown about the

20  audience for the insurance neutrality provision, and this ties

21  in, I might add, to Mr. Brown's use of Mr. Austern's testimony

22  about an illustration of how complicated and difficult to

23  understand and the poor coverage judge is going to be just

24  totally helpless to deal with this when it's presented in front

25  of him.

1          And I have two observations to make about that.

2    First, Mr. Brown didn't question Mr. Austern, who was not

3    tendered as an expert of any sort, much less as a 30(p)(6)

4    witness.  He didn't ask Mr. Austern how much time he'd spent

5    looking at Section 7.15 and trying to figure out what it meant.

6    He didn't ask Mr. Austern whether or not he had relied on his

7    own counsel for advising him that the provision did or didn't

8    work.  All he did was got a sort of spontaneous free form

9    volunteering that based on however little preparation on the

10   subject of insurance neutrality Mr. Austern had undertaken

11   prior to his deposition, that Mr. Austern had at that point in

12   time found the provisions confusing.

13         And with all due respect to Mr. Austern, the question

14   before this Court is not whether Mr. Austern thinks they're

15   confusing, the question is whether this Court thinks they're

16   confusing.  And the question before a coverage court is not

17   going to be the kind of question posed to Mr. Austern, which is

18   Judge X, you've now had the opportunity to hear a variety of

19   evidence on what this provision means.  You've heard lawyers

20   argue about what it means.  Do you think you understand it

21   after all that?  Mr. Austern wasn't asked that question, but

22   the coverage court will be.  And --

23         THE COURT:  I don't know why a coverage court would

24   have to construe the provision, at all.  If the defenses are

25   preserved, it ought to be coverage litigation, not an

1  interpretation of Section 7.15.  That's the point, I think.

2  The point is to get into the --

3          MR. LOCKWOOD:  What the insurers, I think, are

4  arguing is that the ever devious plan proponent lawyers who

5  have now morphed into trust lawyers in the next round of

6  litigation will be trying to argue various things that are

7  inconsistent with the insurance neutrality provisions and that

8  they will mislead the coverage court into accepting such

9  misinterpretation.  I think that's really what they're arguing.

10         And, in this regard, I would like to read something

11  from the CE opinion in the Third Circuit which although it

12  deals with another issue, I think actually is very informative

13  about the Third Circuit's view about how you deal with the

14  alleged incompetence of subsequent judges to understand what's

15  going on in the case before the bankruptcy court.  It says,

16  "The injury complained of here relates to the possibility that

17  a future court will mistakenly rely on the bankruptcy court's

18  valuation of the indemnification claims as zero for purposes of

19  voting and planned confirmation as a ruling on the merits of

20  those claims.  We fail to see how this speculative event arises

21  to the level of direct and pecuniary harm required for

22  bankruptcy appellate standing."

23         The bankruptcy court made clear that the estimation

24  and the value of the indemnity claims was limited for purposes

25  of plan confirmation.  To make the point more explicit, the

1  bankruptcy court did not foreclose the possibility that future

2  litigation might alter its valuation of the indemnities.  And

3  then it quotes from your decision.

4  Based upon these clear limitations on the scope of

5  its findings, we believe a future court will understand the

6  limited relevance of the bankruptcy court's estimations on the

7  operations of those indemnities and the merits of any related

8  claims.

9  In other words, the Third Circuit was unwilling to

10  accept as a basis for altering this Court's decision on the

11  value of indemnification claims, the possibility that some

12  other court down the road might misunderstand what was going on

13  before the bankruptcy court and what the bankruptcy court was

14  doing.  And I would submit to you, Your Honor, that's exactly

15  what Mr. Brown and the others are trying to do here.  They're

16  trying to say that even though Your Honor's confirmation order

17  is going to say that, you know, what I'm doing here is

18  confirming a plan and determining it's in conformity with the

19  bankruptcy code, and I have this insured's neutrality language

20  here, that some other court somewhere is going to become

21  confused and misled and therefore you can't accept the language

22  before you, not because they've shown that it doesn't mean what

23  it says, but rather because they want to speculate about it.

24  Some ways, somebody might argue that it doesn't mean what it

25  says to some other court.  I mean, that's sort of like saying

1  that we can't have a contract enforced by a court where there's

2  a dispute about it because other -- some other judge might not

3  understand the contract because it's really complicated.

4         I mean, the judge -- the duty of courts is to figure

5  out the answers to questions and it doesn't limit itself to the

6  answers to questions that are simple.  And I would submit that

7  this really isn't anywhere nearly as complicated as the

8  insurers are attempting to make it look.

9         Oh, one other point.  It was made most strenuously by

10 Mr. Millner the other day, but it's been made by a number of

11 the insurers, which is that the plan fails and this is some

12 violation of neutrality, I guess, to provide that the

13 assignment of the rights under the policies doesn't include the

14 assignment of the -- the assumption by the trust, the

15 obligations.  Your Honor, these policies, these unsettled

16 policies are non-executory contracts.  It is hornbook

17 bankruptcy law that if you assign a non-executory contract, the

18 assignee takes the contract what they call cum onere.  And that

19 term cum onere, as I'm sure Your Honor is familiar with, means

20 that you take it with all the obligations that comes with it.

21 You don't get to cherry pick it and choose oh, well, I'll take

22 the benefits, but I'll just ignore the detriments.

23        So, the argument that somehow -- and moreover, in

24 those cases where there's a cum onere decision, they don't say

25 and the plan that transferred the executory contract was

1  defective because it didn't state in the plan, it didn't repeat

2  the cum onere doctrine.  It didn't write it into the plan.  It

3  says, that's what the law provides, that you take it with the

4  obligations.  And what Mr. Millner and others are saying is,

5  well, that may be true, but it would make us feel better if you

6  put in the plan that you take it with all the obligations.

7  Well, you know, maybe it would make them feel better.  With all

8  due respect, making them feel better is not a valid objection

9  to a plan provision.  That's all I have, Your Honor.

10         MR. MILLNER:  Two minutes.  One minute to respond to

11  Mr. Lockwood's last cum onere remark.

12         UNIDENTIFIED ATTORNEY:  Robert.  Robert, may we

13  finish our rebuttal?

14         MR. MILLNER:  Oh, sorry.

15         THE COURT:  Mr. Guy?

16         MR. GUY:  Thank you, Your Honor.  Jonathan Guy for

17  the asbestos PI FCR.  First, I think I join the whole courtroom

18  in wishing your daughter the best.

19         THE COURT:  Oh, thank you.

20         MR. GUY:  The issue today is very simple, is the plan

21  insurance neutral or not for the unsettled insurers?  This is a

22  Phase I issue, not a Phase II issue.  It's a very familiar

23  issue for the Court.  The Court has ruled on it many times.

24  The Third Circuit has ruled on it.  And the insurers seem to

25  agree that the point is not whether their coverage defenses are

1   preserved or not to give them insurance neutrality.  They seem

2   to also agree that they want insurance neutrality.  What I'm

3   taking away from the collective argument here is that they

4   think some of it is confusing.

5         As to that, the only thing that I've heard

6   legitimately I believe that is arguably confusing is this issue

7   about beneficiary.  Clearly, we can take a look at that and the

8   plan proponents can fix it, if necessary.  Other than that, I

9   think we're done.

10         We've heard a lot about the overall plan being

11   confusing and insurance neutrality treatment being confusing.

12   Talked about my client, Mr. Austern.  I want to reiterate what

13   Mr. Lockwood said.  Mr. Lockwood was presented by the plan

14   proponents to talk about these issues.  The insurers noticed

15   his deposition to talk about those issues.  Clearly, Mr.

16   Lockwood is an expert on those issues.  He did not notice my

17   client's deposition to talk about insurance neutrality.  For

18   them to come into this court and say, well, it's confusing

19   because of his on-the-spot review of that section, is just

20   plain wrong.

21         Your Honor, on the issue of collusion, I am

22   absolutely certain that no insurer in this courtroom is

23   suggesting that the FCR has colluded with anybody.  I do agree

24   with what they did say about him being a well-respected and

25   highly-regarded individual and I agree, obviously, with what

1  the Court said which is mirroring Mr. Brown's comment that

2  everybody's intent here is of the highest order.  That is an

3  issue for bad faith in connection with the Phase II of this

4  case.  They can raise what arguments they can raise then and,

5  of course, whatever findings the Court makes with regard to the

6  plan being in good faith which we obviously believe it is, will

7  be those findings and they will be binding.

8           And as to any other findings the Court makes, those

9  will be binding, too, but they are the bankruptcy court's

10 findings that have to be made for this case to be confirmed.

11 Thank you, Your Honor.

12           MR. BERNICK:  Your Honor, I just have some -- a few

13 remarks and I want to start out by saying that I guess one of

14 the good things about this process as we think about this

15 phasing effort, whether the phasing effort has produced

16 something that's good, I think it definitely has.  I think that

17 this is an important area to be able to cover and have some

18 time to think about and deal with before we get to Phase II.

19           And the other thing that I think is accomplished is

20 that a lot of people have said what I think are obviously

21 remarks that were made in very good faith, that there is more

22 work to be done between the parties here to try to resolve

23 these issues.  And I'm very confident in my colleague, Mr.

24 Lockwood and Ms. Esayian, that that work, in fact, will be

25 done.  So, nothing that I'm saying now is designed to push back

1 on the idea that more work can be done.

2        But, I do think it's -- I do think that it is a

3 little bit important to talk about what the -- what I'm going

4 try to do is kind of set out in a way a couple different types

5 of issues such that if we can't reach resolution, we're clear

6 on what it is that the benchmark really is for deciding these

7 things if they had to be decided on a contested basis.  And I

8 think that the principal problem that we have here and the

9 discussion today and yesterday is, people are still not

10 listening to the lesson of CE.

11        The insurers made a tremendous effort in the CE case,

12 as did others, obviously, but the insurers made a tremendous

13 effort to get the attention of the Third Circuit on this whole

14 issue, and they were successful.  They got the attention of the

15 Third Circuit and that was a major, major undertaking.  And the

16 CE decision was a landmark decision, there's just no question

17 about it.  And, of course, the CE people had to go back and do

18 some more work and pay a little bit more money.  The good news

19 is that it all was a success in the end there after an awful

20 lot of work.

