**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| | ) | Chapter 11 |
| In re: | ) | |
| | ) | Case No. 01-01139 (JKF) |
| W. R. GRACE & CO., <u>et</u> <u>al</u>., | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | Re: Dkt Nos. 21789, 21790, 22374 |
| | ) | |

**JOINT SUPPLEMENTAL BRIEF OF THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS AND BANK LENDER GROUP WITH RESPECT TO
THE ISSUE OF CLASS 9 IMPAIRMENT AND IN OPPOSITION TO
CONFIRMATION OF FIRST AMENDED JOINT PLAN OF
<u>REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE</u>**

# **TABLE OF CONTENTS**

Page

INTRODUCTION ...................................................................................2

SUPPLEMENTAL PRELIMINARY STATEMENT.......................................................3

STATEMENT OF FACTS...........................................................................5

ARGUMENT........................................................................................9

THE THIRD CIRCUIT PRESUMES IMPAIRMENT FOR VOTING PURPOSES:
     CLASS 9 CREDITORS ARE IMPAIRED PURSUANT TO SECTION 1124
     AND PLAN PROPONENTS CANNOT REBUT THE PRESUMPTION OF
     IMPAIRMENT...............................................................................9

    A.    Because There is No "*Ipso Facto*" Legal Defense to Grace's Post-
         Petition Defaults, Interest Accrues at the Default Interest Rate. ..............10

    B.    Congress and Third Circuit Law Reject Grace's Argument that a Claim
         is Unimpaired Where a Plan Only Pays the Allowed Prepetition
         Amount of the Claim..........................................................................24

CONCLUSION...................................................................................29

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*In re 139-141 Owners Corp.*,
  313 B.R. 364 (Bankr. S.D.N.Y. 2004) .................................................................... 17

*In re Ace-Texas, Inc.*,
  217 B.R. 719 (Bankr. D. Del. 1998) ................................................................. 16, 27

*AM-Haul Carting, Inc.* v. *Contractors Cas. & Sur. Co.*,
  33 F. Supp. 2d 235 (S.D.N.Y. 1998) ..................................................................... 13

*Anchor Resolution Corp.* v. *State Street Bank & Trust Co. of Conn. (In re Anchor Resolution Corp.)*,
  221 B.R. 330 (Bankr. D. Del. 1998) ..................................................................... 12

*Auction of C and F Block Broadband PCS Licenses*,
  15 F.C.C.R. 17500 (2000) .................................................................................... 19

*Butler* v. *Bellwest Mgmt. Corp.* (*In re Butler*),
  14 B.R. 532 (Bankr. S.D.N.Y. 1981) .................................................................... 11

*Butner* v. *United States*,
  440 U.S. 48 (1979) ................................................................................................ 22

*In re Chicago, Milwaukee, St. Paul & Pac. R.R.*,
  791 F.2d 524 (7th Cir. 1986) ..................................................................... 20, 21, 22

*EBC I, Inc.* v. *America Online* (*In re EBC I, Inc.*),
  356 B.R. 631 (Bankr. D. Del. 2006) ..................................................................... 18

*In re FCC*,
  217 F.3d 125 (2d Cir. 2000) ............................................................................ 19, 20

*FCC* v. *NextWave Personal Commc'ns, Inc.*,
  537 U.S. 293 (2003) ........................................................................................ 19, 20

*First Fidelity Bank* v. *Jason Realty, L.P.* (*In re Jason Realty*),
  59 F.3d 423 (3d. Cir. 1995) .................................................................................. 22

*Gen. Elec. Capital Corp.* v. *Future Media Prods. Inc.*,
  547 F.3d 956 (9th Cir. 2008) ................................................................................ 21

*Hepner* v. *PWP Golden Eagle Tree, LLC* (*In re K&J Props., Inc.*),
  338 B.R. 450 (Bankr. D. Colo. 2005) ............................................................. 17, 18

*In re Joshua Slocum, Ltd.*,
  103 B.R. 601 (Bankr. E.D. Pa. 1989) ........................................................ 17

*Mims* v. *Fidelity Funding, Inc.*,
  307 B.R. 849 (N.D. Tex. 2002) ................................................................ 15

*In re New Valley Corp.*,
  168 B.R. 73 (Bankr. D.N.J. 1994) ............................................................ 25

*In re NextWave Personal Commc'ns, Inc.*,
  244 B.R. 253 (Bankr. S.D.N.Y. 2000) ................................... 3, 18, 19, 20

*NextWave Personal Commc'ns, Inc.* v. *FCC*,
  254 F.3d 130 (D.C. Cir. 2001) ........................................................ 19, 20

*Official Comm. of Unsecured Creditors* v. *Manville Forest Prods. Corp.* (*In re
  Manville Forest Prods. Corp.*),
  60 B.R. 403 (S.D.N.Y. 1986) ................................................................. 13

*In re PPI Enters. (U.S.), Inc.*,
  228 B.R. 339 (Bankr. D. Del. 1998) .................................................. 26, 28

*In re Rachels Indus., Inc.*,
  109 B.R. 797 (Bankr. W.D. Tenn. 1990) ........................................... 12, 14

*In re Route One West Windsor Ltd. P'ship*,
  225 B.R. 76 (Bkrtcy.D.N.J.,1998) .......................................................... 16

*Ruskin* v. *Griffiths*,
  269 F.2d 827 (2d Cir. 1959) ................................................................... 22

*In re Skyler Ridge*,
  80 B.R. 500 (Bankr. C.D. Cal. 1987) ..................................................... 13

*Solow* v. *PPI Enters. (U.S.), Inc* (*In re PPI Enters. (U.S.), Inc.*),
  324 F.3d 197 (3d Cir. 2003) .......................................................... passim

*United Merchants & Mfrs., Inc.* v. *Equitable Life Assurance Co. of the United States
  (In re United Merchants & Mfrs.)*,
  674 F.2d 134 (2d Cir. 1982) ................................................................... 12

*United States* v. *Pepperman*,
  976 F.2d 123 (3d Cir. 1992) ................................................................... 21

*Waltz* v. *County of Lycoming*,
  974 F.2d 387 (3d Cir. 1992) ..................................................................... 6

## STATUTES

11 U.S.C. § 362 ................................................................................................................ 14, 20

11 U.S.C. § 363(l) ................................................................................................................ 15

11 U.S.C. § 365 ................................................................................................. 12, 14, 16, 21

11 U.S.C. § 365(b) ........................................................................................................ 11, 16

11 U.S.C. § 365(e) ............................................................................................. 12, 14, 15, 16

11 U.S.C. § 502 .............................................................................................................. 4, 24

11 U.S.C. § 502(b)(2) ..................................................................................... 4, 25, 27, 28

11 U.S.C. § 502(b)(6) .................................................................................................. 27, 28

11 U.S.C. § 525(a) .............................................................................................................. 20

11 U.S.C. § 541(c) .............................................................................................................. 15

11 U.S.C. § 1123 ..................................................................................................... 17, 18, 21

11 U.S.C. § 1124 ......................................................................................................... passim

11 U.S.C. § 1124(1) ....................................................................................... 9, 10, 24, 26, 27

11 U.S.C. § 1124(2) ..................................................................................................... passim

11 U.S.C. § 1124(3) ..................................................................................... 4, 25, 26, 28

11 U.S.C. § 1129 ..................................................................................... 2, 5, 9, 28, 29

11 U.S.C. § 1129(a)(7) ...................................................................................................... 25

## FEDERAL RULES

Fed. R. Evid. 201 ................................................................................................................ 6

## OTHER AUTHORITIES

H.R. Rep. No. 95-595 (1977) ............................................................................. 13, 14, 18

H.R. Rep. No. 103-835 (1994) ......................................................................................... 26

S. Rep. No. 95-989 (1978) ................................................................................................ 10

Pursuant to the Bankruptcy Court's Order, dated July 9, 2009 [Dkt. No. 22374], regarding supplemental briefing related to the Phase I Confirmation Hearing with respect to Class 9 impairment (the "July 9 Order"), the Official Committee of Unsecured Creditors (the "Creditors' Committee") and certain lenders under the Prepetition Bank Credit Facilities[1] (the "Bank Lender Group",[2] collectively, with the Creditors' Committee, the "Joint Objectors,") by their undersigned counsel, hereby submit this joint supplemental brief to their prior pleadings dated May 20, 2009 [Dkt. Nos. 21789; 21790][3] with respect to the issue of Class 9 impairment and in opposition to the confirmation of the First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code [Dkt. No. 20872] (the "Plan")[4] filed by the above-captioned debtors ("Grace" or the "Debtors"), along with the Official Committee of Asbestos Personal Injury Claimants, the Asbestos PI Future Claimants' Representative, and the Official Committee of Equity Holders (together with Grace, the "Plan Proponents"), and in support thereof, respectfully represent as follows:

---

[1]   The Prepetition Bank Credit Facilities include (i) that certain Credit Agreement, dated May 14, 1998, among the W.R. Grace & Co. (the "Company"), W.R. Grace & Co.-Conn, The Chase Manhattan Bank, as Administrative Agent, Chase Securities Inc., as arranger, and certain Banks party thereto (the "1998 Credit Agreement"), and (ii) that certain 364-Day Credit Agreement, dated May 5, 1999, among the Company, W.R. Grace & Co.-Conn, Bank of America National Trust Savings Assoc., as documentation agent, The Chase Manhattan Bank, as administrative agent, Chase Securities Inc., as book manager, and certain Banks party thereto (as amended, including on May 3, 2000, the "1999 Credit Agreement", together with the 1998 Credit Agreement, the "Credit Agreements").  The Credit Agreements are attached as Exs. A and B to the Affidavit of Charles O. Freedgood of JPMorgan Chase Bank, N.A., admitted into evidence by agreement during the "Phase I" confirmation hearings and filed June 26, 2009 and June 30, 2009 [Dkt. Nos. 22279, 22306] (the "Freedgood Affidavit").

