IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et. al.[1] | ) | Case No. 01-01 139 (JKF) |
| | ) | (Jointly Administered) |
| Debtors | ) | |

## PLAN PROPONENTS' SUPPLEMENTAL BRIEF IN SUPPORT OF THE PLAN'S DESIGNATION OF THE BANK LENDER GROUP AS NOT IMPAIRED

---

[1] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/Ma Grace Specialty Chemicals, Inc.), W. R. Grace & Co. Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (fMa Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace 11, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (fMa Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., GC Limited Partners I, Inc., (fMa Grace Cocoa Limited Partners I, Inc.), GC Management, Inc. (fMa Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc. GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B 11 Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G I1 Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (Wa Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation., W. R. Grace Land Corporation, Gracoal, Inc., Gracoal 11, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (fMa GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (fMa Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (F/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (Wa British Nursing Association, Inc.), Remedium Group, Inc. (Wa Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (flk/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

## PRELIMINARY STATEMENT

The Bank Lender Group (the "Lenders') claim that they are impaired under the Plan because it does not pay them postpetition interest at their contract default rate. The fundamental error in the Lenders' impairment argument is that the Lenders presume that their legal, equitable, and contractual rights include the right to postpetition interest at the contract default rate and that this right is being altered by the Plan. The Lenders are wrong as a matter of fact and law. Simply put, the Lenders are not entitled to default interest as part of their allowed claim under § 502(b) of the Bankruptcy Code, and their contract rights (and contract rate of interest thereunder) are not being altered by the Plan in violation of § 1124(1) of the Bankruptcy Code. The Third Circuit's holding in *Solow v. PPI Enters. (U.S.), Inc. (In re PPI Enters. (U.S.), Inc.),* 324 F.3d 197, 203 (3d Cir. 2003), is simple and straightforward -- a claim is only impaired under § 1124 of the Bankruptcy Code if a *plan of reorganization itself*, not some provision of the Bankruptcy Code, alters the alleged rights of a claimant. And here, just as in *PPI Enterprises,* the alleged alteration of the Lenders' rights derives solely from operation of the Bankruptcy Code. Any alleged alteration of the Lenders' rights stems from limitations placed on their allowed claim by § 502(b), the enforcement of the automatic stay under § 362 to prevent payment during the pendency of the bankruptcy proceedings, and the general prohibition of *ipso facto* clauses under bankruptcy law, rather than anything imposed by the Plan itself. That is not impairment within the meaning of § 1124(1).

The Lenders' argument that they are somehow impaired absent an award of postpetition interest at the default rate turns on two questions:

- Whether the Lenders in fact have an enforceable contractual right to interest at the default rate; and

2

- Even assuming that the Lenders could demonstrate such a right, does the abrogation of that right result from operation of the Plan or, instead, from operation of the Bankruptcy Code?

This second question is critical because, under *PPI Enterprises*, impairment of a contractual right by operation of the Code is, as a matter of law, no impairment at all.

Try as they might, the Lenders still cannot manufacture a default under the Credit Agreements entitling them to postpetition interest at the contract default rate. They could not do so in connection with the Court's May 19, 2009 Claims Objection Opinion, and they cannot do so now. Indeed, the Court has provided the Lenders with every opportunity to come forward with proof of an enforceable contractual default entitling them to interest at the default rate, but as the Court recognized, no such proof exists:

> THE COURT:  whether, for purposes of impairment, you can substantiate that you're entitled to the default rate when there is no statutory entitlement because there is no proof that the debtors were in default is a problem. So I need the proof.

6/22/09 Hrg. Tr. 41:16-20.

In their latest submission, the Lenders attempt to cure this absence of proof, but to no avail. The Lenders concede, as they must, that there was no prepetition default under the Credit Agreements. Instead, the Lenders' based their argument for interest at the default rate upon supposed postpetition defaults, namely:  (1) violation of the *ipso facto* clauses in the Credit Agreements; (2) certain alleged violations of the credit reporting requirements contained in the Credit Agreements; and (3) the failure to pay principal and interest under the Credit Agreements during the bankruptcy proceeding. None of these arguments support the proposition that the Lenders are impaired under § 1124(1) of the Bankruptcy Code because they are not being paid default interest.

3

First, as a general matter, *ipso facto* clauses are unenforceable as a matter of law. As the cases so holding have recognized, invalidating *ipso facto* clauses is critical to the fundamental purpose of the bankruptcy laws -- enabling debtors to make a fresh start. The Lenders attempt to circumvent the general prohibition on *ipso facto* clauses by pointing to the exception contained in § 365(e)(2)(B) of the Bankruptcy Code. But that exception only applies to executory contracts, which the Credit Agreements are not.

Second, the Lenders cannot credibly claim a default based on Debtors' alleged non-compliance with certain reporting requirements in the Credit Agreements. Even if Debtors failed to comply with such reporting requirements, something Debtors do not concede, it is crystal clear under the Credit Agreements that the Lenders had to provide notice before accelerating the loans. The Lenders do not, and cannot, allege that they ever provided such notice. Accordingly, the Lenders cannot invoke alleged violations of the Credit Agreements' reporting requirements as a basis for demanding interest at the default rate.

Third, the Debtors' failure to pay interest on the loans, and the failure to repay the loans themselves when they matured during the bankruptcy, cannot be deemed a default of the type rendering the Lenders impaired. It is beyond purview that the Bankruptcy Code precluded the Debtors from paying those loans when they matured, and the Lenders do not contend otherwise. Thus, to the extent that the Lenders claim to be impaired by the Debtors' failure to repay the loans, such "impairment" resulted exclusively from operation of the Bankruptcy Code. Under the Third Circuit's decision in *PPI Enterprises*, that does not constitute impairment for purposes of § 1124.

The Lenders are once again left with no valid basis for claiming impairment under § 1124. Even if the Lenders can demonstrate a contractual right to interest at the default rate of

interest, any such right was altered, if at all, by operation of the Bankruptcy Code. That is not impairment. Accordingly, the Lenders' argument that they are somehow impaired absent an award of postpetition interest at the default rate should again be rejected.

