# Exhibit A

## <u>AMENDED AND RESTATED SETTLEMENT AGREEMENT AND MUTUAL RELEASE</u>

This Amended and Restated Settlement Agreement and Mutual Release ("Amended Agreement") is made by and between W. R. Grace & Co., on its own behalf and on behalf of the Grace Parties, and Lloyd's Underwriters, each as defined herein (collectively, the "Parties").

### WITNESSED THAT:

WHEREAS, Lloyd's Underwriters severally subscribed to certain policies of insurance that provide, or are alleged to provide, insurance coverage to certain Grace Parties; and

WHEREAS, Grace and Lloyd's Underwriters entered into an agreement dated November 17, 1995 (the "1995 London Agreement") concerning the application to Asbestos Claims of certain policies of insurance severally subscribed by Lloyd's Underwriters and London Market Companies in favor of Grace; and

WHEREAS, the Grace Parties and Lloyd's Underwriters agree that the London Market Companies and any other insurance company that may have severally subscribed to or participated on any Subject Policies are not parties to this Amended Agreement and any rights that the Grace Parties have against the London Market Companies or any other insurance company with respect to the Subject Policies, the 1995 London Agreement or otherwise are not being released, compromised or affected by this Amended Agreement in any way. It is acknowledged by Lloyd's Underwriters and the Grace Parties that the London Market Companies and other insurance companies that may have severally subscribed to or participated on any Subject Policies are not parties to this Amended Agreement; and

WHEREAS, the 1995 London Agreement resolved disputes concerning policies of insurance that were severally subscribed by Lloyd's Underwriters and London Market Companies and that had inception dates prior to June 30, 1985. This Amended Agreement is,

1

effective on the Trigger Date, terminating Lloyd's Underwriters' obligations under the 1995 London Agreement and also is resolving obligations that Lloyd's Underwriters may have to the Grace Parties with respect to policies issued to Grace that have inception dates of June 30, 1985 or later as more fully described in the definition of Subject Policies in this Amended Agreement. However, with respect to policies that have inception dates of June 30, 1985 or later, this Amended Agreement shall also not apply to London Market Companies or other insurance companies that participated on those policies, whether such companies are parties to the 1995 London Agreement or not; and

WHEREAS, the Grace Parties have incurred and may incur in the future certain liabilities, expenses, and losses arising out of Asbestos Claims and other Claims; and

WHEREAS, Lloyd's Underwriters were obligated under the 1995 London Agreement to make certain payments in connection with Asbestos Claims under the Subject Policies identified in the 1995 London Agreement; and

WHEREAS, the Grace Parties contended that Lloyd's Underwriters might also be obligated to make payments under the Subject Policies for Claims other than Asbestos Claims; and

WHEREAS, there are or may in the future be disputes between the Parties regarding their respective rights and obligations with respect to insurance coverage under the Subject Policies with respect to Claims and regarding their respective rights and obligations with respect to the 1995 London Agreement; and

WHEREAS, on or about April 2, 2001, W. R. Grace & Co., W. R. Grace & Co-Conn., and certain other debtors filed reorganization cases pursuant to Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware, jointly

2

administered as Bankruptcy Petition No. 01-01139 (JKF), et seq. (the "Chapter 11 Cases"), and

Grace and such other debtors continue to operate their businesses as debtors and debtors-in-

possession; and

WHEREAS, the Grace Parties anticipate that a plan of reorganization will be confirmed

by the Bankruptcy Court in the Chapter 11 Reorganization Cases that the Grace Parties anticipate

will provide for the establishment of one or more trusts pursuant to section 524(g) of the

Bankruptcy Code to process and pay Asbestos Claims involving Grace; and

WHEREAS, the Parties entered into a Settlement Agreement and Mutual Release on or

about November 9, 2006 ("2006 Agreement"), which was approved by the Bankruptcy Court;

and

WHEREAS, the 2006 Agreement permitted Lloyd's Underwriters, at their sole option, to

terminate the 2006 Agreement in the event that the Confirmation Order had not been entered by

the Bankruptcy Court by close of business on December 31, 2008, and the Confirmation Order

was not entered as of that date; and

WHEREAS, the Parties entered into a First Amendment to Settlement and Mutual

Release on or about April 24, 2009, whereby the deadline for termination of the 2006 Agreement

at Lloyd's Underwriters' option was extended to the close of business on June 30, 2009; and

WHEREAS, the Parties entered into a Second Amendment to Settlement Agreement and

Mutual Release on or about June 16, 2009, whereby the deadline for termination of the 2006

Agreement at Lloyd's Underwriters' option was further extended to the close of business on July

31, 2009; and

WHEREAS, the Parties entered into a Third Amendment to Settlement Agreement and

Mutual Release on or about July 13, 2009, whereby the deadline for termination of the 2006

Agreement at Lloyd's Underwriters' option was further extended to the close of business on September 30, 2009; and

WHEREAS, in consideration of certain monetary payments and other consideration as more fully set forth herein, the Parties intend to adopt, by way of compromise, and without (i) prejudice to or waiver of their respective positions in other matters, (ii) trial or adjudication of any issues of fact or law, or (iii) Lloyd's Underwriters' admission of liability or responsibility under the Subject Policies or the 1995 London Agreement, a full and final settlement that: (a) releases and terminates all rights, obligations and liabilities (if any) that the Parties may owe one another with respect to the Subject Policies and the 1995 London Agreement; and (b) fully and finally settles all claims that the Parties asserted or could have asserted against one another pursuant to the Subject Policies and the 1995 London Agreement;

### AGREEMENTS:

NOW, THEREFORE, in full consideration of the foregoing and of the mutual promises and covenants herein contained, and intending to be legally bound hereby, subject to the entry of the Approval Order and subject to the terms and conditions set forth herein, the Parties hereby agree as follows:

### I.    Definitions

The following definitions apply to the capitalized terms wherever those terms appear throughout this Amended Agreement or in any attachments hereto. Capitalized terms in the prefatory paragraph, recitals, this Definitions section, and in the sections below have the meanings ascribed to them therein to the extent they are not otherwise defined in this Definitions section. Capitalized terms not otherwise defined herein shall have the meanings set forth in the

4

First Amended Joint Plan of Reorganization filed by the Plan Proponents on or about February 27, 2009. Each defined term stated in a singular form includes the plural form, each defined term stated in plural form includes the singular form, and each defined term stated in the masculine, feminine or neuter form includes each of the masculine, feminine and neuter forms. The word "including" means "including but not limited to."

A.    2006 Agreement: The term "2006 Agreement" means the Settlement Agreement and Mutual Release among the Parties dated November 9, 2006.

B.    Affiliate: An "Affiliate" of an Entity shall mean another Entity that is directly or indirectly (through one or more intermediaries) controlled by the first Entity.

C.    Amended Agreement: The term "Amended Agreement" means this Amended and Restated Settlement Agreement and Mutual Release, as the same may be amended or modified from time to time in accordance with its provisions.

D.    Approval Order: The term "Approval Order" means an order of the Bankruptcy Court, in form and substance satisfactory to the Parties, approving this Amended Agreement and the compromise and settlement memorialized herein between and among the Parties (the "Approval Order").

E.    Asbestos Claims: "Asbestos Claims" means any and all Claims, asserted by any person or Entity, whether in litigation or not, that arise out of, relate to, involve, result from or are attributable to asbestos in any form (including products containing asbestos) and from any source, including Claims that seek to impose legal liability for damages, or which seek any other relief, because or on account of or arising in any way from the manufacture, sale, installation, presence,

5

removal, replacement, encapsulation or other remediation or abatement of, or testing or monitoring or inspection for, asbestos-containing products or materials including (a) alleged property damage or other harm, or (b) alleged bodily injury, sickness, disease, mental anguish and injury, increased risk of harm, and/or death or other harm, allegedly caused by or on account of asbestos or asbestos fibers.

F.     Bankruptcy Court:   The term "Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware.

G.     Berkshire Company:   The term "Berkshire Company" means Berkshire Hathaway, Inc. or any Subsidiary of Berkshire Hathaway, Inc. that: (1) at the time Lloyd's Underwriters exercise the option set forth in Section II.(C) of this Agreement has a financial strength rating assigned by Standard & Poor's Corporation no lower than the lower of: (a) AA; or (b) the financial strength rating at the time Lloyd's Underwriters exercise their said option of the Settlement Account Agent then in place; or (2) is agreed between the Parties and approved by the Grace Committees, such agreement and/or approval not to be unreasonably withheld or delayed.

H.     Business Day: The term "Business Day" means any day that is not a Saturday, a Sunday, a federal holiday in the United States of America or a national holiday in the United Kingdom.

I.     Claim: The term "Claim" means:

1.     "Claim" as that term is defined in the United States Bankruptcy Code, 11 U.S.C. Sec. 101(5);

2.    "Demand" as that term is defined in the United States Bankruptcy Code, 11 U.S.C. Sec. 524(g)(5); and

3.    any claim (whether past, present or future, known or unknown, asserted or unasserted, foreseen or unforeseen, fixed or contingent, direct or indirect, matured or unmatured, liquidated or unliquidated, direct or consequential, and whether in law, equity, admiralty or otherwise), assertion of right, complaint, cross-complaint, counterclaim, affirmative defense, writ, demand, inquiry, request, directive, obligation, suit, lawsuit, action, cause of action, administrative proceeding, governmental claim or action, order, judgment, settlement, mediation, arbitration, lien and any other assertion of liability of any kind.  For the avoidance of doubt, "Claim" includes any claim:

a.    arising out of, related to, involving, resulting from or attributable to asbestos in any form and from any source, including products containing such substances, or to any other substance, product, matter or material in any form or state;

b.    any cumulative or other injury or damage, including noise induced hearing loss, arising from any activity, operation or exposure;

c.    any alleged bad faith, conspiracy, unfair claim practice, unfair trade practice, fraud or misrepresentation, or extra-contractual or tort liability, under any theory of liability whatsoever;

7

d.   for damages (including any damage or injury of any kind whatsoever caused by or allegedly caused by asbestos), including damages as a result of death, bodily injury, sickness, disease, emotional injury, damage to property, diminution in value or loss of use, economic loss, and punitive, exemplary, statutory damages or penalties, indemnity or defense obligations, insurance premiums (whether retrospectively rated or otherwise), deductibles, self-insured retentions, costs, expenses, contribution or subrogation; and

e.   pursuant to or under a contract, other agreement, promise, representation or warranty or pursuant to any direct action or statutory or regulatory right of action or based on tort liability.

J.   <u>Confirmation Order</u>: The term "Confirmation Order" means an order entered by the Bankruptcy Court in the Chapter 11 Cases confirming the Plan, together with any order of the District Court issued pursuant to section 524(g)(3)(A) of the Bankruptcy Code confirming or affirming such order.

K.   <u>District Court</u>: The term "District Court" means the United States District Court for the District of Delaware.

L.   <u>Entity</u>: The term "Entity" means any individual, corporation, limited liability company, partnership, association, joint stock company, joint venture, estate, trust, including the Trust as defined in Section I.(GG) herein, unincorporated

8

organization, federal, state, local or foreign government or any political subdivision thereof, or other person or entity.

M.    <u>Equitas Entities</u>:  The term "Equitas Entities" means:

    1.    Equitas Holdings Limited and its current and future Subsidiaries and Affiliates, as they may be constituted from time to time, including Equitas Limited, Equitas Insurance Limited, Equitas Reinsurance Limited, and Equitas Policyholders Trustee Limited;

    2.    each of the respective past, present and future parents, divisions, holding companies, merged companies, acquired companies, predecessors-in-interest, successors-in-interest, estates, scheme administrators and assigns of the foregoing, solely in their capacities as such; and

    3.    each of the past, present and future directors, members, officers, shareholders, trustees, receivers, estates (including bankruptcy and insolvency estates), employees, agents, representatives, attorneys, heirs, executors and administrators of the foregoing, solely in their capacities as such.

N.    <u>Execution Date</u>:  The term "Execution Date" means the earliest date on which this Amended Agreement has been signed by all of the Parties.

O.    <u>Final Order</u>:  "Final Order" means an order or judgment of the Bankruptcy Court, the District Court or other court of competent jurisdiction, as entered on the docket in any Chapter 11 Case or the docket of any other court of competent

9

jurisdiction, that has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek certiorari or move for a new trial, reargument or rehearing has expired, and no appeal or petition for certiorari or other proceedings for a new trial, reargument or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument or rehearing has been denied or has resulted in no modification of such order.

P.    Grace:  The term "Grace" means W. R. Grace & Co., a Delaware corporation.

Q.    Grace Committees:  The term "Grace Committees" means the Official Committee of Asbestos Personal Injury Claimants and the Asbestos PI Future Claimants' Representative in the Chapter 11 Cases.

R.    Grace Parties:  The term "Grace Parties" means:

1.    Grace;

2.    W.R. Grace & Co-Conn., a Connecticut corporation;

3.    all other debtors and debtors in possession in the Chapter 11 Cases;

4.    All Subsidiaries, divisions, and Affiliates of the foregoing, including any Entity in which any of the Debtors has an ownership interest of fifty percent (50%) or more;

10

5.    Any predecessor, successor or assign of any of the foregoing Entities;

6.    Any Entity that has been acquired by, merged into or combined with any of the Entities described in this Section I.(R);

7.    Any Entity on whose behalf W. R. Grace & Co. or W. R. Grace & Co-Conn. has the power to release claims under the Subject Policies or the 1995 London Agreement; and

8.    The directors, officers, agents, and employees of the foregoing Entities, in their respective capacities as such.

For avoidance of doubt, "Grace Parties" includes the Reorganized Debtors.

S.    Lloyd's Underwriters:    The term "Lloyd's Underwriters" means all the underwriters, members or Names at Lloyd's, London who, through their participation in syndicates (including those identified on Attachment B hereto), severally subscribed, each in his own proportionate share, to one or more of the Subject Policies, including all underwriters, members or names at Lloyd's, London (whether or not they participated in the syndicates identified in Attachment B hereto) who, through their participation in syndicates (including those identified on Attachment B hereto) severally subscribed to any Subject Policies the existence of which (a) has not presently been established; or (b) has been established but as to which the identities of the Names, members or syndicates are not presently known. (For avoidance of doubt, the term "Lloyd's Underwriters" does not include the Equitas Entities.)

11

T.    London Market Companies:  The term "London Market Companies" means those insurance companies doing business in the London Insurance Market that severally subscribed policies of insurance in favor of Grace and that are parties to the 1995 London Agreement.

U.    Plan:  The term "Plan" means a plan of reorganization filed in the Chapter 11 Reorganization Cases, provided that such plan and modifications thereto:

1.    are not inconsistent with the terms of this Amended Agreement;

2.    do not modify the terms of the Approval Order;

3.    do not materially and adversely affect the interests of Lloyd's Underwriters, the Underwriter Third Party Beneficiaries or the Grace Parties under this Amended Agreement; and

4.    provide for a channeling injunction pursuant to section 524(g) of the Bankruptcy Code that is at least as broad as the Asbestos PI Channeling Injunction provided in the First Amended Joint Plan of Reorganization filed by the Plan Proponents on or about February 27, 2009, and that applies to Lloyd's Underwriters and the Underwriter Third Party Beneficiaries, to the extent such Underwriter Third Party Beneficiaries are eligible for protection under Bankruptcy Code Section 524(g).

