# EXHIBIT 1

Case 01-01139-AMC   Doc 22555-2   Filed 07/20/09   Page 2 of 12

IN RE: W.R. GRACE & CO., ET AL., DEBTORS.                        Case No. 01-01139(JKF)
TELEPHONIC DEPOSITION OF GAIL STOCKMAN, M.D.                             June 17, 2009

Page 1

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

Chapter 11

Case No. 01-01139(JKF)
Jointly Administered

Ref. No. 21544

In re:                          )
                                )
W.R. GRACE & CO., et al.,       )
                                )
                Debtors.        )
                                )

TELEPHONIC DEPOSITION

OF

GAIL STOCKMAN, M.D.

(Taken on Behalf of the Libby Claimants)

Taken at the Offices of
Asa & Gilman Reporting, Inc.
22 Second Avenue, West, Suite 2200
Kalispell, Montana
Wednesday, June 17, 2009 - 10:28 a.m.

Reported by Jolene Asa, RPR, and Notary Public
for the State of Montana, Flathead County

IN RE: W.R. GRACE & CO., ET AL., DEBTORS.
TELEPHONIC DEPOSITION OF GAIL STOCKMAN, M.D.

Case No. 01-01139(JKF)
June 17, 2009

## Page 22

1  said by somebody else. Does that always make a
2  huge difference in our opinion? No. Sometimes it
3  does.
4  BY MR. HEBERLING:
5      Q. And I was asking whether in the majority
6  of cases you would prefer to have the physical
7  examination.
8          MR. WEHNER: Object to form.
9          THE WITNESS: Well, it's always good
10 if you have the opportunity to do a physical
11 examination. It makes you feel more secure in
12 your opinions, but is it absolutely necessary? In
13 many cases, it is not.
14 BY MR. HEBERLING:
15     Q. And is a physical examination also
16 important for the opportunity to get a history
17 from the patient regarding things that may or may
18 not be in the medical records?
19     A. Yes.
20     Q. Let's look at Exhibit 1. You've
21 identified that as your report in this case?
22     A. Yes.
23         MR. WEHNER: Can I just take a quick
24 look? You don't have any other copies of that.
25 Let's just make sure we're looking at the same

## Page 23

1  thing here.
2          Why don't you use this one.
3          THE WITNESS: Look at this one?
4          MR. WEHNER: Yeah. Unless you're for
5  sure they're the same as the one you brought.
6          THE WITNESS: I'm sure.
7  BY MR. HEBERLING:
8      Q. Is it correct that you've offered a
9  number of opinions on the group of people who have
10 asbestos disease from Libby exposures in your
11 report?
12         MR. WEHNER: Object to form.
13         THE WITNESS: I'm sorry. Ask that
14 again.
15 BY MR. HEBERLING:
16     Q. Is it fair to say that you've offered
17 opinions on the group of people who have asbestos
18 disease from Libby exposures in your report?
19     A. That is a small part of my report.
20     Q. Yeah.
21     A. My report contains a lot of opinions in
22 addition to that.
23     Q. Let's look at paragraph 21.
24     A. Okay.
25     Q. At the end you refer to a gross inflation

## Page 24

1  of the estimation of significant asbestos-related
2  disease in the Libby population. Do you see that?
3      A. Yes.
4      Q. And then at paragraph 22, toward the
5  bottom, about six lines up, you say, "Patients
6  have been misdiagnosed." Do you see that?
7      A. Yes.
8      Q. And you're referring to Libby there;
9  correct?
10     A. Yes.
11     Q. And then paragraph 51.
12         That reads, "It has been my personal
13 experience that patients diagnosed as having
14 asbestosis instead have chronic obstructive
15 pulmonary disease secondary to tobacco smoking."
16 Do you see that?
17     A. Yes.
18     Q. Does that refer to Libby as well?
19     A. Yes.
20     Q. And for each of those opinions that we've
21 just briefly discussed, does having examined or
22 treated Libby patients form an important part of
23 the basis for your opinions on the patients from
24 Libby?
25     A. Yes.

## Page 25

1      Q. And is it fair to say generally that
2  examination or treatment of patients is important
3  to your thinking on asbestos-related disease
4  through your experience over the last 10,
5  15 years?
6          MR. WEHNER: Object to form.
7          THE WITNESS: I'm sorry. Repeat
8  that.
9  BY MR. HEBERLING:
10     Q. Is it fair to say generally that the
11 examination and treatment of patients has been
12 important to the development of your thinking on
13 asbestos-related disease over the last 10 to
14 15 years?
15     A. You know, I think equally important or
16 maybe more important is my time spent in review of
17 the medical literature; and, again, as I've said,
18 I can review medical records and look at chest
19 films and CT scans and sometimes get just as much
20 information. So is physical examination
21 essential? No. Is it sometimes helpful? Yes.
22     Q. You said it was equally important with
23 all of these other things. So the review of the
24 literature and review of films and medical records
25 is important; correct?

