## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| W.R. GRACE & CO., *et al.*, | Case No. 01-01139 (JKF) |
|  | (Jointly Administered) |
| Debtors. | |
|  | **Hearing Date: August 24, 2009 at 10:30 a.m. (ET)** |
|  | **Objections Due: August 7, 2009 at 4:00 p.m. (ET)** |

### LIBBY CLAIMANTS' MOTION TO STRIKE, OR ALTERNATIVELY TO LIMIT, THE EXPERT TESTIMONY OF JOHN PARKER, M.D.

The claimants injured by exposure to asbestos from the Debtors' operations in Lincoln County, Montana (the "Libby Claimants"),[1] by and through their counsel, Cohn Whitesell & Goldberg LLP and Landis Rath & Cobb LLP, hereby move this Court to strike the expert testimony of John Parker, M.D. on the same basis that this Court has ruled that the testimony of Dr. Whitehouse must be limited: failure to produce medical records that contributed to formation of Dr. Parker's opinions.

### INTRODUCTION

1.      On April 9, 2009, Arrowood Indemnity Company, f/k/a/ Royal Indemnity Company, filed a "Motion to Strike Dr. Whitehouse Expert Report or, Alternatively, Compel the Production of Documents and Databases on Which He Relies and for Entry of a Confidentiality Order" (D.I. 21245). The matter was heard on May 14, 2009,[2] after which this Court entered the "Modified Order Granting in Part Motion of Arrowood Indemnity Company, f/k/a/ Royal

---

[1]   As identified in the Amended and Restated Verified Statement of Cohn Whitesell & Goldberg LLP and Landis Rath & Cobb LLP Pursuant to Fed. R. Bankr. P. 2019 [D.I. 21365], as it may be amended and restated from time to time.

[2]   Debtors W.R. Grace ("Grace") supported Arrowood's motion with a brief and argument (May 8, 2009, D.I. 21591). Insurers Maryland Casualty Company ("MCC") (April 30, 2009, D.I. 21492) and Continental Casualty Company ("CCC") (May 4, 2009, D.I. 21523) also joined the motion. At the hearing, fellow Plan Proponents Official Committee of Asbestos Personal Injury Claimants ("ACC") and the Asbestos PI Future Claimants' Representative ("FCR") orally joined the motion. Collectively, Arrowood, Grace, MCC, CCC, ACC, and FCR, are hereinafter referred to as "Movants."

Indemnity Company to Strike Whitehouse Expert Report or, Alternatively, Compel the Production of Documents and Databases on Which He Relies and for Entry of a Confidentiality Order." (D.I. 21874) ("Modified Order"). The Modified Order hinges Dr. Whitehouse's ability to testify as an expert in this case on the production of medical records regarding all 1,800 Libby asbestos patients.[3] Undisputed is that almost half of those 1,800 patients (850) are not among the Libby Claimants who are parties in this case, and that the 850 non-claimants represent merely the clinical background of asbestos patients treated by Dr. Whitehouse in Libby.[4]

2.     Libby Claimants have filed a "Motion to Reconsider [the Modified Order]." (D.I. 22017) ("Motion to Reconsider").[5] The Motion to Reconsider asserts, among other bases for reconsideration, that: (1) Federal Rule of Civil Procedure ("FRCP") 26(a)(2)(B) does not require a treating physician like Dr. Whitehouse to produce expert reports or medical records regarding his patients, be they claimants or non-claimants; and (2) even if physicians like Dr. Whitehouse must produce medical records as part of their reliance materials pursuant to FRCP 26(a)(2)(B), Dr. Whitehouse's specific opinions in this case do not rely upon (i.e. depend, relate to, or derive from) his entire clinical background, but should instead be considered limited under the rule to

---

[3] The Modified Order states in relevant part:
> It is FURTHER ORDERED, that medical records ("the records") for any individual in the population of 1800 patients whose medical records have not yet been produced to the Plan Proponents or other requesting parties must be produced by May 21, 2009, regardless of whether or not such individual is a claimant in these bankruptcy proceedings. . . . Failure to produce a complete set of these medical records will bar Dr. Whitehouse from offering any expert opinion that was formed based upon reliance, in whole or in part, on the records.

