THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al.[1] | ) | Case No. 01-01139 (JKF) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | **Hearing Date: August 24, 2009 at 10:30 a.m.** |
| | ) | **Objection Deadline: August 7, 2009 at 4:00 p.m.** |

**MOTION FOR AN ORDER (A) APPROVING THE AGREEMENTS
BY AND BETWEEN W. R. GRACE & CO.-CONN. AND BUYER; (B) AUTHORIZING
THE SALE OF CERTAIN ASSETS OF W. R. GRACE & CO.-CONN.'S MEMBRANES
BUSINESS TO BUYER FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES
AND OTHER INTERESTS; (C) AUTHORIZING THE ASSUMPTION AND
ASSIGNMENT TO BUYER OF CERTAIN EXECUTORY CONTRACTS AND
UNEXPIRED LEASES; AND (D) GRANTING CERTAIN RELATED RELIEF**

W. R. Grace & Co.-Conn. (the "Selling Debtor," and together with the other above-

captioned debtors, the "Debtors"), hereby files this motion (the "Motion") requesting entry of an

---

[1] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food >N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

order, in substantially the form attached hereto as **Exhibit A** (the "Sale Order"), authorizing the sale of the assets of its Membrane Business and related relief to Buyer.[2]

The Selling Debtor's Grace Davison Membranes business (the "Membranes Business"), based in Littleton, Colorado, is a developer and producer of cellulose acetate polymer, spiral-wound membrane modules used to separate carbon dioxide ($CO_2$) and hydrogen sulfide ($H_2S$) from natural gas streams. These membranes are used in the separation systems of natural gas producers, including private and public companies and state-owned enterprises. The Membranes Business maintains a portfolio of intellectual property that includes patents, trade secrets, and manufacturing know-how related to separation membranes for applications ranging from natural gas treatment, to pharmaceutical and semiconductor lithography applications, to "green" technologies such as $CO_2$ capture and bio-separations. The Membranes Business uses predominantly external sales channels in the distribution of its products.

In the first quarter of 2009, the Selling Debtor began considering strategic alternatives for the Membranes Business. Ultimately, the Debtors determined that a sale of the business would be in the best interests of their estates. This decision was based on a number of factors, of which the major factors were that the Membranes Business: (i) is not complementary to the Debtor's other businesses; (ii) is small (less than 1% of the Debtors' sales) but requires significant management attention; (iii) sells into the natural gas industry, an end market in which the Debtors have no other presence and very little leverage; (iv) has significant potential, but would require significant capital expenditure to achieve that potential; (v) would be attractive to a buyer

---

[2] The name of the Buyer and certain confidential terms of the Sale Agreement have been withheld or redacted from this Motion and the Agreement to protect the confidential nature of the information and business sensitivities. The full un-redacted version of the Agreement shall be provided: (i) to the Court, the Official Committees and the FCRs upon request of the Debtors; and (ii) to other parties in interest, upon request and agreement of the Debtors and the Buyer and execution of a confidentiality agreement.

to whose businesses the Membranes Business would be complementary and for whom the necessary capital expenditures would involve synergies not available to the Debtors. The Debtors believe the sale of the Membranes Business will generate value to the Selling Debtor's estate while enabling senior management to focus on higher-return, core activities.

The Selling Debtor and its financial advisor began marketing and soliciting potential buyers for the Membranes Business in the spring of 2009 and have since contacted numerous strategic and financial buyers. These marketing efforts, which are described more fully below, culminated in the Agreements for which the Selling Debtor seeks approval from this Court. The Buyer has agreed to purchase the Membranes Business pursuant to Bankruptcy Code sections 103, 363 and 365 through a private sale process for $22 million subject to certain post-closing adjustments. The Buyer has expressed and demonstrated its strong desire to close the Sale expeditiously. Because of the extensive marketing efforts, the attractiveness of the transaction by comparison with the proposals from other contenders for the business, and the inherent instability created by the marketing of the Membranes Business, the Selling Debtor has determined to move forward with a private sale. Alternatively, the Debtors would have to continue marketing the Membranes Business and repeat an auction sale process that in effect has already occurred, which would subject the estate to significant market risk with a low probability of identifying a higher and better offer, thereby risking the erosion of the business's potential value. Accordingly, the Selling Debtor believes that the Sale is in the best interests of its estate and creditors, and will serve to maximize the value realized for the Membranes Business.

As a result, the Debtors seek entry of the Sale Order:

> (1)    approving the Membranes Asset Sale Agreement, dated July 15, 2009 (the
> "Sale Agreement," a redacted copy of which is attached hereto as **Exhibit B**),

between the Selling Debtor and Buyer and its parent as Guarantor of Buyer's obligations, and such other agreements to be entered into and among the parties as contemplated therein (the "Ancillary Agreements" and together with the Sale Agreement, the "Agreements");

(2)    authorizing the sale (the "Sale") of certain assets (the "Transferred Assets") to the Buyer free and clear of all liens, claims, encumbrances, and other interests (collectively, the "Liens") except Closing Permitted Exceptions (as such term is defined in the Sale Agreement) in accordance with the terms and conditions set forth in the Agreements;

(3)    authorizing the assumption by the Selling Debtor and the assignment to the Buyer of certain related executory contracts and unexpired leases (the "Transferred Contracts") in connection therewith;

(4)    taking effect immediately by virtue of this Court's waiving the 10-day stay under Bankruptcy Rules 6004(h) and 6006(d); and

(5)    granting certain related relief.

## JURISDICTION

1.    This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b). Venue of this proceeding and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

2.    The statutory predicates for the relief requested herein are sections 105(a), 363(b), (f), (m) and (n), and 365 of the Bankruptcy Code, sections 2002(a)(2), 6004(a), (b), (c), (e), (f)

and (h), 6006(a), (c) and (d), 9006 and 9014 of the Bankruptcy Rules, and Rules 2002-1(b) and

9006-1 of the District of Delaware Local Rules.

