# EXHIBIT B

**Execution Copy**

# MEMBRANES ASSET SALE AGREEMENT

July 15, 2009

## TABLE OF CONTENTS

**Page**

| | | |
|---|---|---|
| **ARTICLE 1** | **Definitions** | 1 |
| 1.01 | General | 1 |
| 1.02 | Defined Terms | 2 |
| **ARTICLE 2** | **Purchase and Sale of Transferred Assets, Purchase Price** | 10 |
| 2.01 | Purchase and Sale of Transferred Assets; Assumption of Transferred Liabilities | 11 |
| 2.02 | Transferred and Excluded Assets | 11 |
| 2.03 | Transferred  and Excluded Liabilities | 12 |
| 2.04 | Purchase Price | 14 |
| 2.05 | Purchase Price Allocation | 14 |
| **ARTICLE 3** | **Closing** | 15 |
| 3.01 | Scheduled Closing Date | 15 |
| 3.02 | Time and Place of Closing, Simultaneity | 15 |
| 3.03 | Transfers at the Closing; Ancillary Agreements; Payments | 15 |
| 3.04 | Further Assurances | 16 |
| **ARTICLE 4** | **Purchase Price, Post-Closing Adjustments** | 17 |
| 4.01 | Closing of Books | 17 |
| 4.02 | Definitions | 17 |
| 4.03 | Computations | 17 |
| 4.04 | Closing Statement | 17 |
| 4.05 | Acceptance | 18 |
| 4.06 | Non-Acceptance, Resolution of Disputes | 18 |
| 4.07 | Payment of Adjustments | 19 |
| **ARTICLE 5** | **Seller's Representations and Warranties** | 19 |
| 5.01 | Corporate Organization and Existence | 20 |
| 5.02 | Corporate Power | 20 |
| 5.03 | Authorization | 20 |
| 5.04 | Execution and Delivery | 20 |
| 5.05 | No Conflict | 20 |
| 5.06 | Real Property | 21 |
| 5.07 | Title to and Sufficiency of Assets | 22 |
| 5.08 | Litigation; Investigations | 22 |
| 5.09 | Insurance | 22 |
| 5.10 | Material Contracts | 22 |
| 5.11 | Labor and Employment | 24 |
| 5.12 | Employee Benefit Plans | 25 |
| 5.13 | Environmental Compliance | 25 |
| 5.14 | Intellectual Property | 26 |
| 5.15 | Financial Statements | 28 |
| 5.16 | Taxes | 28 |
| 5.17 | Compliance with Laws | 28 |
| 5.18 | Transactions with Affiliates | 29 |

i

## TABLE OF CONTENTS

**Page**

| | | |
|---|---|---|
| 5.19 | Conduct of the Business | 29 |
| 5.20 | Permits | 30 |
| 5.21 | Product Warranty/Product Liability | 30 |
| 5.22 | No Premerger Obligations | 31 |
| 5.23 | Additional Representations | 31 |
| **ARTICLE 6** | **Buyer Representations and Warranties** | 31 |
| 6.01 | Corporate Organization and Existence | 31 |
| 6.02 | Authorization | 32 |
| 6.03 | No Conflict | 32 |
| 6.04 | Sufficient Funds | 32 |
| 6.05 | No Premerger Obligations | 32 |
| **ARTICLE 7** | **Buyer's Investigation** | 33 |
| 7.01 | Investigation | 33 |
| 7.02 | No Additional Representations | 33 |
| **ARTICLE 8** | **Covenants of Seller and Buyer** | 33 |
| 8.01 | Bankruptcy Court Approval | 33 |
| 8.02 | Access and Inquiry | 34 |
| 8.03 | Licenses and Permits; Consents | 34 |
| 8.04 | Notices to Third Parties | 35 |
| 8.05 | Commercially Reasonable Efforts | 35 |
| 8.06 | Title Insurance and Survey | 35 |
| 8.07 | Termination of Intercompany Agreements | 35 |
| 8.08 | Delivery of Monthly Financials | 35 |
| 8.09 | Assumption and Assignment of Transferred Contracts; Cure Costs | 35 |
| 8.10 | Temporary Employees | 36 |
| **ARTICLE 9** | **Conduct of Business Prior to the Closing** | 36 |
| 9.01 | Operation in Ordinary Course | 36 |
| **ARTICLE 10** | **Conditions Precedent to Buyer's Obligations** | 38 |
| 10.01 | Performance of Covenants and Agreements | 38 |
| 10.02 | Permits, Consents, etc. | 38 |
| 10.03 | Litigation | 38 |
| 10.04 | Certificates of Seller | 38 |
| 10.05 | No Material Adverse Effect | 39 |
| 10.06 | Closing Deliveries | 39 |
| 10.07 | Bankruptcy Court Approval | 39 |
| 10.08 | Title and Survey | 39 |
| **ARTICLE 11** | **Conditions Precedent to Seller's Obligations** | 39 |
| 11.01 | Accuracy of Representations and Warranties | 39 |
| 11.02 | Performance of Covenants and Agreements | 40 |
| 11.03 | Permits, Consents, etc. | 40 |
| 11.04 | Litigation | 40 |

ii

# TABLE OF CONTENTS

Page

| | | |
|---|---|---|
| 11.05 | Certificates of Buyer | 40 |
| 11.06 | Bankruptcy Court Approval | 41 |
| **ARTICLE 12** | **Employee Matters** | **41** |
| 12.01 | Employment | 41 |
| 12.02 | Positions Offered to Subject Business Employees | 41 |
| 12.03 | Inactive Subject Business Employees | 42 |
| 12.04 | Terms of Employment | 43 |
| 12.05 | Employment Related Indemnities | 43 |
| **ARTICLE 13** | **Termination** | **43** |
| 13.01 | Rights to Terminate | 43 |
| 13.02 | Consequences of Termination | 44 |
| **ARTICLE 14** | **Indemnification** | **44** |
| 14.01 | Survival | 44 |
| 14.02 | Seller's Indemnification | 45 |
| 14.03 | Buyer's Indemnification | 46 |
| 14.04 | Procedures for Indemnification | 47 |
| 14.05 | No Consequential Damages | 50 |
| 14.06 | Priority of Payments | 50 |
| 14.07 | Treatment of Indemnity Payments | 51 |
| 14.08 | Indemnification Limitations | 51 |
| 14.09 | Additional Limitations | 51 |
| **ARTICLE 15** | **Cooperation in Various Matters** | **51** |
| 15.01 | Mutual Cooperation | 51 |
| 15.02 | Buyer's Files and Records | 51 |
| **ARTICLE 16** | **Post-Closing Matters** | **52** |
| 16.01 | Reports | 52 |
| 16.02 | Names | 52 |
| 16.03 | Publicity | 52 |
| 16.04 | Seller's Covenant Not to Compete | 52 |
| 16.05 | Non Solicitation of Subject Business Employees | 53 |
| 16.06 | Nonassignable Items | 53 |
| 16.07 | Accounts Receivable and Other Payments Received After Closing | 54 |
| 16.08 | Removal of Maryland Assets | 54 |
| 16.09 | Confidentiality | 54 |
| 16.10 | Release of Restrictions | 55 |
| **ARTICLE 17** | **Expenses** | **55** |
| 17.01 | Buyer's Expenses | 55 |
| 17.02 | Seller's Expenses | 55 |
| 17.03 | Transfer Taxes | 55 |
| 17.04 | Real Estate Prorations | 55 |

iii

## TABLE OF CONTENTS

**Page**

| | | |
|---|---|---|
| **ARTICLE 18** | **Notices** | 56 |
| 18.01 | Notices | 56 |
| **ARTICLE 19** | **General** | 57 |
| 19.01 | Entire Agreement | 57 |
| 19.02 | Governing Law | 57 |
| 19.03 | Venue and Retention of Jurisdiction | 57 |
| 19.04 | Waiver of Jury Trial | 57 |
| 19.05 | Equitable Remedies | 57 |
| 19.06 | Assignment; Successors | 58 |
| 19.07 | Amendments and Waivers | 58 |
| 19.08 | Counterparts | 58 |
| 19.09 | Captions | 58 |
| 19.10 | Severability | 58 |
| 19.11 | No Third Party Beneficiaries | 59 |
| 19.12 | No Successor or Transferee Liability | 59 |
| 19.13 | Guaranty by Buyer Parent | 59 |

