5.13    Environmental Compliance.

(a)    Except as set forth on Schedule 5.13, Seller in connection with the Subject Business is in compliance in all material respects with all applicable EH&S Laws as of the date hereof or the Closing Date.

(b)    Except as set forth on Schedule 5.13, (i) Seller in connection with the Subject Business has in force all Permits required by applicable EH&S Laws as of the date hereof or the Closing Date for the operation of the Subject Business and the Transferred Assets, and no event has occurred that would allow, either upon the giving of notice or lapse of time or otherwise, revocation or early termination of any such Permit.

(c)    Except as set forth on Schedule 5.13, (i) since January 1, 2007, no notices or claims relating to potential liability or legal action under any applicable EH&S Laws in effect during the periods between January 1, 2007 and the date hereof or January 1, 2007 and the Closing Date have been received by Seller in connection with the Subject Business or the Transferred Assets; and (ii) to the Knowledge of Seller, there are no Proceedings, or other hearings, inquiries or audits, pending or threatened, by or before any court or other Governmental Authority or any arbitrator or arbitration panel (other than the Bankruptcy Proceeding) under applicable EH&S Laws with respect to any Seller Entity or their current or former Affiliates with respect to the Subject Business or the Transferred Assets.

(d)    Except as set forth on Schedule 5.13, to Seller's Knowledge, there are no Hazardous Materials present in the Environment that require investigation or remediation pursuant to any applicable EH&S Law as of the date hereof or the Closing Date, or that exceed any remediation or other standard contained in or issued pursuant to any applicable EH&S Law as of the date hereof or the Closing Date, either (i) at the Subject Business Real Property, or (ii) arising from or relating to the Subject Business, and for which any Seller Entity or their current or former Affiliates may be liable.

5.14    Intellectual Property.

(a)    Schedule 5.14(a) sets forth a list of all patents, patent applications, registered trademarks and service marks, trademark and service mark applications, domain names, and trade names used or held for use in the Subject Business. Operation of the Subject Business will not infringe, misappropriate or otherwise use unlawfully any Intellectual Property (other than that listed in Schedule 5.14(a)) owned by any Seller Entity immediately after the Closing. The Subject Business Intellectual Property includes all of the Intellectual Property set forth on Schedule 5.14(a).

(b)    Seller's operation of the Natural Gas Subject Business, except as set forth in Schedule 5.14(b), and manufacture and lease of the membrane modules pursuant to the IP Lease, do not infringe, misappropriate or otherwise make any unlawful or unauthorized use of any third party Intellectual Property, in the United States of America, and to the Knowledge of Seller, outside of the United States of America. To the Knowledge of Seller, Seller's operation of the Subject Business

(other than the Natural Gas Subject Business and manufacture and lease of the membrane modules pursuant to the IP Lease which are addressed above) does not infringe, misappropriate or otherwise make any unlawful or unauthorized use of any third party Intellectual Property. To the Knowledge of Seller, no third party is infringing, misappropriating or otherwise making any unlawful or unauthorized use of any Subject Business Intellectual Property, or any Intellectual Property licensed to Seller for which Seller has the right to enforce. There is no pending, or to the Knowledge of Seller, threatened, Proceeding alleging that Seller's operation of the Subject Business infringes, misappropriates or otherwise makes any unlawful or unauthorized use of any third party Intellectual Property (including any such Proceeding seeking that Seller license, or refrain from using, any third party Intellectual Property).

(c)    (i)    Seller exclusively owns the Intellectual Property listed in <u>Schedule 5.14(a),</u> <u>Parts 1, 2 and 5,</u> and jointly owns with a third party the Intellectual Property listed in <u>Schedule 5.14(a), Part 3</u>. Seller makes no representation or warranty with respect to whether the ownership of Intellectual Property listed in <u>Schedule 5.14(a), Part 3</u>, including joint ownership, is correctly recorded, or that <u>Schedule 5.14(a), Part 3</u> contains and/or accurately sets forth all patents and/or applications corresponding to the priority patent application filed for each of the two patent families set forth therein. Seller's ownership of Intellectual Property listed in <u>Schedule 5.14(a), Parts 2 and 3</u> is, to the Knowledge of Seller, subject to terms and conditions of related development agreements with the third party joint owner, which development agreements are listed in <u>Schedule 5.10(a)</u>. To the Knowledge of Seller, Seller is joint holder of record, of the Intellectual Property listed in <u>Schedule 5.14(a), Part 4</u>, of which Seller makes no other representation or warranty as to ownership.

(ii)    Seller has the right to transfer or assign all right, title, and interest to the Natural Gas Subject Business Intellectual Property at the Closing. To the Knowledge of Seller, Seller has the right to transfer or assign all right, title, and interest to Subject Business Intellectual Property, other than (A) the Natural Gas Subject Business Intellectual Property and (B) the Intellectual Property listed on <u>Schedule 5.14(a)</u>, at the Closing.

(iii)    Seller has the right to transfer or assign all of its right, title and interest in and to the Subject Business Intellectual Property listed on <u>Schedule 5.14(a)</u>, except for the Intellectual Property listed in <u>Schedule 5.14(a), Part 4</u>, free and clear of all Liens (other than Permitted Exceptions), subject to terms and conditions contained in the agreements set forth in <u>Schedule 5.14(c)(iii)</u>. To the Knowledge of Seller, no other contractual terms and obligations, other than those of agreements set forth in <u>Schedule 5.14(c)(iii)</u> exist to limit or otherwise condition the assignment or transfer of such foregoing Subject Business Intellectual Property listed on <u>Schedule 5.14(a)</u> (other than the items listed in <u>Schedule 5.14(a), Part 4</u>) from Seller to Buyer.

(d)    Seller, in connection with the Subject Business, has not entered into a stand alone agreement whose primary operation at Law is to indemnify any other Person for or against any infringement, misappropriation, or other unlawful or unauthorized use of Intellectual Property. For the avoidance of doubt, such a stand alone agreement does not include legal obligations or agreements (i) as provided pursuant to the design, manufacture, or sale of products to which the

26

terms and conditions as set forth in <u>Schedule 5.21(a)</u> apply, or (ii) under the terms and conditions of the agreements set forth in <u>Schedule 5.10(a)</u>.

(e)     Other than as set forth in <u>Schedule 5.14(e)</u>, Seller, in connection with the Subject Business, (i) does not license any third party software (other than unmodified commercial-off-the-shelf software), (ii) does not use any open source software, and (iii) has developed, using solely internal resources, all non-commercial software used or held for use by it.

(f)     <u>Schedule 5.14(f)</u> lists the agreements between Seller and all of the Subject Business Employees providing for confidentiality obligations with respect to Intellectual Property and assignment of Intellectual Property developed in connection with the Subject Business. Copies of such agreements have been made available to Buyer. Seller has not received written notice and the other party has not otherwise repudiated in a manner reasonably communicated to the management of Seller or any other Seller Entity, any provision in any agreement listed in <u>Schedule 5.14(f)</u>, and neither Seller nor any Seller Entity has waived any material rights under any such agreement. To Seller's Knowledge, (i) each such agreement is legal, valid, binding and enforceable against the other party in accordance with its terms, and is in full force and effect, subject (other than with respect to the Bankruptcy Proceeding) to bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer and similar Laws of general applicability relating to or affecting creditors' rights and to general equity principles (whether in equity or at law), and (ii) neither Seller nor the other party is in breach or default, and (A) no event has occurred which with notice or lapse of time or both would constitute a breach or default, or permit termination, modification, or acceleration thereof and (B) the other party has not notified Seller or any other Seller Entity of any intention to terminate, modify or accelerate such agreement.

(g)     Seller has used commercially reasonable efforts to maintain the confidentiality of any legally protectable Natural Gas Subject Business Intellectual Property. To the Knowledge of Seller, Seller has used commercially reasonable efforts to maintain the confidentiality of any legally protectable Subject Business Intellectual Property other than the Natural Gas Subject Business Intellectual Property.

(h)     No loss or expiration of any of the Intellectual Property listed in <u>Schedule 5.14(a)</u>, <u>Parts 1, 2 and 5</u>, is pending, or to the Knowledge of Seller, is threatened, except for Intellectual Property expiring at the end of its statutory term (and not as a result of any act or omission by Seller, including a failure to pay any required maintenance fees except in the ordinary course of business).

5.15    <u>Financial Statements</u>.

(a)     <u>Schedule 5.15(a)</u> contains an unaudited statement of net assets of the Subject Business as of December 31, 2008, and May 31, 2009 (the "Net Assets Statements"). The Net Assets Statements reflect all amounts necessary for a fair presentation of the current assets, fixed assets and current liabilities of the Subject Business as of such dates, in accordance with the accounting principles set forth in <u>Schedule 4.03(a)</u>.

(b)     Schedule 5.15(b) sets forth the unaudited statements of income of the Subject Business for the years ended December 31, 2008 and December 31, 2007 and for the five (5) month period ended May 31, 2009 (collectively, the "Income Statements"). The Income Statements present fairly, in all material respects, the results of operations of the Subject Business for the periods to which they relate, in accordance with Seller's accounting principles set forth on Schedule 4.03(a), consistently applied.

5.16    Taxes.

(a)     Seller has (i) duly filed with the appropriate taxing authority (or there has been filed on its behalf) all Tax returns required to be filed by it (taking into account all applicable extensions) with respect to the Subject Business and (ii) paid all Taxes shown as due on such Tax returns when payable. All such Tax returns are true and correct in all material respects.

(b)     There are no Liens for Taxes upon any Transferred Assets, except for Liens for Taxes not yet due and payable.

(c)     There is no audit, examination, deficiency, refund litigation or proposed adjustment pending or in progress or threatened with respect to any Taxes relating to the Subject Business.

(d)     There are no outstanding written requests, agreements, consents or waivers to extend the statutory period of limitations applicable to the assessment of any Taxes relating to the Subject Business.

(e)     Seller, with respect to the Subject Business, is in material compliance with all applicable information reporting and Tax withholding requirements under U.S. federal, state and local, and non-U.S. Tax Laws.

5.17    Compliance with Laws. Since January 1, 2007, Seller (or its past or present Affiliates) has complied in all material respects with all applicable Laws in connection with the Subject Business, and no Proceeding has been commenced, and to Seller's Knowledge, no Proceeding has been filed, and no hearing, audit or inquiry has been commenced, against Seller alleging any failure to so comply by or before any court or other Governmental Authority or any arbitrator or arbitration panel (other than the Bankruptcy Proceeding).

5.18    Transactions with Affiliates. Except as set forth on Schedule 5.18, no Seller Entity other than Seller or any other division of Seller, and none of the directors or officers, and to the Knowledge of Seller, none of the consultants, employees or managers of Seller or any other Seller Entity (or to the Knowledge of Seller, any of the respective Affiliates of any such entities or individuals) have been involved in any business arrangement or relationship with the Subject Business, are entitled to any payment or transfer of any assets from the Subject Business, have any interest in any material property or asset owned, leased, licensed or used by the Subject Business, or have a material interest in any customer or supplier of the Subject Business or any provider of products or services to the Subject Business.

5.19 <u>Conduct of the Business</u>. Since May 31, 2009, except as specifically disclosed in Schedule 5.19, the Subject Business has not:

(a)     suffered any theft, damage, destruction or casualty loss in excess of $100,000 in the aggregate to its assets (including the Transferred Assets), whether or not covered by insurance;

(b)     entered into any settlement regarding the breach or infringement of, any Subject Business Intellectual Property;

(c)     subjected any of the Transferred Assets to any Lien (other than Permitted Exceptions and Liens that will be released at or prior to the Closing);

(d)     sold, leased, subleased, licensed, assigned, transferred or otherwise disposed of any of its material tangible or intangible assets (including the Subject Business Intellectual Property) (except for sales of Inventory and non-exclusive licenses granted in the ordinary course of business) or, to the Knowledge of Seller, disclosed any confidential information (other than pursuant to agreements requiring the Person to whom the disclosure was made to maintain the confidentiality of such confidential information);

(e)     waived, canceled, compromised or released any material rights or material claims of material value, other than in the ordinary course of business;

(f)     except (i) as required pursuant to the terms of any Seller Benefit Plan or (ii) for increases in annual salary or hourly wages or cash bonuses in the ordinary course of business (which do not individually exceed 5% of base salary), (A) granted to any Subject Business Employee any increase in compensation or benefits, (B) granted to any Subject Business Employee any increase in severance or termination pay, (C) entered into or amended any employment, indemnification, severance, or termination agreement with any employee (except where required by Law), or (D) taken any action to accelerate any payments, rights or benefits, or made any material determinations not in the ordinary course of business, under any Seller Benefit Plan;

(g)     made any material change in its accounting principles, methods or practices, or made or changed any Tax election, or settled any material Tax controversy;

(h)     other than pursuant to its capital budget, authorized, committed to or made any capital expenditures that aggregate in excess of $84,000;

(i)     made any loans or advances to, or guarantees for the benefit of, any Person (other than advances to employees of the Subject Business for travel and business expenses incurred in the ordinary course of business);

(j)     instituted, compromised or settled any Proceeding;

(k)     acquired any other business or Person (or any significant portion or division thereof), whether by merger, consolidation or reorganization or by purchase of its assets or stock or acquired

29

any other material assets;

     (m)    entered into any Contracts with, any Affiliate of Seller;

     (n)    induced, or attempted to induce, any employee of the Subject Business, whether directly or indirectly, to terminate his or her employment with the Subject Business as of or following the Closing;

     (o)    dismissed any member of the Subject Business' senior management team (except for cause) or employed or engaged (or offered to employ or engage) any other Person with total compensation of $75,000 per year or higher; or

     (p)    committed or agreed, in writing or other legally binding manner, to any of the foregoing, except as expressly contemplated by this Agreement.

