# EXHIBIT A

### EVIDENCE TO BE ESTABLISHED BY DR. ALAN C. WHITEHOUSE, PhD., M.D.

1.      Dr. Alan C. Whitehouse is a board certified pulmonologist, who practiced in Spokane, Washington, from 1969 - 2004, and at the Center for Asbestos Related Disease (CARD) Clinic in Libby, Montana, from 2004 to date.

2.      Since 1980 Dr. Whitehouse has treated over 1,000 patients for asbestos disease from Libby winchite asbestos exposure.  In the 1980s he was skeptical, based on the medical literature at the time, that pleural plaques or even pleural thickening would progress into severe disease.  Eventually he recognized that what was he was seeing was pleural disease which was highly progressive, with interstitial disease often appearing in a late stage of disease progression. Dr. Whitehouse will demonstrate disease progression with chest x-ray series.

3.      Dr. Whitehouse and the other doctors at the CARD Clinic in Libby follow the diagnostic criteria at American Thoracic Society (2004) Official Statement "Diagnosis and Initial Management of Non-Malignant Diseases Related to Asbestos," Am J Respir Crit Care Med, 170:691-715.  From the exposure histories and other documents, Dr. Whitehouse will describe the mining operations and the worker, family, and community exposures.  Very few patients have significant asbestos exposures outside Libby.

4.      Dr. Whitehouse is the author of Whitehouse (2004), "Asbestos Related Pleural Disease Due to Tremolite Associated With Progressive Loss of Lung Function:  Serial Observations in 123 Miners, Family Members, and Residents of Libby, Montana," Am J Ind Med 46:219-225, and Whitehouse et al (2008), "Environmental Exposure to Libby Asbestos and Mesotheliomas," Am J Ind Med., 51(11):877-880.  Both were relied upon by the EPA in its 6/17/09 Declaration of a Public Health Emergency for the Libby Asbestos Site.

5.      Peipins et al (2003), "Radiographic Abnormalities and Exposure to Asbestos-

Contaminated Vermiculite in the Community of Libby, MT, USA, Environ Health Persp, 2003; 111:14, pp. 1753-59, describes the screenings done by the ATSDR in Libby in 2000 and 2001. Chest x-rays were taken on 6,668 participants, representing 61% of the area population, of whom 18% (1,186 of 6,668) had pleural abnormalities. This is an extraordinary rate of pleural abnormalities in a community member population. As a result of the screenings, hundreds of new patients were seen at the CARD Clinic in Libby. Many were diagnosed with asbestos disease. Many others were diagnosed with other lung disease or were told they had no asbestos disease.

6.      For the Whitehouse (2004) study, Dr. Whitehouse selected all patients with at least two lung function tests to evaluate the progression of lung function loss over time. This was a descriptive epidemiology study. Dr. Whitehouse found that over an average of 35 months between first and last pulmonary function test, patients had lost forced vital capacity (FVC) at a rate of 2.2% per year, had lost total lung capacity (TLC) at the rate of 2.3% per year, and had lost diffusion capacity at the rate of 3.0% per year. With a loss of 3.0% per year over a decade, a patient may progress from 90% of predicted (normal range) to 60% of predicted, which is severe. 55% of the patients in the study had pleural disease only, and had the same lung function loss. This extent of lung function loss from pleural disease has not been reported elsewhere. Since the Whitehouse (2004) study, 36 of 133 subjects have died. 83% (30/36) died of asbestos-related disease.

7.      The Whitehouse (2008) study reported 31 mesotheliomas from Libby winchite exposure, and 11 environmental mesotheliomas in subjects who did not work at the W.R. Grace mine. Lincoln County, Montana's mesothelioma mortality rate is now #3 in the nation. CDC, NIOSH, Fig. 7-10.

8.      Lincoln County, Montana, has the highest asbestos mortality rate in the nation. CDC, NOISH, Fig. 1-10.  There have been over 295 deaths from malignant and non-malignant asbestos-related disease due to Libby winchite exposure.

9.      Pleural disease from Libby winchite exposure presents a phenomenon of rapid radiographic progression not reported elsewhere.  Dr. Whitehouse will demonstrate with patients' chest x-rays.  He will also describe the course of the disease.

10.     Amphibole asbestos is generally viewed as more toxic than chrysotile asbestos. Libby winchite asbestos is an amphibole.  Amphibole exposure appears to cause more diffuse pleural thickening, more pleuritic chest pain and pleural effusions than does predominately chrysotile exposure.  The Libby exposures were 24 hours per day, with no respite to clear out the airways.  This appears to be generally different from exposures reported elsewhere in the United States.

11.     Dr. Frank and Dr. Whitehouse performed a study called the CARD mortality study, which is a descriptive epidemiological study.  From the patient population at the CARD Clinic, including pre-2004 patients of Dr. Whitehouse in Spokane, 186 deceased were identified, who had complete records and death certificates.  Dr. Whitehouse determined that 110 had died of non-malignant and malignant asbestos-related disease, based on a contributing factor analysis, with 34 cancers and 76 non-malignant asbestos deaths.  This is a proportionate mortality of 59% (110/186), higher than that reported for any other U.S. cohort.  CARD patients once diagnosed have a probability of death by asbestos-related disease.

12.     For the 76 non-malignant asbestos deaths, chest x-ray measurements were done, on the thickness and extent of pleural thickening, blunting of the costophrenic angle, interstitial fibrosis, and other parameters.  Spreadsheets attached to the Expert Report of Dr. Alan C.

Whitehouse, at Exh. 7, present separately the data as measured by Dr. Whitehouse and by Dr. Frank. Dr. Whitehouse may testify to his readings, which are similar. Here we will present the readings by Dr. Frank.

