IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>W.R. GRACE & CO., *et al.*,<br><br>              Debtors. | Chapter 11<br><br>Case No. 01-01139 (JKF)<br>Jointly Administered<br><br>Re: Docket Nos. 22153, 22398, 22477 and 22600<br><br>Hearing Date: July 27, 2009 @ 8:30 a.m. (EST) |

## DECLARATION OF TANCRED V. SCHIAVONI III

Pursuant to 28 U.S.C. § 1746, Tancred V. Schiavoni III, hereby declares as follows, under penalty of perjury:

**I.     PERSONAL BACKGROUND**

1.     I am a partner at O'Melveny & Myers LLP. Together with Carl J. Pernicone of Wilson Elser Moskowitz Edelman & Dicker LLP and Garvan F. McDaniel of Bifferato Gentilotti LLP, I serve as counsel for Arrowood Indemnity Company ("Arrowood") in this case. I participated in negotiations with representatives of the Debtors, the Asbestos Claimants Committee ("ACC") and the Future Claimants Representative ("FCR") in the above entitled proceeding that resulted in the Debtors entering into the Settlement Agreement and Mutual Release with the Royal Parties (the "Arrowood Rule 9019 Settlement"). I submit this declaration in support of Debtors' Motion for an Order Approving Settlement Agreement and Mutual Release with the Royal Parties [Dkt. No. 22153] ("Debtors' Approval Motion") and in opposition to the Motion to Compel [Dkt. No. 22477] and separate Motion to Defer [Dkt. No. 22468] filed by the Libby Claimants.

2.     Except as otherwise indicated, the facts set forth in this Declaration are based upon my knowledge of the negotiation of the settlement with the Debtors based upon my

participation in negotiations and my review of documents either filed or produced. It is not based on communications with my clients. As indicated below, my deposition was noticed by Arrowood and the Libby Claimants were offered an opportunity to question me but they declined. If I were called upon to testify, I could and would testify competently to the facts set forth herein.

## II.    THE SETTLEMENT

### *The Disputes with the Royal Parties*

3.    The Debtors alleged that Royal Indemnity Company ("Royal") issued two high-level late-year excess policies that provided insurance coverage to W. R. Grace & Co. ("Grace"). In addition, Royal was alleged to have issued certain policies to the Zonolite Company ("Zonolite"), one of Grace's predecessors, prior to 1963, although there were disputes between Grace and Royal regarding the existence and terms of some of these policies. As described more fully in Section 2.10.2 of the Disclosure Statement, the coverage issued by Royal to Zonolite was fully settled and released as to all asbestos-related claims pursuant to a January 5, 1995 Settlement Agreement (the "1995 Settlement Agreement").[1] Arrowood Indemnity Company, as the successor-in-interest to Royal, has been designated in each plan of reorganization filed by the Debtors, including the Plan currently on file, as a Settled Asbestos Insurance Company with respect to these previously settled policies. The 1995 Settlement Agreement did not address the

---

[1] *See also* Nov. 14, 2008, Hr. Tr., p. 40 line 4-16 (MR. FREEDMAN: Royal Insurance, as Mr. Schiavoni indicated, we now believe we have an agreement done, and I'd like to spell out the gist of that without going into the granular detail on what it is. Grace has agreed, and the ACC and the Future claimants' representative assent that the Royal primary policies identified in the 1995 settlement agreement are fully settled. The plan proponents are revising the disclosure statement to say that and the plan proponents have filed a revised Exhibit 5, which states that pursuant to that settlement agreement, these Royal primary policies are entitled to protections afforded in the plan and the settlement agreement to the extent of the indemnities that are provided there as set forth -- THE COURT: All right.") [Dkt# 20167]

two high-level late-year excess policies issued by Royal to Grace, one of which had an asbestos exclusion.

