# EXHIBIT 1

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| W.R. GRACE & CO., *et al.*, | Case No. 01-01139 (JKF) |
| Debtors. | Jointly Administered |
| | **Re: Docket Nos. 22513, 22397 and 22411**<br>**Hearing Date and Time: July 27, 2009** |

**ARROWOOD'S MEMORANDUM OF LAW IN REPLY TO
LIBBY CLAIMANTS' AND BNSF'S OBJECTIONS TO DEBTORS'
MOTION TO APPROVE THE ARROWOOD SETTEMENT**

Garvan F. McDaniel, Esq. (#4167)
BIFFERATO GENTILOTTI, LLC
800 N. King Street-Plaza Level
Wilmington, DE 19801
Tel: (302) 429-1900
Fax: (302) 429-8600

- and -

Carl. J. Pernicone, Esq.
WILSON, ELSER, MOSKOWITZ,
EDELMAN & DICKER, LLP
150 East 42nd Street
New York, New York 10017
Tel: (212) 490-3000

- and -

Tancred V. Schiavoni, Esq.
Gary Svirsky, Esq.
O'MELVENY & MYERS LLP
7 Times Square
New York, New York 10036
Tel: (212) 326-2000

*Attorneys for Arrowood Indemnity
Company f/k/a Royal Indemnity Company*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................1

ARGUMENT ...........................................................................................................2

POINT I    THE LIBBY CLAIMANTS OBJECTIONS ARE
BASED ON INCORRECT FACTUAL ASSERTIONS
AND UNTENABLE THEORIES OF LAW .............................................2

    A.    THE LIBBY CLAIMANTS FAIL TO
ADDRESS THE MARTIN FACTORS ................................................2

    B.    THE LIBBY CLAIMANTS HAVE NO LEGAL OR EQUITABLE
INTEREST IN GRACE'S POLICIES, ANY MORE THAN THEY
DO IN OTHER PROPERTY OF THE ESTATE.......................................7

        1.    The Libby Claimants do not have vested rights in
the Grace Policies under Montana or any other law .......................7

        2.    The Libby Claimants' "vested rights" theory has
been rejected by other bankruptcy courts ........................................9

    C.    THE LIBBY CLAIMANTS COMPLAINTS ABOUT THE SCOPE AND
APPLICATION OF SECTION 524(G) ARE NOT RIPE FOR
ADJUDICATION..........................................................................11

    D.    THE LIBBY CLAIMANTS OTHER COMPLAINTS ARE MERITLESS ..................13

POINT II    BNSF IS NOT A PARTY TO THE GRACE POLICIES AND HAS
NO PROPERTY OR OTHER RIGHTS IN THOSE POLICIES ..........................15

CONCLUSION........................................................................................................19

# TABLE OF AUTHORITIES

**Page**

## CASES

*In re A. H. Robins Co.*,
  88 B.R. 755 (E.D. Va. 1988) .......................................................................................... 18

*A.H. Robins Co. v. Piccinin*,
  788 F.2d 994 (4th Cir. 1986) ....................................................................................... 22

*Bassett v. Federal Kemper Ins. Co.*,
  565 S.W.2d 823 (Mo. Ct. App. 1978) ......................................................................... 19

*In re Burns & Roe Enters.*,
  2005 Bankr. LEXIS 3173 (Bankr. D.N.J. Feb. 17, 2005) ............................................ 16

*Bujol v. Entergy Servs.*,
  833 So. 2d 947 (La. App. 1 Cir. Aug. 14, 2002) ......................................................... 19

*Charter Bank of Boonville v. Shelter General Ins.*,
  664 S.W.2d 44 (Mo. Ct. App. 1984) ........................................................................... 19

*Cloud v. Vance*,
  97 Mich. App. 446 (Mich. Ct. App. 1980) ................................................................. 20

*In re Davis*,
  730 F.2d 176 (5th Cir. 1984) ....................................................................................... 22

*In re Dow Corning Corp.*,
  198 B.R. 214 (Bankr. E.D. Mich. 1996) ............................................ 17, 19, 20, 21, 23

*In re Drexel Burnham Lambert Group, Inc.*,
  995 F.2d 1138 (2d Cir. 1993) ..................................................................................... 16

*In re Forty-Eight Insulations, Inc.*,
  133 B.R. 973 (Bankr. N.D. Ill. 1991) ......................................................................... 18

*Houston v. Edgeworth*,
  993 F.2d 51 (5th Cir. 1993) ......................................................................................... 22

*Kruzich v. Old Republic Ins. Co.*,
  188 P.3d 983 (Mont. 2008) ......................................................................................... 21

*In re Martin*,
  91 F.3d 389 (3d Cir, 1996) ................................................................................... passim

*Macarthur Co. v. Johns-Manville Corp.*,
  837 F.2d 89 (2d Cir. N.Y. 1988) ................................................................................. 22

*Madar v. League Gen. Ins. Co.*,
  394 N.W. 2d 90 (Mich. Ct. App. 1986) ...................................................................... 18

*Maryland Casualty Co. v. W.R. Grace & Co.*,
  No. 88-04337 (S.D.N.Y. June 21, 1988) ..................................................................... 20

# TABLE OF AUTHORITIES
## (continued)

**Page**

*McLane v. Farmers Ins. Exch.*,
  150 Mont. 116 (Mont. 1967)................................................................................................. 18

*In re Neshaminy Office Building Assocs.*,
  62 B.R. 798 (E.D. Pa. 1986) (citation omitted) .................................................................... 10

*Protective Committee of Stockholders of TAIT Trailer Ferry, Inc. v. Anderson*,
  390 U.S. 414 (1968)................................................................................................................. 9

