UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

IN RE:                          )
                                )   Chapter 11
W.R. GRACE & CO.,               )
                                )   Case No. 01-1139(JFK)
                                )
                                )   July 27, 2009
                    Debtors     )


TRANSCRIPT OF HEARING
BEFORE THE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

| | |
|---|---|
| For the Debtors:<br>W.R. Grace & Co. | DAVID M. BERNICK, ESQUIRE<br>THEODORE FREEDMAN, ESQUIRE<br>KIRKLAND & ELLIS, LLP<br>601 Lexington Avenue<br>New York, NY  10022 |
| | JANET S. BAER, ESQUIRE<br>KIRKLAND & ELLIS, LLP<br>200 East Randolph Drive<br>Chicago, IL  60601 |
| For Official Committee<br>of Asbestos Property<br>Damage Claimants: | DANIEL SPEIGHTS, ESQUIRE<br>SPEIGHTS & RUNYAN<br>P.O.  Box 685<br>Hampton, SUPERIOR COURT 29924 |
| For Libby Claimants: | DANIEL C. COHN, ESQUIRE<br>COHN, WHITESELL & GOLDBERG<br>101 Arch Street<br>Boston, MA  02110 |
| Audio Operator: | JUDY FISHER |
| Transcribed by: | DIANA DOMAN TRANSCRIBING<br>P.O. Box 129<br>Gibbsboro, New Jersey  08026-129<br>(856) 435-7172<br>FAX:  (856) 435-7124<br>Email:  Dianadoman@comcast.net |

Proceedings recorded by electronic sound recording; transcript
produced by transcription service.

(Appearances continued)

| | |
|---|---|
| For Arrowood Indemnity Co.: | TANCREDI SCHIAVONI, ESQUIRE<br>O'MELVENY & MYERS<br>Times Square Tower<br>7 Times Square<br>New York, NY  10036 |
| For David Austern and PIFCR: | JONATHAN P. GUY, ESQUIRE<br>ROGER FRANKEL, ESQUIRE<br>ORRICK, HERRINGTON & SUTCLIFFE LLP<br>Washington Harbour<br>3050 K Street, N.W.<br>Washington, D.C. 20007 |
| For Long Acres Master Fund, Long Acre Capital Partners, and BNSF Railway: | JAMES C. CARIGNAN, ESQUIRE<br>PEPPER, HAMILTON, LLP<br>Hercules Plaza<br>Suite 5100<br>1313 Market Street<br>Wilmington, DE  19899<br><br>LINDA J. CASEY, ESQUIRE<br>PEPPER, HAMILTON, LLP<br>3000 Two Logan Square<br>18th and Arch Streets<br>Philadelphia, PA  19103 |
| For Unsecured Creditors Committee: | KENNETH PASQUALE, ESQUIRE<br>STROOCK & STROOCK & LAVAN<br>180 Maiden Lane<br>New York, NY  10038 |
| For Morgan Stanley Senior Funding, Inc.: | CRAIG MARTIN, ESQUIRE<br>EDWARDS, ANGELL, PALMER & DODGE<br>919 North Market Street<br>15th Floor<br>Wilmington, DE 19801 |
| For Libby Claimants: | TOM L. LEWIS, ESQUIRE<br>LEWIS & SLOVAK, P.C.<br>P.O. Box 2325<br>GREAT FALLS, MT 59403 |
| For Unsecured Creditors Committee: | KENNETH PASQUALE, ESQUIRE<br>STROOCK & STROOCK & LAVAN<br>180 Maiden Lane<br>New York, NY  10038 |

3

I N D E X

                                                    PAGE

Debtors' objection to claim filed by                 12

        Neutocrete (#7)

Debtor's objection to the testimony and              12

        report of Dr. Terry M. Spear (#8)


Debtors' motion for protective order (#4)            13

ARGUMENT:

BY:  Mr. Bernick                              14, 31, 41

BY:  Mr. Speights                                27, 33

THE COURT:

Decision                                             42


Item 6, Libby Motions                                46

ARGUMENT:

BY:  Mr. Cohn                                46, 87, 132

BY:  Mr. Bernick                               55, 104

BY:  Mr. Schiavoni                             67, 112

BY:  Mr. Guy                                   77, 121

BY:  Mr. Laughlin                              79, 122

BY:  Ms. Casey                                 81, 128

THE COURT:

Ruling                                              136

4

1    (Index continued)                                    PAGE

2    Motion for reconsideration (medical files)      148

3    ARGUMENT:

4    BY:  Mr. Bernick                              148, 162, 177

5                                                      187, 193

6    BY:  Mr. Lewis                                   153, 186

7    BY:  Mr. Cohn                                    164

8    BY:  Mr. Laughlin                                192

9    BY:  Mr. Pasquale                                199

10

11   Telephone appearance list read into the record starting at

12   page 4.  Live appearances follow beginning on page 5.  Parties

13   arguing are listed on cover.

14

15   Spellings not provided are phonetic.

Colloquy                                                            5

1                      (Court in Session)

2            THE CLERK:  All rise.

3            THE COURT:  Good morning.  Please be seated.  Folks,

4    if you want to remove jackets, please do.  We're trying to make

5    it cooler in here, and hopefully, that will work, but I don't

6    know when.  So feel free.

7            This is the matter of W.R. Grace, bankruptcy number

8    01-1139.  The list of participants by phone.  Scott Baena,

9    Janet Baer, Daniel Beller, Ari Berman, David Bernick, Jeffrey

10   Boerger, Deanna Boll, Thomas Brandi, Elizabeth Cabreser,

11   Douglas Cameron, Linda Casey, Steven Church, Richard Cobb,

12   Tiffany Cobb, Jacob Cohn, Andrew Craig, Leslie Davis, Michael

13   Davis, Elizabeth DeCristofaro, Elizabeth Define, Martin Dies,

14   Terence Edwards, Lisa Esaylan, Sandy Esserman, Marion Fairey,

15   Theodore Freedman, Jeff Friedman, Robert Gilbert, Christopher

16   Grego, James Green, John Greene, Robert Guttmann, Barbara

17   Harding, John Harding, Sarah Hargrove, Sarah Harnett, Robert

18   Horkovich, Brian Kasprzak, Gentry Klein, Stuart Kovensky,

19   Matthew Kramer, Arlene Krieger, Lewis Kruger, Richard Levy,

20   Kevin Maclay, Peri Mahaley, Douglas Mannal, Nancy Manzer,

21   Robert Craig Martin, John Mattey, Garvan McDaniel, Alex

22   Mueller, Marty Murray, Kate Orr, Merrit Pardini, David Parsons,

23   Steve Peirce, Carl Pernicone, Margaret Phillips, John Phillips,

24   Mark Platt, Mark Plevin, Joseph Radecki, James Restivo, Richard

25   Riley, Andrew Rosenberg, Samuel Rubin, Alan Runyan, Jay Sakalo,

Colloquy                                           6

1    Tancred Schiavoni, Allen Schwartz, Darrell Scott, Mark

2    Shelnitz, Michael Shiner, Walter Slocombe, Jason Solganick,

3    Daniel Speights, Shayne Spencer, Brian Stansbury, Theodore

4    Tacconelli, Edward Westbrook, Jennifer Whitener, Richard Wyron

5    and Rebecca Zubaty.

6              All right.  I'll take entries -- oh, wait.  One

7    second.  I need -- here we go.  All right.  I'll take entries

8    in court, please.

9              MR. BERNICK:  Good morning, Your Honor.  David

10   Bernick for Grace.

11             MR. FREEDMAN:  Theodore Freedman for Grace.

12             MS. BAER:  Janet Baer for Grace.

13             MR. LOCKWOOD:  Peter Lockwood for the ACC,

14   Your Honor.

15             MR. FRANKEL:  Your Honor, Roger Frankel for David

16   Austern and PIFCR.  Also with me is Jonathan Guy, my partner.

17             MR. PASQUALE:  Good morning, Your Honor.  Ken

18   Pasquale from Stroock for the Unsecured Creditors Committee.

19             MR. COBB:  Good morning, Your Honor, Richard Cobb of

20   Landis, Rath & Cobb on behalf of the bank lender group.

21             THE COURT:  Excuse me one second.  Okay.  Thank you.

22             MR. HORKOVICH:  Robert Horkovich, insurance counsel

23   to the ACC.

24             MR. FENCH:  Nathan Fench (phonetic) for the ACC,

25   Your Honor.

1          MR. HURFORD:  Mark Hurford for the ACC.

2          MS. MAKOWSKI:  Kitty Makowski from Pachulski for

3     Grace.

4          MS. TREVORROW:  Tara Trevarrow, Bilzin, Sumberg for

5     the Property Damage Committee.

6          MR. TACCONELLI:  Good morning, Your Honor.  Theodore

7     Tacconelli for the property damage committee.

8          MR. MCDANIEL:  Good morning, Your Honor.  Garvan

9     McDaniel for Arrowood Indemnity.  With me is Tancred Schiavoni

10    and Carl Pernicone.

11         THE COURT:  One second, please.  Okay.  Thank you.

12         MR. BLABEY:  Good morning, Your Honor.  David Blabey

13    from Kramer, Levin -

14         THE COURT:  I'm sorry.  Is that microphone on?  I'm

15    having an awful lot of trouble hearing everybody.  I've known

16    the people, so -- most of the people so far.  So I know who you

17    are, but I'm having difficulty with hearing you.

18         MR. BLABEY:  Sorry.  I'll speak up.  David Blabey

19    from Cramer, Levin on behalf of the Equity Committee.

20         THE COURT:  Thank you.

21         MS. COBB:  Good morning, Your Honor.  Tiffany Cobb on

22    behalf of the Scotts Company.

23         THE COURT:  Is there something you can do to adjust

24    that microphone?  I can't hear from that?

25         THE CLERK:  No, Your Honor.  I can -

1          THE COURT:  Please do, because it's very difficult to
2    hear.
3          MR. COHN:  Good morning, Your Honor.  Let's try an
4    experiment.  Daniel Cohn for the Libby claimants.  Can you hear
5    any better now?
6          THE COURT:  Not really.  Thank you.
7          MR. COHN:  It may just not be on.
8          THE COURT:  I think it is, because when you move
9    aside, I can hear an echo, but it's just not loud.  It's just
10   not coming back here.  So yes.  I normally don't want you to
11   shout, but maybe you need to.  Okay, Mr. Cohn.  Thank you.
12         MR. LEWIS:  Good morning, Your Honor.  I'm Tom Lewis.
13   I'm here on behalf of the Libby claimants.
14         THE COURT:  Good morning.
15         MR. DEMMY:  Good morning, Your Honor.  John Demmy of
16   Stevens & Lee for Fireman's Fund Insurance Company and the
17   Olians insurers.
18         MR. PLEVIN:  Good morning, Your Honor.  Mark Plevin
19   on behalf of Fireman's Fund Insurance Company with respect to
20   its surety claim.
21         MS. DECRISTOFARO:  Good morning, Your Honor.
22   Elizabeth DeCristofaro for Continental Casualty Company.
23         THE COURT:  One second.  Thank you.  Good morning.
24         MS. ALCABES:  Good morning, Your Honor.  Elisa
25   Alcabes.  I'm here with Mary Beth Forshaw for Travelers

1   Casualty --

2              THE COURT:  I'm sorry.  You're here with who?

3              MS. CAMPUS:  Mary Beth Forshaw --

4              THE COURT:  Okay.

5              MS. CAMPUS:  -- for Travelers Casualty & Surety

6   Company.

7              MR. GIANNOTTO:  Good morning, Your Honor.  Michael

8   Giannotto for Continental Casualty Company.

9              MR. GLOSBAND:  Good morning, Your Honor.  Daniel

10  Glosband, also for Continental Casualty Company.

11             MR. BROWN:  Good morning, Your Honor.  Michael Brown

12  for OneBeacon America Insurance company, Seaton Insurance

13  Company, Republic Insurance Company, and GEICO.

14             MR. MILNER:  Good morning, Your Honor.

15             THE COURT:  Good morning.

16             MR. MILNER:  Robert Milner for General Insurance

17  company of America.

18             MR. SHINER:  Good morning, Your Honor.

19             THE COURT:  Good morning.

20             MR. SHINER:  Michael Shiner for certain London market

21  companies and for AXA Belgium.

22             MS. MCCABE:  Good morning, Your Honor.  Eileen McCabe

23  for AXA Belgium.

24             THE COURT:  One second.  Okay.  Thank you.

25             MR. COCO:  Good morning, Your Honor.  Nathan Coco on

Colloquy                                        10

1    behalf of Fresenius.

2              THE COURT:  Good morning.

3              MR. TURETSKY:  Good morning, Your Honor.  David

4    Turetsky of Skadden on behalf of Sealed Air Corporation.

5              MR. CRAIG:  Good morning.

6              THE COURT:  Good morning.

7              MR. CRAIG:  Andrew Craig for Allstate Insurance

8    Company.

9              MR. CARIGNAN:  Good morning, Your Honor.  James

10   Carignan of Pepper, Hamilton for Long Acre Master Fund, Long

11   Acre Capital Partners, and BNSF Railway.  Also with me in the

12   courtroom is my colleague, Ms. Linda Casey for BNSF.

13             MS. MILLER:  Good morning, Your Honor.

14             THE COURT:  Good morning.

15             MS. MILLER:  Kathy Miller for Kaneb.

16             MR. RICH:  Good morning, Your Honor.  Alan Rich for

17   the PDFCR.

18             MR. CASSADA:  Good morning, Your Honor.  I'm Garland

19   Cassada from Robinson, Bradshaw & Hinson.  I'm here for Garlock

20   Sealing Technologies.

21             THE COURT:  One second.  Okay.  Thank you.  Good

22   morning.

23             MR. WAXMAN:  Good morning.  Jeff Waxman on behalf of

24   Garlock Sealing Technologies.

25             MR. WARD:  Good morning.  Matthew Ward of Womble,

Colloquy                                    11

1    Carlyle, the State of Montana.

2            MR. ROSENBERG:  Good morning, Your Honor.  David

3    Rosenberg of Kozyak, Tropin & Throckmorton representing

4    Anderson Memorial Hospital.

5            THE COURT:  Good morning.

6            MR. SPEIGHTS:  Good morning, Your Honor.  Dan

7    Speights representing Anderson Memorial Hospital.

8            MR. LONGOSZ:  Good morning, Your Honor.  Edward

9    Longosz on behalf of Maryland Casualty and Zurich.

10           MR. WISLER:  Good morning, Your Honor.  Jeffrey

11   Wisler also on behalf of Maryland Casualty and Zurich.

12           THE COURT:  Is that everyone?

13                   (No verbal response)

14           THE COURT:  Okay.  Ms. Baer?

15           MS. BAER:  Good morning again, Your Honor.  Janet

16   Bear on behalf of the debtor.  Your Honor, we have a couple

17   matters we just want to get rid of which will take a few

18   seconds, and then we'll get into the more meaty matters.

19           Judge, items 1 and 2 are claims related matters that

20   we're asking just be continued to the August hearing.

21           THE COURT:  All right.

22           MS. BAER:  Agenda item number 3, Your Honor, has been

23   resolved.  It was a objection to the claim of Madison Complex.

24   It's been resolved for under $50,000.  So it needs no court

25   approval, and the stipulation has been filed.  Your Honor, the

                        Colloquy                          12

1    other matter --

2              THE COURT:  One second, please.

3              MS. BAER:  I'm sorry.

4              THE COURT:  How is it going to get taken off of the

5    agenda?  You'll just simply remove it?

6              MS. BAER:  Yes.

7              THE COURT:  All right.

8              MS. BAER:  Your Honor, item number 7 is the next one

9    I'd like to take up.  That will just take a moment.  Item

10   number 7 is the debtor's objection to a claim filed by

11   Neutocrete Products, Inc.  It is a contractual related issue.

12   It's -- there is no pending lawsuit anywhere.  The issues came

13   up in the proof of claim.  We've objected.  Neutocrete has

14   responded.  We are asking that that matter be sent to the

15   mediation process that we have put in place to try to resolve.

16             THE COURT:  All right.  So you'll just temporarily

17   take it off and put it back on when it's appropriate?

18             MS. BAER:  That's correct, Your Honor.

19             THE COURT:  All right.

20             MS. BAER:  That takes care of the simple matters.

21   Oh, and item number 8, Your Honor, I forgot.  Item number 8,

22   the debtor's objection with respect to the testimony and report

23   of Dr. Terry M. Spear.  That is being continued, Your Honor, to

24   the August hearing.

25             THE COURT:  All right.

1     MS. BAER:  That then takes us back, Your Honor, to

2  item number 4, which is the debtor's motion for a protective

3  order related to the deposition of Mark Shelnitz, and

4  Mr. Bernick will address that.

5     THE COURT:  Okay.  Before you do, I want to do a

6  couple of housekeeping things before we get into the substance.

7  We're having some difficulty getting some PDF searchable

8  documents.  We're also having trouble with people forgetting to

9  link pleadings, and I'm not getting document numbers and link

10  pleadings on orders.

11     With the volume of information that's being filed,

12  this is a significant problem, and if it doesn't get fixed,

13  after today, I'm striking the pleadings.  There is a case

14  management order in place and a local rule here that governs

15  this, and I am not going to have any non-PDF searchable

16  documents, because we need to use them, and I'm not going to

17  have documents that don't have appropriate links and document

18  numbers placed on them, including the perspective orders.

19     So I hope everybody is very clear about this.  It's

20  for your benefit as well as the Court's, but there is an order

21  in place that is for that purpose in making sure we can track

22  things, and I'm not going to permit them.  I'm going to strike

23  the pleadings from henceforth.

24     In addition, we're getting an awful lot of late

25  filings, which I have pretty much been granting motions because

1   of the plan confirmation process to expedite review, to get

2   them onto the upcoming agendas.  I'm not doing that after this

3   month.  You file things timely so that everybody can get

4   prepared, everybody can get prepared.  So that's a warning.

5           Okay.  Now, end of diatribe.  So go ahead.

6   Mr. Bernick.

7           MS. BAER:  Thank you, Your Honor.

8           MR. BERNICK:  Well, on that note, Your Honor,

9   incidentally, is there -- is there a moving mic along here

10  someplace or -- there we go.  While that's in process,

11  Your Honor, first of all, we appreciate your making so much

12  time available today.  It's a very full agenda.  There is a lot

13  of stuff to get done, and we do appreciate your accommodating

14  us by starting early in -- in the efforts obviously to also

15  move over the Flynn Coat (phonetic) matter, and I'll express my

16  appreciation to the Flynn Coat folks as well for agreeing to

17  that with such alacrity and so we can proceed today.

18          I've looked through the agenda today in order to make

19  a suggestion about how we can proceed in a way that preserves

20  kind of a logical flow of matters, because I think if we go in

21  the order of the agenda itself, we'll end up going kind of back

22  and forth a little bit, and for purposes of letting everybody

23  know what I am at least going to propose, subject to

24  Your Honor's approval, as an order to proceed is to begin with

25  item 4, then go to item 6.  7 and 8 are -- are no longer before

1  us here this morning.  We would then go to item 10, then item

2  9, then item 11, and then items 5, 12, and 13.

3          THE COURT:  Mona (phonetic), could -- I left the

4  agenda on the conference table in that orange folder.  Would

5  you -- oh, do you need it?

6          A FEMALE SPEAKER:  No.

7          THE COURT:  Okay.  Thank you.  All right,

8  Mr. Bernick.  That's fine.

9          MR. BERNICK:  So -- and basically, the idea is that 4

10  -- 4 and 6 are kind of separate more or less not preliminary

11  matters, but they -- they don't really go to the sequence of

12  events leading up to the confirmation hearing.  Item 10 is a

13  status report on phase 1, which it would appear by logic should

14  take place before item 9, which is the pretrial conference with

15  regard to phase 2, and then items 11, 5, 12, and 13 are all

16  matters that really bear upon the pretrial order and

17  proceedings leading up to the confirmation hearing.  Item 11

18  relates to the lenders, and then 5, 12, and 13 all relate to

19  the Libby claimant.

20          So that's basically the reason that we're -- we think

21  we should proceed in that fashion, and if that's all right, as

22  I think Your Honor has indicated that it is, I think we can

23  begin with item 4, and item 4 relates to -- it's our motion for

24  protective order, Grace's motion for protective order to bar

25  the deposition of our number one legal officer, Mr. Shelnitz,

Argument - Bernick                                    16

1      who's general counsel of the company.

2              The -- the orders necessitated in light of an effort

3      by Speights and Runyan on behalf of their claimants, and I'm

4      going to talk about who they're actually representing in this

5      regard in a moment, to depose Mr. Shelnitz, and the essence of

6      why we think that that should not take place is that all

7      matters relating to property damage have been more than

8      adequately covered by the testimony on deposition of Mr. Finke

9      on more than one occasion.  Mr. Finke has been involved in

10     property damage litigation on behalf of Grace for years and

11     years and years.  There is no person at the company who is more

12     familiar with property damage litigation than Mr. Finke.

13             Mr. Finke and Mr. Speights have been -- been

14     opponents and colleagues in settlement, opponents in litigation

15     for years and years and years.  Mr. Finke has been deposed, and

16     all the questions that could have been asked by Mr. Speights

17     could have been asked with respect to Mr. Finke to the extent

18     that those questions are of consequence.

19             So that's the basic essence of what we have to say,

20     and let me then go back a little bit and talk about the context

21     of this, because it bears noting the position that Speights and

22     Runyan holds at this time and in this case.

23             I'm just going to go to the board for a second and

24     give Your Honor an indication of what it is that we're still

25     dealing with here and what it is that really prompts this

Argument - Bernick                                17

1    desire to take Mr. Shelnitz's deposition.

2           Your Honor will recall the approximately 1,550 claims

3    that were filed by the Speights and Runyan firm were -- were

4    expunged due to late authority, no authority.  There were

5    others that were withdrawn by Mr. Speights - Speights and

6    Runyan to the extent that there were issues concerning

7    authority.  Mr. Speights says well, I'll wait.

8           There were approximately 44 additional claims that

9    were expunged as being late.  That was affirmed by the Third

10   Circuit.  There are 34 additional claims that were expunged.

11   They're Canadian claims.  They were subject to the ultimate

12   statute of limitations.  That matter is now on appeal.

13          Now, against that backdrop, there has been settlement

14   with Mr. Speights.  If we subtract all of that, I think that

15   there are roughly 122 additional claims, and out of those 122

16   additional claims, 121 have been settled.  The documentation is

17   in various stages.  Some of them have already approved by

18   Your Honor, which means that we have one -- one claim that's

19   left insofar as I can turn that, and Mr. Speights will correct

20   me if I'm mistaken in that regard.

21          Anderson Memorial.  Why should we not have another

22   opportunity today to extend the prolonged and multi-round

23   process of litigating issues that emanate from Anderson

24   Memorial?  We should not deprive ourselves of that opportunity.

25   So we're here on Anderson Memorial again.

1           Now, Mr. Speights in pursuing the Anderson Memorial

2     claim on behalf of his client is pursuing a claim that's styled

3     as a class action, and Your Honor is very familiar with the

4     extended process that we went through on discovery on that, the

5     class certification hearings, the effort to take an appeal.

6     Apparently, Anderson Memorial is very anxious not only to

7     pursue their claim, but to continue to pursue the idea that

8     it's a class action, indeed, a class action that is a

9     nationwide class action, i.e. a Federal class action, but the

10    complaint that Mr. Spikes has on behalf of Anderson Memorial is

11    that Anderson is not being treated fairly, and in particularly

12    in the code language, is not being given equal treatment, that

13    there is discrimination against Anderson.  Why?  Because under

14    the plan, the Anderson claim to the extent that it's pursued

15    has to be pursued post-confirmation before this Court in

16    Federal Court together with -- because this is -- in part,

17    because this is a Federal class action.

18           Mr. Speights on behalf of Anderson points out that

19    that's not fair, because future PD - what are current PD

20    claims.  There are the expunged ones that are on appeal, but

21    beyond that, there are -- there is only one other current PD

22    claim, which I'll talk about in a minute.  Virtually all the PD

23    claims that we're really talking about here any future PD

24    claims.  I say any, because we don't believe that there is such

25    a thing as a future PD claim, but to the extent that there is,

1    the plan documents call out that those claims can be pursued in

2    State Court.  Bankruptcy Court no longer will -- will have

3    jurisdiction over the matter.  They can be pursued in State

4    Court provided that the issue of whether they're really new

5    claims gets litigated in the first instance before the

6    Bankruptcy Court.

7         But Mr. Speights believes that the allowance or the

8    -- the provision that says that to the extent that future

9    claims really are future claims, they can be pursued in State

10   court where -- because there has been no other litigation

11   relating to them today -- shows that his client is being

12   treated in an unequal way.

13        Secondly, there is a current PD claim that goes down

14   -- back down to State Court.  Indeed, it never came here, which

15   was the Solo case.  The Solo case, we have a lift stay

16   treatment under the plan, and the reason for that is relatively

17   simple, which is that the Solo case was tried to verdict and

18   was -- either an appeal was taken on appeal.  It's an appellate

19   status at the time the bankruptcy is filed, and basically, it's

20   been put on hold.  So because that matter already was in

21   process in State Court and on appeal, there is absolutely no

22   sense in having it litigated before this Court.

23        So Solo is a very exceptional circumstance and the

24   Solo case under the plan stays in State Court.  There is a lift

25   stay so that the appeal can proceed.

Argument - Bernick                                         20

1          Now, Mr. Speights is free to make his arguments

2     regarding discrimination and unfair treatment in the context of

3     the confirmation hearing.  That is a legal issue.  The facts

4     that are involved for a discriminatory treatment claim are the

5     facts of whether the treatment is unequal or not, and those

6     facts are apparent, apparent from the face of the plan, because

7     the plan calls out the different treatments that apply to all

8     different creditors, and Mr. Speights can make the argument

9     that he has made, in fact, which is that the requirement that

10    his -- Anderson claim remain before this Court post-

11    confirmation is a different treatment, not the same treatment

12    as other claims that are property damage claims.

13          THE COURT:  Mr. Bernick, let me interrupt you for a

14    second.  The only reason I can hear him is because he's using

15    the -- yeah.  There doesn't -- there seems to be a problem with

16    the podium.

17                              (Pause)

18          THE COURT:  Maybe I wasn't close enough.  Is that

19    okay?  No?  No different?

20          MR. BERNICK:  Yeah.  Okay.  Thank you.

21          THE COURT:  Okay.  Thank you.  I'm sorry,

22    Mr. Bernick.  Go ahead.

23          MR. BERNICK:  That's all right.  That gave me an

24    opportunity to be corrected by Mr. Freedman.  The difference in

25    the future PD claims is that they have -- and I remember this

Argument - Bernick                              21

1    now from the negotiations.  The original position was that they

2    should be negotiated in State Court, but, in fact, as a result

3    of the negotiation and the -- and the position that the debtor

4    took in that regard, the latitude is to have them in District

5    Court.  They can be -- they must be in District Court, but the

6    latitude is that they can be in a District Court in another

7    jurisdiction.  That's the difference.  So it's not back down to

8    State Court.

9              The issue though of whatever the treatment is and is

10   it equal or not and is that inappropriate is a legal issue.  We

11   have all the predicate facts that are necessary for that.

12             So on this legal issue, we don't believe that there

13   really is any need for discovery.  That's point one.  Point

14   two, we know that if any discovery commences from our long

15   experience in Anderson Memorial, there is no such thing when it

16   comes to Anderson Memorial as an agreement that actually

17   resolves the discovery dispute.  There is almost no such thing

18   as a court order that actually definitively resolves the

19   discovery dispute.  They keep on coming back and back and back

20   and back until finally says no.  That's exactly what happened

21   with Anderson Memorial on class certification.

22             So with all of those -- with those two basic

23   problems, this is legal in nature and that we know that there

24   is no such thing as a short answer, we nonetheless took a look

25   to determine whether, in fact, there was a way -- what the

1    different matters were that were being raised by Mr. Speights

2    to see, well, is there something there that moves this needle,

3    and the answer to that is no.

4             I have here and I think for ease of reference,

5    Your Honor, the second two columns are the ones that are most

6    important.  We took a look at Mr. Speights's papers to see what

7    was the alleged need for Mr. Shelnitz's deposition, and we

8    wouldn't be making a big deal about -- agenda.  The Judge needs

9    one.

10            MR. SPEIGHTS:  I have an objection, Your Honor.

11            THE COURT:  Thank you.  Mr. Speights?

12            MR. SPEIGHTS:  While this chart is not the end of the

13   world, several years ago, Your Honor ruled that anything put on

14   that board -- several years ago, Your Honor ruled that anything

15   put on that board must be shared at least 24 hours in advance,

16   and I have not seen this before.

17            THE COURT:  All right.

18            MR. SPEIGHTS:  Thank you, Your Honor.

19            THE COURT:  Mr. Bernick?

20            MR. BERNICK:  Yeah.  Well, what's being shown is

21   Mr. Speights' own pleading.  I could get up and write these

22   things.  This is right out of his pleading, and this is simply

23   a summary of my argument.  There is no new material.  It is

24   simply a list.  To say that this is a demonstrative in some

25   fashion means that -- and I compiled the list in order -- sure.

1    I can go read all these things off, but I thought Your Honor

2    might want to keep track.

3            If Mr. Speights really wants to say to Your Honor

4    that this is something that is going to prejudice his argument,

5    I'll take it down, but to sit here and say oh, well, geez, this

6    is somehow prejudicial to his position I think is absurd.

7            THE COURT:  Okay.  Mr. Speights, I don't know yet

8    what it is.  If it's something that is Mr. Bernick's

9    construction of what's out of your pleading, I think as he's

10   going through it, you can look at your pleading and tell me.

11   If it isn't, then I'll require that it be taken down.  If it

12   is, I'm not sure that it's going to be anything other than a

13   summary of his argument.

14           MR. SPEIGHTS:  Your Honor, I don't think it's

15   prejudicial.  I don't think it's -- I think it's Mr. Bernick's

16   spin on the pleadings, but that's fine.  I don't think it's

17   prejudicial.  I'll withdraw my objection, but the next time I'm

18   here and try to put a summary up like I have in the past, I

19   just want to be able to remind Your Honor that Mr. Bernick has

20   been doing the same thing.  That's fine.

21           THE COURT:  If it's -

22           MR. SPEIGHTS:  I withdraw the objection.

23           THE COURT:  -- summaries of pleadings, okay.  If it's

24   summaries of factual information, share it in advance.

25           MR. BERNICK:  Thank you.

1           THE COURT:  That applies to everyone.  Okay.  Go

2      ahead.

3           MR. BERNICK:  Termination of global settlement

4      negotiations in 2005 with Mr. Speights, Mr. Speights wants to

5      find out who done it and is that Mr. Shelnitz and why did he do

6      it, and the answer to that is it is totally irrelevant.  What

7      issue does it go to?  This is negotiation history.  God knows

8      the negotiation histories have been -- in this case in all

9      respects have been marathon.

10          So we're picking out one feature, and he's asking for

11     the mental impressions of the general counsel and kind of

12     saying well, why did you do that.  That's not a proper question

13     at this stage.  Not only that, but it was covered in Mr.

