IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al.[1] | ) | Case No. 01-01139 (JKF) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | **Hearing Date:  September 8, 2009 at 9:00 a.m.** |

**PLAN PROPONENTS' CONSOLIDATED PHASE II BRIEF REGARDING INSURANCE ISSUES IN SUPPORT OF CONFIRMATION OF JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

---

[1]    The Debtors consist of the following 62 entities:  W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co. Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc.,  CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., GC Limited Partners I, Inc., (f/k/a Grace Cocoa Limited Partners I, Inc.), GC Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc. GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation., W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (F/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................ iii

PRELIMINARY STATEMENT ........................................................................... 1

ARGUMENT ....................................................................................................... 1

I.     THE INSURANCE COMPANIES ONLY HAVE STANDING TO OBJECT TO ISSUES THAT DIRECTLY AND PECUNIARILY AFFECT THEM. ...................... 1

II.    THE ASSIGNMENT OF ASBESTOS INSURANCE RIGHTS UNDER THE PLAN IS APPROPRIATE AND DOES NOT PROVIDE INSURANCE COMPANIES WITH A VALID OBJECTION TO CONFIRMATION. ........................... 2

     A.     The Bankruptcy Code Permits the Assignment of Asbestos Insurance Rights Pursuant to a Plan Despite Allegedly Contrary Anti-Assignment Clauses in Insurance Policies. ................................................................ 2

          1.     Section 1123(a)(5) of the Bankruptcy Code Expressly Preempts Any Anti-Assignment Clauses in the Applicable Policies ......................... 3

               (a)     Combustion Engineering Governs Here ........................................... 4

               (b)     No Presumption Against Preemption Applies .................................. 7

               (c)     Preemption under Section 1123(a)(5) is Not Limited to Laws "Relating to the Financial Condition" of a Debtor ............ 9

               (d)     Section 1123(a) Preempts Provisions of Private Contracts ........... 11

          2.     Section 1123(b)(3)(B) of the Bankruptcy Code Also Permits the Transfer of Asbestos Insurance Rights from Policies to the Asbestos PI Trust. ................................................................................................. 14

          3.     Section 524(g) Impliedly Preempts Any Anti-Assignment Clauses in the Policies ......................................................................................... 16

     B.     The Bankruptcy Code Permits the Assignment of Asbestos Insurance Rights Pursuant to a Plan Despite Allegedly Contrary Anti-Assignment Clauses in Asbestos Insurance Reimbursement Agreements. ................................................. 19

          1.     The Legal Analysis is Identical to the Assignment of Rights as to Policies. ................................................................................................. 19

2.      Section 7.2.2(d)(iv) is Appropriate ...........................................................23

(a)     The Analysis of Section 7.2.2(d)(iv) is a Core Proceeding ...........26

(b)     As with the Assignment of Asbestos Insurance Rights,
        the Analysis of Section 7.2.2(d)(iv) Does Not Require an
        Adversary Proceeding....................................................................28

III.    THE INSURANCE COMPANIES' RELATED COMPLAINTS ARE LIKEWISE
        MERITLESS.................................................................................................31

A.      The Insurance Companies' Desire For a Declaration Limiting the Amount
        that the Asbestos PI Trust Will Seek to Recover From Them in the Future
        Pursuant to the Terms of Asbestos Insurance Reimbursement Agreements
        is Not a Valid Objection to Confirmation.................................................31

B.      The Insurance Companies' View that They May be Subject to the Payment
        Percentage for Claims They May Have Against the Asbestos PI Trust is Not
        a Valid Objection to Confirmation. ......................................................32

C.      The Confidentiality Protections of the TDPs Do Not Provide the Insurance
        Companies with a Valid Objection to Confirmation. ............................32

# TABLE OF AUTHORITIES

## CASES

Page

_ACandS, Inc. v. Travelers Cas. & Sur. Co._, 435 F.3d 252 (3d Cir. 2006) ......................27

_In re AmeriServe Food Distribution, Inc._, 315 B.R. 24
    (Bankr. D. Del. 2004) ................................................................................15

_In re Babcock & Wilcox Co._, Nos. 00-10992-10995, 2004 WL 4945985
    (Bankr. E.D. La. Nov. 9, 2004)............................................................. _passim_

_Building and Const. Trades Council of Metropolitan Dist. v. Associated Builders
    and Contractors of Massachusetts/Rhode Island, Inc._, 507 U.S. 218 (1993) ..............11

_In re Buttonwood Partners, Ltd._, 111 B.R. 57 (Bankr. S.D.N.Y. 1990) ............................14

_In re Carolina Tobacco Co._, 360 B.R. 702 (D. Or. 2007)....................................................9

_In re Chase & Sanborn Corp._, 813 F.2d 1177 (11th Cir. 1987)........................................15

_Cipollone v. Liggett Group, Inc._, 505 U.S. 504 (1992) ...............................................11, 12

_Cisneros v. Alpine Ridge Group_, 508 U.S. 10 (1993) ......................................................4, 8

_In re Combustion Engineering, Inc._, 391 F.3d 190 (3d Cir. 2004)............................ _passim_

_In re Congoleum Corp._, No. 03-51524, 2008 WL 4186899
    (Bankr. D.N.J. Sept. 2, 2008)........................................................................3

_Egelhoff v. Egelhoff ex rel. Breiner_, 532 U.S. 141 (2001).................................................8

_Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist._,
    541 U.S. 246 (2004)....................................................................................8

_In re Envirodyne Indus._, 174 B.R. 955 (Bankr. N.D. Ill. 1994) .................................29, 30

_Espinosa v. United Student Aid Funds, Inc._, 553 F.3d 1193
    (9th Cir. 2008)...........................................................................................30

_Estate of Lellock v. Prudential Ins. Co. of Am._, 811 F.2d 186
    (3d Cir. 1987)............................................................................................27

In re Exide Techs., 340 B.R. 222 (Bankr. D. Del. 2006)...................................21

In re Falcon Prods., Inc., 372 B.R. 474 (Bankr. E.D. Mo. 2007) ......................15

In re Farmers Mkts., Inc., 792 F.2d 1400 (9th Cir. 1986)...................................7

In re FCX, Inc., 853 F.2d 1149 (4th Cir. 1988) .............................................9, 11

In re Federal-Mogul Global Inc., 385 B.R. 560 (Bankr. D. Del. 2008)............. *passim*

In re Federal-Mogul Global, 402 B.R. 625 (D. Del. 2009)..............................3, 5

In re Firearms Import and Export Corp., 131 B.R. 1009
    (Bankr. S.D. Fla. 1991)...................................................................22

First Fidelity Bank v. McAteer, 985 F.2d 114 (3d Cir. 1993) ...........................25

In re Food City, Inc., 110 B.R. 808 (Bankr. W.D. Tex. 1990) ..........................14

In re Gen. Dev. Corp., 135 B.R. 1002 (Bankr. S.D. Fla. 1991)........................14

Globecon Group, LLC v. Hartford Fire Ins. Co., 434 F.3d 165
    (2d Cir. 2006)..................................................................................4

In re Grace Indus., Inc., 341 B.R. 399 (Bankr. E.D.N.Y. 2006)........................22

In re Hanson, 397 F.3d 482 (7th Cir. 2005)....................................................30

Holywell Corp. v. Smith, 503 U.S. 47 (1992) ..................................................4

In re Indian Palms Assocs., Ltd., 61 F.3d 197 (3d. Cir. 1995) ............11, 13, 14

Integrated Solutions, Inc. v. Service Support Specialties, Inc.,
    124 F.3d 487 (3d Cir. 1997).............................................................8, 9

In re Kaiser Aluminum Corp., No. 02-10429(JKF), 2006 WL 616243
    (Bankr. D. Del. Feb. 6, 2006) ...........................................................27

In re Kaiser Aluminum Corp., 343 B.R. 88 (D. Del. 2006)....................... *passim*

Kawaauhau v. Geiger, 523 U.S. 57 (1998) ....................................................10

Lamie v. U.S. Trustee, 540 U.S. 526 (2004) ..................................................10

In re Lernout & Hauspie Speech Prods., 264 B.R. 336
    (Bankr. D. Del. 2001) .....................................................................29

In re Mansaray-Ruffin, 530 F.3d 230 (3d Cir. 2008)........................................................30

In re Moore, 290 B.R. 851 (Bankr. N.D. Ala. 2003) ........................................................13

Norfolk & W. Ry. Co. v. Train Dispatchers Ass'n, 499 U.S. 117 (1991) ........................12

Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery,
    330 F.3d 548 (3d Cir. 2003)........................................................................................15

OneBeacon Am. Ins. Co. v. A.P.I., Inc., No. 06-167, 2006 WL 1473004
    (D. Minn. May 25, 2006) ..............................................................................................3

Pac. Gas & Elec. Co. v. California, 350 F.3d 932 (9th Cir. 2003) ...............................9, 10

In re Piper Aircraft Corp., 244 F.3d 1289 (11th Cir. 2001)..............................................14

In re Pittsburgh Corning Corp., No. 00-22876, Memorandum Opinion
    (Bankr. W.D. Pa. Dec. 21, 2006) .............................................................................3, 11

SEC v. Nat'l Sec., Inc., 393 U.S. 453 (1969) ....................................................................17

Sharon Steel Corp. v. Nat'l Fuel Gas Distribution Corp.,
    872 F.2d 36 (3d Cir. 1989).........................................................................................21

In re Sudbury, Inc., 153 B.R. 776 (Bankr. N.D. Ohio 1993)............................................22

In re Tate, 253 B.R. 653 (W.D.N.C. 2000)........................................................................19

Tenn. Student Assistance Corp. v. Hood, 541 U.S. 440 (2004) ........................................29

In re Thorpe Insulation Co., No. 07-19271, (Bankr. C.D. Cal. Apr. 2, 2009)...................18

United States v. Ron Pair Enters., Inc., 489 U.S. 235 (1989).......................................9, 10

U.S. Dep't of Treasury v. Fabe, 508 U.S. 491 (1993) ......................................................17

In re W. Asbestos Co., 313 B.R. 456 (Bankr. N.D. Cal. 2004) ..........................3, 9, 11, 16

## STATUTES

11 U.S.C. § 1123(a)(5)(B) ...................................................................................... *passim*

