UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | Case No. 01-01139 |
| | : | Jointly Administered |
| W.R. GRACE & CO., et al.,[1] | : | **Response Deadline: Aug. 7, 2009** |
| | : | **Phase II Confirmation Hearing:** |
| Debtors-in-possession. | : | **Sept. 8, 2009, at 11:00 a.m. EDT** |
| | : | **Related Docket No.: 21544** |

**PLAN PROPONENTS' PHASE II TRIAL BRIEF IN RESPONSE
TO CONFIRMATION OBJECTIONS OF THE LIBBY CLAIMANTS**

---

[1]    The Debtors consist of the following 62 entities:  W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co. Conn., A-1 Bit & Tool Co., Inc., Alewife  Boston Ltd., Alewife Land Corporation, Amicon, Inc.,  CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., GC Limited Partners I, Inc., (f/k/a Grace Cocoa Limited Partners I, Inc.), GC Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc. GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation., W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (F/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................ 1

ARGUMENT ................................................................................................. 3

I.    The Libby Claimants' Primary Objection of "Discrimination" Is Belied
      by a Quarter-Century of Trust Experience and the Testimony of the Libby
      Claimants' Own Experts ................................................................................. 3

      A.   A Quarter-Century of Trust Administration and Several Dozen Asbestos
           Bankruptcies Have Resulted in a Finely-Tuned Process That Is Embodied
           in the Grace TDP ................................................................................. 4

      B.   In a 524(g) Plan, the "Equal Treatment" of Claims Under § 1123(a)(4)
           Means the Same Payment Percentage and the Same Trust Process ................... 11

      C.   Far from Dismissing the Concerns of the Libby Claimants, the ACC and
           the FCR Did the Opposite: They Worked Hard to Examine Those Concerns
           and to Modify the TDP ........................................................................ 16

      D.   The TDP's Medical Criteria Were Supplemented to Include a Diagnostic
           Category Long Recognized in the Scientific Literature and Effective in
           Capturing the Same Conditions at Libby ................................................ 20

           1.   The TDP Was Supplemented to Include Diffuse Pleural Thickening in
                Its Severe Form Where Associated With Asbestos Exposure ................... 21

           2.   The Libby Claimants' Own Experts Acknowledge That the TDP Will
                Identify and Address the Serious Cases at Libby, and Are Unable to Say
                That It Has a Biased Impact in Libby That Differs from Its Impact Outside
                Libby ................................................................................... 25

      E.   All Experts Agree: There Is No "Unique" or "Different" Disease in Libby. ....... 26

      F.   There Is Not Even a Triable Issue on Discrimination: An Addition to the TDP
           Was Made Specifically to Address Libby's Concerns, and the Modified TDP
           Follows Established Science to Target Severe Pleural Disease for Expedited
           Settlement. ........................................................................................ 27

      G.   The Contention That the TDP Does Not Cover Certain Libby Claimants
           Entirely Misses the Point And Is Unsupported By Evidence. ........................ 29

           1.   The Evidence Demonstrates That the TDP is Highly Effective In Picking
                Out the Serious Pleural Disease Claims At Libby Today .......................... 30

      H.   The Remaining Discrete Criticisms of the TDP Do Not Show Discrimination. .... 33

           1.   Progression ........................................................................... 33

2.  Low Exposure ...........................................................................35

3.  Thickness of the Pleura ..............................................................36

4.  Blunting of the Costophrenic Angle ..................................................38

5.  FEV1/FVC..............................................................................40

6.  DLCO...................................................................................41

I.  The TDP's Scheduled Values Are Not Discriminatory .................................42

II. Nor Can the Libby Claimants Find Discrimination in the Disposition of Proceeds om Non-Products Insurance Coverage .......................................................47

A.  Grace's "Products" and "Non-Products"  Insurance Coverage .......................47

B.  The Libby Claimants Have No Exclusive or "Vested" Rights to the Non-Products Coverage .......................................................................51

C.  The Libby Claimants Have No Right of Direct Action Against Grace's Insurance Carriers ...............................................................................52

D.  The Non-Products Coverage Is Not Limited to Claims Arising from Asbestos Exposure in Libby...............................................................................56

E.  The Libby Claimants' Equal Treatment Objections That Are Based on Their Asserted Claims to Grace's Insurance Coverage Lack Merit..........................59

III. The Libby Claimants' Remaining Objections Are Easily Addressed ....................64

A.  Because Their Claims Are "Substantially Similar" to Other Asbestos PI Claims, the Libby Claimants Are Properly Classified as Class 6 Claimants.........64

B.  The Libby Claimants Do Not Have a Right to Have Their Claims "Allowed" by a Jury in the Tort System, Because § 524(g) Expressly Provides an Alternative Procedure for Resolving Claims Outside Bankruptcy ....................71

C.  The TDP Properly Takes into Account Claims for Wrongful Death and Loss of Consortium ...........................................................................75

D.  The TDP's Treatment of Punitive Damages Claims Is Proper ........................80

E.  The Applicable Standard of Proof Is Preponderance of the Evidence................82

IV. This Court Should Overrule the Libby Claimants' Objections Relating to the "Best Interests of Creditors" Test..............................................................85

CONCLUSION...................................................................................86

# TABLE OF AUTHORITIES

## FEDERAL CASES

In re 15375 Mem'l Corp.,
    382 B.R. 652 (Bankr. D. Del. 2008), *rev'd on other grounds,*
    400 B.R. 420 (D. Del. 2009) ...................................................................... 63

ACandS, Inc. v. Travelers Cas. & Sur. Co.,
    435 F.3d 252 (3d Cir. 2006) ...................................................................... 51

Addington v. Texas,
    441 U.S. 418 (1979) ................................................................................ 83

In re AOV Indus.,
    792 F.2d 1140 (D.C. Cir. 1986) ................................................. 13, 59, 67, 68

In re Armstrong World Indus., Inc.,
    348 B.R. 111 (D. Del. 2006) ...................................................................... 85

In re Armstrong World Indus., Inc.,
    348 B.R. 136 (D. Del. 2006) ...................................................................... 65

In re Babcock & Wilcox,
    No. 00-10992 (Bankr. E.D. La. Apr. 4, 2003) ................................................ 65

Begier v. IRS,
    496 U.S. 53 (1990) ............................................................................... 3, 12

In re Briscoe Enter., Ltd.,
    994 F.2d 1160 (5th Cir. 1993) ................................................................... 82

Butner v. United States,
    440 U.S. 48 (1979) ................................................................................. 74

In re Cent. Med. Ctr., Inc.,
    122 B.R. 568 (Bankr. E.D. Mo. 1990) .................................................... 12, 14

In re Combustion Eng'g, Inc.,
    391 F.3d 190 (3d Cir. 2004) ............................................................... passim

In re Congoleum Corp.,
     362 B.R. 167 (Bankr. D. N.J. 2007) ...................................................... 65, 67

In re Congoleum Corp.,
     362 B.R. 198 (Bankr. D. N.J. 2007) .......................................................... 64

CoreStates Bank v. United Chem. Techs.,
     202 B.R. 33 (E.D. Pa 1996) ...................................................................... 85

In re Dow Corning Corp.,
     198 B.R. 214 (E.D. Mich. 1996) ............................................................... 55

In re Dow Corning Corp.,
     255 B.R. 455 (E.D. Mich. 2000), *aff'd*,
     280 F.3d 648 (6th Cir. 2002) .............................................................. 12, 60

Estate of Lellock v. Prudential Ins. Co.,
     811 F.2d 186 (3d Cir. 1987) ...................................................................... 51

In re Fairfield Executive Assocs.,
     161 B.R. 595 (D.N.J. 1993) ....................................................................... 66

Fed. Home Loan Mortgage Corp. v. Bugg,
     172 B.R. 781 (E.D. Pa. 1994) .............................................................. 84, 85

In re Forty-Eight Insulations, Inc.,
     133 B.R. 973 (Bankr. N.D. Ill. 1991) ......................................................... 51

FTC v. First Capital Consumer Membership Servs., Inc.,
     206 F.R.D. 358 (W.D.N.Y. 2001) .............................................................. 13

Granada Wines, Inc. v. New England Teamsters & Trucking Indus. Pension Fund,
     748 F.2d 42 (1st Cir. 1984) ....................................................................... 67

Granfinanciera, S.A. v. Nordberg,
     492 U.S. 33 (1989) .................................................................................... 73

In re Greate Bay Hotel & Casino, Inc.,
     251 B.R. 213 (Bankr. D.N.J. 2000) ............................................................ 64

In re Greystone III Joint Venture,
    995 F.2d 1274 (5th Cir. 1991).................................................................... 68

Grogan v. Garner,
    498 U.S. 279 (1991) .................................................................................. 82

Herman & MacLean v. Huddleston,
    459 U.S. 375 (1983) ............................................................................. 82, 83

In re Jersey City Med. Ctr.,
    817 F.2d 1055 (3d Cir. 1987)..................................................................... 69

J.G. Link & Co. v. Cont'l Cas. Co.,
    470 F.2d 1133 (9th Cir. 1972).................................................................... 55

John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.,
    987 F.2d 154 (3d Cir. 1993) ................................................................. 67, 68

Johnson v. Physicians Anesthesia Serv., P.A.,
    621 F. Supp. 908, 915 (D. Del. 1985) ........................................................ 77

Langenkamp v. Culp,
    498 U.S. 42 (1990) .................................................................................... 73

In re Lisanti Foods, Inc.,
    329 B.R. 491 (D.N.J. 2005) ....................................................................... 64

In re Mahoney Hawkes, LLP,
    289 B.R. 285 (Bankr. D. Mass. 2002) ........................................................ 69

In re Martin's Point Ltd. P'ship,
    12 B.R. 721 (Bankr. N.D. Ga. 1981) .......................................................... 64

In re Monroe Well Serv., Inc.,
    80 B.R. 324 (Bankr. E.D. Pa. 1987) ...................................................... 72, 81

In re Montgomery Ward Holding Corp.,
    306 B.R. 489 (Bankr. D. Del. 2004) ..................................................... 72, 81

In re Quigley Co.,
    377 B.R. 110 (Bankr. S.D.N.Y. 2007) ....................................................passim

In re S & W Enter.,
    37 B.R. 153 (Bankr. N.D. Ill. 1984) ............................................................ 67

United States v. Noland,
    517 U.S. 535 (1996) ...................................................................................... 81

United States v. Reorganized CF & I Fabricators,
    518 U.S. 213 (1996) ...................................................................................... 81

In re U.S. Mineral Prods.,
    No. 01-2471 (JKF), 2005 WL 5898300
    (Bankr. D. Del. Nov. 29, 2005) ............................................................ 69, 85

In re U.S. Truck Co., Inc.
    800 F.2d 581 (6th Cir. 1986) ........................................................................ 64

United States v. Woodway Stone,
    187 B.R. 916 (W.D. Va. 1995) ............................................................... 84, 85

Westmoreland Human Opportunities, Inc. v. Walsh,
    246 F.3d 233 (3d Cir. 2001) .......................................................................... 51

In re World Health Alternatives, Inc.,
    369 B.R. 805 (Bankr. D. Del. 2007) .............................................................. 51

**STATE CASES**

Alsenz v. Clark County Sch. Dist.,
    864 P.2d 285 (Nev. 1993) .............................................................................. 77

Anderson v. Wetter,
    69 A.105 (Me. 1907) ...................................................................................... 77

Bain v. Gleason,
    726 P.2d 1153 (Mont. 1986) .......................................................................... 77

Barragan v. Superior Ct.,
    470 P.2d 722 (Ariz. Ct. App. 1970)...................................................................76

Bartholomew v. Wis. Patients Comp. Fund,
    717 N.W.2d 216 (Wis. 2006)........................................................................77

Baumgart v. Keene Bldg. Prods. Corp.,
    633 A.2d 1189 (Pa. Super. Ct. 1993) .............................................................77

Bennett v. Nicholas,
    250 S.W.3d 673 (Ky. Ct. App. 2007).............................................................77

Burchfiel v. Boeing Corp.,
    205 P.3d 145 (Wash. Ct. App. 2009) .............................................................78

Bybee v. Abdulla,
    189 P.3d 40 (Utah 2008)...............................................................................77

Conley v. USF&G Co.,
    37 P.2d 565 (Mont. 1934) ............................................................................55

Cummings v. Reins,
    107 P. 904 (Mont. 1910) ..............................................................................55

Darr Constr. Co. v. Workmen's Comp. Appeal Bd.,
    715 A.2d 1075 (Pa. 1998) ............................................................................78

Drake v. St. Francis Hosp.,
    560 A.2d 1059 (Del. 1989)...........................................................................77

DuBray v. Farmers Ins. Exch.,
    36 P.3d 897 (Mont. 2001) .......................................................................53, 54

Eagen v. Calhoun,
    698 A.2d 1097 (Md. 1997)...........................................................................77

Espinoza v. O'Dell,
    633 P.2d 455 (Colo. 1981) ...........................................................................77

Estate of Helmick v. Martin,
    425 S.E.2d 235 (W. Va. 1992) ......................................................................77

In re Estate of Maldonado,
    117 P.3d 720 (Alaska 2005).........................................................................76

Farm & City Ins. Co. v. Am. Standard Ins. Co. of Wis.,
    552 P.2d 1363 (Kan. 1976)..........................................................................77

Flowers v. Marshall,
    494 P.2d 1184 (Kan. 1972)..........................................................................77

Gates v. Foley,
    247 So. 2d 40 (Fla. 1971) ...........................................................................78

Gleaton v. S. Ry. Co.,
    46 S.E.2d 879 (S.C. 1948) ..........................................................................77

Greater Se. Cmty. Hosp. v. Williams,
    482 A.2d 394 (D.C. 1984) ...........................................................................77

Green v. Am. Pharm. Co.,
    960 P.2d 912 (Wash. 1998) .........................................................................78

Hern v. Safeco Ins. Co.,
    125 P.3d 597 (Mont. 2005) ..........................................................................76

Hindmarsh v. Sulpho Saline Bath Co.,
    187 N.W. 806 (Neb. 1922)...........................................................................77

Horwich v. Superior Ct.,
    980 P.2d 927 (Cal. 1999).............................................................................76

Johnson v. BP Chemicals, Inc.,
    707 N.E.2D 1107 (Ohio 1999) .....................................................................58

Jones v. Elliott,
    551 A.2d 62 (Del. 1988)..............................................................................78

King v. Nat'l Spa and Pool Inst., Inc.,
   607 So. 2d 1241 (Ala. 1992) ..................................................................... 76

Kolar v. City of Chicago,
   299 N.E.2d 479 (Ill. App. Ct. 1973) ........................................................ 78

Landers v. B. F. Goodrich Co.,
   369 S.W.2d 33 (Tex. 1963) ....................................................................... 77

Lank v. Moyed,
   909 A.2d 106 (Del. 2006) ......................................................................... 77

Lewis v. Lewis,
   708 A.2d 249 (D.C. 1998) ......................................................................... 77

Mason v. Gerin Corp.,
   647 P.2d 1340 (Kan. 1982) ....................................................................... 77

McCarthy v. William H. Wood Lumber Co.,
   107 N.E. 439 (Mass. 1914) ....................................................................... 77

McDaniel v. Clarkstown Cent. Sch. Dist. No. 1,
   110 A.D.2d 349 (N.Y. App. Div. 1985) .................................................... 77

McLane v. Farmer's Ins. Exch.,
   432 P.2d 98 (Mont. 1967) ......................................................................... 54

Mega Life and Health Ins. Co. v. Superior Ct.,
   92 Cal. Rptr. 3d 399, (Cal. Ct. App. 2009) .............................................. 78

Millington v. Se. Elevator Co.,
   22 N.Y.2d 498 (N.Y. 1968) ....................................................................... 78

Monroe v. Trinity Hospital-Advocate,
   803 N.E.2d 1002 (Ill. App. Ct. 2003) ....................................................... 78

Murphy v. Martin Oil Co.,
   308 N.E.2d 583 (Ill. 1974) ........................................................................ 77

Myers v. McAdams,
    236 S.W.3d 504 (Ark. 2006)..........................................................................76

O'Leary v. Bingham,
    159 A.2d 619 (R.I. 1960)............................................................................77

Otani ex rel. Shigaki v. Broudy,
    92 P.3d 192 (Wash. 2004)..........................................................................77

Ouellette v. State Farm Mut. Auto. Ins. Co.,
    918 P.2d 1363 (Okla. 1994)........................................................................77

Owens-Illinois, Inc. v. Cook,
    872 A.2d 969 (Md. 2005) ..........................................................................78

Ozaki v. Ass'n of Apartment Owners of Discovery Bay,
    954 P.2d 652 (Haw. Ct. App. 1998), *aff'd in part and rev'd in part by*,
    954 P.2d 644 (Haw. 1998) ..........................................................................77

Peterson ex rel. Peterson v. Burns,
    635 N.W.2d 556 (S.D. 2001)......................................................................77

Pezzulli v. D'Ambrosia,
    26 A.2d 659 (Pa. 1942) ..............................................................................77

Pobiego v. Monsanto Co.,
    521 N.E.2d 728 (Mass. 1988) ....................................................................77

Pratt v. Ocean Med. Care, P.C.,
    653 N.Y.S.2d 608 (N.Y. App. Div. 1997)..................................................78

Reeder v. Allport,
    218 S.W.3d 817 (Tex. Ct. App. 2007)........................................................78

Rhein v. Caterpillar Tractor Co.,
    314 N.W.2d 19 (Neb. 1982) ......................................................................77

Ridley v. Guar. Nat'l Ins. Co.,
    951 P.2d 987 (Mont. 1997) ..............................................................53, 54

Rodriguez v. Bethlehem Steel Corp.,
        115 Cal. Rptr. 765 (Cal. 1974) ........................................................................78

Rohlfing v. Moses Akiona, Ltd.,
        369 P.2d 96, 98 (Haw. 1962), *overruled in part by,*
        Greene v. Texeira, 505 P.2d 1169 (Haw. 1973) ..............................................77

Rowell v. Clifford,
        976 P.2d 363 (Colo. Ct. App. 1998) ..............................................................76

Russell v. Ingersoll-Rand Co.,
        795 S.W.2d 243 (Tex. App. 1990), *aff'd,* 841 S.W.2d 343 (Tex. 1992) ..................77

Safeco Ins. Co. v. Mont. Eighth Jud. District,
        2 P.3d 834 (Mont. 2000) ..............................................................................53

Scott v. Porter,
        530 S.E.2d 389 (S.C. Ct. App. 2000)..............................................................77

Shaw v. Jendzejec,
        717 A.2d 367 (Me. 1998)..............................................................................77

Sheets v. Graco Inc.,
        292 N.W.2d 63 (N.D. 1980)..........................................................................77

St. Paul Mercury Ins. Co. v. Cir. Ct. of Craighead County,
        73 S.W.3d 584 (Ark. 2002) ..........................................................................76

Stewart v. United Elec. Light & Power Co.,
        65 A.49 (Md. 1906) .....................................................................................77

Strother v. District of Columbia,
        372 A.2d 1291 (D.C. 1977)...........................................................................77

Tavakoly v. Fiddlers Green Ranch,
        998 So. 2d 1183 (Fla. Dist. Ct. App. 2009) .....................................................78

Thompson v. Wing,
        637 N.E.2d 917 (Ohio 1994)...................................................................76, 77

Turner v. PCR, Inc.,
    754 So. 2d 683 (Fla. 2000) ............................................................................ 58

Ulrigg v. Jones,
    907 P.2d 937 (Mont. 1995) ................................................................ 52, 53, 55

Vassiliu v. Daimler Chrysler Corp.,
    839 A.2d 863 (N.J. 2004) .............................................................................. 77

Walls v. Am. Optical Corp.,
    740 So. 2d 1262 (La. 1999) ........................................................................... 77

Walton v. Absher Constr. Co., Inc.,
    676 P.2d 1002 (Wash. 1984) .......................................................................... 77

Weigel v. Lee,
    752 N.W.2d 618 (N.D. 2008) ........................................................................ 77

Weyerhaeuser v. Commercial Union Ins. Co.,
    15 P.3d 115 (Wash. 2000) .............................................................................. 49

Winding River Vill. Condo. Ass'n, Inc. v. Barnett,
    459 S.E.2d 569 (Ga. Ct. App. 1995) ............................................................. 77

Wyness v. Armstrong World Indus.,
    546 N.E.2d 568 (Ill. 1989) ............................................................................ 77

## CONSTITUTIONS

Ky. Const. § 241 ............................................................................................ 76

## STATUTES

11 U.S.C. § 524(e) ......................................................................................... 63

11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb) ....................................................... 72, 80

11 U.S.C. § 524(g)(2)(B)(ii)(V) ................................................................passim

11 U.S.C. § 524(g)(4)(B)(i) ................................................................. 71

11 U.S.C. § 524(g)(4)(B)(ii) ................................................................ 71

11 U.S.C. § 541................................................................................. 51

11 U.S.C. § 1123(a)(4) ........................................................................ 3

11 U.S.C. § 1141(a).............................................................. 72, 80, 81

Mont. Code Ann § 27-1-507 ................................................................ 76

Mont. Code Ann § 27-1-513 ................................................................ 76

Mont. Code Ann. § 33-18-242 ............................................................. 53

W. Va. Code Ann. § 23-4-2(d)(2) ......................................................... 58

## OTHER AUTHORITY

25A C.J.S. Death § 19 ........................................................................ 76

George Orwell, Animal Farm 114 (Penguin Books 1951) (1945) ................................ 13

3 Alan N. Resnick & Henry J. Sommer, Collier on Bankruptcy ¶ 362.07
    (15th rev. ed. 2004)..................................................................... 63

7 Alan N. Resnick & Henry J. Sommer, Collier on Bankruptcy ¶ 1122.03[3]
    (15th rev. ed. 2004)..................................................................... 64

1 Jeffrey E. Thomas et al., New Appleman Ins. L. Practice Guide
    ¶ 3.09[6][b][ii] (2008) ................................................................... 49

The Plan Proponents[2] submit this trial brief in response to the confirmation objections of the Libby Claimants, including those objections stated in their trial brief of July 13, 2009.

