# EXHIBIT C

Case 01-01139-AMC    Doc 22731-3    Filed 08/07/09    Page 2 of 93

US District Court - Delaware                    FINAL - June 5, 2009
Chapter 11 - W.R. Grace                    Arthur Frank M.D., Ph.D.

Page 1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE
-------------------------------------------------
CHAPTER 11

IN RE:
W.R. GRACE & CO., et al.
        Debtors.

Case No. 01-1139 (JFK)
Jointly Administered
-------------------------------------------------
DEPOSITION OF
Arthur L. Frank, M.D., Ph.D.
June 5, 2009
Philadelphia, Pennsylvania
Lead:  Nathan Finch, Esquire
Firm:  Caplin & Drysdale

FINAL COPY
JANE ROSE REPORTING  1-800-825-3341

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - June 5, 2009
Arthur Frank M.D., Ph.D.

Page 2

APPEARANCES:

McGARVEY, HEBERLING, SULLIVAN
& McGARVEY, LLP
BY: JON HEBERLING, ESQUIRE
745 South Main
Kalispell, Montana  59901
Phone: (406) 752-5566
Representing the Plaintiffs

CAPLIN & DRYSDALE
BY: NATHAN D. FINCH, ESQUIRE
BY: BERNARD S. BAILOR, ESQUIRE
One Thomas Circle, NW, Suite 1100
Washington D.C.  20005
Phone: (202) 862-5000
Ndf@capdale.com
Bsb@capdale.com
Representing the Defendants

Page 3

APPEARANCES:

KIRKLAND & ELLIS, LLP
BY: DAVID BERNICK, ESQUIRE
BY: BRIAN STANSBURY, ESQUIRE
BY: HEATHER A. BLOOM, ESQUIRE
655 Fifteenth Street, NW
Washington DC  20005
Phone: (202) 879-5108
Dbernick@kirkland.com
Bstansbury@kirkland.com
Hbloom@kirkland.com
Representing the Defendants

ECKERT, SEAMANS, CHERIN & MELLON
BY: EDWARD J. LONGOSZ, II, ESQUIRE
1747 Pennsylvania Avenue, NW, 12th Floor
Washington DC  20006
Phone: (202) 659-6619
Elongosz@eckertseamans.com
Representing Maryland Casualty & Zurich

Page 4

APPEARANCES VIA TELEPHONE:

CHRISTENSE, MOORE, COCKRELL,
CUMMINGS & AXELBERG
BY: DALE COCKRELL, ESQUIRE
145 Commons Loop #200
Kalispell, Montana  59901
Phone: (406) 751-6000
Dcockrell@cmccalaw.com
Representing the Defendants

BY: DORI ANNE KUCHINSKY, ESQUIRE
SENIOR LITIGATION COUNSEL
W.R. GRACE
44084 Riverside Parkway, Suite 300
Leesburg, Virginia  20176
Phone: (703) 729-8543
Dori.kuchinsky@grace.com

Page 5

APPEARANCES VIA TELEPHONE:

BY: ALAN B. RICH, ESQUIRE
1401 Elm Street, Suite 4620
Dallas, Texas  75202
Phone: (214) 744-5100
Arich@alanrichlaw.com
Representing the Plaintiffs

JANE ROSE REPORTING
80 Fifth Avenue
New York, New York  10011
Phone:  800-825-3341
Lorraine Murtaugh, Court Reporter

---

Page 6

I N D E X
WITNESS
ARTHUR L. FRANK, M.D., PH.D.
EXAMINATION                PAGE
    BY MR. FINCH          8, 257
    BY MR. BERNICk        98, 229
    BY MR. HEBERLING      225
    BY MR. COCKRELL       263

E X H I B I T S
NUMBER   DESCRIPTION          PAGE MARKED
FRANK-1  EXPERT REPORT OF DR. A. FRANK      12

FRANK-2  SUPPLEMENTAL EXPERT REPORT
         OF DR. A. FRANK            12

FRANK-3  SUR-REBUTTAL AND SUPPLEMENTAL
         EXPERT REPORT OF DR. A. FRANK      12

FRANK-4  REPSONSE OF DR. FRANK AND
         DR. WHITEHOUSE TO ACC'S DR. WELCH  12

FRANK-5  RESPONSE OF DR. FRANK AND
         DR. WHITEHOUSE TO ACC'S
         DR. FRIEDMAN            12

---

Page 7

E X H I B I T S   I N D E X
NUMBER   DESCRIPTION          PAGE MARKED
FRANK-6  RESPONSE OF DR. FRANK AND
         DR. WHITEHOUSE TO ACC'S
         DR. STOCKMAN            12

FRANK-7  SUR-REBUTTAL & SUPPLEMENTAL
         EXPERT REPORT OF DR. WHITEHOUSE    12

FRANK-8  CURRICULUM VITAE        22

FRANK-9  LETTER DATED 11/14/08     25

FRANK-10 ATSDR SUMMARY REPORT      39

FRANK-11 TRUST DISTRIBUTION PROCEDURES
         EXHIBIT FOUR          47

FRANK-12 ATS DOCUMENTS          74

FRANK-13 ARTICLE BY L.S. WELCH, MD    91
FRANK-14 ARTICLE BY PATRICIA SULLIVAN  92

FRANK-15 RESEARCH ARTICLES BY R. LILLIS,
         ET AL            98
FRANK-16 2004 PROGRESSION STUDY      256

---

Page 8

1          ARTHUR L. FRANK, M.D., PH.D.
2              ARTHUR L. FRANK, M.D., PH.D.,
3  after having been first duly sworn, was examined
4  and testified as follows:
5              - - -
6              EXAMINATION
7              - - -
8  BY MR. FINCH:
9      Q    Dr. Frank, my name is Nathan Finch.  I
10  represent something called the Official Committee
11  of Asbestos Personal Injury Claimants in the W.R.
12  Grace Bankruptcy Case.  You've had your deposition
13  taken many times before?
14  A.  I have.
15      Q    If you don't understand something I ask you,
16  can you tell me and I will rephrase the question?
17  A.  I'll try not to be shy.
18      Q    Do you have any understanding of what the
19  Official Committee of Asbestos Personal Injury
20  Claimants is?
21  A.  Only some vague sense of it.
22      Q    What is your vague sense of it?
23  A.  That there's bankruptcy proceedings with
24  Grace and the Asbestos Claimant's Committee is
25  there to discuss funds that are to be utilized for

---

Page 9

1          ARTHUR L. FRANK, M.D., PH.D.
2  paying off claims and to discuss how and in what
3  manner that should be done and sort of to discuss
4  what various cases might be worth.
5      Q    Have you ever served as an expert in any
6  other asbestos bankruptcy?
7  A.  I have.  I have been involved with the
8  Celotex Bankruptcy, with Owens-Corning, or
9  Owens-Illinois, I forget which one, and I recently
10  did some work for Armstrong.
11      Q    What was the nature of the work that you did
12  in the Armstrong Bankruptcy?
13  A.  It was simply to write an affidavit to the
14  effect of what the health effects of asbestos
15  were, basically.
16      Q    And in the Celotex Bankruptcy?
17  A.  That was actually regarding insurance
18  litigation as part of that bankruptcy, and, again,
19  it was to discuss the hazards of asbestos.
20      Q    In any of your other prior engagements --
21  let's make it more broad than that.  Have you
22  ever, other than the Grace Bankruptcy, had the
23  occasion to review or form opinions about a trust
24  distribution procedures, bankruptcy trust
25  distribution procedures?

Page 10

1        ARTHUR L. FRANK, M.D., PH.D.
2   A.   No.
3   Q    I take it you don't hold yourself out as an
4   expert in what criteria should be used to settle
5   asbestos personal injury cases?
6   A.   First of all, I don't hold myself out as an
7   expert.  That's a designation by the courts.
8   Q    Okay.
9   A.   I'm a physician who has some experience wit
10  asbestos and asbestos-related disease, but I have
11  to date not been involved with this kind of
12  adjudication over how settlements might be made.
13  Q    You would agree with me that you don't have
14  any experience in how asbestos personal injury
15  cases are settled from the perspective of someone
16  who is charged with settling those cases on behalf
17  of an asbestos company or an asbestos trust?
18  A.   That's not ever been my role in all the work
19  that I've done with regard to asbestos litigation.
20  That's what lawyers and others are there for.
21  Q    And you certainly don't have any experience
22  or expertise in how much money should be paid to
23  settle various categories of asbestos disease
24  claims?
25  A.   I have heard over the years what claims are

Page 11

1        ARTHUR L. FRANK, M.D., PH.D.
2   settled for and know that they vary jurisdiction
3   by jurisdiction, but I don't get involved in those
4   discussions or negotiations.
5   Q    And so you wouldn't have any opinions or be
6   offering any opinions that particular dollar
7   amounts would be reasonable or unreasonable with
8   respect to the various asbestos-related diseases?
9   A.   That depends on the question I'm asked.
10  Some of the dollar amounts that are being
11  discussed or that are in some of the documents
12  that I've seen seem quite unreasonable for various
13  reasons.
14  Q    Well, you have no experience or expertise in
15  how much money Grace paid historically to resolve
16  asbestos personal injury claims; do you?
17  A.   No.
18  Q    And so you couldn't give --
19  A.   Other than what they have paid in cases in
20  Libby.  I have some knowledge of that.
21  Q    But you don't have any knowledge about what
22  they paid in cases outside of Libby; correct?
23  A.   No.
24  Q    You have no knowledge of the characteristics
25  of the cases outside of Libby and what the

Page 12

1        ARTHUR L. FRANK, M.D., PH.D.
2   decisions were made to settle those cases were as
3   compared to Libby?
4   A.   No.
5   Q    You have no knowledge or opinions about
6   whether or not the factors that go into the
7   decision whether or not to settle an asbestos
8   personal injury claim are reasonable or not
9   reasonable; do you?
10  A.   I have no knowledge since I've not been
11  involved.  I probably have some opinions, but I
12  can't have opinions based on no facts.
13                    - - -
14           (Exhibits Frank-1 through Frank-7
15  were marked for identification and are attached
16  hereto.)
17                    - - -
18  BY MR. FINCH:
19  Q    I'm going to put what has been marked as
20  Frank Deposition Exhibits One, Two, Three, Four,
21  Five, Six and Seven in front of you.
22  A.   Okay.
23  Q    And I'm going to ask you to briefly identify
24  them for the record?
25  A.   The first is entitled "Expert Report of Dr.

Page 13

1        ARTHUR L. FRANK, M.D., PH.D.
2   Arthur Frank", and this would have been a report
3   prepared back in December of 2008, signed the
4   23rd, December 2008.  Number two is one page that
5   says "Supplemental Expert Report".
6   Q    What's the date of that?  It's on the second
7   page.
8   A.   12, March, 2009.  The third one is listed as
9   Sur-Rebuttal and Supplemental Expert Report" dated
10  14, May, 2009.  The next is "Response of Dr. Frank
11  and Dr. Whitehouse to the Report of the ACC's Dr.
12  L. Welch March 2009", that's dated 14, May 2009.
13  The next is "Response of Dr. Frank and Dr.
14  Whitehouse to the Report of the ACC's Dr. G.
15  Stockman, 4/6/09", and that would also be dated
16  14, May.  And the last is --
17  Q    Wait a minute.  Five was Freedman --
18  A.   I'm sorry; I missed Freedman.  "Response of
19  Dr. Frank and Dr. Whitehouse to the ACC's Dr. G.
20  Freedman", I imagine that's also dated.
21  Q    Dated May 2009?
22  A.   14, May, 2009, that's Five.  And Six is
23  Stockman and Seven is the "Sur-Rebuttal and
24  Supplemental Expert Report by Dr. Allen
25  Whitehouse".

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - June 5, 2009
Arthur Frank M.D., Ph.D.

Page 14

ARTHUR L. FRANK, M.D., PH.D.
1
2  Q    Do these reports contain the opinions and
3  conclusions you've been asked to give in
4  connection with the Grace Bankruptcy matter?
5  A.   Yes.
6  Q    So, you understand the purpose of an expert
7  report is to provide all the opinions that you've
8  been asked to give so that I can ask you questions
9  about them; correct?
10 A.   Yes, sir.
11 Q    You have testified from time to time in
12 asbestos personal injury cases; is that correct?
13 A.   From time to time, yes.
14 Q    Is it your opinion, to a reasonable degree
15 of medical certainty, that exposure to chrysotile
16 asbestos from brakes can cause mesothelioma?
17 A.   Yes.
18 Q    Do you hold the opinion that pure
19 chrysotile, to the extent that it exists, can
20 cause mesothelioma?
21 A.   Yes.
22 Q    Do you hold the opinion that any
23 identifiable asbestos exposure above background to
24 pure chrysotile can cause mesothelioma?
25 A.   Yes.

Page 15

ARTHUR L. FRANK, M.D., PH.D.
1
2  Q    Do you hold the opinion that any
3  identifiable exposure to pure chrysotile asbestos
4  above background can be a substantial contributing
5  factor in causing someone's mesothelioma, even if
6  they were exposed to other asbestos fiber types?
7  A.   Yes.
8  Q    So, for example, in your view, working for a
9  few days around a pure chrysotile containing
10 product, to the extent such a thing exists,
11 breathing the fibers omitted by that would
12 contribute to causing someone's mesothelioma, even
13 if they spent ten years working in a shipyard
14 around amphibole-containing products?
15 A.   Yes.
16 Q    And that's your opinion to a reasonable
17 degree of medical certainty?
18 A.   It is.
19 Q    You have testified in the past, and I'll
20 show you this if you want to see it, that in your
21 experience and knowledge most cohorts of
22 individuals who were exposed to asbestos are
23 exposed to mixed fiber types?
24 A.   I probably testified to that.  A better way
25 to describe it I think would be that there are any

Page 16

ARTHUR L. FRANK, M.D., PH.D.
1
2  number of cohorts of single fiber types with
3  regard to amphiboles, it is rare and unusual to
4  have a chrysotile only cohort.
5  Q    So, there are very view chrysotile only
6  cohorts; would you agree with that?
7  A.   Correct.
8  Q    Les Stainer, the cohort he started in South
9  Carolina is one of the handful of pure chrysotile
10 exposure?
11 A.   Yes, or chrysotile miners in Canada or China
12 or elsewhere.
13 Q    Do you have any opinions about whether some
14 of the chrysotile that came from Canada also
15 contains tremolite?
16 A.   That's an interesting question.  It's widely
17 discussed in the literature as containing
18 tremolite.  I have a paper that discusses that.
19 It's a 1988 paper that I did with Dr. Dodson.  We
20 looked at UICC B referenced chrysotile in looking
21 at more than 20,000 fibers, found no evidence of
22 any tremolite in there, and even though you'll
23 find plenty of statements in the literature that
24 says there's tremolite, you will find a great
25 paucity of data as to how much and people make a

Page 17

ARTHUR L. FRANK, M.D., PH.D.
1
2  bold statement but don't have a reference and
3  don't have any data as to how much is actually
4  there.
5  Q    But you wouldn't conclude that there is no
6  possibility of tremolite being in Canadian
7  chrysotile?
8  A.   No, I would not.
9  Q    Have you ever read William Longo's report in
10 this case?
11 A.   Not that I recall.
12 Q    Do you know who Bill Longo is?
13 A.   I know Bill.
14 Q    So, if Dr. Longo testifies that Grace
15 commercial construction products contain both
16 tremolite and Libby amphibole, you wouldn't be in
17 a position to dispute that?
18 A.   No.  It's the kind of studies he does and
19 it's not the kind of studies I do.
20 Q    And have you ever worked with Dr. Longo or
21 relied on his opinions in any context?
22 A.   He and I have certainly been involved in
23 some litigation matters on the same case, but I
24 have not really worked with him on anything.  I've
25 seen reports, on a small number of occasions, that

Case 01-01139-AMC    Doc 22731-3    Filed 08/07/09    Page 7 of 93

US District Court - Delaware                    FINAL - June 5, 2009
Chapter 11 - W.R. Grace                         Arthur Frank M.D., Ph.D.

Page 18

1          ARTHUR L. FRANK, M.D., PH.D.
2    I've probably relied upon.
3         Q    One of the cohorts that's been studied
4    extensively in asbestos medical literature is the
5    insulator cohorts that were studied by
6    Dr. Selikoff and other people, including you, at
7    Mount Sinai; correct?
8    A.   Yes.
9         Q    Can we call that Selikoff insulator cohort?
10   A.   Fine.
11        Q    Would you agree with me that that cohort of
12   asbestos insulation workers was exposed to both
13   chrysotile asbestos and amphibole asbestos?
14   A.   Yes.
15        Q    How would you describe that study, that
16   series of studies; would you describe that as a
17   cohort study?
18   A.   It is a retrospective/prospective cohort
19   study with entry into the study requiring twenty
20   years of work at the time of entry and then
21   followed over the individual's lifetime.
22        Q    I had asked you some questions about
23   chrysotile causing mesothelioma.  Do you believe
24   that pure chrysotile, to a reasonable degree of
25   medical certainty, can also cause lung cancer?

Page 19

1          ARTHUR L. FRANK, M.D., PH.D.
2    A.   Yes.
3         Q    And would you agree that any identifiable
4    exposure to asbestos, above background which is a
5    chrysotile exposure, can contribute to causing
6    lung cancer?
7    A.   Yes.
8         Q    Would you agree with me that any
9    identifiable exposure to asbestos above background
10   that's chrysotile asbestos can contribute to
11   causing non-malignant asbestos diseases?
12   A.   Yes.
13        Q    In your December report, which is Frank
14   Deposition Exhibit Number One --
15   A.   Yes.
16        Q    -- on page ten --
17   A.   Yes, sir.
18        Q    -- at the bottom, you're talking about --
19   before we get to the bottom.  For definitional
20   purposes, if I used the term "Libby asbestos" or
21   "Grace asbestos" to describe the
22   tremolite/winchite/richterite mix of amphiboles
23   that is found in the vermiculite or mined in
24   Libby, Montana, would understand that's what I'm
25   talking about?

Page 20

1          ARTHUR L. FRANK, M.D., PH.D.
2    A.   Yes.  I use it because there is other Grace
3    asbestos that would be found in other settings
4    that would not be the same materials.
5         Q    Well --
6    A.   But if that's the definition you want me to
7    work with, I'll work with it.
8         Q    Let's call Libby asbestos, means the
9    richterite/tremolite/winchite mix that is found in
10   vermiculite or mined in Libby, Montana?
11   A.   All right.
12        Q    And that is a subset of all Grace asbestos,
13   you understand that there are commercial
14   construction products that have asbestos from
15   Canada in them that Grace sold?
16   A.   Yes, that's why I made the comment.  They
17   did.
18        Q    So, do you have any understanding as to
19   whether those commercial construction products,
20   like Monokote, would also have Libby asbestos in
21   them as a result of vermiculite being used as a
22   filler in those products?
23   A.   I do not know.  It may have been.  I have no
24   specific knowledge of that.
25        Q    You wouldn't dispute Dr. Longo, or anybody

Page 21

1          ARTHUR L. FRANK, M.D., PH.D.
2    else that testified, that the majority of Grace's
3    commercial construction products contained Libby
4    asbestos as a --
5    A.   I have no basis to dispute it.
6         Q    On the bottom of page ten in your December
7    2008 report, you write "It is a majority view that
8    amphiboles are more toxic than serpentine
9    asbestos."  And serpentine asbestos would include
10   chrysotile; correct?
11   A.   It is the only serpentine asbestos.
12        Q    Chrysotile is serpentine asbestos?
13   A.   Right.  It doesn't include it.  It is the
14   whole class.
15        Q    And then you say, "My own views at the issue
16   is not settled as there is evidence going both
17   ways."
18   A.   Yes.
19        Q    Is that still your view?
20   A.   Yes.
21        Q    You have testified, I believe, that most
22   people don't claim that there is a different
23   potency factor as between amphiboles and
24   chrysotile for lung cancer.  Is that your opinion?
25   A.   There's a much smaller body of evidence

Page 22

1        ARTHUR L. FRANK, M.D., PH.D.
2    where there is such a claim made.  Most of the
3    discussion has to do with mesothelioma, but there
4    are some people who also feel there is a
5    differential with lung cancer that's been less
6    well studied, I think.
7        Q    And what about as a differential between
8    amphibole and chrysotile for purposes of causing
9    nonmalignant disease?  Is there any literature on
10   either side of that question that would allow you
11   to make a categorical statement that amphibole
12   asbestos exposures are more likely to cause
13   asbestos disease than chrysotile asbestos
14   exposures?
15   A.   No.
16       Q    You came into the deposition, and I took it
17   because it was sitting there in front of you, I
18   think you had an extra copy, you have the most
19   recent copy of your CV?
20   A.   Yes.
21       Q    Can we mark that as Frank Deposition Exhibit
22   Number Eight?
23   A.   Certainly.
24             - - -
25       (Exhibit Frank-8 was marked for

Page 23

1        ARTHUR L. FRANK, M.D., PH.D.
2    identification and is attached hereto.)
3             - - -
4    BY MR. FINCH:
5        Q    Are you generally familiar with the EPA 1986
6    Airborne Asbestos Health Assessment Update?
7    A.   Not especially.  I probably saw it at the
8    time.  I haven't seen it in years and have no
9    specific recollection of it.
10       Q    One of the principal authors is a gentleman
11   by the name of Dr. William Nicholson.  Do you know
12   --
13   A.   I know Bill very well.
14       Q    Do you have a view as to his qualifications
15   and expertise on asbestos-related medical issues?
16   A.   He was trained as a biophysicist and spent a
17   lot of his time working with Dr. Selikoff learning
18   about asbestos, doing asbestos-related research.
19       Q    Do you have an understanding that it is
20   still the official position of the United States
21   Government that all different types of asbestos
22   fiber, and by "all types", I mean amosite versus
23   chrysotile, are equally --
24   A.   Amphiboles.
25       Q    Excuse me.  Amphiboles versus chrysotile are

Page 24

1        ARTHUR L. FRANK, M.D., PH.D.
2    equally potent for causing mesothelioma?
3    A.   Yes.  They have not adopted any other view,
4    even though that has been put forward.
5        Q    And some of the places that it has been put
6    forward, are you familiar with the EPA working
7    group study in 2002 colloquially known as Berman
8    and Crump, where the authors of that surveyed the
9    epidemiological literature and attempted to
10   quantify how much more toxic the amphiboles were
11   than chrysotile fibers for the production of
12   mesothelioma?
13   A.   I am.
14       Q    And what did the EPA do, if anything, with
15   the Berman and Crump work?
16   A.   Had it reviewed by a scientific body who
17   found it weak and unsubstantiated.
18       Q    And just to break that down a little bit
19   more, the Berman and Crump 2003 paper working
20   group study was updated substantially in 2007 and
21   2008 and became something known as Bratt and
22   Crump; correct?
23   A.   I'm specifically aware of that.
24       Q    But it was their work which attempted to
25   quantify the difference between the amphiboles and

Page 25

1        ARTHUR L. FRANK, M.D., PH.D.
2    causing mesothelioma and chrysotile and causing
3    mesothelioma led to a hearing before a science
4    advisory board at the EPA last summer, 2008;
5    correct?
6    A.   Yes.
7        Q    And did you participate in any way in, and
8    by "participate any way", did you review the EPA
9    science advisory board's conclusions about the
10   adequacy of the data to support the Bratt and
11   Crump/Berman and Crump work?
12   A.   I believe I read something about that.  It
13   may have been a summary.
14       Q    Let's mark this as Frank Deposition Nine.
15            - - -
16       (Exhibit Frank-9 was marked for
17   identification and is attached hereto.)
18            - - -
19   BY MR. FINCH:
20       Q    Frank-9, can you identify Frank-9, Dr.
21   Frank?
22   A.   It is a November 14, 2008 letter to the
23   administrator of the EPA, Mr. Johnson, with an
24   attachment, which is a report that the committee
25   put together.

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - June 5, 2009
Arthur Frank M.D., Ph.D.

Page 26

ARTHUR L. FRANK, M.D., PH.D.

1       ARTHUR L. FRANK, M.D., PH.D.
2    Q    And this is the report that the science
3    advisory board put together when they -- let's
4    back up.  The science advisory board was a
5    collection of experts in lots of different
6    disciplines with the question of being asked of
7    them whether or not the Berman and Crump/Bratt and
8    Crump work was sufficiently valid to make
9    quantitative assessments about the differences
10   between asbestos fiber type and asbestos fiber
11   length in causing mesothelioma and lung cancer; is
12   that correct?
13   A.   That was my understanding.
14   Q    And you've seen this document, Frank-9, or a
15   summary of it before?
16   A.   I think I've seen a summary.  I don't think
17   I've seen the whole document as it is presented to
18   me here.
19   Q    And the committee, the science advisory
20   board committee, generally agreed that the
21   scientific basis as laid out in the technical
22   document referring to Bratt and Crump, in support
23   of the proposed method is weak and inadequate.
24   Did you see that, it's on page two of this
25   document?

Page 27

1       ARTHUR L. FRANK, M.D., PH.D.
2    A.   Yes.
3    Q    And so is it your view that it is
4    scientifically not possible to quantify how much
5    more toxic amphiboles can be than chrysotile, at
6    least at this time, with the data we have?
7    A.   That reflects my own view that I think is
8    unsettled.  I think it is a doable piece of work,
9    but it is not doable given the data that we have
10   so far.
11   Q    Given the data, and by "data", we mean the
12   epidemiological and exposure data about all
13   different types of exposure to asbestos that have
14   been assembled in the scientific community to
15   date, you would say it's impossible to say that
16   amphiboles are X-times more likely to cause
17   mesothelioma than chrysotile?
18   A.   Well, it's obviously not impossible since
19   people have done that, so it is possible to say
20   that.  I don't think the basis for saying it is
21   very good.
22   Q    You don't think there's a good scientific
23   basis for saying that?
24   A.   Correct.
25   Q    If Dr. Whitehouse were to testify that in

Page 28

1       ARTHUR L. FRANK, M.D., PH.D.
2    his opinion amphibole exposures are a hundred
3    times more likely to result in mesothelioma than
4    chrysotile only exposures, you would say there is
5    not a good scientific basis to say that?
6    A.   Well, he can look at the science the way he
7    wants and there is data that would be supportive
8    of that view.  Maybe he decides that he accepts
9    that data.  I've looked at that issue and am not
10   persuaded.  But different scientists will use
11   different ways of looking at the same information.
12   Q    Okay.  So, you would disagree with
13   Dr. Whitehouse, if Dr. Whitehouse's opinion is
14   that amphibole fiber are a hundred times more
15   likely, a hundred times more potent for chrysotile
16   for causing mesothelioma, you would disagree --
17   A.   I personally would disagree with that, but
18   other scientists would certainly agree with him.
19   And some would say that crocidolite is 500 times
20   more potent.  That's what Berman and Crump says or
21   Hodgson and Darden.
22   Q    But just because medical experts disagree
23   about something doesn't mean that one of them is
24   unreasonable and the other one is reasonable?
25   A.   No, it does not necessarily mean that.

Page 29

1       ARTHUR L. FRANK, M.D., PH.D.
2    Q    Do you know Dr. Laura Welch?
3    A.   I do.
4    Q    You have coauthored papers with her; is that
5    correct?
6    A.   I have.
7    Q    One of the papers that you coauthored with
8    her was a paper published in 2007, thereabouts,
9    about the ability of chrysotile to cause
10   mesothelioma?
11   A.   Yes, sir.  And more recently the response to
12   a letter to the editor of that journal, and I know
13   Laura from other settings.  When she did sheet
14   metal work many years ago I was involved with that
15   and we both serve on a research group that looks
16   at DOE workers.
17   Q    Have you come to form a view about her
18   opinions about medical issues, asbestos medical
19   issues?
20   A.   I have.
21   Q    Do you believe her opinions are outside of
22   the medical main stream?
23   A.   There are some of her reviews that I agree
24   with, enough to sign onto an article that she was
25   the chief author.  On the other hand, there are

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - June 5, 2009
Arthur Frank M.D., Ph.D.

Page 30

1        ARTHUR L. FRANK, M.D., PH.D.
2   other views that she holds that I disagree with,
3   and I've had those discussions with her from time
4   to time.
5   Q    Do you view her positions on
6   asbestos-related nonmalignant disease issues as
7   expressed in the reports she has done in the Grace
8   case as completely scientifically unsupportive?
9   A.   That's a very general question.  I think
10  there would be some aspects that I would agree
11  with and some that I disagree.  For example,
12  probably the major disagreement as to do with what
13  you call pleural disease, and we actually had this
14  discussion some months back in Washington in
15  another setting in another context.  She does not
16  like the term "pleural asbestosis", where others
17  of us feel that that's a perfectly appropriate
18  view.  But I think that's more a semantic issue
19  than it is really a major scientific issue.
20  Q    You certainly wouldn't characterize Dr.
21  Welch's view on asbestos-related medical issues as
22  extremely pro-defendant or not in -- I'll stop
23  there.  Extremely pro-asbestos defendant?
24          MR. HEBERLING:  Objection;
25  overbroad, compound.

Page 31

1        ARTHUR L. FRANK, M.D., PH.D.
2          THE WITNESS:  Well, first of all,
3   I'm aware that Dr. Welch has been involved with
4   litigation.  I do not know and have never seen a
5   list of who she has done work for.  Most of my
6   dealings have been such that I would say in many
7   aspects we would agree.  I would say that with
8   regard to this matter that we're here about
9   today, I take and have some serious
10  disagreements with her construct about some of
11  the materials that are apparently in question.
12  BY MR. FINCH:
13  Q    You certainly wouldn't suggest that the
14  views that she has expressed on, for example,
15  whether or not you need blunting of the
16  costophrenic angle to call pleural disease a
17  diffuse pleural thickening that that view is a
18  view that is completely unsupported by any medical
19  literature?
20  A.   There's medical literature in support of it.
21  There's medical literature that deals with it
22  otherwise.  And I take that to be as much as
23  anything else, a semantic issue, not an issue of
24  biology.  I mean, what you call something, people
25  call things a lot of different things.  There's a

Page 32

1        ARTHUR L. FRANK, M.D., PH.D.
2   lot of names for a lot of medical conditions.  It
3   doesn't mean it is a serious disagreement.  It's a
4   different view or different construct.  It's like
5   how you classify things.
6   Q    Are you familiar with something called the
7   CARD Clinic, the Center for Asbestos-Related
8   Disease?
9   A.   Yes, I am.  I have been there on a number of
10  occasions.
11  Q    Would you generally believe that statements
12  they make on their website would be truthful and
13  accurate?
14  A.   I've never looked at their website.  I would
15  like to think that they are, but I have no basis
16  to comment one way or the other.
17  Q    The CARD Clinic website says, "Zonolite and
18  Monokote are two trade names under which Libby
19  vermiculite products were marketed.
20          There are two overwhelming examples
21  of the extent to which exposures can spread
22  through commercial products.  Vermiculite
23  contaminated with Libby amphibole asbestos was
24  used to create Zonolite attic insulation it is
25  estimated to be in thirty million homes.

Page 33

1        ARTHUR L. FRANK, M.D., PH.D.
2          The second is Monokote, which is a
3   huge fireproofing material.  It was used to coat
4   all the steel beams that were used in the
5   construction of the World Trade Center Towers in
6   New York City.  You don't have --"
7   A.   I would agree with everything but that
8   last --
9          MR. HEBERLING:  Just a minute, Nat.
10  I'll object to the Witness being questioned on a
11  document he has not seen and, secondly, it's
12  highly compound.  You read quite a bit of it.
13  BY MR. FINCH:
14  Q    Do you have an understanding that Libby
15  amphiboles went into Grace's Monokote product?
16  A.   Yes.
17  Q    So, anyone who worked around or worked with
18  Monokote products could be exposed to the Libby
19  amphiboles?
20  A.   Yes.
21  Q    And anyone who worked around or worked with
22  Grace's Monokote products that contain Libby
23  vermiculite, to the extent they contracted an
24  asbestos-related disease, I take it that your view
25  would be that the exposure to the Libby asbestos

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - June 5, 2009
Arthur Frank M.D., Ph.D.

Page 34

1      ARTHUR L. FRANK, M.D., PH.D.
2  in the Monokote could be a substantial
3  contributing factor to causing their disease?
4  A.    Along with all their other exposures to
5  asbestos, yes.
6  Q    It's a cumulative exposure that adds to the
7  dose that causes disease?
8  A.    Yes.
9  Q    So you couldn't segregate out one exposure
10  as not being responsible and all the rest as being
11  responsible?
12  A.    Correct.
13  Q    So, would you agree with me, to the extent
14  that there are characteristics of asbestos disease
15  caused by exposure to Libby asbestos, that may be
16  different from what we have seen in the medical
17  literature, it is the exposure to the Libby
18  asbestos that may cause those differences and not
19  the geographic location which the exposure
20  occurred that matters?
21  A.    If I understand the question, you're asking
22  me if I believe that Libby asbestos, as earlier
23  defined, regardless of where the exposure takes
24  place, may, in fact, give rise to some different
25  experiences compared to other types of exposure to

Page 35

1      ARTHUR L. FRANK, M.D., PH.D.
2  other asbestos materials, I would answer yes.
3  Q    So, there's not like some kind of magical
4  shield around Lincoln County, Montana that if
5  people breathed Libby asbestos in Lincoln County,
6  Montana it would cause one set of asbestos
7  diseases, but if they breathe the same Libby
8  asbestos in an expansion plant in Michigan or as a
9  result of working on a construction site and
10  working with Monokote products, it would cause
11  different asbestos diseases?
12  A.    The diseases are the same.  There's some
13  significant differences.  People who might work
14  with construction materials would be working with
15  a variety of materials themselves or be around
16  others working with other materials and would have
17  a wide range of exposures to asbestos.
18          If one is talking about occupational
19  exposures, we're generally talking about normal
20  workday kind of exposure.  But living in Libby is
21  essentially a twenty-four hour, seven day a week
22  exposure, which may be further complicated by
23  working directly with the materials or in some
24  other way, spending part of your time in an
25  occupational setting with exposure.  But the

Page 36

1      ARTHUR L. FRANK, M.D., PH.D.
2  diseases aren't different, but the nature of the
3  exposure is certainly different.
4  Q    Well, the diseases that people in Libby
5  suffer are no different than the diseases people
6  outside of Libby suffer; is that correct?
7  A.    It's the same set of asbestos-related
8  diseases.
9  Q    And the type of asbestos to the extent that
10  it is Libby amphiboles and people are exposed to
11  the vermiculite in Libby as compared to Libby
12  amphiboles that end up in Grace's commercial
13  construction products, the type of asbestos the
14  people are exposed to is the same?
15  A.    The same asbestos.
16  Q    So, the only thing that would be different
17  between Libby claimants and people who are suing
18  Grace because they were exposed to Monokote may be
19  the amount of asbestos they were exposed to?
20  A.    Or the fact that they have other exposures
21  or that the intensity of the exposure is less and
22  they have a different response.  But the basic
23  disease would be essentially the same.
24  Q    Okay.
25  A.    Or the diseases.

Page 37

1      ARTHUR L. FRANK, M.D., PH.D.
2  Q    The diseases would be the same between Libby
3  claimants and other Grace claimants; correct?
4  A.    I mean, we're talking about whatever
5  asbestos-related diseases you can get.  The
6  nonmalignant diseases or the various malignancies.
7  So, the diseases are the same.
8  Q    And the type of asbestos that Libby
9  claimants were exposed to would be the same as the
10  type of asbestos that other Grace exposure, at
11  least to the extent you are talking about the
12  Libby amphiboles and Grace's construction
13  products?
14  A.    That's a self-answering question.  That's a
15  circular question.  To the extent you were exposed
16  to something, you are exposed to it.  Libby people
17  much less likely would have exposures to other
18  asbestos materials, whereas others would have
19  had --
20  Q    Exposures to other products?
21  A.    -- a wider variety of products and a variety
22  of other fibers as well.
23  Q    But you couldn't say that people who lived
24  in Lincoln County, Montana are the only people
25  exposed to Libby amphiboles?

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - June 5, 2009
Arthur Frank M.D., Ph.D.

Page 38

ARTHUR L. FRANK, M.D., PH.D.
1
2   A.   Certainly not.
3   Q    So, the thing that might make them different
4   would be the cumulative dose of Libby amphiboles
5   they are exposed to as compared to somebody who
6   lived in California, for example?
7   A.   That would be one thing that I would expect
8   would be different.
9   Q    But would you agree with that the the
10  cumulative dose of exposure to Libby amphibole
11  asbestos would depend on the facts and
12  circumstances of each individual person's
13  situation?
14  A.   Yes.
15  Q    So, for somebody who is a hod carrier who
16  works very closely with someone spraying Monokote,
17  which contains Libby amphibole, and does that for
18  forty years, that person may have a higher a
19  cumulative dose of exposure to Libby asbestos than
20  someone who has an environmental exposure and
21  lived in Lincoln County for the past twenty years?
22  A.   You would have to have an assessment of each
23  case, but one could conceive of such a
24  circumstance.
25  Q    And so, the thing that -- and you haven't

Page 39

ARTHUR L. FRANK, M.D., PH.D.
1
2   done that assessment here, you haven't compared
3   the exposures of the people that live in Libby to
4   the Libby amphibole asbestos as compared to a
5   quantitative basis to the exposures of any of the
6   other hundred thousand other people that are
7   exposed to Grace's Libby asbestos-containing
8   commercial products?
9   A.   I have not done that in this case, nor have
10  I done that in any case I've been involved with.
11  Q    And it's probably not even possible to do
12  that; would you agree?
13  A.   Not accurately.
14  Q    Let's mark this as the next exhibit.
15        - - -
16        (Exhibit Frank-10 was marked for
17  identification and is attached hereto.)
18        - - -
19  BY MR. FINCH:
20  Q    Dr. Frank, do you have Frank-10 in front of
21  you?
22  A.   I do.
23  Q    Have you ever seen this document before?
24  A.   I believe not.
25  Q    Is this something that Dr. Welch cited in

Page 40

ARTHUR L. FRANK, M.D., PH.D.
1
2   one of her reports.  This is an ATSDR analysis of
3   people who lived around expansion plants around
4   the country that would have received unprocessed
5   vermiculite concentrate from Libby.  You haven't
6   done any analysis to analyze this ATSDR study, I
7   take it, if you've never seen it before?
8   A.   Correct.
9   Q    Let me see if I understand correctly what
10  you have personally done with respect to the Libby
11  patient cohort.  And why don't we get some
12  definitions out of the way.
13  A.   Yes, let's get some definitions.  What do
14  you mean by "Libby patient cohort"?
15  Q    Would you agree with me that there are a
16  group of people who lived in Lincoln County,
17  Montana, or worked in Lincoln County, Montana who
18  may or likely probably were exposed to Libby
19  asbestos?
20  A.   Yes.
21  Q    And I have seen in Dr. Whitehouse's report
22  references to some of the papers Libby claimants
23  filed in their brief that the population of people
24  in Lincoln County is around 9,500 people.  Is that
25  your understanding?

Page 41

ARTHUR L. FRANK, M.D., PH.D.
1
2   A.   That's roughly the figure I have.  9,300 I
3   think is what I recall.
4   Q    So, if we were to call that the Libby
5   asbestos exposed cohort --
6   A.   Well, except people moved in and out.  But
7   basically there are people who lived there and
8   have lived there on a regular basis for a long
9   period of time that would be some subset of that
10  number, but somewhere in that neighborhood.
11  Q    Well, you could be a subset or it could be
12  bigger; I mean, the 9,500 is how many people lived
13  there, but it could be people who lived there and
14  either they died or they moved away, so it could
15  be bigger?
16  A.   Right.
17  Q    So, a rough order of magnitude, there's
18  9,500 people that were or could have been exposed
19  to Libby asbestos?
20  A.   At least that number, yes.
21  Q    At least that number.  So why don't we call
22  that the Libby asbestos exposed cohort?
23  A.   You can call it anything you want.  It's not
24  the term I would choose to use for that, but,
25  okay.

Page 42

ARTHUR L. FRANK, M.D., PH.D.

1
2    Q    Well, what term would you choose?
3    A.    I would say the residential cohort of
4    Lincoln County.
5    Q    Okay; the residential cohort of Lincoln
6    County.  And that residential cohort of Lincoln
7    County would also include some people who used to
8    work for Grace at the vermiculite processing plant
9    or the mine there?
10   A.    Correct.
11   Q    So, there's a residential cohort of Lincoln
12   County that's about 9,500 people; right?
13   A.    Yes.
14   Q    And then at some point in the past eight or
15   nine years a Government agency came in and did
16   screenings of some substantial proportion of the
17   residential cohort of Libby County, as I recall.
18   A.    About sixty-one percent, as I recall.
19   Q    And what was the Government agency that did
20   that?
21   A.    ATSDR.
22   Q    The ATSDR went in and took x-rays of about
23   6,800 people, thereabouts?
24   A.    Something like that.
25   Q    And what did they find when they did that

Page 43

ARTHUR L. FRANK, M.D., PH.D.

1
2    analysis?
3    A.    I don't recall the exact number.  They found
4    a lot of people with evidence of asbestos-related
5    disease, some of whom have been former workers,
6    some of whom were simply environmentally exposed,
7    some who were family members of workers.
8    Q    They found some number between a thousand
9    and 2000 people that had evidence of
10   asbestos-related disease on x-ray at least; is
11   that correct?
12   A.    I don't recall the specific number, but they
13   found some percentage of people.  If you tell me
14   it's between one and 2000, I have no basis to
15   disagree with you unless you show me the numbers.
16   Q    If we say that all those people have an
17   asbestos-related disease, would you agree with
18   that?
19   A.    I'll take that as an assumption.  You just
20   said let's say that they all have asbestos-related
21   disease.
22   Q    Would you agree or disagree with me that
23   someone who has x-ray changes that show either
24   pleural plaques or pleural fibrosis or diffuse
25   pleural thickening or asbestosis has an

Page 44

ARTHUR L. FRANK, M.D., PH.D.

1
2    asbestos-related disease?
3    A.    If there is no other known cause in any
4    given individual, yes, that is the mostly likely
5    diagnosis.  With a reasonable degree of medical
6    certainty, that would be the correct diagnosis.
7    Q    All right.  Do you have Dr. Whitehouse's May
8    14th --
9    A.    Exhibit Seven.
10   Q    Yes, Exhibit Seven.
11   A.    I do.
12   Q    I take it you have reviewed Dr. Whitehouse's
13   May 2009 report as part of your work in this case?
14   A.    Yes.
15   Q    And I take it you generally agree with it,
16   although you didn't write it yourself; is that
17   right?
18   A.    Correct.
19   Q    In this report, at page thirty-one, the May
20   2009 Whitehouse report --
21   A.    Yes.
22   Q    -- first full paragraph, Dr. Whitehouse
23   writes, "The CARD Clinic has diagnosed over 1,800
24   patients with asbestos-related disease by either
25   plane chest x-ray or CT scan."

Page 45

ARTHUR L. FRANK, M.D., PH.D.

1
2    A.    Yes.
3    Q    "Has confirmed diagnosis on about a hundred
4    patients in other areas of the U.S."
5    A.    Yes.
6    Q    So, we would agree with me if I were to call
7    those 1,800 people the Libby patient cohort?
8    A.    Or the CARD Clinic cohort.
9    Q    Okay; the CARD Clinic cohort.  The CARD
10   Clinic cohort is a subset of the 9,500 person
11   residential cohort of Lincoln County; correct?
12   A.    Some of the people would be Lincoln County
13   representatives, others would be people who have
14   now lived elsewhere who have come back to the CARD
15   Clinic to be examined or seen, plus the hundred
16   patients from other parts of the United States.
17   So, there would be a large overlap, but it is
18   not --
19   Q    It's not so extensive that --
20   A.    No.
21   Q    You would expect there to be a pretty large
22   overlap between the 1,800 patients of the CARD
23   Clinic and the 9,500 --
24   A.    Right.
25   Q    -- residential exposed --

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - June 5, 2009
Arthur Frank M.D., Ph.D.

Page 46

ARTHUR L. FRANK, M.D., PH.D.
1
2    A.    A large overlap, but not a complete overlap.
3    Q    Of the 1,800 people that are patients of the
4    CARD Clinic, how many of them have you generally
5    examined?
6    A.    Personally examined by doing a hands-on
7    exam?
8    Q    Yes.
9    A.    I've talked to one individual personally.
10   Q    And how many people's x-rays have you
11   reviewed?
12   A.    Probably between hundred and 125, something
13   like that.
14   Q    And how many people's pulmonary function
15   tests have you reviewed of that 1,800 people?
16   A.    Some subset of that. A relatively small
17   percentage.
18   Q    Some subset of the 1,800 or some subset
19   of --
20   A.    No, of the 125 or so.
21   Q    So, of the 1,800 of the CARD Clinic patient
22   cohort, you've looked at x-rays or CT scans of no
23   more than 150 of them?
24   A.    That would probably be a fair statement.
25   Q    And you've looked at pulmonary function

Page 47

ARTHUR L. FRANK, M.D., PH.D.
1
2    tests of no more than twenty-five?
3    A.    Something like that, twenty-five, thirty,
4    forty. I don't know.
5    Q    And approximately how much time have you
6    spent in the past year either looking at x-rays or
7    writing a report or doing anything connected with
8    the testimony you're expected to give in the Grace
9    case?
10   A.    In the last year?
11   Q    Let's break it down. How about in the past
12   month?
13   A.    The past month it would be several hours
14   reading some of these materials. But I'm just
15   trying to think, in the last year it would
16   probably be around twenty to thirty hours.
17   Actually, maybe a bit more.
18   Q    Fifty hours tops?
19   A.    Not more than that.
20                    - - -
21          (Exhibit Frank-11 was marked for
22   identification and is attached hereto.)
23                    - - -
24   BY MR. FINCH:
25   Q    Dr. Frank, have you ever reviewed the W.R.

Page 48

ARTHUR L. FRANK, M.D., PH.D.
1
2    Grace bankruptcy trust distribution procedures for
3    the settlement of asbestos personal injury claims?
4    A.    No, sir. I mean, as I look at this, I've
5    seen pieces of it. I have not seen the whole
6    document.
7    Q    You've seen pieces of it and you are aware
8    that Dr. Whitehouse has opinions about certain
9    aspects of the Grace trust distribution
10   procedures --
11   A.    As do I.
12   Q    As do you -- medical and exposure criteria;
13   correct?
14   A.    Right.
15   Q    And for purposes of -- we keep calling these
16   colloquially TDP. Have you ever been asked to
17   design medical exposure criteria for an asbestos
18   bankruptcy trust to evaluate and, if the trust
19   determines, appropriate to offer a settlement to
20   resolve personal injury claims?
21   A.    No.
22   Q    Have you ever been asked to design claims
23   evaluations and settlement procedures for any kind
24   of asbestos-related disease payment vehicle beyond
25   a trust?

Page 49

ARTHUR L. FRANK, M.D., PH.D.
1
2    A.    No.
3    Q    So, you haven't been asked to create those
4    criteria for any kind of company that has asbestos
5    liabilities?
6    A.    No.
7    Q    Or a workers' compensation board?
8    A.    No.
9    Q    Or a Federally administered asbestos disease
10   evaluation and payment fund?
11   A.    No.
12   Q    Prior to this case -- I think I might have
13   asked you this, but prior to this case have you
14   ever reviewed medical and exposure criteria for a
15   bankruptcy trust?
16   A.    Other than this one, no. What I did review
17   was the criteria under the asbestos bill that has
18   been pending in Congress.
19   Q    The so-called Fair Act that was --
20   A.    The very unfair Fair Act, yes.
21   Q    I would agree with that. But the so-called
22   Fair Act that was proposed in various points in
23   time during 2002 and 2006 that ultimately was not
24   enacted?
25   A.    Correct.

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - June 5, 2009
Arthur Frank M.D., Ph.D.

Page 50

ARTHUR L. FRANK, M.D., PH.D.
1
2    Q    You've reviewed the proposed criteria in
3    that bill?
4    A.    Yes.
5    Q    You have some opinions about certain of the
6    medical and exposure criteria in the Grace TDP; is
7    that correct?
8    A.    Yes.
9    Q    I have read Dr. Whitehouse's reports and
10   I've read your reports, and I think I understand
11   everything that either of you criticized about the
12   medical and exposure criteria in the TDP, but let
13   me just see if I can go through them.  What is the
14   basis for your criticism of the medical and
15   exposure criteria of the TDP?
16   A.    That I believe some of them are unreasonable
17   or not supported by good science particularly.
18   Q    And your belief that they are unreasonable
19   is from a medical perspective; correct?
20   A.    Yes.  I mean, I'm not going to comment on
21   the reasonableness, for example, of the dollar
22   amounts.  That's not something I have any
23   particular knowledge about.  I can have a personal
24   opinion, but I have no expertise or knowledge
25   about how these sums get arrived at.  But I think

Page 51

ARTHUR L. FRANK, M.D., PH.D.
1
2    I can comment on the medical reasoning --
3    Q    The medical reasoning behind the medical and
4    exposure criteria?
5    A.    Correct.
6    Q    I haven't seen anyone from Libby, or at
7    least either you or Dr. Whitehouse, criticize
8    either the diagnostic or exposure criteria for
9    mesothelioma; is that correct?
10   A.    Well, if you want to go by one by one, we
11   can do that.  Well, the diagnosis of mesothelioma,
12   I presume to be a tissue or clinical diagnosis.  I
13   don't know what Grace exposure is defined by
14   section 5.7 (b)(3) is, so I can't comment on that.
15   Q    But you haven't expressed any criticism of
16   the definition of exposure for any of the disease
17   categories in any of your reports; is that
18   correct?
19   A.    There is no definition of exposure for
20   mesothelioma that I see here.  I don't see any
21   for --
22   Q    Well, one of the ways the TDP works, would
23   you agree, is that all of the disease categories
24   require Grace exposure, as defined?  Do you see
25   that?

Page 52

ARTHUR L. FRANK, M.D., PH.D.
1
2    A.    I would think it be appropriate if you are
3    going to collect money that has been derived from
4    a particular company that you would be able to
5    prove that you had exposure to that company's
6    product, I take that as a reasonable thing.  But
7    the amount of exposure, as you've already
8    determined in some earlier questions, can be
9    anything above background.  So, theoretically, one
10   day of exposure would be relevant.
11   Q    Do you have any criticisms of the exposure
12   criteria for any of the diseases that are listed
13   on page twenty-four through twenty-seven of the
14   TDP?
15   A.    Well, it says on page twenty-four, Lung
16   Cancer 1, quote, "significant occupational
17   exposure", with footnote five, which refers to a
18   section that I have no knowledge of.  So, I don't
19   know what the definition significant occupational
20   exposure would be.  To me, significant exposure
21   would be, you know, as little as a day of
22   exposure.  If it requires more than that, I think
23   that would be inappropriate.
24   Q    But you haven't expressed that opinion in
25   any of the reports that you've written here.  I

Page 53

ARTHUR L. FRANK, M.D., PH.D.
1
2    haven't seen it in Dr. Whitehouse's report, that
3    you criticize the exposure criteria of TDP?
4    A.    Correct.  You're asking me now, I'm giving
5    my opinion now.
6    Q    Well, then let's -- if the medical exposure
7    criteria in Grace exposure -- why don't we take a
8    look at 5.7 (b)(3).  It's on page forty-two.
9         MR. HEBERLING:  Nat, at this point
10   I should inform you that based up the Welch
11   deposition, I think we'll be adding an objection
12   to the criteria on the basis that CT scans
13   apparently are not permitted for Level IV, so
14   you should ask about that as well.
15        MR. FINCH:  I will, but let's keep
16   going.
17        THE WITNESS:  So, page forty-two,
18   significant occupational exposure --
19   BY MR. FINCH:
20   Q    No, no.  5.7 (b)(3), page forty-two, Grace
21   exposure.
22   A.    Grace exposure; okay.
23   Q    Grace exposure says, "The Claimant must
24   demonstrate meaningful and credible exposure to
25   any asbestos-containing products marketed by

Page 54

1           ARTHUR L. FRANK, M.D., PH.D.
2    Grace." Or, in clause two, "Meaningful and
3    credible exposure which occurred prior to the
4    effective date." That means whenever this
5    bankruptcy claim gets confirmed "To asbestos,
6    asbestos-containing winchite asbestos or
7    unexpanded asbestos-containing vermiculite ore in
8    Lincoln County, Montana or asbestos,
9    asbestos-containing winchite or
10   asbestos-containing vermiculite ore from Lincoln
11   County during transfer to use prior to completion
12   of a finished product and expansion plan." And
13   there's no time limit on how long that exposure --
14           MR. HEBERLING: Objection;
15   compound.
16   BY MR. FINCH:
17   Q    -- has to be. Do you have any criticism of
18   that as an exposure criteria for mesothelioma?
19           MR. HEBERLING: Objection; vague as
20   to what "that" may mean and compound.
21           THE WITNESS: There is no specific
22   time frame, but I don't know what the term
23   "meaningful and credible exposure" is. So,
24   without a definition of that, see, for example
25   the section above has a number and I would

Page 55

1           ARTHUR L. FRANK, M.D., PH.D.
2    disagree with the number, for example.
3    BY MR. FINCH:
4    Q    The number of what?
5    A    Five years of "significant occupational
6    exposure means employment for a cumulative period
7    of at least five years". I think significant
8    occupational exposure can occur in a matter of
9    days.
10   Q    Do you understand the difference between the
11   presumptive criteria in the TDP and individual
12   review?
13   A    Those are not terms I tend to use. I
14   understand "presumptive criteria" are sort of a
15   baseline of what can be applied to lots of people.
16   An individual review by the term, I take it to
17   mean, applies to individuals.
18   Q    Do you understand that if someone doesn't
19   meet the presumptive criteria, they can have their
20   claim individually reviewed and they could still
21   qualify for a settlement even if they don't meet
22   the presumptive criteria? Do you understand
23   that's the way the TDP works?
24   A    That, I understand is the process, but my
25   understanding is that the individual review need

Page 56

1           ARTHUR L. FRANK, M.D., PH.D.
2    not be done by a physician, and that someone,
3    perhaps untrained in the science of asbestos might
4    be making these adjudications, which I think would
5    be inappropriate. And I think to have this
6    specificity of time doesn't reflect what disease
7    people can actually develop.
8    Q    The cynical occupational exposure
9    requirement doesn't apply to people who were
10   exposed in Lincoln County, Montana; do you
11   understand that?
12   A    If you tell me that that's what it is, I'll
13   take that to be a given, but I have no basis to
14   understand that, never having seen this before.
15   And going back to the next section 5.7 (b)(3), I
16   don't know what "meaningful and credible exposure"
17   is, and it may not have a time frame, but I don't
18   know what that is.
19   Q    If you assume that meaningful and credible
20   means any identifiable exposure to asbestos that
21   someone -- the evidence for which would be
22   something that you could rely on, would that be
23   sufficient exposure to cause mesothelioma?
24           MR. HEBERLING: Objection;
25   misstates the document.

Page 57

1           ARTHUR L. FRANK, M.D., PH.D.
2           THE WITNESS: I think simply living
3    in Libby is reliance enough; that means you were
4    exposed above background, and if you ended up
5    with disease, that should be sufficient.
6    BY MR. FINCH:
7    Q    On the next page, forty-three, where it
8    says, "That meaningful and credible exposure
9    evidence may be established by an affidavit or
10   sworn statement of the claimant or co-worker by
11   invoices, employment, construction or similar
12   records or by other credible evidence." That's
13   how it can be established. So, in your view if
14   someone has an affidavit that says I worked around
15   Grace Monokote for a day, that would be sufficient
16   to cause mesothelioma?
17   A    Yes.
18   Q    And, similarly, if someone were to submit an
19   affidavit that said I lived in Lincoln County,
20   Montana for a day, and while I was there, I know
21   it was -- you know, I lived there for at least a
22   day, that would be sufficient to cause
23   mesothelioma as long as there was some evidence
24   they breathed the air while they were there?
25   A    Well, unless they were using a scuba pack,

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - June 5, 2009
Arthur Frank M.D., Ph.D.

Page 58

1          ARTHUR L. FRANK, M.D., PH.D.
2    you know, for all the time that they were there or
3    a respirator, yes.  I mean, that's from a
4    scientific standpoint.  Obviously, issues other
5    than science come into effect when you're putting
6    together documents like this.  But if you're going
7    to use a scientific basis to do it, you ought to
8    use the most accurate science, and then other
9    decisions can be made that have nothing to do with
10   science, but at least science should be accurate.
11   **Q     For purposes of the definition of Grace**
12   **exposure, would you agree with me that there is no**
13   **minimum time period required in the definition in**
14   **section 5.7 (3)(b)?**
15         MR. HEBERLING:  Objection;
16   misstates the document.
17         THE WITNESS:  It does not speak to
18   a time period, but it talks about meaningful and
19   credible exposure, which I don't understand as
20   to what that is without a time frame.
21   BY MR. FINCH:
22   **Q     But it doesn't say you have to have six**
23   **months exposure, five years exposure to be Grace**
24   **exposure?**
25   A.    It does not.

Page 59

1          ARTHUR L. FRANK, M.D., PH.D.
2    **Q     It doesn't seem to say you have to have a**
3    **week of exposure, it just says "some exposure";**
4    **correct?**
5    A.    "Meaningful and credible".  It doesn't say
6    some exposure.
7    **Q     It says "meaningful and credible exposure".**
8    A.    Whatever that's taken to mean.
9    **Q     Okay.**
10   A.    And it's a very vague statement and it
11   obviously can be interpreted many different ways.
12   What might be meaningful and credible to one
13   person may not be to another for different
14   reasons, but on a scientific basis, meaningful
15   would be, you know, living one day in Libby.
16   **Q     And also working around Grace construction**
17   **products that had Libby vermiculite in them for**
18   **one day?**
19   A.    Correct.
20   **Q     For lung cancer, you would agree with me**
21   **that things, in addition to asbestos exposure,**
22   **cause lung cancer; correct?**
23   A.    There are many things that cause lung
24   cancer.
25   **Q     So, if you were trying to be more certain**

Page 60

1          **ARTHUR L. FRANK, M.D., PH.D.**
2    **rather than less certain that a lung cancer was**
3    **caused by asbestos exposure as opposed to smoking,**
4    **what sort of medical criteria would you look to?**
5    A.    If you have both exposures there's no way.
6    You can't say it was more likely due to one or the
7    other, both contributed.  That's the only
8    scientifically tenable position.  You can't say it
9    is more likely due to this or more likely due to
10   that, and if someone had yet a third carcinogenic
11   exposure for lung cancer, you would have to
12   include that as well.  But there's no way that you
13   could discount if someone develops a lung cancer
14   had exposure to vermiculite or Libby asbestos,
15   whatever term we're using, that it wouldn't have a
16   role.
17   **Q     So, I take it in your view six months of**
18   **Grace exposure in order to contribute to causing**
19   **lung cancer would be medically unreasonable?**
20   A.    It's capricious and arbitrary, not backed by
21   science.
22   **Q     Okay.**
23   A.    Selikoff has data from an asbestos factory
24   that less than a month doubled the risk of lung
25   cancer.  So, to say you have to have six months,

Page 61

1          ARTHUR L. FRANK, M.D., PH.D.
2    you know, is not grounded in science.
3    **Q     At least if you're evaluating it purely from**
4    **a scientific basis as opposed to what level of**
5    **proof you would need to prove a case in a**
6    **courtroom?**
7    A.    That's a different issue.  I mean, that's
8    what lawyers argue about.  I'm a physician and
9    scientist, and I'm being asked to look at it from
10   that perspective.  You know, if somebody
11   designated me Czar for the day to create a
12   document, you know, maybe I would do it
13   differently, but that's not the part of this
14   document that I'm here to talk about, you know, in
15   terms of the dollar value or whatever else.
16         I am here to talk about the
17   reasonableness of the scientific criteria, and
18   then I could make some comments as to, you know,
19   what the values are in terms of the relationship
20   to, you know, what it cost to take care of people
21   and is this a reasonable amount of money.
22         It's one of the same criticisms I had
23   of the Fair Act, that the upper limits, for
24   example, wouldn't in many cases pay for the cost
25   of treatment much less all the other issues that

Case 01-01139-AMC    Doc 22731-3    Filed 08/07/09    Page 18 of 93

US District Court - Delaware                          FINAL - June 5, 2009
Chapter 11 - W.R. Grace                              Arthur Frank M.D., Ph.D.

Page 62

1        ARTHUR L. FRANK, M.D., PH.D.
2   are normally thought of with regard to litigation
3   over an asbestos malignancy, let's say.
4   **Q    So, the criticisms you have the exposure**
5   **criteria are that -- what are your criticisms from**
6   **a scientific basis of the exposure criteria for**
7   **any disease other than mesothelioma?**
8        MR. HEBERLING: Objection;
9   compound.
10       THE WITNESS: Well, why don't we
11   take them one by one.
12   BY MR. FINCH:
13   **Q    Sure.**
14   A.   So, let's take lung Cancer 1. It is
15   unreasonable to consider point number one that you
16   need bilateral asbestos-related nonmalignant
17   disease. Again, if you look at the scientific
18   literature, not that there aren't some people that
19   say that you require evidence of disease of a
20   different nature, but the vast consensus would
21   clearly state that it is not necessary to have
22   evidence of a nonmalignant asbestos-related
23   disease to relate a lung cancer to asbestos. So,
24   that is unreasonable.
25       The six months criteria is

Page 63

1        ARTHUR L. FRANK, M.D., PH.D.
2   unreasonable. The significant occupational
3   exposure, as defined here, you know, seems
4   unreasonable. And it says "supporting medical
5   documentation establishing asbestos exposure as
6   contributing factor", I don't know what that
7   means. It's not medical documentation. It's
8   documentation that you had exposure, which can
9   come from other than -- I mean, it could come from
10   a medical setting in where a doctor says, did you
11   have such and such exposures, but this being a
12   legal proceeding, somebody could write an
13   affidavit and that would be documentation of
14   exposure if it was, in fact, accurate.
15   **Q    Well, one medical documentation could be a**
16   **letter from the doctor saying in my opinion the**
17   **asbestos exposure was a contributing factor in**
18   **causing lung cancer. So, that's --**
19   A.   It says "establishing asbestos exposure as
20   contributing factor". I mean, if you want to say
21   that you need such a document, yes, but, again,
22   you know, one could take another view of this.
23   There are other settings in which there's certain
24   presumptions. Fire fighters who get heart attacks
25   in New York City are presumed to have gotten

Page 64

1        ARTHUR L. FRANK, M.D., PH.D.
2   related to work. I mean, it's just a presumption.
3        Here in Philadelphia I've dealt with
4   a case of a prison guard with hepatitis C, it was
5   presumed that he got it at work. That was written
6   into the criteria. So, you could say that you
7   don't need a medical opinion, you know, relating
8   the two.
9        You can simply say in a similar vein.
10   If you were documentably exposed to Libby asbestos
11   and developed lung cancer, it's a presumption that
12   it had a role in the development of that lung
13   cancer and it wouldn't need medical documentation.
14   You would need the documentation of the exposure
15   and documentation that that was the disease, but
16   you wouldn't need somebody to make that linkage.
17   **Q    But that would be true, not just for people**
18   **who were exposed to Libby asbestos, that would**
19   **also include, to the extent there were any Grace**
20   **claimants who were exposed to the portion of Grace**
21   **asbestos-containing products that didn't have the**
22   **Libby asbestos in it, that would apply to them as**
23   **well; correct?**
24   A.   You could make it apply to them as well,
25   yes.

Page 65

1        ARTHUR L. FRANK, M.D., PH.D.
2   **Q    So, your view as a medical doctor is anybody**
3   **who had exposure to Grace asbestos-containing**
4   **products, regardless of whether they have Libby**
5   **amphiboles in it or not and developed lung cancer,**
6   **you would presume that the asbestos exposure was a**
7   **contributing factor to the lung cancer?**
8   A.   Yes.
9   **Q    What about --**
10   A.   The other problem I have with the statement,
11   and it's similar in other statements, "this is a
12   primary lung cancer". It doesn't define the cell
13   types. Not every primary lung cancer would be
14   asbestos related. There are three cell types that
15   I recognize as being related. There are other
16   primary lung cancers that I would not think are
17   asbestos related.
18       At least in Lung Cancer 2 the
19   statement is "in causing the lung cancer in
20   question", which at least you can read into that
21   that it would have to be of an appropriate cell
22   type. And in Lung Cancer 1, that's not there.
23   **Q    Well, a lung cancer is whether there is a**
24   **contributing factor in causing the cancer in**
25   **question?**

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - June 5, 2009
Arthur Frank M.D., Ph.D.

Page 66

ARTHUR L. FRANK, M.D., PH.D.
1
2    A.    The lung cancer in question; okay.  So,
3    again, you could write that into the criteria,
4    that it was a squamous carcinoma, adenocarcinoma
5    or small carcinoma, the presumption is that there
6    was a relationship.  If it's any other cell type,
7    such as a carcinoid or a sarcoma or lymphoma of
8    the lung, those would not be related.  So, you can
9    eliminate a lot of the need for review and make
10   this a lot simpler or straight forward if you
11   wrote more of those criteria into this and, in
12   fact, made certain presumptions.  And then
13   obviously the question is, you know, where do you
14   want to set the bar?  And from a scientific
15   standpoint, there's no question that if you're
16   exposed to asbestos and get lung cancer, the two
17   are related.  If you want to put other barriers in
18   there, that means you're keeping people out.  It's
19   the same issue that I found unfair in the Fair
20   Act.  There's a certain unfairness to these kinds
21   of criteria.
22   **Q    But the unfairness with respect to these**
23   **types of criteria, in your view, aren't just**
24   **specific to people who live in Libby, Montana,**
25   **they would apply to all people who were suing**

Page 67

ARTHUR L. FRANK, M.D., PH.D.
1
2    **Grace?**
3    A.    Agreed.
4    **Q    So, there's nothing unequal about the**
5    **treatment of the Libby claimants with respect to**
6    **the exposure criteria for lung cancer as compared**
7    **to other Grace claimants?**
8    A.    The science is the same.  There may well be
9    some difference between Libby claimants and other
10   claimants that go beyond the science.  But in
11   terms of the science, it is the same.  It doesn't
12   matter where you get exposed or to what the nature
13   of the asbestos exposure was.
14   **Q    So, to the extent that the exposure criteria**
15   **in the TDP are, and this is for mesothelioma and**
16   **lung cancer, to the extent that the exposure**
17   **criteria in the TDP for mesothelioma and lung**
18   **cancer are unfair or unreasonable in your view**
19   **from a medical science perspective, any**
20   **deficiencies would be the same for Grace claimants**
21   **outside of Libby as for people in Libby?**
22   A.    To that extent, yes.
23   **Q    Why don't we take a little break.  We've**
24   **been going for about an hour and twenty minutes.**
25   **I would like to take a five minute break.**

Page 68

ARTHUR L. FRANK, M.D., PH.D.
1
2    A.    Okay.
3                    - - -
4         (Whereupon a short break was taken
5    at this time.)
6                    - - -
7    BY MR. FINCH:
8    **Q    We were looking at the exposure criteria for**
9    **lung cancer.  Let's go to the Asbestos Pleural**
10   **Disease Level II.**
11   A.    Okay.
12   **Q    The Asbestos Pleural Disease Level II, would**
13   **you agree with me that that has an exposure**
14   **criteria and a medical criteria?**
15   A.    It has a medical criteria in item one.  It
16   has two exposure criteria.  I'm not sure I
17   particularly understand them.  It's a six month
18   Grace exposure and for claimants whose Grace
19   exposure is not described in clause two of the
20   definition of Grace exposure, which I'm not sure
21   what that refers to, five years a cumulative
22   occupational exposure asbestos, which I think is
23   totally inappropriate.
24   **Q    But to the extent it is totally**
25   **inappropriate, it would be equally inappropriate**

Page 69

ARTHUR L. FRANK, M.D., PH.D.
1
2    **to construction workers who were exposed to**
3    **Monokote as it would be to people who live in**
4    **Libby?**
5    A.    Correct.
6    **Q    Now, for diagnosis of a bilateral**
7    **asbestos-related nonmalignant disease, the**
8    **definition of that is found in footnote four on**
9    **page twenty-four.  Do you understand that?**
10   A.    I do.
11   **Q    I didn't see in either your reports or**
12   **Dr. Whitehouse's reports any criticism of the**
13   **requirements for diagnosing bilateral**
14   **asbestos-related nonmalignant disease for the**
15   **asbestosis pleural disease category; is that**
16   **correct?**
17            MR. HEBERLING:  Objection;
18   misstates the reports.  There's an objection to
19   use of "bilateral".
20            THE WITNESS:  I don't recall all
21   the details of what's in the report.
22   BY MR. FINCH:
23   **Q    What if any criticism do you have of the**
24   **medical criteria for bilateral asbestos**
25   **nonmalignant disease as that criteria is applied**

US District Court - Delaware

FINAL - June 5, 2009

Chapter 11 - W.R. Grace

Arthur Frank M.D., Ph.D.

Page 70

ARTHUR L. FRANK, M.D., PH.D.

1  ARTHUR L. FRANK, M.D., PH.D.
2  to the Asbestos Pleural Disease Level II?
3  A.   The reason for that is, I think, comes from
4  two directions.  One is that I believe the data
5  would show that about seven percent of people with
6  asbestos-related nonmalignant disease have it
7  unilaterally, so it cuts out those individuals.
8        I would be happier with something
9  along the lines that if it was bilateral, then,
10  again, it was presumptive because, for example, if
11  you look at the ATS criteria, bilateral pleural
12  changes is almost always related to asbestos.  And
13  then if you had only unilateral disease, then you
14  would require careful documentation of no prior
15  disease or trauma that could explain it leaving as
16  the only reasonable explanation the asbestos
17  exposure.  For example, if someone had had a
18  unilateral pleural thickening but had a severe
19  trauma in an automobile accident or a knife wound
20  or a gunshot wound, those, then, would perhaps not
21  qualify.  But even unilateral disease with the
22  exclusion of other causes, there is reason to say
23  they shouldn't qualify.
24  Q    So, your only criticisms of the medical
25  criteria for Asbestosis Pleural Disease Level II

Page 71

1  ARTHUR L. FRANK, M.D., PH.D.
2  in the definition of bilateral asbestos-related
3  nonmalignant disease is that it requires the
4  disease to be bilateral; is that correct?
5  A.   That's the only medical criteria that's
6  there.
7  Q    Well, you don't have any criticism with the
8  methods for establishing bilateral
9  asbestos-related nonmalignant disease --
10  A.   Well, I didn't finish reading all of that
11  that.
12        MR. BERNICK:  Give him some time.
13        THE WITNESS:  I got halfway through
14  it.  But, no, I would say that those are
15  reasonable.
16  BY MR. FINCH:
17  Q    So, the criteria for bilateral
18  asbestos-related nonmalignant disease, other than
19  the requirement that it be bilateral, the
20  radiographic or pathology criteria or CT criteria
21  set forth in footnote four you believe is
22  reasonable?
23  A.   Well, there are CT criteria.
24  Q    Well, the fact that you can qualify by CT.
25  A.   All right, but there's no criteria.

Page 72

1  ARTHUR L. FRANK, M.D., PH.D.
2  Q    I understand that.
3  A.   It just says CT read by qualified physician.
4  Yes, that would be appropriate.  One zero or
5  higher I agree with.  Evidence of bilateral
6  plaques, thickening, calcification, et cetera.
7  Again, I don't agree with the bilaterality, but if
8  you're going to use that that would be not be
9  inappropriate.  And then the pathology, I'm
10  familiar with the pathologic grading system,
11  though, again, I'm not a pathologist and don't use
12  it and don't know all the fine points of it, but
13  that is another way to establish that.
14  Q    And for people who have asbestos-related
15  nonmalignant disease, which is pleural disease,
16  the medical literature suggests that ninety-three
17  percent of them would be bilateral and seven
18  percent would be unilateral?
19  A.   Yes.
20  Q    So, to the extent that this criteria were
21  designed to identify the vast majority of people
22  with asbestos-related nonmalignant disease, it
23  would be appropriate; is that correct?
24  A.   To the extent it meets that comment you
25  made, yes.  But it does exclude people, which is,

Page 73

1  ARTHUR L. FRANK, M.D., PH.D.
2  I think, inappropriate.  But there needs to be a
3  higher level of proof for documentation if it's
4  unilateral, but that should be considered.  It
5  shouldn't be it only must be bilateral, otherwise,
6  you're out of luck.
7  Q    Well, you understand that if someone doesn't
8  meet these presumptive criteria, they're not out
9  of luck, they can go and demonstrate, for example,
10  someone with unilateral asbestos-related disease
11  could go to individual review and demonstrates
12  exactly what you described as proving that they
13  have been an asbestos-related disease?
14  A.   But, again, my understanding is the
15  individual review need not be done by physician
16  knowledgeable about disease and the claims
17  examiner who doesn't know that seven percent of
18  nonmalignant changes can be unilateral has no
19  scientific basis to know how to evaluate that.
20  Q    You don't know what resources the trust will
21  have if a claims handler had a question about that
22  to ask a doctor; do you?
23  A.   I do not know.
24  Q    And so you can't say how the trust is going
25  to apply these criteria would be reasonable or

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - June 5, 2009
Arthur Frank M.D., Ph.D.

Page 74

1            ARTHUR L. FRANK, M.D., PH.D.
2    unreasonable as you're sitting here in the context
3    of --
4    A.    How it's applied is not a question of it's
5    reasonable or unreasonable.  That's a different
6    question.  The question is are the criteria
7    reasonable or unreasonable, and in some ways as
8    I'm telling you they are unreasonable.  But how
9    they are applied is a whole different question,
10   and that may or not be unreasonable, but I don't
11   know the procedures by which that will be done.
12   Q    For Asbestos Pleural Disease Level III --
13   first of all, you are familiar with the 2004 ATS
14   statement on the diagnosis of asbestos-related
15   nonmalignant disease?
16   A.    I am.
17           MR. FINCH:  Can we mark this next
18   exhibit?
19                   - - -
20           (Exhibit Frank-12 was marked for
21   identification and is attached hereto.)
22                   - - -
23   BY MR. FINCH:
24   Q    Do you have the 2004 ATS Statement on the
25   Diagnosis and Initial Management of Nonmalignant

Page 75

1            ARTHUR L. FRANK, M.D., PH.D.
2    Diseases Related to Asbestos?
3    A.    Yes.
4    Q    And they call them diseases; correct?  They
5    divide them into different diseases?
6    A.    Yes.
7    Q    Would you agree with me that this statement
8    sets forth recommended criteria for determining
9    whether someone has a nonmalignant disease related
10   to asbestos?
11   A.    Yes.
12   Q    Would you also agree with me that the 2004
13   ATS statement doesn't give you any criteria for
14   dividing nonmalignant diseases according to
15   severity of lung function impairment?
16   A.    Correct.  Either you have the disease or you
17   don't have the disease.
18   Q    Right.  And if you have the disease, lung
19   function impairment is not required to have an
20   asbestos-related nonmalignant disease; correct?
21   A.    That's never been the case.  I
22   mean, as physicians we can also make the diagnosis
23   even with perfectly normal pulmonary functions.
24   Q    And if one of the goals of the TDP is to
25   ensure that more money goes to people who have

Page 76

1            ARTHUR L. FRANK, M.D., PH.D.
2    greater degrees of lung function impairment, the
3    2004 ATS document doesn't tell you anything about
4    how to grade people based on how severe their lung
5    function declined as a result of asbestos-related
6    disease?
7    A.    Correct.
8    Q    So, looking at the criteria for asbestos
9    pleural disease on page twenty-six of the TDP.
10   A.    Level III.
11   Q    Level III.  Would you agree with me there is
12   a diagnosis requirement which includes either a
13   radiographic or pathology or x-ray evidence?
14   A.    That's redundant; radiographic and x-ray is
15   the same thing.
16   Q    Excuse me.  Radiographic, CT and x-ray
17   evidence?
18   A.    Yes.  I mean it's the same --
19   Q    It's the same as for category two?
20   A.    Presumably, yes.  The diagnosis based upon
21   footnote four.
22   Q    So, would it be correct that your only
23   criticisms of the diagnosis of bilateral
24   asbestos-related nonmalignant disease for Level
25   III would be the same as the criticisms you have

Page 77

1            ARTHUR L. FRANK, M.D., PH.D.
2    for Level II?
3    A.    Yes.
4    Q    And then it has an exposure criteria?
5    A.    Correct.
6    Q    And your criticism of the exposure criteria
7    is, I take it, that in your view the duration of
8    exposure is too long --
9    A.    I haven't made that statement, nor did I
10   make it with regard to the other statement.  We
11   didn't discuss the time frame with regard to this.
12   I will grant you -- let me be clear about that.
13   We didn't discuss time with regard to asbestosis
14   or pleural disease.  I will recognize that there
15   is a threshold so that some time might be
16   appropriate -- maybe we did discuss it.
17   Q    No, you're absolutely correct.  Let me stop.
18   We discussed the time requirement with respect to
19   the exposure criteria for mesothelioma and lung
20   cancer; correct?
21   A.    Correct.
22   Q    And it's your opinion that six months
23   exposure is not necessary to attribute -- six
24   months asbestos exposure is not necessary to
25   contribute a lung cancer, at least in part, to

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - June 5, 2009
Arthur Frank M.D., Ph.D.

Page 78

ARTHUR L. FRANK, M.D., PH.D.

1
2  asbestos exposure?
3  A.   I would say a minimum of six months, which
4  is what it says.
5  Q   Right.  A minimum of six months is too
6  restrictive or it's too difficult to meet;
7  correct?
8  A.   Correct.
9  Q   And that's true for Libby claimants as well
10  as people outside of Libby?
11  A.   Anything we're going to talk about with
12  regard to criteria probably are not going to be
13  different for who it is.  I mean, if you're
14  talking about the science, it's the same science.
15  Q   So, now we are looking at nonmalignant
16  disease criteria, so I didn't ask you whether or
17  not you have an opinion about whether the duration
18  of exposure criteria for the nonmalignant disease
19  is appropriate or not?
20  A.   You did not.
21  Q   What is your opinion about whether the
22  duration of exposure criteria for the nonmalignant
23  disease is medically reasonable or not for
24  purposes of the Asbestos Pleural Disease Level II?
25  A.   I think the requirement that there be five

Page 79

ARTHUR L. FRANK, M.D., PH.D.

1
2  years of occupational exposure is unreasonable.  I
3  do not think it is unreasonable to say that there
4  is some threshold and that some judgement should
5  be made about adequacy of exposure.  The problem
6  with the threshold issue is there is no number I
7  can give you, and if you look at the literature
8  the numbers vary by orders of magnitude as to what
9  that number is.  But it is not unreasonable to
10  have some minimal time of exposure to develop --
11  Q   An asbestos-related nonmalignant disease?
12  A.   -- nonmalignant disease.  Now, the five year
13  requirement for occupational exposure is
14  unreasonable.
15  Q   Okay.
16  A.   And if you go to the scientific literature,
17  Selikoff, for example, has papers on short-term
18  exposure and the subsequent development of
19  disease, and even six months of exposure in an
20  occupational setting can give you disease.
21      If we had some good number that we
22  can go by we could use that, but there is no such
23  good number.  So, again, some judgement is
24  appropriate, but I would disagree with the five
25  years of occupational exposure.

Page 80

ARTHUR L. FRANK, M.D., PH.D.

1
2  Q   If the five years of occupational exposure
3  doesn't apply to the Libby claimants, would you
4  agree with me that six months of exposure to the
5  Libby asbestos is a reasonable judgement as to a
6  threshold amount, if you will, since you could
7  attribute a nonmalignant disease to exposure to
8  asbestos?
9  A.   It is a number for which there would be no
10  scientific basis.  It is probably not
11  unreasonable.
12  Q   So, to the extent Dr. Welsh and others hold
13  the view that for the nonmalignant disease
14  categories, and that would be category Level IV,
15  severe asbestosis or severe pleural disease, or
16  asbestosis pleural disease Level III and then the
17  asbestos pleural disease Level II, a six month
18  exposure to asbestos requirement for those
19  diseases is at least not unreasonable?
20  A.   I would put it to this way, the idea of some
21  threshold is not unreasonable.  So, for example,
22  someone who spends a day in Libby and has
23  subsequently been shown to develop nonmalignant
24  disease, I would say that that would not be a
25  reasonable relationship unless there were other

Page 81

ARTHUR L. FRANK, M.D., PH.D.

1
2  exposures to asbestos and in other settings and
3  then you would have on say that one day is
4  contributed to whatever.  What might be different,
5  and, again, there is no science that will support
6  this in a scientifically supportable way, is that
7  we don't really know given the Libby asbestos
8  material, which is, in fact, a one fiber, one
9  component of which is well-known, which is
10  tremolite, but the other fibers the whip winchite
11  and richterite, there is no scientific knowledge
12  about those and that what I would say, and this is
13  -- you know, again, there's different ways to
14  handle this.  One might say if someone had even
15  four months exposure, let's say they lived in
16  Libby for four months, subsequently were shown to
17  have pleural disease, then I would have a higher
18  order review to document if they did or did not
19  have in any documentable exposure to asbestos in
20  any other setting; did they work with asbestos,
21  did they live near a shipyard, did they live near
22  another asbestos producing facility, et cetera, et
23  cetera.  And that if one could document that the
24  only known exposure was being in Libby, because we
25  don't have good science, it might be four months

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - June 5, 2009
Arthur Frank M.D., Ph.D.

Page 82

1          ARTHUR L. FRANK, M.D., PH.D.
2    might be enough anyway, but you could reasonably
3    set some minimal number to go by, and six months,
4    for example, would not be unreasonable, and that's
5    just a judgement, there's no science that says
6    that, but that's not an unreasonable judgement,
7    but allowing for the fact that there may be
8    individual cases, those might go to individual
9    review that if somebody had nonmalignant disease
10   with no other exposure except something less than
11   six months in Libby, could it be attributed to
12   Libby.
13   Q    So, if you assume that the vast majority of
14   people in the Libby claimant population, and I
15   don't mean people who have sued or otherwise would
16   sue W.R. Grace and they live in or around Libby,
17   Montana, have at least six months exposure to
18   asbestos, if the six month exposure criteria is
19   reasonable as to them?
20   A    I would think that reasonable.
21   Q    And as to other Grace claimants with a six
22   month exposure criteria to attribute a
23   nonmalignant asbestos disease to Grace would be a
24   reasonable thing?
25   A    If it's reasonable for one, it should be

Page 83

1          ARTHUR L. FRANK, M.D., PH.D.
2    reasonable for somebody else, too.
3    Q    So, that would cover the exposure criteria
4    for all the nonmalignant diseases; because would
5    you agree with me that the exposure criteria for
6    all the nonmalignant diseases is the same?
7    A    Well, they all talk about six months Grace
8    exposure.  They don't all talk about the five
9    years of occupational exposure.
10   Q    Well, they all have the six month Grace
11   exposure?
12   A    Right.
13   Q    And --
14   A    But they don't all have the five year.
15   Q    Right.  Category two and one don't have the
16   five years; correct?
17   A    No.  Category four and three don't have the
18   five years.  Only category two has the five years.
19   Q    For the Asbestosis Pleural Disease Level
20   III, there's also a lung function criteria;
21   correct?
22   A    Correct.
23   Q    What, if any, criticism do you have of the
24   lung function criteria for the Asbestosis Pleural
25   Disease Level III?

Page 84

1          ARTHUR L. FRANK, M.D., PH.D.
2    A    I think the total lung capacity less than
3    eighty percent is reasonable, an FVC less than
4    eighty and the requirement that the ratio being
5    greater than or equal to sixty-five is probably
6    not supportable.  There's no scientific basis to
7    say that that's a requirement that one should
8    have.
9    Q    What is DLCO, D-L-C-O?
10   A    Diffusion capacity.
11   Q    How, if at all, does being a smoker or
12   former smoker impact DLCO?
13   A    It depends.  It may impact it not at all.
14   It may impact it if you have severe emphysema.
15   That would be the only thing that I could relate.
16   The DLCO isn't even listed here.  You know, that's
17   one of the things -- you know, it's funny, the
18   tests that are being used are all ones that are,
19   to a certain extent, and people have argued, they
20   are manipulable by the individual.  You could work
21   harder or not harder.  You could have -- you can
22   make the numbers change.  Something like the DLCO,
23   you have no ability to change that, and yet that's
24   not one of the criteria.
25   Q    One of your criticisms in your report

Page 85

1          ARTHUR L. FRANK, M.D., PH.D.
2    relates to the fact that DLCO, by itself, is not
3    something that could be used to qualify for the
4    TDP criteria, the requirement impairment?
5    A    Can you show that to me?  Or what page are
6    you talking about where that is what it says?
7    Q    Actually, I'll withdraw the question.
8    Frank-4 is your rebuttal to Dr. Welch's report?
9    A    Yes.
10   Q    Do you see that?
11   A    I do.
12   Q    On page two of this you write that you're
13   citing to the Whitehouse 2004 paper.  In his
14   paper, Whitehouse describes that in his opinion
15   the majority of the 1,500 people who have
16   radiologic changes of asbestos exposure are at an
17   increased risk for a progressive loss of lung
18   function from pleural changes alone or from
19   potential future development of interstitial
20   fibrosis.  Do agree with that?
21   A    Yes, I do.
22   Q    Can you quantify that increased risk?
23   A    No.  You know, in the future we can go back
24   and look and see what the rate was, but there's no
25   way to predict what that will be, and it's going

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - June 5, 2009
Arthur Frank M.D., Ph.D.

Page 86

ARTHUR L. FRANK, M.D., PH.D.
1
2  to vary from individual to individual.
3      Q    Do you hold the view that if someone has
4  nonmalignant -- remember how we talked about the
5  1,800 CARD Clinic patient cohort?
6  A.  Yes, sir.
7      Q    Of those 1,800 people, do you have any
8  opinion about how many of them will suffer a
9  decline in lung function?
10  A.  Well, they will all suffer decline in lung
11  function, a decline greater than what occurs with
12  aging, and I can't tell you what the percentage
13  would be that will have abnormal declination of
14  their lung function.  Again, the future will tell
15  us what that number is, but why I certainly can
16  agree with the statement, it simply says that
17  these people are at an increased risk of
18  progressive loss of lung function, not that any
19  one individual will suffer it.
20      Q    So, you wouldn't be able to say, for
21  example, a person who has been diagnosed with
22  pleural disease in Libby would have a seventy
23  percent likelihood of progressing to severe
24  disabling pleural disease that affects their
25  ability to breathe beyond the normal decline you

Page 87

1          ARTHUR L. FRANK, M.D., PH.D.
2  would expect.
3  A.  No.  And nobody has ever said that.  Nobody
4  has made that statement.  They're just saying that
5  those people are at an increased risk of
6  declination, but not who it will be or what the
7  percentage of them will be.  But they are all at
8  an increased risk.  We won't know until the end of
9  their lives which ones did or which ones didn't.
10      Q    Dr. Whitehouse has also done something
11  called a CARD mortality study?
12  A.  Yes.
13      Q    Of the 1,800 people in the Libby patient
14  cohort, do you have opinions about what percentage
15  of them will die as a result of an
16  asbestos-related disease?
17  A.  Again, we wouldn't know.  To date those
18  people that have died represent somewhere, what is
19  it, around sixty percent or so people with
20  nonmalignant disease have died of an
21  asbestos-related disease.
22      Q    But you wouldn't be able to say that based
23  on that that sixty percent of the 1,800 people who
24  have been shown to have pleural changes on x-ray
25  are going to die of an asbestos-related disease?

Page 88

1          ARTHUR L. FRANK, M.D., PH.D.
2  A.  No.  What I said was up-to-date of those who
3  have had disease and have died, sixty percent have
4  been related to asbestos.  So, you can say that it
5  is likely that many of these people may die, but
6  I can't tell you what the exact percentage is.
7  Again, the people who are still alive are the
8  survivors and they may die of something else.  So,
9  the longer it goes, it may be that they are less
10  likely to die of an asbestos disease or the longer
11  it goes it may be that they will live long enough
12  to get the cancers and die of those.
13      Q    So, you wouldn't say that it is more likely
14  than not that every person who has pleural disease
15  as a result of exposure to asbestos in Libby,
16  Montana is going to die from asbestos-related
17  pleural disease?
18  A.  I would not be able to say that.
19      Q    And you would not be able to say it is more
20  likely than not that anyone who has been diagnosed
21  with pleural disease in Libby, Montana is going to
22  suffer a severe lung decline?
23          MR. HEBERLING:  Objection.  Unclear
24  as to whether we're talking about individuals or
25  a group.

Page 89

1          ARTHUR L. FRANK, M.D., PH.D.
2          THE WITNESS:  Well --
3          MR. BERNICK:  I object to the form
4  of the question, too.
5          MR. FINCH:  Let me rephrase the
6  question.
7          MR. BERNICK:  There may be other
8  grounds as well.
9          MR. FINCH:  I'll withdraw the
10  question.
11          THE WITNESS:  I think I know what
12  you're trying to get at, but --
13          MR. BERNICK:  There's not a
14  question.
15          THE WITNESS:  But there's no
16  question pending, so I won't answer it.
17          MR. FINCH:  The question is
18  withdrawn.
19  BY MR. FINCH:
20      Q    I take it, then, that you would not express
21  an opinion if someone presents with pleural
22  disease as a result of exposure in Libby, Montana,
23  and has normal lung function test scores right
24  now, you wouldn't give an opinion that it's more
25  likely than not that person is going to die

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - June 5, 2009
Arthur Frank M.D., Ph.D.

---

Page 90

ARTHUR L. FRANK, M.D., PH.D.

1
2   from asbestos-related pleural disease?
3   A.   Correct.
4   Q    The 2000 ILO Classification document, are
5   you familiar with that?
6   A.   To a certain extent.  I've not particularly
7   studied it in great detail.
8   Q    Are you aware that that document requires
9   the blunting of the costophrenic angle before you
10  would call pleural changes on x-ray diffuse
11  pleural thickening?
12  A.   That is what that document says.  Other
13  people have not taken that to be a requirement,
14  but that's what document says.
15  Q    Can you turn to the 2004 ATS statement?
16  A.   I have it.  What page?
17  Q    707.  In your view, in order to classify
18  pleural disease as diffuse pleural thickening,
19  does the ATS statement require blunting of the
20  costophrenic angle?
21  A.   It's not very well written, but one could
22  interpret that it does say that.
23       MR. BERNICK:  I'm sorry; could I
24  have that last question read back?
25            - - -

---

Page 91

1            ARTHUR L. FRANK, M.D., PH.D.
2            (Whereupon the preceding question
3   was read back.)
4            - - -
5       MR. FINCH:  Why don't we take a
6   break.
7            - - -
8            (Whereupon a short break was taken
9   at this time.)
10           - - -
11           (Exhibit Frank-13 was marked for
12  identification and is attached hereto.)
13           - - -
14  BY MR. FINCH:
15  Q    Dr. Frank, Exhibit Thirteen, is that the
16  article that you co-authored with Laura Welch and
17  a bunch of other people?
18  A.   Co-authored in a sense, to be honest, Laura
19  wrote it, sent it around, we all made whatever
20  comments we wanted to make and then fifty-one of
21  us, I believe, signed on.
22  Q    So, you have reviewed it and you agreed with
23  the opinions and the statements as expressed in
24  the final document?
25  A.   Correct.  To the extent that I agreed to put

---

Page 92

1            ARTHUR L. FRANK, M.D., PH.D.
2   my name to it, yes.
3            - - -
4            (Exhibit Frank-14 was marked for
5   identification and is attached hereto.)
6            - - -
7   BY MR. FINCH:
8   Q    Frank Exhibit Fourteen, what is that
9   document?
10  A.   It's an article from Environmental Health
11  Perspectives, April 2007, the Sullivan paper
12  called "Vermiculate; Respiratory Disease and
13  Exposure in Libby, Montana, Update of a Cohort
14  Mortality Study."
15  Q    Are you familiar with this paper?
16  A.   I believe I am.  It's been a while since
17  I've seen it, but I have seen it in the past.
18  Q    What is the difference between a cohort
19  mortality study and a case control study?
20  A.   A cohort mortality study is a defined group
21  that you follow down time.  A case control study
22  is a collection of cases, not necessarily
23  requiring a control.
24  Q    And what is a series of case reports?
25  A.   It's a series of case reports.  You can make

---

Page 93

1            ARTHUR L. FRANK, M.D., PH.D.
2   decisions based on a series of case reports.  You
3   don't always need epidemiological data, but it's a
4   different kettle of fish.
5   Q    Would you agree with me that Dr.
6   Whitehouse's 123 patient progression study that he
7   describes in his 2004 paper is not a cohort study?
8   A.   Is not a cohort study.
9   Q    And it is not a case control study?
10  A.   He doesn't have controls.  I mean, he has
11  controls for the pulmonary function value, but he
12  didn't go out and a control for every patient.
13  Q    And how would you describe that paper?
14  A.   A descriptive epidemiological study.
15  Q    And what is a descriptive epidemiological
16  study?
17  A.   It's a study that looks at a group of
18  individuals and describes what occurs in that
19  group.
20  Q    Does that descriptive epidemiological study
21  allow you to make comparisons as between that
22  group and other cohorts?
23  A.   Well, first of all, it's not a cohort.
24  Q    Other groups of people?
25  A.   It may or may not.  It depends on what is

---

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - June 5, 2009
Arthur Frank M.D., Ph.D.

Page 94

ARTHUR L. FRANK, M.D., PH.D.
1
2    being studied and what the other comparisons are.
3    **Q    You weren't involved in Dr. Whitehouse's**
4    **2004 paper?**
5    A.    I was not.
6    **Q    Were you involved in any way in his 2008**
7    **paper on mesothelioma?**
8    A.    I mean, I had nothing to with writing it or
9    anything like that.  I can't remember if I was a
10    reviewer for the journal or not.  I review so many
11    articles, I can't remember if I did or did not
12    review that, or if I just saw it when it came out.
13    **Q    What's a longitudinal study?**
14    A.    A longitudinal study is a study following
15    individuals over time or -- that's really a cohort
16    study.  A longitudinal study is looking over time
17    at a population experience with disease.  So, you
18    might, for example, take a factory and look at all
19    the workers in 1950 and then look at the workers
20    again in 1955 and, again, in 1960.  That would be
21    a longitudinal study.  It's not that you would
22    necessarily have the same workers there at each
23    point in time.
24    **Q    For the 1,800 CARD Clinic patients, living**
25    **patients, would you agree with me that nowhere in**

Page 95

1    ARTHUR L. FRANK, M.D., PH.D.
2    **any of Dr. Whitehouse's reports does he report**
3    **what percentage of those people currently are**
4    **suffering from any kind of lung function**
5    **impairment?**
6    A.    I don't recall that there is a published
7    document as to what percentage of those 1,800 have
8    pulmonary function impairment.
9    **Q    Have you done any kind of analysis to**
10    **compare the exposure histories and the amount of**
11    **asbestos exposure which 123 patients in the 2004**
12    **paper experienced as compared to the 800 people in**
13    **the Libby patient cohort?**
14    A.    Nobody has done that.  It's all descriptive.
15    It's not quantitative in terms of their exposure.
16    And the best you can do is quantify them by
17    various groupings.  Employees of Grace, family
18    members of Grace, community exposure, but, again,
19    there's no documentation or measurements that
20    would apply to any one of those individuals as to
21    exactly how much exposure they had.
22    **Q    Would you agree with me that in general the**
23    **people who worked at the Grace mine had, on**
24    **average, significantly higher exposure to asbestos**
25    **than the community exposures?**

Page 96

1    **ARTHUR L. FRANK, M.D., PH.D.**
2    A.    On average, of course.
3    **Q    And, in general, would you agree that the**
4    **greater the asbestos exposure you have, the more**
5    **likely it is you are to suffer an asbestos-related**
6    **nonmalignant disease?**
7    A.    Yes.
8    **Q    Would you agree with me that the more**
9    **exposure you have, the more likely you are to**
10    **suffer a lung function decline as a result of**
11    **nonmalignant asbestos disease?**
12    A.    That is probably true, yes.  That's not
13    really been studied directly.  There's no
14    literature that I'm aware of saying that depending
15    on how much exposure you have, usually it's
16    related to some surrogate of that, such as
17    advanced abnormalities on x-ray which tend to
18    occur with greater exposure rather than a question
19    of lung function versus exposure.
20    **Q    Diffuse pleural thickening, would you agree**
21    **with me that diffuse pleural thickening is an**
22    **asbestos-related disease that occurs outside of**
23    **Libby, Montana?**
24    A.    Certainly.
25    **Q    And in cohorts of people with pleural**

Page 97

1    **ARTHUR L. FRANK, M.D., PH.D.**
2    **disease, approximately nine to twenty percent**
3    **typically have diffuse pleural thickening as**
4    **compared to pleural diseases not pleural**
5    **thickening?**
6    A.    I have not studied that, so I can't tell you
7    that I know that that number is correct.
8    Obviously you get a larger number with discrete
9    disease compared to diffuse disease.  But I don't
10    know what the exact number would be.
11    **Q    Are you familiar with Ruth Lillis 1991 --**
12    A.    Right, it's eighty/twenty percent; eighty
13    and twenty in there.
14    **Q    And that paper also demonstrates, does it**
15    **not, that of the people -- that the diffuse**
16    **pleural thickening, the people tend to suffer much**
17    **more significant lung function declines than the**
18    **people that don't have diffuse pleural thickening?**
19    A.    Yes, as a general proposition.  But it also
20    points out that you can't go by the amount of
21    disease to correlate with how much abnormal
22    pulmonary function she had.  She had no
23    significant difference of the group, for example,
24    of diffuse pleural disease.  There was no
25    significant difference between those that had a

Case 01-01139-AMC    Doc 22731-3    Filed 08/07/09    Page 27 of 93

US District Court - Delaware                          FINAL - June 5, 2009
Chapter 11 - W.R. Grace                              Arthur Frank M.D., Ph.D.

Page 98

1    ARTHUR L. FRANK, M.D., PH.D.
2 lesser amount compared to those that had a greater
3 amount.
4    Q    But there was a big difference between
5 people who had diffuse pleural thickening as to
6 people who had pleural disease that wasn't diffuse
7 pleural thickening?
8 A.  There was a difference, yes.
9    Q    In terms of their lung function declines?
10 A.    Yes.
11    Q    All right.  Why don't we mark that paper for
12 the record, so the record is clear what we're
13 talking about.  I know what you're talking about
14 and you know what you know what you're talking
15 about, but let's mark it.
16                - - -
17         (Exhibit Frank-15 was marked for
18 identification and is attached hereto.)
19                - - -
20 BY MR. FINCH:
21    Q    Frank-15, is that the Lillis paper of 1991
22 that you were thinking of when I asked you
23 questions about --
24 A.  Yes, it is.
25    Q    -- the impact of diffuse pleural thickening

Page 99

1    ARTHUR L. FRANK, M.D., PH.D.
2 on lung function?
3 A.  Yes.
4    Q    All right.
5         MR. FINCH:  I'll pass the Witness.
6                - - -
7         (Whereupon a short break was taken
8 at this time.)
9                - - -
10         EXAMINATION
11                - - -
12 BY MR. BERNICK:
13    Q    We are back on the record.  My name is David
14 Bernick, and I represent W.R. Grace in connection
15 with its bankruptcy, and I'll be asking you some
16 questions here as we go forward probably for the
17 next couple of hours.  I listened pretty carefully
18 this morning, Dr. Frank, to your testimony and I
19 heard you make statements or offer opinions to the
20 effect that something did not have a reasonable
21 scientific basis.  Do you recall offering opinions
22 that something was, it usually was some aspect of
23 the TDP, did not have a reasonable scientific
24 basis?
25 A.    My short-term memory works well enough to

Page 100

1    ARTHUR L. FRANK, M.D., PH.D.
2 remember I said that this morning.
3    Q    So the answer is "yes"?
4 A.    Yes.
5    Q    Now, does that mean when something had
6 reasonable scientific basis, does that mean it is
7 the only reasonable -- the only scientific answer?
8 A.  I don't understand the question.
9    Q    Well, if you say that something does or does
10 not have a reasonable scientific basis, does that
11 mean that that thing, whatever it is, that
12 opinion, is the only answer that can be reached
13 scientifically?
14         MR. HEBERLING:  Objection; unclear.
15         THE WITNESS:  Science can be looked
16 at in many ways.  You will also recall from my
17 answers that there were things that I opined
18 that I said there was no basis in science to say
19 that.
20 BY MR. BERNICK:
21    Q    We're going to get to that.
22 A.    But for those things that there was a
23 scientific basis, I guess one could read the
24 science differently.  But I was offering my
25 opinion that I didn't think there was a reasonable

Page 101

1    ARTHUR L. FRANK, M.D., PH.D.
2 scientific basis to make some of those judgements.
3    Q    For something in your view, when you use the
4 terms, for something to have a reasonable
5 scientific basis, does that mean that it must be the
6 best scientific answer?
7 A.    Ideally, science should be done with the
8 best scientific answer, but you could use other
9 answers or interpret the material in different
10 ways.  Certainly scientists interpret information
11 differently, so one could come to a different
12 conclusion.
13    Q    You've used the terms here expressing your
14 opinions for something to have a reasonable
15 scientific basis does that mean that it must be
16 the best scientific answer?
17 A.    That is not how I used it.  If you ask me
18 would I think that that's appropriate, I think if
19 one is going to make a scientific judgement, one
20 should use the best science available.  Does that
21 mean that doctors might not differ in their
22 interpretation of what the science says, certainly
23 that can occur.
24    Q    I appreciate these answers, and you are
25 being responsive, but let me be clear about what

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - June 5, 2009
Arthur Frank M.D., Ph.D.

Page 102

ARTHUR L. FRANK, M.D., PH.D.
1
2    I'm getting at.  You're offering opinions in the
3    case; right?
4    A.   Yes.
5    Q    And we want to know what the basis for your
6    opinions is and we also want to know what tests or
7    standards you apply in expressing an opinion. So,
8    my questions are all designed to found out what
9    tests or standard you apply when you offer an
10   opinion.
11   A.   It depends on the issue involved.
12   Q    I haven't asked you a question yet,
13   Dr. Frank.  So, I'm now going to refer back to the
14   testimony that you offered this morning.  This
15   morning you offered testimony that something did
16   or did not have a reasonable scientific basis.
17   Those were your words.
18   A.   Yes.
19   Q    And my question is, for something to have a
20   reasonable scientific basis, must it be the best
21   scientific answers, that test that you applied?
22        MR. HEBERLING:  Objection; asked
23   and answered.
24        THE WITNESS:  I would think, yes.
25   BY MR. BERNICK:

Page 103

ARTHUR L. FRANK, M.D., PH.D.
1
2    Q    So, if a scientific proposition or any kind
3    of proposition within your area of expertise is
4    not the best scientific answer, then in your view
5    it does not have a reasonable scientific basis; is
6    that correct?
7    A.   It may have a scientific basis, but it
8    certainly isn't the best basis.  It's a
9    question --
10   Q    I didn't ask that.  I'm asking for the words
11   "reasonable scientific basis".  For something to
12   have a reasonable scientific basis must it be the
13   best scientific answer?
14   A.   I think it is the most reasonable.
15   Q    So, "reasonable" means "most reasonable"?
16   A.   Let me give an analogy back.
17   Q    Can you just answer the question?
18   A.   No, no, no.  I'm trying to explain my
19   answer.
20        MR. HEBERLING:  Let him explain his
21   answer.
22        THE WITNESS:  I want to explain my
23   answer.
24   BY MR. BERNICK:
25   Q    Well, first of all, lower your voice --

Page 104

ARTHUR L. FRANK, M.D., PH.D.
1
2    A.   Well, you are interrupting me in my answer.
3    Q    No, I'm trying to get an answer to the
4    question that I've asked.
5    A.   And I'm trying to give you that answer.  You
6    have an automobile wreck and you get your car
7    fixed and you get it painted, and you notice that
8    there's blemishes in the paint job.  Now, is it a
9    reasonable paint job?  That's a value judgement.
10   You may say, gee, they could have done it better
11   and they could have gotten it completely correct
12   or, you know, it's not quite right, but is it
13   reasonable?  That's a value judgement.  And you'll
14   say, yes, I'll take the car or you'll say, no,
15   that's not reasonable because it's not as good as
16   it could be.  And I think the analogy holds.
17   Q    Are you done?
18   A.   Yes.
19   Q    So, when you say that something does or does
20   not have a reasonable scientific basis, that
21   represents a value judgement on your part; fair?
22   A.   In part it's a value judgement and in part
23   it's a basis of what the scientific literature
24   says you can say.
25   Q    Ultimately when you offer the opinion that

Page 105

ARTHUR L. FRANK, M.D., PH.D.
1
2    something does or does not have a reasonable
3    scientific basis, you are making, you, yourself,
4    are making a value judgement; correct?
5    A.   It's not a value judgement so much as basing
6    it on the science as I understand it and as a
7    scientist I would like to get the best answer, so
8    I would like that paint job to be properly done,
9    not that it is unreasonable to have a few
10   blemishes.
11   Q    I'm just using your analogy.  Under your
12   analogy the paint job could have blemishes and it
13   could still be reasonable?
14   A.   For some people it could be if they don't
15   want to use the best scientific evidence
16   available.
17   Q    And for everybody who makes a judgement
18   about whether something is reasonable, there's a
19   value judgement that's involved; correct?
20   A.   That's probably true.
21   Q    And when you make judgements about what is
22   scientifically reasonable, I take it your test of
23   what is scientifically reasonable is the test of
24   whether the judgement is the best scientific
25   answer?

Page 106

ARTHUR L. FRANK, M.D., PH.D.
2  A.   Based upon the science that is out there,
3  yes.
4  Q    Now, would you agree with me that different
5  scientists who are expertly qualified in your
6  field could have different answers as to what is
7  the best scientific result?
8  A.   From a value standpoint, yes.  From a basis
9  of science, then the science has to be supportive
10  of it.
11  Q    But the same science can be viewed by
12  experts within your field to support different
13  judgements; correct?
14  A.   Yes.
15  Q    Not everybody who is an expert in your field
16  completely agrees about what the right scientific
17  answer is; correct?
18  A.   That applies to most things in life.
19  Q    And it applies to your discipline in
20  particular; correct?
21  A.   Yes.
22  Q    So, when you say that something does or does
23  not have a reasonable scientific basis, do you
24  recognize others within your field could disagree
25  with you about what is a reasonable -- what does

Page 107

ARTHUR L. FRANK, M.D., PH.D.
2  or does not have a reasonable scientific basis?
3  A.   Of course they could disagree with me, but
4  then I would also like to see the science that is
5  supportive of their judgement.
6  Q    Right.  But even when you see the science,
7  they may not agree with you on it; correct?
8  A.   Well, then the science will speak for
9  itself.  They might not agree with it, but one of
10  the nice things about science is that there is
11  some truth to it.
12  Q    But in your view for something to have
13  reasonable scientific basis, it must be the
14  correct scientific answer; correct?
15  A.   As close to correct as you can get it to be.
16  Q    Now, I take it, then, that when you say that
17  something does or does not have a reasonable
18  scientific basis, it's not good enough for that
19  thing, that opinion, to have a scientific basis,
20  it must be the best scientific basis; correct?
21  A.   Correct, because there is also bad science
22  out there and to base your judgement on bad
23  science, which is still science, is not correct.
24  Q    So, when you've offered the opinions that
25  you've -- I'll get to that in a minute.  You've

Page 108

ARTHUR L. FRANK, M.D., PH.D.
2  also talked about things being not scientifically
3  unreasonable.  You've offered opinions this
4  morning that something is not scientific --
5  A.   Correct.
6  Q    -- reasonable.
7  A.   The six months of exposure, for example.
8  Q    Well, whatever it is, you've offered --
9  A.   Not whatever it is.  That was the issue I
10  offered it about.
11  Q    You offered it about others as well.  But
12  when you use the words "not scientifically
13  unreasonable", does that mean that it must be the
14  best scientific answer?
15  A.   It either means it's the best answer or
16  there is no scientific basis to come up with
17  another answer that is more or less reasonable.
18  Q    So, that represents, then, a different kind
19  of judgements that you're making?
20  A.   That's correct.
21  Q    When you say that something is not --
22  A.   When there is no science, it's a different
23  judgement.
24  Q    I try not to interrupt you.  Please just
25  don't interrupt me until I finish my question; is

Page 109

ARTHUR L. FRANK, M.D., PH.D.
2  that all right?
3  A.   Yes.
4  Q    Thank you.  So, when you're making the
5  judgement that you offered this morning, that
6  something is not scientifically unreasonable, that
7  is a judgement that you're making where the test
8  is not whether it is the best scientific answer,
9  but whether it is the only scientific answer?
10  A.   No, it's still --
11  Q    What's the difference?  Explain in your own
12  words.
13  A.   When there is no scientific basis, then one
14  can make a judgement that is reasonable, but which
15  is unsupported by the science, and I guess you
16  could say it's still the best, but then you could
17  quibble over, to use the example we used this
18  morning, six months, could it be four months,
19  could it be seven months, could it be six months
20  and three days, that sort of quibbling.  There's
21  some things where there is no scientific basis
22  that you can point to, then it is still a
23  reasonable judgement and as good as any other
24  judgement.  So, there's none that would be better.
25  Q    Under those circumstances, what's the test

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - June 5, 2009
Arthur Frank M.D., Ph.D.

Page 110

**ARTHUR L. FRANK, M.D., PH.D.**
1
2  **for reasonableness?**
3  A.    If it has some basis in science that can be
4  applied to it.
5  **Q    What does it mean to say that it has some**
6  **basis in science that can be applied to it?**
7  A.    To say that five years of occupational
8  exposure is necessary to produce pleural disease
9  is not grounded in science, because there's
10  nothing that says that that's what's natural.
11  And first of all, it doesn't require occupational
12  exposure, one, and, two, it doesn't necessarily
13  require five years.  One can have shorter periods
14  of exposure and still develop disease, and so you
15  look to what is there in the literature.  And then
16  on that particular subject, which is what we were
17  talking about, there is fairly little that will
18  address that.  And what was reasonable would be
19  something like six months, though, again, I
20  qualified that with some discussion about other
21  ways to deal with it, but it was not an
22  unreasonable construct.  Could you say that seven
23  months would be better or five months would have
24  been better?  Again, there's no basis.  But I gave
25  a judgement that was the best that I could do

Page 111

1        ARTHUR L. FRANK, M.D., PH.D.
2  given that there was no science.
3  **Q    Under those circumstances, where you're**
4  **saying that it's not scientifically unreasonable,**
5  **would you agree with me that other reasonable**
6  **scientists might differ with you about your**
7  **opinion?**
8  A.    Yes.
9  **Q    And let me ask you this, going back to those**
10  **views where you said that something does or does**
11  **not have a reasonable scientific basis, I take it**
12  **that when you talk about basis there, you mean**
13  **some scientific study that actually addresses the**
14  **issue as to what you're offering an opinion?**
15  A.    Yes.
16  **Q    What kind of study does it have to be?**
17  A.    It depends on what the issue is.
18  **Q    Well, but --**
19  A.    It could be an animal study.  It could be a
20  cohort study.  It could be a series of cases.  It
21  depends on what the question is and the level of
22  scientific information you are required to make a
23  judgement.  For example, with the issue of the
24  different potency of fibers, there's a lot of
25  information about that, and I just don't think

Page 112

1        ARTHUR L. FRANK, M.D., PH.D.
2  that unbalanced there's enough there yet because
3  there's pieces that are missing from that
4  discussion that allows me to make a judgement.
5  **Q    So, where you don't have a study on point,**
6  **you can't offer a view about whether something**
7  **does or does not have a reasonable scientific**
8  **basis, you have to go back to your other metric,**
9  **which is to say that something may or may not be**
10  **scientifically unreasonable; fair?**
11  A.    That's too simplistic a way of putting it,
12  but that is one way you could put it.
13  **Q    Now, what if people disagree about whether**
14  **something constitutes a study that really**
15  **addresses the question at issue?**
16  A.    That happens all the time.
17  **Q    And people in your field and the areas that**
18  **we're talking about here sometimes have reasonable**
19  **views about whether something constitutes the type**
20  **of study that can provide a reasonable scientific**
21  **basis or not; correct?**
22  A.    Sometimes they do.  More often they are
23  unreasonable views, but that's a different issue.
24  **Q    Well, you agree with me just in a very**
25  **simple fashion that the views that you're**

Page 113

1        **ARTHUR L. FRANK, M.D., PH.D.**
2  **expressing about whether something does or does**
3  **not have a reasonable scientific basis or whether**
4  **something is or is not scientifically**
5  **unreasonable, they're going to be experts in this**
6  **case who disagree with you; correct?**
7  A.    There's already experts who disagree with
8  me.
9  **Q    Right; we know that.**
10  A.    We know that, so that's a given.
11  **Q    And they are experts that you regard, at**
12  **least in the case of Dr. Welch, being a highly**
13  **qualified expert person in her field, indeed in**
14  **your field; correct?**
15  A.    You're putting words in my mouth that I
16  didn't use.
17  **Q    Well, I'm just asking you -- that's the**
18  **whole idea of leading questions, which are**
19  **permissible for adverse witnesses as you well**
20  **know.  So, yes, I'm putting words in your mouth.**
21  **I'm asking whether you agree or not.**
22  A.    Well, first of all, I don't know that
23  because I'm not schooled in the law.  I have done
24  a fair number of depositions, but, you know --
25  **Q    What's a fair number?**

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - June 5, 2009
Arthur Frank M.D., Ph.D.

Page 114

ARTHUR L. FRANK, M.D., PH.D.

1
2   A.   Thousands.
3   Q    That's an overwhelming number of
4   depositions; right?
5   A.   People can disagree on that.
6   Q    Are you going to quibble with me about that
7   or would you just -- that's an easy one.
8   Overwhelming number of depositions.
9   A.   Compared to what most physicians do, that's
10  an overwhelming number.
11  Q    It probably sets a record, in fact.  Is
12  there any other expert that you know who has
13  testified in depositions as much as you have?
14  A.   I don't keep track of how many times
15  people --
16  Q    Are you aware of one?
17  A.   I've never looked into the issue.
18  Q    I didn't ask you that.  I asked, are you
19  aware of one?
20  A.   No, I'm not.
21  Q    Thank you.  So, if you go back now to the
22  disagreements that you have with Dr. Welch in this
23  case, you would recognize that she is an expert in
24  your field; correct?
25  A.   She is someone who is experienced in this

Page 115

ARTHUR L. FRANK, M.D., PH.D.

1
2   field.  Expert, again, is a designation I take by
3   the court.
4   Q    I've heard that.  I don't buy that.
5   A.   What do you mean?  You can buy it or not.
6   She has expertise beyond what most physicians do
7   about this topic.
8   Q    And on that basis, would you consider her,
9   in your own view, Dr. Frank, to be an expert?  I'm
10  just asking for your scientific view of her as an
11  expert?
12  A.   I don't use the term "expert".  I really
13  have segregated that in my mind to what court's
14  do.  Does she have a special experience and
15  expertise and do I value what she says?  Certainly
16  more than I would for other physicians and in most
17  --
18  Q    Dr. Frank -- I'm sorry.
19  A.   And in most ways I have agreed with her
20  enough of an agreement to sign onto a paper that
21  she was the senior author of.  That doesn't mean
22  we agree about everything.
23  Q    The issue is not whether -- I know that,
24  that's where I'm going.  Obviously you don't agree
25  with Dr. Welch about everything; right?

Page 116

ARTHUR L. FRANK, M.D., PH.D.

1
2   A.   Correct.
3   Q    And no one would expect that you would;
4   right?
5   A.   I don't know.  Some people might.
6   Q    All right.  Mr. Heberling, he agrees with
7   every word that you speak; right?
8        MR. HEBERLING:  Objection.
9        THE WITNESS:  I doubt that.
10       MR. HEBERLING:  Argumentative.
11       MR. BERNICK:  Well, of course it's
12  argumentative.  Cross-examinations are always
13  argumentative, Mr. Heberling.
14       MR. HEBERLING:  Depositions need
15  not be excessively argumentative.
16       MR. BERNICK:  Well, I don't think I
17  was being excessively argumentative.
18  BY MR. BERNICK:
19  Q    Dr. Frank, do you consider yourself to be an
20  expert?
21  A.   No, I do not.  I'm someone who has a certain
22  expertise and has spent forty years of his
23  professional career studying the subject of
24  asbestos.  I do not call myself an expert.
25  Q    You've never called yourself an expert in

Page 117

ARTHUR L. FRANK, M.D., PH.D.

1
2   any context outside of court?
3   A.   No.
4   Q    Is my statement accurate?
5   A.   I have never called myself an expert in
6   anything.
7   Q    Outside of court?
8   A.   Outside of court, I don't believe so.  Not
9   that I can recall.
10  Q    You are certainly aware that a lot people in
11  lay terms talk about somebody being an expert;
12  correct?
13  A.   Absolutely.
14  Q    You also are aware that there are many,
15  many, many, many scientists who from their own
16  point of view as scientists talk about themselves
17  as being experts; correct?
18  A.   I'm not one of them.
19  Q    I didn't ask you that.
20  A.   There are such individuals.
21  Q    There are many such individuals; correct?
22  A.   I've never done a study as to how many do
23  that.
24  Q    You can't make any statement about whether
25  there's a lot of those people out there?

Case 01-01139-AMC    Doc 22731-3    Filed 08/07/09    Page 32 of 93

US District Court - Delaware                    FINAL - June 5, 2009
Chapter 11 - W.R. Grace                         Arthur Frank M.D., Ph.D.

Page 118

ARTHUR L. FRANK, M.D., PH.D.

1    ARTHUR L. FRANK, M.D., PH.D.
2    A.    Frankly, most scientists do not call
3    themselves an expert.
4    Q    Well, in point of fact, there are ways of
5    qualifying as having expertise in given fields
6    scientifically; correct?
7    A.    Yes.
8    Q    A, they have an education that's
9    appropriate; right?
10   A.    True, or board certification or advanced
11   training or series of publications, or whatever.
12   Q    Right.  There are lots and lots of things
13   that scientifically can give rise to the
14   scientific notion that somebody is an expert in a
15   certain field; correct?
16   A.    Yes.
17   Q    And based upon those different things, do
18   you consider yourself to be an expert in your
19   field?
20   A.    I am someone who has a certain expertise and
21   experience and a lot of knowledge, but I would not
22   use the term "expert" to describe myself.
23   Q    I didn't ask you that.
24   A.    Others are very likely to call me an expert.
25   Q    And that's something that's not surprising

Page 119

1    ARTHUR L. FRANK, M.D., PH.D.
2    because there are, in fact, conventions, rules,
3    expectations in the scientific community on the
4    basis of which people refer to one another as
5    being experts or not being experts; fair?
6    A.    I would generally agree with that statement.
7    Q    Now, based upon those same conventions of
8    your particular field, do you regard Dr. Welch as
9    being an expert in your field?
10   A.    Dr. Welch has far more expertise and
11   experience in this area, and if one wants to use a
12   lay term that is commonly used, one could use the
13   term "expert", but it is not one I would choose to
14   use to describe others of my colleagues.
15   Q    You wouldn't describe any of your colleagues
16   as being experts because you described yourself as
17   being an expert; correct?
18   A.    That's right.
19   Q    But I'm saying, if you followed the
20   conventions that scientists in your area use when
21   they refer to somebody as being an expert or not,
22   would you agree that Dr. Welch, following those
23   conventions, is an expert in your field?
24   A.    If one followed those conventions, it is
25   likely she would be called an expert.

Page 120

1    ARTHUR L. FRANK, M.D., PH.D.
2    Q    Now, so we have a situation where -- and you
3    would, again following those same conventions, you
4    would be called an expert, too; correct?
5    A.    I would expect that would be the case.
6    Q    And would you agree with me, we now have a
7    situation where we have two different scientists,
8    both of whom would be called experts based upon
9    scientific convention who in this particular
10   situation with these particular issues that we
11   have before us disagree about whether something
12   has a reasonable scientific basis; correct?
13   A.    So it seems.
14   Q    Now, is there any scientific criteria on the
15   basis of which any well-established convention of
16   science that says that you are right and she is
17   wrong in making that fundamental judgements?
18   A.    Science doesn't work that way.
19   Q    So, if we now go to another question,
20   another series of terms that you've used, you said
21   something is reasonable for nonscientific reasons.
22   Do you remember saying that?
23   A.    I don't specifically recall the context of
24   that.  If you put down that I said it, there's
25   probably a context in which I said it.  At the

Page 121

1    ARTHUR L. FRANK, M.D., PH.D.
2    moment, I don't recall that.
3    Q    But what is the test for something that's
4    reasonable for nonscientific reasons?
5    A.    I'll go back to my painted car analogy.
6    What is reasonable to different people or
7    different car owners will vary depending on
8    whatever sense they bring to it.  Somebody will
9    accept a paint job that somebody else might not.
10   Q    Well, what's the test?  I mean, you just
11   stated that people have different opinions.  We
12   know we have different opinions --
13   A.    The test is whatever people bring to that
14   issue.
15   Q    So, it's purely subjective?
16   A.    In some cases it's subjective.  On the other
17   hand you could actually go measure as to what
18   percentage of the car was properly painted and if
19   the contract says we will paint your car to within
20   ninety-eight percent of covering all of the
21   surface of the car, then you can do an actual
22   measurement.
23   Q    Well, there you would have a legal notion,
24   which is what's in the contract and then you would
25   have a scientific methodology that's used to apply

Page 122

ARTHUR L. FRANK, M.D., PH.D.

1    ARTHUR L. FRANK, M.D., PH.D.
2    it; right?
3    A.   That would apply in that case.
4    Q    So, in that case you're talking about
5    something that is reasonable for legal and
6    scientific reasons; correct?  So, I'm not talking
7    about that situation.  I'm talking about something
8    where, as you put it, something is reasonable or
9    not reasonable for nonscientific reasons what is
10   the test of that?
11   A.   The test of that would probably lie in the
12   eye of the beholder and who is making the
13   judgement and what the purpose of that might be.
14   Q    Then you also had a statement and opinions
15   saying something is or is not supported.  Do you
16   remember that?
17   A.   Yes.
18   Q    What's the test of whether something is or
19   is not supported?
20   A.   If there is something in the scientific
21   literature that you can point to that's of good
22   scientific quality that is something one can point
23   to say this is a reasonable position to take based
24   upon the scientific evidence.
25   Q    Is that different from reasonable scientific

Page 123

1    ARTHUR L. FRANK, M.D., PH.D.
2    basis; to simply say something is or is not
3    supported?
4    A.   It's pretty much the same.
5    Q    Pretty much the same.  So, when you say that
6    something is not supported or is supported, you
7    mean by that that something does or does not have
8    a reasonable scientific basis?
9    A.   Yes.
10   Q    So, when you used the words this morning
11   "not supported", that was shorthand for did not
12   have a reasonable scientific basis?
13   A.   Correct.
14   Q    Is that correct?
15   A.   That would be --
16       MR. HEBERLING:  Asked and answered.
17       THE WITNESS:  That would be a way
18   to look at it, yes.
19       MR. BERNICK:  If he answered it
20   once, he can answer it again, Mr. Heberling.
21       MR. HEBERLING:  No.  The objection
22   is asked and answered.
23   BY MR. BERNICK:
24   Q    Now, this case focuses -- the issues that we
25   have here focus to a large extent on these TDP,

Page 124

1    ARTHUR L. FRANK, M.D., PH.D.
2    Trust Distribution Procedures.  Do you remember
3    that?
4    A.   I do.
5    Q    In fact, you went through and offered a
6    whole bunch of opinions on trust distribution
7    procedures this morning; correct?
8    A.   Yes.
9    Q    Now, is there anything in the science that
10   tells us what is the right standard to use in
11   expressing opinions about trust distribution
12   procedures?
13   A.   Science doesn't address those issues.
14   Science addresses the issues of science, how they
15   are then utilized in another setting, certainly
16   can lead, apparently is present in this case, to
17   vastly different opinions.
18   Q    Well, there is nothing in the TDP that says
19   it's the best scientific answer; is there?
20   A.   It doesn't speak to the quality of science.
21   Q    Right.  And, therefore, when it comes to the
22   TDP itself, there's not in science that you can
23   look to that says this is how a scientist should
24   go about assessing it; is there?
25   A.   Scientists can't address the procedural

Page 125

1    ARTHUR L. FRANK, M.D., PH.D.
2    issues of a TDP.  The scientist can only address
3    the scientific underpinnings of scientific
4    judgements as they are made part of a TDP.
5    Q    Well, but, you're assuming that the TDP is
6    purely a scientific document, and we know it's
7    not; right?
8    A.   I have never assumed that it's a scientific
9    document.  It's very much a political and legal
10   document.
11   Q    So, is there any where that science can tell
12   us, is there any scientific document that says
13   when a scientist assesses a legal, political
14   document this is the right standard to use in
15   assessing it?
16   A.   If you recall the questions this morning, I
17   made -- can I finish my answer?
18   Q    Sure.
19   A.   I made the distinction between those things
20   that were of a scientific nature, which is what I
21   was commenting upon with regard to the science,
22   and the whole legal/political nature of the
23   document is not one that I have any basis to
24   comment upon other than whatever is my personal
25   opinion, which is irrelevant.

Case 01-01139-AMC    Doc 22731-3    Filed 08/07/09    Page 34 of 93

US District Court - Delaware                    FINAL - June 5, 2009
Chapter 11 - W.R. Grace                        Arthur Frank M.D., Ph.D.

Page 126

ARTHUR L. FRANK, M.D., PH.D.

1    ARTHUR L. FRANK, M.D., PH.D.
2    Q    Well, that may well be, but the document
3    you, yourself, have acknowledged was not and is
4    not intended to be a scientific document?
5    A.    But judgements made that are based upon
6    science should be based upon proper science, those
7    parts of it, otherwise you don't need science at
8    all and a bunch of people can sit in a room and
9    say, all right, we're going to do this for this
10   and this for that and it doesn't matter what the
11   science tells us.
12   Q    But your opinion about the relationship, the
13   proper relationship, between the TDP and science
14   is an opinion that itself does not have a
15   scientific test for; correct?  There's nothing in
16   the field of science that tells you how a
17   scientist should look at this particular document;
18   correct?
19   A.    I'm not looking at that way, nor do I
20   suspect that anybody should look at it that way,
21   and I'm leaving it to the lawyers to do the legal
22   stuff.  But what I was commenting upon is the
23   scientific basis for judgements in the TDP that
24   purportedly are based upon science or to reflect
25   what science can tell us about those issues.

Page 127

1    ARTHUR L. FRANK, M.D., PH.D.
2    Q    But the judgements about what is in the TDP
3    are judgements about what to include in the
4    compensation scheme; correct?  The TDP is a
5    compensation scheme.
6    A.    It's a compensation document that one would
7    like to think is based upon --
8    Q    I didn't ask you that.
9    A.    Okay.  It is a compensation document, and
10   the only reason I am here is that there appears to
11   be some scientific questions or issues with regard
12   to that document, because otherwise you would have
13   some economist sitting here instead of me making
14   judgement about what's fair for people.
15   Q    Now, to make a scientific judgement about
16   this legal political document --
17   A.    I'm not making scientific judgements about
18   this document.  I'm making scientific judgements
19   about the scientific underpinning of those parts
20   of the document that purportedly are based upon
21   science.
22   Q    And in making those judgements, are you
23   making those judgements applying the same
24   criteria, the same standards that you would apply
25   in determining whether an opinion published in the

Page 128

1    ARTHUR L. FRANK, M.D., PH.D.
2    peer review article is a good opinion
3    scientifically or a bad decision scientifically?
4    A.    I'm using the same scientific judgement I
5    would use for that.  The political or legal
6    aspects of the document are not what I'm
7    commenting on.
8    Q    Now, who told you, in offering opinions
9    about the TDP, to apply that same scientific
10   standard that you would ordinarily apply in the
11   field of research?  Who told you that?
12   A.    Nobody told me that.  That's what I have
13   chosen to apply.  I think science should be based
14   upon what science tells us, otherwise it becomes
15   an arbitrary and capricious experience and
16   document.
17   Q    I certainly agree that science should do
18   that.  Let me ask you another question, which is
19   about the materials that you've reviewed.  This is
20   going to be much more concrete and tangible.  You tend
21   to get excited here at certain point.  You look
22   like you're kind of slipping off the edge.
23   A.    I'm not the one slipping off the edge.
24        MR. HEBERLING:  Objection;
25   argumentative, improper questioning.

Page 129

1    ARTHUR L. FRANK, M.D., PH.D.
2        THE WITNESS:  I've dealt with a lot
3    of lawyers and --
4    BY MR. BERNICK:
5    Q    Oh, I know, thousands of them.  How many
6    lawyers have you dealt with, incidentally?  It's
7    got to be over a thousand.
8    A.    Well, sometimes it's a lot of the same ones
9    that show up.
10   Q    I see.  Well, this is the first time and I'm
11   exactly like all those other guys and women.  So,
12   materials that you've reviewed, this is a question
13   everybody always asks --
14   A.    Am I to take that as a statement or fact or
15   opinion?
16   Q    However you want.  I say that with a smile.
17   A.    Okay; I'll take it the way I want.
18   Q    Good.  So, one of the questions that all the
19   lawyers have asked you, and this will be
20   completely true to form, is questions about
21   materials that you've reviewed.  And I know a lot
22   of the materials you have reviewed from your
23   expert reports because they identify those.  I
24   want to know about materials that you've reviewed
25   that are not in your expert reports or not

Page 130

ARTHUR L. FRANK, M.D., PH.D.
1
2   referred to in your expert reports.
3   A.   I have reviewed the scientific literature on
4   the subject of asbestos for forty years.  That
5   includes thousands of articles and that's what I
6   bring in reaching my judgements.
7   Q    Now, I want to ask specifically whether you
8   have reviewed the testimony or expert reports of
9   anybody who testified or offered expert
10  disclosures in the criminal case that was just
11  concluded?
12  A.   I have seen nothing about that case other
13  than what was on the blog.  I've seen no
14  testimony.  Obviously some of the people who
15  testified in that I've seen other materials of
16  their's, such as Dr. Whitehouse, but I have seen
17  nothing out of the criminal case.
18  Q    That's helpful.  That folder just got turned
19  over very quickly.
20  A.   Good.
21  Q    So, we know that the TDP is part of a
22  compensation scheme.  You certainly have that
23  understanding; do you not?
24  A.   I do.
25  Q    And do you understand that the TDP is not

Page 131

ARTHUR L. FRANK, M.D., PH.D.
1
2   the individual review, it is a series of criteria
3   that can be satisfied by submitting the right kind
4   of documentation?
5        MR. HEBERLING:  Objection;
6   misstates the document.
7        THE WITNESS:  So, it seems.
8   BY MR. BERNICK:
9   Q    And, again, I think that's correct in any
10  event, but that's certainly your understanding;
11  correct?
12  A.   It's a document that lays out criteria that,
13  as Mr. Finch and I discussed this morning, allows
14  for individual review of some criteria are not
15  met.
16  Q    And when we about talk the TDP criteria, can
17  we just have in mind those same things that you
18  looked at with Mr. Finch as the different category
19  of disease and what requires to make a claim for
20  that kind of disease?
21  A.   We can.
22  Q    Now, do you understand that those criteria
23  set forth in those TDPs, that part of the TDP, do
24  you understand that the purpose of having that as
25  opposed to the individual review is so that people

Page 132

ARTHUR L. FRANK, M.D., PH.D.
1
2   can get expedited evaluation of their claims and,
3   they hope, expedited payment for their claim; is
4   that your understanding?
5   A.   No, that is not my understanding.
6   Q    Well, if everybody had individual review you
7   wouldn't need all the rest of this stuff; right?
8   A.   It would be an alternate system and
9   personally I happen to think that an individual
10  review would be better and probably quicker.
11  Q    It may well be, and I don't have an opinion
12  one way or another, God bless us, it's not up to
13  me.
14  A.   But you just stated that the reason that you
15  put forth for this document was to make it quicker
16  and to get payments to people quicker, and I'm not
17  sure that that, in fact, is the case.
18  Q    Well, I just asked -- all I, in fact, asked
19  you was your understanding.  Do you have an
20  understanding that the reason, the purpose, for
21  having these TDP criteria is so that large volumes
22  of people can get their claims processed without
23  individual review?
24  A.   I do not understand what the rationale for a
25  TDP is.  If you tell me that that is why they are

Page 133

ARTHUR L. FRANK, M.D., PH.D.
1
2   often constructed, that certainly seems
3   reasonable.
4   Q    I want you to assume that the purpose of the
5   TDP categories that you've looked at is to be able
6   to establish entitlement to compensation for a
7   large number of people, and on the basis solely of
8   the submission of documentation, certain kinds of
9   documents.  I want you to assume that; okay?
10  A.   Yes.
11  Q    Now, for that to have any scientific basis,
12  would you agree with me that the TDPs need to
13  identify a pattern of disease that has been
14  recognized and established scientifically?
15  A.   One would like to think, but I don't think
16  this document does that.
17  Q    I didn't ask you that.  We're going to get
18  to whether it does or not, and I respect that
19  you're going to have different views on that.  I'm
20  just asking you if the purpose of the TDP is to
21  handle the large volume of claims without
22  individual review, would you agree with me that
23  the only way that can be done with any scientific
24  basis is if science has identified and established
25  that certain pattern of disease?

Page 134

ARTHUR L. FRANK, M.D., PH.D.
1
2 A.   Science doesn't establish anything.  People
3 establish things.  Scientists establish things.
4 Science doesn't establish things and as we've
5 discussed, science can be seen differently by
6 different people.  Now, how you can construct a
7 TDP will very much reflect on the philosophical
8 rationale you want to bring to it such as the
9 possibility that you want to pay people quickly or
10 the possibility that you want to differentially
11 pay people in certain ways?
12 **Q     Again, I don't think we're disagreeing on**
13 **that.  I'm just trying to frame that if the goal**
14 **is a goal that says we want to determine**
15 **compensation for a large number of people without**
16 **individual review, for that to have any scientific**
17 **basis, science must have identified a certain pattern of disease**
18 **must have identified a certain pattern of disease**
19 **that recurs in a number of people and can be**
20 **established through objective criteria; correct?**
21 A.   If all you are interested in is any criteria
22 or any science, or whatever the phrase.
23 **Q     Any scientific basis.**
24 A.   Any scientific basis, then I would agree
25 that that is one way to do it.  If you want to do

Page 135

1 ARTHUR L. FRANK, M.D., PH.D.
2 it on a basis that most accurately reflects the
3 science, then any scientific basis is not a
4 standard I would like to hold to.
5 **Q     Well, let's take it one step further and go**
6 **to a question that you indicated.  If the purpose**
7 **of the TDP is to assess compensation for large**
8 **numbers of people without individual review, would**
9 **you agree with me that for that TDP to have a**
10 **reasonable scientific basis science must have**
11 **studied and determined a certain pattern of**
12 **disease as occurring repeatedly?**
13 MR. HEBERLING:  Objection; asked
14 and answered twice.
15 MR. BERNICK:  No, it's a different
16 question.
17 BY MR. BERNICK:
18 **Q     Do you understand the difference now?**
19 A.   It's a difference, and then the only
20 qualifier would be when you used the phrase
21 "reasonable scientific basis" is that your
22 reasonable and my reasonable, my reasonable was
23 the best science and your reasonable, as we
24 discussed, could include not necessarily the
25 best --

Page 136

1 ARTHUR L. FRANK, M.D., PH.D.
2 **Q     We'll adopt your standard, to have the best**
3 **scientific basis if you want to have a**
4 **compensation scheme that works without individual**
5 **review and processes large numbers of people,**
6 **would you agree with me for it to have the best**
7 **scientific basis that scientist must have**
8 **established a recurrent pattern of disease that**
9 **can be identified through objective criteria?**
10 A.   Yes.
11 **Q     Now, if the compensation scheme is to**
12 **neither overpay nor underpay, this same -- you're**
13 **going to agree with me about this.  This one is**
14 **going to be an easy one.  Would you agree with me**
15 **that if the compensation scheme without individual**
16 **review is to neither overpay, that is to not to**
17 **pay too many people, or underpay, which is to pay**
18 **too few people, that it must further be tailored**
19 **to what science says about that disease?**
20 A.   I'm not sure I would agree with that.  I
21 think it's not a question of worrying so much
22 about overpayment and underpayment as it is about
23 a certain sense of equity and where you want to
24 set the bar as to how easy it is to get payment or
25 not.  The question of what the levels of payment

Page 137

1 ARTHUR L. FRANK, M.D., PH.D.
2 are is a whole other issue that I'm not
3 particularly prepared to discuss.  But, no, I'm
4 not sure I would necessarily agree with your
5 statement.
6 **Q     Well, let me rephrase the question, because**
7 **I thought it was going to be easy, and I still**
8 **think it's going to be --**
9 A.   No, it's not.
10 **Q     Well, I'm saying I want you to assume that**
11 **the purpose of the compensation scheme is neither**
12 **to overpay nor to underpay; that's the purpose,**
13 **that's what you want to accomplish.  Would you**
14 **agree with me that under those circumstances if**
15 **the compensation scheme is to have the best**
16 **scientific basis, it must be tailored to what**
17 **science has established is recurrent patterns of**
18 **disease?**
19 A.   If that is your desire, I guess you could
20 say that that would be an easy one, and, yes, I
21 could say I agree with it, but I don't think
22 that's what the compensation scheme should aim to
23 do.
24 **Q     Now, in talking about the categories of**
25 **disease that we have in the TDP, it's true, is it**

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - June 5, 2009
Arthur Frank M.D., Ph.D.

Page 138

ARTHUR L. FRANK, M.D., PH.D.
1
2    not that, that there are different categories, one
3    for mesothelioma, another for lung cancer and the
4    like?
5    A.   It's self-evident.  That's an easy one.
6    Q    That's an easy one.  I'll try to make them
7    all like that.
8    A.   No, you won't.
9    Q    You know, you remind me of this very smart
10   and able client that I named Dori Kuchinsky.
11           MS. KUCHINSKY:  Don't make me take
12   you off mute.
13           MR. BERNICK:  That's why you guys
14   get along so well.
15           MS. KUCHINSKY:  I take that as a
16   compliment, David.  Thank you.
17           MR. BERNICK:  It was meant to be a
18   compliment to both of you.
19   BY MR. BERNICK:
20   Q    So, you have categories in the TDP and the
21   categories are basically driven, defined by, A,
22   the type of disease and, B, some measure of
23   severity; correct?
24   A.   So it appears.
25   Q    Well, but based upon what you went through

Page 139

ARTHUR L. FRANK, M.D., PH.D.
1
2    this morning, is that your --
3    A.   That's what the scheme has.  It has cancer
4    one type, which is relatively easy and
5    straightforward, and it has another type of cancer
6    that has several levels, it has the third type
7    that pays a different amount of money for cancers
8    that are in some dispute and then when things
9    really get a bit hairy is this question of
10   asbestosis.
11   Q    Right.  But in each of the cases that you've
12   talked about -- well, actually, it's really more
13   in the case of asbestosis, but in each of the
14   cases that you talked about, with the exception of
15   mesothelioma, I think, would you agree with me
16   that categories are driven both by disease type
17   and by severity?
18   A.   No.  Lung cancer is not a question.  It's
19   just as severe to have it or not have it, the only
20   difference in severity is if you can be cured of
21   it or not.  Obviously for the others, for the
22   nonmalignant diseases, they are driven by
23   severity.  I don't know how you have levels of
24   severity of cancer.  That's never a good thing to
25   have.

Page 140

ARTHUR L. FRANK, M.D., PH.D.
1
2    Q    Fair enough.  Now, you are aware that the
3    TDP, many parts of the TDP have been used
4    literally for years; correct?
5    A.   I gather that is the case and have found it
6    just as inappropriate in other settings as I have
7    in this.
8    Q    Well, I'm sure that would be true, but I was
9    really getting at a different thing, which is that
10   these TDPs have been used in a variety of
11   bankruptcies for many, many years.  Is that your
12   understanding?
13   A.   That is my understanding.
14   Q    Is it your understanding that the TDP in
15   this case was revised to include a brand new
16   category?
17   A.   No.
18   Q    You weren't aware that the --
19   A.   I've never looked at an old one, so I don't
20   know if this one is the same or different.  So,
21   I'm not aware.
22   Q    Well, let's get specific then.  I'm not
23   going to go back on that.  If you weren't aware of
24   it, you weren't aware of it, but let's take a look
25   at what is the TDP.  The TDP is Exhibit Eleven, so

Page 141

ARTHUR L. FRANK, M.D., PH.D.
1
2    if you page through that pile and go to Exhibit
3    Eleven.
4    A.   I have it.
5    Q    And on page twenty-six I think we get to the
6    page of interest.  We have a category for Severe
7    Asbestosis, Level Roman IV A, and a category for
8    Severe Disabling Pleural Disease, Level IV B.  Do
9    you see that?
10   A.   I do.
11   Q    Now, severe asbestosis, as it's defined,
12   you've got a bunch of different criteria, but
13   asbestosis is a disease type that is defined in
14   the scientific literature; correct?
15   A.   It is a type of pneumoconiosis caused by
16   asbestos.  The type is pneumoconiosis, the
17   definition is the pneumoconiosis caused by
18   asbestos.
19   Q    So, when you think about the pneumoconiosis
20   caused by asbestos, is asbestosis, as it is
21   targeted here, I'll just use that loose term, do
22   you refer to that as a disease type or a subtype,
23   or, you know, what is the right way of talking
24   about --
25   A.   It is a disease.

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - June 5, 2009
Arthur Frank M.D., Ph.D.

Page 142

ARTHUR L. FRANK, M.D., PH.D.

1
2  Q    A disease?
3  A.   It is a specific, definable disease.
4  Q    And asbestosis is a specific, definable
5  disease; correct?
6  A.   Yes.
7  Q    Now, as asbestosis involving interstitial
8  fibrosis, is that a type of asbestosis or is it a
9  subtype?  Again, how do you --
10  A.   That's where there's some varying opinions
11  in the scientific community.  Some people claim
12  that asbestosis is only a disease of the
13  parenchyma of the lung and the term "asbestosis"
14  for those individuals applies to fibrotic changes
15  in the parenchyma of the lung caused by asbestos.
16  There's another school of thought that says that
17  it's either the parenchyma of the lung or the
18  pleura surrounding the lung which becomes
19  fibrotic, and those together are called
20  "asbestosis".  And then one can have subtypes,
21  which is parenchymal asbestosis or pleural
22  asbestosis.  But it would still be asbestosis.
23  And if you ascribe to the first school, then
24  asbestos applies only to the parenchyma, and
25  there's no subtypes.  If you apply to the second

Page 143

ARTHUR L. FRANK, M.D., PH.D.

1
2  definition, then it's applies to two different
3  types of asbestosis.
4  Q    But certainly the scientific literature
5  recognizes that there is a distinct diagnostic
6  entity; that is, parenchymal asbestosis?
7  A.   Yes.
8  Q    I mean, when I use the term "distinct
9  diagnostic entity", is there a better word to use.
10  And this is purely nomenclature so that the
11  deposition can go more smoothly.
12  A.   That's as good as anything.
13  Q    Okay.  Now, would you agree with me severe
14  asbestosis, as it appears in the TDP level Roman
15  IV A is focused on, I'm not asking whether it does
16  a great job or a bad job, is focused on
17  parenchymal asbestosis?
18  A.   That's how it's defined in this TDP.
19  Q    So the answer is "yes"?
20  A.   Yes.
21  Q    Whereas severe disabling pleural disease,
22  Roman IV B, is focused on pleural asbestosis or
23  pleural disease not involving fibrosis of the
24  parenchyma?
25  A.   Yes.

Page 144

ARTHUR L. FRANK, M.D., PH.D.

1
2  Q    And it is also defined, not only by that
3  diagnostic entity, pleural disease not involving
4  the parenchyma, but it has to be a severely
5  disabling disease; right?
6  A.   That's what it says.
7  Q    So, the purpose of this TDP on its face is
8  to focus not on parenchymal asbestosis and not on
9  pleural disease that's short of severely
10  disabling, but to focus specifically on pleural
11  disease that is severely disabling; right?
12  A.   That question didn't make sense.  The
13  beginning didn't match the rest of it.
14  Q    I'll rephrase it.
15  A.   Please.
16  Q    We can see that the disease, the diagnostic
17  entity that's targeted by Level Roman IV B is
18  different from the diagnostic entity that's
19  targeted by Level IV A?
20  A.   Yes, I agreed to that already.
21  Q    Right.  And we can also see that Level IV B
22  is differentiated from Level III by virtue of it's
23  being focused on those cases that are severely
24  disabling; correct?
25  A.   That's what the title says.

Page 145

ARTHUR L. FRANK, M.D., PH.D.

1
2  Q    Now, if we went to the scientific
3  literature, we would find that parenchymal
4  asbestosis has been identified as a diagnostic
5  entity going back for decades; correct?
6  A.   Yes.
7  Q    Is it also true that if we went to the
8  scientific literature, pleural disease has been
9  defined as a diagnostic entity going back for
10  many, many years in the scientific literature?
11  A.   It goes back as far as the parenchymal
12  disease, the original description of
13  pneumoconiosis was 1867 by a German pathologist by
14  the name of Zenker, and he said that a
15  pneumoconiosis, and he was the one that coined the
16  term, dust disease of the lung, was a disease that
17  affected both the parenchyma and the pleura of the
18  lung.
19  Q    Fascinating.  In the scientific literature
20  going back for a very long time, there was a
21  diagnostic entity related to asbestos exposure
22  called diffuse pleural thickening; correct?
23  A.   I don't know what you mean by "a long time".
24  Q    Back to at least the early 1970's.
25  A.   That's not a long time.  There's a lot

Page 146

1          ARTHUR L. FRANK, M.D., PH.D.
2     longer and older literature.
3     Q    Okay.  Okay.
4     A.   You know, that's why I was confused.
5     There's a lot longer and older literature than
6     that.
7     Q    Dori was a flower child back at that point
8     in time.  No, Dori is much to young to have been a
9     flower child, but you were a flower child; right?
10    A.   Probably.  On a good day, yes.
11    Q    It's considered fashionable then and now,
12    but back in -- I'll rephrase my question.  Is it
13    true that the scientific literature defined a
14    diagnostic entity called diffuse pleural
15    thickening at least as of the 1970's and without
16    relationship to Libby, Montana?
17    A.   Yes.
18    Q    And would you agree with me by the 1970's it
19    was a well-established diagnostic entity?
20    A.   I have not researched or studied the
21    specific use of that term, but certainly pleural
22    disease caused by asbestos, by whatever name it
23    went, had various descriptions and that would have
24    been one characterization of the pleural disease
25    you got from asbestos.

Page 147

1          ARTHUR L. FRANK, M.D., PH.D.
2     Q    Well, for purposes of this case or at any
3     other time, have you actually gone back and done a
4     literature search to determine what the literature
5     has to say about diffuse pleural thickening?
6     A.   Not that term.  I have studied the issue of
7     what one should call pleural disease caused by
8     asbestos, and descriptive changes one could say
9     include both what is now called diffuse pleural
10    thickening or circumscribed or discrete pleural
11    thickening or pleural plaquing.  But the older
12    literature, and I have gone back and read that,
13    did not make that specific distinction.  When that
14    distinction was first made, I don't know, but it
15    was certainly relatively recently.
16    Q    That distinction is well-recognized in the
17    scientific literature today; that is, the
18    distinction between diffuse pleural thickening and
19    circumscribed pleural plaques; correct?
20    A.   It is recognized as being different, but the
21    definition of what accounts for either of those is
22    not necessarily consistent.
23    Q    We'll get to that definition in a minute.
24    Would you agree with me that today diffuse pleural
25    thickening is recognized as a distinct diagnostic

Page 148

1          ARTHUR L. FRANK, M.D., PH.D.
2     entity in the scientific literature?
3     A.   Distinct from what?
4     Q    Distinct from other forms of pleural
5     disease?
6     A.   Yes.
7     Q    And it is diffuse pleural thickening that is
8     the target or focal point for Level IV B; correct?
9     A.   Yes.
10    Q    Now, let me ask you a little bit about
11    diffuse pleural thickening, then.  Diffuse pleural
12    thickening can involve, I think you've made
13    mention, in fact, that the pleura actually has
14    different parts to it anatomically?
15    A.   I have not.  We haven't discussed that, but
16    I would if so asked.  There's the visceral pleura
17    and the parietal pleura.
18    Q    I thought you had referred to that for sure,
19    but --
20    A.   No, I have not.
21    Q    I'm probably confusing you with a less able
22    witness that I have asked the same questions of.
23    A.   Or many of the other thousand doctors that
24    you have taken depositions from.
25    Q    No, to the contrary.  I have not taken a

Page 149

1          ARTHUR L. FRANK, M.D., PH.D.
2     thousand depositions of doctors.  I don't think
3     I've taken a thousand depositions.  I'm not nearly
4     as experienced in that area as you are.  So, the
5     parietal pleura is what portion of the pleura?
6     A.   That that would line the inside of the chest
7     wall.
8     Q    And the visceral pleura is what part of the
9     pleura?
10    A.   The pleura overlying the lung parenchyma.
11    Q    And those are distinct anatomical features
12    of the human body; correct?
13    A.   Yes.
14    Q    And is it true that the literature
15    distinguishes, scientific literature distinguishes
16    diffuse pleural thickening of the parietal pleura
17    from diffuse pleural thickening that also involves
18    the visceral pleura; correct?
19    A.   I have not studied that particular issue.
20    I'm sure they have been discussed in separate
21    terms.  I recall reading some people talk about
22    the parietal pleura and some about the visceral
23    pleura, but I have not studied the use of
24    terminology with regard to that.
25    Q    Well, is there a difference between diffuse

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - June 5, 2009
Arthur Frank M.D., Ph.D.

Page 150

ARTHUR L. FRANK, M.D., PH.D.

1
2    pleural thickening involving the parietal pleura
3    only versus just diffuse pleural thickening
4    involving both the parietal pleura and the
5    visceral pleura?
6    A.    There are some things that are the same and
7    there are some things that are different.  What's
8    the same is that they are caused by the cell type
9    laying down the same collagenous material.  What's
10   different is they are anatomically in two
11   different places.
12   Q    Well, but they are not only anatomically in
13   two different places, there are different types of
14   diffuse pleural thickening; aren't they?
15   A.    No, it's the same collagen being laying down
16   by fibroblast.  It's the same in that sense, it's
17   just that it's in different places.  There is
18   nothing structurally different about the
19   thickening in the parietal or visceral pleuras.
20   Q    Are you testifying that as an expert based
21   upon your actual review of the scientific
22   literature?
23   A.    I'm testifying to the extent that I have not
24   studied the terminology.  I'm not a pathologist.
25   I'm not an anatomist.  That would be my

Page 151

ARTHUR L. FRANK, M.D., PH.D.

1
2    understanding from what I've read.
3    Q    I am just asking kind of pretty candidly,
4    have you actually focused on what the literature
5    has to say --
6    A.    I've already said no.  I'm sorry.
7    Q    What the literature has to say about the
8    differences, if any, between diffuse pleural
9    thickening involving the parietal pleura only
10   versus diffuse pleural thickening involving also
11   the visceral pleura?
12   A.    I have not focused on that in my review of
13   the scientific literature.
14   Q    Thank you.  Now, are you familiar with the
15   difference between -- are you familiar that
16   certain kinds of diffuse pleural thickening
17   involved overlapping pleural plaques?
18   A.    I am not sure what you mean by overlapping
19   pleural plaques.
20   Q    I guess, then, that you wouldn't be familiar
21   with diffuse pleural thickening involving
22   overlapping pleural plaques?
23   A.    I guess not.  I don't understand the term.
24   I've never seen the term "overlapping pleural
25   plaques".

Page 152

ARTHUR L. FRANK, M.D., PH.D.

1
2    Q    Well, are you familiar that diffuse pleural
3    thickening actually can involve different
4    presentations of the tissue?
5    A.    Yes.
6    Q    And pleural plaques are the distinct
7    appearance of pleural tissue; correct?
8    A.    Yes, and they may or may not be calcified.
9    Q    And they may or may not be calcified.  But
10   do you know whether there's a certain kind of
11   diffuse pleural thickening that involves the
12   appearance of overlapping pleural plaques?
13   A.    I'm not aware.  As I said, I've never seen
14   that term.
15   Q    Do pleural plaques involve the parietal
16   pleura, the visceral pleura or both?
17   A.    It can be either.
18   Q    I'm sorry?
19   A.    It can be either or both.
20   Q    Well, is there any difference in frequency
21   with which --
22   A.    I have not studied that.  I don't know.
23   Q    I'm sorry; let me just finish so that the
24   record is clear.  Do you know, are you aware of
25   the frequency with which pleural plaques can

Page 153

ARTHUR L. FRANK, M.D., PH.D.

1
2    involve the parietal pleura or the visceral
3    pleura?
4    A.    I do not know.
5    Q    Are you familiar with the term blunting of
6    the costophrenic angle?
7    A.    Yes.
8    Q    What is blunting of the costophrenic angle?
9    A.    It's when fibrotic changes occur in not that
10   part of the sulcus where the diaphragm and the
11   side wall of the chest meet.
12   Q    Does the pleura extend down into the
13   costophrenic angle?
14   A.    Yes.
15   Q    So, when we talk about blunting of the
16   costophrenic angle, is that blunting of the pleura
17   at the costophrenic angle?
18   A.    It can be, or it can be a collection of
19   fluid.
20   Q    Are you familiar with what the literature
21   says about the blunting of the costophrenic angle
22   in connection with diffuse pleural thickening?  Do
23   you understand the --
24   A.    Not really.  One of the definitions of
25   diffuse pleural thickening requires a blunting of

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - June 5, 2009
Arthur Frank M.D., Ph.D.

Page 154

1           ARTHUR L. FRANK, M.D., PH.D.
2    the angle with fibrotic change.  Others do not
3    take it as a requirement.
4         Q     But if you examine the literature to
5    determine either the -- first of all, if you
6    examine the literature to determine the origin of
7    diffuse pleural thickening where there is a
8    blunting of the costophrenic angle?
9    A.    I don't understand the question.  What do
10   you mean by "origin".  What the cause is?
11        Q     Yes.
12   A.    There are many causes of it.
13        Q     Many causes of diffuse pleural thickening
14   where there was a blunting of the costophrenic
15   angle?
16   A.    There can be.
17        Q     Well, tell me what all the different causes
18   are.
19   A.    Obviously, asbestos is one, but you can have
20   infections in the chest that give you a blunted
21   angle with pleural thickening, that would tend to
22   be unilateral.  Theoretically, trauma can do it.
23   Benign asbestotic pleural effusions, the residue
24   of that can you give you that finding.
25        Q     Well, let's focus on diffuse pleural

Page 155

1           ARTHUR L. FRANK, M.D., PH.D.
2    thickening involving blunting of the costophrenic
3    angle associated with asbestos.  I'm assuming that
4    we have asbestos exposure and I'm assuming that we
5    have an association with an asbestos exposure.
6    A.    Then you have two possibilities.  You've got
7    the fibrotic changes or you've got the residue of
8    a benign asbestotic pleural effusion.
9         Q     So, to be clear, where you have blunting of
10   the costophrenic angle and diffuse pleural
11   thickening, the cause of the diffuse pleural
12   thickening is either the residue of benign pleural
13   effusion or fibrosis?
14   A.    Yes.  Well, they're both fibrosis, it's just
15   fibrosis without a precedent benign asbestotic
16   pleural effusion.
17        Q     And if it's fibrosis without a precedent
18   benign pleural effusion, where does the fibrosis
19   come from?
20   A.    From the irritation of asbestos of the
21   pleura.
22        Q     Of the pleura or of the parenchyma?  Are you
23   saying that you can get blunting of the
24   costophrenic angle, pleural thickening involving
25   blunting of the costophrenic angle --

Page 156

1        ARTHUR L. FRANK, M.D., PH.D.
2    A.    From changes in the pleura, yes.
3         Q     Solely from changes of -- let me be much
4    more precise so that we don't go back and forth or
5    this.  I want to make sure we're clear.  Where you
6    have blunting of the costophrenic angle and
7    diffuse pleural thickening, is it your testimony
8    that that can be caused without either fibrosis of
9    the parenchyma or the residue from a benign
10   pleural effusion?
11   A.    I haven't studied to know if it can occur in
12   the absence of fibrosis in the parenchyma, so I
13   don't know about that.
14        Q     So, when you talked about fibrosis, you were
15   talking as opposed to a benign pleural effusion,
16   you were talking as a second cause, you were
17   talking about fibrosis emanating from the
18   parenchyma; correct?
19   A.    No, pleura.
20        Q     Well, but fibrosis emanating from the pleura
21   in the absence of interstitial fibrosis and in the
22   absence of benign pleura effusion, I thought you
23   just said you hadn't studied that?
24   A.    No, it's the other way around.  I haven't
25   studied the parenchyma.  You're --

Page 157

1           ARTHUR L. FRANK, M.D., PH.D.
2         Q     Oh, I see.
3    A.    You're reversing it now.
4         Q     So, you're saying that there are two causes
5    that you are aware of?
6    A.    You can have scarring of the pleura or you
7    can have residue of benign asbestotic pleural
8    effusion.  I do no know if you will bet a blunted
9    costophrenic angle.  I imagine you can if you get
10   severe parenchymal fibrosis and subpleural
11   fibrosis, but I haven't studied that issue.
12        Q     Well, where you don't have the benign
13   pleural effusion and the residue from that --
14   A.    Yes.
15        Q     -- and you still have blunting of the
16   costophrenic angle, are you saying that it comes
17   from the plaquing process?
18   A.    You're throwing in another term now.  What
19   is the plaquing process?
20        Q     Well, the fibrotic process induced by the
21   presence of asbestos fibers.
22   A.    But it's not the plaquing process, it's a
23   fibrotic process, and plaques are plaques and
24   obviously you're using diffuse pleural thickening
25   as a different entity, so that's why I didn't want

Page 158

ARTHUR L. FRANK, M.D., PH.D.
1  to respond to the plaquing process, not knowing
2  what you meant by that.
3  Q    Well, I could be precise. First of all, are
4  you aware of any scientific literature that says
5  that the fibrotic process giving rise to plaques
6  can cause blunting of the costophrenic angle of
7  the pleura?
8  A    I don't recall what's in the literature, but
9  I've certainly seen such cases clinically.
10  Q    So, without any evidence of benign pleural
11  effusion, you've seen cases -- are these personal
12  cases you've seen not reported in the literature
13  or you just don't know?
14  A    Well, certainly it's cases I've seen. We've
15  seen all kinds of things at Sinai.
16  Q    Well, I'm talking about very specific --
17  A    You're being very specific, and I will tell
18  you that if you're asking me to give answers about
19  the specificity of this particular entity and its
20  pathologic and anatomic roots, this is not a
21  subject that I have particularly studied. This is
22  the second or third time I've said this now. So,
23  I'm giving you the answer based on my experience.
24  But if you're asking me about the scientific
25

Page 159

ARTHUR L. FRANK, M.D., PH.D.
1  literature, I do not recall what the scientific
2  literature says specifically about that subject.
3  Q    And just to be clear, that subject is the
4  cause of diffuse pleural thickening involving
5  blunting of the costophrenic angle?
6  A    In the absence of a benign asbestotic
7  pleural effusion; correct.
8  Q    Have you looked at the literature to see, or
9  do you know, whether the confluence of pleural
10  plaques can affect the visceral pleura?
11  A    I don't understand the phrase "the
12  confluence of pleural plaques". You asked me
13  about overlapping plaques. Now you're asking me
14  about confluence of plaques. Those are not terms
15  I'm familiar with.
16  Q    Is it true that not all diffuse pleural
17  thickening is associated with severe impairment?
18  A    The simple answer is yes, and the simple
19  answer beyond that is there is very poor
20  correlation with radiologic appearance and
21  pulmonary function, if you want to use the term
22  "severe" or "disabling" in terms of someone's
23  pulmonary function status.
24  Q    But you would agree with me, to the general
25

Page 160

ARTHUR L. FRANK, M.D., PH.D.
1  proposition, that not all diffuse pleural
2  thickening is associated with severe impairment?
3  A    And conversely, what would be considered
4  very mild or minimal kinds of disease can be
5  associated with severe disabling changes, none of
6  which is reflected here in the document.
7  Q    I didn't ask you about what was reflected in
8  the document. We're going to get to the document,
9  let me assure you. I'm just trying to find out
10  about the science first.
11  A    Well, the science is, what you said is
12  correct and the converse is correct.
13  Q    Is it also true that, I'm assuming that it
14  is by virtue of your prior answer, that the
15  relationship between diffuse pleural thickening
16  and impairment has been studied by scientists?
17  A    Mr. Finch and I reviewed the Lillis article,
18  for example, which studied that very question.
19  Q    And Lillis is not alone; correct? There are
20  other people that have done research on the same
21  subject?
22  A    Yes.
23  Q    Have you done a review of the literature to
24  study the different studies or different articles
25

Page 161

ARTHUR L. FRANK, M.D., PH.D.
1  that have been published on the relationship
2  between diffuse pleural thickening and impairment?
3  A    Not specifically, no.
4  Q    Is it true that studying that relationship
5  is a complicated process?
6  A    Studying most relationships in science is a
7  complicated process, and this one is, too.
8  Q    And the complications that are involved in
9  determining the relationship between diffuse
10  pleural thickening and impairment include the fact
11  that there are other causes of lung impairment;
12  right?
13  A    There's many causes of lung impairment.
14  Q    Including smoking, obviously?
15  A    Yes.
16  Q    And that if you want to look at diffuse
17  pleural thickening in particular, diffuse pleural
18  thickening is not the only asbestos-related
19  disease that can impair the functioning of the
20  lung; correct?
21  A    Correct.
22  Q    Obviously, you have parenchymal fibrosis as
23  well?
24  A    Yes.
25

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - June 5, 2009
Arthur Frank M.D., Ph.D.

Page 162

ARTHUR L. FRANK, M.D., PH.D.
1
2    Q    Is the research also complicated by the fact
3    that you need to have reliable radiographic
4    readings?
5    A.   I'm not sure I understand the question.  I
6    mean, any time you're going to do a scientific
7    study you need to have reliable assessment of what
8    the radiographs look like.
9    Q    Right.  And what I'm really kind of getting
10   at, isn't it true that when it comes to diffuse
11   pleural thickening in particular that quality of
12   the radiographic assessments has not always been
13   very strong; correct?
14   A.   The quality of radiograph assessments for
15   asbestos disease in general has not always been
16   very strong.
17   Q    You're right.  I deserve that.  Is it also
18   true that diffuse pleural thickening is actually
19   more rare than other forms of asbestosis?
20   A.   Yes.
21   Q    Now --
22   A.   It is less common.
23   Q    Less common.
24   A.   Or more rare.
25   Q    Isn't it true that there is no scientific

Page 163

ARTHUR L. FRANK, M.D., PH.D.
1
2    literature, none, demonstrating that diffuse
3    pleural thickening involving the parietal pleura
4    alone is associated with severe lung impairment?
5    A.   I have never studied that.  I do not know
6    one way or the other.
7    Q    Did you study the McCloud paper?
8    A.   I have.
9    Q    Well, are you familiar with it today so you
10   can speak to it as an expert?
11   A.   If you have a copy of it, it will refresh my
12   memory.
13   Q    I'm just asking do you know what McCloud
14   studied?
15   A.   He was looking at -- I forget the details of
16   it, so I would rather have a copy to look at
17   before I comment.
18   Q    Well, what studies do you know about the
19   relationship between diffuse pleural thickening
20   and severe impairment, that is to say --
21   A.   I'm not sure studies look at -- no study
22   that I'm aware of looked at the level -- was
23   designed to study only one level of impairment.
24   The Lillis paper was not designed to study just
25   severe impairment.

Page 164

ARTHUR L. FRANK, M.D., PH.D.
1
2    Q    I understand that, but certainly --
3    A.   I'm not aware of any paper that was designed
4    to look at just severe impairment.  That was the
5    nature of the question.
6    Q    Then I'll be clearer about my question.  Are
7    you aware of any studies that have included the
8    assessment of whether diffuse pleural thickening
9    results in severe impairment or is associated with
10   it?
11   A.   I'm sure I've read things that says that,
12   yes, they can be associated.  I can't give you the
13   citations for it at the moment.
14   Q    I just want the science.  Based upon the
15   scientific literature, under what --
16   A.   Well, there's another problem that we have,
17   and that is I don't know what the term "severe"
18   means to you.  We have one set of document -- or
19   we have a document here that gives some
20   definition, but I don't know what "severe" is as
21   you used the term.
22   Q    Well, you know that there could be
23   significant reductions in lung function without it
24   being severe; correct?
25   A.   It's an arbitrary cutoff as to what you say

Page 165

ARTHUR L. FRANK, M.D., PH.D.
1
2    is mild, moderate or severe.  I mean, it's like
3    people asking me is it a moderate or severe or
4    heavy smoking history.  It's all in the eyes of
5    the beholder.  Until you have a working
6    definition --
7    Q    I'm going to give you one.  Are you familiar
8    that PFD, pulmonary function test scores, have
9    with them a range of normal, that is that in
10   interpreting pulmonary function tests there are
11   standards or guidelines for what the range of
12   normal is?
13   A.   Yes.
14   Q    And I'll just ask you, are you aware of any
15   science which demonstrates that diffuse pleural
16   thickening can be associated with a diminution in
17   lung function such that is below normal range?
18   A.   Yes.
19   Q    Tell me what science says what are the
20   conditions under which diffuse pleural thickening
21   can result in a diminution of lung function below
22   the range of normal?
23   A.   I'm not sure I understand the question.
24   Q    Well, if there are scientists that are
25   examining -- I'll be clearer.  If there are

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - June 5, 2009
Arthur Frank M.D., Ph.D.

Page 166

ARTHUR L. FRANK, M.D., PH.D.
1  scientists who are examining the relationship
2  between diffuse pleural thickening on the one hand
3  and impairment on the other --
4  A.   Right.
5  Q    I'm just asking, what does the scientific
6  literature say about the circumstances under which
7  diffuse pleural thickening is associated with a
8  diminution of lung function below normal limits?
9        MR. HEBERLING: Objection; unclear
10 as to what "circumstances" means.
11       THE WITNESS: That's exactly right.
12 I don't know what you mean by "circumstances".
13 Some patients with the radiologic findings will
14 have normal pulmonary function, some will have a
15 mild diminution of function and some will have a
16 significant diminution of function.
17 BY MR. BERNICK:
18 Q    And tell me what the literature says about
19 the circumstances under which -- the conditions
20 under which diffuse pleural thickening is found to
21 be associated with an impairment such that lung
22 function drops below normal limits.  What are
23 properties of --
24 A.   I don't know that there are some that are

Page 167

ARTHUR L. FRANK, M.D., PH.D.
1  cited in the literature, and if they are, I'm not
2  familiar with them.
3  Q    Let me just be clear.  Is it completely
4  arbitrary and unpredictable whether diffuse
5  pleural thickening will, in fact, be associated
6  with a significant drop in lung function, or have
7  you just not looked at this in the literature?
8  A.   I have not looked at it in the literature.
9  I've looked at other issues of a similar nature.
10 It is not exactly arbitrary in terms of what,
11 let's say, the degree of parenchymal change.
12       There is some evidence that the
13 higher the radiographic score, the more severe
14 pulmonary function abnormalities will be in
15 groups.  But for any individual, you can have a
16 mildly abnormal x-ray with severe pulmonary
17 function abnormality and for others you can have a
18 significantly high score in terms of parenchymal
19 change with perfectly normal pulmonary function.
20 So, in that sense it is very arbitrary.  It is not
21 predictable for any individual.  For groups, as a
22 group, the higher the radiographic score the more
23 likely one will have a significant diminution of
24 pulmonary function.

Page 168

ARTHUR L. FRANK, M.D., PH.D.
1  Q    So, with that statement, which I appreciate,
2  when we're talking about interstitial fibrosis or
3  would be picked up by asbestosis, what is it Roman
4  IV A, when we're talking about that, science says
5  that as groups people who have the higher levels
6  of fibrosis on radiographic reading tend to have
7  more diminished lung function; is that fair?
8  A.   Yes.
9  Q    In the same fashion, can you tell me what
10 science has to say about when diffuse pleural
11 thickening is associated with lost of lung
12 function?
13 A.   I cannot.  I have not studied that.
14 Q    Do you ever get blunting of the costophrenic
15 angle in the pleura where the fibrosis is only
16 parietal?
17 A.   I don't know.
18 Q    Now, we started out -- if we were to go
19 through the criteria in this TDP Roman IV B, we
20 see that there are requirements regarding the
21 extent and thickness of the pleura; right?
22 A.   Yes.
23 Q    There are criteria involving blunting of the
24 costophrenic angle; correct?

Page 169

ARTHUR L. FRANK, M.D., PH.D.
1  A.   Well, it is assumed under Dr. Welch's
2  definition.  She has adopted, I believe, the ATS
3  document and the interpretation that says that
4  blunting is required.
5        MR. HEBERLING: David, if you are
6  going in to a new area --
7        MR. BERNICK: No, I just want to
8  close this out.
9        MR. HEBERLING: You know, it's
10 12:30.  It might be time for lunch.
11       MR. BERNICK: I'm going to close
12 this out and that's fine.  I will be a few
13 minutes.
14       MR. HEBERLING: So, you'll be done
15 with the deposition?
16       MR. BERNICK: No, we'll just take a
17 lunch break.  I would like to be able to tell
18 you yes, but I can't tell you that.  I know I'm
19 going on and on, but I want to get out of here,
20 too, so.
21 BY MR. BERNICK:
22 Q    So, if we go to the TDP for Roman IV B, we
23 can see, I think just to get us back on the same
24 page, there are criteria for the extent and

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - June 5, 2009
Arthur Frank M.D., Ph.D.

Page 170

ARTHUR L. FRANK, M.D., PH.D.
1
2    thickness of the pleura and there's also an
3    assumption of blunting of the costophrenic angle;
4    correct?
5    A.   It doesn't speak to it here, but that would
6    be my understanding.
7    Q    And, again, Roman IV B is specific to severe
8    impairment, is it not, as measured in the way that
9    it indicates?
10   A.   Yes.  That is this definition of "severe
11   impairment".
12   Q    Okay.
13   A.   And it has certain requirements.
14   Q    And, again, would the answers to the
15   questions here be the same as what you said
16   previously, which is you have not studied what
17   science has to say about the relationship, if any,
18   between the extent and thickness of the pleura and
19   severity of impairment of lung function; have you?
20   A.   I have not, nor am I aware that there is a
21   need to have any particular extent or width.
22   Q    And would the same thing be true about
23   blunting of the costophrenic angle; have you made
24   a study of what the scientific literature says
25   about the relationship between blunting of the

Page 171

ARTHUR L. FRANK, M.D., PH.D.
1
2    costophrenic angle and degree of impairment?
3    A.   Well, to the extent that there is presence
4    of a blunted costophrenic angle, the impairment
5    seems to be greater in groups of such individuals
6    compared to groups of such individuals with pleura
7    plaquing but without the blunted angle.
8    Q    But have you actually studied the literature
9    on that subject?
10   A.   Well, Lillis talks to that subject.
11   Q    Well, that one article.
12   A.   And there's McCloud, there's another one, I
13   think.  I just don't have the recollection of
14   those articles as well.
15   Q    Well, is it true that blunting of the
16   costophrenic angle is a good marker for diminution
17   of lung function; that is to say, that often
18   diminution of lung function is associated with
19   blunting of the costophrenic angle and,
20   conversely, blunting of the costophrenic angle is
21   often associated with loss of lung function?
22   A.   For groups of individuals, it is a marker
23   that there is a correlation, but for any given
24   individual it may not hold.
25   Q    And you just don't know whether the same is

Page 172

ARTHUR L. FRANK, M.D., PH.D.
1
2    true with regard to extent and thickness?
3    A.   I'm not aware that there is data that would
4    speak to that.
5    Q    Is it correct, then, that if you have a TDP
6    that is designed to capture large numbers of
7    people being processed on the basis of objective
8    data as groups of people, wouldn't it make sense
9    if you're trying to pick up severe impairment from
10   diffuse pleural thickening, wouldn't it make sense
11   to include a requirement of blunting of the
12   costophrenic angle?
13   A.   It depends on -- you know, I don't
14   understand the question.
15   Q    I'll rephrase it.
16   A.   It's got a problem in there.  You've got a
17   severe problem with the question.
18   Q    So, if we have a process where the TDP
19   portion of the process is designed to process
20   large groups of people on the basis of objective
21   findings and without individual review, and it
22   also includes the part where people who fail those
23   criteria can still get individual review, doesn't
24   it make sense to have, as part of the TDP review,
25   a requirement for blunting of the costophrenic

Page 173

ARTHUR L. FRANK, M.D., PH.D.
1
2    angle if you want to pick up severe impairment?
3    A.   Not especially.  I think the judgement
4    should be what the pulmonary function -- severe is
5    a pulmonary function judgement, not a radiologic
6    judgement.  So, if your desire is to compensate
7    people based upon the severity of their disease
8    clinically, which is not a radiologic diagnosis,
9    but a physiologic diagnosis, then you would use
10   pulmonary function testing and you would use DLCO
11   and it wouldn't matter what the radiographic
12   changes are.
13   Q    But you only want to compensate people who
14   have --
15   A.   You're telling me who I want to compensate?
16   Q    No, no?
17   A.   If one wants to compensate.
18   Q    If one wants to compensate people who have
19   the severe impairment, however it might be
20   measured, the severe impairment from the diffuse
21   pleural thickening, not from any other source, but
22   from the diffuse pleural thickening, wouldn't it
23   be appropriate, in light of the science on
24   costophrenic angle blunting, to include that as a
25   requirement?

Page 174

ARTHUR L. FRANK, M.D., PH.D.
1
2  A.   It depends on what your definition -- first
3  of all, it's the same problem you had with the
4  last question that I said you a problem with.  It
5  depends on what your definition of diffuse pleural
6  thickening is.  If you use Dr. Welch's definition
7  of diffuse pleural thickening, you don't have to
8  use the idea of the presence or absence of a
9  blunted angle, because by definition, it can't be
10  diffuse pleural thickening unless there's a
11  blunted angle.
12  Q   Well, I'm saying -- I understand it and I
13  want to get very specific and clear so you're okay
14  with at least the question.  You're smiling like
15  you don't believe me when I say that, but be that
16  as it may, I'm going to ask you the question a
17  different way.  The goal is to have -- I want you
18  to assume that the goal is to have groups of
19  people processed in a way that is reflective of
20  what the scientific literature says about diffuse
21  pleural thickening.  I want you to assume that.  I
22  further want you to assume that you only want to
23  capture people who have severe pulmonary
24  impairment, however that might be measured, and
25  have that impairment from no cause other than the

Page 175

ARTHUR L. FRANK, M.D., PH.D.
1
2  diffuse pleural thickening, it's the only cause.
3  That's what you want to pick up.  And if people
4  aren't picked up, then they can go through
5  individual review, but you want to process volumes
6  of people.  Are you aware of the scientific
7  literature identifying any other marker of diffuse
8  pleural thickening that is associated with lung
9  function impairment other than blunting of the
10  costophrenic angle?
11          MR. HEBERLING:  Objection;
12  compound, vague.
13          THE WITNESS:  It's a
14  self-fulfilling question.
15  BY MR. BERNICK:
16  Q   Well, I'll begin with the end.  Are you
17  aware of anything in the literature that is a
18  marker for a linkage between diffuse pleural
19  thickening and impairment of lung function other
20  than blunting of the costophrenic angle?
21  A.   It goes back to the question of how do you
22  define diffuse pleural thickening?
23  Q   Diffuse pleural thickening defined to
24  include both blunting of the costophrenic angle
25  and cases where it's not there.

Page 176

ARTHUR L. FRANK, M.D., PH.D.
1
2  A.   Okay.  So, that would not be using the
3  definition according to the 2000 revision of the
4  ILO Classification.
5  Q   First of all, I'll put out the question.
6  You're now going to target for volume treatment
7  people who have diffuse pleural thickening with or
8  without costophrenic angle blunting, you want to
9  target them and you want to use the scientific
10  literature to figure out of those people who have
11  diffuse pleural thickening and a significant
12  diminution of lung function and which ones of them
13  is the diminution of lung function most clearly
14  caused by the diffuse pleural thickening.  That's
15  what you want to do.
16  A.   Yes.
17  Q   Isn't it true that the only marker or
18  requirement the literature gives you in order to
19  differentiate those people who are severely
20  impaired in association with diffuse pleural
21  thickening, is blunting of the costophrenic angle?
22          MR. HEBERLING:  Objection; compound
23  and vague.
24          THE WITNESS:  It's irrelevant.  If
25  you've got somebody with diffuse pleural

Page 177

ARTHUR L. FRANK, M.D., PH.D.
1
2  thickening, even without a blunted angle and
3  they have severe diminution of the pulmonary
4  function test and you have determined that they
5  had exposure to asbestos and there is no other
6  explanation for their --
7  BY MR. BERNICK:
8  Q   I didn't say no other explanation.  That's
9  the whole point --
10          MR. HEBERLING:  Objection.  Let him
11  finish his answer.  One question at a time.
12          THE WITNESS:  The finding of the
13  blunted angle doesn't mean that it was caused by
14  asbestos.  You still need the history of
15  exposure, which is part of the criteria, but
16  whatever.  The presence or absence of the
17  blunted angle becomes irrelevant.
18          If you've got the pulmonary
19  function data and you have a disease that you've
20  ascribed to asbestos, with or without the
21  blunted angle, you ought to be able to make the
22  determination.  If you want to be clearer or if
23  you want to -- this whole issue, not just
24  regarding IV B, but any of these, becomes a
25  philosophical issue.  Do you want to make it, as

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - June 5, 2009
Arthur Frank M.D., Ph.D.

Page 178

ARTHUR L. FRANK, M.D., PH.D.
1
2 you put it, quick and simple and, you know,
3 maximizing the number of people you put through,
4 or do you want to set up so many barriers that
5 it makes it hard for people to get through this?
6 And where you set that, you know, is a
7 determination that ought to be based on science,
8 but obviously, to me anyway, based upon other
9 issues with regard to this whole document --
10 **Q    Let's go back to --**
11 A.    -- because it's irrelevant with regard to
12 the specific issue if you have a blunted angle or
13 not if you have diminished pulmonary function and
14 you have pleural disease caused by asbestos.
15 **Q    Let's be clear, because I don't think that's**
16 **consistent with what you've already told us?**
17 MR. HEBERLING:  David, let me
18 advise you, he gets up really early in the
19 morning and usually likes to each lunch before
20 noon.
21 MR. BERNICK:  We'll finish up here.
22 If the Witness wants to take a break, we'll take
23 a break.  I want to take a break soon, too, but
24 I want to finish up this line of examination
25 before the skeen is lost.

Page 179

ARTHUR L. FRANK, M.D., PH.D.
1
2 BY MR. BERNICK:
3 **Q    If you have somebody who has significant**
4 **impairment of lung function measured by whatever**
5 **test you want to pick --**
6 A.    Well, the ones I want to pick aren't here.
7 **Q    Well, I didn't ask you that.  I said by**
8 **whatever ones you wanted to pick, and you wanted**
9 **to know the likelihood -- and they had diffuse**
10 **pleural thickening with or without a costophrenic**
11 **angle, they have diffuse pleural thickening --**
12 A.    Right, I understand.
13 **Q    And you say, I want to go to the scientific**
14 **literature and determined if there is any way to**
15 **find out whether their diffuse pleural thickening**
16 **is caused by -- or causes the diminution of lung**
17 **function, isn't it true that the only factor that**
18 **the literature tells us makes it more likely that**
19 **diffuse pleural thickening is the cause of the**
20 **diminution of lung function is blunting of the**
21 **costophrenic angle?**
22 A.    It depends on what level you want to set
23 your assurance at.
24 **Q    I understand that.**
25 A.    If you're looking for an additional factor,

Page 180

ARTHUR L. FRANK, M.D., PH.D.
1
2 that would be an additional factor you could use.
3 You could also change where you set the numbers
4 for your pulmonary function.  You can set them,
5 like Social Security Disability does, so low that
6 the likelihood is you're going to be dead within a
7 year before they're going to pay you disability,
8 you can set it wherever you want and you can
9 require or not require more or less proof to make
10 you feel more or less comfortable.  Clearly given
11 your construct if you want to make it more
12 different and to be more sure under whatever
13 construct you want to be more sure, which is also
14 a way of saying you're less likely to pay people,
15 so I don't see how it cuts down on individual
16 review or getting more people through the system,
17 then you would adopt the idea of using the
18 costophrenic angle as one additional information
19 that makes it more likely that their pulmonary
20 function is, in fact, related to their pleural
21 thickening.
22 **Q    Would you agree with me that there is a**
23 **reasonable scientific basis for using blunting of**
24 **the costophrenic angle as a criteria if the goal**
25 **is to make it more certain that a group of**

Page 181

1 **ARTHUR L. FRANK, M.D., PH.D.**
2 **people's diminution of lung function is, in fact,**
3 **attributable to diffuse pleural thickening?**
4 A.    More certain than what?  Than what else?
5 **Q    Than without using it, that the inclusion**
6 **of --**
7 A.    I don't think so.  It's a question of more
8 or less likely to be due to that cause or some
9 other cause.
10 **Q    That's what I'm saying.**
11 A.    Diffuse pleural thickening with or without a
12 blunted angle, you want to be able to determine in
13 that case, especially if you're requiring
14 bilateral changes, that it's caused by asbestos.
15 So, the addition of the blunted angle or not
16 should make no difference.  You've already --
17 **Q    Should?**
18 A.    It doesn't make any --
19 **Q    Well, that's where we're going.**
20 MR. HEBERLING:  Objection.  Let him
21 finish his answer.
22 THE WITNESS:  It's a question of --
23 you can set up a hierarchy and say you have to
24 meet three of these or four of these or five of
25 these or six of these.  The higher the number of

Page 182

ARTHUR L. FRANK, M.D., PH.D.

1  ARTHUR L. FRANK, M.D., PH.D.
2  things you want to meet before you feel
3  comfortable in paying somebody money, then that
4  would be something that you would include.
5      If you actually want to use the
6  idea that you want to be equitable to people and
7  pay people and get them through the system
8  quickly and not require a lot of review, it
9  shouldn't matter if there's blunted angles or
10  not, you're using a lower level of proof, which
11  should still be adequate if it is believed that
12  it was caused by asbestos with or without the
13  blunting.  But if you wanted to make it more
14  different, than you can, in fact, can add the
15  blunting in.
16  Q    Fair enough.  Let's adopt your rue brick,
17  but use -- you have the business about how you
18  want to make it more different or make it harder
19  and we'll let the court decide what the
20  appropriate answer to that is or whether that's
21  even relevant.  I'm just asking about the science.
22  And there's a difference between -- I'm going to
23  focus on between making something harder on the
24  one hand and then on the other making the number
25  of people narrower, but based upon scientific data

Page 183

1  ARTHUR L. FRANK, M.D., PH.D.
2  and study.  So, it's not just arbitrary, the
3  science tells you, yes, if you do that you make it
4  more likely that the diminution in function is, in
5  fact, caused by the disease that you're trying to
6  compensate for.  So, having said all that, I'll
7  put a question to you.
8  A.   Okay.
9  Q    We want to compensate people who have both a
10  severe diminution in lung function and diffuse
11  pleural thickening, and the two are causally
12  related; that is, the diminution of lung function
13  is caused by diffuse pleural thickening.  I want
14  you to assume that's what the goal is of the
15  category.  And now we want to say, well, what can
16  we do to make it more certain scientifically that
17  the two things are tied together, the diffuse
18  pleural thickening and the loss of lung function?
19  That's the question on the table.  And what I'm
20  asking you is, isn't it true that there is
21  science, that science says, that blunting of the
22  costophrenic angle, if it's present, makes it more
23  likely that a severe loss in lung function was, in
24  fact, caused by diffuse pleural thickening?
25  A.   It would apply to groups of people, it would

Page 184

1  ARTHUR L. FRANK, M.D., PH.D.
2  not apply to any given individual.
3  Q    Subject to that, is the answer to my
4  question "yes"?
5  A.   It is a piece of science that makes you more
6  certain that a group of individuals has their
7  disease caused by asbestos, but it would not apply
8  to a particular individual.
9  Q    And is that also true with respect to
10  bilateral as opposed to unilateral diffuse pleural
11  thickening?
12  A.   Yes.
13  Q    Now, in light of your Counsel's remark, I
14  want to close this up by just talking about lung
15  function briefly, and then we'll take the break.
16  Lung function, under this TDP, this category, lung
17  function is measured by forced vital capacity
18  results; correct?
19  A.   Yes.
20  Q    And it's not measured by DLCO; correct?
21  A.   Correct.
22  Q    Now, is it true that, again, if you're
23  processing large groups of people and you want to
24  know do they have a severe loss of lung function,
25  science says that there's a reasonable basis for

Page 185

1  ARTHUR L. FRANK, M.D., PH.D.
2  measuring their severe loss of lung function by
3  using forced vital capacity results?
4  A.   That is certainly one way you can do that
5  measurement, but it doesn't exclude the
6  possibility of using other measurements as well.
7  Q    Again, I would accept that answer, and I
8  would then want to go to DLCO in particular.  DLCO
9  is another way of measuring loss of lung function;
10  correct?
11  A.   Correct, one that is not as capable of being
12  manipulated by the individual.
13  Q    Well --
14  A.   It is more objective than the subjective
15  nature of PFTs.
16  Q    But results from DLCO, that is when you have
17  diminished DLCO, there can be many causes of
18  diminished DLCO that are not specific to asbestos;
19  correct?
20  A.   Yes.
21  Q    Now, with forced vital capacity results,
22  you're able to differentiate impairment due to
23  restriction from impairment due to obstruction;
24  correct?
25  A.   Yes.

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - June 5, 2009
Arthur Frank M.D., Ph.D.

Page 186

ARTHUR L. FRANK, M.D., PH.D.
1
2    Q    In the case of diffuse pleural thickening,
3    isn't it correct, absolutely correct under the
4    science, that the impairment associated with
5    diffuse pleural thickening is restrictive and not
6    obstructive?
7    A.    I do not know.  I know you can get
8    restrictive changes, but you can also get
9    obstructive changes following exposure to
10   asbestos.  I do not know if you will find that
11   with diffuse pleural thickening or if you require
12   parenchymal disease.
13   Q    Very fair.  If it is the case that science
14   says that the impairment associated with diffuse
15   pleural thickening is restrictive and not
16   obstructive, isn't it true that forced vital
17   capacity will enable you to determine whether lung
18   function impairment is associated with diffuse
19   pleural thickening or something else?
20   A.    Yes.
21   Q    DLCO can't tell you that; correct?
22   A.    Can't tell you if it's related to -- well --
23   Q    It can't tell you whether the lung function
24   impairment is either restrictive or obstructive;
25   correct?

Page 187

ARTHUR L. FRANK, M.D., PH.D.
1
2    A.    But you have other pieces of information
3    that will help you decide that it's not an
4    isolated finding.  If you have -- if you do
5    pulmonary function testing, you will know if
6    somebody has obstructive disease.  If they have a
7    chest x-ray, you'll know if they have severe
8    emphysema which would reduce DLCO because it
9    had --
10   Q    True enough.
11   A.    If I can just finish.  If you're doing it
12   only in isolation, it is not as good as a single
13   isolated test, but if you're doing it as a battery
14   of assessments, knowing the other factors such as
15   what the chest x-rays looks like and what the PFTs
16   look like, DLCO may, in fact, be a better
17   measurement.
18   Q    But we're now talking about volume
19   processing of claims without doctors doing -- I'm
20   sorry -- without doctors doing, you know, "B"
21   Reads as part of the claims qualification process,
22   so if you wanted --
23   A.    But I believe it does require a "B" Read,
24   because if you're having a criteria that requires
25   an ILO reading, I believe it is required to be

Page 188

ARTHUR L. FRANK, M.D., PH.D.
1
2    done by people of a certain -- probably a "B"
3    Reader.
4    Q    But I'm saying, by the time the
5    documentation comes in to be processed, no one
6    else is looking at x-rays anymore, it's just
7    what's recorded on the piece of paper.  So, if all
8    that you know from the piece of paper is DLCO, you
9    can't tell -- let me be more clear about this.
10   From forced vital capacity you can tell whether
11   the lung function impairment is obstructive or
12   restrictive.  We've established that; correct?
13   A.    But you can also have -- it doesn't speak to
14   that here.  It's not asking anybody to look at the
15   FEV1, for example.  You can sometimes have a mixed
16   picture, and sometimes your FVC can be diminished
17   because you have --
18   Q    There's a ratio requirement.
19   A.    Well, it's a ration requirement, but --
20            MR. HEBERLING:  Let him finish.
21            THE WITNESS:  -- but you could have
22   a severe obstructive disease, your FVC will go
23   down, so it would look like a restrictive
24   process, but it's really secondary to an
25   obstructive process.

Page 189

ARTHUR L. FRANK, M.D., PH.D.
1
2    BY MR. BERNICK:
3    Q    Well, the point of the ratio is to be able
4    to determine whether there's a restrictive versus
5    an obstructive process; correct?
6    A.    It does help with that, but it would still
7    be nice to look at all the numbers including the
8    FEV1, because you're getting it anyway.
9    Q    You're getting it anyway.  So, my question,
10   though, is if you put in DLCO as an alternative
11   basis where the forced vital capacity results do
12   not show restrictions, how do you find out whether
13   the DLCO, on its face, the DLCO won't tell you
14   whether a loss of defusing capacity is caused by
15   restriction or caused by many other things,
16   including smoking; correct?
17   A.    How do you tell that is, you go to item four
18   of this medical exposure criteria, supporting
19   medical documentation.  You look to see what the
20   documentation says and what the judgement of the
21   doctor is as to what the cause of the reduced DLCO
22   is.
23   Q    But that's individual review.
24   A.    Not if you're asking it to be done before
25   you send it in.

Page 190

1            ARTHUR L. FRANK, M.D., PH.D.
2    Q    No. What you're asking to be done is that
3    people must qualify for things that appear above,
4    plus supply the documentation of it. It doesn't
5    require that you submit the whole medical record.
6    A.   It says, "Supporting medical documentation
7    establishing asbestos exposure as a contributing
8    fact in causing the pulmonary disease in
9    question."
10   Q    Which is what they have above. That is, you
11   have to have documentation of these things.
12        MR. HEBERLING: Objection;
13   argumentative.
14        THE WITNESS: It says you have to
15   have --
16   BY MR. BERNICK:
17   Q    Let's make it simpler, because now we're
18   back into parsing the TDP, and I know that that is
19   something you don't have the -- forget all that.
20   Question, if you have a DLCO, that's what you
21   have, there are many other causes of loss of
22   diffusing function capacity that in order to
23   evaluate you would have to have medical files;
24   correct?
25   A.   You need to have medical files to do this

Page 191

1            ARTHUR L. FRANK, M.D., PH.D.
2    assessment.
3    Q    I'm asking you whether you would need to
4    have medical files; correct?
5    A.   You would need to have medical files just as
6    you would need to have medical files for these
7    cases as well.
8    Q    Well, you wouldn't need to have medical --
9    all you need to have for the forced vital capacity
10   are the force vital capacity results?
11   A.   No, it requires all of these things, that
12   somebody still has to look at, including a medical
13   assessment that links them all together. That's
14   what it says here.
15   Q    Okay. We'll take a lunch break.
16   A.   Okay.
17               - - -
18        (Whereupon a short break was taken
19   at this time.)
20               - - -
21   BY MR. BERNICK:
22   Q    Dr. Frank?
23   A.   Yes, sir.
24   Q    The TDP, focusing again on Roman IV B.
25   A.   Yes.

Page 192

1            ARTHUR L. FRANK, M.D., PH.D.
2    Q    I want to figure out whether that TDP has
3    the effect of excluding, not picking up, what's
4    called excluding, people with diffuse pleural
5    disease outside of Libby; people who are described
6    in the scientific literature, nothing to do with
7    Libby, and have diffuse pleural thickening. And
8    my question to you is whether some of them are
9    excluded, not picked up by the TDP, Roman IV B?
10   A.   There shouldn't be anything different about
11   people outside Libby than inside Libby. It will
12   pick up or not pick up people according to
13   whatever criteria you get adopted.
14   Q    We know from the literature that there are
15   people with diffuse pleural thickening outside of
16   Libby who wouldn't meet the thickness and the
17   extent requirements; right?
18   A.   There will be people inside Libby who won't
19   meet it.
20   Q    I understand that. But I'm focusing first
21   on outside and then we'll get to Libby.
22   A.   There is nothing different about the people
23   outside than inside.
24   Q    Well, I guess that really kind of then takes
25   me to the question. Is there any analysis that

Page 193

1            ARTHUR L. FRANK, M.D., PH.D.
2    has been done which says that the proportion of
3    people with nonmalignant asbestos-related disease
4    as a result of exposures in Libby, that the mix of
5    those people, in terms of whether they have
6    diffuse pleural thickening or not is any different
7    than it is outside of Libby?
8    A.   I haven't seen that kind of comparison.
9    What I can tell you is the percentage of people in
10   Libby with only community exposure getting disease
11   is far higher than I've seen anywhere else. But
12   I've not seen what proportion have that particular
13   problem in Libby versus the proportion that have
14   it outside of Libby. The closest you would be
15   able to get to look at that is, let's say,
16   something like Dr. Lillis study where you have the
17   insulators where she found roughly twenty percent
18   met those criteria. I don't know what the
19   percentage would be in Libby.
20   Q    But the insulators would have been workers;
21   right?
22   A.   Well, you didn't specify workers or
23   nonworkers. You said people in Libby, that could
24   include workers.
25   Q    But I mean, just in general terms, you're

Case 01-01139-AMC    Doc 22731-3    Filed 08/07/09    Page 51 of 93

US District Court - Delaware                    FINAL - June 5, 2009
Chapter 11 - W.R. Grace                         Arthur Frank M.D., Ph.D.

Page 194

1           ARTHUR L. FRANK, M.D., PH.D.
2    not aware of anybody else who has done an analysis
3    of disease patterns of Libby to see if it comes to
4    nonmalignant respiratory disease and diffuse
5    pleural thickening specifically whether there is a
6    different pattern of manifestation of those
7    conditions on Libby versus elsewhere?
8    A.    I've not seen it published.  I can tell you
9    from my various trips to Libby and in talking with
10   the doctors at the CARD Clinic that there do seem
11   to be factors in Libby that do not sound like what
12   I've seen in any other group or read about in any
13   other group.  There's a higher percentage of
14   people with chest pain, which is a rare
15   manifestation of asbestos-related disease in other
16   populations.
17            There appears to be a pattern in some
18   individuals of acute obstructive changes, which
19   tend not to be seen elsewhere.  There is a
20   severity of disease leading to death with rather
21   minimal changes on x-ray, some of which are even
22   only found occasionally on CT scan that is not
23   like the pattern of disease I see elsewhere, but
24   none of that has been written or put into the
25   scientific literature.

Page 195

1           ARTHUR L. FRANK, M.D., PH.D.
2    Q.    And have you done the analysis about whether
3    the TDP category Roman IV B would have any kind of
4    disproportionate effect on people with diffuse
5    pleural disease at Libby?
6    A.    I have not done that kind of analysis.
7    Q.    Are you aware of anybody who has?
8    A.    No.
9    Q.    Let me ask you about the mortality data that
10   you've worked on, and then I'll be done.  As I
11   understand it, there's a group of people who were
12   residents of Libby who died and whose disease has
13   been recorded at the CARD Clinic and in turn
14   reviewed by Dr. Whitehouse and others, including
15   yourself?
16   A.    Yes.
17   Q.    And that the review of the mortality
18   experience at the CARD Clinic, can we just call
19   that the CARD mortality study or CARD mortality
20   data?
21   A.    Yes.
22   Q.    Which would you prefer?
23   A.    The latter.
24   Q.    Okay.  And as I further understand it, the
25   CARD mortality data, the analysis of that data,

Page 196

1    has now been updated as of May of this year?
2    A.    Yes.
3    Q.    And that updated data is not reflected in
4    various
5    sur-sur-supplemental-supplemental-supplemental
6    reports; right?
7    A.    I'm not sure I know what a
8    sur-sur-supplemental-supplemental-supplemental
9    report is, but I think you're being a little
10   facetious, but it has been reflected in other
11   documents.
12   Q.    Right.  I was being a little facetious?
13   A.    Well, I just want the record to be clear
14   about that so I'm not answering something that
15   made no real sense.
16   Q.    Later on it will come back to haunt you as a
17   serious statement.
18   A.    You can imagine in the number of depositions
19   that I've given lines are pulled out in kinds of
20   places.
21   Q.    Right.  So, as I understand it, you in
22   particular have gone ahead and reviewed the
23   medical records of seventy-six nonmalignant
24   deaths; is that correct?

Page 197

1           ARTHUR L. FRANK, M.D., PH.D.
2    A.    No, I have not reviewed the medical records.
3    I have reviewed radiographic data, but I've not
4    reviewed the medical records in all those cases.
5            MR. HEBERLING:  Off the record.
6                         - - -
7            (Whereupon a discussion was held
8    off the stenographic record.)
9                         - - -
10   BY MR. BERNICK:
11   Q.    To get back on the same page, there were
12   seventy-six nonmalignant deaths where you read the
13   documentation of the radiographic readings?
14   A.    I read the x-rays or the CT scans and made
15   measurements, not just reading the documentation.
16   Q.    Now, how did seventy-six get picked out?
17   A.    Those were the deaths at the clinic from
18   individuals I believe you said the criteria were
19   nonoccupational exposure.
20   Q.    No, I didn't say that.
21   A.    These were the deaths at the clinic with --
22   I'm not exactly sure, as I sit here right now, to
23   remember how those seventy-six got selected.
24   Q.    And maybe this will shorten the examination
25   even more and we'll wait for Dr. Whitehouse to

Case 01-01139-AMC    Doc 22731-3    Filed 08/07/09    Page 52 of 93

US District Court - Delaware                FINAL - June 5, 2009
Chapter 11 - W.R. Grace                     Arthur Frank M.D., Ph.D.

Page 198

ARTHUR L. FRANK, M.D., PH.D.

1  clarify all these things when we examine him. My
2  understanding is that of the people who had
3  asbestos-related illness at the CARD Clinic and
4  died, and have died up through May of this year,
5  that those cases of mortality were reviewed in
6  order to determine whether asbestos-related
7  illness was a contributing factor in the deaths of
8  these individuals?
9  A.   No. It was reviewed --
10              MR. HEBERLING: Objection;
11  misstates the record.
12              MR. BERNICK: That's not even an
13  objection. It's object to form.
14  BY MR. BERNICK:
15  Q   If I'm wrong, tell me why I'm wrong.
16  A.   The last part of your statement --
17  Q   Well, there was some analysis that was done.
18  A.   Right, that these --
19  Q   All right. You go ahead.
20  A.   These were people that have died at the CARD
21  Clinic, and I forget how you characterize it. I
22  was just about to answer and the objection came in
23  and the thought left my head. There were people
24  that died at the CARD Clinic for which there was

Page 199

ARTHUR L. FRANK, M.D., PH.D.

1  radiographic evidence and you said as --
2  Q   As the cause.
3  A.   -- cause of death. No, that was the
4  mischaracterization. There were seventy-six
5  deaths and they had been analyzed by underlining
6  cause of death or the disease was present but
7  didn't necessarily cause their death. So, the
8  number who died of what appeared to be
9  asbestos-related disease who entered that study, I
10  think the number is now sixty-two, that's the --
11  Q   Let me just get at this. A subset -- if we
12  begin with the group of people who died and who
13  were studied or seen at the CARD Clinic --
14  A.   Right.
15  Q   -- and, therefore, made their way into the
16  mortality study, some subgroup of them was
17  identified where a determination was made that
18  their death was, in some fashion or by some test,
19  caused by their asbestos exposure?
20  A.   Correct.
21  Q   Were you involved in the process of making
22  the determination of the causal relationship
23  between the death of those individuals on the one
24  hand and their exposure to asbestos on the other?

Page 200

ARTHUR L. FRANK, M.D., PH.D.

1  A.   I did not have a role in the decision about
2  any given case I had discussions over what the
3  criteria to be used would look like to make the
4  data as compatible as we could with the way that I
5  have been trained and brought up at Mount Sinai
6  with Dr. Selikoff to make that determination.
7  Since you know, as I'm sure you do, his data looks
8  at, for example, death certificate data and then
9  best evidence. And the best evidence sometimes
10  supercedes and clarifies what is written on the
11  death certificate. So, the mortality study, the
12  ultimate decision was not made by me, but the
13  process and the construct to use I had a
14  contribution to.
15  Q   So, you are knowledgeable about it?
16  A.   Yes.
17  Q   So, the goal is to isolate or find within
18  the broader group of people who died at CARD, or
19  who died and whose records are at CARD, find the
20  subgroup of those whose deaths were, in some
21  fashion, causally attributable to their asbestos
22  exposure. That was the goal; right?
23  A.   Yes.
24  Q   And the question was, what should be the

Page 201

ARTHUR L. FRANK, M.D., PH.D.

1  test of the relationship? What test should be
2  adopted in determining whether the death was
3  caused by asbestos exposure, that was the issue
4  you were addressing; right?
5  A.   Yes.
6  Q   And what ultimately was the test, as you
7  understood it, that was used in analyzing the CARD
8  mortality data? Just state it for us.
9  A.   That those that would be said to have died
10  of an asbestos-related disease had their, as the
11  underlining cause of death, a disease that was
12  related to asbestos. Other individuals had
13  evidence of asbestos disease, but it did not
14  contribute -- or it may have contributed to their
15  death or it may have been present when they died
16  of something unrelated to asbestos, and those
17  would be categorized separately.
18  Q   So, I want to become now more precise about
19  that. As I understand it, there was a review done
20  of the death certificates for the individuals at
21  the CARD Clinic; correct?
22  A.   Yes.
23  Q   And death certificates typically have a
24  primary cause of death and then they have a second

Case 01-01139-AMC    Doc 22731-3    Filed 08/07/09    Page 53 of 93

US District Court - Delaware                    FINAL - June 5, 2009
Chapter 11 - W.R. Grace                         Arthur Frank M.D., Ph.D.

Page 202

ARTHUR L. FRANK, M.D., PH.D.

1
2 line --
3 A.   It's not primary.  It's usually immediate
4 cause of death caused by or due to -- they have
5 several such lines, and then they usually have
6 another box that says, other significant
7 conditions.
8 Q    So, in your own words, then, two lines to
9 the death certificate?
10 A.   Well, there's at least three, probably four
11 lines.  For example, the immediate cause of death
12 could be listed as pulmonary arrest or cardiac
13 arrest.  The underlying cause could be a lung
14 cancer or asbestosis.  So, you code it as to what
15 the underlying cause was, not the immediate
16 physiological entity.
17 Q    So, what does "immediate cause" mean in a
18 death certificate?  What is it supposed to mean?
19 A.   What was the final event that caused the
20 demise.
21 Q    And then the second line or second cause was
22 what, again?
23 A.   It's usually called "due to" or sometimes it
24 says "as a consequence of".
25 Q    And what's the test for whether something is

Page 203

ARTHUR L. FRANK, M.D., PH.D.

1
2 a cause?  What's the test of what goes on that
3 second line?
4 A.   There are official ways of doing that called
5 -- there are individuals who do such coding.
6 They're called nosologists.
7 Q    Right.
8 A.   And that's the official way to do it.  But
9 basically the other way to do it is to look at the
10 totality of the record and make a clinical
11 judgement as to what the cause of death is.  And
12 so the death certificate may say, you know,
13 pulmonary arrest or heart attack or something like
14 that, but then it's caused by something else.
15 Sometimes they're very simple and straightforward,
16 there isn't this multiplicative of lines that are
17 used.
18          It simply says lung cancer or
19 mesothelioma, but sometimes it says pulmonary
20 arrest due to mesothelioma.  So, the cause of
21 death was mesothelioma and not the physiological
22 event.
23 Q    So, to put it in a nutshell, the death
24 certificate is supposed to reflect the immediate
25 cause of death, that being the condition immediate

Page 204

ARTHUR L. FRANK, M.D., PH.D.

1
2 precedent to death, and then it's also supposed to
3 reflect the cause of death; that is, what the
4 death was due to.
5 A.   Is that a question or a statement?
6 Q    An attempt to make a succinct statement and
7 ask you whether it was true or not.
8 A.   The reality of the way death certificates
9 are filled out is sort of as follows, very rarely
10 do physicians in their training, either in medical
11 school or as residents, get training in filling
12 out death certificates.  We are not trained as a
13 nosologist would be trained, and death
14 certificates have significant problems with it.
15          Most physicians will put down as the
16 cause of death not the immediate physiologic
17 entity, such as cardiac arrest or pulmonary
18 arrest, or whatever, but they will put down the
19 underlying cause.  Some go through more of a
20 complicated step.  But I would say the vast
21 majority of death certificates will have one
22 cause, but it is also entirely legitimate to put
23 down that series of events, and there's no good
24 rule that doctors follow.
25          For example, it may say pulmonary

Page 205

ARTHUR L. FRANK, M.D., PH.D.

1
2 arrest caused by mesothelioma as a consequence of
3 asbestos exposure.  I mean, you will see that on
4 death certificates.  So, you have to make some
5 judgement and the judgement is the cause of death
6 was really mesothelioma.
7 Q    That's what you are aiming for, is to
8 determine the cause of death?
9 A.   The cause of death.  The most accurate
10 depiction of the cause of death.
11 Q    Now, what you're saying is that because the
12 death certificate either might not be available or
13 may not be properly filled out or may not be very
14 revealing, in the work that you've done outside of
15 Libby, you can look to the best evidence, I think
16 is what you called it?
17 A.   Correct.
18 Q    And what does the best evidence refer to?
19 A.   And I haven't done those kinds of study,
20 just to be clear.  I was part of the studies at
21 Sinai where this was done and I had to do with
22 the insulators cohort that we talked about earlier
23 this morning.
24          When an insulator would die, a copy
25 of the death certificate would come to Mount

Case 01-01139-AMC   Doc 22731-3   Filed 08/07/09   Page 54 of 93

US District Court - Delaware                    FINAL - June 5, 2009
Chapter 11 - W.R. Grace                         Arthur Frank M.D., Ph.D.

Page 206

1           ARTHUR L. FRANK, M.D., PH.D.
2    Sinai.  What Dr. Selikoff would then do is write
3    to the physician and/or to the hospital, it was
4    usually the hospital where the death occurred, and
5    obtain medical records and ideally obtain
6    pathology, and then Dr. Suzuki, one of the
7    pathologists who was on the staff in the
8    environmental sciences laboratory, would review
9    the tissue, because there were many errors,
10   especially back in the '70's and such where things
11   as mesothelioma weren't as well-recognized, and
12   there would be misdiagnoses.
13          For example, it would say
14   carcinomatosis of the abdomen as a cause of death,
15   and they would miss the fact that it was a
16   peritoneal mesothelioma.  Or it would be listed as
17   a lung cancer when it was a meso.  Or sometimes it
18   was listed as a meso when it was actually a lung
19   cancer.  So, at the end of the day we relied upon
20   the most accurate and experienced pathologic
21   diagnosis, along with the clinical judgement that
22   Dr. Selikoff would bring as he would classify
23   those.
24   Q    Again, was the goal to be looking for the
25   judgement that you were looking to make was a

Page 207

1           ARTHUR L. FRANK, M.D., PH.D.
2    judgement about the cause of death; correct?
3    A.   Yes.
4    Q    Now, this process, this kind of best
5    evidence method, I understand that you're familiar
6    with it and it was used by Dr. Selikoff, but has
7    it ever actually been published anywhere as a
8    methodology for determining the cause of death?
9    A.   Not that I'm aware of and I'm aware of many
10   other studies where they've gone to that level of
11   follow-up to obtain the original tissues and so
12   forth.  And so most studies will just use what's
13   listed on the death certificate, but, again,
14   having done a study as a student working with
15   Dr. Selikoff reviewing death certificates, I can
16   tell you that death certificates are woefully
17   incorrect and inadequate for good epidemiological
18   work.
19   Q    For purposes of the work that Dr. Selikoff
20   was doing, which was to do research; right?
21   A.   Yes.
22   Q    It was important for him in doing his
23   research to have consistency in what he was using
24   as a measure of cause and including cause of
25   mortality in his mortality studies; is that right?

Page 208

1           ARTHUR L. FRANK, M.D., PH.D.
2    A.   Yes.
3    Q    And so he's got a lot of people who have
4    death certificates and those death certificates
5    are going to be filled out to reflect the cause in
6    the way that you've indicated subject to all its
7    limitations?
8    A.   Yes.
9    Q    And where he didn't have the death
10   certificate or he had new people coming in and he
11   wanted to include them in all cases the common
12   denominator was, for doing his research, he wanted
13   to be able to say, here was the cause of death;
14   fair?
15   A.   First of all, he did have a death
16   certificate in every case.  He wouldn't always
17   have hospital records or tissue.  And if you look
18   at his published data, he always listed both.  He
19   puts down DC, death certificate evidence, and then
20   he puts BE, best evidence.  And you'll notice for
21   particularly the malignancies there are a fair
22   number of discrepancies.
23   Q    So, I stand corrected, and that's fine, but
24   basically for Dr. Selikoff to do his research and
25   put together mortality studies, which involve

Page 209

1           ARTHUR L. FRANK, M.D., PH.D.
2    death, it was important for him to be ascertaining
3    in each case a cause of death?
4    A.   Yes.
5    Q    And in your consultation in connection with
6    this case, you advised Dr. Whitehouse, or others,
7    on how to do it the same way as Dr. Selikoff?
8    A.   As close as we can get to it, yes, without
9    doing a separate pathological review.
10   Q    Now, in the legal world, how many times have
11   you been asked for your opinion on whether a
12   certain asbestos exposure was a substantial
13   contributing factor in causing disease or death?
14   A.   Many times.
15   Q    Many times.  "A substantial contributing
16   factor" is a legal term; correct?
17   A.   Yes.
18   Q    "Substantial contributing factor" is not a
19   scientific term; correct?
20   A.   Correct, and so I've testified many times.
21   Q    And so you've testified many times.  In
22   figuring out which of the CARD mortality cases
23   were caused by Libby asbestos exposure, did
24   anybody apply -- was the test applied whether
25   asbestos exposure was the cause or was the test

Page 210

1          ARTHUR L. FRANK, M.D., PH.D.
2    applied whether asbestos exposure was a
3    substantial contributing factor?
4    A.    I believe it was the latter rather than the
5    former.  For example, you could have a lung cancer
6    which could have two causes, but a substantial
7    contributing cause would be the exposure to
8    asbestos.  If you had a mesothelioma, then it's a
9    lot easier than it's the asbestos.
10    Q     So, in the case of lung cancer, even when
11    the person was a smoker, if they had a history of
12    exposure to asbestos, asbestos could still be
13    found to be a substantial contributing factor;
14    fair?
15    A.    Yes.
16    Q     Whose decision was it to use "substantial
17    contributing factor" as opposed to "the cause"?
18          MR. HEBERLING:  Objection; assumes
19    that "substantial contributing factor" was used.
20    BY MR. BERNICK:
21    Q     This is an effort to tell you something.
22    But I'm just asking for what you know.  Whose
23    decision was it?
24    A.    I am not sure the decision was used to use
25    the term "substantial contributing cause", which

Page 211

1          ARTHUR L. FRANK, M.D., PH.D.
2    is we have now both agreed is a legal term.  It
3    was Dr. Whitehouse who made the ultimate decision
4    of was this a death that was an asbestos-related
5    death or not.
6    Q     When it came to the seventy-six nonmalignant
7    deaths that you read --
8    A.    Yes.
9    Q     -- was it your understanding that these were
10    deaths where asbestos-related illness was a
11    substantial contributing factor or a significant
12    contributing factor or is it your understanding
13    that these were cases where asbestos-related
14    illness was the cause of death?
15    A.    When I read the x-rays I knew that these
16    were all patients that had had asbestos-related
17    disease.  I did not know what the ultimate
18    judgement was about those particular individuals
19    as to what was thought to be their cause of death.
20    That was not a part of the analysis that I made.
21    So, I don't know ultimately, and you'll ask
22    Dr. Whitehouse, I'm sure, what criteria he used.
23    Q     Ultimately, how many of the people who were
24    included in the seventy-six nonmalignant deaths,
25    how many of those people had diffuse pleural

Page 212

1          ARTHUR L. FRANK, M.D., PH.D.
2    thickening?
3    A.    It's all there on the table.  I don't have
4    the number in my head out of that what number did.
5    More had pleural plaques and diffuse pleural
6    thickening, is my recollection, but I can't give
7    you the numbers.  I would have to see the tables
8    and look them again.
9    Q     Do you know out of the seventy-six people
10    how many people in the CARD study had both diffuse
11    pleural thickening, with or without costophrenic
12    blunting, and had restrictive lung function below
13    the range of normal?
14    A.    I didn't look at the pulmonary function data
15    for those individuals.  I was simply reading those
16    x-rays and doing my own independent analysis of
17    what was on the x-rays or CT scans.  I do know
18    just antidotally without an analysis that there
19    would have been many individuals who were judged
20    to have died of an asbestos-related disease --
21    Q     The cause, or substantial --
22    A.    The cause, who would not fit the criteria as
23    they are outlined in document eleven.
24    Q     Which is, are you talking about, category
25    one --

Page 213

1          ARTHUR L. FRANK, M.D., PH.D.
2    A.    Any category.  They wouldn't fit any
3    category.
4    Q     They wouldn't fit any category?
5    A.    Correct.  Well, I guess they would fit
6    probably the second to last one, whatever the --
7    there were people --
8    Q     Well, let's be clear.
9    A.    Okay.  There were people who would not have
10    fit the category of severe asbestosis, though they
11    died of asbestos disease because they wouldn't
12    have either met the criteria as listed here, nor
13    would they have fit category IV B, severe
14    disabling pleural disease, because they wouldn't
15    fit those criteria either.  But they were dead
16    from their asbestos disease.
17    Q     Well, let's just be clear, have you done
18    your own analysis of the cause of death for
19    anybody at the CARD Clinic?
20    A.    No.
21    Q     So, when you say there are people who died
22    of asbestos-related disease, you're relying upon
23    there being a death certificate that says that or
24    the best evidence analysis done by somebody else?
25    A.    Dr. Whitehouse.

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - June 5, 2009
Arthur Frank M.D., Ph.D.

Page 214

ARTHUR L. FRANK, M.D., PH.D.

2  Q   Dr. Whitehouse.  In how many cases -- did
3  you actually look at the death certificates?
4  A.   No.
5  Q   So, you don't know how many of the people
6  who comprised the mortality study had a death
7  certificate that said they died of asbestos
8  disease or Whitehouse analysis based on best
9  evidence?  You don't know how the population
10 breaks out?
11 A.   More than half the people died of an
12 asbestos-related disease.
13 Q   In the CARD Clinic study?
14 A.   Of this seventy-six.
15 Q   I understand that, but you don't know in how
16 many cases that statement was based upon a death
17 certificate as opposed to Dr. Whitehouse's best
18 evidence analysis?
19 A.   Well, every case that had a death
20 certificate was also given his best evidence
21 analysis, so there's both and they could be
22 congruent or they could be different.
23 Q   But I'm saying, you don't know --
24 A.   I don't know how that breaks down.
25 Q   In how many cases -- well, did

Page 215

ARTHUR L. FRANK, M.D., PH.D.

2  Dr. Whitehouse fill out any of the death
3  certificates himself?
4  A.   I believe he did, but I can't say that for
5  sure.  Some of them were patients he knew.  Over
6  the years I don't know if he himself filled out
7  the death certificates or not.
8  Q   In how many cases --
9  A.   He knew all of these individuals.
10 Q   He knew all of these individuals, and where
11 he didn't fill out the death certificate, the
12 death certificate could have been filled out by
13 somebody who talked with him about how it should
14 be filled out; correct?
15 A.   Anything could be possible.  They could have
16 talked to him.  They could have talked to somebody
17 else.  They could have just filled it out
18 themselves, it depends where they died.  It could
19 have been the house staff on duty who filled it
20 out.  Who knows.
21 Q   With respect to the seventy-six nonmalignant
22 deaths that you analyzed, in how many cases was a
23 cause of death determined by somebody other than
24 Dr. Whitehouse or people who practiced with
25 Dr. Whitehouse?

Page 216

ARTHUR L. FRANK, M.D., PH.D.

2  A.   I don't know.  I didn't do any of that
3  analysis.  I told you the only thing I did was
4  read the radiology and make my independent
5  judgement of what was there on the radiographs.
6  Q   I just want to ask you very plainly, on
7  reading the radiology, you filled out a bunch of
8  forms; right?
9  A.   I did.
10 Q   Who put together the forms?
11 A.   Dr. Whitehouse.  It was a form that he had
12 used to do the first reading, and then he brought
13 blank forms and the materials and we sat there and
14 I read the x-rays independently.
15 Q   So, Dr. Whitehouse had already read all the
16 x-rays that comprised the seventy-six people?
17 A.   He had.
18 Q   And he had filled out his own form and
19 basically you were there to be a second read?
20 A.   Yes.
21 Q   Now, that was not a blind read; right?  You
22 didn't have any controls that you were looking at?
23 A.   No.
24 Q   You just knew that everybody who
25 comprised --

Page 217

ARTHUR L. FRANK, M.D., PH.D.

2  A.   Actually, no, I think I asked him -- now
3  that I think about it.  I can't recall.  We
4  discussed it and I just can't recall if we did
5  this.  He had, you know, a computer full of these
6  reads and I said I would like to also put some in
7  there that aren't part of this group, because that
8  way I'm reading them blind and I don't know who is
9  who.
10 Q   Do you know if he did that or not?
11 A.   Honestly, I don't recall.
12 Q   Do you know, when you did the reading --
13 A.   We may not have, but we certainly discussed
14 it.
15 Q   But did you fill out a sheet for every one
16 that you read?
17 A.   Yes.
18 Q   And then a total of how many did you read?
19 A.   I don't recall.
20     MR. BERNICK:  The sheets that he
21 filled out, were they attached to something?
22     MR. STANSBURY:  An expert report,
23 yes.
24 BY MR. BERNICK:
25 Q   Did you attach to your expert report all of

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - June 5, 2009
Arthur Frank M.D., Ph.D.

Page 218

ARTHUR L. FRANK, M.D., PH.D.
1
2  the sheets that you filled out?
3  A.   I belive so.  If there are seventy-six, then
4  there's only that seventy-six.  If there is more
5  than seventy-six, then it was other cases as well.
6  Q    But if it's only seventy-six, if it's
7  seventy-six or less, than, in fact, the procedure
8  that you used --
9  A.   I knew that these were all people that had
10 been judged to have had disease.
11 Q    So, in that case, it was not a blind
12 reading?
13 A.   Correct.
14 Q    And we'll, again, try and figure that out
15 with Dr. Whitehouse.  Was there anybody else,
16 besides you and Dr. Whitehouse, who read the
17 x-rays of these people for purposes of doing this
18 analysis?
19 A.   Not that I'm aware of.  And Dr. Welch was
20 present when we did this, as were some of your
21 legal colleagues.
22 Q    Is that right?  They're holding out on me.
23 Do you know why you were chosen or asked to do
24 this second read of the x-rays?
25 A.   You would have to ask the people that asked

Page 219

ARTHUR L. FRANK, M.D., PH.D.
1
2  me why they chose me.
3  Q    You didn't say why me?
4  A.   No.
5  Q    You just said okay?
6  A.   Yes.
7  Q    Now, you testified before, as I know, I'm
8  sure because I have such a good memory, that
9  typically you don't do reading of x-rays; correct?
10 A.   I do them whenever they are sent to me.
11 Most lawyers do not send me x-rays.  Those that
12 do, I read.  And years ago, when there were a lot
13 more cases of asbestosis that were part of the mix
14 of the cases that I saw, I saw a lot more x-rays
15 and read them quite regularly.
16         I would say at least eighty, maybe
17 ninety percent of the cases that I see now are
18 mesotheliomas, and x-rays are pretty irrelevant.
19 And even in the few that are lung cancers, I
20 probably don't see more than two or three cases of
21 asbestosis a year any more.
22 Q    Did you discuss with Dr. Whitehouse or with
23 anybody else what was the purpose of you doing the
24 second read as opposed to somebody who was a
25 certified "B" Reader?

Page 220

ARTHUR L. FRANK, M.D., PH.D.
1
2  A.   We did not have that discussion.  And CTs
3  are not relevant with regard to "B" Readership
4  anyway in terms of the measurements on those.
5  Q    But you just didn't review the CTs?
6  A.   No, we didn't do just that.  No, that's
7  true.
8  Q    So, when it came to the x-rays there are
9  certainly people who are more qualified than you
10 to performed a second "B" Read of x-rays; is that
11 correct?
12 A.   Is that a statement or a judgement?
13 Q    It's a statement that I think you're going
14 to agree with because I think it's true.
15 A.   I don't think being a "B" Reader or not,
16 even though I took the exam once and didn't pass
17 it, makes me either unqualified or less qualified.
18 I have been reading x-rays for close to forty
19 years.  I have been trained by Dr. Selikoff to
20 read them.  I've had research papers published on
21 the basis of my readings of x-rays, but I am not a
22 "B" Reader.  I mean, that's the only thing I am
23 not, but if you say that just because someone is a
24 "B" Reader they are more qualified --
25 Q    I didn't say that.

Page 221

ARTHUR L. FRANK, M.D., PH.D.
1
2  A.   Well, that was the implication.
3  Q    I'll repose my question.  I apologize for
4  its coming across as being, in some fashion, a
5  slight.  It was not intended to be.  But there
6  certainly are people who are more qualified than
7  you to do a second reading of an x-ray for
8  asbestos-related illness; correct?
9  A.   I think I'm as qualified as anyone to do a
10 second reading or a first reading or a tenth
11 reading of an x-ray looking for asbestos disease
12 as anybody else.  So, I don't know what you mean
13 by "more qualified".
14         The only qualification that I don't
15 have, if you want to use that as a standard, is
16 there are "B" Readers.  I am not a "B" Reader.
17 That would be one judgement to say they are better
18 qualified.  But I would think there are very few
19 physicians who have seen as many x-rays as I have.
20 Q    Let's just talk about asbestosis, and let's
21 talk about pleural thickening in particular.  Do
22 you think that following the conventions that are
23 followed by scientists in your field when it comes
24 to saying somebody is an expert or not, do you
25 think that you're an expert in "B" Reading of

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - June 5, 2009
Arthur Frank M.D., Ph.D.

Page 222

ARTHUR L. FRANK, M.D., PH.D.

1
2  diffuse pleural thickening?
3  A.    First of all, I'm not a "B" Reader, so let's
4  leave that out.  "B" Reading is a convention.  I
5  mean, I do readings using the ILO classification.
6  That doesn't make them a "B" Read, but they are
7  like what a "B" Reader would use.  I would say
8  that I've had as much experience in doing this as
9  anyone I know of, especially with regard to
10  asbestos.
11        If you want to say to me are there
12  people who are more experience in reading x-rays
13  for co-workers pneumoconiosis or more silicotics
14  than I've seen, there are probably, undoubtedly,
15  people that have seen far more of those x-rays.
16  But I have seen as many x-rays and have probably
17  have had as much experience as any of my
18  contemporaries that I am aware of.
19  Q    Well, why can't you tell us whether blunting
20  of the costophrenic angle affects either or both
21  of the parietal or viscera pleura?
22  A.    You can't tell that from an x-ray.
23  Q    You can't?
24  A.    Well, when you see a blunting, you don't
25  know exactly -- I mean, we had that discussion

Page 223

ARTHUR L. FRANK, M.D., PH.D.

1
2  earlier.  I don't know the anatomy of that.
3  Q    Why wouldn't you if you were an expert in
4  reading the x-rays in that particular respect?
5  A.    Because you are not marking down on a form
6  is it a parietal pleura or is it a visceral
7  pleura.  You're marking down is there evidence of
8  a blunted angle.  That's all you're marking down.
9  And you don't know what it's from.  I mean, it
10  could be fluid, too.  That's all -- you know, I
11  can tell a blunted angle as well anybody else.
12  You could probably even tell one.
13  Q    Don't get carried away.
14  A.    There are some lawyers who have either
15  wanted to or actually took the "B" Reader exam.
16  Q    I'm not one of those people.  Any question
17  that smoking can cause a loss of diffusing
18  capacity?
19  A.    In some people, it certainly does.
20  Q    That's not an infrequent -- it's a
21  well-established potential consequence of smoking;
22  correct?
23  A.    I wouldn't say it's all that frequent.  You
24  have to have pretty severe lung disease to get a
25  drop in DLCO just from cigarettes.

Page 224

ARTHUR L. FRANK, M.D., PH.D.

1
2  Q    Do you know about the background of the
3  revisions to the ILO guidelines in 2000; that is,
4  how the revision came about?
5  A.    No.  I was not part of that process.
6  Q    Have you studied that process?
7  A.    Not especially.  I had colleagues at Sinai
8  who were involved with earlier such iterations,
9  and they were off doing that.  Selikoff would do
10  it, Dr. Lillis would do it.
11  Q    The ILO guidelines are part of a process
12  that involves people who you would, in fact,
13  acknowledged that given conventions of the word
14  "expert" in the scientific field are experts in
15  your field; correct?
16  A.    Yes.
17  Q    And the process of developing and revising
18  the ILO classifications and guidelines is a
19  process taken very, very seriously and an attempt
20  is made to meet the highest standards; correct?
21  A.    I would like to think so.
22  Q    That's certainly your understanding;
23  correct?
24  A.    Right.  But there are serious flaws with the
25  system in many ways.

Page 225

ARTHUR L. FRANK, M.D., PH.D.

1
2  Q    I have nothing further at this time.
3        MR. HEBERLING:  Anyone on the
4  speaker phone who would like to examine?
5        MS. KUCHINSKY:  I would, but I
6  won't.
7        MR. COCKRELL:  Dale Cockrell; I
8  have no questions.
9        MR. HEBERLING:  Well, I will ask a
10  couple.
11        MR. BERNICK:  At your peril.
12        - - -
13        EXAMINATION
14        - - -
15  BY MR. HEBERLING:
16  Q    Do you recall the discussion of the 1,800
17  people diagnosed at the CARD Clinic with
18  asbestos-related disease?
19  A.    I do.
20  Q    And of the 1,800 so diagnosed, do you have
21  an opinion whether an individual with normal lung
22  functions and an asbestos-related disease
23  diagnosis will be more likely than not to die of
24  an asbestos-related disease, malignant or
25  nonmalignant?

Page 226

1    **ARTHUR L. FRANK, M.D., PH.D.**
2         MR. FINCH: Objection.
3         MR. BERNICK: Objection. It's not
4    in his expert report and you haven't provided a
5    foundation for it.
6         MR. FINCH: Same objection.
7         THE WITNESS: The data that we have
8    from the CARD Clinic, as I understand it, is
9    that more than fifty percent of the individuals
10   who have been diagnosed with a nonmalignant
11   asbestos disease will ultimately die of an
12   asbestos disease. So, it is entirely possible
13   that of the 1,800 people, a large number of them
14   will die of an asbestos-related disease.
15        MR. BERNICK: Is that the best you
16   can do?
17        MR. HEBERLING: Wait a minute, I'm
18   doing the examination.
19        MR. BERNICK: We're creating a
20   record here. Go ahead.
21        MR. FINCH: Go ahead. I'll have
22   some follow up based on this.
23   BY MR. HEBERLING:
24   **Q    As to an individual diagnosed with asbestos**
25   **disease, do you have an opinion whether it is more**

Page 227

1    **ARTHUR L. FRANK, M.D., PH.D.**
2    **likely than not that they would die of an**
3    **asbestos-related disease, malignant or**
4    **nonmalignant?**
5         MR. BERNICK: I'm sorry; can I have
6    the question read back?
7                   - - -
8         (Whereupon the preceding question
9    was read back.)
10                  - - -
11        MR. BERNICK: Which individual,
12   Libby or some place else?
13        MR. HEBERLING: CARD Clinic person.
14        MR. BERNICK: CARD Clinic person,
15   so somebody diagnosed today; is that the
16   question?
17        MR. HEBERLING: That's the
18   question, yes.
19        MR. FINCH: Objection; lack of
20   foundation, lack of disclosure of expert
21   information on which he relies to make that
22   statement.
23        MR. HEBERLING: It's in his report.
24        MR. FINCH: No, it's not.
25        MR. HEBERLING: Yes.

Page 228

1    ARTHUR L. FRANK, M.D., PH.D.
2         MR. BERNICK: Well, there's no
3    basis for it. It's in his report, but there's
4    no basis for it in his report. It's the same
5    problem. Go ahead, answer the question.
6         THE WITNESS: If the pattern of
7    disease holds as it has for people so far, it is
8    more likely than not that an individual will die
9    of an asbestos-related disease. That does not
10   mean everyone will, and I can't predict who
11   those would be, but the odds are given on the
12   basis of what has occurred. So far if the
13   pattern holds, more than fifty percent will die
14   of an asbestos-related disease.
15        MR. BERNICK: Fifty percent of
16   what?
17        THE WITNESS: Of the 1,800.
18        MR. BERNICK: He didn't ask you
19   that. He's asking about an individual.
20        MR. HEBERLING: You will have the
21   opportunity to examine him, Mr. Bernick. Please
22   don't interrupt.
23        MR. BERNICK: Go ahead. Sorry.
24   BY MR. HEBERLING:
25   **Q    Do you recall a discussion of the Lillis**

Page 229

1    **ARTHUR L. FRANK, M.D., PH.D.**
2    **1991 article?**
3    A.   Yes.
4    **Q    And there was a group with diffuse pleural**
5    **thickening defined as requiring blunting?**
6    A.   Yes.
7    **Q    And then there was another group with**
8    **pleural thickening without blunting?**
9    A.   Yes, called pleural plaques.
10        MR. FINCH: Objection to form.
11   BY MR. HEBERLING:
12   **Q    And in the group without blunting, was**
13   **increasing pleural thickening predictive of loss**
14   **of lung function?**
15        MR. BERNICK: Objection; leading.
16        THE WITNESS: Yes. There was a
17   statistically significant relationship that as
18   the severity of the pleural disease got worse,
19   the pulmonary function would get worse.
20   BY MR. HEBERLING:
21   **Q    And did this hold for the diffuse pleural**
22   **thickening group?**
23        MR. BERNICK: Objection; leading.
24   BY MR. HEBERLING:
25   **Q    Do you have an opinion whether this held as**

Case 01-01139-AMC    Doc 22731-3    Filed 08/07/09    Page 60 of 93

US District Court - Delaware                                FINAL - June 5, 2009
Chapter 11 - W.R. Grace                                    Arthur Frank M.D., Ph.D.

Page 230

1          ARTHUR L. FRANK, M.D., PH.D.
2    to the diffuse pleural thickening group, which did
3    have blunting?
4          MR. BERNICK: Same thing; it's
5    still leading.
6          THE WITNESS: I have an opinion,
7    and the opinion, based upon the data, is that
8    there was no statistically significant
9    difference with regard to the severity of
10   disease correlated, pulmonary function related,
11   to the severity of the radiologic changes.
12         MR. HEBERLING: That's it.
13              - - -
14         EXAMINATION
15              - - -
16   BY MR. BERNICK:
17   Q    Do you believe it's appropriate as an expert
18   witness to testify in response to your Counsel's
19   question to opinions where you don't have
20   knowledge of the data?
21   A    If I don't have knowledge of the data, as
22   you've heard me say, I will say I don't have
23   knowledge of the data.
24   Q    Will you say to us here today,
25   notwithstanding having answered the questions that

Page 231

1          ARTHUR L. FRANK, M.D., PH.D.
2    Mr. Heberling posed, you don't have the data on
3    what comprises the 1,800 people?
4    A    The data I have is that there are 1,800
5    people who have been diagnosed with nonmalignant
6    disease at the CARD Clinic.
7    Q    And who told you that?
8    A    Mr. Heberling.
9    Q    Did anyone else tell you that?
10   A    It's probably in Dr. Whitehouse's report.
11   Q    Did anyone else tell you that?
12   A    Tell me that 1,800 people at the CARD Clinic
13   have asbestos disease?
14   Q    Have been diagnosed as having
15   asbestos-related illness?
16   A    Not that I recall.
17   Q    Did you actually look to see whether that
18   statement of Mr. Heberling gave you was true?
19   A    I did not look at 1,800 sets of records.
20   Q    I didn't ask you that. Did you have any
21   data saying what Mr. Heberling said was true?
22   A    If I can find it -- here is Dr. Whitehouse's
23   report. I believe he has a statement to that in
24   here. The CARD Clinic has diagnosed over 1,800
25   patients with asbestos-related disease.

Page 232

1          ARTHUR L. FRANK, M.D., PH.D.
2    Q    So, do you know how many of those people
3    have pleural plaques?
4    A    No.
5    Q    Do you have idea how many of those people
6    have pleural thickening?
7    A    It's not enumerated here.
8    Q    Do you know how many of those people have
9    any diminution in lung function?
10   A    No.
11   Q    So, you offered an opinion that 1,800 people
12   are more likely than not -- of those people each
13   one of them is more likely than not to die of an
14   asbestos-related illness when you have no idea of
15   the portion of those people with pleural plaque;
16   correct?
17   A    What I have seen is similar patients with
18   nonmalignant asbestos disease --
19   Q    I didn't ask you that.
20   A    It's not based on the statement if I know if
21   they had pleural plaques or not.
22   Q    I want you to assume that ninety percent of
23   these people have pleural plaques. That's all
24   they have is pleural plaques. Is it still
25   accurate to stay that more than half of the 1,800,

Page 233

1          ARTHUR L. FRANK, M.D., PH.D.
2    or within the 1,800, it is more likely than not
3    that they will die of an asbestos-related illness?
4          MR. HEBERLING: Objection; unclear
5    as to the meaning of "pleural plaques".
6    BY MR. BERNICK:
7    Q    Does "pleural plaque" have any lack of
8    clarity to you, Dr. Frank?
9    A    Not at the moment.
10   Q    So, with that clear notion of what a pleural
11   plaque is, I want you to assume that ninety
12   percent of the people who comprise the 1,800 have
13   pleural plaques. Is your testimony in response to
14   Mr. Heberling's question still accurate?
15   A    My statement was if it follows the same
16   patterns as other -- that's what I said. If it
17   follows the same pattern as other individuals that
18   have died so far with asbestos-related disease.
19   And we didn't qualify those as to asbestosis or
20   pleural plaques or whatever, then the statement
21   would hold true.
22         If you want to ask me about the
23   pleural plaques specifically, I would have to go
24   back and look at the seventy-six that have died
25   and see which percentage of those had only pleural

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - June 5, 2009
Arthur Frank M.D., Ph.D.

Page 234

ARTHUR L. FRANK, M.D., PH.D.
1
2  plaques or how many had asbestosis, how many
3  malignancies there were and then I can more
4  actually answer your question.  But I answered
5  accurately within the confines of what was put to
6  me and how I answered.
7  Q    The data that you have is for mortality;
8  right?
9  A.    Right.
10  Q    And the mortalities are mortalities where
11  you have the data, you know what the pattern is
12  and, therefore, you can make the statement;
13  correct?
14  A.    And I said, if the pattern holds, then --
15  Q    I'm sorry; just one at a time.
16  A.    Yes.
17  Q    With respect to the people who have died and
18  the mortality that are comprised by the mortality
19  data, you have there knowledge of what the pattern
20  of disease and manifestation is; correct?
21  A.    Right.  Some got lung cancer, some got
22  mesothelioma, some died of asbestosis or pleural
23  disease.
24  Q    I asked you before would it appropriate to
25  offer testimony, even in response to

Page 235

ARTHUR L. FRANK, M.D., PH.D.
1
2  Mr. Heberling's questions where you don't have any
3  data.  Do you remember that?
4  A.    Yes.
5  Q    You don't have data for what the pattern of
6  disease is for the 1,800; correct?
7  A.    Which is why I said if the pattern holds.
8  You're right, I do not have the pattern of
9  disease.
10  Q    Therefore, it would be inappropriate to
11  express any opinion with respect to what the
12  future might bring with respect to the 1,800
13  themselves; correct?
14  A.    No, it's not inappropriate.  It's the same
15  thing going back to the 17,800 insulators.  We
16  know after years and the pattern of disease from a
17  subset of those that have died, that about twenty
18  percent die of lung cancer and ten percent die of
19  mesotheliomas and ten percent die of asbestosis,
20  and another percent die of other asbestos-related
21  cancers.
22  So, in the asbestos insulators,
23  looking to the future to the ones that haven't
24  died, you can say that about half of them can be
25  expected to die of an asbestos-related disease.

Page 236

ARTHUR L. FRANK, M.D., PH.D.
1
2  So, similarly, on the basis of what we do have, if
3  the same pattern holds for the 1,800 as applies to
4  the seventy-six, that is what you would expect.
5  Q    But for the insulators you had
6  epidemiological studies follow that cohort over
7  time, correct, years of epidemiological studies?
8  A.    Right.
9  Q    Controlled epidemiological studies; correct?
10  A.    Right.
11  Q    With respect to the Libby CARD study, you do
12  not have any controlled epidemiological data;
13  correct?
14  A.    But what you have is --
15  Q    Do you have any controlled --
16  MR. HEBERLING:  Just a minute.  Let
17  him finish his --
18  THE WITNESS:  You don't have
19  controlled epidemiology, but you have a pattern
20  of disease in those people that have been
21  diagnosed with a nonmalignant asbestos disease,
22  and more than half of them have died of --
23  ultimately have been judged to die of an
24  asbestos-related condition.
25  BY MR. BERNICK:

Page 237

ARTHUR L. FRANK, M.D., PH.D.
1
2  Q    Right.  And are those the people who have
3  already been diagnosed and died of an
4  asbestos-related illness?
5  A.    Right.  And these are people, the 1,800 of
6  those who have been diagnosed, but they haven't
7  died yet.
8  Q    Right.  And, therefore, you do not know what
9  the pattern of mortality is for that group of
10  people; correct?
11  A.    We'll know it when they're all dead.
12  Q    No.  You do not know anything about the
13  pattern of mortality for the 1,800; correct?
14  A.    No.  If the seventy-six are a subset of the
15  1,800, then we have some data as to the pattern of
16  mortality.
17  Q    That's what's called apples and oranges.
18  A.    No.
19  Q    1,800 haven't died, so you can't say --
20  A.    But 17,800 asbestos insulators haven't died
21  either.
22  Q    With respect to the 17,000, they all have
23  not died, but instead of simply knowing
24  proportions of those who have died have died of a
25  certain disease

Page 238

1         ARTHUR L. FRANK, M.D., PH.D.
2    A.   Right.
3    Q    -- you know much more than that.  You have
4    controlled epidemiological studies which tell you
5    with respect to the cohort as a whole both the
6    incidence of disease and incidence of mortality,
7    and it's on the basis of that control data that
8    you're able to make predictions about what future
9    mortality will be both with respect to people and
10   the cohort as a whole and with respect to people
11   who die.
12   A.   I wouldn't exactly agree with that statement
13   because you have epidemiological data as to the
14   deaths and you can compare that to the general
15   population to say if it's more or less than would
16   occurred anywhere else.  You don't have an
17   epidemiological study as to the percent that have
18   disease.
19        In fact, insulators with thirty
20   years, over ninety percent of them have disease,
21   so it's pretty much a given that everybody in that
22   cohort has disease.  So, there's some
23   similarities.  1,800 people, all of whom have been
24   diagnosed with a nonmalignant disease.  17,000
25   insulators, at least ninety percent plus after

Page 239

1         ARTHUR L. FRANK, M.D., PH.D.
2    thirty years have disease.  You have some subset
3    of those that have died, and here you have a
4    subset.
5    Q    Remember I asked you at the beginning what
6    it took to have a reasonable scientific basis for
7    an opinion?
8    A.   Yes.
9    Q    And you told me that, A, that it had to be
10   the best scientific answer and, B, it had to be
11   based upon studies; right?
12   A.   Right.
13   Q    There is no study of the 1,800; correct?
14   A.   Yes, there is.  There is a study of the
15   1,800, which is that they all have
16   asbestos-related disease.
17   Q    That's not a study.  That's just an
18   assertion that's been given to you.
19        MR. HEBERLING:  Objection;
20   argumentative, excessively argumentative.
21   BY MR. BERNICK:
22   Q    Are you saying that there has been a
23   scientific study of the 1,800 people; yes or no?
24   A.   I will say that there has been an assessment
25   of 1,800 people -- more than 1,800 people, but of

Page 240

1         ARTHUR L. FRANK, M.D., PH.D.
2    the people studied at the CARD Clinic, 1,800 have
3    been judged by the clinicians at that clinic as
4    having nonmalignant asbestos disease.
5    Q    And, therefore, you believe that there is a
6    reasonable scientific basis for making future
7    predictions about the probabilities of mortality,
8    a reasonable -- wait.  We want to go back to your
9    own standard.  Do you believe that there's a
10   reasonable scientific basis for making predictions
11   about probabilities of mortality in the 1,800; yes
12   or no?
13   A.   Yes, with the caveats as I answered the
14   question.
15   Q    So, that satisfies your standard.  Your
16   opinion about the future of the 1,800 satisfies
17   your own standards as representing the best
18   science?
19   A.   It's the best of what's available.
20   Q    No, hold on.
21   A.   No, it's the best of what's available.
22   Unless you have --
23   Q    No.
24        MR. HEBERLING:  Objection.  Let him
25   finish.

Page 241

1         ARTHUR L. FRANK, M.D., PH.D.
2        MR. BERNICK:  I'll withdraw the
3    question.
4        MR. HEBERLING:  Let him finish.  Go
5    ahead and finish your answer.
6    BY MR. BERNICK:
7    Q    Go ahead, do whatever you want.  Go ahead,
8    answer the question.
9    A.   Would I like more data?  Yes.  If I had more
10   data, I probably wouldn't have qualified it the
11   way I did.  I said if the pattern holds with what
12   we've seen with the seventy-six, we can expect
13   that of the 1,800 more than half will die of a
14   disease.
15   Q    I didn't ask about that.  That wasn't even
16   remotely related to my question.  I asked you
17   about --
18        MR. HEBERLING:  Objection;
19   excessively argumentative.
20   BY MR. BERNICK:
21   Q    I asked you very specific question.  I said
22   following your own test of reasonable scientific
23   basis, are you telling me that you have a
24   reasonable scientific basis for making future
25   predictions about what will happen in the way of

Case 01-01139-AMC    Doc 22731-3    Filed 08/07/09    Page 63 of 93

US District Court - Delaware                    FINAL - June 5, 2009
Chapter 11 - W.R. Grace                         Arthur Frank M.D., Ph.D.

Page 242

1           ARTHUR L. FRANK, M.D., PH.D.
2    mortality for the 1,800 people as a group if
3    you're following your own test?
4    A.    I think within certain limits I have a
5    reasonable ability to say that this group will
6    have a higher mortality of asbestos disease
7    than --
8    Q    I didn't ask you that question.
9    A.    Well, that's how I took the question.
10   Q    Do you want to go back over what you said?
11   You said that where you didn't actually have a
12   study, but instead you had to make reference to
13   other science, you said under those circumstances
14   you would say that it's not scientifically
15   supported, but it's not unreasonable.
16   A.    Well, here we have a study.  It is a limited
17   study.  It is seventy-six deaths --
18   Q    That's the answer you gave me before.  You
19   had to have a study of the issue.  Before --
20   A.    That is a study.
21   Q    Of the issue; the 1,800.  You have no study
22   whatsoever of the 1,800.
23   A.    You're the one doing the apples and oranges.
24   You're saying you have to have the answer before
25   you can make a statement about what will happen.

Page 243

1           ARTHUR L. FRANK, M.D., PH.D.
2    If I have to have a study of the 1,800, all
3    1,800 --
4    Q    No.
5    A.    -- then this --
6    Q    You just have to have a --
7           MR. HEBERLING:  Objection.  Let him
8    finish.
9    BY MR. BERNICK:
10   Q    You have to have a study of people --
11          MR. HEBERLING:  Let him finish.
12   BY MR. BERNICK:
13   Q    You have to have a study --
14          MR. HEBERLING:  Let him finish.
15   BY MR. BERNICK:
16   Q    You have to have a study of people --
17          MR. HEBERLING:  Let him finish.
18   BY MR. BERNICK:
19   Q    -- who aren't actually dead.
20          MR. BERNICK:  Objection.
21   BY MR. BERNICK:
22   Q    All you have with respect --
23          MR. HEBERLING:  Objection,
24   Mr. Bernick.  You're not letting him finish.
25          MR. BERNICK:  He finished answering

Page 244

1           ARTHUR L. FRANK, M.D., PH.D.
2    the question.
3           MR. HEBERLING:  No, I don't quite
4    think so.
5           MR. BERNICK:  You can pick it up if
6    there is something that I --
7           MR. HEBERLING:  We're losing the
8    question now because of this verbiage.
9           MR. BERNICK:  Well, the verbiage is
10   necessary because I'm not getting an answer to
11   the question.
12          THE WITNESS:  You're getting an
13   answer, you just don't like the answer.
14   BY MR. BERNICK:
15   Q    Let me assure you --
16   A.    And if you're not clear, then let's pursue
17   it until you're clear.
18   Q    I am completely and utterly satisfied with
19   every answer that you give that's responsive to my
20   question.  It's not a question of preference, its
21   a question of responsiveness.  And I just want to
22   know, with respect to the 1,800 all you have is
23   Dr. Whitehouse saying they've been diagnosed with
24   asbestos-related illness.  With respect to the
25   CARD mortality study you have far more data and

Page 245

1           ARTHUR L. FRANK, M.D., PH.D.
2    it's focused on a group of people who not only
3    have been so diagnosed, they've died.  That's a
4    different perimeter.  They are differently defined
5    groups; correct?
6    A.    One is a subset of the other group.
7    Q    That could be.  Well, there's a lot of
8    things.  They're all a subset of Libby just
9    because --
10   A.    Okay.
11   Q    Well, you don't know that either one of them
12   are representative of what happens with respect to
13   the Libby population as a whole because you
14   haven't tested that; correct?
15   A.    And I'm not making any statements about the
16   Libby population as a whole.
17   Q    That's my whole point.  You have nothing on
18   the basis of which scientifically to extrapolate
19   or extend --
20   A.    To the whole Libby population; absolutely
21   not.  You're absolutely correct.
22   Q    And, likewise, you have nothing on the basis
23   of which to extend the mortality experience of
24   people who already have died to what will be the
25   mortality experience of people who actually have

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - June 5, 2009
Arthur Frank M.D., Ph.D.

Page 246

1           ARTHUR L. FRANK, M.D., PH.D.
2    only been diagnosed as having disease.  The one
3    statement is a statement about causes of death
4    with respect to people who have died.  The other
5    statement is a statement about what people will
6    die of who have simply been diagnosed with the
7    disease.  They are two different measures of two
8    different groups scientifically; correct?
9    A.   No.  One is a subset of the other group.  I
10   assume that the seventy-six patients who died were
11   a subset of the 1,800 patients with disease.
12   Q    Fair enough.  That is your assumption;
13   correct?
14   A.   Right.  And, again, that's why I said, if
15   the pattern holds.
16   Q    Have you done anything to test that
17   assumption?
18   A.   I have not.
19   Q    Do you know of anyone else who has done
20   anything to test that assumption?
21   A.   To date, no.
22   Q    Now, I want to ask you whether you agree or
23   disagree with Dr. Whitehouse himself has said about whether he
24   subject.  Have you looked to find out what
25   Dr. Whitehouse himself has said about whether he

Page 247

1           ARTHUR L. FRANK, M.D., PH.D.
2    has the science to be able to predict the future
3    of what will happen with respect to the people who
4    have been diagnosed?
5    A.   I do not know how he has responded to --
6           MR. HEBERLING:  Objection;
7    misstatement of the record.
8    BY MR. BERNICK:
9    Q    Are you familiar with the fact that his
10   testimony on this subject was stricken?
11          MR. HEBERLING:  Objection; outside
12   this case, misrepresentation of the record.  In
13   the criminal case you were talking about whether
14   he could predict the progression of disease in
15   the town of Libby.  It's an entirely different
16   subject.
17          MR. BERNICK:  I don't know what in
18   the world you're talking about.
19          MR. HEBERLING:  I've got the
20   transcript.
21          MR. BERNICK:  I'm looking at it
22   myself.
23   BY MR. BERNICK:
24   Q    Dr. Whitehouse says that he couldn't make
25   predictions of the future based upon science at

Page 248

1           ARTHUR L. FRANK, M.D., PH.D.
2    Libby.  Do you disagree with that?
3           MR. HEBERLING:  Objection;
4    inadequate reading of the context of the
5    statement.
6           THE WITNESS:  You'll have to ask
7    Dr. Whitehouse what he means.  And I didn't say
8    I knew what was going to happen.  You know,
9    you're --
10   BY MR. BERNICK:
11   Q    You said it was "possible"; you're right.
12   A.   It's possible and if it follows the same
13   pattern, this is what you can expect.  It may turn
14   out -- we won't know until either a study is done
15   or until these 1,800 people are dead.
16   Q    Right.  And what kind of study would need to
17   be done to be able to make a scientific
18   prediction?  What kind of study?
19   A.   Some pieces of it would already exist.  For
20   example --
21   Q    Please tell me what kind of study would need
22   to be done?
23          MR. HEBERLING:  Objection.  Let him
24   finish.
25   BY MR. BERNICK:

Page 249

1           ARTHUR L. FRANK, M.D., PH.D.
2    Q    What kind of scientific study --
3           MR. HEBERLING:  He began an answer
4    and you interrupted him.  Let him finish.
5           MR. BERNICK:  You know, all you're
6    doing is interfering.
7           THE WITNESS:  A study of the
8    literature that looks at similar issues.  Dr.
9    Elms in Northern Ireland took shipyard workers
10   and showed that those with pleural plaques were
11   more likely to develop a malignancy than those
12   without pleural plaques.  So, one could look at
13   what percentage of people with pleural plaques
14   and see if it might be applicable to this
15   population.
16   BY MR. BERNICK:
17   Q    What if they're not exposed to the same
18   material?
19   A.   They were exposed to asbestos.
20   Q    No.  I'm talking about Libby amphibole.
21   Dr. Lehman said, in the case of Libby, you have to
22   look at the data relating to Libby because of the
23   nature of the material and the nature of the
24   exposures.  Would you agree or disagree with that
25   statement?

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - June 5, 2009
Arthur Frank M.D., Ph.D.

Page 250

ARTHUR L. FRANK, M.D., PH.D.

1
2 A.   That would get you closer to what might
3 ultimately occur.  But if you're looking for
4 studies that would allow you to make some
5 predictive judgements about what might have
6 occurred to these people, you could look to other
7 situations that are similar.
8 Q    If you want to have, using your own test,
9 which is a reasonable scientific basis, to have a
10 reasonable scientific basis for scientifically
11 predicting the future of what's going to happen to
12 the 1,800, what kind of study would you need to
13 have at Libby, using your own test?
14 A.   Any studies that you would do is no longer
15 predictive.  It's showing what is occurring at the
16 time.
17 Q    Right.
18 A.   And so you could say, perhaps arbitrarily,
19 you have 1,800 and when the first 900 have died,
20 you have a better sense of what the other 900 will
21 die of.
22 Q    If you have analyzed the people who have
23 died and compared them to the 1,800 as a whole to
24 see whether they are the same or different, you
25 couldn't extrapolate to the 1,800 unless you've

Page 251

ARTHUR L. FRANK, M.D., PH.D.

1
2 picked a representative group of people; correct?
3 A.   Well, by the time you got to 900, you would
4 expect them to be representative and you would
5 look to that.  You would see -- first of all, they
6 all have one common characteristic already, which
7 is they've already all been diagnosed with an
8 asbestos-related nonmalignant disease, so they
9 have either asbestosis or pleural plaques or
10 pleural thickening or some manifestation of
11 asbestos disease.
12 Q    So, you then have to follow that cohort.
13 A.   So, you know already that those people,
14 without knowing what the exact number would be,
15 are at a greatly increased risk of dying of an
16 asbestos disease and certainly of an
17 asbestos-related malignancy.
18 Q    Not if they're all pleural plaques.
19 A.   Sure.
20 Q    Oh, really?
21 A.   Yes.
22 Q    Pleural plaques are predictive --
23 A.   Predictive of cancer, absolutely.  I was
24 just giving you the Elm's study.
25 Q    Are pleural plaques predictive, alone,

Page 252

ARTHUR L. FRANK, M.D., PH.D.

1
2 predictive of either asbestosis or diffuse pleural
3 thickening?
4 A.   No.
5 Q    So --
6 A.   It is predictive of malignancy, though.
7 Q    So, pleural plaques, you can't on the basis
8 -- we've already studied malignancy at Libby ad
9 nauseam; correct?  You have full-blown controlled
10 epidemiological studies that give you the
11 mortality curves for Libby; correct?
12 A.   Which are enormous.
13 Q    Which are enormous for people with high
14 dose.
15 A.   As you would expect.
16 Q    Right.  And we also know that nobody has
17 found on the basis of carcinogenic mortality
18 studies or morbidity --
19 A.   What is a carcinogenic mortality study?
20 Q    Nobody has found on the basis of the
21 epidemiological studies for mortality or morbidity
22 for cancer end points, nobody has found that the
23 people of the community of Libby are more likely
24 than others to die of cancer; correct?
25 A.   That's not correct.

Page 253

ARTHUR L. FRANK, M.D., PH.D.

1
2      MR. HEBERLING:  Objection;
3 misstates the record.
4      THE WITNESS:  Dr. Whitehouse's 2008
5 paper --
6 BY MR. BERNICK:
7 Q    That's not a mortality study and it's not an
8 epidemiological study.
9      MR. HEBERLING:  Objection;
10 misstates the record.
11      THE WITNESS:  But it is a
12 sufficient basis to say that eleven, or whatever
13 the number of cases, in a population of roughly
14 10,000 in fifteen years gives you a rate of
15 mesothelioma in that community far beyond what
16 you see in any other community in the United
17 States.
18 BY MR. BERNICK:
19 Q    If you assume that those eleven people with
20 mesothelioma got it from exposures of Libby?
21 A.   Yes.
22 Q    But they didn't; right?
23      MR. HEBERLING:  Objection;
24 misstates the record.
25      THE WITNESS:  Most of them did.

Case 01-01139-AMC    Doc 22731-3    Filed 08/07/09    Page 66 of 93

US District Court - Delaware                    FINAL - June 5, 2009
Chapter 11 - W.R. Grace                         Arthur Frank M.D., Ph.D.

Page 254

1        ARTHUR L. FRANK, M.D., PH.D.
2   BY MR. BERNICK:
3   Q    Well, how do you know? Did Dr. Whitehouse
4   tell you that?
5   A.   I have seen data that were, I think, three
6   of the eleven had potentially other exposures.
7   Eight had only known community exposure.
8   Q    Really?
9   A.   That is my understanding.
10  Q    Did you actually study that?
11  A.   I didn't go back and verify that. On the
12  basis of that information, if that is, in fact,
13  correct, and I have no reason to believe that it
14  isn't, then that would be a rate that's much
15  higher than what you would expect to see in a
16  community of that size.
17  Q    Are you going to testify to that as being
18  the best that science can say?
19  A.   It is the best information that I have at
20  the moment.
21  Q    I didn't ask you that.
22  A.   The best that science can say is studies
23  that haven't been done yet.
24  Q    Right. And is it also true --
25  A.   Are you out there doing those studies? Is

Page 255

1        ARTHUR L. FRANK, M.D., PH.D.
2   anybody else out there doing those studies? Is
3   anybody paying to get the data that you're asking
4   me to present to you?
5   Q    This is not --
6   A.   You know, it's fascinating. We don't have
7   data, so you go on the basis of what's best and
8   then what's best in terms of what's available
9   isn't good enough because it's not what the best
10  studies would be.
11  Q    I'm sorry; I'm not going to respond to that
12  because I don't think it's appropriate that I do.
13  So, I'll ask you a question --
14       MR. HEBERLING: Objection;
15  argumentative. Just ask him a question.
16  BY MR. BERNICK:
17  Q    Would you agree with me that when it comes
18  to predicting the future of what is going to
19  happen to the 1,800 or to any other group of
20  people at Libby, that the best science that is a
21  reasonable scientific basis for making a
22  prediction of future mortality has not been put in
23  place as of this date?
24  A.   No, I would not agree with that.
25  Q    And I want you to tell me now the best

Page 256

1        ARTHUR L. FRANK, M.D., PH.D.
2   scientific evidence that you have, the best
3   scientific studies that you have, that can be used
4   by a reasonable science to actually predict future
5   mortality at Libby. What's the best science?
6   A.   I would say the experience in the last few
7   years of community only exposures with
8   mesothelioma and the rate being somewhere around
9   eighty per million having been calculated from
10  that tells me that we've got a rate that is eight
11  to eighty times higher than you would expect in
12  any other community pretty much.
13  Q    And those number comes from the 2008 paper
14  with the eleven mesotheliomas?
15  A.   Yes.
16  Q    That's all I got.
17       MR. FINCH: I have some follow up
18  based on Mr. Heberling's questions.
19            - - -
20       (Exhibit Frank-16 was marked for
21  identification and is attached hereto.)
22            - - -
23            EXAMINATION
24            - - -
25  BY MR. FINCH:

Page 257

1        ARTHUR L. FRANK, M.D., PH.D.
2   Q    Dr. Frank, would you agree with me that for
3   any individual who has pleural plaque, it is not
4   more likely than not that that individual will
5   later develop mesothelioma?
6   A.   I would agree with that.
7   Q    Would you agree with me that for any
8   individual who has pleural plaque, it is not more
9   likely than not that that person will develop lung
10  cancer?
11  A.   I agree with that.
12  Q    So, when you gave the opinion that of the
13  1,800 people who have been diagnosed with some
14  kind of asbestos-related disease that for each and
15  every one of them it was more likely than not they
16  would die of an asbestos-related disease, what
17  diseases were you talking about?
18  A.   The combination of nonmalignant and
19  malignant disease accumulatively if the pattern
20  holds with what we have seen so far.
21  Q    And what you have seen so far, you were
22  referring to the people, the 186 people examined
23  in the CARD mortality study -- the seventy-six?
24  A.   The seventy-six.
25  Q    -- in the CARD mortality study?

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - June 5, 2009
Arthur Frank M.D., Ph.D.

Page 258

ARTHUR L. FRANK, M.D., PH.D.
1
2   A.   Yes.
3   Q   I have put a document in front of you that
4   we've marked Exhibit Sixteen.  The first page of
5   that is the 9,521 people who live in Lincoln
6   County, Montana.  I think we agreed --
7   A.   We discussed this this morning.
8   Q   We discussed this this morning.  That's
9   basically the population of people potentially
10  exposed to asbestos in Libby; right?
11  A.   Correct.
12  Q   And the next sheets shows the 1,800 CARD
13  Clinic patients with some kind of asbestos-related
14  disease; correct?
15  A.   Yes.
16  Q   The third page -- well, why don't we skip to
17  the fourth page.  The 1,800 is broken down into
18  950 people who are living claimants, and in 850
19  people who there has not been any medical records
20  produced in this case.  Are you aware of that?
21  A.   I'm aware that not all 1,800 records have
22  been produced.  How many were or were not produce,
23  I do not know.
24  Q   Why don't you go to the last page of the
25  document.

Page 260

ARTHUR L. FRANK, M.D., PH.D.
1
2   lung function decline?
3   A.   Correct.
4   Q   You can't predict how many of the 1,800
5   people will suffer a lung function decline?
6   A.   Correct.
7   Q   For any individual person in the 1,800, you
8   can't say it's more likely than not that that
9   person will suffer a lung function decline caused
10  by asbestos that is greater than what you would
11  expect from aging; correct?
12  A.   Correct.
13  Q   You can't say it's more likely than not that
14  that will happen; correct?
15  A.   Correct.
16  Q   Okay.  What I believe you testified to in
17  response to Mr. Heberling's question is that if
18  the pattern of disease you have seen in the
19  seventy-six people that have died of
20  asbestos-related disease as determined by
21  Dr. Whitehouse, if that pattern holds, then you
22  could say that for any given person in the 1,800
23  patient cohort that it is more likely than not
24  they will die of an asbestos-related disease?
25  A.   Yes.

Page 259

ARTHUR L. FRANK, M.D., PH.D.
1
2   A.   The last page?
3   Q   The last page.  You personally don't have
4   any data about the 1,800 CARD Clinic patients with
5   asbestos-related disease other than as shown in
6   the seventy-six who are in the mortality study;
7   correct?
8   A.   Correct.
9   Q   The 1,800 people in the CARD Clinic with
10  asbestos-related disease, you don't know how many
11  of them had community exposures versus
12  occupational exposures at the Grace mine; correct?
13  A.   Correct.
14  Q   You don't know the approximate dose of
15  asbestos that any of them were exposed to;
16  correct?
17  A.   Correct.  And I doubt anybody knows what the
18  dose was that anybody was exposed to.
19  Q   Well, you don't even know whether it was an
20  --
21  A.   Occupation or nonoccupational.
22  Q   Occupational or nonoccupational?
23  A.   Correct.
24  Q   You don't know whether any of the 1,800 or
25  how many of the 1,800 are suffering any kind of

Page 261

ARTHUR L. FRANK, M.D., PH.D.
1
2   Q   That can only be true if the seventy-six
3   people are representative of the 1,800; correct?
4   A.   Yes.
5   Q   The only common criteria, as far as you
6   know, that the seventy-six have with the 1,800 is
7   that they were -- well, there are two.  One, that
8   they were exposed to Libby asbestos, and, two,
9   they were diagnosed at some point with an
10  asbestos-related disease; correct?
11  A.   Yes.
12  Q   Other than that, you don't know how
13  representative, if at all, the seventy-six are of
14  the 1,800?
15  A.   Correct.
16  Q   And so if it turns out that the seventy-six
17  people who died of asbestos-related disease had
18  far higher occupational level of exposures than
19  the type of exposures that the 1,800 patients had,
20  that seventy-six may not be representative at all;
21  correct?
22  A.   Correct.
23  Q   And if it turns out that the seventy-six
24  people who died of asbestos-related diseases as
25  determined by Dr. Whitehouse had a greater

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - June 5, 2009
Arthur Frank M.D., Ph.D.

---

Page 262

ARTHUR L. FRANK, M.D., PH.D.
1
2 duration of exposure than the 1,800 patients, you
3 couldn't say that they were representative;
4 correct?
5 A.    Well, whatever their dose was, or whatever
6 their exposure was, if they are not representative
7 of the 1,800, then I can't say that the pattern
8 will hold.
9 Q    And you don't know whether when in making
10 his assessment of the seventy-six who died of
11 asbestos-related disease, how many of them were
12 smokers versus nonsmokers; correct?
13 A.    Correct.
14 Q    You don't know how many of the 1,800 are
15 smokers versus nonsmokers; correct?
16 A.    Correct.
17 Q    If only a small number of the seventy-six
18 were smokers, but the majority of the 1,800 were
19 smokers, would you agree the seventy-six may not
20 be representative of the experience of the 1,800?
21 A.    They may end up having a higher rate of
22 disease because the synergistic affects of
23 asbestos and smoking.
24 Q    The 1,800 may?
25 A.    Yes. If there are more smokers there.

---

Page 263

ARTHUR L. FRANK, M.D., PH.D.
1
2 Q    But they may not as well; correct?
3 A.    If there are fewer smokers they will have a
4 lower rate.
5 Q    But you don't have any data that tells you,
6 other than the fact that they were exposed to
7 Libby asbestos and Dr. Whitehouse's determined
8 that they had a nonmalignant asbestos disease, as
9 to how representative the seventy-six are of the
10 1,800?
11 A.    Correct.
12 Q    That's all I have.
13          MR. HEBERLING: No further
14 questions on this side. Anybody on the phone
15 want to ask a question?
16          MR. COCKRELL: This is Dale
17 Cockrell. I have just a couple.
18          - - -
19          EXAMINATION
20          - - -
21 BY MR. COCKRELL:
22 Q    Dr. Frank, earlier you testified about, and
23 I may have missed this or misunderstood it, but
24 when you were reviewing and preparing the
25 seventy-six sheets on the deceased patients, I

---

Page 264

ARTHUR L. FRANK, M.D., PH.D.
1
2 think you had said something about you did that in
3 the presence of Dr. Welch and maybe some
4 attorneys?
5 A.    Yes, sir.
6 Q    Who was there besides Dr. Welch, yourself
7 and Dr. Whitehouse?
8 A.    Mr. Heberling was there -- no. An attorney
9 from Boston was it and Mr. Bailor.
10 Q    Mr. Bailor?
11 A.    Yes.
12 Q    When did you do that?
13 A.    June -- when was it --
14          MR. FINCH: February.
15          THE WITNESS: Sometime in February.
16          MR. BAILOR: I'm not under oath.
17          THE WITNESS: On a Friday in
18 February.
19          MR. COCKRELL: That's all I have.
20          - - -
21          (Whereupon the Witness was excused
22 at 2:50 p.m.)
23          - - -
24
25

---

Page 265

ARTHUR L. FRANK, M.D., PH.D.
1
2          C E R T I F I C A T E
3          - - -
4 STATE OF PENNSYLVANIA        :
5                              :
6 COUNTY OF PHILADELPHIA       :
7          - - -
8          I, Lorraine Murtaugh, Professional
9 Reporter and Notary Public, in and for the
10 Commonwealth of Pennsylvania, do hereby certify
11 that the foregoing testimony of ARTHUR L. FRANK,
12 M.D., PH.D., was taken before me at 1801 Market
13 Street, Philadelphia, Pennsylvania, on Friday,
14 June 5, 2009; that the foregoing testimony was
15 taken by me in shorthand by myself and reduced to
16 typing under my direction and control; that the
17 foregoing pages 1 and 261 contain a true and
18 correct transcription of all of the testimony of
19 said Witness.
20
21
22
23
          .....................
          LORRAINE MURTAUGH
24        Notary Public
25        My Commission expires
          August 15, 2012

---

Page 266

1    ACKNOWLEDGMENT OF DEPONENT
2
3        I, ARTHUR FRANK,
4    do hereby certify that I have read the
5    foregoing pages and that the same is a
6    correct transcription of the answers given
7    by me to the questions therein propounded,
8    except for the corrections or changes in form
9    or substance, if any, noted in the attached
10   Errata Sheet.
11
12
13   _____
14       ARTHUR FRANK
15   Signed this _____ day of _____,2009.
16
17              ---
18        E R R A T A
19              ---
20   PAGE  LINE  CHANGE     REASON THEREFOR
21   _____
22   _____
23   _____
24   _____
25   _____

Page 268

1    NOTICE TO READ AND SIGN
2
3       A copy of this deposition transcript
4    is being provided to counsel for the witness
5    by JANE ROSE REPORTING for signature.
6
7
8
9
10   _____
11       JANE ROSE REPORTING
         80 Fifth Avenue
12   New York, New York 10011
         1-800-825-3341
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 267

1              ---
2        E R R A T A
3              ---
4    PAGE  LINE  CHANGE     REASON THEREFOR
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24   _____
25   _____

Case 01-01139-AMC   Doc 22731-3   Filed 08/07/09   Page 70 of 93

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - June 5, 2009
Arthur Frank M.D., Ph.D.
Page 269

**A**

**abdomen** 206:14
**ability** 29:9 84:23
    86:25 242:5
**able** 52:4 86:20 87:22
    88:18,19 133:5
    138:10 148:21
    169:18 177:21
    181:12 185:22 189:3
    193:15 208:13 238:8
    247:2 248:17
**abnormal** 86:13 97:21
    167:17
**abnormalities** 96:17
    167:15
**abnormality** 167:18
**absence** 156:12,21,22
    159:7 174:8 177:16
**absolutely** 77:17
    117:13 186:3 245:20
    245:21 251:23
**accept** 121:9 185:7
**accepts** 28:8
**accident** 70:19
**accomplish** 137:13
**accounts** 147:21
**accumulatively**
    257:19
**accurate** 32:13 58:8
    58:10 63:14 117:4
    205:9 206:20 232:25
    233:14
**accurately** 39:13
    135:2 234:5
**ACC's** 6:21,24 7:4
    13:11,14,19
**acknowledged** 126:3
    224:13
**ACKNOWLEDGMENT**
    266:1
**Act** 49:19,20,22 61:23
    66:20
**actual** 121:21 150:21
**acute** 194:18
**ad** 252:8
**add** 182:14
**adding** 53:11
**addition** 59:21 181:15
    180:2,18
**address** 110:18
    124:13,25 125:2
**addresses** 111:13
    112:15 124:14
**addressing** 201:5
**adds** 34:6
**adenocarcinoma** 64:4
**adequacy** 25:10 79:5
**adequate** 182:11

**adjudication** 10:12
**adjudications** 56:4
**administered** 1:11
    49:9
**administrator** 25:23
**adopt** 136:2 180:17
    182:16
**adopted** 24:3 169:3
    192:13 201:3
**advanced** 96:17
    118:10
**adverse** 113:19
**advise** 178:18
**advised** 209:6
**advisory** 25:4,9 26:3,4
    26:19
**affect** 159:11
**affidavit** 9:13 57:9,14
    57:19 63:13
**agency** 42:15,19
**aging** 86:12 260:11
**ago** 29:14 219:12
**agree** 10:13 16:6
    18:11 19:3,8 28:18
    29:23 30:10 31:7
    33:7 34:13 38:9
    39:12 40:15 43:17
    43:22 44:15 45:6
    49:21 51:23 58:12
    59:20 68:13 72:5,7
    75:7,12 76:11 80:4
    83:5 85:20 86:16
    93:5 94:25 95:22
    96:3,8,20 106:4
    107:7,9 111:5
    112:24 113:21
    115:22,24 119:6,22
    120:6 128:17 133:12
    133:22 134:24 135:9
    136:6,13,14,20
    137:4,14,21 139:15
    143:13 146:18
    147:24 159:25
    180:22 220:14
    238:12 246:22
    249:24 255:17,24
    257:2,6,7,11 262:19
**agreed** 26:20 67:3
    91:22,25 115:19
    144:20 211:2 258:6
**agreement** 115:20
**agrees** 106:16 116:6
**ahead** 196:23 198:20
    226:20,21 228:5,23
    241:5,7,7
**aim** 137:22
**aiming** 205:7
**air** 57:24
**Airborne** 23:6

**al** 1:7 7:24
**ALAN** 5:5
**alive** 88:7
**Allen** 13:24
**allow** 22:10 93:21
    250:4
**allowing** 82:7
**allows** 112:4 131:13
**alternate** 132:8
**alternative** 189:10
**amosite** 23:22
**amount** 36:19 52:7
    61:21 80:6 95:10
    97:20 98:2,3 139:7
**amounts** 11:7,10
    50:22
**amphibole** 17:16
    18:13 22:8,11 28:2
    28:14 32:23 38:10
    38:17 39:4 249:20
**amphiboles** 16:3
    19:22 21:8,23 23:24
    23:25 24:10,25 27:5
    27:16 33:15,19
    36:10,12 37:12,25
    38:4 65:5
**amphibole-containi...**
    15:14
**analogy** 103:16
    104:16 105:11,12
    121:5
**analysis** 40:2,6 43:2
    95:9 192:25 194:2
    195:2,6,25 198:18
    211:20 212:16,18
    213:18,24 214:8,18
    214:21 216:3 218:18
**analyze** 40:6
**analyzed** 199:6 215:22
    250:22
**analyzing** 201:8
**anatomic** 158:21
**anatomical** 149:11
**anatomically** 148:14
    150:10,12
**anatomist** 150:25
**anatomy** 223:2
**and/or** 206:3
**angle** 31:16 90:9,20
    153:6,8,13,16,17,21
    154:2,8,15,21 155:3
    155:10,24,25 156:6
    157:9,16 158:7
    159:6 168:16,25
    170:3,23 171:2,4,7
    171:16,19,20 172:12
    173:2,24 174:9,11
    175:10,20,24 176:8
    176:21 177:2,13,17

**177:21 178:12**
    179:11,21 180:18,24
    181:12,15 183:22
    222:20 223:8,11
**angles** 182:9
**animal** 111:19
**ANNE** 4:15
**answer** 35:2 89:16
    100:3,7,12 101:6,8
    101:16 103:4,13,17
    103:19,21,23 104:2
    104:3,5 105:7,25
    106:17 107:14
    108:14,15,17 109:8
    109:9 123:20 124:19
    125:17 143:19
    158:24 159:19,20
    160:15 177:11
    181:21 182:20 184:3
    185:7 198:23 228:5
    234:4 239:10 241:5
    241:8 242:18,24
    244:10,13,13,19
    249:3
**answered** 102:23
    123:16,19,22 135:14
    230:25 234:4,6
    240:13
**answering** 196:15
    243:25
**answers** 100:17 101:9
    101:24 102:21 106:6
    158:19 170:14 266:6
**antidotally** 212:18
**anybody** 20:25 65:2
    126:20 130:9 188:14
    194:2 195:7 209:24
    213:19 218:15
    219:23 221:12
    223:11 255:2,3
    259:17,18 263:14
**anymore** 188:6
**anyway** 82:2 178:8
    189:8,9 220:4
**apologize** 221:3
**apparently** 31:11
    53:13 124:16
**appear** 190:3
**appearance** 152:7,12
    159:21
**APPEARANCES** 2:3
    3:2 4:3 5:3
**appeared** 199:9
**appears** 127:10
    138:24 143:14
    194:17
**apples** 237:17 242:23
**applicable** 249:14
**applied** 55:15 69:25

**177:21 178:12** 74:4,9 102:21 110:4
    110:6 209:24 210:2
**applies** 55:17 106:18
    106:19 142:14,24
    143:2 236:3
**apply** 56:9 64:22,24
    66:25 73:25 80:3
    95:20 102:7,9
    121:25 122:3 127:24
    128:9,10,13 142:25
    183:25 184:2,7
    209:24
**applying** 127:23
**appreciate** 101:24
    168:2
**appropriate** 30:17
    48:19 52:2 65:21
    72:4,23 77:16 78:19
    79:24 101:18 118:9
    173:23 182:20
    230:17 234:24
    255:12
**approximate** 259:14
**approximately** 47:5
    97:2
**April** 92:11
**arbitrarily** 250:18
**arbitrary** 60:20 128:15
    164:25 167:5,11,21
    183:2
**area** 103:3 119:11,20
    149:4 169:7
**areas** 45:4 112:17
**argue** 61:8
**argued** 84:19
**argumentative** 116:10
    116:12,13,15,17
    128:25 190:13
    239:20,20 241:19
    255:15
**Arich@alanrichlaw....**
    5:9
**Armstrong** 9:10,12
**arrest** 202:12,13
    203:13,20 204:17,18
    205:2
**arrived** 50:25
**Arthur** 1:14 6:3 8:1,2
    9:1 10:1 11:1 12:1
    13:1,2 14:1 15:1
    16:1 17:1 18:1 19:1
    20:1 21:1 22:1 23:1
    24:1 25:1 26:1 27:1
    28:1 29:1 30:1 31:1
    32:1 33:1 34:1 35:1
    36:1 37:1 38:1 39:1
    40:1 41:1 42:1 43:1
    44:1 45:1 46:1 47:1
    48:1 49:1 50:1 51:1

Case 01-01139-AMC    Doc 22731-3    Filed 08/07/09    Page 71 of 93

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - June 5, 2009
Arthur Frank M.D., Ph.D.
Page 270

52:1 53:1 54:1 55:1
56:1 57:1 58:1 59:1
60:1 61:1 62:1 63:1
64:1 65:1 66:1 67:1
68:1 69:1 70:1 71:1
72:1 73:1 74:1 75:1
76:1 77:1 78:1 79:1
80:1 81:1 82:1 83:1
84:1 85:1 86:1 87:1
88:1 89:1 90:1 91:1
92:1 93:1 94:1 95:1
96:1 97:1 98:1 99:1
100:1 101:1 102:1
103:1 104:1 105:1
106:1 107:1 108:1
109:1 110:1 111:1
112:1 113:1 114:1
115:1 116:1 117:1
118:1 119:1 120:1
121:1 122:1 123:1
124:1 125:1 126:1
127:1 128:1 129:1
130:1 131:1 132:1
133:1 134:1 135:1
136:1 137:1 138:1
139:1 140:1 141:1
142:1 143:1 144:1
145:1 146:1 147:1
148:1 149:1 150:1
151:1 152:1 153:1
154:1 155:1 156:1
157:1 158:1 159:1
160:1 161:1 162:1
163:1 164:1 165:1
166:1 167:1 168:1
169:1 170:1 171:1
172:1 173:1 174:1
175:1 176:1 177:1
178:1 179:1 180:1
181:1 182:1 183:1
184:1 185:1 186:1
187:1 188:1 189:1
190:1 191:1 192:1
193:1 194:1 195:1
196:1 197:1 198:1
199:1 200:1 201:1
202:1 203:1 204:1
205:1 206:1 207:1
208:1 209:1 210:1
211:1 212:1 213:1
214:1 215:1 216:1
217:1 218:1 219:1
220:1 221:1 222:1
223:1 224:1 225:1
226:1 227:1 228:1
229:1 230:1 231:1
232:1 233:1 234:1
235:1 236:1 237:1
238:1 239:1 240:1

241:1 242:1 243:1
244:1 245:1 246:1
247:1 248:1 249:1
250:1 251:1 252:1
253:1 254:1 255:1
256:1 257:1 258:1
259:1 260:1 261:1
262:1 263:1 264:1
265:1,11 266:3,14
**article** 7:21,22 29:24
91:16 92:10 128:2
160:18 171:11 229:2
**articles** 7:23 94:11
130:5 160:25 171:14
**asbestos** 8:11,19,24
9:6,14,19 10:5,10,14
10:17,17,19,23
11:16 12:7 14:12,16
14:23 15:3,6,22 18:4
18:12,13,13 19:4,9
19:10,11,20,21 20:3
20:8,12,14,20 21:4,9
21:9,11,12 22:12,13
22:13 23:6,18,21
26:10,10 27:13
29:18 32:23 33:25
34:5,14,15,18,22
35:2,5,6,8,11,17
36:9,13,15,19 37:8
37:10,18 38:11,19
39:4 40:19 41:5,19
41:22 48:3,17 49:4,9
49:17 54:5,6,8 56:3
56:20 59:21 60:3,14
60:23 62:3,23 63:5
63:17,19 64:10,18
64:22 65:6,14,17
66:16 67:13 68:9,12
68:22 69:24 70:2,12
70:16 74:12 75:2,10
76:8 77:24 78:2,24
80:5,8,17,18 81:2,7
81:19,20,22 82:18
82:23 85:16 88:4,10
88:15 95:11,24 96:4
96:11 116:24 130:4
141:16,18,20 142:15
142:24 145:21
146:22,25 147:8
154:19 155:3,4,5,20
157:21 162:15 177:5
177:14,20 178:14
181:14 182:12 184:7
185:18 186:10 190:7
199:20,25 200:22
201:4,13,14,17
205:3 209:12,23,25
210:2,8,9,12,12
213:11,16 214:7

221:11 222:10
226:11,12,24 231:13
232:18 235:22
236:21 237:20 240:4
242:6 249:19 251:11
251:16 258:10
259:15 260:10 261:8
262:23 263:7,8
**asbestosis** 30:16
43:25 69:15 70:25
77:13 80:15,16
83:19,24 139:10,13
141:7,11,13,20
142:4,7,8,12,13,20
142:21,22,22 143:3
143:6,14,17,22
144:8 145:4 162:19
168:4 202:14 213:10
219:13,21 221:20
233:19 234:2,22
235:19 251:9 252:2
**asbestos-containing**
39:7 53:25 54:6,7,9
54:10 64:21 65:3
**asbestos-related**
10:10 11:8 23:15,18
30:6,21 32:7 33:24
36:7 37:5 43:4,10,17
43:20 44:2,24 48:24
62:16,22 69:7,14
70:6 71:2,9,18 72:14
72:22 73:10,13
74:14 75:20 76:5,24
79:11 87:16,21,25
88:16 90:2 96:5,22
161:19 193:3 194:15
198:4,7 199:10
201:11 211:4,10,13
211:16 212:20
213:22 214:12 221:8
225:18,22,24 226:14
227:3 228:9,14
231:15,25 232:14
233:3,18 235:20,25
236:24 237:4 239:16
244:24 251:8,17
257:14,16 258:13
259:5,10 260:20,24
261:10,17,24 262:11
**asbestotic** 154:23
155:8,15 157:7
159:7
**ascertaining** 209:2
**ascribe** 142:23
**ascribed** 177:20
**asked** 11:9 14:3,8
18:22 26:6 48:16,22
49:3,13 61:9 98:22
102:12,22 104:4

114:18 123:16,22
129:19 132:18,18
135:13 148:16,22
159:13 209:11 217:2
218:23,25 234:24
239:5 241:16,21
**asking** 34:21 53:4
99:15 103:10 113:17
113:21 115:10
133:20 143:15 151:3
158:19,25 159:14
163:13 165:3 166:6
182:21 183:20
188:14 189:24 190:2
191:3 210:22 228:19
255:3
**asks** 129:13
**aspect** 99:22
**aspects** 30:10 31:7
48:9 128:6
**assembled** 27:14
**assertion** 239:18
**assess** 135:7
**assesses** 125:13
**assessing** 124:24
125:15
**assessment** 23:6
38:22 39:2 162:7
164:8 191:2,13
239:24 262:10
**assessments** 26:9
162:12,14 187:14
**associated** 155:3
159:18 160:3,6
163:4 164:9,12
165:16 166:8,22
167:6 168:12 171:18
171:21 175:8 186:4
186:14,18
**association** 155:5
176:20
**assume** 56:19 82:13
133:4,9 137:10
174:18,21,22 183:14
232:22 233:11
246:10 253:19
**assumed** 125:8 169:2
**assumes** 210:18
**assuming** 125:5 155:3
155:4 160:14
**assumption** 43:19
170:3 246:12,17,20
**assurance** 179:23
**assure** 160:10 244:15
**ATS** 7:19 70:11 74:13
74:24 75:13 76:3
90:15,19 169:3
**ATSDR** 7:14 40:2,6
42:21,22

**attach** 217:25
**attached** 12:15 23:2
25:17 39:17 47:22
74:21 91:12 92:5
98:18 217:21 256:21
266:9
**attachment** 25:24
**attack** 203:13
**attacks** 63:24
**attempt** 204:6 224:19
**attempted** 24:9,24
**attic** 32:24
**attorney** 264:8
**attorneys** 264:4
**attributable** 181:3
200:22
**attribute** 77:23 80:7
82:22
**attributed** 82:11
**August** 265:25
**author** 29:25 115:21
**authors** 23:10 24:8
**automobile** 70:19
104:6
**available** 101:20
105:16 205:12
240:19,21 255:8
**Avenue** 3:20 5:15
268:11
**average** 95:24 96:2
**aware** 24:23 31:3 48:7
90:8 96:14 114:16
114:19 117:10,14
140:2,18,21,23,24
152:13,24 157:5
158:5 163:22 164:3
164:7 165:14 170:20
172:3 175:6,17
194:2 195:7 207:9,9
218:19 222:18
258:20,21
**AXELBERG** 4:6

**B**
**b** 5:5 6:10 7:1 16:20
51:14 53:8,20 56:15
58:14 138:22 141:8
143:22 144:17,21
148:8 168:20 169:23
170:7 177:24 187:20
187:23 188:2 191:24
192:9 195:3 213:13
219:25 220:3,10,15
220:22,24 221:16,16
221:25 222:3,4,6,7
223:15 239:10
**back** 13:3 26:4 30:14
45:14 56:15 85:23
90:24 91:3 99:13

Case 01-01139-AMC    Doc 22731-3    Filed 08/07/09    Page 72 of 93

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - June 5, 2009
Arthur Frank M.D., Ph.D.
Page 271

102:13 103:16 111:9
112:8 114:21 121:5
140:23 145:5,9,11
145:20,24 146:7,12
147:3,12 156:4
169:24 175:21
178:10 190:18
196:17 197:11
206:10 227:6,9
233:24 235:15 240:8
242:10 254:11
**backed** 60:20
**background** 14:23
15:4 19:4,9 52:9
57:4 224:2
**bad** 107:21,22 128:3
143:16
**Bailor** 2:17 264:9,10
264:16
**bankruptcies** 140:11
**bankruptcy** 1:1 8:12
8:23 9:6,8,12,16,18
9:22,24 14:4 48:2,18
49:15 54:5 99:15
**bar** 66:14 136:24
**barriers** 66:17 178:4
**base** 107:22
**based** 12:12 53:10
76:4,20 87:22 93:2
106:2 118:17 119:7
120:8 122:23 126:5
126:6,24 127:7,20
128:13 138:25
150:20 158:24
164:14 173:7 178:7
178:8 182:25 214:8
214:16 226:22 230:7
232:20 239:11
247:25 256:18
**baseline** 55:15
**basic** 36:22
**basically** 9:15 41:7
138:21 203:9 208:24
216:19 258:9
**basing** 105:5
**basis** 21:5 26:21 27:20
27:23 28:5 32:15
39:5 41:8 43:14
50:14 53:12 56:13
58:7 59:14 61:4 62:6
73:19 80:10 84:6
99:21,24 100:6,10
100:18,23 101:2,5
101:15 102:5,16,20
103:5,7,8,11,12
104:20,23 105:3
106:8,23 107:2,13
107:18,19,20 108:16
109:13,21 110:3,6

110:24 111:11,12
112:8,21 113:3
115:8 119:4 120:12
120:15 123:2,8,12
125:23 126:23 133:7
133:11,24 134:17,23
134:24 135:2,3,10
135:21 136:3,7
137:16 172:7,20
180:23 184:25
189:11 220:21 228:3
228:4,12 236:2
238:7 239:6 240:6
240:10 241:23,24
245:18,22 250:9,10
252:7,17,20 253:12
254:12 255:7,21
**battery** 187:13
**beams** 33:4
**began** 249:3
**beginning** 144:13
239:5
**behalf** 10:16
**beholder** 122:12 165:5
**belief** 50:18
**believe** 18:23 21:21
25:12 29:21 32:11
34:22 39:24 50:16
70:4 71:21 91:21
92:16 117:8 169:3
174:15 187:23,25
197:18 210:4 215:4
230:17 231:23 240:5
240:9 254:13 260:16
**believed** 182:11
**belive** 218:3
**benign** 154:23 155:8
155:12,15,18 156:9
156:15,22 157:7,12
158:11 159:7
**Berman** 24:7,15,19
26:7 28:20
**BERNARD** 2:17
**BERNICK** 3:5 6:6
71:12 89:3,7,13
90:23 99:12,14
100:20 102:25
103:24 116:11,16,18
123:19,23 129:4
131:8 135:15,17
138:13,17,19 166:18
169:8,12,17,22
175:15 177:7 178:21
179:2 189:2 190:16
191:21 197:10
198:13,15 210:20
217:20,24 225:11
226:3,15,19 227:5
227:11,14 228:2,15

228:18,21,23 229:15
229:23 230:4,16
233:6 236:25 239:21
241:2,6,20 243:9,12
243:15,18,20,21,24
243:25 244:5,9,14
247:8,17,21,23
248:10,25 249:5,16
253:6,18 254:2
255:16
**best** 95:16 101:6,8,16
101:20 102:20 103:4
103:8,13 105:7,15
105:24 106:7 107:20
108:14,15 109:8,16
110:25 124:19
135:23,25 136:2,6
137:15 200:10,10
205:15,18 207:4
208:20 213:24 214:8
214:17,20 216:15
239:10 240:17,19,21
254:18,19,22 255:7
255:8,9,20,25 256:2
256:5
**bet** 157:8
**better** 15:24 104:10
109:24 110:23,24
132:10 143:9 187:16
221:17 250:20
**beyond** 44:24 67:10
86:25 115:6 159:20
253:15
**big** 98:4
**bigger** 41:12,15
**bilateral** 62:16 69:6,13
69:19,24 70:9,11
71:2,4,8,17,19 72:5
72:17 73:5 76:23
181:14 184:10
**bilaterality** 72:7
**bill** 17:12,13 23:13
49:17 50:3
**biology** 31:24
**biophysicist** 23:16
**bit** 24:18 33:12 47:17
139:9 148:10
**blank** 216:13
**blemishes** 104:8
105:10,12
**bless** 132:12
**blind** 216:21 217:8
218:11
**blog** 130:13
**BLOOM** 3:7
**blunted** 154:20 157:8
171:4,7 174:9,11
177:2,13,17,21
178:12 181:12,15

182:9 223:8,11
**blunting** 31:15 90:9,19
153:5,8,15,16,21,25
154:8,14 155:2,9,23
155:25 156:6 157:15
158:7 159:6 168:15
168:24 169:5 170:3
170:23,25 171:15,19
171:20 172:11,25
173:24 175:9,20,24
176:8,21 179:20
180:23 182:13,15
183:21 212:12
222:19,24 229:5,8
229:12 230:3
**board** 25:4 26:3,4,20
49:7 118:10
**board's** 25:9
**body** 21:25 24:16
149:12
**bold** 17:2
**Boston** 264:9
**bottom** 19:18,19 21:6
**box** 202:6
**brakes** 14:16
**brand** 140:15
**Bratt** 24:21 25:10
26:22
**break** 24:18 47:11
67:23,25 68:4 91:6,8
99:7 169:18 178:22
178:23,23 184:15
191:15,18
**breaks** 214:10,24
**breathe** 35:7 86:25
**breathed** 35:5 57:24
**breathing** 15:11
**BRIAN** 3:6
**brick** 182:16
**brief** 40:23
**briefly** 12:23 184:15
**bring** 121:8,13 130:6
134:8 206:22 235:12
**broad** 9:21
**broader** 200:19
**broken** 258:17
**brought** 200:6 216:12
**Bsb@capdale.com**
2:22
**Bstansbury@kirkla**
3:12
**bunch** 91:17 124:6
126:8 141:12 216:7
**business** 182:17
**buy** 115:4,5

———————————

**C**

**C** 64:4 265:2,2
**calcification** 72:6

**calcified** 152:8,9
**calculated** 256:9
**California** 38:6
**call** 18:9 20:8 30:13
31:16,24,25 41:4,21
41:23 45:6 75:4
90:10 116:24 118:2
118:24 147:7 195:18
**called** 8:10 32:6 87:11
92:12 116:25 117:5
119:25 120:4,8
142:19 145:22
146:14 147:9 192:4
202:23 203:4,6
205:16 229:9 237:17
**calling** 48:15
**Canada** 16:11,14
20:15
**Canadian** 17:6
**cancer** 18:25 19:6
21:24 22:5 26:11
52:16 59:20,22,24
60:2,11,13,19,25
62:14,23 63:18
64:11,13 65:5,7,12
65:13,18,19,22,23
65:24 66:2,16 67:6
67:16,18 68:9 77:20
77:25 138:3 139:3,5
139:18,24 202:14
203:18 206:17,19
210:5,10 234:21
235:18 251:23
252:22,24 257:10
**cancers** 65:16 88:12
139:7 219:19 235:21
**candidly** 151:3
**capable** 185:11
**capacity** 84:2,10
184:17 185:3,21
186:17 188:10
189:11,14 190:22
191:9,10 223:18
**Caplin** 1:18 2:15
**capricious** 60:20
128:15
**capture** 172:6 174:23
**car** 104:6,14 121:5,7
121:18,19,21
**carcinogenic** 60:10
252:17,19
**carcinoid** 66:7
**carcinoma** 66:4,5
**carcinomatosis**
206:14
**CARD** 32:7,17 44:23
45:8,9,9,14,22 46:4
46:21 86:5 87:11
94:24 194:10 195:13

Case 01-01139-AMC    Doc 22731-3    Filed 08/07/09    Page 73 of 93

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - June 5, 2009
Arthur Frank M.D., Ph.D.
Page 272

195:18,19,19,25
198:4,21,25 199:14
200:19,20 201:8,22
209:22 212:10
213:19 214:13
225:17 226:8 227:13
227:14 231:6,12,24
236:11 240:2 244:25
257:23,25 258:12
259:4,9
**cardiac** 202:12 204:17
**care** 61:20
**career** 116:23
**careful** 70:14
**carefully** 99:17
**Carolina** 16:9
**carried** 223:13
**carrier** 38:15
**case** 1:10 8:12 17:10
17:23 30:8 38:23
39:9,10 44:13 47:9
49:12,13 61:5 64:4
75:21 92:19,21,24
92:25 93:2,9 102:3
113:6,12 114:23
120:5 122:3,4
123:24 124:16
130:10,12,17 132:17
139:13 140:5,15
147:2 181:13 186:2
186:13 200:3 208:16
209:3,6 210:10
214:19 218:11
247:12,13 249:21
258:20
**cases** 9:4 10:5,15,16
11:19,22,25 12:12
14:12 61:24 82:8
92:22 111:20 121:16
139:11,14 144:23
158:10,12,13,15
175:25 191:7 197:4
198:6 208:11 209:22
211:13 214:2,16,25
215:8,22 218:5
219:13,14,17,20
253:13
**Casualty** 3:24
**categorical** 22:11
**categories** 10:23
51:17,23 80:14
133:5 137:24 138:2
138:20,21 139:16
**categorized** 201:18
**category** 69:15 76:19
80:14 83:15,17,18
131:18 140:16 141:6
141:7 183:15 184:16
195:3 212:24 213:2

213:3,4,10,13
**causal** 199:23
**causally** 183:11
200:22
**cause** 14:16,20,24
18:25 22:12 27:16
29:9 34:18 35:6,10
44:3 56:23 57:16,22
59:22,23 154:10
155:11 156:16 158:7
159:5 174:25 175:2
179:19 181:8,9
189:21 199:3,4,7,8
201:12,25 202:4,11
202:13,15,17,21
203:2,11,20,25
204:3,16,19,22
205:5,8,9,10 206:14
207:2,8,24,24 208:5
208:13 209:3,25
210:7,17,25 211:14
211:19 212:21,22
213:18 215:23
223:17
**caused** 34:15 60:3
141:15,17,20 142:15
146:22 147:7 150:8
156:8 176:14 177:13
178:14 179:16
181:14 182:12 183:5
183:13,24 184:7
189:14,15 199:20
201:4 202:4,19
203:14 205:2 209:23
260:9
**causes** 34:7 70:22
154:12,13,17 157:4
161:12,14 179:16
185:17 190:21 210:6
246:3
**causing** 15:5,12 18:23
19:5,11 22:8 24:2
25:2,2 26:11 28:16
34:3 60:18 63:18
65:19,24 190:8
209:13
**caveats** 240:13
**cell** 65:12,14,21 66:6
150:8
**Celotex** 9:8,16
**Center** 32:7 33:5
**certain** 48:8 50:5
59:25 60:2 63:23
66:12,20 84:19 90:6
116:21 118:15,20
128:21 133:8,25
134:11,18 135:11
136:23 151:16
152:10 170:13

180:25 181:4 183:16
184:6 188:2 209:12
237:25 242:4
**certainly** 10:21 17:22
22:23 28:18 30:20
31:13 36:3 38:2
86:15 96:24 101:10
101:22 103:8 115:15
117:10 124:15
128:17 130:22
131:10 133:2 143:4
146:21 147:15
158:10,15 164:2
185:4 217:13 220:9
221:6 223:19 224:22
251:16
**certainty** 14:15 15:17
18:25 44:6
**certificate** 200:9,12
202:9,18 203:12,24
205:12,25 207:13
208:10,16,19 213:23
214:7,17,20 215:11
215:12
**certificates** 201:21,24
204:8,12,14,21
205:4 207:15,16
208:4,4 214:3 215:3
215:7
**certification** 118:10
**certified** 219:25
**certify** 265:10 266:4
**cetera** 72:6 81:22,23
**change** 84:22,23
154:2 167:12,20
180:3 266:20 267:4
**changes** 43:23 70:12
73:18 85:16,18
87:24 90:10 142:14
147:8 153:9 155:7
156:2,3 160:6
173:12 181:14 186:8
186:9 194:18,21
230:11 266:8
**CHAPTER** 1:4
**characteristic** 251:6
**characteristics** 11:24
34:14
**characterization**
146:24
**characterize** 30:20
198:22
**charged** 10:16
**CHERIN** 3:18
**chest** 44:25 149:6
153:11 154:20 187:7
187:15 194:14
**chief** 29:25
**child** 146:7,9,9

**China** 16:11
**choose** 41:24 42:2
119:13
**chose** 219:2
**chosen** 128:13 218:23
**CHRISTENSE** 4:5
**chrysotile** 14:15,19,24
15:3,9 16:4,5,9,11
16:14,20 17:7 18:13
18:23,24 19:5,10
21:10,12,24 22:8,13
23:23,25 24:11 25:2
27:5,17 28:4,15 29:9
**cigarettes** 223:25
**Circle** 2:18
**circular** 37:15
**circumscribed** 147:10
147:19
**circumstance** 38:24
**circumstances** 38:12
109:25 111:3 137:14
166:7,11,13,20
242:13
**citations** 164:13
**cited** 39:25 167:2
**citing** 85:13
**City** 33:6 63:25
**claim** 12:8 21:22 22:2
54:5 55:20 131:19
132:3 142:11
**claimant** 53:23 57:10
82:14
**claimants** 8:11,20
36:17 37:3,3,9 40:22
64:20 67:5,7,9,10,20
68:18 78:9 80:3
82:21 258:18
**Claimant's** 8:24
**claims** 9:2 10:24,25
11:16 48:3,20,22
73:16,21 132:2,22
133:21 187:19,21
**clarifies** 200:11
**clarify** 198:2
**clarity** 233:8
**class** 21:14
**classification** 90:4
176:4 222:5
**classifications** 224:18
**classify** 32:5 90:17
206:22
**clause** 54:2 68:19
**clear** 77:12 98:12
101:25 152:24 155:9
156:5 159:4 167:4
174:13 178:15 188:9
196:14 205:20 213:8
213:17 233:10
244:16,17

**clearer** 164:6 165:25
177:22
**clearly** 62:21 176:13
180:10
**client** 138:10
**clinic** 32:7,17 44:23
45:8,9,10,15,23 46:4
46:21 86:5 94:24
194:10 195:13,18
197:17,21 198:4,22
198:25 199:14
201:22 213:19
214:13 225:17 226:8
227:13,14 231:6,12
231:24 240:2,3
258:13 259:4,9
**clinical** 51:12 203:10
206:21
**clinically** 158:10 173:8
**clinicians** 240:3
**close** 107:15 169:9,12
184:14 209:8 220:18
**closely** 38:16
**closer** 250:2
**closest** 193:14
**coat** 33:3
**coauthored** 29:4,7
**Cockrell** 4:5,7 6:8
225:7,7 263:16,17
263:21 264:19
**code** 202:14
**coding** 203:5
**cohort** 16:4,8 18:9,11
18:17,18 40:11,14
41:5,22 42:3,5,6,11
42:17 45:7,8,9,10,11
46:22 86:5 87:14
92:13,18,20 93:7,8
93:23 94:15 95:13
111:20 205:22 236:6
238:5,10,22 251:12
260:23
**cohorts** 15:21 16:2,6
18:3,5 93:22 96:25
**coined** 145:15
**collagen** 150:15
**collagenous** 150:9
**colleagues** 119:14,15
218:21 224:7
**collect** 52:3
**collection** 26:5 92:22
153:18
**colloquially** 24:7
48:16
**combination** 257:18
**come** 29:17 45:14 58:5
63:9,9 101:11
108:16 155:19
196:17 205:25

Case 01-01139-AMC    Doc 22731-3    Filed 08/07/09    Page 74 of 93

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - June 5, 2009
Arthur Frank M.D., Ph.D.
Page 273

comes 70:3 124:21
    157:16 162:10 188:5
    194:3 221:23 255:17
    256:13
comfortable 180:10
    182:3
coming 208:10 221:4
comment 20:16 32:16
    50:20 51:2,14 72:24
    125:24 163:17
commenting 125:21
    126:22 128:7
comments 61:18
    91:20
commercial 17:15
    20:13,19 21:3 32:22
    36:12 39:8
Commission 265:25
committee 8:10,19,24
    25:24 26:19,20
common 162:22,23
    208:11 251:6 261:5
commonly 119:12
Commons 4:8
Commonwealth
    265:10
community 27:14
    95:18,25 119:3
    142:11 193:10
    252:23 253:15,16
    254:7,16 256:7,12
    259:11
company 10:17 49:4
    52:4
company's 52:5
compare 95:10 238:14
compared 12:3 34:25
    36:11 38:5 39:2,4
    67:6 95:12 97:4,9
    98:2 114:9 171:6
    250:23
comparison 193:8
comparisons 93:21
    94:2
compatible 200:5
compensate 173:6,13
    173:15,17,18 183:6
    183:9
compensation 49:7
    127:4,5,6,9 130:22
    133:6 134:15 135:7
    136:4,11,15 137:11
    137:15,22
complete 46:2
completely 30:8 31:18
    104:11 106:16
    129:20 167:4 244:18
completion 54:11
complicated 35:22

161:6,8 162:2
    204:20
complications 161:9
compliment 138:16,18
component 81:9
compound 30:25
    33:12 54:15,20 62:9
    175:12 176:22
comprise 233:12
comprised 214:6
    216:16,25 234:18
comprises 231:3
computer 217:5
conceive 38:23
concentrate 40:5
conclude 17:5
concluded 130:11
conclusion 101:12
conclusions 14:3 25:9
concrete 128:20
condition 203:25
    236:24
conditions 32:2
    165:20 166:20 194:7
    202:7
confines 194:5
confirmed 45:3 54:5
confluence 159:10,13
    159:15
confused 146:4
confusing 148:21
Congress 49:18
congruent 214:22
connected 44:7
connection 14:4 99:14
    153:22 209:5
consensus 62:20
consequence 202:24
    205:2 223:21
consider 62:15 115:8
    116:19 118:18
considered 73:4
    146:11 160:4
consistency 207:23
consistent 147:22
    178:16
constitutes 112:14,19
construct 31:10 32:4
    110:22 134:6 180:11
    180:13 200:14
constructed 133:2
construction 17:15
    20:14,19 21:3 33:5
    35:9,14 36:13 37:12
    57:11 59:16 69:2
consultation 209:5
contain 14:2 17:15
    33:22 265:17
contained 21:3

containing 15:9 16:17
contains 16:15 38:17
contaminated 32:23
contemporaries
    222:18
context 17:21 30:15
    74:2 117:2 120:23
    120:25 248:4
contract 121:19,24
contracted 33:23
contrary 148:25
contribute 15:12 19:5
    19:10 60:18 77:25
    201:15
contributed 60:7 81:4
    201:15
contributing 15:4 34:3
    63:6,17,20 65:7,24
    190:7 198:8 209:13
    209:15,18 210:3,7
    210:13,17,19,25
    211:11,12
contribution 200:15
control 92:19,21,23
    93:9,12 238:7
    265:16
controlled 236:9,12,15
    236:19 238:4 252:9
controls 93:10,11
    216:22
convention 120:9,15
    222:4
conventions 119:2,7
    119:20,23,24 120:3
    221:22 224:13
converse 160:13
conversely 160:4
    171:20
copy 1:24 22:18,19
    163:11,16 205:24
    268:3
correct 11:22 14:9,12
    16:7 18:7 21:10
    24:22 25:5 26:12
    27:24 29:5 34:12
    36:6 37:3 40:8 42:10
    43:11 44:6,18 45:11
    48:13 49:25 50:7,19
    51:5,9,18 53:4 59:4
    59:19,22 64:23 69:5
    69:16 71:4 72:23
    75:4,16,20,21 76:7
    76:22 77:5,17,20,21
    78:7,8 83:16,21,22
    90:3 91:25 97:7
    103:6 104:11 105:4
    105:19 106:13,17,20
    107:7,14,14,15,20
    107:21,23 108:5,20

112:21 113:6,14
    114:24 116:2 117:12
    117:17,21 118:6,15
    119:17 120:4,12
    122:6 123:13,14
    124:7 126:15,18
    127:4 131:9,11
    134:20 138:23 140:4
    141:14 142:5 144:24
    145:5,22 147:19
    148:8 149:12,18
    152:7 156:18 159:8
    160:13,13,20 161:21
    161:22 162:13
    164:24 168:25 170:4
    172:5 184:18,20,21
    185:10,11,19,24
    186:3,3,21,25
    188:12 189:5,16
    190:24 191:4 196:25
    199:21 201:22
    205:17 207:2 209:16
    209:19,20 213:5
    215:14 218:13 219:9
    220:11 221:8 223:22
    224:15,20,23 232:16
    234:13,20 235:6,13
    236:7,9,13 237:10
    237:13 239:13 245:5
    245:14,21 246:8,13
    251:2 252:9,11,24
    252:25 254:13
    258:11,14 259:7,8
    259:12,13,16,17,23
    260:3,6,11,12,14,15
    261:3,10,15,21,22
    262:4,12,13,15,16
    263:2,11 265:18
    266:6
corrected 208:23
corrections 266:8
correctly 40:9
correlate 97:21
correlated 230:10
correlation 159:21
    171:23
cost 61:20,24
costophrenic 31:16
    90:9,20 153:6,8,13
    153:16,17,21 154:8
    154:14 155:2,10,24
    155:25 156:6 157:9
    157:16 158:7 159:6
    168:15,25 170:3,23
    171:2,4,16,19,20
    172:12,25 173:24
    175:10,20,24 176:8
    176:21 179:10,21
    180:18,24 183:22

212:11 222:20
counsel 4:16 268:4
Counsel's 184:13
    230:18
country 40:4
County 35:4,5 37:24
    38:21 40:16,17,24
    42:4,6,7,12,17 45:11
    45:12 54:8,11 56:10
    57:19 258:6 265:6
couple 99:17 225:10
    263:17
course 96:2 107:3
    116:11
court 1:1 5:18 115:3
    117:2,7,8 182:19
courtroom 61:6
courts 10:7
court's 115:13
cover 83:3
covering 121:20
co-authored 91:16,18
co-worker 57:10
co-workers 222:13
create 32:24 49:3
    61:11
creating 226:19
credible 53:24 54:3,23
    56:16,19 57:8,12
    58:19 59:5,7,12
criminal 130:10,17
    247:13
criteria 10:4 48:12,17
    49:4,14,17 50:2,6,12
    50:15 51:4,8 52:12
    53:3,7,12 54:18
    55:11,14,19,22 60:4
    61:17 62:5,6,25 64:6
    66:3,11,21,23 67:6
    67:14,17 68:8,14,14
    68:15,16 69:24,25
    70:11,25 71:5,17,20
    71:20,23,25 72:20
    73:8,25 74:6 75:8,13
    76:8 77:4,6,19 78:12
    78:16,18,22 82:18
    82:22 83:3,5,20,24
    84:24 85:4 120:14
    127:24 131:2,12,14
    131:16,22 132:21
    134:20,21 136:9
    141:12 168:20,24
    169:25 172:23
    177:15 180:24
    187:24 189:18
    192:13 193:18
    197:18 200:4 211:22
    212:22 213:12,15
    261:5

Case 01-01139-AMC    Doc 22731-3    Filed 08/07/09    Page 75 of 93

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - June 5, 2009
Arthur Frank M.D., Ph.D.
Page 274

**criticism** 50:14 51:15
54:17 69:12,23 71:7
77:6 83:23
**criticisms** 52:11 61:22
62:4,5 70:24 76:23
76:25 84:25
**criticize** 51:7 53:3
**criticized** 50:11
**crocidolite** 28:19
**Cross-examinations**
116:12
**Crump** 24:8,15,19,22
25:11 26:8,22 28:20
**Crump/Berman** 25:11
**Crump/Bratt** 26:7
**CT** 44:25 46:22 53:12
71:20,23,24 72:3
76:16 194:22 197:14
212:17
**CTs** 220:2,5
**CUMMINGS** 4:6
**cumulative** 34:6 38:4
38:10,19 55:6 68:21
**cured** 139:20
**currently** 95:3
**CURRICULUM** 7:10
**curves** 252:11
**cutoff** 164:25
**cuts** 70:7 180:15
**CV** 22:19
**cynical** 56:8
**Czar** 61:11

**D**

**D** 2:16 6:1 7:1
**Dale** 4:7 225:7 263:16
**Dallas** 5:7
**Darden** 28:21
**data** 16:25 17:3 25:10
27:6,9,11,11,12 28:7
28:9 60:23 70:4 93:3
172:3,8 177:19
182:25 195:9,20,25
195:25 196:4 197:3
200:5,8,9 201:9
208:18 212:14 226:7
230:7,20,21,23
231:2,4,21 234:7,11
234:19 235:3,5
236:12 237:15 238:7
238:13 241:9,10
244:25 249:22 254:5
255:3,7 259:4 263:5
**date** 10:11 13:6 27:15
54:4 87:17 246:21
255:23
**dated** 7:12 13:9,12,15
13:20,21
**David** 3:5 99:13

**138:16 169:6 178:17**
**day** 35:21 52:10,21
57:15,20,22 59:15
59:18 61:11 80:22
81:3 146:10 206:19
266:15
**days** 15:9 55:9 109:20
**Dbernick@kirkland....**
3:11
**DC** 3:9,21 208:19
**Dcockrell@cmccala....**
4:11
**dead** 180:6 213:15
237:11 243:19
248:15
**deal** 110:21
**dealings** 31:6
**deals** 31:21
**dealt** 64:3 129:2,6
**death** 194:20 199:4,7
199:8,19,24 200:9
200:12 201:3,12,16
201:21,24,25 202:4
202:9,11,18 203:11
203:12,21,23,25
204:2,3,4,8,12,13,16
204:21 205:4,5,8,9
205:10,12,25 206:4
206:14 207:2,8,13
207:15,16 208:4,4,9
208:13,15,19 209:2
209:3,13 211:4,5,14
211:19 213:18,23
214:3,6,16,19 215:2
215:7,11,12,23
246:3
**deaths** 196:25 197:12
197:17,21 198:8
199:6 200:21 211:7
211:10,24 215:22
238:14 242:17
**Debtors** 1:8
**decades** 145:5
**deceased** 263:25
**December** 13:3,4
19:13 21:6
**decide** 182:19 187:3
**decides** 28:8
**decision** 12:7 128:3
200:2,13 210:16,23
210:24 211:3
**decisions** 12:2 58:9
93:2
**declination** 86:13 87:6
**decline** 86:9,10,11,25
88:22 96:10 260:2,5
260:9
**declined** 76:5
**declines** 97:17 98:9

**defendant** 30:23
**Defendants** 2:23 3:14
4:12
**deficiencies** 67:20
**definable** 142:3,4
**define** 65:12 175:22
**defined** 34:23 51:13
51:24 63:3 92:20
138:21 141:11,13
143:18 144:2 145:9
146:13 175:23 229:5
245:4
**definition** 20:6 51:16
51:19 52:19 54:24
58:11,13 68:20 69:8
71:2 141:17 143:2
147:21,23 164:20
165:6 169:3 170:10
174:2,5,6,9 176:3
**definitional** 19:19
**definitions** 40:12,13
153:24
**defusing** 189:14
**degree** 14:14 15:17
18:24 44:5 167:12
171:2
**degrees** 76:2
**DELAWARE** 1:2
**demise** 202:20
**demonstrate** 53:24
73:9
**demonstrates** 73:11
97:14 165:15
**demonstrating** 163:2
**denominator** 208:12
**depend** 38:11
**depending** 96:14
121:7
**depends** 11:9 84:13
93:25 102:11 111:17
111:21 172:13 174:2
174:5 179:22 215:18
**depiction** 205:10
**DEPONENT** 266:1
**deposition** 1:13 8:12
12:20 19:14 22:16
22:21 25:14 53:11
143:11 169:16 268:3
**depositions** 113:24
114:4,8,13 116:14
148:24 149:2,3
196:19
**derived** 52:3
**describe** 15:25 18:15
18:16 19:21 93:13
118:22 119:14,15
**described** 68:19 73:12
119:16 192:5
**describes** 85:14 93:7

**93:18**
**description** 6:11 7:2
145:12
**descriptions** 146:23
**descriptive** 93:14,15
93:20 95:14 147:8
**deserve** 162:17
**design** 48:17,22
**designated** 61:11
**designation** 10:7
115:2
**designed** 72:21 102:8
163:23,24 164:3
172:6,19
**desire** 137:19 173:6
**detail** 90:7
**details** 69:21 163:15
**determination** 177:22
178:7 199:18,23
200:7
**determine** 134:14
147:4 154:5,6
181:12 186:17 189:4
198:7 205:8
**determined** 52:8
135:11 177:4 179:14
215:23 260:20
261:25 263:7
**determines** 48:19
**determining** 75:8
127:25 161:10 201:3
207:8
**develop** 56:7 79:10
80:23 110:14 249:11
257:5,9
**developed** 64:11 65:5
**developing** 224:17
**development** 64:12
79:18 85:19
**develops** 60:13
**diagnosed** 44:23
86:21 88:20 225:17
225:20 226:10,24
227:15 231:5,14,24
236:21 237:3,6
238:24 244:23 245:3
246:2,6 247:4 251:7
257:13 261:9
**diagnosing** 69:13
**diagnosis** 44:5,6 45:3
51:11,12 69:6 74:14
74:25 75:22 76:12
76:20,23 173:8,9
206:21 225:23
**diagnostic** 51:8 143:5
143:9 144:3,16,18
145:4,9,21 146:14
146:19 147:25
**diaphragm** 153:10

**die** 87:15,25 88:5,8,10
88:12,16 89:25
205:24 225:23
226:11,14 227:2
228:8,13 232:13
233:3 235:18,18,19
235:20,25 236:23
238:11 241:13 246:6
250:21 252:24
257:16 260:24
**died** 41:14 87:18,20
88:3 195:12 198:5,5
198:21,25 199:9,13
200:19,20 201:10,16
212:20 213:11,21
214:7,11 215:18
233:18,24 234:17,22
235:17,24 236:22
237:3,7,19,20,23,24
237:24 239:3 245:3
245:24 246:4,10
250:19,23 260:19
261:17,24 262:10
**differ** 101:21 111:6
**difference** 24:25 55:10
67:9 92:18 97:23,25
98:4,8 109:11
135:18,19 139:20
149:25 151:15
152:20 181:16
182:22 230:9
**differences** 26:9 34:18
35:13 151:8
**different** 21:22 23:21
26:5 27:13 28:10,11
31:25 32:4,4 34:16
34:24 35:11 36:2,3,5
36:16,22 38:3,8
59:11,13 61:7 62:20
74:5,9 75:5 78:13
81:4,13 93:4 101:9
101:11 106:4,6,12
108:18,22 111:24
112:23 118:17 120:7
121:6,7,11,12
122:25 124:17
131:18 133:19 134:6
135:15 138:2 139:7
140:9,20 141:12
143:2 144:18 147:20
148:14 150:7,10,11
150:13,13,17,18
152:3 154:17 157:25
160:25,25 174:17
180:12 182:14,18
192:10,22 193:6
194:6 214:22 245:4
246:7,8 247:15
250:24

Case 01-01139-AMC    Doc 22731-3    Filed 08/07/09    Page 76 of 93

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - June 5, 2009
Arthur Frank M.D., Ph.D.
Page 275

**differential** 22:5,7
**differentially** 134:10
**differentiate** 176:19
  185:22
**differentiated** 144:22
**differently** 61:13
  100:24 101:11 134:5
  245:4
**difficult** 78:6
**diffuse** 31:17 43:24
  90:10,18 96:20,21
  97:3,9,15,18,24 98:5
  98:6,25 145:22
  146:14 147:5,9,18
  147:24 148:7,11,11
  149:16,17,25 150:3
  150:14 151:8,10,16
  151:21 152:2,11
  153:22,25 154:7,13
  154:25 155:10,11
  156:7 157:24 159:5
  159:17 160:2,16
  161:3,10,17,18
  162:10,18 163:2,19
  164:8 165:15,20
  166:3,8,21 167:5
  168:11 172:10
  173:20,22 174:5,7
  174:10,20 175:2,7
  175:18,22,23 176:7
  176:11,14,20,25
  179:9,11,15,19
  181:3,11 183:10,13
  183:17,24 184:10
  186:2,5,11,14,18
  192:4,7,15 193:6
  194:4 195:4 211:25
  212:5,10 222:2
  229:4,21 230:2
  252:2
**diffusing** 190:22
  223:17
**Diffusion** 84:10
**diminished** 168:8
  178:13 185:17,18
  188:16
**diminution** 165:16,21
  166:9,16,17 167:24
  171:16,18 176:12,13
  177:3 179:16,20
  181:2 183:4,10,12
  232:9
**direction** 265:16
**directions** 70:4
**directly** 35:23 96:13
**disability** 180:5,7
**disabling** 86:24 141:8
  143:21 144:5,10,11
  144:24 159:23 160:6

213:14
**disagree** 28:12,16,17
  28:22 30:2,11 43:15
  43:22 55:2 79:24
  106:24 107:3 112:13
  113:6,7 114:5
  120:11 246:23 248:2
  249:24
**disagreeing** 134:12
**disagreement** 30:12
  32:3
**disagreements** 31:10
  114:22
**discipline** 106:19
**disciplines** 26:6
**disclosure** 227:20
**disclosures** 130:10
**discount** 60:13
**discrepancies** 208:22
**discrete** 97:8 147:10
**discuss** 8:25 9:2,3,19
  77:11,13,16 137:3
  219:22
**discussed** 11:11
  16:17 77:18 131:13
  134:5 135:24 148:15
  149:20 217:4,13
  258:7,8
**discusses** 16:18
**discussion** 22:3 30:14
  110:20 112:4 197:7
  220:2 222:25 225:16
  228:25
**discussions** 11:4 30:3
  200:3
**disease** 10:10,23 22:9
  22:13 30:6,13 31:16
  32:8 33:24 34:3,7,14
  36:23 43:5,10,17,21
  44:2,24 48:24 49:9
  51:16,23 56:6 57:5
  62:7,17,19,23 64:15
  68:10,12 69:7,14,15
  69:25 70:2,6,13,15
  70:21,25 71:3,4,9,18
  72:15,15,22 73:10
  73:13,16 74:12,15
  75:9,16,17,18,20
  76:6,9,24 77:14
  78:16,18,23,24
  79:11,12,19,20 80:7
  80:13,15,16,17,24
  81:17 82:9,23 83:19
  83:25 86:22,24
  87:16,20,21,25 88:3
  88:10,14,17,21
  89:22 90:2,18 92:12
  94:17 96:6,11,22
  97:2,9,9,21,24 98:6

110:8,14 131:19,20
  133:13,25 134:18
  135:12 136:8,19
  137:18,25 138:22
  139:16 141:8,13,22
  141:25 142:2,3,5,12
  143:21,23 144:3,5,9
  144:11,16 145:8,12
  145:16,16 146:22,24
  147:7 148:5 160:5
  161:20 162:15 173:7
  177:19 178:14 183:5
  184:7 186:12 187:6
  188:22 190:8 192:5
  193:3,10 194:3,4,15
  194:20,23 195:5,12
  199:7,10 201:11,12
  201:14 209:13
  211:17 212:20
  213:11,14,16,22
  214:8,12 218:10
  221:11 223:24
  225:18,22,24 226:11
  226:12,14,25 227:3
  228:7,9,14 229:18
  230:10 231:6,13,25
  232:18 233:18
  234:20,23 235:6,9
  235:16,25 236:20,21
  237:25 238:6,18,20
  238:22,24 239:2,16
  240:4 241:14 242:6
  246:2,7,11 247:14
  251:8,11,16 257:14
  257:16,19 258:14
  259:5,10 260:18,20
  260:24 261:10,17
  262:11,22 263:8
**diseases** 11:8 19:11
  35:7,11,12 36:2,4,5
  36:8,25 37:2,5,6,7
  52:12 75:2,4,5,14
  80:19 83:4,6 97:4
  139:22 257:17
  261:24
**disproportionate**
  195:4
**dispute** 17:17 20:25
  21:5 139:8
**distinct** 143:5,8
  147:25 148:3,4
  149:11 152:6
**distinction** 125:19
  147:13,14,16,18
**distinguishes** 149:15
  149:15
**distribution** 7:16 9:24
  9:25 48:2,9 124:2,6
  124:11

**DISTRICT** 1:2
**divide** 75:5
**dividing** 75:14
**DLCO** 84:9,12,16,22
  85:2 173:10 184:20
  185:8,8,16,17,18
  186:21 187:8,16
  188:8 189:10,13,13
  189:21 190:20
  223:25
**doable** 27:8,9
**doctor** 63:10,16 65:2
  73:22 189:21
**doctors** 101:21 148:23
  149:2 187:19,20
  194:10 204:24
**document** 26:14,17,22
  26:25 33:11 39:23
  48:6 56:25 58:16
  61:12,14 63:21 76:3
  81:18,23 90:4,8,12
  90:14 91:24 92:9
  95:7 125:6,9,10,12
  125:14,23 126:2,4
  126:17 127:6,9,12
  127:16,18,20 128:6
  128:16 131:6,12
  132:15 133:16 160:7
  160:9,9 164:18,19
  169:4 178:9 212:23
  258:3,25
**documentable** 81:19
**documentably** 64:10
**documentation** 63:5,7
  63:8,13,15 64:13,14
  64:15 70:14 73:3
  95:19 131:4 133:8
  188:5 189:19,20
  190:4,6,11 197:13
  197:15
**documents** 7:19 11:11
  58:6 133:9 196:12
**Dodson** 16:19
**DOE** 29:16
**doing** 23:18 46:6 47:7
  187:11,13,19,20
  203:4 207:20,22
  208:12 209:9 212:16
  218:17 219:23 222:8
  224:9 226:18 242:23
  249:6 254:25 255:2
**dollar** 11:6,10 50:21
  61:15
**Dori** 4:15 138:10 146:7
  146:8
**Dori.kuchinsky@gr...**
  4:21
**dose** 34:7 38:4,10,19
  252:14 259:14,18

262:5
**doubled** 60:24
**doubt** 116:9 259:17
**Dr** 6:12,15,18,20,21,21
  6:23,24,25 7:3,4,5,8
  8:9 12:25 13:10,11
  13:11,13,13,14,19
  13:19,19,24 16:19
  17:14,20 18:6 20:25
  23:11,17 25:20
  27:25 28:13,13 29:2
  30:20 31:3 39:20,25
  40:21 44:7,12,22
  47:25 48:8 50:9 51:7
  53:2 69:12 80:12
  85:8 87:10 91:15
  93:5 94:3 95:2 99:18
  102:13 113:12
  114:22 115:9,18,25
  116:19 119:8,10,22
  130:16 169:2 174:6
  191:22 193:16
  195:14 197:25 200:7
  206:2,6,22 207:6,15
  207:19 208:24 209:6
  209:7 211:3,22
  213:25 214:2,17
  215:2,24,25 216:11
  216:15 218:15,16,19
  219:22 220:19
  224:10 231:10,22
  233:8 244:23 246:23
  246:25 247:24 248:7
  249:8,21 253:4
  254:3 257:2 260:21
  261:25 263:7,22
  264:3,6,7
**driven** 138:21 139:16
  139:22
**drop** 167:7 223:25
**drops** 166:23
**Drysdale** 1:18 2:15
**due** 60:6,9,9 181:8
  185:22,23 202:4,23
  203:20 204:4
**duly** 8:3
**duration** 77:7 78:17,22
  262:2
**dust** 145:16
**duty** 215:19
**dying** 251:15
**D-L-C-O** 84:9
**D.C** 2:19

---

**E**

**E** 6:1,10 7:1,1 265:2,2
  266:18 267:2
**earlier** 34:22 52:8
  205:22 223:2 224:8

Case 01-01139-AMC    Doc 22731-3    Filed 08/07/09    Page 77 of 93

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - June 5, 2009
Arthur Frank M.D., Ph.D.
Page 276

263:22
**early** 145:24 178:18
**easier** 210:9
**easy** 114:7 136:14,24
  137:7,20 138:5,6
  139:4
**ECKERT** 3:18
**economist** 127:13
**edge** 128:22,23
**editor** 29:12
**education** 118:8
**EDWARD** 3:19
**effect** 9:14 58:5 99:20
  192:3 195:4
**effective** 54:4
**effects** 9:14
**effort** 210:21
**effusion** 155:8,13,16
  155:18 156:10,15,22
  157:8,13 158:12
  159:8
**effusions** 154:23
**eight** 22:22 42:14
  254:7 256:10
**eighty** 84:3,4 97:12
  219:16 256:9,11
**eighty/twenty** 97:12
**either** 22:10 41:14
  43:23 44:24 47:6
  50:11 51:7,8 69:11
  75:16 76:12 108:15
  142:17 147:21
  152:17,19 154:5
  155:12 156:8 186:24
  204:10 205:12
  213:12,15 220:17
  222:20 223:14
  237:21 245:11
  248:14 251:9 252:2
**eleven** 140:25 141:3
  212:23 253:12,19
  254:6 256:14
**eliminate** 66:9
**ELLIS** 3:4
**Elm** 5:6
**Elms** 249:9
**Elm's** 251:24
**Elongosz@eckertse...**
  3:23
**emanating** 156:17,20
**emphysema** 84:14
  187:8
**Employees** 95:17
**employment** 55:6
  57:11
**enable** 186:17
**enacted** 49:24
**ended** 57:4
**engagements** 9:20

**enormous** 252:12,13
**ensure** 75:25
**entered** 199:10
**entirely** 204:22 226:12
  247:15
**entitled** 12:25
**entitlement** 133:6
**entity** 143:6,9 144:3
  144:17,18 145:5,9
  145:21 146:14,19
  148:2 157:25 158:20
  202:16 204:17
**entry** 18:19,20
**enumerated** 232:7
**environmental** 38:20
  92:10 206:8
**environmentally** 43:6
**EPA** 23:5 24:6,14 25:4
  25:8,23
**epidemiological** 24:9
  27:12 93:3,14,15,20
  207:17 236:6,7,9,12
  238:4,13,17 252:10
  252:21 253:8
**epidemiology** 236:19
**equal** 84:5
**equally** 23:23 24:2
  68:25
**equitable** 182:6
**equity** 136:23
**Errata** 266:10
**errors** 206:9
**especially** 23:7 173:3
  181:13 206:10 222:9
  224:7
**Esquire** 1:17 2:7,16,17
  3:5,6,7,19 4:7,15 5:5
**essentially** 35:21
  36:23
**establish** 72:13 133:6
  134:2,3,3,4
**established** 57:9,13
  133:14,24 134:20
  136:8 137:17 188:12
**establishing** 63:5,19
  71:8 190:7
**estimated** 32:25
**et** 1:7 7:24 72:6 81:22
  81:22
**evaluate** 48:18 73:19
  190:23
**evaluating** 61:3
**evaluation** 49:10
  132:2
**evaluations** 48:23
**event** 131:10 202:19
  203:22
**events** 204:23
**everybody** 105:17

106:15 129:13 132:6
  216:24 238:21
**evidence** 16:21 21:16
  21:25 43:4,9 56:21
  57:9,12,23 62:19,22
  72:5 76:13,17
  105:15 122:24
  158:11 167:13 199:2
  200:10,10 201:14
  205:15,18 207:5
  208:19,20 213:24
  214:9,18,20 223:7
  256:2
**exact** 43:3 88:6 97:10
  251:14
**exactly** 73:12 95:21
  129:11 166:12
  167:11 197:22
  222:25 238:12
**exam** 46:7 220:16
  223:15
**examination** 6:4 8:6
  99:10 178:24 197:24
  225:13 226:18
  230:14 256:23
  263:19
**examine** 154:4,6 198:2
  225:4 228:21
**examined** 8:3 45:15
  46:5,6 257:22
**examiner** 73:17
**examining** 165:25
  166:2
**example** 15:8 30:11
  31:14 38:6 50:21
  54:24 55:2 61:24
  70:10,17 73:9 79:17
  80:21 82:4 86:21
  94:18 97:23 108:7
  109:17 111:23
  160:19 188:15 200:9
  202:11 204:25
  206:13 210:5 248:20
**examples** 32:20
**exception** 139:14
**excessively** 116:15,17
  239:20 241:19
**excited** 128:21
**exclude** 72:25 185:5
**excluded** 192:9
**excluding** 192:3,4
**exclusion** 70:22
**Excuse** 23:25 76:16
**excused** 264:21
**exhibit** 7:17 19:14
  22:21,25 25:16
  39:14,16 44:9,10
  47:21 74:18,20
  91:11,15 92:4,8

98:17 140:25 141:2
  256:20 258:4
**Exhibits** 12:14,20
**exist** 248:19
**exists** 14:19 15:10
**expansion** 35:8 40:3
  54:12
**expect** 38:7 45:21 87:2
  116:3 120:5 236:4
  241:12 248:13 251:4
  252:15 254:15
  256:11 260:11
**expectations** 119:3
**expected** 47:8 235:25
**expedited** 132:2,3
**experience** 10:9,14,21
  11:14 15:21 94:17
  115:14 118:21
  119:11 128:15
  158:24 195:18 222:8
  222:12,17 245:23,25
  256:6 262:20
**experienced** 95:12
  114:25 149:4 206:20
**experiences** 34:25
**expert** 6:12,14,18 7:8
  9:5 10:4,7 12:25
  13:5,9,24 14:6
  106:15 113:13
  114:12,23 115:2,9
  115:11,12 116:20,24
  116:25 117:5,11
  118:3,14,18,22,24
  119:9,13,17,21,23
  119:25 120:4 129:23
  129:25 130:2,8,9
  150:20 163:10
  217:22,25 221:24,25
  223:3 224:14 226:4
  227:20 230:17
**expertise** 10:22 11:14
  23:15 50:24 103:3
  115:6,15 116:22
  118:5,20 119:10
**expertly** 106:5
**experts** 26:5 28:22
  106:12 113:5,7,11
  117:17 119:5,5,16
  120:8 224:14
**expires** 265:25
**explain** 70:15 103:18
  103:20,22 109:11
**explanation** 70:16
  177:6,8
**exposed** 15:6,22,23
  18:12 33:18 36:10
  36:14,18,19 37:9,15
  37:16,25 38:5 39:7
  40:18 41:5,18,22

43:6 45:25 56:10
  57:4 64:10,18,20
  66:16 67:12 69:2
  249:17,19 258:10
  259:15,18 261:8
  263:6
**exposure** 14:15,23
  15:3 16:10 19:4,5,9
  27:12,13 33:25 34:6
  34:9,15,17,19,23,25
  35:20,22,25 36:3,21
  37:10 38:10,19,20
  48:12,17 49:14 50:6
  50:12,15 51:4,8,13
  51:16,19,24 52:5,7
  52:10,11,17,20,20
  52:22 53:3,6,7,18,21
  53:22,23,24 54:3,13
  54:18,23 55:6,8 56:8
  56:16,20,23 57:8
  58:12,19,23,23,24
  59:3,3,6,7,21 60:3
  60:11,14,18 62:4,6
  63:3,5,8,14,17,19
  64:14 65:3,6 67:6,13
  67:14,16 68:8,13,16
  68:18,19,20,22
  70:17 77:4,6,8,19,23
  77:24 78:2,18,22
  79:2,5,10,13,18,19
  79:25 80:2,4,7,18
  81:15,19,24 82:10
  82:17,18,22 83:3,5,8
  83:9,11 85:16 88:15
  89:22 92:13 95:10
  95:11,15,18,21,24
  96:4,9,15,18,19
  108:7 110:8,12,14
  145:21 155:4,5
  177:5,15 186:9
  189:18 190:7 193:10
  197:19 199:20,25
  200:23 201:4 205:3
  209:12,23,25 210:2
  210:7,12 254:7
  262:2,6
**exposures** 22:12,14
  28:2,4 32:21 34:4
  35:17,19 36:20
  37:17,20 39:3,5 60:5
  63:11 81:2 95:25
  193:4 249:24 253:20
  254:6 256:7 259:11
  259:12 261:18,19
**express** 89:20 235:11
**expressed** 30:7 31:14
  51:15 52:24 91:23
**expressing** 101:13
  102:7 113:2 124:11

Case 01-01139-AMC    Doc 22731-3    Filed 08/07/09    Page 78 of 93

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - June 5, 2009
Arthur Frank M.D., Ph.D.
Page 277

**extend** 153:12 245:19
    245:23
**extensive** 45:19
**extensively** 18:4
**extent** 14:19 15:10
    32:21 33:23 34:13
    36:9 37:11,15 64:19
    67:14,16,22 68:24
    72:20,24 80:12
    84:19 90:6 91:25
    123:25 150:23
    168:22 169:25
    170:18,21 171:3
    172:2 192:17
**extra** 22:18
**extrapolate** 245:18
    250:25
**extremely** 30:22,23
**eye** 122:12
**eyes** 165:4

**F**

**F** 265:2
**face** 144:7 189:13
**facetious** 196:11,13
**facility** 81:22
**fact** 34:24 36:20 63:14
    66:12 71:24 81:8
    82:7 85:2 114:11
    118:4 119:2 124:5
    129:14 132:17,18
    148:13 161:11 162:2
    167:6 180:20 181:2
    182:14 183:5,24
    187:16 190:8 206:15
    218:7 224:12 238:19
    247:9 254:12 263:6
**factor** 15:5 21:23 34:3
    63:6,17,20 65:7,24
    179:17,25 180:22
    198:8 209:13,16,18
    210:3,13,17,19
    211:11,12
**factors** 12:6 187:14
    194:11
**factory** 60:23 94:18
**facts** 12:12 38:11
**fail** 172:22
**fair** 46:24 49:19,20,22
    61:23 66:19 104:21
    112:10 113:24,25
    119:5 127:14 140:2
    168:8 182:16 186:13
    208:14,21 210:14
    246:12
**fairly** 110:17
**familiar** 23:5 24:6 32:6
    72:10 74:13 90:5
    92:15 97:11 151:14

151:15,20 152:2
    153:5,20 159:16
    163:9 165:7 167:3
    207:5 247:9
**family** 43:7 95:17
**far** 27:10 119:10
    145:11 193:11
    222:15 228:7,12
    233:18 244:25
    253:15 257:20,21
    261:5,18
**fascinating** 145:19
    255:6
**fashion** 112:25 168:10
    199:19 200:22 221:4
**fashionable** 146:11
**features** 149:11
**February** 264:14,15,18
**Federally** 49:9
**feel** 22:4 30:17 180:10
    182:2
**FEV1** 188:15 189:8
**fewer** 263:3
**fiber** 15:6,23 16:2
    23:22 26:10,10
    28:14 81:8
**fibers** 15:11 16:21
    24:11 37:22 81:10
    111:24 157:21
**fibroblast** 150:16
**fibrosis** 43:24 85:20
    142:8 143:23 155:13
    155:14,15,17,18
    156:8,12,14,17,20
    156:21 157:10,11
    161:23 168:3,7,16
**fibrotic** 142:14,19
    153:9 154:2 155:7
    157:20,23 158:6
**field** 106:6,12,15,24
    112:17 113:13,14
    114:24 115:2 118:15
    118:19 119:8,9,23
    126:16 128:11
    221:23 224:14,15
**fields** 118:5
**fifteen** 253:14
**Fifteenth** 3:8
**Fifth** 5:15 268:11
**fifty** 47:18 226:9
    228:13,15
**fifty-one** 91:20
**fighters** 63:24
**figure** 41:2 176:10
    192:2 218:14
**figuring** 209:22
**filed** 40:23
**files** 190:23,25 191:4,5
    191:6

**fill** 215:2,11 217:15
**filled** 204:9 205:13
    208:5 215:6,12,14
    215:17,19 216:7,18
    217:21 218:2
**filler** 20:22
**filling** 204:11
**final** 1:24 91:24 202:19
**Finch** 1:17 2:16 6:5
    8:8,9 12:18 23:4
    25:19 31:12 33:13
    39:19 47:24 53:15
    53:19 54:16 55:3
    57:6 58:21 62:12
    68:7 69:22 71:16
    74:17,23 89:5,9,17
    89:19 91:5,14 92:7
    98:20 99:5 131:13
    131:18 160:18 226:2
    226:6,21 227:19,24
    229:10 256:17,25
    264:14
**find** 16:23,24 42:25
    145:3 160:10 179:15
    186:10 189:12
    200:18,20 231:22
    246:24
**finding** 154:24 177:12
    187:4
**findings** 166:14
    172:21
**fine** 18:10 72:12
    169:13 208:23
**finish** 71:10 108:25
    125:17 152:23
    177:11 178:21,24
    181:21 187:11
    188:20 236:17
    240:25 241:4,5
    243:8,11,14,17,24
    248:24 249:4
**finished** 54:12 243:25
**Fire** 63:24
**fireproofing** 33:3
**Firm** 1:18
**first** 8:3 10:6 12:25
    31:2 44:22 74:13
    93:23 103:25 110:11
    113:22 129:10
    142:23 147:14 154:5
    158:4 160:11 174:2
    176:5 192:20 208:15
    216:12 221:10 222:3
    250:19 251:5 258:4
**fish** 93:4
**fit** 212:22 213:2,4,5,10
    213:13,15
**five** 12:21 13:17,22
    52:17 55:5,7 58:23

67:25 68:21 78:25
    79:12,24 80:2 83:8
    83:14,16,18,18
    110:7,13,23 181:24
**fixed** 104:7
**flaws** 224:24
**Floor** 3:20
**flower** 146:7,9,9
**fluid** 153:19 223:10
**focal** 148:8
**focus** 123:25 144:8,10
    154:25 182:23
**focused** 143:15,16,22
    144:23 151:4,12
    245:2
**focuses** 123:24
**focusing** 191:24
    192:20
**folder** 130:18
**follow** 92:21 204:24
    226:22 236:6 251:12
    256:17
**followed** 18:21 119:19
    119:24 221:23
**following** 94:14
    119:22 120:3 186:9
    221:22 241:22 242:3
**follows** 8:4 204:9
    233:15,17 248:12
**follow-up** 207:11
**footnote** 52:17 69:8
    71:21 76:21
**force** 191:10
**forced** 184:17 185:3
    185:21 186:16
    188:10 189:11 191:9
**foregoing** 265:11,14
    265:17 266:5
**forget** 9:9 163:15
    190:19 198:22
**form** 9:23 29:17 89:3
    129:20 198:14
    216:11,18 223:5
    229:10 266:8
**former** 43:5 84:12
    210:5
**forms** 148:4 162:19
    216:8,10,13
**forth** 71:21 75:8
    131:23 132:15 156:4
    207:12
**forty** 38:18 47:4
    116:22 130:4 220:18
**forty-three** 57:7
**forty-two** 53:8,17,20
**forward** 24:4,6 66:10
    99:16
**found** 16:21 19:23
    20:3,9 24:17 43:3,8

43:13 66:19 69:8
    102:8 140:5 166:21
    193:17 194:22
    210:13 252:17,20,22
**foundation** 226:5
    227:20
**four** 7:17 12:20 69:8
    71:21 76:21 81:15
    81:16,25 83:17
    109:18 181:24
    189:17 202:10
**Fourteen** 92:8
**fourth** 258:17
**frame** 54:22 56:17
    58:20 77:11 134:13
**Frank** 1:14 6:3,12,15
    6:18,20,23 7:3 8:1,2
    8:9 9:1 10:1 11:1
    12:1,20 13:1,2,10,13
    13:19 14:1 15:1 16:1
    17:1 18:1 19:1,13
    20:1 21:1 22:1,21
    23:1 24:1 25:1,14,21
    26:1 27:1 28:1 29:1
    30:1 31:1 32:1 33:1
    34:1 35:1 36:1 37:1
    38:1 39:1,20 40:1
    41:1 42:1 43:1 44:1
    45:1 46:1 47:1,25
    48:1 49:1 50:1 51:1
    52:1 53:1 54:1 55:1
    56:1 57:1 58:1 59:1
    60:1 61:1 62:1 63:1
    64:1 65:1 66:1 67:1
    68:1 69:1 70:1 71:1
    72:1 73:1 74:1 75:1
    76:1 77:1 78:1 79:1
    80:1 81:1 82:1 83:1
    84:1 85:1 86:1 87:1
    88:1 89:1 90:1 91:1
    91:15 92:1,8 93:1
    94:1 95:1 96:1 97:1
    98:1 99:1,18 100:1
    101:1 102:1,13
    103:1 104:1 105:1
    106:1 107:1 108:1
    109:1 110:1 111:1
    112:1 113:1 114:1
    115:1,9,18 116:1,19
    117:1 118:1 119:1
    120:1 121:1 122:1
    123:1 124:1 125:1
    126:1 127:1 128:1
    129:1 130:1 131:1
    132:1 133:1 134:1
    135:1 136:1 137:1
    138:1 139:1 140:1
    141:1 142:1 143:1
    144:1 145:1 146:1

Case 01-01139-AMC    Doc 22731-3    Filed 08/07/09    Page 79 of 93

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - June 5, 2009
Arthur Frank M.D., Ph.D.
Page 278

147:1 148:1 149:1
150:1 151:1 152:1
153:1 154:1 155:1
156:1 157:1 158:1
159:1 160:1 161:1
162:1 163:1 164:1
165:1 166:1 167:1
168:1 169:1 170:1
171:1 172:1 173:1
174:1 175:1 176:1
177:1 178:1 179:1
180:1 181:1 182:1
183:1 184:1 185:1
186:1 187:1 188:1
189:1 190:1 191:1
191:22 192:1 193:1
194:1 195:1 196:1
197:1 198:1 199:1
200:1 201:1 202:1
203:1 204:1 205:1
206:1 207:1 208:1
209:1 210:1 211:1
212:1 213:1 214:1
215:1 216:1 217:1
218:1 219:1 220:1
221:1 222:1 223:1
224:1 225:1 226:1
227:1 228:1 229:1
230:1 231:1 232:1
233:1,8 234:1 235:1
236:1 237:1 238:1
239:1 240:1 241:1
242:1 243:1 244:1
245:1 246:1 247:1
248:1 249:1 250:1
251:1 252:1 253:1
254:1 255:1 256:1
257:1,2 258:1 259:1
260:1 261:1 262:1
263:1,22 264:1
265:1,11 266:3,14
**Frankly** 118:2
**Frank-1** 6:12 12:14
**Frank-10** 7:14 39:16
39:20
**Frank-11** 7:16 47:21
**Frank-12** 7:19 74:20
**Frank-13** 7:21 91:11
**Frank-14** 7:22 92:4
**Frank-15** 7:23 98:17
98:21
**Frank-16** 7:25 256:20
**FRANK-2** 6:14
**FRANK-3** 6:17
**Frank-4** 6:20 85:8
**FRANK-5** 6:23
**FRANK-6** 7:3
**Frank-7** 7:7 12:14
**Frank-8** 7:10 22:25

**Frank-9** 7:12 25:16,20
25:20 26:14
**Freedman** 13:17,18,20
**frequency** 152:20,25
**frequent** 223:23
**Friday** 264:17 265:13
**FRIEDMAN** 6:25
**front** 12:21 22:17
39:20 258:3
**full** 44:22 217:5
**full-blown** 252:9
**function** 46:14,25
75:15,19 76:2,5
83:20,24 85:18 86:9
86:11,14,18 89:23
93:11 95:4,8 96:10
96:19 97:17,22 98:9
99:2 159:22,24
164:23 165:8,10,17
165:21 166:9,15,16
166:17,23 167:7,15
167:18,20,25 168:8
168:13 170:19
171:17,18,21 173:4
173:5,10 175:9,19
176:12,13 177:4,19
178:13 179:4,17,20
180:4,20 181:2
183:4,10,12,18,23
184:15,16,17,24
185:2,9 186:18,23
187:5 188:11 190:22
212:12,14 229:14,19
230:10 232:9 260:2
260:5,9
**functioning** 161:20
**functions** 75:23
225:22
**fund** 49:10
**fundamental** 120:17
**funds** 8:25
**funny** 84:17
**further** 35:22 135:5
136:18 174:22
195:24 225:2 263:13
**future** 85:19,23 86:14
235:12,23 238:8
240:6,16 241:24
247:2,25 250:11
255:18,22 256:4
**FVC** 84:3 188:16,22

**G**

**G** 13:14,19
**gather** 140:5
**gee** 104:10
**general** 30:9 95:22
96:3 97:19 159:25
162:15 193:25

238:14
**generally** 23:5 26:20
32:11 35:19 44:15
46:4 119:6
**gentleman** 23:10
**geographic** 34:19
**German** 145:13
**getting** 102:2 140:9
162:9 180:16 189:8
189:9 193:10 244:10
244:12
**give** 11:18 14:3,8
34:24 47:8 71:12
75:13 79:7,20 89:24
103:16 104:5 118:13
154:20,24 158:19
164:12 165:7 212:6
244:19 252:10
**given** 27:9,11 44:4
56:13 81:7 111:2
113:10 118:5 146:10
171:23 180:10 184:2
196:20 200:3 214:20
224:13 228:11
238:21 239:18
260:22 266:6
**gives** 164:19 176:18
253:14
**giving** 53:4 158:6,24
251:24
**go** 12:6 50:13 51:10
67:10 68:9 73:9,11
79:16,22 82:3,8
85:23 93:12 97:20
99:16 112:8 114:21
120:19 121:5,17
124:24 135:5 140:23
141:2 143:11 156:4
168:19 169:23 175:4
178:10 179:13 185:8
188:22 189:17
198:20 204:19
226:20,21 228:5,23
233:23 240:8 241:4
241:7,7 242:10
254:11 255:7 258:24
**goal** 134:13,14 174:17
174:18 180:24
183:14 200:18,23
206:24
**goals** 75:24
**God** 132:12
**goes** 75:25 88:9,11
145:11 175:21 203:2
**going** 12:19,23 21:16
50:20 52:3 53:16
56:15 58:6 67:24
72:8 73:24 78:11,12
85:25 87:25 88:16

88:21 89:25 100:21
101:19 102:13 111:9
113:5 114:6 115:24
126:9 128:20 133:17
133:19 136:13,14
137:7,8 140:23
145:5,9,20 160:9
162:6 165:7 169:7
169:12,20 174:16
176:6 180:6,7
181:19 182:22 208:5
220:13 235:15 248:8
250:11 254:17
255:11,18
**good** 27:21,22 28:5
50:17 79:21,23
81:25 104:15 107:18
109:23 122:21 128:2
129:18 130:20
139:24 143:12
171:16 187:12
204:23 207:17 219:8
255:9
**gotten** 63:25 104:11
**Government** 23:21
42:15,19
**Grace** 1:7 4:17 8:12,24
9:22 11:15 14:4
17:14 19:21 20:2,12
20:15 30:7 36:18
37:3,10 42:8 47:8
48:2,9 50:6 51:13,24
53:7,20,22,23 54:2
57:15 58:11,23
59:16 60:18 64:19
64:20 65:3 67:2,7,20
68:18,18,20 82:16
82:21,23 83:7,10
95:17,18,23 99:14
259:12
**Grace's** 21:2 33:15,22
36:12 37:12 39:7
**grade** 76:4
**grading** 72:10
**grant** 77:12
**great** 16:24 90:7
143:16
**greater** 76:2 84:5
86:11 96:4,18 98:2
171:5 260:10 261:25
**greatly** 251:15
**grounded** 61:2 110:9
**grounds** 89:8
**group** 24:7,20 29:15
40:16 88:25 92:20
93:17,19,22 97:23
167:23 180:25 184:6
194:12,13 195:11
199:13 200:19 217:7

229:4,7,12,22 230:2
237:9 242:2,5 245:2
245:6 246:9 251:2
255:19
**groupings** 95:17
**groups** 93:24 167:16
167:22 168:6 171:5
171:6,22 172:8,20
174:18 183:25
184:23 245:5 246:8
**guard** 64:4
**guess** 100:23 109:15
137:19 151:20,23
192:24 213:5
**guidelines** 165:11
224:3,11,18
**gunshot** 70:20
**guys** 129:11 138:13

**H**

**H** 6:10 7:1
**hairy** 139:9
**half** 214:11 232:25
235:24 236:22
241:13
**halfway** 71:13
**hand** 29:25 121:17
166:3 182:24 199:25
**handful** 16:9
**handle** 81:14 133:21
**handler** 73:21
**hands-on** 46:6
**happen** 132:9 241:25
242:25 247:3 248:8
250:11 255:19
260:14
**happens** 112:16
245:12
**happier** 70:8
**hard** 178:5
**harder** 84:21,21
182:18,23
**haunt** 196:17
**hazards** 9:19
**Hbloom@kirkland.c…**
3:13
**head** 198:24 212:4
**health** 9:14 23:6 92:10
**heard** 10:25 99:19
115:4 230:22
**hearing** 25:3
**heart** 63:24 203:13
**HEATHER** 3:7
**heavy** 165:4
**Heberling** 2:5,7 6:7
30:24 33:9 53:9
54:14,19 56:24
58:15 62:8 69:17
88:23 100:14 102:22

Case 01-01139-AMC    Doc 22731-3    Filed 08/07/09    Page 80 of 93

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - June 5, 2009
Arthur Frank M.D., Ph.D.
Page 279

103:20 116:6,8,10
116:13,14 123:16,20
123:21 128:24 131:5
135:13 166:10 169:6
169:10,15 175:11
176:22 177:10
178:17 181:20
188:20 190:12 197:5
198:11 210:18 225:3
225:9,15 226:17,23
227:13,17,23,25
228:20,24 229:11,20
229:24 230:12 231:2
231:8,18,21 233:4
236:16 239:19
240:24 241:4,18
243:7,11,14,17,23
244:3,7 247:6,11,19
248:3,23 249:3
253:2,9,23 255:14
263:13 264:8
**Heberling's** 233:14
235:2 256:18 260:17
**held** 197:7 229:25
**help** 187:3 189:6
**helpful** 130:18
**hepatitis** 64:4
**hereto** 12:16 23:2
25:17 39:17 47:22
74:21 91:12 92:5
98:18 256:21
**hierarchy** 181:23
**high** 167:19 252:13
**higher** 38:18 72:5 73:3
81:17 95:24 167:14
167:23 168:6 181:25
193:11 194:13 242:6
254:15 256:11
261:18 262:21
**highest** 224:20
**highly** 33:12 113:12
**historically** 11:15
**histories** 95:10
**history** 165:4 177:14
210:11
**hod** 38:15
**Hodgson** 28:21
**hold** 10:3,6 14:18,22
15:2 80:12 86:3
135:4 171:24 229:21
233:21 240:20 262:8
**holding** 218:22
**holds** 30:2 104:16
228:7,13 234:14
235:7 236:3 241:11
246:15 257:20
260:21
**homes** 32:25
**honest** 91:18

**Honestly** 217:11
**hope** 132:3
**hospital** 206:3,4
208:17
**hour** 35:21 67:24
**hours** 47:13,16,18
99:17
**house** 215:19
**huge** 33:3
**human** 149:12
**hundred** 28:2,14,15
39:6 45:3,15 46:12

---

**I**

**idea** 80:20 113:18
174:8 180:17 182:6
232:5,14
**ideally** 101:7 206:5
**identifiable** 14:23 15:3
19:3,9 56:20
**identification** 12:15
23:2 25:17 39:17
47:22 74:21 91:12
92:5 98:18 256:21
**identified** 133:24
134:17,18 136:9
145:4 199:18
**identify** 12:23 25:20
72:21 129:23 133:13
**identifying** 175:7
**II** 3:19 68:10,12 70:2
70:25 77:2 78:24
80:17
**III** 74:12 76:10,11,25
80:16 83:20,25
144:22
**illness** 198:4,8 211:10
211:14 221:8 231:15
232:14 233:3 237:4
244:24
**ILO** 90:4 176:4 187:25
222:5 224:3,11,18
**imagine** 13:20 157:9
196:19
**immediate** 202:3,11
202:15,17 203:24,25
204:16
**impact** 84:12,13,14
98:25
**impair** 161:20
**impaired** 176:20
**impairment** 75:15,19
76:2 85:4 95:5,8
159:18 160:3,17
161:3,11,12,14
163:4,20,23,25
164:4,9 166:4,22
170:8,11,19 171:2,4
172:9 173:2,19,20

174:24,25 175:9,19
179:4 185:22,23
186:4,14,18,24
188:11
**implication** 221:2
**important** 207:22
209:2
**impossible** 27:15,18
**improper** 128:25
**inadequate** 26:23
207:17 248:4
**inappropriate** 52:23
56:5 68:23,25,25
72:9 73:2 140:6
235:10,14
**incidence** 238:6,6
**incidentally** 129:6
**include** 21:9,13 42:7
60:12 64:19 127:3
135:24 140:15 147:9
161:11 172:11
173:24 175:24 182:4
193:24 208:11
**included** 164:7 211:24
**includes** 76:12 130:5
172:22
**including** 18:6 161:15
189:7,16 191:12
195:14 207:24
**inclusion** 181:5
**incorrect** 207:17
**increased** 85:17,22
86:17 87:5,8 251:15
**increasing** 229:13
**independent** 212:16
216:4
**independently** 216:14
**indicated** 135:6 208:6
**indicates** 170:9
**individual** 32:18 44:4
46:9 55:11,16,25
73:11,15 82:8,8
84:20 86:2,2,19
131:2,14,25 132:6,9
132:23 133:22
134:16 135:8 136:4
136:15 167:16,22
171:24 172:21,23
175:5 180:15 184:2
184:8 185:12 189:23
225:21 226:24
227:11 228:8,19
257:3,4,8 260:7
**individually** 55:20
**individuals** 15:22
55:17 70:7 88:24
93:18 94:15 95:20
117:20,21 142:14
171:5,6,22 184:6

194:18 197:18 198:9
199:24 201:13,21
203:5 211:18 212:15
212:19 215:9,10
226:9 233:17
**individual's** 18:21
**induced** 157:20
**infections** 154:20
**inform** 53:10
**information** 28:11
101:10 111:22,25
180:18 187:2 227:21
254:12,19
**infrequent** 223:20
**initial** 74:25
**injury** 8:11,19 10:5,14
11:16 12:8 14:12
48:3,20
**inside** 149:6 192:11,18
192:23
**insulation** 18:12 32:24
**insulator** 18:5,9
205:24
**insulators** 193:17,20
205:22 235:15,22
236:5 237:20 238:19
238:25
**insurance** 9:17
**intended** 126:4 221:5
**intensity** 36:21
**interest** 141:6
**interested** 134:21
**interesting** 16:16
**interfering** 249:6
**interpret** 90:22 101:9
101:10
**interpretation** 101:22
169:4
**interpreted** 59:11
**interpreting** 165:10
**interrupt** 108:24,25
228:22
**interrupted** 249:4
**interrupting** 104:2
**interstitial** 85:19 142:7
156:21 168:3
**invoices** 57:11
**involve** 148:12 152:3
152:15 153:2 208:25
**involved** 9:7 10:11
11:3 12:11 17:22
29:14 31:3 39:10
94:3,6 102:11
105:19 151:17 161:9
199:22 224:8
**involves** 149:17
152:11 224:12
**involving** 142:7
143:23 144:3 150:2

150:4 151:9,10,21
155:2,24 159:5
163:3 168:24
**Ireland** 249:9
**irrelevant** 125:25
176:24 177:17
178:11 219:18
**irritation** 155:20
**isolate** 200:18
**isolated** 187:4,13
**isolation** 187:12
**issue** 21:15 28:9 30:18
30:19 31:23,23 61:7
66:19 79:6 102:11
108:9 111:14,17,23
112:15,23 114:17
115:23 121:14 137:2
147:6 149:19 157:11
177:23,25 178:12
201:4 242:19,21
**issues** 23:15 29:18,19
30:6,21 58:4 61:25
120:10 123:24
124:13,14 125:2
126:25 127:11
167:10 178:9 249:8
**item** 68:15 189:17
**iterations** 224:8
**IV** 53:13 80:14 141:7,8
143:15,22 144:17,19
144:21 148:8 168:5
168:20 169:23 170:7
177:24 191:24 192:9
195:3 213:13

---

**J**

**J** 3:19
**JANE** 1:25 5:14 268:5
268:11
**JFK** 1:10
**job** 104:8,9 105:8,12
121:9 143:16,16
**Johnson** 25:23
**Jointly** 1:11
**JON** 2:7
**journal** 29:12 94:10
**judged** 212:19 218:10
236:23 240:3
**judgement** 79:4,23
80:5 82:5,6 101:19
104:9,13,21,22
105:4,5,17,19,24
107:5,22 108:23
109:5,7,14,23,24
110:25 111:23 112:4
122:13 127:14,15
128:4 173:3,5,6
189:20 203:11 205:5
205:5 206:21,25

Case 01-01139-AMC    Doc 22731-3    Filed 08/07/09    Page 81 of 93

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - June 5, 2009
Arthur Frank M.D., Ph.D.
Page 280

207:2 211:18 216:5
220:12 221:17
**judgements** 101:2
105:21 106:13
108:19 120:17 125:4
126:5,23 127:2,3,17
127:18,22,23 130:6
250:5
**June** 1:15 264:13
265:14
**jurisdiction** 11:2,3

**K**

**Kalispell** 2:9 4:9
**keep** 48:15 53:15
114:14
**keeping** 66:18
**kettle** 93:4
**kind** 10:11 17:18,19
35:3,20 48:23 49:4
95:4,9 103:2 108:18
111:16 128:22 131:3
131:20 151:3 152:10
162:9 192:24 193:8
195:3,6 207:4
248:16,18,21 249:2
250:12 257:14
258:13 259:25
**kinds** 66:20 133:8
151:16 158:16 160:5
196:20 205:19
**KIRKLAND** 3:4
**knew** 211:15 215:5,9
215:10 216:24 218:9
248:8
**knife** 70:19
**know** 11:2 17:12,13
20:23 23:11,13 29:2
29:12 31:4 47:4
51:13 52:19,21
54:22 56:16,18
57:20,21 58:2 59:15
61:2,10,12,14,18,20
63:3,6,22 64:7 66:13
72:12 73:17,19,20
73:23 74:11 81:7,13
84:16,17 85:23 87:8
87:17 89:11 97:7,10
98:13,14,14 102:5,6
104:12 113:9,10,20
113:22,24 114:12
115:23 116:5 121:12
125:6 129:5,21,24
130:21 138:9 139:23
140:20 141:23
145:23 146:4 147:14
152:10,22,24 153:4
156:11,13 157:8
158:14 159:10 163:5

163:13,18 164:17,20
164:22 166:13,25
168:18 169:10,19
171:25 172:13 178:2
178:6 179:9 184:24
186:7,7,10 187:5,7
187:20 188:8 190:18
192:14 193:18 196:8
200:8 203:12 210:22
211:17,21 212:9,17
214:5,9,15,23,24
215:6 216:2 217:5,8
217:10,12 218:23
219:7 221:12 222:9
222:25 223:2,9,10
224:2 232:2,8,20
234:11 235:16 237:8
237:11,12 238:3
244:22 245:11
246:19 247:5,17
248:8,14 249:5
251:13 252:16 254:3
255:6 258:23 259:10
259:14,19,24 261:6
261:12 262:9,14
**knowing** 158:2 187:14
237:23 251:14
**knowledge** 11:20,21
11:24 12:5,10 15:21
20:24 50:23,24
52:18 81:11 118:21
230:20,21,23 234:19
**knowledgeable** 73:16
200:16
**known** 24:7,21 44:3
81:24 254:7
**knows** 215:20 259:17
**Kuchinsky** 4:15
138:10,11,15 225:5

**L**

**L** 1:14 6:3 8:1,2 9:1
10:1 11:1 12:1 13:1
13:12 14:1 15:1 16:1
17:1 18:1 19:1 20:1
21:1 22:1 23:1 24:1
25:1 26:1 27:1 28:1
29:1 30:1 31:1 32:1
33:1 34:1 35:1 36:1
37:1 38:1 39:1 40:1
41:1 42:1 43:1 44:1
45:1 46:1 47:1 48:1
49:1 50:1 51:1 52:1
53:1 54:1 55:1 56:1
57:1 58:1 59:1 60:1
61:1 62:1 63:1 64:1
65:1 66:1 67:1 68:1
69:1 70:1 71:1 72:1
73:1 74:1 75:1 76:1

77:1 78:1 79:1 80:1
81:1 82:1 83:1 84:1
85:1 86:1 87:1 88:1
89:1 90:1 91:1 92:1
93:1 94:1 95:1 96:1
97:1 98:1 99:1 100:1
101:1 102:1 103:1
104:1 105:1 106:1
107:1 108:1 109:1
110:1 111:1 112:1
113:1 114:1 115:1
116:1 117:1 118:1
119:1 120:1 121:1
122:1 123:1 124:1
125:1 126:1 127:1
128:1 129:1 130:1
131:1 132:1 133:1
134:1 135:1 136:1
137:1 138:1 139:1
140:1 141:1 142:1
143:1 144:1 145:1
146:1 147:1 148:1
149:1 150:1 151:1
152:1 153:1 154:1
155:1 156:1 157:1
158:1 159:1 160:1
161:1 162:1 163:1
164:1 165:1 166:1
167:1 168:1 169:1
170:1 171:1 172:1
173:1 174:1 175:1
176:1 177:1 178:1
179:1 180:1 181:1
182:1 183:1 184:1
185:1 186:1 187:1
188:1 189:1 190:1
191:1 192:1 193:1
194:1 195:1 196:1
197:1 198:1 199:1
200:1 201:1 202:1
203:1 204:1 205:1
206:1 207:1 208:1
209:1 210:1 211:1
212:1 213:1 214:1
215:1 216:1 217:1
218:1 219:1 220:1
221:1 222:1 223:1
224:1 225:1 226:1
227:1 228:1 229:1
230:1 231:1 232:1
233:1 234:1 235:1
236:1 237:1 238:1
239:1 240:1 241:1
242:1 243:1 244:1
245:1 246:1 247:1
248:1 249:1 250:1
251:1 252:1 253:1
254:1 255:1 256:1
257:1 258:1 259:1

260:1 261:1 262:1
263:1 264:1 265:1
265:11
**laboratory** 206:8
**lack** 227:19,20 233:7
**laid** 26:21
**large** 45:17,21 46:2
123:25 132:21 133:7
133:21 134:15 135:7
136:5 172:6,20
184:23 226:13
**larger** 97:8
**Laura** 29:2,13 91:16
91:18
**law** 113:23
**lawyers** 10:20 61:8
126:21 129:3,6,19
219:11 223:14
**lay** 117:11 119:12
**laying** 150:9,15
**lays** 131:12
**lead** 1:17 124:16
**leading** 113:18 194:20
229:15,23 230:5
**learning** 23:17
**leave** 222:4
**leaving** 70:15 126:21
**led** 25:3
**Leesburg** 4:19
**left** 198:24
**legal** 63:12 121:23
122:5 125:9,13
126:21 127:16 128:5
209:10,16 211:2
218:21
**legal/political** 125:22
**legitimate** 204:22
**Lehman** 249:21
**length** 26:11
**Les** 16:8
**lesser** 98:2
**letter** 7:12 25:22 29:12
63:16
**letting** 243:24
**let's** 9:21 20:8 25:14
26:3 39:14 40:13
43:20 47:11 53:6,15
62:3,14 68:9 81:15
98:15 135:5 140:22
140:24 154:25
167:12 178:10,15
182:16 190:17
193:15 213:8,17
221:20,20 222:3
244:16
**level** 53:13 61:4 68:10
68:12 70:2,25 73:3
74:12 76:10,11,24
77:2 78:24 80:14,16

80:17 83:19,25
111:21 141:7,8
143:14 144:17,19,21
144:22 148:8 163:22
163:23 179:22
182:10 207:10
261:18
**levels** 136:25 139:6,23
168:6
**liabilities** 49:5
**Libby** 11:20,22,25
12:3 17:16 19:20,24
20:8,10,20 21:3
32:18,23 33:14,18
33:22,25 34:15,17
34:22 35:5,7,20 36:4
36:6,10,11,11,17
37:2,8,12,16,25 38:4
38:10,17,19 39:3,4,7
40:5,10,14,18,22
41:4,19,22 42:17
45:7 51:6 57:3 59:15
59:17 60:14 64:10
64:18,22 65:4 66:24
67:5,9,21,21 69:4
78:9,10 80:3,5,22
81:7,16,24 82:11,12
82:14,16 86:22
87:13 88:15,21
89:22 92:13 95:13
96:23 146:16 192:5
192:7,11,11,16,18
192:21 193:4,7,10
193:13,14,19,23
194:3,7,9,11 195:5
195:12 205:15
209:23 227:12
236:11 245:8,13,16
245:20 247:15 248:2
249:20,21,22 250:13
252:8,11,23 253:20
255:20 256:5 258:10
261:8 263:7
**lie** 122:11
**life** 106:18
**lifetime** 18:21
**light** 173:23 184:13
**likelihood** 86:23 179:9
180:6
**likes** 178:19
**likewise** 245:22
**Lillis** 7:23 97:11 98:21
160:18,20 163:24
171:10 193:16
224:10 228:25
**limit** 54:13
**limitations** 208:7
**limited** 242:16
**limits** 61:23 166:9,23

Case 01-01139-AMC    Doc 22731-3    Filed 08/07/09    Page 82 of 93

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - June 5, 2009
Arthur Frank M.D., Ph.D.
Page 281

242:4
**Lincoln** 35:4,5 37:24
    38:21 40:16,17,24
    42:4,5,6,11 45:11,12
    54:8,10 56:10 57:19
    258:5
**line** 149:6 178:24
    202:2,21 203:3
    266:20 267:4
**lines** 70:9 196:20
    202:5,8,11 203:16
**linkage** 64:16 175:18
**links** 191:13
**list** 31:5
**listed** 13:8 52:12 84:16
    202:12 206:16,18
    207:13 208:18
    213:12
**listened** 99:17
**literally** 140:4
**literature** 16:17,23
    18:4 22:9 24:9 31:19
    31:20,21 34:17
    62:18 72:16 79:7,16
    96:14 104:23 110:15
    122:21 130:3 141:14
    143:4 145:3,8,10,19
    146:2,5,13 147:4,4
    147:12,17 148:2
    149:14,15 150:22
    151:4,7,13 153:20
    154:4,6 158:5,9,13
    159:2,3,9 160:24
    163:2 164:15 166:7
    166:19 167:2,8,9
    170:24 171:8 174:20
    175:7,17 176:10,18
    179:14,18 192:6,14
    194:25 249:8
**litigation** 4:16 9:18
    10:19 17:23 31:4
    62:2
**little** 24:18 52:21 67:23
    110:17 148:10
    196:10,13
**live** 39:3 66:24 69:3
    81:21,21 82:16
    88:11 258:5
**lived** 37:23 38:6,21
    40:3,16 41:7,8,12,13
    45:14 57:19,21
    81:15
**lives** 87:9
**living** 35:20 57:2 59:15
    94:24 258:18
**LLP** 2:6 3:4
**location** 34:19
**long** 41:8 54:13 57:23
    77:8 88:11 145:20

145:23,25
**longer** 88:9,10 146:2,5
    250:14
**longitudinal** 94:13,14
    94:16,21
**Longo** 17:12,14,20
    20:25
**LONGOSZ** 3:19
**Longo's** 17:9
**look** 28:6 48:4 53:8
    60:4 61:9 62:17
    70:11 79:7 85:24
    94:18,19 110:15
    123:18 124:23
    126:17,20 128:21
    140:24 161:17 162:8
    163:16,21 164:4
    187:16 188:14,23
    189:7,19 191:12
    193:15 200:4 203:9
    205:15 208:17 212:8
    212:14 214:3 231:17
    231:19 233:24
    249:12,22 250:6
    251:5
**looked** 16:20 28:9
    32:14 46:22,25
    100:15 114:17
    131:18 133:5 140:19
    159:9 163:22 167:8
    167:9,10 246:24
**looking** 16:20 28:11
    47:6 68:8 76:8 78:15
    94:16 126:19 163:15
    179:25 188:6 206:24
    206:25 216:22
    221:11 235:23
    247:21 250:3
**looks** 29:15 93:17
    187:15 200:8 249:8
**Loop** 4:8
**loose** 141:21
**Lorraine** 5:18 265:8,23
**losing** 244:7
**loss** 85:17 86:18
    171:21 183:18,23
    184:24 185:2,9
    189:14 190:21
    223:17 229:13
**lost** 168:12 178:25
**lot** 23:17 31:25 32:2,2
    43:4 66:9,10 111:24
    117:10,25 118:21
    129:2,8,21 145:25
    146:5 182:8 208:3
    210:9 219:12,14
    245:7
**lots** 26:5 55:15 118:12
    118:12

**low** 180:5
**lower** 103:25 182:10
    263:4
**luck** 73:6,9
**lunch** 169:11,18
    178:19 191:15
**lung** 18:25 19:6 21:24
    22:5 26:11 52:15
    59:20,22,23 60:2,11
    60:13,19,24 62:14
    62:23 63:18 64:11
    64:12 65:5,7,12,13
    65:16,18,19,22,23
    66:2,8,16 67:6,16,17
    68:9 75:15,18 76:2,4
    77:19,25 83:20,24
    84:2 85:17 86:9,10
    86:14,18 88:22
    89:23 95:4 96:10,19
    97:17 98:9 99:2
    138:3 139:18 142:13
    142:15,17,18 145:16
    145:18 149:10
    161:12,14,21 163:4
    164:23 165:17,21
    166:9,22 167:7
    168:8,12 170:19
    171:17,18,21 175:8
    175:19 176:12,13
    179:4,16,20 181:2
    183:10,12,18,23
    184:14,16,16,24
    185:2,9 186:17,23
    188:11 202:13
    203:18 206:17,18
    210:5,10 212:12
    219:19 223:24
    225:21 229:14 232:9
    234:21 235:18 257:9
    260:2,5,9
**lymphoma** 66:7
**L.S** 7:21

**M**

**magical** 35:3
**magnitude** 41:17 79:8
**main** 2:8 29:22
**major** 30:12,19
**majority** 21:2,7 72:21
    82:13 85:15 204:21
    262:18
**making** 56:4 105:3,4
    108:19 109:4,7
    120:17 122:12
    127:13,17,18,22,23
    182:23,24 199:22
    240:6,10 241:24
    245:15 255:21 262:9
**malignancies** 37:6

208:21 234:3
**malignancy** 62:3
    249:11 251:17 252:6
    252:8
**malignant** 225:24
    227:3 257:19
**Management** 74:25
**manifestation** 194:6
    194:15 234:20
    251:10
**manipulable** 84:20
**manipulated** 185:12
**manner** 9:3
**March** 13:8,12
**mark** 22:21 25:14
    39:14 74:17 98:11
    98:15
**marked** 6:11 7:2 12:15
    12:19 22:25 25:16
    39:16 47:21 74:20
    91:11 92:4 98:17
    256:20 258:4
**marker** 171:16,22
    175:7,18 176:17
**Market** 265:12
**marketed** 32:19 53:25
**marking** 223:5,7,8
**Maryland** 3:24
**match** 144:13
**material** 33:3 81:8
    101:9 150:9 249:18
    249:23
**materials** 20:4 31:11
    35:2,14,15,16,23
    37:18 47:14 128:19
    129:12,21,22,24
    130:15 216:13
**matter** 14:4 31:8 55:8
    67:12 126:10 173:11
    182:9
**matters** 17:23 34:20
**maximizing** 178:3
**McCloud** 163:7,13
    171:12
**McGARVEY** 2:5,6
**MD** 7:21
**mean** 23:22 27:11
    28:23,25 31:24 32:3
    37:4 40:14 41:12
    48:4 50:20 54:20
    55:17 58:3 59:8 61:7
    63:9,20 64:2 75:22
    76:18 78:13 82:15
    93:10 94:8 100:5,6
    100:11 101:5,15,21
    108:13 110:5 111:12
    115:5,21 121:10
    123:7 143:8 145:23
    151:18 154:10 162:6

165:2 166:13 177:13
    193:25 202:17,18
    205:3 220:22 221:12
    222:5,25 223:9
    228:10
**meaning** 233:5
**meaningful** 53:24 54:2
    54:23 56:16,19 57:8
    58:18 59:5,7,12,14
**means** 20:8 54:4 55:6
    56:20 57:3 63:7
    66:18 103:15 108:15
    164:18 166:11 248:7
**meant** 138:17 158:3
**measure** 121:17
    138:22 207:24
**measured** 170:8
    173:20 174:24 179:4
    184:17,20
**measurement** 121:12
    185:5 187:17
**measurements** 95:19
    185:6 197:15 220:4
**measures** 246:7
**measuring** 185:2,9
**medical** 14:15 15:17
    18:4,25 23:15 28:22
    29:18,18,22 30:21
    31:18,20,21 32:2
    34:16 44:5 48:12,17
    49:14 50:6,12,14,19
    51:2,3,3 53:6 60:4
    63:4,7,10,15 64:7,13
    65:2 67:19 68:14,15
    69:24 70:24 71:5
    72:16 189:18,19
    190:5,6,23,25 191:4
    191:5,6,8,12 196:24
    197:2,4 204:10
    206:5 258:19
**medically** 60:19 78:23
    78:6 153:11 181:24
    182:2 192:16,19
    224:20
**meets** 72:24
**MELLON** 3:18
**members** 43:7 95:18
**memory** 99:25 163:12
    219:8
**mention** 148:13
**meso** 206:17,18
**mesothelioma** 14:16
    14:20,24 15:5,12
    18:23 22:3 24:2,12
    25:2,3 26:11 27:17
    28:3,16 29:10 51:9
    51:11,20 54:18
    56:23 57:16,23 62:7

Case 01-01139-AMC    Doc 22731-3    Filed 08/07/09    Page 83 of 93

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - June 5, 2009
Arthur Frank M.D., Ph.D.
Page 282

67:15,17 77:19 94:7
138:3 139:15 203:19
203:20,21 205:2,6
206:11,16 210:8
234:22 253:15,20
256:8 257:5
mesotheliomas
219:18 235:19
256:14
met 131:15 193:18
213:12
metal 29:14
method 26:23 207:5
methodology 121:25
207:8
methods 71:8
metric 112:8
Michigan 35:8
mild 160:5 165:2
166:16
mildly 167:17
million 32:25 256:9
mind 115:13 131:17
mine 42:9 95:23
259:12
mined 19:23 20:10
miners 16:11
minimal 79:10 82:3
160:5 194:21
minimum 58:13 78:3,5
minute 13:17 33:9
67:25 107:25 147:23
226:17 236:16
minutes 67:24 169:14
mischaracterization
199:5
misdiagnoses 206:12
misrepresentation
247:12
missed 13:18 263:23
missing 112:3
misstatement 247:7
misstates 56:25 58:16
69:18 131:6 198:12
253:3,10,24
misunderstood
263:23
mix 19:22 20:9 193:4
219:13
mixed 15:23 188:15
moderate 165:2,3
moment 121:2 164:13
233:9 254:20
money 10:22 11:15
52:3 61:21 75:25
139:7 182:3
Monokote 20:20 32:18
33:2,15,18,22 34:2
35:10 36:18 38:16

57:15 69:3
Montana 2:9 4:9 19:24
20:10 35:4,6 37:24
40:17,17 54:8 56:10
57:20 66:24 82:17
88:16,21 89:22
92:13 96:23 146:16
258:6
month 47:12,13 60:24
68:17 80:17 82:18
82:22 83:10
months 30:14 58:23
60:17,25 62:25
77:22,24 78:3,5
79:19 80:4 81:15,16
81:25 82:3,11,17
83:7 108:7 109:18
109:18,19,19 110:19
110:23,23
MOORE 4:5
morbidity 252:18,21
morning 99:18 100:2
102:14,15 108:4
109:5,18 123:10
124:7 125:16 131:13
139:2 178:19 205:23
258:7,8
mortalities 234:10,10
mortality 87:11 92:14
92:19,20 195:9,17
195:19,19,25 198:6
199:17 200:12 201:9
207:25,25 208:25
209:22 214:6 234:7
234:18,18 237:9,13
237:16 238:6,9
240:7,11 242:2,6
244:25 245:23,25
252:11,17,19,21
253:7 255:22 256:5
257:23,25 259:6
Mount 18:7 200:6
205:25
mouth 113:15,20
moved 41:6,14
multiplicative 203:16
Murtaugh 5:18 265:8
265:23
mute 138:12
M.D 1:14 6:3 8:1,2 9:1
10:1 11:1 12:1 13:1
14:1 15:1 16:1 17:1
18:1 19:1 20:1 21:1
22:1 23:1 24:1 25:1
26:1 27:1 28:1 29:1
30:1 31:1 32:1 33:1
34:1 35:1 36:1 37:1
38:1 39:1 40:1 41:1
42:1 43:1 44:1 45:1

46:1 47:1 48:1 49:1
50:1 51:1 52:1 53:1
54:1 55:1 56:1 57:1
58:1 59:1 60:1 61:1
62:1 63:1 64:1 65:1
66:1 67:1 68:1 69:1
70:1 71:1 72:1 73:1
74:1 75:1 76:1 77:1
78:1 79:1 80:1 81:1
82:1 83:1 84:1 85:1
86:1 87:1 88:1 89:1
90:1 91:1 92:1 93:1
94:1 95:1 96:1 97:1
98:1 99:1 100:1
101:1 102:1 103:1
104:1 105:1 106:1
107:1 108:1 109:1
110:1 111:1 112:1
113:1 114:1 115:1
116:1 117:1 118:1
119:1 120:1 121:1
122:1 123:1 124:1
125:1 126:1 127:1
128:1 129:1 130:1
131:1 132:1 133:1
134:1 135:1 136:1
137:1 138:1 139:1
140:1 141:1 142:1
143:1 144:1 145:1
146:1 147:1 148:1
149:1 150:1 151:1
152:1 153:1 154:1
155:1 156:1 157:1
158:1 159:1 160:1
161:1 162:1 163:1
164:1 165:1 166:1
167:1 168:1 169:1
170:1 171:1 172:1
173:1 174:1 175:1
176:1 177:1 178:1
179:1 180:1 181:1
182:1 183:1 184:1
185:1 186:1 187:1
188:1 189:1 190:1
191:1 192:1 193:1
194:1 195:1 196:1
197:1 198:1 199:1
200:1 201:1 202:1
203:1 204:1 205:1
206:1 207:1 208:1
209:1 210:1 211:1
212:1 213:1 214:1
215:1 216:1 217:1
218:1 219:1 220:1
221:1 222:1 223:1
224:1 225:1 226:1
227:1 228:1 229:1
230:1 231:1 232:1
233:1 234:1 235:1

236:1 237:1 238:1
239:1 240:1 241:1
242:1 243:1 244:1
245:1 246:1 247:1
248:1 249:1 250:1
251:1 252:1 253:1
254:1 255:1 256:1
257:1 258:1 259:1
260:1 261:1 262:1
263:1 264:1 265:1
265:12

### N

N 6:1 7:1
name 8:9 23:11 92:2
99:13 145:14 146:22
named 138:10
names 32:2,18
narrower 182:25
Nat 33:9 53:9
Nathan 1:17 2:16 8:9
nature 9:11 36:2 62:20
67:12 125:20,22
164:5 167:10 185:15
249:23,23
nauseam 252:9
Ndf@capdale.com
2:21
near 81:21,21
nearly 149:3
necessarily 28:25
92:22 94:22 110:12
135:24 137:4 147:22
199:8
necessary 62:21
77:23,24 110:8
244:10
need 31:15 55:25 61:5
62:16 63:21 64:7,13
64:14,16 66:9 73:15
93:3 116:14 126:7
132:7 133:12 162:3
162:7 170:21 177:14
190:25 191:3,5,6,8,9
248:16,21 250:12
needs 73:2
negotiations 11:4
neighborhood 41:10
neither 136:12,16
137:11
never 31:4 32:14 40:7
56:14 75:21 114:17
116:25 117:5,22
125:8 139:24 140:19
151:24 152:13 163:5
new 31:15 16 33:6
63:25 140:15 169:7
208:10 268:12,12
nice 107:10 189:7

Nicholson 23:11
nine 25:14 42:15 97:2
ninety 219:17 232:22
233:11 238:20,25
ninety-eight 121:20
ninety-three 72:16
nomenclature 143:10
nonmalignant 22:9
30:6 37:6 62:16,22
69:7,14,25 70:6 71:3
71:9,18 72:15,22
73:18 74:15,25 75:9
75:14,20 76:24
78:15,18,22 79:11
79:12 80:7,13,23
82:9,23 83:4,6 86:4
87:20 96:6,11
139:22 193:3 194:4
196:24 197:12 211:6
211:24 215:21
225:25 226:10 227:4
231:5 232:18 236:21
238:24 240:4 251:8
257:18 263:8
nonoccupational
197:19 259:21,22
nonscientific 120:21
121:4 122:9
nonsmokers 262:12
262:15
nonworkers 193:23
non-malignant 19:11
noon 178:20
normal 35:19 75:23
86:25 89:23 165:9
165:12,17,22 166:9
166:15,23 167:20
212:13 225:21
normally 62:2
Northern 249:9
nosologist 204:13
nosologists 203:6
Notary 265:9,24
noted 266:9
notice 104:7 208:20
268:1
notion 118:14 121:23
233:10
notwithstanding
230:25
November 25:22
number 6:11 7:2 13:4
16:2 17:25 19:14
22:22 32:9 41:10,20
41:21 43:3,8,12
54:25 55:2,4 62:15
79:6,9,21,23 80:9
82:3 86:15 97:7,8,10
113:24,25 114:3,8

Case 01-01139-AMC    Doc 22731-3    Filed 08/07/09    Page 84 of 93

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - June 5, 2009
Arthur Frank M.D., Ph.D.
Page 283

114:10 133:7 134:15
134:19 178:3 181:25
182:24 196:19 199:9
199:11 208:22 212:4
212:4 226:13 251:14
253:13 256:13
262:17
**numbers** 43:15 79:8
84:22 135:8 136:5
172:6 180:3 189:7
212:7
**nutshell** 203:23
**NW** 2:18 3:8,20

___

**O**

**oath** 264:16
**object** 33:10 89:3
198:14
**objection** 30:24 53:11
54:14,19 56:24
58:15 62:8 69:17,18
88:23 100:14 102:22
116:8 123:21 128:24
131:5 135:13 166:10
175:11 176:22
177:10 181:20
190:12 198:11,14,23
210:18 226:2,3,6
227:19 229:10,15,23
233:4 239:19 240:24
241:18 243:7,20,23
247:6,11 248:3,23
253:2,9,23 255:14
**objective** 134:20
136:9 172:7,20
185:14
**obstruction** 185:23
**obstructive** 186:6,9,16
186:24 187:6 188:11
188:22,25 189:5
194:18
**obtain** 206:5,5 207:11
**obviously** 27:18 58:4
59:11 66:13 97:8
115:24 130:14
139:21 154:19
157:24 161:15,23
178:8
**occasion** 9:23
**occasionally** 194:22
**occasions** 17:25
32:10
**Occupation** 259:21
**occupational** 35:18,25
52:16,19 53:18 55:5
55:8 56:8 63:2 68:22
79:2,13,20,25 80:2
83:9 110:7,11
259:12,22 261:18

**occur** 55:8 96:18
101:23 153:9 156:11
250:3
**occurred** 34:20 54:3
206:4 228:12 238:16
250:6
**occurring** 135:12
250:15
**occurs** 86:11 93:18
96:22
**odds** 228:11
**offer** 48:19 99:19
102:9 104:25 112:6
234:25
**offered** 102:14,15
107:24 108:3,8,10
108:11 109:5 124:5
130:9 232:11
**offering** 11:6 99:21
100:24 102:2 111:14
128:8
**official** 8:10,19 23:20
203:4,8
**Oh** 129:5 157:2 251:20
**okay** 10:8 12:22 28:12
36:24 41:25 42:5
45:9 53:22 59:9
60:22 66:2 68:2,11
79:15 127:9 129:17
133:9 143:13 146:3
146:3 170:12 174:13
176:2 183:8 191:15
191:16 195:24 213:9
219:5 245:10 260:16
**old** 140:19
**older** 146:2,5 147:11
**omitted** 15:11
**once** 123:20 220:16
**ones** 84:18 87:9,9
129:8 176:12 179:6
179:8 235:23
**opined** 100:17
**opinion** 14:14,18,22
15:2,16 21:24 28:2
28:13 50:24 52:24
53:5 63:16 64:7
77:22 78:17,21
85:14 86:8 89:21,24
100:12,25 102:7,10
104:25 107:19 111:7
111:14 125:25
126:12,14 127:25
128:2 129:15 132:11
209:11 225:21
226:25 229:25 230:6
230:7 232:11 235:11
239:7 240:16 257:12
**opinions** 9:23 11:5,6
12:5,11,12 14:2,7

16:13 17:21 29:18
29:21 48:8 50:5
87:14 91:23 99:19
99:21 101:14 102:2
102:6 107:24 108:3
121:11,12 122:14
124:6,11,17 128:8
142:10 230:19
**opportunity** 228:21
**opposed** 60:3 61:4
131:25 156:15
184:10 210:17
214:17 219:24
**oranges** 237:17
242:23
**order** 41:17 60:18
81:18 90:17 176:18
190:22 198:7
**orders** 79:8
**ordinarily** 128:10
**ore** 54:7,10
**origin** 154:6,10
**original** 145:12 207:11
**ought** 58:7 177:21
178:7
**outlined** 212:23
**outside** 11:22,25
29:21 36:6 67:21
78:10 96:22 117:2,7
117:8 192:5,11,15
192:21,23 193:7,14
205:14 247:11
**overbroad** 30:25
**overlap** 45:17,22 46:2
46:2
**overlapping** 151:17,18
151:22,24 152:12
159:14
**overlying** 149:10
**overpay** 136:12,16
137:12
**overpayment** 136:22
**overwhelming** 32:20
114:3,8,10
**Owens-Corning** 9:8
**Owens-Illinois** 9:9
**owners** 121:7

___

**P**

**pack** 57:25
**page** 6:4,11 7:2 13:4,7
19:16 21:6 26:24
44:19 52:13,15 53:8
53:17,20 57:7 69:9
76:9 85:5,12 90:16
141:2,5,6 150:25
197:11 258:4,16,17
258:24 259:2,3
266:20 267:4

**pages** 265:17 266:5
**paid** 10:22 11:15,19,22
**pain** 194:14
**paint** 104:8,9 105:8,12
121:9,19
**painted** 104:7 121:5
121:18
**paper** 16:18,19 24:19
29:8 85:13,14 92:11
92:15 93:7,13 94:4,7
95:12 97:14 98:11
98:21 115:20 163:7
163:24 164:3 188:7
188:8 253:5 256:13
**papers** 29:4,7 40:22
79:17 220:20
**paragraph** 44:22
**parenchyma** 142:13
142:15,17,24 143:24
144:4 145:17 149:10
155:22 156:9,12,18
156:25
**parenchymal** 142:21
143:6,17 144:8
145:3,11 157:10
161:23 167:12,19
186:12
**parietal** 148:17 149:5
149:16,22 150:2,4
150:19 151:9 152:15
153:2 163:3 168:17
222:21 223:6
**Parkway** 4:18
**parsing** 190:18
**part** 9:18 35:24 44:13
61:13 77:25 104:21
104:22,22 125:4
130:21 131:23 149:8
153:10 172:22,24
177:15 187:21
198:17 205:20
211:20 217:7 219:13
224:5,11
**participate** 25:7,8
**particular** 11:6 50:23
52:4 106:20 110:16
119:8 120:9,10
126:17 149:19
158:20 161:18
162:11 170:21 184:8
185:8 193:12 196:23
211:18 221:21 223:4
**particularly** 50:17
68:17 90:6 137:3
158:22 208:21
**parts** 45:16 126:7
127:19 140:3 148:14
**pass** 99:5 220:16
**pathologic** 72:10

158:21 206:20
**pathological** 209:9
**pathologist** 72:11
145:13 150:24
**pathologists** 206:7
**pathology** 71:20 72:9
76:13 206:6
**patient** 40:11,14 45:7
46:21 86:5 87:13
93:6,12 95:13
260:23
**patients** 44:24 45:4,16
45:22 46:3 94:24,25
95:11 166:14 211:16
215:5 231:25 232:17
246:10,11 258:13
259:4 261:19 262:2
263:25
**PATRICIA** 7:22
**pattern** 133:13,25
134:18 135:11 136:8
194:6,17,23 228:6
228:13 233:17
234:11,14,19 235:5
235:7,8,16 236:3,19
237:9,13,15 241:11
246:15 248:13
257:19 260:18,21
262:7
**patterns** 137:17 194:3
233:16
**paucity** 16:25
**pay** 61:24 134:9,11
136:17,17 180:7,14
182:7
**paying** 9:2 182:3
255:3
**payment** 48:24 49:10
132:3 136:24,25
**payments** 132:16
**pays** 139:7
**peer** 128:2
**pending** 49:18 89:16
**Pennsylvania** 1:16
3:20 265:4,10,13
**people** 16:25 18:6
21:22 22:4 27:19
31:24 35:5,13 36:4,5
36:10,14,17 37:16
37:23,24 39:3,6 40:3
40:16,23,24 41:6,7
41:12,13,18 42:7,12
42:23 43:4,9,13,16
45:7,12,13 46:3,15
55:15 56:7,9 61:20
62:18 64:17 66:18
66:24,25 67:21 69:3
70:5 72:14,21,25
75:25 76:4 78:10

Case 01-01139-AMC   Doc 22731-3   Filed 08/07/09   Page 85 of 93

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - June 5, 2009
Arthur Frank M.D., Ph.D.
Page 284

82:14,15 84:19
85:15 86:7,17 87:5
87:13,18,19,23 88:5
88:7 90:13 91:17
93:24 95:3,12,23
96:25 97:15,16,18
98:5,6 105:14
112:13,17 114:5,15
116:5 117:10,25
119:4 121:6,11,13
126:8 127:14 130:14
131:25 132:16,22
133:7 134:2,6,9,11
134:15,19 135:8
136:5,17,18 142:11
149:21 160:21 165:3
168:6 172:7,8,20,22
173:7,13,18 174:19
174:23 175:3,6
176:7,10,19 178:3,5
180:14,16 182:6,7
182:25 183:9,25
184:23 188:2 190:3
192:4,5,11,12,15,18
192:22 193:3,5,9,23
194:14 195:4,11
198:3,21,24 199:13
200:19 208:3,10
211:23,25 212:9,10
213:7,9,21 214:5,11
215:24 216:16 218:9
218:17,25 220:9
221:6 222:12,15
223:16,19 224:12
225:17 226:13 228:7
231:3,5,12 232:2,5,8
232:11,12,15,23
233:12 234:17
236:20 237:2,5,10
238:9,10,23 239:23
239:25,25 240:2
242:2 243:10,16
245:2,24,25 246:4,5
247:3 248:15 249:13
250:6,22 251:2,13
252:13,23 253:19
255:20 257:13,22,22
258:5,9,18,19 259:9
260:5,19 261:3,17
261:24
**people's** 46:10,14
181:2
**percent** 42:18 70:5
72:17,18 73:17 84:3
86:23 87:19,23 88:3
97:2,12 121:20
193:17 219:17 226:9
228:13,15 232:22
233:12 235:18,18,19

235:20 238:17,20,25
**percentage** 43:13
46:17 86:12 87:7,14
88:6 95:3,7 121:18
193:9,19 194:13
233:25 249:13
**perfectly** 30:17 75:23
167:20
**performed** 220:10
**peril** 225:11
**perimeter** 245:4
**period** 41:9 55:6 58:13
58:18
**periods** 110:13
**peritoneal** 206:16
**permissible** 113:19
**permitted** 53:13
**person** 38:18 45:10
59:13 86:21 88:14
89:25 113:13 210:11
227:13,14 257:9
260:7,9,22
**personal** 8:11,19 10:5
10:14 11:16 12:8
14:12 48:3,20 50:23
125:24 158:12
**personally** 28:17
40:10 46:6,9 132:9
259:3
**person's** 38:12
**perspective** 10:15
50:19 61:10 67:19
**Perspectives** 92:11
**persuaded** 28:10
**PFD** 165:8
**PFTs** 185:15 187:15
**Philadelphia** 1:16 64:3
265:6,13
**philosophical** 134:7
177:25
**phone** 2:10,20 3:10,22
4:10,20 5:8,17 225:4
263:14
**phrase** 134:22 135:20
159:12
**physician** 10:9 56:2
61:8 72:3 73:15
206:3
**physicians** 75:22
114:9 115:6,16
204:10,15 221:19
**physiologic** 173:9
204:16
**physiological** 202:16
203:21
**Ph.D** 1:14 6:3 8:1,2 9:1
10:1 11:1 12:1 13:1
14:1 15:1 16:1 17:1
18:1 19:1 20:1 21:1

22:1 23:1 24:1 25:1
26:1 27:1 28:1 29:1
30:1 31:1 32:1 33:1
34:1 35:1 36:1 37:1
38:1 39:1 40:1 41:1
42:1 43:1 44:1 45:1
46:1 47:1 48:1 49:1
50:1 51:1 52:1 53:1
54:1 55:1 56:1 57:1
58:1 59:1 60:1 61:1
62:1 63:1 64:1 65:1
66:1 67:1 68:1 69:1
70:1 71:1 72:1 73:1
74:1 75:1 76:1 77:1
78:1 79:1 80:1 81:1
82:1 83:1 84:1 85:1
86:1 87:1 88:1 89:1
90:1 91:1 92:1 93:1
94:1 95:1 96:1 97:1
98:1 99:1 100:1
101:1 102:1 103:1
104:1 105:1 106:1
107:1 108:1 109:1
110:1 111:1 112:1
113:1 114:1 115:1
116:1 117:1 118:1
119:1 120:1 121:1
122:1 123:1 124:1
125:1 126:1 127:1
128:1 129:1 130:1
131:1 132:1 133:1
134:1 135:1 136:1
137:1 138:1 139:1
140:1 141:1 142:1
143:1 144:1 145:1
146:1 147:1 148:1
149:1 150:1 151:1
152:1 153:1 154:1
155:1 156:1 157:1
158:1 159:1 160:1
161:1 162:1 163:1
164:1 165:1 166:1
167:1 168:1 169:1
170:1 171:1 172:1
173:1 174:1 175:1
176:1 177:1 178:1
179:1 180:1 181:1
182:1 183:1 184:1
185:1 186:1 187:1
188:1 189:1 190:1
191:1 192:1 193:1
194:1 195:1 196:1
197:1 198:1 199:1
200:1 201:1 202:1
203:1 204:1 205:1
206:1 207:1 208:1
209:1 210:1 211:1
212:1 213:1 214:1
215:1 216:1 217:1

218:1 219:1 220:1
221:1 222:1 223:1
224:1 225:1 226:1
227:1 228:1 229:1
230:1 231:1 232:1
233:1 234:1 235:1
236:1 237:1 238:1
239:1 240:1 241:1
242:1 243:1 244:1
245:1 246:1 247:1
248:1 249:1 250:1
251:1 252:1 253:1
254:1 255:1 256:1
257:1 258:1 259:1
260:1 261:1 262:1
263:1 264:1 265:1
265:12
**pick** 172:9 173:2 175:3
179:5,6,8 192:12,12
244:5
**picked** 168:4 175:4
192:9 197:16 251:2
**picking** 192:3
**picture** 188:16
**piece** 27:8 184:5 188:7
188:8
**pieces** 48:5,7 112:3
187:2 248:19
**pile** 141:2
**place** 34:24 227:12
255:23
**places** 24:5 150:11,13
150:17 196:21
**plainly** 216:6
**Plaintiffs** 2:11 5:10
**plan** 54:12
**plane** 44:25
**plant** 35:8 42:8
**plants** 40:3
**plaque** 232:15 233:7
233:11 257:3,8
**plaques** 43:24 72:6
147:19 151:17,19,22
151:25 152:6,12,15
152:25 157:23,23
158:6 159:11,13,14
159:15 212:5 229:9
232:3,21,23,24
233:5,13,20,23
234:2 249:10,12,13
251:9,18,22,25
252:7
**plaquing** 147:11
157:17,19,22 158:2
171:7
**Please** 108:24 144:15
228:21 248:21
**plenty** 16:23
**pleura** 142:18 145:17

148:13,16,17 149:5
149:5,8,9,10,16,18
149:22,23 150:2,4,5
151:9,11 152:16,16
153:2,3,12,16
155:21,22 156:2,19
156:20,22 157:6
158:8 159:11 163:3
168:16,22 170:2,18
171:6 222:21 223:6
223:7
**pleural** 30:13,16 31:16
31:17 43:24,24,25
68:9,12 69:15 70:2
70:11,18,25 72:15
74:12 76:9 77:14
78:24 80:15,16,17
81:17 83:19,24
85:18 86:22,24
87:24 88:14,17,21
89:21 90:2,10,11,18
90:18 96:20,21,25
97:3,4,4,16,18,24
98:5,6,7,25 110:8
141:8 142:21 143:21
143:22,23 144:3,9
144:10 145:8,22
146:14,21,24 147:5
147:7,9,10,11,18,19
147:24 148:4,7,11
148:11 149:16,17
150:2,3,14 151:8,10
151:16,17,19,21,22
151:24 152:2,6,7,11
152:12,15,25 153:22
153:25 154:7,13,21
154:23,25 155:8,10
155:11,12,16,18,24
156:7,10,15 157:7
157:13,24 158:11
159:5,8,10,13,17
160:2,16 161:3,11
161:18,18 162:11,18
163:3,19 164:8
165:15,20 166:3,8
166:21 167:6 168:11
172:10 173:21,22
174:5,7,10,21 175:2
175:8,18,22,23
176:7,11,14,20,25
178:14 179:10,11,15
179:19 180:20 181:3
181:11 183:11,13,18
183:24 184:10 186:2
186:5,11,15,19
192:4,7,15 193:6
194:3 195:5 211:25
212:5,5,11 213:14
221:21 222:2 229:4

Case 01-01139-AMC    Doc 22731-3    Filed 08/07/09    Page 86 of 93

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - June 5, 2009
Arthur Frank M.D., Ph.D.
Page 285

229:8,9,13,18,21
230:2 232:3,6,15,21
232:23,24 233:5,7
233:10,13,20,23,25
234:22 249:10,12,13
251:9,10,18,22,25
252:2,7 257:3,8
**pleuras** 150:19
**plus** 45:15 190:4
238:25
**pneumoconiosis**
141:15,16,17,19
145:13,15 222:13
**point** 42:14 53:9 62:15
94:23 109:22 112:5
117:16 118:4 122:21
122:22 128:21 146:7
148:8 177:9 189:3
245:17 261:9
**points** 49:22 72:12
97:20 252:22
**political** 125:9,13
127:16 128:5
**poor** 159:20
**population** 40:23
82:14 94:17 214:9
238:15 245:13,16,20
249:15 253:13 258:9
**populations** 194:16
**portion** 64:20 149:5
172:19 232:15
**posed** 231:2
**position** 17:17 23:20
60:8 122:23
**positions** 30:5
**possibilities** 155:6
**possibility** 17:6 134:9
134:10 185:6
**possible** 27:4,19
39:11 215:15 226:12
248:11,12
**potency** 21:23 111:24
**potent** 24:2 28:15,20
**potential** 85:19 223:21
**potentially** 254:6
258:9
**practiced** 215:24
**precedent** 155:15,17
204:2
**preceding** 91:2 227:8
**precise** 156:4 158:4
201:19
**predict** 85:25 228:10
247:2,14 256:4
260:4
**predictable** 167:22
**predicting** 250:11
255:18
**prediction** 248:18

255:22
**predictions** 238:8
240:7,10 241:25
247:25
**predictive** 229:13
250:5,15 251:22,23
251:25 252:2,6
**prefer** 195:22
**preference** 244:20
**prepared** 13:3 137:3
**preparing** 263:24
**presence** 157:21
171:3 174:8 177:16
264:3
**present** 124:16 183:22
199:7 201:16 218:20
255:4
**presentations** 152:4
**presented** 26:17
**presents** 89:21
**Presumably** 76:20
**presume** 51:12 65:6
**presumed** 63:25 64:5
**presumption** 64:2,11
66:5
**presumptions** 63:24
66:12
**presumptive** 55:11,14
55:19,22 70:10 73:8
**pretty** 45:21 99:17
123:4,5 151:3
219:18 223:24
238:21 256:12
**previously** 170:16
**primary** 65:12,13,16
201:25 202:3
**principal** 23:10
**prior** 9:20 49:12,13
54:3,11 70:14
160:15
**prison** 64:4
**probabilities** 240:7,11
**probably** 12:11 15:24
18:2 23:7 30:12
39:11 40:18 46:12
46:24 47:16 78:12
80:10 84:5 96:12
99:16 105:20 114:11
120:25 122:11
132:10 146:10
148:21 188:2 202:10
213:6 219:20 222:14
222:16 223:12
231:10 241:10
**problem** 65:10 79:5
164:16 172:16,17
174:3,4 193:13
228:5
**problems** 204:14

**procedural** 124:25
**procedure** 218:7
**procedures** 7:16 9:24
9:25 48:2,10,23
74:11 124:2,7,12
**proceeding** 63:12
**proceedings** 8:23
**process** 55:24 157:17
157:19,20,22,23
158:2,6 161:6,8
172:18,19,19 175:5
187:21 188:24,25
189:5 199:22 200:14
207:4 224:5,6,11,17
224:19
**processed** 132:22
172:7 174:19 188:5
**processes** 136:5
**processing** 42:8
184:23 187:19
**produce** 110:8 258:22
**produced** 258:20,22
**producing** 81:22
**product** 15:10 33:15
52:6 54:12
**production** 24:11
**products** 15:14 17:15
20:14,19,22 21:3
32:19,22 33:18,22
35:10 36:13 37:13
37:20,21 39:8 53:25
59:17 64:21 65:4
**professional** 116:23
265:8
**progressing** 86:23
**progression** 7:25 93:6
247:14
**progressive** 85:17
86:18
**proof** 61:5 73:3 180:9
182:10
**proper** 126:6,13
**properly** 105:8 121:18
205:13
**properties** 166:24
**proportion** 42:16
193:2,12,13
**proportions** 237:24
**proposed** 26:23 49:22
50:2
**proposition** 97:19
103:2,3 160:2
**propounded** 266:7
**prove** 52:5 61:5
**provide** 14:7 112:20
**provided** 226:4 268:4
**proving** 73:12
**pro-asbestos** 30:23
**pro-defendant** 30:22

**Public** 265:9,24
**publications** 118:11
**published** 29:8 95:6
127:25 161:2 194:8
207:7 208:18 220:20
**pulled** 196:20
**pulmonary** 46:14,25
75:23 93:11 95:8
97:22 159:22,24
165:8,10 166:15
167:15,17,20,25
173:4,5,10 174:23
177:3,18 178:13
180:4,19 187:5
190:8 202:12 203:13
203:19 204:17,25
212:14 229:19
230:10
**pure** 14:18,24 15:3,9
16:9 18:24
**purely** 61:3 121:15
125:6 143:10
**purportedly** 126:24
127:20
**purpose** 14:6 122:13
131:24 132:20 133:4
133:20 135:6 137:11
137:12 144:7 219:23
**purposes** 19:20 22:8
48:15 58:11 78:24
147:2 207:19 218:17
**pursue** 244:16
**put** 12:19 24:4,5 25:25
26:3 66:17 80:20
91:25 112:12 120:24
122:8 132:15 176:5
178:2,3 183:7
189:10 194:24
203:23 204:15,18,22
208:25 216:10 217:6
234:5 255:22 258:3
**puts** 208:19,20
**putting** 58:5 112:11
113:15,20
**p.m** 264:22

_____
**Q**
_____
**qualification** 187:21
221:14
**qualifications** 23:14
**qualified** 72:3 106:5
110:20 113:13 220:9
220:17,24 221:6,9
221:13,18 241:10
**qualifier** 135:20
**qualify** 55:21 70:21,23
71:24 85:3 190:3
233:19
**qualifying** 118:5

**quality** 122:22 124:20
162:11,14
**quantify** 24:10,25 27:4
85:22 95:16
**quantitative** 26:9 39:5
95:15
**question** 8:16 11:9
16:16 22:10 26:6
30:9 31:11 34:21
37:14,15 65:20,25
66:2,13,15 73:21
74:4,6,6,9 85:7 89:4
89:6,10,14,16,17
90:24 91:2 96:18
100:8 102:12,19
103:9,17 104:4
108:25 111:21
112:15 120:19
128:18 129:12 135:6
135:16 136:21,25
137:6 139:9,18
144:12 146:12 154:9
160:19 162:5 164:5
164:6 165:23 172:14
172:17 174:4,14,16
175:14,21 176:5
177:11 181:7,22
183:7,19 184:4
189:9 190:9,20
192:8,25 200:25
204:5 221:3 223:16
227:6,8,16,18 228:5
230:19 233:14 234:4
240:14 241:3,8,16
241:21 242:8,9
244:2,8,11,20,20,21
255:13,15 260:17
263:15
**questioned** 33:10
**questioning** 128:25
**questions** 14:8 18:22
52:8 98:23 99:16
102:8 113:18 125:16
127:11 129:18,20
148:22 170:15 225:8
230:25 235:2 256:18
263:14 266:7
**quibble** 109:17 114:6
**quibbling** 109:20
**quick** 178:2
**quicker** 132:10,15,16
**quickly** 130:19 134:9
182:8
**quite** 11:12 33:12
104:12 219:15 244:3
**quote** 52:16

_____
**R**
_____
**R** 7:23 265:2 266:18

Case 01-01139-AMC    Doc 22731-3    Filed 08/07/09    Page 87 of 93

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - June 5, 2009
Arthur Frank M.D., Ph.D.
Page 286

266:18 267:2,2
**radiograph** 162:14
**radiographic** 71:20
  76:13,14,16 162:3
  162:12 167:14,23
  168:7 173:11 197:3
  197:13 199:2
**radiographs** 162:8
  216:5
**radiologic** 85:16
  159:21 166:14 173:5
  173:8 230:11
**radiology** 216:4,7
**range** 35:17 165:9,11
  165:17,22 212:13
**rare** 16:3 162:19,24
  194:14
**rarely** 204:9
**rate** 85:24 253:14
  254:14 256:8,10
  262:21 263:4
**ratio** 84:4 188:18
  189:3
**ration** 188:19
**rationale** 132:24 134:8
**reached** 100:12
**reaching** 130:6
**read** 17:9 25:12 33:12
  50:9,10 65:20 72:3
  90:24 91:3 100:23
  147:12 151:2 164:11
  187:23 194:12
  197:12,14 211:7,15
  216:4,14,15,19,21
  217:16,18 218:16,24
  219:12,15,24 220:10
  220:20 222:6 227:6
  227:9 266:4 268:1
**Reader** 188:3 219:25
  220:15,22,24 221:16
  222:3,7 223:15
**Readers** 221:16
**Readership** 220:3
**reading** 47:14 71:10
  149:21 168:7 187:25
  197:15 212:15 216:7
  216:12 217:8,12
  218:12 219:9 220:18
  221:7,10,10,11,25
  222:4,12 223:4
  248:4
**readings** 162:4 197:13
  220:21 222:5
**reads** 187:21 217:6
**real** 196:16
**reality** 204:8
**really** 17:24 30:19 81:7
  94:15 96:13 112:14
  115:12 139:9,12

140:9 153:24 162:9
  178:18 188:24
  192:24 205:6 251:20
  254:8
**reason** 70:3,22 127:10
  132:14,20 254:13
  266:20 267:4
**reasonable** 11:7 12:8
  12:9 14:14 15:16
  18:24 28:24 44:5
  52:6 61:21 70:16
  71:15,22 73:25 74:5
  74:7 78:23 80:5,25
  82:19,20,24,25 83:2
  84:3 99:20,23 100:6
  100:7,10,25 101:4
  101:14 102:16,20
  103:5,11,12,14,15
  103:15 104:9,13,15
  104:20 105:2,13,18
  105:22,23 106:23,25
  107:2,13,17 108:6
  108:17 109:14,23
  110:18 111:5,11
  112:7,18,20 113:3
  120:12,21 121:4,6
  122:5,8,9,23,25
  123:8,12 133:3
  135:10,21,22,22,22
  135:23 180:23
  184:25 239:6 240:6
  240:8,10 241:22,24
  242:5 250:9,10
  255:21 256:4
**reasonableness** 50:21
  61:17 110:2
**reasonably** 82:2
**reasoning** 51:2,3
**reasons** 11:13 59:14
  120:21 121:4 122:6
  122:9
**rebuttal** 85:8
**recall** 17:11 41:3 42:18
  43:3,12 69:20 95:6
  99:21 100:16 117:9
  120:23 121:2 125:16
  149:21 158:9 159:2
  217:3,4,11,19
  225:16 228:25
  231:16
**received** 40:4
**recognize** 65:15 77:14
  106:24 114:23
**recognized** 133:14
  147:20,25
**recognizes** 143:5
**recollection** 23:9
  171:13 212:6
**recommended** 75:8

**record** 12:24 98:12,12
  99:13 114:11 152:24
  190:5 196:14 197:5
  197:8 198:12 203:10
  226:20 247:7,12
  253:3,10,24
**recorded** 188:7 195:13
**records** 57:12 196:24
  197:2,4 200:20
  206:5 208:17 231:19
  258:19,21
**recurrent** 136:8
  137:17
**recurs** 134:19
**reduce** 187:8
**reduced** 189:21
  265:15
**reductions** 164:23
**redundant** 76:14
**refer** 102:13 119:4,21
  141:22 205:18
**reference** 17:2 242:12
**referenced** 16:20
**references** 40:22
**referred** 130:2 148:18
**referring** 26:22 257:22
**refers** 52:17 68:21
**reflect** 56:6 126:24
  134:7 203:24 204:3
  208:5
**reflected** 160:7,8
  196:4,11
**reflective** 174:19
**reflects** 27:7 135:2
**refresh** 163:11
**regard** 10:19 16:3 31:8
  62:2 77:10,11,13
  78:12 113:11 119:8
  125:21 127:11
  149:24 172:2 178:9
  178:11 220:3 222:9
  230:9
**regarding** 9:17 168:21
  177:24
**regardless** 34:23 65:4
**regular** 41:8
**regularly** 219:15
**relate** 62:23 84:15
**related** 64:2 65:14,15
  65:17 66:8,17 70:12
  75:2,9 88:4 96:16
  145:21 180:20
  183:12 186:22
  201:13 230:10
  241:16
**relates** 85:2
**relating** 64:7 249:22
**relationship** 61:19
  66:6 80:25 126:12

126:13 146:16
  160:16 161:2,5,10
  163:19 166:2 170:17
  170:25 199:23 201:2
  229:17
**relationships** 161:7
**relatively** 46:16 139:4
  147:15
**relevant** 52:10 182:21
  220:3
**reliable** 162:3,7
**reliance** 57:3
**relied** 17:21 18:2
  206:19
**relies** 227:21
**rely** 56:22
**relying** 213:22
**remark** 184:13
**remember** 86:4 94:9
  94:11 100:2 120:22
  122:16 124:2 197:23
  235:3 239:5
**remind** 138:9
**remotely** 241:16
**repeatedly** 135:12
**rephrase** 8:16 89:5
  137:6 144:14 146:12
  172:15
**report** 6:12,14,18 7:8
  7:14 12:25 13:2,5,9
  13:11,14,24 14:7
  17:9 19:13 21:7
  25:24 26:2 40:21
  44:13,19,20 47:7
  53:2 69:21 84:25
  85:8 95:2 196:10
  217:22,25 227:23
  228:3,4 231:10,23
**reported** 158:13
**Reporter** 5:18 265:9
**REPORTING** 1:25 5:14
  268:5,11
**reports** 14:2 17:25
  30:7 40:2 50:9,10
  51:17 52:25 69:11
  69:12,18 92:24,25
  93:2 95:2 129:23,25
  130:2,8 196:7 226:4
**repose** 221:3
**represent** 8:10 87:18
  99:14
**representative** 245:12
  251:2,4 261:3,13,20
  262:3,6,20 263:9
**representatives** 45:13
**representing** 2:11,23
  3:14,24 4:12 5:10
  240:17
**represents** 104:21

108:18
**REPSONSE** 6:20
**require** 51:24 62:19
  70:14 90:19 110:11
  110:13 180:9,9
  182:8 186:11 187:23
  190:5
**required** 58:13 75:19
  110:10 111:22 169:5
  187:25
**requirement** 56:9
  71:19 76:12 77:18
  78:25 79:13 80:18
  84:4,7 85:4 90:13
  154:3 172:11,25
  173:25 176:18
  188:18,19
**requirements** 69:13
  168:21 170:13
  192:17
**requires** 52:22 71:3
  90:8 131:19 153:25
  187:24 191:11
**requiring** 18:19 92:23
  181:13 229:5
**research** 7:23 23:18
  29:15 128:11 160:21
  162:2 207:20,23
  208:12,24 220:20
**researched** 146:20
**residential** 42:3,5,6,11
  42:17 45:11,25
**residents** 195:12
  204:11
**residue** 154:23 155:7
  155:12 156:9 157:7
  157:13
**resolve** 11:15 48:20
**resources** 73:20
**respect** 11:8 40:10
  66:22 67:5 77:18
  133:18 184:9 215:21
  223:4 234:17 235:11
  235:12 236:11
  237:22 238:5,9,10
  243:22 244:22,24
  245:12 246:4 247:3
**respirator** 58:3
**respiratory** 92:12
  194:4
**respond** 158:2 255:11
**responded** 247:5
**response** 6:23 7:3
  13:10,13,18 29:11
  36:22 230:18 233:13
  234:25 260:17
**responsible** 34:10,11
**responsive** 101:25
  244:19

Case 01-01139-AMC    Doc 22731-3    Filed 08/07/09    Page 88 of 93

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - June 5, 2009
Arthur Frank M.D., Ph.D.
Page 287

**responsiveness**
244:21
**rest** 34:10 132:7
144:13
**restriction** 185:23
189:15
**restrictions** 189:12
**restrictive** 78:6 186:5
186:8,15,24 188:12
188:23 189:4 212:12
**result** 20:21 28:3 35:9
76:5 87:15 88:15
89:22 96:10 106:7
165:21 193:4
**results** 164:9 184:18
185:3,16,21 189:11
191:10
**retrospective/prosp.**
18:18
**revealing** 205:14
**reversing** 157:3
**review** 9:23 25:8 49:16
55:12,16,25 66:9
73:11,15 81:18 82:9
94:10,12 128:2
131:2,14,25 132:6
132:10,23 133:22
134:16 135:8 136:5
136:16 150:21
151:12 160:24
172:21,23,24 175:5
180:16 182:8 189:23
195:17 201:20 206:8
209:9 220:5
**reviewed** 24:16 44:12
46:11,15 47:25
49:14 50:2 55:20
91:22 128:19 129:12
129:21,22,24 130:3
130:8 160:18 195:14
196:23 197:2,3,4
198:6,10
**reviewer** 94:10
**reviewing** 207:15
263:24
**reviews** 29:23
**revised** 140:15
**revising** 224:17
**revision** 176:3 224:4
**revisions** 224:3
**RICH** 5:5
**richterite** 81:11
**richterite/tremolite/...**
20:9
**right** 20:11 21:13
41:16 42:12 44:7,17
45:24 48:14 71:25
75:18 78:5 83:12,15
89:23 97:12 98:11

99:4 102:3 104:12
106:16 107:6 109:2
113:9 114:4 115:25
116:4,6,7 118:9,12
119:18 120:16 122:2
124:10,21 125:7,14
126:9 131:3 132:7
139:11 141:23 144:5
144:11,21 146:9
161:13 162:9,17
166:5,12 168:22
179:12 192:17
193:21 196:7,13,22
197:22 198:19,20
199:15 200:23 201:5
203:7 207:20,25
216:8,21 218:22
224:24 234:8,9,21
235:8 236:8,10
237:2,5,8 238:2
239:11,12 246:14
248:11,16 250:17
252:16 253:22
254:24 258:10
**rise** 34:24 118:13
158:6
**risk** 60:24 85:17,22
86:17 87:5,8 251:15
**Riverside** 4:18
**role** 10:18 60:16 64:12
200:2
**Roman** 141:7 143:14
143:22 144:17 168:4
168:20 169:23 170:7
191:24 192:9 195:3
**room** 126:8
**roots** 158:21
**ROSE** 1:25 5:14 268:5
268:11
**rough** 41:17
**roughly** 41:2 193:17
253:13
**rue** 182:16
**rule** 204:24
**rules** 119:2
**Ruth** 97:11

_____
                S
_____

**S** 2:17 6:10 7:1
**sarcoma** 66:7
**sat** 216:13
**satisfied** 131:3 244:18
**satisfies** 240:15,16
**saw** 23:7 94:12 219:14
219:14
**saying** 27:20,23 63:16
87:4 96:14 111:4
119:19 120:22
122:15 137:10

155:23 157:4,16
174:12 180:14
181:10 188:4 205:11
214:23 221:24
231:21 239:22
242:24 244:23
**says** 13:5 16:24 28:20
32:17 52:15 53:23
57:8,14 59:3,7 63:4
63:10,19 72:3 78:4
82:5 85:6 86:16
90:12,14 101:22
104:24 110:10
115:15 120:16
121:19 124:18,23
125:12 134:14
136:19 142:16 144:6
144:25 153:21 158:5
159:3 164:11 165:19
166:19 168:5 169:4
170:24 174:20
183:21 184:25
186:14 189:20 190:6
190:14 191:14 193:2
202:6,24 203:18,19
213:23 247:24
**scan** 44:25 194:22
**scans** 46:22 53:12
197:14 212:17
**scarring** 157:6
**scheme** 127:4,5
130:22 136:4,11,15
137:11,15,22 139:3
**school** 142:16,23
204:11
**schooled** 113:23
**science** 25:3,9 26:2,4
26:19 28:6 50:17
56:3 58:5,8,10,16
60:21 61:2 67:8,10
67:11,19 78:14,14
81:5,25 82:5 100:15
100:18,24 101:7,20
101:22 105:6 106:2
106:9,9,11 107:4,6,8
107:10,21,23,23
108:22 109:15 110:3
110:6,9 111:2
120:16,18 124:9,13
124:14,14,20,22
125:11,21 126:6,6,7
126:11,13,16,24,25
127:21 128:13,14,17
133:24 134:2,4,5,17
134:22 135:3,10,23
136:19 137:17
160:11,12 161:7
164:14 165:15,19
168:5,11 170:17

173:23 178:7 182:21
183:3,21,21 184:5
184:25 186:4,13
240:18 242:13 247:2
247:25 254:18,22
255:20 256:4,5
**sciences** 206:8
**scientific** 24:16 26:21
27:14,22 28:5 30:19
58:4,7 59:14 61:4,17
62:6,17 66:14 73:19
79:16 80:10 81:11
84:6 99:21,23 100:6
100:7,10,23 101:2,5
101:6,8,15,16,19
102:16,20,21 103:2
103:4,5,7,11,12,13
104:20,23 105:3,15
105:24 106:7,16,23
107:2,13,14,18,19
107:20 108:4,14,16
109:8,9,13,21
111:11,13,22 112:7
112:20 113:3 115:10
118:14 119:3 120:9
120:12,14 121:25
122:6,20,22,24,25
123:8,12 124:19
125:3,3,6,8,12,20
126:4,15,23 127:11
127:15,17,18,19
128:4,9 130:3
133:11,23 134:16,23
134:24 135:3,10,21
136:3,7 137:16
141:14 142:11 143:4
145:2,8,10,19
146:13 147:17 148:2
149:15 150:21
151:13 158:5,25
159:2 162:6,25
164:15 166:6 170:24
174:20 175:6 176:9
179:13 180:23
182:25 192:6 194:25
209:19 224:14 239:6
239:10,23 240:6,10
241:22,24 248:17
249:2 250:9,10
255:21 256:2,3
**scientifically** 27:4
30:8 60:8 81:6
100:13 105:22,23
108:2,12 109:6
111:4 112:10 113:4
118:6,13 128:3,3
133:14 183:16
242:14 245:18 246:8
250:10

**scientist** 61:9 105:7
124:23 125:2,13
126:17 136:7
**scientists** 28:10,18
101:10 106:5 111:6
117:15,16 118:2
119:20 120:7 124:25
134:3,17 160:17
165:24 166:2 221:23
**score** 147:14,19,23
**scores** 89:23 165:8
**screenings** 42:16
**scuba** 57:25
**SEAMANS** 3:18
**search** 147:4
**second** 13:6 33:2
142:25 156:16
158:23 201:25
202:21,21 203:3
213:6 216:19 218:24
219:24 220:10 221:7
221:10
**secondary** 188:24
**secondly** 33:11
**section** 51:14 52:18
54:25 56:15 58:14
**Security** 180:5
**see** 15:20 26:24 40:9
50:13 51:20,20,24
54:24 69:11 85:10
85:24 107:4,6
129:10 141:9 144:16
144:21 157:2 159:9
168:21 169:24
180:15 189:19 194:3
194:23 205:3 212:7
219:17,20 222:24
231:17 233:25
249:14 250:24 251:5
253:16 254:15
**seen** 11:12 17:25 23:8
26:14,16,17 31:4
33:11 34:16 39:23
40:7,21 45:15 48:5,5
48:7 51:6 53:2 56:14
92:17,17 130:12,13
130:15,16 134:5
151:24 152:13
158:10,12,13,15,16
193:8,11,12 194:8
194:12,19 199:14
221:19 222:14,15,16
232:17 241:12 254:5
257:20,21 260:18
**segregate** 34:9
**segregated** 115:13
**selected** 197:23
**self-answering** 37:14
**self-evident** 138:5

Case 01-01139-AMC    Doc 22731-3    Filed 08/07/09    Page 89 of 93

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - June 5, 2009
Arthur Frank M.D., Ph.D.
Page 288

self-fulfilling 175:14
Selikoff 18:6,9 23:17
  60:23 79:17 200:7
  206:2,22 207:6,15
  207:19 208:24 209:7
  220:19 224:9
semantic 30:18 31:23
send 189:25 219:11
senior 4:16 115:21
sense 8:21,22 91:18
  121:8 136:23 144:12
  150:16 167:21 172:8
  172:10,24 196:16
  250:20
sent 91:19 219:10
separate 149:20 209:9
separately 201:18
series 18:16 92:24,25
  93:2 111:20 118:11
  120:20 131:2 204:23
serious 31:9 32:3
  196:18 224:24
seriously 224:19
serpentine 21:8,9,11
  21:12
serve 29:15
served 9:5
set 35:6 36:7 66:14
  71:21 82:3 131:23
  136:24 164:18 178:4
  178:6 179:22 180:3
  180:4,8 181:23
sets 75:8 114:11
  231:19
setting 30:15 35:25
  63:10 79:20 81:20
  124:15
settings 20:3 29:13
  63:23 81:2 140:6
settle 10:4,23 12:2,7
settled 10:15 11:2
  21:16
settlement 48:3,19,23
  55:21
settlements 10:12
settling 10:16
seven 12:21 13:23
  35:21 44:9,10 70:5
  72:17 73:17 109:19
  110:22
seventy 86:22
seventy-six 196:24
  197:12,16,23 199:5
  211:6,24 212:9
  214:14 215:21
  216:16 218:3,4,5,6,7
  233:24 236:4 237:14
  241:12 242:17
  246:10 257:23,24

259:6 260:19 261:2
  261:6,13,16,20,23
  262:10,17,19 263:9
  263:25
severe 70:18 76:4
  80:15,15 84:14
  86:23 88:22 139:19
  141:6,8,11 143:13
  143:21 157:10
  159:18,23 160:3,6
  163:4,20,25 164:4,9
  164:17,20,24 165:2
  165:3 167:14,17
  170:7,10 172:9,17
  173:2,4,19,20
  174:23 177:3 183:10
  183:23 184:24 185:2
  187:7 188:22 213:10
  213:13 223:24
severely 144:4,9,11,23
  176:19
severity 75:15 138:23
  139:17,20,23,24
  170:19 173:7 194:20
  229:18 230:9,11
sheet 29:13 217:15
  266:10
sheets 217:20 218:2
  258:12 263:25
shield 35:4
shipyard 15:13 81:21
  249:9
short 68:4 91:8 99:7
  144:9 191:18
shorten 197:24
shorter 110:13
shorthand 123:11
  265:15
short-term 79:17
  99:25
show 15:20 43:15,23
  70:5 85:5 129:9
  189:12
showed 249:10
showing 250:15
shown 80:23 81:16
  87:24 259:5
shows 258:12
shy 8:17
side 22:10 153:11
  263:14
sign 29:24 115:20
  268:1
signature 268:5
signed 13:3 91:21
  266:15
significant 35:13
  52:16,19,20 53:18
  55:5,7 63:2 97:17,23

97:25 164:23 166:17
  167:7,24 176:11
  179:3 202:6 204:14
  211:11 229:17 230:8
significantly 95:24
  167:19
silicotics 222:13
similar 57:11 64:9
  65:11 167:10 232:17
  249:8 250:7
similarities 238:23
similarly 57:18 236:2
simple 112:25 159:19
  159:19 178:2 203:15
simpler 66:10 190:17
simplistic 112:11
simply 9:13 43:6 57:2
  64:9 86:16 123:2
  203:18 212:15
  237:23 246:6
Sinai 18:7 158:16
  200:6 205:21 206:2
  224:7
single 16:2 187:12
sir 14:10 19:17 29:11
  48:4 86:6 191:23
  264:5
sit 126:8 197:22
site 35:9
sitting 22:17 74:2
  127:13
situation 38:13 120:2
  120:7,10 122:7
situations 250:7
six 12:21 13:22 58:22
  60:17,25 62:25
  68:17 77:22,23 78:3
  78:5 79:19 80:4,17
  82:3,11,17,18,21
  83:7,10 108:7
  109:18,19 110:19
  181:25
Sixteen 258:4
sixty 87:19,23 88:3
sixty-five 84:5
sixty-one 42:18
sixty-two 199:11
size 254:16
skeen 178:25
skip 258:16
slight 221:5
slipping 128:22,23
small 17:25 46:16 66:5
  262:17
smaller 21:25
smart 138:9
smile 129:16
smiling 174:14
smoker 84:11,12

210:11
smokers 262:12,15,18
  262:19,25 263:3
smoking 60:3 161:15
  165:4 189:16 223:17
  223:21 262:23
smoothly 143:11
Social 180:5
sold 20:15
solely 133:7 156:3
somebody 38:5,15
  61:10 63:12 64:16
  82:9 83:2 117:11
  118:14 119:21 121:8
  121:9 176:25 179:3
  182:3 187:6 191:12
  213:24 215:13,16,23
  219:24 221:24
  227:15
someone's 15:5,12
  159:23
soon 178:23
sorry 13:18 90:23
  115:18 151:6 152:18
  152:23 187:20 227:5
  228:23 234:15
  255:11
sort 9:3 55:14 60:4
  109:20 204:9
sound 194:11
source 173:21
South 2:8 16:8
so-called 49:19,21
speak 58:17 107:8
  116:7 124:20 163:10
  170:5 172:4 188:13
speaker 225:4
special 115:14
specific 20:24 23:9
  43:12 54:21 66:24
  140:22 142:3,4
  146:21 147:13
  158:17,18 170:7
  174:13 178:12
  185:18 241:21
specifically 24:23
  120:23 130:7 144:10
  159:3 161:4 194:5
  233:23
specificity 56:6
  158:20
specify 193:22
spending 35:24
spends 80:22
spent 15:13 23:16
  47:6 116:22
spraying 38:16
spread 32:21
squamous 66:4

staff 206:7 215:19
Stainer 16:8
stand 208:23
standard 102:9 124:10
  125:14 128:10 135:4
  136:2 221:15 240:9
  240:15
standards 102:7
  127:24 165:11
  224:20 240:17
standpoint 58:4 66:15
  106:8
STANSBURY 3:6
  217:22
started 16:8 168:19
state 62:21 201:9
  265:4
stated 121:11 132:14
statement 17:2 22:11
  46:24 57:10 59:10
  65:10,19 74:14,24
  75:7,13 77:9,10
  86:16 87:4 90:15,19
  117:4,24 119:6
  122:14 129:14 137:5
  168:2 196:18 198:17
  204:5,6 214:16
  220:12,13 227:22
  231:18,23 232:20
  233:15,20 234:12
  238:12 242:25 246:3
  246:3,5,5 248:5
  249:25
statements 16:23
  32:11 65:11 91:23
  99:19 245:15
States 1:1 23:20 45:16
  253:17
statistically 229:17
  230:8
status 159:24
stay 232:25
steel 33:4
stenographic 197:8
step 135:5 204:20
Stockman 7:5 13:15
  13:23
stop 30:22 77:17
straight 66:10
straightforward 139:5
  203:15
stream 29:22
Street 3:8 5:6 265:13
stricken 247:10
strong 162:13,16
structurally 150:18
student 207:10
studied 18:3,5 22:6
  90:7 94:2 96:13 97:6

Case 01-01139-AMC    Doc 22731-3    Filed 08/07/09    Page 90 of 93

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - June 5, 2009
Arthur Frank M.D., Ph.D.
Page 289

135:11 146:20 147:6
149:19,23 150:24
152:22 156:11,23,25
157:11 158:22
160:17,19 163:5,14
168:14 170:16 171:8
199:14 224:6 240:2
252:8
studies 17:18,19
18:16 160:25 163:18
163:21 164:7 205:20
207:10,12,25 208:25
236:6,7,9 238:4
239:11 250:4,14
252:10,18,21 254:22
254:25 255:2,10
256:3
study 7:25 18:15,17
18:19,19 24:7,20
40:6 87:11 92:14,19
92:19,20,21 93:6,7,8
93:9,14,16,17,20
94:13,14,14,16,16
94:21 111:13,16,19
111:20 112:5,14,20
117:22 160:25 162:7
163:7,21,23,24
170:24 183:2 193:16
195:19 199:10,17
200:12 205:19
207:14 212:10 214:6
214:13 236:11
238:17 239:13,14,17
239:23 242:12,16,17
242:19,20,21 243:2
243:10,13,16 244:25
248:14,16,18,21
249:2,7 250:12
251:24 252:19 253:7
253:8 254:10 257:23
257:25 259:6
studying 116:23 161:5
161:7
stuff 126:22 132:7
subgroup 199:17
200:21
subject 110:16 116:23
130:4 158:22 159:3
159:4 160:22 171:9
171:10 184:3 208:6
246:24 247:10,16
subjective 121:15,16
185:14
submission 133:8
submit 57:18 190:5
submitting 131:3
subpleural 157:10
subsequent 79:18
subsequently 80:23

81:16
subset 20:12 41:9,11
45:10 46:16,18,18
199:12 235:17
237:14 239:2,4
245:6,8 246:9,11
substance 266:9
substantial 15:4 34:2
42:16 209:12,15,18
210:3,6,13,16,19,25
211:11 212:21
substantially 24:20
subtype 141:22 142:9
subtypes 142:20,25
succinct 204:6
sue 82:16
sued 82:15
suffer 36:5,6 86:8,10
86:19 88:22 96:5,10
97:16 260:5,9
suffering 95:4 259:25
sufficient 56:23 57:5
57:15,22 253:12
sufficiently 26:8
suggest 31:13
suggests 72:16
suing 36:17 66:25
Suite 2:18 4:18 5:6
sulcus 153:10
Sullivan 2:5 7:22
92:11
summary 7:14 25:13
26:15,16
summer 25:4
sums 50:25
supercedes 200:11
Supplemental 6:14,17
7:7 13:5,9,24
supply 190:4
support 25:10 26:22
31:20 81:5 106:12
supportable 81:6 84:6
supported 50:17
122:15,19 123:3,6,6
123:11 242:15
supporting 63:4
189:18 190:6
supportive 28:7 106:9
107:5
supposed 202:18
203:24 204:2
sure 62:13 68:16,20
125:18 132:17
136:20 137:4 140:8
148:18 149:20
151:18 156:5 162:5
163:21 164:11
165:23 180:12,13
196:8 197:22 200:8

210:24 211:22 215:5
219:8 251:19
surface 121:21
surprising 118:25
surrogate 96:16
surrounding 142:18
surveyed 24:8
survivors 88:8
Sur-Rebuttal 6:17 7:7
13:9,23
sur-sur-supplement...
196:6,9
suspect 126:20
Suzuki 206:6
sworn 8:3 57:10
synergistic 262:22
system 72:10 132:8
180:16 182:7 224:25

_____

T

T 6:10 7:1 265:2,2
266:18 267:2
table 183:19 212:3
tables 212:7
tailored 136:18 137:16
take 10:3 31:9,22
33:24 40:7 43:19
44:12,15 52:6 53:7
55:16 56:13 60:17
61:20 62:11,14
63:22 67:23,25 77:7
89:20 91:5 94:18
104:14 105:22
107:16 111:11 115:2
122:23 129:14,17
135:5 138:11,15
140:24 154:3 169:17
178:22,22,23 184:15
191:15
taken 8:13 59:8 68:4
90:13 91:8 99:7
148:24,25 149:3
191:18 224:19
265:12,15
takes 34:23 192:24
talk 61:14,16 78:11
83:7,8 111:12
117:11,16 131:16
149:21 153:15
221:20,21
talked 46:9 86:4 108:2
139:12,14 156:14
205:22 215:13,16,16
talking 19:18,25 35:18
35:19 37:4,11 78:14
85:6 88:24 98:13,13
98:14 110:17 112:18
122:4,6,7 137:24
141:23 156:15,16,17

158:17 168:3,5
184:14 187:18 194:9
212:24 247:13,18
249:20 257:17
talks 58:18 171:10
tangible 128:20
target 148:8 176:6,9
targeted 141:21
144:17,19
TDP 48:16 50:6,12,15
51:22 52:14 53:3
55:11,23 67:15,17
75:24 76:9 85:4
99:23 123:25 124:18
124:22 125:2,4,5
126:13,23 127:2,4
128:9 130:21,25
131:16,23 132:21,25
133:5,20 134:7
135:7,9 137:25
138:20 140:3,3,14
140:25,25 143:14,18
144:7 168:20 169:23
172:5,18,24 184:16
190:18 191:24 192:2
192:9 195:3
TDPs 131:23 133:12
140:10
technical 26:21
TELEPHONE 4:3 5:3
tell 8:16 43:13 56:12
76:3 86:12,14 88:6
97:6 125:11 126:25
132:25 154:17
158:18 165:19
166:19 168:10
169:18,19 186:21,22
186:23 188:9,10
189:13,17 193:9
194:8 198:16 207:16
210:21 222:19,22
223:11,12 231:9,11
231:12 238:4 248:21
254:4 255:25
telling 74:8 173:15
241:23
tells 124:10 126:11,16
128:14 179:18 183:3
256:10 263:5
ten 15:13 19:16 21:6
235:18,19
tenable 60:8
tend 55:13 96:17
97:16 128:20 154:21
168:7 194:19
tenth 221:10
term 19:20 30:16
41:24 42:2 54:22
55:16 60:15 115:12

118:22 119:12,13
141:21 142:13 143:8
145:16 146:21 147:6
151:23,24 152:14
153:5 157:18 159:22
164:17,21 209:16,19
210:25 211:2
terminology 149:24
150:24
terms 55:13 61:15,19
67:11 95:15 98:9
101:4,13 117:11
120:20 149:21
159:15,23 167:11,19
193:5,25 220:4
255:8
test 89:23 102:21
105:22,23 109:7,25
121:3,10,13 122:10
122:11,18 126:15
165:8 177:4 179:5
187:13 199:19 201:2
201:2,7 202:25
203:2 209:24,25
241:22 242:3 246:16
246:20 250:8,13
tested 245:14
testified 8:4 14:11
15:19,24 21:2,21
114:13 130:9,15
209:20,21 219:7
260:16 263:22
testifies 17:14
testify 27:25 230:18
254:17
testifying 150:20,23
testimony 47:8 99:18
102:14,15 130:8,14
156:7 233:13 234:25
247:10 265:11,14,18
testing 173:10 187:5
tests 46:15 47:2 84:18
102:6,9 165:10
Texas 5:7
Thank 109:4 114:21
138:16 151:14
their's 130:16
theoretically 52:9
154:22
thereabouts 29:8
42:23
THEREFOR 266:20
267:4
thickening 31:17
43:25 70:18 72:6
90:11,18 96:20,21
97:3,5,16,18 98:5,7
98:25 145:22 146:15
147:5,10,11,18,25

Case 01-01139-AMC    Doc 22731-3    Filed 08/07/09    Page 91 of 93

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - June 5, 2009
Arthur Frank M.D., Ph.D.
Page 290

148:7,11,12 149:16
149:17 150:2,3,14
150:19 151:9,10,16
151:21 152:3,11
153:22,25 154:7,13
154:21 155:2,11,12
155:24 156:7 157:24
159:5,18 160:3,16
161:3,11,18,19
162:11,18 163:3,19
164:8 165:16,20
166:3,8,21 167:6
168:12 172:10
173:21,22 174:6,7
174:10,21 175:2,8
175:19,22,23 176:7
176:11,14,21 177:2
179:10,11,15,19
180:21 181:3,11
183:11,13,18,24
184:11 186:2,5,11
186:15,19 192:7,15
193:6 194:5 212:2,6
212:11 221:21 222:2
229:5,8,13,22 230:2
232:6 251:10 252:3
**thickness** 168:22
170:2,18 172:2
192:16
**thing** 15:10 36:16 38:3
38:7,25 52:6 76:15
82:24 84:15 100:11
107:19 139:24 140:9
170:22 216:3 220:22
230:4 235:15
**things** 31:25,25 32:5
59:21,23 84:17
100:17,22 106:18
107:10 108:2 109:21
118:12,17 125:19
131:17 134:3,3,4
139:8 150:6,7
158:16 164:11 182:2
183:17 189:15 190:3
190:11 191:11 198:2
206:10 245:8
**think** 15:25 22:6,18
26:16,16 27:7,8,20
27:22 30:9,18 32:15
41:3 47:15 49:12
50:10,25 52:2,22
53:11 55:7 56:4,5
57:2 65:16 68:22
70:3 73:2 78:25 79:3
82:20 84:2 89:11
100:25 101:18,18
102:24 103:14
104:16 111:25
116:16 127:7 128:13

131:9 132:9 133:15
133:15 134:12
136:21 137:8,21
139:15 141:5,19
148:12 149:2 169:24
171:13 173:3 178:15
181:7 196:10 199:11
205:15 217:2,3
220:13,14,15 221:9
221:18,22,25 224:21
242:4 244:4 254:5
255:12 258:6 264:2
**thinking** 98:22
**third** 13:8 60:10 139:6
158:23 258:16
**Thirteen** 91:15
**thirty** 32:25 47:3,16
238:19 239:2
**thirty-one** 44:19
**Thomas** 2:18
**thought** 62:2 137:7
142:16 148:18
156:22 198:24
211:19
**thousand** 39:6 43:8
129:7 148:23 149:2
149:3
**thousands** 114:2
129:5 130:5
**three** 12:20 65:14
83:17 109:20 181:24
202:10 219:20 254:5
**threshold** 77:15 79:4,6
80:6,21
**throwing** 157:18
**tied** 183:17
**time** 14:11,11,13,13
18:20 23:8,17 27:6
30:3,4 35:24 41:9
47:5 49:23 54:13,22
56:6,17 58:2,13,18
58:20 68:5 71:12
77:11,13,15,18
79:10 91:9 92:21
94:15,16,23 99:8
112:16 129:10
145:20,23,25 146:8
147:3 158:23 162:6
169:11 177:11 188:4
191:19 225:2 234:15
236:7 250:16 251:3
**times** 8:13 28:3,14,15
28:19 114:14 209:10
209:14,15,20,21
256:11
**tissue** 51:12 152:4,7
206:9 208:17
**tissues** 207:11
**title** 144:25

**today** 31:9 147:17,24
163:9 227:15 230:24
**told** 128:8,11,12
178:16 216:3 231:7
239:9
**topic** 115:7
**tops** 47:18
**total** 84:2 217:18
**totality** 203:10
**totally** 68:23,24
**Towers** 33:5
**town** 247:15
**toxic** 21:8 24:10 27:5
**track** 114:14
**trade** 32:18 33:5
**trained** 23:16 200:6
204:12,13 220:19
**training** 118:11 204:10
204:11
**transcript** 247:20
268:3
**transcription** 265:18
266:6
**transfer** 54:11
**trauma** 70:15,19
154:22
**treatment** 61:25 67:5
176:6
**tremolite** 16:15,18,22
16:24 17:6,16 81:10
**tremolite/winchite/ri...**
19:22
**trips** 194:9
**true** 64:17 78:9 96:12
105:20 118:10
129:20 137:25 140:8
145:7 146:13 149:14
159:17 160:14 161:5
162:10,18,25 170:22
171:15 172:2 176:17
179:17 183:20 184:9
184:22 186:16
187:10 204:7 220:7
220:14 231:18,21
233:21 254:24 261:2
265:17
**trust** 7:16 9:23,24
10:17 48:2,9,18,18
48:25 49:15 73:20
73:24 124:2,6,11
**truth** 107:11
**truthful** 32:12
**try** 8:17 108:24 138:6
218:14
**trying** 47:15 59:25
89:12 103:18 104:3
104:5 134:13 160:10
172:9 183:5
**turn** 90:15 195:13

248:13
**turned** 130:18
**turns** 261:16,23
**twenty** 18:19 38:21
47:16 67:24 97:2,13
193:17 235:17
**twenty-five** 47:2,3
**twenty-four** 35:21
52:13,15 69:9
**twenty-seven** 52:13
**twenty-six** 76:9 141:5
**twice** 135:14
**two** 12:20 13:4 26:24
32:18,20 54:2 64:8
66:16 68:16,19 70:4
76:19 83:15,18
85:12 110:12 120:7
143:2 150:10,13
155:6 157:4 183:11
183:17 202:8 210:6
219:20 246:7,7
261:7,8
**type** 26:10 36:9,13
37:8,10 65:22 66:6
112:19 138:22 139:4
139:5,6,16 141:13
141:15,16,22 142:8
150:8 261:19
**types** 15:6,23 16:2
23:21,22 27:13
34:25 65:13,14
66:23 143:3 150:13
**typically** 97:3 201:24
219:9
**typing** 265:16

**U**

**UICC** 16:20
**ultimate** 200:13 211:3
211:17
**ultimately** 49:23
104:25 201:7 211:21
211:23 226:11
236:23 250:3
**unbalanced** 112:2
**unclear** 88:23 100:14
166:10 233:4
**underlining** 199:6
201:12
**underlying** 202:13,15
204:19
**underpay** 136:12,17
137:12
**underpayment** 136:22
**underpinning** 127:19
**underpinnings** 125:3
**understand** 8:15 14:6
19:24 20:13 34:21
40:9 50:10 55:10,14

55:18,22,24 56:11
56:14 58:19 68:17
69:9 72:2 73:7 100:8
105:6 130:25 131:22
131:24 132:24
135:18 151:23
153:23 154:9 159:12
162:5 164:2 165:23
172:14 174:12
179:12,24 192:20
195:11,24 196:22
201:20 207:5 214:15
226:8
**understanding** 8:18
20:18 23:19 26:13
33:14 40:25 55:25
73:14 130:23 131:10
132:4,5,19,20
140:12,13,14 151:2
170:6 198:3 211:9
211:12 224:22 254:9
**understood** 201:8
**undoubtedly** 222:14
**unequal** 67:4
**unexpanded** 54:7
**unfair** 49:20 66:19
67:18
**unfairness** 66:20,22
**unilateral** 70:13,18,21
72:18 73:4,10,18
154:22 184:10
**unilaterally** 70:7
**United** 1:1 23:20 45:16
253:16
**unpredictable** 167:5
**unprocessed** 40:4
**unqualified** 220:17
**unreasonable** 11:7,12
28:24 50:16,18
60:19 62:15,24 63:2
63:4 67:18 74:2,5,7
74:8,10 79:2,3,9,14
80:11,19,21 82:4,6
105:9 108:3,13
109:6 110:22 111:4
112:10,23 113:5
242:15
**unrelated** 201:17
**unsettled** 27:8
**unsubstantiated**
24:17
**unsupported** 31:18
109:15
**unsupportive** 30:8
**untrained** 56:3
**unusual** 16:3
**Update** 23:6 92:13
**updated** 24:20 196:2,4
**upper** 61:23

Case 01-01139-AMC    Doc 22731-3    Filed 08/07/09    Page 92 of 93

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - June 5, 2009
Arthur Frank M.D., Ph.D.
Page 291

**up-to-date** 88:2
**use** 20:2 28:10 41:24
  54:11 55:13 58:7,8
  69:19 72:8,11 79:22
  101:3,8,20 105:15
  108:12 109:17
  113:16 115:12
  118:22 119:11,12,14
  119:20 124:10
  125:14 128:5 141:21
  143:8,9 146:21
  149:23 159:22 173:9
  173:10 174:6,8
  176:9 180:2 182:5
  182:17 200:14
  207:12 210:16,24
  221:15 222:7
**usually** 96:15 99:22
  178:19 202:3,5,23
  206:4
**utilized** 8:25 124:15
**utterly** 244:18
**U.S** 45:4

**V**

**vague** 8:21,22 54:19
  59:10 175:12 176:23
**valid** 26:8
**value** 61:15 93:11
  104:9,13,21,22
  105:4,5,19 106:8
  115:15
**values** 61:19
**variety** 35:15 37:21,21
  140:10
**various** 9:4 10:23 11:8
  11:12 37:6 49:22
  95:17 146:23 194:9
  196:5
**vary** 11:2 79:8 86:2
  121:7
**varying** 142:10
**vast** 62:20 72:21 82:13
  204:20
**vastly** 124:17
**vehicle** 48:24
**vein** 64:9
**verbiage** 244:8,9
**verify** 254:11
**Vermiculate** 32:22
  92:12
**vermiculite** 19:23
  20:10,21 32:19
  33:23 36:11 40:5
  42:8 54:7,10 59:17
  60:14
**versus** 23:22,25 96:19
  150:3 151:10 189:4
  193:13 194:7 259:11

262:12,15
**view** 15:8 16:5 21:7,19
  23:14 24:3 27:3,7
  28:8 29:17 30:5,18
  30:21 31:17,18 32:4
  33:24 57:13 60:17
  63:22 65:2 66:23
  67:18 77:7 80:13
  86:3 90:17 101:3
  103:4 107:12 112:6
  115:9,10 117:16
**viewed** 106:11
**views** 21:15 30:2
  31:14 111:10 112:19
  112:23,25 133:19
**Virginia** 4:19
**virtue** 144:22 160:15
**viscera** 222:21
**visceral** 148:16 149:8
  149:18,22 150:5,19
  151:11 152:16 153:2
  159:11 223:6
**VITAE** 7:10
**vital** 184:17 185:3,21
  186:16 188:10
  189:11 191:9,10
**voice** 103:25
**volume** 133:21 176:6
  187:18
**volumes** 132:21 175:5

**W**

**wait** 13:17 197:25
  226:17 240:8
**wall** 149:7 153:11
**want** 15:20 20:6 41:23
  51:10 63:20 66:14
  66:17 102:5,6
  103:22 105:15
  129:16,17,24 130:7
  133:4,9 134:8,9,10
  134:14,25 136:3,23
  137:10,13 156:5
  157:25 159:22
  161:17 164:14 169:8
  169:20 173:2,13,15
  174:13,17,21,22,22
  175:3,5 176:8,9,15
  177:22,23,25 178:4
  178:23,24 179:5,6
  179:13,22 180:8,11
  180:13 181:12 182:2
  182:5,6,18 183:9,13
  183:15 184:14,23
  185:8 192:2 196:14
  201:19 216:6 221:15
  222:11 232:22
  233:11,22 240:8
  241:7 242:10 244:21

246:22 250:8 255:25
  263:15
**wanted** 91:20 179:8,8
  182:13 187:22
  208:11,12 223:15
**wants** 28:7 119:11
  173:17,18 178:22
**Washington** 2:19 3:9
  3:21 30:14
**wasn't** 98:6 241:15
**way** 15:24 25:7,8 28:6
  32:16 35:24 40:12
  55:23 60:5,12 72:13
  80:20 81:6 85:25
  94:6 112:11,12
  120:18 123:17
  126:19,20 129:17
  132:12 133:23
  134:25 141:23
  156:24 163:6 170:8
  174:17,19 179:14
  180:14 185:4,9
  199:16 200:5 203:8
  203:9 204:8 208:6
  209:7 217:8 241:11
  241:25
**ways** 21:17 28:11
  51:22 59:11 74:7
  81:13 100:16 101:10
  110:21 115:19 118:4
  134:11 203:4 224:25
**weak** 24:17 26:23
**website** 32:12,14,17
**week** 35:21 59:3
**Welch** 6:21 7:21 13:12
  29:2 31:3 39:25
  53:10 91:16 113:12
  114:22 115:25 119:8
  119:10,22 218:19
  264:3,6
**Welch's** 30:21 85:8
  169:2 174:6
**well-established**
  120:15 146:19
  223:21
**well-known** 81:9
**well-recognized**
  147:16 206:11
**Welsh** 80:12
**went** 33:15 42:22
  124:5 138:25 145:2
  145:7 146:23
**weren't** 94:3 140:18
  140:23,24 206:11
**we'll** 53:11 136:2
  147:23 169:17
  178:21,22 182:19
  184:15 191:15
  192:21 197:25

218:14 237:11
**we're** 31:8 35:19 37:4
  60:15 78:11 88:24
  98:12 100:21 112:18
  126:9 133:17 134:12
  156:5 160:9 168:3,5
  181:19 187:18
  190:17 226:19 244:7
**we've** 67:23 134:4
  158:15 188:12
  241:12 252:8 256:10
  258:4
**whatsoever** 242:22
**whip** 81:10
**Whitehouse** 6:21,24
  7:4,8 13:11,14,19,25
  27:25 28:13 44:20
  44:22 48:8 51:7
  85:13,14 87:10
  130:16 195:14
  197:25 209:6 211:3
  211:22 213:25 214:2
  214:8 215:2,24,25
  216:11,15 218:15,16
  219:22 244:23
  246:23,25 247:24
  248:7 254:3 260:21
  261:25 264:7
**Whitehouse's** 28:13
  40:21 44:7,12 50:9
  53:2 69:12 93:6 94:3
  95:2 214:17 231:10
  231:22 253:4 263:7
**wide** 35:17
**widely** 16:16
**wider** 37:21
**width** 170:21
**William** 17:9 23:11
**winchite** 54:6,9 81:10
**wit** 10:9
**withdraw** 85:7 89:9
  241:2
**withdrawn** 89:18
**witness** 6:2 31:2 33:10
  53:17 54:21 57:2
  58:17 62:10 69:20
  71:13 89:2,11,15
  99:5 100:15 102:24
  103:22 116:9 123:17
  129:2 131:7 148:22
  166:12 175:13
  176:24 177:12
  178:22 181:22
  188:21 190:14 226:7
  228:6,17 229:16
  230:6,18 236:18
  244:12 248:6 249:7
  253:4,11,25 264:15
  264:17,21 265:19

268:4
**witnesses** 113:19
**woefully** 207:16
**women** 129:11
**word** 116:7 143:9
  224:13
**words** 102:17 103:10
  108:12 109:12
  113:15,20 123:10
  202:8
**work** 9:10,11 10:18
  18:20 20:7,7 24:15
  24:24 25:11 26:8
  27:8 29:14 31:5
  35:13 42:8 44:13
  64:2,5 81:20 84:20
  120:18 205:14
  207:18,19
**workday** 35:20
**worked** 17:20,24
  33:17,17,21,21
  40:17 57:14 95:23
  195:10
**workers** 18:12 29:16
  43:5,7 49:7 69:2
  94:19,19,22 193:20
  193:22,24 249:9
**working** 15:8,13 23:17
  24:6,19 35:9,10,14
  35:16,23 59:16
  165:5 207:14
**works** 38:16 51:22
  55:23 99:25 136:4
  247:18
**world** 33:5 209:10
  247:18
**worrying** 136:21
**worse** 229:18,19
**worth** 9:4
**wouldn't** 11:5 17:5,16
  20:25 30:20 31:13
  60:15 61:24 64:13
  64:16 86:20 87:17
  87:22 88:13 89:24
  119:15 132:7 151:20
  172:8,10 173:11,22
  191:8 192:16 208:16
  213:2,4,11,14 223:3
  223:23 238:12
  241:10
**wound** 70:19,20
**wreck** 104:6
**write** 9:13 21:7 44:16
  63:12 66:3 85:12
  206:2
**writes** 44:23
**writing** 47:7 94:8
**written** 52:25 64:5
  90:21 194:24 200:11
**wrong** 120:17 198:16

Case 01-01139-AMC    Doc 22731-3    Filed 08/07/09    Page 93 of 93

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - June 5, 2009
Arthur Frank M.D., Ph.D.
Page 292

198:16
**wrote** 66:11 91:19
**W.R** 1:7 4:17 8:11
  47:25 82:16 99:14

---

**X**

**X** 6:1,10 7:1,1
**x-ray** 43:10,23 44:25
  76:13,14,16 87:24
  90:10 96:17 167:17
  187:7 194:21 221:7
  221:11 222:22
**x-rays** 42:22 46:10,22
  47:6 187:15 188:6
  197:14 211:15
  212:16,17 216:14,16
  218:17,24 219:9,11
  219:14,18 220:8,10
  220:18,21 221:14
  222:12,15,16 223:4
**X-times** 27:16

---

**Y**

**year** 47:6,10,15 79:12
  83:14 180:7 196:2
  198:5 219:21
**years** 10:25 15:13
  18:20 23:8 29:14
  38:18,21 42:15 55:5
  55:7 58:23 68:21
  79:2,25 80:2 83:9,16
  83:18,18 110:7,13
  116:22 130:4 140:4
  140:11 145:10 215:6
  219:12 220:19
  235:16 236:7 238:20
  239:2 253:14 256:7
**York** 5:16,16 33:6
  63:25 268:12,12
**young** 146:8

---

**Z**

**Zenker** 145:14
**zero** 72:4
**Zonolite** 32:17,24
**Zurich** 3:24

---

**#**

**#200** 4:8

---

**0**

**01-1139** 1:10

---

**1**

**1** 52:16 62:14 65:22
  265:17
**1,500** 85:15
**1,800** 44:23 45:7,22

46:3,15,18,21 86:5,7
87:13,23 94:24 95:7
225:16,20 226:13
228:17 231:3,4,12
231:19,24 232:11,25
233:2,12 235:6,12
236:3 237:5,13,15
237:19 238:23
239:13,15,23,25,25
240:2,11,16 241:13
242:2,21,22 243:2,3
244:22 246:11
248:15 250:12,19,23
250:25 255:19
257:13 258:12,17,21
259:4,9,24,25 260:4
260:7,22 261:3,6,14
261:19 262:2,7,14
262:18,20,24 263:10
**1-800-825-3341** 1:25
  268:12
**10,000** 253:14
**10011** 5:16 268:12
**11** 1:4
**11/14/08** 7:12
**1100** 2:18
**12** 6:12,15,18,21,25
  7:5,8 13:8
**12th** 3:20
**12:30** 169:11
**123** 93:6 95:11
**125** 46:12,20
**14** 13:10,12,16,22
  25:22
**14th** 44:8
**1401** 5:6
**145** 4:8
**15** 265:25
**150** 46:23
**17,000** 237:22 238:24
**17,800** 235:15 237:20
**1747** 3:20
**1801** 265:12
**186** 257:22
**1867** 145:13
**1950** 94:19
**1955** 94:20
**1960** 94:20
**1970's** 145:24 146:15
  146:18
**1986** 23:5
**1988** 16:19
**1991** 97:11 98:21
  229:2

---

**2**

**2** 65:18
**2:50** 264:22
**20,000** 16:21

**2000** 43:9,14 90:4
  176:3 224:3
**20005** 2:19 3:9
**20006** 3:21
**2002** 24:7 49:23
**2003** 24:19
**2004** 7:25 74:13,24
  75:12 76:3 85:13
  90:15 93:7 94:4
  95:11
**2006** 49:23
**2007** 24:20 29:8 92:11
**2008** 13:3,4 21:7 24:21
  25:4,22 94:6 253:4
  256:13
**2009** 1:15 13:8,10,12
  13:12,21,22 44:13
  44:20 265:14 266:15
**2012** 265:25
**20176** 4:19
**202** 2:20 3:10,22
**214** 5:8
**22** 7:10
**225** 6:7
**229** 6:6
**23rd** 13:4
**25** 7:12
**256** 7:25
**257** 6:5
**261** 265:17
**263** 6:8

---

**3**

**3** 51:14 53:8,20 56:15
  58:14
**300** 4:18
**39** 7:14

---

**4**

**4/6/09** 13:15
**406** 2:10 4:10
**44084** 4:18
**4620** 5:6
**47** 7:17

---

**5**

**5** 1:15 265:14
**5.7** 51:14 53:8,20
  56:15 58:14
**500** 28:19
**59901** 2:9 4:9

---

**6**

**6,800** 42:23
**655** 3:8
**659-6619** 3:22

---

**7**

**70's** 206:10
**703** 4:20
**707** 90:17
**729-8543** 4:20
**74** 7:19
**744-5100** 5:8
**745** 2:8
**751-6000** 4:10
**752-5566** 2:10
**75202** 5:7

---

**8**

**8** 6:5
**80** 5:15 268:11
**800** 95:12
**800-825-3341** 5:17
**850** 258:18
**862-5000** 2:20
**879-5108** 3:10

---

**9**

**9,300** 41:2
**9,500** 40:24 41:12,18
  42:12 45:10,23
**9,521** 258:5
**900** 250:19,20 251:3
**91** 7:21
**92** 7:22
**950** 258:18
**98** 6:6 7:24