# EXHIBIT J

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W.R. GRACE & CO., et al., | ) | Case No. 01-01139 (JKF) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |

VIDEOTAPED DEPOSITION OF TERRY M. SPEAR, Ph.D.

Taken at:

Nordhagen Court Reporting

1734 Harrison Avenue

Butte, Montana

July 29, 2009

8:35 a.m.

2

1  APPEARANCES OF COUNSEL:
2
3  FOR THE DEBTOR:
4      BRIAN THOMAS STANSBURY
5      Attorney at Law
6      Kirkland & Ellis LLP
7      655 Fifteenth Street, NW
8      Washington, D.C. 20005
9
10
11  FOR THE LIBBY CLAIMAINTS:
12      TOM L. LEWIS
13      Attorney at Law
14      Lewis, Slovak & Kovacich, PC
15      P.O. Box 2325
16      Great Falls, Montana  59403-2325
17
18
19  FOR THE ASBESTOS CLAIMANTS COMMITTEE:
20      (Telphonically)
21      BERNARD S. BAILOR
22      Attorney at Law
23      Caplin & Drysdale, Chtd.
24      One Thomas Circle, NW
25      Washington, DC  20005

3

1  APPEARANCES (Continued):
2
3  FOR THE PD FCR:
4      (Telephonically)
5      ALAN B. RICH
6      Attorney at Law
7      Alan Rich Law
8      Elm Place
9      1401 Elm Street, Suite 4620
10      Dallas, Texas  75201
11
12
13  FOR THE PI FCR:
14      (Telephonically)
15      KATHLEEN A. ORR
16      Attorney at Law
17      Orrick Herrington & Sutcliffe, LLP
18      Columbia Center
19      1152 15th Street, N.W.
20      Washington, DC  20005
21
22
23
24
25

4

1  APPEARANCES (Continued):
2
3  FOR THE PI FCR:
4      (Telephonically)
5      GABRIELLA V. CELLAROSI
6      Attorney at Law
7      Eckert Seamans Cherin & Mellott, LLC
8      1747 Pennsylvania Avenue, N.W. - Suite 1200
9      Washington, DC 20006-4604
10
11
12  FOR MARYLAND CASUALTY:
13      (Telephonically)
14      JEFFREY C. WISLER
15      Attorney at Law
16      Connolly Bove Lodge & Hutz LLP
17      The Nemours Building
18      1107 North Orange Street
19      Wilmington, Delaware  19899
20
21
22  Also Present:
23      MORGAN ROHRHOFER, Case Assistant
24      VIDEOGRAPHER:  John Nordhagen
25

5

1          I N D E X
2  Witness:                        Page:
3      TERRY M. SPEAR, Ph.D.
4      Examination by Mr. Stansbury . . .    8
5      Examination by Mr. Lewis  . . . .  210
6      Examination by Mr. Stansbury . . .  214
7
8      Videotape No. 1 . . . . . . . .    6
9      Videotape No. 2 . . . . . . . .   66
10      Videotape No. 3 . . . . . . . .  130
11      Videotape No. 4 . . . . . . . .  197
12
13
14          E X H I B I T S
15  NO. PAGE  DESCRIPTION
16   1   66   May 2008 Curriculum Vitae
17   2   67   June 2009 Curriculum Vitae
18   3   74   "Trees as reservoirs" - Spear co-author
19   4   77   Firewood Harvesting Simulations article
20   5   77   Fate of Libby Amphibole Fibers article
21   6   87   Spear Expert Report
22   7  131   Morbidity/Mortality of Vermiculite Miners
23
24
25

2 (Pages 2 to 5)

6

1          TERRY M. SPEAR, Ph.D.
2     WEDNESDAY, JULY 29, 20 09; BUTTE, MONTANA
3               - - -
4          BE IT REMEMBERED THAT, pursuant to notice, the
5    deposition of Terry M. Spear, Ph.D., was taken at the time
6    and place and with the appearances of counsel hereinbefore
7    noted before Candice L. Nordhagen, Registered Professional
8    Reporter and Notary Public for the State of Montana.
9          `
10   The following proceedings were had:
11
12          VIDEOGRAPHER:  The time is 8:32.  We're on the
13   record.
14          This is the videotaped deposition of Dr. Terry
15   Spear, taken by the co-counsel for Debtors and
16   Debtors-in-Possession.
17          This is Case No. 01-01139 (JFK); In re:  W.R.
18   GRACE & CO., et al., Debtors.
19          This deposition is being taken on July 29,
20   2009, at Nordhagen Court Reporting; 1734 Harrison Avenue;
21   Butte, Montana.
22          The court reporter is Candi Nordhagen.
23          The videographer is John Nordhagen.
24          Counsel will now introduce themselves, after
25   which the court reporter will swear in the witness.

7

1          MR. STANSBURY:  Brian Stansbury of Kirkland &
2    Ellis for W.R. Grace.
3          MR. LEWIS:  Tom Lewis, for the Libby
4    claimants.
5          Anybody on line?
6          MR. BAYLOR:  Okay.  Bernard Baylor, for the
7    Asbestos Claimants Committee.
8          MR. RICH:  Alan Rich is on the line for the
9    Property Damage FCR.  And if you take down my e-mail, I
10   will e-mail you back my full contact information.
11          It's Alan, A-L-A-N @ alanrich - R-I-C-H - law
12   - L-A-W - dotcom.
13          MS. ORR:  This is Kate Orr for the Personal
14   Injury FCR.
15          MS. CELLAROSI:  Gabriella Cellarosi for
16   Maryland Casualty.
17          MR. STANSBURY:  Anybody --
18          MR. WISLER:  Jeffrey Wisler, for Maryland
19   Casualty.
20          MR. STANSBURY:  Anybody else?  Going once.
21
22          TERRY M. SPEAR, Ph.D.,
23   having been called as a witness by the
24   Debtor, being first duly sworn, was
25   examined and testified as follows:

8

1              EXAMINATION
2    BY MR. STANSBURY:
3     Q.   Good morning.
4     A.   Good morning.
5     Q.   Would you please introduce yourself for the
6    record.
7     A.   My name is Terry Spear.
8     Q.   My name is Brian Stansbury and I represent
9    W.R. Grace in this bankruptcy proceeding.
10         You are a doctor, correct?
11    A.   Yes.
12    Q.   What is your degree in?
13    A.   Industrial hygiene.
14    Q.   Okay.  And where do you currently work?
15    A.   At Montana Tech of the University of Montana.
16    Q.   Now, Dr. Spear, you've had your deposition
17   taken before, correct?
18    A.   Yes.
19    Q.   About how many times?
20    A.   I don't know.  Quite a few; I don't have that
21   number.
22    Q.   More than 30?
23    A.   Probably.
24    Q.   Less than a hundred?
25    A.   Probably.

9

1     Q.   Somewhere in the 50-or-so range?
2     A.   I would guess.
3     Q.   Okay.  So you're familiar with the process,
4    then.
5     A.   Yes.
6     Q.   All right.  I'm just going to go over a couple
7    issues.  And if you have any questions, just let me know.
8    First, I would ask that when responding, you do so in a
9    "yes", "no", or audible manner, as opposed to nodding your
10   head or saying "um-hmm", just so we keep the record clean.
11   Is that fair?
12    A.   Yes.
13    Q.   Also, I will strive at all times not to speak
14   over you; and hopefully, we can avoid you speaking over
15   me, again, for the benefit of the court reporter to keep
16   the record clear.  Is that fair?
17    A.   That's fair.
18    Q.   Okay.  Are you under any medication today that
19   would inhibit your ability to answer questions truthfully,
20   honestly, and completely?
21    A.   No.
22    Q.   Okay.  And unless stated otherwise, I'm going
23   to presume that you understood my questions.  If at any
24   point I ask a question that for whatever reason you don't
25   understand, please let me know so I can rephrase it or we

10

1  can ensure that we're on the same page. Is that fair?
2      A. That's fair.
3      Q. Okay. You say you're at Montana Tech at the
4  University of Montana?
5      A. Yes.
6      Q. And what is your title?
7      A. My title is professor and department head.
8      Q. And that's the -- what is the actual, what is
9  the department?
10      A. The department is the Safety, Health and
11  Industrial Hygiene Department.
12      Q. Okay. And how long have you worked there?
13      A. I have been at Montana Tech for 26 years, I
14  think.
15      Q. Uninterrupted?
16      A. For the most part. Yeah, I haven't had any
17  other employment with other companies.
18      Q. Okay. What is your educational background?
19      A. My, from -- well, my educational background is
20  a bachelor's degree in microbiology from the University of
21  Montana.
22      Q. Is that in Missoula?
23      A. Yes.
24      Q. Okay.
25      A. And then a master's of science degree in

11

1  industrial hygiene from the University of Minnesota, and
2  then a Ph.D. in industrial hygiene from the University of
3  Minnesota.
4      Q. When did you get your Ph.D. from the
5  University of Minnesota?
6      A. It was awarded in 1996, I believe.
7      Q. Okay. And was that -- were you still working
8  at Montana Tech at the time?
9      A. Yes.
10      Q. Were you alternating between going to classes
11  at the University of Minnesota and coming back to Montana
12  Tech, or what was the arrangement?
13      A. I did take a leave of absence, I believe it
14  was in the late '80s, and went back to Minnesota and took
15  classes. And then I -- there were other trips back and
16  forth to Minnesota from Montana Tech, not any extended
17  trips, but basically traveled back and forth to do
18  examinations and such.
19      Q. Now, at Montana Tech, are you teaching courses
20  right now?
21      A. Yes.
22      Q. What courses do you teach?
23      A. Oh, I, over the years, I've taught many
24  different courses. Now I primarily teach courses in
25  respiratory protection, courses in sampling strategy,

12

1  small particle technology.
2      Q. Okay.
3      A. I think those are the main ones.
4      Q. Let me just, let me unpack this a bit just so
5  I'm clear. We're in the summer right now. So let's say
6  last spring, which courses did you teach?
7      A. Last spring I taught respiratory protection
8  and I believe it was sampling strategies.
9      Q. Okay. Let's talk about respiratory
10  protection. Could you briefly describe what that class
11  entails?
12      A. It entails providing -- teaching the students
13  how to develop a respiratory protection program, going
14  through the different types of respirators, fit testing of
15  workers who are to wear respirators, training in
16  respiratory protection.
17      Q. And in the course of that class, is there any
18  point in that class when you deal with, for example,
19  asbestos in particular?
20      A. Yes.
21      Q. How prevalent was that, was asbestos, in the
22  discussion in your class?
23      A. Well, since I do a lot of work in asbestos, I
24  make sure that I cover the topic with the students. And I
25  mean it certainly isn't the focus of the class, but we

13

1  talk about respiratory protection where asbestos is
2  concerned.
3      Q. Okay. And you said "tree samplings"? Was
4  that the other --
5      A. Pardon me?
6      Q. What was the other course you said?
7      A. Sampling strategies.
8      Q. Oh, sampling strategies, I'm sorry, I
9  misunderstood. Sampling strategies, and what is that?
10      A. That's a course involving designing sampling
11  strategies for contaminants in the workplace.
12      Q. And by that, you mean, for example, taking air
13  samples?
14      A. Well, yeah. It's not an instrument course.
15  You know, that's covered in the sampling course, a
16  different course. But it's mainly how do we assure that
17  we're collecting representative samples, defining exposure
18  groups, and things pertaining to that.
19      Q. Do you teach graduate or undergraduate
20  students?
21      A. Those two classes are graduate classes.
22      Q. Okay. Now, other than your coursework at
23  Montana Tech, what other work have you done in the past
24  ten years related to asbestos in particular?
25      A. Other than -- what was the first part of your

14

1  question?
2     Q.  Teaching at Montana Tech.  You mentioned
3  respiratory protection, a course which, you know, relates
4  to asbestos exposure.  Other than -- and I guess what I'm
5  really trying to get to is:  Beyond your role as an
6  educator, what work have you done in the last ten years
7  related to asbestos?
8     A.  Well, we've been doing research pertaining to
9  asbestos for longer than ten years, since about 2003;
10 consulting work pertaining to asbestos.
11    Q.  Okay.  Now, let's look at the -- if I read --
12 it would be research work and consulting work.  Let's
13 start with the research work.  Now, what research projects
14 have you worked on related to asbestos?
15    A.  The research has involved evaluating asbestos
16 exposure pathways associated with the amphibole asbestos
17 in Libby, and then also doing research pertaining to
18 vermiculite or other asbestos-containing materials within
19 homes.
20    Q.  And by vermiculite in homes, are you referring
21 to vermiculite attic insulation?
22    A.  Yes.
23    Q.  Any other type of vermiculite product in the
24 home that was studied?
25    A.  No, it was primarily vermiculite attic

15

1  insulation -- or is primarily vermiculite attic
2  insulation; wall, some wall insulation.
3     Q.  Oh, vermiculite attic insulation that was put
4  in the walls.  Is that what --
5     A.  Yes.
6     Q.  Okay.  So the asbestos pathways in Libby,
7  which pathways have you studied?
8     A.  We've been looking primarily at the dispersion
9  of asbestos from the mine site into the forest beyond
10 Libby and into the town of Libby and along transportation
11 corridors.
12    Q.  Now, is that dispersion in any way ongoing or
13 is it simply studying historical dispersion?
14    A.  Well, we believe that there's evidence that
15 it's ongoing, but is what we're doing is basically
16 evaluating, trying to determine the boundaries of this
17 contamination, so it's not always easy to tell if it's
18 historical or current.
19    Q.  Okay.  And so the dispersion of the asbestos
20 from the site in the ambient air?  Is that --
21    A.  Well, that was one way it was dispersed was
22 ambient air, and I'm sure it was dispersed through
23 movement by machines and road dust and things like that.
24    Q.  So that would be human activity in the mine
25 site and surrounding area kicking up dust.  Is that a way

16

1  of describing that?
2     A.  That would be fair.
3     Q.  Okay.  Any other pathways other than asbestos
4  traveling in the ambient air and people kicking up dust
5  around the mine site?
6     A.  Well, and the transportation of it; the
7  loading of it and the transportation of it.
8     Q.  Okay.  So ambient air, we'll call it "activity
9  that unsettles settled dust."  Is that a fair way of
10 describing that?
11    A.  Yes.
12    Q.  Okay.  And then you said the transportation of
13 it?
14    A.  Yeah, loading and transportation of it, I
15 believe is what I said.
16    Q.  And would that refer to loading and
17 transportation involving rail lines?
18    A.  Well, rail lines or other types of loading,
19 truck loading and things like that, I guess.
20    Q.  Where was the truck loading occurring?
21    A.  Well, just basically from the mine and then
22 being transferred down to different points along the
23 highway and then unloading by truck.  And so I'm just
24 trying to cover all the different aspects of how they
25 would load it.

17

1     Q.  Okay.  So transportation loading and
2  unloading, is that a fair way of describing the third
3  pathway?
4     A.  Yes.
5     Q.  Okay.  Any other pathway for potential
6  exposure in the communities, let's say, in Libby that
7  you've studied?
8     A.  Not currently, we haven't.
9     Q.  What about historically?
10    A.  Well, no, none of the research has involved --
11 that research has not involved any in-house types of
12 sampling.  The vermiculite research has.
13    Q.  Oh, and that would be -- okay, I understand
14 what you're saying.  So when you refer to vermiculite,
15 this is what we were speaking of earlier, which was the
16 Zonolite attic insulation that was in attics and also was
17 in, in some cases, the walls of homes, correct?
18    A.  Yes.
19    Q.  Okay.  So we can just make that the fourth
20 item on the list where we have asbestos traveling from the
21 mine site from the ambient air; asbestos kicked up around
22 the mine site by human activity; transportation, which
23 includes loading and unloading of vermiculite; and then
24 Zonolite attic insulation in homes.  Are there any other
25 pathways of exposure besides those four that you have

18

1   studied?
2       A.   That I have studied, no.
3       Q.   Okay.  Are there any other pathways other than
4   those four that you are aware of?
5       A.   Well, I think there's, again, there's a lot of
6   activity that go on in homes that could stir up asbestos
7   dust there and create exposures.
8       Q.   From Zonolite attic insulation or from some
9   other source?
10      A.   Well, it could be from attic insulation or it
11  could be from other sources that made their way into the
12  home.
13      Q.   Are you aware of any other sources?
14      A.   Well, windblown dust.
15      Q.   Okay.  So that would be, again, kind of under
16  the first heading which would be asbestos that's blown
17  from the air, blown through the air from the mine site.
18  Is that what you're referring to there?
19      A.   That would be one method, yes.
20      Q.   Okay.
21      A.   And then transport just by human activity,
22  carrying it in on your clothes or your feet.
23      Q.   Okay.  And so this research that you've done,
24  on whose behalf was it performed?
25      A.   The research that we began in 2003 was, was

19

1   funded through a COBRE Grant, the University of Montana.
2       Q.   And which, so I'm clear, which was the 2003
3   research?
4       A.   That's doing the Libby work.
5       Q.   So all those, all four categories you were
6   speaking of earlier, all that's been funded by a grant
7   through the University of Montana that was issued in 2003?
8       A.   Well, in part.
9       Q.   In part.
10      A.   It began with funding from COBRE, the
11  University of Montana, and then there was some funding
12  provided from the University of Utah to do some later work
13  in the more recent years.
14      Q.   And which work was that, the more recent work
15  in later years you mentioned?
16      A.   We've been working with the Forest Service to
17  determine potential occupational exposure within their
18  jobs within the forest around the mine.
19      Q.   Okay.  And this work was what was ultimately
20  published in a series of papers, correct?
21      A.   Yes.  In fact, let me correct myself a little
22  bit here.
23      Q.   Okay.
24      A.   The University of Utah funded the initial
25  firewood harvesting simulation study.

20

1       Q.   Okay.  So let me write that down real quick.
2   The University of the Utah, the harvesting study.  And was
3   that the study that was published in 2007?
4       A.   I believe so.
5       Q.   Okay, okay.  What other studies -- what other
6   sources of funding were involved with other studies that
7   you've published?
8       A.   Well, the Forest Service is funding the
9   studies we're doing for them.
10      Q.   And which study is that?
11      A.   The occupational exposure of Forest Service
12  workers.
13      Q.   And have the findings of that study been
14  published in a paper?
15      A.   Not yet.
16      Q.   Okay.  The work you've done for the Forest
17  Service, is it in any way bearing on your opinions in this
18  case?
19      A.   Yes.
20      Q.   Is it something that you have produced, these
21  findings that you have?  Have you taken samples?
22      A.   Yes.
23      Q.   When did you take these samples?
24      A.   I believe it was -- we did the initial Forest
25  Service sampling or study last summer, not this summer but

21

1   last summer.
2       Q.   And this is in Lincoln County?
3       A.   Yes.
4       Q.   Okay.  How many samples did you take?
5       A.   Boy, that's a -- we do a series of air
6   sampling, personal air sampling; and then we also do wipe
7   sampling of Tyvek clothing they were wearing for
8   protection.
9       Q.   And personal air sampling, is that often
10  abbreviated PBZ?
11      A.   Yes.
12      Q.   Okay.  And that's "personal breathing zone";
13  is that right?
14      A.   Yes.
15      Q.   Okay.  So you do personal breathing zone
16  sampling.  And then you said "wipe sampling"?
17      A.   Yes.
18      Q.   What is wipe sampling?
19      A.   Wipe sampling is wiping a surface or a garment
20  with, basically, an alcohol wipe to remove dust or
21  asbestos.
22      Q.   Okay.  So you have done both personal
23  breathing zone sampling and wipe sampling for the Forest
24  Service.  And this was, I believe you said, the summer
25  2008, correct?

22

1     A.   I believe that's when we did it.
2     Q.   Do you have an estimate of how many samples
3  you took?
4     A.   Well, I would say the air samples, I would
5  estimate that we took -- I don't know if it was in the
6  range of 50 samples.
7     Q.   And what about the wipe samples?
8     A.   Well, the wipe samples, we used composite
9  wipes.  So if you count individual wipes, there were
10  probably maybe 60 or 70 wipe samples.  I don't remember
11  the exact numbers.
12     Q.   And this work that you've done for the Forest
13  Service, just so I'm clear, this is not the work that was
14  published in the recent publications that you have
15  authored related to your work in Libby, correct?
16     A.   It has not been published yet.
17     Q.   Okay, not yet.  So it's not available to the
18  public, then, correct?
19     A.   That would be correct.
20     Q.   Okay.  However, you say this does inform your
21  opinion about potential exposures in Libby?
22     A.   In and around Libby, yes.
23     Q.   Okay.  How so?
24     A.   Well --
25        MR. LEWIS:  Well, wait now.  I want to object.

23

1  He hasn't said that it forms his opinions in this case.
2  It's not a completed study.  He hasn't reached final
3  opinions.  Okay?  And it informs his opinions generally,
4  but he's not testifying it informs his opinions in this
5  case.
6        MR. STANSBURY:  I will ask going forward you
7  not coach the witness through your objections.
8        You may answer the question.
9        THE WITNESS:  Well, yeah, all of the work that
10  we do in Libby informs me generally as to the, you know,
11  the dispersal of the asbestos in and around Libby.
12  Obviously, this work hasn't been published.  We haven't
13  even finalized the results for the Forest Service
14  occupational study, so -- (pause.)
15     Q.   (By Mr. Stansbury) But you are aware of the
16  results, correct?
17     A.   I'm aware of results.
18     Q.   And that is something which impacts your
19  understanding of potential exposures in and around Libby,
20  correct?
21     A.   Well, this focused on the Forest Service
22  occupational study, so it's a narrow -- much narrower than
23  the bark studies.  Let's put it that way.
24     Q.   But it would still impact, let's say, forest
25  workers working in the forest in and around Libby,

24

1  correct?
2     A.   I'm sorry, what would impact?
3     Q.   The findings of your work for the forestry
4  department.  The work you've done for the forestry
5  department and the samples taken and your analysis of
6  those samples informs your opinion about potential
7  exposure somebody would have in the forest around Libby,
8  correct?
9     A.   Well, in terms of Forest Service employees,
10  yes.
11     Q.   Okay.  And what are Forest Service employees,
12  just so I'm clear?
13     A.   Well, these are people that work for the
14  Forest Service and do work that the Forest Service
15  requires them to do.
16     Q.   And what is that?  What kind of work is that?
17     A.   Well, they do trail maintenance, and they do
18  tree measurement, and they evaluate forests for forest
19  health, and they have test plots where they evaluate tree
20  growth.  And that's part of what they do.
21     Q.   What kind of -- and so when you did --
22     A.   They fight forest fires.
23     Q.   So when you did this study, you simulated
24  activities, correct?
25     A.   Yes.

25

1        MR. LEWIS:  Objection; that's not what he's
2  testified to so far.
3     Q.   (By Mr. Stansbury) I believe your answer to
4  the question was "yes"?
5     A.   For the Forest Service, we simulated the
6  activities that they would perform.
7     Q.   And which activities were those?  Just so I'm
8  -- you mentioned some activities earlier, but just so I'm
9  clear, which activities did you simulate?
10     A.   We simulated trail maintenance when they're
11  clearing trails.
12     Q.   Okay.
13     A.   We simulated tree measurement.
14     Q.   Okay.
15     A.   We simulated walking through the forest if
16  they were walking to get to a stand of trees to evaluate.
17     Q.   Okay.  Anything else?
18     A.   And we simulated fire line construction.
19     Q.   What is fire line construction?
20     A.   If there's a forest fire, and it's the
21  constructing of a fire line around the fire.
22     Q.   How is that constructed?  Is it made of --
23  what is it made of?
24     A.   It's done with hand tools.
25     Q.   Hand tools.  And where, generally, did you

26

1  conduct these simulations?
2      A.  The area was probably - let's see if I can get
3  my directions right - probably northeast of where the mine
4  site was outside of the restricted zone of the mine, and
5  essentially between the mine and Lake Koocanusa.
6      Q.  We might need some help with spelling on that
7  one later on.
8      Any other research other than what we've discussed
9  this morning?  Any other asbestos-related research?
10     Let me rephrase this:  Have you conducted any other
11  asbestos-related research other than what we've discussed
12  so far this morning?
13     A.  Let me think for just a second.  I don't
14  believe so.
15         MR. LEWIS:  Counsel, I'm not going to coach
16  the witness, but I, but I don't know if you intended by
17  "research" formal research projects or background research
18  many years ago.  From the witness's answer, I'm not sure
19  he understood the question.
20         MR. STANSBURY:  That would be coaching the
21  witness.
22         MR. LEWIS:  No, it is not coaching the witness
23  sir.  I'm trying to clarify the record here.  Your
24  question was broad.  And what do you mean?
25         I'll make a formal objection.  The question is

27

1  vague because it refers to "other research" without
2  defining what you mean by "other research"; and therefore,
3  it's an improper question.
4      Q.  (By Mr. Stansbury) Dr. Spear, is there any
5  other research that you conducted related to asbestos
6  other than what we've discussed this morning?
7      A.  Well, the understanding of our questioning
8  along those regard is that you were asking about research
9  that we were performing in Libby to collect data and
10  publish results.
11     Q.  Okay, then let's clarify this.  And again, to
12  the extent that you ever misinterpret or are concerned you
13  may be, please feel free to raise it.
14     Other than Libby, is there any other research
15  related to asbestos generally that you've performed?
16     A.  Well, I performed literature research of
17  asbestos.
18     Q.  And what is literature research?  Does that
19  mean reviewing literature?
20     A.  Yes.
21     Q.  Okay.  But that's not, for example, taking
22  samples and analyzing the samples and reaching conclusions
23  based on the sampling, correct?
24     A.  Correct.
25     Q.  Okay.  What type of literature reviews have

28

1  you done?
2      A.  Just literature reviews to, in my own mind,
3  understand the knowledge of asbestos and the hazard of
4  asbestos over time, and how companies were dealing with
5  these issues, and things like that.
6      Q.  When did you first conduct - and I'm going to
7  use the term "comprehensive", and if you have any
8  question, please feel free to -- I'm happy to clarify.
9  When did you first conduct a comprehensive review of
10  asbestos literature?
11         MR. LEWIS:  Object to the form of the question
12  on the grounds that it's compound and unintelligible as
13  stated.
14         THE WITNESS:  Yeah, I mean what you consider
15  comprehensive, I may not.
16     Q.  (By Mr. Stansbury) Okay.
17     A.  I mean to me, that's a confusing word.
18     Q.  And let's get that, let's figure that out.
19     When did you first review any article related to
20  asbestos?
21     A.  Well, probably back in 1978.
22     Q.  Okay.  Do you remember what that was?
23     A.  I don't remember what it was.
24     Q.  Okay.  When did you first decide to seek out
25  asbestos literature specifically for purposes of

29

1  researching and broadening your understanding of asbestos
2  literature?
3      A.  Probably in 1979.
4      Q.  And what was the reason for doing that?
5      A.  Because I was working at a copper smelter in
6  Anaconda, and we certainly had asbestos-containing
7  materials there.  And we had issues that I had to look up
8  pertaining to asbestos.
9      Q.  What kind of articles did you read?
10     A.  Well, at that time, I'm sure I read the OSHA
11  and the NIOSH publications, and some of the textbooks or
12  National Safety Council information; Patty's Industrial
13  Hygiene and Toxicology, things like that, that provided
14  information on asbestos.
15     Q.  Did you survey epidemiological literature?
16     A.  I'm sorry?
17     Q.  Did you read epidemiological literature?
18     A.  I'm sure I did.
19     Q.  Okay.  Do you recall any studies that you
20  reviewed in 1979?
21     A.  No.  I'm sure I saw the Doll study in 1979.  I
22  don't specifically recall all the articles I looked at in
23  1979, I'm sorry.
24     Q.  Okay.  Did you continue -- well, let me
25  rephrase that.  Do you have any idea of how many articles

30

1   you reviewed in 1979?
2       A.  I don't have.  I don't.  I can't give you a
3   number.  I mean it's many years ago and I don't remember
4   the articles I looked up.
5       Q.  Okay.  Did you stay current with the asbestos
6   literature after 1979?
7       A.  Yes.
8       Q.  What publications would you review on an
9   ongoing basis after 1979?
10      A.  Well, the publications in the American
11  Industrial Hygiene Association Journal and the American
12  Conference of Governmental Industrial Hygiene Association
13  Journal.
14      Q.  So those are both, as the title would imply,
15  publications aimed at industrial hygiene issues, correct?
16      A.  Well, yes, I believe that would be correct,
17  then.
18      Q.  So they would look at things such as exposure
19  levels, sampling methods, issues like that, correct?
20      MR. LEWIS:  Objection; that's a compound
21  question.
22      But you can answer, Doctor.
23      THE WITNESS:  Well, yeah, I mean it could
24  cover many different aspects.  I mean there were -- you
25  know, they would talk about protecting workers through

31

1   sanitation, and clothing, and showers, and things like
2   that.  Sure, I mean it would cover not only sampling and
3   standards, but how do we control the exposures.
4       Q.  Okay.  Do these articles --
5       A.  The Annals of Occupational Hygiene, obviously,
6   too, is another one that was -- that I considered to be
7   important even back in the late '70s.
8       Q.  But would these publications contain mortality
9   studies of cohorts exposed to asbestos?
10      A.  They could provide summaries of those types of
11  studies.
12      Q.  But that would not be the central focus of
13  these articles?
14      A.  Well, I'm not sure.  I mean the -- certainly,
15  a lot of the textbooks and the articles that you're
16  referring to discussed mortality and rates of death from
17  asbestos exposure.
18      Q.  Okay.  What about pulmonary function testing?
19  Was that an area of asbestos medicine that you stayed
20  current on during this time period?
21      A.  Not really.
22      MR. LEWIS:  Objection.  This witness is not a
23  medical doctor.  He's not qualified to testify as to
24  pulmonary studies.
25      Q.  (By Mr. Stansbury) You may answer the

32

1   question.
2       A.  Well, yeah, I'm not a medical doctor.  I
3   certainly read medical literature and toxicological
4   literature.  I'm not a toxicologist, I mean, but it all
5   informs me concerning the subject matter of asbestos.
6       Q.  Okay.  Well, let's, I guess, then, kind of go
7   through some of the areas where you -- well, some of your
8   qualifications, so to speak, with respect to different
9   aspects of asbestos disease.
10      MR. LEWIS:  Objection to the form of the
11  question.
12      Q.  (By Mr. Stansbury) You mentioned that you have
13  no medical training, correct?
14      A.  Correct.
15      Q.  Okay.  And that would include no training in
16  radiology, correct?
17      A.  Correct.
18      Q.  No training in pulmonary medicine generally,
19  correct?
20      A.  Correct.
21      Q.  Do you have any experience obtaining exposure
22  histories from a patient?
23      A.  No.
24      Q.  And so, of course, you're not able to diagnose
25  patients with asbestos-related disease, correct?

33

1       A.  Correct.
2       Q.  Do you have an opinion on whether there is a
3   distinction between individuals who have developed an
4   asbestos disease from exposures in Libby, Montana, as
5   opposed to individuals who have developed an asbestos
6   disease from exposures outside of Libby, Montana?
7       MR. LEWIS:  Could the court reporter read back
8   the question?  It's a long question and I'm not sure I
9   understand it.
10      (The pending question was read by the court
11  reporter.)
12      MR. LEWIS:  Okay.  I'm going to object to the
13  form of the question on -- it's vague.  The word
14  "distinction", I don't know what you mean by that.
15  Perhaps the witness does, and I'm not going to coach him
16  or interfere with his answer, but the question is vague
17  and overbroad.
18      THE WITNESS:  I had, you know, I had two
19  questions pertaining to the question.  And --
20  BY MR. STANSBURY:
21      Q.  Sure.  What were your questions?
22      A.  What do you mean by, yeah, the distinction
23  between individuals?  Are we talking about male versus
24  female?
25      Q.  Okay.

34

1      A.   And then the second question is:  When you say
2  exposure outside of Libby, are we talking about exposure
3  to asbestos, or different types of asbestos, or what are
4  we talking about?
5      Q.   Good, and I appreciate you asking me about
6  that, any questions you have.
7           Obviously, you're aware that people who are exposed
8  to asbestos may develop disease, correct?
9      A.   Yes.
10     Q.   And people in Libby have been exposed to
11 asbestos from Libby and developed disease, correct?
12     A.   Correct.
13     Q.   And people, let's say, in Pascagoula,
14 Mississippi, have been exposed to asbestos and developed
15 disease from those exposures, correct?
16     A.   Yes.
17     Q.   Often asbestos that had nothing to do with
18 Libby, Montana, correct?
19     A.   That could be correct.
20     Q.   And those, you know, just from your general
21 review of the medical literature, you are aware that these
22 diseases fall into -- there are different types of
23 diseases associated with asbestos exposure, correct?
24     A.   Correct.
25     Q.   Mesothelioma, correct?

35

1      A.   Yes.
2      Q.   Lung cancer?
3      A.   Yes.
4      Q.   And there are also various forms of
5  non-malignant asbestos-related diseases, correct?
6      A.   Correct.
7      Q.   And that could include asbestosis, correct?
8      A.   Yes.
9      Q.   Fibrosis of the pleura, correct?
10     A.   Yes.
11     Q.   And do you have any opinion as to how any of
12 those diseases would manifest themselves differently in a
13 person whose exposure was to asbestos in Libby as opposed
14 to a person who was exposed to a different type of
15 asbestos outside of Libby?
16     A.   Yes.
17     Q.   You have an opinion?
18     A.   Based on my review of the Libby work and the
19 medical literature.
20     Q.   What is that opinion?
21     A.   My opinion is that the asbestos, the amphibole
22 asbestos in Libby seems to be causing a very severe
23 pulmonary fibrosis which is progressive and fast-acting
24 and can lead to death, which is different than what's been
25 seen in other cohorts exposed to different types of

36

1  asbestos.
2      Q.   Okay.  So let's unpack that.  So the answer to
3  my question would be you do have an opinion, and your
4  opinion relates not to mesothelioma or lung cancer, per
5  say.  The opinion you stated relates to that non-malignant
6  disease, correct?
7           MR. LEWIS:  Objection.  He didn't testify to
8  everything you asked him to assume by that question, if
9  that is a hypothetical question, and the question is
10 compound.
11     Q.   (By Mr. Stansbury) You may answer.
12     A.   What I referred to was the pulmonary fibrosis.
13     Q.   Okay.  Which is a non-malignant disease,
14 correct?
15     A.   Yes.
16     Q.   Do you have an opinion as to any difference
17 involving lung cancer or mesothelioma?
18     A.   Well, I testified in previous depositions
19 regarding Libby that there are certainly some medical
20 literature that is saying that the tremolite - in that
21 case they were talking about tremolite, not Libby
22 amphibole - is a long, thin fiber, and it has been shown
23 to be a very potent mesothelioma causer.
24     Q.   Okay.  So you do have an opinion regarding
25 Libby disease -- strike that.

37

1           You do have an opinion with respect to mesothelioma.
2  What about lung cancer?  Do you have an opinion about how
3  a person exposed to asbestos in Libby as opposed to a
4  person exposed to a different type of asbestos elsewhere
5  may develop lung cancer?
6      A.   Well, I think all forms of asbestos can cause
7  lung cancer.
8      Q.   But you don't have an opinion as to weather
9  Libby asbestos has a greater likelihood of causing lung
10 cancer as opposed to another form of asbestos?
11     A.   I don't really have an opinion on that.
12     Q.   Okay.  So let's talk about your mesothelioma
13 and your pulmonary fibrosis opinions.  Let's start with
14 the pulmonary fibrosis.  And what type of pulmonary
15 fibrosis are you talking about?  Are you talking
16 interstitial disease or are you talking about pleural
17 disease?
18     A.   Pleural.
19     Q.   Okay.  Do you have an opinion as to how
20 exposure to Libby tremolite affects interstitial disease
21 compared to the way other forms of asbestos cause
22 interstitial disease?
23     A.   Well, I don't.  I can't comment on medical
24 diagnosis or medical findings.  All I'm saying is I draw
25 my opinion or I form my opinion based on what I'm reading

38

1    in the medical literature.
2        Q.   Okay.  So from what you're reading in the
3    medical literature, can you identify any piece of
4    literature that would support an opinion that exposure to
5    Libby asbestos would have a greater likelihood of causing
6    interstitial disease as opposed to other forms of
7    asbestos?
8        A.   I don't.
9        Q.   Okay.  But you do have that opinion with
10   respect to pleural disease, correct?
11       A.   Yes.
12       Q.   Okay.  So let's focus, then, on pleural
13   disease.  Now -- and maybe I should take one quick step
14   back.  When we're talking about asbestos from Libby, what
15   is the asbestos from Libby?
16       A.   Asbestos from Libby is a mixture of
17   amphiboles.
18       Q.   Which amphiboles?
19       A.   Well, it's what's been identified as winchite
20   and richterite and tremolite, and then another one that I
21   can't pronounce, riebeckite, or some long name that I
22   don't even try to pronounce.
23       Q.   Now, are there any difference -- what are the
24   differences between winchite and tremolite?
25       A.   Well, my -- I'm not a mineralogist, either,

39

1    but my understanding is that they're in the same mineral
2    family, but there's differences in, I think, sodium and
3    potassium for one.  But again, I'm not a mineralogist.
4        Q.   The same question with respect to
5    richterite.  Are you available -- are you aware of any
6    differences between richterite and tremolite?
7        A.   Well, again, the same mineral family, to my
8    knowledge.
9        Q.   Okay.  The majority of the amphibole in Libby
10   is winchite, correct?
11       A.   Yes.
12       Q.   In fact, based on what's in the literature,
13   often tremolite would be as low as 6 percent of the
14   amphibole material in the ore from Libby, correct?
15       A.   It could be.
16       Q.   Okay.  It could be higher, correct?
17       A.   Yes.
18       Q.   But in some cases, over 80 percent was
19   winchite, correct?
20       A.   Yes.
21       Q.   Okay.  So is it fair to say winchite is the
22   predominant amphibole in the Libby amphibole?
23       A.   According to Meeker, I believe that would be
24   his assumptions, that it's mostly winchite, followed by
25   richterite, followed by tremolite.

40

1        Q.   And you, you rely on Meeker, don't you, in
2    your expert report?
3        A.   Well, I rely on his mineralogy expertise, I
4    guess, yes.
5        Q.   Okay, okay.  So when we're talking about Libby
6    amphibole, we're talking about a mix of these four
7    amphiboles, correct?
8        A.   Yes.
9        Q.   Okay.  And so if I use the term "Libby
10   amphibole," you understand I'm referring to the four
11   amphiboles found in Libby, Montana, correct?
12       A.   Yes.
13       Q.   Okay.  So let's go back to the pleural
14   disease.  What is your opinion about any differences in
15   the way pleural disease has manifested itself in people
16   exposed to the Libby amphibole?
17       A.   Well, again, I'm not a toxicologist or a
18   medical doctor, but these are amphiboles.  We know that
19   amphiboles, in general, are toxic and cause severe lung
20   disease.  And so now we have a combination of amphiboles,
21   and so, obviously, it's going to be toxic.  And my opinion
22   basically comes from talking to the doctors in, in Libby.
23       Q.   Okay.  And you kind of led me to where I
24   wanted to go, because your opinions are not based on your
25   training as an industrial hygienist, correct?  Your

41

1    opinions -- let me rephrase that.
2        Your opinions about pleural disease in Libby are not
3    based on your training as an industrial hygienist,
4    correct?
5        A.   Well, we don't get medical training as an
6    industrial hygienist.
7        Q.   Okay.  What specific opinions do you have
8    about pleural disease in Libby?  You mentioned them
9    earlier, but I just want to make sure that we're clear
10   about them so we can go over them.
11       A.   I'm sorry, what --
12       Q.   You mentioned that you thought pleural disease
13   in Libby was - and again, I'm paraphrasing here, and I'd
14   like you, to the extent that I misstate this, correct it -
15   it's progressive, progresses to death.  You mentioned a
16   couple of things about pleural disease in Libby very
17   quickly when we were talking about it earlier, and I just
18   wanted to go over that real quick.  If you would, please,
19   identify those.
20       A.   Well, in reading the literature and talking to
21   Dr. Black specifically, he's seeing in his patients
22   pleural disease which is occurring quicker or manifesting
23   itself sooner than they would normally expect; it's more
24   painful than other types of exposures outside of Libby; it
25   is progressive, they're seeing progression of this

11 (Pages 38 to 41)

42

1  disease; and it can be fatal; it's affecting pulmonary
2  function.
3       Q.  So we have pleural disease in Libby that,
4  unlike other pleural disease elsewhere, occurs quicker, is
5  more painful, progressive, and can be fatal.  Did I
6  summarize that correctly, sir?
7       A.  That's my understanding, yes.
8       Q.  Okay.  And are these opinions that you intend
9  to offer when you testify?
10      A.  Well, I don't know if, if I'm, you know, if
11 I'm allowed to offer anything related to medical.  I mean
12 I'm an industrial hygienist.  I'm just saying I read the
13 medical literature, I work in Libby, I work with Dr. Black
14 as a technical advisor to the TAG, and I get this
15 information from the doctors.
16      Q.  Okay.  So -- and I guess because I asked
17 earlier if you had an opinion, and perhaps I should be
18 more specific, when I ask if you have an opinion on this,
19 you may have an opinion on the weather, but do you have an
20 -- is this an opinion that you believe that you can
21 testify about in court?
22      A.  I don't even know how to answer your question.
23 I'm not a lawyer.  I don't know if I would be allowed to
24 opine that.
25      Q.  Do you believe that you are qualified to opine

43

1  on those issues?
2       A.  Well, if, if, you know, reading the medical
3  literature and speaking to doctors in Libby qualifies me,
4  then, yes.
5       Q.  Because that would be the extent of your basis
6  for this opinion.  It's review of medical literature and
7  discussion -- I think you identified Dr. Black.  That was
8  the basis of your opinion about Libby pleural disease,
9  correct?
10      A.  Yes.
11      Q.  Okay.  Which literature have you reviewed to
12 form this opinion?
13      A.  Well, different studies by, I guess, Patricia
14 Sullivan, Rohs, Lockey, the Peipens publication,
15 Dr. Whitehouse's publications.
16      Q.  So that would be the Sullivan study, the Rohs
17 study, the Lockey study, the Peipens study, and then you
18 mentioned Dr. Whitehouse's publications.  Are there any
19 other publications that have informed your opinions about
20 pleural disease in Libby?
21      A.  Well, I'm sure there are.  Those are the ones
22 that come to mind.  I mean it's hard for me to pinpoint
23 specific publications as we sit here.
24      Q.  Okay.  And the Sullivan study, that is the
25 NIOSH mortality follow-up study, correct?

44

1       A.  Yes.
2       Q.  And does that study in any way identify or
3  address the pain involved with pleural disease?
4       A.  Not that I know of.
5       Q.  Okay.  Does it discuss the onset of pleural
6  disease in particular?
7       A.  I don't -- I haven't read the article in
8  awhile.  You know, it's mainly a mortality study to look
9  at the mortality of workers that worked at the mine.
10      Q.  Right.
11      A.  So it may not be specific to pleural disease
12 for all I know.
13      Q.  Okay, okay.  And the Rohs study, that is a
14 study, a follow-up study -- I guess when I say "the Rohs
15 study," we can kind of put Rohs and Lockey together,
16 correct?  We're talking about the study of the workers in
17 the O.M. Scott facility in Marysville, Ohio, correct?
18      A.  Correct.
19      Q.  Okay.  So the Lockey/Rohs study, Lockey
20 published in the early '80s, correct?
21      A.  Yes.
22      Q.  And then Rohs published a follow-up in, I
23 think, either 2007 or 2008, correct?
24      A.  Yes.
25      Q.  And what about the Rohs study informed your

45

1  opinion about pleural disease in Libby?
2       A.  Well, it's pointing to a greater toxicity of
3  the Libby amphibole, that we're seeing disease in lower
4  concentrations than we have in previous studies pertaining
5  to other types of asbestos.
6       Q.  And so just so I'm clear, what she reports are
7  the exposure levels at the Marysville facility, correct?
8       A.  Who are we referring to?
9       Q.  Rohs.
10      A.  Okay.
11      Q.  I'll repeat the question.  Dr. Rohs reports
12 the exposure levels at the Marysville facility, correct?
13      A.  Yes.
14      Q.  And she also reports the prevalence of pleural
15 abnormalities among the workers, correct?
16      A.  Yes.
17      Q.  And she breaks down the population into
18 quartiles, correct, or is it quintiles?
19      A.  As far as I remember, yes.  I haven't looked
20 at those in awhile, either.
21      Q.  But four or five exposure categories, correct?
22      A.  Yes.
23      Q.  And one of the findings of the studies that
24 she focuses on is that we see pleural abnormalities in the
25 lower exposure quartile, correct?

46

1    A.    Could you repeat that?
2    Q.    One of the important findings she addresses in
3  the study was that there were individuals with an elevated
4  level of pleural abnormalities in the lowest exposure
5  quartile, correct?
6    A.    I believe that's correct.
7    Q.    Are you aware of any other finding in that
8  study that impacts your understanding of pleural disease
9  from exposure to asbestos in Libby?
10    A.    Well, I get the Rohs and the Lockey study
11  mixed up, just in my mind, but -- you know, so they saw,
12  in the early years, they saw a certain percentage of
13  people with pulmonary disease. And then they followed
14  these people up after 20-something years, and it went from
15  like 4 percent pleural disease up to 26 percent pleural
16  disease.
17    Q.    Right, right. And so that's -- the percent
18  you're talking about is the prevalence of pleural
19  abnormalities in the working population, correct?
20    A.    Yes.
21    Q.    Okay. But nothing in that study addresses the
22  pain of pleural disease, correct?
23    A.    Well, that's correct.
24    Q.    Okay.
25    A.    I guess they don't have the opportunity to

47

1  talk to the patients in Libby.
2    Q.    Well, the people in Marysville, Ohio, were
3  exposed to Libby amphibole, correct?
4    A.    Right. But I'm just saying I get this
5  information from Dr. Black who tells me what's --
6    Q.    Oh, I understand.
7    A.    -- what's being reported.
8    Q.    For now let's focus specifically on the
9  literature rather than the conversations with Dr. Black.
10  There's nothing in the Rohs study which addresses the pain
11  involved with Libby pleural disease, correct?
12    A.    Not that I know of.
13    Q.    Okay. And the Rohs study was a morbidity
14  study, did not look at mortality, correct?
15    A.    Right.
16    Q.    So there is nothing in that study that would
17  support an opinion regarding the fatality involved with
18  Libby pleural disease, correct?
19    A.    I believe that would be correct.
20    Q.    And the issue of "occurs quicker", how does
21  the Rohs study impact that opinion?
22    A.    Well, other than the fact that, you know, it
23  was reported that with time-weighted average exposure
24  levels of, I think it was, 0.3 to 0.4 or 0.5 per cc
25  averaged over an eight-hour day, they were still seeing

48

1  pulmonary abnormalities. And this was among a working
2  population that was working at the time, so I guess from
3  that standpoint. But again, the "quicker" part comes
4  from, again, the discussion with Dr. Black --
5    Q.    Okay.
6    A.    -- that we're seeing these things happen
7  quickly.
8    Q.    So just to be clear, then, the Rohs study does
9  not support an opinion about the onset of Libby pleural
10  disease from first exposure, does it?
11        MR. LEWIS: Object to the form of the question
12  using the term "support". It implies something that is
13  not present by his prior answer. To the extent that the
14  question purports to summarize a prior answer, it
15  incorrectly does so and is therefore improper.
16        MR. STANSBURY: I'm going to ask that you keep
17  your objections in line with the Federal Rules of Civil
18  Procedure, state them briefly and succinctly to preserve
19  the record, and not coach the witness.
20        You man answer, sir.
21        MR. LEWIS: I'm going to -- I want to make a
22  statement on the record. There was no coaching there.
23  When I practice before the Federal Courts, I understand
24  that you have to inform the Court of the basis for your
25  objection and not just make some small objection like, "I

49

1  object to the form of the question." That's improper.
2  And that's all I did, and there was no coaching of the
3  witness in that objection.
4        MR. STANSBURY: Again, I'm going to ask you to
5  state the objection succinctly and briefly.
6        You may answer the question.
7        MR. LEWIS: That was as succinctly and briefly
8  as I could make my objection given the nature of your
9  question.
10        THE WITNESS: I think we should back up
11  because I don't know where we were.
12        MR. STANSBURY: I think that was his objection
13  in the first place was to create that impression of not
14  knowing where we are.
15        MR. LEWIS: I move to strike statement of
16  Counsel on the record. It's improper. He's not a
17  witness. He's a lawyer. He needs to, he needs to shorten
18  up his questions and ask understandable questions so we
19  don't have these objections.
20        MR. STANSBURY: Could you read back the last
21  question before the exchange that I had with Mr. Lewis?
22        (The record was read by the court reporter as
23  follows:
24        "QUESTION: So just to be clear, then, the
25  Rohs study does not support an opinion about the onset of

50

1 Libby pleural disease from first exposure, does it?")
2     THE WITNESS: Well, from my recollection, it
3 doesn't.
4     Q. (By Mr. Stansbury) Okay. And then that leaves
5 "progressive." And I guess maybe I should ask you to
6 explain what you mean when you say something is
7 progressive.
8     A. Well, my understanding is that it refers to
9 the progression of the disease after the exposure stops.
10     Q. And how is this a unique or distinct
11 manifestation in Libby?
12     A. Well, again, in speaking -- reading the
13 medical literature I've read and talking to Dr. Black,
14 they believe that it's progressing.
15     Q. But if I'm exposed to asbestos working in
16 Mississippi, it's chrysotile asbestos, for a few years and
17 then my exposures stop, I'm still at risk of developing
18 disease, correct?
19     A. Well, yes, but it may not progress. It may
20 not continue to envelope different portions of the lung.
21 Again, I'm not a medical doctor.
22     Q. Okay. So again, I think that your
23 qualifications here, perhaps this, you know, can close up
24 some of this discussion. You're not a medical expert.
25 These issues as to whether Libby disease occurs quicker,

51

1 is more painful, is more progressive, or is more fatal,
2 these are not issues in which you intend to offer opinions
3 at the confirmation hearing?
4     MR. LEWIS: Objection; that's a compound
5 question.
6     THE WITNESS: Well, those, those are my
7 opinions based on what my understanding is of the
8 situation. And if someone asks me for that opinion, I'd
9 just repeat what we did today.
10     Q. (By Mr. Stansbury) Okay. And so then we'll
11 just tie this up real quick, then. We discussed Sullivan,
12 we discussed Rohs and Lockey, and then you mentioned
13 Peipens as well, correct?
14     A. Yes.
15     Q. And that was the published finding of the
16 ATSDR screening analysis, correct?
17     Let me rephrase that. Peipens' paper was the
18 published results of the ATSDR's medical surveillance
19 program in Libby in the summers of the 2000 and 2001,
20 correct?
21     A. Yes.
22     Q. Okay. And that study examined individuals by
23 giving them a questionnaire, administering an x-ray, and
24 examine -- strike that.
25     In that medical surveillance, the ATSDR had each

52

1 person fill out a questionnaire, correct?
2     A. I believe that's correct.
3     Q. And the questionnaire included information
4 about the potential exposure pathways, correct?
5     A. Yes.
6     Q. They also administered an x-ray, correct?
7     A. They did.
8     Q. And they had those x-rays read by B readers,
9 correct?
10     A. Right.
11     Q. And then they also administered pulmonary
12 function tests, correct?
13     A. Yes.
14     Q. Okay. Are you aware of whether the pulmonary
15 function tests results were in the Peipens paper?
16     A. I don't. I'd have to review the paper, I
17 don't remember.
18     Q. Okay. And one of the takeaways from the
19 Peipens paper was that approximately 17 percent of the
20 screened individuals had pleural abnormalities, correct?
21     A. Well, yeah, depending on what group we're
22 looking at. They had different percentages.
23     Q. But I believe if you looked at just the
24 entirety of the population screened, it was approximately
25 17 percent, correct?

53

1     A. That could be correct.
2     Q. Eleven hundred eighty-six people, does that
3 sound about right?
4     A. Well, the Peipens study talked about, I
5 believe it was 9,000-something --
6     Q. Oh, no.
7     A. -- people.
8     Q. I understand. But did they --
9     MR. LEWIS: I object. You promised this
10 witness you would not interrupt him and you cut him off in
11 his answer.
12     Q. (By Mr. Stansbury) Did you have anything else
13 to add?
14     A. Well, no. You threw a number out there that I
15 didn't know where it came from.
16     Q. Let me put the number into context. They
17 administered x-rays on approximately 6600 people. Does
18 that sound about right to you?
19     A. That sounds about right.
20     Q. And I believe 1,186 were found to have pleural
21 abnormalities, correct?
22     A. I don't remember the number.
23     Q. Okay. How does the Peipens paper inform any
24 opinions that you may have about pleural disease in Libby?
25     A. Well, the Peipens paper, I think, pointed out

14 (Pages 50 to 53)

54

1  that there is a potential -- there is environmental -- or
2  disease caused from environmental exposure to Libby
3  amphibole.
4      Q.   Okay.  But that does not --
5      A.   As well as, you know, I mean, basically, the
6  highest rates were in the working population.  In their
7  exposure category where they could not identify a pathway,
8  that percentage was 6.7 percent, so that's roughly 3 times
9  higher than what you would expect to find in other types
10 of population-based studies that have been done looking at
11 the prevalence of abnormalities of the lung associated
12 with asbestos.
13     Q.   Okay.  That paper, however, did not inform
14 your opinion as to whether pleural disease occurs more
15 quickly in Libby, though, correct?
16     A.   That's probably correct.
17     Q.   Okay.  Nor does the Peipens paper inform your
18 opinion as to whether Libby pleural disease was more
19 painful, correct?
20     A.   Correct.
21     Q.   Does it inform your -- does the Peipens paper
22 inform your opinion as to whether pleural disease in Libby
23 is more progressive?
24     A.   Well, I don't know how to answer that
25 question, I guess -- probably not.

55

1      Q.   Okay.  And it certainly doesn't impact your
2  opinion as to whether pleural disease in Libby was more
3  fatal, correct?
4      A.   No.
5      Q.   Okay.  And then you mention Dr. Whitehouse's
6  paper.  Which paper was that?
7      A.   Well, he's had several.  I've looked at
8  several of his recent publications.
9      Q.   You published one in 2004, correct?
10     A.   Yes.
11     Q.   And you also published a paper in 2008
12 regarding mesothelioma, correct?
13     A.   Yes.
14     Q.   So the 2004 paper, how did that paper inform
15 your opinions as about pleural disease in Libby?
16     A.   I believe that in -- Dr. Whitehouse's papers
17 describe the disease rates and the effects on pulmonary
18 function, and I believe the 2004 paper talks about the
19 pleural disease rate, but I could be wrong.
20     Q.   Okay.  Does it inform your opinion as to
21 whether -- does the Whitehouse 2004 paper inform your
22 opinion as to whether pleural disease occurs more quickly
23 in Libby?
24     A.   I don't remember if that was discussed in the
25 paper or not.

56

1      Q.   Okay.  Sitting here today, does the 2004 paper
2  in any way inform your understanding as to whether pleural
3  disease in Libby is more painful?
4      A.   No.
5      Q.   Sitting here today, does the 2004 paper in any
6  way inform your opinion as to whether pleural disease in
7  Libby is more progressive?
8      A.   I believe it does, yes.  I think that
9  progression is discussed.  I don't know if -- I don't
10 remember the specifics of that paper.
11     Q.   So sitting here today, you cannot think of a
12 specific way in which that paper informs your
13 understanding of progression of disease in Libby?
14     A.   I can't remember specifically how it discusses
15 that topic as I sit here today.
16     Q.   Okay.  And the 2004 paper by Whitehouse does
17 not inform your opinion about the fatality involved with
18 pleural disease in Libby, correct?
19     A.   Not that I know of.
20     Q.   Okay.  You mentioned on a couple of occasions
21 Dr. Black, your conversations with Dr. Black informed your
22 opinions, correct?
23     A.   Yes.
24     Q.   And who is Dr. Black?
25     A.   Dr. Black works in the card clinic up in

57

1  Libby.
2      Q.   What is his role there?
3      A.   I believe he's the director or he runs the
4  card clinic.
5      Q.   Okay, runs the card clinic.  And what kind of
6  doctor is Dr. Black?
7      A.   I don't know.
8      Q.   Is he a pulmonologist?
9      A.   I don't know for sure if he's a pulmonologist.
10 I guess I haven't looked at his resume.
11     Q.   Okay.  Do you think that's important, what
12 kind of doctor -- a person, a doctor's training, do you
13 think that's relevant to their work as a doctor?
14     A.   I suppose it could be, sure.
15     Q.   Okay.  And sitting here today, you're not
16 aware of any pulmonary training Dr. Black has had,
17 correct?
18     A.   No.  Like I say, I haven't looked at his
19 resume.
20     Q.   Okay.  Were you aware that Dr. Black was
21 trained as a pediatrician?
22     A.   No.
23     Q.   Okay.  Do you believe -- okay, so you weren't
24 aware of that.
25     A.   No.

58

1    Q.   Okay.  And you weren't aware that he worked at
2    St. John's Hospitals -- St. John's Hospital for many years
3    in pediatrics, correct?
4    A.   No.
5    Q.   Okay.  You weren't aware that he never did a
6    residency or fellowship in radiology, pulmonary medicine,
7    or occupational medicine, correct?
8    A.   Correct.
9    Q.   Okay.  But your conversations with him have
10   informed your opinions about pleural disease in Libby?
11   A.   And what he's seeing in patients that they're
12   screening through the card clinic.
13   Q.   Okay.  Again, though, as you said it earlier,
14   you're not a medical professional.  Your opinions are
15   based on conversations with Dr. Brad Black in review of
16   the studies that we mentioned earlier, correct?
17        MR. LEWIS:  Objection.  This is a summary of
18   his testimony.  It's improper, it's compound.  And
19   therefore, it's an improper question, and I object to the
20   form of the question.
21   Q.   (By Mr. Stansbury) You may answer.
22   A.   Yeah, in forming my opinions related to the
23   toxicity of the Libby amphibole, I think is what I said is
24   that those are the articles which I've read most recently,
25   but not all of the articles I've read pertaining to

59

1    toxicity of asbestos, including Libby amphibole.
2    Q.   But sitting here today, there's no other
3    article you can think of that informs any opinions you
4    have about any pleural disease in Libby?
5    A.   No.
6    Q.   Okay.  Do you have any specific opinions
7    about -- let me back up a second.  Are you familiar with
8    the term "diffuse pleural thickening"?
9    A.   Well, I've seen the term.
10   Q.   Do you have any opinions about diffuse pleural
11   thickening?
12   A.   No.
13   Q.   Okay.  That's not something you intend to
14   opine about at the confirmation hearing, is it?
15   A.   No.
16   Q.   Okay.  And you're not an epidemiologist
17   either, correct?
18   A.   Correct.
19   Q.   You have no education that qualifies you to
20   opine on epidemiology, correct?
21   A.   Correct.
22   Q.   Do you have an opinion on the levels of
23   exposure that cause asbestos-related diseases?
24   A.   Yes.
25   Q.   And what is the basis of that opinion?

60

1    A.   Well, the basis of that opinion, again, is my
2    review of the medical literature and scientific journal
3    articles.
4    Q.   Do you believe that epidemiology should be the
5    basis of establishing which exposure levels can cause
6    disease?
7    A.   I do believe that is one part of it, but it
8    certainly isn't the only part of it.
9    Q.   What other parts are there?
10   A.   Well, there are -- basic clinical studies is
11   another part of it, what is being seen in clinics with
12   patients.  Some of that may not appear as an epidemiologic
13   study.  And, I guess, other types of studies in different
14   types of plants where they're seeing disease rates or
15   mortality rates that may or may not be considered an
16   epidemiologic study are important from an industrial
17   hygiene standpoint.
18   Q.   So your opinions on which exposure levels can
19   cause disease are based in part on case reports of disease
20   cases that have occurred in various locations?
21   A.   In part.  That could be part, sure.
22   Q.   Do you give greater weight to an
23   epidemiological study than you would to a case report?
24   A.   I think if it's a well-done epidemiologic
25   study it would be given more weight.

61

1    Q.   Okay.  But your opinion on which exposure
2    levels can cause disease, they're based on your review of
3    literature, correct?
4    A.   And my, yeah, work with asbestos; my 20 or 30
5    years of an industrial hygienist reading literature.
6    Q.   But as an industrial hygienist, your role is
7    to focus on the actual exposures themselves and preventing
8    those exposures, correct?
9    A.   That's a big part of our job, yes.
10   Q.   Okay.  Do industrial hygienists offer opinions
11   in the course of their role as industrial hygienists as to
12   which levels of exposures can cause disease?
13   A.   Well, if they were seeing disease rates within
14   the plant they're working with, I think their information
15   would be important to establishing what the level of
16   exposure can be that causes disease, sure.
17   Q.   But what information would that be?
18   A.   Well, from there, if they're sampling a
19   workplace and they have medical records saying that -- or
20   medical exams showing a certain disease rate in a working
21   population, then, sure, that provides information of
22   exposure that could potentially cause disease.
23   Q.   But is it the -- strike that.
24        Is it the industrial hygienist, though, who would
25   take those exposure data as well as the medical

62

1  information and reach an opinion as to whether an exposure
2  has caused disease?  Is that the industrial hygienist's
3  role?
4      A.  No.  The industrial hygienist's role would be
5  to provide that data to people that wanted to simulate it
6  and perhaps do an epidemiologic study.
7      Q.  Okay.  So an industrial hygienist is a
8  critical component of developing this epidemiological
9  understanding, correct?
10     A.  Yes.
11     Q.  However, the industrial hygienist is -- strike
12  that.
13         However, the industrial hygienist's role is to focus
14  on, specifically, the exposure data, correct?
15     A.  Well, for the most part, making sure we
16  collect representative samples that could be used in an
17  epidemiologic study, as well as controlling the exposure.
18     Q.  Industrial hygienists clearly don't do the
19  medical examinations themselves, do they?
20     A.  No.
21     Q.  Industrial hygienists do not determine
22  toxicity based on mortality compared to exposure levels,
23  correct?
24     A.  Correct.
25     Q.  Okay.  That's not an industrial hygienist's

63

1  role, is it?
2      A.  No.
3      Q.  Okay.  Now, you're also not an expert on
4  insurance issues, are you?
5      A.  No.
6      Q.  You have no opinion as to Grace's historical
7  insurance policies, correct?
8      A.  I guess I don't know what you mean by
9  "historical insurance policies."  I --
10     Q.  This is something you know nothing about,
11  correct?
12     A.  Well, other than, I mean, I've certainly read
13  the Grace exhibits where there are memos from the
14  insurance companies, but I don't know what your question
15  is pertaining to.
16     Q.  You have no opinion as to how -- well, strike
17  that.  You have no --
18         MR. LEWIS:  We will concede that this witness
19  will not offer any testimony concerning insurance issues
20  in this case.
21     Q.  (By Mr. Stansbury) Okay, let me ask one more
22  follow-up on that.  You have no opinion on what
23  constitutes a product for insurance purposes, do you?
24     A.  No.
25     Q.  Okay.  Have you reviewed the trust

64

1  distribution procedure in this case?
2      A.  No.
3      Q.  Okay.  So you have no opinion on the medical
4  criteria contained in that TDP, do you?
5      A.  No.
6      Q.  And you have not evaluated the exposure
7  treated in that TDP, have you?
8      A.  No.
9      Q.  So you intend to offer no opinions about those
10  issues at the confirmation hearing, correct?
11     A.  No.
12     Q.  Okay.  And you are not offering any opinions
13  specific to the objections stated by the Libby claimants,
14  are you?
15         MR. LEWIS:  Objection; lack of foundation.
16  I'm not sure he's seen the objections.
17     Q.  (By Mr. Stansbury) Well, let's establish that.
18  Have you reviewed the objections submitted by the Libby
19  claimants?
20     A.  No.
21     Q.  So you have no opinion on those objections, do
22  you?
23     A.  No.
24     Q.  Okay.  Do you have any opinion regarding the
25  amounts paid in settlement to past Libby claimants?

65

1      A.  What do you mean do I have an opinion?
2      Q.  Well, I mean do you intend to offer any
3  opinion about the value of past settlements?
4      A.  No.
5      Q.  Okay.  Do you intend to offer any opinion
6  about the exposures that any individual Libby claimant may
7  have had?
8      A.  Well, I mean that's what I do is I basically
9  evaluate exposures.  So if I was asked to, if I was given
10  information, I guess I could provide an opinion on that.
11     Q.  Right.  So if you had information on a
12  person's exposure, you could evaluate that exposure,
13  correct?
14     A.  Yes.
15     Q.  Have you reviewed any of the exposures for any
16  of the Libby claimants?
17     A.  I don't know who they are, so I don't -- I
18  guess I haven't reviewed them.
19     Q.  Okay.  So sitting here today, you do not
20  intend to offer any testimony about an individual
21  claimant's exposure, do you?
22     A.  At this time, I guess I haven't seen the
23  claimant, so I don't know what their exposure was.
24         MR. STANSBURY:  Will you mark this as an
25  exhibit, please?  Madam court reporter, if you could mark

17 (Pages 62 to 65)

66

1　that as Exhibit 1, please.
2　　(Document marked Deposition
3　Exhibit No. 1 for identification.)
4　BY MR. STANSBURY:
5　　Q.  Dr. Spear, I'm handing you what's been marked
6　as Exhibit 1, which is the CV of Dr. Terry Spear, and it's
7　dated May 2008.  Is this your most recent CV?
8　　A.  No.
9　　Q.  Okay.  When was --
10　　A.  I have one with me.
11　　Q.  Oh.  Could I get that one, please?
12　　A.  You bet.
13　　Q.  Great.
14　　　MR. LEWIS:  We're probably going to need some
15　copies.  Would this be a good time to take a break?
16　　　MR. STANSBURY:  Sure, let's take a break.
17　　　VIDEOGRAPHER:  The time is 9:43.  We're off
18　the record.
19　　　(A brief recess was taken.)
20　　　VIDEOGRAPHER:  This is Tape 2 of the
21　videotaped deposition of Dr. Terry Spear.
22　　　The time is 9:49.  We're on the record.
23　　　MR. STANSBURY:  Okay.  And so do we have --
24　actually, let's make this Exhibit 2.
25　　　MS. ROHRHOFER:  Oh, really?  Okay.

67

1　　　MR. STANSBURY:  Yeah, because we still have
2　the old exhibit, we have the old CV as Exhibit 1.
3　　　(Document marked Deposition
4　Exhibit No. 2 for identification.)
5　BY MR. STANSBURY:
6　　Q.  So I'm handing you what is marked as Exhibit
7　2, which is your June 2009 CV.
8　　A.  I'm confused.
9　　Q.  There was, the May one was 1.  That one was 1.
10　　A.  This is marked 1 but it's 2009.
11　　Q.  Yeah, we're not going to use old one.  We're
12　not going to use the old one.  We're going to use the new
13　one instead.
14　　　(Off-the-record discussion.)
15　BY MR. STANSBURY:
16　　Q.  So you have a -- according to your CV, your BA
17　is in microbiology, correct?
18　　A.  Yes.
19　　Q.  You have a master's in environmental health,
20　correct?
21　　A.  Yes.
22　　Q.  And then a Ph.D. in environmental health from
23　the University of Minnesota, correct?
24　　A.  Yes.
25　　Q.  Okay.  And in your CV under "Related

68

1　Professional Experience," tell me if I read this
2　correctly.  It's on the second page (quoted as read):
3　　　"Provide consultation to a variety of general
4　industry and mining companies on program document
5　development, health and safety compliance auditing,
6　regulatory issues, industrial hygiene field sampling,
7　on-site hazard assessment, and training.  Over 20 years of
8　experience providing expert witness testimony involving
9　consultation and participation in more than 50 personal
10　injury and illness liability litigation cases for
11　plaintiffs, defendants, private industry, and insurance
12　companies."
13　　　Did I read that correctly, sir?
14　　A.  Yes.
15　　Q.  Okay.  I want to focus on the expert witness
16　testimony.  You list here:  Plaintiffs, defendants,
17　private industry, and insurance companies.
18　　　You were also retained as an expert witness by the
19　U.S. Government at one time, correct?
20　　A.  Yes.
21　　Q.  And that was in connection with what?
22　　A.  The criminal trial?
23　　Q.  Yes.  When were you retained by the U.S.
24　Government?
25　　A.  I believe it was sometime in 2005.

69

1　　Q.  Do you recall if it was winter or spring or
2　summer?
3　　A.  Not really.  I believe, I believe it was
4　sometime in 2005 when I was -- when I first started doing
5　work in that issue.  I may have been contacted before
6　that.  I don't remember the chronology.
7　　Q.  Who is the, which -- do you remember who the
8　-- well, strike that.
9　　　Who was the first person you recall contacting you
10　from the U.S. Government?
11　　A.  Kris McLean.
12　　Q.  And who is Kris McLean?
13　　A.  He's the district attorney out of Missoula.
14　　Q.  And what did he ask you?
15　　A.  He asked me if I'd be interested in discussing
16　participating in the criminal trial.
17　　Q.  Okay.  And was this over the phone, this first
18　conversation?
19　　A.  Yes.
20　　Q.  Was it a substantive call or was it just a
21　"hi", get to know each other, followed up by a later
22　meeting?
23　　A.  It was just, yeah, that type of call.
24　　Q.  Okay.  When did you first meet -- was the next
25　meeting with Mr. McLean face to face?

18 (Pages 66 to 69)

70

1   A.   Yes.
2   Q.   When did that occur, do you recall?
3   A.   Again, I believe it would have been in 2005.
4   Q.   Okay.
5   A.   I don't recall exactly when.
6   Q.   Okay. And could you briefly summarize that
7   first face-to-face meeting with Mr. McLean?
8   A.   Well, I believe they presented me with the
9   allegations in the trial proceedings and we discussed
10  those. And I believe he asked me if I would be willing to
11  be a witness on, I think -- originally, it was on two of
12  those aspects.
13  Q.   Which two aspects?
14  A.   I believe, you know, one pertained to
15  sanitation. I don't remember -- both of them pertained to
16  similar things, but -- (pause.)
17  Q.   So one was sanitation and the other one?
18  A.   I don't remember.
19  Q.   But it related to the historical operation of
20  the mine and mill up in Libby?
21  A.   Yes, I think that would be fair.
22  Q.   Okay. Did you talk to him at all about any of
23  your work regarding the forests around Libby?
24  A.   Well, no, because at that time, we'd just
25  begun that work in late '03 and we hadn't published

71

1   anything on that.
2   Q.   Did you tell him that was ongoing?
3   A.   Well, not then --
4   Q.   Okay.
5   A.   -- because it wasn't really ongoing.
6   Q.   Gotcha.
7   A.   I mean it was discussed and we were planning
8   things. We hadn't published anything. I notified him
9   after we had a publication.
10  Q.   Okay. And so obviously, you agreed to serve
11  as an expert witness for the Government, correct?
12  A.   Yes.
13  Q.   And were you paid for your services?
14  A.   Yes.
15  Q.   What was the paying rate?
16  A.   I believe $150 an hour.
17  Q.   And what specific services did you provide for
18  the U.S. Government?
19  A.   I provided Mr. McLean with an opinion.
20  Q.   In the form of a written report?
21  A.   Yes.
22  Q.   Okay. And this written report commented on
23  the historical vermiculite mining and milling operation in
24  Libby, correct?
25  A.   I believe it did.

72

1   Q.   And you also offered opinions about what the
2   industrial hygiene standards were at various times during
3   that operation, correct?
4   A.   And I don't remember if we -- if that was part
5   of the opinion. I mean, certainly, it was on standards
6   pertaining to how do we keep materials from leaving the
7   workplace and getting its way into the home.
8   Q.   Right. But you also were of the opinion that
9   W.R. Grace had failed to comply with the industrial
10  hygiene standards that were in place at that time,
11  correct?
12  A.   Yes.
13  Q.   Okay. What were some of the areas where you
14  found W.R. Grace to be lacking?
15  A.   Well, No. 1, lack of informing the worker of
16  the hazards of the materials, Libby amphibole that they
17  were working with --
18  Q.   Right.
19  A.   -- lack of control of the dust, whether it be
20  engineering controls, administrative controls, or personal
21  protective equipment; lack of sanitation or control of
22  dispersion and taking this material home. That's, that
23  was the main part of it.
24  Q.   Okay. Did you meet with anybody else from the
25  U.S. Government other than Mr. McLean?

73

1   A.   Well, when we had the first meeting, they came
2   over to Montana Tech and there were two other individuals
3   that worked for the EPA, and I don't remember who they
4   were.
5   Q.   But they were EPA individuals?
6   A.   That's what I understand.
7   Q.   Okay. How many times did you meet with
8   Mr. McLean?
9   A.   Just once.
10  Q.   Okay. And then you submitted a report. Did
11  you have any other conversations with him over the phone?
12  A.   I believe we had other phone conversations,
13  just keeping me updated on -- at least initially, like
14  2005, maybe part of 2006.
15  Q.   Okay. What about 2008 - 2009? Did you
16  continue a dialogue with Mr. McLean?
17  A.   No. The only dialogue would be if we had a
18  publication, I wanted to make sure that there was no
19  conflict of interest in his eyes, so I would send him the
20  fact that we had a paper published pertaining to Libby and
21  just to let him know.
22  Q.   So you informed Mr. McLean about these various
23  forest studies that you were doing, correct?
24  A.   Yes.
25  Q.   And you also informed the publications that

74

1  you were working with the U.S. Government at the time?
2      A.   I'm sorry, I lost that one.
3      Q.   Oh. So you mentioned you were concerned about
4  a conflict of interest with the Government and you
5  disclosed to the Government that you were writing these
6  papers, correct?
7      A.   Yes.
8      Q.   Did you make a disclosure in the other
9  direction as well to these papers that you were testifying
10  for the U.S. Government?
11     A.   I didn't.
12     Q.   Okay. And just so we're clear, this is --
13  we're talking about an article in 2006 that was submitted
14  to the International Journal for Scientific Research Into
15  the Environment and its Relationship with Human Kind,
16  right? Is that your 2006 article? You might have it in
17  front of you.
18     A.   This is what you're referring to?
19     Q.   May I see?
20     A.   (Handing document to counsel.)
21         MR. STANSBURY: Could we mark this as an
22  exhibit, please?
23         (Document marked Deposition
24     Exhibit No. 3 for identification.)
25  BY MR. STANSBURY:

75

1      Q.   So we're looking at "Trees as reservoirs for
2  amphibole fibers in Libby, Montana," published 2006. And
3  the authors are Tony Ward, Terry Spear, Julie Hart, Curtis
4  Noonan, Andrij Holian --
5      A.   Yeah.
6      Q.   -- okay, Myron Getman, and James Webber. Did
7  I read that correctly, sir?
8      A.   Yes.
9      Q.   Okay. And this article - we can discuss it in
10  detail a little bit later, but just so I'm clear - this
11  article, you examined tree bark to determine the asbestos
12  contents in that tree bark, correct?
13     A.   Yes.
14     Q.   Okay. And at the time of this article's
15  publication, you were working as a consultant to the U.S.
16  Government in connection with the criminal case, correct?
17     A.   Yes.
18     Q.   Had you also be retained by individuals who
19  had lawsuits against W.R. Grace for personal injury
20  arising from exposures in and around the mine?
21     A.   At that time, I don't believe so.
22     Q.   Okay. Do you recall -- you had testified
23  previously, though, on behalf of plaintiffs, correct?
24     A.   I have, yes.
25     Q.   When was the last time you had testified on

76

1  behalf of a plaintiff in a Libby case?
2      A.   I guess -- I don't remember. It could have
3  been the mid 2000s. I don't remember the last time I
4  testified.
5      Q.   Okay. When were you retained in connection
6  with this case?
7      A.   I believe it was 2008.
8      Q.   2008. So you had testified in the mid 2000s,
9  as you said, on behalf of individuals exposed to asbestos
10  from Libby, correct?
11     A.   To the best of my memory.
12     Q.   Okay. And at this time, you were working as a
13  consultant for the U.S. Government in a criminal trial
14  against W.R. Grace involving alleged criminal releases of
15  asbestos into the ambient air, correct?
16     A.   Well, again, takehome exposure is what I was
17  asked to testify on.
18     Q.   Okay.
19     A.   My testimony, as I understand it, for Kris
20  McLean was to basically evaluate how they could have
21  controlled asbestos takehome with sanitation procedures.
22     Q.   And do you have your 2007 article in front of
23  you, sir, in your folder?
24     A.   Is this the firewood harvesting?
25     Q.   Yes, sir.

77

1      A.   Yes.
2         MR. STANSBURY: Okay. Could we mark that as
3  an exhibit, please, madam court reporter?
4         (Document marked Deposition
5     Exhibit No. 4 for identification.)
6  BY MR. STANSBURY:
7      Q.   Exhibit 4 is "Evaluation of Asbestos Exposures
8  during Firewood-Harvesting Simulations in Libby, Montana,
9  USA - Preliminary Data", by Julie Hart, Tony Ward, Terry
10  M. Spear, Kelly Crispen, and Tara R. Zolnikov.
11         Did I read that correctly, sir?
12     A.   Yes.
13     Q.   And this is published in the "Annals of
14  Occupational Hygiene" in 2007. Is that correct, sir?
15     A.   Yes.
16     Q.   Okay. And in this paper, you're looking at
17  activities that could occur in the forest and potential
18  asbestos exposures that could arise from those activities,
19  correct?
20     A.   Well, specifically from harvesting firewood,
21  yes.
22     Q.   Okay. Can I get the 2009 -- do you also have
23  the 2009 paper in front of you, sir?
24     A.   I don't.
25         (Document marked Deposition

**78**

1      Exhibit No. 5 for identification.)
2   BY MR. STANSBURY:
3      Q.   I'm handing you what has been marked as
4   Exhibit 5. Okay. I've handed you what has been marked as
5   Exhibit 5, which is "Fate of Libby Amphibole Fibers When
6   Burning Contaminated Firewood," by Tony Ward, Julie Hart,
7   Terry Spear, Brienne Meyer, and James Webber, published in
8   2009 in "Environmental Science Technology".
9      Is that correct, sir?
10     A.   Yes.
11     Q.   Okay. And this article examined potential
12  asbestos exposures that could occur when using wood as
13  firewood in an indoor heating oven, correct?
14     A.   Yeah, I don't know if it evaluated exposures.
15  We were mainly trying to determine if wood that was
16  contaminated with the asbestos was burned, where would it
17  end up, I mean where did it go.
18     Q.   Okay. So this was not aimed at looking at
19  potential exposures.
20     A.   Well, not -- no, because we didn't really
21  concentrate on doing an exposure measurement. It was
22  mainly just sampling within the stove itself.
23     Q.   Okay. The 2007 paper, however, you are
24  looking at, Exhibit 4, you are looking at potential
25  exposures, correct?

**79**

1      A.   Yes.
2      Q.   Okay. Did you ever talk about this paper with
3   Kris McLean?
4      A.   No.
5      Q.   Okay. Did you ever talk about the 2009 paper
6   with Kris McLean?
7      A.   No.
8      Q.   But you did discuss Exhibit 3, which was the
9   2006 paper, you discussed that with Kris McLean?
10     A.   No.
11     Q.   Oh, you never discussed any of these with Kris
12  McLean?
13     A.   No. I basically would notify him of what we
14  were trying to publish and that we were doing research up
15  in Libby.
16     Q.   So you made him aware that you were doing this
17  research, though, correct?
18     A.   Yes.
19     Q.   Okay. And the 2009 paper, you say it does not
20  focus on potential exposures, correct?
21     A.   Well, not -- that wasn't the main aim of the
22  study. It was to determine where are the fibers when you
23  burn wood contaminated with the amphibole asbestos. Do
24  they go out the stack? Do they go -- stay in the
25  ductwork? Do they stay in the ash?

**80**

1      Q.   Was your concern that potentially people could
2   be exposed to asbestos when burning firewood?
3      A.   I believe that would be fair, that there could
4   be a potential concern.
5      Q.   Okay. And with Exhibit 4, the 2007 paper,
6   there was a concern that there could be exposure to
7   asbestos in the harvesting of firewood, correct?
8      A.   Yes.
9      Q.   Okay. Exposure in the ambient air, correct --
10  well, strike that.
11     This would be airborne exposures that arise from
12  activities involved with harvesting firewood, correct?
13     A.   Yes.
14     Q.   Okay. And those could potentially cause
15  disease, correct?
16     A.   I suppose that's correct, yes.
17     Q.   Right. That's your concern is preventing
18  disease, correct?
19     A.   Yes.
20     Q.   And so with the 2006 paper, Exhibit 3; the
21  2007 paper, Exhibit 4; the 2009 paper, Exhibit 5; when
22  submitting these papers, you did not disclose to any of
23  the publications that you were testifying as -- strike
24  that.
25     With respect to Exhibit 3, the 2006 paper; Exhibit

**81**

1   4, the 2007 paper; and 2009, the -- which is Exhibit 5,
2   the 2009 paper, you did not disclose to the journals that
3   you had been retained as an expert by the U.S. Government?
4      A.   I didn't.
5      Q.   Okay. Did you disclose to any of the journals
6   that you had previously testified on behalf of Libby
7   claimants?
8      A.   No.
9      Q.   Did you disclose to any of the journals about
10  your retention in this matter here?
11     A.   I didn't. I wasn't -- well, no. I wasn't
12  retained for this case until 2008 so -- (pause.)
13     Q.   But for the 2009 paper, Exhibit 5, this was
14  published after you were retained, correct?
15     A.   Yes.
16     Q.   Okay. Why didn't you feel it was necessary to
17  disclose that information to the journals?
18     A.   Well, because we are doing research to
19  determine pathways of exposure. And it's not being paid
20  for by any law firm, and I'm not doing it for a law firm.
21  I'm doing it as a research exercise to try to determine
22  pathways of exposure.
23     Q.   But this work is relevant to your opinions in
24  this case, correct?
25     A.   I think all the work I've done in Libby before

21 (Pages 78 to 81)

82

1   these publications is relevant, yes.
2       Q.   Okay.  So, for example, the 2007 paper, in
3   your mind, this paper could be used to support an opinion
4   that individuals in Libby could develop disease from
5   harvesting lumber, correct?
6       A.   I suppose it could be.
7       Q.   Okay.  "Yes" or "no," sir?  Do you agree that
8   that's true?
9       A.   Yes.
10      Q.   Okay.  And presumably, this could be an
11  individual who is a Libby claimant, correct?  Are you
12  aware of any Libby claimants who may have been exposed in
13  the forest?
14      A.   I've never been involved with a court case
15  that involved forestry or exposure to firewood, no.
16      Q.   Okay.  Are you aware of any disease that's
17  arisen from exposure to forestry or firewood?
18      A.   I'm not.  I haven't seen any data on that.
19      Q.   Okay.  So sitting here today, you have no
20  opinion as to whether exposures in the woods at Libby
21  could cause disease?
22      A.   Well, again, I'm not a doctor and I don't want
23  to state an opinion as to if our research is saying that
24  -- we don't say that in the research that it could cause a
25  disease.  We basically say that there could be exposures

83

1   and perhaps it would lead to a concern for disease.
2       Q.   Okay.  Well, let's narrow this down a bit,
3   because earlier we were talking, I'd asked you about
4   whether you had opinions as to what exposure levels could
5   cause disease.  And you said that you did, correct?
6       A.   Yes.
7       Q.   Okay.  And that was based in part on your
8   review of epidemiological literature, correct?
9       A.   In part, yes.
10      Q.   As well as case reports, correct?
11      A.   Yes.
12      Q.   Okay.  Do you have an opinion as to whether
13  the exposures identified in Exhibit 4 can cause disease?
14      A.   And Exhibit 4 --
15      Q.   Yes.
16      A.   -- is the firewood harvesting?
17      Q.   Yes, sir.
18      A.   Yeah, I mean we wanted to determine if -- we
19  knew the wood was contaminated, so we wanted to determine
20  can we liberate fibers if we do this activity.  So based
21  on the personal breathing zone samples, we, you know, we
22  found that fibers are liberated.
23      Q.   Okay.  And were they liberated at a level that
24  you believe could pose a threat to human health?
25      A.   Well, since -- particularly for Libby

84

1   amphibole, I'm not sure we know what level, lowest level
2   was going to cause disease, then I guess any level would
3   concern me.
4       Q.   Okay.  And so this research, the 2007 paper,
5   just so we're clear, who paid for that research?
6       A.   Which one again?
7       Q.   The 2007, Exhibit 4, the harvesting study.
8       A.   This was paid for through the University of
9   Utah, I believe.
10      Q.   Okay.
11      A.   And it wasn't mine.  It was Julie Hart's
12  research.  It was her grant.
13      Q.   Did you ever send a copy of this to Kris
14  McLean?
15      A.   I don't remember if I did or not.  I may very
16  well have.  I just wanted to keep him informed that we
17  were doing the work up in Libby.
18      Q.   Okay.  So you're doing the work in Libby,
19  establishing these exposures.  And then today, you're
20  offering testimony about potential exposures that could be
21  occurring in Libby that could cause disease, correct?
22      A.   Yes.
23      Q.   And a basis of that opinion is, in part, the
24  studies, correct?
25      A.   Well, I rely on these studies, yes.

85

1       Q.   Okay.  And you're being compensated for being
2   here today, correct?
3       A.   Yes.
4       Q.   What is your -- is your hourly rate still $150
5   an hour?
6       A.   Yes.
7       Q.   Okay.  So you did these studies that were
8   published in 2006, 2007, and 2009 without disclosing that
9   you had previously testified on behalf of individuals who
10  got disease from Libby, correct?
11          MR. LEWIS:  Objection.  Disclosing to who?
12          MR. STANSBURY:  To -- fair point.
13          MR. LEWIS:  Okay.
14      Q.   (By Mr. Stansbury) To the journal, correct?
15  To either -- any of the journals, correct?
16      A.   I did not disclose it to the journal, but I
17  wasn't the grant administrator, either.
18      Q.   But you are one of the authors listed,
19  correct?
20      A.   Yes.
21      Q.   Okay.  And then today, you are being
22  compensated to offer opinions that are based in part on
23  this research you've previously done, correct?
24      A.   Yes.
25      Q.   Okay.  And in particular, and with respect to

22 (Pages 82 to 85)

86

1 the 2009 paper, you were retained in this case when that
2 paper was being considered for publication, correct?
3    A.   Yes.  It was being considered in 2008.
4    Q.   Okay.  And you at no point disclosed to the
5 journal that you were receiving compensation to offer
6 opinions about exposures in the same forest that were the
7 subject of that paper?
8    A.   No.
9    Q.   Okay.  Did you review the guidelines for
10 disclosing conflicts of interest before submitting any of
11 those three papers?
12    A.   Well, I didn't.  I basically helped put the
13 papers together, and I think Tony Ward and Julie Hart
14 submitted them, so -- (pause.)
15    Q.   Okay.  Did you disclose to them that you had
16 been working for -- you had historically worked for
17 plaintiffs?
18    A.   Yes.  They know that I have been.
19    Q.   Okay.  And they knew that you were working for
20 the U.S. Government?
21    A.   I don't know if they knew that or not.  I
22 believe so.
23    Q.   But they certainly knew that you were involved
24 with personal injury cases involving exposures in Libby,
25 correct?

87

1    A.   I believe they knew that.
2    Q.   But there was no disclosure made?
3    A.   Not that I know of.
4    Q.   Okay.  I would like to look -- do you have
5 your expert report with you today, sir?
6    A.   Yes.
7       MR. STANSBURY:  Could we mark that as an
8 exhibit, please.
9       MR. LEWIS:  I've got one.  What exhibit number
10 are you going to put on it?
11       (Document marked Deposition
12    Exhibit No. 6 for identification.)
13       MR. LEWIS:  Maybe I'll take this other, the
14 other copy.
15 BY MR. STANSBURY:
16    Q.   Before you is Exhibit 6.  Is this your expert
17 report, sir?
18    A.   Yes.
19    Q.   Okay.  And does this opinion reflect the
20 entirety of the opinions you intend to offer at the
21 confirmation hearing?
22    A.   Yes.
23    Q.   Okay.  Has there been any work done since the
24 submission of this report that you believe informs the
25 opinions that you wish to offer in this case?

88

1    A.   No.
2    Q.   Okay.  It's a pretty long report.  Let's see
3 here, it's 27 pages; is that right?
4    A.   I believe that's like 32 counting references.
5    Q.   Okay, counting references, okay.  And the
6 paragraphs are numbered, correct?
7    A.   Yes.
8    Q.   And some of these paragraphs deal with related
9 points and some of them deal with very different points,
10 correct?
11    A.   That would be fair, I think.
12    Q.   Okay.  What I'd like to do is kind of walk
13 through the report so we can kind of identify which
14 paragraphs relate to specific opinions you intend to offer
15 at the hearing.  And to the extent that we can kind of
16 group of the paragraphs together, perhaps we could do so.
17 Would you be willing to walk through that with me?
18    A.   Sure.
19    Q.   Okay.  Now, Paragraph 1, your name and where
20 you live, I think we can move past that.  And 2 and 3 are
21 background information.  Paragraphs 4 and 5, these
22 paragraphs both relate to the published studies we were
23 just discussing, correct?
24    A.   Yes.
25    Q.   Paragraph 4 relates to Exhibit 3, whereas

89

1 Paragraph 5 relates to Exhibit 4.  Correct, sir?
2    A.   Yes.
3    Q.   Okay.  And there's no reference in this report
4 to Exhibit 5, the 2009 paper.  That was published after
5 this report, correct?
6    A.   Yes.
7    Q.   But do you intend to offer any opinions at the
8 confirmation hearing based on that paper?
9    A.   No.
10    Q.   Okay.  So we can just put that aside, then,
11 and not talk about it, correct?
12    A.   Fine.
13    Q.   Okay.  Now, looking at Paragraph 6, Paragraph
14 6 and 7, these discuss - and if you don't like my
15 clarification, please tell me - these discuss the
16 historical conditions at the mining and milling facility,
17 correct, sir?
18    A.   Well, yeah.  It discusses, you know, the basic
19 flow of operations, flow of materials.  And to that
20 extent, I think you're correct.
21    Q.   Okay.  Well, let's agree to a term that we can
22 both be comfortable with.  Paragraph 6 and 7 both relate
23 to the historical operating conditions at Libby?  Is
24 that --
25    A.   Yes, again --

90

1    Q.   Okay.
2    A.   -- the way things were processed.
3    Q.   Okay.
4    A.   And what --
5    Q.   So those were the historical conditions.
6    Paragraph 8, tell me if I read this correctly:
7         "The community of Libby lies in a mountain
8    valley. The valley air shed functions somewhat like a
9    bowl. Pollutants when disturbed by wind or human activity
10   tend to be recycled into the bowl."
11        Did I read that correctly, sir?
12   A.   Yes.
13   Q.   Okay. That opinion relates to the atmospheric
14   conditions in Libby, correct?
15   A.   Yes.
16   Q.   Okay. Outdoor, right?
17   A.   Yes.
18   Q.   Ambient air, is that another term for that as
19   well?
20   A.   Yes, it could, I guess.
21   Q.   Okay. Do industrial hygienists typically
22   study the ambient air?
23   A.   Well, the industrial hygienist is primarily
24   concerned with what goes on inside the plant, but
25   certainly we do become involved with public exposure

91

1    because materials do move outside the plant. And so from
2    that standpoint, I wouldn't be quite that narrow.
3    Q.   Okay. So when you say moving outside the
4    plant, do you mean, you know, a cloud of dust moving down
5    the street, or does that also involve atmospheric
6    conditions, you know, thousands of feet in all directions?
7    A.   Well, probably not. I mean we certainly have
8    to record, you know, atmospheric conditions when we're
9    doing sampling. We want to know wind speeds and wind
10   directions and pressures, temperatures, and things like
11   that. So that's all atmospheric, I guess.
12   Q.   Okay. And the statement, "The valley airshed
13   functions somewhat like a bowl," what is your basis for
14   that opinion?
15   A.   Well, the basis for it is that there are a lot
16   of inversions in Libby, I mean if you've ever been up
17   there in the wintertime.
18   Q.   Oh, I have.
19   A.   And so it tends to have -- you know, the air
20   tends to settle within the valley.
21   Q.   Okay.
22   A.   That's all I meant there.
23   Q.   Okay. Have you ever studied systematically
24   the extent to which any type of particulate or pollutant
25   would remain static in the Libby atmosphere compared to

92

1    the atmosphere of other areas?
2    A.   I haven't personally, no.
3    Q.   Okay. Have you reviewed any literature which
4    has studied the Libby atmosphere in that manner?
5         THE WITNESS: As compared -- excuse me,
6    Counsel. I don't mean to interfere, but when you say "in
7    that manner," are you saying as compared to some other
8    place?
9         MR. STANSBURY: Yes.
10        MR. LEWIS: Okay.
11        THE WITNESS: Well, yes, I have looked at
12   literature describing that comparison.
13   Q.   (By Mr. Stansbury) Can you name any of the
14   literature which --
15   A.   Well, I -- let me -- I guess maybe I better
16   clarify. I mean I've looked at the literature that Tony
17   Ward has put together where he looks at source
18   apportionment; in other words, what's contributing to the
19   particulates in the air in Libby. Is it automobile
20   exhaust? Wood smoke? So from that standpoint, I've
21   looked at that type of literature.
22   Q.   Is that a published paper?
23   A.   I don't know if it's published or not.
24   Q.   Okay.
25   A.   I believe it is.

93

1    Q.   But that's something that informs your opinion
2    as to whether the airshed functions somewhat like a bowl.
3    It was Tony Ward's work, correct?
4    A.   Well, in part, yeah.
5    Q.   In part. Did that work examine asbestos in
6    particular?
7    A.   Not that I'm aware.
8    Q.   Okay. It focused on, I think you mentioned,
9    automobile exhaust. Is that one of the potential
10   substances?
11   A.   I believe so, wood smoke, and there were other
12   things that they looked at.
13   Q.   Okay. But you've not looked at any literature
14   specific to how asbestos either remained or does not
15   remain in the atmosphere in Libby, have you?
16   A.   Well, I've obviously looked at current studies
17   being done by EPA as the technical advisor to the TAG.
18   That's my job, is to, you know, evaluate what EPA is doing
19   up there and to try to find out if, you know, if there's
20   any problems with that. And so I do read their reports.
21   I've read their ambient air sampling reports and different
22   things.
23   Q.   Okay. None of those reports, though, are
24   cited in this, in this expert report, though, right?
25   A.   No.

94

1    Q.   Okay.  Nor is the Tony Ward article, correct?
2    A.   Correct.
3    Q.   Okay.  And so when it says pollutants when
4    disturbed by wind or human activity tend to be recycled in
5    the bowl, that opinion is based also on Tony Ward's work
6    as well as the EPA's work?
7    A.   Well, yes, in part, and just having been up
8    there and just seeing how stagnant the air can be.  So, I
9    mean, that's the word "recycle."  It's not going to move
10   out of there very readily.
11   Q.   When you say just seeing the air, is that
12   something that I would be just as capable of observing as
13   you would, the stagnant air?
14   A.   Yes.
15   Q.   Okay.  That's not something that's based on an
16   expertise that you have, correct?
17   A.   No.
18   Q.   Okay.  Let's look at Paragraph 9, sir.
19   Paragraph 9, and actually, I believe Paragraph 9, 10, and
20   11, these paragraphs all seem to discuss ways in which
21   people in the community may have been exposed to asbestos
22   from the mining and milling facility; is that correct,
23   sir?
24   A.   I believe that that would be correct in part,
25   yes.

95

1    Q.   Okay.  So is it fair to say that these three
2    paragraphs, 9, 10, and 11, they deal with potential
3    community exposures?
4    A.   Yes.
5    Q.   Okay.  Paragraph 12:  Various tests on the
6    dust showed 27 to 40 percent asbestos.  You cite to common
7    exhibits, correct?
8    A.   Yes, common exhibits and, I mean, the
9    percentages are also listed in, you know, publications
10   like by EPA or ATSDR.
11   Q.   But these are historical measurements,
12   correct?  These weren't measurements that were done
13   recently, correct?
14   A.   I believe they're historical.
15   Q.   Okay.  And so they reflect the historical
16   conditions that existed when the mine and the mill was
17   operating, correct?
18   A.   Well, I'm not, I'm not sure how to answer your
19   question.  I mean the percentages, I don't know if they've
20   changed.  If they have, I don't know it.
21   Q.   Okay, okay.
22   A.   But, yeah, these do come from people looking
23   historically at what's being reported.
24   Q.   Those were the conditions historically.
25   Historically, 27 to 40 percent of the dust showed some

96

1    asbestos in it, correct?
2    A.   Yes.
3    Q.   Okay.  Let's turn to Paragraph 13.  Now,
4    Paragraph 13, you're talking about the industrial hygiene
5    literature, correct?
6    A.   Yes.
7    Q.   And specifically, the literature is
8    understanding of asbestos, correct?
9    A.   Yes.
10   Q.   And you also mention that, and if I say this
11   correctly:  "The above was clear in the occupational
12   medicine and industrial hygiene literature, and W.R. Grace
13   and its predecessor Zonolite Company should have been well
14   aware of it."
15   Correct?
16   A.   Yes.
17   Q.   Okay.  So this one, it's not necessarily just
18   historical conditions.  We're also kind of talking here
19   about what W.R. Grace or Zonolite should have known at the
20   time, correct?
21   A.   Yes.
22   Q.   And the way a company knows things, so to
23   speak, is a function of its decision to gather
24   information, correct?
25   A.   Yes.

97

1    Q.   And that's an important part of being a
2    responsible company in your mind, correct?
3    A.   Well, that's one way.
4    Q.   One way.
5    A.   Obviously, the other way is that someone gives
6    them information --
7    Q.   Okay.
8    A.   -- and provides information to them.
9    Q.   But a company informing itself of potential
10   hazards, that's part of a responsible company's code of
11   conduct, correct?
12   A.   Please say that again.
13   Q.   Sure.  A company informing themselves of
14   potential hazards involving their enterprise, that is part
15   of a responsible company's code of conduct, correct?
16       MR. LEWIS:  I'm going to object as -- I think
17   the term "code of conduct" is vague.  Without showing what
18   you mean by that, I don't know how the witness can answer
19   the question.  I think the question is vague.
20   Q.   (By Mr. Stansbury) Do you understand my
21   question, sir?
22   A.   No.
23   Q.   Okay.  You believe that companies can act
24   responsible?
25   A.   I hope that they do, yes.

98

1    Q.  You believe companies can act irresponsibly,
2  don't you?
3    A.  Yes.
4    Q.  It's your opinion that Grace acted
5  irresponsibly for many years with respect to the mining
6  and milling operation in Libby, correct?
7    A.  Yes.
8    Q.  Do you consider that irresponsibility to be a
9  course of conduct that Grace took?
10    A.  I don't know what you mean by "course of
11  conduct."
12    Q.  Do you -- well, we can come to an agreement on
13  whatever words you want to use here.  What I'm trying to
14  get across, though, is this opinion - and there's going to
15  be a lot of opinions in this report - really talks about
16  what Grace should have known, correct?
17    A.  Yes.
18    Q.  What they should have done, correct?
19    A.  Yes.
20    Q.  What they didn't do, correct?
21    A.  Yes.
22    Q.  Is there any way you would term -- is there
23  any term you would use to describe those issues?  I'm open
24  to whatever term you want to use.
25    A.  Well, that's fine.  We just mentioned them

99

1  individually, so --
2    Q.  Okay.  So, but they're actions, I mean these
3  are all actions or inactions by Grace, correct?
4    A.  Yes.
5    Q.  Okay.  And can we use the term "conduct"?  I
6  mean is the term "conduct" comfortable to say that
7  somebody's conduct is responsible when they put in a
8  medical surveillance program?  That's a form of conduct
9  that's responsible, correct?
10    A.  That would be fine.
11    Q.  Okay.  And, you know, not making any effort to
12  keep a facility clean, that's irresponsible conduct,
13  correct?
14    A.  Yes.
15    Q.  And so I'm not trying to -- you know, I like
16  the word "conduct" because it's easy.  I just want to make
17  sure we're on the same page here.
18    Paragraph 13 talks about Grace's failure to -- or
19  states that they should have known.  And one way a company
20  knows something is by informing itself, either somebody
21  telling them or, you know, taking affirmative steps to
22  learn, correct?
23    MR. LEWIS:  Objection; that's a compound
24  question and it's improper.
25    Q.  (By Mr. Stansbury) Do you understand the

100

1  question, sir?
2    A.  Well, yes.  And by informing themselves
3  meaning, you know, searching the literature for what's
4  known about a particular topic like asbestos, conducting
5  studies which are published and get the word out.
6    Q.  Right.
7    A.  Yeah, that's conduct.
8    Q.  Okay.  So that's what Paragraph 13 --
9  Paragraph 13, you know, addresses that.  Paragraph 14, I'm
10  going to read this out loud (quoted as read):
11    "The central principles of industrial hygiene
12  literature are to study, to warn and to protect.  These
13  principles extend not only to Grace workers in Libby, but
14  also to family members of workers, and to the community.
15  W.R. Grace and its predecessor Zonolite Company did not
16  adequately study, warn or protect the workers, their
17  families, or the community of Libby."
18    Did I read that correctly, sir?
19    A.  Yes.
20    Q.  Okay.  Again, this is an example where you
21  believe Grace's conduct was improper with respect to the
22  workers, the family members, and the community of Libby
23  correct, sir?
24    A.  Yes.
25    Q.  Okay.  Paragraph 15, this one's a little bit

101

1  longer.  But again, is it fair to say, and this is -- you
2  know, because you actually are quoting, I believe, Earl
3  Lovick's deposition testimony, correct, from the
4  Schnetter v. W.R. Grace transcript?
5    MR. LEWIS:  Objection; that's not correct.
6    THE WITNESS:  Well, are we on 15?
7    MR. LEWIS:  That's his trial testimony.
8    MR. STANSBURY:  Oh, excuse me.  Thank you,
9  Tom, I appreciate that.
10    Q.  (By Mr. Stansbury) Paragraph 15 runs onto page
11  7 all the way to page 8, correct?
12    A.  Fifteen, yes.
13    Q.  Okay.  And once again, here you are examining
14  what Grace knew about the conditions in Libby.  And as you
15  state in the last sentence of the paragraph:  "Grace
16  continues to send men into the dry mill for eight years
17  after 1966."
18    Is that correct, sir?
19    A.  Yes.
20    Q.  So again, this speaks to Grace's, in your
21  mind, improper conduct during this time period, correct,
22  sir?
23    A.  Yes.
24    Q.  Okay.  Moving on to Paragraph 16:  "Grace knew
25  of the connection between asbestos exposure and lung

W.R. GRACE & CO.          TERRY M. SPEAR, Ph.D.          July 29, 2009

102

1  cancer through the 1964 State Report, and was therein
2  informed of 'possible widespread carcinogenic air
3  pollution'" - citation to Exhibit 53 - "Risks of asbestos
4  to community members were quite clearly spelled out to
5  Grace executives in 1968," again citing Exhibit 119.
6      So here you believe that Grace was aware that there
7  were community risks, correct?
8      A.  Yes.
9      Q.  And Grace, in your mind, was not warning
10  people about these risks, correct?
11      A.  That's correct.
12      Q.  So again, not proper conduct for a company
13  like Grace, correct?
14      A.  That's correct.
15      Q.  Okay.  Paragraph 17, this to me looks more
16  like discussions of the historical operations at Libby.
17  Is that a fair description of Paragraph 17?
18      A.  Yes, the date 1967.
19      Q.  Right.  And you're talking about the test was
20  done in a large "600 fan" of the dry mill.  So this
21  doesn't necessarily speak to their conduct, but again as
22  we were discussing earlier, speaks to what the conditions
23  were historically, correct, sir?
24      A.  Well, it -- you know, if you read between the
25  lines, it speaks of their conduct, too, because it was

103

1  right in this time frame that the stack on the dry mill
2  was horizontally located, so -- (pause.)
3      Q.  Okay.  So, again, in your mind, this is part
4  of the conduct, then.  You would put this under, again,
5  another example where Grace's conduct was improper.
6      A.  Yes.
7      Q.  Okay, that's fair.  Paragraph 18, here you're
8  looking at - and I'm going to read this out, tell me if I
9  read this correctly:
10      "Residents have reported that Libby in
11  1950-1990 was a dusty place.  The manager of Grace
12  operations estimated in 1965 that 'you could get a five
13  count in downtown Libby on many dry days.'" Exhibit 79.
14      This would have been 5 -- and could you please
15  explain what "mppcf" means so we're clear?
16      A.  Million particles per cubic foot.
17      Q.  -- "or about 20 fibers per cubic centimeter."
18  See Amandus (1987), citing Libby studies, expert report of
19  Dr. Alan C. Whitehouse.
20      "In 1975, Grace performed measurements of
21  ambient air at three locations in Libby and obtained 0.67,
22  1.1, and 1.5 f./cc" -- which is fibers per cubic
23  centimeter.  Is that correct, sir?
24      A.  Yes.
25      Q.  -- "indicating a serious hazard from breathing

104

1  the air in Libby," Exhibit 20, expert report of
2  Dr. Whitehouse.
3      Now, this paragraph speaks more to potential
4  community exposures, correct, sir?
5      A.  Yes.
6      Q.  Okay.  Let's look at Paragraph 19.  Again, I
7  believe this paragraph speaks to Grace's conduct at the
8  time, the last sentence being:  "Accordingly, Grace's
9  medical surveillance program was inadequate at all times
10  up to 1990."
11      Do you agree, sir?
12      A.  Yes.
13      Q.  Okay.  Paragraph 20, again, this is -- does
14  this deal with Grace's conduct?
15      A.  Yes.
16      Q.  Okay.  Paragraph 21, same question:  Does this
17  deal with Grace's conduct?
18      A.  (Perusing document) -- yes.
19      Q.  Paragraph 22, does this pertain to Grace's
20  conduct?
21      A.  (Perusing document) -- yes.
22      Q.  Paragraph 23, does this relate to Grace's
23  conduct?
24      A.  (Perusing document) -- yes.
25      Q.  Paragraph 24, does this relate to Grace's

105

1  conduct?
2      A.  (Perusing document) -- well, it pertains to
3  their conduct and -- their conduct, and, you know, their
4  knowledge.
5      Q.  Okay.  And the knowledge that either informed
6  or perhaps did not inform the conduct they took, correct?
7      A.  Yeah, their knowledge of what was going on
8  within their own plant.
9      Q.  Right.  And as you say, Grace settled the
10  case, correct?
11      A.  Where do I say that at -- yes, okay.
12      Q.  That's correct?
13      A.  Yes.
14      Q.  So that was the course of conduct they took
15  was to settle the case, correct?
16      A.  Yes.  In part, I believe that would be
17  correct.
18      Q.  Okay.  Paragraph 25, and I believe this
19  relates to a study of workers.  And again, you state:
20  "This study was not disclosed."  Is that correct?
21      A.  Yes.
22      Q.  And does that relate to Grace's conduct at the
23  time?
24      A.  Yes, and state of the knowledge.
25      Q.  And state of knowledge.  Paragraph 26, this is

27 (Pages 102 to 105)

106

1  a study of hamsters which, as you state, was not
2  disclosed.  Does this relate to Grace's conduct and
3  knowledge at the time?
4      A.  Yes.
5      Q.  Okay.  Paragraph 27, again, does this relate
6  to Grace's conduct?
7      A.  Yes.
8      Q.  I'd like to read Paragraph 27 for the record.
9  Tell me if I read this correctly, please.
10         "In 1980 NIOSH proposed a study on Libby
11  workers.  Grace's response was to consider alternatives,
12  including to 'obstruct and block'" - "obstruct and block"
13  in quotes - "the study."
14      Did I read that correctly, sir?
15      A.  Yes.
16      Q.  Now, ultimately, though, Grace cooperated with
17  NIOSH, didn't they?
18      A.  Yes.
19      Q.  And that study --
20      A.  Well, eventually NIOSH came into the plan,
21  sure.
22      Q.  Right.  However eventually, this proposed
23  study became the Amandus study, correct?
24      A.  Yes.
25      Q.  Okay.  But you don't mention that below, do

107

1  you?
2      A.  No.
3      Q.  Okay.  Paragraph 28, again, does this relate
4  to Grace's conduct, historical conduct?
5      A.  (Perusing document) -- yes.
6      Q.  Okay.  Paragraph 28 -- excuse me, Paragraph
7  29, does this relate to Grace's historical conduct?
8      A.  (Perusing document) -- it relates to their
9  conduct, yes.
10      Q.  Okay.  Paragraph 30, does this relate to
11  Grace's historical conduct?
12      A.  (Perusing document) -- yes.  And in addition
13  to relating to their conduct, it relates to, you know,
14  what is done in the field of industrial hygiene, so just
15  so we're clear on that.
16      Q.  Okay.  No, that's fair.  But what is done in
17  the field of industrial hygiene is, particularly at that
18  time, is certainly a relevant consideration when
19  evaluating their conduct, correct, sir?
20      A.  Yes.
21      Q.  Okay.  Paragraph 31, once again, does this
22  relate to Grace's historical conduct?
23      A.  (Perusing document) -- yes.
24      Q.  Okay.  Paragraph 32, does this relate to
25  Grace's historical conduct?

108

1      A.  (Perusing document) -- yes.
2      Q.  Now, Paragraph 33, this discusses the -- how
3  would you characterize Paragraph 33?
4      A.  Let me read it.  May I?
5      Q.  Please do.
6      A.  (Perusing document) -- it certainly pertains
7  to their knowledge.
8      Q.  Ultimately -- okay, so it pertains to their
9  knowledge.  So you would say -- or is it fair to say this
10  provides just background on the natural conditions in the
11  Libby area?
12      A.  Well, it pertains to their conduct, too --
13      Q.  Okay.
14      A.  -- because they're actually trying to market
15  this stuff.
16      Q.  Fair, okay.  And Paragraph 34, I'll read this
17  for the record (quoted as read):
18         "Grace knowingly endangered the health of
19  workers, family members of workers and community members
20  in Libby for decades.  This constituted gross violations
21  of applicable industrial hygiene standards."
22      Did I read that correctly, sir?
23      A.  Yes.
24      Q.  And that, of course, relates to their conduct,
25  does it not?

109

1      A.  Yes.
2      Q.  The term "knowingly endangered," is that a
3  term that's often used in industrial hygiene?
4      A.  Well, "knowingly" -- I mean they endangered
5  and they knew what was in this material, so they knowingly
6  endangered these people.
7      Q.  Is that an opinion that you shared with Kris
8  McLean, that they had knowingly endangered these people?
9      A.  I don't know if it was or not.
10      Q.  Okay.  Okay, Paragraph 35, is it fair to say
11  that this paragraph speaks generally about the history of
12  the medical community's understanding of asbestos disease?
13      A.  Yes.
14      Q.  This is in no way specific to Grace, correct?
15      A.  It speaks to the historical knowledge of.
16      Q.  So arguably, this could be something which
17  could be used to evaluate their conduct because of what
18  they could have historically known, correct?
19      A.  Yes.
20      Q.  Okay.  Paragraph 36, this paragraph speaks to
21  the, I would say, mineralogical content of the Libby
22  amphibole; is that correct?
23      A.  Yes, and also knowledge about the toxicity of
24  at least part of that amphibole.
25      Q.  "The Montana Supreme Court has found asbestos

28 (Pages 106 to 109)

110

1 dust was a well known toxic inhalant prior to 1956." Is
2 that the portion that you say speaks to toxicity?
3     A.   Which paragraph are you on again?
4     Q.   Sure, 36, I'm reading in the middle of the
5 paragraph.
6     A.   Oh, okay.  Yeah, and the reference to Vorwald.
7     Q.   What is Vorwald?
8     A.   Vorwald essentially performed some
9 toxicological studies on tremolite.
10    Q.   However, our understanding of the toxicity of
11 tremolite today is more informed by studies performed by
12 individuals such as Amandus, McDonald, Sullivan, or
13 Lockey, correct?
14    A.   Well, considering the fact that we are looking
15 at the different forms of amphibole in there, yes.
16    Q.   Okay.  So this paragraph speaks more to
17 historical understanding, correct, as opposed to current
18 understanding?
19          MR. LEWIS:  Objection, because if you read the
20 rest of the paragraph, obviously, it talks about current
21 understanding as I see it.  So I think that misstates what
22 the --
23          MR. STANSBURY:  Provided we're limiting this
24 to toxicity.  On the issue of toxicity, I see the Meeker
25 study --

111

1          MR. LEWIS:  Why don't you restate your
2 question --
3          MR. STANSBURY:  Yeah, maybe --
4          MR. LEWIS:  -- and I won't object if that's
5 what you're limiting it to.
6          MR. STANSBURY:  Right, that's what I'm
7 limiting it to.
8     Q.   (By Mr. Stansbury) This, the discussion of
9 toxicity in this paragraph speaks to when the medical
10 community first became aware that tremolite was toxic but
11 is not necessarily the authoritative source today for
12 determining the toxicity of these fibers, correct?
13          MR. LEWIS:  Of asbestos -- of Libby fibers?
14          MR. STANSBURY:  Of Libby fibers.
15          MR. LEWIS:  Okay.  No objection.
16          THE WITNESS:  Well, yeah, the reference to
17 Vorwald talks about the toxicity as evaluated through tox
18 studies in his lab in 1951.  But that, by no means, was
19 the only discussion of the hazards of --
20    Q.   (By Mr. Stansbury) Right.
21    A.   -- or the toxicity of tremolite prior to that.
22    Q.   Okay.  And then you also cite to Meeker in
23 this paragraph, correct?
24    A.   Yes.
25    Q.   And for the purpose of -- I'll read this for

112

1 the record:  "More recently, sophisticated analysis has
2 shown that Libby asbestos is 84% winchite, 11% richterite,
3 and 6% tremolite."
4     Did I read that correctly, sir?
5     A.   Yes.
6     Q.   Okay.  And as you stated, you're not a
7 mineralogist, correct.
8     A.   No.
9     Q.   You're not a toxicologist, correct?
10    A.   Correct.
11    Q.   You don't have any opinions that go beyond
12 what is available in the public literature with respect to
13 the toxicology or mineralogy of the Libby fibers, correct?
14    A.   Correct.
15    Q.   Okay.  Paragraph 37, once again, this
16 paragraph, similar to the ones before it, discusses the
17 historical understanding by the medical community of
18 potential health risks caused by asbestos, correct?
19    A.   Well, the health risks -- I'll read that
20 again.  (Perusing document) -- yes.
21    Q.   Okay.  And similarly, Paragraph 38 also refers
22 to historical knowledge of the health effects from
23 exposure to asbestos, correct?
24    A.   Yes.
25    Q.   And Paragraph 39 also refers to the historical

113

1 understanding of health effects associated with exposure
2 to asbestos, correct?
3     A.   Yes.
4     Q.   And Paragraph 40 also refers to the historical
5 understanding of medical literature with the caveat here
6 that you mentioned industrial hygienists often review this
7 literature, correct?
8     A.   Yes.
9     Q.   Okay.  If I could read Paragraph 40 for the
10 record:
11          "By the 1960s, hundreds of articles and
12 studies published in the industrial hygiene and medical
13 literature established that asbestos exposure is harmful
14 and can be fatal.  These materials were readily available
15 to anyone interested in learning about the dangers of
16 asbestos.  As a standard practice, industrial hygienists
17 review industrial hygiene literature, as well as
18 occupational medicine literature."
19          Did I read that correctly, sir?
20    A.   Yes.
21    Q.   Okay.  So once again, we're speaking about the
22 state as of the 1960s, correct?
23    A.   Yes.
24    Q.   Okay.  Paragraph 41, this paragraph speaks
25 about historical conditions but specifically discusses

114

1  potential community exposures arising out of the
2  historical conditions, correct, sir?
3      A.  Yes.  It's speaking to the, you know, the
4  aerodynamic properties of asbestos and how it can expose
5  people who are not directly working with the material.
6      Q.  In Paragraph 42 --
7      A.  It also speaks -- if I may interrupt for just
8  a second --
9      Q.  Sure.
10     A.  -- it also speaks to control.
11     Q.  Historical control?
12     A.  Well, it's -- the same controls we use now are
13  what was used historically, so -- (pause.)
14     Q.  Okay.  But obviously because we're talking
15  about Libby, we're talking about historical operation
16  because it hasn't been operation for, I guess, 18 - 19
17  years, correct?
18     A.  That's fine.
19     Q.  Okay.  In Paragraph 42, I'm going to read the
20  first sentence:  "Asbestos fibers in the air are known to
21  travel long distances from their source or point of
22  origin."
23     Did I read that correctly, sir?
24     A.  Yes.
25     Q.  And then you cite to the Environmental

115

1  Protection Agency, and you say as follows, which states as
2  follows:
3      "During the time that the asbestos fiber
4  remains airborne, it is able to move laterally with air
5  currents and contaminate spaces distant from the point of
6  release.  Significant levels of contamination have been
7  documented hundreds of meters from a point source of
8  asbestos fibers, and fibers also move across contamination
9  barrier symptoms with the passage of workers during
10  removal of material.
11     "The theoretical times needed for such
12  respirable fibers to settle from a 3 meter ceiling are 4,
13  20 and 80 hours in still air.  Turbulence will prolong the
14  settling and also cause reentrainment of fallen fibers,'
15  (Sprayed Asbestos Containing Materials in Buildings, A
16  Guidance Document, U.S. Envirnomental Protection Agency,
17  March 1978)."
18     Did I read that correctly, sir?
19     A.  Yes.
20     Q.  So this is a cite to an EPA source a little
21  over 30 years ago, correct?
22     A.  In 1978, yes.
23     Q.  Discussing how asbestos fibers travel,
24  correct?
25     A.  Yes.

116

1      Q.  Has our understanding of how asbestos fibers
2  behaved in the air changed in any way in the last 31
3  years?
4      A.  Very little if at all.
5      Q.  Okay, okay.  So again, this paragraph would
6  speak to, you know, ultimately would speak to the
7  potential for exposure in the community, correct?
8      A.  Yes, bystander exposure, I think.
9      Q.  Okay, okay.  Paragraph 43, does that similarly
10  speak to the potential exposure of a bystander?
11     A.  Yes.
12     Q.  Okay.
13     MR. LEWIS:  Counsel, I'm not trying to be
14  difficult here, but "bystander" has legal connotations as
15  well, like a bystander liability, and I'm a little
16  concerned about that.  So I don't want to interrupt your
17  examination.  I think I understand what you mean by
18  "bystander," but if you don't, on my examination, I'll ask
19  the witness his understanding of bystander.
20     If you could clear that up now, I think that
21  might be helpful.
22     MR. STANSBURY:  Okay.
23     MR. LEWIS:  It's up to you.
24     Q.  (By Mr. Stansbury) I'm getting "bystander
25  exposure" from your report.  That's in Paragraph 43; is it

117

1  not?
2      A.  Correct.
3      Q.  And what do you mean by "bystander exposure"?
4      A.  "Bystander" would mean, again, someone who is
5  not working directly with the material, but they're doing
6  something else at distances away from that job.
7      Q.  Right.
8      A.  So that's what I mean by "bystander."
9      Q.  Okay.
10     A.  It's kind of a loose term, I guess.
11     Q.  Sure.
12     MR. LEWIS:  Thank you, Counsel, for allowing
13  that clarification.
14     Q.  (By Mr. Stansbury) Paragraph 44, I think this
15  paragraph relates to general principles of industrial
16  hygiene, correct?
17     A.  Yes.
18     Q.  It's not specific to Libby in any way, is it
19  not?
20     A.  It's general industrial hygiene principles.
21     Q.  Okay.  Paragraph 45, does this relate to the
22  historical conditions and operations of the Libby
23  vermiculite mine?
24     A.  (Perusing document) -- in part, yes.
25     Q.  What else does it relate to?

118

1     A.   Yeah, it relates to percentages, basically, in
2  the materials, so it would be historical.
3     Q.   Okay.  And Paragraph 46, reading the first
4  sentence, "Soil containing Libby asbestos at levels equal
5  to or greater than 1% are generally considered a health
6  hazard requiring remediation," did I read that correctly,
7  sir?
8     A.   Yes.
9     Q.   What is your basis for that sentence?
10    A.   My basis for that sentence is published
11 studies from EPA, Atkinson's, I think, study.  I think
12 they might be listed in here.
13    Q.   Is it --
14    A.   NIOSH; there's a series of articles that
15 discuss this 1 percent issue, if that's what we want
16 to --
17    Q.   Is it a federally mandated action level?  Is
18 that your understanding?
19    A.   And we're talking about the 1 percent?
20    Q.   Yes, yes.
21    A.   The 1 percent is a, is a percentage which
22 would be considered asbestos containing for removal, I
23 guess would be the best way to describe it.
24    Q.   Okay.  As an industrial hygienist, is it
25 common for you to examine the asbestos content of soil?

119

1     A.   Well, we have -- or I have.  It could be one
2  of our tasks, yes.
3     Q.   Do you have any training studying the
4  propensity of asbestos fibers to be released from soil?
5     A.   Well, we've -- again, the literature tells us
6  how it could be released from soils.  In terms of my
7  personal experience, yeah, we've collected soil samples
8  for asbestos and -- (pause.)
9     Q.   So you did examination of - and maybe I'm
10 using this term incorrectly - "bulk material," correct?
11    A.   Yes.
12    Q.   Okay.  That's distinct, though, from doing
13 airborne measurements, correct?
14    A.   Yes.
15    Q.   Okay.  Do you have an opinion as to the
16 propensity of asbestos in soil to be released into the
17 ambient air?
18    A.   Yes.
19    Q.   What is your opinion?
20    A.   My opinion is that amphibole asbestos from
21 Libby can be released into the air if it is contained in
22 low, very low percentages within the soil; very clear.
23    Q.   Okay.  And what is your basis for that
24 opinion?
25    A.   Again, studies that have been done by EPA in

120

1  Libby; Atkinson's; NIOSH considers it to be a friable
2  material where if not bound up in anything, it's going to
3  be released from the material that it's contained in.  The
4  fibers are all loose.
5     Q.   You say:  "A review of the literature."  Prior
6  to working with Libby, had you ever studied the propensity
7  of asbestos to be released from soil?
8     A.   No.
9     Q.   Okay.  Had you ever studied releases of any
10 hazard from soil?
11    A.   From soil, no.
12    Q.   Okay.  So soil analysis was not something that
13 you had previously done until you got involved with Libby,
14 correct?
15    A.   That would be fair.
16    Q.   In your 20 -- how many years have you been an
17 industrial hygienist?
18    A.   I don't know; 30.
19    Q.   Thirty years, okay.  So dealing with soil was
20 not something that you had dealt with previously.
21    A.   Well, you know, I hate to be limited.  I mean
22 I've been involved with looking at asbestos levels in
23 dust, in other words.  I don't know if you want to call
24 that "soil," but soil -- I'm trying to think if I've done
25 soil work previous to the Libby work, and I can't remember

121

1  if I'm looking at dust levels or levels that are contained
2  in the dust on a surface, or something like that.
3     Q.   For example, settled dust that has settled on
4  a surface of part of an industrial facility?  Is that what
5  you're talking about?
6     A.   Yes.
7     Q.   Okay.
8     A.   Or a home or something like that.
9     Q.   Right.  But that is distinct from soil, is it
10 not?
11    A.   Yes.
12    Q.   Okay.  And the tendency of an asbestos fiber
13 to be released from a flat surface is certainly different
14 than a tendency of an asbestos fiber to be released from
15 soil, correct?
16    A.   Well, it could be.  I think it's all related
17 to activity.
18    Q.   Okay.  What activities have you personally
19 done to determine the tendency of asbestos to be released
20 from soil?
21    A.   Well, what activities have I done -- I mean
22 we're currently involved with a research project where
23 we're analyzing surface dust in homes that contain
24 vermiculite attic insulation.  We are taking air samples
25 at the same time.  So we're trying to establish if there

122

1  is a risk from surface contamination as to an airborne
2  exposure. So that's the work I've done.
3      Q.  But that's not soil. That is asbestos within
4  a home. That's not asbestos that is in the soil on the
5  ground, correct?
6      A.  Right, it's in a house or --
7      Q.  Okay. And that's what industrial hygienists
8  tend to look at is soil within -- excuse me. Strike that.
9      Industrial hygienists tend to examine asbestos
10  within a facility or on a settled surface, correct?
11      A.  Well, no, I wouldn't say that. I mean you
12  could have an industrial facility where they're doing a
13  removal job like asbestos siding. And obviously, the soil
14  is contaminated from that siding, so we would look at
15  soil. And we've done that up at Montana Tech.
16      Q.  Okay. But the question I had asked earlier,
17  which elicited the response regarding the work you've done
18  in homes, was what work you have done studying the release
19  of asbestos from soil in Libby.
20      A.  Well, again, it would be the same sort of
21  situation where -- an industrial hygienist would be
22  concerned about a release into any media, whether it be
23  soil or dust, and we certainly take air samples in
24  conjunction with that. So whether or not we can establish
25  a relationship between what's in the soil or the media and

123

1  the air is another question, but we certainly look at
2  those aspects.
3      Q.  I understand looking at the aspect, but
4  sitting here today, have you derived a relationship from
5  your work that compares the amount of asbestos in soil
6  with the amount of asbestos that's released into the air
7  when the soil is disrupted?
8      A.  Well, no, that's work that's ongoing right now
9  in Libby. No one had that relationship right now.
10      Q.  So sitting in here, sitting here today, you're
11  not aware of any reliable source that would allow us to
12  determine the potential airborne releases from asbestos in
13  soil?
14      MR. LEWIS:  I'm going to object to the form of
15  the question because I think that assumes -- misstates the
16  witness evidence in the sense that he was talking about
17  quantification as to whether or not there were such
18  releases, but -- so I think the question assumes facts not
19  in evidence.
20      MR. STANSBURY:  I think you could say "assumes
21  facts not in evidence" without coaching the witness. I
22  would appreciate doing so next time.
23      You may answer.
24      MR. LEWIS:  Well, I would appreciate, Counsel,
25  that when you restate his testimony, you restate it

124

1  accurately. And that's the problem here. If you're going
2  to load up your questions by your own paraphrase of his
3  testimony and -- that's deceptive questioning and that's
4  what I object to here.
5      MR. STANSBURY:  Okay. Let's get back to --
6  let's refocus on that for a moment.
7      Could you read the last pending question,
8  please.
9      (The record was read by the court reporter as
10  follows:
11      "QUESTION: So sitting here today, you're not
12  aware of any reliable source that would allow us to
13  determine the potential airborne releases from asbestos in
14  soil?")
15      THE WITNESS:  Well, I'm aware of studies that
16  have been done and are being done by the EPA in Libby
17  where they are evaluating release of asbestos fibers from
18  soil.
19  BY MR. STANSBURY:
20      Q.  Okay. Other than those studies, anything
21  else?
22      A.  Not that I can think of right now.
23      Q.  Okay. So let's talk about those studies,
24  then. Are these studies that are ongoing now?
25      A.  Well, they're doing activity-based sampling in

125

1  Libby right now, in Libby and up at the mine.
2      Q.  Um-hmm.
3      A.  Paul Peronard did the initial studies in the
4  early '90s in Libby where they did activity-based sampling
5  to try to determine what is coming off gardening,
6  driveways, working with soils as well as other types of
7  media, sure.
8      Q.  Okay. Did you rely upon those results in
9  formulating your opinions regarding the hazards from
10  asbestos in soil in Libby?
11      A.  Yes. This 1 percent issue, yes, I've relied
12  on that.
13      Q.  Specifically, you relied upon the studies done
14  by EPA, correct?
15      A.  Yeah, I relied on the knowledge I have accrued
16  in reading EPA documents both before I became a technical
17  advisor for the TAG and after.
18      Q.  Okay. And which -- by "EPA documents," we're
19  talking about post 1999 EPA documents, correct, the ones
20  that deal with the studies that you're referencing?
21      Those all began when Paul Peronard came to Libby in
22  November of '99, correct?
23      A.  Yes.
24      Q.  Okay. So with respect to those post 1999 EPA
25  studies, which ones have been published?

32 (Pages 122 to 125)

126

1    A.   Well, they're published by EPA, I guess.  I
2  don't know how to answer your question.  I'm trying to
3  look -- yeah, like they're referencing the Christopher
4  Weis memorandum is referenced in Paragraph 48, so those
5  are the types of things I'm referring to.
6    Q.   The Christopher Weis memorandum, so we're
7  clear, the one in Paragraph 48 that relates to -- now I'm
8  going to read the statement that you have citing that and
9  let me know if I read it correctly:
10        "These results clearly indicate that
11  vermiculite insulation in homes or commercial buildings is
12  a substantial reservoir of asbestos-contaminated source
13  material that may lead to ongoing exposure of area
14  residents and workers."
15        Did I read that correctly, sir?
16    A.   Yes.
17    Q.   Okay.  So he's talking about, again, asbestos
18  in homes and in commercial buildings, correct?
19    A.   Yes, as part of the work that was done up
20  there by Peronard and others, looking at exposure levels
21  that are coming from soil and different sort of things
22  based on activities that are being done.
23    Q.   Okay.  But that citation here that you list,
24  this is not speaking about soils specifically, is it not?
25    A.   If you read the citation, I think you will

127

1  find that it's talking about soil, but -- if you read the
2  paper.
3    Q.   Okay.  So is it fair to say, then, that one
4  item we have identified that informs your opinion about
5  the potential release of asbestos from soil is the Chris
6  Weis action memorandum?
7    A.   Yes.
8    Q.   Okay.  Anything else?
9    A.   Well, there's been more recent publications by
10  EPA in the later time period where they are -- where
11  they've collected indoor air samples at a given period in
12  time, and then they've gone back and collected indoor air
13  samples later on.  And they are attributing in their
14  documents to this increase in indoor air asbestos at a
15  later date due to the soil, the soil contamination.  So
16  that informs my opinion.
17    Q.   How would indoor air be related to releases
18  from soil?
19    A.   Because it blows into the house.  I'm not
20  talking, you know, anything too complicated here.
21    Q.   Okay.  So -- and when was this study
22  conducted?
23    A.   Well, I think there's been some done in the
24  early, well, probably 2005 - 2006.  There are technical
25  memorandums.  I can't quote them by --

128

1    Q.   Right.
2    A.   -- number, but -- (pause.)
3    Q.   Were these memoranda cited in your report?
4    A.   I don't know if they're cited in my report or
5  not.  They may not be.
6    Q.   Okay.  Sitting here today, were these
7  memoranda included among your reliance materials?
8    A.   Yes.  Well, I mean, it's like I say, I'm
9  trying to include --
10    Q.   Well, did you produce copies?  Are you aware
11  of whether copies of these memoranda were produced to us?
12    A.   I'm not aware of that.
13    Q.   Okay.
14    A.   You were asking me about my knowledge of soil
15  and release of asbestos from the soil.
16    Q.   Understood.  So clearly, you clearly relied on
17  these memoranda in reaching this opinion, correct?
18    A.   I've relied on all of the documents that I've
19  read over the years pertaining to potential of release
20  from soils into the air.
21    Q.   Okay.  And so far we've listed the Chris Weis
22  memoranda; the EPA studies that look at indoor air that, I
23  believe you said, inferred that the indoor air was a
24  result of asbestos being blown in from the soil.  Is that
25  correct?

129

1    A.   I believe that's what they concluded.
2    Q.   Okay.  Are there any other sources that inform
3  your opinion as to the propensity of asbestos be released
4  from soil?
5    A.   Well, again, there's other citations:  EPA
6  2001, EPA 2004.
7    Q.   I'm sorry, which page are we on?
8    A.   I was looking under Paragraph 46.
9    Q.   The ones that speak to the --
10    A.   It begins with soil containing Libby asbestos.
11    Q.   Sitting here today, are you aware of a
12  correlation between asbestos and soil and the amount of
13  asbestos that can be released into the air?
14    A.   Well, that's a question mark.
15    Q.   Okay.  So that's certainly something you
16  cannot say reliably that "X" level of asbestos in the soil
17  will produce "Y" level of asbestos in the air, correct?
18    A.   That would be correct.
19    Q.   Okay.
20        MR. LEWIS:  Is it a good time for a break?
21        MR. STANSBURY:  Yeah, let's take a break.
22  That's fine.
23        VIDEOGRAPHER:  The time is 11:08.  We're off
24  of the record.
25        (The lunch recess was taken.)

130

1    VIDEOGRAPHER:  This is Tape 3 of the
2  videotaped deposition of Dr. Terry Spear.
3    The time is 11:47.  We're on the record.
4  BY MR. STANSBURY:
5    Q.  Okay.  Dr. Spear, can we move to Paragraph 52,
6  please.  And in 52 and 53, there are statements here
7  regarding the toxicity of asbestos from Libby; is that
8  correct, sir?
9    A.  Yes.
10    Q.  And once again, you are not a toxicologist,
11  correct?
12    A.  That's correct.
13    Q.  You don't intend to offer any specific
14  opinions about toxicity at the confirmation hearing, do
15  you?
16    A.  I cannot offer any opinions on toxicology, no.
17    Q.  Okay.  Dr. Spear, have you reviewed the
18  Amandus paper, 1987?
19    A.  I have at one point in time, yes.
20    Q.  Okay.  Who is Harlan Amandus?
21    A.  I'm sorry, who is he?
22    Q.  Yeah.  Do you know who he is?
23    A.  No.
24    Q.  Okay.  You've never met him before?
25    A.  I've never met him.

131

1    Q.  You are aware that he was working at NIOSH at
2  the time he wrote that paper, correct?
3    A.  Yes.
4    Q.  NIOSH is the National Institute of
5  Occupational Safety and Health; is that correct?
6    A.  Yes.
7    Q.  And that is part of the United States
8  Government, is it not?
9    A.  Yes.
10    (Document marked Deposition
11    Exhibit No. 7 for identification.)
12  BY MR. STANSBURY:
13    Q.  Okay.  I'm handing you what's been marked as
14  Exhibit 7.  Exhibit 7 is "The Morbidity and Mortality of
15  Vermiculite Miners and Millers Exposed to Tremolite: Part
16  I.  Exposure Estimates"; authors:  Amandus, Wheeler,
17  Jankovic, and Tucker; published in 1987 in the American
18  Journal of Industrial Medicine.
19    Did I read that correctly, sir?
20    A.  Yes.
21    Q.  Okay.  And do you -- is this familiar with
22  you?  Do you recognize this document?
23    A.  Yes.
24    Q.  Okay.  This is the paper by Amandus that
25  specifically focuses on establishing the exposures,

132

1  correct?
2    A.  That's correct.
3    Q.  Because in order to determine something like
4  toxicity, you need to know information about exposure,
5  correct?
6    A.  Yes.
7    Q.  Okay.  And this is clearly the paper of the
8  three most relevant to your area of expertise, is it not?
9    A.  I'm sorry, by "three" --
10    Q.  You're aware that there was a mortality study
11  and a morbidity study also done by Amandus, correct?
12    A.  Yes.
13    Q.  Okay.  And so the papers that look at, those
14  papers, the morbidity study, are you familiar with that?
15    A.  Yes.
16    Q.  Okay.  That looked at radiographic
17  abnormalities in the working population and correlated
18  that to exposures, correct?
19    A.  Yes.
20    Q.  The mortality study looked at mortality within
21  a worker cohort and correlated that with exposure,
22  correct?
23    A.  Yes.
24    Q.  Both papers were dependent upon the exposure
25  data contained in this paper, correct?

133

1    A.  That's correct.
2    Q.  And of the three papers, this is the paper
3  that primary falls within your area of expertise, correct?
4    A.  Well, in terms of exposure measurement, yes.
5    Q.  Yes, okay.  And do you have any general
6  opinions regarding this paper?
7    A.  Well, I've read this paper, you know,
8  associated with other W.R. Grace cases, and my general
9  opinion pertaining to any exposure measurements at the
10  mine site, or it may be if it was done outside the mine
11  site in Libby, is that during this time frame, they were
12  basically looking at PCM analysis.  And in my opinion, the
13  fibers that were less than 5 micrometers in length are not
14  being factored into the exposure.
15    Q.  Five micrometers or five microns?
16    A.  The same thing:  Microns/micrometers.
17    Q.  Micrometers is the same -- okay, got it.
18    So you believe that this paper should have looked at
19  fibers with -- that were less than 5 microns in length,
20  correct?
21    A.  Yeah.  As an industrial hygienist, my opinion
22  is that the -- that fibers shorter than 5 micrometers can
23  be toxic, but we don't know that they're not toxic.  And
24  I'm uncomfortable with not considering that in either risk
25  assessment, or evaluation, or what have you.

W.R. GRACE & CO.                TERRY M. SPEAR, Ph.D.                July 29, 2009

134

1    Q.   Are you aware of other epidemiological studies
2    that only counted fibers longer than 5 microns in length?
3        A.   That's been the standard practice.
4        Q.   Okay. So this paper is in no way an outlier,
5    so to speak, insofar as they only counted fibers longer
6    than 5 micrometers, correct?
7        A.   Correct.
8        Q.   It's just something that you personally,
9    Dr. Spear, do not agree with, correct?
10       A.   Well, not just me personally, but there's an
11   accumulating -- I mean I think that, hopefully, the risk
12   of asbestos will eventually look at short fibers, not just
13   long fibers. The reason that they were looking at long
14   fibers was simply due to the analytical sensitivity of the
15   method. OSHA's current standard of 0.1 fibers per cc is
16   that level because that is the level of analytical
17   sensitivity; in other words, we have no reliability if
18   we're trying to quantify fibers at lower levels. And so
19   hopefully as technology increases and we can start more
20   consistently evaluating all fibers, then the risk will
21   take into account short fibers. That's my opinion.
22       Q.   Okay. So, you know, we've already
23   established, correct, that it is common in industrial
24   hygiene literature to report only those asbestos fibers
25   that are longer than 5 microns in length, correct?

135

1        A.   Yes.
2        Q.   Okay. However, if you were to report all
3    fibers, including those that are less than 5 microns, that
4    would, typically, have the effect to increase the amount
5    of fibers that are counted, correct?
6        A.   Yes.
7        Q.   Okay. So the exposures would appear higher,
8    correct?
9        A.   Well, it would be representative of what a
10   person breathes in, whether they're short fibers or long
11   fibers, yes.
12       Q.   Okay. But just to make sure we're clear, so
13   let's say somebody had 5 fibers per cc only counting
14   fibers that were 5 microns or longer, if you were to count
15   all fibers, you would expect that person to have a higher
16   exposure measurement, correct?
17       A.   Yes.
18       Q.   Okay. And although we discussed earlier
19   you're not a toxicologist or an epidemiologist, but as an
20   industrial hygienist, you do understand how exposure
21   quantifications fit into a toxicology analysis, correct?
22       A.   Yes.
23       Q.   Okay. And one of the data points, for
24   example, on a mortality study would be actual mortality,
25   the people who have died, correct?

136

1        A.   Yes.
2        Q.   When they died, correct?
3        A.   Yes.
4        Q.   And information related to that. And that
5    mortality, it becomes -- is compared to their exposure in
6    order to drive the toxicity of the substance, correct?
7        A.   Yes.
8        Q.   Okay. And so if you were to do an analysis
9    looking at fibers at level "X", given a certain level of
10   the mortality, and then you were to derive a toxicity
11   factor - we can assume that you've just done that for a
12   moment because I don't want to ask too long of a question
13   - but that makes sense, correct?
14       A.   Kind of, I guess.
15       Q.   Well, determining -- let me make sure we're on
16   the same page. You determine toxicity based on certain
17   exposure levels, correct?
18       A.   Yes, and length of exposure.
19       Q.   And length of exposure. So you get cumulative
20   exposure, correct?
21       A.   Yes.
22       Q.   So if the exposure levels are higher at the
23   same length of exposure, you're going to have higher
24   cumulative exposure, correct?
25       A.   Yes.

137

1        Q.   And thank you for pointing this out. It's
2    that accumulative exposure that is then used and compared
3    against mortality to derive the toxicity of the substance,
4    correct?
5        A.   Yes.
6        Q.   And that's not specific to asbestos. This is
7    the way you would approach any type of exposure to a
8    hazard if you wanted to derive the toxicity, correct?
9        A.   That's correct.
10       Q.   Okay. So if you were to -- when evaluating
11   that initial exposure, if you were to include additional
12   fibers, let's say shorter fibers, that would give you a
13   higher exposure measurement, correct?
14       A.   Yes.
15       Q.   And over the same duration, a higher
16   cumulative exposure, correct?
17       A.   Yes.
18       Q.   So if you were looking at the exact same
19   analysis, although now you have higher cumulative
20   exposures, that would show a lower level of toxicity for
21   the substance, would it not?
22       A.   It could, but I don't think the same points
23   apply to morbidity, either, or disease rates, you know, in
24   a person, what rates actually cause disease prior to
25   mortality.

35 (Pages 134 to 137)

138

1    Q.   I'm sorry, I don't follow.
2    A.   Well, I just -- I don't agree with that same
3  philosophy in terms of you're talking about mortality
4  studies or people dying from asbestos. I think that to
5  determine risk of asbestos exposure in causing disease, I
6  do think that we have to consider total exposure.
7    Q.   Okay. And I'm not contesting that at this
8  moment. But looking at total exposure, if you do get
9  higher exposure because you're counting additional fibers
10  and you use that number to determine cumulative exposure,
11  the toxicity of the substance will be lower, assuming that
12  the mortality end points are the same, correct?
13    A.   Because of using -- I understand your point.
14    Q.   Okay. And just so I make sure I understand my
15  own point, to the extent that Dr. Amandus, working for
16  NIOSH, may have excluded fibers shorter than 5 microns,
17  that would have the impact of increasing the toxicity of
18  the Libby amphiboles based on the findings of the study,
19  correct?
20        MR. LEWIS: Hold on. I object to that
21  question. That question is very ambiguous. What's the
22  antecedent for the pronoun "that" in your question?
23    Q.   (By Mr. Stansbury) Dr. Spear, you seem to
24  understand the question.
25        MR. LEWIS: Well, the question -- that doesn't

139

1  make any difference whether -- if the question is
2  improper, it's improper. It's misleading, it's vague,
3  it's also compound.
4        MR. STANSBURY: I'll ask you to, again, not
5  coach the witness.
6        MR. LEWIS: I didn't coach the witness. What
7  did I say to the witness there, Counsel?
8        MR. STANSBURY: Could you please read back the
9  last question, madam court reporter?
10        (The record was read by the court reporter as
11  follows:
12        "QUESTION: And just so I make sure I
13  understand my own point, to the extent that Dr. Amandus,
14  working for NIOSH, may have excluded fibers shorter
15  than" --
16        MR. STANSBURY: Let me try to ask the question
17  in a way that will, you know, address everybody's
18  concerns.
19  BY MR. STANSBURY:
20    Q.   To the extent that Dr. Amandus, working for
21  NIOSH, may have under-counted fibers by excluding fibers
22  shorter than 5 microns, by doing so, given the mortality
23  and morbidity end points he worked with, that would have
24  the effect of reporting a toxicity factor in the Libby
25  amphibole that actually may have been higher were he to

140

1  have followed your suggested method of counting all
2  fibers, correct?
3    A.   It could have that effect.
4    Q.   Okay. Other than the exclusion of fibers
5  shorter than 5 microns, are there any other statements in
6  Dr. Amandus's paper or any other findings that you find to
7  be unsupportable scientifically?
8    A.   Well, no. It was a peer-reviewed article and,
9  certainly, it's been referenced and cited many times.
10  There's always questions on exposure reconstruction.
11    Q.   Okay.
12    A.   Things like that.
13    Q.   Okay. I wanted to walk through a couple parts
14  of this paper, then. And starting on page 2, under
15  "Exposure Measurements":
16        "Samples of airborne dust have been taken in
17  the mill since 1942 and in the mine since 1968. Prior to
18  1969, 336 midget impinger samples were collected by the
19  state of Montana primarily in the dry mill, and after
20  1967, 4116 membrane filter samples of airborne dust were
21  collected by federal agencies (NIOSH, MESA, and MSHA)" --
22  NIOSH, MESA, and MSHA, just so the court reporter is clear
23  - "and the company in most areas of the facility (Table
24  II). Before 1974, filter samples were either general area
25  or short-term personal samplings collected over periods

141

1  ranging from 20 minutes to several hours, and were not
2  likely to have reflected the 8-hr TWA exposure."
3        Did I read that correctly, sir?
4    A.   Yes.
5    Q.   Do you agree with this approach?
6    A.   Well, yes, because -- well, I agree. That
7  approach does still take place today.
8    Q.   Okay. And MESA, M-E-S-A, that no longer
9  exists by that name, correct?
10    A.   Right.
11    Q.   What did MESA stand for?
12    A.   The Mine Enforcement and Safety
13  Administration, I think.
14    Q.   And that was a federal agency --
15    A.   Yeah.
16    Q.   -- correct --
17    A.   Yes.
18    Q.   -- or administration. And then MSHA, that's
19  the successor to MESA?
20    A.   Yes.
21    Q.   And what does MSHA stand for?
22    A.   Mine Safety and Health Administration.
23    Q.   Okay. And if you could turn to Table III --
24  or page 3, Table II, excuse me. "Table II. Description
25  of Environmental Samples," this reflects where this data

W.R. GRACE & CO.             TERRY M. SPEAR, Ph.D.             July 29, 2009

---

142

1  in this paper was collected from, correct?
2      A.   Yes.
3      Q.   And 789 of the samples from 1971 to 1981 were
4  collected by MESA and/or MSHA, correct, sir?
5      A.   Yes, sir.
6      Q.   Forty-eight of the samples from 1967 to '68
7  were collected by NIOSH, correct?
8      A.   Yes.
9      Q.   And then 336 samples using the mppcf
10 measurement were collected from 1956 to 1969 by the State
11 of Montana, correct?
12     A.   Yes.
13     Q.   And so -- and then the company between 1970
14 and 1982 collected 3,279 samples, correct?
15     A.   That's what the Table II says, yes.
16     Q.   Okay.  And again, this is a peer-reviewed
17 study.  You have no reason to dispute that, correct?
18     A.   I'm sorry?
19     Q.   Again, this is a peer-reviewed study.  You
20 have no reason to dispute the findings of the table,
21 correct?
22     A.   No.
23     Q.   Okay.  So it's fair to say that the exposure
24 data underlying this study was based on a large number of
25 samples, correct?

---

143

1      A.   There are a large number of samples, yes.
2      Q.   Okay.  Some of which were collected by the
3  State of Montana, correct?
4      A.   Yes.
5      Q.   And some by various federal agencies, correct?
6      A.   Yes.
7      Q.   Okay.  Are you familiar with how he derived
8  the location operations approach to estimating exposures?
9      A.   I've looked at it before.
10     Q.   Okay.
11     A.   I'm vaguely familiar with it.
12     Q.   Okay.  Do you have any reason to believe that
13 using location operations -- well, strike that.
14         Is the use of location operations to estimate
15 exposures within a facility a common practice in
16 industrial hygiene?
17     A.   Well, we would typically nowadays try to
18 divide work forces up into similar exposed groups.  And
19 they don't necessarily have to be in one location, they
20 could be similar groups that work in different locations,
21 but I believe this is a method that they used then.
22     Q.   Okay.  And you consider it a reliable method?
23     A.   Well, I think "reliable" to as reliable as it
24 can be.
25     Q.   Okay.  Does the use of location operation

---

144

1  cause you to have less confidence in this paper?
2      A.   It could, well, particularly when workers --
3  you know, if they're in and out of different locations and
4  move a lot.
5      Q.   Okay.  Do you believe they try to take into
6  account the idea of individuals moving in and out of
7  locations?
8      A.   I'm sure they did.
9      Q.   Okay.  On Table IV -- excuse me, page 4 Table
10 III, now, this table summarizes the average fiber per cc
11 values calculated from membrane filter samples collected
12 in 1967 through 1962 by location, operation, and year,
13 correct?
14     A.   Um-hmm.
15     Q.   "Yes," sir?
16     A.   Yes.
17     Q.   Okay.  And I want to look at a couple of these
18 measurements.  Specifically, the new wet mill, post '76,
19 the average exposure was 0.8 fibers per cc, correct?
20     A.   I need to make sure I know where you're
21 looking at again.
22     Q.   Sure.
23     A.   You're on Table III?
24     Q.   Yes.
25     A.   You're looking at new wet mill?

---

145

1      Q.   Yes, post '76, after '76.
2      A.   Oh, okay.
3      Q.   That's 0.8 fibers per cc, correct, sir?
4      A.   Yes.
5      Q.   And that's based on 1,214 samples, correct?
6      A.   Yes.
7      Q.   Do you recall what the MSHA PEL was in 1976?
8      A.   I don't recall.  It could have been 5.  I know
9  MSHA was always slower than OSHA in changing PEL --
10     Q.   Right.
11     A.   -- their limits.
12     Q.   Right.  But it was certainly higher than 0.8,
13 correct?
14     A.   Yes, and it's -- but this number is certainly
15 higher than the current, the current exposure limit,
16 which --
17     Q.   The current OSHA PEL or MSHA PEL?
18     A.   The OSHA PEL.
19     Q.   Right.  Is it your understanding that MSHA or
20 OSHA was primarily responsible for regulating the mine?
21     A.   Well, I think for the mine itself, it was
22 MSHA.  And then for some of the in-town facilities, I
23 believe OSHA would have had some jurisdiction.  I've had
24 this discussion --
25     Q.   Right.

---

37 (Pages 142 to 145)

W.R. GRACE & CO.                    TERRY M. SPEAR, Ph.D.                    July 29, 2009

146

1      A.   -- before in depositions.
2      Q.   Okay.  Is it fair to say that for the mill
3    associated with the mine, that would still fall under
4    MSHA's jurisdiction?
5      A.   Yes.
6      Q.   Okay.  And 1976 on, the PEL within that wet
7    mill was below MSHA's PEL, correct?
8      A.   Yes.
9      Q.   Okay.  Moving on, sir, on page 5, there seems
10   to be an issue with converting mppcf to fibers per cc,
11   correct?
12     A.   Yes.
13     Q.   And this is certainly an analysis that I
14   believe requires some estimation, correct?
15     A.   Well, yes.  It's very suspect, particularly
16   unless all of the other sampling variables were the same.
17   You know, I mean it's hard to apply that conversion across
18   the board.
19     Q.   Right.  So that conversion, though, would only
20   have been used for samples that were created prior to
21   1969, correct?
22     A.   Yes.
23     Q.   Because after 1969, they're using fiber per
24   cc, correct?
25     A.   Yes.

147

1      Q.   Okay.  So to the extent there are any
2    questions over this conversion, that would relate to
3    pre-1969 exposures.  Am I correct, sir?
4      A.   Yes, wherever they were using million
5    particles per cubic foot.
6      Q.   Okay.  And those exposures were very high,
7    correct?
8      A.   Yes.
9      Q.   Nobody disputes that the exposures in the dry
10   mill were well in access of any PEL, correct?
11     A.   Say that again.
12     Q.   The exposures in the dry mill were, in some
13   cases, over 100 fibers per cc, correct?
14     A.   Yes.
15     Q.   Okay.  And so while there may be some
16   ambiguity in converting the mppcf to fibers per cc, we're
17   still dealing with very large numbers, correct?
18     A.   Yes.
19     Q.   This is not an instance where we're trying to
20   convert data and seeing whether it fits under a 0.1 or 0.5
21   PEL.  We're talking about data that involved measurements
22   that are very high, even if there is some imprecision in
23   the conversion, correct?
24     A.   Yes.
25     Q.   Okay.  And if we look on page 6, we see Table

148

1    V, which is the conversion ratio.  This appears to be a
2    matrix that compares measurements of mppcf to fibers per
3    cc; is that correct, sir?
4      A.   Yes.
5      Q.   Have you ever seen the use of a matrix of this
6    form before?
7      A.   Very seldom, I guess.  Only in these earlier
8    studies pertaining to the -- well, I'm sure it was done
9    with other asbestos work, too.
10     Q.   Right.  But it wouldn't be done nowadays
11   because we're not using mppcf any more, are we?
12     A.   Right.
13     Q.   So during this period of transition was when
14   these types of problems arose, correct?
15     A.   Yes.  And the reason we aren't using million
16   particles per cubic foot any more is because it was highly
17   unreliable and it was very difficult to try to count
18   asbestos fibers using that method, so it's certainly all
19   very unreliable.
20     Q.   Okay.  Have you ever relied upon a study that
21   used mppcf in its measurements?
22     A.   No.  I don't know what you mean.
23     Q.   Well, you say it's unreliable, measurements
24   that are measured in mppcf.  You were citing studies
25   earlier in your expert report that were pre 1965 in some

149

1    instances.
2      A.   Right.
3      Q.   Those studies would have used mppcf, correct?
4      A.   Yes.
5      Q.   So it's not as if Amandus was using data that
6    nobody else had ever used in the published literature,
7    correct?
8      A.   Well, right.  That was the only choice we had.
9      Q.   Right.  And given that, is the use of a matrix
10   a reasonable means of trying to convert mppcf to fiber per
11   cc?
12         MR. LEWIS:  You mean today?  Give some time
13   foundation.  You said "is" rather than "was."
14     Q.   (By Mr. Stansbury) Well, we're never going to
15   deal with any data post 1967 -- '69 or '70 that's in
16   mppcf's.  We're always talking about historical data, are
17   we not?
18     A.   Yes.
19     Q.   Okay.  So given -- dealing with this data in
20   which you do have a comprehensive exposure analysis that
21   goes in an era from mppcf to a time in which we're
22   measuring in fiber per cc, is the use of a matrix a
23   reasonable method for converting mppcf to fibers per cc?
24     A.   Yes.  I think Amandus was trying to use
25   historical data, as unreliable as it may be.  In terms of

38 (Pages 146 to 149)

150

1  identifying fibers, he was trying to use it. He had
2  historical data that he was trying to use.
3      Q. Okay. And is that a reasonable method to do
4  so?
5      A. I'm sure it's been done before.
6      Q. Okay. So he's not an outlier in this regard?
7      A. No.
8      Q. Okay. And if you look on the bottom -- on the
9  middle of page 6, I guess it's the last sentence of the
10 first full paragraph, we see the line: "Due to the lack
11 of exposure data in these areas, estimates before 1968 are
12 considered 'guesstimates.'"
13     Did I read that correctly, sir?
14     A. I want to make sure I know where you're
15 reading that at.
16     Q. Sure; sure, sure.
17     A. Where, where were you at again?
18     Q. Oh, sure. I'm right here -- (indicating.)
19     A. So "due to the lack of exposure," that's where
20 you started?
21     Q. Yes, sir.
22     A. I do see that, yes.
23     Q. Okay. So he's certainly being very
24 forthcoming over some of the limitations of the data,
25 correct?

151

1      A. Yes.
2      Q. Later, in the next sentence -- the next
3  paragraph, actually, he says:
4          "However, the 'guesstimates' for those LOs
5  prior to 1968 had a small effect on the average cumulative
6  exposure estimate for the overall cohort, and on the
7  estimates of the exposure-response curves, because a small
8  number of workers was employed in these areas."
9      Did I read that correctly, sir?
10     A. You read that correctly.
11     Q. Do you believe that's a relevant qualification
12 for the guesstimate issue that he himself has flagged?
13     A. Well, it is in the aspect that when he's
14 looking at number of workers employed under a given job
15 class in these areas, but it does not really factor in
16 employees that have to go through those area, or even in
17 it's intermittently, that do not have that job class. So
18 that would be the only caveat I would add.
19     Q. So that might have the impact of
20 underestimating exposure?
21     A. Well, or just not determining exposure to all
22 workers because they weren't in that job class. There
23 were other workers who went through that area who were
24 exposed.
25     Q. Okay. The next paragraph, there does seem to

152

1  be, if I'm not mistaken, some effort to address the fact
2  that workers moved throughout the course of the day,
3  correct?
4          MR. LEWIS: I'm going to object. The question
5  is argumentative. The question is a paraphrase. It's not
6  a proper question. Object to the form of the question.
7      Q. (By Mr. Stansbury) Okay, you may answer, sir.
8      A. So we're referring to the last paragraph,
9  then?
10     Q. Yes.
11     A. Yes. He's saying that weighted by the
12 proportion of time a worker employed in a job spent in an
13 LO area. Okay, but again, if there's workers just going
14 through that area, they're not considered in that job
15 class. So that's, that's just, you know, my
16 interpretation.
17     Q. Okay. But the impact, the net impact of not
18 classifying workers who move in and out of areas could
19 both increase or decrease exposure estimates, correct?
20     A. It could.
21     Q. Okay. So it's not necessarily a bias that
22 would have a specific impact of increasing or decreasing
23 in one way for certain, correct?
24     A. Yeah, it's a bias I don't know how you would
25 measure unless you had a pump on each person as they

153

1  walked through these areas --
2      Q. Right.
3      A. -- but that wasn't done.
4      Q. But given the data that they had, this was
5  again a reasonable means of trying to compensate for that?
6      A. Sure.
7      Q. Okay. Could we move to page 10, please, the
8  "Discussion"? I'm going to read beginning with the first
9  sentence under there:
10         "The questionable accuracy of the exposure
11 estimates before 1968 is recognized. Key factors that
12 need to be considered in estimating exposure are
13 precision, time periods for combining samples, estimators,
14 the conversion ratio, and assumptions as to exposures in
15 areas where samples have not been taken. In most studies
16 such as ours, there is little one can do but work within
17 the constraints of the available data."
18     Did I read that correctly, sir?
19     A. Yes.
20     Q. Do you agree with that statement?
21     A. Yes.
22     Q. Okay. And again, just so we're clear, the
23 guesstimate, that question applies to exposures that
24 occurred prior, 1968 and earlier, correct?
25     A. Well, in talking about specific exposure

39 (Pages 150 to 153)

154

1　results or quantification, yeah.
2　　Q.　Yes.
3　　A.　I mean, obviously, exposure areas where
4　samples have not been taken, well, obviously, we don't
5　have any exposure data, do we?
6　　Q.　Right.  But there was, there was an attempt to
7　address that, was there not?
8　　A.　Right.
9　　Q.　And that would be Table VI of the report,
10　correct, sir?
11　　A.　Yes.
12　　Q.　So once again, they are making a reasonable
13　effort to compensate for any limitations of the historical
14　data, correct?
15　　A.　I think they were doing the best they could do
16　with the data they had.
17　　Q.　Okay.  Are there any -- strike that.  Do you
18　know of any other literature other than -- let me back up
19　one second.
20　　Dr. McDonald also did a study of this population,
21　correct?
22　　A.　Yes.
23　　Q.　And is it fair to say that his exposure
24　analysis has some of the same virtues and limitations that
25　we just discussed with respect to Dr. Amandus's study?

155

1　　A.　Yes.
2　　Q.　Okay.  Other than Dr. Amandus and
3　Dr. McDonald's papers, are you aware of any other
4　published literature which more accurately captures the
5　exposure experience within the Libby facility?
6　　A.　Involving the mine, no.
7　　Q.　Let me ask that again because you're right, I
8　should have clarified.  Other than Amandus and McDonald's
9　papers, are you aware of any other published report that
10　more accurately characterizes the asbestos exposure
11　experience in the Libby vermiculite mining and milling
12　operation?
13　　A.　No.
14　　Q.　Are you aware of any unpublished papers or
15　reports that more accurately characterize the asbestos
16　exposure conditions in the Libby vermiculite mining and
17　milling operation?
18　　A.　I'm not.
19　　Q.　Okay.  And you're familiar with the Sullivan
20　paper.  You mentioned it earlier, correct?
21　　A.　Yes.
22　　Q.　That was published in 2008?  2007?
23　　A.　Pretty recently, yes.
24　　Q.　Fairly recently.  The exposure data for that
25　paper was Amandus's paper that we just reviewed, correct?

156

1　　A.　Yes.
2　　Q.　Okay.  And that was also -- the Sullivan paper
3　was a peer-reviewed, published paper, correct?
4　　A.　Yes.
5　　Q.　Okay.  Now, when going through your report, we
6　identified a lot of sections as dealing with Grace's
7　conduct, correct?
8　　A.　Yes.
9　　Q.　And in reaching these opinions, you developed
10　a certain amount of familiarity with the Libby vermiculite
11　mining and milling operation as a whole, correct, sir?
12　　A.　In reaching these opinions?
13　　Q.　In reaching your opinions characterizing --
14　well, let me ask it a little bit differently.
15　　In order to assess Grace's conduct, you first had to
16　become very familiar with the Libby vermiculite mining and
17　milling operation as a whole, correct?
18　　A.　Yes.  I have been, I have been assessing this
19　situation since 1996, and my opinions have not changed
20　regardless of research that I've done in terms of how I
21　think Grace behaved or the hazards of Libby amphibole.
22　　Q.　Right.  And I guess the point I'm trying to
23　reach, though, in reaching your opinions, you had to learn
24　about what actually happened year in and year out at the
25　mining operation in Libby, correct?

157

1　　A.　Yes.
2　　Q.　Okay.  So it is certainly an area where you
3　consider yourself to be very familiar?
4　　A.　Yes.
5　　Q.　Okay.  And part of the Libby operation
6　involved sending ore elsewhere, correct?
7　　A.　Yes.
8　　Q.　Okay.  And this was unexpanded vermiculite,
9　correct?
10　　A.　Yes.
11　　Q.　And was there asbestos in that vermiculite?
12　　A.　Yes.
13　　Q.　And that asbestos would go where -- or, excuse
14　me, that vermiculite would go where?
15　　A.　Well, the vermiculite would go to expanding
16　plants across the country.
17　　Q.　Okay.  Some of those plants were owned by
18　Grace, correct?
19　　A.　I believe some of them were.
20　　Q.　And some of them were not, correct?
21　　A.　Yes.
22　　Q.　For example, O.M. Scott, the fertilizer
23　manufacturing facility, expanded vermiculite, did they
24　not?
25　　A.　Yes.

158

1    Q.    Okay.  So that would be an example of an
2  expanding operation that was not owned by Grace, correct?
3    A.    Yes.
4    Q.    Okay.  And the workers in those plants would
5  have been at risk of being exposed to asbestos, correct?
6    A.    Yes.
7    Q.    And in the case of the Marysville, Ohio
8  facility, they were in fact exposed to asbestos, correct?
9    A.    Yes.
10    Q.    Okay.  And you have no reason to believe that
11  that would be any different in the numerous other
12  expanding plants all across the country, correct?
13    A.    That workers were exposed to asbestos?
14    Q.    Yes.
15    A.    No.
16    Q.    Right.  It occurred all over the country, did
17  it not?
18    A.    Yes.
19    Q.    Okay.  Now, are you familiar with the various
20  products that were generated using Libby vermiculite?
21    A.    I am somewhat familiar with the products.
22  I've looked through the, you know, the exhibits over time
23  and saw they used it in cement and --
24    Q.    So let's, if we can -- which products are you
25  familiar with?

159

1    A.    I don't know, Monokote; I don't know, other
2  types of cement products I've seen in the exhibits; the
3  insulation; foundation insulation.
4    Q.    Okay.  So like, for example, Monokote-3 --
5    A.    Yes.
6    Q.    -- that contained vermiculite and chrysotile,
7  correct?
8    A.    I believe so.
9    Q.    So a person who was exposed to Monokote-3 may
10  have been exposed to asbestos from Libby.
11    A.    Yes.
12    Q.    Okay.  Similarly, a person who had Zonolite
13  attic insulation in their home, they could have been
14  exposed to asbestos from Libby, correct?
15    A.    Yes.
16    Q.    Okay.  And to the extent that there were
17  expanding operations in various cities, to the extent that
18  there was -- well, let me rephrase this.
19         Have you studied exposures to asbestos from Libby
20  that occurred outside of Libby?
21    A.    We have done some preliminary work in Spokane.
22    Q.    What kind of work is this?
23    A.    It was, again, through the COBRE grant.  And
24  we basically did a very preliminary survey of
25  neighborhoods surrounding the Spokane expanding plant.

160

1    Q.    And what were the findings of that analysis?
2    A.    Well, they're very preliminary.  In fact,
3  they're still being worked up but -- so it's, I mean we --
4  fibers were detected in areas outside of the plant that is
5  no longer there.
6    Q.    Okay.  So this is just one example; however,
7  in this example, it illustrates that people outside of an
8  expanding plant outside of Libby - in this case, Spokane -
9  may have been exposed to asbestos that was released during
10  the expanding process, correct?
11    A.    I suppose that's correct.  And then the other
12  work would be - you said outside of Libby - would be
13  associated with the vermiculite grant that we're currently
14  working doing the homes.
15    Q.    And this is -- oh, this is what we were
16  speaking about earlier, looking at the attic insulation.
17    A.    Right.
18    Q.    Right.  And so that -- and, okay.  Is it fair
19  to say there may be some distinctions there, though?  With
20  the attic insulation, you have exposure to
21  already-expanded vermiculite, correct?
22    A.    Yes.
23    Q.    But there's still asbestos in it, right?
24    A.    Yes.
25    Q.    So there could be an exposure, correct?

161

1    A.    We're talking about the attic insulation?
2    Q.    Yes.
3    A.    Yes.
4    Q.    An expanding plant, by its very nature, you
5  have unexpanded vermiculite going in, correct?
6    A.    Yes.
7    Q.    So the people there may have been exposed to
8  unexpanded vermiculite, correct?
9    A.    As well as after it's expanded.
10    Q.    Right.  So, but it -- certainly, the exposure
11  one would have to unexpanded vermiculite would be
12  different, potentially, in terms of potential intensity
13  than an exposure to expanded vermiculite, correct?
14    A.    I mean it could be.  I don't know if I've seen
15  enough data to draw any conclusions on that.
16    Q.    Now, within the Libby community, is it fair to
17  say you have people - not workers, putting workers aside -
18  within the Libby community, is it fair to say that you
19  have people who were exposed in Libby to both unexpanded
20  and expanded vermiculite?
21    A.    Yes.
22    Q.    What would be potential expanded vermiculite
23  -- let me rephrase that.
24         What would be an example of expanded vermiculite
25  exposures that would occur in Libby?

162

1     A.   Of expanded or unexpanded?
2     Q.   Expanded.
3     A.   Of expanded, the vermiculite attic insulation.
4     Q.   Okay.
5     A.   I believe some expanded stuff was used in some
6  of the gardens or the lawns, and then people were
7  expanding it themselves on their stoves to watch it pop.
8     Q.   That's right.  But that would actually be an
9  exposure to unexpanded that became expanded, correct?
10    A.   Expanded, yeah, I don't know.
11    Q.   But what exposures to unexpanded vermiculite
12 occurred within the Libby community?
13    A.   Well, I think to the processed ore being
14 hauled into Libby, for one; as well as material that was
15 transported across the river and then brought into the
16 town by railroad car, and then leaks occurred and
17 contaminated areas around the railroad.
18    Q.   So these leaks caused expansion -- so these
19 leaks around the railroad caused exposure to unexpanded
20 vermiculite in Libby, correct?
21    A.   You asked about unexpanded, right?
22    Q.   Yes, sir; yes.
23    A.   I believe that the EPA has found unexpanded
24 vermiculite in some of the operable units they're now
25 currently trying to clean up.

163

1     Q.   And particularly with respect to the railroad
2  exposures, those would also occur or could have occurred
3  outside of Libby as well, correct?
4     A.   I would say so, yes.
5     Q.   Okay.  Let me rephrase that a little bit more
6  artfully.  People outside of Libby may have been exposed
7  to unexpanded vermiculite through leaks from railcars,
8  correct?
9     A.   Yes.
10    Q.   And that would have meant -- that could have
11 meant exposure to actual asbestos from those railcars,
12 correct?
13    A.   Yes.
14    Q.   Libby asbestos, correct?
15    A.   Yes.
16    Q.   Okay.  I'd like to go back to your 2006 paper.
17 I believe it's Exhibit 3.  I'm looking on page 2, and
18 there's a picture of a map on page 2.  That's Libby,
19 correct -- or that's actually an area outside of Libby,
20 correct?
21    A.   Yeah, that's showing the mine road there.
22        MR. STANSBURY:  All right.  And just so the
23 record is clear, by page 2, I mean page 461 of the
24 published paper, but I think Dr. Spear understood what I
25 meant.

164

1     Q.   (By Mr. Stansbury) And this is northeast of
2  Libby, correct, sir?
3     A.   Yes.
4     Q.   Okay.  And Location 1 appears to be just north
5  of the mine, correct?
6     A.   Well, Location 1 was actually right up at the
7  mine site itself, I think.
8     Q.   Okay.  So you put that on mine property?
9     A.   Yes.
10    Q.   Okay.  Location 2 appears to be north of the
11 mine.  Is that, is that a fair statement, sir?
12    A.   Yes, going down the road a ways.
13    Q.   How far from the mine would you say Location 2
14 is?
15    A.   Probably a couple miles.  I guess as the road
16 travels, a couple miles; less by -- less as the crow
17 flies.
18    Q.   And then Location 3 occurred at what appears
19 to be the intersection of Highway 37 and Rainey Creek
20 Road; is that correct, sir?
21    A.   Yes.
22    Q.   Okay.  Now, Location 1 and 2, can I just walk
23 up there right now and sample that if I wanted to myself?
24    A.   If you got permission from EPA, you could.
25    Q.   I need permission from EPA, right, because

165

1  that's a restricted area, correct?
2     A.   Right.
3     Q.   People just can't walk into either Location 1
4  or 2 that you sampled, right?
5     A.   That is correct.
6     Q.   What about Location 3?
7     A.   Location 3 was just right off the highway, so
8  that's open to access.
9     Q.   Okay.  So it's fair to say that the average
10 person is not wandering around Location 1 or 2 on any
11 given day, correct?
12    A.   I hope not.
13    Q.   Unless they're wearing a protective suit.
14 Okay.  Now, you say on page 461, page 2 of the document,
15 looking at the left-hand column, second paragraph, last
16 sentence, tell me if I read this correctly:
17        "Since asbestos fibers are durable silicates
18 and do not decompose in the environment, the airborne
19 asbestos fibers released and dispersed from the Libby mine
20 and processing areas throughout 70 years of operation have
21 likely deposited throughout the surrounding areas."
22 Did I read that correctly, sir?
23    A.   Yes.
24    Q.   And this study looked at the depositing of
25 fibers in bark, correct?

42 (Pages 162 to 165)

166

1    A.   Yes.
2    Q.   Do you have any way of knowing whether the
3  asbestos in a given bark, bark sample, was released 20
4  years ago as opposed to 40 years ago?
5    A.   Not in samples collected in this area, we
6  don't.  We've collected samples outside of the mine sites
7  in what's called the - I'm trying to think of the name -
8  the Forest Service has a testing facility where they have
9  larch trees or some type of tree.  And all of those trees
10 were planted after the mine was shut down, and we've done
11 bark sampling in there and we've found fibers.
12   Q.   Okay.  But that would be part of that study
13 you mentioned earlier, correct, the forestry?  That's part
14 of your forestry study?
15   A.   Well, actually, it's been -- it's part of,
16 kind of, a method to determine along -- you know, EPA has
17 now done a lot of bark sampling in lines going out from
18 the mine using our method, and basically -- so we
19 basically started the work in trying to find out how far
20 from the mine have they gone, so it's part of that work.
21 We did do additional bark sampling as part of the Forest
22 Service study.  You are correct there.
23   Q.   Okay.  And that, that analysis, though, has
24 not been discussed in your expert report.  We didn't see
25 it when we were looking at your report, correct?

167

1    A.   That's correct.
2    Q.   Okay.  But for this paper, you were not able
3  to tell when the asbestos was actually released, correct?
4    A.   That would be correct.
5    Q.   Okay.  Moving to page 462, page 3 of the
6  document, looking at the table, and I see results here for
7  tests that were done on various locations.  I see three
8  samples for Location 1; is that correct?
9    A.   Yeah, so Location 1, three samples.
10   Q.   And are those all bark samples?
11   A.   Yes, they would all be bark samples.
12   Q.   One question I had, if we could move, the same
13 page but on the right column, I guess five lines down from
14 the top:  "Tree core samples were only collected from the
15 locations surrounding the mine in the initial sampling
16 program."
17       Did I read that correctly, sir?
18   A.   Yes.
19   Q.   What are the tree core samples?
20   A.   When we began doing the bark sampling, we
21 wanted to make sure we covered all bases, so we did take
22 soil samples near the tree, we also took bark samples, and
23 then we did tree core samples to make sure that the fibers
24 were not being taken up by the root system and would be
25 inside the tree, basically.

168

1    Q.   Right.  And --
2    A.   So then after we realized those were all
3  negative and it doesn't seem very plausible they'd be
4  taken up in the root system, we discontinued that
5  approach.
6    Q.   What about the soil samples?  Did you publish
7  the soil sample results?
8    A.   They were not published as part of this paper
9  and I don't even know what the results are.
10   Q.   So you don't know whether there was asbestos
11 in the actual soil there?
12   A.   Yeah, I can't recall what happened to the soil
13 samples.
14   Q.   Okay.  Are you familiar with the term
15 "naturally occurring asbestos"?
16   A.   Yes.
17   Q.   Now, I think that's -- I've been told in some
18 ways that's kind a misnomer, in that all asbestos is
19 naturally occurring.
20   A.   Right.
21   Q.   But what I'm speaking of particularly is
22 asbestos, and particularly the Libby amphibole, that was
23 not released as part of Grace's vermiculite operation.
24 Are you familiar with what I'm talking about?
25   A.   Yes.

169

1    Q.   Do you have an opinion about, and we're going
2  to just use the term "naturally occurring asbestos"?
3    A.   Yes.
4    Q.   What is your opinion?
5    A.   My opinion is that in over thousands of years
6  with deposits up there on the hill and natural erosion,
7  that there could be some naturally occurring asbestos, but
8  I think that the releases from that compared to releases
9  from activities associated with the mine would be, would
10 be much less.
11   Q.   Where would the naturally occurring asbestos
12 be located?
13   A.   What do you mean "be located"?
14   Q.   Well, I mean, for example, if I'm in the
15 center of Libby, you know, let's say St. John's Hospital,
16 is there naturally occurring asbestos in the soil right
17 there?
18   A.   Well, I don't know that.
19   Q.   Okay.  Do you have an opinion as to where
20 naturally occurring asbestos would most likely be found in
21 the Lincoln County area?
22   A.   I guess I don't.
23   Q.   Okay.
24   A.   I mean in terms -- are you referring to
25 asbestos that moved somewhere else, or what's in the

170

1  actual mineral deposits that existed?
2      Q.   Mineral deposits the existed.
3      A.   Yeah, I think it could be -- I think it's been
4  found in some of the river areas, if I remember right, and
5  I don't spend a lot of time reading the mineralogy
6  journals, but -- (pause.)
7      Q.   Right.  Are you aware if there are any
8  mineralogical differences between the Libby amphiboles
9  that were released from the vermiculite mining operation
10  as opposed to those Libby amphibols that have occurred
11  naturally?
12     A.   You're referring to the Gunter papers,
13  probably?
14     Q.   Yes.
15     A.   I believe he's contending that just recently,
16  yes, that if it doesn't have the sodium/potassium peak,
17  then it's not from the mine.  So I'm aware of some of that
18  work, yes.
19     Q.   Did you in any way when conducting this -- let
20  me start over.
21     Have you analyzed any of your samples using
22  Dr. Gunter's analysis to determine whether the asbestos
23  that you detected was from the mining and milling
24  operation as opposed to naturally occurring asbestos?
25     A.   Well, we haven't -- for one thing, I'm not,

171

1  I'm not -- I think there's a lot of variability in what we
2  would find in given deposits.  In other words, when Meeker
3  did his work, he looked at, you know, a larger number of
4  samples than previous researches, and now Gunter has
5  looked at many more samples.  So I think that, you know,
6  there's going to be variability in what we see based on
7  the number of samples, and I think that Gunter is drawing
8  some conclusions that I'm not saying I'm going to agree
9  with.
10     But in terms of your question, you know, we sent all
11  our samples in for transmission electron microscopy so we
12  get the peaks with the results.  And I can only tell you
13  the only ones I've looked at would be the recent ones that
14  we've done, because I haven't had time to go back and look
15  at the other ones, but I think I will.  And we found the
16  sodium/potassium peaks in 60 percent of the last batch of
17  samples we've taken from the forest.
18     Q.   Okay.  And those peaks would suggest that they
19  were actually from the milling operation?
20     A.   From the mine.
21     Q.   Mine.
22     A.   What Gunter is calling "the mine."
23     Q.   Right, the mine.  This 2006 paper, though, the
24  samples that were reported in this paper, you've in no way
25  analyzed them in a method that would enable you to say

172

1  whether or not they were from the mining and milling
2  operation as opposed to just naturally occurring asbestos,
3  correct?
4      A.   We could do that.  I mean we have the peaks,
5  like I'm trying to tell you.
6      Q.   But you haven't reported that, correct?
7      A.   No, we have not reported that.
8      Q.   Okay.  Nor have you, sitting here today,
9  analyzed these data for those purposes?
10     A.   No.
11     Q.   Okay.  Looking back at Table 1, it looks, if
12  I'm not mistaken, and correct me if I'm wrong, that there
13  were quite a few amphibole fibers in the tree bark from
14  sample 1A on Location 1, correct?
15     A.   Yes.
16     Q.   And 530 million amphibole fibers per gram of
17  bark.  Did I read that correctly?
18     A.   So which sample are we looking at again?
19     Q.   I'm looking at the first sample, Location 1,
20  amphibole fiber per gram of bark.
21     A.   Yes.
22     Q.   So that translates to 100 million fibers per
23  cc, correct?
24     A.   Yes.
25     Q.   And would that number include fibers less than

173

1  5 microns?
2      A.   Yes.
3      Q.   Okay.  So in this table, you haven't
4  differentiated between fibers that are shorter than
5  5 microns and those that are longer, correct?
6      A.   Yeah.  The process that we use is called AHERA
7  TEM, basically.  And so we ask the lab to report results
8  back for all fibers greater than 0.1 micrometers in
9  length.  So we get it broken down by -- we got it broken
10  down by less than 5, greater than 5.
11     Q.   Would that include cleavage fragments as well?
12     A.   No.
13     Q.   Okay.  But it would include fibers less than
14  5 microns in length.
15     A.   Correct.
16     Q.   Okay.  So it would, this would be a
17  distinct -- well, let me rephrase that.
18     In order to compare these data to, let's say,
19  Amandus's data, you would need to exclude fibers less than
20  5 microns in order to do an apples-to-apples comparison,
21  correct?
22     A.   Well, yeah, these are bark samples.  I mean we
23  aren't talking about air samples.
24     Q.   These are just bark samples.
25     A.   These are bulk samples.

44 (Pages 170 to 173)

174

1    Q.   Right.  So these -- so that's a fair point.
2  So these are not directly correlated to airborne
3  exposures, right?
4    A.   No.  These are, these are media samples.
5  These are samples in a given media like bark.
6    Q.   Okay.
7    A.   I would certainly make no attempt to compare
8  it to, you know, airborne.
9    Q.   Would you be willing to offer an opinion as to
10 what the potential airborne exposures would be from these
11 trees given those measurements, those bulk measurements?
12   A.   Well, just looking at the amount in bark, no,
13 because again, that's why we've tried to conduct other
14 studies.  We're trying to find out:  Well, if it's in the
15 media, then how does it get out of the media?
16   Q.   Right.  And that's what your 2007 study
17 relates to, correct?
18   A.   Right.
19   Q.   So this study, this would not support an
20 opinion that there are actual exposures occurring because
21 of the asbestos that had been trapped in the barks of
22 trees.  This study merely identifies the presence of
23 asbestos fibers in the barks of trees, correct?
24   A.   It supports the scientific hypothesis that
25 asbestos fibers traveled through the air and deposited on

175

1  these trees.
2    Q.   Okay.  But as we stated earlier, you didn't
3  differentiate between fibers that were naturally occurring
4  as opposed to those that were released from the Grace
5  mining/milling operation, correct?
6    A.   Well, in this particular paper, I told you we
7  have looked at bark samples from the same area and they
8  contained the sodium/potassium peaks.
9    Q.   But you haven't reported or produced those
10 findings?
11   A.   No, we haven't.
12   Q.   Okay.  And you certainly haven't produced them
13 in this case, correct?
14   A.   That's correct.
15   Q.   Okay.  Looking back at the table, Location 4
16 is your control, correct?
17   A.   Yes.
18   Q.   And that is Albany, New York, and it's a pine
19 tree.  And you detected no amphibole fibers, correct?
20   A.   Correct.
21   Q.   Location 5 is on the rail line, correct?
22   A.   Yes.
23   Q.   And you detected 19 million amphibole fibers
24 per gram of bark, correct?
25   A.   Yes.

176

1    Q.   And that translates to 5.8 million fibers per
2  cubic -- per square centimeter, correct?
3    A.   Yes.
4    Q.   Now, one thing I noticed was the analytical
5  sensitivity for Location 5 as opposed to Location 4.  And
6  analytical sensitivity, is that the lowest level that you
7  would be able to detect?  How would you describe
8  "analytical sensitivity"?
9    A.   It's the lowest detect limits for a fiber that
10 a lab can do and get repeatable results.  So depending on
11 what method you're collecting samples by, whether you're
12 doing like PCM analysis where they just count fibers, that
13 has a different analytical sensitivity than when they're
14 doing TEM on an air sample.  And then when they're doing
15 bulk sample, so these are essentially bulk analysis,
16 there's going to be a different analytical sensitivity
17 associated with that.
18   Q.   And so if I understand that correctly, 19
19 million was the analytical sensitivity for the sample from
20 Albany, New York, correct?
21   A.   Yes.
22   Q.   And the one, the analytical sensitivity for
23 Location 5 which was in Libby by the rail station was 1.2
24 million, correct?
25   A.   Yes.

177

1    Q.   So if there had been 10 million amphibole
2  fibers per gram of bark in the Albany, New York pine, you
3  would not have been able to detect that, correct?
4    A.   Well, yeah.  It's really based on their
5  ability to be able to count.  Usually, TEM analysis in
6  terms of at least an air sample, they want the ability to
7  be able to see 1 fiber per square millimeter of filter
8  that they analyze.  Okay?  So it's really, I think,
9  related more to the type of material, the bulk of material
10 that they analyze.
11   Q.   More related to the type.  So why was the
12 analytical sensitivity so much lower for Location 5 as
13 opposed to the control group?
14   A.   It could be because there's different types of
15 bark, different types of tree.  This is a big variable in
16 all this work --
17   Q.   Right.
18   A.   -- is different trees have different bark.  So
19 that would be the best I can explain it.  I mean Jim
20 Webber would be the best person to explain that.  He's the
21 analyst.
22   Q.   But, I mean, just so I -- kind of going back
23 to one of my previous questions:  If there had been 10
24 million amphibole fibers per gram of bark in Location 4's
25 sample, it still would have not been detected given that

45 (Pages 174 to 177)

178

1  analytical sensitivity, correct?
2      A.  Well, I don't know if that's entirely
3  accurate, because like I say, they do the method so that
4  they can detect a certain number of fibers per area of
5  what they're analyzing.  So I don't know.  I see what
6  you're going -- I see where you're going with your
7  question, but -- (pause.)
8      Q.  Right.  But it's something that --
9      A.  I don't know if that's right or wrong.
10     Q.  Okay; okay, that's fair.  But Location 7 was
11  the Libby Middle School track and there were 0.13 million
12  amphibole fibers per gram of bark and 0.25 million
13  amphibole fibers per square centimeter, correct?
14     A.  Yes.
15     Q.  And again, the detection analytical
16  sensitivity for Location 7 was 0.13 million, correct?
17     A.  Yeah.
18     Q.  And the amount detected was right at that
19  analytical sensitivity level, correct?
20     A.  Pretty close.
21     Q.  Needless to say, if the same analytical
22  sensitivity used for Location 4 were used on Location 7,
23  none would have been detected, correct?
24     A.  Well, if that analytical sensitivity applied
25  to that sample, yeah, but I don't think it does.

179

1      Q.  Why is that?
2      A.  Well, because I've tried to explain what I
3  know about it, is the fact that it's going to depend upon
4  the sample preparation, the type of bark, the amount of
5  bark that they use.  I mean, for example, if I collected
6  air samples and I send in five different air samples to a
7  lab for TEM analysis, the analytical sensitivity for every
8  one of those samples is going to be different because of
9  the volume of air that we collect.
10     Q.  Right.  So the -- I understand why you have
11  different sensitivities; however, the sensitivity is still
12  a, if you will, a cutoff point below which you cannot
13  reliably report the data, correct?
14     A.  In that sample, yeah.
15     Q.  Right.  And so to the extent that there -- if
16  there had been, for whatever reason, a 19 million fibers
17  per gram analytical sensitivity for Location 7, it
18  certainly would not have been able to detect the 0.13
19  million amphibole per gram of bark that you reported,
20  correct?
21     A.  Well, yeah, again, if that sensitivity applied
22  to those different samples.  I mean I would have to say
23  what I'd say before.  I don't know if that's accurate or
24  not.
25     Q.  Okay.  So sitting here today, you really can't

180

1  speak to that either way?
2      A.  No.
3      Q.  Okay.  And Then Location 8 was Asa Wood
4  Elementary School.  I take it that is in Libby; is that
5  correct?
6      A.  Yes.
7      Q.  And there were no fibers detected there,
8  correct?
9      A.  Right.
10     Q.  So we see a great range of asbestos in the
11  trees, with one end of the spectrum being Location 1,
12  which is, as you said, on the mine site; with Asa Wood
13  Elementary in town, where no fibers were detected in the
14  bark, correct?
15     A.  Exactly.  We were trying to do that very
16  thing.  We wanted to start at the mine and then go out.
17     Q.  Okay.  Of course, as I said earlier, Locations
18  1 and 2 where you had the highest exposures, people just
19  can't walk onto those areas without first getting
20  clearance in EPA, correct?
21     A.  Right.
22     Q.  Okay.  In doing your analysis, did you ever
23  try to identify whether there was any vermiculite deposits
24  within the bark?
25     A.  I guess I don't understand that question.

181

1      Q.  Well, is -- vermiculite dust, can that be
2  transferred through the air?
3      A.  Oh, sure, I'm sure it could.
4      Q.  And vermiculite dust could have ended up on
5  the bark of tree as well, correct?
6      A.  Sure.
7      Q.  And if there was a high level of vermiculite
8  dust in the tree, that would, perhaps, suggest that the
9  dust had come from the mining and milling facility as
10  opposed to naturally occurring asbestos, correct?
11     A.  Because vermiculite can't be naturally
12  occurring?  I'm not following your logic.
13     Q.  Well, I mean, vermiculite -- it occurs in
14  Vermiculite Mountain, correct?
15     A.  Yeah.
16     Q.  And that's the primary source of vermiculite
17  in the area, correct?
18     A.  Yeah.
19     Q.  So to the extent that there was vermiculite in
20  tree bark, what other sources of vermiculite would you
21  attribute that to other than from Vermiculite Mountain?
22     A.  Well, I wouldn't attribute it to any.
23     Q.  Right.  And so would that have been a way of
24  determining whether some of this asbestos was actually
25  coming from Vermiculite Mountain, whether there was

182

1  actually vermiculite dust located there as well?
2      A.  I guess it could have been.
3      Q.  Okay.
4      A.  I mean we were studying asbestos, but --
5  (pause.)
6      Q.  Right.  So there's no, in any of these studies
7  -- no time in any of these did you actually identify
8  whether vermiculite itself was present, correct?
9      A.  Well, not to my knowledge.  I haven't seen all
10  of the scans from all of these different samples, either,
11  so --
12      Q.  But it certainly hasn't been reported in the
13  papers?
14      A.  It hasn't been reported in the papers.
15      Q.  Right.  And you certainly haven't produced
16  that in this case.
17      A.  (Nodding head affirmatively.)
18      Q.  Now, on page 464, the last paragraph before
19  "Discussion":
20          "SEM observation revealed that the amphibole
21  fibers were deposited on the surface of the bark and not
22  through its depth.  Most of the fibers were located in the
23  crevices and wrinkles of the bark rather than on its
24  smooth surfaces."
25          Did I read that correctly, sir?

183

1      A.  Yes.
2      Q.  Could you explain in lay terms what that
3  means?
4      A.  Well, it just means if you look -- I think the
5  easiest way is just to look at the pictures.  It refers
6  you to these pictures.
7      Q.  I like pictures.
8      A.  Well, I mean, you know, so the purpose of the
9  pictures is that you look at Figure 2 and you can see
10  certain long fibers.  And then you look at exactly the
11  same spot on the micrograph that was blown up to larger
12  magnification, and you start to see many more fibers that
13  are embedded deeper into the bark.  So you look at the
14  bark surface under a microscope.  As you could imagine,
15  it's going to be rough and a lot of little crevices and
16  stuff.  So basically, it just -- it works its way into the
17  crevices and stays there.
18      Q.  Now, do trees shed their bark over time?
19      A.  Some do.
20      Q.  Do you know whether these particular trees do?
21      A.  I think some of these species do.  I'm not a
22  botanist so I'm not going there.
23      Q.  Who is the botanist on this?
24      A.  Well, we had, early on we had a student who
25  was doing some of the bark - what's the word I'm looking

184

1  for - classification.  I mean I can go out and look at a
2  tree and I don't know what kind of tree it is.  So that's
3  about all I can say about that.  I mean that's -- the
4  question that we always get is, you know:  How does bark
5  relate to all of this?
6      Q.  Right.
7      A.  Or tree species.
8      Q.  Right.  And so sitting here today, you have no
9  opinion as to how that would impact your data?
10      A.  Well, tree species, we only sample at a
11  certain distance where we can reach a tree.  I mean if you
12  go -- what happens if you go up into a tree?  Are there
13  fibers loosely held on the pine needles?  You know, this
14  is just very exploratory.
15      Q.  Right.  And at this point, you know, there
16  were, there were eight samples, one of which was a
17  control, so -- actually, I don't see a Sample 6, so I
18  guess there were seven samples, one of which was a
19  control; so six actual samples, two of which were in the
20  restricted area, and one of which was also right at the
21  intersection the Rainey Creek Road and Highway 37,
22  correct?
23      A.  Yes.
24      Q.  Do you believe that those samples and the
25  findings in those samples are representative of the forest

185

1  in Lincoln County in general?
2      A.  Well, you don't have to rely on my -- or our
3  paper for this particular question because all you have to
4  do is go to the EPA Web site.  And just like those other
5  EPA papers I'm referring to, you can get them off the Web
6  site; that you asked them if I cite them or not, well,
7  they're on the web site.  But anyway, you can go to EPA's
8  Web site and you can see a map of what they found in the
9  bark going from the mine all the way across Lake Koocanusa
10  and they will give you concentration gradients going
11  beyond the mine.
12      Q.  Right.
13      A.  So you can draw your own conclusions from
14  that.
15      Q.  Okay.  But your conclusions, based on your
16  analysis, you would not purport to have taken a
17  representative sample in this paper, correct?
18      A.  In this paper, we were starting at the mine.
19  We wanted to -- we assumed that would have the highest
20  level of contaminants.  And then we worked our way away
21  from the mine.  That was the point.
22      Q.  Okay.  It was not to say -- to speak or give
23  conclusions about the forest as a whole, correct?
24      A.  Well, that's not entirely correct, no, because
25  obviously, if you would -- if we find it, you know, we

186

1　even find half the concentration at the road so many miles
2　down from the mine, then we could assume that the forest
3　in the same circle around that same area could be
4　similarly contaminated.
5　　Q.　Did you make any effort to randomly select or
6　select a representative sample of the trees that were in
7　the area off of the mine?
8　　A.　Well, we tried to -- we basically tried to
9　sample in areas which we could easily access, since we
10　were all suited up and it's very difficult work.
11　　Q.　Sure.
12　　A.　And so, you know, that would be a good
13　question.  And basically, we tried to collect samples from
14　areas moving down from the mine off roadways as far as we
15　could get, and we did try to, over time, have tried to
16　collect samples from representative tree species.
17　　How come you and I are the only ones interested in
18　this paper?
19　　Q.　I think, I think it's fascinating.  So, just
20　so I understand what you're saying:  You start at the
21　mine, you move farther away all the way in town.  However,
22　would you feel comfortable extrapolating these findings to
23　trees that were 5 to 10 miles due south of the mine?
24　　A.　Well, I mean we didn't have the resources or
25　the manpower to do that sort of approach, so EPA took our

187

1　-- basically what we found after we reported this to EPA,
2　then they did their sampling.  They dropped people in by
3　helicopter and took samples on these lines going from the
4　mine.
5　　Q.　Okay.
6　　A.　In all directions.
7　　Q.　So EPA's work, you believe, constitutes a more
8　representative analysis or -- let me rephrase that.
9　　The sampling done by EPA, in your opinion, was more
10　comprehensive in its attempt to sample a more
11　representative sample of the trees?
12　　A.　Representative area around the mine, yes.
13　　Q.　Right, okay.  And I guess, you know, I don't
14　-- you're not purporting to do so here.  I'm just trying
15　to make the record clear on this.  This is not a paper
16　that is trying to take a number of samples and then
17　extrapolate those findings to the forest in general.
18　That's not what this paper seeks to do, correct?
19　　A.　I don't believe we have enough samples to do
20　that.
21　　Q.　Okay.  That is just what I was trying to make
22　clear.  Moving on to page -- well, staying on page 464,
23　I'll move back to the figures, in the "Conclusion," and
24　this is, I guess, the last two sentences on this page, I'm
25　going to read this, and let me know if I read this

188

1　correctly:
2　　　"The result of the railroad sample raises the
3　possibility that the transportation corridors through
4　which Libby vermiculite was hauled to other locations
5　throughout the United States may also be contaminated.
6　This suggests that similar studies of bark from trees near
7　vermiculite processing sites across the country could be
8　used to determine the extent of amphibole fiber
9　contamination in those locales."
10　　Did I read that correctly, sir?
11　　A.　Yes.
12　　Q.　And if I understand this correctly, you're
13　saying that because this Libby vermiculite was taken
14　across the country, it is possible that we would find
15　exposures had occurred that resulted in asbestos fibers
16　being deposited in trees far, far away from the Libby
17　mine, correct?
18　　A.　Is what it's really saying is that, you know,
19　since we've done this work, this approach has been done in
20　other areas of the country.  Back in New York, they've
21　used the same approach near chrysotile mines and used to
22　identify, you know, the dispersal of asbestos.  So that's
23　what really this is saying, is that this can be used as an
24　approach to track where asbestos goes.
25　　Q.　Right.

189

1　　A.　I think that's all it's saying.
2　　Q.　Well, I guess the language I focused on,
3　though, was:  "That the transportation corridors through
4　which Libby vermiculite was hauled to other locations
5　throughout the United States may also be contaminated."
6　　A.　Yes.
7　　Q.　And you agree with that statement?
8　　A.　Yes.
9　　Q.　Okay.  So it is quite possible that there are
10　forests outside of Lincoln County in which unexpanded
11　vermiculite was taken through that area and people who
12　engage in certain activities in that forest may be exposed
13　to asbestos, correct?
14　　A.　Well, I don't like your use of the word
15　"forest."  I mean we're talking about areas adjacent to
16　like a railroad track.
17　　Q.　Okay.  But trees near a railroad track,
18　correct?
19　　A.　And I'll buy that one.
20　　Q.　Okay.  So let me start that over, then.  Is
21　your opinion, then, that because unexpanded vermiculite
22　was sent all across the country, that it is quite possible
23　that there were releases of asbestos that were retained by
24　trees?  Correct?
25　　A.　Yes.

48 (Pages 186 to 189)

W.R. GRACE & CO.               TERRY M. SPEAR, Ph.D.                July 29, 2009

190

1    Q.    And a person who engages in certain activities
2    around those trees may be exposed to asbestos from this
3    tree, correct?
4    A.    If they performed some activity that disturbed
5    the media, sure.
6    Q.    Okay.  And this would be asbestos that came
7    from unexpanded vermiculite, correct?
8    A.    Yes, or, I guess, asbestos that came from
9    anywhere if it was transported through that area.
10    Q.    Right, right.  Which unexpanded vermiculite
11    was, correct?
12    A.    Yes.
13    Q.    Okay.  The same kind of unexpanded vermiculite
14    that was found around Libby, correct?
15    A.    Yes.
16    Q.    Okay.  If we could move to Exhibit 4 again,
17    which was your harvesting simulations.  Now, earlier you
18    corrected me when I made an ill-advised attempt to compare
19    bulk sampling to air samples, that those are not proper
20    data to compare, correct?
21    A.    Yes.
22    Q.    However, here we are now dealing with air
23    samples, correct?
24    A.    Yes.
25    Q.    And these are the kind of data that could be

191

1    compared to exposures that occur on a job site, correct?
2    A.    On a job site where they were sawing up
3    contaminated firewood?
4    Q.    Well, I mean even more generally.  The
5    measurements you take of the activity simulated here,
6    those data measurements, those fiber-per-cc measurements,
7    those data could be compared to other types of
8    occupational exposures to asbestos when trying to assess
9    exposure level, correct?
10    A.    Well, just in, yeah, saying we've got this
11    level doing this activity and this level taking a chain
12    saw to a piece of wood; yeah, we can do that.
13    Q.    Okay.
14    A.    I don't know what it means.  This was designed
15    to look at what happens if we start handling these trees.
16    Q.    Okay.  But just so I understand, when we were
17    talking about Amandus earlier, we talked about how
18    exposure data was used as part of an epidemiological
19    study, correct?
20    A.    Yes.
21    Q.    And so presumably, to the extent that you have
22    this exposure data, were you to have information about the
23    duration or circumstances surrounding exposure, you could
24    develop a cumulative exposure for somebody if given the
25    right exposure history, correct?

192

1    A.    You may be able to, I guess, as long as we're
2    talking about that particular activity.
3    Q.    Okay.  In this case, do you intend to offer
4    any opinions about individuals who have worked in some
5    type of logging capacity in the Lincoln County area with
6    respect to what their exposures may have been?
7    A.    Well, to me, the fact that all of this work
8    started because that's what we were originally proposing
9    was to study logging operations in Libby as a large scale
10    operation, and so we wanted to collect preliminary data,
11    so I guess from that standpoint, we were trying to
12    determine if there was a source of exposure from sawing up
13    wood, yes.
14    Q.    Okay.  So the idea of determining whether
15    there's a source of exposure, is it fair to characterize
16    that as a preliminary undertaking?
17    A.    I think -- well, this says "preliminary" in
18    the title.  I don't know if you read that or not.
19    Q.    Yes, yes.  That's a good point.  That's --
20    okay.  So at this stage, you are establishing the
21    existence of potential exposures, correct?
22    A.    Yes.
23    Q.    But you haven't reached a point of actually
24    trying to estimate a cumulative exposure that an
25    individual has had who may have engaged in these

193

1    activities, correct?
2    A.    I have not.
3    Q.    Okay.  Nor do you intend to offer an opinion
4    of that nature at the confirmation hearing, correct?
5    A.    That would be fair.
6    Q.    Okay.  Now, did you take soil measurements
7    during the course of the sampling activities?
8    A.    For this paper, I don't believe so.
9    Q.    Okay.  And some of the activities included
10    literally sawing trees over, correct?
11    A.    Yes.
12    Q.    Let me get a quick list of the activities just
13    so, you know, we're not -- I'm not speculating.  Where's
14    -- I believe it's in the paper, but off the top of your
15    head, if not, what are the --
16    A.    Yeah, we basically had -- we tried to divide
17    up into people with different tasks.  So we had a
18    chain-sawer; we had a person who would assist the
19    chain-sawer in getting the tree in position, clearing
20    brush; then we would have people that would move the sawed
21    material and stack it --
22    Q.    Which task --
23    A.    -- there were two of them.
24    Q.    Which task did you perform?
25    A.    I was the chain-sawer.

Nordhagen Court Reporting          QA@Bresnan.net          406-494-2083

194

1    Q.   That's got to be the best job of the bunch.
2    A.   It was.
3    Q.   I think the mover got the short end of the
4  stick. No pun intended.
5    A.   Well, I think the stackers. They were -- they
6  had to rope --
7         MR. LEWIS: Have you ever been, ever been on a
8  chain saw?
9         MR. STANSBURY: I have been on a chain saw.
10        MR. LEWIS: If you get on one of these big
11 chain saws, that's no bargain.
12        MR. STANSBURY: Oh, it's -- at least it's
13 enjoyable. I've also -- I've been on a chain saw and I've
14 shlepped wood around. And between the two, I'll take the
15 chain saw.
16        THE WITNESS: But the stackers had to walk,
17 you know. So they'd be walking and there'd be hills. I
18 think they had the worst job.
19    Q.   (By Mr. Stansbury) Okay. And then once the
20 tree had fallen, you would also saw the branches off the
21 tree, correct?
22    A.   Right.
23    Q.   And so as you say, people are walking back and
24 forth throughout this process, correct?
25    A.   Yes.

195

1    Q.   Trees are falling from an upright position
2  onto the ground, correct?
3    A.   Yes.
4    Q.   Kicking up whatever debris is on the ground,
5  correct?
6    A.   Correct.
7    Q.   And so, however -- and you're taking
8  measurements of personal breathing zones, correct?
9    A.   Yes.
10   Q.   You're also doing wipe measurements, correct?
11   A.   Yes.
12   Q.   Okay. However, with the personal breathing
13 zone measurements, you did not differentiate between
14 exposures that may have occurred from asbestos coming out
15 of the bark of the tree as opposed to asbestos coming out
16 of the soil, correct?
17   A.   Out of the soil or people walking through
18 brush that wasn't associated. You know, you're walking
19 through brush, I mean like green - what's the word I'm
20 looking for - you know, green foliage.
21   Q.   Right.
22   A.   Yeah, we didn't account for that and we can't
23 account for that.
24   Q.   Okay, okay. And similarly as we discussed
25 earlier, you haven't differentiated between asbestos

196

1  fibers that were from the Libby mining vermiculite
2  operation as opposed to "naturally occurring asbestos,"
3  correct?
4    A.   We just looked for Libby amphiboles.
5    Q.   Okay. So the amphiboles that were identified
6  could have been from the bark of the tree, correct?
7    A.   Yes.
8    Q.   Could have been from the soil, correct?
9    A.   Could have been.
10   Q.   Okay. And could have just been naturally
11 occurring asbestos, correct?
12   A.   But all asbestos is naturally occurring.
13   Q.   Well, let me rephrase that, then: Naturally
14 occurring asbestos that was not originally released as
15 part of the Grace mining and milling operation, correct?
16   A.   If it was there, it could have been that,
17 sure.
18   Q.   Okay. Right, just making clear that you did
19 not attempt to differentiate, did you?
20   A.   No.
21   Q.   Okay.
22        MR. STANSBURY: I think we have 5 minutes left
23 on the tape, so why don't we take a quick break and then
24 we'll resume after that so he can change the tape.
25        VIDEOGRAPHER: This concludes Tape 3 of the

197

1  videotaped deposition of Dr. Terry Spear.
2        The time is 1:07. We're off the record.
3        (A brief recess was taken.)
4        VIDEOGRAPHER: The time is 1:17. This is Tape
5  4 of the videotaped deposition of Dr. Terry Spear.
6        We're on the record.
7  BY MR. STANSBURY:
8    Q.   Okay. Going back to Exhibit 4, I believe, if
9  we could turn to page 719.
10        MR. LEWIS: Seven -- excuse me?
11        MR. STANSBURY: Seven nineteen.
12        MR. LEWIS: Thank you.
13   Q.   (By Mr. Stansbury) And Figure 1, location of
14 the 2006 harvest, firewood harvesting simulations
15 conducted off of Rainey Creek Road, near the former
16 vermiculite in the EPA-restricted zone near Libby Montana,
17 the distance from Highway 37 to the harvest locations was
18 1.5 kilometers.
19        Did I read that correctly?
20   A.   Yes.
21   Q.   So that, the harvest location, that's where
22 these samples were taken?
23   A.   The harvest, yeah -- during this study, you
24 mean?
25   Q.   Yes, sir.

50 (Pages 194 to 197)

198

1    A.   Yes.
2    Q.   Okay.  How many trees did you chop down in
3  total?
4    A.   I'm not sure how many trees we chopped down in
5  total.  I mean we did -- I believe some of the trees were
6  partially down, some we felled.  They're all standing
7  dead.  We didn't cut any live trees.
8    Q.   You didn't cut any live trees at all?
9    A.   No.
10    Q.   Okay.  If we could turn to Table 2 on page
11  721, this is TEM wipe sample results from three firewood
12  harvest simulation trials conducted in the Libby
13  EPA-restricted zone near Libby, Montana.
14    Did I read that correctly, sir?
15    A.   Yes.
16    Q.   Okay.  So it sounds like there were three
17  harvest trials.  Is that what we were talking about
18  earlier, where you chop down the trees, cut them up, and
19  then haul and stack the wood?
20    A.   Well, a trial was basically over a given
21  period of time.  See, we had to limit our time doing this
22  work because of the fact that, again, we were suited up
23  and it was summertime and we couldn't spend too much time
24  in these suits.  So a trial would involve like a period of
25  time, 40 minutes - an hour, probably 40 minutes, and

199

1  whatever trees we cut up during that time period would be
2  part of that trial.  So we did that three different times.
3    Q.   Okay.  And as this indicates by the title of
4  this table, this harvesting occurred inside the
5  EPA-restricted zone, correct?
6    A.   Yes.
7    Q.   Okay.  And I believe on page 722 under
8  "Conclusion," the last paragraph of the left column, tell
9  me if I read this correctly:
10    "The authors recognize that the
11  firewood-harvesting simulations presented in this study
12  represent near worst-case scenarios."
13    Did I read that correctly, sir?
14    A.   Yes.
15    Q.   Okay.  So is it fair to say you would not
16  extrapolate any airborne release findings from this study
17  to similar activities that would occur elsewhere in and
18  around Lincoln County, correct?
19    A.   Correct, unless we knew the bark levels were
20  the same.  But we don't know that, so you are correct.
21    Q.   Okay.  Did you develop a method for predicting
22  the airborne release that would occur from a given bark
23  level?
24    A.   No.
25    Q.   Okay.  Sitting here today, are you able to

200

1  predict airborne releases given bulk measurements of
2  asbestos within bark?
3    A.   No.
4    Q.   Okay.  You mentioned in this paper the
5  restrictive zone was once used for logging.  Is that
6  correct?
7    A.   That was my understanding, yes.
8    Q.   What was the basis of that understanding?
9    A.   Oh, I think I've -- that's a matter of public
10  record.  I believe the Forest Service may have told us
11  that.  I think I've seen it in depositions.  Yeah, I don't
12  have any doubts about that they were -- that there was
13  logging done off that road or nearby.  Jackson Creek Road
14  comes in from the northeast side of that, or mainly the --
15  I don't know if that's important or not, but -- (pause.)
16    Q.   Well, let's look at Table 1 for a moment.
17    A.   Okay.
18    Q.   Now, this is the --
19    A.   Table 1?
20    Q.   Yes, on page 720.
21    A.   Okay.
22    Q.   Now, this is the PBZ, the personal breathing
23  zone results, correct?
24    A.   Yes.
25    Q.   And the chain saw operator, which we've

201

1  established was you, correct?
2    A.   Yes.
3    Q.   And "n = 3," that means -- what does that
4  equal?
5    A.   Number of samples we collected.
6    Q.   Okay, so number of airborne samples.  How long
7  would you take each sample?
8    A.   I think it's stated in here somewhere.  Again,
9  it seems like they were fairly short-term samples, less
10  than an hour.
11    Q.   And you then predicted a time-weighted average
12  for those samples?
13    A.   Well, these are sample time-weighted averages,
14  so these are just the concentrations for the sample time.
15  We didn't extrapolate the eight hours.
16    Q.   Okay.  So what impact would extrapolating the
17  eight hours have on your findings?
18    A.   Well, if a person did chain-sawing the same
19  amount of time as we did and found the same results, and
20  then if we divided that by eight hours, it's going to go
21  down.  I mean the concentration will be less.  However, if
22  a person did this particular operation for eight hours,
23  then that would be the eight-hour time-weighted average.
24  Does that make any sense?  This is how we try to teach our
25  students.

51 (Pages 198 to 201)

202

1    Q.   Right. I just want to make sure that, you
2  know, the record's clear and that I'm following it, too.
3  So the mean PCM sample TWA -- and TWA is a time-weighted
4  average, right?
5    A.   Yes.
6    Q.   It's 0.72 fibers per milliliter, which is
7  fibers per cc, right?
8    A.   Right.
9    Q.   Okay. And for the operator assistant, it was
10  0.26 fibers per cc, correct?
11    A.   Yes.
12    Q.   And the stackers, it drops to 0.07 and 0.12
13  respectively, correct?
14    A.   Yes.
15    Q.   And so the total mean for all tasks was 0.29
16  fibers per cc, correct?
17    A.   Right.
18    Q.   Okay. Now, do you have an opinion as to the
19  meaning of those findings or the importance of those
20  findings?
21    A.   Well, in my opinion, they aren't very
22  important because obviously, fibers per cc are just that,
23  fibers. You know, there's lots of fibers in the forest.
24    Q.   Right.
25    A.   We're talking about sawdust.

203

1    Q.   So we haven't, at this point, reduced it to
2  asbestos fibers, correct?
3    A.   That's right.
4    Q.   Okay. What about the mean TEM sample TWA?
5  Are we then looking at actual asbestos fiber for these
6  measurements?
7    A.   Yes. These are structures per square
8  centimeter -- or per cubic centimeter --
9    Q.   And so the first --
10    A.   -- and broken down by, you know, length.
11    Q.   Okay. So there are two columns -- or three
12  columns of mean TEM data, the first of which measures
13  fibers less than 5 microns, correct?
14    A.   In length.
15    Q.   In length; in length, thank you. The second
16  column measures fibers greater than 5 microns in length,
17  correct?
18    A.   Yes.
19    Q.   And then the third column measures total
20  asbestos fibers irrespective of length, correct?
21    A.   Yes, but basically, it's kind of the
22  combination of the two.
23    Q.   Right. You're basically adding them together,
24  correct?
25    A.   Yeah.

204

1    Q.   Okay. And so if we were to want to compare
2  these measurements with Amandus's data, we would use the
3  mean -- would we use the "Mean TEM Sample TWA greater than
4  5 microns" column?
5    A.   Well, I don't believe Amandus did any TEM. I
6  think it was all PCM.
7    Q.   PCM, right. How would the TEM and PCM
8  compare?
9    A.   Well, generally, we could expect -- I mean if
10  we're just talking about -- let's say we had nothing but
11  asbestos in this room floating around in the air, and if
12  we did PCM versus TEM, we'd see more with TEM because of
13  the greater magnification.
14    Q.   Okay.
15    A.   If you have a mixed, where you've got
16  different types of fibers -- see, TEM is only looking at
17  asbestos. So if we've got mixed fibers, then we may see
18  more with PCM. Does that make sense?
19    Q.   Okay. Why would we see more with PCM?
20  Because we wouldn't --
21    A.   Because it's going to count all fibers.
22    Q.   Right.
23    A.   So it's going to count the asbestos fibers as
24  well as the other fibers. Do you see what I'm saying? I
25  don't know if that makes sense.

205

1    Q.   I do. So I'm thinking back to the exposure
2  measurements that Amandus used which used PCM. The actual
3  asbestos present in the air for those measurements may
4  have been higher than what was measured -- than what was
5  reported, rather?
6    A.   Are we going back to the Amandus?
7    Q.   Yes, not focusing on the old pre '68 data.
8  I'm talking about like the data in the late '60s and
9  throughout the '70s through the '80s where they reported
10  in PCM fibers per cc.
11    A.   Well, if there were fibers present that were
12  non asbestos, that would be the case. I don't know if
13  that was true or not.
14    Q.   Okay.
15    A.   You know, and the other -- with PCM, you just
16  have to keep in mind that they're counting fibers, but for
17  one thing, PCM can only see a diameter of a fiber like
18  0.25 micrometers in diameter. So if there's real thin
19  fibers, we're not even going to see them under the
20  microscope, whereas with TEM, we would see it. So that's
21  kind of another reason why we might see more TEM fibers if
22  we had the same, the same asbestos atmosphere.
23    Q.   So is it fair to say that, and based on this
24  paper, one of the worst-case scenarios you would
25  anticipate in terms of exposure for a chain saw operator

206

1  would be 0.11 fibers per cc if we were to count all
2  fibers, including those shorter than 5 microns, correct?
3      A.   Are we looking at the last column? Where are
4  we looking at?
5      Q.   The last column, the chain saw operator.
6      A.   Chain saw operator. So for that number of
7  samples, pretty limited number of samples, yeah, we found
8  that number.
9      Q.   Right. And again, just so the record's clear,
10  this is what the paper states is a worst-case scenario of
11  potential exposure, correct?
12      A.   Well, we called it "worst case" simply because
13  we felt that the mine would be most likely to have the
14  highest contamination. We were on the mine road.
15      Q.   Right, right. So --
16      A.   Is that worse than being somewhere else on the
17  mine road? I don't know.
18      Q.   But in terms of being somewhere in Lincoln
19  County forest area using a chain saw, an area that is away
20  from the mine, you would not expect to see exposures
21  higher than this, would you?
22      A.   If we knew that the concentration in the media
23  was less, yeah. We would assume that it would be less.
24      Q.   You would assume it would be less, right.
25      A.   But, you know, you can't make those

207

1  conclusions unless you knew.
2      Q.   But again, you would not extrapolate these
3  measurements to other parts of the forest without some
4  form of measurement done in advance, correct?
5      A.   Right. And we haven't attempted to do that.
6      Q.   Okay. So I just want to make sure the
7  record's clear that you were not stating based upon this
8  paper, you believe similar exposures are occurring
9  throughout the Lincoln County forest, correct?
10      A.   Right. A very limited number samples, a pilot
11  study, preliminary data, the only thing we can say from
12  this study, basically, is that if you work on contaminated
13  trees, you can put fibers into the air or get them on your
14  clothes.
15      Q.   Okay. And but fair to say, you stated
16  earlier, at the confirmation hearing, you are not going to
17  offer an opinion about any specific individual's potential
18  exposures from having worked as a chain saw operator in
19  Lincoln County, correct?
20      A.   No.
21      Q.   Okay.
22           MR. LEWIS: That's a double-negative, Counsel.
23  You asked -- I don't think you want the answer to stand as
24  stated.
25           MR. STANSBURY: Could you repeat the last

208

1  question?
2           MR. LEWIS: But the answer is "no," he's not
3  going to be offering any testimony on that subject.
4           (The record was read by the court reporter as
5  follows:
6           "QUESTION: But fair to say, you stated
7  earlier, at the confirmation hearing, you are not going to
8  offer an opinion about any specific individual's potential
9  exposures from having worked as a chain saw operator in
10  Lincoln County, correct?
11           "ANSWER: No.")
12           MR. STANSBURY: Is that a double negative?
13           MR. LEWIS: Yeah, it is.
14           MS. ROHRHOFER: I'm not an English major. I
15  think --
16           MR. LEWIS: You asked if it's correct that
17  he's not going to, and he said "no."
18           But anyway, he's not, just for the record,
19  he's not going to offer any testimony as to that last
20  question.
21           MR. STANSBURY: I'll ask him one more time.
22  BY MR. STANSBURY:
23      Q.   You're not going to offer any -- is it correct
24  to say that you will not offer any testimony at the
25  confirmation hearing about an individual's potential

209

1  exposures from sawing, hauling, or stacking wood in the
2  Libby forest?
3      A.   That would be correct.
4      Q.   Okay.
5           MR. STANSBURY: I appreciate you looking out
6  for me, Tom.
7           MR. LEWIS: Well --
8           MR. STANSBURY: That's good. You're right.
9           MR. LEWIS: It doesn't have any -- he's not
10  going to testify about that.
11      Q.   (By Mr. Stansbury) And we stated earlier that
12  your 2009 paper was not in your expert report, correct?
13      A.   Correct.
14      Q.   And you don't intend to offer any testimony
15  related to that at the confirmation hearing, correct?
16      A.   No.
17      Q.   Okay. And again so the record's clear, we
18  looked through your report and although we did see
19  references where you were talking about medical findings,
20  you yourself are not a medical doctor, correct?
21      A.   That's correct.
22      Q.   You don't intend to offer any medical
23  testimony about asbestos disease, correct?
24      A.   No.
25      Q.   Okay. Nor are you a toxicologist, correct?

210

1    A.    That's correct.
2    Q.    You do not intend to offer opinions about
3    toxicity of amphiboles in Libby, correct?
4    A.    Correct.
5         MR. LEWIS:  Don't ask these questions over
6    again.  Please don't.  They're repetitive.
7    Q.    (By Mr. Stansbury)  Nor are you an
8    epidemiologist, correct?
9    A.    Correct.
10    Q.    You're not going to offer epidemiological
11    opinions, correct?
12    A.    That's correct.
13    Q.    Okay.
14        MR. STANSBURY:  Pass the witness.
15        MR. LEWIS:  Okay.  Did we get -- what you
16    referred to as the "Amandus study", was that marked?
17        MR. STANSBURY:  I believe it was.
18        MR. LEWIS:  Is that 7?
19        MS. ROHRHOFER:  Yeah, Exhibit 7.
20        MR. LEWIS:  Okay, thanks.  Let me check.  I
21    probably don't have any questions.
22        (Pause in proceedings.)
23
24    BY MR. SPEAR:
25    Q.    I guess I want to clarify one thing,

211

1    Dr. Spear.  The EPA studies that you considered, you
2    referred to some studies by Paul Peronard.  Do you recall
3    that?
4    A.    Yes.
5    Q.    Are those studies that you referenced all
6    publicly available?
7    A.    Yes.  They're on the EPA Web site, I believe.
8    Q.    Is that how you obtained them?
9    A.    Yes.
10    Q.    Okay.  And does that include the bark studies
11    and the map prepared by the EPA?  Is that on the Web site
12    as well?
13    A.    That's a good question.
14    Q.    Do you know when that study and that map was
15    made available to the public or -- let me finish.  Let me
16    rephrase the question.
17        Do you know when that EPA study, the bark study and
18    the map that you described, was issued by the EPA?
19    A.    My recollection is it was in 2008.
20    Q.    Do you know if it was before or after your
21    report?
22    A.    Before or after this report.
23    Q.    Your expert report.
24    A.    My expert report.  I guess I don't know the
25    exact timeline.

212

1    Q.    All right.
2    A.    I mean I just know that because of our work
3    with the Forest Service, we had to have access to that
4    map.  I mean we've, we've been working with EPA.
5    Q.    And that's the Forest Service work that you're
6    engaged in right now that's not been completed --
7    A.    Yes.
8    Q.    -- is that correct?
9    A.    Yes.
10    Q.    All right.  Do you know where that map can be
11    found?
12    A.    I don't know what you mean.  I have it, the
13    Forest Service has it, EPA has it.  I don't know if
14    they've released the map.
15    Q.    Okay.
16    A.    I just don't know.  I'm just being honest with
17    you, I don't know.
18    Q.    Okay.
19    A.    I mean it isn't in a publication because we
20    don't, we don't know if we have the right to put that in
21    there.
22    Q.    And you do not, is it -- I don't know if you
23    testified about this:  Do you or do you not intend to rely
24    on that map for your testimony in this case?
25    A.    Well, to me, it described the spread of

213

1    asbestos from the, from the mine.  But I don't -- I
2    haven't offered it as an opinion, so I just brought it up
3    in the case of cross-examination, so I probably wouldn't
4    rely on it.
5    Q.    Okay.  You, in your report --
6        MR. LEWIS:  Excuse me, Counsel.
7    Q.    (By Mr. Lewis)  I'll refer you to Exhibit 4.
8    You talk about a harvest location.
9    A.    Looking at the map?
10    Q.    Yes, it's Figure 1 on page 719.
11    A.    Okay.
12    Q.    I want to clarify.  The harvest location was
13    not on the mine site.  Is that true or untrue?
14    A.    That is true.
15    Q.    Okay.  Do you know where the screening, what
16    has been called the "screening plant" is located on the
17    Kootenai River?
18    A.    By the -- yes.
19    Q.    Okay.  Is that at the intersection of the
20    river and Rainey Creek Road?
21    A.    Yes.
22    Q.    How far was the harvest location from the
23    screening plant?
24    A.    Well, what did we say -- whatever the distance
25    was given up that road.  I think we state 1.5 kilometers.

W.R. GRACE & CO.        TERRY M. SPEAR, Ph.D.        July 29, 2009

214

1    Q.   Okay.
2    A.   From Highway 37, so we add another --
3    Q.   So less than a mile?
4    A.   Yes.
5    Q.   Okay.  That's all I have.
6         MR. LEWIS:  I'll reserve the rest of my
7    questions in time of -- until the confirmation hearing.
8
9    BY MR. STANSBURY:
10   Q.   Just one quick clarifying point.  The harvest
11   location was not on the mine, but it was in the
12   EPA-restricted zone, correct?
13   A.   Yes.
14   Q.   Okay.
15        VIDEOGRAPHER:  Anybody else on the line?
16   Everybody done?
17        MR. LEWIS:  Are there any questions?
18        MR. STANSBURY:  Going once, twice.  All right,
19   everybody.
20        VIDEOGRAPHER:  Okay.  This concludes the
21   videotaped deposition of Dr. Terry Spear in the matter of
22   W.R. Grace & Company, et al., Debtors.
23        The time is 1:37.  It's July 29, 2009.
24        We're off the record.
25             * * * * *

216

1    DEPOSITION OF:    TERRY M. SPEAR, Ph.D.
2    DEPOSITION DATE:    JULY 29, 2009
3    IN RE:        W.R. Grace & Co, Debtor
4    COURT REPORTER:    CANDICE L. NORDHAGEN
5    I have read my deposition and make the following
     corrections or additions:
6
7    PAGE #  LINE    CORRECTION
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22   Signed under penalty of perjury this _____ day of
     _____, _____.
23
24             _____
25             Terry M. Spear, Ph.D.

215

1    STATE OF MONTANA    )
2                      : ss.
3    County of Silver Bow )
4
5         I, Candice L. Nordhagen, Registered Professional
6    Reporter, Notary Public in and for the County of Silver
7    Bow, State of Montana, do hereby certify:
8
9         That the witness in the foregoing deposition, Terry
10   M. Spear, Ph.D., was by me first duly sworn according to
11   law in the foregoing cause; that the deposition was then
12   taken before me at the time and place herein named; that
13   the deposition was reported by me in machine shorthand and
14   later transcribed by computer, and that the foregoing two
15   hundred fourteen (214) pages contain a true record of the
16   witness, all done to the best of my skill and ability.
17        IN WITNESS WHEREOF, I have hereunto set my hand and
18   affixed my notarial seal this _____ day of _____,
19   2009.
20
          _____
21
               Candice L. Nordhagen
22
               Notary Public for the State of
23             Montana residing at Butte,
               Montana.  My commission
24   (NOTARIAL SEAL)        expires September 15, 2011.
25

**A**

abbreviated 21:10
ability 9:19 177:5,6
  215:16
able 32:24 115:4
  167:2 176:7 177:3,5
  177:7 179:18 192:1
  199:25
abnormalities 45:15
  45:24 46:4,19 48:1
  52:20 53:21 54:11
  132:17
absence 11:13
access 147:10 165:8
  186:9 212:3
account 134:21 144:6
  195:22,23
accrued 125:15
accumulating 134:11
accumulative 137:2
accuracy 153:10
accurate 178:3
  179:23
accurately 124:1
  155:4,10,15
act 97:23 98:1
acted 98:4
action 118:17 127:6
actions 99:2,3
activities 24:24 25:6
  25:7,8,9 77:17,18
  80:12 121:18,21
  126:22 169:9
  189:12 190:1 193:1
  193:7,9,12 199:17
activity 15:24 16:8
  17:22 18:6,21 83:20
  90:9 94:4 121:17
  190:4 191:5,11
  192:2
activity-based
  124:25 125:4
actual 10:8 61:7
  135:24 163:11
  168:11 170:1
  174:20 184:19
  203:5 205:2

add 53:13 151:18
  214:2
adding 203:23
addition 107:12
additional 137:11
  138:9 166:21
additions 216:5
address 44:3 139:17
  152:1 154:7
addresses 46:2,21
  47:10 100:9
adequately 100:16
adjacent 189:15
administered 1:8
  52:6,11 53:17
administering 51:23
administration
  141:13,18,22
administrative 72:20
administrator 85:17
advance 207:4
advisor 42:14 93:17
  125:17
aerodynamic 114:4
affirmative 99:21
affirmatively 182:17
affixed 215:18
agencies 140:21
  143:5
agency 115:1,16
  141:14
ago 26:18 30:3
  115:21 166:4,4
agree 82:7 89:21
  104:11 134:9 138:2
  141:5,6 153:20
  171:8 189:7
agreed 71:10
agreement 98:12
AHERA 173:6
aim 79:21
aimed 30:15 78:18
air 13:12 15:20,22
  16:4,8 17:21 18:17
  18:17 21:5,6,9 22:4
  76:15 80:9 90:8,18
  90:22 91:19 92:19

93:21 94:8,11,13
  102:2 103:21 104:1
  114:20 115:4,13
  116:2 119:17,21
  121:24 122:23
  123:1,6 127:11,12
  127:14,17 128:20
  128:22,23 129:13
  129:17 173:23
  174:25 176:14
  177:6 179:6,6,9
  181:2 190:19,22
  204:11 205:3
  207:13
airborne 80:11 115:4
  119:13 122:1
  123:12 124:13
  140:16,20 165:18
  174:2,8,10 199:16
  199:22 200:1 201:6
airshed 91:12 93:2
al 1:7 6:18 214:22
Alan 3:5,7 7:8,11
  103:19
alanrich 7:11
Albany 175:18
  176:20 177:2
alcohol 21:20
allegations 70:9
alleged 76:14
allow 123:11 124:12
allowed 42:11,23
allowing 117:12
already-expanded
  160:21
alternating 11:10
alternatives 106:11
Amandus 103:18
  106:23 110:12
  130:18,20 131:16
  131:24 132:11
  138:15 139:13,20
  149:5,24 155:2,8
  191:17 204:5 205:2
  205:6 210:16
Amandus's 140:6
  154:25 155:25

173:19 204:2
ambient 15:20,22
  16:4,8 17:21 76:15
  80:9 90:18,22 93:21
  103:21 119:17
ambiguity 147:16
ambiguous 138:21
American 30:10,11
  131:17
amount 123:5,6
  129:12 135:4
  156:10 174:12
  178:18 179:4
  201:19
amounts 64:25
amphibole 5:20
  14:16 35:21 36:22
  39:9,14,22,22 40:6
  40:10,16 45:3 47:3
  54:3 58:23 59:1
  72:16 75:2 84:1
  109:22,24 110:15
  139:25 156:21
  168:22 172:13,16
  172:20 175:19,23
  177:1,24 178:12,13
  179:19 182:20
  188:8
amphiboles 38:17,18
  40:7,11,18,19,20
  138:18 170:8,10
  196:4,5 210:3
amphobile 78:5
  79:23 119:20
Anaconda 29:6
analysis 24:5 51:16
  112:1 120:12
  133:12 135:21
  136:8 137:19
  146:13 149:20
  154:24 160:1
  166:23 170:22
  176:12,15 177:5
  179:7 180:22
  185:16 187:8
analyst 177:21
analytical 134:14,16

176:4,6,8,13,16,19
176:22 177:12
178:1,15,19,21,24
179:7,17
**analyze** 177:8,10
**analyzed** 170:21
171:25 172:9
**analyzing** 27:22
121:23 178:5
**Andrij** 75:4
**and/or** 142:4
**Annals** 31:5 77:13
**answer** 9:19 23:8
25:3 26:18 30:22
31:25 33:16 36:2,11
42:22 48:13,14,20
49:6 53:11 54:24
58:21 95:18 97:18
123:23 126:2 152:7
207:23 208:2,11
**antecedent** 138:22
**anticipate** 205:25
**anybody** 7:5,17,20
72:24 214:15
**anyway** 185:7 208:18
**appear** 60:12 135:7
**appearances** 2:1 3:1
4:1 6:6
**appears** 148:1 164:4
164:10,18
**apples-to-apples**
173:20
**applicable** 108:21
**applied** 178:24
179:21
**applies** 153:23
**apply** 137:23 146:17
**apportionment** 92:18
**appreciate** 34:5
101:9 123:22,24
209:5
**approach** 137:7
141:5,7 143:8 168:5
186:25 188:19,21
188:24
**approximately** 52:19
52:24 53:17

**area** 15:25 26:2
31:19 108:11
126:13 132:8 133:3
140:24 151:16,23
152:13,14 157:2
163:19 165:1 166:5
169:21 175:7 178:4
181:17 184:20
186:3,7 187:12
189:11 190:9 192:5
206:19,19
**areas** 32:7 72:13 92:1
140:23 150:11
151:8,15 152:18
153:1,15 154:3
160:4 162:17
165:20,21 170:4
180:19 186:9,14
188:20 189:15
**arguably** 109:16
**argumentative** 152:5
**arisen** 82:17
**arising** 75:20 114:1
**arose** 148:14
**arrangement** 11:12
**artfully** 163:6
**article** 5:19,20 28:19
44:7 59:3 74:13,16
75:9,11 76:22 78:11
94:1 140:8
**articles** 29:9,22,25
30:4 31:4,13,15
58:24,25 60:3
113:11 118:14
**article's** 75:14
**Asa** 180:3,12
**asbestos** 2:19 7:7
12:19,21,23 13:1,24
14:4,7,9,10,14,15
14:16 15:6,9,19
16:3 17:20,21 18:6
18:16 21:21 23:11
27:5,15,17 28:3,4
28:10,20,25 29:1,8
29:14 30:5 31:9,17
31:19 32:5,9 33:4,5
34:3,3,8,11,14,17

34:23 35:13,15,21
35:22 36:1 37:3,4,6
37:9,10,21 38:5,7
38:14,15,16 45:5
46:9 50:15,16 54:12
59:1 61:4 75:11
76:9,15,21 77:7,18
78:12,16 79:23 80:2
80:7 93:5,14 94:21
95:6 96:1,8 100:4
101:25 102:3
109:12,25 111:13
112:2,18,23 113:2
113:13,16 114:4,20
115:3,8,15,23 116:1
118:4,22,25 119:4,8
119:16,20 120:7,22
121:12,14,19 122:3
122:4,9,13,19 123:5
123:6,12 124:13,17
125:10 126:17
127:5,14 128:15,24
129:3,10,12,13,16
129:17 130:7
134:12,24 137:6
138:4,5 148:9,18
155:10,15 157:11
157:13 158:5,8,13
159:10,14,19 160:9
160:23 163:11,14
165:17,19 166:3
167:3 168:10,15,18
168:22 169:2,7,11
169:16,20,25
170:22,24 172:2
174:21,23,25
180:10 181:10,24
182:4 188:15,22,24
189:13,23 190:2,6,8
191:8 195:14,15,25
196:2,11,12,14
200:2 203:2,5,20
204:11,17,23 205:3
205:12,22 209:23
213:1
**asbestosis** 35:7
**asbestos-containing**

14:18 29:6
**asbestos-contamin...**
126:12
**asbestos-related** 26:9
26:11 32:25 35:5
59:23
**ash** 79:25
**aside** 89:10 161:17
**asked** 36:8 42:16
65:9 69:15 70:10
76:17 83:3 122:16
162:21 185:6
207:23 208:16
**asking** 27:8 34:5
128:14
**asks** 51:8
**aspect** 123:3 151:13
**aspects** 16:24 30:24
32:9 70:12,13 123:2
**assess** 156:15 191:8
**assessing** 156:18
**assessment** 68:7
133:25
**assist** 193:18
**assistant** 4:23 202:9
**associated** 14:16
34:23 54:11 113:1
133:8 146:3 160:13
169:9 176:17
195:18
**Association** 30:11,12
**assume** 36:8 136:11
186:2 206:23,24
**assumed** 185:19
**assumes** 123:15,18
123:20
**assuming** 138:11
**assumptions** 39:24
153:14
**assure** 13:16
**Atkinson's** 118:11
120:1
**atmosphere** 91:25
92:1,4 93:15 205:22
**atmospheric** 90:13
91:5,8,11
**ATSDR** 51:16,25

95:10
**ATSDR's** 51:18
**attempt** 154:6 174:7
  187:10 190:18
  196:19
**attempted** 207:5
**attic** 14:21,25 15:1,3
  17:16,24 18:8,10
  121:24 159:13
  160:16,20 161:1
  162:3
**attics** 17:16
**attorney** 2:5,13,22
  3:6,16 4:6,15 69:13
**attribute** 181:21,22
**attributing** 127:13
**audible** 9:9
**auditing** 68:5
**authored** 22:15
**authoritative** 111:11
**authors** 75:3 85:18
  131:16 199:10
**automobile** 92:19
  93:9
**available** 22:17 39:5
  112:12 113:14
  153:17 211:6,15
**Avenue** 1:22 4:8 6:20
**average** 47:23 144:10
  144:19 151:5 165:9
  201:11,23 202:4
**averaged** 47:25
**averages** 201:13
**avoid** 9:14
**awarded** 11:6
**aware** 18:4,13 23:15
  23:17 34:7,21 39:5
  46:7 52:14 57:16,20
  57:24 58:1,5 79:16
  82:12,16 93:7 96:14
  102:6 111:10
  123:11 124:12,15
  128:10,12 129:11
  131:1 132:10 134:1
  155:3,9,14 170:7,17
**awhile** 44:8 45:20
**A-L-A-N** 7:11

**a.m** 1:25

---

**B**

**B** 3:5 5:14 52:8
**BA** 67:16
**bachelor's** 10:20
**back** 7:10 11:11,14
  11:15,17 28:21 31:7
  33:7 38:14 40:13
  49:10,20 59:7 124:5
  127:12 139:8
  154:18 163:16
  171:14 172:11
  173:8 175:15
  177:22 187:23
  188:20 194:23
  197:8 205:1,6
**background** 10:18,19
  26:17 88:21 108:10
**BAILOR** 2:21
**bankruptcy** 1:1 8:9
**bargain** 194:11
**bark** 23:23 75:11,12
  165:25 166:3,3,11
  166:17,21 167:10
  167:11,20,22
  172:13,17,20
  173:22,24 174:5,12
  175:7,24 177:2,15
  177:18,24 178:12
  179:4,5,19 180:14
  180:24 181:5,20
  182:21,23 183:13
  183:14,18,25 184:4
  185:9 188:6 195:15
  196:6 199:19,22
  200:2 211:10,17
**barks** 174:21,23
**barrier** 115:9
**based** 27:23 35:18
  37:25 39:12 40:24
  41:3 51:7 58:15
  60:19 61:2 62:22
  83:7,20 85:22 89:8
  94:5,15 126:22
  136:16 138:18
  142:24 145:5 171:6

177:4 185:15
  205:23 207:7
**bases** 167:21
**basic** 60:10 89:18
**basically** 11:17 15:15
  16:21 21:20 40:22
  54:5 65:8 76:20
  79:13 82:25 86:12
  118:1 133:12
  159:24 166:18,19
  167:25 173:7
  183:16 186:8,13
  187:1 193:16
  198:20 203:21,23
  207:12
**basis** 30:9 43:5,8
  48:24 59:25 60:1,5
  84:23 91:13,15
  118:9,10 119:23
  200:8
**batch** 171:16
**Baylor** 7:6,6
**bearing** 20:17
**began** 18:25 19:10
  125:21 167:20
**beginning** 153:8
**begins** 129:10
**begun** 70:25
**behalf** 18:24 75:23
  76:1,9 81:6 85:9
**behaved** 116:2
  156:21
**believe** 11:6,13 12:8
  15:14 16:15 20:4,24
  21:24 22:1 25:3
  26:14 30:16 39:23
  42:20,25 46:6 47:19
  50:14 52:2,23 53:5
  53:20 55:16,18 56:8
  57:3,23 60:4,7
  68:25 69:3,3 70:3,8
  70:10,14 71:16,25
  73:12 75:21 76:7
  80:3 83:24 84:9
  86:22 87:1,24 88:4
  92:25 93:11 94:19
  94:24 95:14 97:23

98:1 100:21 101:2
  102:6 104:7 105:16
  105:18 128:23
  129:1 133:18
  143:12,21 144:5
  145:23 146:14
  151:11 157:19
  158:10 159:8 162:5
  162:23 163:17
  170:15 184:24
  187:7,19 193:8,14
  197:8 198:5 199:7
  200:10 204:5 207:8
  210:17 211:7
**benefit** 9:15
**Bernard** 2:21 7:6
**best** 76:11 118:23
  154:15 177:19,20
  194:1 215:16
**bet** 66:12
**better** 92:15
**beyond** 14:5 15:9
  112:11 185:11
**bias** 152:21,24
**big** 61:9 177:15
  194:10
**bit** 12:4 19:22 75:10
  83:2 100:25 156:14
  163:5
**Black** 41:21 42:13
  43:7 47:5,9 48:4
  50:13 56:21,21,24
  56:25 57:6,16,20
  58:15
**block** 106:12,12
**blown** 18:16,17
  128:24 183:11
**blows** 127:19
**board** 146:18
**botanist** 183:22,23
**bottom** 150:8
**bound** 120:2
**boundaries** 15:16
**Bove** 4:16
**Bow** 215:3,7
**bowl** 90:9,10 91:13
  93:2 94:5

W.R. GRACE & CO.            TERRY M. SPEAR, Ph.D.            July 29, 2009

**Box** 2:15
**Boy** 21:5
**Brad** 58:15
**branches** 194:20
**break** 66:15,16
  129:20,21 196:23
**breaks** 45:17
**breathes** 135:10
**breathing** 21:12,15
  21:23 83:21 103:25
  195:8,12 200:22
**Brian** 2:4 7:1 8:8
**brief** 66:19 197:3
**briefly** 12:10 48:18
  49:5,7 70:6
**Brienne** 78:7
**broad** 26:24
**broadening** 29:1
**broken** 173:9,9
  203:10
**brought** 162:15
  213:2
**brush** 193:20 195:18
  195:19
**Building** 4:17
**buildings** 115:15
  126:11,18
**bulk** 119:10 173:25
  174:11 176:15,15
  177:9 190:19 200:1
**bunch** 194:1
**burn** 79:23
**burned** 78:16
**burning** 78:6 80:2
**Butte** 1:23 6:2,21
  215:23
**buy** 189:19
**bystander** 116:8,10
  116:14,15,18,19,24
  117:3,4,8

**C**

**C** 4:14 103:19
**calculated** 144:11
**call** 16:8 69:20,23
  120:23
**called** 7:23 166:7

173:6 206:12
  213:16
**calling** 171:22
**cancer** 35:2 36:4,17
  37:2,5,7,10 102:1
**Candi** 6:22
**Candice** 6:7 215:5,21
  216:4
**capable** 94:12
**capacity** 192:5
**Caplin** 2:23
**captures** 155:4
**car** 162:16
**carcinogenic** 102:2
**card** 56:25 57:4,5
  58:12
**carrying** 18:22
**case** 1:7 4:23 6:17
  20:18 23:1,5 36:21
  60:19,23 63:20 64:1
  75:16 76:1,6 81:12
  81:24 82:14 83:10
  86:1 87:25 105:10
  105:15 158:7 160:8
  175:13 182:16
  192:3 205:12
  206:12 212:24
  213:3
**cases** 17:17 39:18
  60:20 68:10 86:24
  133:8 147:13
**Casualty** 4:12 7:16
  7:19
**categories** 19:5 45:21
**category** 54:7
**cause** 37:6,21 40:19
  59:23 60:5,19 61:2
  61:12,22 80:14
  82:21,24 83:5,13
  84:2,21 115:14
  137:24 144:1
  215:11
**caused** 54:2 62:2
  112:18 162:18,19
**causer** 36:23
**causes** 61:16
**causing** 35:22 37:9

38:5 138:5
**caveat** 113:5 151:18
**cc** 47:24 103:22
  134:15 135:13
  144:10,19 145:3
  146:10,24 147:13
  147:16 148:3
  149:11,22,23
  172:23 202:7,10,16
  202:22 205:10
  206:1
**ceiling** 115:12
**Cellarosi** 4:5 7:15,15
**cement** 158:23 159:2
**center** 3:18 169:15
**centimeter** 103:17,23
  176:2 178:13 203:8
  203:8
**central** 31:12 100:11
**certain** 46:12 61:20
  136:9,16 152:23
  156:10 178:4
  183:10 184:11
  189:12 190:1
**certainly** 12:25 29:6
  31:14 32:3 36:19
  55:1 60:8 63:12
  72:5 86:23 90:25
  91:7 107:18 108:6
  121:13 122:23
  123:1 129:15 140:9
  145:12,14 146:13
  148:18 150:23
  157:2 161:10 174:7
  175:12 179:18
  182:12,15
**certify** 215:7
**chain** 191:11 194:8,9
  194:11,13,15
  200:25 205:25
  206:5,6,19 207:18
  208:9
**chain-sawer** 193:18
  193:19,25
**chain-sawing** 201:18
**change** 196:24
**changed** 95:20 116:2

156:19
**changing** 145:9
**Chapter** 1:5
**characterize** 108:3
  155:15 192:15
**characterizes** 155:10
**characterizing**
  156:13
**check** 210:20
**Cherin** 4:7
**choice** 149:8
**chop** 198:2,18
**chopped** 198:4
**Chris** 127:5 128:21
**Christopher** 126:3,6
**chronology** 69:6
**chrysotile** 50:16
  159:6 188:21
**Chtd** 2:23
**circle** 2:24 186:3
**circumstances**
  191:23
**citation** 102:3 126:23
  126:25
**citations** 129:5
**cite** 95:6 111:22
  114:25 115:20
  185:6
**cited** 93:24 128:3,4
  140:9
**cities** 159:17
**citing** 102:5 103:18
  126:8 148:24
**Civil** 48:17
**CLAIMAINTS** 2:11
**claimant** 65:6,23
  82:11
**claimants** 2:19 7:4,7
  64:13,19,25 65:16
  81:7 82:12
**claimant's** 65:21
**clarification** 89:15
  117:13
**clarified** 155:8
**clarify** 26:23 27:11
  28:8 92:16 210:25
  213:12

clarifying 214:10
class 12:10,17,18,22
    12:25 151:15,17,22
    152:15
classes 11:10,15
    13:21,21
classification 184:1
classifying 152:18
clean 9:10 99:12
    162:25
clear 9:16 12:5 19:2
    22:13 24:12 25:9
    41:9 45:6 48:8
    49:24 74:12 75:10
    84:5 96:11 103:15
    107:15 116:20
    119:22 126:7
    135:12 140:22
    153:22 163:23
    187:15,22 196:18
    202:2 206:9 207:7
    209:17
clearance 180:20
clearing 25:11
    193:19
clearly 62:18 102:4
    126:10 128:16,16
    132:7
cleavage 173:11
clinic 56:25 57:4,5
    58:12
clinical 60:10
clinics 60:11
close 50:23 178:20
clothes 18:22 207:14
clothing 21:7 31:1
cloud 91:4
coach 23:7 26:15
    33:15 48:19 139:5,6
coaching 26:20,22
    48:22 49:2 123:21
COBRE 19:1,10
    159:23
code 97:10,15,17
cohort 132:21 151:6
cohorts 31:9 35:25
collect 27:9 62:16

179:9 186:13,16
    192:10
collected 119:7
    127:11,12 140:18
    140:21,25 142:1,4,7
    142:10,14 143:2
    144:11 166:5,6
    167:14 179:5 201:5
collecting 13:17
    176:11
Columbia 3:18
column 165:15
    167:13 199:8
    203:16,19 204:4
    206:3,5
columns 203:11,12
combination 40:20
    203:22
combining 153:13
come 43:22 95:22
    98:12 181:9 186:17
comes 40:22 48:3
    200:14
comfortable 89:22
    99:6 186:22
coming 11:11 125:5
    126:21 181:25
    195:14,15
comment 37:23
commented 71:22
commercial 126:11
    126:18
commission 215:23
Committee 2:19 7:7
common 95:6,8
    118:25 134:23
    143:15
communities 17:6
community 90:7
    94:21 95:3 100:14
    100:17,22 102:4,7
    104:4 108:19
    111:10 112:17
    114:1 116:7 161:16
    161:18 162:12
community's 109:12
companies 10:17

28:4 63:14 68:4,12
    68:17 97:23 98:1
company 96:13,22
    97:2,9,13 99:19
    100:15 102:12
    140:23 142:13
    214:22
company's 97:10,15
compare 173:18
    174:7 190:18,20
    204:1,8
compared 37:21
    62:22 91:25 92:5,7
    136:5 137:2 169:8
    191:1,7
compares 123:5
    148:2
comparison 92:12
    173:20
compensate 153:5
    154:13
compensated 85:1,22
compensation 86:5
completed 23:2 212:6
completely 9:20
compliance 68:5
complicated 127:20
comply 72:9
component 62:8
composite 22:8
compound 28:12
    30:20 36:10 51:4
    58:18 99:23 139:3
comprehensive 28:7
    28:9,15 149:20
    187:10
computer 215:14
concede 63:18
concentrate 78:21
concentration 185:10
    186:1 201:21
    206:22
concentrations 45:4
    201:14
concern 80:1,4,6,17
    83:1 84:3
concerned 13:2 27:12

74:3 90:24 116:16
    122:22
concerning 32:5
    63:19
concerns 139:18
concluded 129:1
concludes 196:25
    214:20
Conclusion 187:23
    199:8
conclusions 27:22
    161:15 171:8
    185:13,15,23 207:1
conditions 89:16,23
    90:5,14 91:6,8
    95:16,24 96:18
    101:14 102:22
    108:10 113:25
    114:2 117:22
    155:16
conduct 26:1 28:6,9
    97:11,15,17 98:9,11
    99:5,6,7,8,12,16
    100:7,21 101:21
    102:12,21,25 103:4
    103:5 104:7,14,17
    104:20,23 105:1,3,3
    105:6,14,22 106:2,6
    107:4,4,7,9,11,13
    107:19,22,25
    108:12,24 109:17
    156:7,15 174:13
conducted 26:10 27:5
    127:22 197:15
    198:12
conducting 100:4
    170:19
Conference 30:12
confidence 144:1
confirmation 51:3
    59:14 64:10 87:21
    89:8 130:14 193:4
    207:16 208:7,25
    209:15 214:7
conflict 73:19 74:4
conflicts 86:10
confused 67:8

confusing 28:17
conjunction 122:24
connection 68:21
  75:16 76:5 101:25
Connolly 4:16
connotations 116:14
consider 28:14 98:8
  106:11 138:6
  143:22 157:3
consideration 107:18
considered 31:6
  60:15 86:2,3 118:5
  118:22 150:12
  152:14 153:12
  211:1
considering 110:14
  133:24
considers 120:1
consistently 134:20
constituted 108:20
constitutes 63:23
  187:7
constraints 153:17
constructed 25:22
constructing 25:21
construction 25:18
  25:19
consultant 75:15
  76:13
consultation 68:3,9
consulting 14:10,12
contact 7:10
contacted 69:5
contacting 69:9
contain 31:8 121:23
  215:15
contained 64:4
  119:21 120:3 121:1
  132:25 159:6 175:8
containing 115:15
  118:4,22 129:10
contaminants 13:11
  185:20
contaminate 115:5
contaminated 78:6
  78:16 79:23 83:19
  122:14 162:17

186:4 188:5 189:5
  191:3 207:12
contamination 15:17
  115:6,8 122:1
  127:15 188:9
  206:14
contending 170:15
content 109:21
  118:25
contents 75:12
contesting 138:7
context 53:16
continue 29:24 50:20
  73:16
Continued 3:1 4:1
continues 101:16
contributing 92:18
control 31:3 72:19,21
  114:10,11 175:16
  177:13 184:17,19
controlled 76:21
controlling 62:17
controls 72:20,20
  114:12
conversation 69:18
conversations 47:9
  56:21 58:9,15 73:11
  73:12
conversion 146:17,19
  147:2,23 148:1
  153:14
convert 147:20
  149:10
converting 146:10
  147:16 149:23
cooperated 106:16
copies 66:15 128:10
  128:11
copper 29:5
copy 84:13 87:14
core 167:14,19,23
correct 8:10,17 17:17
  19:20,21 21:25
  22:15,18,19 23:16
  23:20 24:1,8,24
  27:23,24 30:15,16
  30:19 32:13,14,16

32:17,19,20,25 33:1
  34:8,11,12,15,18,19
  34:23,24,25 35:5,6
  35:7,9 36:6,14
  38:10 39:10,14,16
  39:19 40:7,11,25
  41:4,14 43:9,25
  44:16,17,18,20,23
  45:7,12,15,18,21,25
  46:5,6,19,22,23
  47:3,11,14,18,19
  50:18 51:13,16,20
  52:1,2,4,6,9,12,20
  52:25 53:1,21 54:15
  54:16,19,20 55:3,9
  55:12 56:18,22
  57:17 58:3,7,8,16
  59:17,18,20,21 61:3
  61:8 62:9,14,23,24
  63:7,11 64:10 65:13
  67:17,20,23 68:19
  71:11,24 72:3,11
  73:23 74:6 75:12,16
  75:23 76:10,15
  77:14,19 78:9,13,25
  79:17,20 80:7,9,12
  80:15,16,18 81:14
  81:24 82:5,11 83:5
  83:8,10 84:21,24
  85:2,10,14,15,19,23
  86:2,25 88:6,10,23
  89:1,5,11,17,20
  90:14 93:3 94:1,2
  94:16,22,24 95:7,12
  95:13,17 96:1,5,8
  96:15,20,24 97:2,11
  97:15 98:6,16,18,20
  99:3,9,13,22 100:23
  101:3,5,11,18,21
  102:7,10,11,13,14
  102:23 103:23
  104:4 105:6,10,12
  105:15,17,20
  106:23 107:19
  109:14,18,22
  110:13,17 111:12
  111:23 112:7,9,10

112:13,14,18,23
  113:2,7,22 114:2,17
  115:21,24 116:7
  117:2,16 119:10,13
  120:14 121:15
  122:5,10 125:14,19
  125:22 126:18
  128:17,25 129:17
  129:18 130:8,11,12
  131:2,5 132:1,2,5
  132:11,18,22,25
  133:1,3,20 134:6,7
  134:9,23,25 135:5,8
  135:16,21,25 136:2
  136:6,13,17,20,24
  137:4,8,9,13,16
  138:12,19 140:2
  141:9,16 142:1,4,7
  142:11,14,17,21,25
  143:3,5 144:13,19
  145:3,5,13 146:7,11
  146:14,21,24 147:3
  147:7,10,13,17,23
  148:3,14 149:3,7
  150:25 152:3,19,23
  153:24 154:10,14
  154:21 155:20,25
  156:3,7,11,17,25
  157:6,9,18,20 158:2
  158:5,8,12 159:7,14
  160:10,11,21,25
  161:5,8,13 162:9,20
  163:3,8,12,14,19,20
  164:2,5,20 165:1,5
  165:11,25 166:13
  166:22,25 167:1,3,4
  167:8 172:3,6,12,14
  172:23 173:5,15,21
  174:17,23 175:5,13
  175:14,16,19,20,21
  175:24 176:2,20,24
  177:3 178:1,13,16
  178:19,23 179:13
  179:20 180:5,8,14
  180:20 181:5,10,14
  181:17 182:8
  184:22 185:17,23

185:24 187:18
188:17 189:13,18
189:24 190:3,7,11
190:14,20,23 191:1
191:9,19,25 192:21
193:1,4,10 194:21
194:24 195:2,5,6,8
195:10,16 196:3,6,8
196:11,15 199:5,18
199:19,20 200:6,23
201:1 202:10,13,16
203:2,13,17,20,24
206:2,11 207:4,9,19
208:10,16,23 209:3
209:12,13,15,20,21
209:23,25 210:1,3,4
210:8,9,11,12 212:8
214:12
**corrected** 190:18
**CORRECTION**
216:7
**corrections** 216:5
**correctly** 42:6 68:2
68:13 75:7 77:11
90:6,11 96:11
100:18 103:9 106:9
106:14 108:22
112:4 113:19
114:23 115:18
118:6 126:9,15
131:19 141:3
150:13 151:9,10
153:18 165:16,22
167:17 172:17
176:18 182:25
188:1,10,12 197:19
198:14 199:9,13
**correlated** 132:17,21
174:2
**correlation** 129:12
**corridors** 15:11
188:3 189:3
**Council** 29:12
**counsel** 2:1 6:6,24
26:15 49:16 74:20
92:6 116:13 117:12
123:24 139:7

207:22 213:6
**count** 22:9 103:13
135:14 148:17
176:12 177:5
204:21,23 206:1
**counted** 134:2,5
135:5
**counting** 88:4,5
135:13 138:9 140:1
205:16
**country** 157:16
158:12,16 188:7,14
188:20 189:22
**County** 21:2 169:21
185:1 189:10 192:5
199:18 206:19
207:9,19 208:10
215:3,6
**couple** 9:6 41:16
56:20 140:13
144:17 164:15,16
**course** 12:17 13:6,10
13:14,15,16 14:3
32:24 61:11 98:9,10
105:14 108:24
152:2 180:17 193:7
**courses** 11:19,22,24
11:24,25 12:6
**coursework** 13:22
**court** 1:1,21 6:20,22
6:25 9:15 33:7,10
42:21 48:24 49:22
65:25 77:3 82:14
109:25 124:9 139:9
139:10 140:22
208:4 216:4
**Courts** 48:23
**cover** 12:24 16:24
30:24 31:2
**covered** 13:15 167:21
**co-author** 5:18
**co-counsel** 6:15
**create** 18:7 49:13
**created** 146:20
**Creek** 164:19 184:21
197:15 200:13
213:20

**crevices** 182:23
183:15,17
**criminal** 68:22 69:16
75:16 76:13,14
**Crispen** 77:10
**criteria** 64:4
**critical** 62:8
**cross-examination**
213:3
**crow** 164:16
**cubic** 103:16,17,22
147:5 148:16 176:2
203:8
**cumulative** 136:19
136:24 137:16,19
138:10 151:5
191:24 192:24
**current** 15:18 30:5
31:20 93:16 110:17
110:20 134:15
145:15,15,17
**currently** 8:14 17:8
121:22 160:13
162:25
**currents** 115:5
**Curriculum** 5:16,17
**Curtis** 75:3
**curves** 151:7
**cut** 53:10 198:7,8,18
199:1
**cutoff** 179:12
**CV** 66:6,7 67:2,7,16
67:25

---

**D**

**D** 5:1
**Dallas** 3:10
**Damage** 7:9
**dangers** 113:15
**data** 27:9 61:25 62:5
62:14 77:9 82:18
132:25 135:23
141:25 142:24
147:20,21 149:5,15
149:16,19,25 150:2
150:11,24 153:4,17
154:5,14,16 155:24

161:15 172:9
173:18,19 179:13
184:9 190:20,25
191:6,7,18,22
192:10 203:12
204:2 205:7,8
207:11
**date** 102:18 127:15
216:2
**dated** 66:7
**day** 47:25 152:2
165:11 215:18
216:22
**days** 103:13
**DC** 2:25 3:20 4:9
**dead** 198:7
**deal** 12:18 88:8,9
95:2 104:14,17
125:20 149:15
**dealing** 28:4 120:19
147:17 149:19
156:6 190:22
**dealt** 120:20
**death** 31:16 35:24
41:15
**debris** 195:4
**Debtor** 2:3 7:24
216:3
**Debtors** 1:9 6:15,18
214:22
**Debtors-in-Possess...**
6:16
**decades** 108:20
**deceptive** 124:3
**decide** 28:24
**decision** 96:23
**decompose** 165:18
**decrease** 152:19
**decreasing** 152:22
**deeper** 183:13
**defendants** 68:11,16
**defining** 13:17 27:2
**degree** 8:12 10:20,25
**Delaware** 1:2 4:19
**department** 10:7,9
10:10,11 24:4,5
**depend** 179:3

dependent 132:24
depending 52:21
  176:10
deposited 165:21
  174:25 182:21
  188:16
depositing 165:24
deposition 1:17 6:5
  6:14,19 8:16 66:2
  66:21 67:3 74:23
  77:4,25 87:11 101:3
  130:2 131:10 197:1
  197:5 214:21 215:9
  215:11,13 216:1,2,5
depositions 36:18
  146:1 200:11
deposits 169:6 170:1
  170:2 171:2 180:23
depth 182:22
derive 136:10 137:3
  137:8
derived 123:4 143:7
describe 12:10 55:17
  98:23 118:23 176:7
described 211:18
  212:25
describing 16:1,10
  17:2 92:12
description 5:15
  102:17 141:24
designed 191:14
designing 13:10
detail 75:10
detect 176:7,9 177:3
  178:4 179:18
detected 160:4
  170:23 175:19,23
  177:25 178:18,23
  180:7,13
detection 178:15
determine 15:16
  19:17 62:21 75:11
  78:15 79:22 81:19
  81:21 83:18,19
  121:19 123:12
  124:13 125:5 132:3
  136:16 138:5,10

166:16 170:22
  188:8 192:12
determining 111:12
  136:15 151:21
  181:24 192:14
develop 12:13 34:8
  37:5 82:4 191:24
  199:21
developed 33:3,5
  34:11,14 156:9
developing 50:17
  62:8
development 68:5
diagnose 32:24
diagnosis 37:24
dialogue 73:16,17
diameter 205:17,18
died 135:25 136:2
difference 36:16
  38:23 139:1
differences 38:24
  39:2,6 40:14 170:8
different 11:24 12:14
  13:16 16:22,24
  30:24 32:8 34:3,22
  35:14,24,25 37:4
  43:13 50:20 52:22
  60:13 88:9 93:21
  110:15 121:13
  126:21 143:20
  144:3 158:11
  161:12 176:13,16
  177:14,15,18,18
  179:6,8,11,22
  182:10 193:17
  199:2 204:16
differentiate 175:3
  195:13 196:19
differentiated 173:4
  195:25
differently 35:12
  156:14
difficult 116:14
  148:17 186:10
diffuse 59:8,10
direction 74:9
directions 26:3 91:6

91:10 187:6
directly 114:5 117:5
  174:2
director 57:3
disclose 80:22 81:2,5
  81:9,17 85:16 86:15
disclosed 74:5 86:4
  105:20 106:2
disclosing 85:8,11
  86:10
disclosure 74:8 87:2
discontinued 168:4
discuss 44:5 75:9
  79:8 89:14,15 94:20
  118:15
discussed 26:8,11
  27:6 31:16 51:11,12
  55:24 56:9 70:9
  71:7 79:9,11 135:18
  154:25 166:24
  195:24
discusses 56:14 89:18
  108:2 112:16
  113:25
discussing 69:15
  88:23 102:22
  115:23
discussion 12:22 43:7
  48:4 50:24 67:14
  111:8,19 145:24
  153:8 182:19
discussions 102:16
disease 32:9,25 33:4
  33:6 34:8,11,15
  36:6,13,25 37:16,17
  37:20,22 38:6,10,13
  40:14,15,20 41:2,8
  41:12,16,22 42:1,3
  42:4 43:8,20 44:3,6
  44:11 45:1,3 46:8
  46:13,15,16,22
  47:11,18 48:10 50:1
  50:9,18,25 53:24
  54:2,14,18,22 55:2
  55:15,17,19,22 56:3
  56:6,13,18 58:10
  59:4 60:6,14,19,19

61:2,12,13,16,20,22
  62:2 80:15,18 82:4
  82:16,21,25 83:1,5
  83:13 84:2,21 85:10
  109:12 137:23,24
  138:5 209:23
diseases 34:22,23
  35:5,12 59:23
dispersal 23:11
  188:22
dispersed 15:21,22
  165:19
dispersion 15:8,12,13
  15:19 72:22
dispute 142:17,20
disputes 147:9
disrupted 123:7
distance 184:11
  197:17 213:24
distances 114:21
  117:6
distant 115:5
distinct 50:10 119:12
  121:9 173:17
distinction 33:3,14
  33:22
distinctions 160:19
distribution 64:1
district 1:2 69:13
disturbed 90:9 94:4
  190:4
divide 143:18 193:16
divided 201:20
doctor 8:10 30:22
  31:23 32:2 40:18
  50:21 57:6,12,13
  82:22 209:20
doctors 40:22 42:15
  43:3
doctor's 57:12
document 66:2 67:3
  68:4 74:20,23 77:4
  77:25 87:11 104:18
  104:21,24 105:2
  107:5,8,12,23 108:1
  108:6 112:20
  115:16 117:24

131:10,22 165:14
167:6
**documented** 115:7
**documents** 125:16,18
125:19 127:14
128:18
**doing** 14:8,17 15:15
19:4 20:9 29:4 69:4
73:23 78:21 79:14
79:16 81:18,20,21
84:17,18 91:9 93:18
117:5 119:12
122:12 123:22
124:25 139:22
154:15 160:14
167:20 176:12,14
176:14 180:22
183:25 191:11
195:10 198:21
**Doll** 29:21
**dotcom** 7:12
**double** 208:12
**double-negative**
207:22
**doubts** 200:12
**downtown** 103:13
**Dr** 6:14 8:16 27:4
41:21 42:13 43:7,15
43:18 45:11 47:5,9
48:4 50:13 55:5,16
56:21,21,24,25 57:6
57:16,20 58:15 66:5
66:6,21 103:19
104:2 130:2,5,17
134:9 138:15,23
139:13,20 140:6
154:20,25 155:2,3
163:24 170:22
197:1,5 211:1
214:21
**draw** 37:24 161:15
185:13
**drawing** 171:7
**drive** 136:6
**driveways** 125:6
**dropped** 187:2
**drops** 202:12

**dry** 101:16 102:20
103:1,13 140:19
147:9,12
**Drysdale** 2:23
**ductwork** 79:25
**due** 127:15 134:14
150:10,19 186:23
**duly** 7:24 215:10
**durable** 165:17
**duration** 137:15
191:23
**dust** 15:23,25 16:4,9
18:7,14 21:20 72:19
91:4 95:6,25 110:1
120:23 121:1,2,3,23
122:23 140:16,20
181:1,4,8,9 182:1
**dusty** 103:11
**dying** 138:4
**D.C** 2:8

_____

## E

**E** 5:1,14
**Earl** 101:2
**earlier** 17:15 19:6
25:8 41:9,17 42:17
58:13,16 83:3
102:22 122:16
135:18 148:7,25
153:24 155:20
160:16 166:13
175:2 180:17
190:17 191:17
195:25 198:18
207:16 208:7
209:11
**early** 44:20 46:12
125:4 127:24
183:24
**easiest** 183:5
**easily** 186:9
**easy** 15:17 99:16
**Eckert** 4:7
**education** 59:19
**educational** 10:18,19
**educator** 14:6
**effect** 135:4 139:24

140:3 151:5
**effects** 55:17 112:22
113:1
**effort** 99:11 152:1
154:13 186:5
**eight** 101:16 184:16
201:15,17,20,22
**eighty-six** 53:2
**eight-hour** 47:25
201:23
**either** 38:25 44:23
45:20 59:17 85:15
85:17 93:14 99:20
105:5 133:24
137:23 140:24
165:3 180:1 182:10
**electron** 171:11
**Elementary** 180:4,13
**elevated** 46:3
**Eleven** 53:2
**elicited** 122:17
**Ellis** 2:6 7:2
**Elm** 3:8,9
**embedded** 183:13
**employed** 151:8,14
152:12
**employees** 24:9,11
151:16
**employment** 10:17
**enable** 171:25
**endangered** 108:18
109:2,4,6,8
**ended** 181:4
**Enforcement** 141:12
**engage** 189:12
**engaged** 192:25
212:6
**engages** 190:1
**engineering** 72:20
**English** 208:14
**enjoyable** 194:13
**ensure** 10:1
**entails** 12:11,12
**enterprise** 97:14
**entirely** 178:2 185:24
**entirety** 52:24 87:20
**envelope** 50:20

**Envirnomental**
115:16
**environment** 74:15
165:18
**environmental** 54:1
54:2 67:19,22 78:8
114:25 141:25
**EPA** 73:3,5 93:17,18
95:10 115:20
118:11 119:25
124:16 125:14,16
125:18,19,24 126:1
127:10 128:22
129:5,6 162:23
164:24,25 166:16
180:20 185:4,5
186:25 187:1,9
211:1,7,11,17,18
212:4,13
**EPA's** 94:6 185:7
187:7
**EPA-restricted**
197:16 198:13
199:5 214:12
**epidemiologic** 60:12
60:16,24 62:6,17
**epidemiological**
29:15,17 60:23 62:8
83:8 134:1 191:18
210:10
**epidemiologist** 59:16
135:19 210:8
**epidemiology** 59:20
60:4
**equal** 118:4 201:4
**equipment** 72:21
**era** 149:21
**erosion** 169:6
**essentially** 26:5 110:8
176:15
**establish** 64:17
121:25 122:24
**established** 113:13
134:23 201:1
**establishing** 60:5
61:15 84:19 131:25
192:20

estimate 22:2,5
  143:14 151:6
  192:24
estimated 103:12
estimates 131:16
  150:11 151:7
  152:19 153:11
estimating 143:8
  153:12
estimation 146:14
estimators 153:13
et 1:7 6:18 214:22
evaluate 24:18,19
  25:16 65:9,12 76:20
  93:18 109:17
evaluated 64:6 78:14
  111:17
evaluating 14:15
  15:16 107:19
  124:17 134:20
  137:10
evaluation 77:7
  133:25
eventually 106:20,22
  134:12
everybody 214:16,19
everybody's 139:17
evidence 15:14
  123:16,19,21
exact 22:11 137:18
  211:25
exactly 70:5 180:15
  183:10
examination 5:4,5,6
  8:1 116:17,18 119:9
examinations 11:18
  62:19
examine 51:24 93:5
  118:25 122:9
examined 7:25 51:22
  75:11 78:11
examining 101:13
example 12:18 13:12
  27:21 82:2 100:20
  103:5 121:3 135:24
  157:22 158:1 159:4
  160:6,7 161:24

169:14 179:5
exams 61:20
exchange 49:21
exclude 173:19
excluded 138:16
  139:14
excluding 139:21
exclusion 140:4
excuse 92:5 101:8
  107:6 122:8 141:24
  144:9 157:13
  197:10 213:6
executives 102:5
exercise 81:21
exhaust 92:20 93:9
exhibit 65:25 66:1,3
  66:6,24 67:2,2,4,6
  74:22,24 77:3,5,7
  78:1,4,5,24 79:8
  80:5,20,21,21,25,25
  81:1,13 83:13,14
  84:7 87:8,9,12,16
  88:25 89:1,4 102:3
  102:5 103:13 104:1
  131:11,14,14
  163:17 190:16
  197:8 210:19 213:7
exhibits 63:13 95:7,8
  158:22 159:2
existed 95:16 170:1,2
existence 192:21
exists 141:9
expanded 157:23
  161:9,13,20,22,24
  162:1,2,3,5,9,10
expanding 157:15
  158:2,12 159:17,25
  160:8,10 161:4
  162:7
expansion 162:18
expect 41:23 54:9
  135:15 204:9
  206:20
experience 32:21
  68:1,8 119:7 155:5
  155:11
expert 5:21 40:2

50:24 63:3 68:8,15
  68:18 71:11 81:3
  87:5,16 93:24
  103:18 104:1
  148:25 166:24
  209:12 211:23,24
expertise 40:3 94:16
  132:8 133:3
expires 215:24
explain 50:6 103:15
  177:19,20 179:2
  183:2
exploratory 184:14
expose 114:4
exposed 31:9 34:7,10
  34:14 35:14,25 37:3
  37:4 40:16 47:3
  50:15 76:9 80:2
  82:12 94:21 131:15
  143:18 151:24
  158:5,8,13 159:9,10
  159:14 160:9 161:7
  161:19 163:6
  189:12 190:2
exposure 13:17 14:4
  14:16 17:6,25 19:17
  20:11 24:7 30:18
  31:17 32:21 34:2,2
  34:23 35:13 37:20
  38:4 45:7,12,21,25
  46:4,9 47:23 48:10
  50:1,9 52:4 54:2,7
  59:23 60:5,18 61:1
  61:16,22,25 62:1,14
  62:17,22 64:6 65:12
  65:12,21,23 76:16
  78:21 80:6,9 81:19
  81:22 82:15,17 83:4
  90:25 101:25
  112:23 113:1,13
  116:7,8,10,25 117:3
  122:2 126:13,20
  131:16 132:4,21,24
  133:4,9,14 135:16
  135:20 136:5,17,18
  136:19,20,22,23,24
  137:2,7,11,13,16

138:5,6,8,9,10
  140:10,15 141:2
  142:23 144:19
  145:15 149:20
  150:11,19 151:6,20
  151:21 152:19
  153:10,12,25 154:3
  154:5,23 155:5,10
  155:16,24 160:20
  160:25 161:10,13
  162:9,19 163:11
  191:9,18,22,23,24
  191:25 192:12,15
  192:24 205:1,25
  206:11
exposures 18:7 22:21
  23:19 31:3 33:4,6
  34:15 41:24 50:17
  61:7,8,12 65:6,9,15
  75:20 77:7,18 78:12
  78:14,19,25 79:20
  80:11 82:20,25
  83:13 84:19,20 86:6
  86:24 95:3 104:4
  114:1 131:25
  132:18 135:7
  137:20 143:8,15
  147:3,6,9,12 153:14
  153:23 159:19
  161:25 162:11
  163:2 174:3,10,20
  180:18 188:15
  191:1,8 192:6,21
  195:14 206:20
  207:8,18 208:9
  209:1
exposure-response
  151:7
extend 100:13
extended 11:16
extent 27:12 41:14
  43:5 48:13 88:15
  89:20 91:24 138:15
  139:13,20 147:1
  159:16,17 179:15
  181:19 188:8
  191:21

W.R. GRACE & CO.        TERRY M. SPEAR, Ph.D.        July 29, 2009

**extrapolate** 187:17
  199:16 201:15
  207:2
**extrapolating** 186:22
  201:16
**eyes** 73:19
**e-mail** 7:9,10

_____
**F**
**f** 103:22
**face** 69:25,25
**face-to-face** 70:7
**facilities** 145:22
**facility** 44:17 45:7,12
  89:16 94:22 99:12
  121:4 122:10,12
  140:23 143:15
  155:5 157:23 158:8
  166:8 181:9
**fact** 19:21 39:12
  47:22 73:20 110:14
  152:1 158:8 160:2
  179:3 192:7 198:22
**factor** 136:11 139:24
  151:15
**factored** 133:14
**factors** 153:11
**facts** 123:18,21
**failed** 72:9
**failure** 99:18
**fair** 9:11,16,17 10:1,2
  16:2,9 17:2 39:21
  70:21 80:3 85:12
  88:11 95:1 101:1
  102:17 103:7
  107:16 108:9,16
  109:10 120:15
  127:3 142:23 146:2
  154:23 160:18
  161:16,18 164:11
  165:9 174:1 178:10
  192:15 193:5
  199:15 205:23
  207:15 208:6
**fairly** 155:24 201:9
**fall** 34:22 146:3
**fallen** 115:14 194:20

**falling** 195:1
**falls** 2:16 133:3
**familiar** 9:3 59:7
  131:21 132:14
  143:7,11 155:19
  156:16 157:3
  158:19,21,25
  168:14,24
**familiarity** 156:10
**families** 100:17
**family** 39:2,7 100:14
  100:22 108:19
**fan** 102:20
**far** 25:2 26:12 45:19
  128:21 164:13
  166:19 186:14
  188:16,16 213:22
**farther** 186:21
**fascinating** 186:19
**fast-acting** 35:23
**fatal** 42:1,5 51:1 55:3
  113:14
**fatality** 47:17 56:17
**Fate** 5:20 78:5
**FCR** 3:3,13 4:3 7:9
  7:14
**federal** 48:17,23
  140:21 141:14
  143:5
**federally** 118:17
**feel** 27:13 28:8 81:16
  186:22
**feet** 18:22 91:6
**felled** 198:6
**fellowship** 58:6
**felt** 206:13
**female** 33:24
**fertilizer** 157:22
**fiber** 36:22 115:3
  121:12,14 144:10
  146:23 149:10,22
  172:20 176:9 177:7
  188:8 203:5 205:17
**fibers** 5:20 75:2 78:5
  79:22 83:20,22
  103:17,22 111:12
  111:13,14 112:13

114:20 115:8,8,12
  115:14,23 116:1
  119:4 120:4 124:17
  133:13,19,22 134:2
  134:5,12,13,14,15
  134:18,20,21,24
  135:3,5,10,11,13,14
  135:15 136:9
  137:12,12 138:9,16
  139:14,21,21 140:2
  140:4 144:19 145:3
  146:10 147:13,16
  148:2,18 149:23
  150:1 160:4 165:17
  165:19,25 166:11
  167:23 172:13,16
  172:22,25 173:4,8
  173:13,19 174:23
  174:25 175:3,19,23
  176:1,12 177:2,24
  178:4,12,13 179:16
  180:7,13 182:21,22
  183:10,12 184:13
  188:15 196:1 202:6
  202:7,10,16,22,23
  202:23 203:2,13,16
  203:20 204:16,17
  204:21,23,24
  205:10,11,16,19,21
  206:1,2 207:13
**fiber-per-cc** 191:6
**fibrosis** 35:9,23
  36:12 37:13,14,15
**field** 68:6 107:14,17
**Fifteen** 101:12
**Fifteenth** 2:7
**fight** 24:22
**figure** 28:18 183:9
  197:13 213:10
**figures** 187:23
**fill** 52:1
**filter** 140:20,24
  144:11 177:7
**final** 23:2
**finalized** 23:13
**find** 54:9 93:19 127:1
  140:6 166:19 171:2

174:14 185:25
  186:1 188:14
**finding** 46:7 51:15
**findings** 20:13,21
  24:3 37:24 45:23
  46:2 138:18 140:6
  142:20 160:1
  175:10 184:25
  186:22 187:17
  199:16 201:17
  202:19,20 209:19
**fine** 89:12 98:25
  99:10 114:18
  129:22
**finish** 211:15
**fire** 25:18,19,20,21
  25:21
**fires** 24:22
**firewood** 5:19 19:25
  76:24 77:20 78:6,13
  80:2,7,12 82:15,17
  83:16 191:3 197:14
  198:11
**firewood-harvesting**
  77:8 199:11
**firm** 81:20,20
**first** 7:24 9:8 13:25
  18:16 28:6,9,19,24
  48:10 49:13 50:1
  69:4,9,17,24 70:7
  73:1 111:10 114:20
  118:3 150:10 153:8
  156:15 172:19
  180:19 203:9,12
  215:10
**fit** 12:14 135:21
**fits** 147:20
**five** 45:21 103:12
  133:15,15 167:13
  179:6
**flagged** 151:12
**flat** 121:13
**flies** 164:17
**floating** 204:11
**flow** 89:19,19
**focus** 12:25 31:12
  38:12 47:8 61:7

62:13 68:15 79:20
**focused** 23:21 93:8
  189:2
**focuses** 45:24 131:25
**focusing** 205:7
**folder** 76:23
**foliage** 195:20
**follow** 138:1
**followed** 39:24,25
  46:13 69:21 140:1
**following** 6:10
  181:12 202:2 216:5
**follows** 7:25 49:23
  115:1,2 124:10
  139:11 208:5
**follow-up** 43:25
  44:14,22 63:22
**foot** 103:16 147:5
  148:16
**forces** 143:18
**foregoing** 215:9,11
  215:14
**forest** 15:9 19:16,18
  20:8,11,16,24 21:23
  22:12 23:13,21,24
  23:25 24:7,9,11,14
  24:14,18,22 25:5,15
  25:20 73:23 77:17
  82:13 86:6 166:8,21
  171:17 184:25
  185:23 186:2
  187:17 189:12,15
  200:10 202:23
  206:19 207:3,9
  209:2 212:3,5,13
**forestry** 24:3,4 82:15
  82:17 166:13,14
**forests** 24:18 70:23
  189:10
**form** 28:11 32:10
  33:13 37:10,25
  43:12 48:11 49:1
  58:20 71:20 99:8
  123:14 148:6 152:6
  207:4
**formal** 26:17,25
**former** 197:15

**forming** 58:22
**forms** 23:1 35:4 37:6
  37:21 38:6 110:15
**formulating** 125:9
**forth** 11:16,17
  194:24
**forthcoming** 150:24
**Forty-eight** 142:6
**forward** 23:6
**found** 40:11 53:20
  72:14 83:22 109:25
  162:23 166:11
  169:20 170:4
  171:15 185:8 187:1
  190:14 201:19
  206:7 212:11
**foundation** 64:15
  149:13 159:3
**four** 17:25 18:4 19:5
  40:6,10 45:21
**fourteen** 215:15
**fourth** 17:19
**fragments** 173:11
**frame** 103:1 133:11
**free** 27:13 28:8
**friable** 120:1
**front** 74:17 76:22
  77:23
**full** 7:10 150:10
**function** 31:18 42:2
  52:12,15 55:18
  96:23
**functions** 90:8 91:13
  93:2
**funded** 19:1,6,24
**funding** 19:10,11
  20:6,8

_____
**G**

**Gabriella** 4:5 7:15
**gardening** 125:5
**gardens** 162:6
**garment** 21:19
**gather** 96:23
**general** 34:20 40:19
  68:3 117:15,20
  133:5,8 140:24

185:1 187:17
**generally** 23:3,10
  25:25 27:15 32:18
  109:11 118:5 191:4
  204:9
**generated** 158:20
**Getman** 75:6
**getting** 72:7 116:24
  180:19 193:19
**give** 30:2 60:22
  137:12 149:12
  185:10,22
**given** 49:8 60:25 65:9
  127:11 136:9
  139:22 149:9,19
  151:14 153:4
  165:11 166:3 171:2
  174:5,11 177:25
  191:24 198:20
  199:22 200:1
  213:25
**gives** 97:5
**giving** 51:23
**go** 9:6 18:6 32:6
  40:13,24 41:10,18
  78:17 79:24,24
  112:11 151:16
  157:13,14,15
  163:16 171:14
  180:16 184:1,12,12
  185:4,7 201:20
**goes** 90:24 149:21
  188:24
**going** 7:20 9:6,22
  11:10 12:13 23:6
  26:15 28:6 33:12,15
  40:21 48:16,21 49:4
  66:14 67:11,12,12
  84:2 87:10 94:9
  97:16 98:14 100:10
  103:8 105:7 114:19
  120:2 123:14 124:1
  126:8 136:23
  149:14 152:4,13
  153:8 156:5 161:5
  164:12 166:17
  169:1 171:6,8

176:16 177:22
  178:6,6 179:3,8
  183:15,22 185:9,10
  187:3,25 197:8
  201:20 204:21,23
  205:6,19 207:16
  208:3,7,17,19,23
  209:10 210:10
  214:18
**good** 8:3,4 34:5 66:15
  129:20 186:12
  192:19 209:8
  211:13
**Gotcha** 71:6
**Government** 68:19
  68:24 69:10 71:11
  71:18 72:25 74:1,4
  74:5,10 75:16 76:13
  81:3 86:20 131:8
**Governmental** 30:12
**Grace** 1:7 6:18 7:2
  8:9 63:13 72:9,14
  75:19 76:14 96:12
  96:19 98:4,9,16
  99:3 100:13,15
  101:4,14,15,24
  102:5,6,9,13 103:11
  103:20 105:9
  106:16 108:18
  109:14 133:8
  156:21 157:18
  158:2 175:4 196:15
  214:22 216:3
**Grace's** 63:6 99:18
  100:21 101:20
  103:5 104:7,8,14,17
  104:19,22,25
  105:22 106:2,6,11
  107:4,7,11,22,25
  156:6,15 168:23
**gradients** 185:10
**graduate** 13:19,21
**gram** 172:16,20
  175:24 177:2,24
  178:12 179:17,19
**grant** 19:1,6 84:12
  85:17 159:23

160:13
**great** 2:16 66:13
  180:10
**greater** 37:9 38:5
  45:2 60:22 118:5
  173:8,10 203:16
  204:3,13
**green** 195:19,20
**gross** 108:20
**ground** 122:5 195:2,4
**grounds** 28:12
**group** 52:21 88:16
  177:13
**groups** 13:18 143:18
  143:20
**growth** 24:20
**guess** 9:2 14:4 16:19
  32:6 40:4 42:16
  43:13 44:14 46:25
  48:2 50:5 54:25
  57:10 60:13 63:8
  65:10,18,22 76:2
  84:2 90:20 91:11
  92:15 114:16
  117:10 118:23
  126:1 136:14 148:7
  150:9 156:22
  164:15 167:13
  169:22 180:25
  182:2 184:18
  187:13,24 189:2
  190:8 192:1,11
  210:25 211:24
**guesstimate** 151:12
  153:23
**guesstimates** 150:12
  151:4
**Guidance** 115:16
**guidelines** 86:9
**Gunter** 170:12 171:4
  171:7,22
**Gunter's** 170:22

─────────
**H**
─────────
**H** 5:14
**half** 186:1
**hamsters** 106:1

**hand** 25:24,25
  215:17
**handed** 78:4
**handing** 66:5 67:6
  74:20 78:3 131:13
**handling** 191:15
**happen** 48:6
**happened** 156:24
  168:12
**happens** 184:12
  191:15
**happy** 28:8
**hard** 43:22 146:17
**Harlan** 130:20
**harmful** 113:13
**Harrison** 1:22 6:20
**Hart** 75:3 77:9 78:6
  86:13
**Hart's** 84:11
**harvest** 197:14,17,21
  197:23 198:12,17
  213:8,12,22 214:10
**harvesting** 5:19
  19:25 20:2 76:24
  77:20 80:7,12 82:5
  83:16 84:7 190:17
  197:14 199:4
**hate** 120:21
**haul** 198:19
**hauled** 162:14 188:4
  189:4
**hauling** 209:1
**hazard** 28:3 68:7
  103:25 118:6
  120:10 137:8
**hazards** 72:16 97:10
  97:14 111:19 125:9
  156:21
**head** 9:10 10:7
  182:17 193:15
**heading** 18:16
**health** 10:10 24:19
  67:19,22 68:5 83:24
  108:18 112:18,19
  112:22 113:1 118:5
  131:5 141:22
**hearing** 51:3 59:14

64:10 87:21 88:15
  89:8 130:14 193:4
  207:16 208:7,25
  209:15 214:7
**heating** 78:13
**held** 184:13
**helicopter** 187:3
**help** 26:6
**helped** 86:12
**helpful** 116:21
**hereinbefore** 6:6
**hereunto** 215:17
**Herrington** 3:17
**hi** 69:21
**high** 147:6,22 181:7
**higher** 39:16 54:9
  135:7,15 136:22,23
  137:13,15,19 138:9
  139:25 145:12,15
  205:4 206:21
**highest** 54:6 180:18
  185:19 206:14
**highly** 148:16
**highway** 16:23
  164:19 165:7
  184:21 197:17
  214:2
**hill** 169:6
**hills** 194:17
**historical** 15:13,18
  63:6,9 70:19 71:23
  89:16,23 90:5 95:11
  95:14,15 96:18
  102:16 107:4,7,11
  107:22,25 109:15
  110:17 112:17,22
  112:25 113:4,25
  114:2,11,15 117:22
  118:2 149:16,25
  150:2 154:13
**historically** 17:9
  86:16 95:23,24,25
  102:23 109:18
  114:13
**histories** 32:22
**history** 109:11
  191:25

**Hold** 138:20
**Holian** 75:4
**home** 14:24 18:12
  72:7,22 121:8 122:4
  159:13
**homes** 14:19,20
  17:17,24 18:6
  121:23 122:18
  126:11,18 160:14
**honest** 212:16
**honestly** 9:20
**hope** 97:25 165:12
**hopefully** 9:14
  134:11,19
**horizontally** 103:2
**Hospital** 58:2 169:15
**Hospitals** 58:2
**hour** 71:16 85:5
  198:25 201:10
**hourly** 85:4
**hours** 115:13 141:1
  201:15,17,20,22
**house** 122:6 127:19
**human** 15:24 17:22
  18:21 74:15 83:24
  90:9 94:4
**hundred** 8:24 53:2
  215:15
**hundreds** 113:11
  115:7
**Hutz** 4:16
**hygiene** 8:13 10:11
  11:1,2 29:13 30:11
  30:12,15 31:5 60:17
  68:6 72:2,10 77:14
  96:4,12 100:11
  107:14,17 108:21
  109:3 113:12,17
  117:16,20 134:24
  143:16
**hygienist** 40:25 41:3
  41:6 42:12 61:5,6
  61:24 62:7,11 90:23
  118:24 120:17
  122:21 133:21
  135:20
**hygienists** 61:10,11

62:18,21 90:21
113:6,16 122:7,9
**hygienist's** 62:2,4,13
62:25
**hypothesis** 174:24
**hypothetical** 36:9

**I**

**idea** 29:25 144:6
192:14
**identification** 66:3
67:4 74:24 77:5
78:1 87:12 131:11
**identified** 38:19 43:7
83:13 127:4 156:6
196:5
**identifies** 174:22
**identify** 38:3 41:19
44:2 54:7 88:13
180:23 182:7
188:22
**identifying** 150:1
**II** 140:24 141:24,24
142:15
**III** 141:23 144:10,23
**illness** 68:10
**illustrates** 160:7
**ill-advised** 190:18
**imagine** 183:14
**impact** 23:24 24:2
47:21 55:1 138:17
151:19 152:17,17
152:22 184:9
201:16
**impacts** 23:18 46:8
**impinger** 140:18
**implies** 48:12
**imply** 30:14
**importance** 202:19
**important** 31:7 46:2
57:11 60:16 61:15
97:1 200:15 202:22
**imprecision** 147:22
**impression** 49:13
**improper** 27:3 48:15
49:1,16 58:18,19
99:24 100:21

101:21 103:5 139:2
139:2
**inactions** 99:3
**inadequate** 104:9
**include** 32:15 35:7
128:9 137:11
172:25 173:11,13
211:10
**included** 52:3 128:7
193:9
**includes** 17:23
**including** 59:1
106:12 135:3 206:2
**incorrectly** 48:15
119:10
**increase** 127:14
135:4 152:19
**increases** 134:19
**increasing** 138:17
152:22
**indicate** 126:10
**indicates** 199:3
**indicating** 103:25
150:18
**individual** 22:9 65:6
65:20 82:11 192:25
**individually** 99:1
**individuals** 33:3,5,23
46:3 51:22 52:20
73:2,5 75:18 76:9
82:4 85:9 110:12
144:6 192:4
**individual's** 207:17
208:8,25
**indoor** 78:13 127:11
127:12,14,17
128:22,23
**industrial** 8:13 10:11
11:1,2 29:12 30:11
30:12,15 40:25 41:3
41:6 42:12 60:16
61:5,6,10,11,24
62:2,4,7,11,13,18
62:21,25 68:6 72:2
72:9 90:21,23 96:4
96:12 100:11
107:14,17 108:21

109:3 113:6,12,16
113:17 117:15,20
118:24 120:17
121:4 122:7,9,12,21
131:18 133:21
134:23 135:20
143:16
**industry** 68:4,11,17
**inferred** 128:23
**inform** 22:20 48:24
53:23 54:13,17,21
54:22 55:14,20,21
56:2,6,17 105:6
129:2
**information** 7:10
29:12,14 42:15 47:5
52:3 61:14,17,21
62:1 65:10,11 81:17
88:21 96:24 97:6,8
132:4 136:4 191:22
**informed** 43:19
44:25 56:21 58:10
73:22,25 84:16
102:2 105:5 110:11
**informing** 72:15 97:9
97:13 99:20 100:2
**informs** 23:3,4,10
24:6 32:5 56:12
59:3 87:24 93:1
127:4,16
**inhalant** 110:1
**inhibit** 9:19
**initial** 19:24 20:24
125:3 137:11
167:15
**initially** 73:13
**injury** 7:14 68:10
75:19 86:24
**inside** 90:24 167:25
199:4
**insofar** 134:5
**instance** 147:19
**instances** 149:1
**Institute** 131:4
**instrument** 13:14
**insulation** 14:21 15:1
15:2,2,3 17:16,24

18:8,10 121:24
126:11 159:3,3,13
160:16,20 161:1
162:3
**insurance** 63:4,7,9,14
63:19,23 68:11,17
**intend** 42:8 51:2
59:13 64:9 65:2,5
65:20 87:20 88:14
89:7 130:13 192:3
193:3 209:14,22
210:2 212:23
**intended** 26:16 194:4
**intensity** 161:12
**interest** 73:19 74:4
86:10
**interested** 69:15
113:15 186:17
**interfere** 33:16 92:6
**intermittently**
151:17
**International** 74:14
**interpretation**
152:16
**interrupt** 53:10
114:7 116:16
**intersection** 164:19
184:21 213:19
**interstitial** 37:16,20
37:22 38:6
**introduce** 6:24 8:5
**inversions** 91:16
**involve** 91:5 198:24
**involved** 14:15 17:10
17:11 20:6 44:3
47:11,17 56:17
80:12 82:14,15
86:23 90:25 120:13
120:22 121:22
147:21 157:6
**involving** 13:10
16:17 36:17 68:8
76:14 86:24 97:14
155:6
**in-house** 17:11
**in-town** 145:22
**irrespective** 203:20

irresponsibility 98:8
irresponsible 99:12
irresponsibly 98:1,5
issue 47:20 69:5
  110:24 118:15
  125:11 146:10
  151:12
issued 19:7 211:18
issues 9:7 28:5 29:7
  30:15,19 43:1 50:25
  51:2 63:4,19 64:10
  68:6 98:23
item 17:20 127:4
IV 144:9

**J**

Jackson 200:13
James 75:6 78:7
Jankovic 131:17
Jeffrey 4:14 7:18
JFK 6:17
Jim 177:19
JKF 1:7
job 61:9 93:18 117:6
  122:13 151:14,17
  151:22 152:12,14
  191:1,2 194:1,18
jobs 19:18
John 4:24 6:23
John's 58:2,2 169:15
Jointly 1:8
journal 30:11,13
  60:2 74:14 85:14,16
  86:5 131:18
journals 81:2,5,9,17
  85:15 170:6
Julie 75:3 77:9 78:6
  84:11 86:13
July 1:24 6:2,19
  214:23 216:2
June 5:17 67:7
jurisdiction 145:23
  146:4

**K**

Kate 7:13
KATHLEEN 3:15

keep 9:10,15 48:16
  72:6 84:16 99:12
  205:16
keeping 73:13
Kelly 77:10
Key 153:11
kicked 17:21
kicking 15:25 16:4
  195:4
kilometers 197:18
  213:25
kind 18:15 24:16,21
  29:9 32:6 40:23
  44:15 57:5,12 74:15
  88:12,13,15 96:18
  117:10 136:14
  159:22 166:16
  168:18 177:22
  184:2 190:13,25
  203:21 205:21
Kirkland 2:6 7:1
knew 83:19 86:19,21
  86:23 87:1 101:14
  101:24 109:5
  199:19 206:22
  207:1
know 8:20 9:7,25
  13:15 14:3 22:5
  23:10 26:16 30:25
  33:14,18 34:20
  40:18 42:10,10,22
  42:23 43:2 44:4,8
  44:12 46:11 47:12
  47:22 49:11 50:23
  53:15 54:5,24 56:9
  56:19 57:7,9 63:8
  63:10,14 65:17,23
  69:21 70:14 73:21
  78:14 83:21 84:1
  86:18,21 87:3 89:18
  91:4,6,8,9,19 92:23
  93:18,19 95:9,19,20
  97:18 98:10 99:11
  99:15,21 100:3,9
  101:2 102:24 105:3
  107:13 109:9 114:3
  116:6 120:18,21,23

126:2,9 127:20
128:4 130:22 132:4
133:7,23 134:22
137:23 139:17
144:3,20 145:8
146:17 148:22
150:14 152:15,24
154:18 158:22
159:1,1 161:14
162:10 166:16
168:9,10 169:15,18
171:3,5,10 174:8
178:2,5,9 179:3,23
183:8,20 184:2,4,13
184:15 185:25
186:12 187:13,25
188:18,22 191:14
192:18 193:13
194:17 195:18,20
199:20 200:15
202:2,23 203:10
204:25 205:12,15
206:17,25 211:14
211:17,20,24 212:2
212:10,12,13,16,17
212:20,22 213:15
knowing 49:14 166:2
knowingly 108:18
  109:2,4,5,8
knowledge 28:3 39:8
  105:4,5,7,24,25
  106:3 108:7,9
  109:15,23 112:22
  125:15 128:14
  182:9
known 96:19 98:16
  99:19 100:4 109:18
  110:1 114:20
knows 96:22 99:20
Koocanusa 26:5
  185:9
Kootenai 213:17
Kovacich 2:14
Kris 69:11,12 76:19
  79:3,6,9,11 84:13
  109:7

**L**

L 2:12 6:7 215:5,21
  216:4
lab 111:18 173:7
  176:10 179:7
lack 64:15 72:15,19
  72:21 150:10,19
lacking 72:14
Lake 26:5 185:9
language 189:2
larch 166:9
large 102:20 142:24
  143:1 147:17 192:9
larger 171:3 183:11
late 11:14 31:7 70:25
  205:8
laterally 115:4
law 2:5,13,22 3:6,7
  3:16 4:6,15 7:11
  81:20,20 215:11
lawns 162:6
lawsuits 75:19
lawyer 42:23 49:17
lay 183:2
lead 35:24 83:1
  126:13
leaks 162:16,18,19
  163:7
learn 99:22 156:23
learning 113:15
leave 11:13
leaves 50:4
leaving 72:6
led 40:23
left 196:22 199:8
left-hand 165:15
legal 116:14
length 133:13,19
  134:2,25 136:18,19
  136:23 173:9,14
  203:10,14,15,15,16
  203:20
let's 12:5,9 14:11,12
  17:6 23:23,24 26:2
  27:11 28:18,18 32:6
  34:13 36:2 37:12,13
  38:12 40:13 47:8

W.R. GRACE & CO.          TERRY M. SPEAR, Ph.D.          July 29, 2009

64:17 66:16,24 83:2
88:2 89:21 94:18
96:3 104:6 124:5,6
124:23 129:21
135:13 137:12
158:24 169:15
173:18 200:16
204:10
**level** 46:4 61:15
83:23 84:1,1,2
118:17 129:16,17
134:16,16 136:9,9
137:20 176:6
178:19 181:7
185:20 191:9,11,11
199:23
**levels** 30:19 45:7,12
47:24 59:22 60:5,18
61:2,12 62:22 83:4
115:6 118:4 120:22
121:1,1 126:20
134:18 136:17,22
199:19
**Lewis** 2:12,14 5:5 7:3
7:3 22:25 25:1
26:15,22 28:11
30:20 31:22 32:10
33:7,12 36:7 48:11
48:21 49:7,15,21
51:4 53:9 58:17
63:18 64:15 66:14
85:11,13 87:9,13
92:10 97:16 99:23
101:5,7 110:19
111:1,4,13,15
116:13,23 117:12
123:14,24 129:20
138:20,25 139:6
149:12 152:4 194:7
194:10 197:10,12
207:22 208:2,13,16
209:7,9 210:5,15,18
210:20 213:6,7
214:6,17
**liability** 68:10 116:15
**Libby** 2:11 5:20 7:3
14:17 15:6,10,10

17:6 19:4 22:15,21
22:22 23:10,11,19
23:25 24:7 27:9,14
33:4,6 34:2,10,11
34:18 35:13,15,18
35:22 36:19,21,25
37:3,9,20 38:5,14
38:15,16 39:9,14,22
40:5,9,11,16,22
41:2,8,13,16,24
42:3,13 43:3,8,20
45:1,3 46:9 47:1,3
47:11,18 48:9 50:1
50:11,25 51:19
53:24 54:2,15,18,22
55:2,15,23 56:3,7
56:13,18 57:1 58:10
58:23 59:1,4 64:13
64:18,25 65:6,16
70:20,23 71:24
72:16 73:20 75:2
76:1,10 77:8 78:5
79:15 81:6,25 82:4
82:11,12,20 83:25
84:17,18,21 85:10
86:24 89:23 90:7,14
91:16,25 92:4,19
93:15 98:6 100:13
100:17,22 101:14
102:16 103:10,13
103:18,21 104:1
106:10 108:11,20
109:21 111:13,14
112:2,13 114:15
117:18,22 118:4
119:21 120:1,6,13
120:25 122:19
123:9 124:16 125:1
125:1,4,10,21
129:10 130:7
133:11 138:18
139:24 155:5,11,16
156:10,16,21,25
157:5 158:20
159:10,14,19,20
160:8,12 161:16,18
161:19,25 162:12

162:14,20 163:3,6
163:14,18,19 164:2
165:19 168:22
169:15 170:8,10
176:23 178:11
180:4 188:4,13,16
189:4 190:14 192:9
196:1,4 197:16
198:12,13 209:2
210:3
**liberate** 83:20
**liberated** 83:22,23
**lies** 90:7
**likelihood** 37:9 38:5
**limit** 145:15 198:21
**limitations** 150:24
154:13,24
**limited** 120:21 206:7
207:10
**limiting** 110:23 111:5
111:7
**limits** 145:11 176:9
**Lincoln** 21:2 169:21
185:1 189:10 192:5
199:18 206:18
207:9,19 208:10
**line** 7:5,8 25:18,19,21
48:17 150:10
175:21 214:15
216:7
**lines** 16:17,18 102:25
166:17 167:13
187:3
**list** 17:20 68:16
126:23 193:12
**listed** 85:18 95:9
118:12 128:21
**literally** 193:10
**literature** 27:16,18
27:19,25 28:2,10,25
29:2,15,17 30:6
32:3,4 34:21 35:19
36:20 38:1,3,4
39:12 41:20 42:13
43:3,6,11 47:9
50:13 60:2 61:3,5
83:8 92:3,12,14,16

92:21 93:13 96:5,7
96:12 100:3,12
112:12 113:5,7,13
113:17,18 119:5
120:5 134:24 149:6
154:18 155:4
**litigation** 68:10
**little** 19:21 75:10
100:25 115:20
116:4,15 153:16
156:14 163:5
183:15
**live** 88:20 198:7,8
**LLC** 4:7
**LLP** 2:6 3:17 4:16
**LO** 152:13
**load** 16:25 124:2
**loading** 16:7,14,16,18
16:19,20 17:1,23
**locales** 188:9
**located** 103:2 169:12
169:13 182:1,22
213:16
**location** 143:8,13,14
143:19,25 144:12
164:4,6,10,13,18,22
165:3,6,7,10 167:8
167:9 172:14,19
175:15,21 176:5,5
176:23 177:12,24
178:10,16,22,22
179:17 180:3,11
197:13,21 213:8,12
213:22 214:11
**locations** 60:20
103:21 143:20
144:3,7 167:7,15
180:17 188:4 189:4
197:17
**Lockey** 43:14,17
44:15,19 46:10
51:12 110:13
**Lockey/Rohs** 44:19
**Lodge** 4:16
**logging** 192:5,9 200:5
200:13
**logic** 181:12

**long** 10:12 33:8 36:22
  38:21 88:2 114:21
  134:13,13 135:10
  136:12 183:10
  192:1 201:6
**longer** 14:9 101:1
  134:2,5,25 135:14
  141:8 160:5 173:5
**look** 14:11 29:7 30:18
  44:8 47:14 87:4
  94:18 104:6 122:8
  122:14 123:1 126:3
  128:22 132:13
  134:12 144:17
  147:25 150:8
  171:14 183:4,5,9,10
  183:13 184:1
  191:15 200:16
**looked** 29:22 30:4
  45:19 52:23 55:7
  57:10,18 92:11,16
  92:21 93:12,13,16
  132:16,20 133:18
  143:9 158:22
  165:24 171:3,5,13
  175:7 196:4 209:18
**looking** 15:8 52:22
  54:10 75:1 77:16
  78:18,24,24 89:13
  95:22 103:8 110:14
  120:22 121:1 123:3
  126:20 129:8
  133:12 134:13
  136:9 137:18 138:8
  144:21,25 151:14
  160:16 163:17
  165:15 166:25
  167:6 172:11,18,19
  174:12 175:15
  183:25 195:20
  203:5 204:16 206:3
  206:4 209:5 213:9
**looks** 92:17 102:15
  172:11
**loose** 117:10 120:4
**loosely** 184:13
**LOs** 151:4

**lost** 74:2
**lot** 12:23 18:5 31:15
  91:15 98:15 144:4
  156:6 166:17 170:5
  171:1 183:15
**lots** 202:23
**loud** 100:10
**Lovick's** 101:3
**low** 39:13 119:22,22
**lower** 45:3,25 134:18
  137:20 138:11
  177:12
**lowest** 46:4 84:1
  176:6,9
**lumber** 82:5
**lunch** 129:25
**lung** 35:2 36:4,17
  37:2,5,7,9 40:19
  50:20 54:11 101:25
**L-A-W** 7:12

---

**M**

**M** 1:17 5:3 6:1,5 7:22
  77:10 215:10 216:1
  216:25
**machine** 215:13
**machines** 15:23
**madam** 65:25 77:3
  139:9
**magnification** 183:12
  204:13
**main** 12:3 72:23
  79:21
**maintenance** 24:17
  25:10
**major** 208:14
**majority** 39:9
**making** 62:15 99:11
  154:12 196:18
**male** 33:23
**man** 48:20
**manager** 103:11
**mandated** 118:17
**manifest** 35:12
**manifestation** 50:11
**manifested** 40:15
**manifesting** 41:22

**manner** 9:9 92:4,7
**manpower** 186:25
**manufacturing**
  157:23
**map** 163:18 185:8
  211:11,14,18 212:4
  212:10,14,24 213:9
**March** 115:17
**mark** 65:24,25 74:21
  77:2 87:7 129:14
**marked** 66:2,5 67:3,6
  67:10 74:23 77:4,25
  78:3,4 87:11 131:10
  131:13 210:16
**market** 108:14
**Maryland** 4:12 7:16
  7:18
**Marysville** 44:17
  45:7,12 47:2 158:7
**master's** 10:25 67:19
**material** 39:14 72:22
  109:5 114:5 115:10
  117:5 119:10 120:2
  120:3 126:13
  162:14 177:9,9
  193:21
**materials** 14:18 29:7
  72:6,16 89:19 91:1
  113:14 115:15
  118:2 128:7
**matrix** 148:2,5 149:9
  149:22
**matter** 32:5 81:10
  200:9 214:21
**McDonald** 110:12
  154:20
**McDonald's** 155:3,8
**McLean** 69:11,12,25
  70:7 71:19 72:25
  73:8,16,22 76:20
  79:3,6,9,12 84:14
  109:8
**mean** 12:25 13:12
  26:24 27:2,19 28:14
  28:17 30:3,23,24
  31:2,14 32:4 33:14
  33:22 42:11 43:22

  50:6 54:5 63:8,12
  65:1,2,8 71:7 72:5
  78:17 83:18 91:4,7
  91:16 92:6,16 94:9
  95:8,19 97:18 98:10
  99:2,6 109:4 116:17
  117:3,4,8 120:21
  121:21 122:11
  128:8 134:11
  146:17 148:22
  149:12 154:3 160:3
  161:14 163:23
  169:13,14,24 172:4
  173:22 177:19,22
  179:5,22 181:13
  182:4 183:8 184:1,3
  184:11 186:24
  189:15 191:4
  195:19 197:24
  198:5 201:21 202:3
  202:15 203:4,12
  204:3,3,9 212:2,4
  212:12,19
**meaning** 100:3
  202:19
**means** 103:15 111:18
  149:10 153:5 183:3
  183:4 191:14 201:3
**meant** 91:22 163:10
  163:11,25
**measure** 152:25
**measured** 148:24
  205:4
**measurement** 24:18
  25:13 78:21 133:4
  135:16 137:13
  142:10 207:4
**measurements** 95:11
  95:12 103:20
  119:13 133:9
  140:15 144:18
  147:21 148:2,21,23
  174:11,11 191:5,6,6
  193:6 195:8,10,13
  200:1 203:6 204:2
  205:2,3 207:3
**measures** 203:12,16

203:19
**measuring** 149:22
**media** 122:22,25
 125:7 174:4,5,15,15
 190:5 206:22
**medical** 31:23 32:2,3
 32:13 34:21 35:19
 36:19 37:23,24 38:1
 38:3 40:18 41:5
 42:11,13 43:2,6
 50:13,21,24 51:18
 51:25 58:14 60:2
 61:19,20,25 62:19
 64:3 99:8 104:9
 109:12 111:9
 112:17 113:5,12
 209:19,20,22
**medication** 9:18
**medicine** 31:19 32:18
 58:6,7 96:12 113:18
 131:18
**Meeker** 39:23 40:1
 110:24 111:22
 171:2
**meet** 69:24 72:24
 73:7
**meeting** 69:22,25
 70:7 73:1
**Mellott** 4:7
**members** 100:14,22
 102:4 108:19,19
**membrane** 140:20
 144:11
**memoranda** 128:3,7
 128:11,17,22
**memorandum** 126:4
 126:6 127:6
**memorandums**
 127:25
**memory** 76:11
**memos** 63:13
**men** 101:16
**mention** 55:5 96:10
 106:25
**mentioned** 14:2
 19:15 25:8 32:12
 41:8,12,15 43:18

51:12 56:20 58:16
 74:3 93:8 98:25
 113:6 155:20
 166:13 200:4
**merely** 174:22
**MESA** 140:21,22
 141:8,11,19 142:4
**mesothelioma** 34:25
 36:4,17,23 37:1,12
 55:12
**met** 130:24,25
**meter** 115:12
**meters** 115:7
**method** 18:19 134:15
 140:1 143:21,22
 148:18 149:23
 150:3 166:16,18
 171:25 176:11
 178:3 199:21
**methods** 30:19
**Meyer** 78:7
**microbiology** 10:20
 67:17
**micrograph** 183:11
**micrometers** 133:13
 133:15,17,22 134:6
 173:8 205:18
**microns** 133:15,19
 134:2,25 135:3,14
 138:16 139:22
 140:5 173:1,5,14,20
 203:13,16 204:4
 206:2
**Microns/micromet...**
 133:16
**microscope** 183:14
 205:20
**microscopy** 171:11
**mid** 76:3,8
**middle** 110:4 150:9
 178:11
**midget** 140:18
**mile** 214:3
**miles** 164:15,16
 186:1,23
**mill** 70:20 95:16
 101:16 102:20

103:1 140:17,19
 144:18,25 146:2,7
 147:10,12
**Millers** 131:15
**milliliter** 202:6
**millimeter** 177:7
**milling** 71:23 89:16
 94:22 98:6 155:11
 155:17 156:11,17
 170:23 171:19
 172:1 181:9 196:15
**million** 103:16 147:4
 148:15 172:16,22
 175:23 176:1,19,24
 177:1,24 178:11,12
 178:16 179:16,19
**mind** 28:2 43:22
 46:11 82:3 97:2
 101:21 102:9 103:3
 205:16
**mine** 15:9,24 16:5,21
 17:21,22 18:17
 19:18 26:3,4,5 44:9
 70:20 75:20 84:11
 95:16 117:23 125:1
 133:10,10 140:17
 141:12,22 145:20
 145:21 146:3 155:6
 163:21 164:5,7,8,11
 164:13 165:19
 166:6,10,18,20
 167:15 169:9
 170:17 171:20,21
 171:22,23 180:12
 180:16 185:9,11,18
 185:21 186:2,7,14
 186:21,23 187:4,12
 188:17 206:13,14
 206:17,20 213:1,13
 214:11
**mineral** 39:1,7 170:1
 170:2
**mineralogical** 109:21
 170:8
**mineralogist** 38:25
 39:3 112:7
**mineralogy** 40:3

112:13 170:5
**Miners** 5:22 131:15
**mines** 188:21
**mining** 68:4 71:23
 89:16 94:22 98:5
 155:11,16 156:11
 156:16,25 170:9,23
 172:1 181:9 196:1
 196:15
**mining/milling** 175:5
**Minnesota** 11:1,3,5
 11:11,14,16 67:23
**minutes** 141:1 196:22
 198:25,25
**misinterpret** 27:12
**misleading** 139:2
**misnomer** 168:18
**Mississippi** 34:14
 50:16
**Missoula** 10:22 69:13
**misstate** 41:14
**misstates** 110:21
 123:15
**mistaken** 152:1
 172:12
**misunderstood** 13:9
**mix** 40:6
**mixed** 46:11 204:15
 204:17
**mixture** 38:16
**moment** 124:6
 136:12 138:8
 200:16
**Monokote** 159:1
**Monokote-3** 159:4,9
**Montana** 1:23 2:16
 6:2,8,21 8:15,15
 10:3,4,13,21 11:8
 11:11,16,19 13:23
 14:2 19:1,7,11 33:4
 33:6 34:18 40:11
 73:2 75:2 77:8
 109:25 122:15
 140:19 142:11
 143:3 197:16
 198:13 215:1,7,23
 215:23

**morbidity** 47:13
　131:14 132:11,14
　137:23 139:23
**Morbidity/Mortality**
　5:22
**MORGAN** 4:23
**morning** 8:3,4 26:9
　26:12 27:6
**mortality** 31:8,16
　43:25 44:8,9 47:14
　60:15 62:22 131:14
　132:10,20,20
　135:24,24 136:5,10
　137:3,25 138:3,12
　139:22
**mountain** 90:7
　181:14,21,25
**move** 49:15 88:20
　91:1 94:9 115:4,8
　130:5 144:4 152:18
　153:7 167:12
　186:21 187:23
　190:16 193:20
**moved** 152:2 169:25
**movement** 15:23
**mover** 194:3
**moving** 91:3,4
　101:24 144:6 146:9
　167:5 186:14
　187:22
**mppcf** 103:15 142:9
　146:10 147:16
　148:2,11,21,24
　149:3,10,21,23
**mppcf's** 149:16
**MSHA** 140:21,22
　141:18,21 142:4
　145:7,9,17,19,22
**MSHA's** 146:4,7
**Myron** 75:6
**M-E-S-A** 141:8

──────────────
　　　　**N**
──────────────
**n** 5:1 201:3
**name** 8:7,8 38:21
　88:19 92:13 141:9
　166:7

**named** 215:12
**narrow** 23:22 83:2
　91:2
**narrower** 23:22
**National** 29:12 131:4
**natural** 108:10 169:6
**naturally** 168:15,19
　169:2,7,11,16,20
　170:11,24 172:2
　175:3 181:10,11
　196:2,10,12,13
**nature** 49:8 161:4
　193:4
**near** 167:22 188:6,21
　189:17 197:15,16
　198:13 199:12
**nearby** 200:13
**necessarily** 96:17
　102:21 111:11
　143:19 152:21
**necessary** 81:16
**need** 26:6 66:14
　132:4 144:20
　153:12 164:25
　173:19
**needed** 115:11
**needles** 184:13
**Needless** 178:21
**needs** 49:17,17
**negative** 168:3
　208:12
**neighborhoods**
　159:25
**Nemours** 4:17
**net** 152:17
**never** 58:5 79:11
　82:14 130:24,25
　149:14
**new** 67:12 144:18,25
　175:18 176:20
　177:2 188:20
**nineteen** 197:11
**NIOSH** 29:11 43:25
　106:10,17,20
　118:14 120:1 131:1
　131:4 138:16
　139:14,21 140:21

　140:22 142:7
**nodding** 9:9 182:17
**non** 205:12
**non-malignant** 35:5
　36:5,13
**Noonan** 75:4
**Nordhagen** 1:21 4:24
　6:7,20,22,23 215:5
　215:21 216:4
**normally** 41:23
**north** 4:18 164:4,10
**northeast** 26:3 164:1
　200:14
**notarial** 215:18,24
**Notary** 6:8 215:6,22
**noted** 6:7
**notice** 6:4
**noticed** 176:4
**notified** 71:8
**notify** 79:13
**November** 125:22
**nowadays** 143:17
　148:10
**number** 8:21 30:3
　53:14,16,22 87:9
　128:2 138:10
　142:24 143:1
　145:14 151:8,14
　171:3,7 172:25
　178:4 187:16 201:5
　201:6 206:6,7,8
　207:10
**numbered** 88:6
**numbers** 22:11
　147:17
**numerous** 158:11
**NW** 2:7,24
**N.W** 3:19 4:8

──────────────
　　　　**O**
──────────────
**object** 22:25 28:11
　33:12 48:11 49:1
　53:9 58:19 97:16
　111:4 123:14 124:4
　138:20 152:4,6
**objection** 25:1 26:25
　30:20 31:22 32:10

　36:7 48:25,25 49:3
　49:5,8,12 51:4
　58:17 64:15 85:11
　99:23 101:5 110:19
　111:15
**objections** 23:7 48:17
　49:19 64:13,16,18
　64:21
**observation** 182:20
**observing** 94:12
**obstruct** 106:12,12
**obtained** 103:21
　211:8
**obtaining** 32:21
**obviously** 23:12 31:5
　34:7 40:21 71:10
　93:16 97:5 110:20
　114:14 122:13
　154:3,4 185:25
　202:22
**occasions** 56:20
**occupational** 19:17
　20:11 23:14,22 31:5
　58:7 77:14 96:11
　113:18 131:5 191:8
**occur** 70:2 77:17
　78:12 161:25 163:2
　191:1 199:17,22
**occurred** 60:20
　153:24 158:16
　159:20 162:12,16
　163:2 164:18
　170:10 188:15
　195:14 199:4
**occurring** 16:20
　41:22 84:21 168:15
　168:19 169:2,7,11
　169:16,20 170:24
　172:2 174:20 175:3
　181:10,12 196:2,11
　196:12,14 207:8
**occurs** 42:4 47:20
　50:25 54:14 55:22
　181:13
**offer** 42:9,11 51:2
　61:10 63:19 64:9
　65:2,5,20 85:22

W.R. GRACE & CO.          TERRY M. SPEAR, Ph.D.          July 29, 2009

86:5 87:20,25 88:14
89:7 130:13,16
174:9 192:3 193:3
207:17 208:8,19,23
208:24 209:14,22
210:2,10
**offered** 72:1 213:2
**offering** 64:12 84:20
208:3
**Off-the-record** 67:14
**oh** 11:23 13:8 15:3
17:13 47:6 53:6
66:11,25 74:3 79:11
91:18 101:8 110:6
145:2 150:18
160:15 181:3
194:12 200:9
**Ohio** 44:17 47:2
158:7
**okay** 7:6 8:14 9:3,18
9:22 10:3,12,18,24
11:7 12:2,9 13:3,22
14:11 15:6,19 16:3
16:8,12 17:1,5,13
17:19 18:3,15,20,23
19:19,23 20:1,5,5
20:16 21:4,12,15,22
22:17,20,23 23:3
24:11 25:12,14,17
27:11,21,25 28:16
28:22,24 29:19,24
30:5 31:4,18 32:6
32:15 33:12,25 36:2
36:13,24 37:12,19
38:2,9,12 39:4,9,16
39:21 40:5,5,9,13
40:23 41:7 42:8,16
43:11,24 44:5,13,13
44:19 45:10 46:21
46:24 47:13 48:5
50:4,22 51:10,22
52:14,18 53:23 54:4
54:13,17 55:1,5,20
56:1,16,20 57:5,11
57:15,20,23,23 58:1
58:5,9,13 59:6,13
59:16 61:1,10 62:7

62:25 63:3,21,25
64:3,12,24 65:5,19
66:9,23,25 67:25
68:15 69:17,24 70:4
70:6,22 71:4,10,22
72:13,24 73:7,10,15
74:12 75:6,9,14,22
76:5,12,18 77:2,16
77:22 78:4,11,18,23
79:2,5,19 80:5,9,14
81:5,16 82:2,7,10
82:16,19 83:2,7,12
83:23 84:4,10,18
85:1,7,13,21,25
86:4,9,15,19 87:4
87:19,23 88:2,5,5
88:12,19 89:3,10,13
89:21 90:1,3,13,16
90:21 91:3,12,21,23
92:3,10,24 93:8,13
93:23 94:1,3,15,18
95:1,5,15,21,21
96:3,17 97:7,23
99:2,5,11 100:8,20
100:25 101:13,24
102:15 103:3,7
104:6,13,16 105:5
105:11,18 106:5,25
107:3,6,10,16,21,24
108:8,13,16 109:10
109:10,20 110:6,16
111:15,22 112:5,6
112:21 113:9,21,24
114:14,19 116:5,5,9
116:9,12,22 117:9
117:21 118:3,24
119:12,15,23 120:9
120:12,19 121:7,12
121:18 122:7,16
124:5,20,23 125:8
125:18,24 126:17
126:23 127:3,8,21
128:6,13,21 129:2
129:15,19 130:5,17
130:20,24 131:13
131:21,24 132:7,13
132:16 133:5,17

134:4,22 135:2,7,12
135:18,23 136:8
137:10 138:7,14
140:4,11,13 141:8
141:23 142:16,23
143:2,7,10,12,22,25
144:5,9,17 145:2
146:2,6,9 147:1,6
147:15,25 148:20
149:19 150:3,6,8,23
151:25 152:7,13,17
152:21 153:7,22
154:17 155:2,19
156:2,5 157:2,5,8
157:17 158:1,4,10
158:19 159:4,12,16
160:6,18 162:4
163:5,16 164:4,8,10
164:22 165:9,14
166:12,23 167:2,5
168:14 169:19,23
171:18 172:8,11
173:3,13,16 174:6
175:2,12,15 177:8
178:10,10 179:25
180:3,17,22 182:3
185:15,22 187:5,13
187:21 189:9,17,20
190:6,13,16 191:13
191:16 192:3,14,20
193:3,6,9 194:19
195:12,24,24 196:5
196:10,18,21 197:8
198:2,10,16 199:3,7
199:15,21,25 200:4
200:17,21 201:6,16
202:9,18 203:4,11
204:1,14,19 205:14
207:6,15,21 209:4
209:17,25 210:13
210:15,20 211:10
212:15,18 213:5,11
213:15,19 214:1,5
214:14,20
**old** 67:2,2,11,12
205:7
**once** 7:20 73:9

101:13 107:21
112:15 113:21
130:10 154:12
194:19 200:5
214:18
**ones** 12:3 43:21
112:16 125:19,25
129:9 171:13,13,15
186:17
**one's** 100:25
**ongoing** 15:12,15
30:9 71:2,5 123:8
124:24 126:13
**onset** 44:5 48:9 49:25
**on-site** 68:7
**open** 98:23 165:8
**operable** 162:24
**operating** 89:23
95:17
**operation** 70:19
71:23 72:3 98:6
114:15,16 143:25
144:12 155:12,17
156:11,17,25 157:5
158:2 165:20
168:23 170:9,24
171:19 172:2 175:5
192:10 196:2,15
201:22
**operations** 89:19
102:16 103:12
117:22 143:8,13,14
159:17 192:9
**operator** 200:25
202:9 205:25 206:5
206:6 207:18 208:9
**opine** 42:24,25 59:14
59:20
**opinion** 22:21 24:6
33:2 35:11,17,20,21
36:3,4,5,16,24 37:1
37:2,8,11,19,25,25
38:4,9 40:14,21
42:17,18,19,20 43:6
43:8,12 45:1 47:17
47:21 48:9 49:25
51:8 54:14,18,22

55:2,20,22 56:6,17
59:22,25 60:1 61:1
62:1 63:6,16,22
64:3,21,24 65:1,3,5
65:10 71:19 72:5,8
82:3,20,23 83:12
84:23 87:19 90:13
91:14 93:1 94:5
98:4,14 109:7
119:15,19,20,24
127:4,16 128:17
129:3 133:9,12,21
134:21 169:1,4,5,19
174:9,20 184:9
187:9 189:21 193:3
202:18,21 207:17
208:8 213:2
opinions 20:17 23:1,3
23:3,4 37:13 40:24
41:1,2,7 42:8 43:19
51:2,7 53:24 55:15
56:22 58:10,14,22
59:3,6,10 60:18
61:10 64:9,12 72:1
81:23 83:4 85:22
86:6 87:20,25 88:14
89:7 98:15 112:11
125:9 130:14,16
133:6 156:9,12,13
156:19,23 192:4
210:2,11
opportunity 46:25
opposed 9:9 33:5
35:13 37:3,10 38:6
110:17 166:4
170:10,24 172:2
175:4 176:5 177:13
181:10 195:15
196:2
Orange 4:18
order 132:3 136:6
156:15 173:18,20
ore 39:14 157:6
162:13
origin 114:22
originally 70:11
192:8 196:14

Orr 3:15 7:13,13
Orrick 3:17
OSHA 29:10 145:9
145:17,18,20,23
OSHA's 134:15
Outdoor 90:16
outlier 134:4 150:6
outside 26:4 33:6
34:2 35:15 41:24
91:1,3 133:10
159:20 160:4,7,8,12
163:3,6,19 166:6
189:10
oven 78:13
overall 151:6
overbroad 33:17
owned 157:17 158:2
O.M 44:17 157:22

## P

page 5:2,15 10:1 68:2
99:17 101:10,11
129:7 136:16
140:14 141:24
144:9 146:9 147:25
150:9 153:7 163:17
163:18,23,23
165:14,14 167:5,5
167:13 182:18
187:22,22,24 197:9
198:10 199:7
200:20 213:10
216:7
pages 88:3 215:15
paid 64:25 71:13
81:19 84:5,8
pain 44:3 46:22
47:10
painful 41:24 42:5
51:1 54:19 56:3
paper 20:14 51:17
52:15,16,19 53:23
53:25 54:13,17,21
55:6,6,11,14,14,18
55:21,25 56:1,5,10
56:12,16 73:20
77:16,23 78:23 79:2

79:5,9,19 80:5,20
80:21,21,25 81:1,2
81:13 82:2,3 84:4
86:1,2,7 89:4,8
92:22 127:2 130:18
131:2,24 132:7,25
133:2,6,7,18 134:4
140:6,14 142:1
144:1 155:20,25,25
156:2,3 163:16,24
167:2 168:8 171:23
171:24 175:6 185:3
185:17,18 186:18
187:15,18 193:8,14
200:4 205:24
206:10 207:8
209:12
papers 19:20 55:16
74:6,9 80:22 86:11
86:13 132:13,14,24
133:2 155:3,9,14
170:12 182:13,14
185:5
paragraph 88:19,25
89:1,13,13,22 90:6
94:18,19,19 95:5
96:3,4 99:18 100:8
100:9,9,25 101:10
101:15,24 102:15
102:17 103:7 104:3
104:6,7,13,16,19,22
104:25 105:18,25
106:5,8 107:3,6,6
107:10,21,24 108:2
108:3,16 109:10,11
109:20,20 110:3,5
110:16,20 111:9,23
112:15,16,21,25
113:4,9,24,24 114:6
114:19 116:5,9,25
117:14,15,21 118:3
126:4,7 129:8 130:5
150:10 151:3,25
152:8 165:15
182:18 199:8
paragraphs 88:6,8
88:14,16,21,22

94:20 95:2
paraphrase 124:2
152:5
paraphrasing 41:13
Pardon 13:5
part 10:16 13:25 19:8
19:9 24:20 48:3
60:7,8,11,19,21,21
61:9 62:15 72:4,23
73:14 83:7,9 84:23
85:22 93:4,5 94:7
94:24 97:1,10,14
103:3 105:16
109:24 117:24
121:4 126:19 131:7
131:15 157:5
166:12,13,15,20,21
168:8,23 191:18
196:15 199:2
partially 198:6
participating 69:16
participation 68:9
particle 12:1
particles 103:16
147:5 148:16
particular 12:19
13:24 44:6 85:25
93:6 100:4 175:6
183:20 185:3 192:2
201:22
particularly 83:25
107:17 144:2
146:15 163:1
168:21,22
particulate 91:24
particulates 92:19
parts 60:9 140:13
207:3
Pascagoula 34:13
Pass 210:14
passage 115:9
pathway 17:3,5 54:7
pathways 14:16 15:6
15:7 16:3 17:25
18:3 52:4 81:19,22
patient 32:22
patients 32:25 41:21

47:1 58:11 60:12
**Patricia** 43:13
**Patty's** 29:12
**Paul** 125:3,21 211:2
**pause** 23:14 70:16
  81:12 86:14 103:2
  114:13 119:8 128:2
  170:6 178:7 182:5
  200:15 210:22
**paying** 71:15
**PBZ** 21:10 200:22
**PC** 2:14
**PCM** 133:12 176:12
  202:3 204:6,7,7,12
  204:18,19 205:2,10
  205:15,17
**PD** 3:3
**peak** 170:16
**peaks** 171:12,16,18
  172:4 175:8
**pediatrician** 57:21
**pediatrics** 58:3
**peer-reviewed** 140:8
  142:16,19 156:3
**Peipens** 43:14,17
  51:13,17 52:15,19
  53:4,23,25 54:17,21
**PEL** 145:7,9,17,17
  145:18 146:6,7
  147:10,21
**penalty** 216:22
**pending** 33:10 124:7
**Pennsylvania** 4:8
**people** 16:4 24:13
  34:7,10,13 40:15
  46:13,14 47:2 53:2
  53:7,17 62:5 80:1
  94:21 95:22 102:10
  109:6,8 114:5
  135:25 138:4 160:7
  161:7,17,19 162:6
  163:6 165:3 180:18
  187:2 189:11
  193:17,20 194:23
  195:17
**percent** 39:13,18
  46:15,15,17 52:19

52:25 54:8 95:6,25
  118:15,19,21
  125:11 171:16
**percentage** 46:12
  54:8 118:21
**percentages** 52:22
  95:9,19 118:1
  119:22
**perform** 25:6 193:24
**performed** 18:24
  27:15,16 103:20
  110:8,11 190:4
**performing** 27:9
**period** 31:20 101:21
  127:10,11 148:13
  198:21,24 199:1
**periods** 140:25
  153:13
**perjury** 216:22
**permission** 164:24,25
**Peronard** 125:3,21
  126:20 211:2
**person** 35:13,14 37:3
  37:4 52:1 57:12
  69:9 135:10,15
  137:24 152:25
  159:9,12 165:10
  177:20 190:1
  193:18 201:18,22
**personal** 7:13 21:6,9
  21:12,15,22 68:9
  72:20 75:19 83:21
  86:24 119:7 140:25
  195:8,12 200:22
**personally** 92:2
  121:18 134:8,10
**person's** 65:12
**pertain** 104:19
**pertained** 70:14,15
**pertaining** 13:18
  14:8,10,17 29:8
  33:19 45:4 58:25
  63:15 72:6 73:20
  128:19 133:9 148:8
**pertains** 105:2 108:6
  108:8,12
**Perusing** 104:18,21

104:24 105:2 107:5
  107:8,12,23 108:1,6
  112:20 117:24
**philosophy** 138:3
**phone** 69:17 73:11,12
**Ph.D** 1:17 5:3 6:1,5
  7:22 11:2,4 67:22
  215:10 216:1,25
**PI** 3:13 4:3
**picture** 163:18
**pictures** 183:5,6,7,9
**piece** 38:3 191:12
**pilot** 207:10
**pine** 175:18 177:2
  184:13
**pinpoint** 43:22
**place** 3:8 6:6 49:13
  72:10 92:8 103:11
  141:7 215:12
**plaintiff** 76:1
**plaintiffs** 68:11,16
  75:23 86:17
**plan** 106:20
**planning** 71:7
**plant** 61:14 90:24
  91:1,4 105:8 159:25
  160:4,8 161:4
  213:16,23
**planted** 166:10
**plants** 60:14 157:16
  157:17 158:4,12
**plausible** 168:3
**please** 8:5 9:25 27:13
  28:8 41:18 65:25
  66:1,11 74:22 77:3
  87:8 89:15 97:12
  103:14 106:9 108:5
  124:8 130:6 139:8
  153:7 210:6
**pleura** 35:9
**pleural** 37:16,18
  38:10,12 40:13,15
  41:2,8,12,16,22
  42:3,4,4 43:8,20 44:3
  44:5,11 45:1,14,24
  46:4,8,15,15,18,22
  47:11,18 48:9 50:1

52:20 53:20,24
  54:14,18,22 55:2,15
  55:19,22 56:2,6,18
  58:10 59:4,8,10
**plots** 24:19
**point** 9:24 12:18
  85:12 86:4 114:21
  115:5,7 130:19
  138:13,15 139:13
  156:22 174:1
  179:12 184:15
  185:21 192:19,23
  203:1 214:10
**pointed** 53:25
**pointing** 45:2 137:1
**points** 16:22 88:9,9
  135:23 137:22
  138:12 139:23
**policies** 63:7,9
**pollutant** 91:24
**pollutants** 90:9 94:3
**pollution** 102:3
**pop** 162:7
**population** 45:17
  46:19 48:2 52:24
  54:6 61:21 132:17
  154:20
**population-based**
  54:10
**portion** 110:2
**portions** 50:20
**pose** 83:24
**position** 193:19 195:1
**possibility** 188:3
**possible** 102:2 188:14
  189:9,22
**post** 125:19,24
  144:18 145:1
  149:15
**potassium** 39:3
**potent** 36:23
**potential** 17:5 19:17
  22:21 23:19 24:6
  52:4 54:1 77:17
  78:11,19,24 79:20
  80:4 84:20 93:9
  95:2 97:9,14 104:3

112:18 114:1 116:7
116:10 123:12
124:13 127:5
128:19 161:12,22
174:10 192:21
206:11 207:17
208:8,25
**potentially** 61:22
80:1,14 161:12
**practice** 48:23
113:16 134:3
143:15
**pre** 148:25 205:7
**precision** 153:13
**predecessor** 96:13
100:15
**predict** 200:1
**predicted** 201:11
**predicting** 199:21
**predominant** 39:22
**preliminary** 77:9
159:21,24 160:2
192:10,16,17
207:11
**preparation** 179:4
**prepared** 211:11
**presence** 174:22
**present** 4:22 48:13
182:8 205:3,11
**presented** 70:8
199:11
**preserve** 48:18
**pressures** 91:10
**presumably** 82:10
191:21
**presume** 9:23
**pretty** 88:2 155:23
178:20 206:7
**prevalence** 45:14
46:18 54:11
**prevalent** 12:21
**preventing** 61:7
80:17
**previous** 36:18 45:4
120:25 171:4
177:23
**previously** 75:23

81:6 85:9,23 120:13
120:20
**pre-1969** 147:3
**primarily** 11:24
14:25 15:1,8 90:23
140:19 145:20
**primary** 133:3
181:16
**principles** 100:11,13
117:15,20
**prior** 48:13,14 110:1
111:21 120:5
137:24 140:17
146:20 151:5
153:24
**private** 68:11,17
**probably** 8:23,25
22:10 26:2,3 28:21
29:3 54:16,25 66:14
91:7 127:24 164:15
170:13 198:25
210:21 213:3
**problem** 124:1
**problems** 93:20
148:14
**procedure** 48:18 64:1
**procedures** 76:21
**proceeding** 8:9
**proceedings** 6:10
70:9 210:22
**process** 9:3 160:10
173:6 194:24
**processed** 90:2
162:13
**processing** 165:20
188:7
**produce** 128:10
129:17
**produced** 20:20
128:11 175:9,12
182:15
**product** 14:23 63:23
**products** 158:20,21
158:24 159:2
**professional** 6:7
58:14 68:1 215:5
**professor** 10:7

**program** 12:13 51:19
68:4 99:8 104:9
167:16
**progress** 50:19
**progresses** 41:15
**progressing** 50:14
**progression** 41:25
50:9 56:9,13
**progressive** 35:23
41:15,25 42:5 50:5
50:7 51:1 54:23
56:7
**project** 121:22
**projects** 14:13 26:17
**prolong** 115:13
**promised** 53:9
**pronoun** 138:22
**pronounce** 38:21,22
**propensity** 119:4,16
120:6 129:3
**proper** 102:12 152:6
190:19
**properties** 114:4
**property** 7:9 164:8
**proportion** 152:12
**proposed** 106:10,22
**proposing** 192:8
**protect** 100:12,16
**protecting** 30:25
**protection** 11:25 12:7
12:10,13,16 13:1
14:3 21:8 115:1,16
**protective** 72:21
165:13
**provide** 31:10 62:5
65:10 68:3 71:17
**provided** 19:12 29:13
71:19 110:23
**provides** 61:21 97:8
108:10
**providing** 12:12 68:8
**public** 6:8 22:18
90:25 112:12 200:9
211:15 215:6,22
**publication** 43:14
71:9 73:18 75:15
86:2 212:19

**publications** 22:14
29:11 30:8,10,15
31:8 43:15,18,19,23
55:8 73:25 80:23
82:1 95:9 127:9
**publicly** 211:6
**publish** 27:10 79:14
168:6
**published** 19:20 20:3
20:7,14 22:14,16
23:12 44:20,22
51:15,18 55:9,11
70:25 71:8 73:20
75:2 77:13 78:7
81:14 85:8 88:22
89:4 92:22,23 100:5
113:12 118:10
125:25 126:1
131:17 149:6 155:4
155:9,22 156:3
163:24 168:8
**pulmonary** 31:18,24
32:18 35:23 36:12
37:13,14,14 42:1
46:13 48:1 52:11,14
55:17 57:16 58:6
**pulmonologist** 57:8,9
**pump** 152:25
**pun** 194:4
**purport** 185:16
**purporting** 187:14
**purports** 48:14
**purpose** 111:25
183:8
**purposes** 28:25 63:23
172:9
**pursuant** 6:4
**put** 15:3 23:23 44:15
53:16 86:12 87:10
89:10 92:17 99:7
103:4 164:8 207:13
212:20
**putting** 161:17
**P.O** 2:15

―――――――――
**Q**
―――――――――
**qualification** 151:11

W.R. GRACE & CO.          TERRY M. SPEAR, Ph.D.          July 29, 2009

**qualifications** 32:8
  50:23
**qualified** 31:23 42:25
**qualifies** 43:3 59:19
**quantification**
  123:17 154:1
**quantifications**
  135:21
**quantify** 134:18
**quartile** 45:25 46:5
**quartiles** 45:18
**question** 9:24 14:1
  23:8 25:4 26:19,24
  26:25 27:3 28:8,11
  30:21 32:1,11 33:8
  33:8,10,13,16,19
  34:1 36:3,8,9,9 39:4
  42:22 45:11 48:11
  48:14 49:1,6,9,21
  49:24 51:5 54:25
  58:19,20 63:14
  95:19 97:19,19,21
  99:24 100:1 104:16
  111:2 122:16 123:1
  123:15,18 124:7,11
  126:2 129:14
  136:12 138:21,21
  138:22,24,25 139:1
  139:9,12,16 152:4,5
  152:6,6 153:23
  167:12 171:10
  178:7 180:25 184:4
  185:3 186:13 208:1
  208:6,20 211:13,16
**questionable** 153:10
**questioning** 27:7
  124:3
**questionnaire** 51:23
  52:1,3
**questions** 9:7,19,23
  33:19,21 34:6 49:18
  49:18 124:2 140:10
  147:2 177:23 210:5
  210:21 214:7,17
**quick** 20:1 38:13
  41:18 51:11 193:12
  196:23 214:10

**quicker** 41:22 42:4
  47:20 48:3 50:25
**quickly** 41:17 48:7
  54:15 55:22
**quintiles** 45:18
**quite** 8:20 91:2 102:4
  172:13 189:9,22
**quote** 127:25
**quoted** 68:2 100:10
  108:17
**quotes** 106:13
**quoting** 101:2

**R**

**R** 77:10
**radiographic** 132:16
**radiology** 32:16 58:6
**rail** 16:17,18 175:21
  176:23
**railcars** 163:7,11
**railroad** 162:16,17
  162:19 163:1 188:2
  189:16,17
**Rainey** 164:19
  184:21 197:15
  213:20
**raise** 27:13
**raises** 188:2
**randomly** 186:5
**range** 9:1 22:6
  180:10
**ranging** 141:1
**rate** 55:19 61:20
  71:15 85:4
**rates** 31:16 54:6
  55:17 60:14,15
  61:13 137:23,24
**ratio** 148:1 153:14
**reach** 62:1 156:23
  184:11
**reached** 23:2 192:23
**reaching** 27:22
  128:17 156:9,12,13
  156:23
**read** 14:11 29:9,10
  29:17 32:3 33:7,10
  42:12 44:7 49:20,22

  50:13 52:8 58:24,25
  63:12 68:1,2,13
  75:7 77:11 90:6,11
  93:20,21 100:10,10
  100:18 102:24
  103:8,9 106:8,9,14
  108:4,16,17,22
  110:19 111:25
  112:4,19 113:9,19
  114:19,23 115:18
  118:6 124:7,9 126:8
  126:9,15,25 127:1
  128:19 131:19
  133:7 139:8,10
  141:3 150:13 151:9
  151:10 153:8,18
  165:16,22 167:17
  172:17 182:25
  187:25,25 188:10
  192:18 197:19
  198:14 199:9,13
  208:4 216:5
**readers** 52:8
**readily** 94:10 113:14
**reading** 37:25 38:2
  41:20 43:2 50:12
  61:5 110:4 118:3
  125:16 150:15
  170:5
**real** 20:1 41:18 51:11
  205:18
**realized** 168:2
**really** 14:5 31:21
  37:11 66:25 69:3
  71:5 78:20 98:15
  151:15 177:4,8
  179:25 188:18,23
**reason** 9:24 29:4
  134:13 142:17,20
  143:12 148:15
  158:10 179:16
  205:21
**reasonable** 149:10,23
  150:3 153:5 154:12
**recall** 29:19,22 69:1,9
  70:2,5 75:22 145:7
  145:8 168:12 211:2

**receiving** 86:5
**recess** 66:19 129:25
  197:3
**recognize** 131:22
  199:10
**recognized** 153:11
**recollection** 50:2
  211:19
**reconstruction**
  140:10
**record** 6:13 8:6 9:10
  9:16 26:23 48:19,22
  49:16,22 66:18,22
  91:8 106:8 108:17
  112:1 113:10 124:9
  129:24 130:3
  139:10 163:23
  187:15 197:2,6
  200:10 208:4,18
  214:24 215:15
**records** 61:19
**record's** 202:2 206:9
  207:7 209:17
**recycle** 94:9
**recycled** 90:10 94:4
**reduced** 203:1
**reentrainment**
  115:14
**refer** 16:16 17:14
  213:7
**reference** 89:3 110:6
  111:16
**referenced** 126:4
  140:9 211:5
**references** 88:4,5
  209:19
**referencing** 125:20
  126:3
**referred** 36:12
  210:16 211:2
**referring** 14:20 18:18
  31:16 40:10 45:8
  74:18 126:5 152:8
  169:24 170:12
  185:5
**refers** 27:1 50:8
  112:21,25 113:4

183:5
**reflect** 87:19 95:15
**reflected** 141:2
**reflects** 141:25
**refocus** 124:6
**regard** 27:8 150:6
**regarding** 36:19,24
47:17 55:12 64:24
70:23 122:17 125:9
130:7 133:6
**regardless** 156:20
**Registered** 6:7 215:5
**regulating** 145:20
**regulatory** 68:6
**relate** 88:14,22 89:22
104:22,25 105:22
106:2,5 107:3,7,10
107:22,24 117:21
117:25 147:2 184:5
**related** 13:24 14:7,14
22:15 27:5,15 28:19
42:11 58:22 67:25
70:19 88:8 121:16
127:17 136:4 177:9
177:11 209:15
**relates** 14:3 36:4,5
88:25 89:1 90:13
105:19 107:8,13
108:24 117:15
118:1 126:7 174:17
**relating** 107:13
**relationship** 74:15
122:25 123:4,9
**release** 115:6 122:18
122:22 124:17
127:5 128:15,19
199:16,22
**released** 119:4,6,16
119:21 120:3,7
121:13,14,19 123:6
129:3,13 160:9
165:19 166:3 167:3
168:23 170:9 175:4
196:14 212:14
**releases** 76:14 120:9
123:12,18 124:13
127:17 169:8,8

189:23 200:1
**relevant** 57:13 81:23
82:1 107:18 132:8
151:11
**reliability** 134:17
**reliable** 123:11
124:12 143:22,23
143:23
**reliably** 129:16
179:13
**reliance** 128:7
**relied** 125:11,13,15
128:16,18 148:20
**rely** 40:1,3 84:25
125:8 185:2 212:23
213:4
**remain** 91:25 93:15
**remained** 93:14
**remains** 115:4
**remediation** 118:6
**remember** 22:10
28:22,23 30:3 45:19
52:17 53:22 55:24
56:10,14 69:6,7
70:15,18 72:4 73:3
76:2,3 84:15 120:25
170:4
**REMEMBERED** 6:4
**removal** 115:10
118:22 122:13
**remove** 21:20
**repeat** 45:11 46:1
51:9 207:25
**repeatable** 176:10
**repetitive** 210:6
**rephrase** 9:25 26:10
29:25 41:1 51:17
159:18 161:23
163:5 173:17 187:8
196:13
**report** 5:21 40:2
60:23 71:20,22
73:10 87:5,17,24
88:2,13 89:3,5
93:24 98:15 102:1
103:18 104:1
116:25 128:3,4

134:24 135:2
148:25 154:9 155:9
156:5 166:24,25
173:7 179:13
209:12,18 211:21
211:22,23,24 213:5
**reported** 47:7,23
95:23 103:10
171:24 172:6,7
175:9 179:19
182:12,14 187:1
205:5,9 215:13
**reporter** 6:8,22,25
9:15 33:7,11 49:22
65:25 77:3 124:9
139:9,10 140:22
208:4 215:6 216:4
**reporting** 1:21 6:20
139:24
**reports** 45:6,11,14
60:19 83:10 93:20
93:21,23 155:15
**represent** 8:8 199:12
**representative** 13:17
62:16 135:9 184:25
185:17 186:6,16
187:8,11,12
**requires** 24:15
146:14
**requiring** 118:6
**research** 14:8,12,13
14:13,15,17 17:10
17:11,12 18:23,25
19:3 26:8,9,11,17
26:17,17 27:1,2,5,8
27:14,16,18 74:14
79:14,17 81:18,21
82:23,24 84:4,5,12
85:23 121:22
156:20
**researches** 171:4
**researching** 29:1
**reserve** 214:6
**reservoir** 126:12
**reservoirs** 5:18 75:1
**residency** 58:6
**residents** 103:10

126:14
**residing** 215:23
**resources** 186:24
**respect** 32:8 37:1
38:10 39:4 80:25
85:25 98:5 100:21
112:12 125:24
154:25 163:1 192:6
**respectively** 202:13
**respirable** 115:12
**respirators** 12:14,15
**respiratory** 11:25
12:7,9,13,16 13:1
14:3
**responding** 9:8
**response** 106:11
122:17
**responsible** 97:2,10
97:15,24 99:7,9
145:20
**rest** 110:20 214:6
**restate** 111:1 123:25
123:25
**restricted** 26:4 165:1
184:20
**restrictive** 200:5
**result** 128:24 188:2
**resulted** 188:15
**results** 23:13,16,17
27:10 51:18 52:15
125:8 126:10 154:1
167:6 168:7,9
171:12 173:7
176:10 198:11
200:23 201:19
**resume** 57:10,19
196:24
**retained** 68:18,23
75:18 76:5 81:3,12
81:14 86:1 189:23
**retention** 81:1
**revealed** 182:20
**review** 28:9,19 30:8
34:21 35:18 43:6
52:16 58:15 60:2
61:2 83:8 86:9
113:6,17 120:5

**reviewed** 29:20 30:1
  43:11 63:25 64:18
  65:15,18 92:3
  130:17 155:25
**reviewing** 27:19
**reviews** 27:25 28:2
**Rich** 3:5,7 7:8,8
**richterite** 38:20 39:5
  39:6,25 112:2
**riebeckite** 38:21
**right** 9:6 11:20 12:5
  21:13 26:3 44:10
  46:17,17 47:4,15
  52:10 53:3,18,19
  65:11 72:8,18 74:16
  80:17 88:3 90:16
  93:24 100:6 102:19
  103:1 105:9 106:22
  111:6,20 117:7
  121:9 122:6 123:8,9
  124:22 125:1 128:1
  141:10 145:10,12
  145:19,25 146:19
  148:10,12 149:2,8,9
  150:18 153:2 154:6
  154:8 155:7 156:22
  158:16 160:17,18
  160:23 161:10
  162:8,21 163:22
  164:6,23,25 165:2,4
  165:7 167:13 168:1
  168:20 169:16
  170:4,7 171:23
  174:1,3,16,18
  177:17 178:8,9,18
  179:10,15 180:9,21
  181:23 182:6,15
  184:6,8,15,20
  185:12 187:13
  188:25 190:10,10
  191:25 194:22
  195:21 196:18
  202:1,4,7,8,17,24
  203:3,23 204:7,22
  206:9,15,15,24
  207:5,10 209:8
  212:1,6,10,20

214:18
**risk** 50:17 122:1
  133:24 134:11,20
  138:5 158:5
**risks** 102:3,7,10
  112:18,19
**river** 162:15 170:4
  213:17,20
**road** 15:23 163:21
  164:12,15,20
  184:21 186:1
  197:15 200:13,13
  206:14,17 213:20
  213:25
**roadways** 186:14
**ROHRHOFER** 4:23
  66:25 208:14
  210:19
**Rohs** 43:14,16 44:13
  44:14,15,22,25 45:9
  45:11 46:10 47:10
  47:13,21 48:8 49:25
  51:12
**role** 14:5 57:2 61:6
  61:11 62:3,4,13
  63:1
**room** 204:11
**root** 167:24 168:4
**rope** 194:6
**rough** 183:15
**roughly** 54:8
**Rules** 48:17
**runs** 57:3,5 101:10
**R-I-C-H** 7:11

─────────────
        **S**
─────────────
**S** 2:21 5:14
**safety** 10:10 29:12
  68:5 131:5 141:12
  141:22
**sample** 164:23 166:3
  168:7 172:14,18,19
  176:14,15,19 177:6
  177:25 178:25
  179:4,14 184:10,17
  185:17 186:6,9
  187:10,11 188:2

198:11 201:7,13,14
  202:3 203:4 204:3
**sampled** 165:4
**samples** 13:13,17
  20:21,23 21:4 22:2
  22:4,6,7,8,10 24:5,6
  27:22,22 62:16
  83:21 119:7 121:24
  122:23 127:11,13
  140:16,18,20,24
  141:25 142:3,6,9,14
  142:25 143:1
  144:11 145:5
  146:20 153:13,15
  154:4 166:5,6 167:8
  167:9,10,11,14,19
  167:22,22,23 168:6
  168:13 170:21
  171:4,5,7,11,17,24
  173:22,23,24,25
  174:4,5 175:7
  176:11 179:6,6,8,22
  182:10 184:16,18
  184:19,24,25
  186:13,16 187:3,16
  187:19 190:19,23
  197:22 201:5,6,9,12
  206:7,7 207:10
**sampling** 11:25 12:8
  13:7,8,9,10,15
  17:12 20:25 21:6,6
  21:7,9,16,16,18,19
  21:23,23 27:23
  30:19 31:2 61:18
  68:6 78:22 91:9
  93:21 124:25 125:4
  146:16 166:11,17
  166:21 167:15,20
  187:2,9 190:19
  193:7
**samplings** 13:3
  140:25
**sanitation** 31:1 70:15
  70:17 72:21 76:21
**saw** 29:21 46:11,12
  158:23 191:12
  194:8,9,13,15,20

200:25 205:25
  206:5,6,19 207:18
  208:9
**sawdust** 202:25
**sawed** 193:20
**sawing** 191:2 192:12
  193:10 209:1
**saws** 194:11
**saying** 9:10 17:14
  36:20 37:24 42:12
  47:4 61:19 82:23
  92:7 152:11 171:8
  186:20 188:13,18
  188:23 189:1
  191:10 204:24
**says** 94:3 142:15
  151:3 192:17
**scale** 192:9
**scans** 182:10
**scenario** 206:10
**scenarios** 199:12
  205:24
**Schnetter** 101:4
**School** 178:11 180:4
**science** 10:25 78:8
**scientific** 60:2 74:14
  174:24
**scientifically** 140:7
**Scott** 44:17 157:22
**screened** 52:20,24
**screening** 51:16
  58:12 213:15,16,23
**seal** 215:18,24
**Seamans** 4:7
**searching** 100:3
**second** 26:13 34:1
  59:7 68:2 114:8
  154:19 165:15
  203:15
**sections** 156:6
**see** 26:2 45:24 74:19
  88:2 103:18 110:21
  110:24 147:25
  150:10,22 166:24
  167:6,7 171:6 177:7
  178:5,6 180:10
  183:9,12 184:17

185:8 198:21
204:12,16,17,19,24
205:17,19,20,21
206:20 209:18
**seeing** 41:21,25 45:3
47:25 48:6 58:11
60:14 61:13 94:8,11
147:20
**seek** 28:24
**seeks** 187:18
**seen** 35:25 59:9 60:11
64:16 65:22 82:18
148:5 159:2 161:14
182:9 200:11
**seldom** 148:7
**select** 186:5,6
**SEM** 182:20
**send** 73:19 84:13
101:16 179:6
**sending** 157:6
**sense** 123:16 136:13
201:24 204:18,25
**sensitivities** 179:11
**sensitivity** 134:14,17
176:5,6,8,13,16,19
176:22 177:12
178:1,16,19,22,24
179:7,11,17,21
**sent** 171:10 189:22
**sentence** 101:15
104:8 114:20 118:4
118:9,10 150:9
151:2 153:9 165:16
**sentences** 187:24
**September** 215:24
**series** 19:20 21:5
118:14
**serious** 103:25
**serve** 71:10
**Service** 19:16 20:8,11
20:17,25 21:24
22:13 23:13,21 24:9
24:11,14,14 25:5
166:8,22 200:10
212:3,5,13
**services** 71:13,17
**set** 215:17

**settle** 91:20 105:15
115:12
**settled** 16:9 105:9
121:3,3 122:10
**settlement** 64:25
**settlements** 65:3
**settling** 115:14
**seven** 184:18 197:10
197:11
**severe** 35:22 40:19
**shared** 109:7
**shed** 90:8 183:18
**shlepped** 194:14
**short** 134:12,21
135:10 194:3
**shorten** 49:17
**shorter** 133:22
137:12 138:16
139:14,22 140:5
173:4 206:2
**shorthand** 215:13
**short-term** 140:25
201:9
**show** 137:20
**showed** 95:6,25
**showers** 31:1
**showing** 61:20 97:17
163:21
**shown** 36:22 112:2
**shut** 166:10
**side** 200:14
**siding** 122:13,14
**Signed** 216:22
**Significant** 115:6
**silicates** 165:17
**Silver** 215:3,6
**similar** 70:16 112:16
143:18,20 188:6
199:17 207:8
**similarly** 112:21
116:9 159:12 186:4
195:24
**simply** 15:13 134:14
206:12
**simulate** 25:9 62:5
**simulated** 24:23 25:5
25:10,13,15,18

191:5
**simulation** 19:25
198:12
**simulations** 5:19 26:1
77:8 190:17 197:14
199:11
**sir** 26:23 42:6 48:20
68:13 75:7 76:23,25
77:11,14,23 78:9
82:7 83:17 87:5,17
89:1,17 90:11 94:18
94:23 97:21 100:1
100:18,23 101:18
101:22 102:23
103:23 104:4,11
106:14 107:19
108:22 112:4
113:19 114:2,23
115:18 118:7
126:15 130:8
131:19 141:3 142:4
142:5 144:15 145:3
146:9 147:3 148:3
150:13,21 151:9
152:7 153:18
154:10 156:11
162:22 164:2,11,20
165:22 167:17
182:25 188:10
197:25 198:14
199:13
**sit** 43:23 56:15
**site** 15:9,20,25 16:5
17:21,22 18:17 26:4
133:10,11 164:7
180:12 185:4,6,7,8
191:1,2 211:7,11
213:13
**sites** 166:6 188:7
**sitting** 56:1,5,11
57:15 59:2 65:19
82:19 123:4,10,10
124:11 128:6
129:11 172:8
179:25 184:8
199:25
**situation** 51:8 122:21

156:19
**six** 184:19
**skill** 215:16
**Slovak** 2:14
**slower** 145:9
**small** 12:1 48:25
151:5,7
**smelter** 29:5
**smoke** 92:20 93:11
**smooth** 182:24
**sodium** 39:2
**sodium/potassium**
170:16 171:16
175:8
**soil** 118:4,25 119:4,7
119:16,22 120:7,10
120:11,12,19,24,24
120:25 121:9,15,20
122:3,4,8,13,15,19
122:23,25 123:5,7
123:13 124:14,18
125:10 126:21
127:1,5,15,15,18
128:14,15,24 129:4
129:10,12,16
167:22 168:6,7,11
168:12 169:16
193:6 195:16,17
196:8
**soils** 119:6 125:6
126:24 128:20
**somebody** 24:7 99:20
135:13 191:24
**somebody's** 99:7
**somewhat** 90:8 91:13
93:2 158:21
**sooner** 41:23
**sophisticated** 112:1
**sorry** 13:8 24:2 29:16
29:23 41:11 74:2
129:7 130:21 132:9
138:1 142:18
**sort** 122:20 126:21
186:25
**sound** 53:3,18
**sounds** 53:19 198:16
**source** 18:9 92:17

111:11 114:21
115:7,20 123:11
124:12 126:12
181:16 192:12,15
**sources** 18:11,13
20:6 129:2 181:20
**south** 186:23
**spaces** 115:5
**speak** 9:13 32:8
96:23 102:21 116:6
116:6,10 129:9
134:5 180:1 185:22
**speaking** 9:14 17:15
19:6 43:3 50:12
113:21 114:3
126:24 160:16
168:21
**speaks** 101:20 102:22
102:25 104:3,7
109:11,15,20 110:2
110:16 111:9
113:24 114:7,10
**Spear** 1:17 5:3,18,21
6:1,5,15 7:22 8:7,16
27:4 66:5,6,21 75:3
77:10 78:7 130:2,5
130:17 134:9
138:23 163:24
197:1,5 210:24
211:1 214:21
215:10 216:1,25
**species** 183:21 184:7
184:10 186:16
**specific** 41:7 42:18
43:23 44:11 56:12
59:6 64:13 71:17
88:14 93:14 109:14
117:18 130:13
137:6 152:22
153:25 207:17
208:8
**specifically** 28:25
29:22 41:21 47:8
56:14 62:14 77:20
96:7 113:25 125:13
126:24 131:25
144:18

**specifics** 56:10
**spectrum** 180:11
**speculating** 193:13
**speeds** 91:9
**spelled** 102:4
**spelling** 26:6
**spend** 170:5 198:23
**spent** 152:12
**Spokane** 159:21,25
160:8
**spot** 183:11
**Sprayed** 115:15
**spread** 212:25
**spring** 12:6,7 69:1
**square** 176:2 177:7
178:13 203:7
**ss** 215:2
**St** 58:2,2 169:15
**stack** 79:24 103:1
193:21 198:19
**stackers** 194:5,16
202:12
**stacking** 209:1
**stage** 192:20
**stagnant** 94:8,13
**stand** 25:16 141:11
141:21 207:23
**standard** 113:16
134:3,15
**standards** 31:3 72:2
72:5,10 108:21
**standing** 198:6
**standpoint** 48:3
60:17 91:2 92:20
192:11
**Stansbury** 2:4 5:4,6
7:1,1,17,20 8:2,8
23:6,15 25:3 26:20
27:4 28:16 31:25
32:12 33:20 36:11
48:16 49:4,12,20
50:4 51:10 53:12
58:21 63:21 64:17
65:24 66:4,16,23
67:1,5,15 74:21,25
77:2,6 78:2 85:12
85:14 87:7,15 92:9

92:13 97:20 99:25
101:8,10 110:23
111:3,6,8,14,20
116:22,24 117:14
123:20 124:5,19
129:21 130:4
131:12 138:23
139:4,8,16,19
149:14 152:7
163:22 164:1 194:9
194:12,19 196:22
197:7,11,13 207:25
208:12,21,22 209:5
209:8,11 210:7,14
210:17 214:9,18
**start** 14:13 37:13
134:19 170:20
180:16 183:12
186:20 189:20
191:15
**started** 69:4 150:20
166:19 192:8
**starting** 140:14
185:18
**state** 6:8 48:18 49:5
82:23 101:15 102:1
105:19,24,25 106:1
113:22 140:19
142:10 143:3
213:25 215:1,7,22
**stated** 9:22 28:13
36:5 64:13 112:6
175:2 201:8 207:15
207:24 208:6
209:11
**statement** 48:22
49:15 91:12 126:8
153:20 164:11
189:7
**statements** 130:6
140:5
**states** 1:1 99:19
115:1 131:7 188:5
189:5 206:10
**static** 91:25
**stating** 207:7
**station** 176:23

**stay** 30:5 79:24,25
**stayed** 31:19
**staying** 187:22
**stays** 183:17
**step** 38:13
**steps** 99:21
**stick** 194:4
**stir** 18:6
**stop** 50:17
**stops** 50:9
**stove** 78:22
**stoves** 162:7
**strategies** 12:8 13:7,8
13:9,11
**strategy** 11:25
**street** 2:7 3:9,19 4:18
91:5
**strike** 36:25 49:15
51:24 61:23 62:11
63:16 69:8 80:10,23
122:8 143:13
154:17
**strive** 9:13
**structures** 203:7
**student** 183:24
**students** 12:12,24
13:20 201:25
**studied** 14:24 15:7
17:7 18:1,2 91:23
92:4 120:6,9 159:19
**studies** 20:5,6,9
23:23 29:19 31:9,11
31:24 43:13 45:4,23
54:10 58:16 60:10
60:13 73:23 84:24
84:25 85:7 88:22
93:16 100:5 103:18
110:9,11 111:18
113:12 118:11
119:25 124:15,20
124:23,24 125:3,13
125:20,25 128:22
134:1 138:4 148:8
148:24 149:3
153:15 174:14
182:6 188:6 211:1,2
211:5,10

**study** 19:25 20:2,3,10
  20:13,25 23:2,14,22
  24:23 29:21 43:16
  43:17,17,17,24,25
  44:2,8,13,14,14,15
  44:16,19,25 46:3,8
  46:10,21 47:10,13
  47:14,16,21 48:8
  49:25 51:22 53:4
  60:13,16,23,25 62:6
  62:17 79:22 84:7
  90:22 100:12,16
  105:19,20 106:1,10
  106:13,19,23,23
  110:25 118:11
  127:21 132:10,11
  132:14,20 135:24
  138:18 142:17,19
  142:24 148:20
  154:20,25 165:24
  166:12,14,22
  174:16,19,22
  191:19 192:9
  197:23 199:11,16
  207:11,12 210:16
  211:14,17,17
**studying** 15:13 119:3
  122:18 182:4
**stuff** 108:15 162:5
  183:16
**subject** 32:5 86:7
  208:3
**submission** 87:24
**submitted** 64:18
  73:10 74:13 86:14
**submitting** 80:22
  86:10
**substance** 136:6
  137:3,21 138:11
**substances** 93:10
**substantial** 126:12
**substantive** 69:20
**successor** 141:19
**succinctly** 48:18 49:5
  49:7
**suggest** 171:18 181:8
**suggested** 140:1

**suggests** 188:6
**suit** 165:13
**Suite** 3:9 4:8
**suited** 186:10 198:22
**suits** 198:24
**Sullivan** 43:14,16,24
  51:11 110:12
  155:19 156:2
**summaries** 31:10
**summarize** 42:6
  48:14 70:6
**summarizes** 144:10
**summary** 58:17
**summer** 12:5 20:25
  20:25 21:1,24 69:2
**summers** 51:19
**summertime** 198:23
**support** 38:4 47:17
  48:9,12 49:25 82:3
  174:19
**supports** 174:24
**suppose** 57:14 80:16
  82:6 160:11
**Supreme** 109:25
**sure** 12:24 15:22
  26:18 29:10,18,21
  31:2,14 33:8,21
  41:9 43:21 57:9,14
  60:21 61:16,21
  62:15 64:16 66:16
  73:18 84:1 88:18
  95:18 97:13 99:17
  106:21 110:4 114:9
  117:11 125:7
  135:12 136:15
  138:14 139:12
  144:8,20,22 148:8
  150:5,14,16,16,16
  150:18 153:6
  167:21,23 181:3,3,6
  186:11 190:5
  196:17 198:4 202:1
  207:6
**surface** 21:19 121:2,4
  121:13,23 122:1,10
  182:21 183:14
**surfaces** 182:24

**surrounding** 15:25
  159:25 165:21
  167:15 191:23
**surveillance** 51:18,25
  99:8 104:9
**survey** 29:15 159:24
**suspect** 146:15
**Sutcliffe** 3:17
**swear** 6:25
**sworn** 7:24 215:10
**symptoms** 115:9
**system** 167:24 168:4
**systematically** 91:23

——————————
        **T**
——————————

**T** 5:14
**table** 140:23 141:23
  141:24,24 142:15
  142:20 144:9,9,10
  144:23 147:25
  154:9 167:6 172:11
  173:3 175:15
  198:10 199:4
  200:16,19
**TAG** 42:14 93:17
  125:17
**take** 7:9 11:13 20:23
  21:4 38:13 61:25
  66:15,16 87:13
  122:23 129:21
  134:21 141:7 144:5
  167:21 180:4
  187:16 191:5 193:6
  194:14 196:23
  201:7
**takeaways** 52:18
**takehome** 76:16,21
**taken** 1:19 6:5,15,19
  8:17 20:21 24:5
  66:19 129:25
  140:16 153:15
  154:4 167:24 168:4
  171:17 185:16
  188:13 189:11
  197:3,22 215:12
**talk** 12:9 13:1 30:25
  37:12 47:1 70:22

79:2,5 89:11 124:23
  213:8
**talked** 53:4 191:17
**talking** 33:23 34:2,4
  36:21 37:15,15,16
  38:14 40:5,6,22
  41:17,20 44:16
  46:18 50:13 74:13
  83:3 96:4,18 102:19
  114:14,15 118:19
  121:5 123:16
  125:19 126:17
  127:1,20 138:3
  147:21 149:16
  153:25 161:1
  168:24 173:23
  189:15 191:17
  192:2 198:17
  202:25 204:10
  205:8 209:19
**talks** 55:18 98:15
  99:18 110:20
  111:17
**tape** 66:20 130:1
  196:23,24,25 197:4
**Tara** 77:10
**task** 193:22,24
**tasks** 119:2 193:17
  202:15
**taught** 11:23 12:7
**TDP** 64:4,7
**teach** 11:22,24 12:6
  13:19 201:24
**teaching** 11:19 12:12
  14:2
**Tech** 8:15 10:3,13
  11:8,12,16,19 13:23
  14:2 73:2 122:15
**technical** 42:14 93:17
  125:16 127:24
**technology** 12:1 78:8
  134:19
**Telephonically** 3:4
  3:14 4:4,13
**tell** 15:17 68:1 71:2
  89:15 90:6 103:8
  106:9 165:16 167:3

W.R. GRACE & CO.                TERRY M. SPEAR, Ph.D.                July 29, 2009

171:12 172:5 199:8
**telling** 99:21
**tells** 47:5 119:5
**Telphonically** 2:20
**TEM** 173:7 176:14
203:4,12 204:3,5,7
204:12,12,16
205:20,21
**temperatures** 91:10
**ten** 13:24 14:6,9
**tend** 90:10 94:4
122:8,9
**tendency** 121:12,14
121:19
**tends** 91:19,20
**term** 28:7 40:9 48:12
59:8,9 89:21 90:18
97:17 98:22,23,24
99:5,6 109:2,3
117:10 119:10
168:14 169:2
**terms** 24:9 119:6
133:4 138:3 149:25
156:20 161:12
169:24 171:10
177:6 183:2 205:25
206:18
**Terry** 1:17 5:3 6:1,5
6:14 7:22 8:7 66:6
66:21 75:3 77:9
78:7 130:2 197:1,5
214:21 215:9 216:1
216:25
**test** 24:19 102:19
**testified** 7:25 25:2
36:18 75:22,25 76:4
76:8 81:6 85:9
212:23
**testify** 31:23 36:7
42:9,21 76:17
209:10
**testifying** 23:4 74:9
80:23
**testimony** 58:18
63:19 65:20 68:8,16
76:19 84:20 101:3,7

123:25 124:3 208:3
208:19,24 209:14
209:23 212:24
**testing** 12:14 31:18
166:8
**tests** 52:12,15 95:5
167:7
**Texas** 3:10
**textbooks** 29:11
31:15
**thank** 101:8 117:12
137:1 197:12
203:15
**thanks** 210:20
**theoretical** 115:11
**they'd** 168:3 194:17
**thickening** 59:8,11
**thin** 36:22 205:18
**thing** 133:16 170:25
176:4 180:16
205:17 207:11
210:25
**things** 13:18 15:23
16:19 28:5 29:13
30:18 31:1 41:16
48:6 70:16 71:8
90:2 91:10 93:12,22
96:22 126:5,21
140:12
**think** 10:14 12:3 18:5
26:13 37:6 39:2
43:7 44:23 47:24
49:10,12 50:22
53:25 56:8,11 57:11
57:13 58:23 59:3
60:24 61:14 70:11
70:21 81:25 86:13
88:11,20 89:20 93:8
97:16,19 110:21
116:8,17,20 117:14
118:11,11 120:24
121:16 123:15,18
123:20 124:22
126:25 127:23
134:11 137:22
138:4,6 141:13
143:23 145:21

149:24 154:15
156:21 162:13
163:24 164:7 166:7
168:17 169:8 170:3
170:3 171:1,5,7,15
177:8 178:25 183:4
183:21 186:19,19
189:1 192:17 194:3
194:5,18 196:22
200:9,11 201:8
204:6 207:23
208:15 213:25
**thinking** 205:1
**third** 17:2 203:19
**Thirty** 120:19
**Thomas** 2:4,24
**thought** 41:12
**thousands** 91:6 169:5
**threat** 83:24
**three** 86:11 95:1
103:21 132:8,9
133:2 167:7,9
198:11,16 199:2
203:11
**threw** 53:14
**throughout7** 165:20
**tie** 51:11
**time** 6:5,12 11:8 28:4
29:10 31:20 48:2
65:22 66:15,17,22
68:19 70:24 72:10
74:1 75:14,21,25
76:3,12 96:20
101:21 103:1 104:8
105:23 106:3
107:18 115:3
121:25 123:22
127:10,12 129:20
129:23 130:3,19
131:2 133:11
149:12,21 152:12
153:13 158:22
170:5 171:14 182:7
183:18 186:15
197:2,4 198:21,21
198:23,25 199:1
201:14,19 208:21

214:7,23 215:12
**timeline** 211:25
**times** 8:19 9:13 54:8
72:2 73:7 104:9
115:11 140:9 199:2
**time-weighted** 47:23
201:11,13,23 202:3
**title** 10:6,7 30:14
192:18 199:3
**today** 9:18 51:9 56:1
56:5,11,15 57:15
59:2 65:19 82:19
84:19 85:2,21 87:5
110:11 111:11
123:4,10 124:11
128:6 129:11 141:7
149:12 172:8
179:25 184:8
199:25
**told** 168:17 175:6
200:10
**Tom** 2:12 7:3 101:9
209:6
**Tony** 75:3 77:9 78:6
86:13 92:16 93:3
94:1,5
**tools** 25:24,25
**top** 167:14 193:14
**topic** 12:24 56:15
100:4
**total** 138:6,8 198:3,5
202:15 203:19
**town** 15:10 162:16
180:13 186:21
**tox** 111:17
**toxic** 40:19,21 110:1
111:10 133:23,23
**toxicity** 45:2 58:23
59:1 62:22 109:23
110:2,10,24,24
111:9,12,17,21
130:7,14 132:4
136:6,10,16 137:3,8
137:20 138:11,17
139:24 210:3
**toxicological** 32:3
110:9

**toxicologist** 32:4
  40:17 112:9 130:10
  135:19 209:25
**toxicology** 29:13
  112:13 130:16
  135:21
**track** 178:11 188:24
  189:16,17
**trail** 24:17 25:10
**trails** 25:11
**trained** 57:21
**training** 12:15 32:13
  32:15,18 40:25 41:3
  41:5 57:12,16 68:7
  119:3
**transcribed** 215:14
**transcript** 101:4
**transferred** 16:22
  181:2
**transition** 148:13
**translates** 172:22
  176:1
**transmission** 171:11
**transport** 18:21
**transportation** 15:10
  16:6,7,12,14,17
  17:1,22 188:3 189:3
**transported** 162:15
  190:9
**trapped** 174:21
**travel** 114:21 115:23
**traveled** 11:17
  174:25
**traveling** 16:4 17:20
**travels** 164:16
**treated** 64:7
**tree** 13:3 24:18,19
  25:13 75:11,12
  166:9 167:14,19,22
  167:23,25 172:13
  175:19 177:15
  181:5,8,20 184:2,2
  184:7,10,11,12
  186:16 190:3
  193:19 194:20,21
  195:15 196:6
**trees** 5:18 25:16 75:1

166:9,9 174:11,22
  174:23 175:1
  177:18 180:11
  183:18,20 186:6,23
  187:11 188:6,16
  189:17,24 190:2
  191:15 193:10
  195:1 198:2,4,5,7,8
  198:18 199:1
  207:13
**tremolite** 36:20,21
  37:20 38:20,24 39:6
  39:13,25 110:9,11
  111:10,21 112:3
  131:15
**trial** 68:22 69:16 70:9
  76:13 101:7 198:20
  198:24 199:2
**trials** 198:12,17
**tried** 174:13 179:2
  186:8,8,13,15
  193:16
**trips** 11:15,17
**truck** 16:19,20,23
**true** 82:8 205:13
  213:13,14 215:15
**trust** 63:25
**truthfully** 9:19
**try** 38:22 81:21 93:19
  125:5 139:16
  143:17 144:5
  148:17 180:23
  186:15 201:24
**trying** 14:5 15:16
  16:24 26:23 78:15
  79:14 98:13 99:15
  108:14 116:13
  120:24 121:25
  126:2 128:9 134:18
  147:19 149:10,24
  150:1,2 153:5
  156:22 162:25
  166:7,19 172:5
  174:14 180:15
  187:14,16,21 191:8
  192:11,24
**Tucker** 131:17

**Turbulence** 115:13
**turn** 96:3 141:23
  197:9 198:10
**TWA** 141:2 202:3,3
  203:4 204:3
**twice** 214:18
**two** 13:21 33:18
  70:11,13 73:2
  184:19 187:24
  193:23 194:14
  203:11,22 215:14
**type** 14:23 27:25
  35:14 37:4,14 69:23
  91:24 92:21 137:7
  166:9 177:9,11
  179:4 192:5
**types** 12:14 16:18
  17:11 31:10 34:3,22
  35:25 41:24 45:5
  54:9 60:13,14 125:6
  126:5 148:14 159:2
  177:14,15 191:7
  204:16
**typically** 90:21 135:4
  143:17
**Tyvek** 21:7

———————————

**U**
**ultimately** 19:19
  106:16 108:8 116:6
**um-hmm** 9:10 125:2
  144:14
**uncomfortable**
  133:24
**underestimating**
  151:20
**undergraduate** 13:19
**underlying** 142:24
**understand** 9:25
  17:13 28:3 33:9
  40:10 47:6 48:23
  53:8 73:6 76:19
  97:20 99:25 116:17
  123:3 135:20
  138:13,14,24
  139:13 176:18
  179:10 180:25

186:20 188:12
  191:16
**understandable**
  49:18
**understanding** 23:19
  27:7 29:1 39:1 42:7
  46:8 50:8 51:7 56:2
  56:13 62:9 96:8
  109:12 110:10,17
  110:18,21 112:17
  113:1,5 116:1,19
  118:18 145:19
  200:7,8
**understood** 9:23
  26:19 128:16
  163:24
**undertaking** 192:16
**under-counted**
  139:21
**unexpanded** 157:8
  161:5,8,11,19 162:1
  162:9,11,19,21,23
  163:7 189:10,21
  190:7,10,13
**unintelligible** 28:12
**Uninterrupted** 10:15
**unique** 50:10
**United** 1:1 131:7
  188:5 189:5
**units** 162:24
**University** 8:15 10:4
  10:20 11:1,2,5,11
  19:1,7,11,12,24
  20:2 67:23 84:8
**unloading** 16:23 17:2
  17:23
**unpack** 12:4 36:2
**unpublished** 155:14
**unreliable** 148:17,19
  148:23 149:25
**unsettles** 16:9
**unsupportable** 140:7
**untrue** 213:13
**updated** 73:13
**upright** 195:1
**USA** 77:9
**use** 28:7 40:9 67:11

W.R. GRACE & CO.          TERRY M. SPEAR, Ph.D.          July 29, 2009

67:12,12 98:13,23
98:24 99:5 114:12
138:10 143:14,25
148:5 149:9,22,24
150:1,2 169:2 173:6
179:5 189:14 204:2
204:3
**Usually** 177:5
**Utah** 19:12,24 20:2
84:9
**U.S** 68:19,23 69:10
71:18 72:25 74:1,10
75:15 76:13 81:3
86:20 115:16

————————
**V**
**v** 4:5 101:4 148:1
**vague** 27:1 33:13,16
97:17,19 139:2
**vaguely** 143:11
**valley** 90:8,8 91:12
91:20
**value** 65:3
**values** 144:11
**variability** 171:1,6
**variable** 177:15
**variables** 146:16
**variety** 68:3
**various** 35:4 60:20
72:2 73:22 95:5
143:5 158:19
159:17 167:7
**vermiculite** 5:22
14:18,20,21,23,25
15:1,3 17:12,14,23
71:23 117:23
121:24 126:11
131:15 155:11,16
156:10,16 157:8,11
157:14,15,23
158:20 159:6
160:13,21 161:5,8
161:11,13,20,22,24
162:3,11,20,24
163:7 168:23 170:9
180:23 181:1,4,7,11
181:13,14,16,19,20

181:21,25 182:1,8
188:4,7,13 189:4,11
189:21 190:7,10,13
196:1 197:16
**versus** 33:23 204:12
**VI** 154:9
**videographer** 4:24
6:12,23 66:17,20
129:23 130:1
196:25 197:4
214:15,20
**Videotape** 5:8,9,10
5:11
**videotaped** 1:17 6:14
66:21 130:2 197:1,5
214:21
**violations** 108:20
**virtues** 154:24
**Vitae** 5:16,17
**volume** 179:9
**Vorwald** 110:6,7,8
111:17

————————
**W**
**wait** 22:25
**walk** 88:12,17 140:13
164:22 165:3
180:19 194:16
**walked** 153:1
**walking** 25:15,16
194:17,23 195:17
195:18
**wall** 15:2,2
**walls** 15:4 17:17
**wandering** 165:10
**want** 22:25 41:9
48:21 68:15 82:22
91:9 98:13,24 99:16
116:16 118:15
120:23 136:12
144:17 150:14
177:6 202:1 204:1
207:6,23 210:25
213:12
**wanted** 40:24 41:18
62:5 73:18 83:18,19
84:16 137:8 140:13

164:23 167:21
180:16 185:19
192:10
**Ward** 75:3 77:9 78:6
86:13 92:17 94:1
**Ward's** 93:3 94:5
**warn** 100:12,16
**warning** 102:9
**Washington** 2:8,25
3:20 4:9
**wasn't** 71:5 79:21
81:11,11 84:11
85:17 153:3 195:18
**watch** 162:7
**way** 15:12,21,25 16:9
17:2 18:11 20:17
23:23 37:21 40:15
44:2 56:2,6,12 72:7
90:2 96:22 97:3,4,5
98:22 99:19 101:11
109:14 116:2
117:18 118:23
134:4 137:7 139:17
152:23 166:2
170:19 171:24
180:1 181:23 183:5
183:16 185:9,20
186:21
**ways** 94:20 164:12
168:18
**wear** 12:15
**wearing** 21:7 165:13
**weather** 37:8 42:19
**web** 185:4,5,7,8
211:7,11
**Webber** 75:6 78:7
177:20
**WEDNESDAY** 6:2
**weight** 60:22,25
**weighted** 152:11
**Weis** 126:4,6 127:6
128:21
**well-done** 60:24
**went** 11:14 46:14
151:23
**weren't** 57:23 58:1,5
95:12 151:22

**wet** 144:18,25 146:6
**we'll** 16:8 51:10
196:24
**we're** 6:12 10:1 12:5
13:17 15:15 20:9
38:14 40:5,6 41:9
44:16 45:3 48:6
52:21 66:14,17,22
67:11,11,12 74:12
74:13 75:1 84:5
91:8 96:18 99:17
103:15 107:15
110:23 113:21
114:14,15 118:19
121:22,23,25
125:18 126:6
129:23 130:3
134:18 135:12
136:15 147:16,19
147:21 148:11
149:14,16,21 152:8
153:22 160:13
161:1 169:1 174:14
189:15 192:1
193:13 197:2,6
202:25 204:10
205:19 214:24
**we've** 14:8 15:8
19:16 26:8,11 27:6
119:5,7 122:15
128:21 134:22
166:6,10,11 171:14
171:17 174:13
188:19 191:10
200:25 204:17
212:4,4
**Wheeler** 131:16
**WHEREOF** 215:17
**Whitehouse** 55:21
56:16 103:19 104:2
**Whitehouse's** 43:15
43:18 55:5,16
**widespread** 102:2
**willing** 70:10 88:17
174:9
**Wilmington** 4:19
**winchite** 38:19,24

W.R. GRACE & CO.    TERRY M. SPEAR, Ph.D.    July 29, 2009

39:10,19,21,24
112:2
**wind** 90:9 91:9,9 94:4
**windblown** 18:14
**winter** 69:1
**wintertime** 91:17
**wipe** 21:6,16,18,19
21:20,23 22:7,8,10
195:10 198:11
**wipes** 22:9,9
**wiping** 21:19
**wish** 87:25
**Wisler** 4:14 7:18,18
**withdraw** 211:16
**witness** 5:2 6:25 7:23
23:7,9 26:16,21,22
28:14 30:23 31:22
33:15,18 48:19 49:3
49:10,17 50:2 51:6
53:10 63:18 68:8,15
68:18 70:11 71:11
92:5,11 97:18 101:6
111:16 116:19
123:16,21 124:15
139:5,6,7 194:16
210:14 215:9,16,17
**witness's** 26:18
**wood** 78:12,15 79:23
83:19 92:20 93:11
180:3,12 191:12
192:13 194:14
198:19 209:1
**woods** 82:20
**word** 28:17 33:13
94:9 99:16 100:5
183:25 189:14
195:19
**words** 92:18 98:13
120:23 134:17
171:2
**work** 8:14 12:23
13:23 14:6,10,12,12
14:13 19:4,12,14,14
19:19 20:16 22:12
22:13,15 23:9,12
24:3,4,13,14,16
35:18 42:13,13

57:13 61:4 69:5
70:23,25 81:23,25
84:17,18 87:23 93:3
93:5 94:5,6 120:25
120:25 122:2,17,18
123:5,8 126:19
143:18,20 148:9
153:16 159:21,22
160:12 166:19,20
170:18 171:3
177:16 186:10
187:7 188:19 192:7
198:22 207:12
212:2,5
**worked** 10:12 14:14
44:9 58:1 73:3
86:16 139:23 160:3
185:20 192:4
207:18 208:9
**worker** 72:15 132:21
152:12
**workers** 12:15 20:12
23:25 30:25 44:9,16
45:15 100:13,14,16
100:22 105:19
106:11 108:19,19
115:9 126:14 144:2
151:8,14,22,23
152:2,13,18 158:4
158:13 161:17,17
**working** 11:7 19:16
23:25 29:5 46:19
48:1,2 50:15 54:6
61:14,20 72:17 74:1
75:15 76:12 86:16
86:19 114:5 117:5
120:6 125:6 131:1
132:17 138:15
139:14,20 160:14
212:4
**workplace** 13:11
61:19 72:7
**works** 56:25 183:16
**worse** 206:16
**worst** 194:18 206:12
**worst-case** 199:12
205:24 206:10

**wouldn't** 91:2 122:11
148:10 181:22
204:20 213:3
**wrinkles** 182:23
**write** 20:1
**writing** 74:5
**written** 71:20,22
**wrong** 55:19 172:12
178:9
**wrote** 131:2
**W.R** 1:7 6:17 7:2 8:9
72:9,14 75:19 76:14
96:12,19 100:15
101:4 133:8 214:22
216:3

---

### X

**X** 5:1,14 129:16
136:9
**x-ray** 51:23 52:6
**x-rays** 52:8 53:17

---

### Y

**Y** 129:17
**yeah** 10:16 13:14
16:14 23:9 28:14
30:23 32:2 33:22
52:21 58:22 61:4
67:1,11 69:23 75:5
78:14 83:18 89:18
93:4 95:22 100:7
105:7 110:6 111:3
111:16 118:1 119:7
125:15 126:3
129:21 130:22
133:21 141:15
152:24 154:1
162:10 163:21
167:9 168:12 170:3
173:6,22 177:4
178:17,25 179:14
179:21 181:15,18
191:10,12 193:16
195:22 197:23
200:11 203:25
206:7,23 208:13
210:19

**year** 144:12 156:24
156:24
**years** 10:13 11:23
13:24 14:6,9 19:13
19:15 26:18 30:3
46:12,14 50:16 58:2
61:5 68:7 98:5
101:16 114:17
115:21 116:3
120:16,19 128:19
165:20 166:4,4
169:5
**York** 175:18 176:20
177:2 188:20

---

### Z

**Zolnikov** 77:10
**zone** 21:12,15,23
26:4 83:21 195:13
197:16 198:13
199:5 200:5,23
214:12
**zones** 195:8
**Zonolite** 17:16,24
18:8 96:13,19
100:15 159:12

---

### $

**$150** 71:16 85:4

---

### 0

**0** 165:20
**0.07** 202:12
**0.1** 134:15 147:20
173:8
**0.11** 206:1
**0.12** 202:12
**0.13** 178:11,16
179:18
**0.25** 178:12 205:18
**0.26** 202:10
**0.29** 202:15
**0.3** 47:24
**0.4** 47:24
**0.5** 47:24 147:20
**0.67** 103:21
**0.72** 202:6

W.R. GRACE & CO.          TERRY M. SPEAR, Ph.D.          July 29, 2009

**0.8** 144:19 145:3,12
**01-01139** 1:7 6:17
**03** 70:25
**09** 6:2

---

**1**

**1** 5:8,16 66:1,3,6 67:2
  67:9,9,10 72:15
  88:19 118:15,19,21
  125:11 164:4,6,22
  165:3,10 167:8,9
  172:11,14,19 177:7
  180:11,18 197:13
  200:16,19 213:10
**1A** 172:14
**1%** 118:5
**1,186** 53:20
**1,214** 145:5
**1.1** 103:22
**1.2** 176:23
**1.5** 103:22 197:18
  213:25
**1:07** 197:2
**1:17** 197:4
**1:37** 214:23
**10** 94:19 95:2 153:7
  177:1,23 186:23
**100** 147:13 172:22
**11** 1:5 94:20 95:2
**11%** 112:2
**11:08** 129:23
**11:47** 130:3
**1107** 4:18
**1152** 3:19
**119** 102:5
**12** 95:5
**1200** 4:8
**13** 96:3,4 99:18 100:8
  100:9
**130** 5:10
**131** 5:22
**14** 100:9
**1401** 3:9
**15** 100:25 101:6,10
  215:24
**15th** 3:19
**16** 101:24

**17** 52:19,25 102:15
  102:17
**1734** 1:22 6:20
**1747** 4:8
**18** 103:7 114:16
**19** 104:6 114:16
  175:23 176:18
  179:16
**1942** 140:17
**1950-1990** 103:11
**1951** 111:18
**1956** 110:1 142:10
**1960s** 113:11,22
**1962** 144:12
**1964** 102:1
**1965** 103:12 148:25
**1966** 101:17
**1967** 102:18 140:20
  142:6 144:12
  149:15
**1968** 102:5 140:17
  150:11 151:5
  153:11,24
**1969** 140:18 142:10
  146:21,23
**197** 5:11
**1970** 142:13
**1971** 142:3
**1974** 140:24
**1975** 103:20
**1976** 145:7 146:6
**1978** 28:21 115:17,22
**1979** 29:3,20,21,23
  30:1,6,9
**1980** 106:10
**1981** 142:3
**1982** 142:14
**1987** 103:18 130:18
  131:17
**19899** 4:19
**1990** 104:10
**1996** 11:6 156:19
**1999** 125:19,24

---

**2**

**2** 5:9,17 66:20,24
  67:4,7 88:20 140:14

163:17,18,23
  164:10,13,22 165:4
  165:10,14 180:18
  183:9 198:10
**20** 6:2 61:4 68:7
  103:17 104:1,13
  115:13 120:16
  141:1 166:3
**20-something** 46:14
**2000** 51:19
**2000s** 76:3,8
**20005** 2:8,25 3:20
**20006-4604** 4:9
**2001** 51:19 129:6
**2003** 14:9 18:25 19:2
  19:7
**2004** 55:9,14,18,21
  56:1,5,16 129:6
**2005** 68:25 69:4 70:3
  73:14 127:24
**2006** 73:14 74:13,16
  75:2 79:9 80:20,25
  85:8 127:24 163:16
  171:23 197:14
**2007** 20:3 44:23
  76:22 77:14 78:23
  80:5,21 81:1 82:2
  84:4,7 85:8 155:22
  174:16
**2008** 5:16 21:25
  44:23 55:11 66:7
  73:15 76:7,8 81:12
  86:3 155:22 211:19
**2009** 1:24 5:17 6:20
  67:7,10 73:15 77:22
  77:23 78:8 79:5,19
  80:21 81:1,2,13
  85:8 86:1 89:4
  209:12 214:23
  215:19 216:2
**2011** 215:24
**21** 104:16
**210** 5:5
**214** 5:6 215:15
**22** 104:19
**23** 104:22
**2325** 2:15

**24** 104:25
**25** 105:18
**26** 10:13 46:15
  105:25
**27** 88:3 95:6,25 106:5
  106:8
**28** 107:3,6
**29** 1:24 6:2,19 107:7
  214:23 216:2

---

**3**

**3** 5:10,18 54:8 74:24
  79:8 80:20,25 88:20
  88:25 115:12 130:1
  141:24 163:17
  164:18 165:6,7
  167:5 196:25 201:3
**3,279** 142:14
**30** 8:22 61:4 107:10
  115:21 120:18
**31** 107:21 116:2
**32** 88:4 107:24
**33** 108:2,3
**336** 140:18 142:9
**34** 108:16
**35** 109:10
**36** 109:20 110:4
**37** 112:15 164:19
  184:21 197:17
  214:2
**38** 112:21
**39** 112:25

---

**4**

**4** 5:11,19 46:15 77:5
  77:7 78:24 80:5,21
  81:1 83:13,14 84:7
  88:21,25 89:1
  115:12 144:9
  175:15 176:5
  178:22 190:16
  197:5,8 213:7
**4's** 177:24
**40** 95:6,25 113:4,9
  166:4 198:25,25
**41** 113:24
**4116** 140:20

W.R. GRACE & CO.          TERRY M. SPEAR, Ph.D.

**42** 114:6,19
**43** 116:9,25
**44** 117:14
**45** 117:21
**46** 118:3 129:8
**461** 163:23 165:14
**462** 167:5
**4620** 3:9
**464** 182:18 187:22
**48** 126:4,7

---
**5**
---

**5** 5:20 78:1,4,5 80:21
  81:1,13 88:21 89:1
  89:4 103:14 133:13
  133:19,22 134:2,6
  134:25 135:3,13,14
  138:16 139:22
  140:5 145:8 146:9
  173:1,5,10,10,14,20
  175:21 176:5,23
  177:12 186:23
  196:22 203:13,16
  204:4 206:2
**5.8** 176:1
**50** 22:6 68:9
**50-or-so** 9:1
**52** 130:5,6
**53** 102:3 130:6
**530** 172:16
**59403-2325** 2:16

---
**6**
---

**6** 5:8,21 39:13 87:12
  87:16 89:13,14,22
  147:25 150:9
  184:17
**6%** 112:3
**6.7** 54:8
**60** 22:10 171:16
**60s** 205:8
**600** 102:20
**655** 2:7
**66** 5:9,16
**6600** 53:17
**67** 5:17
**68** 142:6 205:7

**69** 149:15

---
**7**
---

**7** 5:22 89:14,22
  101:11 131:11,14
  131:14 178:10,16
  178:22 179:17
  210:18,19
**70** 22:10 149:15
**70s** 31:7 205:9
**719** 197:9 213:10
**720** 200:20
**721** 198:11
**722** 199:7
**74** 5:18
**75201** 3:10
**76** 144:18 145:1,1
**77** 5:19,20
**789** 142:3
**79** 103:13

---
**8**
---

**8** 5:4 90:6 101:11
  180:3
**8-hr** 141:2
**8:32** 6:12
**8:35** 1:25
**80** 39:18 115:13
**80s** 11:14 44:20
  205:9
**84%** 112:2
**87** 5:21

---
**9**
---

**9** 94:18,19,19 95:2
**9,000-something**
  53:5
**9:43** 66:17
**9:49** 66:22
**90s** 125:4
**99** 125:22