# EXHIBIT L

# Report on the W. R. Grace Trust

## Mark A. Peterson

## Legal Analysis Systems

## March 2009 (Revised June 2009)

# Table of Contents

1. Overview of Report ...................................................................................  1

2. Dr. Peterson's Qualifications ...................................................................  2

3. Two Differing Forecasts of Liability for Asbestos Bodily Injury Claims ......................  3
   3.1. Parameters Common to Both Liability Forecasts  ...............................  3
   3.2. Changes Over Time  ............................................................  4

4. Trust Distribution Procedures ..................................................................  5
   4.1. Standard TDP Provisions  ....................................................  5
   4.2. Parameters of the Trust's TDP  ..............................................  7
   4.3. Libby and Other Extraordinary Claims  ......................................  8

5. Forecasting the Trust's Asbestos Liability  ..................................................  11
   5.1. Number of Trust Claims  .....................................................  11
   5.2. Number of Compensable Trust Claims ........................................  12
   5.3. Values for Each TDP Category  ..............................................  14
   5.4. Forecasts of Trust Liability for Asbestos Bodily Injury Claims  ..................  14
   5.5. Comparison of Trust Liability to Hypothetical Tort Liability  .............  15

6. Rule 26 Disclosures and Signature  ..........................................................  18

# Tables

Table 1: Disease Categories and Payment Parameters for TDP  .....................................  6

Table 2: Libby and Non-Libby Nonmalignant Verdicts Since 1997 ................................  10

Table 3: Forecast Trust Claim Filings, by Disease  ........................................  11

Table 4: Forecast Trust Claim Filings, After Nonmalignant Adjustment  ......................  12

Table 5: Payment Rates for Trust  ..............................................................  13

Table 6: Mapping Projection Disease to Manville TDP Disease Categories ................  13

Table 7: Forecast of Claims Compensated by the Trust  ................................................  14

Table 8: Forecast Liability of Claims Compensated by the Trust  ..................................  15

Table 9: Forecast NPV of Claims Compensated by the Trust  ......................................  15

Table 10: NPV of Total Liability  ..................................................................  17

## 1. Overview of Report

The proposed consensual reorganization plan in this case establishes the W. R. Grace and Co. Personal Injury Settlement Trust ("Grace Trust" or "Trust") as the exclusive vehicle for paying current and future asbestos bodily injury claims against any of the Debtors.

As experts for the W. R. Grace Official Committee of Asbestos Personal Injury Claimants, my company, Legal Analysis Systems ("LAS") and I provide technical and quantitative assistance in the development of the Trust Distribution Procedures ("TDP") that will be used by the Trust. This report summarizes the work that we did on these matters and presents our forecast of the Trust's liability for current and future asbestos bodily injury claims that will be channeled to the Trust.

After briefly summarizing my experience (Section 2), I discuss the relationships between our liability forecasts for the Trust versus the forecasts of Grace's liability from my report for the Estimation Hearing in this case. The two forecasts differ: Grace's liability for asbestos claims in the bankruptcy and the value of those claims are based on how the claims would be resolved in the ordinary course of litigation of the claims. In contrast, the values of claims filed with the Trust and the Trust's liability are determined by the bankruptcy plan, specifically the Trust's TDP. In Section 3, I discuss how these two forecasts are similar (e.g. both use the same forecasts of number of submitted claims) and how they differ.

In Section 4, I discuss key provisions of the Trust's TDP and how it exemplifies and is derived from a standard TDP that has been used in forming most asbestos trusts during this decade. I discuss analyses that underlie the application of this standard TDP to the history and specifics of the Debtors in this case. Then I discuss some of the particular issues raised by claims from Libby Montana and how the TDP accommodates those claims within a structure that provides similar treatment to claims from all jurisdictions.

In Section 5, I discuss and present our forecasts of the Trust's liability for all present and future asbestos bodily injury claims. The liability ranges from $6.3 billion to $9.3 billion, with $7.4 billion as my preferred estimate (all present-valued to 2010). I also compared the Trust's forecast liabilities under the TDP to forecasts of what the Trust would have to pay if it resolved claims by returning to tort litigation and settlements. Using the TDP of the proposed reorganization plan, the Trust's liabilities were lower than its liability would be in tort litigation. The TDP could save up to $1 billion in liabilities compared to litigation.

## 2. Dr. Peterson's Qualifications

I have been retained as an expert by the W. R. Grace Official Committee of Asbestos Personal Injury Claimants ("ACC") on matters of estimation and treatment of asbestos bodily injury claims. My report for the Estimation Hearing in this case[1] described my past research, publications and expert work on such matters (in Section 2).

I summarize here my qualifications to provide the subject matter of this report: development and estimation of liability for the Trust, which will be formed by the proposed consensual reorganization plan.[2]

As a member of the research staff for RAND's Institute for Civil Justice I have studied and written on trusts and claims processing facilities in mass tort cases. From 1990 through 1995 I worked as "the Special Advisor" and special master for Judges Jack B. Weinstein and Burton Lifland in restructuring the Manville Trust, which had been formed in 1988 as the first asbestos trust but had soon become insolvent. After 1995 I continued to serve as the Special Advisor to the Trust, its beneficiaries and the Courts in implementing and changing as needed the restructuring plan. Since July 2007, I have been a trustee of the Manville Trust. I have also been a trustee of the Fuller Austin Settlement Trust since 1998, another asbestos trust, and a director of nonprofit corporations owned by each trust to process asbestos claims.

I have testified in court as an expert eleven times about other asbestos trust TDPs and/or liabilities of asbestos trusts.

During the past seventeen years I have provided technical and quantitative support for drafting TDPs for many newly formed trusts, most based on the principles and structure of Manville's current TDP, adopted in 2002. I serve as an expert for many asbestos trusts both on matters of estimating liabilities under the trust's TDP and on technical matters involving operations of the TDP.

