IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., <u>et. al.</u>[1] | ) | Case No. 01-01 139 (JKF) |
| | ) | (Jointly Administered) |
| Debtors | ) | |

## PLAN PROPONENTS' PHASE II BRIEF REGARDING BANK LENDER ISSUES IN SUPPORT OF CONFIRMATION OF JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

---

[1] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/Ma Grace Specialty Chemicals, Inc.), W. R. Grace & Co. Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (fMa Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace 11, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (fMa Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., GC Limited Partners I, Inc., (fMa Grace Cocoa Limited Partners I, Inc.), GC Management, Inc. (fMa Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc. GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B 11 Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G 11 Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (Wa Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation., W. R. Grace Land Corporation, Gracoal, Inc., Gracoal 11, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (fMa GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (fMa Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (F/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (Wa British Nursing Association, Inc.), Remedium Group, Inc. (Wa Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (flk/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. iii

PRELIMINARY STATEMENT ........................................................................................1

STATEMENT OF FACTS................................................................................................3
    I.      the record is clear that the unsecured creditors' crusade to get full default
        interest is a classic effort to renegotiate their piece of an overall deal after
        their exposure to other constituencies has been limited...........................................3
        A.    The unsecured creditors agreed to the fairness of non-default rates
              of postpetition interest where the proposed plan left value for
              equity............................................................................................................3
        B.    As the Debtors negotiated a settlement of their asbestos liabilities,
              the Committee and the Lenders stood by their agreement with the
              Debtors and did not object to the draft term sheet. .......................................9
    II.     there is no proof that THE DEBTORS ARE SOLVENT BECAUSE THE
        DISPUTED ASBESTOS LIABILITIES HAVE NEVER BEEN AND
        NEVER WILL BE ADJUDICATED. ...................................................................12
        A.    The record is clear that, absent the Plan and the settlements
              conditioned upon it, massive liabilities are in dispute covering a
              huge range of estimated values. ....................................................................12
        B.    The liability disputes foreclose any demonstration of solvency.
              The Plan disposes of that liability and therefore cannot be relied on
              to prove solvency. .........................................................................................14

ARGUMENT....................................................................................................................15
    I.      postpetition default interest FOR UNSECURED CREDITORS IS clearly
        not allowable under the BANKRUPTCY code. ..................................................15
    II.     The lenders are not impaired and therefore the court need never reach the
        impact of sections 1129(b) and 1129(a)(7) of the bankruptcy code. ....................18
        A.    The Committee and the Lenders have no legal, equitable or
              contractual right to default interest. .............................................................19
             1.    *The ipso facto clauses in the Credit Agreements do not*
                    *entitle the Lenders to contractual default interest.* .........................20
             2.    *The ipso facto exception under § 365(e)(2)(B) of the*
                    *Bankruptcy Code does not apply here.* ...........................................27
             3.    *Debtors' alleged violation of the Credit Agreements'*
                    *reporting requirements does not entitle the Lenders to*
                    *contractual default interest.* ............................................................28
             4.    *Debtors' failure to pay principal and interest under the*
                    *Credit Agreements during the bankruptcy proceeding does*
                    *not entitle the Lenders to contractual default interest.* ...................30
             5.    *The Lenders are not impaired by the Plan's non-payment of*
                    *the postpetition maturity rate of interest.* .......................................34
        B.    The Lenders are not impaired because the Plan does not alter any
              entitlement to interest the Lenders may have. .............................................35

III.   the best interest test and the fair and equitable requirement are
       inapplicable for the additional reason that the committee and the lenders
       cannot prove solvency...........................................................................................42
       A.     The burden is on the Committee and the Lenders' to establish
              Debtors' solvency. ...................................................................................42
       B.     There is no basis on which to conclude that Debtors are balance
              sheet solvent because there has been no final and binding
              determination of Debtors' liabilities.........................................................43
       C.     Debtors' market capitalization does not establish solvency. .....................44
       D.     The plan of reorganization contemplated by the proposed asbestos
              settlement does not establish solvency. ....................................................45
IV.    while not applicable here, neither the best interest test nor the fair and
       equitable requirement calls for the payment of default interest............................46
       A.     The Best Interests Test does not entitle the Lenders to a default rate
              of interest. ...............................................................................................46
       B.     The Fair and Equitable Test does not entitle the Lenders to a
              default rate of interest. .............................................................................47
              1.     *The fact that the rate of postpetition interest in the Plan
                     resulted from arms-length negotiations is proof positive
                     that this rate is fair and equitable.*................................................48
              2.     *The absolute priority rule is satisfied because the allowed
                     amount of the Lenders' claim will be paid in full.*..........................51
V.     The plan was proposed in good faith and should be confirmed. ...........................57

CONCLUSION ........................................................................................................58

# TABLE OF AUTHORITIES

**Cases**                                                                       **Page**

American Classic Voyages, 384 B.R. 62 (D. Del. 2008)................................................44

In re Ace-Texas, Inc., 217 B.R. 719 (Bankr. D. Del. 1998) ..................................40, 41

In re A.H. Robins Co., Inc., 89 B.R. 555 (E.D. Va. 1988) ..........................................50

In re Anchor Resolution Corp., 221 B.R. 330 (Bankr. D. Del. 1998) ....................24-26

In re Armstrong World Industries, Inc., 432 F.3d 507 (3d Cir. 2005)...................51, 52

In re Beguelin, 220 B.R. 94 (9th Cir. 1998) ....................................................14-16, 40

In re Best, 365 B.R. 725 (Bankr. W.D. Ky. 2007)...........................................14-16, 40

In re Bradford, 6 B.R. 741, 744 (D. Nev. 1980) ..........................................................56

In re Bus. Fin. Corp., 451 F.2d 829 (3d Cir. 1971) ....................................................45

In re Cardelucci, 285 F.3d 1231 (9th Cir. 2002)..............................................15, 16, 40

In re Chateaugay Corp., 156 B.R. 391 (S.D.N.Y. 1993) .............................................14

In re Chedick, No. 95-01096, 1996 WL 762329 (Bankr. D. Colo. Mar. 22, 1996)..............20, 22

In re Chiapetta, 159 B.R. 152 (Bankr. E.D. Pa. 1993).....................................15, 16, 40

In re Consolidated Operating Partners L.P., 91 B.R. 113 (Bankr. D. Colo. 1988)...............54, 55

In re Coram Healthcare, 315 B.R. 343 (Bankr. D. Del. 2004) ...............................49, 51

In re Country Manor of Kenton, Inc., 254 B.R. 179 (Bankr. N.D. Ohio 2000)...............15, 16, 51

In re Crystal Apparel, Inc., 220 B.R. 816 (Bankr. S.D.N.Y. 1998)..............................32

In re Cybergenics, 226 F.3d 237 (3d Cir. 2000) ..........................................................57

In re Dow Corning Corp., 237 B.R. 380 (Bankr. E.D. Mich. 1999)............................16

In re Dow Corning Corp., 244 B.R. 678 (Bankr. E.D. Mich. 1999)......................20, 22

In re Dow Corning, 456 F.3d 668 (6th Cir. 2006) ..................................................53-56

In re EBC I, Inc., 356 B.R. 631 (Bankr. D. Del. 2006) ...............................................20

In re Exide Technologies, et. al., 303 B.R. 48 (Bankr. D. Del. 2003) ...................42, 53

iii

In re Garriock, 373 B.R. 814 (E.D. Va. 2007) ............................................................ 15-17, 34, 40

In re Global Crossing, 295 B.R. 726 (Bankr. S.D.N.Y. 2003) ..................................................... 57

In re Godsey, 134 B.R. 865 (Bankr. M.D. Tenn. 1991) ............................................................. 16

In re Hutchins, 99 B.R. 56 (Bankr. D. Colo. 1989) ...................................................................... 21

In re Jartran, Inc., 44 B.R. 331 (Bankr. N.D. Ill. 1984) ................................................................ 46

In re Johns-Manville Corp., 60 B.R. 612 (Bankr. S.D.N.Y. 1986) .............................................. 32

In re Leslie Fay Cos., Inc., 168 B.R. 294 (Bankr. S.D.N.Y. 1994) ............................................. 32

In re MCorp Financial, Inc., 137 B.R. 219 (Bankr. S.D. Tex. 1992) .......................................... 53

In re Melenzyer, 142 B.R. 829 (Bankr. W.D. Tex. 1992) ..................................................... 15, 16

In re Mirant Corp., No. 03-46590-DML-11, 2005 Bankr. LEXIS 909 (Bankr. N.D. Tex.
    May 24, 2005) ................................................................................................................... 37

In re New Valley Corp., 168 B.R. 73 (Bankr. D.N.J. 1994) ........................................................ 39

In re NextWave Personal Communications, Inc., 244 B.R. 253 (Bankr. S.D.N.Y. 2000) .... 30, 33

In re Ogle, 261 B.R. 22 (Bankr. D. Idaho 2001) ......................................................................... 32

In re Peacock, 87 B.R. 657 (Bankr. D. Colo. 1988) ............................................................. 21, 22

In re Peninsula Intern. Corp., 19 B.R. 762 (Bankr. Fla. 1982) .................................................... 28

In re PWS Holdings Corp., 228 F.3d 224 (3d Cir. 2000) ............................................................ 56

In re Railway Reorganization Estate, Inc., 133 B.R. 578 (Bankr. D. Del. 1991) .................. 20, 22

In re Resorts, 145 B.R. 412 (D.N.J. 1990) .................................................................................. 52

In re Skyler Ridge, 80 B.R. 500 (Bankr. C.D. Calif. 1987) ......................................................... 55

In re Smith, 123 B.R. 863 (Bankr. C.D. Cal. 1991) ..................................................................... 35

In re Southland Corp., 160 F.3d 1054 (5th Cir. 1998) ................................................................. 55

In re Taylor, 146 B.R. 41 (M.D. Ga. 1992) ................................................................................. 21

In re Texaco Inc., 73 B.R. 960 (Bankr. S.D.N.Y. 1987) ............................................................. 27

In re Timbers of Inwood Forest Assocs., Ltd., 793 F.2d 1380 (5th Cir. 1986) ...................... 31, 51

In re Vogt, 250 B.R. 250 (Bankr. M.D. La. 2000) ....................................................................... 16

Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.), 843 F.2d 636 (2d Cir. 1988) ....... 46

Matter of Lamar Haddox Contractor, Inc., 40 F.3d 118, 121 (5th Cir. 1994) ............................ 42

Matter of Rose, 21 B.R. 272 (Bankr. D.N.J. 1982) ............................................................. 21-24

Riggs Nat. Bank of Washington, D.C. v. Perry, 729 F.2d 982 (4th Cir. 1985) ..................... 21, 24

Solow v. PPI Enters. (U.S.), Inc. (In re PPI Enters. (U.S.), Inc.), 324 F.3d 197 (3d Cir.
    2003) .................................................................................................................. passim

United States Nat. Bank of Ore. v. Independent Ins. Agents of America, Inc., 508 U.S.
    439, 113 S. Ct. 2173, 124 L.Ed.2d 402 (1993) ................................................................ 37

VFB LLC v. Campbell Soup Co., 482 F.3d 624 (3d Cir. 2007).......................................... 44, 45

Williams v. Stone, 109 F.3d 890 (3d Cir. 1997).......................................................................... 31

**Statutes**

11 U.S.C. § 101(5) ..................................................................................................................... 51

11 U.S.C. § 365(e)(2)(B) ........................................................................................... 21, 23, 26-28

11 U.S.C. § 501 ........................................................................................................................... 51

11 U.S.C. § 502.................................................................................................................... passim

11 U.S.C. § 506(b) ....................................................................................................... 31, 40, 54-56

11 U.S.C. § 726(a)(5)........................................................................................................... passim

11 U.S.C. § 1124................................................................................................................... passim

11 U.S.C. § 1129(b)(2) ........................................................................................................ passim

**Miscellaneous**

Clyde P. Stickney & Roman L. Weil, Financial Accounting 914 (10th ed. 2003)..................... 43

Alexander Porter, *Postpetition Interest on Unsecured Claims in the Case of a Solvent
    Debtor: Toward a More Consistent Statutory Regime*, 81 S. Cal. L. Rev. 1341
    (2008)................................................................................................................................. 56

Carmen H. Lonstein & Steven A.. Domanowski, *Payment of Post-Petition Interest to
    Unsecured Creditors: Federal Judgment Rate Versus Contract Rate*, 12 AM
    BANKR. INST. L. REV. 421 (2004) ...................................................................................... 55

4 Collier On Bankruptcy ¶ 502.03[3][c] (15th ed. rev. 2006) ......................................... 15, 17, 34

HR. Rep No. 595, 95th Cong., 1st Sess 414 (1977) ............................................................... 52, 56

Williston on Contracts, § 30.19 ....................................................................................... 31

## PRELIMINARY STATEMENT

The analytical structure that governs disposition of the Lenders' right to default interest has long been clear and, while a fog of technical arguments and nuances have extended the briefing and argument, the basic answers that have emerged are straight-forward. In order:

- Entitlement to Default Interest: None.
    1. 11 U.S.C. § 502 controls and disallows <u>any</u> unmatured, postpetition interest.
    2. § 726(a)(5), the singular exception to § 502(b)'s disallowance of interest allows some postpetition interest but still does not provide what the Lenders seek. The rate of interest allowed under § 726(a)(5) is the federal judgment rate and can never be the default rate.

- Impairment: None.
    1. There have been no legally cognizable contractual defaults.
    2. The Code and not the Plan is the source of any limitation of rights.

- Sections 1129(a)(7) and 1129(b): Neither section requires that the Lenders get more than what the Plan already provides.

While the law precludes the Lenders' demands, it is also essential to look beyond the necessary analysis of Bankruptcy Code provisions to the history that brings us to where we are today. This history has particular relevance to the Phase II issue of "fair and equitable," should the Court decide to reach that issue. This history neither has been factually controverted by the Lenders in their extensive briefs, nor has its intersection with the law been accurately understood by them. The reality is that (a) the Lenders continuously and repeatedly negotiated for the existing rate of postpetition interest set forth in the Plan; (b) the Lenders' commitment through the date of Grace's asbestos settlement specifically contemplated that equity would receive value

1

under the Plan; (c) the Debtors counted on the Lenders' spoken and written word in seeking to limit the potential liability that threatened to wipe out equity and that drove market prices for unsecured debt far below par; and (d) the Lenders voiced no objection when they learned that the Debtors had succeeded in putting together an overall deal predicated upon paying the Lenders the agreed rate of interest. It is only later that they insisted upon 100% default interest when it appeared that they might be out of danger from the Debtors' asbestos liability. These are the unrebutted facts.

