# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al.[1] | ) | Case No. 01-01139 (JKF) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | **Hearing Date: September 8, 2009 at 9:00 a.m.** |

## **PLAN PROPONENTS' MAIN BRIEF IN SUPPORT OF PLAN CONFIRMATION**

---

[1] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co. Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., GC Limited Partners I, Inc., (f/k/a Grace Cocoa Limited Partners I, Inc.), GC Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc. GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation., W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (F/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

# TABLE OF CONTENTS

I.      INTRODUCTION.............................................................................................1

II.     CASE HISTORY: SYSTEMATIC AND HOTLY CONTESTED
        SEQUENCED LITIGATION PRODUCES SETTLEMENT OF EACH
        PORTION OF THE CASE IN A COHESIVE 524(g) PLAN. ...................................2

        A.      Grace Files Chapter 11 To Determine The Scope Of Its Personal Injury
                Liability.............................................................................................................3

        B.      Sequenced Litigation Begins Under Judge Wolin, Including The Prosecution
                Of Fraudulent Conveyance Claims Against Sealed Air And Fresenius.
                Settlement Produces Significant Value For The Estate, Predicted Upon
                Achieving An Overall 524(g) Plan. .................................................................6

        C.      The Court Addresses The Traditional Property Damage Litigation And, In
                Stages, Administers Litigation Of The Current Property Damage Claims.............9

        D.      Massive Estimation Litigation Unfolds Over The Scope Of The Personal
                Injury Liability.  Midtrial, Agreement Is Reached To Resolve This Central
                Issue In The Case. ..........................................................................................11

        E.      Plan Formulation Leads To The Appointment Of An Fcr For Property
                Damage And The Resolution Of The Zai Litigation .........................................14

        F.      The Plan Is Finalized And The Vote Is Taken.................................................17

III.    THE JOINT PLAN IS A SECTION  524(g) SETTLEMENT. ...............................18

        A.      The Joint Plan Implements Section 524(g) To Address Grace's Asbestos
                Liability...........................................................................................................18
                1.      The Joint Plan Achieves The Paramount Goal of Treating Grace's
                        Current and Future Asbestos Claimants In Substantially the Same
                        Manner. ...............................................................................................19
                2.      The Joint Plan Provides A Final Global Resolution of Grace's
                        Asbestos Liabilities Through Section 524(g). .........................................23
                3.      The Joint Plan Implements the Policies and Strictures of Section
                        524(g)..................................................................................................25
                        a)      Asbestos PI Claims (Class 6).......................................................26
                        b)      Asbestos PD Claims and US ZAI PD Claims (Class 7A and
                                7B).............................................................................................29
                        c)      CDN ZAI PD Claims (Class 8).....................................................31

        B.      Treatment of Grace's Other Constituencies Under the Joint Plan.......................31
                1.      General Unsecured Claims are Unimpaired ............................................31
                2.      Other Creditors Are Also Unimpaired....................................................32
                3.      Equity Interests ...................................................................................32

IV.     JURISDICTION AND BURDEN OF PROOF. ....................................................32

i

V.     THE JOINT PLAN HAS BEEN PROPOSED IN GOOD FAITH -- 11
       U.S.C. § 1129(a)(3). ...........................................................................................34

VI.    THE JOINT PLAN IS IN THE BEST INTERESTS OF ALL IMPAIRED
       CREDITORS......................................................................................................37

       A.     The Legal Standard for the Best Interests Test in the Third Circuit.....................37

       B.     The Joint Plan Is Plainly in the Best Interests of All Creditors ............................38

       C.     The Liquidation Analysis Demonstrates that the Debtors Have Satisfied the
              Best Interests Test......................................................................................................39
              1.     The Value of the Debtors' Assets Is Significantly Higher in Chapter
                     11 Than in Chapter 7.....................................................................................39
              2.     The Debtors Have a Higher Asset Value in Chapter 11 Than in
                     Chapter 7 Because of Sealed Air and Fresenius Contributing Over $1
                     Billion in Value..............................................................................................40
              3.     Assets Available for Unsecured Creditors......................................................43
              4.     The Liabilities of the Debtors in Chapter 7 Are Uncertain and There
                     Is a Wide Range of Potential Liabilities in a Chapter 7..............................44

VII.   CLASSIFICATION OF INDIRECT PI TRUST CLAIMS -- CLASS 6 VS.
       CLASS 9............................................................................................................47

       A.     The Classification of Indirect PI Trust Claims in Class 6 is Permissible
              Under 11 U.S.C. § 1122...............................................................................................47
              1.     Pursuant to Section 524(g), All Indirect Claims Are Channeled to the
                     Asbestos PI Trust. ........................................................................................47
              2.     Specific Objections to Classification in Class 6. ...........................................50
                     a)     Insurers' Objections to Classification in Class 6. ...........................50
                     b)     FFIC Objections................................................................................52
                     c)     BNSF's Objections. ..........................................................................56
                     d)     Scotts' Objections. ...........................................................................59
                     e)     MCC's Objections. ...........................................................................60
                     f)     Montana's Objections. ......................................................................62

VIII.  THE ASBESTOS PI TDP TREATS INDIRECT PI TRUST CLAIMS
       PROPERLY.......................................................................................................63

       A.     The Asbestos PI TDP Adequately Specifies The Treatment Of Indirect PI
              Trust Claims In Accordance With Section 1123(a)(3). .........................................63

       B.     The Asbestos PI TDP Provides For Similar Treatment Of All Class 6 Claims
              In Accordance With Sections 1123(a)(4) And 524(g)(2)(B)(II)(V). .....................66

IX.    THE INSURANCE COMPANIES' COMPLAINTS REGARDING ALLEGED
       TRUST ADVISORY COMMITTEE CONFLICTS OF INTEREST ARE
       MERITLESS. .....................................................................................................71

       A.     The Trust Advisory Committee is a Well-Established Element of Asbestos
              Personal Injury Trusts. ..............................................................................................71

| | | |
|---|---|---|
| B. | The TAC's Role and Powers are Limited.............................................................73 | |
| | 1. | The TAC Only Represents Present Claimants..........................................73 |
| | 2. | The TAC's Powers Are Limited and Subject to Judicial Review. ............74 |
| C. | TAC Members' Duties to Present Claimants and Clients Are Compatible...........75 | |
| | 1. | TAC members advocate only on behalf of present claimants. ..................75 |
| | 2. | TAC members comply with the Rules of Professional Conduct. ...............77 |
| D. | The Insurance Companies' Hypothetical "Conflicts" are Unrealistic. ..................77 | |
| | 1. | Insurance Companies cannot assume that TAC members bring unmeritorious claims.................................................................................78 |
| | 2. | Insurance Companies cannot assume that every dollar paid to a Present Claimant reduces the recovery of another Present Claimant. .......79 |

| | | |
|---|---|---|
| X. | **THE INSURANCE COMPANIES DO NOT HAVE STANDING TO COMPLAIN ABOUT THE SECTION 524(g) FUNDING REQUIREMENTS. .......79** | |

| | | |
|---|---|---|
| XI. | **RELEASES AND EXCULPATION PROVISIONS IN THE JOINT PLAN ARE PROPER.............................................................................................................80** | |
| A. | The Releases in the Joint Plan are Appropriate and Consistent With Section 1123(b) of the Bankruptcy Code...............................................................80 | |
| | 1. | The Joint Plan Provides for Three Categories of Releases. ......................80 |
| | | a) The Sealed Air and Fresenius Releases .........................................81 |
| | | b) The Successor Claims Injunction in § 8.5 of the Joint Plan Is Permitted Under Applicable Third Circuit Law .............................89 |
| | | c) The Third Party Releases in Section 8.8.7 of the Joint Plan Are Consensual and Satisfy Applicable Third Circuit Law...........94 |
| | 2. | The Debtors' Release Provisions Are Appropriate Under the Facts and Circumstances of This Chapter 11 Case and Should Be Approved........................................................................................................96 |
| | 3. | Objections to the Releases Should Be Denied .........................................97 |
| B. | The Exculpation Clause is Proper Under Third Circuit Law................................98 | |
| C. | Objections to the Exculpation Clause. ...............................................................101 | |
| | 1. | Objections to the Scope of the Exculpation Clause. ..............................101 |
| | 2. | Objections to the Language of the Exculpation Clause. ..........................103 |
| | | a) CNA's Objection ........................................................................103 |
| | | b) FFIC's Objections.......................................................................104 |
| | | c) Seaton and OneBeacon's Objections............................................104 |

| | | |
|---|---|---|
| XII. | **THE REMAINING OBJECTIONS TO PLAN CONFIRMATION PURSUANT TO §§ 1129, 1122, 1123, AND 1124 OF THE BANKRUPTCY CODE LACK MERIT...................................................................................................105** | |
| A. | Each Class of Claims Has Either Accepted the Joint Plan or Is Not Impaired Under the Joint Plan -- 11 U.S.C. §§ 1124(1), 1129(a)(8) and 1129(b). .............105 | |
| B. | The Joint Plan Provides For the Same Treatment For Each Claim In Each Class -- 11 U.S.C. § 1123(a)(4) ...........................................................................108 | |

C.    The Joint Plan Provides Adequate Means For Its Implementation -- 11 U.S.C. § 1123(a)(5)...........................................................112

D.    The Debtor Has Disclosed All Necessary Information Regarding Directors, Officers, Trustees, And Insiders -- 11 U.S.C. § 1129(a)(5)...............................112

E.    Any Payments Made or To Be Made by the Debtor For Services or For Costs and Expenses Have Been Approved by or Are Subject To the Approval of the Court -- 11 U.S.C. § 1129(a)(4).................................................114

F.    The Joint Plan Complies With the Applicable Provisions of Title 11 (11 U.S.C. § 1129(a)(1)) ..................................................................................115

XIII.  **OBJECTIONS THAT THE JOINT PLAN FAILS TO COMPLY WITH SECTION 524(g) AND 105(a) LACK MERIT. ..........................................116**

A.    Section 524(g) Objections of Anderson Memorial ............................................116

B.    Requirement that the Trust Be Funded by the Debtors' Securities and Obligation to Make Future Payments -- 11 U.S.C. § 524(g)(2)(B)(i)(II)............118

C.    Requirement that the Section 524(g) Trust Own, or Be Entitled to Own a Majority of the Voting Shares of the Debtors -- 11 U.S.C. § 524(g)(2)(B)(i)(III) .............................................................................................121

D.    Requirement that The Debtors Be Subject to Substantial Future Demands for Payment Arising from Their Asbestos-Related Activities -- 11 U.S.C. § 524(g)(2)(B)(ii)(I) ..............................................................................................123

E.    Requirement that the Trust Will Operate Through Mechanisms that Provide Reasonable Assurance that Present Claims and Future Demands That Involve Similar Claims Will Be Treated In Substantially The Same Manner -- 11 U.S.C. § 524(g)(2)(B)(ii)(V).................................................................124

F.    The Extension of the Channeling Injunction to Certain Third Parties is Permissible -- 11 U.S.C. § 524(g)(4)(A)(ii)(III) ..................................................126

G.    Issuance of the Channeling Injunction is Fair and Equitable in Light of the Benefits Provided to the Trust -- 11 U.S.C. § 524(g)(4)(B)(ii). ..........................127

H.    The Allegedly Overly Broad Nature of the Section 524(g) Injunction Does Not Provide the Insurance Companies with a Valid Objection to Confirmation. .....................................................................................................134

I.    The Allegedly Overly Narrow Nature of the Section 524(g) Injunction Does Not Provide the Insurance Companies With a Valid Objection to Confirmation. .....................................................................................................135

J.    The Asbestos Insurance Entity Injunction Is Duly Authorized by Section 105(a) of the Bankruptcy Code and the Injunctions In the Joint Plan Do Not Preclude Co-Defendants From Accessing Their Own Insurance Policies...........137
    1.    This Court May Issue the Asbestos Insurance Entity Injunction Pursuant to Section 105(a) of the Bankruptcy Code...............................137

|  | 2. | The Joint Plan, and the Relief Sought Under the Asbestos Insurance Entity Injunction and the Asbestos PI Channeling Injunction, Do Not Enjoin Co-Defendants From Pursuing Insurance Rights Under Policies Issued Directly to Them. ............................................. 138 |

XIV. **MISCELLANEOUS OTHER OBJECTIONS TO THE JOINT PLAN ALSO LACK MERIT** ...................................................................................... 139

    A.    FFIC's Setoff Rights are adequately preserved ................................. 139

    B.    The Joint Plan Does Not Violate Sections 502(a) & (b) ...................... 141

    C.    Allstate's Retention of Jurisdiction arguments fail ............................. 142

    D.    Edwards Claimants' Objection .......................................................... 144

    E.    Anderson Memorial's Opt-Out Argument Lacks Merit. ..................... 147

    F.    Kaneb's Objections Regarding the Scope of the Discharge are Unfounded. ...... 148

XV. **THE JOINT PLAN COMPLIES WITH ALL OTHER REQUIREMENTS FOR CONFIRMATION SET FORTH IN SECTIONS 1122, 1123, 1129, AND 524(g) OF THE BANKRUPTCY CODE** .................................................. 149

    A.    The Plan Proponents Have Complied With the Disclosure and Solicitation Provisions of the Bankruptcy Code -- 11 U.S.C. § 1129(a)(2). ............................ 149

    B.    The Joint Plan Does Not Contain Any Rate Changes Subject to the Jurisdiction of Any Governmental Regulatory Commission -- 11 U.S.C. § 1129(a)(6). ............................ 150

    C.    The Joint Plan Provides For Payment of Priority Claims -- 11 U.S.C. § 1129(a)(9). ............................ 151

    D.    If Classes Are Impaired, At Least One Impaired Class Has Accepted the Joint Plan -- 11 U.S.C. § 1129(a)(10). ............................ 151

    E.    All Statutory Fees Will Be Paid -- 11 u.S.C. § 1129(a)(12). ............... 151

    F.    The Joint Plan Provides For the Continuation of Retiree Benefits -- 1129(a)(13). ............................ 152

    G.    The Joint Plan Properly Classifies Claims Under Section 1123(a)(1) and (2). ... 152

    H.    The Joint Plan Provides that the Reorganized Debtors' Charters Will Prohibit the Issuance of Nonvoting Equity Securities -- 11 U.S.C. § 1123(a)(6). ............................ 153

    I.    The Joint Plan Complies With Provisions Regarding Directors, Officers, Trustees and Insiders -- 11 U.S.C. § 1123(a)(7) ............................ 154

    J.    The Joint Plan Complies With Section 1123(b) With Respect To Permissive Provisions ............................ 154

    K.    Certain § 524(g) Requirements Are Not In Dispute ............................ 155

**XVI.  CONCLUSION** .............................................................................................................**157**

