Sealed Air and Fresenius, however, would likely not have contributed the same amount of money to the Debtors' estates in a chapter 7 liquidation as they are contributing under the Joint Plan, since section 524(g) would not have protected them from successor liability claims in a liquidation. While the Debtors' liquidation analysis notes that under a chapter 7 liquidation the potential recovery from Sealed Air and Fresenius could reach approximately $978 million, in fact, the likelihood is that the amount that they would have contributed is closer to zero. Because of the lack of section 524(g) protection to avoid successor liability claims, the only value for creditors that would be available in a chapter 7 liquidation are the proceeds that Sealed Air and Fresenius would be willing to pay to avoid a fraudulent conveyance action.

It is unlikely, however, that they would be willing to pay much to settle a fraudulent conveyance action. At the time of the transaction, Houlihan Lokey Howard & Zukin determined that the Debtors were solvent even taking into account all asbestos liability through 2039.[86] In the view of Sealed Air and Fresenius, Judge Wolin in his solvency opinion limited the claims to be taken into account for purposes of solvency to those claims that were filed or could have been filed, i.e., the diseases that were diagnosable, as of the date of the transaction in 1997.[87] As Dr.

---

[86] Houlihan Lokey Howard & Zukin Solvency Opinion, dated August 14, 1997, at Bates No. H00203-06.

[87] See Opinion of Judge Wolin, In re W.R. Grace & Co., et al., Case No. 01-1139, Adv. Pro. 02-2210 (Bankr. D. Del. July 29, 2002) at 20-21:

> It is reasonable to conclude that of the tens of thousands of persons making claims for asbestos personal injury against W.R. Grace after the 1998 transfer date, substantial numbers of them had viable claims against the company prior to that time. Asbestos had not been manufactured or employed in industry for many years prior to 1998 and any person with a post-1998 claim must have been exposed long before the transfer date. That such exposure would lead to long-term, serious, health effects with long latency periods has been common knowledge for twenty to perhaps thirty years. It may be, under some states; law, that this exposure is enough. See, e.g., Avers, 106 N.J. 557. However, it must also follow that many, and no doubt a substantial majority, of these persons had some physical manifestation of their exposure, whether they knew it at that time

(Continued...)

Peterson, the expert for the Asbestos PI and PD Claimants who were the plaintiffs in the fraudulent conveyance action, admitted, claims are asserted within one year for malignant claims and within five years for non-malignant claims, significantly earlier and fewer than claims filed through 2039.[88] Thus, as they understood Judge Wolin's opinion, it is reasonable to believe that the Debtors would have been found to be solvent at the time of the transaction and, thus, in the opinion of Sealed Air and Fresenius, the fraudulent conveyance action alone was of little value for Sealed Air and Fresenius to settle.

Moreover, it is unlikely that Sealed Air or Fresenius would be willing to pay much to resolve a fraudulent transfer claim without also receiving successor liability protection from future claims, which would be impossible in the context of a chapter 7 liquidation. This is so because even if Sealed Air had paid to resolve a fraudulent transfer claim brought by the chapter 7 trustee, as soon as the liquidation was over and the stay lifted, all future asbestos claimants would immediately have the right to sue Sealed Air under successor liability theories, and thus any payment to resolve the fraudulent transfer case would do nothing to resolve the liability for future claims, which is the bulk of the liability in any event. As such, it is unlikely that Sealed Air would pay any significant money to resolve the fraudulent transfer claim when it would still be subject to suit from future claimants.

---

or not. Exposure and physical manifestation doubtless gave the affected person a claim under the laws of most states. *See Schweitzer*, 758 F.3d at 942 (quoting W. Prosser & P. Keeton, *Prosser & Keeton on Torts* 165 (5th ed. 1984)). Therefore, and for the reasons stated thus far, these persons had a "right to payment" and thus a claim for purposes of the solvency analysis of the UFTA on the transfer date.

[Dkt. No. 121].

[88] Expert Report of Dr. Mark A. Peterson in Connection with the Asbestos Personal Injury Estimation Hr'g, dated June 20, 2007 [Dkt. No. 16113, Ex. A].

Therefore, any recovery in a liquidation from the fraudulent conveyance action, if any, is far more likely to be on the lower end of the estimated recovery range, producing far less value for the Debtors' estates than the combined Sealed Air and Fresenius settlement payments under the Joint Plan. Thus, in addition to the increased value of the Debtors' assets of over $1 billion in chapter 11 compared to chapter 7, chapter 11 also provides the estates with an additional $1.1 billion in capital from Sealed Air and Fresenius that likely would not have been available in chapter 7.

### 3. Assets Available for Unsecured Creditors.

In addition, the liquidation value available for the unsecured creditors would be reduced by, among other things:

- the claims of secured creditors to the extent of the value of their collateral;

- the costs of the liquidation, as well as other administrative expenses of the Debtors' chapter 7 cases;

- costs of the reorganization as well as other unpaid administrative expenses of the chapter 11 cases; and

- priority claims and priority tax claims.

According to the liquidation analysis, the costs associated with a chapter 7 liquidation would reduce the assets available in a liquidation by $126-144 million. In chapter 11, the costs associated with the Joint Plan would reduce the Debtors' assets by $176 million. Accounting for the costs of a liquidation and a reorganization, and the value of the Insurance Recovery proceeds and Cash, which is the same in both chapter 7 and chapter 11, the Plan yields greater value to unsecured creditors with an estimated high-end value of $4.680 billion to a low-end value of $4.280 billion. This is compared to an estimated high-end value of $3.371 billion (which

includes an unlikely $1 billion payment by Sealed Air and Fresenius in a chapter 7 liquidation) to a low-end value of $2.211 billion for unsecured claims in a liquidation.

In short, the Joint Plan likely provides for more than $2 billion in assets for unsecured creditors, after all costs and recoveries are calculated, than would be available in a chapter 7 liquidation.

### 4. The Liabilities of the Debtors in Chapter 7 Are Uncertain and There Is a Wide Range of Potential Liabilities in a Chapter 7.

One of the primary benefits of the Joint Plan is the certainty that it provides the Debtors with respect to their liabilities. Under the Joint Plan, the Debtors are able to provide approximately $1.4 billion to satisfy general unsecured claims, which include postpetition interest as set forth in their treatment under the Joint Plan. Likewise, under the Joint Plan, the Debtors provide approximately $2.773 billion to $2.424 billion to settle Asbestos PI and PD Claims. Under the low-end scenario under the Joint Plan, Asbestos PI payments consist of $2.214 billion and Asbestos PD payments consist of $209.1 million.[89] Under the high-end scenario under the Joint Plan, Asbestos PI payments consist of $2.562 billion and Asbestos PD Claims consist of $212.3 million.

Under the most likely high chapter 7 scenario, the Debtors can most likely, at best, provide only $2.4 billion to General Unsecured Creditors, Asbestos PI and PD Claims (*i.e.*, the high value of the Debtors under chapter 7, which is $1.250 billion, plus Cash and Insurance Recovery Proceeds, for a total asset value of $2.537 billion, minus liquidation costs of $126 million.

---

[89] Includes non-ZAI PD Settlement of $112 million and US ZAI Settlement of $54.5 million.

A chapter 7 trustee would be forced to resolve all those unsecured claims with only the limited assets of $2.4 billion while winding down the estate. There is no reason to doubt that Asbestos PI and PD claims would have been hotly contested and vigorously disputed with wide-ranging potential values for the claims, as they were in chapter 11. Under these circumstances, it is unlikely that in the process of liquidating the estate that the chapter 7 trustee would be willing to litigate the claims. Instead, the chapter 7 trustee would almost certainly settle the claims.

While the outcome cannot be known, it is equally almost certainly true that the chapter 7 trustee would neither have the incentive nor the leverage to settle at low values. As such, the unsecured claims would face the prospect of not receiving anywhere near the value of claims given the limited amount of assets and the potential billions of dollars of claims.

While the Debtors' estimates for Asbestos PI liability ranged from $200 million and $989 million, with a median value of $468 million, according to the Asbestos PI Claimants, estimates of the Debtors' total PI liability ranged from "between $4.7 and $6.2 billion and most likely between $5.4 and $6.2 billion" [90] (and the claims through 2009 alone, without taking account of the acceleration of claims in a chapter 7 liquidation, total over $2.828 billion).[91]

Likewise, while the Joint Plan provides for at least $149.3 million for non-ZAI PD Claims, the potential liability for non-ZAI claims was highly uncertain and potentially significantly higher. While the Joint Plan provides for between $54.5 million and $58 million to ZAI Claimants (and potential additional contingent payments), outside of the Joint Plan, the potential liability of ZAI Claims was also highly uncertain and potentially significantly higher.

---

[90]  *See* Expert Report of Dr. Mark Peterson in Connection with the Asbestos Personal Injury Estimation Hr'g, dated June 20, 2007 [Dkt. No. 16113, Ex. A]

[91]  *See* Email from Nathan Finch to Dan Cohn (June 7, 2009 at 8:50 PM).

At one point, ZAI Claimants argued that ZAI could potentially be in 11 million homes[92] with a value of $5,000 to $7,500 per home.[93] Even using the ZAI Claimants' later estimate of ZAI damage of one million homes at $3,000 to $5,000 per home, the total liability would be from $3 billion to $5 billion.[94] Liability for Non-ZAI PD Claims combined with ZAI PD Claims reaches between $4 billion and $6 billion.

In sum, the potential liability of the Asbestos PI and PD Claims in a chapter 7 liquidation exceeded $10 billion and the General Unsecured Creditors would have a claim for $999 million and any postpetition interest to the extent any value remained. Given the nature of a chapter 7 liquidation and the disputed and uncertain nature of Asbestos PI and PD liability, as well as the limited pool of $2.4 billion of assets, all the creditors would likely receive far less than 100 cents on the dollar for any settlements they made. On the other hand, under the Joint Plan, the Debtors' liability for asbestos claims were settled to a finite number with their respective representatives.[95]

Accordingly, the Debtors have proven by a preponderance of the evidence that impaired creditors would recover an amount under the Joint Plan equal to or greater than the amount that they would recover in a liquidation. Thus, the Debtors have satisfied the best interests test under section 1129(a)(7) of the Bankruptcy Code.

---

[92] Zonolite Attic Insulation Class Plaintiffs' Memorandum of Law in Support of Motion for Summary Judgment, Appendix E (Legend to Production Information from Bureau of Mines Minerals Yearbooks), dated July 9, 2003 [Dkt. No. 4028].

[93] ZAI Claimants' Opposition to Grace's Motion for an Immediate Bar Date, dated April 10, 2008, at 9 [Dkt. No. 18493].

[94] 6/2/08 Hrg. Tr. at 137 [Dkt. No. 18913].

[95] Traveler's Tr. Br., dated July 13, 2009, based on the best interests test, is similarly without merit for they fail to take into account any recoveries reserved for Asbestos PI and PD claimants. [Dkt. No. 22420].

## VII. CLASSIFICATION OF INDIRECT PI TRUST CLAIMS -- CLASS 6 VS. CLASS 9

### A. THE CLASSIFICATION OF INDIRECT PI TRUST CLAIMS IN CLASS 6 IS PERMISSIBLE UNDER 11 U.S.C. § 1122.

#### 1. Pursuant to Section 524(g), All Indirect Claims Are Channeled to the Asbestos PI Trust.

Under the Joint Plan, all Indirect PI Trust Claims will be channeled to the Asbestos PI Trust.[96] These claims include claims for indemnification, contribution, or reimbursement from Grace in connection with its asbestos liabilities.[97] The Joint Plan's Asbestos PI Channeling Injunction is consistent with the language of section 524(g). 11 U.S.C. § 524(g)(1)(B) provides that "[a]n injunction may be issued under subparagraph (A) to enjoin entities from taking legal action for the purpose of directly or *indirectly* collecting, recovering, or receiving payment or recovery with respect to any claim or demand that, under a plan of reorganization, is to be paid in whole or in part by a trust described in paragraph (2)(B)(i)." (emphasis added). Moreover, the injunction described in section 524(g)(2)(B)(i) applies in connection with a trust that will "assume the liabilities of a debtor which . . . has been named as a defendant in . . . actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos containing products." These two sections, read together, support the proposition that a section 524(g)(1)(B) injunction may bar indirect efforts to collect on a chapter 11 debtor's asbestos liabilities.

Because the term "indirectly," as used in section 524(g)(1)(B), is not defined in the Bankruptcy Code, it is helpful to examine the legislative history of the section, and the purposes

---

[96] Joint Plan § 8.2.1.

[97] Joint Plan § 1.1(138).

that section 524(g) is intended to achieve.  In *Johns-Manville Corp.*,[98] the plan of reorganization

channeled all "indemnification or contribution liabilities or obligations of any of the Debtors . . .

to the extent that such . . . indemnifications [sic] or contribution responsibilities cover claims

against such other person that would, if such claims were made directly against any of the

Debtors" constitute a claim for "death, personal injuries, or personal damages" attributable to

acts or omissions of the debtor prior to the confirmation date.[99]  The legislative history of

section 524(g) indicates that Congress explicitly intended to clarify that bankruptcy courts have

the power to issue the injunction in *Manville*.[100]

The history and language of section 524(g) demonstrate that a section 524(g) injunction

can properly channel claims for indemnification, contribution, or other means of reimbursement

arising from or related to a debtor's asbestos-related liabilities.[101]  Consistent with the injunction

in the *Johns-Manville* case, and with Congress' intent that "all asbestos-related claims and

demands must be made against the court-approved trust,"[102] the test for when a claim can be

channeled by a section 524(g) injunction is whether it re-opens or revives the debtor's past,

---

[98]  *See Collier on Bankruptcy supra* note 40 at App. Pt. 9-76 ("The procedure [in 524(g)] is modeled on the trust/injunction in the Johns-Manville case").

[99]  Manville Corporation Second Amended and Restated Plan of Reorganization and Related Documents, Case No. 80 B 11656, (Bankr. S.D.N.Y. filed Nov. 28, 1988) (Plan §§ 2.4, 3.4; Ex. A, at 2).

[100]  *See Collier on Bankruptcy, supra* note 40 at App. Pt. 9-119 (Statement of Senator Heflin) ("A good example of this would be the injunctions issued in the Manville and the UNR Industries reorganizations, both of which are intended to be covered by this section and both of which will be confirmed as permanent under this statute").

[101]  As explained *supra* in Part III.A, section 524(g) was enacted for the purpose of allowing debtors to achieve a global resolution of their asbestos liabilities.

