role of professionals in the reorganization process and the need for "safeguards" to protect professionals from second-guessing by creditors and courts.[250] *In re Coram Healthcare* is also consistent with the standards applied in *PWS*.[251] In that case, the court declined to issue a *release* of certain third party claims.[252] However, the court endorsed the approach taken in *PWS*, finding that the exculpation clause in that case "merely restated the standard by which parties would be liable to creditors."[253]

## C.    OBJECTIONS TO THE EXCULPATION CLAUSE.

Certain parties have objected to the scope and the language of the Exculpation Clause.[254] These objections fall into two basic categories: 1) objections arguing that the scope of the Exculpation Clause is too broad, in that it includes exculpation for parties that have not contributed to Grace's reorganization; and 2) objections arguing that the language defining the standard of conduct required for exculpation should be revised to exclude protection for certain conduct. The Plan Proponents address these objections in turn.

### 1.    Objections to the Scope of the Exculpation Clause.

The U.S. Trustee,[255] Anderson Memorial, AXA Belgium, GEICO, the Libby Claimants, London,[256] MCC,[257] OneBeacon,[258] and Zurich have objected to the Exculpation Clause, arguing

---

[250] *Id.* at 234.

[251] 315 B.R. 321, 336-67 (Bankr. D. Del. 2004).

[252] *Id.*

[253] *Id.*

[254] These parties include the United States Trustee, Anderson Memorial, AXA Belgium, CNA, FFIC, GEICO, the Libby Claimants, Certain London Insurers, MCC, Seaton and OneBeacon, and Zurich.

[255] Acting United States Trustee's Objection to the First Amended Plan of Reorganization at 5-6.

that it applies to parties that should not be exculpated. Specifically, these parties object to the inclusion of various non-debtor third parties under Article 11.9 of the Joint Plan.

In *PWS Holding Corp.*, the Third Circuit found that exculpation of non-debtor third parties is "commonplace" in chapter 11 plans where a plan does not purport to release such parties from liability for gross negligence or willful misconduct.[259] In *PWS*, the court approved a clause limiting the liability of the debtors, various plan sponsors, and the directors, employees, advisors, and agents of each.[260] Consistent with *PWS*, this Court, in prior orders, has confirmed plans where parties benefiting from exculpation were "instrumental to the successful prosecution of the chapter 11 case."[261] In this case, each party to be exculpated has been instrumental to the negotiations and procedures leading to the Joint Plan. Therefore, the Exculpation Clause is proper and the objection on this ground must fail.

---

[256]  Objection of Certain London Market Insurance Companies to Confirmation of First Amended Joint Plan of Reorganization at 15 [Dkt. No. 21801].

[257]  Maryland Casualty Company's Objection to First Amended Joint Plan of Reorganization at 4 [Dkt. No. 21783].

[258]  Final Objections of OneBeacon America Insurance Company and Seaton Insurance Company to Confirmation of Amended Joint Plan of Reorganization at 35 [Dkt. No. 21763].

[259]  *PWS*, 228 F.3d at 245.

[260]  *Id.* at 246.

[261]  *In re ABB Lummus Global Inc.*, No. 06-10401 (JKF), 2006 WL 2052409, at *20 (Bankr. D. Del. June 29, 2006); *In re US Mineral Prod.'s Co.*, No. 01-2471 (JKF), 2005 WL 5898300, at *14 (Bankr. D. Del. Nov. 29, 2005). Because § 11.9 of the Joint Plan merely states the appropriate standard of liability for the Exculpated Parties and does not release claims against them, the five-factor test employed in *In re Zenith* and *In re Genesis* does not apply in this case. *See supra*, note 243.

### 2.    Objections to the Language of the Exculpation Clause.

CNA,[262] FFIC,[263] and OneBeacon[264] have objected to the language of the exculpation

clause, claiming that it misstates the appropriate standard of conduct for the Exculpated Parties.

The Plan Proponents respond as follows:

#### a)    CNA's Objection

CNA argues that extension of the Exculpation Clause's standards of conduct to the

Trustees and the TAC is "unjustified."[265] CNA proposes that the Exculpation Clause be

"clarified" to state that individuals remain liable for "bad faith, including bad faith breach of the

covenant of good faith and fair dealing owed to Asbestos PI Trust beneficiaries" and "willful

misappropriation."[266] CNA argues that this language is necessary for the Trust to comply with

12 Del. Code § 3806(e).

CNA fails to explain how the language of the Joint Plan as currently stated fails to guard

against the concerns it raises. Instead, CNA's argument is merely an underhanded attempt to

impugn the integrity of the proposed members of the TAC. CNA fails to explain how "willful

misconduct" does not include "willful misappropriation" and acts taken in bad faith. Obviously,

"willful misappropriation" would constitute "willful misconduct" because misappropriation is

---

[262] Final Plan Objections of CNA Companies to the First Amended Plan of Reorganization at 22 ("CNA's Objection") [Dkt. No. 21794].

[263] Final Phase I and Non-Surety Claim Related Phase II Objections of Fireman's Fund Insurance Company at 14 (arguing that the Exculpation Clause violates the prohibition against prospective waivers of malpractice) [Dkt. No. 21791].

[264] OneBeacon/Seaton Objection to Confirmation at 35-56 (objecting to exculpation from liability for post-Effective Date administration of the Asbestos PI Trust and Asbestos PD Trust).

[265] CNA's Objection at 22.

[266] *Id.*

clearly "misconduct." A trustee's acts taken in bad faith are also characterized by willful

misconduct, as opposed to mere negligence.[267] Because § 11.9 of the Joint Plan does not release

any party from liability for willful misconduct, it will not excuse acts of willful misappropriation

or acts taken in bad faith. Thus, CNA's objection on this ground should be rejected.

### b)    FFIC's Objections

FFIC argues that the Exculpation Clause violates the rule against prospective waivers of

malpractice claims. It should first be noted that Article 11.9 of the Joint Plan does not purport to

waive malpractice claims. Rather, it merely states the standard of liability to be applied to any

claims against the Exculpated Parties arising out of the chapter 11 proceeding. Moreover, as

explained *supra*, Article 11.9 is properly understood as a conclusion of law by the Court stating

the correct standard of liability to be applied to certain claims. The Court is not prohibited from

reaching this conclusion. Exculpatory provisions such as § 11.9 are "commonplace,"[268] and are

regularly included in plans of reorganization properly confirmed by bankruptcy courts.[269]

Therefore, FFIC's objection is unfounded and should be rejected.

### c)    Seaton and OneBeacon's Objections

Various parties have argued that the Exculpation Clause is improper to the extent that it

grants "prospective immunity from liability" for administration of the Asbestos PI Trust and

Asbestos PD Trust. These parties provide no support for this assertion, merely stating that

---

[267] *See* Restatement (Second) of Trusts § 170 cmt. t (1959) (stating that trustees may be empowered dispose of trust property on their own account, but violate their duties to beneficiaries if they act in bad faith); 3 Austin W. Scott & William F. Fratcher, Scott on Trusts § 187.4 (4th ed. 1988) (noting that a trustee's acts of bad faith are characterized by dishonesty, such as taking a bribe for making a payment).

[268] *PWS*, 228 F.3d at 245.

[269] *See supra* note 242.

"prospective immunity from liability is plainly improper."[270]  This argument misstates this issue-
-as explained *supra*, Article 11.9 does not grant "immunity" to any party.  Rather, it merely
states the appropriate standard of liability.[271]

Courts that have spoken on this issue have not adopted the objecting parties' view.  In
*Coram Healthcare*, the court found that exculpation clauses such as that in the plan are permitted
"to the extent that they are limited to ***post-petition*** activity which does not constitute gross
negligence or willful misconduct."[272]  Moreover, the objecting parties fail to note the numerous
cases that have approved plans applying this standard to claims arising from the negotiation,
confirmation, and implementation of a chapter 11 plan.[273]  Because Article 11.9 is proper under
Delaware law, the objections on this ground must fail.

## XII.    THE REMAINING OBJECTIONS TO PLAN CONFIRMATION PURSUANT TO §§ 1129, 1122, 1123, AND 1124 OF THE BANKRUPTCY CODE LACK MERIT.

### A.    EACH CLASS OF CLAIMS HAS EITHER ACCEPTED THE JOINT PLAN OR IS NOT IMPAIRED UNDER THE JOINT PLAN -- 11 U.S.C. §§ 1124(1), 1129(a)(8) AND 1129(b).

Subject to the exceptions contained in section 1129(b) of the Bankruptcy Code, section
1129(a)(8) of the Bankruptcy Code requires that each class of claims and interests must either

---

[270]  Seaton and OneBeacon Phase II Objection at 38.

[271]  *See PWS*, 228 F.3d at 246-47 (reasoning that the exculpation provision "does not affect the liability of third parties, but rather sets forth the appropriate standard of liability.").

[272]  315 B.R. at 337 (emphasis added).

[273]  *See, eg., In re Owens Corning*, Case No. 00-3837 (JKF), D.I. 19366 (Bankr. D. Del. Sept. 26, 2006) (Confirmation Order); *In re Pliant Corp.*, Case No. 06-10001 (MFW) D.I. 923 (Bankr. D. Del. Jun. 23, 2006) (Confirmation Order); *In re USG Corp.*, Case No. 01-02094 (JKF), D.I. 11688 (Bankr. D. Del. Jun. 16, 2006) (Confirmation Order); *In re Birch Telecom, Inc.*, Case No. 05-12237 (PJW), D.I. 702 (Bankr. D. Del. Mar. 30, 2006) (Confirmation Order); *In re Kaiser Aluminum Corp.*, Case No. 02-10429 (JKF), D.I. 8225 (Bankr. D. Del. Feb. 6, 2006) (Confirmation Order); *In re Russell-Stanley Holdings, Inc.*, Case No. 05-12339 (MFW), D.I. 254 (Bankr. D. Del. Oct. 25, 2005) (Confirmation Order); *In re NII Holdings, Inc.*, Case No. 02-11505 (MFW), D.I. 381 (Bankr. D. Del. Oct. 28, 2002) (Confirmation Order).

(a) have accepted the plan or (b) not be impaired under the plan. 11 U.S.C. §§ 1129(a)(8)(A) and 1129(b). A class of claims accepts a plan if the holders of at least two-thirds in dollar amount and more than one-half in number of claims of that class vote to accept the plan, counting only those claims whose holders actually vote. 11 U.S.C. § 1126(c). A class of interests accepts a plan if holders of at least two-thirds of the amount of shares vote to accept the plan, counting only those shares whose holders actually vote. 11 U.S.C. § 1126(d).

As set forth herein, and in the Amended Declaration of Kevin A. Martin Certifying Tabulation of Ballot Regarding Vote on First Amended Joint Plan of Reorganization and Exhibit A thereto, filed on August 5, 2009,[274] the Joint Plan was accepted by approximately 99.5% of the valid Ballots of claimants in Class 6, 99% of the valid Ballots of claimants in Class 7A, 88% of the valid Ballots of claimants in Class 7B, 100% of the valid Ballots of claimants in Class 8, and 90% of the valid Ballots of equity interest holders in Class 10. This mandate satisfies not only the 75% acceptance threshold contemplated by section 524(g) of the Bankruptcy Code, but also the threshold established by section 1126(c); namely that more than 50% in number and 2/3 in dollar amount of the voting classes of claimants accept the Joint Plan.

Accordingly, arguments by certain Class 6 Claimants alleging unfair discrimination or violations of the fair and equitable test under section 1129(b) lack merit.[275] Section 1129(b) only applies to impaired creditors whose class does not accept the plan. Here, Class 6 overwhelmingly accepted the Joint Plan; thus, the section 1129(b) analysis is not implicated.

---

[274] Amended Declaration of Kevin A. Martin, dated August 5, 2009 and Exhibit 1 thereto [Dkt. No. 22706].

[275] *See* FFIC's Phase II Tr. Br. at 25-26, Montana Phase II Trial Br. at 34; MCC Tr. Br. at 9-10.

Likewise, Class 9 has made arguments under section 1129(b), but it is not an impaired

class.[276] The question of whether a claim is "impaired" is governed by section 1124 of the

Bankruptcy Code, which states in pertinent part: "Except as provided in § 1123(a)(4) of this

title, a class of claims or interests is impaired under a plan unless, with respect to each claim or

interest of such class, the plan – (1) leaves unaltered the legal, equitable, and contractual rights to

which such claim or interest entitles the holder of such claim or interest[.]" 11 U.S.C. § 1124

(emphasis added). Both the Lenders and Morgan Stanley have argued that the Joint Plan has

improperly classified Class 9 as unimpaired because in order to be unimpaired, the holders of

claims in Class 9 must be provided with default interest.[277] As the Plan Proponents have argued

in the Phase I briefing, as set forth in the Plan Proponents' Phase II Brief on Lender Issues being

filed currently herewith, and as will be demonstrated in the Confirmation Hearing, Class 9

Claimants are not entitled to default interest in order to be deemed unimpaired.

In addition, Anderson Memorial has argued that Class 7A is impaired because they

cannot recover post-petition interest or pursue their claims in their chosen forum.[278] Anderson

Memorial's objections are entirely without merit. First, with respect to the post-petition interest

argument, if Anderson Memorial's Asbestos PD Claim were to be resolved, pursuant to the Class

7A CMO, Anderson Memorial will be paid pursuant to the terms of the Joint Plan. Under the

Joint Plan, each holder of an Asbestos PD Claim in Class 7A shall be paid the allowed amount of

its Asbestos PD Claim in full, in Cash, by the Asbestos PD Trust. Accordingly, Anderson

---

[276] The votes of creditors in Class 9 were provisionally solicited and provisionally tabulated. More than one-half in number of claims voting in class 9 voted to accept the Joint Plan; but the provisional vote did not obtain the requisite two-thirds dollar amount for acceptance.

[277] Morgan Stanley Objection at 7-9 [Dkt. No. 22416].

