# Exhibit A

## AMENDED AND RESTATED SETTLEMENT AGREEMENT

This Amended and Restated Settlement Agreement (hereinafter the "Amended Agreement" is made as of the Execution Date by and among W.R. GRACE & CO. (hereinafter referred to as "Grace") and certain LONDON MARKET INSURANCE COMPANIES identified on Attachment A hereto (hereinafter referred to collectively as the "Party Insurers") (Grace and the Party Insurers being referred to hereinafter collectively as the "Parties").

### WITNESSETH THAT:

WHEREAS, the Party Insurers, along with other insurers that are not parties to this Amended Agreement, severally subscribed to certain liability insurance policies in favor of Grace as more fully set forth and identified on Attachment B hereto (the insurance policies subscribed to by the Party Insurers identified on Attachment B hereinafter are referred to as the "Subject Insurance Policies"); and

WHEREAS, Grace has incurred, and the Trust (as defined below) may incur in the future certain liabilities, expenses or losses that might impact the products liability aggregate limits of the Subject Insurance Policies including claims, proceedings and actions made, asserted or filed, or which may in the future be made, asserted or filed, against Grace or the Trust by numerous claimants alleging bodily injury arising out of exposure to asbestos or asbestos-containing materials; and

WHEREAS, the Party Insurers provided excess or umbrella liability coverage to Grace pursuant to the Subject Insurance Policies for various periods during the years 1966 to 1985; and

WHEREAS, Grace has demonstrated to the satisfaction of the Party Insurers that the applicable products liability aggregates of the primary insurance policies issued to Grace by Continental Casualty Company (CNA), Maryland Casualty Company, Royal Indemnity Company, General Insurance Company of America and Travelers Casualty and Surety Company (f/k/a The Aetna Casualty and Surety Company) have been fully and properly exhausted; and

WHEREAS, Grace and the Party Insurers previously entered into a Confidential Settlement Agreement dated November 17, 1995 (the "1995 Agreement"); and

WHEREAS, Grace and the Party Insurers had satisfied all of their respective obligations under the 1995 Agreement prior to April 4, 2001; and

WHEREAS, on or about April 4, 2001, Grace and various affiliated companies filed voluntary petitions under Chapter 11 of the United States Bankruptcy Code in the United States District Court for Delaware, In re W.R. Grace & Co., et al., No. 01-01139 (JKF) (the "Bankruptcy Case"), and they continue to operate their businesses as debtors and a debtors-in-possession; and

WHEREAS, the proposed plan of reorganization in the Bankruptcy Case contemplates the creation of the Trust under Bankruptcy Code Section 524(g) to direct the processing, liquidation and payment of claims for bodily injury due to exposure to asbestos or asbestos-containing materials; and

WHEREAS, the Parties disagree regarding the extent to which their respective

rights and obligations under the 1995 Agreement will continue to apply in the event that a plan of reorganization is approved in the Bankruptcy Case; and

WHEREAS, Party Insurers have filed objections to the confirmation of the plan of reorganization proposed by Grace and other proponents of the plan of reorganization in the Bankruptcy Case; and

WHEREAS, the Parties wish to fully and finally compromise and resolve their disputes regarding the application of the Parties' rights and obligations under the 1995 Agreement to the changed circumstances occasioned by the filing of the Bankruptcy Case by amending the 1995 Agreement and entering into such supplemental agreements as are necessary in light of such changed circumstances; and

WHEREAS, this Amended Agreement is strictly a business accommodation, unrelated to the merits of the respective claims of the Parties hereto, subject to a complete reservation of rights as to matters not specifically resolved by this Amended Agreement, and without prejudice to their respective positions on policy wording or coverage pursuant to the Subject Insurance Policies; and

WHEREAS, the Parties acknowledge that this Amended Agreement is not intended to govern all claims for which Grace or the Trust may in the future seek coverage from the Party Insurers under the Subject Insurance Policies or otherwise;

NOW, THEREFORE, in consideration of the foregoing and of the mutual agreements herein contained, and subject to the terms and conditions set forth below, and intending to be legally bound, the Parties agree as follows:

## I.    SCOPE OF AGREEMENT

This Amended Agreement sets forth an arrangement among the Parties under the Subject Insurance Policies by which the Party Insurers shall reimburse the Trust for their several shares of amounts paid by the Trust for Defense Costs and Indemnity Payments in connection with Bodily Injury Claims (as defined below) that constitute Asbestos PI Claims (as defined below).  This Amended Agreement shall not affect the rights and obligations of the Parties under the Subject Insurance Policies with respect to insurance coverage for claims that are not Bodily Injury Claims, except as provided in Section X with respect to the release of claims subject to the products/completed operations hazard in accordance with that Section.   Grace and the Party Insurers continue to reserve all of their rights with respect to claims that are outside of the scope of the 1995 Agreement and this Amended Agreement.

## II.    DEFINITIONS

The following definitions shall apply to the listed terms wherever those terms appear in this Amended Agreement, as well as in any exhibits or attachments hereto.  Moreover, each defined term stated in a singular form shall include the plural form, and each defined term stated in a plural form shall include the singular form, and each defined term stated in the masculine form or in the feminine form shall include the other.  Section and subsection numbers used in this Amended Agreement refer to sections and subsections of this Amended Agreement unless otherwise specifically stated.

A.    1995 Agreement

"1995 Agreement" means the Confidential Settlement Agreement entered into between Grace and the Party Insurers dated 17 November, 1995.

B.    Approval Order

"Approval Order" means an order of the Bankruptcy Court, to be entered in the Bankruptcy Case, in form and substance satisfactory to the Parties, pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure, approving this Amended Agreement and the compromise and settlement memorialized herein.

C.    Asbestos Insurance Policy

"Asbestos Insurance Policy" has the meaning set forth in the Joint Plan of Reorganization.

D.    Asbestos Insurance Settlement Agreement

"Asbestos Insurance Settlement Agreement" has the meaning set forth in the Joint Plan of Reorganization.

E.    Asbestos PI Channeling Injunction

"Asbestos PI Channeling Injunction" has the meaning set forth in the Joint Plan of Reorganization.

F.    Asbestos PI Claim

"Asbestos PI Claim" has the meaning set forth in the Joint Plan of Reorganization.

G.    <u>Bankruptcy Case</u>

"Bankruptcy Case" means <u>In re W.R. Grace & Co., et al.</u>, No. 01-1139 (JKF) and the other bankruptcy cases that are jointly administered under Case No. 01-00139, including any appeals of decisions in the Bankruptcy Case.

H.    <u>Bankruptcy Code</u>

"Bankruptcy Code" means Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, as amended from time to time.

I.    <u>Bankruptcy Court</u>

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware and, to the extent it exercises jurisdiction over the Bankruptcy Case, the United States District Court for the District of Delaware.

J.    <u>Bell Curve Allocation Method</u>

"Bell Curve Allocation Method" shall mean the percentages set forth in Attachment D for allocating Defense Costs paid by the Grace Group or the Trust for certain specified types of Bodily Injury Claims.

