# EXHIBIT 6

1              IN THE UNITED STATES BANKRUPTCY COURT

2                 FOR THE DISTRICT OF DELAWARE

3

4
   In Re:                        )
5                                ) Chapter 11
   W.R. GRACE & CO., et al,      )
6                                ) Case No. 01-1139 (JKF)
            Debtors.             )
7   _____) Volume I

8

9

10
        VIDEOTAPED DEPOSITION OF ALAN C. WHITEHOUSE, M.D.

11
            Taken at the instance of the Debtors

12

13

14

15

16                                   March 19, 2009

17                                   8:30 a.m.

18                                   818 W. Riverside Avenue

19                                   Spokane, Washington

20

21

22
            BRIDGES REPORTING & LEGAL VIDEO
23            Certified Shorthand Reporters
                1312 N. Monroe Street
24            Spokane, Washington  99201
            (509) 456-0586 - (800) 358-2345
25

Page 2

```
 1          BE IT REMEMBERED that the videotaped
 2   deposition of ALAN C. WHITEHOUSE, M.D., was taken in
 3   behalf of the Debtors pursuant to the Federal Rules of
 4   Civil Procedure before William J. Bridges, Certified
 5   Shorthand Reporter for Washington, Idaho and Oregon, on
 6   Thursday, the 19th day of March, 2009, at the law offices
 7   of Evans, Craven & Lackie, 818 W. Riverside Avenue, Suite
 8   250, Spokane, Washington, commencing at the hour of 8:30
 9   a.m.
10
11          *          *          *
12
13          APPEARANCES:
14
15   For W.R. GRACE & CO.:
16
17               BRIAN THOMAS STANSBURY, ESQ.
                 Kirkland & Ellis
                 Attorneys at Law
18               655 Fifteenth Street N.W.
                 Washington, D.C.  20005
19               (202) 879-5969
                 bstansbury@kirkland.com
20
21
22               KAREN F. LEE, ESQ.
                 Kirkland & Ellis
                 Attorneys at Law
23               655 Fifteenth Street N.W.
                 Washington, D.C.  20005
24               (202) 879-5969
                 kflee@kirkland.com
25
```

Page 4

```
 1   APPEARANCES (Cont'd):
 2
 3   For Asbestos Claimants    BARNARD S. BAILOR, ESQ.
     Committee:                Caplin & Drysdale
 4                             Attorneys at Law
     (via telephone)          One Thomas Circle N.W.
 5                             Suite 1100
                               Washington, D.C.  20005
 6                             (202) 862-5049
                               bsb@capdale.com
 7
 8
 9   For Equity Committee:     DAVID E. BLABEY, JR., ESQ.
                               Kramer, Levin, Naftalis &
     (via telephone)          Frankel
10                             Attorneys at Law
                               1177 Avenue of the Americas
11                             New York, New York  10036
                               (212) 715-9248
12                             dblabey@kramerlevin.com
13
14
     For Continental Casualty  ELIZABETH M. DeCRISTOFARO
15   Company:                  Ford, Marrin, Esposito,
                               Witmeyer & Gleser
16   (via telephone)          Attorneys at Law
                               88 Pine Street
17                             23rd Floor
                               New York, New York 10005-1809
18                             (212) 269-4900
                               emdecristofaro@fmew.com
19
20
21   For Property Damage       ALAN RICH, ESQ.
     Future Claimant           Law Offices of Alan Rich
22   Representatives:          Attorney at Law
                               1401 Elm Street
23   (via telephone)          Suite 4620
                               Dallas, TX  752202
24                             (214) 744-5100
25
```

Page 3

```
 1   APPEARANCES (Cont'd):
 2
 3   For Libby claimants:      JON L. HEBERLING, ESQ.
                               McGarvey, Heberling, Sullivan &
 4                             McGarvey
                               Attorneys at Law
 5                             745 South Main
                               Kalispell, MT  59901
 6                             (406) 752-5566
                               jheberling@mcgarveylaw.com
 7
 8
 9   For Arrowwood:            TANCRED V. SCHIAVONI, ESQ.
                               O'Melveny & Myers
10                             Attorneys at Law
                               Times Square Tower
11                             7 Times Square
                               New York, New York  10036
12                             (212) 326-2000
                               tschiavoni@omm.com
13
14
15   For Future Claimants      JONATHAN P. GUY, ESQ.
     Representatives for       Orrick, Herrington & Sutcliffe
16   P.I. Claims:              Attorneys at Law
                               1152 15th Street N.W.
17   (via telephone)          Washington, D.C.  20005-1706
                               (202) 339-8516
18                             jguy@orrick.com
19
20
     For Maryland Casualty     LAURA G. STOVER, ESQ.
21   Company and Zurich        Eckert, Seamans, Cherin &
     American Insurance        Mellot
22   Company:                  Attorneys at Law
                               1747 Pennsylvania Avenue N.W.
23   (via telephone)          Washington, D.C.  20006-4604
                               (202) 659-6629
24                             lstover@eckertseamans.com
25
```

Page 5

```
 1   APPEARANCES (Cont'd)
 2
 3   For the State of          DALE R. COCKRELL, ESQ.
     Montana:                  Christensen, Moore, Cockrell,
 4                             Cummings & Axelberg
                               Attorneys at Law
 5                             145 Commons Way
                               Kalispell, MT  59901
 6                             (406) 751-6003
                               dcockrell@cmccalaw.com
 7
 8
 9
     Also present:            GREG GLOVER, videographer
10                            Bridges Reporting & Legal Video
                              1312 North Monroe
11                            Spokane, WA  99201
                              (509) 456-0586
12
13
14
                              TIM FITZSIMMONS
15
16
17
                              MORGAN ROHRHOFER
18
19
20
21
22
23          *          *          *
24
25
```

2 (Pages 2 to 5)

Page 6

I N D E X :

W.R. GRACE & CO., et al

Case No. 01-1139 (JKF)

March 19, 2009

T E S T I M O N Y

ALAN C. WHITEHOUSE                     PAGE NO:

   Examination by Mr. Stansbury          12 - 271

PRODUCTION REQUESTS:

X-rays or CT's for Raymond Siefke in Dr.          117
Whitehouse's possession or CARD Clinic's possession

Page 7

E X H I B I T S :

No:        Identification:             Page:

1   Notice of Deposition, Dr. Alan C. Whitehouse       16
    March 19, 2009

2   Libby Claimants' Preliminary Objections to         16
    First   Amended Joint Chapter 11 Plan,
    Bates 2009_08086 - 93

3   3-ring binder, Expert Report by Dr. Alan C         75
    Whitehouse, with CD's and 24 exhibits attached

4   Imaging Report, 2/23/06, St. John's Lutheran       82
    Hospital, Bates 2009-L550-512_0008177

5   Imaging Report, 4/2/08, St. John's Lutheran        83
    Hospital, Bates 2009-L550-481_0008987

6   Imaging Report, 7/7/08, St. John's Lutheran        85
    Hospital, Bates 2009-LP006_0009251

7   X-ray Report, 3/12/01, St. John's Lutheran         85
    Hospital, Bates L550-093-R-MRC-00005

8   Imaging Report, 8/11/08, St. John's Lutheran       86
    Hospital, Bates 2009-L550-015_0009095

9   Imaging Report, 6/25/07, St. John's Lutheran       89
    Hospital, Bates 2009-L550-426_0009133

10  Imaging Report, 10/27/08, St. John's Lutheran      98
    Hospital, Bates 2009-L550-219_0009172

Page 8

No:        Identification:             Page:

11  X-ray Report, 1/25/99, St. John's Lutheran         99
    Hospital, Bates L550-464-R-MRC-00007

12  Imaging Report, 3/23/08, St. John's Lutheran       101
    Hospital, Bates 2009-L550-494_0009011

13  X-ray Report, 1/25/99, Raymond Siefke, St.         101
    John's Lutheran Hospital

14  Exercise Stress Test, 11/16/94, Raymond Siefke     102
    St. John's Lutheran Hospital

15  Office Chart, 2/28/01, Raymond Siefke, by Dr.      103
    Whitehouse

16  Cardiac Clinic Note, 3/15/95, Raymond Siefke       118
    St. John's Lutheran Hospital

17  Office note, 3/13/02, Raymond Siefke, by Dr.       109
    Whitehouse

18  Certificate of Death, Raymond Siefke, State of     ---
    Montana

21  Article, "The Morbidity and Mortality of           125
    Vermiculite Miners and Millers Exposed to
    Tremolite-Actinolite: Part I, Exposure
    Estimates," American Journal of Industrial
    Medicine, 1987, Bates 2009_05546 - 59

25  Mortality in Libby, Montana, 1979-1998             135
    Executive Summary, Bates ASD2000001 - 34

Page 9

No:        Identification:             Page:

26  Review of Asbestos-Related Abnormalities Among     146
    a Group of Patients from Libby, Montana, A
    Pilot Study of Environmental Cases, Final
    Report, August 2002, Bates 2009_01594 - 638

27  Letter, 3/21/01, Dr. Whitehouse to Jon             147
    Heberling, Bates 2009_00531

28  Deposition of Dannie C. Middleton, 8/12/02         149
    USA vs. W.R. Grace & Company, et al, Bates
    2009_00806 - 90

30  Libby Claimants' Disclosure of Potential           155
    Expert Witnesses, 8/21/06

31  Letter, Bruce Case to Donna Rossie, ATSDR          156
    with draft peer review document, Bates
    2009_05838 - 49

34  Consensus Report, Asbestos, Asbestosis, and        163
    Cancer; the Helsinki criteria for diagnosis
    and attribution, Bates 2009_04731 - 36

35  Asbestos-Related Disease Associated with           168
    Exposure to Asbestiform tremolite, American
    Journal of Industrial Medicine, 1994, Bates
    2009_08075 - 85

36  The Diagnosis of Nonmalignant Diseases Related     173
    to Asbestos, American Thoracic Society, Bates
    2009_00053 - 58

37  Diagnosis and Initial Management of                175
    Nonmalignant Diseases Related to Asbestos,
    American Thoracic Society Documents, Bates
    2009_00661 - 85

Page 10

| No: | Identification: | Page: |
|---|---|---|
| 44 | Asbestos-Related Pleural Disease Due to Tremolite Associated With Progressive Loss of Lung Function: Serial Observations in 123 Miners, Family Members, and Residents of Libby, Montana, American Journal of Industrial Medicine, 2004, Bates 2009_01096 - 102 | 192 |
| 46 | Libby Expert's Response to Dr. Weill report by Dr. Whitehouse and Dr. Frank, 5/8/07, Bates 2009-01103 - 30 | 195 |
| 56 | Videotaped Deposition of Dr. Whitehouse 10/18/07, Bates 2009_00237 - 505 | 204 |
| 57 | Letter, 12/14/95, Dr. Whitehouse, Bates LP072-ME-MRC-00002 - 3 | 206 |
| 58 | Letter, 12/14/95, Dr. Whitehouse to Jon Heberling, Bates L550-493-ME-MRC-00014 - 15 | 207 |
| 59 | Letter, 10/30/95, Jon Heberling to Dr. Whitehouse, Bates L550-493-ME-MRC-00059 | 208 |
| 60 | Handwritten note given to Dr. Whitehouse by Nurse Kimberly Rowse at the CARD Clinic | 209 |
| 61 | Letter, 8/13/97, Dr. Whitehouse to blank, Bates LP055-ME-MRC-00004, 2009_03262 | 209 |
| 62 | Letter, 8/13/97, Dr. Whitehouse to blank, Bates LP055-ME-MRC-00004, 2009_03262 | 210 |
| 63 | Letter, 9/25/96, Dr. Whitehouse to blank, Bates LP076-ME-MRC-00002, 2009_03403 | 213 |

Page 11

| No: | Identification: | Page: |
|---|---|---|
| 64 | Letter, 9/25/96, Dr. Whitehouse to Jon Heberling Bates L550-538-ME-MRC-00045, 2009_03465 | 213 |
| 65 | Letter, 12/14/95, Dr. Whitehouse to Jon Heberling, Bates 2009_04351 - 52 | 215 |
| 66 | Chart note, 2/14/01, Dr. Whitehouse, Bates LP098-ME-MRC-00015 | 249 |
| 69 | Chart notes, 4/18/89, 4/24/89, Dr. Whitehouse Bates LP029-ME-MRC-00002 | 254 |
| 70 | Series "ATS/ERS Task Force: Standarisation of Lung Function Testing," Interpretative strategies for lung function tests, European Respiratory Journal, Bates 2009_08391 - 411 | 255 |

*          *          *

Page 12

1    THE VIDEOGRAPHER:  Good morning.  Here
2  begins the deposition of Dr. Alan C. Whitehouse in
3  regarding W.R. Grace & Co. in the United States
4  Bankruptcy Court for the District of Delaware.  The case
5  number is 01-1139 (JKF).
6    Today's date is March 19, 2009.  The time is
7  approximately 8:32.  The deposition is being taken at
8  Evans, Craven & Lackie, 818 West Riverside, Suite 250,
9  Spokane, Washington.
10    The videographer is Greg Glover, the court
11  reporter is William Bridges, both here on behalf of
12  Bridges Reporting and Legal Video located at 1312 North
13  Monroe, Spokane, Washington, 99201.
14    Would counsel and all present please identify
15  yourselves and state whom you represent.
16    MR. STANSBURY:  Brian Stansbury of
17  Kirkland & Ellis, and I represent W.R. Grace & Company.
18    MR. HEBERLING:  Jon Heberling of
19  McGarvey, Heberling, Sullivan & McGarvey, representing
20  the Libby claimants.
21    MR. SCHIAVONI:  Good morning, Doctor.
22  Tancred Schiaoni from O'Melveny & Myers.  I represent
23  Arrow Wood.
24    MS. LEE:  Karen Lee, Kirkland & Ellis,
25  representing W.R. Grace.

Page 13

1    MR. STANSBURY:  People on the phone,
2  could you introduce yourselves please, again, for the
3  benefit of the court reporter.
4    MS. STOVER:  Laura Stover, Eckert
5  Seamans, Cherin & Mellot, representing Maryland Casualty
6  Company and Zurich American Insurance Company.
7    MR. BAILOR:  Bernard Bailor from Caplin &
8  Drysdale, Washington, D.C., representing the Asbestos
9  Claimants Committee.
10    MR. GUY:  Jonathan Guy, Orrick,
11  Herrington & Sutcliffe, representing the Future Claimants
12  Representatives for P.I. claims.
13    MR. BLABEY:  David Blabey, Kramer, Levin,
14  Naftalis & Frankel, representing the Equity Committee.
15    MS. DeCRISTOFARO:  Elizabeth
16  DeCristofaro, Ford, Marrin, Esposito, Witmeyer & Gleser,
17  for Continental Casualty Company.
18    THE VIDEOGRAPHER:  Would the court
19  reporter please swear in the witness.
20
21    (ALAN C. WHITEHOUSE, called as a witness by
22  the Debtors, being first duly sworn to tell the truth,
23  the whole truth and nothing but the truth, was examined
24  and testified as follows:)
25

1                    EXAMINATION
2
3    BY MR. STANSBURY:
4        Q.    Good morning, sir.
5        A.    Good morning.
6        Q.    Could you please state your name for the
7    record?
8        A.    Alan Whitehouse.
9        Q.    And you are a medical doctor, right?
10       A.    I am.
11       Q.    Dr. Whitehouse, my name is Brian Stansbury.
12   I represent W.R. Grace.
13            Before we get started, I wanted to go over a
14   few background issues just to make sure we were on the
15   same page.  I know this isn't your first time at the
16   rodeo.  But I wanted to ask you a few questions.
17            First of all, I'm going to assume you
18   understand my question, unless you say otherwise.
19            Is that fair?
20       A.    That's fair.  I have some hearing problems,
21   though.
22       Q.    Okay.  Please let me know if at any time I'm
23   talking too fast or you do not understand my question.
24   Okay?
25       A.    Okay.

1        Q.    Additionally, I will ask that when I am
2    asking a question, that you will allow me to finish the
3    question before answering, and I will strive to do the
4    same when you are answering the questions.  That way the
5    court reporter keeps the record clear.
6            Does that sound good?
7        A.    Okay.
8        Q.    Additionally, when answering questions, I
9    will ask that you answer with an audible yes or no, as
10   opposed to a nod, just, again, so the record is clear.
11           Is that fair?
12       A.    Yes.
13       Q.    Are you under any medication today that would
14   affect your ability to answer questions?
15       A.    I don't think so.
16       Q.    Okay.  All right.  Dr. Whitehouse, I'm
17   handing you what's been marked as Exhibit 1.  And this is
18   a deposition notice for today.
19           And you are Dr. Alan C. Whitehouse, correct?
20       A.    That's correct.
21       Q.    Okay.  And you intend to offer expert
22   testimony in the matter of In re:  W.R. Grace & Company,
23   correct?
24       A.    I do.
25       Q.    Okay.  And it is March 19th, 2009, correct?

1        A.    Yes.
2        Q.    Okay.  Now, I'm going to hand you what's been
3    marked as Exhibit 2.  And this document is entitled Libby
4    Claimants' Preliminary Objections to First Amended Joint
5    Chapter 11 Plan.
6            Have you ever seen this document before?
7                 (Pause in the proceedings).
8        A.    I have not seen this specific document.  I am
9    familiar with what's in it, though.
10       Q.    All right.
11       A.    But I am reading it right now.
12       Q.    All right.  The reason I present this to you
13   is it is my understanding that the Libby claimants are
14   objecting to the proponents' plan.
15           And on page 2 there's a list of criticisms.
16   And I think you may have opinions with respect to some of
17   them.  And I wanted to ensure that you do or do not.
18           The first, and I'll read, and tell me if I am
19   reading this correctly, "The TDP excludes legitimate
20   Libby claims by requiring the blunting of the
21   costophrenic angle as a criterion for disease level."
22           Do you see that?
23       A.    Yes.
24       Q.    Did I read that correctly?
25       A.    Yes.

1        Q.    Do you agree with that statement?
2        A.    I do.
3        Q.    Okay.  Next statement.  "The TDP excludes
4    legitimate Libby claims by requiring a minimum three
5    millimeter pleural thickening as a criterion for disease
6    level."
7            Do you see that statement?
8        A.    Yes.
9        Q.    Do you agree with that?
10       A.    Yes.
11       Q.    Okay.  Next, "The TDP excludes legitimate
12   Libby claims by requiring pleural thickening coverage of
13   over 25 percent as a criterion for disease level."
14           Did I read that correctly?
15       A.    Yes.
16       Q.    Do you agree with that statement?
17       A.    I do.
18       Q.    Next, "The TDP excludes legitimate Libby
19   claims by not permitting the use of DLCO to establish
20   severity and impairment of asbestos-related disease."
21           Did I read that correctly?
22       A.    Yes.
23       Q.    Do you agree with that statement?
24       A.    I do.
25       Q.    Next, "The TDP excludes legitimate Libby

Page 18

1 claims by requiring an FEV1/FVC ratio over 65 percent as
2 a criterion for disease level."
3        Did I read that correctly?
4    A.    Yes.
5    Q.    And do you agree with that statement?
6    A.    I do.
7    Q.    Now, you intend to offer opinions at a
8 hearing related to the disease that various Libby
9 claimants have, is that correct?
10   A.    That's correct.
11   Q.    And based on these statements, it is your
12 belief that the current mechanism for assessing claims
13 does not properly characterize Libby disease?
14       Is that true?
15       MR. HEBERLING:  Objection.  Calls for a
16 legal conclusion.
17       THE WITNESS:  Basically -- Repeat the
18 question again.
19       MR. STANSBURY:  Would you read back the
20 last question, please sir.
21            (Record read).
22       THE WITNESS:  I agree.
23   Q.    (BY MR. STANSBURY:)  And just so I am clear,
24 when we are talking about disease and Libby, are we
25 talking primarily about the interstitial disease in Libby

Page 19

1 or the pleural disease in Libby?
2    A.    We are talking about everything, but
3 predominantly the pleural disease.
4    Q.    So, your objection is really to the way we
5 are dealing with pleural disease, is that correct?
6    A.    Not entirely.
7    Q.    Primarily?
8    A.    Primarily.
9    Q.    And do you believe that the pleural disease
10 suffered by people in Libby exposed to tremolite from
11 Libby is distinct from pleural disease other people
12 exposed to other asbestos may have?
13   A.    Well, to begin with, your statement is
14 incorrect, because it's not tremolite that we are talking
15 about.  We are talking about winchite, richterite and
16 tiny amounts of tremolite.
17       So, we're talking about a different category
18 of asbestos, in part.
19   Q.    And so I am clear, that that mixture of
20 minerals has been referred to in the past as the Libby
21 amphibole, is that correct?
22   A.    That's correct.
23   Q.    Okay.  So, with that caveat, is it your
24 belief that people who have been exposed to this
25 winchite, richterite, tremolite hybrid are -- have a

Page 20

1 pleural disease that is distinct from individuals who
2 have been exposed to other forms of asbestos?
3    A.    "Distinct" is a difficult word to use in that
4 situation.
5        There are manifestations of it that are
6 frequently different.  They are much more severe in
7 general.  Any of these findings may be seen in other
8 types of asbestos.  It is just the degree.  We have to
9 clarify what we are talking about.
10   Q.    All right.  Well, let's clarify what we are
11 talking about, just so we are clear.  Do you believe
12 that people who have been exposed to winchite,
13 richterite, tremolite from Libby have a more severe form
14 of pleural disease than people exposed to, let's say,
15 chrysotile?
16   A.    Yes.  Clearly.
17   Q.    Okay.  Do you believe that people exposed to
18 winchite, richterite, tremolite from Libby have a more
19 severe pleural disease than people exposed to amosite?
20   A.    That's not been totally established,
21 because there's -- You might want to use the term
22 amphiboles.  Okay?
23   Q.    Okay.  Let me back up, just so that I am
24 clear.
25   A.    Why don't you back it up, put it into a

Page 21

1 category that works.
2    Q.    Sure.  Sure.  So, on the -- and maybe this is
3 important, then.  So, perhaps it's not winchite,
4 richterite, tremolite that it creating the more severe
5 pleural disease, it is all amphiboles in general, is that
6 correct?
7    A.    There's two parts -- There's more than one
8 part of the answer to that.
9        One is that all amphiboles seem to have more
10 pleural disease, and that's true from the Australian
11 studies and other studies.
12       But in addition, it would appear as if Libby
13 asbestos, and this is somewhat preliminary, is worse than
14 amosite, not yet established whether it's worse than
15 Australian crocidolite.  It may very well be.
16   Q.    All right.  So, you've said a lot there, and
17 let's unpack that.
18       Chrysotile you firmly believe does not cause
19 the same severe pleural disease that winchite,
20 richterite, tremolite does, correct?
21   A.    Yes.
22   Q.    Okay.  And as you just said, amosite likely
23 does not cause as severe pleural disease as winchite,
24 richterite, tremolite do, is that correct?
25   A.    When you look at the studies of, like,

6 (Pages 18 to 21)

Page 22

1 insulators, they were exposed to both chrysotile and
2 amosite, because that was the mixture that was in most of
3 the asbestos on the East Coast.
4      So, how you distinguish those two clearly,
5 one from the other, is difficult to do, because you can't
6 do both exposures at the same time.
7      To my knowledge, there are a few studies
8 relative to amosite alone.  I'm not really very familiar
9 with those.
10     Q.   Okay.  So, you're more familiar, then, with
11 studies involving chrysotile, crocidolite, and I believe
12 you mentioned --
13     A.   Uh-huh.
14     Q.   -- the experience with it when you were in
15 Australia?
16     A.   Yes.
17     Q.   And those are studies authored be Cookson, is
18 that correct?
19     A.   And others.
20     Q.   And others.  But Cookson has written studies
21 about -- --
22     A.   Cookson, and other people.
23     Q.   So, you don't necessarily have an opinion at
24 this time as to how pleural disease from exposure to
25 winchite, richterite, tremolite, compares to amosite,

Page 23

1 correct?
2      A.   Pure amosite?
3      Q.   Pure amosite.  Correct.
4      A.   The amosite that's related to chrysotile, I
5 had a fair amount of experience.  But there is amosite in
6 the chrysotile that most of the insulators were exposed
7 to.
8      Q.   And, so, those people who were exposed to
9 this mixture of chrysotile and amosite, they do not have
10 the same severe pleural disease that people who were
11 exposed to winchite, richterite and tremolite?
12     A.   No.  They have very different
13 characteristics of their disease and death rates and
14 things like that.
15     Q.   All right.  So, the chrysotile, amosite
16 exposures are different from winchite, richterite
17 tremolite exposures, correct?
18     A.   I believe it is.
19     Q.   With respect to pleural disease, correct?
20     A.   With respect to the extent of pleural disease
21 and probably the potency.  But some of that, I think
22 based upon known exposure levels of the insulators, yes,
23 it is very different.
24     Q.   Okay.  I understand.  But with respect to
25 crocidolite, crocidolite exposures may cause pleural

Page 24

1 disease that is as severe as the pleural disease caused
2 by exposure to winchite, richterite and tremolite, is
3 that right?
4      A.   I suspect it is.
5      Q.   Okay.  Now, let's talk about your basis for
6 that.
7      May I ask you what you have in front of you,
8 sir?
9      A.   My exert report.
10     Q.   Okay.  Could I see a copy of that, please?
11     A.   And Arthur Frank's is in there, too.
12     Q.   Okay.  I'm going to mark this as an exhibit.
13 And this is the expert report of Dr. --
14     A.   Are you planning to take that with you?
15     Q.   Well, we will copy it and you can keep the
16 original.
17     A.   You've already got a copy.
18     Q.   No.  I understand.  But we are going to have
19 a file copy for the court reporter.
20     So, this is a binder that contains CD's, and
21 the CD's listed are 123 patients for Whitehouse 2004;
22 Libby studies as of 12/08; Whitehouse References, 12/08;
23 Whitehouse Progression Films, Exhibit 6; Mortality Study,
24 Medical Records, 116, Exhibit 7; Mortality Study, Death
25 Certificates, 85, Exhibit 7; Mortality Study,

Page 25

1 Spreadsheets, Exhibit 7; Libby Mesos, Exhibit 9; Weill
2 Comparison, Exhibit 19; CARD PFT Comparison, Exhibit 23.
3      Are there any other CD's in this binder other
4 than those that I have just listed?
5      A.   No, not that I know of.
6      Q.   And is this your complete expert report?
7      A.   Yeah.
8      Q.   Okay.  Do you intend to offer any opinions at
9 this hearing that are not contained in this report?
10     MR. HEBERLING:  Brian, we have issued a
11 supplemental expert report at this point.
12     MR. STANSBURY:  The one that was
13 served --
14     MR. HEBERLING:  Rebuttal opinions and so
15 forth.
16     MR. STANSBURY:  Okay.
17     Q.   So, other than rebuttal opinions, do you
18 intend to offer any other opinions?
19     A.   It depends on what you ask me.
20     Q.   Okay.
21     A.   If you ask me things that are out of that
22 scope, and I could answer them, then I will.
23     Q.   Okay.  Now, let me ask you this, then:  With
24 respect to your opinions regarding Libby pleural
25 disease --

7 (Pages 22 to 25)

DR. ALAN WHITEHOUSE - by Mr. Stansbury
(509)456-0586  BRIDGES REPORTING & LEGAL VIDEO  (800)358-2345

Page 26

1    First of all, other than the characterization
2 of Libby pleural disease, is there any other aspect of
3 the Grace medical criteria that you have examined that
4 you find objectionable?
5    A.   Yes.
6    Q.   What is that?
7    A.   Oh, some of the references -- I don't know if
8 these are actually written in the entire scope of it, but
9 objections to obstructive disease as relates to
10 asbestosis.
11    Q.   Okay.
12    A.   Objections relative to smoking.  Other
13 diseases.  There's a whole host of things --
14    Q.   Let's --
15    A.   -- that don't make sense medically.
16    Q.   Let's flush this out, just so we are clear.
17 First, as we were discussing, pleural disease.
18    A.   Right.
19    Q.   And you believe that the plan as proposed
20 does not properly compensate people who have been exposed
21 to winchite, richterite and tremolite, correct?
22        MR. HEBERLING:  Objection.  Calls for a
23 legal conclusion.  Ask him about the medical criteria.
24    Q.   (BY MR. STANSBURY)  Dr. Whitehouse, you can
25 answer the question.

Page 27

1    A.   Repeat the question.
2    Q.   You believe that the Grace plan adequately
3 compensates people for pleural disease who were exposed
4 to winchite, richterite and tremolite?
5    A.   No, clearly --
6        MR. STANSBURY:  Objection.  It calls for
7 legal conclusion.
8        THE WITNESS:  From my standpoint, it
9 clearly does not adequately compensate them.
10    Q.   (BY MR. STANSBURY)  Because of the medical
11 criteria?
12    A.   Because the medical criteria are very flawed.
13    Q.   Let's make a list of those medical criteria
14 right now.  What are the criteria that you find
15 problematic with respect with pleural disease?
16        MR. HEBERLING:  Objection, overbroad.  He
17 doesn't have the criteria in front of him.
18        THE WITNESS:  That is true.  And I might
19 forget one.  But I will --
20        First off, the ones that are listed here.
21    Q.   (BY MR. STANSBURY)  Okay.  The ones we just
22 listed?
23    A.   Yeah.  Related to thickness of blunted
24 angles, extent --
25    Q.   So, let me see.

Page 28

1    A.   So, the FEV1/FVC ratio and the DLCO, those to
2 begin with are the more obvious.  There are a whole bunch
3 of other ones.
4    Q.   All right.  So let's list those.  With
5 respect to the definition of diffuse pleural thickening,
6 or DPT, is it often called that?
7    A.   Yes.
8    Q.   Okay.  You object to requiring blunting of
9 the costophrenic angle, correct?
10    A.   Yes.
11    Q.   And what is the costophrenic angle?
12    A.   That's the angle of the lowest part of the
13 lung laterally, inferiorly, where the diaphragm meets the
14 chest wall.
15    Q.   Okay.  You also object to the requirement
16 that the pleural fibrosis cover 25 percent of the pleura,
17 is that correct?
18    A.   Yes.
19    Q.   You also object to the requirement of a three
20 millimeter thickness, is that correct?
21    A.   Yes.
22    Q.   What else do you object to with respect to
23 the definition of diffuse pleural thickening?
24        MR. HEBERLING:  Objection, unfair
25 question.  He does not have the definition in front of

Page 29

1 him.
2        THE WITNESS:  Actually, I think it would
3 be a good idea if you would give me the definitions, the
4 whole plan, so I don't have -- I have most of them in my
5 head, but I want to make sure I don't miss something.
6    Q.   (BY MR. STANSBURY)  I don't believe I have
7 the entire list with me right now.
8        If we could just kind of go through the
9 medical side, in terms of what medical criteria you think
10 are flawed, and to the extent that we locate the list, we
11 can circle back, if necessary.  So far we have listed
12 blunting of the costophrenic angle, the requirement that
13 it cover 25 percent of the pleura, the three millimeter
14 thickness requirement.
15    A.   Uh-huh.
16    Q.   What else do you find objectionable with
17 respect to the definition of diffuse pleural thickening?
18    A.   The FEV1 --
19        MR. HEBERLING:  Objection, overbroad,
20 unfair question.  He doesn't have the criteria in front
21 of him.
22    Q.   (BY MR. STANSBURY)  You said --
23    A.   FEV1/FVC ratios.
24    Q.   Now, is that with respect to the definition
25 of diffuse pleural thickening, or is that more of an

Page 30

1  impairment issue?
2      A.    Well, it's an impairment issue, but it is all
3  part of the same package.
4      Q.    Okay.  So, to the extent that they require
5  showing a restricted defect to recover for diffuse
6  pleural thickening --
7      A.    Yeah.  They require showing a restrictive
8  defect, where it's been shown that the obstructive defect
9  is more common.
10     Q.    Okay.
11     A.    And they just leave that out.  They just
12  choose to ignore that.
13     Q.    And the FEV1/FVC ratio is a method of
14  determining whether a defect is restrictive or
15  obstructive, correct?
16     A.    Well, it is and it isn't.  The problem is,
17  that this is not that simple.  And you can put something
18  like that in legal terms and write all of these numbers
19  down and everything else, and you will find out that half
20  the patients already fall out of it, because it's a thing
21  that's very much judgment issues, it's based on all kinds
22  of criteria, rather than just a single set of written
23  down --
24     Q.    Well, let's unpack the FEV1/FVC ratio.  The
25  FEV1 measures the amount of air exhaled in the first

Page 31

1  second of a spirometry test, correct?
2      A.    Correct.
3      Q.    And the FVC is the force vital capacity,
4  correct?
5      A.    That's correct.
6      Q.    That is the entire level of air that's
7  exhaled, is that correct?
8      A.    That's the volume that's exhaled, yes.
9  That's the volume from maximal inspiration to maximal
10  expiration.
11     Q.    And so, this ratio compares the amount of air
12  exhaled in the first second with the total volume of the
13  air that is exhaled, correct?
14     A.    That's correct.
15     Q.    And just so I'm clear, the notion of the
16  FEV1/FVC ratio, the reason it's instructive to a
17  pulmonologist is that it determines what level of air is
18  getting out in the first second compared to the amount of
19  air exhaled total, correct?
20     A.    That's correct.
21     Q.    And if there's an obstructive defect, it
22  might take a person a little while to exhale, as opposed
23  to somebody who does not have an obstructive defect, is
24  that correct?
25     A.    That's true.

Page 32

1      Q.    Okay.  And so, somebody who has a lower
2  FEV1/FVC ratio is not exhaling as much in the first
3  second as he or she is throughout the total test,
4  correct?
5      A.    No.  But don't try to equate that
6  necessarily to obstructive disease by itself.
7      Q.    But is that true, though?
8      A.    That's true.
9      Q.    Okay.  And there are people in your
10  profession who use that measurement to assess whether
11  there is an obstructive component to observed impairment,
12  correct?
13     A.    That's correct.
14     Q.    Okay.  So, it is not -- the FEV1/FVC ratio is
15  not some far-out concept that you've never used, correct?
16     A.    No.
17     Q.    Okay.
18     A.    Use it all the time.
19     Q.    Right.  And in your practice, if you see
20  somebody who has an FEV1/FVC ratio of 35, let's say,
21  would that suggest that they may have an obstructive
22  defect?
23     A.    Now, you are talking about the extreme levels
24  of that.  When you are talking about 65 percent, people
25  over the age of 70, their normal predicted FEV1/FVC ratio

Page 33

1  is very close to that.
2      Q.    Okay.
3      A.    And, so, you've allowed virtually zero margin
4  beyond that point.
5      Q.    Now, this objection with respect to the
6  application of the FEV1/FVC ratio, is that something that
7  you think is specific to people who have been exposed to
8  winchite, richterite, and tremolite, or would you say
9  this is a criticism you have with respect to the
10  application of this ratio generally across all claimants?
11     A.    Basically, I consider it generally across all
12  the asbestos.  It is possible in any patient with
13  asbestos disease.
14     Q.    All right.  So, you do not think that
15  somebody who is exposed to chrysotile should be treated
16  differently from somebody who has been exposed to
17  winchite, richterite or tremolite with respect to the
18  FEV1/FVC ratio, correct?
19     A.    That's not able to be answered as a yes or
20  no.
21     Q.    Well, why not?
22     A.    Why not?  Because of the fact that you've got
23  so many other factors that go into this.  You haven't
24  mentioned the things that are really important, is, is
25  there a combined restrictive defect, is there an elevated

Page 34

1 residual volume, what's the total lung capacity. These
2 things don't occur in absentia.
3    Q.    Okay.
4    A.    When you do pulmonary function studies, you
5 don't look at one single number. You look at the whole
6 study as it relates to age. And then in addition to
7 this, you've got a whole bunch of different authors for
8 normal predicted numbers.
9    Q.    All right.
10    A.    So, you have to define who you are going to
11 use. I think there's at least 11, to my latest
12 knowledge, and it keeps changing. So, how are you going
13 to define whose you are going to use?
14    Q.    Okay. I understand that. But just so I am
15 clear, everything you've said just now, you would make
16 that same argument if you were talking about somebody who
17 had been exposed to chrysotile as you would somebody who
18 had been exposed to winchite, richterite, tremolite,
19 correct?
20    A.    I might, that particular argument, yes.
21    Q.    All right. With respect to the diffuse
22 pleural thickening we were speaking of earlier, that's an
23 issue that is more specific to the people that have been
24 exposed to the winchite, richterite, tremolite amphibole,
25 correct?