21        But, the real teaching of CE is, in fact, the

22 insurance process.  And what CE says, the lesson of CE is that

23 when it comes the question of neutrality, there is one vehicle

24 that is chosen for assuring neutrality, period, and that is the

25 superpreemptory clause.  That's it.  That is the gold standard

1  that Mr. Giannotto talked about, it's recognized.  It is a

2  standard that we had to follow, and we did.  It is the standard

3  that the Court has to follow and has followed in the past and

4  presumably is going to follow again.  And the critical thing is

5  that there wasn't some other fix, or some other device or some

6  other additional language that the CE Court said, and you need

7  this, too.  This was the vehicle.  That's it.

8         Now, to implement that vehicle, that is to say, we're

9  now going to have a superpreemptory provision, it has to read

10  out that way.  But, we now have to marry it to 524G and a

11  trust, matters that the CE Court didn't really take up,

12  specifically.  Well, what's the interplay between?  If we

13  follow the lesson of CE and we have this clause and yet we're

14  going to have a trust with a 524G channeling injunction, guess

15  what?  We're going to need to have this language, but we're

16  then going to need to have carve outs.  This is not -- the

17  carve outs are not kind of oh, well, gee, the debtor or the

18  plan proponents' predilections for creating more problems and

19  more complexity for coverage courts.  It is necessitated by the

20  idea of having a trust with a 524G channeling injunction and

21  the trust then holding these insurance assets so that they can

22  be deployed because they're enormously valuable in this case.

23  So, that's what produced the carve outs, is the necessity of

24  having a broad language of the superpreemptory provision and

25  yet the ability to have insurance go to the trust.

1          Now, the carriers may say, well, that's your problem,

2    maybe you shouldn't have the insurance and the trust and they

3    don't like the idea of having a trust.  They don't like the

4    idea of not being involved in the formulation of how the trust

5    is going to operate.  They don't like the idea of the insurance

6    being in the hands of the trust and we understand that.  But,

7    the fact of the matter is, that this is a critical, critical

8    step in the implementation of this plan.  It's not simply a

9    preference to say necessity is essential to the deal.

10          So, in light of that, we have to acknowledge that by

11    gosh, the plan is not going to be neutral with respect to those

12    carved out matters and Your Honor is going to have to determine

13    on the merits whether they are permissible.  This is all

14    necessity.  This is not optionality.

15          Now, the first set of issues that the carriers raise

16    are issues of clarity.  As we do this, it's certainly important

17    to be clear.  And there was a concern raised that there might

18    be misconstruction of these carve outs and that is a totally

19    fair criticism.  And to the extent that we have issues about

20    clarity, there's no question and there's no issue of the fact

21    that we've got to be clear and Your Honor has told us areas

22    where more clarity can be obtained and Mr. Lockwood, Ms.

23    Esayian and Mr. Guy I'm sure will work on clarity.  That's just

24    not an issue.  In fact, you might even think about, I have no

25    authority for saying this, but what if you made the

1  superpreemptory provision in all bold caps so everybody knows

2  that's the magical language, that's the important stuff, that's

3  what you go to first like a disclaimer of warranty is a buyer

4  beware.  This is not going to trump anything, coverage judge

5  beware.

6        But, there are other issues that are being put out on

7  the table that go beyond clarity.  And the other issues that

8  are raised are issues about getting more substantively, the

9  more.  And the necessity of getting more has been attached to

10  the argument that Mr. Lockwood addressed, and that was

11  reiterated again and again, which is the concern over getting

12  comfort that as this goes forward in the coverage process, it's

13  all going to be understood and it's going to be given effect,

14  whatever the Court -- whoever the Court might be.

15        It's kind of wouldn't you want, Your Honor, wouldn't

16  you want if you were us to have this provision and, well, if it

17  doesn't really change anything and you intend to do it, why

18  don't you just say it?  It's the idea that it has to be --

19  there has to be a certain amount of advocacy built into this so

20  that what is substantively intended here is, in fact, given

21  effect before a coverage court.

22        And the difficulty with that is that it doesn't

23  listen to the lesson of CE.  CE said that the solution to this

24  problem is the substantive provision called the superpreemptory

25  provision.  That is the vehicle.  The CE Court didn't say, oh,

1  well, gee, we now have to have some more umph developed into it

2  by adding on substantive provisions such that there's a

3  sufficient momentum behind the superpreemptory provision that

4  even some poor coverage judge will get it.  That's not what the

5  CE Court said.  That's not the benchmark.  That is not the

6  standard.

7       The communication that they said was appropriate was

8  the superpreemptory provision.  And, therefore, everything that

9  is added onto the superpreemptory provision is essentially a --

10 and beyond that in the carve outs is essentially an engraftment

11 that is not what the Third Circuit chose.  They're trying to

12 expand the ambit of what the Third Circuit has said is a viable

13 concept which is neutrality by saying the neutrality must be

14 communicated, and must be developed through an enhanced

15 vehicle.

16      And there's no -- there's nothing about this case

17 that's different from CE in terms of a need for that kind of

18 enhancement.  There's nothing that's been said that oh well,

19 coverage situation is different or neutrality really has to be

20 different, and what CE held in the Third Circuit has now got to

21 be different by virtue of new facts that are out there.  There

22 are no new facts that are out there that says that somehow the

23 language itself is insufficient and ineffective.  That's point

24 one.

25      Point two, inevitably you have to ask the question of

1    what is the job of this Court and what is the problem with --

2    the supposed problem with these coverage courts?  There's only

3    one alternative to putting this off to coverage litigation

4    which everybody seems to want to do and that is to have the

5    litigation here which nobody seems to want to do.  So, if the

6    litigation is going to be not in this court, it's going to be

7    in the court of the trust's choosing and that may be a state

8    court in the jurisdiction that the insurers don't like, or it

9    may be that the insurers get there first and they file their

10   coverage case in a court of their choosing at which point

11   you've got to believe that somehow they would pick a court of

12   their choosing where they thought that the coverage judge was

13   going to get it and was going to understand the language of the

14   superpreemptory provision.

15          But if, in fact, the trust strikes first and they

16   pick an unfavorable jurisdiction, you know what, the fact that

17   the forum may not be favorable is not a problem of this

18   bankruptcy case, this court and of the Third Circuit and the

19   language that they endorsed.  That is a problem, if it is a

20   problem, of jurisdiction, of courts to hear coverage disputes.

21   So, when the carriers say they don't want to litigate it here,

22   they're making the choice to say, they want to litigate it

23   someplace else and when they make that choice, they're subject

24   to the risk that they'll have a judge who doesn't really care

25   or a jurisdiction that is unsympathetic.

1        That is not this Court's problem.  We don't have to
2  sit there and develop a plan that is, I'll say it with all due
3  respect to whoever it is that the carriers chooses, the judge,
4  idiot proof.  It has to be a plan that tracks the language of
5  CE.  That is the basic problem.  And so you get to the question
6  of, what's this Court's job?  This Court's job is to follow CE.
7  This Court's job is not to solve the basic problem of what's
8  going to happen in the coverage court.

9        Number three.  You have to ask the question, well,
10  with whatever you add, if you wanted to reach out and kind of
11  assist the communication process, you have to ask the question
12  are you adding something that is worth the problems that might
13  be created by virtue of what you're adding?  That is, every
14  time you add a new provision, you don't necessarily -- it's not
15  necessarily an all-benefit process.  You then have to reconcile
16  that provision with a lot of different things.  For example,
17  you have to reconcile that position with the truth.  And Your
18  Honor pointed out yesterday the fact that you can't say that
19  this case and this proceeding will have no impact on a coverage
20  proceeding.

21        It might, to the extent that this case is the
22  dispositive determination of issues that are accorded solely to
23  the jurisdiction of this Court.  It is going to have some kind
24  of impact.  So, you can't say it's not going to have any kind
25  of impact.  And that's illustrative of the problem which is, as

1  Mr. Lockwood and Ms. Esayian and Mr. Guy go through the more

2  provisions, not just the clarities, but the more provisions,

3  each one creates its own little world of problems and that's

4  why it's so tedious to hear anybody go through them is that

5  they are each one kind of a little set of problems and no

6  matter which provisions are, they are a little set of problems.

7          And that inevitably then gets to the next point which

8  is that as soon as you start to say, I want comfort for what

9  happens down the road, or Mr. Brown says consider the audience,

10 you are immediately speculating about who's the audience, in

11 what context on what issue.  There is no one audience.  You

12 can't sit there and tailor this to an audience unless what you

13 were trying to do is to say, we'll assume that the audience is

14 stupid, hostile, uninterested, lazy and again you get back to

15 the proposition that you got to make this thing so rudimentary

16 and hit them over the head or say you got no choice.  Well,

17 that is a rank speculation.  We can all speculate about who the

18 audience will be and what the context will be.  And speculation

19 should not drive this process.  The benchmark is not

20 speculation about what might happen in a coverage court.  The

21 benchmark is what <u>CE</u> told us was the right language.

22          And the final problem with the mores, you got, (a) is

23 it true, (b) do you have to speculate, and (c) you start to get

24 something else coming in the process which I'll call creeping

25 coverage controversy, CCC, creeping coverage controversy.  And

1  we've had that already which is that kind of be careful you ask

2  too much.  We're now speculating that there's a coverage judge

3  who's out there of one stripe or another.  And we're

4  speculating that they're not going to get this or they're not

5  going to get that and will be hostile to it.  So, the solution

6  in the more provisions is to hit them over the head and say

7  here, we anticipated that you might be enticed to do this bad

8  and awful thing, so we're going to tell you not to do it.

9  Don't do this.

10        And the difficulty with that is that it starts to be,

11  in a sense, a process of injecting us and this Court into

12  telling the coverage judge what the potential coverage issue

13  is.  For example, Mr. Brown said you know, if you take a look

14  at that order, it's not really true that rights are being

15  preserved.  That's not really accurate and maybe you ought to

16  scratch that from the order.

17        Let's just see how that would work.  If Your Honor

18  had that order read out, that it's not just -- it's not rights

19  and defenses.  It's just defenses.  Then Mr. Brown's colleague

20  who goes down to Texas or whatever to argue coverage, says, uh,

21  that was stricken and the reason it was stricken is that it's

22  very apparent that the rights have not been preserved, that

23  this is all a question of defenses and remedies, that really

24  the TDP itself was already a breach.  That's essentially what

25  Mr. Brown argued, that the TDP itself already is a breach.  And

1 so now he'll say oh well, you know, we flagged this issue and

2 really the TDP itself already is a breach, Mr. Coverage Judge,

3 aAnd that's already been decided and -- but we have a complete

4 remedy.