[2]   The Bank Lender Group includes (i) Anchorage Advisors, LLC; (ii) Avenue Capital Group; (iii) Babson Capital Management LLC; (iv) Bass Companies; (v) Caspian Capital Advisors, LLC; (vi) Catalyst Investment Management Co., LLC; (vii) Cetus Capital, LLC; (viii) DE Shaw Laminar Portfolios, LLC; (ix) Farallon Capital Management, L.L.C., (x) Goldman Sachs & Co. (as ex officio member); (xi) Halcyon Asset Management LLC; (xii) Intermarket Corp.; (xiii) JP Morgan Chase, N.A. Credit Trading Group; (xiv) Loeb Partners Corporation; (xv) MSD Capital, L.P.; (xvi) Normandy Hill Capital, L.P.; (xvii) Onex Debt Opportunity Fund Ltd.; (xviii) P. Schoenfeld Asset Management, LLC; (xix) Restoration Capital Management, LLC; and (xx) Royal Bank of Scotland, PLC.  The Bank Lender Group, together with all holders of claims under the Credit Agreements, including the previous holders of such claims, are collectively referred to as the "Bank Lenders."

[3]   Collectively referred to as the "May 20 Impairment Objections".

[4]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan.

## INTRODUCTION

1.      At the conclusion of the June 22, 2009 hearing on Phase I Impairment Issues, the parties agreed that in light of the various new points raised at the hearing, there would be supplemental briefing due on July 17, 2009.  The schedule for supplemental briefing is memorialized in the July 9 Order of this Court.

2.      On July 13, 2009, the Creditors' Committee and the Bank Lender Group, pursuant to the Court's Third Amended Case Management Order, dated May 5, 2009 [Dkt. No. 21544], filed a joint pre-trial brief in opposition to confirmation of the Plan [Dkt. No. 22441] ("Joint Pre-Trial Brief").  As set forth in footnote 9 of the Joint-Pre-Trial Brief, in the interests of completeness and efficiency, the Creditors' Committee and the Bank Lender Group included their supplemental briefing on the impairment issues within the Joint Pre-Trial Brief.  This was appropriate given how inter-related the various issues with respect to impairment of Class 9 are with the section 1129 issues raised in the Joint Pre-Trial Brief.  Nonetheless, in order to comply with the July 9 Order, the Joint Objectors concluded that this supplemental brief was still required to be filed as a procedural matter.  The arguments contained herein are identical to those set forth in the Joint Pre-Trial Brief.

3.      In accordance with the July 9 Order, the Joint Objectors have focused in this supplemental brief on the new arguments raised at the June 22 hearing and the issues that seemed to most concern the Court.  In addition, the Joint Objectors, for context purposes, have included a limited statement of facts based on the Freedgood Affidavit and accompanying exhibits admitted into evidence that were filed on June 26, 2009 and June 30, 2009 [Dkt. Nos. 22279, 22306].  Because a number of the new arguments and issues raised at the June 22 hearing overlap with or are extensions of prior arguments raised in the May 20 Impairment Objections,

some of the material from the May 20 Impairment Objections are also included in this

supplemental brief.

## SUPPLEMENTAL PRELIMINARY STATEMENT

4.      This supplemental brief addresses the following issues and argument:

a.   During its over eight years in bankruptcy, Grace has not only failed to pay the Bank Lenders the $500 million in principal it owes them but has never paid any of the interest owed on that money.  Grace contends that it is somehow not in default, and thus, the Bank Lenders have no right to any contractual default-rate interest.  But Grace's bankruptcy filing itself constituted a default under the Credit Agreements—one that accelerated all of Grace's obligations under the loan documents.

b.   The Bankruptcy Code is unequivocal that credit agreements do not qualify as executory contracts subject to the Code's prohibition on the enforcement of so-called *ipso facto* clauses.  Grace's failure to pay $500 million in principal upon acceleration, and its failure to pay any of the interest owed on that principal amount or on unpaid interest, are also defaults that triggered the default interest provisions under the Credit Agreements.  No provision of the Bankruptcy Code or caselaw absolves Grace from these defaults.

c.   What's more, Grace's failure to pay the $500 million in principal at the stated maturity dates (in 2001 and 2003, respectively) automatically provides thereafter for payment under the Credit Agreements of the default interest rate without reliance upon any default or any need to otherwise accelerate the loans.

d.   The numerous defaults that occurred here are not excused by any *ipso facto* legal defense.  None of the provisions of the Bankruptcy Code that prohibit the enforcement of *ipso facto* clauses are applicable here.  The case law cited by Grace is factually inapposite, including *In re NextWave Personal Commc'ns, Inc.*, 244 B.R. 253, 276 (Bankr. S.D.N.Y. 2000), which is also no longer good law.   Consequently, there is no legal authority to absolve Grace from the defaults arising under the terms of the Credit Agreements.

e.   Separate and apart from any defaults, the loans by their own terms matured in 2001 and 2003 (without reliance on either acceleration or an Event of Default).  At a minimum, putting aside the bankruptcy filing default and interest payment defaults, the contractual default rate applies because that is the rate payable once the loans became due upon the un-accelerated maturity dates in 2001 and 2003.

f.  The Third Circuit *presumes* that Class 9 is impaired and each claim within the Class has the right to vote.  It is the Plan Proponents' burden to overcome the presumption of impairment and establish that the Plan leaves the legal, equitable and contractual rights of each claim entirely unaltered.  By proposing to pay the Bank Lenders under the Plan an interest rate *other* than the applicable rate under the Credit Agreements—the Plan alters the Bank Lenders' rights.  The Plan Proponents have failed to satisfy their burden and overcome the Third Circuit's presumption of impairment.  Consequently, the Bank Lenders' legal and contractual rights are impaired, Class 9 is impaired and all claimants classified within Class 9 have the right to vote on the Plan.

g.  Congress made clear in its repeal of section 1124(3) that for purposes of impairment, entitlement to post-petition interest on the *allowed* prepetition claim is a something *separate* and *additional* to the allowed prepetition claim.

h.  All of Grace's arguments based on section 502, including that section 502 "trumps" or adversely alters a creditor's state law contract rights, are simply a repackaging of the repudiated *New Valley* decision expressly rejected by Congress in its repeal of section 1124(3).

i.  Section 502(b) only determines the "allowed" amount of a creditor's prepetition claim.  As the Third Circuit and Congress made clear, section 502(b) does not eliminate or determine a creditor's legal, equitable or contractual entitlements to post-petition interest on such allowed claim

j.  Impairment is determined on a creditor-by-creditor basis depending on the relevant legal, contractual, and equitable rights of each creditor—in the case of the Bank Lenders, as defined by the Credit Agreements.

k.  Having established that as a matter of contract, default interest is due under the Credit Agreements (whether as a result of natural maturity of the loans, acceleration upon a bankruptcy filing or payment default) and that there is no *ipso facto* defense to the enforcement of the default interest rate, and having further established that post-petition interest must be paid on an allowed claim for impairment purposes, the failure of the Plan to pay post-petition interest of the contractual default rate alters the Bank Lenders' contract rights and thus the Bank Lenders are impaired by the Plan.

l.  Grace's reliance on section 1124(2) as a defense must fail for a number of reasons, including most fundamentally that the reinstatement provisions of that Bankruptcy Code section are not applicable since the loans made under the Credit Agreements matured over five years ago and cannot be reinstated.

m.  This supplemental brief does not address Grace's arguments raised at the June 22 hearing and in its response to the May 20 Impairment Objections, that, for purposes of determining impairment under section 1124, the Joint Objectors are required to establish that Grace was solvent.  The issue of Grace's

4

solvency is irrelevant to section 1124 and is only relevant to issues to be decided pursuant to section 1129(b)(2).  The Joint Objectors' arguments regarding solvency are fully set forth in the Joint Pre-Trial Brief.