## PROCEDURAL HISTORY

In its May 19, 2009 Opinion, the Court held that the Lenders were not entitled to postpetition interest at the default rate as part of their allowed claim pursuant to §§ 502(b) and 726 of the Bankruptcy Code. 5/19/09 Memorandum Opinion at 1 ("Claims Objection Opinion") [Dkt. No. 21747]. The Court made clear that "the presumption is that unsecured creditors receive no interest at all" and noted the limited exceptions to the general rule where (a) the debtor is shown to be solvent after all distributions were made (applying § 726 of the Bankruptcy Code to chapter 11 through § 1129(a)(7)) or (b) the creditor is oversecured. *Id.* at 5. These exceptions do not apply to the Lenders. They are unsecured creditors, not oversecured creditors, and as the Court observed, there was no showing of the Debtors' solvency. *Id.* at 6.

Significantly, in its Claims Objection Opinion, the Court did not reach factual issues respecting whether the Debtors were solvent, and the appropriate rate of postpetition interest that the Lenders might be entitled to receive if in fact the Debtors are found to be solvent. There was no need to. The Plan already contemplates that postpetition interest will be paid, and it will be paid at a rate above the contract rate of interest. Accordingly, the Court was simply required to address the merits of the Lenders' contractual rights to default interest.

The Court first looked at the prepetition period and found that "[i]t is undisputed that there were no prepetition defaults with respect to the obligations to the Bank Lenders and so no prepetition interest is owed." *Id.* at 4-5.[2] As to the postpetition period, the Court found that there

---

2   The Lenders do not dispute that even in the context before the Court today, no prepetition defaults occurred. 6/22/09 Hrg. Tr. 46:14 (Mr. Rosenberg: "and we agree that there's no pre-petition default.").

was "no evidence [of alleged postpetition defaults] presented to substantiate a default on Bank Lenders' claims." *Id.* at 3. The Lenders argued that *ipso facto* clauses in the Credit Agreement caused a default under the agreements as soon as the bankruptcy petition was filed, and Debtors' alleged failure to meet certain reporting requirements created another default under the Credit Agreements. *See* 9/29/08 Hr. Tr. at 61-62.[3] The Court, however, reviewed the evidence and concluded that there was insufficient evidence that any alleged reporting requirements constituted a default of a type that would trigger default interest under the loan documents, and as a matter of law, a bankruptcy filing "*per se* is not a permissible basis for invoking the contract default interest rate." Claims Objection Opinion at 4. The Court also held that the Bankruptcy Code precluded the Debtors from paying postpetition interest during the bankruptcy proceedings under the Credit Agreements; thus, it could not be held to have defaulted for that reason. *Id.* at 5.

In sum, the Court held that:

> the "law simply does not <u>entitle</u> any creditor in the position of the Bank Lenders to a default rate of interest . . . [there may be] a presumption of postpetition default interest payable to unsecured creditors only when solvency has been determined as a matter of fact, which in this case, it has not, or where the creditor is oversecured, which the Bank Lenders are not. Even oversecured creditors do not have an absolute right to default interest; equitable considerations come into play.

*Id.* at 10 (emphasis in original).

Accordingly, the Court concluded that whatever the Lenders' legal entitlement to postpetition interest might be with respect to their allowed claim, the proper rate is not the default rate. The Lenders effectively now ask the Court to reconsider its conclusion, but offer no good reason to do so.

---

[3]    9/29/08 Hrg. Tr. (JKF) at 61-62 [Dkt. No. 19874].

## **ARGUMENT**

The parties do not dispute that § 1124(1) provides that the Plan must "leave[] unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest." 11 U.S.C. § 1124(1); *Solow v. PPI Enters. (U.S.), Inc. (In re PPI Enters. (U.S.), Inc.)*, 324 F.3d 197, 203 (3d Cir. 2003). The parties also do not dispute that the contract provides for interest at one of two rates -- a non-default rate or a default rate. Furthermore, the parties do not dispute that pursuant to the Plan, the Debtors intend to pay interest at a rate *higher* than the non-default contract rate in the Credit Agreements.[4]  The dispute arises solely over whether interest must be paid at the default rate in order to render the Lenders unimpaired.

The resolution of this dispute turns first on the threshold question of whether the Lenders have an enforceable contractual right to interest at the default rate under their Credit Agreements. Absent such a right, the Lenders cannot even begin to argue that the non-payment of interest at the default rate alters their "legal, equitable, and contractual rights" for purposes of § 1124. Even assuming that the Lenders can demonstrate a contractual right to interest at the default rate, the question then becomes what is it that altered that right -- the Plan or the Bankruptcy Code. Because if the alteration of the contractual right to default interest is a consequence of the operation of the Code, the Lenders cannot claim impaired status.

The Third Circuit has made clear that a claim is only impaired under § 1124 of the Bankruptcy Code if a plan of reorganization itself, not some provision of the Bankruptcy Code, alters the alleged rights of a claimant. *PPI Enterprises.*, 324 F.3d at 204-05. That is the express

---

[4]  As previously indicated, however, if the Court concludes that the rate of interest being offered to the Lenders is somehow discriminatory against other creditors in Class 9 because the Lenders are receiving more than their contractual rate of interest under the Plan (*i.e,* the rate previously negotiated with the Committee), then the Plan Proponents will have no objection to lowering the rate of postpetition interest paid to the Lenders to the stated non-default rate.

holding of *PPI Enterprises*. Notwithstanding the Lenders' efforts to mischaracterize *PPI Enterprises*, there is absolutely nothing in that opinion that even remotely suggests that the failure to pay postpetition default interest results in impairment.[5] Indeed, as this Court correctly observed: "[T]he court said nothing about the interest being paid at the default rate and the case cannot be read to require the default rate to be paid." Claims Objection Opinion at 12.