V.    Plan Effective Date:  The term "Plan Effective Date" means the first Business Day after the date on which all conditions precedent to the effectiveness of the Plan (as specified therein) are satisfied or waived or, if a stay of the Confirmation

12

Order is in effect on such date, the first Business Day after the expiration, dissolution, or lifting of such stay.

W.    Plan Proponents:  The term "Plan Proponents" means, collectively, the Debtors, the Official Committee of Asbestos Personal Injury Claimants, the Asbestos PI Future Claimants' Representative, and the Official Committee of Equity Security Holders in the Chapter 11 Reorganization Cases.

X.    Reorganized Debtor:  The term "Reorganized Debtor," "Reorganized Debtors" or "Reorganized Grace" shall mean the Debtors on and after the Plan Effective Date.

Y.    Resolute:  The term "Resolute" means Resolute Management Services Limited (formerly known as Equitas Management Services Limited).

Z.    Settlement Account:  The term "Settlement Account" means the bank trust or escrow account created pursuant to the Settlement Account Agreement.

AA.    Settlement Account Agent:  The term "Settlement Account Agent" means J.P. Morgan Chase Bank, N.A., or any other bank or financial institution appointed to serve as successor trustee or escrow agent of the Settlement Account pursuant to this Amended Agreement and the Settlement Account Agreement with the prior written consent of the Parties, which shall not be unreasonably or unseasonably withheld.

13

BB.  <u>Settlement Account Agreement</u>:  The term "Settlement Account Agreement" means the agreement creating the Settlement Account, a copy of which is appended hereto as Attachment C.

CC.  <u>Settlement Amount</u>:  The term "Settlement Amount" means the sum of Ninety Million Dollars U.S. ($90,000,000).

DD.  <u>Subject Policies</u>:  The term "Subject Policies" means:

    1.  all insurance policies listed on Attachment A hereto; and

    2.  all known and unknown policies of insurance (whether or not listed in Attachment A hereto) severally subscribed to by Lloyd's Underwriters and providing coverage to any Grace Party that were originally allocated by the Lloyd's Policy Signing Office or otherwise to the 1992 year of account or any earlier year of account, including any liabilities under such contracts reinsured to close into the 1993 or any later year of account, but excluding any liabilities re-signed or reallocated pursuant to a premium transfer into the 1993 or later year.

Notwithstanding the foregoing, Subject Policies shall not, in any event, include policies of insurance incepting on or after January 1, 1998.

14

EE.     Subsidiary: A "Subsidiary" of an Entity shall mean a corporation as to which the Entity possesses shares of common stock and exercises control through the voting power of such stock.

FF.     Trigger Date: The term "Trigger Date" means the day that the last of the following has occurred, provided that this Amended Agreement has not previously become null and void pursuant to its terms:

1.      The Approval Order becomes a Final Order;

2.      The time during which Lloyd's Underwriters have the right to terminate this Amended Agreement pursuant to Section VIII.(B) shall have passed without Lloyd's Underwriters' providing written notice of termination;

3.      The Confirmation Order becomes a Final Order;

4.      The occurrence of the Plan Effective Date with respect to a plan that satisfies the definition of Plan set forth in Section I.(U); and

5.      The Trust executes a written agreement, in form and substance satisfactory to the Parties, binding the Trust to the terms of this Amended Agreement as if the Trust had been a Party hereto as of the Execution Date, unless the Confirmation Order provides that the Trust shall be bound by this Amended Agreement as if the Trust had been a Party hereto as of the Execution Date, in which case the Trigger Date may occur without the Trust executing such a written agreement.

15

GG.   <u>Trust</u>.  The term "Trust" shall mean the "Asbestos PI Trust" as defined in the First Amended Joint Plan of Reorganization filed by the Plan Proponents on or about February 27, 2009, or such other trust as may be established under section 524(g) of the Bankruptcy Code to process and pay Asbestos PI Claims pursuant to a Plan filed by the Plan Proponents.

HH.   <u>Trust Agreement</u>.  The term "Trust Agreement" shall mean the agreement in connection with the formation and establishment of the Trust.

II.   <u>Underwriter Third Party Beneficiaries</u>   The term "Underwriter Third Party Beneficiaries" means:

1.   Resolute;

2.   The Equitas Entities;

3.   Any Person from time to time retained by or on behalf of Lloyd's Underwriters to act as their agent for claims handling (including reinsurance collection) and/or to provide actuarial, or legal or other advice or services related to claims handling (including reinsurance collection), including Resolute Management Services Limited and Resolute Management Inc., solely in such capacity;

4.   The past, present and future reinsurers and retrocessionaires of Lloyd's Underwriters and/or the Equitas Entities or any of them, including National Indemnity Company and any other entity from time to time controlled (whether directly or indirectly) by Berkshire Hathaway, Inc.

16

that is a reinsurer or retrocessionaire for any one or more of Lloyd's Underwriters, Resolute and/or the Equitas Entities, solely in such capacity;

5.    All past, present and future trustees, officers, directors, employees, Subsidiaries, Affiliates, representatives, attorneys and agents of Lloyd's Underwriters or of any of the Entities set forth in subsections 1, 3 and 4 above, if any, solely in such capacity; and

6.    The respective heirs, executors, predecessors, successors and assigns (including any administrator, receiver, trustee, personal representative, liquidator (provisional or otherwise) or equivalent appointee/s under relevant insolvency law) of Lloyd's Underwriters or of any of the Entities identified in subsections 1, 3, 4 and 5 above, solely in such capacity.

II.    **Payment of the Settlement Amount**

A.    The Parties acknowledge that Lloyd's Underwriters paid the Settlement Amount to the Settlement Account Agent as required by Section II.(A) of the 2006 Agreement, and that such Settlement Amount together with investment earnings thereon (collectively "Settlement Funds") have, until the date of execution of this Amended Agreement, been held in escrow in the Settlement Account by J.P. Morgan Chase Bank, N.A. as Settlement Account Agent.

B.    As soon as practicable after the Bankruptcy Court has issued the Approval Order and the latter has become a Final Order, the Parties will instruct the Settlement Account Agent to pay to or at the direction of Resolute or any future run-off agent for Lloyd's Underwriters, including Resolute Management, Inc., an amount equal to fifty-two (52) percent of all interest or

17

other investment earnings earned on the Settlement Amount from the time of its establishment
through and including March 31, 2009. Such payment shall be made by wire transfer using the
following instructions, unless otherwise instructed by Resolute or any future run-off agent for
Lloyd's Underwriters:

| | |
|---|---|
| **Bank Name:** | Barclays Bank PLC |
| **Bank Address:** | 1 Churchill Place, London |
| **Account Name:** | RMSL USD Insurance Settlement Account |
| **Account Number:** | 42865599 |
| **Beneficiary:** | Resolute Management Services Limited |
| **Sort Code:** | 20-00-00 |
| **Swift Code:** | BARCGB22 |
| **Correspondent Bank:** | Barclays Bank PLC, 222 Broadway, NY 10038 USA (SWIFT: BARCUS33) |
| **IBAN No:** | GB02 BARC 2000 0042 8655 99 |

The wire transfer should quote the following reference – IADR4036.

The remaining forty-eight (48) percent of the interest and other investment earnings
earned through and including March 31, 2009, together with all interest and other investment
earnings earned on the Settlement Amount from April 1, 2009 until the earlier of (i) the date the
Settlement Amount is transferred in accordance with subsection (C) immediately below if such
transfer occurs, or (ii) the Trigger Date, will continue to be held in escrow by the Settlement
Account Agent and will be released following the Trigger Date in accordance with Section II.(F)
of this Amended Agreement.

C.    At any time after the Bankruptcy Court has issued the Approval Order and it has
become a Final Order and before the Trigger Date, Lloyd's Underwriters shall have the option to
transfer the Settlement Amount from the Settlement Account Agent to a Berkshire Company.
Lloyd's Underwriters may exercise such option by providing written notice to the other Parties.

Such notice shall identify the Berkshire Company to which the Settlement Amount shall be transferred, shall include the wiring instructions for such transfer and shall be accompanied by a signed undertaking by the identified Berkshire Company that it will agree to abide by the provisions of subsections II.(D), II.(E) and VIII.(C) below. Within ten (10) business days of receipt of such a notice, the Parties will instruct the Settlement Account Agent to transfer the Settlement Amount to the identified Berkshire Company using the wiring instructions set forth in such notice.

D.      Commencing from the date that the Settlement Amount is transferred in accordance with subsection (C) immediately above, within fifteen (15) business days after the end of each calendar quarter, the Berkshire Company will pay to the Settlement Account Agent, for deposit into the Settlement Account, an amount equal to the amount of interest that the Settlement Amount would have earned if it had been held in the JPMorgan U.S. Government Money Market Fund, Agency Shares (or, if such fund no longer exists, a reasonably equivalent fund to be agreed by the Parties, such agreement not to be unreasonably withheld or delayed) for the days in the preceding calendar quarter that the Settlement Amount was held by the Berkshire Company. The Berkshire Company will be entitled to retain any interest or other investment earnings earned on the Settlement Amount in excess of the amount paid to the Settlement Account Agent in accordance with this subsection (D).

E.      If the Settlement Amount is transferred in accordance with subsection (C) above, within thirty (30) days of the Trigger Date, the Berkshire Company will pay to the Trust the Settlement Amount, along with any interest or other investment earnings calculated in

19

accordance with subsection (D) immediately above that have not already been paid to the Settlement Account Agent.

F.     On the Trigger Date, the Parties will direct the Settlement Account Agent to release any Settlement Funds remaining in the Settlement Account to the Trust, less (i) any expenses that the Settlement Account Agent incurs pursuant to the Settlement Account Agreement; (ii) any reserves required under the Settlement Account Agreement to be held for the payment of taxes, indemnities, or otherwise; and (iii) any losses incurred under any investment of the Settlement Amount permissible under the Settlement Account Agreement.  Upon the release of the Settlement Funds as provided in the preceding sentence, legal and equitable title to the Settlement Funds in the Settlement Account shall pass irrevocably to the Trust.

G.     Except as otherwise expressly provided in Section VIII.(C) with respect to return of the Settlement Amount, the Settlement Amount and any and all past payments by Lloyd's Underwriters under, arising out of, or related to or involving the Subject Policies and the 1995 London Agreement are deemed final and irrevocable payments.  Lloyd's Underwriters' payment of the Settlement Amount is in addition to any and all payments made by Lloyd's Underwriters to or for the benefit of the Grace Parties prior to the Execution Date.

## III.     Several Liability

The Grace Parties, the Trust and Lloyd's Underwriters acknowledge that (i) the obligations of Lloyd's Underwriters hereunder are several, and not joint, (ii) no Lloyd's Underwriter shall be liable for any portion of the Settlement Amount allocated to any other Lloyd's Underwriter, and (iii) no Lloyd's Underwriter shall be liable for any share of the Subject Policies subscribed by other Entities.

## IV.    Releases

A.    Release By the Grace Parties and the Trust:

Except for the obligations created by this Amended Agreement,

1.    Effective on the Trigger Date, the Grace Parties (on behalf of themselves and their successors and assigns, in their capacities as such) and the Trust hereby release, remise, covenant not to sue and forever discharge Lloyd's Underwriters from and against:

a.    any and all Claims that the Grace Parties and the Trust ever had, now has, or hereafter may have against Lloyd's Underwriters; and/or

b.    liabilities to any Grace Party or the Trust of any Lloyd's Underwriters,

in either the case of (a) or (b) above,

i.    for, arising out of, or in connection with insurance coverage (including both defense costs and indemnification claims) under the Subject Policies and the 1995 London Agreement with respect to Lloyd's Underwriters' participation in the Subject Policies, the 1995 London Agreement or any other agreement between the Parties relating to the Subject Policies; or

21

ii.  arising out of or in connection with any act, omission, representation or conduct of any sort in connection with any of the Subject Policies, the 1995 London Agreement or any other agreement between the Parties relating to the Subject Policies, with respect to Lloyd's Underwriters' participation in the Subject Policies, the 1995 London Agreement or such other agreement; or

iii.  otherwise arising from or relating to the Subject Policies, the 1995 London Agreement or any other agreement between the Parties relating to the Subject Policies, with respect to Lloyd's Underwriters' participation in the Subject Policies, the 1995 London Agreement or such other agreement.

2.  Effective on the Trigger Date, the Grace Parties and the Trust intend to reserve no rights or benefits whatsoever under or in connection with the Subject Policies and the 1995 London Agreement, but only to the extent subscribed by or participated in by Lloyd's Underwriters, with respect to any past, present or future Claims, the Grace Parties and the Trust expressly reserving all other rights and benefits under the Subject Policies and the 1995 London Agreement to the extent subscribed by or participated in by Entities other than Lloyd's Underwriters.

22

3.    Effective on the Trigger Date, (i) any and all rights, duties, responsibilities and obligations of Lloyd's Underwriters created by or in connection with the Subject Policies and the 1995 London Agreement are hereby terminated, and (ii) the Grace Parties and the Trust have no insurance coverage from Lloyd's Underwriters under the Subject Policies or rights against Lloyd's Underwriters under the 1995 London Agreement. The releases contained in this Amended Agreement as among the Grace Parties, the Trust and Lloyd's Underwriters are intended to operate with respect to Lloyd's Underwriters as though Lloyd's Underwriters had never subscribed to the Subject Policies.

4.    All releases contained in this Section IV. also extend to the Underwriter Third Party Beneficiaries, which are intended third-party beneficiaries of the terms of the releases with the right to enforce such terms, to the same extent as they extend to Lloyd's Underwriters.

5.    THE GRACE PARTIES AND THE TRUST ACKNOWLEDGE THAT THEY HAVE BEEN ADVISED BY THEIR ATTORNEYS CONCERNING, AND ARE FAMILIAR WITH, THE CALIFORNIA CIVIL CODE SECTION 1542 AND EXPRESSLY WAIVE ANY AND ALL RIGHTS UNDER CALIFORNIA CIVIL CODE SECTION 1542, WHICH PROVIDES THAT "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF

23

EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR," AND UNDER ANY OTHER FEDERAL OR STATE STATUTE OR LAW OF SIMILAR EFFECT.

6.    The Grace Parties and the Trust expressly assume the risk that acts, omissions, matters, causes or things may have occurred that they do not know or do not suspect to exist.

B.    <u>Releases By Lloyd's Underwriters</u>:

Except for the obligations created by this Agreement,

1.    Effective on the Trigger Date, Lloyd's Underwriters hereby release, remise, covenant not to sue and forever discharge the Grace Parties and the Trust from and against;

a.    any and all Claims that Lloyd's Underwriters ever had, now have, or hereafter may have against the Grace Parties and/or the Trust; and/or

b.    liabilities to Lloyd's Underwriters of any Grace Party and/or the Trust,

in either case of (a) or (b) above

i.    for, arising out of, or in connection with insurance coverage, including both defense costs and indemnification claims, under the Subject Policies, the 1995 London

24

Agreement or any other agreement between the parties relating to the Subject Policies, with respect to Lloyd's Underwriters' participation in the Subject Policies, the 1995 London Agreement or any other such agreement; or

ii.     arising out of or in connection with any act, omission, representation or conduct of any sort in connection with any of the Subject Policies, the 1995 London Agreement or any other agreement between the Parties with respect to the Subject Policies, with respect to Lloyd's Underwriters' participation in the Subject Policies, the 1995 London Agreement or any other such agreement; or

iii.    otherwise arising from or relating to the Subject Policies, the 1995 London Agreement or any other agreement between the Parties relating to the Subject Policies, with respect to Lloyd's Underwriters' participation in the Subject Policies, the 1995 London Agreement or such other agreement.