Case 01-01139-AMC    Doc 22555-2    Filed 07/20/09    Page 4 of 12

IN RE: W.R. GRACE & CO., ET AL., DEBTORS.                              Case No. 01-01139(JKF)
TELEPHONIC DEPOSITION OF GAIL STOCKMAN, M.D.                                    June 17, 2009

Page 26

1  A. Yes.
2  Q. And, likewise, physical exams are
3  generally important; correct?
4  A. They may be. Sometimes there's not much
5  information that you get on a physical
6  examination, and certainly it's important -- I've
7  done a number of studies on people who are dead
8  who all you have available is medical records and
9  x-rays, and I feel quite confident that I'm able
10 to render opinions in those cases. So I don't
11 think physical examination is always essential.
12 Sometimes it's helpful, and if it's possible, we
13 like to do it.
14 Q. Do you think that having done so many
15 examinations and having treated asbestos patients
16 is important to the evolution of your thinking
17 about asbestos disease?
18     MR. WEHNER: Object to form.
19     THE WITNESS: Certainly the more
20 experience you have in dealing with patients and
21 looking at x-rays and the more time you've devoted
22 to reviewing medical literature -- All of those
23 things together combine to help you form your
24 opinions.
25 /////

Page 27

1  BY MR. HEBERLING:
2  Q. And having done the physical examinations
3  over the years, it's an important part, along with
4  other important parts, such as the literature and
5  the films and the records; correct?
6     MR. WEHNER: Object to form. Asked
7  and answered.
8     THE WITNESS: Again, doing physical
9  examinations -- Sometimes people can have
10 asbestosis and have a completely normal physical
11 examination. Sometimes people have abnormal
12 physical examinations that don't have anything to
13 do with their asbestos-related problems. If
14 you're asking me if I consider physical
15 examination essential, no, I do not in all cases.
16 BY MR. HEBERLING:
17 Q. No. I was just asking if it's important
18 generally to your thinking. I'm not asking
19 whether it's essential or always required or
20 anything like that.
21     MR. WEHNER: Object to form. Asked
22 and answered.
23     THE WITNESS: It's not been the most
24 essential thing in my development of knowledge
25 about asbestos-related disease.

Page 28

1  BY MR. HEBERLING:
2  Q. Would you agree that it plays a
3  significant role --
4     MR. WEHNER: Object to form.
5  BY MR. HEBERLING:
6  Q. -- in the development of your thinking?
7  A. I'm not sure it does -- did.
8  Q. Let's go to paragraph 14.
9     The first sentence says, "Since 2008, I
10 have provided pulmonary second opinion reviews
11 based on medical records and chest x-rays and CT
12 scans to the Libby Medical Program on
13 approximately 25 to 30 patients of the CARD
14 clinic." Do you see that?
15 A. Yes.
16 Q. And so the Libby Medical Program, is that
17 the Grace-funded Libby Medical Program?
18 A. That's my understanding, yes.
19 Q. As administered by HNA?
20 A. Yes.
21 Q. And you didn't do physical exams for
22 these second opinion reviews; correct?
23 A. Some of these patients were expired, so
24 that's correct.
25 Q. You didn't perform physical examinations

Page 29

1  on any of these second opinion reviews; correct?
2  A. Not on this particular bunch that I'm
3  referring to in this first sentence.
4  Q. Okay. That's 25 to 30 patients?
5  A. Yes.
6  Q. And all of them have had exposure to
7  Libby asbestos; correct?
8  A. That's my understanding.
9  Q. Then the next sentence says, "In
10 addition, I have seen and examined 12 to
11 15 patients for the Libby Medical Program." Do
12 you see that?
13 A. Yes.
14 Q. And you did physical examinations on
15 these; correct?
16 A. Yes.
17 Q. But you did not follow up with treatment?
18 A. No.
19 Q. And, again, all of these patients had
20 exposure to Libby asbestos?
21 A. That was certainly the allegation, yes.
22 Q. And you would have confirmed that through
23 history?
24 A. Yes.
25 Q. Then the next clause says, "And I have

IN RE: W.R. GRACE & CO., ET AL., DEBTORS.
TELEPHONIC DEPOSITION OF GAIL STOCKMAN, M.D.

Case No. 01-01139(JKF)
June 17, 2009

Page 30

1 evaluated and followed 15 to 20 patients from
2 Libby who were either self-referred or referred by
3 their primary physicians." Do you see that?
4    A. Yes, I do.
5    Q. And, of course, you did physical
6 examinations on these people?
7    A. Yes.
8    Q. And some treatment as well?
9    A. Yes.
10   Q. And, again, all of these people had
11 exposure to Libby asbestos?
12   A. Yes.
13   Q. So doing the math, I see a maximum of
14 35 patients you've done physical examinations on?
15   A. That's probably about correct.
16   Q. And were these patients important to the
17 formulations of your opinions on asbestos disease
18 from Libby exposures?
19       MR. WEHNER: Object to form.
20       THE WITNESS: They were certainly
21 important in that they served as a sample of
22 patients who are alleged to have asbestos-related
23 disease from Libby.
24 BY MR. HEBERLING:
25   Q. And, again, doing the math, from the