[4] All references to 1,800 patients by the Court and Movants (and any basis for finding reliance upon 850 non-claimants) stem exclusively from one simple statement in the Report of Dr. Alan C. Whitehouse, 12/29/08, ¶ 2, "I currently practice chest medicine at the [CARD] in Libby, Montana, where we have over 1,800 active cases of asbestos disease from exposure to Libby asbestos." Nothing in any of Dr. Whitehouse's reports or other parts of the record suggests that Dr. Whitehouse actually relied upon or even looked at patient records of the 850 non-claimants in relation to this case, i.e. in his capacity as a litigation expert.

[5] See also Libby Claimants' Reply Brief in Support of Motion to Reconsider. (D.I. 22466). Briefs opposing the Motion to Reconsider have been filed by Grace (D.I. 22388) and Arrowood (D.I. 22390).

the 950 Libby Claimants in this case and the other reliance materials identified in his expert reports and which records have been produced.  The Motion to Reconsider is pending.

3.    The Libby Claimants hereby file this Motion to Strike, or Alternatively to Limit the Expert Testimony of John Parker, M.D. ("Motion to Strike") based on principles requiring consistency throughout this case based upon the Court's rulings and interpretations of a medical expert's obligations pursuant to FRCP 26(a)(2)(B).  As set forth below, Dr. Parker should be held to the same (or higher)[6] standard relied upon by this Court and applied to Dr. Whitehouse.

4.    At present, the Court's rulings reflect that a medical expert must produce medical records regarding the asbestos patients they have treated or seen and which form the basis of their medical expertise in asbestos disease.  If the Motion to Reconsider is granted and clarifies that all of Dr. Whitehouse's expert testimony is not tied to the production of records regarding hundreds of asbestos patients whose claims are not at issue in this case and which have not been specifically relied upon by Dr. Whitehouse for his opinions in this case, Libby Claimants reserve the right to amend their Motion to Strike or seek other appropriate relief so that Dr. Parker's duties of production pursuant to FRCP 26(a)(2)(B) are interpreted in accordance with whatever new standard is set by the Court at such time.

## ARGUMENT

**I.    This Court Must Apply FRCP 26(a)(2)(B) and its Interpretation of What Materials a Medical Expert is Found to Rely Upon Consistently Throughout this Case for All Medical Experts.**

5.    Dr. Whitehouse's May 14, 2009, report states in relevant part:

---

[6]   Dr. Whitehouse is on special footing because he is a treating physician. *See Salas v. U.S.*, 165 F.R.D. 31, 33 (W.D.N.Y. 1995) (quoting FRCP 26(a)(2), Advisory Committee's Notes, 1993 Amendment, specifically excluding treating physicians).  Dr. Parker has indisputably been "retained or specially employed to provide expert testimony in the case."  FRCP 26(a)(2)(b).  Therefore, no treating physician exception that would otherwise mitigate Dr. Parker's duty of production pursuant to FRCP 26(a)(2) applies.

¶ 84.    The data and other information considered in forming the above opinions and observations include:

> a.    Unless otherwise indicated, observations made in litigation are based upon the approximately 950 persons with ARD who are [Libby Claimants], and specific non-client patients who are listed in the documents in ¶ 82, for whom redacted medical records have been delivered.  This is a very large number, and provides sufficient data to describe all phenomena discussed in this report.

The Court and Movants, however, reject or ignore this definition of what medical records and which Libby asbestos patients Dr. Whitehouse relies upon for his specific opinions in this case. Instead, they look beyond the factual record[7] and interpret FRCP 26(a)(2)(B) so as to establish that Dr. Whitehouse is relying upon all Libby asbestos patients for his opinions in this case.