## BACKGROUND

### A.      The Debtors' Chapter 11 Cases and the Membranes Business

3.       The Debtors are engaged in specialty chemicals and specialty materials businesses

on a worldwide basis through two operating segments: Grace Davison, which includes silica- and

alumina-based catalysts and materials used in a wide range of industrial applications as well as

materials used for rigid food and beverage packaging; and Grace Construction Products, which

includes specialty chemicals and materials used in commercial and residential construction.

Both divisions have global operations with sales throughout North America, Europe, the Asia-

Pacific region, and Latin America.

4.       Grace Davison accounted for $2.2 billion of sales in 2008, constituting 67% of the

Debtors' consolidated revenue.  Grace Construction Products had $1.1 billion in sales accounting

for 33% of the Debtors' consolidated revenue.  The Membranes Business is a business unit of

Grace Davison and had sales of approximately $6.0 million in 2008.  Thus, the Membranes

Business represents less than 1% of the Debtors' consolidated 2008 revenue.

5.       The Membranes Business, based in Littleton, Colorado, is a developer and

producer of cellulose acetate polymer, spiral-wound membrane modules used to separate carbon

dioxide ($CO_2$) and hydrogen sulfide ($H_2S$) from natural gas streams. These membranes are used

in the separation systems of natural gas producers, including private and public companies and

state-owned enterprises.  The Membranes Business maintains a portfolio of intellectual property

that includes patents, trade secrets, and manufacturing know-how related to separation

membranes for applications ranging from natural gas treatment, to pharmaceutical and

5

semiconductor lithography applications, to "green" technologies such as $CO_2$ capture and bio-separations.

6.    The Membranes Business uses predominantly external sales channels in the distribution of its products. Its principal distributor represents approximately 90% of Membrane Business sales.

7.    The major competitive advantage of the Membranes Business is its technological competency including certain trade secrets and other intellectual property.

8.    The Membranes Business has sixteen employees. Fifteen are located at its production facility in Littleton, Colorado, and its senior principal scientist is based in Columbia, Maryland.

**B.    The Selling Debtor's Extensive Marketing and Sales Efforts**

9.    In April 2008, the Debtors, in consultation with Seale & Associates, Inc., its financial advisor ("Seale"), started pursuing the sale of the Membranes Business. Seale and the Debtors reviewed information on 1300 companies and Seale contacted more than 100 potential strategic buyers and 70 potential financial buyers. Generally, strategic buyers were more interested than financial buyers because they are looking to add the Membranes Business to the package of goods and services that they already offer to natural gas producers.

10.    A brief summary of the investment opportunity was provided to more than 115 potential buyers (both strategic and financial). Of these, 32 potential buyers eventually entered into confidentiality agreements, received a detailed information memorandum, and 12 submitted a preliminary indication of interest containing a preliminary purchase price. Based on the preliminary purchase prices in the indications of interest, four potential buyers were invited to and participated in a tour of the Littleton, Colorado manufacturing facility, and presentations by the management of the business, followed by substantial due diligence through access to an

6

electronic data room and follow-up questions that were answered by the Selling Debtor's management through Seale.

11.     Each of the four potential buyers then submitted a revised firm bid, subject to negotiation of a definitive agreement for the transaction.  In evaluating each bid, the Selling Debtor considered primarily the dollar amount of the bid, Seller Debtor's confidence that the bid would hold up, the bid's required closing conditions, and relative ease of transition of the Membranes Business to the potential buyer's organization.  The Buyer's bid was the second highest; but taking into account all the evaluation criteria, its bid was the most attractive.  The Buyer has a business that is similar to the Membranes Business and therefore was able to quickly understand and evaluate many aspects of the Membranes Business.  The Buyer had received pre-approval of the transaction by its senior executives, and was prepared to move on an accelerated timeline.  By contrast, the highest bidder was unfamiliar with the business, and required an extra two weeks of due diligence before it was prepared to move forward.  The highest bid was therefore basically a further indication of interest, and the Seller Debtor had no certainty whether a bona fide final offer would be forthcoming, much less whether the price would hold up. By contrast, the Buyer had provided a firm bid and was ready to begin negotiations immediately. Based on these factors and circumstances, the Selling Debtor determined, in its business judgment, that the offer from the Buyer was materially better than the three other bids submitted and, as such, constituted the highest and best offer for the Membranes Business.

12.     Moreover, the Buyer has the capability and operating expertise to close the transaction and integrate the Membranes Business into its own operations with only limited transitional assistance from the Debtors.

7

13.     Thus, after examining all of the alternatives, the Selling Debtor concluded that the prompt consummation of a transaction with the Buyer is in the best interests of the Selling Debtor and its affiliates, their creditors, and their estates, and will maximize the value received for the assets of the Membranes Business.

14.     Therefore, the Selling Debtor negotiated and entered into the Agreements with the Buyer, contingent upon Court approval, for which it now seeks approval from this Court.

### C.     Terms and Conditions of the Sale Agreement with the Buyer

15.     On July 15, 2009, after two weeks of intensive arms-length negotiations, the Selling Debtor and the Buyer and the Guarantor executed the Sale Agreement, which is subject to this Court's approval.  As more fully described in the Sale Agreement, the Selling Debtor proposes to sell the Membranes Business to the Buyer on the following terms and conditions:[3]

| | |
|---|---|
| **Selling Debtor** | W. R. Grace & Co.-Conn. |
| **Buyer** | [Redacted] |
| **Guarantor** | [Redacted] |
| **Purchase Price (Section 2.04)** | $22,000,000 |
| **Transferred Assets (Section 2.02(b))** | All of the Selling Debtor's right, title, and interest in assets used exclusively in the Membranes Business including, but not limited to: (i) real property; (ii) leases; (iii) machinery and equipment; (iv) inventory; (v) accounts receivable; (vi) books and records; (vii) rights under the Transferred Contracts; (viii) Permits, to the extent transferable; (ix) office supplies; and (x) intellectual property (including software), but excluding the Excluded Assets. |