iv

## Exhibits and Schedules

### Exhibits

| | |
|---|---|
| 1.02A | Knowledge Group |
| 1.02B | Maryland Assets |
| 1.02C | Sale Order |
| 1.02D | Table A Items |
| 1.02E | Title Policy Endorsements |
| 1.02F | Transferred Contracts |
| 3.03(a) | Form of Special Warranty Deed |
| 3.03(b) | Form of Bill of Sale and Assignment and Assumption Agreement |
| 3.03(c) | Form of Intellectual Property Assignment Agreement |
| 3.03(d) | Form of Transition Services Agreement |
| 14.09 | Additional Limitations |

v

## Disclosure Schedules

| | |
|---|---|
| 1.02 | IP Lease |
| 2.02(a) | Equipment |
| 2.02(a)(x) | Claims |
| 2.02(b) | Excluded Assets |
| 4.01 | Inventory Taking Procedures |
| 4.03(a) | Accounting Principles and Procedures |
| 4.03(b) | Sample Closing Working Capital Amount |
| 5.05 | Conflicts |
| 5.06(a) | Description of Subject Business Real Property |
| 5.07 | Title to and Sufficiency of Assets |
| 5.08(a) | Litigation |
| 5.08(b) | Investigations |
| 5.09 | Insurance |
| 5.10(a) | Contracts |
| 5.10(d) | Material Bids, Proposals and Purchase Orders |
| 5.11(a) | Labor and Employment |
| 5.11(b) | Labor Related Claims |
| 5.12 | Employee Benefit Plans |
| 5.13 | Environmental Compliance |
| 5.14(a) | Intellectual Property |
| 5.14(b) | Intellectual Property Exception |
| 5.14(c) | Assignment Agreements |
| 5.14(e) | Intellectual Property Ownership |
| 5.14(f) | Employee Non-Disclosure Agreements |
| 5.15(a) | Net Assets Statements |
| 5.15(b) | Income Statements |
| 5.18 | Transactions with Affiliates |
| 5.19 | Conduct of Business |
| 5.20 | Permits |
| 5.21(a) | Standard Terms and Conditions |
| 5.21(b) | Proceedings |
| 5.23 | Additional Representation |
| 9.01 | Operation in Ordinary Course |
| 9.01(o) | Inducement to Termination |
| 12.01 | Employment |
| 16.06(b) | Restricted IP |

1780151.3

## MEMBRANES ASSET SALE AGREEMENT

**MEMBRANES ASSET SALE AGREEMENT** (this "Agreement") dated July 15, 2009, by and among W. R. Grace & Co.-Conn., a Connecticut corporation ("Seller"), and [REDACTED],[1] a Delaware limited liability company ("Buyer"), and, with respect solely to Sections 6.01, 6.02, 6.03, 6.05 and 19.13, [REDACTED], a Delaware corporation ("Buyer Parent").

### WITNESSETH:

**WHEREAS,** pursuant to sections 363 and 365 of the Bankruptcy Code, Seller wishes to sell, transfer, assign, convey and deliver to Buyer, and Buyer wishes to purchase, accept and acquire, from Seller all of the Transferred Assets and assume all of the Transferred Liabilities, in each case, in accordance with the terms and subject to the conditions set forth in this Agreement and in the Bankruptcy Code;

**WHEREAS,** Buyer Parent wishes to guarantee the obligations of Buyer under this Agreement and the other Transaction Documents;

**NOW THEREFORE,** in consideration of the mutual covenants herein contained, and for other good and valuable consideration, the value, receipt and sufficiency of which are acknowledged, the parties hereby agree as follows:

### ARTICLE 1

### Definitions

1.01    General. All Article and Section numbers, and Exhibit and Schedule references, used in this Agreement refer to Articles and Sections of this Agreement, and Exhibits and Schedules attached hereto or delivered simultaneously herewith, unless otherwise specifically stated. Any of the terms defined in this Agreement may be used in the singular or the plural. In this Agreement, unless otherwise specifically stated: "hereof," "herein," "hereto," "hereunder" and the like mean and refer to this Agreement as a whole and not merely to the specific Section, paragraph or clause in which the word appears; words importing any gender include the other gender; the term "including" shall mean "including but not by way of limitation" and the term "ordinary course of business" shall mean "ordinary course of business, consistent with past practice."

---

1 The name of the Buyer and certain confidential terms of this Agreement have been withheld or redacted from this Motion and this Agreement to protect the confidential nature of the information and business sensitivities. The full un-redacted version of this Agreement shall be provided: (i) to the Court, the Official Committees and the FCRs upon request of the Debtors; and (ii) to other parties in interest, upon request and agreement of the Debtors and the Buyer and execution of a confidentiality agreement.

1.02    Defined Terms.  For purposes of this Agreement, the following defined terms have the meanings set forth in this Section.

"Acquired Business" has the meaning given such term in Section 16.04.

"Affiliate" of any Person means any other Person which, directly or indirectly, controls or is controlled by or is under common control with such Person.  A Person shall be deemed to "control," be "controlled by" or be "under common control with" any other Person if such other Person possesses, directly or indirectly, power to direct or cause the direction of the management or policies of such Person whether through the ownership of voting securities or other ownership interests, by contract or otherwise.

"Agreement" has the meaning given such term in the Preamble.

"Ancillary Agreements" means the agreements described in Section 3.03.

"Approved Indemnification Claim" has the meaning given such term in Section 14.04.

"Arbitrator" has the meaning given such term in Section 4.06.

"Bankruptcy Code" means Chapter 11 of Title 11, U.S.C. §§101 *et seq.*, as amended.

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware.

"Bankruptcy Proceeding" means In re: *W. R. Grace & Co. et al., Debtors*, Chapter 11, Case Nos. 01-1139 et al. (JKF) (Jointly Administered) in the Bankruptcy Court.

"Basket Amount" has the meaning given such term in Section 14.02.

"Business Day" means a day that is not a Saturday or Sunday, nor a day on which banks are required or authorized to be closed in New York City.

"Buyer" has the meaning given such term in the Preamble.

"Buyer Claim" has the meaning given such term in Section 14.02.

"Buyer Entity" means any of Buyer, its Subsidiaries, and any Person of which Buyer is a Subsidiary.

"Buyer Group" means, collectively, Buyer and its Subsidiaries, and any Person of which Buyer is a Subsidiary.

"Buyer Indemnified Parties" has the meaning given such term in Section 14.02.

"Buyer Parent" has the meaning given such term in the Preamble.

2

"Buyer's Severance Plan" has the meaning given such term in Section 12.02.

"Claim" has the meaning given such term in Section 14.03.

"Closing" means the actions to be taken by Seller and Buyer described in Section 3.03.

"Closing Current Assets" has the meaning given such term in Section 4.02.

"Closing Current Liabilities" has the meaning given such term in Section 4.02.

"Closing Date" means the date on which the Closing takes place.

"Closing Permitted Exceptions" means (a) Liens for Taxes, assessments, levies and other charges of Governmental Authorities not yet due and payable or being contested in good faith by appropriate proceedings, and (b) with respect to the Subject Business Real Property (i) matters disclosed by the Survey, the existence of which, individually or in the aggregate, would not materially and adversely diminish the value or marketability of or interfere with the present use, operation or occupancy of the Subject Business Real Property, (ii) easements, encroachments, restrictions, rights of way and any other non-monetary Liens of public record disclosed by the Title Commitment, the existence of which, individually or in the aggregate, would not materially and adversely diminish the value or marketability of or interfere with the present use, operation or occupancy of the Subject Business Real Property, (iii) zoning and building restrictions and (iv) Liens of Seller's secured credit facility, all of which shall be released at or prior to the Closing; provided, however, that in no event shall any monetary Liens encumbering or otherwise affecting the Subject Business Real Property (other than as described in subsection (a) or (b)(iv) above) be deemed to be Closing Permitted Exceptions.

"Closing Statement" has the meaning given such term in Section 4.04.

"Closing Working Capital Amount" has the meaning given such term in Section 4.02.

"Code" means the Internal Revenue Code of 1986, as amended.