     5.20    Permits. Schedule 5.20 sets forth a complete and correct list of all material Permits obtained or necessary in connection with the operation of the Transferred Assets and the Subject Business. To the Knowledge of Seller, all of the Permits set forth or required to be set forth on Schedule 5.20 are valid and in full force and effect. Seller has not received any written notice, and to the Knowledge of Seller, Seller has not received any other notice, from any Governmental Authority stating an intention to terminate or modify any material Permit.

     5.21    Product Warranty/Product Liability.

     (a)    Schedule 5.21(a) sets forth the standard terms and conditions with respect to products designed, manufactured or sold by the Subject Business and services rendered by the Subject Business and lists all material deviations from the warranties and guaranties contained therein that Seller has offered or agreed to give in the six months prior to the date hereof.

     (b)    Except as set forth on Schedule 5.21(b), there is currently no pending, and since January 1, 2008, there has been no pending or, to the Knowledge of Seller, threatened Proceeding and the Subject Business has no material liability with respect to (i) any product alleged to have a defect in manufacture or design, (ii) any other product liability or any similar claim with respect to any product sold by the Subject Business, or (iii) any claim for the breach of any express or implied product warranty or any similar claim with respect to any such product other than standard warranty obligations made by the Subject Business in the ordinary course of business to purchasers of its products. To Seller's Knowledge, since January 1, 2008, there has not been any accident, happening or event caused or allegedly caused by any hazard, defect, alleged hazard or alleged defect in manufacture, design, materials or workmanship relating to any product sold by the Subject Business. There is currently no pending, and since January 1, 2008, there has been no pending, nor to the Knowledge of Seller, threatened, voluntary or compulsory recall, market withdrawal, safety alert, investigation or any other similar notice or action relating to any alleged defect or violation, or lack of safety or efficacy of any product.

30

5.22    No Premerger Obligations.  The Transactions do not give rise to any premerger notification or, subject to entry of the Sale Order and its becoming a Final Order, any other approval obligations on the part of Seller or any other Seller Entity under the Law of any jurisdiction.

5.23    Additional Representation.  Seller further represents and warrants the answers set forth in Schedule 5.23; provided, however, that such representation and warranty is given only as of the date hereof.

## ARTICLE 6

## Buyer Representations and Warranties

Each of Buyer and Buyer Parent represents and warrants to Seller as of the date hereof and as of the Closing as follows:

6.01    Corporate Organization and Existence.  Buyer is a limited liability company duly organized, validly existing and in good standing under the Laws of Delaware.  Buyer Parent is a corporation duly organized, validly existing and in good standing under the Laws of Delaware.  Each of Buyer and Buyer Parent has full power to enter into this Agreement and the other Transaction Documents to which it is or will be a party and, subject to entry of the Sale Order and it becoming a Final Order, perform its obligations hereunder and thereunder.  The execution and delivery by each of Buyer and Buyer Parent of this Agreement and the other Transaction Documents to which it is or will be a party, and its performance of its obligations hereunder and thereunder, have been duly authorized by all required action on the part of Buyer and Buyer Parent.  Buyer is duly authorized to conduct business and is in good standing under the Laws of each jurisdiction where such qualification is required, except in such jurisdictions where the failure to be so qualified or licensed would not reasonably be expected to have a material adverse effect on Buyer's ability to consummate the Transactions.

6.02    Authorization.  Each of Buyer and Buyer Parent has duly and validly executed and delivered this Agreement and the other Transaction Documents to which it is a party which are being executed and delivered simultaneously with this Agreement. The remaining Transaction Documents to which Buyer will be a party, when executed and delivered at the Closing, will be duly and validly executed and delivered by Buyer.  This Agreement and each Transaction Document to which Buyer or Buyer Parent is a party which is being executed simultaneously with this Agreement constitutes, and each Transaction Document to which it is a party upon its execution and delivery at the Closing will constitute (assuming as to this Agreement and each other Transaction Document to which Seller is a party, its due authorization, execution and delivery by Seller and entry of the Sale Order and its becoming a Final Order) a legal, valid and binding obligation of Buyer or Buyer Parent, as applicable, enforceable against Buyer or Buyer Parent, as applicable, in accordance with its terms, subject to bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer and similar Laws of general applicability relating to or affecting creditors' rights and to general equity principles (whether in equity or at law).

31

6.03    No Conflict. The execution and delivery by each of Buyer and Buyer Parent of this Agreement and the other Transaction Documents to which it is or will be a party, and the performance by each of Buyer and Buyer Parent of its obligations hereunder and thereunder, do not (a) conflict with its organizational documents, or (b) subject to entry of the Sale Order and its becoming a Final Order, result in any violation or breach of any of the provisions of, or constitute a default under, any Law, Order or Contract  to which it is a party or by which it is bound, which violation, breach or default would materially adversely affect its ability to execute and deliver this Agreement or any other Transaction Document to which it is or will be a party or perform its obligations hereunder or thereunder.

6.04    Sufficient Funds. Buyer will have on the Scheduled Closing Date sufficient funds to consummate the Transactions.

6.05    No Premerger Obligations.  The Transactions do not give rise to any premerger notification or, subject to entry of the Sale Order and its becoming a Final Order, any other approval obligations on the part of Buyer or Buyer Parent under the Law of any jurisdiction.

### ARTICLE 7

### Buyer's Investigation

Buyer hereby acknowledges the following:

7.01    Investigation.  Buyer has conducted its own investigation and has made its own evaluation of the Subject Business, the Transferred Assets and the Transferred Liabilities; provided that except as provided by applicable Law, no knowledge of, or investigation by or on behalf of, any Buyer will constitute a waiver of Buyer's right to enforce any covenant, representation or warranty, contained herein or affect any right Buyer may have to indemnification.

7.02    No Additional Representations. Except for the specific representations and warranties in this Agreement, neither Seller nor any other Seller Entity is making any representation or warranty, express or implied, of any nature whatsoever with respect to the Subject Business, the Transferred Assets or the Transferred Liabilities.

### ARTICLE 8

### Covenants of Seller and Buyer

8.01    Bankruptcy Court Approval.

(a)     Seller shall use commercially reasonable efforts to have the Bankruptcy Court approve the Sale Order at its hearing on August 24, 2009, or, if after such use of commercially reasonable efforts, Seller is unable to obtain such approval at such hearing, as soon as practicable thereafter, and not vacate, stay, amend, reverse, supplement, or modify the Sale Order. Upon entry of the Sale Order, Seller shall (i) use commercially reasonable efforts to cause the Sale Order to

32

become a Final Order as soon as possible after its entry and to obtain any other approvals or consents from the Bankruptcy Court that may be reasonable necessary to consummate the Transactions and (ii) not seek to revoke, modify, or supplement the Sale Order without the prior written consent of Buyer.

(b)     Buyer shall use commercially reasonable efforts (including providing testimony as required at any hearing before the Bankruptcy Court) to assist Seller in obtaining approval of the Sale Order at its hearing on August 24, 2009, or, if after such use of commercially reasonable efforts, Seller is unable to obtain approval at such hearing, as soon as practicable thereafter.

(c)     Seller shall promptly provide Buyer with drafts of all documents, motions, orders, filings or pleadings that Seller or any Affiliate thereof proposes to file with the Bankruptcy Court or any other court or tribunal which relate in any manner, directly or indirectly, to (i) this Agreement, the Ancillary Agreements or the Transactions; (ii) the Sale Motion; (iii) entry of the Sale Order; or (iv) the Subject Business, and will provide Buyer with a reasonable opportunity to review such documents in advance of their service and filing.

(d)     Seller shall comply with all requirements of the Bankruptcy Code and Federal Rules of Bankruptcy Procedure in connection with obtaining approval of the sale of the Transferred Assets (including the assumption and assignment to Buyer of any Transferred Contracts) to Buyer pursuant to this Agreement.  Notice of the hearing on the request for entry of the Sale Order pursuant to the Sale Motion, notice of any hearings at which objections to proposed Cure Costs or other issues regarding the proposed assumption and assignment of the Transferred Contracts pursuant to the Sale Motion, and notice of the deadline for all objections to entry of the Sale Order or any other order related thereto or to the Sale Motion shall be properly served by Seller in accordance with all applicable Federal Rules of Bankruptcy Procedure and all applicable local rules and standing orders of the Bankruptcy Court on all parties required to receive such notices, including all parties who have asserted Liens in the Transferred Assets, all parties to Transferred Contracts, counsel to any statutory committee appointed in the Bankruptcy Proceeding, the Office of the United States Trustee for the District of Delaware, all financial institutions that have currently outstanding loans to Seller, all parties filing notices of appearance or requests for papers in the Bankruptcy Proceeding, the Internal Revenue Service, the U.S. Environmental Protection Agency and any applicable state environmental agency, the Pension Benefit Guaranty Corporation, and, to the extent required, each of Seller's other creditors.  In addition, notice of the Sale Motion and the hearing on the request for entry of the Sale Order and the objection deadline for such hearing shall be given by Seller, in a form reasonably satisfactory to Buyer, by publication of a notice in *The Wall Street Journal* National Edition and *The Denver Post* at a time reasonably in advance of such objection deadline and hearing.

8.02     Access and Inquiry.  Between the date of this Agreement and the Closing, Seller shall give Buyer reasonable access to the books and records, files, customer lists, accounting records and the facilities of the Subject Business and Buyer upon request will be permitted to contact and make reasonable inquiry of employees of Seller regarding the Subject Business. Buyer acknowledges that the terms of the Confidentiality Agreement shall apply to information obtained by Buyer and its

33

representatives pursuant to this Section.

8.03    <u>Licenses and Permits; Consents</u>.

(a)    Buyer and Seller will cooperate after the date hereof to prepare and file or cause to be prepared and filed, at Buyer's cost, with the appropriate Governmental Authorities applications for the issuance or transfer to Buyer of all Permits required for Buyer to operate the Subject Business after the Closing, to be effective upon the Closing. Buyer and Seller shall use their commercially reasonable efforts to secure such Permits. Prior to Closing, neither Buyer nor Seller shall communicate with any Governmental Authorities in connection with such Permit transfer or issuance without first consulting with the other Party or Parties and providing the other Party or Parties with an opportunity to participate in such communications.

(b)    As soon as practicable after the date hereof, Seller will give all required notices to third parties and Buyer and Seller will use their commercially reasonable efforts to obtain all consents as may be required or appropriate in connection with the consummation of the Transactions and to preserve all rights and benefits of the Subject Business [REDACTED].

8.04    <u>Notices to Third Parties</u>. Buyer and Seller shall cooperate to make all other filings and to give notice to all third parties that may reasonably be required to consummate the transactions contemplated by this Agreement.

8.05    <u>Commercially Reasonable Efforts</u>. In making commercially reasonable efforts as required under this Article 8 or elsewhere is this Agreement, no Party shall be required to make any payment (other than for reasonable legal fees and payment of any applicable Cure Costs) that it is not presently contractually required to make, divest or hold separate or license any assets of Buyer, any member of the Buyer Group or any of its Affiliates (including assets of the Subject Business), make any change in the conduct of its business or that of the Subject Business other than to perform under the terms of this Agreement, accept any limitation on the future conduct of its business or that of the Subject Business, accept any significant modification in any existing agreement or arrangement, or agree to any of the foregoing.