13.    14 of the 76 non-malignant asbestos deaths were of pure pleural disease (26%). They had no interstitial fibrosis on the last chest x-ray. This far exceeds that reported elsewhere in the United States.

14.    55% (37/67) died with moderate or extensive pleural disease, and most of them (20 of the 37) had minimal or no interstitial fibrosis (ILO 1/0 or less). This presents quite a contrast to other cohorts in the U.S. where the predominate cause of death by asbestos disease is interstitial fibrosis.

15.    88% (61/69) had pleural thickening, whereas in most other U.S. cohorts about 15-20% have had pleural thickening.

16.    47% had only DLCO (diffusion capacity) as severe (under 65% of normal), not FVC or TLC. This is not reported elsewhere.

17.    Comparison was made between the CARD mortality study and studies on the asbestos insulators' cohort. Remarkably the Libby patients in the CARD study had a higher proportionate mortality from asbestos disease than did the insulators, even though two-thirds of the Libby patients were family members of miners and community members, most of whom had relatively light exposure compared to the insulators. The death rate from asbestosis in the Libby patients was about three times that of the insulators.

18.    The TDP medical criteria requirement of blunting of the costophrenic angle for level 4B is scientific arbitrary and not consistent with medical practice. Nor is blunting a measure of severity of pleural disease. The blunting requirement results in 42% of the CARD

patients who died of non-malignant asbestos disease not being classified as severe pleural disease, level 4B. Examples will be described. Three forms of diffuse pleural thickening are described in McLoud et al (1985) and ATS (2004). The forms of diffuse pleural thickening due to extension of interstitial fibrosis and due to confluence of large plaques generally do not involve blunting of the costophrenic angle. It is scientifically arbitrary to exclude these forms of pleural thickening from the level 4B definition of diffuse pleural thickening.

19.     The TDP medical criteria level 4B requirements of 3mm thickness and over 25% extent of the chest wall are not a part of the definition or standard diagnosis of diffuse pleural thickening. Nor are they measures of severity of asbestos disease. Their inclusion in the medical criteria for level 4B severe pleural disease is scientifically arbitrary. A significant number of the CARD patients who died of non-malignant asbestos disease, died with thin diffuse pleural thickening or extent under 25% (16% and 18% respectively). Examples will be described.

20.     The TDP medical criteria for levels 3 and 4B omit to use diffusion capacity (DLCO) as a measure of disease severity. DLCO is a standard measure of severity of asbestos disease in texts and clinical practice. Its arbitrary omission excludes 47% of the CARD mortality study patients who died of non-malignant asbestos-related disease. Examples will be described.

21.     The TDP medical criteria for levels 3 and 4B use FVC as a measure of severity of disease, but limit it by excluding patients with an FEV1/FVC ratio of 65 or less. This ratio is an indicator of the presence of obstructive defect. Asbestos exposure and smoking both cause obstructive defect. If the physician's information submitted under the TDP rules out emphysema, then the application of the FEV1/FVC ratio requirement is scientifically arbitrary, as applied to patients with asbestos disease. Where there is emphysema and asbestos disease, then a scientifically sound approach would be to apply an exclusion based upon a requirement that the

ratio be >65 and that TLC be abnormal (over 120). 40% of the CARD mortality study deceased have an FEV1/FVC ratio at 65 or less. Examples including non-smokers will be described.

22.    The TDP medical criteria use CT scans for diagnosis and evaluation at levels 2 and 3 (mild and moderate asbestosis/pleural disease), but not at level 4 (severe asbestosis/pleural disease). This is scientifically arbitrary because mild, moderate, and severe asbestos-related disease are all diagnosed by the same criteria at ATS (2004). Chest x-rays miss 20 - 50% of pleural disease, as compared to CT scans. Examples will be described.

23.    The TDP medical criteria exclude patients with unilateral disease. This is scientifically arbitrary.

24.    Dr. Whitehouse will discuss the medical condition of 23 patients on the spreadsheet "CHX measurements by Dr. Whitehouse on various clients of MHSM and LSK 3/13/09." All but Barnes are disqualified from level 4B by various medical criteria.

25.    Where chest x-ray readings by the CARD doctors, Grace doctors, and ATSDR doctors have been compared, the ATSDR readings were about two times as likely to confirm the CARD doctors' readings than the Grace doctors. Where CARD pulmonary function tests have been compared to other Northwest Montana labs' pulmonary function tests on the same patients, the CARD pulmonary function tests prove to be more conservative, meaning results are closer to normal values.

26.    Dr. Whitehouse will testify as a treating physician based on medical records (already delivered) re PFT and CHX status of various patients as compared to the TDP medical criteria. Such patients may include those on the witness list, the list of settled cases, and the Dr. Whitehouse report Exh. 7 CARD mortality study, Exh. 6 rapid progression, and plaques to interstitial disease, Exh. 8 patients on oxygen, Exh. 9 mesotheliomas, Exh. 10 deceased clients,

and the 23 patients listed on the spreadsheet titled "CHX measurements by Dr. Whitehouse on various clients of MHSM and LSK."

27.    Dr. Whitehouse will testify to additional matters set forth in his reports.  He will also respond to statements by Grace and Asbestos Claimants Committee doctors per the rebuttal reports on file.

# EXHIBIT B

## EVIDENCE TO BE ESTABLISHED BY DR. ARTHUR L. FRANK

1.      Arthur L. Frank, M.D., Ph.D., is board certified in occupational medicine. He is a professor of Public Health at the Drexel School of Public Health in Philadelphia, PA.  Dr. Frank has made four visits to Libby and has reviewed chest x-rays on about 125 Libby patients and pulmonary function tests on about 30 patients.