4.   In settlement discussions, Arrowood disputed the extent of its coverage obligation, if any, under the one high-level excess policy without an asbestos exclusion. In addition, Arrowood raised, and had indicated that it would raise, certain objections to the plan of reorganization and other matters, and Arrowood filed a Proof of Claim in the Bankruptcy Case in an unliquidated amount.[2]  Arrowood also claimed to hold certain rights of contribution, indemnity, reimbursement and/or subrogation as a result of the $100 million payment Royal made in satisfaction of its obligations under the January 5, 1995 Settlement Agreement.[3]

*The Settlement Agreement*

5.   On June 17, 2009, the Debtors and Arrowood entered into a Settlement Agreement which, subject to the approval of the Court, compromises and resolves the disputes concerning the Royal coverage. A copy of the Arrowood Rule 9019 Settlement Agreement was annexed as Exhibit "A" to the Debtors' Approval Motion.[4]  The Parties to the Settlement Agreement are (a) the Grace Parties and (b) the Royal Parties, both of which are defined in the Settlement Agreement.[5]  Pursuant to, and subject to the terms and conditions of the Arrowood Rule 9019 Settlement Agreement, the Royal Parties specifically have contracted to receive, among other things: (a) a channeling injunction; (b) the benefit of the releases to be delivered

---

[2]  The objections that the Royal Parties raised to the Plan are set out, among other places, in Royal's Preliminary Objections to Debtors' Joint Plan of Reorganization [Dk. 20450]; Arrowood's Objections to Debtors' Amended Joint Plan of Reorganization [Dk. 21814]; Arrowood's Phase II Objections to the Non-Debtor Release and Exculpation Provisions and the Injunction Impairing its Rights of Contribution, Subrogation and Reimbursement that are Contained in the Amended Joint Plan of Reorganization [Dk. 21815]; Arrowood's Phase I Trial Brief Objecting to the Amended Joint Plan's Non-Debtor Release and Exculpation Provisions and the Injunction that Impairs Arrowood's Rights of Contribution, Subrogation and Reimbursement [Dk. 21945]; and Arrowood's Phase I Trial Brief Objecting to the Plan Proponents' First Amended Joint Plan of Reorganization [Dk. 21946].
[3]  *See* Arrowood's Objections to Debtors' Amended Joint Plan of Reorganization [Dk. 21814].
[4]  *See* Debtor's Motion for an Order Approving Settlement Agreement and Mutual Release with the Royal Parties [Dk. 22153].
[5]  *Id*.

under the Plan; and (c) the benefit of the releases contained in the Arrowood Rule 9019 Settlement Agreement.[6]

6. I was involved throughout in the settlement negotiations. I attended a settlement session attended by representatives of the various settling parties and participated in various telephone calls before and after. Based on my personal involvement in the settlement, I attest that the terms of the Arrowood Rule 9019 Settlement Agreement are the product of extensive and comprehensive arm's-length negotiations, and they reflect true compromise on the issues by all of the parties thereto.

7. As part of the negotiation of the Arrowood Rule 9019 Settlement Agreement, the Debtors, the ACC and the FCR sought as large a cash payment from Arrowood as possible, based on, among other things, Royal's alleged liability under the high-level excess policy without an asbestos exclusion but also other factors. Arrowood, for its part, argued that the Debtors, the ACC and FCR should take into consideration the allocation profile of the high-level excess policy, Arrowood's status in run-off, and the overall value of the package of financial and non-financial consideration offered by Arrowood as well as other factors including the factors discussed in Section III below.

8. The deal that was ultimately struck among the parties and incorporated in the Arrowood Rule 9019 Settlement Agreement obligates the Royal Parties to provide a package of

---

[6] *See* Settlement Agreement [Dk. 22153] at Section III(C) ("The Debtors shall . . . designate the Royal Affiliated Companies as Settled Asbestos Insurance Companies . . . who have satisfied all requirements necessary to be deemed Asbestos Protected Parties . . . entitling them to the full benefits and protections of the Asbestos PI Channeling Injunction"); Section III(D) ("The Debtors, Committee and Futures Representative will exercise their reasonable best efforts to obtain an Asbestos PI Channeling Injunction"); Section III(E) ("The Debtors and, upon its creation, the Trust, covenant that they shall not at any time from and after the Release Date take any action to terminate, reduce or limit the scope of the Asbestos PI Channeling Injunction as it applies, upon the Release Date, to any Royal Affiliated Companies."); Section IV(A) ("[T]he Grace Parties and the Trust release the Royal Released Parties forever from any and all Claims, whether known or unknown, for or with respect to: (1) insurance coverage and/or other benefits under the Subject Insurance Policies . . . (2) Extra-Contractual Claims . . . To the extent that the Grace Parties may be deemed to have any rights to insurance coverage and/or other benefits under the BNSF Policies, the Grace Parties hereby fully release and extinguish such rights and any Claims they may have against the Royal Released Parties arising under the BNSF Policies.")

consideration that includes, among other things, the payment of the Settlement Amount of $5.8 million; the withdrawal of Arrowood's objections to the Plan; the resolution of Arrowood's Proof of Claim; and compromises with respect to Arrowood's rights of contribution, indemnity, reimbursement and subrogation.