*Spann v. Commercial Standard Ins. Co. of Dallas, Tex.*,
  82 F.2d 593 (8th Cir. 1936) ................................................................................................... 19

*In re Teltronics Services, Inc.*,
  762 F.2d 185 (2d Cir. 1985).................................................................................................... 16

*In re Thorpe Insulation Co.*,
  No. 2:07-19271-BB (Bankr. C.D. Cal.)................................................................................. 24

*Tringali v. Hathaway Machinery Co.*,
  796 F.2d 553 (1st Cir. 1986)................................................................................................... 22

## OTHER AUTHORITIES

10-9019 COLLIER ON BANKRUPTCY (15th Ed. Rev.) ............................................................. 10, 16

Arrowood Indemnity Company f/k/a Royal Indemnity Company ("Arrowood") submits this memorandum of law in reply to the Libby Claimants' Objection to Debtors' Motion to Approve Settlement with the Royal Parties, dated July 10, 2009 (Dk. No. 22397), and the Objection of BNSF Railroad Company to the Debtors Motion for an Order Approving Settlement Agreement ("Arrowood Rule 9019 Settlement Agreement") and Mutual Release with the Royal Parties, dated July 13, 2009 (Dk. No. 22411).

## PRELIMINARY STATEMENT

1.      There is no question that the Arrowood Rule 9019 Settlement Agreement easily satisfies the *Martin* factors that this Court must consider in approving a settlement.  The Libby Claimants do not even try to address the undisputed record showing that the settlement ends highly complex, costly and contentious present and future coverage and other litigation, where the probability of success was uncertain.  The settlement also compromises Arrowood's rights of contribution, indemnity, reimbursement and subrogation, which likewise delivers significant value to the estate.  In short, the Libby Claimants have utterly failed to present any reason to challenge the Debtors' business judgment, which is the only relevant inquiry here.

2.      As for the Libby Claimants vested rights claims, they are based on a single, inapposite, forty-year-old state case where the court refused to allow a driver to waive his insurance coverage at the expense of the injured party by failing to tender a valid defense.  That is obviously not what is happening here.  More recently, bankruptcy courts have rejected similar vested rights arguments.  And the claim that the settlement somehow exceeds the scope of a not-yet-issued Section 524(g) injunction is not before the Court now and therefore not yet ripe.  In being asked to approve this settlement, the Court is not deciding whether a section 524(g)

channeling injunction should issue.  So there is no good faith basis for the Libby Claimants to contend that the approval of the settlement impairs their rights or violates Section 524(g).

3.      Like the Libby Claimants, BNSF does not mention the *Martin* factors in objecting to the Arrowood Rule 9019 Settlement.  Rather, BNSF advances the entirely novel theory that it has property rights or other interests in policies that Arrowood allegedly issued to Grace—and to which BNSF is ***not*** a party.  The only possible way BNSF could have any rights in policies issued to Grace ("Grace Policies") is if BNSF were actually listed as a "named insured," "additional named insured," or "additional insured," in the endorsements and declaration pages of the Grace Policies.  But the Grace Policies do not identify BNSF anywhere, and it has never executed any contract with Arrowood.  Nor does BNSF allege anything to the contrary.  And Grace's insurance manager, Jay Hughes, has testified that none of Grace's Policies state that BNSF is an insured—named, additional, or otherwise.  BNSF has no legal or equitable interest in the Grace Policies any more than it does in other estate property.  A settlement of the Debtors' coverage claims therefore does not—and cannot—impair BNSF's property rights.

## ARGUMENT

## POINT I.

## THE LIBBY CLAIMANTS OBJECTIONS ARE
## BASED ON INCORRECT FACTUAL ASSERTIONS
## AND UNTENABLE THEORIES OF LAW

**A.      The Libby Claimants Fail to Address the *Martin* Factors**

4.      Bankruptcy Rule 9019(a) provides, in pertinent part that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement."  Fed.

R. Bankr. P. 9019(a). The standards by which courts evaluate a proposed settlement is well established and is set out in *In re Martin*, 91 F.3d 389, 393 (3d Cir, 1996).[1]

5. Here, the Court has a wealth of information about the complexity of the litigation and the Debtors' probability of success in the coverage litigation.[2] Grace litigated various issues with respect to coverage for asbestos claims for years pre-petition.[3] Throughout this bankruptcy, the insurers presented their positions in numerous briefs, motions and oral arguments.[4] The Debtors have likewise set forth their position in various briefs, motions and arguments.[5] It is hard to imagine a more transparent record to evaluate the merits of the parties' litigation positions. With respect to the cost and delay involved, the Court has been able to review all of the Debtors' attorneys' billing records and has firsthand seen the time delay involved.[6] The

---

[1] As set forth in the Debtors' Approval Motion, the Third Circuit has recognized four factors that a bankruptcy court should consider in evaluating a motion for approval of a settlement agreement: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." *In re Martin*, 91 F.3d 389, 393 (3d Cir. 1996). As such, a bankruptcy court should approve a settlement agreement if such agreement is both "fair and equitable" and in the best interests of the estate. 10-9019 *Collier on Bankruptcy* ¶ 9019, 02 (15th ed. Rev.). In making this determination, a bankruptcy court should avoid second-guessing the Debtors in the exercise of their business judgment and, instead, endeavor to ascertain whether the terms of the settlement agreement fall below "the lowest point in the range of reasonableness." *In re Neshaminy Office Building Assocs.*, 62 B.R. 798, 803 (E.D. Pa. 1986) (citation omitted). Other bankruptcy courts in the Third Circuit have deemed similar materials to provide "a sufficient factual background" for approval of an insurer settlement. *See In re Congoleum*, Oct. 31, 2005 Tr. at 26:21-27:2 (Dkt. No. 3223).