14     Finke's deposition and it's moot.

15          Look who's sitting here now.  However it happened,

16     God bless, we got virtually everything settled, and the only

17     thing that's left is one case.  He wants to go back and revisit

18     history of what took place four years ago.

19          Development of strategy for all PD claims.  That is

20     pure and simple privileged.  What our strategy was, how we

21     decided to pursue this matter is not his business.  It is flat

22     out privileged.

23          Negotiations regarding the proposed plan treatment of

24     PD claims, again, what is the relevance of that?  We have --

25     with respect to discrimination is here it is.  You have a

1   treatment here and a treatment here.  Is it discriminatory?

2   That's not a question of intent.  That's not a question of vast

3   conspiracy.  It is what it is.  Is it discriminatory or not?

4   And it was covered in the Finke deposition.

5            Understand Grace's position regarding his objections.

6   Mr. Finke was deposed twice, once as an individual for a day by

7   Mr. Speights, and then as a 30(b)(6) witness where Mr. Speights

8   apparently failed to -- to make the notice of the 30(b)(6)

9   deposition, but he had the opportunity to ask for Grace's

10  position regarding his objections of Mr. Finke, and, in fact,

11  we stated our position with respect to his objections.

12           Negotiation with planned proponents regarding PD

13  claims.  Mr. Inselbuch was asked flat out, well, you know, what

14  was the discussion about that, and his answer was pretty

15  simple, which is he said this is Grace's problem, PD is Grace's

16  problem.  That's the end of it.  What more is there to find

17  out?  Well, he wants to then go back and find well, what did

18  Grace decide to do.

19           He's already gotten the discovery vis-a-vis

20  discussions with the plan proponents.  So that's really a

21  reinvented request to get well, what is it that Grace did, and

22  we've already told him what Grace did.

23           Negotiations regarding the ZAI agreement.  Of what

24  relevance is that to the discrimination claim?  And the ZAI

25  agreement was not only negotiated.  It was embedded in a class

1    settlement.  That's been gone through with -- with numerous

2    people.  Mr. Finke has been deposed twice on that subject.

3           And finally, Grace's justification for the alleged

4    disparate treatment of Anderson in the plan, disparate

5    treatment of Anderson, the plan.  Well, the question of whether

6    there is disparate treatment is answerable from the face of the

7    documents.  The justification is a legal justification.  It's

8    not a question of somebody's subjective intent.  It's not a

9    question of what our strategic considerations were.

10          If there were something that really was discreet,

11   factual, and really was material to the issue that's been

12   raised and not discovered, God knows, even though Mr. Speights

13   has had the opportunity to inquire about it, we'd give it to

14   him, but that's not what this is.  This is Mr. Speights for

15   whatever reason now going after Mr. Shelnitz as the GC to find

16   out well, why is it that -- well, you settled 121 cases, why

17   didn't you settle this case, and maybe it's because somehow we

18   don't like him or there is some kind of conspiracy.  That is --

19   that's the real reason for this inquiry.  That is what it

20   invites, and we don't believe it's appropriate, and therefore,

21   we know it's a discovery matter and Your Honor is generally

22   pretty flexible on discovery, but we just don't see it here.

23   This harassing discovery.

24          THE COURT:  Mr. Speights?

25          MR. SPEIGHTS:  Good morning, Your Honor.

1        THE COURT:  Good morning.

2        MR. SPEIGHTS:  I came to Wilmington today to argue a

3    discovery matter whether I'm entitled to take a deposition.

4    The burden is on Grace to prohibit my taking the deposition of

5    Mr. Shelnitz.  I'm not going to, unless Your Honor wants to

6    direct me to, head down the confirmation battle, nor am I going

7    to spend my time correcting the plethora of mathematical

8    mistakes made by Mr. Bernick on his board.

9        Back when we had to list witnesses preliminarily in

10   April, I listed two witnesses by name, Mr. Finke and

11   Mr. Shelnitz.  Mr. Finke was a person that I dealt with in

12   South Carolina regarding the Anderson case.  Mr. Shelnitz took

13   over as general counsel some time in early 2005.

14       I did take Mr. Finke's deposition and I learned some

15   valuable things that I think will assist Anderson when it

16   opposes confirmation at the hearing in September.  I then

17   noticed Mr. Sheltnitz's deposition, and low and behold, they

18   filed this motion for a protective order.

19       Now, Mr. Shelnitz is not some head of a company that

20   has no involvement in anything.  Mr. Shelnitz has been the

21   major person involved in these -- in the plan development going

22   back to 2005.  He negotiated the deal with the PI claimants.

23   He negotiated the deal and signed the term sheet for the ZAI

24   claimants.  He supervised the claims objections process, and

25   indeed, in something I did not mention in my brief but I just

Argument - Speights                              28

1   thought about Saturday.  I went to Pacer and looked and word

2   searched Mr. Shelnitz and found that he has filed or Grace has

3   filed a number of pleadings with declarations of Mr. Shelnitz

4   in which Mr. Shelnitz identifies himself as the person at

5   Grace, starting in pleadings in 2005 and going until recently,

6   as the person in charge of the claims process or claims review

7   with respect to objections at W.R. Grace.  So this is not some

8   wild idea that I'm taking a person not involved.

9           In any event, I noticed his deposition.  Big deal.

10  Two witnesses I listed originally.  I noticed his deposition

11  for several reason.  Number one, I wanted discovery.  That's

12  what lawyers do.  I wanted to understand Grace's position so I

13  could decide what witnesses and what documents did I need, and

14  I wanted to understand Grace's position on several plan

15  confirmation issues, that by the time I noticed him I had

16  raised along with the Kozyak firm and our objections which we

17  filed in May.  So I wanted pure discovery.

18          In addition, Your Honor, I anticipated that Grace

19  might call Mr. Shelnitz as a witness in this case.  Whether it

20  did or did not, I would have sought his deposition, but if it

21  did, I wanted to know early on what he was going to say about

22  several issues so that I could be prepared to cross-examine him

23  and prepared to gather documents of what other information I

24  needed if he turned out to be a witness.

25          Now, Your Honor, at some point, it's reflected in --

Argument - Speights                                        29

1    in the briefs, Grace listed Mr. Shelnitz as a witness in

2    response to the insurer's 30(b)(6) notices of deposition, and

3    then when I started trying to depose him, they withdrew him as

4    a witness on the 30(b)(6).  I'm not sure of the sequencing,

5    whether my noticing had something to do with that or not, but

6    they -- they at one time had him listed as a 30(b)(6) witness,

7    and I could have gone there and cross-examined.  I don't have

8    to serve my own notice as a party in this case in order to have

9    the right to participate in depositions.

10        In any event, Grace filed a motion for protective

11   order, and they have the burden.  Well, Your Honor, then

12   something else happened that, frankly, mystifies me.

13   Your Honor in an order -- that doesn't mystify me, your order,

14   but requiring plan submissions, and Grace had to file plan

15   submissions on July 20th.  That's after all the briefing on

16   Mr. Shelnitz, and after I read the plan submission, I, frankly,

17   thought, Your Honor, I was going to get a telephone call from

18   Mr. Bernick or Ms. Baer or somebody over there on the side,

19   maybe even the quiet Mr. Lockwood would call me and say -

20        A MALE SPEAKER:  I don't know a quiet Mr. Lockwood.

21        MR. SPEIGHTS:  He's gotten might quiet these last few

22   months.  And low and behold, right in the plan submissions,

23   Grace listed witnesses.  Mr. Shelnitz is listed as a witness.

24   After identifying him, it says a number of things.

25        "Mr. Shelnitz may also testify in support of the plan

1                  proponent's contention that the plan of

2                  reorganization is proposed in good faith pursuant to

3                  the Bankruptcy Code."

4            Now, this is a witness that Anderson may see in

5      September at the confirmation hearing, a witness that we first

6      noticed for deposition back in May.  Now, I don't understand

7      this.  I don't understand how Grace after it files a motion for

8      protective order can list Mr. Shelnitz as a witness on good

9      faith and I can't take his deposition on good faith, because

10     that's what it goes to.

11           And I can sit up here an hour and a half talking

12     about the history of Anderson and everything else, but I

13     shouldn't have to justify taking a witness's deposition who's

14     listed nor should Grace be able to say well, we'll decide, you

15     know, the night before he testifies whether we're really going

16     to use him.  People list witnesses.  I list witnesses all the

17     time.  I don't call every witness I list.  Your Honor wanted to

18     get it down to bare bones though.  This is their bare bone

19     witness list with Mr. Shelnitz on it, and I shouldn't have to

20     wait until the night before, because if I take his deposition,

21     I may need to add a witness.  I may need to add documents.  I

22     may need to come up with thinking on our position, and I just

23     rest on this, Your Honor.  I would love to respond to

24     Mr. Bernick, but we've got a limited amount of time today, but

25     if they can list a witness and I can't depose him, then the

1    rules are not what I think they are.

2              THE COURT:  Mr. Bernick?

3              MR. BERNICK:  Yeah.  Mr. Shelnitz was listed.  He was

4    listed pursuant to Your Honor's direction that we do so, and he

5    will testify as to the matters that we have listed on the left-

6    hand column, because frankly, with respect to these, he is not

7    only the best person but may also be the only person, and to

8    the extent that we've done that, yes, we've opened the door

9    with respect to that.

10             Yes, we did list him on good faith, and then it did

11   dawn on us that of all the people that were going to take

12   advantage of that to pursue the kind of discovery that should

13   not be triggered by a disclosure with respect to good faith,

14   Mr. Speights was certain to walk through that door, and

15   therefore, we amended -- we have just amended our pretrial

16   submission to withdraw Mr. Shelnitz on good faith.  It's not

17   worth the candle to have Mr. Shelnitz now with that hook be

18   used to go back through the long history of how -- what Grace's

19   strategies were with respect to Mr. Speights.

20             Good faith does not permit that kind of inquiry.

21   Good faith says have you negotiated this plan earnestly, have

22   you negotiated it at arms length, have you produced a result

23   that is a result that says yes, this debtor in good faith is

24   trying to resolve as much of its liabilities as it can and

25   emerge, and we're very confident that if Mr. Shelnitz were

1    produced on that subject and the examination was confined to

2    that, we wouldn't have a problem, but that is not what is

3    happening here.  What is happening here is you can see it.

4    This is a conspiracy theory deposition.  This is let's get the

5    general counsel.  It's not good enough what Grace says in its

6    papers about its legal position.  It's not good enough what

7    Mr. Finke says in the deposition.  Mr. -- Mr. Speights wants

8    the opportunity to beat Mr. Shelnitz above the -- about the

9    head and shoulders on why in my one claim out of 122 claims,

10   out of -- I mean, you talk about good faith, the thousands of

11   claims, the enormous expenditure of time that's been dedicated

12   to litigating with Mr. Speights.  He now wants to say well, I

13   want one more crack at the general counsel.

14        What's missing here -- what's missing here is a

15   specific showing, a specific showing that says that these kinds

16   of matters are germane to Mr. Speights' clients with respect to

17   an issue that is an appropriate legal issue.  Discrimination

18   doesn't require it.  That's simply a question of whether the

19   treatment is the same or not and why, and we have -- we'd

20   absolutely be able to account for that based upon the

21   documents.

22        And the question of good faith, I mean, the whole

23   negotiation with respect to PD has shown good faith.  Not only

24   have we settled everything with Mr. Speights.  We've settled

25   everything with everybody.  There can be no issue about our

1    good faith.

2         So what is this?  This is an effort to take this

3    opportunity to create pressure and leverage, perceived leverage

4    with respect to this one client where Mr. Speights has said

5    well, they're not going to settle, we're going to keep him in

6    the game, we're going to make as much trouble as we can.

7         I know Your Honor is not generally interested in

8    motivations.  The real question here is the law.  You don't

9    depose a lawyer without a specific showing of need.

10   Mr. Shelnitz is a lawyer.  There has not been a specific

11   showing of need.  We've given him the factual discovery he's

12   entitled to.  This is now an excuse to basically interrogate an

13   opponent, an opponent who is a lawyer, and that is outside the

14   limits.

15        THE COURT:  Mr. Speights.

16        MR. SPEIGHTS:  I admit I'm a little hard of hearing,

17   Your Honor.  Did Mr. Bernick -- and I don't address -- cross

18   talk down here.  I don't deal in cross talk, but did

19   Mr. Bernick say that Mr. -- he's amending orally?

20        THE COURT:  No.  I think he said he filed an

21   amendment.

22        MR. SPEIGHTS:  Filed?  When was this amendment filed?

23   I've never seen it, Your Honor.  I've come all the way, 8-hour

24   trip to Wilmington, Delaware to argue this motion primarily.

25   I've never seen such an amendment.

1          MR. BERNICK:  I stand corrected.  It's not been

2     amended yet.

3          MR. SPEIGHTS:  Well, should I argue -- should I argue

4     to state of the record if it is or state of the record in

5     Mr. Bernick's mind?

6          THE COURT:  If you're going to call Mr. Shelnitz as a

7     witness on good faith, you clearly have the right to take his

8     deposition on the issue of good faith.  If they're not going to

9     call him as a witness on good faith, then I think the issue

10    will be moot as to him, because they're withdrawing and not

11    calling him on the issue of good faith, but I didn't understand

12    that that's where your objection was heading.  So I apologize

13    if that's the case.  Maybe you better readjust my thinking

14    process.

15         I thought that what Anderson was saying was that

16    because it is going to be forced to resort to a hearing before

17    this Court as opposed to wherever else, the other property

18    damage claims if they ever are proven to exist have to go, that

19    that was discriminatory.  Is there more to it than that?

20         MR. SPEIGHTS:  Yes, Your Honor, and I will address

21    that, and Mr. Rosenberg is also here to the -- to the extent I

22    have to walk over to the bankruptcy world from -- from where we

23    are.  Let me make two comments before jumping into that.

24         I do disagree respectfully with Your Honor's

25    suggestion that if they withdraw him as a good faith witness,

1    I'm not entitled to take him.  I noticed his deposition before

2    they listed him as a good faith deposition and proving, in

3    effect, bad faith, I want to get the discovery from

4    Mr. Shelnitz, who's been at the heart of all of the matters

5    that I raised cane about starting in 2005.

6            So whether he does or does not withdraw him, I have

7    that issue.  I also say that even if he amends -- I think what

8    Mr. Bernick is imagining he is going to file is something to

9    delete the sentence about good faith from this pleading but

10   leaves Mr. Shelnitz as a witness, and if he leaves him as a

11   witness, I still have a right to depose him like every other

12   person in this courtroom --

13           THE COURT:  Well, that's true.

14           MR. SPEIGHTS:  -- and I will be there, and he can --

15   Mr. Bernick certainly is capable of making his objections and

16   et cetera, et cetera, but he's going to be deposed, and I

17   didn't hear Mr. Bernick say that he is going to withdraw

18   Mr. Shelnitz as a witness.

19           THE COURT:  No, and I agree with that, Mr. Speights.

20   If he's listed as a witness, he can be deposed.

21           MR. SPEIGHTS:  Right.

22           THE COURT:  I think the issue will be whether or not

23   the -- that if he's not listed to testify as to a particular

24   issue, and for this purpose, let's just say on good faith, then

25   the question is whether the deposition that goes to issues

1    concerning good faith will be calculated to lead reasonably to

2    discoverable and admissible evidence, and it may or it may not.

3    I don't know the context at this point in time, but it clearly

4    wouldn't be as relevant as it will be if he is listed as a

5    witness to call in good faith.  Then I don't think you have the

6    relevance issue to worry about at all.

7              MR. SPEIGHTS:  And typically, Your Honor, that if we

8    were deposing him, because he is a witness and we try to go

9    into an area which the opponent objects to, that's the time you

10   have the motions filed and argued.  Typically, matters are

11   taken in a deposition and we get through them in less time than

12   it's taken the parties to argue this matter here before you

13   today.

14             THE COURT:  That's --

15             MR. SPEIGHTS:  So, I mean, that's the typical way to

16   do it, but let me go back to your question since you asked

17   about where we're coming from.  I'll put it in the

18   nonbankruptcy language.

19             If I call my client, Anderson Memorial Hospital, the

20   hospital itself, and I say under the plan that the debtor has

21   proposed, this is what's going to happen.  You are going to

22   have a trial post-confirmation before the Bankruptcy Court

23   probably in Pittsburgh.  They will probably -- more discovery,

24   despite the fact that we had discovery for years in South

25   Carolina, and then you and the hospital witnesses familiar with

1    the problem and what's been done will have to go to Pittsburgh

2    for a trial.  In addition, the experts at Anderson retain --

3            THE COURT:  I'd actually love to try a case in South

4    Carolina, Mr. -- Mr. Speights.  So if you can make an effort to

5    get a courtroom in South Carolina and that's the only part of

6    this, I'm game.

7            MR. SPEIGHTS:  Well, I probably could get a courtroom

8    in beautiful Hampton, South Carolina, Your Honor, but -- but

9    assuming arguendo that that's not an option, although if the

10   debtor wants to put that on the table, we'll add that to the

11   smorgasbord of possibilities, it means that we also have to

12   bring our experts who are typically in the Anderson area,

13   including Atlanta, which is an hour and 45 minutes away, and

14   we'll all have to go, and I don't think you'll take three weeks

15   to try the case like most cases tried in the tort system, but

16   you won't have a jury, but we'll try it nonjury before you for

17   some period of time, and Your Honor will reach a decision.

18            Now, at the same time, I will tell -- and I will tell

19   my client now, the good news is if you win before Judge

20   Fitzgerald, you get 100 cents on the dollar.  Well, one thing I

21   do know more about than I believe anybody in the courtroom, not

22   many things, but one thing is I know asbestos property damage

23   clients.  I know what they think and how they feel.

24            What if I told my client well, instead, maybe I'll

25   try to talk Judge Fitzgerald into letting you be treated like

1    the asbestos personal injury claimants.  There isn't going to

2    be a 524 trust, and I believe if we can be that -- treated like

3    them, I will be able to participate in drafting the trust

4    procedures and then the claims will be decided, your claim will

5    be decided not by Judge Fitzgerald but will be decided by

6    trustees, which, by the way, I'm going to have an opportunity

7    to participate in choosing, and then if I don't like that

8    result, ultimately, we can go to the tort system.  Now, the bad

9    news is you don't get -- you don't get 100 cents on the dollar,

10   but the good news is you get this low cost transactional

11   method, you never have to travel anywhere, and we'll file the

12   claim forms and move it on, or there is also this ZAI trust

13   over here, same thing.  They don't get 100 cents on the dollar

14   either, but they get to pick their trustees.  They get to write

15   their own procedures.  It's low transactional cost, and maybe

16   you could be treated like that.

17          Well, I haven't asked Anderson that specific

18   question, but I'll guarantee you 90 percent of the claimants in

19   the country would prefer going to one of these trust routes and

20   be able to stay home.  It's a practical thing beside being a

21   legal issue.

22          And I want to ask Mr. Shelnitz, I want to ask Grace,

23   I want to cross-examine witnesses at trial why Anderson is

24   deprived of that opportunity, but I also want to ask why future

25   all PD claims, Mr. Rich's clients, his clients' clients, all

1    future PD claims, under the PDCMO, which is part of the plan,

2    which was amended in negotiations between the debtors and

3    Mr. Rich -- originally, Mr. Rich's clients, Judge Sander's

4    clients, were going to be treated the same way as Anderson, but

5    it go amended in negotiations I believe Mr. Shelnitz is very

6    aware of if he -- if he, in fact, did not participate in.

7           So they got amended, and Judge Sanders' traditional

8    PD claimants who are getting 100 cents on the dollar, if they

9    are really futures, and you decide that, get to go back to the

10   tort system in the district where they are.  There is a federal

11   courthouse in Anderson, South Carolina.  Okay?

12          But only Anderson, only Anderson -- and I don't think

13   I'm paranoid to say this.  It's a fact.  Only Anderson is

14   treated in what I consider, what my lawyers tell me is a

15   disparate way.

16          We don't have to decide that today.  I think it's a

17   disparate treatment.  I also think it's produced not in good

18   faith, because I think there is a lot of history here, and it

19   must be placed in context.  I don't take long depositions.  I

20   took Mr. Finke's deposition and finished in mid-afternoon, and

21   the insurers all had their questions of them, and we all

22   finished in that day.

23          I'm not looking to keep the general counsel of Grace

24   involved in some deposition of mine that goes on endlessly.  I

25   know exactly what I want to ask.  The know exactly what I want

1    to ask.  I want to get to the heart of this matter concerning

2    the disparate treatment of Anderson and how it came about that

3    Anderson is treated this way, and to the extent that history is

4    relevant to place it in context, I want to ask history, and

5    they can -- they can make all the objections there, and we can

6    call you on the phone like the rules provide and say we've got

7    a discovery dispute, Judge.

8              THE COURT:  Oh, am I looking forward to that,

9    Mr. Speights.

10             MR. SPEIGHTS:  Well, they won't do it.  You know,

11   it's a chicken little argument is what it is, Your Honor.  Have

12   you seen us arguing anything on the depositions.  I've just

13   participated in six or eight depositions, and low and behold,

14   we've had a few cross words at those depositions.  Okay?

15             MR. BERNICK:  Not between you and I.  Just --

16             MR. SPEIGHTS:  Mr. Bernick doesn't cover these

17   depositions.

18             MR. BERNICK:  Very disappointed.  Very disappointed.

19             MR. SPEIGHTS:  Okay.  I mean, but we brought none of

20   this to your attention.  I -- I would almost bet the moon that

21   we'll go take Mr. Shelnitz, it will be a very polite

22   deposition, we'll get to the heart of the matter, and then at

23   confirmation, we'll argue the merits, but again, he is still

24   listed as a witness, and I need to take him sooner rather than

25   later, because I need to know how to build our case, and I know

1   the minute I list another witness, Mr. Bernick is going to

2   raise cane, too late, too late.  Thank you, Your Honor.

3             THE COURT:  Okay.  Mr. Bernick, quickly.

4             MR. BERNICK:  Very, very briefly.  Very revealing.

5   We now have a statement on the record about what the -- in

6   common sense terms, what the beef is, and the beef is well, PD

7   is different, just like I said he would say, ZAI is different,

8   just like I said he would say, and PI is different.

9             He said well, why am I not treated the same way, and

10  the answer is pretty simple, which is that we have a settlement

11  with the personal injury claimants, lots of back and forth,

12  lots of compromise and had to take place pursuant to a trust

13  structure that's very, very important to the PI claimants, and

14  we settled with them.  We own a settlement with Anderson

15  Memorial.

16            We respect to the PD futures, we have a settlement

17  with respect to the PD futures that covers them as well.  With

18  respect to ZAI, we have a settlement with respect to ZAI.  So,

19  of course, in the context of settlement, settlement,

20  settlement, lots of things can happen.  Lots of variables get

21  discussed, including the question about where current or future

22  claims would actually be resolved or actually be litigated.

23            And so the real question is Mr. Speights is asking

24  well, why don't you all do that for me.  Well, first of all, we

25  could settle with Mr. Speights and we have settled with

Argument - Bernick/The Court - Decision                    42

1    Mr. Speights, and he can't claim that we're in bad faith with

2    respect to not settling with him, because one out of 122 is all

3    that we're left with.  That's a pretty high success rate, and

4    we've settled with everybody else, everybody else.  There is no

5    issue about the desire of this client to settle including with

6    Mr. Speights' clients notwithstanding all that he's done in

7    this litigation.

8           So what he really wants to say is well, even though I

9    haven't settled Anderson, I want you to give me something on

10   Anderson that will make me happy.  Okay.  Well, he can come to

11   us and make the proposal that says even though we haven't

12   settled Anderson, give me something that will make me happy,

13   and I guess that's a settlement proposal.  Maybe he wants to

14   make it, but he can't take a deposition of Mr. Shelnitz and put

15   that proposition to him in a deposition.  A deposition is not

16   the venue for making settlement proposals and finding out

17   whether the settlement proposals are acceptable or not, and it

18   is most certainly not appropriate to go back over this whole

19   history and say well, why did you do this and why did you do

20   that and why did you do that.  That's settlement strategy.

21   That's litigation strategy.  That's not his business.

22          And now we have heard exactly what he wants to do and

23   we know why it is wrong.

24          THE COURT:  Okay.  To the extent that Mr. Shelnitz is

25   listed as a witness on behalf of the debtor, he's clearly open

1    and available for deposition.  I don't think there -- anyone

2    can dispute that fact.  To the extent that the purpose is

3    Mr. Speights' deposition notice that is directed to looking at

4    discriminatory treatment of Anderson Memorial.  I think that is

5    clear from the face of the plan.  I mean, I think the issue is

6    clear from the face of the plan.  I'm not sure it is factual as

7    much as it is a legal issue.  There is different treatment, and

8    the question of whether that is discriminatory I think is a

9    legal conclusion that has to be drawn.

10           The efforts to discover the debtor's settlement

11    strategy is clearly improper.  The Court would -- that would

12    certainly not be able to be admissible evidence under the rules

13    of procedure.  So that -- there is no purpose to exploring that

14    issue.

15           With respect to good faith, bad faith, however, if

16    Mr. Shelnitz has information that would lead either to a

17    construction of good faith or bad faith, it seems to me once

18    he's called as a witness, the areas of inquiry are not

19    necessarily limited to his direct testimony by way of cross-

20    examination, and so I think the area is opened in that respect.

21    Now, I don't know how far.  There have to be some limits, but

22    nonetheless, that could be an appropriate area for cross-

23    examination if he's called as a witness.

24           So I think the appropriate thing at this point is to

25    say that.  Mr. Shelnitz has to be made available for deposition

1    as long as he's going to be called as a witness, and rather

2    than striking Mr. Speights' deposition notice because

3    Mr. Shelnitz is being listed as a witness, I'm going to allow

4    the deposition to take place.  I'm not going to determine the

5    parameters other than what I have currently addressed on the

6    record.  I don't think settlement strategy or litigation

7    strategy is appropriate in any event.  It would be either

8    privileged or not admissible under the various rules, but to

9    the extent that it's getting to good faith, I can't make that

10   determination in this vacuum.

11           So I will not strike the deposition notice, but I am

12   to a certain extent limiting the areas of inquiry from some of

13   those that are listed in the notice.  Do you need a specific

14   order on this issue or do you simply want me to continue it

15   until the next Omnibus to make sure that, in fact, something

16   happens with respect to this deposition?

17           MR. BERNICK:  We're satisfied with Your Honor's

18   statements from the bench.

19           MR. SPEIGHTS:  I think we probably need an order even

20   if it just says as stated on the bench, from the bench.  I rise

21   only to say -- and may be -- are we still going to have a break

22   for Flynn Coat, Your Honor?

23           THE COURT:  No.  I was able to get the parties to

24   agree to submit orders.

25           MR. SPEIGHTS:  I would like to suggest then at the

1    break -- I assume you'll take a break at some point?

2              THE COURT:  Yes.  I will be.

3              MR. SPEIGHTS:  That -- to see whether we can agree on

4    a date for the deposition.  I'm loathed to leave Wilmington

5    today without some date, because I've been trying since May,

6    and perhaps they could contact Mr. Shelnitz and find an

7    agreeable date, but -- but I really want the deposition so that

8    I don't -- I'm not forced to come in here late asking for leave

9    of Court to do other things.

10             MR. BERNICK:  Yeah.  We'll -- a lot of people are

11   going to attend that deposition.  I don't know when it's going

12   to be.  We'll submit -- we'll circulate dates or a potential

13   date and see.  With all that important, I'm sure that

14   Mr. Speights will make himself available, but we've undertaken

15   to make Mr. Shelnitz available for a timely deposition in

16   connection with the phase 2 proceedings in this case.

17             THE COURT:  All right.  If Mr. Shelnitz can be made

18   available I think within the next two weeks.  Why don't we

19   simply set a two-week deadline to get it done?  That way --

20             MS. BAER:  He is out of -- Your Honor, Mr. Shelnitz

21   is going on -- out of town for about ten days.  I do have a

22   couple of dates --

23             THE COURT:  Okay.

24             MR. BAER:  -- in August however that I can provide.

25             THE COURT:  In August?  Fine.  Then why don't I

1    simply say by the end of August.  That should be sufficient

2    time if he's not going to be --

3            MR. BERNICK:  That's fine.

4            THE COURT:  -- available.  Mr. Speights, it will have

5    to be taken by the end of August at a date that is yet to be

6    determined by the parties.  Okay.  I'll take an order then when

7    you two can draft one that simply says that the rulings on the

8    record are the rulings of the Court with regard to this motion.

9            MR. BERNICK:  Thank you, Your Honor.  The next item

10   on the agenda is item 6, and I think that that really has

11   essentially two parts to it.  One, the preliminary part, are

12   motions that have been filed by the -- on behalf of the Libby

13   claimants with respect to deferring this matter and also

14   discovery.  Obviously, we very actively resist and oppose those

15   motions and want to get to the real event from our point of

16   view, which is the Court's approval of the settlement with

17   Arrowood, and because it is the claimant's motion -- so I would

18   propose that we proceed first with the claimant's motion and

19   then proceed with our motion for approval, and if that's

20   satisfactory, I think it's up to Mr. Cohn to go first and talk

21   about their motions if that's all right with Mr. Cohn.

22           MR. COHN:  Yes, sir.

23           THE COURT:  Good morning.

24           MR. COHN:  Good morning again, Your Honor.  There are

25   actually two Libby motions, but they're interrelated,

Argument - Cohn                                         47

1    Your Honor, and we can probably streamline things by dealing

2    with the two preliminary motions all at once.

3            The relationship is this.  There is a motion to defer

4    consideration of the Royal settlement motion until a time when

5    the Libby claimants have completed discovery, and then there is

6    a motion to compel related to the discovery that remains

7    uncompleted.  So with your permission, may I address both?

8            THE COURT:  Yes.

9            MR. COHN:  Okay.  The -- a key issue underlying the

10   Royal settlement is just what coverage is there out there that

11   is being settled.  Everybody acknowledges that there are two

12   excess policies that -- that are out there as of right now and

13   that are being settled under this -- under this settlement.

14   However, there is also the Libby claimants' contention that

15   there is unsettled primary coverage for nonproducts claims.

16           This, Your Honor, dates back to a series of ten years

17   of -- of insurance policies issues by Royal to the Zonolite

18   Company which Grace then acquired.  Zonolite Company was the

19   prior order of the -- prior owner -- I'm sorry -- of the Grace

20   facilities in the vicinity of Libby, Montana.

21           This -- as I say, it's primary insurance.  It means

22   that you don't have to -- it pays the first dollars,

23   Your Honor.  There is no other insurance that would need to be

24   accessed first.  It clearly covers by -- by the terms of the

25   policies products and nonproducts claims.

1          The types of claims, however, that our clients have

2    -- so the products claims are irrelevant, Your Honor.  The

3    types of claims that our -- our clients are primarily asserting

4    are nonproducts claims, in other words, claims that result from

5    Grace's operations, not its products.

6          There are two basis on which we argue that this

7    coverage is still outstanding.  One of them is that the 1995

8    settlement agreement which indisputably settled Royal's

9    products coverage is at the very least ambiguous on the issue

10   of whether it settled nonproducts coverage as well, and in that

11   circumstance, Your Honor, of course, it's hornbook law.