11 U.S.C. § 1123(a)(5)(F).........................................................................................13

11 U.S.C. § 1123(a)(5)(G) ....................................................................................13

11 U.S.C. § 1123(a)(5)(H) ...............................................................................10, 13

11 U.S.C. § 1123(a)(5)(I) .................................................................................10

11 U.S.C. § 1123(a)(6) ...............................................................................10, 13

11 U.S.C. § 1123(b)(3)(B) ............................................................................ *passim*

11 U.S.C. § 1129(a)(3) ....................................................................................14

11 U.S.C. § 1141(b) ........................................................................................15

11 U.S.C. § 1322(c)(1) ...................................................................................13

11 U.S.C. § 365(c)(3) .....................................................................................13

11 U.S.C. § 365(n)(1)(B) ................................................................................13

11 U.S.C. § 524(e) ..........................................................................................25

11 U.S.C. § 524(g) ..................................................................................... *passim*

11 U.S.C. § 541 .......................................................................................6, 9, 14

28 U.S.C. § 1334(e) ..................................................................................27, 29

28 U.S.C. § 157(b)(1) ...............................................................................27, 29

28 U.S.C. § 157(b)(2)(A) ...............................................................................27

28 U.S.C. § 157(b)(2)(L) ...............................................................................27

28 U.S.C. § 157(b)(2)(M) ..............................................................................27

Fed. R. Bankr. P. 3020(b)(1) ..........................................................................28

Fed. R. Bankr. P. 7001 ...............................................................................29, 30

Fed. R. Bankr. P. 7001(1) ..............................................................................29

Fed. R. Bankr. P. 7001(2) ..............................................................................30

Fed. R. Bankr. P. 7001(6) ..............................................................................30

Fed. R. Bankr. P. 7001(9) ..............................................................................................28

Fed. R. Bankr. P. 9014..................................................................................................28

## OTHER AUTHORITY

Alan N. Resnick et al., 10 COLLIER ON BANKRUPTCY ¶ 7001.02
    (15th ed. rev. 2006)............................................................................................29, 30

Vern Countryman, Executory Contracts in Bankruptcy, Part 1,
    57 MINN. L. REV. 439, 460 (1973)............................................................................21

The above-captioned debtors (the "Debtors"), together with the Official Committee of Asbestos Personal Injury Claimants, the Official Committee of Equity Security Holders, and the Asbestos PI Future Claimants' Representative (collectively, the "Plan Proponents"), hereby submit this Phase II Brief regarding insurance issues in support of confirmation of their First Amended Joint Plan of Reorganization (as amended, the "Joint Plan").[2]

## PRELIMINARY STATEMENT

The Phase II Confirmation process respecting the Joint Plan will commence on September 8, 2009.  At that hearing, Plan Proponents will demonstrate that the Plan should be confirmed.  This brief specifically demonstrates that the Plan's provisions addressing the transfer of Asbestos Insurance Rights and the treatment of Asbestos Insurance Reimbursement Agreements are fully appropriate, and responds to certain related objections by the Insurance Companies.[3]

## ARGUMENT

**I.    THE INSURANCE COMPANIES ONLY HAVE STANDING TO OBJECT TO ISSUES THAT DIRECTLY AND PECUNIARILY AFFECT THEM.**

The limited issues as to which those Insurance Companies that are not creditors of the Debtors have standing involve the transfer of Asbestos Insurance Rights under the Joint Plan, and the Plan's related treatment of Asbestos Insurance Reimbursement Agreements.  As demonstrated conclusively in the pre- and post- trial Phase I briefs filed by the Plan Proponents [D.I. 22021 and D.I. 22478], other than with respect to those limited issues, with respect to non-

---

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Joint Plan.  The "Insurance Companies" are the Insurers who filed objections to the Plan.

[3]    The other objections by Insurance Companies are addressed in the Plan Proponents' Main Brief in Support of Plan Confirmation (the "Main Brief").

creditor insurers the Joint Plan is entirely "insurance neutral" under controlling Third Circuit precedent. Accordingly, as standing is determined issue by issue in the federal courts, such Insurance Companies have no standing to object to the Plan on any other grounds.

## II.   THE ASSIGNMENT OF ASBESTOS INSURANCE RIGHTS UNDER THE PLAN IS APPROPRIATE AND DOES NOT PROVIDE INSURANCE COMPANIES WITH A VALID OBJECTION TO CONFIRMATION.

The assignment of Asbestos Insurance Rights to the Asbestos PI Trust is appropriate as to both insurance policies and Asbestos Insurance Reimbursement Agreements. Section 7.2.2(d)(iv) of the Plan therefore prevents the transfer of Asbestos Insurance Rights under Asbestos Insurance Reimbursement Agreements from being rendered nugatory and is properly tailored to that goal. Moreover, the evidence at the Phase II confirmation hearing will show that the operation of the Asbestos PI TDPs is consistent with the past practice of the parties to the Asbestos Insurance Reimbursement Agreements and appropriate.

### A.   The Bankruptcy Code Permits the Assignment of Asbestos Insurance Rights Pursuant to a Plan Despite Allegedly Contrary Anti-Assignment Clauses in Insurance Policies.

Several Insurance Companies object to the assignment of Asbestos Insurance Rights under their policies to the Asbestos PI Trust, and argue that such assignment precludes the Plan from being confirmed.[4] Those Insurance Companies also recognize, however, that this Court has already rejected that argument multiple times in prior cases and that those rulings have been affirmed, and therefore the Insurance Companies state that they are including the issue in their briefs to preserve it for a potential future appeal.[5]

---

[4] FFIC Non-Surety Phase II Trial Br. ("FFIC Br.") at 25 & App.; Zurich Phase II Trial Br. ("Zurich Br.") at 4-5; CNA Phase II Trial Br. ("CNA Br.") at 36-38; GEICO Phase I Trial Br. ("GEICO Br.") at 18-24.

[5] FFIC Br. at 25; Zurich Br. at 5 n.2; CNA Br. at 38; GEICO Br. at 18 n.6.

The Plan Proponents set forth the governing analysis below, an analysis that applies equally to the transfer of Asbestos Insurance Rights under Asbestos Insurance Reimbursement Agreements as well as under policies.

1.    Section 1123(a)(5) of the Bankruptcy Code Expressly Preempts Any Anti-Assignment Clauses in the Applicable Policies.

Every court to consider the issue, including the Third Circuit, this Court and numerous other bankruptcy and district courts, has held that Section 1123(a)(5)(B) of the Bankruptcy Code permits the assignment, under a plan, of insurance-related rights and proceeds to a trust.  See In re Combustion Eng'g, Inc., 391 F.3d 190, 219 n.27 (3d Cir. 2004); In re Kaiser Aluminum Corp., 343 B.R. 88, 95 (D. Del. 2006); In re Federal-Mogul Global Inc., 385 B.R. 560, 567 (Bankr. D. Del. 2008), aff'd, In re Federal-Mogul Global, 402 B.R. 625 (D. Del. 2009); In re Congoleum Corp., No. 03-51524, 2008 WL 4186899, at *2 (Bankr. D.N.J. Sept. 2, 2008); In re Pittsburgh Corning Corp., No. 00-22876, Memorandum Opinion, at 44-49 (Bankr. W.D. Pa. Dec. 21, 2006) (attached as Ex. A); In re W. Asbestos Co., 313 B.R. 456, 462 (Bankr. N.D. Cal. 2004) (holding that insurance assets could be assigned to Section 524(g) trust "pursuant to Bankruptcy Code Section 1123(a)(5)(B), notwithstanding any state law or private contractual provisions to the contrary"); In re Babcock & Wilcox Co., Nos. 00-10992-10995, 2004 WL 4945985, at *17-18 (Bankr. E.D. La. Nov. 9, 2004) (holding that Section 1123(a) "constitutes an explicit express Congressional intent to supersede state law restrictions on the transfer of estate property"), vacated on other grounds, 2005 WL 4982364 (E.D. La. Dec. 28, 2005); OneBeacon Am. Ins. Co. v. A.P.I., Inc., No. 06-167, 2006 WL 1473004, at *3 (D. Minn. May 25, 2006) (citing Section 1123(a)(5)(B) in affirming bankruptcy court decision permitting assignment of insurance policies to trust "without regard to their anti-assignment provisions").  That Section 1123(a)(5)(B) of the Bankruptcy Code permits the transfer of property of the estate pursuant to a properly confirmed

plan is not open to reasonable dispute.  See Holywell Corp. v. Smith, 503 U.S. 47, 55 (1992)

(finding that Section 1123(a)(5)(B) authorizes transfer of estate property to a liquidating trust).

This uniform precedent follows the clear and preemptory text of that section, which

provides that "[n]otwithstanding any otherwise applicable nonbankruptcy law, a plan shall * * *

provide adequate means for the plan's implementation, such as * * * transfer of all or any part of

the property of the estate to one or more entities, whether organized before or after the

confirmation of such plan."  11 U.S.C. § 1123(a)(5)(B).  The Supreme Court has confirmed that

such a "notwithstanding" clause expresses a clear statement of intent "to supersede all other

laws," and that "[a] clearer statement is difficult to imagine."  Cisneros v. Alpine Ridge Group,

508 U.S. 10, 18 (1993) (citations omitted).  The Bankruptcy Code expressly preempts any

contractual provisions that would purport to prevent assignment of the Asbestos Insurance

Rights.[6]

(a)    Combustion Engineering Governs Here.

The Third Circuit's decision in In re Combustion Eng'g, Inc., 391 F.3d 190 (3d Cir.

2004), is controlling authority.  In Combustion Engineering, as here, a plan of reorganization

assigned a debtor's rights to insurance proceeds from the debtor's estate to a trust, see 391 F.3d

at 206-07, 207 n.11, & 218, and the Third Circuit upheld the assignment as authorized by the

---

[6] GEICO argues that, as a result of the assignment of Asbestos Insurance Rights, "the Insurers face materially increased risk under the Plan."  GEICO Br. at 22.  But, as recognized in Federal-Mogul and other cases, "to the extent that the events giving rise to liability have already occurred, there will be no additional risk to the insurance companies by virtue of the assignments," and state law does not preclude such assignment.  Federal-Mogul, 385 B.R. at 567 (noting that under state law, "an insurer may not limit an insured's ability to assign . . . rights under a policy after the occurrence of the event which gives rise to the insurer's liability.") (citation omitted).  The tortious exposures to asbestos have already occurred, and there is thus no additional risk to the Insurance Companies and state law permits the assignment.  Indeed, GEICO's own cited case makes this clear.  "As a general matter, New York follows the majority rule that [a no-transfer clause] is valid with respect to transfers that were made prior to, but not after, the insured-against loss has occurred."  Globecon Group, LLC v. Hartford Fire Ins. Co., 434 F.3d 165, 170 (2d Cir. 2006) (citations omitted) (emphasis added).