## PRELIMINARY STATEMENT

The Libby Claimants' plan objections rest, in large measure, on the following false premise:  That the Libby claims are different from and more valuable than other Asbestos PI Claims, and therefore the Libby Claimants are entitled to a greater proportionate share of the Trust's assets than the non-Libby claimants.  To make their case for a greater share of the assets, the Libby Claimants assert that they have been improperly classified with other Asbestos PI Claims and that the Plan and the Asbestos PI TDP ("**TDP**")[3] do not treat them equally, and therefore "discriminate" against them.  But their assertions ring hollow.  The Libby Claimants hold unsecured Asbestos PI Claims based on diseases caused by exposure to Grace asbestos. These claims are no different from the scores of thousands of similar claims in any way that matters for purposes of classification under § 1122 of the Bankruptcy Code.  Moreover, the TDP entitles all Asbestos PI Claimants to the same payment percentage and the same procedural devices for having their claims reviewed, evaluated, and settled, or otherwise liquidated by the Asbestos PI Trust.  For these reasons, the TDP does not treat the Libby Claimants disparately in violation of Bankruptcy Code § 1123(a)(4).

---

[2]    Except for the term "Libby Claimants," and unless otherwise defined herein, all capitalized terms have the meanings given to them in the First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated February 27, 2009 [D.I. 20872].

[3]    The TDP is attached hereto as **Exhibit A**.

The Libby Claimants also contend that they have rights to certain "non-products" or "premises" insurance coverage of the Debtors that few other Class 6 claimants could access. They contend that their "superior access" to such insurance coverage requires their claims to be placed in a class separate from all other Asbestos PI Claims.   They further contend that the Plan's proposal to transfer all of the Debtors' Asbestos Insurance Rights to the Trust, as opposed to giving the "non-products" coverage to them and those few other holders of claims that can access that coverage, violates the equal treatment requirement of § 1123(a)(4).   As discussed below, the Libby Claimants' factual assertions about the Debtors' non-products coverage being available almost exclusively to them are simply not true.   But even if they were correct about the nature of this coverage and what claims could reach it, their classification and equal treatment objections lack merit.

The remainder of the Libby Claimants' complaints about the Plan and TDP – relating to punitive damages, wrongful death claims, and the like – are a laundry list of complaints that affect all Asbestos PI Claimants generally, not just the Libby Claimants.   Thus, the Libby Claimants' cries of "discriminatory treatment" at the hands of the ACC and the other Plan Proponents are wholly devoid of merit.

The TDP and the scheduled values contained therein were carefully negotiated by the attorneys representing the Asbestos PI FCR ("**FCR**") and counsel for the individual members of the ACC, including the attorneys acting as counsel for the Libby Claimants.   Thus, all the principal stakeholders were represented and involved in the negotiations.   Both the non-Libby ACC members and the FCR carefully considered the Libby Claimants' concerns with the

"Manville-based" TDP, and where appropriate the TDP was changed in an attempt to satisfy the Libby Claimants' concerns.  Yet, dissatisfied with the outcome of the TDP negotiations, the Libby Claimants seek to play a spoiler's game, trying to defeat a confirmable plan of reorganization that is long overdue.  This Court should have none of it.  Given that the Class 6 claimants, of which the Libby Claimants are a properly classified part, voted overwhelmingly in favor of the Plan and the TDP, the Libby Claimants provide no basis under the Bankruptcy Code to deny confirmation.  For all the reasons set forth herein, the Court should overrule their objections and confirm the Plan.

## ARGUMENT

**I.    The Libby Claimants' Primary Objection of "Discrimination" Is Belied by a Quarter-Century of Trust Experience and the Testimony of the Libby Claimants' Own Experts**

"Equality of distribution among creditors is a central policy of the Bankruptcy Code." Begier v. IRS, 496 U.S. 53, 58 (1990).  The Bankruptcy Code furthers that policy "by requiring that a plan of reorganization provide similar treatment to similarly situated claims."  In re Combustion Eng'g, Inc., 391 F.3d 190, 239 (3d Cir. 2004).  "Several sections of the Code are designed to ensure equality of distribution from the time the bankruptcy petition is filed."  Id. Among those Code provisions is § 1123(a)(4), which requires that a Chapter 11 plan "provide the same treatment for each claim or interest of a particular class."  11 U.S.C. § 1123(a)(4) (2009).  Also applicable is § 524(g), which compels the resolution of asbestos claims and demands through a trust on "substantially the same" basis.  Among other things, § 524(g) requires the trusts to "operate through mechanisms" that will "provide reasonable assurance that

- 3 -

the trust will *value*, and be in a financial position to *pay*, present claims and future demands that involve similar claims *in substantially the same manner*."   *Id*. § 524(g)(2)(B)(ii)(V) (emphasis added).   Chief among those "mechanisms" for providing substantially-similar treatment of asbestos claims is the TDP.

A.   **A Quarter-Century of Trust Administration and Several Dozen Asbestos Bankruptcies Have Resulted in a Finely-Tuned Process That Is Embodied in the Grace TDP**

The provisions of the Grace TDP were not written completely from scratch, but instead were drawn from a long lineage of previous asbestos bankruptcy cases, beginning with the ground-breaking Johns-Manville Corporation reorganization.   The TDP here embodies provisions that, for the reasons explained below, amply satisfy the requirements of the Bankruptcy Code, including § 524(g) and its mandate of equal treatment.

Since 1982, when Johns-Manville Corporation filed for reorganization, the asbestos claimants' and the asbestos defendants' constituencies have been wrestling with unique issues that have needed to be resolved in order to develop viable plans of reorganization.   Resolution of those issues, which began with the Johns-Manville plan, have followed a similar pattern or methodology that, albeit improved upon over time and even further in this case, has remained structurally the same for the last 25 years.   Numerous courts have approved that methodology as the model for resolving asbestos-related bankruptcies, and the methodology has proven effective and workable post-confirmation in resolving asbestos claims fairly and in a manner consistent with the provisions of the Bankruptcy Code.

In each asbestos-related bankruptcy, a plan must deal not only with valuing, liquidating, and paying the tens of thousands of asbestos personal-injury claims pending in the tort system at the time a petition was filed, but also with the anticipated tens of thousands of future claims.  In most of these reorganizations, the principal collection of assets available to respond to the claims of creditors has been the significant ongoing business value of the debtors, many of which were long out of the asbestos-related businesses.  To craft and confirm a plan of reorganization in any reasonable timeframe, a methodology needed to be developed not only to make unnecessary the litigation of the tens of thousands of present asbestos claims, but also to deal with future claims. For if the future claims were not resolved by the Plan and continued to accrue and be pressed against the reorganized debtor, that debtor would simply be forced into a future bankruptcy and the values it provided as an ongoing business would be destroyed.

The methodology developed to respond to these challenges was a plan that created a trust, administered by independent trustees, to which all asbestos claims, present and future, are channeled by injunction away from the debtor for resolution and liquidation by the trust and payment with assets provided to the trust under the plan.  The channeling injunction concept was crafted in the Johns-Manville bankruptcy and was codified in the Bankruptcy Code as § 524(g) in 1994.

Having developed a methodology for reorganizing the debtor, the asbestos claimants constituency then needed to fashion a methodology to evaluate and, if appropriate, liquidate and pay the present and future asbestos claimants on as equivalent a basis over time as might be possible.  That challenge has been resolved over the same two decades by the crafting of what is

called a "trust distribution process" or TDP.  The charge of the TDP was to provide a mechanism by which to liquidate and pay the debtor's *several* share of liability to each claimant as efficiently and inexpensively as possible in light of the inadequacy of the available resources to pay that liability in full.  The <u>Grace</u> bankruptcy is yet another link in this chain of resolutions and does not differ in principle from any of its predecessors.  The ultimate size of the asbestos liability was a matter of substantial dispute, and the compromise/settlement that resolved that dispute, as embodied in the Plan, will not provide sufficient assets to compensate the claimants in full.  The basic treatment provided by the Plan for asbestos claimants is identical structurally to that provided asbestos claimants in each of the major reorganizations confirmed over the past two decades.

To conserve resources and empower the Trust to pay greater amounts to claimants (as opposed to defense costs), a method had to be developed pursuant to which the overwhelming majority of the claims could be resolved by settlement without the need for extensive individualized dispute resolution.  To liquidate the great majority of claims, the Grace TDP, like all others, provides for an "Expedited Review" process that identifies eight asbestos-related disease levels and provides medical and exposure criteria for each disease level.  If a claimant satisfies the medical and exposure criteria for a particular disease level, the claimant will, in effect, receive an "automatic settlement offer" under the TDP to pay the scheduled value for that disease level, multiplied by the payment percentage.  The disease levels and their medical and exposure criteria have been developed over a long period of time to reflect, as best as can be done, existing medical science and knowledge about exposure requirements and relevant tort

system considerations so that the Trust can be reasonably certain that if the expedited review criteria are met, the claimant in fact has an asbestos-related disease caused by exposure to the Debtor's asbestos such that a settlement offer is warranted.  These criteria cut across all asbestos defendants and have remained constant in TDPs developed by parties to asbestos bankruptcies and approved by courts over the past two decades.  The scheduled values in each TDP reflect the nationwide settlement histories of the particular debtor and the trends in that settlement history, and come from the best estimates that the asbestos constituency's experts can make based upon the nationwide average settlement values for claims against the debtor.   The streamlined Expedited Review procedures are designed to encourage settlement, and other features of the TDP, such as the "cap" on judgments, are designed to discourage extensive trials, avoid "lottery-type" jury verdicts, and make it possible for the Trust to be able to more reliably estimate its future asbestos liability.  Similar methods have been adopted in prior plans, and the result has been that over the last several years approximately 90% of all claimants at the various trusts have been satisfied to resolve their claims pursuant to Expedited Review, providing a very low-transaction-cost method of liquidating the bulk of the claims.[4]

Of course, it was recognized from the outset that while an Expedited Review process might satisfy the overwhelming majority of the claimants, there would be some who would not be so satisfied and, because the injunction channeled all claims against the debtor to the 524(g) trust, the trust had to have a process for dealing with the exceptions.  Three principal areas of

---

[4]    It should be noted that the exposure and medical criteria in the TDP are significantly more stringent than the settlement criteria Grace used to resolve claims in prepetition tort litigation.

dissimilarity in the claims characterize most of these outliers.  First, the particular claim would be entitled to substantially higher damages if the claim were litigated in the tort system.  This set of factors can occur when the tort system would likely provide a substantially higher damages award because, for example, the victim succumbs to mesothelioma at a relatively young age, has many dependents, or is in an unusually high earnings occupation, unlike most asbestos-related workers.  Second, the claimant's exposure to the debtor's asbestos followed an unusual path, one that would not satisfy the criteria provided under Expedited Review but which, nonetheless, creates a claim against the debtor.  Third, beginning even in the <u>Johns-Manville</u> bankruptcy, the need to deal specially with those claimants whose exposure to asbestos was principally, if not entirely, to the debtor's asbestos, unlike the overwhelming majority of claimants who were exposed to the asbestos of a number of defendants, thus rendering an award based upon the debtor's several share of liability inadequate.  Each of these forms of exceptional situations is dealt with pursuant to the TDP's Individual Review process, which, where resolution is not reached amicably with the trust, provides for mediation, arbitration, and even litigation to liquidate the claims.

Finally, because the Trust will not be able to pay every claimant 100% of the liquidated value of his or her claim, whether liquidated by Expedited Review or Individual Review, the TDP provides for application of a payment percentage to be applied to the liquidated value of the claim.  Section 524(g) of the Code charges the Trust to value and pay all present and future claims in substantially the same manner.  Toward that end, the Trust will be required regularly to calculate and recalculate the payment percentage based upon the best estimates that it will have

and can be made of the value of its resources over time and the amount of the claims it will face over the same period.

Based upon analysis in this case, the analyses done in earlier cases, and the evaluation of the performance of the now-existing asbestos trusts, it is believed that pursuant to the Grace Plan and, in particular, the TDP, the Asbestos PI Trust will fairly liquidate and pay all Asbestos PI Claims.  The Libby Claimants object and argue that the factual history of exposure in Libby and the disease patterns there are different and that, as a result, the TDP does not treat them fairly.  In fact, as is described below, the Libby Claimants are no different from any other claimants in any way that matters under the Bankruptcy Code.  To the extent that their claims need to be valued individually, the Individual Review procedures fairly address all of the aspects of their claims that they consider to be different.

No one disputes that there have been valid asbestos personal injury claims in the past and will be valid asbestos personal injury claims in the future relating to Grace's historical operations in Lincoln County, Montana.  At the same time, it is fair to say that the diseases afflicting claimants from Libby, Montana, are the same diseases suffered by hundreds of thousands of other asbestos victims throughout the country.[5]  The asbestos to which the Libby Claimants were

---

[5]    Prior to going into bankruptcy, Grace settled fewer than 100 claims brought by residents of Libby, Montana, and fewer than 200 "Libby claims" were pending when Grace went into bankruptcy.  By contrast, Grace settled or otherwise resolved prepetition over 160,000 asbestos personal injury claims from outside of Libby, and another 130,000 claims were pending when Grace went into bankruptcy.

exposed[6] was transported throughout the country under circumstances where hundreds of thousands of non-Libby residents also are alleged to have been exposed to it.[7]  What is different about the Libby Claimants from the "typical" Grace Claimant is that they allege that they have been exposed primarily to asbestos for which Grace is responsible, just as the plant workers in Manville, New Jersey were exposed to asbestos for which Johns-Manville was primarily responsible.  Thus, compensation based on the historic nationwide average of settlements of Grace's several share of liability might be too low.  This subject is addressed in this TDP, as in each of the other previous TDPs, by providing for "extraordinary treatment" where it can be shown that the exposure was predominantly to asbestos or to conduct for which Grace has legal

---

[6]  Asbestos fiber types include amphiboles and chrysotile.  The vermiculite from the Libby Montana mine contained amphibole asbestos fibers – a mixture of tremolite, winchite, and richterite – which the Libby Claimants and their experts call "Libby asbestos."

[7]  The Libby Claimants contend that "[w]hile Libby Asbestos Disease is a result of the Libby amphibole asbestos, Grace's overwhelming asbestos liability is due to chrysotile asbestos that was incorporated into its construction and insulation products."  (Libby Tr. Br. 20.)  That contention, however, ignores the following facts that the Libby Claimants' experts do not dispute:

- Grace's construction products containing "commercially-added asbestos" (e.g., Monokote 3) also contained vermiculite which was contaminated with amphibole asbestos (called "Libby asbestos" by the Libby Claimants and their experts).

- The vermiculite concentrate that contained "Libby asbestos" as a contaminant was shipped to expansion plants across the country, thereby potentially exposing anyone who worked in or lived in the vicinity of an expansion plant to "Libby asbestos."  Agency for Toxic Substances and Disease Registry, Summary Report: Exposure to Asbestos-Containing Vermiculite from Libby, Montana, at 28 Processing Sites in the United States (2008).

- All of the Libby medical experts, including Dr. Whitehouse, recognized that the type of asbestos to which Libby Claimants were exposed was no different than the asbestos that other Grace claimants were exposed to outside of Libby.  *See* Transcript of Deposition of Dr. Alan Whitehouse, June 16, 2009, at 21:12-20, 26:9-19, 27:14-21 (hereinafter, "**Whitehouse 06/16/2009 Dep.**"), attached hereto as **Exhibit B**; Transcript of Deposition of Dr. Arthur L. Frank, June 5, 2009, at 22:07-15, 23:19-24:4, 27:3-10, 33:14-36:15, 37:23-38:14, 38:25-39:13 (hereinafter, "**Frank Dep.**"), attached hereto as **Exhibit C**.

responsibility.  The TDP's extraordinary claims process provides that a claimant can receive as much as five times the scheduled value if the exposure was 75% the fault of Grace or up to eight times the scheduled value where Grace's responsibility was 95%.  While there may be exceptions, it is expected that most Libby residents will be able to satisfy the eight-times multiple criteria so that the available limits of compensation would fall well within the experience that seriously-injured Libby claimants have had in pre-bankruptcy settlements with Grace.

**B.    In a 524(g) Plan, the "Equal Treatment" of Claims Under § 1123(a)(4) Means the Same Payment Percentage and the Same Trust Process**

In their objections, the Libby Claimants attack the proposed TDP, relying not so much on § 524(g), but on § 1123(a)(4) instead.[8]  Section 1123(a)(4), however, "does not require precise equality, only approximate equality."  In re Quigley Co., 377 B.R. 110, 116 (Bankr. S.D.N.Y. 2007) (citations omitted).  Equality of treatment under § 1123(a)(4) bears two important

---

[8]    In their papers, the Libby Claimants make the fatuous assertion that § 524(g)'s command that trusts "value" and "pay" present claims and future demands "in substantially the same manner" applies only to future demands.  The treatment of present claims, they contend, is governed solely by § 1123(a)(4).  Libby Tr. Br. 75-76.  This is simply an untenable reading of § 524(g)(2)(B)(ii)(V), which refers to "present claims" and "future demands" in the same sentence without using commas, provisos, or parentheses to distinguish between those two types of claims.  To support their radical reading of the statute, the Libby Claimants point to a footnote in the Combustion Engineering decision, in which the Third Circuit supposedly refers to that provision as being "specifically tailored to protect the due process rights of future claimants."  Id. at 76 (quoting Combustion Eng'g, Inc., 391 F.3d at 234 n.45).  The Libby Claimants neglect to mention that the Third Circuit makes this statement when discussing other provisions of § 524(g) that are more "specifically tailored" to protecting the due process rights of future claimants, such as the appointment of a future claimants' representative.  See Combustion Eng'g, Inc., 391 F.3d at 234 n.45.  Moreover, even if § 524(g)(2)(B)(ii)(V) were so "specifically tailored," that does not mean the provision applies only to future demands.  The Libby Claimants are simply reading too much into a sidebar statement contained in one of many footnotes in that opinion. The Court should accordingly reject their contention as frivolous.

- 11 -

hallmarks.  First, all members of the class "must receive equal value."  *Id*.  In other words, the members' claims must be subject to the same pro rata distribution or payment percentage.  *See* Begier, 496 U.S. at 58 (stating that "creditors of equal priority should receive pro rata shares of the debtor's property").  Second, all class members must be subject to the "same process for claim satisfaction."  In re Central Med. Ctr., Inc., 122 B.R. 568, 575 (Bankr. E.D. Mo. 1990).  In other words, their claims must be subject to the same procedures for liquidating or resolving them.  *See* In re Dow Corning Corp., 255 B.R. 455, 497-98 (E.D. Mich. 2000), *aff'd*, 280 F.3d 648 (6th Cir. 2002).

The TDP here embraces both attributes.  It provides that all Class 6 claims will be subject to one payment percentage, and it embodies one uniform set of procedures for liquidating or resolving all Class 6 claims.  In particular, the TDP contemplates that the Trust will make settlement offers in differing amounts during Expedited Review, such amounts varying based on the disease level, exposure proof, and other relevant factors.  *See* TDP §§ 2.2 & 5.3(a) (Exhibit A).  But this "standing settlement offer" approach does not constitute unequal treatment.  The settlement value of each claim in the tort system will vary according to the specific facts involved, such as severity of disease and causation evidence.  The TDP is designed to approximate nationwide settlement values obtained for different claims in the tort system, while at the same time giving all claimants the same rights and procedures for resolving and liquidating their claims against the 524(g) trust.  In this respect, the TDP treats all Class 6 claims, including those of the Libby Claimants, the same.  The TDP thus satisfies § 1123(a)(4).