In the course of my work as an expert for the ACC I provided technical consulting about the Trust Distribution Procedures proposed for the Trust and liabilities that would likely arise under the TDP. This report describes and provides background for that work and presents LAS's forecasts of Trust liability under the TDP.

---

1.    W. R. Grace Projected Liabilities for Asbestos Personal Injury Claims As of April 2001, by Mark A. Peterson of Legal Analysis Systems dated June 2007, revised January 2009. This report is identical to the report of June 2007 except that it incorporates several arithmetic corrections of nonmalignant forecasts which were provided to other parties to the estimation prior to my deposition.

2.    My resume is attached as Exhibit 1.

## 3. Two Differing Forecasts of Liability for Asbestos Bodily Injury Claims

My previous report for the Estimation Hearing provided a detailed description of our forecast of Debtors' liability for asbestos bodily injury claims--the methods, data, rationale, analyses and results. The report described Grace's liability in the tort litigation system. How many pending and future claims would Grace receive? How much would Grace have to pay to liquidate and resolve those claims within the tort litigation process that determines values for such claims (mostly through mutual agreements to settle rather than fully litigate claims)?

Rather than repeating the discussion and analysis from the estimation report, I have attached my estimation report as Exhibit 2.

For the most part, issues involving the Trust are different from those addressed in my earlier estimation report. For example, while the estimation report forecasts the amount that Grace would have to pay to resolve asbestos claims within the litigation (and ancillary settlement) process that establishes values for such claims, this report forecasts how much the Trust would have to pay to resolve claims through the processes of the Trust Agreement and its TDP, which the consenting parties have accepted as the bases for resolving asbestos claims in the future. The Trust-TDP processes differ in many ways from the litigation process that Grace faced before bankruptcy.

- Through the TDP, the proposed plan adds conditions and requirements for payment by the Trust. These stricter requirements have been accepted by all consenting parties, including asbestos bodily injury claimants, as part of the proposed plan. Such strict requirements were never accepted by asbestos plaintiffs in Grace's pre-petition litigation and Grace could not successfully have imposed such requirements.

- Because of these new, stricter requirements, the Trust will pay a smaller percent of claims than Grace had paid in litigation.

- Because the Trust will now be paying fewer, but more qualified claimants who have satisfied the stricter new requirements, the Trust will value claims in amounts higher on average than settlements in litigation.

- The Trust will pay claimants more quickly than in litigation, both because the TDP process is more streamlined and also because litigation delays in state and federal courts are far longer than processing times under a TDP.

### 3.1. Parameters Common to Both Liability Forecasts

Even though the Trust-TDP process is essentially different from the litigation process that I addressed in my estimation report, for this report I carry over some of the discussion and analyses from the estimation report, referencing relevant sections from the earlier report.

Our present estimation of Trust liability is based on two key parameters from the estimation report:

- **Forecast Number of Claims.** Trust liability forecasting starts with and is based on the same number of claims forecast in the estimation report. The Trust is the conduit for paying all asbestos bodily injury claims that will be brought against Grace. Therefore, I assume that the Trust will receive and face the same set of claims that Grace would have received in tort litigation.

- **Forecast Rejection Rates.** I estimate rates at which the Trust will reject claims by first excluding from payment the same percent of claims that I estimated would have been rejected by Grace in litigation. I then assume that more claims will be rejected by the Trust because of

the stricter requirements of the Trust's TDP.  My estimation report estimated the percent of claims for each disease that Grace would reject in litigation primarily for having shown no asbestos exposure caused by Grace or no proof of an asbestos disease.  I assume here that the Trust will refuse to pay similar percentages of claims for the same reasons.  But in addition, the Trust will apply more restrictive requirements of its TDP and so will reject or make only minimal, $300 payments on more claims than Grace had rejected in litigation.

## 3.2. Changes Over Time

Grace itself recognized that changes occurring at the time of its bankruptcy were increasing its risks and future liability (Peterson 2009, p. 5).  Both the number of new claims and the amounts that Grace had to pay to resolve claims were increasing (Ibid, Section 4.3.3.1) and, as I discussed in the estimation report, both were likely to increase further (Ibid, Section 3.2).

Indeed, data from other asbestos defendants show continuing increases since 2001 in the values of asbestos claims and in the numbers of newly filed cancer claims.  Although Grace has not paid an asbestos claim in eight years, has not received a new asbestos claim in eight years, these increases still apply to and magnify Grace's asbestos liability.

- Cancer claim filings have increased particularly for mesothelioma, the most costly claims (Ibid, Sections 6.2 and 6.2.3).

- Average amounts paid to claimants have increased (Ibid, 4.3.3.2 and 4.3.3.3).

- The size of verdicts awarded to asbestos plaintiffs have increased sharply (Ibid, Table 1, Section 3.2).

These data on the experience of other asbestos defendants since 2001 strongly imply that claims filings and all claims costs would have continued to increase sharply for Grace after its 2001 petition date.  Our forecasts of future claims filings both for Grace and now for the Trust reflect this contemporaneous experience by other defendants and extend the increases in new cancer filings that Grace experienced before bankruptcy into the years after its petition date (Ibid, Section 6.2.3).  Similarly, our analyses both of Grace's trends and recent settlement values show that Grace's costs for resolving asbestos claims would have continued to increase from 2001 through 2007, the date of my original estimation report (Ibid, Section 4.3.3).  The Trust's TDP values reflect these current, increased costs.

Since I prepared my 2007 estimation report, asbestos litigation has continued to change.  In particular, filings of nonmalignant claims have decreased sharply since 2003 reaching levels in the last two years that are lower than those we forecast for Grace in those years.  Our current estimates of the number of nonmalignant claims that will be received by the Trust now reflect these continuing changes.  We have reduced our forecast of nonmalignant claims below the level of my estimation report.

# 4. Trust Distribution Procedures

## 4.1. Standard TDP Provisions

The proposed Joint Plan of Reorganization establishes the Trust and TDP that the Trust will use to process, evaluate, liquidate and pay pending and future asbestos bodily injury claims. If this proposed plan is confirmed, the TDP would determine what claims are compensable and the values of those claims.