What is it that the Lenders have failed to understand about how critical these facts are legally? It is that, should the issue of fairness and equity be reached, this history drives the appropriate rate of interest, not some formula. Fairness and equity do not work by formula. They look to balance and a fit with the facts. The facts here show neither clear solvency nor clear insolvency. We are in the grey area of disputed solvency. That greyness, uncertainty, makes provision for a compromise interest rate the obviously fair and appropriate solution -- generous postpetition interest as contemplated by the Plan but not default interest. Indeed, it was these considerations that caused the Debtors and Lenders to agree upon an actual rate of postpetition interest. That rate is fair and equitable precisely because the parties picked it out in arms length negotiations, giving weight to the same factual and legal uncertainties that continue to exist today. This is so regardless of whether the historical letter agreements remained formally in effect -- the whole idea of equity is to provide resolution where agreements no longer control.

Now at the end of what has turned out to be extensive litigation, the facts call out for approval of Grace's decision to stand by its commitment to pay some postpetition interest, rather

2

than returning to their baseline legal position and litigating for no postpetition interest. The law calls for the same result because it is what was agreed upon and what is fair.

## STATEMENT OF FACTS

**I.  THE RECORD IS CLEAR THAT THE UNSECURED CREDITORS' CRUSADE TO GET FULL DEFAULT INTEREST IS A CLASSIC EFFORT TO RENEGOTIATE THEIR PIECE OF AN OVERALL DEAL AFTER THEIR EXPOSURE TO OTHER CONSTITUENCIES HAS BEEN LIMITED.**

The history of this dispute traces back to late 2004, when the Debtors were preparing to file their original plan of reorganization. In the Debtors' view, it was important that the Debtors' plan have the full support of both the general unsecured creditors and the equity holders, so that the Debtors could focus their legal efforts on unresolved matters related to asbestos contingencies. Accordingly, the Debtors took great pains to negotiate with the Official Committee of Unsecured Creditors (the "Committee"), ultimately reaching an agreement on the amount, including the rate of postpetition interest, that the Debtors would pay each constituency represented by the Committee.

With an agreement with the Committee firmly in place, the Debtors were able to turn their attention to settling their asbestos liabilities. All the while, the Committee continued to support their agreement with the Debtors. However, once the Debtors reached an agreement as to the remainder of their liabilities, the Committee at the last minute reneged on their agreement with the Debtors and decided to try to extract more from them.

**A.  The unsecured creditors agreed to the fairness of non-default rates of postpetition interest where the proposed plan left value for equity.**

As the Debtors prepared their original plan of reorganization, their management team, led by then-Chief Financial Officer Robert Tarola, entered into negotiations with representatives for the Committee and the Official Committee of Equity Holders in an effort to enlist their support

3

for the plan. The point person for the Committee during these negotiations was Mr. Thomas Maher of J.P. Morgan Chase & Co., Chairperson of the Creditors' Committee. Tarola Decl. ¶ 3.[2]

Throughout these negotiations, Mr. Maher received input and recommendations from several of the Lenders under the Credit Agreements. One such Lender, D.K. Acquisition Partners L.P., urged the Creditor's Committee "to insist that W. R. Grace commit to pay the contract default rate" as part of any plan of reorganization. See CC-JPM-0000009-12, attached hereto as Exhibit A, at 1. However, another Lender, D.E. Shaw Laminar Portfolios, which at the time described itself as "likely the largest holder of W. R. Grace & Co. bank debt," encouraged the Creditors' Committee to compromise by accepting "postpetition interest in excess of floating-rate LIBOR (albeit less than fixed-rate LIBOR)." See CC-JPM-0000014-15, attached hereto as Exhibit B, at 1. In its letter to counsel for the Creditors' Committee, D.E Shaw, rather presciently, wrote as follows: "In this context, we believe that every avenue to reach agreement among the Debtor, the Committee and the equity committee should be aggressively pursued. Through our involvement in cases like Owens Corning, we have seen what can happen when one constituency is seen by the court to be the obstacle to resolution." Id.

In the negotiations with the Debtors, Mr. Maher indicated that the Committee would agree to be a proponent of the Debtors' plan if, and only if, the Debtors would agree to pay postpetition interest to the Lenders and other unsecured creditors at rates acceptable to the Committee. Tarola Decl. ¶ 3. With respect to postpetition interest for the Lenders, Mr. Maher initially took the position that the Committee would "not sign on to the Plan unless they get default interest compounded quarterly." See DR01448, attached hereto as Exhibit C, at 1. In

---

[2]  Declaration of Robert M. Tarola in Support of Debtors' Objection to the Unsecured Claims Asserted Under the Debtors' Credit Agreements Dates as of May 14, 1998 and May 5, 1999 ("Tarola Decl."), dated Aug. 14, 2008 [Dkt. 19323].

taking this hard-line stance, Mr. Maher pointed out that the Committee accounted for only a "small tranch of the bank debt," and that "the non-committee holders [were] posturing for a full default rate." See DR00525, attached hereto as Exhibit D, at 1. The Debtors were unwilling to meet the demand of the "non-committee holders" for postpetition interest at the contract default rate.

On November 13, 2004, as negotiations with the Committee continued, the Debtors, with no co-proponents, filed their original Plan of Reorganization (the "Original Plan") [Dkt 6895]. Section 3.1.9 of the Original Plan provided that the holders of general unsecured claims would receive postpetition interest equal to the interest they would have received in a non-default situation. Id. Importantly, the Original Plan also provided that the equity holders would retain majority ownership in the reorganized Debtors. Id. at § 3.1.10.

Negotiations between the Debtors and the Committee continued after the filing of the Debtors' Original Plan. Eventually, Mr. Maher moved off his demand for postpetition interest at the contract rate of default and agreed that the Lenders under the Credit Agreements would accept postpetition interest at the rate of 6.09% per annum, compounded quarterly, and other unsecured creditors would accept a non-default contract rate or the federal judgment rate of 4.19%, compounded annually. Tarola Decl. ¶ 4. The 6.09% interest rate that Mr. Maher agreed to accept on behalf of the Lenders was higher than the contract rate of interest, but lower than the default rate of interest.

A cornerstone of both the Original Plan and what would later become the joint plan was the provision granting equity holders a level of economic value in the reorganized Debtors. Indeed, when Mr. Maher agreed on the rates of postpetition interest under what would become a joint plan, it was expressly contemplated, as set forth in both the Original Plan and later in the

5

joint plan, that equity holders would retain a significant level of economic value in the reorganized Debtors. Tarola Decl. ¶ 4. This was a key factor in obtaining the support of the Equity Committee for the joint plan. Id. Neither Mr. Maher nor any other representative from the Committee ever suggested that the agreed-upon rates of postpetition interest would change if it turned out that the value of equity retained by current shareholders would be different from that estimated in the joint plan. Id.

The agreement between the Debtors and the Committee concerning postpetition interest was memorialized in a letter dated January 12, 2005. See January 12, 2005 Letter Agreement, attached hereto as Exhibit E. The next day, the Debtors filed an Amended Joint Plan of Reorganization (the "2005 Joint Plan") that incorporated the agreed-upon postpetition interest rates to be paid on the Lenders' claims under the Credit Agreements and on all other general unsecured claims. See Amended Joint Plan of Reorganization at § 3.1.9(b), dated Jan. 13, 2005 [Dkt. 7560].

Critically, in entering into the January 12, 2005 Letter Agreement, Mr. Maher did so on behalf of the entire Committee, including the Lenders. See May 19, 2009 Memorandum Opinion ("Claims Objection Op.") [Dkt. No. 21747] at 2 n.3. This was not a case where "Committee members each agreed on their own behalf and not as authorized representatives of other Committee members. Id. Rather, this was a case where the Committee was representing all of its members in agreeing to the rate of postpetition interest set forth in the January 12, 2005 Letter Agreement. Id.

Toward the end of 2005, Mr. Maher indicated that if the Debtors wanted the Committee's continued support for the 2005 Joint Plan, there would have to be an adjustment to the agreed-upon rate of postpetition interest under the Credit Agreements. Tarola Decl. ¶ 6. He indicated

no need to change the postpetition rates of interest for other unsecured claims. Id. This led to another round of negotiations over roughly three-months time between the Committee and the Debtors' management team. Id.

In February 2006, the Debtors and the Committee agreed that, in exchange for the Committee's continued support of the 2005 Joint Plan, the Debtors would pay the Lenders postpetition interest at the rate of 6.09% through December 31, 2005 and, beginning January 1, 2006, at a floating adjusted interest rate tied to the "prime" rate of interest (the "floating Adjusted Base Rate"). Tarola Decl. ¶ 7. This agreement was memorialized in a letter dated February 27, 2006 (the "February 27, 2006 Letter Agreement"). See February 27, 2006 Letter Agreement, attached hereto as Exhibit F. Again, in entering into the February 27, 2006 Letter Agreement, Mr. Maher did so on behalf of the entire Committee, including the Lenders. See Claims Objection Op. at 2 n.3.

At the time the Debtors and the Committee entered into the February 27, 2006 Letter Agreement, the 2005 Joint Plan, which was in the public record, contemplated that equity would retain significant value in the reorganized Debtors. Shelnitz Decl. ¶ 5.[3] No one from the Committee ever suggested that the February 27, 2006 Letter Agreement would terminate or that the agreed-upon postpetition interest rate should be increased if it turned out that equity did in fact retain significant value in the Debtors. Id.

The Debtors relied on the 2005 Joint Plan and the February 27, 2006 Letter Agreement for accounting purposes and, eventually, for purposes of negotiating the agreement in principle to settle the asbestos personal injury claims. Tarola Decl. ¶ 9. In addition, all of the Debtors'

---

[3]   Declaration of Mark A. Shelnitz in Support of Debtors' Objection to the Unsecured Claims Asserted Under the Debtors' Credit Agreements Dates as of May 14, 1998 and May 5, 1999 ("Shelnitz Decl."), dated Aug. 14, 2008 [Dkt. 19324].

financial statements, settlement scenarios, valuation models and other information prepared from January 2005 through March 2008, both actual and projected, were based on the postpetition interest rates agreed to in the 2005 Joint Plan and the February 27, 2006 Letter Agreement. Id.

The Debtors also relied upon these postpetition interest rates in all communications with the Committee and its financial advisors and all other official committees and representatives in the Debtors' chapter 11 cases. Id. ¶ 10. For example, within approximately 30 days following every calendar quarter since mid-2001, the Debtors hosted a call with the financial advisors of all official committees and the asbestos personal injury futures representative. Id. The purpose of these calls was to update the financial advisors of the official committees about the financial condition of the Debtors. Id. During those calls that took place after the February 27, 2006 Letter Agreement, the Debtors would almost always mention that their financials were based upon the assumption that postpetition interest would be paid at rates reflected in the 2005 Joint Plan and the February 27, 2006 Letter Agreement. Id. No one ever objected.

Beginning in 2007, Lewis Kruger of Stroock Stroock & Lavan LLP ("Stroock"), counsel for the Committee, contacted Mark Shelnitz, the Debtors' General Counsel, to say that the market price of the unsecured debt under the Credit Agreements suggested that some of the Lenders were now expecting default interest. Shelnitz Decl. ¶ 13. Mr. Kruger never indicated that all, or even most, of the Lenders were expecting default interest; he said only that some of the Lenders had this expectation. Id. Mr. Shelnitz responded by noting that the Debtors and the Committee had an agreement in place, memorialized in the February 27, 2006 Letter Agreement, by which the Creditors' Committee pledged its support for the 2005 Joint Plan. Id. Mr. Shelnitz indicated to Mr. Kruger that the Debtors were relying on the Committee to honor that Agreement. Id. Mr. Kruger never said or did anything in response to suggest that the

8

Committee, counsel for the Committee or the Lenders would withdraw support for the 2005 Joint Plan. Id. And Mr. Kruger certainly never said or did anything to suggest that the Committee would vote against a plan of reorganization if it failed to provide for a default rate of interest for the Lenders. Id.

### B. As the Debtors negotiated a settlement of their asbestos liabilities, the Committee and the Lenders stood by their agreement with the Debtors and did not object to the draft term sheet.

Throughout the entire negotiation process between Debtors and the Committee, the asbestos personal injury claims (the "Asbestos PI Claims") cast an enormous cloud of uncertainty over not just the Debtors, but also the unsecured creditors, whose recovery was in doubt so long as the asbestos liabilities were unresolved. Consequently, both the Debtors and the Committee understood that a settlement of the Asbestos PI Claims would greatly benefit all parties, and that such a settlement would avoid the need to adjudicate those liabilities. To this end, the parties continued to work towards a settlement rather than an adjudication of Debtors' potential asbestos liabilities.

Toward the end of the first quarter of 2008, the Debtors entered into negotiations with the Asbestos Claimants' Committee, the Future Claims Representative and the Equity Committee in an effort to resolve all of the Asbestos PI Claims and to gather additional support for a consensual plan of reorganization. Throughout those negotiations, the February 27, 2006 Letter Agreement remained in place. These negotiations ultimately resulted in the Term Sheet For Resolution Of Asbestos Personal Injury Claims, dated April 6, 2008 (the "Proposed Asbestos Settlement"), which the Debtors will implement in the context of a chapter 11 plan. See Proposed Asbestos Settlement, attached hereto as Exhibit G. This Term Sheet reflected the fact that the asbestos liabilities were settled rather than adjudicated. Id. at 1-2.

Before the Debtors executed the Proposed Asbestos Settlement, they sent a draft Term Sheet to counsel for the Creditors' Committee. In response, on April 4, 2008, Ms. Krieger at Stroock sent an email to Mr. Shelnitz setting forth "our initial thoughts on changes to the Allowed General Unsecured Claims treatment description in the Term Sheet." See CC-SSL-0000158, attached hereto as Exhibit H, at 1. Ms. Krieger did not express any Committee opposition to the rates of postpetition interest set forth in the draft Term Sheet; she only sought to preserve (for the first time) an option for a "holder" to apply for a higher rate of postpetition interest. Specifically, Ms. Krieger proposed that the Debtors pay

> 100% of allowed amount plus postpetition interest as follows: (i) for holders of pre-petition bank credit facilities, postpetition interest at the rate of 6.09% from the filing date through December 31, 2005 and thereafter at floating prime, in each case compounded quarterly in the manner provided for under such bank credit facilities; and (ii) for all other unsecured claims, interest at 4.19% compounded annually, or if pursuant to an existing contract, interest at the non-default contract rate; provided, however, any such holder may seek to obtain a higher interest rate and shall be entitled to such higher interest rate if the Court determines such rate is appropriate.

Id.

Ms. Krieger's proposal reflects the same economic treatment for postpetition interest as that set forth in the February 26, 2007 Letter Agreement. While Ms. Kreiger suggested that individual Lenders should have the right to "seek to obtain a higher interest rate," she tellingly did not make a demand for contractual default interest. Nor did she say anything about the absolute priority rule requiring such interest. To the contrary, her email demonstrates that, as of April 4, 2008, the Committee was still supportive of the February 26, 2006 Letter Agreement and, obviously, still of the view that the postpetition interest rates reflected in that Agreement were fair and equitable.