# TABLE OF AUTHORITIES

## CASES

Aaron C. Edwards et al. v. Pittsburgh Corning Corp. et al.,
   Cause No. B-150, 896-J (Tex. D. Ct. March 28, 2000) ................................................... 144

Allegheny Health, Educ. and Research Found. v. AFSCME (In re Allegheny),
   383 F.3d 169 (3d Cir. 2004)............................................................................................91

Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship,
   526 U.S. 434 (1999)................................................................................................ 35, 38

Barnard v. Langer,
   109 Cal.App. 4th 1453 (Cal. App. 2. Dist. 2003) ........................................................ 76

Beal Bank, S.S.B. v. Waters Edge Ltd. P'ship,
   248 B.R. 668 (D. Mass. 2000) ...................................................................................... 136

Bedrock Ltd., LLC v. U.S.,
   541 U.S. 176 (2004)...................................................................................................... 121

Behring Int'l Inc. v. Greater Houston Bank,
   662 S.W.2d 642 (Tex. Ct. App. 1983) .......................................................................... 139

Caminiti v. United States,
   242 U.S. 470, 485 (1917)............................................................................................... 119

Cent. Virginia Cmty. Coll. v. Katz,
   546 U.S. 356 (2006)........................................................................................................ 89

Cohen v. Karp,
   122 A.2d 524 (Md. 1923) ............................................................................................... 139

Connecticut Nat'l Bank v. Germain,
   503 U.S. 249 (1992)....................................................................................................... 119

CoreStates Bank, N.A. v. United Chemical Technologies, Inc.,
   202 B.R. 33 (E.D. Pa. 1996) .................................................................................... 33, 38

Daniel v. Am. Bd. of Emergency Med.,
   428 F.3d 408 (2d Cir.2005)............................................................................................ 121

Debtors v. Walton (In re United Artists Theatre Co.),
   315 F.3d 217 (3d Cir. 2003)............................................................................................ 87

Envtl. Def. v. Duke Energy Corp.,
   549 U.S. 561 (2007)....................................................................................................... 129

Fed. Ins. Co v. Grace,
    No. 04-844, 2004 U.S. Dist. WL 5517843 (D. Del. Nov. 22, 2004) .................................. 24

First Fidelity Bank v. McAteer,
    985 F.2d 114 (3d Cir. 1993) ............................................................................................. 87

First Nat'l Bank of Birmingham v. Ingalls,
    257 Ala. 536, 59 So. 2d 914 (1952) ................................................................................. 21

Georgine v. Amchem Prods., Inc.,
    157 F.R.D. 246 (E.D. Pa 1994) .......................................................................................... 3

Gillman v. Continental Airlines (In re Continental Airlines),
    203 F.3d 203 (3d Cir. 2000) ................................................................................. 87, 90, 93

Greenleaf v. Garlock, Inc.,
    174 F.3d 352 (3d Cir. 1999) ........................................................................................... 133

Hammond v. Myers,
    30 Tex. 375 (Tex. 1867) ................................................................................................. 140

Hanson v. First Bank of South Dakota, N.A.,
    828 F.2d 1310 (8th Cir. 1987) .......................................................................................... 34

Hartford Underwriter's Ins. Co. v. Union Planters Bank, N.A.,
    503 U.S. 1 (2000) ........................................................................................................... 119

Heartland Wireless Communications, Inc.,
    Case No. 98-2692 (Bankr. D. Del. Mar. 15, 1999) ........................................................... 99

Herman & MacLean v. Huddleston,
    459 U.S. 375 (1983) ......................................................................................................... 33

Hohl v. Bastian,
    279 B.R. 165 (W.D. Pa. 2002) .......................................................................................... 91

In re ABB Lummus Global Inc.,
    No. 06-10401 (JKF), 2006 WL 2052409 (Bankr. D. Del. June 29, 2006) ..................... 100, 102

In re ACandS, Inc.,
    311 B.R. 36 (Bankr. D. Del. 2004) .................................................................................... 69

In re ACG Holdings, Inc.,
    No. 08-11467 (Bankr. D. Del. Aug. 6, 2008) .................................................................... 94

In re Adelphia Comm. Corp.,
    368 B.R. 140 (Bankr. S.D.N.Y. 2007) .............................................................................. 38

In re Adelphia Comm. Corp.,
    361 B.R. 337 (S.D.N.Y. 2008) ............................................................................. 67

In re Amatex Corp.,
    110 B.R. 168 (Bankr. E.D. Pa. 1990) .............................................................. 141

In re ANC Rental Corp., Inc.,
    341 B.R. 178 (Bankr. D. Del. 2006) ............................................................... 140

In re AOV Indus., Inc.,
    792 F. 2d 1140 (D.C. Cir. 1986) ...................................................................... 50

In re Armstrong World Indus., Inc.,
    348 B.R. 136 (D. Del. 2006) ...................................................................... 49, 51

In re Asbestos Claims Mgmt. Corp.,
    294 B.R. 663 (N.D. Tex. 2003) ....................................................................... 49

In re Babcock & Wilcox Company,
    Bankr. Case No. 00-10992 (Bankr. E.D. La.) ................................................ 142

In re Birch Telecom, Inc.,
    Case No. 05-12237 (PJW), D.I. 702 (Bankr. D. Del. Mar. 30, 2006) ............... 105

In re Briscoe Enters., Ltd., II,
    994 F.2d 1160 (5th Cir. 1993) ........................................................................ 35

In re Burns & Roe Enter.'s, Inc.,
    No. 08-4191 (GEB), 2009 U.S. Dist. WL 438694 (D.N.J. Feb. 23, 2009) ....... passim

In re Celotex Corp.,
    204 B.R. 586 (M.D. Fla. 1996) ....................................................................... 49

In re Central Medical Center, Inc.,
    122 B.R. , 568, 575 (Bankr. E.D. Mo. 1990) ........................................ 21, 67, 111

In re Century Glove, Inc.,
    1993 WL 239489 (Bankr. D. Del. 1993) ................................................... 34, 37-38

In re Combustion Eng'g,
    391 F.3d 190 (3d. Cir. 2004) ....................................................................... passim

In re Congoleum Corp.,
    426 F.3d 675 (3d Cir. 2005) ........................................................................... 71

In re Congoleum Corp.,
    362 B.R. 167 (Bankr. D.N.J. 2007) .................................................... 120, 122, 130

In re Congoleum Corp.,
No. 03-51524, 2008 Bankr. WL 4186899 (Bankr. D.N.J. Sept. 2, 2008) ......................... 21

In re Congoleum Corp.,
No. 03-51524, 2009 Bankr. WL 499262, (Bankr. D.N.J. Feb. 26, 2009) ......................... 69

In re Conseco, Inc.,
301 B.R. 525 (Bankr. N.D. Ill. 2003) ............................................................. 94

In re Coram Healthcare Corp.,
315 B.R. 321 (Bankr. D. Del. 2004) ...................................................... passim

In re Crysler LLC,
Case No. 09-2311 (2d Cir. Aug. 5, 2009) ...................................................... 40

In re Dow Corning Corp.,
244 B.R. 635 (Bankr. E.D. Mich. 1999) ......................................................... 52

In re Dow Corning Corp.,
255 B.R. 445 (E.D. Mich. 2000) ................................................... 21, 67, 111

In re Drexel Burnham Lambert Group, Inc.,
960 F.2d 285 (2d Cir. 1992) ................................................................... 100

In re Dura Auto. Sys., Inc.,
No. 06-11202 (Bankr. D. Del. May 13, 2008) ................................................. 94

In re Eagle-Picher Indus., Inc.,
203 B.R. 256 (S.D. Ohio 1996) ........................................................ 113, 117

In re Enron Corp.,
326 B.R. 497 (S.D.N.Y. 2005) ........................................................... 99-100

In re Entergy New Orleans, Inc.,
2007 WL 1343804 (Bankr. E.D. La. 2007) .................................................... 35

In re Exide Techs.,
303 B.R. 48 (Bankr. D. Del. 2003) ................................................... 86, 94, 96

In re Federal Mogul-Global,
2007 WL 4180545 (Bankr. D. Del. 2007) ................................................ 49, 128

In re Federal-Mogul Global Inc.,
385 B.R. 560 (Bankr. D. Del. 2008) ........................................................... 21

In re Finova Group, Inc.,
304 B.R. 630 (D. Del. 2004) ................................................................... 111

x

In re Foamex Int'l Inc.,
No. 05-12685 (Bankr. D. Del. Feb. 1, 2007) ..................................................... 94

In re Genesis Health Ventures, Inc.,
266 B.R. 591 (Bankr. D. Del. 2001) ................................................ 33, 99, 115

In re Gibson Group, Inc.,
66 F.3d 1436 (6th Cir. 1995) ........................................................... 35

In re G-I Holdings, Inc.,
328 B.R. 691 (D.N.J. 2005) ............................................................... 22

In re Hazel Pointe, LP,
2009 WL 1789111 (Bankr. N.D. Tex. 2009) .................................................. 35

In re Hilex Poly Co., LLC,
No. 08-10890 (Bankr. D. Del. June 26, 2008) ................................................ 94

In re Hillsborough Holdings Corp.,
197 B.R. 372 (Bankr. M.D. Fla. 1996) ........................................................ 23

In re Integrated Tele. Express, Inc.,
384 F.3d 108 (3d Cir. 2004) ................................................................... 34

In re Joint Eastern & Southern Districts Asbestos Litig.,
982 F.2d 721 (2d Cir. 1992) ............................................................... 20, 76

In re Kaiser Aluminum Corp.,
Case No. 02-10429 (JKF), D.I. 8225 (Bankr. D. Del. Feb. 6, 2006) ................................ 105, 128, 142

In re Koelbl,
751 F.2d 137 (2d Cir. 1984) ................................................................... 34

In re Lason, Inc.,
300 B.R. 227 (Bankr. D. Del. 2003) ............................................................ 38

In re Lernout & Hauspie Speech Products, N.V.,
301 B.R. 651 (Bankr. D. Del. 2003) ........................................................ 69, 136

In re Levitz Furniture Inc.,
Case No. 97-1842 (MFW) (Bankr. D. Del. Dec. 14, 2000) ............................................ 99

In re Lisanti Foods, Inc.,
329 B.R. 491 (D.N.J. 2005) ................................................................... 114

In re Lowenschuss,
67 F.3d 1382 (9th Cir. 1995) ................................................................. 115

In re Magnatrax Corp.,
     2003 WL 22807541 (Bankr. D. Del. 2003) ...................................................... 35

In re Martin,
     91 F.3d 389 (3d Cir. 1996).................................................................................. 86

In re MCorp Fin., Inc.,
     160 B.R. 941 (S.D. Tex. 1993) ........................................................................... 35

In re Mid-Valley, Inc.,
     305 B.R. 425 (Bankr. W.D. Pa. 2004) ............................................................... 71

In re MUMA Servs. Inc.,
     286 B.R. 583 (Bankr. D. Del 2002) ................................................................... 76

In re National Gypsum Co.,
     No. 90-37213 (Bankr. N.D. Tex. March 9, 1993) ........................................... 117

In re National/Northway Ltd. P'Ship,
     279 B.R. 17 (Bankr. D. Mass. 2002) .................................................................. 52

In re New Century TRS Holdings, Inc.,
     __ B.R. __, 2009 WL 1704554 (D. Del. June 16, 2009) ................................... 67

In re NII Holdings, Inc.
     288 B.R. 356 (Bankr. D. Del. 2002) ................................................................. 105

In re North American Refractories Company
     (Bankr. W.D. Pa. Nov., 14 2007)................................................................... 90, 93

In re One Times Square Assoc.'s Ltd. P'ship,
     159 B.R. 695 (S.D.N.Y 1993)............................................................................. 52

In re Owens Corning,
     Case No. 00-3837 (JKF), D.I. 19366 (Bankr. D. Del. Sept. 26, 2006)............................. 105, 142

In re Pacor, Inc.,
     110 B.R. 686 (E.D. Pa. 1990) ........................................................................... 140

In re Pliant Corp.,
     Case No. 06-10001 (MFW) D.I. 923 (Bankr. D. Del. Jun. 23, 2006) ............... 105

In re Porter Hayden Co.,
     No. 02-54152, 2006 Bankr. WL 4667137 (Bankr. D. Md. June 30, 2006) ....................... 49

In re PPI Enters. (U.S.), Inc.,
     324 F.3d 197 (3d Cir. 2002)............................................................................... 35

In re PWS Holding Corp.,
        228 F.3d 224 (3d Cir. 2000)................................................................................ passim

In re Quigley Co.,
        346 B.R. 647 (Bankr. S.D.N.Y. 2006) ............................................................. 24

In re Remy Worldwide Holdings Inc.,
        No. 07-11481 (Bankr. D. Del. Nov. 20, 2007) ................................................ 94

In re Resorts Int'l Inc.,
        145 BR. 412 (Bankr. D.N.J. 1990) ................................................................. 115

In re Russell-Stanley Holdings, Inc.,
        Case No. 05-12339 (MFW), D.I. 254 (Bankr. D. Del. Oct. 25, 2005) ............... 105

In re Sea Containers Ltd.,
        No. 06-11156 (Bankr. D. Del. Nov. 24, 2008) ................................................ 94

In re SemCrude, L.P.,
        399 B.R. 388 (Bankr. D. Del. 2009) ............................................................... 139

In re SGL Carbon Corp.,
        200 F.3d 154 (3d Cir. 1999)............................................................................. 34

In re Sound Radio, Inc.,
        93 B.R. 849 (Bankr. D.N.J. 1988) .................................................................... 34

In re Source Enters., Inc.,
        2007 WL 2903954 (Bankr. S.D.N.Y. 2007) ..................................................... 35

In re Sun Country Dev., Inc.,
        764 F.2d 406 (5th Cir. 1985) ........................................................................... 35

In re Texaco Inc.,
        84 B.R. 893 (Bankr. S.D.N.Y. 1988).............................................................. 115

In re T-H New Orleans L.P.,
        116 F.3d 790, 802 (5th Cir. 1997) .................................................................... 35

In re Trust of Rosenberg,
        273 Neb. 59, 727 N.W.2d 430 (Neb. 2007)...................................................... 21

In re UNR Industries, Inc.,
        71 B.R. 467 (Bank.N.D.Ill.1987)...................................................................... 24

In re USG Corp.,
        Case No. 01-02094 (JKF), D.I. 11688 (Bankr. D. Del. Jun. 16, 2006) ............ 105

In re US Mineral Prod.'s Co.,
No. 01-2471 (JKF), 2005 WL 5898300 (Bankr. D. Del. Nov. 29, 2005) ......................... 35, 100, 102

In re U.S. Truck Co., Inc.,
42 B.R. 790 (Bankr. E.D. Mich 1984) ............................................................... 52

In re Walker,
165 B.R. 994 (E.D. Va. 1994) ..................................................................... 34, 35

In re Wedtech Corp.,
85 B.R. 285 (Bankr. S.D.N.Y. 1988) ............................................................. 141