[102]  *Collier on Bankruptcy, supra* note 40 at App. Pt. 9-118 (statement of Senator Heflin).

present, or future asbestos liabilities.[103] The importance of blocking indirect asbestos claims against debtors' estates is readily demonstrated by the large number of cases under section 524(g) that have adopted procedures substantially identical to those in the Joint Plan.[104]

Moreover, recent cases interpreting section 524(g) have expressly allowed channeling of indirect asbestos claims (including those based on contractual rights) to a 524(g) trust. The District Court for the District of Delaware has found that "[b]ecause Indirect PI Trust Claims, including those arising under contract, *relate to* direct Asbestos Personal Injury Claims, they are appropriately channeled to the Asbestos PI Trust and have historically been channeled to trusts established in connection with asbestos related chapter 11 cases."[105]

With regard to classification, it should first be noted that the characterization of a claim as "contractual" or otherwise has never been an important issue for classifying claims under 11 U.S.C. § 1122(a).[106] For example, unsecured contract claims are routinely grouped with

---

[103] *See In re Asbestos Claims Mgmt. Corp.*, 294 B.R. 663 (N.D. Tex. 2003) (confirming plan channeling indirect asbestos claims where definition of indirect claims under plan explicitly included asbestos-related contractual claims for reimbursement, indemnification, and other forms of relief); *In re Celotex Corp.*, 204 B.R. 586 (M.D. Fla. 1996) (same); *In re Porter Hayden Co.*, No. 02-54152, 2006 WL 4667137 (Bankr. D. Md. June 30, 2006) (same); *In re Fed. Mogul Global*, No. 01-10578, 2007 WL 4180545 (Bankr. D. Del. Nov. 16, 2007) (same).

[104] *See In re Burns & Roe. Enters. Inc.*, No. 08-4191, 2009 WL 438694, at *24 (D.N.J. Feb. 23, 2009) (approving classification grouping direct and indirect asbestos claims in one class where definition of indirect claim under plan included claims for indemnification and subrogation); *In re Asbestos Claims Mgmt. Corp.*, 294 B.R. 663 (N.D. Tex. 2003) (affirming plan grouping direct and indirect asbestos claims together where definition of indirect claim under plan explicitly included contractual claims for reimbursement, indemnification, and other forms of relief); *In re Celotex Corp.*, 204 B.R. 586 (M.D. Fla. 1996) (same); *In re Porter Hayden Co.*, No. 02-54152, 2006 WL 4667137 (Bankr. D. Md. June 30, 2006) (same); *In re Fed. Mogul Global*, No. 01-10578, 2007 WL 4180545 (Bankr. D. Del. Nov. 16, 2007) (same).

[105] *In re Armstrong World Indus., Inc.*, 348 B.R. 136, 168-69 (D. Del. 2006) (emphasis added).

[106] This Court has already noted, in the context of a guarantor's reimbursement claim in the *Solow* case, that Asbestos Claims arising from contracts should not be treated differently from Asbestos Claims arising from tort claims. *See* 4/25/05 Hrg. Tr. [Dkt. No. 8364] at 29 ("Yes, it is a contractual obligation, but it's an obligation to pay an asbestos claim which the debtor would otherwise have to pay and which is going to be addressed in the debtor's plan of reorganization as payment of an asbestos claim.").

unsecured personal injury claims in a general unsecured class. Rather, the most relevant factors for classification are the nature and extent of a party's rights to the debtor's property under the Bankruptcy Code.[107] In this sense, section 524(g) is critical. To the extent that a claim may be properly channeled under section 524(g), the claimant must seek reimbursement from the section 524(g) trust.[108] This characteristic distinguishes direct and indirect Asbestos Claims from all other claims in Grace's bankruptcy because the nature and extent of these claimants' rights against the estate are fundamentally different.[109] Thus, the relevant issue is which claims can be properly channeled to the Asbestos PI Trust under section 524(g). Various parties have objected to the classification of their Indirect PI Trust Claims in Class 6. As the Plan Proponents explain *infra*, each of these objections is unfounded because each of these claims is properly channeled to the Trust and may therefore be properly classified with other Asbestos Claims.

## 2. Specific Objections to Classification in Class 6.

### a) Insurers' Objections to Classification in Class 6.

Various insurers (the "Class 6 Objecting Insurers")[110] object to the classification of their alleged indemnification claims under various settlement agreements in Class 6. These parties argue that their claims should be classified as Class 9 General Unsecured Claims because they

---

[107] *See* 7 Lawrence P. King et al., Collier on Bankruptcy ¶ 1122.03[3] (15th Ed. 2009) ("In classifying claims, courts have looked at the nature of the claim (e.g., senior or subordinated, secured or unsecured) and *the relationship of the claim to the property of the debtor*.") (emphasis added). *See also In re AOV Indus., Inc.*, 792 F. 2d 1140, 1151 (D.C. Cir. 1986) ("the focus of the classification is the legal character of the claim *as it relates to the assets of the debtor*") (emphasis added).

[108] *See* 11 U.S.C. § 524(g)(1)(B).

[109] *See id.*

[110] These parties include Allstate, General Insurance, Longacre (as successor to National Union Fire Insurance Company), Seaton and OneBeacon, and Travelers.

are "contractual" in nature and should not be classified with personal injury claims.[111] The basic

flaw in this argument is that, unlike the General Unsecured Claims in Class 9, these claims are

fundamentally intertwined with Grace's liability for asbestos-related injuries. Indeed, absent

Grace's liability for personal injuries allegedly caused by Grace asbestos, the alleged

indemnification claims under the various settlement agreements would never have arisen.[112] If

the Class 6 Objecting Insurers are allowed to seek indemnification from Grace for asbestos-

related claims by third parties, Asbestos PI Claimants will have a back door to recovery from

Grace and will not be effectively channeled to the Asbestos PI Trust. This result would defeat

the purpose of section 524(g), which is to achieve a global, equitable resolution of the debtor's

asbestos liabilities.[113] Because these indemnification claims could do nothing other than revive

or re-open Grace's asbestos liabilities, these claims are properly channeled to the Asbestos PI

Trust.[114] Therefore, these claims are correctly classified in Class 6, and the Class 6 Objecting

Insurers' objections to the classification of their claims should be rejected.[115]

---

[111] There is nothing in section 1122(a) that requires the Plan Proponents to classify Indirect PI Trust Claims in Class 9. Section 1122(a) of the Bankruptcy Code provides that a plan *may* place a claim or interest in a particular class if such claim or interest is substantially similar to the other claims or interests of such class. 11 U.S.C. § 1122(a) (emphasis added); *see also* 5 Collier on Bankruptcy ¶ 1122.03, at 1122-27 (Lawrence P. King ed. 15th ed. 1995) (noting that "substantially similar" has been generally interpreted to mean similar in legal character to other claims against the debtor's assets or to other interests in the debtor). As discussed in the text, the key reason for classifying Indirect PI Trust Claims in Class 6 is that they implicate Grace's asbestos liability. As such, Indirect PI Trust Claims are "substantially similar" to all other Asbestos Claims within the meaning of section 1122(a).

[112] *See In re Armstrong World Indus., Inc.*, 348 B.R. 136, 168-69 (D. Del. 2006) (noting that claims that relate to asbestos personal injury claims may be properly channeled by a 524(g) injunction).

[113] *See In re Combustion Engineering*, 391 F.3d 190, 235 n.47 (3d Cir. 2004) (noting that one of the purposes of a 524(g) channeling injunction is to limit the debtor's derivative asbestos liability). *See also* discussion in Part III.A.

[114] *See supra*, Part VII.A.1.

[115] Longacre cites a number of cases for its proposition that "[o]mitting [its] claim from Class 9 . . . and placing it in Class 6 . . . is not proper." Longacre Tr. Br. at 9 [Dkt. No. 22427]. Not one of the cases that Longacre cites
(Continued...)

Moreover, Longacre's argument that the Plan discriminates against its claim is without merit. Longacre holds a deficiency claim under a bond issued to secure an asbestos settlement, and thus clearly falls within the scope of claims that Congress intended to be channeled under section 524(g). Morgan Stanley, on the other hand, has a claim against letters of credit that were not issued as part of an asbestos settlement.

### b) FFIC Objections.

#### (1) Objection to Classification of FFIC Surety Bond Claim in Class 6

FFIC objects to the classification of its contingent claim for indemnification as a Class 6 Claim. FFIC posted a supersedeas bond on behalf of Grace in connection with Grace's appeal of a Texas state court judgment against it in connection with five consolidated personal injury cases (the "Edwards Cases").[116] FFIC claims a contingent right to payment under a related indemnity agreement to the extent that the trial court's judgment is affirmed, Grace fails to pay the judgment, and FFIC is required to pay the judgment pursuant to the bond.[117]

---

supports this proposition, as none of them involve classification of asbestos claims in a § 524(g) case, or even a situation that is reasonably analogous to such. Specifically, *In re National/Northway Ltd. P'Ship,* 279 B.R. 17, 25-26 (Bankr. D. Mass. 2002), involved separate classification of an undersecured creditor's deficiency claim in a single-asset real estate case -- a classification scheme that bears no resemblance to this case, where the separately classified Asbestos Claims have fundamentally different rights against the estate than the General Unsecured Creditors in Class 9. *See also* 11 U.S.C. § 506(a)(1). For the same reason, *In re One Times Square Assoc.'s Ltd. P'ship,* 159 B.R. 695, 702-04 (S.D.N.Y. 1993), does not support Longacre's argument, as that case involved separate classification of unsecured claims with identical rights against the debtor's property. *Dow Corning* and *EBP* simply stand for the proposition that in some cases it may be permissible to classify tort claims separately from general unsecured claims -- these cases say nothing about when classifying these claims together might be prohibited. *In re Dow Corning Corp.,* 244 B.R. 635 (Bankr. E.D. Mich. 1999) and *In re EBP, Inc.,* 172 B.R. 241 (Bankr. N.D. Ohio 1994). Finally, *In re U.S. Truck Co., Inc.,* 42 B.R. 790, 793-94, involved classification of claims that would be paid over a one-year period with claims that would be paid in perpetuity. In this case, there is no such disparity in the reimbursement period for claims. *See* Asbestos PI TDP, Exhibit 4 to Exhibit Book, at §§ 5.6, 5.13.

[116] Phase II "Surety Claim" Related Objections of Fireman's Fund Insurance Company, As A Creditor, To Confirmation of the First Amended Plan of Reorganization at 1 [Dkt. No. 21791].

[117] *Id.* at 7-8.

FFIC argues that the "legal character" of its claim is dissimilar from other claims in Class 6, and in support of this statement it offers five arguments: 1) its claim is at least partially secured by its right to setoff against its obligation to Grace and by a letter of credit issued by Wachovia[118]; 2) its claim is a contractual indemnity claim, whereas most Asbestos PI Claims arise in tort, and most of the Indirect PI Trust Claims are "contribution claims by tort system co-defendants of Grace"; 3) there is "no element of negligence on the part of Grace" concerning FFIC claim, unlike Asbestos PI Claimants; 4) Grace is the primary obligor to the Edwards plaintiffs, and FFIC is "merely a secondary obligor;" and 5) FFIC conferred a benefit to Grace by posting the bond, unlike the Asbestos PI Claimants whose claims "are not based on any benefit they conferred to Grace."

As explained *supra*, asbestos-related contractual indemnity claims can be properly classified with other asbestos claims and channeled to a section 524(g) trust.[119] FFIC's contingent claim against Grace arises from an indemnification agreement obligating Grace to reimburse FFIC for any amount that FFIC pays to the plaintiffs in the *Edwards* cases. The *Edwards* cases arise directly from Grace's asbestos-related activities. Therefore, FFIC's claim is no different from any other Indirect PI Trust Claim in the sense that it is a claim for indemnification arising from Grace's asbestos liabilities, and would revive Grace's past asbestos liability in contravention of the mandates of section 524(g). This claim would have been

---

[118] This argument is discussed in the next section of this Memorandum.

[119] FFIC's contention that its claim cannot be channeled by section 524(g) is more fully addressed in Part VII.A.2.b(2), *infra*.

channeled under the injunction issued in the *Johns-Manville* case,[120] and it is properly channeled here.

FFIC's remaining contentions are wholly without merit. The Asbestos PI TDP clearly indicates that presence or lack of negligence on Grace's part is not a factor considered in distributing trust proceeds. Instead, Asbestos PI Claimants must merely provide evidence of disease and exposure.[121] Grace's status as a primary obligor to the *Edwards* claimants, and the fact that FFIC conferred a benefit to Grace, are likewise irrelevant for purposes of classification. Section 524(g)(1)(B) explicitly allows channeling of claims "directly or indirectly" seeking payment for asbestos liabilities. Thus, "a secondary obligor" indirectly seeking payment of asbestos liabilities may be properly channeled to the Asbestos PI Trust, and the mere fact that a party conferred a benefit to the debtor is of no importance for classification in these circumstances.

### (2) Objection to Channeling of FFIC's Indemnity Claim to the Asbestos PI Trust

FFIC also argues that the Court's injunctive power under section 524(g) "cannot be construed so broadly as to include discrete contractual claims."[122] Essentially, FFIC argues that its claim is "unique," and that Grace is not "likely to confront an overwhelming number of

---

[120] *See* discussion of the *Manville* Plan, *supra* Part VII.A.1.

[121] Asbestos PI TDP § 5.7 at Exhibit 4 to the Exhibit Book.

[122] Phase II "Surety Claim" Related Objections of Fireman's Fund Insurance Company, As A Creditor, To Confirmation of the First Amended Plan of Reorganization at 27 [Dkt. No. 21791]. This Court already rejected a similar argument by a party whose potential claim arose from an appeal bond (*Solow* claim). *See* 4/25/09 Hrg. Tr. at 29 ("Yes, it is a contractual obligation, but it's an obligation to pay an asbestos claim which the debtor would otherwise have to pay and which is going to be addressed in the debtor's plan of reorganization as payment of an asbestos claim.").

claims that are 'similar'" to its claim.[123]  FFIC's objection discusses the purposes of section

524(g), citing *Combustion Engineering*.  Yet FFIC misses the obvious consequences of the

language it quotes from *Combustion Engineering*: if Grace is to emerge from this chapter 11 case

as "an economically viable entity" that has been "cleansed of asbestos liability," all indirect

asbestos liability resulting from its complex web of contracts must be channeled to the Asbestos

PI Trust.[124]

   That any given contract can be characterized as "unique" does not determine whether a

claim may be channeled under section 524(g)-- no provision of section 524(g) carves out an

exception for "unique" or "discrete" claims, and with good reason.  All asbestos-related claims,

including personal injury claims, have some unique attributes.[125]  What the asbestos-related

claims share is a common threat to disrupt the equitable distribution procedures of section 524(g)

by favoring some asbestos claimants over others and destroying the source of funding for the

Joint Plan.[126]

   Nor does FFIC's allegation that its claim is partially secured change this analysis.