[278] Anderson Mem. Tr. Br. at 28-30 [Dkt. No. 22437].

Memorial will be paid 100% of its allowed claim upon resolution of its claim, leaving Anderson unimpaired.

Whether or not Anderson Memorial is entitled to post-petition interest will be determined by the Court. In the resolution of Anderson Memorial's claim, Anderson Memorial will have the ability to assert any and all grounds for allowance of Anderson Memorial's claim. If the Court determines that Anderson has an allowed claim and should be paid interest as part of that allowed claim, then by definition, the Joint Plan contemplates that such interest will be paid to Anderson.

With respect to Anderson's objection that the Joint Plan leaves it impaired for denying Anderson the "ability to pursue its claim in its chosen forum," such objection is also without merit. By filing a proof of claim with the Bankruptcy Court, Anderson Memorial has consented to jurisdiction here, and cannot now raise a jurisdictional objection.[279] It is simply not the case that a claim is impaired because the claimant is required to respond to a motion seeking to disallow its claim in the Bankruptcy Court after it submitted to the Bankruptcy Court's jurisdiction by filing its claim in that forum.

## B.     THE JOINT PLAN PROVIDES FOR THE SAME TREATMENT FOR EACH CLAIM IN EACH CLASS -- 11 U.S.C. § 1123(a)(4)

Section 1123(a)(4) requires that a plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." 11 U.S.C. § 1123(a)(4). The Joint Plan's treatment provisions will result in equality of treatment for each Claim or Interest within a

---

[279] *See In re Winstar Comm'ns, Inc.,* 554 F.3d 382, 406 (3d Cir. 2009) ("the Supreme Court has held that when a creditor files a proof of claim, the creditor brings itself 'within the equitable jurisdiction of the Bankruptcy Court'" (citing *Langenkamp v. Culp,* 498 U.S. 42, 44-45 (1990)).

particular class. Thus, the Joint Plan complies with section 1123(a)(4) of the Bankruptcy Code.[280]

Various insurers raise objections related to section 1123(a)(4) based on alleged discriminatory treatment under the Asbestos PI TDP. *See* Part VII.B *supra*. In addition, Anderson Memorial argues that the Joint Plan does not comply with section 1123(a)(4) of the Bankruptcy Code on the ground that the "Plan singles out Anderson for treatment not afforded to any other asbestos creditor."[281] Specifically, Anderson argues, "[e]very other asbestos claim either: (1) has been settled and will be paid on the effective date; (2) is subject to alternative resolution procedures with lowered proof thresholds; or (3) is permitted to litigate in its chosen forum. Only Anderson, of all the asbestos claims filed against the Debtors, is required to litigate its claims in order to be entitled to payment, but is precluded from doing so in the forum it chose nearly a decade before this bankruptcy case was commenced."[282]

This objection is without merit. Anderson Memorial is not treated any differently than other Class 7A Asbestos PD Creditors. The Joint Plan scrupulously provides the same treatment for Class 7A Asbestos PD Claimants by subjecting them all to the same PD CMO. The PD CMO provides that all Asbestos PD Claims that were filed as of the PD Bar Date and which are unresolved as of the Effective Date will be adjudicated by the Bankruptcy Court.[283] Currently, aside from Anderson Memorial's individual claim, there are 16 claims for buildings located in the United States and 21 claims for buildings located in Canada (all of which are represented by

---

[280] *See supra* Part VIII.B.

[281] Anderson Mem. Tr. Br. at 23.

[282] *Id.* at 23-24.

[283] Class 7A PD CMO at I.A.

Speights & Runyan), for which there are settlements in principle, but settlement agreements have not been executed. All of these claims will continue to be subject to disallowance proceedings before this Court until those settlements are final. In addition, the State of California has appealed orders of this Court disallowing certain Class 7A Asbestos PD Claims. If the result of those appeals requires a remand, the subsequent disallowance proceedings will continue before this Court.[284]

Nor can Anderson claim discrimination because a future Class 7A PD Claim, which is not barred by the PD Bar Date, will have its claim liquidated through a proceeding commenced in either the United States District Court for the District of Delaware or such other United States District Court that has jurisdiction over the action commenced.[285] Anderson Memorial, by filing a proof of claim, has consented to jurisdiction in this Court. Future Asbestos PD Claims that are not barred by the PD Bar Date will not be required to submit to this Court's jurisdiction for purposes of claims allowance, but will be subject to precisely the same rules and procedures with respect to resolution of their claims, namely the Federal Rules of Evidence and Federal Rules of Civil Procedure. The fact that application of these rules will occur in a different forum from the proceedings involving the allowance of Anderson's claim, does not constitute discrimination against Anderson in any sense, much less for purposes of section 1123(a)(4).

Morgan Stanley also argues that the Joint Plan violates section 1123(a)(4) of the Bankruptcy Code because the Joint Plan provides different rates of post-petition interest to

---

[284] The only exception is for the *Solow* Claim, which was litigated prepetition in the New York state courts where judgment was entered against Grace, and Grace has filed a prepetition appeal. The bankruptcy stay is to be lifted as to the *Solow* Claim only, so that the prepetition appeal may proceed in the New York Supreme Court Appellate Division. *See* Class 7A PD CMO, Ex. A, ¶ 7.

[285] Class 7A PD CMO at II.C.1.

different types of claimants under Article 3.1.9 of the Joint Plan.[286]  Specifically, Morgan Stanley

alleges that different rates of interest are proposed for different Non-Lender Claimants in Class

9, thereby violating section 1123(a)(4) of the Bankruptcy Code for failure to provide equal

treatment to all holders in the class.  However, the fact that different Non-Lender Claimants may

be entitled to different rates of post-petition interest under applicable non-bankruptcy law or

otherwise is not a basis to separately classify each of these claims.  All of these Non-Lender

Claimants are being paid in full the allowed amount of the claims with post-petition interest, and

each of them had the opportunity to dispute the amount of post-petition interest as set forth by

the procedures available under Article 3.1.9(d) of the Joint Plan.  Indeed, Morgan Stanley has

availed itself of these procedures and will have the opportunity to demonstrate that it is entitled

to a different rate of post-petition interest than is offered by the Joint Plan.  Therefore, they are

all similarly situated pursuant to section 1123(a)(4) of the Bankruptcy Code.  *See also In re*

*Finova Group, Inc.*, 304 B.R. 630, 637 (D. Del. 2004) (Section 1123(a)(4) provides for equal

treatment, which does not require equal payment); *In re Central Medical Center, Inc.*, 122 B.R.

568, 575 (Bankr. E.D. Mo. 1990) (if a plan subjects class members to the same process for claim

satisfaction, there is no violation of section 1123(a)(4), notwithstanding that such process could

yield a different pecuniary result for different claimants within the same class); *In re Dow*

*Corning Corp*, 255 B.R. 445, 500 (E.D. Mich. 2000) ("[a]s to whether the claim is being treated

fairly within the class, the inquiry is whether the claim is subject to the *same process* in

satisfying the claim as the other claims within the class") (emphasis added).

---

[286]  Morgan Stanley Obj. at 6-7.

### C.      THE JOINT PLAN PROVIDES ADEQUATE MEANS FOR ITS IMPLEMENTATION -- 11 U.S.C. § 1123(a)(5).

Section 1123(a)(5) requires that a plan "provide adequate means for the plan's implementation" and sets forth several examples of such means, including retention by the debtor of property of the estate, sales of the debtor's property, satisfaction or modification of any lien and the issuance of securities of the debtor in exchange for claims or interests. 11 U.S.C. § 1123(a)(5).

Article 7 and other provisions of the Joint Plan provide adequate means for implementation of the Joint Plan. Article 7 provides the framework for the creation and operation of the Asbestos PI Trust and the Asbestos PD Trust, and the Joint Plan's mechanism to pay or otherwise resolve all Asbestos PI Trust Claims and Asbestos PD Trust Claims asserted against the Debtors. This Article is supplemented by the Joint Plan's exhibits setting forth the Trusts' guidelines, the Trusts' by-laws, and the procedures by which the Trusts will resolve Asbestos PI Trust Claims and Asbestos PD Trust Claims. Article 7 of the Joint Plan also sets forth the various transactions that will enable the Debtors to effectuate the Joint Plan's terms, including the transfers of assets to the Asbestos PI Trust and the Asbestos PD Trust, and the various other corporate actions necessary for consummation.

Taken together, the Joint Plan provisions, and existing and contemplated settlements ensure that upon confirmation by this Court, the Debtors will be able to implement the Joint Plan in keeping with the requirements of section 1123(a)(5) of the Bankruptcy Code.

### D.      THE DEBTOR HAS DISCLOSED ALL NECESSARY INFORMATION REGARDING DIRECTORS, OFFICERS, TRUSTEES, AND INSIDERS -- 11 U.S.C. § 1129(A)(5).

Sections 1129(a)(5)(A)(i) and (ii) of the Bankruptcy Code require that the Debtors disclose the "identity and affiliations of any individual proposed to serve, after confirmation of

112

the plan, as a director, officer, or voting trustee of the debtor," and require a finding that "the

appointment to, or continuance in, such office of such individual, is consistent with the interests

of creditors and equity security holders and with public policy . . . ." 11 U.S.C.

§§ 1129(a)(5)(A)(i) and (ii).  Section 1129(a)(5)(B) requires a plan proponent to disclose the

"identity of any insider that will be employed or retained by the reorganized debtor, and the

nature of any compensation for such insider." 11 U.S.C. § 1129(a)(5)(B).  The Plan Proponents

filed their Plan Supplement on May 8, 2009 [Dkt. No. 21594] as amended on May 15, 2009

[Dkt. No 21706], which disclose all of the relevant information regarding who will service, after

confirmation, as directors or officers of the Debtors.

FFIC alleges, in a conclusory sentence without citation, that the Joint Plan does not

satisfy section 1129(a)(5)(A)(ii) because the TAC is allegedly in a position to control the

Asbestos PI Trust, and the appointment of the TAC is not consistent with the interests of

creditors or public policy.[287]

Plan Proponents have already shown in Part IX.B.2, *supra*, that the TAC is not in a

position to control the Asbestos PI Trust and that its function and composition is well-recognized

and appropriate.  Moreover, section 1129(a)(5) does not apply to the TAC, because its members

are not "director[s], officer[s], or voting trustee[s] of the debtor" or of an affiliate or successor to

the debtor.  11 U.S.C. § 1129(a)(5).  *See In re Eagle-Picher Indus.,* 203 B.R. 256, 267-68 (S.D.

Ohio 1996) ("the members of the TAC are not subject to the provisions of § 1129(a)(5)(A)(i)"

because such members "are not directors, officers or voting trustees of the debtor.").

---

[287] FFIC Br. at 18.

E.    **ANY PAYMENTS MADE OR TO BE MADE BY THE DEBTOR FOR SERVICES OR FOR COSTS AND EXPENSES HAVE BEEN APPROVED BY OR ARE SUBJECT TO THE APPROVAL OF THE COURT -- 11 U.S.C. § 1129(a)(4).**

Section 1129(a)(4) of the Bankruptcy Code requires that payments for services or for costs and expenses incurred in connection with the case, or in connection with the plan and incident to the case, have either been approved, or are subject to approval, by the Court as reasonable. 11 U.S.C. § 1129(a)(4). The Joint Plan provides for the Court's retention of jurisdiction to hear and determine any and all applications by professionals for compensation and reimbursement of expenses arising out of or related to the Debtors' Chapter 11 cases.[288] Thus, the Joint Plan fully complies with the requirements of section 1129(a)(4) of the Bankruptcy Code.

FFIC alleges, again in a conclusory sentence without citation, that the Joint Plan does not satisfy section 1129(a)(4) because the compensation to be provided to the TAC members is not set forth in the Joint Plan or Plan documents.[289] But there is no requirement in section 1129(a)(4) that such compensation be set forth.[290] *In re Burns & Roe Enters., Inc.* 2009 WL 438694, at *9 & *28 (D. N.J. 2009) (rejecting identical argument by FFIC); *In re Lisanti Foods, Inc.*, 329 B.R. 491, 503 (D.N.J. 2005) (rejecting argument "that the Plan fails under 11 U.S.C. § 1129(a)(4) because it did not require Bankruptcy Court approval for fees and expenses of the Trustee and other necessary professionals" because "the Plan was not required to mandate

---

[288]  *See* Joint Plan at § 10.5.

[289]  FFIC Br. at 17.

[290]  In any event, Asbestos PI Trust Agreement does address the compensation of the TAC at § 5.6.

bankruptcy court approval for fees and expenses related to post-confirmation administration of the estate").

### F.    THE JOINT PLAN COMPLIES WITH THE APPLICABLE PROVISIONS OF TITLE 11 (11 U.S.C. § 1129(a)(1))[291]

Section 1129(a)(1) states that a court can confirm a plan only if "[t]he plan complies with the applicable provisions of this title." 11 U.S.C. § 1129(a)(1). The legislative history suggests that the applicable provisions are those governing the plan's internal structure and drafting. *See* S. Rep. No. 989, 95th Cong., 2d Sess. 126 (1978) ("Paragraph (1) [of Section 1129(a)] requires that the plan comply with the applicable provisions of chapter 11, such as section 1122 and 1123, governing classification and contents of plan."); *see also In re NII Holdings,* 288 B.R. 356, 359-62 (Bankr. D. Del. 2002) (plan could be confirmed under 1129(a)(1) because classification under 1122 was proper, the plan would be adequately implemented under 1123, and the other requirements of 1123 would be satisfied). In addition, a plan must comply with all other sections of the Bankruptcy Code. *See In re Genesis Health Ventures Inc.*, 266 B.R. 591, 600-09 (Bankr. D. Del. 2001) (plan could only be confirmed under 1129(a)(1) subject to modification of particular nonconsensual third party releases governed by section 524(e)).[292]  For the reasons set forth herein and as will be demonstrated at the Confirmation Hearing, the Joint Plan complies

---

[291]  Section 1129(a)(1) of the Bankruptcy Code requires that a plan comply with the applicable provisions of title 11. This provision is predominantly directed at compliance with Sections 1122 and 1123 governing classification of claims and the contents of a plan, respectively. *See* H.R. Rep. No. 595, 95th Cong., 2d Sess. 126 (1977), *reprinted in* 1978 U.S.S.C.A.N. 5963, 6087; *In re Texaco Inc.,* 84 B.R. 893, 905 (Bankr. S.D.N.Y.) ("In determining whether a plan complies with section 1129(a)(1), reference must be made to Code §§ 1122 and 1123 with respect to the classification of claims and the contents of a plan of reorganization."), *appeal dismissed,* 92 B.R. 38 (S.D.N.Y. 1988).