K.    <u>Bodily Injury Claims</u>

"Bodily Injury Claim" shall mean any claim, demand, suit, action or request for relief or action, or any portion of same, that seeks monetary damages or other payment or relief from any member of the Grace Group or the Trust for bodily injury alleged to have been caused,

in whole or in part, by exposure to asbestos-containing materials manufactured, sold or distributed by any member of the Grace Group or any of its licensees; except as follows:

1.     Claims or lawsuits brought against the Grace Group or the Trust by former Grace Group employees under any workers' compensation statute, occupational disease law or law of similar import or any claim or lawsuit brought by anyone else for contribution or indemnity, or other legal relief, arising out of bodily injury suffered by current or former Grace Group employees in the course and scope of their employment with the Grace Group shall not be considered Bodily Injury Claims for purposes of this Amended Agreement.

2.     Claims against the Grace Group or the Trust which do not arise out of products liability, including but not limited to claims by or on behalf of individuals who allege that they were injured as a result of exposure to asbestos at premises owned or operated by the Grace Group shall not be considered Bodily Injury Claims for purposes of this Amended Agreement.

3.     The Parties reserve all of their respective rights under the Subject Insurance Policies with respect to the claims described in subsections (1) and (2) of this Section immediately above, and such claims shall not be considered within the scope of this Amended Agreement notwithstanding that such claims may arise out of exposure to asbestos-containing materials.

L.    Committee

"Committee" means the Official Committee of Asbestos Personal Injury Claimants appointed in the Bankruptcy Case.

M.    Confirmation Order

"Confirmation Order" means an order entered by the District Court in the Bankruptcy Case confirming the Joint Plan of Reorganization or affirming or reissuing the order of the Bankruptcy Court confirming the Joint Plan of Reorganization.

N.    Debtors

"Debtors" has the meaning set forth in the Joint Plan of Reorganization.

O.    Defense Costs

"Defense Costs" shall mean all fees, expenses and costs, as defined in the Subject Insurance Policies, incurred by the Grace Group in connection with defending Asbestos-Related Claims or by the Trust in defending Bodily Injury Claims. The Parties agree that such fees, expenses and costs shall include but are not limited to all attorneys' fees, costs and expenses; experts' fees, costs and expenses; court fees, costs and expenses; costs and expenses for responding to requests for production of documents; costs and expenses for storing documents produced in response to a request for production of documents or otherwise compiled in connection with defending Asbestos-Related Claims; except that Defense Costs shall not include the Grace Group's general overhead, administrative or internal expenses, expenses incurred by the Trust in the administration of the Trust, or any costs incurred by the Grace Group or the Trust in connection with the litigation, negotiation or resolution of insurance coverage issues.

P.    <u>Effective Date</u>

"Effective Date" has the meaning set forth in the Joint Plan of Reorganization.

Q.    <u>Execution Date</u>

"Execution Date" means the first date on which both W.R. Grace & Co. and Party Insurers have executed this Amended Agreement.

R.    <u>Final Order</u>

"Final Order" means an order or judgment (including any modification or amendment thereof) that remains in effect and has not been reversed, vacated, stayed or amended and as to which the time to appeal or seek review, rehearing or writ of certiorari has expired and as to which no appeal or petition for review, reconsideration, rehearing or certiorari has been taken or, if taken, remains pending.

S.    <u>Futures Representative</u>

"Futures Representative" means David Austern, the Asbestos PI Future Claimants' Representative appointed, for each Debtor, by Orders of the Bankruptcy Court dated May 24, 2004, and any successor to him.

T.    <u>Grace and Grace Group</u>

1.    "Grace" shall mean W. R. Grace & Co.

2.    "Grace Group" shall mean Grace, the past and present subsidiaries and affiliates of Grace, the predecessors and successors of such subsidiaries and affiliates, the directors, officers, agents and employees of Grace and of

such subsidiaries and affiliates, and any other entity that was insured under the Subject Insurance Policies (including endorsements), and those insureds' subsidiaries, affiliates, successors, directors, officers, agents and employees.

U.      Grace Product

"Grace Product" shall mean any asbestos-containing product manufactured, handled, sold or distributed by the Grace Group, or for which the Grace Group faces liability exposure.

V.      Indemnity Payments

"Indemnity Payments" shall mean the amounts paid by the Trust to holders of Asbestos PI Claims with respect to Bodily Injury Claims (but not to holders of Indirect PI Trust Claims) pursuant to the Trust Distribution Procedures.

W.      Insurance Policies

1.      "Subject Insurance Policies" shall mean all of the insurance policies listed on Attachment B hereto.

2.      "Excess Insurance Policies" shall mean all of the excess and umbrella insurance policies, including but not limited to the Subject Insurance Policies, that were issued to Grace and were in effect prior to July 1, 1985 and did not contain "asbestos exclusions". Attachment C sets forth a schedule of all Excess Insurance Policies, including the Subject Insurance Policies, showing the remaining available products liability coverage under each such policy as of April 4, 2001, after allocating costs reimbursed by Party Insurers, other London

Market insurers and other Grace Group insurers to the Grace Group for claims settled and expenses incurred prior to April 4, 2001.

    X.    <u>Joint Plan of Reorganization</u>

        "Joint Plan of Reorganization" means the First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code of W.R. Grace & Co., et al., the Official Committee of Asbestos Personal Injury Claimants, the Asbestos PI Future Claimants Representative, and the Official Committee of Equity Security Holders Dated February 27, 2009, including all exhibits thereto, as such plan may be modified from time to time.

    Y.    <u>Party Insurers</u>

        "Party Insurers" shall mean those London Market Insurance Companies that are identified on Attachment A hereto.

    Z.    <u>Person</u>

        "Person" means an individual, a corporation, a partnership, a joint venture, an association, a joint stock company, a limited liability company, a limited liability partnership, an estate, an unincorporated organization, a trust, a class or group of individuals, or any other entity or organization, including any federal, state or local governmental or quasi-governmental body or political subdivision, department, agency or instrumentality thereof.

    AA.    <u>Settled Asbestos Insurance Company</u>

        "Settled Asbestos Insurance Company" has the meaning set forth in the Joint Plan of Reorganization.

BB.    Triggered-Policy Years (Bodily Injury Claims)

"Triggered Policy Years" for a Bodily Injury Claim means every policy year effective in whole or in part during the period beginning on the date on which the injured person was first exposed to a Grace Product and ending on the date on which the person's disease first became known (i.e., the earliest of the date of diagnosis, death, claim or suit); provided, however, that for purposes of allocating Defense Costs with respect to Bodily Injury Claims under this Amended Agreement, "Triggered Policy Years" shall not include any policy year in which the Grace Group does not have insurance coverage for Bodily Injury Claims, whether as a result of exhaustion of policies, "asbestos exclusions" contained in policies, or because such coverage never existed, as set forth on Attachment C.  The determination of the date of an injured person's first exposure to a Grace Product shall be based upon the following factors set forth in decreasing order of preference:

1.    The first date of the injured person's actual exposure to a Grace Product that is alleged to have caused the person's injury, based upon objective facts available to Grace or the Trust; or

2.    The first date of the injured person's claimed exposure to a Grace Product that is alleged to have caused the person's injury, as set forth in the complaint or other claim documentation, or as reflected by other information reasonably available to Grace or the Trust.