Page 35

1    A.    Clearly more, because of the extent of the
2 pleural disease --
3    Q.    All right.
4    A.    -- in that group.
5    Q.    I just wanted to make sure we were clear on
6 that. So, the definition of the diffuse pleural
7 thickening, is something that is much more of a
8 Libby-specific issue, correct?
9    A.    I think generally related to the fact that we
10 have so much pleural disease there, which is not seen
11 nearly to that extent with chrysotile.
12    Q.    Okay. FEV1/FVC issue. We have discussed
13 this. Now, you disagree with the use of this metric, so
14 to speak. Is that the right way, metric?
15    A.    No.
16    Q.    You would disagree with the use of that lung
17 function measurement as the way --
18    A.    No. We use that measurement. I disagree
19 with putting an absolute number on it in absentia of
20 other aspects of it.
21    Q.    Okay. And that objection you just made is
22 universal across anybody exposed to asbestos?
23    A.    Yes.
24    Q.    It is not Libby-specific?
25    A.    Any competent chest physician is going to

Page 36

1 make that objection.
2    Q.    So is not Libby specific. Let's talk about
3 DLCO. What is DLCO?
4    A.    Diffusion capacity for carbon monoxide in
5 milliliters per minute, per millimeter mercury barometric
6 pressure.
7    Q.    And earlier that was among -- I think that
8 was the fourth list on Exhibit -- fourth item on the list
9 in Exhibit 2, was the "TDP excludes legitimate Libby
10 claims by not permitting the use of DLCO to establish
11 severity impairment of asbestos-related disease."
12    Correct?
13    A.    That's correct.
14    Q.    And you feel very strongly about this,
15 correct?
16    A.    Oh, yeah. Very strong about it.
17    Q.    You think that if somebody has a decrement in
18 DLCO, that that could be attributed to their asbestos
19 disease, correct?
20    A.    Yes.
21    Q.    Now, so, you would suggest using DLCO as one
22 measurement to determine whether somebody has an
23 asbestos-related disease, and more specifically,
24 impairment associated with that disease, correct?
25    A.    Yes.

Page 37

1    Q.    Do you believe that DLCO is a more
2 specific -- Strike that.
3    Do you believe that DLCO is a more effective
4 lung function measurement for assessing lung disease in
5 Libby, amongst people exposed to winchite, richterite and
6 tremolite, as opposed to people exposed to chrysotile?
7    A.    There is no one measurement. There are a
8 number of problems associated with that.
9    We know the reason for why the DLCO's are
10 decreased. Okay? They are due to subpleural fibrosis
11 and they're frequently not present on the plain chest
12 films.
13    You can see lots of stuff in the literature
14 concerning DLCO decreases in pleural disease alone, and
15 some of those articles relate to chrysotile. There's not
16 a huge number of articles on that. But DLCO has been
17 known to be reduced for years, and people for God knows
18 what reason have chosen to ignore it.
19    Q.    Now, the fact that DLCO can be used to assess
20 impairment amongst people exposed to asbestos, you
21 believe that people exposed to winchite, richterite and
22 tremolite are more likely to have a decrement in DLCO
23 than somebody who was exposed to chrysotile?
24    A.    Yeah. I think so.
25    Q.    Okay. So, DLCO, the use of DLCO to determine

10 (Pages 34 to 37)

Page 38

1 whether there is impairment, that is especially important
2 when assessing somebody exposed to winchite, richterite
3 and tremolite, correct?
4     A.    Oh, I'm not saying it's especially important.
5 All of these things are important, taken in their
6 context.
7         You're trying to make one single thing more
8 important, this more important, this more important.
9 That's now how it's looked at.
10    Q.    Well, let's look at it --
11    A.    That's not how it should be looked at.
12    Q.    All right.
13    A.    Physicians don't look at it that way.
14 Remember, I'm a practicing physician.  I am not an
15 academician up there making rules for the world.  Okay?
16    Q.    Understood.
17    A.    I'm looking at real people and their real
18 problems and their pulmonary function abnormalities.
19    Q.    And one of the reasons we want to use DLCO in
20 your opinion is we do not want to overlook somebody who
21 has impairment, correct?
22    A.    No.  Absolutely.  In fact, we have people
23 that are on continuous oxygen with low DLCO's in normal
24 spirometry and normal lung volumes, and that's their only
25 isolated abnormality.

Page 39

1     Q.    Okay.
2     A.    And we have the radiographic evidence to back
3 it up --
4     Q.    So, we have --
5     A.    -- on top of it.
6     Q.    So, we have people who have normal FVC and
7 normal TLC, but reduced DLCO, correct?
8     A.    Yes.
9     Q.    And people who, you say, have radiographic
10 evidence of pleural disease, correct?
11    A.    Yeah, on CT-scan generally.
12    Q.    On CT-scan.  What about x-ray?
13    A.    You don't see the interstitial stuff on the
14 x-rays.  You see, it is the interstitial stuff that gives
15 you the low DLCO, not the pleural disease by itself.
16    Q.    Okay.  Well, let's back up a second.  That's
17 important.
18        My understanding was we were talking about
19 diffuse pleural thickening earlier --
20    A.    Uh-huh.
21    Q.    -- and how to define it, correct?
22    A.    Uh-huh.
23    Q.    Could you answer yes or no, sir?
24    A.    Yes.
25    Q.    Okay.  Now, does diffuse pleural thickening

Page 40

1 in the absence of interstitial disease cause a decrement
2 in DLCO?
3     A.    That's a very interesting question, and one
4 that I actually would really like to answer.
5         My suspicions are, based upon looking at
6 hundreds of CT-scans with diffuse pleural thickening, is
7 that the DLCO decreases are usually associated with
8 subpleural interstitial disease right adjacent to the
9 areas of fibrosis.
10        You can't see it on the plane chest x-ray.
11 It varies in degree.  And even on CT it is not a perfect
12 test.
13        So, you see pleural thickening and a low
14 DLCO.  Interstitial disease is probably there, but you
15 may not see it.  It depends on the technique.  It depends
16 on the quality of the equipment.  There's a myriad of
17 factors that go into it.
18    Q.    So, we just might not be able to see it.
19    A.    You may not be able to see it at that point.
20 Or you may see minimal degrees of it.  And it may be a
21 lot more than that.
22        Most of the time we see it.
23    Q.    Do you think you are more adept at
24 recognizing this, as you call it, subpleural fibrosis,
25 than a different physician would be?

Page 41

1     A.    No, not necessarily.  I think the other two
2 physicians that work up in the CARD clinic, Dr. Black,
3 and Dr. Heppe, both recognize that just as well as I do.
4         I would dare say, though, that there are a
5 limited number of people in this country that really
6 understand the significance of that, and those are the
7 people that work, and generally are pulmonologists who
8 work all the time with people with asbestos disease.
9     Q.    What is Dr. Heppe's first name?
10    A.    Mark.
11    Q.    Mark.  And what is his background?
12    A.    He's an internist.
13    Q.    What is an internist?
14    A.    That's a physician that practices general
15 internal medicine.  He's done that for years.  He's very
16 experienced.  And he's been at the clinic for a couple of
17 years.  And he's also been seeing this stuff for years in
18 the emergency room at the hospital.
19    Q.    Did he do a residency in pulmonology?
20    A.    No.
21    Q.    Did he do a residency in radiology?
22    A.    No.
23    Q.    Did he do a residency in occupational
24 medicine?
25    A.    No.

Page 42

1    Q.    Did he do a fellowship in radiology?
2    A.    No.  All of these questions are going to be
3  no, and you know it, even before you ask me.
4    Q.    Well, I just want to make sure, just so he
5  have this understanding.
6    A.    Well, you're making the assumption that
7  because you had all of this particular training, that you
8  can't see things, you know.
9          Competent physicians with an open mind who
10  are inquisitive see these things.  And they understand.
11  And it doesn't take them very long.  They read the
12  literature.  And we have a wealth of literature up there
13  available to us.  And they get it.
14    Q.    So, Dr. Heppe has not completed a residency
15  or fellowship in radiology, pulmonology or occupational
16  medicine, correct?
17    A.    No.
18    Q.    Okay.  The other physician is Dr. Brad Black,
19  is that correct?
20    A.    That's correct.
21    Q.    And Dr. Brad Black has not completed a
22  residency or a fellowship in radiology, pulmonology or
23  occupational medicine, correct?
24    A.    That's correct.
25    Q.    His primary training is a pediatrician,

Page 43

1  correct?
2    A.    Originally, yes.
3    Q.    Okay.  But correct, yes?
4    A.    Yes.  That's correct.
5    Q.    Okay.  And asbestos disease is not very
6  common in children, is it?
7    A.    I'm not so sure about that anymore.  But
8  probably not.
9    Q.    When they --
10    A.    We're going to find that out in about 10
11  years.
12    Q.    We're going to find that out in 10 years.
13  Why is that?
14    A.    Because we've got a ton of children that have
15  been exposed to this stuff.
16    Q.    When?  Do you know?
17    A.    All along here.
18    Q.    All along?
19    A.    But particularly, all along from, regardless
20  of when they were born.  But in the last 10, 20 years, as
21  well.
22    Q.    Currently, ongoing?
23    A.    Probably.  But I don't know the extent of it
24  now.
25    Q.    Do you know anything about the levels of

Page 44

1  exposure?
2    A.    I do in the past, but I don't know now.
3    Q.    Do you know about the levels of past
4  community exposures?
5    A.    Yes, I do.
6    Q.    And what were the highest levels?
7    A.    Well, the levels at the hospital in downtown
8  and around the mill were about, as I recall the highest I
9  saw was a little bit over 1.5 fiber per cc.
10    Q.    Fiber per cubic centimeter, is that correct?
11    A.    That's correct.
12    Q.    And when was that measurement taken?
13    A.    Late '70s.
14    Q.    Late '70s?
15    A.    Or early '80s.
16    Q.    Or early '80s.
17    A.    I think it was the late '70s.
18    Q.    Late '70s.  Well, let's say 1980, to be
19  conservative.  So, somebody who had been exposed at the
20  age of one to that measurement in 1980 --
21    A.    Uh-huh.
22    Q.    -- would be 30 years old now?
23    A.    Close to it, yeah.
24    Q.    Okay.  Do you have any specific measurements
25  post-1980 regarding community exposure?

Page 45

1    A.    No.  I know there are some, but I don't have
2  them.  I haven't seen them.
3    Q.    So, you sitting here, you can't offer an
4  opinion about the levels of exposure, correct?
5    A.    No.  You know, we went through in the
6  criminal trial about all of this, you know.
7    Q.    Right.
8    A.    What is, is.
9    Q.    What is, is.
10    A.    What is, is.  If you have the disease, you
11  were exposed -- and you lived in Libby, you did get the
12  exposure.
13    Q.    If you have which disease?
14          MR. HEBERLING:  Objection.  Please let
15  him finish.  That was one of the agreements at the
16  beginning.
17          THE WITNESS:  If you were exposed to --
18  If you have asbestos changes in your radiograph and you
19  have -- you lived in Libby, you were exposed to asbestos.
20          Now, you have to do a good exposure history.
21          But you may not be able to find out exactly
22  which exposure was the worst, whether it was the track,
23  piles of stuff that were left around somebody's attic,
24  whatever.  I mean, this stuff is still in attics all
25  over Libby.

12 (Pages 42 to 45)

1        So, if you show up with asbestos disease, I
2   don't really care what the exposure levels were. I
3   doesn't matter.  It was enough to give them disease.
4        Q.    (BY MR. STANSBURY:)  And by "disease," you
5   mean interstitial fibrosis, for example?
6        A.    No.  I mean any asbestos things.
7        Q.    But --
8        A.    This is all a spectrum, all the way from a
9   plaque to interstitial disease.  And you've seen it
10  already.  You saw it on the board in Judge Molloy's
11  courtroom.  You saw x-rays that went from a plaque to
12  interstitial disease.  You now have two of them on CD
13  that you can look at.  They're the same thing.  And I've
14  got dozens here, if necessary, probably.
15       Q.    This is interesting.  But I want to kind of
16  close out what we were first talking about real quick
17  before we move on to --
18       A.    I think I just closed it off.  Okay?
19       Q.    DLCO, this discussion began as we were
20  talking about, whether it was caused by the diffuse
21  pleural thickening --
22       A.    Uh-huh.
23       Q.    -- or, as you call it, subpleural
24  interstitial fibrosis.
25       A.    Subpleural fibrosis is what we refer to it

1   as.
2        Q.    Subpleural fibrosis, correct?
3        A.    Yes.
4        Q.    Okay.  And it is your belief that it is not
5   the pleural fibrosis but the subpleural fibrosis, and
6   that would be fibrotic changes within the lung itself,
7   correct?
8        A.    Yes.  Although, you know, you have to
9   consider other things that go along with this.  Many
10  times there's lung entrapped in pleural thickening.
11       And, so, that may be a shunt for oxygen
12  uptake, and that may order the DLCO in itself.
13       And, so, it is possible, even though you
14  don't see interstitial fibrosis, that there's enough
15  alteration in the ventilation profusion ratios in that
16  area right around the pleura that it would affect the
17  DLCO.
18       Q.    So, that would be an example where a pleural
19  fibrotic change in and of itself could affect DLCO?
20       A.    I think it's possible.  I think more often
21  than not, though, we see subpleural fibrosis.
22       Q.    More often than not it's subpleural fibrosis?
23       A.    I think for the most part, yeah.
24       Q.    So, that's fibrotic changes within the
25  interstitium, correct?

1        A.    Right in the subpleural region, yes.
2        Q.    But it would be within the interstitium, the
3   actual lung itself?
4        A.    Yes.
5        Q.    So, that would be interstitial fibrosis,
6   correct?
7        A.    I guess, if you want to call it that way.
8   Although we don't quite use that term.  Because you get
9   all of these definitions in the past that have evolved
10  around plain chest x-rays.
11       Now we are talking about CT's.  We're not
12  talking about chest x-rays.  This is stuff that we are
13  not seeing on chest x-ray.  We are seeing only on the
14  high resolution CT's.
15       Q.    So, you --
16       A.    And actually we are only seeing it since we
17  really got an upgrade in the last three years or so.
18       Q.    And the "we" would be you, Dr. Heppe and Dr.
19  Black?
20       A.    And Dr. Becker.
21       Q.    And Dr. Becker.
22       A.    And a couple radiologists in Kalispell also.
23       Q.    And what are their names?
24       A.    Oh -- Well, there's McDonald.  I don't
25  remember the other names.

1        Q.    Okay.  So, Dr. Becker can --
2        A.    And Gordon Teel, also, of course, who I've
3   worked with for years.
4        Q.    Gordon Teel.
5        A.    Although I haven't been working with him more
6   recently.  He's well aware of this, also.
7        Q.    What about Dr. Lynch at National Newish?  He
8   can see this, correct?
9        A.    Correct.  And Dr. Newell who also looks at
10  these as well.
11       Q.    What about Dr. Shipley at Cincinnati?
12       A.    I think Dr. Shipley is incompetent when it
13  comes to looking at these -- at the Libby asbestos
14  pleural disease.
15       Q.    Shipley is incompetent with respect to the
16  Libby asbestos pleural disease?
17       A.    I believe that, yes.  Because I think that --
18  And all of us have felt that same way about it.
19       Q.    Okay.  What about Dr. Molina at North
20  Carolina?
21       A.    He's very spotty.  I mean, these are the two
22  guys that Grace's insurance plan sends all of the x-rays
23  to.  And Molina is sort of on and off.  Sometimes he sees
24  things, sometimes he doesn't.
25       Q.    So, he's not incompetent, he's on and off, is

13 (Pages 46 to 49)

Page 50

1  that correct?
2      A.   Yeah.
3      Q.   What about Dr. Pistorese, and I'll help you
4  with the spelling, I believe it's P-I-S-T-O-R-E-S-E, in
5  Kalispell?
6      A.   You know, you're asking me to make statements
7  about physicians who are actively in private practice.
8  And I'm not going to do that.  Okay?  I don't mind
9  talking about Shipley.
10         But I'm not going to make comments like that
11 in a public purview concerning physicians who are
12 sometimes doing what they think are right, but with whom
13 many of us disagree.
14         And so, I'm not willing to say anything
15 other than the fact that we frequently disagree with him.
16     Q.   Okay.  Well, I'm not asking you to use the
17 word incompetent.  That was your word with respect to Dr.
18 Shipley.
19     A.   I know it was.  That's right.
20     Q.   With respect to Dr. Pistorese, and this is
21 not a pejorative inquiry, but simply a question as to
22 whether Dr. Pistorese recognizes this subpleural fibrotic
23 change that you were discussing --
24     A.   I don't --
25     Q.   If I could finish.

Page 51

1          -- that causes the decrement in DLCO.
2      A.   I have no idea, because I don't know that
3  he's even seen any of these.  He hasn't seen any of the
4  Libby patients for a number of years.  For whatever
5  reason, we have not seen his name on things for a long
6  time.
7      Q.   What about Dr. Obermiller, also in Kalispell?
8  Same question.
9      A.   I don't know whether he does or not.
10     Q.   So, you do not know whether he is capable of
11 recognizing this subpleural change that --
12     A.   Oh, I am sure he is capable of it.
13     Q.   Let me just finish.
14     A.   All right.
15     Q.   You do not know whether Dr. Obermiller
16 recognizes this subpleural change that causes the
17 decrement in DLCO?
18     A.   I think he probably does.  But I can't give
19 you a specific example.  I don't -- I haven't seen very
20 much from him either recently.
21     Q.   Okay.
22     A.   Although I must admit he almost tends to
23 disagree with everything that's done in the CARD Clinic
24 all the time.
25     Q.   Okay.  Now, just to kind of wrap up the DLCO

Page 52

1  point for now.
2      A.   Uh-huh.
3      Q.   It is, in your opinion, the decrement in DLCO
4  can be caused either by fibrotic changes of the pleura,
5  or subpleural interstitial changes that you often
6  recognize on CT but not on x-ray --
7      A.   Yes.
8      Q.   -- that occur in connection with the diffuse
9  pleural thickening, is that correct?
10     A.   Yes.  And there are other causes for a
11 decreased DLCO that we haven't gotten into, though.
12     Q.   Non-asbestos-related causes, or asbestos-
13 related causes?
14     A.   Non-asbestos-related causes.  But they
15 coexist.
16     Q.   Okay.  So, there are certainly other causes
17 in decrement in DLCO that have nothing to do with
18 asbestos?
19     A.   Yes.  That's right.
20     Q.   Such as smoking?  Correct?
21     A.   Well, assuming that you have -- Usually that
22 occurs with very severe obstructive airway disease in the
23 absence of any asbestos disease, yeah.
24     Q.   What else can cause a decrement in DLCO?
25     A.   All kinds of other interstitial lung

Page 53

1  diseases.  I mean, there's only about, I think there's
2  probably 500 or so listed in causes of interstitial lung
3  disease.
4      Q.   So, there's potentially 500 different causes
5  of a decrement in DLCO?
6      A.   Who knows?  I don't know what the actual
7  number is.  It may not be that many.  But there's a very
8  large number of interstitial lung diseases, all of which
9  are capable of producing a decrease in DLCO.
10     Q.   So, certainly a decrement in DLCO is not
11 dispositive for the presence of an asbestos-related
12 disease, correct?
13     A.   Well, not by itself, no.
14     Q.   And this phenomena that we've discussed
15 earlier with respect to either the pleural change or the
16 subpleural interstitial change causing the decrement in
17 DLCO, is that a specific finding with respect to those
18 exposed to winchite, richterite and tremolite, or is that
19 a general finding for people exposed to chrysotile
20 asbestos, as well?
21     A.   I can't answer your question, because I have
22 not looked at large numbers of high resolution CT-scans
23 on people that are just solely chrysotile exposed.
24     Q.   Do you believe that people who have
25 chrysotile exposures -- Let me start that over.

14 (Pages 50 to 53)

Page 54

1        Do you believe that people with chrysotile
2   exposures who develop pleural changes have a decrement in
3   DLCO?
4        A.    I have seen that --
5        Q.    Okay.
6        A.    -- in some patients with chrysotile exposure,
7   but not a large number.
8        Q.    If you treat somebody who has a chrysotile
9   exposure and they have normal FVC, normal TLC, but a
10  decreased DLCO, with fibrotic changes of the pleura, and
11  no changes apparent on x-ray, would you believe that the
12  decrement in DLCO was caused by the asbestos pleural
13  disease?
14       A.    Yes.
15       Q.    Okay. So, this is not necessarily a Libby
16  specific issue? Again, just like FEV1/FVC, we are not
17  seeing some unique phenomenon in Libby which makes DLCO
18  an applicable lung function measurement whereas it would
19  not be with respect to other exposed cohorts, correct?
20       A.    Probably not. Although I think the frequency
21  and the extent of it in Libby is far more than what has
22  been seen elsewhere.
23       Now, to partly answer your question, also
24  there's been a recent article in the last couple of years
25  from Australia, from Wittenoom, of DLCO decreases that

Page 55

1   basically is along the same line of things that I am
2   saying about DLCO.
3        Q.    Who wrote that article?
4        A.    Oh, God. I knew you were going to ask me
5   that. I was trying to remember who it was. It's in
6   there.
7        Q.    It is in your expert report?
8        A.    It is in there. Somewhere in there.
9        Q.    Okay. So, just to summarize, the FEV1/FVC
10  issue, that is not a Libby-specific issue? That is a
11  general issue that is applicable to those exposed to
12  winchite, richterite and tremolite, as well as
13  chrysotile, correct?
14       A.    But I think you need to put that into the
15  perspective of the extents of severe pleural disease in
16  chrysotile and the frequency with which it's seen, which
17  is considerably less. And in addition to the fact that
18  an awful lot of layouts in academic centers just have
19  never bothered to do DLCO's.
20       Q.    Well, I was speaking more about the FEV1/FVC
21  issue, not the DLCO issue.
22       A.    Oh. Well, then you had better repeat the
23  question again.
24       Q.    Sure. Sure. The FEV1/FVC ratio was more of
25  a general criticism, not necessarily a Libby-specific

Page 56

1   one, correct?
2        A.    Yeah. I think so.
3        Q.    The DLCO one certainly is applicable to both
4   those exposed to winchite, richterite, tremolite, as well
5   as those exposed to chrysotile, but the frequency and
6   extent with which you observed this phenomenon is greater
7   in those exposed to winchite, richterite and tremolite --
8        A.    Correct.
9        Q.    -- correct? That's correct?
10       A.    Yes. I would agree.
11       Q.    Okay. And again, the DPT issue, the diffuse
12  pleural thickening issue, that is much more of a Libby-
13  specific issue, correct, insofar as those exposed to
14  winchite, richterite, tremolite develop --
15       A.    Do you mean as far as the --
16            MR. HEBERLING: Objection. Objection,
17  unclear as to what the DPT issue is.
18       Q.    (BY MR. STANSBURY:) Let me rephrase that for
19  you. The issues we discussed earlier with respect to
20  diffuse pleural thickening, and those would be including
21  requiring of the blunting of the costophrenic angle,
22  coverage of over 25 percent of the pleura, and three
23  millimeter thickness.
24       Those were much more applicable, those
25  concerns are much more applicable to those who have been

Page 57

1   exposed to winchite, richterite and tremolite as opposed
2   to chrysotile, correct?
3        A.    Yes.
4        Q.    Okay. Now, I believe these were the five
5   issues we discussed in Exhibit 2 at the very beginning.
6       Now I want to ask what your basis for this
7   belief is. And I think throughout the course of our
8   discussion it became somewhat clear, but just so we are
9   on the same page, is it fair to say that these opinions
10  that you have are based in large part on your experience
11  as a pulmonologist who has treated individuals exposed to
12  winchite, richterite and tremolite?
13       A.    In large part, it is.
14       Q.    Okay. So, in large part this is based on
15  your diagnostic practice, correct?
16       A.    Well, it's a diagnostic practice, but also
17  gathering all of the data together and looking at it in
18  large groups, and looking at people who died from it as
19  well. So --
20       But, yes, it comes from my experience. Where
21  else would you get the experience? I mean, except for
22  having seen, you know, 1500 or more of these people.
23       Q.    Okay. Let's kind of unpack that statement.
24  So, it's based in part on just the day in, day out
25  experiences of being a diagnostic -- Strike that.

1          Your opinions are based in part on your day
2    in, day out experiences of a pulmonologist, treating
3    these individuals, correct?
4       A.    Right.  Let me -- Go ahead.
5       Q.    Your opinions are also based on these
6    analyses you conducted involving data obtained from
7    people in your diagnostic practice, correct?
8       A.    That's correct.
9       Q.    Now, let's identify those analyses.  One
10   would be your 2004 paper published in the American
11   Journal of Industrial Medicine, correct?
12      A.    That's true.
13      Q.    What was the title of that paper?  It was
14   kind of long.  But just so we are clear.
15      A.    It was --
16      Q.    Is it Asbestos-Related Pleural Disease Due to
17   Tremolite --
18      A.    Yeah.
19      Q.    -- Associated with Progressive Loss of Lung
20   Function?
21      A.    Progressive Loss of Lung Function, yes.
22      Q.    Okay.  That's one, correct?
23      A.    That's one.
24      Q.    Would another be your CARD Mortality
25   Analysis?

1       A.    Yes.
2       Q.    And the death rates you observed in the lung
3    function measurements and the radiographic abnormalities
4    that you observed of the individuals in that CARD
5    Mortality Analysis also informs your opinion, correct?
6       A.    Yes.
7       Q.    Are there any other similar analogies you've
8    done of people in your patient group that informed your
9    opinion?
10      A.    Well, we've been challenged many times
11   concerning radiographic readings and things like that.
12   So, there's studies that are in here relative to
13   comparing x-ray readings with outside sources.
14      Q.    So, this would be the HNA comparison?
15      A.    That's the HNA comparison.  Comparison with
16   Shipley and Molina.  And, you know, Lynch's, Newell's,
17   Decker's, a radiologist in Kalispell, myself, Gordon
18   Teel, Brad Black, as to almost basically a scoring of who
19   read how.
20          And then more recently, of course, getting
21   backup from several real experts from Selikoff's lab in
22   Mt. Sinai, from Steve Lavin and Arthur Frank, who has
23   basically looked at all of this stuff and have concurred
24   with how we read the films.
25      Q.    Okay.  So, we're going to call this the HNA

1    comparison, which was, as you said, I am looking at
2    Shipley, Molina, Lynch, Newell.  There you are comparing
3    your interpretations of radiographs and CT with theirs,
4    correct?
5       A.    Yes.  But what we're doing and mostly what
6    we did then and what we're doing now is, we continue to
7    do on a regular basis, is be sure that we're on track.
8          And, so, we're utilizing all of our resources
9    to have people look at films that we can.  And, so,
10   that's where that data comes from.
11          And of course more recently we've got some
12   people that have been doing asbestos work for 40, 50 --
13   40 years or so.
14      Q.    Now, just so I'm clear, how does the
15   comparison of reads, and presumably analyses that
16   demonstrate how your reads compare to others and which
17   ones may be more accurate, how does that inform your
18   opinion as to the definition of diffuse pleural
19   thickening, the use of FEV1/FVC, or the use of DLCO to
20   determine impairment?
21      A.    That has nothing -- That's tangential to
22   that.
23      Q.    Okay.
24      A.    These other opinions are formed based upon
25   looking at the patient.

1          Of course, you know, we've looked at all of
2    these patients, contrary to Grace's experts, none of whom
3    have been looked at really carefully.  Well, maybe a few.
4    But very few have been looked at by anybody else.
5          We've looked at them.  We've taken their
6    histories, their exposure histories.  Done physical exams
7    on them.  Followed them for periods of time.  Watched
8    what's happened to their x-rays.  Looked at their films,
9    their CT-scans, discussed it with other people.
10          It's a lot of work that goes into what you
11   see as a final product on a chart.  And then it's done
12   year after year.  And, you know, if we find something
13   that was wrong, we correct it.
14      Q.    So, you've actually been able to lay eyes on
15   these people, take their vital signs, conduct physical
16   examinations, you know,  be in the same room with these
17   individuals, correct?
18      A.    Oh, sure.
19      Q.    And, so, you're able to offer opinions, in
20   your mind, that somebody who has not had that
21   opportunity, cannot?
22      A.    Yeah.  I think so.
23      Q.    So, the fact that somebody, let's say, such
24   as Dr. Stephen Haber?
25      A.    Stephen who?

Page 62

1    Q.    Stephen Haber.  H-A-B-E-R.
2    A.    Is that what his first name is?  I didn't
3  know that was his first name.
4    Q.    That fact that he has never examined any of
5  these people limits the opinion he can reach, correct?
6    A.    Very, very much so.
7    Q.    So, without that opportunity, he can't have
8  the same information that you have, correct?
9    A.    True.  All he's done is chart reviews, and
10  looked at x-rays, and probably has not had the
11  opportunity to look at everything sequentially.  There's
12  too much.
13    Q.    All right.
14    A.    It's taken us eight years to get to this
15  point, and he's up there for two days?  Come on, you
16  know.
17    Q.    But it's fair to say that the opportunity to
18  actually examine individuals is very critical to reaching
19  informed opinion about disease, correct?
20    A.    That's true.
21    Q.    Okay.  So -- But getting back to the point
22  about the basis of your opinion, you said that the HNA
23  comparison was, as you put it, tangential to the DPT,
24  FEV1/FVC, and DLCO opinions, correct?
25    A.    That's correct.

Page 63

1    Q.    However, the 2004 published paper, as well as
2  the CARD Mortality Study, those were supportive of those
3  opinions regarding DPT, FEV1/FEV and DLCO, is that
4  correct?
5    A.    Well, to begin with, the 2004 paper was
6  actually written in 2001.  It takes several years to get
7  something published.
8    Q.    Understood.
9    A.    And we've learned a hell of a lot more since
10  that time.  Clearly, I have.
11        I mean, that was written about a year, year-
12  and-a-half after CARD was started, before it finally got
13  published.  And this is true of all papers.
14        The same with that mesothelioma paper.  That
15  had been -- that was finished almost two years ago before
16  it was published last fall.
17        So, one forms opinions as you go along.
18        These opinions are opinions that have become
19  more and more evident as the criteria were published, and
20  became evident that all these people were not going to be
21  covered.  And that's what triggered that Mortality Study.
22  Because there were so many of these people that died of
23  this disease, it wouldn't be considered to have
24  compensation.
25    Q.    So, although your understanding has evolved

Page 64

1  since the 2004 published paper which was written in 2001,
2  it is fair to say, though, that that is informative for
3  your overall opinions with respect to DPT --
4    A.    Yeah.  That's actually informative.  And as
5  you may or may not know, 36 of those people died.
6        But also it's the ongoing follow-up of the
7  whole group of people in the clinic and the progression
8  of things.  And that's another paper which is in the
9  process of being written right now.
10    Q.    Okay.  Well, let's hold that thought for a
11  second.  When you mention this ongoing process, that goes
12  back, though, to your diagnostic practice, correct?
13    A.    Well, yeah.  I mean, that all started in the
14  '80s.
15    Q.    Right.  But what I'm trying to just get my
16  brain around is understanding what forms the basis of
17  your opinion.  The diagnostic practice is obviously the
18  backbone of this, correct?
19    A.    Sure.
20    Q.    And --
21        THE VIDEOGRAPHER:  I'm sorry, Doctor.
22  Your hands are covering your face.  Sorry.
23        THE WITNESS:  Sorry.
24    Q.    (BY MR. STANSBURY:)  However, you had
25  mentioned that some analysis of individuals within your

Page 65

1  practice had been informative to your opinions as well.
2  And among those are the CARD Mortality Study, which is in
3  your expert report, correct?
4    A.    Uh-huh.
5    Q.    Yes or no.
6    A.    Yes.
7    Q.    Okay.  But it has not been published in the
8  peer review literature, correct?
9    A.    No, it has not.
10    Q.    Okay.  The 2004 paper which was published is
11  instructive to your opinions, correct?
12    A.    Right.
13    Q.    Are there any other analyses that are
14  relevant to your opinions regarding the definition of
15  diffuse pleural thickening, the use of FEV1/FVC, or the
16  use of DLCO?
17    A.    Well, yeah.  The opinion comes about because
18  you look at somebody in the clinic that has -- and maybe
19  you've already answered the question -- but you look at
20  somebody in the clinic who is severely impaired, okay,
21  and has an isolated DLCO.  That's one example.  Okay?
22        Or they don't have blunting of the angles but
23  have diffuse pleural thickening otherwise.  Very short of
24  breath.  Maybe on continuous oxygen.
25        And you look at the criteria.  And you find

17 (Pages 62 to 65)

Page 66

1  that, no, they aren't going to be -- there's no way that
2  they're going to fall through that -- they're going to
3  fall out when it comes time to request compensation for
4  their asbestos disease.
5      Q.    I understand.  But that goes back again to
6  your diagnostic practices, right?
7      A.    It goes back to my diagnostic practice, yes.
8      Q.    I'm just trying to make sure I understand.
9  So, the diagnostic practice, once again, critical to
10  these opinions.
11          The 2004 paper also is informative to these
12  opinions.  The 2007 CARD Mortality Analysis is also
13  informative for your opinions on DPT, DLCO and the
14  FEV1/FVC ratio.
15          Just so we're clear, are there any other
16  analyses that you have done that are supportive of those
17  opinions?
18      A.    There are so many analyses over the years of
19  one sort or another, most of which don't get published.
20          Certainly I have looked at an awful lot of
21  people with obstructive changes who would fall out of
22  compensation and who's obstructive disease is solely
23  related to their asbestosis, but they don't meet the 65
24  percent requirement for FEV1/FVC ratio.  They have low
25  residual volumes.  Normal total lung capacities.  Things

Page 67

1  like that.  They do not meet the criteria.  And we have a
2  lot of those.  And they have a lot of interstitial
3  disease.
4      Q.    Once again, but that is an opinion you have
5  reached based upon your diagnostic practice.
6          What I am trying to do, understand here, Dr.
7  Whitehouse, is identify the various sources of
8  information.
9          There is this broad category, your diagnostic
10  practice, your many years of working as a pulmonologist,
11  that is very fundamental to your opinions, correct?
12      A.    That's true.
13      Q.    The CARD Mortality Study, the 2004 published
14  paper.  Anything else that forms the basis of these
15  opinions?
16      A.    Well, the basis of the opinions concerning
17  radiology.  We've done comparison studies not only with
18  HNA but also with Dr. Weill, studies that he had done.
19      Q.    But, again, as you mentioned earlier, that
20  does provide information on how you're doing in terms of
21  recognizing radiographic impairment.
22          But as you said, that was tangential to the
23  fundamental questions of the definition of pleural
24  disease, use of DLCO and the use of the FEV1/FVC
25  criteria, correct?