5        Well, at that point, Your Honor is being

6 characterized as having walked down the road and already

7 flagged the problem that there is a breach in the TDP itself.

8 And there's almost an invitation.  And Mr. Presse's (phonetic)

9 affidavit does the same thing.  The whole idea that the TDP

10 can't be consistent with coverage the way that it was

11 negotiated, the way that it's styled, what it says, can't be

12 consistent with coverage rights and we know it today.

13        That whole notion is an argument.  It's a coverage

14 argument.  So, the idea that we have to have more provisions to

15 guard against the possibility of misapprehensions and

16 misconduct by the coverage judge gets this Court pretty closely

17 into the coverage litigation itself, to the point that there

18 are repeated protestations, oh, Your Honor, we're not asking

19 you to decide coverage.  Well, but they're asking you to

20 anticipate the coverage litigation and start to involve

21 yourself in their process of telling the coverage judge that

22 this is what happened or what didn't happen.

23        And this really comes back to fundamentally the same

24 proposition.  The fix, the fix to the problem that the CE court

25 chose knowing all about, as Mr. Lockwood indicated, the fact

1  that there are going to be coverage cases down the road, the

2  fix is this, it's this language.  It is not these additional

3  provisions that are the cold comfort provisions that are

4  designed to get the Court and this process and inferentially

5  the Circuit involved in trying to figure out what is

6  sufficiently clear and what is sufficiently protective of the

7  coverage issue for a subsequent court.  The CE Court already

8  resolved that issue, and it's not any of those provisions.

9       Now, in the service of getting things done maybe we

10  can see if we can reach agreement, and we'll try.  And I'm not

11  suggesting that there's any limitation from a negotiation point

12  of view on whether we can reach agreement.  But, if we can't

13  reach agreement, these arguments are per se under the Third

14  Circuit's decision out of line.  They used the wrong

15  benchmark.  And then we get finally to standing.  Why are we

16  doing all of this in the context of standing?  We want the

17  neutrality.  That's important under any set of circumstances.

18  But, we also want the standing determination.  Why is that

19  important?

20       It's important because, and I've changed this chart,

21  and I've given copies of it in advance to all the carriers.  I

22  changed the chart a little in two ways.  One is to underscore

23  that the carve outs or exceptions all fall within the same

24  subject matter ambit which is the preservation of coverage

25  rights and defenses.  We have the neutrality provision itself

1 and the exceptions that are exceptions to the neutrality

2 provision, but they relate to the same subject matter which is

3 preservation of -- they relate to the coverage, the provision

4 of insurance.  If there is no standing here, the real effect of

5 this is not that we'll necessarily have all of a sudden a

6 completely different cast of characters, we'll be down to Mr.

7 Millner -- no, it will be Mr. Brown or some pure coverage

8 player.  I promised myself I wasn't going to mention it because

9 I still want that chart up there at the end of the day.

10 But, it's not that we're going to necessarily have,

11 you know, a whole bunch of insurers disappearing.  It is that

12 with respect to each insurer that comes in for Phase II there's

13 a threshold question which is, what is their standing?  And to

14 establish their standing in Phase II it will no longer be

15 anything to do with providing insurance.  It will be, do they

16 have a claim?  Do they have a real claim, as opposed to a

17 speculative claim or an abstract idea that they may have a

18 claim?  Do they actually have a claim?  And that is -- because

19 it's only those people that will then have standing to raise

20 these other questions.  So, the real benefit of the standing

21 determination in connection with neutrality is that it creates

22 now a clear litmus test for participation in Phase II which is

23 them to come in, as Mr. Lockwood has said, and demonstrate that

24 they really have a claim.

25 So my last observation about standing is, (a) it's

1  important, and (b) what's the test?  People have said, well, CE

2  went off on a person aggrieved standard, and that is correct.

3  CE was person aggrieved and that is a special bankruptcy

4  overlay to Prudential standing that deals with the appellate

5  process, and we understand that.  The point that needs to be

6  made though is that CE person aggrieved is really an

7  engraftment upon or an extension of the doctrine of Prudential

8  standing.  And whether or not person aggrieved is met here, and

9  I'm not saying that it's not met here, but whether or not it's

10 met here is not the point.  In this case, Prudential standing

11 applies, because this Court is operating in the context of an

12 Article III system.

13      And because Prudential's standing applies, we go back

14 to cases like Quigley that decided at the trial court level

15 saying, wait a minute, bankruptcy is one thing, but we're here

16 in the federal system, Prudential's standing applies.

17 Prudential's standing applies right here.  Interested party or

18 party in interest under the bankruptcy code does not trump the

19 Prudential standing requirement.  Whether or not they are

20 parties in interest in this case does not address the issue of

21 Prudential's standing which is their ability not only to

22 participate in the case, as parties in interest, if they are

23 parties in interest, but to strike out at other provisions in

24 the plan that don't satisfy the requirements for Prudential

25 standing.  That don't sufficiently pertain to them in a direct

1  enough way that warrants their standing up and dealing with all

2  these problems even at the trial court level.

3         So, standing should be decided on the basis of not

4  party in interest, party in interest does not trump Prudential

5  standing.  It should be decided on the basis of the Prudential

6  standing requirements.  And on that basis we believe that once

7  there is agreement or a court order regarding neutrality, each

8  and every insurer that comes in for the second round has got to

9  stand up and demonstrate to us what is their claim that does

10  not relate to coverage and is it sufficiently real to give them

11  standing to address these other provisions of the plan?  Thank

12  you, Your Honor.

13         THE COURT:  All right.  Okay.  Mr. Millner, I'll hear

14  you, then we're going to take a few minute recess.

15         MR. MILLNER:  Just on the issue of cum onere.  It's

16  not comfort that we seek, and it's --the problem is this.  Mr.

17  Lockwood's proposition is that the assignment of a contract,

18  the assignment of the rights, the assignment of the contract

19  takes with it necessarily the obligations, and therefore my

20  saying that the plan should be express on that is merely asking

21  for comfort.  Quite to the contrary.  The plan does not purport

22  to assign insurance contracts.  It purports to assign only

23  certain rights,

24  asbestos-related rights to a trust.  And because of that the

25  transfer of the obligations that go with it does have to be

1 express.  Precise --

2          THE COURT:  But, that's what I was asking about

3 yesterday because I'm not certain that that's really what the

4 insurers want.  Maybe your client wants that, I don't know.

5 But, to the extent that the debtor has certain access to

6 information and the duty to cooperate and so forth in most, if

7 not all, of the other cases, those obligations have remained

8 with the debtor.  Now, how the debtor carries that out is a

9 different issue.  But, that obligation has not been

10 transferred.

11          MR. MILLNER:  The only duty I've seen remain with the

12 debtor in any of these cases, and it's been expressed in some

13 of them, has been the duty to cooperate.  The duties to pay

14 retrospective premiums, for example, have gone with the trust.

15          THE COURT:  To the trust.

16          MR. MILLNER:  And the other duties to --

17          THE COURT:  Oh.  So, you're saying this plan doesn't

18 provide for even the monetary -- whatever the -- if there are

19 retrospective premiums, none of that obligation follows the

20 trust.

21          MR. MILLNER:  I'm not sure.  I don't think so.  I

22 don't think it's express.  We could check that.  Clearly, the

23 obligations pertaining to my contract which say it's an

24 obligation not to tender asbestos related claims, that is an

25 obligation that this plan is silent on.  The point of these

1  charts, one of the points is that the neutrality language has
2  to be married to the plan.  If the plan itself is defective in
3  some regard, then the neutrality language won't work.  What I'm
4  saying is the plan is defective in this regard.  The plan has
5  to spell this out expressly.

6         We may ultimately disagree, perhaps a duty of defense
7  could be -- stay with the debtor, although that I've only seen
8  in actual stipulations like Mogul.  But, the plan at least
9  should be express.  This has implications beyond the
10 neutrality, Your Honor, as I was trying to say yesterday,
11 because at least in my case if the obligation not to tender
12 claims doesn't go to that trust, if the Court permits
13 assignment, which it's done in every other case -- so I'm
14 thinking where we'll go here -- then my client is prejudiced by
15 saying it can't urge as a defense against that trust that it's
16 breaching, that contract where the rights were assigned.

17        And number two, when we get to Phase II by that
18 legerdemain they will have cutoff my setoff right because the
19 entity breaching the contract would say, well, normally you
20 would have a right of setoff, your damage is against whatever
21 I'm claiming.  But, here I've somehow split the obligations
22 from the rights.  So, this is a substantive point, and whether
23 you agree or disagree with anything else I've said, Mr.
24 Lockwood's cum onere argument doesn't solve it.  That's my
25 remark.

1          THE COURT:  Okay.

2          MR. BERNICK:  For Your Honor's information I'm told

3  that there are no retrospective premiums that remain for

4  asbestos personal injury claims.

5          THE COURT:  All right.  Okay, let's take a ten minute

6  recess, and then we'll reconvene.  Thank you.

7                          (Recess)

8          THE COURT:  Anybody have any additional arguments

9  that you want to raise before we start to evidentiary

10 submissions?

11         MR. GIANNOTTO:  Your Honor, Michael Giannotto for

12 Continental Casualty and Continental Insurance.  Just very,

13 very briefly.

14         I just want to comment upon some of the statements

15 made by Mr. Bernick about the standing issues.  I think maybe

16 he inadvertently misspoke.  He said in Phase II the insurers --

17 the only way the insurers would have standing is if they could

18 show that they had a claim under some of these clauses.  I

19 think what he likely meant, and I think what his paper says is,

20 basically, if we were harmed by a specific provision, you know,

21 one of these exculpation, or injunction provisions or the other

22 provisions he points to, the key understanding is whether we're

23 harmed, not whether we have a claim under them.

24         And the second point is only, Mr. Bernick mentioned,

25 as he had yesterday, that, you know, in his view we would have

1 to establish what he calls these Prudential standing

2 requirements, issue-by-issue, not asserting someone else's

3 rights, that sort of stuff.  And you had said, Your Honor,

4 yesterday to me when I was standing here that you believe that

5 was the law in this Circuit.  Respectfully, I don't -- I know

6 some bankruptcy courts have applied those standards and other

7 bankruptcy courts have not, and I don't believe it's the law in

8 this Circuit.  And I don't want to argue that here, but what I

9 understood when we spoke yesterday is that we'll have a chance

10 to argue our standing in our briefs.