5.      Accordingly, the Plan Proponents have not satisfied their burden to overcome the presumption of "impairment" and thus, the Court should find that Class 9 is "impaired" and thus, require the Plan Proponents to count the votes of Class 9 creditors.

## STATEMENT OF FACTS

### The Credit Agreements and Proofs of Claim

6.      Prepetition, Grace entered into the Credit Agreements.  Under them, Grace owes the Bank Lenders $500 million in aggregate principal amount plus an additional $3 million of interest that accrued prepetition.[5]  The scheduled maturity of the 1998 Credit Agreement occurred over five years ago on May 16, 2003.  (1998 Credit Agreement §§ 1.1, 2.2.)  It has a non-default interest rate equal to the Alternate Base Rate, with a default rate of the Alternate Base Rate plus 2%.  (*Id.* §§ 1.1, 5.1(b), 5.1(c), 5.5.)  The scheduled maturity of the 1999 Credit Agreement occurred over eight years ago on May 2, 2001.  (1999 Credit Agreement §§1.1, 2.2; Amendment to 1999 Credit Agreement, dated as of May 3, 2000, § 1.2 (amending definition of Termination Date); Freedgood Aff. ¶ 9.)  It has a non-default interest rate equal to the Alternate Base Rate, with a default rate of the Alternate Base Rate plus 2%.  (1999 Credit Agreement §§ 1.1, 5.1(b), 5.1(c), 5.5.)  The Credit Agreements are governed by New York law.  (Credit Agreements § 13.11.)

7.      JPMorgan Chase Bank, N.A. ("JPMorgan") serves as administrative agent (the "Administrative Agent") under the Credit Agreements.  It timely submitted proofs of claim

---

[5]  *See* 1998 Credit Agreement at Sch. 1 ($250 million aggregate commitment); 1999 Credit Agreement at Sch. 1 ($250 million aggregate commitment); Proofs of Claim, Exs. C & D to Freedgood Affidavit.

nos. 9159 and 9168 dated March 27, 2003 (the "Proofs of Claim")[6] for amounts owed on account

of, but not limited to, principal, interest, and fees on the loans and advances made under the

Credit Agreements.[7]

**Events of Default**

        8.      Grace filed for bankruptcy on April 2, 2001.  Grace's bankruptcy filing

was an event of default under the Credit Agreements.  (Credit Agreements § 10(f)(i)(A).)  The

bankruptcy filing event of default automatically accelerated the loans without the need for any

demand or notice.  (Credit Agreements § 10 (providing that if a bankruptcy filing default occurs

with respect to any Borrower, "*automatically* the Commitments to such Borrower shall

immediately terminate and the Loans made to such Borrower hereunder (with accrued interest

thereon) and all other amounts owing under this Agreement and the Notes of such Borrower

shall *immediately* become due and payable") (emphasis supplied).)[8]  Grace's bankruptcy filing

thus accelerated all principal and interest outstanding as of April 2, 2001.  There was $500

million of principal outstanding on April 2, 2001, and approximately $3 million of unpaid

interest had accrued up until April 2, 2001 (the $503 million amount owing as of April 2, 2001,

the "Petition Date Claim Amount").

        9.      Grace did not pay (and has not to this day paid) the Petition Date Claim

Amount when it became due on April 2, 2001.  (Freedgood Aff. ¶ 13.)[9]  Under the Credit

---

[6]    *See* Proofs of Claim, Exs. C & D to Freedgood Affidavit; Freedgood Aff. ¶ 14.

[7]    In addition to default interest rate, the Credit Agreements provide for payment of facility fees, attorneys' fees and specified method for calculating interest.  (Credit Agreements §§ 1.1, 5.2, 5.7, 5.13.)  The Plan seeks to exclude the Bank Lenders' claims for postpetition interest calculated at the default rate (Plan § 3.1.9(b)(A), but Grace owes the Bank Lenders these other amounts as well pursuant to the terms of the Credit Agreements.

[8]    This automatic acceleration provision contrasts with other defaults under the Credit Agreements that specifically require notice to terminate the commitments and accelerate the loans.

[9]    The Court may take judicial notice of pleadings filed on the docket in these bankruptcy cases.  *See* Fed. R. Evid. 201 (a court may take notice of judicially noticed facts "not subject to reasonable dispute"); *Waltz* v. *County of*

Agreements, Grace's failure to make a payment of principal or interest when due post-petition (whether by acceleration or otherwise) in accordance with the Credit Agreements *automatically* triggered the default rate of interest on such missed payment from the date of non-payment until payment in full.  (*See* Credit Agreements § 5.1(c) (applying the default interest rate "if all or a portion of (i) the principal amount of any Loan or (ii) any interest payable thereon shall not be paid when due (whether at the stated maturity, by acceleration or otherwise)").)  Because Grace did not pay the Petition Date Claim Amount when it became due, interest on the Petition Date Claim Amount *automatically* and without the need for any notice has accrued at the default rate since April 2, 2001.

10.    Even overlooking that the loans accelerated automatically on April 2, 2001, the Petition Date, the Credit Agreements provided that the actual scheduled maturity dates of the Credit Agreements occurred in 2001 and 2003, respectively.  (1998 Credit Agreement §§ 1.1, 2.2; Amendment to 1999 Credit Agreement, dated as of May 3, 2000, § 1.2 (amending definition of Termination Date).)  Grace has made no payments of principal under the Credit Agreements after April 2, 2001.  (Freedgood Aff. ¶ 13.)  At a minimum then, under section 5.1(c) of the Credit Agreements, the natural maturity of the principal amounts due in 2001 and 2003, respectively, *automatically* resulted in accrual of interest on such unpaid amounts after 2001 and 2003 at the default rate, without the need for either the occurrence of any "Event of Default" or notice of any kind.

11.    Furthermore, the Credit Agreements provide for quarterly payments of interest.  (Credit Agreements § 1.1.)  Grace made no payments of interest during the pendency of these cases.  (Freedgood Aff. § 13.)  The failures to pay interest on the loans and notes after such

---

*Lycoming*, 974 F.2d 387, 389 (3d Cir. 1992) (pleadings, motions, and briefs that were part of the record were "subject to judicial notice" without further proof).

interest became due in accordance with the terms of the Credit Agreements constituted "Events of Default" that entitled the Bank Lenders to accelerate the entire outstanding amount of the loans and notes.  (*See* Credit Agreements § 10(a).)

12.     Grace further defaulted on a number of non-monetary reporting obligations under the Credit Agreements.  As outlined in the Freedgood Affidavit, Grace failed to furnish each bank all certificates and other information required by section 8.2(a)-(c) of the Credit Agreements, failed to promptly give notices to JPMorgan Chase Bank, N.A. as required by section 8.7, and failed to remedy such breaches within 30 days.  (*See* Freedgood Aff. ¶ 13.) These defaults constitute "Events of Default" that entitled the Bank Lenders to accelerate the entire outstanding amount of the loans and notes.  (*See* Credit Agreements § 10(d).)

13.     In sum, Grace failed, among other things, to repay the $500 million principal amount of the loans due under the Credit Agreements as they matured in 2001 and 2003 or upon acceleration, and to pay certain interest payments, all as required by the Credit Agreements.  In addition, the Credit Agreements provide that Grace's failures to pay interest and principal of the loans upon maturity or acceleration are events that automatically trigger the default rate of interest set forth in the Credit Agreements.  (Credit Agreements §§ 1.1, 2.2(a), 5.1(c), 8.3, 10(a).)

**The Plan**

14.     Grace's Plan provides that each holder of an allowed general unsecured claim in Class 9 shall be paid "the Allowed Amount of its Allowed General Unsecured Claim" with "post-petition interest."  (Plan § 3.1.9(b).)  Under the Plan, interest accruing after the Petition Date on the Bank Lenders' allowed claims is "calculated at the rate of 6.09% from the Petition Date through December 31, 2005 and thereafter at floating prime, in each case

compounded quarterly through the Effective Date." (*Id.* § 3.1.9(b)(i)(A).)  This is less than the contractual default rate set forth in the Credit Agreements.

15.    The Plan Proponents classify the Bank Lenders' claims as "unimpaired" to establish the irrebuttable presumption that the Bank Lenders have accepted the Plan and to avoid the rigorous requirements of section 1129.  (*See id.* § 3.1.9(c).)