Under *PPI Enterprises*, the critical question is this: Does the Plan itself alter the Lenders' legal, equitable, or contractual rights. *PPI Enterprises*, 324 F.3d at 204. Here, the Lenders cannot argue that the Plan alters their contractual right to interest under the Credit Agreements. That is because the Plan will pay the Lenders the allowed amount of their claim plus postpetition interest. In fact, it will pay them postpetition interest at a rate higher than the federal judgment rate and higher than the non-default contract rate. Instead, the Lenders argue that they are impaired by virtue of the fact that they will not receive interest at the contract default rate under the Plan. But the Plan does not need to pay the Lenders the default rate of interest under their contracts to render them unimpaired for purposes of § 1124(1). As discussed below, there have not been any defaults under the Credit Agreements that would warrant an award of default interest. Nor has there been any showing of solvency to suggest that the equities may lie in awarding interest at something other than the non-default rate.[6] Thus, the Lenders are not impaired for purposes of § 1124(1).

---

[5]   The Third Circuit's discussion of postpetition interest in *PPI Enterprises* arose in response to the repeal of § 1124(3) of the Bankruptcy Code which was intended to address the "anomalous result" from *In re New Valley Corp.*, 168 B.R. 73 (Bankr. D.N.J. 1994), where the court held that the language of § 1124(3) allowed a solvent debtor to pay the "allowed" claims of unsecured creditors in full, excluding postpetition interest, without risking impairment. The Lenders make much of *New Valley* and § 1124(3), but it is important to note that the repeal of § 1124(3) did not repeal or impact § 1124(1). In any event, *New Valley* is not the case at bar -- there has been no showing of solvency here and postpetition interest here is being awarded.

[6]   Solvency will be addressed as part of the Phase II briefing, and is not the subject of this Supplemental Impairment Brief except to note that this Court has already observed:

## I.    THE *IPSO FACTO* CLAUSES IN THE CREDIT AGREEMENTS CANNOT TRIGGER AN EVENT OF DEFAULT.

### A.    *Ipso Facto* Clauses Generally Are Unenforceable As A Matter Of Law.

On June 22nd, the Lenders argued that "the mere filing of the bankruptcy, as clearly provided under Section 10 of the credit agreement, accelerates -- causes a default without any notice required whatsoever and accelerates all payment, and thereby kicks in default interest." 6/22/09 Hrg. Tr.. at 56:16-20; Lenders' Pre-Trial Brief at ¶ 48.[7] Indeed, the Lenders claimed that they are entitled to default interest under the Credit Agreements without the need for notice because Grace defaulted by the mere act of filing for Chapter 11. Lenders' Pre-Trial Brief at ¶ 48. In their Pre-Trial Brief, the Lenders go so far as to say "Grace's position boils down to one *never accepted by any court*: that the Bank Lenders are not impaired because their contractual right to default interest, as a result of some type of "*ipso facto*" legal defense, is unenforceable in bankruptcy." *Id.* (emphasis added). Notwithstanding the Lenders' hyperbole, the fact is that Grace's position is very much consistent with a long line of precedent.

Courts repeatedly and consistently have held that *ipso facto* clauses, like those in the Credit Agreements, are unenforceable as a matter of law. Claims Objection Opinion at 4 ("[a]s a matter of law, the bankruptcy filing *per se* is not a permissible basis for invoking the contract default interest rate."); *see also In re EBC I, Inc.*, 356 B.R. 631, 640 (Bankr. D. Del. 2006) ("*Ipso facto* clauses (by which a contract is terminated as a result solely of the debtor's insolvency or bankruptcy) are generally disfavored, if not expressly void, under the Bankruptcy

---

Bank Lenders face another obstacle. Section 726(a)(5) provides that, if a debtor is solvent, interest is to be paid at the legal rate, not at the contract default rate.

Claims Objection Opinion at 9.

[7]    Joint Pre-Trial Memorandum of the Official Committee of Unsecured Creditors and Bank Lender Group in Opposition to Confirmation of First Amended Join Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated July 12, 2009 ("Lenders' Pre-Trial Brief") [Dkt. No. 22441].

Code."); *In re Railway Reorganization Estate, Inc.*, 133 B.R. 578, 582 (Bankr. D. Del. 1991)

("Clauses which purport to terminate, limit or otherwise modify a debtor's interest in its property

upon the filing of a bankruptcy petition are unenforceable under the Code"); *In re Dow Corning*

*Corp.*, 244 B.R. 678, 696 (Bankr. E.D. Mich. 1999) (recognizing "a basic bankruptcy policy that

abhors the operation of so-called 'ipso facto' clauses[,] . . . which trigger a default . . . upon the

happenstance of bankruptcy," and that "bankruptcy default clauses are not favored and are

generally unenforceable under the Bankruptcy Code."); *In re Chedick*, No. 95-01096, 1996 WL

762329, at * 3 (Bankr. D. Colo. Mar. 22, 1996) (*ipso facto* clause was "void as a matter of public

policy" because "[t]he courts have not hesitated to invalidate such provisions as penalizing the

debtor's efforts to obtain a fresh start even in the absence of an express statutory provision

against the particular ipso fact [sic] clause") (citing *In re Taylor*, 146 B.R. 41, 45-47)); *In re*

*Hutchins*, 99 B.R. 56, 57 (Bankr. D. Colo. 1989) ("Bankruptcy default clauses are not favored

and are generally unenforceable under the Bankruptcy Code."); *In re Taylor,* 146 B.R. 41, 46

(M.D. Ga. 1992), ("There is clear Congressional dissatisfaction with the 'ipso facto' clause.

Sections 363(1), 365(e), and 541(c) all deal with situations when such clauses are held invalid.

Additionally, "[i]t is clear from the legislative history and from the express intention of Congress

to protect the 'fresh start of debtors' that the invocation of insolvency statutes is not favored.