2.    Effective on the Trigger Date, Lloyd's Underwriters intend to reserve no rights or benefits whatsoever under or in connection with the Subject Policies and the 1995 London Agreement, but only to the extent subscribed by or participated in by Lloyd's Underwriters, with respect to any past, present or future Claims.

25

3.      Effective upon the Trigger Date, any and all rights, duties, responsibilities and obligations of the Grace Parties or the Trust created by or in connection with the Subject Policies and the 1995 London Agreement are hereby terminated.  As of the Trigger Date, Lloyd's Underwriters have no rights with respect to the Grace Parties under the Subject Policies and the 1995 London Agreement.   The releases contained in this Amended Agreement are intended to operate as though Lloyd's Underwriters had never subscribed to the Subject Policies.  Nothing in this Section IV.(B)(3) shall affect Lloyd's Underwriters' right to seek reimbursement from their reinsurers or retrocessionaires in their capacities as such (but not including any Grace Party).

4.      LLOYD'S UNDERWRITERS ACKNOWLEDGE THAT THEY HAVE BEEN ADVISED BY THEIR ATTORNEYS CONCERNING, AND ARE FAMILIAR WITH, THE CALIFORNIA CIVIL CODE SECTION 1542 AND EXPRESSLY WAIVE ANY AND ALL RIGHTS UNDER CALIFORNIA CIVIL CODE SECTION 1542, WHICH PROVIDES THAT "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR," AND UNDER ANY OTHER FEDERAL OR STATE STATUTE OR LAW OF SIMILAR EFFECT.

26

5.　　Lloyd's Underwriters expressly assume the risk that acts, omissions, matters, causes or things may have occurred that they do not know or do not suspect to exist.

## V.　　**Indemnification**

A.　　Obligation of the Reorganized Debtors and the Trust to Indemnify

Reorganized Debtors shall defend, indemnify and hold harmless Lloyd's Underwriters, including defense costs, in respect of any and all Claims, other than Asbestos PI Claims subject to the Asbestos PI Channeling Injunction, against Lloyd's Underwriters relating to the Subject Policies, the 1995 London Agreement or any other agreement between the Parties relating to the Subject Policies, whether by way of direct action or otherwise, made by any Entity, including: (i) other insurers of Grace; (ii) any person or Entity claiming to be insured under the Subject Policies; (iii) any person or Entity who has made or will or can make a claim under the Subject Policies or the 1995 London Agreement; (iv) any person or Entity who has acquired or been assigned the right to make a claim under the Subject Policies or the 1995 London Agreement; or (v) any federal, state or local government or any political subdivision, agency, department, board or instrumentality thereof. In no event, however, shall the total amount that Reorganized Debtors is required to pay to defend, indemnify and hold harmless Lloyd's Underwriters exceed an amount equal to the Settlement Amount. Once Reorganized Debtors have paid a total amount equal to the Settlement Amount to defend, indemnify and hold harmless Lloyd's Underwriters, or any one or more of them, the Trust's obligation to defend, indemnify and hold harmless Lloyd's Underwriters pursuant to this Section V. shall cease. In the event that the Reorganized Debtors defend Lloyd's Underwriters against Claims alleging fraudulent conduct, criminal conduct, gross

27

malfeasance or misfeasance or intentional wrongdoing, the Reorganized Debtors shall be entitled to recoup the costs of such defense if Lloyd's Underwriters are in fact determined to have engaged in such conduct. The Parties acknowledge that this indemnification includes Claims, other than Asbestos PI Claims subject to the Asbestos PI Channeling Injunction, made by any person or Entity over whom Grace does not have control, including former Subsidiaries, predecessors in interest, and sellers or purchasers of assets.

The Trust will defend, indemnify and hold harmless Lloyd's Underwriters, including defense costs, in respect of any Asbestos PI Claim subject to the Asbestos PI Channeling Injunction asserted against Lloyd's Underwriters relating to the Subject Policies or the 1995 London Agreement, provided, however, that the total amount that the Trust will pay to defend, indemnify and hold harmless Lloyd's Underwriters shall not exceed an amount equal to the Settlement Amount. Once the Trust has paid a total amount equal to the Settlement Amount to defend, indemnify and hold harmless Lloyd's Underwriters, or any one or more of them, the Trust's obligation to defend, indemnify and hold harmless Lloyd's Underwriters with respect to Asbestos PI Claims subject to the Asbestos PI Channeling Injunction shall cease.

Claims subject to the indemnification and hold harmless obligations of Reorganized Debtors, or the Trust, as applicable, subject to this Section V.(A) shall be referred to hereinafter as "Indemnified Claims."

B.    Notice of Indemnified Claims

Lloyd's Underwriters shall forward promptly to Reorganized Debtors, or the Trust, as applicable, any demand, notice, summons or other process (an "Indemnified Claim Notice") received by them in connection with any Indemnified Claim. Reorganized Debtors, or the Trust,

28

as applicable, shall promptly, and in any event within ten (10) Business Days of receipt of an Indemnified Claim Notice, acknowledge in writing their obligations under this Amended Agreement in connection with the Indemnified Claim and shall in fact assume responsibility for the defense of the Indemnified Claim as hereinafter set forth.  To the extent that Reorganized Debtors, or the Trust, as applicable, do not agree that the Claim so submitted is an Indemnified Claim pursuant to this Amended Agreement, Reorganized Debtors, or the Trust, as applicable, shall so inform Lloyd's Underwriters, in writing, within ten (10) Business Days of receipt of such Indemnified Claim Notice.  Reorganized Debtors, or the Trust, as applicable, shall solicit and consider the views and obtain the consent of Lloyd's Underwriters in choosing counsel to defend an Indemnified Claim, which consent shall not be unreasonably withheld.  Following solicitation and consideration of the views of Lloyd's Underwriters, Reorganized Debtors, or the Trust, as applicable, shall have the right and the obligation to direct the defense of the Indemnified Claim; provided, however, that:

1.      Reorganized Debtors, or the Trust, as applicable, shall take no position on behalf of Lloyd's Underwriters with respect to an Indemnified Claim, substantive or procedural, without Lloyd's Underwriters' consent;

2.      In any filing with a Court, Reorganized Debtors, or the Trust, as applicable, shall state in the caption of the filing that it is filed by them "as indemnitor of Lloyd's Underwriters."  Unless waived in writing, every representation and filing made by counsel retained by Reorganized Debtors, or the Trust, as applicable, shall contain the following disclaimer: "Lloyd's Underwriters have settled the claims that are the subject of this action concerning policies.  Accordingly, Lloyd's Underwriters now take

29

no position with respect to these policies. All statements and positions are solely those of Reorganized Debtors [or the Trust, as applicable,] and shall not constitute any representation or admission by Lloyd's Underwriters";

3.    Reorganized Debtors, or the Trust, as applicable, shall provide Lloyd's Underwriters with draft copies of all pleadings, briefs, discovery requests and responses, and other court papers and correspondence sufficiently in advance of filing, service or mailing to permit a reasonable opportunity to review and comment on same; and

4.    Reorganized Debtors, or the Trust, as applicable, shall resist production of documents, information and witnesses of Lloyd's Underwriters if Lloyd's Underwriters determines and so advises Reorganized Debtors, or the Trust, as applicable, that they are not properly discoverable. Any production of documents, information or witnesses of Lloyd's Underwriters shall be made only as expressly authorized by Lloyd's Underwriters and only pursuant to applicable discovery rules, including subpoena rules.

C.    <u>Authority to Settle Indemnified Claims</u>

Provided that Reorganized Debtors, or the Trust, as applicable, have timely accepted the tender of any Indemnified Claim and are fully complying with their obligations regarding the defense of such Indemnified Claim, Reorganized Debtors, or the Trust, as applicable, shall have the sole right to settle any tendered Indemnified Claim for which they take responsibility and

Lloyd's Underwriters shall not settle any Indemnified Claim without the prior written consent of Reorganized Debtors, or the Trust, as applicable.

D.    Failure to Defend Indemnified Claims

Should Reorganized Debtors, or the Trust, as applicable, fail to timely respond to the tender of any Indemnified Claim or fail to fully comply with their obligations regarding such Indemnified Claim, Lloyd's Underwriters shall be free to defend such Indemnified Claim as they, in their sole discretion, deem appropriate and to settle any such Indemnified Claim as they see fit. Reorganized Debtors, or the Trust, as applicable, shall not be permitted to object to, contest or otherwise challenge Lloyd's Underwriters' actions in defending any such Indemnified Claim and the reasonableness of any such settlement absent fraud or bad faith on the part of Lloyd's Underwriters, and Reorganized Debtors, or the Trust, as applicable, shall fully reimburse Lloyd's Underwriters for all expenses they incur in the legal defense and settlement of such Indemnified Claim.

E.    No Waiver of Attorney-Client Privilege

Nothing in this Amended Agreement shall be construed or asserted to be a waiver of Lloyd's Underwriters' or Grace's or Reorganized Debtors', or the Trust's, as applicable, attorney-client privilege, or any other privilege or immunity, in connection with any Indemnified Claim, nor shall anything contained herein be construed as evidence that any Indemnified Claim is well founded in fact or law.

F.    Third-Party Beneficiaries

The indemnification and hold harmless undertaking set forth in this Section shall also extend to the benefit of the Underwriter Third Party Beneficiaries, which are intended third-party beneficiaries of the terms of this indemnification and hold harmless undertaking with the right to enforce its terms. Notwithstanding the foregoing, the Trust will defend, indemnify and hold harmless Underwriter Third Party Beneficiaries only to the extent that Asbestos PI Claims against such Entities are subject to the Asbestos PI Channeling Injunction.

VI.    **Assignment of Subrogation, Contribution and Reimbursement Rights Against Other Insurers**

A.    Payments Made Under this Amended Agreement

Lloyd's Underwriters shall not seek reimbursement of any payments Lloyd's Underwriters made to or for the benefit of any Grace Party under the Subject Policies, the 1995 London Agreement and the 2006 Agreement, whether by way of a Claim for contribution, subrogation, indemnification or otherwise, from anyone other than Lloyd's Underwriters' reinsurers or retrocessionaires in their capacity as such, except as provided in Section VIII.(C) below. Notwithstanding the foregoing, if a third party pursues a contribution, subrogation, indemnification or similar Claim against Lloyd's Underwriters relating to any of the Subject Policies, the 1995 London Agreement or the 2006 Agreement, then Lloyd's Underwriters shall be free to assert such a Claim against such third party, to the extent permitted by the Plan. To the extent Lloyd's Underwriters recover any amount from such third party, the net proceeds of such recovery (after any payment made by Lloyd's Underwriters to such third party on its Claim and after Lloyd's Underwriters are reimbursed from such proceeds for their fees, costs and expenses incurred in prosecuting or defending such Claims) shall be paid by Lloyd's Underwriters

32

promptly to the Settlement Account Agent for deposit in the Settlement Account, or directly to the Trust if such recovery occurs after the Trigger Date. The Grace Parties and the Trust shall use reasonable best efforts to obtain from all insurers with which they settle agreements similar to those contained in this Section VI.(A).

B.     Payments Received from Other Insurers

In the event that the Trigger Date occurs and:

1.     Grace, the Reorganized Debtors, or the Trust, as applicable, and/or any other Entity becomes entitled to receive a payment from one or more of the insurers other than Lloyd's Underwriters for any Claims that have been remised, released, acquitted and forever discharged as against Lloyd's Underwriters pursuant to this Amended Agreement, and

2.     as a result of such other insurer's obligation to pay described in Section VI.(B)(1) above, such insurer either:

a.     enters into a settlement with Lloyd's Underwriters, which settlement has been consented to by Grace, the Reorganized Debtors, or the Trust, as applicable, and any other Entity (as applicable), requiring Lloyd's Underwriters to reimburse some or all of the payment made or to be made by such insurer; or

b.     obtains a final, non-appealable judicial or quasi-judicial determination or award entitling such insurer to obtain a sum certain from Lloyd's Underwriters for contribution, subrogation or indemnification or other similar Claim, against Lloyd's

33

Underwriters for their alleged share or equitable share, or to enforce subrogation rights, if any, relating to such payment referenced in Section VI.(B)(1) above,

the Entity entitled to receive such payment shall voluntarily reduce the amount of payment to be received by them (referenced in Section VI.(B)(1) above) by the amount necessary to reduce or eliminate such settlement, determination or award against Lloyd's Underwriters (referenced in Section VI.(B)(2) above).

To ensure that such a reduction is accomplished, Lloyd's Underwriters shall be entitled to assert this Section VI. as a defense to any action against them for any such portion of the determination or award against Lloyd's Underwriters (referred to in Section VI.(B)(2) above) and shall be entitled to have the court or appropriate tribunal issue such orders as are necessary to effectuate the reduction to protect Lloyd's Underwriters from any liability for the determination or award. Grace, the Reorganized Debtors, or the Trust, as applicable, and/or any other Entity (as applicable) agrees that in any proceeding against other insurers in which Grace, the Reorganized Debtors, or the Trust, as applicable, and/or any other Entity makes a claim for insurance rights or benefits for any Claim that may give rise to the events referenced in Section VI.(B)(1) above, they will provide notice to Lloyd's Underwriters of such Claim within thirty (30) days of the time Grace and/or the Reorganized Debtors, or the Trust, as applicable, first becomes aware that such Claim is reasonably likely to result in a claim against Lloyd's Underwriters and shall consent to Lloyd's Underwriters' intervention in any such proceeding to the extent that Lloyd's Underwriters seek to intervene to effectuate the intent of this Section VI.

34

## VII.    Bankruptcy Obligations

### A.    Designation of Lloyd's Underwriters and Underwriter Third Party Beneficiaries as Settled Asbestos Insurance Companies

The Debtors shall designate (i) Lloyd's Underwriters, and (ii) Underwriter Third Party Beneficiaries, to the fullest extent, but only to the extent, such Underwriter Third Party Beneficiaries are eligible for protection under Bankruptcy Code Section 524(g), as Settled Asbestos Insurance Companies on Exhibit 5 of the Exhibit Book to the Plan. The Parties agree that the designation: "Lloyd's Underwriters and Underwriter Third Party Beneficiaries, all as defined in the Amended and Restated Settlement Agreement and Mutual Release" is an acceptable designation for the list of Settled Asbestos Insurance Companies. Such list shall also set forth the Subject Policies identified on Attachment A hereto and shall describe the presently unknown Subject Policies in substantially the same terms set forth in Section I.(DD)(2).

### B.    Trust Bound by Amended Agreement

The Debtors shall use their reasonable best efforts to cause the Confirmation Order to provide that the Trust shall be bound by this Amended Agreement as if the Trust had been a Party hereto as of the Execution Date, or to cause the Trust to execute a written agreement, in form and substance satisfactory to the Parties, binding the Trust to the Terms of this Amended Agreement as if the Trust had been a Party hereto as of the Execution Date.

### C.    Grace Committees' Approval

By executing this Amended Agreement, Lloyd's Underwriters confirm receipt of such written approval of this Amended Agreement and the releases contained herein from the Grace Committees.