Page 31

1 first category there were a maximum of 30 for whom
2 you did a records and films review?
3    A. Yes.
4    Q. And were these patients also important in
5 the formulation of your opinions about asbestos
6 disease from Libby exposures?
7    A. Yes.
8    Q. And as to the first category, the records
9 review cases, do you still have access to these
10 reviews?
11   A. Access to the --
12   Q. To these reviews?
13   A. To my reports, do you mean?
14   Q. Yes.
15   A. Yes.
16   Q. And for the 12 to 15 you examined for the
17 Grace Libby Medical Program, do you still have
18 access to the records on those?
19   A. Those would be at Rocky Mountain Heart &
20 Lung.
21   Q. Right. And you work there?
22   A. Yes.
23   Q. So you would have access to them?
24   A. Yes.
25   Q. Then for the 15 or 20 that you have

Page 32

1 followed, you'd have access to the records of
2 those as well; right?
3    A. Yes.
4    Q. Would you agree, with only 35 patients
5 examined, you do not have a sufficient number to
6 do a scientific study of asbestos disease from
7 Libby exposures?
8    A. I would agree with that. Certainly not
9 an epidemiological study.
10   Q. You don't have a copy of ATS 2004 with
11 you, do you?
12   A. I don't know if I do or not.
13      Yes, I do.
14      MR. WEHNER: Can I see it?
15 BY MR. HEBERLING:
16   Q. Good. I've got one as well.
17   A. Okay.
18      MR. WEHNER: Are we going to mark
19 your copy or her copy?
20      MR. HEBERLING: Mine is written on
21 all over. I'm not going to insist on marking it.
22 If anyone else wants to --
23      THE WITNESS: This is my only copy.
24      MR. HEBERLING: Yeah. That's her
25 only copy. It's a familiar document. I don't

Page 33

1 think it's necessary to mark it.
2 BY MR. HEBERLING:
3    Q. Does that appear to be the American
4 Thoracic Society 2004 Diagnosis and Initial
5 Management of Nonmalignant Diseases Related to
6 Asbestos?
7    A. Yes. Actually, it was -- The official
8 statement was dated December 12th, 2003, but it's
9 called the 2004 document.
10   Q. Because that's when it was published?
11   A. Probably.
12   Q. Bottom left column. Do you see the
13 notation of the publication?
14   A. Yes. Uh-huh.
15   Q. Yeah. And that is what we've discussed
16 before as a document that pulmonologists and
17 others who treat lung disease use in diagnosing
18 asbestos-related disease; correct?
19   A. It's certainly a guideline.
20   Q. And this is the one -- You've testified
21 that you use it as well; correct?
22   A. Yes.
23   Q. In the left-hand column on the first
24 page, second paragraph, it says, This statement
25 presents guidance for the diagnosis of

9 (Pages 30 to 33)

ASA & GILMAN REPORTING, INC.    (406)752-5751/752-3334

IN RE: W.R. GRACE & CO., ET AL., DEBTORS.
TELEPHONIC DEPOSITION OF GAIL STOCKMAN, M.D.

Case No. 01-01139(JKF)
June 17, 2009

Page 186

1  THE WITNESS: I have seen many people
2  with pleural plaques.
3  BY MR. HEBERLING:
4  Q. Right. And you don't consider pleural
5  plaques a disease; right?
6  MR. WEHNER: Objection. Asked and
7  answered.
8  THE WITNESS: You know, I consider it
9  a marker of asbestos exposure, and I have seen
10 those. I have not seen anybody with restrictive
11 lung disease from diffuse pleural thickening.
12 BY MR. HEBERLING:
13 Q. So would it be correct to say that in all
14 of these patients listed in paragraph 14 you have
15 not diagnosed any with asbestos-related pleural
16 disease; correct?
17 A. No. I've diagnosed some with pleural
18 plaques.
19 Q. And are you diagnosing that as a disease?
20 A. I am diagnosing it as an entity, as a
21 marker of asbestos exposure. Do I think it's
22 causing them symptoms or signs? No.
23 Q. Okay. So I still don't think I've quite
24 got an answer. You haven't actually diagnosed
25 anybody with asbestos-related pleural disease;

Page 187

1  correct?
2  MR. WEHNER: Object to form.
3  THE WITNESS: In the sense that I do
4  not think that asymptomatic pleural plaques are a
5  disease, that's correct.
6  BY MR. HEBERLING:
7  Q. I'm sorry. It's getting late, but did
8  you say that you had diagnosed anybody with
9  diffuse pleural thickening?
10 A. I said I had not.
11 Q. That's what I thought. Okay.
12 And, again, of all of these people
13 referenced in paragraph 14, are they all smokers
14 or ex-smokers?
15 A. I can't tell you that without reviewing
16 their records, but certainly the patients with
17 COPD are either current or ex-smokers.
18 Q. And, of course, our side can't evaluate
19 what you've done because we haven't received any
20 of the records either; correct?
21 MR. WEHNER: Object to form.
22 THE WITNESS: No. I don't know that.
23 I know that when the doctors at the CARD clinic
24 refer someone over, they certainly get a copy of
25 my report.