6.    The Modified Order can only be interpreted as a categorical factual and legal determination about the broad scope of the concept of "reliance" under FRCP 26(a)(2)(B) in this case.[8]  It holds that because Dr. Whitehouse intends to offer medical opinions about Libby asbestos, he "relied upon," for purposes of FRCP 26(a)(2)(B), all of the 1,800 Libby asbestos patients he has ever treated and their records.  Implicitly, it holds that a doctor who has treated patients with disease similar to that on which he is offering expert opinions relies upon his expertise treating all such patients, and is therefore required to produce the records from his related patient population.

7.    While Libby Claimants wish the Court to reconsider its Modified Order, the Libby Claimants and all parties remain bound by its effect.  Applying the Modified Order and its interpretation of FRCP 26(a)(2)(B) to all the medical experts in this case, any doctor intending to offer an opinion regarding asbestos disease that was formed based upon reliance, "in whole or in

---

[7]  *See* fn. 4 above.
[8]  None of the Movants ever cited any case applying FRCP 26(a)(2)(B) in this manner to a medical expert, much less to a treating physician.  Likewise, the Court, both at the May 14 hearing and in its Order, seems to rely on general principles about an expert's obligations (identified only in FRCP 26), and not on any specific authority.

part,"[9] on medical expertise developed while treating or examining patients with asbestos disease must produce the medical records regarding all his or her asbestos patients.

**II.**    **Dr. Parker Has Failed to Produce Records on Which He Must Be Recognized to Rely under the Modified Order and FRCP 26(a)(2)(B) in this Case, and Should Therefore be Barred from Offering Any Expert Opinions on Asbestos Disease.**

8.    Dr. Parker testified at his June 9, 2009, deposition that his clinical experience with patients is one of the important bases for her opinions:

> Q.    Can you tell us about your clinical experience treating asbestos-diseased patients?
> A.    Yes, when I was in San Francisco, California, I took care of patients who had worked in a variety of shipyards in the Bay area.  And then in Morgantown, I've cared for people with asbestos-related disease since 1985 in the pulmonary clinic at West Virginia University.  Those are my major clinical experiences.
>        I've also seen patients and many x-rays on people that have been asbestos-exposed around the world.
> Q.    Could you estimate what number of patients with asbestos disease you've examined?
> A.    I've seen between 20 and 50 people with mesothelioma.  I've seen between 20 and 50 or 60 people with asbestosis.  And I've seen probably 200 people with asbestos-related pleural disease.
>        And lung cancer, probably, again, about 20 patients with lung cancer that we - - or I felt was asbestos-related, and probably several thousand people with lung cancer that may not have been asbestos-related.
> Q.    Of these numbers you gave, what portion would be in the last ten years?
> A.    Last ten years?  Probably 75 percent, in the last ten years.
> Q.    And would the same numbers hold for patients treated?
>        The first question was to patients examined.
> A.    Yes.  Patients that I've examined, I was a treating or consulting physician on, yes.
> Q.    Okay.  And what number of patients with asbestos disease have you followed as treating physician for over two years?
> A.    Well, most of the mesos - - patients with mesothelioma, unfortunately, died in less than two years.  And the patients with asbestosis, probably about half of them I've seen for more than two years.  The people with asbestos-related pleural disease, probably only a quarter of those patients have I seen for two years consecutively.  I may have seen them six or eight years ago and then seen them again.

---

[9] *See* Modified Order.

And the lung cancer patients, very few of those have I followed for more than two years because they're usually managed by oncology after the diagnosis is established.

Q.  And what number of patients with asbestos disease from predominantly amphibole exposures have you examined or treated in the last ten years?

A.  Would you ask that question again, please?

Q.  What number of patients with asbestos disease from predominantly amphibole exposures have you examined or treated in the last ten years?

A.  Fewer than 25 percent of the patients, in response to your first question, would have had amphibole exposure, usually mixed amphibole and Chrysotile exposures.

Q.  Somewhere 20 or 25 percent?

A.  Less than 25 percent, yes.

Q.  Less than 25 percent could be 1 percent. So is it, say, in the neighborhood of 15 to 25 percent or - -

A.  Sure. 15 to 25 percent.

Q.  Okay. Generally, is the examination and treatment of actual patients important to the development of your opinions on asbestos disease?