---

[3]     Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such terms in the Sale Agreement, a redacted copy of which is attached hereto as **Exhibit B**.  To the extent of any inconsistency between the summary set forth herein and the Sale Agreement, the terms and conditions of the Sale Agreement shall govern.

| Excluded Assets (Section 2.02(b)) | All assets of the Seller and its Affiliates not used exclusively in the Membranes Business, and also (i) cash and cash items; (ii) tax refunds; (iii) intercompany receivables; (iv) insurance policies and policy refunds; (v) employee benefit plans and related funds and refunds; (vi) records relating to any of the Excluded Liabilities; and (vii) the names "Grace" and "Davison." |
|---|---|
| Transferred Contracts (Exhibit 1.02F) | The Contracts identified in Exhibit 1.02F. Buyer may add additional Contracts to Exhibit 1.02F up to sixty (60) days following the Closing Date, in which case the Selling Debtor will file and notice the affected counterparties by motion. |
| Cure Costs (Section 8.09) | To be split 50%-50% between Seller and Buyer. |
| Transferred Liabilities (Section 2.03(a)) | Buyer shall assume and be liable for only the following obligations and liabilities of Seller and its Affiliates: (i) obligations under the Transferred Contracts (other than fifty percent (50%) of Cure Costs) to the extent arising at or after the Closing, solely with respect to periods beginning on and after the Closing Date; (ii) all ordinary course payables of Seller specifically related to the operation of the Subject Business (excluding intercompany payables) accruing prior to the Closing Date to the extent and in the amounts set forth on the Closing Statement; (iii) all ordinary course vacation benefit plan accruals for the current calendar year to the extent and in the amounts set forth on the Closing Statement; and (iv) all payment and performance obligations under Permits included in the Transferred Assets to the extent arising on or after the Closing Date, solely with respect to periods beginning on and after the Closing Date. |
| Excluded Liabilities (Section 2.03(b)) | Buyer is not assuming any liabilities of Seller or any Seller Entity other than the Transferred Liabilities. The Excluded Liabilities include among other things environmental, health and safety liabilities arising with respect to relating to circumstances existing prior to the Closing; liability under any Seller Benefit Plans; any liability or obligation related to any other business of any Seller Entity other than the Membranes Business; and all liabilities and obligations arising out of the Transferred Assets or the Membranes Business prior to the Closing Date. |
| Employee Matters (Article 12) | • Buyer shall offer each Subject Business Employee a job that is comparable to the employee's job with the Membranes Business as of the Closing, at no reduction in base salary or base hourly rate as in effect immediately prior to the Closing,<br>• Buyer shall not assume any Seller Benefit Plans. Buyer shall make available to each Continued Employee all benefits which are made available to its similarly situated employees. |

K&E 15240222.3

| | |
|---|---|
| **Closing Date (Section 3.01)** | The fifth Business Day after conditions to Closing (other than conditions that are required to be fulfilled at the Closing) have been fulfilled or waived, or as the Parties shall otherwise agree in writing. |
| **Closing Conditions (Articles 10, 11)** | The Sale Order has become a Final Order; all covenants and agreements required to be performed before the Closing have been performed; no Material Adverse Effect has occurred. |
| **Termination of the Sale Agreement (Article 13)** | The Sale Agreement may be terminated: at any time prior to the Closing by written agreement of Seller and Buyer; at the written election of Buyer or Seller, if the Closing has not occurred within one hundred-eighty (180) days after the date of the Sale Agreement by reason of the failure to be satisfied of any of the conditions to Closing (provided that no Party may terminate if the failure to close is the result of a breach of the Sale Agreement by that Party); at any time prior to Closing if (i) Seller's case is converted to a case under chapter 7 of the Bankruptcy Code, (ii) a plan of reorganization is filed by Seller which is incompatible with the performance of Seller's obligations under the Sale Agreement or (iii) a chapter 11 trustee is appointed for Seller; by Buyer if the Bankruptcy Court approves an order authorizing the sale of the Transferred Assets to another Person. |
| **Break-Up Fee (Section 13.02(a))** | 2.5% of the Purchase Price, or $550,00, payable within 30 days of closing of an alternative transaction. |
| **Indemnification (Article 14)** | • With customary exceptions (validity of agreement, title to assets, etc.) most representations and warranties expire 18 months after the Closing (24 months for environmental and intellectual property). <br> • Each of Seller's and Buyer's indemnification obligations for breach of representations and warranties are subject to a deductible per occurrence of $25,000 with a $100,000 aggregate deductible and will be limited to and not exceed $4,400,000, provided that certain fundamental representations and warranties are not subject to the foregoing limitations. |
| **Release of Restrictions (Section 16.10)** | [Redacted] |

## RELIEF REQUESTED

16.    By this Motion, pursuant to sections 105(a), 363(b), (f) and (m), and 365 of the Bankruptcy Code, the Selling Debtor:  (a) seeks entry of an order by this Court approving the Agreements with the Buyer and authorizing the sale of the Membranes Business to the Buyer

free and clear of all Liens (except the Closing Permitted Exceptions), upon the terms set forth in the Agreements and Sale Order, (b) seeks authority for the Selling Debtor to assume and assign to the Buyer the Transferred Contracts, (c) requests authority to pay a Break-Up Fee to the Buyer, if applicable, (d) requests that the Sale Order be effective immediately by waiving the 10-day stay under Bankruptcy Rule 6004(h) and 6006(d), and (e) requests such other and further relief as is just and proper.

## BASIS FOR RELIEF

17.     In accordance with Bankruptcy Rule 6004, sales of property rights outside the ordinary course of business may be conducted by private sale or public auction.  The Selling Debtor has determined that the Sale of the Membranes Business by private sale to the Buyer will produce the highest and best offer for this business (thereby maximizing the value of to its estate) and is in the best interests of the Selling Debtor and its affiliates, their estates, and their creditors.