"Confidential Information" has the meaning given such term in Section 16.09.

"Confidentiality Agreement" means the confidentiality agreement dated April 2, 2009, between Seller and Buyer.

"Continued Employees" has the meaning given such term in Section 12.01.

"Contract" means any lease, license, contract, agreement or other binding commitment, whether oral or written and whether express or implied.

"Cure Costs" means all payments under section 365 of the Bankruptcy Code which are required to assume and assign the Transferred Contracts.

"Damages" means any and all losses, assessments, damages (including damages related to any awards for equitable relief or any obligations, prohibitions or Liens imposed on the Transferred Assets or Subject Business), penalties, fines, amounts paid in settlement, defense costs, Taxes, Liens, costs or expenses (including interest), of any nature whatsoever, including, (a) in connection with the defense of a Third Party Claim, reasonable attorneys' fees and other out-of-pocket expenses, and (b) in connection with any Claim other than a Third Party Claim, reasonable attorneys' fees and other out-of-pocket expenses solely of the prevailing party. For purposes of this definition, "prevailing party" shall mean a defendant that is fully exonerated or cleared in connection with the defense of the applicable Proceeding, or a plaintiff that is awarded all or any portion of the relief claimed thereby in the applicable Proceeding.

"Disclosure Schedules" means, collectively, the various schedules referred to in this Agreement.

"Dispute Notice" has the meaning given such term in Section 14.04.

"Dispute Period" has the meaning given such term in Section 14.04.

"Division Presidents" has the meaning given such term in Section 14.04.

"EH&S Law" means any Law, or any Hazardous Material standard issued pursuant to any Law, whenever in effect (except to the extent any specific reference to EH&S Law herein may be qualified by a particular date), which relates to or otherwise imposes liability, obligations or standards relating to the protection of human health and safety and the Environment, including the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. § 9601 *et seq.*), the Hazardous Materials Transportation Act (49 U.S.C. App. § 1801 *et seq.*), the Resource Conservation and Recovery Act (42 U.S.C. § 6901 *et seq.*), the Clean Water Act (33 U.S.C. § 1251 *et seq.*), the Clean Air Act (42 U.S.C. § 7401 *et seq.*), the Toxic Substance Control Act (15 U.S.C. § 2601 *et seq.*), the Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. § 136 *et seq.*), the Occupational Safety and Health Act (29 U.S.C. § 651 *et seq.*), the Registration, Evaluation, Authorization and Restriction of Chemicals (Reg. (EC) No. 1907/2006 of the European Parliament), Restriction of Hazardous Substances (Dir. 2002/95/EC of the European Parliament) and any Law having similar effect in any other jurisdiction.

"Employee Closing Date" has the meaning set forth in Section 12.05.

"Environment" means soil, surface and sub-surface land, surface waters (including navigable, non-navigable, ephemeral and maritime waters), groundwater, stream sediments, ambient air (including indoor air), plant life, animal life and natural resources.

"Excluded Assets" has the meaning given such term in Section 2.02.

"Excluded Liabilities" has the meaning given such term in Section 2.03.

"Executive" has the meaning given such term in Section 12.01.

"Final Closing Working Capital Amount" has the meaning given such term in Section 4.06.

"Final Order" means any order of the Bankruptcy Court after all opportunities for rehearing, reargument, petition for certiorari and appeal are exhausted or expired and any requests for rehearing have been denied, and that has not been revised, stayed, enjoined, set aside, annulled, reversed, remanded, modified or suspended, with respect to which any required waiting period has expired, and to which all conditions to effectiveness prescribed therein or otherwise by Law or Order have been satisfied; provided, however, that no order shall fail to be a Final Order solely because of the possibility that a motion pursuant to Rule 60 of the Federal Rules of Civil Procedure or Rule 9024 of the Federal Rules of Bankruptcy Procedure may be filed with respect to such order.

"Governmental Authority" means any federal, state, municipal or foreign government or other political subdivision thereof, and any entity exercising executive, legislative, judicial, regulatory or administration functions of or pertaining to government, including any governmental authority, agency, department, board, commission or instrumentality of the United States, any foreign government, any State of the United States or any political subdivision of any of the foregoing, and any court or tribunal of competent jurisdiction.

"Hazardous Materials" means any wastes, pollutants, contaminants, hazardous or toxic substances or organisms (including Legionella species, Stachybotrys species, petroleum, polychlorinated biphenyls, asbestos and asbestos-containing materials) that is listed, defined, designated, classified or regulated under any applicable EH&S Law.

"Income Statements" has the meaning given such term in Section 5.15.

"Indemnified Party" has the meaning given such term in Section 14.04.

"Indemnifying Party" has the meaning given such term in Section 14.04.

"Indemnity Cap" has the meaning given such term in Section 14.02.

"Initial Purchase Price" has the meaning given such term in Section 2.04.

"Insurance Policies" means insurance policies or other insurance coverage.

"Intellectual Property" or "IP" means any and all of the following:

    (a)    United States and foreign patents, patent applications, and patent disclosures, including all reissues, divisions, continuations, continuations-in part, substitutions, or extensions of any of the foregoing;

    (b)    (i) trademarks, service marks, trade names, brand names, trade dress, logos, and designs, assumed names and other indications of origin, whether

registered or unregistered, and any applications or renewals therefor, and (ii) all goodwill symbolized thereby or associated with (i);

(c)     United States and foreign copyrights, whether registered or unregistered, and any applications therefor or renewals thereof; and

(d)     inventions, formulae, processes, designs, ideas, know-how, show-how, manufacturing know-how, trade secrets, computer software and technical manuals and documentation which are not embodied within subparagraphs (a), (b) and (c).

"Inventory" has the meaning given such term in Section 2.02.

"IP Assignment" has the meaning given such term in Section 3.03.

"IP Lease" means that certain lease by Seller of Intellectual Property set forth on Schedule 1.02.

"Knowledge of Seller" or "Seller's Knowledge" means the knowledge that any of the individuals listed on **Exhibit 1.02A** has on the date of this Agreement or on the Closing Date, as applicable.

"Law" means any federal, state, local, municipal, foreign or other law, statute, constitution, principle of common law, ordinance, code, decree, rule or regulation of any Governmental Authority.

"Lien" means any mortgage, pledge, security interest, easement, covenant, charge, right-of-way or other lien or encumbrance.

"Maryland Assets" means certain assets used in the Subject Business that are located at Seller's facilities in Columbia, Maryland, or Curtis Bay (Baltimore), Maryland, which are listed in **Exhibit 1.02B**.

"Material Adverse Effect" means any change, effect, occurrence or development that, individually or in the aggregate, has or would reasonably be expected to have a material adverse effect upon the Transferred Assets or Transferred Liabilities, or on the business, condition (financial or otherwise), operations or results of operations of the Subject Business, taken as a whole, but excluding (a) economic effects or changes that are generally applicable to the industries and markets in which the Subject Business operates, (b) general changes in the United States or world financial markets or general economic conditions, (c) general changes in applicable Laws (except, in the case of clauses (a), (b) and (c), to the extent such effect or change disproportionately affects the Subject Business), or (d) the failure, in and of itself, to win any particular bid or proposal made to a customer (or any cancellation or revocation of any request for proposal from any customer) or meet any projections, but not the facts underlying such failure.

6

"Material Contracts" has the meaning given such term in Section 5.10.

"Minimum Claim Amount" has the meaning given such term in Section 14.02.

"Natural Gas Subject Business" means the operation of the Subject Business as conducted within one year before the Closing with respect to manufacture and sale of natural gas membranes, membrane modules and membrane systems for use in natural gas separations.

"Natural Gas Subject Business Intellectual Property" means Seller's interest in Intellectual Property that is used or held for use exclusively in the Natural Gas Subject Business or that has been developed for, or is under development for use exclusively in the Natural Gas Subject Business.

"Net Assets Statements" has the meaning given such term in Section 5.15.

"Nonassignable Items" has the meaning given such term in Section 16.06.

"Objection Notice" has the meaning given such term in Section 4.05.

"Order" means any judgment, order or similar act issued, made or rendered by any Governmental Authority.

"Parties" means Seller, Buyer and Buyer Parent, collectively, and "Party" means Seller, Buyer or Buyer Parent, individually.