8.06    <u>Title Insurance and Survey</u>. Buyer shall order the Title Commitment and the Survey and deliver copies of the same to Seller. Seller shall provide all reasonable cooperation to Buyer in Buyer's efforts to obtain for the benefit of Buyer the Survey and the Title Policy, including executing and delivering such affidavits, documents and other agreements as are required by the Title Insurer to issue the Title Policy. The cost of obtaining the Title Commitment, the Survey and the Title Policy shall be borne by Buyer.

8.07    <u>Termination of Intercompany Agreements</u>. Any Contracts or other arrangements between Seller or any other Seller Entity in connection with the Subject Business, on the one hand, and any other Seller Entity or any other division of Seller, on the other hand, shall be terminated by Seller as of or prior to the Closing; and in any event, Buyer shall have no rights or obligations thereunder or with respect thereto.

8.08    Delivery of Monthly Financials.  Until the Closing Date, Seller shall, as promptly as practicable but in no event later than 15 days after the end of each calendar month, prepare and deliver to Buyer an income statement and statement of net assets of the Subject Business for such calendar month.  Such unaudited statements shall be prepared in accordance with the accounting policies set forth in Schedule 4.03(a), consistently applied.

8.09    Assumption and Assignment of Transferred Contracts; Cure Costs.  In the event that any Cure Cost obligation exists with respect to any Transferred Contract, at the Closing, Seller shall assign to Buyer and Buyer will assume all of the Transferred Contracts.  Seller and Buyer shall each be responsible for one-half of such Cure Costs.  Notwithstanding the foregoing, Buyer may request and Seller shall file with the Bankruptcy Court a request by Buyer to modify **Exhibit 1.02F** to add additional Contracts related to the Subject Business as Transferred Contracts and have Buyer and Seller pay the corresponding Cure Costs, if any, in the manner provided in this Section 8.09; provided, however, that any such request to modify **Exhibit 1.02F** is made in writing by Buyer within sixty (60) days following the Closing Date, and provided, further, that Seller shall not be required to modify **Exhibit 1.02F** with respect to any Contract that it has previously rejected in the Bankruptcy Proceeding.

8.10    Temporary Employees.  In connection with the hiring of any temporary employees prior to Closing, Seller shall consult with Buyer prior to such hiring, except to the extent prohibited by Law.

## ARTICLE 9

### Conduct of Business Prior to the Closing

9.01    Operation in Ordinary Course.  From the date hereof through the Closing or the earlier termination of this Agreement, except as set forth on Schedule 9.01 or as specifically required by this Agreement, Seller, in connection with the Subject Business, shall comply in all material respects with applicable Laws and conduct the Subject Business in the ordinary course of business (including repairing or replacing casualty losses and making previously budgeted capital expenditures in the ordinary course of business) and shall use its commercially reasonable efforts to preserve intact the Subject Business and relationships with third parties (including customers and suppliers) and to keep available the services of its current officers and employees; provided, however, that the occurrence of any event (or failure to occur of any necessary event), which occurrence (or failure to occur) is beyond the reasonable control of Seller, shall not constitute a violation or breach of this Section 9.01. Without limiting the generality of the foregoing, from the date hereof until the Closing, unless Buyer has previously consented in writing thereto, Seller, in connection with the Subject Business, will not, and will cause the other Seller Entities not to:

(a)    enter into any settlement regarding the breach or infringement of, any Subject Business Intellectual Property;

(b)    subject any of the Transferred Assets to any Lien (other than Permitted Exceptions

35

and Liens that will be released at or prior to the Closing);

(c)     sell, lease, sublease, license, assign, transfer or otherwise dispose of any of its tangible or intangible assets (including the Subject Business Intellectual Property) (except for sales of Inventory and non-exclusive licenses granted in the ordinary course of business);

(d)     waive, cancel, compromise or release any rights or claims of material value, other than in the ordinary course of business or disclose any confidential information (other than pursuant to agreements requiring the Person to whom the disclosure is made to maintain the confidentiality of such confidential information);

(e)     enter into, amend, waive or terminate any material provision of any Material Contract or the Subject Business' material rights thereunder or enter into any other material transaction (other than sales or Contracts for sales of Inventory) or materially change any material business practice;

(f)     except (i) as required pursuant to the terms of any Seller Benefit Plan or (ii) for increases in annual salary or hourly wages or cash bonuses in the ordinary course of business (which do not individually exceed 5% of base salary), (A) grant to any employee any increase in compensation or benefits, (B) grant to any employee any increase in severance or termination pay, (C) enter into or amend any employment, consulting, indemnification, severance, collective bargaining or termination agreement with any employee (except where required by Law), (D) establish, adopt, enter into or amend in any material respect any Seller Benefit Plan, (E) take any action to accelerate any payments, rights or benefits, or make any material determinations not in the ordinary course of business, under any Seller Benefit Plan or (F) loan or advance money or other property to any employee, other than ordinary course employee expense advances;

(g)     make any material change to its accounting methods, principles or practices;

(h)     authorize, commit to or make any capital expenditures not previously budgeted that aggregate in excess of $84,000;

(i)     make any loans or advances to, or financial guarantees for the benefit of, any Persons other than the Subject Business (other than advances to employees of the Subject Business for travel and business expenses incurred in the ordinary course of business);

(j)     institute, compromise or settle any material Proceeding;

(k)     grant any warranties or similar performance guarantee to its customers other than in the ordinary course of business;

(l)     acquire any other business or Person (or any significant portion or division thereof), whether by merger, consolidation or reorganization or by purchase of its assets or stock or acquired any other material assets;

(m)     except in the ordinary course of business, (i) acquire or dispose of any property or

36

assets or (ii) cancel any debts or waive any claims or rights of substantial value;

      (n)     enter into any Contracts with, any Affiliate of Seller, except to the extent required by Law;

      (o)     except as provided in <u>Schedule 9.01(o)</u>, induce, or attempt to induce, any Subject Business Employee, whether directly or indirectly, to terminate his or her employment with the Subject Business as of or following the Closing;

      (p)     dismiss any member of the Subject Business' senior management team (except for cause) or employ or engage (or offer to employ or engage) any other Person with total compensation of $75,000 per year or higher;

      (q)     make any material change in its general pricing practices or policies or any material change in its credit or allowance practices or policies; or

      (r)     commit or agree, in writing or other legally binding manner, to any of the foregoing, except as expressly contemplated by this Agreement.

## ARTICLE 10

### Conditions Precedent to Buyer's Obligations

All obligations of Buyer under this Agreement are subject, at Buyer's option, to the fulfillment prior to or at the Closing, of each of the following conditions:

10.01 <u>Performance of Covenants and Agreements</u>.  Seller shall have performed in all material respects all of the covenants and agreements required to be performed by Seller at or prior to the Closing pursuant to this Agreement.

10.02 <u>Permits, Consents, etc.</u>  Each environmental Permit set forth on <u>Schedule 5.20</u> either (a) has been obtained effective as of the Closing or (b) would reasonably be expected to be obtained after the Closing without penalty or other material adverse consequences to Buyer. There shall be no other material Permit, consent, approval or authorization of, or declaration to or filing with, any Governmental Authority required in connection with the Transactions that has not been accomplished or obtained and which could not reasonably be expected to be accomplished or obtained after the Closing without penalty or other material adverse consequences to Buyer.

10.03 <u>Litigation</u>.  No Proceeding by any third Person (including any Governmental Authority) shall have been instituted (and remain pending on the Closing Date) against any Seller Entity or Buyer Entity (or any Affiliate of any Seller Entity or Buyer Entity), and no Order shall have been issued (and remain outstanding on the Closing Date), that questions, or reasonably could be expected to lead to subsequent questioning of, the validity or legality of this Agreement or the Transactions which in the case of a Proceeding, if successful, would materially adversely affect the right of Buyer to consummate the Transactions or to continue the Subject Business after the Closing

substantially as currently operated.

10.04   Certificates of Seller.

(a)     Seller shall have delivered to Buyer a certificate of Seller, dated the Closing Date, signed by the President or any Vice President of Seller to the effect that the conditions set forth in Sections 10.01 and 10.05 have been satisfied, subject, with respect to the condition set forth in Section 10.05, for any matters listed on such certificate. The listing of such matters shall not (i) be or be deemed an admission that such matters, individually or collectively, constitute a Material Adverse Effect or (ii) constitute a waiver by Buyer of any of its rights contained in Article 14 or any of the conditions precedent to the Closing hereunder or cure any breach of any representation, warranty or covenant contained herein.

(b)     Seller shall have delivered to Buyer a certificate of Seller, dated the Closing Date, signed by the Secretary or an Assistant Secretary of Seller, (i) certifying that the execution, delivery and performance of the Transaction Documents to which Seller is a party have been duly authorized by the Board of Directors or its duly authorized delegee, and that such authorization has not been amended but remains in full force and effect on the Closing Date, and (ii) certifying the incumbency as officers or authorized signatories of Seller, and the authenticity of specimen signatures, of all Persons signing any Transaction Documents on behalf of Seller.

10.05   No Material Adverse Effect.   There will not have occurred, from the date hereof through and including the Closing, any Material Adverse Effect.

10.06   Closing Deliveries.   Seller shall have delivered to Buyer those items set forth in Section 3.03.

10.07   Bankruptcy Court Approval.   The Sale Order shall have been entered and shall have become a Final Order.

10.08   Title and Survey.   Buyer shall have received the Title Policy and the Survey.

## ARTICLE 11

### Conditions Precedent to Seller's Obligations

All obligations of Seller under this Agreement are subject, at Seller's option, to the fulfillment prior to or at the Closing, of each of the following conditions:

11.01   Accuracy of Representations and Warranties.   The representations and warranties of Buyer contained in this Agreement shall be true and correct (without regard to any materiality or material adverse effect qualifications or exceptions contained therein) in all respects at and as of the Closing Date, except for such breaches or failures to be true and correct that would not reasonably be expected, individually or in the aggregate, to have a material adverse effect upon the ability of Buyer to consummate the Transactions or on the ability of Buyer Parent to perform its obligations under

38

this Agreement.

11.02  <u>Performance of Covenants and Agreements</u>.  Buyer shall have performed in all material respects at or prior to the Closing all of the covenants and agreements required to be performed by Buyer at or prior to the Closing pursuant to this Agreement.

11.03  <u>Permits, Consents, etc.</u>  Each environmental Permit set forth on <u>Schedule 5.20</u> either (a) has been obtained effective as of the Closing or (b) would reasonably be expected to be obtained after the Closing without penalty or other material adverse consequences to Buyer.  There shall be no other material Permit, consent, approval or authorization of, or declaration to or filing with, any Governmental Authority required in connection with the Transactions which has not been accomplished or obtained and which could not reasonably be expected to be accomplished or obtained after the Closing without penalty or other material adverse consequences to the Seller Group.

11.04  <u>Litigation</u>.  No Proceeding by any third Person (including any Governmental Authority) shall have been instituted (and remain pending on the Closing Date) and against any Seller Entity or Buyer Entity (or any Affiliate of any Seller Entity or Buyer Entity), and no Order shall have been issued (and remain outstanding on the Closing Date), that questions, or reasonably could be expected to lead to subsequent questioning of, the validity or legality of this Agreement or the Transactions which in the case of a Proceeding, if successful, would materially and adversely affect the right of Buyer to consummate the Transactions or to continue the Subject Business after the Closing substantially as currently operated might involve material liability on the part of any Seller Entity.

11.05  <u>Certificates of Buyer</u>.

(a)    Buyer shall have delivered to Seller a certificate of Buyer, dated the Closing Date, signed by an authorized representative of Buyer to the effect that the conditions set forth in Sections 11.01 and 11.02 have been satisfied.

(b)    Buyer shall have delivered to Seller a certificate of Buyer, dated the Closing Date, signed by an authorized representative of Buyer, (i) certifying that resolutions of the Board of Managers of Buyer authorizing the Transactions and the execution, delivery and performance of the Transaction Documents to which Buyer is a party have been duly adopted and have not been amended but remain in full force and effect as of the Closing Date, and (ii) certifying the incumbency as officers or authorized signatories of Buyer, and the authenticity of specimen signatures, of all Persons signing any Transaction Documents on behalf of Buyer.  Buyer Parent shall have delivered to Seller a certificate of Buyer Parent, dated the Closing Date, signed by an authorized representative of Buyer Parent, (y) certifying the due authorization of Buyer Parent's execution, delivery and performance of this Agreement and that such authorization has not been amended but remains in full force and effect as of the Closing Date, and (z) certifying the incumbency as officers or authorized signatories of Buyer Parent, and the authenticity of specimen signatures, of all Persons signing any Transaction Documents on behalf of Buyer Parent.