2.      A few other asbestos disease cohorts are reported as predominately pleural.  None are reported as being progressive, severe, or leading to pleural death. Most asbestos disease cohorts show predominately interstitial disease, which is rarely progressive and rarely severe.  This is in sharp contrast to the Libby cohort, which is predominately pleural and the pleural disease is generally progressive and often severe. The Libby cohort appears to present more widespread disease in the community with more community exposure cases than in other pleural cohorts.  The only other area with a somewhat similar pattern of disease from environmental exposures is in parts of Turkey.

3.      It is also significant that Libby asbestos disease may appear early after intense exposure.  This phenomenon is rarely seen elsewhere, other than in benign asbestotic pleural effusion.  Early presentation also speaks to the high toxicity of the Libby asbestos.

4.      Dr. Frank will also testify to the matters set forth at Evidence to be Established by Dr. Alan C. Whitehouse, paragraphs 3-23, and will testify to additional matters in the reports of Dr. Whitehouse (which Dr. Frank concurs in), and will respond to statements by Grace and Asbestos Claimant Committee doctors per the rebuttal reports on file.

# EXHIBIT C

## EVIDENCE TO BE ESTABLISHED BY DR. TERRY SPEAR

1.      Dr. Terry Spear is a professor of industrial hygiene at Montana Tech of the University of Montana, in Butte, Montana.  He has a bachelor's degree in microbiology, a master's degree in environmental health, and doctor of philosophy in environmental health.  He has studied asbestos exposure issues in Libby, Montana, for more than 10 years.

2.      Dr. Spear will testify regarding asbestos exposures to Grace workers, family members of Grace workers, and members of the Libby community resulting from Grace's vermiculite mining and milling activity in Libby, Montana, as described in greater detail in his report.

3.      Dr. Spear will describe the history of Grace's mining and milling activities in Libby.  He will describe the materials mined and milled in Libby, and will testify as to the amphibole asbestos content of the materials.  He will describe the extremely dusty conditions at the Grace mine and mill, and will explain the exposures resulting to workers' and their families from those conditions.  Conditions at the Libby mine and mill exposed workers and their families to extremely high levels of amphibole asbestos, as described in greater detail in Dr. Spear's report and the attached exhibits.

4.      Dr. Spear will also describe the community-wide exposures to amphibole asbestos in Libby.  Material containing amphibole asbestos was widely distributed throughout the town of Libby.  Anyone living in or visiting Libby was exposed to harmful levels of asbestos in the ambient air of the community.

5.      Dr. Spear will testify that the asbestos in Libby, to which workers, family members of workers, and community members were exposed, all originated from Grace's vermiculite mining and milling operations.  While some other asbestos-containing materials did exist in Libby, Dr. Spear

will testify that the overwhelming majority of asbestos and resulting exposures in Libby originated from the Grace mine and mill.

6.      Dr. Spear will testify that Grace was aware of, failed to take any action to mitigate, and failed to provide any warning concerning the extreme health hazards created by its operations, as set forth in greater detail in Dr. Spear's report.

7.      Dr. Spear will provide testimony regarding specific exposure levels, based on industrial hygiene studies conducted at the Grace mine and mill, as well as asbestos levels measured in the town of Libby. Dr. Spear's testimony regarding asbestos levels at the mine and mill and in Libby will be based on documents referenced in his report and produced with the report.

# EXHIBIT D

## EVIDENCE TO BE ESTABLISHED BY DR. CRAIG A. MOLGAARD, Ph.D.

1.      Dr. Craig A. Molgaard, Ph.D., is a Professor of epidemiology, and Chair of the School of Public Health, University of Montana, Missoula, MT.

2.      Dr. Molgaard will describe the various fields of epidemiology: observational/experimental and descriptive/analytic.  Analytic epidemiology studies may be randomized and usually have controls.  Analytic studies may test a hypothesis and examine causal relationships.  Descriptive studies may establish a statistical association, and develop inferences and conclusions, upon which public health decisions may be based.  The "hierarchy of evidence" in epidemiology includes opinions based on clinical experience and descriptive studies.  See Last, Ed., a Dictionary of Epidemiology (4th Ed. 2001), p.85.  This work is relied upon by the vast majority of epidemiologists.

3.      Dr. Molgaard will respond criticisms of various studies by Grace epidemiologists Dr. Moolgavkar and Dr. Ory, and the Asbestos Claimants' Committee's Dr. Welch (occupational medicine).  Peipins et al (2003), "Radiographic Abnormalities in Exposure to Asbestos-Contaminated Vermiculite in the Community of Libby, Montana, USA," Env Health Persp 111(14) 1753-1759, is a proper descriptive epidemiology study.  Descriptive studies may be self selected.  Peipins et al (2003) is a population based study, which screened 61% of the population of Central Lincoln County, Montana.  The study has no control group.  Nor could one be constructed in the Libby area, given the ubiquitous nature of vermiculite contamination in Libby.  Instead a background rate (a norm) for pleural abnormalities was properly established at 2-4%.  The study found 18% of participants had pleural abnormalities, a high excess rate compared to the background rate.  Chest x-ray reading procedures were proper.  The study was properly peer reviewed and published.