9. Throughout the negotiation of the settlement, Arrowood made clear that it would enter into the Arrowood Rule 9019 Settlement Agreement and pay the Settlement Amount *only* if it was given certainty that Arrowood and its affiliates would be released fully from, and have injunctive protection against, all *asbestos-related claims* that may be based on, or derive from, the Subject Insurance Policies, as set forth in the Arrowood Rule 9019 Settlement Agreement.

### III. FACTS RELEVANT TO CONSIDERATION OF THE MARTIN FACTORS

10. I understand that the Debtors have asked the Court in the Debtors' Approval Motion to take into consideration a number of factors in assessing the reasonableness of the Arrowood Rule 9019 Settlement.[7] In this regard, I ask the Court to take into consideration the following:

*The complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it.*

11. One of the factors that the Debtors have asked the Court to take into consideration in assessing the reasonableness of the settlement is "the complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attending it."[8] In this regard, I ask the Court to take into consideration the fact that Grace litigated various issues with respect to coverage for Grace's asbestos claims for years prior to the petition date, as well as the facts

---

[7] Debtors' Motion for an Order Approving Settlement Agreement and Mutual Release with the Royal Parties [Dk. 22153] at ¶ 15 (hereinafter, "Debtors' Motion").
[8] Debtors' Motion, ¶ 15.

known to the Court about these proceedings through prior pleadings about the pre-petition coverage actions including without limitation the Disclosure Statement proceedings.

12.     Arrowood argued in its filings that it could have asserted numerous defenses to liability.  In addition to asserting defenses to coverage, Arrowood filed a proof of claim and asserted certain claims seeking affirmative relief against the Debtors.[9]  Arrowood vigorously litigated the issues associated with its proof of claim and could have continued to do so if it did not settle.  Arrowood also had available to it various forms of relief in furtherance of its claims had the parties not entered into the Arrowood Rule 9019 Settlement Agreement.

13.     Arrowood offered experts supporting its positions.[10]  In addition, Arrowood identified various witnesses.[11]  If Arrowood did not settle, it could have litigated not just the issues I discuss below, but also issues unique to Arrowood's claims including indemnity, equitable indemnity and other claims arising from Royal's $100 million settlement payment to Grace as part of the 1995 Settlement Agreement.

### *The likely difficulties in collection.*

14.     Another of the factors that the Debtors asked the Court to take into consideration in assessing the reasonableness of the Arrowood Rule 9019 Settlement Agreement is "the likely difficulties in collection."[12]  In this regard, I respectfully ask the Court to take into consideration Arrowood's allocation profile, as discussed in paragraphs 15 through 16 below, and Arrowood's current status, as is discussed in paragraph 17 below.

---

[9] *See* Arrowood's Objection to Debtors' Disclosure Statement for Joint Plan of Reorganization and Approval Motion at 36 [Dk. 19991] ("Royal has both insurance-related claims and contract-related claims against Grace. The contractual claims must be treated like other contract claims.").

[10] *See* Arrowood's Final Witness List for Phase II Confirmation Hearing [Dk. 22122] (Arrowood listed the following experts: Sean T. Mathis, George L. Priest, James B. Shein, and Bernd Heinz.); *see also* Preliminary Expert Disclosure Statement of Bernd G. Heinze [Dk. 21032].

[11] *See* Arrowood's Final Witness List for Phase II Confirmation Hearing [Dk. 22122].

[12] Debtors' Motion, ¶ 15.