[2] *See* Declaration of Tancred V. Schiavoni III, dated July 23, 2009 ¶¶ 11-13, 19-20 (hereinafter "Schi. Decl.").

[3] *Id.*

[4] *See e.g.*,OneBeacon American Insurance Company's and Seaton Insurance Company's Final Objection to Confirmation of Amended Joint Plan of Reorganization [Dkt. No. 21763]; Zurich Insurance Company's and Zurich International (Bermuda) Ltd.'s Objection to First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code of W. R. Grace & Co., et al., The Official Committee of Asbestos Personal Injury Claimants, The Asbestos Pi Future Claimants Representative, and The Official Committee of Equity Security Holders Dated February 27, 2009 [Dkt. No. 21764]; Government Employees Insurance Company's, Republic Insurance Company n/k/a Starr Indemnity & Liability Company's Final Objection to Confirmation of Amended Joint Plan of Reorganization [Dkt. No. 21771]; Maryland Casualty Company's Objection to First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code of W. R. Grace & Co., et al., The Official Committee of Asbestos Personal Injury Claimants, The Asbestos Pi Future Claimants Representative, and The Official Committee of Equity Security Holders Dated February 27, 2009 [Dkt. No. 21783]; Final Plan Objections Of CNA Companies To The First Amended Joint Plan Of Reorganization [Dkt. No. 21794]; AXA Belgium as Sucessor to Royale Belge SA's Objection to Confirmation of Amended Plan Dated February 27, 2009 [Dkt. No. 21803].

[5] *See* Sch. Decl. ¶¶ 11-13, 19-20.

[6] *See* Sch. Decl. ¶¶ 11-13, 19-20.

decades-long coverage action between the Debtors and CNA demonstrates the risks and complexity of coverage litigation.[7]  There is also a collection risk associated with Arrowood, and this is easily confirmed by the allocation profile of its policies, perusing Arrowood's submissions and reviewing publicly available data, all of which show that Arrowood is in run-off.[8]

6.      Yet, the Libby Claimants utterly fail to address the *Martin* factors.  At most, the Libby Claimants imply that the contribution to be made by Arrowood might somehow be inadequate but offer no explanation or supporting facts.  In doing so, however, the Libby Claimants focus merely on the immediate cash payment due under the settlement and ignore all else, including the prior $100 million settlement.  The Arrowood Rule 9019 Settlement obligates Arrowood to provide a package of consideration that includes, among other things, the payment of the Settlement Amount of $5.8 million; the withdrawal of Arrowood's objections to the Plan; the resolution of Arrowood's proof of claim; and compromises with respect to Arrowood's rights of contribution, indemnity, reimbursement and subrogation.[9]

7.      The compromise of Arrowood's rights of contribution, indemnity, reimbursement and subrogation alone delivers significant value.  The prior Grace/Royal settlement that was executed on January 5, 1995, resulted in a $100 million settlement payment (the "1995 Settlement Agreement").  The 1995 Settlement Agreement imposes indemnification and other obligations on the Debtors that entitle Arrowood to damages or other compensatory payments, including restitution for the amount that any claimants may obtain, legal fees, indemnification and other costs and expenses incurred by Arrowood as a result of any claims tendered to

---

[7] *See id.* at ¶ 25; *see also Maryland Casualty Co. v. W.R. Grace & Co.*, No. 88-04337, (S.D.N.Y. June 21, 1988).

[8] *See* Sch. Decl. ¶¶ 14-18; *see* Arrowood's Objection to Debtors' Disclosure Statement for Joint Plan of Reorganization and Approval Motion at 4 [Dk. No. 19991] ("Royal is in run-off and is actively regulated by the Delaware Insurance Department.")

[9] *See* Sch. Decl. ¶ 8.

Arrowood under the Royal policies settled by the 1995 Settlement Agreement.[10]  To the extent that additional protection may be afforded to these policies by the Arrowood Rule 9019 Settlement, the estate benefits directly, materially, and significantly.[11]

8.      The Libby Claimants also misstate their own claims.  Even assuming that the 1995 Settlement Agreement did not unconditionally release Arrowood from coverage obligations for asbestos-related claims under the policies settled under the 1995 Settlement Agreement— which is clearly not the case—any right or interest that Grace had in Royal's coverage has long since expired.[12]  Moreover, any claim against the Royal policies would be subject to a host of defenses as explained in Arrowood's objection to the Disclosure Statement and demonstrated by the decades-long CNA action.[13]  The contention that the claims that the Libby Claimants might assert would be characterized as premises/operations claims, as opposed to product claims, also would be hotly disputed and is questioned even by the Debtors.[14]  Finally, putting aside the one super high level excess policy, the last cover period for the alleged Royal policies terminated

---

[10]  *See* Arrowood's Objection to Disclosure Statement, Point I(B), dated November 10, 2008 [Dkt. No. 19991]

[11]  *Id.*

[12]  As explained in Arrowood's Disclosure Statement Objections, this is because among other thing: (a) the notice provisions of the Policies' have not been complied with; (b) the applicable statute of limitations has run; (c) the doctrines of judicial estoppel, equitable estoppel, waiver and acquiescence bar any asbestos-related claims; (d) all asbestos-related claims have been waived; and (e) the doctrine of laches bars all asbestos-related claims against Arrowood.  *See* Arrowood's Objection to Disclosure Statement, Point II, dated November 10, 2008 [Dkt. No. 19991]

[13]  Among other defenses available to Grace's insurers, is the defense that Grace has not complied with the contractual consent requirements of its policies—namely, the "consent to settlement," "voluntary payment" and "cooperation and assistance" provisions of the policies.  This is an issue that the New York Court of Appeals recently addressed in *Vigilant Insurance Co. v. Bear Stearns Cos.*, 10 N.Y.3d 170, 174 (N.Y. 2008) (finding that an insured's violation of a contractual consent requirement relieved the insurer of any obligation to fund a settlement even though the settlement was found to be "fair, adequate, and in the public interest," by a federal district court).  The resolution of this issue in the insurers' favor would be essentially case dispositive. *See also Congoleum Corporation v. ACE American Insurance Co*., MID-L-8908-01 (N.J. Super. Law Div. May 18, 2007); *See* Sch. Decl. ¶ 19.