12   Extrinsic evidence may be introduced, and what we've done is

13   we've tried to explore the extrinsic evidence, and there has

14   been one key element of discovery that has been resisted, and

15   that is production of drafts of the 1995 settlement agreement.

16         Those have been withheld expressly, Your Honor.  This

17   is -- in fact, I don't even know if they exist, because we --

18   what Royal has said to us is that they will simply not produce

19   them whether they exist or not, and so that's clearly something

20   that is relevant to this.

21         THE COURT:  Why?  The -- the settlement in the case

22   that it is the full agreement of the parties notwithstanding

23   anything that took place beforehand.  So why are the drafts

24   relevant?

25         MR. COHN:  Oh, because, Your Honor, the settlement

1    itself is -- the settlement itself by its terms is ambiguous,

2    and so what you would want to look at is any extrinsic evidence

3    that might give an indication of what the parties intended, and

4    if, for example -- and I'm just going to name, you know, one

5    that I have no reason to believe exists, Your Honor, but it's

6    an example of why parties do discovery, because this is the

7    kind of thing that -- you know, that you're -- that you're

8    looking for.

9         If there was a clause in a prior draft that said all

10   non products coverage is being expressly preserved and it got

11   stricken, well, that would be bad for me, or alternatively, if

12   there was some -- you know, if there was some clause in a prior

13   draft that -- that got stricken which said that -- that

14   products coverage is being settled as well and then it got

15   dropped for the final agreement, that would be -- you know,

16   that would be a telling -- you know, that would be a telling

17   piece of evidence about what the parties intended.

18        So you always in these situations, Your Honor, where

19   you're looking for the intent of the draftsman in a situation

20   where the final product is ambiguous, it is always permissible

21   to inquire into the drafts and the other communications that

22   went back and forth in the negotiation process to find -- the

23   goal being to find what was the intention of the parties at the

24   time.

25        Now, the -- the -- Grace and Royal have pointed out

1    that there is a bunch of other evidence that they have tried to

2    -- that they've tried to introduce that would point to the

3    nonproducts coverage as having been settled.  It is -- it is

4    intriguing that Grace's witness is primarily responsible --

5    that's Mr. Posner -- primarily responsible for insurance

6    matters agrees that -- that the nonproducts insurance as well

7    as products insurance was settled, but there is evidence that

8    points in a different direction, some of it emanating from

9    Mr. Posner himself.  For example, the submission by Grace after

10   the 1995 settlement of some Libby claims to be -- to be covered

11   by the Royal Insurance policies, and also, Grace is listing --

12   which you may recall, Your Honor, because it took place right

13   here in the court -- in the drafts of the disclosure statement,

14   there was a schedule and the schedule listed what insurance was

15   settled, and the Royal Insurance was listed as being not

16   settled with respect to nonproducts coverage.

17           So somebody presumably had some basis for -- for

18   doing that, notwithstanding the fact that now that there is a

19   settlement with Royal, it's convenient to take the position

20   that -- that the nonproducts coverage had been settled all

21   along.  So this is an important area of inquiry to determine

22   what it is that the estate is giving up in the context of this

23   settlement.

24           $5.8 million is probably a fair price for the excess

25   -- to settle the excess coverage standing alone, Your Honor,

1    but you could be talking about potentially hundreds of millions

2    of dollars of coverage that's being -- that's being given up

3    for no consideration whatsoever, and that is a -- certainly an

4    important subject for inquiry in the context of the settlement.

5            The -- I'll get -- when we argue the motion itself, I

6    will, of course, address the alternative basis why the

7    settlement is objectionable and why we think the coverage is

8    still out there, but right now, I'm confining myself to issues

9    on which there is a need and a legitimate need for discovery.

10   So let me turn then to the second issue on which there remains

11   a need for discovery, and that is the issue of what exactly

12   were the negotiations amongst the parties to this settlement --

13   I'm not talking about the 2009 settlement -- as it relates to

14   this -- what we claim is unsettled nonproducts coverage.

15           It would appear from what we now know, Your Honor,

16   that the demand -- the negotiation with Royal started off with

17   a demand, that the demand was with reference solely to excess

18   policies, had absolutely nothing to do with there being any

19   unsettled nonproducts coverage.  We believe, Your Honor, that

20   in the course of the negotiations, there was no mention of this

21   unsettled or allegedly unsettled nonproducts coverage, and

22   that's important to know, Your Honor, because, again, when you

23   look at the disparity between the values of the -- of the

24   coverages here, it would appear to us that the negotiating

25   record amongst the parties will establish that the estate is

Argument - Cohn                                                     52

1    receiving no consideration whatsoever for what is actually the

2    most valuable surrendering of -- of coverage that it -- that it

3    is making.

4              THE COURT:  Okay.  Well, I guess my confusion is that

5    the 1995 settlement for $100.0 million, if it didn't include

6    the nonproducts coverage, settled a face amount that was due of

7    only 10.0 million.  Why would someone pay $100.0 million to

8    settle a $10.0 million face?

9              MR. COHN:  I believe, Your Honor, the coverage also

10   covered defense costs, and I believe that the defense costs may

11   have had no limit on them, which means that --

12             THE COURT:  $90.0 million to recover 10?

13             MR. COHN:  Well, that --

14             THE COURT:  That's a lot of defense costs, Mr. Cohn.

15             MR. COHN:  Well, Your Honor, if that's -- then, you

16   know, that -- that obviously -- you know, areas -- that goes --

17   that goes to the very question of the -- of extrinsic evidence

18   of what the parties intended under that agreement.  So if --

19   you know, if -- if what you would like to have is a full

20   presentation on that issue as well, in other words, why is it

21   -- why is it that parties would settle for $100.0 million that

22   which has a face value of 10 unless they meant to include this

23   nonproducts coverage, Your Honor, we would be happy to -- to

24   provide that presentation, but, of course, we're going to need

25   appropriate discovery in order to do it.

1          We'll do that on an expedited basis.  We're willing

2     to -- we're willing to take all reasonable steps to do this

3     quickly.  We have -- we have already engaged in -- in the

4     discovery that -- that we've been able to on this issue -- I'm

5     sorry -- on -- concerning the Royal motion, and we'll continue

6     to work very quickly to get this done.  It ought to be possible

7     with agreement and cooperation among the parties to get this

8     done in time for --

9          THE COURT:  Well, isn't --

10         MR. COHN:  -- the August hearing.

11         THE COURT:  Isn't the real issue what the extent of

12    the 1995 settlement was, and to the extent that was the debtors

13    are doing is settling two excess policies and nothing more,

14    then the order should make it clear or the settlement should

15    make it clear that what they're settling is the excess policies

16    and nothing more.  The 1995 settlement is what it is, and if it

17    included the nonproducts, it did, and if it didn't include

18    nonproducts, it didn't, but why does this settlement have to

19    address that issue if what it's doing is settling the excess?

20         MR. COHN:  That -- Your Honor, that's an excellent

21    point.  That really goes to our argument -- to the argument --

22    one of the arguments that we make against the settlement, but

23    that's right.  Why -- why -- if all you're -- if the price is

24    being calibrated and if all you're -- if all the benefit to the

25    estate is getting is the $5.8 million, that's a good forecast

Argument - Cohn                                             54

1    of what would be paid anyway under the excess policies, that's

2    right.  Why -- why give up this potentially, you know, tens or

3    hundreds of millions of dollars of other coverage?

4            And that -- but that, as I say, goes to the -- that,

5    as I say, is an argument that we'll -- that we'll make on the

6    merits of the Royal settlement.  I'm trying to -- I'm trying

7    to --

8            THE COURT:  But if, in fact, the -- there is an

9    agreement that the settlement only covers the excess, then no

10   discovery is necessary, because I think you're in agreement

11   that the 5.8 million is a fair price for a settlement of those

12   excess policies.

13           MR. COHN:  No, Your Honor.  What -- what Royal gets

14   is a -- is a release that covers the unsettled nonproducts --

15           THE COURT:  Right.  What I said is --

16           MR. COHN:  -- coverage if it exists.

17           THE COURT:  I think what I said is if that release is

18   not in there and -- as to the 1995 settlement, whatever that

19   is --

20           MR. COHN:  Right.

21           THE COURT:  -- and the only thing that's being

22   settled is the excess policy coverage, then you don't have any

23   problem with a release on the excess policies in exchange for

24   5.8 million.

25           MR. COHN:  I would be delighted with that,

1    Your Honor, but that's --

2              THE COURT:  Then let me hear why we're doing

3    something more than that first.

4              MR. COHN:  Thank you, Your Honor.

5              THE COURT:  Because I -- frankly, I don't understand

6    why we're doing more than that either.

7              MR. BERNICK:  This is relatively simple, Your Honor,

8    and I'm happy to go through this in more detail, but

9    Mr. Schiavoni is back there and knows this in much more detail

10   than I do, but from the debtor's point of view, the story is a

11   very, very simple story.  Our people have been deposed on this

12   already.  The record is there.  That's why --

13             THE COURT:  But they either got releases already on

14   those settlements or they don't.

15             MR. BERNICK:  Yeah.  Well --

16             THE COURT:  There is no need to incorporate that

17   release here in exchange for what may appear to be no -- no

18   additional consideration.  So why?  So why are we complicating

19   this record?

20             MR. BERNICK:  That's all Mr. -- that's all Mr. Cohn's

21   gloss.

22             THE COURT:  Well, it's mine too.

23             MR. BERNICK:  Well, but it's their -- there is no

24   facts.  He just said it.  He just said it, and facts are these.

25   The '95 policy was settled.  It included everything, and we can

1    go through the --

2              THE COURT:  Then you don't need another release.

3              MR. BERNICK:  What?

4              THE COURT:  Then you don't need another release.

5              MR. BERNICK:  No, but what --

6              THE COURT:  If the 1995 settlement included

7    everything on the primaries, then it is what it is.

8              MR. BERNICK:  It is what it is, but we all know that

9    in the context of litigation over coverage, particularly in a

10   mass tort context, there is always some element of uncertainty.

11             THE COURT:  Yeah.  That's the way it is.

12             MR. BERNICK:  And -- well, there is an element of

13   uncertainty, and an insurer, any company, any company in the

14   context of settlement has the opportunity to ask for a release

15   and ask for a release that is designed to reduce uncertainty.

16   That is part of the bargaining process.

17             So no.  We're not going to make the representation

18   that the only thing that was settled was the excess policies.

19   The excess policies were the principle value that was left was

20   the possibility of getting coverage on the excess policies.

21             THE COURT:  Then I need something, some evidence

22   that's going to show me that this is a fair settlement, because

23   to the extent that the 1995 settlement provided a settlement

24   for all primary policies, it did, and Royal already has a

25   release to that extent.  To the extent that there are now two

1    more policies that you're trying to settle, frankly, I don't

2    see a basis --

3              MR. BERNICK:  Well --

4              THE COURT:  -- for backing up without some additional

5    consideration, and then I need to know how is the consideration

6    being addressed so that I can determine that, in fact, the

7    settlement is in the best interest of the estate.

8              MR. BERNICK:  Okay.  Let me just back up for a

9    second.  First of all, with respect to Mr. Cohn -- respect to

10   Mr. Cohn, Mr. Cohn by his own admission is focused on the

11   nonproducts coverage --

12             THE COURT:  Yes.

13             MR. BERNICK:  -- because his clients have nonproducts

14   claims.  With respect to what the settlement agreement says,

15   the settlement agreement could not be clearer, and Your Honor

16   already has --

17             THE COURT:  Which settlement?

18             MR. BERNICK:  This is the 1995 settlement agreement.

19             THE COURT:  All right.

20             MR. BERNICK:  And the recitals pick out and talk

21   about asbestos related claims.  Here is the definition.

22             "Damages for injury or damage to buildings and

23             property allegedly caused by asbestos [not just

24             asbestos products] asbestos or asbestos containing

25             materials, all such injury claims and related

Argument - Bernick                               58

1          lawsuits as asbestos related claims."

2          And then bodily injury --

3          "Bodily injury, sickness, disease and/or death as a

4          result of an exposure to asbestos or asbestos

5          containing materials."

6          It's not just products.  It's anything, and that

7     obviously would pick up the -- the claims for -- for exposures

8     that are not based upon a product.

9          The specific release by Grace says -- it's a release,

10    blah, blah, blah, blah --

11         "...for any claims, liabilities...which Grace has or

12         may have against Royal in any way related to the

13         New York primary action and/or payment or handling of

14         asbestos related claims and other product claims

15         under the primary policies."

16         It's as broad as broad can be.

17         THE COURT:  All right.  So then you don't need the

18    additional release in this one.

19         MR. BERNICK:  Well --

20         THE COURT:  You're shooting yourself in the foot,

21    Mr. Bernick.

22         MR. BERNICK:  Mr. Cohn first -- Mr. Cohn first, and

23    then we'll -- we'll deal with this issue, but let's get --

24    let's get the basic -- entire agreement.  Couldn't be clearer.

25    There is a merging clause here.  This closes it out.  This is

1   the deal.  There is not a single piece of testimony that says

2   that this was not the deal.

3          He says there is ambiguity.  There is no ambiguity.

4   The parole evidence rule does not apply.  Nonproducts coverage

5   is gone as of 1995.  Full stop.

6          Mr. -- Mr. Cohn's interest in this whole matter

7   vis-a-vis his clients is gone full stop.  There is no incipient

8   interest that he can have through his current clients in

9   property that no longer is there because it's been resolved.

10          So Mr. Cohn waltzes away, and Your Honor now has a

11   remaining concern with the fairness of the settlement that now

12   is before the Court.

13          Now, before the Court today, we have a settlement.

14   The settlement takes out the litigation risk that Arrowood

15   faced with respect to its excess policies.  At that time, there

16   is then a question of well, what else is there that might be

17   residual for any reason.  Not just nonproducts.  It could be

18   anything, and certainly, any client has the opportunity to ask

19   for a broad release.  Maybe belt and suspenders is a broad

20   release.

21          The remain -- and there can't be a question but that

22   as a matter of contract and settlement, this happens every day

23   of the week.  The boilerplate language on the broad nature of a

24   release is something that is used -- you know, it's always

25   used.  It's not confined.  It's not confined to some narrow

1    construction of the subject matter.  It is designed to be broad

2    in order to cover the unforeseeable, to recover -- to cover

3    arguments that might be made, whether they're nonproducts or

4    not.

5           THE COURT:  In a coverage court, not here.

6           MR. BERNICK:  No.  Well, I don't -- I think,

7    Your Honor, really, the only remaining question is the adequacy

8    of the consideration that is paid.

9           THE COURT:  Uh-huh.

10           MR. BERNICK:  So you say $5.8 million.  Mr. Cohn

11    doesn't know and there is no record before the Court that said

12    that well, $5.8 million was negotiated in resolution purely,

13    narrowly, and simply of the risk to the excess policies.

14           THE COURT:  Which is what I just said.  I need some

15    evidence --

16           MR. BERNICK:  Well --

17           THE COURT:  -- that shows me --

18           MR. BERNICK:  -- but --

19           THE COURT:  -- that it's reasonable.

20           MR. BERNICK:  To the -- no.  The question is whether

21    the release that was obtained is reasonably -- reasonably

22    supports the -- or it's reasonably supported by the

23    consideration.

24           There is no -- there is no magical number that says

25    the excess policies alone were worth $5.8 million.  The deal

1    that got struck was a deal that says in exchange for the full

2    package, which is Arrowood walks away and walks away forever,

3    the price is $5.8 million, and there is a record that says that

4    it's reasonable, and the record is robust and the record

5    doesn't require the allocation of -- well, this amount for the

6    excess policies, this amount for residual risk, this amount for

7    whatever, this amount for the costs -- the costs of litigating

8    the matter --

9              THE COURT:  That's right.

10             MR. BERNICK:  -- which are also considerable, this

11   amount for getting peace with Mr. Schiavoni.  I mean, you know,

12   look, there are real, real issues here.

13             Okay.  So we get -- we get peace.  Grace gets peace.

14   Grace gets the value that is -- is on the table, and there are

15   a whole series of considerations.  Your Honor, the record is

16   plain.  It's in there in black and white in the declarations

17   that have been provided that say here are all the different

18   things that the estates and the creditors get for this, and

19   it's not just the litigation prospect against the excess

20   policies.  You can't -- you can't parse or quantify monetarily

21   all of these different intangibles.  They are there.  They are

22   the price.  They are part of peace from Arrowood, and the price

23   is $5.8 million, and the record, Your Honor, could not be more

24   robust.  Where does it come from?  It comes from Mr. Horkovich,

25   from Anderson, Kill.  It comes from Caplin and Drysdale that's

1    done this about a gagillion different times, and it comes from

2    Mr. Schiavoni who's done this a lot.  You couldn't have more

3    capable people negotiating this package.

4         Mr. Cohn now comes in, and he says well, I can't take

5    issue with Mr. Schiavoni.  I can't take issue with Caplin and

6    Drysdale.  I can't take issue with Horkovich.  I tried to take

7    issue with the 1995 settlement.  That goes nowhere, but he says

8    now I want a little ledger where you have the excess policies

9    were for 5.732, intangible one was $28,000 and intangible two,

10   $29,000.  It doesn't work that way.  We're not required to do

11   it.  The process doesn't work.  You don't do deals on that

12   basis.  You do deals as packages.

13        So he is imposing -- he is importing, and I think

14   he's gotten a little traction with Your Honor, maybe a lot of

15   traction with Your Honor, that somehow, in accounting for the

16   reasonableness of a settlement, you have to force into the mold

17   of dollars and cents each element of --

18             THE COURT:  Oh, no.

19             MR. BERNICK:  -- of value.

20             THE COURT:  No.  I don't think I ever have said

21   something.  I said that I want some evidence as to why this

22   settlement is in the best interest of the estate when it

23   appears to incorporate a release that the debtor has already

24   given from the perspective of the plan proponents for something

25   that the debtor already was paid for.

1          MR. BERNICK:  No.  No.  The release --

2          THE COURT:  So where is there --

3          MR. BERNICK:  The release --

4          THE COURT:  -- additional consideration?

5          MR. BERNICK:  The release is there.

6          THE COURT:  Mr. Bernick.

7          MR. BERNICK:  I'm sorry.

8          THE COURT:  Where is there additional consideration

9    even necessary when the debtor has already given a release,

10   which is what the debtor is telling me.  The 1995 settlement

11   incorporated a release.

12         MR. BERNICK:  Okay.

13         THE COURT:  And the debtor got $100.0 million as --

14   in the exchange for that settlement.

15         MR. BERNICK:  Assume that there is no value in the

16   5.8 for that.  Assume that it's gone, it's history, that it's

17   already happened.  The five point --

18         THE COURT:  Then the question I need is --

19         MR. BERNICK:  Yes.

20         THE COURT:  -- why is it necessary, because this

21   additional litigation risk I can't see.  If that policy is as

22   clear as everybody thinks it is --

23         MR. BERNICK:  There is nothing --

24         THE COURT:  -- then there is no additional litigation

25   risk.

1          MR. BERNICK:  The nature of the release is not in

2     some fashion -- I'll be corrected if I'm wrong on this.  Okay.

3     I'm wrong on it already.  I'm going to defer -- but the point

4     of the matter is that all of these different things are

5     intangibles, and nobody is saying to the Court that there is X

6     additional money that got paid to make sure that there was a

7     belt and suspenders on the old 1995 release.

8          What they're saying is it's $5.8 million.  That was

9     the bottom line number.  There is no separate ledger in the

10    settlement that says X's for this, Y's for this, Z's for this.

11    There is a -- there is a -- there is a -- an overall package

12    that gives final peace to Royal/Arrowood.  It costs

13    $5.8 million, and the reasonableness of it is established from

14    the process that was gone through to reach it.

15         Now, does it include this?  It includes it.  It

16    includes potentially kinds of other risks, all kinds of other

17    benefits.  There is no reason to exclude it.  Why would you

18    exclude it?

19         THE COURT:  If it's going to buy peace with the Libby

20    claimants because you don't need it, why would you include

21    it --

22         MR. BERNICK:  It's not -- it's not --

23         THE COURT:  -- when you already have it?

24         MR. BERNICK:  Well, because  God knows, the world is

25    always uncertain.  I don't think it defeats the reasonableness

1    of the settlement.  Why -- I mean, I don't even understand.

2    Let's assume -- let's assume that -- let's assume that --

3              THE COURT:  How can you settle something you've

4    already settled?  I guess that's the bottom line.

5              MR. BERNICK:  Well, it's not --

6              THE COURT:  You're telling me you've already settled

7    this issue, and now as -- as a part of another settlement which

8    is drawing objections, you're resettling --

9              MR. BERNICK:  They get --

10             THE COURT:  -- the same issue.

11             MR. BERNICK:  They get 520 -- they get the best

12   protection in the world.  They get 524(g) in insurance junction

13   protection out of a Bankruptcy Court that wraps this thing up.

14   I've got to tell you, I'm not -- I don't represent Arrowood.

15   I've never -- I don't think I've ever --

16             THE COURT:  But they'd get that --

17             MR. BERNICK:  -- represented an insurance company.

18             THE COURT:  -- based on the 1995 settlement.

19             MR. BERNICK:  What?

20             THE COURT:  They'd get that on the primary policies

21   based on the 1995 settlement.  That's the debtor's position.

22             MR. BERNICK:  I'm sorry, Your Honor.  I've

23   represented a lot of different companies that faces asbestos

24   liability situations, and wrapping this into a 524 injunction

25   and plan is as good as gold, and it's better than that.  It's

1    better, because it's subject to enforcement by a court that has

2    sole and exclusive jurisdiction for now and forever.  You're no

3    longer -- if somebody comes back in -- you know, in State Court

4    with some kind of direction action statute and files a lawsuit

5    against Arrowood, it's -- it's oh, let me argue now whether, as

6    Mr. Cohn says, whether this is ambiguous or not, whether we're

7    going to have parole evidence or not.

8         No.  You -- we don't have to make the argument.  They

9    don't have to make the argument in State Court.  It's -- it's

10   go directly to go.  There is a 524 -- there is an injunction

11   coming out of a Federal Court that says you shouldn't be here

12   with your direction action claim, period.

13        Boy, if I were representing a company that had that

14   situation, and I do, not an insurance company, I want the

15   524(g).  I'd pay for the 524(g).  God knows, we are paying for

16   the 524(g) so that we don't have to face State Court litigation

17   all over the place.

18        I mean, Your Honor heard for the chorus over here,

19   and now we'll hear it again.  They say well, you know, what

20   might happen in some Godforsaken part of a State Court in the

21   United States of America.  Well, Mr. Schiavoni is of like mind.

22   His client also is an insurance company, and they're concerned

23   about exactly the same kind of risk.  So they say I like

24   524(g), I want -- I want the full protection that is available

25   under the law in this court and there is added value to it.

1   What was that value?  I have no idea.  I don't think anybody

2   quantified it, but it is part of the package that was

3   purchased.

4        So the Mr. -- the Mr. Cohn argument that says oh,

5   it's ambiguous and oh, this or that, I can see him making that

6   argument in Libby.  He will make the argument in Libby.  That's

7   why he's standing up and talking, because he'd rather say well,

8   we're here in Montana now on some kind of claim outside of the

9   bankruptcy and well, gee, you know, that 1995 thing is

10  ambiguous, let's go relitigate it in Libby, Montana.

11       THE COURT:  Okay.  Let me hear from Mr. Schiavoni

12  about one thing.  I don't know the effect on the settlement of

13  the fact that the company -- the insurance company is in

14  runoff.  So if you could explain to me how that factors into

15  this settlement proposal, I would appreciate it.

16       MR. SCHIAVONI:  Your Honor, it goes directly to one

17  of the Martin factors, which is the collectability, the risk of

18  collectability.  We put in an affidavit an we also have here an

19  executive from Arrowood who, if called to testify, is prepared

20  to confirm that Arrowood is in runoff.  It ceased writing

21  insurance policies some time ago.  Its ratings in -- in Moody's

22  and S&P and what not were withdrawn.

23       This is an issue that goes to fundamentally would

24  this -- you know, would this coverage be collectible out in the

25  future.  It enhances the value of any current settlement,

1    because if Arrowood isn't there five or six years from now, a

2    current settlement now that puts money in the trust that

3    resolves other Arrowood issues is of more value now.

4           And, Your Honor, I hope that answers your question,

5    but just to pick up on -- on a point that Mr. Bernick -

6           THE COURT:  Well, I don't know the timing issues, I

7    think Mr. Schiavoni.  I simply don't know.  I understand the

8    concept of runoff, but over what period of time is some runoff

9    likely to take place?

10          MR. SCHIAVONI:  Let me explain what I think it means

11   in this context.  Arrowood ceased doing active business,

12   writing -- bringing in new revenues some time ago, a fair

13   amount of time ago it really wrapped up its operations.  The

14   runoff they hope to complete as soon as possible.  They are

15   faced with claims on a current basis, but to the extent they

16   have long tail claims, yes.  They'll be faced with claims going

17   out, you know, for some period of time, but they're looking to

18   wrap up the runoff as -- as quickly as humanly possible.

19          THE COURT:  All right.

20          MR. SCHIAVONI:  There is no -- there is no set date.

21   They're -- they're operating under the -- the direct guidance

22   of the Delaware Insurance Department.  They're subject to very

23   -- you know, to periodic quarterly reviews of where they are.

24   They are directed to try to resolve claims as -- as quickly as

25   they possible, as they have now.

1          The real point though is that this is not Zurich.

2    This is not Travelers.  We are not backed by billions of

3    dollars of new ongoing revenues coming in.  This is a very,

4    very defined entity.

5          It -- to some extent, you may have heard some

6    arguments like this in connection with Equitoss (phonetic), the

7    London market carriers, but this is a -- compared to Equitoss,

8    this is almost like a fly on the back of an elephant.  It's a

9    very, very, very small company with very, very limited assets

10   which, in fact, Judge when they made the 1995 settlement, it

11   was an attempt to resolve at that point, because they were out

12   of -- they were effectively out of business, it was an attempt

13   looking forward to resolve the entire package of all asbestos

14   liabilities in a fair way.

15         That's what they tried to do then.  They thought they

16   were completely done at that point.  It is absolutely essential

17   from Arrowood's point of view that we leave with any settlement

18   with the debtors with finality, not just because that's what

19   just -- people always want, but it's because especially given

20   the position that we're in and the fact that we've got to

21   report back to the Delaware Insurance Department about where we

22   are, that we need to sort of check these off that this one is

23   done and we can move on.  There is no residual risk.

24         On this issue of consideration, I don't think you've

25   got the full picture if you're focused on the $5.8 million as

1    -- as the driving consideration here.  This is a package, as --

2    as everyone has referred to, but the rest of the package there

3    is tremendous value in.

4           We have a proof of claim outstanding against the --

5    the debtor.  We also have under the terms of the 1995

6    settlement indemnification for that $100.0 million.  We also

7    have a whole series of contractual rights that go to issues

8    about no claims being tendered to us in the future.

9           Many of the types of issues that are in that contract

10   drive objections that we had otherwise advanced to the plan

11   and, in fact, drive objections that other settled -- previously

12   settled insurers had.  We are settling as part of this

13   settlement the entire package of our objections against the

14   plan, that -- we -- we are normalizing those as part of this.

15   That is of real value, and other courts have found that is of

16   real value.

17          Equally, if not more important, we are compromising

18   the proof of claim.  When the -- you know, Mr. Cohn sort of is

19   of the view that well, you make $100.0 million payment under a

20   settlement, and then he can sort of come by and shake us down

21   on some sort of threat that maybe this deal isn't good enough

22   and, you know, we're just dumb enough to sort of pay twice.

23          When the deal was done in the first place, the

24   parties did what good lawyers do.  They put in the deal.

25   They're like we're giving you $100.0 million, but should any

1    more claims get tendered to us or people come back to us,

2    basically, we have claims back against the estate on that.  We

3    are normalizing, resolving all of those.  There is huge value

4    there.

5          I don't -- I would tell you with respect to the

6    monetary consideration that from Arrowood's standpoint, these

7    excess policies -- we joked during -- during the settlement

8    negotiations that they're so high and so late, that even on a

9    sunny day in San Francisco, you can't see those policies.

10   Okay?

11         We don't think -- this is Arrowood.  I will tell you

12   that the debtors and the claimant's lawyers are viewed

13   aggressively, that they should get as big a dollar number as

14   possible, but from Arrowood's perspective, no money was owed on

15   those excess policies or would be owes for decades because they

16   were so high.  $7.5 million of the -- of the excess that was at

17   risk, that was 75 percent of it, was excess of $150.0 million.

18   That would have meant that if you spread the claims over 20 or

19   30 years, they would have had to have burned through like

20   $4.0 billion before they'd touch that money.  I'm not aware of

21   any trusts that as of this date have actually spent that --

22   anywhere near that realm of money.

23         So the dollars we think were not necessary here for

24   any other reason to just -- other than to drive a package

25   settlement.  The -- the deliver of the proof of claim release,

1    the -- the -- the resolution of the contractual claims are all

2    of huge, huge value.

3            Now, on this issue, Judge, about what discovery was

4    provided and what record the -- that there is to support the

5    fairness of the overall settlement, and I would say not -- if

6    you want to include in that package was the '95 settlement

7    fair, well, is there proof of that in the record, and the

8    answer is absolutely yes, there is.

9            We put in a declaration from myself, Your Honor.

10   It's quite detailed.  I'm prepared to -- if called to testify,

11   to verify that the -- all the facts in that declaration are

12   accurate.  We have our entire negotiating team here.  Mr.

13   Pernicone is prepared to take the stand and testify --

14           THE COURT:  Well, as to the 1995 settlement, there is

15   no issue about the fairness.  That's been approved.  That's a

16   done deal.  I don't see any issue about fairness in that

17   capacity, and I'm aware of the -- of the declarations, and I

18   have read them all.  So I don't think the issue with respect to

19   the negotiations and so forth that led to the 5.8 million is

20   the issue.

21           The issue is whether or not a release that actually

22   goes back to the 1995 nonproducts coverage should be

23   incorporated in this agreement, and I was forgetting, frankly,

24   the fact that there are the other additional aspects of

25   consideration that are valuable to the debtor in addition to

1     the funding, and I appreciate the contingency nature of the

2     funding as -- as well, the 5.8 million as well in terms of how

3     late an excess policy this is.

4              So I can stop you on the negotiation side.

5              MR. SCHIAVONI:  Well, Judge, let me just -- just tell

6     you one other thing that's in the record as far as -- that

7     hasn't been talked about.  On the '95 settlement, three

8     witnesses were produced by the debtor already, Mr. Posner,

9     Mr. Hughes, and Mr. Finke. They were all questioned about that

10    settlement, how it worked, what the coverage was under it, how

11    it was negotiated, was it at arms length, et cetera, and --

12             THE COURT:  You mean produced for discovery in this

13    case.

14             MR. SCHIAVONI:  Yes.  Absolutely.

15             THE COURT:  Now.  Okay.

16             MR. SCHIAVONI:  Because it is one of their

17    confirmation objections, I guess, that somehow, that settlement

18    wasn't fair.  They sort of -- I don't -- and frankly, I don't

19    understand the objection, but it was raised in connection with

20    their -- their papers.