Bankruptcy Code, despite insurance companies' contention that policy provisions prevented such assignment.[7]

Combustion Engineering involved the transfer of insurance rights from the estate to a Section 524(g) trust.  The Third Circuit's opinion in Combustion Engineering expressly states in numerous places that the insurance proceeds at issue were not simply part of the assets of the estate, but were being assigned to a trust under the plan — that was the whole point in dispute. See, e.g., 391 F.3d at 208 ("Certain insurance companies argued that Plan provisions *assigning policy proceeds to the Asbestos PI Trust* violated existing policies and/or settlement agreements with Combustion Engineering.") (emphasis added); id. at 206 ("The parties agreed *the post-confirmation trust would be funded* by contributions from Combustion Engineering [the debtor], ABB Limited, U.S. ABB, Lummus and Basic. The Bankruptcy Court found that *under the Plan Combustion Engineering would contribute its rights to proceeds under certain insurance policies* and settlement agreements with a face amount exceeding $320 million.") (emphasis added); id. at 216 ("The Bankruptcy Court found the assignment of insurance proceeds *to the Asbestos PI Trust* did not impair the rights of insurers.") (emphasis added).

The Third Circuit also specifically addressed the assignability of insurance rights as property of the estate to other entities: having held that the debtor's insurance policies were

---

[7] CNA argues that Combustion Engineering only addressed whether the right to insurance proceeds could be assigned, whereas the assignment in the current case is supposedly broader.  CNA Br. at 37.  CNA is incorrect, and its proposed distinction is irrelevant in any event.  As in this Plan, the plan in Combustion Engineering assigned the right to sue insurers to the trusts.  See, e.g., Combustion Engineering Plan, at 7.2.1, 7.2.10 and 7.2.13 (attached as Ex. B).  The holding of that case is fully applicable here with respect to the assignability of the Asbestos Insurance Rights, any semantic differences notwithstanding.  The district court, in affirming this Court's decision in Federal-Mogul, likewise rejected this argument by an insurance company.  In re Federal-Mogul Global, 402 B.R. 625, 636-37 (D. Del. 2009) (rejecting insurers' argument that Combustion Engineering could be distinguished because it focused on the transfer of insurance proceeds not insurance rights, and stating that "the record before the Court and the Third Circuit's opinion in Combustion Eng'g plainly demonstrate that insurance rights were at issue").

(Continued…)

property of the estate, despite the anti-assignment provisions in the policies, this Court went on

to say more generally that "[s]ection 541 effectively preempts any contractual provision that

purports to limit or restrict the rights of a debtor to transfer or assign its interests in bankruptcy."

Id. at 219 n.27.   In support of this conclusion, it pointed to Section 1123(a)(5)(B), which

authorizes the *transfer* of property of the estate to "one or more entities."[8]   The Third Circuit's

reliance on both Section 1123(a)(5) and Section 541 (rather than on Section 541 alone) confirms

that it agreed with the District Court ruling that a debtor's right to insurance proceeds not only is

part of its bankruptcy estate pursuant to Section 541, but that Section 1123(a)(5)(B) expressly

authorizes the transfer of such right to proceeds, as property of the estate, to a trust.

All courts to consider the issue, including this Court, have properly interpreted and

applied the Third Circuit's decision in Combustion Engineering.   "The Court of Appeals for the

Third Circuit explained that '[p]ut simply, § 541 prohibits restrictions on the interests of the

debtor, which includes the insurance policies held by [the debtor],' id. at 219, and, with respect

to property of the estate, Section 1123(a)(5)(B) expressly contemplates that the debtor's interests

in the policies may be assigned to a trust or other entity.   Id. at n. 27."   Federal-Mogul, 385 B.R.

at 567.   "In Combustion Engineering, the Third Circuit discussed the same issue raised here, i.e.

whether a plan of reorganization can provide for the assignment of insurance proceeds to a

Section 524(g) *trust*, and concluded that Section 541(c)(1) and *Section 1123(a)(5)(B)* of the

Bankruptcy Code expressly permit[] the assignment of a debtor's interest in insurance policies *to*

---

Even if CNA were correct, however, that there was some difference between the contractual rights assigned
here and in Combustion Engineering, CNA still fails to show why that fact would lead to a different legal outcome
here.  It would not.

[8]      Combustion Eng'g, 391 F.3d at 219 n.27.

*a trust or other entity*, even if the subject insurance policies contain a prohibition on assignment." Kaiser, 343 B.R. at 95 (emphasis added).

In short, there can be no valid dispute over whether a debtor's insurance rights may be assigned to a trust pursuant to a plan of reorganization, because that was the issue posed to and decided by the Third Circuit in Combustion Engineering, a decision in accord with all other courts to consider the issue. This Court should continue to follow that controlling precedent.

(b)    No Presumption Against Preemption Applies.

Even assuming this issue had not already been determined by the Third Circuit, the district court and this Court, the Insurance Companies' objections have no merit. Pursuant to Section 1123(a)(5)(B), "[n]otwithstanding any otherwise applicable nonbankruptcy law, a plan shall * * * provide adequate means for the plan's implementation, such as * * * transfer of all or any part of the property of the estate to one or more entities, whether organized before or after the confirmation of such plan." 11 U.S.C. § 1123(a)(5)(B). This language is clear, and expressly preempts nonbankruptcy rights that might otherwise interfere with the provisions of a Chapter 11 plan as described in that section.

Pursuant to its constitutional power to "establish * * * uniform Laws on the subject of Bankruptcies throughout the United States" [Art. II, sec. 8, cl. 4], "Congress may, within its constitutional limitations, abrogate state law entitlements in bankruptcy." In re Farmers Mkts., Inc., 792 F.2d 1400, 1403 (9th Cir. 1986). The Insurance Companies do not argue, nor could they, that Congress does not have the power to override state law and contractual restrictions that otherwise would preclude the assignment of rights under insurance policies and insurance reimbursement agreements. On its face, the "notwithstanding" language of Section 1123(a)(5) is a direct and explicit exercise of that power. The plain meaning of Section 1123(a)(5)(B)

therefore reflects a clear congressional intent to override non-bankruptcy restrictions regarding the transfer of property of the estate to another entity as necessary for implementation of a plan.

While several Insurance Companies recite formulas to the effect that there is a presumption against preemption,[9] such presumptions give way when interpreting statutes such as Section 1123(a) that clearly provide for preemption. See Egelhoff v. Egelhoff ex rel. Breiner, 532 U.S. 141, 151 (2001) (noting that presumption against preemption "can be overcome where * * * Congress has made clear its desire for pre-emption"). As the Supreme Court has noted, it is well-recognized that the term "notwithstanding" as found in Section 1123(a) expresses a clear statement of intent "to supersede all other laws." Cisneros, 508 U.S. at 18. There is therefore no basis to attempt to construe Section 1123(a) to neutralize its preemptive effect.

Indeed, the Supreme Court has rejected the use of such a presumption to limit the scope of clear language. In Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist., 541 U.S. 246, 256 (2004), the Supreme Court applied the plain language of the statute as written because "[t]he language of § 209(a) is categorical" and noted that "[t]he dissent objects to our interpretive method, which neither invokes the 'presumption against preemption' to determine the scope of pre-emption nor delves into legislative history." See also Egelhoff, 532 U.S. at 151. No presumption against preemption applies here.[10]

---

[9] GEICO Br. at 19; CNA Br. at 38 n.39.

[10] While several Insurance Companies attempt to rely on Integrated Solutions, Inc. v. Service Support Specialties, Inc., 124 F.3d 487 (3d Cir. 1997), Zurich Br. at 4 and GEICO Br. at 19, that case further supports the preemptive effect of Section 1123(a). In Integrated Solutions, the purchaser, who had apparently acquired a Chapter 7 bankruptcy estate's prejudgment tort claims pursuant to a Section 363 sale, sought to prosecute those claims in contravention of applicable state law prohibiting the assignment of such claims. 124 F.3d at 493. The purchaser argued that it had properly been sold those claims notwithstanding applicable state law, which the purchaser argued was preempted by the Bankruptcy Code. Id. In support of its preemption argument, the purchaser cited to Sections 704(1) and 363(b)(1) of the Bankruptcy Code. Id. Given that neither of these statutes contains any express preemption language, the Third Circuit had little problem in finding that "neither § 363(b)(1) nor § 704(1) expressly

(Continued…)

    (c)    <u>Preemption under Section 1123(a)(5) is Not Limited to Laws "Relating to the Financial Condition" of a Debtor.</u>

Several Insurance Companies seek to rely on <u>Pacific Gas & Elec. Co. v. California</u>, 350 F.3d 932 (9th Cir. 2003).[11]  In that case, the Ninth Circuit violated basic rules of statutory construction and held that Section 1123(a) preempts applicable nonbankruptcy law only insofar as such law relates to a debtor's financial condition.  The Insurance Companies nevertheless attempt to rely on that case's analysis, ignoring that the holding in <u>Pacific Gas</u> squarely conflicts with the holdings of the Third Circuit in <u>Combustion Engineering</u>, the Fourth Circuit in <u>In re FCX, Inc.</u>, 853 F.2d 1149 (4th Cir. 1988) and every other court that has considered the issue, including this Court.[12]  Indeed, in <u>Cisneros</u>, 508 U.S. at 18, the Supreme Court itself cited <u>FCX</u> with approval regarding its interpretation of Section 1123(a)(5) as "supersed[ing] all other laws."