The Libby Claimants contend that the TDP does not afford them equal treatment in Class 6 because the TDP's scheduled values are less than the historic settlement averages of the Libby claims.  In other words, the Libby Claimants argue that the TDP does not treat them *equally* with other Class 6 members because it fails to treat their claims *preferentially*.  The type of plan favored by the Libby Claimants would make them akin to the privileged characters in Orwell's <u>Animal Farm</u>, where all claimants are equal but some "are more equal than others."[9]  But these fanciful notions of equal treatment have no vitality under the Bankruptcy Code.  Indeed, many previous bankruptcy cases have approved TDPs that the Libby Claimants now complain about.  To list just the most recent examples, the courts overseeing the following asbestos bankruptcy cases confirmed plans containing TDPs very similar to the Grace TDP: Owens Corning, Armstrong, USG, Federal Mogul, Kaiser, Babcock & Wilcox, and Mid-Valley.

The TDP at issue here specifically contemplates special circumstances that justify departure from standardized requirements and treatment.  As is required by the Code, the Libby Claimants have the same avenues available to them under the TDP as other Asbestos PI Claimants do, if they wish to have greater values assigned to their claims.  If they believe their claims are worth more than the scheduled values, they may pursue Individual Review of their claims.  *See* TDP § 5.3(b) (Exhibit A).  If they are dissatisfied with the outcome of Individual Review, the TDP permits them to seek further review through non-binding arbitration and then a

---

[9]   George Orwell, <u>Animal Farm</u> 114 (Penguin Books 1951) ("All animals are equal, but some animals are more equal than others."), *quoted in* <u>FTC v. First Capital Consumer Membership Servs., Inc.</u>, 206 F.R.D. 358, 365 (W.D.N.Y. 2001); *see also* <u>In re AOV Indus.</u>, 792 F.2d 1140, 1156 (D.C. Cir. 1986) (Starr, J., dissenting).

jury trial in the tort system.  *See* TDP §§ 5.10 & 5.11 (Exhibit A).  The Libby Claimants could also seek "extraordinary claims" treatment under the TDP, which could increase their liquidated claim amounts eight-fold if they establish, *inter alia*, that their exposure to asbestos was "95% the result of exposure to an asbestos-containing product or to conduct for which Grace has legal responsibility" or five-fold if they establish it was 75% Grace exposure.  TDP § 5.4(a) (Exhibit A).  As with all other Asbestos PI Claimants, the TDP does not relegate the Libby Claimants to the scheduled values as their sole remedy.  Because the TDP provides these alternative avenues to all Asbestos PI Claimants, it treats all Asbestos PI Claimants equally.

But the Libby Claimants continue to grouse.  They complain that because the scheduled values in Expedited Review are not commensurate with their allegedly "more valuable" claims, the TDP will force them to pursue the alternative avenues, such as Individual Review, which, they contend, will be more time-consuming and less predictable than Expedited Review.  But, again, the Libby Claimants are not arguing for equal treatment; they are pushing for preferred treatment.  They want a form of Expedited Review that will offer higher scheduled values only to them.  If the TDP were to adopt that approach, it would be conferring special treatment on the Libby Claimants, which in turn, would violate Code §§ 524(g) and 1123(a)(4).

As noted above, § 1123(a)(4) requires the application of one payment percentage and one set of procedures for resolving claims to all class members.  *See* Quigley, 377 B.R. at 116; Central Med. Ctr., Inc., 122 B.R. at 575.  As a result, the Libby Claimants' other assertions of unequal treatment based on medical criteria, jury verdict caps, deferred payment installments, the FIFO queue, and punitive damages must fail.  The TDP's medical criteria apply to all Asbestos

- 14 -

PI Claimants, not just the Libby Claimants. *See* TDP §§ 5.3(a)(3) & 5.3(b)(1)(A) (Exhibit A). So too, the caps on jury verdicts do not violate § 1123(a)(4) because they affect all Class 6 claimants the same way. *See* TDP §§ 5.11 & 7.7 (Exhibit A). Indeed, nearly all verdicts and judgments in the tort system exceed the settlement values contemplated under this TDP. In that respect, the TDP will "cap out" all claimants, not just the Libby Claimants. Similarly, the TDP provision that would stretch out, over the course of six to 10 years, the payments to those who obtained judgments in the tort system post-confirmation is proper, inasmuch as it applies to all Class 6 members and not just the Libby Claimants. *See* TDP § 7.7 (Exhibit A). After pursuing Individual Review and non-binding arbitration, all claimants under the TDP will have the option to liquidate their claim by judgment in the tort system. *See* TDP §§ 5.11 & 7.6 (Exhibit A). The timing consequences flowing from that decision are the same for all Class 6 members who elect that option.

Additionally, the TDP's FIFO queue applies uniformly to all Asbestos PI Claims and not just to the Libby Claimants. All claimants at the back of the FIFO queue (and all holders of future demands) will bear at least some theoretical risk that the Trust will end up with insufficient funds to pay them under the same payment percentage that applied to those claimants at the front of the FIFO queue. Such "risk" is not uniquely shouldered by the Libby Claimants. And, in any event, § 524(g) requires all trusts to minimize that risk by employing "mechanisms," such as "matrices" and a "periodic review" of claims estimates, that will provide "reasonable assurance" that all present claims and future demands will be paid in substantially the same manner. *See* 11 U.S.C. § 524(g)(2)(B)(ii)(V) (2009).

- 15 -

With respect to punitive damages, the Libby Claimants are not the only holders of those claims; virtually all prepetition claims against Grace sought punitive damages. The TDP does not provide for the payment of punitive damages because, *inter alia*, all Class 6 members (both present claimants and future demand holders) will not receive full payment of their compensatory claims. The important point here is that all Class 6 claimants will be denied payment of any punitive damages claims they might have, not just the Libby Claimants. *See* TDP § 7.4 (Exhibit A).

> ### C.    Far from Dismissing the Concerns of the Libby Claimants, the ACC and the FCR Did the Opposite:  They Worked Hard to Examine Those Concerns and to Modify the TDP

As with other Plan Documents, the TDP is the product of negotiation and compromise. It does not have to be perfect, nor does it have to guarantee that every conceivably "valid" Asbestos PI Claim will qualify for a particular level of compensation under Expedited Review. At the proverbial end of the day, confirmation of the Plan and approval of the TDP do not turn on whether the Libby Claimants' views about TDP's medical criteria for non-malignant claimants are correct. Nor do they turn on whether the views of the Plan Proponents' experts are correct. As long as the TDP is proposed in good faith, approved by a properly-constituted class of Asbestos PI Claimants, and comports with the Bankruptcy Code, including §§ 524(g), 1123 and 1129, which it clearly does, there is simply no basis for this Court to deny confirmation even if it believed every word of the Libby Claimants' criticisms concerning the alleged inadequacies of the TDP.

The Libby Claimants argue that because of the nature of the exposure and the nature of the asbestos to which they were exposed, they suffer from a more severe form of pleural disease than do other asbestos victims throughout the world.  Moreover, the Libby Claimants argue that because of their exposures, the nonmalignant disease from which they suffer progresses more rapidly than the nonmalignant disease suffered by other asbestos victims.  The correctness of these allegations is not even supported by the Libby Claimants' own experts.  As noted above, asbestos to which the Libby residents were exposed was in use throughout the country.  The vast majority of asbestos claims faced by Grace arose outside of Libby, and related to products containing both commercially added chrysotile and vermiculite, as well as products containing vermiculite.  In either case, the potential for exposure to Libby asbestos was in most Grace products.  With the sole exception of Dr. Whitehouse, all of the medical and epidemiological experts in this case have conceded that once an individual contracts an asbestos-related disease – whether it be lung cancer, mesothelioma, asbestosis or diffuse pleural thickening – the disease is the same whether the person lives in Libby or Boston.  And it would be contrary to all existing medical and epidemiological data to think differently.  Thus, there is no TDP designed to address a unique "Libby-specific" disease that has no support in scientific literature or even among the Libby Claimants' own experts, save Dr. Whitehouse.  To do so would be contrary to existing science and the mandates of the Code.[10]

---

[10]    Despite this, the Libby Claimants continue to make irresponsible, sweeping factual assertions about the supposed differences between asbestos-related disease caused by exposure to "Libby asbestos" and disease caused by other types of asbestos fibers.

The TDP, however, does provide for a category of disease not found in any other bankruptcy plan entitled "Severe Disabling Pleural Disease" (Disease Level IV-B). Based upon the long existing medical literature concerning severe pleural disease, and working with a nationally recognized asbestos medical expert, Dr. Laura Welch, the TDP's drafters incorporated new medical and exposure criteria into the TDP for severe pleural disease so that if in fact any Libby Claimant, or for that matter any claimant from anywhere else, should suffer this disease, there would be provision for it in the TDP. The addition of this new provision appropriately

---

As explained above, even if everything the Libby Claimants say about asbestos-related medical issues were true, which it is not, their complaints still provide no basis under the Bankruptcy Code for denying confirmation. Nevertheless, each of the Libby Claimants' assertions about the supposed differences between "Libby Asbestos Disease" and asbestos-related diseases elsewhere are refuted not only by the Plan Proponents' experts, by authoritative medical literature, and by U.S. government studies; they are also refuted by the testimony of the Libby Claimants' own experts, Drs. Frank and Molgaard.

Dr. Molgaard's testimony, in particular, completely undermines the Libby Claimants' assertion that the supposed differences between "Libby Asbestos Disease" and the diseases caused by exposure to "non-Libby" asbestos render the TDP inappropriate or unfair to the Libby Claimants. At his deposition, Dr. Molgaard testified extensively about the difference between "analytical epidemiology," which can be used to used determine whether exposure to a toxin can cause disease or the relative risk of disease resulting from such exposure, and "descriptive epidemiology," which cannot be used to prove causation or risk hypotheses. Dr. Molgaard testified that Dr. Whitehouse's expert reports and published articles about pleural disease being caused by exposure to "Libby asbestos" were entirely examples of "descriptive epidemiology." As such, Dr. Whitehouse's reports and articles could be not used to prove any of the Libby Claimants' assertions about the relative toxicity of "Libby asbestos" compared to other asbestos fiber types or the relative severity, prognosis, "probability of death," or progressivity of "Libby Asbestos Disease" compared to pleural disease seen elsewhere. *See* Transcript of Deposition of Dr. Craig Molgaard, June 25, 2009, at 155:14-22, 156:14-23, 157:18-25, 160:14-162:4, 168:3-15, 170:24-171:6, 181:2-18, 182:19-183:17, and 193:6-194:16, (hereinafter, "**Molgaard Dep.**") attached hereto as **Exhibit D.** The testimony of Dr. Molgaard, among other things, conclusively demonstrates that any of Dr. Whitehouse's testimony on epidemiological matters and the alleged differences between "Libby Asbestos Disease" and pleural disease seen elsewhere is so unreliable and without foundation that it is inadmissible on Daubert grounds. The Plan Proponents will file a Daubert motion to preclude Dr. Whitehouse from offering such testimony within the timeframe specified by the CMO.

accommodates claimants, in Libby and elsewhere, whose impairment from pleural disease may be more severe than other claimants' with pleural disease.   Where this is the case, those claimants should receive higher compensation, and will under the TDP in this Plan.

Similarly, to accommodate the assertion that Libby nonmalignant disease victims may see their diseases progress more rapidly than other nonmalignant disease victims throughout the world, the TDP permits claimants to come back later and assert a subsequent claim not only for the development of a malignant disease, but also for the progression of their disease to severe asbestosis or Severe Disabling Pleural Disease.   The Plan Proponents and their experts, as well as some of the Libby Claimants' own experts, disagree that progression of disease is related to residence in Libby.   Again, this assertion makes no medical or scientific sense and is contrary to all scientific literature.   But the Plan Proponents do agree that if an individual contracts one asbestos-related disease, and subsequently develops another, more severe disease, the individual should be compensated at the higher disease level.   Accordingly, the TDPs was modified to allow for that possibility for all claimants, including Libby claimants.   Finally, as noted above, the "extraordinary claims multiplier" found in section 5.4 of the TDP was raised from five times the Expedited Review scheduled value to eight times the scheduled value so that any severely injured Libby claimant whose injuries were caused almost entirely by exposure to Grace asbestos would receive compensation in line with what severely injured prepetition claimants from Libby had received in settlement of their claims.

### D.    The TDP's Medical Criteria Were Supplemented to Include a Diagnostic Category Long Recognized in the Scientific Literature and Effective in Capturing the Same Conditions at Libby

The Libby Claimants contend that the TDP provisions for resolving pleural disease claims do not adequately take into consideration the characteristics of severe pleural disease, which they call "Libby Asbestos Disease."  On that basis, they argue, the TDP violates the Libby Claimants' rights under the Bankruptcy Code.[11]

These criticisms are simply off the mark.  Contrary to what the Libby Claimants suggest, there are rational bases for the TDP's medical and exposure criteria.  The TDP is neither intended nor designed to treat the Libby Claimants unfairly.  The TDP's Expedited Review process is designed to identify and resolve expeditiously the vast majority of claims based on medical and exposure criteria that claims reviewers can easily apply and which, if satisfied, will allow the Trust to be reasonably certain that the claimant has, in fact, an asbestos-related disease of a readily definable severity caused by exposure to Grace's asbestos.  It is understood and expected that a small but not insignificant percentage of claimants, who may well have had viable claims against Grace in the tort system, will not meet the medical or exposure criteria for Expedited Review.  For this reason, the TDP's provisions for Individual Review, arbitration, and if necessary, litigation, operate as a "safety valve"; they allow the Trust (and potentially a jury) to compensate injuries based on out-of-the-ordinary fact patterns such as novel medical issues of

---

[11]    The Libby Claimants do not complain about the medical criteria for cancer or asbestosis claims, nor do they assert that the exposure criteria in the TDP are improper.

the type asserted by Dr. Whitehouse, or exceptional exposure facts, or very large lost wages, which make the claim in some way different from the "run-of-the-mill" Asbestos PI Claim.

At bottom, what the Libby Claimants are seeking is relaxed Expedited Review criteria that would simply permit a diagnosing physician, such as Dr. Whitehouse, to qualify claimants for settlement offers based on no criteria other than such physician's personal opinion that the claimant's medical condition entitles him or her to be placed in a higher disease level that offers more generous compensation than a lower one. Such an approach would effectively destroy the Trust's ability to use the disease levels and values in Expedited Review as an efficient and fair way of settling large numbers of claims at agreed values because the Trust would have to evaluate the legitimacy of every individual diagnosis it received. It would also render the Trust's ability to forecast its future payments for unresolved present and future claims, and to set and maintain a stable payment percentage for such claims, substantially more difficult.

> **1.    The TDP Was Supplemented to Include Diffuse Pleural Thickening in Its Severe Form Where Associated With Asbestos Exposure**

The Libby Claimants primarily complain about the TDP's medical criteria for "Severe Disabling Pleural Disease" (Disease Level IV-B), which are as follows:

> Diagnosis of *diffuse pleural thickening* of at least extent "2" and at least width "a" as one component of a bilateral non-malignant asbestos-related disease based on definitions as set forth in the 2000 revision of the ILO classification, plus (a) TLC less than 65%, or (b) FVC less than 65% and FEV1/FVC ratio greater than 65%.[12]

---

[12]    TDP § 5.3(a)(3), at 26 (emphasis added) (Exhibit A).

The TDP specifies that the definition of "diffuse pleural thickening" must "come from the 2000 ILO Classification for Pneumoconiosis," which "restricts diffuse pleural thickening to cases where there is associated blunting of the costophrenic angle."[13]

The Libby Claimants criticize both the radiographic (x-ray) and the lung function criteria for "Severe Disabling Pleural Disease." But as Dr. Welch, the ACC's medical expert who designed that category's medical criteria, will testify, authoritative medical literature amply supports all aspects of the criteria.

*Radiographic Requirements.* As an initial matter, the medical literature draws a very clear distinction between two main types of asbestos-related pleural disease – pleural plaque, which in the vast majority of cases does not affect lung function, and diffuse pleural thickening, which can cause severe lung function decline.[14] As Dr. Welch will explain, there are several well-designed epidemiological studies demonstrating that significant to severe lung function decline occurs as a result of asbestos-related pleural disease only where there is blunting of the costophrenic angle.[15] In its 2000 revisions to the guidelines for reading x-rays for asbestos-related disease, the panel of medical experts from the International Labor Organization revised

---

[13]  *Id.* at 26, n.7.

[14]  *See* American Thoracic Society, <u>Diagnosis and Initial Management of Nonmalignant Disease Related to Asbestos</u>, Am. J. Respir. Crit. Care Med., Vol. 170 at 691-715 (2004), attached hereto as **Exhibit E**; R. Lilis et al., <u>Pulmonary Function and Pleural Fibrosis: Quantitative Relationships With an Integrative Index of Pleural Abnormalities</u>, Am. J. of Indus. Med., 20:145-161 (1991), attached hereto as **Exhibit F**.

[15]  Blunting of the costophrenic angle is a phenomenon that can be observed on a chest x-ray. The costophrenic angle is the place on each side of the chest where the diaphragm meets the ribs. It normally appears as a sharply pointed angle. In the presence of pleural effusion this angle appears blunted on a chest x-ray.

the guidelines to require blunting of the costophrenic angle, width of 3 millimeters, and 25% extent of disease as requirements before an asbestos-related pleural disease is determined to be diffuse pleural thickening.  Thus, each of the radiographic criteria complained about by the Libby claimants is, in fact, required by the 2000 ILO guidelines.[16]  *See* Int'l Labour Office, Guidelines for the Use of the ILO International Classification of Radiographs of Pneumoconioses, O.S.H. Ser. No. 22 (rev. ed. 2000), at 7-8, (hereinafter "**2000 ILO Guidelines**"), attached hereto as **Exhibit G**.

*Lung Function Test Requirements*.  The lung function test requirements are similarly designed to identify cases where it is clear that the lung function loss is a result of asbestos-related pleural disease and not something else.  The Libby Claimants have two criticisms of the TDP's medical criteria for the two non-malignant disease levels that require lung function declines (Disease Levels III and IV).  First, they correctly observe that a test measuring diffusing capacity (DLCO) is generally used in the evaluation of non-malignant asbestos diseases.  Their complaint is that a reduced DLCO test result, standing alone, is insufficient under the TDP to qualify for additional compensation.  But as Dr. Welch will testify, many lung diseases other

---

[16]  While the Libby Claimants also complain about the TDP's failure to allow High Resolution Computed Tomography (HRCT) scans for Category IV in the Expedited Review process, the reason for this is that, unlike the ILO system for reviewing x-rays, there is no generally accepted protocol for classifying HRCT scans.  A proposal has been put forward for a classification system for HRCT analogous to that of the ILO system for plain chest radiographs, but it has not been widely adopted. Diagnosis and Initial Management of Nonmalignant Diseases Related to Asbestos, at 697 (Exhibit E). The Libby Claimants, like any claimant who seeks to qualify for Category IV, are of course free to submit HRCT scan evidence during Individual Review.

than asbestos diseases can reduce DLCO.[17]  Thus, a decline in DLCO, without any objectively measured lung function decline on other types of lung function tests, could well be the result of a disease that is not asbestos-related.

If the goal of the Expedited Review criteria is to identify those cases where it is fairly certain that the disease is asbestos-related and that any lung function decline is the result of an asbestos-related disease – and that certainly is the goal – then it is clearly reasonable to exclude an isolated DLCO decline as a basis for additional compensation.  Any claimant whose lung function decline is solely measurable by a reduced DLCO score is free in the Individual Review process (or in arbitration or litigation, if it comes to that) to use exactly the arguments and evidence discussed by the Libby Claimants to persuade the Trust (or an arbitrator or jury, as the case may be) that their lung function loss is, in fact, the result of an asbestos-related disease, so they should qualify for the additional compensation.

Second, the Libby Claimants complain about the FEV1/FVC[18] ratio requirements.  All the medical experts agree that, generally speaking, non-malignant asbestos-related diseases cause

---

[17]  Current or former smokers are a prime example of people who often can have reduced DLCO.

[18]  Forced Vital Capacity (FVC) and Forced Expiratory Volume in 1 Second (FEV1) are two components of pulmonary function tests that measure lung function.  FVC measures the total capacity of the lung in liters. FEV1 measures the maximum volume of air in liters that can be forcibly blown out in one second. FEV1/FVC is the ratio of FEV1 to FVC. In healthy adults this ratio is approximately 75–80%.  A decrease in the FEV1/FVC ratio strongly suggests that smoking, rather than asbestos, is the major factor responsible for airway limitation.