The Trust's TDP follows the standard form used for almost every asbestos trust created since 2002. To assure that funds will remain available to pay claimants, the TDP and bankruptcy plans in which they are embedded, together with Bankruptcy Code Section 524(g), provide a broad set of protections of the financial interests of the Trust, debtors, insurers and other parties who contribute assets to the Trust, which include:

- Trust claimants' recoveries are capped at the TDP *Maximum Value* or at most the *Extraordinary Claim Value*, caps that would not be imposed in the tort system. In asbestos tort litigation, multi-million dollar verdicts, even 8-figure verdicts, are no longer uncommon. Under the TDP, the Trust would have to pay no more than the pro-rata Payment Percent of $1.44 million, and then only for the highest valued, extraordinary mesothelioma claim (i.e., a claimant with the greatest damages who was exposed to asbestos exclusively or almost exclusively (95%) by Grace alone). For most mesothelioma claims, those that are not *Extraordinary Claims*, the *Maximum Claim Value* is $450,000 (TDP sections 7.7, 5.3(b)(3) and 5.4).

- The TDP has specific, stricter exposure requirements. To receive compensation, claimants must show "meaningful and credible" exposure to asbestos for which Grace has responsibility (Ibid, Section 5.7). To be paid more than $300, claimants who do not have mesothelioma must also show at least five years of total asbestos exposures. To receive significant payment (more than about $1,000), claimants who do not have mesothelioma must show *Significant Occupational Exposure*--i.e., regular and either direct or proximate exposures for at least five years (Ibid, Section 5.7(b)(2)).[3] Grace could not impose such strict and specific requirements in its pre-petition litigation and settlements, as reflected in its settlement agreements and Grace's correspondence with Mendes and Mount, counsel for its insurers, notifying them of general settlements.

- The TDP eliminates any punitive damages risk.

- Medical criteria in the TDP for nonmalignant, lung and other cancer claims are more stringent, detailed and difficult to meet than Grace's historical settlement agreements for those diseases.

- The Trust can refuse medical evidence from any doctor or facility it determines to be unreliable. Grace could do this in its pre-petition tort litigation only through specific agreements; it had no means to enforce such restrictions globally.

_____

3.    Nonmalignant claimants who have at least 6 months Grace Exposure and five cumulative years any asbestos exposure but cannot show *Significant Occupational Exposure* might qualify to have their claims valued at $2,500 (Ibid, Section 5.3(a)(3), Level II; Section 5.7(b)). Payments to such claimants will account for less than 7 percent of total Trust payments, Table 9, below. Claimants who can otherwise show "meaningful and credible" Grace Exposure may qualify for the $300 payment under Level I (Ibid). Claimants who cannot meet these presumptive exposure requirements can offer other proof to show asbestos exposure for which Grace has legal responsibility through the TDP's *Individual Review* process (Ibid, Section 5.7(b)(1)). To receive payment for mesothelioma, which can be caused by even minimal asbestos exposures, claimants must show "meaningful and credible" Grace Exposure (Ibid, Section 5.3(a)(3), Level II; Section 5.7(b)).

Most significantly, the Trust, debtors, insurers and other parties can obtain protection against any further litigation in tort. Trust claimants can access tort litigation only against the Trust and only after completing a series of dispute resolution steps. While providing claimants with an opportunity to resolve their claims through jury trials with the Trust, the Grace (and other) TDP encourages claimants to resolve their claims through the TDP's administrative procedures in order to avoid the burdens, delay and heavy costs that litigation would bring. Related provisions of other, similar TDPs are effective. Among the millions of claims submitted to asbestos trusts under TDPs since 1995, I know of no claimant who has pursued a claim to trial.

The TDP establishes nine disease categories and exposure and medical rules that claimants must satisfy to be given value within each category: one category each for mesothelioma and other cancer claims; two lung cancer categories; four nonmalignant categories that differ by disease severity or causation criteria; and a ninth *Other Asbestos Disease* category that offers minimal payment for claimants who have an asbestos related disease but do not meet criteria for other categories.

The TDP sets values for each category (Table 1). All but one of the categories offer a fixed *Scheduled Value* that can be accepted as the settlement value by any claimant who meets the category's criteria. One lung cancer category, for claimants with less apparent asbestos causation, provides no scheduled value; rather, the Trust will review and place values on its cases individually.

**Table 1:** Disease Categories and Payment Parameters for TDP

| Scheduled Disease | TDP Payment Parameters | | |
| --- | --- | --- | --- |
| | Scheduled Value | Average Value | Maximum Value |
| Mesothelioma (Level VIII) | $180,000 | $225,000 | $450,000 |
| Lung Cancer 1 (Level VII) | $42,000 | $45,000 | $95,000 |
| Lung Cancer 2 (Level VI) | None | $14,000 | $33,000 |
| Other Cancer (Level V) | 20,000 | $20,500 | $35,000 |
| Severe Asbestosis (Level IV-A) | $50,000 | $62,240 | $100,000 |
| Severe Disabling Pleural Disease (Level IV-B) | $50,000 | $62,240 | $100,000 |
| Asbestosis/Pleural Disease (Level III) | $7,500 | $8,500 | $15,000 |
| Asbestosis/Pleural Disease (Level II) | $2,500 | $3,000 | $5,000 |
| Other Asbestos Disease-Cash Disc Pymt (Level I) | $300 | None | None |

A claimant can choose instead to have an *Individual Review* (*IR*) of his/her claim that can result in a settlement value greater or less than the *Scheduled Value*. Claimants who have exceptionally large losses or special damages can attempt to obtain settlements greater than scheduled values by electing to proceed through IR. Since most asbestos-related cancers are fatal and an unfortunately great fraction involve great pain, IR is likely to provide higher compensation not simply because a claimant's injuries are serious but also because the injury produced high financial loss or the claimant was especially young or the claimant had other demanding circumstances.