10

As noted above, the Debtors entered into the Proposed Asbestos Settlement on April 6, 2008. In that settlement, the Debtors specifically incorporated the economic treatment for postpetition interest set forth in Ms. Krieger's email: "100% of allowed amount plus post-petition interest as follows: (i) for holders of pre-petition bank credit facilities, post-petition interest at the rate of 6.09% from the filing date through December 31, 2005 and thereafter at floating prime, in each case compounded quarterly; and (ii) for all other unsecured claims, interest at 4.19%, compounded annually, or if pursuant to an existing contract, interest at the non-default contract rate." See Exhibit G, Proposed Asbestos Settlement ¶ 7.

It was not until this global agreement was in place and the road to reorganization was finally cleared that the Lenders decided to make an eleventh-hour effort to try to renegotiate their long-standing agreement with the Debtors. On April 21, 2008, counsel for the Lenders sent the Debtors a letter rejecting the rate of postpetition interest reflected in the Proposed Asbestos Settlement and demanding interest at the contract default rate. See Lenders' April 21, 2008 Letter, attached hereto as Exhibit I, at 2. For the first time, the Lenders made a formal demand for default interest. And for the first time, the Lenders argued that equity's participation in the Plan, a cornerstone of the Plan, violated the absolute priority rule.

The Debtors objected to the Lenders' demand and the issue was presented to the Court. In a May 19, 2009 opinion, this Court held that "the Bank Lenders are not entitled to postpetition interest at the default rate" under 11 U.S.C. § 502(b) or § 726, but deferred decision as to whether the Lenders are entitled to such interest under section 1129. Claims Objection Op. at 1.

II.     **THERE IS NO PROOF THAT THE DEBTORS ARE SOLVENT BECAUSE THE DISPUTED ASBESTOS LIABILITIES HAVE NEVER BEEN AND NEVER WILL BE ADJUDICATED.**

   A.    **The record is clear that, absent the Plan and the settlements conditioned upon it, massive liabilities are in dispute covering a huge range of estimated values.**

Among the most significant hurdles that the Committee and the Lenders must overcome before they even get to the analysis under section 1129 is the requirement that they prove the Debtors are solvent. This they cannot do. The most significant component of Debtors' liabilities, the Asbestos PI Claims, has never been agreed upon or adjudicated. The estimation proceeding, which was designed specifically to estimate the value of the Asbestos PI Claims, was not completed. And there has never been an agreed upon or adjudicated resolution of Debtors' potential property damage asbestos claims. Without such adjudication, the liabilities cannot be established, and the Lenders and Committee cannot prove that the Debtors are solvent.

The incomplete estimation proceeding only highlights the fact that, absent the Plan, there is an enormously wide range of estimated values of the Debtors' asbestos liabilities. For example, the Debtors' estimation expert, Dr. Tom Florence, estimated that value of Debtors' asbestos personal injury claims ranged between $200 million and $989 million with a median value of $468 million. But Dr. Denise Martin, another one of Debtors' experts, determined that at the standard 95% confidence interval for scientific reliability, Dr. Florence's estimates could range from $4.6 million to $6.3 billion. The PI Committee's expert, Dr. Mark Peterson, could offer no more definite estimates of Debtors' asbestos liabilities. He opined that Debtors' potential liabilities for asbestos personal injury claims were "between $4.7 and $6.2 billion and

12

most likely between $5.4 and $6.2 billion."[4]    See Expert Report of Dr. Mark Peterson in Connection with the Asbestos Personal Injury Estimation Hearing, dated June 20, 2007 at ES-5 [Dkt. 16113, Ex. A].

Likewise, the value of the Zonolite Attic Insulation ("ZAI") claims is also highly uncertain and disputed. While the Plan provides between $54.5 million and $58 million to ZAI (and potential additional contract payments), ZAI made substantially higher demands. For example, ZAI claimants have previously stated that ZAI could potentially be in 11 million homes[5] with a value of $5,000 to $7,500 per home,[6] for a total of up to $82.5 billion. Even using the claimants' lower estimates of 1 million homes[7] at a value of $3,000 to $5,000 per home,[8] the total liability would be $3 billion to $5 billion. The range of non-ZAI Property Damage liability is also entirely uncertain. While the Plan provides $149.3 million for non-ZAI Property Damage claims, the potential claim was much greater. Together, the total potential Property Damage liability, absent a Plan, reaches at least $3.149 billion to $5.149 billion and may be much greater.

---

[4]    Notably, even at the low end of this range, Debtors would be insolvent. Likewise, the Debtors would be insolvent under Dr. Florence's analysis at the high end of the 95% confidence interval, which translates to a liability estimate of $6.3 billion.

[5]    See Zonolite Attic Insulation Class Plaintiffs' Memorandum of Law in Support of Motion for Summary Judgment, Appendix E (Legend to Production Information from Bureau of Mines Minerals Yearbooks), dated July 9, 2003 [Dkt 4028].

[6]    See ZAI Claimants' Memorandum of Points and Authorities in Support of United States Zonolite Claimants Motion for Class Certification at 14, dated Oct. 29, 2008 [Dkt 19911]

[7]    See Transcript of Proceedings Before The Honorable Judith K. Fitzgerald United States Bankruptcy Court Judge at 134:9-19, 137:13-22, dated June 2, 2008 ("6/2/08 Hrg. Tr.") [Dkt 18913].

[8]    See ZAI Claimants' Motion for Order of Final Approval of the U.S. ZAI Class Settlement at 12, dated Feb. 25, 2009 [Dkt 20842]

**B.**    **The liability disputes foreclose any demonstration of solvency. The Plan disposes of that liability and therefore cannot be relied on to prove solvency.**

As described above, there has never been an adjudication of Debtors' asbestos liabilities, and estimates of those liabilities vary greatly. There is simply no estimation method that can accurately measure the Debtors' asbestos liabilities. Without a binding determination of Debtors' potential asbestos liabilities, there cannot be a final and binding determination that Debtors are solvent. Zilly Aff. ¶ 4.[9]

As discussed infra, the Lenders' new expert, Robert J. Frezza, relies on estimates from the never-completed estimation hearing to attempt to "determine" Debtors' solvency. This attempt is unavailing. Indeed, the only way that Mr. Frezza can even begin to argue Debtors' solvency is by relying upon the Plan, the very one to which the Committee and the Lenders now object. Absent the Plan, there is no cap on Debtors' asbestos liabilities. As already noted, the Proposed Asbestos Settlement, which forms the basis of the Plan, does not represent an adjudication of the Debtors' asbestos liabilities. Rather, it represents a compromise that disposes of the need to adjudicate those liabilities. Without the Plan, all that is left are potentially enormous amounts of asbestos liabilities, the adjudication of which would determine whether Debtors are solvent. In other words, the Plan does not prove solvency; it paves the way for solvency from and after the Effective Date.

---

[9]    Declaration of Pamela D. Zilly in Support of Debtors' Objection to the Unsecured Claims Asserted Under the Debtors' Credit Agreements Dates as of May 14, 1998 and May 5, 1999 at ¶ 4, dated Aug. 14, 2008 [Dkt. 19325].

**ARGUMENT**

## I.   POSTPETITION DEFAULT INTEREST FOR UNSECURED CREDITORS IS CLEARLY NOT ALLOWABLE UNDER THE BANKRUPTCY CODE.

Section 502(b)(2) of the Bankruptcy Code governs the allowance of claims and interests in chapter 11 cases. That section expressly forbids the allowance of a claim for "unmatured interest." See 11 U.S.C. § 502(b)(2); In re Chateaugay Corp., 156 B.R. 391, 403 (S.D.N.Y. 1993) ("502(b)(2) bars postpetition interest on a pre-petition unsecured claim"). As this Court stated in its Claims Objection Opinion: "[U]nder § 502(b)(2) allowed claims do not include unmatured interest." (Claims Objection Op. at 3.)

The only exception in the Bankruptcy Code to the general prohibition on postpetition interest is contained in Section 726(a)(5), which allows for the payment of postpetition interest on unsecured claims "at the legal rate" in the event of surplus in Chapter 7. While the Bankruptcy Court makes no provision for the payment of postpetition interest in Chapter 11 cases, courts over the years have fashioned a rule that allows unsecured creditors to receive postpetition interest in Chapter 11 cases where the estate is solvent. See, e.g., In re Beguelin, 220 B.R. 94, 98 (B.A.P. 9th Cir. 1998) ("As a general rule, interest on a claim ceases to accrue upon the filing of a bankruptcy petition. An award of postpetition interest, however, may be allowed when the debtor is solvent.") (internal citations omitted); In re Best, 365 B.R. 725, 726 (Bankr. W.D. Ky. 2007) ("Post-petition interest may be allowed...where the alleged bankrupt proves solvent.").

As discussed, this rule does not even come into play because this is not a solvent debtor case.[10] But putting that aside for now, the important point is that courts allowing postpetition interest in solvent debtor cases consistently have held that such interest should be paid at the rate

---

[10] See Section II, supra at 12; Section III, infra at 45.

15

set forth in § 726(a)(5), that is, "at the legal rate." See In re Cardelucci, 285 F.3d 1231, 1234 (9th Cir. 2002) (where a debtor in bankruptcy is solvent, an unsecured creditor is entitled to "payment of interest at the legal rate from the date of the filing of the petition") (quoting § 726(a)(5)); In re Garriock, 373 B.R. 814, 815 (E.D. Va. 2007) ("As a general rule, unsecured creditors may not recover post-petition interest on their allowed claims. 11 U.S.C. § 502(b)(2). However, where an estate's assets exceed claims, as is the case here, a creditor is entitled to "interest at the legal rate from the date of the filing of the petition."); In re Best, 365 B.R. at 726 ("The issue before the Court is not whether Steier [an unsecured creditor of a solvent debtor] is entitled to post-petition interest, but rather what is the 'legal rate as prescribed by 11 U.S.C. § 726(a)(5)."); In re Beguelin, 220 B.R. at 99 ("Having determined that Volcano is entitled to postpetition gap interest, we must next consider the meaning of the 'legal rate of interest' applicable pursuant to § 726(a)(5)); In re Country Manor of Kenton, Inc., 254 B.R. 179, 181 (Bankr. N.D. Ohio 2000); In re Chiapetta, 159 B.R. 152, 159 (Bankr. E.D. Pa. 1993); In re Melenyzer, 143 B.R. 829, 831 (Bankr. W.D. Tex. 1992); see also 4 Collier On Bankruptcy ¶ 502.03[3][c] at p. 502-30 (15th ed. rev. 2006) ("when interest is payable because the debtor proves to be solvent, the proper rate or interest is the statutory or legal rate [under § 726(a)(5)]").

The "legal rate" of interest, in turn, has almost uniformly been construed to mean the federal judgment rate. See, e.g., In re Garriock, 373 B.R. at 815-16; In re Best, 365 B.R. at 727; In re Cardelucci, 285 F.3d at 1234; In re Country Manor of Kenton, Inc., 254 B.R. at 183; In re Vogt, 250 B.R. 250, 265 (Bankr. M.D. La. 2000); In re Dow Corning Corp., 237 B.R. 380, 405-12 (Bankr. E.D. Mich. 1999); In re Beguelin, 220 B.R. at 99-101; In re Chiapetta, 159 B.R. at 152; In re Melenyzer, 143 B.R. at 833; In re Godsey, 134 B.R. at 865, 867-68 (Bankr. M.D. Tenn. 1991).

These cases recognize that the use of the federal judgment rate in solvent debtor cases best serves the fundamental purpose of postpetition interest, which is to compensate creditors for the cost of delay that occurs between the time of entitlement (the petition date) and the time of payment. See Garriock, 373 B.R. at 816; In re Melenyzer, 143 B.R. at 833. This "cost of delay affects all creditors equally, and the federal judgment rate accurately reflects the time value of each creditor's claims." Garriock, 373 B.R. at 816. The Committee and the Lenders labor under the mistaken belief that an award of postpetition interest in solvent debtor cases is designed to somehow give effect to the parties' contract prior to the petition date. But that is wrong. The purpose of postpetition interest in such cases is to compensate unsecured creditors for the cost of delay inherent in bankruptcy, and the federal judgment rate adequately accomplishes this purpose.

In their pre-trial memorandum, the Committee and the Lenders argue that they are entitled to the rate of interest which applies under the Credit Agreements if the Loans are not paid upon maturity. That rate happens to be the same as the default rate. See Credit Agreements, Section 4.4. This argument is squarely prohibited by section 502(b)(2). As noted by a leading bankruptcy commentator, "[i]nterest does not survive the debt from which it stemmed; if the debt was extinguished, so was any interest relating to it." 4 Collier on Bankruptcy ¶ 502.03[3][c] (15th ed. rev. 2007); see also Garriock, 373 B.R. at 816 (same). Accordingly, once Grace's petition was filed, all contractual rights to accrue interest which the Lenders might have had ceased by operation of section 502(b)(2). There is nothing in the Bankruptcy Code that in any way revives these contractual rights. Instead, the Bankruptcy Code makes it clear that the Committee and the Lenders have no entitlement to contractual default interest.

17

To the extent that the Lenders have any right to postpetition interest under the Bankruptcy Code, such interest is only payable at the legal rate: "when interest is payable because a debtor prove to be solvent, the proper rate of interest is the statutory or legal rate." Collier on Bankruptcy at ¶ 502.03[3][c]. The Plan, therefore, already provides the Committee and the Lenders with more postpetition interest than they are entitled to under the Code.

## II.    THE LENDERS ARE NOT IMPAIRED AND THEREFORE THE COURT NEED NEVER REACH THE IMPACT OF SECTIONS 1129(b) AND 1129(a)(7) OF THE BANKRUPTCY CODE.

The Committee and the Lenders spend the bulk of their pre-trial brief attempting to invoke two statutory exceptions to section 502(b)'s bar against postpetition interest. These exceptions, which apply only in solvent debtor cases, are the "best interests" test of section 1129(a)(7) and the "fair and equitable" requirement of section 1129(b) of the Bankruptcy Code. But in addition to the requirement that a debtor be solvent, these exceptions are only available to creditors whose claims are "impaired." Solow v. PPI Enters. (U.S.), Inc. (In re PPI Enters. (U.S.), Inc.) ("PPIE"), 324 F.3d 197, 205 n.14 (3d Cir. 2003). Here, the Lenders are not impaired as a matter of law. Accordingly, the bests interests and fair and equitable tests do not apply. The Committee and the Lenders cannot credibly claim an entitlement to contractual default interest based on Code provisions that do not even apply.

The question of whether a claim is impaired entails a two-pronged inquiry. The first prong is governed by section 1124 of the Bankruptcy Code, which states in pertinent part: "Except as provided in section 1123(a)(4) of this title, a class of claims or interests is impaired under a plan unless, with respect to each claim or interest of such class, the plan – (1) leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest[.]" 11 U.S.C. § 1124. The critical question under section 1124(1) is whether the Committee and the Lenders can demonstrate that they had a "legal,"

18

equitable," or "contractual" right to default interest in the first place. Absent such a showing, they cannot even begin to argue that they are impaired under the Plan.