In re Western Asbestos Co.,
313 B.R. 832 (Bankr. N.D. Cal. 2003) ............................................... 23, 121, 129

In re Western Asbestos Co.,
313 B.R. 456 (Bankr. N.D. Cal. 2004) ........................................................... 135

In re Westmoreland Coal Co.,
Case Nos. 94-1066 through 94-1070 (Bankr. D. Del. Dec. 16, 2006) ............... 99

In re Winstar Comm'ns, Inc.,
554 F.3d 382 (3d Cir. 2009) ....................................................................... 108

In re W.R. Grace & Co., et al.,
Case No. 01-1139 (Bankr. D. Del. July 29, 2002) ............................................ 41

In re W.R. Grace & Co.,
386 B.R. 17 (Bankr. D. Del. 2008) ................................................................. 56

In re Zenith Elecs. Corp.,
241 B.R. 92 (Bankr. D. Del. 1999) ........................................................... passim

International Wireless Communications Holdings, Inc.,
Case No. 98-02007 (Bankr. D. Del. Mar. 26, 1999) ......................................... 99

Jennings v. Murdock,
220 Kan. 182, 553 P.2d 846 (Kan. 1976) ....................................................... 21

Kane v. Johns-Manville (In re Johns-Manville Corp.),
843 F.3d 636 (2d Cir. 1988) ............................................................. 19, 34, 150

Kossman v. The TJX Companies, Inc.,
136 B.R. 640 (W.D. Pa. 1991) ...................................................................... 91

Langenkamp v. Culp,
498 U.S. 42 (1990) ................................................................................... 108

Loewenthal v. Coonan,
    67 P. 324 (Cal. 1902) ........................................................................................................... 140

Lowery v. Lewis,
    21 F.3d 344 (9th Cir. 1994) ............................................................................................. 78

MacArthur Co. v. Johns-Manville Corp.,
    837 F.2d 89 (2d Cir. 1988)................................................................................... 21, 24, 60

Manati Sugar Co. v. Mock,
    75 F.2d 284, 285 (2d Cir. 1935)...................................................................................... 34

Matter of Isis Foods, Inc.,
    24 B.R. 75 (Bankr. W.D. Mo. 1982)............................................................................. 141

Nemours Found. v. Gilbane, Aetna, Fed. Ins. Co.,
    632 F. Supp. 418 (D.Del. 1986)...................................................................................... 78

Newbery Corp. v. Fireman's Fund Ins. Co.,
    95 F.3d 1392 (9th Cir. 1996) ......................................................................................... 141

New England Diaries, Inc. v. Dairy Mart Convenience Stores, Inc
    (In re Dairy mart Convenience Stores, Inc.),
    351 F.3d 86 (2d Cir. 2003).............................................................................................. 56

The Official Comm. Of Unsecured Creditors of Cybergenics Corp. v. Chinery,
    304 F.3d 316 (3rd Cir. 2002) ............................................................................................ 7

Pacor Inc. v. Higgins,
    742 F.2d 984 (3d Cir. 1984)............................................................................................ 90

Papiernik v. Papiernik,
    544 N.E.2d 664 (Ohio 1989)........................................................................................... 73

Schweitzer v. Consolidated Rail Corp.,
    758 F. 3d 758 F.2d 936(3d Cir. 1985) ............................................................................ 42

Scotts Company v. Am. Employers Ins. Co., et al.,
    Adv. Proc. 04-55083 (filed Sept. 2, 2004) ...................................................................... 59

Travelers Indemnity Co. v. Bailey,,
    ____ U.S. ____, 129 S.Ct. 2195 (2009).................................................................... 82, 92

Trojan Hardware Co. v. Bonacquisti Const. Corp.,
    141 A.D.2d 278 (N.Y. Ct. App. 1988)................................................................... 139, 140

United Artists Theatre Co. v. Walton (In re United Artists Theatre Co.),
    315 F.3d 217 (3d Cir. 2003)........................................................................................... 100

United States v. Continental Airlines (In re Continental Airlines),
    134 F.3d 536 (3d Cir. 1998) .................................................................. 141

United States v. Energy Res. Co.,
    495 U.S. 545 (1990) ............................................................................ 89

United States v. Ron Pair Enter.'s, Inc.,
    489 U.S. 235 (1989) ............................................................................ 119

United States v. Wells,
    519 U.S. 482 (1997) ............................................................................ 129

Victoria Sales Corp. v. Emery Air Freight, Inc.,
    917 F.2d 705 (2d Cir. 1990) ................................................................ 120

Viveros v. Nationwide Janitorial Ass'n, Inc.,
    200 F.R.D. 681 (N.D. Ga. 2000) ......................................................... 78

Williams v. Am. Bank of the Mid-Cities, N.A. (In re Williams),
    61 B.R. 567 (Bankr. N.D. Tex. 1986) .................................................. 140

W. R. Grace & Co. v. Margaret Chakarian,
    Adv. Proc. A-01-771, Dkt. No. 253 (Bankr. D. Del. July 22, 2004) ....... 59, 91

## STATUTES, RULES, AND LEGISLATIVE HISTORY

11 U.S.C. § 101(5)(A) ................................................................................. 126

11 U.S.C. § 101(49) ................................................................................. 22, 116, 120

11 U.S.C. § 102(7) ..................................................................................... 123

11 U.S.C. § 105(a) .................................................................................... passim

11 U.S.C. § 502(a) ..................................................................................... 141

11 U.S.C. § 502(b) ..................................................................................... 141

11 U.S.C. § 502(e) ................................................................................... 68, 141

11 U.S.C. § 506(a)(1) ............................................................................... 52, 56

11 U.S.C. § 507 ......................................................................................... 152

11 U.S.C. § 524(e) ................................................................................... 87, 115

11 U.S.C. § 524(g) .................................................................................... passim

11 U.S.C. § 541(a) ............................................................................ 24

11 U.S.C. § 553(a) ..................................................................... 139, 141

11 U.S.C. § 1103(b) ........................................................................ 76, 99

11 U.S.C. § 1122 ................................................................... 47, 51, 115

11 U.S.C. § 1123 ............................................................................ 66, 115

11 U.S.C. § 1123(a)(1) ......................................................................... 152

11 U.S.C. § 1123(a)(2) ......................................................................... 153

11 U.S.C. § 1123(a)(3) ........................................................................... 63

11 U.S.C. § 1123(a)(4) .................................................................... passim

11 U.S.C. § 1123(a)(5) .................................................................. 112, 113

11 U.S.C. § 1123(a)(6) ......................................................................... 154

11 U.S.C. § 1123(a)(7) ......................................................................... 154

11 U.S.C. § 1123(b)(1) ......................................................................... 155

11 U.S.C. § 1123(b)(2) ......................................................................... 155

11 U.S.C. § 1123(b)(3)(A) ......................................................... 80, 85, 96

11 U.S.C. § 1123(b)(6) ......................................................................... 155

11 U.S.C. § 1124 ........................................................................... 105, 107

11 U.S.C. § 1125 ................................................................................. 150

11 U.S.C. § 1126(c) ............................................................................. 106

11 U.S.C. § 1126(d) ............................................................................. 106

11 U.S.C. § 1129 ........................................................................... passim

11 U.S.C. § 1141(d)(1)(A) ................................................................... 141

28 U.S.C. § 157(b) ................................................................................. 32

28 U.S.C. § 157(b)(5) ........................................................................... 142

28 U.S.C. § 1334(a) ............................................................................... 32

28 U.S.C. § 1334(c)(l)..................................................................... 142

28 U.S.C. § 1334(c)(2)..................................................................... 142

28 U.S.C. § 1408 ............................................................................ 32

28 U.S.C. § 1409 ............................................................................ 32

28 U.S.C. § 1411 ............................................................................ 148

28 U.S.C. § 1930 ............................................................................ 151

12 Del. Code. §3303(a)................................................................... 73

12 Del. Code §3806(e)................................................................... 103

140 Cong. Rec. S4523 (daily ed. April 20, 1994)........................... 22, 25

Fed. R. Bankr. P. 9019(a) ............................................................... 86

H.R. Rep. No. 595, 95th Cong., 1st Sess. 412 (1977) ................... 149

H.R. Rep. No. 595, 95th Cong., 2d Sess. 126 (1977) ................... 115

## MISCELLANEOUS

Alan N. Resnick & Henry J. Sommer,
    4 Collier on Bankruptcy ¶ 524.07[2] (15th ed.2005)....................... 122

Alan N. Resnick & Henry J. Sommer, eds.,
    Vol. E-1 Collier on Bankruptcy (15th ed. rev. 2009) ....................... passim

Allan D. Windt,
    2 Insurance Claims and Disputes § 11:30 (5th ed. rev. 2009) ........... 57

Austin W. Scott & William F. Fratcher,
    3 Scott on Trusts § 187.4 (4th ed. 1988)......................................... 104

Christine M. Gimeno,
    California Jurisprudence § 10 (3d ed. rev. 2009)............................... 139

Frank J. Macchiarola,
    *The Manville Personal Injury Settlement Trust: Lessons for the Future* 17 Cardozo L.
    Rev. 583 (1996) ............................................................................. 18-21

Lawrence P. King, et al.,
    5 Collier on Bankruptcy ¶ 1122.03 (15th ed. 1995) ........................ 51

Lawrence P. King et al.,
7 Collier on Bankruptcy ¶ 1122.03[3] (15th Ed. 2009) ...................................................... 50, 55

Lee R. Russ & Thomas F. Segalla,
9 Couch on Insurance § 126:7 (3d ed. rev. 2009) ............................................................. 57

Norman J. Singer,
1A Sutherland Statutory Construction 135-36 (6th ed. 2002) ........................................... 120

Ralph R. Mabey & Peter R. Zisser,
*Improving Treatment of Future Claims: The Unfinished Business Left by the Manville*
*Amendments*, 69 Am. Bankr. L.J. 487 (1995) ..................................................................... 25

Restatement of Restitution, § 76 (1937) ...................................................................................... 61

Restatement of Restitution, § 81 (1937) ...................................................................................... 62

Restatement (Second) of Trusts § 170 cmt. t (1959) .................................................................... 104

Restatement (Third) of Trusts § 75 cmt. a **(2007)** ........................................................................ 74

W. Prosser & P. Keeton,
Prosser & Keaton on Torts (5th ed. 1984) ......................................................................... 42

2 Report of the Judicial Conference Ad Hoc Committee
on Asbestos Litigation 2 (Mar. 1991) .......................................................................................... 3

# I.  INTRODUCTION

Age generally does not become litigation, for the many obvious reasons which do not bear repeating here.  But the aging of this case has largely been driven by the procedures that are dictated by law, deployed to address what is probably an unprecedented number of issues, disputed and then resolved by varying constituencies who have acted entirely at arms length and through experienced counsel.  And age therefore has produced enormous value.

Two values stand out because they are the goal of the two basic parameters that produced the proposed Joint Plan.  The first is fairness.  The merits of all positions on all issues have been explored meticulously and transparently, and the fairness and good faith of the resulting settlements have been and are still measurable against the standards of fairness assured by the litigation process.  The Joint Plan is indisputably fair because it was preceded by fair and open litigation.

The Joint Plan secondly is in good faith, and in a particularly demanding sense.  As the Court well knows, good faith embodies the concept of achieving the purposes of the reorganization process.  In any Chapter 11 case, those purposes include providing a fresh start for an ongoing enterprise.  But this is a section 524(g) case and plan.  And section 524(g) articulates very specific and demanding organization goals: closure for massive litigation, payment through a trust mechanism that must provide similar treatment for current claims and future demands, funding the trust so that such payments can be ensured . . . and the list goes on.  The dictates of section 524(g) create enormous hurdles and they can only be satisfied through consent.  Multiple constituencies and thousands of claims must be corralled -- sometimes literally.  And then, of course, section 524(g) provides equally impressive value.  Such value has been achieved here.  The Joint Plan has many parts, each of which was custom made.  But each

1

was made to fit into a section 524(g) plan and none could have been crafted without it. The Joint Plan is a model for good faith under section 524(g).

The long history of this case therefore is a crucial predicate to the merit of the Joint Plan and should be a source of confidence rather than apology. So too the complexity of the Joint Plan, which was the inevitable product of the complex issues that it resolves. But the most auspicious aspect of the Joint Plan, both for the parties and the Court, is how broadly consensual it is. It has the overwhelming support of the asbestos personal injury claimants, except for a small self-styled subgroup that call themselves the "Libby Claimants" who collectively make up less than 1% of all asbestos claimants. It has the support of virtually all traditional property damage claimants. And it has the support of the ZAI class, both the PI Future Claimants Representative and the PD Future Claimants Representative, and Equity. And only one issue stands in the way of support by the general unsecured claimants.

This is the main brief filed by the Plan Proponents in support of confirmation of the Joint Plan. It reviews the history of the case, the legal and practical demands of section 524(g), and demonstrates compliance with the confirmation standards. Separate briefs are being filed to deal with issues specific to the Lenders, the Insurers, and the Libby Claimants. All remaining objections are addressed in the latter sections of this brief.

## II.   CASE HISTORY: SYSTEMATIC AND HOTLY CONTESTED SEQUENCED LITIGATION PRODUCES SETTLEMENT OF EACH PORTION OF THE CASE IN A COHESIVE 524(g) PLAN.

Prior to its April 2, 2001 chapter 11 filing, Grace was a financially strong specialty chemicals company. It did have an extensive litigation history, principally arising from asbestos claims. There were various types of asbestos litigation, including traditional property damage litigation going back to the 1970's, personal injury litigation of about the same vintage, environmental litigation, and, most recently, the ZAI litigation. It was the personal injury

2

litigation alone that had come to be unmanageable and forced the decision to file the chapter 11 case. But once in bankruptcy, all of the pending litigation and more, had to be addressed systematically.

## A.    GRACE FILES CHAPTER 11 TO DETERMINE THE SCOPE OF ITS PERSONAL INJURY LIABILITY.

Grace's Chapter 11 filing was compelled by two fundamental developments in the personal injury litigation which made that litigation unmanageable for Grace. First, in Grace's view, the tort system long ago ceased to provide any realistic opportunity to define the actual responsibility of any manufacturer of asbestos products, including Grace, for asbestos-related claims. As the Supreme Court had observed, the tort system was besieged by an "elephantine mass of asbestos cases" that "defies customary judicial administration."[2] The situation is "a disaster of major proportions to both the victims and the producers of asbestos" alike.[3]

Second, litigants (on both sides) developed what was essentially a privatized claims resolutions business. However, in and around 2000, that very privatized process began to threaten the surviving asbestos defendants, dramatically increasing their exposure to asbestos claims and thereby destroying their already attenuated programs for managing claims. As other companies involved in asbestos litigation filed bankruptcy, the claims against Grace in particular skyrocketed—without apparent connection to any new principle of liability or accepted principle of science. In 2000 alone, asbestos claims against *Grace* increased 81% over the prior year, reaching a total of nearly 49,000 claims. Year to date trends for 2001 prior to its Chapter 11

---

[2]    *Ortiz v. Fiberboard Corp.,* 527 U.S. 815, 821 (1999).