Although FFIC's claim is backed by a letter of credit and has all the protections that affords,

none of which are affected by the Joint Plan, it does not have a "secured claim"  under section

---

[123] *Id.* at 28.

[124] *See In re Combustion Eng'g, Inc.*, 391 F.3d at 234.

[125] *See* 7 *Collier on Bankruptcy* ¶ 1122.03[3][a] (Lawrence P. King, ed., 15th ed. 2009) (noting that claims or interests do not need to be identical to be placed in the same class).

[126] *See id.*

506(a)(1).[127] FFIC's claim for indemnification, therefore, is no different from any other unsecured, asbestos-related indemnification claim in this case.

### c) BNSF's Objections.

BNSF asserts that its Indirect PI Trust Claims are not substantially similar to the underlying asbestos claims, and should be separately classified for voting purposes. BNSF has been sued in various actions seeking recovery for asbestos-related injuries caused by asbestos contained in vermiculite mined by Grace and transported by BNSF and its predecessors.[128] BNSF claims rights to indemnification from Grace under the terms of contracts and leases between Grace and BNSF. Moreover, BNSF claims that it is an additional insured under various policies issued to Grace and that it has claims against these policies. Finally, BNSF claims that Arrowood, MCC, and CNA issued policies solely to BNSF, and that BNSF has claims against these policies.[129] As explained, BNSF's objection must fail if its claims against Grace are properly channeled by the 524(g) injunction. For the reasons stated above, BNSF's claims can be channeled by a 524(g) injunction if they re-open or revive the debtor's past, present, or future asbestos liabilities.

This Court has already had occasion to consider the relationship between BNSF's claims and Grace's asbestos-related conduct.[130] In an opinion dated April 11, 2008, the Court

---

[127] *See New England Dairies, Inc. v. Dairy Mart Convenience Stores, Inc. (In re Dairy Mart Convenience Stores, Inc.),* 351 F.3d 86, 91 (2d Cir. 2003) (finding that a claim secured by a letter of credit issued by a bank was not a 'secured claim' under section 506 because the debtor did not have an interest in the letter of credit even when it pledged collateral in order to obtain the letter of credit.).

[128] *Id.* at 2.

[129] *Id.* at 4.

[130] *See In re W.R. Grace & Co.,* 386 B.R. 17, 30-31 (Bankr. D. Del. 2008).

considered whether BNSF and Grace shared an "identity of interest such that a suit against [BNSF] is essentially a suit against [Grace]."[131] The Court answered this question affirmatively, finding that "it is the Debtors' operations and conduct at the Libby mines that are at the core of the issues raised in the Montana Actions filed against BNSF."[132] Thus, any indemnification action by BNSF against Grace would similarly be based on Grace's operations and conduct at the Libby mines, and would clearly constitute a "legal action for the purpose of . . .indirectly . . . receiving payment or recovery with respect to" Grace's underlying asbestos liability.[133] Thus, these claims are properly channeled by the 524(g) injunction, and are properly classified with other Asbestos Claims.[134]

BNSF's objection to the treatment of its claims as an additional insured fails for the simple reason that it has no such claims.[135] Insurance policies do not extend coverage to "additional insureds" unless the policies so specify.[136] Not one of the policies BNSF identifies contains any language naming BNSF, or any category of entity that might include BNSF, as an "additional insured." Likewise, the endorsements themselves are devoid of any mention of "additional insureds." For these and other reasons, BNSF's position that it qualifies as an

---

[131] *Id.* at 30.

[132] *Id.*

[133] *See* 11 U.S.C. § 524(g)(1)(B).

[134] *See supra* Part VII.A.1

[135] BNSF's objection on this ground also fails for the same reasons articulated *infra* in Part VII.A.2(d).

[136] *See* Lee R. Russ & Thomas F. Segalla, 9 *Couch on Insurance* § 126:7 (3d ed. rev. 2009) ("Of course, any such third-party coverage must be specifically included in the insurance contracted for, and coverage will not be extended to protect individuals and entities not within the intended scope of an endorsement."); *cf.* Allan D. Windt, 2 *Insurance Claims and Disputes* § 11:30 (5th ed. rev. 2009) ("The parties to whom an insurer owes policy benefits are set forth in the policy. An insurer's duties are defined by what *it* contracted to do, not by what *the insured* contracted to do.").

additional insured under Grace's own policies was rejected by the Court for lack of evidence.[137]
As such, BNSF's argument that the Joint Plan improperly enjoins their rights under Grace's
policies collapses: they have no such rights.[138]

Finally, BNSF's objection to the channeling of its claims against insurance policies
issued to BNSF fails because these claims are not channeled under the Joint Plan. Under Article
8.2.1 of the Joint Plan, the Asbestos PI Channeling Injunction only enjoins claims against
"Asbestos Protected Parties" and their property. The insurers who issued the BNSF Policies are
not deemed Asbestos Protected Parties with respect to those policies. Insurers only qualify as
Asbestos Protected Parties to the extent they are Settled Asbestos Insurance Companies.[139]
Insurers are only Settled Asbestos Insurance Companies with respect to Asbestos Insurance
Policies identified as the subject of an Asbestos Insurance Settlement Agreement in Exhibit 5 of
the Joint Plan.[140] BNSF's own policies are not listed on Exhibit 5. Moreover, in order to qualify
as an Asbestos Insurance Policy, an insurance policy must provide coverage to an Insurance
Contributor; BNSF is not an Insurance Contributor.[141] Thus, the BNSF Policies do not qualify as

---

[137] Transcript of July 27, 2009 Omnibus Hearing at 138:2-4 ("To the extent that BNSF is contending that it is an additional insured, I cannot see that it's an additional insured.") [Dkt. No. 22674].

[138] BNSF's allegations that two of Grace's policies contain "manuscript endorsements" does not alter this conclusion. As a threshold matter, one of the policies BNSF identifies cannot be located and its terms cannot be proven. As to the second policy, the non-standard wording of the "manuscript endorsement" does not enhance its legal effect. The endorsement indemnifies the Debtors against losses from the Debtors' contractual indemnities to BNSF, and as such, does not make BNSF an "additional insured" under Grace's policies. 7/27/09 Hrg. Tr. at 138:6-9 ("The additional insurance that the debtor purchased was for the benefit of the debtor, to the extent that it ever faced a contractual obligation to BNSF. And it was not for BNSF's direct coverage.").

[139] Joint Plan § 1.1.50.

[140] Id. at § 1.1.200.

[141] Id. at §§ 1.1.11, 1.1.140.

Asbestos Insurance Policies, and BNSF's claims against its insurers under its own policies are not enjoined by the Asbestos PI Channeling Injunction.

### d) Scotts' Objections.

Scotts objects to the classification of its Indirect PI Trust Claims as Class 6 claims. Scotts has been sued in several jurisdictions by claimants seeking damages for injuries allegedly arising from Scotts' sale of products containing vermiculite purchased from Grace or its predecessors.[142] Scotts alleges that many of Grace's insurance policies extended coverage to vendors of Grace's products, and asserts that it has claims under the vendor endorsement provisions of those policies.[143]

Though Scotts concedes that the claims in Class 6 share a common factual basis (Grace's liability for asbestos-related injuries),[144] it contends that because its claims are based on insurance agreements and not personal injuries the claims in Class 6 are dissimilar and the Joint Plan should not be confirmed. For the reasons stated *supra* in Part VII.A.1, this objection must fail if Scotts' claim can be channeled under section 524(g).

Scotts' claims fall squarely within the paradigm of claims that have historically been channeled under section 524(g). In *MacArthur*, the Second Circuit upheld the bankruptcy court's power to issue an injunction preventing suits against the debtor's insurers under vendor

---

[142] Objection of the Scotts Company LLC to the Confirmation of First Amended Joint Plan of Reorganization at 3 [Dkt. No. 21775].

[143] It should be noted that Scotts has never demonstrated that it is an additional insured under these policies. *See W.R. Grace & Co. v. Margaret Chakarian*, Adv. Proc. A-01-771, (Bankr. D. Del. July 22, 2004) [Dkt. No. 253] (indicating that Scotts must litigate whether it is entitled to coverage in an appropriate forum); *Scotts Company v. Am. Employers Ins. Co., et al.*, Adv. Proc. 04-55083 (filed Sept. 2, 2004) [Dkt. No. 1] (declaratory judgment action stayed by this Court).

[144] Objection of the Scotts Company LLC to the Confirmation of First Amended Joint Plan of Reorganization at 22 [Dkt. No. 21775].

endorsements in insurance policies.[145]  The court found that "MacArthur's rights as an insured vendor are completely derivative of Manville's rights as the primary insured.  Such derivative rights are no different in this respect from those of the asbestos victims who have already been barred from asserting direct actions against the insurers."[146]  As discussed *supra* in Part VII.A.1, Congress intended section 524(g) to grant bankruptcy courts the power to execute an injunction at least as broad as that in the *Manville* case.  Therefore, Scotts' claims are properly channeled under section 524(g), and its objection to the classification of its claims in Class 6 must fail.

### e)     MCC's Objections.

MCC objects to the classification of its alleged contractual indemnification claims in Class 6.  MCC acknowledges that its claims "may be treated as Class 6 Claims to the extent that they arise from third party claims against MCC that will be permanently enjoined by the Asbestos PI Channeling Injunction."[147]  Moreover, MCC concedes that "[u]nder the First Amended Plan, MCC is fully protected from and against any and all third party claims arising from or relating to the Debtors or their operations, including all Asbestos PI Claims."[148]  Despite these concessions, MCC further asserts that any claims arising from third-party claims against MCC that are not enjoined must be classified as Class 9.

MCC asserts that "*no such claims exist*," but that the Libby Claimants "have argued otherwise."[149]  Even assuming, contrary to MCC's own admission, that these claims exist, MCC

---

[145] *MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, 91 (2d Cir. 1988).

[146] *Id.*

[147] Maryland Casualty Company's Objection at 3 [Dkt. No. 21783].

[148] *Id.* n.2.

[149] *Id.* at 7 n.9 (emphasis added).

fails to explain how it would be entitled to indemnification from Grace on account of a claim that does not "[arise] from or [relate] to the Debtors, their products, or their operations."[150] In fact, these claims -- if they do exist -- by definition would not give rise to any rights of indemnity against Grace under any of MCC's settlement agreements or under common law.

Tellingly, MCC does not explain how claims that do not "[arise] from or [relate] to the Debtors, their products, or their operations"[151] would give it indemnification rights against Grace under MCC's settlement agreements. Nor can MCC assert a valid cause of action for common-law indemnification or contribution based on such claims. The general rule for common-law indemnification is that:

> A person who, in whole or in part, has discharged a duty which is owed by him but which as between himself and another should have been discharged by the other, is entitled to indemnity from the other, unless the payor is barred by the wrongful nature of his conduct.[152]

MCC cannot assert that Grace is obligated to discharge MCC's duties under any judgment for a claim that does not "[arise] from or [relate] to the Debtors, their products, or their operations."[153] Likewise, Grace is not liable to MCC for contribution under any such claim. The general rule for contribution is that:

> Unless otherwise agreed, a person who has discharged more than his proportionate share of a duty owed by himself and another as to which, between the two, neither had a prior duty of performance, is entitled to contribution from

---

[150] *Id.* at 4.

[151] *Id.*

[152] Restatement of Restitution § 76 (1937).

[153] Maryland Casualty Company's Brief in Support of Its Phase II Objections at 4 [Dkt. No. 22426].

the other, except where the payor is barred by the wrongful nature of his conduct.[154]

Because MCC is objecting to the treatment of indemnification claims that by definition cannot be asserted, arising from claims that it concedes are frivolous, its objection should be rejected.

### f) Montana's Objections.

Montana objects to classification of its claims in Class 6. For the reasons stated *supra* in Part VII.A.1, Montana's claims are properly classified if they are properly channeled under section 524(g). Courts have consistently found that claims against debtors for indemnification and contribution based on asbestos liabilities can be channeled under section 524(g).[155]

Montana asserts that its claims are "based on different acts (alleged failure to warn)" rather than Grace's asbestos liabilities.[156] But in claiming that it has rights of indemnification and contribution against Grace, Montana states that "[i]f liability is imposed on Montana as a result of the matters alleged in the various State Court Actions, such liability was caused by the Debtors."[157] Montana tries to have it both ways -- it purports to have claims against Grace because it is being held liable for Grace's actions, but asserts that its claims cannot be channeled because its claims are based on different acts than those that give rise to Grace's asbestos liabilities.

---

[154] Restatement of Restitution § 81 (1937).

[155] *See supra*, note 103.

[156] The State of Montana's Brief in Opposition to Confirmation of the First Amended Joint Plan of Reorganization at 20 [Dkt. No. 22429].

[157] *Id.* at 8.

In fact, to the extent that Montana has claims for indemnification and/or contribution against Grace for asbestos liabilities, those claims *must* arise from Grace's actions giving rise to its own asbestos liabilities.[158] Any claim Montana may have against Grace for contribution and indemnification of necessity would not be predicated on Montana's violation of its own duty to warn, for which it would be independently liable, but rather would be based on Grace's alleged liability, including any alleged failure to warn. To the extent that Montana's asbestos liability is not based on Grace's actions, Montana has no cause of action against Grace.[159] Therefore, because any claims that Montana holds against Grace are properly channeled under section 524(g), Montana's objection should be rejected.[160]

## VIII.  THE ASBESTOS PI TDP TREATS INDIRECT PI TRUST CLAIMS PROPERLY

### A.  THE ASBESTOS PI TDP ADEQUATELY SPECIFIES THE TREATMENT OF INDIRECT PI TRUST CLAIMS IN ACCORDANCE WITH SECTION 1123(a)(3).

FFIC, Montana, and MCC allege that the Joint Plan violates section 1123(a)(3)[161] because, they say, it does not specify how Indirect PI Trust Claims will be treated post-

---

[158] *See* discussion of common law indemnification and contribution, *supra* Part VII.A.2(c).