[292]  Where the release provisions of a plan are appropriate, courts have expressly held the plan may be confirmed under section 1129(a)(1). *See e.g. In re Resorts Int'l Inc.,* 145 BR. 412, 467-68 (Bankr. D.N.J. 1990); *In re Lowenschuss,* 67 F.3d 1394, 1400-01 (9th Cir. 1995), *cert. denied,* 517 U.S. 1243 (1996).

with all provisions of the Bankruptcy Code; therefore, the Joint Plan does not violate section

1129(a)(1) of the Code.

## XIII.  OBJECTIONS THAT THE JOINT PLAN FAILS TO COMPLY WITH SECTION 524(g) AND 105(a) LACK MERIT.

### A.    SECTION 524(g) OBJECTIONS OF ANDERSON MEMORIAL

Anderson Memorial argues that the Joint Plan fails to satisfy the requirements of section

524(g).  Specifically, Anderson argues that the Joint Plan provides for disparate treatment of

similarly-situated Asbestos PD Claims,[293] that the Asbestos PD Trust is not a genuine trust, and

that the Joint Plan's two-trust structure is impermissible.

Anderson's argument that the Asbestos PD Trust is not a "genuine" trust ignores the fact

that it complies with each requirement for a section 524(g) trust.  First, the Asbestos PD Trust is

clearly constituted as a Delaware Trust pursuant to the Asbestos PD Trust Agreement at Exhibit

3 in the Exhibit Book to the Disclosure Statement and the Joint Plan.  In accordance with

524(g)(2)(B)(i)(II), the Asbestos PD Trust is funded in part by securities of the Debtors, namely

the Class 7A Deferred Payment Agreement, which constitutes a "note" specifically included

within the definition of "security" under the Bankruptcy Code.[294]  Moreover, upon the

occurrence of specified contingencies, the Asbestos PD Trust will own a majority share of the

Reorganized Grace, in compliance with section 524(g)(2)(B)(i)(III).[295]  Most importantly, the

Asbestos PD Trust provides specific distribution procedures to ensure that future claims are paid

---

[293]  For the Plan Proponents' response to this objection, *see* Part VII.B *supra.*

[294]  11 U.S.C. § 101(49)(A)(i).

[295]  *See* Share Issuance Agreement, Ex. 20 in Exhibit Book to Disclosure Statement and Joint Plan.

in the same manner as present claims.[296] Because the Asbestos PD Trust complies with each of section 524(g)'s requirements for such a trust, Anderson's argument that it is not a "genuine" trust is without merit.

In addition, Anderson incorrectly argues that the two-trust structure adopted by the Joint Plan is not permissible. Anderson bases this assertion solely on its observation that section 524(g) always refers to "trust" in the singular. This argument is clearly unfounded. The Bankruptcy Code contains a specific rule of construction stating that "the singular includes the plural."[297] Thus, each use of the term "trust" in section 524(g) must also be read to mean "trusts." Because there is no analogous rule requiring that the use of the plural be read to include the singular, Congress' use of the singular when referring to 524(g) trusts must be understood as intending not to *preclude* a single-trust structure, rather than requiring it. Not surprisingly, in at least two prior bankruptcy cases, bankruptcy courts have confirmed plans creating two separate 524(g) trusts for personal-injury claims and property-damage claims.[298]

A two-trust structure as used in this case is also consistent with the meaning and purposes of section 524(g), and offers significant practical benefits. Section 524(g) explicitly contemplates a distinction between different types of asbestos claims, providing that a plan must be approved by "a separate class or *classes* of" asbestos claimants by a 75% vote.[299] In this case,

---

[296] *See* 11 U.S.C. § 524(g)(2)(B)(ii)(V); ZAI Trust Distribution Procedures at Exhibit 33 in Exhibit Book to Disclosure Statement and Joint Plan, Case Management Order for Class 7A Asbestos PD Claims at Exhibit 25 in Exhibit Book to Disclosure Statement and Joint Plan.

[297] 11 U.S.C. § 102(7).

[298] *See In re Eagle-Picher Indus., Inc.*, 203 B.R. 256, 271 (S.D. Ohio 1996) (confirming plan implementing separate trusts for personal injury and property damage claims); *In re National Gypsum Co.*, No. 90-37213 (Bankr. N.D. Tex. March 9, 1993) (Order Confirming [4294-1] Amended Plan ) (same).

[299] 11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb) (emphasis added).

the interests of Asbestos PI Claimants and Asbestos PD Claimants, the nature of PI and PD

claims, and their treatment under the Joint Plan vary in several significant respects. A two-trust

structure permits the procedures for paying PD claims and PI claims to be tailored to suit each

type of claim. Traditional PD Claims are administered through litigation in the court system,[300]

while ZAI claims are administered by a ZAI-tailored TDP.[301] Asbestos PI claims are

administered by a separate TDP, tailored to personal injury claims.[302] And, the individuals

charged with responsibility under the Joint Plan to assist the respective trustees of each trust (the

PI FCR and the PI TAC in the case of PI Claims, and the PD FCR and PD TAC in the case of PD

Claims) represent different interests and have expertise in different areas. Given these

attributes, the two-trust structure in the Joint Plan is entirely consistent with the plain language

and purposes of section 524(g).

## B.    REQUIREMENT THAT THE TRUST BE FUNDED BY THE DEBTORS' SECURITIES AND OBLIGATION TO MAKE FUTURE PAYMENTS -- 11 U.S.C. § 524(g)(2)(B)(i)(II)

Section 524(g)(2)(B)(i)(II) requires that a trust be funded "in whole or in part by the

securities of one or more debtors" and by "the obligation of such debtor or debtors to make

future payments." The Bankruptcy Code defines the term "security" broadly, and the

"securities" within this definition include warrants and notes.[303] The provisions set forth in the

---

[300] *See* Case Management Order for Class 7A Asbestos PI Claims, Exhibit 25 in Exhibit Book to Disclosure Statement and Joint Plan.

[301] *See* ZAI Trust Distribution Procedures, Exhibit 33 in Exhibit Book to Disclosure Statement and Joint Plan.

[302] *See* Asbestos PI TDP, Exhibit 4 in Exhibit Book to Disclosure Statement and Joint Plan.

[303] 11 U.S.C. §§ 101(49)(A)(i), (XV); *see also In re Burns & Roe Enter.'s, Inc.*, No. 08-4191, 2009 U.S. Dist. WL 438694, at *31, *35 (D.N.J. Feb. 23, 2009) (holding that a promissory note is a "security" for purposes of § 524(g)(2)(B)(i)(II)).

Joint Plan for funding the Asbestos PI and PD Trusts fit the structure required by § 524(g). The

Asbestos PI Trust is funded in part by the Warrants, and by Grace's obligation to make

continuing payments under the Asbestos PI Deferred Payment Agreement [304] The Asbestos PD

Trust is funded in part by Cash and by two different deferred payment agreements, one for Class

7A and one for Class 7B.[305] As the evidence at trial will show, Grace will be a healthy, robust

company following confirmation of the Joint Plan, fully capable of fulfilling its continuing

obligations to fund the Trusts.[306]

Several parties have objected to the proposed funding of the Trusts, reading into the Code

a requirement that the debtor provide equity to the Trusts. These parties acknowledge that

"security" is a defined term in the Code, but argue that definition does not apply to section

524(g).

It is a hallowed principle of statutory interpretation that Congress "says in a statute what

it means and means in a statute what it says there."[307] Thus, where the language of a statute is

clear, "the sole function of the courts is to enforce it according to its terms."[308] The definition of

"security" in section 101(49) of the Bankruptcy Code is clear, and specifically includes both

warrants and notes. When a term is defined in the definitional section of a statute, that definition

---

[304] *See* Asbestos PI Deferred Payment Agreement, Exhibit 11 in Exhibit Book, Warrant Agreement, Exhibit 24 in Exhibit Book.

[305] *See* Class 7A Deferred Payment Agreement at Exhibit 27 in the Exhibit Book, and Class 7B Deferred Payment Agreement at Exhibit 28 in the Exhibit Book.

[306] *See In re Combustion Eng'g,* 391 F.3d at 248.

[307] *Hartford Underwriter's Ins. Co. v. Union Planters Bank, N.A.,* 503 U.S. 1, 4 (2000) (citing *Connecticut Nat'l Bank v. Germain,* 503 U.S. 249, 254 (1992)) (internal quotation marks omitted).

[308] *United States v. Ron Pair Enter.'s, Inc.,* 489 U.S. 235, 241 (1989) (quoting *Caminiti v. United States,* 242 U.S. 470, 485 (1917)).

controls the construction of that term "wherever it appears throughout the statute."[309]  In

accordance with this principle, the definition of "security" in section 101(49) applies to section

524(g).[310]  Courts in the Third Circuit have never held otherwise,[311] and the cases cited by

objecting parties provide no basis for ignoring the definition that Congress has assigned to

"security."  Notably, *Combustion Engineering* does not state that a debtor must contribute equity

shares to a trust to satisfy section 524(g)'s requirements .  Rather, it states that the debtor must be

"able to make future payments into the trust."[312]  Moreover, in its opinion in *In re Congoleum*,

the Third Circuit simply noted that the debtor would not be required to contribute equity under

the plan.[313]  *Congoleum* contains no statement contradicting the definition stated in section

101(49), and the Third Circuit did not even consider this issue in the appeal.[314]  In fact, the few

courts that have considered this issue have found that securities other than equity can satisfy the

funding requirements in section 524(g).[315]

---

[309]  1A Norman J. Singer, Sutherland Statutory Construction 135-36 (6th ed. 2002) (citing *Victoria Sales Corp. v. Emery Air Freight, Inc.*, 917 F.2d 705 (2d Cir. 1990)).

[310]  *See id.*

[311]  *See, e.g., In re Burns & Roe Enter.'s, Inc.*, No. 08-4191, 2009 U.S. Dist. WL 438694, at *31, *35 (D.N.J. Feb. 23, 2009) (holding that a promissory note is a "security" for purposes of § 524(g)(2)(B)(i)(II)).

[312]  *In re Combustion Eng'g*, 391 F.3d 190, 248 (3d Cir. 2004).

[313]  426 F.3d 675, 680 (3d Cir. 2005).

[314]  *See id.* at 684 (summarizing the court's issues raised on appeal). Certain objecting parties also cite a lower-court opinion issued on remand in *Congoleum*, *In re Congoleum*, 362 B.R. 167, 175 (Bankr. D.N.J. 2007) (noting that the debtor had waited until the Seventh Modified plan to contribute equity to the trust). Even if a single statement made by a sister court in *dicta* could supercede the express intent of Congress as stated in a statutory definition, *Congoleum* says little about the issue. The court ultimately found the trust's funding inadequate because of "meager" payments and a failure to satisfy the requirement that the trust own at least 51% of the debtor's voting shares upon specified contingencies, not because the debtor had failed to contribute equity. *Id.* at 175-79.

[315]  *See In re Burns & Roe Enter.'s, Inc.*, No. 08-4191, 2009 U.S. Dist. WL 438694, at *31, *35 (D.N.J. Feb. 23, 2009) (holding that a promissory note is a "security" for purposes of § 524(g)(2)(B)(i)(II)); *In re Western*
(Continued...)

The objecting parties also point to various statements made in the legislative record to support their proposed definition of "securities." When the text of a statute is clear, the court has "no occasion to resort to legislative history."[316] Only when the court discerns ambiguity should it "resort first to canons of statutory construction, and, if the meaning remains ambiguous, to legislative history."[317] Thus, reference to legislative history is entirely unnecessary where, as here, the statute is clear and unambiguous on its face.

The objecting parties' arguments regarding the definition of "security" disregard the express language of the Code and misconstrue Third Circuit case law. The Joint Plan fulfills the funding requirements set forth in section 524(g), and these objections should therefore be rejected.

### C.    REQUIREMENT THAT THE SECTION 524(g) TRUST OWN, OR BE ENTITLED TO OWN A MAJORITY OF THE VOTING SHARES OF THE DEBTORS -- 11 U.S.C. § 524(g)(2)(B)(i)(III)

Section 524(g) requires that the trust "is to own, or by exercise of rights granted under [the] plan would be entitled to own if specific contingencies occur, a majority of the voting shares of [each debtor]; the parent corporation of each [] debtor; or a subsidiary of each [] debtor that is also a debtor."[318] The Code does not define the term "specified contingencies," but this requirement is generally understood to "ensure that, if there are not sufficient funds in the trust

---

*Asbestos Co.*, 313 B.R. 832 (Bankr. N.D. Cal. 2003) (holding that a note is a security and the debtor need not make payments in the form of dividends).

[316] *Bedrock Ltd., LLC v. U.S.*, 541 U.S. 176, 186 (2004).

[317] *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 423 (2d Cir.2005) (citations omitted).