CC.    <u>Trust</u>

"Trust" means the "Asbestos PI Trust" as defined in the Joint Plan of Reorganization, or such other trust as may be established under Section 524(g) of the Bankruptcy Code to process and pay Asbestos PI Claims pursuant to a plan of reorganization filed by Grace, the Committee and the Futures Representative.

DD.    <u>Trust Distribution Procedures</u>

"Trust Distribution Procedures" means the WRG Asbestos PI Trust Distribution Procedures substantially in the form attached as Exhibit 4 to the Joint Plan of Reorganization.

## III.    <u>EXHAUSTION OF INSURANCE COVERAGE</u>

The Parties agree and acknowledge (A) that the applicable products liability aggregates of the primary insurance policies issued to Grace by Continental Casualty Company (CNA), Maryland Casualty Company, Royal Indemnity Company, General Insurance Company of America and Travelers Casualty and Surety Company (f/k/a The Aetna Casualty and Surety Company) have been fully and properly exhausted without regard to any payment being made pursuant to this Amended Agreement; and (B) that for purposes of this Amended Agreement, Grace's remaining insurance coverage for Bodily Injury Claims shall be deemed to exist only in the years, and only in the amounts, set forth on Attachment C.

## IV.    DETERMINATION OF TRIGGERED POLICY YEARS AND ALLOCATION OF DEFENSE COSTS FOR BODILY INJURY CLAIMS

Defense Costs paid after April 4, 2001 with respect to Bodily Injury Claims shall be allocated among the Subject Insurance Policies and all other Excess Insurance Policies in accordance with the following procedures:

A.    The Trust shall determine, subject to review and audit by the Party Insurers, the Triggered Policy Years for each individual injured person and all Defense Costs paid by the Grace Group or the Trust with respect to the Bodily Injury Claims regarding such injured person shall be allocated equally among such Triggered Policy Years.  Such allocation shall be included with each quarterly bill submitted to the Party Insurers by the Trust pursuant to Section VII.  By "allocate equally", the Parties mean the following:

1.    For each individual Bodily Injury Claim the total sum of Defense Costs for which the Trust seeks reimbursement on a quarterly bill shall be spread among the Triggered Policy Years.  The Parties acknowledge that law firms defending the Grace Group or the Trust on multiple Bodily Injury Claims may submit a single bill covering multiple cases and that the Trust will allocate such Defense Costs equally among all open cases defended by each such law firm.  The Party Insurers agree to accept such allocation for purposes of this Amended Agreement.

2.    Defense Costs for a Bodily Injury Claim allocable to a Triggered Policy Year shall be allocated to the lowest layer Excess Insurance Policy with remaining products liability coverage for such Triggered Policy Year.

Upon exhaustion of the lowest layer Excess Insurance Policy for a Triggered Policy Year, Defense Costs allocable to such Triggered Policy Year shall be allocated to the next layer Excess Insurance Policy with remaining products liability coverage for such Triggered Policy Year. When all layers of insurance in a Triggered Policy Year have been exhausted, Defense Costs allocable to such Triggered Policy Year shall be reallocated to the remaining Triggered Policy Years in proportion to the respective shares of Defense Costs for such claim allocable to each remaining Triggered Policy year.

3.    Consistent with the foregoing, no allocation shall be made to an Excess Insurance Policy that expires before the date of first exposure to a Grace Product or to an Excess Insurance Policy that incepts after the date of diagnosis, death or date of filing of the claim, whichever is earliest. If, however, the Trust does not have sufficient information to determine Triggered Policy Years for an injured person, the Defense Costs for Bodily Injury Claims regarding such injured person shall be allocated to each year within the period 1957 to 1985 (the "Coverage Block") that has remaining products liability insurance coverage in accordance with Attachment D. When all policies in a year become exhausted, the percentage allocated to said year shall be reallocated to other years with remaining aggregate limits. Once the Triggered Policy Years become known for such injured person, future Defense Costs for Bodily Injury

Claims regarding such injured person shall be allocated only to Triggered Policy Years; but any Defense Costs which had previously been included on a quarterly bill submitted by the Trust to the Party Insurers shall not be reallocated.

4.    The allocation of Defense Costs for Bodily Injury Claims shall reflect (1) the time on risk for each Excess Insurance Policy to which Defense Costs for a Bodily Injury Claim are to be allocated (in order to account for policies having a term of less than a full year and situations in which only a portion of a policy's term is triggered by a claim), and (2) the participation percentage of each Excess Insurance Policy in the applicable layer of insurance coverage.

5.    Defense Costs for a Bodily Injury Claim shall not be allocated to any Triggered Policy Year in which the products liability aggregate limits of all Excess Insurance Policies have been exhausted.  After such exhaustion, any Defense costs which would otherwise be allocable to such Triggered Policy Year shall be reallocated to all other Triggered Policy Years in proportion to the respective shares of Defense Costs for such claim allocable to each remaining Triggered Policy Year.

B.    Allocation to each Triggered Policy Year of Defense Costs for Bodily Injury Claims shall be made notwithstanding the presence of insurer insolvencies or refusals by the insurers of triggered Excess Insurance Policies to make payments in connection with such

claims. If any insurer fails to reimburse the Trust for that insurer's allocation of Defense Costs as determined under this Amended Agreement, then the Trust and not any Party Insurer shall be responsible for that particular unreimbursed allocation. Wherever the Trust is deemed to be responsible under this Amended Agreement for an insurer's unreimbursed allocation of any Indemnity Payments, such insurer shall be deemed to have paid such allocation for purposes of determining the exhaustion of policy limits of the Excess Insurance Policy to which such allocation was made. Nothing in this Amended Agreement shall be construed to in any way limit the Trust's ability to enforce its rights against any such non-paying insurer.

C.      Where an allocation of Defense Costs is made to an Excess Insurance Policy that is not a Subject Insurance Policy and such Excess Insurance Policy has available, non-exhausted products liability coverage, the allocation will be treated, for purposes of this Amended Agreement, as if it shall be paid under such Excess Insurance Policy up to its available limits, even if the insurer that issued such policy declines to pay the allocation established by this Amended Agreement.

D.      The amount of Defense Costs paid by the Grace Group or the Trust after April 4, 2001 shall be determined without regard to any amounts already received by the Grace Group or the Trust, or received by the Grace Group or the Trust in the future, from other insurers, whether as a result of settlement agreements or otherwise. The Trust shall be responsible for the share of Defense Costs allocated for purposes of this Amended Agreement to Excess Insurance Policies that are otherwise attributable to an insurer that is not a Party Insurer, including but not limited to those insurers with whom Grace or the Trust has entered into settlement agreements.

E.      The Parties recognize that, in some instances, the Trust may initially be required to rely on allegations in the complaint or other claim documentation to determine Triggered Policy Years for Defense Costs with respect to particular injured persons. In such circumstances, the Trust shall, as soon as practicable, establish, by cost-effective means, objective evidence of the first date of actual exposure to a Grace Product and the date of diagnosis or death for such injured person.   In the event that the complaint or other claim documentation contains insufficient information for the Trust to determine Triggered Policy Years for Defense Costs, Defense Costs for the Bodily Injury Claims with regard to such injured person shall be allocated among all years in the Coverage Block that have remaining products liability insurance coverage in accord with the Bell Curve Allocation Method.  When all policies in a year become exhausted, the percentage allocated to said year shall be reallocated to other years with remaining aggregate limits.