Page 68

1      A.    That's correct.
2      Q.    Okay.  So, it's fair to say that what we've
3  identified, then, that is what's forming the basis of
4  your opinion?
5          MR. HEBERLING:  Objection, vague.
6          THE WITNESS:  Your tone and the way you
7  say that tends to minimize what the private practitioners
8  do.
9      Q.    (BY MR. STANSBURY:)  I'm not attempting to
10  minimize it.  All I'm trying to do is just get a list.
11  At this point I just want to make sure I understand what
12  the bases are.
13          And the diagnostic practice incudes your
14  analyses of how many individuals?
15      A.    What do you mean?  In the total clinic --
16      Q.    Yes.
17      A.    -- that I have seen?  I don't know the exact
18  number.  We've got 1800 cases.  I have seen most of them.
19      Q.    So, there are 1800 people whose patient care
20  over the years is relevant to your opinions in this case?
21      A.    Yes.
22      Q.    Okay.  And do you know how many of those
23  individuals for whom you have produced medical records in
24  this case?
25      A.    Basically, how many -- It's however many are

Page 69

1  involved in the lawsuit for the bankruptcy -- before the
2  bankruptcy was filed.  I assume that's the number.
3      Q.    Okay.
4      A.    And I think there's seven or eight hundred,
5  something like that.
6      Q.    Seven or eight hundred.  But you mentioned
7  1800 people, correct?
8      A.    Oh, yes.  There's an awful lot of people.
9  And we continue to diagnose people on a regular basis.
10      Q.    And in your mind you don't segment these
11  seven or eight hundred people and think, this is the
12  basis of my opinion.  You look at all 1800 --
13      A.    We look at them all, yeah.
14      Q.    Right.  So, all of them are relevant to your
15  opinion?
16      A.    Yes.
17      Q.    Okay.  Just want to make sure we are clear on
18  that.
19          So, the diagnostic history of these 1800
20  people, the 2004 study, the CARD Mortality Analysis,
21  those are the fundamental bases of your opinions,
22  correct?
23      A.    Yes.  I guess.
24      Q.    Okay.
25      A.    That's fair enough.

18 (Pages 66 to 69)

Page 70

1    Q.    Thank you, sir.  You also mentioned another
2  study that was ongoing.  What was that?
3    A.    We have progression.
4    Q.    You mentioned, you were going to publish
5  something soon.  I just heard that.
6    A.    Well, we've had a number of people who have
7  rapidly progressed, which has not been reported in the
8  literature before, with asbestos diseases.  And I'm in
9  the process of assembling a number of cases.  I've
10  actually got about 40 cases.
11    Q.    40 cases.
12    A.    I think total.  But I am sort of narrowing
13  them down to the ones that we can -- You know, there are
14  some practical aspects, if you are going to put something
15  in a paper and you want to demonstrate something with
16  x-rays so they can be seen, and you've seen x-rays in
17  these papers, they are hard to read.  And, so, basically
18  trying to decide which cases to use.
19    Q.    And how far along are you in this process?
20    A.    Oh, I've written a draft.
21    Q.    Pardon me?
22    A.    I've written a draft.  But I keep adding
23  cases because I keep seeing more.  And so I add a case,
24  and then I don't know what I'm going to do on it.
25          You know, Steve Lavin, who's involved in

Page 71

1  that, wants me to keep it to about six cases to keep it
2  simple.  And, so, I'm having trouble deciding which
3  six --
4    Q.    Understood.
5    A.    -- I will use.
6    Q.    And Steve Lavin was the person from
7  Selikoff's lab from Mt. Sinai?
8    A.    Mt. Sinai, yeah.
9    Q.    Okay.  And have you sent Steve Lavin a draft?
10    A.    Oh, yeah.  He's seen a draft.  In fact he's
11  written part of it.  In fact, he's been upset with me
12  because I haven't gotten any further along.  But I've
13  been doing all of this legal stuff all summer, so I
14  haven't had time.
15    Q.    When did you first send him a draft of this?
16    A.    I didn't send it to him.  He did it in
17  Libby.  He comes out there.  He hasn't been out there
18  since -- I think it was last spring.  We're pushing a
19  year since I've really done very much on it, except
20  collect more cases.
21    Q.    Okay.  But he came out spring of 2008?
22    A.    I think that's when it was.
23    Q.    Okay.
24    A.    April or May, somewhere in there.
25    Q.    All right.  Did you have a draft for him

Page 72

1  then?
2    A.    Oh, yeah.  And then he chewed it up and
3  rewrote a bunch of things, and then I rewrote some.  It's
4  sitting, waiting for more work.
5    Q.    Can I see a draft?
6    A.    No.
7    Q.    Why not?
8    A.    Because I don't have anything that's in a
9  position that I would give it to you.
10    Q.    Okay.
11    A.    It hasn't been introduced as evidence.  And
12  I'm not going to -- Until I get ready to publish it, it's
13  not your business.
14    Q.    Okay.  But these individuals, they are
15  individuals who have rapid pleural disease, correct?
16    A.    Yes.
17    Q.    And you're forming opinions on them, aren't
18  you?
19    A.    Yes.
20    Q.    Okay.  And those opinions are obviously very
21  relevant to how we assess pleural disease, correct?
22    A.    Yes.
23    Q.    Okay.  But you do not want to share that with
24  this court or any of us?
25    A.    No, I'm not going to.  Because it's --

Page 73

1          MR. HEBERLING:  I'll insert an objection
2  also.
3          We have a series of rapid progression cases,
4  which is what we're using in this litigation.
5          So, as to what he publishes, you know, there
6  are rules of disclosure before publication, you know.  He
7  has to follow those.
8    Q.    (BY MR. STANSBURY:)  Let's look at this list
9  real quick.
10    A.    Some of the cases are in there already.
11    Q.    Oh, I understand.  Let's take a quick look,
12  just so we are on the same page.  Because it sounds like
13  a study that will be very instructive to your ongoing
14  opinions about pleural disease in Libby, correct?
15    A.    Yeah.
16    Q.    Let me make sure I find --
17    A.    We are providing drafts.  Basically, it's
18  just something you don't do until after you've got the
19  thing pretty well written.  I don't know what I'm going
20  to take out of it, you know, especially when you have
21  three authors or four authors, they all have an idea of
22  what to do.
23    Q.    Will Lavin be a potential author?
24    A.    Who?
25    Q.    Lavin.

DR. ALAN WHITEHOUSE - by Mr. Stansbury
(509)456-0586  BRIDGES REPORTING & LEGAL VIDEO  (800)358-2345

1      A.      Oh, Lavin will.  Brad Black.  Mark Heppe is
2  very good at reading things.
3      Q.      Is this it right here?
4      A.      Yeah.
5      Q.      Exhibit 6?
6      A.      Yes.  That's part of the list, yeah.
7      Q.      That's part of the list.
8      A.      In fact that is the whole list.
9      Q.      All right.
10      A.      And you have the names here obviously,
11  because most of them have legal actions.
12      Q.      So, if I could have that back for one moment,
13  please.
14      A.      Basically, to explain what's on here --
15      Q.      Sure.
16      A.      -- there's 22 on here out of the 40 or so
17  that I have.  And I culled out these.
18              And then I've taken the dates here and put
19  down their FVC, FEV1, DLCO sequentially in each one.  And
20  I'm not sure whether you have the x-rays or not.
21      Q.      I think we have some of them.
22      A.      You may have -- you may not have all of them.
23  Because then I have culled it down to about six.  And
24  then I've been working on it since then.
25              And each time I do that, then I have to

1  rewrite things because I have a new history to put in
2  there, number of other things.
3      Q.      Okay.  So, this is Exhibit 6 to your report,
4  which is Exhibit 3 in this deposition.
5      A.      Yeah.
6      Q.      And --
7      A.      I'm sorry.  I forgot that was in there.  I'm
8  sorry.
9      Q.      I see 22 names on this list, some of whom, I
10  just have initials.
11              MR. STANSBURY:  And I take it those are
12  not your clients, Mr. Heberling, is that correct?
13              MR. HEBERLING:  Yes.  That's correct.
14              THE WITNESS:  In view of, you know,
15  confidentiality issues.
16      Q.      (BY MR. STANSBURY:)  Understood.  I respect
17  that.
18      A.      Have to obey HIPAA laws.
19      Q.      And the people whose names are here are
20  claimants, is that correct?
21      A.      Yes.
22      Q.      All right.  So, Robert Mack is on the list.
23      A.      Uh-huh.
24      Q.      We have next HC, and that's obviously
25  somebody whose confidentiality we are protecting.

1      A.      Yes.
2      Q.      Wendy Challinor.
3      A.      Uh-huh.
4      Q.      Ron Masters.
5      A.      Uh-huh.
6      Q.      Larry Hill.
7      A.      Uh-huh.
8      Q.      Ken Moss.
9      A.      Yep.
10      Q.      Jeff Swennes, S-W-E-N-N-E-S.
11      A.      Uh-huh.
12      Q.      Lonnie Kelley, K-E-L-L-E-Y.
13      A.      Uh-huh.
14      Q.      Clinton Hagen, H-G-E-N.
15      A.      H-A-G-E-N.
16      Q.      Excuse me.  Bruce Cole.  Al Dickerman.
17  Andrew Wright, W-R-I-G-H-T.  Dean Atkins.  Jack
18  Deshazer.  And Deshazer is spelled, D-E-S-H-A-Z-E-R.
19  Walt Torgison.  Art Schauer.  And Schauer is spelled
20  S-C-H-A-U-E-R.  Ruben Fellenburg, F-E-L-L-E-N-B-U-R-G.
21  And then WW.
22              Those are the individuals on this list, is
23  that correct?
24      A.      Six of those are dead.  I think six.
25      Q.      Okay.  And, so, by my count that's one, two,

1  three, four, five, six, seven, eight, nine, 10, 11, 12,
2  13, 14, 15, 16, 17, 18 people on the list.
3      A.      Uh-huh.
4      Q.      All right?
5      A.      Yep.
6      Q.      Okay.  So, those are the names you've
7  produced to us.  But you've mentioned there are up to 40
8  people who may be in your paper, correct?
9      A.      No.  No, no.
10      Q.      Oh.  Let me rephrase that.
11      A.      You said that wrong.  What I'm saying is,
12  that 40 cases --
13      Q.      40 cases.
14      A.      -- I found 40 cases that meet the criteria
15  that I originally set out, which was rapid changes within
16  five years.
17      Q.      Let me rephrase that, then.  You've
18  identified 40 people who rapidly progressed from pleural
19  disease to interstitial disease, is that correct?
20      A.      No.  There's one that's developed severe
21  interstitial disease.  But most of them are increasing in
22  pleural disease.
23      Q.      So, these are people who have had rapid
24  progression --
25      A.      Actually, I'm wrong about that.  There are

Page 78

1  two at least that have had rapid interstitial disease.
2      Q.    So, your contention --
3      A.    I'd have to look at the list again to sort it
4  out.
5      Q.    So, your contention therefore is that these
6  people have pleural disease only, with the exception of
7  one or two, and it's been progressing rapidly, correct?
8      A.    Right.
9      Q.    All right.
10     A.    Yeah.  This paper is not restricted just to
11  pleural disease.  This is rapid progression from Libby
12  asbestos disease.
13     Q.    Okay.  And some of these people, for example,
14  Ken Moss.
15     A.    Uh-huh.
16     Q.    He's a former Grace worker, correct?
17     A.    Yeah.  He worked there a couple of months, I
18  believe, or maybe a year.
19     Q.    Perhaps dating back to 1973?
20     A.    I think quite a while ago, yes.
21     Q.    Okay.  Even did work as a dry mill sweeper,
22  didn't he?
23     A.    Actually, unless I have all the data on that,
24  I won't remember each one individually.  Okay?
25     Q.    But fair to say, he is a former Grace worker,

Page 79

1  correct?
2      A.    Yeah.
3      Q.    And are you aware that in September of 2001
4  Dr. Becker read a CT as finding interstitial changes for
5  him?
6      A.    He may have.  I'm not -- I'd have to look at
7  my own notes about the thing.
8            Yeah.  No, some of these people do have
9  interstitial changes.
10     Q.    Okay.
11     A.    A lot of them do.
12     Q.    So, what's the progression we are talking
13  about, then?
14     A.    We're talking the whole thing.  But we are
15  talking about rapid.
16     Q.    So, what is rapid?
17     A.    You know, you make the assumption that
18  asbestos is a slow disease over 30 years.
19            We are talking about a period of very rapid
20  change in a short period.  Pulmonary functionalists will
21  tell you -- tells you the answer about the time frame.
22            You see marked decline in pulmonary function
23  over a very short period of time.  That's the -- that,
24  along with the radiograph, are the two criteria.  Whether
25  it's interstitial or pleural doesn't matter in this

Page 80

1  study.  This relates just to patients that have Libby
2  asbestos disease.
3      Q.    Okay.  So, the title of this exhibit then
4  wouldn't be rapid progression of pleural disease only,
5  correct?
6      A.    No.  Probably not.
7      Q.    This is really progression of asbestos
8  disease generally, correct?
9      A.    Yeah.  You're looking at drafts.  I mean,
10  this is the way I keep stuff on my computer.
11     Q.    Okay.
12     A.    Okay?  Hopefully I can still find it.  I
13  don't know if you have had that experience.  But when
14  you've got so much stuff like this, I have to put
15  something in that allows me to find it relatively easily.
16     Q.    So, you mentioned earlier about the role of
17  the diagnostic process and your diagnostic history, the
18  role that's played in forming your opinions, correct?
19     A.    Yes.
20     Q.    Okay.  I want to talk a little bit about some
21  of your diagnostic process.  You are familiar with Dr.
22  Becker, correct?
23     A.    Yeah.
24     Q.    And who is Dr. Becker?
25     A.    He's a radiologist at St. John's Hospital.

Page 81

1      Q.    Okay.  And where is St. John's Hospital?
2      A.    Across the street from CARD Clinic in Libby.
3      Q.    Okay.  And often people will be given an
4  x-ray or a CT by Dr. Becker, correct?
5      A.    Yeah.  He reads them.  He reads for the
6  hospital.
7      Q.    And you get copies of his reads, correct?
8      A.    Yes.
9      Q.    And they're part of the diagnostic process,
10  aren't they?
11     A.    That's right.
12     Q.    Sometimes you agree with him, sometimes you
13  disagree, is that right?
14     A.    I think that's true of medicine in general,
15  yeah.
16     Q.    All right.
17     A.    Actually our agreement with Dr. Becker
18  actually is really very high.  He's actually pretty good.
19  He has sometimes what we think are lapses.  He likes to
20  use the word "subtle."
21     Q.    Subtle.
22     A.    Which drives me right up a tree.  But then on
23  the other hand I have the pulmonary function that goes
24  along with it.
25     Q.    I'm handing you what's been marked as Exhibit

21 (Pages 78 to 81)

Page 82

1  4. This is a February 2003 -- Excuse me, February 23 --
2  Strike that.
3          I'm handing you a February 23rd, 2006 chest
4  x-ray read by Dr. Becker.
5      A.    Yeah.
6      Q.    And I'm reading under Impression, and tell me
7  if I have read this correctly. "Extensive pleural
8  parenchymal changes, consistent with changes from
9  previous asbestos exposure."
10          Did I read that correctly?
11      A.    That's correct.
12      Q.    This is probably somebody who's got, it looks
13  like, interstitial changes, correct? That's what
14  parenchymal means, right?
15      A.    Yeah. But I have no idea, because that may
16  refer to a number of things. It may not refer to
17  something that is diffuse. It may be just something that
18  is localized.
19      Q.    He says above, "There are extensive calcified
20  pleural-based plaques noted bilaterally," correct?
21      A.    And then he said there are "mildly prominent
22  interstitial markings."
23      Q.    Okay. But this is somebody who has been
24  exposed to asbestos, correct?
25          MR. HEBERLING: Let him finish the

Page 83

1  answer.
2          THE WITNESS: No. I'm finished.
3      Q.    (BY MR. STANSBURY:)    This is somebody who
4  has likely been exposed to asbestos, correct?
5      A.    Right.
6      Q.    He has calcified pleural plaques, right?
7      A.    Yes.
8      Q.    And, you know, he says, mildly prominent, but
9  there are certainly interstitial -- He says "probably
10  represents interstitial fibrosis," correct?
11      A.    Correct.
12      Q.    So, this is probably somebody who has
13  asbestos exposure and it looks like they are developing
14  disease, correct?
15      A.    Well, I mean, he had fairly well developed
16  disease.
17      Q.    Okay. So, let's move on to Exhibit 5. I'm
18  handing you what has been marked as Exhibit 5, and this
19  is an April 2nd, 2008 chest x-ray, also by Dr. Becker.
20      A.    Uh-huh.
21      Q.    And here the impression is "Extensive pleural
22  parenchymal changes, consistent with previous asbestos
23  exposure, stable from the prior examination."
24          Do you see that, sir?
25      A.    Yes.

Page 84

1      Q.    Again, this is probably somebody with
2  asbestos disease, right?
3      A.    I would assume so.
4      Q.    Okay. And, so, when you as a pulmonologist
5  get this read back from Dr. Becker, this is certainly
6  something where you would think, okay, problem here, this
7  person has got disease, correct?
8      A.    Well, let me tell you how we use x-ray
9  reports.
10          Pulmonologists, I have been reading x-rays
11  and reading for a very large group, I have read for a
12  very large group since about 1977, until I retired,
13  reading all the films.
14          I read the radiologist's interpretations to
15  be certain that there's not something that I might have
16  missed. Because I always think it's a good idea to see,
17  you know, second read on that may be helpful. I always
18  look at them.
19      Q.    Uh-huh.
20      A.    Beyond that, I may not agree with the word
21  extensive, I may not have even agreed with parenchymal,
22  if they've got a lot of en face plaquing. That's how
23  pulmonologists basically use the x-ray reports.
24          You know, general practitioners, family docs,
25  use it literally, for the most part.

Page 85

1      Q.    So, as a pulmonologist, when you get this
2  report back from Dr. Becker and you see language like
3  this, this suggests that this person has some asbestos
4  disease, correct?
5      A.    Yeah.
6      Q.    I'm going to hand you what has marked as
7  Exhibit 6.
8      A.    Okay.
9      Q.    This is a July 7, 2008 CT read from Dr.
10  Becker. And again, the impression, "Extensive pleural
11  parenchymal changes consistent with previous asbestos
12  exposure."
13          Is that correct? Am I reading that correct,
14  sir?
15      A.    Yes.
16      Q.    Once again, this suggests this person has
17  asbestos disease, and that's how you understand Dr.
18  Becker's words here, correct?
19      A.    Sure.
20      Q.    Okay. I'm going to put these here. I'm
21  going to call these category A. These three exhibits are
22  examples where you've just got clear statements from Dr.
23  Becker.
24          Now I am going to hand you Exhibit 7. And
25  this is going to contain that language you don't like.

1  "Impression. There are some subtle changes that could
2  feasibly be due to previous asbestos exposure."
3      A.    Uh-huh.
4      Q.    I read that correctly?
5      A.    Yep.
6      Q.    And, so, that's one where you just kind of
7  look at that and scratch your head?
8      A.    No. I don't scratch my head. Dr. Becker
9  actually, you know, whether he wants to call it subtle or
10 I want to call it something else, I have more information
11 than he has.
12          The fact, the more important thing is, the
13 fact that he read it.
14     Q.    Okay. Again, this read from Dr. Becker,
15 would the word equivocal be a fair description of his
16 read?
17     A.    That's not an equivocal read. Knowing Dr.
18 Becker, it is not equivocal.
19     Q.    But it is certainly not as clear. He is
20 describing these as subtle. These are not as clear as
21 the category A reads, right?   He is hedging his bets
22 here, right?
23     A.    That may very well be, right.
24     Q.    I am handing you what's been marked as
25 Exhibit 8.

1      A.    I think hedging his bets may be a good term.
2      Q.    We'll use that term, then.
3      A.    Okay.
4      Q.    This is a -- Excuse me. This is an August
5  11, 2008 chest x-ray read, also by Dr. Becker.
6      A.    Uh-huh.
7      Q.    And here under the chest x-rays it says
8  "There is some pleural thickening noted, stable from the
9  previous examination. No calcified plaques are noted.
10 No obvious interstitial fibrosis."
11          And the impression is "Pleural-based changes,
12 may or may not be due to previous asbestos exposure."
13          Once again, is this a read where, as I have
14 said earlier, kind of hedging his bets, so to speak.
15     A.    Well, actually, not. He's correct in saying
16 may or may not be due to, because he does not have the
17 information --
18     Q.    Okay.
19     A.    -- to make that diagnosis.
20     Q.    Okay.
21     A.    And that's not his business. The radiologist
22 or the general practitioners of chest radiology, they
23 read all kinds of things.
24          Whereas people like myself or like
25 orthopedists who read bones, become very expert at

1  reading nuances, and pick up a lot more sometimes on
2  x-rays.
3          What he reads may or may not be due to that.
4  He doesn't want to make that diagnosis. And he
5  shouldn't. Radiologists basically should be descriptive,
6  maybe give you a differential diagnosis, but not make a
7  definitive diagnosis.
8      Q.    And while "consistent with" is not a
9  diagnosis, in category A he is saying, "pleural
10 parenchymal changes consistent with previous asbestos
11 exposure."
12     A.    Yes.
13     Q.    This is certainly not as strong of language
14 as that, is it? May or may not. Again, that is more of
15 hedge betting?
16     A.    But if you look at his readings over a long
17 period of time, you will realize that some days he's in a
18 subtle mood and some days he's in a different mood.
19     Q.    Okay.
20     A.    And I don't fault him for that, you know.
21     Q.    Okay.
22     A.    There's days, you may feel crummy some days
23 and some days you write differently.
24     Q.    I'm handing you --
25     A.    There's nothing wrong with that.

1      Q.    I'm handing you what's marked as Exhibit 9,
2  and this is a June 25th, 2007 read from Dr. Becker.
3      A.    Yeah.
4      Q.    And again the Impression, "Minor non-specific
5  pleural thickening. May or may not be due to previous
6  asbestos exposure."
7      A.    Uh-huh.
8      Q.    Did I read that correctly?
9      A.    Yeah.
10     Q.    That's very similar to the previous three --
11 two reads that we just looked at, Exhibits 7 and 8,
12 correct?
13     A.    Yep.
14     Q.    And, again, would it be fair to put these in
15 a category B, where Dr. Becker is again not being as
16 decisive or definitive, but again, as I said, more
17 hedging his bets on these?   Is that --
18     A.    Oh, I don't think you should do that. I
19 don't think you should do it.
20          It's a radiologic reading that shows
21 something that is consistent with asbestos disease. He's
22 done his job in the reading of that. He's not seen
23 anything else that could be a significant problem, like a
24 nodule or something like that.
25          The reading is somewhat helpful to us in that

Page 90

1 regard. He's done his job.
2        It doesn't matter to me whether he reads it
3 as extensive or subtle. And in fact some of the ones he
4 will read as negative, and I disagree with him. And
5 there have rarely been occasions where I thought the
6 thing was negative and he's read something.
7        I mean, that's the way it goes in this
8 business.
9    Q.   I understand. However, if you as a
10 pulmonologist get this read back from the radiologist,
11 and the first three exhibits that we looked at, what I'm
12 calling category A, we see much more, I would say, clear
13 reads in terms of the finding of an asbestos-related
14 abnormality on x-ray or CT than we saw in these category
15 B reads.
16    A.   If you think that --
17        MR. HEBERLING: Objection. Asked and
18 answered.
19        THE WITNESS: If you think that makes any
20 difference on how I deal with anything, you're absolutely
21 wrong.
22    Q.   (BY MR. STANSBURY:)  Why?
23    A.   It makes absolutely no difference.
24    Q.   Why?
25    A.   Because I read my own x-rays, and I have

Page 91

1 pulmonary functions, I have a patient in front of me, and
2 I have their symptoms and their chest exam, and their
3 complaints of pleurisy, and I have all of these other
4 things that I have to use.
5        All he's done -- You know, if he didn't read
6 these x-rays at all, it wouldn't make a darn bit of
7 difference to us. When I was reading for my group, which
8 I did for, you know, God knows, 20-some odd years, along
9 with my partner, we read all of them for a group that
10 finally wound up being 27 doc's, we'd read a lot of
11 x-rays every day. We didn't have a radiologist being
12 involved at all. We were considered competent to read
13 x-rays in their own right, as a board-certified
14 pulmonologist.
15        So, whether he read these or not probably
16 doesn't make a whole lot of difference.
17    Q.   So, you, as a medical professional, are not
18 interested in what the radiologist across the street has
19 to say?
20    A.   I'm interested in it only because of the fact
21 of the possibility he may see something that I didn't
22 see. And I think it's always a good idea, if there's
23 something available, to look at it. I mean, I just don't
24 file it. I do look at it. Okay? He's required, the
25 hospital's required by law to have a radiologist read all

Page 92

1 of these. Okay?
2    Q.   You mentioned the possibility of him seeing
3 something you did not see.
4    A.   Possibly.
5    Q.   What about the possibility of him not seeing
6 something that you believe that you saw?
7    A.   That may happen, too.
8    Q.   Okay.
9    A.   So what? I mean, that really doesn't make a
10 whole lot of difference to me.
11    Q.   It makes no difference if a radiologist does
12 not read a x-ray or a CT the same way you do?
13    A.   No. It doesn't make any difference to me at
14 all.
15    Q.   Why not?
16    A.   Because I am better at it.
17    Q.   You are better than Dr. Becker?
18    A.   Yeah. You are damn right I am.
19    Q.   Okay. What about Dr. Lynch?
20    A.   I don't know Dr. Lynch. He's a good
21 radiologist. I know that. But he's spotty, too. If you
22 look at his reports, you'll see that he may have read
23 four different films in that screening program from
24 ATSDR, and read changes on two and not on two other ones.
25 Okay?

Page 93

1        So, technique may go into it. There's all
2 kinds of things that could go into this.
3    Q.   Who is better than you at reading x-rays or
4 CT's?
5    A.   I'm sure there are pulmonologists that are a
6 whole hell of a lot better than me. And there's also
7 pulmonary radiologists that may be better. Gordon Teel's
8 a good example of that.
9    Q.   So, you would trust a Gordon Teel read? If
10 he did not see something you saw, you would second-guess
11 your original read?
12    A.   Well, of course, what I do, and used to do
13 all the time, was I'd give Gordon a call, or I on several
14 occasions have taken x-rays up to the hospital and said,
15 "I'm not sure what we're talking about here. What I'm
16 seeing and what you're seeing seem to be different." And
17 then we'll hash it out.
18    Q.   How often do you do that with Dr. Becker?
19 How often do you call Dr. Becker and say, "I'm not seeing
20 this," or "You're not seeing this, let's have a meeting
21 of the minds"?
22    A.   Well, when he doesn't see something, I don't
23 really pursue it particularly. If he sees something that
24 I don't see, and particularly if I'm having some problems
25 really seeing it, I get on the phone. And we both have

24 (Pages 90 to 93)

DR. ALAN WHITEHOUSE - by Mr. Stansbury
(509)456-0586  BRIDGES REPORTING & LEGAL VIDEO  (800)358-2345

Page 94

1 it on computer. So we can look at the same thing, same
2 x-ray at the same time.
3     Q.   Now, these asbestos diseases, these are life-
4 threatening diseases, correct?
5     A.   In the long run, yes.
6     Q.   So, if another medical doctor, in this case,
7 a radiologist, reads a piece of radiology such that he
8 does not find an abnormality --
9     A.   Uh-huh.
10    Q.   -- suggesting that this person does not have
11 a life-threatening disease --
12    A.   Uh-huh.
13    Q.   -- you wouldn't call him up to ask about
14 that?
15    A.   No, I probably would not.
16    Q.   Why not?
17    A.   Because of the fact that I've got all of the
18 other information. I've probably even got old films that
19 may have shown things and he doesn't see them on the CARD
20 film, or he is very little experienced in reading this
21 sort of stuff.
22    Q.   Do you tell your patients that, that "Dr.
23 Becker disagreed with me"?
24    A.   Oh, sometimes I do, sometimes I don't.
25    Q.   Why wouldn't you tell a patient that another

Page 95

1 medical professional did not think you have a life-
2 threatening disease?
3     A.   You know, that's probably -- would be the
4 very best way to confuse an issue. Because basically if
5 there is minimal changes that are hard to see, that I see
6 them and he doesn't, I explain that to the patient. I
7 explain it. I say, "Look, these look a little bit
8 equivocal, and I'm not sure whether -- what we're
9 seeing," and then I get a CT-scan.
10         And then I sit down with the patient with the
11 CT-scan and I show him what I see.
12         And if you look through a large series of
13 things that we've done that way, you will find that the
14 CT-scans more often than not show changes on the CT that
15 I read as equivocal on the x-ray and the radiologist read
16 as negative.
17    Q.   Nonetheless, don't you think the patient is
18 entitled to know that another medical professional does
19 not think that they have disease?
20    A.   You know, you're asking a question that, you
21 know, I'm the one that's the person that a buck stops
22 with me, okay? You know, what are we talking about here?
23         We're talking about somebody that may have a
24 minimal disease at this point, when we are talking about
25 where we disagree, like there may or may not be a plaque

Page 96

1 here. Okay?
2         And, yeah, maybe sometimes I have said,
3 "Well, Dr. Becker didn't see this. I think this is here.
4 I'm going to get a CT and we'll talk about it." There's
5 nothing wrong with that.
6     Q.   But there are --
7     A.   You're trying to make -- you're really --
8 you're trying to make this into something as a wrong way
9 of practicing medicine. And it is not. This is very
10 appropriate in medicine. And I think that -- especially
11 when you are talking about minimal disease.
12        So, don't try to put me on the defensive by
13 saying that I didn't follow through or do care properly
14 because I didn't necessarily tell the patient in the same
15 terms exactly what Becker wrote.
16    Q.   I am just --
17    A.   That is wrong.
18    Q.   Well, I'm just trying to understand why that
19 is wrong.
20    A.   I've told you why it's wrong. Because I
21 follow through with them.
22    Q.   All right.
23    A.   And I've got another visit that's coming up
24 that I may go over it with the patient, too.
25    Q.   But don't you believe a patient has a right

Page 97

1 to know if another medical professional has disagreed
2 with your opinion?
3         MR. HEBERLING:   Objection, asked and
4 answered.
5         THE WITNESS:   Yeah. I'm not even going
6 to answer.
7     Q.   (BY MR. STANSBURY:)   Why not?
8     A.   Because I have answered it. Okay?
9     Q.   You've said --
10    A.   You're pushing me to say that I'm practicing
11 wrongly because I don't tell a patient when Dr. Becker
12 doesn't see something. Sometimes there are obvious
13 things that he doesn't see.
14        There's obvious things that a number of other
15 radiologists have not seen as well, that are very
16 apparent when I look at it.
17        I've got other people in that clinic that I
18 can show x-rays to. I've got people all over the place
19 that I can show it to.
20    Q.   And that's --
21    A.   There's no reason why I have to tell them
22 that Dr. Becker didn't read this when there's something
23 that's there and it's apparent. And I can show it to the
24 patient that it's there, and I can show it to Brad Black
25 or to Mark Heppe, and if they agree with it, or if they

don't agree with it, then we are dealing with an equivocal situation.

But you are making it out that I don't tell Dr. Becker, and there's something -- or tell them that Dr. Becker read it as negative and there's something wrong with that.

That is absolutely wrong, and you are putting the wrong context on that, and I am really objecting to it.

Q. Okay. Well, I am going to hand you Exhibit 10.

A. Sure. You'll show me some that say that, too, I'm sure.

Q. Again, here we see, this is an October 27, 2008 x-ray read.

A. Sure.

Q. This one, "No obvious pleural-based thickening or plaquing is noted. The patient had some mildly prominent chronic appearing interstitial changes." And under Impression it says, "No obvious evidence to suggest previous asbestos exposure."

A. Okay.

Q. This is very different from the previous two categories.

A. That's right. But if you are going to show

me this one, you had better show me the chart and the x-ray.

Q. Okay. Let's look at another example. I'm handing you --

A. I don't know what point you're making here.

Q. I am handing you what's marked as Exhibit 11. This is a January 25th, 1999 CT read.

Okay?

A. Uh-huh.

Q. And on this one, this one's a little bit longer, the impressions are there are some, and would you help me with the pronunciation of that word, just so we are correct? Would you read the impression?

A. What? "Emphysematous changes in both lungs."

Q. Just wanted to make sure I had that right. What is that?

A. Emphysema.

Q. And what is emphysema?

A. Lung disease that may be related to smoking or other diseases, chronic asthma, a number of other things, that creates blebs or hyperinflation.

Q. Could you read the next sentence, please?

A. "Previous sternotomy with what appears to be coronary artery bypass draft. Small wedge shaped density in the lower left lung field is probably scarring."

MR. STANSBURY: Did you catch that, sir?

COURT REPORTER: Uh-huh.

MR. STANSBURY: Okay.

Q. Are any of those statements consistent with an asbestos change, just so I am clear?

A. They might be.

Q. Emphysema is?

A. Yeah. They may be. If the guy's got interstitial lung disease, he may have blebs in both lungs.

Q. So, emphysema -- You're going to have to help me again, sir.

A. Emphysematous changes mean blebs.

Q. Okay. So, emphysematous changes --

A. Yes.

Q. -- could be caused by asbestos exposure?

A. Yes, they can. They can be caused by an asbestos interstitial disease.

Q. And the previous paragraph, I guess the second paragraph, it says, "The patient has had a previous sternotomy with sternal sutures and anterior mediastinal clips from what I suspect represents a coronary artery bypass."

Does that mean this person has had open heart surgery?

A. Probably. I am sure it is, yes.

Q. "There are no pleural based densities or calcifications."

Did I read that correctly?

A. That is correct.

Q. So, this person, he finds changes consistent with emphysema, this person has had previous heart surgery, and he sees no pleural changes, is that correct?

A. That's correct.

Q. Okay.

A. That's what it says.

Q. I'm handing you what's marked as Exhibit 12. This is a March 23rd, 2006 read by Dr. Becker.

A. Uh-huh.

Q. And again the impression. "No obvious evidence to suggest changes from previous asbestos exposure."

Is that correct?

A. Sure. Yeah.

Q. Okay. Now, I want to go back to Exhibit 11. I'm handing you what has been marked as Exhibit 13.

Is Exhibit 13 the same as Exhibit 11?

(Pause in the proceedings).

A. I think so. The date of birth is the same.

Q. It is also a January 25th, 1999 CT read,

Page 102

1  correct?
2      A.    Right.
3      Q.    And the person's name is Raymond Siefke,
4  spelled S-I-E-F-K-E --
5      A.    Siefke.
6      Q.    Siefke?
7      A.    Uh-huh.
8      Q.    Raymond Siefke?
9      A.    Right.
10     Q.    Date of birth, October 30th, 1921.  And once
11  again, as we discussed when we were looking at Exhibit
12  11, Dr. Becker is finding no pleural abnormalities,
13  evidence of coronary bypass surgery, and changes
14  consistent with emphysema.
15           Is that correct?
16     A.    That's right.
17     Q.    Okay.  I'm handing you what's been marked as
18  Exhibit 14.  Exhibit 14 is a medical record by Guy Katz.
19     A.    Uh-huh.
20     Q.    It is dated November 16, 1994.  It is also
21  for Raymond Siefke, is that correct?  Top left of the
22  page, sir.
23     A.    I think it's the same one.
24     Q.    The date --
25     A.    There are a whole bunch of Siefkes in town.

Page 103

1      Q.    Right.
2      A.    I'll grant you, it probably is.
3      Q.    Okay.  And the Impression here, "Markedly
4  abnormal stress test with reduced functional aerobic
5  capacity," and then "Positive EKG" -- excuse me --
6  "Positive EKG changes suggestive of ischemia."
7           Did I read that correctly?
8      A.    Yes.
9      Q.    What is ischemia?
10     A.    Lack of blood supply.
11     Q.    That is a heart disease, correct?
12     A.    Yeah.  I got him a bypass, so, this is the
13  same person obviously.
14     Q.    Right.  And that can cause some serious
15  problems with somebody having ischemia, correct?
16     A.    Yes.
17     Q.    Can cause chest pain?
18     A.    It can.
19     Q.    Can cause shortness of breath?
20     A.    It can.
21     Q.    And this was in 1994.
22     A.    He had a bypass at some point in time after
23  that.  And my chart would indicate that.
24     Q.    I'm handing you what's been marked as Exhibit
25  15.