11       THE COURT:  Yes.

12       MR. GIANNOTTO:  And what we just don't want you to do

13 is prejudge that by ruling here that all those Prudential

14 things apply, because we'll be briefing that we don't think

15 they do, and we can join issue on that.

16       THE COURT:  I haven't made any rulings.  What I think

17 I said is, I think that's the law in the Circuit.  So, if you

18 think I'm wrong show me why.

19       MR. GIANNOTTO:  Okay.  Thank you, Your Honor.  That's

20 all I have.

21       THE COURT:  That's the purpose of the briefing.

22       MR. GIANNOTTO:  That's all I have, Your Honor.

23       THE COURT:  Okay.

24       MR. BROWN:  Your Honor, Michael Brown for Geico,

25 Seaton and Republic.  I truly will be brief.

1         Mr. Bernick said in his presentation that, "Each

2   provision creates a world of problems."  And I think to some

3   extent he's right about that.  And one of the provisions that's

4   creating a world of problems for the insurers is -- appears in

5   the definition of asbestos insured coverage defenses.  It's the

6   Romanette (i) that says, "The plan or any plan documents do not

7   comply with the bankruptcy code."  It sounds innocuous, but it

8   does create a world of problems, at least possibly, and that's

9   a problem that needs to be solved.

10         The second thing I wanted to point out was, there was

11  an awful lot of talk about the unknown coverage judge that's

12  going to have to deal with this.  I don't want there to be any

13  suggestion on our part, if indeed it was certainly on the part

14  of the plan proponents, that this person is going to not want

15  to do the right thing and isn't going to understand the

16  provision.  The point here is simply this, we've spent the last

17  day and a half dealing with essentially 7.15, a page and a

18  half.  And the coverage judge should not be subjected to that.

19  It should be clear, and it can be made clear, and that's what

20  should happen.  Thank you.

21         THE COURT:  Anyone else?  Mr. Bernick.

22         MR. BERNICK:  Whatever Your Honor obviously wants to

23  do next, we'll do.  But, I thought that it might be appropriate

24  if we're done with arguments and we get through perhaps the

25  less exciting process of going through documents, and I'm

1  assuming -- I believe that there is discussion underway about

2  how to make that more efficient or as efficient as it can be.

3  We should probably return to the question of the schedule so

4  that we have clarity on what it is that we're supposed to be

5  doing and when we're supposed to be doing it.  And I think that

6  we discussed that preliminarily yesterday.

7          I don't know that anything in particular has changed

8  from where we were yesterday, but I think that we should find

9  out whether people have views that are different from what Your

10  Honor articulated.  And then I think that it would be important

11  to do a couple of things.  One is, on the Phase II hearing --

12  pretrial hearing, we would want to do that on the 27th.  If

13  we're going to do that on the 27th, Your Honor should probably

14  impose some requirements this time around for how we're going

15  to do it the old-fashioned way and in a way therefore that

16  leads to fewer misunderstandings about what the pretrial

17  conference is going to involve.

18          And then finally, we did make a request through Ms.

19  Baker that we talk about whether there might be some additional

20  Phase II hearing dates as closely as possible.  That's not by

21  way of, you know, -- of course, if you create the field of

22  dreams people will come.  If there's more time people will tend

23  to use it.  But, at least it avoids the opposite problem which

24  is that we run out of time.  We just don't have enough time to

25  get things done.  So, I don't know if Your Honor's had the

1 chance to look through the calendar.

2          THE COURT:  I was just looking at my calendar.  I

3 asked Ms. Baker to ask Mr. O'Neill whether the Flintkote trial

4 was -- plan confirmation was actually going forward because, it

5 was three or four days right after Grace was to finish.  And

6 she just handed me a note that said that the new plan was just

7 filed.  I haven't seen it, so I guess it is going forward then?

8 Is it going to be ready by then?

9          MR. O'NEILL:  I believe so, Your Honor.  I can

10 confirm that and report back also if there's any change in

11 schedule, et cetera.

12          THE COURT:  Okay.  That would be helpful, because it

13 may be easier to figure out how to keep Grace going for that

14 two weeks in a row, and to put Flintkote somewhere else.  But,

15 I guess the other question is, is Flintkote going to need that

16 whole time, four days?

17          MR. LOCKWOOD:  Well, Your Honor, Mr. Bernick is one

18 of the principal objectors.

19          THE COURT:  Yes, I know.

20          MR. BERNICK:  I'll be happy to do that after I've

21 read the new plan.  If it's like the old plan, there's going to

22 be more to be said about that.  But, I know we have a -- the

23 omnibus is going to focus on Flintkote on the -- what's the --

24          THE COURT:  On Monday.

25          MR. BERNICK:  On Monday, right.  So --


**J&J COURT TRANSCRIBERS, INC.**

1      THE COURT:  So that may -- depending on whether

2  Flintkote's actually ready to go back to confirmation at that

3  time -- or to confirmation at that time, that may affect this

4  schedule.

5      MR. BERNICK:  Why don't we leave it that we'll see

6  what happens with Flintkote?  But, the request is kind of a

7  standing request.  I don't know that we need to know

8  immediately, but that is something that I think would be

9  important to do to give us some flexibility.

10      THE COURT:  All right.  Well, the Flintkote dates in

11  the event that that does get freed up, so everyone can check,

12  are the 14th through the -- let me double check whether the

13  17th is included.  I've forgotten.

14      It's the 14th through the 17th of September, and then

15  Grace was to take place the following week -- I'm sorry, the

16  week before.  I apologize.  The week before.  So, this --

17  basically that would just continue this trial.

18      MR. BERNICK:  Well, we'll see what we can do in

19  connection with the Flintkote case to assure that that result

20  occurs.  I'm just being facetious.

21      THE COURT:  All right.  And then after that the dates

22  --

23      MR. LOCKWOOD:  If he withdraws objection, Your Honor,

24  it would shorten things (indiscernible).

25      THE COURT:  The next two dates that I have in a row

1   that are clear are October 13th and 14th.  Keeping in mind that

2   I know you folks don't like traveling on holidays, the 12th is

3   Monday and it is a holiday.  It's Columbus Day.  It's a court

4   holiday, apparently.  I don't know that -- at least in this

5   area schools and things are not out.  But, that might not be

6   the case everywhere.  So, I would have the 13th and 14th as two

7   days in a row.  That's as far as I got.

8          MR. BERNICK:  Okay.  Well, maybe the most promising

9   thing, obviously, would be Flintkote, because that would just

10  make it all nice and continuous.

11         THE COURT:  And if you can resolve it so that

12  Flintkote only needs two days, then that might be --

13         MR. BERNICK:  I'm kind of surprised if in any event

14  Flintkote would need more than two days.

15         THE COURT:  Well, you folks can talk about that

16  perhaps at lunch and see, and Mr. O'Neill can double check,

17  too, and maybe after lunch we can address that issue.  But,

18  that's what I know I have available right now.

19         MR. BERNICK:  Okay.  So, I guess that leaves us first

20  of all to find out whether the carriers have any further

21  feelings with respect to the dates that were posed yesterday

22  for further proceedings, and then maybe on the matters leading

23  up to the pretrial conference, is there something that we can

24  just look to that sets out what Your Honor generally requires

25  for the pretrial and --

1          THE COURT:  Yes.  I'll just tell you what it is that

2  I think I would like.  What I really want to know is the

3  statement of issues at this point.  I guess a list of the

4  witnesses that you would call in support of those issues.  And

5  normally I would ask for your documents to be pre-marked for

6  identification, but that's a little bit in advance of when the

7  trial will actually take place.  I don't need them that soon.

8  So, what I need from you is dates by which all of that

9  information can be submitted.  I would like to have at least a

10  statement of issues in preparation for the pretrial so I can

11  make sure we're on the same planet.

12          MR. BERNICK:  Well, what if we had a list of issues,

13  but then also a list of witnesses with a brief description of

14  exactly what they're going to address?

15          THE COURT:  Yes.

16          MR. BERNICK:  Whether the witnesses are appearing

17  live or by way of deposition.

18          THE COURT:  Actually that would be helpful, too,

19  because that might assess how much time would actually be

20  needed for the Phase II hearing, and to the extent that you

21  need additional days that may work.  I guess the question for

22  me is, is discovery finished on the Phase II?  I don't know.

23          MR. BERNICK:  No.  There's still some discovery

24  outstanding, but it's really quite limited.  In terms of

25  depositions I think there are a couple more depositions that

1  are out there, but I think most of them are done.  That's to

2  set aside the solvency thing which is on its own little track.

3  It also sets aside feasibility which is an issue that's out

4  there.  I think that that's going to be pretty straightforward

5  at the end of the day.  But, there will be some -- something

6  will have to take place on feasibility.  But, on the general

7  question of how far progress has been made in service of

8  getting ready I think a huge amount of the work for Phase II

9  has been done and there's really comparatively -- I don't think

10 that we're anywhere near off track.  If anything, we're more

11 ahead of the game than at least I expected that we would be at

12 this point in time.  That's just my own observation.

13        THE COURT:  Okay.  Well, I guess the question is,

14 let's say a week in advance of the hearing which you're saying

15 July 27 is the day you want.  So the 20th would be the day.  I

16 guess that's when I would like the pretrial statements filed

17 that will identify the issues, a witness and a brief

18 description.  And to the extent you know it, I would like the

19 documents identified, even though not attached, especially, you

20 know, insurance policies.  What I may ask you to do if that's

21 going to be a large portion of the exhibits is just to submit

22 them on a disk, if that's possible, with perhaps one

23 representative policy that has to be submitted on paper.  And

24 those policies you may already be putting in the record today,

25 I don't know.  You folks can let me know whether that will

1   work.  But, I don't think I need gazillions of trees cut if the

2   policies are all going to have to be in.

3          MR. BERNICK:  The other thing that I would -- you

4   know, inevitably the pretrial conferences, because when people

5   have to do these kinds of things of course then they err on the

6   side of over inclusion so as not to be caught short.  And

7   inevitably what that means is that everybody then does a huge

8   amount of work unnecessarily.  It seems to me that maybe if we

9   could get some indication from the Court that these should be

10  real lists; that is, people that we believe we will, in fact,

11  call and with a high degree of confidence.  And then -- but to

12  have in the pretrial order a provision that says, you know,

13  people can amend their -- at least their exhibit lists, and on

14  cause can amend their witness lists and, you know, cause will

15  be reasonably granted.  So, that people can supplement.  I'd

16  rather have supplementation than have a real list to begin with

17  than to have these completely unrealistic lists --

18         THE COURT:  Well, at the pretrial if you're not

19  realistic in the pretrial statements you'll have to be

20  realistic at the pretrial conference, because you're going to

21  tell me, essentially, at the pretrial, if not before, who

22  you're calling so that we can figure out the timing that's

23  needed for this trial.