## ARGUMENT

### THE THIRD CIRCUIT PRESUMES IMPAIRMENT FOR VOTING PURPOSES: CLASS 9 CREDITORS ARE IMPAIRED PURSUANT TO SECTION 1124 AND PLAN PROPONENTS CANNOT REBUT THE PRESUMPTION OF IMPAIRMENT

16.    The Plan violates sections 1129(a)(1) and 1124 of the Bankruptcy Code by improperly classifying the claims of the Bank Lenders as "unimpaired."  (*See* Plan at §3.1.9(f).)  The Third Circuit *presumes* impairment and creditors' rights to vote under a plan.  *Solow* v. *PPI Enters. (U.S.), Inc.*, (*In re PPI Enters. (U.S.), Inc.*), 324 F.3d 197, 203 (3d Cir. 2003).   Grace can only overcome the presumption and satisfy its burden if it demonstrates that the plan leaves creditors' legal, equitable, and contractual rights unaltered.  *Id*.

17.    Under section 1124(1) of the Bankruptcy Code, a class of claims is impaired under a plan if such plan alters the legal, equitable, or contractual rights to which such claim entitles the holder of such claim.[10]  The legal, equitable, and contractual rights of the Bank Lenders include the right to post-petition interest at the contract default rate and the right to be paid facility fees and attorneys' fees due under such contracts.  The Plan impairs the Bank Lenders' claims because it alters their legal, equitable, and contractual rights by, among other

---

[10]    The Creditors' Committee also objected to confirmation of the Plan on grounds including that the non-Bank Claims in Class 9 were impaired because they were not assured that their legal, equitable, or contractual rights were unaltered by the Plan's protocol for such claims.  *See* Creditors' Committee Plan Objection [Dkt. No. 21790].  During the "Phase I" hearings on June 22, the Debtors committed to certain language modifications designed to resolve this objection.  Hearing Tr. 127:16-21, June 22, 2009 [Dkt. No. 22294].  The Creditors' Committee reserves its objection in this regard until such time as the language proposed by the Debtors (which the Debtors have yet to provide) is acceptable to the Creditors' Committee.

reasons, (i) failing to pay the Bank Lenders' claims in full, in cash, including with post-petition

interest at the applicable contract rate set forth in the Credit Agreements, and (ii) failing to assure

payment of the Bank Lenders' claims in full on the Plan's Effective Date.[11]

18.     Congress and the Third Circuit are crystal clear on the law on

"impairment."  If the chapter 11 plan does not leave the creditor's legal, equitable, and

contractual rights "*entirely 'unaltered*,' the creditor's claim will be labeled as impaired under

§ 1124(1) of the Bankruptcy Code."  *In re PPI Enters. (U.S.), Inc.*, 324 F.3d at 202 (emphasis

supplied); S. Rep. No. 95-989, at 120 (1978).  By proposing to pay the Bank Lenders' claims at

an interest rate *other* than the applicable contract rate—which is the default rate as triggered by

Grace's bankruptcy filing, occurrence of the stated maturity of the loans, and uncontested

payment defaults—the Plan clearly alters the Bank Lenders' rights such that they are impaired

and entitled to vote.

**A.     Because There is No "*Ipso Facto*" Legal Defense to Grace's Post-Petition Defaults, Interest Accrues at the Default Interest Rate.**

19.     Grace's position boils down to one never accepted by any court:  that the

Bank Lenders are not impaired because their contractual right to default interest, as a result of

some type of "*ipso facto*" legal defense, is unenforceable in bankruptcy.  This is simply wrong as

a matter of law.

20.     Under the Credit Agreements, Grace's bankruptcy filing automatically

accelerated the maturity of the $503 million Petition Date Claim Amount (comprising $500

---

[11]  The Plan fails to pay the Bank Lenders in full inasmuch as the Bank Lenders will receive no payment of interest on the Effective Date of the Plan—including interest that accrued before the Petition Date and interest that Grace concedes the Bank Lenders are entitled to—in the event that no Final Order resolving the Objection has been entered by such time.  *See* Plan § 3.1.9(d)(iii).  Second, it prohibits the accrual after the Effective Date of *any* interest on past due unpaid amounts of interest.  *Id.*  Moreover, the Plan does not contain a reserve to assure payment of amounts owed to the Bank Lenders and not paid on the Plan's Effective Date.  The reserve issue may be further addressed connection with briefing on feasibility, which is due on August 25, 2009 in accordance with the Third Amended Case Management Order.

million of principal and $3 million of interest earned Prepetition). In addition, the actual stated

maturity dates of the loans occurred in 2001 and 2003, respectively, at which point the loans

unquestionably became due. Finally, interest was payable quarterly on such amounts. Grace's

failure to satisfy these monetary contractual obligations when due post-petition (whether due

upon acceleration or on the stated maturity and/or on interest payment dates assuming there had

been no acceleration) automatically triggered the default interest rate without the need for the

Bank Lenders to send a notice. (*See* Freedgood Aff. ¶ 13; Credit Agreements §§ 1.1, 2.2(a),

5.1(c), 8.3, 10(a), 10(f)(i)(A).)

21.     The fact that Grace failed to satisfy these contractual payment obligations

post-petition is, and will remain, uncontested. Instead, Grace asserts that it has a legal defense

while in bankruptcy because of the doctrine of "*ipso facto*." (Hearing Tr. 116:8-10, June 22,

2009, [Dkt. 22294] ("With respect to the payment [default] … we thought before that that was

disposed of because it's, effectively, an *ipso facto* provision…").) Neither the express language

of the Bankruptcy Code nor any implied "*ipso facto*" legal defense shields a debtor from a

default, even one occurring post-petition, on its obligations under a loan agreement. Moreover,

even assuming *arguendo*, that any type of *ipso facto* defense was applicable (none is), it cannot

in any event be used as a defense to alter the interest rate payable upon the loans once they

reached their scheduled maturity dates in 2001 and 2003.

**Bankruptcy Code's Recognition of Defaults**

22.     *First*, numerous Bankruptcy Code provisions expressly recognize that

defaults survive and must be considered whether they occurred pre- or post-petition. *See* 11

U.S.C. § 365(b)(1); *Butler* v. *Bellwest Mgmt. Corp.* (*In re Butler*), 14 B.R. 532, 535 (Bankr.

S.D.N.Y. 1981); *In re Rachels Indus., Inc.*, 109 B.R. 797, 811-12 (Bankr. W.D. Tenn. 1990)

("[T]he debtor, when attempting to assume under § 365, must cure both prepetition and

postpetition defaults."); *see also* 11 U.S.C. § 1124(2)(A).  Most importantly, section 1124(2)(A)

provides that *a claim can only be unimpaired if* the plan "cures any such default that occurred

before *or after* the commencement of the case." (emphasis supplied).

23.    Accordingly, bankruptcy courts can and do recognize both bankruptcy-

triggered defaults, as well as other post-petition defaults.  For example, in this district, Judge

Walsh in *Anchor Resolution Corp.* v. *State Street Bank & Trust Co. of Conn. (In re Anchor

Resolution Corp.)*, 221 B.R. 330, 336-37 (Bankr. D. Del. 1998) enforced a make-whole

provision triggered by an event of default where the "default" was the filing of a bankruptcy

petition.  The noteholders filed a proof of claim seeking the full make-whole amount under their

note purchase agreement, arguing that they were entitled to the full make-whole amount as a

result of the bankruptcy filing because the bankruptcy filing was a contractual event of default

under the note purchase agreement and the note restructuring agreement, which triggered the

obligation to pay the full make-whole amount.  *Id.* at 334.

24.    The debtor in *Anchor Resolution* argued that the bankruptcy filing was not

enforceable as a default pursuant to section 365(e)(1)(B) of the Bankruptcy Code, and thus, the

noteholders were only entitled to a lesser adjusted make-whole amount under the note

restructuring agreement.  *Id.* at 335.  Judge Walsh unequivocally held that because the note

restructuring agreement was not an executory contract as a matter of law, section 365(e) was

inapplicable to the note restructuring agreement and, therefore, "[t]he Debtor's filing of its

Chapter 11 petition created a restructuring event of default."  *Id.* at 337; *see also, e.g.*, *United

Merchants & Mfrs., Inc.* v. *Equitable Life Assurance Co. of the United States (In re United

Merchants & Mfrs.)*, 674 F.2d 134, 143-44 (2d Cir. 1982) (enforcing a liquidated damages

provision triggered by the filing of a Chapter XI petition).