The Fourth Circuit concurred in this reasoning when it held "ipso facto" clauses unenforceable as

a matter of law."), *rev'd on other grounds*, 3 F.3d 1512 (11th Cir. 1993); *Riggs Nat. Bank of*

*Washington, D.C. v. Perry*, 729 F.2d 982, 985 (4th Cir. 1985) ("we align ourselves with the

District Court and other Federal courts that have held default-upon-filing clauses unenforceable

as a matter of law."); *In re Peacock,* 87 B.R. 657, 659 (Bankr. D. Colo. 1988) ("the filing of a

bankruptcy Petition by the Debtors does not, as a matter of law, constitute a default under the

bankruptcy default clause, or '*ipso facto*' clause of the Contract," as such an "*ipso facto* clause in the Contract thwarts the Debtors fresh start provided under the Code and imposes a penalty upon the Debtor[ ] for exercising [its] constitutional right to file bankruptcy."); *Matter of Rose*, 21 B.R. 272, 273-77 (Bankr. D.N.J. 1982) (refusing to enforce an *ipso facto* clause in the absence of any express provision invalidating it because the legislative history of the Code "indicates that bankruptcy-default clauses are to be invalid in all types of contracts, without limitation," and enforceability would, "in effect, render a penalty on the debtors," and "defeat the purpose of providing a 'fresh start' to the debtors.").

The reason that courts normally refuse to enforce *ipso facto* clauses is because to do so would frustrate the most basic purpose of the Bankruptcy Code -- to provide debtors with a fresh start. *See In re Railway Reorganization Estate*, 133 B.R. at 582 (*ipso facto* clauses "contravene Code policy of providing debtors with a fresh start."); *In re Chedick*, 1996 WL 762329, at * 3 ("courts have not hesitated to invalidate such provisions as penalizing the debtor's efforts to obtain a fresh start even in the *absence* of an express statutory provision against the particular ipso fact [sic] clause.") (emphasis added); *In re Peacock* 87 B.R. at 659 (an "*ipso facto* clause in the Contract thwarts the Debtors fresh start provided under the Code and imposes a penalty upon the Debtor[ ] for exercising [its] constitutional right to file bankruptcy."); *Matter of Rose*, 21 B.R. at 273-77 (enforcing an *ipso facto* clause would "defeat the purpose of providing a 'fresh start' to the debtors.").

*Dow-Corning* exemplifies the judiciary's disdain for *ipso facto* clauses.  In that case, Judge Spector determined that Plan Proponents would have to provide pendency interest to Class 4 creditors in accordance with the terms of their contracts to satisfy the "fair and equitable" test of § 1129(b), but refused to give effect to contractual provisions that purported to define as a

default the filing of a voluntary bankruptcy petition. *In re Dow Corning Corp.*, 244 B.R. 678, 696 (Bankr. E.D. Mich 1999). The court recognized "a basic bankruptcy policy that abhors the operation of so-called 'ipso facto' clauses[,] . . . which trigger a default . . . upon the happenstance of bankruptcy," and that "bankruptcy default clauses are not favored and are generally unenforceable under the Bankruptcy Code." *Id.* (internal citations omitted).

In their papers, the Lenders take the position that courts will invalidate *ipso facto* clauses only under specific, enumerated provisions of the Bankruptcy Code, such as Sections 363(1), 365(e), and 541(c). Lenders' Pre-Trial Brief at ¶¶ 55-58. Not so. It is certainly true that courts have held *ipso facto* clauses to be invalid under these specific Code provisions. But, as discussed above, it is also true that courts have found such clauses to be invalid as a general matter without regard to any specific Code provision. As courts have recognized, the specific provisions of the Code invalidating *ipso facto* clauses -- Sections 363(1), 365(e), and 541(c) -- serve as evidence of their general unenforceability, not as an exhaustive list of situations where such clauses are unenforceable. Accordingly, courts have invalidated *ipso facto* clauses based on more general principles of equity even where none of the express Code provisions applied. For example, in *Matter of Rose*, 21 B.R. 272, 273-74 (D.N.J. 1982)*, a secured creditor sought to invoke an *ipso facto* bankruptcy filing clause to declare unpaid installments of a loan immediately due and payable or reclamation of the vehicle in the alternative. *Id.* at 273. The court determined that § 365(e) could not apply directly to render the *ipso facto* clause unenforceable because the contract was non-executory. *Id.* at 273-74. However, the court still held that the *ipso facto* clause was unenforceable despite the fact that § 365(e) did not apply and despite the fact that no other provision invalidating *ipso facto* provisions applied directly. The court recognized that:

> [i]t does not necessarily follow that just because Section 365(e) of
> the Bankruptcy Code does not refer to non-executory contracts

> that they are, therefore, valid. In fact, the opposite conclusion might be inferred, for the Bankruptcy Act, prior to 1979, specifically made such bankruptcy-default clauses enforceable in leases under Section 70b; Congress did not see fit to continue this enforceability.

*Id.* at 276. Under its analysis, the court was convinced that "the legislative history indicates that bankruptcy-default clauses are to be invalid in *all* types of contracts *without limitation*." *Id.*

The court also found that §§ 363(1) and 541(c)(1)(B), although inapplicable in that case, reflected *evidence* of Congress' intent to invalidate *ipso facto* clauses, noting that "there is no statutory mandate that bankruptcy-default clauses are valid and enforceable. The only congressional statement is clear that in most, if not all, instances, such clauses are not enforceable." *Id.* Thus, "there [was] simply no reason to assume that Congress intended to make these clauses enforceable in non-executory contracts. Indeed, such an assumption would be directly contrary to the spirit and purpose of the Bankruptcy Code" because "one of the objectives of bankruptcy laws is to enable debtors to make a fresh start." *Id.* A bankruptcy-default clause, "if valid and enforceable, would defeat the purpose of providing a 'fresh start' to the debtors." *Id.* at 277.

The Fourth Circuit engaged in a similar analysis in *Riggs National Bank of Washington v. Perry*, 729 F.2d 982 (4th Cir. 1984). Under a similar set of facts as discussed in *Rose*, a secured creditor with a claim on an automobile sought to use an *ipso facto* default as the basis to lift the automatic stay under § 362(d). *Id.* at 983-84. Recognizing the "clear Congressional purpose to create a way by which debtors may obtain a fresh start towards reorganization of their financial obligations," the court chose to "align [itself] with the District Court and other Federal courts that have held default-upon-filing clauses unenforceable as a matter of law," and refused to modify the stay because of an *ipso facto* default on the part of the debtor. *Id.* at 984-85.