D.      Obligations of the Parties

Promptly following the Execution Date, the Debtors will prepare and file a Motion to approve this Amended Agreement with the Bankruptcy Court, which Motion shall be in form and substance reasonably satisfactory to Lloyd's Underwriters. The Debtors will use their reasonable best efforts promptly to obtain entry of the Approval Order, and promptly to obtain entry of the Approval Order as a Final Order. Lloyd's Underwriters, at their own expense, will cooperate with the Debtors in obtaining the Approval Order. The Debtors will use their reasonable best efforts to cause the Approval Order to provide, among other things:

1.      that, effective on the Trigger Date, (i) Lloyd's Underwriters, and (ii) Underwriter Third Party Beneficiaries, to the extent such Entities are eligible for protection under Bankruptcy Code Section 524(g), will be designated as Settled Asbestos Insurance Companies with respect to the Subject Policies on Exhibit 5 of the Exhibit Book to the Plan; and

2.      That the terms of this Amended Agreement are approved in their entirety, including the provisions relating to defense and indemnification of Lloyd's Underwriters set forth in Section V.

After the Approval Order becomes a Final Order, Lloyd's Underwriters shall not object to or oppose confirmation of a plan of reorganization for the Debtors so long as it meets the definition of Plan set forth in Section I.(U) hereof, or Lloyd's Underwriters waive the requirements of Section I.(U) or any of them, and shall not appeal the Confirmation Order, unless this Amended Agreement becomes null and void pursuant to its terms.

E.    No Prejudice of Lloyd's Underwriters' Rights under Amended Agreement

After the Trigger Date, the Grace Parties and the Trust shall not seek to terminate, reduce or limit the scope of the Asbestos PI Channeling Injunction with respect to (i) Lloyd's Underwriters, and (ii) Underwriter Third Party Beneficiaries, to the extent such Entities are eligible for protection under Bankruptcy Code Section 524(g), and shall oppose any such efforts by other Entities to do so. In addition, the Grace Parties and the Trust shall not take any other action that would prejudice the rights of Lloyd's Underwriters and/or Underwriter Third Party Beneficiaries under this Amended Agreement and they shall oppose any such efforts by other Entities to do so.

F.    No Impairment of this Amended Agreement

No ruling, proceeding or other matter in connection with the confirmed Plan or the Chapter 11 Reorganization Cases will impair, affect or modify the Parties' rights or obligations under this Amended Agreement, and the Debtors shall exercise reasonable best efforts to ensure that the Confirmation Order expressly will so affirm. For the avoidance of doubt, this Section VII.(F) is not intended to impair, affect or modify the Parties' rights or obligations under this Amended Agreement, including the Parties' rights under this Section VII.

## VIII.    Termination of Amended Agreement

A.    Conditions for Termination by Any Party

Any Party may terminate this Amended Agreement and render this Amended Agreement null and void by providing written notice of termination to the other Parties and the Grace Committees within one-hundred twenty (120) days of the occurrence of any of the below described conditions of termination:

1.     The Chapter 11 Reorganization Cases of W. R. Grace & Co. or W.R. Grace & Co.-Conn. are dismissed or converted into Chapter 7 cases.

2.     The Bankruptcy Court decides not to enter the Approval Order, the Approval Order is not entered by the Bankruptcy Court prior to the conclusion of the Confirmation Hearing (subject to Lloyd's Underwriters' right to waive or extend this timing condition), or the Approval Order is modified or reversed on appeal and therefore does not become a Final Order.

B.     Conditions for Termination by Lloyd's Underwriters

Lloyd's Underwriters, at their sole option, may terminate this Amended Agreement and render this Amended Agreement null and void by providing written notice of termination to the Grace Parties and the Grace Committees within one hundred twenty (120) days of the occurrence of any of the below described conditions of termination:

1.     The Approval Order as entered by the Bankruptcy Court or as modified on appeal

a.     does not provide that (i) Lloyd's Underwriters, and (ii) Underwriter Third Party Beneficiaries, to the extent such Entities are eligible for protection under Bankruptcy Code Section 524(g), will be designated as Settled Asbestos Insurance Companies on Exhibit 5 of the Exhibit Book to the Plan; or

38

b.     does not approve the provisions relating to defense and indemnification of Lloyd's Underwriters set forth in Section V. of this Amended Agreement.

2.     (i) Lloyd's Underwriters, and (ii) Underwriter Third Party Beneficiaries, to the extent such Entities are eligible for protection under Bankruptcy Code Section 524(g), are not properly designated as Settled Asbestos Insurance Companies on Exhibit 5 of the Exhibit Book to the Plan with respect to the Subject Policies pursuant to the Plan as of the time the Confirmation Order is entered by the Bankruptcy Court or as of the time the Confirmation Order becomes a Final Order.

3.     The Confirmation Order has not been entered by the Bankruptcy Court by close of business on December 31, 2013, or such later date to which the Parties agree.

4.     A confirmation order is issued and the plan of reorganization confirmed does not meet the definition of Plan set forth in Section I.(U).

5.     The Confirmation Order fails to provide that the Trust shall be bound by this Amended Agreement as if the Trust had been a Party hereto as of the Execution Date, and the Trust fails to execute a written agreement, in form and substance satisfactory to the Parties, binding the Trust to the Terms of this Amended Agreement as if the Trust had been a Party hereto as of the Execution Date, within sixty (60) days of the Effective Date.

Failure by Lloyd's Underwriters to give timely written notice of termination following the occurrence of a condition of termination shall be deemed a permanent waiver of such condition by Lloyd's Underwriters.

C.    Reimbursement of Settlement Amount Following Termination Under Section VIII.(A), (B) or (D)

If this Amended Agreement is terminated and rendered null and void pursuant to Section VIII.(A), (B) or (D), Lloyd's Underwriters shall be immediately entitled to reimbursement of the Settlement Amount plus any interest or investment income accrued on the Settlement Amount (minus (i) any reasonable and proper costs incurred by the Settlement Account Agent; (ii) any reserves required under the Settlement Account Agreement to be held for the payment of taxes, indemnities or otherwise; or (iii) losses incurred under any investment of the Settlement Amount permissible under the Settlement Account Agreement) held in the Settlement Account or due pursuant to Section II.(D) from any Berkshire Company holding the Settlement Amount but not yet paid by such Berkshire Company, and the Parties shall so direct the Settlement Account Agent or the Berkshire Company that received the Settlement Amount, as applicable.  To the extent that Settlement Funds are held in the Settlement Account at the time of termination under Section VIII.(A), (B) or (D), the Settlement Account Agent shall disburse the funds as provided in Section 2.6 of the Settlement Account Agreement.  While all Parties are required to provide the direction set forth above in the event of termination of this Amended Agreement, the Settlement Account Agent shall disburse the funds at the direction of Lloyd's Underwriters, Resolute or any future run-off agent for Lloyd's Underwriters, including Resolute Management, Inc., upon the notices, certifications, orders or arbitration decisions provided for in Section 2.6 of

40

the Settlement Account Agreement whether all Parties provide the direction set forth above or not.

D.    Conditions for Termination by the Trust

In the event that a Berkshire Company receives the Settlement Amount and fails to make the payment to the Trust required by Section II.(E) of this Amended Agreement, the Trust is entitled to terminate the Amended Agreement and declare it null and void or seek to enforce it, at its option, provided that the Trust must provide written notice to Lloyd's Underwriters and the Berkshire Company of its intent to terminate the Amended Agreement within thirty (30) days of the last date the Settlement Amount was required to be paid to the Trust pursuant to Section II.(E) or forever waive its right to terminate the Amended Agreement on this ground.

E.    Dispute Resolution

Any dispute among the Parties arising out of or relating to the right to terminate under this Section shall be finally resolved by binding arbitration in accordance with the International Institute for Conflict Resolution & Resolution's Rules for Non-Administered Arbitration then currently in effect by a sole arbitrator.  Such arbitration must be held in New York or Washington D.C. and resolved on an expedited basis, and must be completed with an award by the arbitrator entered no more than ninety (90) days from the date any Party demands arbitration. The arbitration shall be governed by the Federal Arbitration Act, 9 U.S.C. §§1-16, and judgment upon the award rendered by the arbitrator(s) may be entered by any court having jurisdiction thereof.  Each Party shall bear its own fees and costs incurred in connection with such arbitration.

41

F.    Provisions Surviving Termination

Notwithstanding anything in this Amended Agreement to the contrary, in the event this Amended Agreement terminates, is ineffective, and/or is null and void pursuant to this Section VIII.:

1.    This Amended Agreement, other than Sections I., VIII., XI.(A-B) and XII. through XIX. (which Sections shall remain in full force and effect), shall be vitiated and shall be a nullity and shall be void ab initio;

2.    The Settlement Funds shall be reimbursed to Lloyd's Underwriters as provided in Section VIII.(C);

3.    None of the Parties shall be bound by the terms of any Approval Order;

4.    Lloyd's Underwriters and the Underwriter Third Party Beneficiaries shall not be designated as Settled Asbestos Insurance Companies, and Lloyd's Underwriters shall neither seek nor receive any benefit or protection of a Settled Asbestos Insurance Company under the Plan;

5.    The Parties shall have the rights, defenses and obligations under or with respect to the Subject Policies, the 1995 London Agreement or any other agreement between the Parties relating to the Subject Policies, other than the 2006 Agreement, that they would have had absent this Amended Agreement,

6.    The releases provided in Section IV. shall become null and void ab initio;

42

7.    Lloyd's Underwriters shall be free to pursue their objections to any plan of reorganization and to appeal from any confirmation order; and

8.    Any otherwise applicable statutes of limitations or repose, or other time-related limitations, shall be deemed to have been tolled for the period from the Execution Date through the date that the Amended Agreement becomes null and void, and no Party shall assert, plead, raise or otherwise rely on or take advantage, whether actively or passively, of any time-related defense to any Claim by any other Party related to such period and if any Party breaches this obligation, it shall be deemed to have created a new cause of action against it at the time of such breach for which it shall be liable in damages equal to the amount of damages it avoided by reason of the breach.  This covenant shall be deemed to last for the maximum time period allowed by applicable law as provided in Section XV.

G.    <u>No Termination for Wrongful Acts</u>

Except as otherwise expressly provided herein, in the event that a Party asserts that any action or refusal to take action that is required by this Amended Agreement is wrongfully taken or not taken by a Party, the Party so asserting may not claim that the Amended Agreement is terminated, but must pursue such rights as it has to enforce the Amended Agreement against the Party asserted to have been in breach.

43

## IX.    Cooperation on Document and Information Sharing

### A.    Allocation of Settlement Amount to Subject Policies

Lloyd's Underwriters may prepare an allocation of the Settlement Amount (or a grossed up amount where appropriate) to the Subject Policies from which the shares allocated to insolvent insurers that subscribed to one or more of the Subject Policies can be derived. If Lloyd's Underwriters prepare such an allocation, Lloyd's Underwriters shall cooperate (beginning as of the Execution Date) with the Grace Parties or the Trust, as applicable, by directing London Market Claims Service ("LMCS") or other similar Entity to provide (upon reasonable notice, at the requesting Party's expense (provided that the requesting Party shall have no obligation to pay any internal costs of Lloyd's Underwriters, including costs associated with time and expenses of any of Lloyd's Underwriters' employees), and in a manner convenient to Lloyd's Underwriters) to the administrator/liquidator of any insolvent company or solvent company in a solvent scheme that company's share, if any, allocated on a per policy and per year basis. Such allocation will be provided directly to the administrator/liquidator of such insolvent company or solvent company in a solvent scheme, and will not be provided directly to the Grace Parties or the Trust, or any broker. Lloyd's Underwriters shall notify the Grace Parties within thirty (30) days after such companies have been provided with the information set forth above, of the names and addresses of the persons to whom such information was provided and the date(s) on which such information was provided. Any such allocation shall not bind the Grace Parties or the Trust, and shall not affect Lloyd's Underwriters' payment obligations under this Amended Agreement. This Section IX.(A) is solely for the benefit of the Grace Parties and the Trust to enable them to pursue claims against insolvent companies or solvent companies in solvent schemes.

44

B.    Reorganized Debtors' and the Trust's Obligation to Provide Information

After the Trigger Date, Lloyd's Underwriters shall have the right (upon reasonable notice and in a manner convenient to the Reorganized Debtors and the Trust), to review and obtain from the Reorganized Debtors or the Trust, as applicable, relevant files, information and documents in the possession of Reorganized Debtors or the Trust:

1.    concerning Asbestos PI Claims subject to payment or potential payment with the proceeds of this Amended Agreement, and/or

2.    required of or necessary to Lloyd's Underwriters in connection with any Claims, arbitrations or litigation for reinsurance for the Settlement Amount or in connection with this Amended Agreement.

C.    Specific Information to be Provided

For the avoidance of doubt, the relevant files, information and documents referenced to in Section IX.(B) above shall include:

1.    information from any database maintained by Reorganized Debtors or to which they have the right to obtain access from the Trust, or by the Trust, any information that Reorganized Debtors collect or to which they have the right to obtain access from the Trust, or that the Trust collects, in connection with the payment of Asbestos PI Claims; and

2.    for each Asbestos PI Claim resolved:

a.    the Claimant's name;

b.    a claim number;

45

c.      jurisdiction;

d.      status (open or closed);

e.      date of first exposure as set forth in the complaint or as reflected by information reasonably available to Reorganized Debtors or the Trust;

f.      alleged disease and, to the extent reasonably available to Reorganized Debtors or the Trust, the date of diagnosis; and

g.      the amount of indemnity paid.

D.      Duty of Cooperation

As of the Trigger Date, Reorganized Debtors or the Trust, as applicable, shall reasonably cooperate in obtaining and providing the files, information and documents referred to in Section IX.(B) above at Lloyd's Underwriters' reasonable request and expense (provided that Lloyd's Underwriters shall have no obligation to pay any internal costs of Reorganized Debtors or the Trust, including costs associated with time or expenses of Reorganized Debtors' of the Trust's employees). For the avoidance of doubt and without limitation of the foregoing, Reorganized Debtors and the Trust shall undertake all reasonable actions to cooperate with Lloyd's Underwriters in connection with their reinsurers, including (upon reasonable notice, at Lloyd's Underwriters' expense other than internal costs of Reorganized Debtors or the Trust, and in a manner convenient to Reorganized Debtors) responding to reasonable requests for information and meeting with representatives of reinsurers. Such cooperation shall include providing Lloyd's Underwriters' representative access to all claim files related to Asbestos PI Claims maintained by Reorganized Debtors or to which they have the right to obtain access from the

46

Trust, or by the Trust, including all product exposure, medical, claim status, and payment records contained in such files.

E.    Information Subject to Disclosure

For avoidance of doubt, the files, information and documents subject to this Section IX. are limited to those in the possession of Reorganized Debtors or the Trust, including their counsel and consultants.

F.    No Effect on Liability

For the avoidance of doubt, this Section IX., and any results of such a review:

1.    shall not affect Lloyd's Underwriters' obligations under this Amended Agreement;

2.    shall not obligate Reorganized Debtors or the Trust to collect any information from any Claimant that they are not otherwise obligated to collect; and

1.    shall not give Lloyd's Underwriters and/or the Underwriter Third Party Beneficiaries any right to challenge the allowance or payment of any Claim by Reorganized Debtors or the Trust.