Page 188

1  BY MR. HEBERLING:
2  Q. Of course there's no way to tell who that
3  has been from the information at paragraph 14;
4  correct?
5  A. Because I didn't keep a record.
6  Q. And just to make the record clear, you
7  haven't delivered any medical records of any of
8  the patients referenced at paragraph 14; correct?
9  A. I have not personally delivered any
10 records, no.
11 Q. To us?
12 A. No.
13 Q. Right. And of the patients, again,
14 referenced in paragraph 14, where there's COPD
15 have you diagnosed emphysema?
16 A. Again, you know, if they had significant
17 emphysematous changes on x-ray, I would have
18 probably mentioned the term "emphysema," but COPD
19 covers emphysema and chronic bronchitis and
20 reactive airways disease.
21 Q. Let's go to paragraph 52.
22 It begins, "Dr. Whitehouse states in his
23 report to this court that only 15 percent of
24 smokers develop clinically significant COPD." Do
25 you see that?

Page 189

1  A. Yes.
2  Q. Now, that statement actually comes from
3  ATS 2004; correct?
4  A. I don't recall that -- seeing that on ATS
5  2004.
6  Q. I can't find it right now. The statement
7  ultimately originates in the surgeon general's
8  report; correct?
9  MR. WEHNER: Object to form.
10 THE WITNESS: I don't know where he
11 got the statement, but I don't believe that it's
12 true. I certainly don't agree with it.
13 BY MR. HEBERLING:
14 Q. Looking at the December 2008
15 Dr. Whitehouse report, at page 48 the bottom line
16 says, ATS 1995, page 79, states, Only about
17 15 percent of cigarette smokers develop clinically
18 significant COPD. Do you see that?
19 A. I see that. I guess that would depend on
20 what your definition of clinically significant is.
21 Q. And are you familiar with the ATS 1995
22 COPD statement?
23 A. I'm sure I've looked at it.
24 Q. You cite at paragraph 52 some studies on
25 autopsies on people with a history of smoking. Is

ASA & GILMAN REPORTING, INC.

(406)752-5751/752-3334

IN RE: W.R. GRACE & CO., ET AL., DEBTORS.
TELEPHONIC DEPOSITION OF GAIL STOCKMAN, M.D.

Case No. 01-01139(JKF)
June 17, 2009

Page 62

1 the bottom.
2     On Exhibit 1 it says, "Patients have been
3 misdiagnosed." Do you see that?
4     A. Let me find that. Yes.
5     Q. And that means you disagree with the CARD
6 doctors' diagnosis?
7     A. Yes, it does.
8     Q. Did you count the number?
9     A. I have not counted a number, no.
10     Q. So you wouldn't know how many of these
11 would have been plaques-only cases?
12     A. I don't know.
13     Q. And you wouldn't know the number of
14 plaques-only cases in the estimation of the CARD
15 doctors?
16     A. No.
17     Q. Do you assume that doctors at CARD
18 discussed prognosis with their patients?
19     A. I have no idea.
20     Q. You don't make an assumption either way?
21     A. No.
22     Q. And the prognosis will depend on the
23 particular patient findings; correct?
24     A. It should.
25     Q. And then further in paragraph 22 -- I'll

Page 63

1 read the whole statement. "In fact, patients have
2 been misdiagnosed, and their physicians advised of
3 this misdiagnosed, which subsequently is recorded
4 on death certificates." Do you see that?
5     A. Yes.
6     Q. Do you have any count on the number of
7 cases where that happened?
8     A. No, I don't have a count.
9     Q. And you can't tell us the names of the
10 people?
11     A. No.
12     Q. And this is just your impression from
13 having seen records?
14     A. This is my impression from having seen
15 patients, talked to patients and reviewed records,
16 yes.
17     Q. And these also would come from the cases
18 you've done medical records review on or examined
19 and treated as listed in paragraph 14; correct?
20     A. Yes.
21     Q. Yeah. Here at the bottom of the
22 page seven of your report, Exhibit 1, you say,
23 "Use of the term 'asbestosis' as a wastebasket"
24 term -- "wastebasket," rather, "to describe even
25 minimum pleural plaquing." Do you see that?

Page 64

1     A. Yes.
2     Q. But, again, you haven't counted the cases
3 where that has occurred?
4     A. No. I'm looking at the comparison with
5 the Markowitz study in which at least 37 percent
6 of these patients had no asbestosis as the basis
7 for that statement.
8     Q. So you're assuming that if they don't
9 have asbestosis they have minimal pleural
10 plaquing?
11     A. No, but I've seen patients with minimal
12 pleural plaquing who come in telling me that they
13 have asbestosis because that's what Dr. Black and
14 Dr. Whitehouse told them.
15     Q. And in those cases was it Dr. Whitehouse
16 and Dr. Black's reading of the films that there
17 was diffuse pleural thickening?
18     A. I don't know. In order to be accurate
19 and in order to be scientific, you have to reserve
20 the term "asbestosis" for asbestosis. It has
21 nothing to do with pleural disease no matter how
22 severe.
23     Q. And, again, in those cases you don't have
24 a count on how many there were where the CARD
25 doctors considered there was pleural thickening or

Page 65

1 pleural plaques?
2     A. Other than what's stated in the mortality
3 study.
4     Q. Then in the Dr. Whitehouse report of
5 December 2008, could you refer to page 17?
6     A. Okay.
7     Q. Do you see Item 5?
8     A. Yes.
9     Q. And do you see that 89 percent in the
10 mortality study had pleural thickening?
11     A. Yes.
12     Q. And do you understand that that, in the
13 terms of the CARD mortality study, means diffuse
14 pleural thickening, which was measured?
15     A. Yes, but it's my understanding from
16 reading this report that diffuse pleural
17 thickening was not necessarily defined the way the
18 rest of the scientific community does because
19 Dr. Whitehouse doesn't agree with that definition.
20 So I don't know how many of these had pleural
21 thickening and how many of them had pleural
22 plaques.
23     Q. And you didn't look on the spreadsheets
24 to make a determination?
25     A. I don't have the spreadsheets, and I

IN RE: W.R. GRACE & CO., ET AL., DEBTORS.
TELEPHONIC DEPOSITION OF GAIL STOCKMAN, M.D.