A.  For individual patients with asbestos-related disease, it's my preference to see them and examine them, in addition to seeing their chest x-rays and lung function testing.

Q.  And then, generally, as to the disease entity, is it important to have experience treating patients, as to your understanding of the disease entity?

A.  Yes.

MR. STANSBURY: Object to the form.

BY MR. HEBERLING:

Q.  And what number of patients with diffuse pleural thickening have you examined or treated in the last ten years?

A.  About 20. Probably about 10 percent of the patients that I've seen with asbestos-related pleural disease have had diffuse pleural thickening.

Q.  And then what number of chest x-rays of patients with asbestos disease have you examined in, say, the last ten years?

A.  30,000.

I should clarify that. I've looked at probably 30,000 x-rays in the last ten years. And your question was how many people with asbestos-related - -

Q.  Right.

A.  - - disease have I seen chest x-rays on?
Probably about - - somewhere between 3- and 5,000. Many people have had asbestos exposure that I've seen the x-rays of, but I - - probably about 3- to 5,000.

Q.  And are your opinions on asbestos disease still evolving?

A.  Yes.

Q.   And does the evolution, in part, relate to the examination and treatment of patients with asbestos disease?

A.   That plays some role.  I think the epidemiologic evaluation of cohorts of patients with asbestos-related disease provides stronger evidence; but I certainly do depend upon my clinical experience in caring for patients and seeing patients presented by other physicians. (3:22—8:14).[10]

9.    Just as Dr. Whitehouse recognized his treatment of 1,800 Libby asbestos patients as part of the information on which he based his clinical opinions regarding Libby asbestos disease, this testimony reflects that Dr. Parker's clinical experience with asbestos disease should be considered pursuant to the Modified Order as part of "the data or other information considered by [Dr. Parker] in forming" his opinions regarding asbestos disease.[11]  Applying the same interpretation of FRCP 26(a)(2)(B) to Dr. Parker that was used as a basis for the Modified Order regarding Dr. Whitehouse, this Court must recognize that the medical records which have not been produced reflecting Dr. Parker's clinical treatment of patients with asbestos disease constitute his reliance materials pursuant to FRCP 26(a)(2)(B).  The Plan Proponents, however, have not produced any of the medical records reflecting Dr. Parker's clinical treatment of patients with asbestos disease.

10.    After having failed to produce medical records reflecting his clinical treatment of patients with asbestos disease, the Modified Order, together with FRCP 26 and FRCP 37, establishes that the sanction for Dr. Parker's failure to produce his reliance materials is that he shall be barred from offering any opinion regarding asbestos disease.  The basis for this sanction was set forth by Movants and indeed relied upon by the Court when adopting the Modified Order.  It should be applied consistently to Dr. Parker.

---

[10]   Attached as Exhibit 1 are all portions of the June 9, 2009, deposition which are cited herein.

[11]   *See* FRCP 26(a)(2)(B)(ii).

**III.    Even if Dr. Parker's Expert Testimony is Not Altogether Barred, He Has Failed to Produce Libby Medical Records on Which He Relies and Should be Precluded from Offering Any Opinions Regarding Libby Asbestos Disease.**

11.    Dr. Parker's opinions in this case are also based upon his own review of medical records regarding specific Libby asbestos patients.  He reviewed 200 "enriched" radiographic films from Libby asbestos patients in February and April 2009, and also reviewed another 7,000 films from the Libby community as part of an earlier study.[12]  *See* Exhibit 1, 116:23—118:11.

12.    Dr. Parker's opinions regarding Libby asbestos disease generally, and in specific rebuttal to Dr. Whitehouse's opinions in this case, relate directly to and were formed in reliance upon his review of, among other records, those particular Libby asbestos films.  *Id.*  As such, the records regarding those Libby asbestos patients must be considered as a distinct and critical element among Dr. Parker's reliance materials pursuant to FRCP 26(a)(2)(B), and likewise under the Modified Order.  Nonetheless, Dr. Parker has failed to identify by name, much less produce any of the records regarding, his review of and experience with Libby asbestos patients.