18.     The Agreements represent the culmination of a comprehensive, arms-length negotiation for the Sale of the Membranes Business in exchange for the highest and best consideration available for such business.  In the Selling Debtor's business judgment, the Selling Debtor believes that the Sale will provide a larger recovery for the Selling Debtor's estate than would be provided by any other viable alternative.  The bases for the relief requested in this Motion are founded in a number of provisions of the Bankruptcy Code and Bankruptcy Rules. These bases are discussed in detail below.

A.      **Bankruptcy Code Section 363 Permits The Sale Of The Membranes Business Outside The Ordinary Course Of Business.**

19.     Section 363 of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Although section 363 of the Bankruptcy Code does not specify a

11

standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, the bankruptcy courts routinely authorize sales of a debtor's assets if such sale is based upon the sound business judgment of the debtor. See, e.g., Meyers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996); The Official Committee of Unsecured Creditors v. The LTV Corp. (In re Chateaugay Corp.), 973 F.2d 141, 143 (2d Cir. 1992); Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070-71 (2d Cir. 1983); In re Delaware & Hudson Railway Co., 124 B.R. 169, 176 (D. Del. 1991). Indeed, the Delaware & Hudson Railway court rejected the pre-Code "emergency" or "compelling circumstances" standard, finding the "sound business purpose" standard applicable and, discussing the requirements of that test under Lionel, observing:

> A non-exhaustive list of factors to consider in determining if there is a sound business purpose for the sale include: the proportionate value of the asset to the estate as a whole; the amount of elapsed time since the filing; the likelihood that a plan of reorganization will be proposed and confirmed in the near future; the effect of the proposed disposition of the future plan of reorganization; the amount of proceeds to be obtained from the sale versus appraised values of the property; and whether the asset is decreasing or increasing in value.

124 B.R. at 176. The Delaware & Hudson Railway court further held that:

> [o]nce a court is satisfied that there is a sound business reason or an emergency justifying the pre-confirmation sale, the court must also determine that the trustee has provided the interested parties with adequate and reasonable notice, that the sale price is fair and reasonable and that the proposed purchaser is proceeding in good faith.

Id.

20.    Furthermore, once "the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." Committee of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 616 (Bankr.

S.D.N.Y. 1986).  There is a presumption that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company."  The Official Comm. of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)).  Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1).

21.     The Selling Debtor has proposed the Sale of the Membranes Business after thorough consideration of all viable alternatives, and has concluded that the Sale is supported by a number of sound business reasons.  As previously discussed, the Membranes Business: (i) represents less than 1% of the Debtors' revenues, (ii) is the Debtors' sole business unit that sells into the natural gas industry, and (iii) is a non-core operation.  Thus, the Selling Debtor seeks to sell the Membranes Business at this time to generate value to the estate while enabling the Debtors' senior management to focus on higher-return, core activities.

22.     The Selling Debtor also believes that the amount of the consideration received for the Membranes Business is fair and reasonable.  The fairness and reasonableness of the consideration to be paid by the Buyer ultimately has been demonstrated by adequate "market exposure" and a fair marketing process – the best means for establishing whether a fair and reasonable price is being paid.

23.     Thus, the extensive marketing efforts have demonstrated that there is a limited market for the Membranes Business and that the offer made by the Buyer is the best offer that the Debtor has received for such assets.  The timing contemplated by this Motion -- an expected closing date in September 2009 -- will eliminate any potential uncertainty surrounding the

Membranes Business and mitigate the risk that its financial performance and hence the value of the Membranes Business might suffer from this uncertainty.  Accordingly, the Selling Debtor, in its business judgment, believes that the Agreements are in the best interests of the estate and its creditors.  The Selling Debtor requests that this Court make a finding at the hearing on this Motion that the proposed Sale is a proper exercise of the Selling Debtor's business judgment and is duly authorized.

**B.      The Sale Of The Membranes Business Free And Clear Of Liens And Other Interests Is Authorized By Section 363(f).**

24.      The Selling Debtor further submits that it is appropriate to sell the Membranes Business free and clear of Liens (except the Closing Permitted Exceptions) pursuant to section 363(f) of the Bankruptcy Code, with any such Liens attaching to the net sale proceeds of the Membranes Business to the extent applicable.  Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of any interest in such property of an entity other than the estate if:

(1)      applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2)      such entity consents;

(3)      such interest is a lien and the price at which such property is sold is greater than the aggregate value of all liens on such property;

(4)      such interest is in bona fide dispute; or

(5)      such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

25.      This provision is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).

14

26.    Because Bankruptcy Code section 363(f) is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Membranes Business "free and clear" of liens and interests. In re Dundee Equity Corp., 1992 Bankr. LEXIS 436, at *12 (Bankr. S.D.N.Y. Mar. 6, 1992) ("[s]ection 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met."); In re Elliott, 94 B.R. 343, 345 (E.D. Pa. 1988) (same).

27.    The Selling Debtor believes that one or more of the tests of section 363(f) are satisfied with respect to the transfer of the Membranes Business pursuant to the Sale Agreement. In particular, the Selling Debtor believes that at least section 363(f)(2) will be met in connection with the transactions proposed under the Sale Agreement because each of the parties holding liens on the Membranes Business will consent, or absent any objection to this Motion, will be deemed to have consented to, the Sale.    Any lienholder also will be adequately protected by having its Liens, if any, in each instance against the Selling Debtor or its estate, attach to the cash proceeds of the Sale ultimately attributable to the Membranes Business in which such creditor alleges an interest, in the same order of priority, with the same validity, force and effect that such creditor's liens had prior to the Sale, subject to any claims and defenses the Selling Debtor and its estate may possess with respect thereto.    Accordingly, section 363(f) authorizes the transfer and conveyance of the Membranes Business free and clear of any Liens (other than the Permitted Exceptions).

C.    **The Transferred Assets And Transferred Contracts Should Be Sold Free And Clear Of Successor Liability.**

28.    Under the terms of the Sale Agreement, the Buyer is not liable for any of the Selling Debtor's liabilities as a successor to the Selling Debtor's business or otherwise (the "Excluded Liabilities"), unless expressly assumed.    Extensive case law exists providing that

15

claims against a buyer are directed to the proceeds of a free and clear sale of property and may not subsequently be asserted against a buyer.