"Permit" means any approval, authorization, consent, franchise, license, permit or certificate issued or required by any Governmental Authority.

"Permitted Exceptions" means (a) Liens for Taxes, assessments, levies and other charges of Governmental Authorities not yet due and payable or being contested in good faith by appropriate proceedings, and (b) with respect to the Subject Business Real Property (i) matters disclosed by the Survey, (ii) easements, encroachments, restrictions, rights of way and any other non-monetary Liens of public record disclosed by the Title Commitment, (iii) zoning and building restrictions and (iv) Liens of Seller's secured credit facility, all of which shall be released at or prior to the Closing; provided, however, that in no event shall any monetary Liens encumbering or otherwise affecting the Subject Business Real Property (other than as described in subsection (a) or (b)(iv) above) be deemed to be Permitted Exceptions.

"Person" means any individual, partnership, firm, trust, association, company, limited liability company, corporation, joint venture, unincorporated organization, other business entity or Governmental Authority.

"Pre-Closing EH&S Liabilities" means any liability of the Subject Business, or any liability that may attach to an entity purchasing the Subject Business, for Damages arising under applicable EH&S Laws and relating to circumstances existing prior to the Closing, including liabilities under applicable EH&S Laws arising from (a) personal injuries or property damage from exposures to

Hazardous Materials sold, distributed or otherwise placed into the Environment prior to the Closing; (b) ownership or operation of the Subject Business Real Property, or from any condition existing thereon or emanating therefrom (including the release or migration or threatened release or migration of Hazardous Materials into or through the Environment), prior to the Closing; (c) noncompliance with applicable EH&S Laws on or prior to the Closing; (d) manufacturing or sales of products, or other activities or operations of the Subject Business, in each case prior to the Closing; (e) circumstances prior to the Closing relating to the Excluded Assets or any other real property or businesses owned or operated at any time by any Seller Entity or their current or former Affiliates; (f) transportation, storage, disposal, treatment or recycling of Hazardous Materials by the Subject Business, any Seller Entity or their Affiliates prior to Closing; and (g) obligations pursuant to section 1.21 (Environmental Compliance and Indemnity) of the Vesting Deed relating to circumstances existing prior to the Closing.

"Proceeding" means any action, suit, litigation, arbitration or proceeding, commenced, brought, conducted or heard by or before, any court or other Governmental Authority or any arbitrator or arbitration panel, other than the Bankruptcy Proceeding.

"Purchase Price" has the meaning given such term in Section 4.07.

"Research Employee" has the meaning given such term in Section 12.01.

"Restricted IP" has the meaning given in Section 16.06.

"Sale Motion" means a motion which Seller shall file with the Bankruptcy Court seeking approval for the Transactions, which shall be in form and substance reasonably satisfactory to Buyer.

"Sale Order" means an order to be submitted to the Bankruptcy Court substantially in the form attached hereto as **Exhibit 1.02C** that, with such changes that are reasonably acceptable to Buyer and as may be approved by the Bankruptcy Court, is entered by the Bankruptcy Court approving the consummation of the Transactions.

"Scheduled Closing Date" has the meaning given such term in Section 3.01.

"Seller" has the meaning given such term in the Preamble.

"Seller Benefit Plan" has the meaning given such term in Section 5.12.

"Seller Claims" has the meaning given such term in Section 14.03

"Seller Entity" means any of WRG, Seller, any Subsidiary of WRG or Seller, and any other Affiliate of any of the foregoing.

"Seller Group" means, collectively, WRG, Seller, their Subsidiaries and the other Affiliates of any of the foregoing.

8

"Seller Indemnified Parties" has the meaning given such term in Section 14.03.

"Senior Executive" has the meaning given such term in Section 14.04.

"Senior Managers" has the meaning given such term in Section 14.04.

"Subject Business" means the development, manufacture and sale, primarily at and from Seller's facilities in Littleton, Colorado (including related activities at and from Seller's facilities in Columbia, Maryland and Curtis Bay (Baltimore), Maryland prior to Closing), of polymer based membranes, membrane modules and membrane systems, each for purification of natural gas or other hydrocarbons.

"Subject Business Employees" has the meaning given such term in Section 12.01.

"Subject Business Intellectual Property" means Seller's interest in Intellectual Property that is used or held for use exclusively in the Subject Business or has been developed for, or is under development for use exclusively in the Subject Business.

"Subject Business Real Property" means the real property owned by Seller and located at 8101 Midway Drive, Littleton, Douglas County, Colorado, together with any and all buildings, structures, fixtures and improvements located thereon and appurtenances thereto.

"Subsidiary" of a Person means any other Person in which the first Person directly or through one or more intermediaries owns securities or other equity interests representing more than 50% of the voting power of all such securities or other equity interests.

"Survey" means a current plat of survey of the Subject Business Real Property (a) prepared in accordance with the Minimum Standard Detail Requirements for ALTA/ACSM Land Title Surveys (as jointly established and adopted in 2005 by the American Land Title Association and the National Society of Professional Surveyors), (b) performed by a surveyor registered in the State of Colorado, (c) certified to Buyer and the Title Insurer, and (d) containing the Table A Items listed on **Exhibit 1.2D**, and (e) otherwise in form and substance reasonably acceptable to Buyer.

"Tax" means any federal, state, local or foreign governmental tax or assessment, including income tax, any payroll or other similar employment tax, any sales, use, excise, gross receipts or value added tax, or any tax on real or personal property, including interest and penalties with respect thereto.

"Third Party Claims" means any and all Claims by any Person, other than Seller Entities or Buyer Entities or any of their Affiliates, which could give rise to a right of indemnification under this Article.

"Title Commitment" means a current preliminary title report or title commitment for the Subject Business Real Property issued by the Title Insurer showing fee simple title in Seller,

proposing to insure Buyer, and committing to insure the Subject Business Real Property in the amount of the Purchase Price allocated to the Subject Business Real Property.

"Title Insurer" means First American Title Insurance Company or such other title insurance company selected by Buyer.

"Title Policy" means an ALTA Form B (2006) Owner's Policy of Title Insurance (or the most recent form available in the State of Colorado) issued by the Title Insurer in the full amount of the Purchase Price allocated to the Subject Business Real Property and insuring fee simple title to the Subject Business Real Property in a Buyer Entity or any of their Affiliates, and which (a) is subject only to the Closing Permitted Exceptions, (b) contains the endorsements listed on **Exhibit 1.02E**, (c) contains no exception for the gap between Closing and recording of the deed, and (d) is otherwise reasonably acceptable to the Buyer Group in all respects.

"Transaction Documents" means this Agreement, the Ancillary Agreements and any other agreements, instruments and documents executed and delivered pursuant to this Agreement.

"Transactions" means the transactions contemplated by this Agreement.

"Transferred Assets" has the meaning given such term in Section 2.02.

"Transferred Contracts" means the Contracts listed on **Exhibit 1.02F**.

"Transferred Liabilities" has the meaning given such term in Section 2.03.

"Transferee" has the meaning given such term in Section 19.06.

"Transition Date" has the meaning given such term in Section 14.03.

"Transition Services Agreement" has the meaning given such term in Section 3.03.

"Valuation Time" means 11:59 p.m. Eastern time on the date immediately prior to the Closing Date.

"Vesting Deed" means that certain Special Warranty Deed from Mission Viejo Business Properties, Inc., as grantor, and Seller, as grantee, dated December 9, 1988 and recorded in Book 831, Page 157 of the Douglas County, Colorado Recorder's Office.

"WRG" means W. R. Grace & Co., a Delaware corporation, of which Seller is a direct wholly-owned Subsidiary.

## ARTICLE 2

### Purchase and Sale of Transferred Assets; Purchase Price

10

2.01    <u>Purchase and Sale of Transferred Assets; Assumption of Transferred Liabilities</u>. On the terms and subject to the conditions of this Agreement, at the Closing, subject to Section 16.06, Seller shall sell, assign, transfer, convey and deliver to Buyer (or cause to be sold, assigned, transferred, conveyed and delivered to Buyer), free and clear of all Liens (other than Permitted Exceptions) to the maximum extent permissible under section 363 of the Bankruptcy Code, and Buyer shall purchase, acquire and accept the Transferred Assets and assume from Seller the Transferred Liabilities.