11.06  Bankruptcy Court Approval.  The Sale Order shall have been entered and shall have become a Final Order.

## ARTICLE 12

### Employee Matters

12.01  Employment.

(a)  Except as set forth on Schedule 12.01, effective on the day after the Closing Date, (i) each Seller employee who is employed exclusively in the Subject Business and (ii) any other Seller Entity employee who performs substantial services for the Subject Business and is designated by Seller as an employee who is being transferred with the Subject Business (collectively, the "Subject Business Employees") shall cease to be an employee of Seller. All employees described in clauses (i) and (ii) above as of the date of this Agreement are listed on Schedule 12.01. If the executive employee set forth on Schedule 12.01 (the "Executive") exercises his right to re-employment with Seller, Seller shall make the services of the Executive available to Buyer for a period of three (3) months after the Closing Date (or for so long as he remains employed with Seller if he ceases to be employed less than three months following the Closing Date) on a full time basis at the fully burdened cost of his services (which shall not be materially increased between the Closing and the termination of such three month period) or upon such other terms as Buyer and Seller may agree. In the event the Executive does not become a Continued Employee, Buyer and Seller shall request that the Executive enter into a noncompetition and confidentiality agreement with Buyer. If the Executive does not enter into a noncompetition and confidentiality agreement with Buyer, upon Buyer's request, if permissible under applicable Law, Seller shall enforce the terms of the Executive's existing noncompetition and confidentiality agreement for the benefit of Buyer; and Buyer will reimburse Seller for any and all costs and expenses it incurs in connection with such enforcement and shall hold harmless Seller from and against any Damages arising from such enforcement. If the research employee set forth on Schedule 12.01 (the "Research Employee") does not become a Continued Employee, Buyer and Seller shall request that the Research Employee enter into a confidentiality agreement with Buyer. If the Research Employee does not enter into a confidentiality agreement with Buyer, upon Buyer's request, if permissible under applicable Law, Seller shall enforce the terms of the Research Employee's existing confidentiality agreement for the benefit of Buyer; and Buyer will reimburse Seller for any and all costs and expenses it incurs in connection with such enforcement and shall hold harmless Seller from and against any Damages arising from such enforcement.

(b)  Each Subject Business Employee who accepts an offer of employment from Buyer in accordance with Section 12.02 shall become an employee of Buyer effective on the day after the Closing Date; and all such employees are referred to as "Continued Employees". Seller is making no representation or warranty as to which, if any, Subject Business Employees will accept offers of employment from Buyer.

12.02  Positions Offered to Subject Business Employees.  Buyer shall offer each Subject

40

Business Employee employment to commence on the day after the Closing Date. With respect to each Subject Business Employee, the position offered by Buyer (i) shall be for a job that is comparable to the Subject Business Employee's job with the Subject Business as of the Closing, (ii) shall be at no reduction in base salary or base hourly rate effective immediately prior to the Closing, (iii) shall initially be within fifty (50) miles of the current location of the Subject Business and (iv) shall provide employee benefit plan coverage as follows:

    (A)    <u>Vacation</u>.

    (1)    Effective as of the day after the Closing Date, Buyer shall assume all liability and obligations of Seller to each Continued Employee with respect to vacation from the Closing.

    (2)    Each Continued Employee shall be given credit by the Buyer Group for the employee's prior service with the Seller Group for purposes of the Buyer Group's vacation policies, to the extent such service is recognized under Seller's vacation policies.

    (B)    <u>Severance</u>.

    (1)    Effective as of the day after the Closing Date, the Continued Employees shall be covered by Buyer's severance program or policy ("Buyer's Severance Plan").

    (2)    Under Buyer's Severance Plan, for purposes of determining severance benefits payable for terminations eligible for severance in accordance with Buyer's Severance Plan within 12 months after the Closing Date, each Continued Employee shall be given credit by the Buyer Group for service with the Seller Group through the Closing Date (and service with the Buyer Group after the Closing Date).

    (C)    <u>Other Plans</u>.    Except as otherwise provided in this Section with respect to vacation and severance benefits, effective as of the day after the Closing Date, Buyer shall make available to each Continued Employee the 401(k) plans, medical plans, dental plans, disability plans, group insurance plans and all other benefits under the Buyer's plans, policies and arrangements, which are made available by the Buyer Group to its similarly situated employees. With respect to any such plan, policy or arrangement that requires an employee to attain any specific length of service with Buyer in order to participate in, or be eligible for, or to be vested in, any benefits provided thereunder, each Continued Employee shall be given credit for purposes of determining such participation, eligibility and vesting (but not for purposes of the accrual of any benefits under any such plan, policy or arrangement) for the Employee's length of service with the Seller Group through the Closing Date.

    12.03    <u>Inactive Subject Business Employees</u>. This Agreement shall not obligate Buyer to employ any Subject Business Employee who is classified by Seller as being on long-term disability leave as of the Closing. Any Subject Business Employees who are regarded by Seller as being on short-term disability, worker's compensation, or other leave of absence (whether paid or unpaid) as of the Closing shall continue such status with Buyer after the Closing and shall be offered

employment with the Buyer, in accordance with the provisions set forth above in Section 12.02, provided that such Subject Business Employees return to active employment within six months of the Closing Date and provided that the commencement date of such leave is included in Schedule 5.11(a).

12.04    Terms of Employment. As to terms and conditions of employment not specified in this Article, from and after the Closing the Continued Employees (i) shall be treated in a similar manner as the other employees of the Buyer Group who are similarly situated, (ii) shall be entitled to participate on the same basis as such other employees in all job training, career development and educational programs of the Buyer Group, and (iii) shall be entitled to fair and equitable consideration together with such other employees in connection with any management or executive job opportunities or any other promotional opportunities with the Buyer Group; provided, however, that Continued Employees will be employed at will, which means their employment may be terminated at any time or for any reason, just as a Continued Employee may terminate employment at any time and for any reason, and nothing in this Section 12.04 or this Agreement generally shall modify their employment at will status.

12.05    Employment Related Indemnities. Seller shall indemnify Buyer from and against all Damages resulting from claims from the Subject Business Employees (including Continued Employees) where such Claims are based on facts alleged to have occurred prior to the day after the Closing Date (the "Employee Closing Date") or on or after the Closing Date as provided in subsection (b) below, including a Claim by any Subject Business Employee who declines to accept employment with Buyer.  Buyer shall indemnify the Seller Group from and against all Damages resulting from Claims based on facts arising after the Employee Closing Date, including: (a) the employment, or termination of employment, of any Continued Employee, (b) any Claim made by any Subject Business Employee for any severance pay, excluding any claim for entitlement to severance based on an alleged obligation by Seller created before the Employee Closing Date or based on termination by Seller after refusal of an offer to become an employee of Buyer and (c) any Claim made by any Continued Employee that results from the actual or alleged non-continuance, reduction or change of the terms and conditions of employment (including any reduction or change of the employment-related benefits provided to such employee), which occurs on or after the Employee Closing Date.  Buyer shall also indemnify the Seller Group from and against all Damages resulting from Claims based on Buyer's hiring practices and decisions with respect to the Subject Business.

## ARTICLE 13

### Termination

13.01    Rights to Terminate.

(a)    This Agreement may be terminated at any time prior to the Closing by written agreement of Seller and Buyer.

(b)    This Agreement may be terminated at the written election of Buyer or Seller, if the

42

Closing has not occurred within one hundred-eighty (180) days after the date of this Agreement by reason of the failure to be satisfied of any of the conditions set forth in Article 10 or Article 11 hereof, respectively (provided that no Party may terminate this Agreement pursuant to this clause if the failure to consummate the transactions contemplated by this Agreement is the result of a breach of this Agreement by the Party seeking to terminate this Agreement).

(c)      This Agreement may be terminated by Buyer at any time prior to Closing if (i) Seller's case is converted to a case under chapter 7 of the Bankruptcy Code, (ii) a plan of reorganization is filed by Seller which is incompatible with the performance of Seller's obligations under this Agreement or (iii) a chapter 11 trustee is appointed for Seller.

(d)      This Agreement may be terminated by Buyer if the Bankruptcy Court approves an order authorizing the sale of the Transferred Assets to another Person.

13.02    <u>Consequences of Termination</u>.

(a)      In the event that (i) this Agreement is terminated pursuant to Section 13.01 (other than pursuant to Section 13.01(a) or as a result of Buyer's material breach of this Agreement) or (ii) prior to the twelve (12) month anniversary of the date of this Agreement, Seller receives Bankruptcy Court approval to sell all or substantially all of the Transferred Assets to a third party and such sale to the third party pursuant to such Bankruptcy Court approval closes at any time thereafter, then Seller shall pay Buyer a fee equal to 2.5% of the Initial Purchase Price within thirty (30) days of the closing of such sale.  Any fee payable pursuant to this Section shall be subject to Section 14.06.

(b)      The obligations of the Parties under this Section 13.02, Section 14.06 and Article 17 shall survive any termination of this Agreement.

## ARTICLE 14

### Indemnification

14.01    <u>Survival</u>. All of the representations and warranties contained in this Agreement or in any certificate delivered by Buyer or Seller pursuant to this Agreement will survive the Closing and continue in full force and effect until the eighteen (18) month anniversary of the Closing Date, except that (a) the representations and warranties contained in Sections 5.01 (Corporate Organization and Existence), 5.02 (Corporate Power), 5.03 (Authorization), 5.04 (Execution and Delivery), 5.05 (No Conflict), 5.07 (Title to Assets), 5.18 (Transactions with Affiliates), 6.01 (Corporate Organization and Existence), 6.02 (Authorization) and 6.03 (No Conflict) hereof will survive the Closing indefinitely, and (b) the representations and warranties contained in Sections 5.13 (Environmental Compliance) and 5.14 (Intellectual Property) hereof will survive the Closing until the second anniversary of the Closing Date.  All covenants or agreements contained in this Agreement or any other Transaction Document which by their terms have any remaining obligation to be performed or observed following the Closing will survive until fully performed or observed in accordance with their terms.  Subject to Section 14.08, notwithstanding anything herein to the contrary, each

43

representation or warranty which is the subject of one or more claims asserted in writing prior to the expiration of the applicable period set forth above will survive with respect to the related claim or claims until the final resolution thereof. Each of the representations and warranties in Articles 5 and 6 is a separate and independent warranty and will be applied and interpreted separately and independently from all other representations and warranties contained herein and from all covenants contained herein.

14.02  Seller's Indemnification.

(a)      Subject to the terms and conditions of this Article 14, Seller agrees to reimburse, defend, indemnify and hold harmless Buyer and its present and future Affiliates and their respective managers, directors, officers, employees and representatives (collectively, the "Buyer Indemnified Parties") for, from, against and in respect of any and all Damages resulting from, caused by or that exist or arise due to, any of the following (collectively, "Buyer Claims"):

(i)      prior to their expiration in accordance with Section 14.01 hereof, any inaccuracy of any representation or breach of any warranty made or given by Seller in this Agreement or any certificate delivered by Seller pursuant to this Agreement;

(ii)      any breach of or failure by Seller to perform or comply with any covenant or agreement contained in this Agreement or any other Transaction Document to which Seller is a party (other than the Transition Services Agreement);

(iii)      any Excluded Asset or Excluded Liability; and

(iv)      reasonable attorneys' fees and other out-of-pocket expenses of a Buyer Indemnified Party in its defense of any Third Party Claim resulting from, caused by or that exists or arises due to any of the foregoing, if the defense of such Claim is not assumed by Seller, and the Buyer Indemnified Party is fully exonerated or cleared with respect to such Claim in the applicable Proceeding.