1

4.      ATSDR (2002) "Health Consultation - Mortality in Libby, Montana (1979-1998)," is a proper descriptive epidemiology study.  Compared to U.S. rates, mortality from asbestosis in Central Lincoln County was 40-80 x higher than expected.  Dr. Molgaard will also respond to minor criticisms of the ATSDR (2002), study as offered by Dr. Moolgavkar and Dr. Ory, as per Dr. Molgaard's Sur-rebuttal Report.  In response to Dr. Moolgavkar's statement, that "there is no evidence that environmental exposures contributed to the deaths from pneumoconiosis," Dr. Molgaard demonstrates that although there was just one environmental (non-miner) asbestosis death as of 1998, there have been 21 such environmental asbestosis deaths since 1998, per the CARD mortality study,[1] 15 of which died with Central Lincoln County as their residence.  The deaths since 1998 produce an exceedingly high death rate for both miners and non-miners.  This is confirmed by the CDC, NIOSH, finding that Lincoln County, Montana, is #1 for asbestosis mortality among counties in the United States.

Dr. Moolgavkar also states that "the ATSDR (2002) study offers no evidence that environmental exposure contributed to mesothelioma deaths in the Libby area."  This again is based upon one environmental mesothelioma death as of 1998.  Since 1998 there have been three more environmental mesothelioma deaths, with Libby as place of residence at the time of death.[2]  This is strong evidence that environmental exposure contributed to mesothelioma deaths in the Libby area.

5.      Whitehouse (2004), "Asbestos Related Pleural Disease Due to Tremolite Associated With Progressive Loss of Lung Function:  Serial Observations in 123 Miners, Family

---

[1] 38 asbestosis deaths per underlying cause on the death certificate (per Exh. 7a, Dr. Whitehouse report, as revised), less two deaths pre 1999 (Don Johnson and Don Riley), less 15 other mine workers, nets 21 non-miner asbestosis deaths since 1998.  Figures stated at Sur-rebuttal Report of Dr. Craig Molgaard (epidemiology), pp.10 and 16 contain typos and are revised by new exhibits 7 and 7a to the Whitehouse Report (see Errata sheet).
[2] Exh. 9 to Dr. Whitehouse Report May 2009 (Trimble, Wilson, Pederson).

2

Members, and Residents of Libby, Montana," Am J Ind Med 46:219-225, is a proper descriptive

epidemiologic study.  The study found that 76% of the subjects had progressive lung function

loss, averaging 2-3% per year for FVC, TLC, and DLCO.  The study design is proper.  Dr.

Whitehouse had 491 patients with asbestos-related disease from exposure to Libby asbestos.  The

study included all 123 subjects with two or more pulmonary function tests, after 30 subjects were

excluded for reasons stated.  Use of two data points (first and last pulmonary function tests) is

entirely consistent with other longitudinal lung function studies.

A dose/response analysis was not required, indeed there was no data to support such

analysis.  Few papers on the distribution and determinants of asbestos disease include a

does/response analysis.  Random selection and individual controls are not necessary in a

descriptive epidemiologic study.  The comparison population is the broader population from

which the pulmonary function test norms are derived.  The papers' statistical analysis and

treatment of variables was proper.  The 123 subjects are stated to be representative of the

asbestos disease population.  Last, A Dictionary of Epidemiology, p.157, states that

"representative . . . means simply that the sample resembles the population in some way."  The

123 subjects need not be representative of the Libby asbestos disease population in all respects.

The Whitehouse (2004) study was properly peer reviewed and published.

6.      Whitehouse et al (2008), "Environmental Exposure to Libby Asbestos and

Mesotheliomas," Am J Ind Med 51(11):877-880, is a proper descriptive epidemiologic study.

7.      The CARD mortality study is a proper descriptive epidemiologic study.  The

study design is proper.  The protocol is sufficiently stated.  Time, place and persons affected are

clearly stated.  The study fits the definition of an epidemiological case only study.

Evidence of causation by asbestos is established for each patient diagnosed per the

American Thoracic Society (2004) criteria. This means that a level of exposure to Libby fibers sufficient to cause disease has been found in each patient diagnosed. Accumulation of over 1,500 diagnoses of asbestos-related disease from exposure to Libby asbestos certainly may form the basis for a conclusion that there was sufficient exposure to Libby asbestos to cause disease.

Age profiles are normally taken into consideration when comparing two populations. However, as Last, Ed., (2001), p.145, notes, "unlike the standard mortality ratio, it (the proportional mortality ratio) does not require data on age composition of the population, but only the deaths." In the CARD mortality study, a proportional mortality ratio is used, and 59% of total deaths were by asbestos-related disease (by contributing factor analysis). Dr. Welch, without citation to the literature, states that a contributing factor death certificate analysis is not standard. This is incorrect. Death certificate analyses by both underlying cause and contributing factor analysis are common. See, e.g., CDC, NIOSH, Table 1-10.

Dr. Welch concludes that the CARD mortality study did not follow the exact methods of Selikoff et al, and therefore the CARD mortality study is not comparable to the asbestos insulators studies. It is rare that epidemiologic studies use exactly the same methods. The methods here are comparable. The CARD mortality study presents a higher proportionate mortality (52% by primary cause analysis) than do the asbestos insulators (45%).

8.      Dr. Moolgavkar calculates a "Libby potency factor for lung cancer." He relies on estimates done by Amandus et al (1987), which authors call "guesstimates," and "largely guesswork." They cannot form the basis for detailed epidemiologic conclusions. The EPA, Science Advisory Board, Asbestos Committee considered the method used by Moolgavkar and "generally agreed that the scientific basis as laid out in the technical documents in support of the proposed method is weak and inadequate. The primary concern is lack of available data to

4

estimate the TEM specific levels of exposure for the epidemiological studies utilized in this analysis." Moolgavkar calculates a potency factor for mesothelioma using methods likewise found to be weak and inadequate. Moreover, Moolgavkar did not use current information. There are five more worker mesothelioma deaths since 2001.

9.      On June 17, 2009, the EPA designated the Libby area of Montana as a Public Health Emergency, stating that the "threat posed by asbestos at the Libby site is unique in its severity and scope." This means that the public health situation regarding asbestos-related disease and mortality in Libby is extremely serious.