15. Arrowood asserted that under a *pro rata* allocation the excess policy allegedly issued by Royal in 1983 would have been among the last to respond. The Royal high-level excess policy that did not contain an asbestos exclusion, Excess Policy ED102071, has a $10 million aggregate limit. The policy was alleged to provide $2.6 million in coverage excess of $75 million for Layer A and $7.4 million in coverage excess of $150 million for Layer B. Arrowood contended that all underlying coverage below the attachment point had to be properly exhausted before Excess Policy ED102071 might be triggered.

16. Since the attachment point for at least $7.4 million of coverage was excess of $150 million, Arrowood asserted that this policy would only have been impaired by proof of truly massive numbers of meritorious claims given the levels at which this policy incepts. This is all the more the case if the Trust is deeded to only exhaust underlying coverage to the extent that claims are actually paid by the Trust as opposed to allowed. Moreover, the Debtors and/or the Trust would have had to go through extra hurdles to demonstrate the date of first exposure for each claimant in order to implicate Arrowood's coverage, given its placement in the coverage chart. And, of course, all of this assumes that the Debtors would have prevailed in coverage litigation with Arrowood.

17. Separate and apart from the issue of when and if coverage might be triggered, is the issue of what funds would be available. Arrowood disclosed in its Objection to the Disclosure Statement that it is in run-off, is actively regulated by the Delaware Insurance Department; no longer underwrites policies, and has no source of new insurance revenues.[13] Arrowood also disclosed that Moody's, A.M. Best and Fitch withdrew Royal's ratings in 2005

---

[13] *See* Arrowood's Objection to Debtors' Disclosure Statement for Joint Plan of Reorganization and Approval Motion at 4 [Dk. 19991] ("Royal is in run-off and is actively regulated by the Delaware Insurance Department.")

when the company announced its intention to enter into run-off and that these ratings were below investment grade before they were withdrawn.[14]

18.     The take away from all of this is that Arrowood contended that it would have taken an extended period of time and a truly massive volume of meritorious claims before Arrowood's high level excess policy would have shown any significant impairment even under assumptions most favorable to the claimants.  Under the terms of the Arrowood Rule 9019 Settlement Agreement, however, the Settlement Amount to be paid by Arrowood will be paid within thirty days of the Approval Order becoming a Final Order.[15]

### *The probability of success in litigation.*

19.     Another of the factors that the Debtors have asked the Court to take into consideration in connection with assessing the reasonableness of the settlement is "the probability of success in the litigation."[16]  In this regard, I respectfully ask the Court to take into consideration the various defenses that were available to Arrowood including without limitation the no voluntarily payment and consent to settle defenses,[17] as well as the risks to the estate that flowed from adverse rulings trigger, occurrence and allocation.  The length of the pre-petition coverage litigation involving CNA and the lack of an affirmative outcome to date reflects, in part, demonstrates the uncertainty of success in litigation.  *See Maryland Casualty Co. v. W.R. Grace & Co.*, No. 88-04337, (S.D.N.Y. June 21, 1988).

---

[14] *Id.*

[15] *See* Settlement Agreement [Dk. 22153-2] at Section I(JJ) ("Payment Date" means the first day that is thirty (30) calendar days after the Approval Order becomes a Final Order.").

[16] Debtors' Motion, ¶ 15.

[17] Among other defenses available to Grace's insurers, is the defense that Grace has not complied with the contractual consent requirements of its policies -- namely, the "consent to settlement," "voluntary payment" and "cooperation and assistance" provisions of the policies.  This is an issue that the New York Court of Appeals recently addressed in *Vigilant Insurance Co. v. Bear Stearns Cos.*, 10 N.Y.3d 170, 174 (N.Y. 2008) (finding that an insured's violation of a contractual consent requirement relieved the insurer of any obligation to fund a settlement even though the settlement was found to be "fair, adequate, and in the public interest," by a federal district court).  The resolution of this issue in the insurers' favor would be essentially case dispositive; see also *Congoleum Corporation v. ACE American Insurance Co.*, MID-L-8908-01 (N.J. Super. Law Div. May 18, 2007).