[14]  *See* Jay Hughes, June 11, 2009, Deposition Tr. pages 469:5-470-7 (Mr. Hughes: "Well, the claims brought against the railroad [by the Libby Claimants] wouldn't be products liability claims because the unexpanded concentrate that was being loaded wasn't a product, I guess, that was manufactured and sold or a products liability responsibility for BNSF.  But it could be a products claims with respect to Grace, same kinds of exposures.")

decades ago in 1963 and few, if any, claimants remain who could even possibly trigger coverage.[15]

9.     In making the determination that the Arrowood Rule 9019 Settlement is in the best interest of the estate, the Court should avoid second-guessing the Debtors in the exercise of their business judgment and, instead, endeavor to ascertain whether the terms of the Arrowood Rule 9019 Settlement fall below "the lowest point in the range of reasonableness."  *In re Neshaminy Office Building Assocs.*, 62 B.R. 798, 803 (E.D. Pa. 1986) (citation omitted).  A debtor is free to exercise its business judgment when determining the appropriate settlement terms.  As the court in *In re Dow Corning Corp.* stated:

> A court reviewing the business judgment of a trustee or debtor in possession in accepting a settlement of a controversy must look at the facts as they exist at the time of the settlement and not how they might have existed had the pre-petition debtor done something different a year or two before.  The trustee must play the cards he/she is dealt.

198 B.R. 214, 232 (Bankr. E.D. Mich. 1996).

10.     When confronted with objections to a coverage settlement, a debtor is not required -- as the Libby Claimants seem to suggest -- to pursue every possible theory of coverage, regardless of the likelihood of recovery.  In rejecting this contention, the court in *In re Dow Corning Corp.* observed:

> The Debtor stated that it considered the possibility of "coverage for the underlying claims . . . under insurance other than [the products hazard provision], but determined there was no credible basis for pursuing such coverage."  In light of the so far unsuccessful track record of such an argument in cases like this, ***the Court must conclude that the Debtor's decision not to pursue the separate coverage was reasonable, and that it lost nothing of value in not pursuing it.***

*Id. at* 231.  The same applies here.

---

[15]    Among the policies covered by the 1995 Settlement Agreement, the last policy that Royal is alleged to have issued ended in 1963 or almost 47 years ago.  *See* Sch. Decl. 16.

11.     The Arrowood Rule 9019 Settlement easily falls within the range of reasonableness for settlements of this type.  The payment of the Settlement Amount will increase the assets available to the Asbestos PI Trust to pay asbestos claims, remove Arrowood as an objector to Plan confirmation and resolve Arrowood's claims against the estate.[16]  The Debtors' estates and the Trust will also save the litigation costs that would be involved in litigating these matters with Arrowood.[17]  Similarly, while the Debtors asserted in settlement negotiations that their claims against Arrowood are meritorious, Arrowood argued that the issues in dispute are complex, and the outcome is not certain.[18]

12.     Furthermore, the Arrowood Rule 9019 Settlement Agreement provides for the immediate payment of the Settlement Amount into an escrow account within 30 days of the Approval Order becoming final and includes other provisions that ensure that the Trust has immediate access to the funds upon the Trust's creation.[19]

**B.     The Libby Claimants Have No Legal or Equitable Interest in Grace's Policies, Any More Than They Do in Other Property of the Estate.**

13.     The Libby Claimants assertion that they "are not bound to the Debtors' settlement because their rights against Royal had already vested at the time of the settlement," finds no support in the law.[20]

**1.     The Libby Claimants do not have vested rights in the Grace Policies under Montana or any other law.**

14.     In support of their "vested rights" theory, the Libby Claimant's rely on a single Montana Supreme Court decision from 1967 holding that an insurer could not rescind an

---

[16] *See* Sch. Decl. ¶ 22.

[17] *Id.*

[18] *Id.*

[19] *Id.*

[20] Libby Claimants' Objection to Debtors' Motion to Approve Settlement with Royal Parties, dated July 10, 2009, at 9. (Dk. No. 22397) (the "Libby Objections").

automobile insurance policy because it "did not meet the requirement that [it] promptly rescind and thus has waived [its] right to void the policy *ab initio*." *McLane v. Farmers Ins. Exch.*, 150 Mont. 116, 119 (Mont. 1967). In the narrow context where the insured had valid grounds to maintain coverage and failed to assert a defense, the court held that the insured could not "affect the rights of the plaintiff for his rights vested prior to the attempted rescission." *Id.* Essentially, the court refused to allow an automobile owner effectively to waive his insurance coverage at the expense of the party he injured by failing to tender a valid defense. *Id.* That situation is a far cry from that presented here.