21             So they had an opportunity to take that discovery

22    during plan confirmation, and, in fact, they did, and, in fact,

23    a very detailed record was elicited in connection with those

24    depositions.  Arrowood -- and that record is totally and

25    completely in support of -- of three things, one, that the 1995

1   settlement was a full and complete settlement of all asbestos

2   claims; two, that the settlement was negotiated at arms length

3   and in good faith; and three, that that was a reasonable

4   settlement at the time by the parties given all the

5   circumstances that took place.

6          You can -- Arrowood designated that testimony from

7   Mr. Posner and from Mr. Hughes and to the extent there is a

8   short reference to Mr. Finke in connection with the phase one

9   confirmation hearing.  That -- I consider that effectively in

10  the record.  It's cited in support of the debtor's motion, and

11  it's cited in our -- in our reply papers.  It is part of this

12  record in support of the overall fairness of the overall

13  settlement here, that the -- the original consideration that

14  was paid was fair, that this now is wrapping this all up and

15  tying it down and resolving it all as part of one single deal.

16         And, Judge, I would like to add one other thing.  We

17  went a step further than.  All right?  When Mr. Cohn for the

18  first time raised this notion that well, he didn't think he had

19  enough discovery about whether or not the last settlement was a

20  full settlement, we said well, hell, we'll go out and we'll

21  bring -- we'll give you the person who signed the settlement

22  for us, we'll offer him for deposition, and I even went so far

23  to say you have questions about the current settlement and how

24  the two deal with each other, I'll offer myself.  I was a chief

25  negotiator.

1          And, Judge, we offered it.  He -- Mr. Cohn declined

2     to come to the deposition.  I then went so far as actually to

3     notice my own deposition and to notice Mr. Ken Hooper's

4     deposition.  I was able to sell a few tickets to my deposition,

5     but one I was not able to sell was to Mr. Cohn.  He refused to

6     come not just to my deposition, but he refused to come to the

7     deposition of Ken Hooper who signed the '95 settlement.

8          Mr. Posner signed the '95 settlement for Grace.  He

9     had a full, total, complete opportunity to ask him any

10    questions he wanted about the fairness of that settlement, the

11    finality of it and everything else.  The record that came out

12    is the record that he stuck with.

13         The one beef he seems to have now is that he doesn't

14    have drafts of the '95 settlement, but, Judge, we've given him

15    the final settlement.  It has an integration clause in it, and

16    in addition to that, Judge, the parties here, we have testimony

17    from the fellow who signed it, Mr. Posner, for Grace.  He

18    testified that that settlement was full and final and complete

19    and covered all asbestos related claims.

20         We have the offer of the testimony from Ken Hooper,

21    the Arrowood person who signed it for us who says the exact

22    same thing.  We also produced -- and I won't give you the cites

23    unless you want them, but they're in -- they're in the briefs.

24    We produced contemporaneous letters that these two gentlemen

25    exchanged between each other at the time of the settlement that

1    say that it was a complete settlement and it covered all

2    asbestos related claims.  We also have --

3            THE COURT:  So your position is that even -- even if

4    the drafts exist and even if they said something to the

5    contrary, the testimony of the witnesses is that their intent

6    was to settle everything.  So to the extent that it was somehow

7    left out of the 1995 settlement, that would have been a mutual

8    mistake.

9            MR. SCHIAVONI:  I would go a step further, Judge.  I

10   would say that the law in this circuit -- and I'm going to

11   quickly try to find the case -- is that when two parties to a

12   contract agree -- are in accord as to its meaning, that

13   evidence -- extrinsic evidence in that circumstances is not

14   permitted --

15           THE COURT:  Yeah.  That is --

16           MR. SCHIAVONI:  -- as a matter of law.

17           THE COURT:  I think that is the law in the circuit,

18   but none -- whether it is or not, I'm having a little bit of

19   difficulty understanding where the 1995 settlement is ambiguous

20   anyway.  That's one reason.  I don't know why the additional

21   release is needed, because I don't think it's ambiguous.  But

22   okay.  I understand.

23           MR. SCHIAVONI:  Well, I'm not going to be arguing

24   with a judge.  God, if I said anything to suggest it was

25   ambiguous, I mean, that's --

1            THE COURT:  All right.

2            MR. SCHIAVONI:  -- not where I'm going either.

3            THE COURT:  Let me hear from Mr. Cohn.  I understand

4    your arguments.  I think I need to see whether or not there is

5    -- oh, Mr. Guy, I need to find out whether there is some need

6    for discovery.  I'm not necessarily convinced there is.

7            MR. SCHIAVONI:  Your Honor, there is just one last

8    point.  There is also -- I mean, this Court has issued ruling

9    -- many, many rulings about drafts not being discoverable, and

10   there is all sorts of good policy reasons --

11           THE COURT:  Well --

12           MR. SCHIAVONI:  -- behind that.

13           THE COURT:  -- plan drafts.  You know, I keep --

14   everything keeps expanding.  I've been talking about plan

15   drafts, but regardless of that fact, to the extent that

16   producing drafts would, in fact, show something to the contrary

17   here, assuming they exist, I think you're correct.  The

18   witnesses have pointed out that their intent was to settle all

19   coverage and that they interpret this policy as having done

20   that, and the parties to the document are uniform in that.  I

21   don't have a dispute between the parties regarding the intent

22   of the 1995 settlement.

23           MR. SCHIAVONI:  Thank you, Your Honor.

24           THE COURT:  Mr. Guy?

25           MR. GUY:  Thank you, Your Honor.  I think Your Honor

1    is already there on the drafts as to the 90/95 settlement.   If

2    we thought it was unclear, we would have made --

3                THE COURT:  I can't hear you, Mr. Guy.  I'm sorry.

4                MR. GUY:  I'm sorry, Your Honor.

5                THE COURT:  Yeah.  I apologize, but that microphone

6    is just not working well.

7                MR. GUY:  Your Honor, on the drafts of the 90/95

8    settlement, you're already there on that I can see.  The

9    document is clear.  If we thought it was unclear, we would have

10   negotiated differently.  We didn't think it was unclear.

11               On the negotiations for this settlement that is

12   before you today, Mr. Schiavoni made himself available, and

13   Mr. Cohn didn't ask him any questions, didn't even take his

14   deposition.  So he's had that opportunity.  We don't think it's

15   appropriate to get into the negotiations between the parties

16   for settlements that are coming before you today.

17               I recognize it's not the plan, but we're trying to

18   negotiate with multiple parties right now in advance of

19   confirmation so we can streamline the confirmation and get this

20   debtor out of bankruptcy.  It can't be the case that a party

21   who comes in and says well, I want to imagine the settlement in

22   '95 said something different and therefore, I want discovery of

23   what you agreed to, what the parties agreed to in the context

24   of a settlement agreement that's before you today that is plain

25   on its face.  Both of them -- no one is arguing the settlement

1    that's before you today is ambiguous.

2           Your Honor, on the consideration which is your

3    crucial question, and I think this is going to neutralize the

4    need to get to the merits of the motion, and we'll go back to

5    it if you need more, but Royal is giving up its rights, its

6    indemnification rights under the 90/95 settlement.  That is

7    huge, absolutely huge.  There is plenty of consideration for

8    what you have before you without even getting into the other

9    issues that Mr. Schiavoni raised.

10          THE COURT:  I think that adds a -- quite a bit of

11   value over and above $5.8 million.

12          MR. GUY:  Thank you, Your Honor.

13          THE COURT:  Mr. -- Mr. Laughlin.

14          MR. LAUGHLIN:  I have one point to make, Your Honor.

15   You've been pointed out to all of the evidence, including

16   nobody bothered to mention that I got deposed on this

17   settlement.  That's a first.  That's been educed in favor of

18   the favor of the fairness of the settlement.

19          Mr. Cohn has done one thing that at least initially

20   seemed to be getting traction with Your Honor, which is he's

21   come in here and said well, I think that $5.8 million is fair

22   amount for the excess policies, but, you know, how much are you

23   getting for the release, et cetera.  There has been a lot of

24   discussion that you listened to about it's a package deal, and

25   certainly, Mr. Schiavoni has made it quite clear that whether

1    you want to call it belt and suspenders or otherwise, he was

2    adamant that he get a court approved blessing of the scope of

3    the release.

4            Remember, the 1995 agreement is just an agreement

5    between two parties.  This is -- this is an additional step, as

6    Mr. Bernick pointed out, but there is one thing that's

7    absolutely lacking here with respect to Mr. Cohn, which is the

8    stuff about $5.8 million a good deal for the excess only.

9    That's just lawyer talk.  He has not put on a declaration --

10                   (Microphone feedback)

11           THE COURT:  I'm sorry.

12           MR. LAUGHLIN:  He has not tendered a witness, a

13   declaration --

14                   (Microphone feedback)

15           THE COURT:  Pardon me.  Whoever is on the phone who I

16   don't know what you're doing, but it's causing a lot of

17   feedback.  If the Court Call operator is on, can you please

18   mute those lines?

19           OPERATOR:  Yes, I will, Your Honor.

20           THE COURT:  Thank you.  I'm sorry, Mr. Laughlin.

21           MR. LAUGHLIN:  As an objector, if he's going to come

22   in here and assert that he's valued this package in some way

23   differently from what the plan proponents valued it, which is

24   5.8 million for a package of give-ups on both sides, he's got

25   some obligation to tender that.  He hasn't.

1       So all we have now is alleged opinion, alleged facts

2   from somebody who's put it in a brief and making oral argument

3   on it, and that's simply not enough under any rule of evidence

4   that I'm aware of to create an issue -- a triable issue of fact

5   or an issue of disputed fact.

6       I mean, he -- he -- they had ample opportunity to

7   produce a witness if they were going to do so, whether it be an

8   expert or a fact witness or what have you, and they totally

9   failed to do so.

10      MR. CARIGNAN:  Again, for the record, James Carignan

11  of Pepper, Hamilton for BSNF Railway.  I'd like to respectfully

12  move the admission of my colleague, Linda Casey, pro hac vice.

13  Papers haven't been filed yet, but they are prepared and we'll

14  file them this afternoon.

15      THE COURT:  All right.  Ms. Casey, where are you

16  admitted?

17      MS. CASEY:  I'm admitted in the states of

18  Pennsylvania, New York, and New Jersey.

19      THE COURT:  And are you in good standing?

20      MS. CASEY:  Yes, I am.

21      THE COURT:  All right.  You're admitted for today.

22  Thank you.

23      MS. CASEY:  Thank you.  Your Honor, as you pointed

24  out, the settlement agreement does not just settle the

25  quote/unquote newly discovered excess policies, the high level

1      policies.  The settlement agreement, which is 36 pages long,

2      goes through in great detail to insure that the 1995 settlement

3      release, as purported by the parties, is judicially approved as

4      in the best interest of the estate.

5              BNSF has throughout the confirmation process all the

6      way back in December asserted that it has rights in these

7      policies, that, in fact, there are endorsements that

8      specifically relate to the debtor's obligations to indemnify

9      BNSF.

10             THE COURT:  Well, what the endorsements do is say

11     that the insurance company will pick up the debtor's indemnity.

12     It doesn't give BNSF any rights under the policies.  It simply

13     determines who's going to pay the indemnity obligation.

14             MS. CASEY:  Well, there is two issues on that.

15     First, there are -- there is case law that says that when there

16     is this type of endorsement that specifically protects BNSF, it

17     becomes an additional insured, and secondly and more

18     importantly is the indemnifications provided a -- the debtors

19     paid separate policy premiums and obtain separate policy

20     limits, and one of the issues --

21             THE COURT:  There is not a limit.  It's an agreement

22     to indemnify to the extent the debtor is obligated to

23     indemnify.  I didn't -- at least I didn't see a limit.  I'm

24     sorry.

25             MS. CASEY:  Your Honor, if I may, the debtors filed a

Argument- Casey                                          83

1   reply to our objection and included the endorsement from it.

2   It does have a confidential designation on it.  However, it has

3   been filed on the record by the debtors.

4            THE COURT:  Okay.

5            MS. CASEY:  So I'd like to --

6            THE COURT:  All right.  If I may, I haven't seen it.

7   I'm sorry.  If that's the case, I have not seen a limit.  I

8   have seen an indemnity language.

9                         (Pause)

10           MS. CASEY:  You'll see at the --

11           THE COURT:  Yeah.  What I have seen is the language,

12  but not the part that's below.

13           MS. CASEY:  Right.  And about three-quarters of the

14  way down, it has bodily injury liability, $200,000 each person,

15  $500,000 each accident.

16           THE COURT:  Okay.

17           MS. CASEY:  There is no aggregate listed for this --

18  this liability that is specifically relating to the BNSF

19  indemnification obligation.  I am assuming that we are going to

20  the merits of the motion, not just whether the case should be

21  -- gone forward.  However, there is no evidence in the record

22  concerning this specific protection.  BNSF has asserted

23  throughout as, again, from December through today that Royal --

24  Royal Indemnity Company is not entitled to the 524(g)

25  injunction as it relates to the claims against these policies

1    relating to BNSF's indemnification claims, because the

2    settlement agreement could not as a matter of law release

3    BNSF's rights under these policies to the extent we have those

4    state law rights.  To the extent we don't have those state law

5    rights, there is no evidence to suggest that the settlement

6    agreement in 1995 included a provision to pay for the amounts

7    that the debtors are entitled under this policy.

8            In addition, the plan does not have a specific fund.

9    This -- this is not shared proceeds.  Other asbestos creditors

10   are not entitled to these proceeds under these separate limits.

11   The plan doesn't have a specific contribution designated for

12   BNSF for its rights to assert claims against the estate that is

13   protected by insurance, protected by this provision.

14           Prior to the entry into this agreement, BNSF had

15   whatever legal arguments it had.  The 1995 agreement provided

16   whatever it provided, and we would come into the confirmation

17   hearing being able to present any of those arguments to

18   Your Honor.

19           This settlement agreement is more than just belts and

20   suspenders, because it is requiring Your Honor to find that the

21   releases contained in the 1995 agreement are in the best

22   interest of the estate and that they fall within the -- the

23   reasonable parameters for a settlement.  This belt and

24   suspenders is inappropriate under this record, because there is

25   nothing in this record that addresses what the separate limits

1    of liability that do not appear to have an aggregate limit of

2    liability at all for personal bodily injury on the

3    indemnification side.  The record is just simply not adequate

4    at this time to bring in this 1995 release that was never

5    approved by a court and that should not be approved today.

6              This is also -- the settlement agreement requires the

7    debtors to get a 524(g) injunction.  The -- BNSF and other

8    parties have asserted objections to a 524(g) to Royal for

9    various reasons, including the fact that there has been no

10   contribution made directly to the trust under the policy that

11   the contribution made to the trust is not fair and equitable to

12   future claimants and other objections that this settlement is

13   seeking to tie up without the appropriate evidence to

14   demonstrate.

15             The 1995 agreement is what the 1995 agreement is.  It

16   wasn't approved by the Court.  There is no evidence to suggest

17   that there was something that should be -- that this additional

18   release, which is potentially worth several millions of dollars

19   according to the Libby claimants and several million dollars

20   according to BNSF, is appropriate and fair and in the best

21   interest of the estate.

22             THE COURT:  Well, to the extent the claims are

23   asserted against Royal under the 1995 agreement and there is an

24   indemnity obligation on behalf of the estate for those claims,

25   to the extent that Royal is giving up those claims, that is in

1    everybody's best interest it seems.

2            MS. CASEY:  Your Honor, it's -- that appears to be

3    illusory, because if they have a 524(g) injunction which

4    absolutely and completely provides them the best protection

5    ever against anybody ever asserting a claim against them, they

6    would have no indemnification claims to come back to the estate

7    with.

8            THE COURT:  Well, the plan provides for certain

9    indirect claims that can be adjudicated, and those would

10   probably be indirect claims.

11           MS. CASEY:  Well, the -- to the extent that Arrowood

12   would have an indemnification claim, it would be an indirect PI

13   claim to go against the trust.

14           THE COURT:  Right.

15           MS. CASEY:  My point, however, is that it would be

16   getting a 524(g) injunction absolutely prohibiting any party

17   from asserting a claim directly against Royal, and all of those

18   claims would be channeled to the trust.  So the value of those

19   indirect PI claims is zero.  No claims could ever be asserted

20   against Royal, because 524(g) prevents it, and, in fact, this

21   agreement specifically provides that any claims that BNSF

22   asserts against BNSF's own insurance policies that are not

23   subject to the -- to the 524(g) injunction, that those

24   indemnification claims by Royal survive this agreement.

25           So the only indemnification claims that could

Argument - Casey/Cohn                                          87

1    reasonably be in existence after the entry of a confirmation

2    order, which includes a 524(g) injunction, are not being

3    waived.  What are being waived are ones that would be

4    eliminated by the very entry of the 524(g) injunction.

5              THE COURT:  Okay.  Mr. Cohn?  That was a long way of

6    getting back to your initial argument, Mr. Cohn.

7              MR. COHN:  Yes.  Well, yes, Your Honor, and what I

8    want to do is finish our --

9              MR. SCHIAVONI:  Your Honor, I would -- I'm sorry.  At

10   some point, I would like to be heard on BNSF's objection.

11             THE COURT:  Yeah.  Actually, I didn't appreciate that

12   I was getting into BNSF first.  So I would like to finish

13   Mr. Cohn's recitation, and then we'll deal with BNSF.

14             MR. SCHIAVONI:  Okay.

15             MR. COHN:  Thank you, Your Honor.  Now, we have heard

16   -- we have heard that this is just -- that some of the things

17   that we're suggesting are just, you know, lawyer talk because

18   there is no record.  Your Honor, the reason that there is no

19   record is because we've been denied discovery.  That's the

20   whole -- the whole point of this.

21             The only thing that you have in the record as of this

22   moment, if it even counts, is you have an affidavit of

23   Mr. Finke.  I did take Mr. Finke's deposition.

24             THE COURT:  Well, the affidavit or declaration of

25   Mr. Schiavoni.

1          MR. COHN:  Yes.  That's true.  The -- the nonestate -
2    - I should have been clearer.  The only thing that you have
3    from the proponents of the settlement on behalf of the estate.
4    mr. -- you know, obviously, Arrowood as the -- you know, as the
5    -- as the nonestate party is always subject to a sort of, you
6    know, me thinks you doth protest too much kind of skepticism.
7          THE COURT:  I don't know why.  I mean, in this
8    instance, to the extent that Arrowood is high an excess carrier
9    as it -- as it professes, and I haven't heard anything that
10   indicates otherwise, there is no basis that Arrowood would be
11   compelled to settle upon but for the fact that the parties want
12   to resolve all of their --
13         MR. COHN:  But --
14         THE COURT:  -- relationship.
15         MR. COHN:  Well, but that was not the position that
16   the estate has taken in the course of these negotiations.
17         THE COURT:  But that's Arrowood's position.
18         MR. COHN:  Right.  Yes, Your Honor.
19         THE COURT:  I mean, parties --
20         MR. COHN:  That's --
21         THE COURT:  -- bargain --
22         MR. COHN:  Of course.
23         THE COURT:  -- from a different perspective.
24         MR. COHN:  Well, of course, Your Honor, and -- and in
25   that regard, Your Honor, the key issue from our perspective and

1  the one that we were talking about earlier, which is why -- you

2  know, why give a release if there is no consideration for that

3  release.  On that subject, Your Honor, I deposed Mr. Finke and

4  -- and asked him the question --

5  "Q   So would you have any knowledge either personally or

6  through those communications with your counsel concerning

7  negotiation of the economic terms of the deal between Grace and

8  Royal?"

9          The witness answers, "No."  No personal knowledge."

10          And I asked --

11  "Q   Do you know whether in the course of the negotiations

12  between Grace and Royal there was any reference made to the

13  Libby claimants' contentions that coverage remains outstanding

14  for their claims under the Royal primary policies?"

15          And the witness says --

16  "A   I do not know that.  No."

17          So the one -- the one person who is tendered as a --

18  as -- as the estate -- as a -- as an estate proponent of the

19  settlement for us to depose turned out to have no personal

20  knowledge in what we regard as the key issue in terms of

21  approval of this settlement, and under these circumstances,

22  Your Honor, the consideration of this motion should be

23  deferred, and we -- the plan proponent should produce whoever

24  it is who is knowledgeable, who -- this negotiation was done by

25  somebody.

1          THE COURT:  But what difference does the negotiation

2     make?  The documents -- both documents, the 1995 settlement and

3     the 2009 agreement are pretty -- I think pretty clear.  I don't

4     see a basis for going behind what the 1995 agreement says on

5     its face.  I don't see a reasonable construction that indicates

6     that it does not also cover nonproducts liability.  It clearly

7     does.  The language of the -- is bifurcated.  The language at

8     one section talks about bodily personal injury and in another

9     section, talks specifically about building premises and other

10    aspects of the coverage.  So I don't know --

11         MR. COHN:  Well --

12         THE COURT:  -- where this is going, because I don't

13    think you get behind the face of the agreement if the agreement

14    is clear, and it seems to me the agreement is clear, the 1995

15    one.  Then to the extent the 2009 agreement is asking for I'll

16    guess retroactive court blessing of the 1995 agreement to the

17    extent that it has to be incorporated into the 2009 agreement,

18    the issue is whether the overall settlement at this point is

19    fair on behalf of the estate and in the debtor's best business

20    judgment.  That is the standard that the Court is to look at.

21         So the debtor is saying Arrowood is in runoff, we

22    don't know how long it's going to be around, we don't know for

23    what period of time anything will be collectible.  We've

24    already received 100.0 million for the direct policies.  These

25    are very high level excess policies.  They're going to pay us

1    an additional 5.8 million, and in addition to that, not expect

2    us to pay back against any claims that we may have to reimburse

3    them for in the event that they ever arise under the settlement

4    that provided the indemnity.  What's not fair?

5                MR. COHN:  Well -- oh, I'm sorry, Your Honor.  If --

6    I thought that we were on discovery.  Obviously, the parties

7    have slopped over into the merits and I'm -- I'm happy to do

8    that, but --

9                THE COURT:  Well --

10               MR. COHN:  -- you have not heard me yet on the

11   merits.

12               THE COURT:  No, I haven't, and that's I think what

13   I'm asking, because --

14               MR. COHN:  Sure.

15               THE COURT:  -- to the extent that the agreements are

16   clear on their face, I don't know that I need -- see the need

17   for discovery.  To the extent that you're -- and I don't hear

18   you contending that the 5.8 million for the excess policies,

19   even if I could bifurcate this and say that 5.8 million is just

20   for the excess, there isn't an objection raised that that's

21   unfair.  Why is it -- why is it not also in the best interest

22   of the estate that the estate get a release of all the other

23   claims that Arrowood may have against the estate in exchange

24   for the 1995 release?  Let's put it that way.

25               MR. COHN:  Well -- well, all right.  The first -- the

1   first thing that we need to talk about, Your Honor, is the --

2   is the -- is the arbitrage between hundred cent dollars and

3   fractional dollars.  If -- if there were to be any

4   indemnification claims, they're going to be paid at 25 to 35

5   cents on the dollar according to the disclosure statement.  If

6   coverage is being left on the table, Your Honor, that could

7   have been pursued, then those are hundred cent dollars.

8           So -- so that -- so that the -- the surrender -- the

9   surrender of an indemnification claim in the face of a

10  meritorious claim for coverage is by definition a bad deal for

11  the estate.

12          THE COURT:  Why?  They've already been paid $100.0

13  million.  You can't --

14          MR. COHN:  Because --

15          THE COURT:  You can't excise out the fact that Royal

16  has already contributed $100.0 million.

17          MR. COHN:  Well -- well, you can, Your Honor, in the

18  sense that -- in the sense that -- that those were -- that was

19  -- that was a prepetition event.  It has nothing to do with

20  whether coverage remains outstanding today.

21          THE COURT:  Well, sure, it does.  If they settled it,

22  it's not outstanding.

23          MR. COHN:  No.  That -- Your Honor, that I

24  understand, and let me -- and let me accept for the moment, you

25  know, we do -- we do disagree about whether the 1995 agreement

Argument - Cohn                                          93

1    settled the coverage, but let's assume for purposes of what I'm

2    about to say that it did and that there is -- that therefore,

3    by its terms, there is no further coverage outstanding.

4           We have cited in our brief, Your Honor, the law not

5    only of the State of Montana, but also the doctrine that

6    appears to be prevalent in other jurisdictions as well, and you

7    see it in the insurance treatises, which says that once the

8    rights of a -- of an injured claimant vest in insurance

9    coverage, the action of the insured and the insurer cannot --

10   cannot settle the coverage out from under the person whose

11   rights have already vested, and that's important here, because

12   the settlement took place in 1995.  By then, the injury to the

13   Libby claimants had occurred.

14          So all those -- all those Libby claimants who had

15   worked at the -- at the Grace facility or had been injured by

16   exposure to people who -- the dust that people brought home on

17   their clothes or just the ambient dust in the Libby -- in the

18   air of Libby, those people who had suffered those injuries had

19   always suffered them before this purported settlement dealt

20   away their rights.

21          Now, under -- under well established principles of

22   insurance law, again, as cited in the brief, those claims still

23   exist.  As of this moment -- as of this moment, but for the

24   automatic stay, the Libby claimants would have the ability to

25   pursue Royal for that coverage and -- and get paid

1    notwithstanding even the 1995 settlement agreement, even

2    assuming that it did by its terms purport to settle this

3    nonproducts coverage.

4           Now, I do -- it's important to -- to note,

5    Your Honor, that when insurers settle products coverage --

6    let's say that you have -- let's say you had $100.0 million

7    limit of products coverage and the insurer paid $100.0 million

8    of claims or settled for 100.0 million or whatever.  That

9    coverage is gone despite people's vested rights.

10          So the vested rights -- the vested rights of -- of

11   claimants matter only when you're talking about coverage where

12   the aggregate limits have not been reached, and -- and that's

13   why you're hearing this argument perhaps for the first time in

14   this case, because the focus here is on this nonproducts

15   coverage which does not have aggregate limits, and because of

16   that, Your Honor, because of that, we -- we have a situation

17   where what is being given up under this settlement with this

18   throw-in kind of release that -- that now extends not just to

19   the excess policies but that's going to now extend to the -- to

20   the nonproducts coverage, what that's going to do, Your Honor,

21   is that's going to take away valuable rights of -- of the Libby

22   claimants, and that's bad for two reasons.

23          first of all, Your Honor, because these are rights of

24   the Libby claimants, they're not property of the estate, and

25   therefore, cannot be taken away, or alternatively, even if they

1    were -- even if it was --

2           THE COURT:  The Libby claimants aren't named insured.

3    I mean, they may be injured, but the policies -- I think in the

4    mass tort context, it's been pretty clear that the proceeds of

5    policies belong to the debtor.  They are -- that is property of

6    the estate.  To the extent that it's going to be committed to a

7    trust, the claims by the Libby entities are going to go to the

8    trust to be resolved.  They're not going to go directly against

9    the insurers.

10          MR. COHN:  Well, and there -- and therein -- therein

11   lies the problem, Your Honor, because what's going to happen is

12   that the Libby -- rights that now under nonbankruptcy law,

13   which the Libby claimants have against the insurer, these

14   vested rights under this policy which -- which will pay --

15   which will pay 100 cents on the dollar to the extent that they

16   establish obviously that they -- the value of their claims,

17   what's now happening -- what's now going to happen as a result

18   of this settlement is that the -- the money is going to --

19   well, first of all, there is no money.  Right?  Because

20   remember, no consideration is being paid for this, but --

21          THE COURT:  They're giving up rights, but okay.

22          MR. COHN:  Well, but the 5 -- the 5.8 million was

23   calibrated solely with respect to the excess policy.  Nobody is

24   -- they're not writing --

25          MR. LAUGHLIN:  Objection, Your Honor.  He's

1    testifying, as I pointed out in my last thing about the 5.8

2    million.

3              THE COURT:  I think the evidence that I have so far

4    indicates that this is a package deal, that there were lots of

5    factors that were considered.  So -- but I think I posited the

6    question.  Let's just assume that the 5.8 is only for the

7    excess coverage.  What is there that benefits the estate for

8    the other release going back to 1995, and to the extent that

9    you could put things in buckets, and I agree you can't, but to

10   the extent you can, one of the buckets would include the fact

11   that Arrowood is giving up the indemnity claims that it has

12   against this estate --

13             MR. COHN:  All right.  So let's --

14             THE COURT:  -- and the fact that it's already paid

15   $100.0 million, only 10 of which can possibly be aggregated to

16   the bodily injury coverage, because that's the limit of the

17   policy.

18             MR. COHN:  Your Honor, once again, we -- I -- that --

19   that I -- that is not correct.  I don't think that's anywhere

20   in the record that -- that the reasons why the price was

21   $100.0 million in 1995, and I respectfully suggest my

22   understanding of it from the materials that I've seen, and

23   again, there point Mr. Lockwood.  I can't testify about this,

24   because I've got not personal knowledge, but we've obviously

25   informed ourselves about this, and the reason for the $100.0

1    million price was not that the -- was not that the -- the

2    products -- I'm sorry -- was not that the nonproducts coverage

3    was being settled.  That's not the delta between 10.0 million

4    and 100.0 million.

5              THE COURT:  All right.

6              MR. COHN:  It's -- it's defense costs.  Now --

7              COUNSEL:  Your Honor --

8              THE COURT:  I'm sorry, but I cannot possibly in good

9    conscience imagine that it would take $90.0 million to recover

10   10.  I can't imagine any court approving that to the extent it

11   goes before a court.  I can't imagine any client approving it

12   to the extent it's just related to a client.

13             MR. COHN:  Well, Your Honor, there is -- I need -- I

14   need to point out there is really nothing -- there is nothing

15   in the record about this.  If that's an important point, we

16   should -- we should have a record on it.

17             THE COURT:  No.  It isn't, because --

18             MR. COHN:  Right.

19             THE COURT:  -- like the current settlement, it's --

20   it is a package deal.

21             MR. COHN:  Right.

22             THE COURT:  So it encompassed whatever it

23   encompassed, but --

24             MR. COHN:  Okay.

25             THE COURT:  -- what is clear from the face of the --

Argument - Cohn                                                98

1    of the settlement is that it encompassed more than bodily

2    injury coverage.

3              MR. COHN:  That's -- Your Honor, you've said that.

4    As I say, we disagree, but for purposes of this argument, I'm

5    assuming -- I'm assuming that what you said is correct.

6              THE COURT:  All right.

7              MR. COHN:  The '95 agreement, let's assume that it

8    did -- that it did purport to dispose of all nonproducts claims

9    as well as -- as well as products claims related to asbestos.

10   We still have those vested rights, and so the effect of this

11   settlement is, if you just pick a number -- let's say that the

12   Libby claimants have $200.0 million of claims.  What happens is

13   that the $200.0 million of potential coverage is being given

14   up, and if you say well, but that's an exchange for release of

15   the indemnification claim, the indemnification claim is worth

16   25 or 35 cents on the dollar.  So it's -- it's -- if you take

17   30 cents, Your Honor, just to make the math easy, you know,

18   what the estate is getting is value of 60.0 million for giving

19   200.0 million, and the --

20             THE COURT:  That's what settlements do.  I mean,

21   settlements make exchanges.