The Ninth Circuit's construction of Section 1123(a) in <u>Pacific Gas</u> is plainly wrong because its importation into Section 1123(a) of the words "relating to financial condition" from

---

authorizes the trustee to sell property in violation of state law transfer restrictions." <u>Id.</u>  More importantly, the Court contrasted those two sections with other sections of the Bankruptcy Code that *do* contain express preemption provisions, including Section 1123(a), noting that "[t]he clear lack of Congressional intent to preempt state law restrictions on transferring property of the estate is even more telling given the explicit language that Congress uses when it intends to displace state nonbankruptcy law in other provisions of the Bankruptcy Code." <u>Id.</u> (citing as examples of such explicit preemption provisions Sections 1123(a), 541(c)(1), 728(b) and 363(l) of the Bankruptcy Code).  The Third Circuit's decision in <u>Integrated Solutions</u> thus demonstrates, yet again, that Court's consistent view that Section 1123(a) is expressly preemptive of contrary nonbankruptcy law.  <u>See</u> <u>Kaiser</u>, 343 B.R. at 95 (noting that the "Third Circuit [in <u>Integrated Solutions</u>] distinguished Sections 363 and 704 from Section 1123(a) of the Bankruptcy Code, which expressly provides for the preemption of nonbankruptcy law.  Accordingly, the Court concludes that the Bankruptcy Court did not err in concluding that the anti-assignment clauses in the [debtor's] insurance policies are preempted by the Bankruptcy Code.").

[11] FFIC Br. App. at A-1 — A-4; GEICO Br. at 20; CNA Br. at 38 n.39.

[12] Indeed, even in the Ninth Circuit, no transfer of insurance rights to a trust has been rejected.  <u>See</u>, <u>e.g.</u>, <u>In re W. Asbestos Co.</u>, 313 B.R. at 462.  Given the breadth of the phrase "financial condition" (which is undefined by the statute) as applied in the Ninth Circuit, such a transfer would very well be approved even under the incorrect Ninth Circuit approach.  <u>See</u>, <u>e.g.</u>, <u>In re Carolina Tobacco Co.</u>, 360 B.R. 702, 712 (D. Or. 2007) (rejecting a narrow definition of financial condition as "actions triggered by a bankruptcy filing or the debtor's insolvency," and holding that "[t]he term financial condition represents a concept that is somewhat broader than operational status," and that a

(Continued…)

Section 1142 violates the plain meaning rule of statutory interpretation.  See, e.g., United States v. Ron Pair Enters., Inc., 489 U.S. 235, 241 (1989) ("[W]here * * * the statute's language is plain, the sole function of the courts is to enforce it according to its terms.") (internal quotations omitted); Lamie v. U.S. Trustee, 540 U.S. 526, 534-36 (2004) (refusing to import language to a Bankruptcy Code provision from another Bankruptcy Code provision).

The Ninth Circuit's interpretation also renders Section 1123(a)'s "notwithstanding" clause meaningless with respect to several subsections of that Section, as those subsections do not relate to financial condition and it is implausible that a statute relating to financial condition would interfere with their operation except under the most unlikely and strained of interpretations, including subsections (a)(5)(I) (amendment of debtor's charter); (a)(5)(H) (extension of maturity date or change in interest rate or other term of outstanding securities); and (a)(6) (mandatory inclusion in charter of provision restricting issuance of nonvoting equity securities).  See Kawaauhau v. Geiger, 523 U.S. 57, 62 (1998) (noting that courts should be "hesitant to adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law").[13]

---

statute that "would preclude Carolina from selling cigarettes if the company failed to make the escrow payments" was "relate[d] to financial condition").

[13] Moreover, the Ninth Circuit's holding that Sections 1123(a)(5) and 1142(a) must be construed to mean the same thing, notwithstanding their very different texts and the different temporal and procedural contexts in which these provisions apply, was based on a single sentence in which Senator DeConcini indicated that, under Section 1123 as enacted in 1978, "[i]f the plan is confirmed, then any action proposed in the plan may be taken notwithstanding any otherwise applicable nonbankruptcy law in accordance with section 1142(a) of title 11."  Pacific Gas, 350 F.3d at 942.  The Ninth Circuit also pointed to the fact that in 1984, Congress amended both Section 1123(a) and the title of Section 1142 to substitute the word "implementation" for "execution."  This amendment is hardly evidence of legislative intent sufficient to ignore the plain language of the statute and certainly does not demonstrate that Congress intended the preemptive effect of Section 1123(a)(5) to be limited by Section 1142(a)'s "relating to financial condition" language.  See, e.g., Federal-Mogul, 385 B.R. at 572 n.27 ("We note that the language of each of § 363(l), § 1142(a) and § 1123(a)(5) varies. * * * Inasmuch as the provisions address different time periods in the life cycle of a bankruptcy * * * we think it likely that Congress intended this difference in statutory language.").

(d)      Section 1123(a) Preempts Provisions of Private Contracts.

Several Insurance Companies argue that because the "notwithstanding" language of Section 1123(a)(5) does not specifically refer to contracts, and other provisions of the Bankruptcy Code do, therefore Section 1123(a)(5) cannot preempt private contract rights.[14] They cite *no* case, however, that supports their overly constricted interpretation of Section 1123(a)(5)[15] and they completely ignore that the Third Circuit, and every other court that has considered the issue, has held that Section 1123(a)(5) preempts the terms of private contracts that would interfere with the adequate implementation of a plan.  See, e.g., Combustion Eng'g, 391 F.3d at 219 n.27 (insurance contracts); Kaiser, 343 B.R. at 95 (insurance policies); Pittsburgh Corning Op. at 48 (insurance policies); FCX, 853 F.2d at 1154-55 (bylaws of cooperative); W. Asbestos Co., 313 B.R. at 462 (insurance contract); Babcock & Wilcox, 2004 WL 4945985, at *18 (insurance contracts); *see also* In re Indian Palms Assocs., Ltd., 61 F.3d 197, 209 (3d. Cir. 1995) (extending contractual maturity date of mortgage pursuant to § 1123(a)(5)).  Indeed, the dichotomy the Insurance Companies attempt to set up here between contract rights and "nonbankruptcy law" is a false dichotomy, because the anti-assignment provisions of the insurance contracts are only relevant if those provisions would be enforceable under state law.

FFIC cites to the plurality (not the majority) opinion in Cipollone v. Liggett Group, Inc., 505 U.S. 504 (1992) for the proposition that a contract's terms are not state law within the scope

---

[14] GEICO Br. at 19, FFIC Br. App. at A-9 – A-10; CNA Br. at 38 n.39.

[15] Building and Const. Trades Council of Metropolitan Dist. v. Associated Builders and Contractors of Massachusetts/Rhode Island, Inc., 507 U.S. 218 (1993), GEICO Br. at 19 & FFIC Br. App. at A-9 n.33 & 34, does not address the application of an express preemptive provision of a statute at all, and none of the other several cases

(Continued…)

of an express preemption clause. <u>See</u> FFIC Br. at A-9 n.34 (citing <u>Cipollone</u> at 526). But FFIC misstates the analysis of the plurality, and ignores the directly on-point controlling authority cited therein. The <u>Cipollone</u> plurality analyzed a narrow provision of federal law that stated "[n]o requirement or prohibition based on smoking and health shall be imposed under State law," and decided that a warranty was not a requirement or prohibition that was imposed under state law, but one which was imposed by the contracting party upon itself. 505 U.S. at 515, 526 & n.24. The plurality specifically distinguished the preemption of a "*requirement or prohibition* imposed under State law" from the preemption of a "*liability* imposed under state law" — which it acknowledged might require a different result. <u>Id.</u> at 526 n.24 (citations omitted). This distinction is logical because, as the plurality noted, while a *requirement or prohibition* in a warranty is self-imposed and not imposed by state law, the *liability* for the breach of such a contract would be imposed by the state law. The plurality opinion in <u>Cipollone</u>, therefore, does not support the proposition that a contract's terms are not "state law."

Indeed, the Supreme Court decision in <u>Norfolk & W. Ry. Co. v. Train Dispatchers Ass'n</u>, 499 U.S. 117 (1991), cited in <u>Cipollone</u>, is directly on point. There, the Supreme Court was analyzing a preemptive provision that exempted certain rail carriers from "the antitrust laws and all other law, including State and municipal law." <u>Id.</u> at 128. The Court noted that "[t]he exemption is broad enough to include laws that govern the obligations imposed by contract," as "[a] contract depends on a regime of common and statutory law for its effectiveness and enforcement." <u>Id.</u> at 129-30. Accordingly, the Court held that the "exemption * * * from 'all other law' *effects an override of contractual obligations*, as necessary to carry out an approved

---

cited by FFIC hold that contracts cannot be expressly preempted. Indeed, most do not even address the Bankruptcy Code, much less Section 1123(a), at all.

transaction, by suspending application of the law that makes the contract binding." Id. at 130 (emphasis added).  Thus, the language of Section 1123(a)(5) that allows transfers from the estate "[n]otwithstanding any otherwise applicable nonbankruptcy law" on its face preempts the state law enforcing such contractual anti-assignment provisions, and thus the provisions themselves.

Precedent aside, the Insurance Companies' narrow interpretation is also incorrect because it renders several subsections of Section 1123(a) meaningless.[16]  The clause "[n]otwithstanding any otherwise applicable nonbankruptcy law" applies to each of the subsections of Section 1123(a).  A number of these subsections refer to strictly contractual matters and would have no meaning if the "notwithstanding" clause were read to only preempt state statutes and regulations.  See 11 U.S.C. § 1123(a)(5)(F) ("cancellation or modification of any indenture or similar instrument"), § 1123(a)(5)(G) ("curing or waiving of any default"), § 1123(a)(5)(H) (modifying certain terms of "outstanding securities") and § 1123(a)(6) (modifying certain terms of corporate charter).  For example, if, as FFIC contends, the "notwithstanding" clause only provides for the preemption of state laws and regulations and not privately agreed contract provisions, then Section 1123(a)(5)(H), which explicitly authorizes a plan to extend the maturity date or change the interest rates or "other terms" of outstanding securities, is meaningless.  Not surprisingly, the Third Circuit agrees that Section 1123(a) applies to private contracts.  See

---

[16] FFIC's reference to certain sections of the Bankruptcy Code where the term "contract" is specifically used also ignores that under various sections of the Bankruptcy Code, the term "applicable nonbankruptcy law" includes private contract rights, even where there is no explicit use of the term "contract" or "agreement."  For example, Section 365(c)(3) of the Bankruptcy Code prohibits a trustee from assuming a lease that has been "terminated under applicable nonbankruptcy law prior to the order for relief." 11 U.S.C. § 365(c)(3) (emphasis added).  It is clear that the statute applies to leases that have expired or terminated under their own contractual terms as well as to the largely theoretical possibility that leases somehow are terminated pursuant to state statutory or regulatory law.  See In re Moore, 290 B.R. 851, 879-80 (Bankr. N.D. Ala. 2003) (noting that Section 365(c)(3) encompasses contractual termination or expiration of lease).  Other Bankruptcy Code sections also use "applicable nonbankruptcy law" to encompass private contract rights.  See, e.g., 11 U.S.C. § 365(n)(1)(B) (distinguishing between "exclusivity

(Continued...)