The American Thoracic Society states: "The characteristic change in pulmonary function observed in asbestosis is a restrictive impairment, characterized by reduction in lung volumes (especially the FVC and total lung capacity), decreased diffusing capacity, and arterial hypoxemia. Large airway function, as reflected by the FEV1/FVC ratio, is generally well preserved."  Diagnosis and Initial Management of Nonmalignant Diseases Related to Asbestos, at 700 (Exhibit E).

a restrictive lung defect, but do not usually cause obstructive disease.  While there may be some obstructive component to lung function loss caused by asbestos-related diseases in some individuals, in the great majority of cases an asbestos-related disease will cause a restrictive defect, not an obstructive defect.  The FEV1/FVC ratio is designed to determine whether the lung function decline measured by Total Lung Capacity or spirometry is caused by restrictive disease or obstructive disease.  If the lung function decline is restrictive in nature, the FEV1/FVC ratio will be greater than 65 in most people.  If FEV1/FVC ratio is reduced below that, it is likely that the individual suffers from obstructive lung disease, which includes many smoking-related diseases such as emphysema or chronic obstructive pulmonary disease.  Like the DLCO issue, the FEV/FVC requirement is designed to identify those cases where it is fairly certain that the lung function decline is a result of an asbestos-related disease and not something else.   And, as in the case of DLCO, in the Individual Review process a claimant will be free to offer the Trust any competent medical evidence or testimony he wishes to try to persuade it that he in fact suffers from the claimed asbestos-related disease, even if he does not meet the Expedited Review criteria.[19]

2.    **The Libby Claimants' Own Experts Acknowledge That the TDP Will Identify and Address the Serious Cases at Libby, and Are Unable to Say That It Has a Biased Impact in Libby That Differs from Its Impact Outside Libby**

The Libby Claimants' own experts have now acknowledged under examination that the TDP will compensate severe cases of asbestos-related disease in Libby, including asbestos-

---

[19]   *See* TDP §§ 5.3(b)(1)(A), 5.7(a)(2) (Exhibit A).

related pleural disease, and that they are unable to demonstrate that the TDP will have a biased impact in Libby that will differ from its impact to claimants outside of Libby.  Asked point blank, Libby Claimants' experts have even conceded that there is no fundamental difference between asbestos disease in Libby, and asbestos disease elsewhere.

### E.      All Experts Agree: There Is No "Unique" or "Different" Disease in Libby

The admission that asbestos related illness at Libby is not a different or unique disease is not a "gotcha." It is clear and serial. Libby Claimants expert Dr. Frank (no stranger to the legal process, he has testified about 1000 times) stated plainly:

> Q:   Well, the diseases that people in Libby suffer are no different than the diseases people outside of Libby suffer; is that correct?
>
> A:   It's the same set of asbestos-related diseases.

Frank Dep. at 36:4-8 (Exhibit C).

Confronted with this testimony, Dr. Whitehouse concurred:

> Q:   Dr. Frank has told us under oath that he does not believe that there is a different disease or a special disease or form of disease, pleural disease in Libby. It's just the same disease. Would you agree with that?
>
> A:   Well, I would agree that it's basically the same disease that has been occasionally seen in chrysotile . . . .

Whitehouse Dep. 06/16/09 at 203:14-21 (Exhibit B).

Even counsel for the Libby Claimants has agreed that their clients should be bound by a stipulation that, based upon pathology, (which is the gold standard for identifying disease), there is no difference between asbestos disease found in Libby and asbestos disease caused by exposure to asbestos outside of Libby:

It is further stipulated and agreed between the Debtor, the Official Committee of Asbestos Claimants and the Libby Claimants that from the standpoint of pathology, there is no difference in the asbestos related disease observed in patients exposed to tremolite, winchite and richterite from Libby, Montana, as opposed to the disease observed in patients exposed to other forms of asbestos. There is no pathological evidence to support a contention that asbestos disease caused by exposures to Libby tremolite, winchite and richterite is distinct from disease caused by other forms of asbestos.

Stipulation Regarding Testimony and Report of Samuel P. Hammar, MD, July 29, 2009, ¶ 6, attached hereto as **Exhibit H**.

> **F.      There Is Not Even a Triable Issue on Discrimination: An Addition to the TDP Was Made Specifically to Address Libby's Concerns, and the Modified TDP Follows Established Science to Target Severe Pleural Disease for Expedited Settlement**

Against the backdrop of agreement that there is no special disease at Libby, Libby counsel nonetheless insist that the medical criteria of the TDP, which govern expedited review, unfairly discriminate against Libby claimants.  Of course, there is nothing in the medical criteria themselves that single out Libby claimants for different treatment. And so, the claim of discrimination just does not add up to begin with:

- Libby claimants have the same disease.

- The TDP does not distinguish between Libby and non-Libby claimants.

- Therefore, the same disease is treated under the same criteria.

- Therefore, no discrimination.

But examination of the Libby experts has taken us one step further. Where the lawyers for the Libby Claimants allege discrimination in the TDP, the Libby experts have helped prove the opposite -- that the TDP *does not* discriminate.  First, they acknowledge that the TDP simply parrots established science.  While, as an historical matter, the TDP was modified here at the

- 27 -

behest of the Libby Claimants to meet their concerns, that modification simply created a new section of the TDP to separately treat a diagnostic entity that has been recognized in the literature literally for decades. Specifically, it is undisputed that the condition known as diffuse pleural thickening is a well recognized and "distinct diagnostic entity," which has been identified and "treated as such in the literature."[20]  The Libby Claimants' experts recognize that the loss of lung function associated with diffuse pleural thickening can be "both significant and severe."[21].

And the new section as written in fact will capture and compensate people who have "severe disabling pleural disease."[22]  The Libby experts further admit that the TDP will function in this way both with respect to individuals in Libby with severe pleural disease and individuals outside of Libby with severe pleural disease

And finally (and critically), their testimony is crystal clear that they have not analyzed the application of the TDP outside of Libby and therefore cannot say that the impact on Libby claimants is different, much less discriminatory:

> Q:   And have you done the analysis about whether the TDP category Roman IV B would have any kind of disproportionate effect on people with diffuse pleural disease at Libby?
>
> A:   I have not done that kind of analysis.

Frank Dep. at 195:2-6 (Exhibit C); *see also* Whitehouse 06/16/09 Dep. at 266:15-269:5 (Exhibit B).

---

[20]  Whitehouse 06/16/09 Dep. at 115:24-116:15 (Exhibit B); *see also* Frank Dep. at 147:23-148:6 (Exhibit C).

[21]  Whitehouse 06/16/09 Dep. at 156:23-157:11 (Exhibit B).

[22]  Whitehouse 06/16/09 Dep. at 180:15-181:23 (Exhibit B).

- 28 -

### G.     The Contention That the TDP Does Not Cover Certain Libby Claimants Entirely Misses the Point And Is Unsupported By Evidence

All of the foregoing concessions are unsurprising given an accurate appreciation of the Libby Claimants' real beef.  It is not that the TDP is less favorable to Libby than to non-Libby claimants.  Rather, it is that the TDP does not extend to claimants whom their experts believe to be sick and deserving of compensation.  This concern, however, simply misses the mark and is not supported by reliable data.

It misses the mark for two important reasons.  The first is that the TDP is not (and should not be) designed to pick up *all* cases of disease that should be compensated.  It is designed to hit the sweet spot of serious cases that are objectively clear enough to be compensated based solely upon an expedited review.  Expanding the scope of the TDP certainly will pick up more claims, but at the expense of picking up both the wheat and the chaff.  By contrast, the TDP for Severe Pleural Disease in this case was carefully tailored based upon existing science.[23]

Second, as a matter of law, the relevant issue is equal treatment under the TDP, not degree of flexibility.  If the TDP is narrow, more work is left for individual review, but there is no unequal treatment inside and outside of Libby.

Not only are the Libby Claimants' complaints just not relevant to the issues before the Court, but repeated efforts to muster evidence in service of those complaints have fallen completely flat.

---

[23]   Frank Dep. at 118:25-120:18 (Exhibit C).

1.    **The Evidence Demonstrates That the TDP is Highly Effective In Picking Out the Serious Pleural Disease Claims At Libby Today**

The expert analysis of Dr. Weill reveals that the TDP is properly designed to capture the cases of severe pleural disease within today's Libby population.  Dr. Weill has analyzed the x-ray and pulmonary function results for the individuals screened in Libby by the ATSDR in 2000 and 2001.  This analysis is based entirely on data gathered by ATSDR.  Dr. Weill applied the TDP requirements for severe pleural disease to the screened population to determine whether the TDP captured the cases of severe pleural disease within Libby.  Dr. Weill found that while severe pleural disease in Libby is a rare finding (less than 1% of the screened population met all of the TDP requirements), the TDP criteria effectively differentiate people with severe pulmonary impairment and those who have a pleural abnormality but no true impairment.  Specifically, those individuals in Libby with pleural abnormalities who meet the TDP radiographic criteria have a statistically significant decrement in lung function compared to those individuals who have pleural abnormalities but do not meet the TDP radiographic criteria.[24]

For their own part, the Libby Claimants have utterly failed to show that the TDP will not capture serious pleural disease cases at Libby.  First, there were the joint opinions of Drs. Frank and Whitehouse based upon the famous 1800 CARD clinic patients. As the Court is well aware,

---

[24]    Dr. David Weill, Sur-Rebuttal Report, July 24, 2009, at 6, (hereinafter, "**Weill Expert Report**") attached hereto as **Exhibit I**.  It is not surprising that Dr. Weill's analysis demonstrates this.  Almost 20 years ago, researchers at Mt. Sinai determined that patients with pleural disease that also had blunting of the costophrenic angle had far more sever decrements in lung function than patients with pleural disease who did not have blunting of the angle on x-ray.  Lilis et al, Pulmonary Function and Pleural Fibrosis, at 156 (Exhibit F).

the 1800 patient files have not been produced, and the Court has ruled that testimony based upon them cannot be admitted.

Reading the handwriting on the wall, the Libby Claimants retreated to the position that the opinions of Dr. Whitehouse could be proven using the files of 950 claimants who are also patients of Dr. Whitehouse.  The threshold problem with this gambit is that it is still inadmissible. It is an historical fact that the opinions were developed on the basis of the 1800 patients.  That fact cannot be deleted by fiat and replaced with a different fact -- that the opinions were based upon 950.

And there are other threshold barriers.  By his own admission, Dr. Whitehouse is not an epidemiologist and not an expert in epidemiology.  Thus, opinions regarding the Libby claimants as a group are opinions that he is not qualified to render.  In the criminal trial, Dr. Whitehouse's testimony was stricken to the extent it went beyond his diagnoses as a treating physician of certain individuals.  Importantly, Dr. Molgaard, who is an epidemiologist has admitted that neither he nor Dr. Whitehouse has "done the analytical epidemiological work" to determine whether Dr. Whitehouse's hypotheses are true. [25]

Undeterred, Dr. Whitehouse tried yet again and offered the opinion for the first time at his deposition that he could extrapolate from 79 cases of Libby residents who had died of non-malignant disease (older, deceased individuals with older exposures) to the 950 still living patients who also happened to have claims pending in this case.  This is an apples to oranges comparison between an historical collection of individuals who have died and a current and still

---

[25]    Molgaard Dep. at 181:2-183:17 (Exhibit D)**.**

living patient population.[26]  Even Dr. Frank recognizes that the notion that the findings from the collection of 79 people who have died can be extrapolated to the larger patient population is merely an "assumption" that, to date, has not been tested.[27]  It is not surprising that there is not even a piece of paper in existence reflecting this extrapolation, much less a method that supports it.

And Dr. Weill has now definitively rebutted this last effort of Dr. Whitehouse to offer an opinion as an epidemiologist.  The analysis of Dr. Weill compares the CARD Mortality Study Population with a more current study of the residents of Libby - the population screened by ATSDR in 2000 and 2001 - and reveals that the CARD Mortality Study population is not representative of a larger population, and the findings with respect to that group of deceased patients are limited to those 79 individuals.  The individuals in the CARD Mortality Study were people with historical exposures in Libby who had sought out a pulmonologist because of respiratory problems.[28]  The demographics, radiographic, and lung function of these individuals were all vastly different from the population screened by ATSDR,[29] the latter population being, according to Libby Claimants' own experts, a better indicator of what the population of Libby actually looks like.[30]  The analysis of Dr. Weill stands alone as the Libby Claimants have made

---

[26]    Whitehouse 06/16/09 Dep. at 308:20-309:10 (Exhibit B).

[27]    Frank Dep. at 245:22-246:21 (Exhibit C).

[28]    Weill Expert Report at 22-23 (Exhibit I).

[29]    Weill Expert Report at 22-24 (Exhibit I).

[30]    Whitehouse 6/16/09 Dep. at 189:11-190:10 (Exhibit B).

no effort to compare this population of 950 patients to a broader population outside of Libby to determine whether there are different patterns for pleural disease in Libby.[31]

**H.      The Remaining Discrete Criticisms of the TDP Do Not Show Discrimination**

There remains a short list of criticisms focusing on discrete aspects of the TDP and the experience at Libby, each of which fail to make out even a prima facie case of discrimination.

**1.      Progression**

Libby Claimants' experts claim that pleural disease in Libby is more severe than it is elsewhere because it progresses faster.  However, this does not address discrimination as there is no connection between how progression of disease in Libby makes the TDP criteria discriminatory.  Dr. Whitehouse conceded that he has not compared the progression of disease in Libby to the progression of disease elsewhere in a manner that would enable him to say that asbestos disease in Libby progresses more quickly than it does elsewhere.

> Q:    Okay. Here you have a study in Libby and it's not a big group, it's a small group, and it was a group that was picked precisely because they picked themselves, in your own words, the rapid progression. If you want to know whether that's unique to Libby, you'd have to look for a comparable study outside of Libby, right?
>
> A:    Right, nobody's published it.
>
> Q:    And so -- but it's not that you know it's unique to Libby, it's that you haven't seen a study like this outside of Libby, correct?
>
> A:    Yeah, but, you know, I don't have x-ray vision to know whether they actually have it and haven't published it, so if they haven't published it, the likelihood is that they haven't seen it.

---

[31]   Whitehouse 06/16/09 Dep. at 114:1-115:10 (Exhibit B).

> Q:    Well, but that is -- that is an inference on your part. All you know is that you have a highly select group of people where you've made this observation at Libby and you're not aware of a comparable study outside of Libby, fair?
>
> A:    That's true.

Whitehouse 06/16/09 Dep. at 289:12-290:7 (Exhibit B).  Ending the matter entirely, the Libby

Claimants' epidemiologist confirms that Dr. Whitehouse's allegations are mere hypotheses that

have yet to be tested.

> Q:    And from a toxicologically, epidemiologically, everything we know in science, there's no reason to think that the stuff -- if you're exposed to the same stuff in Boston as you're exposed to in Libby, the disease that you ultimately get is going to be the same disease; correct?
>
> A:    Right. The only thing, it might be -- the progression has spread. Might be -- could possibly be faster in Libby if there's a more concentrated exposure. That's a hypothetical.
>
> Q:    Right; that's a hypothesis that you would agree hasn't been tested.
>
> A:    Right.

Molgaard Dep. at 98:22-99:9 (Exhibit D).

Dr. Weill's analysis of the individuals in Dr. Whitehouse's (2004) as well as the other

Whitehouse patients for whom x-rays and medical records were produced reveals that, from a

lung function standpoint, there is not a high level of progression of disease.  In Whitehouse

(2004), Dr. Whitehouse contends that the annual decline in lung function in his studied

population increases by two to three percent per year, on average.[32]  Dr. Whitehouse's findings

were based on a mere two data points per person: the first and last PFT for each of the 123

---

[32]    Weill Expert Report at 17 (Exhibit I).

people in his study.[33]   However, when Dr. Weill analyzed the same individuals using all available data for these individuals, he found the annual decline in FVC and TLC for these individuals to be less than one percent, a level which does not suggest progression of disease.[34]

### 2.   Low Exposure

The Libby Claimants also contend that the TDP discriminates against them because they developed disease from much lower exposures than other claimants.   Once again, the Libby Claimants' own expert unequivocally acknowledged that what has been observed among Libby Claimants with "low exposures" is no different than what has occurred to other individuals with low levels of asbestos exposure.

> Q:   And so that would be consistent, that is, what [McCloud] observed outside of Libby with respect to low exposure is consistent with what you observed at Libby with respect to low exposure, correct?
>
> A:   Yes.

Whitehouse 06/16/09 Dep. at 276:7-11 (Exhibit B).

Given the similarity in what has been observed in people with low exposures in Libby and low exposures outside of Libby, there is no basis for the Libby Claimants to contend that the TDP criteria will somehow discriminate against people with low exposures given that the Libby Claimants' own expert acknowledges similar disease patterns among people with low exposures inside Libby and low-exposures from elsewhere.

---

[33]   Weill Expert Report at 16 (Exhibit I).

[34]   Weill Expert Report at 14 & 17 (Exhibit I).

Moreover, many of these low-level exposure pathways alleged by the Libby Claimants - specifically community exposures - occurred outside of Libby as well.  In fact, the Libby Claimants' own industrial hygienist stated that there were environmental exposures that occurred at and around vermiculite expansion facilities all around the United States.

> Q:    Have you studied exposures to asbestos from Libby that occurred outside of Libby?
>
> A:    We have done some preliminary work in Spokane.
>
> Q:    What kind of work is this?
>
> A:    It was, again, through the COBRE grant.  And we basically did a very preliminary survey of neighborhoods surrounding the Spokane expanding plant.
>
> Q:    And what were the findings of that analysis?
>
> A:    Well, they're very preliminary.  In fact, they're still being worked up but -- so it's, I mean we -- fibers were detected in areas outside of the plant that is no longer there.
>
> Q:    Okay.  So this is just one example; however, in this example, it illustrates that people outside of an expanding plant outside of Libby - in this case, Spokane - may have been exposed to asbestos that was released during the expanding process, correct?
>
> A:    I suppose that's correct.

Transcript of Deposition of Dr. Terry Spear, July 29, 2009, 159:19-160:11 (hereinafter, "**Spear Dep.**") attached hereto as **Exhibit J**.

### 3.    Thickness of the Pleura

Libby Claimants' medical experts also object to the TDP requirement that individuals seeking recovery for "Severe Pleural Disease" have pleural thickness of at least three millimeters.    According to Dr. Whitehouse, this is an arbitrary requirement that will

unnecessarily limit recovery for individuals with serious pleural fibrosis that just so happens to be less than three millimeters thick.    Nevertheless, Dr. Whitehouse has not even done the requisite analysis - specifically comparing the prevalence of serious disease among individuals in Libby with thin levels of pleural fibrosis with the prevalence of similar conditions in other exposed cohorts - necessary to determine whether this requirement would have the effect of discriminating against Libby Claimants compared to other claimants.

> Q:    Do you know -- do you know based upon scientific data that the presentation of diffuse pleural thickening at Libby is different in terms of the thickness of the tissue from how it is has been reported, the thickness that's been reported outside of Libby in the scientific literature?

> A:    I haven't -- I doubt it's any significant difference because it's -- I think it's more a matter of degree or more the matter of frequency than it is the amount of degree. I'm sure you can find the same thing in -- outside of Libby in people if you look for it. That's all.

> Q:    Okay. Now, have you done the scientific analysis to say, I've measured and determined that the frequency of thinner pleura in Libby people is greater than the frequency reported in the literature? Have you done that?

> A:    No.

Whitehouse 06/16/09 Dep. at 267:23-268:15 (Exhibit B).

Additionally, Dr. Weill's analysis clearly demonstrates the importance of including a thickness criteria in the TDP.    Dr. Weill's analysis of the ATSDR population isolated those individuals who had DPT with blunting of the costophrenic angle and sufficient thickness of the pleura and compared those individuals to the individuals who also had DPT with blunting of the costophrenic angle but did not have sufficient pleural thickness to meet the TDP criteria for expedited recovery.    By isolating these two groups of individuals, Dr. Weill was able to compare the lung function for those individuals with DPT and blunting who did and did not meet the

thickness requirement.    The comparison revealed that there was a statistically significant difference in lung function for those individuals who had DPT, blunting of the costophrenic angle, and sufficient thickness of the pleura and those individuals who had DPT, blunting of the costophrenic angle, but insufficient thickness of the pleura.[35]    These findings demonstrate that the thickness has a meaningful impact on whether an individual's DPT, in Libby, will result in pulmonary impairment.

### 4.        Blunting of the Costophrenic Angle

Libby Claimants' experts have opined that a person can have diffuse pleural thickening that causes impairment irrespective of whether there is evidence of a blunted costophrenic angle. Again, the point is missed.    Experts for Plan Proponents have identified the robust body of literature that contradicts this view and supports the prevailing view in the medical community that diffuse pleural thickening, which involves fibrosis of the visceral pleura, should be identified only when there is blunting of the costophrenic angle.    If there is no blunting of the costophrenic angle, then the pleural abnormalities identified are likely confluent parietal plaques, pleural fat, or some other condition that does not involve the blunting of the visceral pleura.

Nor is there discrimination.    Dr. Whitehouse concedes that the phenomena he claims that is occurring in Libby - diffuse pleural thickening without blunting of the costophrenic angle - is similar to what is found in the literature describing pleural abnormalities among individuals exposed to non-Libby asbestos.    Specifically, Dr. Whitehouse claims that the cohort studied in

---

[35]    Weill Expert Report at 6 (Exhibit I).

1985 by McCloud had a prevalence of diffuse pleural thickening without blunting of the costophrenic angle that was very similar to what is occurring in Libby.