While the TDP does not fix settlement values for *Individual Reviews*, it limits such settlements in two ways. First, *Individual Review* settlements cannot exceed the *Maximum Value* established for each category, unless a claim meets the special requirements to be found as an *Extraordinary Claim*. Second, the Trust must limit *IR* settlement amounts so that the average settlements of all claims within a category, both those taking the *Scheduled Value* and those *Individually Reviewed*, do not exceed the *Average Value* established for the category.

The TDP structure has been developed to provide efficient, routine resolutions paying *Scheduled Values* to claims meeting the required criteria, while providing individual consideration for claims that do not fit neatly into the categories or that are more serious and valuable than most claims.

Under the TDP a claimant can obtain an *Extraordinary* settlement greater than the *Maximum Value* only by showing that asbestos exposures were caused almost entirely by the debtor. Most claimants will have been exposed by, and have claims against, multiple defendants. In the tort system such claimants would usually receive part of their compensation from Grace, but most compensation from multiple other defendants (i.e. Grace pays only its "several" share of total damages). In contrast claimants who were exposed only (or almost only) by Grace could look only to Grace for compensation. The TDP treats claimants who have little or no recourse to compensation by other companies, who can look only to Grace, as *Extraordinary* and provides them with greater compensation through the Trust.

The specific values of the TDP have been selected to promote its core objectives: efficient resolution of claims in amounts that are both fair across claimants and consistent with the legal values of claims. Offers and widespread election of fixed *Scheduled Values* promote fairness and efficiency. To encourage their selection *Scheduled Values* are typically set at the average value that the debtor would likely have paid in litigation to claimants within each category. In turn, fairness requires that claimants whose claims are very serious and more valuable than *Scheduled Values* have the opportunity to pursue higher values through *Individual Review*. The TDP provides this *IR* opportunity in most cases, while also assuring that *IR* elections do not unduly exhaust funds needed to compensate other deserving claimants.

*Maximum Values* and *Average Values* for each category are intended to achieve these fairness concerns. The *Maximum Value* is typically set in an amount approximately equal to the 95th percentile of amounts that the debtor would have paid to claimants in a category. This level permits appropriate settlement values up to the highest amount of most serious claims while capping the amounts that might have been obtained in litigation for the top few percent of claimants. The *Extraordinary Claims* provisions set an even higher cap for the rare claimant that can meet requirements: TDPs for other, existing trusts cap settlements of *Extraordinary Claims* at five times *Scheduled Value*.

## 4.2. Parameters of the Trust's TDP

In the course of my work as an expert and consultant to the Asbestos Claimants Committee, I helped the ACC adapt these general TDP features to the particularities of claims against Grace.

As with other trusts, the TDP's *Scheduled*, *Maximum* and *Average Values* are based on settlement levels expected for Grace had it continued in asbestos litigation. My expert report in the estimation case presented extensive analysis and discussion of amounts that Grace would likely have paid in continuing litigation after March 2001 (Section 4.3.3) and my proposals of values for the TDP were based on that work.

In order to represent the current values of claims against Grace, TDP values had to be set at levels greater than what Grace paid as settlements in the past. Five different analyses presented in my expert report in the estimation case using three different methods all demonstrated that Grace would have paid far more on average on and after March 2001 to settle asbestos claims than it had paid in pre-petition settlements (Peterson 2009, Tables 13-15). Grace agreed also that its future settlement values would increase above pre-petition levels (Ibid, p. 5).

I used results of these analyses to establish TDP values for the Trust. My expert report showed that all models of the current Grace settlement values were closely similar to amounts actually paid in 2001 by USG, another prominent asbestos defendant, before it entered bankruptcy. USG filed for bankruptcy protection 2001 after Grace and now has a confirmed reorganization plan that

includes TDP values accepted by the parties and approved by the Court. I looked to TDP values for the USG Asbestos Trust as a basis for TDP values.

I provided the Grace Asbestos Claimants Committee with alternative sets of TDP values that were based on and varied modestly from the approved values in the USG TDP. The Grace Asbestos claimants and other plan proponents accepted TDP values close to those of the USG TDP, increasing mesothelioma and other cancer *Scheduled Values* slightly and decreasing values for lung cancer and the lesser nonmalignant categories.

## 4.3. Libby and Other Extraordinary Claims

In developing the TDP, parties paid special attention to asbestos claims arising in and around Libby Montana, where Grace's mining and milling operations exposed both workers and town residents.

Many Libby claimants assert that they were exposed almost exclusively by Grace and its predecessors. Also many Libby claimants with nonmalignant diseases assert that their medical conditions are more serious than pleural disease and/or asbestosis suffered by claimants exposed elsewhere. Although Libby claimants and their representatives assert that fatal nonmalignant diseases and (almost) exclusive exposures to Grace asbestos occur especially frequently among Libby claimants, neither of these asserted conditions is unique to Libby claimants.

For decades, some heavily exposed workers across the country have died from serious asbestosis or pleural thickening. In recognition of these particularly serious claims, previous TDPs have provided as a standard provision high compensation for exceptionally serious or fatal nonmalignant asbestos diseases through the TDPs' *Severe Asbestosis* category. About 1 percent of nonmalignant claimants receive payment through this category (November 2007 Manville Trust data). To reassure that similar high compensation will be provided to claimants who die from either pleural disease or from asbestosis or who suffer from similarly exceptional cases of either disease, the TDP includes both a *Severe Asbestosis* and a *Severe Disabling Pleural Disease* category. While this TDP change--the addition of a specific *Severe Disabling Pleural Disease* category--addresses the particular issues raised by Libby claimants, the change applies to all claimants who might qualify for the category, whether the claimants are from Libby, one of the other sites across the country where Libby vermiculite was processed, or were otherwise exposed to asbestos by Grace. The change supports a fundamental TDP objective of treating comparable claimants comparably.