The second prong of the impairment inquiry is governed by PPIE, where the Third Circuit made clear that a claim is only impaired under section 1124 of the Bankruptcy Code if a plan of reorganization itself, not some provision of the Bankruptcy Code, alters the alleged rights of a claimant. PPIE, 324 F.3d at 204-05. Thus, in the event that the Committee and the Lenders could demonstrate a right to contractual default interest (and, as discussed below, they cannot), the question then becomes what is it that altered that right -- the Plan or the Bankruptcy Code. As discussed in Section A, below, to the extent that the Committee and the Lenders ever had a right to contractual default interest, the impairment of that right resulted solely from the operation of the Bankruptcy Code, which, under PPIE, is statutory impairment. And statutory impairment is no impairment at all.

A.   **The Committee and the Lenders have no legal, equitable or contractual right to default interest.**

Before the Committee and the Lenders can attempt to argue that the Plain impairs their entitlement to contractual default interest, they must demonstrate that they had a "legal, equitable, or contractual" entitlement in the first place. That is, the Committee and the Lenders must demonstrate a legally enforceable default under the Credit Agreements. It is beyond purview that absent a legally enforceable default, the Committee and the Lenders have no entitlement to postpetition interest at the contractual default rate, and no basis to claim impairment as a result of the nonpayment of such interest.

As noted, the Committee and the Lenders do not, and cannot, allege that there was any type of prepetition default under the Credit Agreements that gives them a legally enforceable right to contractual default interest. Instead, the Committee and the Lenders instead base their

claim to contractual default interest on a hodgepodge of alleged postpetition defaults, namely: (1) violation of the *ipso facto* clauses in the Credit Agreements; (2) certain alleged violations of the credit reporting requirements contained in the Credit Agreements; and (3) the failure to pay principal and interest under the Credit Agreements during the bankruptcy proceeding;. None of these arguments gives the Lenders an enforceable legal right to default interest under the Credit Agreements.

<blockquote>

*1.     The ipso facto clauses in the Credit Agreements do not entitle the Lenders to contractual default interest.*

</blockquote>

On June 22, 2009 the Lenders argued that "the mere filing of the bankruptcy, as clearly provided under Section 10 of the credit agreement, accelerates -- causes a default without any notice required whatsoever and accelerates all payment, and thereby kicks in default interest." See Transcript of Proceedings Before The Honorable Judith K. Fitzgerald United States Bankruptcy Court Judge, dated June 22, 2009 ("6/22/09 Hrg. Tr.") at 56:16-20 [Dkt. 22294]. Indeed, the Lenders claim that they are entitled to default interest under the Credit Agreements without the need for notice because Grace defaulted by the mere act of filing for Chapter 11. Lenders' Pre-Trial Br. at ¶ 48. In their Pre-Trial Brief, the Lenders go so far as to say "Grace's position boils down to one <u>never accepted by any court</u>: that the Bank Lenders are not impaired because their contractual right to default interest, as a result of some type of "*ipso facto*" legal defense, is unenforceable in bankruptcy." Id. at ¶ 47 (emphasis added). Notwithstanding the Lenders' hyperbole, the fact is that Grace's position is very much consistent with a long line of precedent.

Courts repeatedly and consistently have held that *ipso facto* clauses, like those in the Credit Agreements, are unenforceable as a matter of law. Claims Objection Op. at 4 ("[a]s a matter of law, the bankruptcy filing per se is not a permissible basis for invoking the contract

default interest rate."); <u>see also</u> <u>In re EBC I, Inc.</u>, 356 B.R. 631, 640 (Bankr. D. Del. 2006) ("*Ipso facto* clauses (by which a contract is terminated as a result solely of the debtor's insolvency or bankruptcy) are generally disfavored, if not expressly void, under the Bankruptcy Code."); In re <u>Railway Reorganization Estate, Inc.</u>, 133 B.R. 578, 582 (Bankr. D. Del. 1991) ("Clauses which purport to terminate, limit or otherwise modify a debtor's interest in its property upon the filing of a bankruptcy petition are unenforceable under the Code"); <u>In re Dow Corning Corp.</u>, 244 B.R. 678, 696 (Bankr. E.D. Mich. 1999) (recognizing "a basic bankruptcy policy that abhors the operation of so-called '*ipso facto*' clauses[,] . . . which trigger a default . . . upon the happenstance of bankruptcy," and that "bankruptcy default clauses are not favored and are generally unenforceable under the Bankruptcy Code."); <u>In re Chedick</u>, No. 95-01096, 1996 WL 762329, at * 3 (Bankr. D. Colo. Mar. 22, 1996) (*ipso facto* clause was "void as a matter of public policy" because "[t]he courts have not hesitated to invalidate such provisions as penalizing the debtor's efforts to obtain a fresh start even in the absence of an express statutory provision against the particular ipso fact[o] clause") (citing <u>In re Taylor</u>, 146 B.R. 41, 45-47)); <u>In re Hutchins</u>, 99 B.R. 56, 57 (Bankr. D. Colo. 1989) ("Bankruptcy default clauses are not favored and are generally unenforceable under the Bankruptcy Code."); <u>In re Taylor</u>, 146 B.R. at 46 ("There is clear Congressional dissatisfaction with the '*ipso facto*' clause. Sections 363(1), 365(e), and 541(c) all deal with situations when such clauses are held invalid. Additionally, '[i]t is clear from the legislative history and from the express intention of Congress to protect the 'fresh start of debtors' that the invocation of insolvency statutes is not favored.' The Fourth Circuit concurred in this reasoning when it held "*ipso facto*" clauses unenforceable as a matter of law."), <u>rev'd on other grounds</u>, 3 F.3d 1512 (11th Cir. 1993) (internal citations omitted); <u>Riggs Nat. Bank of Washington, D.C. v. Perry</u>, 729 F.2d 982, 985 (4th Cir. 1985) ("we align ourselves

21

with the District Court and other Federal courts that have held default-upon-filing clauses unenforceable as a matter of law."); In re Peacock, 87 B.R. 657, 659 (Bankr. D. Colo. 1988) ("[T]he filing of a bankruptcy Petition by the Debtors does not, as a matter of law, constitute a default under the bankruptcy default clause, or '*ipso facto*' clause, of the Contract" as "Creditor's *ipso facto* clause in the Contract thwarts the Debtor's fresh start provided under the Code and imposes a penalty upon the Debtors for exercising their constitutional right to file bankruptcy."); Matter of Rose, 21 B.R. 272, 273, 277 (Bankr. D.N.J. 1982) (refusing to enforce an *ipso facto* clause in the absence of any express provision invalidating it because the legislative history of the Code "indicates that bankruptcy-default clauses are to be invalid in all types of contracts, without limitation," and enforceability would, "in effect, render a penalty on the debtors," and "defeat the purpose of providing a 'fresh start' to the debtors.").

The reason that courts normally refuse to enforce *ipso facto* clauses is because to do so would frustrate the most basic purpose of the Bankruptcy Code -- to provide debtors with a fresh start. See In re Railway Reorganization Estate, 133 B.R. at 582 (*ipso facto* clauses "contravene Code policy of providing debtors with a fresh start."); In re Chedick, 1996 WL 762329, at * 3 ("courts have not hesitated to invalidate such provisions as penalizing the debtor's efforts to obtain a fresh start even in the absence of an express statutory provision against the particular ipso fact[o] clause.") (emphasis added); In re Peacock, 87 B.R. at 659 (*ipso facto* clauses "thwart[] the Debtor's fresh start provided under the Code and imposes a penalty upon the Debtors for exercising their constitutional right to file bankruptcy."); Matter of Rose, 21 B.R. at 277 (enforcing an ipso facto clause would "in effect, render a penalty on the debtors," and "defeat the purpose of providing a 'fresh start' to the debtors.").

Dow-Corning exemplifies the judiciary's disdain for *ipso facto* clauses. In that case, Judge Spector determined that Plan Proponents would have to provide pendency interest to Class 4 creditors in accordance with the terms of their contracts to satisfy the "fair and equitable" test of § 1129(b), but refused to give effect to contractual provisions that purported to define as a default the filing of a voluntary bankruptcy petition. In re Dow Corning Corp., 244 B.R. 678, 696 (Bankr. E.D. Mich 1999). The court recognized "a basic bankruptcy policy that abhors the operation of so-called '*ipso facto*' clauses[,] . . . which trigger a default . . . upon the happenstance of bankruptcy," and that "bankruptcy default clauses are not favored and are generally unenforceable under the Bankruptcy Code." Id. (internal citations omitted).[11]

In their papers, the Lenders take the position that courts will invalidate *ipso facto* clauses only under specific, enumerated provisions of the Bankruptcy Code, such as Sections 363(1), 365(e), and 541(c). Lenders' Pre-Trial Brief at ¶¶ 55-58. Not so. It is certainly true that courts have held *ipso facto* clauses to be invalid under these specific Code provisions. But, as discussed above, it is also true that courts have found such clauses to be invalid as a general matter without regard to any specific Code provision. As courts have recognized, the specific provisions of the Code invalidating *ipso facto* clauses -- Sections 363(1), 365(e), and 541(c) -- serve as evidence of their general unenforceability, not as an exhaustive list of situations where such clauses are unenforceable. Accordingly, courts have invalidated *ipso facto* clauses based on more general principles of equity even where none of the express Code provisions applied. For example, in Matter of Rose, a creditor with a security interest in a vehicle sought to invoke an *ipso facto* bankruptcy filing clause to declare unpaid installments of a loan immediately due and payable or

---

[11] Dow Corning refutes the Lenders contention that *ipso facto* clauses are only unenforceable when they will result in types of termination, forfeiture, or modification of rights not at issue here. The situation was identical. The Court refused to give effect to contractual provisions that purported to define filing for bankruptcy as a default and would affect the interest owed to creditors on this ground.

reclamation of the vehicle in the alternative. 21 B.R. at 273-74. The court determined that section 365(e) could not apply directly to render the *ipso facto* clause unenforceable because the contract was non-executory. Id. at 273-74. However, the court still held that the *ipso facto* clause was unenforceable despite the fact that section 365(e) did not apply and despite the fact that no other provision invalidating *ipso facto* provisions applied directly. The court recognized that:

> [i]t does not necessarily follow that just because Section 365(e) of the Bankruptcy Code does not refer to non-executory contracts that they are, therefore, valid. In fact, the opposite conclusion might be inferred, for the Bankruptcy Act, prior to 1979, specifically made such bankruptcy-default clauses enforceable in leases under Section 70b; Congress did not see fit to continue this enforceability.

Id. at 276. Under its analysis, the court was convinced that "the legislative history indicates that bankruptcy-default clauses are to be invalid in all types of contracts without limitation." Id.

The court also found that sections 363(1) and 541(c)(1)(B), although inapplicable in that case, reflected evidence of Congress' intent to invalidate *ipso facto* clauses, noting that "there is no statutory mandate that bankruptcy-default clauses are valid and enforceable. The only congressional statement is clear that in most, if not all, instances, such clauses are not enforceable." Id. Thus, "there [was] simply no reason to assume that Congress intended to make these clauses enforceable in non-executory contracts. Indeed, such an assumption would be directly contrary to the spirit and purpose of the Bankruptcy Code" because "one of the objectives of bankruptcy laws is to enable debtors to make a fresh start." Id. A bankruptcy-default clause, "if valid and enforceable, would defeat the purpose of providing a 'fresh start' to the debtors." Id. at 277.

The Fourth Circuit engaged in a similar analysis in Riggs National Bank of Washington v. Perry, 729 F.2d 982 (4th Cir. 1984). Under a similar set of facts as discussed in Matter of

Rose, a secured creditor with a claim on an automobile sought to use an *ipso facto* default as the basis to lift the automatic stay under § 362(d). Id. at 983-84. Recognizing the "clear Congressional purpose to create a way by which debtors may obtain a fresh start towards reorganization of their financial obligations," the court chose to "align [itself] with the District Court and other Federal courts that have held default-upon-filing clauses unenforceable as a matter of law," and refused to modify the stay because of an *ipso facto* default on the part of the debtor. Id. at 984-85.

In an attempt to find support for their argument that bankruptcy courts will enforce bankruptcy-triggered defaults, the Lenders cite to Judge Walsh's decision in In re Anchor Resolution Corp., 221 B.R. 330, 338 (Bankr. D. Del. 1998). The Lenders' reliance on In re Anchor Resolution is misplaced. That decision did not even address, let alone resolve, the question of whether a postpetition failure to make payments under a credit agreement, standing alone, constitutes an event of default of the type that will trigger interest. Instead, the decision in In re Anchor Resolution turned on a prepetition failure to pay money owed to secured creditors, an issue that is not present in this case.

The critical events underlying In re Anchor Resolution actually took place well before the bankruptcy filing. Months before it filed for bankruptcy, Anchor Resolution Corp. ("Anchor") had failed to make certain payments under a note purchase agreement, a default that entitled the secured creditors to a "make whole" payment. The creditors, however, did not demand payment of the make whole payment. Instead, the creditors and Anchor entered into a comprehensive twenty-nine page restructuring agreement (the "NRA'), pursuant to which the secured creditors renegotiated Anchor's payment obligations. Id. at 333. Under the NRA, Anchor could pay a lesser adjusted make-whole amount instead of the entire amount owed so long as certain

25

conditions were met, including the absence of a restructuring event of default, such as a bankruptcy filing. Id. at 335-36. Thus, in In re Anchor Resolution, the default occurred prepetition, and the secured creditors chose voluntarily to provide the company with a fresh start.

Several months after the parties entered into the NRA, Anchor filed for bankruptcy protection. Id. at 334. In the bankruptcy, the debtor argued that the secured creditors' allowed claim should only include the lesser adjusted make whole amount in the NRA, and not the make whole amount in the note purchase agreement. Judge Walsh rejected this argument, and rightly so. This was not a case where giving effect to the parties' agreement concerning the effect of a bankruptcy filing would penalize the debtor for exercising its right to file bankruptcy and deprive the debtor of an opportunity to receive a fresh start. To the contrary, prior to filing for bankruptcy, the debtor had already defaulted and received a fresh start, knowing full well that a bankruptcy would mark an end to the creditors' leniency. Thus, failing to give effect to the parties' agreement concerning the effect of a bankruptcy filing in In re Anchor Resolution would actually have penalized the secured creditors for their prepetition leniency and allowed the debtor to reap a windfall. That is clearly not the case here.

Judge Walsh never had occasion to consider the issue presented here -- whether an *ipso facto* clause providing for a default upon the filing of bankruptcy is unenforceable. However, as discussed above, the myriad of courts that have considered this issue have consistently held that such *ipso facto* clauses are unenforceable. Debtors respectfully submit that, consistent with this precedent, the *ipso facto* clauses in Section 10 of the Credit Agreements, under which the loans purportedly accelerate and become immediately due upon Grace's chapter 11 filing, are unenforceable regardless of whether these clauses are tied directly to an express Bankruptcy Code provision related to *ipso facto* clauses such as those found in sections 365, 363 and 541 of

the Bankruptcy Code. To hold otherwise would penalize debtors for invoking their constitutional rights and undermine the Bankruptcy Code's long-standing policy of providing debtors with a fresh start.