[3]    2 REPORT OF THE JUDICIAL CONFERENCE AD HOC COMMITTEE ON ASBESTOS LITIGATION 2 (Mar.1991). *See also Georgine v. Amchem Prods., Inc.,* 157 F.R.D. 246, 265 (E.D. Pa 1994) (observing that the Judicial Conference Report "was a ringing condemnation of the asbestos litigation process in the tort system", *vacated,* 83 F.3d 610 (3d Cir. 1996), *aff'd,* 521 U.S. 591 (1997).

filing were even worse. Grace's per claim average cost to resolve each claim also rose, particularly for mesothelioma claims, as other responsible co-defendants opted for bankruptcy.

The precipitous increase in asbestos litigation had a very real effect on Grace's business. Asbestos claims were no longer merely siphoning off Grace's profits – they threatened Grace's financial health and its core businesses. Under these circumstances, Grace concluded that there was no way to define and resolve its asbestos liability, while preserving the value and viability of its core business operations, other than through a Chapter 11 reorganization.

When Grace filed this case, it decided to advocate a structured, systematic approach to defining its asbestos liability. It filed an Informational Brief which included a comprehensive roadmap for defining its liability to asbestos personal-injury claimants.[4] The Informational Brief specified the problems Grace faced and its proposal for how to address those problems through the chapter 11 proceedings. Specifically, Grace proposed:

- Procedures for the consolidation of all claims before one court, which can apply one set of procedural and evidentiary rules.

- Procedures to stay and enjoin any collateral litigation, which may affect the issues in controversy.

- Procedures to define the population of all current claimants and to obtain information regarding their claims on a reliable and consistent basis.

- Procedures to decide threshold liability issues, including compliance with the precepts of *Daubert*.

- Procedures for developing the criteria for the settlement of valid claims through a post-confirmation trust.[5]

---

[4] *See* Informational Brief, April 2, 2001 [Dkt. No. 6].

[5] *Id.* at p. 2-3.

During the very earliest days of the bankruptcy, the Court and the parties discussed how to structure the Chapter 11. Shortly after the Petition Date, Grace filed a Motion for entry of a case management order, establishment of a bar date for all of the various claims anticipated to be asserted against it, and approval of proof of claim forms.[6] The various constituencies likewise responded with their own proposals for how to address Grace's liabilities and reorganize under Chapter 11.[7] Grace proposed a series of litigation tracks and common issue litigation designed to define its liabilities. By contrast, the PI and PD Committees proposed an estimation process that used prior tort system claims history to project liabilities.

On the eve of the hearing on the parties' various initial case management proposals, the Third Circuit assigned the Grace case, along with several other Delaware chapter 11 asbestos-related cases, to District Judge Alfred Wolin.

---

[6]  Debtors' Motion and Memorandum in Support of Motion for Entry of Case Management Order, Motion to Establish Bar Date, Motion to Approve Claim Forms, and Motion to Approve Notice Program, June 23, 2001 [Dkt. Nos. 536, 537].

[7]  Motion of the Official Committee of Asbestos Property Damage Claimants to Continue the Hearing on Debtors' Motion for Entry of Case Management Order, Establishment of Bar Date, Approval of the Proof of Claim Forms and Approval of the Notice Program, and Motion to Extend the Time to Object or Respond to Such Motions, July 12, 2001 [Dkt. No. 665]; United States' Response to Debtors' Motion for Entry of Case Management Order, Motion to Establish Bar Date, Motion to Approve Claim Forms, and Motion to Approve Notice Program (Docket Number 536), July 12, 2001 [Dkt. No. 671]; Medical Monitoring Claimants' Objection to Debtors' Motion for Entry of Case Management Order, Establishment of Bar Date, Approval of Proof of Claim Forms and Approval of Notice Program (Docket No. 536); Joinder in the Motions for Continuance and Motion for Continuance; and Request for Consideration and Briefing Regarding Class Treatment, July 13, 2001 [Dkt. No. 672]; Zonolite Plaintiffs' Objection to Debtors' Motion for Entry of Case Management Order, Establishment of Bar Date , Approval of Proof of Claim Forms and Approval of Notice Program (Docket No. 536), Motion to Extend the Time to Object or Respond to Such Motions, Joinder in Motion for Continuance by Official Committee of Asbestos Property Damage Claimants, Independent Motion to Continue the Hearing on Debtors' Motion, and Request for Consideration and Briefing Regarding Class Treatment, July 13, 2001 [Dkt. No. 674]; Debtors' Objections to Continuance of the Hearing on its Motion for Entry of a Case Management Order, July 17, 2001 [Dkt. No. 688]; Response of the Official Committee of Unsecured Creditors to the Debtors' Motion for Entry of Case Management Order, Establishment of a Bar Date, Approval of the Proof of Claim Forms and Approval of the Notice Program (Docket No. 586), September 10, 2001 [Dkt. No. 904]; United States Trustee's Statement with Respect to Debtors' Motion for Entry of Case Management Order, Establishment of a Bar Date, Approval of Proof of Claim Forms and Approval of Notice Program [Dkt. No. 545].

**B. SEQUENCED LITIGATION BEGINS UNDER JUDGE WOLIN, INCLUDING THE PROSECUTION OF FRAUDULENT CONVEYANCE CLAIMS AGAINST SEALED AIR AND FRESENIUS. SETTLEMENT PRODUCES SIGNIFICANT VALUE FOR THE ESTATE, PREDICATED UPON ACHIEVING AN OVERALL 524(g) PLAN.**

At the time of the Chapter 11 filing, Sealed Air Corporation and Fresenius AG, to which Grace had spun off various businesses in 1996 and 1998, were named as co-defendants with Grace in litigation alleging successor liability and fraudulent transfers. Sealed Air and Fresenius were also named as co-defendants with Grace in thousands of separate pieces of asbestos personal injury litigation throughout the country. Thus, Sealed Air and Fresenius faced both the reality that they were being sued as successor to Grace and the threat of a deluge of additional claims to come.

With Sealed Air's support, Grace obtained a preliminary injunction enjoining the pending litigation against Sealed Air and Fresenius and prospective actions against other key non-Debtors that (i) arose from alleged exposure to asbestos indirectly or directly allegedly caused by the Debtors; (ii) may be covered under the Debtors' insurance policies; (iii) allege fraudulent transfer or fraudulent conveyance claims; or (iv) are asserted against the Debtors' insurance carriers and allege coverage for asbestos-related liabilities.[8] The litigation against Sealed Air and Fresenius was stayed, but the underlying problem remained to be solved.

After the case was reassigned to Judge Wolin, Sealed Air and Fresenius' problem grew. Judge Wolin authorized the PI and PD Committees to prosecute fraudulent conveyance litigation

---

[8] Order Granting Temporary Restraining Order, April 2, 2001 [Dkt. No. 6]; Order Granting Preliminary Injunction, May 3, 2001 [Dkt. No. 72];Order Granting Modified Preliminary Injunction, January 22, 2002 [Dkt. No. 87].

against Sealed Air and Fresenius. And, at the request of the PI and PD Committees, he also authorized special counsel be retained for the purpose of prosecuting that litigation.

The litigation was hotly contested. The discovery was extensive and highly adversarial, prompting the need for review and resolution on numerous occasions by a Special Master.[9] In the midst of the litigation, the PI and PD Committees also moved for appointment of a Chapter 11 Trustee for the Debtors, alleging that in light of a recent decision by the Third Circuit in the case of *Cybergenics Corp v. Chinery*,[10] and the Debtors refusal to assert or prosecute the fraudulent transfer claims, a trustee was the only way to ensure that a proper representative of the Debtors' estate was empowered to assert the avoidance claims.[11]

In the course of the fraudulent conveyance litigation, the PI and PD Committees also filed a motion to determine (i) the choice of law, and (ii) the standard for determining insolvency.[12] On July 29, 2002, Judge Wolin issued his opinion[13] and, as discussed further below, Judge Wolin found that it was not improper hindsight for a court to attribute current circumstances to the solvency analysis and, thus, post-1998 claims should be included in the solvency analysis. The case proceeded towards trial.

---

[9] *See, e.g.*, Order re Plaintiff's Objection to the Special Master's Order and Report Dated June 13, 2002, July 16, 2002 [Case 02-02210,Dkt No. 97] and Memorandum Opinion [Dkt. No. 99]; Order Granting Motion to Compel, July 23, 2002 [Dkt. No. 140]; Revised Order Granting Motion to Compel, July 24, 2002 [Dkt. No. 115]; Order Denying the United States' Objection to the Special Masters Order, August 1, 2002 [Dkt. No. 141]; Opinion re Special Masters' Order of August 16, 2002, September 3, 2002 [Dkt. No. 203].

[10] *The Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 304 F.3d 316 (3rd Cir. 2002).

[11] The Official Committee of Asbestos Personal Injury Claimant's Motion for an Order Appointing a Trustee for W.R. Grace & Co. and Other Debtors Pursuant to 11 U.S.C. 1104 (a), October 11, 2002 [Dkt. No. 2804].

[12] Memorandum in Support of The Official Committee of Asbestos Personal Injury Claimants and The Official Committee of Asbestos Property Damage Claimants' Motions to Determine (i) the Choice of Law and (ii) the Standard of Insolvency, June 13, 2002 [Dkt. No. 81].

[13] Opinion, July 29, 2002 [Dkt. No. 121].

And settlement negotiations began. The negotiations were intense; they were conducted completely at arm's-length; and both the PI and PD Committees, assisted by their special litigation counsel, acted for the estate. The Debtors were not parties to most of the negotiations.

The settlement discussions ultimately produced, less than three weeks before trial was scheduled to begin on the fraudulent transfer litigation, a major development in the case -- the agreement by Sealed Air and Fresenius to pay over $1 billion in consideration to the Debtors' estates. Critical to the settlement were full and complete releases for Sealed Air and Fresenius from all Grace related liability, including, most importantly, the protection from future asbestos related liability that can only be obtained pursuant to a confirmed chapter 11 plan under section 524(g). Only in this way could Sealed Air and Fresenius be protected from massive successor liability.

Once the settlements were agreed in principle by the parties, the PI and PD Committees, Sealed Air, and Fresenius continued negotiations over the structure of the settlements. The Debtors participated in some of the discussions, but they were not parties to either of the settlement agreements. Ultimately, the Debtors did not object to approval of the settlements, and the Orders approving them bind the Debtors to the terms of the settlement agreements.[14] No objections were made by any parties in interest to approval of the settlements.

Under the settlement agreements, receipt of the substantial consideration from Sealed Air and Fresenius is contingent upon Sealed Air and Fresenius obtaining through a plan: (i) the

---

[14] *See* Order Authorizing, Approving and Implementing Settlement Agreement by and among Plaintiffs The Official Committee of Asbestos Property Damage Claimants and the Official Committee of Asbestos Personal Injury Claimants, the Debtors, and Defendants Fresenius Medical Care Holdings, Inc. and National Medical Care, Inc., June 25, 2003 at 22 [Dkt. No. 522]; Order Approving, Authorizing, and Implementing Settlement Agreement by and among the Plaintiffs, Sealed Air Corporation and Cryovac, Inc., June 27, 2005 at ¶ 4 [Dkt. No. 751].

benefits of a section 524(g) channeling injunction for all asbestos liabilities, both PI and PD; (ii)

a section 105 injunction for successor and other liabilities not covered under section 524(g); (iii)

full releases of Sealed Air and Fresenius and their affiliates and representatives of all asbestos

related liabilities, claims and demands; (iv) indemnities from the Reorganized Debtors; and (v)

section 524(g) trusts structured consistent with Sealed Air and Fresenius' tax planning goals and

requirements. [15]

Thus was laid a strong foundation for a 524(g) plan. All constituencies now had an

enormous economic incentive to reach consensus on how to resolve the many remaining issues.

### C. THE COURT ADDRESSES THE TRADITIONAL PROPERTY DAMAGE LITIGATION AND, IN STAGES, ADMINISTERS LITIGATION OF THE CURRENT PROPERTY DAMAGE CLAIMS.

A much longer, but equally successful, litigation and settlement track was developed for

the traditional property damage claims. After receiving competing proposals, the Court set a bar

date and called for meticulously litigated claims forms to be completed by PD claimants. As a

result of that bar date, over 4,000 PD claims were ultimately filed. These claims were from

multiple jurisdictions in the United States and Canada.

Settlement discussions took place sporadically on a parallel track, sometimes focusing on

individual cases, at other times on an overall or global resolution including the personal injury

claims. These discussions generally involved key attorneys for claimants negotiating directly

with the Debtors. None of these efforts bore fruit.

---

[15] *Id.*

After the bar date passed, the Court ordered sequenced claim objection litigation.[16] The initial focus was on the authority to file claims. Of the approximately 4,000 PD claims filed by the bar date, approximately 3,000 of those claims were filed by one law firm, Speights & Runyan. Through an examination of the claims and targeted discovery, the Debtors concluded that the great majority of the claims appeared to have been filed with no authority from the claimants. Litigation ultimately led to reduction of the pending claims to approximately 1,670, including 586 claims withdrawn as improperly filed on behalf of the alleged Anderson Memorial Class claimants. Another approximately 550 claims were withdrawn for various reasons or disallowed by stipulation, on default or as duplicates.

There then followed consolidated issue litigation where the following issues, among others, were briefed and decided:

- Statutes of Limitations in various jurisdiction;
- Late authority to file claims;
- The Canadian ultimate statute of limitations; and
- Stigma as a basis for claims in Minnesota.

Multiple appeals were pursued on the various rulings.

As the litigation matured, so too did the settlement discussions. These discussions included appointment of a Plan Mediator to address all pending matters, including PI claims.[17]

---

[16] *See* Case Management Order for the Adjudication of Asbestos Property Damage Claims Objection, August 29, 2005 [Dkt. No. 9300]; Order, September 19, 2005, [Dkt No. 9473]; Scheduling Order Regarding Debtors' Fifteenth Omnibus Objections to Claims (Substantive), November 10, 2005, [Dkt No. 11035].

[17] Order Extending Debtors' Exclusive Periods in Which to File a Chapter 11 Plan and Solicit Votes Thereon and Appointing a Plan Mediator, March 9, 2006 [Dkt. No. 12031].

They also involved appointment of a Mediator solely for certain PD issues.[18] The global

mediations failed. However, through a series of separately negotiated settlements between the

various PD claimants' counsel and the Debtors' representatives, ultimately all PD claims were

resolved, save one. All of these resolutions are subject to Court-approved settlement agreements

that are contingent upon approval of a 524(g) plan.