[159] *Id.*

[160] For the Plan Proponents' response to Montana's additional objections to the channeling of its claims under section 524(g), *see infra*, Part XIII.E.

[161] Section 1123(a) requires that a plan "specify the treatment of any class of claims or interests that is impaired under the plan." 11 U.S.C. § 1123(a).

confirmation.[162] FFIC, in particular, alleges that the provisions of the Asbestos PI TDP suggest that the Trustees of the Asbestos PI Trust will simply "make it up as they go along."[163]

But Article 8.2.1 of the Joint Plan states that "[o]n and after the Effective Date, the sole recourse of the Holder of an Asbestos PI Claim . . . shall be to the Asbestos PI Trust pursuant to the provisions of . . . the Asbestos PI TDP." Section 5.6 of the Asbestos PI TDP, in turn, sets forth in detail the manner in which Indirect PI Trust Claims will be treated under the Asbestos PI TDP. In fact, under section 5.6 of the Asbestos PI TDP, Indirect PI Trust Claims will be treated as presumptively valid if four separate conditions are met. First, the Holder's liability for the underlying direct claim must be fixed and liquidated by either settlement or Final Order, and the Holder must fully pay its share of the liability to the underlying direct claimant. Second, the Holder must fully pay the Asbestos PI Trust's share of the liability to the underlying direct claimant. Third, in any case in which the Holder satisfies the underlying direct claim by way of a settlement, the Holder must obtain for the benefit of the Asbestos PI Trust a release of liability. Fourth, the Indirect PI Trust Claim must not be barred by a statute of limitation or repose or by other applicable law. If each of these four conditions is satisfied, the validity of the Indirect PI Trust Claim will be conclusively established.

Alternatively, if a Holder cannot meet the requirements for presumptive validity, the Holder can nevertheless request individual review of its Indirect PI Trust Claim. This review will be conducted in accordance with procedures to be developed and implemented by the Trustees of the Asbestos PI Trust to determine the validity, acceptability, and enforceability of

---

[162] *See* FFIC's Phase II Trial Brief Concerning its Surety Claim at 18-19 [Dkt. No. 22412]; Montana's Phase II Trial Brief at 33 [Dkt. No. 22429]; MCC's Phase II Trial Brief at 9 (invoking section 1123(a)(4) rather than section 1123(a)(3)) [Dkt. No. 22426].

[163] FFIC's Phase II Trial Brief Concerning its Surety Claim at 19.

Indirect PI Trust Claims. If a Holder disagrees with the Asbestos PI Trust's decision, it can then dispute the decision in accordance with the Asbestos PI TDP's ADR Procedures and, afterwards, litigate the dispute in the tort system.

In either event, once the Holder establishes the validity of the its Indirect PI Trust Claim, the Indirect PI Trust Claim will be subject to the same categorization, evaluation, and payment provisions of the Asbestos PI TDP as all other Asbestos PI Claims. Asbestos PI TDP §§ 2.6, 5.6. Thus, the Indirect PI Trust Claim will be paid in first-in-first-out ("FIFO") order based on the date the Indirect PI Trust Claim is liquidated in the claims review process (Asbestos PI TDP § 5.1(c)), and the Holder will receive an amount equal to the lesser of the liquidated value of Indirect PI Trust Claim multiplied by the Payment Percentage, or the liquidated value of the underlying claim multiplied by the Payment Percentage (Asbestos PI TDP §§ 4.1-4.3, 5.3(b)(3), 5.6).

In the face of these detailed provisions, FFIC, Montana, and MCC argue that the Asbestos PI TDP lacks sufficient clarity as to the procedures for individual review that will be developed by the Trustees of the PI Trust. Montana and MCC further contend that the Asbestos PI TDP is too indefinite with respect to the payout amount and payout percentage for Indirect PI Trust Claims. FFIC, for its part, suggests that the Asbestos PI TDP is too imprecise regarding the date when Indirect PI Trust Claims will be paid.

As to all three of these objections, the response is the same: the Asbestos PI TDP is as specific as is practically possible. Virtually none of the alleged Indirect PI Trust Claims exists at this time. As such, there is no experiential base upon which to draw to create more-detailed evidentiary guidelines for conducting individual review of Indirect PI Trust Claims. The most that can be done now is to ensure that procedures are developed, as experience is accumulated,

by the Asbestos PI Trustees, who will act as fiduciaries for the Holders of Indirect PI Trust Claims.[164] Similarly, the Asbestos PI TDP cannot be any more specific with regard to the amount or timing of payment. The ultimate Payment Percentage and the timing of payment are a function of the number of Asbestos PI Claims that are asserted against the Asbestos PI Trust -- a number which is inherently uncertain. The most the Asbestos PI TDP can offer, therefore, is a set of procedures which the Asbestos PI Trustees, as fiduciaries, will implement, with their determinations subject to judicial review if the Holder of an Indirect PI Trust Claim feels aggrieved. For purposes of section 1123, nothing more is required.

In addition, certain insurers argue that classification of their claims in Class 6 is improper because section 5.13 of the Trust Distribution Procedures, which governs payment of Indirect PI Trust Claims, does not expressly allow claims for costs of suit and attorney fees. But under section 5.13, the Trust is instructed to individually review each claim for indemnification to "determine the validity and amount of such claim." Thus, if a claimant seeking indemnification submits a *valid* claim for costs of suit or attorney fees, this claim will be payable under section 5.13. Because these costs are expressly payable under the TDPs, this objection fails.

## B. THE ASBESTOS PI TDP PROVIDES FOR SIMILAR TREATMENT OF ALL CLASS 6 CLAIMS IN ACCORDANCE WITH SECTIONS 1123(a)(4) AND 524(g)(2)(B)(ii)(V).

The Joint Plan does not discriminate against Indirect PI Trust Claims. As CNA admits, the Joint Plan's specific terms, as testified to by witnesses for the Plan Proponents, provide for equal treatment of the Direct PI Trust Claims and the Indirect Trust Claims. Both sets of claims

---

[164] *See* Asbestos PI Trust Agreement § 2.1, at Exhibit 2 to the Exhibit Book.

will be channeled into the Asbestos PI Trust, where they will be resolved pursuant to the terms of the Asbestos PI TDP.

To be confirmable, a plan must "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." 11 U.S.C. § 1123(a)(4). This provision is to be enforced according to its plain language. *In re New Century TRS Holdings, Inc.*, __ B.R. __, 2009 WL 1704554, *10 (D. Del. June 16, 2009) (citations omitted). If claims within the same class are not receiving the same treatment, and the claimants have not consented to such treatment, a plan is not confirmable. *Id.* In *New Century,* the court found that the plan discriminated against some creditors in one of the classes in the plan by paying them less for their claims than other creditors in the class were receiving. *Id.* In *In re Adelphia Comm. Corp.*, 361 B.R. 337, 363-64 (S.D.N.Y. 2008), the court found that the plan approved by the Bankruptcy Court might discriminate unfairly in violation of section 1123(a)(4) by providing broad releases for some, but not all, claimants in the class. However, if the class members are subject "to the *same process* for claim satisfaction", then all claims are considered to be treated equally. *In re Central Med. Ctr.*, 122 B.R. 568, 575 (Bankr. E.D.Mo. 1990) (emphasis added) (holding that lottery system which subjected all members of same class to same means of claim determination did not discriminate); *see also In re Dow Corning Corp.*, 255 B.R. 445, 500-501 (E.D. Mich. 2000) (recognizing that inquiry as to whether claim is being treated fairly is whether it is subject to the same process in satisfying claims as the other claims in the class).

Here, both the Direct PI Trust Claims and the Indirect PI Trust Claims are subject to the same claims process – the Asbestos PI Trust, governed by the terms of the Asbestos PI TDP. *See* the Joint Plan at §3.1.6. CNA asserts that the Joint Plan discriminates against Indirect PI Trust

Claimants by making them allegedly provide a greater showing than Direct PI Trust Claimants under the TDPs. But CNA's complaint is groundless: as CNA itself admits, CNA is complaining about potentially having to prove in the future (1) that it paid a liability for which Grace is liable, and (2) that it obtained a release that covers the Asbestos PI Trust.[165] The second of those is simply inaccurate, as Indirect PI Trust Claimants can seek individual review even without a release, and if they show that under applicable state law they have paid, in whole or in part, a liability that the Trust had to the Direct Claimant, such indirect claimants become entitled to the amount so paid times the applicable payment percentage even without a release.[166] The requirement that CNA demonstrate that it paid a liability for which the Trust is liable is a perfectly reasonable requirement for the Asbestos PI Trust to implement before it pays such claims, and is appropriately tailored to the nature of alleged indemnification claims such as CNA hypothesizes may in the future provide it with Indirect PI Trust Claims. CNA's objection is unsupported by any relevant precedent, and is groundless.

In addition, CNA claims that "the Plan may discriminate against Indirect PI Trust Claims by making them potentially subject to disallowance by the Court under Section 502(e) of the Code on the ground that they are contingent and unliquidated on the date of Plan confirmation."[167] But nowhere in the Joint Plan or the TDPs is there any process for "disallowing" such claims, or an indication that such claims will be "disallowed" on that basis. They will not be, and CNA's unsubstantiated speculation is not a legitimate basis on which to

---

[165] CNA Br. [Dkt. No. 22415] at 22. CNA actually mischaracterizes the provisions of Section 5.6 of the TDPs as requiring a release covering the Asbestos PI Trust, but a reading of that Section demonstrates that that is simply not true.

[166] Asbestos PI TDP § 5.6, at Exhibit 4 to the Exhibit Book.

[167] CNA Br. at 20.

object to the Joint Plan. *See In re Lernout & Hauspie Speech Products, N.V.*, 301 B.R. 651, 656 (Bankr. D. Del. 2003). There is simply no evidence that the Joint Plan will be used to permit disallowance of Indirect PI Trust Claims because any such claims are contingent or unliquidated as of the date of confirmation; in fact, the only evidence shows that Indirect PI Trust Claims will be paid in "substantially the same manner" as Direct PI Trust Claims.

In sum, none of the cases on which CNA relies supports its assertion of discrimination. Unlike in *In re ACandS, Inc.*, 311 B.R. 36 (Bankr. D. Del. 2004) and *In re Congoleum Corp.*, 2009 Bankr. LEXIS 900 (Bankr. D.N.J. Feb. 26, 2009), the Joint Plan here does not provide for claims in the same class to be paid in a disparate manner, nor does it permit a limited number of creditors to litigate claims.

Montana, MCC, and FFIC object to several provisions of the Asbestos PI TDP, also arguing they discriminate against Indirect PI Trust Claims in violation of sections 1123(a)(4)[168] and 524(g)(2)(B)(ii)(V).[169] Broadly speaking, all three objectors argue that Holders of Indirect PI Trust Claims face additional burdens and greater uncertainty in the claims allowance process than other Holders of Class 6 claims.[170]

Montana, for one, objects to provisions of the Asbestos PI TDP that establish maximum values for Asbestos PI Claims and exclude attorneys' fees and defense costs. These provisions, however, are not unique to Indirect PI Trust Claims. Instead, they apply across the board to all

[168] Section 1123(a)(4) requires that the plan "provide the same treatment for each claim or interest of a particular class, unless the holder . . . agrees to a less favorable treatment." 11 U.S.C. § 1123(a)(4).

[169] Section 524(g)(2)(B)(ii)(V) requires that the trust "operate through mechanisms . . . that provide reasonable assurance that the trust will value, and be in a financial position to pay, present claims and future demands that involve similar claims in substantially the same manner." 11 U.S.C. § 524(g)(2)(B)(ii)(V).

[170] *See* Montana's Phase II Trial Brief at 26-33 [Dkt. No. 22429]; MCC's Phase II Trial Brief at 8 [Dkt. No. 22426]; FFIC's Phase II Trial Brief at 19-22 [Dkt. No. 22412].

Asbestos PI Claims channeled to the Asbestos PI Trust, as they do in every approved set of trust distribution procedures in every other section 524(g) case. Similarly, Montana and MCC criticize the Asbestos PI TDP's FIFO payment scheme, with Montana suggesting that the "only fair mechanic" is to withhold all distributions until each and every claim has been asserted (or at least Montana's).[171] (Montana's Phase II Trial Brief, at *31.) The FIFO payment mechanism, however, applies equally to all Asbestos PI Claims. What is more, the Asbestos PI TDP provides numerous protections to ensure that Asbestos PI Claims receive similar treatment regardless of where they fall in the FIFO queue, not the least of which is the Payment Percentage.

Separately, FFIC and Montana object to the requirement, set forth in Asbestos PI TDP section 5.6, that Holders of Indirect PI Trust Claims must obtain a release from the underlying direct claimant for the Indirect PI Trust Claim to be treated as presumptively valid. This requirement, however, imposes no greater burden on Indirect PI Trust Claims than any other Asbestos PI Claims face. All Asbestos PI Claims are required to establish the validity of their claims in order to receive any payment. For Indirect PI Trust Claims, this involves proving that the Holder satisfied a liability of the Debtors. Obtaining a release is simply one way in which a Holder can meet its burden of proof. Indeed, obtaining a release is not an absolute requirement for an Indirect PI Trust Claim to be paid. If a Holder does not have a release, the Holder can still request individual review, and establish the validity of its Indirect PI Trust Claim through other means. Moreover, when the Holder satisfies the underlying claim pursuant to a Final Order, the release requirement is not applicable.

---

[171] Of course, most projections of future asbestos claims extend well beyond 2045. Presumably, Montana is not suggesting that the Asbestos PI Trust hold up all distribution for over thirty-five years.

## IX. THE INSURANCE COMPANIES' COMPLAINTS REGARDING ALLEGED TRUST ADVISORY COMMITTEE CONFLICTS OF INTEREST ARE MERITLESS.

The Insurance Companies seek to rely on the *Congoleum* decision to establish their asserted standing to complain about alleged conflicts of interest of TAC members.[172] But they misconstrue that case, and ignore the controlling authority of *Combustion Engineering*.