[318] 11 U.S.C. § 524(g)(2)(B)(i)(III).

otherwise, the trust may obtain control of the debtor company."[319]   Accordingly, courts have found that these contingencies "need to precede the financial 'point of no return' for the Debtor."[320]

The Joint Plan complies with section 524(g) by granting the Trusts the right to majority ownership of Grace's voting stock upon any Event of Default.[321]  Events of Default are broadly defined, and include, for example, a failure by Grace to maintain licenses and qualifications necessary to conduct its business or payment of a dividend when the company's value is below the Threshold Amount.[322]  Thus, many contingencies set forth in the Asbestos Payment Agreements would allow the Trusts to take control of Grace well before the "financial 'point of no return.'"[323]  Certain Events of Default are also designed to ensure that the Trusts may obtain control of the company if there are not sufficient funds for Grace to honor its obligations to the Trusts.[324]  For example, any failure to make any Deferred Payment under the Asbestos PI Deferred Payment Agreement, the Class 7A Deferred Payment Agreement, or the Class 7B Deferred Payment Agreement for more than five days after the relevant Deferred Payment Date will result in an Event of Default.[325]  The broad range of contingencies contained in the

---

[319]  4 *Collier on Bankruptcy* ¶ 524.07[2] (Alan N. Resnick & Henry J. Sommer eds. 15th ed.2005) (citing 140 Cong. Rec. H10, 765 (daily ed. Oct. 4, 1994)(remarks of Rep. Jack Brooks)).

[320]  *In re Congoleum*, 362 B.R. 167, 176 (D.N.J. 2007).

[321]  *See* Share Issuance Agreement, section 2, Exhibit 20 in Exhibit Book to Disclosure Statement and Joint Plan.

[322]  *See* Asbestos PI Deferred Payment Agreement, §§ 8(d), (e), 6(a)(i), (b), Exhibit 11 in Exhibit Book.

[323]  *See Congoleum*, 362 B.R. at 176.

[324]  *See supra* note 322.

[325]  Asbestos PI Deferred Payment Agreement § 8(a), Exhibit 11 in Exhibit Book.

definition of Events of Default gives substantial leverage to the Trusts to ensure Grace's continued dedication to meeting its obligations under the Deferred Payment Agreements. Thus, the Joint Plan's provisions for majority ownership of the company by the Trusts comply with section 524(g)'s requirements.

Various objecting parties have argued that because the Joint Plan creates two Trusts, and because neither Trust would, by itself, own a majority of voting shares under any contingency, the Joint Plan does not comply with section 524(g). As explained in Part XIII.A *supra*, section 524(g) clearly permits a two-trust structure. For this structure to be possible, contingencies providing for shared control of a debtor must satisfy section 524(g). Moreover, under the rule of construction in 11 U.S.C. § 102(7), "the singular includes the plural." As such, section 524(g)(2)(B)(i)(III) must also be understood to allow an injunction to be issued in connection with "trust[s] that . . . would be entitled to own . . . .a majority of the voting shares of [the debtor]." Therefore, the accommodation set forth in the Share Issuance Agreement that provides for issuance of 50.1% of Grace's shares to the Trusts upon any Event of Default satisfies the requirements of section 524(g)(2)(B)(i)(III).

### D.   REQUIREMENT THAT THE DEBTORS BE SUBJECT TO SUBSTANTIAL FUTURE DEMANDS FOR PAYMENT ARISING FROM THEIR ASBESTOS-RELATED ACTIVITIES -- 11 U.S.C. § 524(g)(2)(B)(ii)(I)

Section 524(g) requires that "the debtor [be] likely to be subject to substantial future demands for payment" of asbestos-related claims.[326] Grace will present evidence at trial proving that it is likely to be subject to continuing demands for payment of asbestos-related claims,

---

[326]  11 U.S.C. § 524(g)(2)(B)(ii)(I).

including personal injury and property damage claims.  Specifically, the debtors will call Dr.

Denise Martin and Dr. Mark Peterson to testify regarding this issue.

### E.     REQUIREMENT THAT THE TRUST WILL OPERATE THROUGH MECHANISMS THAT PROVIDE REASONABLE ASSURANCE THAT PRESENT  CLAIMS AND FUTURE DEMANDS THAT INVOLVE SIMILAR CLAIMS WILL BE TREATED IN SUBSTANTIALLY THE SAME MANNER -- 11 U.S.C. § 524(g)(2)(B)(ii)(V)

Section 524(g)(2)(B)(ii)(V) requires that a trust "will value, and be in a financial position

to pay, present claims and future demands that involve similar claims in substantially the same

manner."[327]  As previously discussed, and as Grace will further show at the Confirmation

Hearing, the Asbestos PI Trust Agreement and the Asbestos PI TDP are specifically designed to

ensure that present and future claimants will receive similar amounts.  Similarly, the ZAI TDP is

designed to ensure that present and future claimants will be treated in substantially the same

manner.  The Class 7A CMO provides for full payment of all claims governed by it, ensuring

that all claims -- present and future -- will be treated in the same manner.  Also, contrary to the

objections asserted by CNA and other parties, Indirect PI Trust Claims will receive treatment

under the Joint Plan equal to other Asbestos Claims in Class 6.[328]

In addition, Montana objects to the channeling of its claims under section 524(g), arguing

that its alleged claims are not "claims or demands" under section 524(g)(1)(B).  In its argument,

Montana ignores the plain language of section 524(g)(5) by asserting that its alleged claims are

not "demands" within the meaning of § 524(g).  Montana has been named as a defendant in

numerous state-court actions (the "Montana Cases") seeking damages resulting from alleged

---

[327]  11 U.S.C. § 524(g)(2)(B)(ii)(V).

[328]  *See* Asbestos PI TDP § 5.13, Exhibit 4 in Exhibit Book.

exposure to asbestos resulting from Grace's mining and processing of asbestos-containing vermiculite within Montana.[329]  Many of these actions allege that Montana aided and abetted Grace in causing the alleged injuries.[330]  Montana alleges that if it is found to be liable for damages in any of the Montana Cases, Grace will be liable to Montana for indemnification and/or contribution because its alleged breaches of various duties were the proximate cause of the alleged injuries.[331]

Section 524(g)(5) defines a "demand" as "a demand for payment, present or future," that "(A) was not a claim during the proceedings leading to the confirmation of a plan of reorganization; (B) arises out of the same or similar conduct or events that gave rise to the claims addressed by the injunction issued under [524(g)(1)]; and (C) pursuant to the plan, is to be paid by a trust described in paragraph (2)(B)(i)."[332]  By the express, unambiguous terms of this provision, any future demand for payment of an asbestos-related claim is a "demand" that can be channeled by a section 524(g) injunction.  Montana first argues that its alleged causes of action against Grace are not "demands" within the meaning of section 524(g) because they are not personal injury, wrongful death, or property damage claims.  This argument fails because, as discussed in Part VII.A.1 *supra*, claims for indemnification or contribution arising from asbestos claims can be, and regularly are, channeled by section 524(g).  Montana also argues that its alleged rights against Grace are not "demands" because there is not yet an amount due on their

---

[329] The State of Montana's Brief in Opposition to Confirmation of the First Amended Joint Plan of Reorganization at 4-5 [Dkt. No. 22429].

[330] *Id.* at 6.

[331] *Id.*

[332] 11 U.S.C. § 524(g)(5).

claims. Again, this argument disregards the definition of "demand" under the Bankruptcy Code. When an amount is presently due, a "claim" necessarily exists.[333] And a "demand," by definition, is a right for payment that does not qualify as a "claim."[334] Thus, Montana's purported causes of action are clearly "demands" under section 524(g).

### F.    THE EXTENSION OF THE CHANNELING INJUNCTION TO CERTAIN THIRD PARTIES IS PERMISSIBLE -- 11 U.S.C. § 524(g)(4)(A)(ii)(III)

A section 524(g) injunction may extend protection to third parties "where a third party has derivative liability for claims against the debtor."[335] Specifically, third parties may be protected when they are liable for claims against the debtor by reason of their ownership of a financial interest in the debtor, their involvement in the management of the debtor or a related party, their provision of insurance to the debtor or a related party, or their involvement in certain transactions with the debtor.[336] The Joint Plan extends the protection of the 524(g) injunction to each of the Asbestos Protected Parties. At trial, Grace will present evidence proving that each of these parties falls into at least one of the categories stated in section 524(g)(4)(A)(ii), in the form of testimony from witnesses Jeffrey Posner, Richard Finke, and Jay Hughes.

The United States Trustee has objected to the inclusion of professionals and past officers and directors in the Channeling Injunctions. The Trustee argues that this is inappropriate under *In re Combustion Engineering*, which held that a 524(g) injunction cannot extend protection to non-derivative, third-party actions against non-debtors. The flaw in this argument is that it fails

---

[333]  11 U.S.C. § 101(5)(A).

[334]  11 U.S.C. § 524(g)(5)(A).

[335]  *Combustion Eng'g*, 391 F.3d at 235.

[336]  11 U.S.C. § 524(g)(4)(A)(ii).

to note that section 524(g) specifically allows protection of third parties whose liability arises from "involvement in the management of the debtor or a predecessor in interest of the debtor, or service as an officer, director, or employee of the debtor or a related party."[337] This section does not limit protection to present directors, and allows protection of professionals to the extent that they have been involved in the management of Grace or one of its predecessors.[338] By their terms, the Channeling Injunctions do not extend protection to these parties beyond the permissible limits. Professionals and past officers and directors will only be released from asbestos-related claims, which could only arise from their involvement in managing the Debtors or a related party. Therefore, the inclusion of these parties in the Channeling Injunctions is proper under section 524(g).

### G.    ISSUANCE OF THE CHANNELING INJUNCTION IS FAIR AND EQUITABLE IN LIGHT OF THE BENEFITS PROVIDED TO THE TRUST -- 11 U.S.C. § 524(g)(4)(B)(ii).

Section 524(g)(4)(B)(ii) requires that the Court find that identifying each party to be protected under the 524(g) injunction is fair and equitable in light of the benefits provided to the trust *on behalf of* each such party. A finding that an injunction is fair and equitable "is closely tied to the value being contributed to the plan."[339] Thus, the value provided under the Joint Plan must be examined "in the context of the overall bankruptcy scheme."[340]

---

[337]  11 U.S.C. § 524(g)(4)(A)(ii)(II).

[338]  *Id.*

[339]  *In re Congoleum Corp.*, 362 B.R. 167, 180 (Bankr. D.N.J. 2007).

[340]  *Id.*

Courts have consistently read this section to allow, in accordance with the plain terms of the statute, a contribution to the trust to be made *on behalf of* a protected party.[341] At trial, Grace will present the testimony of David Austern, the Honorable Alexander M. Sanders, Jr., and Elihu Inselbuch, Esq., in order to demonstrate that each party protected under the Channeling Injunctions will have made directly, or will have made on its behalf, a substantial contribution to the Trusts.[342]

Notwithstanding this, Scotts, BNSF, and Garlock all argue that the Asbestos PI Channeling Injunction is not "fair and equitable" under section 524(g)(4)(B)(ii).[343]   Section 524(g)(4)(B)(ii) establishes that a channeling injunction is valid and enforceable with respect to future "demands" provided that enjoining the demands is "fair and equitable with respect to [future demand holders], in light of the benefits provided, or to be provided, to [the] trust on behalf of" the parties protected by the injunction.   Section 524(g)(4)(B)(ii) does not further define the term "fair and equitable."

Garlock argues that courts have yet to decide what it means to be "fair and equitable" in the section 524(g) context, and that this is a matter of first impression for this Court.[344]  Garlock

---

[341] *See, e.g., In re Kaiser Aluminum Corp.*, 2006 WL 616243, at *17 (Bankr. D. Del. Feb. 6, 2006) (holding that extension of injunction to certain non-debtor protected parties was fair and equitable where debtor contributed $13 million to the trust on behalf of such parties); *In re Burns & Roe Enter.'s, Inc.*, 2009 WL 438694, at *9, *35 (D.N.J. Feb. 23, 2009) (holding that entry of injunction was fair and equitable "in light of the benefits provided, or to be provided, by or on behalf of the Protected Parties and Settling Insurance Entities"); *In re Federal Mogul-Global*, 2007 WL 4180545, at *33 (Bankr. D. Del. 2007) (holding that entry of § 524(g) injunction was fair and equitable "[i]n light of the substantial contributions to be made to the Trust by or on behalf of the Protected Parties"); *In re Armstrong World Indus., Inc.*, 348 B.R. 136, 156 (D. Del. 2006) (same),

[342] *See In re Kaiser Aluminum Corp.*, 2006 WL 616243 (Bankr. D. Del. Feb. 6, 2006) (finding that debtor's "substantial" contribution satisfied "fair and equitable" requirement under § 524(g).

[343] *See* Scotts's Phase II Trial Brief at 18-21; BNSF's Phase II Trial Brief at 22-23; Garlock's Phase II Trial Brief at 8-18.

[344] Garlock's Phase II Trial Brief, at 13 [Dkt. No.22428].

concludes, correctly, that the phrase "fair and equitable" in section 524(g)(4)(B)(ii) does not have the same meaning as the phrase in section 1129(b), which incorporates, among other things, the absolute priority rule. *See In re W. Asbestos Co.*, 313 B.R. 832, 850 n.25 (Bankr. N.D. Cal. 2003); *cf. Envtl. Def. v. Duke Energy Corp.*, 549 U.S. 561, 562 (2007) ("[The] natural presumption that identical words used in different parts of the same act are intended to have the same meaning . . . is not rigid and readily yields whenever there is such variation in the connection in which the words are used as reasonably to warrant the conclusion that they were employed in different parts of the act with different intent") (internal quotation omitted).

From this, however, Garlock leaps to the conclusion that the "only plausible" reading of the phrase "fair and equitable" is that it incorporates the stricter, pre-Code version of the absolute priority rule, which Congress previously rejected when adopting section 1129(b). For support, Garlock relies upon the interpretive canon that when Congress borrows a term of art it is presumed to adopt the term's existing meaning. But Garlock's reliance is misplaced.[345] As the Supreme Court ruled in *United States v. Wells*, 519 U.S. 482, 491 (1997), this canon only applies "if th[e] terms . . . have accumulated settled meaning under . . . the common law and the statute [does not] otherwise dictat[e]." (Internal quotations omitted). Section 524(g)( 4)(B)(ii) satisfies neither of these two conditions.