## V.      DETERMINATION OF TRIGGERED POLICY YEARS AND ALLOCATION OF INDEMNITY PAYMENTS (BODILY INJURY CLAIMS)

Indemnity Payments paid after April 4, 2001 with respect to Bodily Injury Claims shall be allocated among the Subject Insurance Policies and all other Excess Insurance Policies in accordance with the following procedures:

A.      The Trust shall determine, subject to review and audit by the Party Insurers, the Triggered Policy Years for each individual injured person by obtaining documentation which confirms the presence of a compensable asbestos-related disease or injury, as well as documentation confirming exposure by the injured person to a Grace Product.  The Trust shall obtain and retain the documentation required by the Trust Distribution Procedures.  In the

absence of other objective evidence, the Trust shall require each injured person to provide: (a) an affidavit stating the first date of exposure to a Grace Product which is alleged to have caused the injury or disease; (b) competent medical evidence that the injured person has sustained bodily injury; and (c) where necessary due to the absence of objective evidence, an affidavit that states the date of diagnosis or death.

B.    Once the Trust has determined the Triggered Policy Years for an individual injured person, all Indemnity Payments paid by the Grace Group or the Trust with respect to the Bodily Injury Claims regarding such injured person shall be allocated equally among such Triggered Policy Years. Such allocation shall be included with each quarterly bill submitted to the Party Insurers by the Trust pursuant to Section VII. By "allocate equally", the Parties mean the following:

1.    For each individual Bodily Injury Claim the total sum of Indemnity Payments for which the Trust seeks reimbursement on a quarterly bill shall be spread among the Triggered Policy Years.

2.    Indemnity Payments allocable to a Triggered Policy Year shall be allocated to the lowest layer Excess Insurance Policy for such Triggered Policy Year. Upon exhaustion of the lowest layer Excess Insurance Policy for a Triggered Policy Year, Indemnity Payments allocable to such Triggered Policy Year shall be allocated to the next layer Excess Insurance Policy for such Triggered Policy Year. When all layers of insurance for a Triggered Policy Year have been exhausted, Indemnity

Payments allocable to such Triggered Policy Year shall be borne by the Trust.

3.   Consistent with the foregoing, no allocation shall be made to an Excess Insurance Policy that expires before the date of first exposure to a Grace Product or to an Excess Insurance Policy that incepts after the date of diagnosis, death or date of filing of the claim, whichever is earliest.

4.   The allocation of Indemnity Payments for Bodily Injury Claims shall reflect (1) the time on risk for each Excess Insurance Policy to which Indemnity Payments for a Bodily Injury Claim are to be allocated (in order to account for policies having a term of less than a full year and situations in which only a portion of a policy's term is triggered by a claim), and (2) the participation percentage of each Excess Insurance Policy in the applicable layer of insurance coverage.

C.   Allocation to each Triggered Policy Year of Indemnity Payments for Bodily Injury Claims shall be made notwithstanding the presence of insurer insolvencies or refusals by the insurers of triggered Excess Insurance Policies to make payments in connection with such claims. If any insurer fails to reimburse the Trust for that insurer's allocation of Indemnity Payments as determined under this Amended Agreement, then the Trust and not any Party Insurer shall be responsible for that particular unreimbursed allocation. Wherever the Trust is deemed to be responsible under this Amended Agreement for an insurer's unreimbursed allocation of any Indemnity Payments, such insurer shall be deemed to have paid such allocation

for purposes of determining the exhaustion of policy limits of the Excess Insurance Policy to which such allocation was made. Nothing in this Amended Agreement shall be construed to in any way limit the Trust's ability to enforce its rights against any such non-paying insurer.

D.    Where an allocation of Indemnity Payments is made to an Excess Insurance Policy that is not a Subject Insurance Policy and such Excess Insurance Policy has available, non-exhausted products liability coverage, the allocation shall be treated, for purposes of this Amended Agreement, as if it will be paid under such Excess Insurance Policy up to its available limits, even if the Insurer that issued such policy declines to pay the allocation established by this Amended Agreement.

E.    The amount of Indemnity Payments paid by the Grace Group or the Trust after April 4, 2001 shall be determined without regard to any amounts already received by the Grace Group or the Trust, or received by the Grace Group or the Trust in the future, from other insurers, whether as a result of settlement agreements or otherwise. The Trust shall be responsible for the share of Indemnity Payments allocated for purposes of this Amended Agreement to Excess Insurance Policies and to Subject Insurance Policies that are otherwise attributable to an insurer that is not a Party Insurer, including but not limited to those insurers with whom Grace or the Trust has entered into settlement agreements.

## VI.   CLAIMS HANDLING PROCEDURES

A.    The Party Insurers authorize the Trust to handle all Bodily Injury Claims pursuant to the provisions of this Amended Agreement, provided such claim handling is in accordance with the Trust Distribution Procedures.

B.    Each of the Party Insurers hereby appoints, Mendes & Mount, LLP as the representative and agent of such Party Insurer (the "Designated Representative") through whom all actions of the Party Insurers relating to the handling of Bodily Injury Claims are to be taken, and to whom all communications by the Trust to the Party Insurers concerning the handling of Bodily Injury Claims may be directed.

C.    The Trust agrees to obtain and retain documents supporting all claims for reimbursement, and the Party Insurers shall have the right, upon reasonable notice, to review the Trust's files relating to both Defense Costs and Indemnity Payments for Bodily Injury Claims. Notwithstanding the foregoing, the Trust shall not be obligated to provide the Social Security Identification Number of any holder of an Asbestos PI Claim beyond the last four digits. Further, the Trust shall not be obligated to collect any information that it is not otherwise obligated to collect. The results of Party Insurers' review of the Trust's files shall not affect Party Insurers' obligations under this Amended Agreement or permit Party Insurers to challenge the allowance or payment of any Asbestos PI Claim by the Trust, unless, and only to the extent that, the Trust's allowance or payment of any Asbestos PI Claim was not in accordance with the Trust Distribution Procedures.

D.      Grace will continue to provide Party Insurers, through Mendes & Mount, LLP, with quarterly reports of new filings of Bodily Injury Claims, including listings of claims paid during the quarter.

E.      Party Insurers shall keep any reports or other information obtained from the Trust pursuant to this Section VI and Section VII (the "Material") confidential, and shall not disclose Material except to their reinsurers or retrocessionaires, or as otherwise necessary in connection with proceedings to obtain reinsurance with respect to amounts paid pursuant to this Amended Agreement, or to their accountants or counsel, or to a governmental authority as required by law, subject to reasonable assurances that the Persons to whom the Material is disclosed will maintain the confidentiality of the Materials.  Party Insurers may use the Material solely in connection with the Bankruptcy Case, the implementation of this Amended Agreement, any proceeding to obtain reinsurance with respect to amounts paid pursuant to this Amended Agreement, as required to comply with applicable laws or regulations, or for any other internal purpose related to the Bodily Injury Claims presented by the Trust under this Amended Agreement, and shall not create or use a database based on the Material for any other purpose.

F.      Nothing in this Amended Agreement obligates any Party Insurer to make payments on the Trust's behalf, as opposed to reimbursing the Trust, for monies the Trust has paid for Defense Costs and Indemnity Payments.