Page 104

1      A.    Uh-huh.
2      Q.    This is a medical record generated by you,
3  also for Raymond Siefke.
4      A.    Uh-huh.
5      Q.    The date of this report record is February
6  28, 2001.  And it says as follows, at the top:  "Raymond
7  came back for a recheck of his asbestosis."
8           Did I read that correctly?
9      A.    Yep.
10     Q.    "I first saw him in January of 1999 with
11  significant abnormalities on his chest x-ray and on his
12  CT-scan at that time."
13           Did I read that correctly?
14     A.    Uh-huh.
15     Q.    Yes, sir?
16     A.    Yes.
17     Q.    "Dr. Becker, unfortunately, did not read the
18  CT-scan as showing abnormalities."
19           Did I read that correctly?
20     A.    You did.
21     Q.    Okay.  And I believe, looking at the date of
22  January 1999, this is probably referring back to this
23  Exhibit 13, which is a January 25th, 1999 CT read,
24  correct?
25     A.    I assume it probably is, yes.

Page 105

1      Q.    Okay.  Why is it unfortunate that Dr. Becker
2  is not finding asbestosis within Raymond Siefke?
3      A.    Okay.  Now, I'm not even going to answer any
4  more questions about this, unless I have the whole chart.
5      Q.    Okay.  Well, we're under a time constraint
6  here put on by your counsel.
7      A.    Well, I don't care about the time constraint,
8  then.
9      Q.    This is your patient, Dr. Whitehouse.
10     A.    I know.
11           MR. HEBERLING:  Objection, argumentative.
12  Let him finish.
13           THE WITNESS:  I want the whole chart
14  before I'm going to do this.  Because I don't know what
15  else is written about this here.  And I want the x-ray.
16  Okay?  You get me the x-ray, you get me the whole chart.
17  Because I know this guy.  I know this guy real well.
18     Q.    (BY MR. STANSBURY:)  Okay.  Can I speak now,
19  sir?
20     A.    Okay.
21     Q.    We were not given the x-ray or the CT for
22  this person.  The CARD Clinic did not have it.
23           With respect to his whole chart, we are not
24  given whole charts.  We have been given in drips and
25  drabs, pieces of evidence from the U.S. Government or

DR. ALAN WHITEHOUSE - by Mr. Stansbury
(509)456-0586  BRIDGES REPORTING & LEGAL VIDEO  (800)358-2345

1  you, through the CARD Clinic.
2        We do not have Raymond Siefke or any of these
3  individuals' complete records.   We have --
4        MR. HEBERLING:  Objection.
5        MR. STANSBURY:  -- selected records that
6  have been produced to us.
7        MR. HEBERLING:  Objection, argumentative.
8  There was a production in 2006 where you obtained six or
9  seven hundred charts, and we have produced hundreds of
10  others.
11        So, I don't think it's fair to characterize
12  this as dribs and drabs.
13        Q.   (BY MR. STANSBURY:)  Dr. Whitehouse, you said
14  just a second ago you know Raymond Siefke very well.
15        A.   I do.  But, you know, what you've done is
16  you've taken a couple things out of context in the whole
17  thing.
18        I took care of this gentleman for a long
19  time.  Okay?  If this is the same Raymond Siefke that I
20  know, he committed suicide over a worsening of his lung
21  disease.
22        I want the rest of the chart.  Because there
23  are other readings in the chart.  There are readings when
24  he went through screening with the ATSDR screening.  I
25  don't know what else there is.  But I want that.

1        Q.   Dr. --
2        A.   Just because you've got a Becker reading here
3  that doesn't show anything, doesn't read anything on it,
4  doesn't necessarily -- doesn't mean that I'm wrong.
5        What you're doing is trying to impeach me
6  over that one reading, and I won't let you do it without
7  the whole chart.
8        Q.   Dr. Whitehouse, we're working under a very
9  strict time limit.
10        A.   Well, look it --
11        Q.   Let me finish what I was going to say, sir.
12  And you can respond.  Okay?
13        A.   Yeah.
14        Q.   We are working under very strict time limits.
15  Okay?  We do not have all the time to look at the entire
16  chart to the extent that you've produced the entire
17  chart.
18        However, to the extent that you're willing to
19  waive the time limits, I'm perfectly willing to sit down
20  with the whole chart.
21        However, you're not going to prevent us from
22  moving forward with this so that you can review somebody
23  that you previously have stated you know well.
24        Moreover, to the extent that you want to
25  supplement your opinion, you have another report, you can

1  put in that report any other information you want on
2  Raymond Siefke.
3        At this time in my deposition, with my
4  limited time, we're going to go forward.  And, again, to
5  the extent that you want to supplement this in any way,
6  you are welcome to do so in your next report, sir.
7        A.   Okay.
8        MR. HEBERLING:  Okay, Counsel --
9        MR. SCHIAVONI:  I don't know that I am
10  in accord with that last point.  But I'm not ratifying
11  that.  That's all.
12        MR. HEBERLING:  Counsel, if he has to
13  have his chart in front of him and certain films to
14  answer questions, he cannot professionally answer the
15  question without that.  And that's the end of it.
16        So, if you have another deposition, you can
17  further inquire.  You will have all the charts once again
18  produced all over again by that time.
19        As you know, you've asked for all the charts
20  on all the clients.  So, you will have that by the time
21  of the next deposition, and you can further inquire then.
22        Q.   (BY MR. STANSBURY:)  Dr. Whitehouse, I
23  respect your desire to look at all of the charts.   We do
24  have this chart.  But again, if we're going to do that,
25  it's going to be either off the record or we are waiving

1  the time restriction.
2        You're not going to spend my time so you can
3  familiarize yourself with a patient you know well.
4        Do you want to waive the time restrictions?
5        MR. HEBERLING:  We will not waive the
6  time restrictions.  You can ask the questions at the next
7  deposition.
8        THE WITNESS:  You're -- Now, wait a
9  minute.  I've got something so say.
10        Q.   (BY MR. STANSBURY:)  I'm handing you what's
11  been marked as Exhibit 17.
12        MR. HEBERLING:  Well, let him finish --
13        THE WITNESS:  I have something to say
14  here.  Okay?
15        You are basically trying to entrap me in this
16  by not giving me the chart.  If you've got the chart, and
17  you know you've got the chart, you should have brought it
18  here along with this stuff so that I could have looked at
19  it.  Okay?
20        If you had the x-rays, you should have
21  brought it, or you should have told me you were going to
22  discuss this and I would have had it.
23        MR. STANSBURY:  I would have loved to have had
24  the x-ray and the CT for this person, but they are not
25  produced to us.

Page 110

1   THE WITNESS: Hey, that's not my fault.
2   MR. HEBERLING: If you wanted to discuss
3   Ray Siefke, you tell us, and we bring in the chart, we
4   bring the x-rays, and, fine, we can discuss the patient.
5   Q.   (BY MR. STANSBURY:) Dr. --
6   MR. HEBERLING: But he's got over 800
7   patients that he has seen. He can't remember every
8   single piece in every record.
9   Q.   (BY MR. STANSBURY:) Dr. Whitehouse, I'm
10   going to hand you what has been marked as Exhibit 17.
11   "Ray came back for a one-year follow-up for his chest
12   problems with a chief complaint that he can't breathe."
13   This is dated March 13, 2002.
14   "He is very short of breath. Much worse he
15   says in the last year. He said he is waking up short of
16   breath, which is a new phenomenon. He has had a little
17   trouble with his prostate, troubles with Lasix when he
18   gets it, which causes him to have a very large," is it
19   "diuresis"? "He is breathing" -- Excuse me. "He says
20   his breathing is progressively worse and he has an
21   irritative cough. He doesn't cough much up. His sternum
22   clicks. He has difficulty sleeping except on his left
23   side."
24   Did I read that correctly?
25   A.   That's right.

Page 111

1   Q.   All right. Now, below Exam, you have his
2   blood pressure at 170 over 80; heart: Negative except for
3   the sternal click and the disruption of his sternum. And
4   it says, "His chest x-ray now shows a rather marked
5   worsening of the interstitial" --
6   A.   No. You forgot something there.
7   Q.   Oh. Sorry.
8   A.   Why don't you read about the lungs?
9   Q.   Sure. Sure. "Reveal bilateral rales,
10   bilateral rubs in both posterior bases and the extent of
11   these is new. At one time I heard a few rales in the
12   past but this is a rather marked difference." Okay. So
13   now we see rales, bilateral rales, is that correct?
14   A.   Uh-huh.
15   Q.   Okay. "His chest x-ray now shows a rather
16   marked worsening of the interstitial change at the left
17   base. He has had continuing loss of his FVC on his
18   pulmonary function in spite of the fact that his
19   diffusion seems pretty well preserved. His vital
20   capacity is down to 76 percent. I exercised him and he
21   drops to 84 percent with walking.
22   "I obtain oxygen for him and at night and
23   when he was exercising. He is normally saturated at
24   absolute rest. I think we should check him at six weeks.
25   I did talk to him about what appears to be the

Page 112

1   progression of his asbestosis in the last one year and
2   will see him again in six months."
3   Did I read that correctly, sir?
4   A.   Yes.
5   THE VIDEOGRAPHER: Two minutes are left
6   on the tape, Counsel.
7   Q.   (BY MR. STANSBURY:) And at the bottom it
8   says, could you read that note at the bottom? I think it
9   is in your handwriting.
10   A.   "7-18. P.C. - told he committed suicide
11   several days ago (from Dr. Black)."
12   Q.   Now, Dr. Whitehouse, nowhere in here do you
13   talk about emphysema, do you?
14   A.   No.
15   Q.   Okay. Nowhere in here do you talk about any
16   lingering affects from his previous heart surgery, do
17   you?
18   A.   No.
19   Q.   Okay. Nowhere in here do you talk about the
20   loosening of the sternal wires, do you?
21   A.   Yes, I do.
22   Q.   Where?
23   A.   "Except for the sternal click."
24   Q.   Okay.
25   A.   "Disruption of his sternum."

Page 113

1   Q.   Let me make sure I understand your language.
2   That means the stern click, disruption of the sternum,
3   that means loose sternal wires?
4   A.   That means he disrupted his sternum at the
5   time of his surgery, yes.
6   Q.   So, we have an individual who Dr. Becker in
7   1999 read a CT as being negative with respect to pleural
8   changes but having emphysema, showing prior evidence of
9   heart surgery, this person has a diagnosis of ischemia
10   which causes shortness of breath and chest pain, and yet
11   you are focusing entirely upon the progression of his
12   asbestosis, is that correct?
13   A.   I'll give you an explanation for all of this,
14   because I don't think you understand this.
15   To begin with, he had a bypass. I had a
16   bypass also. I had a bypass 10 years ago. I'm not short
17   of breath. I don't have ischemia anymore. I don't have
18   chest pain. That's very common.
19   You get a bypass so that you correct whatever
20   vessel it was. And I don't know how many graphs he had
21   at the time.
22   But he had a good result from that. He had a
23   sternum that clicks and it's an irritant, doesn't affect
24   anything else.
25   Q.   Do you have loose sternal wires, sir?

29 (Pages 110 to 113)

Page 114

1    MR. HEBERLING:  Objection.  He may not
2  have finished his answer.
3    THE WITNESS:  I'm not finished yet.  I
4  don't have loose sternal wires.
5    But it doesn't make any difference.  I have
6  dealt with these for years.  I have set up the whole
7  respiratory unit for the cardiac surgery program at
8  Sacred Heart, which is probably where he had his surgery.
9    MR. SCHIAVONI:  I don't think there is a
10  question pending, so I would object.
11    MR. HEBERLING:  He is finishing his
12  answer.
13    MR. SCHIAVONI:  There is not a question.
14    THE WITNESS:  No.  But he is trying to
15  impeach me, and I have the right to say something about
16  it.
17    MR. SCHIAVONI:  No.  You can answer
18  whatever questions your lawyer asks when it's his time to
19  ask.  But I don't think you can just make speeches.
20    MR. HEBERLING:  There is a question
21  pending, and we can have it read back, if you want.
22    Q.   (BY MR. STANSBURY:)  Dr. Whitehouse --
23    MR. HEBERLING:  Wait a minute.  He's not
24  finished.  We agreed that you would let him finish his
25  answers.

Page 115

1    MR. STANSBURY:  I will respect the
2  agreement.
3    MR. SCHIAVONI:  All right.  I'm just
4  going to object to form, that this is not an answer, it's
5  just a speech.
6    MR. STANSBURY:  Duly noted.
7    MR. SCHIAVONI:  There is no question
8  pending, and I move to strike.
9    MR. HEBERLING:  Go right ahead and
10  finish.
11    THE WITNESS:  I lost my strain of thought
12  a little bit, too, here on top of it.
13    He had no evidence that any of this problem
14  with his heart was causing his problem.
15    Q.   (BY MR. STANSBURY:)  Okay.  This is --
16    A.   His pulmonary function abnormality, if he
17  drops to 84 percent with walking, that's a significant
18  degree of hypoxemia.  We don't just normally see that
19  with somebody that's got ischemia or may have had a
20  bypass.  That was due to his asbestos disease.
21    I don't know what Becker read there.  I'll
22  show you the x-rays, I'll show you the asbestos disease
23  and the interstitial disease.
24    And that's a good example.  Why would I tell
25  him that Dr. Becker read it as abnormal when he's got all

Page 116

1  of these symptoms, he's got abnormalities, he's got
2  rales, and the bilateral rales are consistent with this
3  asbestos disease.
4    Q.   He didn't read it as abnormal.  He read it as
5  normal with respect to asbestos changes.  He found --
6    A.   No.
7    Q.   -- emphysema.
8    THE VIDEOGRAPHER:  I'm sorry.  I'm going
9  to have to interrupt, or we're going to lose the tape.
10  So, we're going to have to go off the record.
11    MR. STANSBURY:  All right.  We will go
12  off the record for five minutes, and we will resume then.
13  Stop the time.
14    Ken, what's the time?
15    THE VIDEOGRAPHER:  We're going to go off
16  the record.  The time is approximately 10:19.
17    MR. STANSBURY:  Okay.
18    (Short recess).
19    THE VIDEOGRAPHER:  This is tape number 2
20  of the deposition of Dr. Alan C. Whitehouse.  The date is
21  March 19, 2009.  The time is approximately 10:32.  We are
22  now back on the record.
23    Q.   (BY MR. STANSBURY:)  Now, Dr. Whitehouse, you
24  had requested the x-ray or the CT of Raymond Siefke.  I
25  would also like to get a copy, or an original of the

Page 117

1  digital versions, to the extent they exist, on CT, of the
2  x-rays or the CT's.
3    Would you be willing to produce any x-rays or
4  CT's for Raymond Siefke in your possession or CARD
5  clinic's possession?
6    MR. HEBERLING:  There is a procedure for
7  that.  Please send us your request.
8    MR. STANSBURY:  We have requested them.
9    THE WITNESS:  You know, I go up there
10  once a month now.
11    Q.   (BY MR. STANSBURY:)  Okay.
12    A.   And I've got other things to do besides
13  provide them.  If you need those, you can actually make
14  copies of them.  They were up there making copies, what,
15  a couple weeks ago of everything that they didn't have.
16    I think you probably already have copies.
17  Nobody's trying to keep anything from you over there.
18    Q.   We specifically requested his radiology, and
19  none was available.
20    And, so, what I would ask, to the extent that
21  you have them elsewhere, other than CARD --
22    A.   I don't have them elsewhere.  All of my
23  x-rays are at the CARD Clinic.  I brought them all up
24  there.  So, if they've lost them or whatever the case may
25  be, there is nothing that I can do about that.

Page 118

1    Q.    Okay.  So, if it's not at the CARD Clinic,
2  you wouldn't have it anywhere else?
3    A.    No.  I don't have it at home, or anything
4  like that.
5    Q.    Okay.
6    A.    I don't keep any x-rays at home.  And it's
7  possible they might be at the other, the rest of the
8  pulmonary guys might still have it.  But I doubt it.
9  Because they've culled everything.
10        Well, that's been seven years.  It might be
11  there.  If you can't find it, you'll have to let me know,
12  and I will ask them.
13    Q.    Okay.  I am handing you what's been marked as
14  Exhibit 16.  This is a March 15th, 1995 record by a
15  cardiologist, Dr. Guy Katz.
16    A.    Uh-huh.
17    Q.    And this is a patient record for Raymond
18  Siefke.  And under impression, number 3, "COPD with
19  exacerbation of wheezing."
20        What is COPD?
21    A.    COPD may be related to emphysema, it may be
22  related to -- it basically is obstructive airways
23  disease.  That is what the abbreviation is for.
24    Q.    Could you say the abbreviation out for me,
25  what it is, what COPD stands for?

Page 119

1    A.    Chronic obstructive pulmonary disease.
2        MR. STANSBURY:  Did you get that, sir?
3        COURT REPORTER:  Uh-huh.
4    Q.    (BY MR. STANSBURY:)  Can COPD be cured?
5    A.    No.
6    Q.    So, if somebody is diagnosed with COPD, they
7  have COPD, correct?
8    A.    No.
9    Q.    Let me rephrase that.  If somebody has COPD,
10  they will have it for life, it is not something that can
11  go away over time, correct?
12    A.    No.  That's true.  If they actually have it.
13    Q.    Okay.  Do you doubt whether he actually had
14  COPD?
15    A.    I don't have the rest of the records here.
16  But I know that, from looking at death certs in Libby, a
17  large percentage of the people that die with asbestos
18  disease are called COPD, when there is absolutely no
19  evidence of it whatsoever in the chart.
20        It is sort of a common nomenclature of family
21  docs and general physicians, that anything that anybody
22  that has trouble with their breathing, they call it COPD.
23        So, I don't know.  You know, you haven't
24  given me the rest of the chart or the pulmonary
25  functions.  And I know you've got them.

Page 120

1    Q.    Okay.  But sitting here today, are you aware
2  of any histological confirmation of Raymond Siefke's
3  asbestosis?
4    A.    I'm not aware of any.
5    Q.    Okay.  Do you know if an autopsy was
6  performed?
7    A.    I don't think it was.  But I don't know that.
8  It might have been, that I don't know about.
9    Q.    Okay.  So, sitting here today, you're not
10  aware of whether there was any confirmation by histology,
11  correct?
12    A.    Correct.
13    Q.    Histology could determine whether he actually
14  had asbestosis, correct?
15    A.    Oh, it could, sure.  Possibly.
16    Q.    Okay.
17    A.    Possibly it could, and possibly it might not
18  either.  It depends on where they look.  Because
19  sometimes they do very limited autopsies.
20    Q.    Who is "they"?
21    A.    Well, in Libby, the mortician has been
22  trained, and I don't think he was trained at this time,
23  so there probably wasn't an autopsy, he's been trained by
24  Brad to take lung sampling.
25    Q.    So, Brad Black, who is a pediatrician,

Page 121

1  trained the -- is he a coroner, or what was his position?
2    A.    You know, you say that in a way, he's
3  pediatrician, like, you know, it's something
4  inappropriate.
5        No.  What he did was he went down and talked
6  to the fellow by the name of Schackenberg (phonetic
7  spelling) about how you can get -- how you sample lungs,
8  which is very easy to do, but you have to do it in six
9  quadrants and things like that in order to get adequate
10  sampling.
11        And we have a lot of people that already have
12  given permission, their families have, for autopsies when
13  they die with asbestos disease.  So -- But I don't think
14  he had been trained in 2002 to do that, I don't think he
15  had gotten that far at that point.
16    Q.    What kind of experience with autopsies does
17  Dr. Black have to permit him to train another as to how
18  to sample lungs?
19    A.    You know, you missed the point again.  Okay?
20  The point is, he just showed him where to get six
21  quadrants of tissue out of the lungs and put them in Form
22  1.  That's all he has to do.
23        It's no big deal.  Anybody can do it.  You
24  could probably train a chimpanzee to do it.
25    Q.    But they usually have a pathologist to do it,

31 (Pages 118 to 121)

DR. ALAN WHITEHOUSE - by Mr. Stansbury
(509)456-0586  BRIDGES REPORTING & LEGAL VIDEO  (800)358-2345

Page 122

1  correct? Isn't a pathologist usually the person who
2  would determine whether there was any asbestosis, based
3  on histology?
4      A.    He might. But autopsies are very rarely
5  done, because the clinicians generally have far more
6  information about it than actually comes out from the
7  autopsy, which is strictly the anatomic part of it.
8          The physician, the practicing physician, has
9  the physiology.
10     Q.    So, a chimpanzee could do this?
11     A.    Well, that was maybe a bad crack. But it
12 doesn't require anybody very intelligent to get pieces of
13 lung in the process of embalming a body.
14     Q.    Okay.
15     A.    It's very easy to do.
16     Q.    And then examining that lung?
17     A.    Well, that's up to a pathologist to do it, if
18 they were going to do it.
19     Q.    So, it is certainly not a chimpanzee that
20 would do that part?
21     A.    No.
22     Q.    It would be a pathologist that would examine
23 the lung?
24     A.    That's correct.
25     Q.    And if someone were to examine Raymond

Page 123

1  Siefke's lung and pleura, he or she could have determined
2  whether he had asbestosis, correct?
3      A.    Probably so.
4          MR. HEBERLING: Objection, asked and
5  answered.
6      Q.    (BY MR. STANSBURY:)  Your answer was
7  "probably so," sir?
8      A.    Probably so. But I don't know.  It depends
9  on who did it, how much they knew about it.
10         It's frequent that when you look at the lung,
11 you cannot make a diagnosis of asbestos bodies or see
12 asbestos in the lung.  That's not unusual at all.
13         The same thing with the pleura. In fact,
14 more frequently in the pleura. It's more by visualizing
15 it than it is anything else.
16     Q.    What about Dr. Sam Hammar.  Does he have the
17 competence to make that examination?
18     A.    Sure, he does.
19     Q.    What about Dr. Victor Roggli?
20     A.    Roggli?
21     Q.    Yes, sir.
22     A.    I would think so.
23     Q.    I want to shift gears for a second to another
24 issue.
25         You know, I was in Missoula when you

Page 124

1  testified in the criminal case, and you talked about the
2  fact that your views on pleural disease had changed over
3  time.
4          Is that correct?
5      A.    That's correct.
6      Q.    Additionally, you were not aware that there
7  was an environmental-only disease in Libby until mid to
8  the late '90s, is that correct?
9      A.    Yes.
10     Q.    Through your work as a pulmonologist,
11 treating people from Libby, and taking occupational
12 histories, you've familiarized yourself with, to an
13 extent, the history of vermiculite operation in Libby,
14 correct?
15     A.    To some degree, yes.
16     Q.    Okay. You are aware of when it began?
17     A.    Yes.
18     Q.    When did it begin?
19     A.    In the 1920s.
20     Q.    Okay. And it continued to the '30s and '40s
21 and '50s, correct?
22     A.    Yes.
23     Q.    What were the exposures like at that time?
24     A.    I assume they were quite high.
25     Q.    Okay. Very high, correct?

Page 125

1      A.    Yeah.
2      Q.    And into the '60s, they were also high,
3  correct?
4          MR. HEBERLING: Objection. Unclear as to
5  where these exposures are.
6      Q.    (BY MR. STANSBURY:)  So, Dr. Whitehouse,
7  let's talk about the dry mill, for example.  Exposures in
8  the dry mill in the '60s were very high, correct?
9      A.    They were.
10     Q.    And it was in the '70s that the wet mill was
11 put in place, correct?
12     A.    Right.
13     Q.    And the exposures in the wet mill were far
14 lower than the exposures in the dry mill, correct?
15     A.    I assume so, although I don't know that I've
16 seen all the data.
17     Q.    I'm handing you what has been marked as
18 Exhibit 21.
19         Do you recognize this document?
20     A.    Oh, yes.
21     Q.    What is this document?
22     A.    An article by Amandus.
23     Q.    Okay. Who is Harlan Amandus?
24     A.    Oh, he's somebody that works at NIOSH. He's
25 a Ph.D.

32 (Pages 122 to 125)

1    Q.    Okay.  And are you aware that he did a study
2  of the Libby workers in the 1980s?
3    A.    Yes.
4    Q.    You're very familiar with this?
5    A.    The '80s or the '70s?
6    Q.    I believe he did a study in the '80s.  I
7  believe it was published -- This article, Exhibit 21,
8  which is entitled "The Morbidity and Mortality of
9  Vermiculite Miners and Millers Exposed to
10  Tremolite-Actinolite: Part I, Exposure Estimates," was
11  published in the American Journal of Industrial Medicine
12  in 1987, is that correct?
13    A.    That's right.
14    Q.    And just so I am clear, the American Journal
15  of Industrial Medicine, that's where your 2004 article
16  was published, is that correct?
17    A.    That's correct.
18    Q.    Along with your 2008 case report on
19  mesothelioma cases, is that right?
20    A.    Right.
21    Q.    I have often heard that journal referenced in
22  the same sentence as Dr. Selikoff.  Is there a reason for
23  that?
24    A.    Well, Landrigan was the editor of the
25  American Journal who actually took over for Selikoff when

1  he died.
2    Q.    So, Selikoff was the editor of this journal
3  until he died?
4    A.    I think he was.
5    Q.    I think he was, too.  But if you will turn to
6  page 4.
7          (Pause in the proceedings).
8    A.    Uh-huh.
9    Q.    Okay.  This is a table, Table III, "The
10  Average f/cc," which I believe is fibers per cubic
11  centimeter, is that correct?
12    A.    Uh-huh.
13    Q.    The average --
14    A.    Yes.
15    Q.    Good.  "The average f/cc Values Calculated
16  From Membrane Filter Samples Collected in 1967 through
17  1982 by Location-Operation and Year."
18          And, so, what we have here is a table that
19  lists, you know, various exposure levels.  And I'm not
20  looking to get too far in the weeds here.  I just want to
21  establish a couple things.  If we look down to dry mill.
22    A.    Yes.
23    Q.    '67 through '71.  What is the average
24  exposure?
25    A.    35.9.

1    Q.    And that's --
2    A.    Fibers per cc.
3    Q.    And that's a high exposure, correct?
4    A.    Yes.
5    Q.    Somebody who was exposed to that day in and
6  day out for many years could develop asbestosis, correct?
7    A.    And did.
8    Q.    So, that -- Okay.  Let's go down to the new
9  wet mill (nonmillwright).
10    A.    Right.
11    Q.    And look at the post-1976 exposures.  What
12  are the averages there?
13    A.    2.0.
14    Q.    Post-'76.  Not '75 through '76.  Post-'76,
15  which is the one below that.
16    A.    Oh.  0.8.
17    Q.    Okay.  And how many samples was that based
18  on?
19    A.    1200.
20    Q.    Okay.  So, that's a lot of data, correct,
21  sir?
22    A.    Yes.
23    Q.    Okay.  And this is, again, a NIOSH report,
24  correct?
25    A.    Yes.

1    Q.    Okay.  Now, so, the exposures in the dry mill
2  were substantially higher than the post-wet mill
3  exposures, correct?
4    A.    Yes.
5    Q.    And the dry mill was in operation in the '40s
6  and '50s and '60s, correct?
7    A.    That's correct.
8    Q.    So, people were exposed in the 1940s to very
9  high levels of asbestos, correct?
10    A.    Yes.
11    Q.    And in some cases they brought it home, and
12  that asbestos was unfortunately spread to family members,
13  correct?
14    A.    That's correct.
15    Q.    Okay.  And people who were exposed at that
16  time, the latency period for these diseases vary, but is
17  30 years a reasonable -- is 30 years a reasonable
18  estimate of latency?
19    A.    Oh, I think it's less than that.
20    Q.    20 years?
21    A.    Well, latency is a very difficult thing to
22  establish, because these people, and Grace's own data,
23  shows that a large number of these people had plaques on
24  their x-rays within five years.
25    Q.    So, people who are exposed in the 1950s,

Page 130

1 their course of disease in some cases was beginning by
2 the 1960s, correct?
3     A.    Yes.
4     Q.    And they were going through this continuum we
5 have discussed, correct?
6     A.    Right.
7     Q.    So, if people would have been exposed in the
8 '40s and '50s, developing diseases in the '60s and '70s
9 and '80s, correct?
10     A.    Correct.
11     Q.    However, and you had the opportunity to treat
12 many of these people, correct?
13     A.    Probably a fair number of them. Most of the
14 ones that I treated had started working there after 1960.
15     Q.    Okay. But even those people who started
16 working, let's say, in 1960 --
17     A.    Uh-huh.
18     Q.    -- the potential that this continuum, as you
19 call it, could have begun in 1965, correct?
20     A.    Could have.
21     Q.    Okay. And then the progression occurs from
22 the onset of disease, correct?
23     A.    Yes.
24     Q.    However, these individuals whom you started
25 seeing in the 1970, 1980, which one?

Page 131

1     A.    1980s.
2     Q.    Okay. So, these people that had been
3 progressing from 1960s who you treated in the 1980s, you
4 never attributed their obstructive disease to their
5 asbestos exposure, did you?
6     A.    Now, what time frame are you talking about?
7 And specifically? We need to be more specific.
8     Q.    I will be very specific. My question deals
9 with people who are exposed in the '50s and '60s.
10     A.    Yes.
11     Q.    Began progressing soon thereafter, and you
12 said as soon as five years.
13     A.    Uh-huh.
14     Q.    And you began treating them in the early
15 1980s, correct?
16     A.    Right.
17     Q.    But you did not observe a distinct pleural
18 pattern at that time, did you?
19     A.    No. That was a matter of learning it, as
20 time went by.
21     Q.    Okay.
22     A.    In fact there's people, and you probably have
23 got the films, too, that I read as normal in 1980, and
24 then I went back when I saw them in '85 and saw that I
25 missed the findings on it.

Page 132

1     Q.    Okay. So, it took you the course of your
2 career to identify the distinct pattern of pleural
3 disease in Libby, correct?
4     A.    No, not the course of my career. No. I
5 identified it within about three or four years of
6 starting to see those people.
7     Q.    So, mid 1980s?
8     A.    Probably.
9     Q.    So, by the --
10     A.    Certainly by the mid-1980s I recognized that
11 there was significant pleural disease. You know, I don't
12 keep track of the dates and that sort of thing.
13     Q.    Let me make sure I'm clear when I say pleural
14 disease. The idea that the pleural disease in Libby was
15 more severe than, say, chrysotile or other forms of
16 pleural disease, you didn't have that opinion in the
17 1980s, did you?
18     A.    Oh, yeah, I did. I did by the end of the
19 1980s, yeah. By 1990 I surely did.
20     Q.    You testified earlier, however, that it was
21 the late 1990s, I believe, at the criminal trial, it was
22 in the late 1990s when you started believing that pleural
23 disease in Libby was discussed.
24     A.    No. That was then a misstatement, because I
25 had known before that that the pleural disease was a

Page 133

1 different process.
2         But it was all in miners at that point in
3 time. It was when the environmental cases and the family
4 member cases started to become so prolific, that I
5 started to look at it more critically.
6         I don't remember the exact dates. It might
7 have been the early '90s for all I know.
8         But I know that I saw -- I testified at trial
9 in 1989 relative to pleural disease at that point in
10 time, and I was certainly becoming aware of the fact that
11 there was something different going on.
12     Q.    Now, you mentioned environmental cases. Were
13 people being exposed to asbestos environmentally in the
14 1950s?
15     A.    Probably.
16     Q.    Okay. Yet you did not see any of these cases
17 until the late 1990s?
18     A.    You know, I don't have explanations for all
19 of that. I don't know the answer to that.
20     Q.    Okay.
21     A.    There is no way I can get the answer to it.
22     Q.    That was my question, was why you weren't
23 seeing this environmental --
24     A.    I have no idea.
25     Q.    -- disease earlier.

DR. ALAN WHITEHOUSE - by Mr. Stansbury
(509)456-0586  BRIDGES REPORTING & LEGAL VIDEO  (800)358-2345

Page 134

1    A.    I have no idea.  Maybe they moved away.  A
2  lot of those people died and they were signed out on
3  their death certificates a COPD.  We know that.  But I
4  don't know the answer to that.
5    Q.    Okay.  Now, who is Aubrey Miller?
6    A.    He's a gentleman who worked for the EPA.
7    Q.    And who is Dan Middleton?
8    A.    He's a gentleman that works for ATSDR.
9    Q.    And what is ATSDR?
10    A.    What is it?  It's toxic disease registry.
11  What are the first two?
12    Q.    I think it's the agency for --
13    A.    Agency for toxic disease.
14    Q.    Just so we have it clear.
15    A.    Right.
16    Q.    Agency for Toxic Substances and Disease
17  Registry, is that correct?
18    A.    That's right.  You've got it.
19    Q.    And you are aware of the mortality analysis
20  that they did for 1979 to 1998, is that correct?
21    A.    Yes.
22    Q.    What is your opinion of that study?
23    A.    It's a very flawed study.
24    Q.    Why is it flawed?
25    A.    Well, if you show me the --

Page 135

1    Q.    Sure.
2    A.    -- the chart in there.
3    Q.    Yeah.  I'll give it to you right now.
4    A.    Where is mine?
5    Q.    Here is your copy right here.
6    A.    You've got mine.
7    Q.    Sure.  Sure.  I'll give this back to you.
8  No.  I will hand you what has been marked as Exhibit 25,
9  which is mortality in Libby, Montana, 1979 to 1998.
10    A.    Right.
11            (Pause in the proceedings).
12          MR. HEBERLING:  Does that have an Exhibit
13  Number?
14          MR. STANSBURY:  25.
15          THE WITNESS:  It's got the whole thing in
16  here.  I will see where the one page I want is.
17    Q.    (BY MR. STANSBURY:)  Okay.  You go to the
18  page you want and I'll go to the pages I want.
19    A.    Well, go ahead.
20    Q.    Can you flip back, there are some tables in
21  the --
22    A.    It's on page 25, is probably what you're
23  going to want me to look at.
24    Q.    All right.  Well, Table 8.
25    A.    Yep.

Page 136

1    Q.    So, are you familiar with this table?
2    A.    Oh, I'm very familiar with it, yes.
3    Q.    Now, are you familiar with confidence
4  intervals?
5    A.    Yeah.  And to begin with, it's a very flawed
6  study.  They have one case of asbestosis.
7          And this was a death certificate study.
8  That's all.  They didn't look at charts or anything else.
9    Q.    Okay.  I understand, sir.
10    A.    And the doctors in Libby signed everybody out
11  as COPD.  I mean, it's garbage in, garbage out.
12    Q.    Let's look at that COPD line within Table 8.
13    A.    I know that.  I know that.
14    Q.    And against the Montana SMR and U.S.SMR, and
15  in both incidents the confidence intervals include a
16  range of a value of less than 1, is that correct?  Is
17  that correct?
18    A.    You know, I'll stick to what I said.  It's
19  garbage in, garbage out.
20    Q.    Dr. Whitehouse, is that correct, though?
21    A.    Yes.  For what it says, yeah, what it says
22  there.  But it's garbage.
23    Q.    It's garbage because they only looked at
24  death certificates?
25    A.    Yeah.  And the way the death certificates

Page 137

1  were coded, which was mostly COPD.  And I've looked at
2  those, and they are the same death certificates, and have
3  the charts.
4    Q.    And based on that notion, that they are
5  mostly COPD, we should probably see some of the
6  asbestosis deaths classified as COPD, then, correct?
7    A.    A huge number of them.
8    Q.    Right.  So we have 73 observed COPD deaths.
9  Is that correct?
10    A.    Yes.
11    Q.    In the Montana expected was 86.1, is that
12  correct?
13    A.    Yes.
14    Q.    The U.S. expected was 63.2, is that correct?
15    A.    That's what it says.
16    Q.    Now, the confidence intervals for the SMR's
17  for both include a value of less than one, correct?
18    A.    Yes.
19    Q.    Okay.  So, that suggests that there is no
20  statistically significant elevation in COP death rate
21  within the nonworking population in Libby from 1979 to
22  1998, correct?
23    A.    No.
24    Q.    Why?
25    A.    Because the study is so badly flawed that it

35 (Pages 134 to 137)

1  should not have ever been published in here.
2      Q.    You said it was badly flawed in part because
3  they were sticking asbestos --
4      A.    No.  Because all they did was death
5  certificates.
6      Q.    Let me finish my question, please.
7      A.    Okay.
8      Q.    You said part of the flaw -- the big flaw of
9  this study was that asbestosis deaths were improperly
10  classified as COPD.
11          Now, if that were the case, we should see an
12  elevated level of COPD deaths, were there elevated deaths
13  of either asbestosis or COPD in the non-working
14  population, correct?
15          MR. HEBERLING:  Objection, misstates the
16  testimony.  He didn't say that was the big flaw.
17          THE WITNESS:  This study was done on
18  death certificates only.  Charts weren't reviewed.
19          And you don't do studies concerning mortality
20  of diseases like this without having looked at the
21  charts.
22          Because if you rely on physicians who are not
23  even aware of the problems that they've got in the
24  community to code death certificates, they code most of
25  them as COPD, or other respiratory things, you know, and

1  then there's the combined cause, and God knows what that
2  is.  I know very well that it's flawed.
3      Q.    Dr. Whitehouse, I'm going to repeat the same
4  question.  I don't think you answered it last time.
5          If they were misclassifying asbestosis deaths
6  as COPD, the deaths still would have showed up as COPD
7  deaths, correct?
8      A.    Yes.  But maybe the COPD rate was lower.  I
9  don't know.  You know, you are asking me to answer a
10  question, a hypothetical question, based upon crummy
11  data, and I'm not going to answer it anymore because
12  there is no way to do it.
13      Q.    This is not a hypothetical question, Dr.
14  Whitehouse.  You are the person who has introduced the
15  possibility of misclassification of asbestosis death as
16  COPD.
17          You do agree that that happens, correct?
18      A.    Yes.
19      Q.    Okay.  And if that happened, we would then
20  look at the COPD deaths to see if there was an elevated
21  level of COPD, correct?
22          MR. HEBERLING:  Objection, asked and
23  answered.
24      Q.    (BY MR. STANSBURY:)  We are not seeing that,
25  are we?