24         So, yes, a real list is -- you know, you can reserve

25  the right to call everybody on everybody else's list.


**J&J COURT TRANSCRIBERS, INC.**

1  Everybody always does that anyway.  But, tell me who you intend

2  to call.  That's what I would like to know.

3            MR. BERNICK:  Right.  Okay.  I think --

4            THE COURT:  And whether it's live of by deposition

5  would be helpful, as well.

6            MR. GIANNOTTO:  Your Honor, just a brief point.

7  Obviously, we'll comply with your deadlines.  One of the --

8  just because of the scheduling in the case management order

9  that presents a little bit of a glitch to this is that while

10 the objectors' trial briefs are due by July 13th and so then

11 the pretrial could be the 27th, the plan proponents' trial

12 brief is not due until August 7th.  And one of the things that

13 we found from the exchange of trial briefs on Phase I were that

14 a lot of the things we thought were issues really weren't

15 issues once we got their trial brief.  And who we might call as

16 a witness may depend upon what position they take because we

17 filed objections, and they haven't really had to respond to

18 those objections yet.

19            We'll file a trial brief.  They will not have to have

20 filed a rebuttal trial brief by then.  And so, you know, we'll

21 try to do the best we can, but since we don't exactly know what

22 issues are really going to be joined until we see their trial

23 brief, you know, we may have to amend things or we may have --

24 because we're just not sure what they're going to do at that

25 point.  I mean, if you could postpone the pretrial until after

1 their trial brief that would solve that problem, but that may

2 screw up everyone's schedule.

3          THE COURT:  When are the trial briefs due, I'm sorry?

4          MR. GIANNOTTO:  The trial briefs for our side, the

5 objectors, are due the 13th of July.  The trial briefs for the

6 plan proponents are due August 7.

7          MR. BERNICK:  Well, that recognizes the reality of

8 what's involved in responding.  How many different briefs do we

9 get?

10          MR. GIANNOTTO:  No, no.  I'm not criticizing the time

11 period.  I mean, that's legit.  I'm just saying that it hampers

12 us in our ability to list witnesses and to really -- you know,

13 we hear you from today, Judge, and yesterday.  You don't want

14 some -- we're going to like challenge everything in the world

15 and here's every witness that's ever named on a document.  We

16 want to make this a meaningful pretrial because that benefits

17 both sides, and it obviously is useful to the Court.  But, if

18 we have their trial brief ahead of time, that makes it easier

19 to do that.  It makes it so we don't have to do overkill

20 because we don't know what they're going to take issue with.

21          MR. BERNICK:  Are you suggesting --

22          COURT CLERK:  Could you turn on your microphone,

23 please?

24          MR. GIANNOTTO:  Yeah, I mean, if that's possible.  I

25 don't know --

1          MR. BERNICK:  In which case we would -- I mean, what

2   we don't want to do is do the same thing with the lenders and

3   with Libby.  So, we'd be talking about two different Phase II

4   pretrial conferences; one on the 27th for the other folks, and

5   then the insurers later on.  If that's okay with the Court I'd

6   -- that's probably all right with us if we can get the right

7   date.

8          THE COURT:  Well, the next omnibus hearing for this

9   case after August 7 is August 24.

10         MR. BERNICK:  Yeah.  That's way too late.

11         THE COURT:  Well, the only other date at the moment

12  that I have is August 18.  I could do it then.  I mean, they're

13  going to need some time to react and to amend whatever it is

14  that the debtor has done.  That's only ten days after the

15  debtors' brief is due.  So if I gave them --

16         MR. BERNICK:  Your Honor, if the only concern is

17  their ability to specify what they intend to do based upon

18  their objections and that they might have to be overly broad

19  that way, I don't think that we should have the -- if we could

20  do it like on the 3rd or, you know, whatever it is --

21         THE COURT:  But, your brief isn't due until the 7th.

22         MR. BERNICK:  Oh, well, then they -- well, maybe it's

23  just not realistic then, I guess, is what I'm really saying.

24  Because if they're going to need to have more flexibility built

25  in to the pretrial so be it.  But, the trial briefs are really

1   important and the pretrial process is something that is

2   important so that we can start to get real.  And if it ends up

3   that they call fewer people as a result of our brief I frankly

4   don't think it's going to be all that shocking.  So I would

5   prefer to stick with the 27th than to have a pretrial that gets

6   that close to the trial.

7        MR. GIANNOTTO:  Your Honor, I mean, it was a shock

8   their briefs in Phase I that they -- I think they agreed with

9   us on a lot.  I think it would be more useful to have narrow

10  issues and stuff.  We'll do what you want to do.  But, I think

11  it would be useful to have the pretrial after their brief.  If

12  the schedule doesn't permit it, the schedule doesn't permit it,

13  and we'll do whatever we have to do.

14       THE COURT:  Well, I just think if you're getting

15  their briefs on the 7th you need some time to react to it.  I

16  need some time to take a look at -- you're going to have to

17  file supplements if you want the supplements.  So, if I give

18  you until, you know, the 13th or something to file supplements

19  and we did an amended or a supplemental pretrial on the 18th I

20  really don't see how it's going to get done any faster than

21  that.

22       MR. GIANOTTO:  That's fine with us.  But, if there's

23  a problem with the Court or with the plan proponents, you know,

24  -- that would be fine with us to have the pretrial.  I just

25  want to understand what you're saying.  You'd have a pretrial

1 on the 27th for the other parties and a pretrial on the 18th

2 for us, or would we be at both?

3         THE COURT:  Well, I think what may make sense perhaps

4 is to do the whole pretrial on the 27th anyway and find out

5 whether just on the basis of the briefs that the insurers have

6 submitted that won't limit the issues.  But, what I'll impose

7 is a requirement that you actually get together and talk with

8 the other side in advance.  I understand that they don't want

9 to submit their rebuttal brief in a hurry because that may take

10 some thought, and I agree.  That may end up eliminating some

11 issues.  But, to the extent that it won't hurt, I think, so

12 that we can at least get some basic idea of who the witnesses

13 are that the insurers intend to call, and how much time I

14 really do need to set aside.

15         I think a pretrial on the 27th is a good idea.  If we

16 need a supplemental one, then I think we could do it on the

17 18th.  Whether we'll need it or not I don't know, but we could

18 reserve the time if we do.  It seems to me if we do the

19 pretrial on the 27th then the debtors' brief is submitted on

20 the 7th and I give the insurers, you know, until the 13th to

21 amend, I guess would be the word, supplement, let's say

22 supplement, your submissions if the debtor has any problem with

23 the supplementation then the 18th would be the day to talk

24 about it.

25         MR. BERNICK:  It's supplementation.  As I understood

1  it, and I don't -- you mean supplement in the sense of further

2  refining.

3          THE COURT:  Change.

4          MR. BERNICK:  Yeah.

5          THE COURT:  Right.

6          MR. BERNICK:  But, because the other advantage of the

7  pretrial conference is if there is some discovery that slipped

8  between the cracks, people have a witness they intend to call

9  who's never been deposed, we can then have some time to deal

10 with that.

11         THE COURT:  Right.  And that would give you until --

12 everybody, that is, until the 18th of August to get that

13 finished, in essence, because that would be the, we'll call it

14 final pretrial.  So, I think it might still be helpful to go

15 through the exercise on the 27th.  I don't want to add expenses

16 that are not necessary.  I just think having gone through the

17 last two days that maybe this is really a necessary expense.

18         MR. GIANNOTTO:  I think from all of our point of

19 views I think it's necessary, Your Honor.  Thank you very much.

20         THE COURT:  All right.  So, then we'll do a pretrial

21 on all Phase II issues, and for all Phase II participants on

22 July 27.  That's -- I'm not sure where that is.  One second.

23         MS. BAER:  It's Delaware.

24         THE COURT:  In Delaware?  Okay.  And a final pretrial

25 on August the 18th here in Pittsburgh.  And let me find a time

1  for that.  Just a second.

2          MR. BERNICK:  This will be insurance?

3          THE COURT:  Yes.  The insurance issues.

4          MR. BERNICK:  And can we make it, you know, if

5  necessary?

6          THE COURT:  Yes.  And how will I know if it's

7  necessary?

8          MR. BERNICK:  I guess we'll have to make sure that

9  you learn, and promptly.  I mean, it seems to me that if we

10  submit our briefs on the 7th that maybe we can have a

11  conversation with -- we'll have a meet and confer call.  Pick a

12  day like the 12th of August to see -- to get a sense from the

13  carriers whether they believe it's necessary and that way Your

14  Honor doesn't have to do -- you know, Your Honor doesn't have

15  to maintain time that really proves to be unnecessary.

16          THE COURT:  All right.  Then I would say that their

17  modified pretrial submissions should be due by August 13th.

18  That would only give you Friday the 14th and Monday the 17th to

19  do a meet and confer.  Pick one.

20          MR. BERNICK:  We'll do it the 15th -- I'm sorry, the

21  14th.

22          THE COURT:  The 14th is Friday.  That would be the

23  day after you get their amended submissions.  So, I don't know

24  if you want until the 17th which is Monday.

25          MR. BERNICK:  I was only thinking about Your Honor's

**J&J COURT TRANSCRIBERS, INC.**

1  convenience.  That would be better for us, certainly.

2           THE COURT:  The 17th is fine, because frankly I think

3  if there's a need to do a supplemental I'm not sure why it

4  can't be done by phone.

5           MR. BERNICK:  Yeah.  Okay.

6           THE COURT:  So the parties are to meet and confer on

7  August 17th.  Pick a time.

8           MR. BERNICK:  Two o'clock in the -- ten o'clock in

9  the morning.  Make it ten o'clock.

10          THE COURT:  10:00 a.m. eastern?

11          MR. BERNICK:  Yes.

12          THE COURT:  All right.  And then I guess I'll just

13  rely on Ms. Baer or Mr. O'Neill or somebody to contact my

14  office and tell me later that day whether we will in fact be

15  doing a hearing on the 18th.

16          MR. BERNICK:  Right.

17          THE COURT:  But now, if we do it by phone does

18  anybody disagree that it could be done by phone?  All right.