25.     Nor can there be any doubt that the Credit Agreements' bankruptcy-triggered acceleration clauses are enforceable, given that a bankruptcy filing already automatically accelerates the maturity of debts as a matter of law, as this Court has aptly noted. (*See* Hearing Tr. 58:16-18, June 22, 2009 [Dkt. 22294] ("The Bankruptcy Code will accelerate all the obligations up to the point of the filing of the bankruptcy.")); *see also* H.R. Rep. No. 95-595, at 353 (1977), ("[B]ankruptcy operates as the acceleration of the principal amount of all claims against the debtor."); *In re Skyler Ridge*, 80 B.R. 500, 507 (Bankr. C.D. Cal. 1987) ("The automatic acceleration of a debt upon the filing of a bankruptcy case is well established."); *cf.* 11 U.S.C. § 1124(2)(C) (statutory provision permitting reinstatement of the maturity date necessarily and expressly assumes enforceability of contractual acceleration provision).

26.     In any event, without deciding whether Grace's bankruptcy filing accelerated the maturity of the loans either as a matter of contract or by operation of law, the stated maturity dates of the loans in 2001 and 2003, respectively, as well as the quarterly interest payment dates, came and went without Grace performing its obligations under the Credit Agreements.  Such post-petition defaults are recognized in bankruptcy; there is no basis to ignore them.  For example, in *AM-Haul Carting, Inc.* v. *Contractors Cas. & Sur. Co.*, 33 F. Supp. 2d 235, 241-43 (S.D.N.Y. 1998), the Court found that the debtor defaulted on its obligations in the wake of its May 1997 bankruptcy, and that the automatic stay provisions of the Code neither prohibited nor nullified that default and the triggering of the surety's obligations.  *See also Official Comm. of Unsecured Creditors* v. *Manville Forest Prods. Corp.* (*In re Manville Forest Prods. Corp.*), 60 B.R. 403, 404 (S.D.N.Y. 1986) (where debtor defaulted on payments of principal and interest while in chapter 11, cure required payment of interest on the missed payments); *In re Rachels Indus.*, 109 B.R. at 811-12 (noting that debtor must cure both

prepetition and post-petition defaults to assume an executory contract under § 365).  The

automatic stay of section 362 of the Bankruptcy Code merely prevents creditors from

immediately enforcing the consequences of a pre or post-petition default; it does not insulate

Grace from the occurrence of a default in the first instance.

**Enumerated *Ipso facto* Defenses Do Not Apply**

27.    *Second*, while Congress has enumerated specific instances, in specific

types of contracts, where so-called *ipso facto* clauses are unenforceable, none of those provisions

apply here.  Every *ipso facto* reference codified in the Bankruptcy Code operates to prevent the

forfeiture, modification, or termination of the debtor's (a) interest in property or (b) rights in an

*executory* contract.  There is no property interest being forfeited, modified, or terminated here,

and the Credit Agreements are not executory contracts.

28.    For example, section 365(e) provides in pertinent part that an executory

contract and any right or obligation under such contract may not be terminated or modified (i) at

any time after the commencement of the case (ii) solely because of a provision that is

conditioned on the insolvency or financial condition of the debtor at any time before the closing

of the case or on the commencement of a case under title 11.[12]  As this Court recognized at the

hearing on June 22, 2009, section 365(e) does not apply.  (Hearing Tr. 117:6, June 22, 2009

[Dkt. 22294] ("I don't think 365 applies.").)  Section 365(e)(2)(B) specifically exempts contracts

to make a loan from the prohibition on *ipso facto* clauses.  Therefore, not only does the

Bankruptcy Code fail to prohibit such clauses in loan agreements, it explicitly allows them.  As a

result, courts recognize that the *ipso facto* defense of section 365(e) does *not* prevent automatic

---

[12]    As noted in the legislative history of section 365(e) of the Bankruptcy Code, Congress was particularly
concerned with the fact that the mere filing of a bankruptcy could force a debtor to forfeit its rights under a
valuable executory contract.  *See* H.R. Rep. No. 95-595 at 348 (1977).  Here, no right of Grace is being
forfeited, modified, or terminated.

acceleration of loan maturity upon the filing of a bankruptcy petition.  *See Mims* v. *Fidelity*

*Funding, Inc.*, 307 B.R. 849, 858 (N.D. Tex. 2002) ("Thus, it is clear that the Bankruptcy Code's

invalidation of *ipso facto* clauses does not apply in this situation involving a contract to make a

loan for the benefit of the debtor.  Accordingly, the Court reverses the Bankruptcy Court's

holding that the Loan was not accelerated.  The Loan's maturity date was accelerated upon [the]

bankruptcy filing on the Petition Date.").

29.    Similarly, the other provisions of the Bankruptcy Code that refer to

prohibited *ipso facto* clauses are inapplicable here.  Section 363(l) of the Bankruptcy Code

provides that the trustee may use, sell, or lease property notwithstanding any provision in a

contract, a lease or applicable law (i) conditioned on the commencement of a case that (ii) may

effect a "*forfeiture, modification, or termination* of the debtor's interest in such property."  11

U.S.C. § 363(l) (emphasis supplied).  The payment of default interest has nothing to do with

Grace's right to use, sell, or lease its property nor does it effect a forfeiture, modification, or

termination of Grace's interests in property or its contractual rights.

30.    Section 541(c) is similarly inapplicable.  Section 541(c) defines property

of the estate to include any interest of the debtor in property notwithstanding any provision in an

agreement (i) conditioned on the commencement of a case and (ii) that effects "a forfeiture,

modification, or termination of the debtor's interest in property."  The Bank Lenders do not seek

to take away any property interest of Grace or assert that such property is not included in its

estate.

31.    Finding support nowhere else in the Bankruptcy Code, Grace's counsel,

during the June 22 hearing, turned to the reinstatement provisions of section 1124(2) of the

Bankruptcy Code.  (Hearing Tr. 120-22, June 22, 2009 [Dkt. No. 22294].)  As an initial matter,

those provisions are irrelevant here because the loans in question matured over five years ago and thus cannot be reinstated. *See In re Ace-Texas, Inc.*, 217 B.R. 719, 726 (Bankr. D. Del. 1998) ("[I]t makes no sense to reinstate the maturity of a claim that has already matured."). In any event, section 1124(2) does not support (either explicitly or implicitly) Grace's attempt to ignore the contractual default-rate interest.

32.    First, Grace's counsel made much of the fact that a debtor need not cure certain types of defaults pursuant to section 1124(2) in order to reinstate a claim. (Hearing Tr. 121-22, June 22, 2009 [Dkt. No. 22294].) However, it should come as no surprise that a debtor need not cure historical insolvency, a bankruptcy filing, or the appointment of a trustee, as these defaults are all impossible to cure (*e.g.* a debtor cannot turn back time and undo its bankruptcy filing). Further, as indicated above, nothing in section 1124(2) states that a contractual provision in a loan agreement may not accelerate the claim. Not only would such a reading be wholly inconsistent with section 365(e)(2), but section 1124(2) presumes that an acceleration has occurred by explicitly allowing a debtor to de-accelerate by reinstating the maturity of the claim as it existed before such default. *See* 11 U.S.C. § 1124(2)(B).

33.    Second, while section 1124(2) exempts from the cure requirement *ipso facto* defaults of the kind specified in or otherwise exempted by section 365(b)(2), cure amounts payable under section 1124(2) (to reinstate accelerated debt) or section 365 (to assume an executory contract) must *always* include past due amounts of principal, interest, or rent, as applicable. *See, e.g.*, *In re Route One West Windsor Ltd. P'ship*, 225 B.R. 76, 85 (Bkrtcy.D.N.J.,1998) (no question that payment of missed interest and principal payments is required to reinstate debt); *In re Joshua Slocum, Ltd.*, 103 B.R. 601, 604 (Bankr. E.D. Pa. 1989) (no dispute that rent payments in arrears post-petition were to be paid as part of the cure

amount).  Grace cannot have it both ways.  A payment default is either *ipso facto* and not subject to the cure requirement, or not *ipso facto* and thus not subject to the cure requirement.  Because payment defaults are not exempt from cure under sections 1124 or 365, payment defaults are not excusable.

34.     Third, section 1124(2) concerns only the "de-acceleration and reinstatement of the original maturity date of the loan *upon curing of a default.*  [It] say[s] nothing about eliminating otherwise enforceable, accrued default interest which would have to be paid as part of the default cure."  *See Hepner* v. *PWP Golden Eagle Tree, LLC (In re K&J Props., Inc.)*, 338 B.R. 450, 461 (Bankr. D. Colo. 2005) (emphasis supplied); *see also In re 139-141 Owners Corp.*, 313 B.R. 364, 368 (Bankr. S.D.N.Y. 2004) (finding no statutory basis in section 1124(2) for judicial nullification of a contract right to default rate interest, and *holding that denial of a creditor's contractual right to interest at a default rate does alter the creditor's contractual rights within the meaning of section 1124(2)(D)*) (emphasis supplied).  Simply put, no aspect of section 1124(2) excuses a debtor from the failure to make post-petition payments of principal or interest.