13

In an attempt to find support for their argument that bankruptcy courts will enforce bankruptcy-triggered defaults, the Lenders cite to Judge Walsh's decision in *In re Anchor Resolution Corp.*, 221 B.R. 330, 338 (Bankr. D. Del. 1998). The Lenders' reliance on *In re Anchor Resolution* is misplaced. That decision did not even address, let alone resolve, the question of whether a ***postpetition*** failure to make payments under a credit agreement, standing alone, constitutes an event of default of the type that will trigger interest. Instead, the decision in *In re Anchor Resolution* turned on a ***prepetition*** failure to pay money owed to secured creditors, an issue that is not present in this case.

The critical events underlying *In re Anchor Resolution* actually took place well before the bankruptcy filing. Months before it filed for bankruptcy, Anchor Resolution Corp. ("Anchor") had failed to make certain payments under a note purchase agreement, a default that entitled the secured creditors to a "make whole" payment. The creditors, however, did not demand payment of the make whole payment. Instead, the creditors and Anchor entered into a comprehensive twenty-nine page restructuring agreement (the "NRA'), pursuant to which the secured creditors renegotiated Anchor's payment obligations. *Id.* at 333. Under the NRA, Anchor could pay a lesser adjusted make-whole amount instead of the entire amount owed so long as certain conditions were met, including the absence of a restructuring event of default, such as a bankruptcy filing. *Id.* at 336. Thus, in *In re Anchor Resolution*, the default occurred prepetition, and the secured creditors chose voluntarily to provide the company with a fresh start.

Several months after the parties entered into the NRA, Anchor filed for bankruptcy protection. In the bankruptcy, the debtor argued that the secured creditors' allowed claim should only include the lesser adjusted make whole amount in the NRA, and not the make whole amount in the note purchase agreement. Judge Walsh rejected this argument, and rightly so.

14

This was not a case where failing to give effect as to the parties' agreement concerning the effect of a bankruptcy filing would penalize the debtor for exercising its right to file bankruptcy and deprive the debtor of an opportunity to receive a fresh start. To the contrary, prior to filing for bankruptcy, the debtor had already defaulted and received a fresh start, knowing full well that a bankruptcy would mark an end to the creditors' leniency. Thus, failing to give effect to the parties' agreement concerning the effect of a bankruptcy filing in *In re Anchor Resolution* would actually have penalized the secured creditors for their prepetition leniency and allowed the debtor to reap a windfall. That is clearly not the case here.[8]

Judge Walsh never had occasion to consider the issue presented here -- whether an *ipso facto* clause providing for a default upon the filing of bankruptcy is unenforceable. However, as discussed above, the myriad of courts that have considered this issue have consistently held that such *ipso facto* clauses are unenforceable. Debtors respectfully submit that, consistent with this precedent, the *ipso facto* clauses in Section 10 of the Credit Agreements, under which the loans purportedly accelerate and become immediately due upon Grace's chapter 11 filing, are unenforceable regardless of whether these clauses are tied directly to an express Bankruptcy Code provision related to *ipso facto* clauses such as those found in §§ 365, 363 and 541 of the Bankruptcy Code. To hold otherwise would penalize debtors for invoking their constitutional rights and undermine the Bankruptcy Code's long-standing policy of providing debtors with a fresh start.

---

[8] The Lenders' suggestion that Judge Walsh concluded that [t]he Debtor's filing of its Chapter 11 petition created a restructuring event of default," solely because the agreement was non-executory and § 365(e) did not apply, is also false. Lenders' Pre-Trial Brief at ¶ 52. Indeed, the debtor argued that the clause was unenforceable under § 541(c)(1)(B) as well, and the Court considered, but ultimately rejected, its applicability. *Id.* at 337-38.

**B.      The *Ipso Facto* Exception Under § 365(e)(2)(B) of the Bankruptcy Code Does
Not Apply Here.**

At the hearing on June 22, counsel for the Lenders argued that the *ipso facto* clauses in

the Credit Agreements are subject to the exception to the general prohibition found in § 365 of

the Bankruptcy Code and are instead enforceable under § 365(e)(2)(B) of the Bankruptcy Code:

> MR. COBB: ...as Your Honor wells knows, 365 deals with
> executory contracts and unexpired leases. There are express carve
> outs for contracts or agreements to loan money. 365(e)(2)
> expressly carves out from the ipso facto defense or protections
> contracts or agreements to loan money. That's exactly what we
> have here, Your Honor.

6/22/09 Hrg. Tr. at 57:11-16. The Court, however, expressed doubt as to whether the Credit

Agreements are executory:

> THE COURT: Well, the 365 argument, of course, is still talking
> about contracts, even contracts to make loans that are executory,
> and carves out an exception to those contracts. So, I'm not sure
> 365 applies in this context, I don't think anybody has ever argued
> that this contract, the loan that's at issue, is executory. So, I don't
> think 365(e)(2) applies at all to the circumstances here.

*Id.* at 116:19-25.

In their brief, the Lenders try to have it both ways. On the one hand, the Lenders

acknowledge the Court's view that § 365 is inapplicable: "As this Court recognized at the

hearing on June 22, 2009, section 365(e) does not apply." Lenders' Pre-Trial Brief at ¶ 56. Yet,

in the very next sentence in their brief, the Lenders argue that § 365(e)(2)(B) specifically allows

*ipso facto* clauses such as those in the Credit Agreements: "[s]ection 365(e)(2)(B) specifically

exempts contracts to make a loan from the prohibition on *ipso facto* clauses." *Id.* If § 365(e)

does not apply because the Credit Agreements are non-executory, § 365(e)(2)(B), which is also

expressly limited to executory contracts, cannot apply to render the *ipso facto* clauses in the

Credit Agreements enforceable. The Lenders cannot in one sentence assert that § 365(e) does

16

not apply on the grounds that the Credit Agreements are not executory and then in the *very next sentence* argue in favor of § 365(e)(2)(B).