G.    Disclosure of Confidential Materials

Lloyd's Underwriters shall not provide any Report (as defined in Section IX.(I) hereto), results, files, information or documents obtained by Lloyd's Underwriters pursuant to this Section IX. (the "Materials") to any other Entity and shall keep the Materials confidential, except

47

that Lloyd's Underwriters may provide the Materials to Entities identified in XI.(D). Lloyd's Underwriters shall exercise their reasonable best efforts to maintain the confidentiality of the Materials, including seeking a confidentiality pledge from any Entity with which they share the Materials and seeking a protective order in any proceeding in which they use the Materials, but Lloyd's Underwriters' right to disclose any portion of the Materials to any of the Entities identified in Section XI.(D) shall not be affected if their reasonable best efforts do not result in a confidentiality pledge being given or a confidentiality order being entered.

H.    Use of Confidential Materials

Lloyd's Underwriters may use Material solely in connection with:

1.    the Chapter 11 Cases; or

2.    in any proceeding to obtain reinsurance with respect to the Settlement Amount or this Amended Agreement; or

3.    Lloyd's Underwriters' compliance with applicable laws or regulations.

For the avoidance of doubt, Lloyd's Underwriters may not use the Materials to build a database of information regarding Asbestos PI Claims or Claimants for use other than in the Chapter 11 Cases or in pursuit of reinsurance for their payment of the Settlement Amount under this Amended Agreement.

I.    Furnishing Reports

At the sole discretion of Reorganized Debtors or the Trust, the obligations under Section IX.(B-C) above may be satisfied by providing Lloyd's Underwriters' representatives on

a quarterly and annual basis with a report (each, a "Report") concerning Asbestos PI Claims activity with respect to the time period that is the subject of Lloyd's Underwriters' request for relevant files, information and documents. Notwithstanding anything to the contrary in this Section IX., Reorganized Debtors or the Trust shall not be required to include in any Report any information that is not required to be collected under the confirmed Plan unless such information is in fact collected. If the following information is required to be collected under the confirmed Plan (or is in fact collected), such Reports shall include:

1.   the number of total Claims filed, pending, settled, dismissed or that went to judgment, the total indemnity paid, and total expense paid; and

2.   with respect to each Claim resolved during the relevant period:

    a.   the Claimant's name;

    b.   the claim number;

    c.   jurisdiction;

    d.   status (open or closed);

    e.   the date of first exposure as set forth in the complaint or as reflected by information reasonably available to Reorganized Debtors or the Trust;

    f.   the asbestos product(s) or premises for which a Grace Party is alleged to be responsible and to which the Claimant alleges exposure;

    g.   the Entity(ies) among the Grace Parties that the Claimant alleges caused his injury;

    h.   the alleged disease and the date of diagnosis;

    i.   whether there is a medical diagnosis of the alleged disease;

    j.   date of death if applicable; and

49

k.      the amount of indemnity paid.

If Reorganized Debtors or the Trust exercises the discretion to provide Reports to Lloyd's Underwriters pursuant to this Section IX.(I), Reorganized Debtors and the Trust shall still be obligated, at the request of Lloyd's Underwriters (upon reasonable notice, at Lloyd's Underwriters' sole expense, and in a manner convenient to Reorganized Debtors or the Trust, as applicable) to make available to Lloyd's Underwriters files, information and documents described in this Section IX. that relate to the Asbestos PI Claims that are the subject of the Report.

J.      No Social Security Numbers

Notwithstanding any of the foregoing, nothing in this Section IX. shall obligate Reorganized Debtors or the Trust to provide the Social Security Identification Number of any Claimant beyond the last four digits.

X.      **Reasonably Equivalent Value**

The Parties acknowledge and agree that:

A.      This Amended Agreement was bargained for and entered into in good faith and as the result of arm's length negotiations.

B.      Based on their respective independent assessments, with the assistance and advice of counsel, of the Chapter 11 Cases, and other matters, the consideration exchanged by the Parties pursuant to this Amended Agreement (including the payments made by Lloyd's Underwriters pursuant to the 2006 Agreement, the mutual releases, the designations of (i) Lloyd's Underwriters, and (ii) Underwriter Third Party Beneficiaries, to the extent such Entities are eligible for protection under Bankruptcy Code Section 524(g), as Settled Asbestos Insurance

50

Companies, and the other benefits exchanged by the Parties) constitute a fair and reasonable settlement of the Parties' disputes and of their respective rights and obligations relating to the Subject Policies and the 1995 London Agreement and constitute reasonably equivalent value.

## XI.   Confidentiality and Press Release

### A.   Settlement Negotiations

Settlement negotiations leading up to this Amended Agreement, all information exchanged between the Parties in connection with such negotiations, and all related discussions, are confidential and shall be deemed to fall within the protection afforded to compromises and to offers to compromise by Rule 408 of the Federal Rules of Evidence and any parallel state law provisions and shall not be disclosed by either Party except as permitted in this Section XI.

### B.   Protection of Confidential Information

In the event that a private litigant (other than a Party to this Amended Agreement, the Reorganized Debtors, or the Trust), by way of document request, interrogatory, subpoena or questioning at deposition or trial, attempts to compel disclosure of anything protected by this Section XI., the Party from whom disclosure is sought shall decline to provide the requested information on the ground that this Amended Agreement prevents such disclosure. In the event that such private litigant seeks an order from any court or governmental body to compel such disclosure, or in the event that a court, government official or governmental body (other than the Inland Revenue, Internal Revenue Service, Securities and Exchange Commission or Financial Services Authority) requests or requires disclosure of anything protected by this Section XI., the Party from whom disclosure is sought promptly shall give written notice by facsimile or hand-delivery to the other Party, and promptly shall provide copies of all notice papers, orders,

requests or other documents in order to allow each Party to take such protective steps as may be appropriate. All costs incurred by a Party in accordance with this provision shall be the sole responsibility of the Party incurring such costs.

C.    Press Releases

Any Party issuing a press release concerning this Amended Agreement within thirty (30) days after the Execution Date shall provide the other Parties with a draft copy for comment (but not approval) no later than twenty-four (24) hours before issuance.

D.    Permitted Disclosures

Notwithstanding anything in this Section XI., nothing in this Amended Agreement shall prevent any Party from disclosing or releasing information relating to the negotiation of this Amended Agreement in any form and at any time after the Execution Date to:

1.    reinsurers or retrocessionaires of any Lloyd's Underwriter directly or through intermediaries or as otherwise necessary in connection with proceedings to obtain reinsurance with respect to the Settlement Amount or this Amended Agreement;

2.    outside auditors, attorneys or accountants of any Party;

3.    the Underwriter Third Party Beneficiaries;

4.    to the extent required by law, including, to the extent applicable, to the Inland Revenue, the Internal Revenue Service, the Securities and

52

Exchange Commission, the Financial Services Authority or other U.S., U.K. or other governmental authority that properly requires disclosure by a Party hereto;

5.  to the extent and in any form that such information is required to be disclosed or released to satisfy reporting requirements imposed by law, including any Federal securities laws; and

6.  in connection with the approval of this Amended Agreement by the Bankruptcy Court.

## XII.  Non-Prejudice and Construction of Amended Agreement

### A.  Character of This Amended Agreement

This Amended Agreement is not a contract of insurance. This Amended Agreement is not subject to rules or construction governing contracts of insurance, including the doctrine of contra proferentum. This Amended Agreement is a compromise between the Parties and shall not be construed as an admission of coverage under the Subject Policies, nor shall this Amended Agreement or any provision hereof be construed as a waiver, modification or retraction of the positions of the Parties with respect to the interpretation and application of the Subject Policies.

### B.  Scope of this Amended Agreement

This Amended Agreement is the product of informed negotiations and involves compromises of the Parties' previously stated legal positions. Accordingly, this Amended Agreement does not reflect upon the Parties' views as to rights and obligations with respect to matters or Entities outside the scope of this Amended Agreement. This Amended Agreement is

53

without prejudice to positions taken by Lloyd's Underwriters with regard to other insureds, and without prejudice to positions taken by Debtors and/or the Reorganized Debtors or the Trust with regard to other insurers. Except for the express references to unidentified Lloyd's Underwriters and the Underwriter Third Party Beneficiaries, the Parties specifically disavow any intention to create rights in third parties under or in relation to this Amended Agreement.

### C.    Construction of this Amended Agreement

This Amended Agreement is the jointly drafted product of arm's length negotiations between the Parties with the benefit of advice from counsel, and the Parties agree that it shall be so construed. As such, no Party will claim that any ambiguity in this Amended Agreement shall, as a matter of law, be construed against the other Party.

### XIII. Modification

Except as expressly provided herein, no change or modification of this Amended Agreement shall be valid unless it is made in writing and signed by the Parties. In the event that any Party is dissolved or otherwise ceases to exist, the remaining Parties may modify this Amended Agreement without that Party's consent.

### XIV. Integration

### A.    Entire Agreement

This Amended Agreement, including its Attachments, constitutes the entire agreement and understanding among the Parties with respect to the subject matter hereof, and supersedes all discussions, agreements and understandings, both written and oral, among the Parties with respect hereto. Except as expressly set forth in this Amended Agreement, there are no

representations, warranties, promises or inducements, whether oral, written, expressed or implied, that in any way affect or condition the validity of this Amended Agreement or alter its terms. If the facts or law related to the subject matter of this Amended Agreement are found hereafter to be other than is now believed by any of the Parties, the Parties expressly accept and assume the risk of such possible difference of fact or law and agree that this Amended Agreement nonetheless shall be and remain effective according to its terms. This Amended Agreement shall have perpetual existence except as provided herein. Upon the Approval Order becoming a Final Order, this Amended Agreement shall also supersede all prior agreements between the Parties relating to the subject matter of this Amended Agreement, including the 1995 London Agreement and the 2006 Agreement and other agreements that have been entered into by the Parties that relate to the Subject Policies and such other agreements shall become null and void; provided, however, that if this Amended Agreement is terminated in accordance with Section VIII, any agreements between the Parties in effect immediately prior to the 2006 Agreement, including but not limited to the 1995 London Agreement, shall remain in effect as between the Parties. Notwithstanding the foregoing, the Settlement Account Agreement, a copy of which is appended hereto as Attachment C, will remain in full force and effect.

B.    Titles and Captions

Titles and captions contained in this Amended Agreement are inserted only as a matter of convenience and are for reference purposes only. Such titles and captions are intended in no way to define, limit, expand or describe the scope of this Amended Agreement or the intent of any provision hereof.

## XV.    Governing Law

This Amended Agreement shall be governed by, and shall be construed in accordance with, the laws of the State of Delaware without regard to its choice of law rules. Nothing in this Section XV. shall affect what law would govern the interpretation or application of the Subject Policies.

## XVI.    Representations

Each Party represents and warrants that it has authority to execute this Amended Agreement as its binding and legal obligation, and the Debtors represent and warrant that they have the authority to execute this Amended Agreement as the binding and legal obligation of all Parties within the definition of the Grace Parties (subject, however, in the case of the Debtors, to the requirement that the Approval Order be entered). Each Party represents and warrants that the persons signing this Amended Agreement on its or their behalf is authorized to execute this Amended Agreement (subject, however, in the case of the Debtors to the requirement that the Approval Order be entered).

## XVII.    Execution and Authority

### A.    Originals and Counterparts

There will be two (2) signed originals of this Amended Agreement, which may be executed in duplicate counterparts, each of which shall be deemed an original and all of which shall constitute one and the same instrument. Each counterpart may be delivered by facsimile transmission or by e-mailing a scanned version, and a faxed or scanned signature shall have the same force and effect as an original signature.

B.      Authority of Resolute and Designation of Attorney-in-Fact

The Parties agree and acknowledge that Resolute presently acts as run-off agent for Lloyd's Underwriters, and that, in its capacity as run-off agent, Resolute, and any future run-off agent for Lloyd's Underwriters, including Resolute Management, Inc., has authority to act and to designate and authorize signatories for Lloyd's Underwriters with respect to any and all of Lloyd's Underwriters' rights and obligations under this Amended Agreement.    Lloyd's Underwriters have designated James Sottile, Esquire, as their attorney-in-fact for the limited purpose of executing this Amended Agreement on their behalf with express authority to do so.

## XVIII. Notices, Consent to Jurisdiction and Service of Suit

Unless another person is designated, in writing, for receipt of notices hereunder, any and all statements, communications or notices to be provided pursuant to this Amended Agreement shall be in writing and sent by next Business Day courier service, with receipt or tracking number requested, postage prepaid (except as otherwise specified in this Amended Agreement). In addition, Grace shall provide to the Grace Committees copies of all notices, instructions and other notifications which Grace sends or receives under the Settlement Account Agreement, such copies to be provided at the time Grace sends such notice, instruction or other notification, or within one Business Day after Grace receives such notice, instruction or other notification. Such notices to the Parties shall be sent to the following:

If to the Grace Parties:                    W. R. Grace & Company
                                            7500 Grace Drive
                                            Columbia, Maryland  21044
                                            Attn:  Secretary

                                            Fax:  (410) 531-4367

                                            with a copy (which shall not constitute notice)

to :

Theodore L. Freedman
Kirkland & Ellis LLP
Citigroup Center
601 Lexington Avenue
New York, NY 10022-4611

Fax: (212) 446-4900

If to Lloyd's Underwriters:        Resolute Management Services Limited
                                   Claims Division
                                   33 St. Mary Axe
                                   London EC3A 8LL ENGLAND
                                   Attn: Head of Direct Claims

                                   Fax: 011 44 020 7342-2100

                                   with a copy (which shall not constitute notice)
                                   to :

                                   James Sottile
                                   Zuckerman Spaeder LLP
                                   1800 M Street, NW, Suite 1000
                                   Washington, DC 20036-5802

                                   Fax: (202) 822-8106

Notices to the Grace Committees shall be sent to the following:

If to the Official Committee of Asbestos    Peter Van N. Lockwood
Personal Injury Claimants:                  Caplin & Drysdale
                                            One Thomas Circle, NW
                                            Washington, DC 20005

                                            Fax: (202) 429-3301

                                            with a copy (which shall not constitute notice)
                                            to :

                                            Robert M. Horkovich
                                            Anderson Kill & Olick, PC
                                            1251 Avenue of the Americas
                                            New York, NY 10020

58

Fax: (212) 278-1733

If to the Asbestos PI Future Claimants'     David T. Austern
Representative:                             Asbestos PI Future Claimants' Representative
                                           c/o Claims Resolution Management Corporation
                                           3110 Fairview Park Drive, Suite 200
                                           Falls Church, VA 22042-0683

                                           Fax No.: (703) 205-6249

                                           with a copy (which shall not constitute notice)
                                           to :

                                           Orrick, Herrington & Sutcliffe LLP
                                           3050 K Street, N.W., Suite 200
                                           Washington, DC 20007-5135
                                           Attention: Roger Frankel

                                           Fax No.: (202) 339-8500


## XIX.    Binding Effect

This Amended Agreement shall be binding on and inure to the benefit of the successors

and assigns of the Parties.

## XX.    Continuing Court Jurisdiction

The Parties shall not object to the Bankruptcy Court's exercising jurisdiction to resolve

disputes under or concerning this Amended Agreement, its terms and performance, including

disputes concerning the Settlement Account Agreement, whether this Amended Agreement has

or should terminate, whether modifications to the Plan disqualify it as a "Plan" as defined in

Section I.(U), or whether the Trigger Date has occurred. Any Party that is concerned whether an

action it or another Party takes or proposes to take under or with respect to this Amended

Agreement is consistent with or violative of its terms may request from the Bankruptcy Court an

order or instructions so determining. Any Party may seek specific performance from the

59

Bankruptcy Court of the terms of this Amended Agreement by another Party that refuses or fails to take actions or refrain from taking actions required by this Amended Agreement.