Case No. 01-01139(JKF)
June 17, 2009

Page 178

1  THE WITNESS: I think most do not.
2  BY MR. HEBERLING:
3      Q. Most do not?
4      A. I don't think so.
5      Q. Which ones do not?
6      A. I can't tell you offhand.
7      Q. Do you know if Crapo does?
8      A. Crapo, I believe, was the one that was
9  done on the Mormons, who were nonsmokers, so --
10     Q. And that's been criticized for excluding
11 smokers; correct?
12     A. Yeah, which I found a little odd, because
13 what you want to know as a reference value is what
14 normal lung function is, so --
15     Q. If normal includes a population of
16 smokers, wouldn't you want to know if the lung
17 function loss is greater than the normal
18 population which includes smokers?
19     A. No. I think that that pretty much
20 muddies the waters because what you want to know
21 is what is the function of a normal lung for any
22 particular person of size, weight and age.
23     Q. Okay. So, then, in Yates is it fair to
24 say there was progressive loss of lung function as
25 noted by the authors?

Page 179

1      A. Well, what she says in her final
2  paragraph is that there was an initial loss of
3  lung function followed by a period of relative
4  stability in the majority of the cases and, in a
5  minority, recurring episodes of pleural
6  inflammation appeared to cause further
7  progression.
8      Q. And there was enough progression in the
9  minority to cause the mean for the whole group to
10 incur what they called considerably more loss than
11 predicted values; correct?
12     A. It's probably statistically significantly
13 greater, but it doesn't look like a huge change on
14 an annual basis.
15     Q. Then at paragraph 37 of your report.
16        Have you got that?
17     A. Yes.
18     Q. The first sentence says, "The diagnosis
19 of asbestos-related diffuse pleural thickening is
20 a diagnosis of exclusion." Do you see that?
21     A. Yes.
22     Q. To make that exclusion, is it generally
23 useful to have a physical examination to do that?
24        MR. WEHNER: Object to form. Asked
25 and answered.

Page 180

1      THE WITNESS: Not necessarily. If
2  you have a complete set of medical records or a
3  good history and chest radiographs or if you have
4  information about latency and exposures, physical
5  examination would not be absolutely necessary.
6  BY MR. HEBERLING:
7      Q. Okay. And in medicine nothing is
8  necessarily so in an absolute sense; correct?
9         MR. WEHNER: Object to form.
10        THE WITNESS: As I've said, we never
11 say never in medicine.
12 BY MR. HEBERLING:
13     Q. Right. So would it be fair to say that
14 to perform this diagnosis of exclusion one would
15 generally need a physical exam --
16     A. No.
17     Q. -- in most cases?
18     A. I wouldn't agree with that.
19     Q. Let's go to paragraph 51. There you
20 begin or you state in the whole paragraph, "It has
21 been my personal experience that patients
22 diagnosed as having asbestosis instead have
23 chronic obstructive pulmonary disease secondary to
24 tobacco smoking." Do you see that?
25     A. Yes.

Page 181

1      Q. And I believe you said that opinion
2  applies to the Libby patients as well; correct?
3         MR. WEHNER: Object to form, and
4  misstates prior testimony.
5         THE WITNESS: I am talking about
6  patients that I have seen from the CARD clinic,
7  not patients in general.
8  BY MR. HEBERLING:
9      Q. Okay. So it's only Libby, only CARD
10 clinic patients; correct?
11     A. It is patients that have been referred to
12 me with a diagnosis of asbestosis, and after I
13 evaluate them, I determine that they, in fact,
14 have chronic obstructive pulmonary disease.
15     Q. And this is, again, based upon your
16 records, reviews and exams, treatment of patients
17 that were described in paragraph 14?
18     A. Yes.
19        MR. WEHNER: Objection. Asked and
20 answered.
21 BY MR. HEBERLING:
22     Q. So are you saying that all such patients
23 have COPD, not asbestosis, or are you saying often
24 that this is the case?
25     A. I'm saying the vast majority of patients

IN RE: W.R. GRACE & CO., ET AL., DEBTORS.
TELEPHONIC DEPOSITION OF GAIL STOCKMAN, M.D.

Case No. 01-01139(JKF)
June 17, 2009

### Page 182

that I have seen coming to me with a diagnosis of asbestosis in fact have cigarette smoking-related disease.

Q. Would you say that the vast majority of the patients that you have followed and treated fit this category also?

A. The patients from --

MR. WEHNER: Object to form.