13.    Libby Claimants have attempted since Dr. Parker's deposition to obtain the medical records regarding those Libby asbestos patients upon which he relies as the basis for his opinions in this case about Libby asbestos disease.[13]  The Plan Proponents have not produced the records in a timely, usable fashion.  The failure by Dr. Parker and the Plan Proponents to identify or produce records regarding these Libby asbestos patients leaves the Libby Claimants utterly incapable of responding to Dr. Parker's opinions.

14.    The principles that led this Court to adopt the Modified Order apply with even greater force to opinions that Dr. Parker intends to offer regarding Libby asbestos disease and

---

[12]  *See* Exhibit 1, 116:23—118:11; *see also* Exhibit 1, 121:17—124:4 (discussing Dr. Parker's opinions after review of Libby chest x-rays).

[13]  *See* June 30, 2009, letter to counsel addressing Dr. Parker's reliance materials, attached hereto as Exhibit 2.

Dr. Whitehouse.  Libby medical records were examined by Dr. Parker solely in his function as an expert in this case and with the express purpose of forming and evaluating opinions regarding Libby asbestos disease and/or Dr. Whitehouse's opinions in this case.  Yet because Dr. Parker and the Plan Proponents have failed to produce the underlying medical records and other documents on which Dr. Parker's opinions in this case rely, Libby Claimants cannot test the opinions that Dr. Parker developed after reliance on those documents or offer any kind of rebuttal.  *See McMillan v. Weeks Marine, Inc.*, 478 F. Supp. 2d 651, 659 ("The purpose of [FRCP 26(a)(2)(B)] is to give opposing parties a reasonable opportunity to prepare for effective cross examination or to secure their own expert witness.").  Libby Claimants need and are entitled to review the underlying documents on which Dr. Parker relied when forming the opinions that he is offering in this case.  Redacted or later-produced records are not sufficient. The prejudice already suffered by Libby Claimants from Dr. Parker's failure to produce is real and significant.  *See Brooks v. Price*, 121 Fed. Appx. 961, 965 (3d Cir. 2005) ("being forced to cross-examine an opposing expert without the benefit of a meaningful opportunity to depose him puts a party at a substantial disadvantage.").

15.    The sanction for such failure is clear.  "FRCP 37(c)(1) gives teeth to the expert disclosure requirements 'by forbidding the use at trial of any information required to be disclosed by Rule 26(a) that is not properly disclosed.'"  *Olson v. Montana Rail Link, Inc.*, 227 F.R.D. 550, 552 (D. Mont. 2005) (prohibiting medical expert who waited until two days before his deposition to provide the data underlying his opinions from relying in any way upon data or conclusions that were not timely provided in accordance with case schedule); *see also United States v. 68.94 Acres of Land*, 918 F.2d 389, 396-97 (3d Cir. 1990) (expert properly excluded after relying on data that had not been disclosed); *Smith v. Botsford Gen'l Hosp.*, 419 F.3d 513, 516-17 (6th Cir.

2005) (affirming the striking of expert who failed to disclose all data and information considered in forming his opinion).  Here, Dr. Parker should be barred from offering any testimony or opinions based, in whole or in part, upon records or documents that have not been provided, including specifically those documents that he reviewed or prepared regarding Libby asbestos patients.

<u>**CONCLUSION**</u>

Based upon the above, Libby Claimants respectfully request that this Court strike altogether or alternatively limit any expert testimony from Dr. Parker, and grant any further relief that is just and proper.

Dated: July 20, 2009
        Wilmington, Delaware

**LANDIS RATH & COBB LLP**

_(signature)_

Adam G. Landis (No. 3407)
Kerri K. Mumford (No. 4186)
919 Market Street, Suite 1800
Wilmington, DE  19801
Telephone:  (302) 467-4400
Facsimile:  (302) 467-4450

- and -

Daniel C. Cohn
Christopher M. Candon
**COHN WHITESELL & GOLDBERG LLP**
101 Arch Street
Boston, MA 02110
Telephone:  (617) 951-2505
Facsimile:  (617) 951-0679

_Counsel for Libby Claimants_

{393.001-W0001427.}