29.     Although section 363(f) of the Bankruptcy Code provides for the sale of assets "free and clear of any interests," the term "any interest" is not defined anywhere in the Bankruptcy Code. Folger Adam Security v. DeMatteis/MacGregor JV, 209 F.3d 252, 257 (3d Cir. 2000). In the case of In re Trans World Airlines. Inc., 322 F.3d 283, 288-89 (3d Cir. 2003), the Third Circuit specifically addressed the scope of the term "any interest." The Third Circuit observed that while some courts have "narrowly interpreted that phrase to mean only in rem interests in property," the trend in modern cases is towards "a more expansive reading of 'interests in property' which 'encompasses other obligations that may flow from ownership of the property.'" Id. at 289 (citing 3 Collier on Bankruptcy 363.06[1]). As determined by the Fourth Circuit in In re Leckie Smokeless Coal Co., 99 F.3d 573, 581-582 (4th Cir. 1996), a case cited approvingly and extensively by the Third Circuit in Folger, the scope of section 363(f) is not limited to in rem interests. Thus, the Third Circuit in Folger stated that Leckie held that the debtors "could sell their assets under § 363(f) free and clear of successor liability that otherwise would have arisen under federal statute." Folger, 209 F.3d at 258.

30.     Courts have consistently held that a buyer of a debtor's assets pursuant to a section 363 sale takes free from successor liability resulting from pre-existing claims. See The Ninth Avenue Remedial Group v. Allis-Chalmers Corp., 195 B.R. 716, 732 (Bankr. N.D. Ind. 1996) (stating that a bankruptcy court has the power to sell assets free and clear of any interest that could be brought against the bankruptcy estate during the bankruptcy); MacArthur Company v. Johns-Manville Corp. (In re Johns-Manville Corp.), 837 F.2d 89, 93-94 (2d Cir. 1988) (channeling of claims to proceeds consistent with intent of sale free and clear under section

16

363(f) of the Bankruptcy Code); In re New England Fish Co., 19 B.R. 323, 329 (Bankr. W.D. Wash. 1982) (transfer of property in free and clear sale included free and clear of Title VII employment discrimination and civil rights claims of debtor's employees); In re Hoffman, 53 B.R. 874, 876 (Bankr. D.R.I. 1985) (transfer of liquor license free and clear of any interest permissible even though the estate had unpaid taxes); American Living Systems v. Bonapfel (In re All Am. Of Ashburn, Inc.), 56 B.R. 186, 190 (Bankr. N.D. Ga. 1986) (product liability claims precluded on successor doctrine in a sale of assets free and clear); WBQ Partnership v. Virginia Dept. of Medical Assistance Services (In re WBQ Partnership), 189 B.R. 97, 104-05 (Bankr. E.D. Va. 1995) (Commonwealth of Virginia's right to recapture depreciation is an "interest" as used in section 363(f)).

31.    Here, the Debtors' chapter 11 cases were filed in good faith.  The Buyer has engaged in arm's-length negotiations with the Selling Debtor and has not exerted control or undue influence over the Selling Debtor.  The Buyer is completely and wholly unrelated to the Selling Debtor.  The Buyer does not, and will not, share any common incorporators, officers, directors, or controlling stockholders with the Selling Debtor, and the Buyer is not an insider of the Selling Debtor.  See 11 U.S.C. § 101(31).

32.    In addition, no other person or entity (or persons or entities) has offered to enter into an agreement or series of agreements as favorable to the Selling Debtor as the Sale Agreement.  If the Sale Agreement is not approved, then management will be forced to evaluate options that are not as attractive as the current offer.  For obvious reasons, the very purpose of an order purporting to authorize the transfer of assets free and clear of all "interests" would be frustrated if claimants could thereafter use the transfer as a basis to assert claims against a purchaser arising from a seller's pre-sale conduct.

33.     Furthermore, the Selling Debtor is providing notice of the proposed sale to all known parties in interest that may assert claims or interests relating to the Transferred Assets against the Selling Debtor, including, but not limited to, trade creditors, contract counterparties, lenders and other parties known to the Selling Debtor to be asserting claims of any kind relating to the Transferred Assets.  Under section 363(f) of the Bankruptcy Code, the Buyer is entitled to know that the Transferred Assets are not infected with latent claims that will be asserted against the Buyer after the proposed transaction is completed.  Accordingly, consistent with the above-cited case law, the order approving the Sale should state that the Buyer is not liable as a successor under any theory of successor liability, for claims that encumber or relate to the Transferred Assets.

**D.     The Buyer Is A Good Faith Buyer And Is Entitled To The Full Protection Of Section 363(m) Of The Bankruptcy Code, And The Transfer Of The Membranes Business Does Not Violate Section 363(n).**

34.     Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).  While the Bankruptcy Code does not define "good faith," the Third Circuit in In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143 (3d Cir. 1986) held that:

> [t]he requirement that a buyer act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings.  Typically, the misconduct that would destroy a buyer's good faith status at a judicial sale involves fraud, collusion between the Proposed Buyer and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

788 F.2d at 147 (citations omitted).

35.     In the present case, the Sale is an intensively-negotiated transaction in which the Buyer has, at all times, acted in good faith under the <u>Abbotts Dairy</u> standards. In addition to a fair and reasonable value offered by the Buyer, the proposed sale also is the product of arms-length, good faith negotiations, in which the Selling Debtor bargained for the maximum possible purchase price for the Membranes Business. Extensive negotiations were held between the parties involving substantial time and energy by the parties and their professionals, and the Agreements reflect give-and-take and compromises by both sides.