2.02    <u>Transferred and Excluded Assets</u>.

(a)    The "Transferred Assets" shall consist of all of the right, title and interest that Seller possesses to or in, to and under any and all of the assets, properties, rights, Contracts and claims of any kind and nature, whether tangible or intangible, real, personal or mixed, and wherever located, that are owned, leased, licensed, used or held for use by Seller exclusively in connection with the Subject Business, including the following (but in every case, excluding the Excluded Assets) (collectively, the "Transferred Assets"):

(i)    the Subject Business Real Property;

(ii)    the Maryland Assets;

(iii)    all machinery and equipment (including any Intellectual Property owned by or licensed to Seller that is embodied in the mechanical features and physical design of such machinery or equipment), test skids, furniture, hardware, fixtures, automobiles, trucks, tractors, trailers, tools, tooling and other tangible personal property of every kind and description: (A) located at the Subject Business Real Property; or (B) wherever located, including, in each case, the items set forth on Schedule 2.02(a);

(iv)    all inventories and supplies of raw materials, works-in-process, finished goods, spare parts, supplies, storeroom contents, packaging inventories and other inventories (collectively, "Inventory");

(v)    all trade accounts, notes receivable, accounts receivable and other receivables;

(vi)    all prepayments and deposits;

(vii)    all books and records (other than Tax returns and related work papers), files, customer lists, accounting records, papers, tapes, disks, manuals, keys, reports, plans, catalogs, sales and marketing and promotional materials and all other printed and written materials, and general intangibles;

(viii)    all rights under or pursuant to all warranties, representations and guarantees, whether express or implied, made by suppliers, manufacturers, contractors and other third parties with respect to any of the Transferred Assets, other than any of the foregoing to the extent that it relates to any

11

Excluded Asset or Excluded Liability;

(ix)    all the Permits listed or required to be listed on <u>Schedule 5.20</u> (to the extent transferable);

(x)    all claims, causes of action, choses in action, rights of recovery, rights of set off, and rights of recoupment listed on <u>Schedule 2.02(a)(x)</u>;

(xi)    the Subject Business Intellectual Property;

(xii)    all rights in, to and under the Transferred Contracts; and

(xiii)    all of the respective forms, office supplies and warehouse and other supplies, including pallets, strapping and other packaging, production and manufacturing supplies and maintenance supplies.

(b)    Notwithstanding anything to the contrary contained in this Agreement, the Transferred Assets shall not include, and Seller or another Seller Entity shall retain all right, title and interest that it possesses to or in, each of the following assets, properties, rights, Contracts and claims (collectively, the "Excluded Assets"):

(i)    cash and cash items, other than petty cash deposits with third parties;

(ii)    refunds of Taxes arising out of the Subject Business for all Tax periods (or portions thereof) ending at or prior to the Closing Date;

(iii)    amounts receivable from any unit of Seller other than the Subject Business or from any other Seller Entity;

(iv)    Insurance Policies, claims with respect to Insurance Policies, and refunds of amounts previously paid or prepaid on account of Insurance Policies;

(v)    employee benefit plans and funds maintained by, or in conjunction with, any Seller Entity, and refunds of amounts previously paid or prepaid amounts on account of such employee benefit plans and funds;

(vi)    records to the extent relating exclusively to any of the Excluded Liabilities;

(vii)    the names "Grace" and "Davison", whether alone or in combination with each other or with other words, including in any trade name or trade or service mark; and

(viii)    the other assets listed on <u>Schedule 2.02(b)</u>;

2.03    <u>Transferred and Excluded Liabilities</u>.

12

(a)     At the Closing, Buyer shall assume only the following obligations and liabilities of Seller as and to the extent relating exclusively to the Subject Business (collectively, the "Transferred Liabilities"):

(i)     all obligations under the Transferred Contracts (other than fifty percent (50%) of all Cure Costs) to the extent arising at or after the Closing, solely with respect to periods beginning on and after the Closing Date;

(ii)     all ordinary course payables of Seller specifically related to the operation of the Subject Business (excluding intercompany payables) accruing prior to the Closing Date to the extent and in the amounts set forth on the Closing Statement;

(iii)     all ordinary course vacation benefit plan accruals for the current calendar year to the extent and in the amounts set forth on the Closing Statement; and

(iv)     all payment and performance obligations under Permits included in the Transferred Assets to the extent arising on or after the Closing Date, solely with respect to periods beginning on and after the Closing Date.

(b)     It is expressly understood and agreed that, except for Transferred Liabilities, neither Buyer, any Buyer Entity nor any Affiliate of Buyer or any Buyer Entity is assuming, nor shall they be or become liable for, any other liability or obligation of Seller or any other Seller Entity, whether occurring or accruing before, at or after the Closing, or of the Subject Business, whether occurring or accruing before or at the Closing.  In furtherance and not in limitation of the foregoing, with the exception of the Transferred Liabilities, neither Buyer nor any of its Affiliates shall assume, or be deemed to have assumed, any of the following liabilities or obligations of Seller or any other Seller Entity, whether occurring or accruing before, at or after the Closing, or of the Subject Business, whether occurring or accruing before or at the Closing, whether or not disclosed on any Schedule hereto ("Excluded Liabilities"):

(i)     any breach or default under any Transferred Contract to the extent occurring, accruing during or arising out of the period prior to the Closing;

(ii)     any ordinary course or non-ordinary course payable to the extent not set forth, or in excess of the amount set forth, on the Closing Statement;

(iii)     any liabilities arising out of Seller Benefit Plans;

(iv)     all employment liabilities to the extent occurring or accruing prior to the Closing Date;

(v)     any liability or obligation arising out of or relating to any (A) former employee, officer, director or consultant of any Seller Entity or (B) Subject Business Employee who does not become a Continued Employee;

13

(vi)    all liabilities to the extent relating in any way to Excluded Assets;

(vii)    any liability of any Seller Entity for any indebtedness (including fifty percent (50%) of all Cure Costs relating to Transferred Contracts);

(viii)    Taxes of any Seller Entity, including Taxes arising out of the Subject Business for all Tax periods (or portions thereof) ending at or prior to the Closing Date;

(ix)    amounts payable to any unit of Seller other than the Subject Business, or to any other Seller Entity and any liabilities arising out of any transaction between Seller and any other Seller Entity in connection with the Subject Business;

(x)    premiums or any other charges under any Insurance Policy;

(xi)    (A) any liability in any way related to asbestos, (B) [REDACTED] environmental remediation activities required by EH&S Laws or as necessary to meet cleanup standards under EH&S Laws (regardless of whether such activities may be voluntary measures) or (C) [REDACTED] all Pre-Closing EH&S Liabilities;

(xii)    all liabilities and obligations, including any liability arising from claims for injury to persons or property, arising out of the Transferred Assets or the Subject Business prior to the Closing Date;

(xiii)    any obligation for Seller's or any other Seller Entity's legal, accounting or other professional fees or expenses related to or in connection with the preparation of this Agreement or the consummation of the Transactions;

(xiv)    any fines by Governmental Authorities existing or arising prior to the Closing Date;

(xv)    any matters disclosed or required to be disclosed on Schedules 5.08(a) or (b); and

(xvi)    to the extent not otherwise specified hereunder or in any of the other Transaction Documents, any liability to the extent arising from or connected with the operation of the Subject Business prior to the Closing Date.

2.04    Purchase Price.  "Initial Purchase Price" means twenty-two million U.S. dollars (US$22,000,000). The Initial Purchase Price shall be subject to adjustment as set forth in Article 4. The Initial Purchase Price, as so adjusted, shall be the "Purchase Price". The Purchase Price shall be allocated among the Transferred Assets as provided in Section 2.05.

2.05    Purchase Price Allocation.

(a)    Each Party agrees to prepare and timely file U.S. Internal Revenue Service Form 8594 (Asset Acquisition Statement) in accordance with Section 1060 of the Code with respect to the Transferred Assets and to cooperate in every reasonable way with the other Parties in the preparation

14

of such form.

(b)     The Parties agree that the portion of the Initial Purchase Price to be allocated to the Subject Business Real Property shall be $[REDACTED].