(b)      Notwithstanding Section 14.02(a) hereof, other than with respect to Sections 5.01 (Corporate Organization and Existence), 5.02 (Corporate Power), 5.03 (Authorization), 5.04 (Execution and Delivery), 5.05 (No Conflict), 5.07 (Title to Assets) and 5.18 (Transactions with Affiliates), which shall not be subject to limitation, the obligations of Seller pursuant to Section 14.02(a)(i) hereof: (i) will not apply with respect to any individual Claim for indemnifiable Damages of less than $25,000 (the "Minimum Claim Amount"), after which, subject to Section 14.02(b)(ii) below, the Buyer Indemnified Parties shall be entitled to recover all such Damages, including the Minimum Claim Amount; and (ii) until the aggregate of all Damages claimed by all Buyer Indemnified Parties, or any of them under Section 14.02 exceeds $100,000 (the "Basket Amount"), after which the Buyer Indemnified Parties shall be entitled to recover all such Damages in excess of the Basket Amount; and (iii) will be limited to, and will not exceed, $4,400,000 (the "Indemnity Cap"). The dollar thresholds set forth in this Section have been negotiated for the special purpose of the provision to which they relate, and are not to be taken as evidence of the level of "materiality" for

44

purposes of any statutory or common law which may be applicable to the Transactions under which a level of materiality might be an issue.

(c)     All amounts owing pursuant to this Section 14.02 will be paid promptly, and in any event, not more than five (5) Business Days following notice of the final adjudication or determination thereof, by wire transfer from Seller of immediately available funds to the account designated in writing by any Buyer Indemnified Party entitled to such payment. All amounts payable pursuant to this Section shall be subject to Section 14.06 hereof.

14.03   Buyer's Indemnification.

(a)     Subject to the terms and conditions of this Article 14, from and after the Closing Date, Buyer agrees to reimburse, defend, indemnify and hold harmless Seller and its present and future Affiliates and their respective managers, officers, employees and representatives (collectively, the "Seller Indemnified Parties") for, from, against and in respect of any and all Damages resulting from, caused by or that exist or arise due to, any of the following (collectively, "Seller Claims", and together with Buyer Claims, the "Claims"):

(i)     prior to their expiration in accordance with Section 14.01 hereof, any inaccuracy of any representation or breach of any warranty made or given by Buyer in this Agreement or any certificate delivered by Buyer pursuant to this Agreement;

(ii)    any breach of or failure by Buyer to perform or comply with any covenant or agreement contained in this Agreement or any other Transaction Document to which Buyer is a party (other than the Transition Services Agreement);

(iii)   any Transferred Asset or Transferred Liability; and

(iv)    reasonable attorneys' fees and other out-of-pocket expenses of a Seller Indemnified Party in its defense of any Third Party Claim resulting from, caused by or that exists or arises due to any of the foregoing, if the defense of such Claim is not assumed by Buyer, and the Seller Indemnified Party is fully exonerated or cleared with respect to such Claim in the applicable Proceeding.

(b)     Notwithstanding Section 14.03(a) hereof, other than with respect to Sections 6.01 (Corporate Organization and Existence), 6.02 (Authorization) and 6.03 (No Conflict) which shall not be subject to limitation, the obligations of Buyer pursuant to Section 14.03(a)(i) hereof: (i) will not apply with respect to any individual Claim for indemnifiable Damages of less than the Minimum Claim Amount, after which, subject to Section 14.03(b)(ii) below, the Seller Indemnified Parties shall be entitled to recover all such Damages, including the Minimum Claim Amount; and (ii) until the aggregate of all Damages claimed by all Seller Indemnified Parties, or any of them under Section 14.03 exceeds the Basket Amount, after which the Seller Indemnified Parties shall be entitled to recover all such Damages in excess of the Basket Amount; and (iii) will be limited to, and will not exceed, the Indemnity Cap. The dollar thresholds set forth in this Section have been negotiated for

45

the special purpose of the provision to which they relate, and are not to be taken as evidence of the level of "materiality" for purposes of any statutory or common law which may be applicable to the Transactions under which a level of materiality might be an issue.

(c)    All amounts owing pursuant to this Section 14.03 will be paid promptly, and in any event not more than five (5) Business Days following notice of the final adjudication or determination thereof, by wire transfer by Buyer of immediately available funds to the account designated in writing by any Seller Indemnified Party entitled to such payment.

(d)    [REDACTED]

14.04   Procedures for Indemnification.

(a)    No Party hereto shall be liable for any Claim for indemnification under this Article 14 unless written notice of a Claim for indemnification is delivered by the Party seeking indemnification (the "Indemnified Party") to the Party from whom indemnification is sought (the "Indemnifying Party") prior to the expiration of any applicable survival period set forth in Section 14.02(b) or prior to the Transition Date in the case of Claims relating to the subject matter of Section 14.03(d) (in which event the Claim shall survive until resolved). If any third party notifies the Indemnified Party with respect to any Third Party Claim against the Indemnifying Party under this Article 14, then the Indemnified Party shall notify the Indemnifying Party promptly thereof in writing; provided that no delay on the part of the Indemnified Party in notifying the Indemnifying Party shall relieve the Indemnifying Party from any obligation hereunder unless, and then only to the extent that, the Indemnifying Party is actually prejudiced thereby. All notices given pursuant to this Section shall describe with reasonable specificity the nature of the Claim, the amount of the Claim (to the extent then known) and the basis of the Indemnified Party's Claim for indemnification.

(b)    Following receipt of notice of a Claim in accordance with Section 14.04(a) (other than a Third Party Claim which shall be governed by Section 14.04(c) below), the Indemnifying Party shall have sixty (60) days from the date it receives notice of such Claim (the "Dispute Period") to make such investigation of the Claim as the Indemnifying Party deems necessary or desirable. For purposes of such investigation, the Indemnified Party shall make available to the Indemnifying Party all the material information related to such Claim relied upon by, or in possession or control of, the Indemnified Party to substantiate such Claim. If the Indemnifying Party disagrees with the validity or amount of all or a portion of such Claim made by the Indemnified Party, the Indemnifying Party shall deliver to the Indemnified Party written notice thereof (the "Dispute Notice") prior to the expiration of the Dispute Period. If no Dispute Notice is received by the Indemnified Party within the Dispute Period with respect to all or any portion of such Claim or the Indemnifying Party provides notice that it does not have a dispute with respect to all or any portion of such Claim, such Claim (or undisputed portion thereof) shall be deemed approved and consented to by the Indemnifying Party (such Claim being referred to herein as an "Approved Indemnification Claim"). The Indemnifying Party shall pay the Indemnified Party any such Approved Indemnification Claim within five (5) Business Days after such Claim is determined to be an Approved Indemnification Claim. If a Dispute Notice is received by the Indemnified Party within the Dispute Period and the

46

Indemnified Party and the Indemnifying Party do not agree to the validity and/or amount of such disputed Claim (or portion thereof), no payment shall be made on account of the disputed portion of such Claim until such disputed Claim is resolved, whether by adjudication of such matter, agreement between Buyer and Seller or otherwise (and upon any such resolution, such Claim (or portion thereof) shall be deemed to be an Approved Indemnification Claim).  All amounts payable by Seller pursuant to this Section shall be subject to Section 14.06.

(c)    After the Indemnified Party has given notice of a Third Party Claim to the Indemnifying Party pursuant to Section 14.04(a), the Indemnifying Party shall be entitled upon written notice to the Indemnified Party (i) to participate in the defense of such Claim and (ii) to the extent desired (and if the Indemnifying Party agrees in writing not to challenge the facts underlying any judgment associated with such indemnification Claim in any subsequent Proceeding between the Indemnified Party and the Indemnifying Party regarding the Indemnifying Party's obligation to indemnify the Indemnified Party for the Damages associated with such indemnification Claim), to assume the defense thereof with qualified counsel of its own choice reasonably acceptable to the Indemnified Party, in each case, at the Indemnifying Party's sole cost and expense; provided, however, that the Indemnified Party may participate in such defense.  Unless and until the Indemnifying Party assumes the defense of a Third Party Claim, the Indemnified Party shall have the right to undertake the defense of such Third Party Claim, by qualified counsel or other representatives of its own choosing reasonably acceptable to the Indemnifying Party, subject to the right of the Indemnifying Party to assume the defense of such Third Party Claim at any reasonable time prior to settlement, compromise or final determination thereof, upon which such assumption, the Indemnifying Party shall promptly reimburse the Indemnified Party for all costs and expenses incurred by the Indemnified Party at any time in connection with the defense of such Third Party Claim prior to the Indemnifying Party's assumption thereof.  The Party controlling the defense of a Third Party Claim shall consider in good faith any recommendations made by any other Party with respect to the defense of such Third Party Claim.  Subject to Section 14.08, any other provision of this Agreement to the contrary notwithstanding, the Party voluntarily participating in, but not controlling, the defense of a Third Party Claim shall bear its own costs of such participation, including its attorney's fees.

(d)    Subject to Section 14.08, notwithstanding any provision of this Agreement to the contrary with respect to control of the defense:

(i)    For any Claim whose resolution may require environmental remediation, installation or modification of equipment, Permit modification or operational changes at the Subject Business Real Property, the Party controlling the defense pursuant to this Section 14.04 shall work cooperatively with the other Party and act by consensus when developing, modifying and implementing a strategy to resolve the Claim, and both Parties shall be entitled to participate in all communications with any Governmental Authority relevant to the resolution of the Claim on commercially reasonable terms.

(ii)    For any Claim (A) that seeks injunctive relief by or against the Indemnified Party with

47

respect to Intellectual Property, (B) that includes a Claim against a customer or supplier of the Indemnified Party, or (C) as to which the Indemnified Party reasonably believes that an adverse determination would have a material adverse effect on the Indemnified Party's reputation or future business prospects, the Indemnified Party shall have the right to undertake the defense of such Third Party Claim, by qualified counsel or other representatives of its own choosing reasonably acceptable to the Indemnifying Party.

(e)     The Indemnified Party shall not agree or consent to the entry of any judgment or enter into any settlement of any Third Party Claim that might give rise to liability of the Indemnifying Party under this Article 14 without the Indemnifying Party's prior written approval, which approval shall not be unreasonably withheld, conditioned or delayed.  The Indemnifying Party shall not agree or consent to any settlement without the prior written approval of the Indemnified Party unless such settlement imposes only monetary damages that are less than the then-remaining Indemnity Cap and the Indemnified Party receives a full release.

(f)     Any disputes regarding (i) the reasonableness of the implementation of Section 14.04(d)(i) or (ii) the reasonableness of withholding, conditioning or delaying any approval required by Section 14.04(e) shall be resolved pursuant to the following procedures:

(i)     If the representatives of the Parties having primary responsibility for handling the Claim are unable to resolve the dispute, they shall immediately elevate the issue to the President of the Davison division of Seller and the President of Buyer (collectively, the "Division Presidents"). The Division Presidents will confer and make an effort to resolve the dispute reasonably and promptly, but in any event within 72 hours or such other time frame as they may agree upon in writing.

(ii)     If the Division Presidents are unable to resolve the dispute within such time frame, they shall elevate the issue to the Chief Executive Officer of Seller and the President of the division within which Buyer operates (collectively, the "Senior Managers").  The Senior Managers will confer and make an effort to resolve the dispute reasonably and promptly, but in any event within 72 hours or such other time frame as they may agree upon in writing.

(iii)     If the Senior Managers are unable to resolve the dispute within such time frame, they shall elevate the issue to the Chief Executive Officer of Seller and the Chief Executive Officer of Buyer Parent (collectively, the "Senior Executives").  The Senior Executives will confer and make an effort to resolve the dispute reasonably and promptly, but in any event within one (1) week or such other time frame as they may agree upon in writing.  Delegations from a Party's Senior Executive shall require the agreement of the other Party's Senior Executive.

(iv)     Resolution of the dispute, whether in accordance with subsection (i), (ii) or (iii) above or otherwise, shall be reflected in a written agreement.

(v)     (A)     If the Senior Executives are unable to resolve the dispute within such time

48

frame, either Party may initiate an arbitration to resolve such dispute by delivering notice to the other Party. The Party initiating the arbitration shall provide a list of at least three arbitrators with its initial arbitration notice, and the Parties thereafter shall have seven (7) calendar days to agree upon an arbitrator from such list. Unless otherwise agreed to in writing by the Parties, the arbitrator shall be a recognized expert in the relevant field of specialization who has been practicing in such field for at least ten (10) years. If the Parties are unable to agree upon an arbitrator in this period, at the request of either Party the arbitrator shall be selected by the American Arbitration Association in accordance with its Commercial Arbitration Rules.

(B)     The arbitration shall take place at the Subject Business Real Property, or such other place as the Parties may agree in writing.