10.     The CDC, NIOSH, Work-Related Lung Disease Surveillance System, Table 1-10. "Asbestosis: Counties with the highest age-adjusted death rates (per million population), U.S. residents age 15 and over, 1995-2004," shows that Lincoln County, Montana has the #1 rate for asbestosis in the United States. CDC, NIOSH, "Work-Related Lung Disease Surveillance System, Table 7-10 Malignant Mesothelioma: Counties with the highest age-adjusted death rates (per million population), U.S. residents age 15 and over, 2000-2004," shows that Lincoln County, Montana has the #3 rate for mesothelioma in the United States. The NIOSH tables present convincing epidemiologic evidence of the long-term lethal effect of asbestos exposure in Libby and Lincoln County, Montana. The NIOSH mortality rates provide better epidemiologic evidence than fiber potency calculations. That 4% of the miners were female (Sullivan, 2007), and yet 18.2% of the asbestosis deaths were female indicates disease from non-occupational exposure is consistent with the findings in the Whitehouse report.

11.     Dr. Molgaard will also testify in response to statements by Grace and Asbestos Claimant Committee experts per the Sur-rebuttal Report of Dr. Craig Molgaard (epidemiology).

# EXHIBIT E

## EVIDENCE TO BE ESTABLISHED BY JON HEBERLING

1.      Jon Heberling is an attorney licensed to practice law in the State of Montana. He has handled claims against Grace for injuries resulting from exposure to asbestos arising from Grace's operations in Libby, Montana, for many years.

2.      Mr. Heberling is expected to testify regarding settlements negotiated with Grace, in asbestos injury cases arising from exposure to Grace asbestos in Libby, Montana, prior to Grace's Petition for Bankruptcy. He will explain the nature of his clients' cases and the factors which impacted settlement negotiations. He will also testify regarding the factors which Grace counsel communicated to him as having an influence on settlement value. Information concerning the settlements Mr. Heberling negotiated with Grace prior to its bankruptcy has been exchanged in discovery in this case.

3.      Mr. Heberling is also expected to testify regarding the nature of existing, non-settled claims arising from exposure to Grace's asbestos in and around Libby, Montana. Mr. Heberling will testify as to the similarity between the existing claims and the many claims which Grace settled prior to its bankruptcy.

4.      Mr. Heberling is expected to testify regarding the criteria in the TDP, as related to cases which Grace settled prior to its bankruptcy. In particular, Mr. Heberling will testify that his clients settled cases at values substantially in excess of the values which would be assigned to them under the TDP. In negotiating such cases, neither Mr. Heberling' clients nor Grace identified certain factors which influence claim value under the TDP as having any influence whatsoever on settlement value prior to the bankruptcy. Furthermore, many factors which influence claim value under the TDP would not have a significant impact on the value of a case under Montana tort law. Many other factors which do impact the value of a case under Montana law are not adequately considered under the TDP.

# EXHIBIT F

## EVIDENCE TO BE ESTABLISHED BY TOM LEWIS

1.       Tom Lewis is an attorney licensed to practice law in the State of Montana. He has handled claims against Grace for injuries resulting from exposure to asbestos arising from Grace's operations in Libby, Montana, for many years.

2.       Mr. Lewis is expected to testify regarding settlements negotiated with Grace, in asbestos injury cases arising from exposure to Grace asbestos in Libby, Montana, prior to Grace's Petition for Bankruptcy. He will explain the nature of his clients' cases and the factors which impacted settlement negotiations. He will also testify regarding the factors which Grace counsel communicated to him as having an influence on settlement value. Information concerning the settlements Mr. Lewis negotiated with Grace prior to its bankruptcy has been exchanged in discovery in this case.

3.       Mr. Lewis is also expected to testify regarding the nature of existing, non-settled claims arising from exposure to Grace's asbestos in and around Libby, Montana. Mr. Lewis will testify as to the similarity between the existing claims and the many claims which Grace settled prior to its bankruptcy.

4.       Mr. Lewis is expected to testify regarding the criteria in the TDP, as related to cases which Grace settled prior to its bankruptcy. In particular, Mr. Lewis will testify that his clients settled cases at values substantially in excess of the values which would be assigned to them under the TDP. In negotiating such cases, neither Mr. Lewis' clients nor Grace identified certain factors which influence claim value under the TDP as having any influence whatsoever on settlement value prior to the bankruptcy. Furthermore, many factors which influence claim value under the TDP would not have a significant impact on the value of a case under Montana tort law. Many other factors which do impact the value of a case under Montana law are not adequately considered under the TDP.

# EXHIBIT G

## EVIDENCE TO BE ESTABLISHED BY DR. JOHN PARKER, M.D., Ph.D.

1.      In the Libby cohort, the pleural injury is clearly more severe, and the pleural injury more common than with chrysotile exposed populations.  This is consistent with amphibole cohorts.

2.      Amphibole cohorts have significantly more pleural abnormalities than predominately chrysotile cohorts.

3.      Libby presents more thin pleural thickening (under 3mm) than do chrysotile cohorts.

4.      Amphibole cohorts, including Libby, present significant sub-pleural interstitial fibrosis, which is generally different from chrysotile cohorts.

5.      Amphibole cohorts, including Libby, present significantly more cases of pure pleural disease than do chrysotile cohorts.

6.      Amphibole cohorts, including Libby, present significantly more pure pleural effusions.

7.      Amphibole cohorts, including Libby, present significantly more cases of rounded atelectasis than do chrysotile cohorts.

Deposition of Dr. John Parker, 6/9/09, pp.121-126.