20. In addition, Arrowood raised, or indicated that it would raise, certain objections to the Plan of Reorganization and other matters and filed a proof of claim in the Bankruptcy Case in an unliquidated amount.[18] While the outcome of these objections may have been uncertain, there was a prospect that Arrowood would prevail on some of its claims and defenses. In assessing this risk, Arrowood further asks the Court to consider the credentials of the experts that it offered in support of Arrowood's positions.[19] No doubt, Grace would dispute, and perhaps hotly dispute, some or all of the conclusions of these experts. Nonetheless, these are well regarded professionals and the fact that they support Arrowood's positions further buttresses the notion that Arrowood's claims and defenses merited serious consideration.

### *The best interests of the Debtors, their estates and their creditors.*

21. The ACC and the FCR are not parties to the Arrowood Rule 9019 Settlement Agreement, but have consented in writing to the Debtors' entry into the Agreement, which consent is a condition precedent to the effectiveness of the Agreement. The ACC delivered a signed copy of its written consent on June 26, 2009. The FCR delivered a signed copy of his written consent on June 26, 2009. True and correct copies of their consents are attached hereto as Exhibits A and B.

22. Court approval of the Arrowood Rule 9019 Settlement will result in an increase in the assets available to the Trust to pay asbestos claims, remove Arrowood as an objector to Plan confirmation and resolve Arrowood's claims against the estate. The Debtors' estates and the

---

[18] *See* Royal's Preliminary Objections to Debtors' Joint Plan of Reorganization [Dk. 20450]; Arrowood Indemnity Company, f/k/a Royal Indemnity Company's Objections to Debtors' Amended Joint Plan of Reorganization [Dk. 21814]; Arrowood's Phase II Objections to the Non-Debtor Release and Exculpation Provisions and the Injunction Impairing its Rights of Contribution, Subrogation and Reimbursement that are Contained in the Amended Joint Plan of Reorganization [Dk. 21815]; Arrowood's Phase I Trial Brief Objecting to the Amended Joint Plan's Non-Debtor Release and Exculpation Provisions and the Injunction that Impairs Arrowood's Rights of Contribution, Subrogation and Reimbursement [Dk. 21945]; Arrowood's Phase I Trial Brief Objecting to the Plan Proponents' First Amended Joint Plan of Reorganization [Dk. 21946].

Trust will also save the litigation costs that would be involved in litigating these matters with Arrowood. Furthermore, the Arrowood Rule 9019 Settlement Agreement provides for the immediate payment of the Settlement Amount into an Escrow Account within 30-days of the Approval Order becoming a Final Order and includes other provisions that ensure that the Trust has immediate access to the funds upon the Trust's creation.

23. Publication notice of the July 10 objection deadline for the Debtors' Approval Motion and July 27 hearing date was run in the national edition of USA Today. I am not aware of any asbestos claimant or asbestos claimant constituency other than the plaintiff firms whose clients call themselves the Libby Claimants that have objected to the settlement.[20]

## IV. DUE DILIGENCE PERFORMED BY PARTIES AND DISCOVERY PROVIDED TO OBJECTORS

24. In their Motion to Compel and separate Motion to Defer, the Libby Claimants make the assertion that the Debtors and Arrowood have not provided sufficient information to allow the Court to assess the Debtors' Approval Motion. This is wrong.

25. The Debtors and Arrowood have provided the Libby Claimants and BNSF with a wide range of information and documents to evaluate the settlement. These materials include a copy of the fully executed settlement agreement for which approval is sought (i.e., the Arrowood Rule 9019 Settlement Agreement), the policies covered by the settlement agreement, details of the consideration to be provided and copies of the prior settlement agreement between Grace and Royal. Additionally, in response to the Libby Claimants' requests, the Debtors and/or Arrowood have produced: (i) correspondence contemporaneous with the prior 1995 Settlement Agreement concerning the scope of that settlement; (ii) documents concerning the parties' course of

---

[20] No one other then the Libby Claimants filed an objection by the July 10 deadline for doing so. BNSF filed a pleading three days late on July 13 that purports to set out objections to the settlement but really seems to be an objection to the Plan.

performance under the prior settlement and (iii) documents concerning the issuance of the policies. In addition to these documents, the Libby Claimants have access to the publicly available pleadings and exhibits in the decades long coverage action between Grace and CNA. *See Maryland Casualty Co. v. W.R. Grace & Co.*, No. 88-04337, (S.D.N.Y. June 21, 1988).