15.     Here, unlike *McLane*, it is undisputed that Grace sought, in good faith, to maximize its coverage from Royal and successfully negotiated a *$100 million settlement*.[21] Under similar circumstances, more recent decisions have recognized the long accepted rule that an insured, negotiating in good faith, has the power to settle coverage disputes. For example, in the asbestos context, one court found that "tort claimants have no 'legal or equitable interest' in the insurance policy in the first place, any more than they do in other property of the estate, so that their property rights are not impaired by a settlement of the debtor's claim to coverage." *In re Forty-Eight Insulations, Inc.*, 133 B.R. 973, 978 (Bankr. N.D. Ill. 1991). Other courts have similarly rejected attacks on coverage settlements in the mass torts context. *See*, *e.g.*, *In re A. H. Robins Co.*, 88 B.R. 755, 762 (E.D. Va. 1988) (rejecting plaintiffs claim that debtor and its insurer improperly settled coverage litigation and that the tort claimants were third party beneficiaries to that settlement).

---

[21] The undisputed record before the Court based on the testimony of those involved is that the 1995 Settlement was negotiated at arms length and in good faith. *See* Jeff Posner May 6, 2009, Deposition Tr. pages 308:8-314:7 [Dkt. No. 22144]. The Libby Claimants do not contest this. Nor have they offered any evidence that the deal that was struck was anything other then fair and equitable. *Id.* Royal made a $100 million payment that was more than ten times its alleged policy limits.

16.     Nor do the Libby Claimants cite persuasive non-Montana case law supporting their theory.  They instead cite an Eighth Circuit decision from 1936 and two Missouri state court decisions, all of which involved automobile accidents.  *See Spann v. Commercial Standard Ins. Co. of Dallas, Tex.*, 82 F.2d 593, 594 (8th Cir. 1936) ("The appellant in this case . . . secured a judgment against . . . the assured . . . on April 23, 1934, for damages resulting from the negligent driving of said truck."); *Bassett v. Federal Kemper Ins. Co.*, 565 S.W.2d 823, 827 (Mo. Ct. App. 1978) (awarding $1,517.94 for a minor van accident); *Charter Bank of Boonville v. Shelter General Ins.*, 664 S.W.2d 44, 45 (Mo. Ct. App. 1984) (finding that insured "caused collision damage to the Chevrolet pickup in total reasonable repair cost of $2,746.29.").  In addition, the Libby Claimants rely on a case that was decided under a Louisiana statute that is irrelevant and inapplicable to Montana.  *See Bujol v. Entergy Servs.*, 833 So. 2d 947, 978 (La. App. 1 Cir. Aug. 14, 2002) ("The Direct Action Statute also vests the injured party with rights at the time of the tort") (citing La. R.S. 22:655).

**2.     The Libby Claimants' "vested rights" theory
has been rejected by other bankruptcy courts.**

17.     In *Dow Corning*, 198 B.R. at 218, a mass tort case involving allegedly defective breast implants, the court addressed almost the same argument the Libby Claimants advance here.  There, tort claimants objected to a proposed settlement on the ground that "each one of its constituents [had] a property interest in the Debtor's insurance policies."  *Id.* at 233.  As a result, "the Debtor [could not] compromise [those] policies by delivering releases of the tort claimants' individual interests in the policies."  *Id.*   Thus, the court was asked to "determine whether each individual who holds an unliquidated disputed personal injury claim against the Debtor has a property interest in one or more of the Debtor's insurance policies which provide coverage for personal injuries."  *Id.* at 233-34.

9

18.     While *Dow Corning* was decided under Michigan law, Michigan recognizes the same category of third-party insurance rights identified in *McLane*.  For example, the Libby Claimants rely on *Madar v. League Gen. Ins. Co.*, 394 N.W. 2d 90, 93-94 (Mich. Ct. App. 1986), a case decided under Michigan law, which found that "[r]ights created under an insurance policy become fixed as of the date of the accident" and "where coverage existed at the time of the accident, no subsequent acts by the parties could void that coverage."  The *Dow Corning* court also identified several other Michigan decisions recognizing these rights, including *Cloud v. Vance,* 97 Mich. App. 446, 451 (Mich. Ct. App. 1980), where the court found that "plaintiff had an independent interest in the insurance policy from the time of the accident."

19.     Notwithstanding Michigan's recognition of these so-called "vested rights," the court concluded that those rights have two aspects:  "one which is derivative of the rights of the Debtor in its insurance policies and another which is independent and superior to the Debtor's rights."  *Dow Corning*, 198 B.R. at 242.  The court found, however, that "enforcement of both the derivative aspect and the independent aspect" was foreclosed by the court's determination "that the settlement of the Debtor's rights in the policies were fair and equitable and made in good faith."  *Id.*  Moreover, the court found that the "interest amounts to no more than a mere expectation and does not rise to the level of a constitutionally protected property right."  *Id.*

20.     The court also based its decision on the fact that the Michigan decisions, like *McLane* in Montana, each involved an insured that had "let the insurers off the hook while receiving little or no consideration in return."  *Id.* at 240-41.  That key fact pattern stands in stark contrast to the situation here, where Royal paid $100 million to settle the New York Coverage

Action.[22]  Under these circumstances, Royal can hardly be said to have been let off the hook by Grace.

21.    Importantly, the *Dow Corning* court also acknowledged the consequences of accepting the Libby Claimants "vested rights" theory in broader contexts than previous decisions.  The court found that:

> To grant an injured party more than an expectation before receipt of judgment would inhibit legitimate settlements.  ***An insurer would never be able to settle a coverage suit with its insured without impleading the known injured party.***  It is axiomatic that the more parties involved, the more difficult it is to settle.  Even more troubling is the situation, which exists here, where at the time of the proposed settlement there are injured party claimants who are not yet known.  ***If each unknown claimant could later sue the insurer and not be estopped by a fully litigated judgment against its insured or by a fair and equitable settlement, there would be no finality to litigation and no realistic likelihood of settlement***.  Therefore, it is not surprising that there appears to be ***no case*** where a fair and reasonable settlement entered into in good faith between an insurer and insured was subsequently undone by a court.