22             MR. COHN:  Well, but that's -- but that's a

23   settlement that by definition is an unfair -- is an unfair

24   settlement, because whatever the numbers are, the estate is

25   giving up three times as much as it's getting.  The --

Argument - Cohn                                                99

1          THE COURT:  That doesn't -- that doesn't make it by

2    definition an unfair settlement.  There are other things, like

3    the risk of recovery.

4          MR. COHN:  Well, those -- those things can

5    legitimately enter into it, Your Honor, but now let me just

6    focus on whose ox is being gored here.  Whose ox is being gored

7    is the Libby claimants.  This -- these are rights that they

8    have outside of bankruptcy to pursue this coverage, and when

9    you talk about in the mass tort context these claims can get

10   channeled to a trust, well, you -- you can -- the reason that

11   claims get channeled to a trust in the mass tort context, the

12   reason they need to be channeled to a trust is because most of

13   those claims -- I'm sorry -- most of the coverage is products

14   coverage where there are aggregate limits, and if you let

15   everybody go out and just chase the insurer, then the first

16   people to get there who will recover, there will be this race

17   to -- to get -- to get coverage, and -- and among other things,

18   it would leave the future claimants whom -- whom Mr. Guy is

19   bound to protect, it would leave them without any remedy

20   against the insurers, and so in order to follow the mandate of

21   Section 524(g) to treat present and future claimants equally,

22   you have no -- you have no choice, and therefore, you have a

23   justification to -- to channel products coverage to the trust.

24          In the case of nonproducts coverage where there is no

25   limit and where anybody can go ahead and pursue the -- can

1    pursue his claim and it doesn't take away from what the next

2    guy is going to get or the guy after that, in that -- in that

3    circumstance, Your Honor, I respectfully submit there is no

4    justification to take away our client's insurance coverage,

5    which -- which could be worth a great deal to them, and just

6    throw it into this pot where -- where the Libby claimants are

7    going to get a very -- a very small share of it.

8            Their -- their interest in this -- their interest in

9    this is either a property interest which cannot -- of theirs,

10   not the estate's, which cannot be taken away by action of -- in

11   the bankruptcy or -- or the context of -- the context of

12   Grace's bankruptcy, or alternatively, Your Honor, it is -- it

13   is a property in which the Libby claimants have a sufficient

14   property interest under the vested rights doctrine, that they

15   deserve adequate protection, and adequate protection,

16   Your Honor, should take the form of -- of setting aside funds

17   that -- representing the value of the coverage and providing

18   them with -- with adequate protection, and otherwise,

19   Your Honor, we respectfully submit the settlement cannot be

20   approved.

21           In addition, Your Honor, that's -- that's one

22   argument against the -- against the settlement, Your Honor.

23   The -- the other argument, Your Honor, and I think you -- you

24   saw this in our papers, is that the -- the settlement bears a

25   very strange relationship to Section 524(g).

1              What happens is that the estate binds itself, and

2     when I say the estate, this is an obligation that's going to

3     end up with the asbestos PI trust.  The asbestos PI trust is

4     supposed to indemnify Royal up to the full $5.8 million

5     settlement amount against -- against any claims against the

6     Royal -- the Royal parties as defined in the -- in the

7     settlement.

8              Now, those Royal parties go beyond the people who can

9     be or who are protected by 524(g) injunction.  So in other

10    words, this is not just one of those indemnity obligations that

11    kind of backstops, you know, the injunction, where if for some

12    reason the injunction were to fail of its terms or whatever,

13    then -- you know, then as a backup, we say okay, we'll

14    indemnify you for any damage.

15             This is an indemnification by the asbestos PI trust

16    of people who are not protected by the injunction and who under

17    the terms of Section 524(g) cannot be, which means the entire

18    $5.8 million is -- is a losery consideration, because that

19    5.8 million, you know, could go out the door in indemnification

20    costs, but it's also an improper settlement, Your Honor.  How

21    is that we're -- through the back door of this indemnification,

22    how is it that we are providing Royal with a release beyond

23    what they could get if we were standing here straightforwardly

24    at plan confirmation talking about the scope of Section 524(g)

25    and what -- and what any insurer is entitled to get?

1          And I would add, Your Honor, that -- that the

2     interrelationship of this settlement with -- with Section

3     524(g) is such that really, the settlement amounts to -- to a

4     subrosa plan.  To put it another way, if the debtors were now

5     to turn around -- if the debtors are now committing themselves

6     to -- to pursue at confirmation a plan that's now -- that's

7     inconsistent with Section 524(g), and that's certainly -- that

8     certainly implicates and is the kind of issue that ought to be

9     heard in conjunction with confirmation of the plan.

10         THE COURT:  This is the first time I've ever heard

11    that the debtor can be accused of having a subrosa plan when

12    the debtor has got the plan on the table.  I'm having a little

13    difficulty with that concept, frankly, but I understand the

14    point you're making, but --

15         MR. COHN:  It's -- it's really, Your Honor, that this

16    settlement should be considered in conjunction with

17    confirmation of the plan.  We're not that far away from the

18    confirmation hearing, Your Honor.  There would really be very

19    little harm to anybody to just take it all in one fell swoop,

20    and what we would avoid is the possibility, Your Honor, that

21    the debtors -- if they get the settlement approved today, that

22    means that if they now don't pursue a settlement which is

23    contrary to Section 524(g) at confirmation, they're liable to

24    damages as an administration claim, because Royal will take the

25    position you breached your obligation under the settlement

1    agreement to pursue it -- to -- to implement it in good faith.

2              So to avoid that conundrum, frankly, Your Honor -- I

3    call it a conundrum, but, I mean, it's -- you know, this could

4    be real dollars out the door -- why not just take the extra

5    several weeks and -- and put this on for the confirmation

6    hearing?

7              THE COURT:  All right.  And who is it under the

8    settlement that you contend would not be entitled to the 524(g)

9    injunction?

10             MR. COHN:  It is everybody in the definition of Royal

11   parties except for Royal itself -- excuse me.  Arrowood has

12   been represented to be the successor to Royal.  If that's true,

13   Arrowood, of course, is entitled to a Section 524(g)

14   injunction, and -- and I'm sorry, Your Honor.  I'm blanking.  I

15   think we said in our papers there might be one other exception,

16   but the whole panoply of Royal parties who are affiliates and

17   people who have anything to do with Royal and directors and

18   officers and -- and related companies now or in the future, all

19   those people are just ineligible under the terms of Section

20   524(g).

21             THE COURT:  All right.

22             MR. COHN:  And by the way, they're ineligible,

23   Your Honor, not just because they're beyond the scope in the

24   sense not person who can be protected.  They're also people who

25   are not identifiable buy the terms of the injunction.  When you

1       look at that definition of Royal parties, Your Honor, it just

2       -- it doesn't name people by name.  It just gives you these

3       whole kind of categories and relationships, and that is not

4       sufficient for purposes of -- to make them identifiable within

5       the meaning of Section 524(g).

6                   THE COURT:  All right.

7                   MR. COHN:  Thank you.

8                   THE COURT:  Let's finish up with --

9                   MR. BERNICK:  Yes.

10                  THE COURT:  -- the Libby claimants.  Okay.

11      Mr. Bernick?

12                  MR. BERNICK:  Yes.  I think that they're really --

13      the Libby claimants I don't think should take long nor would

14      the BNSF people, but I want to start out with the distinction

15      that Mr. -- Mr. Laughlin made before I withdraw something which

16      is that when it comes to the merits of the motion to approve,

17      that is, was this a good deal or not, and, of course, the

18      standard there is quite flexible.

19                  There really is no record that's been provided by

20      either BSNF or the Libby claimants that says this is a deal

21      that falls below the very generous threshold that's set by the

22      law as being a deal that is a good exercise of business

23      judgment as in terms of the creditor.  They don't have any

24      sufficient -- they have a lot of arguments.  They have

25      absolutely no sufficient, and Your Honor now has heard a review

1       of the very robust record that has been submitted by the plan

2       proponents and by Arrowood that demonstrates why this deal is,

3       in fact, a good deal, and, of course, Your Honor would expect

4       no less, as I said, in the process given the people who are the

5       adversaries in the case.

6              The law is very clear on what the test is.  The law

7       is very clear on what the elements of the test are, and the

8       record is, without exception, with respect to those elements of

9       the test at this point undisputed, and while there may be

10      arguments about whether the burden has been discharged, that

11      is, whether just taking our evidence, which is the only

12      evidence at this point where the burden has been met, I think

13      that as Your Honor has reviewed the matter this morning, I

14      think it's quite clear that that burden has been satisfied.

15             So the real objections that are now being made are

16      really of a different ilk.  The objection that are being made

17      is that both the Libby claimants and the BNSF people say that

18      they have their own property right with respect to these

19      matters, and not only do they have their own property right,

20      but that that property right trumps -- trumps the decision to

21      settle and the basis for the settlement, and that really is

22      what's being said here, and so I want to talk a little bit

23      about the trumping idea.

24             It's got two elements.  One is do they, in fact, have

25      an interest in this property to begin with, and the second is

1    does it trump.  It's not a question of do they have the

2    interest.  I think we've heard that what is perplexing even to

3    try to parse out from Mr. Cohn, as able an advocate as he is.

4           1995 -- he says well, there was a settlement in 1995,

5    and he asserts that he's got claimants who have a vested

6    interest.  Now, as of 1995, to have a vested interest, that is,

7    to be able to have the ability to say you can't settle that

8    policy because we have got -- we've got an entitlement to it,

9    A, they weren't known because they hadn't asserted a claim; B,

10   for all we know -- that was 15 years ago.  There undoubtedly no

11   manifestations, no diagnosis, and they didn't even know

12   themselves who they were.

13          So to the extent that we're talking about people who

14   have this, quote, vested interest, those are people who were

15   unknown, unknowable, indeed, did not exist as plaintiffs,

16   because their claim did not exist.  So there is no vested

17   right, because there was no right and it couldn't vest, and to

18   the extent that they did exist, there was no assertion of that

19   right against the settlement, and the settlement took place.

20   It resolved the matter.

21          So as Your Honor has well indicated, by 1995,

22   nonproducts is resolved.  It's a done deal.  That's all she

23   wrote, and because the Libby claimants are only asserting --

24   you heard from Mr. Cohn this morning -- are only asserting that

25   they have nonproducts type claims, Mr. Cohn is sitting here 15

Argument - Bernick                                      107

1    years later now representing Libby claimants who presumably do

2    have a claim, is talking about people who are nonproducts types

3    of claimants with respect to a matter that was long ago

4    resolved.  The people today have no right, have no property.

5    There is nothing left.  They have no property in which a right

6    can vest, and that's just a fact.

7            So he says I've got this legal theory and this kind

8    of claim of vested interest, but he is 15 years wrong.  That

9    was a done deal in 1995.  There was no interest at that time.

10   So whatever the theoretical argument might be, it does not

11   connect up a right with the property that we're talking about

12   today.   I think that with respect to the Libby claimants, the

13   predicate for the theory is wrong.

14           With respect to BNSF, BNSF gets it wrong also on the

15   facts, and I have a short point about the law, and then I'll

16   sit down.  With respect to the facts, it all comes back down to

17   -- and the case that they cite is a case that went off on

18   different facts.  This is Eleventh Circuit decision, went off

19   on different facts where the court construed not -- not

20   selected for publication in the Federal Reporter.  I don't know

21   what the rule is in the Third Circuit.  I know that that got a

22   lot of debate in connection with the rules a little while ago,

23   but this is a case that actually parsed the policies and parsed

24   the contract and found that there was expressly the creation of

25   a lessee, I think, as an additional insured.

1            Well, what do we have on the facts of our case?  We

2    have in the facts of our cases the endorsement, and the

3    endorsement says not that the railroad is an additional

4    insured, but that the insurance company -- that because the --

5    because the company -- actually, that is, that Grace has

6    assumed liability under contracts and paid an additional

7    premium, the insurance company now is providing coverage to

8    Grace by reason of this contract with the predecessor of BNSF.

9            So the coverage and the endorsement is an endorsement

10   as to Grace in recognition of the fact that Grace has

11   contractually assumed certain liabilities.  Incidentally, it's

12   not clear that these are the liabilities that are issue.  This

13   is some suspension bridge and conveyor belt contract, all kinds

14   of properties where liability could arise at the Libby mine

15   that required insurance.

16           So the endorsement itself is not an endorsement that

17   creates BSNF as an additional insured.  It's an endorsement

18   that says that the scope of coverage as to Grace extends to

19   Grace's entry into a contract with BSNF.  It's completely

20   different, and in case there is an ambiguity, this is a letter

21   dated August 22 of 1955 from the Detroit Insurance Agency to

22   Great Northern Railway Company, which was the name of the

23   company at the time, regarding Zonolite, and the insurance

24   agency sends this letter -- sends this letter to Great Northern

25   Railway, and it gets it exactly right.  The policy in question

1      provides liability coverage for only Zonolite Company including

2      their contractual agreement with the Great Northern Railway

3      Company and Zonolite Company and provided separate insurance to

4      take care of damage to the suspension bridge and conveyor belt

5      as well as workmen's comp -- workmen's compensation for their -

6      - for their client.

7           So the liability is liability coverage for Zonolite

8      only and sweeps in the contractual agreement -- arrangement.

9      This is confirmation at the time that this is not a insurance

10     policy that makes BNSF or Great Northern an additional insured.

11     It's an insurance policy that gives additional protection to

12     Grace and by virtue of or because of Grace's separate

13     contractual arrangement with respect to BNSF.

14          So neither Libby nor BNSF have established the

15     predicate for the argument, which is that, in fact, they have a

16     vested right with respect to the policies, which then leaves

17     the fundamental legal question, which is actually kind of

18     perhaps more interesting than the facts, but even more bizarre.

19          Outside of bankruptcy, if we were not in bankruptcy,

20     some of these arguments might be made that there is a vested

21     right, et cetera, et cetera.  We think that -- we know that on

22     this record, they have not established that as a matter of

23     fact.  So whether we're in or out of bankruptcy, they ain't

24     there with respect to this theory, but the proposition that's

25     being advanced by both of these companies, both of these

1    objectors here is in bankruptcy, and with respect to both of

2    these objectors in bankruptcy, what they're essentially saying

3    is that the vested right that they believe they have in these

4    policies means that the debtor and the other plan proponents

5    and Arrowood cannot, in fact, settle these policies, we're not

6    in control of the process because of these vested rights.  That

7    is an extreme proposition that nowhere enjoys support in the

8    law, and, in fact, the whole code process would be turned on

9    its head were that approach to be adopted.

10           We have Section 541(a), definition of property.  We

11   have Section 363 that permits the sale of assets, and we have

12   9019, which is the process pursuant to which those arrangements

13   are approved.  The whole concept -- not concept but the express

14   provisions of the code contemplate and require that when it

15   comes to insurance policies, it is the debtor that is given the

16   ability to exercise its business judgment to bring the value of

17   that policy to bear in the estate by settlement, and then after

18   that, the people want to quarrel about what's going to happen

19   with the proceeds.  They can quarrel about what's happen --

20   going to happen with the proceeds.

21           Otherwise, any creditor that might be able to argue

22   some interest or some right could hold up and hold hostage the

23   whole resolution process with regard to the policies.  That is

24   exactly the opposite.  It's the settlement of the policies that

25   comes first, and it specifically authorized, indeed, driven by

1    the bankruptcy code, and the creditors are kind of off over

2    here waiting to see what's going to happen.

3            There is no law for the proposition that by virtue of

4    -- certainly of the position that these people are in, but no

5    law for the proposition that says that the settlement process

6    itself cannot take place because other folks may have an

7    interest in the proceeds.  If a settlement is a fair settlement

8    is a fair settlement, the proceeds then come into the estate,

9    and people can quarrel about what happens to them.  That's

10   where we are today.

11           All the arguments about 524(g) and well, geez, you

12   know, it's really perverse, here is what's going to happen,

13   that, God bless, is for another day.  It's another day soon if

14   it has any credibility to those arguments, but 524(g) is not

15   why we're here.  We're here simply to approve the settlement of

16   these matters.  It is a core process under the code --

17           THE COURT:  Well, am I being asked to bless in

18   advance of the plan confirmation the fact that this policy says

19   that, for example, Royal affiliates, Royal's officers and

20   directors are going to benefit from a 524(g) injunction?

21   Because if I am, then I am not willing to do that absent the

22   plan confirmation process.

23           MR. BERNICK:  Yeah.  I -- I can't speak to the

24   related parties' point, and therefore, I will not, but what I

25   am speaking to is the settlement, the terms of the settlement

Argument - Bernick/Schiavoni                                112

1    themselves and whether this is a fair and appropriate

2    settlement, and I believe that's what's up for today.

3              THE COURT:  But that is a term of the settlement,

4    that the debtor at least will --

5              MR. BERNICK:  It is --

6              THE COURT:  -- will propose.

7              MR. BERNICK:  -- a term -- it is a term of -- it is a

8    term of the settlement.

9              THE COURT:  Right.

10             MR. BERNICK:  That is correct.

11             THE COURT:  And I have some difficulty --

12             MR. BERNICK:  I understand that.

13             THE COURT:  -- judging 520 --

14             MR. BERNICK:  So rather than put myself at risk of

15   misspeaking, I'll let Mr. Schiavoni --

16             THE COURT:  You  need to use the microphone.

17             COUNSEL:  No, he doesn't.

18             MS. SCHIAVONI:  Judge, the -- the approval order

19   doesn't require you to issue a 524(g) injunction.  It doesn't

20   issue any injunctions.  It simply approves the settlement, and

21   it commits the debtors to sort of go forward with best efforts

22   on the 524(g) issues.

23             On the -- on the issue of the specific who -- naming

24   of the parties, that is not in the approval order, and that

25   could be deferred until later, but I will tell you this, Judge.

1    Maybe we could resolve the mystery on it now, because we're

2    seeing protection for Royal.  It's -- the company that's now

3    the successor in interest to it is Arrowood.  Okay?  And the --

4    the company that is the parent company of them, Arrowpoint

5    Capital.  To the extent they're sued as a successor in interest

6    or what not, they -- the three of them are traditionally --

7    would be covered.  They're covered in all the settlement

8    approval orders that -- that you have done generally, and we're

9    seeing protection for the officers and directors of the

10   company.  I think that's well within 524(g), but --

11              THE COURT:  I don't --

12              MR. SCHIAVONI:  -- but we can defer that on the

13   officers and directors if you'd like.

14              THE COURT:  I --

15              MR. SCHIAVONI:  And that's not in the approval order

16   either.

17                          (Tape change)

1          THE COURT:  Well the problem is, is the approval

2     order incorporating the settlement as stated.  Because if it

3     is, then I've done it anyway.  And I am not willing to do that.

4     I don't think it's appropriate that I determine 524(g) issues

5     in advance of determining all the 524(g) issues.

6          MR. LAUGHLIN:  Well, Your Honor, the 524(g) objection

7     is, in effect, a condition subsequent to performing under the

8     agreement.  You can approve the settlement and if the plan

9     proponents can't deliver what the agreement requires, then the

10    agreement won't be consummated on the effective date.

11         THE COURT:  Well maybe you want to discuss that

12    issue.  Okay.  That's fine.  I will simply -- I think what I

13    can do is indicate in an order that, to the extent that there

14    are any 524(g) issues, they'll be addressed in the plan

15    confirmation process.

16         MR. SCHIAVONI:  I think we can do -- that's fine,

17    Your Honor.  I mainly wanted to let you know that we weren't

18    really intending to do anything sort of funky, or really

19    unusual.  To the extent that there's disagreement on it, we'll

20    deal with that later.

21         But it's not way out in the realm of craziness.  Just

22    a couple of --

23         THE COURT:  As to the companies, I don't think it is.

24    It seems to me that that's what the 524(g) injunctions normally

25    do.

1      MR. SCHIAVONI:  Okay.  Your Honor, just a couple of

2  other quick points.  This is the first I think it may actually

3  be the first insurance settlement in 7 years in this case.

4  Certainly within years.  Okay.  This is something that has the

5  potential really to pave the way to resolve, not just my

6  problems, but a whole series of objections if -- there were a

7  lot of objections on that -- there was a lot of paper.

8      In fact, I would say there's about a foot of paper

9  that goes -- that has --

10      THE COURT:  Is that all?

11      MR. SCHIAVONI:  -- that has similar problems to me.

12  And I think, you know, in large part, because of that, the

13  estate representatives, all of them, worked very, very hard to

14  try to flesh out a fair resolution on this, that could be used

15  for others.

16      So I would tell you this settlement has some real

17  importance, (a).  (b) you know, as far as this issue of some of

18  delaying the thing, Your Honor, I think there's a lot of

19  reasons to move this forward.

20      One is, for that very reason, that it will sort of

21  pave the way to perhaps get some others done.  I think there

22  might have been a settlement even filed last night that is

23  generally along the lines of, you know, dealing with problems

24  like mine, with these contractual indemnities.

25      The other thing, Judge, is in the settlement

1    agreement itself, I have all these litigation I stand down

2    provisions.  And deferring this thing, you know, it poses a

3    real problem.  And, you know, candidly, Mr. Cohn knows that.

4            And he's not beyond using -- you know, using that as

5    a sort of a weapon to sort of delay us here.  So that we --

6    that's another reason to move forward.

7            Just one other thing is, as far as balancing all of

8    the consideration given here.  We've talked about the

9    consideration, but we didn't sort of talk about at all is the

10   claims, the sort of like, what Mr. Cohn's claims are.

11           Because you do sort of balance them a little bit.

12   Judge, just so that we're all on the same page, I talked about

13   those excess policies being -- you can't see them on a bright

14   day.  With respect to the policies he's talking about, it's

15   very important you understand, those policies were issued

16   almost 50 years ago.

17           I was one year old -- or I think, when the first --

18   when the last policy went into effect.  To the extent anyone's

19   claiming occupational, you know, and exposure that's

20   occupational, they'd be over 70 years old, at this point.

21           We do not think that under the wildest of situations

22   there would be really any real claims left against those

23   policies.

24           It's a factor that I think goes into the overall

25   consideration.  The cases all here teach about deferring to the

Argument - Schiavoni                                      117

1    business judgment of the debtors.  What we're looking at here

2    is the lowest of the realm of reasonableness.  It's not, you

3    know, the highest, as Mr. Cohn would point out.

4          He has, and this is a point you can't emphasize

5    enough, neither Mr. Cohn, nor BNSF, have put in one ounce of

6    proof, no declaration, no exhibits, they don't cite to

7    depositions.

8          They cite to nothing.  There is no proof to counter

9    the proof that the debtors in there would have put into the

10   record.

11         In addition to that, Judge, I would suggest that

12   there's a case that almost deals point blank with this type of

13   situation.  And it deals with both Libby problems and BNSF

14   problems.

15         In re Dow Jones (sic).  It's a bankruptcy decision

16   coming out of Michigan.  But it talked specifically about how,

17   when somebody objects to a coverage settlement --

18         UNIDENTIFIED SPEAKER:  Dow Corning.

19         MR. SCHIAVONI:  Dow Corning.  On my Corning's I just

20   sort of -- I have problems mixing them all up.  But it talked

21   specifically about how a court -- I have to have Mr. Bernick

22   teach me how to do this, but I can't --

23                        (Laughter)

24         MR. BERNICK:  Judge, it's a factor decision and it's

25   quoted in the brief.  We were involved in that case.  It is

1       really a very well written decision.

2                    MR. SCHIAVONI:  Well, clearly, it was briefed and --

3                              (Laughter)

4                    THE COURT:  I'll tell former Judge Spector you're

5       fond of his opinion.

6                    MR. SCHIAVONI:  It talks about, when a court's

7       confronted with objections to coverage settlements, a debtor's

8       not required to pursue every possible theory of coverage,

9       regardless of the likelihood of recovery.

10                   And the court specifically says that, look, when

11      you're faced with multiple different possibilities, you really,

12      you don't have to follow every one.

13                   And that's what you're being asked by Mr. Cohn to do,

14      and I don't -- I think that case speaks directly to that.  On

15      the BNSF front, this case deals directly with this vested

16      rights issue.

17                   And perhaps Your Honor looked at it when you saw the

18      briefing, so I won't belabor it.  But it hammers upon another

19      point that's very, very important.  And that is that, if you --

20      if one were to buy into this theory that Mr. Cohn has

21      articulated, it basically would sort of bring the whole world

22      of mass tort settlements to a complete halt.

23                   Because it would make it utterly impossible to settle

24      with anyone pre-petition.  And it would make it virtually

25      impossible to reach settlements in the asbestos context at all.

1          If our corporate representative, who's here, was

2     called to testify, he would tell you just that.

3          Mr. O'Reilly (phonetic), that if, and to the extent

4     this was the case, we would -- it would be impossible to reach

5     settlements.  It is vitally important to Arrowood to have a

6     complete settlement here.

7          On the BNSF front, I don't think I need to add much

8     to what Mr. Bernick put on the record.  Except I will say one

9     thing.  He didn't mention that one of his own people testified,

10    was questioned about this issue about whose named as an insured

11    on the Grace policies.

12         That was Mr. Hughs (phonetic).  And we cite in the

13    record that deposition testimony.  We offered it in connection

14    with and we designated in connection with the phase 1

15    proceedings.

16         And he testified clearly that BNSF is not designated

17    as either a named insured or additional named insured.  And

18    that they're not an insured under these endorsements.  It's a

19    -- that's the only evidence, essentially, directly on the

20    record on that issue.

21         We offered -- we had someone independently, a former

22    chief litigation counsel in-house for Reliance Insurance, a

23    Fortune 500 company, review all -- review these policies.

24    Review this claim by BNSF.  Mr. Bert Hines (phonetic), he's a

25    nationally recognized expert in this field.

1          We offered to BNSF to allow -- to have them depose

2     him on Friday.  They declined.  They didn't want to depose him,

3     Your Honor.  We haven't put in a declaration from him, but we'd

4     be -- he's -- we have him here also today, sitting in the back

5     of the courtroom.  He'd be prepared to say he's reviewed the

6     policy, and that BNSF is not named as an insured or an

7     additional named insured, and they're not an insured under

8     those endorsements.

9          And he, by the way, Your Honor, would also, if called

10    to testify, testify that he is licensed in the State of Montana

11    to teach a course on additional named insured's.

12         As -- in addition to his other areas of expertise.

13    And he's licensed to do that -- that course for insurance

14    professionals in getting continuing education credits there.

15         Your Honor, we'd ask that the settlement be approved.

16         THE COURT:  Mr. Guy?

17         MR. GUY:  Your Honor, you're being remarkably

18    patient, so I won't be long.  On BNSF, as the other parties

19    have stated, there's no evidence, and we did look at their

20    brief, which had nothing attached to it, no declaration, no

21    policy.

22         Some of the policies that they cite, we haven't even

23    been able to find.  We don't think they exist.  And I could go

24    through the whole brief, going through similar instances like

25    that.

1           But I think it's improper to make these arguments

2     without the factual support, the evidentiary support.  The

3     bottom line is, everybody worked really hard on this

4     settlement.  All the creditors are supporting it.  The ACC's

5     supporting it, the SCR's supporting it, the debtor's supporting

6     it, and Royal supports it.  No one has argued it's in bad

7     faith.

8           No one has argued that the consideration is

9     inadequate.  What they're arguing is, by reference to theories,

10    that they have provided no support to you.  And I would ask

11    that it be approved.  It is absolutely critical, we are working

12    right now, contemporaneously with multiple parties to get

13    settlements before the Court so we can streamline this

14    bankruptcy.

15          If a party is allowed to come in and say, well, I

16    have this theory, but I'm not going to back it up, to derail

17    and delay settlements, we won't be successful in that regard.

18    Thank you, Your Honor.

19             THE COURT:  Mr. Laughlin?

20             MR. LAUGHLIN:  A couple of points, Your Honor.  I

21    never thought I would say this, but in response to Mr. Cohn's

22    vested rights arguments, he repeatedly asserted that there was

23    established law that insured's couldn't settle where there was

24    an accrued claim against the insured, the insurer couldn't

25    settle.

1      First, the reason I wouldn't have thought I'd ever

2  say this, is if you read the Arrowood reply brief, they do an

3  excellent job of demonstrating that, in fact, the established

4  law is to the contrary, and that the Libby claimants are taking

5  two -- basically a couple of cases, some very old, and taking

6  them out of context.

7      And if you think about it, the proposition that Mr.

8  Cohn, and also BNSF, because BNSF the claims -- the contracts

9  that they rely on, the policies that they rely on, are the

10  policies that were the subject of the 1995 settlement

11  agreement.

12      They are not the excess policies.  So if those

13  policies were settled as to the Libby claimants, they were also

14  settled as to BNSF.

15      And BNSF is basically trying to make the same

16  argument, when you get right back down to it, that Libby is,

17  which is that they have rights under those policies, and that

18  the settlement doesn't, to use Mr. Bernick's words, trump that.

19      If you think about the implications for that, what

20  you're saying, in effect, with long tail torts, and we're not

21  just talking asbestos here, we're talking about any --

22  environmental claims, we're talking about any claim where the

23  activity began a whole -- a very long time ago.

24      But there's been no assertion of the claim and no

25  manifestation of the injury.

1              And an insurer and insured that have a dispute about

2      policy coverage limits, whatever, could never settle any

3      policies.  They just couldn't do it.  Because under this vested

4      rights theory, there would always be people with long tail

5      claims as to whom the settlement would not be binding.

6              And you don't need, with all due respect to Mr.

7      Schiavoni, you don't need an expert to figure that out.  I

8      mean, it's inherent in the nature of the argument that's being

9      pressed here.

10             And while I think Mr. Bernick is correct that in a

11     bankruptcy context you have even a further overlay, if you

12     will, of the interests of the debtor's estate and its creditors

13     to look at on that, the fundamental question is, is this Court

14     going to accept an objection by these two objectors, that

15     essentially say that as to -- that no settlement can ever be

16     made that takes away somebody's "rights," because they're

17     vested through injury?

18             This argument is being made now with respect to the

19     1995 settlements.  We have a whole lot of insurers out there

20     with unsettled coverage.

21             In theory, the argument could be made by any

22     dissident asbestos claimant with respect to, if we come into

23     this Court with a settlement of unsettled coverage, that you

24     can't settle this without my permission, because I have vested

25     rights.  And you cannot divest me of those rights.

1          Now Mr. Cohn sort of cavalierly says, well, in a

2     524(g) context, with products limits, you can do that.  But, I

3     mean, he's just making that up.  I mean, his argument is, in

4     effect, an argument that I have a property right and you can't

5     take it away from me.

6          And it's not at all clear to me why 524(g) would

7     authorize you to take away somebody's property right if, you

8     know, the general principles of Section 363, which is what's

9     being invoked here in the settlements, this is a policy

10    buyback, in effect, would produce a different result.

11         So, I mean, I think it's really important for us to

12    understand what's at stake here.  This is not just some, let me

13    apply my Montana case on a motor vehicle accident where, after

14    the accident the insured gave his -- made a collusive deal with

15    the insurer.

16         Which is the one Montana case -- and putting aside

17    for the fact that you would also have the problem of, Grace's

18    insurance is -- governed by New York law, but they claim their

19    exposure was in Montana, so how many other people are going to

20    have claims under other state's laws?