Indian Palms Assocs., 61 F.3d at 209 (citing to § 1123(a)(5)(H) to find that "the plain terms of the Bankruptcy Code refute the proposition that a plan may not extend the maturity date of a mortgage").[17]

2.      Section 1123(b)(3)(B) of the Bankruptcy Code Also Permits the Transfer of Asbestos Insurance Rights from Policies to the Asbestos PI Trust.

Section 1123(b)(3) likewise demonstrates that the Asbestos PI Trust's receipt of the insurance rights is appropriate.  The Insurance Companies do not contest that Section 541(c) overrides contrary nonbankruptcy law to transfer the insurance rights into the estate.  Section 1123(b)(3)(B) provides that a plan may provide for "the retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose, of any *** claim or interest" belonging to the debtor or to the estate.  11 U.S.C. § 1123(b)(3)(B).  As unsecured creditors of the estate benefit from monies recovered by the Asbestos PI Trust, and as the Asbestos PI Trust receives the related liabilities, the Asbestos PI Trust fairly can be viewed as the successor to the estate with respect to the Asbestos Insurance Rights and as thus retaining

---

provision of * * * contract" and "any *other* right under applicable nonbankruptcy law") (emphasis added); 11 U.S.C. § 1322(c)(1) (plan may extend payment date on mortgage "notwithstanding * * * applicable nonbankruptcy law").

[17] GEICO's related suggestion that the "forbidden by law" prong of Section 1129(a)(3) conflicts with the plain language of Section 1123(a) and precludes the assignment of Asbestos Insurance Rights, GEICO Br. at 20-21, suffers from the same infirmities.  Moreover, courts have recognized that Section 1129(a)(3) deals with the proposal of the plan and that the plan proponent need not establish that the *contents* of the plan comply with all non-bankruptcy laws but rather the *proposal* of the plan is not by any means forbidden by law.  See In re Food City, Inc., 110 B.R. 808, 811-13 (Bankr. W.D. Tex. 1990); In re Gen. Dev. Corp., 135 B.R. 1002, 1007 (Bankr. S.D. Fla. 1991); In re Buttonwood Partners, Ltd., 111 B.R. 57, 59-60 (Bankr. S.D.N.Y. 1990) ("[I]t must be construed that the term 'means forbidden by law' subsumes some conduct in connection with obtaining confirmation of such proposal."); In re Piper Aircraft Corp., 244 F.3d 1289, 1300 n.7 (11th Cir. 2001) ("The statutory language [of the "forbidden by law" prong of 1129(a)(3)] refers to the manner by which the plan at issue is proposed to the court and interested parties . . . .").

It is also notable that GEICO cannot cite a single case interpreting  Section 1129(a)(3) to conflict with Section 1123(a), and GEICO's necessary conclusion, that private pre-petition contractual terms constitute "bankruptcy law" that overrides Section 1123(a), is likewise both ridiculous on its face and unsupported by any citation.  To the contrary, as shown throughout this brief, numerous cases have held that Section 1123(a)(5)(B) applies to permit the assignment of insurance rights and proceeds and preempts any anti-assignment clauses.

those rights.[18]   Indeed, FFIC acknowledges that the Asbestos PI Trust "is a successor to Debtors with respect to Asbestos Insurance Rights."   FFIC Br. at 18.

This analysis of Section 1123(b)(3)(B) is amply supported by relevant precedent.   As the Third Circuit has recognized, a creditors' committee may be "authorized to bring a post-confirmation avoidance action in a plan of reorganization," citing § 1123(b)(3)(B).   Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery, 330 F.3d 548, 579 (3d Cir. 2003).   The reason that Section 1123(b)(3)(B) applies to that situation is that creditors' committees or bankruptcy trusts can be "representative[s] of the estate."   See, e.g., In re Chase & Sanborn Corp., 813 F.2d 1177, 1180 n.1 (11th Cir. 1987) (holding that post-confirmation creditor trustee was a "representative of the estate"); In re AmeriServe Food Distribution, Inc., 315 B.R. 24, 31 (Bankr. D. Del. 2004) (holding that post-confirmation liquidating trust is an appropriate representative of the estate under § 1123(b)(3)(B)); In re Falcon Prods., Inc., 372 B.R. 474, 481 (Bankr. E.D. Mo. 2007) (affirming standing of post-confirmation trust to pursue avoidance action and citing § 1123(b)(3)(B)).

The appointment of such an entity can be pursuant to the terms of a plan, as recognized by the Third Circuit's statement in Cybergenics, cited above, that such authorization can be "in a plan of reorganization."   See also Chase & Sanborn, 813 F.2d at 1180 n.1 (approving standing of creditor trustee to pursue claim where "[a]lthough the court did not formally and specifically appoint the creditor trustee to enforce the claims, the reorganization plan approved by the court

---

[18] Such retention would not even trigger anti-assignment clauses in the first place.  Indeed, if it were otherwise, even a reorganized debtor could not receive insurance rights under policies issued prior to the bankruptcy without triggering such anti-assignment clauses, as both reorganized debtors and post-confirmation trusts receive property of the estate through Sections 1141(b) and 1123(b)(3)(B).

recognized that the creditor trustee would have the responsibility of pursuing claims of the debtor"); <u>AmeriServe</u>, 315 B.R. at 31; <u>Falcon Prods.</u>, 372 B.R. at 481.

Some courts have required that a successful recovery by the appointed representative benefit the debtor's estate, and in particular, unsecured creditors.  <u>See</u> <u>AmeriServe</u>, 315 B.R. at 32 (citing authorities).   Applying this requirement, a bankruptcy court for the District of Delaware has held that it was satisfied where a successful recovery by a liquidating trust "would directly benefit this bankruptcy estate by increasing its net assets and the distribution to unsecured creditors." <u>Id.</u> This requirement is likewise met here.  The Plan provides that post-confirmation, the Asbestos PI Trust will have the Asbestos Insurance Rights, including the rights to pursue insurance companies that refuse to meet their obligations under the Policies or Asbestos Insurance Reimbursement Agreements, and that the recoveries from the insurance rights, as well as other assets of the Trust, will be used for the benefit of unsecured creditors. Plan §§ 1.1(13), (47); 7.2.

Section 1123(b)(3)(B) of the Bankruptcy Code thus demonstrates the appropriateness of the Asbestos PI Trust retaining the Asbestos Insurance Rights.  Indeed, in several cases involving the transfer of insurance rights to a trust for the benefit of tort claimants, courts, including this Court, have cited Section 1123(b)(3)(B), in addition to Section 1123(a)(5)(B).  <u>See</u> <u>W. Asbestos Co.</u>, 313 B.R. at 461-62; <u>Federal-Mogul</u>, 385 B.R. at 570-71.

   3. <u>Section 524(g) Impliedly Preempts Any Anti-Assignment Clauses in the Policies.</u>

This Court has previously set forth the appropriate scope of Section 524(g).  For example, this Court noted that "[s]ection 524(g) of the Bankruptcy Code creates a new form of entity: a trust to which asbestos liabilities are channeled and which addresses and pays those liabilities." <u>See</u> <u>Federal-Mogul</u>, 385 B.R. at 573.  This Court also noted that "[a] § 524(g) trust is not a state

law trust and likewise is not a creation of private agreement.  Rather, a § 524(g) trust is one whose existence is authorized and whose contours are delineated by the Bankruptcy Code." Id. Under the Bankruptcy Code, "[s]uch a trust is the successor to the debtor's asbestos liabilities that are channeled to that trust, and those liabilities may include insured asbestos liabilities, inasmuch as § 524(g) clearly contemplates the transfer of insured liabilities to the trust." Id. Moreover, "[i]nsurance policies covering asbestos liabilities are assets held by a debtor." Id. at 573-74.  As insured asbestos liabilities are transferred to the trust, so should be the corresponding assets, rights under the insurance policies that cover those liabilities. Id. at 574.  This Court has also recognized that such a trust is the successor vehicle to the debtor with respect to the debtor's insured asbestos liabilities. Id.

Because the Insurance Companies' interpretation of their contract rights would thwart the purposes of Section 524(g) of the Bankruptcy Code, on the basis of conflict preemption principles, Section 524(g) also impliedly preempts the anti-assignment provisions in the Insurance Companies' policies.[19]  It would be ridiculous to suggest that a Section 524(g) trust would be created without inclusion of existing insurance that covers asbestos claims, the one asset unavailable to a debtor's other creditors.  Moreover, if restrictions on the transfer of insurance rights to a Section 524(g) trust were recognized under the Bankruptcy Code, it would be exceedingly difficult for a debtor with substantial insurance assets to ever use Section 524(g)

---

[19] GEICO's invocation of the McCarran-Ferguson Act, GEICO Br. at 19-20, is irrelevant here: the assignment provisions of the policies are not a "law enacted by any State for the purpose of regulating the business of insurance," nor does GEICO cite any case to the contrary.   GEICO does not, nor can it, demonstrate that the anti-assignment clauses are required under governing state law. U.S. Dep't of Treasury v. Fabe, 508 U.S. 491, 504 (1993) (refusing to equate "laws enacted for the purpose of regulating the business of insurance" with "the business of insurance itself") (quotations and internal punctuation omitted); SEC v. Nat'l Sec., Inc., 393 U.S. 453, 463 (1969) (finding the McCarran-Ferguson Act not applicable because, inter alia, "Arizona has not commanded something which the Federal Government seeks to prohibit.  It has permitted respondents to consummate the merger; it did not order them to do so.").

or otherwise establish a trust without its insurers' consent. Such an outcome would frustrate Congress' intent to permit the creation of a trust to assume a debtor's asbestos liabilities because it could potentially force the debtor either to forego its insurance proceeds as a cost of establishing the trust or agree to the demands of the insurance companies who are seeking to avoid or minimize coverage.