> MR. BERNICK:  I'm sorry. Your voice trailed off a little bit, Dr. Whitehouse. What corresponded almost identically with the --
>
> THE WITNESS:  Oh, the McCloud numbers correlate almost exactly with the Libby number*s* for the incidents of blunting as a criteria for diffuse pleural thickening. We have all these people with diffuse pleural thickening that don't have blunting.
>
> * * * *
>
> Q:  So at least you agree with me that the -- that you can say that with respect to McCloud, he found a comparable rate of severe diffuse pleural thickening without blunting is what you found in Libby, correct?
>
> A:  Yes.

Whitehouse 06/16/09 Dep. at 62:10-17, 275:12-17 (Exhibit B).  So even if Dr. Whitehouse's contention were believed to be true, by his own admission - the requirement of blunting in the TDP impacts claimants in Libby in the same way as it impacts claimants outside Libby and thus there can be no discrimination.

Once again, an actual scientific analysis of the data demonstrates the relevance of blunting of the costophrenic angle in identifying diffuse pleural thickening that causes pulmonary impairment as opposed to benign parietal plaques.  Dr. Weill's analysis isolated the individuals with diffuse pleural thickening and blunting of the costophrenic angle, diffuse pleural thickening without blunting, and those individuals with pleural abnormalities only.[36]  To avoid a

---

[36]   Weill Expert Report at 4 (Exhibit I).

potential confounding influence, Dr. Weill excluded those individuals who also had interstitial disease based on consensus ATSDR x-ray reads.[37]   Based on these consensus ATSDR x-ray reads, there were no individuals with DPT without blunting, 53 people with DPT and blunting of the costophrenic angle, and 710 people with pleural abnormalities but no blunting.[38]  Dr. Weill compared the average FVC for those 53 individuals with DPT and the 710 people who only had pleural abnormalities and found that that the average FVC for those with DPT and blunting was 83% predicted compared to 95% predicted for those individuals who only had pleural abnormalities.  These findings demonstrate that blunting of the costophrenic angle is a predictor of whether an individual will have a decrement in lung function and thus a marker for disabling pleural disease.  The TDP was designed to require radiographic findings that would capture those individuals who have real disease, and blunting of the costophrenic angle does just that.

### 5.    FEV1/FVC

Libby Claimants' own experts concede that they object to the use of the FEV1/FVC ratio in the TDP for reasons that are applicable to all non-malignant personal injury claimants, not merely the Libby Claimants.

> Q:    Okay.  FEV1/FVC issue.  We have discussed this.  Now, you disagree with the use of this metric, so to speak.  Is that the right way, metric?
>
> A.    No.
>
> Q:    You would disagree with the use of that lung function measurement as the way ---

---

[37]   *Id.* at 3.

[38]   *Id.* at 4.

A:    No.  We use that measurement.  I disagree with putting an absolute number on it in abstentia of other aspects of it.

Q:    Okay.  And that objection you just made is universal across anybody exposed to asbestos?

A:    Yes.

Q:    It is not Libby-specific?

A:    Any competent chest physician is going to make that objection.

* * * *

Q.    . . . . . The FEV1/FVC ratio was more of a general criticism, not necessarily a Libby-specific one, correct?

A     Yeah.  I think so.

Transcript of Deposition of Dr. Alan Whitehouse, Mar. 19, 2009, (hereinafter, "**Whitehouse 03/19/09 Dep.**"), at 35:12-36:1; 55:24-56:2, attached hereto as (**Exhibit K**).

### 6.    DLCO

Finally, the Libby Claimants' own expert acknowledged that his objection regarding the exclusion of DLCO (diffusion capacity) as an independent basis to establish impairment, is not Libby specific and would impact individuals with chrysotile only exposures.  Dr. Whitehouse opined that individuals with severe Libby pleural disease may have normal FVC and TLC but have a decrement in DLCO.[39]  As Dr. Whitehouse recognized, there are hundreds of medical conditions that cause a decrement in DLCO, and a decreased DLCO certainly is not dispositive for identifying asbestos-related impairment.[40]  Under the TDP, a claimant cannot establish the

---

[39]    Whitehouse 03/19/09 Dep. (Exhibit K).

[40]    Whitehouse 03/19/09 Dep. at 53:4-13 (Exhibit K)**.**

impairment level necessary to recover for "Severe Pleural Disease" based on a diminished DLCO alone.  However, once again, this will not have discriminatory impact on the Libby Claimants' claims.  Dr. Whitehouse himself has acknowledged that people who have pleural disease outside of Libby, from chrysotile only exposures may have asbestos-related pleural disease that causes a severe decrement in DLCO but not FVC or TLC.

> Q:    If you treat somebody who has a chrysotile exposure and they have normal
>        FVC, normal TLC, but a decreased DLCO, with fibrotic changes of the
>        pleura, and no changes apparent on x-ray, would you believe that the
>        decrement in DLCO was caused by the asbestos pleural disease?
>
> A:    Yes.

Whitehouse 03/19/09 Dep. at 54:8-14 (Exhibit K).

Accordingly, by Dr. Whitehouse's own admission, a person with asbestos-related pleural disease from chrysotile exposure who had a DLCO that demonstrated impairment but normal FVC and TLC would be treated exactly the same under the TDP as a person from Libby with a decrement in DLCO but normal FVC and TLC.  This does not constitute discriminatory treatment.

## I.    The TDP's Scheduled Values Are Not Discriminatory

At bottom, the Libby Claimants' complaints boil down to the amount of money they will receive under the TDP.  Their demands are nothing short of excessive and breathtaking.  For example, they insist that the TDP's settlement values and Expedited Review medical criteria must be revised so that unimpaired non-malignant Libby claimants will be guaranteed settlement payments that are more than twice the average value received by mesothelioma claimants.  Yet, leaving those demands aside for the moment, the fact is that a properly-constituted class of

Asbestos PI Claimants, of which the Libby Claimants are members, voted overwhelmingly to accept the Plan and TDP.  As discussed above, this alone is sufficient for the Court to reject the Libby Claimants' arguments that are premised on the alleged unfairness of the TDP values.

Nevertheless, it bears mention that the Libby Claimants misapprehend what they are entitled to under applicable non-bankruptcy law, and have distorted the history of prepetition Libby settlements and Dr. Peterson's work in arguing that the TDP's scheduled values unfairly discriminate against them.  As a definitional matter, every Libby Claimant whose claim has not been liquidated by settlement or judgment, like every other Asbestos PI Claimant, holds a personal injury tort or wrongful death claim for which neither Grace nor the Trust has admitted either liability or the amount of damages.  When Grace was a defendant in the tort system, all unliquidated asbestos PI claims, if not resolved by settlement or won by Grace on a pretrial motion, would ultimately be "valued" by a jury based on the multitude of factors that go into damages awards in tort cases.  No claimant then, from Libby or otherwise, has a legal entitlement under applicable state law to anything other than what damages he or she could recover against Grace in a trial in which the plaintiff prevailed.

If jury verdicts then are the ultimate arbiter of "tort system value," the Libby Claimants' predecessors from Libby who successfully took their cases to verdict against Grace received awards *that were significantly lower* than the damages awarded to the non-Libby plaintiffs who also prevailed against Grace.  As Grace's historical records and Dr. Mark Peterson's testimony will demonstrate, the average successful plaintiffs' verdicts for non-malignant cases in Libby

was $416,000; and the average plaintiffs' verdict for non-malignant cases outside Libby (not including the <u>Edwards</u> judgment, which is on appeal) was $1,027,995.[41]

What then can the Libby Claimants mean by "tort system value"?  What they are obviously referring to are the average settlement values paid by Grace to the former clients of Mr. Heberling or Mr. Lewis.  The Libby Claimants are essentially arguing that the Plan and the TDP will unfairly discriminate against them unless every current or future Libby Claimant is guaranteed a settlement value from the Trust that equals or exceeds the past settlement averages achieved by other people from Libby.  There are at least three factual flaws with this argument.

First, there is no guarantee under the law or otherwise that any particular claimant will be able to recover from Grace (or the Trust) the same or greater amount in settlement than a past claimant represented by the same law firm was able to recover in settlement prepetition from Grace.  Indeed, there is considerable evidence to indicate that the current group of Libby Claimants have claims that are qualitatively and objectively *weaker* than the Libby claimants who settled their cases with Grace prepetition.  Thus, the argument that the "current" Libby Claimants should receive on average the same level of settlement values as the "historical" Libby Claimants may well be a comparison of apples to oranges.

In the years prior to bankruptcy, Grace settled fewer than 100 asbestos PI claims brought by the Heberling and Lewis law firms.  The vast majority of these cases were brought by former Grace (or Zonolite) workers who were exposed to substantial amounts of asbestos in and around

---

[41]   Dr. Mark Peterson, Preliminary Expert Report on W.R. Grace Trust, March 2009, at 9 (hereinafter "**Peterson Expert Report**"), attached hereto as **Exhibit L.**

the Libby mine and who had clear-cut cases of asbestos-related disease.  By contrast, a much higher percentage of current Libby Claimants are "community exposure" cases with much lower levels of asbestos exposure, who have much more disputable diagnoses of asbestos-related diseases.  While the great majority of "historical" claimants from Libby had objectively measurable declines in lung function, the majority of current Libby Claimants, according to their own materials, have no current decline in lung function.[42]

Second, although the Libby Claimants have a table purporting to show their "historical" settlement averages (at page 18 of their trial brief), they improperly "inflate" these averages by 30% to 240% in an attempt to make their history look better in comparison to the TDP values. As Mr. Inselbuch and Dr. Peterson will explain at the Confirmation Hearing, the TDP values were not derived using the "adjustment factor" cited by the Libby Claimants; they have completely misconstrued or deliberately misstated both the TDP values and Dr. Peterson's work. Moreover, the factors that, in Dr. Peterson's opinion, drove up Grace's nationwide historical settlement averages for mesothelioma and lung cancer in the years immediately prior to Grace's bankruptcy filing – and likely would have continued to increase Grace's settlement averages for several years after 2001 had it not sought bankruptcy protection – would have had little or no applicability to the claims from Libby.  This is so because the factors that, in Dr. Peterson's opinion, drove up Grace's nationwide settlement averages were (1) the fact that many other frontline asbestos defendants (such as Owens Corning and Armstrong) went into bankruptcy in

---

[42]    Libby Tr. Br. 22 ("In Libby, as elsewhere, the current status is that most patients are unimpaired (*i.e.,* no lung function under 80% of normal).").

2000 and thus forced Grace to "pick up their share" of the liability and (2) Grace was increasingly becoming a "target defendant."   Although these factors were new developments in 2000 or 2001 for Grace claimants outside Libby, they would have had little impact on the settlement values in Montana.   Grace, after all, was already *the* target defendant in Montana. Additionally, as the Libby Claimants readily admit, the vast majority of current and prepetition Libby Claimants have no defendants to sue other than Grace, and Grace was already paying the entire share of settlements in Libby.

Third, the Libby Claimants are simply wrong when they assert that the TDP values will not adequately compensate those with severe injuries predominantly caused by exposure to Grace asbestos.  Any Libby Claimant with mesothelioma whose exposure was predominantly to Grace asbestos can qualify for a maximum payment from the Trust of over $1.4 million, which is more than double the historical settlement average for mesothelioma claimants from Libby.  Any Libby Claimant who qualifies for "Severe Disabling Pleural Disease" and who has "extraordinary Grace exposure," as defined in TDP § 5.4, will be eligible to receive a liquidated claim amount of $400,000, which is almost exactly what "impaired" Libby claimants (as that term was defined by Mr. Heberling)[43] received on average in settlement prepetition.  If a Libby Claimant does not meet the Expedited Review medical criteria for Severe Disabling Pleural Disease but believes he has have severe disabling pleural disease nonetheless, he or she has the right under the TDP procedures to attempt to persuade the Trust (in Individual Review), an

---

[43]   *See* Letter from Jon L. Heberling to Mark A. Peterson (June 7, 2006) (hereinafter, "**Peterson Dep. Ex. 5**"), attached hereto as **Exhibit M**.

arbitrator, or eventually a jury that he in fact has this disease and should qualify for higher compensation.  *See* TDP §§ 5.3(b), 5.4(a), 5.10, 5.11, 7.6, 7.7 (Exhibit A).

Moreover, if a Libby Claimant with no decline in lung function (or only a moderate decline in lung function) settles his case against the Trust for a lower amount, but then later develops an asbestos-related cancer or progresses to a more severe non-malignant disease, he can come back to the Trust for a "second bite at the apple" and receive additional settlement compensation for the more severe disease.  *See* TDP § 5.9 (Exhibit A).

## II.    Nor Can the Libby Claimants Find Discrimination in the Disposition of Proceeds from Non-Products Insurance Coverage

The Libby Claimants argue that they have rights or special access to Grace's "non-products" insurance coverage that few, if any, other Asbestos PI Claimants share.[44]  They contend, *inter alia*, that these alleged rights mandate a separate class for them under the Plan, distinct from all other Asbestos PI Claims.[45]  They further argue that the transfer of all the Asbestos Insurance Rights under the Plan, without any special allocation of the non-products coverage to the Libby Claimants, violates the requirement for equal treatment of claims under Bankruptcy Code § 1123(a)(4).[46]  None of these contentions has merit.

### A.    Grace's "Products" and "Non-Products" Insurance Coverage

Grace's comprehensive general liability policies provided Grace with insurance against a wide range of possible liabilities arising out of bodily injury or property damage claims.  In the

---

[44]  Libby Tr. Br. 45-47.

[45]  Libby Tr. Br. 64-68.

[46]  Libby Tr. Br. 80-81.

specialized language of insurance, the policies afford both "products" and "non-products" coverage. "Products" coverage, in the asbestos context, applies to liabilities arising from injury from a Grace asbestos-containing product after its manufacture and distribution. Products coverage also embraces "completed operations coverage" – *i.e.*, coverage of liabilities arising from injuries due to exposure to Grace asbestos after the completion of operations at a particular plant or facility. Conversely, "non-products" coverage applies to other asbestos-based liability claims, both those arising from exposure to asbestos before it became a finished product and entered the stream of commerce and those where the exposure occurred before operations were completed at a particular location (*i.e.*, claims arising from exposure occurring during the operation).[47]

Grace had three primary insurance carriers over the years: Royal Indemnity (now known as Arrowood), Maryland Casualty Company, and Continental/CNA.[48] Their policies include per-claim and per-occurrence limits that apply to all aspects of the liability coverage. Nevertheless, the policies' aggregate limit – *i.e.*, the ceiling on the total amount that the insurance company is required to pay – applies to only "products" or "completed operations"

---

[47] Although the term "premises coverage" is sometimes used synonymously for "non-products" coverage, there is no separate category of "premises" coverage that is uniquely exempt from the aggregate limit; claims based on responsibility for premises are simply part of the broad category of non-products coverage.

[48] Continental is also an excess layer carrier, having issued over $125 million of excess-level coverage to Grace at various layers in the coverage block. Royal (as Arrowood) also sold excess coverage to Grace. The Libby Claimants do not raise any objection based on the excess coverage.

coverage.[49]  Because the policies set no aggregate limit for "non-products" coverage, each new "non-products" claim potentially gives rise to coverage up to the full amount of the per-claim or per-occurrence limit, subject to any deductibles or self-insured retentions.  *See* Weyerhaeuser v. Commercial Union Ins. Co., 15 P.3d 115 (Wash. 2000); 1 Jeffrey E. Thomas et al., New Appleman Insurance Law Practice Guide § 3.09[6][b][ii], at 3-28 (2008).

Grace's primary layer "products" coverage is virtually, if not entirely, exhausted.  But the primary layer "non-products" coverage remains, to the extent not covered in prior settlements with insurance companies.  Nevertheless, the primary coverage was not Grace's only liability insurance.  Grace also procured "excess" coverage – *i.e.*, products and non-products coverage for liabilities that exceeded the policy limits of the primary coverage.  This remaining, unexhausted excess coverage is in excess of $900 million.

The Plan provides that, on the Effective Date, Grace and other Insurance Contributors will transfer their Asbestos Insurance Rights to the Asbestos PI Trust.  Plan § 7.2.2(d).  The Trust will then "step into the shoes" of Grace and the Insurance Contributors vis-à-vis the transferred Asbestos Insurance Rights, including the right to receive proceeds of Grace's liability insurance.  *See id*.  Having assumed those rights, the Trust will pursue indemnity from Grace's insurance companies for the Asbestos PI Claims channeled to it.  When paid to the Trust those proceeds will join the Trust's other assets and be available with them to pay Asbestos PI Claims

---

[49]  Continental Casualty Company's insurance policy states:  "Subject to the above provisions respecting 'each occurrence,' the limits of Personal Injury Liability and Property Damage Liability stated in the declarations as 'aggregate' are respectively the total liability of the Company for all damages because of Personal Injury or Property Damage included within the completed operations and the products hazards."  Continental Casualty Policy No. 902-36-70 (policy period 6-30-73 to 6-30-76).

generally.  In this critical respect, the Trust's rights to liability insurance proceeds are exactly the same as its rights in any other asset of Grace that is transferred to the Trust under the Plan.  The Plan further contemplates the entry of a § 105(a) injunction to protect Grace's non-settling insurance carriers from suit.  *Id.* § 8.4.  This is intended to ensure the orderly administration of the insurance rights and proceeds transferred to the Trust, and prevent one or more claimants from receiving "100-cent dollars" as a recovery simply because they were able to find a way to sue the non-settling insurers ahead of the Trust and its other claimant beneficiaries.

Prior to bankruptcy, Grace entered into settlements with both Royal and Maryland Casualty regarding their primary coverage.  Grace, Royal, and Maryland Casualty dispute the Libby Claimants' assertions that coverage remains under the settled policies.  As agreed to by both parties to the settlements, these settlements covered *both* the products/completed operations coverage and the non-products coverage that were available under those settled policies.[50]  The ACC and FCR do not dispute Grace's or the insurance companies' contentions about what was settled.  On the premise that the Royal and Maryland Casualty settlements resolved the non-products coverage, the only primary-layer "non-products" coverage remaining is under Continental/CNA policies.

---

[50]  Settlement Agreement Between W.R. Grace & Co. and Royal Indemnity Company, Jan. 5, 1995, § IV(4.0), at 7; Agreement Between W.R. Grace & Co.-Conn. and Maryland Casualty Company, Sept. 1, 1991, § 6(A), at 19-20.  At a hearing to approve a settlement on July 30, 2009, the Court ruled, *inter alia*, that no such unsettled primary coverage under the Royal policies remains.

**B.      The Libby Claimants Have No Exclusive or "Vested" Rights to the Non-Products Coverage**

First, as a threshold matter, the Libby Claimants enjoy no exclusive or "vested" rights to the non-products coverage.  This is *Grace's* insurance.  Grace and its predecessors procured the insurance so they would be indemnified for covered losses, including losses arising from their payment of asbestos claims.   In other words, they acquired the insurance for themselves, to protect their own assets.  When Grace filed for bankruptcy, its rights under the policies became property of the estate.  *See* 11 U.S.C. § 541; ACandS, Inc. v. Travelers Cas. & Sur. Co., 435 F.3d 252, 260 (3d Cir. 2006) ("It has long been the rule in this Circuit that insurance policies are considered part of the property of a bankruptcy estate."); Estate of Lellock v. Prudential Ins. Co., 811 F.2d 186, 189 (3d Cir. 1987) (holding that insurance policy is property of the estate even though the policy has not matured, has no cash surrender value, and is otherwise contingent); In re World Health Alternatives, Inc., 369 B.R. 805, 810 (Bankr. D. Del. 2007) ("When an insurance policy provides coverage only to the debtor, courts will generally rule that the proceeds are property of the estate."); *see also* Westmoreland Human Opportunities, Inc. v. Walsh, 246 F.3d 233, 242 (3d Cir. 2001) (stating that definition of property of the estate under § 541 "encompasses rights and interests arising from ordinary contractual relationships").  As property of the estate protected by the § 362 stay, "tort claimants have no 'legal or equitable interest' in the [debtor's] insurance [policies]."  In re Forty-Eight Insulations, Inc., 133 B.R. 973, 978 (Bankr. N.D. Ill. 1991).

There is nothing in the policies at issue that could sustain a claim that the Libby Claimants' asserted "rights" to Grace's policies are superior to those of any other asbestos

- 51 -

claimant whose claims are covered by Grace's policies.  Nor have the Libby Claimants shown that they possess a lien on the non-products coverage or the proceeds thereof.  As a result, the Libby Claimants cannot be heard to contend that they have exclusive rights to the non-products coverage.

### C.    The Libby Claimants Have No Right of Direct Action Against Grace's Insurance Carriers

The Libby Claimants have suggested that under Montana law, they "would be entitled to pursue both Grace and its insurers for the full value of available insurance coverage in effect as of the time of the covered asbestos exposure."  Libby Obj. 90-91.  They are wrong.  Montana law recognizes a right of direct action against a defendant's insurance carrier only in very limited circumstances, none of which applies to the Libby claims.  As a general rule in Montana, "a direct action against an insurer does not lie until the liability of the insured has been established," unless the direct action has been "*expressly sanctioned by the legislature and not merely inferentially deduced.*"  Ulrigg v. Jones, 907 P.2d 937, 943 (Mont. 1995) (emphasis added & citations omitted).  Here, the Libby Claimants have not yet "established" Grace's liability to them on their claims.  They have obtained no judgment against Grace, fixing the amount of their claims.  Nor have they entered into a settlement agreement with Grace that an insurance company has consented to.