Similarly, some Grace claimants, both from Libby and elsewhere in the country, have been exposed to asbestos almost exclusively by Grace rather than by other companies. These claimants must look almost entirely to Grace for compensation. Again, the problem is unique neither to Libby claimants nor to Grace claimants. Throughout the country many victims of asbestos disease were exposed primarily or exclusively by the actions or products of a single company that has since entered bankruptcy. Like many Libby claimants, all of these claimants are exceptionally dependent for compensation on a single Trust created in the bankruptcy proceedings of the company. To address this problem, TDPs all provide opportunities for greater compensation for extraordinary claims where the claimants were exposed primarily or exclusively by the company creating the trust. In previous trusts, extraordinary claimants can receive compensation up to 5 times the scheduled value for the category in which they qualify.

The Grace TDP was adapted to address the unusual circumstances of claimants from Libby or who worked elsewhere in a Grace manufacturing facility. First, the TDP explicitly recognizes that claims will be treated as *Extraordinary* if either the claimant was exposed in a Grace manufacturing facility or at least 75 percent of the claimant's exposure was due to Grace. Second, the TDP provides increased compensation, up to 8 times the *Scheduled Value*, if at least

95 percent of the claimant's exposure is due to Grace. Other *Extraordinary* claimants could receive up to 5 times the *Scheduled Value*, as in other pre-existing asbestos trusts. Again to provide equivalent treatment among claimants, these *Extraordinary Claims* provisions apply to all eligible claimants, those exposed in Libby as well as in other sites where Grace vermiculite was processed.

Under Bankruptcy Code Section 524(g), the proposed reorganization plan and the TDP must treat substantially similar asbestos claimants equivalently. The TDP rules, values and structure that will be used by the Trust are national and apply to all claimants. But recognizing that the facts and values of claims differ, the TDP provides means for claimants to obtain differing values that are appropriate for the circumstances of their claims, by providing nine categories (including four categories of nonmalignant disease), by providing *Individual Review Scheduled* and *Maximum Values*, and by separating and providing exceptionally high values for *Extraordinary Claims*.

Like all asbestos defendants, historical resolution values differ among jurisdictions, some high, some low. Libby plaintiffs received high settlements and verdicts compared to most other jurisdictions. Among other asbestos defendants, resolutions in jurisdictions such as New York or Texas or the San Francisco area are especially high, but TDPs in those cases do not place specific TDP values for claims from those jurisdictions that are higher than the values of claims from other jurisdictions. Rather, the TDPs provide opportunities to obtain high values from the Trust through the same means available here for Libby claimants.

The relatively high historic values paid by Grace to Libby claimants seem to reflect matters that are addressed in the TDP. There was a higher frequency of Libby claims with exclusive or almost-exclusive asbestos exposures from Grace, claims that got higher resolutions because Grace paid almost all damages, not some partial, several share. Libby plaintiffs often claim much more serious nonmalignant injuries than we have seen for the nation as a whole. The higher values for exclusive exposures or more serious nonmalignant injuries will get greater compensation under the TDP. A claimant can get even greater compensation if both apply to his or her claim.

Libby settlement values were also greater historically because Libby claims were historically resolved differently from claims in other jurisdictions. Both because there are few Libby claims, and also because of the particular facts of those claims, most Libby claims were resolved individually or as part of small groups, in contrast to claims elsewhere that were resolved mostly in large groups (Peterson 2009, Table 5). Grace paid significantly more to claims resolved individually or in small groups than those in mass settlements (Peterson 2009, Table 6). Again, the TDP provides for this difference. Most Trust claimants will use the expedited claim process to obtain scheduled values, a process akin to large group settlements. Libby claimants can seek higher values from the Trust through the *Individual Review* process.

We cannot know how each of these matters affected the size of historic resolutions for Libby claims. Our only other index of the relative value of claims is to compare jury verdicts from Libby and elsewhere. Table 2 shows jury verdicts for nonmalignant Grace claims since 1997. Verdicts are actually higher outside of Libby than among Libby claimants. The mean Libby verdict was $416,000. The mean non-Libby verdict was $1,027,995 (excluding cases under appeal) and $5,188,950 (including cases under appeal).

**Table 2:** Libby and Non-Libby Nonmalignant Verdicts Since 1997

| Location | Matter# | GraceID | Dispose Year | Verdict Amount | Status |
|----------|---------|---------|--------------|----------------|--------|
| Libby | 9510340 | 224745 | 1998 | $585,000 | Closed |
| Libby | 9609306 | 288247 | 1998 | $250,000 | Closed |
| Libby | 9809685 | 368069 | 1999 | $413,000 | Closed |
| Other | 9402853 | 147423 | 1999 | $100,000 | Closed |
| Other | 9407292 | 161998 | 1999 | $648,000 | Closed |
| Other | 200106332 | 507771 | 1998 | $2,335,986 | Closed |
| Other | 9501281 | 182491 | 2000 | $9,855,000 | Under Appeal |
| Other | 9501281 | 184898 | 2000 | $8,255,000 | Under Appeal |
| Other | 9501281 | 184994 | 2000 | $8,107,618 | Under Appeal |
| Other | 9501281 | 279129 | 2000 | $3,955,000 | Under Appeal |
| Other | 9501281 | 279146 | 2000 | $8,255,000 | Under Appeal |

## 5. Forecasting the Trust's Asbestos Liability

The Trust will receive asbestos bodily injury claims over the next forty years. The aggregate value of those claims can be reasonably forecast, although, as forecasts, they cannot be precisely determined in advance.

### 5.1. Number of Trust Claims

The Trust is the conduit for paying all asbestos bodily injury claims that are either still pending or will be made in the future against Grace. All claims that would have been brought against Grace had there been no bankruptcy will now be filed with the Trust.

I previously forecast the numbers of claims against Grace for each asbestos-related disease as part of my estimation report for this case.[4] Now this becomes the basis for the forecast of the number of claims that will be filed with the Trust.