### 2. The ipso facto exception under § 365(e)(2)(B) of the Bankruptcy Code does not apply here.

At the Phase I Confirmation Hearing on June 22, counsel for the Lenders argued that the *ipso facto* clauses in the Credit Agreements are not subject to the general prohibition found in section 365(e)(1) of the Bankruptcy Code and are instead enforceable under the exception to this prohibition set forth in section 365(e)(2)(B):

> MR. COBB: ...as Your Honor wells knows, 365 deals with executory contracts and unexpired leases. There are express carve outs for contracts or agreements to loan money. 365(e)(2) expressly carves out from the *ipso facto* defense or protections contracts or agreements to loan money. That's exactly what we have here, Your Honor.

6/22/09 Hrg. Tr. at 57:11-16. The Court, however, expressed doubt as to whether the Credit Agreements are executory:

> THE COURT: Well, the 365 argument, of course, is still talking about contracts, even contracts to make loans that are executory, and carves out an exception to those contracts. So, I'm not sure 365 applies in this context, I don't think anybody has ever argued that this contract, the loan that's at issue, is executory. So, I don't think 365(e)(2) applies at all to the circumstances here.

Id. at 116:19-25.

In their brief, the Lenders try to have it both ways. On the one hand, the Lenders acknowledge the Court's view that section 365 is inapplicable: "As this Court recognized at the hearing on June 22, 2009, section 365(e) does not apply." Lenders' Pre-Trial Brief at ¶ 56. Yet, in the very next sentence of their brief, the Lenders argue that section 365(e)(2)(B) specifically allows *ipso facto* clauses such as those in the Credit Agreements: "[s]ection 365(e)(2)(B)

27

specifically exempts contracts to make a loan from the prohibition on *ipso facto* clauses." Id. If section 365(e) does not apply because the Credit Agreements are non-executory, section 365(e)(2)(B), which is also expressly limited to executory contracts, cannot apply to render the *ipso facto* clauses in the Credit Agreements enforceable. The Lenders cannot in one sentence assert that section 365(e) does not apply on the grounds that the Credit Agreements are not executory and then in the very next sentence argue in favor of section 365(e)(2)(B).

In any case, section 365(e)(2)(B) does not apply regardless of whether the contracts are executory or non-executory. Cases considering the exception set forth in section 365(e)(2)(B) highlight the narrow and circumscribed nature of the exception. The exception only pertains to outstanding executory commitments to extend future credit at the time of filing. See In re Texaco Inc., 73 B.R. 960, 965 (Bankr. S.D.N.Y. 1987) (Section 365(e)(2)(B) was not implicated and the *ipso facto* restriction applied because the creditors only sought to accelerate the loans by virtue of Chapter 11 filings rather than being compelled to extend future credit to the debtor and "[t]he exception pertains only to executory commitments to extend future credit") (emphasis in the original); In re Peninsula Intern. Corp., 19 B.R. 762, 764 (Bankr. Fla. 1982) (same).

Here, section 365(e)(2)(B) does not apply under its terms. While the Debtors will satisfy their remaining payment obligations under the terms of the Plan, the Lenders have no remaining obligations to extend future credit -- they have fully performed. As a result, the exception pursuant to section 365(e)(2)(B) is not implicated here.

### 3. *Debtors' alleged violation of the Credit Agreements' reporting requirements does not entitle the Lenders to contractual default interest.*

The Lenders next argue that the Debtors' alleged violation of certain reporting requirements under the Credit Agreements gives the Lenders a contractual right to interest at the default rate. This argument also fails. According to the Lenders, Grace supposedly failed to

"furnish to each Bank all certificates and other information required by section 8.2(a)-(c), not promptly giving notices to JPMorgan, as required by section 8.7, and not remedying such breaches within 30 days." See Freedgood Aff. (II) at 13.[12] These are the same arguments that the Lenders previously made in the context of the claims objection proceeding, which were flatly rejected as being unsupported by a stitch of evidence. Lender Pre-Trial Br. re Claims Objection at 44; Freedgood Aff. (I) at 13.[13] Specifically, this Court held that the Lenders, "have never, in the 8-year life of this case, expressed dissatisfaction with Debtors' reporting or filed any requests in connection therewith until they responded to Debtors' objection to their claims." Claims Objection Op. at 4. Accordingly, the Court held that for purposes of claims allowance, it had "insufficient evidence that any alleged reporting failures under the loan documents constitute a default of a type that would trigger any default interest provision in the loan documents." Id. There is no new evidence provided since that time to warrant a different result.

In any case, mere non-compliance with reporting requirements would not give the Lenders a right to contractual default interest. The terms of the Credit Agreements specifically required the Lenders to provide notice of an event of a non-monetary default in order to accelerate the loans, and without this event of default, there cannot be acceleration under the terms of the Credit Agreements. The Credit Agreements set forth in detail the procedures by which the Administrative Agent, JPMorgan, may accelerate the loans and trigger default interest if it or a majority of the Lenders determined that was the appropriate course of action. The Committee and Lenders make a point of arguing that "the Administrative Agent complied with

---

[12] Notice of Submission of Affidavit of Charles O. Freedgood and Declaration of Mark A. Shelnitz, dated June 26, 2009, Ex. A [Dkt. No. 22279].

[13] Pre-Trial Memorandum in Opposition to the Debtors' Objection to Claims Asserted Under the Debtors' Credit Agreements Dated as of May 14, 1998 and May 5, 1999, dated Sept. 5, 2008 [Dkt. No. 19478]; Freedgood Affidavit in Support [Dkt. 19479].

the terms of the Credit Agreements and did not engage in any wrongdoing or inequitable conduct." Lender Pre-Trial Brief at ¶ 21. The Plan Proponents do not disagree. But this is irrelevant. Acceleration of the loans was strictly optional. The Administrative Agent chose not to do so. That is certainly not wrongdoing or inequitable conduct. But the fact remains that the Administrative Agent still must make the affirmative decision to accelerate the loans to trigger an entitlement to default interest. It does not happen automatically, and it is not designed to.

In that regard, the Credit Agreements provide that JPMorgan could have accelerated the loans, "making them immediately due and payable" by "notice of default to the Company and the Parent," under Section 10(B)(ii) of the Credit Agreements if it believed that Grace had defaulted and that it had was in the best interest of the banks to accelerate the loans. Alternatively, JPMorgan would have been obligated to call the loans by providing written notice to Grace "upon the request of the Majority Banks." See § 13.2 of the Credit Agreements (requiring the Administrative Agent to provide such notice of default to Grace in writing).

Here, it is undisputed that the Lenders never followed the procedures for accelerating the loans set forth in the Credit Agreements. Indeed, the Lenders never provided any type of "notice of default to the Company and the Parent" that the Majority Banks were accelerating or calling the loans. See Shelnitz Aff. ¶ 9.[14] Because the Administrative Agent did not accelerate the loans by providing the Debtors with a notice of default and because the Majority Banks did not request such acceleration, the Lenders cannot argue that a non-monetary default occurred that would trigger default interest in an impairment context.

        **4.    *Debtors' failure to pay principal and interest under the Credit Agreements during the bankruptcy proceeding does not entitle the Lenders to contractual default interest.***

---

[14] Notice of Submission of Affidavit of Charles O. Freedgood and Declaration of Mark A. Shelnitz, dated June 26, 2009, Ex. B [Dkt. No. 22279].

30

The Committee and the Lenders further argue that Debtors' failure to pay interest on the loans, and the failure to repay the loans themselves when they matured during the bankruptcy, give the Lenders a legally enforceable right to contractual default interest. But as the Court correctly held, a debtor's failure to make postpetition payments cannot be deemed a legally enforceable default:

> [N]onpayment of postpetition interest is not a default. The fact that the Bankruptcy Code precluded Debtors from paying postpetition interest means that Debtors will not be held to have defaulted for that reason. See In re NextWave Personal Communications, Inc., 244 B.R. 253, 264 (Bankr. S.D.N.Y. 2000) (failure to make postpetition payments cannot be deemed a default when the payments are prohibited by the Bankruptcy Code).

Claims Objection Op. at 5.

The Court's Opinion is consistent with bedrock principles of contract interpretation that provide that the Credit Agreements, like all contracts, implicitly incorporate applicable existing law, including the Bankruptcy Code. It is hornbook law that "[e]xcept where a contrary intention is evident, the parties to a contract ... are presumed or deemed to have contracted with reference to existing principles of law." 11 Richard A. Lord, Williston on Contracts § 30.19, 203-04 (4th ed. 1999); see also Williams v. Stone, 109 F.3d 890, 896 (3d Cir. 1997) (noting the general rule that "parties to a contract are presumed to contract mindful of the existing law and that all applicable or relevant laws must be read into the agreement of the parties just as if expressly provided by them, except where a contrary intent is evident") (citations omitted). "Under this presumption of incorporation, valid applicable laws existing at the time of the making of a contract enter into and form a part of the contract as if expressly incorporated in the contract. Thus, contractual language must be interpreted in light of existing law, the provisions of which are regarded as implied terms of the contract, regardless of whether the agreement refers to the governing law." Williston on Contracts, § 30.19 at 205-11.

31

This presumption of incorporation applies with particular force to the federal bankruptcy laws. Thus, the Credit Agreements are deemed to incorporate the requirements of federal bankruptcy law, the provisions of which are regarded as "implied terms" of the Credit Agreements. See In re Timbers of Inwood Forest Associates Ltd., 793 F.2d 1380, 1414-15 (5th Cir. 1986), aff'd rehrng en banc, 808 F.2d 363 (1987) ("the bargain which the creditor enters into incorporates the applicable requirements of federal bankruptcy law"). "Two aspects of the law, of course, are the automatic stay provision of § 362(a) and the interest provisions of § 502(b)(2) and § 506(b). The stay and the interest provisions themselves substantially alter the bargain of the parties." Id. In other words, the automatic stay "has a direct effect on the enforceability of the original agreement." Id.; see also In re Ogle, 261 B.R. 22, 30 (Bankr. D. Idaho 2001) ("[B]ankruptcy by its very nature deprives creditors of the benefit of their agreement with a debtor.").

Of particular relevance in this case, "[i]f the debtor were to agree to do something extraordinary or to do an act which is inimical to the theory and philosophy of the Code, such as the payment of pre-petition indebtedness, then pursuant to section 363(b)(1) the agreement is not enforceable absent notice and a hearing." In re Crystal Apparel, Inc., 220 B.R. 816, 830 (Bankr. S.D.N.Y. 1998) (emphasis added); In re Leslie Fay Cos., Inc., 168 B.R. 294, 303 (Bankr. S.D.N.Y. 1994) (same); In re Johns-Manville Corp., 60 B.R. 612, 617-18 (Bankr. S.D.N.Y. 1986) (same), rev'd on other grounds, 801 F.2d 60 (2d Cir. 1986).

When the Credit Agreements are interpreted in light of federal bankruptcy law, as they must be, it becomes clear that there was no alteration of the Lenders' legal or contractual rights by virtue of Debtor's non-payment of principal and interest during the bankruptcy proceeding. To the contrary, under the implied terms of the Credit Agreements, the Lenders never had any

32

contractual right to such principal or interest in the first place. The Committee and the Lenders cannot claim to be impaired by losing a right that they never had.

One of the implied terms of the Credit Agreements is Section 502(b)(2) of the Bankruptcy Code, which prohibits the payment of any "unmatured interest." Other implied terms of the Credit Agreements include section 363(b) and the automatic stay in section 362(a) of the Bankruptcy Code, which prohibited Debtors from repaying the principal amount of the loans when they matured during the bankruptcy. To give effect to these prohibitions, the general interest provisions of the Credit Agreements must be interpreted as including a carve out for any interest that accrued after the Petition Date. And the provision of the Credit Agreements requirement repayment of the principal upon maturity must be interpreted as including an exception to this repayment requirement if the borrower is in bankruptcy. As such, Debtors' non-payment of principal and interest during the bankruptcy was consistent with the terms of the Credit Agreements. Thus, such non-payment cannot be deemed a "default" that gives the Lenders a legally enforceable right to contractual default interest.

It is precisely because the Credit Agreements are deemed to incorporate the provisions of the Bankruptcy Code that it is "senseless" for the Committee and the Lenders to claim a default based on Debtors' failure to make timely postpetition payments under the Credit Agreements. See In re Nextwave, 244 B.R. at 276 ("It is senseless to speak of a 'default' when, as a matter of bankruptcy law, the debtors had neither the authority nor the ability to make such payments absent notice and court approval."). The Bankruptcy Code provisions are part and parcel of the Credit Agreements, and those provisions prohibited Debtors from paying postpetition interest on the loans and from repaying the principal amount of the loans upon maturity. The Committee and the Lenders cannot credibly claim that the Lenders have a legally enforceable right to

33

interest at the contract default rate based on Debtors' failure to make payments that were prohibited under the terms of the Credit Agreements.

### 5. The Lenders are not impaired by the Plan's non-payment of the postpetition maturity rate of interest.

The Committee and the Lenders make the additional argument that they are impaired by virtue of the fact that Debtors did not pay the rate of interest that applies under the Credit Agreements if the Loans are not paid upon maturity. Lenders' Pre-Trial Brief at ¶ 75. The Committee and the Lenders argue that section 1124(1) of the Bankruptcy Code requires them to receive their contractual rights in order to be "unimpaired" and that the post-maturity rate of interest is part of their contractual rights.

The fundamental flaw in the Committee's and the Lenders' argument is that it presupposes that they have a contractual right to the post-maturity rate of interest. They do not. As noted above, "[i]nterest does not survive the debt from which it stemmed; if the debt was extinguished, so was any interest relating to it." 4 Collier on Bankruptcy ¶ 502.03[3][c] (15th ed. rev. 2007); see also Garriock, 373 B.R. at 816 (same). Thus, any pre-petition right that the Lenders may have had to the post-maturity rate of interest is irrelevant. Any such right was extinguished as of the Petition Date.

Despite all of their conclusory assertions about alleged defaults, the Committee and the Lenders still have not demonstrated that the Lenders have an enforceable contractual right to default interest under the Credit Agreements. The *ipso facto* clauses are unenforceable as a matter of law; the Lenders never sought to declare a default based on Debtors' alleged non-compliance with the reporting requirements; and the Credit Agreements themselves, which incorporate federal bankruptcy law, make clear that the Lenders have no contractual right to the payment of principal or interest following the Petition Date. Because they had no enforceable

34

contractual right to default interest to begin with, the Committee and the Lenders cannot possibly argue that the Plan's failure to pay them such interest somehow alters their "legal, equitable and contractual rights" under section 1124(1). Thus, the Committee and the Lenders cannot satisfy the first prong of the impairment inquiry, and there is no need to even reach the second prong.

**B.      The Lenders are not impaired because the Plan does not alter any entitlement to interest the Lenders may have.**

The Committee's and the Lenders' claim of impairment also fails under the second prong of the analysis, which asks: Does the Plan itself alter the Lenders' legal, equitable or contractual rights? The answer to this question is clearly no. To the extent that the Committee and the Lenders ever had a contractual right to default interest -- and they did not -- any such right was altered, if at all, by operation of the Bankruptcy Code. Under the Third Circuit's decision in PPIE, that means that the Committee and the Lenders are not impaired for purposes of section 1124(1) of the Bankruptcy Code.