### D.   MASSIVE ESTIMATION LITIGATION UNFOLDS OVER THE SCOPE OF THE PERSONAL INJURY LIABILITY. MIDTRIAL, AGREEMENT IS REACHED TO RESOLVE THIS CENTRAL ISSUE IN THE CASE.

Just as asbestos personal injury litigation drove Grace into Chapter 11, resolution of that

litigation was the vital driving force behind Grace's efforts to develop a plan and exit Chapter

11. Asbestos personal injury liability remained at all times the dominant issue in the case.

The parties made many attempts to reach resolution in the case, both with and without the

aid of a mediator. In the fall of 2004, just before the Debtors filed their first plan, it appeared

that a settlement-in-principle was imminent. However, that effort failed.

Ultimately, both sides agreed that an estimation of the PI liability was the necessary next

step in order to advance toward confirmation. The parties, however, had sharp differences over

how the estimation should be conducted and whether/how any resolution could be used to

structure a plan. The Debtors focused on section 502 of the Bankruptcy Code, which requires

that there be legal liability on a claim in order for it to be allowed.[19] Grace sought to deploy the

---

[18]  *See* Order Authorizing the Appointment of Diane M. Welsh as Mediator for the S&R Claims, April 21, 2008 [Dkt. No. 18580].

[19]  *See* Debtors' Motion for Entry of an Order Seeking the Estimation of Asbestos Claims and Certain Related Relief, November 13, 2004 [Dkt. No. 6899]; Debtors' Reply in Support of Their Estimation Motion, January 7, 2005 [Dkt. No. 7502]; W. R. Grace & Co's Motion to Approve PI CMO and Questionnaire, May 10, 2005 [Dkt. No. 8394]; Memorandum of Points and Authorities in Support of W. R. Grace & Co's Motion to Approve PI CMO and Questionnaire, May 10, 2005 [Dkt. No. 8395]; Debtors' Status Report Regarding Motion to Approve Asbestos PI Estimation CMO and Questionnaire, July 14, 2005 [Dkt. No. 8995]; Debtors' Report to Court
(Continued...)

Bankruptcy Code to obtain more data about the pending claims. The PI Committee and PI FCR took a dramatically different approach to estimation, arguing that the Court should use past claims and settlement history to estimate PI claims. [20]

Intense disputes arose over discovery. The Court ordered the claimants to submit detailed questionnaires and back-up documentation for their claims.[21] It took over 20 months to complete the questionnaire process, and the estimation-related discovery. There were numerous motions to compel, over 5 million pages of documents were produced and 80 depositions taken.[22]

---

Pursuant to July 19, 2005 Rulings Regarding Personal Injury Claims and Estimation Proceedings, August 26, 2005 [Dkt. No. 9263].

[20] *See* Objection of the Official Committee of Asbestos Personal Injury Claimants to Debtors' Motion for Entry of an Order Seeking the Estimation of Asbestos Claims and Certain Related Relief, December 21, 2004 [Dkt. No. 7314]; Future Claimants Representative's Consolidated Objection to Disclosure Statement and Plan Related Motions, December 22, 2004 [Dkt. No. 7340]; Opposition of the Official Committee of Asbestos Personal Injury Claimants to Debtors' Motion to Approve PI CMO and Questionnaire, June 30, 2005 [Dkt. No. 8847].

[21] *See* Case Management Order for the Estimation of Asbestos Personal Injury Liabilities, August 29, 2005 [Dkt. No. 9301].

[22] *See, e.g.,* Order Modifying the Case Management Order for the Estimation of Asbestos Personal Injury Liabilities Regarding the Extension of Time for Claimants to Respond to Questionnaires and to Designate Non-Expert Witnesses, December 21, 2005 [Dkt. No. 11403]; Order (REVISED) Modifying the Case Management Order for the Estimation of Asbestos Personal Injury Liabilities Regarding the Extension of Time for Claimants to Respond to Questionnaires and to Designate Non-Expert Witnesses, January 10, 2006 [Dkt. No. 11515]; Case Management Order (AMENDED) for the Estimation of Asbestos Personal Injury Liabilities, January 31, 2006 [Dkt. 11697]; Order Modifying the Case Management Order for the Estimation of Asbestos Personal Injury Liabilities Regarding the Extension of Time for Claimants to Respond to Questionnaires, February 21, 2006 [Dkt. No. 11885]; Case Management Order (AMENDED) for the Estimation of Asbestos Personal Injury Liabilities, March 27, 2006 [Dkt.12151]; Order Modifying the Case Management Order for the Estimation of Asbestos Personal Injury Liabilities Regarding the Extension of Time for Claimants to Respond to Questionnaires, April 27, 2006 [Dkt. No. 12314]; Case Management Order (Amended) (REVISIONS BY THE COURT) for the Estimation of Asbestos Personal Injury Liabilities, July 24, 2006 [Dkt. 12858]; Order as to All Pre-Petition Asbestos PI Litigation Claims, Including Settled Claims, (I) Establishing Bar Dates; (II) Approving Proof of Claim Form; and (III) Approving Notice of Pre-Petition Asbestos Personal-Injury Claims Bar Date, August 21, 2006 [Dkt. 13061]; Order Concerning Schedule for Motions to Compel Regarding the W. R. Grace Asbestos Personal Injury Questionnaire and Schedule for Supplementation of Questionnaire Response, November 14, 2006 [Dkt. 13560]; Order Regarding Amended Case Management Order for the estimation of Asbestos Personal Injury Liabilities, December 19, 2006 [Dkt. No. 14079]; Order Regarding Amended Case Management Order for the Estimation of Asbestos Personal Injury Liabilities, April 02, 2007 [Dkt. No. 15078].

(Continued...)

The estimation trial began in January, 2008, and settlement negotiations accelerated. After 18 days of trial and the completion of the Debtors' case, on April 6, 2008, an agreement-in-principle was reached. That agreement spelled out the essential features of a 524(g) plan that would resolve both personal injury and traditional PD liability. The agreement also required a plan that would comply with the requirements of the Court-approved settlement agreements with Sealed Air and Fresenius.

Pursuant to the term sheet agreement, the following would be paid into the Asbestos PI Trust to be established pursuant to section 524(g) of the Bankruptcy Code:

- The stock and cash to be provided by Sealed Air and Fresenius under the previously approved settlements;

- Cash from Grace in the amount of $250 million, plus interest thereon from January 1, 2009, until the Effective Date of the Joint Plan at the same rate applicable to the Debtors' senior debt;

- A Warrant to acquire 10 million shares of the Grace parent's common stock at an exercise price of $17.00 per share, expiring one year from the Effective Date;

- Deferred cash payments of $110 million per year for five years, beginning in 2019, and $100 million per year for ten years, beginning in 2024; the deferred payments will be obligations of the Reorganized Debtors, backed by 50.1% of the Parent's common stock; and

- The Equity Security Holders of the Company agree to permit the issuance of the warrants and guarantees and to give up their right to prove the solvency of the Debtors through the estimation process or otherwise, in exchange for retaining an interest in the Reorganized Debtors.

*Importantly*, the agreement *settled* the dispute over the size of Grace's personal injury liability. No determination of that liability would take place. The case was now poised for overall resolution.

---

### E. PLAN FORMULATION LEADS TO THE APPOINTMENT OF AN FCR FOR PROPERTY DAMAGE AND THE RESOLUTION OF THE ZAI LITIGATION

As noted above, at the time of its chapter 11 filing, Grace faced a relatively new and unique asbestos related problem. Several purported class actions were filed in various jurisdictions on behalf of owners of homes allegedly containing a loose-fill attic insulation product manufactured by Grace commonly known as Zonolite Attic Insulation ("ZAI"). In these suits, the claimants were seeking damages and other relief, including removal of the ZAI.

During the course of the chapter 11 case, the Debtors asked the Court to set a litigation track for ZAI. The Debtors first suggested that a bar date be set for all ZAI claims.[23] Counsel for ZAI claimants sought certification of a ZAI class. The Court decided that it first needed to understand what these claims represented and directed litigation aimed at determining "whether ZAI posed an unreasonable risk of harm."[24] In order to assure that the ZAI claimants were adequately represented in the litigation, the Court appointed special counsel, at the Debtors' expense, to represent the ZAI Claimants.[25] The PD Committee also was active in monitoring the ZAI litigation. The litigation that ensued, referred to as the "Science Trial," was vigorously pursued by all parties.[26] Ultimately, on December 14, 2006, the Court issued an Opinion holding

---

[23] *See* note 5 above.

[24] Amended Order, November 25, 2002 [Dkt. No. 3093].

[25] Order Approving ZAI Claimants' Revised Special Counsel Designation and Litigation Budget for the ZAI Science Trial, August 26, 2002 [Dkt. No. 2617].

[26] Zonolite Attic Insulation Claimants' Motion for Partial Summary Judgment, July 7, 2003 [4007]; W. R. Grace & Co.'s Motion for Summary Judgment, July 8, 2003 [4009]; Debtors' Motion to Consolidate the Actions of ZAI Claimants Pursuant to Rule 42, July 7, 2003 [Dkt. No. 4010]; ZAI Claimants' Motion for Summary Judgment, July 8, 2003 [4018]; Grace's Memorandum in Opposition to ZAI Claimants' Motion for Partial Summary Judgment Regarding Consumer Protection Act Claims [Re: Docket No. 4007], August 7, 2003 [Dkt. No. 4175]; Claimants' Response to Debtors' Motion to Consolidate the Actions of ZAI Claimants Pursuant to Rule 42, August 8, 2003 [Dkt. No. 4203]; Claimants' Response to W. R. Grace's Motion for Summary
(Continued...)

that, although ZAI was contaminated with asbestos and could release asbestos fibers when disturbed; there is no unreasonable risk of harm from ZAI.[27]

Following the Science Trial Opinion, important questions remained, with respect to ZAI. The Debtors suggested that the Court engage in common issue litigation in order to resolve legal issues.[28] The Debtors also requested and obtained a bar date for ZAI claims.[29] The ZAI claimants moved for interlocutory appeal of the Science Trial Opinion, which request was denied.[30] They then moved: (i) again, for class certification and permission to file a class proof of claim for ZAI claimants;[31] (ii) appointment of an expert witness to address ZAI removal and remediation issues;[32] and (iii) to lift the automatic stay and return ZAI to the tort system.[33] The

---

Judgment, August 8, 2003 [Dkt. No. 4204]; Opposition of W.R. Grace & Co. to Claimants' Motion for Summary Judgment, August 8, 2003 [Dkt. No. 4205]; Zonolite Attic Insulation Claimants' Reply to Grace's Memorandum in Opposition to ZAI Claimants' Motion for Partial Summary Judgment re W.R. Grace's Consumer Protection Liability [Re: Docket No. 4007], August 18, 2003 [Dkt. No. 4291]; Claimants' Reply to W.R. Grace's Response to Claimants' Motion for Summary Judgment, August 18, 2003 [Dkt. No. 4294]; Reply of W.R. Grace & Co. to ZAI Claimants' Response to Grace's Motion for Summary Judgment, August 18, 2003 [Dkt. No. 4298].

[27] Memorandum Opinion, December 14, 2006 [Dkt. No. 14014].

[28] See Debtors Motion for an Order (A) Establishing a Proof of Claim Bar Date for Zonolite Attic Insulation Claims, (B) Approving the Related Proof of Claim Form, Bar Date Notices, and Notices Program, March 18, 2008 [Dkt. No. 18328].

[29] Order (A) Establishing October 31, 2008 As The Proof Of Claim Bar Date for Zonolite Attic Insulation Claims and (B) Approving the Related Proof of Claim Form, Bar Date Notices, and Notice Program, June 17, 2008 [Dkt. No. 18934].

[30] Memorandum and Order (Judge Buckwalter), March 26, 2007 [Dkt. No. 14985].

[31] ZAI Claimants' Motion for Order Recognizing and Permitting Filing of a Washington Class Proof of Claim, March 18, 2008 [Dkt. No. 18323].

[32] ZAI Claimants' Motion for Order to Show Cause Why Court Appointed Expert Witness Should Not Be Designated, March 18, 2008 [Dkt. No. 18326].

[33] Expedited Motion of the ZAI Claimants to Lift Stay and Return ZAI to the Tort System, April 7, 2008 [Dkt. No. 18462].

parties also agreed to the appointment of Bankruptcy Judge Kevin Gross as a ZAI Mediator.[34] The Mediation failed, and the various motions were briefed and argued but not decided.

By this time, the Debtors, the PI Committee, the PI FCR, and the Equity Committee were in the process of developing the Joint Plan. This process brought home the importance of providing a 524(g) channeling injunction for PD claims, including both traditional and ZAI claims. Accordingly, the Plan Proponents turned to the task of obtaining the appointment of a PD FCR.[35] This was accomplished with the agreement of the PD Committee. Negotiations then ensued with the PD FCR over the terms of the Joint Plan, and the parties reached agreement on a form of Case Management Order for PD Claims.[36]

Because ZAI remained very important to an overall resolution of the PD liability, negotiations also intensified to resolve the ZAI liability. In the late fall of 2008, an agreement was reached settling the current ZAI claims. Agreement also was reached with the PD FCR on how to treat future property damage claims under the Plan. A ZAI settlement class was certified by the Court and a class settlement for US ZAI PD Claims was reached whereby such claims will be channeled to the Asbestos PD Trust. The Debtors, Sealed Air and Fresenius will make certain payments directly to the PD Trust for payment of valid US ZAI PD Claims. [37]

---

[34]  *See* Stipulation for the Appointment of the Honorable Kevin Gross as Mediator for the ZAI Property Damage Claims, May 7, 2008 [Dkt. No. 18678].

[35]  *See* Order Granting Application of the Debtors, Pursuant to 11 U.S.C. §§ 105, 524 (g)(4)(B)(i) and 1109, For Entry of an Order Appointing Alexander M. Sanders, Jr. as Legal Representative for Future Asbestos-Related Property Damage Claimants, October 21, 2008 [Dkt. No. 19818].

[36]  *See* Case Management Order for Class 7A Asbestos PD classes, February 27, 2009, Exhibit 25 of the Exhibit Book to the Joint Plan.

[37]  Order, April 1, 2009 [Dkt. No. 21174].

On September 2, 2008, the Debtors also settled the Canadian ZAI Claims by entering into the CDN ZAI Minutes of Settlement, which have been approved by both the Bankruptcy Court and the Canadian CCAA Court.[38] Under the Plan, Canadian ZAI PD Claim are separately classified, channeled to, and paid from a Canadian PD Claims Fund agreed to in the Minutes of Settlement; Canadian PI Claims, including Canadian PI Claims allegedly arising from ZAI exposure, are channeled to the Asbestos PI Trust and resolved in the same manner as US PI Claims; and, any Canadian PD claims related to traditional asbestos property damage are channeled to the PD Trust and resolved in the same manner as US PD Claims.