This case does not involve a "preliminary issue" like the retention of professionals at issue when the Third Circuit considered insurer standing in *In re Congoleum Corp.*, 426 F.3d 675 (3d Cir. 2005), which the Third Circuit held "directly affect[ed]" the rights of the insurers and would affect "the entire bankruptcy proceeding." *Id.* at 685. Rather, as in *Combustion Engineering*, this proceeding deals with confirmation of a plan, which was one of the bases on which the Third Circuit in *Congoleum* distinguished *Combustion Engineering*. Moreover, the allocation of funds among asbestos claimants that the Insurance Companies allege could be affected by such alleged conflicts is not an issue as to which the Insurance Companies have a direct pecuniary interest, and they therefore lack standing to raise it. *In re Mid-Valley, Inc.*, 305 B.R. 425, 434 (Bankr. W.D. Pa. 2004) (holding that the insurance companies' "interests are entirely adverse to those of the asbestos claimants," and they "cannot . . . act on [asbestos claimants'] behalf, any more than any other adverse entity could.").[173]

### A. THE TRUST ADVISORY COMMITTEE IS A WELL-ESTABLISHED ELEMENT OF ASBESTOS PERSONAL INJURY TRUSTS.

The Trust Advisory Committee ("TAC") has been a feature of asbestos personal injury trusts since the *Johns Manville* case upon which section 524(g) of the Bankruptcy Code was

---

[172] GEICO Br. at 28-29 [Dkt. No. 22434]; CNA Br. at 8-9; OneBeacon Phase II Trial Br. ("OneBeacon Br.") at 32.

[173] Several Insurance Companies claim to be creditors and potential beneficiaries of the Asbestos PI Trust, but fail to substantiate that allegation. CNA Br. at 5 [Dkt. No. 22415]; OneBeacon Br. at 32 [Dkt. No. 22433].

based.[174] The TAC became an element of asbestos PI trusts for several reasons. First, because the trustee of an asbestos PI trust was not usually a practicing asbestos personal injury lawyer, and therefore would have limited experience with asbestos personal injury cases, the TAC was created to advise the trustee on such matters. Second, there was a recognition that, over the decades asbestos PI trusts would be in existence, these trusts would have to make operational changes. Because an asbestos PI trust is created as a process of negotiation and compromise between, among other constituencies in bankruptcy, the present and future asbestos claimants, and because those constituencies can have different views about matters such as claim payment percentages, having representatives advise the trust on behalf of those constituencies would help preserve the agreement struck in the bankruptcy case and embodied in the trust itself.[175]

Many courts, including this one, have approved TACs as an integral part of asbestos PI trusts. TACs were created within the Federal Mogul Asbestos Personal Injury Trust, the Celotex Trust, the Burns and Roe Asbestos PI Settlement Trust, the Babcock & Wilcox Asbestos PI Trust, and the DII Industries LLC Asbestos PI Trust, among many others. The TAC proposed in this case is similar in purpose and scope to the TACs created in prior asbestos trusts. The Insurance Companies do not allege that the TAC in this case is different from the TACs approved in prior asbestos bankruptcies.

---

[174] *See* Deposition of Elihu Inselbuch, June 12, 2009 at 219:7-220:16.

[175] *See* Deposition of Peter Van N. Lockwood, May 1, 2009, at 209:16-213:9.

## B.     THE TAC'S ROLE AND POWERS ARE LIMITED.

### 1.     The TAC Only Represents Present Claimants.

The TAC in this case has a limited purpose -- to protect the rights of present personal injury claimants. The Asbestos PI Trust Agreement reflects this, stating expressly that the TAC "shall serve in a fiduciary capacity representing all holders of present PI Trust Claims" for the purpose of protecting the rights of such persons.[176] Other constituencies are given their own fiduciary representative. The Futures Representative represents the interest of future claimants: "He shall serve in a fiduciary capacity, representing the interests of the holders of future PI Trust Claims for the purpose of protecting the rights of such persons."[177]

The Trust Agreement's limitation of the fiduciary duty of the TAC is consistent with Delaware law:

> Notwithstanding any other provision of this Code or other law, the terms of a governing instrument may expand, restrict, eliminate, or otherwise vary . . . a fiduciary's powers, duties, standard of care, rights of indemnification and liability to persons whose interests arise from that instrument . . .

Del. Code. Ann. tit. 12, § 3303(a) (2009).

Trust advisors with limited roles and duties are hardly an innovation. *See, e.g.,* Restatement (Third) of Trusts § 75 cmt. a (discussing grants of power to consent to trustee's action). Thus, the Insurance Companies' suggestions that the TAC has the same fiduciary duty as the Trustees and that TAC members are somehow "co-trustees,"[178] are false. "A trust advisor has only the authority given by the terms of the trust instrument * * *." *Papiernik v. Papiernik,*

---

[176] Asbestos PI Trust Agreement § 5.2 (emphasis added) at Exhibit 4 to the Exhibit Book.

[177] *Id.* at § 6.1.

[178] *E.g.,* One Beacon Phase II Trial Brief [Dkt. No. 22433] at 26, 30.

544 N.E.2d 664, 672 (Ohio 1989*); see also* Restatement (Third) of Trusts § 75 cmt. c

("[u]ltimately the purposes of a power and the nature and extent of the rights, duties, and

liabilities of the power holder * * * depend upon trust language and all relevant circumstances").

Pursuant to the Trust Agreement, the Trustees and the TAC have different duties, the TAC's

duties being owed to a subset of beneficiaries and covering a narrower range of subjects. The

Insurance Companies' allegations of conflict of interest must be evaluated in light of this limited

fiduciary role.

## 2. The TAC's Powers Are Limited and Subject to Judicial Review.

In addition to having a narrower purpose and fiduciary duty than the Trustees, the TAC

has limited powers. The TAC is consulted, along with the Futures Representative, on the general

administration and implementation of the Trust and the TDP.[179] On certain enumerated issues,

ones critical to preserving the settlement embodied in the Trust itself, the TAC and the Futures

Representative have the right to consent.

The TAC's powers are further constrained in two ways. First, structurally, because the

Futures Representative has equivalent rights. So, for example, the TAC could not attempt to

somehow use its consent rights to advantage present claimants over future claimants.

Second, the consent right of the TAC is expressly limited by the Trust Agreement. The

TAC, for example, may not withhold its consent unreasonably.[180] The TAC must also explain in

detail its objections to any course of action in writing within 30 days, or its consent is deemed

---

[179] Asbestos PI Trust Agreement § 2.2(e), at Exhibit 2 to the Exhibit Book.

[180] *Id.* at § 5.7(ii).

given.[181]  Any dispute resulting from the withholding of consent is submitted to alternative

dispute resolution with recourse to the Bankruptcy Court within 30 days.[182]  In exigent

circumstances, the Trustee can bypass ADR altogether and go straight to the Bankruptcy

Court.[183]

In light of these significant limitations on the TAC's power under the structure and terms

of the Trust Agreement, the Insurance Companies' claims that "the TAC, not the Trustees, will

have the paramount and preemptive power over the affairs of the Trust"[184] and that "the TAC can

exercise enormous control over the operation of the Trust and TDP"[185] are erroneous.

### C.   TAC MEMBERS' DUTIES TO PRESENT CLAIMANTS AND CLIENTS ARE COMPATIBLE.

#### 1.   <u>TAC members advocate only on behalf of present claimants.</u>

When the TAC performs its role, it is representing the interest of present claimants in the

claims liquidation process and making sure that the interests of present claimants are not

unreasonably impacted by changes to that process.   When a TAC member represents an

individual personal injury claimant, he or she is seeking a liquidated value from the Trust that

represents a reasonable settlement of the client's claim.   In both cases, the TAC member acts for

present claimants, the former in a general sense and the latter in a specific sense.   There is no

inherent conflict in those dual roles.   Such a situation is well-known in the law.   For example, in

---

[181] *Id.*

[182] *Id.* at § 7.13.

[183] *Id.*

[184] One Beacon Br. at 26-27.

[185] CNA Br. at 13.

bankruptcy law, the lawyer for an individual creditor may also represent a creditors' committee. 11 U.S.C. § 1103(b); *In re MUMA Servs. Inc.*, 286 B.R. 583, 590 (Bankr. D. Del. 2002). Similarly, a class action may be prosecuted by an attorney who also represents an individual claimant.[186]

To achieve even the semblance of a conflict here, the Insurance Companies have to distort the duties of the TAC and its members beyond recognition. In the Insurance Companies' view, the TAC is obliged to resist payments by the Trust,[187] while individual counsel to claimants are ethically obliged to mechanically seek an unreasonable sum regardless of the factual or legal context of the case.[188] As demonstrated above, however, the TAC's role is not to make sure the Trust pays out as little as possible to present claimants. Indeed, that is not the Trust's purpose as a whole; the Trust's purpose is to assume liabilities and to liquidate asbestos PI claims "fairly equitably, and reasonably."[189] Nor, for that matter, is it the TAC members' duty as counsel to individuals to refuse to recommend reasonable settlements and instead litigate endlessly for unreasonable sums. *E.g., Barnard v. Langer,* 109 Cal. App.4th 1453, 1463 n.13

---

[186] CNA's citation of *In re Joint E. & S. Dist. Asbestos Litig.*, 982 F.2d 721 (2d Cir. 1992) for the proposition that TAC members face conflicting fiduciary duties is inapposite. That case considered whether adverse parties, asbestos plaintiffs, and co-defendants could be grouped in a single class under Rule 23 for the purpose of contesting issues arising in an early version of the Manville Trust. The Court found they had to be placed into subclasses because in that litigation the two groups each sought to modify state law in different ways. *Id.* at 740. Here, no such issue is presented. Moreover, the court recognized that it was appropriate that the interests of such indirect and direct claimants had been addressed jointly in the context of establishing a trust during the course of the bankruptcy proceeding. *See id.* (noting that "the interests of [personal injury claimants and the co-defendant claimants] were aligned together in the reorganization, in which their only interest was to maximize the percentage of recovery from Manville of whatever claims they held under state law").

[187] CNA Br. at 17.

[188] One Beacon Br. at 29.

[189] Asbestos PI Trust Agreement § 1.2, at Exhibit 2 to the Exhibit Book.

(2003) ("the goal of a lawyer is to achieve a 'reasonable' settlement, a concept that involves a wide spectrum of considerations and broad discretion") (citation omitted).

### 2. **TAC members comply with the Rules of Professional Conduct.**

The rules of professional conduct do not require an attorney to avoid conflicts of interest that are merely theoretical or entirely speculative, but only conflicts that pose a significant risk that representation of a client will be materially affected. ABA Model Rule 1.7(a)(2) provides that a lawyer shall not represent a client if "there is a *significant risk* that the representation of one or more clients will be *materially limited* by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer" (emphasis added). *See also* Restatement (Third) of the Law Governing Lawyers §§ 128, 135 (prohibiting representation where lawyers representation would be at "substantial risk" of being "materially and adversely affected" by duties to other clients or fiduciary).

Here, there is no significant or substantial risk that participation in the TAC will materially or adversely affect a lawyer's obligation to his or her clients. As demonstrated above, the fiduciary duty of the TAC is limited to representing the collective interests of the present claimants. Insurance Companies fail to offer any actual or significant harm an individual claimant would suffer if their attorney, or if the attorney of another present claimant, serves on the TAC.

### D. THE INSURANCE COMPANIES' HYPOTHETICAL "CONFLICTS" ARE UNREALISTIC.

In an effort to create a conflict where none exists, the Insurance Companies rely on hypotheticals. They offer no factual basis for these conjectures at all; even as speculation they are, at best, improbable. Certainly they do not demonstrate a significant risk of a material

limitation on any TAC member's abilities to fulfill his or her duties to present claimants or clients.

### 1. Insurance Companies cannot assume that TAC members bring unmeritorious claims.

The Insurance Companies offer first a scenario in which TAC members press "unmeritorious" claims on behalf of individual claimants while suppressing procedures to stop unmeritorious claims from being paid by the Trust. "For instance, TAC members have a duty to ensure that the Trust has in place procedures that deny payments to unmeritorious claims in order to preserve the corpus of the Trust for meritorious claim, even if that means that the unmeritorious claims of their own clients are rejected."[190] But the Insurance Companies have no basis to assume that TAC members would bring unmeritorious cases. *See Nemours Found. v. Gilbane, Aetna, Fed. Ins. Co.*, 632 F. Supp. 418, 428 (D. Del. 1986) ("the more logically consistent, honest, and straightforward approach is to credit members of the legal profession with a certain level of integrity"); *Viveros v. Nationwide Janitorial Ass'n, Inc.*, 200 F.R.D. 681, 684 (N.D. Ga. 2000) ("the Court assumes that attorneys will abide by the ethical rules"). A lawyer's zeal on behalf of his client does not require him to take meritless action. *Lowry v. Lewis*, 21 F.3d 344, 346 (9th Cir. 1994). The Insurance Companies' underlying assumption, that counsel will violate their ethical responsibilities, in order to then assert that those counsel will subsequently have a conflict of interest, is legally insupportable, and does not raise a substantial or material risk of a real conflict of interest.

---

[190] CNA Br. at 15.

## 2. Insurance Companies cannot assume that every dollar paid to a Present Claimant reduces the recovery of another Present Claimant.

One Beacon argues that a conflict exists because every dollar paid out to any non-client holder of an Asbestos PI Claim will (at least potentially) reduce what the TAC members' clients recover from the Trust. One Beacon Br. at 29; *see also* CNA Br. at 16 (claiming conflict where non-client claims diminish the funds available to pay TAC member's clients). As recognized by One Beacon in its qualifying phrase "at least potentially," the chance that any individual client of a TAC member will face an empty pocket is remote. The Asbestos PI Trust will be funded with several billion dollars and be in existence for decades.

Moreover, if this "conflict" is taken seriously and every dollar paid out to one claimant reduces what another claimant gets, no attorney, whether or not he or she is a TAC member, could represent more than one asbestos claimant making a claim on the Trust. Each asbestos claimant would need to be separately represented. Such an outcome is completely unworkable, unprecedented and clearly not mandated by the Bankruptcy Code.

## X. THE INSURANCE COMPANIES DO NOT HAVE STANDING TO COMPLAIN ABOUT THE SECTION 524(g) FUNDING REQUIREMENTS.

Several Insurance Companies attempt to complain about the Section 524(g) funding requirements, arguing, for example, that warrants are not "securities" within the meaning of section 524(g).[191] They have no standing to make such arguments. GEICO argues that Insurance Companies do have such standing because "[t]he Plan Proponents' failure to comply with the requirements of § 524(g) impacts the fairness of the Plan," and because the Insurance Companies are "targeted sources of funding to pay for Asbestos PI Claims submitted to the Trust

---

[191] GEICO Br. [Dkt. No. 22434] at 29-35; OneBeacon Br. at 32-37.

and as parties enjoined by the § 524(g) injunctions * * *."[192] Yet, those arguments do not

distinguish the decision in *Combustion Engineering*, where the Third Circuit unequivocally held

that the insurance companies did not have standing to complain about alleged noncompliance

with section 524(g). *See Combustion Eng'g,* 391 F.3d at 248 ("While the Objecting Insurers

argue that § 524(g)(2)(B)(i)(II) is not satisfied, they do not have standing to raise this matter.").