First, Garlock itself acknowledges that "before the enactment of section 524(g), the law knew two meanings of the term 'fair and equitable.'" "Fair and equitable," therefore, can hardly

---

[345] Garlock also cites legislative history which it contends proves that Congress was aware of the pre-Code absolute priority rule at the time that section 524(g) was enacted. Garlock's Phase II Trial Brief at 14. By Garlock's own admission, however, the references to the pre-Code absolute priority rule that Garlock cites were made in the course of discussing the deletion of another, wholly-unrelated section of the Bankruptcy Code. In no way do the comments suggest that Congress intended to incorporate the pre-Code absolute priority rule in section 524(g).

be said to have a settled meaning.  To the extent its meaning is settled, moreover, it is settled against the pre-Code version of the absolute priority rule, which Congress abandoned back in 1978, some sixteen years before enacting section 524(g).[346]

Second, the structure and language of section 524(g) dictate a meaning for the term "fair and equitable" other than one which incorporates the stricter, pre-Code version of the absolute priority rule.  Section 524(g)(2)(B)(ii)(IV)(bb)'s requirement that at least seventy-five percent of claimants whose claims are channeled vote in favor of the plan directly contradicts the notion that Congress intended to impose a strict absolute priority requirement through section 524(g)(4)(B)(ii).  Furthermore, the term "fair and equitable" in 524(g)(4)(B)(ii) is modified by the clause "in light of the benefits provided, or to be provided, to such trust on behalf of [the protected parties]."  This clause, to which Garlock's reading fails to give effect, demonstrates that the term "fair and equitable" relates to the substantiality of the protected parties' contributions.  Thus, the presumption that Congress adopts the existing meaning of a term of art is inapplicable to section 524(g)(4)(B)(ii).

When properly construed, therefore, the term "fair and equitable" in section 524(g)(4)(B)(ii) requires that the contributions the Asbestos Protected Parties will make to the Asbestos PI Trust collectively be substantial enough to justify awarding them the protections of the Asbestos PI Channeling Injunction.  Contrary to Garlock's arguments, other courts have already reached this straight-forward conclusion.  *See In re Congoleum Corp.*, 362 B.R. 167, 180 (Bankr. D.N.J. 2007) ("A review of the case law suggests that finding that an injunction is fair and equitable is closely tied to the value being contributed to the plan.").

---

[346] *See* Garlock's Phase II Tr. Br., at 15 ("'Fair and equitable,' of course, now has another meaning:  the form of absolute priority enacted in 1978 by section 1129.").

Here, of course, the Debtors and other parties are contributing substantial assets to the Asbestos PI Trust, on behalf of themselves and others, including the Settled Asbestos Insurance Companies, which assets include, among other things, (i) more than $250 million in Cash, (ii) deferred payments totaling $1.5 billion over a fifteen-year period, (iii) the Cryovac Payment, (iv) the Fresenius Payment, (v) the Warrant, (vi) their Asbestos Insurance Rights, and (vii) the Asbestos PI Trust Causes of Action.[347] These contributions are more than sufficient to justify extending the protections of the Asbestos PI Channeling Injunction to all of the Asbestos Protected Parties.

Scotts and BNSF argue, however, that the Debtors' contributions do not merit extending the protections of the Asbestos PI Channeling Injunction to the Settled Asbestos Insurance Companies. Specifically, they argue the Debtors have not adequately delineated which assets are being contributed on behalf of the Settled Asbestos Insurance Companies and have not proven that those assets would not otherwise have been contributed. Scotts further argues that it is insufficient for the Debtors to contribute assets "on behalf of" the Settled Asbestos Insurance Companies, instead, the Settled Asbestos Insurance Companies must contribute new money on their own.

What is lost in the objectors' argument is that the extension of the Asbestos PI Channeling Injunction's protections to the Settled Asbestos Insurance Companies is designed to protect the assets of the Asbestos PI Trust. Without the protections of the Asbestos PI Channeling Injunction, the Asbestos PI Trust could face competing claims: a claimant could first submit a direct claim against the Asbestos PI Trust and obtain a recovery at the applicable

---

[347] Joint Plan §§ 1.1.46, 7.2.2.

Payment Percentage and then the same claimant could later sue the Settled Asbestos Insurance Companies for the deficiency, triggering an indemnity claim by the Settled Asbestos Insurance Companies that would in turn give rise to an Indirect PI Trust Claim against the Asbestos PI Trust under the Asbestos Insurance Settlement Agreements.[348] Extending the protections of the Asbestos PI Channeling Injunction to the Settled Asbestos Insurance Companies eliminates such "double dipping." The benefit to the Settled Asbestos Insurance Companies is collateral.

Moreover, to the extent the Settled Asbestos Insurance Companies are benefiting, in a collateral manner, from the Asbestos PI Channeling Injunction, the Debtors are making a contribution on their "behalf," consistent with the plain language of the statute. And section 524(g)(4)(B)(ii) does not require the Debtors to delineate, asset-by-asset, which part of their contribution is attributable to which entity. Section 524(g) simply requires that the total package of assets contributed to the Trust be sufficient to justify the total protections awarded. That standard is met here.

BNSF and Garlock separately argue that the Asbestos PI TDP is not "fair and equitable." *See* BNSF's Phase II Trial Brief at 26-27; Garlock's Phase II Trial Brief at 18-23. Section 524(g)'s "fair and equitable" requirement, however, does not extend to <u>trust distribution procedures</u>. All section 524(g) requires with regard to trust distribution procedures is that the trust "operate through mechanisms . . . that provide reasonable assurance that the trust will value, and be in a financial position to pay, present claims and future demands that involve similar claims in substantially the same manner." 11 U.S.C. § 524(g)(2)(B)(ii)(V). The provisions of

---

[348] Scotts argues that there could never be more than one claim against the Asbestos PI Trust. *See* Scotts's Phase II Tr. Br. at 20-21. This contention rests on the assumption that claimants would pursue *either* the Asbestos PI Trust or the Settled Asbestos Insurance Companies. Scotts fails to consider the possibility that they might pursue both.

the Asbestos PI TDP that BNSF complains about, imposing claim limits and multi-step review, accomplish just that. Likewise, the provisions of the Asbestos PI TDP that Garlock protests, restricting impleader of the Asbestos PI Trust, are essential to preserve trust assets from dissipation through the transaction costs attendant upon litigation in the tort system just as the TDP restricts direct claimants from initiating litigation against the Trust as part of suits brought against codefendants.

Garlock's argument that the Asbestos PI TDP enables plaintiffs to receive multiple recoveries through "gamesmanship" is meritless. The single satisfaction rule prohibits claimants from seeking to recover more than the full amount of their claims. *See*, *e.g.*, *Greenleaf v. Garlock, Inc.*, 174 F.3d 352, 357 (3d Cir. 1999) (describing single satisfaction rule). The TDP itself also precludes multiple recoveries. Section 2.1 of the TDP is clear that, consistent with past settlement practices, recovery from the trust is intended to compensate a claimant only for Grace's "several share" of the damages suffered by that claimant. Asbestos PI TDP § 2.1. Moreover, under section 5.6 of the TDP, Indirect Claimants such as Garlock can file a claim against the Trust if they believe they have paid the liability of the Trust to a claimant the Trust would otherwise have had to pay.

Garlock's contention that the Asbestos PI TDP permits plaintiffs to bring "secret claims" and thereby encourages "inconsistent positions" is likewise mistaken. The TDP does not relieve the Trust from the obligation to respond to a properly issued subpoena. *Id.* at § 6.5. Nor does the TDP affect Garlock's right to obtain materials submitted to the Trust by claimants from the claimants themselves. Finally, the Trust has the power to audit the reliability of exposure and medical evidence and, if the Trust determines that individuals or entities have provided

unreliable evidence to the Trust, the Trust is authorized to impose a range of corrective measures, including seeking sanctions or prosecution. *Id.* at § 5.8.

### H.    THE ALLEGEDLY OVERLY BROAD NATURE OF THE SECTION 524(g) INJUNCTION DOES NOT PROVIDE THE INSURANCE COMPANIES WITH A VALID OBJECTION TO CONFIRMATION.

In conclusory fashion, AIU asserts that the Joint Plan fails to satisfy section 1129(a)(3) because the Joint Plan enjoins it from pursuing Contribution Claims against Settled Insurance Companies, allegedly violating its state law rights.[349]  AIU fails to establish that it has any such state law rights to begin with, but even more significantly, AIU fails to appreciate that section 524(g) of the Bankruptcy Code expressly allows for such an injunction.  "Notwithstanding the provisions of section 524(e), such an injunction may bar any action directed against a third party who is identifiable from the terms of such injunction (by name or as part of an identifiable group) and is alleged to be directly or indirectly liable for the conduct of, claims against, or demands on the debtor to the extent such alleged liability of such third party arises by reason of * * * (III) the third party's provision of insurance to the debtor or a related party."  11 U.S.C. § 524(g)(4)(A)(ii).  Moreover, Article 7.15(i) of the Joint Plan provides explicitly that parties to Asbestos Insurance Reimbursement Agreements have the right to set off any contribution claim they may have against obligations to the Trust, ensuring that they will not suffer an economic detriment from the channeling of claims to the Trust.

---

[349] AIU Br. at 12 [Dkt. No. 22421].

I.    **THE ALLEGEDLY OVERLY NARROW NATURE OF THE SECTION 524(g) INJUNCTION DOES NOT PROVIDE THE INSURANCE COMPANIES WITH A VALID OBJECTION TO CONFIRMATION.**

Several Insurance Companies continue to state their belief that the Joint Plan should provide for a 524(g) Injunction in favor of any Insurance Company that settles its coverage obligations, even if it does so after confirmation of the Joint Plan.[350]  CNA and FFIC both cite *In re Western Asbestos Co.* to support their argument that a plan cannot require insurance settlements to be reached by a certain in time in order to be subject to the 524(g) Injunction, but that case actually confirmed a plan that did so limit such settlements.  *In re Western Asbestos Co.*, 313 B.R. 456, 458 (Bankr. N.D. Cal. 2004) (approving plan containing definition of "Settling Asbestos Insurance Company" that included only specific insurers and "any Asbestos Insurance Company that has, *before the Effective Date*, entered into an Asbestos Insurance Settlement Agreement * * *")[351]  Thus, far from supporting their position, the *Western Asbestos* bankruptcy case disproves it.

Moreover, there is no requirement in section 524(g) that a section 524(g) plan must contain such a supplemental injunction.  11 U.S.C. § 524(g)(2)(B)(ii)(IV)(aa) (a supplemental injunction must be "set out in such plan" for there to be exclusive jurisdiction in the district court over it).  Insurance Companies fail to recognize the permissive (not mandatory) nature of such an injunction.

Moreover, as a condition to enforceability of the injunction, the court must determine "before entering the order confirming such plan," that naming such third party in the injunction

---

[350] CNA Br. at 23-26; FFIC Br. at 15-17.

[351] Western Asbestos Plan Glossary of Terms § 148(b) (italics in original).

is fair and equitable with respect to subsequent demand holders. 11 U.S.C.

§ 524(g)(4)(B)(ii)(emphasis added). Also, insurance companies to be protected under a section

524(g) injunction must be "part of an identifiable group." 11 U.S.C. § 524(g)(4)(A)(ii). The

Insurance Companies fail to demonstrate that the statute contemplates that such an injunction can

be issued in connection with confirmation covering as-yet-unidentified entities, and the language

of the statute seems to indicate the contrary.

More generally, objectors such as the Insurance Companies are not entitled to preclude

confirmation of a plan of reorganization merely because they wish it contained different terms

that would be more favorable to their interests. Instead, they have to rebut the Plan Proponents'

showing that the Joint Plan is confirmable under the Bankruptcy Code. *See Beal Bank, S.S.B. v.*

*Waters Edge Ltd. P'ship,* 248 B.R. 668, 678 (D. Mass. 2000) ("[a] plan must be confirmed if it

meets the thirteen general requirements listed in § 1129(a)."). They have not done so.[352] *In re*

*Lernout & Hauspie Speech Products, N.V.,* 301 B.R. 651, 656 (Bankr. D. Del. 2003) ("Creditors

objecting to the proposed plan bear the burden of producing evidence to support their

objection.").

---

[352] For the same reasons, CNA's belief that the language of the Section 524(g) injunction should be expanded to include independent duties of CNA, CNA Br. at 25, is likewise not a valid objection to confirmation, nor is its belief that that injunction should be expanded to include policies allegedly covered by an Asbestos Insurance Reimbursement Agreement or to include "non-products" coverage under an Asbestos Insurance Settlement Agreement. CNA Br. at 34-36.

J.    **THE ASBESTOS INSURANCE ENTITY INJUNCTION IS DULY AUTHORIZED BY SECTION 105(a) OF THE BANKRUPTCY CODE AND THE INJUNCTIONS IN THE JOINT PLAN DO NOT PRECLUDE CO-DEFENDANTS FROM ACCESSING THEIR OWN INSURANCE POLICIES.**

1.    **This Court May Issue the Asbestos Insurance Entity Injunction Pursuant to Section 105(a) of the Bankruptcy Code.**

Scotts and BNSF argue that section 105(a)[353] of the Bankruptcy Code does not support the application of the Asbestos Insurance Entity Injunction to claims against non-settling Asbestos Insurance Entities for alleged coverage under the Asbestos Insurance Policies.[354] Citing *In re Combustion Engineering, Inc.*, 391 F.3d 190 (3d Cir. 2005), Scotts and BNSF contend that where an injunction does not meet the specific requirements of section 524(g), the Joint Plan cannot circumvent section 524(g) by using the general powers of section 105. Because the non-settling Asbestos Insurance Entities are not contributing to the Asbestos PI Trust, Scotts and BNSF reason that the Asbestos Entity Injunction would be invalid under section 524(g) and, therefore, is invalid under section 105(a).