VII.    **PAYMENT OF INDEMNITY AMOUNTS**

A.      On a quarterly basis, the Trust shall submit a billing to the Party Insurers, identifying Defense Costs and Indemnity Payments for Bodily Injury Claims within the scope of

this Amended Agreement that have been paid by the Trust during the period covered by the billing. The Trust shall bill Party Insurers for Party Insurers' allocated share of the amounts actually paid by the Trust with respect to Asbestos PI Claims at the prescribed Payment Percentage as set forth in Section IV of the Trust Distribution Procedures. Said billing shall clearly identify for each Bodily Injury Claim the name of the claimant or injured person, the Triggered Policy Year(s), the amount of any Indemnity Payments and any Defense Costs paid in connection therewith (or allocated thereto in accordance with this Amended Agreement) during the period covered by the billing. The billings shall further allocate the Indemnity Payments and Defense Costs to each of the Subject Insurance Policies that is within the scope of this Amended Agreement and shall allocate Indemnity Payments and Defense Costs to Grace in accordance with this Amended Agreement.

B.    The Trust will allocate payments to the Excess Insurance Policies and Subject Insurance Policies in the same order that actual payments for Bodily Injury Claims are made by the Trust during the quarter.

C.    Within thirty (30) days after receipt by Mendes & Mount, LLP of a billing setting forth the information specified in subsection A of this Section, the Party Insurers shall make payments to the Trust in an amount equal to their respective shares of the total amount of the Defense Costs and Indemnity Payments shown on such billing. Party Insurers, through Mendes & Mount, LLP will advise the Trust in writing of the identity of each Party Insurer making payment, together with that Party Insurer's share of the total payment, with each transmittal of funds to the Trust. If any Party Insurer fails to pay its share of such payment to Grace within

sixty (60) days of such receipt, such Party Insurer shall pay interest to Grace on the unpaid amount thereof with interest for the period commencing on the thirty-first day after receipt of such billing and ending on the date of payment at the rate of interest announced from time to time by the main office of Citibank N. A. in New York, NY as its "prime rate" plus three percentage points. Any such interest payments shall not be counted in determining whether the products liability aggregate limits of any of the Subject Insurance Policies have been exhausted and shall be in addition to such limits. Should any Party Insurer dispute any portion of the billing, it shall pay the undisputed portion within thirty (30) days of receipt of the billing and shall notify the Trust in writing that it disputes all or a portion of the billing. Interest as set forth in this paragraph shall continue to accrue on any disputed amounts which Party Insurers become obligated to pay.

D.    All payments by the Party Insurers to Grace shall be made pursuant to written instructions provided by the Trust to the Party Insurers through Mendes & Mount, LLP.

E.    Notwithstanding Section VII(C) above, Party Insurers shall not be required to make payments to the Trust in excess of (1) $5,000,000.00 during the first twelve (12) months following the Effective Date; (2) $5,000,000.00 during the second twelve (12) months following the Effective Date; (3) $4,000,000.00 during the third twelve (12) months following the Effective Date; and (4) $3,000,000.00 during each twelve-month period thereafter. Party Insurers will pay amounts billed to Party Insurers in excess of the amounts set forth in (1) through (4) above, as applicable, to the Trust during the following twelve-month period, subject to the maximum amount applicable to that period, and such excess amounts, if any, shall continue to roll over to

the next period until they are fully paid. Party Insurers shall not be obligated to pay interest on any amounts in excess of annual caps that roll over to subsequent periods, provided that payment is otherwise timely made. For the avoidance of doubt, nothing in this Section VII(E) shall reduce the total amount Party Insurers are obligated to pay under Section VII(C) of this Amended Agreement. If, at any time after the Execution Date, a Party Insurer reaches a separate settlement agreement with Grace or the Trust, the annual maximum set forth in (1) through (4) above will be reduced by the share that would otherwise have been billed to that Party Insurer during the applicable period. In addition, the annual maximum set forth in (1) through (4) above will be reduced by the allocated share of any Party Insurer that, following the Execution Date, becomes insolvent or enters into a scheme of arrangement, whether solvent or insolvent. Notwithstanding the foregoing, in the event a Party Insurer reaches a separate settlement agreement with Grace or the Trust, or becomes insolvent or enters into a scheme of arrangement, that Party Insurer shall not be entitled to the protection of an annual maximum allocated share as set forth in (1) through (4) unless Grace and/or the Trust and such Party Insurer reach a separate agreement to that effect.

F.     The Trust shall not seek reimbursement from Party Insurers, and Party Insurers shall have no obligation to make payment to the Trust or to any third party, with respect to (1) any asbestos-related claims that are not Bodily Injury Claims, or (2) any expenses incurred by the Trust in administering the Trust.

G.     The Party Insurers shall not have the right to seek reimbursement of any payments made to Grace under the 1995 Agreement or to the Trust pursuant to this Amended Agreement,

whether by way of contribution, subrogation, reimbursement, indemnification or otherwise, from any Person, other than the Party Insurers' reinsurers in their capacities as such. Notwithstanding the foregoing, if another insurer of the Grace Group pursues a claim sounding in contribution, subrogation, reimbursement, indemnification or otherwise, against any Party Insurer, then such Party Insurer will be free to assert a claim sounding in contribution, subrogation, reimbursement, indemnification or otherwise against such other insurer, to the extent permitted by the Plan. To the extent that the Party Insurer recovers a judgment or settlement against such other insurer with respect to a payment made under the 1995 Agreement or this Amended Agreement, the net proceeds thereof (i.e. less any fees, costs and expenses incurred by Party Insurer in prosecuting and defending such claim) will be distributed promptly to Grace or, after the Effective Date, to the Trust. Grace and the Trust will use their reasonable best efforts to obtain from all insurers with which they settle disputes regarding coverage for Asbestos PI Claims agreements similar to the conditions set forth in this Section VII(G).

H.    Following the Effective Date, in the event that

   1.    Grace, the Trust and/or any other Person becomes entitled to receive a payment from one or more of the insurers other than Party Insurer for any claims that have been released and discharged as against Party Insurer pursuant to this Amended Agreement; and

   2.    As a result of such other insurer's obligation to pay described in Section VII(H)(1) above, such insurer either:

a.    enters into a settlement with Party Insurer, which settlement has been consented to by Grace or the Trust and any other Person (as applicable), requiring Party Insurer to reimburse some or all of the payment made or to be made by such insurer; or

b.    obtains a final, non-appealable judicial or quasi-judicial determination or award entitling such insurer to obtain a sum certain from Party Insurer for contribution, subrogation or indemnification or other similar claim, against Party Insurer for the latter's alleged share or equitable share, or to enforce subrogation rights, if any, relating to such payment referenced in Section VII(H)(1) above,

the Person entitled to receive such payment shall voluntarily reduce the amount of payment to be received by such Person by the amount necessary to reduce or eliminate such settlement, determination or award against Party Insurer.  To ensure that such a reduction is accomplished, Party Insurer shall be entitled to assert this Section VII(H) as a defense to any action against it for any such portion of the determination or award against Party Insurer and shall be entitled to have the court or appropriate tribunal issue such orders as are necessary to effectuate the reduction to protect Party Insurer from any liability for the determination or award.  In any proceeding against other insurers in which Grace or the Trust makes a claim for insurance rights or benefits for any claim that may give rise to the events referenced in Section VII(H)(1) above, notice will be provided to Party Insurer of such claim within thirty (30) days of the time Grace or the Trust first becomes aware that such claim is reasonably likely to result in a claim against

Party Insurer and shall consent to Party Insurer's intervention in any such proceeding to effectuate the intent of this Section VII(H).