1      A.    No.  Maybe because of being in Libby and
2  maybe, these were environmental, excluding workers and
3  all, maybe they were nonsmokers.  Maybe the COPD death
4  rate might have been very, very low.
5          Maybe 40 of those deaths are all asbestosis
6  deaths that were miscoded, then the COPD death rate is
7  lower.  I don't know the answer to that.  I know the
8  study was badly flawed.
9          You mean, only one death from asbestosis?
10  That's ridiculous.  I had a half a dozen in my own
11  practice.
12      Q.    From environmental exposure?
13      A.    Yeah.  Not from environmental.  I guess, it
14  excludes workers.
15      Q.    Right.  That's the whole point of this, Dr.
16  Whitehouse.  I'm looking at environmental only.  I'm
17  excluding the working population.
18          And I heard your earlier criticism that they
19  misclassified asbestosis as COPD.  And I wanted to look
20  at that a little bit more closely.  However, I am not
21  seeing a statistically elevated level of COPD, nor am I
22  seeing a significantly elevated level of combined causes
23  of death either.  Which combines lung cancer,
24  mesothelioma, COPD, asbestosis and other respiratory
25  diseases.

1          Am I reading that correctly, combined causes?
2          MR. HEBERLING:  Objection, asked and
3  answered.  He said it was crummy data.  That's it.
4          MR. STANSBURY:  I'm going to ask you to
5  no longer direct the witness.  You can lodge your
6  objection, but they should be stated succinctly and not
7  in a manner to try to steer the witness.  Thank you.
8      Q.    Dr. Whitehouse, combined causes looks at
9  other respiratory, asbestosis, COPD, mesothelioma and
10  lung cancer, correct?
11      A.    Yes.
12      Q.    And there is not a statistically significant
13  elevated level of death by those combined causes amongst
14  the non-working population in Libby from 1979 to 1998,
15  correct?
16          MR. HEBERLING:  Objection, asked and
17  answered.
18          THE WITNESS:  It's crummy data, and I'm
19  unable to deal with it anymore.
20      Q.    (BY MR. STANSBURY:)  Dr. Whitehouse --
21      A.    I know it's crummy data.
22      Q.    Dr. Whitehouse?
23      A.    Yes.
24      Q.    I'm just asking what the table says and
25  whether it's accurate.  This is from the ATSDR, who you

Page 142

1  have dealt with, working with on your pilot study. This
2  is a government agency. And I am asking about what they
3  find based upon a review of death certificates.
4             MR. HEBERLING: Objection, asked and
5  answered. You're asking him if he thinks it's
6  accurate. He's answered that --
7     Q.    (BY MR. STANSBURY:) Dr. --
8     Q.    -- three or four times.
9     Q.    (BY MR. STANSBURY:) Dr. Whitehouse, I'm not
10 asking you for anything other than what the table says.
11 And by combined causes of death, we see no statistically
12 significant elevated level of death in the non-working
13 population from 1979 to 1998, correct?
14            MR. HEBERLING: Objection, asked and
15 answered.
16    Q.    (BY MR. STANSBURY:) Correct, sir?
17            MR. HEBERLING: Objection. Asked and
18 answered.
19    Q.    (BY MR. STANSBURY:) Correct, sir?
20            MR. HEBERLING: Objection, asked and
21 answered.
22    Q.    (BY MR. STANSBURY:) You may answer the
23 question.
24    A.    In reviewing very flawed deaths -- very
25 flawed data, that's what it says.

Page 143

1     Q.    Okay. We have come to agreement on that,
2  then. You do not agree.
3             What analysis have you done to determine that
4  the data was flawed?
5     A.    You know, I haven't done an analysis myself.
6  But I'm very tuned to what goes on in Libby and what is
7  said about this by a variety of people.
8             And I'm not even going to try to repeat or go
9  through everything. But I've been known -- I've known
10 for a long time that this was flawed data.
11    Q.    Let me unpack what you've just said. You
12 haven't reviewed this data systematically to analyze
13 whether it's --
14    A.    No.
15    Q.    -- valid, correct?
16    A.    No. That information came from people that
17 were in the know about the study and how it was done in
18 the first place.
19    Q.    Who were these people in the know?
20    A.    I don't know. I can't even remember who it
21 was, it's been so darn long ago. This came about in
22 meetings and things like that that I have been to.
23    Q.    But just so I am clear, you haven't analyzed
24 this data yourself, then?
25    A.    No, I haven't. Why would I?

Page 144

1     Q.    Well, because you are sitting here, trying to
2  not answer a question, based on --
3             MR. HEBERLING: Objection, argumentative.
4             MR. SCHIAVONI: I would move on.
5             MR. STANSBURY: May I finish the
6  question?
7             MR. HEBERLING: No. You can't finish a
8  question like that.
9     Q.    (BY MR. STANSBURY:) Dr. Whitehouse, you have
10 criticized this data and are refusing to answer questions
11 about the data in this study, but you yourself have not
12 analyzed this data, have you?
13            MR. HEBERLING: Objection, argumentative.
14 He has not refused to answer your questions. Ask him a
15 proper question.
16            Don't answer that question.
17            MR. STANSBURY: Dr. -- Excuse me. Mr.
18 Heberling --
19            MR. HEBERLING: Go ask a proper question.
20            MR. STANSBURY: -- please do not instruct
21 your witness.
22            THE WITNESS: He has instructed me not
23 to answer the question. I am not going to answer.
24    Q.    (BY MR. STANSBURY:) Is he your lawyer?
25    A.    What?

Page 145

1     Q.    Does he represent you?
2     A.    He represents the Libby people.
3     Q.    Okay. I am asking you a question. You are
4  not answering questions about --
5             Did you refuse to answer any more questions
6  about this?
7     A.    No, not about the other. But I am not going
8  to answer that question.
9     Q.    About the table?
10    A.    Yeah. You are going to ask me whether or
11 not I reviewed the data myself.
12            No, I didn't review the data myself. You
13 already know the answer to that.
14    Q.    Okay. Good. I just wanted to make sure we
15 are clear on that.
16    A.    So, why ask?
17    Q.    Because you were refusing to answer other
18 questions --
19            MR. HEBERLING: Objection. He has not
20 refused. The record will show that he has not refused to
21 answer other questions.
22            MR. STANSBURY: Allow me to state my
23 questions before stating your objections.
24            MR. HEBERLING: It's not a proper
25 question.

DR. ALAN WHITEHOUSE - by Mr. Stansbury
(509)456-0586  BRIDGES REPORTING & LEGAL VIDEO  (800)358-2345

1    Q.    (BY MR. STANSBURY:)  Dr. Whitehouse, you
2  didn't want to answer any more questions about Table 8,
3  did you?  And because, the reason you stated was, you
4  didn't like the data in this study, correct?  Garbage in,
5  garbage out?
6    A.    That's correct.
7    Q.    Okay.  Garbage in, garbage out, but you never
8  analyzed the data yourself, did you?
9    A.    I did not.
10    Q.    Okay.  Thank you.  I'm handing you what's
11  been marked as Exhibit 26.  And this is entitled Review
12  of Asbestos-Related Abnormalities Among a Group of
13  Patients from Libby, Montana, A Pilot Study of
14  Environmental Cases, Final Report, August 2002.
15    A.    I'm aware of this.
16    Q.    Okay. And in fact you weren't just aware of
17  this, you were involved in this, weren't you, sir?
18    A.    Yeah.  I provided the cases.
19    Q.    And you worked with Dan Middleton on this,
20  correct?
21    A.    Well, basically, I provided the cases that I
22  thought were environmental cases.
23    Q.    Okay.
24    A.    And then they took it from there.
25    Q.    Okay.  Did you have any involvement with them

1  after they took it from there, as you put it?
2    A.    No.
3    Q.    Okay.
4    A.    None at all.
5    Q.    I hand you what has been marked as Exhibit
6  27.  It is a letter dated March 21st, 2001, from you to
7  Jon Heberling, attorney.
8        And that is Jon Heberling sitting next to
9  you, correct?
10    A.    Uh-huh.
11    Q.    Yes, sir?
12    A.    Yes.
13    Q.    And focusing on the second -- third
14  paragraph, "The second issue that came up concerning,"
15  and this name has been redacted, "is that the EPA has
16  asked me about patients I might have that have asbestos
17  only from insulation and having worked outside of Libby.
18  I guess this is of some importance to them as far as
19  their getting funds for their continuing investigation.
20  I would wonder how you feel about releasing data on a
21  confidential basis to the EPA concerning" blank.  "It
22  would be all right with" blank "to do so but I thought I
23  would check with you first."
24        Do you remember writing this letter, sir?
25    A.    No.

1    Q.    Okay.  Is that your signature at the bottom,
2  sir?
3    A.    Yes.
4    Q.    Okay.  Now, is this in any way related to the
5  ATSDR pilot study?
6    A.    No, I don't think so.
7    Q.    Okay.  This is about providing materials to
8  EPA.
9    A.    Yes.
10    Q.    Was there ever a study that came from this?
11    A.    I don't think so.
12    Q.    Did you provide any information to EPA?
13    A.    I don't know.  I don't think so.  I doubt I
14  did.
15    Q.    Okay.
16    A.    But I don't know.
17    Q.    Why would you be seeking Jon Heberling's
18  permission to send patient records, your patients, to
19  EPA?
20        MR. HEBERLING:  Objection, misstates the
21  letter.  It doesn't necessarily mean patient records.
22        THE WITNESS:  I'm not even -- I don't
23  even recall what this was about.
24            (Pause in the proceedings).
25        THE WITNESS:  I have no idea.  I can't

1  even recall.
2    Q.    (BY MR. STANSBURY:)  Okay.  Well, I'm handing
3  you what has been marked as Exhibit 28.  This is a
4  deposition of Dan Middleton, taken in the cost recovery
5  action.
6        You mentioned that Dan Middleton was one of
7  the individuals you had worked with on the ATSDR pilot
8  study.  You provided him with cases, correct?
9    A.    Yeah.
10    Q.    Okay.  I'd like to direct you to page 13 of
11  his sworn testimony.  And if you look right here where my
12  finger is pointing, which doesn't have line numbers, but
13  about a fourth of the way down the page.
14        "QUESTION:  When you made this request of
15  Dr. Whitehouse, how many people did he identify?
16        "ANSWER:  27.
17        "QUESTION:  27?  At any time did he tell
18  you there were more than 27?
19        "ANSWER:  I think that there was a cutoff
20  point.  I think that he gave us -- I would have to go
21  back to the protocol, but I believe there were up
22  through -- well, I don't remember exactly what it was to
23  be honest with you, but it was sometime between when we
24  started in 2000 and the report.  But, there was a cutoff
25  point and he did indicate that there were more, but I

Page 150

1  believe he identified he had seen up to a certain point.
2          "QUESTION:  Certain point in time?
3          "ANSWER:  Yes.
4          "QUESTION:  But you believe that he told
5  you that there were actually more than 27?
6          "ANSWER:  Yes.
7          "QUESTION:  And what did you do with that
8  information that there were more than 27, did you want to
9  get that information?
10         "ANSWER:  We didn't pursue that.  We had
11  to have some cutoff point, so we selected a cutoff
12  point."
13         Did I read that correctly, sir?
14  A.    Yes.
15  Q.    So, you had more than 27, but you only
16  provided 27 to ATSDR, is that correct?
17  A.    I provided all I had up to the cut-off point
18  that they gave me.
19  Q.    Okay.
20  A.    And I don't know how many more I had after
21  that.
22  Q.    And how many of those individuals were
23  determined to have only environmental exposure?
24  A.    In that 27?
25  Q.    Yes, sir.

Page 151

1  A.    There were eight of them.
2  Q.    So, out of the 27, eight had environmental
3  exposure, correct?
4  A.    Yeah.  And basically what they did was they
5  went through every little single detail about it, and
6  were able to find another exposure, and they were very,
7  very strict about the thing, to get down to those eight.
8  Q.    Okay.  I'm going to ask you to turn to page
9  18, please.  Now, these x-rays for these individuals were
10  classified by B-readers, correct?
11  A.    I think they were, yeah.
12  Q.    Three B-readers, actually, right?  I'm going
13  to read, and please follow along with me toward the top
14  of the page.
15         "QUESTION:  With respect to these four
16  that the reviewers and your study had found did not have
17  lung changes consistent with asbestos-related disease,
18  how did Dr. Whitehouse react to that?
19         "ANSWER:  He was upset.
20         "QUESTION:  Did he tell you why he was
21  upset?
22         "ANSWER:  I don't think so.
23         "QUESTION:  How did he express that state
24  of being upset, did he call you?
25         "ANSWER:  Yes.

Page 152

1          "QUESTION:  And --
2          "ANSWER:  Yes.  He did call me at least
3  once to discuss it.
4          "QUESTION:  And can you" --
5          Answer, they're talking over each other.
6          "ANSWER:  Well, I can't recall if I
7  called him or he called me but we talked.
8          "QUESTION:  You had a conversation.
9          "ANSWER:  Yes.
10         "QUESTION:  What was the nature of
11  what -- what did he express to you about these findings?
12         "ANSWER:  He was very upset that the
13  B-readers had not confirmed his reading of x-rays.
14         "QUESTION:  And did he give you any
15  opinion?  What did he tell you about the B-readers
16  results?  What did he say about it?
17         "ANSWER:  I don't remember specifically.
18  He was upset that they had disagreed with him and
19  certainly believed he was correct.
20         "QUESTION:  Did he ask you to redo the
21  study with respect to those people?
22         "ANSWER:  I think he -- not redo the
23  study, I think he was -- his first question -- what we do
24  is a case series and he asked if we could just leave
25  those out.

Page 153

1          "QUESTION:  And you didn't leave them
2  out, though, right?
3          "ANSWER:  No.
4          "QUESTION:  Why not?
5          "ANSWER:  It wouldn't have been a
6  complete -- it would have been inappropriate."
7          Did I read that correctly, sir?
8  A.    Yes.
9  Q.    Do you recall this conversation of Mr.
10  Middleton?
11  A.    I don't recall that conversation.  And I want
12  to go down about another line, too.
13  Q.    Okay.  Sure.
14  A.    "QUESTION:  Did he ever threaten to take his
15  name off your poster?
16         "ANSWER:  Yes."
17  Q.    Answer, yes.  Okay.  So, you were upset and
18  you threatened to take the name off the poster, is that
19  true?
20  A.    No.
21  Q.    You never threatened --
22  A.    No.  That's an absolute wrong.
23  Q.    So, you do not agree with what Mr. Middleton
24  has said under oath?
25  A.    No.  I never talked to him about that at all.

Page 154

1 I never would have said that. You know --
2    Q.    Did you have a reaction --
3    A.    I didn't have this reaction about being upset
4 either. I called him -- or he called me, one or the
5 other, to talk it over with him about what the
6 B-readers --
7         These were people, some of whom had fairly
8 subtle findings on their x-rays that I, you know, that I
9 gave him the names to. Perhaps maybe what we need to do
10 is go back and get all of those names out of there and
11 then go back and look at the x-rays again and see what
12 happened subsequently to them.
13    Q.    That would be great.
14    A.    Get the whole charts.
15    Q.    That would be great. If I requested that
16 through Mr. Heberling, would you be willing to give me
17 the names of the individuals who were in the ATSDR pilot
18 study?
19    A.    I don't even have them anymore.
20    Q.    You don't have them anymore?
21    A.    I don't. Dan Middleton has them. It was all
22 confidential. He has the names, though, at this point.
23    Q.    Okay.
24    A.    Or he has the numbers that would allow it to
25 be found. It was a long time ago.

Page 155

1    Q.    Okay. Okay. I'm handing you what's been
2 marked as Exhibit 30.
3         First let me ask you, do you know who Bruce
4 Case is?
5    A.    Oh, yes.
6    Q.    Who is Bruce Case?
7    A.    He is an investigator at McGill, I think.
8    Q.    I'm handing you what's been marked as Exhibit
9 30, and it says, Libby Claimants' Disclosure of Potential
10 Expert Witnesses, and at the bottom first page, Bruce
11 Winston Case, M.D., M.Sc, Dipl. Occ. Hyg., F.R.C.P.(C.),
12 and he is at the Department of Pathology, Montreal
13 General Hospital.
14         Now, I understand that this individual is no
15 longer an expert witness for the Libby claimants. But it
16 appears that he was initially named as one. And if you
17 look on the next page, so was Arthur Frank and yourself.
18         Were you aware that Bruce Case was
19 potentially an expert witness on behalf of the Libby
20 claimants?
21    A.    At one time I do remember that, yes.
22    Q.    Do you remember why he was no longer included
23 as an expert witness?
24    A.    I think actually it was because of the fact
25 that he felt that chrysotile was not a toxic substance,

Page 156

1 and that -- You laugh, but that is exactly what he
2 thought.
3    Q.    I spilled something on myself. That's why I
4 laughed.
5    A.    But he had been writing about it and various
6 things, had been testifying on behalf of the Canadian
7 government. And it just felt pretty inappropriate to use
8 him.
9    Q.    Okay. So, his opinions on the toxicity --
10    A.    I don't know anything about him, to tell you
11 the truth, other than that. That's about the total
12 extent of my knowledge.
13    Q.    Were you aware that he did a review of the
14 ATSDR pilot study?
15    A.    No.
16    Q.    Okay. I'm going to hand you what has been
17 marked as Exhibit 31. And this is a letter to Donna
18 Rossie, ATSDR, from Bruce Case, and it is a "Review of
19 the Asbestos-Related Abnormalities Among a Group of
20 Patients from Libby, Montana: A Pilot Study of
21 Environmental Cases."
22         And most specifically, I want to direct you
23 to page 3, please.
24              (Pause in the proceedings.)
25    A.    Page 3?

Page 157

1    Q.    Yes, sir. The page number at the bottom of
2 page 3 --
3    A.    There is no number.
4    Q.    Is there a Bates number on the far right?
5    A.    Yeah.
6    Q.    Okay. If you look at 2009_05840.
7         MR. HEBERLING: I'll object. I think
8 you're asking the witness to comment on a document that
9 you haven't established that he's ever seen before.
10    Q.    (BY MR. STANSBURY:) Have you ever seen this
11 document before?
12    A.    I've never seen it before. I have no idea
13 what it is.
14    Q.    Okay. I'm going to read from the second
15 paragraph. Tell me if I read there correctly, please.
16 "The term 'disease' is misapplied, or perhaps just
17 inadequately explained, to" --
18    A.    Where are you?
19    Q.    Oh, I'm sorry. I am in the second to last
20 paragraph, the first sentence, "The term disease."
21    A.    Yes.
22    Q.    "The term 'disease' is misapplied, or perhaps
23 just inadequately explained, to 'pleural plaques.' Most
24 scientists in this area do not consider pleural plaques a
25 'disease,' but a marker of exposure. There also seems to

1 be an unclear separation in some of the tables between
2 diffuse pleural fibrosis (which is a very serious
3 disease) and pleural plaques."
4 Did I read that correctly, sir?
5 A. Uh-huh.
6 Q. Yes, sir?
7 A. Yes.
8 Q. Okay. Do you agree with that statement?
9 A. No. Because in fact the ATS in their 2004
10 statement, they finally decided that pleural plaques are
11 a disease.
12 Q. We will look at that statement in a little
13 bit.
14 Let's turn to page, I guess it's actually the
15 next page, 2009_05841, first paragraph. "Goals and
16 Objectives: These are clearly enough stated, but suffer
17 from the deficits inherent in the above comments. In
18 addition, even accepting the validity of a search for
19 so-called 'environmental' disease as a separate category,
20 the authors fail to verify whether or not their subjects
21 actually had exposure at the vermiculite mine."
22 Do you agree with that statement?
23 MR. HEBERLING: Objection. This is a
24 document he said he's never seen before.
25 (Pause in the proceedings).

1 THE WITNESS: "Exposure at the
2 vermiculite mine." These are environmental cases.
3 This study came about because I had a number
4 of cases that appeared to be just environmental
5 exposures, and just people that lived in Libby.
6 So, they may or may not actually have had
7 exposures to the mine. They probably did not. I didn't
8 think they did at the beginning. Now, maybe they did and
9 I didn't know about it.
10 That's why the pilot study was done, was to
11 look for that sort of stuff, that's the reason it was
12 done in the first place.
13 Q. Do you agree with this criticism?
14 A. No. What's he criticizing, and for what
15 reason?
16 (Pause in the proceedings).
17 A. I don't get it. It was a pilot study just to
18 demonstrate that there were a number of cases that truly
19 were environmental.
20 All the rest of the stuff that you've got
21 here is just all sort of tangential.
22 That's the whole reason for doing it. That's
23 the reason they came to my office, because they knew that
24 I had said that I had environmental cases, and provided
25 all the x-rays and all the other stuff for them, and then

1 they wound up selecting the whole thing.
2 Q. So, to what --
3 A. I mean, because that was of something that
4 had not been significantly described previously in Libby.
5 That was the only reason for the pilot study.
6 Q. You say "they." Are you talking about Aubrey
7 Miller?
8 A. I'm talking about Aubrey Miller and Dan
9 Middleton. You know, we provided all the films and the
10 charts and things. I got releases from all the patients
11 to do it.
12 Q. And, so, would you say that your conversation
13 with them is what really informed them on the potential
14 of environmental disease?
15 A. Would you repeat that?
16 Q. Was your conversation with them what informed
17 them about the potential for environmental disease?
18 A. Oh, basically --
19 MR. HEBERLING: Objection, lack of
20 foundation, hearsay.
21 Q. (BY MR. STANSBURY:) You can answer, sir.
22 A. I'm not sure how to answer that. I mean,
23 basically I told them that I thought that there was
24 environmental cases there of pleural disease. Okay?
25 Q. All right.

1 A. And you're saying, well, they didn't have
2 disease. Well, according to the ATS, they do have
3 disease, and at the time I thought they had disease, too.
4 Q. I'm not saying that. I'm handing you a
5 document by Bruce Case who earlier was named as an
6 expert.
7 A. This is sort of garbage, too.
8 Q. Well, look at 2009_05847.
9 (Pause in the proceedings).
10 A. Uh-huh.
11 Q. At the very bottom, "Select the appropriate
12 category below." He indicates that he did not recommend
13 this study. Correct?
14 A. "Recommended changes or reasons for not
15 recommending." "Not recommended." What does that mean?
16 (Pause in the proceedings).
17 Q. You don't understand what he means by "not
18 recommending"?
19 A. No. I haven't the slightest idea what he
20 means.
21 Q. Okay.
22 A. I wish you would explain to me what that
23 question means.
24 Q. I believe it means that he's not recommending
25 that they publish the study.

Page 162

1    A.    It doesn't say that. It says "appropriate
2  category below (list recommended changes or reasons for
3  not recommending)." He just says not recommending --
4  "Not Recommended."
5         What does that mean? He didn't recommend any
6  changes. It doesn't say anything about whether to
7  publish it or not.
8    Q.    Okay. Fair enough. Now, we've talked
9  earlier about this continuum disease and we've talked
10  about pleural plaques and we've talked about diffuse
11  pleural thickening.
12        We haven't talked as much about asbestosis.
13  Now, you've talked about this with individuals before.
14  You believe, if I understand correctly, that pleural
15  changes can be classified as pleural asbestosis, is that
16  correct?
17    A.    That's correct.
18    Q.    And you cite as your basis for this, the work
19  of Dr. Irving Selikoff, correct?
20    A.    Well, part of it. Also, my own observations
21  that it's all part of a continuum. You go from plaque to
22  pleural thickening to interstitial disease.
23    Q.    But in terms of just the origin of the term,
24  that is a Selikoff term, correct?
25    A.    Yeah. But it gets used more and more all the

Page 163

1  time. I see it in the literature all the time now.
2    Q.    I hand you what has been marked as Exhibit
3  34. And this is entitled "Asbestos, asbestosis, and
4  Cancer: the Helsinki criteria for diagnosis and
5  attribution."
6         Are you familiar with this consensus report
7  document?
8    A.    I've seen this report, yes.
9    Q.    Have you read it before?
10    A.    A long time ago.
11    Q.    Okay. If you will turn to the second page,
12  2009_04732. Do you see that?
13    A.    Uh-huh.
14    Q.    And on the second column under "Pleural
15  disorders," are you following me?
16    A.    Uh-huh.
17    Q.    First paragraph, last sentence. Tell me if I
18  read this properly. "Avoidance of the term 'pleural
19  asbestosis' is recommended. Pleural plaques are usually
20  asymptomatic, and without clinically important findings."
21        Did I read that correctly, sir?
22    A.    Yes.
23    Q.    And this is from the Scandinavian Journal of
24  Organ Environmental Health, 1997, correct?
25    A.    That's correct.

Page 164

1    Q.    And that was after Dr. Selikoff's work?
2    A.    Yeah. It says "Pleural plaques are usually
3  asymptomatic, and without clinically important findings."
4         Well, there's been numerous articles that
5  show that pleural plaques are associated with pulmonary
6  function abnormalities, and they obviously go on and
7  develop it.
8         You know, basically it's wrong, and the ATS
9  finally recognized that it was wrong. So, regardless of
10  what they put out, it's wrong.
11    Q.    Let's turn to the last page of that document,
12  please.
13    A.    Okay.
14    Q.    2009_04736.
15    A.    Okay.
16    Q.    On this page if you look at the beginning --
17  the end of the previous page, you see the list of
18  participants.
19    A.    Yeah. So?
20    Q.    Do you know John Dement, are you familiar
21  with him?
22    A.    Well, where are you on this page?
23    Q.    Top of 2009_04736, top left, first line, John
24  Dement. Do you see that, sir?
25    A.    I'm familiar with the name.

Page 165

1    Q.    He used to work at NIOSH, correct?
2    A.    He did.
3    Q.    He was a signatory to this document, wasn't
4  he?
5    A.    He was.
6    Q.    At the bottom of that same column, John E.
7  Parker (National Institute for Occupational Safety and
8  Health, United States)."
9         Are you familiar with Dr. Parker?
10    A.    Yes.
11    Q.    Who is Dr. Parker?
12    A.    Wait a minute. That's a different Parker.
13  I'm not familiar with him.
14    Q.    Okay. You're familiar with the Amandus
15  study?
16    A.    Right. He is one of the authors on that.
17    Q.    He was not. But are you aware that he was
18  one of the individuals who traveled with Harlan Amandus
19  to explain the findings of the study to the Libby
20  workers?
21    A.    I was not aware of that.
22    Q.    Are you aware that he's also a pulmonologist,
23  such as yourself?
24    A.    There is no way I would be aware of that.
25    Q.    Are you familiar with the Peipins study? I

DR. ALAN WHITEHOUSE - by Mr. Stansbury
(509)456-0586 BRIDGES REPORTING & LEGAL VIDEO (800)358-2345

Page 166

1  believe Dr. Black --
2      A.    I am.
3      Q.    And that was also part of the ATSDR screening
4  study, correct?
5      A.    Yes.
6      Q.    Were you aware that Dr. Parker was the tie
7  breaking B-reader in that study?
8      A.    No, I was not.
9      Q.    You were aware that Dr. Lockey was a reader
10 in that study, correct?
11     A.    Oh. You're talking -- This is not John
12 Parker.
13     Q.    Jack Parker?
14     A.    Jack Parker. Okay. That's who we're talking
15 about now. I know who that is.
16     Q.    So, we're talking about, he goes by John, I
17 guess, in his formal --
18     A.    No. He goes by Jack.
19     Q.    So, we're talking about John or Jack Parker.
20     A.    We're talking about Jack Parker. We all know
21 who Jack Parker is.
22     Q.    So, let me kind of ask you those previous
23 questions then, just under this new understanding.
24           Were you aware that he travelled with Dr.
25 Amandus to Libby?

Page 167

1      A.    No, I was not aware of that.
2      Q.    Okay. You are aware that he was the tie
3  breaking B-reader?
4      A.    Yes.
5      Q.    You are aware that he was a co-author of the
6  ATSDR CT study, correct? The Muravov study?
7      A.    I am not aware of that. I don't remember
8  that for sure.
9      Q.    Okay. Are you aware that he is currently
10 reading x-rays from Libby for ATSDR at this time?
11     A.    I'm not sure whether he's reading them now or
12 not.
13     Q.    You're aware that there's an ongoing ATSDR
14 analysis, correct?
15     A.    Well, we have taken over the Massa study.
16 That is now to my knowledge all being done through the
17 clinic, and they are being sent to Lynch and to Newell.
18 And I don't know that there is other readings.
19           I have not seen Parker's name on a reading
20 for a long time.
21     Q.    But you are aware that he was a reader in
22 2000 and 2001?
23     A.    Oh, he was back then, yeah.
24     Q.    Now, nowhere in this document does he carve
25 out Libby from the description of pleural plaques,

Page 168

1  correct?
2      A.    Well, why would he? This is in '97. This is
3  long before the whole business with Libby broke.
4      Q.    Well, he was in --
5      A.    And he wasn't looking -- There would be no
6  reason for him to really do so when they were looking
7  strictly at miners when the Amandus study was done.
8      Q.    But there is no mention by Dr. Parker that,
9  having worked with Dr. Amandus, I see a different
10 experience with respect to pleural disease in Libby?
11     A.    I don't know. I haven't even talked to him.
12 I don't even know what his thoughts are on it. I have no
13 idea.
14     Q.    What about Dr. Victor Roggli?
15     A.    I know who he is.
16     Q.    Okay. I am handing you what is marked as
17 Exhibit 35. And this is "Asbestos-Related Disease
18 Associated with Exposure to Abestiform Tremolite."
19     A.    Uh-huh.
20     Q.    And the authors are Sharon Srebro,
21 S-R-E-B-R-O, and Victor Roggli, R-O-G-G-L-I. And this
22 was published again in the American Journal of Industrial
23 Medicine in 1994, is that correct, sir?
24     A.    That's right.
25     Q.    Are you familiar with this study?

Page 169

1      A.    I think I've read it sometime along the line.
2  I don't remember when, though.
3      Q.    But this isn't the first time you've laid
4  eyes on this, correct?
5      A.    No, I don't think so.
6      Q.    And, again, this was before the Helsinki
7  criteria document, correct?
8      A.    Way before.
9      Q.    Well, not way before. Three years.  If you
10 would turn to page 2009_08079.
11           (Pause in the proceedings).
12     A.    All right.
13     Q.    At the top of the page, I guess it's the
14 first full sentence after the Roggli and Longo cite, "The
15 other (case 2) was a man who lived near a vermiculite
16 processing plant during the first 20 years of his life
17 and, as a child, sometimes played in the piles of
18 vermiculite tailings. The longest tremolite fibers
19 detected in this study were in this patient, with many
20 greater than 100 microns in length. Representative
21 scanning electron micrographs from this case are shown in
22 Figure 1."
23           Did I read that correctly, sir?
24     A.    Yeah.
25     Q.    So, clearly he has familiarity with tremolite

1  from vermiculite, correct?
2          MR. HEBERLING:  Objection.  Unclear as to
3  who "he" might be.
4      Q.    (BY MR. STANSBURY:)  Dr. Roggli.  Is that
5  correct, sir?
6      A.    Well, of course -- Okay.  You're talking
7  about tremolite.  Are you talking about South Carolina,
8  vermiculite processing plant, or are you making the
9  assumption it was Libby?
10          Because there is indeed two tremolite
11  vermiculite processing plants that W.R. Grace owns in
12  South Carolina to my knowledge.  Is that where it came
13  from?
14          Because, you know, if they are analyzing all
15  of this stuff, they would have found that it wasn't
16  tremolite to begin with.
17      Q.    And if you would turn to page 2009_08077, I
18  believe it is actually two pages earlier than where you
19  are now.
20      A.    Uh-huh.
21      Q.    The paragraph underneath the table, do you
22  see where I am at?
23      A.    Uh-huh.
24      Q.    Yes, sir?
25      A.    I see it.

1      Q.    I guess it's the second full sentence, "The
2  diagnosis of asbestosis was confirmed by one of the
3  authors using the histologic criteria set forth by the
4  Pneumoconiosis Committee of the College of American
5  Pathologists and the National Institute for Occupational
6  Safety and Health, which defines the minimum criteria
7  permitting the diagnosis of asbestosis as 'demonstration
8  of discrete foci of fibrosis in the wall of respiratory
9  bronchioles associated with accumulations of asbestos
10  bodies.'"
11          Do I have that correct, sir?
12      A.    Uh-huh.
13      Q.    Yes?
14      A.    Yes.
15      Q.    And the cite is the Craighead?
16      A.    What?
17      Q.    The cite is the Craighead?
18      A.    Yes.
19      Q.    That is defining asbestosis based on
20  interstitial fibrosis, correct?
21      A.    Yeah.  Basically, yes.
22      Q.    Not fibrosis of the pleura, correct?
23      A.    Well, all he's talking about right there is
24  defining diagnosis related to foci in the respiratory
25  bronchioles.  Yeah.  That's fine.  That's an okay

1  definition for asbestosis.  But it doesn't say anything
2  about anything else.
3      Q.    That's right.  There's no mention of pleural
4  asbestosis as a means of diagnosing asbestosis, correct?
5      A.    Why would there have to be?
6      Q.    Why would there be if it wasn't asbestosis?
7      A.    Well, you know, I have no idea why he
8  selected that, why he doesn't deal with anything else at
9  the time, except why at that time that was the same time
10  people thought that plaques were not a disease and were
11  pretty much ignoring pleural disease, and were also in
12  this article talking about tremolite and not about what
13  was going on at Libby.
14          So, I am not quite sure how this fits in.
15      Q.    So, you are not aware of whether that
16  tremolite was from South Carolina or Libby?
17      A.    I have no idea.
18      Q.    But that would be relevant to Dr. Roggli's
19  understanding of disease from tremolite in Libby,
20  correct?
21      A.    It might be.  It might not be.
22      Q.    Again, though, Dr. Roggli is signatory of the
23  Helsinki criteria, who at least had experience with
24  asbestosis caused by exposure to tremolite, made no
25  reference in the Helsinki criteria to a different

1  criteria for looking at pleural disease in Libby,
2  correct?
3      A.    No.
4      Q.    Okay.  I'm handing you what's been marked as
5  Exhibit 36.  Do you recognize this document, sir?
6          (Pause in the proceedings).
7      A.    Well, this is the old ATS one, I take it,
8  isn't it?
9      Q.    Yes, sir.  The 1986 ATS statement.  And if
10  you could turn to page 2, which is 2009_00054.
11      A.    Uh-huh.
12      Q.    On the far left column, second to last
13  paragraph, under the heading "Pulmonary Asbestosis,
14  Definition."  I am going to read, and please tell me if I
15  read this correctly.  "The term asbestosis should be
16  reserved for the interstitial fibrosis of the pulmonary
17  parenchyma in which asbestos bodies or fibers may be
18  demonstrated.  While pleural abnormalities are commonly
19  associated with parenchymal disease, they should be
20  separately classified as there are differences between
21  pleural and parenchymal fibrosis in epidemiology,
22  clinical features and prognosis."
23          Did I read that correctly?
24      A.    Yeah.  You read it right.  Except it has been
25  18 years until the next ATS study.  Clinical thinking has

DR. ALAN WHITEHOUSE - by Mr. Stansbury
(509)456-0586  BRIDGES REPORTING & LEGAL VIDEO  (800)358-2345

1 changed.
2 Q.    Okay.  But as of 1986, the 1986 study, based
3 on the 1986 ATS statement, asbestosis was defined as
4 parenchymal disease, correct?
5 A.    Oh, yes.  It had been for years before that.
6 Q.    Okay.  And when you were examining people in
7 Libby pre-2004, this was the most authoritative document
8 by the American Thoracic Society on the diagnosis of
9 asbestos disease, correct?
10 A.    Yeah.  Although I don't know that I had ever
11 seen that at the time.  I was following through with what
12 Selikoff was saying.
13 Q.    So, while you were diagnosing people prior to
14 2004, you were not following the ATS guidelines for
15 diagnosing asbestos disease?
16 A.    I was using the term asbestosis for both,
17 because it was real clear, and Selikoff backed that up,
18 that you could call it pleural asbestosis, but when you
19 became logical about the whole thing, they were all part
20 of the same spectrum.
21 Q.    So, just so -- I think you said earlier, you
22 weren't familiar with this back then?
23 A.    Oh, I may have seen it a long time ago.  I
24 haven't looked at it for years, though, if I have.  I'm
25 not sure I ever looked at it.  I know what was in it.