19  It will only be by Court Call then.  So make sure you call

20  Court Call and sign up in enough time, in advance that you're

21  registered so that if the hearing does go through for this one,

22  my office must have had 25 calls about people who hadn't signed

23  up.  Please, don't do that.  I'm going to say no to everybody.

24  You've got lots of warning.  Sign up now if you need to.  Okay.

25  What time is convenient?  It really -- at the moment my day is

1  free.  So --

2          MR. BERNICK:  I would prefer to have it in the

3  morning, Your Honor.  I have a deposition in San Francisco on

4  the 19th and 20th and I want to travel to it.  So if it's at

5  all possible I'd like to have it in the morning.

6          THE COURT:  Nine eastern?

7          MR. BERNICK:  Or ten.

8          THE COURT:  Ten eastern?  Okay.

9          MR. BERNICK:  Nobody starts working in New York until

10  ten o'clock.

11          THE COURT:  All right.  Is there anything else then

12  about the Phase II pretrial?

13          MS. BAER:  Your Honor, the original date that of July

14  20th we don't need.

15          THE COURT:  Okay.  Well, you don't need it for Phase

16  II.

17          MS. BAER:  We don't need it for Phase II pretrial.

18          THE COURT:  Okay.

19          MS. BAER:  We do have something already on the 21st

20  which is the followup.

21          THE COURT:  Is there anybody who needs the 20th of

22  July for any reason in your contemplation at the moment?  All

23  right, I'm going to cancel the July 20 hearing then.

24          MR. PASQUALE:  It's not on the 27th, Your Honor?  The

25  time.

1          THE COURT:  Oh, on the 27th.  I'm sorry.  Your normal

2   -- I think that's an omnibus date, Mr. Pasquale.  So it'd be --

3          MR. PASQUALE:  Well, that's the omnibus date.

4          THE COURT:  Yes.  Whatever your normal time is.

5          MS. BAER:  It's 10:30.

6          THE COURT:  10:30.  Thank you.  All right, will the

7   debtor -- do I need to go over the dates?  Can the debtor

8   submit an order that will put this on the record?

9          MS. BAER:  Your Honor, we thought -- we talked about

10  a lot of different dates on different things.  Perhaps we

11  should do one order that kind of sets out all the different

12  resulting new hearings and dates as a result of this Phase I

13  hearing.

14         THE COURT:  All right.  Do you need me to repeat what

15  I have or are you okay?

16         MS. BAER:  I think I've got it.  We can go over it.

17  Sure.

18         MR. BERNICK:  Well, if it's right there in front of

19  you.

20         THE COURT:  All right.  Well, I'm starting with the

21  date the plan proponents' rebuttal brief is due which is August

22  27th.  Despite that fact we will do a pretrial conference on

23  July 27 at 10:30 in Delaware.  We will have a final pretrial on

24  August 18th.  I'll be here in Pittsburgh, but it will be by

25  phone, if necessary, at 10:00 a.m. eastern time.  The insurers'

1 modifications, if any, to their pretrial submissions are due by

2 August 13.  The parties have a meet and confer scheduled on

3 August 17th at 10 a.m. eastern, following which the debtor will

4 contact my office to let me know whether the hearing is

5 actually going forward the following day.  That's what I have.

6 　　　　　All right, now, what about the schedule for Phase I

7 continuation.  I guess maybe we need the evidentiary

8 submissions first or --

9 　　　　　MR. BERNICK:  The evidentiary -- I think that all --

10 I think where we left it was that evidentiary submissions and

11 then the briefs would simply pick up.  Well, the evidentiary

12 submissions today, then there are the Grace evidentiary

13 submissions, if any, by way of counters and objections.  And

14 that was July 2nd.

15 　　　　　THE COURT:  All right.  I thought the insurers were

16 going to confer and see whether the schedule I outlined

17 yesterday was --

18 　　　　　MR. BERNICK:  Oh.  Yeah.

19 　　　　　THE COURT:  -- okay.  You want to repeat the dates if

20 you have --

21 　　　　　MR. BERNICK:  Well, I don't -- well, I'll just be

22 echoing what Ms. Baer tells me so maybe -- or if Your Honor has

23 them there.

24 　　　　　THE COURT:  Well, I can get them.  I don't have them

25 at the moment.

1          MR. BERNICK:  We have them.

2          THE COURT:  Oh, Ms. Baer has them.  Okay.

3          MS. BAER:  Your Honor, on the evidence, the DIP

4    designations and counter designations are due by July 2nd, and

5    they will be consecutive -- not consecutive, there will be

6    post-trial submissions by both parties at the same time on

7    insurance neutrality on July 16th and limited to 30 pages per

8    side.  And a followup hearing, if needed on those matters, is

9    July 21st at 9 a.m.

10          MR. BERNICK:  Although it's not expected that that is

11   argument based upon the evidence.  The argument essentially

12   would be today and in the briefs.  So that is as I, at least

13   understood it, the 21st is a maybe depending upon whether it's

14   necessary.

15          THE COURT:  Right.  My concern is I don't know

16   whether I can make rulings on the objections if there are any

17   objections.  If there aren't any objections I'm not sure I'll

18   need it.  But if there are objections I may need to find out

19   what the context of some of those objections is.  That's, I

20   guess, what my primary concern is.  It's rather odd to do the

21   closing arguments before you have the evidence submitted.

22          MR. BERNICK:  Insofar as the objections are

23   concerned, we can certainly make sure that our objections are

24   stated in a way that lays them out.  I mean, again, we're --

25   the relevance objections are going to be probably the key ones,

1 and I think our relevance objections we'll figure out a way in

2 which to state it so it doesn't simply say objection relevance.

3 We'll have a certain number of relevance objections that will

4 probably set out the description of what the relevance

5 objection is so that Your Honor has a better appreciation of

6 that.  And then, you know, my feeling is that once it's in --

7 once the objections are in and the brief -- any supplemental

8 briefs are written that the resolution of the objections can

9 await Your Honor's decision on the matter that you basically

10 tell us what -- where the objections came out, and tell us what

11 the answer is at the same time.

12          THE COURT:  Well, that's okay as long as I understand

13 what the objection is in the context.  But that's what I --

14 because I need them from the insurers with respect to any

15 submissions the debtors may have, too.  So that's my concern.

16 I need a vehicle to make sure I can rule on the objections.

17          MR. BERNICK:  Well, I guess maybe if the insurers can

18 agree to do the same thing, that is, if they have objections,

19 to be a little bit descriptive about them and whatever

20 materials are submitted to the Court.

21          THE COURT:  Yes.  Maybe that's the thing to do, just

22 give me a fulsome objection and lay out what it is.  If it's

23 relevance, tell me why.  If it's hearsay, cite the rule that

24 you're relying on so that I have a clue in advance.  And that

25 may eliminate the need for that hearing.  I just won't know

1   until I see the submission.  So we can do that one by phone,

2   too, if everybody wants.  There isn't going to be an

3   evidentiary presentation.  I'm fine with doing it by phone.

4   That way no one has to make travel arrangements in the event

5   that it's not -- it doesn't go forward.  Is that agreeable to

6   everyone?

7            MR. BERNICK:  From our point of view it would be.

8            THE COURT:  All right.  So that will also be by phone

9   then.  And I think that was at nine o'clock, correct?

10           MS. BAER:  Yes, Your Honor.

11           MR. BROWN:  Your Honor, that's July 21st?

12           THE COURT:  Yes, sir.  July 21.  Oh, wait, I'm sorry.

13           MS. BAER:  July 21st.

14           THE COURT:  I can't do -- I'm sorry.  I have to see

15   whether I can do that.  That's a Delaware day, not a Pittsburgh

16   day.  I'll let you know about that after lunch.  Is everyone

17   going to be back after lunch?  What I need to do is find out

18   what my 20th calendar looks like.  Oh, they're only Grace days.

19   I'm sorry.  I'm confused.  Oh, I'm sorry, I'm confused.  The

20   27th is the omnibus day.  I'm misreading my calendar.  I

21   apologize.  Yes, we can definitely do the 21st by phone.

22           MR. BERNICK:  Nine o'clock or ten o'clock?

23           THE COURT:  You want ten o'clock instead of nine?  It

24   doesn't -- that again, it's reserved for you.  It doesn't

25   matter to me.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. BERNICK:  Ten o'clock is fine with Grace.

2          THE COURT:  Ten?  All right, it will be at 10 a.m.

3   then eastern time.  The only way I'll be able to let you know

4   that it's not necessary, I'll have someone contact, I guess,

5   Ms. Baer who can then do a notice if in fact the hearing's

6   canceled.  Otherwise, if you don't get a notice from the debtor

7   then you'll know that the hearing is going to go forward.  And

8   that would be the sum and substance of the contact, just to

9   make sure that the debtor can use the list to get in touch with

10  everyone, because I don't have access to do that.  And it won't

11  be me anyway.  It would be one of my staff members.  But that

12  would be the purpose.  Anybody object to that?  Okay.  That's

13  what I'm going to do then.

14          Okay, what else in terms of schedules?

15          MR. BERNICK:  Nothing, I guess, other than what we're

16  going to do this afternoon unless you all have some.

17          MR. BROWN:  Just a question, Your Honor, for

18  clarification.  The counter designations and the objections of

19  the plan proponents are July 2nd.  I thought I heard Your Honor

20  say that they're -- if there are objections from the insurers

21  with respect to the counter designations.  We didn't have a

22  date for that.

23          THE COURT:  I thought I said to put them -- you could

24  file them the same day your brief is due --

25          MR. BROWN:  Oh.  Okay.


                **J&J COURT TRANSCRIBERS, INC.**

1              THE COURT:  -- which I think is the 16th, correct?

2              MR. BROWN:  Got you.

3              MR. BERNICK:  Correct.  But if you'll let us -- well,

4  I promised yesterday or what I talked about yesterday I think

5  still would make sense although it doesn't have to be before

6  the briefs, is if we can give Your Honor a set of the

7  depositions marked up with both the designations and the

8  counters and the objections on the transcript page.  Obviously

9  the objections there will be shorter.  If the carriers will --

10  as soon as you give us -- well, as soon as you have the

11  objections you give them to us we can complete that document

12  and then submit that to the Court.

13              THE COURT:  Okay.  Well, can you do objections, you

14  know, a day or so earlier than your briefs are due?