35.     *Finally*, Grace's reading of section 1124 is incompatible with section 1123.  On this point, Grace's counsel, at the June 22 hearing, argued that the Plan "cures the default to the extent that there was non-payment of principal and interest."  (Hearing Tr. 120:23-25, June 22, 2009 [Dkt. No. 22294].)  Although Grace may claim to have attempted to cure these defaults, they did so improperly.  In 1994 Congress added section 1123(d) to the Bankruptcy Code, which states that "if it is proposed in a plan to cure a default the amount necessary to cure the default *shall be determined in accordance with the underlying agreement* and applicable nonbankruptcy law."  *See In re K&J Props., Inc.*, 338 B.R. at 461 ("The 1994 amendments to

section 1123 appear specifically to address this matter, requiring ' . . . the amount necessary to cure the default, shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law.' *Section 1123(a)(5)(G) and section 1124(2) provide no basis to nullify the post-petition default interest . . . to the extent it is otherwise allowable under [the] loan documents and applicable nonbankruptcy law.*") (emphasis supplied).  The underlying agreement, which the Bank Lenders seek to enforce, unequivocally provides for a default rate of interest.  Section 1123 thus requires that any "cure payment" reflect this default rate of interest.

**No Unenumerated *Ipso Facto* Defense Exists**

36.     Unable to identify a statutory *ipso facto* provision that is on point, Grace goes outside of the Bankruptcy Code in search of a broad "penumbra-like" *ipso facto* defense to the enforcement of any contractual right triggered either by the bankruptcy filing or by the debtor's failure to make payments during the pendency of its bankruptcy case.  Specifically, Grace contends that a provision that triggers the default rate of interest upon a missed payment constitutes a prohibited *ipso facto* clause.  (Objection at 16-17.)  This argument ignores the very definition of the type of clause from which Congress sought to protect debtors—a clause that effectuated a forfeiture, modification, or termination of a contract right *based solely on a bankruptcy filing*.  *See* H.R. Rep. No. 95-595 at 348 (1977) ("These clauses . . . *automatically terminate* the contract or lease, in the event of bankruptcy.") (emphasis supplied).

37.     Grace cites to two cases in support of its impermissible attempt to broaden the definition of a prohibited *ipso facto* clause—*In re NextWave Personal Commc'ns, Inc.*, 244 B.R. 253, 276 (Bankr. S.D.N.Y. 2000) and *EBC I, Inc.* v. *America Online (In re EBC I, Inc.)*, Inc., 356 B.R. 631 (Bankr. D. Del. 2006).[13]  Both cases are inapposite as each involves a

---

[13]     Hearing Tr. 119, June 22, 2009 [Dkt. No. 22294].

purported *termination* of non-loan executory contracts constituting a forfeiture of a valuable asset of the debtors' estates—the very consequence that Congress intended to prevent in rendering such "*ipso facto*" clauses unenforceable pursuant to the aforementioned provisions of the Bankruptcy Code.  We could find *no case* that stands for the proposition that a debtor is *excused* from the obligation to pay default interest where the default is the failure to pay the interest itself.[14]

38.     Grace relies on *NextWave* for its statement that "[i]t is senseless to speak of a default when, as a matter of bankruptcy law, the debtors had neither the authority nor the ability to make such payments absent notice and court approval."  *See NextWave*, 244 B.R. at 276.  This pronouncement simply is not good law.  The *NextWave* bankruptcy court did not cite to a single authority (in the statute or case law) in support of this conclusion.  Moreover, the decision was reversed by the Second Circuit on a writ of mandamus due to lack of subject-matter jurisdiction.  *See In re FCC*, 217 F.3d 125 (2d Cir. 2000).[15]

---

[14]    There are many cases in which default interest was awarded, and based on the facts it appears that the only contractual basis for such interest was either maturity of the loans (by acceleration or natural maturity) or post-petition payment defaults.  This factual circumstance was not cited as a basis for these rulings because the debtors in these cases did not raise any type of *ipso facto* defense.  A compendium of such cases will be presented to the Court and the Plan Proponents.

[15]    Apparently, because the case caption before the Second Circuit differs from the bankruptcy court case, the reversal does not register in Westlaw subsequent history.  Following the Second Circuit's reversal, NextWave filed a petition with the FCC seeking reconsideration of the license cancellation, which the FCC denied.  *Auction of C and F Block Broadband PCS Licenses, Order on Reconsideration,* 15 F.C.C.R. 17500 (2000).  NextWave appealed directly to the Court of Appeals for the D.C. Circuit, with the U.S. Supreme Court eventually hearing the case.  Both the D.C. Circuit and U.S. Supreme Court acknowledge the Second Circuit's reversal of the bankruptcy court decision reported at 244 B.R. 253.  *See FCC* v. *NextWave Personal Commc'ns, Inc.*, 537 U.S. 293, 299 (2003) ("NextWave sought emergency relief in the Bankruptcy Court, which declared the FCC's cancellation of respondent's licenses 'null and void' as a violation of various provisions of the Bankruptcy Code.  *In re NextWave Personal Commc'ns, Inc.,* 244 B.R. 253, 257-58 (Bankr. S.D.N.Y. 2000).  Once again, the Court of Appeals for the Second Circuit reversed.  *In re FCC,* 217 F.3d 125 (2000).") (citations in original); *NextWave Personal Commc'ns, Inc.* v. *FCC,* 254 F.3d 130 (D.C. Cir. 2001) ("The dispute then returned to the bankruptcy court, which declared the Commission's cancellation of NextWave's licenses 'null and void' as a violation of various provisions of the Bankruptcy Code, including the automatic stay provisions of section 362(a).  *In re NextWave Personal Commc'ns, Inc.,* 244 B.R. 253, 257-58, 267-68 (Bankr. S.D.N.Y. 2000) . . . .  Again, the Second Circuit reversed.  *In re FCC,* 217 F.3d 125 (2000).") (citations in original).

39.    In any event, even if it had not been reversed on other grounds, *NextWave* did not hold and does not support the proposition that post-petition defaults need not be cured: to the contrary, in *NextWave* the FCC purported to terminate NextWave's licenses *despite* the fact that the "economic consequence of [delayed payment to the FCC] will be fully cured by payment in full of all applicable interest, *penalties and late fees* upon confirmation under the debtor's modified Plan." *See NextWave*, 244 B.R. at 270 (emphasis supplied).

40.    In contrast to *NextWave*, *In re Chicago, Milwaukee, St. Paul & Pac. R.R.*, 791 F.2d 524 (7th Cir. 1986), involved the exact question at issue here: whether certain debenture holders should receive principal plus interest on their bonds where the indenture trustee declared a default after the debtor filed its petition. *Id.* at 525-26. In *Chicago*, the debtor objected to the debenture holders' claims for principal plus interest on principal during the default years, arguing that "repayment of the principal should not be accelerated, that no interest is due for the years in which there was no available net income, and that interest on interest should not be allowed." *Id.* at 526. The Seventh Circuit upheld the lower court's decision to permit acceleration of the principal and interest in accordance with the terms of the indentures, based on the occurrence of the default declaration and payment defaults after commencement of the bankruptcy case. *Id.*

41.    Significantly, the Seventh Circuit flatly rejected arguments identical to those previously advanced here; the Court summarily dismissed the debtor's argument that it

---

Despite the extensive history and opportunity to adopt the bankruptcy court's reasoning, no subsequent court ever adopted the bankruptcy court's view that post-petition non-payment defaults are not cognizable. As indicated above, the FCC denied the petition for reconsideration. The D.C. Circuit ruled in favor of NextWave on the narrow ground that the FCC's action violated section 525(a) of the Bankruptcy Code, which does not apply in this case as the Bank Lenders are not government actors. *NextWave*, 254 F.3d at 156. The Supreme Court's opinion was likewise limited to section 525. *See NextWave*, 537 U.S. at 295.

should be excused from the consequences of its default because it could not make payments in

bankruptcy and rejected the debtor's "appeal to equity" on those grounds:

> It is not a good answer that, once bankruptcy was declared, a
> default under clause (a) [a payment default] was impossible
> because the debtor could not have repaid the principal immediately
> even if it had wanted to do so.  Defaults are often involuntary.

*Id.* at 529.  The Third Circuit agrees with *Chicago* that the mere fact that "'a [bankruptcy]

proceeding is equitable does not give the judge a free-floating discretion to redistribute rights . . .