In any case, § 365(e)(2)(B) does not apply regardless of whether the contracts are executory or non-executory. Cases considering the exception set forth in § 365(e)(2)(B) highlight the narrow and circumscribed nature of the exception. The exception only pertains to outstanding executory commitments to extend *future* credit at the time of filing. *See In re Texaco Inc.*, 73 B.R. 960, 965 (Bankr. S.D.N.Y. 1987) (§ 365(e)(2)(B) was not implicated and the *ipso facto* restriction applied because the creditors only sought to accelerate the loans by virtue of Chapter 11 filings rather than being compelled to extend future credit to the debtor and "[t]he exception pertains only to executory commitments to extend *future* credit)) (emphasis in the original); *In re Peninsula Intern. Corp.*, 19 B.R. 762, 764 (Bankr. Fla. 1982) (same).

Here, § 365(e)(2)(B) does not apply under its terms. While the Debtors will satisfy their remaining payment obligations under the terms of the Plan, the Lenders have no remaining obligations to extend future credit -- they have fully performed. As a result, the exception pursuant to § 365(e)(2)(B) is not implicated here.

C.    **Section 1124(2) Of The Bankruptcy Code Also Counsels Against *Ipso Facto* Defaults As A Basis For Impairment.**

The Plan Proponents recognize that § 1124(2) of the Bankruptcy Code is not directly applicable to the claims at issue here because the loans have matured and because there have been no enforceable defaults that have accelerated the debt. *See In re Ace-Texas, Inc.*, 217 B.R. 719, 726 (Bankr. D. Del. 1998) (recognizing that § 1124(2) only applies to debt that was accelerated by a default and that § 1124(2) also does not apply to matured debt because it "makes no sense to reinstate the maturity of a claim that has already matured."). The Plan Proponents are not attempting to reinstate what has already matured. But the Plan Proponents

note that if *ipso facto* defaults do not need to be cured under §1124(2) to reinstate a debt for purposes of leaving a creditor unimpaired, then *ipso facto* defaults should have no bearing on whether a claim is impaired under § 1124(1) when a debtor seeks to pay in full a claim under its plan. *See* Collier on Bankruptcy ¶ 1124.03[3] at p. 1124-13 (15th ed. rev. 2006) ("Under section 1124(2)(A), in order to deaccelerate or otherwise place the creditor in its original position and leave it unimpaired, it is necessary to 'cure' any defaults, whether prepetition or postpetition, that may have occurred, except those relating to insolvency and the like and those defaults of a kind that section 365(b)(2) expressly does not require to be cured.").[9]

Just as §1124(2) allows a debtor to cure any substantive defaults, but does not require a debtor to cure technical *ipso facto* defaults to render a claim unimpaired, § 1124(1) just as assuredly should preclude any penalty in the form of a finding of impairment as a result of the simple act of filing bankruptcy.    Any contrary interpretation would create internal

---

[9]  Section 1124(2)(A) was clarified by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA") and while BAPCPA is only applicable to cases commenced on or after October 17, 2005, the amendment did not substantively change § 1124(2)(A) of the Bankruptcy Code as it previously existed.  Rather, it has merely clarified principles long manifest in § 1124(2)(A).  As one bankruptcy scholar noted:

> Section 1124(2)(A) was amended to provide that a cure is not required of a default "of a kind that section 365(b)(2) expressly does not require to be cured." It is hard to know what this language added to the statute; it already provided that "a default of a kind specified in section 365(b)(2)" did not have to be cured. There is no default that section 365(d)(2) "expressly" does not require to be cured that was not covered by the existing language.

Richard F. Broude, Reorganizations Under Chapter 11 of the Bankruptcy Code § 10.02[2], 10-7 (Law Journal Press 2009).  Indeed, Courts recognized that debtors could reinstate interest without curing *ipso facto* defaults years before BAPCPA crystallized this principle.  *See, e.g., In re Next Wave Personal Communications Inc.*, 244 B.R. 253, 262-69 (Bankr. S.D.N.Y. 2000) ("Section 1124(a)(2) [sic] 'permits the plan to reinstate the maturity of a claim or interest without curing any defaults with respect to the financial condition of the debtor that are included in the Section 365(b)(2)(A) ipso facto clauses.'") (quoting 7 Collier on Bankruptcy ¶ 1124.03[2] at p. 1124-10 (15th Ed. rev.1999)), *vacated on other grounds by In re F.C.C.*, 217 F.3d 125 (2d. Cir. 2000); *see also In re Yardley*, 77 B.R. 643, 645 (Bankr. M.D. Tenn. 1987) ( noting that ". . .under § 365(b)(2), the trustee need not cure a default that relates to insolvency, financial condition, the commencement of a case under the Bankruptcy Code..." and that "[i]f Congress intended that non-monetary defaults be incurable under § 365, it would be unnecessary if not inconsistent for Congress to exempt the laundry list of non-monetary defaults in § 365(b)(2)" from the need to cure).

inconsistencies and an absurd and unjust result in violation of fundamental principles of statutory construction. *I.N.S. v. Phinpathya*, 464 U.S. 183, 198 (1984) ("It is a hornbook proposition that '[a]ll laws should receive a sensible construction...as not to lead to injustice, oppression, or an absurd consequences...'"); *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 574 (1982) ("interpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available."); *In re Kaiser Aluminum Corp.*, 456 F.3d 328, 338 (3d Cir. 2006) ("[a] basic tenet of statutory construction is that courts should interpret a law to avoid bizarre or absurd results.").

## II.    DEBTORS' ALLEGED VIOLATION OF THE CREDIT AGREEMENTS' REPORTING REQUIREMENTS DOES NOT TRIGGER THE LENDERS' RIGHT TO DEFAULT INTEREST.