IN WITNESS WHEREOF, the Parties have executed this Amended Agreement by their duly authorized representatives.

**W.R. GRACE & CO. ON ITS OWN BEHALF AND ON BEHALF OF ALL PERSONS INCLUDED IN THE DEFINITION OF GRACE PARTIES**

By: _Mark A. Shelnitz_

Name: _MARK A. SHELNITZ_

Title: _VP General Counsel & Sec._

Date: _07/17/2009_

**FOR LLOYD'S UNDERWRITERS**

By: _____

Name: James Sottile

Title: Attorney-in-Fact

Date: _____

60

Bankruptcy Court of the terms of this Amended Agreement by another Party that refuses or fails to take actions or refrain from taking actions required by this Amended Agreement.

IN WITNESS WHEREOF, the Parties have executed this Amended Agreement by their duly authorized representatives.

**W.R. GRACE & CO. ON ITS OWN BEHALF AND ON BEHALF OF ALL PERSONS INCLUDED IN THE DEFINITION OF GRACE PARTIES**

By: _____

Name: _____

Title: _____

Date: _____


**FOR LLOYD'S UNDERWRITERS**

By: _____

Name: James Sottile

Title: Attorney-in-Fact

Date: July 17, 2009

60

**ATTACHMENT A**

**Known Subject Policies**

KⁱE 11466573.3

**Attachment A**
**W R Grace Policies**

| Policy number | Inception | Termination |
|---|---|---|
| 59 / 2209 /2 (1ST YEAR) | 20-Oct-59 | 20-Oct-60 |
| 59 / 2209 / 3 (1ST YEAR) | 20-Oct-59 | 20-Oct-60 |
| 59 / 2209 / 4 (1ST YEAR) | 20-Oct-59 | 20-Oct-60 |
| 59 / 2209 / 5 (1ST YEAR) | 20-Oct-59 | 20-Oct-60 |
| 59 / 2209 / 2 (2ND YEAR) | 20-Oct-60 | 20-Oct-61 |
| 59 / 2209 / 3 (2ND YEAR) | 20-Oct-60 | 20-Oct-61 |
| 59 / 2209 / 4 (2ND YEAR) | 20-Oct-60 | 20-Oct-61 |
| 59 / 2209 / 5 (2ND YEAR) | 20-Oct-60 | 20-Oct-61 |
| 59 / 2209 / 2 (3RD YEAR) | 20-Oct-61 | 20-Oct-62 |
| 59 / 2209 / 3 (3RD YEAR) | 20-Oct-61 | 20-Oct-62 |
| 59 / 2209 / 4 (3RD YEAR) | 20-Oct-61 | 20-Oct-62 |
| 59 / 2209 / 5 (3RD YEAR) | 20-Oct-61 | 20-Oct-62 |
| 66 - 180360 (1ST YEAR) | 17-May-66 | 20-Oct-67 |
| 66- 180360 (2ND YEAR) | 20-Oct-66 | 20-Oct-67 |
| 66- 180360 (3RD YEAR) | 20-Oct-67 | 20-Oct-68 |
| 914 / 1/ 02502 (1ST YEAR) | 20-Oct-68 | 20-Oct-69 |
| 914 /1/ 0110 9 (A) | 14-Nov-69 | 18-Oct-70 |
| 914 / 1/ 4119 | 14-Nov-69 | 30-Jun-70 |
| 914 / 1/02502 (2ND YEAR) | 20-Oct-69 | 20-Oct-70 |
| 914 /1 / 0110 (B) | 20-Oct-70 | 28-Jun-71 |
| 914 / 1/ 4119 (A) | 30-Jun-70 | 30-Jun-71 |
| 914 / 1/02502 (3RD YEAR) | 20-Oct-70 | 28-Jun-71 |
| 944105953 (1ST YEAR) | 30-Jun-71 | 30-Jun-72 |
| 944105953 (2ND YEAR) | 30-Jun-72 | 30-Jun-73 |
| 944105953 (3RD YEAR) | 30-Jun-73 | 30-Jun-74 |
| 74DD862 (1ST YEAR) | 30-Jun-74 | 30-Jun-75 |
| 74DD863C (1ST YEAR) | 17-Jun-74 | 30-Jun-75 |
| 74DD862 (2ND YEAR) | 30-Jun-75 | 30-Jun-76 |
| 74DD863C (2ND YEAR) | 30-Jun-75 | 30-Jun-76 |
| 76DD1594C | 30-Jun-76 | 30-Jun-77 |
| 76DD1595C (PERIOD 1) | 30-Jun-76 | 30-Jun-77 |
| 74DD862 / ON32277 (YR3) | 30-Jun-76 | 30-Jun-77 |
| 74DD863C (3RD YEAR) | 30-Jun-76 | 30-Jun-77 |
| 76DD1594C (PERIOD 2) | 30-Jun-77 | 30-Jun-78 |
| 76DD1595C (PERIOD 2) | 30-Jun-77 | 30-Jun-78 |
| 77DD1831 | 30-Jun-77 | 30-Jun-78 |
| 77DD1832 | 30-Jun-77 | 30-Jun-78 |
| 77DD1829 | 30-Jun-77 | 30-Jun-78 |
| 78DD1594C (PERIOD 3) | 30-Jun-78 | 30-Jun-79 |
| 78DD1595C (PERIOD 3) | 30-Jun-78 | 30-Jun-79 |
| 78DD1417C | 30-Jun-78 | 30-Jun-79 |
| 78DD1418C | 30-Jun-78 | 30-Jun-79 |
| 78DD1419C | 30-Jun-78 | 30-Jun-79 |
| 78DD1420C | 30-Jun-78 | 30-Jun-79 |
| 78DD1633C/PY107779 (1ST YEAR) | 30-Jun-79 | 30-Jun-80 |

| Policy number | Inception | Termination |
|---|---|---|
| 79DD1634C/PY107879 | 30-Jun-79 | 30-Jun-80 |
| 79DD1635C/ PY107979 | 30-Jun-79 | 30-Jun-80 |
| 79DD1635B0 | 30-Jun-79 | 30-Jun-80 |
| PY011779/79DD1637C | 30-Jun-79 | 30-Jun-80 |
| 79DD1636C | 30-Jun-79 | 30-Jun-80 |
| 79DD1633C/ PY107779 (2ND YEAR) | 30-Jun-80 | 30-Jun-81 |
| 80DD1643 / PY107880 (1ST YEAR) | 30-Jun-80 | 30-Jun-81 |
| 80DD1644 / PY107980 | 30-Jun-80 | 30-Jun-81 |
| 80DD1645 / PY108080 | 30-Jun-80 | 30-Jun-81 |
| 80DD1646C/ PY111780 | 30-Jun-80 | 30-Jun-81 |
| 80DD1647/ PY111880 | 30-Jun-80 | 30-Jun-81 |
| 79DD1633C/ PY107779 (3RD YEAR) | 30-Jun-81 | 30-Jun-82 |
| KY001332 | 1-Nov-81 | 30-Jun-82 |
| 80DD1643 / PY107880 (2ND YEAR) | 30-Jun-81 | 30-Jun-82 |
| PY030181 | 30-Jun-81 | 30-Jun-82 |
| PY030281 | 30-Jun-81 | 30-Jun-82 |
| PY030381 | 30-Jun-81 | 30-Jun-82 |
| 82-18828-6 | 30-Jun-82 | 30-Jun-83 |
| KY017882 (1ST YEAR) | 30-Jun-82 | 30-Jun-83 |
| KY017782 (1ST YEAR) | 30-Jun-82 | 30-Jun-83 |
| KY017780 | 30-Jun-82 | 30-Jun-83 |
| KY017882 | 30-Jun-82 | 30-Jun-83 |
| 83-18828-7 | 30-Jun-83 | 30-Jun-84 |
| KY017882 (2ND YEAR) | 30-Jun-83 | 30-Jun-84 |
| KY017782 (2ND YEAR) | 30-Jun-83 | 30-Jun-84 |
| KY048183 (1ST YEAR) | 30-Jun-83 | 30-Jun-84 |
| KY048283 (1ST YEAR) | 30-Jun-83 | 30-Jun-84 |
| KY017882 (3RD YEAR) | 30-Jun-84 | 30-Jun-85 |
| KY017782 (3RD YEAR) | 30-Jun-84 | 30-Jun-85 |
| KY048183 (2ND YEAR) | 30-Jun-84 | 30-Jun-85 |
| KY048283 (2ND YEAR) | 30-Jun-84 | 30-Jun-85 |
| PY276185 | 30-Jun-85 | 30-Jun-86 |
| PY284785 | 30-Jun-85 | 30-Jun-86 |
| PY284885 | 30-Jun-85 | 30-Jun-86 |

**ATTACHMENT B**

Known Lloyd's, London, Syndicate Numbers

K&E 14465733

**Attachment B**
**W R Grace Syndicates**

| | | | |
|---|---|---|---|
| 2 | 219 | 494 | 764 |
| 15 | 223 | 499 | 772 |
| 16 | 231 | 502 | 782 |
| 18 | 235 | 506 | 783 |
| 32 | 238 | 507 | 786 |
| 33 | 239 | 510 | 793 |
| 35 | 243 | 516 | 795 |
| 36 | 250 | 518 | 797 |
| 43 | 263 | 529 | 801 |
| 46 | 274 | 531 | 807 |
| 55 | 276 | 551 | 812 |
| 56 | 278 | 553 | 813 |
| 57 | 279 | 555 | 819 |
| 60 | 283 | 557 | 823 |
| 64 | 300 | 558 | 825 |
| 65 | 301 | 568 | 830 |
| 69 | 315 | 573 | 838 |
| 86 | 316 | 576 | 839 |
| 88 | 322 | 583 | 845 |
| 90 | 335 | 596 | 846 |
| 95 | 342 | 604 | 849 |
| 99 | 346 | 618 | 867 |
| 108 | 347 | 620 | 868 |
| 109 | 362 | 621 | 884 |
| 126 | 365 | 632 | 896 |
| 128 | 368 | 633 | 905 |
| 129 | 371 | 634 | 918 |
| 130 | 373 | 635 | 921 |
| 151 | 383 | 650 | 933 |
| 160 | 404 | 651 | 935 |
| 164 | 406 | 661 | 943 |
| 169 | 408 | 679 | 948 |
| 175 | 417 | 694 | 972 |
| 183 | 425 | 701 | 975 |
| 190 | 433 | 720 | 986 |
| 199 | 448 | 722 | 987 |
| 204 | 450 | 727 | 989 |
| 206 | 471 | 729 | 990 |
| 210 | 479 | 751 | 998 |
| 211 | 484 | 755 | 999 |
| 213 | 489 | 763 | |

**ATTACHMENT C**

**Settlement Account Agreement**

## SETTLEMENT ACCOUNT AGREEMENT

THIS SETTLEMENT ACCOUNT AGREEMENT, dated as of November 28 2006 (the "Escrow Agreement"), is made by, between and among W. R. Grace & Co. on its own behalf and on behalf of the Grace Parties, and Lloyd's Underwriters, each as defined in the Settlement Agreement and Mutual Release between the Grace Parties and Lloyd's Underwriters dated as of November 13, 2006 (the "2006 Settlement Agreement"), and JPMorgan Chase Bank, N.A. as escrow agent (the "Escrow Agent") (the Grace Parties, the Lloyd's Underwriters and the Escrow Agent shall be referred to herein separately as an "Escrow Party" and collectively as the "Escrow Parties").

### WITNESSETH:

WHEREAS, all capitalized terms not otherwise defined in this Escrow Agreement shall have the meanings ascribed to them in the 2006 Settlement Agreement; and

WHEREAS, Grace and Lloyd's Underwriters entered into an agreement dated November 17, 1995 (the "1995 London Agreement") concerning the application to Asbestos Claims of certain policies of insurance severally subscribed by Lloyd's Underwriters and London Market Companies in favor of Grace ; and

WHEREAS, the Grace Parties have incurred and may incur in the future certain liabilities, expenses, and losses arising out of Asbestos Claims and other Claims; and

WHEREAS, Lloyd's Underwriters are obligated under the 1995 London Agreement to make certain payments in connection with Asbestos Claims under the Subject Policies identified in the 1995 London Agreement; and

WHEREAS, the Grace Parties contend that Lloyd's Underwriters may also be obligated to make payments under the Subject Policies for Claims other than Asbestos Claims; and

K&E 11467353.8

WHEREAS, there are or in the future may be disputes between the Grace Parties and Lloyd's Underwriters regarding their respective rights and obligations with respect to insurance coverage under the Subject Policies with respect to Claims and regarding their respective rights and obligations with respect to the 1995 London Agreement; and

WHEREAS, the Grace Parties and Lloyd's Underwriters have reached a settlement of all rights, obligations and liabilities (if any) that the Parties may owe one another with respect to the Subject Policies and the 1995 London Agreement that is embodied in the 2006 Settlement Agreement; and

WHEREAS, the Grace Parties and Lloyd's Underwriters wish to appoint an escrow agent to hold and disburse funds in accordance with the 2006 Settlement Agreement; and

WHEREAS, the escrow account hereby established is intended to qualify as a "qualified settlement fund" ("QSF") within the meaning of Section 1.468B-1 of the Treasury Regulations promulgated under Section 468B of the Internal Revenue Code of 1986, as amended from time to time.

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants and agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Escrow Parties hereto agree as follows:

## ARTICLE I

SECTION 1.1 Appointment of Escrow Agent.    The Grace Parties and Lloyd's Underwriters hereby appoint the Escrow Agent as the escrow agent under this Escrow Agreement, and the Escrow Agent hereby accepts such appointment.

2

## ARTICLE II
### The Escrow Account

SECTION 2.1 Deposit.    Pursuant to the 2006 Settlement Agreement, Lloyd's Underwriters shall deliver the sum of Ninety Million United States dollars (US$90,000,000) (the "Settlement Amount") to the Escrow Agent to be deposited into an escrow account pending further distributions of the funds as provided in Section 2.2 below (hereafter the "Escrow Account").    Said amount, as it may increase or decrease as contemplated by this Escrow Agreement (hereafter the "Escrow Funds") shall be held, invested and disbursed by Escrow Agent in accordance with the terms hereof for the benefit of the holders of the types of Claims for which the Grace Parties were provided coverage under the Subject Policies, until the respective interests of such claimants, if any, with respect to the Settlement Funds, shall have been determined or otherwise agreed to.    Subject to and in accordance with the terms and conditions hereof, Escrow Agent agrees that it shall receive, hold in escrow, invest and reinvest, and release or distribute the Escrow Funds.    It is hereby expressly stipulated and agreed that all interest and other earnings on the Escrow Funds shall become a part of the Escrow Funds for all purposes, and that all losses resulting from the investment or reinvestment thereof from time to time and all amounts charged thereto to compensate or reimburse the Escrow Agent from time to time for amounts owing to it hereunder shall from the time of such loss or charge no longer constitute part of the Escrow Funds.