THE WITNESS: What patients are we talking about?

BY MR. HEBERLING:

Q. In paragraph 14 you say, "And I have evaluated and followed 15 to 20 patients from Libby who were either self-referred or referred by their own primary physicians." Do you believe that your statement that the vast majority of patients with Libby exposures have COPD instead of asbestosis applies to this 15 or 20 patients as well?

A. Yes. Some of those patients have pleural plaques, but they don't have asbestosis, and they definitely have COPD.

Q. You say some of them. Is this a minority or --

A. I said some of them what?

### Page 183

Q. You said that some of the patients have COPD.

A. No. I said some of the patients have pleural plaques.

Q. Yeah. Pleural plaques and COPD; correct? Maybe I didn't hear your answer right.

A. They come to me because they're short of breath and they have a diagnosis of asbestosis, and I found that they may have some pleural plaques but their cause of shortness of breath is their COPD.

Q. If they have a diagnosis of asbestosis, how is it they were sent to you?

A. Sometimes the family doctor sends them for a second opinion. Sometimes they just come to me for a second opinion, or they come to Rocky Mountain Heart & Lung.

Q. So you said that these -- Again, referring to this 15 to 20 patients, I believe you said that they have a diagnosis of asbestosis?

A. They have been given a diagnosis of asbestosis at the CARD clinic when, in fact, they have chronic obstructive pulmonary disease that needs treatment.

Q. And somehow they were referred to you by

### Page 184

the primary physician or came in themselves even though they'd already been seen and treated at the CARD clinic?

MR. WEHNER: Object to form.

THE WITNESS: They'd certainly been seen at the CARD clinic.

BY MR. HEBERLING:

Q. And this applies to all of them?

MR. WEHNER: Object to form.

THE WITNESS: Applies to all of what?

BY MR. HEBERLING:

Q. All of the 15 to 20.

A. You know, I can't tell you that without looking at the records, but I'm telling you that certainly the vast majority have -- When they come to me for an oxygen requirement, for shortness of breath, they have chronic obstructive pulmonary disease related to tobacco smoking.

I'm going to have to take a break because I'm losing my voice.

Q. I'm sorry. We're pretty close to the end.

A. Okay. Let me just have a short break.

(Brief recess.)

/////

### Page 185

BY MR. HEBERLING:

Q. So I was asking about paragraph 14, the three categories of people that you've seen, records reviews, second opinion exams and then patients you've followed.

A. That's correct.

Q. So would it be correct to say that for all three categories the vast majority of patients diagnosed as having asbestosis by CARD, in fact, have COPD from smoking?

A. Yes. That's my opinion.

Q. Have you done numbers on these various categories of patients?

MR. WEHNER: Objection. Asked and answered.

THE WITNESS: No.

BY MR. HEBERLING:

Q. Have you diagnosed asbestosis in any of these patients?

A. I don't recall doing that. Certainly a significant number of them have pleural plaques.

Q. Have you diagnosed asbestos-related pleural disease in any of these patients referenced at paragraph 14?

MR. WEHNER: Object to form.

IN RE: W.R. GRACE & CO., ET AL., DEBTORS.
TELEPHONIC DEPOSITION OF GAIL STOCKMAN, M.D.

Case No. 01-01139(JKF)
June 17, 2009

Page 186

1  THE WITNESS: I have seen many people
2  with pleural plaques.
3  BY MR. HEBERLING:
4  Q. Right. And you don't consider pleural
5  plaques a disease; right?
6  MR. WEHNER: Objection. Asked and
7  answered.
8  THE WITNESS: You know, I consider it
9  a marker of asbestos exposure, and I have seen
10 those. I have not seen anybody with restrictive
11 lung disease from diffuse pleural thickening.
12 BY MR. HEBERLING:
13 Q. So would it be correct to say that in all
14 of these patients listed in paragraph 14 you have
15 not diagnosed any with asbestos-related pleural
16 disease; correct?
17 A. No. I've diagnosed some with pleural
18 plaques.
19 Q. And are you diagnosing that as a disease?
20 A. I am diagnosing it as an entity, as a
21 marker of asbestos exposure. Do I think it's
22 causing them symptoms or signs? No.
23 Q. Okay. So I still don't think I've quite
24 got an answer. You haven't actually diagnosed
25 anybody with asbestos-related pleural disease;

Page 187

1  correct?
2  MR. WEHNER: Object to form.
3  THE WITNESS: In the sense that I do
4  not think that asymptomatic pleural plaques are a
5  disease, that's correct.
6  BY MR. HEBERLING:
7  Q. I'm sorry. It's getting late, but did
8  you say that you had diagnosed anybody with
9  diffuse pleural thickening?
10 A. I said I had not.
11 Q. That's what I thought. Okay.
12    And, again, of all of these people
13 referenced in paragraph 14, are they all smokers
14 or ex-smokers?
15 A. I can't tell you that without reviewing
16 their records, but certainly the patients with
17 COPD are either current or ex-smokers.
18 Q. And, of course, our side can't evaluate
19 what you've done because we haven't received any
20 of the records either; correct?
21 MR. WEHNER: Object to form.
22 THE WITNESS: No. I don't know that.
23 I know that when the doctors at the CARD clinic
24 refer someone over, they certainly get a copy of
25 my report.