36.     In addition, the Buyer is not an "insider" of any of the Debtors, as that term is defined in section 101(31) of the Bankruptcy Code. There is absolutely no indication of fraud or improper insider dealing of any kind. The Sale Agreement does not constitute an avoidable transaction pursuant to section 363(n) and the Buyer should receive the protections afforded good faith purchasers by section 363(m). Accordingly, the Selling Debtor requests that the Court make a finding at the hearing that the Buyer is entitled to the full protections of Bankruptcy Code section 363(m).

### E.     **Assumption And Assignment Of The Transferred Contracts Is Authorized By Section 365 Of The Bankruptcy Code.**

37.     The Sale contemplates the assumption and assignment of certain executory contracts and unexpired leases of the Membranes Business to the Buyer, which are necessary to the Buyer for the continuation of the Membranes Business and, at the same time, will enhance the value of the Sale to the Selling Debtor's estate by curtailing further administrative liability to the estate and eliminating certain rejection claims. Specifically, the Debtors propose to assume and assign to Buyer those Transferred Contracts set forth on **Exhibit B** to the proposed Sale Order (the "<u>List of Transferred Contracts</u>"). The List of Transferred Contracts also sets forth next to each Transferred Contract the proposed Cure Amount that the Selling Debtor proposes to

19

pay to each counterparty. The Debtors believe that most of the Transferred Contracts were entered into post-petition and in any event, the Debtors believe they are current on all outstanding obligations under the Transferred Contracts and that no cure amounts are owing. In an abundance of caution and to the extent applicable, the Selling Debtor requests approval to assume and assign the Transferred Contracts to the Buyer pursuant to section 365(f) of the Bankruptcy Code, notwithstanding any provisions in the Transferred Contracts, including those described in sections 365(b)(2) and (f)(1) and (3) of the Bankruptcy Code, that prohibit such assignment.

38.    Section 365(f) of the Bankruptcy Code provides, in pertinent part, that:

> The trustee may assign an executory contract or unexpired lease of the debtor only if –
>
> (A)    the trustee assumes such contract or lease in accordance with the provisions of this section; and
>
> (B)    adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2). Under section 365(a), a debtor "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Section 365(b)(1), in turn, codifies the requirements for assuming an unexpired lease or executory contract of a debtor, providing that:

> (b) (1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee –
>
> (A)    cures, or provides adequate assurance that the trustee will promptly cure, such default ….;
>
> (B)    compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

        (C)     provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(l).

39.    The standard applied by a court in determining whether the assumption or rejection of an executory contract or unexpired lease pursuant to section 365(a) should be approved is the "business judgment" test, which requires a debtor to determine that the requested assumption or rejection would be beneficial to its estate. See, e.g., In re Group of Institutional Investors, Inc. v. Chicago, Milwaukee, St. Paul and Pac. R.R. Co., 318 U.S. 523, 550 (1943) ("the question [of assumption] is one of business judgment"); Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1098-99 (2d Cir. 1993) (to decide a motion to assume the court must put itself in the position of the trustee and determine whether such assumption would be a good decision or a bad one).

40.    Courts generally will not second-guess a debtor's business judgment concerning the assumption of an executory contract. See In re Paolo Gucci, 193 B.R. 411, 414 (S.D.N.Y. 1996); see also Sharon Steel Corp. v. National Gas Fuel Distrib. Corp. (In re Sharon Steel Corp.), 872 F.2d 36, 40 (3d Cir. 1989); In re III Enter., Inc., 163 B.R. 453, 469 (Bankr. E.D. Pa. 1994) ("Generally, a court will give great deference to a debtor's decision to assume or reject an executory contract. A debtor need only show that its decision to assume or reject the contract is an exercise of sound business judgment—a standard which we have concluded many times is not difficult to meet.").

41.    In the present case, the Selling Debtor's assumption and assignment of the Transferred Contracts to the Buyer meets the business judgment standard and satisfies the requirements of section 365 of the Bankruptcy Code. As discussed above, the transactions contemplated by the Agreements will provide significant benefits to the Selling Debtor's estate.

21

Because the Selling Debtor cannot obtain the benefits of the Sale Agreement without the assumption of the Transferred Contracts referenced above, the assumption of these Transferred Contracts is undoubtedly a sound exercise of the Selling Debtor's business judgment.

42.     Further, a debtor in possession may assign an executory contract or an unexpired lease of the debtor if it assumes the agreement in accordance with section 365(a), and provides adequate assurance of future performance by the assignee, whether or not there has been a default under the agreement. See 11 U.S.C. § 365(f)(2). Significantly, among other things, adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. See, e.g., In re Bygaph, Inc., 56 B.R. at 605-06 (stating that adequate assurance of future performance is present when the prospective assignee of a lease from the debtor has financial resources and has expressed willingness to devote sufficient funding to the business in order to give it a strong likelihood of succeeding).

43.     The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." EBG Midtown South Corp. v. McLaren/Hart Envtl. Engineering Corp. (In re Sanshoe Worldwide Corp.), 139 B.R. 585, 592 (S.D.N.Y. 1992) (citations omitted), aff'd, 993 F.2d 300 (2d Cir. 1993); Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1989).

44.     Here, the Buyer has agreed to pay half of the Cure Amounts in connection with the Transferred Contracts, although the Selling Debtor estimates that the cure payments associated with all of the Transferred Contracts is $0.00. Furthermore, the assignee, i.e., the Buyer, has sufficient assets to continue performance under the Transferred Contracts from and

22

after the Closing Date.  To the extent necessary, the Buyer is able and willing, at the Sale

Hearing or earlier to a party upon request, to demonstrate to the satisfaction of this Court that

adequate assurance of future performance is present.  The Sale Hearing will therefore provide the

Court and other interested parties with the opportunity to evaluate and, if necessary, challenge

the ability of the Buyer or other successful bidder to provide adequate assurance of future

performance under the Transferred Contracts.  Accordingly, the Selling Debtor submits that the

assumption and assignment of the Transferred Contracts as set forth herein should be approved.

45.    To assist in the assumption, assignment and sale of the Transferred Contracts, the

Selling Debtor also requests that the Court enter an order providing that anti-assignment

provisions in the Transferred Contracts shall not restrict, limit or prohibit the assumption,

assignment and sale of the Transferred Contracts and are deemed and found to be unenforceable

anti-assignment provisions within the meaning of section 365(f) of the Bankruptcy Code.