(c)     The Parties agree that the portion of the Initial Purchase Price to be allocated to the intangible assets shall be $[REDACTED].

(d)     The Parties agree that the remaining portion of the Purchase Price shall be allocated to net current assets and fixed assets (not including the Subject Business Real Property).

## ARTICLE 3

### Closing

3.01     <u>Scheduled Closing Date</u>.  The "Scheduled Closing Date" shall be the fifth (5th) Business Day after the date on which the conditions to Closing set forth in Articles 10 and 11 (other than Sections 10.04 and 11.05 and any other items that, by their nature are required to be satisfied at Closing) shall have been fulfilled or waived, or such other day as Seller and Buyer may agree to in an amendment to this Agreement executed and delivered in accordance with Section 19.07.

3.02     <u>Time and Place of Closing, Simultaneity</u>.  The Closing shall take place at 10:00 a.m. Eastern time on the Scheduled Closing Date at the offices of Seller, 7500 Grace Drive, Columbia, Maryland.  All of the actions to be taken and documents to be executed and delivered at the Closing shall be deemed to be taken, executed and delivered simultaneously, and no such action, execution or delivery shall be effective until all actions to be taken and executions and deliveries to be effected at the Closing are complete.  The Closing shall, for all purposes hereunder, be deemed effective at 12:01 a.m. Eastern time, on the Closing Date.

3.03     <u>Transfers at the Closing; Ancillary Agreements; Payments</u>.  At the Closing:

(a)     Seller shall execute and deliver to Buyer a special warranty deed for the Subject Business Real Property in the form attached hereto as **Exhibit 3.03(a)**, subject only to the Closing Permitted Exceptions;

(b)     Seller and Buyer shall execute and deliver to each other a Bill of Sale and Assignment and Assumption Agreement in substantially the form attached hereto as **Exhibit 3.03(b)**;

(c)     Seller and Buyer shall execute and deliver to each other an Intellectual Property Assignment Agreement in substantially the form attached hereto as **Exhibit 3.03(c)** (an "IP Assignment") covering: (i) all the patents and patent applications set forth or required to be set forth in <u>Schedule 5.14(a), Part 1</u>, (ii) all trademarks, trademark applications and domain names set forth or required to be set forth in <u>Schedule 5.14(a), Part 5</u> and (iii) any other patents and patent applications that are not then Restricted IP; provided, that if there are patents or patent applications that are

15

Restricted IP as of the Closing, then promptly after such patent or patent applications cease to be Restricted IP, the Seller and Buyer shall execute and deliver to each other an IP Assignment covering such patents and patent applications;

(d)     Seller and Buyer shall execute and deliver to each other a Transition Services Agreement in substantially the form attached hereto as **Exhibit 3.03(d)** (the "Transition Services Agreement");

(e)     Seller shall deliver the certificates required pursuant to Section 10.04 hereof and Buyer shall deliver the certificates required pursuant to Section 11.05 hereof;

(f)     Seller shall deliver to Buyer a list identifying all customers of the Subject Business along with the letter code assigned to each such customer on the Schedules and in other due diligence or other related materials delivered or made available to Buyer prior to the Closing; and

(g)     Buyer shall pay the Initial Purchase Price to Seller. Such payment shall be made by means of a wire transfer to Seller's account as follows:

> Bank: JPMorgan Chase Bank, NA
> Bank ABA #: 021000021
> Bank SWIFT code CHASUS33
> Bank account name: W. R. Grace & Co.-Conn.
> Bank account number: 016001257
> Text message: Funds from [REDACTED] re: Membranes.

In addition, each of Buyer and Seller shall execute and deliver such other agreements, instruments and other documents to effect, confirm or evidence the transactions contemplated by this Agreement as the other Parties shall reasonably request. Each such document shall be reasonably satisfactory in form and substance to the Party to whom such document is delivered, but shall contain no representations, warranties, covenants or agreements other than those specifically contained in this Agreement.

3.04    Further Assurances. At any time and from time to time after the Closing, at the request and expense of any Party, the other Parties shall execute and deliver, or cause to be executed and delivered, all such deeds, assignments, and other documents, and take or cause to be taken all such other actions, as the requested Party reasonably deems necessary or advisable in order to complete, perfect or evidence any of the Transactions. Any out-of-pocket expenses related to any such request shall be paid by the requesting Party.

### ARTICLE 4

### Purchase Price, Post-Closing Adjustments

4.01    Closing of Books. Seller shall close the books and related accounting records, on a

16

going concern basis, of Seller (but only to the extent that they relate to the Subject Business) as of the Valuation Time, and take a physical count of the Subject Business Inventory at or within two weeks prior to such time. Such Inventory count shall be taken in accordance with the inventory-taking procedures described in <u>Schedule 4.01</u>. Representatives of Buyer may observe the taking of such inventory.

4.02    <u>Definitions</u>.

(a)    "Closing Current Assets" means the aggregate amount, as of the Valuation Time, of all the accounts receivable and Inventory of the Subject Business included in the Transferred Assets, computed in accordance with Section 4.03.

(b)    "Closing Current Liabilities" means the aggregate amount, as of the Valuation Time, of (i) all ordinary course payables of Seller specifically related to the operation of the Subject Business (excluding intercompany payables) accruing prior to the Closing Date, (ii) employee payroll and vacation benefit plan accruals of the Subject Business and (iii) deferred revenue, in each case, computed in accordance with Section 4.03.

(c)    "Closing Working Capital Amount" means the amount of the Closing Current Assets less the amount of the Closing Current Liabilities.

4.03    <u>Computation of Closing Current Assets and Liabilities</u>. The Closing Current Assets and the Closing Current Liabilities shall be determined in U.S. dollars on a going concern basis, in accordance with the accounting policies set forth in <u>Schedule 4.03(a)</u>, consistently applied, and in accordance with the sample Closing Working Capital Amount set forth on <u>Schedule 4.03(b)</u>.

4.04    <u>Closing Statement</u>.

(a)    As soon as reasonably practicable but in no event more than ninety (90) days after the Closing, Seller shall deliver to Buyer a report setting forth Seller's determination of the Closing Working Capital Amount (the "Closing Statement"), along with supporting documentation.

(b)    Seller agrees to provide Buyer and its accountants supporting documentation and access to the books and records of the Subject Business to the extent reasonably requested by Buyer for purposes of reviewing the contents of the Closing Statement, and any related supporting schedules prepared by Seller in connection with the preparation of such statement, and will cause appropriate personnel of Seller to provide reasonable assistance to Seller and its representatives in connection with such review. Each Party shall pay the costs, if any, of its own accountants and advisors in connection with the preparation and review of the Closing Statement contemplated by this Section 4.04.

4.05    <u>Acceptance</u>. If Buyer does not object to the Closing Working Capital Amount shown on the Closing Statement delivered by Seller, by written notice of objection (the "Objection Notice") delivered to Seller within thirty (30) calendar days after Buyer's receipt of such statement, describing

in reasonable detail each of its proposed adjustments to Seller's determination thereof, then the Closing Working Capital Amount shown on the Closing Statement shall be final and binding on the Parties.

4.06    Non-Acceptance, Resolution of Disputes.

(a)    If Buyer timely delivers an Objection Notice, then Buyer and Seller shall promptly endeavor to agree upon the proper amount of the items in dispute. If a written agreement settling any disputed items has not been reached within thirty (30) days after the date of Buyer's receipt of the Objection Notice, then either Seller or Buyer may, by notice to the other, submit for determination by arbitration in accordance with this Section the question of what adjustments, if any, must be made to Buyer's determination of such amount in order for it to be determined in accordance with the provisions of this Agreement.