(C)     The arbitration decision shall be made within a time period of forty-five (45) calendar days after the appointment of the arbitrator, or such other time period agreed upon by the Parties which shall take into account any deadlines that may apply to the underlying dispute. The arbitrator shall, in consultation with the Parties, establish a schedule for submissions consistent with this time period.

(D)     The arbitrator shall render its decision based on the commercial reasonableness of each Party's position from the perspective of both Parties taking into account the involvement of any Governmental Authorities in the underlying dispute; provided, that in no event shall the arbitrator award punitive damages to any Party. To the extent relevant, the arbitrator's interpretation of and remedies under this Agreement shall be governed by the laws of Colorado.

(E)     The Party losing the arbitration shall pay the arbitration costs, and each Party shall bear the costs of their own experts and counsel advising them.

(F)     The determination of the arbitrator(s) shall be final, binding and conclusive upon all Parties. Any arbitration decision may be entered in and enforced by any court having jurisdiction thereof.

14.05   No Consequential Damages. No Party shall seek or be entitled to recover its own special, incidental, indirect, consequential or punitive damages in any claim for indemnification under this Article unless any such damages were awarded to a third party pursuant to a Third Party Claim for which the Indemnified Party was entitled to indemnification pursuant to this Article 14.

14.06   Priority of Payments. Subject to entry of the Sale Order, any amounts that become payable by Seller pursuant to this Agreement or any of the Ancillary Agreements shall constitute administrative expenses of Seller's estate and will not be discharged, modified, or otherwise affected by any plan of reorganization or liquidation for Seller.

14.07   Treatment of Indemnity Payments. All indemnification payments made pursuant to this Agreement will be treated by the Parties as adjustments to the Purchase Price.

49

14.08   Indemnification Limitations.  Notwithstanding anything to the contrary contained in this Agreement, in the event of any fraud in the inducement with respect to this Agreement committed by or on behalf of any Party or any Affiliate of any Party prior to the Closing Date, no limitation set forth in this Article 14 or otherwise in this Agreement shall be applicable to any rights or obligations of the Parties.

14.09   Additional Limitations.  [REDACTED]

## ARTICLE 15

### Cooperation in Various Matters

15.01   Mutual Cooperation.

(a)     After the Closing, each Party shall cooperate with the other Parties as reasonably requested by such other Party in connection with the prosecution or defense of any claims or other matters relating to the Subject Business, other than claims between the Parties under this Agreement. Such cooperation shall include the furnishing of testimony and other evidence, permitting access to employees and providing information regarding the whereabouts of former employees.

(b)     Seller shall use commercially reasonable efforts to, and Buyer shall use commercially reasonable efforts to assist Seller to obtain any certificate or other document from any Governmental Authority or other Person as may be necessary to mitigate, reduce or eliminate any Tax that could be imposed (including, but not limited to, any Tax with respect to the transactions contemplated hereby).

15.02   Buyer's Files and Records.  On reasonable notice and regulations during normal business hours, Buyer shall allow Seller access to any files and records in Buyer's possession relating to the Subject Business prior to the Closing that Seller requires in order to properly prepare documents required to be filed with any Governmental Authority, and the right to copy and make extracts therefrom.  If at any time Buyer intends to dispose of such any files and records, it shall give Seller notice of such disposal, and at Seller's request given within sixty days after such notice, deliver to Seller, at Seller's expense, any of such items that Seller requests.

## ARTICLE 16

### Post-Closing Matters

16.01   Reports.  Buyer shall provide such information as Seller may reasonably request in connection with Seller's preparation of financial, Tax and other reports and statements relating to the Subject Business for periods prior to the Closing.  Seller shall provide such assistance as Buyer may reasonably request at Buyer's expense for Buyer's preparation of financial, Tax and other reports and statements relating to the Subject Business for periods after the Closing.

16.02   Names.  After the Closing, Buyer shall have no right to use the "Grace" and/or

"Davison" names, and Buyer shall not, nor permit any other Buyer Entity to, refer (other than in response to unsolicited inquiries or in announcements of the occurrence of the Closing, including public disclosure it reasonably believes is required to be made under applicable Law or any listing or trading agreement concerning its or any of its Affiliates' publicly-traded securities) to their respective businesses as formerly being owned by or associated with Seller, except that for a period of 90 days after the Closing, Buyer shall have the right to use any all signs, labels, stationery, business cards, packaging materials, catalogues, sales and promotional or advertising materials and printed forms that use such names and are included in the Transferred Assets as of the Closing, or have been ordered prior to the Closing for use in the Subject Business. Buyer shall use commercially reasonable efforts to minimize such usage and to discontinue it as soon as reasonably practicable after the Closing.

16.03  Publicity. Except as may be required or desirable to comply with the requirements of any applicable Law or the rules and regulations of the U.S. Securities and Exchange Commission or of any stock exchange or national market system upon which the securities of Buyer, Seller or any of their respective Affiliates are listed, no Party will issue any press release or other internal announcement or external public announcement relating to the subject matter of this Agreement or the Transactions without the prior approval (which approval will not be unreasonably withheld, conditioned or delayed) of Buyer and Seller. The disclosing Party shall use commercially reasonable efforts to give each other Party such advance notice as is reasonably practical before issuing any press release or making any other public announcement otherwise authorized in this Section 16.03.

16.04  Seller's Covenant Not to Compete.

For a period of five (5) years after the Closing Date, Seller will not, and will cause each other Seller Entity not to directly or indirectly, anywhere in the world engage in the development, manufacture and sale of polymer based membranes, membrane modules and membrane systems, each for purification of natural gas or other hydrocarbons; provided that the foregoing shall not apply with respect to a business acquired by a Seller Entity after the Closing Date if, in the twelve (12) month period prior to such acquisition, the net sales of products of the acquired business that compete with those developed, manufactured or sold (or proposed to be developed, manufactured or sold) by the Subject Business were less than (a) $1,500,000 or (b) 10% of the net sales of the entire acquired business during such period and Seller uses commercially reasonable efforts to divest such competing portion of such acquired business (the "Acquired Business") within twelve (12) months following such acquisition. If the Seller Entity shall not have effected such divestment within one year after its acquisition despite its commercially reasonable efforts, Buyer shall grant the Seller Entity reasonable extension of the divestment period not to exceed six months during which the Seller Entity must either divest or idle the Acquired Business. When the Seller Entity proposes to sell the Acquired Business, it shall notify Buyer and give Buyer the opportunity to participate in the bidding or other process for the sale of the Acquired Business on a basis substantially equal to the other interested bidders.

16.05  Non Solicitation of Subject Business Employees. For a period of three (3) years after

51

the Closing Date, Seller shall not and shall cause the other Seller Entities not to, directly or indirectly, solicit for employment or hire, any Continued Employee who is, or within the thirty (30) days prior to such solicitation or hiring has been, employed by a Buyer Entity or any Affiliate of a Buyer Entity or by a Seller Entity in the case of a solicitation or hiring within the thirty (30) days following the Closing; provided, however, that a general public advertisement by any Seller Entity for employees in the ordinary course of business and not specifically directed at any employee of the Subject Business, shall not constitute a breach of the foregoing representation with respect to solicitation.

16.06   Nonassignable Items.

(a)     Nothing in this Agreement or the other Transaction Documents nor the consummation of the Transactions shall be construed as an attempt or agreement to assign any Transferred Asset, including any Transferred Contract, Permit, certificate, approval, authorization or other right, which by its terms or applicable Law, as modified by the Bankruptcy Code, is nonassignable without the consent of a third party or a Governmental Authority or the Bankruptcy Court or is cancelable by a third party in the event of assignment ("Nonassignable Items") unless and until such consent has been obtained. Buyer and Seller shall use commercially reasonable efforts to obtain and satisfy all consents and to resolve all impracticalities of sale, conveyance, assignment, sublease or transfer necessary to convey to Buyer all Nonassignable Items. If any such consents are not obtained and satisfied or if an attempted sale, conveyance, assignment, sublease or transfer would be ineffective, then, to the maximum extent permitted by Law and the Transferred Asset, the Parties agree to cooperate with one another in any reasonable alternative arrangement (including, subcontracting and delegation of performance), that will give Buyer the full benefits of such Transferred Asset. The cost to establish any such reasonable alternative arrangement shall be borne by Seller. To the extent that Buyer is provided the benefits of any Transferred Asset, Buyer shall perform for the benefit of the Seller Entities and any third party the obligations of a Seller Entity pursuant to such Nonassignable Item and shall indemnify and hold harmless the Seller Entities from and against any and all obligations and liabilities of such Seller Entities after the Closing under such Nonassignable Item. If Buyer requests that a Seller Entity enforce rights under any such Nonassignable Item and such enforcement requires the filing by a Seller Entity of a Proceeding, Buyer will reimburse such Seller Entity for any and all costs and expenses it incurs as a result of Buyer's request and shall hold harmless each Seller Entity from and against any liability arising from the action requested by Buyer. Notwithstanding any of the foregoing, the treatment of nonassignable Subject Business Intellectual Property shall be governed exclusively by Section 16.06(b).

(b)     [REDACTED]

16.07   Accounts Receivable and Other Payments Received After Closing.  In the event that Seller or any other Seller Entity receives any payment relating to any account receivable (including any amounts received under a letter of credit by Seller or any other Seller Entity in respect of a product delivery by or on behalf of Buyer) of the Subject Business outstanding or any other payment related to the Transferred Assets on or after the Closing Date, Seller or its Affiliate will deliver such

funds to Buyer promptly upon identification of the payment as owed to Buyer.

16.08   Removal of Maryland Assets.  As soon as practicable (but in any event, within ninety (90) days) after the termination of the Transition Services Agreement, Buyer shall remove from Seller's facilities in Columbia, Maryland and Curtis Bay (Baltimore), Maryland, all Maryland Assets not already moved or in transit other than the test skid, which shall be removed within one hundred-twenty (120) days after the Closing Date.  From and after the Closing Date, Seller shall allow Buyer and its employees, agents, representatives and contractors to store and remove the Maryland Assets until the Maryland Assets are fully removed.  Buyer shall comply with all reasonable regulations of the Seller Entities in connection with such storage and removal.

16.09   Confidentiality.  Seller agrees that, (a) at all times from and after the Closing Date with respect to know-how and trade secrets and (b) for five years from and after the Closing Date with respect to all other confidential information, except as otherwise required by applicable Law or the rules of any stock exchange on which Seller's or WRG's securities may be listed, it will, and will cause each of the other Seller Entities and its and their directors, officers and employees to, keep secret and retain in the same confidential manner as Seller maintains its similarly situated confidential information, and will not use for the benefit of themselves or others, any confidential information with respect to the Subject Business that it or any other Seller Entities, or any of its or their directors, officers, employees, agents, representatives or consultants possesses as of or prior to the Closing Date, including know-how, trade secrets, customer lists, details of any Contracts, pricing policies, operational methods, marketing plans or strategies, product development techniques, plans or processes, other than any of the foregoing which (y) are in or become part of the public domain other than by reason of a breach by Seller of this Section 16.09, or (z) as of the date of the disclosure by a Seller Entity had been independently developed by or otherwise was in the possession of the recipient other than by reason of a breach by a Seller of this Section 16.09 (collectively, the "Confidential Information").  In the event Seller or any other Seller Entity is requested or required (by oral request or written request for information or documents in any Proceeding, interrogatory, subpoena, civil investigative demand or similar process) to disclose any Confidential Information, then Seller, on its own behalf or on behalf of such other Seller Entity, will notify Buyer promptly in writing of the request or requirement, unless such notice may cause it to be in violation of applicable Law or the terms of such request so that Buyer may seek an appropriate protective Order (at Buyer's expense) or waive compliance with this Section 16.09, and shall otherwise cooperate at Buyer's expense with obtaining such Order or other assurance that confidential treatment will be accorded to such Confidential Information.  The Confidentiality Agreement shall be deemed to automatically terminate upon the Closing.

16.10   Release of Restrictions.  [REDACTED]

## ARTICLE 17

### Expenses

17.01   Buyer's Expenses.  Buyer shall pay, and indemnify all Seller Entities against all

53

Damages arising from, expenses incurred by or on behalf of the Buyer Group in connection with the preparation, authorization, execution and performance of this Agreement and the Transactions, including, but not limited to, all fees and expenses of brokers, finders, agents, representatives, consultants, counsel and accountants.