# EXHIBIT H

**EVIDENCE TO BE ESTABLISHED BY DR. SURESH MOOLGAVKAR, M.D., Ph.D.**

1.      The cancers generally associated with exposure to asbestos are mesothelioma and lung cancer.  With respect to these cancers, there is compelling epidemiologic evidence supported by experimental studies that amphiboles are considerably more toxic than chrysotile.

2.      Among the asbestos fibers, amphiboles are much more potent than chrysotile, with amosite being about 100 times and crocidolite being about 500 times more toxic.  Hodgson and Darnton (2000).

3.      The risk of asbestos associated lung cancer depends on fiber type and dimensions. Hodgson and Darnton (2000) say, "the risk differential between chrysotile and the two amphibole fibers for lung cancer is thus between 1:10 and 1:50."

4.      As with the malignant diseases, amphiboles are more potent in causing asbestosis than chrysotile.

5.      Both the Hodgson and Darnton (2000) and Berman and Crump (2008) publications are reliable, and Dr. Moolgavkar has relied on both.  Moolgavkar Depo, 5/26/09, pages 90-95.

# EXHIBIT I

## EVIDENCE TO BE ESTABLISHED BY MARK PETERSON

1.      The Libby Claimants expect to introduce testimony from Mark Peterson, either live if produced by the Plan Proponents or by deposition.

2.      Dr. Peterson is expected to testify, consistent with his deposition testimony, that he has served as a consultant and expert witness for the Asbestos PI Committee in this case and, as such, estimated Asbestos PI Claims against Grace and prepared analyses used to develop the Trust Distribution Procedures (TDP) under the proposed Chapter 11 plan. Dr. Peterson is knowledgeable concerning claims against Grace, the Grace TDP, and the TDPs in other asbestos Chapter 11 cases on which the proposed Grace TDP was modeled.

3.      Dr. Peterson is expected to testify concerning the development, terms and expected operation of the proposed Grace TDP, including as it relates to claims asserted by individuals exposed to asbestos in and around Libby, Montana.  Such testimony is expected to include the matters described in ¶¶ 4-5 below.

4.      Dr. Peterson is expected to testify that almost all pre-bankruptcy settlements of asbestos personal injury claims reflect the defendants several, rather than joint and several, liability for the claim. Scheduled Values for each category of disease under the TDP reflect a fair estimate of the current tort system value of the average claim in that category.  The Extraordinary Claims provisions of the TDP are designed to address plaintiffs who are exposed only to Grace's asbestos. The 8x multiplier within the Extraordinary Claims provision of the Grace TDP reflects the nature and value of Libby Claims. Dr. Peterson is expected to testify that he expects most Libby Claims to qualify as Extraordinary Claims.

5.      Dr. Peterson is also expected to testify concerning various estimates, and methodologies for estimating, claims and claim values.

# EXHIBIT J

## EVIDENCE TO BE ESTABLISHED BY ELIHU INSELBUCH

1.      The Libby claimants expect to introduce testimony from Elihu Inselbuch, either live if produced by the Plan Proponents or by deposition.

2.      Mr. Inselbuch is expected to testify, consistent with his deposition testimony, that he has served as counsel to the Asbestos PI Committee in this case and, as such, was actively involved in negotiating the proposed Chapter 11 plan and developing the Trust Distribution Procedures (TDP) thereunder.  Mr. Inselbuch is knowledgeable concerning the TDPs in other asbestos Chapter 11 cases on which the proposed Grace TDP was modeled.

3.      Mr. Inselbuch is expected to testify concerning the development, terms and expected operation of the proposed Grace Plan and TDP, including as it relates to claims asserted by individuals exposed to asbestos in and around Libby, Montana.  Such testimony is expected to include the matters described in ¶¶ 4-6 below.

4.      Mr. Inselbuch is expected to testify that claim values under the TDP are established with reference to historical recoveries against Grace in the tort system, adjusted to reflect what would have been changes in such recoveries during the period of Grace's bankruptcy but for the fact that litigation against Grace was stayed.  Scheduled Values under the TDP are greater than the adjusted-historical average in order to attract claimants to elect Expedited Review.  In other trusts, about 90% of asbestos personal injury claims are resolved through Expedited Review.

5.      Mr. Inselbuch is expected to testify that a variance from the standard form of TDP provision concerning Extraordinary Claims was included in the Grace TDP as the result of discussions with Libby representatives.  Under this variance, a claimant whose asbestos exposure was 95% to Grace's asbestos is eligible for up to eight times the Scheduled Value for the claim based on its disease level.  The 8x multiplier was designed to bring the Scheduled Value into line

with historic recoveries by Libby Claimants against Grace.  Yet the provision was drafted so as to leave it uncertain whether any Libby Claimant who also has a cause of action against any other party, such as the State of Montana or BNSF, will be eligible for Extraordinary Claim treatment. If a claim is determined by the Asbestos PI Trust not to be an Extraordinary Claim, the aggrieved claimant may appeal to an Extraordinary Claims Panel.  Mr. Inselbuch, who serves on the Extraordinary Claims Panel in other cases, is expected to testify that decision of this panel may not be overturned, even by binding arbitration in accordance with the TDP, or by a court or jury if the claimants exercises his right under the TDP to pursue his claim through the tort system absent a satisfactory resolution of his claim with the Asbestos PI Trust.

6.      Mr. Inselbuch is expected to testify that, although the Grace TDP does not expressly address how wrongful death claims will be treated, based on the practice under other TDPs there will only be a single claim allowed in respect of each injured person.  If the injured person's claim is paid by the Asbestos PI Trust, then even if the injured person dies and his spouse has a valid wrongful death claim under nonbankruptcy law, such claim will not be paid by the Asbestos PI Trust.  In order to prevent such a claim from even being asserted against the Asbestos PI Trust, the Trustees are anticipated to require—in accordance with the practice in other cases, and even though no provision of the TDP so permits—delivery of a release of any possible wrongful death claim.  Mr. Inselbuch is expected to testify that loss-of-consortium claims, even if valid under applicable non-bankruptcy law, are anticipated to be treated the same way as wrongful death claims.