26. The comprehensive extent of the document discovery provided can also be seen by walking through the answers provided by Arrowood to the Libby Claimants' document requests:

- ***Document Request No. 1*** asked for all insurance policies issued by a Royal Party to Grace. In response to this request, Grace produced its policy library and Arrowood produced the Royal excess policies.

- ***Document Request No. 2*** asks for all settlement agreements between a Grace Party and a Royal Party, including the final 1995 Settlement Agreement and earlier drafts. In response to this request, Arrowood produced the signed Stipulation of Authenticity between Grace and Arrowood that contains, amongst other documents relating to the 1995 Settlement, a copy of the 1995 Settlement Agreement.

- ***Document Request No. 3*** asks for all the documents of the Royal Parties that concern the 1995 Settlement Agreement, including documents relating to the negotiation of the settlement, and documents relating to interpretation of the Settlement. In response to this very expansive, burdensome, and vague Request, Arrowood and the Debtors have produced letters Royal and Grace exchanged during the negotiation, and finalization, of the 1995 Settlement Agreement—some of which explicitly discuss the extent of the coverage resolved by the 1995 Settlement Agreement—as well as documents from the signed Stipulation of Authenticity that include correspondence of the Royal Parties related to the 1995 Settlement Agreement, and all of the exhibits to Arrowood's Disclosure Statement objections (which dealt almost exclusively with issues relating to the 1995 Settlement).

- ***Document Request No. 4*** asks for all communications, between any Grace Party and any Royal Party relating to the 1995 Settlement Agreement, including communications in the course of negotiation of the settlement, communications after the settlement's execution, communications concerning the submission of claims under any of the Subject Insurance Policies following the 1995 Settlement Agreement, and the May 5, 2006 letter from Carl Pernicone and Jay Hughes to Jon Moyer. In response to this similarly expansive, vague and overly-burdensome Request, Arrowood and the Debtors have produced letters Royal and Grace exchanged during the negotiation, and finalization, of the 1995 Settlement Agreement—some of which explicitly discuss the extent of the coverage resolved by the 1995 Settlement Agreement. These documents comprise communications

- ***Document Request No. 5***, which is far from clearly drafted, asks for all documents that "form the basis for statements made in the first full paragraph of page 5 of the letter dated November 8, 2008 from Paul Koepff and Tancred Schiavoni to David Bernick."  Arrowood has produced in response to this Request correspondence between Grace and Arrowood relating to the 1995 Settlement Agreement, the Stipulation of Authenticity and the documents contained therein and all of the exhibits to its Disclosure Statement objections. Arrowood specifically objects to this Document Request on the grounds that its use of the vague term "form the basis of" makes this Request, as drafted, both unclear and unduly burdensome.

- ***Document Request No. 6*** asks for all secondary evidence referred to in paragraph VII.G. of the Settlement Agreement and all secondary evidence previously exchanged between the parties.  In response to this request, Arrowood produced historical documents and Grace made available a witness for deposition during confirmation-related discovery who was extensively cross-examined by the Libby Claimants on these documents.

- ***Document Request No. 7*** states just three words: "All BNSF Policies." While the meaning of this request is not entirely clear, Arrowood and the Debtors have produced in response copies of the contractual indemnity agreement between BNSF and Grace, as well as correspondence, including some from over 50 years ago, relating to the BNSF contractual indemnity agreements.

27.  The Debtors also provided a declaration of a corporate representative, Mr. Finke, that confirms the arm's length negotiation of the Arrowood Rule 9019 Settlement and explains its terms.[21]  The Debtors volunteered to produce Mr. Finke for deposition and he will be deposed by the Libby Claimants took by telephone on July 23.  Prior to this, the Debtors produced for deposition as part of plan confirmation discovery three corporate-designee witnesses, Messrs. Hughes, Posner and Finke, who were extensively cross-examined by the Libby Claimants over the course of three days about the prior 1995 Settlement Agreement and the Royal policies that are the subject of the current Arrowood Rule 9019 Settlement.[22]

---

[21] *See* Declaration of Richard C. Finke In Support of Debtors' Motion for an Order Approving Settlement Agreement and Mutual Release with Arrowood Indemnity Company [Dkt. No. 22581].