*Id.* at 242 (emphasis added).  As Montana also recognizes a strong public policy favoring settlement, these concerns weigh heavily against reading *McLane* beyond the narrow confines to which it has been applied.  *See*, *e.g.*, *Kruzich v. Old Republic Ins. Co.*, 188 P.3d 983,992 (Mont. 2008) ("The public policy of this State is to encourage settlement and avoid unnecessary litigation.  Thus, we have stated that to encourage settlement and preserve the sanctity of . . . settlement agreements, we will reopen such agreements only 'rarely and reluctantly.'").

## C.    The Libby Claimants Complaints about the Scope and Application of Section 524(g) Are not Ripe for Adjudication

22.    In being asked to approve this settlement, the Court is not deciding whether a section 524(g) channeling injunction should issue—which may be issued only pursuant to a plan of reorganization.  As a result, there is simply no good-faith basis for the Libby Claimants to

---

[22]  *See* Sch.  Decl. ¶¶ 3-4.

contend that the approval of the Arrowood Rule 9019 Settlement Agreement impairs their rights or violates Section 524(g).[23]  These objections should be dismissed because arguments with respect to the scope of a potential injunction issued pursuant to section 524(g) are not yet ripe.

23.    Fundamentally, the harm of which the Libby Claimants complain is that the Arrowood Rule 9019 Settlement contemplates a process by which the Debtors and Arrowood will proceed together to seek the protection of a section 524(g) channeling injunction.  But the possibility that in the future, if the settling parties are successful, a channeling injunction may run against the Libby Claimants does not in this circumstance render the scope of the injunction ripe for adjudication now.  The fact that the harm complained of requires additional future events, which may never occur, or may occur in a form and scope that is not yet known, means that the claims are not ripe for decision.[24]

24.    The issue before the Court on the Debtors' Approval Motion is whether the Settlement Agreement is in the best interests of the estate.  10-9019 *Collier on Bankruptcy* ¶ 9019.02 (15th ed. Rev.).  The relevant inquiry is whether the settlement is appropriate under the ***Debtors'*** business judgment.[25]

---

[23] Section 524(g) provides for third-party non-debtor relief for asbestos liability in a variety of situations including where the liability is based on:  "the third party's provision of insurance to the debtor or a related party."  *See* 11 U.S.C. § 524(g)(4)(A)(iii).  Arrowood clearly falls within subpart (iii).  Arrowood is "alleged to be directly or indirectly liable for the conduct of, claims against, or demands on the debtor."  *See id.*  There is no basis for anyone to contend that this relief will not be available to Arrowood if the Plan is confirmed.

[24] *Nextel Communications of Mid-Atlantic, Inc. v. City of Margate* 305 F.3d 188 (3d. Cir. 2002) ("The ripeness doctrine reflects a judgment that the disadvantages of a premature review that may prove too abstract or unnecessary ordinarily outweigh the additional costs of-even repetitive-post implementation litigation") (*citing Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S 726, 735 (1998)).  *See also Semeric Corp. v. City of Philadelphia*, 142 F.3d 582, 597 (3d Cir. 1998).

[25] In the normal course, "the court would defer to the trustee's judgment so long as there is a legitimate business justification."  *In re Martin*, 91 F.3d at 395.  Only if the settlement "fall[s] below the lowest point in the range of reasonableness" should it be rejected.  *In re Teltronics Services, Inc.*, 762 F.2d 185, 189 (2d Cir. 1985).

**D.      The Libby Claimants Other Complaints Are Meritless**

25.      Relying on a single Fifth Circuit case decided in the context of a malpractice

claim against a doctor, the Libby Claimants argue that the proposed settlement is impermissible

because the proceeds of subject policies are purportedly not property of the estate.  *See Houston*

*v. Edgeworth*, 993 F.2d 51, 55 (5th Cir. 1993).  But the Libby Claimants ignore the plethora of

asbestos and other mass tort cases where insurance proceeds have been held to be property of the

estate.  *See*, *e.g*., *Macarthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, 92 (2d Cir. N.Y. 1988)

(affirming District Court decision finding Manville's insurance policies and their proceeds to be

"substantial property of the Manville estate."); *Tringali v. Hathaway Machinery Co.*, 796 F.2d

553, 560 (1st Cir. 1986) (rejecting argument that proceeds of liability insurance are not property

of the estate); A.*H. Robins Co. v. Piccinin*, 788 F.2d 994 (4th Cir. 1986); *In re Davis*, 730 F.2d

176 (5th Cir. 1984).

26.      The Libby Claimants attempt to distinguish those cases by asserting that the

proceeds of the Debtors' coverage may be sufficient to pay the Libby Claimants fails.  Because

the 1995 Settlement Agreement released all asbestos-related claims, including any

premises/operations claims, against Arrowood, the Libby Claimants cannot assert an interest in

the proceeds of those policies—as there are no potential proceeds.[26]  But even if the 1995

---

[26]   The Debtors represented to the Court at the Disclosure Statement hearing and in its Disclosure Statement that the
Royal coverage issued to Zonolite was fully settled and the ACC and FCR assented:

> MR. FREEDMAN:  Royal Insurance, as Mr. Schiavoni indicated, we now
> believe we have an agreement done, and I'd like to spell out the gist of that
> without going into the granular detail on what it is.  Grace has agreed, and the
> ACC and the Future claimants' representative assent that the Royal primary
> policies identified in the 1995 settlement agreement are fully settled.  The plan
> proponents are revising the disclosure statement to say that and the plan
> proponents have filed a revised Exhibit 5, which states that pursuant to that
> settlement agreement, these Royal primary policies are entitled to protections
> afforded in the plan and the settlement agreement to the extent of the
> indemnities that are provided there as set forth --
>
> THE COURT:  All right.