21         And are we going to have 50 state laws apply to these

22    policies?  I mean, that's just a sort of an additional overlay.

23         So I suggest to you that it is simply not reasonable

24    or sensible to think that the arguments that are being made

25    about vested rights here can or should be adopted by this

Laughlin - Arguments                                125

1    Court, given the implications of them and given the very, very

2    feeble legal authority in support of them.

3              Oh, and the other has to do with the business about

4    the scope of the protection, the 524(g) order.  And Mr. Cohn

5    made an argument that sort of said, you can't give the 514(g)

6    injunction, because they don't qualify, which is premature.

7              It's clear that, if we can't deliver the 524(g)

8    injunction, then either Mr. Schiavoni's client will walk the

9    deal, or we'll renegotiate it.

10             But the other thing he argued was that, well, there's

11   an indemnity that's separate from the 524(g) protection that

12   would cover these people.

13             So the trust, if it couldn't deliver the 524(g)

14   injunction, would nevertheless be on the hook for the

15   indemnity, which equals the total amount of the consideration

16   being paid in the first place.

17             And with respect to that, I would simply say that,

18   Mr. Cohn has made no effort to show why, under Montana law, or

19   any other law, a Libby claimant, or for that matter BNSF if it

20   wanted to adopt this argument, would have a claim against the

21   officers and directors of Royal.

22             When the only connection that the Libby claimants

23   have with Royal, is the issuance of an insurance policy.  And,

24   of course, the one thing that 524(g) does protect people

25   against, is claims based on the provision of insurance to the

Laughlin - Arguments                                    126

1    debtor.

2            So it seems to me, we've either got a situation here

3    in which the 524(g) injunction will be determined to be proper

4    at the end of the day, because it applies only to the extent

5    that it applies.

6            And, I mean, it's only going to enjoin claims by

7    people who are suing officers and directors for insurance

8    coverage.  That would have to be -- that's the only possible

9    claim that one could even theorize.

10           Or alternatively the claims are just being

11   hypothesized out of whole cloth.

12           THE COURT:  But it's not for today.

13           MR. LAUGHLIN:  The 524(g) piece of it is not for

14   today.  The challenge to the fairness and reasonableness of the

15   agreement, because it has an indemnity, which might go beyond

16   the scope of the 524(g), is here today.  And I'm simply arguing

17   that to argue that in effect the 5.8 million dollars of

18   consideration is going to go out the back door, via the

19   indemnity, so the debtors and the trust aren't going to get

20   anything out of the deal, is wholly misguided in the absence of

21   showing of any realistic possibility that such a claim that

22   would trigger that indemnity against an officer and director,

23   could be made by the Libby claimants or anybody else under any

24   applicable law.

25           There's -- it's just a total failure of proof with

1    respect to that argument.  And I suggest to you that it borders

2    on the preposterous on its face.

3            Because I'm not aware, and I suspect you're not

4    aware, of the notion that insurance companies can get --

5    officers could get sued because somebody didn't get to collect

6    on some insurance policy that they made a settlement of.

7            Thank you, Your Honor.

8            THE COURT:  Okay.  BNSF you have counsel, would you

9    like to address this issue, because I'm going to wrap this up.

10           MS. CASEY:  Your Honor, the settlement agreement

11   purports to settle, not just the excess policies that were

12   found, but to wrap in the 1995 agreement.

13           BNSF has filed objections to the plan that the

14   debtors and the parties were aware of before they entered into

15   settlement agreement, that stated that the 1995 settlement

16   agreement did not settle that portion of the endorsement that

17   has been provided to Your Honor that shows the separate policy

18   limits.

19           And that if it had, the Royal is not entitled to a

20   524(g) injunction, because it was not sufficient.  There was

21   not sufficient consideration.

22           In addition, BNSF filed an objection to the plan that

23   says that the 100.0 million dollars that was paid previously,

24   was paid to the pre-petition debtor, it was not paid to the

25   asbestos PI trust and it was not paid in exchange for the

Casey - Argument                                    128

1    release for the future claimants.

2          And, therefore, there's not -- they're not entitled

3    to the 524(g) injunction.

4          THE COURT:  Well that issue, the entitlement to the

5    524(g) injunction, I'm not addressing today.  The settlement

6    commits the debtor to propose that injunction and to do its

7    best efforts to obtain it.

8          And I think Mr. Laughlin correctly stated that the

9    condition is that if the debtor -- the plan proponents can't

10   deliver, then this settlement won't take effect.

11         It's conditioned on that.  I'm not prejudging the

12   524(g) injunction.  But I am looking to the issues concerning

13   the fairness of this settlement.

14         I don't see how BNSF has rights under these insurance

15   policies.  It has a collection action that could be brought

16   against the debtor, and the debtor in turn can then present its

17   claims over to Royal.

18         But BNSF will be treated in the plan by raising their

19   claims against the debtor, to the extent that they exist

20   anyway.  So I can't see how BNSF is in anyway jeopardized by

21   this settlement.

22         MS. CASEY:  Well let's assume that BNSF does not have

23   the rights and the question is, is the settlement fair and

24   equitable as to the parties?

25         There's been a lot -- as to the creditors.  There's

1    been a lot of statements that BNSF and Libby claimants haven't

2    provided any proof.  However, one of the things that I will say

3    is that there's a 1995 agreement that purports to have paid a

4    100.0 million dollars to release the claims.  And the parties

5    have said, there was 10 million dollar limits.

6              Well as Your Honor said, everybody's sort of

7    scratching their head and saying, well where did the 100.0

8    million dollars come from?  There's no evidence to say to this

9    Court that that 100.0 million dollars was in fact a fair and

10   equitable settlement.

11             They're asking to tie that in, to have you say that

12   it was, by saying that by giving the five and a half million,

13   or 5.8 million to the excess policy, and giving the releases

14   for the proof of claim, and getting an indemnification --

15   waiving indemnification claims partially, because the estate --

16   the trust has to use its first 5.8 million dollars to indemnify

17   Royal for any claims made against it, by actually defending the

18   channeling injunction up to the first 5.8 million dollars of

19   stuff against them.

20             So then, but there's no proof here that shows that in

21   1995 a 100.0 million dollars was a fair and equitable

22   settlement for the policies.

23             THE COURT:  Actually, I have the affidavits that

24   indicate that they were fairly negotiated, that that was the

25   was the parties' intent to settle all the policy limits and

Casey - Argument                                    130

1    that in the opinion of the people who entered into the

2    settlement, that it was a good deal.  What I don't have, is any

3    evidence to the contrary.

4              MR. SCHIAVONI:  Your Honor, I also object that this

5    is not an argument that's stated in BNSF's late filed

6    objection.

7              They assert that they have a --

8              THE COURT:  Mr. Schiavoni, if you're speaking, you

9    need to use a microphone.  Go ahead, ma'am.

10             MR. COHN:  Your Honor, the only affidavit that I have

11   seen is the affidavit that says that the 10 million dollar

12   excess policy could be fairly compromised for the 5.8 million

13   dollars.

14             If there are --

15             THE COURT:  I'm sorry, there's -- I'm sure there's a

16   declaration, but I can't tell you who, that raises the question

17   of why Arrowood would have settled for a 100.0 million dollars

18   if it was only the products coverage.

19             There is some -- I apologize, I know I read it.  I

20   just don't know whose declaration or affidavit it is.

21             UNIDENTIFIED SPEAKER:  Arrowood.

22             THE COURT:  Mr. Schiavoni's.

23                        (Pause)

24             MS. CASEY:  I apparently haven't received that, so I

25   haven't been able to look at that.

1          THE COURT:  I can't -- in taking a look at the

2    policy, the 1995 -- what the parties were attempting to settle

3    with the 10 million dollar coverage, it's a little difficult to

4    see how 100.0 million dollars in 1995, we are talking 15 years

5    ago, 100.0 million dollars, I don't know what the present value

6    of that amount would be, but I'm sure that it would be worth

7    significantly more in today's dollars than it was in 1995.

8          It's difficult to see how that isn't a fair

9    settlement on the face of what the parties are propounding the

10   settlement to be on the face of the settlement agreement.

11         MS. CASEY:  Okay.  And understanding, Your Honor,

12   that you're not determining any of the 524(g) issues today --

13         THE COURT:  I'm not.

14         MS. CASEY:  -- then I have nothing further.

15         THE COURT:  Mr. Cohn?

16         MR. COHN:  Your Honor, the rights of the Libby

17   claimants under this coverage -- let me step back.  The -- when

18   you adjudicate matters of property rights, those rights are

19   determined under state law.  That's obviously a fundamental

20   principle that we all work on -- work through here in

21   bankruptcy.

22         And the rights of the Libby claimants with respect to

23   coverage under these policies, and everybody in this room will

24   acknowledge this, are triggered by the injury and the exposure.

25   Otherwise, why would we be talking about --

Cohn - Argument                                    132

1              THE COURT:  Well it's triggered by the injury and the

2       exposure in the period of time it's covered by the policy.

3              MR. COHN:  Yes.

4              THE COURT:  It's not that much of a foregone

5       conclusion.  And Mr. Bernick's correct, that was 15 years ago,

6       and Mr. Schiavoni correct that they were on policies that were

7       issued a substantially long period of time ago, I think he said

8       50 years, I -- if you're looking at a 1995 settlement of

9       policies, it was clearly before then.  And I think the policies

10      were for periods that began in the fifties.

11             MR. COHN:  That's correct, Your Honor.

12             THE COURT:  Okay.  So if none of the claims were

13      asserted at the time, and no one is here actually asserting

14      that they had a claim under that policy now, I'm being asked

15      hypothetically to determine that there is such a person.

16             But I don't have any evidence that there is such a

17      person.

18             MR. COHN:  Well, Your Honor, we have certainly

19      alleged that.

20             THE COURT:  But allegations don't suffice to show me

21      why this settlement is not fair and equitable.

22             MR. COHN:  Well, Your Honor, we'd be happy to offer

23      proof of that, because in fact it's --

24             THE COURT:  But the time to do it was with -- in

25      objection to the settlement.

1          MR. COHN:  Well, Your Honor, in fact, one of the

2    issues that we're going to deal with a little later in this

3    hearing is the whole issue of what --

4          THE COURT:  Only if we get there.

5          MR. COHN:  Is the whole issue of what would be a way,

6    in terms of don't consume horrendous amounts of this Court's

7    time, for us to prove people's rights under these insurance

8    policies.

9          And we've actually been trying and for, you know, to

10   work on that by stipulation with the parties, have not

11   succeeded.  And I'm just telling you that really what you're in

12   effect inviting us to do and requiring us to do, is to reduce

13   claimants to say, you know, put on the stand and say, I was

14   exposed in such and such a year, and I have coverage under this

15   policy.

16         And that's -- we've been trying to avoid doing that,

17   under circumstances where we didn't need to.

18         THE COURT:  But I don't even have an affidavit that

19   says that, as counsel you know that there are those claimants,

20   without identifying who they are.

21         I have no evidence.

22         MR. COHN:  As counsel, we know.  Your Honor, you've

23   been accepting representations from other lawyers here, accept

24   that one.  We have clients who --

25         MR. BERNICK:  Can we make a process suggestion?

Cohn - Argument                                134

1    I think that going down this road will create a mini coverage

2    issue.

3              THE COURT:  It will.  And I'm not going there.

4              MR. BERNICK:  Right.  We've got a legal issue about

5    whether if Mr. Lockwood -- any others -- if you don't have a

6    claim at the time settlement takes place, then to say that an

7    incipient claim, not even known, not even knowable, means that

8    you can't settle as of a given date, that's a legal -- I'm

9    sorry, that's a legal issue that I think Your Honor could

10   resolve.

11             I think that, with all due respect to Mr. Cohn, if he

12   wants to -- the whole matter's now before Your Honor, it's been

13   argued.  If there's something else that he wants to proffer

14   before the Court, we would object it not being timely, but I

15   think that Your Honor's in a position where we now have taken

16   up the bulk of our time this morning, given -- to good use, but

17   we really have a lot of other matters to take up --

18             THE COURT:  Mr. -- go ahead.

19             MR. COHN:  Your Honor, from a process perspective,

20   Your Honor, I actually -- I agree that what -- that what was

21   argued was an issue of law, and I would ask, for that purpose,

22   that it be -- that you accept the representation that there are

23   such people out there who would qualify, if we can leap the

24   legal hurdles that Mr. Bernick has argued.

25             But to turn around and say that, even though it's

1    really not something that could fairly be disputed, you know,

2    either there are -- there about 950 of these Libby claimants,

3    and they have claims resulting from all different periods of

4    time.

5            And, yes, Your Honor, some of them do go back to the

6    1950's.  And to rule against us on the basis that some -- that

7    these claimants don't exist who would have these rights, Your

8    Honor that --

9            THE COURT:  That's not the basis, Mr. Cohn.  That's

10   not the point.

11           MR. COHN:  Then that's fine, Your Honor, if I'm to be

12   ruled against on an issue of law, I would say, Your Honor, that

13   I don't think anybody has -- well they've come up with theories

14   and they've come up with parades of horrible's about what it is

15   that would happen if you recognized the vested rights argument.

16           The problem is, they have not come up with any law to

17   the contrary.  The law is as it was stated in our brief.  And

18   I'll rest on that, Your Honor.

19           THE COURT:  Okay.

20           MR. COHN:  Although I'm happy to answer any

21   questions.

22           THE COURT:  I don't have any.  I've read the papers,

23   I've read the submissions of the parties.  It seems to me that

24   the original discovery requests were really an effort to figure

25   out an interpretation of the 1995 settlement agreement, on the

1   theory that the settlement agreement is not clear on its face.

2            I can't support that discovery request, because I

3   think the 1995 settlement agreement is clear on its face.  It

4   is an effort by the parties, and it is supported by the

5   declarations and affidavits, and I think deposition testimony,

6   but the -- whatever was submitted, I apologize, I read a lot of

7   stuff in a hurry, and I don't remember item-by-item which came

8   in by way of deposition, or affidavit, or declaration.

9            But there is supporting factual matter on the record

10  with respect to this item that indicates that the intent of the

11  parties was to settle, both the products and the non-products.

12  And I think the agreement itself is clear, so, frankly, I don't

13  even think their intent, at this point, evidence of their

14  intent would come into the record, because it's clear.

15           Tot he extent that the agreement is not clear, there

16  is the supporting evidence that indicates that was the intent

17  of the parties to negotiate a deal.  So I don't see the need

18  for discovery on that issue.  To the extent that this vested

19  rights argument is that the Libby claimants could not -- let me

20  state it a different way.

21           That the debtors could not have settled the policies

22  out from under the Libby claimants, surely they would have to

23  know who the Libby claimants were who were contending that they

24  had vested rights, in order not to make that settlement.

25           I think everybody's argument that indicates that the

Ruling                                                            137

1    beneficiary of the policy, or the insured, pardon me, under the

2    policy can't settle its own policies, and then figure out how

3    to deal with who would have been the beneficiaries in another

4    context, is not correct.

5          The insurance stands for the insured.  Yes, it is

6    there for beneficiaries in that it gives certain entities a

7    right to pursue insurance coverage, but the insured is the

8    debtor.

9          The debtor's the one who determines whether or not to

10   continue that insurance, not the beneficiaries under that

11   policy.

12         To the extent that there may be vested rights, maybe

13   there are.  I don't have any way of knowing that there are or

14   are not.  But I don't think that's the basis for this

15   determination.

16         I'm not aware of, but for a very, I think, odd on its

17   facts case that was cited, any indication by courts that say

18   that the insured's are not permitted to settle policies with

19   the insurance companies.

20         I'm just simply not aware of it, and I can't

21   understand how that could be the case, after all, they're the

22   contracting parties.

23         So if they want to settle their own liability, it

24   seems to me they've got the right to do that.  Particularly in

25   a bankruptcy case, where the proceeds of those policies are

1    property of the estate.

2           To the extent that BNSF is contending that it is an

3    additional insured, I cannot see that it's an additional

4    insured.  Not only does the August 1955 letter indicate to the

5    contrary, but in addition, the policy itself indicates to the

6    contrary.  The additional insurance that the debtor purchased

7    was for the benefit of the debtor, to the extent that it ever

8    faced a contractual obligation to BNSF.

9           And it was not for BNSF's direct coverage.

10          So I don't see the basis for discovery.  I don't see

11   a basis to hold up a determination of the settlement on the

12   merits today.  It appears to me that, on the merits, the debtor

13   has exercised its best business judgment for the benefit of

14   this estate in settling this policy.

15          Part of my analysis is the fact that Arrowood is in

16   runoff, and that is a significant issue for collectibility in

17   the future.

18          These are high -- the two policies specifically at

19   issue are very high excess coverage policies, and it's possible

20   that by the time they were ever accessed, Arrowood would not be

21   around, nor have a successor at that time available to pay the

22   liabilities, in any event.

23          To the extent that the settlement incorporates this

24   release for the 1995 obligations, the record stands for the

25   proposition that there has been adequate consideration and

1   bargained for value in exchange.

2          It is a package deal.  I'm not in anyway going to try

3   to bifurcate out the components of that package.  So I see no

4   need for discovery.  I see no basis on which to deny the motion

5   to approve the settlement.

6          However, I am not predetermining the 524(g)

7   injunction issues.  So I would like an order that makes it

8   clear that I understand that the obligation is of the plan

9   proponents to pursue 524(g) relief for the Royal parties.  But

10   I am not predetermining that issue.  It's reserved for plan

11   confirmation.

12          Have I covered everything, by way of the objections

13   and motion to approve?

14          MR. COHN:  Yes, Your Honor.  Not exactly to our

15   satisfaction, but you've certainly covered it.

16          THE COURT:  Okay.  I just wanted to make sure I

17   haven't missed anything.  Because it's been a couple of hours

18   worth of argument, and I just wanted to be sure that I covered

19   all the points.

20          MR. BERNICK:  I know Your Honor's going to want to

21   take a break, and we're still with the 1:30 is the --

22          THE COURT:  Yes.

23          MR. BERNICK:  Okay.  So we have if we --

24          THE COURT:  Actually I thought it was 1:15.  But --

25          MR. BERNICK:  We'll do 1:30 --

1            THE COURT:  Yours truly, has to be outside at 1:30.

2    I'll see if I can get that changed to --

3            MR. BERNICK:  That would be terrific.

4            THE COURT:  -- a little later.  But I can't guarantee

5    it.

6            MR. BERNICK:  Well I understand that.  As I look at

7    it, and I don't mean to introduce a whole another subject for

8    discussion before we take the break, but as the debtor, with

9    some degree of at least influence over the order of

10   proceedings, there are four discrete substantive matters that

11   still need to be addressed.

12           There's the -- and the need for having them be

13   addressed, is that they bear directly on the course of

14   discovery going forward, and, therefore, the ability to adhere

15   to the schedule.

16           One is solvency.  Another -- and then there are three

17   Libby issues that are fairly discrete issues, and I think that

18   two of them are already well-known to the Court, because

19   they've been the subject of ,(a) prior rulings, or (b) prior

20   commentary by the Court.

21           And the last one is their motion to supplement their

22   objections.  Those four matters, I think, can be heard about 20

23   minutes a pop.  My hope is that we can do that.  That then

24   leaves us with what we were supposed to talk about, which is

25   phase 2 pretrial order.

1      I'll tell Your Honor that we have circulated a case

2    management order, and we did so last Friday.  And the case

3    management order, and if anybody says they don't have copies or

4    whatever, we got copies here, people can look at them on the

5    break, whatever.

6          But it's basically a schedule going forward.  It

7    leaves open the major issues that are part of the rest of the

8    agenda, so I think it's really other things that are not

9    controversial.  It would great if people could look at it and

10   then we can talk, Your Honor.  I think Your Honor would

11   probably like an overview on what looks like the evidence going

12   forward and how the trial would work.

13         We have a proposal for how the trial would work, and

14   we have a proposed CMO to get us to trial.

15         I'm not sure that we can get those matters resolved

16   today, due to the shortness of time.  But also because people

17   need to have the opportunity to look at this and digest it.

18   Maybe it would be appropriate to see if we can have a

19   telephonic call -- telephonic call somewhat redundant -- to

20   talk about both of those matters.  But certainly the case

21   management order.

22         The case management order, because it doesn't deal

23   with the controversial matters, really is a question of, when

24   are everybody going to exchange exhibits, when are the motions

25   in limine going to be filed, when are Daubert -- and then the

Colloquy                                         142

1    designations and counter designations.

2           So my hope is that it won't be too controversial.

3    That's really what it does.  Our proposal, therefore, would be

4    to start right after the break with the remaining matters in

5    controversy.  That is item 11, which is solvency; item 5, which

6    is Libby; 12 and 13, which are Libby.

7           Those are the four matters.  And then finish up with

8    the pretrial order and report on the pretrial submissions.

9           THE COURT:  All right.  We'll take a 10 minute

10   recess.

11                      (Recess)

12          THE COURT:  Please be seated.  Mr. Bernick, with

13   respect to a discussion by telephone concerning the case

14   management order and pretrial process, how about Thursday at

15   noon?

16          MR. BERNICK:  That would be fine, from the debtor's

17   point of view.

18          THE COURT:  I'll reserve two hours, that should give

19   you enough time to --

20          MR. FINCH:  Your Honor, I'm going to be on an

21   airplane on Thursday at noon.

22          THE COURT:  Anybody able to participate for you, Mr.

23   Finch?

24          MR. FINCH:  Well I just asked -- and he seemed to

25   indicate otherwise.

Colloquy                                                    143

1              UNIDENTIFIED SPEAKER:  Well, okay.  I got to get my

2       instructions in advance, though, Your Honor.

3              THE COURT:  All right.  Thursday at noon.  By phone.

4              UNIDENTIFIED SPEAKER:  Your Honor, we're probably

5       going to need some special court call arrangements to get that

6       in.

7              THE COURT:  Can they get us a list that soon?  Yes.

8       Wednesday by 4 to make the arrangements to participate through

9       Court call, is fine.

10             UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

11             THE COURT:  Okay, Mr. Bernick.

12             MR. BERNICK:  We've had a discussion on the break

13      with respect to item 11.  Item 11 is solvency.  And the issue

14      that we've raised there, I think Your Honor probably has seen,

15      or may or may not have seen in the report that we filed -- the

16      status report that we filed concerning matters relating to the

17      default interest issue.

18             In a discussion with Mr. Pasquale and Mr. Cobb over

19      the break, which is, as usual, very productive.  And -- it was.

20      So, they have a new -- they have an expert, I won't say new,

21      because they would object to that characterization.

22             They have an expert named Freza (phonetic), and Mr.

23      Freza is apparently is going to address the issue of solvency.

24      I've gotten an informal indication from counsel about exactly

25      what he's going to do.

1          That informal indication has allayed some of my

2    concerns about whether we're going to get to the end of this

3    thing.  And in light of it, they propose to have his expert

4    report in our hands a week from today.

5          Now that's a week, and weeks make a big difference,

6    at this point.  But given the scope of what they described as

7    being his report, that's fine.

8          So we'll get an expert report from Mr. Freza next

9    Monday.  At that point, obviously, we're going to need to

10   respond.  And we have Ms. Zilly (phonetic) who is going to be

11   testifying for the debtor's on solvency, and any supplement

12   that she'll do, we'll produce within a week.

13         To the extent, then, that we have to proceed with

14   depositions, there are depositions that have to be taken.  And

15   I think that then it really is up to us to figure out a

16   deadline for the commencement and completion of those

17   depositions.

18         And rather than try to haggle that out now with the

19   Court and take up more time today, we're happy to have a

20   discussion with Mr. Pasquale and Mr. Cobb concerning the

21   completion of the remaining depositions that will effect the

22   solvency issue.

23         So I think that's where we are on item 11.

24         THE COURT:  All right.  Well then, if that's the

25   case, why don't I expect that you're going to submit on a

1    certification of counsel whatever you've agreed to?

2              If you haven't agreed, just put it on Thursday's

3    agenda at noon.

4              MR. BERNICK:  That's what I would think.

5              MR. PASQUALE:  Your Honor, that process -- Ken

6    Pasquale for the unsecured creditors committee.  The process

7    sounds fine.  I would note that, in the debtor's various

8    submissions there are -- we have one witness, one on affidavit,

9    one live.

10             Debtors have 6 or 7.  So it's a two-way street, we'll

11   need to discuss deposition dates for all of those witnesses.

12             So I just want to be clear on that, for the record.

13             Thank you.

14             THE COURT:  Okay.  But I think you ought to be able

15   to work that out.

16             MR. PASQUALE:  I sure hope so, Your Honor.

17             THE COURT:  Is Thursday by noon -- at noon

18   sufficient, if you can't for some reason?

19             MR. PASQUALE:  No reason we shouldn't be able to work

20   that out by then.

21             THE COURT:  All right.

22             MR. MARTIN:  Your Honor, Craig Martin, for the

23   record, for Morgan Stanley senior funding.  I just rose,

24   because item 11 touches on impairment issues.

25             And I just wanted to remind the Court that we

Colloquy                                    146

1    participated in the prior proceedings on impairment.  And to

2    the extent that they're ongoing issues related to impairment,

3    we would like to be included in that.

4              I discussed this with Mr. Bear (phonetic), I don't

5    think it's an issue, but I just wanted to make the Court aware

6    of that.

7              THE COURT:  Can you live with the same deadlines?

8              MR. MARTIN:  Well this is really --

9              THE COURT:  I mean, on the solvency issue?

10             MR. BERNICK:  Your Honor, on the solvency issue --

11             THE COURT:  Yes.

12             MR. MARTIN:  -- to the extent we've been

13   participating, we've been coordinating with the committee, so

14   the deadlines that have been stated, I have no issue with

15   those.

16             THE COURT:  All right.

17             MR. MARTIN:  I just wanted to remind Your Honor that

18   we were lurking around on these issues.

19             THE COURT:  All right.

20             MR. BERNICK:  We've noticed the lurking.  The

21   lurking, though, I think has been on item 10, which is a status

22   report on impairment, and we didn't mean to pass over that

23   issue.  In fact, we'll be coming back to that, because Mr.

24   Lockwood has a very lengthy and scholarly report to make with

25   respect to impairment.

Bernick - Argument                                   147

1          We'll come back to item 10.

2          MR. LOCKWOOD:  Not true, Your Honor.  One minute.

3          MR. BERNICK:  We'll come back to 10, and talk about

4    impairment, and also where things stand on other phase 1, which

5    is insurers.  so I don't mean to skip over that, I'm just

6    trying to get to the finish line here.

7          UNIDENTIFIED SPEAKER:  You mean, insurance neutrality

8    not --

9          MR. BERNICK:  No impairment, and insurance

10   neutrality.

11         UNIDENTIFIED SPEAKER:  Oh, okay.

12         MR. BERNICK:  Phase 1.  Okay.  So that then takes us

13   to --

14         THE COURT:  Mr. Bernick, excuse me one second.

15         MR. BERNICK:  Yeah, I'm sorry.

16                              (Pause)

17         THE COURT:  Okay, Mr. Bernick, I'm sorry.  I

18   neglected to see whether I could get a later car.  So I'm going

19   to try that now.

20         MR. BERNICK:  Okay.  Well on the basis of that prompt

21   resolution, we now go with optimism, that the same thing will

22   happen on the next three, although, I'm not sure.

23         So item 5 relates to the motion for reconsideration

24   with respect to -- the motion for reconsideration with respect

25   to the medical files that should be produced in connection with

1   the testimony of Dr. Whitehouse (phonetic).

2           Your Honor will recall that Your Honor issued an

3   order on this subject, directing that any and all files that

4   were part of the materials that Mr. -- Dr. Whitehouse relied

5   upon, needed to be produced.

6           That extended, under the record then stood at 1,800

7   files.  And Your Honor entered an order.  There's now a motion

8   for reconsideration.

9           And I want to put this a little bit in context,

10  without spending too much time on it.  So that we can come back

11  to this later in connection with item 12, I believe that it is.

12          But effectively, we're talking about two basic kinds

13  of evidence.  There is epidemiological evidence, which relates

14  to groups.  Then there's evidence relating to individual

15  diagnosis.  And there's clearly a distinction between these two

16  different kinds of evidence.

17          Your Honor has well recognized that distinction in

18  addressing this in connection with the prior order.  And as

19  you'll hear in just a moment Judge Molloy also addressed this

20  distinction specifically in dealing with Dr. Whitehouse.

21          There's no question but that the objection that's

22  been raised by the Libby claimants implicates what happens with

23  respect to groups, that is epidemiology.  And I say that

24  because, the position that's being taken by the Libby claimants

25  insofar as the plan is concerned, centrally focuses on the

1    question that they address, which is, are the Libby claimants

2    different, such that the treatment of the Libby claims in the

3    plan is unequal and discriminatory?

4              That is fundamentally a group issue.  The plan deals

5    with groups of claimants.  We don't resolve claims, claim-by-

6    claim, or we don't address claims or treat claims in the plan

7    by saying, claimant number one, here's the treatment.

8              It is a group.  And because it's a group, it poses a

9    fundamental question that epidemiologist answer, which is, well

10   as a group are they different.

11             There's also no question but that, as Dr. Whitehouse

12   has proceeded in this case as a witness, that this is the kind

13   of role that he has sought to play.

14             He has not simply come in as talking about individual

15   diagnoses, he's produced expert reports.  Indeed, multiple,

16   multiple expert reports.  He has testified that the basis for

17   his expert work, in part, there's a whole group of people,

18   there's been 1,800 people in the Card plaintiff.

19             And the opinions that he has offered, are opinions

20   that are broad opinions that go to the group of claimants as a

21   whole.  So when it comes to the question of what Dr. Whitehouse

22   has done, he has purported to address these fundamental issues

23   that epidemiologist's look at.

24             He's not the only one.  They have an epidemiologist,

25   a Dr. Moolgauker.  And Dr. Moolgauker also has addressed this

1    issue.  And they have another expert, Dr. Frank.  And Dr. Frank

2    also has addressed this issue.

3            But what brings us here is an order with respect to

4    Dr. Whitehouse, and Dr. Whitehouse most certainly has acted as

5    an expert in addressing these issues of what happens with

6    respect to a group of people.

7            Now we don't believe that, at the end of the day,

8    that Dr. Whitehouse is going to be even remotely qualified to

9    do what he purports to do.  And, in fact, we have here an order

10   that was filed on April 21st in the criminal case, because we

11   sought to strike Dr. Whitehouse's testimony in the criminal

12   case, on the grounds that -- and I'm going to disappoint Mr.

13   Schiavoni in here -- "Dr. Whitehouse is qualified to give

14   expert opinions as a physician specializing in pulmonary

15   disease.  His area of expertise is specific causation, not

16   general causation.  Dr. Whitehouse lacks the specialized

17   knowledge and training necessary to render an epidemiological

18   opinion, which creates the concern that his opinion testimony

19   was not based on a valid scientific methodology.  That concern

20   was confirmed on cross-examination, where Dr. Whitehouse

21   conceded that his opinion was the product, not of valid

22   science, but rather of his own subjective assessment."

23           And then the cross then follows.

24           So Dr. Whitehouse sought to express these broad

25   opinions in Minnesota, and was -- he did so initially, and then

Bernick - Argument                              151

1    the jury was instructed to disregard his testimony, because he

2    wasn't qualified to render that kind of opinion.