This case presents a perfect example of how the anti-assignment provisions in the Insurance Companies' policies could be used to thwart Section 524(g). The Debtors have hundreds of millions of dollars in insurance coverage available to pay for losses related to asbestos claims. This insurance coverage is an important asset that will fund the Asbestos PI Trust. Yet notwithstanding that their coverage defenses are preserved, the Insurance Companies seek to escape coverage obligations under their policies because the rights to proceeds under the policies are being transferred along with the asbestos liabilities to the Section 524(g) trust. The Insurance Companies are clearly attempting to use the anti-assignment provisions in their policies to realize a windfall, in contravention of the objectives of Section 524(g). Implied preemption is warranted to prevent such an inequitable result. See In re Thorpe Insulation Co., No. 07-19271, Tentative Ruling at 20 (Bankr. C.D. Cal. Apr. 2, 2009) (attached as Ex. C) ("Section 524(g) expressly contemplates the creation of a trust and the transfer of the debtor's assets to the trust for the purpose of paying claims. You can't have a plan under section 524(g) without creating a trust and transferring insurance proceeds to the trust. Any contractual provisions prohibiting such a transfer are preempted by section 524(g), among other provisions of the bankruptcy code."); Babcock & Wilcox, 2004 WL 4945985, at *18 ("The implementation of section 524(g) provides support for the argument that Congress intended to permit the transfers contemplated by the Plan in asbestos cases. * * * [The insurance companies']

interpretation would allow insurers to gut the reorganization and channeling injunction provisions specifically provided for in § 524(g). No law has been cited by the insurers to support such a proposition. Authority does exist, however, to support the proposition that § 524(g) was adopted to foster reorganization."). See also In re Tate, 253 B.R. 653, 671 (W.D.N.C. 2000).

> **B.    The Bankruptcy Code Permits the Assignment of Asbestos Insurance Rights Pursuant to a Plan Despite Allegedly Contrary Anti-Assignment Clauses in Asbestos Insurance Reimbursement Agreements.**

Most of the Asbestos Insurance Reimbursement Agreements do not contain anti-assignment clauses, and there is thus no basis for the Insurance Companies to object to the assignment of such reimbursement agreements to the Asbestos PI Trust, nor do they do so. For those few Asbestos Insurance Reimbursement Agreements that are alleged to contain anti-assignment clauses,[20] the legal analysis as to the transfer of Asbestos Insurance Rights is identical to the analysis of such transfer as to policies.

> 1.    The Legal Analysis is Identical to the Assignment of Rights as to Policies.

With the exception of Zurich, the Insurance Companies do not deny that the same legal principles that make clear that the assignment of Asbestos Insurance Rights in *policies* to the Asbestos PI Trust are appropriate also apply equally to such assignment of Asbestos Insurance Rights in *Asbestos Insurance Reimbursement Agreements*.

Zurich's "analysis" on this point is limited to one sentence: "[f]urthermore, even if Third Circuit (sic) reaches a similar conclusion as to assignment with respect to the Zurich policies, Zurich respectfully submits that additional considerations are presented by the purported

---

[20] See Zurich Br. at 4-5; AIU Br. at 12-13.

assignment of 'Asbestos Insurance Reimbursement Agreements', such as the Agreement, where Zurich already agreed to compromise certain of its rights under a policy in reliance upon the Debtors' performance of certain defined obligations under the Agreement."[21]

Zurich never identifies such alleged "additional considerations," much less makes a legal argument supporting its cryptic contention, and to the contrary, the transfer of Asbestos Insurance Rights under the Asbestos Insurance Reimbursement Agreements is appropriate for identical reasons that the transfer of Asbestos Insurance Rights under insurance policies is appropriate.  For example, Section 1123(a)(5)(B)'s clearly preemptive language is not limited to policies but encompasses such coverage-in-place agreements.  Likewise, Section 1123(b)(3)(B)'s demonstration that the Asbestos PI Trust is the successor in interest to the Debtors and entitled to retain rights such as the Asbestos Insurance Rights applies equally to both Asbestos Insurance Reimbursement Agreements and policies.  Section 524(g) likewise demonstrates both a statutory basis for and reason why such transfers are necessary for the functioning of the Bankruptcy Code as to both types of insurance contracts.

No Insurance Company has argued in their Phase II trial briefs that their insurance policies are executory contracts.  Similarly, the Asbestos Insurance Reimbursement Agreements that are underlain by such policies are likewise non-executory.  All except one of the Insurance Companies do not dispute that the Asbestos Insurance Reimbursement Agreements are non-executory and several expressly take the position that Asbestos Insurance Reimbursement Agreements *are* non-executory.  "Thus, the May 1997 [Asbestos Reimbursement] Agreement is non-executory * * * *'"  CNA Br. at 34.  "[B]ankruptcy law does not authorize such

---

[21] Zurich Br. at 5 n.2.

modifications of non-executory contracts [referencing, *inter alia*, an Asbestos Insurance Reimbursement Agreement]."  Travelers' Phase II Trial Br. ("Travelers' Br.") at 3.

LMI is the sole Insurance Company to argue that such agreements are executory.  LMI's argument relies on its view that various tasks of the Debtor under its Asbestos Insurance Reimbursement Agreement with LMI are allegedly "material," such as alleged limited consent to settlement rights, and limited auditing and reporting rights.[22]  But LMI does not cite a single case to support its position that any of those rights are material, or that Asbestos Insurance Reimbursement Agreements, which are premised on further resolution of issues under policies that themselves clearly are non-executory, are somehow executory.  The cases demonstrate the contrary.

In determining whether a contract is executory, the Third Circuit as well as lower courts in the Third Circuit have adopted the Countryman definition, which defines an executory contract as one where "the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other."  Sharon Steel Corp. v. Nat'l Fuel Gas Distribution Corp., 872 F.2d 36, 39 (3d Cir. 1989) (citing Vern Countryman, Executory Contracts in Bankruptcy, Part 1, 57 MINN. L. REV. 439, 460 (1973)); In re Exide Techs., 340 B.R. 222, 229 (Bankr. D. Del. 2006).  Moreover, the case law, including from this Court, is overwhelmingly clear that where a debtor's only remaining obligations are nonmaterial obligations, the existence of such nonmaterial obligations does not transform an otherwise non-executory insurance policy into an executory contract.  See, e.g., Federal-Mogul, 385 B.R. at 574-75 ("ministerial

---

[22] Phase II Trial Brief of Certain London Market Insurance Companies ("LMI," and brief cited as "LMI Br.") at 14.

obligations" such as "ongoing obligations of cooperation, retrospective premiums, deductibles and notice" do not "transform [] otherwise non-executory insurance polic[ies] into [] executory contract[s]"); In re Grace Indus., Inc., 341 B.R. 399, 402-03 (Bankr. E.D.N.Y. 2006) (stating that an insurance policy was not an executory contract despite the debtor's duties to pay retroactive premiums and deductibles/self-insurance because those duties were not material obligations); In re Sudbury, Inc., 153 B.R. 776, 777-80 (Bankr. N.D. Ohio 1993) (holding that the insurance policy was not an executory contract despite the debtor's duties with respect to retroactive premiums and the cooperation clause, including notice obligations, providing information demanded by the insurer, cooperating in the defense of claims, consent to settlements and preservation of the insurer's right to subrogation because such duties were ministerial); In re Firearms Import and Export Corp., 131 B.R. 1009, 1011-14 (Bankr. S.D. Fla. 1991) (holding that the insurance policy was not an executory contract despite the debtor's ongoing duties to pay retroactive premiums and deductibles, notify the insurer of claims, cooperate with the insurer in settlements and lawsuits, and enforce rights to contribution and indemnification against third parties because those duties were not material obligations).

In In re Babcock & Wilcox Co., 2004 WL 4945985, the court considered a coverage-in-place agreement that, like the Asbestos Insurance Reimbursement Agreements here, set forth a methodology by which an insurance company would in the future pay covered claims. Id. at *30. The coverage-in-place agreement also included a provision addressing the manner in which the debtor was to manage asbestos-related claims that it later would submit to the insurer for coverage. Id. at *31. The court held that this claims-management provision, while creating an ongoing obligation for the debtor, was not material and did not cause the coverage-in-place agreement to be an executory contract. Id. at *32. The court concluded that the claims-

management provision was "in the nature of an incidental continuing obligation" that did not go to the "root of the agreement" such that a breach would allow the insurer to terminate performance under the agreement.  Id.  Instead, the court held that the root of the agreement was the compromise of the parties' coverage disputes.  Id. at *31-32.  The court thus concluded that the coverage-in-place agreement was not an executory contract.  Id. at *32.  The same conclusion applies here.

Overwhelming precedent demonstrates that the Asbestos Insurance Reimbursement Agreements are non-executory contracts, as expressly or implicitly acknowledged by all but one of the Insurance Companies to address the issue.  As shown above, the issues relating to the transfer of Asbestos Insurance Rights as to Asbestos Insurance Reimbursement Agreements are identical to those relating to the transfer of such rights as to insurance policies.  Similarly, overwhelming precedent demonstrates that such transfers are appropriate under the Bankruptcy Code, and do not provide a valid basis to object to confirmation.

2.    Section 7.2.2(d)(iv) is Appropriate.

Section 7.2.2(d)(iv) of the Plan is appropriate, and the Insurance Companies' persistent attempts to mischaracterize that provision, in the face of a clear explanation of its effect, fails to state a valid objection to confirmation.  Despite that provision's explicit language, the Insurance Companies argue that it provides that the Asbestos PI Trust need not comply "with the other terms and conditions" of an Asbestos Insurance Reimbursement Agreement other than paying a claim.[23]  They ignore the clear language of that provision:

> On the Effective Date, the Asbestos PI Trust shall be the successor to all rights of the Debtors and Non-Debtor Affiliates under each Asbestos Insurance

---

[23] LMI Br. at 11; AIU Br. at 8-11; Allstate Br. at 8; Hartford Br. at 4; Travelers' Br. at 5.

> Reimbursement Agreement.  The Asbestos PI Trust's payment of an Asbestos PI Claim <u>under the PI TDP</u> shall be deemed to constitute settlement and payment of such claim <u>by or on behalf of the Debtors</u> or Non-Debtor Affiliates within the meaning of, and in full compliance with, each Asbestos Insurance Reimbursement Agreement.

Plan § 7.2.2(d)(iv) (emphasis added).