Additionally, the Libby Claimants have not pointed to a single Montana statute that purports to vest them with a right of direct action against the insurance companies that have

extended non-products coverage to Grace.  Without such "legislative sanction," the Libby

Claimants have no right of direct action under Montana law.  *See* Ulrigg, 907 P.2d at 943-44.[51]

Nevertheless, in support of their theory of direct action rights, the Libby Claimants have

cited, *inter alia*, a number of Montana cases arising from automobile accidents in which the

Montana Supreme Court held that the auto accident victim could recover certain "undisputed"

damages, such as medical expenses, directly from the defendant's insurance carrier before

defendant's liability had been established by judgment or settlement.  *See* DuBray v. Farmers

Ins. Exch., 36 P.3d 897 (Mont. 2001); Safeco Ins. Co. v. Mont. Eighth Jud. Dist., 2 P.3d 834

(Mont. 2000); Ridley v. Guar. Nat'l Ins. Co., 951 P.2d 987 (Mont. 1997).  But in those cases, the

right to recover damages directly from the insurance carrier was premised on "Montana's public

policy of protecting innocent victims of automobile accidents, as established by the 'mandatory

liability protection' provisions found" in the Montana Code.  DuBray, 36 P.3d at 900 (citing

Ridley, 951 P.2d at 993).  Needless to say, the Libby Claimants cannot rely on Montana's

"public policy of protecting innocent victims of automobile accidents," as established by the

Montana Code, to assert their direct action rights.  These Montana cases, then, are readily

distinguishable.

---

[51]  In Ulrigg, the court observed that a third-party claimant could sue an insurance company directly for
violating Montana's Unfair Trade Practices Act.  *Id*. at 943 (citing Mont. Code Ann. § 33-18-242
(2008)).  In other words, the Montana Unfair Trade Practices Act was the "legislative sanction"
allowing the direct action against the insurance carrier to occur.  The Libby Claimants have never
cited the Montana Unfair Trade Practices Act as being the legal basis for their direct action or "vested
rights" claims, nor could they.

The Libby Claimants also turn to much older insurance cases under Montana law to support their claims of direct action.  One of those cases, <u>McLane v. Farmers Ins. Exch.</u>, 432 P.2d 98 (Mont. 1967), arose from an auto accident.  The plaintiff in <u>McLane</u> obtained a judgment against the defendant-policyholder and sought to collect on that judgment from the policyholder's insurance.  The policyholder's insurance carrier, however, claimed that the applicable insurance policy had been rescinded because the policyholder had not answered questions on his insurance application truthfully.  But the Montana Supreme Court found that the carrier had impliedly waived its right to rescind the policy *ab initio* because it had not immediately exercised that right upon discovery of the policyholder's untruths and because it had accepted the policyholder's premiums and had paid other claims arising from the same auto accident.  Alternatively, if the policy was voidable, the Montana Supreme Court determined that the plaintiff still prevailed because his "rights" had "vested either at the time of the accident or at the time of the implied waiver of the right to rescind."  *Id.* at 100.  "Exactly which of the two possible times" the rights vested, "this court need not decide."  *Id.*

The <u>McLane</u> decision cannot be read to support the Libby Claimants' assertion of "vested" or direct action rights.  <u>McLane</u>, after all, was an auto accident case.  As later Montana cases have demonstrated, the rights of auto accident victims vis-à-vis the car insurance are based on a "public policy," drawn from the Montana Code, to protect innocent victims of auto accidents.  *See* <u>DuBray</u>, 36 P.3d at 900 (citing <u>Ridley</u>, 951 P.2d at 993).  Moreover, since <u>McLane</u>, no subsequent decision of the Montana Supreme Court has ever held that a victim's

right to insurance proceeds "vests" at the time of the accident.[52]   Indeed, the Montana Supreme

Court may have abrogated that part of the <u>McLane</u> opinion when it stated in <u>Ulrigg</u> that, absent

legislative sanction, a direct action against a carrier arises when the liability of the policyholder

is established.  *See* <u>Ulrigg</u>, 907 P.2d at 943 (citing <u>Conley v. USF&G Co.</u>, 37 P.2d 565 (Mont.

1934), and <u>Cummings v. Reins</u>, 107 P. 904 (Mont. 1910)).

The second of the older cases, <u>J.G. Link & Co. v. Cont'l Cas. Co.</u>, 470 F.2d 1133 (9th

Cir. 1972), also fails to provide sustenance for the Libby Claimants' theory that they have

"vested" or direct-action rights.  In that case, the Ninth Circuit interpreting Montana law allowed

a third-party claimant direct recovery based on language in the policy that permitted a direct

action once the policyholder's liability had been fixed by a post-trial judgment or written

agreement.  *See id.* at 1138-39.  <u>J.G. Link</u> does not apply here because the Libby Claimants have

not pointed to any post-trial judgment or written agreement establishing Grace's liability to them.

In sum, the Libby Claimants can find no basis under the law to assert a "vested right" in the non-

products coverage or a right of direct action against Grace's carriers.  *See also* <u>In re Dow

Corning Corp.</u>, 198 B.R. 214, 238 (E.D. Mich. 1996) (holding that Michigan statute that allows

post-judgment garnishment action against insurer does not create pre-judgment rights or interest

in the injured plaintiff).

---

[52]   This part of the <u>McLane</u> decision alone refutes the Libby Claimants' assertion that they obtained
"vested rights" in Grace's insurance when Grace obtained that insurance.  *See* Libby Obj. 88.  In
other words, obtaining insurance is not a trigger under <u>McLane</u> or any other case that gives rise to any
"vested right" or right of direct action.

**D.    The Non-Products Coverage Is Not Limited to Claims Arising from Asbestos Exposure in Libby**

The Libby Claimants are wrong when they assert that only their claims can give rise to indemnity from the non-products coverage.  Nothing in the Continental/CNA policies, or any of the other policies, limits the non-products coverage to Grace facilities in Libby, Montana.  To the extent that non-products coverage is available, the remaining non-products coverage applies equally to claims arising from operations and before product-completion, wherever located.

Grace had operations all over the country that potentially could be the source of "non-products" asbestos claims.  The Libby Claimants have no "geographical" claim that trumps the potential non-products claims of individuals exposed on other Grace premises.

Even claims based on "non-products" exposure to vermiculite mined or processed at Libby would not necessarily, depending on individual circumstances, be limited to the residents of Libby and its surrounding region.  Grace shipped asbestos-containing vermiculite from Libby, Montana, to expansion plants around the country, where the vermiculite was "expanded," so that it could be converted into Grace products.  At those expansion plants, and in the communities surrounding them, individuals were exposed to asbestos-containing vermiculite from Libby.  Some of them may suffer from asbestos-related diseases that may be the result of those exposures.  Because they may allege that they were exposed to asbestos in connection with Grace's vermiculite-processing operations, or were invitees on Grace-owned premises, there may be allegations that, if true, could give rise to claims that potentially could be covered by the non-products insurance.

- 56 -

The federal EPA recently stated in a document that 245 sites within the United States received shipments – totaling over 6 million tons – of unfinished asbestos-containing vermiculite concentrate from the Libby mine.  ATSDR, Summary Report: Exposure to asbestos-containing vermiculite from Libby, Montana, at 28 processing sites in the United States, October 2008, at 7-8 (hereinafter, "**2008 ATSDR Report**"), attached hereto as **Exhibit N**.  The government survey concluded that "three groups of people . . . experienced significant exposure to asbestos (specifically Libby amphiboles) associated with facilities that exfoliated vermiculite: former employees, household contacts of former employees, and some community members, particularly children, who had frequent, direct contact with VC [vermiculite concentrate] or waste rock from these facilities."[53]  In addition, the survey concluded that "residual asbestos in the form of Libby amphiboles may be present in *indoor settled dust* at many of other 78 sites identified as former exfoliation facilities," and that it may also be present in exterior soil at those sites. [54]

This alleged widespread exposure to Libby amphiboles as a result of "non-products" type exposures at sites remote from Libby leaves Grace – as, after confirmation, it will leave the Trust – exposed to potential claims that may involve allegations of asbestos exposures that may trigger "non-products" insurance coverage.  In one prepetition case, a mesothelioma plaintiff, Dayton Prouty, whose father had worked in a Michigan exfoliation plant, alleged exposure from, *inter alia*, playing near the plant and from his father's dusty clothes.  Grace settled Prouty's asbestos-

---

[53]    2008 ATSDR Report, at vii (Exhibit N).

[54]    2008 ATSDR Report, at viii-ix (Exhibit N).

related claim for nearly $4 million.[55]  Additionally, former Grace employees have sued Grace, alleging injury from exposure to asbestos on its premises, as opposed to exposure to a finished asbestos-containing product.[56]

Given these exposures and expansion plant operations outside Libby, the Libby Claimants cannot claim to be the only potential "non-products claimants" in the world.  The Libby Claimants are neither unique nor special among the population of asbestos claimants – all of whom have different exposures, over different time periods, and under different and unique conditions.  Indeed, every asbestos claimant has a unique exposure scenario.  The Code does not contemplate that an asbestos trust must account for every unique situation and the potential availability or non-availability of insurance coverage for the claim.  The insurance coverage is an asset of Grace that should be liquidated, and pooled with other available assets to benefit Asbestos PI Claimants.  There is no precedent in case law, or under the Code, for the treatment sought by the Libby Claimants.  Indeed, there would be no way to resolve asbestos bankruptcies if the Libby Claimants' contentions regarding insurance proceeds were accepted.

In sum, the Libby Claimants have no exclusive or "vested" rights in the non-products insurance coverage.  They hold no right of direct action against Grace's insurance carriers.  And,

---

[55]  While Grace has not yet attempted to recover the cost of the Prouty claim from CNA as a "non-products" claim, any claim with similar exposure facts could well give rise to non-products coverage.

[56]  Such claims are ordinarily prevented from being asserted against Grace in the tort system by the workers' compensation bar; however, in some jurisdictions (in addition to Montana) there are exceptions that allow employees or former employees to sue their employer in tort for injuries cased at unsafe work premises.  *See, e.g.*, W. Va. Code Ann. § 23-4-2(d)(2) (West 2009); *see also* Johnson v. BP Chemicals, Inc., 707 N.E.2d 1107, 1114 (Ohio 1999); Turner v. PCR, Inc., 754 So. 2d 683, 691 (Fla. 2000).

they are not the only ones holding "non-products claims."  For these reasons, the very premises that underlie their Plan objections have no merit.

###    E.    The Libby Claimants' Equal Treatment Objections That Are Based on Their Asserted Claims to Grace's Insurance Coverage Lack Merit

Because the Libby Claimants have neither exclusive nor direct rights to the Debtors' non-products coverage, they cannot argue that they are "giving up" more valuable insurance rights than other Class 6 claimants, in exchange for treatment under the Plan.  In support of their flawed argument, the Libby Claimants cite the AOV Industries case, in which the plan at issue required one creditor to release a personal guaranty against a non-debtor in order to receive a distribution from a special fund.  *See* In re AOV Indus., 792 F.2d 1140, 1151-52 (D.C. Cir. 1986).  Because other creditors in that same class did not hold similar guarantees, and thus were not required to relinquish similar rights against a non-debtor guarantor, the D.C. Circuit concluded that the plan treated the creditor holding the guaranty unequally, in violation of Code § 1123(a)(4).  *Id.*  Nevertheless, the AOV Industries case is inapposite because the plan there required the creditor to relinquish a direct right against the non-debtor guarantor, which no other members of the class possessed.  Here, as noted, the Libby Claimants have no vested rights or rights of direct action against the insurance companies, and at the very least, they enjoy no unique rights against the non-products insurance coverage.  As such, all Asbestos Insurance Rights are property being transferred to the Trust where they will be asserted for the benefit of all Asbestos PI Claimants as required by the Code.

Additionally, courts have criticized this aspect of the AOV decision, observing that it would be impossible for a court to measure the amount of "consideration" each class member

would be giving up in exchange for treatment under the plan.  *See, e.g.*, Quigley, 377 B.R. at 117-19; Dow Corning Corp., 255 B.R. at 497.  That observation applies with greater force in an asbestos-related bankruptcy like this one.  Here, many of the Class 6 claims will arise in the future, long after confirmation of the Plan.  Any effort to measure the "consideration" that these future demand holders would be "giving up" under the Plan would be a speculative and futile exercise.  This is particularly so where the Libby Claimants cannot demonstrate with any certainty what, if any, success their claims would have in reaching Grace's non-products coverage.  For this reason, the Court should reject the Libby Claimants' invitation to follow that part of the AOV decision.

More fundamentally, in a 524(g) case, no asbestos PI claimant or class of such claimants should have exclusive access to insurance policies, to the detriment of other asbestos PI claimants who would stand to receive a lesser pro rata share of recovery.  To ensure that all present claims and future demands are paid "in substantially the same manner," it is necessary to pool all of the debtors' insurance rights into the 524(g) trust.[57]

The treatment of the insurance proceeds under the Plan by assigning them to the Trust and preventing Libby Claimants or others from doing an "end-around" in an effort to increase their own recovery at the expense of other asbestos claimants is critical to ensuring that there is equal treatment of Class 6 creditors within the meaning of § 1123(a)(4) and that that Plan

---

[57]  In a sense, this is what generally happens for unsecured claims in bankruptcy – *viz.*, all the debtor's unencumbered assets are marshaled and used to pay unsecured claims equally, regardless of whether any creditor might have been able to recover more or less from the debtor in the absence of bankruptcy.

complies with § 524(g).  As discussed above, pursuant to the Plan, Grace and other contributing parties will transfer assets to the Asbestos PI Trust.  However, most of the value of these assets consists of consideration other than insurance proceeds.  The Trust will monetize the contributed assets over time with the goal of maximizing their value, and will use the proceeds from the sale and liquidation of the non-cash assets as the basis for paying claims.  The Trust's payments to claimants will be in the form of cash, which the Trust will have because it is funded by a variety of assets contributed by the Debtors or other parties on behalf of themselves and the other Asbestos Protected Parties in exchange for the channeling injunction that frees the Debtors from present and future asbestos claims.  Based on the estimated value of the Trust assets at any particular point in time as compared to the estimated value of the Trust liabilities at the same point in time, the Trust will pay the same pro-rata payment percentage of the value of each claim to all of the claimants whose claims are channeled to the Trust.   Because the Trust uses the same procedures (the TDP) to liquidate all Class 6 claims, and pays them all the same pro-rata payment percentage, the Plan is able to satisfy the equal treatment provision of § 1123(a)(4).

Moreover, the extent to which the Trust will be able to access Grace's insurance to pay some or all of the liability presented by any particular claim against the Trust will vary enormously depending in large part on the facts specific to that claim and the outcome of future negotiations or litigation between the Trust and the insurance companies.  When Grace was a defendant in the tort system, the insurance companies would reimburse Grace for part or all of the cost of resolving any particular asbestos PI claim, and how much insurance would cover the cost of the claim turned on the unique facts applicable to each and every claim, depending on the

claimant's years of exposure to a Grace asbestos-containing product.  For some claims, Grace received a substantial recovery from its insurance companies; for others, nothing or almost nothing.[58]  How much insurance proceeds Grace received when it paid any individual claim literally varied on a claim-by-claim basis depending on the exposure and other facts for that claim.  However, the historical settlement values paid by Grace to resolve asbestos PI claims did not depend on how much coverage was available to pay any particular claim.

It is possible that for some Libby Claimants, or other persons with non-products exposures that occurred entirely within the years of potentially available coverage, the Trust may be able to recover the entire cost of paying that asbestos claim from the primary layer non-products coverage (a proposition CNA surely will dispute).  For most claimants, the Trust will be able to recover only a fraction of the cost of the claim from insurance companies.  For still other claimants, *e.g.* someone who was first exposed to asbestos in Libby beginning in 1986, after the asbestos exclusions were written into Grace's insurance policies, the Trust will not be able to recover anything from insurance on that claim.

The Libby Claimants of course, like all other Asbestos PI Claimants, hold Asbestos PI Claims against Grace that will be channeled to the Trust.  The Libby Claimants are not proposing to have a separate scheme whereby they give up their right to cash payments from the Trust in exchange for sole access to the non-products coverage.  Instead, they are proposing a "have your cake and eat it too" scenario.  What they seek is the right to collect money both from the Trust

---

[58]    At the time it went into bankruptcy, Grace was recovering from its insurance companies on average only about 25-37% of the amounts it paid to settle or otherwise resolve asbestos personal injury claims.

(which is and will be funded in substantial part by the proceeds of the "products" coverage that the claims held by most Libby Claimants will not reach) and from any primary layer non-products insurance coverage that remains.

If the Libby Claimants (or any other sub-group of asbestos creditors) were permitted, in addition to receiving a distribution from the Trust, to separately pursue the "non-products" insurance proceeds, which indisputably are estate assets that belonged prepetition to Grace, the Libby Claimants would receive a higher percentage of the value of their claims than other Class 6 claimants.  Such a result could well violate § 1123(a)(4) and/or § 524(g).  The proposed Plan's treatment of the Asbestos Insurance Rights avoids this problem.

As a result of the Plan provisions described above, the case cited by the Libby Claimants, in which the court lifted the automatic stay to allow a claimant to proceed against the debtor's liability insurance, is distinguishable because it did not involve asbestos mass-tort claims, nor did it implicate § 524(g).  *See* In re 15375 Mem'l Corp., 382 B.R. 652 (Bankr. D. Del. 2008), *rev'd on other grounds,* 400 B.R. 420 (D. Del. 2009), *and cited in* Libby Tr. Br. 97.  In that case, the insurers were neither protected by, nor entitled to, a bankruptcy discharge because they were non-debtors.  *See* 11 U.S.C. § 524(e) (2009).[59]  Here, as noted above, the Plan pools the insurance rights and protects insurers pursuant to the 105 and 524(g) injunctions to ensure that present claims and future demands are paid "in substantially the same manner," as § 524(g)

---

[59]   Moreover, the chapter of the Collier treatise that the Libby Claimants quote is inapposite because it discusses the cases interpreting and applying § 362 of the Bankruptcy Code, not § 524(g).  *See* Libby Tr. Br. 97 (quoting 3 Alan N. Resnick & Henry J. Sommer, Collier on Bankruptcy ¶ 362.07, at 362-85 (15th rev. ed. 2004)).

directs.  *See* discussion *supra* at Part II A.  The Court should overrule the Libby Claimants' Plan objections relating to insurance.

### III.    The Libby Claimants' Remaining Objections Are Easily Addressed

#### A.    Because Their Claims Are "Substantially Similar" to Other Asbestos PI Claims, the Libby Claimants Are Properly Classified as Class 6 Claimants

Section 1122(a) of the Bankruptcy Code provides, in relevant part, that "a plan may place a claim . . . in a particular class only if such claim . . . is *substantially similar* to the other claims . . . of such class."  11 U.S.C. § 1122(a) (2008) (emphasis added).  Thus, claims may be included in the same class provided they are "substantially similar."  Only *dissimilar* claims must be classified separately.  *See* In re U.S. Truck Co., 800 F.2d 581, 585 (6th Cir. 1986) (noting that the statute only prohibits dissimilar claims from being included in the same class).  Plan proponents have "considerable discretion" in classifying claims.  In re Greate Bay Hotel & Casino, Inc., 251 B.R. 213, 224 (Bankr. D.N.J. 2000).

By its terms, § 1122(a) requires only substantial similarity, *not* absolute homogeneity. *See* 7 Alan N. Resnick & Henry J. Sommer, Collier on Bankruptcy ¶ 1122.03[3] (15th rev. ed. 2004).  To determine whether claims are "substantially similar" under § 1122(a), courts look to the "legal character" of the claims, particularly as they relate to the debtor's assets.  *See, e.g.*, Combustion Eng'g, Inc., 391 F.3d at 244 n.63; In re Congoleum Corp., 362 B.R. 198, 203 (Bankr. D.N.J. 2007); In re Lisanti Foods, Inc., 329 B.R. 491, 510 (D.N.J. 2005).  A plan's classification thus satisfies § 1122 if the claims are "of equal rank with each other, [and] against the same property."  In re Martin's Point Ltd. P'ship, 12 B.R. 721, 725 (Bankr. N.D. Ga. 1981).