My estimation report provides details of these forecasts, which use standard estimation methods based on Grace's asbestos claims database, data on claims filings against other asbestos defendants including filing levels for six years following Grace's bankruptcy petition, and epidemiological forecasts of asbestos-related cancer incidence that have proved to be highly accurate (Peterson 2009, Sections 4 and 6).

Table 3 shows counts both of pending unresolved and liquidated (but unpaid) claims, the forecast of future Trust claim filings for each asbestos disease, and totals. Note that values of pending liquidated claims are assumed to be previously agreed upon settlement values for each claim as representing in Grace's claims database and are not determined by the TDP.

**Table 3:** Forecast Trust Claim Filings, by Disease

| Claim Status | Number of Claims | | | | Total |
|---|---|---|---|---|---|
| | **Meso** | **Lung** | **Othc** | **Nonm** | |
| Pending Unresolved | 2,885 | 5,346 | 1,325 | 93,365 | 102,921 |
| Future | 29,268 | 26,086 | 8,765 | 520,183 | 584,302 |
| Subtotal | 32,153 | 31,432 | 10,090 | 613,548 | 687,223 |
| Liquidated | 139 | 466 | 215 | 17,700 | 18,520 |
| Grand Total | 32,292 | 31,898 | 10,305 | 631,248 | 705,743 |

Sources: Tables 21 and 35, Peterson 2009.

Table 3's forecasts reflect the data and our best understanding of filing trends through 2006. In 2007 we had assumed that nonmalignant claim filings would follow in parallel the slow long-term decrease in the incidence of asbestos-related cancers forecast by Nicholson and his colleagues. Now in 2009 we have the advantage of two more years of experience, which generally confirms our 2007 forecast trends for cancer, but which suggests that the decreasing filing trends for nonmalignant claims observed through 2006 will be a more permanent and significant event in asbestos litigation. In response to this further information, we now assume that decreases in future nonmalignant filings will be sharper than the decreases we had forecast in 2007.

---

4.    W. R. Grace Projected Liabilities for Asbestos Personal Injury Claims As of April 2001, by Mark A. Peterson of
      Legal Analysis Systems dated June 2007 as revised January 2009.

We look to the filing experiences of the Manville Trust, where the "nonmalignant multiplier" (the annual ratio of nonmalignant filings in a year to the Nicholson et. al. forecast of all asbestos-related cancer incidence for the year) in 2003-2006 fell to 50.7 percent of its rate during 2000. We now assume that Grace would have seen a similar decrease, with gradual decreases in the nonmalignant multiplier from its 2000-2001 level until such filings are only 50.7 percent of that value by 2005. We assume that in 2006 and all further years, the multiplier will remain at 50.7 percent of the 2000-2001 level.

| 2001 | 2002 | 2003 | 2004 | 2005 | 2006+ |
|------|------|------|------|------|-------|
| 100.0% | 87.7% | 75.4% | 63.0% | 50.7% | 50.7% |

This nonmalignant adjustment effectively cuts the nonmalignant claims forecast in half. Table 4 shows the forecast of future Trust claim filings after applying this adjustment.

**Table 4:** Forecast Trust Claim Filings, After Nonmalignant Adjustment

| Claim Status | Number of Claims | | | | Total |
|---|---|---|---|---|---|
| | **Meso** | **Lung** | **Othc** | **Nonm** | **Total** |
| Pending Unresolved | 2,885 | 5,346 | 1,325 | 93,365 | 102,921 |
| Future | 29,268 | 26,086 | 8,765 | 293,248 | 357,367 |
| Subtotal | 32,153 | 31,432 | 10,090 | 386,613 | 460,288 |
| Liquidated | 139 | 466 | 215 | 17,700 | 18,520 |
| Grand Total | 32,292 | 31,898 | 10,305 | 404,313 | 478,808 |

Sources: Tables 21 and 35, Peterson 2009.

## 5.2. Number of Compensable Trust Claims

Among the 460,288 forecast unliquidated claims (Table 4, third row total), the Trust will reject those that do not have an asbestos-related disease or cannot demonstrate exposure to asbestos caused by Grace or otherwise fail to meet TDP or legal requirements. Our forecasts use two analytic steps to eliminate such non-compensable claims.

First, we assume that if Grace would not have paid a claim, i.e. those without Grace exposures and/or asbestos related disease, then neither would the Trust. The analyses of my estimation report assumed that had Grace continued in litigation, it would have successfully dismissed many more claims than it had pre-petition. I assume that the Trust would also reject more claims than Grace had pre-petition and so apply to Trust claims the same relatively high rejection rates used in my estimation report.

Table 5 shows alternative payment percentages that I used in my estimation report, the converse of rejection rates. For example, historically, among all mesothelioma claims resolved claims by Grace through any means, 92.1% were resolved with payment or, conversely, a 7.9% rejection rate (100.0% - 92.1% = 7.9%). Our forecasts both for Grace in litigation and now for the Trust use significantly lower alternative payment rates, *Reduced* or *Lowest* from Table 5. Among cancer claims I expect that actual Trust claim acceptance rates will be closer to Reduced than the Lowest rates. For nonmalignant claims I assume that the Trust will accept only 57.8%, rejecting over 40 percent of such claims.

**Table 5:** Payment Rates for Trust

| Payment Rate Definition | Payment Rates | | | |
|---|---|---|---|---|
| | Meso | Lung | Othc | Nonm |
| Historic | 92.1% | 95.3% | 96.7% | 96.3% |
| Reduced | 78.3 | 81.0 | 82.2 | 57.8 |
| Lowest | 64.5 | 66.7 | 67.7 | 57.8 |

Source: Table 33, Peterson 2009.