In PPIE, the Third Circuit held that a claim is only impaired under section 1124 of the Bankruptcy Code if a plan of reorganization itself, not some provision of the Bankruptcy Code, alters the alleged rights of a claimant. PPIE, 324 F.3d at 204. This limitation is consistent with the language of section 1124(1), which, as noted above, provides: "Except as provided in section 1123(a)(4) of this title, a class of claims or interests is impaired under a plan unless, with respect to each claim or interest of such class, *the plan* – (1) leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest[.]" 11 U.S.C. § 1124 (emphasis added).

The distinction between plan impairment and statutory impairment is critical in these cases. "[A] creditor's claim outside of bankruptcy is not the relevant barometer for impairment; [the court] must examine whether the plan itself is a source of limitation on a creditor's legal,

equitable, or contractual rights." PPIE, 324 F.3d at 204. As long as a plan does not itself alter a creditor's rights but leaves such creditor subject to the other provisions of the Bankruptcy Code, the creditor's claim is unimpaired. Id. ("[W]e hold that where § 502(b)(6) alters a creditor's nonbankruptcy claim, there is no alteration of the claimant's legal, equitable, and contractual rights for the purposes of impairment under § 1124(1)."); see also In re Smith, 123 B.R. 863, 867 (Bankr. C.D. Cal. 1991) ("[A] plan may limit payment of claims to 'the extent allowed,' without impairing them; for until claims are allowed, or deemed allowed, the holders thereof are not entitled to distribution from the bankruptcy estate.").

This clearly is not a case of plan impairment. The Plan itself does not alter the Lenders' alleged contractual right to postpetition interest at the default rate. Instead, this contractual right, if it even exists, is impaired solely by operation of the Bankruptcy Code and, more specifically, section 502(b), which prohibits allowance of a claim for "unmatured interest." As the Third Circuit has held, this is not the type of "impairment" that will trigger a claimant's rights under section 1124. PPIE, 324 F.3d at 204-05 ("'[I]mpairment by statute' [is] an oxymoron. Impairment results from what the *plan* does, not what the statute does.") (emphasis in the original).

Hoping to circumvent the express holding of PPIE, the Committee and the Lenders seize upon dicta from that decision in which the Third Circuit seems to concur with the Bankruptcy Court's finding that, in a solvent debtor case, a claim will not qualify as unimpaired under section 1124(1) unless the claim is also paid postpetition interest. Id. at 207. There are two problems with the Committee's and the Lenders' position. First, this dicta is inconsistent with the express holding of PPIE. And second, even if this dicta is considered part of the Court's holding, it still does not give the Lenders an entitlement to contractual default interest.

There is no question that, under the express holding of PPIE, the Committee and the Lenders are not impaired under section 1124(1). The Committee and the Lenders claim that they will be impaired if they do not receive postpetition interest at the contract default rate. But just as in PPIE, this alleged impairment derives solely from operation of section 502(b) of the Bankruptcy Code. The only difference between this case and PPIE is the applicable subsection of section 502(b). In PPIE, the impairment resulted from operation of section 502(b)(6), and in this case the alleged impairment results from operation of section 502(b)(2), which prohibits the payment of "unmatured interest." The Lenders do not, and credibly cannot, argue that PPIE applies only to impairment by one subsection of section 502(b) but not to other subsections. Other courts certainly have not parsed so finely the Third Circuit's holding. See, e.g., In re Mirant Corp., No. 03-46590-DML-11, 2005 Bankr. LEXIS 909, at *15 (Bankr. N.D. Tex. May 24, 2005) ("If the 'impairment' asserted is a consequence of the proper operation of the statute, it is not an impairment entitling the affected class to a vote.").

The dicta cited by the Lenders -- suggesting that the failure to pay post-petition interest would leave a claim impaired -- seems at odds with the Third Circuit's distinction between plan impairment and statutory impairment. As noted above, the prohibition on postpetition interest derives from the express language of section 502(b)(2) of the Bankruptcy Code. This is a classic example of statutory impairment which, under a strict reading of PPIE is no impairment at all. PPIE, 324 F.3d at 204 ("A plan which leaves a claimant subject to other applicable provisions of the Bankruptcy Code does no more to alter a claimant's legal rights than does a plan which leaves a claimant vulnerable to a given state's usury laws or to federal environmental laws."). The Lenders do not even address, let alone attempt to explain, the tension between the dicta they cite and the Third Circuit's express holding. Needless to say, if they cannot be reconciled, the

37

express holding controls.  See <u>United States Nat. Bank of Ore. v. Independent Ins. Agents of America, Inc.</u>, 508 U.S. 439, 463 n.11, (1993) (emphasizing "the need to distinguish an opinion's holding from its dicta").

But even assuming that the dicta cited by the Lenders somehow limits the holding of <u>PPIE</u>, the fact remains that the Third Circuit's decision still does not support the Lenders' contention that they are impaired by virtue of the fact that they will not receive contractual default interest.  The language on which the Lenders rely states only that a cash payment equal to the allowed amount of a claim, but without postpetition interest, "could not qualify for nonimpairment under § 1124(1) because the failure to pay postpetition interest does not leave unaltered the contractual or legal rights of the claim."  <u>Id</u>. at 207.  Thus, at most, <u>PPIE</u> stands for the proposition that a claim must receive postpetition interest to qualify as unimpaired.  Nothing in that opinion even remotely suggests that the postpetition interest must be paid at the contractual default rate.

To the contrary, the decision in <u>PPIE</u> undermines the Lenders' contention that they are somehow impaired by the nonpayment of contractual default interest.  It is undisputed that the Lenders' only basis for demanding contractual default interest is that such interest arguably would be owed under the two Credit Agreements outside the bankruptcy context.  But as the Third Circuit made clear, "a creditor's claim outside of bankruptcy is not the relevant barometer for impairment."  <u>Id</u>. at 204.  Instead, "a creditor's rights must be ascertained with regard to applicable statutes ..."  <u>Id</u>.  There is nothing in the Bankruptcy Code or any other statute that entitles the Lenders to contractual default interest.  In fact, the only provision of the Bankruptcy Code that speaks to the appropriate rate of postpetition interest is section 726(a)(5) and, as noted above, that section provides only for postpetition interest at the "legal rate."

In their pre-trial memorandum, the Committee and the Lenders concede that "*PPIE* did not specify that 'default rate' interest be paid in *every* case to satisfy section 1124(1)." (Lenders Trial Brief at ¶ 82 (emphasis in original).) In truth, PPIE did not specify that default interest had to be paid in *any* case to satisfy section 1124(1). Indeed, far from compelling the payment of postpetition interest at the contractual default rate, PPIE suggests that such interest need only be paid at the "legal rate," or the federal judgment rate, to render a claim unimpaired. As already noted, the Plan will pay the Committee and the Lenders postpetition interest at a rate higher than the federal judgment rate. Nothing in the language of PPIE requires more.

Contrary to the Committee's and the Lenders' protestations, Debtors' failure to pay postpetition interest at the contract default rate does not somehow "resurrect[] the discredited analysis of In re New Valley Corp., 168 B.R. 73 (Bankr. D.N.J. 1994)." (Lender Pre-Trial Br. at ¶¶ 77-82.) The New Valley court's application of section 1124(3) "allowed a solvent debtor to pay the 'allowed' claims of unsecured creditors in full, excluding post-petition interest, without risking impairment." PPIE, 324 F.3d at 205 (citing New Valley, 168 B.R. at 77-80). This result, of course, is inconsistent with a long line of cases, discussed above, holding that unsecured creditors are entitled to receive postpetition interest where a debtor is solvent. See Section I, supra at 16. Accordingly, Congress deleted section 1124(3) of the Bankruptcy Code to preclude the anomalous result reached in New Valley. See H.R. Rep. 103-835, at 47-48 (1994)).

At most, the repeal of section 1124(3) stands for the proposition that Congress "intended that to be unimpaired, the claim must receive post-petition interest." PPIE, 324 F.3d at 206. But that is the only significance that can be attached to the repeal of section 1124(3). As with the dicta in PPIE, that repeal does not in any way support the Committee's and the Lenders'

conclusory assertion that a claim must receive postpetition interest at the contractual default rate to be rendered unimpaired.

According to the Committee and the Lenders, the "takeaway from *PPIE* and the legislative history of section 1124 is that the impairment determination must be made on a *creditor-by-creditor* basis, depending on the relevant legal, contractual, and equitable rights at stake." Lender Pre-Trial Br. at ¶ 81 (emphasis in original). That is wrong. To be clear, the only possible "takeaway" from PPIE and the repeal of section 1124(3) is that, for a claim to be unimpaired in a solvent debtor case, a claim must receive postpetition interest, with the precise rate to be "ascertained with regard to applicable statutes." The only rate mentioned in the applicable statute, section 726(a)(5) of the Bankruptcy Code, is the one applied to postpetition claims in Chapter 7 cases: the legal rate. And that is the federal judgment rate. Courts apply this rate uniformly in solvent debtor cases precisely to avoid the type of creditor-by-creditor analysis that the Committee and the Lenders now advocate. Best, 365 (B.R. 725, 727 (Bankr. W.D. Kentucky 2007) (the use of the federal judgment rate as the legal rate "promotes, equality, fairness and predictability in the distribution of interest on creditors claims"); Cardelucci, 285 F.3d at 1234 (same); Beguelin, 220 B.R. at 100-101 (same); Chiapaetta, 159 B.R. at 160 ("Use of the federal judgment rate ... assures a ratable distribution [among creditors].").

The Committee and the Lenders cite In re Ace-Texas, Inc., 217 B.R. 719 (Bankr. D. Del. 1998), for the proposition that "[w]hen the agreement requires a higher post-default rate of interest, this means the higher rate must be paid." Id. at 727. Lender Pre-Trial Br. at ¶ 81. The Committee's and the Lenders' reliance on Ace-Texas is misplaced. Ace-Texas involved an *oversecured* creditor and a prepetition default, and thus under the express terms of section 506(b), the creditor was entitled to interest on its claims as "provided for under the agreement ...

under which the claim arose." <u>Ace-Texas</u>, 217 B.R. at 723-24. This case is the polar opposite. Here, there were no pre-petition defaults and the Lenders "are unsecured, not oversecured, and, therefore, § 506 does not apply." Claims Op. at 6-7. In this case, then, the agreement under which the claim arose was extinguished as of the Petition Date, and any prepetition contract rates are irrelevant. See <u>Garriock</u>, 329 B.R. at 816. Thus, in sharp contrast with the creditors in <u>Ace-Texas</u>, the Lenders have no contractual default interest. As such they cannot claim to be impaired by the Plan's failure to pay such interest.[15]

Try as they might, the Committee and the Lenders cannot find any authority for the proposition that the Lenders are somehow impaired by the failure to receive postpetition interest at the contractual default rate. <u>Ace-Texas</u> does not support this proposition; the repeal of section 1124(3) does not support this proposition; and as this Court already held, <u>PPIE</u> does not support this proposition. Claims Objection Op. at 12 (<u>PPIE</u> "said nothing about the interest being paid at the default rate and the case cannot be read to require the default rate to be paid."). The reason that they cannot find any such authority is because it does not exist. To the contrary, controlling authority, most notably <u>PPIE</u>, demonstrates that the Lenders are not impaired under section 1124 of the Bankruptcy Code. Accordingly, the exceptions to the prohibition on "unmatured interest" found in section 1129 of the Bankruptcy Code do not even come into play.

---

[15]  It is also worth noting that <u>Ace-Texas</u> predates the Third Circuit's decision in <u>PPIE</u>, which is now the governing standard for determining whether a claim is impaired under section 1124 of the Bankruptcy Code. In <u>PPIE</u>, the Third Circuit clearly held that "a creditor's claim outside of bankruptcy is not the relevant barometer for impairment" and that the focus must be on "whether the plan itself is a source of limitation" on the creditor's rights. <u>PPIE</u>, 324 F.3d at 204. To the extent that the language from <u>Ace-Texas</u> on which the Lenders purport to rely is inconsistent with this standard, <u>PPIE</u> now controls.

## III. THE BEST INTEREST TEST AND THE FAIR AND EQUITABLE REQUIREMENT ARE INAPPLICABLE FOR THE ADDITIONAL REASON THAT THE COMMITTEE AND THE LENDERS CANNOT PROVE SOLVENCY.

The fact that the Lenders are not impaired under section 1124(1) of the Bankruptcy Code means that they have no basis to invoke any of the exceptions to section 502(b)'s bar against postpetition interest. Both the "best interests" test of section 1129(a)(7) and the "fair and equitable" requirement of section 1129(b) require, as a threshold matter, a showing of impairment, and the Committee and the Lenders cannot make that showing. But in addition to impairment, the exceptions found in sections 1129(a)(7) and 1129(b) of the Bankruptcy Code also require proof of solvency. The Committee and the Lenders fall short on this front as well.

The Committee and the Lenders have not carried their burden of establishing Debtors' solvency, and they cannot do so. There has not been, and cannot be, a final and binding determination of Debtors' asbestos liabilities, meaning that there has not been, and cannot be, a final and binding determination of Debtors' solvency. And absent a showing of solvency, unsecured creditors, such as the Lenders, have no entitlement to any postpetition interest.

### A. The burden is on the Committee and the Lenders' to establish Debtors' solvency.

As a threshold matter, it is important to recognize that the burden is squarely on the Lenders and the Committee to prove solvency. It is well-settled that "[c]reditors objecting to the proposed plan bear the burden of producing evidence to support their objection." In re Exide Technologies, et. al., 303 B.R. 48, 58 (Bankr. D. Del. 2003).[16] In this case, the Lenders' and the

---

[16] A rule requiring the Committee and the Lenders, as the parties seeking funds, to establish solvency is consistent with the framework of the Bankruptcy Code. Far from establishing a presumption of solvency, as the Lenders and Creditors have argued, the Bankruptcy Code actually suggests that debtors enjoy a presumption of insolvency. See 11 U.S.C. § 547(f) (for the purposes of avoiding a transfer, "the debtor is presumed to have been insolvent on and during the 90 days immediate[ly] preceding the date of the filing of the petition."); see also Matter of Lamar Haddox Contractor, Inc., 40 F.3d 118, 121 (5th Cir. 1994) (with respect to avoiding a
(footnote continued)

42

Committee's objection is premised on the Plan's failure to pay them contractual default interest, and any claim to contractual default interest requires, at a minimum, a solvent debtor. Thus, to support their objection, the Committee and the Lenders must, as a threshold matter, carry their burden of producing persuasive evidence that Debtors are solvent. They cannot do so.

As discussed above, the Committee and the Lenders advance three arguments in an attempt to establish Debtors' solvency. First, they claim Debtors are "balance-sheet solvent" based on Debtors' estimates of their asbestos personal injury liabilities. Second, they claim that Debtors' market capitalization establishes solvency. And third, they claim that the Court can somehow infer solvency from the fact that equity stands to retain value under the proposed Plan. For all of the reasons discussed above, none of these arguments helps the Committee and the Lenders satisfy their burden to establish Debtors' solvency.