## F.    THE PLAN IS FINALIZED AND THE VOTE IS TAKEN

On March 9, 2009, the Disclosure Statement for the Joint Plan was approved by the Court and solicitation began of all impaired classes. The Plan was overwhelming accepted by all impaired classes.[39]

---

[38] *See* CDN ZAI Minutes of Settlement, September 2, 2008, Exhibit 9 of the Exhibit Book to the Joint Plan.

[39] *See* Section VI below for details regarding the outcome of the vote.

## III. THE JOINT PLAN IS A SECTION 524(g) SETTLEMENT.

### A. THE JOINT PLAN IMPLEMENTS SECTION 524(g) TO ADDRESS GRACE'S ASBESTOS LIABILITY.

Mass tort liability from asbestos operations involves a complex, multi-dimensional web, including the underlying ultimate claims of putative asbestos victims, the defendant/debtor's defenses, the interests of parties with future demands, the rights of co-defendants with potential contribution claims, indemnity rights of former affiliates, claims arising under historical insurance settlements, and rights and obligations of insurers with respect to open coverage. Congress enacted section 524(g) with the specific purpose of providing a mechanism to affect a global resolution of all of these competing asbestos related claims, interests and obligations in the context of a confirmed chapter 11 plan. The pending objections to the Joint Plan largely raise issues that go to the integrity of the asbestos settlements incorporated into the Joint Plan. In order to address those objections it is important to consider them in the context of the core policies which Congress intended to implement by enacting section 524(g) as a special provision for resolution of a Chapter 11 debtor's asbestos liability. In particular, as demonstrated below, there are two fundamental objectives of section 524(g) that drive the structure of the Joint Plan:

- The Joint Plan contemplates mechanisms for claims valuation and funding that will assure that similar claims are treated in substantially the same manner, both as among current claimants, and with respect to the comparative treatment of current and future claimants;[40]

---

[40] *See* Frank J. Macchiarola, *The Manville Personal Injury Settlement Trust: Lessons for the Future,* 17 Cardozo L. Rev. 583, 584 (1996) ("In short, the Trust faced a problem of equity -- how to equally compensate claimants with equal disease severity."); Vol. E-1 *Collier on Bankruptcy,* App. Pt. 9-78 (Alan Resnick & Henry J. Somner eds. 15th ed. rev. 2009) (reprinting records located at 140 Cong. Rec. H 10,764 (daily ed. Oct. 4, 1994) ("In order for future claimants to be bound by a trust/injunction, section 111 requires that the trust operate in a structure and manner necessary to give reasonable assurance that the trust will value, and be able to pay, similar present and future claims in substantially the same manner.") (section-by-section analysis of the provisions of the Act).

- The Joint Plan provides a final and global resolution of all of Grace's asbestos liability including claims of current claimants, future claimants, co-defendants, and alleged indemnified parties.

1. **The Joint Plan Achieves The Paramount Goal of Treating Grace's Current and Future Asbestos Claimants In Substantially the Same Manner.**

Congress modeled section 524(g) on the injunction issued in the *Johns-Manville* case, where the court instituted novel procedures to address the two greatest problems with asbestos-related liability: long latency periods for illnesses and ubiquitous use of asbestos-containing products.[41] *Manville* correctly noted that piecemeal resolution of its asbestos liabilities would quickly lead to liquidation and would leave nothing for claimants who develop injuries in the future. The "cornerstone" of the *Manville* plan was the trust: "a mechanism designed to satisfy the claims of all asbestos victims, both present and future."[42] From the onset, the trust was inadequately funded to pay claims at 100 cents on the dollar, as both the number of claims and the per claim liability vastly exceeded initial projections. Moreover, the structure of the trust as originally constituted favored present claimants and encouraged a "race to the courthouse." The trust paid out enormous sums of money in defense costs and courthouse-steps settlements on the eve of trial, and it quickly became apparent that the trust was insolvent.[43]

The trust's insolvency led to years of class action litigation overseen by Judge Jack Weinstein of the Eastern District of New York, along with the bankruptcy judge who oversaw the Manville reorganization, in an eventually successful attempt to restructure the trust and the

---

[41] *See supra* note 40 at App. Pt. 9-76; *see also In re Combustion Eng'g,* 391 F.3d 190, 234 (3d. Cir. 2004) ("Section 524(g) provides a special form of supplemental injunctive relief for an insolvent debtor facing the unique problems and complexities associated with asbestos liability.").

[42] *Kane v. Johns-Manville,* 843 F.3d 636, 640 (2d Cir. 1988).

[43] *See* Macchiarola, *supra* note 40, at 605.

claims payment procedures. The most important lesson from the original *Manville* experiment was that resolution of claims through litigation in the tort system will quickly exhaust the assets of an asbestos trust, and a trust must therefore be structured to discourage litigation by establishing procedures that offer fair distributions to claimants without resort to the tort system. This was the goal of the complex Trust Distribution Procedures ultimately developed by the Manville Trust, which came into effect in 1995.[44] The procedures aimed to curb litigation and preserve value in the trust for future claimants by establishing set payouts for diseases, and adopting procedures that encouraged settlement. Under the Trust Distribution Procedures, asbestos claims were channeled into a four-step resolution process. First, the claimant would be presented with a settlement offer based on the scheduled value of the claimant's disease. If the claimant rejected this offer, the claimant could seek individual review by the trust. If individual review failed to resolve the claim, the claimant could seek review by the Extraordinary Claims Panel, which was essentially an arbitration panel within the trust. Only failing this form of review could a claimant proceed to litigate in the tort system. In enacting section 524(g), Congress endorsed the basic structure of the Manville Trust Distribution Procedures by requiring 524(g) trusts to adopt similar procedures under section 524(g)(2)(B)(ii)(V):

> [T]he trust will operate through mechanisms such as structured, periodic, or supplemental payments, pro rata distributions, matrices, or periodic review of estimates of the numbers and values of present claims and future demands, or other comparable mechanisms, that provide reasonable assurance that the trust will value, and be in a financial position to pay, present claims and future demands that involve similar claims in substantially the same manner.

---

[44] *See* Macchiarola, *supra* note 40, at 607-18 (describing the evolution of the Trust Distribution Procedures); *In re Joint Eastern and Southern Districts Asbestos Litig.,* 878 F.Supp. 473 (S.D.N.Y. 1995), *aff'd in part and vacated in part,* 78 F.3d 764 (2d Cir. 1996).

As the Trust Distribution Procedures in *Manville* demonstrate, equality among claimants does not imply that each claimant will be paid the same amount. Rather, equality in the context of a 524(g) trust means that all claims are subject to the same procedures, and that similar claims are treated in substantially the same manner.[45] Moreover, achieving this requires that the trustee have the power to marshal assets into the trust as necessary to provide equitable distributions, even if doing so disadvantages certain claimants.[46] In many asbestos cases, one of the debtor's most valuable assets is the debtor's insurance policies, and to achieve equitable distribution, the trust must have the power to manage the proceeds of these policies.[47]

Another problem for the Manville Trust was the uncertainty surrounding the ultimate extent of Johns-Manville's asbestos liability. Because the trust's primary asset was the company's stock, any cash contributions to the trust came at the expense of lower stock values, and less total value to satisfy claims.[48] Section 524(g), enacted in the wake of *Manville*'s failings, contains numerous requirements designed to create a viable, healthy company to fund

---

[45] *See In re Dow Corning Corp.*, 255 B.R. 445, 510 (E.D. Mich. 2000) ("The requirement under § 1123(a)(4) that all claims be treated equally is satisfied when the class members are subject 'to the *same process* for claim satisfaction.'") (emphasis in original) (citing *In re Central Medical Center, Inc.*, 122 B.R. 568, 575 (Bankr. E.D. Mo. 1990).

[46] *See In re Trust of Rosenberg*, 727 N.W.2d 430, 444 (Neb. 2007) (holding that the trustee did not breach his fiduciary duty to a beneficiary by attempting to marshal a life insurance policy benefiting her into a trust because a trustee "owes no duty of impartiality to [the plaintiff] in her individual capacity, only as a cobeneficiary of the trust"); *Jennings v. Murdock*, 553 P.2d 846, 866 (Kan. 1976) (the trustee cannot be faulted for any decision simply because that decision impairs the interests of a particular beneficiary) (citing *First Nat'l Bank of Birmingham v. Ingalls*, 59 So. 2d 914, 923-24 (Ala. 1952).

[47] *See MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, 92 (2d Cir. 1988) ("Manville's insurance policies and their proceeds were 'substantial property of the Manville estate'"); *In re Federal-Mogul Global Inc.*, 385 B.R. 560, 573-74 (Bankr. D. Del. 2008) ("Just as insured asbestos liabilities may be transferred to the trust, so may the corresponding assets, the insurance policies, proceeds, or policy rights, as applicable in any given Plan, that stand to cover those liabilities."); *In re Congoleum Corp.*, No. 03-51524, 2008 WL 4186899, at *5 (Bankr. D.N.J. Sept. 2, 2008) ("from the very inception of § 524(g) it was understood that insurance assets are often an important component of the assets a debtor has available to contribute to a § 524(g) trust").

[48] Macchiarola, *supra* note 40, at 605.

future claims while ensuring a fair compromise between present asbestos claimants, future asbestos claimants, and other creditors of the debtor.[49] At the core of this compromise is a deal whereby "[i]n exchange for funding the trust, the debtor, its predecessors and successors in interest, and any affiliates receive broad protection from any asbestos-related claims."[50] In this sense, section 524(g) affirms "what Chapter 11 reorganization is supposed to be about -- allowing an otherwise viable business to quantify, consolidate, and manage its debt so that it can satisfy its creditors to the maximum extent feasible, but without threatening its continued existence and the thousands of jobs that it provides."[51]

Lest the compromise outlined in section 524(g) unfairly benefit the debtor, the Bankruptcy Code provides specific funding requirements for 524(g) trusts. These trusts must be funded "in whole or in part by the securities of one or more debtors involved in such plan and by the obligation of such debtor or debtors to make future payments."[52] Debtors have broad discretion concerning which type of securities will fund a trust when the net effect of the funding mechanism is consistent with the goal of continued distributions to claimants.[53] Moreover, 524(g) trusts must have the possibility of owning a majority of the reorganized company's voting

---

[49] *Collier on Bankruptcy*, *supra* note 40 at App. Pt. 9-77 ("the Committee also recognizes that the interests of future claimants are ill-served if Johns-Manville and other asbestos companies are forced into liquidation and lose their ability to generate stock value and profits that can satisfy claims"); 140 Cong. Rec. S4523 (daily ed. April 20, 1994) (statement of Sen. Heflin) ("[A]ny plan of reorganization must contain a mechanism to address equitably the debtor's liability to all creditors. Without that mechanism, liquidation may be inevitable and little or nothing would be left to compensate future claimants").

[50] *See In re G-I Holdings, Inc.*, 328 B.R. 691, 695 (D.N.J. 2005); *see also* 11 U.S.C. § 524(g)(1)(B).

[51] *Collier on Bankruptcy*, *supra* note 40 at App. Pt. 9-119 (statement of Sen. Heflin).

[52] 11 U.S.C. § 524(g)(2)(B)(i)(II).

[53] *See* 11 U.S.C. § 101(49) (stating broad definition of "security"); *In re Burns & Roe Enter.'s, Inc.*, No. 08-4191 (GEB), 2009 U.S. Dist. WL 438694, at *31, *35 (D.N.J. Feb. 23, 2009) (holding that a promissory note is a "security" for purposes of § 524(g)(2)(B)(i)(II)).

shares under specified contingencies.[54] Debtors have substantial discretion in satisfying this requirement.[55]

### 2. The Joint Plan Provides A Final Global Resolution of Grace's Asbestos Liabilities Through Section 524(g).

While section 524(g) is technically a supplement to the injunction available to chapter 11 debtors upon a discharge, it in fact acts as a scheme of benefits and conditions which, when taken together, provide an appropriate and fair platform for settling the numerous competing interests implicated by a chapter 11 case in which asbestos claims predominate. In particular, from a debtor's standpoint, an injunction issued under section 524(g) offers three unique benefits. First, the injunction enjoins all present and future, direct and indirect, asbestos-related claims and demands against the debtor and channels them to a court-ordered trust.[56] Second, the injunction channels certain claims against third parties to the trust when "a third party has derivative liability for the claims against the debtor."[57] Finally, following exhaustion of appeals, the injunction is permanent.[58]

To further ensure fairness to asbestos claimants, a plan implementing a section 524(g) injunction must be accepted by 75% of the present claimants affected by the injunction.[59] Due to the logistical challenges facing asbestos claimants entitled to vote on a plan, many cases excuse

---

[54]  11 U.S.C. § 524(g)(2)(B)(i)(III).

[55]  *See In re Western Asbestos Co.*, 313 B.R. 832, 851 (Bankr. N.D. Cal. 2003).

[56]  11 U.S.C. §§ 524(g)(1)(B), 524(g)(4)(B).

[57]  11 U.S.C. § 524(g)(4)(A)(ii); *In re Combustion Eng'g*, 391 F.3d 190, 237 (3d Cir. 2004).

[58]  11 U.S.C. § 524(g)(3)(A)(i).

[59]  11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb). *See also In re Hillsborough Holdings Corp.*, 197 B.R. 372, 379 (Bankr. M.D. Fla. 1996) ("the 75% vote requirement is an integral and an indispensable part of § 524(g)").

asbestos claimants from the requirement to file claims and allow their attorneys to vote the

claims of all of the attorneys' clients in a single, master ballot.[60] The interests of future claimants

are expressly protected by the requirement that the court appoint a legal representative under its

section 105(a) powers.[61]

Because Congress intended that section 524(g) allow debtors to affect a global resolution

of their asbestos liabilities, section 524(g) also gives the bankruptcy court substantial power to

enjoin asbestos-related claims against third parties that are "alleged to be directly or indirectly

liable for the conduct of, claims against, or demands on the debtor."[62] This provision is

necessary in light of the reality that the debtor, and therefore the trust, will have limited assets to

pay present claims and future demands. In this sense, this provision is also consistent with the

Bankruptcy Code's expansive definition of "property of the estate."[63] By allowing the court to

enjoin all asbestos-related actions against third parties that would diminish the assets available to

the trust, section 524(g)(4)(A)(ii) promotes "[e]quality of distribution among creditors."[64]

Through this mechanism, the court can ensure that all of the debtor's asbestos-related liabilities

are paid from the trust, even when a claimant ostensibly seeks to recover from a third party.[65]

---

[60] *In re Quigley Co.*, 346 B.R. 647, 653 (Bankr. S.D.N.Y. 2006).

[61] 11 U.S.C. § 524(g)(4)(B); *Fed. Ins. Co. v. Grace*, No. 04-844, 2004 WL 5517843, at *6 (D. Del. Nov. 22, 2004) (citing *In re UNR Industries, Inc.*, 46 B.R. 671 (Bank. N.D. Ill. 1985); *In re UNR Industries, Inc.*,71 B.R. 467 (Bank. N.D. Ill. 1987)).