## XI. RELEASES AND EXCULPATION PROVISIONS IN THE JOINT PLAN ARE PROPER.

### A. THE RELEASES IN THE JOINT PLAN ARE APPROPRIATE AND CONSISTENT WITH SECTION 1123(b) OF THE BANKRUPTCY CODE.

Articles 8.8.1, 8.8.3, 8.8.7 and 8.8.8 of the Joint Plan contain certain release provisions

that are appropriate and necessary under the facts and circumstances of this case and which

comply with applicable Third Circuit law. The release provisions are the culmination of

extensive arm's-length negotiations between, and have been critical in obtaining the support of,

the Debtors' key constituencies, including the ACC, the Asbestos PI FCR, and the Official

Committee of Equity Security Holders. These releases are fair and equitable, are given for

valuable consideration, and are in the best interests of the Debtors and this chapter 11 case.

Section 1123(b)(3)(A) of the Bankruptcy Code states that a plan may provide for the "settlement

or adjustment of any claim or interest belonging to the debtor or to the estate."[193]

### 1. The Joint Plan Provides for Three Categories of Releases.

The Joint Plan provides for three general categories of releases (i) the release of the

Sealed Air Indemnified Parties and Fresenius Indemnified Parties, (ii) the release of third parties,

---

[192] GEICO Br. at 35.

[193] 11 U.S.C. § 1123(b)(3)(A).

and (iii) debtor releases. The principal terms of the releases in Article 8 of the Joint Plan are described below.

### a) The Sealed Air and Fresenius Releases

The releases of the Sealed Air Indemnified Parties and the Fresenius Indemnified Parties have already been approved by the Court and also satisfy applicable Third Circuit law with respect to debtor releases.

The Joint Plan provides that the Debtors shall, upon consideration of the Cryovac Payment, provide releases to:

> the Sealed Air Indemnified Parties from any and all present and future Asbestos-Related Claims and Demands related thereto and any and all present and future SA Claims, Canadian Claims, SA Debts, and SA Damages on the basis of, and arising from, or attributable to (in whole or in part, directly or indirectly) the Fresenius Transaction that have accrued or been asserted or that hereafter might accrue or be asserted against the Sealed Air Indemnified Parties, and that each Non-Debtor Affiliate shall not institute, participate in, maintain, maintain a right to or assert against the Sealed Air Indemnified Parties, either directly or indirectly, on its own behalf, derivatively, or on behalf of any other Entity any and all present and future Asbestos-Related Claims and Demands related thereto, and any and all claims present and future SA Claims, Canadian Claims, SA Debts, and SA Damages on the basis of, arising from, or attributable to (in whole or in part, directly or indirectly) the Fresenius Transaction.

Joint Plan § 8.8.1.

Similarly, upon receipt of the Fresenius Payment, the Debtors will provide releases to:

> each and every Fresenius Indemnified Party from any and all Grace-Related Claims, including, for the avoidance of doubt, claims and causes of action under chapter 5 of the Bankruptcy Code or similar claims or causes of action under state or any other law, that the Debtors, the Reorganized Debtors, the Asbestos PI Committee or the Asbestos PD Committee have asserted or could have asserted in the Bankruptcy Court or any other forum against any of the Fresenius Indemnified Parties and the release that is attached as Appendix B to the Fresenius Settlement Agreement shall become effective.

*Id.* at § 8.8.3.

> **(1)** **Releases of Sealed Air Indemnified Parties and Fresenius Indemnified Parties Have Already Been Approved by the Court and to Deny Them Is a Violation of Res Judicata**

Both of the Settlement Agreements were approved by this Court in orders entered on June 27, 2005 and June 25, 2003 respectively. Accordingly, the releases contained in the Settlement Agreements are no longer subject to review. The United States Supreme Court in *Travelers Indemnity Co. v. Bailey*, 129 S.Ct. 2195, 2205 (2009), reiterated the black letter principle that once a court enters a final order it is *res judicata* "to the parties and those in privity with them, not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose."[194] So long as a party seeking to attack the order was put on notice regarding the bankruptcy proceeding and was given a fair chance to be heard, they cannot collaterally challenge a final order.[195] This Court recognized the applicability of *res judicata* to judicially-approved settlement agreements at the hearing to consider a potential objection to a release required by the Fresenius Settlement Agreement, the Court observed: "Well, it [the objection] can be preserved, but I don't know how it's not res judicata if the order that approved the settlement, which was entered years ago, provided for it."[196] The Settlement Agreements were subject to judicial review and approved after notice and a hearing. The orders approving the

---

[194] *Travelers Indem. Co. v. Bailey*, 129 S. Ct. 2195, 2205 (2009).

[195] *Id.*

[196] 11/14/09 Hrg. Tr. at 31 [Dkt. No. 20167].

Settlement Agreements became final long ago, and parties in interest are precluded under principles of *res judicata* from attacking the validity of the releases.

The Court approved the Sealed Air Settlement Agreement pursuant to Bankruptcy Rule 9019.[197] The Sealed Air Settlement Order provides that "the [Sealed Air] Agreement is hereby authorized and approved in all respects."[198] The Sealed Air Settlement Order requires the Debtors to comply with the Sealed Air Settlement Agreement.[199] Furthermore, the Sealed Air Settlement Order clearly states that, "[t]he terms of the[Sealed Air] Settlement Agreement and this Order shall not be subject to modification by this or any other Court through any order or judgment . . ."[200] In addition, the Sealed Air Settlement Order unequivocally provides that "[t]he terms and provisions of the [Sealed Air] Settlement Agreement and this Order shall be binding in all respects upon, and shall inure to the benefit of the creditors, Plaintiffs, [Sealed Air] and their respective successors and assigns, and any affected third parties . . ."[201] The Sealed Air Settlement Order contains express findings that due, proper, and sufficient notice of the Sealed Air Settlement Agreement and of the hearing to approve the settlement was given and that the result of the Sealed Air Settlement Agreement fell comfortably within the range of litigation possibilities.[202] Furthermore, in the Sealed Air Settlement Order, the Court specifically finds (among other things) that: [a]pproval of the [Sealed Air] Settlement Agreement "furthers the

---

[197] The Sealed Air Settlement Order is Exhibit 23 in the Exhibit Book to the Disclosure Statement and Joint Plan.

[198] *See* Sealed Air Settlement Order at ¶ 5.

[199] *Id.* at ¶ 4.

[200] *Id.* at ¶ 5.

[201] *Id.* at ¶ 9.

[202] *Id.* at ¶¶ D, E.

paramount interests of creditors in the [Chapter 11 Cases]," "would increase the funds available to a plan of reorganization . . . ," "will avoid the continued expense in the [Sealed Air Action], thereby resulting in a net economic benefit to [the Debtors'] bankruptcy estates and their creditors in the range of $1.2 billion," and "is in the best interests of the Plaintiffs, the Debtors, their bankruptcy estates, the creditors thereof and all parties in interest in these cases."[203] Additionally, the Sealed Air Settlement Order specifically stated that the "terms and provisions of the Settlement Agreement and this Order shall be binding in all respects upon, and shall inure to the benefit of the creditors, the Plaintiffs and the SAC Defendants . . . and any affected third parties."[204] The order required the Debtors to take all necessary acts to carry out the Sealed Air Settlement Agreement.[205]

Similarly, the Fresenius Settlement Agreement was the result of a court-supervised negotiation and was approved under Bankruptcy Rule 9019.[206] The releases of the Fresenius Indemnified Parties was a direct result of these negotiations. The order included an explicit finding that the releases were in exchange for a substantial contribution and were fair to the bankruptcy estate and that without such releases the Fresenius Settlement Agreement would not have been possible.[207] Like the Sealed Air Settlement Agreement, notice of the settlement was given to all parties in interest. The Court found that the Fresenius Settlement Agreement

---

[203] *Id.* at ¶ O, Q.

[204] *Id.* at ¶ 6.

[205] *Id.* at ¶ 2.

[206] The Fresenius Settlement Order is Exhibit 14 in the Exhibit Book to the Disclosure Statement and Joint Plan.

[207] *See* Fresenius Settlement Order at ¶¶ YY, AAA.

increased the funds available to fund a plan of reorganization and permitted the Debtors to focus their attention on developing and confirming a plan of reorganization.[208]

In light of the foregoing, there is simply no basis for the Court to revisit the releases in favor of the Sealed Air Indemnified Parties and the Fresenius Indemnified Parties. Indeed, permitting a few dissatisfied parties to collaterally attack and nullify releases that were approved years ago would be grossly unfair to: (1) the Plan Proponents, who proposed the Joint Plan and included the releases in reliance upon the orders approving the Settlement Agreements; (2) the vast majority of the Debtors' creditors who have not objected to the releases and stand to lose the benefit of substantial payments that are to be made under the Settlement Agreement if the releases are revisited and reduced; and (3) the Sealed Air Indemnified Parties and the Fresenius Indemnified Parties, who stand to lose the benefit of their court-approved Settlement Agreements.

> **(2)** **The Debtors' Release of Sealed Air Indemnified Parties and Fresenius Indemnified Parties Also Satisfy Applicable Third Circuit Law**

The Debtors' releases of claims against the Sealed Air Indemnified Parties and the Fresenius Indemnified Parties are supported by section 1123(b)(3)(A) of the Bankruptcy Code.[209] Section 1123(b)(3)(A) specifically states that a chapter 11 plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."[210] Settlements pursuant to a plan are generally subject to the same standard applied to settlements under

---

[208]  *Id.* at ¶¶ UU, VV.

[209]  *See In re Coram Healthcare Corp.*, 315 B.R. 321, 334 (Bankr. D. Del. 2004).

[210]  11 U.S.C. § 1123(b)(3)(A).

Bankruptcy Rule 9019.[211] The Third Circuit applies a four-factor balancing test in considering motions to approve settlements under Bankruptcy Rule 9019, weighing:

(1)     the probability of success in litigation;

(2)     the likely difficulties in collection;

(3)     the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and

(4)     the paramount interest of the creditors.[212]

As mentioned above, the Settlement Agreements have also both already been approved under Bankruptcy Rule 9019; accordingly, they have already satisfied the Third Circuit standard for approving releases.

> **(3)     To the Extent That the Release of the Sealed Air Indemnified Parties and Fresenius Indemnified Parties Is Not Considered Consensual, They Nonetheless Meet the Third Circuit Standard for Non-Consensual Nondebtor Releases.**

In addition, the releases of the Sealed Air Indemnified Parties and the Fresenius Indemnified Parties also satisfy the Third Circuit standard for the releases of nondebtors. Where a chapter 11 plan of reorganization provides for the release and injunction of nondebtors' claims, courts in the Third Circuit traditionally consider five factors in allowing such provisions as part of the plan:

1.     an identity of interest between the debtor and nondebtor such that a suit against the non-debtor will deplete the estate's resources;

2.     a substantial contribution to the plan by the nondebtor;

3.     the necessity of the release to the reorganization;

---

[211]  *Coram*, 315 B.R. at 335.

[212]  *In re Martin*, 91 F.3d 389, 393 (3d Cir. 1996); *In re Exide Techs.*, 303 B.R. 48, 67-68 (Bankr. D. Del. 2003).

4.    the overwhelming acceptance of the plan and release by creditors and interest holders; and

5.    the payment of all or substantially all of the claims of the creditors and interest holders under the plan.[213]

The Debtors submit that such factors are satisfied given the facts of these cases. The Debtors have broad indemnification obligations to the Sealed Air Indemnified Parties and the Fresenius Indemnified Parties such that a suit against such parties is, effectively, a suit against the Debtors.[214] Moreover, pursuant to the Settlement Agreements, Sealed Air and Fresenius are

---

[213] *See, e.g., Coram,* 315 B.R. at 335 (citing *In re Zenith Elecs. Corp.,* 241 B.R. 92, 110 (Bankr. D. Del. 1999)); *Debtors v. Walton (In re United Artists Theatre Co.),* 315 F.3d 217, 227 (3d Cir. 2003) (In approving the indemnification provisions in a financial advisor's retention agreement: "The 'hallmarks of permissible non-consensual releases' are 'fairness, necessity to the reorganization, and specific factual findings to support these conclusions.' . . . Added to these requirements is that the releases 'were given in exchange for fair consideration.') (citing *Gillman v. Continental Airlines (In re Continental Airlines),* 203 F.3d 203, 214 (3d Cir. 2000) (while recognizing that third parties may be released and claims against them may be enjoined under a plan where there is a specific factual findings of fairness, necessity to the reorganization and fair consideration, injunction of claims against officers and directors of debtor violated section 524(e) of the Bankruptcy Code in that case)). *Accord In re PWS Holding Corp.,* 228 F.3d 224, 246 (3d Cir. 2000) (discussing Continental Airlines: "We did not treat § 524(e) as a per se rule barring any provision in a reorganization plan limiting the liability of third parties . . . Indeed, because this release does not affect the liability of third parties, but rather sets for the appropriate standard of liability, we believe that this release is outside of the scope of § 524(e)."). *Cf. First Fidelity Bank v. McAteer,* 985 F. 2d 114, 118 (3d Cir. 1993) (confirmation of chapter 13 plan, which did not include a third party release and injunction, did not release nondebtor insurer from its obligation for credit insurance on a motor vehicle).