Again, Scotts and BNSF fail to recognize that the purpose of the Asbestos Insurance Entity Injunction is not to benefit the non-settling Asbestos Insurance Entities, but to protect the assets of the Asbestos PI Trust. In contrast to the situation in *Combustion Engineering,* the Asbestos Insurance Entity Injunction does not "achieve a result inconsistent" with section 524(g). *Cf.* 391 F.3d at 236. To the contrary, the Asbestos Insurance Entity Injunction carries out section 524(g), which is precisely what section 105(a) allows.

---

[353] Section 105, in pertinent part, authorizes bankruptcy courts to issue "any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

[354] *See* Scotts's Phase II Trial Brief at 26-29 [Dkt. No. 22425]; BNSF's Phase II Trial Brief at 24-25 [Dkt. No. 22410].

2.     **The Joint Plan, and the Relief Sought Under the Asbestos Insurance Entity Injunction and the Asbestos PI Channeling Injunction, Do Not Enjoin Co-Defendants From Pursuing Insurance Rights Under Policies Issued Directly to Them.**

BNSF argues that the Joint Plan improperly seeks to enjoin its rights to pursue coverage under the BNSF Policies -- policies issued *solely* to BNSF.[355]  As a careful review of the relevant definitions in the Joint Plan makes clear, the Asbestos Insurance Entity Injunction does not apply to BNSF's own separate policies.

Under Article 8.4.1.1 of the Joint Plan, the Asbestos Insurance Entity Injunction only enjoins claims against "Asbestos Insurance Entities" arising out of a claim against the Debtors or any "Asbestos Insurance Rights."  The insurers who issued the BNSF Policies are not Asbestos Insurance Entities with respect to such policies; insurers are Asbestos Insurance Entities only with respect to Asbestos Insurance Policies they issued to one or more Insurance Contributors (which BNSF is not).[356]  Moreover, BNSF's rights under its policies do not qualify as Asbestos Insurance Rights, because such rights are only rights of Insurance Contributors (which BNSF is not).[357]  Thus, BNSF's claims based on those rights are not enjoined by the Asbestos Insurance Entity Injunction.

---

[355]  *See* BNSF's Phase II Trial Brief at 15-18.

[356]  *Id.* at § 1.1.9.

[357]  *Id.* at § 1.1.13.

## XIV.    MISCELLANEOUS OTHER OBJECTIONS TO THE JOINT PLAN ALSO LACK MERIT

### A.    FFIC'S SETOFF RIGHTS ARE ADEQUATELY PRESERVED

FFIC argues that the Joint Plan violates section 1129(a)(1)[358] by failing to preserve FFIC' alleged setoff rights under section 553(a).[359] FFIC contends that it has a present right to set off amounts that the Debtors might in the future owe to FFIC under the Indemnity Agreement (the "Surety Claim") against obligations FFIC may owe to the Debtors under its insurance policies. FFIC further argues that its purported right of setoff is impaired by the Joint Plan.

As a threshold matter, FFIC is incorrect in its assertion that it has a current right of setoff. Section 553 does not create a right of setoff; rather, it preserves a creditor's pre-existing rights under applicable state law. *In re SemCrude, L.P.*, 399 B.R. 388, 393 (Bankr. D. Del. 2009). Under applicable state law, a right of setoff does not arise until both parties' debts cease to be contingent. *See Trojan Hardware Co. v. Bonacquisti Const. Corp.*, 141 A.D.2d 278, 281 (N.Y. Ct. App. 1988) (holding state statute authorizing setoff does not include "liabilities which are contingent in that it is uncertain as to whether anything will ever be demandable") (internal quotation omitted); *Behring Int'l Inc. v. Greater Houston Bank*, 662 S.W.2d 642, 652 (Tex. Ct. App. 1983) ("An offset is not authorized if the debt is only contingent."); *see also Cohen v. Karp*, 122 A.2d 524, 525 (Md. 1923) ("To entitle the defendant to make such a defense, he must only have a right to receive the amount due him from the plaintiff, but his claim must be of such a nature that he can sue for and recover it in a court of law."); Christine M. Gimeno, 16

---

[358] Section 1129(a)(1) requires that a plan comply with the "applicable" provisions of the Bankruptcy Code.

[359] *See* FFIC's Phase II Trial Brief, at 9-12 [Dkt. No. 22412]. Section 553(a) provides that the Bankruptcy Code "does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case . . . against a claim of such creditor against the debtor that arose before the commencement of the case," with certain exceptions.

*California Jurisprudence* § 10 (3d ed. rev. 2009) ("Ordinarily, when a liability is contingent, and not fixed, it is unavailable as a setoff without the consent of the plaintiff.") (citation omitted).

FFIC's Surety Claim will remain contingent until FFIC pays, which it may never do, the *Edwards* judgment pursuant to the Bond.[360]  *See Hammond v. Myers*, 30 Tex. 375, 375 (Tex. 1867); *Bullock v. Campbell,* 9 Gill 182, 182 (Md. 1850); *Loewenthal v. Coonan*, 67 P. 324, 324 (Cal. 1902).  Prior to that time, FFIC does not have a right of setoff under applicable state law.[361]

Should FFIC eventually develop a right to setoff, however, FFIC's right would be preserved under the Joint Plan.  FFIC's Surety Claim and the Debtors' rights under FFIC's insurance policies will be transferred to the Asbestos PI Trust, preserving mutuality, and nothing in the Joint Plan or the Asbestos PI TDP will prohibit FFIC from exercising its setoff.

Only if the Court finds that FFIC's Surety Claim cannot be channeled to the Asbestos PI Trust, as FFIC now argues, will FFIC's right of setoff be impaired by confirmation.  FFIC's Surety Claim is a pre-petition contingent claim for reimbursement based upon FFIC's securing the claim of the *Edwards* plaintiffs.  *See In re ANC Rental Corp., Inc.,* 341 B.R. 178, 181 (Bankr. D. Del. 2006) (finding contractual indemnity claim arose pre-petition when the contract was first executed); *In re Pacor, Inc.*, 110 B.R. 686, 689 (E.D. Pa. 1990) ("A claim of a surety is contingent, in this context, until the surety pays the principal creditor.") (quoting 3 Collier on

---

[360]  FFIC's Phase II Pretrial Brief at 7.

[361]  FFIC cites case law which recognizes that parties' debts may be setoff even if they are not mature when one of the parties is insolvent. FFIC's Phase II Trial Brief at 12 (citing *Williams v. Am. Bank of the Mid-Cities, N.A. (In re Williams)*, 61 B.R. 567, 571 n.4 (Bankr. N.D. Tex. 1986))). But this rule does not negate the requirement that both parties' debts be non-contingent. *See Trojan Hardware Co.*, 141 A.D.2d at 282 ("There is an important distinction between an unmatured debt and a contingent liability. An unmatured debt is generally evidenced by a contract and is a readily discernible amount which can be expected in the normal course of events to be due and owing in the future, although the obligation has not yet ripened. A contingent liability, however, is marked by uncertainty as to whether any obligation will ever arise. ") (internal citations omitted).

Bankruptcy ¶ 502.05[1]).  As such, it would be disallowed under section 502(e)(1)(B) and discharged under section 1141(d)(1)(A) leaving FFIC with no claim to setoff against its obligations to the Debtors.[362]

The Joint Plan thus cannot be said to impair FFIC's setoff rights in violation of section 1129(a)(1).  If anything, the Joint Plan acts to preserve rights which would otherwise be cut off.

### B.    THE JOINT PLAN DOES NOT VIOLATE SECTIONS 502(a) & (b)

FFIC alleges that the Joint Plan deprives it of the right to object to asbestos claims in violation of Section 502(a) of the Bankruptcy Code, and that the Asbestos PI TDP grants the Asbestos PI Trust the authority to allow claims in violation of section 502(b) of the Code.[363] FFIC cites no authority for either proposition.  To the contrary, the Asbestos PI Trust and its treatment of asbestos claims are expressly authorized by section 524(g) of the Bankruptcy Code, and FFIC cannot cite a single case holding that such treatment is a violation of section 502.

---

[362] FFIC cites case law from other jurisdictions for the proposition that a claim may be setoff under section 553(a) without regard to whether it is contingent or unliquidated as long as state law provides a right of setoff.  FFIC's Phase II Trial Brief at 2 (citing *Newbery Corp. v. Fireman's Fund Ins. Co.*, 95 F.3d 1392, 1398-99 (9th Cir. 1996) and *Matter of Isis Foods, Inc.*, 24 B.R. 75, 76 (Bankr. W.D. Mo. 1982))).  None of these authorities, however, addresses the situation in which a claim is not only contingent or unliquidated, but is also of the type disallowed under section 502(e).  Setoff rights based on contingent claims for reimbursement, such as the Surety Claim, are necessarily cut off when the underlying claim is disallowed.  *See* 11 U.S.C. § 553(a)(1) (preserving a creditor's setoff rights notwithstanding any other provision of the Bankruptcy Code except if the creditor's underlying claim is disallowed).  Otherwise, "a debtor's estate containing numerous contingent claims subject to indemnity or contribution would [] be impossible to administer because huge, indeterminate sums might have to be reserved to cover such claims if they would materialize in the future."  *In re Amatex Corp.*, 110 B.R. 168, 171 (Bankr. E.D. Pa. 1990) (discussing the policies behind section 502(e)); *accord In re Wedtech Corp.*, 85 B.R. 285, 290 (Bankr. S.D.N.Y. 1988) ("By [section 502(e)], Congress apparently sought to achieve the administrative purpose of enabling distribution to unsecured creditors without a reserve for these types of contingent claims when the contingency may not occur until after the several years it often takes to litigate the underlying lawsuit."); *cf. United States v. Continental Airlines (In re Continental Airlines)*, 134 F.3d 536, 542 (3d Cir. 1998) (stating "[we] hold that the right of a creditor to set-off in a bankruptcy reorganization proceeding must be duly exercised in the bankruptcy court before the plan of reorganization is confirmed; the failure to do so extinguishes the claim," and finding that a creditor's post-confirmation setoff may "unnecessarily protract the bankruptcy proceedings," "consume judicial resources," prove "unfair to other creditors and the Debtors," and "undermine the plan of reorganization and the objectives and structure of the Bankruptcy Code").

[363]    FFIC Tr. Br. at 18.

Moreover, acceptance of this argument would require the Bankruptcy Court and the District Court to spend years, if not decades, allowing and disallowing tens of thousands of individual asbestos PI claims. Indeed, under 28 U.S.C. § 157(b)(5) and 28 U.S.C. § 1411, such proceedings would have to be tried in a district court before juries, a result that would be disastrous for the court system and which section 524(g) of the Bankruptcy Code was clearly intended to prevent.

### C.    ALLSTATE'S RETENTION OF JURISDICTION ARGUMENTS FAIL.

Allstate argues that "the scope of the [Court's] retention can be no broader than would otherwise be permissible under applicable law. The retention should not and cannot, for example, alter or otherwise limit the permissive or mandatory abstention provisions set forth in 28 U.S.C. §§ 1334(c)(l) and (2)."[364] The Plan Proponents agree, but nothing in the provisions for retention of jurisdiction are overly broad, and nothing in these provisions would prevent this Court from abstention where appropriate.

The only provision that Allstate expressly references is Article 10.9 of the Joint Plan. This provision provides that the Court retain nonexclusive jurisdiction over matters concerning the Asbestos Insurance Policies, Asbestos Insurance Reimbursement issues, and other insurance issues. Allstate notes that:

> the Plan contains numerous provisions for the "retention" of jurisdiction by the bankruptcy court to hear and determine a wide variety of matters. Among those, Article 10.9 provides that the bankruptcy court will retain jurisdiction "[t]o hear and determine matters concerning the Asbestos Insurance Policies, Asbestos In-Place Insurance Coverage, Asbestos Insurance Reimbursement Agreements, and Asbestos Insurance Settlement

---

[364] Phase II Trial Brief on Behalf of Allstate Insurance Company, Solely as Successor in Interest to Northbrook Excess and Surplus Insurance Company, Formerly Northbrook Insurance Company, In Opposition to Confirmation of First Amended Joint Plan of Reorganization ("Allstate Brief") at 15 [Dkt. 22406].

Agreements; *provided, however*, that the Court shall have nonexclusive jurisdiction over such matters."[365]

Allstate fails to explain how Article 10.9 or any other provisions for retention of jurisdiction are overbroad or violate the law. None do. Critically, as Allstate acknowledges, Article 10.9 provides that the Court will retain <u>nonexclusive</u> jurisdiction over insurance issues. Because jurisdiction is nonexclusive, this Court may abstain where insurance matters do not affect the administration of the estate or would otherwise be inappropriate for the Court to determine. In recognition of this principle, this Court has confirmed plans of reorganization where it has retained non-exclusive jurisdiction over insurance matters. *See, e.g.,* "Owens Corning Confirmation Order"[366] (providing that "the Bankruptcy Court and/or the District Court shall have concurrent rather than exclusive jurisdiction with respect to disputes relating to rights under insurance polices issued to OCD that are included in the OC Asbestos Personal Liability Insurance Assets."); "Kaiser Aluminum Plan, Article XII"[367] (stating that "the Bankruptcy Court will have concurrent rather than exclusive jurisdiction with respect to disputes relating to rights under insurance policies included in the PI Insurances Assets."); *see also* Babcock & Wilcox Plan, Article 9.10 (providing that the court could "hear and determine matters concerning insurance; provided, however, that the Court shall have nonexclusive jurisdiction over such

---

[365] *Id.* (emphasis in the original).

[366] Order Confirming the Sixth Amended Joint Plan of Reorganization for Owens Corning and its Affiliated Debtors and Debtors-in-Possession (as Modified), Dkt. No. 19366, *In re Owens Corning, et al.*, No. 00-03837 (JKF), at *58 (Bankr. D. Del. Sept. 26, 2006).