## VIII.    LIMITATION OF POLICIES TO WHICH ALLOCATIONS CAN BE MADE

A.    The Trust expressly agrees that no Defense Costs or Indemnity Payments shall be allocated to insurance policies subscribed to by certain underwriters at Lloyd's, London and certain London market insurance companies in place during the time period October 20, 1959 to October 20, 1962 ("1959-1962 Policies") for claims that arise out of asbestos-containing products manufactured, handled, sold or distributed by the Zonolite Company ("Zonolite") or its subsidiaries or licensees.  Party Insurers likewise reserve all of their rights with respect to said claims.

B.    The Trust expressly reserves its rights to seek coverage under the 1959-1962 Policies for claims arising out of all Grace Products other than those asbestos-containing products manufactured, handled, sold or distributed by the Zonolite Company ("Zonolite") or its subsidiaries or licensees.

## IX.    SEVERAL LIABILITY

A.    Each Party Insurer agrees to pay only its individual respective subscribed share of any payments due under this Amended Agreement and shall only be liable for its respective, several share of such Indemnity Payments and Defense Costs as provided for in this Amended Agreement.

B.     The Parties acknowledge that the obligations of the Party Insurers subscribing to the Subject Insurance Policies are several, and not joint obligations.  The Parties agree that (1) no Party Insurer shall be liable for any amounts allocable under this Amended Agreement to any other Party Insurer, including any non-paying or insolvent subscriber, or any non-paying and/or insolvent companies subscribing to the Subject Insurance Policies and (2) the Trust shall not seek to recover from any individual Party Insurer on the basis of this Amended Agreement an amount in excess of such Party Insurer's subscribed share of the Subject Insurance Policies, other than interest which may be due pursuant to this Amended Agreement.

C.     Nothing in this Amended Agreement shall be construed to affect or impair any right or remedy Grace or the Trust may have to recover against any Party Insurer an amount in excess of such Party Insurer's allocated share under this Amended Agreement based upon a separate, independent guarantee, assumption agreement or similar agreement between such Party Insurer and Grace or the Trust, or based upon an insurance policy other than the Subject Insurance Policies.

## X.     RELEASE

As each individual Party Insurer pays its subscribed share of the products/completed operations aggregate limit of a Subject Insurance Policy, Grace, on behalf of itself and the Debtors, and the Trust agree that such Party Insurer is fully released and discharged from any other claim under said Policy which is within the scope of the products/completed operations hazards.

Grace, on behalf of itself and the Debtors, and the Trust hereby waive and forever discharge any and all claims which they may have, arising under common or statutory law, against the Party Insurers for breach of the covenant of good faith and fair dealing (including however else a claim of "bad faith" or for "extra-contractual damages" may be characterized) in connection with the losses and/or payments within the scope of this Amended Agreement, arising at any time in the past up to and including the date of this Amended Agreement.

## XI.    CONFIDENTIALITY

A.    The Parties agree that all information relating to the negotiation of this Amended Agreement (collectively referred to in this Amended Agreement as the "Information," except that such term does not include information that is or becomes available other than as a result of an act or omission of any of the Parties) shall be confidential and are not to be disclosed except as follows:

1.    The fact that the Parties have entered into this Amended Agreement may be disclosed to any Person;

2.    The Information may be disclosed as necessary to obtain an Approval Order from the Bankruptcy Court;

3.    The Information may be disclosed by order of court, or pursuant to a written agreement of the Parties;

4.    The Information may be disclosed by a Party Insurer to its reinsurers, directly or through intermediaries;

5.      Grace, the Committee, the Futures Representative or the Trust may disclose the Information to other insurers and their representatives;

6.      The Information may be disclosed to outside auditors or accountants of any Party or to the Inland Revenue or Internal Revenue Service;

7.      The Information may be disclosed to representatives of any insurer subscribing or allegedly subscribing to one or more of the Subject Insurance Policies, including an insurer that is, has been or may become insolvent in the future including, without limitation, any liquidators, provisional liquidators, scheme administrators, trustees or similarly empowered persons or entities;

8.      A Party may disclose the Information to its accountants, to its counsel, to underwriters in connection with offerings of securities to be issued by such Party and to counsel for such underwriters; and

9.      The Information may be disclosed in any action brought to enforce the terms of this Amended Agreement;

provided, however, that a Party making disclosure of any of the Information pursuant to one of the exceptions set forth in clauses (3) through (8) above shall inform any Person to which such disclosure is made of the confidential nature of the Information and of the understanding upon which it has been disclosed and shall use reasonable efforts to obtain the agreement of such Person to hold the Information in confidence.

B.    A Party may describe and/or make reference to this Amended Agreement to the extent that such disclosure is required to comply with any statute, rule or other requirement of any government or governmental agency or other authority.  Without limiting the foregoing, the Parties agree that Grace may describe and/or make reference to this Amended Agreement in a Current Report on Form 8-K, a Quarterly Report on Form 10-Q, an Annual Report on Form 10-K or any other report or filing that, on advice of counsel, Grace is required to make pursuant to the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended, and in any financial statements and/or related notes included or incorporated by reference in any such report or filing.

C.    In the event a court, litigant or governmental body requests or requires disclosure of anything protected by this paragraph, the Party from whom disclosure is sought shall immediately give written notice to the other Party in order to allow each Party to take such protective steps as may be appropriate.

D.    Material protected by this Section shall be deemed to fall within the protection afforded compromises and offers of compromise by Rule 408 of The Federal Rules of Evidence and similar provisions of state law or state rules of court.

## XII.    INDEMNIFICATION

A.    From and after the Effective Date, the Trust shall indemnify and hold the Party Insurers harmless at all times from and against any and all liability, loss, cost or expense whenever arising (except as otherwise provided in subsections B, D, E and H of this Section) imposed upon or incurred by any Party Insurer as a result of any known or unknown, past,

pending, future, or threatened claims, rights, demands, lawsuits, causes of action or proceedings that are asserted, initiated or continued by Grace or the Trust or any Person not a party to this Amended Agreement against such Party Insurer that are based upon the Subject Insurance Policies and constitute Asbestos PI Claims that are subject to the Asbestos PI Channeling Injunction. (The matters for which the Trust is obligated pursuant to this Section to indemnify and hold harmless the Party Insurers are hereinafter referred to as "Indemnifiable Claims".)

B.    The Trust's obligation to indemnify a Party Insurer for Indemnifiable Claims shall be subject to an aggregate limit equal to the aggregate amount reimbursed to Grace and/or the Trust by such Party Insurer for Defense Costs and Indemnity Payments under the 1995 Agreement and this Amended Agreement. Once the Trust has paid or incurred liabilities, losses, costs and expenses (including, but not limited to, fees and disbursements of counsel) for all Indemnifiable Claims of such Party Insurer in an amount equal to the amount previously reimbursed to Grace and/or the Trust by such Party Insurer, the Trust shall not be obligated to continue to defend such Party Insurer and may elect to turn over to the Party Insurer full control of all pending actions and proceedings the defense of which the Trust has assumed pursuant to this Section.