1 Q.    But this document, and the contents of this
2 document, did not guide your diagnostic practices,
3 correct?
4 A.    Not at all.
5 Q.    Okay.  I am handing you what has been marked
6 as Exhibit 37.  Do you recognize this document?
7 A.    Yeah.  This is the 2004 statement.
8 Q.    This is the 2004 American Thoracic Society
9 statement on "Diagnosis and Initial Management of
10 Nonmalignant Diseases Related to Asbestos."
11 A.    That's right.
12 Q.    Okay.  And if you would turn to 2009_00667,
13 and there's two columns.  The right column, we have the
14 heading halfway down the page, "Nonmalignant Disease
15 Outcomes," and we have "Asbestosis."
16             (Pause in the proceedings).
17 A.    Where is this?
18 Q.    Sure.  2009_00667.  Are you there, sir?
19 A.    667.  Okay.
20 Q.    Okay.  Good.  Far right column.
21 A.    Uh-huh.
22 Q.    Halfway down the page.  "Nonmalignant Disease
23 Outcomes."
24 A.    Uh-huh.
25 Q.    "Asbestosis."  Are you with me?

1 A.    I've got it.
2 Q.    Second paragraph.  Tell me if I have read
3 this correctly.  "Asbestosis specifically refers to
4 interstitial fibrosis caused by the deposition of
5 asbestos fibers in the lung.  It does not refer to
6 visceral pleural fibrosis, the subpleural extensions of
7 fibrosis into the interlobular septae or lesions of the
8 membranous bronchioles."
9             Did I read that correctly, sir?
10 A.    You did.
11 Q.    And you recognize this document, the 2004 ATS
12 statement, as being of great value in guiding your
13 diagnostic practice, correct?
14 A.    Well, not of great value.  It is like all
15 other documents that are published.  It produces
16 guidelines for people, but that's all.  I mean, it
17 doesn't really change what you do.
18 Q.    But the American Thoracic Society, this is
19 their authoritative statement as of 2004, correct?
20 A.    Yeah, basically.
21 Q.    And in this statement it says that asbestosis
22 specifically refers to interstitial fibrosis, correct?
23 A.    It also says in here it refers to pleural
24 asbestosis, in another area in here, by the way.
25 Q.    Where?  Where does it say pleural asbestosis?

1 A.    I'm not sure where it is.  I would have to
2 find it.
3 Q.    Take a second.
4             (Pause in the proceedings).
5 A.    Well, it's going to be more than a second.
6             MR. STANSBURY:  We can go off the record.
7 Let's go off the record and take a break.  You can look
8 for it.  Then we will go back on the record.
9             THE VIDEOGRAPHER:  We are going to go off
10 the record.  The time is approximately 11:33.
11             (Short recess).
12             THE VIDEOGRAPHER:  We are going back on
13 the record.  The time is approximately 11:40.
14             THE WITNESS:  I actually can't find that
15 in this article.  And I've been reading a bunch of other
16 articles that I know it's in recently.  And I suspect
17 that's where I mixed it up.
18 Q.    (BY MR. STANSBURY:)  So just so the record is
19 clear, the 2004 ATS statement says "Asbestosis
20 specifically refers to interstitial fibrosis caused by
21 the deposition of asbestos fibers in the lungs," and it
22 does not use the term pleural asbestosis, is that
23 correct, sir?
24 A.    That's correct.
25 Q.    Okay.  Let's move on at this time.  Well,

1  actually, before I do that, it's fair to say, isn't it,
2  that numerous people that you have diagnosed, in whom you
3  have only seen pleural abnormalities, you've called them
4  asbestotic, is that correct?
5     A.    Yes.
6     Q.    Okay.  So that is not an issue for debate
7  right now, correct?
8     A.    No.  In fact, I am referring to basically
9  the pleural asbestosis.  Maybe I should have been more
10  clear about the terminology.
11     Q.    Does that concern you, whether you may be
12  giving a patient the wrong idea as to what disease he or
13  she has, if you were to call it asbestosis, when they
14  only have pleural abnormalities?
15     A.    No, not really.  And, in fact, the people in
16  Libby have generally called it that themselves.  It's the
17  general overall blanket for anything that they've got
18  that's asbestos-related.
19           But, you know, most of the time I talk to
20  them about asbestos-related pleural disease and don't use
21  the term "asbestosis."  And sometimes I do.
22     Q.    Let's talk about an example.  Someone like
23  Cameron Foote.
24     A.    Uh-huh.
25     Q.    Believed that at the age of 41 -- Cameron

1  Foote, for example, believes that he has asbestosis.  He
2  has testified to that effect.
3     A.    Hmm.
4     Q.    I've looked through your records on him.  He
5  has pleural plaques.  Is that correct?
6     A.    Yeah.
7     Q.    Okay.  So, he has pleural changes only, but
8  he believes that he has asbestosis.
9          Correct?
10     A.    Yeah.  And I think that comes about just
11  because of the way people in Libby view all of this, a
12  lot of it.
13     Q.    How important is the precision of diagnostic
14  labeling in the medical profession?
15     A.    Well, generally, it is.  But in this
16  particular situation it probably doesn't make a whole lot
17  of difference, because of the fact that this is a very
18  large community, many of whom have maybe, at least a
19  third of whom have asbestos-related changes on their
20  x-rays.
21          And, so, whatever they want to call it, it is
22  probably easier for them to relate that they have
23  asbestosis to each other, than to say that they've got a
24  pleural plaque or something like that.
25          And the ones that are more knowledgeable will

1  discuss it in terms of pleural plaque.
2     Q.    But according to the 2004 statement, the '86
3  statement, and the Helsinki criteria, it would not be
4  correct to tell somebody like Cameron Foote that he has
5  asbestosis, correct?
6     A.    I don't know that I told him that.
7     Q.    Okay.  But he has testified to that.  But you
8  are not sure if you told him that?
9     A.    No.  I'm not sure that I have told him that.
10          Most of the people that I have talked to,
11  I've told them that they have -- Well, I will tell them
12  that they have asbestosis, if they have fibrotic changes
13  on their chest x-ray, or subpleural fibrosis.  But I will
14  generally tell them that they have asbestos pleural
15  thickening.
16     Q.    But it does not surprise you that he claims
17  that he has asbestosis, does it?
18     A.    No, it does not surprise me at all, because
19  of the climate in Libby.
20     Q.    Aren't you concerned that this is creating a
21  climate where people believe that they have diseases that
22  they do not?
23     A.    I think they have it all in perspective,
24  frankly, in general.  I don't think it's creating any
25  significant confusion or anything else, no matter what

1  they call it.
2     Q.    Well, asbestosis is a very serious disease,
3  correct?
4     A.    So is pleural thickening.
5     Q.    Well, let's talk about asbestosis.
6  Interstitial fibrosis can cause loss of long function,
7  correct?
8     A.    Yes.
9     Q.    It can lead to death, correct?
10     A.    Yes.
11     Q.    According to the Helsinki criteria, pleural
12  plaques alone are markers of exposure, correct?
13     A.    Well, according to the -- That's true.  They
14  are markers of exposure.  But they also, after you get
15  experience with looking at CT-scans and things like that,
16  they are the harbinger of more disease, and they are also
17  the harbinger of the progression of that over a period of
18  time.
19     Q.    The harbinger, meaning that when you see a
20  pleural plaque, you will see interstitial fibrosis down
21  the road?
22     A.    You may.  Or you may see diffuse pleural
23  thickening, or subpleural fibrosis.  You may see more on
24  CT.  It's not --
25          And they recognize that in the ATS thing,

Page 182

1  that a pleural plaque is a disease, for the first time,
2  something that everybody that deals with this realized
3  for a long while.
4      Q.    Well, hold on. I thought you said there was
5  no pleural asbestosis. Have they used the term --
6      A.    No.  They do recognize that pleural plaque
7  is a disease.
8      Q.    Do they use the term "disease" anywhere in
9  this statement?
10      A.    I will have to take a look at it. But I
11  think they do.
12      Q.    Why don't we look at that at lunch, in the
13  interest of time. I do not believe they refer to that as
14  a disease. And it's hard to prove a negative.
15          However, in the interest of time, I'd like to
16  move on at this point, away from that particular issue.
17  We can revisit that if you like.
18      A.    Yeah. We will revisit it.
19      Q.    You recognize that the interstitial fibrosis
20  is distinct from a parietal pleural fibrotic process,
21  correct?
22      A.    It's all part of the same spectrum. That's
23  the point that I make. And mainly because of the fact
24  that we have watched so many people with pleural
25  thickening develop subpleural fibrosis, and it becomes

Page 183

1  evident throughout their whole lungs.
2      Q.    But this is what I want to make clear. When
3  you talk about this continuum, fibrotic process, that's
4  what's occurring with asbestosis, correct?
5      A.    Uh-huh.
6      Q.    Fibrosis, correct?
7      A.    Right.
8      Q.    And it's caused by asbestos bodies within the
9  air sacs, correct?
10      A.    Or against the pleural. It's the same cause
11  for both of them.
12      Q.    Well, what term do you use for the air sacs?
13      A.    Alveoli.
14      Q.    So, you have asbestos bodies lodged in the
15  alveoli, correct?
16      A.    Uh-huh.
17      Q.    You have to say --
18      A.    Yes.
19      Q.    And that leads to an inflammatory process,
20  correct?
21      A.    Yes.
22      Q.    And that leads to fibrotic changes within the
23  lungs, correct?
24      A.    Yes.
25      Q.    And when you have diffuse fibrotic changes

Page 184

1  throughout the lungs from this fibrotic reaction to
2  asbestos bodies, that is asbestosis, correct?
3      A.    Yes.
4      Q.    Okay. Fibrotic changes on the outside of the
5  pleura, the parietal pleural, what are those called?
6      A.    They are called either clots or diffuse
7  pleural thickening.
8      Q.    Would you say that diffuse pleural thickening
9  refers more to the fibrotic changes of the visceral
10  pleura?
11      A.    They may refer to both.
12      Q.    But are pleural plaques more often involving
13  the parietal pleura?
14      A.    No. More often -- Most of the changes that
15  you wind up seeing are on the visceral pleura, and you
16  see pleural plaques on the parietal pleura very
17  frequently.
18      Q.    So, pleural plaque on the parietal pleura,
19  that's the area, that's the outer area of the pleura,
20  right?
21      A.    Right.
22      Q.    And, so, is it your view that the fibrosis
23  just migrates from the parietal pleura to the visceral
24  pleura to the outer regions of the lungs and then to the
25  base of the lungs?

Page 185

1      A.    Well, think about it for a little bit. How
2  do you get a plaque on the parietal pleura if you don't
3  have it in the lung adjacent to it to get it there in the
4  first place? That's how the fibers got there.  I mean,
5  they didn't come through the chest wall.
6      Q.    I understand. But the fibrotic changes that
7  cause asbestosis are independent of the existence of the
8  plaque. They are caused by the fibrotic changes of the
9  asbestos bodies within the air sacs, correct?
10      A.    Yeah. You can say that if you want to. But
11  that's like saying that, maybe a good example, I'll try
12  to come up with a decent example with pneumonia or
13  something, if I can come up with something quickly.
14          You know, when you've got a pleural plaque,
15  or you've got a pleural thickening, or asbestosis, you've
16  got asbestos fibers throughout all those areas. Okay?
17          And we have seen so many people with a
18  pleural plaque, Grace's own x-rays have shown this,
19  develop diffuse pleural thickening, develop pulmonary
20  fibrosis, or asbestosis, over a period of 20 years.
21          And it's obvious that there's a sequence of
22  events, and the pleural plaque doesn't exist as just a
23  beauty mark or a marker there that they had exposure.
24  It's part of the whole process. It's just that it's
25  early in the process.

Page 186

1    So, it's like saying that you don't have
2 pneumonia until the whole lobe is involved, it's just a
3 little infection over here that doesn't account for
4 anything.
5    Q.    Something like gangrene.
6    A.    Uh-huh.
7    Q.    That literally spreads, correct, throughout
8 the body?
9    A.    That's a bad example.
10    Q.    Okay.  I'm talking about some type of process
11 where the inflammation is actually just spreading.
12    That is not what you're describing with the
13 pleural plaque asbestosis.  You are talking about
14 fibrotic changes on the outside of the pleura and then
15 independent fibrotic changes that are occurring inside
16 the interstitium for those to develop asbestosis,
17 correct?
18    A.    I don't think it's independent.  Because if
19 you have seen on those x-rays, that there is a pleural
20 plaque, and it gets larger, and the plaque gets larger,
21 and the next thing you're seeing is extensive pleural
22 thickening.  And the pleura becomes fused, both of the
23 pleural surfaces, the visceral and the parietal pleura
24 become fused at that point in many of the people that
25 have diffuse pleural thickening.

Page 187

1    And how do you know?  You really can't say
2 that that plaque doesn't have anything to do with it.
3 It's all part of a continuum that if you've got the
4 plaque, it may develop into diffuse pleural thickening in
5 that locale.  Whether it's parietal or visceral pleura,
6 it's all part of the same sequence of events.
7    Q.    I understand that.
8    A.    So, just because you say there's interstitial
9 asbestos fibers present over here, that there's not the
10 same situation through the whole thing, does not make any
11 sense.  It doesn't make sense from a medical standpoint,
12 a clinical sense, or even just a logic standpoint, that
13 they would be all -- they'd be independent of each other.
14 They aren't.  There is no way they can be.
15    Q.    Why not?
16    A.    Why not?
17    Q.    Right.
18    A.    Because there are some that have gone on and
19 progressed.
20    Q.    I recognize that these two independent
21 disease processes can develop.  However, to suggest that,
22 you know --
23    I hear what you are saying on the fusing of
24 the parietal and visceral pleura.
25    A.    Okay.

Page 188

1    Q.    But this image that you're creating with this
2 language of continuum is one of just this migration of
3 fibrosis across to this subpleural region of the
4 interstitium, and then into the lower levels of the
5 lungs.  That is the image that your language is invoking,
6 at least in me.
7    A.    You know, you're getting --
8    MR. HEBERLING:  Objection.  Misstatement
9 of the testimony.
10    THE WITNESS:  You get plaques also on the
11 visceral pleura.  Okay?  And most of the time on x-ray
12 you can't tell where they are, whether they are on one or
13 the other.  They may be on both, they may be only on one.
14    You know, you're basically saying that
15 somebody can, like somebody that has an infectious
16 disease, that they can have a little bit of an infectious
17 disease here, and the pneumonia develops out here, and
18 this has nothing to do with (indicating).  That's
19 nonsense.
20    This is all part of the asbestos disease.
21 It's a continuum.  It's a spectrum.
22    Q.    Is there a causal continuum?
23    A.    Yes, there is.  It is called the asbestos
24 finer.
25    Q.    No, no, no, no.  I mean from between the

Page 189

1 pleural plaque to the asbestosis.
2    A.    It meets Koch's postulates.  It's the same
3 thing that you use for bacteriology.  You have the
4 organism, it causes the infection, you give them back the
5 organism, it causes another infection, and then prove
6 that they are related.
7    The same thing with asbestos fibers.
8    Q.    Let me make sure I understand this, and I
9 will restate this, I want to make sure I'm clear.
10    So, your contention is that if there is a
11 fibrotic process of the parietal pleura, this may cause
12 interstitial fibrosis?
13    A.    It may not.  It may not directly.  But it's
14 all part of the continuum of the disease.
15    And you say it's a marker of exposure.  I say
16 it's a marker of disease.
17    Q.    But my question, though, is whether it is
18 causal.  You said earlier that it was causal.  That a
19 plaque could cause asbestosis.
20    A.    How do you --
21    MR. HEBERLING:  Objection.  Misstatement
22 of the testimony.
23    THE WITNESS:  How do you know?  You've
24 got fibers everywhere in here in large numbers.
25    Q.    (BY MR. STANSBURY:)  Okay.

48 (Pages 186 to 189)

Page 190

1    A.    You're trying to say that asbestosis is a
2 different disease than a pleural plaque.
3         That's nonsense.  The radiography, pathology,
4 fiber counts, everything, tells you, no, that isn't the
5 case.  That's nonsense.
6         It's all part of a continuum.
7    Q.    I think to call it nonsense would be to fly
8 in the face of the statements of the ATS guidelines in
9 the Helsinki criteria.  I don't consider what they say
10 nonsense.
11         And they do call them distinct disease
12 processes.
13         MR. HEBERLING:  Objection, argumentative.
14    Q.    (BY MR. STANSBURY:)  You are using the term
15 nonsense, Dr. Whitehouse.  That's a strong term of art.
16 To say something is nonsense when the ATS criteria
17 recognized the distinct aspect of these disease
18 processes, that's a strong statement.
19    A.    Yeah.  And you know what, they are ultimately
20 probably going to eat their words, because there will be
21 a paper coming out that shows the continuum between
22 plaques, interstitial disease and a large number of
23 people.
24    Q.    And that's the paper that we talked about at
25 the very beginning of this deposition, correct?

Page 191

1    A.    I don't think we've talked about that one
2 particularly very much.
3    Q.    There is another one?
4    A.    You don't know about that one.  It is not in
5 publication yet.
6    Q.    Are you involved in this paper?
7    A.    No.
8    Q.    Okay.  Who is involved?
9    A.    Some radiologists, and I don't even remember
10 their names.
11    Q.    And does it involve Libby?
12    A.    Uh-huh.
13    Q.    Yes?
14    A.    Oh, yes.
15    Q.    Do they work with you on this?
16    A.    No.
17    Q.    Do they work with Dr. Black?
18    A.    To some degree, yes.
19    Q.    Okay.  And did Mr. Black facilitate the
20 transfer of the radiographs to these individuals?
21    A.    I don't know whether he did or not.  But the
22 CARD Clinic cooperated.
23    Q.    This is very important.  Because you are
24 talking about this continuum.  And to the extent that
25 this continuum exists, I do not think it's consistent

Page 192

1 with some of the other literature.  But to the extent it
2 exists, I would really like to know more about a study
3 coming out that would support it, because I would think
4 that would be highly relevant to this opinion, don't you?
5    A.    I don't know whether it will be out this
6 summer or not.  It is still being reviewed by the
7 authors.  It will be eventually.  But when it is, I know
8 it is about ready for publication.
9    Q.    Do you know which journal, by any chance?
10    A.    Chest.
11    Q.    Chest.  So it is an article in Chest that is
12 going to demonstrate this continuum of disease from
13 pleural plaque --
14    A.    Uh-huh.
15    Q.    -- to --
16    A.    To interstitial disease.
17    Q.    -- to interstitial disease.
18    A.    And I've got two x-rays of patients of mine,
19 and I assume they are probably in this study, I would
20 guess.
21    Q.    I am handing you what's been marked as
22 Exhibit 44.  Do you recognize this document, sir?
23    A.    It's a paper that I wrote.
24    Q.    Okay.  And this is the 2004 paper we
25 discussed earlier, correct?

Page 193

1    A.    Uh-huh.
2    Q.    Yes, sir?
3    A.    Yes.
4    Q.    And this is one of the papers that is
5 relevant, as you have said, to your opinions in this
6 case, correct?
7    A.    Correct.
8    Q.    Okay.  Can you look on page 221, upper right
9 corner, of this document.
10    A.    221?
11    Q.    Yes.  The upper right corner.
12    A.    I don't have any page numbers up there.
13    Q.    You don't have page numbers?  We can go off
14 the Bates numbers.  That's fine.  But it's your paper.  I
15 thought you might be more familiar with the page numbers.
16    A.    The page numbers didn't come through on this.
17    Q.    Oh, how unfortunate.  2009_01098.
18    A.    09 what?
19    Q.    8?
20    A.    8.  Okay.
21    Q.    It's the third page of the document.  That
22 may have been the easiest way to do that.
23    A.    Oh.  This one does have a number on it.  Some
24 of the others don't.
25    Q.    Good.  So, we are looking at the left column.

1  It begins with "Two or more."
2      A.   Uh-huh.
3      Q.   I'm going to read, and tell me if I read this
4  correctly.  "Two or more sets of pulmonary functions were
5  available on 153 patients.  These subjects are
6  representative of the Libby area population and the
7  practice group of 491 patients.  All had lived in Libby
8  the majority of their life prior to 1990."
9      A.   Yes.
10     Q.   "The majority of the 123 patients were
11 ex-smokers with eight of 123 (7 percent) being current
12 smokers."
13          Do I have that correct?
14     A.   Yes.
15     Q.   I want to go back up to that first statement.
16 Second sentence I read.  "These subjects are
17 representative of the Libby area population and the
18 practice group of 491 patients."
19          Is that correct?
20     A.   Yes.
21     Q.   Okay.  Now, this is published in the American
22 Journal of Industrial Medicine, correct?
23     A.   Correct.
24     Q.   And if I go online and find this article in
25 that journal, I'm going to read this and it's going to

1  say, these subjects are representative of the Libby area
2  population, correct?
3      A.   Correct.
4      Q.   Okay.  I'm handing you what's marked as
5  Exhibit 46.  This is the Libby expert response to the Dr.
6  Weill report by Dr. Alan C. Whitehouse, Dr. Arthur L.
7  Frank, May 8, 2007.
8      A.   Okay.
9      Q.   Do you recognize this report, sir?
10          (Pause in the proceedings).
11     Q.   And specifically I wanted to direct you --
12     A.   Where's the signature page?
13     Q.   You know, I don't see the signature page on
14 this copy.
15     A.   I don't either.
16     Q.   Well, I'll ask you a question about it.  If
17 you don't agree with what I say here, and you question
18 the validity of the document, we can address that.  But
19 if you look on 2009_01115, which is page 12 of the
20 document.
21          (Pause in the proceedings).
22     A.   Okay.
23     Q.   Halfway down the page, 10.4.
24     A.   Uh-huh.
25     Q.   I'm going to read from this.  Tell me if I

1  read this correctly.  "The statement at Whitehouse
2  (2004), page 221, is clarified to read as follows.
3  'These subjects are representative of the Libby area
4  (asbestos disease) population and the practice group of
5  491 patients.'"
6          Did I read that correctly?
7      A.   Yes.
8      Q.   Do you agree with that statement?
9      A.   Actually, I do.  He put in here, I did, or
10 Arthur did, the disease population in parentheses, and
11 that's for asbestos disease.  And that's reasonable.
12     Q.   Okay.  So, is it fair to say that what is in
13 your paper where it says that these people are
14 representative of the Libby area population, is not true?
15 In fact, these people are representative of the people in
16 Libby who have disease, is that correct?
17     A.   Well, that's a matter of splitting hairs.
18 But, yeah, it's probably true.
19     Q.   Well, I think it's important.  I think the
20 idea of something being representative is certainly an
21 important concept, correct, sir?
22     A.   Well, except that everything deals with the
23 491 patients in the practice who had changes.  So, you
24 can do it any way you want to.
25     Q.   Well --

1      A.   It is representative of it.  I think, you
2  know, I think his criticism is wrong.  I think it's
3  overkill.
4      Q.   Well, let's back up.  Putting aside the issue
5  of whether it's representative of the 491 people, you say
6  in your paper, "These people are representative of the
7  Libby area population," meaning that what occurred in
8  this cohort represents what's happening in the Libby area
9  population.
10          Correct?
11     A.   Well, in a sense, it is certainly related to
12 the asbestos disease population, which includes about now
13 a third of the population.  So, maybe I am splitting
14 hairs a little bit.
15          But I don't think that's a big fault that's
16 in there.  It may have been better written, but it's not
17 worth arguing over.
18     Q.   But you are now recognizing it should have
19 read "asbestos disease population"?
20     A.   Yes.  It might have been better to read it
21 that way.
22     Q.   Did you alert the Journal of this change?
23     A.   No, I didn't alert the Journal of the change.
24 Why would I?  You've come up with this long after this
25 thing was written, you know.  People understand things

1  like that. There's minor errors a lot in papers like
2  that.
3      Q.    This paper identifies rapid progressive loss
4  of lung function --
5      A.    Right.
6      Q.    -- in a patient population.
7      A.    That's right. It does.
8      Q.    And you say that is representative of the
9  Libby area population.
10      A.    You know, you're splitting hairs, again. It
11  is generally representative of it.
12          But it's the asbestos, it is very clear from
13  the rest of the paper, that that is what I was talking
14  about. Okay? So, what you're doing, you're making an
15  issue out of something which is really probably not much
16  of an issue.
17      Q.    It is not an issue as to whether it is
18  representative or not?
19      A.    No. It's that the paper defines it much
20  better as it goes through the whole thing. Okay?
21      Q.    Defines what?
22      A.    What I just said. That it is representative
23  of the asbestos group, of people that have asbestos
24  disease. Particularly the practice group, of all the
25  patients that I had in the database at that time.

1      Q.    Now, in this study you had the x-rays of
2  individuals and in some cases the HRCT's classified --
3      A.    Yes.
4      Q.    -- by a radiologist, correct?
5      A.    Yes.
6      Q.    And that was Dr. Gordon Teel?
7      A.    Yes. Now, he looked at the first film, okay?
8  That was deliberate, to have him look at the first film.
9  And then he had CT's to look at also to verify the first
10  film. Because there were some of them that were truly
11  negative or very critical --
12      Q.    Okay.
13      A.    -- which were confirmed by CT.
14      Q.    But you didn't publish the individual
15  findings and corollate the individuals who had pleural
16  abnormalities with lung function loss, did you?
17      A.    The degree, no. But that was done. Because
18  he and I looked at the extent of the pleural thickening,
19  and then I did the correlations statistically, and there
20  wasn't any. And I think that may be in here. I'm not
21  sure.
22      Q.    This is a different question.
23      A.    That is in there.
24      Q.    And we can address that in a moment. The
25  question, I'm reading from the same page, "A total of 67

1  of 123 --
2              (Cell phone ringing).
3      A.    Is that mine?
4      Q.    I think that's the cell phone.
5          MR. HEBERLING:  I think you need to
6  clarify what you are reading from.
7      Q.    (BY MR. STANSBURY:)  The same page, bottom of
8  the page, right above the chart.
9      A.    Yeah.
10      Q.    "A total of 67 of 123 (55 percent) had no
11  evidence on chest x-ray or HRCT of interstitial changes."
12      A.    Right.
13      Q.    "The remaining patients (56) had minimal
14  radiographic evidence of irregular interstitial changes
15  involving the bases at profusion category of 0/1 or 1/0."
16          Did I read that correctly, sir?
17      A.    Yes.
18      Q.    So, if I understand this, some of these
19  people had interstitial changes, and some of these people
20  did not.
21          Is that a correct characterization?
22      A.    No, no. They all had pleural changes.
23      Q.    No. I said interstitial.
24      A.    Yeah. But a certain percentage of them did
25  have interstitial -- minimal interstitial changes, as

1  well.
2          UNIDENTIFIED SPEAKER:  Excuse me. There
3  is a lot of beeping coming through.
4          MR. SCHIAVONI:  Is the battery dead?
5          MS. LEE:  No. I think somebody might
6  have put it on hold. I can turn the volume down.
7          MR. STANSBURY:  Yeah. Turn the volume
8  down.
9      Q.    This paper, taking a step back, identifies a
10  rapid decline in DLCO amongst individuals with pleural
11  abnormalities, is that correct, sir?
12      A.    That's correct.
13      Q.    And I think it was above 3 percent, is that
14  correct?
15      A.    Yeah, something like that. 3.0 or 3.2.
16      Q.    Okay. However --
17      A.    3.0.
18      Q.    -- some of the people had interstitial
19  changes as well, correct?
20      A.    Yeah. Very minimal. A lot of them were
21  0.1's, and a lot of them, Gordon didn't read those.
22      Q.    He didn't read them?
23      A.    He didn't -- the 0.1's, he didn't think they
24  were significant.
25      Q.    Okay. We discussed earlier, however, that

Page 202

1 interstitial changes can cause decrements in DLCO's,
2 correct?
3    A.    Yes.
4    Q.    So, individuals who have interstitial changes
5 and pleural abnormalities, you can't tell whether it's
6 the pleural change or the interstitial changes that's
7 causing the decline, correct?
8    A.    Well, yes, you can, from a standpoint of the
9 fact that ILO nomenclature is 0/1 or a 1/0 doesn't
10 necessarily represent disease.  And there's no certainty
11 of disease based on those two categories.
12    Q.    So, you're saying a 1/0 does not represent
13 disease?
14    A.    Doesn't necessarily.  It may very well.  But
15 you yourself, or the compensation committee or whatever
16 they are called, has excluded anything other than 2/1.
17 And, so, there's always that equivocal nature of a 1/0 or
18 a 0/1.
19    Q.    But you didn't publish in this paper the
20 number of people who have a greater 1/0, did you?
21    A.    No.
22    Q.    And you only had one B-reader, correct?
23    A.    I didn't have any B-reader.
24    Q.    No B-readers.
25    A.    Gordon Teel, although, is a pulmonary board

Page 203

1 of radiologist.
2         (Beeping on phone is continuing).
3         MR. GUY:  This is Jonathan.  I don't
4 want to interrupt, but is there any way --
5         MR. STANSBURY:  Let's hang up and call
6 back again.  I am going to terminate the line, and call
7 back in.
8         Let's go off the record momentarily.
9         THE VIDEOGRAPHER:  Yes.  We are going to
10 go off the record.  The time is approximately 12:07.
11         (Noon recess).
12         THE VIDEOGRAPHER:  This is the beginning
13 of tape number 3 of the deposition of Dr. Alan C.
14 Whitehouse.  The date is March 19, 2009.  The time is
15 approximately 12:41.  We are back on the record.
16    Q.    (BY MR. STANSBURY:)  Dr. Whitehouse, going
17 back to your study, if we could turn to page 2009_01097.
18         (Pause in the proceedings).
19    Q.    And looking in the left column, the paragraph
20 before Materials and Methods, halfway down there is a
21 sentence that begins "They were examined."  After that it
22 begins, "The patients were either referred by internists
23 and family practitioners or were self-referred."
24         Do you see that sentence, sir?
25    A.    Uh-huh.

Page 204

1    Q.    Yes, sir?
2    A.    Yes.
3    Q.    Did I read that correctly?
4    A.    You did.
5    Q.    And I believe you were questioned about this
6 in a previous deposition, about the issue of referral,
7 and I believe you testified as follows.  I am happy to
8 provide this testimony if you want it.
9         "If there were people that the lawyers had
10 told us to see, they still came on their own volition, so
11 I still consider that a self-referral.  I didn't get
12 referral letters from lawyers sending patients to me at
13 all."
14         Could I have the deposition transcript,
15 please?  Let's look at this.  Exhibit 56, which is the
16 October 18, 2007 deposition in this proceeding.
17         Do you remember this deposition, sir?
18    A.    Yes.
19    Q.    And you were under oath, correct?
20    A.    Yes.
21    Q.    Okay.  On page 204 of this transcript, which
22 is towards the back.
23         (Pause in the proceedings).
24    A.    Okay.
25    Q.    If you would look at line 10, and read from

Page 205

1 there to, say, line 18.
2         (Pause in the proceedings).
3    A.    Yep.
4    Q.    Out loud, please.
5    A.    Which one is that?
6    Q.    Line 10 to line 18, out loud, please.
7    Q.    Question.  Okay.
8    Q.    Could you read that out loud?
9    A.    Okay.
10         "QUESTION:  The patients were either
11 referred by internists and family practitioners or were
12 self-referred.  Correct?
13         "ANSWER:  That's true.  And if there were
14 people that the lawyers had told us to see, they still
15 came on their volition.  So I still consider that a
16 self-referral.  I didn't get referral letters from
17 lawyers sending patients to me at all.
18         "QUESTION:  This is a document that he
19 originally received from the CARD Clinic in connection
20 with one of the first productions.  We can mark that as
21 Exhibit -- wherever we are."
22    Q.    So, it is fair to say that you said, with
23 respect to your study, "if there were people that the
24 lawyers had told us to see, they still came on their own
25 volition.  So I still consider that a self-referral.  I

Page 206

1 didn't get referral letters from lawyers sending me
2 patients at all." That is your testimony?
3     A.    I believe so. I don't recall getting any.
4     Q.    I'm handing you what has been marked as
5 Exhibit 57. Actually, let me see that for one second,
6 please, if I could have that back. Sorry about that.
7         I'm handing you what has been marked as
8 Exhibit 57. This was a record produced to W.R. Grace in
9 March of 2006 by the CARD Clinic under the direction of
10 the U.S. Government in connection with the criminal case,
11 and these were the records for the individuals whose
12 records were the basis of your published study.
13        And here we see a letter dated December 14th,
14 1995, and it begins, "Thank you for referring" blank, and
15 the person's name is redacted, "for evaluation of
16 asbestosis."
17        Did I read that correctly?
18     A.    Yes.
19     Q.    And the recipient of this will is redacted,
20 correct?
21     A.    Yes.
22     Q.    If you will turn to the next page, please.
23     A.    All right.
24     Q.    Last line before "Sincerely yours."
25     A.    Okay.