15              MR. BROWN:  Sure.

16              MR. BERNICK:  As long as they come to us then we can

17  mark up the transcript.

18              THE COURT:  All right.  How about the objections due

19  -- you're going to get the debtors' July 2nd.  How about the

20  objections due by the 12th so that the debtor can actually file

21  that chart with me by the 16th.  Does that give the debtor

22  enough time?

23              MR. BERNICK:  I believe the 13th is a Monday.

24              THE COURT:  I'm sorry.  I'm looking at June.  I

25  apologize.  Yes.  They'd be due the 13th.  Would that give the

1 debtor enough time to do the chart?

2 MR. BERNICK: Oh, absolutely. It's not going to take

3 that much.

4 THE COURT: All right. So the debtors' counter

5 designations and objections to the designations already

6 submitted are due July 2. There are no other deposition

7 designations being submitted after today by insurers, correct?

8 MR. BROWN: Yeah, just the one that you mentioned

9 yesterday, Your Honor, that you didn't have a copy of that was

10 filed under seal. Mr. Posner's.

11 THE COURT: Yes.

12 MR. BROWN: Just that one is the only other one that

13 I'm aware of.

14 THE COURT: Okay. But that will -- the debtors --

15 I'm sorry.

16 UNIDENTIFIED ATTORNEY: Your Honor, there was one

17 supplemental designation that we wanted to add. And I was

18 going to add it when we proffered our evidence or designations.

19 And that was in the Lockwood deposition we were going to add, I

20 think it was about 17 lines.

21 THE COURT: Okay. That's fine. Just let the debtor

22 know today what those designations will be so that the debtor

23 can meet the July 2nd deadline. That's what I'm attempting to

24 do. Okay.

25 UNIDENTIFIED ATTORNEY: (Inaudible).

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Yes.  What I'm asking the debtor to do is

2    submit a binder.  The reason I'm asking for these designations

3    and objections early is on the 16th I would like to get from

4    the debtor a binder that has everything in it so that I will

5    get the post-trial briefs, the designations.  If the insurers

6    are handing up documents today I don't need those.  If not then

7    I'd like them in the binders identified as to who they're

8    coming from so that I have a record that is a good paper

9    record.  I think that would be helpful, because that way I'll

10   have everything in one spot.  So the counters are due July 2nd,

11   the post-trial brief by the insurers is due July 16, but the

12   objections to the debtors' evidence are due July 13th, and then

13   the hearing is still potentially July 21 at ten o'clock by

14   phone.

15          MR. BROWN:  Okay.  And then, Your Honor, just in

16   terms of process we have the policy stipulations and we have

17   some miscellaneous exhibits.  Do you want that to all be part

18   of this submission that you're describing?

19          THE COURT:  Well, I thought you were offering them

20   today or are you --

21          MR. BROWN:  That was the intent and I spoke to Ms.

22   Harding earlier and, I mean, you have binders of all of our

23   exhibits.  We intend actually to cull some of those out and

24   narrow the exhibits that we're going to submit.  And it might

25   be easier if we didn't all come back here and go through the

1  mechanical exercise this afternoon, but submitted them culled

2  down as we intend to, you know, in the next day or two.

3           THE COURT:  That would be fine as long as I get them

4  from the debtor in one set by July 16.  I won't have an

5  opportunity to look at them before everything is submitted

6  anyway.

7           MR. BROWN:  Okay.

8           MS. HARDING:  And then we'll do our objections.

9  We'll do our objections -- if we have objections, Your Honor,

10 we'll submit them on the 16th at the same time we do the --

11 with the binder?

12          THE COURT:  With the binder.  Yes.

13          MR. BROWN:  No, we'll do our objections on the 2nd.

14          MS. HARDING:  On the 2nd with the designations.

15 Okay.  Great.

16          MR. BROWN:  Right.

17          THE COURT:  Right.  Oh, okay, I'm sorry.  I

18 apologize.  I was getting the parties confused.  Yes.  Your

19 objections are due on the 2nd because you already have their

20 designations.

21          MR. BROWN:  Right.

22          MS. HARDING:  But -- well, --

23          THE COURT:  Theirs are due the 13th.

24          MR. BROWN:  Your Honor, the only thing I think they

25 will be -- they have the deposition designations.  I think what

1 they're waiting for, and actually they're not even waiting for,

2 they probably have the policy stipulations already.  If not we

3 can obviously get them --

4           UNIDENTIFIED ATTORNEY:  We're waiting for the cull.

5           MR. BROWN:  Right.  What they're waiting for is

6 specific exhibits and some discovery responses.  And that's it,

7 I think.

8           MR. BERNICK:  But my understanding is that we're

9 going to get those as a cull, but on the -- we're going to get

10 some description of what the proffer is.  That is what it's

11 being offered for.  And the discovery responses, for example,

12 which particular discovery responses on the miscellaneous

13 documents, what are they for?  I mean, I don't want to impose a

14 burden, but that will certainly enable the objection process to

15 be much more transparent to the Court.  So if we object on

16 relevance it'll be clear what the proffer is.  It'll be clear

17 what the objection is.

18           THE COURT:  Well, I'm assuming with respect to the

19 insurance policies that the plan proponents are objecting

20 simply because you don't think I need to look at them, it's a

21 matter of law.

22           MR. BERNICK:  Right.  That's not the policies.  There

23 are some miscellaneous documents, or at least there were that

24 are not policies.  And so just want to be clear on what the

25 proffer for those is.  Not the policies.  And again, after the

1 cull I don't think we're probably talking about a huge number

2 of documents anyhow.

3          THE COURT:  All right.

4          MR. BROWN:  I think that's right, Your Honor.  It's

5 not many.

6          THE COURT:  Okay.  Then all in -- any insurer want to

7 go through the exercise today of submitting your evidence?  If

8 you do I'll receive it.  Otherwise I'll have you send it to the

9 debtor.  Okay, there are some who do --

10          MR. BROWN:  What?

11          THE COURT:  -- want to submit the evidence today.

12 Mr. Pasquale.

13          MR. PASQUALE:  Thank you, Your Honor, Ken Pasquale.

14 While we're scheduling, I just wanted to jump in before we go

15 back to exhibits on the insurance side.  Ms. Baer, I don't

16 think we ever mentioned what we talked about yesterday.  And

17 Your Honor, I think someone misspoke.  We were talking about

18 simultaneous briefing that we did agree to on the impairment

19 argument from yesterday.  I think the date that was discussed

20 yesterday was July 10th and I think everyone intended that that

21 would be July 17th.

22          MS. BAER:  But it's not simultaneous.  My

23 understanding is it was --

24          ATTORNEYS:  It is simultaneous.

25          MS. BAER:  Okay.

1          MR. PASQUALE:  Simultaneous briefing on impairment

2  and the correct date is July 17th by 4 p.m.  The only change is

3  yesterday we had talked about the 10th and I just wanted to be

4  sure on the record.

5          MS. BAER:  Okay.  Yeah.  I was looking at the other

6  thing which is your submission on discovery.

7          MR. BROWN:  All right, and let's be clear, let's --

8          THE COURT:  All right, I'm confused.  Let me start

9  over again.

10          MR. BROWN:  Okay, Your Honor.  I'm sorry.

11          THE COURT:  What I just did was to deal with the

12  insurance neutrality.  So this is a different schedule.  It's

13  going to deal with impairment.

14          MR. PASQUALE:  Correct.  This is the supplemental

15  briefing we discussed yesterday on impairment.  At the time the

16  date that was referenced was July 10th.

17          THE COURT:  Yes.

18          MR. PASQUALE:  The correct date would be July 17th, a

19  week later, simultaneous briefing by both sides.

20          THE COURT:  Because this is continued until when?

21          MR. PASQUALE:  This is the 27th.

22          THE COURT:  Okay.

23          MR. PASQUALE:  This really -- actually it's a Phase I

24  issue.  I don't know that it continued -- it's the followup

25  from yesterday.


**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  All right.  So I apologize, Mr. Pasquale,

2     it was a long day yesterday.  I don't actually recall why I

3     need a supplemental argument, but I may.

4          MR. PASQUALE:  We went through all of the charts

5     yesterday and there were a lot of issues that came up that had

6     not previously been briefed.

7          THE COURT:  Oh.  All right.  Now I understand.  Okay.

8     I'm still stuck on insurance neutrality.  I'm sorry.  Okay.

9          MR. PASQUALE:  I know.  I understand, Your Honor.  So

10    that's what I'm referencing.

11         THE COURT:  So supplemental argument then is on July

12    27.

13         MR. PASQUALE:  I don't know that we talked about

14    supplemental argument as opposed to briefing.

15         MS. BAER:  I don't think it was in -- right, it was

16    just briefing.

17         MR. PASQUALE:  We did argue yesterday.

18         MR. BERNICK:  The only thing that is up for brief --

19    the only thing that is up for discussion on the 27th, as I

20    recall, is the follow on to the solvency discussion.  And it's

21    a separate schedule.  But at the conclusion I believe Your

22    Honor directed to have supplemental briefs to deal with

23    standing -- any further standing issues simultaneously.  And I

24    wasn't aware that the 17th versus the 10th, but --

25         MR. FREEDMAN:  It had to do with the ipso facto

1 arguments.

2          MR. BERNICK:  I understand that.  I understand what

3 it was about.  The question is the date.

4          MS. BAER:  The date is the 17th.  We did not talk

5 about --

6          MR. FREEDMAN:  It was intended to be the 17th.

7          MS. BAER:  -- having any further hearing.

8          MR. FREEDMAN:  Submit the briefs.

9          MS. BAER:  Right.

10          THE COURT:  Okay, that's fine.

11          MR. BERNICK:  We're in agreement.

12          MS. BAER:  Right.

13          THE COURT:  It'll be the -- the date is the 17th an

14 I'm not going to schedule any additional argument.  If I think

15 it's necessary after I get through the briefs then I'll let you

16 know.

17          MR. PASQUALE:  That was our understanding, Your

18 Honor.  Thank you.

19          THE COURT:  All right.

20          MR. PASQUALE:  And just to close the issues on the

21 committee lenders and the plan proponents, on the solvency side

22 of things, just so we're clear, and there's no change from what

23 we discussed yesterday, but just so we're talking scheduling

24 all at one time, we will submit on our side, the lenders and

25 the committee, I guess it's a statement of any additional

1 information or what those issues are within two weeks, and

2 that's July 10th.  The plan proponents will then submit their

3 counter or response or whatever you want to call that two weeks

4 after that.  So July 24th.  And that issue, Mr. Bernick, is

5 correct.  That was my understanding as well that we would

6 discuss that as part of the pretrial on the 27th.