.'"  *United States* v. *Pepperman*, 976 F.2d 123, 131 (3d Cir. 1992) (quoting *Chicago*, 791 F.2d at

528).

42.     That *Chicago* was decided under the old Bankruptcy Act, which was

admittedly tolerant of *ipso facto* provisions, is particularly instructive here.  In enacting the new

Bankruptcy Code, Congress had the opportunity to render post-petition payment defaults

unrecognizable, and chose not to do so.  Instead, numerous Code provisions expressly

acknowledge that defaults can and do occur, and rather than excuse debtors from complying with

their non-bankruptcy law obligations, the Code often compels debtors' performance in exchange

for receiving certain benefits.  *See, e.g.*, 11 U.S.C. §§ 365, 1123, 1124.

43.     In the absence of any evidence in the Bankruptcy Code or the legislative

history to extend the notion of an "*ipso facto*" clause beyond one which effects a forfeiture,

modification, or termination of rights based solely on a bankruptcy filing, adopting Grace's all-

encompassing definition of an *ipso facto* clause is wholly impermissible.  *See Gen. Elec. Capital*

*Corp.* v. *Future Media Prods. Inc.*, 547 F.3d 956, 960 (9th Cir. 2008) ("[T]he default rate should

be enforced, subject only to the substantive law governing the loan agreement, unless a provision

of the Bankruptcy Code provides otherwise.").

**There Is No Compelling Basis for an "Equitable Exception" to the Statute**

44.    Courts enforce creditors' rights in accordance with their contracts because the Supreme Court mandates that they must.  *See Butner* v. *United States*, 440 U.S. 48, 55 (1979).  Absent a compelling federal interest, there is no ability of the court to excuse Grace's performance of its state law contract obligations.  The Supreme Court held that:

> Property interests are created and defined by state law.  *Unless some federal interest requires a different result*, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding. Uniform treatment of property interests by both state and federal courts within a State serves to reduce uncertainty, to discourage forum shopping, and to prevent a party from receiving "a windfall merely by reason of the happenstance of bankruptcy."

*Id*. (quoting *Lewis* v. *Mfrs. Nat'l Bank*, 364 U.S. 603, 609 (1961)) (emphasis supplied).  *See also First Fidelity Bank* v. *Jason Realty, L.P. (In re Jason Realty),* 59 F.3d 423, 427 (3d. Cir. 1995) (citing *Butner* and finding that goal must be to ensure that creditor "is afforded in federal bankruptcy court the same protection [it] would have under state law if no bankruptcy had ensued.").

45.    There is no compelling federal interest that would permit the Court to allow Grace to read the default interest provisions out of the Credit Agreements.  Congress has already decided when a default should be excused, and this circumstance is not one of them. What's more, echoed for decades in case after case, courts agree that no federal purpose is served by affording a windfall to shareholders at the expense of creditors.  "The only good reason for refusing to give a creditor in reorganization all that he bargained for when he extended credit is to help other creditors."  *Chicago*, 791 F.2d at 527-28; *see also, e.g.*, *Ruskin* v. *Griffiths*, 269 F.2d 827, 832 (2d Cir. 1959) ("No benefit will be given to the debenture holders at the expense of any other class of creditors.  The burden of this payment will fall entirely on the interest of the

stockholders.  They cannot complain that they are treated inequitably when their interest is cut down by the payment of a sum to which the debenture holders are clearly entitled by the express provisions of the trust indenture.") (citation omitted).  No possible federal interest is served by allowing shareholders to use the Bank Lenders' money for more than eight years at a rate lower than the contract provides so that Grace's shareholders can get a greater recovery for themselves.

46.    Any ruling that would extinguish the Bank Lenders' state property rights, governed by New York law, in the wake of these uncontested defaults would violate the Supreme Court's express mandate in *Butner*.

## At a Minimum Bank Lenders Are Entitled to Default Interest After May 2001 and May 2003

47.    Finally, regardless of whether (i) the bankruptcy filing itself resulted in legal acceleration of the loans or caused acceleration under the terms of the Credit Agreements, or (ii) the failure to pay interest when due caused such acceleration, the loans matured by their own terms in May 2001 (1999 Credit Agreement) and May 2003 (1998 Credit Agreement).  At that point, section 10 of the Credit Agreements (Events of Default) is unnecessary and inapplicable.  Once the loans are due, section 5.1(c) of the Credit Agreements provides the interest rate for the loans without the need to resort to Section 10 (Events of Default).  That interest rate is the Alternate Base Rate plus 2%—the so-called "default rate."  Such interest rate is not a consequence of a default; instead, it is simply the rate that applies if the principal is still outstanding after natural maturity.  There can be no *ipso facto* defense to a change in the rate of interest under the Credit Agreements that does not even result from a default, but rather, simply flows from the natural maturity of the loans themselves.

**B.**     **Congress and Third Circuit Law Reject Grace's Argument
that a Claim is Unimpaired Where a Plan Only Pays
the Allowed Prepetition Amount of the Claim.**

48.     Grace has previously argued (including at the hearing before this Court on

June 22, 2009), that even if defaults did occur, the Bank Lenders nevertheless still are not

"impaired" for purposes of voting on a plan if the plan pays a creditor the allowed prepetition

amount of its claim in full, but excluding payment of any post-petition interest.[16]  Grace's

position at the June 22, 2009 hearing was that a claim is unimpaired for purposes of section 1124

even where the plan proposes to pay a creditor no amount of post-petition interest so long as

Grace pays the "allowed" amount of the claim in accordance with section 502 of the Bankruptcy

Code—on the infirm legal theory that section 502 of the Bankruptcy Code "trumps" or

effectively adversely alters a creditor's state law rights embodied in its contract.[17]  There is no

doubt that Grace's position is wrong:  as detailed in the legislative history, Congress expressly

*rejected* this argument through its amendment to section 1124.

49.     Grace further maintains, in the alternative, that even if a creditor must

receive *some* interest on its allowed claim to qualify as "unimpaired," for purposes of

impairment, the law does not require that such interest be paid at the default contract rate.  In so

arguing, Grace ignores the fundamental requirement that to be "unimpaired" under section

1124(1), a creditor's legal, contractual, and equitable rights must not be altered.  For impairment

purposes, a debtor does not have license to choose a rate of post-petition interest different from

the loan documents.  Grace's Plan alters the Bank Lenders' contractual rights because it proposes

---

[16]   Debtors' Trial Br. in Support of Obj. to the Unsecured Claims Asserted Under the Debtors' Credit Agreement
dated as of May 14, 1998 and May 5, 1999, dated Sept. 5, 2008, at ¶ 48 [Dkt. No. 19476].

[17]   *See* Hearing Tr. 110-11, June 22, 2009 [Dkt. No. 22294].

to pay them an interest rate other than that provided in their contracts.  The Plan clearly alters the Bank Lenders' contractual rights.  The Bank Lenders' claims are impaired.

### 1.    Repeal of New Valley.

50.    The Plan Proponents' approach to impairment resurrects the discredited analysis of *In re New Valley Corp.*, 168 B.R. 73 (Bankr. D.N.J. 1994), a decision that Congress repudiated in its 1994 repeal of section 1124(3).  The repealed provision specified that a creditor receiving full payment of an "allowed claim" was not impaired.[18]  In *New Valley*, the debtor objected to certain lenders' claims and sought declaratory judgment rulings that (a) payment under the plan of the full amount of the lenders' allowed prepetition claims rendered such claims unimpaired, and (b) the debtor had no obligation to pay post-petition interest on unimpaired claims.  168 B.R. at 74.  The conclusion reached by the *New Valley* court rested on the interplay of sections 502(b)(2), 1129(a)(7)(A), and the now-repealed section 1124(3).  While acknowledging the reorganization-solvent debtor exception to non-payment of post-petition interest, the bankruptcy court in *New Valley* held that "§ 1124(3) allowed a solvent debtor to pay the 'allowed' claims of unsecured creditors in full, *excluding post-petition interest, without risking impairment*."  *PPIE*, 324 F.3d at 205 (citing *New Valley*, 168 B.R. at 77-80) (emphasis supplied).