The Lenders next argue that the Debtors' alleged violation of certain reporting requirements under the Credit Agreements gives the Lenders a contractual right to interest at the default rate. This argument fails. According to the Lenders, Grace supposedly failed to "furnish to each Bank all certificates and other information required by section 8.2(a)-(c), not promptly giving notices to JP Morgan, as required by section 8.7, and not remedying such breaches within 30 days." *See* Freedgood Aff. (II) at ¶ 13.[10]  These are the same arguments that the Lenders previously made in the context of the claims objection proceeding, which were flatly rejected as being unsupported by a stitch of evidence.  Lender Pre-Trial Br. re Claims Objection at 44; Freedgood Aff. (I) at ¶ 13.[11]  Specifically, this Court held that the Lenders, "have never, in the 8-year life of this case, expressed dissatisfaction with Debtors' reporting or filed any requests in

---

[10]  Notice of Submission of Affidavit of Charles O. Freedgood and Declaration of Mark A. Shelnitz, dated June 26, 2009, Ex. A [Dkt. No. 22279].

[11]  Pre-Trial Memorandum in Opposition to the Debtors' Objection to Claims Asserted Under the Debtors' Credit Agreements Dated as of May 14, 1998 and May 5, 1999, dated Sept. 5, 2008 [Dkt. No. 19478]; Freedgood Affidavit in Support [Dkt. 19479].

connection therewith until they responded to Debtors' objection to their claims." Claims Objection Opinion at 4. Accordingly, the Court held that for purposes of claims allowance, it had "insufficient evidence that any alleged reporting failures under the loan documents constitute a default of a type that would trigger any default interest provision in the loan documents." *Id.* There is no new evidence provided since that time to warrant a different result.[12]

Moreover, even if the Lenders had offered evidence of non-compliance with the Credit Agreements' reporting requirements, the fact remains that such non-compliance still would not give the Lenders a right to contractual default interest. The terms of the Credit Agreements specifically required the Lenders to provide notice of an event of a non-monetary default in order to accelerate the loans, and without this event of default, there cannot be acceleration under the terms of the Credit Agreements. The Credit Agreements set forth in detail the procedures by which the Administrative Agent, JP Morgan, may accelerate the loans and trigger default interest if it or a majority of the Lenders determined that was the appropriate course of action. In that regard, the Credit Agreements provide that JP Morgan could have accelerated the loans, "making them immediately due and payable" by "notice of default to the Company and the Parent," under Section 10(B)(ii) of the Credit Agreements if it believed that Grace had defaulted and that it had was in the best interest of the banks to accelerate the loans. Alternatively, JP Morgan would have been obligated to call the loans by providing written notice to Grace "upon the request of the Majority Banks." *See* § 13.2 of the Credit Agreements (requiring the Administrative Agent to provide such notice of default to Grace in writing).

Here, it is undisputed that the Lenders never followed the procedures for accelerating the loans set forth in the Credit Agreements. Indeed, the Lenders never provided any type of

---

[12] Further discussion of the alleged non-monetary defaults may be addressed in the Plan Proponents' Phase II Pre-Trial Brief.

"notice of default to the Company and the Parent" that the Majority Banks were accelerating or

calling the loans. *See* Shelnitz Aff. at ¶ 9.[13]  Because the Administrative Agent did not accelerate

the loans by providing the Debtors with a notice of default and because the Majority Banks did

not request such acceleration, the Lenders cannot argue that a non-monetary default occurred that

would trigger default interest in an impairment context.

### III.   THE LENDERS ARE NOT IMPAIRED UNDER SECTION 1124 OF THE BANKRUPTCY CODE BY THE PLAN'S FAILURE TO PAY THEM INTEREST AT THE DEFAULT RATE.

In their latest attempt to establish a default entitling them to default interest, the Lenders

argue that the Credit Agreements matured in 2001 and 2003 respectively, and this "automatically

resulted in accrual of interest on such unpaid amounts after 2001 and 2003 at the default rate,

without the need for either the occurrence of any 'Event of Default' or notice of any kind."

Lenders' Pre-Trial Brief at 10.  This essentially is an add-on to their next argument, which is that

that "the Credit Agreements provide for quarterly payments of interest . . . failures to pay interest

on the loans and notes after such interest became due in accordance with the terms of the Credit

Agreements constituted 'Events of Default' that entitled the Lenders to accelerate the entire

outstanding amount of the loans and notes." *Id.*  The Court has already rejected the Lenders'

impairment based on the failure to pay quarterly interest, and the Lenders' impairment argument

based on the failure to repay the loans upon maturity fares no better.

Under *PPI Enterprises*, "[a]s long as a plan does not itself alter a creditor's rights, but

leaves such creditor subject to the other provisions of the Bankruptcy Code, the creditor's claim

is unimpaired." *PPI Enterprises*, 324 F.3d at 204.  "A creditor's claim outside of bankruptcy is

not the relevant barometer for impairment; [the court] must examine whether the plan itself is a

---

[13]   Notice of Submission of Affidavit of Charles O. Freedgood and Declaration of Mark A. Shelnitz, dated June 26, 2009, Ex. B [Dkt. No. 22279].

source of limitation on a creditor's legal, equitable, or contractual rights." *Id.*, at 204 ("[W]e hold that where § 502(b)(6) alters a creditor's nonbankruptcy claim, there is no alteration of the claimant's legal, equitable, and contractual rights for the purposes of impairment under § 1124(1)."). Here, the fact that the Lenders did not receive quarterly interest, or repayment of the principal, resulted solely from operation of the Bankruptcy Code, and not from the Plan. Thus, as a matter of law, the Lenders are unimpaired.

The only reason that the Debtors failed to make timely interest payments after the filing of their bankruptcy petitions is because they were legally prohibited from doing so under § 502. That section expressly prohibits the postpetition interest on a prepetition unsecured claim. 11 U.S.C. § 502(b)(2); *In re Chateaugay Corp.*, 156 B.R. 391, 403 (S.D.N.Y. 1993). This Court recognized as much in previously rejecting the Lenders' argument that they were impaired based on the Debtors' failure to pay quarterly interest after the petition date:

> Furthermore, nonpayment of postpetition interest is not a default. The fact that the Bankruptcy Code precluded Debtors from paying postpetition interest means that Debtors will not be held to have defaulted for that reason. *See In re NextWave Personal Communications, Inc.,* 244 B.R. 253, 264 (Bankr. S.D.N.Y. 2000) (failure to make postpetition payments cannot be deemed a default when the payments are prohibited by the Bankruptcy Code).[14]

Claims Objection Opinion at 5.