SECTION 2.2 Distribution of Escrow Funds.    The Grace Parties and Lloyd's Underwriters agree that the Escrow Agent shall hold the Escrow Funds and shall disburse the Escrow Funds (other than to pay the expenses of the Escrow Agent as provided in Section 2.6 below) only upon the occurrence of any one or more of the following events (each, individually, a "Disbursement Event"):

3

KAE 11467353.8

(a)    Joint written instructions from the Grace Parties and Lloyd's Underwriters to the Escrow Agent in accordance with the terms of the 2006 Settlement Agreement, the confirmed Plan, or as ordered by the Bankruptcy Court directing the disbursement of Escrow Funds;

(b)    Notification by the Grace Parties and Lloyd's Underwriters that a tax payment or payments is due as provided in Section 3.8; or

(c)    Final Order of any court of competent jurisdiction directing the disbursement of Escrow Funds consistent with the 2006 Settlement Agreement or the confirmed Plan.

Upon the occurrence of any of the foregoing Disbursement Events, the Escrow Agent shall disburse all or part of the Escrow Funds in accordance with such written instruction, notification or Final Order. Disbursement to the Grace Parties shall be by wire transfer to: ABA No. 021 000 021 (for domestic US transfers); Swift Code:  CHAS US 33 (for international transfers; JPMorgan Chase Bank, N.A., Account No.016001257; Account Name – W. R. Grace & Co.-Conn. Disbursement to Lloyd's Underwriters shall be by wire transfer to:  Swift Code:  MI DL GB 22; HSBC Bank Plc; Account No. 38902727, Account Name – Equitas Limited; Reference: WRGRACE / IADR 3283. Either the Grace Parties or Lloyd's Underwriters may change its disbursement account upon ten Business Days' prior written notice to the Escrow Agent.

SECTION 2.3 Investment of the Escrow Funds.

A.    Definitions for Section 2.3.

1.    "Initial Agreed Investments" shall mean the investment of 80% of the initial Escrow Funds and interest thereon in the JPMorgan U.S. Government Fund and 20% of

4

the initial Escrow Funds and interest therein in the JPMorgan Cash Deposit Account.  The Escrow Parties agree that the Initial Agreed Investments were determined by agreement of the Grace Parties and Lloyd's Underwriters, that neither the Grace Parties on the one hand, nor Lloyd's Underwriters and/or its run-off agent, Equitas Limited, on the other hand, provided any investment or other advice to each other in connection with the Initial Agreed Investments and that the Grace Parties, Lloyd's Underwriters and Equitas Limited shall have no liability to one another or to any other Escrow Party should the market value of the Initial Agreed Investments decrease and/or should the Escrow Parties not achieve the investment return or any other financial benefit they expected to recover and/or earn.

2.    "Eligible Investments" shall mean:  (A) The Initial Agreed Investments provided that such investments continue to satisfy the criteria of sub-section (B) hereof; and (B)(i) obligations issued or guaranteed by the United States of America or any agency or instrumentality thereof (provided that the full faith and credit of the United States is pledged in support thereof) and provided that the maximum maturity limit for any individual security is 366 days, and (ii) shares of money market funds with a minimum credit rating of AAA or A1/P1 by S&P or Moody's and minimum assets of at least $1 billion.

B.    Eligible Investments.  The Escrow Agent shall invest the Escrow Funds solely in Eligible Investments.  Initially, the Escrow Funds shall be invested in the Initial Agreed Investments.  If the Initial Agreed Investments or any Eligible Investments later made by the Escrow Agent cease to be Eligible Investments at any time, the Escrow Agent shall, as soon as practicable, liquidate such investments at the then fair market value and promptly reinvest such monies as are generated by a liquidation (or any series thereof) in Eligible Investments; provided, however, that after giving effect to any such reinvestment, at least 80% of the Escrow

K&E 11467353.8

Funds shall be invested in obligations described in (B)(i) of the definition of Eligible Investments, and no more than 20% of the Escrow Funds are invested in shares described in (B)(ii) of the definition of Eligible Investments.

      C.    Limitations on Escrow Agent's liability with respect to Eligible Investments. The Escrow Agent shall not be responsible for any loss due to interest rate fluctuation or early withdrawal penalty. The Grace Parties and Lloyd's Underwriters understand that Eligible Investments are not necessarily insured by the United States Government or any agency or instrumentality thereof, or of any state or municipality, and that such deposits do not necessarily earn a fixed rate of return. In no instance shall the Escrow Agent have any obligation to provide investment advice of any kind. The Escrow Agent shall not be liable or responsible for any loss resulting from any investments made pursuant to this Section 2.3 other than as a result of Escrow Agent's gross negligence or willful misconduct or failure to comply with sufficient written instructions. It is expressly agreed and understood by the Escrow Parties that the Escrow Agent shall not in any way whatsoever be liable for losses on any investments undertaken in accordance with the terms of this Escrow Agreement, including, but not limited to, losses from market risks due to premature liquidation or resulting from other actions taken pursuant to this Escrow Agreement.

      Receipt, investment and reinvestment of the Escrow Funds and payment of the Escrow Agent's fees and expenses from the Escrow Funds as provided in Section 2.6 shall be confirmed by the Escrow Agent as soon as practicable by account statement separately to the Grace Parties and to Lloyd's Underwriters, and any discrepancies in any such account statement shall be noted either by the Grace Parties or Lloyd's Underwriters, or both, to the Escrow Agent within thirty (30) calendar days after receipt thereof. Failure to inform the Escrow Agent in writing of any

6

discrepancies in any such account statement within said 30-day period shall conclusively be deemed confirmation of such account statement in its entirety. For purposes of this paragraph, (a) each account statement shall be deemed to have been received by the party to whom directed on the earlier to occur of: (i) actual receipt thereof; or (ii) three (3) Business Days (hereinafter defined) after the deposit thereof in the United States Mail, postage prepaid; and (b) the term "Business Day" shall mean any day of the year, excluding Saturday, Sunday and any other day on which national banks are required or authorized to close in the United States of America

SECTION 2.4 <u>Resignation/Removal and Appointment of Successor Escrow Agent.</u> The Escrow Agent may resign hereunder upon thirty (30) days' prior written notice to the Grace Parties and Lloyd's Underwriters. The Grace Parties and Lloyd's Underwriters may remove the Escrow Agent at any time upon thirty (30) days prior written notice executed by both the Grace Parties and Lloyd's Underwriters. A successor escrow agent shall be appointed by agreement between the Grace Parties and Lloyd's Underwriters if (a) there is a resignation or removal, or (b) the Escrow Agent is dissolved, taken under the control of any public officer or officers or if a receiver appointed by a court, or otherwise becomes incapable of acting hereunder. Upon the acceptance by the successor escrow agent of such appointment, the Escrow Agent shall deliver the Escrow Funds to the successor agent and the Escrow Agent will be released from its obligations hereunder by written instrument, a copy of which shall be delivered to the Grace Parties , Lloyd's Underwriters, the resigning Escrow Agent and the successor escrow agent.

SECTION 2.5 <u>Term of Escrow Agreement.</u> This Escrow Agreement shall remain in full force and effect until such time as all the amounts in the Escrow Account have been distributed in accordance with Section 2.2 hereof; *provided, however,* that in the event all fees, expenses,

7

costs and other amounts required to be paid to Escrow Agent hereunder are not fully and finally paid prior to termination, the provisions of Article III hereof shall survive the termination hereof.

SECTION 2.6 Escrow Agent Fees and Expenses. The Escrow Agent shall be paid for its services hereunder in accordance with Escrow Agent's fee schedule as attached as Schedule I hereto as in effect from time to time, together with all reasonable expenses incurred by the Escrow Agent in connection with the performance of its duties and otherwise in connection with the preparation, operation, administration and enforcement of this Escrow Agreement, including, without limitation, attorneys' fees, brokerage costs and related expenses incurred by the Escrow Agent (the "Expenses"). The Escrow Agent's fees and Expenses shall be paid from the funds on deposit in the Escrow Account. In the event that the Escrow Funds are insufficient to pay the Escrow Agent's fee, the Escrow Agent shall bill the annual administration fee to the Grace Parties. The obligation to pay or reimburse the Escrow Agent for the Expenses shall survive the satisfaction and discharge of this Escrow Agreement or the earlier resignation or removal of the Escrow Agent. The Escrow Agent agrees to advise the Grace Parties and Lloyd's Underwriters in writing of increases in fees before such fees take effect and of all new fees not agreed to prior to execution of this Escrow Agreement.

SECTION 2.7 Lloyd's Underwriters' Agents and Representatives. Equitas Limited, as the run-off agent for Lloyd's Underwriters, shall have full power and authority to act on behalf of Lloyd's Underwriters with respect to all matters relating to this Escrow Agreement. Equitas Limited has appointed James Sottile as Lloyd's Underwriters' Representative and attorney-in-fact in connection with this Escrow Agreement. Equitas Limited may change the Lloyds' Underwriters' Representative and attorney-in-fact at any time and from time to time upon ten Business Days' prior written notice to the Escrow Agent and the Grace Parties. The Escrow

8

Agent may rely upon any decision, consent or instruction of Equitas Limited or the Lloyd's Underwriters' Representative received by the Escrow Agent in connection with this Escrow Agreement, and is relieved from any liability to any person for any acts performed in accordance with any such decision, consent or instruction except for its own failure to comply with sufficient written instructions, willful misconduct or gross negligence. The Escrow Agent may rely, without inquiry, upon any written notice from Equitas Limited of any successor Lloyd's Underwriters' Representative, and may deal with such successor with respect to the escrow created by this Escrow Agreement.

## ARTICLE III
### The Escrow Agent

SECTION 3.1 Scope of Undertaking. The Escrow Agent's duties and responsibilities in connection with this Escrow Agreement shall be limited to those expressly set forth in this Escrow Agreement. The Escrow Agent is not a principal, participant or beneficiary in any transaction underlying this Escrow Agreement, including, but not limited to, the Subject Policies or the 2006 Settlement Agreement, and shall have no duty to inquire beyond the terms and provisions hereof. Except as otherwise provided in Section 2.3, the Escrow Agent shall have no responsibility or obligation of any kind in connection with this Escrow Agreement or the Escrow Funds other than to receive, hold, invest, reinvest and deliver the Escrow Funds and provide notices and statements as herein provided. Without limiting the generality of the foregoing, it is hereby expressly agreed and stipulated by the Grace Parties and Lloyd's Underwriters that the Escrow Agent shall not be required to exercise any investment discretion hereunder and shall have no investment or management responsibility and, accordingly, shall have no duty to, or liability for its failure to, provide investment recommendations or investment advice to the Grace Parties and Lloyd's Underwriters or either of them under this Escrow Agreement. The Escrow

9

Agent shall not be liable for any error in judgment, any act or omission, any mistake of law or fact, or for anything it may do or refrain from doing in connection herewith, except for its own failure to comply with sufficient written instructions, willful misconduct or gross negligence. It is the intention of the Grace Parties and Lloyd's Underwriters that the Escrow Agent shall never be required to use, advance or risk its own funds in the performance of any of its duties.

SECTION 3.2 <u>Reliance; Liability</u>. The Escrow Agent may rely on, and shall not be liable for acting or refraining from acting in accordance with, any written notice, instruction or request or other document furnished to it hereunder or pursuant hereto and reasonably believed by it to have been signed or presented by the Grace Parties, Equitas Limited and/or Lloyd's Underwriters as appropriate. The Escrow Agent shall be responsible for holding, investing, reinvesting and disbursing the Escrow Funds pursuant to this Escrow Agreement. Except in circumstances involving the Escrow Agent's failure to comply with sufficient written instructions, willful misconduct or gross negligence, the Escrow Agent in no event shall be liable for special, indirect or consequential loss or damage of any kind whatsoever (including but not limited to lost profits), even if the Escrow Agent has been advised of the likelihood of such loss or damage and regardless of the form of action. The Escrow Agent is not responsible or liable in any manner whatsoever for the sufficiency, correctness, genuineness or validity of the subject matter of this Escrow Agreement or any part hereof, or for the transaction or transactions requiring or underlying the execution of this Escrow Agreement, the form or execution hereof, or for the identity or authority of any person executing this Escrow Agreement or any part hereof, or depositing the Escrow Funds.

10

SECTION 3.3 <u>Escrow Agent's Own Funds</u>. None of the provisions of this Escrow Agreement shall require the Escrow Agent to expend or risk its own funds in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers.

SECTION 3.4 <u>No Duty of Investigation</u>. The Escrow Agent shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, entitlement, order, approval or other paper or document presented to the Escrow Agent by the Grace Parties, Equitas Limited and Lloyd's Underwriters.

SECTION 3.5 <u>Acting Through an Agent</u>. The Escrow Agent may execute any of its powers and perform any of its duties hereunder directly or through agents or attorneys (and shall be liable only for the careful selection of any such agent or attorney) and may consult with counsel, accountants and other skilled persons that may be selected and retained by it. The Escrow Agent shall not be liable for anything done, suffered or omitted in good faith by it in accordance with the advice or opinion of any such counsel, accountants or other persons. In the event that the Escrow Agent shall be uncertain as to its duties or rights hereunder or shall receive instructions, claims or demands from any party hereto which, in its opinion, conflict with any of the provisions of this Escrow Agreement, it shall be entitled to refrain from taking any action and its sole obligation shall be to notify the other Escrow Parties of its decision so to refrain, and to keep safely all property held in escrow until it shall be directed otherwise in writing by all of the other Escrow Parties hereto or by a final order or judgment of a court of competent jurisdiction.

SECTION 3.6 <u>Indemnification</u>. The Grace Parties and Lloyd's Underwriters agree jointly and severally to indemnify and defend the Escrow Agent, its officers, directors, partners, employees and agents (each herein called an "Indemnified Party") against, and hold each

11

Indemnified Party harmless from, any and all losses, liabilities and expenses, including, but not limited to, fees and expenses of outside counsel, court costs, costs damages and claims, costs of investigation, litigation and arbitration, tax liability (other than for income taxes on fees earned hereunder) and loss on investments suffered or incurred by any Indemnified Party in connection with or arising from or out of (i) the execution, delivery or performance of this Escrow Agreement, or (ii) the compliance or attempted compliance by any Indemnified Party with any instruction or direction upon which the Escrow Agent is authorized to rely under this Escrow Agreement, except to the extent that any such loss, liability or expense may result from the willful misconduct or gross negligence or failure to comply with sufficient written instructions of such Indemnified Party.  The Escrow Parties acknowledge that the foregoing indemnity shall survive the resignation or removal of the Escrow Agent or the termination of this Escrow Agreement.

SECTION 3.7 Security Procedures.  In the event funds transfer instructions are given (other than in writing at the time of execution of this Escrow Agreement), as indicated in Schedule II attached hereto, whether in writing, by facsimile or otherwise, the Escrow Agent is authorized to seek confirmation of such instructions by telephone call-back to the person or persons designated on Schedule II hereto, and the Escrow Agent may rely upon the confirmation of anyone purporting to be the person or persons so designated.  Schedule II may be changed only in a writing actually received and acknowledged by the Escrow Agent.

It is understood that, absent willful misconduct or gross negligence or failure to comply with sufficient written instructions, in any transfer of Escrow Funds, the Escrow Agent and the transferee's bank may rely solely upon any account numbers or similar identifying number provided by any of the Escrow Parties to identify:  (i) the transferee, (ii) the transferee's bank, or

12

(iii) an intermediary bank. The Escrow Agent may apply any of the Escrow Funds for any payment order it executes using any such account or similar identifying number, even where its use may result in a person other than the transferee being paid, or the transfer of funds to a bank other than the transferee's bank or an intermediary bank.