Page 188

1  BY MR. HEBERLING:
2  Q. Of course there's no way to tell who that
3  has been from the information at paragraph 14;
4  correct?
5  A. Because I didn't keep a record.
6  Q. And just to make the record clear, you
7  haven't delivered any medical records of any of
8  the patients referenced at paragraph 14; correct?
9  A. I have not personally delivered any
10 records, no.
11 Q. To us?
12 A. No.
13 Q. Right. And of the patients, again,
14 referenced in paragraph 14, where there's COPD
15 have you diagnosed emphysema?
16 A. Again, you know, if they had significant
17 emphysematous changes on x-ray, I would have
18 probably mentioned the term "emphysema," but COPD
19 covers emphysema and chronic bronchitis and
20 reactive airways disease.
21 Q. Let's go to paragraph 52.
22    It begins, "Dr. Whitehouse states in his
23 report to this court that only 15 percent of
24 smokers develop clinically significant COPD." Do
25 you see that?

Page 189

1  A. Yes.
2  Q. Now, that statement actually comes from
3  ATS 2004; correct?
4  A. I don't recall that -- seeing that on ATS
5  2004.
6  Q. I can't find it right now. The statement
7  ultimately originates in the surgeon general's
8  report; correct?
9  MR. WEHNER: Object to form.
10 THE WITNESS: I don't know where he
11 got the statement, but I don't believe that it's
12 true. I certainly don't agree with it.
13 BY MR. HEBERLING:
14 Q. Looking at the December 2008
15 Dr. Whitehouse report, at page 48 the bottom line
16 says, ATS 1995, page 79, states, Only about
17 15 percent of cigarette smokers develop clinically
18 significant COPD. Do you see that?
19 A. I see that. I guess that would depend on
20 what your definition of clinically significant is.
21 Q. And are you familiar with the ATS 1995
22 COPD statement?
23 A. I'm sure I've looked at it.
24 Q. You cite at paragraph 52 some studies on
25 autopsies on people with a history of smoking. Is

48 (Pages 186 to 189)

IN RE: W.R. GRACE & CO., ET AL., DEBTORS.
TELEPHONIC DEPOSITION OF GAIL STOCKMAN, M.D.

Case No. 01-01139(JKF)
June 17, 2009

Page 194

1  comment.
2      Q. Okay. Then below the discussion of
3  Mr. Dickerman, do you see a chart of never smokers
4  from the Libby claimants' medical records?
5      A. Yes.
6      Q. Did you review any of those records?
7      A. None of those look like familiar names,
8  but I can't say for sure.
9      Q. If, in fact, we have all of these never
10 smokers with reduced FEV1/FVC ratios, doesn't that
11 indicate that it's possible to get some kind of
12 obstructive defect from asbestos disease?
13         MR. WEHNER: Objection.
14 Hypothetical.
15         THE WITNESS: Again, these are bits
16 and pieces of pulmonary function tests in patients
17 that I don't know. I haven't seen their x-rays.
18 I really can't comment.
19 BY MR. HEBERLING:
20     Q. You've said all obstructive pattern
21 associated with Libby amphibole asbestos disease
22 as described by Dr. Whitehouse is, in fact, COPD
23 secondary to tobacco smoking. Could there be an
24 obstructive pattern in some of these people due to
25 asthma?

Page 195

1      A. It's possible.
2      Q. Did you rule out asthma in all of the
3  patients that you have reviewed or seen as listed
4  at paragraph 14?
5      A. Certainly the patients I've seen I have
6  done pulmonary function testing on, and it is
7  possible to differentiate asthma from emphysema in
8  my pulmonary function testing.
9      Q. Did you rule out asthma in all of those
10 cases?
11     A. Again, I don't recall, but I believe that
12 the majority of them are not only smokers but
13 heavy smokers with COPD.
14     Q. Then, at paragraphs 59, 60 and 61, you
15 discuss three people, but we've received no
16 medical records on those people, so --
17         MR. WEHNER: That's not true, Jon.
18         MR. HEBERLING: Not true?
19         MR. WEHNER: You got redacted medical
20 records. Bernie sent them to you by e-mail.
21         MR. HEBERLING: I never received any.
22         MR. WEHNER: I've got the e-mail.
23         MR. HEBERLING: I never received it.
24         MR. WEHNER: That's fine. I've got
25 an e-mail.