46.    Section 365(f)(1) of the Bankruptcy Code permits a debtor to assign unexpired

leases and contracts free from such anti-assignment restrictions:

> [N]otwithstanding a provision in an executory contract or unexpired lease of the
> debtor, or in applicable law, that prohibits, restricts, or conditions the assignment
> of such contract or lease, the trustee may assign such contract or lease under
> paragraph (2) of this subsection.

11 U.S.C. § 365(f)(1).

47.    Section 365(f)(1), by operation of law, invalidates provisions that prohibit, restrict,

or condition assignment of an executory contract or unexpired lease. See, e.g., Coleman Oil Co.,

Inc. v. The Circle K Corp. (In re The Circle K Corp.), 127 F. 3d 904, 910-11 (9th Cir. 1997) ("no

principle of bankruptcy or contract law precludes us from permitting the Debtors here to extend

their leases in a manner contrary to the leases' terms, when to do so will effectuate the purposes

of section 365").  Section 365(f)(3) goes beyond the scope of section 365(f)(1) by prohibiting

23

enforcement of any clause creating a right to modify or terminate the contract or lease upon a proposed assumption or assignment thereof. See, e.g., In re Jamesway Corp., 201 B.R. 73 (Bankr. S.D.N.Y. 1996) (section 365(f)(3) prohibits enforcement of any lease clause creating right to terminate lease because it is being assumed or assigned, thereby indirectly barring assignment by debtor; all lease provisions, not merely those entitled anti-assignment clauses, are subject to court's scrutiny regarding anti-assignment effect).

48.    Other courts have recognized that provisions that have the effect of restricting assignments cannot be enforced. See In re Rickel Home Centers, Inc., 240 B.R. 826, 831 (D. Del. 1998) ("In interpreting Section 365(f), courts and commentators alike have construed the terms to not only render unenforceable lease provisions which prohibit assignment outright, but also lease provisions that are so restrictive that they constitute de facto anti-assignment provisions."). Similarly, in In re Mr. Grocer, Inc., the court noted that:

> [the] case law interpreting § 365(f)(l) of the Bankruptcy Code establishes that the court does retain some discretion in determining that lease provisions, which are not themselves ipso facto anti-assignment clauses, may still be refused enforcement in a bankruptcy context in which there is no substantial economic detriment to the landlord shown, and in which enforcement would preclude the bankruptcy estate from realizing the intrinsic value of its assets.

77 B.R. 349, 354 (Bankr. D.N.H. 1987).    Thus, the Selling Debtor requests that any anti-assignment provisions be deemed not to restrict, limit or prohibit the assumption, assignment and sale of the Transferred Contracts and be deemed and found to be unenforceable anti-assignment provisions within the meaning of section 365(f) of the Bankruptcy Code.

F.    **A Private Sale Of The Membranes Business Is Authorized Under Bankruptcy Rule 6004.**

49.    Bankruptcy Rule 6004(f)(1) provides that "[a]ll sales not in the ordinary course of business may be by private sale or by public auction." Fed. R. Bankr. P. 6004(f)(1).    Courts often allow chapter 11 debtors to sell assets outside the ordinary course of business by private

24

sale when the debtors demonstrate that the sale is permissible pursuant to section 363(b) of the Bankruptcy Code. See, e.g., Palermo v. Pritam Realty, Inc. (In re Pritam Reality, Inc.), 233 B.R. 619 (D.P.R. 1999) (upholding the bankruptcy court's approval of a private sale conducted by a chapter 11 debtor); In re Condere Corp., 228 B.R. 615 (Bankr. S.D. Miss. 1998) (approving a private sale of a chapter 11 debtor's assets where the standards of § 363(b) were met); In re Embrace Systems Corp., 178 B.R. 112, 123 (Bankr. W.D. Mich. 1995) ("A large measure of discretion is available to a bankruptcy court in determining whether a private sale should be approved. The court should exercise its discretion based upon the facts and circumstances of the proposed sale."); In re Wieboldt Stores, Inc., 92 B.R. 309 (N.D. Ill. 1988) (affirming right of chapter 11 debtor to transfer assets by private sale).

50.     Here, the Selling Debtor proposes to proceed with the sale of the Membranes Business by way of a private sale without incurring the cost and delay associated with conducting a public auction. An auction is not required under section 363(b) of the Bankruptcy Code. *In re Trans World Airlines, Inc.*, 2001 WL 18202326, at *4 (Bankr. D. De. 2001) (noting that "a 363(b) sale transaction does not require an auction procedure. The auction procedure has developed over the years as an effective means for producing arm's length fair value transaction."). As discussed above, the Selling Debtor extensively marketed the Membranes Business and conducted multiple bidding rounds to obtain the highest and best offer therefor. As a result, the Selling Debtor submits that the Buyer's offer is the highest and best that the Selling Debtor has received, and constitutes fair market value, given the limited market for the Membranes Business.

51.     The alternative to the proposed Sale is to continue to market the Membranes Business and conduct another auction sale process, which would subject the estate to significant

25

market risk with a low probability of identifying a higher and better offer. The Selling Debtor believes that further delays in completing the Sale could lead to deteriorating financial performance of the Membranes Business and eroded potential value. Moreover, employees and customers of the Membranes Business would continue to face uncertainty regarding the future of the Membranes Business. This uncertainty could potentially lead to loss of employees, weakened financial performance, and the erosion of value.

52.     Because a private sale is specifically authorized under Bankruptcy Rule 6004 and the Selling Debtor believes that the Buyer's offer is the highest and best offer for the Membranes Business, the Selling Debtor requests that this Court approve the proposed private sale of the Membranes Business to the Buyer in accordance with the Agreements.