(b)    Any such determination by arbitration shall be made by Ernst & Young LLP, or such other nationally recognized accounting firm that the Parties may agree upon (the "Arbitrator") and shall be final and binding on the Parties. The Arbitrator shall be directed to render a written report as promptly as practicable on the unresolved disputed items and to resolve only those issues of dispute set forth in the Objection Notice and to make such modifications, if any, to the Closing Statement as shall reflect such determination. Not later than thirty (30) days after the engagement of the Arbitrator (as evidenced by its written acceptance by facsimile or otherwise to the Parties), the Parties shall submit simultaneous briefs to the Arbitrator (with a copy to the other Parties) setting forth their respective positions regarding the issues in dispute and their respective calculations of the Closing Statement. Rebuttal briefs shall be submitted simultaneously by the Parties within fifteen (15) days after the submission of the initial briefs. The Arbitrator shall be instructed to use the accounting policies set forth in Schedules 4.03(a) and (b) in connection with its determination hereunder and shall render its decision resolving the dispute within thirty (30) days after submission of the rebuttal briefs. If additional or other information is required by the Arbitrator, the Arbitrator shall give notice thereof to the Parties as soon as practicable before the expiration of such thirty (30)-day period, and the Parties shall promptly respond; provided, however, that, without the written consent of Seller and Buyer, no request for additional or other information shall act as an extension of the thirty (30)-day period in which the Arbitrator must render its decision.

(c)    The fees and expenses of the Arbitrator for any such determination by arbitration shall be shared as follows: Seller shall bear that portion thereof equal to the total amount of such fees and expenses multiplied by a fraction, the denominator of which shall be the difference between the Closing Working Capital Amount as finally proposed by Buyer before the arbitration began and the Closing Working Capital Amount as finally proposed by Seller before the arbitration began, and the numerator of which shall be the difference between the Closing Working Capital Amount as determined by the Arbitrator and the Closing Working Capital Amount as finally proposed by Seller before the arbitration began. Buyer shall bear the remainder of such fees and expenses.

(d)    Nothing herein shall be construed to authorize or permit the Arbitrator to determine (i) any question or matter whatsoever under or in connection with this Agreement or any other

18

Transaction Document except the determination of what adjustments, if any, must be made in one or more of the items reflected in the Closing Working Capital Amount as shown on the Closing Statement delivered by Buyer in order for the Closing Working Capital Amount to be determined in accordance with the provisions of this Agreement and (ii) a Final Closing Working Capital Amount that is not in the range between and including the final proposals of Seller and Buyer. Nothing herein shall be construed to require the Arbitrator to follow any rules or procedures of any arbitration association.

(e)     The Closing Working Capital Amount as finally determined pursuant to this Section shall constitute the "Final Closing Working Capital Amount."

4.07    Payment of Adjustments.

(a)     In the event that the Final Net Working Capital Amount is less than $[REDACTED], Seller shall pay to Buyer the amount of such difference in accordance with Section 4.07(c) and Section 14.06.

(b)     In the event that the Final Net Working Capital Amount is more than $[REDACTED], Buyer shall pay to Seller the amount of such difference in accordance with Section 4.07(c).

(c)     Any payment pursuant to this Section 4.07 will be made within five (5) Business Days following the final determination of the amount thereof in accordance with this Section. Any payment pursuant to this Section 4.07 will be paid by wire transfer of immediately available funds to the account designated in writing by the Party receiving the payment. Any payment pursuant to this Section will be treated by the Parties as an adjustment to the Initial Purchase Price, and the Initial Purchase Price, as so adjusted, shall be the "Purchase Price". Interest shall be paid on the amount of the net adjusting payment, from and including the Closing Date to but not including the date of payment, at a floating rate per annum equal to the U.S. prime rate, as reported by *The Wall Street Journal*, in effect from time to time during the period from the Closing Date until the date of payment.

## ARTICLE 5

### Seller's Representations and Warranties

Seller represents and warrants to Buyer as of the date hereof and as of the Closing Date as follows:

5.01    Corporate Organization and Existence. Seller is a corporation duly organized and validly existing under the Connecticut Business Corporation Act and has the full power and authority to carry on the Subject Business and to own and use the assets and properties owned and used by it in connection therewith, including the Transferred Assets. Seller is duly authorized to conduct business and is in good standing as a foreign corporation in Colorado.

5.02    Corporate Power.  Subject to entry of the Sale Order and its becoming a Final Order, Seller has full corporate power to enter into this Agreement and the other Transaction Documents to which it is or will be a party and perform its obligations hereunder and thereunder.

5.03    Authorization.  Subject to entry of the Sale Order and its becoming a Final Order, the execution and delivery by Seller of this Agreement and the other Transaction Documents to which it is or will be a party and its performance of its obligations hereunder and thereunder have been duly authorized by all required corporate action.

5.04    Execution and Delivery.  Subject to entry of the Sale Order and its becoming a Final Order, Seller has duly and validly executed and delivered this Agreement and at Closing, will have duly and validly executed and delivered the other Transaction Documents to which it is a party and which are being executed and delivered simultaneously with this Agreement.  The remaining Transaction Documents to which Seller will be a party, when executed and delivered at the Closing, will be duly and validly executed and delivered by Seller.  Subject to entry of the Sale Order and its becoming a Final Order, this Agreement and each Transaction Document to which it is a party which is being executed simultaneously with this Agreement constitutes, and each Transaction Document to which it is a party upon its execution and delivery at the Closing will constitute (assuming as to each such Transaction Document to which Buyer is a party, its due authorization, execution and delivery by Buyer and entry of the Sale Order and its becoming a Final Order) a legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, subject (other than with respect to the Bankruptcy Proceeding) to bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer and similar Laws of general applicability relating to or affecting creditors' rights and to general equity principles (whether in equity or at law).

5.05    No Conflict.  Except as specified in Schedule 5.05, and subject to entry of the Sale Order and its becoming a Final Order, the execution and delivery by Seller of this Agreement and the other Transaction Documents to which it is or will be a party, and its performance of its obligations hereunder and thereunder, do not (a) conflict with its certificate of incorporation or by-laws; (b) result in any violation or breach of any of the provisions of, or constitute a default under, any Law or Order to which Seller or any other Seller Entity is a party or by which it is bound, which violation, breach or default would materially adversely affect Seller's ability to execute and deliver this Agreement or any other Transaction Document to which it is or will be a party or perform its obligations hereunder or thereunder; or (c) result in any breach of any of the provisions of, or constitute a default under, any Contract to which Seller or any other Seller Entity is a party or by which it is bound, which such breach or default of which would materially adversely affect its ability to execute and deliver this Agreement or any other Transaction Document to which it is or will be a party or perform its obligations hereunder or thereunder.

5.06    Real Property.

(a)    Schedule 5.06(a) sets forth a true and complete legal description and street address of the Subject Business Real Property.  The Subject Business Real Property constitutes all of the real property used in the direct manufacturing operations of the Subject Business.  To Seller's

Knowledge, Seller has good and marketable title in fee simple to the Subject Business Real Property, free and clear of all Liens other than the Permitted Exceptions. Neither the Subject Business Real Property nor any portion thereof is subject to any lease, sublease, license or other agreement granting to any Person other than Seller any right to use or occupy the Subject Business Real Property. No third party has any option, right of first offer or right of first refusal to acquire, lease or license the Subject Business Real Property or any portion thereof or interest therein. There are no Persons in possession of the Subject Business Real Property other than Seller. Seller is not a party to any real property leases, subleases, license or other occupancy agreements pursuant to which Seller is the lessee, sublessee, licensee or occupant of any real property in connection with the Subject Business.

(b)     To the Knowledge of Seller, there are no proposed or pending changes to any zoning regulation or official plan affecting the Subject Business Real Property.

(c)     Neither Seller nor the Seller Group has received any written notice of any pending, threatened or contemplated condemnation or eminent domain Proceedings that affect the Subject Business Real Property. To Seller's Knowledge, Seller has not received any oral notice of the intention of any Governmental Authority to take or use all or any part of the Subject Business Real Property, and to Seller's Knowledge, there are no pending or threatened or contemplated condemnation or eminent domain Proceedings or hearings that affect the Subject Business Real Property.

(d)     The Subject Business Real Property is in good operating condition and, in all material respects, in a state of good maintenance and repair. There are no material defects in any of the structural components of the buildings and other improvements located in, on or about the Subject Business Real Property, and the electrical, plumbing (including water treatment capabilities for the operation of the Subject Business) and utility systems are in good working order and condition in all material respects, ordinary wear and tear excepted.

(e)     Neither Seller nor any other Seller Entity has received from any third party any written, or to Seller's Knowledge, any other, notice of any violation, breach or default of the Restrictions (as defined and contained in the Vesting Deed), including any such notice alleging nuisance, noxious or offensive activity related to the Subject Business Real Property.