17.02  Seller's Expenses.  Seller shall pay, and indemnify the Buyer Entities and their Affiliates against all Damages arising from, expenses incurred by or on behalf of Seller in connection with the preparation, authorization, execution and performance of this Agreement and the Transactions, including, but not limited to, all fees and expenses of brokers, finders, agents, representatives, consultants, counsel and accountants. Any amounts payable pursuant to this Section 17.02 shall be subject to Section 14.06.

17.03  Transfer Taxes.  Buyer and Seller shall each pay 50% of any stamp duty, sales, transfer, value added, gross receipts, excise, recording, registration or similar Tax applicable to this Agreement, the transfer to Buyer of the Transferred Assets pursuant to this Agreement, the other Transaction Documents or the Transactions.

17.04  Real Estate Prorations.  The following prorations relating to the Subject Business Real Property shall be made at Closing:

(a)  All real and personal property Taxes and assessments, whether general or special, and all ad valorem and other Taxes levied with respect to the Subject Business Real Property or any other tangible asset included in the Transferred Assets for any taxable period that includes any period before the Closing Date and ends after the Closing Date shall be prorated on a taxable period basis, with Seller being liable for such Taxes attributable to the days in the taxable period prior to the Closing Date and Buyer being liable for such Taxes attributable to days in the taxable period on or after the Closing Date.

(b)  All charges for water, wastewater treatment, sewer charges, electricity, fuel, gas, telephone, garbage and other utilities and operating expenses relating to the Subject Business Real Property shall be prorated as of the Closing Date, with Seller being liable to the extent such items relate to any time period prior to the Closing Date, and Buyer being liable to the extent such items relate to any time period on or after the Closing Date.

(c)  If any of the foregoing proration amounts cannot be determined as of the Closing Date due to final invoices not being issued as of the Closing Date, Seller and Buyer shall prorate such items as and when the actual invoices are issued to the appropriate Party. The Party owing amounts to the other by means of such prorations shall pay the same within thirty (30) days after delivery of a written request by the paying Party. Any amounts payable pursuant to this Section 17.04 shall be subject to Section 14.06.

## ARTICLE 18

### Notices

18.01  <u>Notices</u>.  All notices and other communications hereunder shall be in writing and shall be deemed duly delivered (i) upon receipt after being sent by registered or certified mail, return receipt requested, postage prepaid, (ii) upon receipt after being sent for next Business Day delivery, fees prepaid, via a reputable nationwide overnight courier service, or (iii) on the date of receipt (or, the first Business Day following such receipt if the date of such receipt is not a Business Day) of transmission by facsimile, in each case to the intended recipient as set forth below:

If to Seller:

> W. R. Grace & Co.-Conn.
> 7500 Grace Drive
> Columbia, Maryland 21044
> Attention: Corporate Secretary
> Facsimile: (410) 531-4545
> Confirmation: (410) 531-4362

If to Buyer or Buyer Parent:

> [REDACTED]

with a copy in the case of a notice to Buyer to:

> [REDACTED]

with a copy (which shall not constitute notice) to:

> Jenner & Block LLP
> 330 N. Wabash Avenue
> Chicago, Illinois 60611
> Attention: John F. Cox
> Facsimile: (312) 840-7396

No Party shall refuse delivery of any notice hereunder.  Each Party may change the address to which such communications are to be directed to it by giving written notice to the other Parties in the manner provided above.

## ARTICLE 19

### General

55

19.01  Entire Agreement.  This Agreement (including the Disclosure Schedules, Exhibits and Ancillary Agreements) sets forth the entire agreement and understanding of the Parties and related Persons with respect to the subject matter hereof and supersedes all prior agreements, arrangements and understandings relating thereto.

19.02  Governing Law.  The construction, interpretation and other matters arising out of or in connection with this Agreement (whether arising in contract, tort, equity or otherwise) shall in all respects be governed by and construed (a) to the extent applicable, in accordance with the Bankruptcy Code, and (b) to the extent the Bankruptcy Code is not applicable, in accordance with the Laws of the State of Delaware, without giving effect to rules governing the conflict of laws.

19.03  Venue and Retention of Jurisdiction.  Each Party irrevocably and unconditionally submits to the exclusive jurisdiction of the Bankruptcy Court for any litigation arising out of or in connection with this Agreement and the Transactions (and agrees not to commence any litigation relating thereto except in the Bankruptcy Court, other than actions in any court of competent jurisdiction to enforce any judgment, decree or award rendered by any such court as described herein); provided, however, that this Section 19.03 shall not be applicable in the event the Bankruptcy Proceeding has closed, in which case the Parties irrevocably and unconditionally submit to the exclusive jurisdiction of the federal courts in the District of Delaware and state courts of the State of Delaware for any litigation arising out of or in connection with this Agreement and the Transactions.

19.04  Waiver of Jury Trial.  EACH PARTY WAIVES THE RIGHT TO A TRIAL BY JURY IN ANY DISPUTE IN CONNECTION WITH OR RELATING TO THIS AGREEMENT OR ANY MATTERS DESCRIBED OR CONTEMPLATED HEREIN, AND AGREES TO TAKE ANY AND ALL ACTION NECESSARY OR APPROPRIATE TO EFFECT SUCH WAIVER.

19.05  Equitable Remedies.  The Parties agree that irreparable damage would occur in the event that any provision of this Agreement was not performed in accordance with the terms hereof and that the Parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy at law or equity without the necessity of demonstrating the inadequacy of monetary damages or the posting of a bond.

19.06  Assignment; Successors.  This Agreement shall be assignable by Buyer and Buyer Parent only with the prior written consent of Seller, and shall be assignable by Seller only with the written prior consent of Buyer, which consents shall not be unreasonably withheld or delayed; provided, however, that Buyer may assign any and all rights and/or obligations hereunder, in whole or in part, to any one or more of its Subsidiaries or Affiliates or to a buyer of all or substantially all of the Transferred Assets (or a business containing all or substantially all of the Transferred Assets) (each, a "Transferee") upon notice to the non-assigning Party. Any assignment not in accordance with this Section 19.06 shall be void and of no effect. Any assignment in accordance with this Section 19.06 shall not relieve the assigning Party of any of its obligations hereunder. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.

56

19.07  Amendments and Waivers.  This Agreement may be amended, superseded or terminated, only by a written instrument specifically referring to this Agreement and specifically stating that it amends, supersedes or terminates this Agreement, executed by Seller, Buyer and Buyer Parent.  At any time prior to the Closing, the Parties may extend the time for performance of, or waive compliance with, any of the covenants, agreements or conditions of each other Party to this Agreement and may waive any breach of the representations or warranties of each other Party.  No agreement extending or waiving any provision of this Agreement will be valid or binding unless it is in writing and is executed and delivered by or on behalf of the Party against which it is sought to be enforced.  Unless otherwise agreed to by the Parties, the failure in any one or more instances of a Party hereto to insist upon performance of any of the terms, covenants or conditions of this Agreement, to exercise any right or privilege in this Agreement conferred, or the waiver by said party of any breach of any of the terms, covenants or conditions of this Agreement will not be construed as a subsequent waiver of any other terms, covenants, conditions, rights or privileges, but the same will continue and remain in full force and effect as if no such forbearance or waiver had occurred.

19.08  Counterparts.  This Agreement may be executed in two or more counterparts, each of which counterparts may be signed by one or all Parties.  Each such counterpart shall be an original, but all such counterparts shall constitute one and only one agreement.

19.09  Captions.  The captions used in this Agreement are for convenience of reference only and shall not be considered in the interpretation of the provisions hereof.

19.10  Severability.  In the event that any provision of this Agreement or the application thereof, becomes or is declared by a court of competent jurisdiction to be illegal, void or unenforceable, the remainder of this Agreement shall continue in full force and effect and the application of such provision to other Persons or circumstances shall be interpreted so as reasonably to effect the intent of the Parties.  The Parties further agree to replace such void or unenforceable provision of this Agreement with a valid and enforceable provision that shall achieve, to the extent possible, the economic, business and other purposes of such void or unenforceable provision.

19.11  No Third Party Beneficiaries.  The terms and provisions of this Agreement shall not confer third party beneficiary rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns.

19.12  No Successor or Transferee Liability.  Except where expressly prohibited under applicable Law or otherwise expressly ordered by the Bankruptcy Court, upon the Closing, neither Buyer, any other Buyer Entity, nor any of its or their stockholders shall be deemed to (a) be the successor of Seller; (b) have, de facto, or otherwise, merged with or into Seller; (c) be a mere continuation or substantial continuation of Seller or the enterprise(s) of Seller; or (d) other than as set forth in this Agreement, be liable for any acts or omissions of Seller in the conduct of Seller's business or arising under or related to the Transferred Assets.  Without limiting the generality of the foregoing, and except as otherwise provided in this Agreement, neither Buyer, any other Buyer Entity, nor any of its or their stockholders shall be liable for any Claims against Seller, any other Seller Entity or any of its or their predecessors, and neither Buyer, any other Buyer Entity, nor any of

57

its or their stockholders shall have any successor, transferee or vicarious liability of any kind or character whether known or unknown as of the Closing, whether now existing or hereafter arising, or whether fixed or contingent, with respect to Seller's business or any obligations of Seller or any other Seller Entity arising prior to the Closing, except as provided in this Agreement, including liabilities on account of any Taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of Seller's business prior to the Closing.

19.13 <u>Guaranty by Buyer Parent</u>. Buyer Parent hereby guarantees the payment and performance of Buyer's (or any Transferee's) obligations under this Agreement and the other Transaction Documents. Buyer Parent acknowledges and agrees that no release or extinguishments of Buyer's (or any Transferee's) obligations or liabilities (other than in accordance with the terms of this Agreement or any other Transaction Document), whether by decree in any bankruptcy proceeding or otherwise, shall affect the continuing validity and enforceability of this guarantee; provided, however, that Buyer Parent will be entitled to assert in its own name any and all of the rights, defenses, counterclaims, exculpations, set-offs, indemnities and limitations on liability to which Buyer (or any Transferee) may be entitled to assert under this Agreement or any other Transaction Document.

*[Remainder of page intentionally left blank]*

**IN WITNESS WHEREOF,** the Parties have executed this Agreement as of the date first above written.

**W. R. GRACE & CO.-CONN.**                          **[REDACTED]**

By: _____            By: _____
    Name:  Gregory E. Poling                       Name: [REDACTED]
    Title: Vice President, W.R. Grace & Co.-Conn.        Title: [REDACTED]
        President, Grace Davison

                                    **[REDACTED]**
                                    **(with respect solely to Sections 6.01, 6.02, 6.03, 6.05 and 19.13)**

                                    By: _____
                                        Name:  [REDACTED]
                                        Title: [REDACTED]

SCHEDULE 5.10(a)
CONTRACTS

| Contract ID | Counter Party | Name of the Contract | Date of the Contract | Service / Type of Contract | Address |
|---|---|---|---|---|---|
| 06-5397 | PetroLink International, LLC | Non-Exclusive Agency Agreement | 1/1/2006 | Agency agreement | 330 Rayford Road, #212 Spring, Texas 77386 |
| 02-3663 | Membrane Extraction Technology, Ltd. | Distribution Agreement | 12/13/2002 | Distribution agreement | 437 Sherfield Building London, United Kingdom SW7 2AZ |
| 02-3669 | Kvaerner Process Systems | Exclusive Supply Agreement | 8/7/2002 | Supply agreement | 7909 Parkwood Circle, 6th Floor Houston, Texas 77036 |
| 06-5110 | ProSep Technologies, Inc. | Supply Agreement | 12/1/2005 | Supply agreement | 908 Town & Country Boulevard, Suite 120 Houston, Texas 77024 |
| 06-5378 | Intelligent Energy, Inc. | Letter Agreement | 6/30/2006 | Supply agreement | 2955 Redondo Avenue Long Beach, California 90806 |
| 09-6515 | Sheikh Sons | Non-Exclusive Commercial Agency Agreement – Pakistan | 1/1/2008 | Agency agreement | 31-34 Bank Square Market Model Town Lahore, Pakistan 54700 |
| 09-6446 | Air Liquide | Bulk Product Agreement | 4/1/2007 | Supply agreement | 432 N. 44 Street Ste 290 Phoenix, Arizona 85008 |
| N/A | Monument EHS, LLC | Independent Contractor Agreement | 3/3/2008 | Consulting agreement | P.O. Box 514 19685 Aries Drive Monument, Colorado 80132 |