# EXHIBIT K

## EVIDENCE TO BE ESTABLISHED BY PETER LOCKWOOD

1.      The Libby Claimants expect to introduce testimony from Peter Lockwood, either live if produced by the Plan Proponents or by deposition.

2.      Mr. Lockwood is expected to testify, consistent with his deposition testimony, that he has served as counsel to the Asbestos PI Committee in this case and, as such, was actively involved in negotiating the proposed Chapter 11 plan and developing the Trust Distribution Procedures (TDP) thereunder.  Mr. Lockwood is expected to testify concerning the development, terms and expected operation of the proposed Grace Plan and TDP, including as it relates to claims asserted by individuals exposed to asbestos in and around Libby, Montana.  He is expected to testify concerning the operation of the Asbestos PI Channeling Injunction and other injunctions under the proposed Plan.  And he is expected to testify that under the TDP—in contrast to Libby Claimants asserting claims for Level IV-B (Severe Pleural Disease)—all claimants with mesothelioma who were exposed to Grace asbestos should qualify for a Level VIII (Mesothelioma) claim on Expedited Review, merely by demonstrating (a) that they have been diagnosed with mesothelioma, and (b) had exposure to Grace's asbestos.

# EXHIBIT L

## EVIDENCE TO BE ESTABLISHED THROUGH TESTIMONY OF
## EARL LOVICK, Deceased

(To be introduced by excerpts from Lovick's testimony during depositions or trials)

Earl Lovick, deceased, testified under oath in the following legal proceedings:

1.  Earl Lovick deposition, September 6, 1989, in *Floyd Cole, et al. v. W. R. Grace*, U. S. District Court for the District of Montana, Cause No. GD 83-13686.

2.  Earl Lovick trial testimony, August 23, 1990, *Johnson v. W. R. Grace*, U. S. District Court, for the District of Montana, Cause No. 88-145-M-HP.

3.  Earl Lovick deposition, May 27, 1992, *Robertson, Vose, DeShazer, et al. v. W. R. Grace*, Montana Nineteenth Judicial District Court, Lincoln County, Montana, Cause Nos. DV-92-39, DV-92-40, DV-92-42.

4.  Earl Lovick deposition, December 19, 1996, *Hurlbert, Skramstad, Kaeding, Riley v. W. R. Grace*, Montana Nineteenth Judicial District Court, Lincoln County, Montana, Cause Nos. DV-95-109, DV-95-127, DV-96-71, DV-96-111.

5.  Earl Lovick trial testimony, April 29, 1997, *Dan Schnetter v. W. R. Grace*, Nineteenth Judicial District Court, Lincoln County, Montana, Cause No. CDV-94-74.

6.  Earl Lovick trial testimony, May 20, 1997, *Lester Skramstad v. W. R. Grace*, Nineteenth Judicial District Court, Lincoln County, Montana, Cause No. DV-95-127.

In this prior testimony, Earl Lovick testified that he was a manager and ultimately mine and mill manager at the W. R. Grace facilities in Libby, Lincoln County, Montana for many years. He started work for Zonolite in 1947 and retired in 1983. He then became a litigation consultant for Grace.

He described the business of W. R. Grace in Libby. He was knowledgeable of the nature

of operation at the Libby mine, mill, and associated facilities. He describes the old dry mill and the nature of the dust exposure there.

He admitted that for every ton of vermiculite produced by Grace at the Libby facility, 21 tons of waste material, including significant amounts of asbestos in the form of fine tailings, had to be disposed of at the mine. Thousands of tons of this waste material (in dry semi processed form) was just thrown over the side of the mountain and drained into Rainy Creek and the Kootenai River that runs through the town of Libby. Until 1970 or 1971, the fine tailings were discharged into the Kootenai. During the extraction process at the old dry mill asbestos fibers would coat everything and pile up on the rafters.

Zonolite and Grace could never get all of the asbestos out of the vermiculite concentrate they processed through the mill on Zonolite (or Vermiculite) Mountain. The vermiculite concentrate contained about 3% asbestos fibers. For every one ton of vermiculite concentrate, there was 2/3 of a tone of asbestos. 330 tons of asbestos went through the mill each day and was either discarded over the side of the mountain, went down the creek into the Kootenai River, or went into the air.

He will testify as to the W. R. Grace knew for years that extended exposure to its vermiculite and asbestos and ingestion of these substances was unreasonably dangerous and hazardous to the health of Grace employees and their families.

Lovick testified that he personally first learned of the asbestos hazard from a 1956 report from the State of Montana. Neither he nor general manager at that time, Mr. Bleich, did anything in response to this official Montana State report. All they told the workers was that they were being exposed only to "nuisance dust," not asbestos fibers. The management of W. R. Grace and its predecessor Zonolite Company attempted to keep the official report concerning dangers of

asbestos in the Grace work place confidential and for the eyes of management only. Management successfully deceived the workers and did not pass the information in the reports on to them.  Reports from the State of Montana concerning the asbestos health hazard at the Libby mine and mill were not given or provided to any employee below management level.   He admits that Grace concealed such knowledge from the workers.