[22] *See* Jeff Posner May 6, 2009, Deposition Tr. pages 143:12-148:12, 148:13-149:23 and 308:8-314:7 [Arrowood's Initial Deposition Designations of Testimony of Jeffrey Posner, Richard Finke, Jay Hughes and Peter Van N.

28. On July 9, Arrowood offered to produce its counsel and an Arrowood representative involved in the negotiation of the Arrowood Rule 9019 Settlement. When the Libby Claimants failed to follow up on either deposition, Arrowood noticed the deposition of its corporate designate, Kemp Hooper, for July 17 and counsel, Tancred Schiavoni, for July 21.[23] The Libby Claimants and BNSF were served with notice and invited to attend and question. The Libby Claimants responded to both notices by sending emails *declining the invitation to attend*.[24]

## V. DISCOVERY PROVIDED TO OBJECTORS ON THE 1995 SETTLEMENT AGREEMENT

29. As noted above, the Debtors produced for deposition as part of plan confirmation discovery three corporate-designee witnesses, Messrs. Hughes, Posner and Finke, who were extensively cross-examined by the Libby Claimants over the course of three days about the prior 1995 Settlement Agreement and the Royal policies that are the subject of that settlement and the current Arrowood Rule 9019 Settlement.[25]

30. I attended the depositions of Messrs. Posner and Hughes. Mr. Posner attested to the good faith and arm's length nature of the 1995 Settlement Agreement.[26] Mr. Posner also testified that he was personally involved in, and directly negotiated, the 1995 Settlement Agreement.[27] Mr. Hughes testified that he was involved with the settlement.[28] They both

---

Lockwood and Request for Judicial Notice, Dkt. No. 22144] (attesting to good faith and arm's length nature of the 1995 settlement); Jay Hughes June 11, 2009, Deposition Tr. pages 367:6-371:12 [Dkt. No. 22144] (confirming that "Grace had fully and finally released Royal from any further liability for asbestos-related claims under the Grace/Zonolite policies").

[23] *See* Notice Deposition of Kemp Hooper [Dkt. No. 22464] and Notice of Tancred V. Schiavoni [22465].
[24] True and correct copies of emails from the Libby Claimants stating their refusal to attend are attached as Ex. C.
[25] *See* Jeff Posner May 6, 2009, Deposition Tr. pages 143:12-148:12, 148:13-149:23 and 308:8-314:7 [Arrowood's Initial Deposition Designations of Testimony of Jeffrey Posner, Richard Finke, Jay Hughes and Peter Van N. Lockwood and Request for Judicial Notice, Dkt. No. 22144] (attesting to good faith and arm's length nature of the 1995 settlement); Jay Hughes June 11, 2009, Deposition Tr. pages 367:6-371:12 [Dkt. No. 22144] (confirming that "Grace had fully and finally released Royal from any further liability for asbestos-related claims under the Grace/Zonolite policies").
[26] *See* Jeff Posner May 6, 2009, Deposition Tr. pages 143:12-149:23 and 308:8-314:7 [Dkt. No. 22144];
[27] *Id.* at 145:3-145:19, 308:10-314:4.
[28] Jay Hughes, June 11, 2009, Deposition Tr. 369:2-369:8 [Dkt. No. 22144].

offered testimony confirming that, under the 1995 Settlement Agreement, the Debtors fully and finally released Royal from any possible liability for asbestos-related claims under the Grace/Zonolite policies.[29]

31.    Specifically, Jay Posner, Grace's Insurance Manager, testified with regard to intended scope of the 1995 Settlement Agreement that:

> Q.  Did you ever take the position at any time after the 1995 settlement agreement on behalf of Grace that Royal had an obligation to cover claims for personal injury from asbestos exposure arising out of Libby, Montana?
>
> A.  No, I don't recall I ever did, nor would I, because, again, I negotiated the agreement. I understood how the release worked. Despite the fact that there may be letters going to Royal at various points in time, ***I had always understood that the claims were released by the agreement and I never made a demand upon Royal nor did I ever have any discussions with them claiming otherwise***.
>
> Q.  Did you ever take the position on behalf of Grace at any, time after the 1995 settlement agreement was entered into that the settlement agreement did not release claims for premises coverage as opposed to products coverage?
>
> A.  I -- my recollection -- I don't have the agreement in front of me. My recollection of the agreement is that we gave them two releases. We gave them a complete products release and we gave them what I'm going to call an asbestos-related release, and ***the asbestos-related release encompassed not only asbestos products claims but asbestos premises claims***.[30]