Settlement Agreement somehow did not release all asbestos-related claims, the Libby Claimants have not established that other claimants would not similarly claim against the proceeds of the primary policies.[27] As for the excess policy now being settled, that policy has an aggregate limit. Thus, the Libby Claimants are competing against all other asbestos-claimants for the proceeds of that policy, and it is properly classified as property of the estate subject to disposition under Section 9019.

27.     Likewise, the mere fact that the proposed settlement agreement requires the Debtors, the Asbestos PI Committee and the Asbestos PI Future Claimants' Representative to use reasonable best efforts to obtain an Asbestos PI Channeling Injunction does not render it a *sub rosa* plan of reorganization. To the contrary, courts routinely approve settlement agreements that contain similar requirements.[28] There is simply no legal foundation for the Libby Claimant's assertion that this clause somehow renders the proposed settlement a *sub rosa* plan.

---

Nov. 14, 2008, Hr. Tr., p. 40 line 4-16 (Dkt. No. 20167).

[27] Peter Lockwood, the ACC's counsel, has countered that the Libby Claimants assertion on this point and contended that:

> [A]s we previously pointed out in our papers, the so-called premises coverage is not limited to the Libby claimants, despite Mr. Cohn's assertions to the contrary. And therefore, the Committee, in considering this issue, was not somehow or another focusing on whether or not they should give away the Libby claimants' rights as opposed to the rights of others, all claimants that might be entitled to that coverage.

Nov. 14, 2008, Hr. Tr., 43:6-12. [Dkt. No. 20167]

[28] *See Dow Corning*, 198 B.R. at 220 (approving settlements requiring the debtor to "use its best efforts to include in any plan of reorganization a channeling injunction to protect the London Market Insurers from additional third-party claims on policies released pursuant to the settlement."); *In re Thorpe Insulation Co.*, No. 2:07-19271-BB, Dk. 852, 853, 866 (Bankr. C.D. Cal.) (approving three settlement agreements that mandate that the debtors use their best efforts to obtain a channeling injunction and confirm a plan with specific terms).

## POINT II.

## BNSF IS NOT A PARTY TO THE GRACE POLICIES AND HAS
## NO PROPERTY OR OTHER RIGHTS IN THOSE POLICIES

28.     BNSF raises a hodgepodge of objections to the Debtors Approval Motion, none of

which refer to the factors set out in *In re Martin*, 91 F.3d 389, 294 (3d Cir. 1996).  Rather, BNSF

bases its objections on the bizarre assertion that it has property rights or other interests in policies

that Royal allegedly issued to Grace (the "Grace Policies") and to which BNSF is indisputably

***not*** a party.  BNSF's objections are that the Arrowood Rule 9019 Settlement  constitutes a "*sub*

*rosa* plan of reorganization," impermissible releases claims that are not-derivative of Debtors'

asbestos liability, and an unconstitutional "taking of [BNSF's] property without just

compensation."[29]  That is nonsense.

29.     BNSF never explains what was secret about the Arrowood Rule 9019 Settlement

Agreement, how payments Arrowood makes to fund an asbestos trust are not derivative of

Debtors' asbestos liability, or where the government actor is in this alleged unconstitutional

taking.

30.     There simply is no merit to BNSF's objections because BNSF had—and has—no

rights in the Grace Policies.  BNSF cites no relevant contractual provisions or case law

supporting its assertion that Arrowood has any obligation to BNSF.  Tellingly, BNSF cites no

Grace Policy language that even remotely suggests BNSF may have any rights vis-à-vis

Arrowood.  Indeed, BNSF has never executed any contract with Arrowood.  That should

therefore end the matter.

31.     The only possible way BNSF could have any rights in the Grace Policies is if it

were actually listed as a "named insured," "additional named insured," or "additional insured,"

---

[29]  *See* BNSF Objection to Motion for Order Approving Settlement Agreement at ¶¶ 3, 16-30.

on the endorsements and declaration pages of the relevant policies.  But BNSF is not mentioned anywhere in the Grace Policies—nor does BNSF contend otherwise.

32.     As though it were not clear enough that the Grace Policies do not mention BNSF, the Debtors' insurance manager, Jay Hughes, after reviewing the Grace Policies, confirmed under oath that BNSF is not mentioned in the Grace Policies, let alone as a "named insured," "additional named insured," or "additional insured."[30]  Mr. Hughes also testified that he advised BNSF that it had no basis for pursuing asbestos-related claims against Royal under the Grace or Zonolite Policies:

> Q.     In May of 2006, did you advise BNSF that there was no basis for BNSF to pursue coverage from Royal for asbestos-related claims under the Zonolite Policies?
>
> A.     Yes.[31]

33.     Contemporaneous correspondence with the issuance of the policies further confirms that BNSF is not a "named insured," "additional named insured," or "additional insured" under the Grace Policies:

> The policy in question provides liability coverage for only Zonolite Company [Grace], including their contractual agreement with Great Northern Railway Co., and Zonolite Company have provided separate insurance to take care of damage to the suspension bridge and conveyor belt as well as workers compensation for their employees.[32]

34.     With no policy language or case law to rely on, BNSF confuses—perhaps deliberately—a provision in a contract it entered into with Grace whereby Grace agreed to indemnify BNSF for certain liabilities.  But Arrowood is *not* a party to the contract between

---

[30]  *See* Sch. Decl. ¶¶ 33-34.

[31]  Jay Hughes, June 11, 2009, Deposition Tr. 372:12-174 [Dkt. No. 22144].