3           We believe that that kind of motion is appropriate

4    here.  It will be made.  We believe that ultimately Dr.

5    Whitehouse will not be permitted, should not be permitted to

6    testify.

7           But that is not the issue that brings us here today.

8    The issue that brings us here today is the production of

9    documents that need to be available in the event that he is to

10   be proffered as a witness on this subject.

11          And the -- Your Honor has addressed that.  Your Honor

12   addressed it in the form of an order.  That order was entered.

13   And that order was clearly based upon a sound and accurate

14   assessment of both the law and the facts.

15          Rule 26 clearly does apply to his expert opinions, to

16   the extent that they go beyond what they would be as a treating

17   physician, that is, individual diagnosis.  The fact that he's a

18   treating physician does enable him then to avoid the disclosure

19   requirements of Rule 26 when he goes beyond talking about

20   individual patients, and talks about a broader proposition.

21          The issue is fundamentally whether Rule 26 needs to

22   be followed, or he expresses such broad opinions.  It clearly

23   does, and we're entitled to get the information.

24          That was the state of the record before.  It remains

25   the state of the record today.  There is nothing new.  The

1    motion for reconsideration should be denied.

2              And this is of critical importance here, because

3    we're talking about -- we've already deposed the guy and we're

4    talking about a very substantial volume of additional

5    information that would be relevant to the cross-examination of

6    this witness.

7              So we don't believe that the motion for

8    reconsideration is well taken.  I know that I've essentially

9    argued my opposition, but I felt that I would expedite the

10   matter.

11             THE COURT:  All right.  Mr. Cohn?

12             MR. LEWIS:  Your Honor, I'm Tom Lewis, I'll be

13   arguing this motion.

14             THE COURT:  All right.  Mr. Lewis.

15             MR. LEWIS:  I have the dubious distinction of

16   appearing before this Court for the first time to argue a

17   motion that's already been lost.

18             I'll do the best that I can to be brief.  I would

19   also point out that we now know that even Mr. Bernick makes

20   mistakes.  Because he just represented to the Court that the

21   criminal trial that he was talking about occurred in Minnesota.

22             It actually occurred in Missoula, Montana.

23             MR. BERNICK:  Absolutely right.  And I'll never

24   forget it.

25             MR. LEWIS:  It was meant to be a little bit of humor.

1    I'll get off the humor.  Which I'm not very good at.  First of

2    all, I think what Mr. Bernick has done here, is pointed the

3    Court to epidemiology, which is, they're hard on it, they think

4    that this doctor is -- will not be qualified to testify, based

5    primarily on admissions that he made in the criminal trial, and

6    Judge Molloy's ruling.

7            I would point out to the Court that that was the only

8    portion of his trial testimony that was stricken, and he was on

9    the stand for four and a half hours.  And that was a very small

10   part of his overall testimony.

11           So he will be testifying in this case, as he did in

12   the criminal case, as a treating physician.

13           With respect to treating physicians, under Rule 26,

14   treating physicians are not required to file a report.  It's

15   only when he gets in the area of his various studies that he

16   needs to file a complete report.

17           And he has filed a report, we have a change in his

18   report.  We filed a modification, or an amendment to the

19   report, in which he indicates he'll only be relying on his

20   experience with the 850 or 950 --

21           THE COURT:  Well how is he going to subtract that

22   out?  I mean, if his studies were all based on 1,800 people,

23   how does he suddenly say, I'm taking half of the population

24   out, and my opinions stay the same, because I'm no longer going

25   to rely on those?

1           MR. LEWIS:  Okay.

2           THE COURT:  I mean, as a treating physician, fine, to

3    the extent that's relevant, and I'm not ruling on relevance, I

4    think he can testify as a treating physician.  But that doesn't

5    permit him to get into epidemiological issues.  And that's the

6    problem.

7           And all I thought I was addressing in the prior

8    order, was the his ability to testify and from what documents,

9    as an expert in the epidemiology area, and not in the treating

10   physician area.

11          And no one had even raised that issue with me.

12          MR. LEWIS:  Well I'm responding to Mr. Bernick's

13   comments on epidemiology, which I think should be left for a

14   later day, in terms of the <u>Daubert</u> motions in this thing.  What

15   I'm trying to say to you, Your Honor, is that, like most of the

16   physicians who will testify in this case, Dr. Whitehouse cannot

17   separate all of his prior clinical experience from the

18   testimony that he will give concerning his reports as filed

19   with the Court.

20          He can give opinion testimony based upon the 950

21   Libby clients, who are Libby claimants who have filed claims in

22   this case.

23          The difficulty here, in this case -- with the order,

24   was two-fold, in our view.  First of all, it did not address

25   the physician testimony and the treating physician testimony.

Lewis - Argument                                        155

1          THE COURT:  That's because no one objected to it.  I

2     wasn't addressing it, because nobody raised it.

3          MR. LEWIS:  And secondly, it ruled that his testimony

4     would not be allowed, unless he could produce, within one week,

5     the other 850 non-claimant patient's records.

6          THE COURT:  That he -- any records he relied on, I

7     think was the issue.

8          MR. LEWIS:  The difficulty with the order, in our

9     opinion, is that the Court by its order required him to perform

10    a practical impossibility.

11         THE COURT:  Well he was already outside the time to

12    produce the documents that attached his expert report.  I was

13    giving him some additional time.

14         MR. LEWIS:  Well we filed affidavits from the two

15    repositories of records in Libby.  One of them was St. Johns

16    Lutheran Hospital.  The other was the Card Clinic (phonetic).

17    Both of them indicate that Dr. Whitehouse does not have

18    unfettered ability to produce those records.

19         THE COURT:  They've been filed in connection with

20    this motion.  They were not filed in connection with the

21    original motion.

22         MR. LEWIS:  Yes.  That is true, Your Honor.  We are

23    submitting that as new evidence, as to the difficulty in

24    complying with the order of the Court, and the inability --

25         THE COURT:  How is that new evidence?  Dr. Whitehouse

1    knew what he had access to and didn't have access to before.

2              MR. LEWIS:  But Dr. Whitehouse did not have the power

3    to produce those records, Your Honor.

4              THE COURT:  Well then he didn't have any ability to

5    rely on them.  If he's going to be called as an expert to

6    testify at trial, the rules are very clear.  That the evidence

7    that the expert relies on has to be producible.  If he couldn't

8    produce it, he shouldn't have been using it.

9              I mean, he's creating his own problems.

10             MR. LEWIS:  He has produced -- let's talk about what

11   he has produced.  He's produced all records relating to his

12   2004 peer reviewed study.  He's produced all records relating

13   to his 2008 peer reviewed study.

14             He's also produced all of the records of those

15   individuals included in his mortality study.  The difficulty

16   for him was, we had no way of knowing, and he had no way of

17   knowing, that he was going to have to provide records of those

18   individuals he treated, but who were not claimants in this

19   case.

20             THE COURT:  Certainly he knew.  Or his counsel knew.

21   Those are the requirements of the Federal Rules.  If you

22   designate someone as an expert, that's the requirement of the

23   Federal Rule.  That argument simply doesn't hold any water.

24             MR. LEWIS:  Well the result of the Court's order, is

25   to strike his testimony as to virtually everything, other than

1    his treating physician testimony, and I assume the studies, if

2    they qualify as proper under Daubert challenge, for which he's

3    provided the records.

4         The difficulty for us is that, the order seems to say

5    that any testimony he may offer that relies in whole or in

6    part --

7         THE COURT:  It does say that.

8         MR. LEWIS:  That's a -- we believe that's over the

9    top, because of the fact that every physician who will testify

10   in this case will be relying on all of their training and

11   experience.  And in fact that's the foundation you lay, and

12   perhaps with every witness you put on as an expert.

13        THE COURT:  Well, the clarification that you may

14   need, is that I wasn't asked to address and wasn't addressing

15   any testimony that he may be offering as a fact witness as a

16   treating physician.

17        That wasn't the intent of the order.  The objection I

18   had was to strike his expert reports, based on the -- and not

19   permit any testimony based on them, because he hadn't produced

20   all the underlying documentation.

21        That's the only issue I was -- I asked to address and

22   that's the only issue I did address.  So if you need

23   clarification on that score, I'm happy to provide it.  To the

24   extent he's being called as a fact witness, he obviously hasn't

25   produced an expert report, he doesn't need to produce an expert

Lewis - Argument                                                    158

1    report, and that order doesn't bar his testimony as a fact

2    witness.

3            And I'm happy to put that in writing, if that's

4    necessary.  You can submit an order to that effect.

5            MR. BERNICK:  We would, and I'll also state, we don't

6    have a problem with that proposit -- we don't know -- we don't

7    know that the treating physician testimony is germane to an

8    issue in the case, but on the basis of the prior order, we're

9    not arguing the prior order prevents him from testifying to --

10   as a treating physician for something that he did with an

11   individual.

12           THE COURT:  Okay.

13           MR. LEWIS:  That's disposed of.  But we think the

14   Court should reconsider its ruling and allow him to testify

15   based upon his experience with the claimants.  He has -- he had

16   no power to get their records, we had no power to get their

17   records until there was an order of this Court.

18           They're not parties --

19           THE COURT:  But you never asked for an order.

20           MR. LEWIS:  Pardon me?

21           THE COURT:  You never asked for an order.  You

22   certainly could have approached the Court to say, we're calling

23   this guy as an expert witness for trial.  He needs to produce

24   records.  We don't have the ability to get them, absent a Court

25   order.

1          I never heard a word about any of this, until there

2     was an objection, because he hadn't produced the records, and

3     the rules require him to produce the records.  I don't see how

4     you get out of the Rule.

5          The Rule says you produce the records.  That's the

6     Rule.  That's not this Court's rule.  That's the Federal Rules.

7     And to the extent that he --

8          MR. LEWIS:  Well we respectfully disagree.  We

9     believe that, to the extent that the Court has required him to

10    get records that he does not have access to, the Court can't

11    require practical impossibility from this --

12         THE COURT:  But he had access to them.  You can't, on

13    the one hand tell me he relied on them for purposes of issuing

14    his opinion, and on the other hand say he has no access to

15    them.

16         MR. LEWIS:  He can reach them, because he is a

17    treating physician.  He doesn't own the records at St. Johns

18    Lutheran, he doesn't own the records at Card.  We've got

19    affidavits that say he cannot produce those.

20         THE COURT:  He is accessing records for people he

21    didn't treat?

22         MR. LEWIS:  No, these are all people the treated,

23    Your Honor.

24         THE COURT:  But who are not claimants here.

25         MR. LEWIS:  Who are not claimants.

1          THE COURT:  Then he could have approached his own

2     patients and said, I have need to disclose these records for a

3     limited context, may I?

4          MR. LEWIS:  You're talking about 850 --

5          THE COURT:  Well it's his report, not mine.

6          MR. LEWIS:  That's no easy --

7          THE COURT:  He's the one who relied on the 1,800

8     people for the basis for his report.

9          MR. LEWIS:  The effect is to strike testimony, that

10    is the heart of our case against -- in these confirmation

11    proceedings.

12         THE COURT:  I don't see a way around it.  He's

13    required to produce the evidence.  And to say that he can now

14    somehow or other bifurcate in his mind the 850 people from the

15    950 and that everything he's already written based on 1,800 --

16    a sample of 1,800, is going to be the same, based on a sample

17    of 950, I don't --

18         MR. LEWIS:  Well there will be applied -- in the same

19    manner to the other witnesses who have not provided --

20         THE COURT:  The backup documents?

21         MR. LEWIS:  The backup documents for their --

22         THE COURT:  Yes.

23         MR. LEWIS:  -- clinical history?

24         THE COURT:  Yes.

25         MR. LEWIS:  I disagree with the Court.  I don't see

Lewis - Argument                                             161

1    why this physician cannot testify that he can separate out his

2    experience with the 950 that are claimants in this case, and

3    not rely on the experience with the 850 who are not claimants

4    in this case.

5              THE COURT:  Well, first of all, the records haven't

6    been produced.  And so, to the extent that someone wants to

7    cross-examine him about that fact, how can they, when the

8    evidence hasn't been produced?

9              It's the same problem, only stated from the reverse,

10   you know, from the flip-side of the coin.  The evidence still

11   has to be produced, whether it's to support his testimony, or

12   to support the fact that he can testify without having relied

13   on the information he first said he relied on.

14             I just don't see a way around the production

15   requirement.

16             MR. LEWIS:  Thank you, Your Honor.

17                           (Tape Change)

18

19

20

21

22

23

24

25

1    THE COURT:  I need -- I will need an order.  Is the debtor

2    going to prepare these in -- in conjunction with --

3              MR. BERNICK:  Yes.  Yes.

4              THE COURT:  -- opposing counsel?  Okay.  Thank you.

5              MR. BERNICK:  And -- and we'll make sure to clarify

6    that -- that the prior order did not address testimony --

7    factual testimony of Dr. Whitehouse as a treating physician, to

8    the extent that it's relevant.

9              THE COURT:  Okay.  That -- that would be

10   fine --

11             MR. BERNICK:  Yeah.

12             THE COURT:  -- because I did not intend to make

13   that --

14             MR. BERNICK:  -- Yeah.  And I --

15             THE COURT:  -- part of the order.

16             MR. BERNICK:  And I do appreciate Mr. Lewis's

17   position.  It's a very difficult one.  And I know from the

18   experience of taking Dr. Whitehouse's deposition, which Mr.

19   Lewis defended -- he's a very capable and -- and honorable

20   lawyer -- is just -- well, enough said.  Your Honor, we'd then

21   like to turn to item 12 on the agenda.  Maybe we won't need

22   that Thursday time after all.  I won't say that.

23             Item 12 on the agenda deals with the question of --

24   of testimony from individual claimants from Libby.  And the

25   very, very brief history on this, Your Honor, because this is a

Bernick - Argument                                          163

1     motion -- this is a motion to -- to determine -- to basically

2     have the Court confirm what -- what came up last time -- I

3     guess this was back in May -- that the testimony of individual

4     Libby claimants on medical issues would not be appropriate.

5     But let me just give a very short history.

6                    THE COURT:  Well, Mr. Bernick --

7                    MR. BERNICK:  Sure.

8                    THE COURT:  -- I don't understand what issue is going

9     to come up on which individual claimants are going to testify.

10    This is not covered litigation.  To the extent that there is

11    something relevant about the nature of the plant or the

12    conditions under which they work, frankly, I -- right now,

13    sitting here right now, I can't see that relevance.  But if

14    there is some relevance, I think they can testify about that

15    fact.  But I am hard-pressed to see what relevance there is to

16    any issues that will affect confirmation.

17                   MR. BERNICK:  Okay.  Well --

18                   THE COURT:  So I think I need to hear from Mr.

19    Cohn --

20                   MR. BERNICK:  That's fine.

21                   THE COURT:  -- on this one.  And -- and I'm cutting

22    off the history because I'm aware of the history.  I don't need

23    a recitation of it.

24                   MR. BERNICK:  That's fine.

25                   MR. COHN:  Your Honor, there are four -- there are

1      four issues on which -- or four types of issues, I should say,

2      on which we would assert that individual testimony may be

3      needed.  One of them is -- is medical condition.  And it is --

4      it is true that that was the subject of this Court's ruling in

5      connection with deposition testimony.  And what you said then

6      similarly, by the way, to what you just said now, is that.  But

7      I don't know what might come up at trial, and -- and so you are

8      not ruling on the issue of whether individuals could testify

9      about medical issues at trial.

10             And with this motion -- one of the things this motion

11     attempts to do is to -- is to obtain that ruling from you.  And

12     I want to say that we would -- and that raises two issues,

13     really.  One is -- one is, you know, because of the reservation

14     of -- that you made at the earlier hearing, that you were not

15     ruling on trial issues, we absolutely needed to list these

16     witnesses on our witness list, because otherwise we're -- we're

17     waiving a right.

18             THE COURT:  Mr. Cohn, to the extent they're

19     duplicative, I can assure you, you're not going to call 100

20     individual witnesses to basically tell me the conditions and

21     the problems that they're individually facing.  That's what you

22     have Dr. Whitehouse for.

23             MR. COHN:  Well, apparently we don't, Your Honor.

24             THE COURT:  Well, you do as the treating physician.

25             MR. COHN:  So -- so anyway, that's -- but that's part

1    one.  I just really wanted to make it clear that the reason

2    that these people are on the witness list, those -- those

3    individuals who are on the witness list with a view toward

4    testifying as to medical issues are on there because there was

5    -- it was expressly reserved in the record that -- that you

6    were not ruling upon whether they could testify at trial.

7              THE COURT:  But --

8              MR. COHN:  And we needed to preserve the record.

9              THE COURT:  So pick four or five of them, because I

10   probably won't even hear that if -- that many if it's

11   cumulative.  And designate who they are, and I'll permit those

12   depositions to go forward.  I'm not ruling that they're

13   relevant.  I doubt that they will be relevant based on other

14   confirmation hearings, but I don't want to foreclose the fact

15   that some relevant evidence may come up.

16             But I am not going to permit depositions of 100

17   people who will say that they -- you know, their conditions are

18   such that they can't walk up and down the steps.  That's what

19   Dr. Whitehouse can say.  He's the treating physician.  And you

20   can probably bring in almost all, if not all, of this evidence

21   through him.

22             MR. COHN:  Thank you, though, as to the four or five,

23   Your Honor.

24             Now, the second -- the second topic upon which --

25   upon which individual testimony will be needed -- and this

1    accounts also for -- for some of the people who were on the --

2    on the witness list that we filed -- is to testify about pre-

3    Bankruptcy settlements.  And the reason why that's important,

4    Your Honor, is because one of the contentions that we make is

5    that the value of these Libby claims in the tort system is much

6    higher than is required or even permitted to be -- to be

7    liquidated -- the liquidated amount of their claims under the

8    TDP.

9             THE COURT:  Are these the two lawyers?

10            MR. COHN:  No, I'm going to get to that.

11            THE COURT:  Who are you --

12            MR. COHN:  These are -- these are individual

13   claimants --

14            THE COURT:  They're going to know that their

15   settlements were higher than what Grace litigated with other

16   individual people in the tort system?

17            MR. COHN:  No.  No, Your Honor.

18            THE COURT:  Okay.

19            MR. COHN:  No, this is -- this is testimony by -- by

20   the -- those whose cases were settled about their exposure and

21   their condition and so on, which will enable us -- it's just

22   one element of -- of the proof.  The other element of which

23   will be, yes, and there are these other people out there who

24   are -- who are unsettled, who are in a similar position and

25   have a similar profile to these people who were settled.

1        So the prepetition guy settled for $400,000.  But the

2   TDP would permit the same person -- or person with the same

3   profile -- only to settle for -- or sorry, only to have a claim

4   of at most, say, $20,000.

5        THE COURT:  And this evidence isn't available through

6   Grace's prepetition settlement history?

7        MR. COHN:  The prepetition settlement history will

8   say the -- the person and the amount of the settlement.  And in

9   fact, we have -- we are largely in agreement as to what the

10  prepetition settlement names and amounts were.  But there are

11  other facts that are -- do not appear from that settlement

12  database.  For example, was the person an employee or a spouse

13  or family member of an employee or a community member.

14        Another thing that doesn't appear is the period of

15  exposure.  And those -- those are necessary to -- oh, and also

16  -- and also, for that matter, the medical condition.  Those --

17  those facts are necessary in order to do a comparison.  If we

18  simply said, Your Honor, yeah, there was some Libby claimant

19  out there who got a $400,000 settlement pre-Bankruptcy and so,

20  therefore, all of our -- all of our claimants should get

21  $400,000 settlements under the TDP, you'd laugh, because you'd

22  say, no, Mr. Cohn, I need --

23        THE COURT:  This --

24        MR. COHN:  -- I need apples to apples.

25        THE COURT:  I do.  I need it from an expert who's

Cohn - Argument                                168

1    going to make this comparison and say this is the relevance of

2    this issue.  This is -- this is the subject of expert

3    testimony.  An individual plaintiff can't possibly tell me that

4    their settlement was higher than the settlement of another

5    individual plaintiff.

6              MR. COHN:  No, they're not doing the comparison, Your

7    Honor.  They're just -- they're just -- it's -- as with any

8    other case that you try, you have building blocks.  And each

9    piece of evidence is a building block, because --

10             THE COURT:  I'm not trying tort claims.  I'm trying

11   whether or not --

12             MR. COHN:  Well --

13             THE COURT:  -- the plan is fair and equitable as to a

14   class.  So an expert ought to be telling me whether the people

15   who are in that class are substantially either similar or not

16   similar or whatever the objection or the proponents are going

17   to say with respect to that.  This isn't a matter for

18   individuals.

19             MR. COHN:  Your Honor, with -- with respect, we -- we

20   assert that the way that we intend to -- to prove this is by

21   introducing the -- the claimants and their -- their testimony

22   about their -- their profile.  And we also intend to -- through

23   the lawyers who -- Mr. Lewis and Mr. Heberling  who represented

24   them -- to draw the -- the similarity to the profiles of the

25   Libby claimants who exist now, and who -- who ought to be

1    obtaining similar values under the TDP.

2              THE COURT:  Okay.  And why is that something that you

3    need the individual claimants for and not just the lawyers who

4    are going to make this comparison?  Because to the extent that

5    they're going to be called as experts to make that comparison,

6    clearly the individual profiles is information that they could

7    consider in the course of making that decision.  In fact, they

8    have to consider it to make that decision.  So I'm at a loss as

9    to why I need the individual claimants to testify and why they

10   need to be produced for discovery.

11             MR. COHN:  Because -- well, in order -- in order --

12   in order to complete the record and -- and to permit to -- to

13   establish what the underlying facts are about the pre-

14   Bankruptcy settlements in a way that someone can't simply come

15   along and say, well, you know, we disagree with the lawyer's

16   perspective on the case.  I mean, you have a person testifying

17   to the actual facts.

18             MR. LAUGHLIN:  (Phonetic) Isn't -- isn't the issue

19   what Grace knew about the claimants?  Because Grace was the one

20   that entered into the settlement.  The individual claimant,

21   unless he's going to testify about, I had personal settlement

22   negotiations with Grace, I mean, for all the record would show,

23   Grace wouldn't know half of the profile that the individual

24   claimant is proposing to testify about.

25             MR. COHN:  And -- and the -- and that -- that part of

1    the testimony will be established through the lawyers,

2    obviously, who conducted the settlement negotiations and,

3    therefore, who knew what information Grace had access to in the

4    context of negotiating he settlement.

5              MR. LAUGHLIN:  But the other part of the testimony is

6    irrelevant.  If Grace didn't know what their profile was, it

7    couldn't have taken it into account in entering into the

8    settlement.

9              THE COURT:  I -- I just -- I'm at a loss to see how

10   the individual plaintiffs are going to either add or subtract

11   anything in this capacity.  The experts, yes, I can understand

12   where you're going from the expert testimony.  And if those --

13   if those are going to be the lawyers who negotiated the

14   settlement, fine.  But I -- I'm missing where the individuals

15   are adding anything.

16             MR. LAUGHLIN:  Your Honor, the deadline for expert --

17             MR. COHN:  Well, I'm not sure -- yes, I --

18             THE COURT:  Can't -- I can't hear you.

19             MR. COHN:  The -- Your Honor, I -- I'm going to

20   disagree with the characterization of Lewis and Mr. Heberling

21   in that capacity as -- as experts.  They're more analogous to

22   the treating physician in the sense that they're not --

23             THE COURT:  Oh, the fact witnesses.  All right.

24             MR. COHN:  -- they're not -- well, they're not

25   sitting there -- they're not sitting there saying, you know, in

1    the -- in the abstract, you know, here's -- we had nothing to

2    do with this in the past, but we're --

3              THE COURT:  All right.

4              MR. COHN:  Okay.  So I just wanted to make that

5    clear, because I believe somebody was about to shout out from

6    the audience, the -- the deadline, you know, has passed for

7    expert testimony.  And we did not think this was expert

8    testimony and have not proffered it as such.

9              THE COURT:  All right.

10             MR. COHN:  A third purpose, Your Honor, for which

11   Libby claimant individual testimony is being introduced is to

12   -- is in order to familiarize this Court with conditions at the

13   -- at the mine and at Grace's facilities in -- in Libby, which

14   we think is important for any fair consideration of the

15   position of these claimants in this case.  However, we can do

16   through the four or five that you have -- that you have said

17   that you would allow.  So I think maybe that's a non-issue at

18   this point.

19             THE COURT:  All right.

20             MR. COHN:  And then -- and then finally, Your Honor,

21   when -- when Mr. Schiavoni, in his -- in his motion, refers to

22   the thousand Libby witnesses, here is what he is talking about.

23   There's actually been kicking -- kicking around for months our

24   proposal by way of a stipulation, with the plan proponents, to

25   -- to deal with how -- how we are going to prove insurance

                        Cohn - Argument                      172

1    rights with respect to confirmation.  Because as you know, very

2    important elements of our -- our objections to confirmation

3    have to do with the fact that the Libby claimants have -- have

4    insurance rights.

5            In order to - in order to prove what those insurance

6    rights are, there basically are two things.  One is the

7    policies.  In fact, we need -- we need to have some preferably

8    stipulation to -- to put copies of the policies into evidence.

9    But the other side of it, Your Honor, is, okay, who are these

10   claimants?  What were their periods of exposure?  Were they --

11   you know, who -- who were they?  Were they community members?

12   Or were they actual employees of Grace?  Or were they -- were

13   they family members?  Those data are necessary in order to be

14   able to argue who -- who is entitled to coverage, and under --

15   under what policy.

16           So therefore, in order to prove the value of the

17   insurance coverage -- I mean, the coverage itself is just

18   insurance policies.  It's a matter of law.  You just interpret

19   -- interpret the policy.  But -- but the application of the

20   individual -- the individual circumstances to that is something

21   that needs to be proof.

22           Now, the -- the awful way to do it, quite frankly,

23   Your Honor, would be to -- to bring in every one of our clients

24   and have them, you know, testify for what would be about five

25   minutes about, you know, yes, I worked at Grace.  These are the

Cohn - Argument                                     173

1    years, what I did, you know, et cetera, et cetera.  Rather than

2    do that, it would seem to me that there ought to be a

3    stipulation on this.  However, we have -- we have -- as I say,

4    we first proffered this -- raised this issue in March.  Traded

5    some drafts, but have not -- have not obtained a stipulation

6    with the plan proponents on this issue.  And so that's why the

7    -- we had to add these people to our witness list.

8           THE COURT:  So you're asking for a stipulation from

9    the opposing parties that indicate that there are -- how about

10   hypothetically -- that hypothetically there are people who fall

11   within this class, so that you can then make your legal

12   argument.  I think the problem -- I mean, unless the claims

13   have been somehow already tendered, there may be an issue about

14   binding the trust at a later time if people haven't already

15   come forward with claims.

16          MR. COHN:  Well, first of all, Your Honor, one thing

17   I want to make very clear is that none of what we're talking

18   about would be binding on the trust or on any insurer,

19   because --

20          THE COURT:  All right.  It's only for confirmation?

21          MR. COHN:  It's only -- it's only to deal with how we

22   can avoid having 1,000 people give very brief testimony on the

23   subject of the underlying facts necessary to -- to establish

24   their relationship to these insurance policies.

25          THE COURT:  All right.

1    MR. COHN:  And I hear people go falling off to the

2    side, but I -- this is a -- this is a problem of proof that we

3    must solve.  And if we can't solve it by some reasonable

4    stipulation, then we need to solve it by offering the

5    testimony.  And that's why these people are on the list.  Thank

6    you.

7    THE COURT:  All right.  Well, you don't need 1,000 of

8    them.  You only need one in each of whatever policy period you

9    are in order, I think, to make the connection, correct, that

10   you're arguing about?

11   MR. COHN:  Well, if you're saying -- if you're saying

12   meaning that we could argue, you know, sample -- you know,

13   sample claimants, then the difficulty with arguing on a sample

14   basis, Your Honor, is that it's always possible in these things

15   for someone to argue that, oh, yeah, if there's one outlier or

16   whatever whose, you know, being prejudiced in one way, that's

17   not -- that doesn't rise to the level of something that the

18   trust distribution procedures have to address.

19   What our argument is, is that we -- is that our

20   people are being systematically deprived; meaning that they --

21   they all or nearly all have valuable insurance rights that are

22   not being taken account of under the TDP.  They're not being

23   recognized under the plan.  And so that's why we think a broad

24   based stipulation is probably the -- the way to go.  And we'll

25   draft it in a way that's not prejudicial to anyone, but that

Cohn - Argument                                         175

1    just lets us establish this just baseline evidentiary building

2    block, if you will, for our -- for our objection.

3              THE COURT:  Okay.  And the stipulation would be to

4    the effect that there have been people who were injured who

5    would make claims under the policies?

6              MR. COHN:  Well, yeah, actually, the way that we --

7    the way that we drafted it was to actually attach -- just

8    attach a list of people which would designate each person as

9    either family member or employee or -- or spouse.  That's one

10   column.  And then there would be years of exposure.  I -- I

11   think that was it, you know.  But just --

12             THE COURT:  Okay.  But -- but the issue -- you're --

13   you're concept of rights under the insurance policies is based

14   on the fact that these are tort claimants who would file a

15   claim to the insurance that's available under the policies,

16   correct?

17             MR. COHN:  Well, they -- yes, that they have -- they

18   certainly have direct rights under those -- under those

19   policies pursuant to the argument we just made.  But more

20   importantly, for this purpose, Your Honor, Grace -- you know,

21   people have said, remember, it's Grace's insurance?  Grace

22   would have rights to recover under its policies for these --

23   you know, on account of these people's claims.  And yet,

24   despite the fact that -- that they have these independent

25   rights, and the fact that Grace has these rights to -- to --

1   because I -- I misspoke when I said "more importantly," Your

2   Honor.  I mean, also.

3            The fact is that the trust is going to -- is going to

4   get potentially large recoveries on account of Libby insurance,

5   while the Libby claimants are going to just be kind of thrown

6   -- not just thrown into the pile with everybody else, but --

7   but we say, you know, paid less than they -- than they should.

8   And that's -- that's our -- you know, that's the basis of our -

9   - that's a basis of our insurance related objections.  And we

10  need to be able to prove it.

11           THE COURT:  Okay.  I just wanted to know the scope of

12  what it was you were asking.  And if I understand it, the base

13  -- the basis for the stipulation that you're asking for

14  essentially is that there are tort claimants who suffered an

15  injury, who would make a claim under the insurance policies?

16           MR. COHN:  Yes.

17           THE COURT:  Okay.

18           MR. COHN:  Yes.

19           MR. BERNICK:  There is a stipulation between the

20  Libby claimants and?

21           MR. COHN:  And -- and the plan proponents, because it

22  relates to a confirmation objection.

23           MR. BERNICK:  And asking the carriers to stipulate?

24           MR. COHN:  We are not asking the carriers to.  And we

25  think it should expressly state that it is not binding and not

1    prejudicial to them, because it's not -- it wouldn't be fair to

2    them to do that in the context of a plan confirmation hearing.

3              THE COURT:  Well, the -- yes, the issue is not that

4    they have a claim.  It's that they would make a claim, correct?