That Section merely makes clear that the Asbestos PI Trust is the successor to the Debtors with respect to the Asbestos Insurance Reimbursement Agreements, and that payments by the Asbestos PI Trust under the TDPs therefore must be accorded the same status as payments by the pre-petition Debtors with respect to the Asbestos Insurance Reimbursement Agreements. The express language and scope of 7.2.2(d)(iv) is thus that: (1) payments of an Asbestos PI Claim by the Asbestos PI Trust, rather than the Debtors, constitutes a valid payment by "Grace" within the meaning of those agreements, and relatedly; (2) that such payments by the Asbestos PI Trust, made within the framework of the PI TDPs as contemplated by Section 524(g), likewise do not provide a valid excuse for the Insurance Companies with Asbestos Insurance Reimbursement Agreements to refuse to meet their payment obligations under those agreements. Both of these are narrow rulings mandated by the federal preemptive law set forth above in Sections 1123(a)(5) and 524(g), and likewise authorized by Section 1123(b)(3)(B).  Absent such rulings, the transfer of Asbestos Insurance Rights under Asbestos Insurance Reimbursement Agreements may not be effective, in violation of the requirements of those Sections.

With the two narrow and necessary exceptions set forth above, nothing in Section 7.2.2(d)(iv) purports to strip alleged obligations from the Asbestos Insurance Reimbursement Agreements, and the Insurance Companies remain free to complain about any alleged failure by the Asbestos PI Trust to, for example, abide by any audit or reporting obligations in those agreements, limited only by the principle that such arguments cannot be used by the Insurance

Companies to avoid their payment obligations because of the mere transfer of those agreements to the Asbestos PI Trust, and its processing of those claims, as it must, under the PI TDPs.

Under similar circumstances, the court in the <u>Babcock & Wilcox</u> case went even further and held that the "[t]he terms of this Plan and the Asbestos Insurance Rights Assignment Agreement do not violate any obligation of the Debtors or any Insurance Contributor under any consent-to-settlement, cooperation, management-of-claims, or no-action provision of any Subject Asbestos Insurance Policy or Subject Asbestos Insurance Settlement Agreement." 2004 WL 4945985, at *4 n.16. It is fully appropriate for this Court to, as required by Section 1123(a)(5), "provide adequate means for the plan's implementation," and Section 524(g)'s establishment of a trust mechanism likewise requires that such a trust be able to access estate property properly transferred to it, such as Asbestos Insurance Rights. This is especially true given the Asbestos PI Trust's status as a successor to the Debtor's asbestos liabilities and insurance contracts covering those liabilities under Sections 524(g) and 1123(b)(3)(B).

Section 524(e) of the Bankruptcy Code likewise makes clear that non-debtors, such as Insurance Companies, are not discharged of their obligations because of the discharge of a debtor. 11 U.S.C. § 524(e). "Furthermore, the protection from liability afforded the debtor under the Code does not affect the liability of the debtor's insurers. Courts, relying on 11 U.S.C. § 524(e), have allowed claimants to proceed with tort claims against the debtor for the purpose of collecting from the debtor's liability insurer." <u>First Fidelity Bank v. McAteer</u>, 985 F.2d 114, 118 (3d Cir. 1993). Thus, Section 524(e) "assures creditors that the discharge of a debtor will not preclude them from collecting the full amount of debt from [the debtor's insurers]." <u>Id.</u> at 117. Section 524(e) further demonstrates the necessity of Section 7.2.2(d)(iv) of the Plan, to prevent

Insurance Companies from attempting to rely on Grace's bankruptcy and resulting transfer to the Asbestos PI Trust to eliminate their insurance obligations.

As also set forth in Plan Proponents' Phase II Pre-Trial Statement [D.I. 22633], Insurance Companies with Asbestos Insurance Reimbursement Agreements are not prejudiced by the Asbestos PI TDPs.  The settlement criteria in the TDPs are based upon appropriate medical standards and ensure that adequate information is gathered about a claim prior to paying it.

Also, the evidence at the hearing will show that the practices required by the TDPs are similar to Grace's historical practices.  Finally, the TDPs limit the amount any claimant can recover from Grace in ways that do not exist in the tort system.  Section 7.2.2(d)(iv) of the Plan, in conjunction with the Asbestos PI TDPs, is fully appropriate and necessary to provide adequate means for the Plan's implementation.

Hartford also alleges both that this Court's approval of a plan containing Section 7.2.2(d)(iv) is a non-core proceeding and that a resolution as to the appropriateness of Section 7.2.2(d)(iv) requires an adversary proceeding.  Hartford is wrong on both counts.

(a)    The Analysis of Section 7.2.2(d)(iv) is a Core Proceeding.

Hartford asserts that Section 7.2.2(d)(iv) is "non-core" because it allegedly does not invoke a substantive right provided by title 11 and is not an issue that could arise only in the context of a bankruptcy case.[24]  But the issue presented here is whether Section 7.2.2(d)(iv) is authorized by the Bankruptcy Code, or conversely, whether its operation gives the Insurance Companies that are parties to Asbestos Insurance Reimbursement Agreements a valid objection to confirmation.  This is clearly a core issue.  The Bankruptcy's Court's authority to make a

---

[24] Hartford Br. at 8.

determination as to the assignment of certain Asbestos Insurance Reimbursement Agreements is derived from its jurisdiction over confirmation and the administration of property of the estate, expressly "core" matters under the Code.[25]   See 28 U.S.C. § 1334(e); 28 U.S.C. § 157(b)(1) & (2)(A), (L), and (M); see also Estate of Lellock v. Prudential Ins. Co. of Am., 811 F.2d 186, 189 (3d Cir. 1987).

It is also black letter law that insurance policies and rights thereunder are property of the estate.  See ACandS, Inc. v. Travelers Cas. & Sur. Co., 435 F.3d 252, 260 (3d Cir. 2006) ("It has long been the rule in this Circuit that insurance policies are considered part of the property of a bankruptcy estate."); Combustion Engineering, 391 F.3d at 218 ("[E]ven if the subject insurance policies purported to prohibit assignment of Combustion Engineering's insurance proceeds, these provisions would not prevent the assignment of proceeds to the bankruptcy estate."); In re Kaiser Aluminum Corp., No. 02-10429(JKF), 2006 WL 616243, at *4 & *24 (Bankr. D. Del. Feb. 6, 2006), aff'd 343 B.R. 88 (D. Del. 2006) ("Section 1123(a)(5) of the Bankruptcy Code expressly permits the transfer of the Reorganizing Debtors' rights to proceeds from the Included PI Trust Insurance Policies under the Plan and preempts any anti-assignment provisions of the Included PI Trust Insurance Policies[]" and resolution of that issue is included in a "core proceeding pursuant to 28 U.S.C. § 157(b)(2).").  For the same reasons, Asbestos Insurance Reimbursement Agreements and rights thereunder are property of the estate.  "To the extent that a determination need be made of whether the Plan is capable of confirmation, or whether it is incapable of confirmation because its provisions run afoul of certain contractual rights of insurers, that

---

[25] Also, as set forth above, Section 7.2.2(d)(iv) is necessary to clearly protect the Asbestos Insurance Rights from being impermissibly abrogated by the happenstance of bankruptcy and the corresponding transfer to the Asbestos PI Trust.

determination is at the very heart of the function of the bankruptcy court, that is to determine whether the Plan is confirmable under the Bankruptcy Code.  To the extent that the confirmation involves issues regarding the workings of a § 524(g) injunction, that too is a core matter." Babcock & Wilcox, 2004 WL 4945985, *5.  The determination of whether Section 7.2.2(d)(iv) renders the Plan unconfirmable, or whether, to the contrary, it is authorized by various provisions of the Bankruptcy Code, is a quintessential core matter.

> (b)    As with the Assignment of Asbestos Insurance Rights, the Analysis of Section 7.2.2(d)(iv) Does Not Require an Adversary Proceeding.

Nor does the above determination require an adversary proceeding, as Hartford argues.[26] Hartford itself, like various other Insurance Companies, has raised various "substantive" objections to Section 7.2.2(d)(iv), and has argued that those objections preclude confirmation of the Plan.[27]  Having thus posed those issues for this Court's determination in a contested matter, as Hartford agrees a confirmation proceeding is,[28] it ill behooves Hartford to then claim that the Court cannot determine the issues it has itself raised.  Indeed, the Bankruptcy Rules also make clear that objections to confirmation are contested matters.  "An objection to confirmation is governed by Rule 9014 [regarding contested matters]."  Fed. R. Bankr. P. 3020(b)(1).

Hartford's argument is also premised on the twin assertions that the Plan Proponents: (1) seek a declaratory judgment[29] under Bankruptcy Rule 7001(9) (a position also taken by FFIC

---

[26] Hartford Br. at 5-7.

[27] See, e.g., Hartford Br. at 2-3, 9-10.

[28] Hartford Br. at 5.

[29] Hartford Br. at 5.

with respect to the assignment of Asbestos Insurance Rights) and; (2) do so "to recover money or property" under Bankruptcy Rule Rule 7001(1).  Both are false.

First, Plan Proponents do not seek a declaratory judgment,[30] and the Court's authority to rule on the appropriateness of the Plan, including Section 7.2.2(d)(iv) of the Plan, stems from the fact that this is a "core" issue, as set forth above, not from the Declaratory Judgment Act.  See e.g., 28 U.S.C. § 1334(e) and § 157(b)(1); Tenn. Student Assistance Corp. v. Hood, 541 U.S. 440, 447 (2004) ("Bankruptcy courts have exclusive jurisdiction over a debtor's property, wherever located, and over the estate.").

Second, similarly to the issues involved with the assignment of Asbestos Insurance Rights to the Asbestos PI Trust, Plan Proponents seek to confirm a Plan that preempts contrary contractual provisions, if any, that would preclude the Asbestos PI Trust from being the recognized successor in interest to the Debtors with respect to the Asbestos Insurance Rights under the Asbestos Insurance Reimbursement Agreements and able to access those rights.  This is neither a request for a declaratory judgment nor is it a proceeding to recover money or property.  Indeed, Hartford cannot cite a single case supporting its view that confirmation of a Plan pursuant to preemptive bankruptcy law constitutes a proceeding to recover money or property within the meaning of Bankruptcy Rule 7001(1).  To the contrary, as Collier's explains, "[p]roceedings within Rule 7001(1) include actions by trustees or debtors to collect on the debtor's accounts receivable, to compel the turnover of property of the estate pursuant to section

---

[30] Nor does the fact that a proceeding seeks a declaratory judgment, without more, require an adversary proceeding. See, e.g., In re Envirodyne Indus., 174 B.R. 955, 961 n.14 (Bankr. N.D. Ill. 1994) ("Even if the Limited Release were considered a declaratory judgment, this does not mean that an adversary proceeding would have been required, as Fed.R.Bankr.P. 7001 does not define all proceedings seeking declaratory judgments as being adversary proceedings."); In re Lernout & Hauspie Speech Prods., 264 B.R. 336, 339 (Bankr. D. Del. 2001) ("Rule 7001(9) applies only where the underlying action qualifies under one of the other sections.") (citing Advisory Comm. Note to Fed. R. Bankr. P. 7001 (1983)) (emphasis added).