In two asbestos Chapter 11 cases, the bankruptcy courts upheld the plan's classification of settled and non-settled asbestos PI claims into one class, because they were all unsecured, non-priority claims against the bankruptcy estate. *See* Quigley Co., 377 B.R. at 116; In re Babcock & Wilcox, No. 00-10992, Reasons for Order at 4 (Bankr. E.D. La. Apr. 4, 2003). Similarly, in In re Armstrong World Indus., Inc., 348 B.R. 136, 159-60 (D. Del. 2006), the district court upheld the combined classification of all asbestos-related PI claims *and* indirect claims, regardless of whether they arose under contracts or tort law. The district court in Armstrong found the combined classification to be proper since all the claims related, directly or indirectly, to the debtor's liability for asbestos-related personal injuries and wrongful death. *See id.*[60]

Here, all the Class 6 claims, including those of the Libby Claimants, are "substantially similar" to one another, and are thus properly classified together. As in Quigley and Babcock & Wilcox, these claims are all unsecured, non-priority claims against the Debtors' estates. Additionally, as in Armstrong, each of the claims arises, directly or indirectly, from personal injury caused by exposure to Grace's asbestos or asbestos-containing products. On the Plan's Effective Date, all Class 6 claims will be channeled to the Asbestos PI Trust pursuant to 11 U.S.C. § 524(g). For these reasons, all Class 6 claims, including those of the Libby Claimants, are of the same legal character. Their common attributes are sufficient to classify them together in Class 6.

---

[60] *Cf. also* In re Congoleum Corp., 362 B.R. 167, 182 (Bankr. D.N.J. 2007) (finding plan that divided asbestos PI claims into four separate classes to be "unconfirmable on its face").

The Libby Claimants argue that § 1122 requires separate classification because their claims are allegedly different from, and more valuable than, the other Class 6 claims. But, as related above, these asserted differences, even if they existed, provide no basis for separate classification. They have no exclusive or "vested" rights in the non-products insurance coverage. They hold no rights of direct action against Grace's insurance carriers. And, they are not the only ones whose claims may potentially implicate Grace's "non-products" insurance coverage.

The primary alleged differences cited by the Libby Claimants – *e.g.*, a "different" disease, better causation evidence, larger historical settlement values, etc. – merely address the strength of their evidence and the disease they suffer from, not the "legal character" of their claims. As noted, only the claims' legal character is relevant to determine proper classification. The validity and settlement value of each and every Asbestos PI Claim varies depending on its evidentiary strength.[61] Each claim turns on its own set of facts. Some claims will carry clear and compelling product ID evidence, while others will not. Some claims, such as cancer claims, will command greater amounts of compensatory damages, and in that respect, will be more "valuable." These varying degrees of evidentiary strength are not unique to the Libby claims, and at the end of the day, such differences fail to supply a proper basis for classifying them separately. *Cf.*, In re Fairfield Executive Assocs., 161 B.R. 595, 602-03 (D.N.J. 1993) (holding that the larger amount of creditor's unsecured deficiency claim did not provide proper basis for

---

[61]  Grace settled significantly more claims outside of Libby at values in excess of the $300,000 (the average settlement value for all "historical" Libby claims) than the number of claims it settled in Libby.

classifying it separately from the general unsecured claims of the debtor's trade creditors). Indeed, the Libby Claimants have failed to cite a single decision holding that such differences require separate classification.

At its core, the Libby Claimants' position suffers a fatal logical defect – it contains no limiting principle. If differences such as evidentiary strength or severity of disease – much less skill of lawyering or particular geographical origin – mandated separate classification as a matter of law, then any subgroup of claimants, from mesothelioma victims to clients of the most successful attorneys, could obtain their own separate class. Indeed, any capable lawyer could elaborate some difference between claims within a proposed class, and could thus win a separate class for his or her clients. This would lead to a proliferation of essentially similar classes within Chapter 11 plans, which courts generally disfavor. *See* AOV Indus., 792 F.2d at 1151 (D.C. Cir. 1986) (stating that while "there is no restriction on the total number of classifications [in the plan], logistics and fairness dictate *consolidation* rather than proliferation of classes") (emphasis added); *see also, e.g.*, John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs., 987 F.2d 154, 158 n.6 (3d Cir. 1993) (noting general rule that claims of same kind and rank should be placed in the same class); Granada Wines, Inc. v. New England Teamsters & Trucking Indus. Pension Fund, 748 F.2d 42, 46 (1st Cir. 1984) (noting that a single classification for unsecured creditors is the rule, not the exception); Congoleum Corp., 362 B.R. at 184 ("Tort claims are unsecured claims" and "[i]n typical Chapter 11 cases all unsecured claims are in the same class.") (citation & footnote omitted); In re S & W Enter., 37 B.R. 153, 163 (Bankr. N.D. Ill.

1984) ("[G]eneral unsecured claims not separable under Section 1122(b) must be placed in the same class.").[62]

The Libby Claimants also contend that their alleged "rights" to the non-products insurance coverage mandates their separate classification.  As a threshold matter, their assertions regarding the non-products coverage are simply not true, for the reasons explained above.  *See supra* part II.  Yet, even if the Libby Claimants did have access to insurance policies or proceeds that other Class 6 claimants could not access, that still would not justify a separate class for them.  For classification purposes, it makes no difference if one group of claimants can look to recourse outside the bankruptcy estate.  Courts have consistently ruled that "[t]he fact that some members of the class may also look to third parties for payment, while others in the class do not have the same right, does not mandate separate classification."  Quigley Co., 377 B.R. at 116; *see also, e.g.,* Route 37 Bus. Park Assocs., 987 F.2d at 161 (rejecting as "beside the point" the debtor's contention that Hancock should be classified separately from the trade creditors because Hancock had recourse against the debtor's general partners); AOV Indus., 792 F.2d at 1151 ("The existence of a third-party guarantor does not change the nature of a claim *vis-a-vis* the bankrupt estate and, therefore, is irrelevant to a determination of whether claims are

---

[62]  Moreover, creating artificial distinctions between claims as a means to justify the preferential treatment of a subset of otherwise similar claimants would lead to exactly the type of gerrymandering prohibited by § 1129 of the Bankruptcy Code.  *See, e.g.*, In re Greystone III Joint Venture, 995 F.2d 1274, 1277 (5th Cir. 1991) (stating that "if claims could be arbitrarily placed in separate classes, it would almost always be possible for the Debtor to manipulate 'acceptance' by artful classification."); Route 37 Bus. Park Assocs., 987 F.2d at 158 (stating that "critical confirmation requirements" of § 1129 would be undermined if debtor were given "complete freedom" to separately classify similar claims).

'substantially similar' for classification purposes."). Accordingly, the Court should reject the Libby Claimants' pleas for their own separate class.

The cases cited by the Libby Claimants in support of separate classification are inapposite. Libby Tr. Br. 67-68. In all the cases cited by them in which separate classification was approved, the plans had proposed to separately classify the claims from the outset, which is not the case here.[63] Plans may place similar claims into separate classes, provided the classification is reasonable. *See, e.g.*, In re Jersey City Med. Ctr., 817 F.2d 1055, 1061 (3d Cir. 1987). But a court's determination that claims *may* be classified separately says nothing about whether they *must* be classified separately. Just because in some situations a court has approved a proposed separate classification of similar claims does not change the general principle that similar claims should be classified together. The Libby Claimants have cited not a single case in which a court required a plan proponent to divide one class of unsecured claims into separate and distinct classes in order to have its plan confirmed.

Additionally, the Libby Claimants distort the Third Circuit's holding in Combustion Engineering when they describe the central issue there as asbestos PI claimants with "weaker legal rights" swamping the votes of other class members "with stronger legal rights." Libby Tr. Br. 81. Contrary to what the Libby Claimants suggest, the real issue in Combustion Engineering was *not* classification under § 1122(a), but rather the proposed treatment of asbestos claims. What really concerned the Third Circuit in Combustion Engineering was the arrangement to

---

[63]    *See* In re U.S. Mineral Prods., No. 01-2471, 2005 WL 5898300, *13 (Bankr. D. Del. Nov. 29, 2005) (Fitzgerald, J.); In re Mahoney Hawkes, LLP, 289 B.R. 285, 289 (Bankr. D. Mass. 2002).

have a 524(g) trust pay all asbestos PI claimants when only *some* of those claimants had already received generous distributions from a prepetition settlement trust known as the "CE Settlement Trust." *See* Combustion Eng'g, Inc., 391 F.3d at 204-05.  Many of the claimants participating in the CE Settlement Trust had "received as much as 95% of the full liquidated value of their claims."  *Id.* at 244.  But the other claimants (*i.e.*, the non-participants) did not stand to receive distributions from the 524(g) trust that were as favorable as those received by the CE Settlement Trust participants.  *See id.* at 242.

Here, by contrast, there is no prepetition settlement trust paying generous distributions to only some, but not all, of the Asbestos PI Claimants.  Under the Plan, all Class 6 claims will be channeled to a 524(g) trust that will pay all valid claims under one payment percentage, in accordance with the TDP.  *See* TDP § 2.3 (Exhibit A).  The equal treatment issues raised in Combustion Engineering do not pertain here.  What is more, the outcome urged by the Libby Claimants more closely mirrors the two-trust scheme that the Third Circuit considered suspect in Combustion Engineering.  The Libby Claimants want to be segregated from the other Class 6 claimants in order to enjoy more favorable payment terms and exclusive access to property interests (*i.e.*, the non-products coverage), as did the CE Settlement Trust participants in Combustion Engineering.  Instead of looking to Combustion Engineering to sustain the Libby Claimants' objections, this Court should rely on that decision to overrule them.  For all these reasons stated above, the Court should reject the Libby Claimants' classification objections.

**B.    The Libby Claimants Do Not Have a Right to Have Their Claims "Allowed" by a Jury in the Tort System, Because § 524(g) Expressly Provides an Alternative Procedure for Resolving Claims Outside Bankruptcy**

The Libby Claimants erroneously contend that the Plan is unconfirmable because the TDP allegedly violates their right to a trial by jury.  They assert that because the TDP, in effect, caps the amount of damages that a jury may award, the TDP is somehow unconstitutional.  The Libby Claimants further contend that the same damages caps deprive them of their right to have their claims "allowed" according to state law.  As with their other objections, these arguments misapprehend the function and purpose of § 524(g) and indeed of bankruptcy in general, and therefore must fail.

Section 524(g) provides a sweeping and comprehensive form of "supplemental injunctive relief" that not only discharges a debtor from its asbestos liability, but also establishes a mechanism – *viz.,* the 524(g) trust – for valuing and paying asbestos-related claims outside the bankruptcy case.  *See* Combustion Eng'g, Inc., 391 F.3d at 234.  Congress conditioned § 524(g) injunctive relief on the satisfaction of certain safeguards, many of which "are specifically tailored to protect the due process rights of future claimants."  *Id*. at 234 n.45.  For example, before granting 524(g) relief, a court must determine that the channeling injunction is "fair and equitable" to future claimants.  11 U.S.C. § 524(g)(4)(B)(ii) (2009).  The court must also appoint a legal representative to represent the interests of future claimants.  *See id*. at § 524(g)(4)(B)(i).  Importantly, too, claimants whose claims are to be addressed by the trust are given a say as to whether the proposed injunction-trust arrangement is acceptable to them; the court cannot grant

524(g) relief unless these claimants vote by a 75% super-majority to accept the plan.  *See id*. § 524(g)(2)(B)(ii)(IV)(bb).

Nevertheless, once confirmed, the 524(g) plan serves as the "new contract" between the debtors and their creditors, binding all creditors to its terms, whether or not they voted to accept it.  *See id*. § 1141(a); *see also, e.g.*, In re Montgomery Ward Holding Corp., 306 B.R. 489, 495 (Bankr. D. Del. 2004) (stating that upon confirmation "the plan becomes a legally binding agreement"); In re Monroe Well Serv., Inc., 80 B.R. 324, 334 (Bankr. E.D. Pa. 1987) ("The provisions of a confirmed plan bind all creditors whether or not a particular creditor has voted to accept the plan.").  On the plan's effective date, the asbestos PI claims are channeled not to the courts for resolution, but instead to the 524(g) trust, which is commanded by statute to "operate through mechanisms" that will "value" and "pay" such claims "in substantially the same manner."  11 U.S.C. § 524(g)(2)(B)(ii)(V) (2009).  By vesting the trusts, and not the courts, with the responsibility to "value" and "pay" present claims and future demands, Congress intended that the § 524(g) trusts would serve as an *alternative* to the tort system and to § 502 allowance proceedings.  And, by requiring these trusts to "operate through mechanisms such as … matrices" that will "value" such claims and demands "in substantially the same manner," Congress intended for these trusts to "value" similarly-situated claims similarly, and not simply replicate or mimic the disparate range of verdicts or settlement amounts such claims might garner in the tort system.  Because a confirmed § 524(g) plan serves as the "new contract," accepted by a supermajority of asbestos PI claimants, all such claimants are bound to the new, alternative mechanism for "valuing" and "paying" their claims.  Class 6 has already accepted the

Plan by the requisite supermajority – indeed, over 90% of the class voted in favor of it.  If the Plan is ultimately confirmed, all members of that class will be bound by the Plan's terms, which will significantly alter their right to have a jury liquidate their claim in the tort system or their pre-consummation rights to a § 502 allowance proceeding.

In this respect, the Libby Claimants' objection essentially amounts to nothing; they are premising their objection on a "right" they and all other asbestos claimants voting as a class will have effectively waived once the Plan is confirmed.  Furthermore, the Supreme Court's decisions in Granfinanciera and Langenkamp cannot give their objection any legal traction because both cases addressed the issue of when the Seventh Amendment right to a jury trial attaches in a judicial proceeding to avoid a preference or fraudulent transfer.  *See* Langenkamp v. Culp, 498 U.S. 42, 42-43 (1990) (per curiam); Granfinanciera, S.A. v. Nordberg, 492 U.S. 33, 36-37 (1989).  Neither addressed how an asbestos settlement trust is to "value" and "pay" asbestos-related claims and future demands pursuant to § 524(g).

Additionally, the Libby Claimants suggest that § 524(g) cannot override a Seventh Amendment right to a jury trial, but in doing so they misidentify the fundamental issue.  This dispute is not about the supremacy of a constitutional right.  Rather, it is about whether the Libby Claimants should prevail on a plan objection premised on a perceived "right" that the class they belong to has contractually agreed to give up upon confirmation of a 524(g) plan.  Because the Libby Claimants will be deemed to have waived that right, pursuant to Code §§ 524(g) and 1141(a), the Court should overrule their objection.

- 73 -

To be sure, the TDP gives the Libby Claimants the option of having a jury determine their claims in the tort system as a last resort, when its mechanisms for facilitating a settlement have failed.  *See* TDP §§ 2.2 & 5.11 (Exhibit A).  But this is an option the TDP merely affords. It is not intended to recognize a constitutional right to a jury trial, which all Asbestos PI Claimants will be deemed to have waived in favor of the Trust's mechanisms for valuing and paying claims under the TDP.

As a slight variation of their jury trial argument, the Libby Claimants contend that the TDP violates their right to have their claims "allowed" or liquidated in accordance with state law.  Libby Tr. Br. 86.  Citing <u>Butner v. United States</u>, 440 U.S. 48 (1979), the Libby Claimants assert that claims "in bankruptcy cases must be allowed or disallowed under state law *except where the Bankruptcy Code otherwise provides*."  *Id.* (emphasis added).  Their argument is fatally defective because it overlooks what the Bankruptcy Code – and, more specifically, § 524(g) – "otherwise provides."  As previously noted, § 524(g) requires asbestos settlement trusts to employ "mechanisms" providing reasonable assurance that the trusts will "value" present claims and future demands "in substantially the same manner."   11 U.S.C. § 524(g)(2)(B)(ii)(V) (2009).  One purpose of such mechanisms is to encourage settlements and ADR mechanisms of the sort embodied in the TDPs to drastically reduce the transaction costs of resolving claims one-by-one in litigation.

By "valuing" the present claims and future demands pursuant to the TDPs, the trust does not engage in the litigation exercise of "allowance" or "disallowance," as this Court would do in a § 502 allowance proceeding.  Thus, the concepts of "allowance" and "disallowance" under

§ 502 simply do not apply to a 524(g) trust or to the treatment of Asbestos PI Claims under the TDP.  This Court would be effectively striking the requirement that the Trust operate through mechanisms, such as the TDP, to value and pay present claims and future demands in substantially the same manner from § 524(g) itself, if it were to permit the Libby Claimants to "opt out" of the TDP and to liquidate their claims in the tort system or in a § 502 allowance proceeding in amounts larger than what the TDP would otherwise permit.  Section 524(g) mandates greater consistency when valuing similarly-situated claims.  Exempted from the TDP's caps, the Libby Claimants could theoretically obtain verdicts, judgments, or even settlement values larger than the values awarded to non-Libby claimants holding similar claims.  Although this is the outcome the Libby Claimants undoubtedly hope to achieve, it would nonetheless lead to exactly the kind of disparate treatment § 524(g) is aimed at minimizing.[64]  For all of these reasons, the Libby Claimants' objections should be overruled.

### C.    The TDP Properly Takes into Account Claims for Wrongful Death and Loss of Consortium

The Libby Claimants assert that the Plan is unconfirmable because the TDP allegedly "provides for automatic disallowance" of asbestos-related claims for wrongful death.  Libby Tr. Br. 89.  That is not correct.  Repeatedly, the Libby Claimants deliberately distort the provisions and operation of the Trust as it relates to these claims.  To be clear, the Trust will operate vis-à-vis these claims in the same manner as has now been approved in numerous 524(g) bankruptcies.  As a threshold matter, to understand how the TDP addresses wrongful death claims, it is

---

[64]    By the same token, lifting the caps as to *all* asbestos PI claimants would simply magnify the problem.

important to note the distinction between wrongful death claims and "survival actions" for personal-injury torts.  Wrongful death claims, for the most part, arise under state statutes because the common law did not provide a remedy for wrongful death.[65]  These statutes typically define the class of persons, usually the decedent's heirs, who may benefit from a recovery in the wrongful death action.  *See, e.g.*, Barragan v. Superior Ct., 470 P.2d 722, 724 (Ariz. Ct. App. 1970); Horwich v. Superior Ct., 980 P.2d 927, 935 (Cal. 1999).  Separate and apart from the wrongful death statutes are the "survival" statutes, which allow the decedents' personal representative to continue with the decedent's personal injury claim, for the benefit of his or her estate.  *See, e.g.*, Thompson v. Wing, 637 N.E.2d 917, 920 (Ohio 1994).  As with many other States, the State of Montana has enacted a survival statute and a wrongful death statute, and thus recognizes both rights of action.  *See* Mont. Code Ann. §§ 27-1-507 & 27-1-513 (2007) (survival statute and wrongful death statute, respectively).[66]  Hence, the law of Montana, as it relates to wrongful death actions, is by no means unique.  More than 30 States permit recovery for wrongful death actions and survival actions.[67]

---

[65]  The wrongful death statutes of most states are based on "Lord Campbell's Act," an 1846 English statute that created a right of action for wrongful death.  *See* 25A C.J.S. Death § 19 (2009). Nevertheless, a few states have constitutional provisions related to wrongful death actions.  *See, e.g.*, Ky. Const. § 241 (creating a cause of action for wrongful death).

[66]  Although the survival cause of action and the wrongful death cause of action are separate, Montana law requires them to be "combined in one legal action, and any element of damages may be recovered only once."  Hern v. Safeco Ins. Co., 125 P.3d 597, 605 (Mont. 2005).

[67]  *See, e.g.*, King v. Nat'l Spa and Pool Inst., Inc., 607 So. 2d 1241, 1245-46 (Ala. 1992); In re Estate of Maldonado, 117 P.3d 720, 724-25, 728-29 (Alaska 2005); Barragan v. Superior Ct., 470 P.2d 722, 724 (Ariz. Ct. App. 1970);  Myers v. McAdams, 236 S.W.3d 504, 506 (Ark. 2006); St. Paul Mercury Ins. Co. v. Cir. Ct. of Craighead County, 73 S.W.3d 584, 589 (Ark. 2002); Horwich v. Sup. Ct. of L.A. County, 980 P.2d 927, 935 (Cal. 1999); Rowell v. Clifford, 976 P.2d 363, 364 (Colo. Ct. App.