Our second step distributes our forecast for each of the four asbestos disease categories into the Trust TDP's nine disease categories. Grace's historical claims database supports forecasts only for the four types of asbestos diseases. Neither Grace's nor any other defendant's database provides the detailed information needed to make separate forecasts of claims satisfying the criteria for each of nine TDP categories. Fortunately, the Manville Trust (and increasingly other more recent trusts) have been developing experience and data showing how claims in each of the four diseases sort themselves into the more numerous disease categories like those of the Grace TDP. Table 6 shows the transition matrix derived from Manville data: how claims for each of the four types of asbestos disease distribute into the eight Manville TDP categories.

**Table 6:** Mapping Projection Disease to Manville TDP Disease Categories

| Projection Disease | TDP Disease | | | | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|
| | Meso | Lung1 | Lung2 | Othc | SevA | ImpA | NonM | CDP | |
| Meso | 1.000 | | | | | | | | 1.000 |
| Lung | | 0.543 | 0.357 | | | | | 0.100 | 1.000 |
| Othc | | | | 0.739 | | | | 0.261 | 1.000 |
| Nonm | | | | | 0.010 | 0.173 | 0.765 | 0.052 | 1.000 |

Source: November 2007 Manville Trust data.

Because the disease categories and criteria are highly similar among most TDPs for asbestos trusts established over the past seven years, it is appropriate and reasonable to assume that Trust claims will distribute similarly to the Manville transition matrix.[5] We use the Manville transition matrix to allocate the forecast Grace claims into TDP categories, but do not distinguish between the two categories of severe asbestos disease.

After applying payment rates and the Manville Transition Matrix, we derive our forecast of the number of Trust claims that will be accepted and compensated in each of the TDP categories. These results are shown in Table 7.

---

5.    As one difference, the Grace TDP has two separate categories for severe nonmalignant claims, one each for severe asbestosis and severe pleural disease claims. The Manville TDP has only one category that would apply to both types of severe nonmalignant claims. This difference has little significance. The Manville Trust will compensate both severe asbestosis or severe pleural claims within its one category. The Grace TDP simply splits into two categories claims that Manville will pay in one. Because such severe nonmalignant cases are rare, the offer of one or two categories would not have a material effect on overall Trust liability.

**Table 7:** Forecast of Claims Compensated by the Trust

| Disease | Payment Rates | | |
|---|---|---|---|
| | Historic | Reduced | Lowest |
| Meso | 29,612 | 25,175 | 20,738 |
| Lung1 | 16,268 | 13,827 | 11,386 |
| Lung2 | 10,696 | 9,091 | 7,486 |
| Othc | 7,211 | 6,130 | 5,049 |
| SevAB | 3,723 | 2,234 | 2,234 |
| ImpA | 64,402 | 38,654 | 38,654 |
| NonM | 284,781 | 170,928 | 170,928 |
| CDP | 24,901 | 16,330 | 15,499 |
| Subtotal | 441,594 | 282,370 | 271,974 |
| Liquidated | 18,520 | 18,520 | 18,520 |
| Grand Total | 460,114 | 300,890 | 290,495 |

## 5.3. Values for Each TDP Category

We use the TDP's *Average Value* for each TDP category to value claims in the category. Like all similar TDPs, the TDP instructs trustees to liquidate claims in each category in amounts that will approximate the *Average Value* for the category. Experience shows that existing trusts are able to comply with this instruction. The TDP's *Average Values* for each TDP category, our forecast of the values for claims in each category, are shown in Table 1 above.

## 5.4. Forecasts of Trust Liability for Asbestos Bodily Injury Claims

We multiply the number of compensable claims in each TDP category (Table 7) times the *Average Values* for that category in order to derive the Trust's overall liability.

We carry out this calculation separately for claims arriving in each year and make several time value adjustments. First, we assume that all pre-petition claims will be paid during the Trust's first year; that claims accruing during the bankruptcy period will be paid in the Trust's second and third years; that claims filed in the first four years will experience two years' delay; and that delays after that will be only one year. These payment year assumptions determine the amount of inflation and sequencing adjustments added to a claim and also the term or years for present valuation. Second, we apply the TDP's rules for the timing of inflation and sequencing adjustments, with inflation at 2.5 percent and sequencing adjustments at 5 percent. Third, we assume a 5.11 percent discount rate for present valuation.[6]

Table 8 shows our forecast of the total nominal value of the Trust's liability for asbestos bodily injury claims (with inflation and sequencing adjustments but no present valuation).

---

6.   The inflation and discount rate assumptions are the same as those of my estimation report, to facilitate comparison. Both are long term rates, which have will be affected only modestly by current economic conditions. The discount rate estimates the long-term, post-tax rate of return that the Trust might earn on its assets. The difference between the discount rate and the inflation rate represents the Trust's real earning rate, how much it would earn on assets excluding the effects of monetary inflation.

**Table 8:** Forecast Liability of Claims Compensated by the Trust

| Disease | Payment Rates | | |
|---|---|---|---|
| | Historic | Reduced | Lowest |
| Meso | $8,441 | $7,176 | $5,911 |
| Lung1 | 925 | 787 | 648 |
| Lung2 | 189 | 161 | 132 |
| Othc | 186 | 158 | 130 |
| SevAB | 297 | 178 | 178 |
| ImpA | 702 | 421 | 421 |
| NonM | 1,095 | 657 | 657 |
| CDP | 10 | 6 | 6 |
| Subtotal | $11,844 | $9,544 | $8,084 |
| Liquidated | $84 | $84 | $84 |
| Grand Total | $11,928 | $9,628 | $8,168 |

Notes: Millions of dollars of the year when paid.  Indemnity is inflation adjusted at 2.5% per year.

Table 9 shows our forecast of the total present value of the Trust's liability for asbestos bodily injury claims (with inflation, sequencing and discount rate adjustments).