**B.    There is no basis on which to conclude that Debtors are balance sheet solvent because there has been no final and binding determination of Debtors' liabilities.**

A corporation's balance sheet, by definition, reflects all of its liabilities. And a liability, in turn, has three essential characteristics: "(1) the obligation to transfer assets or services has a specified or knowable date; (2) the entity has little or no discretion to avoid the transfer; and (3) the event causing the obligation has already happened, that is, it is not executory." Clyde P. Stickney & Roman L. Weil, Financial Accounting 914 (10th ed. 2003). Absent the Plan, Debtors' potential asbestos liabilities do not possess a single one of these characteristics. First, absent the Plan, there is no way to know if Debtors will even have an obligation to transfer assets to pay potential asbestos liabilities, and there certainly will not be "a specified or knowable date" for satisfying this unknown obligation. Second, absent the Plan, Debtors will have complete

---

transfer as preferential "there is a presumption of insolvency for the ninety days preceding the filing of bankruptcy.").

discretion to avoid the transfer of assets, as there will be no adjudicated or agreed asbestos liabilities that Debtors have to satisfy. And third, the event that ultimately will cause the obligation -- the estimation proceeding -- has not happened. Given the unresolved and disputed nature of Debtors' potential asbestos liabilities, there is no valid evidentiary basis on which to make a final and binding determination as to Debtors' asbestos liabilities. Thus, the Committee and the Lenders cannot demonstrate that Debtors are balance sheet solvent absent the Plan.

### C. Debtors' market capitalization does not establish solvency.

Equally unavailing is the Committee's and Lenders' contention that the Debtors' current equity value, as measured by the trading price of W. R. Grace stock on the New York Stock Exchange, somehow demonstrates the Debtors' solvency. Absent a determination of the Debtors' total liabilities, the Debtors' equity value cannot possibly speak to the operative legal test of whether or not the Debtors are solvent. At most, the market capitalization, which has fluctuated wildly over the past few years, merely reflects traders' speculation as to the most likely outcome of the Debtors' total liabilities, most notably its Asbestos PI Claims.

In an effort to muster some legal support for their position, the Committee and the Lenders cite to the Third Circuit's decision in VFB LLC v. Campbell Soup Co., 482 F.3d 624 (3d Cir. 2007), for the proposition that a company's market capitalization necessarily provides a reliable measure of its value. Lender Pre-Trial Br. at ¶¶ 93. But the Court's holding in VFB was far more limited, a fact made clear in American Classic Voyages, 384 B.R. 62 (D. Del. 2008), a case decided roughly a year after VFB. In American Classic Voyages, this Court specifically rejected the contention that VFB requires the solvency of a public company to be measured using a market capitalization methodology. Id. at 64-65. Instead, the Court in American Classic Voyages held that, in measuring solvency, the Bankruptcy Court had properly eschewed the market capitalization methodology in favor of a discounted cash flow analysis. Id. With its

44

decision in <u>American Classic Voyages</u>, this Court left no doubt that <u>VFB</u> stands only for the unremarkable proposition that market capitalization may or may not be a reliable measure of solvency, depending on the particular facts of a given case.

Moreover, <u>VFB</u> itself suggests that, on the particular facts of this case, Debtors' market capitalization would not be a reliable proxy of solvency. The key factual issue in <u>VFB</u> centered upon the value of a division that had been spun off by Campbell Soup Company. While the District Court found that it could rely upon the division's market capitalization nine months after the spin, it specifically rejected the contention that it could rely upon the division's market capitalization at the time of the spin itself. 482 F.3d at 632. The District Court concluded that the division's market capitalization was artificially inflated at the time of the spin, and thus was not good evidence of value. <u>Id</u>. This case is no different. As demonstrated by the unrebutted Affidavit of Ms. Zilly, Debtors' market capitalization can be artificially inflated (or deflated) depending on the market's guess as to the outcome of Debtors' potential asbestos liabilities. Zilly Aff. ¶¶ 8-9. Thus, in this particular case, there is a very good reason to "distrust" Debtors' stock price, <u>VFB</u>, 482 F.3d at 633, and thus Debtors' market capitalization is not good evidence of value.

**D.     The plan of reorganization contemplated by the proposed asbestos settlement does not establish solvency.**

The Creditors' Committee and the Lenders then argue that solvency is established by the fact that equity stands to retain value under a plan of reorganization based upon the Proposed Asbestos Settlement. Lender Pre-Trial Brief at ¶¶ 96-98. This argument makes no sense. Solvency, as noted above, is measured as the value of a company's assets in excess of the value of its liabilities. <u>See</u> <u>In re Bus. Fin. Corp.</u>, 451 F.2d at 835. The Proposed Asbestos Settlement, however, does not even purport to determine the Debtors' liabilities. Instead, the Proposed

45

Asbestos Settlement represents a compromise in which each of the constituencies reached an arms length agreement concerning how to allocate the Debtors' assets specifically to avoid the need to litigate solvency. Because the various constituencies have never reached agreement on the Debtors' total liabilities, the Proposed Asbestos Settlement has no bearing on the issue of solvency. Indeed, if a plan incorporating the Proposed Asbestos Settlement is not consummated, the various constituencies will be right back where they were before that Settlement – embroiled in a dispute over the Debtors' total liabilities and, more generally, the Debtors' solvency. And should that happen, the Asbestos PI claimants almost certainly will seek to have the Debtors' liabilities resolved for a higher number than that set forth in the Proposed Asbestos Settlement.

IV.    **WHILE NOT APPLICABLE HERE, NEITHER THE BEST INTEREST TEST NOR THE FAIR AND EQUITABLE REQUIREMENT CALLS FOR THE PAYMENT OF DEFAULT INTEREST.**

As discussed above, the Committee and the Lenders cannot establish that their claims are impaired under section 1124(1) of the Bankruptcy Code. Nor can they prove that Debtors are solvent. Either one of these failures of proof, standing alone, means that the exceptions to section 502(b)'s prohibition on "unmatured interest" will never apply. And even if these exceptions did apply, the Lenders still would not be entitled to contractual default interest. Payment of contractual default interest is not required under the "best interests" test, and it certainly would not be "fair and equitable" to award such interest where, as here, the Committee and the Lenders are attempting to reap a windfall by reneging on their prior agreements.

A.    **The Best Interests Test does not entitle the Lenders to a default rate of interest.**

The "best interests" test of section 1129(a)(7) requires a plan of reorganization to provide each dissenting creditor or interest holder in an impaired class of claims with value that is not less than the amount such holder would receive if the debtor was liquidated under chapter 7. See

In re Johns-Manville Corp., 843 F.2d 636, 649 (2d Cir. 1988) (holding that the presentation of liquidation analysis showing lesser probable recovery in chapter 7 satisfies section 1129(a)(7)). In essence, the best interests test contemplates a comparison of distributions under a proposed chapter 11 plan of reorganization with those that would be realized in a hypothetical chapter 7 liquidation. See In re Jartran, Inc., 44 B.R. 331, 390 (Bankr. N.D. Ill. 1984). A chapter 7 liquidation, in turn, is governed by the priority scheme set forth in section 726 of the Bankruptcy Code. Under section 726(a)(5), in a chapter 7 liquidation, a creditor must receive pendency interest on its claim "at the legal rate from the date of the filing of the petition" before distributions may be made back to the debtor. 11 U.S.C. § 726(a)(5). As discussed in Section I, supra at 16, courts consistently have interpreted the "legal rate" of interest to be the federal judgment rate.

The best interest test, therefore, would at most entitle the Committee and the Lenders to postpetition interest at the legal rate, or the federal judgment rate. But under the terms of the Plan, they are already slated to receive more than that. As of the Petition Date, the federal judgment rate was 4.19%, which was below the contract rate and default rate under either of the Credit Agreements at that time. Clearly, then, the Committee and the Lenders cannot argue that the best interests test warrants the payment of postpetition interest at the contract default rate.

**B.      The Fair and Equitable Test does not entitle the Lenders to a default rate of interest.**

As with the "best interests test," the "fair and equitable" test would not even support, much less mandate, an award to the Lenders of postpetition interest at the contract default rate. As discussed below, there is a threshold question as to whether section 1129(b) should be construed as even allowing for an award of postpetition interest. But, ultimately, it does not matter. That is because the undisputed evidence amply demonstrates that the rate of postpetition

interest provided for in the Plan is fair and equitable. Indeed, the only real question is whether, in view of the equitable considerations here, the Committee and the Lenders should receive less postpetition interest than that provided for in the Plan.

### 1. The fact that the rate of postpetition interest in the Plan resulted from arms-length negotiations is proof positive that this rate is fair and equitable.

There is no better barometer of what is a fair and equitable rate of postpetion interest than arms-length negotiations. And it is arms-length negotiations that resulted in the rate of postpetition interest provided for in the Plan. While the Committee and the Lenders now struggle to distance themselves from this historical fact, their efforts are unavailing. The Committee and the Lenders make much of the Court's finding that "the 2005 Letter Agreement, as amended by the 2006 Letter Agreement, is no longer in effect. See Claims Objection Op. at 2 n.3. But that does not change the fact that the Committee and the Lenders previously agreed, twice, that the rate of postpetition interest provided for in the Plan is fair and equitable. And they did so under facts identical to those that exist today. Indeed, in 2005, when the Committee, including the Lenders, first agreed upon the postpetition interest provided for in the Plan, the solvency of Debtors' was in dispute and Debtors' proposed chapter 11 plan called for substantial value to remain with equity. The same facts existed in 2006, when the Committee, on behalf of the Lenders, reaffirmed the fairness of the Plan's rate of postpetition interest. And the same facts still exist today. The Debtors' solvency is still in dispute, and the Plan still calls for equity to retain substantial value.

Plan Proponents respectfully submit that there is no better evidence that the Plan's rate of postpetition interest is fair and equitable than the fact that this rate resulted from arms-length negotiations under exactly the same circumstances that exist today. The Committee and the

48

Lenders cannot credibly assert that there is something unfair or inequitable about a rate of postpetition interest that they themselves negotiated.

This seemingly conclusive evidence of what is fair and equitable is bolstered by the remainder of the evidentiary record. That record demonstrates that, throughout these chapter 11 cases, the Committee and the Lenders have done nothing but delay Debtors' emergence from bankruptcy. As this Court knows, the Debtors have spent years overcoming seemingly insurmountable obstacles in their effort to emerge from bankruptcy. And at every turn, the Committee and the Lenders have impeded the process by behaving in a self-serving and dilatory manner that has threatened to derail Debtors' reorganization efforts. This is reason enough to deny the Committee's and the Lenders' demand for postpetition interest at the contractual default rate. See In re Coram Healthcare Corp., 315 B.R. 321, 346-47 (Bankr. D. Del. 2004) (holding that a delay in the debtors' ultimate emergence resulting from a conflict of interest involving the debtors' unsecured noteholders and the fact that the "[n]oteholders have consistently acted as a group in this case in advancing their interests and opposing the Equity Committee" did not warrant payment of postpetition default interest under section 1129(b) of the Bankruptcy Code).

Examples of the Committee's and the Lenders' counter-productive behavior are not hard to come by. For one thing, the Committee and the Lenders improperly are attempting to "have it both ways" by accepting all of the benefits of the Plan without accepting what they perceive to be the burdens. The only reason that the Lenders stand to receive their principal and any postpetition interest whatsoever is because all of the parties to the Plan have made meaningful concessions that, if implemented, will enable the Debtors to emerge from bankruptcy. While the Lenders are all too willing to accept the concessions of the other constituencies, they are unwilling to make any concessions of their own. What makes the Lenders' stance particularly

49

unfair is that the only so-called "concession" required of the Lenders under the Plan is that they accept postpetition interest at a rate that is higher than both the federal judgment rate and the contract rate.

In addition, the Committee and the Lenders have reneged on their prior agreement as to the appropriate postpetition interest rate, thereby jeopardizing the entire Plan. If the rate of postpetition interest set forth in the Plan were to change as a result of the Lenders' demand, the equity holders would be well within their rights to resume the estimation litigation over the Asbestos PI Claims. Should that occur, any hope the Debtors currently have of emerging from bankruptcy would be seriously compromised. This potentially disastrous impact of an award of postpetition interest at the contract default rate is reason enough to reject the Lenders' demand. Cf. In re A.H. Robins Co., Inc., 89 B.R. 555, 562 (E.D. Va. 1988) (disallowing claim for punitive damages in a chapter 11 case because of the potential impact on the debtor's plan of reorganization).

The Lenders' rejection of the agreed-upon rate of postpetition interest, which is greater than the Lenders' bargained for standard contract rate of interest and is significantly greater than the federal judgment rate of interest, is particularly inequitable in light of the fact that, but for the Debtors' litigation and reorganization efforts throughout these cases, which have resulted in the Plan following the recent claims estimation proceedings, the Lenders might not be in a position to demand full repayment of their principal, let alone postpetition interest at the contract default rate

These are just a few examples of the Committee's and the Lenders' opportunistic and unreasonable conduct. It is clear from the undisputed evidentiary showing that a true balance of

the equities shows that the Committee and the Lenders plainly are not entitled to contractual default interest, and arguably are not entitled to any postpetition interest at all.

## 2. The absolute priority rule is satisfied because the allowed amount of the Lenders' claim will be paid in full.

In their pre-trial memorandum, the Committee and the Lenders argue that the absolute priority rule requires that the Lenders receive contractual default interest before equity can retain any value under the Plan. Lender Pre-Trial Brief at ¶¶ 97-98. This argument is wrong as a matter of law. The absolute prior rule has nothing to do with the payment of postpetition interest. Instead, that rule simply requires that unsecured creditors must receive the full amount of their "allowed claims" before equity can retain value. See 11 U.S.C. § 1129(b)(2) (prohibiting confirmation of a plan over the dissent of an impaired class of unsecured claims unless "the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such a claim...") (emphasis added). This requirement is plainly satisfied by Debtors' Plan.

It is well settled that an "allowed claim" does not include postpetition interest. See In re Coram Healthcare, 315 B.R. at 344 ("an allowed claim does not include interest unmatured as of the petition date") (emphasis added); In re Country Manor of Kenton, Inc., 254 B.R. 179 (Bankr. N.D. Ohio 2000) ("As a result [of section 502(b) of the Bankruptcy Code], upon a party objecting to a proof of claim such as occurred in the instant case, unmatured interest (i.e., postpetition interest) does not, under any circumstance, become a part of that creditor's allowed claim.") (emphasis added); In re Timbers, 793 F.2d at 1399-1400 ("an allowed claim may not include 'unmatured interest'") (emphasis in original) (citing § 502(b)(2)). The Lenders' "allowed claims" consist of the principal and interest that was due and owing under the Credit Agreements as of the petition date. See 11 U.S.C. §§ 101(5), 501 and 502. It is undisputed that

51

these allowed claims will be paid in full under the Plan. That is all that is required under the absolute priority rule.