[62] *See* 11 U.S.C. § 524(g)(4)(A)(ii).

[63] *See* 11 U.S.C. § 541(a).

[64] *In re Combustion Eng'g*, 391 F.3d at 239.

[65] *See MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d at 92 (upholding injunction blocking suits against debtor's insurers because the affected polices were "substantial property of the Manville estate which would be diminished if and to the extent that third party direct actions against the insurance carriers result in plaintiffs' judgments").

For claims against third parties to be channeled under section 524(g), the court must find that enjoining future demands against such parties is fair and equitable with respect to claimants "in light of the benefits provided" to the trust *on behalf of* the protected parties.[66] By its own terms, this section requires that any third parties protected by the injunction have contributions made to the trust on their behalf.

Congress intended section 524(g) to allow debtors to emerge "free and clear of all asbestos-related liabilities other than those defined in the confirmed plan of reorganization," so that "all asbestos-related claims and demands must be made against the court-approved trust."[67] The logic and pragmatism of this goal can hardly be debated -- the high costs and inequalities produced by piecemeal litigation of asbestos liabilities are extensively documented.[68] The structure and pre-requisites of section 524(g) facilitate achievement of a global resolution of a debtor's asbestos liabilities through procedures that balance the interests of each affected party, and that maximize the total value available to all constituents.[69]

3.    **The Joint Plan Implements the Policies and Strictures of Section 524(g).**

The Joint Plan incorporates the settlements discussed above and uses section 524(g) of the Bankruptcy Code as it historically has been used such that a trust structure will form the basis of a final and global resolution of the asbestos claims attributable to the Debtors' products or

---

[66]  11 U.S.C. § 524(g)(4)(B)(ii).

[67]  *Collier on Bankruptcy*, *supra* note 40 at App. Pt. 9-118 (statement of Sen. Heflin).

[68]  *See, e.g.*, Ralph R. Mabey & Peter R. Zisser, *Improving Treatment of Future Claims: The Unfinished Business Left by the Manville Amendments*, 69 Am. Bankr. L.J. 487, 487-88 (1995).

[69]  140 Cong. Rec. S4523 (daily ed. April 20, 1994) ("the injunction provision is simply about growing the pie available to victims") (statement of Sen. Heflin).

operations. The Joint Plan divides Asbestos Claims into three Classes: (1) Asbestos PI Claims (Class 6), including CDN ZAI PI Claims, (2) Asbestos PD Claims (Class 7), including Asbestos PD Claims (other than US ZAI PD Claims) in Class 7A and US ZAI PD Claims in Class 7B, and (3) CDN ZAI PD Claims (Class 8).

### a)  Asbestos PI Claims (Class 6)

The Asbestos PI Settlement, which is the foundation for the Joint Plan, requires the following assets to be paid into the Asbestos PI Trust to be established pursuant to section 524(g) of the Bankruptcy Code:

- the stock and cash to be provided by Sealed Air and Fresenius under the previously approved settlements;

- Cash from Grace in the amount of $250 million, plus interest thereon from January 1, 2009, until the Effective Date of the Joint Plan at the same rate applicable to the Debtors' senior debt;

- a Warrant to acquire 10 million shares of the Grace parent's common stock at an exercise price of $17.00 per share, expiring one year from the Effective Date;

- Rights to proceeds under the Debtors' asbestos-related insurance coverage;

- Deferred cash payments of $110 million per year for five years, beginning in 2019, and $100 million per year for ten years, beginning in 2024; the deferred payments will be obligations of the Reorganized Debtors, backed by 50.1% of the Parent's common stock; and

- The Equity Security Holders of the Company agree to permit the issuance of the warrants and guarantees and to give up their right to prove the solvency of the Debtors through the estimation process or otherwise, in exchange for retaining an interest in the Reorganized Debtors.

The Asbestos PI Trust will provide for the resolution of all Asbestos PI Claims and Successor Claims arising out of or based on any Asbestos PI Claim, including those arising subsequent to the date hereof. In addition, the Asbestos PI Trust will pay all valid CDN ZAI PI Claims, which shall be channeled to the Asbestos PI Trust on the Effective Date of the Joint Plan.

In particular, the Asbestos PI Trust will value and pay Asbestos PI Claims through a mechanism, principally negotiated among counsel for members of the Asbestos Claimants' Committee and the Asbestos PI FCR, known as the Asbestos PI TDP:

- The Asbestos PI TDP both mirrors and builds upon the trust payment procedures that evolved in the *Manville* case, and in numerous asbestos chapter 11 cases that have been confirmed since then;

- The Asbestos PI TDP contemplates four principal processes for valuing and paying claims:

  (i) expedited review whereby claimants are given the opportunity to accept a fair offer for satisfaction of their claims after presentation of streamlined evidence of exposure and disease;

  (ii) individual review which contemplates the opportunity to address directly with the Asbestos PI Trust specific issues unique to the claimant;

  (iii) ADR; and

(iv) ultimate resort to the tort system for purposes of establishing the validity of and valuing the actual damages incident to the claim.

- The Asbestos PI TDP is designed to encourage claimants to settle their claims under the expedited review procedures specifically so that the costs and risks of more elevated review will be avoided from both the perspective of the claimants and the Asbestos PI Trust;

- The Asbestos PI TDP imposes limits on certain elements of a claim that might occur in the tort system, such as excessive jury awards and punitive damages that would threaten to drain the Asbestos PI Trust of its assets at the expense of the ultimate goal of section 524(g) that both current and future claimants be treated in substantially the same manner.

- The Asbestos PI Trust provides for the payment of both direct and indirect claims that are channeled to the Trust, including claims for indemnification and contribution (§ 5.6) and specific claims related to the rights of parties who assert interests in the Debtors' insurance policies (§ 5.12), and indemnification claims related to settled insurance policies (§ 5.13).

- The Asbestos PI Trust is given sole discretion to manage and maximize the value for its benefit of the proceeds of the Debtors' insurance coverage related to asbestos PI liability, including the protection afforded by an Asbestos Insurance Entity Injunction that will preclude third parties whose asbestos claims are channeled to the Asbestos PI Trust from seeking preferential access to that insurance through separate coverage claims.

### b)     Asbestos PD Claims and US ZAI PD Claims (Class 7A and 7B)

Class 7 of the Joint Plan comprises the Asbestos PD Claims against the Debtors. All Class 7 Claims are channeled under the Joint Plan to an Asbestos PD Trust pursuant to section 524(g). The terms of the Joint Plan respecting Class 7 and various Plan Documents relating to the treatment of Class 7 were extensively negotiated among the Debtors, the Asbestos PD FCR, and representatives of PD creditors, including claimants holding US ZAI PD Claims.

Class 7A represents all Asbestos PD Claims against the Debtors other than US ZAI PD Claims and Canadian PD ZAI Claims. Under the Joint Plan:

- All current and future claims in Class 7A are unimpaired and will be paid the full amount of their allowed claims.

- All Class 7A Claims are channeled to the Asbestos PD Trust. The Class 7A Claims that were filed by the PD Bar Date and have been resolved through settlement or otherwise as of the Effective Date of the Joint Plan will be paid in full on the Effective Date.

- Pursuant to the Class 7A Case Management Order (Ex. 25 in the Exhibit Book), Class 7A Claims that are not settled or allowed as of the Effective Date, will be allowed pursuant to the claims allowance procedures presently in effect and paid in full the allowed amount of their claims by the Asbestos PD Trust.

- Future Class 7A Claims that can demonstrate that they are not barred by operation of the PD bar date, will be allowed through litigation commenced in a federal district court with jurisdiction over the claims, and paid in full the allowed amount of their claims by the Asbestos PD Trust.

- On the Effective Date, Sealed Air and Fresenius will collectively fund the Asbestos PD Trust with Cash as specified in the Joint Plan to pay the Allowed Class 7A Claims, and the Debtors will deliver to the Asbestos PD Trust a Deferred Payment Agreement pursuant to which they will agree to fund all amounts to be paid to Class 7A Claims allowed subsequent to the Effective Date.

Class 7B represents all US ZAI PD Claims. US ZAI PD Claims will be paid pursuant to the ZAI TDP, which will be in the form of Exhibit 33 included in the Exhibit Book to the Joint Plan, consistent with the class settlement agreement discussed above. The Debtors, Sealed Air, and Fresenius will make certain payments directly to the PD Trust for payment of valid US ZAI PD Claims. On the Effective Date of the Joint Plan, the PD Trust will receive $30 million in Cash, plus interest accrued at the same rate applicable to the Debtors' senior Exit Financing, from April 1, 2009 to the Effective Date, on account of US ZAI PD Claims to be transferred equally by Cryovac, Inc. and Fresenius directly to the Asbestos PD Trust for the benefit of holders of US ZAI PD Claims and Demands in Class 7B; provided, however, that Cryovac, Inc.'s transfer to the Asbestos PD Trust as part of the Class 7B Initial Payment when aggregated with Cryovac, Inc.'s transfer to the Asbestos PD Trust as part of the Class 7A Initial Payment shall not exceed 50% of the Cash component of the Cryovac Payment; and *provided, further*, that the Fresenius transfer to the Asbestos PD Trust as part of the Class 7B Initial Payment when aggregated with Fresenius' transfer as part of the Class 7A Initial Payment shall not exceed 65% of the Fresenius Payment. The Reorganized Debtors will pay another $30 million to the PD Trust for US ZAI PD Claims on the third anniversary of the Effective Date, and the Reorganized Debtors shall have certain additional contingent payments due to the PD Trust for US ZAI PD

Claims in the event the PD Trust's assets dedicated to US ZAI PD Claims fall below certain levels.

### c) CDN ZAI PD Claims (Class 8)

CDN ZAI PD Claims will be channeled to the CDN ZAI PD Claims Fund and resolved in accordance with the terms of the CDN ZAI Minutes of Settlement. Under the CDN ZAI Minutes of Settlement, which were approved by the Canadian Court on October 17, 2008, the Debtors agreed to pay, on the Effective Date, approximately $6.5 million (CDN dollars) to the CDN ZAI PD Claims Fund in order to pay all valid CDN ZAI PD Claims. On the Effective Date, the Asbestos PD Trust shall be funded with all funding as set forth in the CDN ZAI Minutes of Settlement, and the Asbestos PD Trust shall immediately transfer such amounts to the CDN ZAI PD Claims Fund to be used in the manner set forth in the CDN ZAI Minutes of Settlement.

### B. TREATMENT OF GRACE'S OTHER CONSTITUENCIES UNDER THE JOINT PLAN.

#### 1. General Unsecured Claims are Unimpaired

The Joint Plan provides that all Holders of General Unsecured Claims (Class 9) will be paid the value of their Allowed Claims in Cash in full. Unless previously agreed to by a Holder of a General Unsecured Claim, such Holder will be entitled to payment of interest on such General Unsecured Claim at the applicable rate specified in the Joint Plan. There is a dispute between the Plan Proponents, Morgan Stanley Senior Funding, Inc.("Morgan Stanley"), the Unsecured Creditors' Committee ("UCC"), and the Lenders regarding whether all General Unsecured Claims are receiving Cash under the Joint Plan in the full amount of their respective Claims as a result of the rate of post-petition interest to be paid on these claims. The Plan Proponents have addressed these issues in Phase I confirmation briefs, will address additional Lender arguments in the Lender brief being filed concurrently herewith, and will address any

additional arguments raised by the UCC and Morgan Stanley and not elsewhere addressed herein.

## 2. **Other Creditors Are Also Unimpaired**

The Debtors will satisfy certain other of their non-asbestos related liabilities, including tax, workers' compensation, employee-related benefits, pension and retirement medical obligations, and Intercompany Claims, as they become due and payable over time. In essence, these claims against the Debtors will "pass through" confirmation and be paid by the Reorganized Debtors in the ordinary course of their business unless any of such claims are expunged. The Reorganized Debtors will fund distributions on account of these claims directly, with funds from a number of sources including: (1) Cash on hand; (2) the Exit Financing; and (3) cash flow from future operations.

## 3. **Equity Interests**

The Joint Plan provides that Parent Common Stock will remain outstanding. However, the interests of existing stockholders will be subject to dilution by, among other things, the issuance of Parent Common Stock upon exercise of the Warrant or under the Parent's obligation to issue shares of the Parent Common Stock if the Parent fails to perform its guaranty of Grace-Conn's obligations to make deferred payments to the Asbestos PI Trust or the Asbestos PD Trust under the Asbestos PI Deferred Payment Agreement, the Class 7A Asbestos PD Deferred Payment Agreement, or the Class 7B Asbestos PD Deferred Payment Agreement.

## IV. **JURISDICTION AND BURDEN OF PROOF.**

This Court has jurisdiction over these cases pursuant to 28 U.S.C. § 1334(a) and 28 U.S.C. § 157(b). Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. In order to confirm a plan of reorganization in a chapter 11 case, the Plan Proponents must establish, by a preponderance of the evidence, that the requirements of 11 U.S.C. §§ 1129(a) and

524(g) are satisfied. *See Herman & MacLean v. Huddleston,* 459 U.S. 375, 390 (1983); *In re Genesis Health Ventures, Inc.,* 266 B.R. 591, 599 (Bankr. D. Del. 2001); *Corestates Bank v. United Chem. Techs.,* 202 B.R. 33 (E.D. Pa. 1996).

## **ARGUMENT**

The primary objections to the Joint Plan fall into several categories. This Memorandum is intended to address all such objections, other than those related to the Lenders, Libby, and certain Insurer-specific issues such as assignment, all of which will be addressed in separate Memoranda filed by the Plan Proponents currently herewith. The roadmap to this Memorandum is as follows:

- Section V -- Good Faith of Joint Plan;

- Section VI -- Best Interests Test;

- Section VII -- Classification;

- Section VIII -- Discrimination Under TDPs;

- Section IX -- Conflicts of the TAC;

- Section X -- Insurer Standing As To Section 524(g) Funding;

- Section XI -- Release and Exculpation Provisions;

- Section XII -- Remaining Objections Under Sections 1122, 1123, 1124, and 1129 of the Bankruptcy Code;

- Section XIII -- Remaining Objections Under Sections 524(g) and 105(a) of the Bankruptcy Code;

  Section XIV -- Miscellaneous Additional Objections; and

  Section XV -- Compliance With Undisputed Confirmation-Related Sections of the Code.

As will be addressed herein and in the companion Memoranda referred to above, and as will be demonstrated at the Confirmation Hearing, the Joint Plan satisfies all of the requirements

for confirmation under the Code and applicable Third Circuit law. Accordingly, the objections to the Joint Plan should be overruled, and the Joint Plan should be confirmed.