[214] Sealed Air Distribution Agreement § 4.02(a) (providing that "the New Grace Group shall indemnify, defend and hold harmless the Packco Indemnitees from and against (i) all Indemnifiable Losses arising out of or due to the failure or alleged failure of any member of the New Grace Group (x) to pay any Grace-Conn. Liabilities (including, without limitation, all Liabilities specifically excluded from the definition of Packco Liabilities herein), whether such Indemnifiable Losses relate to events, occurrences or circumstances occurring or existing, or whether such Indemnifiable Losses are asserted, before or after the Distribution Date, or (y) to perform any of its obligations under this Agreement (including the obligation to effect the transfers as provided in the last sentence of Section 2.01(a)); (ii) all Indemnifiable Losses arising out of or based upon any untrue statement or alleged untrue statement of a material fact, or omission or alleged omission to state a material fact required to be stated, in the Registration Statements or the Joint Proxy Statement or any preliminary or final form thereof or any amendment thereto, or necessary to make the statements therein not misleading, except that such indemnifications shall not apply to any Indemnifiable Losses that arise out of or are based upon any statement or omission, or alleged statement or omission, in any of the portions of the Registration Statements or the Joint Proxy Statement, or any preliminary or final form thereof or any amendment thereto, solely with respect to information relating to SAC supplied by SAC specifically for use in the preparation thereof or relating to Newco after the Merger; and (iii) all Indemnifiable Losses arising from or relating to all existing litigation brought by pre-Merger shareholders of Grace acting in such capacity and all litigation to be brought by pre-Merger shareholders of Grace acting in such capacity and relating to any events or transactions occurring prior to the Effective Time or to the transactions contemplated by the Transaction Agreements."); § 5.04(b)

(Continued...)

paying over $1 billion in cash and stock (as applicable) to the Asbestos PI Trust and the Asbestos PD Trust. While these payments are being made directly to the Asbestos PI Trust and the Asbestos PD Trust, they also increase the funds that the Debtors have available to pay other claims. The result is the Joint Plan that pays General Unsecured Claims the full amount of their allowed claims and that provides for significant value to the Debtors' existing equity holders. This extraordinary outcome would not be possible without the contributions of the Sealed Air Indemnified Parties and the Fresenius Indemnified Parties. Indeed, without such contributions, the Debtors could not be effectively reorganized. These contributions are, however, conditioned upon the releases.[215] The releases are, therefore, necessary and essential to the Debtors' reorganization. Finally, the releases were accepted by the majority of Creditors who voted in favor of the Joint Plan.

---

(providing that "Grace and New Grace shall cooperate, and shall cause their respective Groups to cooperate, to terminate, or to cause a member of the New Grace Group to be substituted in all respects for any member of the Packco Group in respect of, all obligations of any member of the Packco Group under any Grace-Conn. Liabilities for which such member of the Packco Group may be liable, as guarantor, original tenant, primary obligor or otherwise. The foregoing sentence does not apply to the Grace-Conn. Public Debt, which is governed by Section 2.06. If such a termination or substitution is not effected by the Distribution Date, (i) New Grace shall indemnify and hold harmless the Packco Indemnitees for any Indemnifiable Loss arising from or relating thereto, and (ii) without the prior written consent of the Chief Financial Officer, Treasurer or any Assistant Treasurer of Grace, from and after the Distribution Date, New Grace shall not, and shall not permit any member of the New Grace Group to, renew or extend the term of, increase its obligations under, or transfer to a third party, any loan, lease, contract or other obligation for which any member of the Packco Group is or may be liable unless all obligations of the Packco Group with respect thereto are thereupon terminated by documentation reasonably satisfactory in form and substance to the Chief Financial Officer, Treasurer or any Assistant Treasurer of Grace ...."), § 1.01 (definitions of Grace-Conn. Liabilities, Indemnifiable Losses, New Grace Group, Packaging Business, Packo, Packo Assets, Packo Liabilities); *see also* Agreement and Plan of Merger dated as of August 14, 1997, Annex A (defining "Environmental Law," which definition is subsequently incorporated into the Distribution Agreement); Supplemental Agreement dated March 30, 1998, § 6.01 (supplementing definition of Grace-Conn. Liabilities); Fresenius Distribution Agreement § 4.02(a) (same).

[215] *See* Fresenius Settlement Order at ¶ AAA and Sealed Air Settlement Agreement at § II.C.i.

**b)  The Successor Claims Injunction in Article 8.5 of the Joint Plan Is Permitted Under Applicable Third Circuit Law**

Article 8.5 of the Joint Plan provides for the "issuance of the Successor Claims Injunction" pursuant to section 105(a) of the Bankruptcy Code. The Successor Claims Injunction enjoins "[a]ll Entities that have held or asserted, that hold or assert, or that may in the future hold or assert, any Successor Claim based on or arising from, in whole or in part, directly or indirectly, the Cryovac Transaction or Fresenius Transaction (other than Successor Claims arising out of or based on any Asbestos PI Claim, Asbestos PD Claim, or CDN ZAI PD Claim) against any Asbestos Protected Party . . . from taking any and all legal or other actions or making any demand for the purpose of directly or indirectly claiming, collecting, recovering, or receiving any payment, recovery, satisfaction, or any other relief whatsoever on, of, or with respect to any such Successor Claim . . .."[216] The Successor Claims Injunction is well within the Court's jurisdiction and represents a valid exercise of this Court's authority pursuant to section 105(a) of the Bankruptcy Code and established Third Circuit law and, as an additional matter, has already been judicially approved by way of the final orders approving the Sealed Air Settlement Agreement and the Fresenius Settlement Agreement.

Bankruptcy courts are vested with "broad authority" to hear and determine issues related to the disposition of a debtor's assets.[217] Notably, this authority is limited neither by the Constitution nor by statute to the *res* of a debtor.[218] Thus, the test for determining whether a

---

[216] *See* Joint Plan § 8.5.1.

[217] *United States v. Energy Res. Co.*, 495 U.S. 545, 549 (1990).

[218] *See Cent. Virginia Cmty. Coll. v. Katz*, 546 U.S. 356, 370 (2006) ("The Framers would have understood that the laws on the subject of bankruptcies included laws providing . . . for more than simple adjudications of rights in the res"); *Energy Res. Co.*, 495 U.S. 545 (1990) (affirming the bankruptcy court's jurisdiction to restructure debtor/creditor relationships in a plan not limited to assets in which the debtor had a property interest).

bankruptcy court has jurisdiction over the subject matter of a dispute is broad.[219] In addition, while section 105(a) of the Bankruptcy Code does not create substantive rights that would otherwise be unavailable under the Bankruptcy Code,[220] section 105(a) permits a court to issue injunctive relief where "unusual circumstances" exist, such as in cases involving "settlement of massive liabilities against debtors and co-liable parties."[221] Specifically, in determining the appropriateness of third-party injunctions, the Third Circuit has considered "fairness, necessity to the reorganization, and specific factual findings to support these conclusions."[222]

Under these standards, the Successor Claims Injunction in Article 8.5 of the Joint Plan is well within the Court's jurisdiction and appropriate under the circumstances. The Successor Claims Injunction bars claims against Grace or any other Asbestos Protected Party arising from either the Cryovac Transaction or the Fresenius Transaction.[223] It is without dispute that Sealed Air and Fresenius have broad pre-bankruptcy contractual indemnification rights against the Debtors arising from (as applicable) the Cryovac Transaction documents and the Fresenius Transaction documents.[224] In addition, the Debtors have broad indemnification obligations to the

---

[219] *See In re Combustion Eng'g*, 391 F.3d 190, 226 (3d Cir. 2004) (citing *Pacor Inc. v. Higgins*, 742 F.2d 984, 994 (3d Cir. 1984) (emphasis in original) ("The usual articulation of the test for determining whether a civil proceeding is related to bankruptcy is whether the *outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy* . . . An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate.").

[220] *Id.* at 236.

[221] *See In re North American Refractories Company*, Revised Memorandum Opinion on Confirmation of Third Amended Plan of Reorganization, (Bankr. W.D. Pa. Nov. 14, 2007) (JKF), November 13, 2007 (citing *Gillman v. Continental Airlines (In re Continental Airlines*, 203 F.3d 203, 213 (3d Cir. 2000)).

[222] *Id.*

[223] *See* Joint Plan §§ 8.5.1.

[224] *See supra* note 176.

Sealed Air Indemnified Parties and the Fresenius Indemnified Parties arising from the Settlement Agreements.[225] These indemnification obligations extend to any claims based on or arising from the Cryovac Transaction and the Fresenius Transaction and the Sealed Air Indemnified Parties' and the Fresenius Indemnified Parties' prior corporate affiliation with the Debtors.[226] The assertion of such claims against the Sealed Air Indemnified Parties and the Fresenius Indemnified Parties, therefore, implicates property of the Debtors' estates insofar as it triggers the Debtors' indemnification obligations to such parties. In light of the foregoing, the Court clearly has jurisdiction to enjoin these claims.[227] Moreover, inclusion of the Successor Claims Injunction in the Joint Plan is a pre-condition to settlements entered into by Fresenius and Sealed Air with Grace resolving contentious litigation that could have seriously disrupted Grace's reorganization.[228] Indeed, the District Court expressly found that the injunctions were in

---

[225] *See* Fresenius Settlement Agreement, at Ex. B to the Exhibit Book, § 2.02(f); Sealed Air Settlement Agreement, at Ex. 22 to the Exhibit Book, § II.c.(vii); Indemnification Agreement attached as Exhibit 6 to Sealed Air Settlement Agreement.

[226] *See* Fresenius Settlement Agreement § 2.02(f); Indemnification Agreement, Exhibit 6 to Sealed Air Settlement Agreement; *supra* note 224.

[227] *See Allegheny Health, Educ. and Research Found. v. AFSCME (In re Allegheny)*, 383 F.3d 169, 175 n.7 (3d Cir. 2004) (holding that related to jurisdiction existed because the non-debtor's indemnity claim, based on a contractual indemnity provision, had already matured, the debtor was required to indemnify the non-debtor or pay for its defense of third-party claims covered by the indemnity agreement, and the third-party had made a demand on the debtor to defend it in the third-party action); *W.R. Grace & Co. v. Chakarian (In re W.R. Grace & Co.)*, 315 B.R. 353, 359-60 (Bankr. D. Del. 2004) (exercising related to jurisdiction by preliminarily enjoining claims against a non-debtor third-party because a judgment against the third-party would "unquestionably affect [d]ebtors" and their estates by triggering the debtors' indemnity obligations for asbestos-related injuries); *Hohl v. Bastian*, 279 B.R. 165, 176 (W.D. Pa. 2002) (holding that the court had related to jurisdiction over a state court action against a non-debtor by virtue of a provision in the debtor's bylaws indemnifying officers, directors and employees for certain actions because the debtor's liabilities would be affected by a decision in favor of either party in that case; "the mere existence of [the third-party action] creates a potential new liability for [the debtor]."); *Kossman v. The TJX Companies, Inc.*, 136 B.R. 640, 642 (W.D. Pa. 1991) (holding that an indemnification provision in an acquisition agreement between the third-party defendant and the debtor provided the basis for related to jurisdiction over plaintiff's claims for breach of commercial lease).

[228] *See* Fresenius Settlement Agreement § 2.02(D); Sealed Air Settlement Agreement § II(c)(6).

exchange for a substantial contribution and were fair to the bankruptcy estate and that without such injunction, the Fresenius Settlement Agreement would not have been possible.[229]

The Settlement Agreements have been approved by final orders and, thus, the requirements and provisions of these agreements are no longer subject to review and are protected from attack by the well-established principles of *res judicata*.[230] Even if the judicially approved Settlement Agreements are not, themselves, dispositive with regard to the propriety of the Successor Claims Injunction, the Successor Claims Injunction is nevertheless appropriate because it complies with applicable Third Circuit law. As explained herein, protecting the Sealed Air Indemnified Parties and the Fresenius Indemnified Parties from Successor Claims is a central component of the Settlement Agreements. Without the Successor Claims Injunction, Sealed Air and Fresenius would not have entered into the Settlement Agreements. It follows that without the Successor Claims Injunction, the Debtors' estates would not benefit from the $1.1 billion contribution on behalf of Sealed Air and Fresenius which contribution, without question, is necessary to the reorganization. Thus, because the Successor Claims Injunction allowed for the Debtors to enter into the Settlement Agreements and results in an additional $1.1 billion in contributions to the Joint Plan, the Successor Claims Injunction is necessary to the reorganization and complies with Third Circuit law.

Seaton and OneBeacon argue that because "it appears that the § 105(a) Successor Claims Injunction would enjoin some or all of the contract claims that non-debtors OneBeacon and

---

[229] *See* Fresenius Settlement Order at §§ YY, AAA.

[230] *See Travelers Indemnity Co. v. Bailey*, 129 S. Ct. 2195 (2009).

Seaton have against non-debtor Fresenius and, therefore, it has the effect of circumventing the more specific requirements of § 524(g)."[231] They continue, stating that:

> "Seaton and OneBeacon also have, or may have, contract claims or other claims against non-debtors Fresenius and/or Sealed Air arising from settlement agreements that released products and/or environmental coverage under their policies. Even if the Court had jurisdiction, Bankruptcy Code § 105(a) may not be used to enjoin such claims absent a significant showing that the Plan Proponents cannot make here."[232]

This argument misses the mark for several reasons. First, as explained above, section 105(a) permits a court to issue injunctive relief where "unusual circumstances" exist, such as in cases involving "settlement of massive liabilities against debtors and co-liable parties."[233] This case clearly settles massive liabilities against debtors and co-liable parties. Second, the Settlement Agreements, which require the Successor Claims Injunction, were already approved by this Court and the District Court, respectively. Thus, Seaton and OneBeacon are barred from pursuing this objection by principles of *res judicata*. And third, to the extent that Seaton and OneBeacon have any contract claims against Fresenius and/or Sealed Air arising from settlement agreements that released asbestos related products coverage under their policies, such claims are Class 6 Claims and Seaton and OneBeacon's sole recourse is to the Asbestos PI Trust pursuant to the Asbestos PI Channeling Injunction, not the Successor Claims Injunction. Thus, to the extent that Seaton and OneBeacon's claims are Class 6 Claims, Seaton and OneBeacon lack standing to object to the Successor Claims Injunction because it does not affect their rights. Thus, for all the

---

[231] *See* Seaton/OneBeacon Tr. Br. at 24.

[232] *Id.* at 25.

[233] *See In re North American Refractories Company*, Revised Memorandum Opinion on Confirmation of Third Amended Plan of Reorganization, Bankr. (W.D. Pa. Nov. 13, 2007) (JKF) (citing *Gillman v. Continental Airlines (In re Continental Airlines)*, 203 F.3d 203, 213 (3d Cir. 2000)).

foregoing reasons, Seaton and OneBeacon's objection to the Successor Claims Injunction should

be overruled.

<blockquote>
c)      **The Third Party Releases in Section 8.8.7 of the Joint Plan Are Consensual and Satisfy Applicable Third Circuit Law.**
</blockquote>

The Joint Plan also provides for certain consensual third party releases. Courts in the

Third Circuit consistently have approved consensual third-party releases of similar scope.[234] The

Joint Plan provides for the release by certain "Holders of Claims or Equity Interests," who vote

in favor of the Joint Plan, of their claims and causes of actions against certain third parties

including:

> the Asbestos Protected Parties, the Unsecured Creditors'
> Committee, the Asbestos PI Committee, the Asbestos PD
> Committee, the Equity Committee, Asbestos PI FCR, and the
> Asbestos PD FCR, and each such party's Representatives, as of the
> Effective Date, from any and all claims . . . each Holder of a Claim
> or Equity Interest who receives or retains any property under this
> Plan shall also be deemed to unconditionally release the Fresenius
> Indemnified Parties to the same extent as the release in the
> preceding sentence.