[367] Second Amended Joint Plan of Reorganization of Kaiser Aluminum Corporation, Kaiser Aluminum & Chemical Corporation and Certain of their Debtor Affiliates, Dkt. No. 7312, *In re Kaiser Aluminum Corp.*, No. 02-10429 (JKF), at *64 (Bankr. D. Del. Sept. 7, 2005), confirmed February 6, 2006 [Dkt. No. 8225].

matters."), confirmed on January 18, 2006.[368] Because the Joint Plan provisions contemplate a

modest retention of jurisdiction that is in keeping with applicable law, the Court should overrule

Allstate's objection.

### D.    EDWARDS CLAIMANTS' OBJECTION

Aaron C. Edwards, James T. Beam, Edward E. Storey, John M. Thomas, and Sheila

Martin, individually and as Administratrix of the Estate of Jessie J. Williamson, Deceased, and

as Representative of the Wrongful Death Beneficiaries (collectively, the "Edwards Claimants")

obtained a judgment and award of damages against Grace in the matter of *Aaron C. Edwards et*

*al. v. Pittsburgh Corning Corp. et al.*, Cause No. B-150,896-J, slip. op. (Tex. D. Ct. March 28,

2000) (the "Edwards Judgment").[369] Grace subsequently appealed the Edwards Judgment, and

FFIC posted a supersedeas bond promising to indemnify the Edwards Claimants in the event that

Grace fails to pay any resulting final judgment (the "Bond"). As a consequence of the Debtors'

chapter 11 filings, Grace's appeal of the Edwards Judgment remains stayed pending

confirmation, and the Edwards Judgment has yet to become final and non-appealable.[370]

In their objection to the Joint Plan, the Edwards Claimants argue that the language of

section 5.2(a) of the Asbestos PI TDP generates uncertainty as to the treatment of claims based

---

[368] Order Confirming the Joint Plan of Reorganization as of September 28, 2005, as Amended Through January 17, 2006, Dkt. No. 7053, *In re Babcock & Wilcox Company*, Bankr. Case No. 00-10992 (Bankr. E.D. La.), confirmed by the district court for the Eastern District of Louisiana, Case No. 0558 (E.D. La. Jan. 18, 2006).

[369] The Edwards Judgment was rendered on a jury verdict awarding the Edwards Claimants actual damages in excess of (i) $4.85 million for Aaron C. Edwards, (ii) $3.25 million for James T. Beam, (iii) $3.25 million for Edward E. Storey, (iv) $3.1 million for John M. Thomas, and (v) $2.45 million for Sheila Martin. These damage awards far exceed the Maximum Values provided in the Asbestos PI TDP for comparable claims. Asbestos PI TDP § 5.3(b)(3).

[370] At the time that the Texas Court of Appeals suspended the appeal, Grace had filed its opening appellate brief. No other proceedings had taken place.

on the Edwards Judgment and secured by the Bond (collectively, the "Edwards Claims").   In

pertinent part, section 5.2(a) of the Asbestos PI TDP provides:

> **Processing and Payment.**    As soon as practicable after the
> Effective Date, the PI Trust shall pay, upon submission by the
> claimant of the appropriate documentation, all PI Trust Claims that
> were liquidated . . . (ii) by a jury verdict or non-final judgment in
> the tort system obtained prior to the Petition Date, <u>provided there is
> no supersedeas bond associated with such verdict or judgment,</u> [or]
> (iii) by a judgment that became final and non-appealable prior to
> the Petition Date . . . ([together with PI Trust Claims liquidated by
> other specified means] **"Pre-Petition Liquidated Claims"**).

(Emphasis added.)  The Edwards Claimants assert that this language, which plainly excludes the

Edwards Claims from the definition of Pre-Petition Liquidated Claims, raises the specter that the

Edwards Claims will be unintentionally deemed Unliquidated PI Trust Claims and processed

pursuant to section 5.3 of the Asbestos PI TDP.  The Edwards Claimants' point is well-taken.

Their proposed solution, on the other hand, is not.

The Edwards Claimants argue that the treatment of the Edwards Claims should be

clarified by removing the clause "provided there is no supersedeas bond associated with such

verdict or judgment" (the "Supersedeas Bond Clause") from section 5.2(a).  Eliminating the

Supersedeas Bond Clause, however, would effectively nullify the marshalling requirement of

section 5.2(b) of the Asbestos PI TDP.  Section 5.2(b) provides:

> **Marshalling of Security.**    Holders of Pre-Petition Liquidated
> Claims that are secured by . . . appeal bonds . . . shall first exhaust
> their rights against any applicable security or surety before making
> a claim against the PI Trust. Only in the event that such security or
> surety is insufficient to pay the Pre-Petition Liquidated Claim in
> full shall the deficiency be processed and paid as a Pre-Petition
> Liquidated Claim.

Absent the Supersedeas Bond Clause, the Edwards Claims would be deemed Pre-Petition

Liquidated Claims.   In keeping with section 5.2(b), the Edwards Claimants could then

prematurely seek to exhaust their rights under the Bond before prosecuting the pending appeal.

When FFIC inevitably takes the position that it need not pay on the Bond because the Edwards

Judgment is not yet a final judgment, the Edwards Claimants could claim against the Asbestos PI

Trust for the deficiency – *i.e.,* the full amount of the Edwards Claims – needlessly depleting the

Asbestos PI Trust's assets.[371]

To preserve section 5.2(b)'s marshalling requirement, while at the same time clarifying

the treatment of the Edwards Claims, the Plan Proponents contemplate a plan change that would

restate section 5.2(a), in pertinent part, as follows:

> **Processing and Payment.** As soon as practicable after the
> Effective Date, the PI Trust shall pay, upon submission by the
> claimant of the appropriate documentation, all PI Trust Claims that
> were liquidated . . . (ii) by a jury verdict or non-final judgment in
> the tort system obtained prior to the Petition Date, provided there is
> no **letter of credit, appeal bond,** supersedeas bond **or other
> security or surety (collectively, "Security")** associated with such
> verdict or judgment, [or] (iii) by a judgment that ~~became~~is final
> and non-appealable ~~prior to the Petition Date~~. . . ([together with PI
> Trust Claims liquidated by other specified means] "**Pre-Petition
> Liquidated Claims**").

(Double underline indicating insertion; strikethrough indicating deletion.)   Under this revised

version of section 5.2(a), the Edwards Claims still would not be deemed Pre-Petition Liquidated

Claims in the first instance.    The Edwards Claims could eventually become Pre-Petition

Liquidated Claims, however, only if the Edwards Claimants successfully prosecute the pending

appeal, and the Edwards Judgment becomes final and non-appealable.

---

[371] Grace believes that it has a very strong position on appeal.  5/15/09 Dep. Tr.(Richard Finke) at 283:10-12.
Grace's appellate brief sets forth fourteen separate grounds justifying reversal, including the fact that one of the
twelve jurors failed to reveal (i) during voir dire that she and her husband were actively preparing to file an
asbestos personal injury lawsuit against Grace, and (ii) later, during trial, that she and her husband actually filed
the suit.

The Plan Proponents believe that the contemplated plan change will adequately clarify the treatment of the Edwards Claims under the Asbestos PI TDP. Because the Edwards Claimants otherwise consent to treatment as Pre-Petition Liquidated Claims subject to the marshalling requirement of section 5.2(b),[372] this change should fully resolve the Edwards Claimants' objection.

### E.    ANDERSON MEMORIAL'S OPT-OUT ARGUMENT LACKS MERIT.

Anderson Memorial's argument that the Joint Plan violates an opt-out right related to the ZAI Settlement is without merit. Specifically, Anderson Memorial argues that "although the ZAI settlement purports to provide for opt-out rights for claimants who elect not to participate in the class settlement, those rights are effectively illusory because under the Joint Plan, opt-out ZAI claimants are subject to the same exact treatment as the ZAI class members."[373]

This argument completely misconceives the architecture of the Joint Plan as it relates to Class 7B. While the ZAI settlement was a class settlement, the Joint Plan's treatment of Class 7B is not a class settlement, rather, it is a chapter 11 Bankruptcy Code resolution of the rights of all US ZAI PD Claimants. The concept of "opt-out" right is simply not relevant to or implicated by any provision of chapter 11. Indeed, an opt-out right would be directly contrary to the Bankruptcy Code's provisions that substantially similar claims be classified within the same class and that a plan provide the same treatment for each claim of a particular class.[374] Thus, this Court should overrule Anderson Memorial's objection with respect to a purported Class 7B opt-out right.

---

[372] *See* Edwards Claimants' Objection at 12.

[373] *See* Anderson Memorial Trial Brief at 30.

[374] *See* 11 U.S.C. §§ 1122(a), 1123(a)(4).

F.    **KANEB'S OBJECTIONS REGARDING THE SCOPE OF THE DISCHARGE ARE UNFOUNDED.**

Kaneb Pipe Line Operating Partnership ("Kaneb") seeks to preserve certain alleged rights to assert setoff and recoupment in certain Texas State Court appellate litigation with the Debtors.[375] Kaneb failed to file a proof of claim in these chapter 11 cases and, thus, it has no right to seek affirmative relief from the Debtors. The Debtors have already conceded that they do not contest that the discharge under the Joint Plan will not prevent Kaneb from asserting its alleged defenses to the claims being pursued by the Debtors against Kaneb in the Texas Litigation. As a result, Kaneb apparently is seeking some sort of "belts and suspenders" finding from the Court in that regard. This is unnecessary.

Kaneb also argues that its alleged indemnity claims against the Debtors for cost of environmental remediation under a fully performed 1992 Merger Agreement may not be discharged because the Merger Agreement is an executory contract.[376] As has already been demonstrated to the Court, the Merger Agreement is not executory. There were no material obligations to be performed by each party as of the petition date. Further, whether the Merger Agreement is executory, is not a plan issue. The only issue before the Court is whether the discharge provisions of the Joint Plan comply with the Bankruptcy Code and are consistent with Third Circuit precedent. Nothing in section 8.1 of the Joint Plan seeks to discharge the Debtors' obligations under assumed executory contracts.

Finally, Kaneb argues that it has certain alleged rights under Grace insurance policies for environmental cost recovery and that the discharge should not prohibit Kaneb from pursuing its

---

[375] Kaneb Pipe Line Trial Brief, dated July 13, 2009 [Dkt. No. 22417].

[376] Kaneb Tr. Br. at 4-6 [Dkt. No. 21707].

monetary claims in the Texas appeal nominally in order to recover under any insurance policy.[377]
The issue that Kaneb raises is not a discharge issue. It is an insurance coverage issue, as
addressed by this Court earlier this year in conjunction with Kaneb's previous lift stay
motion.[378] As articulated in the Phase I briefing and further discussed in the Plan Proponents'
Insurance Trial brief filed herewith, the Joint Plan is insurance neutral. Thus, once the Joint Plan
is confirmed, to the extent that Kaneb has insurance coverage claims, those claims may be
addressed by the appropriate court in the appropriate insurance coverage litigation. The
discharge does not affect such litigation. However, if the insurance being pursued is property of
the estate for which the proceeds are being transferred to the Asbestos PI Trust, the Asbestos PI
Trust will ultimately be the party in interest in that litigation, not the Debtors. Thus, Kaneb's
objections are without merit and should be overruled.

## XV.    THE JOINT PLAN COMPLIES WITH ALL OTHER REQUIREMENTS FOR CONFIRMATION SET FORTH IN SECTIONS 1122, 1123, 1129, AND 524(g) OF THE BANKRUPTCY CODE

### A.    THE PLAN PROPONENTS HAVE COMPLIED WITH THE DISCLOSURE AND SOLICITATION PROVISIONS OF THE BANKRUPTCY CODE -- 11 U.S.C. § 1129(a)(2).

Section 1129(a)(2) of the Bankruptcy Code requires that a plan proponent "compl[y] with
the applicable provisions of [title 11]." 11 U.S.C. § 1129(a)(2). Generally, the inquiry under
Section 1129(a)(2) focuses on whether the plan proponent has complied with the disclosure and
solicitation requirements of Section 1125 of the Bankruptcy Code. *See* H.R. Rep. No. 595, 95th
Cong., 1st Sess. 412 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6368; S. Rep. No. 989, 95th

---

[377] *Id.*

[378] *See* Transcript of proceedings of April 27, 2009 [Dkt. No. 21627].

Cong. 2d Sess. 126 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5912 (Section 1129(a)(2)

"requires that the proponent of the plan comply with the applicable provisions of chapter 11,

such as § 1125 regarding disclosure"); *In re Johns-Manville Corp.*, 68 B.R. 618, 630 (Bankr.

S.D.N.Y. 1986), *aff'd,* 78 B.R. 407 (S.D.N.Y. 1987), *aff'd sub nom. Kane v. Johns-Manville*

*Corp.*, 843 F.2d 636 (2d Cir. 1988).

The Disclosure Statement is detailed and sufficient.  By order entered March 9, 2009, this

Court, after notice and a hearing, approved the Disclosure Statement as providing "adequate

information" within the meaning of Section 1125 of the Bankruptcy Code.  Solicitation

requirements were also met.  As part of the Disclosure Statement Order, this Court approved the

form of Ballots, voting and tabulation procedures, and the contents and manner of service of the

solicitation packages containing the approved Disclosure Statement and the approved Ballots.

As set forth in the R.R. Donnelley and BNC Group Certificate of Service filed with the Court on

June 1, 2009, the Solicitation Packages were served in accordance with the Voting Procedures

Order.  The Notice of Confirmation Hearing published in the Wall Street Journal and various

other publications with broad readership constituted good, adequate and sufficient notice of the

Confirmation Hearing in compliance with due process requirements.[379]

### B.    THE JOINT PLAN DOES NOT CONTAIN ANY RATE CHANGES SUBJECT TO THE JURISDICTION OF ANY GOVERNMENTAL REGULATORY COMMISSION -- 11 U.S.C. § 1129(a)(6).