C.    As soon as practicable after receipt by a Party Insurer of notice of any complaint or the commencement or continuation of any action or proceeding that constitutes an Indemnifiable Claim, such Party Insurer shall notify the Trust in writing of such Indemnifiable Claim and shall tender the defense thereof to the Trust.

D.      Any failure by the Party Insurers to promptly notify the Trust of any Indemnifiable Claim, or to tender the defense thereof to the Trust, shall relieve the Trust from any indemnification obligation with respect thereto.

E.      After the Trust receives any notice of an Indemnifiable Claim pursuant to subsection C of this Section, the Trust shall promptly notify the Party Insurers whether the Trust will assume the defense of the Party Insurer(s) against such Indemnifiable Claim.  If the Trust elects to assume the defense of such Indemnifiable Claim, the Trust shall select counsel to represent the Party Insurers (which may include counsel presently representing Grace) and the Trust shall assume the payment of the fees and disbursements of such counsel; except that (1) the Trust shall not be required to pay the fees and disbursements of more than one law firm for all Party Insurers in any jurisdiction in any single action or proceeding, and (2) the Trust's selection of counsel to represent the Party Insurers shall be subject to the consent of the Party Insurers, which consent shall not be unreasonably withheld.  In any action or proceeding in which the Trust assumes the defense of a Party Insurer, such Party Insurer shall have the right to participate in such litigation and to retain its own counsel at such Party Insurer's own expense.

F.      The Trust and the Party Insurers shall consult to the extent practicable about all decisions to be made, either procedural or substantive, by counsel retained on behalf of the Party Insurers pertaining in any material manner defense of any Indemnifiable Claim.  In the event the Parties are unable to agree, the final decision with respect to the defense of the Party Insurers, either procedural or substantive shall rest with the Trust, except that the Trust shall allow the Party Insurers complete control over the positions asserted in the interpretation of the language

of the Subject Insurance Policies. The Trust shall keep the involved Party Insurers apprised in a timely manner of all significant developments in such defense and shall provide the Party Insurers at the Party Insurers' request, status reports that advise Party Insurers of such developments.

G.    Any settlement or compromise made by the Trust on behalf of any Party Insurer with respect to an Indemnifiable Claim shall not require such Party Insurer's approval, but shall provide that it is not an admission of liability by such Party Insurer and is without precedent beyond the scope of the matters addressed by such compromise or settlement. The Trust shall give notice and provide reasonable and timely disclosure as soon as is practicable to the Party Insurers of any proposed settlement or compromise. The Party Insurers shall have such time as is practicable to review the proposed settlement or compromise and to present their views to the Trust. The Trust shall make reasonable efforts to accommodate the Party Insurers before agreeing to any settlement or compromise. The Party Insurers shall not dispute any decision that was lawful and that was reasonably made within the discretion of the Trust. The Trust shall use best efforts to keep such settlement or compromise confidential.

H.    If the Trust declines to assume the defense of any Indemnifiable Claim, or fails to assume such defense in a timely manner, then the Party Insurer may employ and exclusively direct counsel to defend against such Indemnifiable Claim, and the Trust shall pay the reasonable fees and disbursements of such counsel; provided, however, that the Trust shall not be required to pay the fees and disbursements of more than one law firm for all Party Insurers in any jurisdiction in any single action or proceeding. If the Party Insurers settle any such

Indemnifiable Claim without previously obtaining the Trust's consent, which consent shall not be unreasonably withheld, then the Trust shall be relieved of any obligation to indemnify the Party Insurers for such settlement. The Party Insurers shall use reasonable efforts to keep such settlement or compromise confidential.

I.      Nothing herein shall constitute any waiver of each Party Insurer's attorney-client privilege, which privilege shall extend only to such counsel retained to represent such Party Insurer and shall not extend to the Trust or its counsel unless specifically waived by such Party Insurer in writing with reference to a particular attorney-client communication.

J.      The Party Insurers and the Trust shall cooperate reasonably with each other to protect their respective interests with respect to Indemnifiable Claims. If the Trust has assumed the defense of any action or proceeding the Party Insurers shall comply in a timely manner with the Trust's appointed counsel's requests for access to documentation or information requested by the Trust's appointed counsel for purposes of defense. The Trust shall cooperate with the Party Insurers to avoid taking any positions in such litigation which are adverse to the general business interests of the Party Insurers. If the Trust has failed or declined to assume the defense of any action or proceeding, the Trust shall comply in a timely manner with any Party Insurer's requests for access to documentation or information requested by Party Insurers for purposes of such defense.

K.      For the avoidance of doubt, amounts paid by the Trust pursuant to this Section to or on behalf of Party Insurers in connection with Indemnified Claims shall be paid in full and

shall not be subject to any Payment Percentage as described in Section IV of the Trust Distribution Procedures.

## XIII.  PUNITIVE DAMAGES

The Party Insurers shall have no obligation under the Subject Insurance Policies or otherwise to reimburse or indemnify the Grace Group or the Trust for the portion of any judgment that constitutes fines, penalties, punitive or exemplary damages, or any damages where the amount is a multiple of the compensatory damages.  (Such fines, penalties, punitive, exemplary damages or multiple damages are hereinafter referred to collectively as "Punitive Damages".)

## XIV.  BANKRUPTCY-RELATED OBLIGATIONS

A.    Committee and Futures Representative Approval.  By executing this Amended Agreement, Party Insurers confirm receipt of written approval by the Committee and Futures Representative of this Amended Agreement and the releases contained herein.

B.    Approval Motion.  Promptly following the Execution Date, Grace will prepare and file a motion seeking entry of the Approval Order with the Bankruptcy Court, which motion will be in form and substance satisfactory to the Parties.  Grace will use its reasonable best efforts promptly to obtain entry of the Approval Order, and promptly to obtain entry of the Approval Order as a Final Order.  Party Insurers, at their own expense, will cooperate with Grace in obtaining the Approval Order.

C.    Order. Grace will use its reasonable best efforts to cause the Bankruptcy Court to enter an order providing, among other things:

1.    that the terms of this Amended Agreement are approved in their entirety, and that Grace is authorized to take all actions necessary to implement and effectuate the terms of the Amended Agreement;

2.    that this Amended Agreement will be designated an Asbestos Insurance Settlement Agreement and that Party Insurers will be designated Settled Asbestos Insurance Companies with respect to the Subject Insurance Policies and the claims released herein; and

3.    that the Trust, upon its creation, will be bound to the provisions of this Amended Agreement with the same force and effect as if the Trust was a Party to this Amended Agreement from the Execution Date.

D.    No Modification of Asbestos PI Channeling Injunction.    Grace and, upon its creation, the Trust, covenant that:

1.    From and after the Effective Date, they will take no action to terminate, reduce or limit the scope of the Asbestos PI Channeling Injunction so as to materially and adversely affect Party Insurers, except in accordance with Section XIV(E) below; and

2.    To the extent that they seek any other injunction with respect to insurance companies that are similarly situated to Party Insurers, they will use reasonable best efforts to include Party Insurers within the scope of such injunction.