Page 207

1     Q.    "Thank you for referring him for an
2 evaluation."
3         Did I read that correctly?
4     A.    Yes.
5     Q.    All right. Now I am going to hand you what
6 has been marked as Exhibit 58. Keep this letter here,
7 please. This letter was produced to us a month later,
8 redacted, by the U.S. Government, and I believe that you
9 will see that Exhibits 57 and 58 are identical.
10        Do you see that?
11     A.    Obviously I wrote a letter.
12     Q.    Now, who was the recipient of the letter on
13 the December 14th, 1995 letter?
14     A.    Mr. Heberling.
15     Q.    Jon Heberling. So, this is an example of a
16 referral from an attorney, correct?
17     A.    I guess you would have to consider that, yes.
18 I made an error.
19     Q.    You said "Thank you for referring," correct?
20     A.    Yes.
21     Q.    But you had also said that there were no
22 letters, correct?
23     A.    I didn't recall any at the time that I was
24 deposed.
25     Q.    Okay. I'm handing you what has been marked

Page 208

1 as Exhibit 59. And if you will compare this document to
2 Exhibit 58, the patient identifier, 550-493.
3         (Pause in the proceedings).
4     Q.    And this is indeed, if I am not mistaken, a
5 letter from Mr. Heberling, referring this individual to
6 you, correct?
7     A.    And then on the bottom it says DNKA, did not
8 keep his appointment.
9     Q.    Did not keep his appointment. But judging by
10 your letter here --
11     A.    He must have later, yeah.
12     Q.    All right.
13     A.    He had an appointment in October, and he
14 didn't show.
15     Q.    Okay. This was a person referred by Mr.
16 Heberling, then, correct?
17     A.    I assume it, yeah.
18     Q.    Which would be inconsistent with your earlier
19 testimony, correct?
20     A.    Which would be what?
21     Q.    Inconsistent in your testimony in the
22 previous deposition, in which you said there were no
23 referrals and no letters.
24     A.    I guess you are right. Unfortunately, the
25 reason it got dropped is because the guy didn't show up

Page 209

1 the first time.
2     Q.    Okay.
3     A.    And then did on his own.
4     Q.    I'm handing you what has been marked as
5 Exhibit 60. Do you recognize the handwriting on this
6 piece of paper?
7     A.    No.
8     Q.    This was a note given to me by Nurse Kimberly
9 Rowse at the CARD Clinic. Is that Nurse Rowse's
10 handwriting?
11     A.    It probably is, yes.
12     Q.    She's the head nurse at the CARD Clinic?
13     A.    Yes, she is. Yeah. Well, she's sort of the
14 manager there, yeah. I guess that is her handwriting.
15 It is in pencil, isn't it.
16     Q.    I am handing you what has been marked as
17 Exhibit 61, and this is a letter dated October 13 --
18 August 13, 1997. Once again, for LP055. Another
19 individual from your study. This is produced in March of
20 2006 where the redactions were handled through the CARD
21 Clinic.
22        What does it say above the addressee of this
23 letter, which has been redacted?
24        MR. HEBERLING: Objection. We don't know
25 that this person is from the study. I mean, you're

Page 210

1  representing that. But the record does not so reflect as
2  of yet.
3        THE WITNESS: I can't read it.
4    Q.   (BY MR. STANSBURY:) What about before "Thank
5  you"? What does that say?
6    A.   "Referring M.D."
7    Q.   What does that mean?
8    A.   I don't know.
9    Q.   What does "referring M.D." mean?
10   A.   It means that there was an M.D. that may have
11 referred the patient. But it says, "Thank you for
12 referring him," and there is something crossed out. It
13 is very short. So, I don't know what it is.
14   Q.   Okay.
15   A.   I have no idea whether it was anybody even in
16 this study.
17   Q.   But the doctor who referred this has been
18 redacted, correct?
19   A.   I guess. I'm sure it is, yeah.
20   Q.   Okay. I'm handing you what's been marked as
21 Exhibit 62. If you will look, this is also a letter from
22 August 13th, 1997. This was produced in April of 2006.
23 The redactions were handled by the U.S. Government at
24 this time.
25        Now we see under what was "referring M.D." on

Page 211

1  the previous exhibit, the recipient of this letter was
2  Jon Heberling, attorney.
3    A.   I see that. And again, who's the patient?
4    Q.   The patient, the information has been
5  redacted from us, is LP, if you look at the document. He
6  was LP055, was how it was produced to us in March of
7  2006. We were not permitted to know the names, and
8  personal identifiable information was redacted.
9        The broader patient records were produced to
10 us in April of 2006, and we received this record, and
11 this 550 was from the 550 database that you referenced in
12 your report.
13   A.   Yeah. But that wasn't necessarily the ones
14 that were in here either.
15   Q.   But that's the same person, isn't it? Look
16 at those letters.
17   A.   Oh, yeah. It's the same person, yeah.
18   Q.   So, the first letter, the LP055.
19   A.   Yeah.
20   Q.   Okay. This is clearly a referral from Jon
21 Heberling, is it not?
22   A.   Well, it is or it is not. It says "Enclosed
23 is a copy of the workup I did." I write sometimes --
24 what happens is I ask the patient about referring
25 physicians or anybody that they want me to send the

Page 212

1  workup to, and then I will send it with a cover letter.
2  And this is a typical cover letter.
3        When somebody refers it, I usually say, thank
4  you for referring somebody. This one says, "Enclosed is
5  a copy of the workup."
6        I don't know that he referred the patient at
7  all. I have no idea.
8    Q.   If you will look at the bottom of Exhibit --
9  I'm sorry. Which Exhibit Number is unredacted?
10   A.   This one?
11   Q.   Yeah. What Exhibit Number is that?
12   A.   What is the number?
13   Q.   Yes. Exhibit Number.
14   A.   Oh. 62.
15   Q.   At the bottom of Exhibit 62 does it not
16 say, "Jon, thank you for referring him." Is that
17 correct?
18   A.   Well, I guess it does, yes.
19   Q.   So, it sounds to me like this is again
20 another referral.
21   A.   It may very well be.
22   Q.   Okay. So, once again, the prior testimony,
23 about there being no referrals in this study, may not be
24 accurate, correct?
25   A.   It may be.

Page 213

1    Q.   Okay. I'm handing you what has been marked
2  as Exhibit 63, which is a medical record for LP076 dated
3  September 25th, 1996.
4        Once again, the recipient of the letter has
5  been redacted in this version produced in March of 2006,
6  but as it says, "Thank you for referring him."
7        We do not know who the addressee is. Is that
8  correct?
9    A.   It's covered up here.
10   Q.   Right.
11   A.   I assume you have another copy of it.
12   Q.   You assume correctly. I'm handing you what
13 has been marked as Exhibit 64, which is the same letter,
14 also dated September 25th, 1996, for 550-538. Again,
15 this is produced under the direction and redaction of the
16 U.S. government, and once again, the recipient of the
17 letter is Jon Heberling, is it not?
18   A.   How do I know that any of these were in this
19 study?
20   Q.   Well, you produced those records in March of
21 2006.
22   A.   Yeah. But we produced 500 and some odd
23 records.
24   Q.   In March of 2006 you produced 123.
25        MR. HEBERLING: Brian, you're going to

Page 214

1  have to establish this in the record in another way.  You
2  can't ask him these questions.
3      Q.    (BY MR. STANSBURY:)  Dr. Whitehouse, you
4  produced these records through the U.S. government, they
5  were made available for use in the bankruptcy.
6          MR. HEBERLING:  Objection, misstates the
7  record.
8          THE WITNESS:  The government also has the
9  records on the whole database.
10     Q.    (BY MR. STANSBURY:)  Which whole database?
11     A.    The 550 that were in my database.
12     Q.    That's exactly what that second record is.
13 It came from --
14     A.    Yeah.  But what does it have to do
15 necessarily with this paper?
16     Q.    Because they are the same people.
17         MR. HEBERLING:  Objection, argumentative.
18 Ask him questions.
19         THE WITNESS:  Tell me that it's one of
20 the ones in here, and prove to me that it's one of the
21 ones in here, not just one that's in the 550.
22     Q.    (BY MR. STANSBURY:)  Was Jay Swennes in your
23 study?
24         COURT REPORTER:  Say that again?
25         MR. STANSBURY:  Jay Swennes.

Page 215

1  S-W-E-N-N-E-S.
2      A.    I think he was, yes.
3      Q.    All right.
4      A.    Jay Swennes -- There's two Swennes'.  There's
5  a Jeff and a Jay.
6      Q.    Excuse me.  Jeff.  Was Jeff Swennes in your
7  study?
8      A.    I believe he was.
9          MR. STANSBURY:  What Exhibit Number are
10 we on?
11         THE WITNESS:  This was long before that
12 study was even thought about, five years before that.
13         MR. STANSBURY:  What exhibit number are
14 we on?
15         MS. LEE:  65.
16     Q.    (BY MR. STANSBURY:)  I'm handing you Exhibit
17 65, which is another copy of the December 15th, 1995
18 letter where you are thanking Jon Heberling for the
19 referral.  This letter was produced as part of a PIQ.
20 Again, we see that it is Jeff Swennes --
21         MR. HEBERLING:  Objection.  Argumentative
22 and lack of foundation.
23         Just ask him questions.  Don't argue with
24 him.
25     Q.    (BY MR. STANSBURY:)  If you want to, you can

Page 216

1  compare that to this letter right here, tell me if they
2  are the same letter, Exhibit 57.  They should match.
3          This confusion over who is who is an issue of
4  CARD's creation, not --
5          MR. HEBERLING:  Objection, argumentative.
6      Q.    (BY MR. STANSBURY:)  Is that the same person,
7  Dr. Whitehouse?
8          MR. HEBERLING:  CARD --
9          THE WITNESS:  It looks like it was.  But,
10 you know, I didn't create any -- If you have problems
11 with CARD, it's nothing that I had anything to do with.
12 Your people came in there, made copies of charts.  The
13 feds made copies of charts.  I had nothing to do with any
14 of that.
15     Q.    (BY MR. STANSBURY:)  Well, clearly --
16     A.    So, don't put it on me.
17         MR. HEBERLING:  In the criminal case,
18 Grace obtained permission to go back to CARD in the two
19 or three weeks before the criminal case started on the
20 representation to the court that they had screwed up all
21 the identifications of the patient numbers, and they
22 didn't know what they had.  So, they had to copy it all
23 over again.
24     Q.    (BY MR. STANSBURY:)  Is Jeff Swennes in your
25 study, sir?

Page 217

1          MR. HEBERLING:  So, if you want to get
2  into an argument on the issues, I think that's a good
3  one.
4          THE WITNESS:  I don't know.  Because I
5  don't have my computer here.  He may be.  He may very
6  well be.  I'm very familiar with Jeff.
7      Q.    (BY MR. STANSBURY:)  And is that the same
8  letter as Exhibit 57?
9          MR. HEBERLING:  Objection, unclear as to
10 what he is referring to.
11     Q.    (BY MR. STANSBURY:)  Which exhibit do you
12 have in your hand?
13     A.    Well, wait a minute.  It is not.  The typing
14 is different.  It's very different.  Look at this.  This
15 thing is big, broad type.  This is little tiny type.
16     Q.    I believe the copies are different.  But if
17 you want to look word for word, Dr. Whitehouse, I believe
18 these are the exact same letters.  If you can find any
19 words that are different that are unredacted, please do
20 so.
21         But one looks like it was copied in a much
22 larger font than another.  But these are the same
23 letters.  Jeff Swennes, as this letter indicates, was
24 referred by Mr. Heberling.
25         MR. HEBERLING:  Objection, argument,

Page 218

1  lack of foundation.  None of this is in the record.
2             (Pause in the proceedings).
3             THE WITNESS:  Whose copy is this
4  (indicating)?
5      Q.    (BY MR. STANSBURY:)  That was a copy I pulled
6  out.
7      A.    I see.
8             MR. SCHIAVONI:   I've never in my career
9  seen someone intervene in a bankruptcy and not say who
10  they are as a client.  And I have a standing objection to
11  that process taking place here.  None of the other --
12             I don't know what's happened with Grace, but
13  no creditor in this case has consented to people
14  appearing in the bankruptcy secretly.
15             To the extent we can't cross-examine them
16  because their names are blotted out, I'm being
17  substantially prejudiced.
18      Q.    (BY MR. STANSBURY:)  Just so the record is
19  clear, Exhibit 57, a letter that was produced and marked
20  LP072, December 14, 1995, thanking Mr. Heberling for a
21  referral, is the same letter as Exhibit 65, December 14,
22  1995, in which it's clear that the recipient of this
23  letter was Jon Heberling.  It was redacted in Exhibit 57.
24  It isn't here.
25             Do you still stand by your statement --

Page 219

1             MR. HEBERLING:  Objection.
2             MR. STANSBURY:  Allow me to finish my
3  yes.
4      Q.    Do you still stand by your previous statement
5  that none of the individuals in your study were referred
6  to you by Mr. Heberling?
7             MR. HEBERLING:  Objection, compound.
8  There are three or four issues there.  Misstates the
9  record.
10             THE WITNESS:  There may have been a
11  couple in there.
12      Q.    (BY MR. STANSBURY:)  Okay.
13      A.    And I may have made a mistake on that.  So,
14  what?
15      Q.    Well, you make a statement in your paper
16  which is consistent.
17      A.    Okay.  But, you know, how many years is that
18  before I even started to work on that paper?  That's six
19  years before that.
20      Q.    So, six years before Mr. Heberling is already
21  bringing you the people who are going to be in this
22  study?
23      A.    He is not bringing me people because they are
24  going to be in the study.
25      Q.    He is bringing you people because he wants

Page 220

1  clients, is he not?
2      A.    No, he is not, particularly.  He is bringing
3  them because he -- I think if he sent people to me, it is
4  because they trust me to make, you know, honest
5  representations of what's wrong with them, make diagnoses
6  appropriately.  It had nothing to do with the study.
7      Q.    Is Jeff Swennes somebody who is a Libby
8  claimant?
9      A.    Yeah.  I don't know that I knew that at the
10  time.  How did I know that?  I see all kinds of people
11  that I don't know whether they are claimants or what they
12  are.
13      Q.    But this individual who you believe is in
14  your study --
15      A.    Yes.
16      Q.    -- was referred by Mr. Heberling six years
17  before you wrote the study?
18      A.    You know, what may have happened in some of
19  these things also is that the patient comes in and they
20  tell me that Mr. Heberling thought that he could come in,
21  or there's a guy in Great Falls that occasionally sends
22  stuff over, too.
23             And, so, I ask him, "Do you want me to send a
24  letter to your attorney about that?"
25             And they say, "Yes."

Page 221

1             So, I send them a letter.  So, some of them
2  may have been referred.   Some of them may have just told
3  me that that was their attorney and they wanted me to
4  send a letter.  And I'll send a letter, like it is a
5  referral letter.  It's just common decency in the medical
6  practice, you know.  So, there may be a couple.  So what?
7      Q.    Is Mr. Heberling in the medical practice?
8      A.    No.  He's not in the medical practice.
9  You've missed the point.  Okay?  The point was, that I do
10  send referral letters to people, sometimes even if they
11  are not referred, as a common courtesy, if the patient
12  wants me to do it.  Okay?
13      Q.    But you specifically say, thank you for
14  referring him for an evaluation, correct?
15      A.    I just answered that.  Okay?  I said,
16  sometimes I send referral letters to the doc's that
17  didn't refer it, as a common courtesy because the patient
18  wants me to do it.
19      Q.    But that's not Mr. Heberling, is it?
20      A.    Well, but it doesn't matter whether it's
21  doc's, lawyers, insurance companies, whatever.  I mean,
22  that's just the way I dictate sometimes.
23             I don't know for sure that he had actually
24  said -- Maybe he did.  He might very well have sent him.
25             But, you know, you're making an issue out of

DR. ALAN WHITEHOUSE - by Mr. Stansbury
(509)456-0586  BRIDGES REPORTING & LEGAL VIDEO  (800)358-2345

Page 222

1 something that occurred probably, I would guess, six
2 years before I even thought about doing this study, after
3 I had enough data that all of a sudden it hit me that
4 these people were getting a whole lot worse.
5     Q.    But is it fair to say that one of the people
6 who may have assisted you in the introduction of the
7 patients who became the subject of this study was Mr.
8 Heberling?
9     A.    Oh, he might have, he might not have.  I
10 mean, I've been seeing patients in Libby since 1970.
11 I've seen a huge number of people with asbestos disease.
12 The word is out.  If you want to see somebody to make a
13 diagnosis, look at things critically, go see me.  I
14 mean, that word has been out in Libby for the last 15 or
15 20 years.
16    Q.    So, you're the person they would come to
17 anyways?
18    A.    They would come to me anyway.
19    Q.    Because you're the person that will give
20 them, as you put it, the critical look?
21    A.    Yes, that's right.  And, you know, for all
22 the ones that you see here that have disease, there's
23 probably an equal number that I didn't find anything on,
24 and told them so.
25    Q.    Do you have a list of people that you told --

Page 223

1     A.    No, I don't have a list of that.  I don't
2 keep a list like that.
3     Q.    Why is that?
4     A.    Because I'm a practicing physician.  You
5 know, I don't do all this work that I do with this, just
6 because of lawyers, or keeping lists because I think that
7 some day somebody like yourself is going to be
8 questioning me.
9         I don't do that.  I practice because I take
10 care of people.  That's my primary job.  And to advise
11 them and give them advice concerning what they have and
12 what they might expect.  And then to follow them up over
13 the years and tell them what's going on.  That's my job.
14    Q.    But it might not necessarily entail advice as
15 to what people like Dr. Becker may say who disagrees with
16 you?
17    A.    I already answered that.
18         MR. HEBERLING:  Objection.  Asked and
19 answered.
20         THE WITNESS:  I already answered that.
21 I'm not even going to answer it again.  Okay?
22    Q.    (BY MR. STANSBURY:)  Okay.  Could we look at
23 your report for one moment, please?
24    A.    Which one?
25    Q.    Your expert report.

Page 224

1     A.    Sure.
2     Q.    I'm reading from the report, if you want to
3 follow along, just to make sure I'm clear.
4             (Pause in the proceedings).
5     Q.    Actually, can I see it for a moment again,
6 please?  I apologize, sir.  I'm handing you --  This is
7 an older one.
8             (Pause in the proceedings).
9     Q.    Do you have this?  I am reading a statement
10 from your 2006 expert report in the bankruptcy case.
11 "Since 1980 I have evaluated or treated over 700 patients
12 for asbestos disease from Libby asbestos.  Since about
13 2000 patient data has been tracked on a database."
14         Is that an accurate statement?
15    A.    Where is this?
16    Q.    This is in your previous record.  I will show
17 you the page.
18    A.    Yes.  You need to.
19    Q.    It is more as to whether that statement is
20 correct.
21    A.    Yeah.  That's correct.
22    Q.    Okay.  So, you are keeping this information
23 on these people, then?
24    A.    You know I am.  I don't do it anymore.
25    Q.    Okay.

Page 225

1     A.    There was 550, and you knew it, you made
2 copies of everything, you made a big deal out of the
3 whole thing.  And it was basically garbage data because I
4 was trying to keep track of patients in my office, when
5 I'd see them in Libby and I would record their pulmonary
6 function studies, so I would have some basis for
7 comparison, so that I knew what I was dealing with with
8 the patient.
9         That is the reason for the database.  It had
10 nothing to do with anything else.
11    Q.    Do you still have it in electronic form?
12    A.    Oh, I probably do.  I don't know where it is.
13    Q.    Is it included among the materials that you
14 produced?
15    A.    It was produced to you and the feds. way
16 earlier, I know that.
17    Q.    When?
18    A.    Oh, a long time ago.  Whenever you made those
19 copies.  You made copies of all the charts.
20    Q.    We copied the charts, yes.  But this is
21 talking about a database.
22    A.    Yeah.  You have the database.  It was made
23 available to you.
24    Q.    When?
25    A.    It wasn't much of -- About the same time, I'm

DR. ALAN WHITEHOUSE - by Mr. Stansbury
(509)456-0586  BRIDGES REPORTING & LEGAL VIDEO  (800)358-2345

1 sure.  I don't know where it is or what you did with it.
2    Q.    But you do remember producing the database?
3    A.    Oh, I know I did.
4    Q.    Okay.  All right.
5    A.    If you ask me to produce something, I produce
6 it.
7    Q.    Unless it's a draft paper.
8          MR. SCHIAVONI:   Could we have a copy of
9 it?  Does he still have?
10         THE WITNESS:  He's got it.  He should
11 have it somewhere.
12         MR. SCHIAVONI:  Well, I don't.  I don't.
13 Could I find out, where is it?
14         MR. STANSBURY:  Sure.  We'll worry about
15 where --
16         THE WITNESS:  There's a whole lot of
17 problems with it, because there's an awful lot of names
18 in it that are not involved with lawsuits.  All kinds of
19 HIPAA issues involved in this.  Okay?  And somebody went
20 through, I know, and deleted names or crossed them out,
21 ones that were not involved in lawsuits or anything at
22 one time.
23         But you have it.  Okay?  And I'm not going to
24 go through and do all the deletions and everything again.
25 I don't have time to do it.  And you have it.  So, you

1 find it.  Okay?
2    Q.    (BY MR. STANSBURY:)  I want to go back to
3 your study for a moment, please.
4    A.    Okay.
5    Q.    2009_01097.  Bottom right, "Results."  It
6 begins, "Of the 491 subjects."
7          Do you see where I am?
8    A.    Yes.
9    Q.    "Of the 419 subjects, 220 were employees of
10 the vermiculite facilities, 121 were family members, and
11 150 were environmental exposures."
12         Did I read that correctly?
13    A.    Yes.
14    Q.    Okay.  Now, with respect -- And this is the
15 population that you said the 123 patients was
16 representative of, correct?
17    A.    Yep.
18    Q.    Okay.  Let's look at the 123 patients, on the
19 next page, well, you are on that page now, first full
20 paragraph, "The majority of the 123 patients were
21 ex-smokers with eight of 123 (7 percent) being current
22 smokers.  Also, 27 (21 percent) never smoked.  In total,
23 86 (70 percent) were former employees of W.R. Grace.  27
24 (22 percent) were family members of employees, and 10 of
25 123 (8 percent) were characterized as Libby environmental

1 exposures only."
2          Did I read that correctly, sir?
3    A.    You did.
4    Q.    And that information is accurate, correct?
5    A.    Yes.  But these were at the beginning.  This
6 491 --
7    Q.    Right.
8    A.    -- is the number down the line when the thing
9 was finally finished.
10    Q.    Right.
11    A.    And the number of environmental ones had
12 increased, and the number of miners had relatively
13 decreased.  Although in relative terms, they are not that
14 different.
15    Q.    Well, based on the -- the 123, it looks to me
16 like 70 percent were former employees.  That's correct,
17 right?
18    A.    Yeah.  And they were about 50 percent of the
19 overall 291.  But there were a lot of other ones that
20 were added to that 429 after I did this study.
21    Q.    Well --
22    A.    Just so we're clear, I believe -- or actually
23 in the interim period of time, but didn't have two
24 pulmonary function studies.  Because that was one of the
25 criteria, was two of them.

1    Q.    It says here, 220 of the 491 were employees,
2 is that right?
3    A.    That's right.
4    Q.    Less than 50 percent, correct?
5    A.    It is less than 50 percent.
6    Q.    So -- and then with respect to environmental
7 cases, 150 were environmental exposures in the 491
8 population, correct?
9    A.    Where is there?  Okay.  Yeah.  They were.
10 Yeah.
11    Q.    And what percentage is that?  Is that about a
12 third?
13    A.    Yeah.  Roughly.
14    Q.    Yeah.
15    A.    A little less than that.  About 30 percent.
16    Q.    Okay.  So, in one study 8 percent are
17 environmental exposures, whereas 31 percent are
18 environmental cases, correct, in the other -- Strike
19 that.
20         MR. HEBERLING:  Objection,
21 unintelligible.
22    Q.    (BY MR. STANSBURY:)  In the published study,
23 8 percent of the 123 individuals are environmental cases,
24 whereas 31 percent of the larger 491 patient population
25 were alleged environmental disease cases, correct?

Page 230

1    A.    Yes.
2    Q.    Okay.
3    A.    That's true.    Except that there's one thing
4    that you've forgotten about.
5    Q.    What is that?
6    A.    And that is that they had to have two
7    studies.
8    Q.    Oh, I'm not talking about your selection
9    criteria at this point.  I'm talking about your statement
10   that they are representative.  Okay?
11   A.    Miner difference.  Okay?
12   Q.    No.  I think it's a significant difference.
13   One deals with who is in the study, the other deals with
14   whether a sub-cohort represents the larger cohort.
15   Correct?
16   A.    Whatever.
17   Q.    No, Dr. Whitehouse, not whatever.  Is that
18   correct?
19   A.    Well, you know, you're down to the point
20   where you're really splitting hairs.
21   Q.    Okay.
22   A.    This is not very important.
23   Q.    It's not?
24   A.    It's not very important to the overall text
25   and context of what this study was about.  Okay?

Page 231

1    Q.    It's not important that --
2    A.    No, it isn't.    It really isn't important.
3    Q.    May I finish the question, please.
4          It's not important that 70 percent of the
5    people were workers, 70 percent with occupational
6    exposures, whereas less than half in the larger cohort
7    do, and that only 8 percent in this cohort have
8    environmental exposures, whereas 31 percent in the large
9    cohort do?  Do you not consider that to be significant
10   with respect to whether one is representative of the
11   other?
12   A.    I clearly defined the percentage of people in
13   each group in this paper.  I very clearly defined it.  86
14   in one.  27 of the other.  10 of the other.  I don't know
15   how much more clearer I can be.
16   Q.    So, you have --
17   A.    These all came out of a group of people that
18   were seeing me on a regular basis.  Now, it turns out
19   there were more.
20         But on the other hand, there was a lot more
21   miners originally.  Now a lot of them have died off, at
22   that time.
23   Q.    I recognize that.  I'm not questioning the
24   reason why there was a larger occupational group in the
25   sub-cohort as opposed to the larger cohort.

Page 232

1          I'm asking you whether you believe that it is
2    significant as to whether one is representative of the
3    other.
4    A.    I don't think that that's a significant
5    difference.
6    Q.    So, you don't think that the nature of
7    exposure matters?
8    A.    Let's see what we wrote about this, since I'm
9    sure Weill is the one that --
10   Q.    Page 12.
11   A.    You've got it right on the tip of your
12   tongue, don't you.
13                (Pause in the proceedings).
14   A.    There's your answer right there, in the last
15   paragraph.
16   Q.    What does it say?  Would you hand it to me?
17   A.    It's been so long ago that I wrote this with
18   Arthur, that I can't recall all of the answers to it,
19   unfortunately.
20   Q.    May I see it, please?
21   A.    Yes, you can.  Let me clip it back together
22   again.  It's page 12, the last paragraph.
23   Q.    Okay.
24   A.    Read it.
25   Q.    Will do.    "Weill further criticizes the

Page 233

1    study as not 'representative of the practice group of 491
2    patients.'  Again the criticism is misplaced.  It is
3    difficult to say that the 123 patients are not generally
4    representative of the 491 patients, where 123 is 25
5    percent of the total 491 patients at the time of the
6    study in 2001.  123 patients is a large group.  It is
7    fair to say that it is probable that if 123 patients with
8    pleural disease who have two lung function tests are
9    progressing, then the patients with only one lung
10   function test are progressing as well.  Scientifically,
11   this is a solid conclusion.  Weill does not suppose that
12   it is not.  Clinical observation also supports that a
13   majority of patients are progressing.  This clinical
14   observation is what prompted the study in the first
15   place."
16         Did I read that correctly, sir?
17   A.    You did.
18   Q.    Your basic argument is because 123 is about
19   25 percent 491, that what occurs in that smaller cohort,
20   I will use your exact words, "It is fair to say that it
21   is probable that if 123 patients with pleural disease who
22   have two lung function tests are progressing, then the
23   patients with only one lung function test are progressing
24   as well."
25         Correct?

DR. ALAN WHITEHOUSE - by Mr. Stansbury
(509)456-0586  BRIDGES REPORTING & LEGAL VIDEO  (800)358-2345

Page 234

1    A.    Uh-huh.

2    Q.    Yes?

3    A.    And that was not only my opinion.  That was
4    also Arthur Frank's, as well.

5    Q.    Arthur Frank's, as well.  So, just because
6    it's 25 percent, it doesn't make a difference to you of
7    whether the fundamental exposures of those individuals
8    differ?

9    A.    We don't know that.

10    Q.    Well, you do know that.  You know that 70
11    percent of the 123 were occupational, 22 percent were
12    take home, and 8 percent were environmental, correct?

13          MR. HEBERLING:  Objection.  The questions
14    and answers are not matching.  Be very clear what your
15    question is so that he can answer it.

16          THE WITNESS:  We have no idea what all
17    exposure levels of all these family and environmental
18    cases are.  We have ideas, but we don't know.

19          And we don't even know whether it makes a
20    difference whether you have 10 percent of that exposure
21    level that the miners had or not.  It may be just as bad
22    as having, working in the dry mill.  We don't know the
23    answers to that.

24    Q.    (BY MR. STANSBURY:)  So, you don't think it
25    matters what the dose of the exposure was?

Page 235

1    A.    We don't know what dose it takes to get how
2    much disease.  Okay?

3    Q.    Okay.

4    A.    That's the point.  I made that point in the
5    criminal trial, too.  Okay?

6          These people have disease.  Okay?  The family
7    members have disease.  We have the environmental cases.
8    And time has borne out, as we've gotten more and more and
9    more environmental cases.  It's just the matter of at
10    what time frame they were exposed.

11    Q.    Do you believe these 123 individuals are
12    representative of the larger 1800 patient population that
13    you have referenced earlier?

14    A.    There's more miners in there now obviously
15    than there are now.  But on the other hand, if you wait
16    20 years, it may be exactly representative.  You don't
17    know.  Because you've got different years of exposures
18    in the groups.

19    Q.    What's your criteria for what's representa-
20    tive?

21    A.    I don't have a good criteria.  We don't have
22    a good criteria.  There's no way to get a good criteria.
23    Because you have family that were exposed in the mine, we
24    have family members, we have people that were exposed in
25    the lumber mill, people that were exposed in the

Page 236

1    community, all at different times.

2          It would take a large study to categorize
3    exactly when their exposures were and then put them into
4    groups and see what they look like.

5          They may all look alike.  I don't know that.
6    I don't know the answer to that.

7    Q.    So, you do not have a good criteria for
8    determining whether a certain subgroup is representative
9    of the larger group?  Is that what you just said?

10          MR. HEBERLING:  Objection, unclear as to
11    the meaning of representative.

12          THE WITNESS:  I don't know what you mean.

13    Q.    (BY MR. STANSBURY:)  You used the word
14    representative, Dr. Whitehouse, in your paper.  What did
15    you mean?

16    A.    Show me where --

17    Q.    It's on the --

18    A.    Show it to me.

19    Q.    Sure, sure.  "These subjects are
20    representative of the Libby area population, although now
21    we know that means Libby area" --

22    A.    Oh.  You are talking about that original
23    statement?

24    Q.    Absolutely.  You're making representations.
25    You are saying that these are representative.  That's a

Page 237

1    significant statement in epidemiology, and you are now
2    testifying that you don't have criteria to do that, and
3    you haven't explained to me how you determined one was
4    representative of the other.

5          MR. HEBERLING:  Objection, argumentative,
6    and misstates the record.   He explained it was pleural
7    disease that they have all have.

8          MR. STANSBURY:  Do not guide the witness.
9    I object and move to strike.

10          MR. HEBERLING:  If you're going to be
11    argumentative, I'm just going to have to object over and
12    over again.

13          MR. STANSBURY:  You can state your
14    objection succinctly in compliance with the Federal Rules
15    of Civil Procedure.

16          THE WITNESS:  Repeat the question.

17    Q.    (BY MR. STANSBURY:)  Sure.  I'm trying to
18    understand what you mean when you say that these 123
19    individuals are representative of the larger population.
20    I mean, it's a term with meaning.  I want to understand
21    what your meaning is.

22    A.    They are representative of Libby area
23    population, and I think it's clarified with the other
24    thing in asbestos disease.  And the paper makes it clear
25    that that is what we're dealing with.  Okay?

DR. ALAN WHITEHOUSE - by Mr. Stansbury
(509)456-0586  BRIDGES REPORTING & LEGAL VIDEO  (800)358-2345

1    Q.    You did not report the amount of lung
2  function lost based on exposure category, correct?
3    A.    No.
4    Q.    So, we have a cohort of 123 people that are
5  comprised of 86 workers, 70 percent of that population
6  had occupational exposures, correct?
7    A.    That's right.
8    Q.    And you don't report what level of lung
9  function occurred in those individuals compared to the 10
10  people or 8 percent who only had alleged environmental
11  exposures, correct?
12    A.    Actually all the statistics were done on all
13  of those and there wasn't any difference in them.
14        And when you are writing a paper like this,
15  and you're writing it for practicing physicians who may
16  read this, as opposed to the academicians, maybe you
17  didn't understand this when you looked at this, I know
18  you didn't, but I used percentage of predicted for
19  pulmonary functions.  And that was criticized by the
20  academicians.
21        But it's not going to be criticized by the
22  practicing physicians, because they want the information
23  in the form in which they use it, which is percentage of
24  predicted.
25        The same way, practicing physicians, they're

1  not interested in all of that garbage, about all the
2  other stuff, the semantics of this.  They're interested
3  in what happened to those 23 people and what the numbers
4  were.
5        And, so, the paper, of necessity, doesn't
6  have every single cottonpickin' detail in it, because it
7  gets to be so full of details that nobody will read it.
8  The practicing doc won't read it, if there's the case.  I
9  guarantee you of that.
10    Q.    Do you think this paper is at all relevant to
11  determining whether the people in the Libby community who
12  only have environmental exposures may have disease?
13    A.    No, I didn't say that.
14    Q.    Okay.  Making sure we are clear on that.
15        Moving on, did you report loss of lung
16  function, based on diffuse pleural thickening, as opposed
17  to pleural plaque?
18    A.    No, we did not.  They were all grouped
19  together.
20    Q.    Okay.  So, you did not differentiate
21  radiographic abnormalities?
22    A.    No, I did not.  In that regard.  I did relate
23  the matter of interstitial disease.
24        And in fact, we did go over all of those
25  numbers and determine that there really wasn't any

1  significant difference concerning extent, which was just
2  basically, includes the pleural plaques on the one end
3  and the diffuse pleural thickening on the other end of
4  that.  And there wasn't a statistical difference between
5  the two.
6    Q.    And your classification of the x-rays was
7  based on Gordon Teel, correct?
8    A.    Yeah.
9    Q.    Okay.  He was not a B-reader, correct?
10    A.    He's about 10 steps ahead of any B-reader
11  you've ever seen.
12    Q.    Really?  I've seen some pretty good B-readers
13  in my day.
14        MR. HEBERLING:  Objection, argumentative.
15        THE WITNESS:  That is argumentative, and
16  Gordon Teel's an extraordinarily good pulmonary
17  radiologist.  And he's pulmonary trained.  You don't have
18  to be pulmonary trained to be a B-reader.  You can be a
19  general internist and still be a B-reader.  Okay?
20        So, you're making comparisons that are not
21  fair.
22    Q.    (BY MR. STANSBURY:)  But he is using
23  B-reading classifications, is he not?
24    A.    No.
25    Q.    0/1 and 1/0, where do those --

1    A.    I use those.
2    Q.    Are you a B-reader?
3    A.    I used to be.  I'm not now.
4    Q.    Okay.
5    A.    I know what they mean.  I know what they look
6  like.  And so does he.  But he doesn't use them either.
7        There's only one B-reader in Washington, in
8  Seattle.  There's none in Montana.  I don't know about
9  Idaho.  There's none in Northern Idaho.  The reason why,
10  it's not a useful tool.
11    Q.    When the ATSDR came to town to do the mass
12  screening that they did, who read the x-rays?
13    A.    Oh, they had B-readers to read them, yes.
14    Q.    Three B-readers, correct?
15    A.    Yes.
16    Q.    Which is what the Iowa guidelines recommend,
17  correct?
18    A.    Yeah.  But that was basically an
19  epidemiologic study.  That's not a diagnostic study.
20    Q.    Okay.  So, this is --
21    A.    It's not a diagnostic study.
22    Q.    Okay.  Well, let me back up, then.  Let's get
23  it out --
24    A.    It has epidemiological overtones, and there
25  are epidemiologic fashions of the progression of things

1 with this. But it's also a study to document the
2 severity of losses of lung function. It doesn't require
3 a B-reader.
4     Q.    So, this is not an epidemiologic study?
5     A.    Yeah, this is an epidemiologic study.
6     Q.    You just said it wasn't.
7            MR. HEBERLING: Objection. Misstating
8 the record. Argumentative. That's enough.
9            THE WITNESS: I did not say that.
10           MR. STANSBURY: Lower your voice, please.
11           MR. HEBERLING: That's enough.
12           MR. STANSBURY: Lower your voice.
13           MR. HEBERLING: Do you hear me?
14           MR. STANSBURY: Lower your voice.
15           MR. HEBERLING: Are you hearing me? Are
16 you hearing me?
17           MR. STANSBURY: I am hearing you. And I
18 am asking you to lower your voice.
19           MR. HEBERLING: That is enough. You need
20 to understand that.
21           MR. STANSBURY: You need to lower your
22 voice.
23           MR. HEBERLING: You've been misstating
24 the record and arguing with this witness all day long,
25 and that's enough.