7           THE COURT:  Okay.  That's what I was trying to get to

8 on the 27th, and that's why I was confused.  Okay, thank you.

9           MR. PASQUALE:  Thank you, Your Honor.

10           THE COURT:  Give me one second.  Okay.  Mr. Lockwood.

11           MR. LOCKWOOD:  Your Honor, one final detail.

12 Yesterday, as I recall, you had indicated with respect to the

13 arguments the insurers were making about the TAC and the

14 Congoleum case that you had directed them to submit if you

15 determined that the plan was insurance neutral, you directed

16 them to brief the proposition of why they would have standing

17 as unsettled insurers to argue about the TAC conflicts of

18 interest.

19           THE COURT:  Yes.

20           MR. LOCKWOOD:  And I don't recall that you had ever

21 set any kind of a schedule for that.  I don't know whether you

22 think one is needed or since it's tied to your ruling on

23 insurance neutrality it's a little open-ended.

24           THE COURT:  Maybe the thing to do is just set a date

25 and get the issue -- well, no, because that may mean you've got

**J&J COURT TRANSCRIBERS, INC.**

1 additional work to do.  I don't know.

2          MR. BERNICK:  Your Honor, I'd make a suggestion on

3 that, because we do have time between the 27th of July and the

4 final confirmation hearing.  Maybe if you have some feeling

5 about where the neutrality decision is going to come out.  Why

6 don't we just take that up as an item 4 of the pre-trial

7 conference on the 27th.  And by that time we might -- you might

8 have a further feel for that, and we can determine what the

9 briefing would be.  There'd still be significant time.  There's

10 no real reason that that has to be decided -- standing has to

11 be decided immediately.  I'm sure we'll get wrapped up into the

12 basic question about, you know, what their alleged conflict is.

13          THE COURT:  All right.  That makes sense, because I

14 think that will still give you some time to negotiate this

15 language, too.  Because I'm hoping you can come to some

16 consensus as to what the neutrality language ought to be.  And

17 I've heard your arguments, obviously I'll give you a decision

18 if you can't come to an agreement.  But it seems to me truly

19 that you're not that far apart as to the basics.  Some insurers

20 seem to want aspects added that the debtor doesn't want to add.

21 I say the debtor, the plan proponents don't want to add.  The

22 plan proponents seem to have a few things in that are a little

23 troubling to the insurers.  It seems to me that what's in 7.15

24 now could probably be tweaked to accommodate everybody's

25 interests.  I don't think it's that far off the mark.  But

1  tweaking probably wouldn't hurt it from anybody's side.  So I

2  will give you marching orders to go tweak.

3         MR. BERNICK:  A little detail there.  At the end of

4  the day yesterday, or I guess, beginning mid-day yesterday

5  there were discussions amongst counsel about how those

6  affidavits should be submitted in connection with the lender

7  issue of impairment.  As Your Honor asked what the undisputed

8  facts were we had said we would edit the affidavits of Messrs.

9  Shelnitz and Freedgood and submit them.  I understand that

10  they're very close, but it seems to me that they ought to be

11  submitted.  We ought to get to resolution on that fast.

12  Probably the best way to do that is just to say that that

13  should be done by this Friday the 26th, because there's no

14  reason why it shouldn't be done by the 26th.  And that way

15  it'll be resolved instead of being, you know, kind of a

16  hangover issue that we have to deal with later on.

17         MR. PASQUALE:  Ken Pasquale.  Not a problem, Your

18  Honor.  Friday is fine.

19         THE COURT:  Okay.  Then the affidavits will be due by

20  June 26th, but that won't change the briefing schedule.  The

21  briefing schedule stays fixed.  Okay.  Would you like a lunch

22  recess?  How long are your submissions going to take?  All

23  right.

24         MR. BERNICK:  Can we just maybe talk about that

25  process a little bit?  The policies -- there's going to be a

1  relevance issue.  And I'm assuming that Your Honor's not going

2  to resolve the relevance issue today?

3          THE COURT:  I don't think I can.

4          MR. BERNICK:  Right.  So with respect to the policies

5  the only issue, as I understand it, is the authentication of

6  the policy.  And Mr. Horkovich is not here today as I recall.

7  Is Lisa?

8          UNIDENTIFIED ATTORNEY:  She's here.

9          MR. HORKOVICH:  I'm here, David.

10         MR. BERNICK:  Oh, you are.  So you're present

11 virtually.  So if Mr. Millner stands up and gives his usually

12 effective arguments with respect to the authenticity of the

13 whatever it is policy, are you going to be prepared to address

14 that this afternoon?

15         MR. HORKOVICH:  Yes.  I think it should go flowingly.

16 We worked it out with all the insurance companies yesterday.

17 There was some authentication issues, Your Honor, and we have

18 provided the insurance companies with our best copies of the

19 policies so the insurance companies have agreed to substitute

20 where their policies may have been lacking.  And so we've

21 reached a couple of formal stipulations in writing which could

22 be submitted, and have agreed with the insurance companies as

23 to what documents would be submitted in terms of the insurance

24 policies.  And as far as the insurance policies and the

25 settlements are concerned, Your Honor, we will save our

1  relevance objection, but for the purposes of this Phase I

2  hearing would waive authenticity and business record exceptions

3  with regard to the insurance policies that --

4         THE COURT:  Mr. Horkovich, are you on a speaker

5  phone?  You're fading out.

6         MR. HORKOVICH:  No, Your Honor, I'm sorry, I'm not on

7  a speaker phone.  I think it's all going to work out just fine,

8  Your Honor.  With two of the insurance companies, Mr. Brown's

9  clients and Elizabeth DeCristofaro's clients we've reached

10 actual formal written stipulation.  And those stipulations

11 could be submitted to the Court with the policies.  With the

12 rest of the insurance companies we've agreed upon what exhibits

13 could be submitted with their declarations.  And as to those

14 policies and settlement agreements we would still maintain

15 relevance objections.  But for the purposes of this Phase I

16 hearing, and without prejudice to other proceedings and later

17 hearings we would waive authenticity and business record and

18 other objections save relevance to the admission of the

19 settlement agreements and the insurance policies.

20        MR. BERNICK:  Your Honor, it seems to me that

21 whatever Mr. Horkovich and Mrs. Sayen and the carriers are

22 going to work out offline they're going to work out and that

23 we'll learn about it.  I think that the only issue is with

24 respect to those exhibits that are going to be tendered yet

25 today because people want to tender them today, I'm assuming

1 that they're all just policies and settlement agreements so

2 that Mr. Horkovich can comment on them.  That all other

3 exhibits beyond policies and settlement agreements are subject

4 to the cull, and that the cull will be done, as I understand

5 from Ms. Harding, by -- we'll get that stuff by the 26th.

6         UNIDENTIFIED ATTORNEY:  This Friday.  Yes.  The 26th.

7         MR. BERNICK:  Okay.  So that all that's going to

8 happen this afternoon then for those who are here and want to

9 make themselves useful and effective and get these matters of

10 record are people who've got policies and settlement agreements

11 who want to do that this afternoon.  And Mr. Horkovich can

12 participate by phone along with Mr. Guy and Mrs. Sayen.  And I

13 think that we're just going to be making a record pretty much

14 of what's been agreed.

15         UNIDENTIFIED ATTORNEY:  I have letters to you.

16 Exactly.

17         MR. BERNICK:  If you have letters to me that Mr.

18 Horkovich can authenticate that's fine.  But I would have

19 thought that letters to me are part of the cull.  So if --

20         UNIDENTIFIED ATTORNEY:  I'm planning to introduce

21 them.

22         MR. BERNICK:  What?

23         UNIDENTIFIED ATTORNEY:  I'm planning on introducing

24 them.

25         MR. BERNICK:  Well, that's exactly the kind of --

1           THE COURT:  All right.  Let's just get started.

2    Let's take a recess for lunch because this is obviously not

3    going to be the easy submission that everybody thinks it is.

4    So we will take a --

5           MR. BERNICK:  Well, Your Honor, really before we do

6    that for people to hang around at the estate's expense just to

7    deal with somebody who wants to put in a letter, I mean, I

8    really don't think that that makes a lot of sense to take up

9    the Court's time with arguments about miscellaneous documents.

10   If it's policies and agreements, there are a stack of them, and

11   they can be handled.  And I would urge that with respect to

12   non-agreements and non-policies that they be carried over to

13   this cull process.  And if he wants to tender it we'll take a

14   look at it.  But for everybody to sit around here this

15   afternoon while Mr. Cohn kind of waves his document I think is

16   a waste of money and time.

17          MR. COHN:  Your Honor, real quickly.

18          THE COURT:  You need a microphone.

19          MR. COHN:  I'm talking about 15 policies, four

20   letters from my firm to his firm, a settlement agreement, and

21   some interrogatory responses from them.  There's no

22   authenticity --

23          MR. BERNICK:  Oh, so now it's an interrogatory this

24   time.

25          MR. COHN:  Well, they're admissions that they've

1  made.  So I'm going to, you know, going to proffer them subject

2  to the relevance objection.  It's not an authentication issue.

3  And as long as it's taken me to tell you that I could proffer

4  it.

5        THE COURT:  All right.  We're going to do it today.

6  Whatever the insurers -- this is the date that's set for the

7  evidentiary hearing.  We're going to take whatever they want to

8  give me today.  To the extent that it's -- something is going

9  to go through this cull process and you prefer to get it in in

10  one binder set that may end up being a better way to go about

11  it.  If you don't want to do it that way we're here.  We'll

12  take a recess until 1:15, and then we'll reconvene and I'll

13  hear the evidence.  And that's what I'm hearing this afternoon.

14  We're starting with evidence, not argument.  Does anybody have

15  anything you want to say by way of argument before we leave?

16  Thank you.  We're in recess.

17                    *  *  *  *  *

18

19

20

21

22

23

24

25

# C E R T I F I C A T I O N

We, RITA BERGEN, MARY POLITO, and KIMBERLY UPSHUR, court approved transcribers, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of our ability.


/s/ Rita Bergen              DATE:  June 25, 2009
RITA BERGEN

/s/ Mary Polito
MARY POLITO

/s/ Kimberly Upshur
KIMBERLY UPSHUR
J&J COURT TRANSCRIBERS, INC.