51.    The *New Valley* decision not only denied unsecured creditors the post-petition interest to which they were entitled, but also deprived them of the opportunity to challenge the fairness of their treatment under the plan at confirmation.  To prevent a repeat of the anomalous result reached in *New Valley*, Congress repealed section 1124(3) to make it clear

---

[18]    The language of repealed section 1124(3) provided as follows:  "Except as provided in section 1123(a)(4) of this title, a class of claims or interests is impaired under a plan unless, with respect to each claim or interest of such class, the plan -(3) provides that, on the effective date of the plan, the holder of such claim or interest receives, on account of such claim or interest, cash equal to -(A) with respect to a claim, the allowed amount of such claim . . . ."  11 U.S.C. § 1124(3) (repealed).

that in a case where the junior equity class is to retain any interest, the failure to pay a creditor a separate amount of post-petition interest in addition to the "allowed" prepetition amount of its claim constitutes impairment as a matter of law.  *See PPIE*, 324 F.3d at 206.  As reflected in the unambiguous legislative history, Congress's motivation in deleting section 1124(3) was to overturn the *New Valley* decision and "preclude this unfair result in the future."  *Id.* at 206 (citing H.R. Rep. No. 103-835, at 47-48 (1994)).

52.    Subsequently, the Third Circuit dispelled any doubt as to Congress's intent in eliminating section 1124(3) in *PPIE* by upholding the lower bankruptcy court's conclusion that in repealing section 1124(3):

> [Congress] intended that to be unimpaired, the claim must receive post-petition interest.

*PPIE*, 324 F.3d at 206 (quoting *In re PPI Enters. (U.S.), Inc.*, 228 B.R. 339, 352 (Bankr. D. Del. 1998)) (emphasis supplied).  A cash payment equal to the allowed prepetition amount of the claim, but without post-petition interest, "could not qualify for nonimpairment under section 1124(1) because the failure to pay post-petition interest does not leave unaltered the contractual or legal rights of the claim."  *Id.* at 207 (quoting *PPIE*, 228 B.R. at 352).

**2.    Impairment Is Determined On a Creditor-by-Creditor Basis.**

53.    Grace maintains that even if *PPIE* compels the payment of some post-petition interest, it does not for impairment purposes require payment at the default rate.  Of course, *PPIE* did not specify that "default rate" interest be paid in *every* case to satisfy section 1124(1).  Nor did *PPIE* in any way preclude the payment of default rate interest.  The takeaway from *PPIE* and the legislative history of section 1124 is that the impairment determination must be made on a *creditor-by-creditor* basis, depending on the relevant legal, contractual, and equitable rights at stake.  The "presumption of impairment is overcome only if the plan 'leaves

unaltered the [creditor's] legal, equitable, and contractual rights.'"  *PPIE*, 324 F.3d at 203

(quoting section 1124(1)).  "When the agreement requires a higher post-default rate of interest,

this means the higher rate must be paid.  Any other treatment would alter the creditor's rights."

*In re Ace-Texas, Inc.*, 217 B.R. 719, 727 (Bankr. D. Del. 1998) (internal quotation omitted).

54.     Where the contract provides for default interest (as is the case here), a plan

that does not provide for the payment of such default interest undoubtedly alters the claimant's

contractual rights for purposes of section 1124(1).  If Grace must make a separate post-petition

interest payment, it must be paid under *PPIE* at the contract rate to render the Bank Lenders'

claims unimpaired, and as such, Grace's attempt to pay such interest at a rate lower than that

provided for in the loan documents alters the Bank Lenders' contractual rights.  It's that simple.

Classifying the Bank Lenders as unimpaired even where the Plan proposes payment at an interest

rate other than the applicable contract violates the unambiguous terms of section 1124(1).

**3.     Section 502(b)(2) Concerns the Allowed Amount of a Claim;
It Does Not Limit or Determine the Legal, Equitable and
Contractual Entitlement to Post-Petition Interest.**

55.     Grace also argues, purportedly relying on *PPIE*, that section 502(b)(2),

and not the Plan, is the source of impairment of the Bank Lenders' legal and contractual rights,

and therefore, that its classification scheme complies with *PPIE*.  Grace's *PPIE* argument is

meritless.

56.     *PPIE* dealt with whether a plan improperly classified a landlord's allowed

claim as "unimpaired" where the plan proposed to pay the full amount of the "allowed" claim as

reduced by section 502(b)(6) plus post-petition interest on his allowed claim.  The creditor

contended that his claim was impaired by operation of section 502(b)(6) and the plan itself.

*PPIE*, 324 F.3d at 203-04.  The Third Circuit rejected the creditor's "impairment by statute

argument," but at the same time held that a claim must receive post-petition interest *on* the

allowed prepetition claim, as capped under section 502(b)(6), *to be unimpaired*.  This clearly establishes that for purposes of *impairment*, the entitlement to post-petition interest on the allowed prepetition claim is something *separate* and *in addition* to the allowed prepetition claim.

57.    Grace's argument that section 502(b)(2), and not the Plan, is the source of impairment of the Bank Lenders' legal and contractual rights is untenable.  Besides flying in the face of Congress' amendment to section 1124 repealing section 1124(3)—which thereby mandates that creditors receive a post-petition interest payment—Grace's 502(b)(2) argument fails because section 502(b)(2), like section 502(b)(6), only determines the "allowed amount" of a creditor's prepetition claim.  It has nothing to do with a creditor's *separate legal and contractual entitlement to a post-petition interest payment on the allowed amount of such creditor's claim* in the circumstances specified in section 1129 of the Bankruptcy Code, as discussed below.  By this distinction, the Third Circuit on the one hand concluded that full payment of the allowed prepetition claim as limited by section 502(b)(6) would initially render the claim unimpaired, but held, on the other hand, that a creditor must receive a post-petition interest payment on the allowed amount of the claim for such claim to be unimpaired.  That is why the *PPIE* plan provided for interest on the allowed prepetition claim of the landlord as limited by section 502(b)(6) to render such claim unimpaired.[19]

58.    Section 502(b)(6), as *PPIE* explained, is just the first step: it only determines the "allowed amount" of a landlord's prepetition claim.  *See PPIE*, 324 F.3d at 205.  That provision, though, does not affect the landlord's right to receive a post-petition interest payment on the "allowed amount" of the landlord's prepetition claim because the entitlement to a post-petition interest payment—the second step—is separate and in addition to the allowed

---

[19]    The *PPIE* plan paid the complaining creditor post-petition interest in addition to the allowed amount of such creditor's claim as reduced by section 502(b)(6).  *See PPIE,* 228 B.R. at 343.

amount of its prepetition claim. *Id.* at 206. Questions regarding whether an impaired creditor is entitled to post-petition interest and at what rate are answered in the first instance by the applicable contracts (which in this case are the Credit Agreements), other sections of the Bankruptcy Code, like section 1129, and decades of caselaw. A creditor not receiving all that the creditor's contract provides is undeniably impaired.[20]

## **CONCLUSION**

59.    For the aforementioned reasons and those set forth in the May 20 Impairment Objections, the Joint Objectors respectfully submit that Plan Proponents have not satisfied their burden to overcome the presumption that the Bank Lender Claims are "impaired." Accordingly, the Court should find that Class 9 is "impaired" and thus, require the Plan Proponents to count the votes of Class 9 creditors for all purposes in connection with the Plan.

---

[20]    Grace's own Plan makes it clear that a creditor's entitlement to post-petition interest is in addition to the allowed amount of a creditor's claim. "Each Holder of an Allowed General Unsecured Claims shall be paid the Allowed Amount of its Allowed General Unsecured claim *with post-petition interest* . . . *Post-petition interest on* Allowed General Unsecured Claims shall be determined as follows: . . ." *See* Plan at §3.1.9(b). (emphasis supplied).

Dated:    Wilmington, Delaware
        July 17, 2009

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Stephen J. Shimshak
Andrew N. Rosenberg
Margaret A. Phillips
Rebecca R. Zubaty
1285 Avenue of the Americas
New York, New York  10019-6064
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990

-and-

**LANDIS RATH & COBB LLP**


/s/ James S. Green, Jr.
Richard Cobb (No. 3157)
James Green (No. 4406)
919 Market Street, Suite 1800
Post Office Box 2087
Wilmington, Delaware  19899
Telephone:  (302) 467-4400
Facsimile:  (302) 467-4450

Counsel for the Bank Lender Group

**STROOCK & STROOCK & LAVAN LLP**
Lewis Kruger
Kenneth Pasquale
Arlene Krieger
180 Maiden Lane
New York, New York 10038
Telephone:  (212) 806-5400
Facsimile:  (212) 806-6006

-and-

**DUANE MORRIS LLP**


/s/ Richard W. Riley
Michael R. Lastowski (No. 3892)
Richard W. Riley (No. 4052)
1100 North Market Street, Suite 1200
Wilmington, Delaware 19801-1246
Telephone: (302) 657-4942
Facsimile:  (302) 657-4901

-and-

William S. Katchen**,** Esquire
744 Broad Street, Suite 1200
Newark, New Jersey  07102-3889
Telephone: (973) 424-2031
Facsimile: (973) 556-1380

Counsel for the Official Committee
of Unsecured Creditors of W.R. Grace &
Co. *et al.*