Similarly, the fact that the Debtors failed to repay the principal amount of the loans when they matured during the bankruptcy proceeding likewise was a function of the Bankruptcy Code, not the Plan. "With exceptions not here applicable . . . the debtors' property can be used to pay pre-petition claims only pursuant to court order or in the context of a confirmed plan of reorganization." *In re NextWave Personal Communications Inc.*, 244 B.R. 253, 264 (Bankr.

---

[14] While *NextWave* was vacated on other grounds, the analysis that the *NextWave* bankruptcy court undertook is still instructive.

S.D.N.Y. 2000), *vacated on other grounds by, In re F.C.C.*, 217 F.3d 125 (2d Cir. 2000); *see also In re Merry-Go-Round Enterprises, Inc.* 400 F.3d 219, 221 (4th Cir. 2005) (Court disallowed unauthorized postpetition interest payments debtor made on whole life insurance policy loans as avoidable transfers under § 549(a) of the Bankruptcy Code); *In re 48th Street Steakhouse, Inc)*, 835 F.2d 427, 431 (2d Cir.1987) ("actions taken in violation of the [automatic] stay are void and without effect" (quoting Collier on Bankruptcy )), *cert. denied*, 485 U.S. 1035 (1988); *In re Garnett*, 47 B.R. 170, 171 (Bankr. E.D.N.Y. 1985) ("[t]he action of a party in violation of the [automatic] stay without court approval is void and without effect"), *aff'd*, 124 B.R. 426 (S.D.N.Y. 1991); *Delpit v. Commissioner of Internal Revenue Service*, 18 F.3d 768, 771 (9th Cir.1994) ("Section 362 'is exceedingly broad in scope' and 'should apply to almost any type of formal or informal action against the debtor or the property of the estate."). Thus, whatever the Lenders may be entitled to receive in the form of postpetition interest under the Credit Agreements, they cannot look to the Debtors' failure to pay the claims after the maturity date as giving them a legal entitlement to default interest.

## CONCLUSION

The Lenders assertion that the test of whether they are impaired turns on payment of postpetition interest at the default rate under the Credit Agreements is wrong. First, the Lenders cannot point to a legal or factual event of default which would give them an enforceable right to postpetition interest on their allowed claim at the default rate stated in their contract. Second, while certain circumstances (including a showing of solvency and appropriate equitable considerations) might permit the Lenders to claim some entitlement over the amount of their allowed claim under § 502(b), there is simply no precedent to support the contention that interest should be assessed at the default rate stated in the Credit Agreements, either for purposes of an

allowed claim or for impairment.   Rather, the rate which is provided to the Lenders under the Plan should be found to satisfy both tests, and in particular, renders the Lenders unimpaired for purposes of determining whether their failure to accept the Plan has any impact on confirmation of the Plan.

Dated: July 17, 2009
Wilmington, Delaware

Respectfully submitted,

KIRKLAND & ELLIS LLP
David M. Bernick, P.C.
Theodore L. Freedman
Eric F. Leon
Deanna D. Boll
Justin Brooks
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900


and

THE LAW OFFICES OF JANET S. BAER, P.C.
Janet S. Baer, P.C.
70 W. Madison Street
Suite 2100
Chicago, IL 60602
Telephone: (312) 641-2162

and


  /s/ Kathleen P. Makowski
PACHULSKI, STANG, ZIEHL & JONES LLP
James E. O'Neill (Bar No. 4042)
Timothy Cairns (Bar No. 4228)
Kathleen P. Makowski (Bar No. 3648)
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705
(Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400

*Counsel for the Debtors and Debtors in Possession*

25

CAMPBELL & LEVINE, LLC

_/s/ Kathleen Campbell Davis_

Mark T. Hurford (Bar No. 3299)
Kathleen Campbell Davis (Bar No. 4229)
800 N. King Street, Suite 300
Wilmington, DE 19801
Telephone:  (302) 426-1900
Facsimile:  (302) 426-9947

and

CAPLIN & DRYSDALE, CHARTERED
Elihu Inselbuch
375 Park Avenue, 35th Floor
New York, NY 10152-3500
Telephone: (212) 319-7125
Facsimile: (212) 644-6755

Peter Van N. Lockwood
Nathan D. Finch
Jeffrey A. Liesemer
Kevin Maclay
One Thomas Circle, N.W.
Washington, D.C. 20005
Telephone:  (202) 862-5000
Facsimile:  (202) 429-3301

_Counsel for the Official Committee of Asbestos Personal Injury Claimants_

PHILIPS, GOLDMAN & SPENCE, P.A.


   */s/ John C. Phillips*
John C. Philips (Bar No. 110)
1200 North Broom Street
Wilmington, DE 19806
Telephone:  (302) 655-4200
Facsimile:  (302) 655-4210

and

ORRICK, HERRINGTON & SUTCLIFFE LLP
Roger Frankel
Richard H. Wyron
Jonathan P. Guy
Debra L. Felder
1152 15th Street, NW
Washington, DC 20005
Telephone: (202) 339-8400
Facsimile: (202) 339-8500

*Counsel for David T. Austern, Asbestos PI Future
Claimants' Representative*

SAUL EWING LLP

*/s/ Teresa K.D. Currier*
Teresa K.D. Currier (Bar No. 3080)
222 Delaware Avenue, Suite 1200
P.O. Box 1266
Wilmington, DE 19899
Telephone:  (302) 421-6800
Facsimile:  (302) 421-6813

and

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Philip Bentley
Gregory Horowitz
Douglas Mannal
1177 Avenue of the Americas
New York, NY 10022
Telephone:  (212) 715-9100
Facsimile: (212) 715-8000

*Counsel for the Official Committee of Equity Security Holders*