SECTION 3.8 Tax Obligations. Upon execution of this Escrow Agreement, Grace and Lloyd's Underwriters shall each provide the Escrow Agent with its applicable taxpayer identification number documented by an appropriate Form W-8 or Form W-9. Grace represents and warrants that its correct Taxpayer Identification Number ("TIN") assigned by the Internal Revenue Service ("IRS") is set forth on Schedule III. Lloyd's Underwriters represents that the correct TIN for its run-off agent, Equitas Limited, assigned by the IRS or other tax identification number assigned by any other taxing authority is set forth in Schedule III. The Escrow Agent shall report any income paid to Lloyd's Underwriters to Equitas Limited. Failure so to provide such information may prevent or delay disbursements from the Settlement Amount and may also result in the assessment of a penalty and the Escrow Agent's being required to withhold tax on any interest or other income earned on the Escrow Funds. Any payments of income shall be subject to applicable withholding regulations then in force in the United States and any other applicable jurisdiction. The Grace Parties and Lloyd's Underwriters agree that any applicable international, federal or other taxes relating to any interest or other income earned on the Escrow Funds shall be paid from the Escrow Funds. The Grace Parties and Lloyd's Underwriters shall retain the services of an appropriate third-party, whose services shall be paid from the Escrow Funds, to timely file all required and appropriate federal, state and local tax returns and make timely payment out of the Escrow Funds of any taxes due by or lawfully assessed against the Escrow Account.

13

K&E 11467353.8

The Escrow Agent shall have no duty to comply with the provisions of Treasury Reg. § 1.468B, cited above. Furthermore, the Escrow Agent shall not be deemed to have any knowledge or responsibility concerning the applicability of such regulation to the transactions contemplated by this Agreement.

## ARTICLE IV
### Miscellaneous

SECTION 4.1 Waivers; Amendments; Benefit of Agreement.

(a)     No failure or delay by any Escrow Party in exercising any power or right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. No waiver of any provision of this Escrow Agreement or consent to any departure there from shall in any event be effective unless the same shall be authorized as provided in paragraph (b) below, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. No notice or demand on any Escrow Party in any case shall entitle such Escrow Party to any other or further notice or demand in similar or other circumstances. Except as otherwise expressly provided herein, all rights and remedies existing under this Escrow Agreement are cumulative with, and not exclusive of, any rights or remedies otherwise available.

(b)     No provision of this Escrow Agreement may be waived, amended supplemented, or modified except pursuant to an agreement in writing entered into by the Grace Parties, Lloyd's Underwriters and the Escrow Agent.

(c)     Nothing in this Escrow Agreement, expressed or implied, shall give or be construed to give to any person other than the Escrow Parties any legal or equitable right,

14

KAE 11467353.1

remedy or claim under this Escrow Agreement, or under any covenants and provisions of this Escrow Agreement, each covenant and provision being for the benefit of the Grace Parties and Lloyd's Underwriters.

SECTION 4.2 <u>Legal Capacity</u>. Each of the Grace Parties, Lloyd's Underwriters and the Escrow Agent represents and warrants that it has the legal capacity to enter into and perform its obligations under this Escrow Agreement.

SECTION 4.3 <u>Notices</u>. All communications or notices provided for hereunder (including a notice of change of address) will be in writing, will be addressed in accordance with the information set forth below and will be deemed given (a) in the case of delivery by hand, when delivered by hand, (b) in the case of delivery by a standard overnight carrier, upon the date of delivery indicated in the records of such carrier, (c) in the case of a facsimile transmission, when received by recipient in legible form, or (d) in the case of delivery by certified mail with return receipt requested, upon delivery to the recipient:

If to the Grace Parties:

    7500 Grace Drive
    Columbia, Maryland  21044
    Attn:  Secretary
    Fax:  (410) 531-4367

    and

    7500 Grace Drive
    Columbia, Maryland  21044
    Attn:  Finance Manager, Corporate Treasury
    Fax:  (410) 531-4461

If to Lloyd's Underwriters or Equitas:

15

K&E 11467353.8

Equitas Limited
Claims Division
33 St. Mary Axe
London  EC3A 8LL
ENGLAND
Attn:  Head of Direct Claims
Phone:  011 44 207 342-2000
Fax:  011 44 207 342-1000

With a copy to:

Zuckerman Spaeder LLP
1800 M Street N.W., Suite 1000
Washington, DC  20036
Attn: James Sottile, IV, Esq.
Phone:  (202) 778-1800
Fax:  (202) 822-8106
e-mail:  jsottile@zuckerman.com

If to the Escrow Agent:

JPMorgan Chase Bank, N.A.
4 New York Plaza
Escrow Services
21st Floor
New York, New York  10004
Attention:  James M. Foley
Phone:  (212) 623-5182
Fax:  (212) 623-6168
Email:  james.foley@jpmorgan.com

or at such other addresses as any Escrow Party may designate by notice to the other Escrow

Parties in accordance with this Section 4.3.

SECTION 4.4 Governing Law; Waiver of Jury Trial; Jurisdiction.

(a)    This Escrow Agreement shall be governed by and construed in accordance

with the laws of the State of New York including all matters of construction, validity and

performance.

16

K&E 11467353.8

(b)    TO THE FULLEST EXTENT PERMITTED BY LAW, EACH ESCROW PARTY HERETO HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHTS THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH, THIS ESCROW AGREEMENT OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY OF THE ESCROW PARTIES. THIS PROVISION IS A MATERIAL INDUCEMENT FOR EACH ESCROW PARTY TO ENTER INTO THIS ESCROW AGREEMENT.

SECTION 4.5 Counterparts. This Escrow Agreement may be executed in three or more counterparts, and by the different Escrow Parties hereto in separate counterparts, each of which when so executed and delivered, shall be an original, but all of which together shall constitute one and the same instrument. All signatures of the Escrow Parties may be transmitted by facsimile, and such facsimile will, for all purposes, be deemed to be the original signature of such Escrow Party whose signature it reproduces, and will be binding upon such Escrow Party.

SECTION 4.6 Severability. If any term or provision of this Escrow Agreement or the application thereof to any circumstance shall, in any jurisdiction and to any extent, be invalid or unenforceable, such term or such provision shall be ineffective as to such jurisdiction to the extent of such invalidity or unenforceability without invalidating or rendering unenforceable any remaining terms or provisions of this Escrow Agreement or the application of such term or provision to circumstances other than those as to which it is held invalid or unenforceable. To the extent permitted by applicable law, the Escrow Parties waive any provision of law that renders any term or provision of this Escrow Agreement invalid or unenforceable in any respect.

17

SECTION 4.7 <u>Rules of Interpretation</u>.    This Escrow Agreement shall be construed without regard to any presumption or other rule requiring construction against the Escrow Party drafting this Escrow Agreement.  The headings of the Sections and paragraphs of this Escrow Agreement have been inserted for convenience of reference only and shall in no way restrict or otherwise modify any of the terms or provisions hereof.  All pronouns and any variations thereof refer to the masculine, feminine or neuter, singular or plural, as the context may require.

SECTION 4.8 <u>Entire Agreement</u>.    This Escrow Agreement supersedes all prior agreements, written or oral, between or among any of the Escrow Parties relating to the transaction contemplated hereby or thereby.

SECTION 4.9 <u>Further Cooperation</u>.  Each of the Escrow Parties agrees to cooperate with the other Escrow Parties in effectuating this Escrow Agreement and to execute and deliver such further documents or instruments and to take such further actions as shall be reasonably requested in connection therewith.

SECTION 4.10 <u>Assignment Binding Effect</u>.  No Escrow Party may assign this Escrow Agreement, or any of its rights or obligations hereunder, without the consent of the other Escrow Parties (which consent shall not be unreasonably withheld).  All agreements, representations, warranties and indemnities in this Escrow Agreement and in any agreement, document or certificate delivered concurrently with the execution of this Escrow Agreement, or from time to time hereafter, shall bind the Escrow Party making the same and such Escrow Party's successors and assigns, and shall inure to the benefit of each Escrow Party for whom made and for such Escrow Party's permitted successors and assigns.

SECTION 4.11 <u>Specific Performance</u>.    The rights of the Escrow Parties under this Escrow Agreement are unique and each Escrow Party hereto acknowledges that the failure of an

18

Escrow Party to perform its obligations hereunder would irreparably harm the other Escrow Parties hereto. Accordingly, the Escrow Parties shall, in addition to such other remedies as may be available at law or in equity, have the right to enforce their rights hereunder by actions for specific performance to the extent permitted by law.

SECTION 4.12 Force Majeure. No Escrow Party is liable to any other Escrow Party for losses due to, or if it is unable to perform its obligations under the terms of this Escrow Agreement because of, acts of God, fire, floods, strikes, equipment or transmission failure, or other causes reasonably beyond its control.

19

**IN WITNESS WHEREOF**, the Escrow Parties have executed this Escrow Agreement to be effective as of the date first above written.

W.R. GRACE & CO. ON ITS OWN
BEHALF AND ON BEHALF OF ALL
PERSONS INCLUDED IN THE
DEFINITION OF GRACE PARTIES

By: W B mc Gowan
Name: W. B. McGowan
Title: Senior Vice President

**LLOYD'S UNDERWRITERS**

By:_____
Name: James Sottile, IV
Title: Attorney-in-Fact

**JPMORGAN CHASE BANK, N.A., AS
ESCROW AGENT**

By:_____
Name:_____
Title:_____

20

K&E 11467353.8

IN WITNESS WHEREOF, the Escrow Parties have executed this Escrow Agreement to

be effective as of the date first above written.

**W.R. GRACE & CO. ON ITS OWN
BEHALF AND ON BEHALF OF ALL
PERSONS INCLUDED IN THE
DEFINITION OF GRACE PARTIES**

By:_____
Name:_____
Title:_____

**LLOYD'S UNDERWRITERS**

By:_____
Name: James Sottile, IV
Title: Attorney-in-Fact

**JPMORGAN CHASE BANK, N.A., AS
ESCROW AGENT**

By:_____
Name:_____
Title:_____

20

IN WITNESS WHEREOF, the Escrow Parties have executed this Escrow Agreement to be effective as of the date first above written.

W.R. GRACE & CO. ON ITS OWN
BEHALF AND ON BEHALF OF ALL
PERSONS INCLUDED IN THE
DEFINITION OF GRACE PARTIES

By:_____
Name:_____
Title:_____

LLOYD'S UNDERWRITERS

By:_____
Name:  James Sottile, IV
Title:  Attorney-in-Fact

JPMORGAN CHASE BANK, N.A., AS
ESCROW AGENT

By:_____
Name:_____
       JAMES M. FOLEY
Title:_____
       Assistant Vice President

20

K&E 11467355.6

**Schedule 1**

**FEE SCHEDULE**

**JPMORGAN CHASE BANK, N.A.**

**ESCROW AGENT SERVICES**
**FOR**
**W. R. GRACE & CO. ON ITS OWN BEHALF AND**
**ON BEHALF OF THE GRACE PARTIES**
**AND**
**UNDERWRITERS AT LLOYD'S, LONDON**

| | | |
|---|---|---|
| I. | Acceptance Fee/Annual Administration Fee | $2,500 per annum without pro-ration for partial years |
| II. | Counsel Fees & Expenses | Waived |
| III. | U.S. Government Money Market Fund Administration Fee | 15 bps |

S1-1

### Schedule II

### Telephone Number(s) for Call-backs and Person(s)

### Designated to Instruct or Confirm Funds Transfer Instructions

If to W. R. Grace & Co. on its own behalf and on behalf of the Grace Parties:

| Name | Telephone Number | Signature |
|------|------------------|-----------|
| Bonita Harsh | (410) 531-4434 | *Bonita Harsh* |

If to Certain Underwriters at Lloyd's, London:

| Name | Telephone Number | Signature |
|------|------------------|-----------|
| James Sottile, IV, Esq. | (202) 778-1894 | |
| Glenn E. Brace | 011 44 207 342-2820 | |

In the event funds transfer instructions are given (other than in writing at the time of execution of this Escrow Agreement), whether in writing, by facsimile or otherwise, JPMorgan Chase Bank, N.A. is authorized to seek confirmation of such instructions by telephone call-back to the person or persons designated above, and JPMorgan Chase Bank, N.A. may rely upon the confirmation of anyone purporting to be the person or persons so designated.   Schedule II may be changed only in a writing actually received and acknowledged by JPMorgan Chase Bank.

Pursuant to the above, the respective parties will issue payment orders to us to transfer funds by federal funds wire.   JPMorgan Chase Bank, N.A. reviews the orders to determine compliance and to confirm the signature by the appropriate party, in accordance with this agreement.   Bank policy requires that, where practicable, we undertake callbacks to a party other than the individual who signed the payment order to verify the authenticity of the payment order.

Inasmuch as the above noted parties are the only employee in your office to confirm wire transfers, we will call you to confirm any federal funds wire transfer payment orders purportedly issued by you.   Your continued issuance of payment orders to us in accordance with this procedure will constitute your agreement (1) to the callback security procedure outlines herein and (2) that the security procedure outlined herein constitutes a commercially reasonable method of verifying the authenticity of payment orders.

S2-1

<u>**Schedule II**</u>

**Telephone Number(s) for Call-backs and Person(s)**

**Designated to Instruct or Confirm Funds Transfer Instructions**

If to W. R. Grace & Co. on its own behalf and on behalf of the Grace Parties:

| <u>Name</u> | <u>Telephone Number</u> | <u>Signature</u> |
|---|---|---|
| Bonita Harsh | (410) 531-4434 | |

If to Certain Underwriters at Lloyd's, London:

| <u>Name</u> | <u>Telephone Number</u> | <u>Signature</u> |
|---|---|---|
| James Sottile, IV, Esq. | (202) 778-1894 | |
| Glenn E. Brace | 011 44 207 342-2820 | |

In the event funds transfer instructions are given (other than in writing at the time of execution of this Escrow Agreement), whether in writing, by facsimile or otherwise, JPMorgan Chase Bank, N.A. is authorized to seek confirmation of such instructions by telephone call-back to the person or persons designated above, and JPMorgan Chase Bank, N.A. may rely upon the confirmation of anyone purporting to be the person or persons so designated. Schedule II may be changed only in a writing actually received and acknowledged by JPMorgan Chase Bank.

Pursuant to the above, the respective parties will issue payment orders to us to transfer funds by federal funds wire. JPMorgan Chase Bank, N.A. reviews the orders to determine compliance and to confirm the signature by the appropriate party, in accordance with this agreement. Bank policy requires that, where practicable, we undertake callbacks to a party other than the individual who signed the payment order to verify the authenticity of the payment order.

Inasmuch as the above noted parties are the only employee in your office to confirm wire transfers, we will call you to confirm any federal funds wire transfer payment orders purportedly issued by you. Your continued issuance of payment orders to us in accordance with this procedure will constitute your agreement (1) to the callback security procedure outlines herein and (2) that the security procedure outlined herein constitutes a commercially reasonable method of verifying the authenticity of payment orders.

S2-1

**Schedule III**

**Effective Date:  November 28, 2006**
**W. R. Grace & Co.:**

TIN:  65-0773649

**Equitas Limited:**

TIN:  98-0176716

K&E 11467353.8