Page 196

1          MR. HEBERLING: Let's see the date on
2  it.
3          MR. WEHNER: April 16th, 2000 -- Wait
4  a second.
5      Yeah. April 16th, 2009.
6          MR. HEBERLING: Can we make a copy of
7  it?
8          MR. WEHNER: Yeah. If you'd like.
9      Here. I'll pull out -- You can look at
10 this e-mail, but I'm going to pull off the e-mail.
11         (Brief recess.)
12         (Exhibit 7 was marked.)
13         MR. HEBERLING: Back on the record.
14 BY MR. HEBERLING:
15     Q. I've been examining Exhibit 7, and the
16 first page is a set of e-mails. Here is an e-mail
17 of April 9th, which I do have, and then the e-mail
18 of April 16th, which I do not have. Doctor, does
19 it appear that all dates of birth have been
20 removed?
21         MR. WEHNER: You're now looking at
22 the medical record?
23 BY MR. HEBERLING:
24     Q. Yeah. Exhibit 7.
25     A. Yes. The ages are given, but the dates

Page 197

1  of birth have been removed.
2      Q. And can you identify who these people are
3  by name?
4      A. Not today. I don't remember their names.
5      Q. For the record, we've just been through a
6  procedure whereby Dr. Whitehouse produced at his
7  deposition a way of identifying redacted records
8  as to who the patient was, and since the patient
9  name, Social Security number and birth are all
10 redacted, I don't see how Dr. Whitehouse could
11 identify who the patient is. Is there any way to
12 identify the patient so that Dr. Whitehouse can
13 respond to what you've said about them?
14         MR. WEHNER: Object. Asked and
15 answered.
16         THE WITNESS: I don't remember the
17 patients' names as I sit here today. I'm sure I
18 can find the names. I'll have to go through the
19 records at Rocky Mountain Heart & Lung.
20 BY MR. HEBERLING:
21     Q. As you sit here today, can you tell which
22 one is Mr. M or Ms. J or Ms. N?
23     A. No. I just told you I don't remember
24 their names.
25     Q. You've got a copy of Exhibit 7. Does it

IN RE: W.R. GRACE & CO., ET AL., DEBTORS.
TELEPHONIC DEPOSITION OF GAIL STOCKMAN, M.D.

Case No. 01-01139(JKF)
June 17, 2009

Page 198

1  appear that you saw each of these people just
2  once?
3     A. Yes.
4     Q. And so the first one says "Seen at the
5  request of Libby Medical Program"?
6     A. Yes.
7     Q. So that would be the Grace medical
8  program?
9     A. That's my understanding, yes.
10    Q. It would be some form of second opinion?
11    A. Yes.
12    Q. Then this second patient says "Second
13 opinion with regard to whether her requirement for
14 supplemental oxygen is related to asbestos
15 exposure"?
16    A. Yes.
17    Q. And would that be a question that likely
18 came through the Grace Libby Medical Program as
19 well?
20    A. I don't recall specifically, but I would
21 think so, yes.
22    Q. Then the third patient says "70-year-old"
23 (sic) "WF who comes in for a second opinion about
24 her lung disease." Do you see that?
25    A. Yes.

Page 199

1     Q. Does that appear that she was
2  self-referred?
3     A. I believe this one was self-referred, not
4  referred by a physician. Let me see.
5        I don't recall, but I believe she did not
6  come through the Libby Medical Program.
7     Q. It says the referring physician was Mark
8  Heppe, but Dr. Heppe is at the CARD clinic; right?
9     A. Yes.
10    Q. Do you believe Dr. Heppe referred this
11 lady to you?
12    A. He may have.
13    Q. You don't know?
14    A. I don't know. If it says he did, then he
15 may have.
16    Q. Then at page 23 of your report,
17 paragraph 66.
18       Have you found that?
19    A. Yes.
20    Q. It says, "I have seen five patients from
21 Libby and/or the CARD clinic with lung cancer"?
22    A. Yes.
23    Q. Are these included with the patients
24 listed with paragraph 146 your report?
25    A. No.

Page 200

1     Q. This is separate?
2     A. Yes.
3     Q. So in addition to these five patients
4  with lung cancer, have you seen any other patients
5  from Libby that were not listed in paragraph 14?
6     A. No. I don't think so.
7     Q. And you refer to smoking histories. Did
8  you take a history from all five patients?
9     A. Yes.
10    Q. And these are all patients you examined
11 or treated?
12    A. Yes. On a number of them, I did a
13 bronchoscopy to make a diagnosis and/or sent them
14 for a transthoracic needle biopsy and got a
15 diagnosis and referred them on to the appropriate
16 radiation oncologist or oncologist for treatment.
17    Q. Had any of these patients been seen at
18 the CARD clinic?
19    A. Yes. Some of them had been.
20    Q. And your opinion here that the majority
21 of them had pleural plaques and any other opinions
22 you have about them would be based in part on your
23 examination and treatment of them; correct?
24    A. They all had smoking histories that
25 placed them at high risk for lung cancer without

Page 201

1  invoking any other possible risk factors.
2     Q. And are your opinions on these five
3  patients based in part on your examination and
4  treatment of them?
5     A. Certainly I, you know, made diagnoses of
6  lung cancer by examining them and doing the
7  appropriate tests.
8        MR. HEBERLING: That's all of the
9  questions I have.
10       THE WITNESS: Okay.
11       MR. WEHNER: Anybody on the phone?
12       Hello?
13       No?
14       Going once.
15       MR. HEBERLING: Does anyone want to
16 ask any questions of this witness?
17       MR. WEHNER: Thank you.
18       THE REPORTER: Do you want signature?
19       MR. WEHNER: Yeah. We'll sign.
20       (Whereupon, the Telephonic Deposition
21 of GAIL STOCKMAN, M.D. was concluded at 4:59 p.m.,
22 and signature was reserved.)

ASA & GILMAN REPORTING, INC.

(406)752-5751/752-3334