### G.     Notice Of The Proposed Sale Satisfies Bankruptcy Rule 2002.

53.     A copy of this Motion and the Notice of Motion will be served on: (i) the U.S. Trustee; (ii) counsel to the Committees and the FCRs; (iii) counsel to the administrative agents for the Debtors' prepetition secured lenders; (iv) counsel to the Debtors' postpetition lenders; (v) all parties that have requested special notice pursuant to Bankruptcy Rule 2002; (vi) the Buyer and its counsel; (vii) all persons or entities known or reasonably believed to have asserted a Lien in any of the assets of the Membranes Business; (viii) federal, state and local taxing authorities who have a reasonably known interest in the relief requested by this Motion; (ix) the counterparty to each of the Transferred Contracts; (x) all persons or entities known or reasonably believed to have expressed a serious interest in acquiring the Membranes Business; and (xi) the United States Attorneys for the Districts of Delaware, Colorado and Maryland (collectively, the "Notice Parties"). In addition, the Debtors will be publishing the Notice of the Sale Motion and the hearing on the request for entry of the Sale Order and the objection deadline for such hearing

26

in *The Wall Street Journal* National Edition and *The Denver* Post at a time reasonably in advance of such objection deadline and hearing.

54.     Several sections of the Bankruptcy Code dictate the sufficiency of notice and adequacy of service.  As discussed below, the content and manner of service of this Motion and the related notice satisfies all such requirements:

55.     <u>Section 363 Notice</u>:  Section 363 of the Bankruptcy Code provides that a trustee may sell property "after notice and hearing."  Under section 102(1) of the Bankruptcy Code, the phrase "after notice and hearing" means "notice as is appropriate in the particular circumstances, and such opportunity for a hearing as is appropriate in the particular circumstances."  11 U.S.C. § 102(1)(A).  As set forth above, by service and publication of this Motion, all interested parties have been provided notice of the salient details regarding this Motion and the Sale Hearing.  Accordingly, notice is sufficient under section 363 of the Bankruptcy Code.

56.     <u>Bankruptcy Rule 2002</u>:  Bankruptcy Rule 2002 requires twenty days notice of proposed sales of property other than in the ordinary course of business.  In addition, Bankruptcy Rule 2002 provides that, as to sales, notice of a sale shall "include the time and place of any public sale, the terms and conditions of any private sale and the time fixed for filing objections."  Fed. R. Bankr. P. 2002.  Local Rule 2002-1(b) specifies the parties on whom a Motion for a sale other than in the ordinary course of business must be served in cases pending in this jurisdiction.  The Debtor believes that this Motion and Sale Notice contains the requisite information to reasonably notify parties in interest in satisfaction of the foregoing rules and requirements, and as discussed in detail herein, exigent circumstances necessitate the Selling Debtor to be able to have the Motion approved as expeditiously as possible, but by no later than August 24, 2009, in order for the Debtor to be in a position to close the Sale on or before September 15, 2009).

27

Indeed, by filing on July 20 for a August 24 hearing, the Selling Debtor is providing 35 days notice of the Sale.

57.     Bankruptcy Rules 6004 and 6006:  Bankruptcy Rule 6004 requires that notices of sales of property out of the ordinary course of business comply with Bankruptcy Rule 2002. As set forth above, the Debtor has complied with Bankruptcy Rule 2002.  Bankruptcy Rule 6006 requires notice of a motion to assume or assign an executory contract or unexpired lease to be served on the counterparty to such contract or lease, as well as on other parties in interest as this Court may direct.  The list of Transferred Contracts, including cure amount, and notice of the Motion will be served on counterparties to the Transferred Contracts, and thus this requirement will be satisfied.

58.     Procedural Due Process:  The notice of this Motion that is being provided is "reasonably calculated" to apprise interested parties of the pendency of the matter and to afford them an opportunity to object. See Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950).  Parties in interest have been or will be and should be found to have been afforded adequate notice of this Motion and the Sale Hearing.

59.     The Debtor submits that the notice that they have provided of this Motion and the Sale Hearing is reasonable and appropriate and should be approved by this Court as adequate and sufficient notice.

### H.     Relief Under Bankruptcy Rule 6004(h) is Appropriate.

60.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise." The Selling Debtor requests that any order approving the Agreements be effective immediately by providing that the 10-day stay under Bankruptcy Rule 6004(h) is waived.

28

61.     The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before an order can be implemented. <u>See</u> Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d).  Although Bankruptcy Rule 6004(h) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 10-day stay period, Collier suggests that the 10-day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure."  10 <u>Collier on Bankruptcy</u> 15th Ed. Rev., ¶ 6064.09 (L. King, 15th rev. ed. 1988). Furthermore, Collier provides that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal.  <u>Id.</u>

62.     To preserve the value of the Membranes Business by bringing certainty to the sale process, and because both the Selling Debtor and Buyer desire to close the Sale on or before September 15, 2009, the Selling Debtor seeks to close the Sale as soon as possible after all closing conditions have been met or waived.  Accordingly, the Selling Debtor hereby requests that the Court waive the 10-day stay period under Bankruptcy Rule 6004(h) and 6006(d) or, in the alternative, if an objection to the Sale is filed, reduce the stay period to the minimum amount of time needed by the objecting party to file its appeal to allow the Sale to close.

### No Prior Request

63.     No prior Motion for the relief requested herein has been made to this or any other court.

WHEREFORE, the Selling Debtor requests that the Court grant it the relief requested herein and such other and further relief as is just and proper.

Dated: July 20, 2009

Respectfully submitted,

KIRKLAND & ELLIS LLP
Theodore L. Freedman
Deanna D. Boll
601 Lexington Ave.
New York, NY 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

THE LAW OFFICES OF JANET S. BAER, P.C.
Janet S. Baer, P.C.
70 W. Madison Street
Suite 2100
Chicago, IL 60602
Telephone: (312) 641-2162

and

*James E O'Neill*

PACHULSKI, STANG, ZIEHL & JONES LLP
James E. O'Neill (Bar No. 4042)
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705
(Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400

*Counsel for the Debtors and Debtors in Possession*