(f)     To the Knowledge of Seller, there is no Law, Lien or Order that prevents the facilities located at the Subject Business Real Property from being operated twenty-four (24) hours per day, seven (7) days per week.

5.07     Title to and Sufficiency of Assets. Subject to the representations and warranties made in Section 5.14 with respect to Restricted IP, Seller has good and (except with respect to Nonassignable Items and Restricted IP) transferable title to all of the Transferred Assets and Seller has good leasehold title to those Transferred Assets which Seller purports to lease, in each case, free and clear of all Liens other than Permitted Exceptions. Except for Excluded Assets and Seller's assets used in the performance of Seller's obligations under the Transition Services Agreement, all of the material tangible and intangible assets used or held for use in connection with the Subject

21

Business are included in the Transferred Assets, and except as set forth in <u>Schedule 5.07</u>, the Transferred Assets include all assets reflected on the May 31, 2009 Net Assets Statement, other than those disposed of in compliance with Section 5.19 or in accordance with Section 9.01 (including with the prior written consent of Buyer). The Transferred Assets, together with the services performed under the Transition Services Agreement, include all tangible and intangible assets and rights necessary to conduct the Subject Business in substantially the same manner as presently conducted.

     5.08    <u>Litigation; Investigations</u>.

    (a)    Except as set forth in <u>Schedule 5.08(a)</u>, (i) there are no material Proceedings (other than the Bankruptcy Proceeding) pending or, to the Knowledge of Seller, threatened against Seller in respect of the Subject Business or against the Subject Business, and (ii) to the Knowledge of Seller, there are no other hearings, inquiries or audits pending or threatened against Seller by or before any court or other Governmental Authority (other than the Bankruptcy Proceeding) or any arbitrator or arbitration panel in respect of the Subject Business or against the Subject Business.

    (b)    Except as set forth in <u>Schedule 5.08(b)</u>, there are no pending or, to the Knowledge of Seller, threatened governmental investigations relating in any way to the Subject Business.

     5.09    <u>Insurance</u>.  <u>Schedule 5.09</u> describes the Insurance Policies maintained by Seller exclusively with respect to the Subject Business.

     5.10    <u>Material Contracts</u>.

    (a)    Other than as set forth on <u>Schedule 5.10(a)</u> and except for Contracts that are not being assumed and assigned hereunder, neither Seller nor any other Seller Entity is a party to or otherwise bound by the following (whether written or oral) exclusively in connection with the Subject Business (each, a "Material Contract"):

    (i)    any agreement relating to (A) the license to Seller of any material Intellectual Property owned or controlled by any other Person (other than unmodified, commercially available, off-the-shelf computer software that has an aggregate cost of $150,000 or less), (B) license of any material Intellectual Property (including any Natural Gas Subject Business Intellectual Property) owned or controlled by Seller to any other Person, (C) receipt and/or disclosure and use of any material proprietary Intellectual Property (including any Natural Gas Subject Business Intellectual Property), or (D) the development of any material Intellectual Property (including any Natural Gas Subject Business Intellectual Property) in cooperation with any other Person;

    (ii)    any distributor, manufacturer's representative, sales agent, broker or consultant Contract, or any Contract containing a most-favored nation provision or granting exclusive selling rights to any manufacturer's representative, sales agent, broker or distributor;

    (iii)    any bailment or consignment or other similar Contract relating to Inventory,

22

equipment or other assets of any customer, supplier or third party;

(iv)    any Contract for the purchase of materials, components, supplies, equipment or services (A) pursuant to which Seller has agreed to purchase all of its requirements for the goods and/or services in question or which contain minimum volume or dollar guarantees or commitments requiring the payment to Seller by any other Person of more than $50,000 or having a term of twelve (12) months or longer, or (B) requiring the payment by Seller to any other Person of more than $50,000 or having a term of twelve (12) months or longer;

(v)    any Contract involving the lease of personal property in excess of $50,000 individually or $150,000 in the aggregate;

(vi)    any (A) trust indenture, mortgage, promissory note, loan agreement or other Contract for the borrowing of money, or any Contract or agreement of guarantee, surety, support, indemnification, assumption or endorsement of, or any similar commitment by the Subject Business to become liable for the obligations or other liabilities of any other Person, (B) offset, countertrade or barter agreement or any Contract limiting the freedom of the Subject Business or any employees thereof to engage in any line of business or activity or to compete or otherwise conduct business anywhere in the world, solicit any employees or disclose any information otherwise permitted to be disclosed under applicable Law, or (C) letter of credit or bond (excluding endorsements of instruments for collection of accounts receivable in the ordinary course of business);

(vii)    any power of attorney that could have an effect on the Transferred Assets after Closing;

(viii)    any Contract providing for severance payments, divestiture incentives or other additional rights or benefits in the event of the sale of the Transferred Assets or the Subject Business, excluding any of the foregoing that will not be the obligation of Buyer after the Closing;

(ix)    any partnership or joint venture agreement;

(x)    any Contract between Seller or any other Seller Entity, on the one hand, and any other Seller Entity or any other division of Seller, on the other hand, in exclusive connection with the Subject Business;

(xi)    other than for sales and purchases in the ordinary course of business, any Contract or option for the acquisition or sale by the Subject Business of any material asset or group of assets of the Subject Business; or

(xii)    any settlement agreement with any Governmental Authority or third party within the preceding twelve (12) months or under which there are no outstanding obligations of Seller.

(b)    With respect to each such Material Contract (other than a Material Contract which is listed on Schedule 5.14(f) (which Contracts are covered by the representations and warranties

contained in Section 5.14(f)) or which is an Excluded Asset): (i) the Material Contract is legal, valid, binding and enforceable in accordance with its terms by Seller and, to the Knowledge of Seller, by the other contracting party thereto, and is in full force and effect, subject (other than with respect to the Bankruptcy Proceeding) to bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer and similar Laws of general applicability relating to or affecting creditors' rights and to general equity principles (whether in equity or at law), (ii) neither Seller nor, to the Knowledge of Seller, any other party is in breach or default, and, to the Knowledge of Seller, (A) no event has occurred which with notice or lapse of time or both would constitute a breach or default, or permit termination, modification, or acceleration of and (B) no party has notified Seller or any other Seller Entity of any intention to terminate, modify or accelerate such Material Contract, (iii) Seller has not received written notice, or to the Knowledge of Seller, no party has otherwise repudiated in writing or in a manner reasonably communicated to the management of Seller or any other Seller Entity, any provision of such Material Contract and (iv) neither Seller nor any Seller Entity has waived any material rights under any Material Contract.

(c)     Seller has heretofore delivered or made available to Buyer complete copies, including all amendments and modifications thereto, of all Material Contracts that are binding on the Subject Business.

(d)     To Seller's Knowledge as of the date of this Agreement, none of the four Persons with a bid, proposal or purchase order listed on Schedule 5.10(d) has notified Seller of any intent to materially change any such bid, proposal or purchase order or notified Seller of any circumstances that would preclude or prevent any such bids or proposals from becoming purchase orders or materially delay any bids or proposals from becoming purchase orders.

5.11    Labor and Employment.

(a)     Schedule 5.11(a) lists each Subject Business Employee, his/her work location, title, service commencement date, current base pay and any bonus or other compensation incentive plans in which the Subject Business Employee is eligible to participate. Each written employment Contract covering any such Subject Business Employee has been made available to Buyer.

(b)     Seller is not a party to nor does it have any liability with respect to any collective bargaining agreement or other similar Contract with a labor union or similar organization covering any Subject Business Employee and, to the Knowledge of Seller, there have not, in the previous 18 months, been any organizing campaigns or organizing activities by a union to organize any Subject Business Employee to form or join a union. All employment or labor related litigation claims, including charges filed with the Equal Employment Opportunity Commission or its state counterparts, since January 1, 2004 by any Subject Business Employee are listed on Schedule 5.11(b).

5.12    Employee Benefit Plans. Each employee benefit plan (as defined in Section 3(3) of the Employee Retirement Income Security Act), excluding governmental plans, which as of the date hereof covers any Subject Employee (each a "Seller Benefit Plan") is set forth on Schedule 5.12.

24