SCHEDULE 5.10(a)
CONTRACTS

| Contract ID | Counter Party | Name of the Contract | Date of the Contract | Service / Type of Contract | Address |
|---|---|---|---|---|---|
| N/A | Mobile Mini, LLC | Off-Site Rental Agreement | 6/16/2004 | Rental agreement | 5300 Eudora Street Commerce City, Colorado, 80022 |
| N/A | CBeyond | Services Agreement | 6/4/2007 | Services agreement | 320 Interstate North Parkway S.E., Atlanta, Georgia 30339 |
| N/A | Fenwal Protection Systems | Services Contract | 11/4/2008 | Services agreement | 400 Main Street Ashland, Massachusetts 01752 |
| N/A | Keesen Enterprises, Inc. | Landscape Maintenance Agreement | 3/6/2009 | Services agreement | 3355 S. Umatilla Street Englewood, Colorado 80110 |
| N/A | PureWater Dynamics, Inc. | Rental/Lease Agreement – Personal Property | 4/15/2004 | Rental agreement | 30 Kalameth Street Denver, Colorado 80223 |
| N/A | Qqest Software Systems | 12 Month Extended Service Agreement | 5/13/2009 | Invoice | 9350 South 150 East, Suite 300 Sandy, Utah 84070 |
| N/A | Mills, Derek F. | Agreement | 12/22/2005 | Employee Agreement | 8101 W. Midway Drive, Littleton Colorado, 80125 |
| N/A | Nolen, Cody C. | Agreement | 8/30/2006 | Employee Agreement | 8101 W. Midway Drive, Littleton Colorado, 80125 |
| N/A | Paulaha, Craig G. | Agreement | 10/24/1990 | Employee Agreement | 8101 W. Midway Drive, Littleton Colorado, 80125 |
| N/A | White, L. Steve | Agreement | 12/14/1989 | Employee Agreement | 7500 Grace Drive Columbia, MD 21044 |

SCHEDULE 5.10(a)
CONTRACTS

| Contract ID | Counter Party | Name of the Contract | Date of the Contract | Service / Type of Contract | Address |
|---|---|---|---|---|---|
| N/A | Stouffer, Samantha K. | Agreement | 10/31/2006 | Employee Agreement | 8101 W. Midway Drive, Littleton Colorado, 80125 |
| N/A | Barnett, Jerry T. | Agreement | 11/7/1991 | Employee Agreement | 8101 W. Midway Drive, Littleton Colorado, 80125 |
| N/A | Beeman, Lisa | Agreement | 8/26/1996 | Employee Agreement | 8101 W. Midway Drive, Littleton Colorado, 80125 |
| N/A | Boyarko, Brian P. | Employment Agreement | 8/8/1991 | Employee Agreement | 8101 W. Midway Drive, Littleton Colorado, 80125 |
| N/A | Demps, Enrique | Agreement | 8/30/2006 | Employee Agreement | 8101 W. Midway Drive, Littleton Colorado, 80125 |
| N/A | Estevan, Faye | Agreement | 10/6/2006 | Employee Agreement | 8101 W. Midway Drive, Littleton Colorado, 80125 |
| N/A | Koch, Roy W. | Agreement | 4/4/2007 | Employee Agreement | 8101 W. Midway Drive, Littleton Colorado, 80125 |
| N/A | LaRiviere, John P. | Agreement | 3/22/2007 | Employee Agreement | 8101 W. Midway Drive, Littleton Colorado, 80125 |
| N/A | Martinez, Tina A. | Agreement | 10/23/2006 | Employee Agreement | 8101 W. Midway Drive, Littleton Colorado, 80125 |
| N/A | Stone, Eric A. | Agreement | 11/9/1998 | Employee Agreement | 8101 W. Midway Drive, Littleton Colorado, 80125 |
| N/A | Parker, Linda L. | Agreement | 6/4/2009 | Employee Agreement | 8101 W. Midway Drive, Littleton Colorado, 80125 |

SCHEDULE 5.10(a)
CONTRACTS

**Licenses to Seller**

| Contract ID | Counter Party | Original Date of the Contract | Address |
|---|---|---|---|
| 02-3768 | Confidentiality obligations require that the counter party's name be withheld | 11/11/2002 | |
| 04-4428 | Confidentiality obligations require that the counter party's name be withheld | 8/12/2004 | |

**Licenses by Seller**

| Contract ID | Counter Party | Original Date | Address |
|---|---|---|---|
| 31-1625 | Kvaerner Process Systems Corporation | 8/11/1994 | #200, 1209 – 59th Avenue S.E. Box 19 Calgary, Alberta Canada T2H 2P6 |
| 09-6469 | Confidentiality obligations require that the counter party's name be withheld | 12/31/1996 | |

**Proprietary Information Agreements**

| Contract ID | Counter Party | Original Date | Address |
|---|---|---|---|
| 02-3782 | Confidentiality obligations require that the counter party's name be withheld | 11/21/2002 | |
| 04-4419 | Confidentiality obligations require that the counter party's name be withheld | 5/17/2004 | |
| 05-5002 | Confidentiality obligations require that the counter party's name be withheld | 9/6/2005 | |
| 06-5261 | Confidentiality obligations require that the counter party's name be withheld | 5/15/2006 | |

SCHEDULE 5.10(a)
CONTRACTS

**Proprietary Information Agreements**

| Contract ID | Counter Party | Original Date | Address |
|---|---|---|---|
| 06-5419 | Center for Membrane Applied Science and Technology | 10/20/2006 | MAST Center<br>University of Colorado at Boulder<br>Boulder, CO  80309-0424 |
| 06-5419 | Regents of the University of Colorado | 10/20/2006 | The University of Colorado at Boulder<br>401 Discovery Drive, Suite 390, 589 UCB<br>Boulder, CO  80309-0589 |
| 07-5729 | Membrane Extraction Technology Limited | 4/16/2007 | Sherfield Building<br>London SW7 2AZ<br>United Kingdom |
| 07-5729 | *Confidentiality obligations require that the counter party's name be withheld* | 4/16/2007 | |
| 08-6165 | *Confidentiality obligations require that the counter party's name be withheld* | 7/25/2008 | |
| 09-6367 | *Confidentiality obligations require that the counter party's name be withheld* | 1/15/2009 | |
| 01-3008 | *Confidentiality obligations require that the counter party's name be withheld* | 2/5/2001 | |
| 01-3008 | *Confidentiality obligations require that the counter party's name be withheld* | 2/5/2001 | |
| 01-3151 | Imperial College of Science, Technology and Medicine | 3/27/2001 | South Kensington<br>London SW7 2AZ |
| 02-3498 | *Confidentiality obligations require that the counter party's name be withheld* | 3/14/2002 | |
| 02-3503 | *Confidentiality obligations require that the counter party's name be withheld* | 3/6/2002 | |
| 02-3610 | *Confidentiality obligations require that the counter party's name be withheld* | 6/7/2002 | |

SCHEDULE 5.10(a)
CONTRACTS

**Proprietary Information Agreements**

| Contract ID | Counter Party | Original Date | Address |
|---|---|---|---|
| 02-3622 | *Confidentiality obligations require that the counter party's name be withheld* | 6/27/2002 | |
| 02-3622 | *Confidentiality obligations require that the counter party's name be withheld* | 6/27/2002 | |
| 02-3765 | *Confidentiality obligations require that the counter party's name be withheld* | 10/24/2002 | |
| 03-3940 | Howe-Baker Engineers, Ltd | 4/3/2003 | 3102 E 5th St. Tyler, TX 75701-5103 |
| 03-3981 | *Confidentiality obligations require that the counter party's name be withheld* | 5/4/2003 | |
| 03-4086 | *Confidentiality obligations require that the counter party's name be withheld* | 9/21/2003 | |
| 03-4079 | *Confidentiality obligations require that the counter party's name be withheld* | 9/26/2003 | |
| 03-4087 | *Confidentiality obligations require that the counter party's name be withheld* | 9/26/2003 | |
| 03-4116 | *Confidentiality obligations require that the counter party's name be withheld* | 11/12/2003 | |
| 04-4635 | *Confidentiality obligations require that the counter party's name be withheld* | 11/19/2004 | |
| 04-4564 | *Confidentiality obligations require that the counter party's name be withheld* | 6/10/2004 | |
| 04-4510 | PARATECH Resources, Inc. | 9/21/2004 | 992 Agnes Road El Dorado, AR 71730 |
| 04-4411 | *Confidentiality obligations require that the counter party's name be withheld* | 8/15/2004 | |
| 05-4691 | *Confidentiality obligations require that the counter party's name be withheld* | 1/19/2005 | |

SCHEDULE 5.10(a)
CONTRACTS

**Proprietary Information Agreements**

| Contract ID | Counter Party | Original Date | Address |
|---|---|---|---|
| 05-4936 | *Confidentiality obligations require that the counter party's name be withheld* | 2/1/2005 | |
| 05-4711 | *Confidentiality obligations require that the counter party's name be withheld* | 2/17/2005 | |
| 05-4844 | *Confidentiality obligations require that the counter party's name be withheld* | 4/4/2005 | |
| 05-5062 | *Confidentiality obligations require that the counter party's name be withheld* | 10/26/2005 | |
| 06-5124 | *Confidentiality obligations require that the counter party's name be withheld* | 11/15/2005 | |
| 06-5124 | *Confidentiality obligations require that the counter party's name be withheld* | 11/15/2005 | |
| 06-5390 | *Confidentiality obligations require that the counter party's name be withheld* | 3/22/2005 | |
| 08-6087 | *Confidentiality obligations require that the counter party's name be withheld* | 5/30/2008 | |
| 03-4095 | Mustang Engineers and Constructors L.P. | 10/20/2003 | 16001 Park Ten Place Houston, TX 77084 |
| 03-4118 | *Confidentiality obligations require that the counter party's name be withheld* | 11/17/2003 | |
| 04-4258 | Steeltek Inc. | 3/10/2004 | 4141 South Jackson Tulsa, OK 74107 |
| 99-2375 | Imperial College of Science Technology and Medicine | 9/2/1999 | Department of Chemical Engineering Prince Consort Road London SW7 2BY England |
| 09-6367 | Membrane Technology & Research Inc. | 1/9/2009 | 1360 Willow Road Menlo Park, CA 94025 |

SCHEDULE 5.10(a)
CONTRACTS

| **Proprietary Information Agreements** | | | |
|---|---|---|---|
| **Contract ID** | **Counter Party** | **Original Date** | **Address** |
| 04-4336 | *Confidentiality obligations require that the counter party's name be withheld* | 6/10/2004 | |
| 03-4118 | *Confidentiality obligations require that the counter party's name be withheld* | 11/17/2003 | |
| 02-3631 | *Confidentiality obligations require that the counter party's name be withheld* | 6/7/2002 | |
| 08-6165 | ConocoPhillips | 7/25/2008 | 344-PL Bartlesville Technology Center<br>Bartlesville, OK 74004 |
| 05-4865 | *Confidentiality obligations require that the counter party's name be withheld* | 4/19/2005 | |
| 05-4681 | *Confidentiality obligations require that the counter party's name be withheld* | 1/3/2005 | |
| 01-3377 | Phillips Petroleum Company | 2/2/2001 | 14A Phillips Building<br>Bartlesville, OK 74004 |

SCHEDULE 5.10(a)
CONTRACTS

**Development Agreements**

| Contract ID | Counter Party | Original Date | Address |
|---|---|---|---|
| 31-1508B | ExxonMobil Research and Engineering Company | 3/1/1993 | 3225 Gallows Road Fairfax, Virginia 22037 |
| 00-2561 | ExxonMobil Research and Engineering Company | 1/1/1999 | 3225 Gallows Road Fairfax, Virginia 22037 |
| 00-2562 | *Confidentiality obligations require that the counter party's name be withheld* | 1/1/1999 | |
| 06-5202 | *Confidentiality obligations require that the counter party's name be withheld* | 11/12/2003 | |
| 31-1829 | ExxonMobil Research and Engineering Company | 5/9/1996 | 3225 Gallows Road Fairfax, Virginia 22037 |
| 31-1859 | ExxonMobil Research and Engineering Company | 8/1/1996 | 3225 Gallows Road Fairfax, Virginia 22037 |
| 05-4997 | *Confidentiality obligations require that the counter party's name be withheld* | 8/10/2005 | |
| 07-5595 | Membrane Technology Limited | 11/1/06 | Sherfield Building London SW7 2AZ United Kingdom |
| 07-5494 | *Confidentiality obligations require that the counter party's name be withheld* | 12/5/06 | |