Lovick admitted that Grace management knew by 1962 that Zonolite had a serious health problem related to asbestos exposure, but continued to keep this information away from mine and mill workers, their families, and the Lincoln County community.  Grace management did not warn Grace Libby workers, their families, or the community until many years thereafter.  Earl Lovick admits that Grace actually knew that its employees were becoming ill and suffering asbestos related disease at the Grace facilities in Libby, but did nothing to warn the workers of the asbestos hazard.

# EXHIBIT M

## EVIDENCE TO BE ESTABLISHED BY JAY HUGHES

(To be introduced by live testimony or deposition, depending on availability)

1.      Jay Hughes is an adverse witness, who was designated by Grace as a 30(b)(6) witness.  He is expected to testify consistently with his depositions, wherein he provided the following facts:

2.      Mr. Hughes is senior litigation counsel for W. R. Grace.  He was responsible for the day-to-day management and resolution of the asbestos personal injury claims filed against Grace from approximately 1985 until Grace entered bankruptcy in April, 2001.

3.      Mr. Hughes will testify concerning the factors Grace used to evaluate the settlement value of asbestos personal injury cases against W. R. Grace.  He will testify concerning inventory settlements Grace made with claimant's counsel (e.g., Baron and Budd, 10,000 cases for $50 Million) and that Libby claims were individually worked up by counsel and settled on an individual case basis.  He will testify that the actual average prepetition settlement for Grace's Libby mine and mill workers and their family members was $268,000 per asbestos diseased claimant.  Based on the same information, the average settlement for all other non-Libby claims was approximately $2,500 per claimant.  This evidence will be based on documentation collected and reported in the Grace case management system and was the tool used by Grace to track this kind of information.  Therefore, based on Grace's own documentation and analysis, the average Libby prepetition settlement was more than 100 times the amount of non-Libby settlements.

4.      He is expected to testify that the average prepetition settlement for mesothelioma cases was approximately $90,000.  The average prepetition settlement for mesothelioma cases in Libby exceeded $500,000.

5.    He will testify that the reason for this large disparity in the value of Libby cases as compared to non-Libby cases is the combination of the fact that generally W. R. Grace was the only defendant in the Libby cases and that the strong objective evidence of exposure to Grace asbestos in Libby was not present in most of the monokote and other cases filed against Grace in other parts of the country.  Evidence of exposure in non-Libby cases was often week.  In most non-Libby cases there were a number of potentially liable parties from which plaintiffs could recover, thereby decreasing Grace's individual liability on each claim.

6.    He is expected to confirm that Libby claims are not product claims.  They are claims arising out of exposures during the mining, milling, and production process that leads to a final product.

7.    Mr. Hughes argued that Grace was a peripheral defendant in many jurisdictions and therefore liable for smaller or more modest settlements.  But he agrees that Grace was never a peripheral defendant in asbestos personal injury cases brought by Libby.

He is expected to testify that Libby claims are different from most claims elsewhere in the U. S. because Montana law allows direct actions by Montana employees of Zonolite and W. R. Grace for asbestos exposure in the workplace.  These claims are not barred or precluded by the exclusive remedy provisions of workers' compensation or occupational disease acts like they are in almost every other jurisdiction in the country.

8.    Mr. Hughes may provide foundation testimony for the admissibility of W. R. Grace documents.

# EXHIBIT N

## EVIDENCE TO BE ESTABLISHED BY JEFF POSNER

1.      The Libby Claimants expect to introduce testimony from Jeff Posner, either live

if produced by the Plan Proponents or by deposition.

2.      Mr. Posner is expected to testify, consistent with his deposition testimony, that he

was responsible for securing insurance coverage for asbestos-related injury claims against Grace

for many years.  Mr. Posner is knowledgeable regarding insurance coverages Grace carried and

will testify as to the nature of those coverages, particularly coverages applicable to claims

asserted by individuals exposed to asbestos from Grace's mining and milling activities in Libby,

Montana.

3.      Mr. Posner is expected to testify that claims asserted by individuals exposed to

asbestos in and around Libby, Montana, were covered by "premises" coverage, as opposed to

"products" coverage.  The coverage applicable to the Libby claimants was not subject to

aggregate limits, in contrast to the coverage applicable to the products claims.

4.      Mr. Posner is expected to testify that over 99% of the asbestos personal injury

claims against Grace were products claims, and while some isolated claims covered by premises

coverage may have existed outside Libby, the majority of claims eligible for premises coverage

arose from exposures to asbestos in and around Libby, Montana.

# EXHIBIT O

## EVIDENCE TO BE ESTABLISHED BY DR. PETER LEES

1.      The Libby Claimants intend to introduce the estimation hearing testimony of Dr. Peter Lees, regarding asbestos exposure to individuals exposed to Grace's asbestos-containing finished products.

2.      Dr. Lees' testimony establishes exposure assessments for various categories of Grace claimants, depending on whether the individuals mixed Grace products, cut or removed Grace products, applied Grace products, or did not work directly with Grace products but were either on site or the products were used or present in the work space during use of the products.

3.      Dr. Lees' testimony will establish that most of the claimants asserting asbestos personal injury claims against Grace experienced exposures very different from, and lower than, exposures suffered by individuals in Libby, Montana, as established by other evidence.

# EXHIBIT P

## EVIDENCE TO BE ESTABLISHED BY DR. ELIZABETH ANDERSON

1.      The Libby Claimants intend to introduce the estimation hearing testimony of Dr. Elizabeth Anderson.

2.      Dr. Elizabeth Anderson's testimony categorizes claimants asserting asbestos personal injury claims against Grace based on exposure categories referenced in the testimony of Dr. Peter Lees.  Dr. Anderson's testimony establishes that 77% of the claimants asserting personal injury claims against Grace fall into exposure categories involving such low exposures to Grace asbestos that no reliable scientific evidence exists to support the proposition that exposure to Grace's products cause their disease.