32.    Mr. Posner also explained that the claim submitted by Grace to Royal in 1999—a claim relied upon by the Libby Claimants in an effort to show that Grace and Royal allegedly had different interpretations of the 1995 Settlement Agreement—was nothing more than a clerical error:

---

[29]  Jeff Posner, May 6, 2009, Deposition Tr. 148:13-149:4 [Dkt. No. 22144]; Jay Hughes, June 11, 2009, Deposition Tr. 370:12-17, 370:20-24, 371:3-4, 371:6-9, 371:12-12 [Dkt. No. 22144].

[30]  Jeff Posner, May 6, 2009, Deposition Tr. 147:20-149:4 [Dkt. No. 22144]; *see also* Jay Hughes, June 11, 2009, Deposition Tr. 367:6-371:12 (confirming that "Grace had fully and finally released Royal from any further liability for asbestos-related claims under the Grace/Zonolite policies.") [Dkt. No. 22144].

> [T[o the extent the letter went to them, it would have gone to them in error or just as a matter of routine. But the reality is, is *that since I had negotiated the 1995 agreement*, *I knew that Grace had released all asbestos-related claims which would encompass the Libby claims* so I would not have made a demand upon them to the extent we sent them a letter providing information because it simply went to them as a matter of routine. Had I gotten a phone call, I probably would have told Royal that, yeah, I mean, I agree with them that the claims were released.[31]

33. Jay Hughes, another Grace employee responsible for insurance matters, testified during his June 11, 2009 deposition that the 1995 Settlement Agreement released any and all asbestos-related claims:

> Q. In May of 2006, Mr. Hughes, did you advise BNSF on behalf of Grace that Grace had fully and finally released Royal from any further liability for asbestos-related claims under the Grace-Zonolite Polices?. . .
>
> A. This letter says that. . . .
>
> Q. And that's a statement you authorized to be made to BNSF, right?. . .
>
> A. Yes, Grace authorized , yes. . . .
>
> Q. And Mr. Hughes, did you believe that statement to be true and correct statement at the time it was made? . . .
>
> A. Yes[32]

34. Mr. Hughes testified that he advised BNSF that they had no basis for pursuing asbestos-related claims against Royal under the Zonolite Polices:

> Q. In May of 2006, did you advise BNSF that there was no basis for BNSF to pursue coverage from Royal for asbestos-related claims under the Zonolite Policies?

---

[31] Jeff Posner, May 6, 2009, Deposition Tr. 145:5-19 [Dkt. No. 22144].
[32] Jay Hughes, June 11, 2009, Deposition Tr. 370:12-17, 370:20-24, 371:3-4, 371:6-9, 371:12-12, 372:12-17 [Dkt. No. 22144].

A. Yes.[33]

35. The Debtors and Arrowood also offered to answer the Libby Claimants' questions informally about the Arrowood Rule 9019 Settlement. I participated in two calls with counsel for the Libby Claimants where I offered to respond informally to questions and others did the same.[34]

\*        \*        \*

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed this 22nd day of July 2009, in New York, New York,

_____
Tancred Schiavoni

---

[33] *Id.* at 372:12-17.

[34] The Plan Proponents listed the 1995 Settlement Agreement on the exhibit to the plan that identifies settled insurance and have described the protections afforded to this coverage by the Plan as important to the overall Plan. See Dec. 15, 2008, Hr. Tr., p. 77 line 12-21 (MR. BERNICK: Your Honor, very -- number one, the plan is not effective, so there hasn't been any transfer yet, and number two, with respect to the settled insurance policies, the settled insurance policies are different. And the settled insurance policies now pertain to protected parties. Protected parties are entitled to a 524(g) channeling injunction, so this is very much a part of a -- an important part of the plan, which is now subject to confirmation, so the matter clearly is ripe, and clearly is within the scope of Your Honor to determine in connection with the confirmation of the plan.") [Dkt. No.20371]