[32]  *See* August 22, 1955 letter from Fred M. Beyer of Detroit Insurance Agency to J. C. Kenady of Great Northern Railway.

BNSF and Grace. [33]  Any rights BNSF may have as an indemnitee are specified in the contract between Grace and BNSF.  Those contractual provisions do not magically turn BNSF into a "named insured," "additional named insured," or "additional insured," under the Grace Policies.

35.  The policy governs an insured's rights against the insurer, and not the provisions of any underlying indemnity contract. [34]  In contrast, the relevant contract provisions—and not any insurance policy—govern parties' rights under a contract. [35]  Thus, the contractual liability endorsements in the Grace Policies that BNSF cites served to insure *Grace*—not BNSF—from certain contractual obligations.  Those endorsements do not confer any rights on BNSF or even speak about BNSF.  Mr. Hughes testified to this at his deposition. [36]

36.  In any event, where there is a conflict between the named insured and an additional insured for coverage, even under Montana law (which BNSF would like to apply) any ambiguity in the policy is be resolved *against* the additional insured.  *Travelers Ins. Co. v. American Cas. Co. of Reading, Pa.*, 441 P.2d 177, 181 (Mont. 1968) ("If there is ambiguity we do not think the rule of construing the policy against the insurer is applicable.  Travelers is a

---

[33] *See* Sch. Decl. ¶¶ 33-34.

[34] The reason is that an insured—whether named, additional, or otherwise—has direct rights under the policy because it is in privity with the insurance company.  *See Trinity Universal Ins. Co. v. Woody*, 47 F. Supp. 327, 330 (D.N.J. 1942) (Finding that insurance company owed coverage only for insured listed in the policy "and those in privity with him . . . [T]he right of indemnification cannot be extended by implication or otherwise to [third parties.]"); *see also Madeira v. Affordable Housing Foundation, Inc.*, 469 F.3d 219, 251 (2d Cir. 2006) (affirming district court's grant of motion to dismiss where plaintiffs "would 'have to be [ ] insured[s] under this policy' or otherwise 'in contractual privity with the insurance company in order to maintain a direct action against the insurance company.'").

[35] BNSF cites *Ring Power Corp.* for the proposition that the terms of a lease agreement between an insured and a third party somehow caused the third party to become an additional insured under the insured's policy.  *Ring Power Corp. v. Amerisure Ins. Co.*, No. 08-16414, 2009 WL 1101381 (11th Cir. April 24, 2009).  This is not the holding of *Ring Power Corp.*  Instead, the Eleventh Circuit found that the *terms of the insurance policy* explicitly granted additional insured status to the third party:  an endorsement in the policy stated, "Each of the following is also an insured . . . [a]ny person or organization who is the lessor of equipment leased to you."  *Id.* at *2.  Here, no endorsement in the Grace/Royal policies granted additional insured status to BNSF.  *Ring Power Corp.* is inapposite.

[36] *See* Sch. Decl. ¶¶ 33-34.

stranger to the policy . . .  But in any case ambiguity here should be resolved in favor of the named insured and against the omnibus insured.").

37.    Recognizing the failure of its argument as to the purported "additional named insured" status, BNSF alternatively asserts—with no legal or factual support—that Montana law permits BNSF directly pursue Royal under policies issued to Grace.  Leaving aside that New York law, not Montana law applies,[37] BNSF's assertion that Montana law applies cannot be given any weight in opposition to the Debtors' Approval Motion because BNSF has failed to provide evidence or cases to support it.

38.    While this Court should deny BNSF's objections on the merits, it can also dispense with them in short order because they are late.  *See Anchorage Associates v. Virgin Island Bd. of Tax Review*, 922 F.2d 168, 176 (3d Cir. 1990) (where defendant failed to file timely opposition to motion, district court "could have adjudicated [plaintiff's] motion . . . solely on the basis of what [plaintiff] put before the court in its motion").  The Court set July 10, 2009 as the date by which all objections to the Settlement Approval Motion had to be filed.  BNSF waited until three days after the deadline to file a pleading on July 13.

39.    BNSF did not seek or obtain leave for its untimely filing.  This is more than just a technical violation.  Arrowood was prejudiced by its inability to flush out BNSF's incorrect factual assertions earlier with a deposition.[38]

---

[37] *W.R Grace v. Maryland Cas. Co.*, 1992WL142 0238 (S.D.N.Y. June 9, 1992) (applying NY law to Grace's primary and excess policies despite location of insured risks in multiple states).

[38] Arrowood requested BNSF's deposition before the close of discovery and BNSF did not comply.  *See* Notice of Deposition of BNSF Phase II Witnesses, dated June 11, 2009 [Dkt. No. 22071].

## CONCLUSION

40.    For all of the foregoing reasons, the Court should grant the Debtors' Motion for

an Order Approving Settlement Agreement and Mutual Release with the Royal Parties.

Dated: July 24, 2009
        Wilmington, Delaware

By:/s/ Garvan F. McDaniel
Garvan F. McDaniel, Esq. (#4167)
BIFFERATO GENTILOTTI, LLC
800 N. King Street-Plaza Level
Wilmington, DE 19801
Tel: (302) 429-1900
Fax: (302) 429-8600

- and -

Carl. J. Pernicone, Esq.
WILSON, ELSER, MOSKOWITZ,
EDELMAN & DICKER, LLP
150 East 42nd Street
New York, New York 10017
Tel: (212) 490-3000

- and -

Tancred V. Schiavoni, Esq.
Gary Svirsky, Esq.
O'MELVENY & MYERS LLP
7 Times Square
New York, New York 10036
Tel: (212) 326-2000

*Attorneys for Arrowood Indemnity
Company f/k/a Royal Indemnity Company*