5    I mean, that's what you're saying, that there are individuals

6    out there who contend that they can prove --

7              MR. COHN:  Yeah.

8              THE COURT:  -- that they have a claim.  But this

9    isn't the time to prove that claim.

10             MR. COHN:  Well -- well, yes -- well, it's -- what

11   the stipulation would just do -- it wouldn't even -- it

12   wouldn't even go that far.  The stipulation would just provide

13   the basis on which we could argue that under the terms of the

14   insurance policies they have claims.  And others could argue

15   that they don't.

16             THE COURT:  All right.  Okay.  Mr. Bernick?

17             MR. BERNICK:  I know -- I'm very sensitive to the

18   levitation in the back of the courtroom on this side, and

19   anxious to avoid it because it seems to me that at this point

20   that's kind of a tail-dog situation on -- on the issue that

21   brings us here in item 11.  I'd jut like to go through the list

22   that Mr. Cohn went through and -- and to respond to it to see

23   if we can't get to the point where Your Honor can rule on -- on

24   what genuinely remains at issue.

25             First, with respect to medical conditions, Your Honor

1    basically said, well, come up with four or five people who can

2    talk about their medical conditions.  And on the strength of

3    the idea that it's four or five people, we can argue relevance

4    another day, and we can go ahead and take their depositions.

5    We just need to know who those people are.  That's something

6    that we need to know before Thursday so that we can wrap it

7    into the schedule.  So I would ask Mr. Cohn and Mr. Lewis to

8    think about who the four or five people are, so we can have

9    that discussion sometime between now and Thursday.

10           THE COURT:  That would also encompass the issue about

11   working conditions.  Those -- Mr. Cohn.

12           MR. BERNICK:  Well, I -- working conditions is a

13   different kettle of fish for reasons I'll talk about in just a

14   minute.  Then he says, well, we also needed to talk about the

15   value of cases that were settled and how basically they're

16   getting the short end of the stick in the connection with the

17   TDP.  I think that that testimony really cannot come in through

18   the individual claimants whose claims were settled.

19           And the reason for that is, not only do they have too

20   little, they also have too much, too much for the reasons that

21   Mr. Laughlin indicated too little, because they only will be

22   able to talk about part of the equation.  History shows, and

23   we've been through this many different times, both at the

24   criminal trial, and otherwise, indeed, it's a very basic aspect

25   of personal injury litigation generally.  If you ask the

1    plaintiff what were your exposures, well, you'll get part of

2    the story.  Sometimes it will be accurate, sometimes it won't.

3    I mean, talking about events that took place a very, very long

4    period of time ago.

5            So we get a witness on the stand that says, well, I

6    was -- I only had my exposures through the community.  And

7    community means something for -- one thing for some people,

8    something else for other people.  We went through this ad

9    nauseam for four months in connection with what does a

10   community mean?  What does a family exposure mean?  Your Honor

11   doesn't need to deal with all that, to say nothing of dealing

12   with it through a witness who is only one part of the equation.

13           The other part of the equation is what their medical

14   records will reflect that they told doctors 20 years ago.  It

15   is what their -- what their spouse might say in connection with

16   the deposition.  It's a whole bunch of different things.  If

17   the ultimate goal of the second point is to talk about what

18   went into the value of settled cases, there's a very simple way

19   in which that can be ascertained.  Through records taken from

20   Grace's files and also from the files of Heberling and Lewis

21   regarding the -- the substance of the negotiation.  Because

22   that -- everything will be brought to bear in connection with

23   it.  That will tell us the fact of what occurred.

24           THE COURT:  I thought that's what I said.

25           MR. BERNICK:  No, if it's through the testimony of a

1    witness that is the claimant themselves --

2         THE COURT:  No, no, I don't see -- I thought I said I

3    don't understand what the claimant's going to add to this.  I

4    think it's going to require -- I was using the word expert

5    testimony.  I'll stand corrected to say negotiation -- the part

6    -- the files of the parties who actually participated.  I don't

7    see what the claimants can add to the settlement value issue.

8         MR. BERNICK:  Okay.  That then brings me to -- and if

9    we -- if we have a limited number of those, and they want to

10   talk about a limited number of those, we need to have that

11   discussion, too.  Who are the people and, you know, which ones

12   are we talking about, so we realistically can have a process

13   for -- for dealing with them.  Again, we're not conceding the

14   relevance of any of that, but by way of discovery, that will

15   certainly cover that base.

16        We then have number three, the discussion of

17   conditions at Libby.  And I'm going to Lewis and Heberling in a

18   moment here.  Conditions at Libby are entirely irrelevant.  We

19   could have -- the question is discrimination unequal treatment

20   -- people -- we could have people coming in from all over the

21   country to talk about the abysmal working conditions they had

22   in connection with exposure to other kinds of Grace asbestos.

23        I'm not saying that it was all that abysmal, but I'm

24   sure that they would come in and say that it was that abysmal.

25   But it adds nothing.  It is not material, it's not germane to

Bernick - Argument                    181

1    any issue.  And effectively, it opens the door on cross-

2    examination to all kinds of stuff.  It is, again, very partial.

3    It's a witness saying, here's what I saw.  Well, here's-what-I-

4    saw always has another part to it, another aspect to it.

5         You end up learning the -- the Libby mining

6    operations in connection with the testimony of a witness who's

7    going back for now 20 years, because the facility shut down as

8    a manufacturing facility in 1990.  Completely and utterly

9    irrelevant.  It will be -- it will be a -- a distraction and a

10   burden in the discovery process.  We would actively and still

11   do actively object to any such testimony as being irrelevant.

12   It's a lot --

13        THE COURT:  Well, look, it -- it seems to me that

14   with respect to that issue, if the conditions at the mine

15   somehow or other affect the fairness of the treatment of the

16   Libby claimants, that's the subject matter for expert

17   testimony.  Somebody has to tell me why this group of Libby --

18   Libby claimants is being discriminated against as a group of

19   Libby claimants.  And if one of the factors is that the

20   conditions at the mine were so terrible there and were not as

21   terrible at other places, then that's one of the factors that

22   they're going to tell me about.  But that's the subject matter

23   for expert witnesses, not individual claimants.

24        MR. BERNICK:  And -- and I know you're going to get

25   this in connection with the testimony from Dr. Peterson.  I

Bernick - Argument                                    182

1    mean, there are a whole bunch of different factors that are

2    always out there in the tort system that affect tort system

3    values.  If you try to do a complete analysis of any given

4    settlement, with all the different factors that are involved,

5    and then go to the next settlement and the next settlement, and

6    somehow try to figure out exactly what factors weigh in what

7    way, so that you can make a comparison between Libby and other

8    places, you end up with a multiple regression (phonetic) that's

9    probably got 35 different elements.  Nobody has ever been smart

10   enough to figure that out.  It's never been -- it's never been

11   done.

12             THE COURT:  If they have or not, it's the subject

13   matter for expert testimony.  We've got 15 minutes left.  Let's

14   move.

15             MR. BERNICK:  Yes, I -- right, right, well, yeah,

16   this then brings me to -- this brings me then to Messers

17   Heberling and Lewis because that's really where all this thing

18   is really headed, Your Honor.  And Mr. Heberling and Mr. Lewis,

19   if they testify as fact witnesses about what actually occurred,

20   you know, that's up to them.  But then we're going to face the

21   same problem that we had previously, which is, what about their

22   files?  Because --

23             THE COURT:  They're going to have to produce them.

24             MR. BERNICK:  They're going to have to produce their

25   files.  And privilege and all the rest of that stuff -- you

1    know, again, if we're talking about the same -- you know, same

2    number of people, who is it -- who -- which cases are going to

3    be the famous settled cases?  Which ones are they?  How many?

4    And what files are going to be produced from Heberling and from

5    Lewis without privilege objections?  That's the fact side.

6              Now on the expert side, I would venture to say this

7    is why I want to prolong the agony one minute longer.  We don't

8    have an expert report for these individuals at all; that is

9    Heberling and Lewis.  That when it comes to the expert work

10   that would have to be done, they'd have to be sitting there

11   doing comparisons.  They can't do a -- they can't say Libby is

12   getting the short end of the stick without saying in reference

13   to something else.  Are they also experts on non-Libby claims

14   that have been settled, so that they can say, oh, we're not

15   being treated the right way?  I don't think so.  I don't think

16   that they have that expertise.  They certainly don't have an

17   expert report that says it.  And it seems to me that to take

18   them down the road of doing that is an impossibility at the

19   present time.

20             I think, really, when push comes to shove, the way

21   that this has been handled -- this is not a new issue.  Indeed,

22   the whole TDP has been developed over years and years and years

23   and years, where the values that are in the TDP are matched to

24   tort system values in a fashion that has almost become an art

25   form.  And Dr. Peterson knows about this, and he'll testify

1     about it.

2              The real issue is, what happened with respect to the

3     Libby people?  And are the Libby people being treated unfairly

4     or were they discriminated against as a group in that little

5     art form?  I don't think that Mr. Heberling -- and I know that

6     -- I know Mr. Heberling and I know Mr. Lewis don't have the

7     qualifications and they don't have the background to make that

8     comparison.  And that's why we don't have an expert report is

9     why they're not experts in the field.

10             They're both very capable trial lawyers, and they're

11    both very capable lawyers and advocates for their clients.  But

12    it seems to me that the only way that the Libby claimants at

13    this point, given what they've chosen to do with the experts to

14    address that issue, is by using claim files for settled claims.

15    We're not talking about existing claims.  Existing claims,

16    which they say that Lewis and Heberling are going to address --

17    and you talked about -- I mean, how you can sit there an value

18    an existing claim.  Give me a break.  You know, I mean, that --

19    that's a whole new area of looking into a crystal ball and

20    saying, so and so client's claim is going to be worth X.  No

21    expert report, no competence for doing that.

22             I think that this is really a lawyer's argument point

23    that they know what went into our TDP, that they know their

24    client files that have been settled.  We got to figure out what

25    the client files are that they're going to say demonstrates

1    that the Libby people are being discriminated against.  Tell us

2    what the files are, you know, by Thursday, so we can deal with

3    that.

4            And essentially, what you're talking about is

5    argument to the Court and cross-examination of our TDP.  I say

6    our TDP.  Their TDP.  It's a -- it's a argument of lawyers in

7    court.  If Mr. Heberling takes th stand or Mr. Lewis takes the

8    stand to and say, I don't think that this is fair, they're

9    essentially not doing anything different from what, you know, a

10   score of lawyers in this courtroom could do working with claim

11   files.  People deal with claim files every day of the week.

12           So our proposal would be, give us the four or five

13   people on medicals by Thursday; give us the settled cases where

14   you want -- where we want to introduce the claim files by

15   Thursday.  We can figure out a schedule for -- for dealing with

16   that and deposing the people.  And then we're really talking

17   about a matter of legal argument.

18           With respect to the insurance rights, the insurance

19   rights is basically a question of standing.  They want to say

20   they have standing to contest the treatment of insurance.

21   They're not going to establish that they've actually got

22   coverage in this case and that those rights, in -- in fact,

23   exist and are being compromised.  What they're really saying is

24   that they have standing to complain about the disposition of

25   the insurance.  And I don't think we really need very much to

Lewis - Argument                                      186

1    establish standing.  I don't think we need a bunch of people

2    coming and talking about, oh, I was exposed during X period of

3    time.

4              So that's all that I really have.  I think that with

5    that -- that in place, we can keep on moving forward.

6              THE COURT:  Mr. Lewis, any -- any problem with

7    Thursday for designating whatever client files and for the

8    witnesses?

9              MR. LEWIS:  No, Your Honor.  I would point out one

10   thing.  We do have the deposition of Mr. Hughes (phonetic),

11   which is a 30(b)(6) deposition.  And in his testimony, he

12   agreed that the average settlement in Libby was $268,000, based

13   on the records.  And that the average settlement elsewhere in

14   the United States was between 2 and 4,000, depending upon how

15   you tweak the numbers.  But that's what he said.  He also

16   indicated that the reason that Grace paid more in Libby was

17   multifaceted.  One of them being that generally the only source

18   of asbestos or the 99 or 95 percent source of asbestos in Libby

19   was Grace.

20             So there were not other defendants who -- against

21   whom these people could recover.  Whereas, in the normal cases

22   around the country, there are -- were multiple defendants

23   against whom --

24             THE COURT:  Yes, I -- I've read the portions that

25   you've submitted.

1         MR. LEWIS:  So -- so anyway, that's what this is

2    about.  We can meet these deadlines, and we'd like to work with

3    everybody to keep this as simple as possible.  And -- and I

4    guarantee you, the last thing I want to do is testify before

5    any Court, because lawyers do better on this side of -- of

6    things than in a witness stand.  So if that can be resolved,

7    we'd like to do that.  The difficulty is, we have to put on

8    proof that at least supports our theories in the case.

9    Regardless of whether they prevail, we need to get proof of

10   what we're trying in this case.

11        THE COURT:  All right.  If you can work an order out

12   that resolves this motion in the method that I've just

13   indicated before Thursday, that's fine, you can submit it on a

14   certification of counsel.  Otherwise, I'll just assume that

15   we'll -- you'll tell me on Thursday when an order will be

16   coming in.

17        MR. LEWIS:  Thank you, Your Honor.

18        MR. BERNICK:  That brings us to item 13, which is the

19   motion to file a supplemental objection by the Libby claimants.

20   And the supplemental objection has four basic bullet points.

21   Three of them get back into this medical arena.  And I think,

22   Your Honor, that I had a longer presentation to make, which I

23   will not make, but we -- we really have a -- a moving target

24   problem here that the -- the evidence that's -- you know, the

25   -- we just submitted a report for Dr. Weil on Friday.  We -- we

1    gave all that we could.  But since -- since even Dr. Weil --

2    the scope of what he was going to talk about was defined.

3           We now have a supplemental report by Dr. Moolgauker,

4    who's their epidemiologist.  On July 14th, we get a production

5    of X-rays and HRT -- HRCT's for 17 clients, and then has to

6    come to this process because, otherwise, we can't complete our

7    expert work.  We're trying to.  We can't complete our expert

8    work.

9           So the supplemental objections that are being filed

10   now are supplemental objections that raise yet new medical

11   issues.  And I'm not really terribly -- well, we oppose the --

12           THE COURT:  Didn't I set deadlines for all of this?

13           MR. BERNICK:  Yes.

14           THE COURT:  I mean, I had a deadline for a reason.

15   That was so I don't have to have these arguments.  So I'm not

16   sure why at this point anybody is acting outside the deadline.

17   But what's good for the goose is good for the gander.  It's

18   going to apply evenly to everybody.

19           MR. BERNICK:  Okay.  So we'll take this up, in the

20   interest of time, with Mr. Cohn between now and Thursday.  I'm

21   not sure what there is to be done, but one of the things we're

22   going to have to talk about on Thursday is bringing this

23   medical thing to a conclusion.  It's been extremely robust.  We

24   need to finish our expert reports so that they get them.  They

25   need to take the deposition of Dr. Weil, which has been

1    postponed, because the work has been ongoing, because their

2    work has been ongoing.  And I don't take -- I don't blame

3    anybody, it's just that we got to bring it to a conclusion.  So

4    maybe we should defer this issue for -- until the discussion on

5    Thursday.

6                THE COURT:  That's fine.  And see if you can get some

7    specific dates by which everything is to end, because I thought

8    it was done.

9                MR. BERNICK:  Yes, I understand that.  And we're not

10   agreeing to this, but rather than -- I'm very anxious to use

11   the last 15 minutes to talk about the pretrial order, and I'll

12   just follow Your Honor's lead.  We object to these supplemental

13   objections for the reason that they are not timely filed, and

14   they raise new matters.  I don't even know -- well, they raise

15   new matters in the objection that we don't believe are -- are

16   timely.

17               THE COURT:  All right.  Regardless, work with Mr.

18   Cohn, please, to see if you can get dates by which nothing more

19   is going to be supplemented at.  You know, these reports by way

20   of the basic information have to stop in order to get to trial.

21   And this continual supplementation is not -- it's simply not

22   appropriate.  By now you ought to know your basic case and who

23   your -- who your witnesses are going to be.  So I'll continue

24   number 13 till Thursday.

25               MR. BERNICK:  Okay.  Three minutes on agenda item

1    number 10, which is the -- which is the status report on phase

2    one.  Mr. Lockwood (phonetic) will use 15 seconds, because he's

3    just told me he's going to be -- he'll talk about what's going

4    on with the insurers.

5            THE COURT:  I'm sorry, what agenda number?

6            MR. BERNICK:  This is the agenda item number 10.

7            THE COURT:  Okay.

8            MR. BERNICK:  This is the status on phase one.  And

9    the bottom line is that the briefs regarding default interest

10   -- on impairment on default interest, they've all been

11   submitted.  No surprise, there are yet new arguments that at

12   least are being featured prominently now that weren't before.

13   And -- and our suggestion, Your Honor, is going to be to have a

14   further argument with regard to impairment.  Because it's

15   become -- you know, there's yet no new material that's out

16   there.

17           If Your Honor prefers not to have that, we probably

18   will have some other things to address in our August 7 trial

19   brief.  But -- but I think it may actually -- and I'm not

20   necessarily always in favor of these kinds of things.  I think

21   it may be advantageous to have a further argument with regard

22   to impairment.

23           THE COURT:  Can it be done at the next omnibus?

24           MR. BERNICK:  Next omnibus is what date?

25           COUNSEL:  August 24th.

1          MR. BERNICK:  Answer is yes.

2          THE COURT:  All right.  Put it on for the next

3     omnibus for supplemental argument to the -- no?

4          MR. COBB:  Your Honor, I can do it on the 24th, but I

5     mean, this -- at a certain point, as Your Honor has been

6     saying, of late -- it's all before you.  I -- I don't know what

7     to say.

8          MR. BERNICK:  Well --

9          MR. COBB:  Mr. Bernick would like to talk some more,

10    so I'm happy to join him and talk some more, too.

11         MR. BERNICK:  I -- I think I'm not the only one that

12    takes pleasure in addressing the Court.  It's not a question --

13    I mean, these are all new arguments, frankly, that are being

14    raised by the lenders.  And so if we actually rolled -- oh,

15    look, guess who wants to talk again.  So --

16         THE COURT:  That's fine.  Look, the answer to this

17    one is, I'll hear whatever argument you need to make on August

18    24th.  I'm limiting each side to 15 minutes.

19         MR. BERNICK:  That's fine.  Insurance -- Peter, do

20    you want to talk about insurance briefly, and then we'll talk

21    about pretrial order.

22         MR. LAUGHLIN:  Your Honor, the plan proponents have

23    filed papers taking the position the insurance neutrality

24    changes that they filed after the hearing were adequate to

25    satisfy the law and the Court.  The insurers are taking the

1    position that that's not the case.  And we're going to be

2    having some discussions about that.  And we'll see where we go.

3    But for the moment, at least, everybody's said everything to

4    the Court, that I'm aware of, on that subject that they have to

5    say.

6              THE COURT:  Okay.  So what is it that you need from

7    me?

8              MR. LAUGHLIN:  Nothing.  That's a status report.  You

9    had told us at the last hearing that you encouraged us to be

10   having discussions.

11             THE COURT:  Yes.

12             MR. LAUGHLIN:  And we will be having those

13   discussions.  We've had some preliminary discussions.  We're

14   going to have some more.

15             THE COURT:  All right.  Well, give me another status

16   report at the next omnibus.

17             MR. LAUGHLIN:  Yes, Your Honor.

18             THE COURT:  Thank you.

19             MR. BERNICK:  On the pretrial, which is item number

20   9, I think it's basically a pretty good new story that a lot of

21   the uncertainty and, I'll call it -- well -- choppiness of the

22   phase one pretrial, I think, will be obviated with respect to

23   phase two.  I say that optimistically, but I think that there's

24   certainly material out there that would lend credence to that

25   optimism.

Bernick - Argument                                    193

1      THE COURT:  Make sure you build into that order dates

2   by which pretrials are going to be submitted to this Court,

3   please.

4      MR. BERNICK:  This is it.

5      THE COURT:  Oh, this is the -- no, I mean, a -- don't

6   -- aren't you going to want a pretrial or maybe not, maybe I

7   just thought you would -- at -- right shortly before the case

8   commences?

9      MR. BERNICK:  Well, I think we probably will.  But --

10      THE COURT:  Trial commence --

11      MR. BERNICK:  But this was supposed to be at least

12   the first of the pretrials.

13      THE COURT:  No, I'm talking about pretrial

14   narratives.

15      MR. BERNICK:  Oh, narratives?

16      THE COURT:  Statements.

17      MR. BERNICK:  Well, we have trial briefs that --

18      THE COURT:  The trial briefs, yes.

19      MR. BERNICK:  Yeah, they -- they --

20      THE COURT:  But I want -- I want the list of exhibits

21   pre-marked for identification.

22      MR. BERNICK:  We got that.

23      DEPUTY CLERK:  That was all filed on the 20th.

24      THE COURT:  It was?  Oh, okay.  I just haven't seen

25   it yet.

1              MR. BERNICK:  Okay.  So that's what I'm really

2    talking about.  So just to be clear, Your Honor -- I know

3    there's a lot of things going on.

4              THE COURT:  I saw exhibit lists.  I saw a statement

5    that indicated who the witnesses were going to be and what

6    issue they'd testify and a list of documents.

7              MR. BERNICK:  Yes.

8              THE COURT:  But I haven't seen the documents.

9              MR. BERNICK:  Correct.  And that's --

10             THE COURT:  Okay.

11             MR. BERNICK:  -- that's now going to be in the case

12   management order.  Do we have a -- do we have a line item for

13   the submission of all the --

14             THE COURT:  That's what --

15             MR. BERNICK:  -- binders to the Court?

16             THE COURT:  That's what I'm asking for.

17             DEPUTY CLERK:  We do.

18             MR. BERNICK:  Yeah.  Yes.

19             THE COURT:  Okay.  Fine.

20             MR. BERNICK:  Yeah, okay.  So the -- the state of

21   play is roughly this.  The trial briefs have been filed by the

22   objectors.  There's one trial brief that was deferred, and

23   that's on best interest by the Libby claimants, and I think

24   they get into a little bit later, in light of the testimony of

25   Ms. Zilly (phonetic), which has yet to taken with respect to

1    best interest.  But -- but essentially, the trial briefs have

2    been submitted.

3           Our trial briefs are due on the 7th of August.  The

4    pretrial submissions have all been made pursuant to Your

5    Honor's suggestions.  And there have been 34 different

6    submissions that have been made by parties to the case.  We

7    counted them up, de-duped them.  There are 730 exhibits.  And

8    while that sounds like a lot, there's actually some room for

9    optimism there as well.  The plan proponents have about 270

10   exhibits.  So that covers the waterfront.

11          There are a lot of kind of voluminous exhibit lists

12   that are really driven by, I think, a need to have completeness

13   on -- on policies and the like.  Kaneb has 68 exhibits; BNSF

14   has 91 exhibits.  They're mostly contracts and related

15   correspondence.  Anderson Memorial is 7 -- 37; and Libby is 77.

16   So they're at least manageable populations of documents.

17          One of the things that the proposed CMO does is to

18   say that rather than having the exhibits submitted later among

19   -- exchanged among the parties -- they're listed but they're

20   not exchanged -- that they ought to be exchanged much -- much

21   sooner.  So we're calling for that by August 10th.  And the

22   reason is that the faster that we have them, the faster we're

23   able to really see what some of these things are.  Some of

24   these things we've just never seen before at all.  There are a

25   total of 91 live witnesses who have been listed, but 39 of them

Bernick - Argument                                      196

1    are listed Libby claimant.  So we think that that number is

2    going to shrink significantly.

3           So all this material is there.  There are basically

4    two matters to take up.  One was how to organize the trial, and

5    the other is how to get there.  How to get -- there's the CMO.

6    The CMO basically follows a very traditional format of getting

7    exhibits, deposition -- or deposition designations, motions in

8    limine, Dalbert, all the way down the road.  It will include

9    the submission of the documents to the Court.  I'm not going to

10   go over that today.  We'll talk about that on Thursday.

11          With respect to the overall structure of the trial,

12   this is simply an idea from the debtor, nobody else.  But there

13   are different ways to, quote, skin the cat.  One is to have the

14   plan proponent simply go first and address all issues that the

15   plan proponents want to address, then to have the objectors,

16   one by one, come up and make their objections.  And we can

17   certainly  proceed in that fashion.

18          I think it will be extremely difficult to -- to time

19   the case, to structure the case, and to have Your Honor

20   consider testimony at about the same time when testimony

21   relates to the same subject.  So Grace only thinks that --

22   although, I don't -- I don't dismiss the possibility that

23   others will see the light -- believes that the best way to

24   proceed is to start with the discrete subject matters first,

25   and to kind of push the more general issues to the back end.

1   So Libby would go first.  And the Libby people would put on

2   their objections.  And then we would respond to the Libby

3   objections.  And that probably will take the longest of all of

4   these segments.

5          My hope is we can be done in a couple days, but it

6   may take two-and-a-half, maybe three days, unfortunately.

7   Unless something gets limited, I think that that's what it's

8   going to do.  The lenders would be next. I think that the

9   lenders will be much shorter.  A lot of it's coming in by way

10  of record testimony.  But then there is also live testimony.

11  And I think that the witnesses are likely to be fairly short,

12  in large part because Your Honor is mostly familiar with what

13  all of this is anyhow.  We may have some issues about whether

14  people need to be brought live.  It is the debtor's position

15  that this is a distinct phase and for a distinct purpose in the

16  confirmation, and that people need to be prepared to testify

17  live.

18         So we've indicated this, and this is something that

19  we'll be talking about with Mr. Pasquale and Mr. Cobb in the

20  course of our always productive discussions.  But we think the

21  lenders could probably be done in a day.  We hope so.

22  Insurance -- broad group of people.  But it actually turns out

23  there is a relatively limited number of live witnesses.  So

24  there are three experts, and I think that there are about maybe

25  six or eight other fact witnesses that have listed.  We don't

1    know that they'll all be called.

2           Indirect claimants is the next category that picks up

3    the likes of BNSF, Scott (phonetic), Garlock.  There are --

4    there are some -- live witnesses have been identified, and

5    that's really what drives my time estimates on all this is

6    purely the live testimony.  There are a number of people that

7    have been identified.  We think it's going to be handleable.

8    We hope that not all of them are called.  We think that can be

9    done in less than a day.  Anderson, less than a day.  All  of

10   their issues.

11          I think we'll then be down to -- when I say all of

12   their issues, very generic kinds of live testimony.  Probably

13   mostly from the plan proponents.  Feasibility is an issue that

14   would occur, if it did occur, in that last category.  We, I

15   think, just produced a -- an expert report on feasibility, if

16   memory serves, on Friday.  We hope that the content of that

17   report is such that this does not really emerge as a major

18   issue.  But this is the basic order that we're proposing.  We

19   think it can be done in the days that the Court has allotted.

20   It's going to be tight.

21          And I think that -- I think that because it's going

22   to be tight, Your Honor is going to have to set some time

23   limits perhaps for certain segments of the process.

24          THE COURT:  Well, I think you folks ought to talk

25   about it between now and Thursday.  And I will propose to set

1    some time limits.  I think it's probably going to take a few

2    more days, or at least another day, maybe two, than are

3    currently built into the schedule.  But I'll take a look at the

4    schedule, too.

5            MR. PASQUALE:  Your Honor, just one question.  Ken

6    Pasquale for the Committee.  I'm sure everyone is thinking the

7    same thing.  And I'll address the Court, but it really is a

8    question for Mr. Bernick.  There are a number of witnesses that

9    the plan proponents have listed that come up in a number of

10   these categories.  I'm -- if we take it issue by issue, are the

11   plan proponents going to produce the same witness more than

12   once?  How is this going to work?

13           COUNSEL:  Yeah, that -- that is a very good question.

14   It's already been raised within what would otherwise seem to be

15   the seamless cooperative spirit that binds the plan proponents.

16   Because I know that a certain very famous lawyer, Elihu

17   Ezekiel, is one of the witnesses.  We want to make sure that he

18   comes back, like in Chicago voting, you know, early and often.

19           THE COURT:  So you're going to produce him for every

20   category?

21           COUNSEL:  No, the -- the goal is -- is not -- is to

22   minimize that.  We think it's inevitable that it will be some

23   of it.  I think, for example, Libby and the lenders, kind of at

24   the edge of that are some of the same people who are going to

25   be talking about claim value and solvency and TDP.  But

1   certainly to the extent that Grace people who are listed more

2   than once need to come in for more than one appearance, we will

3   certainly do that.

4        So the idea is not to force the testimony of anybody

5   on the subject matter kind of out of order.  But that's

6   something that's still in process.  We have to talk with --

7   with people about it.  I -- I just don't see -- I mean, the

8   price to be paid for avoiding that is just -- the

9   intelligibility of the process for the Court and its -- and the

10  efficiency of the process, I just -- I just don't see a way of

11  being -- keeping the Court's, you know, focus and the parties

12  focus on the subject matter while we're just taking testimony

13  on something else.

14        THE COURT:  Okay.  It probably would be helpful if

15  they are produced multi times, but to the extent they're not

16  available for production multiple times, I think you should

17  state that up front, so that all parties know.

18        COUNSEL:  Yeah.

19        THE COURT:  Because in this phase, it's possible,

20  perhaps, that while Libby is presenting it's case -- I'm just

21  hypothesizing, I'm not making findings, obviously -- that maybe

22  Anderson doesn't want to appear for that segment because there

23  might not be anything relevant.  So I think you need to

24  identify the fact that certain witnesses will be recalled or

25  will not be recalled, so that all parties make sure they're

1    there for the portions of the testimony they want to hear.

2            COUNSEL:  I think one witness, for sure, that won't

3    be able to be here more than once is Dr. Mark Peterson, for

4    personal reasons related to his wife's health, but -- and this

5    is a point of clarification.  I think what Mr. Bernick was

6    proposing, that if we do it this way, that the plan proponents

7    would put on their evidence related to each issue first,

8    followed by the plan objectors, and not vice-versa.

9            MR. BERNICK:  Well, with respect to Libby, they're

10   just objectors.  I think they would go first under objections.

11           THE COURT:  Folks, you need to work this out.

12           COUNSEL:  Okay.

13           THE COURT:  And we'll continue this till Thursday.

14   Okay.  All right.  Where -- is there anything else between now

15   and Thursday

16           COUNSEL:  Your Honor, did you get a copy of the

17   fourth amended CMO?  I -- I had tried to arrange to send it

18   over.

19           THE COURT:  No.

20           COUNSEL:  Then I'll give it to you right now.

21           THE COURT:  Okay.  All right.  We're adjourned.

22   Thank you.

23                   (Proceedings concluded at 1:27 p.m.)

24                        *  *  *  *  *

25

202

1                    C E R T I F I C A T I O N

2

3        We, Maureen Emmons, Josette Jones and Brenda Boulden,

4   court approved transcriber, certify that the foregoing is a

5   correct transcript from the official electronic sound recording

6   of the proceedings in the above-entitled matter.

7

8   _____        _____

9   DATE                               MAUREEN EMMONS

10

11  _____        _____

12  DATE                               JOSETTE JONES

13

14  _____        _____

15  DATE                               BRENDA BOULDEN

16

17

18