542(a), to obtain a tax refund, to obtain a money judgment based on breach of contract or tortious injury to the debtor, to recover under section 506(c) expenditures made in preserving or disposing of property subject to a lien and, pursuant to section 550(a), to recover property that was the subject of avoided preferences under section 547, fraudulent transfers under section 548 and postpetition transfers set aside under section 549."  Alan N. Resnick et al., 10 COLLIER ON BANKRUPTCY ¶ 7001.02 (15th ed. rev. 2006).  Moreover, as the Asbestos PI Trust has not yet paid any claims, by definition it cannot be seeking "recovery" of money or property with respect to claims it may pay in the future.

Finally, the resolution of this issue does not require an adversary proceeding because any dispute that is not specifically listed in Bankruptcy Rule 7001 may proceed as a contested matter. In re Envirodyne Indus., 174 B.R. 955, 960 (Bankr. N.D. Ill. 1994) ("Any matter that is disputed and not specifically listed under one of the types of adversary proceedings under Fed. R. Bankr. P. 7001 falls under the catch-all term 'contested matter.'").  This dispute is not so listed.[31]

In the appendix to its brief, FFIC takes the solitary position that the resolution of the assignment of the Asbestos Insurance Rights to the Asbestos PI Trust requires an adversary proceeding.[32]  In addition to the other arguments above, which are fully applicable, this position

---

[31] Hartford's reliance on In re Hanson, 397 F.3d 482, 484 (7th Cir. 2005), is misplaced.  In Hanson, an adversary proceeding was required because the debtor was seeking to determine the dischargeability of a debt-a type of proceeding specifically listed in Bankruptcy Rule 7001.  See Fed. R. Bankr. P. 7001(6).  The court in Hanson also found that the creditor there had been deprived of due process in that it never had the opportunity to object to the plan or to otherwise protect its rights. 397 F.3d at 486-87 ("Hanson's failure to serve ECMC with a summons and an adversary proceeding complaint effectively denied ECMC the opportunity of presenting an objection prior to the adjudication of its rights.").  Neither of those two key bases for that decision are present here.  Similarly, In re Mansaray-Ruffin, 530 F.3d 230 (3d Cir. 2008) was a Chapter 13 case involving the avoidance of a lien, also specifically referenced in Bankruptcy Rule 7001(2), and Espinosa v. United Student Aid Funds, Inc., 553 F.3d 1193 (9th Cir. 2008) was also a Chapter 13 case addressing the dischargeability of a debt under Bankruptcy Rule 7001(6), making those cases fully distinguishable because those proceedings were likewise specifically listed in Bankruptcy Rule 7001.

[32] FFIC Br. App. at A-10 – A-11.

is likewise inconsistent with the vast number of Plans containing such assignments that were approved without an adversary proceeding, including this Court's recent decision in <u>Federal-Mogul</u>.

**III.    THE INSURANCE COMPANIES' RELATED COMPLAINTS ARE LIKEWISE MERITLESS.**

    **A.    The Insurance Companies' Desire For a Declaration Limiting the Amount that the Asbestos PI Trust Will Seek to Recover From Them in the Future Pursuant to the Terms of Asbestos Insurance Reimbursement Agreements is Not a Valid Objection to Confirmation.**

Several Insurance Companies that are parties to Asbestos Insurance Reimbursement Agreements request that this Court require the Plan to make clear that the Asbestos PI Trust will only seek reimbursement from them of the amount it pays to a claimant pursuant to the payment percentage, not of the "scheduled value" of the claim.[33]   But as set forth in the previous discussion of Section 7.2.2(d)(iv) of the Plan, that Section does not purport to free the Trust from obligations and requirements of Asbestos Insurance Reimbursement Agreements unless such terms (1) would preclude the substitution of the Asbestos PI Trust for "Grace" under those agreements, or (2) would preclude reimbursement for payments made within the framework of the Asbestos PI TDPs.  Thus, the Plan does not purport to impose reimbursement payments on the Insurance Companies on the basis of the liquidated value of the claims, and this objection is groundless.

---

[33] Allstate Br. at 8; Hartford Br. at 4;Traveler's Br. at 8-9; Zurich Br. at 5; AXA Belgium Br. at 3-4.

B.    **The Insurance Companies' View that They May be Subject to the Payment Percentage for Claims They May Have Against the Asbestos PI Trust is Not a Valid Objection to Confirmation.**

Allstate and Travelers complain that any claims that they may have in the future based on indemnification obligations contained in their Asbestos Insurance Reimbursement Agreements will be treated under the Plan as Indirect PI Trust Claims and thus will paid only at the Trust's payment percentage.[34]  They provide no basis to believe that they may have such indemnification claims in the future in the first place, given that rights to payment for the Debtors' asbestos liabilities under those agreements are likewise transferred to the Asbestos PI Trust, and therefore Allstate and Travelers will be protected by the Section 105 injunction.  Moreover, any claimant, as a condition of getting paid by the Asbestos PI Trust, has to provide a full release.

In any event, to the extent that Allstate and Travelers were in the future to have enforceable indemnification claims from Asbestos Insurance Reimbursement Agreements, they would be treated as obligations of the Trust under the transferred agreements (assuming that those Insurance Companies were performing under those agreements), and not as Indirect PI Trust Claims.  This unsubstantiated objection has no merit.

C.    **The Confidentiality Protections of the TDPs Do Not Provide the Insurance Companies with a Valid Objection to Confirmation.**

Several Insurance Companies with Asbestos Insurance Reimbursement Agreements argue that Section 6.5 of the TDPs, which provides that claimant submissions to the Asbestos PI Trust are presumptively confidential, renders the Plan unconfirmable.[35]  There is no legal support for that contention.  Moreover, there is nothing in Section 7.2.2(d)(iv) of the Plan that purports to

---

[34] Allstate Br. at 12-13; Travelers' Br. at 8-9.

[35] AIU Br. at 11-12; LMI Br. at 23-24.

relieve the Trust of any obligation from the Asbestos Insurance Reimbursement Agreements inconsistent with such confidentiality, including the audit rights that those Insurance Companies specifically assert that such confidentiality violates.   Moreover, the Insurance Companies fail to cite the most relevant language of Section 6.5, language that specifically addresses the very circumstance about which they purport to complain: "Notwithstanding anything in the foregoing to the contrary, with the consent of the TAC and the Futures Representative, the PI Trust may, in specific limited circumstances, disclose information, documents or other materials reasonably necessary in the PI Trust's judgment to preserve, litigate, resolve or settle coverage, or to comply with an applicable obligation under an insurance policy or settlement agreement within the Asbestos Insurance Policies or the Asbestos Insurance Settlement (sic) Agreements * * *."[36] Asbestos PI TDPs § 6.5.   The Insurance Companies' complaint regarding Section 6.5 of the TDPs does not provide them with a valid objection to confirmation.

---

[36] There is a typographical error in the TDPs: the reference to "Asbestos Insurance Settlement Agreements" should be "Asbestos Insurance Reimbursement Agreements," and that language will be corrected in a technical amendment to the Plan.

Dated: August 7, 2009
Wilmington, Delaware

Respectfully submitted,

KIRKLAND & ELLIS LLP
David M. Bernick, P.C.
Theodore L. Freedman
Lisa G. Esayian
601 Lexington Avenue
New York, NY  10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

Barbara Harding
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Telephone: (202) 879-5000
Facsimile:  (202) 879-5200

and

THE LAW OFFICES OF JANET S. BAER, P.C.
Janet S. Baer, P.C.
70 W. Madison Street
Suite 2100
Chicago, IL 60602
Telephone: (312) 641-2162

and

*/s/James E. O'Neill*
PACHULSKI, STANG, ZIEHL & JONES LLP
James E. O'Neill (Bar No. 4042)
Timothy Cairns (Bar No. 4228)
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705
(Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400

*Counsel for the Debtors and Debtors in Possession*

CAMPBELL & LEVINE, LLC


*/s/Marla Rosoff Eskin*
Marla Rosoff Eskin (No. 2989)
Mark T. Hurford (No. 3299)
800 N. King Street, Suite 300
Wilmington, DE 19801
Telephone:  (302) 426-1900
Facsimile:  (302) 426-9947


and

CAPLIN & DRYSDALE, CHARTERED
Elihu Inselbuch
375 Park Avenue, 35th Floor
New York, NY 10152-3500
Telephone: (212) 319-7125
Facsimile: (212) 644-6755

Peter Van N. Lockwood
Nathan D. Finch
Kevin C. Maclay
Jeffrey A. Liesemer

One Thomas Circle, N.W.
Washington, D.C. 20005
Telephone:  (202) 862-5000
Facsimile:  (202) 429-3301

*Counsel for the Official Committee of Asbestos
Personal Injury Claimants*

PHILLIPS, GOLDMAN & SPENCE, P.A.


*/s/John C. Phillips*
John C. Phillips (Bar No. 110)
1200 North Broom Street
Wilmington, DE 19806
Telephone:  (302) 655-4200
Facsimile:  (302) 655-4210

<u>and</u>

ORRICK, HERRINGTON & SUTCLIFFE LLP
Roger Frankel
Richard H. Wyron
Jonathan P. Guy
1152 15th Street, NW
Washington, DC 20005
Telephone: (202) 339-8400
Facsimile: (202) 339-8500

*Counsel for David T. Austern, Asbestos PI Future*
*Claimants' Representative*

SAUL EWING LLP

*/s/Teresa K.D. Currier*

Teresa K.D. Currier (Bar No. 3080)
222 Delaware Avenue, Suite 1200
P.O. Box 1266
Wilmington, DE 19899
Telephone:  (302) 421-6800
Facsimile:  (302) 421-6813

and

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Philip Bentley
Gregory Horowitz
Douglas Mannal
1177 Avenue of the Americas
New York, NY 10022
Telephone:  (212) 715-9100
Facsimile: (212) 715-8000

*Counsel for the Official Committee of Equity Security Holders*