The same is true with respect to loss of consortium claims.  Such claims are by no means unique to Montana or to the Libby Claimants.    Montana recognizes claims for loss of consortium.  *See, e.g.*, Bain v. Gleason, 726 P.2d 1153, 1155 (Mont. 1986).  But so do many

---

1998); Espinoza v. O'Dell, 633 P.2d 455, 461-63 (Colo. 1981); Lank v. Moyed, 909 A.2d 106, 110 (Del. 2006); Johnson v. Physicians Anesthesia Serv., P.A., 621 F. Supp. 908, 915 (D. Del. 1985); Drake v. St. Francis Hosp., 560 A.2d 1059 (Del. 1989); Lewis v. Lewis, 708 A.2d 249, 251 (D.C. 1998); Greater Se. Cmty. Hosp. v. Williams, 482 A.2d 394, 397 (D.C. 1984); Winding River Vill. Condo. Ass'n, Inc. v. Barnett, 459 S.E.2d 569, 571 (Ga. Ct. App. 1995); Strother v. District of Columbia, 372 A.2d 1291, 1295 (D.C. 1977); Rohlfing v. Moses Akiona, Ltd., 369 P.2d 96, 98 (Haw. 1962), *overruled in part by,* Green v. Texeira, 505 P.2d 1169 (Haw. 1973); Ozaki v. Ass'n of Apartment Owners of Discovery Bay, 954 P.2d 652 (Haw. Ct. App. 1998), *aff'd in part and rev'd in part by,* 954 P.2d 644 (Haw. 1998); Wyness v. Armstrong World Indus., 546 N.E.2d 568, 571 (Ill. 1989) (citing Murphy v. Martin Oil Co., 308 N.E.2d 583 (Ill. 1974); Farm & City Ins. Co. v. Am. Standard Ins. Co. of Wis., 552 P.2d 1363, 1373 (Kan. 1976) (citing Flowers v. Marshall, 494 P.2d 1184 (Kan. 1972); Mason v. Gerin Corp., 647 P.2d 1340, 1343 (Kan. 1982); Bennett v. Nicholas, 250 S.W.3d 673, 675 n.1 (Ky. Ct. App. 2007); Walls v. Am. Optical Corp., 740 So. 2d 1262, 1273 (La. 1999); Shaw v. Jendzejec, 717 A.2d 367, 369-70 (Me. 1998); Anderson v. Wetter, 69 A. 105, 109 (Me. 1907); Eagen v. Calhoun, 698 A.2d 1097, 1102 (Md. 1997); Stewart v. United Elec. Light & Power Co., 65 A. 49, 52 (Md. 1906); Pobiego v. Monsanto Co., 521 N.E.2d 728, 732 (Mass. 1988); McCarthy v. William H. Wood Lumber Co., 107 N.E. 439 (Mass. 1914); Hindmarsh v. Sulpho Saline Bath Co., 187 N.W. 806 (Neb. 1922); Rhein v. Caterpillar Tractor Co., 314 N.W.2d 19, 24 (Neb. 1982); Alsenz v. Clark County Sch. Dist., 864 P.2d 285, 286 (Nev. 1993); Vassiliu v. Daimler Chrysler Corp., 839 A.2d 863, 867-68 (N.J. 2004); McDaniel v. Clarkstown Cent. Sch. Dist. No. 1, 110 A.D.2d 349, 350, 352 (N.Y. App. Div. 1985); Weigel v. Lee, 752 N.W.2d 618, 622-23 (N.D. 2008); Sheets v. Graco Inc., 292 N.W.2d 63, 66-67 (N.D. 1980); Thompson v. Wing, 637 N.E.2d 917, 920 (Ohio 1994); Ouellette v. State Farm Mut. Auto. Ins. Co., 918 P.2d 1363, 1366 (Okla. 1994); Baumgart v. Keene Bldg. Prods. Corp., 633 A.2d 1189, 1191 (Pa. Super. Ct. 1993) (citing Pezzulli v. D'Ambrosia, 26 A.2d 659 (Pa. 1942); O'Leary v. Bingham, 159 A.2d 619, 621 (R.I. 1960); Gleaton v. S. Ry. Co., 46 S.E.2d 879, 881 (S.C. 1948); Scott v. Porter, 530 S.E.2d 389, 394-95 (S.C. Ct. App. 2000); Peterson ex rel. Peterson v. Burns, 635 N.W.2d 556, 561-62 (S.D. 2001); Landers v. B. F. Goodrich Co., 369 S.W.2d 33, 35 (Tex. 1963); Russell v. Ingersoll-Rand Co., 795 S.W.2d 243, 245 (Tex. App. 1990), *aff'd,* 841 S.W.2d 343 (Tex. 1992); Bybee v. Abdulla, 189 P.3d 40 (Utah 2008); Otani ex rel. Shigaki v. Broudy, 92 P.3d 192, 194 (Wash. 2004); Walton v. Absher Constr. Co., 676 P.2d 1002, 1006 (Wash. 1984); Estate of Helmick v. Martin, 425 S.E.2d 235, 239 (W. Va. 1992); Bartholomew v. Wis. Patients Comp. Fund, 717 N.W.2d 216, 227, 228 (Wis. 2006).

other States.[68]   All holders of claims for loss of consortium, whether they be from Libby or elsewhere, will be treated the same under the TDP.

Upon the Plan's effective date, all Asbestos PI Claims – which include the personal injury claims preserved under the survival statutes, the wrongful death claims, and any other claims deriving from the disease claim, such as loss of consortium – will be channeled to the Asbestos PI Trust.  *See* Plan §§ 1.1.33, 1.1.34, & 8.2.1.  To minimize multiple recoveries based on the same injury, the TDP contemplates that all derivative claims, such as the wrongful death claims and the loss of consortium claims, will be subsumed in the personal injury claims.  The wrongful death claim and the loss of consortium claim are no more "disallowed" than the survival claim; rather, the TDP ensures that there will be only one recovery for the injury.  If the decedent's personal representative does not believe that the scheduled value provided under the TDP is sufficient payment for the personal injury claim, the personal representative may pursue Individual Review of the claim.  *See* TDP §§ 2.2 & 5.3(b) (Exhibit A).  In valuing the claim during Individual Review, the Trust will take into account various factors, including household disruption and loss of consortium resulting from the decedent's asbestos-related disease.  *See*

---

[68]  *See, e.g.,* Rodriguez v. Bethlehem Steel Corp., 115 Cal. Rptr. 765, 769-70 (Cal. 1974); Mega Life and Health Ins. Co. v. Superior Ct., 92 Cal. Rptr. 3d 399, 404 (Cal. Ct. App. 2009); Jones v. Elliott, 551 A.2d 62, 63 (Del. 1988); Gates v. Foley, 247 So. 2d 40, 45 (Fla. 1971); Tavakoly v. Fiddlers Green Ranch, 998 So. 2d 1183, 1186 (Fla. Dist. Ct. App. 2009); Monroe v. Trinity Hospital-Advocate, 803 N.E.2d 1002, 1005, (Ill. App. Ct. 2003); Kolar v. City of Chicago, 299 N.E.2d 479, 481 (Ill. App. Ct. 1973); Owens-Illinois, Inc. v. Cook, 872 A.2d 969 (Md. 2005); Pratt v. Ocean Med. Care, P.C., 653 N.Y.S.2d 608, 608 (App. Div. 1997); Millington v. Se. Elevator Co., 22 N.Y.2d 498 (1968); Darr Constr. Co. v. Workmen's Comp. Appeal Bd., 715 A.2d 1075, 1080 (Pa. 1998); Reeder v. Allport, 218 S.W.3d 817, 819 (Tex. Ct. App. 2007); Burchfiel v. Boeing Corp., 205 P.3d 145, 158 (Wash. Ct. App. 2009); Green v. Am. Pharm. Co., 960 P.2d 912, 918 (Wash. 1998).

TDP § 5.3(b)(2) (Exhibit A).  As a consequence, the values fixed by the Trust under the TDP will reflect, in appropriate cases, factors such as the PI claimant's death and the number of dependents – elements of a wrongful death claim.  Once the Trust has paid the personal injury claim, the Trust will not pay any derivative claims held by third parties, such as the spouse, resulting from loss of consortium or the deceased claimant's death.  As a practical matter, the Trust will likely require the personal representative, on behalf of all potential wrongful death beneficiaries, to release their claims at the time of payment, or alternatively, require the personal representative to indemnify the Trust in the event an heir files a subsequent claim for the deceased claimant's wrongful death.[69]  *See* TDP § 7.8 (Exhibit A).  This is the practice followed by other asbestos settlement trusts.

As indicated above, with regard to claims for wrongful death or loss of consortium, Montana law is no different from the laws of many other States.  Thus the Libby Claimants are not in a unique situation with regard to how the TDP will treat their wrongful death and loss of consortium claims.  The TDP's treatment of claims for wrongful death or loss of consortium will apply to all such claims channeled to the Trust.  Thus, the TDP does not discriminate against the claims of the Libby Claimants in any respect.[70]

---

[69]  Furthermore, as a practical matter, once the Trust pays the liquidated claim subject to the payment percentage, it will be up to the deceased claimant's personal representative, or legal counsel, to sort out with all persons having an interest in the case how much each will receive as his or her share of the recovery.

[70]  Moreover, given that the requisite super-majority of Class 6 claimants has voted to accept the Plan and assuming the Plan satisfies the remaining requirements of §§ 524(g) and 1129, the Libby Claimants will become contractually bound to the treatment of wrongful death and loss of consortium

### D.      The TDP's Treatment of Punitive Damages Claims Is Proper

The Libby Claimants assert that the Plan is unconfirmable because the TDP "categorically disallows" punitive damages.  Libby Tr. Br. 87.  As a threshold matter, no Libby Claimant holds a judgment for punitive damages.  And, while it is true that the TDP does not provide for the liquidation and payment of punitive claims (TDP § 7.4), this proposed treatment would apply to *all* punitive damages claims, not just ones asserted by the Libby Claimants.  The vast majority of non-Libby claimants also sought punitive damages from Grace in the tort system prepetition.  Punitive damages, accordingly, are not unique to the Libby Claimants.  For this reason, the Libby Claimants cannot use the TDP's treatment of punitive damages to support their baseless cries of unequal treatment and "discrimination."

Moreover, it is important to consider the TDP's treatment of punitive damages within the specialized context of § 524(g), which as noted before, requires all trusts to "value" and "pay" present claims and future demands "in substantially the same manner."    11 U.S.C. § 524(g)(2)(B)(ii)(V) (2009).  Here, the Trust will pay the valid Class 6 claims channeled to it in accordance with the terms of the TDP.  These claims will not be "valued" and "paid," nor even "allowed" or "disallowed," in a § 502 allowance proceeding.  Thus, the absence of express language in § 502 disallowing punitive claims is irrelevant.

Additionally, the proposed treatment of punitive claims under the TDP is treatment that all Asbestos PI Claimants have elected to impose on themselves, just as they are electing to

---

claims under the TDP.  *See supra* part III (and cases cited therein); *see also* 11 U.S.C. § 1141(a) (2009).

accept a partial recovery of their compensatory claims pursuant to the payment percentage. *See* TDP § 4.2 (Exhibit A). As noted above, a 524(g) plan cannot be confirmed unless claimants whose claims are to be addressed by the trust vote by a 75% super-majority to accept the plan. *See* 11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb) (2009). Hence, all Asbestos PI Claimants, including the Libby Claimants, have been given a vote to accept or reject a TDP that will not pay punitive damages claims, and the Asbestos PI Claimants have voted to accept that TDP by an overwhelming margin – over 90% voted in favor of it. In other words, this is not treatment that will be crammed down over the objections of most Asbestos PI Claimants. Rather, this is a treatment that a super-majority in Class 6 has accepted. If the Plan is confirmed, all Class 6 claimants will be contractually bound to that treatment and will have waived any right to be paid on account of any punitive damages claims. *See* 11 U.S.C. § 1141(a) (2009); *see also, e.g.*, Montgomery Ward Holding Corp., 306 B.R. at 495; Monroe Well Serv., Inc., 80 B.R. at 334.

The Noland and CF & I decisions cited by the Libby Claimants are readily distinguishable.[71] Importantly, none of those cases involved asbestos PI claims being channeled to a 524(g) trust and then treated under a TDP that was accepted by a super-majority of claimants within the class. Rather, both decisions dealt with the equitable subordination of penalty claims under Code § 510(c) in non-asbestos bankruptcy cases. The Libby Claimants' reliance on those decisions is therefore misplaced. The Court should accordingly overrule the Libby Claimants' objections.

---

[71] *See* Libby Tr. Br. 87-90 (citing United States v. Noland, 517 U.S. 535 (1996), and United States v. Reorganized CF & I Fabricators, 518 U.S. 213 (1996)).

### E.    The Applicable Standard of Proof Is Preponderance of the Evidence

The Libby Claimants argue that the burden of proof to be carried by the Plan Proponents

is clear and convincing evidence.  They are wrong.

In Grogan v. Garner, 498 U.S. 279 (1991), the United States Supreme Court addressed

the standard of proof applicable to dischargeability proceedings under Code § 523.  The Court

held that the "preponderance of the evidence" standard applied to such actions, observing that

neither the statute, its legislative history, nor the legislative history of a predecessor statute

reflected an intent of Congress to impose a higher evidentiary standard.  The Court further

observed that because "the preponderance-of-the-evidence standard results in a roughly equal

allocation of the risk of error between litigants, *we presume that this standard is applicable in*

*civil actions between private litigants* unless 'particularly important individual interests or rights

are at stake.'"  *Id.* at 286 (quoting Herman & MacLean v. Huddleston, 459 U.S. 375, 389-90

(1983)) (emphasis added).

Two years later, the Fifth Circuit relied on Grogan to determine that the standard for

proving the confirmability of a Chapter 11 plan under § 1129 is the lower "preponderance of the

evidence" standard.  *See* In re Briscoe Enter., Ltd., 994 F.2d 1160 (5th Cir. 1993).  As in Grogan,

the Fifth Circuit found that § 1129 and its legislative history were silent as to the applicable

standard of proof.  *Id.* at 1165.  Citing Grogan and other Supreme Court precedent, the Fifth

Circuit also concluded that, absent any congressional intent to impose a higher standard, the

applicable standard of proof in civil cases involving money disputes, such as plan confirmation

proceedings, was preponderance of the evidence.  *See id.* at 1164-65 (citing Herman & MacLean v. Huddleston, 459 U.S. 375 (1983) and Addington v. Texas, 441 U.S. 418 (1979)).

The Fifth Circuit in Briscoe recognized that the higher "clear and convincing evidence" standard may be applicable in civil cases where an individual's liberty interest or "quasi-liberty" interest was at stake.  *See id.*  But the examples cited by the Fifth Circuit of such cases were deportation, denaturalization, and involuntary commitment to a mental institution.  *See id.* at 1164 (citing Addington, 441 U.S. at 423-24).  The Fifth Circuit concluded that the interests at stake in a confirmation proceeding did not rise anywhere close to that level.  *See id.* at 1165 ("This case is solely about money.").

Nevertheless, relying on Briscoe, the Libby Claimants argue that the "clear and convincing" standard should apply because their treatment under the Plan implicates more than the "mere loss of money."  Libby Tr. Br. 48.  Instead, they argue, what is really at stake here is their "fundamental right … to receive fair and equitable *recompense* for their diminished health and lifespans."  Libby Tr. Br. 49 (emphasis added).  But even the Libby Claimants do not seem convinced of their halfhearted argument here: by using the word "recompense" – which is synonymous with "reward," "payment," and "compensation" – the Libby Claimants are essentially acknowledging that what is at stake here *is* the loss of "fair and equitable" compensation and thus "money."

Additionally, the Libby Claimants cannot muster an argument that comes anywhere close to suggesting that any of their liberty interests is at stake.  Although they may be afflicted with disease as a result of exposure to Grace asbestos, none of them has put forward any evidence that

they are facing something on the level of denaturalization, deportation, or involuntary commitment to a mental institution, as a potential outcome of this confirmation proceeding.

Instead of pointing to a liberty interest, the Libby Claimants rely on an alleged "property interest:" their supposedly "unique rights" to Grace's insurance coverage, which, they contend, are "analogous to the rights of a secured creditor against its collateral that have supported courts' decisions to require" clear and convincing evidence in a confirmation setting. Libby Tr. Br. 49 (citing two cases).[72] But, as demonstrated below, the Libby Claimants do not have any "unique rights" to Grace's insurance, certainly nothing analogous to a secured creditor's lien. Indeed, the Libby Claimants have no claims to any of Grace's insurance that are greater than those of other Asbestos PI Claimants. *See supra* part II. Thus, even assuming that the potential loss of a "property right" could trigger a higher standard of proof, which it cannot in the absence of a congressional enactment to that effect, the Libby Claimants do not have any kind of "right" to the insurance that would justify the higher "clear and convincing" standard.

There is no reason for this Court to depart from the teachings of Grogan and Briscoe. There is no federal statute providing for a higher evidentiary standard in confirmation proceedings, nor is there any liberty interest at stake. At bottom, this case is about how much money the creditors stand to recover under the Plan, nothing more. The two cases cited by the Libby Claimants in support of the "clear and convincing" standard, which were decided after Grogan and Briscoe, did not even acknowledge Grogan and Briscoe, and they adopted the "clear

---

[72] *See* United States v. Woodway Stone, 187 B.R. 916 (W.D. Va. 1995); Fed. Home Loan Mortgage Corp. v. Bugg, 172 B.R. 781 (E.D. Pa. 1994).

and convincing" standard without any analysis or discussion.[73]   Those decisions cannot be considered reliable or persuasive under such circumstances.   Indeed, a number of courts within the Third Circuit have followed <u>Briscoe</u> and applied the lower "preponderance" standard to plan confirmation.   *See* <u>CoreStates Bank v. United Chem. Techs.</u>, 202 B.R. 33, 45 (E.D. Pa 1996) ("Indeed, a debtor need only prove the feasibility of its plan by a preponderance of the evidence, which is 'the appropriate standard of proof under both § 1129(a) and in a cram down.'") (citing <u>Briscoe</u>); *see also* <u>In re Armstrong World Indus., Inc.</u>, 348 B.R. 111, 120 (D. Del. 2006) (same); <u>In re U.S. Mineral Prods. Co.</u>, No. 01-2471 (JKF), 2005 WL 5898300, at *18 (Bankr. D. Del. 2005) ("The plan proponents satisfied their burden to prove the elements of Sections 1129(a) and (b) of the Bankruptcy Code by a preponderance of the evidence, which is the applicable evidentiary standard.").   For all these reasons, this Court should apply the preponderance standard here.

## IV.      This Court Should Overrule the Libby Claimants' Objections Relating to the "Best Interests of Creditors" Test

Because the Libby Claimants have reserved their right to file a subsequent trial brief in support of their objection that the Plan fails the "best interest of creditors" test, the Plan Proponents will file a written response to that brief by the date set forth in the applicable briefing schedule.   The Plan Proponents thus reserve their rights to file such a response.

---

[73]    *See* <u>Woodway Stone</u>, 187 B.R. at 918; <u>Bugg</u>, 172 B.R. at 784-85.

## <u>CONCLUSION</u>

For all the reasons stated herein, the Plan Proponents respectfully request that this Court overrule the Libby Claimants' objections *in toto* and confirm the Plan.

**[Signatures of counsel on following pages]**

Dated: August 7, 2009
Wilmington, Delaware

Respectfully submitted,

KIRKLAND & ELLIS LLP
David M. Bernick, P.C.
Theodore L. Freedman
Lisa G. Esayian
601 Lexington Avenue
New York, NY  10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

Barbara Harding
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Telephone: (202) 879-5000
Facsimile:  (202) 879-5200

*and*

THE LAW OFFICES OF JANET S. BAER, P.C.
Janet S. Baer, P.C.
70 W. Madison Street
Suite 2100
Chicago, IL 60602
Telephone: (312) 641-2162

*and*


*/s/James E. O'Neill*
PACHULSKI, STANG, ZIEHL & JONES LLP
James E. O'Neill (Bar No. 4042)
Timothy Cairns (Bar No. 4228)
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705
(Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400

*Counsel for the Debtors and Debtors in Possession*

CAMPBELL & LEVINE, LLC


*/s/Marla R. Eskin*
Marla R. Eskin (No. 2989)
Mark T. Hurford (No. 3299)
800 N. King Street, Suite 300
Wilmington, DE 19801
Telephone:  (302) 426-1900
Facsimile:  (302) 426-9947

*and*

CAPLIN & DRYSDALE, CHARTERED
Elihu Inselbuch
375 Park Avenue, 35th Floor
New York, NY 10152-3500
Telephone: (212) 319-7125
Facsimile: (212) 644-6755

Peter Van N. Lockwood
Nathan D. Finch
Walter B. Slocombe
Jeffrey A. Liesemer
One Thomas Circle, N.W.
Washington, D.C. 20005
Telephone:  (202) 862-5000
Facsimile:  (202) 429-3301

*Counsel for the Official Committee*
*of Asbestos Personal Injury Claimants*

PHILIPS, GOLDMAN & SPENCE, P.A.

*/s/John C. Philips*
John C. Philips (Bar No. 110)
1200 North Broom Street
Wilmington, DE 19806
Telephone:  (302) 655-4200
Facsimile:  (302) 655-4210

*and*

ORRICK, HERRINGTON & SUTCLIFFE LLP
Roger Frankel
Richard H. Wyron
Jonathan P. Guy
1152 15th Street, NW
Washington, DC 20005
Telephone: (202) 339-8400
Facsimile: (202) 339-8500

*Counsel for David T. Austern,*
*Asbestos PI Future Claimants' Representative*

SAUL EWING LLP


*/s/Teresa K.D. Currier*
Teresa K.D. Currier (Bar No. 3080)
222 Delaware Avenue, Suite 1200
P.O. Box 1266
Wilmington, DE 19899
Telephone:  (302) 421-6800
Facsimile:  (302) 421-6813

*and*

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Philip Bentley
Gregory Horowitz
Douglas Mannal
1177 Avenue of the Americas
New York, NY 10022
Telephone:  (212) 715-9100
Facsimile: (212) 715-8000

*Counsel for the Official Committee*
*of Equity Security Holders*