**Table 9:** Forecast NPV of Claims Compensated by the Trust

| Disease | Payment Rates | | |
|---|---|---|---|
| | Historic | Reduced | Lowest |
| Meso | $6,342 | $5,392 | $4,442 |
| Lung1 | 763 | 648 | 534 |
| Lung2 | 156 | 133 | 109 |
| Othc | 150 | 128 | 105 |
| SevAB | 249 | 149 | 149 |
| ImpA | 588 | 353 | 353 |
| NonM | 918 | 551 | 551 |
| CDP | 8 | 5 | 5 |
| Subtotal | $9,175 | $7,360 | $6,249 |
| Liquidated | $84 | $84 | $84 |
| Grand Total | $9,259 | $7,444 | $6,333 |

Notes: Millions of 2010 dollars.  Indemnity is inflation adjusted at 2.5% per year.  Discount rate is 5.11%.

## 5.5. Comparison of Trust Liability to Hypothetical Tort Liability

The proposed reorganization plan and TDP were developed to mitigate the high cost and lengthy delays of tort litigation while providing fair and even-handed compensation of claims at amounts consistent with the tort values of those claims.

Litigation is simply not an option for the Trust.  If it were to remain in litigation, the Trust could

not comply with the requirements of Bankruptcy Code Section 524(g), meaning that neither the debtors nor its insurers would have the injunctive protection of that section.

A litigation process would be enormously expensive, fatal to the objectives of the Trust.  RAND's Institute for Civil Justice finds that in litigation asbestos defendants and their insurers spend about two dollars for every dollar paid in compensation.  If it were in litigation, the Trust would become a vehicle for paying lawyers, not claimants.  In contrast, based on the experience of current asbestos trusts, the Trust's expenses under the TDP will be about 5 percent of compensation paid to claimants.

The experience of the Manville Trust shows that in fact asbestos trusts cannot succeed in tort litigation.  The original Manville reorganization plan kept the trust in litigation, disastrously.  The trust was insolvent immediately, as it quickly acknowledged.  Both plaintiffs and asbestos co-defendants sued and brought the trust into hundreds of trials.  The Trust's litigation expenses quickly approached $50 million per year (in 1989 dollars), consuming trust corpus.  The trust became unable to pay claims.  Less than two years after the effective date, Judge Jack B. Weinstein stayed all trust payments setting in motion the process that led to the trust's restructuring and became a template for all later trusts.

But continued litigation is not necessary.  Under the TDP, the Trust will operate with rules that will let it be more effective than Grace was in litigation in separating compensable from non-compensable claims.  Its TDP requirements are more specific,  more detailed and stricter than Grace's had been in litigation.  And the Trust's liability under the TDP will most likely be less than, or at worst closely approximate, what its total liability would be were it (impossibly) to return to litigation.

To address this issue quantitatively, we compared our forecast of the Trust's liability under the TDP with forecasts that used instead the payment rates and average values of our tort forecast for Grace (Peterson 2009).  To make the comparison we used the litigation claim values from my expert report, inflating them to 2010, the assumed effective year of the proposed reorganization plan.  As in our current forecast for liability under the Trust's TDP, we used the payment rates from my estimation report.  But for the present litigation forecast, we did not shuffle these claims into TDP categories, categories which would not operate in a litigation process.  As I discussed above, we use the same numbers of pending and future claims for both TDP and the tort litigation forecasts.  We assume (for purposes of this analytic comparison only) that claims would resolve at the same time under either litigation or the TDP process.  We also use the same inflation and discount rates for both forecasts.

Table 10 shows the results of this comparison in net present values of forecast liability.  The effect varies according to which of the five litigation value models we use.  Comparing TDP liability to litigation liability based on USG's historic values, the TDP saves about $1 billion in liability.  Note that the USG model was our preferred value model in our work in estimating Grace's tort-based liability and the basis for deriving the TDP values.  Liability under the TDP is about $700 million less than liability in litigation based on values derived from multiple regression, our "Long-term Trend" value model.  Liability under the TDP is similar to, but mostly less than, liability from litigation for our other three litigation value models.

In short, the Trust's total liability under the TDP is likely less than, but at worst about the same as, what the Trust's liability would be were it to resolve claims within continuing tort litigation.  Were the Trust forced back into litigation, its liabilities would most likely increase, its expenses would increase enormously, it could not provide future claimants with significantly equivalent treatment, the Trust, debtors, insurers and others would lose protection under Bankruptcy Code Section 524(g)--the Trust would fail to meet either the objectives of fair and equivalent compensation of comparable claimants or the requirements and purposes of Section 524(g).

**Table 10:** NPV of Total Liability

| Setting | Dollars | Payment Rates | | |
| --- | --- | --- | --- | --- |
| | | Historic | Reduced | Lowest |
| Tort | Long-term trend | $10,009 | $8,123 | $6,869 |
| Tort | Short-term trend | 9,205 | 7,374 | 6,280 |
| Tort | Quigley | 9,470 | 7,506 | 6,428 |
| Tort | T&N | 9,611 | 7,628 | 6,528 |
| Tort | USG | 10,694 | 8,549 | 7,286 |
| Trust | TDP Avgs | $9,259 | $7,444 | $6,333 |

Notes: Millions of 2010 dollars.

## 6. Rule 26 Disclosures and Signature

**QUALIFICATIONS.**  My qualifications to perform this analysis and provide expert testimony are set forth in my C.V., a copy of which is attached as Exhibit 1.

**MATERIALS CONSIDERED.**  In reaching the opinions and conclusions set forth in this Report, I have relied upon my report for the Estimation Hearing in this case, which is attached as Exhibit 2.  I have also relied upon a current draft TDP.

**COMPENSATION.**  My compensation for services rendered in this case is set forth in the fee applications Legal Analysis Systems files on a regular basis with the Bankruptcy Court.  At present, my hourly rate is $800.

I reserve the right to modify this report as new information becomes available between now and the time of trial.  I anticipate that I will review the expert witness reports of opposing expert(s) and offer my opinions about their analyses and conclusions in rebuttal testimony.


                              /s/ Mark A. Peterson
        _____
                              Mark A. Peterson, J.D., Ph.D.
                              LEGAL ANALYSIS SYSTEMS