The Third Circuit's decision in In re Armstrong World Industries, Inc., 432 F.3d 507 (3d Cir. 2005), does not in any way compel a different conclusion. In Armstrong, unsecured creditors, who were to be paid only 59.5% of their allowed claims under a proposed chapter 11 plan, challenged that plan on the basis that it provided for distributions of warrants to equity without paying unsecured creditors the full amount of their claims. The plan was particularly problematic because it ensured that the warrants would be distributed to equity even though the allowed amount of unsecured creditors' claims would not be paid in full. Given that the creditors stood to recover only 59.5% of their allowed claims, the Third Circuit affirmed the District Court's holding that the issuance of warrants to the equity interest holders violated the absolute priority rule. Id. at 509, 512-513. Any reliance that the Committee and the Lenders place on Armstrong is, at best, misplaced. In sharp contrast with the creditors in Armstrong, the Lenders in this case will be paid 100% of the allowed amount of their claims. Therefore, in contrast with Armstrong, the absolute priority rule is not implicated in this case.[17]

While the express statutory language of section 1129(b) says nothing about any type of postpetition interest, some courts have expressed the view that, even where the express statutory requirements are met, general equitable considerations in a "cram down" situation may justify an award of postpetition interest. But the legislative history of section 1129(b) casts serious doubt

---

[17] In re Resorts, 145 B.R. 412 (D.N.J. 1990), is readily distinguishable on similar grounds. In that case, the plan of reorganization would have allowed equity to retain value even though none of the three bondholder classes would receive the full amount of their allowed claims. Id. at 442. Here, in contrast, it is undisputed that the Committee and the Lenders will receive the full amount of their allowed claims. Neither Armstrong, In re Resorts nor any other case that Debtors have found has ever held that the absolute priority rule prohibits equity from participating in a plan or reorganization where, as here, all senior classes will receive the full amount of their allowed claims.

upon this view and, instead, strongly suggests that the payment of an allowed claim without postpetition interest is all that section 1129(b) contemplates. Indeed the legislative history, subsequent authority, and scholarly analysis suggest that postpetition interest might be prohibited under section 1129(b). In House Report No. 95-595 of the Bankruptcy Reform Act of 1978, Congress explained that under § 1129(b), "[n]o class may be paid more than in full." HR. Rep No. 595, 95th Cong., 1st Sess 414 (1977). The report gave guidance as to what is 'more than in full,' using an example of a hypothetical $1000 claim:

> Consider an allowed secured claim of $1000 in a class by itself…A third plan could [] give a note in a face amount of $1000 due five years from the effective date of the plan plus six percent annual interest commencing on the effective date of the plan on account of this claim… Whether the plan complies…depends on whether the discount rate is less than six percent… If [] the court found the discount rate to be less than the interest rate proposed under the plan, then *the present value of the note would exceed $1000* and the plan would fail confirmation. Id. at 415. (emphasis added).

Far from requiring the payment of default interest, this would seem to indicate that a Plan is <u>unconfirmable</u> under § 1129(b) if it would pay more than the present value of an allowed claim as of the effective date.[18] This treatment is not reserved for secured claims. The report also makes it clear that "the holder of an unsecured claim is not permitted to receive property of a value as of the effective date of the plan on account of such claim that is greater than the allowed amount of such claim." Id. at 415-16. Given this, it is hardly surprising that modern courts expressly recognize that "a corollary of the absolute priority rule is that a senior class cannot receive more than full compensation for its claims." See e.g. In re Exide, 303 B.R. at 61; In re MCorp Financial, Inc., 137 B.R. 219, 225 (Bankr. S.D. Tex. 1992) (same).

---

[18] If the Court concludes that Plan is unconfirmable because of the rate of interest it pays on the Lenders claims, the Plan Proponents are willing to reduce or eliminate this interest.

Notwithstanding the express statutory language and legislative history of section 1129(b), the Committee and the Lenders argue that <u>Dow Corning</u> requires Debtors to postpetition interest at the contract default rate. But <u>Dow Corning</u> is the only case to have ever held this. This Court has already recognized that <u>Dow Corning</u>, at best, stands for the proposition that <u>solvent</u> debtors must pay default interest <u>if</u> the result would not be inequitable. "<u>Dow Corning</u> recognized that '[c]ourts in solvent debtor cases have overwhelmingly concluded that there is a presumption that the default interest rate should be allowed...<u>unless the higher rate would produce an inequitable result</u>." Claims Objection Op. at 7 (citing <u>In re Dow Corning</u>, 456 F.3d 668, 680 (6th Cir. 2006)[19] (emphasis added). Indeed, the court in <u>Dow Corning</u> did not even conclude that payment of default interest was warranted. Instead, it remanded the matter to the district court to determine whether equitable factors warranted such an award. <u>Dow Corning</u>, 456 F.3d at 680.

The analysis in <u>Dow Corning</u> is deeply flawed. It is the <u>only</u> case the Lenders cite requiring debtors to pay postpetition interest at the contract default rate in the context of section 1129(b). None of the cases on which <u>Dow Corning</u> relies address the right to postpetition interest at the default rate in the context of section 1129(b) either. Indeed, <u>Dow Corning</u> stands alone in determining that there is a presumption towards postpetition interest at the default rate under § 1129(b).[20] When the opinion is analyzed, it is immediately clear why this is the case.

---

[19]  This conclusion asserted by <u>Dow Corning</u> is also false. Courts may frequently honor the contractual rights of oversecured creditors under § 506. But courts addressing the issue under § 1129(a)(7), the only other Code provision relevant to plan confirmation, have overwhelmingly concluded that the proper rate of postpetition interest is the federal judgment rate, notwithstanding any higher rate set forth in a contract.

[20]  <u>Dow Corning</u> is also inapposite because of the facts. Under the original plan, the unsecured creditors would receive interest at the federal judgment rate, which was lower than the *nondefault* rate under most of their contracts. Claims Op. at 7 n.8. The plan was then amended to provide for pendency interest "in accordance with the terms of the parties contract." <u>Dow Corning</u>, 456 F.3d at 673. The court had to decide whether to award interest at the default or nondefault rate under the *contract* pursuant to the terms of the plan. The district court concluded the rate should be the base contract rate absent a pre-petition default. <u>Id.</u> at 673-74. Without so much as stating that there was a prepetition *or* postpetition default, the Sixth Circuit held the default rate applied absent a determination the equities counseled otherwise on remand. <u>Id.</u> at 680. Here, of course, the interest
(footnote continued)

Most, if not all, of the cases on which <u>Dow Corning</u> relied involved prepetition defaults as well as oversecured creditors and considered whether contract rights should be honored under section 506(b) of the Code. <u>See e.g.</u> <u>In re Southland Corp.</u>, 160 F.3d 1054, 1059-60 (5th Cir. 1998) (where debtor defaulted prepetition, oversecured creditors who notified the debtor that the default interest rate was in effect were held entitled to default interest under § 506(b)); <u>In re Consolidated Operating Partners L.P.</u>, 91 B.R. 113, 116-17 (Bankr. D. Colo. 1988) (noting that "[w]hen the debtor is solvent, the equities dictate that additional interest be paid to the <u>secured</u> creditor rather than to the debtor" and that the rate of interest is governed by the agreement pursuant to the terms of section 506(b) (emphasis added).

It is entirely inappropriate to conclude that postpetition interest at the contract default rate is warranted under § 1129(b) because courts find that this is so under section 506(b). §506(b) <u>expressly</u> awards interest on a secured claim "under the <u>agreement</u> or State statute under which such claim arose." 11 U.S.C. § 506(b). Indeed, courts recognize that section 506(b) itself "gives an oversecured creditor the right to accrue interest at the rate provided for under the agreement between the creditor and its debtor." <u>See e.g.</u> <u>Consolidated Operating Partners L.P.</u>, 91 B.R. 113, 117 (Bankr. D. Colo. 1988) ("11 U.S.C. § 506(b) gives an oversecured creditor the right to accrue interest at the rate provided for under the agreement between the creditor and its debtor."); <u>In re Skyler Ridge</u>, 80 B.R. 500, 506 (Bankr. C.D. Calif. 1987) (same). But section 1129(b) does no such thing.

Scholars have already faulted <u>Dow Corning</u> for its failure to distinguish between secured and unsecured creditors and have heavily criticized the decision on this and many other grounds. Scholars properly recognize that the bankruptcy court in <u>Dow Corning</u> probably erred by

provided to the Lenders under Plan is not tied to the Credit Agreements and exceeds both the federal judgment rate and the nondefault rate under the Credit Agreements.

recognizing that section 1129(b)(2)(B)(i) might allow postpetition because "section 1129(b)(2)(B)(i) expressly *requires* that an unsecured creditor in a dissenting class receive property *equal* to the allowed amount of its claim, *not more* than the allowed amount of its claim." See Carmen H. Lonstein & Steven A.. Domanowski, Payment of Post-Petition Interest to Unsecured Creditors: Federal Judgment Rate Versus Contract Rate, 12 AM BANKR. INST. L. REV. 421, 438 (2004). These scholars have reasoned that allowed claims do not include post-petition interest under section 502(b), and that Dow Corning erred because "the court misinterpreted the 'fair and equitable' requirements of section 1129(b)(2)(B) in such a way as to *alter* the express requirement that the value of property received under a plan by unsecured creditors be *equal* to the allowed amount of their claims." Id. (emphasis in the original). Such an error is unsurprising considering that all of the cases Dow Corning relied on were cases involving oversecured creditors whose rights to postpetition interest under their contracts were expressly preserved by § 506(b) of the Code.

Other scholars have concluded that the court's decision to read a requirement of postpetition interest into § 1129(b)'s fair and equitable provision was "debatable" and seemingly motivated by the view that it was unfair that a debtor entered bankruptcy as a solvent entity but that if the filing for bankruptcy was truly unwarranted, the court probably "should have made a finding of bad faith instead of creating a new exception for postpetition interest."). Alexander Porter, Postpetition Interest on Unsecured Claims in the Case of a Solvent Debtor: Toward a More Consistent Statutory Regime, 81 S. Cal. L. Rev. 1341, 1350-51 (2008). (emphasis in the original).

Nevertheless, even under the flawed analysis set forth in Dow Corning, the Lenders do not have an entitlement to contractual default interest. As demonstrated above, a review of the

relevant equitable considerations here advocates only a result equal to or less than what the Committee and the Lenders agreed to long ago. The Committee's and the Lenders' belated demand for contractual postpetition interest should be seen for what it is: an improper attempt to reap a windfall by reneging on an agreement that was reached through arms-length negotiations. It would be the height of inequity to reward such tactics.

## V. THE PLAN WAS PROPOSED IN GOOD FAITH AND SHOULD BE CONFIRMED.

The Plan was proposed in good faith because it achieves the Bankruptcy Code's dual goal of providing the Debtors with a fresh start and satisfying creditors' claims.[21] See In re PWS Holdings Corp., 228 F.3d 224, 242 (3d Cir. 2000) ("[F]or purposes of determining good faith under section 1129(a)(3) ... the important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code.").

It is a "[a] paramount duty of a trustee or debtor in possession in a bankruptcy to act on behalf of the bankruptcy estate, that is, for the benefit of the creditors." In re Cybergenics, 226 F.3d 237, 243 (3d Cir. 2000); In re Global Crossing, 295 B.R. 726, 745 (Bankr. S.D.N.Y. 2003). In recognition of this duty, the Plan pays creditors the full amount of their allowed claim as is required by § 1129(b) and postpetition interest in excess of any amount that it must pay creditors by law. It then seeks to provide for the Debtors' shareholders with any remaining value after taking care of creditors in full. Accordingly, the Plan Proponents have proposed the Plan in good faith as required by § 1129(a)(3), and it should be confirmed.

---

[21]  "The objective of bankruptcy laws is to equitably distribute the bankrupt's assets among creditors and to enable the bankrupt to make a fresh start." H.R. Rep. No. 595, 95th Cong., 1st Sess. 360-363 (1977), reprinted in 1978 U.S.C.C.A.N. 5787, 6315-6318; In re Bradford, 6 B.R. 741, 744 (D. Nev. 1980) (same).

57

## CONCLUSION

The result should be clear. The Plan contemplates that the Lenders will receive a rate of interest on their claims which is fair and equitable, as evidenced by the fact that it is the very rate they bargained for and is more than they would be entitled to under the law and facts. Accordingly, the Lenders are not impaired by the Plan and are receiving payment in full on their allowed claims. The Plan's treatment of the Lenders is not an obstacle to confirmation.

Dated: August 7, 2009

KIRKLAND & ELLIS LLP
David M. Bernick, P.C.
Theodore L. Freedman
Deanna D. Boll
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

Barbara Mack Harding
Brian Stansbury
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200

THE LAW OFFICES OF JANET S. BAER, P.C.
Janet S. Baer, P.C.
70 W. Madison Street
Suite 2100
Chicago, IL 60602
Telephone: (312) 641-2162

and

PACHULSKI, STANG, ZIEHL & JONES LLP
James E. O'Neill (Bar No. 4042)
Timothy Cairns (Bar No. 4228)
Kathleen P. Makowski (Bar No. 3648)
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705
(Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400

*Counsel for the Debtors and Debtors in Possession*

CAMPBELL & LEVINE, LLC

Mark T. Hurford (No. 3299)
800 N. King Street, Suite 300
Wilmington, DE 19801
Telephone: (302) 426-1900
Facsimile: (302) 426-9947


<u>and</u>

CAPLIN & DRYSDALE, CHARTERED
Elihu Inselbuch
375 Park Avenue, 35th Floor
New York, NY 10152-3500
Telephone: (212) 319-7125
Facsimile: (212) 644-6755

Peter Van N. Lockwood
Nathan D. Finch
Jeffrey A. Liesemer
One Thomas Circle, N.W.
Washington, D.C. 20005
Telephone: (202) 862-5000
Facsimile: (202) 429-3301

*Counsel for the Official Committee of Asbestos Personal Injury Claimants*

PHILIPS, GOLDMAN & SPENCE, P.A.

John C. Philips (Bar No. 110)
1200 North Broom Street
Wilmington, DE 19806
Telephone: (302) 655-4200
Facsimile: (302) 655-4210

and

ORRICK, HERRINGTON & SUTCLIFFE LLP
Roger Frankel
Richard H. Wyron
Jonathan P. Guy
Debra L. Felder
1152 15th Street, NW
Washington, DC 20005
Telephone: (202) 339-8400
Facsimile: (202) 339-8500

*Counsel for David T. Austern, Asbestos PI Future Claimants' Representative*

SAUL EWING LLP

Teresa K.D. Currier (Bar No. 3080)
222 Delaware Avenue, Suite 1200
P.O. Box 1266
Wilmington, DE 19899
Telephone: (302) 421-6800
Facsimile: (302) 421-6813

and

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Philip Bentley
Gregory Horowitz
Douglas Mannal
1177 Avenue of the Americas
New York, NY 10022
Telephone: (212) 715-9100
Facsimile: (212) 715-8000

*Counsel for the Official Committee of Equity Security
Holders*