## V.  THE JOINT PLAN HAS BEEN PROPOSED IN GOOD FAITH -- 11 U.S.C. § 1129(a)(3).

The Joint Plan has been proposed in good faith and seeks to resolve, among other things, asbestos personal injury litigation against the Debtors that dates back to the 1980's, as well as the Debtors' lengthy chapter 11 cases that commenced on April 2, 2001. Section 1129(a)(3) of the Bankruptcy Code requires that a plan of reorganization be "proposed in good faith and not by any means forbidden by law."[70] The good faith standard requires that the plan be "proposed with honesty, good intentions and a basis for expecting that a reorganization can be effected with results consistent with the objectives and purposes of the Bankruptcy Code."[71]

The requirement of good faith must be viewed in light of the totality of the circumstances surrounding the establishment of the chapter 11 plan. In the context of section 1129(a)(3), good faith is not a free-floating conception of ethics or morality; rather the measure of good faith is whether "there is a reasonable likelihood that the plan will achieve a result consistent with the standards prescribed under the [Bankruptcy] Code."[72] Courts find that plans of reorganization

---

[70]  11 U.S.C. § 1129(a)(3).

[71]  *In re Zenith Elecs. Corp.*, 241 B.R. 92, 107 (Bankr. D. Del. 1999) (quoting *In re Sound Radio, Inc.*, 93 B.R. 849, 853 (Bankr. D.N.J. 1988), *aff'd in part, remanded in part*, 103 B.R. 521 (D.N.J. 1989), *aff'd*, 903 F.2d 964 (3d Cir. 1990)). *See also Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988) (citing *In re Koelbl*, 751 F.2d 137, 139 (2d Cir. 1984) (quoting *Manati Sugar Co. v. Mock*, 75 F.2d 284, 285 (2d Cir. 1935)); *In re Century Glove, Inc.*, No. 90-400-SLR, 1993 WL 239489 at *4 (D. Del. Feb. 10, 1993) ("[w]here the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success, the good faith requirement of section 1129(a)(3) is satisfied").

[72]  *In re Walker*, 165 B.R. 994, 1001 (E.D. Va. 1994) (quoting *Hanson v. First Bank of South Dakota, N.A.*, 828 F.2d 1310, 1315 (8th Cir. 1987)); *see also In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 119 (3d Cir. 2004) (two inquiries relevant to the question of good faith are whether the petition serves a valid bankruptcy purpose such as preserving going concern or maximizing value of the debtor's estate and whether the petition is filed merely to obtain a tactical advantage); *In re SGL Carbon Corp.*, 200 F.3d 154, 165 (3d Cir. 1999) (finding (Continued...)

34

that are proposed after arm's-length negotiations for the purposes of maximizing the value of the debtor's estates satisfy section 1129(a)(3).[73] The good faith test is an objective test that is only concerned with the "objective consequences of the plan, not the moral consciousness of the various proponents."[74] Further, the fundamental purpose of chapter 11 is to enable a distressed business operation to reorganize its affairs and thereby prevent job losses and the adverse economic effects associated with disposing of the debtors' assets at liquidation value.[75] Accordingly, where a plan satisfies the purposes of the Bankruptcy Code and has a good chance of succeeding, the good faith requirement of section 1129(a)(3) is satisfied.[76]

---

good faith requires "some relation" between the chapter 11 plan and the "reorganization-related purposes" of chapter 11); *In re T-H New Orleans L.P.*, 116 F.3d 790, 802 (5th Cir. 1997) (good faith inquiry involves a totality of circumstances analysis, "keeping in mind the purpose of the Bankruptcy Code is to give debtors a reasonable opportunity to make a fresh start").

[73] *See In re U.S. Mineral Prods. Co.*, No. 01-2471, 2005 WL 5898300, at *20 (Bankr. D. Del. Nov. 29, 2005) (plan was the result of extensive arm's-length negotiations between the parties in interest, demonstrating that the plan was proposed in good faith); *In re Magnatrax Corp.*, No. 03-11402, 2003 WL 22807541, at *6 (Bankr. D. Del. Nov. 17, 2003) (same); *In re Source Enters., Inc.*, No. 06-11707, 2007 WL 2903954, at *6 (Bankr. S.D.N.Y. Oct. 1, 2007) (plan that was proposed after arm's-length and good faith negotiations was proposed in good faith); *In re Hazel Pointe, LP*, No. 07-35654, 2009 WL 1789111, at *3 (Bankr. N.D. Tex. June 16, 2009) (same); *In re Entergy New Orleans, Inc.*, No. 05-1343804, 2007 WL 1343804, at *3 (Bankr. E.D. La. May 7, 2007) (same).

[74] *In re MCorp Fin., Inc.*, 160 B.R. 941, 962 (S.D. Tex. 1993); *see also In re PPI Enters. (U.S.), Inc.*, 324 F.3d 197, 211 (3d Cir. 2002) (debtor's subjective intent to avail themselves of certain code provisions is not a bar to a finding of good faith).

[75] *See Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 453 (1999) (basic purposes of chapter 11 are "preserving going concerns" and "maximizing property available to satisfy creditors."); *Walker*, 165 B.R. at 1001 ("Chapter 11 was intended to afford the earnest debtor an opportunity to restructure its finances in such a fashion as to permit continued operation of business ventures so as to enable payment of creditors, rather than face immediate liquidation."); *In re Gibson Group, Inc.*, 66 F.3d 1436, 1442 (6th Cir. 1995) (chapter 11 plan gives debtor opportunity to reorganize in order to provide creditors with going-concern value rather than a "more meager satisfaction through liquidation").

[76] *See T-H New Orleans*, 116 F.3d at 802 ("A debtor's plan may satisfy the good faith requirement even though the plan may not be one which the creditors would themselves design . . ."); *In re Briscoe Enters., Ltd., II*, 994 F.2d 1160, 1167 (5th Cir. 1993) ("This Bankruptcy Court has held that, 'Where the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success, the good faith requirement of section 1129(a)(3) is satisfied.'") (quoting *In re Sun Country Dev., Inc.*, 764 F.2d 406, 408 (5th Cir. 1985)).

The Joint Plan has been specifically designed to address not only the statutory requirements of a chapter 11 plan, but also more importantly, the unique objectives and requirements of section 524(g) of the Bankruptcy Code allowing for a global resolution of all of Grace's asbestos liability. The key elements of the Joint Plan were formulated after contentious litigation on a level playing field supervised by this Court and the District Court, followed by arm's-length negotiations, and ending in settlements approved by the Court and incorporated into the Joint Plan. In particular, the settlements with Sealed Air, Fresenius, the PI Claimants, the PD Claimants, and the ZAI Claimants all came on the heels of vigorous litigation. The Joint Plan is the result of arm's-length bargaining amongst many constituencies and reflects agreement amongst the various parties in interest. Accordingly, the Joint Plan is the culmination of good faith efforts to resolve all disputes for the purpose of allowing the Debtors to exit chapter 11 as a going concern free from any asbestos liability.

The Plan Proponents' good faith in proposing the Joint Plan is further evidenced by the overwhelming support of the Joint Plan by Claim Holders -- all impaired classes voted overwhelmingly in favor of the Joint Plan. The Joint Plan addresses all Claims against the Debtors and enables the Debtors to emerge from chapter 11 as a going concern. Given that the Joint Plan is the objective product of negotiations among all key constituents and provides for reorganization of the Debtors' operations, there is ample evidence to support that the Joint Plan has been proposed in good faith as required by the Bankruptcy Code.

While the Joint Plan has received numerous objections alleging the Plan Proponents' bad faith, such objections are without merit.[77] Typical amongst the objections are allegations alleging unfair treatment by the Joint Plan to their interests and, therefore, the Joint Plan was filed in bad faith.[78] However, disagreements over a creditor's plan treatment are not enough to sustain an allegation of bad faith, as a plan proponent only needs to show that the purpose of the proposed plan is to reorganize and that the plan has a reasonable hope of success.[79]

In light of the above, the Joint Plan has been conceived and proposed with the "honest purpose" and "reasonable hope of success" by which "good faith" under section 1129(a)(3) is measured, and the requirements of section 1129(a)(3) are therefore satisfied.

## VI. THE JOINT PLAN IS IN THE BEST INTERESTS OF ALL IMPAIRED CREDITORS

### A. THE LEGAL STANDARD FOR THE BEST INTERESTS TEST IN THE THIRD CIRCUIT

Under the "best interests" test of section 1129(a)(7), a plan proponent must prove for each impaired class of claims or interests that:

"each holder of a claim or interest of such class --

(i) has accepted the plan; or

(ii) will receive or retain value under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so

---

[77] Objections alleging violations of section 1129(a)(3) of the Bankruptcy Code were filed by FFIC, CNA, London Market Insurers, the State of Montana, Travelers, the Bank Lenders, Anderson Memorial, and the Creditors' Committee.

[78] *See, e.g.*, Creditors' Committee Objection (plan benefits shareholders at expense of creditors); London Market Insurers (plan alters the terms of prior settlement agreement); CNA (plan modifies CNA's existing contract rights).

[79] *In re Century Glove, Inc.*, 1993 WL 239489, at *4 (Bankr. D. Del. 1993) (bad faith claim without merit since it did not address the purpose of the proposed plan or whether the plan had a reasonable hope of success).

receive or retain if the debtor were liquidated under Chapter 7 of this title on such date."

11 U.S.C. § 1129(a)(7).

The Court must find that creditors or equity security holders who do not vote to accept the Joint Plan will receive or retain value under the Joint Plan that is not less than the amount they would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.[80] The best interests test is generally satisfied through a comparison of the estimated recoveries for a debtor's stakeholders in a hypothetical chapter 7 liquidation of that debtor's estate against the estimated recoveries under that debtor's plan of reorganization.[81] As section 1129(a)(7) makes clear, the best interests test applies only to non-accepting holders of impaired claims or interests. Accordingly, to satisfy the best interests test, the Debtors must demonstrate that Creditors holding such Claims will receive at least as much under the Joint Plan as they would receive in a chapter 7 liquidation.[82]

**B.     THE JOINT PLAN IS PLAINLY IN THE BEST INTERESTS OF ALL CREDITORS**

There is no question that the Joint Plan is superior to any other resolution of the Debtors' liability. The value of Grace itself in a chapter 11 is double its value in chapter 7, where it would need to be sold under time pressures and without the protection of section 524(g). Moreover, the

---

[80]   *CoreStates Bank, N.A. v. United Chemical Technologies, Inc.*, 202 B.R. 33, 56 (E.D. Pa. 1996).

[81]   *See Bank of Am.*, 526 U.S. at 441 n.13 ("The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan."); *see also In re Adelphia Commc'ns. Corp.*, 368 B.R. 140, 251 (Bankr. S.D.N.Y. 2007) (section 1129(a)(7) is satisfied when an impaired holder of claims would receive "no less than such holder would receive in a hypothetical chapter 7 liquidation."); *Century Glove, Inc.*, 1993 WL 239489, at *7.

[82]   *See In re Lason, Inc.*, 300 B.R. 227, 232 (Bankr. D. Del. 2003) ("Section 1129(a)(7)(A) requires a determination whether 'a prompt chapter 7 liquidation would provide a better return to particular creditors or interest holders than a chapter 11 reorganization.'").

Debtors benefit from numerous settlements under the Joint Plan, including the $1.1 billion contribution from Sealed Air and Fresenius and global settlements of significant asbestos liabilities with the Asbestos PI Claimants, the Asbestos PD Claimants, and the ZAI Claimants, respectively.

### C. THE LIQUIDATION ANALYSIS DEMONSTRATES THAT THE DEBTORS HAVE SATISFIED THE BEST INTERESTS TEST

The Debtors provided a detailed liquidation analysis as Exhibit 8 in the Exhibit Book for the Joint Plan and Disclosure Statement that demonstrates that the Joint Plan satisfies the "best interests" test.[83] The liquidation analysis provided a comparison of the recoveries under a hypothetical chapter 7 liquidation and under the Joint Plan, adjusting for the various costs and requirements in each scenario.

#### 1. The Value of the Debtors' Assets Is Significantly Higher in Chapter 11 Than in Chapter 7.

In a chapter 11, the value of Grace is significantly higher than its value under a hypothetical chapter 7 liquidation. As shown in Exhibit 8, the value of Grace is reduced from $2.1 billion to $2.5 billion in chapter 11 to $1.05 billion to $1.25 billion in chapter 7. The value of Grace in chapter 7 is reduced by a discount factor of 50% for two main reasons. First, a forced chapter 7 liquidation would significantly erode the value of Grace because it would need to be sold under time pressures to satisfy the expedited sales process in a chapter 7 liquidation. Second, the discount factor also quantifies the probability that the Debtors' businesses cannot be sold for fair value or at all out of the fear and risk of asbestos liability that would follow the sold

---

[83] *See* Liquidation Analysis at Exhibit 8 in the Exhibit Book to the Disclosure Statement to the Joint Plan.

assets because of the lack of section 524(g) protection.[84]  The Joint Plan, by contrast, allows the

Debtors to continue as a going concern with the protection of section 524(g).  In short, Grace's

value in a chapter 11 is more than a billion dollars higher than in a chapter 7.

> **2.      The Debtors Have a Higher Asset Value in Chapter 11 Than in Chapter 7 Because of Sealed Air and Fresenius Contributing Over $1 Billion in Value.**

In addition to the increased value of Grace itself in chapter 11, under the Joint Plan and as

described in more detail herein, Sealed Air and Fresenius are providing a combined payment of

approximately $1.1 billion to "sponsor" the Joint Plan that would likely not be available in a

chapter 7 liquidation.  The $1.1 billion payment was reached for one primary reason that is

available only in chapter 11 and not chapter 7 -- the protection from future successor liability

offered by section 524(g) of the Bankruptcy Code.

Before the Sealed Air Settlement Agreement and the Fresenius Settlement Agreement

(together, the "Settlement Agreements,") both Cryovac, as predecessor to Sealed Air, and

Fresenius, faced enormous potential future liabilities estimated to be as high as $4.2 billion for

successor liability claims relating to exposure to asbestos.[85]  Because of the section 524(g)

injunctions, both Sealed Air and Fresenius were able to cap all potential future liability for

asbestos claims, and, thus were willing to contribute the $1.1 billion under the Sealed Air

Settlement Agreement and Fresenius Settlement Agreement to fund the Asbestos PI Trust and

the Asbestos PD Trust.

---

[84]  *See In re Chrysler LLC*, Case No. 09-2311 (2d Cir. Aug. 5, 2009) (declining to determine a bankruptcy court's authority to extinguish future asbestos claims without section 524(g) protection in a section 363 sale scenario).

[85]  Report of Dr. Mark. A. Peterson, *Summary of Forecasts of Grace Liability and Defense Costs for Asbestos Bodily Injury Claims*, dated September 14, 2002, at 3; *see also* Sealed Air Proof of Claim No. 14361 (which showed a claimed amount in excess of $4.8 billion).