Joint Plan § 8.8.7.

The third-party releases are consensual, as they apply only to Creditors voting to accept

the Joint Plan.[235] The releases were narrowly tailored to release only those who made a

substantial contribution to the reorganization or had indemnification rights against the Debtors if

---

[234] *See, e.g., Exide*, 303 B.R. at 74; *Coram*, 315 B.R. at 366; *In re Zenith Elecs. Corp.*, 241 B.R. 92, 111 (Bankr. D. Del. 1999); *see also In re Sea Containers Ltd.*, No. 06-11156 (Bankr. D. Del. Nov. 24, 2008); *In re ACG Holdings, Inc.*, No. 08-11467 (Bankr. D. Del. Aug. 6, 2008); *In re Hilex Poly Co., LLC*, No. 08-10890 (Bankr. D. Del. June 26, 2008); *In re Dura Auto. Sys., Inc.*, No. 06-11202 (Bankr. D. Del. May 13, 2008); *In re Remy Worldwide Holdings Inc.*, No. 07-11481 (Bankr. D. Del. Nov. 20, 2007); *In re Foamex Int'l Inc.*, No. 05-12685 (Bankr. D. Del. Feb. 1, 2007).

[235] *See Exide*, 303 B.R. at 74 (courts are not required to scrutinize a release of claims by third parties when the release binds only creditors who voted to accept the plan); *In re Conseco, Inc.*, 301 B.R. 525, 528 (Bankr. N.D. Ill. 2003) ("The [ ] release now binds only those creditors who agreed to be bound, either by voting for the Plan or by choosing not to opt out of the release. Therefore, the [ ] release is purely consensual.").

they were not released. Further, interested parties received sufficient notice of the third-party releases and have had ample time to raise any objections thereto. The Ballots sent out by the Debtors clearly set forth the terms of the releases and that by voting in favor of the Joint Plan, the Holder of a Claim or Equity Interest unconditionally released those parties listed in Article 8.8.7 of the Joint Plan. Creditors were therefore on notice that a vote to accept the Joint Plan constituted a consent to the third-party release. Accordingly, the third-party releases of "Holders of a Claim" and "Equity Interests" should be approved.

With respect to the language providing that "each Holder of a Claim or Equity Interest who receives or retains property under this Plan shall also be deemed to unconditionally release the Fresenius Indemnified Parties" to the same extent as the consensual third-party releases, while such a release may not be considered consensual as raised by certain objections they are nevertheless permitted due to the terms of the Fresenius Settlement Order. The Fresenius Settlement Order stated:

> The Plan of Reorganization shall provide that, in consideration of the Settlement Payment, any Person voting in favor of the Plan or receiving property under the Plan shall thereby be deemed to have fully released each and every claim of the NMC Defendants from all Grace-Related Claims that such Person has asserted or could have asserted in this or any other forum against any of the NMC Defendants.

Fresenius Settlement Order at ¶¶ KK(b).

As described above, the releases were already approved by this Court as an explicit provision of the Fresenius Settlement Order and the Court already found such releases were in exchange for valuable consideration and fair and necessary to the Fresenius Settlement Agreement.

## 2. The Debtors' Release Provisions Are Appropriate Under the Facts and Circumstances of This Chapter 11 Case and Should Be Approved.

The releases provided by the Joint Plan described above represent a valid settlement of claims of the Debtors against the parties being released pursuant to section 1123(b)(3)(A) of the Bankruptcy Code.[236] The Debtors will provide releases to:

> [T]he Debtors' and their Non-Debtor Affiliates' Representatives and their respective properties (the "Released Parties"), from any and all claims, obligations, rights, suits, damages, remedies, liabilities, or causes of action

Joint Plan § 8.8.8.

The Debtors respectfully submit that pursuant to the Debtors' business judgment, the Debtor Releases represent a valid settlement of claims of the Debtors against the Released Parties pursuant to section 1123(b)(3)(A) of the Bankruptcy Code. The Debtors concluded that they do not have any meaningful claims against any of the parties being released. Moreover, based on the settlements embodied in the Joint Plan and the favorable recoveries afforded all classes of creditors in light of the economic imperatives of the chapter 11 case, the Debtors believe that pursuing any such claim against the released parties, even if they were somehow determined to be meaningful, would not be in the best interests of the Debtors' various constituencies. Each of the released parties are stakeholders and critical participants in the Joint Plan process and are parties who are typically released in a plan of reorganization. The Debtors also do not believe that they are waiving any valuable claims or assets of the Estates.

---

[236] *See In re Coram Healthcare Corp.*, 315 B.R. at 334-335 (discussing standards for approval of settlements under section 1123(b)(3)(A) of the Bankruptcy Code); *In re Exide Techs.*, 303 B.R. 48, 67 (Bankr. D. Del. 2003).

### 3. <u>Objections to the Releases Should Be Denied</u>

The U.S. Trustee, along with certain other parties, have objected to the third-party releases in the Joint Plan as being overly broad and not permissible under Third Circuit Law.[237] The U.S. Trustee more specifically states that, "the general releases are overbroad in that certain beneficiaries of those releases are not permitted under relevant law to be released" under the standards set out by *In re Zenith Electronics*, 241 B.R. 92 (Bankr. D. Del. 1999).[238] Other objections received point to the language of Article 8.8.7 of the Joint Plan as providing non-consensual releases with respect to the release of third parties and, more specifically, the release of the Fresenius Indemnified Parties.[239]

As discussed above, the releases are the result of extensive arm's-length negotiations and have resulted in all parties contributing meaningful consideration, resulting in a plan that fairly resolves the claims of all parties in interest and allows the Debtors to emerge from the chapter 11 case as a going concern, as well as paying General Unsecured Claims the full amount of their allowed claims and providing significant value to the Debtors' existing equity holders. The Debtors' releases satisfy Third Circuit law with respect to the third-party releases as they are consensual releases and only apply to Holders of Claims and Equity Interests who voted in favor of the Joint Plan. In addition, as discussed earlier, the release as applied to the Fresenius

---

[237] Objections to the third-party releases were filed by the U.S. Trustee, Kaneb Pipe Line, the Creditors' Committee, the ERISA Plaintiffs, Anderson Memorial, Scotts, Seaton One Beacon, CNA, FFIC, AXA Belgium, Government Employees Insurance Company, Zurich Insurance Co. and BNSF.

[238] *See* Acting United States Trustee's Pre-Trial Submission Related to Phase II Confirmation Hearing, dated July 20, 2009, at 2-3 [Dkt. No. 22529].

[239] *See* Trial Brief of Libby Claimants in Opposition to Confirmation of First Amended Joint Plan of Reorganization, dated May 20, 2009, at 79 [Dkt. No. 21811].

Indemnified Parties has already been approved by the Bankruptcy Court. Objections attacking the validity of the release of the Fresenius Indemnified Parties would be a violation of principles of *res judicata*. As for the released parties being overbroad, all of the parties being released have made substantial contributions to the reorganization or have indemnification rights from the Debtors. If they were not released, the Debtors would be obligated to indemnify certain released parties. As a result, a lawsuit against such a party would essentially be a lawsuit against the Debtors. Accordingly, *Zenith* does not apply to the Debtors' to the scope of the Debtors' releases. The objections to the Debtors' releases are without merit and should be denied.

### B.   THE EXCULPATION CLAUSE IS PROPER UNDER THIRD CIRCUIT LAW

Article 11.9 of the Joint Plan contains a standard exculpation provision (the "Exculpation Clause")[240] providing that certain parties (the "Exculpated Parties") will not incur any liability for any act or omission in connection with the confirmation, consummation, or administration of the Joint Plan, unless such act or omission rises to the level of "gross negligence or willful misconduct."

---

240  Article 11.9 of the Joint Plan states: "None of the Reorganized Debtors, the Debtors, the Non-Debtor Affiliates, the Sealed Air Indemnified Parties, the Fresenius Indemnified Parties, the Asbestos PI Trustees of the Asbestos PI Trust, the Asbestos PI Trust Advisory Committee, the Asbestos PD Trustees of the Asbestos PD Trust, the Asbestos PD Trust Advisory Committee, Asbestos PI Committee, the Asbestos PD Committee, the Unsecured Creditors' Committee, the Equity Committee, the Asbestos PI FCR, the Asbestos PD FCR, or any of their respective Representatives are to have or incur any liability to any Entity for any act or omission in connection with or arising out of the Chapter 11 Cases, including the negotiation of this Plan or the settlements provided in the Sealed Air Settlement Agreement and the Fresenius Settlement Agreement, the pursuit of confirmation of this Plan, the consummation of this Plan or the settlements provided in the Sealed Air Settlement Agreement or Fresenius Settlement Agreement, or the administration of this Plan or the property to be distributed under this Plan so long as, in each case such action, or failure to act, did not constitute gross negligence or willful misconduct. In all respects, they will be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under this Plan. Any act or omission taken with the approval of the Bankruptcy Court will be conclusively deemed not to constitute gross negligence or willful misconduct. This section is not intended to preclude a governmental entity from enforcing its police and regulatory powers."

An exculpation provision is not a mandatory release of all liability, but instead establishes the appropriate *standard of liability* with respect to the Exculpated Parties.[241] Bankruptcy courts in the Third Circuit routinely uphold exculpation provisions similar to Article 11.9 of the Joint Plan where, as is the case here, each exculpated party remains liable for acts constituting gross negligence or willful misconduct.[242] In this sense, Article 11.9 of the Joint Plan merely establishes a standard of liability that is consistent with that which such exculpated parties generally owe to creditors (*i.e.*, liability is limited to acts constituting willful misconduct or gross negligence).[243]

It is well established that section 1103 of the Bankruptcy Code limits the liability of statutory committees and their professionals to acts of gross negligence and willful misconduct.[244] Also, exculpation for parties participating in the plan process is appropriate

---

[241] *See In re PWS Holding Corp.*, 228 F.3d 224, 246-47 (3d Cir. 2000) (reasoning that the exculpation provision "does not affect the liability of third parties, but rather sets forth the appropriate standard of liability"); *see also In re Enron Corp.*, 326 B.R. 497, 501 (S.D.N.Y. 2005) (in finding creditors' appeal of confirmation based on the plan's exculpation provision moot, the court specifically noted that the bankruptcy court addressed the exculpation provision and found it appropriate because it excluded gross negligence and willful misconduct).

[242] *See, e.g., PWS*, 228 F.3d at 235 (where the plan provision at issue did not "eliminate liability but rather limit[ed] it to willful misconduct or gross negligence); *In re Westmoreland Coal Co.*, Case Nos. 94-1066 through 94-1070 (Bankr. D. Del. Dec. 16, 2006) (confirmation order); *In re Levitz Furniture Inc.*, Case No. 97-1842 (MFW) (Bankr. D. Del. Dec. 14, 2000) (confirmation order); *International Wireless Communications Holdings, Inc.*, Case No. 98-02007 (Bankr. D. Del. Mar. 26, 1999) (mem. opinion confirming plan); *Heartland Wireless Communications, Inc.*, Case No. 98-2692 (Bankr. D. Del. Mar. 15, 1999) (confirmation order).

[243] It is important to note that because Article 11.9 of the Joint Plan merely states the appropriate standard of liability for the Exculpated Parties and does not release claims against them, see *PWS*, 228 F.3d at 245, the five-factor test employed in *In re Zenith* and *In re Genesis* does not apply to the Exculpation Clause. *See In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 607 (Bankr. D. Del. 2001) (noting that certain parties would be released from all liability under the plan, including liability for acts of gross negligence and willful misconduct); *In re Zenith Electronics Corp.*, 241 B.R. 92, 111 (Bankr. D. Del. 1999) (applying five-factor test where plan released *all* claims against certain parties).

[244] *See PWS*, 228 F.3d at 246-47 (holding that the appropriate standard of liability under section 1103 is "willful misconduct or ultra vires acts," and approving an exculpation of the creditors committee and its professionals subject only to liability for willful misconduct or gross negligence).

where plan negotiations could not have occurred without protection from liability.[245] All of the Exculpated Parties played a key role in the reorganization of the Debtors and the Exculpation Clause played a role in bringing these parties to the table.[246] Consequently, the Debtors request that the Court approve the Exculpation Clause and adopt the appropriate standard of liability for the Exculpated Parties with respect to the Debtors' chapter 11 case.

The Third Circuit's decision in *United Artists Theatre Co. v. Walton*, cited in various objections to the Joint Plan, is consistent with the standard of liability set forth in Article 11.9 of the Joint Plan.[247] In that case, the Third Circuit touched upon the subject of exculpation clauses in the context of examining the propriety of a professional's retention agreement that purported to indemnify it for losses other than those "that are finally judicially determined to have resulted from the gross negligence, bad faith, willful misfeasance, or reckless disregard of its obligations or duties."[248] The District Court, which had original jurisdiction of the bankruptcy case, had approved the terms of the retention of the debtor's financial advisor. On appeal, the U.S. Trustee sought reversal on the ground that indemnification provisions are *per se* unreasonable under Bankruptcy Code sections 327(a) and 328(a).[249] The Third Circuit rejected this request and instead voiced general approval for reasonable indemnification provisions, citing the "essential"

---

[245] *See In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 293 (2d Cir. 1992); *Enron Corp.*, 326 B.R. at 503 (excising similar exculpation provisions would "tend to unravel the entire fabric of the Plan, and would be inequitable to all those who participated in good faith to bring it into fruition.").

[246] *See In re ABB Lummus Global Inc.*, No. 06-10401 (JKF), 2006 WL 2052409, at *20 (Bankr. D. Del. June 29, 2006) (finding exculpation proper where parties benefiting from provision were "instrumental the successful prosecution of the Chapter 11 Case"); *In re US Mineral Prod.'s Co.*, No. 01-2471 (JKF), 2005 WL 5898300, at *14 (Bankr. D. Del. Nov. 29, 2005) (same).

[247] *United Artists Theatre Co. v. Walton (In re United Artists Theatre Co.)*, 315 F.3d 217 (3d Cir. 2003).

[248] *Id.* at 222.

[249] *Id.* at 235.