Section 1129(a)(6) of the Bankruptcy Code requires that any regulatory commission

having jurisdiction over the rates charged by the reorganized debtor in the operation of its

---

[379] *See* Affidavit of Publication, reflecting dates and locations of the publications of Confirmation Hearing Notice, dated June 3, 2009 [Dkt. No. 21974].

business approve any rate change provided for in the plan. The Joint Plan does not provide for any such rate changes, therefore, this requirement is met.

### C.    THE JOINT PLAN PROVIDES FOR PAYMENT OF PRIORITY CLAIMS -- 11 U.S.C. § 1129(a)(9).

Section 1129(a)(9) requires, with some exceptions, that unless the holder agrees otherwise, holders of priority claims must receive cash in the allowed amount of their claim on the effective date of a plan. Articles 2 and 3 of the Joint Plan provide accordingly (*see also* Article 2.1.1 of the Joint Plan in terms of Administrative Expense Claims and 2.1.2 of the Joint Plan in terms of Tax Claims), in compliance with the Bankruptcy Code. *See* 11 U.S.C. § 1129(a)(9)(A) through (C).

### D.    IF CLASSES ARE IMPAIRED, AT LEAST ONE IMPAIRED CLASS HAS ACCEPTED THE JOINT PLAN -- 11 U.S.C. § 1129(a)(10).

Section 1129(a)(10) of the Bankruptcy Code requires that, if a class of claims is impaired under a plan, at least one class of impaired claims must have voted to accept the plan. *See* 11 U.S.C. § 1129(a)(10). As discussed above, impaired Classes 6, 7B, and 8 have voted to accept the Joint Plan. Accordingly, section 1129(a)(10) of the Bankruptcy Code is satisfied.

### E.    ALL STATUTORY FEES WILL BE PAID -- 11 U.S.C. § 1129(a)(12).

Section 1129(a)(12) of the Bankruptcy Code requires that certain fees listed in 28 U.S.C. § 1930 be determined by the Court at the confirmation hearing and paid or otherwise paid on the Effective Date of the Joint Plan. Such fees incurred through confirmation of the Joint Plan have been or will be paid by the Debtors during the pendency of these cases. The Joint Plan provides for the payment on the Effective Date of any then unpaid statutory fees. *See* Article 11.3 of the Joint Plan.

## F.     THE JOINT PLAN PROVIDES FOR THE CONTINUATION OF RETIREE BENEFITS -- 1129(a)(13).

Section 1129(a)(13) of the Bankruptcy Code requires that a "plan provide[] for the continuation after the effective date of payment of all retiree benefits . . . for the duration of the period the debtor has obligated itself to provide such benefits." 11 U.S.C. § 1129(a)(13).

Section 8.1.6 of the Joint Plan makes clear that the Joint Plan does not release claims, if any, under the Pension Plans, and that the Reorganized Parent will continue to be the continuing sponsor of the Pension Plans.

Accordingly, the Plan Proponents have complied with Section 1129(a)(13) of the Bankruptcy Code.  Indeed, the Pension Benefit Guaranty Corporation has analyzed this treatment and has not objected to the Joint Plan.

## G.     THE JOINT PLAN PROPERLY CLASSIFIES CLAIMS UNDER SECTION 1123(a)(1) AND (2).

In compliance with Section 1123(a)(1) of the Bankruptcy Code, the Joint Plan designates classes of claims and interests (other than claims of a kind specified in Bankruptcy Code Sections 507(a)(1), 507(a)(2) or 507(a)(7)).  The classifications are as follows:[380]

- Class 1 -- Priority Claims.  The Bankruptcy Code specifically provides for separate classification of Priority Claims.

- Class 2 -- Secured Claims.  The Bankruptcy Code likewise specifically provides for separate classification of Secured Claims.

- Class 3 -- Employee Benefit Claims

- Class 4 -- Workers' Compensation Claims.

- Class 4 -- Unsecured Trade Claims.

- Class 5 -- Intercompany Claims.

---

[380] *See* Joint Plan at § 3.1.

- <u>Class 6 -- Asbestos PI Trust Claims</u>. This class consists of all Asbestos PI Trust Claims against the Debtors including Asbestos PI Claims (which include CDN ZAI PI Claims and Indirect Asbestos PI Claims).

- <u>Class 7A -- Asbestos PD Claims (excluding US ZAI PD Claims)</u>. This class consists of all U.S. Asbestos Property Damage ("PD") Claims against the Debtors including Asbestos PD Claims and Indirect Asbestos PD Claims (if any).

- <u>Class 7B -- US ZAI PD Claims</u>. This class consists of all US ZAI PD Claims against the Debtors.

- <u>Class 8 -- CDN ZAI PD Claims</u>. This class consists of all CDN ZAI PD Claims.

- <u>Class 9 -- General Unsecured Claims</u>.

- <u>Class 10 -- Equity Interests in the Parent</u>.

- <u>Class 11 -- Equity Interests in Debtors Other than the Parent.</u>

The Joint Plan further complies with the requirement of Section 1123(a)(2) of the

Bankruptcy Code that a plan "specify any class of claims or interests that is not impaired under

the Plan" by specifying that Classes 1, 2, 3, 4, 5, 7A, 9, and 11 are unimpaired under the Joint

Plan and are conclusively presumed to accept the Joint Plan.[381]

## H.     THE JOINT PLAN PROVIDES THAT THE REORGANIZED DEBTORS' CHARTERS WILL PROHIBIT THE ISSUANCE OF NONVOTING EQUITY SECURITIES -- 11 U.S.C. § 1123(a)(6).

Section 1123(a)(6) further provides that a plan must "provide for the inclusion in the

charter of the debtor . . . a provision prohibiting the issuance of nonvoting equity securities . . ."

11 U.S.C. § 1123(a)(6). The Debtors have filed draft amended charters that comply with the

---

[381] *Id.* at § 6.3.

requirement contained in section 1123(a)(6) of the Bankruptcy Code, which will be filed with the respective states of incorporation of all of the Debtors once the Joint Plan goes effective.[382]

### I.    THE JOINT PLAN COMPLIES WITH PROVISIONS REGARDING DIRECTORS, OFFICERS, TRUSTEES AND INSIDERS -- 11 U.S.C. § 1123(a)(7)

Section 1123(a)(7) of the Bankruptcy Code requires that a plan "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan and any successor to such officer, director or trustee." The Debtors have disclosed the identity and affiliations of those individuals who are proposed to serve, after consummation of the Joint Plan, as officers and directors of the Reorganized Debtors.[383]  With respect to trustees of the Asbestos PI Trust, the trustees have been disclosed.[384]  With respect to the trustees of the Asbestos PD Trust, the Plan Proponents will disclose the identity of the trustees in connection with the Confirmation Hearing.  The Bankruptcy Court's involvement in the appointment of Trustees and the approval of the Reorganized Debtors' directors and officers is consistent with the interests of creditors and equity security holders and with public policy, and accordingly, the Plan Proponents have complied with section 1123(a)(7) of the Bankruptcy Code.

### J.    THE JOINT PLAN COMPLIES WITH SECTION 1123(b) WITH RESPECT TO PERMISSIVE PROVISIONS.

Section 1123(b) of the Bankruptcy Code permits the inclusion of a broad variety of other provisions, including any "provision not inconsistent with the applicable provisions" of the

---

[382]  Plan Supplement dated May 8, 2009 [Dkt. No. 21594].

[383]  Plan Supplement dated May 8, 2009 and amended Plan Supp. dated May 15, 2009 [Dkt. No. 21706].

[384]  The Asbestos PI Trustees are proposed as Harry Huge, Lewis Sifford, and Dean Trafelet.

Bankruptcy Code. 11 U.S.C. § 1123(b)(6). The Debtors submit that each of the other provisions

of the Joint Plan satisfies Section 1123(b) (and any other applicable provisions of the Bankruptcy

Code), including the impairment and unimpairment of classes of Allowed Claims and Equity

Interests (section 1123(b)(1); Article 3 of the Joint Plan) and the assumption or rejection of

certain executory contracts and unexpired leases (section 1123(b)(2); Article 9 of the Joint Plan).

Other provisions of the Joint Plan are permissible pursuant to the authority granted in

Section 1123(b)(6) of the Bankruptcy Code, which permits a plan to include other provisions not

inconsistent with the applicable provisions of title 11, including, without limitation, the

provisions of the Joint Plan relating to the Asbestos PI Channeling Injunction and the Asbestos

PD Channeling Injunction under section 524(g) of the Bankruptcy Code, as well as the

Bankruptcy Court's retention of jurisdiction as to specified issues pursuant to Article 10 of the

Joint Plan.. 11 U.S.C. § 1123(b)(6).

## K.    CERTAIN § 524(g) REQUIREMENTS ARE NOT IN DISPUTE

As previously discussed, the Joint Plan meets the remaining requirements of section

524(g). Certain provisions of section 524(g) are not in dispute. The Trusts will assume Grace's

liabilities allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing

products.[385] The Trusts will use their assets to pay asbestos claims.[386] The testimony of Denise

Martin and Mark Peterson will prove that the actual amounts, numbers, and timing of future

asbestos-related demands cannot be determined.[387] Grace will provide evidence proving that the

---

[385] *See* 11 U.S.C. § 524(g)(2)(B)(i)(I); Joint Plan §§ 8.2, 8.3; Asbestos PI Trust Distribution Procedures at Exhibit 4 in Exhibit Book to Disclosure Statement and Joint Plan.

[386] *See* 11 U.S.C. § 524(g)(2)(B)(ii)(II); Asbestos PI Trust Distribution Procedures at Exhibit 4 in Exhibit Book to Disclosure Statement and Joint Plan.

[387] *See* 11 U.S.C. § 524(g)(2)(B)(ii)(II).

pursuit of asbestos claims outside the procedures prescribed by the Joint Plan will threaten the Joint Plan's purpose to deal equitably with asbestos claims, including "future demands,"[388] namely, the testimony of David Austern, the Honorable Alexander M. Sanders, Jr., and Elihu Inselbuch, Esq. As explained throughout this brief and as will be further demonstrated at trial, the Joint Plan's implementation of the Channeling Injunctions accords with section 524(g), and the terms of the Channeling Injunctions, including provisions barring actions against third parties, are set out in the Joint Plan and the Disclosure Statement.[389] As the voting agent will testify, through declaration or otherwise, and as discussed above, separate classes of claimants whose claims are to be channeled to the Trusts have voted at least 75% in favor of the Joint Plan.[390] Finally, during the proceedings leading to the issuance of the injunction, the court appointed legal representatives, David Austern and the Honorable Alexander M. Sanders, Jr., for the purpose of protecting the rights of persons that might subsequently assert demands.[391]

---

[388] *See* 11 U.S.C. § 524(g)(2)(B)(ii)(III).

[389] *See* 11 U.S.C. § 524(g)(2)(B)(ii)(IV)(aa).

[390] *See* 11 U.S.C. § 524(g)(B)(ii)(IV)(bb).

[391] *See* 11 U.S.C. § 524(g)(4)(B)(i); *Fed. Ins. Co. v. Grace*, No. 04-844, 2004 U.S. Dist. WL 5517843 (D. Del. Nov. 22, 2004).

## XVI.   **CONCLUSION**

For the reasons stated herein, the objections to confirmation of the Joint Plan should be overruled, and the Joint Plan should be confirmed.

Dated: August 7, 2009
Wilmington, Delaware

Respectfully submitted,

KIRKLAND & ELLIS LLP
David M. Bernick, P.C.
Theodore L. Freedman
Deanna D. Boll
Christopher Greco
Nathaniel Kritzer
601 Lexington Avenue
New York, NY  10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

and

THE LAW OFFICES OF JANET S. BAER, P.C.
Janet S. Baer, P.C.
70 W. Madison Street
Suite 2100
Chicago, IL 60602
Telephone: (312) 641-2162

and

PACHULSKI, STANG, ZIEHL & JONES LLP
James E. O'Neill (Bar No. 4042)
Timothy Cairns (Bar No. 4228)
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705
(Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400

*Counsel for the Debtors and Debtors in Possession*

157

CAMPBELL & LEVINE, LLC

Mark T. Hurford (No. 3299)
800 N. King Street, Suite 300
Wilmington, DE 19801
Telephone: (302) 426-1900
Facsimile: (302) 426-9947

and

CAPLIN & DRYSDALE, CHARTERED
Elihu Inselbuch
375 Park Avenue, 35th Floor
New York, NY 10152-3500
Telephone: (212) 319-7125
Facsimile: (212) 644-6755

Peter Van N. Lockwood
Nathan D. Finch
Jeffrey A. Liesemer
Kevin Maclay
One Thomas Circle, N.W.
Washington, D.C. 20005
Telephone: (202) 862-5000
Facsimile: (202) 429-3301

*Counsel for the Official Committee of Asbestos
Personal Injury Claimants*

PHILIPS, GOLDMAN & SPENCE, P.A.

John C. Philips (Bar No. 110)
1200 North Broom Street
Wilmington, DE 19806
Telephone:  (302) 655-4200
Facsimile:  (302) 655-4210

and

ORRICK, HERRINGTON & SUTCLIFFE LLP
Roger Frankel
Richard H. Wyron
Jonathan P. Guy
Debra L. Felder
1152 15th Street, NW
Washington, DC 20005
Telephone: (202) 339-8400
Facsimile: (202) 339-8500

*Counsel for David T. Austern, Asbestos PI Future
Claimants' Representative*

159

SAUL EWING LLP

Teresa K.D. Currier (Bar No. 3080)
222 Delaware Avenue, Suite 1200
P.O. Box 1266
Wilmington, DE 19899
Telephone: (302) 421-6800
Facsimile: (302) 421-6813

and

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Philip Bentley
Gregory Horowitz
Douglas Mannal
1177 Avenue of the Americas
New York, NY 10022
Telephone: (212) 715-9100
Facsimile: (212) 715-8000

*Counsel for the Official Committee of Equity Security
Holders*