E.    <u>Withdrawal of Settled Asbestos Insurance Company Designation</u>.  In the event that, at any time after the Effective Date, a Party Insurer fails to pay to the Trust its share of a billing and also fails to advise the Trust that it disputes the unpaid portion of the billing, all within thirty (30) days of receipt of a billing, as required by Section VII of this Amended Agreement, the Trust will provide the Party Insurer with written notice of default in care of Mendes Mount, LLP.  The Party Insurer to which written notice of default was provided by the Trust will have thirty (30) days from the date of receipt of the notice to cure the default or dispute the default in writing.  In the event that the Party Insurer does not cure the default or dispute the default within thirty (30) days, the Trust may withdraw the designation of that Party Insurer as a Settled Asbestos Insurance Company with respect to the Subject Insurance Policies. In the event that the Party Insurer disputes the existence of a default in writing within the prescribed thirty (30) days, the Trust and the Party Insurer shall submit the dispute to arbitration pursuant to Section XX.  In the event that the Arbitrator finds that a Party Insurer defaulted on its payment obligation under this Amended Agreement, the Trust may withdraw the designation of the Party Insurer as a Settled Asbestos Insurance Company, unless the Party Insurer cures the default within thirty (30) days of the Arbitrator's decision, or within such shorter period of time as the Arbitrator may order.  If at any time after the Trust has withdrawn the designation of a Party Insurer as a Settled Asbestos Insurance Company, the Party Insurer or Party Insurers provide documentation demonstrating that the Party Insurer in question has made payment of its outstanding respective share, the Trust shall reinstate the designation of that Party Insurer as a Settled Asbestos Insurance Company.

F.    <u>Trust as a Party</u>.  Upon the Effective Date, the Trust automatically and without need for further action will become a Party to this Amended Agreement.

G.    <u>Suspension of Bankruptcy-Related Activities</u>.  Following the Execution Date, Party Insurers (1) will suspend prosecution of all of their objections to the Joint Plan of Reorganization or plan-related documents, to confirmation of the Joint Plan of Reorganization, or to the Debtors', Committee's or Futures Representative's motions or applications pending in the Bankruptcy Case (including any appeals of decisions in the Bankruptcy Case); (2) will suspend all discovery requests and discovery-related activities; (3) will take no further actions of any nature (including filing new objections to the Joint Plan of Reorganization and initiating discovery) that may hinder, delay or oppose actions of Debtors, the Committee or the Futures Representative in the Bankruptcy Case; and (4) will not oppose the entry of a Confirmation Order; provided, however, that in the event that the Bankruptcy Court does not issue an Approval Order or the Approval Order does not become a Final Order, Party Insurers may renew prosecution of their objections, in which event any filing deadlines shall be deemed to have been tolled.  Following the Execution Date, Grace, the Committee and the Futures Representative will cease pursuing discovery from Party Insurers; provided, however, that in the event the Bankruptcy Court does not issue an Approval Order or the Approval Order does not become a Final Order, Grace, the Committee and the Futures Representative may take any actions regarding Party Insurers as are permitted by Bankruptcy Court procedure.

H.    <u>Withdrawal of Objections</u>.  Upon the Bankruptcy Court's Approval Order becoming a Final Order, Party Insurers shall withdraw all of their objections to the Joint Plan of

Reorganization or plan-related documents, to confirmation of the Joint Plan of Reorganization and to the Debtors', Committee's or Futures Representative's motions or applications pending in the Bankruptcy Case (including any appeals of decisions in the Bankruptcy Case), and expressly consent to the assignment of Asbestos Insurance Rights as provided in the Asbestos Insurance Transfer Agreement, Exhibit 6 to the Joint Plan of Reorganization; provided, however, that, if this Amended Agreement is terminated pursuant to Section XV, Party Insurers will be deemed to have reserved their rights and objections in connection with confirmation-related proceedings, including the deadlines for filings.

I.      Reservation.  Notwithstanding the foregoing, Party Insurers reserve their right to object and be heard in the Bankruptcy Case to the extent that a Person files papers or advocates a position that may cause the Bankruptcy Court to take action that would have a material adverse impact on the Party Insurers.

## XV.      **TERMINATION**

A.      After the Execution Date, this Amended Agreement shall terminate upon the occurrence of any of the following events:

> 1.      The failure of the Committee and the Futures Representative to consent in writing to the Amended Agreement within thirty (30) days of the Execution Date;

> 2.      The entry of an order of the Bankruptcy Court denying approval of this Amended Agreement or the entry of an order by the District Court reversing the Approval Order;

3.    The entry of an order by the Bankruptcy Court dismissing the Bankruptcy Case or converting it into a Chapter 7 case; or

4.    The failure of a Joint Plan of Reorganization to be confirmed, the failure of the Confirmation Order to become a Final Order, or the failure of the Effective Date to occur.

B.    After the Execution Date, Party Insurers shall have the option to terminate this Amended Agreement by providing written notice of termination to Grace, the Committee and the Futures Representative within thirty (30) days of the occurrence of any of the following events:

1.    The entry of an order that becomes a Final Order stating that Subject Insurer is not a Settled Asbestos Insurance Company or that this Amended Agreement is not an Asbestos Insurance Settlement Agreement;

2.    The confirmation of a plan of reorganization that materially and adversely affects the interests of Party Insurers under this Amended Agreement; or

3.    The modification of the Asbestos PI Channeling Injunction in such a way as to materially and adversely affect Party Insurers.

Failure by Party Insurers to give notice of the exercise of its option to terminate this Amended Agreement within thirty (30) days following the occurrence of any of the foregoing events will be deemed a permanent waiver of the option to terminate with respect to that condition.

C.    In the event that this Amended Agreement is terminated pursuant to Section XV(A) or (B):

1.      This Amended Agreement shall be of no further force and effect, and the Parties shall have no further obligations under this Amended Agreement, except the obligations set forth in Section XI, which shall survive termination; and

2.      The 1995 Agreement will remain in force and effect as if this Amended Agreement had never existed.

## XVI.  NON-PREJUDICE AND CONSTRUCTION OF AGREEMENT

A.      This Amended Agreement is intended to be and is a commercial accommodation between the Parties hereto and shall not be construed as an admission of coverage under the Subject Insurance Policies or any other policies subscribed or issued by the Party Insurers in favor of the Grace Group nor shall this Amended Agreement or any provision hereof be construed as a waiver, modification or retraction of the positions of the Parties with respect to the interpretation and application of the Subject Insurance Policies. Any allocations of responsibility for Defense Costs or Indemnity Payments made pursuant to this agreement to an insurer that is not a Party is solely for the convenience of the Parties and shall in no way affect Grace's or the Trust's rights against such other insurers or Grace's or the Trust's rights to settle its claims against such other insurers on an entirely different basis.

B.      This Amended Agreement is the product of informed negotiations and involves compromises of the Parties' previously stated legal positions. Accordingly, this Amended Agreement does not reflect upon the Parties' views as to rights and obligations with respect to matters or Persons outside the scope of this Amended Agreement. This Amended Agreement is