1     Q.    (BY MR. STANSBURY:) Dr. Whitehouse --
2            MR. HEBERLING: You're telling him he's
3 testified that it was not an epidemiological study. I
4 challenge you to find that anywhere in the record.
5            MR. STANSBURY: I believe he said it's a
6 diagnostic study with epidemiological overtones.
7     Q.    Did you use that word, Dr. Whitehouse?
8     A.    Yeah, I did.
9            MR. HEBERLING: That's right. But he
10 didn't say it was not an epidemiological study. Then you
11 asked him the question, and he answered that it is.
12           MR. STANSBURY: I will ask you to keep
13 your objections within the guidelines of the Federal
14 Rules of Civil Procedure.
15           MR. HEBERLING: You have abused this
16 proceeding all day long, and this is where we're drawing
17 the line, Brian.
18     Q.    (BY MR. STANSBURY:) Dr. Whitehouse, there
19 seems to be some confusion on the record as to what this
20 study is. Let's clarify that right now.
21           Okay?
22     A.    The study started out to be a study at
23 looking at what happened to these people diagnostically
24 with their pulmonary function. It is an epidemiologic
25 study in the sense that describes what happened over that

1 period of time to these people. Okay?
2     Q.    And this goes back to my previous question.
3 The Iowa guidelines recommend using three independent
4 B-readers for epidemiological studies, correct?
5     A.    Oh, come on. Okay? Where am I going to get
6 in Spokane, Washington, three independent B-readers?
7 Okay? Where do I get three B-readers?
8            I don't want to deal with B-readers
9 particularly, you know, for epidemiology. This is a
10 study that is a very simple study at heart. Okay? It
11 took a lot of time to do it, but it was very simple in
12 its concept. It doesn't need B-readers to do it.
13     Q.    But it's a study that does not report lung
14 function based on exposure category, correct?
15     A.    It doesn't have to.
16     Q.    But it doesn't?
17     A.    No, it doesn't.
18     Q.    It does not report lung function based upon
19 the appearance of radiographic abnormality, does it?
20     A.    Yeah, actually, it did, because we had done
21 that. We don't report it here, but we had done it.
22     Q.    Well, let's go back to what's in the actual
23 study. Let's focus on that. This is a published study.
24           This published study does not report
25 radiographic -- Strike that.

1            This published study does not report
2 pulmonary impairment based upon specific radiographic
3 abnormality, such as pleural plaque or diffuse pleural
4 thickening, correct?
5     A.    No. Except in the process of doing this
6 thing, Gordon -- and I didn't do this. I just sat there
7 and acted as a scribe. He went through and described the
8 percentage of the chest wall that was involved with this,
9 and then I did the statistics on it to see if it made a
10 difference on the amount that they were losing. And it
11 did not.
12           And that would have included plaques at one
13 end of it, as I said earlier, versus somebody that had
14 diffuse pleural thickening in the entire thoracic space.
15           So it was done. It just wasn't worth
16 presenting here.
17     Q.    Dr. Whitehouse, I asked you a yes or no
18 question, okay, and we can talk about your explanation.
19           But the yes or no question, the answer to
20 that, does this study report pulmonary impairment based
21 on radiographic abnormalities such as diffuse pleural
22 thickening or pleural plaque?
23           The answer to that question is?
24     A.    No.
25     Q.    Okay. Thank you, sir.

Page 246

```
 1    A.    May we have a break for a minute?
 2    Q.    Sure.
 3          MR. STANSBURY:  We can go off the record.
 4          THE VIDEOGRAPHER:  We are going off the
 5   record. The time is approximately 1:23.
 6                    (Short recess).
 7          THE VIDEOGRAPHER:  We are going back on
 8   the record. The time is approximately 1:31.
 9    Q.    (BY MR. STANSBURY:)  Dr. Whitehouse, if we
10   could look at your study on page 220, please, and the tag
11   at the bottom is 2009_01097.  The second column.  The
12   first full paragraph beginning with "Normal values."
13   About seven or eight lines down, that is discussion about
14   30 patients who were excluded.
15    A.    Yes.
16    Q.    I am going to read this outloud, and tell me
17   if I get this correct, sir.  "In total, 30 patients were
18   removed from the study for the following reasons:
19   Chronic obstructive pulmonary disease with elevated
20   residual volumes (14)," I think that's a comma, "previous
21   thoracic surgery (1), unacceptable pulmonary function
22   tests because of patient unreliability and inability to
23   meet ATS acceptability criteria (9), and/or the presence
24   of a significant non-asbestos related condition such as
25   sarcoidosis or congestive heart failure (9)."
```

Page 247

```
 1          Dr. Whitehouse, would it be fair to say that
 2   this is a portion of your selection criteria for your
 3   study?
 4    A.    I don't understand what you mean, a portion.
 5    Q.    Well, you have criteria for who is and is not
 6   in the study, correct?
 7    A.    Well, basically, everybody was in the study
 8   until I excluded them.
 9    Q.    Everybody who had two or more PFT's, correct?
10    A.    And then I excluded the ones which shouldn't
11   be in there.
12    Q.    I am referring to the selection criteria as,
13   you know, the method by which you determined who is and
14   is not in the study.
15    A.    All right.
16    Q.    If I understand that correctly, people with
17   two or more PFT's, and excluding people with other
18   conditions which may affect pulmonary function, is that a
19   fair statement?
20    A.    Yeah.  There's one other thing that I
21   probably should have clarified, when I said previous
22   thoracic surgery, because we did not throw out the people
23   with cabbages.
24    Q.    Could you explain what that term means,
25   cabbages?
```

Page 248

```
 1    A.    Bypasses.
 2    Q.    Bypasses.  So, again, fair to say, then, that
 3   people with previous thoracic surgery may have been in
 4   the study after all?
 5    A.    Well, not people that have resections or
 6   anything like that.  But people, there could have been
 7   somebody that had something miner done in the distant
 8   pass, or a bypass.  Nothing that would have affected the
 9   things in the middle.
10          And if somebody had any kind of thoracic
11   procedure in the middle of the study, they weren't used.
12    Q.    Okay.  So, let me unpack this.  That is not
13   obviously what that paragraph reads.
14    A.    It doesn't say that, but that's what was
15   done.
16    Q.    Do you think it is important for the paper to
17   accurately reflect what was done?
18    A.    Not necessarily -- well, I don't know that --
19   You know, I guess I could have clarified it, but I
20   didn't.  So . . .
21    Q.    Is that something you would ever notify the
22   Journal about?
23    A.    No, I'm not going to notify the Journal about
24   it.  This thing was published a long time ago, and the
25   data is accurate.
```

Page 249

```
 1    Q.    Okay.
 2    A.    I'm not going to notify the Journal about
 3   something unless -- The end results of this were very
 4   accurate.
 5    Q.    But this portion of the selection criteria as
 6   stated does not reflect what was done, correct?
 7    A.    Well, it does, basically.  It probably should
 8   have said previous interim thoracic surgery, is what it
 9   really should have said.
10    Q.    Okay.  I'm handing you Exhibit 66.  It is for
11   LP098.  It is dated 2-4 -- Excuse me.  It is dated
12   February 14th, 2001.  This was among the records produced
13   in March of 2006.
14          Under "Exam," I guess the second paragraph,
15   could you read -- Well, I will read it.  "His chest x-ray
16   shows only the changes of a lobectomy and some
17   irregularity of the diaphragm related to some fluid but
18   there is no pneumothorax and the fluid around the apex is
19   also involved."
20          Did I read that correctly, sir?
21    A.    Yes.  I was also referring to the post-
22   operative care, is what I was referring to.
23    Q.    What is a lobectomy?
24    A.    Removal of a lobe.
25    Q.    So this individual had a portion of a lobe of
```

DR. ALAN WHITEHOUSE - by Mr. Stansbury
(509)456-0586  BRIDGES REPORTING & LEGAL VIDEO  (800)358-2345

Page 250

1  his lung removed?
2      A.    Yeah.  But this was not in -- this was either
3  after -- this was probably after the second pulmonary
4  function that I use, and before anything was done with
5  the lobe.
6          Who is this?  I don't know who this is.
7      Q.    You tell me, Dr. Whitehouse.  It was
8  redacted.  It is LP098.
9          MR. HEBERLING:  Objection, argumentative.
10     Q.    (BY MR. STANSBURY:)  I don't know who it is.
11  It was redacted.
12     A.    I don't even know whether it was somebody in
13  the study.
14     Q.    Well, the only reason I know is because it
15  was produced by the government from CARD in March of
16  2006, represented as the patients who underlie your
17  study.
18     A.    You'll have to do something better than that
19  in follow-up, in identification of this, because I have
20  no idea.  I know darn well that I didn't have anybody in
21  the interim that had surgery on this study.
22     Q.    Well, Dr. Whitehouse, you may be in a better
23  position than I am to do that follow-up, seeing as how
24  these are your patients.
25          Would you be willing to do so, so that we can

Page 251

1  come back and discuss this?
2      A.    Well, actually, I am not willing to do it,
3  because I've got a lot of other things to do.  You know.
4  I'm getting older.  I've got a trial to go through.
5  Another trial with a bankruptcy.
6          And I don't want to spend time rooting
7  through records, trying to find out who this is.
8      Q.    What is the other trial than the bankruptcy
9  that you are going to go through?
10         MR. HEBERLING:  We delivered to you in
11  December the medical records on the 121 of the 123
12  patients.  You have them.
13         MR. STANSBURY:  They're right here,
14  aren't they (indicating)?
15         MR. HEBERLING:  You don't have to use
16  redacted ones.
17         MR. STANSBURY:  No, no, no.  They're in
18  this binder, aren't they?
19         MR. HEBERLING:  I think so.  Most of them
20  are in there.
21         MR. STANSBURY:  Let's pop this up and
22  we'll test this out.
23         MR. HEBERLING:  But how do you know who
24  to look for?
25         MR. STANSBURY:  Well, I'm going to see if

Page 252

1  the numbering lines up.  This is a CD, 123 patients for
2  Whitehouse 2004.
3          MR. HEBERLING:  We don't use your
4  numbering system.  We use names or initials.  So, if
5  you've got the name, then we can find the person.
6          MR. STANSBURY:  So, you don't use
7  numbering, do you?
8          MR. HEBERLING:  No.  We've seen several
9  numbering systems.
10         And for the record, also, we don't have
11  everything that was given in the criminal case.  We don't
12  even know what discovery was in the criminal case.
13         So, these numbering systems may or may not
14  relate to anything that we know about.
15     Q.    (BY MR. STANSBURY:)  I'm going to call out
16  some names.  And if you would, let me know if any of
17  these people have ever had a lobectomy.
18     A.    How am I supposed to know this?
19     Q.    These are your patients.
20     A.    36 of them are dead.  And they are long dead.
21  And this study was done eight years ago.
22     Q.    Miles Rightmire.
23     A.    I don't know.
24     Q.    All right.
25     A.    I don't think so.

Page 253

1          (Pause in the proceedings).
2      Q.    Well, we'll revisit that issue on him.  But
3  you don't know whether this person was in your study.
4  But if somebody had had a lobectomy, should they have
5  been removed from your study?
6          MR. HEBERLING:  Objection, unclear as to
7  the meaning of "this person."
8      Q.    (BY MR. STANSBURY:)  If a person had a
9  lobectomy, should they have --
10     A.    Not if it was done after the study was
11  concluded, I wouldn't have, no.  Why would I have?
12     Q.    All right.
13     A.    It wouldn't have been germane to it.
14     Q.    What about asthma?  Did any of these people
15  have a diagnosis of asthma?
16     A.    They don't have clinical asthma.  They at one
17  time or another may have had a suspicion of asthma.  Some
18  of them had some bronchospasm.  But insofar as actually
19  having clinical asthma, no.
20     Q.    All right.
21     A.    Because that's something I did eliminate them
22  from.  At the time I did the study, that was either
23  totally controlled, if they had it in the past, or it was
24  bronchospasm that occasionally -- not occasionally -- it
25  is frequently associated with this disease.

Page 254

1    Q.    Again, we will have to revisit it to see
2  whether it is the actual person, but LP029, I am reading
3  from a medical record, this is Exhibit Number 69, and it
4  says as follows -- Well, actually why don't you read,
5  where it says, under 4-24-89.
6                (Pause in the proceedings).
7    A.    Oh.  This is the one that had a positive
8  methacholine challenge very distantly in the past.
9    Q.    Uh-huh.
10    A.    And then probably was, by the time it was
11  actually in the study, had it totally controlled.
12    Q.    So, I am going to read this.  Let me know if
13  I have read this correctly.  "The methacholine results
14  were returned and it is apparent that the patient does
15  indeed have severe asthma, which is manifested as a
16  refractory restrictive defect."
17                Did I read that correctly?
18    A.    Uh-huh.
19    Q.    Yes, sir?
20    A.    Yeah.
21    Q.    Okay.  Was this person in your study?
22    A.    I don't know.  I think probably actually it
23  may have been, but I think it was many, many years later,
24  after the asthma was no longer a factor.
25    Q.    Okay.  Let's deal with some more unredacted

Page 255

1  records.  How's that sound?
2    A.    Whatever you want to do.
3    Q.    Okay.  Well, first, ultimately you find a
4  loss of lung function of 3 percent annually in DLCO
5  across the cohort, correct?
6    A.    Uh-huh.
7    Q.    Yes, sir?
8    A.    Yes.
9    Q.    Okay.  And what was the measurement for FVC?
10    A.    2.2.
11    Q.    Okay.  And what was the measurement for TLC?
12    A.    2.3.
13    Q.    Okay.  I'm handing you what's been marked as
14  Exhibit 70.  Here you go.  And it is the "2005 ATS/ERS
15  Task Force: Standardisation of Lung Function Testing.
16  Interpretive Strategies for Lung Function Tests."
17                Are you familiar with this document, sir?
18    A.    Yes, sir, I am.
19    Q.    And again this is an ATS statement, correct,
20  along with the European Respiratory Society?
21    A.    Yes.
22    Q.    If you would look, and let's look at the 2009
23  numbers at the bottom right, 2009_08404.
24                (Pause in the proceedings).
25    Q.    Are you there, sir?

Page 256

1    A.    Yep.
2    Q.    Let's look at table 12 on the bottom right.
3  "Reported significant changes in forced vital capacity
4  (FVC), forced expiratory volume in one second (FEV1),
5  mid-expiratory flow (MEF 25 to 75 percent) and carbon
6  monoxide diffusing capacity (DLCO) over time."
7                Did I read that correctly, sir?
8    A.    Uh-huh.
9    Q.    Yes, sir?
10    A.    Yeah.
11    Q.    And if you look at year-to-year on that
12  table, and, again, this is reporting significant changes,
13  greater than 15 percent for FVC, is that correct?
14    A.    Reported significant changes, year-to-year.
15  Whose numbers are those, under what circumstances?
16    Q.    Well, this would be the ATS and the ERS's
17  numbers.
18    A.    What do they mean?
19    Q.    Well, I believe that would be 15 percent loss
20  of lung function.
21    A.    Not necessarily.  You lose 30 cc's a year.
22  Are those absolute numbers or percentage of predicted?
23    Q.    Well, let's see here.  Hopefully they have
24  explained that.
25    A.    It doesn't look like.

Page 257

1                (Pause in the proceedings).
2    Q.    Have you reviewed this document before, sir?
3    A.    Oh, I have seen it.  I don't know that I
4  have read it very carefully before.
5    Q.    You are not aware of whether that is
6  referring to absolute numbers, 4 percent?
7    A.    I haven't really paid that much attention to
8  it.  And it's way out of line with what I know is the
9  case.
10    Q.    You know, you've mentioned earlier that
11  people have had to have two or more PFT's to be in this
12  study, correct?
13    A.    Yes.
14    Q.    And you used the first and last PFT, correct?
15    A.    Randomly used the first and last study that I
16  had available.
17    Q.    So, you used two data points per person,
18  correct?
19    A.    Right.
20    Q.    Okay.  Let's look at, right above that table,
21  the text that begins, "It is more."  I will read this.
22  "It is more likely that a real change has occurred when
23  more than two measurements are performed over time.  As
24  shown in table 12, significant changes, whether
25  statistical or biological, vary by parameter, time period

Page 258

1  and the type of patient.  When there are only two tests
2  available to evaluate change, the large variability
3  necessities relatively large changes to be confident that
4  a significant change has occurred over -- has in fact
5  occurred."
6        Do you see that, sir?
7        A.   Now, you are talking about a single
8  individual patient.  When you have 123 patients, you have
9  such a large number of people in there that you've
10  eliminated a great deal of the variability.  The
11  statisticians will tell you that.
12       Q.   They recommend using more than two data
13  points, don't they?
14       A.   No.  They are talking about for a single
15  person.  They are not talking about a group of people.
16  They are talking about a single person.
17       Q.   I don't believe it says that.
18       A.   Well, I know they do, because that is exactly
19  what I do when I am looking at a single person.  I see
20  one study, and then I see another one, and if it's
21  changed a lot, I don't really make a big thing out of it
22  until I see it changed a lot the next time.
23       Q.   Let's go down --
24       A.   But on a study like this, some of these
25  people had eight or 10, but it's arbitrarily the first

Page 259

1  one, and the last one, and that's a very highly thought
2  of statistical way to deal with something like that,
3  because it is a random selection in a large number of
4  people.
5        And that's why I did it that way.  And it was
6  checked out with some of the people that were my peer
7  reviewers.
8        Q.   But if you had more data points, clearly that
9  could be better, correct?
10       A.   No.
11       Q.   No?
12       A.   No.  Not when you are doing first and last.
13  No.  Which one do you take?  Do you take the one that
14  shows what you want it to show?
15       Q.   Why not use all the data points?
16       A.   Oh, come on.  You are talking about a huge
17  study, if you do all of the data points.  Do you know
18  what the statistics are like in that sort of thing?
19       Q.   It's a lot of work.
20       A.   Yeah.  You're right.  I was trying to
21  practice medicine.
22       Q.   I understand.
23       A.   Okay.
24       Q.   However, you would agree, though, if you have
25  the time, using five, six, all available data points will

Page 260

1  give you a more accurate picture of what this person's
2  lung function is over time, correct?
3        A.   I'm not doing this on an individual.  This is
4  group.  And you are wrong, flat wrong in your discussion
5  of it.  And you don't understand the fact that when
6  you've got a large group, like 123, you eliminate those
7  various errors.
8        Q.   So, you think that it is not the right
9  approach, when you're dealing with a large group, to use
10  as many data points as possible for each person?
11       A.   This is a satisfactory approach to it, and it
12  was checked by -- it was thought to be by the Journal, by
13  the peer reviewers of the Journal, and the peer reviewers
14  that I had peer review it here.
15       Q.   Putting aside the time constraints,
16  recognizing that, would it have produced a more robust
17  data set to use all available data points?
18       A.   No, it probably wouldn't.  It probably
19  wouldn't have been any better than to do it this way.  I
20  doubt it.
21       Q.   Do you have any literature, are you aware of
22  any study in which they specifically stated it is better
23  to use first and last, rather than all data points?
24       A.   I don't.  But I'm sure I'll find one.
25       Q.   Okay.  Let's move down on this same document.

Page 261

1  We're on page 2009_08405.
2        A.   Okay.
3        Q.   I guess it's this paragraph that begins with
4  "Test variability."  Do you see that, sir?
5        A.   Uh-huh.
6        Q.   Continuing in that paragraph, last
7  sentence, "However, establishing an accelerated rate of
8  loss in an individual is very difficult, and requires
9  many measurements over several years with meticulous
10  quality control of the measurements."
11       Did I read that correctly?
12       A.   Yes.  Except this was not an individual.
13  This was 123 individuals.
14       Q.   I understand.  But do you recognize it is
15  better just to have more data points when doing this?
16       A.   No.  I already explained that to you, and I
17  already answered that.
18       Q.   Let's move on, in the same document, "DLCO
19  Interpretation."  And this speaks to what we were
20  discussing earlier.  I want to make sure we are on the
21  same page.  Second column.  First full paragraph,
22  beginning with "Interpreting."
23       A.   Yes.
24       Q.   "Interpreting the DLCO, in conjunction with
25  spirometry and lung volumes assessment, may assist in

Page 262

1 diagnosing the underlying disease. For instance, normal
2 spirometry and lung volumes associated with decreased
3 DLCO may suggest anaemia, pulmonary vascular disorders,
4 early ILD or early emphysema."
5      Did I read that correctly, sir?
6  A.  Yes.
7  Q.  So, that would suggest that when somebody has
8 abnormal DLCO but normal lung volumes and spirometry, it
9 would suggest anaemia, pulmonary vascular disease, early
10 ILD, or early emphysema.
11      Did I read that correctly?
12  A.  You read it correctly. And you know what,
13 it's just off of the wall as far as all the things that
14 can cause abnormal DLCO's I could add 30 things to that.
15  Q.  Oh, I agree with you on that, sir.
16  A.  You know, it's not something that has any
17 bearing on what we're doing here, okay?
18  Q.  I think it does, though.
19  A.  No, it doesn't. Because we have enough
20 documentary evidence over a long period of time of people
21 with isolated DLCO decreases with reasonable spirometry
22 over very, very long periods of time now, for eight
23 years, that we really are very well aware of the fact
24 that a decreased diffusion capacity and isolation is a
25 manifestation of asbestos pleural disease. And it's in

Page 263

1 the literature and it's been written up that way in the
2 literature. So, all you're doing is producing a smoke
3 screen here.
4  Q.  Well, this is actually not a smoke screen,
5 but rather an ATS --
6      MR. HEBERLING: Objection. Argumenta-
7 tive.
8  Q.  (BY MR. STANSBURY:)  Dr. Whitehouse, is this
9 not --
10      MR. HEBERLING: Just ask him the
11 question.
12  Q.  (BY MR. STANSBURY:)  Is this not an ATS/ERS
13 statement on lung function testing?
14  A.  You know, you could probably quote and find
15 anything you want to out of these studies.
16      I really am an expert in pulmonary function
17 testing. Starting in 1965 when I was in the Air Force
18 and set up my own diffusion laboratory. I really
19 understand this stuff. And I understand how to do it
20 right. And I understand -- I understand what it means
21 under these circumstances.
22      You can find whatever you want to, quotes in
23 here.
24      You haven't told me what kind of spirometers
25 they are using. Are they using computerized stuff, body

Page 264

1 boxes? Are they using nitrogen? What are they using for
2 the studies? None of that is mentioned in here.
3  Q.  My question was, is the ATS/ERS statement a
4 smoke screen?
5  A.  I didn't say it was a smoke screen. This is
6 European, by the way.
7  Q.  ATS/ERS, correct?
8  A.  Yes. ATS/ERS.
9  Q.  That's the American Thoracic Society?
10  A.  Done with the European Respiratory Society.
11  Q.  Oh, it is a joint ATS/ERS statement, correct?
12  A.  Yeah. I assume so.
13  Q.  Okay. That's not a smoke screen. That's an
14 authoritative document, correct?
15  A.  You know, I haven't read there enough to even
16 say very much about it. I know I'm on very solid ground
17 concerning pulmonary function testing. I know I'm on
18 solid ground about it.
19  Q.  Could we move back to 2009_08400, because I
20 think we're going to clarify an earlier point now.
21  A.  08400?
22  Q.  Yes, sir.
23      (Pause in the proceedings).
24  A.  All right.
25  Q.  The table in the bottom left corner, and it

Page 265

1 says, "percent predicted," "percent predicted," do you
2 see that, sir?
3  A.  Yes.
4  Q.  And then if you go back to 2009_08404 --
5  A.  What are you referring to here? Severity
6 classification?
7  Q.  Well, I am answering your question about what
8 the measurements were earlier. I think the answer is
9 that it is percent predicted. Because as we see the
10 variables that they are using here are percent predicted.
11 And if you look --
12  A.  No. They are using percent FEV1 over -- Oh.
13 I guest it is FEV1, percent predicted.
14  Q.  That's my point. If you go back to table 12,
15 it mentions in the text, the variables are the same as in
16 tables 6 and 8.
17  A.  You know, those numbers don't even make
18 sense. That doesn't happen in our lab in Libby. And I
19 don't think it's ever happened in any lab I've ever been
20 involved with.
21  Q.  I just wanted to clarify that table 12 does
22 in fact refer to percent predicted, and in order for it
23 to be considered significant for an FVC, according to the
24 ATS/ERS statement, it must be greater than 15 percent per
25 year, and for DLCO, greater than 10 percent, that's my

DR. ALAN WHITEHOUSE - by Mr. Stansbury
(509)456-0586  BRIDGES REPORTING & LEGAL VIDEO  (800)358-2345

Page 266

1  point. Is that correct, sir?
2      A.    It still do not know. It doesn't say.
3      Q.    That is what the document says, but you don't
4  agree with it, correct?
5      A.    No. It doesn't say. Because I don't know
6  what you're talking -- I don't know what the percentage
7  is. Percentage of what? Absolute number of the FEV1?
8  FEV1 percentage? FEV1, FVC predicted? Or FEV1 -- FVC
9  over FEV1 percentage? It is not real clear.
10     Q.    But going back to the page we were just on,
11 we were looking at the DLCO issue.
12     A.    The other thing is, they were talking about
13 six units, and the Europeans do some things differently
14 with DLCO than we do in this country, and I don't know
15 what six units are. It should be identified if it's
16 milliliters per minute per millimeter of mercury, which
17 it is not identified as such. None of it's identified.
18     Q.    So, as you stated earlier, you didn't
19 necessarily agree with the statement on 2009_08405
20 regarding that low DLCO in connection with normal FVC and
21 lung volumes mean, correct? You did not agree with that
22 statement?
23     A.    Oh, I don't disagree with it. It's just that
24 it's pretty small. I mean, it's such a narrow amount of
25 diseases, because there are so many diseases that cause

Page 267

1  this --
2      Q.    Well, ILD, that means --
3      A.    -- that have pulmonary function otherwise.
4      Q.    Well, ILD is interstitial lung disease,
5  right?
6      A.    That's correct.
7      Q.    And there are numerous types of interstitial
8  lung disease, correct?
9      A.    150 or so, that's right.
10     Q.    Although that's just a sentence, that's well
11 over a hundred potential conditions in which you could
12 see normal FVC, normal TLC, and a decrement in DLCO. But
13 you do not see pleural abnormalities listed here,
14 correct?
15     A.    No, they do not, but they are in many other
16 articles. You're just sort of cherry picking things that
17 you can use to give me problems with this.
18     Q.    Okay.
19     A.    Suggest anaemia, requires very severe
20 anaemia. I would disagree with the DLCO being decreased
21 in early emphysema. In early emphysema, the FEV1/FVC
22 ratio is decreased long before the DLCO goes down.
23     Q.    So, is it fair to say that in formulating the
24 opinions that you will offer at the confirmation hearing,
25 particularly with respect to DLCO and whether pleural

Page 268

1  disease causes DLCO, that you did not take into account
2  the statements in this ATS statement, this ATS/ERS
3  statement regarding lung function?
4      A.    No.   Do you want me to take into account
5  every statement that you've come up relative to this?
6          This is something that I'm not intimately
7  familiar with. So, you can read a statement out of that
8  and I'm supposed to agree or disagree with it, when I've
9  got another statement that may be contrary with that.
10 And that's basically what you're doing here.
11     Q.    Well, let's continue with the rest of this
12 paragraph.
13     A.    And, you know, I'm tired, and I don't feel
14 very well, and I'm going to end this deposition now.
15 Okay.
16     Q.    Dr. Whitehouse, we have not gotten through
17 all of the material. I still have more time.
18     A.    I don't care whether you have or not. You
19 are going to have another chance, another crack at me.
20 I'm done. Okay?
21     Q.    Dr. Whitehouse --
22          MR. HEBERLING: I'm sorry, Brian --
23     Q.    (BY MR. STANSBURY:)  -- let's take a break.
24 Are you walking out of this deposition?
25     A.    I'm walking out.

Page 269

1          MR. HEBERLING: He's already gone beyond
2  probably what he should have. Now, he's not been well.
3          MR. STANSBURY: This is not what we
4  agreed to.
5          MR. HEBERLING: You can't agree on what
6  his condition's going to be at the time of deposition.
7          MR. STANSBURY: We will depose you again.
8          MR. HEBERLING: Oh, yes. You may do
9  that.
10          THE WITNESS: You'll get your other crack
11 at me.  But we're done for today. That's all there is
12 to it.
13          MR. HEBERLING: When you're 71 years old,
14 maybe you will understand this. I mean, you've been at
15 him since 8:30 this morning.
16          THE VIDEOGRAPHER: Are we going --
17          MR. STANSBURY: Stay on the record.
18          MR. SCHIAVONI: John, I don't need to go
19 on. I will just reserve my rights. Is that acceptable?
20          MR. HEBERLING: Certainly you may reserve
21 your rights. You'll get another chance. But, you know,
22 I'll bet we've gone farther than we should have gone
23 already.
24          MR. STANSBURY: And what is the time,
25 sir?

DR. ALAN WHITEHOUSE - by Mr. Stansbury
(509)456-0586  BRIDGES REPORTING & LEGAL VIDEO  (800)358-2345

Page 270

1          THE VIDEOGRAPHER:  The time is --
2          MR. HEBERLING:  Two o'clock.
3          MR. STANSBURY:  No, no, the time of the
4  deposition.
5          THE VIDEOGRAPHER:  Oh.  The total time.
6          THE WITNESS:  Six hours.
7          MR. STANSBURY:  No, it is not.
8          THE WITNESS:  Well, five hours.  Excuse
9  me.  We had a half an hour for lunch.
10              (Pause in the proceedings).
11          THE VIDEOGRAPHER:  It is four hours 24
12  minutes.
13          MR. HEBERLING:  Okay.  Brian, off the
14  record.  Do you really need a copy of that?  You've got
15  one.  I mean, there's nothing, I will represent to you,
16  that that is the thing that -- the same thing that we
17  delivered to everybody in December.
18          MR. STANSBURY:   You didn't deliver it to
19  Tanc.  We will copy it.  Tanc will get a copy.  And then
20  we will send the original back to you.
21          MR. SCHIAVONI:  Is that all right?
22          MR. HEBERLING:  Sure.  I mean, he's got
23  several others.  I've got others.
24      Doctor, this is formal proceeding, and that's
25  the way it's going to be.

Page 271

1          THE WITNESS:  All right.  Bye.
2          MR. HEBERLING:  Okay.  We'll get it back
3  to you.
4          MR. SCHIAVONI:  Thank you, Doctor.
5          MR. STANSBURY:  Do we have the time clear
6  on the record?
7          THE VIDEOGRAPHER:  Yes.
8          MR. STANSBURY:  Okay.  We are off the
9  record.
10          THE VIDEOGRAPHER:  This ends the
11  deposition of Dr. Alan C. Whitehouse.  The date is March
12  19, 2009.  The time is approximately 1:59.  There is a
13  total of three tapes.  The case is in regarding W.R.
14  Grace & Company, et al.  The tapes will reside with Greg
15  Glover, videographer at Bridges Reporting and Legal
16  Video.
17      Thank you.  We are off the record.
18
19              (2:00 p.m.)
20
21      *      *      *
22
23
24
25

Page 272

1  STATE OF WASHINGTON    )
2                         ) ss.
   County of Spokane     )
3
4      I, William J. Bridges, do hereby certify that
5  at the time and place heretofore mentioned in the caption
6  of the foregoing matter, I was a Certified Shorthand
7  Reporter and Notary Public for Washington; that at said
8  time and place I reported in stenotype all testimony
9  adduced and proceedings had in the foregoing matter; that
10  thereafter my notes were reduced to typewriting and that
11  the foregoing transcript consisting of 271 typewritten
12  pages is a true and correct transcript of all such
13  testimony adduced and proceedings had and of the whole
14  thereof.
15      I further certify that I am herewith securely
16  sealing the said original deposition transcript and
17  promptly delivering the same to Attorney Brian T.
18  Stansbury.
19      Witness my hand at Spokane, Washington, on
20  this _____ day of March, 2009.
21
22
                        _____
23                      William J. Bridges
                        CSR NO. 2421
24                      Certified Shorthand Reporter
                        Notary Public for Washington
25                      My commission expires:  11-1-11

Page 273

1          CERTIFICATE OF WITNESS
2
3  STATE OF WASHINGTON    )
                          )
4  COUNTY OF SPOKANE      )
5
6      I, ALAN WHITEHOUSE, declare under penalty of
7  perjury under the laws of the State of Washington, that I
8  am the witness named in the foregoing deposition and that
9  I have read the questions and answers thereon as
10  contained in the foregoing deposition, consisting of
11  pages 12 through 271; that the answers are true and
12  correct as given by me at the time of taking the
13  deposition, except as indicated on the correction sheet.
14
15
16          _____
             ALAN WHITEHOUSE
17
18
19      Executed on the _____ day of _____,
20  2009, at _____, _____.
          (City)           (State)
21
22
23
24  In Re:  W.R. GRACE & CO., et  al
25  3/19/09  -  WJB

69 (Pages 270 to 273)

Page 274

1  Page: _____, Line: _____;
2
3  Page: _____, Line: _____;
4
5  Page: _____, Line: _____;
6
7  Page: _____, Line: _____;
8
9  Page: _____, Line: _____;
10
11 Page: _____, Line: _____;
12
13 Page: _____, Line: _____;
14
15 Page: _____, Line: _____;
16
17 Page: _____, Line: _____;
18
19 Page: _____, Line: _____;
20
21 Page: _____, Line: _____;
22
23 Page: _____, Line: _____;
24
25 Page: _____, Line: _____;

Page 276

1  Page: _____, Line: _____;
2
3  Page: _____, Line: _____;
4
5  Page: _____, Line: _____;
6
7  Page: _____, Line: _____;
8
9  Page: _____, Line: _____;
10
11 Page: _____, Line: _____;
12
13 Page: _____, Line: _____;
14
15 Page: _____, Line: _____;
16
17 Page: _____, Line: _____;
18
19 Page: _____, Line: _____;
20
21 Page: _____, Line: _____;
22
23 Page: _____, Line: _____;
24
25 Page: _____, Line: _____;

Page 275

1  Page: _____, Line: _____;
2
3  Page: _____, Line: _____;
4
5  Page: _____, Line: _____;
6
7  Page: _____, Line: _____;
8
9  Page: _____, Line: _____;
10
11 Page: _____, Line: _____;
12
13 Page: _____, Line: _____;
14
15 Page: _____, Line: _____;
16
17 Page: _____, Line: _____;
18
19 Page: _____, Line: _____;
20
21 Page: _____, Line: _____;
22
23 Page: _____, Line: _____;
24
25 Page: _____, Line: _____;

Page 277

1  Page: _____, Line: _____;
2
3  Page: _____, Line: _____;
4
5  Page: _____, Line: _____;
6
7  Page: _____, Line: _____;
8
9  Page: _____, Line: _____;
10
11 Page: _____, Line: _____;
12
13 Page: _____, Line: _____;
14
15 Page: _____, Line: _____;
16
17 Page: _____, Line: _____;
18
19 Page: _____, Line: _____;
20
21 Page: _____, Line: _____;
22
23
24
                    _____
25                  ALAN WHITEHOUSE